# EXHIBIT 2

Highly Confidential - Subject to Further Confidentiality Review

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN RE: NATIONAL
PRESCRIPTION OPIATE          MDL No. 2804
LITIGATION

                             Case No.
This document relates to:    17-MD-2804

The County of Summit,
Ohio, et al. v. Purdue       Hon. Dan A. Polster
Pharma L.P., et al.
Case No. 17-OP-45004

The County of Cuyahoga v.
Purdue Pharma L.P., et al.
Case No. 18-OP-45090

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

VIDEOTAPED DEPOSITION OF THOMAS G. MCGUIRE, Ph.D.

Tuesday, April 23rd, 2019

9:02 a.m.

Held At:

        Robins Kaplan LLP

        800 Boylston Street

        Boston, Massachusetts

REPORTED BY:

Maureen O'Connor Pollard, RMR, CLR, CSR

Highly Confidential - Subject to Further Confidentiality Review

## Page 2

```
 1    APPEARANCES:
 2
      FOR THE PLAINTIFFS:
 3
          MICHAEL J. PENDELL, ESQ.
 4          MOTLEY RICE LLC
            One Corporate Center
 5          20 Church Street
            Hartford, Connecticut 06103
 6          860-218-2722
            mpendell@motleyrice.com
 7
                -and-
 8
          DAVID J. KO, ESQ.
 9          KELLER ROHRBACK, LLP
            1201 Third Avenue, Suite 3200
10          Seattle, Washington 98101
            206-623-1900
11          dko@kellerrohrback.com
12              -and-
13        THOMAS M. SOBOL, ESQ.
            HAGENS BERMAN SOBOL SHAPIRO LLP
14          55 Cambridge Parkway, Suite 301
            Cambridge, Massachusetts 02142
15          617-482-3700
            tom@hbsslaw.com
16
17
      FOR CUYAHOGA COUNTY:
18
          JOSEPH L. CIACCIO, ESQ.
19          NAPOLI SHKOLNIK PLLC
            400 Broadhollow Road, Suite 305
20          Melville, New York 11747
            631-224-1133
21          jciaccio@napolilaw.com
22
23
24
```

## Page 3

```
 1    APPEARANCES (Continued):
 2    FOR PURDUE PHARMA:
 3        JACQUELINE D. HARRINGTON, ESQ.
            DECHERT LLP
 4          1095 Avenue of the Americas
            New York, New York 10036
 5          212-698-3500
            jacqueline.harrington@dechert.com
 6
 7
      FOR McKESSON CORPORATION:
 8
          JOHN W. ZIPP, ESQ. (Remotely)
 9          COVINGTON & BURLING LLP
            One CityCenter
10          850 Tenth Street, NW
            Washington, DC 20001-4956
11          202-662-5518
            jzipp@cov.com
12
                -and-
13
          DAVID HALLER, ESQ.
14          COVINGTON & BURLING LLP
            620 Eighth Avenue
15          New York, New York 10118
            212-841-1000
16          dhaller@cov.com
17
18    FOR CARDINAL HEALTH, INC.:
19        J. ANDREW KEYES, ESQ.
          JOSEPH S. BUSHUR, ESQ.
20          WILLIAMS & CONNOLLY LLP
            725 Twelfth Street, N.W.
21          Washington, DC 20005
            202-434-5452
22          akeyes@wc.com
            jbushur@wc.com
23
24
```

## Page 4

```
 1    APPEARANCES (Continued):
 2
      FOR AMERISOURCEBERGEN DRUG CORPORATION:
 3
          BRIAN T. HIMMEL, ESQ.
 4          REED SMITH LLP
            225 Fifth Avenue
 5          Pittsburgh, Pennsylvania 15222
            412-288-4058
 6          bhimmel@reedsmith.com
 7
 8    FOR DISCOUNT DRUG MART, INC.:
          ERIC J. WEISS, ESQ. (Remotely)
 9          CAVITCH FAMILO & DURKIN, CO., LPA
            1300 E. 9th Street, 20th Floor
10          Cleveland, Ohio 44114
            216-621-7860
11          eweiss@cavitch.com
12
      FOR WALGREENS:
13
          SHARON DESH, ESQ. (Remotely)
14          BARTLIT BECK LLP
            54 West Hubbard Street
15          Chicago, Illinois 60654
            312-494-4445
16          Sharon.Desh@bartlitbeck.com
17
18
      FOR H.D. SMITH:
19
          WILLIAM J. LEEDER, III, ESQ.
20          BARNES & THORNBURG LLP
            171 Monroe Avenue, NW
21          Grand Rapids, Michigan 49503
            616-742-3979
22          bill.leeder@btlaw.com
23
24
```

## Page 5

```
 1    APPEARANCES (Continued):
 2
      FOR WALMART:
 3
          CLAIRE E. CASTLES, ESQ.
 4          JONES DAY
            555 South Flower Street, 15th Floor
 5          Los Angeles, California 90071-2300
            213-489-3939
 6          ccastles@jonesday.com
 7
 8    FOR ALLERGEN:
          MARTIN L. ROTH, ESQ.
 9          KIRKLAND & ELLIS LLP
            300 North LaSalle
10          Chicago, Illinois 60654
            312-862-7170
11          martin.roth@kirkland.com
12
13
14    FOR JANSSEN and JOHNSON & JOHNSON:
15        JUSTIN E. RICE, ESQ.
            TUCKER ELLIS LLP
16          950 Main Street, Suite 1100
            Cleveland, Ohio 44113
17          216-696-3670
            justin.rice@tuckerellis.com
18
19    FOR HBC SERVICES, INC.:
20        RICHARD I. HALPERN, ESQ.
            MARCUS & SHAPIRA LLP
21          One Oxford Centre, 35th Floor
            301 Grant Street
22          Pittsburgh, Pennsylvania 15219-6401
            412-338-4690
23          halpern@marcus-shapira.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1  APPEARANCES (Continued):
2
3  FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
   SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES
4  INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.)
5     SAMUEL LONERGAN, ESQ.
      REBECCA E. ZOLLER, ESQ.
6     ARNOLD & PORTER KAYE SCHOLER LLP
      250 West 55th Street
7     New York, New York
      212-836-7408
8     samuel.lonergan@arnoldporter.com
      rebecca.zoller@arnoldporter.com
9
10
   FOR RITE AID:
11
      ELIZABETH I. BUECHNER, ESQ. (Remotely)
12    MORGAN, LEWIS & BOCKIUS LLP
      101 Park Avenue
13    New York, New York 10178
      212-309-6864
14    elizabeth.buechner@morganlewis.com
15       -and-
16    MARTHA LEIBELL, ESQ. (Remotely)
      MORGAN, LEWIS & BOCKIUS LLP
17    200 S. Biscayne Boulevard, Suite 5300
      Miami, Florida 33131-2339
18    305-415-3387
      john.lavelle@morganlewis.com
19    martha.leibell@morganlewis.com
20
21
22
23
24

Page 7

1  APPEARANCES (Continued):
2
3  FOR HENRY SCHEIN, INC., and HENRY SCHEIN MEDICAL
   SYSTEMS, INC.:
4
5     MADELINE E. BRUNNER, ESQ. (Remotely)
      LOCKE LORD LLP
6     2200 Ross Avenue, Suite 2800
      Dallas, Texas 75201
7     214-740-8445
      madeline.brunner@lockelord.com
8
9  FOR MALLINCKRODT, LLC:
10    CHRISTINE D'AURIA, ESQ.
      ROPES & GRAY LLP
11    800 Boylston Street
      Boston, Massachusetts 02199-3600
12    617-951-7000
      christine.dauria@ropesgray.com
13
14
15  ALSO PRESENT REMOTELY:
16  JONATHAN JAFFE
    ERICA BENTON
17
18  VIDEOGRAPHER:  Robert Martignetti
19
20
21
22
23
24

Page 8

1              INDEX
2  EXAMINATION                    PAGE
3  THOMAS G. MCGUIRE, Ph.D.
4  BY MR. KEYES                    9
5
6
7
8   E X H I B I T S
   NO.    DESCRIPTION            PAGE
9   1   Expert Report of Professor Thomas
       McGuire, Damages to Bellwethers,
10     March 25, 2019.................. 10
11  2   Thumb drive containing Excel
       Spreadsheet produced by Summit
12     County, Bates SUMMIT_001952976,
       and Excel Spreadsheet produced by
13     Cuyahoga County, Bates
       CUYAH_014627783.....................295
14
15  3   Operating Budget 2017 for Summit
       County, Bates SUMMIT_000007551
       through 8339.........................298
16
17  4   Spreadsheet, ADM Board, Cash
       Balance Forecast Summary, Bates
       SUMMIT_001103655.....................339
18
19  5   Document titled Summit County
       Children Services Operating
       Forecast As of December 31, 2018,
20     Bates SUMMIT_002057610...............346
21
22
23
24

Page 9

1       P R O C E E D I N G S
2
3       THE VIDEOGRAPHER:  We are now on the
4  record.  My name is Robert Martignetti, I'm a
5  videographer for Golkow Litigation Services.
6  Today's date is April 23rd, 2019, and the time
7  is 9:02 a.m.
8       This video deposition is taking place
9  in Boston, Massachusetts In Re: National
10 Prescription Opiate Litigation.
11      The deponent is Thomas McGuire.
12      Counsel will be noted on the
13 stenographic record.
14      The court reporter is Maureen Pollard,
15 and will now swear in the witness.
16
17      THOMAS G. MCGUIRE, Ph.D.,
18 having been duly identified and sworn, was
19 examined and testified as follows:
20      EXAMINATION
21 BY MR. KEYES:
22   Q.  Good morning, Professor McGuire.
23 Would you state your full name for the record?
24   A.  Thomas Gregory McGuire.

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1      Q.  My name is Andrew Keyes, and I'm one
2  of the lawyers on the defense side of this case.
3  I'm with the law firm of Williams & Connolly,
4  and we represent Cardinal Health, one of the
5  defendants.
6          Showing you what has been marked as
7  McGuire Exhibit Number 1.
8          (Whereupon, McGuire Exhibit Number 1
9          was marked for identification.)
10  BY MR. KEYES:
11      Q.  Would you take a look at this exhibit
12  and confirm that this is your report plus the
13  various appendices that you prepared?
14      A.  Yes, it looks right.
15      Q.  Would you turn to Page 47 of
16  Exhibit 1?  Are you there?
17      A.  I am, yes.
18      Q.  There's a signature there.  Is that
19  your signature?
20      A.  Yes, it is.
21      Q.  Did you sign it?
22      A.  Yeah.
23      Q.  On March 25, 2019?
24      A.  I did.

Page 11

1      Q.  And this Exhibit 1 is titled Expert
2  Report of Professor Thomas McGuire, Damages to
3  Bellwethers, dated March 25, 2019.
4          When you refer to bellwethers, are you
5  referring to Summit County and Cuyahoga County?
6      A.  Yes.
7      Q.  And does this report set forth your
8  opinions in this case?
9      A.  Yes, it does, noting that I have
10  another report in the case.
11      Q.  Okay.  You have a second report
12  regarding nuisance?
13      A.  Yes.
14      Q.  And I'll show that to you in a moment.
15      A.  Okay.
16      Q.  But regarding damages to Summit County
17  and Cuyahoga County, this is your report?
18      A.  Yes, it is.
19      Q.  And does it reflect your calculations?
20      A.  Well, it reflects my calculations
21  building on others' calculations.
22      Q.  Including Mr. Cutler?
23      A.  Including Professor Cutler and
24  Professor Rosenthal.

Page 12

1      Q.  And does this set forth your work?
2      A.  Yes.
3      Q.  Okay.  Now, did you have anyone
4  assisting you in this engagement on behalf of
5  Summit County and Cuyahoga County?
6      A.  Yes, I did.
7      Q.  How many people assisted you?
8      A.  This was -- would have been staff at
9  Compass Lexecon.  I would say I know of four or
10  five by name.  And my impression was that there
11  was some more junior people doing some of the
12  kind of data entry work.
13      Q.  Who are the four or five people at
14  Compass Lexecon you know by name that assisted
15  you in this engagement?
16      A.  Hal Sider.
17      Q.  Can you spell the name?
18      A.  Last name is S-I-D-E-R.  Erica Benton,
19  B-E-N-T-O-N.  Alice Kaminski, K-A-M-I-N-S-K-I.
20  And there's a statistician guy who I'll remember
21  before we close today, but there's another guy I
22  worked with by name.
23      Q.  Are those the names of the people at
24  Compass Lexecon that you can remember right now?

Page 13

1      A.  Yes.
2      Q.  Hal Sider, Erica Benton, and Alice
3  Kaminski?
4      A.  Yes.
5      Q.  And then a statistician whose name you
6  think you'll remember later today?
7      A.  Yes.
8      Q.  Anyone else?
9      A.  There might be.  I'll -- if I remember
10  someone, I'll let you know.
11      Q.  What was Hal Sider's role in this
12  engagement?
13      A.  He was a kind of project manager, I
14  would say.
15      Q.  What do you mean by "project manager"?
16      A.  The most senior person at Compass Lex.
17      Q.  And what work did he perform on this
18  engagement?
19      A.  You mean in my report, or overall in
20  the --
21      Q.  In your report.
22      A.  In my report.  He would have been one
23  of the people advising me about the -- kind of
24  the form of presentation of some of the numbers,

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1  and we went over the detailed budgets together,
2  so he would have had input into some of that.
3     Q.  What kind of input?
4        MR. SOBOL:  Just the subject, not the
5  content.
6     A.  Inputs regarding the treatment of
7  different kind of costs that were listed in the
8  budgets.
9  BY MR. KEYES:
10     Q.  Anything else you can tell me about
11  the work that Mr. Sider performed in connection
12  with this engagement?
13     A.  That was the primary thing.  He was
14  aware of what was going on, so...
15     Q.  What do you mean?
16     A.  I mean, he was aware of drafts of
17  report.  He was aware of the stages of work.
18     Q.  What was Erica Benton's role in this
19  engagement?
20     A.  She was -- is also a senior person.  I
21  met -- I haven't met her.  I've just spoken with
22  her on the phone.  She oversaw much of the data
23  collection from the bellwethers.
24     Q.  And when you refer to bellwethers,

Page 15

1  you're referring to Summit County and Cuyahoga
2  County?
3     A.  Yes.
4     Q.  And only those two counties?
5     A.  Yes.
6     Q.  And what do you mean she oversaw the
7  data collection?
8     A.  She was a good person to ask questions
9  of with respect to various components of the
10  cost report, and I -- my impression was she was
11  kind of on top of things and was working with
12  other people and would help them in their data
13  work.
14     Q.  What work did she perform on this
15  engagement?
16        MR. SOBOL:  Just the types, not the
17  content.
18     A.  I think supervising some Compass Lex
19  staff, and also she would have participated in
20  some of the decisions about different forms of
21  costs in the budget.
22  BY MR. KEYES:
23     Q.  What do you mean she participated in
24  decisions?

Page 16

1     A.  A component of my work was to identify
2  from budgets -- from the public budgets of the
3  bellwether counties the components of the costs
4  that might be affected by harms that were due to
5  misconduct of the defendants, and not all of the
6  costs, not all of the budget items would be
7  subject to that, so there was a kind of
8  selection of the budget items that were
9  economically justified and included in that
10  analysis.
11     Q.  Well, you said she participated in
12  decisions regarding the different forms of costs
13  in the budget.  Who made the decisions?
14     A.  I made all the decisions.
15     Q.  So what was her role when you said she
16  participated in the decisions?
17     A.  Well, she would have been involved in
18  the conversations.  When we talked about these
19  things, she would have helped explain what
20  non-compensation costs are there for this
21  particular division.  So there was a lot of kind
22  of interpretation of the details of the budget
23  documents that she helped with.
24     Q.  You mentioned Alice Kaminski.

Page 17

1     A.  Yes.
2     Q.  What was her role in this engagement?
3     A.  Less senior to Erica.  I hope I'm not
4  getting the hierarchy wrong at Compass Lex.  She
5  worked on some of the budget items.  I think she
6  may not have been involved in all of them, but
7  in a component, some components of it.
8     Q.  Anything else you can say about her
9  role in this engagement?
10     A.  No.
11     Q.  What work did she perform on this
12  engagement then?
13     A.  She would have supervised some of the
14  data entry that appears in the Excel
15  spreadsheets in my report.
16     Q.  Anything else?
17     A.  Not that I can think of.
18     Q.  And what was the role of the
19  statistician you referenced?
20        MR. SOBOL:  Was it Evan?
21     A.  Evan.
22  BY MR. KEYES:
23     Q.  What's Evan's last name?
24     A.  I can't remember, I'm sorry.

5 (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    Q.  Okay.
2        MR. SOBOL:  McKay?
3    A.  Evan McKay, yes.
4        MR. KEYES:  I appreciate the
5    assistance, but for now I'd just like to know
6    what Professor McGuire knows without assistance.
7    BY MR. KEYES:
8    Q.  What is Evan's last name, as you
9    remember it?
10   A.  Evan McKay.
11   Q.  What was Evan McKay's role in --
12   A.  I call him a statistician because he
13   seemed to be aware of and interested in some of
14   the conduct of the data analysis, and he was
15   also helpful to me on the budget side.
16   Q.  What work did Mr. McKay perform in
17   this engagement?
18   A.  He helped explain to me some of the
19   analysis being done by Professor Cutler.
20   Q.  Did he help explain to you some of the
21   analysis done by Professor Rosenthal?
22   A.  No, he didn't.
23   Q.  What about the work done by
24   Professor Gruber?

Page 19

1    A.  I'm sorry, what about it?
2    Q.  Did Mr. McKay help explain to you some
3    of the analysis done by Professor Gruber?
4    A.  No, he didn't.
5    Q.  Okay.  Did Mr. McKay explain to you
6    some of the analysis by anyone else in this case
7    beside Professor Cutler?
8    A.  No, he didn't.
9        I have more of another category of
10   assistants once you're done with Compass Lex.
11   Q.  Okay.  Did you speak with
12   Professor Cutler about the work he did in this
13   case?
14   A.  Yes.
15   Q.  Did you speak with Professor
16   Rosenthal?
17   A.  I did, yes.
18   Q.  Did you speak with Professor Gruber?
19   A.  Yes.
20   Q.  And when you said a moment ago that
21   Mr. McKay helped explain some of the analysis by
22   Professor Cutler, are you referring to the
23   statistical analysis that Professor Cutler did?
24   A.  Yes, the regressions.

Page 20

1    Q.  Why did you need Mr. McKay's
2    assistance in understanding the statistical
3    analysis done by Professor Cutler?
4        MR. SOBOL:  Objection.
5    A.  Well, I wanted to be sure I understood
6    it.
7    BY MR. KEYES:
8    Q.  And you found Mr. McKay helpful to
9    your understanding of what statistical analysis
10   and regressions Professor Cutler had performed?
11   A.  Yes.
12   Q.  What else did Mr. McKay do?  You said
13   he seemed to be aware of and had an interest in
14   the conduct of the data analysis.  You said he
15   helped explain to you some of the statistical
16   analysis performed by Professor Cutler.  What
17   else, if anything, did Mr. McKay do?
18   A.  That was his primary role.
19   Q.  And have you met with Mr. Sider?
20   A.  Yes.
21   Q.  How many times?
22   A.  Six, seven.
23   Q.  Have you met with Ms. Benton?
24   A.  No, not in person.

Page 21

1    Q.  Have you talked with Ms. Benton over
2    the phone?
3    A.  Yes.
4    Q.  How many times?
5    A.  Ten.  These are estimates.
6    Q.  Have you met with Ms. Kaminski?
7    A.  Yes.
8    Q.  How many times?
9    A.  One time.
10   Q.  And have you met with Mr. McKay?
11   A.  Never, no, only spoken on the phone.
12   Q.  How many times?
13   A.  Eight times.
14   Q.  How many?
15   A.  Eight.  These are estimates.
16   Q.  Can you tell me anything more about
17   the work that Mr. Sider, Ms. Benton,
18   Ms. Kaminski, or Mr. McKay did to assist you in
19   this engagement?
20       MR. SOBOL:  Objection.
21   A.  They would answer questions for me if
22   I had something more I wanted to know about
23   something.
24   BY MR. KEYES:

6 (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  Q.  Anything else?
2  A.  No, not that I can think of.
3  Q.  Okay.  Did you receive assistance from
4  anyone who was not employed by Compass Lexecon?
5  MR. SOBOL:  Objection to form.
6  A.  Yes.  This was the other category of
7  assistance I wanted to be sure to mention.
8  BY MR. KEYES:
9  Q.  What is this category?
10  A.  This was the primary statistical
11  analyst who helped Meredith Rosenthal.  His name
12  is Forrest.  Last name is McCluer,
13  M-c-C-L-U-E-R.  And similarly to Evan in helping
14  me understand what Dave Cutler did, Forrest was
15  helpful in explaining the analysis that Meredith
16  Rosenthal did.
17  Q.  Forrest McCluer, did I get that name
18  right?
19  A.  Yes.
20  Q.  Did Mr. McCluer work for
21  Professor Rosenthal?
22  A.  Meaning, I'm sorry, at her direction,
23  or for her in some employment relationship?
24  Q.  You said there was a primary

Page 23

1  statistical analyst.  So was Mr. McCluer
2  assisting Professor Rosenthal?
3  A.  He was assisting her in her work, yes.
4  Q.  And so although you did not speak with
5  Professor Rosenthal about her work, you spoke
6  with Mr. McCluer about her work?
7  MR. SOBOL:  Objection.
8  BY MR. KEYES:
9  Q.  Is that correct?
10  A.  No, that's not correct.
11  MR. SOBOL:  Objection.
12  BY MR. KEYES:
13  Q.  Okay.
14  A.  I spoke with both of them about their
15  work.
16  Q.  Okay.
17  A.  I thought I said that.
18  Q.  I may have misunderstood then.
19  And how many times did you speak with
20  Mr. McCluer?
21  MR. SOBOL:  Objection to form.
22  A.  Probably six to eight.
23  BY MR. KEYES:
24  Q.  Do you have an expertise in

Page 24

1  statistics?
2  A.  I'm pretty good at statistics, yes.
3  Q.  Do you claim to have an expertise?
4  A.  I'm sorry, what was the question?
5  Q.  Do you claim to have an expertise in
6  statistics?
7  A.  Well --
8  MR. SOBOL:  Object to the form.
9  A.  -- I would say yes.  And I'll briefly
10  explain, and, of course, you feel free to follow
11  up as you like.
12  Much of the work that I do is applied
13  health economics, and looking back at the work
14  that has had the most impact and received the
15  most recognition in terms of awards and prizes
16  has been applied econometrics.  So while I
17  wouldn't be mistaken for an econometrician,
18  which is a statistician who works with
19  economics, I have expertise in it, and, in fact,
20  much of my academic research is oriented toward
21  statistical methods.
22  BY MR. KEYES:
23  Q.  Have you performed a regression
24  analysis yourself?

Page 25

1  A.  Ever?
2  Q.  Yes.
3  A.  Many times.
4  Q.  Did you perform any regression
5  analysis in this case, in this engagement?
6  A.  No, I didn't.
7  Q.  Do you consider yourself capable of
8  doing a regression analysis in this engagement?
9  MR. SOBOL:  Objection.
10  A.  Well, that would depend on the
11  assignment.
12  BY MR. KEYES:
13  Q.  Well, could you have done the work
14  that Professor Rosenthal did?
15  A.  Could I have done it?  Not as well as
16  she could.
17  Q.  Do you have the expertise to do the
18  work that Professor Rosenthal did?
19  A.  I'd say I have some of the expertise.
20  Q.  So you think you could have done the
21  regression analyses that Professor Rosenthal
22  performed?
23  MR. SOBOL:  Objection to form.
24  A.  Well, the work of specifying the

7 (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    regressions is something that draws on
2    experience as well as technical expertise, and
3    Meredith trumps me on those.  So I might have
4    been able to do it, but Meredith is in a better
5    position to do it.
6    BY MR. KEYES:
7        Q.  Have you -- could you do the work that
8    Professor Cutler did in this case?
9        MR. SOBOL:  Objection.
10       A.  I think my answer would be the same.
11   BY MR. KEYES:
12       Q.  Could you perform the regression
13   analyses that Professor Cutler conducted?
14       A.  It's the same answer.
15   Professor Cutler is first rank in this kind of
16   work, and while I have some qualifications as a
17   statistician, I think he's better positioned to
18   do the work he did.
19       Q.  So you've mentioned four or -- you've
20   mentioned four people by name at Compass Lexecon
21   who assisted you in this engagement.
22       A.  Yes.
23       Q.  You've mentioned the conversations you
24   had with Mr. McCluer.

Page 27

1        A.  Yes.
2        Q.  Did anyone else assist you in this
3    engagement?
4        A.  I don't think so.
5            You're talking about damages?
6        Q.  I am talking about damages right now.
7        A.  Okay.
8        Q.  Anyone else?
9        A.  I don't think so.
10       Q.  There are references in your damages
11   report, which is Exhibit Number 1, to staff and
12   team.  When you refer to staff in your report,
13   who are you referring to?
14       A.  It would have been the staff at
15   Compass Lex primarily.  I guess Forrest would
16   have been included in that.
17       Q.  And when you refer to your team in
18   your damages report, which is Exhibit 1, who are
19   you referring to?
20       A.  Do you mind if you point that to me so
21   I can see where the context is?
22       Q.  Sure.  Will you turn to Page 8 in your
23   report?
24       A.  Okay.

Page 28

1        Q.  Okay.  Paragraph 12.
2        A.  Okay.
3        Q.  It says, "In preparing this report, I,
4    and staff under my direction: analyzed data,
5    reviewed economic literature, court filings,
6    documents produced in this litigation, public
7    information and deposition testimony; and spoke
8    with representatives of the Bellwether
9    governments."
10       A.  Okay.
11       Q.  Do you see that language?
12       A.  Yes.
13       Q.  When you refer to "staff" in that
14   sentence, who are you referring to?
15       A.  The people we just spoke about.
16       Q.  Including Mr. McCluer?
17       A.  Yes.
18       Q.  And then if you turn to Page 28.
19       A.  Okay.
20       Q.  Are you there?
21       A.  Yes.
22       Q.  In Paragraph 51 you say, "To identify
23   affected divisions, I, and my team under my
24   direction, reviewed budget and expenditure

Page 29

1    information from the Bellwether governments."
2            Do you see that language?
3        A.  Yes, I do.
4        Q.  Who are you referring to there?
5        A.  That would be the same people.
6        Q.  Anyone else?
7        A.  No.
8        Q.  Later in the same paragraph a few
9    lines down you say, "In addition, I and members
10   of my team met with local officials to confirm
11   my understanding of both the activities
12   undertaken by these divisions and whether those
13   activities had been affected by the opioid
14   crisis."
15           Do you see that language?
16       A.  I do, yes.
17       Q.  Who are you referring to in that
18   sentence when you say "members of my team"?
19       A.  The same group of people.
20       Q.  Anyone else?
21       A.  No.
22       Q.  Now, you are charging $900 per hour
23   for your time on this engagement, correct?
24       A.  Yes, I am.

8 (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1     Q.  How many hours have you spent as of
2  today on this engagement?
3         MR. SOBOL:  Did you say damages only
4  again?
5     A.  Oh, damages only?
6  BY MR. KEYES:
7     Q.  Damages.
8     A.  Oh, gosh.  I haven't divided my hours
9  between damages and my other report.
10    Q.  Okay.
11    A.  Except it would be in the details of
12 the listing of my hours.  So I would -- I'll
13 guess for you.
14        MR. SOBOL:  Do you want to do that?
15 BY MR. KEYES:
16    Q.  What's your best estimate of the
17 number of hours you have spent on the damages
18 analysis?
19    A.  I would say 250.
20    Q.  And how much time have you spent on
21 the nuisance report?
22    A.  About the same.
23    Q.  So is it your best estimate that
24 you've spent approximately 500 hours on this

Page 31

1  engagement?
2     A.  Yes.
3     Q.  How many hours has Mr. Sider spent on
4  this engagement?
5     A.  I don't know.
6     Q.  How many hours has Ms. Benton spent on
7  this engagement?
8     A.  I don't know.
9     Q.  How many hours has Ms. Kaminski spent
10 on this engagement?
11    A.  I don't know.
12    Q.  How many hours has Mr. McKay spent on
13 this engagement?
14    A.  I don't know.
15    Q.  How many hours has Mr. McCluer spent
16 on this engagement?
17    A.  I don't know.
18    Q.  How much has Compass Lexecon billed
19 the plaintiffs in this case for their work on
20 this engagement?
21    A.  I don't know.
22        MR. SOBOL:  Objection to form.  Sorry,
23 I fell asleep there for a second.  Objection to
24 form.

Page 32

1  BY MR. KEYES:
2     Q.  How much has Compass Lexecon incurred,
3  even if not billed to plaintiffs, for their work
4  on this engagement?
5     A.  I don't know.
6     Q.  Would you turn to Page 19 of your CV.
7     A.  My CV.  Okay.
8     Q.  You attached your CV as Appendix IV.A.
9     A.  Yes, I have it.
10    Q.  And this lists your litigation
11 experience 2014 through present?  Yes?
12    A.  Yes.
13    Q.  And this continues from Pages 19 and
14 20.  Is this something you prepared?
15    A.  Yes.
16    Q.  Is it accurate?
17    A.  Well, there's a couple of additions.
18    Q.  Okay.  What are the additions?
19    A.  The additions are reports I submitted
20 since this was submitted.  On March 25th I
21 submitted a report in a reverse payment case,
22 and then I think April 3rd I may -- or 1st I
23 submitted also a reverse payment case report.
24    Q.  Any other reports or testimony you

Page 33

1  would add to this list?
2     A.  No.
3     Q.  When you say "a reverse payment case,"
4  what do you mean?
5     A.  I mean it's an antitrust case
6  involving the potential anti-competitive effects
7  of a patent settlement.
8     Q.  And did you quantify damages in either
9  of those two cases you just mentioned where you
10 submitted reports on March 25th and April 3rd?
11    A.  No, I didn't.
12    Q.  And in the report that you submitted
13 on March 25th, who did you submit the report on
14 behalf of?
15    A.  It was a -- class plaintiffs.
16    Q.  How about in the report that you
17 submitted on April 3rd?
18    A.  The same.
19    Q.  If you go back to the first page,
20 Page 19, you list the In re: Nexium Antitrust
21 Litigation.
22    A.  Yes.
23    Q.  Was that a reverse payments case?
24    A.  Yes, it was.

9 (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1      Q.   And did you offer opinions in support
2  of the plaintiff?
3      A.   Yes, I did.
4      Q.   Did you calculate damages in that
5  case?
6      A.   No, I didn't.
7      Q.   And the next case you list, United
8  States of America, ex rel. Saldivar versus
9  Fresenius Medical Care Holdings.
10        Do you see that?
11     A.   Yes.
12     Q.   What type of case was that?
13     A.   It was -- I'm probably pronouncing
14  this incorrectly, but a qui tam case.
15     Q.   And for which party did you submit a
16  report and serve as an expert?
17     A.   For the plaintiffs.
18     Q.   Did you quantify damages in that case?
19     A.   No, I didn't.
20     Q.   What were your opinions in that case?
21     A.   They had to do with fraudulent billing
22  and manipulation of tests.
23     Q.   And the next case you list, Monica
24  Barba and Jonathan Reisman, on behalf of

Page 35

1  themselves and all others similarly situated
2  versus Shire U.S., Inc.
3        Do you see that?
4      A.   I do.
5      Q.   What kind of case was that?
6      A.   That was a reverse payment case.
7      Q.   For which party did you issue these
8  reports and serve as an expert?
9      A.   The plaintiffs.
10     Q.   Did you quantify damages in that case?
11     A.   No, I didn't.
12     Q.   Turn to the next case, United States
13  of America, ex rel., Tracey George and Dawn
14  Simmons versus Fresenius Medical Care Holdings,
15  Inc.
16        Do you see that one?
17     A.   Yes, I do.
18     Q.   Was that also a reverse payment case?
19     A.   No.  That was another qui tam case.
20     Q.   And for what party did you issue a
21  report and serve as a testifying expert?
22     A.   The plaintiffs.
23     Q.   Did you quantify damages in that case?
24     A.   No, I didn't.

Page 36

1      Q.   What were your opinions about in that
2  case?
3      A.   It was also about fraudulent billing
4  and test manipulation.
5      Q.   And then the next case you list are In
6  Re: Cipro Cases I & II.
7        Do you see that?
8      A.   I do.
9      Q.   What kind of case was that?
10     A.   That was a reverse payment case.
11     Q.   For what party did you serve as an
12  expert, or provide a report?
13     A.   The plaintiffs.
14     Q.   Did you quantify damages in that case?
15     A.   No, I did not.
16     Q.   Turn to the next page of your CV, In
17  Re: Solodyn Antitrust Litigation.
18        Do you see that?
19     A.   Yes, I do.
20     Q.   What kind of case was that?
21     A.   That was a reverse payment case.
22     Q.   For what party did you serve as an
23  expert and submit these expert reports?
24     A.   For the plaintiffs.

Page 37

1      Q.   Did you quantify damages?
2      A.   No, I didn't.
3      Q.   Next one is In Re: Asacol Antitrust
4  Litigation.
5        Do you see that?
6      A.   I do.
7      Q.   What kind of case was that?
8      A.   That was also a reverse payment case.
9      Q.   For what party did you serve as an
10  expert and submit these expert reports?
11     A.   For the plaintiffs.
12     Q.   Did you quantify damages?
13     A.   No, I didn't.
14     Q.   Next case is United States of America
15  ex rel. Stephen A. Krahling and Joan Wlochowski
16  versus Merck & Co., and In Re: Merck Mumps
17  Vaccine Antitrust Litigation.
18        Do you see that?
19     A.   I do.
20     Q.   Were those distinct cases?  You list
21  them together.
22     A.   I do.  I submitted one report.  I'm
23  not sure about the case question.
24     Q.   Okay.  Well, for the two cases listed

10 (Pages 34 to 37)

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 there, what kind of cases were they?
2     A.  They were cases of monopolization, I
3 would say.
4     Q.  So would you consider them to be
5 reverse payment cases?
6     A.  No, they're not reverse payment cases.
7     Q.  And what were your opinions in that
8 case?
9     A.  It was monopolization.
10     Q.  And for what party did you serve as an
11 expert and submit expert reports?
12     A.  For the plaintiffs.
13     Q.  Did you quantify damages in that case?
14     A.  I quantified overpayments in that
15 case, yes.  Excuse me.  It may have been also a
16 qui tam case.
17     Q.  You say this may have been one?
18     A.  This may have been one.  I'm not
19 100 percent sure.
20     Q.  So in this case you quantified
21 overpayments?
22     A.  Yes.
23     Q.  Overpayments by whom?
24     A.  Public and private payers.

Page 39

1     Q.  To whom?
2     A.  To the company involved.
3     Q.  What was the company involved?
4     A.  It was Merck.
5     Q.  And did you call those overpayments
6 damages in that case?
7     A.  I don't remember.
8     Q.  Did you consider those overpayments to
9 be damages in that case?
10        MR. SOBOL:  Objection.
11     A.  I'm not sure how to answer.  I just
12 considered them overpayments.
13 BY MR. KEYES:
14     Q.  In Re: Niaspan Antitrust Litigation,
15 what kind of case was that?
16     A.  That was a reverse payment case.
17     Q.  For what party did you serve as an
18 expert and submit expert reports?
19     A.  For the plaintiff.
20     Q.  Did you quantify damages in that case?
21     A.  No, I didn't.
22     Q.  And then the last one you list here is
23 In Re: Loestrin 24 FE Antitrust Litigation.
24        Do you see that?

Page 40

1     A.  Yes.
2     Q.  What kind of case was that?
3     A.  That was a reverse payment case.
4     Q.  For what party did you serve as an
5 expert and submit the expert report?
6     A.  Also for the plaintiff.
7     Q.  Did you quantify damages?
8     A.  No, I didn't.
9     Q.  We've reviewed the cases that are
10 listed on Pages 19 and 20 of your CV, plus the
11 two cases that you said earlier you had
12 submitted reports in after the date of this CV.
13 Are there any other cases where you have served
14 as an expert and you have quantified damages?
15     A.  Yes, with the explanation that a
16 report was never submitted, but I was charged
17 with quantifying damages.
18     Q.  What case was that?
19     A.  I don't remember the name of the drug
20 involved.  It was a damages phase of a case in
21 which a generic firm had been determined to
22 enter and sell and profit illegally.  And then
23 the issue in the case at the time I became
24 involved was what the damages should be.

Page 41

1     Q.  You did not submit an expert report in
2 that case?
3     A.  I did not.
4     Q.  Did you testify at all in deposition
5 or hearing or trial?
6     A.  No, I don't think so.
7     Q.  And for what party in that case did
8 you serve as an expert?
9        THE WITNESS:  Is it -- I can answer
10 this freely?
11        MR. SOBOL:  Well...
12        THE WITNESS:  I don't mind, whatever
13 is --
14        MR. SOBOL:  Was the engagement
15 confidential?
16        THE WITNESS:  I believe it was
17 confidential.
18        MR. SOBOL:  So why don't you testify,
19 if it's acceptable, what side of the V you were
20 on, whether the claimant or the defendant, and
21 leave it at that, if you know.
22     A.  Would you mind asking the question
23 that I should answer?
24 BY MR. KEYES:

11 (Pages 38 to 41)

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1     Q.  Well, I'd like to know the name of the
2  party for which you served as an expert in this
3  case where you claim to have quantified damages
4  but you did not submit an expert report and you
5  did not give any testimony.  I'd like to know
6  the name.  If you don't want to give the name,
7  I'd like to know whether it was the claimant or
8  the defendant.
9     A.  It was the defendant.  I'm happy to
10  take instruction if I give you the name.  It's
11  not -- I'm not hiding anything.  I just want
12  to --
13     MR. SOBOL:  The party is not here.
14  BY MR. KEYES:
15     Q.  I can't give you instructions.  I can
16  only ask questions.
17     A.  I'm appealing to whoever can give me
18  instructions.
19     MR. SOBOL:  Well, I'm here, and I'm
20  giving you instructions.  If you have good
21  reason to believe that the engagement was
22  supposed to be confidential without speaking to
23  the party, don't divulge it.  The attorneys will
24  deal with it off-line.  You've identified it was

Page 43

1  the defendant, and that should be acceptable for
2  now.
3     THE WITNESS:  All right.
4  BY MR. KEYES:
5     Q.  Did you testify in a case called Blue
6  Cross and Blue Shield United of Wisconsin versus
7  Marshfield Clinic?
8     A.  I submitted a report and was deposed
9  in that case.
10     Q.  Did you testify at trial in that case?
11     A.  No.
12     Q.  What kind of case was that?
13     A.  That was also -- that was a damages
14  case.  I was involved with damages.  The case
15  itself was monopolization.
16     Q.  So you prepared a report on damages?
17     A.  Yes.
18     Q.  Quantifying damages?
19     A.  Yes.
20     Q.  For which party?
21     A.  For the plaintiff, which was Blue
22  Cross/Blue Shield of Wisconsin, I guess.
23     Q.  Did that case settle?
24     A.  I don't remember.

Page 44

1     Q.  Why didn't you give trial testimony in
2  the case?
3     MR. SOBOL:  Objection to the form.
4     A.  My understanding was I came in on
5  appeal stage.  And I'm not sure why I wasn't
6  asked to testify.
7  BY MR. KEYES:
8     Q.  Did you offer expert opinions in a
9  case called Agostino versus Quest Diagnostics,
10  Inc.?
11     A.  Yes, I did.
12     Q.  Did you submit a report?
13     A.  Yes.
14     Q.  Were you deposed?
15     A.  I don't remember.
16     Q.  Did you give testimony at trial?
17     A.  No.
18     Q.  What kind of case was that?
19     A.  That was a fraudulent billing case.
20     Q.  Did you quantify damages?
21     A.  I don't remember.
22     Q.  What were your opinions in that case?
23     A.  It was fraudulent billings.
24     Q.  That's it?

Page 45

1     A.  Well, there was a lot of backup to
2  that.
3     Q.  Well, I'm asking for your best
4  recollection.  In that case, did you offer
5  opinions quantifying damages?
6     A.  I don't remember.
7     Q.  And for what party did you serve as an
8  expert and submit that report?
9     A.  For a class, plaintiff, for
10  plaintiffs.
11     Q.  Did you serve as an expert in the case
12  titled In Re: Actiq Sales and Marketing
13  Practices Litigation?
14     A.  Yes, I did.
15     Q.  Did you submit a report?
16     A.  Yes.
17     Q.  Were you deposed in that case?
18     A.  I don't remember.
19     Q.  Did you testify at any trial?
20     A.  No.
21     Q.  What kind of case was that?
22     A.  That, I'm not sure of the legal
23  classification.  My work had to do with improper
24  marketing.

12 (Pages 42 to 45)

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    Q.  Did you quantify damages?
2    A.  No.
3    Q.  For what party did you serve as an
4    expert?
5    A.  For the plaintiffs.
6    Q.  Did you serve as an expert in a case
7    titled United States ex rel. Tracey in the
8    Northern District of Alabama?
9    A.  Can you remind me what -- I need more
10   information on it than that.
11   Q.  Do you remember a case in the Northern
12   District of Alabama?
13   A.  You'll have to remind me.
14   Q.  Okay.  Do you remember a case
15   involving the United States ex rel. Tracey?
16   A.  I don't remember.  Sorry.
17   Q.  No recollection of that?
18   A.  No recollection.
19   Q.  Okay.  Besides the cases we've talked
20   about, can you think of any other time when you
21   have served as a testifying expert where you are
22   attempting to quantify damages?
23   A.  I can't think of any.
24   Q.  Have you ever served as a testifying

Page 47

1    expert where you have quantified damages
2    suffered by a municipality, other than this
3    case?
4    A.  No, I haven't.
5    Q.  Have you ever served as a testifying
6    expert where you quantified damages suffered by
7    a government other than this case?
8    A.  I think I would say no.
9    Q.  So have you ever served as a
10   testifying expert where you've quantified the
11   damages allegedly suffered by a municipality or
12   a government as being the expenditures for
13   providing services to their constituents?
14        MR. SOBOL:  Objection.
15   A.  Is this different than the previous
16   question?
17   BY MR. KEYES:
18   Q.  I think it's a subset of the prior
19   question.
20   A.  To which I said no to.
21   Q.  Okay.  So what's your answer to this
22   question?
23        MR. SOBOL:  Objection.
24   A.  So it has to be no, unless I'm

Page 48

1    misunderstanding what you're asking.
2    BY MR. KEYES:
3    Q.  Have you ever served as a testifying
4    expert where you've quantified the damages
5    allegedly suffered by a municipality or a
6    government as being the expenditures for the
7    municipality or government providing services to
8    their constituents?
9        MR. SOBOL:  Objection.
10   A.  I believe I answered the more general
11   question prior to that.  If there's a
12   distinction, I'm missing it.
13   BY MR. KEYES:
14   Q.  It's very simple.  It's a yes-or-no
15   question.  If it's no, you can say no.
16        MR. SOBOL:  Or if he doesn't
17   understand it, he can say he doesn't understand
18   it, which he just did.
19   BY MR. KEYES:
20   Q.  Have you ever served as a testifying
21   expert where you have quantified the damages
22   allegedly suffered by the municipality or the
23   government as being the expenditures incurred in providing
24   municipality or government incurred in providing

Page 49

1    services to their constituents?
2        MR. SOBOL:  Objection.
3    A.  Okay.  I'm not sure what the objective
4    is of asking a general question and then a
5    subquestion that I think is covered by the
6    general question to which I answered no.  And if
7    there's a distinction, I'm missing it.
8    BY MR. KEYES:
9    Q.  So is your answer to my question no?
10        MR. SOBOL:  Objection.
11   A.  It's the answer I just gave ten
12   seconds ago.
13   BY MR. KEYES:
14   Q.  No, you haven't answered it, sir.  I
15   asked a broad question, and you gave me a
16   straight answer.  You said no.  Now I'm asking a
17   more specific question.  And I'm entitled to ask
18   the questions I want.  You may not think it
19   makes any sense --
20   A.  I'm not --
21   Q.  -- but I'm entitled to ask the
22   questions I want.
23        MR. SOBOL:  No question before you.
24   BY MR. KEYES:

13 (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    Q.  So I'm asking you to answer my
2   question, whether you think it's useful or not.
3   Okay?
4         MR. SOBOL:  Objection.  There's no
5   question before you.
6   BY MR. KEYES:
7    Q.  Okay.  Have you ever served as a
8   testifying expert where you purported to
9   quantify the damages suffered by a municipality
10  or government as being the expenditures incurred
11  by the municipality or the government in
12  providing services to its constituents?
13        MR. SOBOL:  Objection to form.
14   A.  We seem to be stuck.  I have answered
15  what I regarded to be a question that covers
16  this, and I'm puzzled why that answer doesn't --
17  isn't sufficient, and my puzzlement leads me to
18  wonder if there's something I'm missing.
19  BY MR. KEYES:
20   Q.  So you're refusing to answer the
21  question?
22        MR. SOBOL:  No, he's not.  He's given
23  the answer several times now.
24  BY MR. KEYES:

Page 51

1    Q.  Have you ever served as a testifying
2   expert where you offered the opinion that an
3   expenditure has an opportunity cost and that
4   opportunity cost is "damages"?
5         MR. SOBOL:  Objection.
6    A.  I'm sorry, I missed the first part.
7   This is research, or this is testifying expert
8   you're asking about?
9   BY MR. KEYES:
10   Q.  Testifying expert.
11       Have you ever served as a testifying
12  expert where you offered an opinion that an
13  expenditure has an opportunity cost, and that
14  opportunity cost is "damage"?
15   A.  So this would -- there's no government
16  qualifier there.  It's any expenditure?
17   Q.  Correct.
18   A.  So this needn't be a government
19  related case, am I -- just so I'm following?
20   Q.  I asked ever.
21   A.  Okay.
22   Q.  So have you ever served as a
23  testifying expert where you have offered the
24  opinion that the expenditure has an opportunity

Page 52

1   cost, and that opportunity cost is "damages"?
2    A.  I would say that's the general
3   economic approach to a question like this, that
4   spending is the right metric for damages because
5   of opportunity cost considerations, and then
6   yes, it's damages.
7    Q.  So please name for me the specific
8   cases where you have offered the opinion that an
9   expenditure has an opportunity cost, and that
10  opportunity cost is "damages."
11   A.  All the cases in which I've responded
12  to your questions that I do damages, that's what
13  damages are regarded in economics.
14   Q.  And did any of those cases involve
15  quantifying damages allegedly suffered by a
16  municipality or a government?
17   A.  No, they did not.
18   Q.  Has a court ever excluded you from
19  testifying as an expert?
20   A.  There was in Nexium some of the work
21  that I did that was not heard by the jury.  I'm
22  not sure if that's what you're asking about.
23   Q.  And it was not heard by the jury
24  because of a decision by the judge?

Page 53

1    A.  By Judge Young, yes.
2    Q.  What was the basis for the judge's
3   decision to not let the jury hear your opinion?
4    A.  My understanding was that -- I did a
5   series of reports in that case, and with respect
6   to one of the later reports I conducted some
7   analysis that Judge Young thought, given the way
8   the case was shaping up, in his view, that it
9   wouldn't be helpful, is my understanding.
10   Q.  So what were the opinions that you
11  were offering that the judge decided the jury
12  could not hear?
13   A.  The opinion was an analysis of stock
14  price movement around the announcement of the
15  settlement between the brand and the generic in
16  that case.
17   Q.  What did the judge say in explaining
18  why he thought that opinion would not be helpful
19  to the jury?
20   A.  I don't remember how he put it.
21   Q.  Has a testifying -- has a court ever
22  barred you from offering opinions on damages?
23   A.  Not so far as I know.
24   Q.  Has a court ever criticized your

14 (Pages 50 to 53)

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    approach or your methodology for quantifying
2    damages?
3        A.  In the Marshfield case that you
4    mentioned a bit ago, Judge Posner and I didn't
5    see eye to eye on the kind of statistical
6    comparisons that should be done.
7        Q.  What was Judge Posner's criticism of
8    your approach?
9        MR. SOBOL:  Objection to the form.
10       A.  The -- I was ahead of my time a bit on
11   that case.  The analysis that I did to quantify
12   damages is what goes now by the name of
13   difference in difference, which is an
14   econometric method where you identify a kind of
15   control group, and you follow that control group
16   forward, you follow your group forward,
17   something happens to the group you're interested
18   in, and you use the control group as a way to
19   adjust for other factors.
20       I don't think I -- I have all the
21   respect in the world for Judge Posner, but I
22   don't think he had seen much of this at that
23   point, which was a number of years ago.  It's
24   now very common methodology.  But my

Page 55

1    understanding of his objection was that I didn't
2    have explicit variables in the model to account
3    for things that would have been adjusted for,
4    controlled for in the difference in difference
5    analysis.
6    BY MR. KEYES:
7        Q.  Have there been other instances where
8    a court has criticized your approach or
9    methodology for quantifying damages?
10       MR. SOBOL:  Objection to the form.
11       A.  None that I can think of.
12   BY MR. KEYES:
13       Q.  Has a court ever barred you from
14   offering opinions on other topics besides
15   damages?
16       MR. SOBOL:  Objection.
17       A.  Not that I know of.
18   BY MR. KEYES:
19       Q.  Has a court ever criticized the
20   opinions you were seeking to offer on other
21   topics besides damages?
22       A.  I don't know.
23       Q.  You can't think of an instance?
24       A.  I can't think of any.

Page 56

1        Q.  Has a court ever excluded your
2    opinions on the ground that you failed to
3    consider competing explanations for your
4    findings?
5        MR. SOBOL:  Objection.  Form.
6        A.  Not so far as I know.
7    BY MR. KEYES:
8        Q.  So have you given me every instance
9    where a court has either excluded you from
10   testifying as an expert, or has barred the
11   opinions you've sought to offer, or have
12   criticized your approach or methodology?
13       MR. SOBOL:  Objection to the form.
14       A.  I'm giving you my best recollection,
15   yes.
16   BY MR. KEYES:
17       Q.  Are you a doctor?
18       A.  I'm not a medical doctor.  I'm an
19   economist.
20       Q.  Have you ever written a prescription
21   for drugs?
22       A.  No, I never have.
23       Q.  Are you a pharmacist?
24       A.  I am not a pharmacist.

Page 57

1        Q.  Have you ever filled a prescription
2    for drugs?
3        A.  Not from the pharmacy side, no.
4        Q.  Are you a pharmacologist?
5        A.  No, I'm not a pharmacologist.
6        Q.  Are you a sociologist?
7        A.  No, you wouldn't say I'm a
8    sociologist.
9        Q.  Are you an epidemiologist?
10       A.  No, I'm not an epidemiologist.
11       Q.  Have you ever worked for a
12   manufacturer of pharmaceuticals?
13       A.  Worked for.  Not in an employment
14   relationship.  As a consultant a few times.
15       Q.  In connection with litigation?
16       A.  Yes.
17       Q.  Have you ever worked as an employee of
18   a distributor of pharmaceuticals?
19       A.  Never as an employment relationship.
20       Q.  Have you ever worked for a pharmacy?
21       A.  Not in an employment relationship.
22       Q.  Have you ever worked for a law
23   enforcement agency?
24       A.  No.

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    Q.  Are you an expert in law enforcement?
2    A.  I wouldn't say I'm an expert in law
3  enforcement, no.
4    Q.  Have you ever worked for the DEA?
5    A.  Never worked for the DEA.
6    Q.  Are you a DEA expert?
7    A.  No, I'm not a DEA expert.
8    Q.  Are you a drug policy expert?
9    A.  I work on drug policy, so I would say
10  yes.
11    Q.  What areas, then, of drug policy do
12  you consider yourself to have an expertise in?
13    A.  The economics of competition,
14  regulation in the pharmacy area.
15    Q.  Anything else?
16    A.  Those are pretty general.
17    Q.  Have you ever worked for the FDA?
18    A.  No, I don't think so.
19    Q.  Are you an FDA regulatory expert?
20    A.  No, I wouldn't say I'm an FDA
21  regulatory expert.
22    Q.  Are you an FDA labeling expert?
23    A.  No, I'm not.
24    Q.  Are you an FDA expert?

Page 59

1    A.  Well, I know some things about the
2  FDA. But expert, I would say no.
3    Q.  Are you an expert in addiction?
4    A.  Well, one of my areas of economics
5  expertise is what's called behavioral health,
6  and that refers to mental health and substance
7  abuse, and addiction falls within that, yes.
8    Q.  So how would you describe your
9  expertise in the area of addiction?
10    A.  I'm an expert in the economics of
11  mental health and behavioral health, and there's
12  a lot of aspects of that.
13    Q.  You're an expert in the economics of
14  behavioral health?
15    A.  Yes.
16    Q.  Okay.
17    A.  And policy.
18    Q.  Are you an expert in pain management?
19    A.  No, I'm not.
20    Q.  Are you an expert in neonatal
21  abstinence syndrome?
22    A.  I am not a medical expert, no, in that
23  or other areas.
24    Q.  Are you an expert in neonatal care?

Page 60

1    A.  Not in the -- no, no.
2    Q.  In your report you periodically refer
3  to "bellwether governments." When you do so,
4  are you referring to Summit County and Cuyahoga
5  County?
6    A.  Yes.
7    Q.  Are you only referring to them?
8    A.  Yes.
9    Q.  And similarly, you refer in your
10  report to bellwether jurisdictions. When you do
11  so, again, are you referring to Summit County
12  and Cuyahoga County and only those two counties?
13    A.  Yes.
14    Q.  You refer in your report to
15  prescription opioid shipments. What do you mean
16  by that?
17    A.  I mean shipments of -- I'm not sure.
18  I'm not clear about that question. Shipments of
19  opioid prescriptions to local areas.
20    Q.  Well, I said, you refer in your report
21  to prescription opioid shipments. What do you
22  mean? And you said, I'm not sure about the
23  question, so I want to make sure you understand
24  the question.

Page 61

1    A.  Okay.
2    Q.  There are references throughout your
3  report to prescription opioid shipments. I want
4  to make sure we're on the same page about what
5  you're referring to when you use the phrase
6  prescription opioid shipments.
7    A.  Okay. I'm using them -- that term in
8  exactly the same way that Professor Cutler uses
9  it in his report, and it is the volume of
10  prescription opioids -- I'm trying not to use
11  the words in the question -- sent to the local
12  jurisdictions, the bellwether jurisdictions.
13    Q.  Sent to pharmacies in those local
14  jurisdictions?
15    A.  They would be sent to pharmacies, yes.
16    Q.  Sent anywhere else besides pharmacies
17  in those local jurisdictions?
18    A.  I'm not sure.
19    Q.  Where else would these prescription
20  opioids be sent in the local jurisdictions
21  besides pharmacies, as you understand it?
22    A.  They might be sent to healthcare
23  providers.
24    Q.  Do you know one way or the other?

16 (Pages 58 to 61)

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1      MR. SOBOL:  Objection to the form.
2      A.  I would have to go back and check and
3  see what Cutler did.
4  BY MR. KEYES:
5      Q.  And when you refer to local
6  jurisdictions, are you referring again to
7  Cuyahoga County and Summit County?
8      A.  Yes.
9      Q.  And only those two counties?
10      A.  Yes.
11      Q.  In your report you refer to the opioid
12  epidemic.  What do you mean by that?
13      A.  I mean the very large death and
14  sickness associated with opioid use.
15      Q.  Which drugs?
16      A.  The prescription opioids.
17      Q.  Do you include illegal drugs?
18      A.  It depends on the context.
19      Q.  What constitutes an epidemic, as you
20  use the term?
21      A.  You know, a major public health issue
22  that affects many people.
23      Q.  And when did the -- to use your term,
24  opioid epidemic, when did it start?

Page 63

1      A.  When did it reach epidemic
2  proportions?  Is that the nature of your
3  question?
4      Q.  Well, you refer in your report a
5  number of times to the opioid epidemic, and I
6  want to understand, when did it start, the
7  opioid epidemic?
8      A.  There's two different ways I could
9  answer that:  When did it become an epidemic,
10  which is when the epidemic started; or when some
11  prior causes were involved that started it, and
12  I'm not sure.
13      Q.  When did the epidemic start?  You just
14  gave me two --
15      A.  You're not helping me here.
16      Q.  You said when -- "there's two
17  different ways I could answer that:  When did it
18  become an epidemic, which is when the epidemic
19  started."  Okay.  When did the epidemic start?
20      MR. SOBOL:  Wait.  Could you just put
21  a full question?  Because I think the record is
22  a little bit unclear right now.
23  BY MR. KEYES:
24      Q.  You've referred to opioid epidemic.

Page 64

1      A.  Yes.
2      Q.  And I want to understand, from your
3  perspective based on the work you've done, when
4  do you understand that opioid epidemic started?
5      A.  What I would say is that answering
6  your question in the sense of when did the
7  opioid crisis become an epidemic, it would have
8  been a gradual process, and the threshold of,
9  yes, we have an epidemic would have been, I
10  don't know, at the time the acceleration in
11  deaths took place, which is ten years ago.
12      Q.  And what is your --
13      A.  Excuse me, I want to make a
14  distinction between that answer and when events
15  that led to the epidemic started, which I
16  understand to be a different question.
17      Q.  What was the peak of the opioid
18  epidemic?
19      MR. SOBOL:  Objection.
20      A.  Well, that depends on how you measure
21  the epidemic.  And if you measure it by deaths
22  from opioids, we're still waiting for the peak.
23  BY MR. KEYES:
24      Q.  What if you measure it another way?

Page 65

1      MR. SOBOL:  Objection.
2  BY MR. KEYES:
3      Q.  You said you could measure it multiple
4  ways.  What are the other ways you could measure
5  the peak of the opioid epidemic?
6      A.  I would tend to measure the nature of
7  the epidemic by the harms that are caused by the
8  epidemic, and there are various ways to do that.
9  Some other metrics might show a different time
10  pattern.
11      Q.  So if you use those other metrics,
12  when do you place in time the peak of the opioid
13  epidemic?
14      MR. SOBOL:  Objection.  Form.
15      A.  Well, I wouldn't -- I think it's the
16  kind of question that defies a single answer
17  like "2011."  As an economist interested in
18  policy, I would want to keep track of the
19  various kind of harms that were associated with
20  the opioid epidemic, and some go up more
21  quickly, some go up more slowly, some may have
22  even peaked.  It's hard to give a year answer to
23  that question.
24  BY MR. KEYES:

17 (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    Q.  Have you studied the opioid epidemic?
2    A.  Well, yes, I would say yes.
3    Q.  So what has your study been?
4         MR. SOBOL:  Objection.
5    BY MR. KEYES:
6    Q.  When you say "yes," what have you done
7    to study the opioid epidemic?
8    A.  Well, I've written two reports on this
9    in the last, whatever, ten months or so, that
10   involved a lot of study.  I've taught about it.
11   That's -- I've helped prepare federal grant
12   proposals to contend with the opioid epidemic.
13   All those involve study.
14   Q.  In your report you refer to
15   distributors a number of times.  Who are the
16   distributors you're referencing?
17   A.  The firms that distribute prescription
18   opioids.
19   Q.  Can you name them?
20   A.  I can name some.  Cardinal Health,
21   McKesson.
22   Q.  Can you name any others?
23   A.  I'll stop there.  Rochester Drug.
24        Not right now, no.

Page 67

1    Q.  So when you refer to distributors in
2    your report, you're referring to the firms that
3    distribute prescription opioids?
4    A.  Yes.
5    Q.  And you can think of Cardinal Health,
6    McKesson, and Rochester Drug?
7    A.  Yes.
8         MR. SOBOL:  Without the report in
9    front of him?
10   BY MR. KEYES:
11   Q.  Can you think of any others?
12        MR. SOBOL:  Without the report in
13   front of him?
14        MR. KEYES:  Sure.
15        MR. SOBOL:  Just so it's clear, the
16   report is in front of him, but you don't want
17   him to go through the report to answer the
18   question, right?
19        MR. KEYES:  I'd like his answer.
20   BY MR. KEYES:
21   Q.  What do you remember, without looking
22   at the report?  We'll look at your report later.
23   A.  Without looking at the report, I gave
24   you the ones I can think of.

Page 68

1    Q.  You also refer to the distributor
2    defendants a number of times.  When you use that
3    term, who are you referring to?
4    A.  The distributors who are defendants in
5    this case.
6    Q.  Okay.  And can you name any of those
7    besides the ones you just listed?
8         MR. SOBOL:  Objection to the form.
9    A.  Not without looking at my report.
10   BY MR. KEYES:
11   Q.  What do you know about the role of
12   distributors in the supply chain?
13        MR. SOBOL:  Objection to the form.
14   A.  Well, I know in general what their
15   role is.  They take product and move it to
16   retail.
17        I'm not sure what you're asking.
18   BY MR. KEYES:
19   Q.  Have you ever studied their practices?
20   A.  In connection with some of these
21   cases, I need to be aware of the general
22   business practices of wholesalers.  And even in
23   my research on the economics of the pharmacy
24   sector, you know, one needs to be aware of the

Page 69

1    role of wholesalers.
2    Q.  What do you know about the role of
3    distributors in the supply chain that only
4    distribute to their own retail pharmacies?
5         MR. SOBOL:  Object to the form.
6    A.  What do I know about them?  I'm sorry,
7    I'm not getting the point of your question.
8    BY MR. KEYES:
9    Q.  Okay.  Can you be more specific about
10   the policies and practices of distributors that
11   distribute to their own retail pharmacies?
12        MR. SOBOL:  Objection to the form.
13   A.  I'm still not sure what you're getting
14   at here.  I'm sorry, I'm just not following what
15   you're asking.
16   BY MR. KEYES:
17   Q.  Okay.  We'll return to that.
18        You refer to opioids.  And can you
19   turn to Page 4 of your report?  Are you there?
20   A.  Yes, I am.
21   Q.  Okay.  The last sentence of
22   Paragraph 6 in the middle of the page says, "In
23   discussing opioids, I follow the CDC's
24   definition, which includes both legal and

18 (Pages 66 to 69)

Page 70

1    illicit opioids."
2         Do you see that?
3    A.  I do, yes.
4    Q.  Okay.  So when you refer to opioids in
5    your report, you are referring to both legal and
6    illicit opioids, correct?
7    A.  Well, it depends on the context.  And
8    when I just -- which includes when I say both
9    legal and illicit, footnote 9, and that explains
10   what it means.
11   Q.  Well, footnote 9 gives a definition
12   of -- the CDC definition of opioids, correct?
13   A.  That's right.
14   Q.  Okay.  But you said in -- on Page 4
15   that when you discuss opioids, you follow the
16   CDC's definition, which includes both legal and
17   illicit opioids.
18        So I'm trying to understand, when
19   there are references later in the report to
20   opioids without any further clarification,
21   you're referring to both legal and illicit
22   opioids?
23        MR. SOBOL:  Objection.  Asked and
24   answered.

Page 71

1    A.  I would have to see the context to be
2    sure what is being meant.
3    BY MR. KEYES:
4    Q.  Would you turn to Page 8 of your
5    report?  Paragraph 12, "In preparing this
6    report, I, and staff under my direction:
7    analyzed data."
8         What specific data did you analyze?
9    A.  The data I analyzed were the budget
10   information of the bellwether jurisdictions, the
11   bellwether governments.
12   Q.  Can you be more specific?  When you
13   refer to the budget information, what are you
14   referring to?
15   A.  Okay.  Each year for each county
16   there's a document that explains the functions
17   of and the expenditures of various divisions in
18   the county, and it's a lot of data that includes
19   breakdowns of expenditures in a division,
20   sometimes by purpose, sometimes by type of
21   expenditure, and it's those data that I analyzed
22   in order to determine damages in this case.
23   Q.  What is that document called?
24   A.  There's many documents.  There's a

Page 72

1    series of budget documents for Cuyahoga, and a
2    series of budget documents for Summit.  It's
3    named later in my report.
4    Q.  Okay.  Anything that you would add
5    besides this budget information that you've
6    described when you refer to analyzing data?
7    A.  That certainly was, you know, the very
8    large majority of what I analyzed.
9    Q.  So besides budget information of the
10   two counties, what data did you personally
11   analyze?
12   A.  That's why I'm wondering if there
13   might be something else that I'm not
14   remembering.  Not that I can remember here.
15   Q.  On Page 6, Paragraph 9 -- do you have
16   that in front of you?
17   A.  Yes.
18   Q.  -- you say, "Through review of the
19   Bellwether governments' budgets and expenditures
20   and interviews with Bellwether government
21   personnel, I have identified certain divisions
22   that are affected by the opioid epidemic, listed
23   here in Table IV.1."
24        Do you see that?

Page 73

1    A.  I do, yes.
2    Q.  When you reference interviews with
3    bellwether government personnel, you're
4    referring to personnel of Summit County and
5    Cuyahoga County?
6    A.  Yes.
7    Q.  Which personnel?
8    A.  I don't remember their names.
9    Q.  Do you remember their titles?
10   A.  Oh, there were --
11        MR. SOBOL:  This is without looking at
12   his report, correct?
13        MR. KEYES:  He has the report in front
14   of him.
15        MR. SOBOL:  He has the report in front
16   of him, then why don't you direct him to the
17   page that has this information?
18        MR. KEYES:  It's his report.  He says
19   that through interviews with bellwether
20   government personnel he has identified certain
21   divisions that are affected by the opioid
22   epidemic.
23   BY MR. KEYES:
24   Q.  I want to know who you interviewed.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    Who are these bellwether personnel to whom
2    you're referring?
3             MR. SOBOL:  My point is there's an
4    appendix, Materials Considered, and if you'd
5    like him to look at that, he may, and if you
6    want him to remember without looking at that,
7    then he won't.
8    BY MR. KEYES:
9         Q.  Without looking at your report, you
10   said -- you already said you don't remember any
11   names.  I'm asking, do you remember the titles
12   of the people?
13            MR. SOBOL:  Without looking at the
14   materials considered, correct?
15            MR. KEYES:  Sure.
16        A.  There were budget officials, sheriff,
17   people from ADAMHS Board, budget director.
18   There was about 40 in total.
19   BY MR. KEYES:
20        Q.  And did you personally participate in
21   these interviews?
22        A.  No, not all, no.
23        Q.  Again, I'm asking you about the
24   bellwether government personnel you interviewed

Page 75

1         A.  That I personally interviewed?
2         Q.  Yes.
3             MR. SOBOL:  And you want him to do it
4    without looking at the materials considered,
5    correct?
6             MR. KEYES:  For the moment, yes.
7             MR. SOBOL:  Okay.
8             MR. KEYES:  I don't think there's
9    anywhere in his report where he identifies any
10   interview with anyone who works for Summit
11   County or Cuyahoga County, but I don't want to
12   waste the time at this point to scan the report
13   for something that doesn't exist.
14   BY MR. KEYES:
15        Q.  I want your recollection.  When you
16   refer to interviews with bellwether government
17   personnel, you said those are personnel of
18   Summit County and Cuyahoga County, and I'd like
19   to know who are those people that you
20   interviewed?
21        A.  These people were interviewed by my
22   staff.
23        Q.  Did you interview any of these people,
24   to use your phrase?

Page 76

1         A.  They were all interviewed by my staff.
2         Q.  Did you interview anyone who worked
3    for Summit County?
4         A.  I can't remember 100 percent
5    whether -- which of the calls I may have been
6    on.  I'm sorry, I just don't remember.
7         Q.  Okay.  So sitting here today, do you
8    remember participating in any interview of
9    anyone who works for Summit County?
10        A.  I can't remember.
11        Q.  Did you interview anyone at Cuyahoga
12   County?
13        A.  I can't remember.
14        Q.  Sitting here today, can you remember
15   participating in any interview of anyone who
16   worked for Cuyahoga County?
17        A.  I can't remember.
18        Q.  So when you say "Through review of the
19   Bellwether governments' budgets and expenditures
20   and interviews with Bellwether government
21   personnel, I have identified certain divisions
22   that are affected by the opioid epidemic listed
23   here in Table IV.1," you're referring
24   exclusively to interviews that someone else

Page 77

1    conducted, correct?
2         A.  These interviews --
3             MR. SOBOL:  Object to the form.
4             Go ahead.
5         A.  These interviews were conducted by
6    staff under my direction.
7    BY MR. KEYES:
8         Q.  Okay.  And did anyone take notes of
9    these interviews of anyone who worked for Summit
10   County or Cuyahoga County?
11        A.  I'm not sure.
12        Q.  Have you seen any notes --
13        A.  I have not.
14        Q.  -- that anyone took of any interviews
15   of anyone who worked for Cuyahoga County or
16   Summit County?
17        A.  No, I have not.
18        Q.  All right.  So with respect to the
19   bellwether government personnel listed here, you
20   didn't participate in those interviews, and you
21   don't remember the names of who was interviewed
22   by your staff, correct?
23        A.  Well, I told you what I could
24   recollect about that.

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    Q. Okay. And you said you don't remember
2    the names. I asked you for the titles, and you
3    told me budget officials, the sheriff, the
4    ADAMHS Board people, and the budget director.
5    That's what you said so far. Can you add to
6    that list?
7    A. Not as I sit here, no.
8    Q. Who interviewed the budget director
9    for Summit County?
10    A. Staff at Compass Lexecon.
11    Q. Who?
12    A. I'm not sure.
13    Q. Who interviewed the budget director at
14    Cuyahoga County?
15    A. I'm not sure. It would have been
16    staff at Compass Lex.
17    Q. Who interviewed officials from the
18    ADAMHS Board for Summit County?
19    A. Staff at Compass Lex.
20    Q. Who?
21    A. I'm not sure.
22    Q. Who interviewed the ADAMHS Board
23    officials for Cuyahoga County?
24    A. Same answer, it would have been staff

Page 79

1    at Compass Lex. I'm not sure of the name of the
2    person.
3    Q. Who interviewed the sheriff for Summit
4    County?
5    A. It would be the same answer.
6    Q. Who interviewed the sheriff for
7    Cuyahoga County?
8    A. Same answer.
9    Q. Who interviewed the budget officials
10    for Summit County?
11    A. Same answer.
12    Q. Who interviewed the budget officials
13    for Cuyahoga County?
14    A. Same answer.
15    Q. So what you know sitting here today is
16    that personnel of Compass Lexecon interviewed
17    these officials, correct?
18    A. Yes, they did.
19    Q. And you don't know whether they took
20    notes, correct?
21    A. I've never seen any notes.
22    Q. Do you know whether they took notes?
23    A. I'm not sure.
24    Q. And you don't know the names of the

Page 80

1    people they interviewed, correct?
2    A. Well, I've told you what I know.
3    Q. Were these interviews by Compass
4    Lexecon in person or over the phone?
5    A. They were a combination.
6    Q. Which of these officials were
7    interviewed in person?
8    A. I'm not sure.
9    Q. Which of these interviews -- officials
10    were interviewed over the phone?
11    A. I'm not sure.
12    Q. How many different interviews were
13    there with the budget officials from Summit
14    County?
15    A. There were about -- oh, for the budget
16    officials only? For someone like that, there
17    likely would have been multiple interviews.
18    Q. You say "likely." Do you know the
19    number of interviews that Compass Lexecon
20    conducted of budget officials in Summit County?
21    A. I don't know the count, no.
22    Q. How about for the budget officials in
23    Cuyahoga County?
24    A. Same answer.

Page 81

1    Q. Same answer for the sheriff for Summit
2    County?
3    A. Same answer.
4    Q. Same answer for the sheriff of
5    Cuyahoga County?
6    A. Same answer.
7    Q. Same answer for the ADAMHS Board
8    officials for either Summit County or Cuyahoga
9    County?
10    A. Same answer.
11    Q. Same answer for the budget director
12    for Summit County or Cuyahoga County?
13    A. Same answer.
14    Q. Now, would you turn to Page 8 of your
15    report? Paragraph 12, "In preparing this
16    report, I, and staff under my direction:
17    analyzed data; reviewed economic literature,
18    court filings, documents produced in this
19    litigation, public information and deposition
20    testimony; and spoke with representatives of the
21    Bellwether governments."
22    Do you see that?
23    A. Yes.
24    Q. And again, that reference to

21 (Pages 78 to 81)

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 bellwether governments is a reference to
2 representatives of Summit County and Cuyahoga
3 County, correct?
4     A.  That's correct.
5     Q.  And just seeing this language, does
6 that spark any recollection of you speaking with
7 anyone who was a representative of either Summit
8 County or Cuyahoga County?
9     A.  No, it doesn't.
10     Q.  Okay.  Would you turn to Page 28 of
11 your report?  In Paragraph 51, about halfway
12 down there's a sentence that begins "In
13 addition."
14     Do you see that?
15     A.  Yes.
16     Q.  "In addition, I and members of my team
17 met with local officials to confirm my
18 understanding of both the activities undertaken
19 by these divisions and whether those activities
20 had been affected by the opioid crisis."
21     Do you see that?
22     A.  Yes, I do.
23     Q.  And when you refer to local officials,
24 you're talking about officials of Cuyahoga

Page 83

1 County and Summit County, correct?
2     A.  I am.
3     Q.  Okay.  But you didn't meet with any
4 officials of Summit County or Cuyahoga County,
5 correct?
6     A.  Well, members of my team did.
7     Q.  You said "I and members of my team met
8 with local officials."  That's not accurate,
9 correct?
10     A.  It depends on how you regard the
11 subject of the sentence.
12     Q.  I may be missing something, but I
13 understand the subject to be I and my members --
14 and members of my team.
15     A.  I think I clarified that these
16 interviews were conducted by members of my team.
17     Q.  Exclusively?
18     A.  Not by me.
19     Q.  Right.
20     So it is inaccurate to say, I met with
21 local officials to confirm my understanding?
22     MR. SOBOL:  Objection to the form.
23     A.  That's not what the sentence says.
24 BY MR. KEYES:

Page 84

1     Q.  It says "I and members of my team."
2     A.  Yes, that's correct.
3     Q.  Okay.  Is this statement accurate that
4 you and members of your team met with local
5 officials?  Yes or no, is it accurate?
6     MR. SOBOL:  Objection.
7     A.  Yes.
8 BY MR. KEYES:
9     Q.  Would you turn to Page 21 of your
10 report?  Are you there?
11     A.  Yes.
12     Q.  In Paragraph 37 you say, "One transfer
13 is 'Rev-FTS Social Services 1,' which DCFS
14 personnel explained comes into the county as a
15 lump sum to be used towards any social service."
16     Do you see that language?
17     A.  I do, yes.
18     Q.  What DCFS personnel is this sentence
19 referring to?
20     A.  I'm not sure.
21     Q.  What does DCFS stand for?
22     A.  Division of Children and Family
23 Services.
24     Q.  And when you refer here to DCFS

Page 85

1 personnel, you're referring to DCFS for which
2 county?
3     A.  This is Cuyahoga.
4     Q.  And who, if you didn't speak with the
5 DCFS personnel, who did?
6     A.  This would have been staff at Compass
7 Lex.
8     Q.  Which staff at Compass Lexecon spoke
9 with DCFS personnel?
10     A.  I'm not sure.
11     Q.  When did they speak with the DCFS
12 personnel?
13     A.  It would have been sometime in the,
14 like I say, July to September time frame.
15     Q.  And who specifically at DCFS provided
16 this explanation?
17     A.  I don't know.
18     Q.  Was this explanation given by these
19 unspecified DCFS personnel in person or over the
20 phone?
21     MR. SOBOL:  Objection to the form.
22     A.  I'm not sure.
23 BY MR. KEYES:
24     Q.  Did they take notes?

22 (Pages 82 to 85)

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    A. I don't know.
2    Q. So how did you come to learn what DCFS
3 personnel explained when it came to Rev-FTS
4 Social Services 1?
5    A. I would have spoken to a staff member
6 at Compass Lex about this.
7    Q. Okay. But which staff person at
8 Compass Lexecon did you speak with?
9    A. I don't remember.
10    Q. When you got an update about what
11 budget officials for either of the counties had
12 said, who reported to you what they said?
13    MR. SOBOL: Objection.
14    A. Where are you now?
15 BY MR. KEYES:
16    Q. Well, earlier we talked about
17 interviews with personnel of Summit County and
18 Cuyahoga County. You didn't remember the names
19 of the people, but -- and you didn't remember
20 titles, but you said they included budget
21 officials.
22    A. Yes.
23    Q. Okay. So who reported to you what
24 these budget officials said?

Page 87

1    A. Okay. It would have been staff at
2 Compass Lex.
3    Q. Who?
4    A. I'm not sure.
5    Q. Who reported to you what the sheriff
6 for Summit County or Cuyahoga County said in
7 these interviews?
8    A. It would have been a staff member at
9 Compass Lex, and I don't remember the person's
10 name.
11    Q. Who reported to you what the ADAMHS
12 Board officials for Summit County or Cuyahoga
13 County said in these interviews?
14    A. It would have been a staff member at
15 Compass Lex, and I don't remember the person's
16 name.
17    Q. Who reported to you what the budget
18 director for Summit County or Cuyahoga County
19 said in these interviews?
20    A. It would have been a staff member at
21 Compass Lex, and I don't remember the person's
22 name.
23    Q. So is it fair to say that you didn't
24 participate in any interviews with anyone who

Page 88

1 works for Summit County or Cuyahoga County,
2 correct?
3    MR. SOBOL: Objection.
4    A. Well, that's not what I said earlier.
5 BY MR. KEYES:
6    Q. Did you speak with anyone who works
7 for Summit County or Cuyahoga County?
8    MR. SOBOL: Objection.
9    A. I believe you already asked that, and
10 I said I may have participated in some of the
11 phone interviews, but I just don't remember.
12 BY MR. KEYES:
13    Q. Okay. You don't remember anything
14 that was said? If you participated in those,
15 you don't remember what was said?
16    MR. SOBOL: Objection.
17    A. I'm sorry, I don't.
18 BY MR. KEYES:
19    Q. And you don't remember who those
20 people were who participated in the interviews?
21    A. I'm sorry, I don't.
22    Q. So what you do know is that the
23 references to interviews throughout this report
24 are interviews conducted by someone at Compass

Page 89

1 Lexecon?
2    A. Primarily, yes.
3    Q. Well, who else besides the people at
4 Compass Lexecon interviewed employees of Summit
5 County or Cuyahoga County?
6    A. Well, I may have been involved in some
7 of the phone interviews.
8    Q. Right. You've said that. May, may
9 not have been.
10    A. I don't want you to forget it.
11    Q. Okay. Can you tell me anything about
12 any conversations that you participated in with
13 anyone at Summit County or Cuyahoga County?
14    MR. SOBOL: Objection to the form.
15 BY MR. KEYES:
16    Q. Anything at all?
17    MR. SOBOL: Objection.
18    A. Okay. I'm thinking. I can't recall
19 anything in particular, no.
20 BY MR. KEYES:
21    Q. Okay. And who of the people you named
22 earlier would have conducted these interviews?
23    A. I would have expected all the people I
24 named earlier -- not Evan, most likely not, and

23 (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  most likely not Hal.  So it would have been
2  primarily Alice and Erica.
3      Q.  And why do you say that?
4      A.  Hal and Evan had somewhat different
5  roles.
6      Q.  If we want to reconstruct what was
7  covered in these interviews, what would we need
8  to do?
9      MR. SOBOL:  Objection.
10     A.  I suppose you would need to find
11 someone with a better memory, number one.  And
12 talk to the people who were there.
13 BY MR. KEYES:
14     Q.  Either the people who were conducting
15 the interview from Compass Lexecon or the people
16 who were interviewed?
17     A.  It would be my thought, yeah.
18     MR. KO:  Okay.  Andy, we've been going
19 for about an hour and a half, so whenever -- if
20 you reach a good point to take a break.
21     MR. KEYES:  Yes, let me just finish
22 one point and then take a break.
23 BY MR. KEYES:
24     Q.  Would you turn to Page 35 of your

Page 91

1  report?  Are you there?
2      A.  Yes.
3      Q.  Okay.  And on Page 35, Paragraph 59,
4  you say, "From these expenditure data, I
5  identify those costs that would be expected to
6  vary in response to changes in the services
7  provided by these divisions.  This
8  identification was also informed by discussions
9  with the personnel in the respective divisions."
10     Do you see that?
11     A.  Yes.
12     Q.  Okay.  What respective divisions are
13 you talking about?  Are you talking about what
14 you identify in your report as the affected
15 divisions?
16     A.  Yes.
17     Q.  So which personnel in these divisions
18 provided information that informed your
19 identification of the costs that would be
20 expected to vary?
21     A.  I don't remember the names.
22     Q.  Do you remember their titles?
23     A.  Only what I provided in my answer
24 earlier.

Page 92

1      Q.  Do you remember their functions within
2  the divisions?
3      A.  These would be people who understand
4  the budgets.
5      Q.  And who conducted these interviews or
6  discussions with the so-called personnel in the
7  respective divisions?
8      A.  This would have been staff at Compass
9  Lexecon.
10     Q.  Do you know who?
11     A.  I'm not sure which interview was
12 conducted by which staff member.  It would have
13 been Alice and Erica primarily.
14     Q.  And how many discussions were there
15 with the personnel in each of these affected
16 divisions?
17     A.  It was about 40 in total.
18     Q.  How do you know that?
19     A.  I just remember being aware of that.
20     Q.  From whom?
21     A.  I've been in contact with staff at
22 Compass Lex, and I was interested in making sure
23 we were doing this thoroughly enough and
24 checking to see, well, what's happened, and

Page 93

1  that's the number that sticks in my mind.
2      Q.  Okay.  And were these discussions with
3  the personnel in the respective divisions over
4  the phone or in person?
5      A.  They would have been a combination.
6      Q.  How do you know that?
7      A.  Well, I know it from talking to staff
8  at Compass Lex.
9      Q.  Were notes taken in connection with
10 any of these so-called discussions with the
11 personnel in the respective divisions?
12     MR. SOBOL:  Objection to the form.
13     A.  I don't know.
14     MR. KEYES:  All right.  Why don't we
15 take a break.
16     THE VIDEOGRAPHER:  The time is
17 10:34 a.m., and we're off the record.
18     (Whereupon, a recess was taken.)
19     THE VIDEOGRAPHER:  The time is
20 10:56 a.m., and we're on the record.
21 BY MR. KEYES:
22     Q.  Professor, you said that Compass
23 Lexecon conducted these interviews at your
24 direction.  What directions did you give Compass

24 (Pages 90 to 93)

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1  Lexecon?
2      A.  Well, I wanted to confirm that the
3  divisions involved were affected by the opioid
4  crisis, and then to confirm that the activities
5  that the divisions involved could be affected by
6  the opioid crisis, and confirm an understanding
7  of what the various budget items and cost
8  categories consisted of.
9      Q.  You said you wanted to confirm those
10  things.
11          My question was, what direction did
12  you give to Compass Lexecon before they
13  conducted these interviews?
14      A.  Well, to seek confirmation.  The
15  material, the printed material has information
16  about divisions' budgets and division
17  activities, but then these need to be confirmed
18  by interviews.
19      Q.  So did you prepare charts that set
20  forth your understanding of which divisions were
21  affected and which costs were affected such that
22  those charts were then shared with personnel in
23  Summit County or Cuyahoga County to get them to
24  confirm your understanding?

Page 95

1          MR. SOBOL:  Objection.
2      A.  I don't recall any charts that were
3  used.
4  BY MR. KEYES:
5      Q.  How about work product?
6      A.  Work product?
7      Q.  Sure.  Charts, analyses.  I asked you
8  what directions you gave.  You said your purpose
9  was to confirm your understanding.  So how did
10  you or Compass Lexecon go about interviewing
11  Summit County and Cuyahoga County officials to
12  confirm your understanding?
13          MR. SOBOL:  Objection.
14      A.  How did we go about it?  Just a matter
15  of talking to people.  Unless I'm missing
16  something in your question.
17  BY MR. KEYES:
18      Q.  Well, did you communicate to Compass
19  Lexecon a specific understanding you had that
20  they then needed to confirm with certain
21  personnel?
22          MR. SOBOL:  Objection.
23      A.  As I mentioned, the budget documents
24  indicate how much divisions spend, and they

Page 96

1  describe the nature of the activities of the
2  division which, you know, upon reading, say,
3  okay, this might be something affected by the
4  opioid crisis.  Then it's a matter of saying,
5  okay, are they really affected by the opioid
6  crisis?  How do we understand the cost
7  categories within that division?  As far as I
8  know, it was all done by interview.
9  BY MR. KEYES:
10      Q.  Okay.  You said you reviewed budget
11  documents?
12      A.  Yes.
13      Q.  And these are documents that
14  articulate what dollars will be budgeted in a
15  particular year for a particular division?
16      A.  Yes, more or less.  Some of them are
17  actual -- some of the actuals you would say what
18  was spent, and some would be budgeted.  For
19  2018, I guess, was budgeted and -- 2018 was
20  budgeted at the time we had the documents.
21      Q.  And who did the review of these budget
22  documents, you or Compass Lexecon?
23      A.  I did a lot of the review of those
24  documents.

Page 97

1      Q.  So tell me how you would look at a
2  budget document to identify affected divisions
3  or affected costs?
4          MR. SOBOL:  Objection.
5      A.  Well, you -- these things are 100 or
6  200 pages, they're public documents, and I made
7  sure I understood the document and understood
8  the nature of the division organization and read
9  about the division's activities and made an
10  initial decision about what looked to me like
11  divisions that would be affected.
12  BY MR. KEYES:
13      Q.  Okay.  So you reviewed these documents
14  to identify which divisions were affected by the
15  opioid crisis --
16          MR. SOBOL:  Objection.
17  BY MR. KEYES:
18      Q.  -- correct?
19          MR. SOBOL:  Objection.
20      A.  Well, that was one of the purposes,
21  yeah.
22  BY MR. KEYES:
23      Q.  And you said you made an initial
24  decision.

25  (Pages 94 to 97)

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    A.  I did say that, yes.
2    Q.  Okay.  And so why didn't you leave it
3  at that, based on reviewing the budget
4  documents?  Why did you take another step?
5    A.  Well, I wanted to make sure I was
6  going in the right direction.
7    Q.  And why weren't you certain that you
8  were going in the right direction just based on
9  your review of the budget documents?
10    MR. SOBOL:  Objection.
11    A.  It just seemed prudent to me to make
12  contact and get clarification.
13  BY MR. KEYES:
14    Q.  Why?
15    MR. SOBOL:  Objection.
16    A.  As I said, it just seemed sensible to
17  talk to officials in the divisions.
18  BY MR. KEYES:
19    Q.  Right.  But why?  Why was it sensible
20  to you to talk to officials in the affected
21  divisions?
22    MR. SOBOL:  Objection.  Asked and
23  answered.
24    A.  I would think it's, you know, in the

Page 99

1  normal course of what I would do.  In the normal
2  course of my research, if I'm trying to identify
3  costs of some kind, and I have the opportunity
4  to talk to people who are actually working
5  there, that's something, you know, someone like
6  me or an economist would generally do.  It just
7  seemed natural to me.
8  BY MR. KEYES:
9    Q.  It's generally your practice?
10    A.  Yeah.
11    Q.  And was it your practice here because
12  you had some questions or some uncertainty based
13  on your review of the budget documents?
14    MR. SOBOL:  Objection.
15    A.  Well, I review the budget documents,
16  here's my judgment, talk to local officials to
17  confirm the judgment.
18  BY MR. KEYES:
19    Q.  Did -- after you reviewed the budget
20  documents, did you believe that they told the
21  whole story and you had all the information you
22  needed?
23    MR. SOBOL:  Objection.
24    About what?

Page 100

1  BY MR. KEYES:
2    Q.  To identify affected divisions or
3  affected costs.
4    A.  Well, as I say in my report, I don't
5  think I necessarily got everything, so what I
6  tried to do was to look where larger budget
7  divisions were involved in terms of their
8  spending, where it seemed more evident that
9  these divisions would be involved in the opioid
10  crisis, and pursue those.  There are probably
11  things left on the table in the sense of other
12  divisions that either weren't spending a lot or
13  not so obvious that I or the staff didn't talk
14  to.  So in the sense of not knowing everything,
15  I probably -- I'm sure that I missed some
16  things.
17    Q.  Okay.  You say in your report at
18  Paragraph 51, "To identify affected divisions,
19  I, and my team under my direction, reviewed
20  budget and expenditure information from the
21  Bellwether governments."
22    Do you see that?
23    A.  Yes.
24    Q.  So I want you to identify with as much

Page 101

1  precision as you can what this budget
2  information was.
3    A.  Okay.  They are the annual reports of
4  the bellwether governments about spending and
5  revenues.  The exact name of them are -- is
6  somewhere later in my report.  They come out
7  every year.
8    Q.  Okay.  So when you say that you and
9  the team under your direction reviewed budget
10  information, are you referring to anything
11  besides these annual reports?
12    A.  That's what I'm referring to here.
13    Q.  Okay.  And when you refer to you and
14  your team under your direction reviewing
15  expenditure information, what expenditure
16  information are you talking about?
17    A.  This would be the same documents.
18    Q.  Okay.  So when you refer to budget
19  information and expenditure information, you're
20  referring to these annual reports?
21    A.  Yes.
22    Q.  Did you look at anything besides these
23  annual reports in order to identify affected
24  divisions?

26 (Pages 98 to 101)

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    A.  I don't recall, so I don't want to say
2  definitely no or definitely yes.  I may have
3  looked at other materials.
4    Q.  But sitting here today, what you
5  remember looking at are the annual budget
6  reports for Summit County and Cuyahoga County?
7    A.  Yes, I can absolutely confirm that I
8  looked at many of those documents.  I don't
9  recollect what other ones I may have looked at.
10    Q.  Now, when you looked at these annual
11  reports for Summit County and Cuyahoga County,
12  what was it in the reports that helped you
13  identify whether they were affected or not by
14  the opioid crisis?
15    A.  Well, primarily the functions,
16  reported functions of the division.
17    Q.  What do you mean by that, "the
18  reported functions"?
19    A.  What they did.
20    Q.  Okay.
21    A.  For example, public safety, pursuit of
22  criminals, Children and Family Services taking
23  care of kids who need to be taken out of homes.
24    Q.  Anything more specific than that?

Page 103

1    A.  Sorry, with respect to what?
2    Q.  With respect to what you saw in these
3  annual budget documents that identified for you
4  that they were affected by the opioid crisis.
5    A.  Okay.  In general, the areas of
6  affect, or effect, that I would be looking for
7  have to do with crime and public safety, and so
8  I was interested in divisions that had to do
9  with crime and public safety.  I was interested
10  in Children and Family Services, so divisions
11  that were active in that area were also ones I
12  focused on.  And public health.
13    Q.  Is it fair to say that if you read in
14  the annual reports that the particular division
15  had something to do with crime and public
16  safety, you would consider it an effective
17  division?
18    MR. SOBOL:  Objection.
19    A.  I would consider it to be considered.
20  I think it's not -- you need to do more.
21  BY MR. KEYES:
22    Q.  Okay.  Same question for child and
23  family services, is it fair to say that if you
24  read in the annual reports that a particular

Page 104

1  division had something to do with Children and
2  Family Services you would consider it an
3  affected division?
4    MR. SOBOL:  Objection.
5    A.  Well, I would investigate whether it
6  was an affected division.
7  BY MR. KEYES:
8    Q.  Same question for public health --
9    MR. SOBOL:  Objection.
10  BY MR. KEYES:
11    Q.  -- again, you would do more, you would
12  investigate?
13    MR. SOBOL:  Objection.
14    A.  Yes.
15  BY MR. KEYES:
16    Q.  So tell me what you would do to
17  investigate.  You've read the budget reports,
18  you see that a division has something to do with
19  crime and public safety or Children and Family
20  Services or public health, it's now to be
21  considered, as you said, but you need to do more
22  and you need to investigate, right?
23    A.  Yeah, that's fair.
24    Q.  Okay.  So what did you do to

Page 105

1  investigate?
2    A.  Well, each division in the budget
3  documents actually has a pretty extensive report
4  on what they do and what their activities, so
5  you do the first level investigation, then go
6  back into the document and read more to be able
7  to characterize more accurately the nature of
8  how the division might be affected.
9    Then the next -- in that process there
10  would be interviews with the officials to make
11  sure that we were understanding those activities
12  correctly, and then go to the numbers, go to the
13  cost numbers and associate the budget items or
14  expenditure items to the activities as best we
15  could.
16    Q.  You said you would go to the officials
17  to confirm your understanding.
18    A.  Yes.
19    Q.  Yes?
20    A.  I said that.
21    Q.  Okay.  So how did you communicate your
22  understanding to the people who were actually
23  going to talk to the officials?
24    A.  Well, you seem to be making this

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    process more complicated than it was. We
2    understand how the opioid crisis can impact
3    families, how it can impact crime, how it can
4    impact public health. There didn't need to be a
5    lot of explanation to be able to confirm that
6    police officers were not only arresting drug
7    criminals, but they would have been involved in
8    first responder activities. They may be the
9    first on the scene with an opioid overdose.
10   Firefighters may be the first on the scene with
11   respect to opioid overdose. I'm confident that
12   I and members of my team had a joint
13   understanding of what we are looking for in
14   these divisions in terms of the nature of their
15   activities and how might they be influenced by
16   the opioid crisis.
17       Q. When you refer to your team --
18       MR. SOBOL: Have you finished your
19   answer?
20       THE WITNESS: Yes.
21   BY MR. KEYES:
22       Q. When you refer to your team having a
23   joint understanding, you're referring to
24   yourself and the Compass Lexecon personnel?

Page 107

1        A. Yes, I am.
2        Q. Okay. Again, I'm just trying to
3    understand what you did. So you said you
4    reviewed these budget reports. You said if it
5    had to do with public safety, children and
6    family services, or crime that you would -- or
7    public health, you would identify it as a
8    potentially affected division, but you had to do
9    more. You said that you then went and read more
10   about those divisions in the budget documents,
11   correct?
12       A. Yes.
13       Q. And then you said at some point you
14   went to the officials of the two counties to
15   confirm your understanding, right?
16       A. That's correct.
17       Q. But you didn't talk to those officials
18   yourself?
19       MR. SOBOL: Objection.
20       A. Well, I think we've covered this
21   already.
22   BY MR. KEYES:
23       Q. Right, because you --
24       MR. SOBOL: He hasn't finished his

Page 108

1    answer.
2    BY MR. KEYES:
3        Q. Because you --
4        MR. SOBOL: He has not finished his
5    answer.
6        A. I do have one more sentence to say
7    about that.
8        I've already -- we've already
9    discussed this extensively, and it was primarily
10   done by Compass Lex, and I don't remember
11   whether or not I was involved in some of the
12   calls.
13   BY MR. KEYES:
14       Q. Right.
15       But you formed an understanding based
16   on the review of these budget reports you've
17   already described, and you wanted to confirm
18   that understanding. How did you communicate
19   your understanding to the Compass Lexecon people
20   who then went to the local officials to confirm
21   that understanding?
22       MR. SOBOL: Objection.
23       A. I'm going to repeat myself, because it
24   wasn't that complicated. I think we had a joint

Page 109

1    understanding of what it means to be impacted by
2    the opioid crisis. Crime, kids, services
3    needed, first responders, this wasn't higher
4    math, what we're looking for here.
5    BY MR. KEYES:
6        Q. Did you give written directions to
7    Compass Lexecon setting forth your understanding
8    and what they should try to confirm with the
9    local officials?
10       A. No, I don't think so.
11       Q. And when the Compass Lexecon personnel
12   spoke with the local officials, did they ever
13   report back to you on what they learned?
14       A. Yes, they did.
15       Q. And what did they tell you about these
16   interviews with these officials that confirmed
17   your understanding of which divisions were
18   affected?
19       MR. SOBOL: Generally speaking.
20       A. They, after the interviews, had a
21   confirmation that the budget categories were
22   correct and being potentially affected by the
23   opioid crisis.
24   BY MR. KEYES:

28 (Pages 106 to 109)

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    Q.  And was it at that point that then you
2  moved to the second step, which is for each
3  affected division to identify what you call
4  affected costs?
5        MR. SOBOL:  Objection.
6    A.  Broadly speaking, that's correct.
7  BY MR. KEYES:
8    Q.  And in your approach, affected costs
9  are costs that vary as the composition of
10  opioid-related services provided by that
11  division changes?
12    A.  Broadly that's correct.
13    Q.  Okay.  And you -- go ahead.
14    A.  They may vary in the activity against
15  which they're directed.
16    Q.  And you break so-called affected costs
17  down into two buckets, compensation costs and
18  non-compensation costs, correct?
19    A.  That's correct.
20    Q.  Okay.  So I want to review your
21  process for identifying the affected costs for
22  any particular affected division.  Okay?  You
23  say you looked at detailed expenditure data for
24  Cuyahoga County.

Page 111

1    A.  Yes, I did.
2    Q.  And you say you looked at expenditure
3  data for Summit County.
4    A.  I did.
5    Q.  Would you turn to Page 34 of your
6  report?
7    A.  Sure.
8    Q.  Are you there?
9    A.  Yes.
10    Q.  At the bottom of Page 34 you say,
11  "Detailed expenditure data for Cuyahoga County
12  were obtained from the Cuyahoga County Budget
13  Office for all divisions and departments within
14  these divisions."
15        Do you see that?
16    A.  Yes.
17    Q.  And then you drop a footnote, footnote
18  82, which references one document, Bates number
19  CUYAH_014627783.
20        Do you see that?
21    A.  I do, yes.
22    Q.  Okay.  So is that the document that
23  contains this detailed expenditure data for
24  Cuyahoga County?

Page 112

1        MR. SOBOL:  That's referenced here.
2    A.  I would -- I don't remember what
3  014627783 is.
4  BY MR. KEYES:
5    Q.  Well, you say that -- let's turn this
6  over -- you also received expenditure data for
7  Summit County from the county government, and
8  you list SUMMIT_001952976.
9        Do you see that?
10    A.  I do, yes.
11    Q.  Did you look at any other expenditure
12  data for Summit County?
13    A.  I looked at every year for these
14  places.
15    Q.  Okay.
16    A.  And I don't remember the footnotes or
17  what these things exactly are referring to, but,
18  yeah, a lot of documents.
19    Q.  So were these budget documents or
20  something different when you reference this
21  expenditure data?
22    A.  Well, I --
23        MR. SOBOL:  Objection to form.
24    A.  The expenditure data were actuals that

Page 113

1  came from the annual reports which were actual
2  expenditures.
3        The budgeted, as I mentioned earlier,
4  I believe, referred just to the last year.
5  BY MR. KEYES:
6    Q.  So other than the two files that are
7  listed here in these footnotes, what expenditure
8  data did you look at for either Cuyahoga County
9  or Summit County?
10    A.  Well, as I said, I don't know exactly
11  what this Bates is referring to or the one in
12  footnote 83 without checking exactly what
13  documents are referred to there, but I looked at
14  the budget documents for all the years for both
15  jurisdictions.
16    Q.  Other than the budget documents, did
17  you look at any expenditure data?
18    A.  By that I mean expenditure data.  I
19  try to keep that clear, but maybe I haven't been
20  as clear as I should be on that.
21        So for the years up through, I
22  believe, 2017, these are reports of what was
23  actually spent by category and sometimes by line
24  item in these affected divisions.  For 2018, the

29 (Pages 110 to 113)

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1   actuals were not yet in at the time I did this,
2   and there the budgets needed to be looked at.
3   So they were planned expenditures, you would
4   say.
5       Q.   So is it one document that contained
6   all the expenditure data for Cuyahoga County up
7   through 2017?
8       A.   Some of the documents included more
9   than one year, but there was an annual report
10  every year.
11      Q.   Okay.  Same question for Summit
12  County, was it one document that contained all
13  the expenditure data for Summit County up
14  through 2017?
15      A.   Some of the documents included more
16  than one year, but it was a report for each
17  year.
18      Q.   Okay.  Well, you tell me, because you
19  say in the very next sentence, Paragraph 59, you
20  say, "From these expenditure data, I identify
21  those costs that would be expected to vary in
22  response to changes in the services provided by
23  these divisions."
24          Do you see that?

Page 115

1       A.   Yes.
2       Q.   And these expenditure data refers to
3   the two documents that were noted in footnotes
4   82 and 83 --
5           MR. SOBOL:  Objection.
6   BY MR. KEYES:
7       Q.   -- correct?
8           MR. SOBOL:  Objection.
9       A.   Well, I think I've commented on the
10  particular Bates numbers in those footnotes.
11  And I don't know exactly what that's referring
12  to, so it's hard for me to answer precisely with
13  respect to that Bates number.  But what I can
14  tell you is I looked at expenditure data for
15  each division for each bellwether for each year.
16  BY MR. KEYES:
17      Q.   So describe that data for me.
18          MR. SOBOL:  Objection.
19  BY MR. KEYES:
20      Q.   Tell me what you looked at.
21      A.   It comes in a big book, and it is
22  organized around the organization of the
23  government.  And then there are divisions and
24  sometimes departments within divisions, and

Page 116

1   there is multiple tables that describe in
2   summary form and in detail form what the
3   spending is for each unit per division.
4       Q.   How did you use that data, then, to
5   identify what you call affected costs?
6       A.   Okay.  The purpose here is to
7   identify, as you said in your earlier question,
8   costs that might vary as the demands put on
9   public services by the opioid crisis vary.
10          So, for example, there will be some
11  costs that do not fall in that category.  If
12  there's an IT system and IT staff with respect
13  to the police department, I made the assumption
14  for labor categories that seemed to be
15  associated with kind of fixed costs or
16  overhead-type expenditures that those people
17  would not -- the cost associated with those
18  people would not be affected as the opioid
19  crisis went up or down.
20          But there was other personnel such as
21  police officers who are involved in crime
22  prevention who would be affected by the opioid
23  crisis.  And the budget documents are actually
24  quite detailed in terms of the job title, the

Page 117

1   salaries of these people, enabling me in most
2   cases to be -- to make a pretty good
3   determination, in my view, that the costs are
4   allocated reasonably between those that might
5   and might not be affected by the waxing and
6   waning of demands presented by opioids.
7       Q.   So you would do this based on -- what
8   information --
9           MR. SOBOL:  You just asked an
10  open-ended question.  You should find out
11  whether the witness has finished his answer.
12  BY MR. KEYES:
13      Q.   Have you finished with your answer?
14      A.   Yes, I am.
15      Q.   So how did you go about specifically
16  going through the expenditure data to determine
17  whether something was overhead or not overhead?
18      A.   It was, you know, my judgment based on
19  the job activities of the people involved.
20      Q.   Did you use someone else's judgment to
21  assist you, or solely your judgment?
22      A.   I think we discussed it as a team at
23  different times, yeah.
24      Q.   Who else did you discuss it with?

30 (Pages 114 to 117)

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    A.  This would have been a Compass Lex
2  team effort.
3    Q.  Who?
4    A.  Same team we discussed.  Hal would
5  have been in this, I'm not sure about Evan, but
6  Alice and Erica.
7    Q.  And then how would you know whether
8  something was fixed or not, to use your term,
9  based on your review of the expenditure data?
10    A.  Well, once I made a determination that
11  I put it into fixed costs, if it weren't fixed
12  then I'm being conservative, so I tried to be
13  reasonable and even conservative in that
14  allocation.  And if I put the IT staff in the
15  fixed cost area, even if they're not, even if
16  more crimes lead to overtime of the IT guys,
17  then since I'm not counting it, I didn't worry
18  about it after that.
19    Q.  You've identified IT as an example of
20  a fixed cost, right?
21    A.  Yes.
22    Q.  My question is broader than that.
23    When you're looking through the costs
24  in the expenditure data, how do you determine

Page 119

1  whether that cost is fixed or not?
2    A.  It was a matter of judgment.
3    Q.  Okay.  And how did you bring your
4  judgment to bear to determine for any particular
5  cost whether it was fixed or not?
6    A.  Well, economists deal in costs of
7  different types, there's marginal costs, there's
8  variable costs, there's fixed costs, so as just
9  general training one is oriented to this kind of
10  distinction.  And I went through the budget, in
11  many cases job title by job title, to make a
12  determination of, with respect to the
13  compensation costs, where people belonged in one
14  or the other.
15    Q.  So you looked at this expenditure
16  data, you used your judgment to determine
17  whether it was fixed or not, overhead or not?
18    A.  Broadly speaking, that's correct.
19    Q.  Okay.  And then you say "This
20  identification" -- that is, the identification
21  of varied costs, variable costs -- "was also
22  informed by discussions with the personnel in
23  the respective divisions."
24    How was that accomplished?

Page 120

1    A.  I mean, it would have been the same
2  process.  Talking to them.
3    Q.  So did you have a list that broke out
4  all of the costs into variable costs and fixed
5  costs, and that list was then provided to
6  Compass Lexecon, and Compass Lexecon reviewed it
7  with personnel from Summit County or Cuyahoga
8  County?
9    MR. SOBOL:  Objection.
10    A.  It wasn't as mechanical as that.
11  There had to be a classification into one or the
12  other, so in that sense, yes, there was a list
13  for each of the, you know, many, many
14  expenditure categories for a particular
15  division.  So this was no, this was yes, this
16  was no, this is yes.  So that's -- in a sense
17  there was a list.
18    The list wasn't -- didn't come from me
19  to them.  It came as a team effort to determine
20  which of the things belong in one category or
21  the other, and then it's confirmation that --
22  you know, it's not mechanical, but general
23  confirmation with officials in the local
24  jurisdictions.

Page 121

1  BY MR. KEYES:
2    Q.  What do you mean it's not mechanical?
3    A.  Well, it is what I just described it
4  to be, which to me wasn't a mechanical Tom's
5  list, CL's list, send list to officials.  It
6  was, we made this determination, we checked with
7  them with respect to some things that might have
8  been unclear.
9    Q.  When you said "we made the
10  determination," you're talking about you and
11  your Compass Lexecon team?
12    A.  Yes, that was inputs from not just me.
13    Q.  And based on the inputs from your team
14  and your judgment, you took every cost and you
15  put it into one category or the other, it was
16  either variable or it was fixed, correct?
17    MR. SOBOL:  Objection.
18    A.  Basically that's the methodology, yes.
19  BY MR. KEYES:
20    Q.  What steps were taken then to take
21  that list that breaks every cost into variable
22  or fixed and confirm it with someone at the
23  county?
24    MR. SOBOL:  Objection.  Asked and

31 (Pages 118 to 121)

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    answered.
2        A.  There, in most cases it's pretty clear
3    where a certain cost belongs, and in those cases
4    it's just pretty clear.
5    BY MR. KEYES:
6        Q.  Meaning no one followed up with
7    someone at Summit County or Cuyahoga County,
8    correct?
9        MR. SOBOL:  Objection.
10       A.  Well, everything wasn't cleared with
11   officials in Summit County.  If I were confident
12   that it was a variable cost, then I'm prepared
13   to stand behind it.
14   BY MR. KEYES:
15       Q.  Okay.  So I understand you formed your
16   judgment, every cost category was put into
17   variable cost or fixed cost, Compass Lexecon
18   participated in that process, correct?
19       A.  Yes.
20       Q.  If I understand you correctly, you
21   said that not every determination was then
22   cleared with officials from Summit County or
23   Cuyahoga County because you were so confident
24   you got it right --

Page 123

1        MR. SOBOL:  Objection.
2    BY MR. KEYES:
3        Q.  -- right?
4        A.  In many cases I was very confident
5    that this determination was correct.
6        Q.  Okay.  But there are other instances
7    where you weren't very confident, where there
8    was some step to go to the officials to confirm
9    your judgment as to whether it was a fixed or a
10   variable cost, right?
11       A.  I believe there were some that were
12   unclear, and there was -- some additional work
13   had to be done by Compass Lex to make that
14   determination.
15       Q.  Which ones were unclear?
16       A.  I don't remember.
17       Q.  And so for the ones that were unclear,
18   I realize you don't remember which ones they
19   were, but the ones that were unclear, you say
20   some additional work had to be done.  I take it
21   that work was to go to people at Summit County
22   or Cuyahoga County to get them to tell you
23   whether you were right in either calling that
24   cost variable or fixed?

Page 124

1        MR. SOBOL:  Objection.
2        A.  Well, let me give you an example which
3    I think will be helpful in understanding.
4        Initially the costs associated with
5    vehicles, police cars, was not put in the
6    variable category, and that seemed to me to be
7    overly conservative, that if police are riding
8    around and dealing with opioid problems they're
9    going to use their cars more frequently, and
10   some of their auto expenses would be properly
11   regarded as variable.  So that means, okay, what
12   about this cost.  We went back into the
13   documents, looked at the capital costs.  Some of
14   them are in the capital budgets as opposed to in
15   the expenditure budget, so we take a look at
16   that, and what should be done about that.
17       And I'm not 100 percent sure that this
18   would have been talked about with the local
19   official, but that's an example of the kind of
20   thing where there was some uncertainty about how
21   we should handle police cars.
22   BY MR. KEYES:
23       Q.  But I'm trying to get to your
24   methodology as a general matter.

Page 125

1        You've gone through all of the costs
2    for each of the affected divisions, and you've
3    made a judgment whether that -- each cost is
4    fixed or variable.  You said some you were very
5    confident about.
6        A.  Most I was very confident about.
7        Q.  And those didn't require any further
8    confirmation?
9        A.  Not in my view.
10       Q.  But there were others where you were
11   not very confident, correct?
12       MR. SOBOL:  Objection.
13       A.  Well, I just gave you an example of
14   one.
15   BY MR. KEYES:
16       Q.  Okay.
17       A.  That sort of looks like a fixed cost,
18   but on the other hand, you can make an argument
19   it's a variable cost.
20       Q.  And how do we reconstruct which ones
21   you were very confident about and which ones you
22   weren't?
23       A.  I'm confident in all the
24   classifications that are available to you.

32 (Pages 122 to 125)

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1    Q.  How do we reconstruct which ones you
2    were very confident on and which ones you were
3    not very confident based on your review of the
4    cost categories before you sought confirmation
5    from some unspecified local officials?
6        MR. SOBOL:  Objection.
7    BY MR. KEYES:
8        Q.  Is there any way to reconstruct that
9    now?
10        MR. SOBOL:  Objection.
11        A.  I'm not sure that would be -- I think
12    it's -- I'm sure you and everyone has been
13    involved in these complicated decisions about
14    something that is mostly conversation, and it's
15    hard for me to think how one would reconstruct
16    that beyond talking to the people.
17        But even then, like, I can't tell you
18    necessarily which of the categories, what we
19    thought about IT, what we thought about health
20    insurance costs, whether they would be regarded
21    as fixed or variable.  All those things were
22    considered, and it was a process is all I can
23    tell you.
24    BY MR. KEYES:

Page 127

1        Q.  Okay.  But again --
2        A.  Excuse me.
3        The answer to that process of what I
4    decided is described exactly in this report, and
5    I'm very confident that the variable costs are
6    variable, and if there's some evidence or some
7    question you have about any particular cost,
8    then I'm all for talking about it.
9        Q.  Okay.  But which ones of those are you
10    very confident about now because of the
11    reassurance Compass Lexecon got from Summit
12    County and Cuyahoga County officials?
13        MR. SOBOL:  Objection.
14        A.  I wouldn't have included something in
15    the variable cost category unless I were
16    confident about it.  Some of them seemed obvious
17    to me.  And compensation for beat cops, that's a
18    variable cost.  Some others, I don't remember
19    the process, it may have been a team discussion,
20    it may have been a confirmation with officials,
21    but it was ultimately an economic decision about
22    what are the variable costs associated with
23    these divisions, taking what I considered to be
24    a pretty conservative approach and not putting

Page 128

1    everything into a variable, but to explicitly
2    set aside stuff that -- cost categories that
3    wouldn't seem in the short run to vary with the
4    nature of, say, crime or the nature of why a
5    child is taken from a home, why a corpse comes
6    into the medical examiner.  There's some things
7    that don't vary with that, which I set aside.
8    BY MR. KEYES:
9        Q.  Can you identify which of the cost
10    categories you were not confident about based on
11    your review of the expenditure data such that
12    someone from Compass Lexecon went out to local
13    officials to get some kind of confirmation?
14        MR. SOBOL:  Objection.  Asked and
15    answered twice.
16    BY MR. KEYES:
17        Q.  Can you identify those today?
18        MR. SOBOL:  Objection.  Asked and
19    answered twice.
20        A.  I believe I answered that question
21    completely a few minutes ago.  If you'd like me
22    to take another shot at it, I'm happy to do
23    that.  The cost categories that you see in my
24    report, I'm confident in all those cost

Page 129

1    categories.  I use my judgment as an economist
2    to identify what I thought were variable costs.
3    Some of this involved discussion with team
4    members who may have been more familiar with
5    some of the operations of the division, and some
6    of it may have involved confirmation with local
7    officials, but I don't remember.
8    BY MR. KEYES:
9        Q.  I'm not asking you about confidence
10    today.
11        MR. SOBOL:  He's not finished.
12        A.  One more second.
13    BY MR. KEYES:
14        Q.  You're not answering my question.
15        MR. SOBOL:  You're interrupting his
16    answer.
17        MR. KEYES:  I am, because he said it
18    before, and he's not answering the question.
19    BY MR. KEYES:
20        Q.  Do you understand the question?
21        MR. SOBOL:  He understands the
22    question.  If you want to interrupt him,
23    interrupt him, but he's going to continue the
24    answer to the question when you finish your

33 (Pages 126 to 129)

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    interruption.
2    BY MR. KEYES:
3         Q.  Do you understand my question?
4         MR. SOBOL:  Don't answer that
5    question.  Finish answering the other question
6    that he asked so he doesn't create a record
7    which is inaccurate.
8         A.  I was about to wrap up and say while
9    I'm confident in all the cost allocations that
10   are made in my report, I don't remember, you
11   know, which one would have been -- at what stage
12   the confidence arose.
13   BY MR. KEYES:
14        Q.  So can you identify for me now which
15   of the cost categories you are not confident
16   about based on your review of the expenditure
17   data such that someone from Compass Lexecon went
18   out to local officials to get some kind of
19   confirmation?
20        MR. SOBOL:  Asked and answered four
21   times.
22   BY MR. KEYES:
23        Q.  Can you identify those categories?
24        MR. SOBOL:  Asked and answered four

Page 131

1    times.
2         A.  I'm not sure what I said earlier did
3    not answer that question.
4    BY MR. KEYES:
5         Q.  It's a yes-or-no question.
6         A.  If you want me to repeat the answer,
7    I'm happy to do that.
8         Q.  I don't want you to explain what you
9    think now and why you're confident now.  I'm
10   trying to understand which ones were so obvious
11   to you based on your review of the expenditure
12   data and which ones you said, this is my
13   judgment, but I'm not certain, we should go
14   check with the local officials.  And I can't get
15   an answer from you as to which ones those were.
16        I want to know which ones required
17   going out to local officials.  Can you tell me
18   which ones those were?
19        MR. SOBOL:  Andrew, I think you're
20   frustrated because you haven't listened to his
21   answers.  If you'll listen to the answer, you'll
22   hear the answer to the question in it.  He'll
23   repeat himself, but you're not listening.
24        A.  I want to make clear that every

Page 132

1    allocation in my report between variable and not
2    variable costs is ones -- is an allocation that
3    I'm comfortable with -- more than comfortable
4    with, I'm confident in.  Some of those were such
5    that it seemed obvious to me as an economist
6    that a cost category such as a beat cop would be
7    one that, okay, we're going to make this
8    variable, and that doesn't need discussion with
9    the team, that doesn't need any kind of
10   follow-up at all.
11        Other cost categories were ones that I
12   needed more.  Police cars are a good example of
13   that.  It seemed to me it's in the capital
14   budget.  So maybe I think capital is fixed, but
15   on the other hand, cars wear out.  The more
16   driving around police do, the faster they wear
17   out.  It seemed after consideration and
18   discussion with my team that some of the police
19   car costs should be put into the variable cost
20   category.  There were others that would have
21   needed confirmation from local officials.  I'm
22   not sure which those were.
23        But in the end, I stand by all of my
24   classifications, and if there's any one you want

Page 133

1    to question, please bring it up.
2    BY MR. KEYES:
3         Q.  Is there any way to reconstruct which
4    cost categories fell into the three buckets you
5    just outlined?
6         MR. SOBOL:  Objection.
7         A.  My memory would not be probably the
8    best way to do that, but one could attempt to
9    talk to the people involved and do the best you
10   can in a reconstruction.
11   BY MR. KEYES:
12        Q.  Is there any other way besides talking
13   to the people at Compass Lexecon to determine
14   which cost categories fell into each of the
15   three budgets you outlined?
16        MR. SOBOL:  Objection.
17        A.  I can't think of any.
18   BY MR. KEYES:
19        Q.  Would you turn to Page 39 of your
20   report.  Paragraph 69, you say, "The approaches
21   for other Bellwether divisions generally follow
22   the examples above; however, there are
23   idiosyncrasies within the Bellwether divisions
24   that require modifications of this approach for

34 (Pages 130 to 133)

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    some divisions and/or years."
2        Do you see that?
3        A.  Yes.
4        Q.  What are the idiosyncrasies to which
5    you are referring?
6        A.  Let me see what this is here.
7        So what I'm doing in the report here
8    is explaining for the reader how this works, and
9    it is -- involves a lot of work with a lot of
10   numbers for divisions.  And what I chose to do
11   in the report was to pick out one of the
12   divisions and explain in detail how that
13   decision about affected cost gets determined.  I
14   didn't want the reader to think that this is
15   exactly the way it happened in every division.
16       So by idiosyncrasies, it just means it
17   depends on the division how one would kind of
18   make these different determinations.  The total
19   cost would be pretty much the same.  The costs
20   associated with wages and salaries and benefits,
21   those are common to all the divisions.
22       Then the overhead adjustment, that's
23   where differences creep in.  There are
24   idiosyncrasies with respect to the nature of

Page 135

1    overhead adjustment in each of the divisions.
2        Q.  Are there -- you referred to
3    idiosyncrasies in terms of your overhead
4    adjustment.  Are you referring to any other
5    idiosyncrasies?
6        A.  Well, given 1, 2 and 3, where
7    idiosyncrasies come in within the terms of 3,
8    then 4 follows.  That's just a multiplication.
9    More idiosyncrasies come in on the affected
10   non-compensation costs.  Some divisions, for
11   example, contract out for services.  Most don't.
12   And so those contracting out for services need
13   to be considered as part of a variable cost, and
14   a determination is made.
15       But it's not the same cookie-cutter
16   division by division.  It depends on what they
17   do.  It depends on what they spend their money
18   on.  Then we got affected non-compensation costs
19   offset to affected compensation costs.  This
20   offset could be a governmental transfer, for
21   example, that's division-specific, so that's
22   another source of idiosyncrasy.  And the same
23   with non-compensation costs.
24       So I don't know, you have to -- this

Page 136

1    was a description of the steps, but the actual
2    application of those in each division varied
3    somewhat.
4        Q.  Did you write this report?
5        A.  Yes, I did.
6        Q.  You actually drafted the language?
7        A.  Yes.
8        Q.  Would you turn to Paragraph 65.
9    That's on Page 37.  And you discussed the
10   overhead adjustment factor.
11       A.  Yes.
12       Q.  You say that you identified the
13   "personnel involved in activities that are
14   unlikely to be related to providing services
15   that are affected by opioids."
16       Do you see that?
17       A.  Yes.
18       Q.  Okay.  And are you able to tell me
19   anything more than what you've already said
20   about how you went about identifying those
21   personnel for purposes of calculating your
22   overhead adjustment factor?
23       MR. SOBOL:  Objection.
24       A.  Well, beyond the statement that it's a

Page 137

1    division-by-division decision and allocation of
2    particular job titles into those two different
3    categories which depends on the division.
4    BY MR. KEYES:
5        Q.  Once you thought you had identified
6    the personnel who were involved in activities
7    unlikely to be related to providing services
8    that are affected by opioids, did you take any
9    steps to validate your identification to confirm
10   you got it right?
11       A.  Well, in the case of that decision,
12   suppose I take a police chief and say, chief,
13   you're not -- we have to keep you around anyway,
14   and you're not variable with respect to demands
15   on opioids.  If I'm right, I'm right.  If I'm
16   wrong, I'm being conservative.
17       So by the nature of this allocation,
18   it's being at least conservative.  So even if
19   there were some variable costs in that cost
20   category, as long as I'm not counting them, then
21   I'm being conservative in the report.
22       Q.  You just explained to me why you think
23   you were being conservative.  That wasn't my
24   question.

35 (Pages 134 to 137)

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  My question was, what steps did you
2  take to investigate and confirm that you got it
3  right when you identified people who you thought
4  were involved in activities unlikely to be
5  related to providing services affected by
6  opioids?
7  MR. SOBOL: Objection. Asked and
8  answered.
9  A.  This is really an example of the kind
10  of question we went around and around on a bit
11  ago.  This is a classification issue.  Do they
12  belong over here?  Do they belong over there?
13  And the way I answered that question
14  was saying that on the basis of my kind of
15  experience and training as an economist, I felt
16  confident in some.  Some needed team
17  discussions, some needed beyond that, maybe
18  there's something the local officials can help
19  with.  I don't remember which of these
20  allocations fell into where in that process each
21  of those allocations worked themselves out.
22  BY MR. KEYES:
23  Q.  When you identified what you consider
24  to be affected non-compensation costs, what

Page 139

1  steps did you take to investigate or test your
2  belief that those affected non-compensation
3  costs, in fact, varied with the level of
4  services affected by opioids?
5  A.  Well, this is another version of the
6  same question.  This is putting things into this
7  bucket or that bucket.  Some lab supplies, say,
8  seemed that they would vary in proportion to the
9  number of autopsies performed, so that seemed
10  like an easy one to me.  Others would have
11  required team discussion.  Others would have
12  benefited by confirmation.
13  Q.  So again, you've got the three buckets
14  of obvious to you, call for team discussion, and
15  required confirmation from local officials.
16  MR. SOBOL: Objection.
17  BY MR. KEYES:
18  Q.  Right?
19  MR. SOBOL: Objection.
20  A.  Well, I'm really describing a process
21  here.
22  BY MR. KEYES:
23  Q.  As part of your process, though, these
24  affected non-compensation costs fell into one of

Page 140

1  these three buckets?  Bucket is my word, but
2  you're dividing them into three groups?
3  A.  I'm describing a three-step process.
4  The bucket analogy or metaphor is kind of
5  oversimplification and would seem to indicate
6  that there's a bright line between this bucket,
7  that bucket, and that bucket.  And these are --
8  it's a process.
9  Q.  But can you tell me which of those
10  affected non-compensation costs you sought
11  confirmation for?
12  MR. SOBOL: Objection.
13  A.  Well, this is another version of the
14  question I talked about earlier, and in this
15  process of making a determination of in that
16  bucket or this bucket, some I felt confident I
17  could make on my own, some were discussion, more
18  discussion, some would have involved checking.
19  I can't tell you sitting here which of those --
20  where they fell out in that process into being
21  put into one bucket or the other.
22  BY MR. KEYES:
23  Q.  Once you identified what you
24  considered to be the affected divisions, and

Page 141

1  then for each affected division the affected
2  costs, you then attempted to estimate the
3  damages -- what you call damages incurred by
4  those affected divisions as a result of
5  defendants' misconduct, correct?
6  A.  That's right.
7  Q.  And for that you say you rely on the
8  analyses and opinions presented in the Cutler
9  report?
10  A.  That's correct.
11  Q.  So you used the percentages that were
12  derived by Professor Cutler, correct?
13  A.  That's correct.
14  Q.  And is it your understanding that
15  Professor Cutler calculated these percentages
16  using regression analyses?
17  A.  Yes, he did.
18  Q.  Did you replicate Professor Cutler's
19  regression analyses?
20  A.  I didn't conduct my own regression
21  analysis, no.
22  Q.  Did you test Professor Cutler's
23  regression analyses?
24  A.  Well, they -- I tested them in the

36 (Pages 138 to 141)

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1   sense of seeing whether I thought they were
2   reasonable, but I didn't conduct any statistical
3   tests on them.
4       Q.  Did you validate his regression
5   analyses in any way?
6       MR. SOBOL:  Objection.
7       A.  What -- can you explain what you mean
8   by "validate"?
9   BY MR. KEYES:
10      Q.  Yes, confirm that the estimates that
11  he arrived at using his regression analyses are
12  correct.
13      A.  Well, I was familiar enough with the
14  process to know he was doing it correctly.
15      Q.  Did you do your own analysis to
16  attempt to replicate, test, or validate his
17  results?
18      MR. SOBOL:  Objection.  Asked and
19  answered.
20      A.  I didn't replicate his statistics.  I
21  did tests in the sense of asking myself, do
22  these seem reasonable, which they do.  And then
23  validate, I was aware of his methods and thought
24  they were valid methods.

Page 143

1   BY MR. KEYES:
2       Q.  Do you have the expertise to replicate
3   the regression analyses that Professor Cutler
4   performed?
5       MR. SOBOL:  Objection.  Asked and
6   answered.
7       A.  Well, the hard part of what Cutler did
8   is not writing a one-line Stata code given the
9   specification to come up with his estimates, and
10  I certainly do have -- I could run one line of
11  Stata code.  The hard part of what Professor
12  Cutler did is finding the right data,
13  determining the right specification, in some
14  cases interpreting correctly.  That -- he's
15  better than me for that kind of stuff.
16  BY MR. KEYES:
17      Q.  If Professor Cutler's percentages are
18  wrong, that would have a direct negative impact
19  on your calculations, correct?
20      MR. SOBOL:  Objection.
21      A.  Depends on what direction they're
22  wrong, unless I'm misunderstanding what you mean
23  by "negative."
24  BY MR. KEYES:

Page 144

1       Q.  Well, if his percentages are too
2   high --
3       A.  Okay.
4       Q.  -- what impact does that have on your
5   calculations?
6       A.  His percentages attribute -- I'm
7   trying to make sure I understand here --
8   attribute too high a percentage to defendants'
9   misconduct.  Then since it's a proportional
10  analysis that I do using those numbers, if his
11  numbers fall in some proportion, my damages
12  numbers would fall in the same proportion.
13      Q.  Does Professor Cutler rely on the work
14  of Professor Rosenthal?
15      A.  Yes, he does.
16      Q.  What is your understanding of what
17  Professor Rosenthal did?
18      A.  Professor Rosenthal investigated the
19  empirical connection between a certain kind of
20  marketing by defendant manufacturers and
21  shipments at the national level, shipments of
22  prescription opioids.
23      Q.  Did Professor Cutler, to your
24  knowledge, replicate Professor Rosenthal's

Page 145

1   regression analyses?
2       MR. SOBOL:  Scope.  Objection, scope.
3       A.  Not to my knowledge.
4   BY MR. KEYES:
5       Q.  Okay.  Are you aware of anything that
6   Professor Cutler did to test or validate
7   Professor Rosenthal's work?
8       A.  Well, I think his role with respect to
9   Professor Rosenthal would have been a little bit
10  like my role with respect to him.  Did it make
11  sense to him?
12      And so before I go on, I shouldn't
13  answer from his kind of subjective perspective,
14  so this -- maybe that's a question for Dave and
15  not for Tom.
16      Q.  If Professor Rosenthal's work has
17  flaws, does that have an impact on
18  Professor Cutler's work?
19      MR. SOBOL:  Objection.  Scope.
20      A.  I think it depends on what you're
21  talking about in terms of what flaws you might
22  mean.
23  BY MR. KEYES:
24      Q.  Well, if Professor Rosenthal's

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    percentages are wrong, that has an impact on
2    Professor Cutler's work, correct?
3        A.  Well, there's, again, a proportional
4    mathematical relationship between shares that
5    Professor Rosenthal estimates and shares that
6    David then provides to me.  So mathematically,
7    if Meredith -- Professor Rosenthal's shares are
8    too low, for example, and more of the shipments
9    are attributable to defendants' misconduct, that
10   would raise David's estimated shares of my
11   costs.
12       Q.  And the opposite would be true as
13   well?
14       A.  And the opposite would be true as
15   well.
16       Q.  For your work in your damages report,
17   do you rely at all on Professor Gruber's work?
18       A.  Well, you know, broadly, some of the
19   things that Professor Gruber says in his report
20   are consistent with the analyses of both
21   Professor Cutler and Rosenthal, so my numbers
22   come from Rosenthal-Cutler.
23       My understanding and the
24   reasonableness of my conclusions are confirmed

Page 147

1    by Professor Gruber's work.
2        Q.  Do any of the percentages you use come
3    from Professor Gruber's work?
4        A.  No, the percentages don't.
5        Q.  Do all the percentages that you use in
6    your work come from Professor Cutler?
7        A.  I believe that's correct, yes, for the
8    damages.
9        Q.  Did Professor Cutler's analysis focus
10   only on data from Summit County and Cuyahoga
11   County?
12       MR. SOBOL:  Objection.
13       A.  No, it didn't.
14   BY MR. KEYES:
15       Q.  Okay.  Did he perform his calculations
16   based on national averages?
17       MR. SOBOL:  Objection.
18       A.  I believe most of his empirical
19   analysis was a subset of counties which were, I
20   think, designated large counties, several
21   hundred of these that were about the same size
22   as the bellwether county.
23   BY MR. KEYES:
24       Q.  Several hundred counties across the

Page 148

1    country?
2        A.  Yes.
3        Q.  Which Professor Cutler deemed to be of
4    roughly the same size at Cuyahoga or Summit
5    Counties?
6        MR. SOBOL:  Objection.
7        A.  My understanding is not that they were
8    the same size, but they were large.  They would
9    fit into a category of large, which meant a
10   minimum size.
11   BY MR. KEYES:
12       Q.  And what was the threshold for being
13   large, as you understand it?
14       MR. SOBOL:  Objection.
15       A.  I don't remember.
16   BY MR. KEYES:
17       Q.  And did you do any comparison of the
18   data specific to Cuyahoga County or Summit
19   County versus the data for these several hundred
20   large counties that were part of
21   Professor Cutler's analysis?
22       MR. SOBOL:  Objection.
23       A.  I'm not sure what you're asking.
24   BY MR. KEYES:

Page 149

1        Q.  Well, I asked you whether -- you use
2    Professor Cutler's percentages.
3        A.  That's correct.
4        Q.  Professor Cutler's percentages are the
5    result of his regression analyses, right?
6        A.  That's one of the things that fed into
7    it, yes.
8        Q.  The inputs for his regression analyses
9    are data for what you describe as several
10   hundred large counties around the country,
11   correct?
12       MR. SOBOL:  Objection.
13       A.  That's my understanding of what he
14   used for his regressions.
15   BY MR. KEYES:
16       Q.  And so I'm asking you whether you, in
17   connection with your work in this engagement,
18   did any comparison of the data for these several
19   hundred large counties, as you describe it,
20   versus the data specific to Summit County or
21   Cuyahoga County.
22       A.  What would be the example of what
23   you're trying to get at?
24       Q.  I don't want to limit it to anything.

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    I mean, for any of the data sets that
2 Professor Cutler drew on that you say came from
3 several hundred large counties around the
4 country, did you compare that data set to an
5 equivalent data set that was specific to Summit
6 County or Cuyahoga County?
7    MR. SOBOL:  Objection.
8    A.  Well, my report wasn't sort of
9 empirical at that level, so I think I would say
10 I didn't do it.
11 BY MR. KEYES:
12    Q.  You prepare your calculations for the
13 period 2006 through 2018?
14    A.  That's correct.
15    Q.  Okay.  Why that time period?
16    A.  That was my assignment.
17    Q.  Your assignment from whom?
18    A.  From counsel.
19    Q.  Which counsel?
20    A.  There's a bunch of them.
21    Q.  Well, who gave you that specific
22 instruction?
23    A.  It was a team.  I don't remember which
24 group in particular.

Page 151

1    Q.  Do you remember any of the names?
2    A.  David Ko, Tom Sobol, Joe Rice, Ann
3 Ritter, Derek Loeser.
4    Q.  Anyone else?
5    A.  I'm probably forgetting people, but
6 that's all I can remember right now.
7    Q.  And do you have an understanding as to
8 the rationale for picking that period, 2006
9 through 2018?
10    MR. SOBOL:  That's a yes or no
11 question.
12    THE WITNESS:  Sorry, I didn't hear the
13 objection.
14    MR. SOBOL:  It's a yes or a no
15 question.
16    A.  No.
17 BY MR. KEYES:
18    Q.  Have you done any analysis as part of
19 your engagement to determine whether 2006
20 through 2018 is the appropriate time period for
21 measuring damages, then?
22    MR. SOBOL:  Objection.
23    A.  No, I didn't do that.  I didn't
24 undertake that analysis.

Page 152

1 BY MR. KEYES:
2    Q.  In Appendix IV.B, which is the
3 Materials Considered, you list a few data sets.
4    A.  Is there a page you've got me looking
5 at here?
6    Q.  Well, it's IV.B, and it follows your
7 CV.
8    MR. SOBOL:  Page 6 of the Materials
9 Considered, is that what you're turning to?
10    MR. KEYES:  Well, I'm calling his
11 attention to IV.B first.
12    A.  I'm in IV.B.
13 BY MR. KEYES:
14    Q.  Then there are several categories, and
15 one category are data sources?
16    A.  Okay.
17    Q.  Are you there?
18    A.  Yes.
19    Q.  Okay.  ARCOS data.  Do you see that?
20    A.  Yes.
21    Q.  What is ARCOS data?
22    A.  That's a county level shipments data
23 set.
24    Q.  And who maintains the ARCOS data?

Page 153

1    A.  It's a government function.  I can't
2 remember what level of government.
3    Q.  Do you remember what government branch
4 or agency maintains the ARCOS data?
5    A.  I can't remember.
6    Q.  Did you look at the ARCOS data as part
7 of your damages engagement here?
8    A.  Yes.
9    Q.  What ARCOS data did you look at?
10    A.  These would have been shipment
11 summaries.
12    Q.  Okay.  And how did you receive those
13 shipment summaries?
14    A.  They would have been in tables and
15 figures.
16    Q.  Provided by whom?
17    A.  Provided by staff at Compass Lex, or
18 perhaps Greylock McKinnon.
19    Q.  Did you request the ARCOS data?
20    A.  It had been requested, so wherever the
21 original request came, it wasn't from me.
22    Q.  What do you mean "it had been
23 requested"?
24    A.  Some member of the economic team

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    requested the data. I'm not sure who.
2        Q.  When you refer to the economic team,
3    who are you referring to?
4        A.  The other economic experts in this
5    case.
6        Q.  Referring to Professor Rosenthal,
7    Professor Cutler, Professor Gruber?
8        A.  Yes.
9        Q.  Did you request the ARCOS data?
10       A.  I didn't request it personally.
11       Q.  Okay.  And did you sign a protective
12   order regarding access to and use of ARCOS data?
13       A.  I signed a protective order.  I don't
14   remember signing one with respect to this data
15   alone.
16       Q.  You don't remember signing a
17   protective order specific to ARCOS data?
18       A.  I don't remember.
19       Q.  And was the ARCOS data relevant to
20   your quantification of damages?
21       A.  Yes.
22       Q.  How so?
23       A.  Well, this was the main subject of
24   Professor Cutler's analysis, and it was very

Page 155

1    relevant, how the data turned out and the
2    results turn out for my damages calculation.
3        Q.  Did you use the ARCOS data in your own
4    calculations?
5        A.  I used them in the sense of the
6    results that Professor Cutler obtained from
7    using the ARCOS data.
8        Q.  Okay.  So you're saying the ARCOS data
9    may have been relevant to Professor Cutler's
10   work and the calculations he arrived at,
11   correct?
12       A.  That's -- yes, that's correct.
13       Q.  Separate from Professor Cutler's
14   calculations, was the ARCOS data relevant to
15   the -- did you use the ARCOS data in your work
16   in this engagement?
17       A.  I don't think I used it in any way
18   independent of Professor Cutler's analysis.
19       Q.  You also referenced BLS data?
20       A.  Yes.
21       Q.  What's BLS?
22       A.  That's Bureau of Labor Statistics.
23       Q.  Did you request the BLS data, or was
24   that something requested by someone else on the

Page 156

1    economic team?
2        A.  That would have been requested by
3    someone else on the economic team.
4        Q.  Did you review the BLS data?
5        A.  By "review," do you mean look at the
6    data?
7        Q.  Did you look at it?
8        A.  I looked at some tables from the BLS
9    data.
10       Q.  And did you use the BLS data in your
11   work on the damages engagement, separate and
12   apart from relying on Professor Cutler's
13   percentages?
14       A.  I think I understand the question.
15           This was used by David Cutler who
16   contributed percentages to me, but I didn't do
17   any independent analysis of the BLS data.
18       Q.  Okay.  There are a number of other
19   data sources listed here, and we can go through
20   them one by one, but is the same true for each
21   of these other data sources --
22           MR. SOBOL:  Objection.
23   BY MR. KEYES:
24       Q.  -- that it was requested by someone on

Page 157

1    the economic team, not by you, that it may have
2    been used by Professor Cutler, but separate from
3    what Professor Cutler did to arrive at
4    percentages that you used, you otherwise did not
5    use the data in your work to quantify damages?
6            MR. SOBOL:  Objection.
7        A.  I'm looking.  I'd have to go back and
8    confirm where the crime -- how the crime data
9    plays in here.
10   BY MR. KEYES:
11       Q.  The FBI crime data?
12       A.  The FBI crime data.
13       Q.  Sitting here today, do you know how
14   the FBI crime data is relevant to the work you
15   did separate and apart from relying on
16   Professor Cutler's percentages?
17       A.  I don't want to say the wrong thing.
18   I would have to go back and check and see how
19   the crime accounting was done to be sure.
20       Q.  Okay.  So you don't know as to the FBI
21   crime data.
22           How about the other categories?
23           MR. SOBOL:  Objection.
24   BY MR. KEYES:

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    Q.  Did you actually use the data in any
2  of these other categories that are listed
3  separate and apart from whether they were used
4  by Professor Cutler to arrive at the statistics
5  and the percentages that you used?
6    A.  I would have to go back and check and
7  see about the census data, and even the multiple
8  causes of death data.  This would require a
9  little bit of homework or time --
10    Q.  Okay.
11    A.  -- going back here today.
12    Q.  Well, looking at this list of data
13  sources, can you identify for me any of the data
14  that you used in your work separate and apart
15  from whether Professor Cutler used it to arrive
16  at percentages that you then used?
17    A.  I understand the question.
18        And for a couple of these, I have to
19  go back and check to be sure.
20    Q.  Okay.  And you've identified those.
21    A.  Yes.
22    Q.  What about the other ones?
23    A.  I don't think so.
24    Q.  You don't think you used them?

Page 159

1    A.  I don't think I used them, except for
2  having been used by other -- one of the other
3  economists.
4    Q.  Did you sign any data use agreement
5  with the National Center for Health Statistics?
6    A.  I don't think so, no.
7    Q.  Okay.  Did you sign any data use
8  agreement with the Pacific Institute for
9  Research and Evaluation?
10    A.  I don't think so.
11    Q.  Did you sign any data use agreement
12  with any other organization in connection with
13  your work on this engagement?
14    A.  I can't think of any.
15    Q.  You list on the prior page, Page 5 of
16  Appendix IV.B, Deposition Transcripts.
17        Do you see those?
18    A.  Yes.
19    Q.  Are those the only deposition
20  transcripts you considered?
21    A.  I can't think of any others.
22    Q.  Okay.  And for -- you list six
23  deposition transcripts here, correct?
24    A.  That's right.

Page 160

1    Q.  Did you read all of them?
2    A.  Well, I read some of all of them.  I
3  didn't read all of all of them.
4    Q.  Okay.  So you read -- did you read any
5  of these deposition transcripts in its entirety?
6        MR. SOBOL:  Objection.  Asked and
7  answered.
8    A.  I -- well, some of them I may have
9  more like flipped through and seen all the
10  pages, but I don't claim to have read any of
11  them word for word.
12  BY MR. KEYES:
13    Q.  When you skimmed through them, how did
14  you determine what portions to read or skim or
15  not read or skim at all?
16    A.  This is another one of those processes
17  in which in this case the enterprise was I was
18  interested in certain, in this case, evidence
19  from deposition of local officials, and the
20  primary thing I remember is I'm interested in
21  evidence that the opioid crisis has affected the
22  spending in these divisions in some way that may
23  have moved funds over in one direction from
24  another.  And what I would have done is say, and

Page 161

1  asked my staff, here are depositions of people
2  who might know about that, would you please go
3  through these depositions and see if there's
4  some indication that there's evidence for that.
5    Q.  So did your staff give you summaries
6  or --
7        MR. SOBOL:  He hasn't finished.
8    A.  The process isn't quite over.
9        So they would have flagged certain
10  parts of the deposition, and then I would go
11  back and confirm that that was actually what was
12  being said, my interpretation of what was being
13  said, and then I'd read around that to make sure
14  there wasn't some context I was missing, and
15  then I maybe took a quick look at the rest of
16  the deposition.
17  BY MR. KEYES:
18    Q.  Did anyone on your so-called team
19  prepare any summaries of the deposition
20  testimony?
21    A.  Not so far as I know.
22    Q.  Did you intend to read all of the
23  deposition transcripts in the case?
24        MR. SOBOL:  Objection.

41 (Pages 158 to 161)

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1    A.  I never intended to read all the
2  depositions, no.
3  BY MR. KEYES:
4    Q.  Did you intend to read all the
5  deposition testimony in the case about whether
6  there was evidence that the opioid crisis
7  affected the spending of particular divisions?
8    A.  I think "all" would be an
9  overstatement.  I was looking for sufficient
10  evidence to back up my report, and at this point
11  I thought that was sufficient.
12    Q.  So who identified these six deposition
13  transcripts as being transcripts, at least
14  portions of which you should read for your work
15  in this case?
16    A.  This would have been me saying, I'm
17  interested in testimony of local officials,
18  either in budget documents or something else, or
19  in deposition, that indicates money has been
20  moved as a result of opioid crisis.  So it would
21  have been that level of that's what I would like
22  to see.  And then staff made a determination of
23  who among the deponents maybe has something to
24  say about that, and then they would read those

Page 163

1  depositions.
2    Q.  And when you said "I'm interested in
3  the testimony of local officials either in
4  budget documents or something else, or in
5  deposition, that indicates money has been moved
6  as a result of the opioid crisis," to whom did
7  you say that?
8    A.  That would have been a team-type
9  statement.
10    Q.  The economic team?
11    A.  No, it wasn't to --
12    Q.  Compass Lexecon team?
13    A.  This would have been to Compass
14  Lexecon.
15    Q.  And what steps did you take to make
16  sure that they got their hands on all the
17  deposition testimony that met your parameters?
18    A.  As I explained, I didn't feel it
19  necessary to be exhaustive with respect to the
20  deposition of officials who may have said
21  something about this.  I gave them that general
22  direction.  This came back a pretty substantial
23  list that included backup for me that I felt
24  like, okay, check, I have evidence from local

Page 164

1  officials that this diversion is taking place.
2    Q.  Who does Donna Skoda work for?
3    A.  Donna Skoda.
4    Q.  Does she work for Summit County?
5    A.  I would have a 50/50 chance of getting
6  this right.  I'm sorry if I don't remember.
7    Q.  Does she work for Cuyahoga County?
8    A.  Same chance.
9    Q.  Does she work for someone besides
10  Summit County or Cuyahoga County?
11    A.  I don't remember who she worked for.
12    Q.  Do you remember what her title is?
13    A.  I think she's a budget person, but
14  I'm, again, just trying to recollect as best I
15  can.
16    Q.  Do you remember what division she
17  works for?
18    A.  I don't remember.
19    Q.  Gary Gingell, who does he work for?
20    A.  I don't remember.
21    Q.  Summit County?
22    A.  I don't remember.
23    Q.  Cuyahoga County?
24    A.  I don't remember.

Page 165

1    Q.  Someone other than Summit County or
2  Cuyahoga County?
3    A.  I don't remember.
4    Q.  Do you know his title?
5    A.  I am afraid I don't.
6    Q.  Do you know what division he worked
7  for?
8        MR. SOBOL:  Objection.
9    A.  I'm afraid I don't.
10  BY MR. KEYES:
11    Q.  Is the same true for Greta Johnson?
12        MR. SOBOL:  Objection.
13        What's the question?
14  BY MR. KEYES:
15    Q.  That you don't know who she works for?
16        MR. SOBOL:  Go ahead.
17    A.  I don't remember Greta Johnson, or
18  where she would have worked.
19  BY MR. KEYES:
20    Q.  Do you know what her title was?
21        MR. SOBOL:  Objection.  Asked and
22  answered.
23    A.  I don't remember what her title is.
24  BY MR. KEYES:

42 (Pages 162 to 165)

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1     Q.  Or what division she worked for?
2         MR. SOBOL:  Objection.  Asked and
3     answered.
4         A.  I don't remember that.
5     BY MR. KEYES:
6     Q.  Okay.  How about Jackie Pollard, who
7     did she work for?
8         A.  I don't remember.
9     Q.  What was her title?
10        MR. SOBOL:  Objection.  Asked and
11    answered.
12        A.  I don't -- I don't -- sorry, I don't
13    remember.
14    BY MR. KEYES:
15    Q.  What division did she work for?
16        MR. SOBOL:  Objection.  Asked and
17    answered.
18        A.  I don't remember.
19    BY MR. KEYES:
20    Q.  Margaret Keenan, who did she work for?
21        A.  I don't remember.
22    Q.  What was her title?
23        MR. SOBOL:  Objection.  Asked and
24    answered.

Page 167

1         A.  I don't remember.
2     BY MR. KEYES:
3     Q.  What division did she work for?
4         MR. SOBOL:  Objection.  Asked and
5     answered.
6         A.  I don't remember.
7     BY MR. KEYES:
8     Q.  Molly Leckler, who did she work for?
9         A.  I think she's a substance abuse
10    person.
11    Q.  For?
12        A.  She was talking about drug courts, if
13    I remember her deposition testimony.
14    Q.  Did she work for Summit County or
15    Cuyahoga County, or other?
16        A.  I don't remember which county she
17    would have worked for, sorry.
18    Q.  Do you remember her title?
19        A.  I don't remember her title.
20    Q.  If other people not listed here had
21    testified about whether the opioid crisis
22    affected their division's spending, is that
23    something you would have wanted to see?
24        MR. SOBOL:  Objection.  Asked and

Page 168

1     answered.
2         A.  Well, not necessarily.
3     BY MR. KEYES:
4     Q.  Why not?
5         A.  I think in --
6         MR. SOBOL:  Well, objection.  Asked
7     and answered.
8         A.  In many situations, one needs
9     sufficient information to make a determination.
10    It doesn't mean you need all possible
11    information to make a determination.  And in my
12    judgment, looking through these six depositions
13    gave me sufficient confidence that the approach
14    saying that funds were diverted from other uses
15    to the opioid crisis was a valid and reliable
16    method.
17    BY MR. KEYES:
18    Q.  Which of these six people, if any,
19    worked for the Office of Medical Examiner?
20        A.  I don't remember.
21    Q.  Okay.  If none of them worked for the
22    Office of Medical Examiner, but others who did
23    work for the Office of Medical Examiner were
24    deposed about this very topic, would you want to

Page 169

1     see their testimony?
2         A.  Well, it's the same question I just
3     answered.  This set of deponents gave me
4     sufficient confidence that I was approaching it
5     in the right way.
6     Q.  What if personnel from the Office of
7     Medical Examiner said they couldn't identify any
8     variable costs, would that be relevant to your
9     work?
10        A.  Oftentimes real world people use terms
11    differently than economists use terms, so it
12    depends, I would say.
13    Q.  What if people who worked for the
14    Office of Medical Examiner testified "I can't
15    think of a single expense we had that changed
16    because of the opioid crisis," would that be
17    relevant to your work --
18        MR. SOBOL:  Objection.
19    BY MR. KEYES:
20    Q.  -- to know that they said that?
21        MR. SOBOL:  Objection.
22        A.  It might be relevant.  I would have
23    to -- I wouldn't necessarily conclude that
24    there's no variable costs.

43 (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1    BY MR. KEYES:
2        Q.  Because you think you might be right
3    and they might be wrong?
4            MR. SOBOL:  Objection.
5        A.  I'm approaching the question in a
6    particular way, and I would have to really know
7    the context of how the person -- what the person
8    was asked, how they might see the world, and
9    then try to understand their answer.
10   BY MR. KEYES:
11       Q.  When you gave directions to the
12   Compass Lexecon team to go get confirmation
13   either which divisions you thought were affected
14   or which costs you thought were affected, did
15   you tell them to only go talk to people who had
16   been deposed in the case?
17       A.  No.  This was a very general interest
18   of mine that I articulated early, and it was
19   something I was on the lookout for.
20       Q.  Did Compass Lexecon team talk to
21   people who were not deposed in the case?
22           MR. SOBOL:  Objection.  Asked and
23   answered.
24       A.  They would have talked to some of the

Page 171

1    local officials we talked about earlier.
2    BY MR. KEYES:
3        Q.  You only identified by broad category,
4    you don't remember the names.  So I'm trying to
5    figure out, even if you don't remember their
6    names, do you know whether Compass Lexecon
7    talked to people who worked for Summit County or
8    Cuyahoga County who were not deposed in this
9    case?
10       A.  I am not sure.  Those are two
11   different lists.  Whether their list was
12   deposed, I really can't tell you one way or the
13   other.
14       Q.  There's a discussion in your report
15   starting on Page 23.  It's the section titled
16   "Municipal Governments Have Been Impacted by the
17   Opioid Epidemic:  Examples from Bellwether
18   Governments."
19           Do you see that?
20       A.  Yes.
21       Q.  Starts on 23 and goes through 28.
22           Do you see that?
23       A.  Yes, I do.
24       Q.  And so this discussion on Pages 23

Page 172

1    through 28 is based on what you've read,
2    correct?
3        A.  Well, so far there are references to
4    things I would have read.  It looks like
5    their -- all the backup here is to written
6    material, yes.
7        Q.  Okay.
8        A.  Excuse me.  Pardon me.  There's a
9    deposition of Molly Leckler here.  See if I got
10   it right with respect -- yes, drug court, Molly
11   Leckler.
12       Q.  So the discussion on Pages 23
13   through 28 is based on what you've read?
14       A.  Including the deposition testimony,
15   yes.
16       Q.  Okay.  Is it accurate to say that this
17   discussion on these pages is not based on any
18   firsthand experience of yours?
19       A.  "Firsthand experience," what do you
20   mean by that?
21       Q.  I mean, you are describing what you
22   read, not what you experienced yourself, you
23   didn't see it yourself, you didn't live it
24   yourself.

Page 173

1        A.  You mean, do I have any firsthand
2    experience with drug abuse?  Is that what you're
3    asking?
4        Q.  No.  I'm asking you, the stuff that
5    you've included in here is stuff you've read.
6        A.  We already established that.
7        Q.  It's not based on what you
8    experienced, it's not based on something you
9    studied yourself, these are not studies that you
10   conducted, correct?
11           MR. SOBOL:  Objection.
12           I think you just asked about four
13   questions in a row, so I think you should
14   reframe the question so we make sure it's clear
15   what question he's answering.
16   BY MR. KEYES:
17       Q.  Let's take them one step at a time.
18           The material on Pages 23 through 28,
19   this is not describing any studies you've
20   conducted, correct?
21       A.  These are studies that I and my team
22   identified that would make the point that
23   municipal governments have been affected.
24       Q.  So it is not material that you have

44 (Pages 170 to 173)

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1    studied yourself? These are not studies you
2    conducted yourself?
3        A. It says what they are. Counsel of
4    Economic Advisors, I did not do that study. As
5    part of my professional work, I study the
6    studies.
7        Q. You didn't conduct any of the studies
8    that are referenced on these pages, correct?
9        A. I didn't conduct any studies here.
10       Q. And you didn't personally calculate
11   any of the statistics that are reported on these
12   pages, correct?
13       MR. SOBOL: Objection.
14       A. Oh, gosh, did I? I think these are --
15   it's a review of relevant studies. I didn't
16   conduct any new empirical analysis of any of the
17   things that are reported here in this section.
18   BY MR. KEYES:
19       Q. Did you test or validate any of the
20   numbers or statistics that are in this section?
21       MR. SOBOL: Objection.
22       A. At some place in my report or in this
23   section you're talking about?
24   BY MR. KEYES:

Page 175

1        Q. I'm talking about the discussion on
2    Pages 23 through 28.
3        A. As a self-contained unit, it doesn't
4    count. Validation might have done elsewhere in
5    the report.
6        Q. Did you test or validate any of the
7    numbers or statistics in this section?
8        A. The question is still ambiguous, but
9    I'll try to answer it.
10       I didn't do any validation within this
11   section of the material noted in this section.
12       Q. Do you think you validated it
13   elsewhere in your report?
14       A. I do.
15       Q. Where do you think you validated it
16   elsewhere?
17       A. This would be in my public nuisance
18   report.
19       Q. So you're switching reports.
20       I'm talking about this report, damages
21   report. Did you validate it anywhere in this
22   report?
23       MR. SOBOL: Asked and answered.
24   BY MR. KEYES:

Page 176

1        Q. I want to make sure the record is
2    clear. Your answer is no?
3        MR. SOBOL: Objection.
4        To what?
5        A. Well, let me state what I think is the
6    issue here.
7        Of the studies that are mentioned in
8    this section of my report, I did not in this
9    section of this report conduct any validation of
10   those studies.
11   BY MR. KEYES:
12       Q. Nor did you conduct any validation of
13   those studies elsewhere in your damages report,
14   correct?
15       A. I think that's correct, although I did
16   get around to it in another context.
17       Q. There are some references in your
18   report and in the appendices to a crime-focused
19   adjustment.
20       Do you recall the crime-focused
21   adjustment?
22       A. Yes, I do.
23       Q. What is the crime-focused adjustment?
24       A. Well, this was an approach to

Page 177

1    recognizing that police do things other than
2    deal with criminals. They direct traffic, for
3    example, and I wanted to make a cut at not
4    attributing to opioids variable costs associated
5    with police that might be not likely to be
6    affected by opioids.
7        Q. So do you know which, sitting here
8    right now, which divisions you used a
9    crime-focused adjustment on?
10       A. I think it primarily would have been
11   the law enforcement. I have to go back and
12   check to see if it applied to anything else.
13       Q. Okay. I believe you used it for the
14   office of prosecutor. Why?
15       A. Well, for the same reason. There are
16   different types of crimes, and some may not be
17   affected by opioids.
18       Q. And how did you determine what
19   percentage to use for your crime-focused
20   adjustment for the Office of Prosecutor? Not
21   necessarily the numbers, but what was your
22   method?
23       A. This would have been looking at the
24   underlying documents. Probably it would have

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    required a discussion with the team on this one
2    to make a determination of what goes where.
3        Q.  Was that also a subject of follow-up
4    by the Compass Lexecon team with any officials
5    who worked for Summit County or Cuyahoga County?
6        A.  I'm not sure about that.
7        Q.  I believe you also used a
8    crime-focused adjustment for the Court of Common
9    Pleas.
10        Does that sound right to you?
11        A.  That seems right to me.
12        Q.  Why did you use a crime-focused
13    adjustment for the Court of Common Pleas?
14        A.  Because I think that division handles
15    things that wouldn't be affected by the opioid
16    crisis.
17        Q.  Such as?
18        A.  I didn't want to count them.
19        I'm not sure what the category would
20    be.
21        Q.  Did you take the same approach in
22    trying to arrive at a crime-focused adjustment
23    for the Court of Common Pleas as you did for
24    Office of Prosecutor, which is you used your

Page 179

1    best judgment based on your review of the cost
2    categories?  Then there was a team discussion,
3    and in some instances there was follow-up with
4    local officials?
5        A.  Yeah, the general --
6        MR. SOBOL:  Objection to the form of
7    the question.
8        A.  The general methodology would have
9    been the same.
10    BY MR. KEYES:
11        Q.  I believe you also used a
12    crime-focused adjustment for the sheriff's
13    office.  Does that seem right to you?
14        A.  It does seem right.
15        Q.  Why?
16        A.  For the same reason.
17        Q.  And did you follow the same
18    methodology?
19        A.  The same general process, yes.
20        Q.  You say on Page 20 of your report at
21    Paragraph 35, "On instruction from counsel, I
22    deduct as an offset any revenue received from
23    other governments, or any other external
24    sources, that was provided for the sole purpose

Page 180

1    of funding opioid-specific activities, to arrive
2    at cost to the Bellwether governments net of
3    outside contributions."
4        Do you see that?
5        A.  Yes.
6        Q.  Which counsel gave you that
7    instruction?
8        A.  I don't remember.
9        Q.  What is your understanding of the
10    rationale for that instruction?
11        MR. SOBOL:  Objection.
12        Can you explain why you think that
13    gets -- does not violate the limitation on
14    discussions between the experts and counsel?
15        MR. KEYES:  Yes, because he
16    specifically discussed it in Paragraph 35 of his
17    report to explain what he's doing, and I want to
18    understand why he's doing that.
19        MR. SOBOL:  I instruct him not to
20    answer that, if that's your reason.
21    BY MR. KEYES:
22        Q.  Okay.  So just so the record is clear,
23    what is your understanding of the rationale for
24    deducting as an offset any revenue received from

Page 181

1    other governments or any other external sources
2    that was provided for the sole purpose of
3    funding opioid-specific activities?
4        MR. SOBOL:  I instruct him not to
5    answer.
6        You might ask the threshold question
7    whether or not, yes or no, he has an
8    understanding about it, because that might avoid
9    any needless battle over this issue.
10    BY MR. KEYES:
11        Q.  Well, did you follow the instruction?
12        MR. SOBOL:  If he doesn't have a
13    memory --
14    BY MR. KEYES:
15        Q.  Did you follow the instruction?
16        MR. SOBOL:  That's a different
17    question.  He can answer that question.
18        A.  As best I could, yes.
19    BY MR. KEYES:
20        Q.  And did the instruction make sense to
21    you?
22        A.  It made sense to me as an economist.
23        Q.  And as an economist, did the
24    instruction have a reasonable rationale?

46 (Pages 178 to 181)

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1        A.  Well, I can only speak from an
2   economics perspective, and it has a reasonable
3   rationale from the standpoint of economics.
4        Q.  What is that rationale?
5        A.  Under the view that damages consist of
6   costs incurred by the local governments, the
7   local governments, the government of Cuyahoga,
8   the government of Summit County as a result of
9   the opioid crisis, the degree to which those
10  costs are shared with another entity, for
11  example, the state government or a federal
12  government, then they do not count against the
13  damages to the local jurisdictions.
14        Now, as an economic statement, I
15  understand from counsel that there's some legal
16  issues that I don't appreciate, but that's my
17  economic understanding.
18        Q.  So in this engagement, did you
19  endeavor to exclude all expenditures that were
20  funded by revenue from other sources, that is
21  besides the two counties where the funding was
22  dedicated to funding opioid-specific activities?
23        MR. SOBOL:  Objection.
24        A.  Well, this is more subtle than your

Page 183

1   question may imply.
2        The relevant economic question is, if
3   the division would not have spent, say, $100 on
4   opioid-related activities, then how much would
5   its budgets for other things have to fall?  And
6   depending on the form of the -- what are called
7   in public finance intergovernmental transfers,
8   that question could be answered in different
9   ways.
10        A simple case would be, suppose the
11  federal government pays for 50 percent of
12  community policing devoted to opioids, so if you
13  can identify a budget category, we're going to
14  send police out to do drug work that is directed
15  to opioids, and the feds say we'll pay
16  50 percent of that, then any costs of that are
17  shared between the two entities, and 50 percent
18  of those costs only would have been counted
19  against the damages to the local government.
20        Another example would be, say, a block
21  grant, which is the other kind of spectrum here
22  in which the local government receives an amount
23  that is determined by a formula and said broadly
24  you have to spend this on alcohol-drug abuse and

Page 184

1   mental health services, but this is the amount
2   you have.  And then in that case, there would be
3   no deduction because they would get that same
4   intergovernmental transfer, however much they
5   spent on opioids or not.
6        So that's -- I know that was long,
7   but --
8   BY MR. KEYES:
9        Q.  So is the difference -- is the
10  difference between --
11        MR. SOBOL:  He hasn't finished.
12        A.  I just have one more sentence.
13        That's the kind of question that needs
14  to be applied to various categories of
15  governmental aid.
16  BY MR. KEYES:
17        Q.  So is the difference between your two
18  hypotheticals whether the locality could take
19  those dollars and spend it on something besides
20  opioids?
21        A.  Well, that's a kind of quick summary
22  of what the issue is, would they have the money
23  available to do something else if they didn't
24  spend it on opioids.

Page 185

1        Q.  So you endeavor to exclude money that
2   Summit County or Cuyahoga County received that
3   it could only spend on the opioid problem,
4   because if the opioid problem didn't exist they
5   wouldn't have gotten the money, and they
6   couldn't have spent the money on something else.
7   Is that fair?
8        MR. SOBOL:  Objection.
9        You may answer.
10        A.  Well, it's not the way an economist
11  would put the -- not the way an economist would
12  characterize it.  The way I would characterize
13  it is if there's either a total or a share of
14  spending that a local government incurs to
15  defeat opioids, if some of that is offset
16  against intergovernmental transfers, it only
17  would be received if those expenditures are
18  incurred, then that's treated as an offset to
19  the local expenditures because that frees up
20  some of the local money to be spent elsewhere.
21  BY MR. KEYES:
22        Q.  Can you turn to Tables IV.13 and
23  IV.12?  It's the very end of your report.
24        A.  Okay.

47 (Pages 182 to 185)

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1      Q.  So Table IV.12 is the damages for
2  Cuyahoga County, correct?
3      A.  That's correct.
4      Q.  And Table IV.13 is damages for Summit
5  County?
6      A.  That's correct.
7      Q.  And Table IV.14 is the summation of
8  the two?
9      A.  That's correct.
10     Q.  Okay.  And these are damages
11 attributable to the defendants' misconduct,
12 correct?
13     A.  That's my understanding, yes.
14     Q.  Okay.  And you said earlier in your
15 report that the analysis presented here does not
16 attempt to distinguish damages attributable to
17 manufacturers from those attributable to
18 distributors or other CSA registrants."
19        Is that correct?
20     A.  I remember saying that, yes.
21     Q.  Okay.  And when you use the phrase
22 "other CSA registrants," what is the CSA you're
23 referring to?
24     A.  I think it's Controlled Substance Act.

Page 187

1      Q.  And who are the other CSA registrants?
2      A.  Do you mind if I just go there and
3  take a look?
4      Q.  Sure.  Page 12, Paragraph 19.
5      A.  I believe some pharmacies are also CSA
6  registrants.
7      Q.  Are you including pharmacies in the
8  "other CSA registrants" here?
9      A.  I'm including whatever other CSA
10 registrants there are.
11     Q.  Okay.  And you've identified
12 pharmacies.  Can you identify any other category
13 of people who are CSA registrants besides
14 manufacturers and distributors?
15        MR. SOBOL:  And pharmacies.
16 BY MR. KEYES:
17     Q.  And pharmacies.
18     A.  No, that's all I can do.
19     Q.  Are doctors CSA registrants?
20     A.  I don't know.
21     Q.  Have you looked into that in
22 connection with your work in this case?
23     A.  No, I haven't.
24     Q.  Okay.  Going back to the tables at the

Page 188

1  end of your report, Tables IV.12, 13, and in the
2  summary 14, these are calculations of what you
3  call damages attributable to defendants'
4  misconduct, correct?
5      A.  That's correct.
6      Q.  And when you refer to defendants'
7  misconduct, you refer to misleading marketing,
8  correct?
9      A.  I believe I'm a bit more general than
10 that, at least in some places.
11     Q.  Okay.  Well, let's go back to Pages 11
12 and 12.  Do you see that it says, "the damage
13 methodology depends on the share of prescription
14 opioid shipments attributable to misleading
15 marketing," the very beginning of Paragraph 19.
16     A.  Okay.  There's the rest of the
17 sentence there.
18     Q.  Right.
19        But you do reference misleading
20 marketing.  So what damages -- have you
21 calculated which damages are attributable to
22 misleading marketing --
23        MR. SOBOL:  Objection.
24 BY MR. KEYES:

Page 189

1      Q.  -- and not something else?
2        MR. SOBOL:  Objection.
3      A.  What I have calculated is an
4  estimated -- an estimate of the total damages
5  without attempting to attribute them to any of
6  the particular defendants.
7  BY MR. KEYES:
8      Q.  Okay.  So for the damages you've
9  calculated, have you determined which portion of
10 those damages were caused by misleading
11 marketing as opposed to something else?
12     A.  Well, the way I would answer that is
13 following the methodology of the framework of
14 Rosenthal, Cutler, and me.
15        Professor Rosenthal estimates that
16 there are shipments due to defendants'
17 misleading advertising, so that's what her
18 empirical estimate is --
19     Q.  And only that, correct?
20        MR. SOBOL:  Were you finished with
21 your answer?
22     A.  No, but I'll try to be brief.
23        That's what Professor Rosenthal does.
24 And then that's applied by Professor Cutler to

48 (Pages 186 to 189)

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1    the shipments' harm connection, and that's
2    applied to me.
3            So kind of literally the formula of
4    those three combinations of analyses take
5    damages and attribute them to misleading
6    marketing by the defendants.
7            Now, I don't want to stop my answer
8    there, because I'm not making a determination
9    that there might have been other actors,
10   including distributors, including pharmacies,
11   that may have intervened in that process and
12   reduced the damages.
13           I don't know what -- I'm not opining
14   on their legal responsibility or what that
15   empirical allocation is.  I have a kind of
16   total, and I'm not taking that total and saying,
17   this part is for you and that part is for you.
18   BY MR. KEYES:
19       Q.  And when you say "this part is for you
20   and this part is for you," you're talking about
21   which part is attributable to misleading
22   marketing as opposed to something else?
23       A.  Yes.
24           And the other thing I would say about

Page 191

1    this is I don't necessarily think it's a zero
2    sum game.  And I'm not sure how one would
3    approach it in the law of saying, well, maybe
4    more than one party was responsible for
5    something; then what happened, I don't know.
6    But my own economic analysis is to say, here's
7    the -- in aggregate what the damage is.
8            MR. SOBOL:  Should we take the lunch
9    break?
10           MR. KEYES:  Soon.  Just give me a few
11   minutes.
12   BY MR. KEYES:
13       Q.  Do these calculations identify which
14   damages are attributable to failures to control
15   the supply chain?
16       A.  Well, as I tried to explain, my
17   damages are a kind of total damage.  And if
18   you're asking me a hypothetical of what would
19   have happened differently had somebody done
20   something, first of all, it's probably not a
21   good question for me.  And then it wasn't part
22   of my assignment to try to sort that out.
23       Q.  Do these calculations identify which
24   damages are attributable to "excessive and

Page 192

1    unnecessary shipments"?
2            MR. SOBOL:  Objection.
3            Is that quote from his report, or
4    something else?
5            MR. KEYES:  "Excessive and unnecessary
6    shipments" are in his report, yes.
7        A.  It does ring true.
8    BY MR. KEYES:
9        Q.  So you have identified certain damages
10   that you say are attributable to defendants'
11   misconduct.  Those are set forth in the tables
12   at the end of your report, but those tables do
13   not break out damages based on what's
14   attributable to misleading marketing versus
15   failures to control the supply chain versus
16   excess of and unnecessary shipments, correct?
17       A.  Well, no, I wouldn't put it that way.
18   The three-step empirical analysis associates
19   those damages to misleading marketing.  That's
20   what Professor Rosenthal does connected to
21   Cutler connected to McGuire.  So just from an
22   economic logical causality interpretation,
23   that's what those numbers show.  I -- having
24   said that, there is a sense in which your

Page 193

1    statement is correct, that given those total
2    damages due to misleading advertising, I'm
3    not -- I haven't taken them and decided what
4    portion of these might be attributable to some
5    other actors or who might be jointly responsible
6    for something.  I haven't done that analysis.
7        Q.  And have you identified or linked up
8    damages with particular misleading marketing?
9        A.  Can you --
10           MR. SOBOL:  Objection.
11       A.  -- explain what you mean?
12   BY MR. KEYES:
13       Q.  Well, you've referenced
14   Professor Rosenthal's calculated -- made
15   calculations about the number of opioid
16   shipments that are attributable to misleading
17   marketing and that her work feeds into
18   Professor Cutler, right?  And Professor Cutler's
19   work feeds into your work, and you're the one
20   that calculates damages?
21       A.  That's correct.
22       Q.  Do you offer any damages for this that
23   are linked up with particular misleading
24   marketing?

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1        MR. SOBOL: Objection.
2     A.  "Particular" meaning what?
3  BY MR. KEYES:
4     Q.  Particular marketing by particular
5  defendants that was identified as being
6  misleading.
7        MR. SOBOL: Objection.
8     A.  My understanding of what
9  Professor Rosenthal did was to aggregate the sum
10 of misleading advertising by the defendants in
11 this case, and that's what followed through.
12       I also understand that if some
13 misleading advertising of that were pulled out
14 in some way, then the calculation would be very
15 straightforward to do the multiplications
16 slightly differently, thanks to Excel, and then
17 come up with different damages numbers, which is
18 to say I think I'm capable of doing that, but in
19 this report I didn't try to attribute to
20 particular defendants.
21 BY MR. KEYES:
22    Q.  Particular groups of defendants or
23 particular defendants, correct?
24       MR. SOBOL: Objection.

Page 195

1     A.  I've covered this, I think, in my
2  answers.
3  BY MR. KEYES:
4     Q.  Okay.  Have you in your report offered
5  any calculation of damages caused by any
6  particular defendant?
7        MR. SOBOL: Objection to the form.
8     A.  I think this is kind of a version of
9  what I just spoke about, and I use the aggregate
10 figures that Professor Rosenthal and David used
11 to come up with aggregate damages.
12 BY MR. KEYES:
13    Q.  And those aggregate figures are based
14 on misleading marketing?
15       MR. SOBOL: Objection.
16    A.  Well, the aggregate figures are based
17 on step one of this, which is Professor
18 Rosenthal's analysis connecting a measure of
19 misleading advertising to total shipments.  So
20 that is literally the causal statement.
21 BY MR. KEYES:
22    Q.  And that follows through
23 Professor Cutler's work into your work?
24    A.  That's correct.

Page 196

1     Q.  Do you offer any calculation of the
2  specific damages caused by the specific conduct
3  of any particular manufacturer or manufacturing
4  defendant?
5        MR. SOBOL: Objection, asked and
6  answered.  Objection, asked and answered.
7     A.  I don't see the difference between
8  what I've already talked about and this
9  question, if there is.  I'm sorry.
10 BY MR. KEYES:
11    Q.  Do you offer any calculation of the
12 specific damages caused by the particular
13 conduct of a particular distributor or
14 distributor defendant?
15       MR. SOBOL: Objection.  Asked and
16 answered.
17    A.  The answer is broadly similar to what
18 I've answered already with respect to
19 manufacturers.  And what I do is estimate a
20 total, and I don't attribute that to particular
21 defendants, particular distributor defendants,
22 nor do I attempt to allocate it even between the
23 group of distributor defendants and the group of
24 manufacturer defendants.

Page 197

1  BY MR. KEYES:
2     Q.  And the same is true for any retail
3  pharmacy defendants, correct?
4        MR. SOBOL: Objection.
5     A.  I would answer in the same way, yes.
6  BY MR. KEYES:
7     Q.  And the same is true for any, quote,
8  other CSA registrant, to use your phrase?
9        MR. SOBOL: Objection.
10    A.  Maybe remind me what "the same" means,
11 sir.
12 BY MR. KEYES:
13    Q.  "The same" means you haven't broken
14 out the damages that you attribute to the
15 conduct of any particular retail pharmacy
16 defendant, just like you said for any particular
17 distributor defendant or any particular
18 manufacturer defendant.
19       MR. SOBOL: Objection.
20 BY MR. KEYES:
21    Q.  Correct?
22       MR. SOBOL: Objection.
23    A.  Yes.  What I have estimated is a total
24 damages without attempting to attribute that to

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1    groups or individual defendants.
2    BY MR. KEYES:
3       Q.  Have you undertaken to determine what
4    damages are attributable to the conduct of
5    entities that are not defendants in this case --
6          MR. SOBOL:  Objection.
7    BY MR. KEYES:
8       Q.  -- such as pharmacies or prescribing
9    doctors?
10         MR. SOBOL:  Objection.
11      A.  Well, my analysis was directed to the
12   defendant manufacturers and distributors in this
13   case, and so it was that aspect of damages that
14   I was asked to assess, and that's what I did.
15   BY MR. KEYES:
16      Q.  And so did you factor in the conduct
17   of pharmacies or prescribing physicians in your
18   work?
19         MR. SOBOL:  Objection.
20      A.  That's not really a question at this
21   stage of the analysis.  That's a question that
22   would be better directed to the -- to Rosenthal
23   or Cutler who were attempting to associate
24   shipments or harms to particular behavior.  For

Page 199

1    me, that's an input at this point.
2    BY MR. KEYES:
3       Q.  Well, do you have an understanding,
4    sitting here today, as to whether
5    Professor Rosenthal or Professor Cutler factored
6    into their analysis the conduct of pharmacies or
7    prescribing doctors?
8          MR. SOBOL:  Objection.  Scope.
9       A.  What they did was a valid empirical
10   analysis to identify the independent effect of
11   in Meredith's case misleading advertising, and
12   in David Cutler's case shipments on a harm, and
13   if one does that in a valid way, then that
14   answers the question at issue.
15   BY MR. KEYES:
16      Q.  How does looking at the, what you
17   describe as the independent factor of
18   prescription shipments address the role that
19   pharmacies or prescribing physicians played?
20         MR. SOBOL:  Objection.  Scope.
21      A.  This is -- the reports that we're
22   talking about now, the non-McGuire reports we're
23   talking about are reliable and valid approaches
24   to associating the magnitude of harm to the

Page 200

1    factors they're interested in, and if you do
2    that, then you're kind of done.  So they
3    determined what they needed to know, and they
4    designed a good way to do that.
5    BY MR. KEYES:
6       Q.  So what did they do to address the
7    role of prescribing physicians or pharmacies, as
8    you understand it?
9          MR. SOBOL:  Objection.  Scope, asked
10   and answered.
11      A.  They specified valid regressions that
12   were capable of identifying causality in a
13   reliable way.
14   BY MR. KEYES:
15      Q.  You use the word "attribute" or
16   "attributable" throughout your report.  What do
17   you mean by that?
18         MR. SOBOL:  Well, can you show him an
19   example?
20         MR. KEYES:  Sure.
21      A.  I'm just going to get a little bit of
22   water while you page through there.
23   BY MR. KEYES:
24      Q.  Sure.  Why don't you look at Page 4.

Page 201

1       A.  Okay.  I'll be right back.
2          (Pause.)
3       A.  Okay.  I'm on Page 4.
4       Q.  Okay.  You talk about "whether there
5    is a valid economic methodology for attributing
6    a share of Bellwether government costs to
7    defendants' misconduct; that is, to attribute
8    damages to defendants' misconduct."
9       A.  Yes.  Okay.
10      Q.  Do you see on Page 5, whether one may
11   identify the costs of the divisions of the
12   bellwether governments which may be attributable
13   to defendants' misconduct?
14      A.  Yes, I see that.  Well, actually I
15   don't, but I believe you.
16      Q.  Damages are estimated by applying the
17   estimates of the percent of harms attributable
18   to defendants' misconduct.
19      A.  I'm sorry.  Where is that last one?
20      Q.  It was on Page 7.
21      A.  Okay.
22      Q.  You talk about -- on Page 9 you talk
23   about an economic framework used to calculate
24   damages to the bellwether divisions that are

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    attributable to prescription opioid shipments.
2        A.  I see.
3        Q.  15, "the main economic criteria for
4    identifying costs or providing services" --
5           MR. SOBOL:  Wait, let him get there --
6    or me, he's faster than I am.  Go ahead.
7    BY MR. KEYES:
8        Q.  "The main economic criteria for
9    identifying costs of providing services
10   attributable to the opioid" -- blank, missing
11   word.
12       A.  I'm sorry, which paragraph are you in?
13       Q.  Paragraph 25.
14       A.  25.
15       Q.  A few lines down there's a line that
16   says, "Instead, as discussed in more detail
17   below."
18           Do you see that?
19       A.  Yes.  Okay.
20       Q.  "The main economic criteria for
21   identifying costs of providing services
22   attributable to the opioid," and then there's a
23   missing word.
24       A.  Yeah.  Okay.

Page 203

1        Q.  So you keep saying "attribute" or
2    "attributable."  What do you mean by
3    attributable?
4        A.  Due to.
5        Q.  Due to.  What do you mean by "due to"?
6    Are you offering the opinion that they are
7    caused by the defendants' misconduct?
8           MR. SOBOL:  What's the "they"?
9           MR. KEYES:  The damages, whenever you
10   refer to them.
11       A.  I'm relying on Rosenthal and Cutler
12   before me to have done that causal work so that,
13   given their findings, which I regard to be
14   reliable, then these damages are due to
15   defendants' misconduct.
16   BY MR. KEYES:
17       Q.  So are you offering an opinion on
18   causation?
19           MR. SOBOL:  Asked and answered.
20   Objection.
21   BY MR. KEYES:
22       Q.  You say you rely on Professor
23   Rosenthal and Professor Cutler.  I get it.  Are
24   you offering an opinion on causation?

Page 204

1           MR. SOBOL:  Objection.
2        A.  I know this is a legal word, so let me
3    just be sure of what I am saying about this.
4           Given the valid empirical
5    investigation of both Rosenthal and Cutler, who
6    at the end of his report comes to a conclusion,
7    there is a causal conclusion that Cutler brings
8    forth to say that this share of the harm are due
9    to defendants' misconduct.  That's David
10   Cutler's statement.  Taking that statement as
11   given, then what I say is that this is the
12   magnitude of damages that are due to defendants'
13   misconduct.
14   BY MR. KEYES:
15       Q.  So you believe that Professor Cutler
16   is providing that causal link, and you're
17   relying on him for that causal link?
18           MR. SOBOL:  Objection.  Asked and
19   answered.
20       A.  Well, there's two causal links that
21   are involved, both Rosenthal's report and
22   Cutler's report.
23   BY MR. KEYES:
24       Q.  Okay.  I was going to take them one at

Page 205

1    a time, but we can take them together.
2           You believe that Professor Rosenthal
3    and Professor Cutler provide the causal links --
4           MR. SOBOL:  Objection.
5    BY MR. KEYES:
6        Q.  -- and you're relying on them for
7    those causal links?
8           MR. SOBOL:  Objection.
9           Which question do you want him to
10   answer?
11          MR. KEYES:  The one I just asked.
12          MR. SOBOL:  Both of them?  Objection
13   to the form then.
14       A.  I do rely on Professor Rosenthal and
15   Professor Cutler whose empirical analyses
16   together reliably, in my view,
17   associates/attributes the harms to the
18   defendants' misconduct, and that's what I need
19   in order to do my allocation of damages.
20   BY MR. KEYES:
21       Q.  Okay.  So you are quantifying those
22   harms --
23          MR. SOBOL:  Objection.
24   BY MR. KEYES:

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1      Q.  -- in your report?
2          MR. SOBOL:  Objection.
3  BY MR. KEYES:
4      Q.  You are quantifying what you are
5  saying are the cost consequences of those harms
6  to Summit County and Cuyahoga County?
7      A.  Yeah, that's broadly what I'm doing.
8      Q.  And you are relying on
9  Professor Cutler and Professor Rosenthal for the
10  causal link between the defendants' conduct and
11  those cost consequences?
12         MR. SOBOL:  Objection.  Asked and
13  answered.
14  BY MR. KEYES:
15     Q.  Correct?
16         MR. SOBOL:  Objection.  Asked and
17  answered.
18     A.  I'm not sure what kind of trouble I
19  might get myself into here, but yes, Rosenthal
20  studies the beginning with the misconduct
21  itself, to shipments.  David picks it up at the
22  shipment stage, looks at harms.  And so putting
23  those two reliable econometric investigations
24  together, one can attribute the harms to the

Page 207

1  misconduct.  And then --
2  BY MR. KEYES:
3      Q.  And that's the work they're doing?
4          MR. SOBOL:  He hasn't finished.
5      A.  Then once those shares have been
6  determined by Professor Cutler, my work is to
7  take those shares, apply them to the variable
8  costs, and determine the dollar number.
9  BY MR. KEYES:
10     Q.  All right.  So you are quantifying
11  what you are saying are the cost consequences of
12  the harms that Professor Cutler and Professor
13  Rosenthal link up with the defendants' conduct?
14         MR. SOBOL:  Objection.  Asked and
15  answered.
16     A.  Well, I mean, I'm -- the same question
17  has come at me like four or five times now, so
18  I'll just defer to my earlier answers on this,
19  if that's all right.
20  BY MR. KEYES:
21     Q.  Did I say something that was
22  incorrect?
23         MR. SOBOL:  Objection.
24         Let's take a lunch break.  People are

Page 208

1  getting a little testy.  It's getting --
2          MR. KEYES:  I'm not getting testy.
3          MR. SOBOL:  No, you are.
4          MR. KEYES:  I'm just trying to get an
5  answer to my question.
6          MR. SOBOL:  It was 20 minutes ago that
7  I asked for the lunch break.  I have been more
8  than gentlemanly about this.
9          MR. KEYES:  I would like an answer to
10  my question.  So --
11         MR. SOBOL:  "Well, I'm not testy?"
12  Yes, you are.
13  BY MR. KEYES:
14     Q.  You are quantifying what you are
15  saying are the cost consequences of the harms
16  that Professor Cutler and Professor Rosenthal
17  link up with the defendants' conduct.  Is that
18  an accurate --
19         MR. SOBOL:  Objection.
20  BY MR. KEYES:
21     Q.  -- statement or not?
22         MR. SOBOL:  Objection.  Asked and
23  answered.
24     A.  I think that was -- you're just

Page 209

1  quoting from me, is that right?
2      Q.  I'm repeating my question.  Is that
3  accurate or not?
4          MR. SOBOL:  I don't know where you
5  are.
6  BY MR. KEYES:
7      Q.  If it's inaccurate, tell me why.
8          MR. SOBOL:  I still don't know where
9  we are.
10         Do you understand the question that's
11  before you?
12     A.  I want to go to lunch, too, so you ask
13  a clear question, I'll give a fresh answer, and
14  we'll see where we are.
15  BY MR. KEYES:
16     Q.  In your damages report you are
17  quantifying what you are saying are the cost
18  consequences of the harms that Professor Cutler
19  and Professor Rosenthal link up with the
20  defendants' conduct?
21         MR. SOBOL:  Objection.  Asked and
22  answered.
23     A.  There's three steps in this that make
24  it a causal connection between defendants'

53 (Pages 206 to 209)

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1    misconduct and the cost consequences to the
2    local governments.
3         The first connection is investigated
4    by Professor Rosenthal who connects the
5    misconduct to the shipments.  Cutler picks up
6    the shipments, connects up the harms, comes to a
7    conclusion for me about the share of harms
8    attributable to -- and I mean that in a causal
9    way -- attributable to defendants' misconduct,
10   and that allows me to use that share to quantify
11   it in dollar terms.
12        MR. SOBOL:  Thank you.
13        MR. KEYES:  Okay.  Let's take a break
14   for lunch.
15        THE VIDEOGRAPHER:  The time is 1:02 p.m.
16   and we're off the record.
17        (Whereupon, a luncheon recess was
18        taken.)
19
20
21
22
23
24

Page 211

1         AFTERNOON SESSION
2
3         THE VIDEOGRAPHER:  The time is
4    2:05 p.m., and we're on the record.
5    BY MR. KEYES:
6    Q.  Professor McGuire, would you turn to
7    Page 16 of your report, which is McGuire Exhibit
8    Number 1?  Are you there?
9    A.  Yes.
10   Q.  And in Paragraph 26 you say --
11   consider a hypothetical, right?
12   A.  Yes, I see that.
13   Q.  You say, "Suppose there is only one
14   Chief and there would need to be one Chief
15   regardless of whether there were an opioid
16   crisis," right?
17   A.  I see that.
18   Q.  And then you continue, "Suppose
19   further that the Chief works 8 hours a day and
20   his or her salary would be the same with or
21   without opioid-related activities."  Correct?
22   A.  I see that, yes.
23   Q.  So in your hypothetical, the sheriff
24   is paid a salary and works eight hours a day?

Page 212

1    A.  Yes.
2    Q.  Then you say, "In the absence of an
3    opioid crisis, the Chief would spend 8 hours
4    attending to non-opioid-related problems.  If
5    the opioid crisis causes the Chief to spend 1
6    hour a day on opioid-related issues, the time
7    the Chief has for other issues falls by 1 hour."
8         Do you see that?
9    A.  I do, yes.
10   Q.  And then you acknowledge that the
11   government's spending on the chief is fixed.
12        Do you see that?
13   A.  Yes, I don't see it, but I --
14   Q.  Well, the next sentence says --
15   A.  It's part of the example.  I'm not
16   disputing it.
17   Q.  You say in the next sentence, "What is
18   'fixed' in this example is the total work time
19   of (and spending on) the Chief of the Sheriff's
20   Department."
21   A.  Yes.
22   Q.  Okay.  So the government doesn't spend
23   any more or less if the chief spends any time on
24   opioid-related issues, correct?

Page 213

1    A.  That's the nature of this example,
2    yes.
3    Q.  Okay.  And then you say if he has to
4    start spending one hour per day on
5    opioid-related issues, then he only has seven
6    hours to spend on non-opioid-related issues.
7    Correct?
8    A.  That's what the example says, yes.
9    Q.  And you then assert that "The
10   reallocation of that time to opioid-related
11   activity result in a loss of time and effort on
12   alternative activities, which is an economic
13   cost."  Correct?
14   A.  That's what I say.
15   Q.  And that's an opportunity cost?
16   A.  You can think of that as an
17   opportunity cost.
18   Q.  Which means that something is given up
19   when the chief has to spend that one hour on
20   opioid-related issues, correct?
21   A.  So far so good.
22   Q.  And that opportunity cost could be as
23   simple as leisure time of the chief?
24        MR. SOBOL:  Objection.

54 (Pages 210 to 213)

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1      A.  Well, there you've lost me.
2   BY MR. KEYES:
3      Q.  It could be.
4           MR. SOBOL:  Objection.
5   BY MR. KEYES:
6      Q.  That's not what you specify in your
7   hypothetical, but that is something that could
8   be given up by the chief?
9           MR. SOBOL:  Objection.
10      A.  I don't know.  You're adding something
11   here.  This is --
12   BY MR. KEYES:
13      Q.  I am.
14      A.  This is work-related activities is
15   what the point of the example is.
16      Q.  Okay.  But the opportunity cost is not
17   a financial cost --
18           MR. SOBOL:  Objection.
19   BY MR. KEYES:
20      Q.  -- because the sheriff, the chief's
21   employer, doesn't pay anything more if the chief
22   spends one hour on opioid-related activities and
23   seven hours on non-opioid-related activities
24   instead of all eight hours on non-opioid-related

Page 215

1   activities, correct?
2           MR. SOBOL:  Objection.
3      A.  No, I disagree with that, too.  The
4   appropriate metric of this opportunity cost is
5   financial.
6   BY MR. KEYES:
7      Q.  But it's not a financial cost.  His
8   employer doesn't spend anything more --
9           MR. SOBOL:  Objection.  Asked and
10   answered.
11   BY MR. KEYES:
12      Q.  -- is that correct?
13           MR. SOBOL:  Objection.  Asked and
14   answered.
15      A.  Well, the example lays out and, in
16   fact, specifies that even in the situation in
17   which the time and the spending on the chief is
18   the same, the appropriate economic approach to
19   this question is the economic value of the
20   activities given up if the chief spends an hour
21   on opioids.
22   BY MR. KEYES:
23      Q.  That's the economic value.  That's not
24   a financial cost necessarily.

Page 216

1           MR. SOBOL:  Objection.  Asked and
2   answered.
3      A.  I'm really not following what you're
4   trying to get at here.
5   BY MR. KEYES:
6      Q.  What is the extra money that the
7   chief's employer is spending as a result of the
8   chief spending one hour per day on
9   opioid-related activities instead of all eight
10   hours on non-opioid-related activities?
11      A.  Okay.  This example, I think, is very
12   explicit about that, and it states, as you read
13   into the record a few minutes ago, that the
14   spending on the chief is fixed.  And the point
15   of the example is even in this context in which
16   the number of hours worked and the spending on
17   the chief is fixed, the appropriate economic
18   financial measure of the loss to the
19   jurisdiction is the wage of the chief spent on
20   opioids.
21      Q.  If the chief goes from eight hours a
22   day on non-opioid-related activities to one hour
23   on opioid-related activities, and seven hours on
24   non-opioid-related activities, is there any

Page 217

1   out-of-pocket expense for his employer?
2           MR. SOBOL:  Objection.
3      A.  I didn't hear the first part of your
4   hypothetical, sorry.
5   BY MR. KEYES:
6      Q.  If the chief goes from eight hours a
7   day on non-opioid-related activities to one hour
8   per day on opioid-related activities, and seven
9   hours per day on non-opioid-related activities,
10   is there any out-of-pocket expense for his
11   employer?
12      A.  What do you mean by "out-of-pocket
13   expense"?
14      Q.  Is there any additional expenditure of
15   funds by the chief's employer when that switch
16   occurs?
17           MR. SOBOL:  Objection.
18      A.  This example states that there is --
19   the spending is fixed as the chief spends an
20   hour on opioids instead of on the other
21   problems, and it's intended to convey that even
22   in this situation the appropriate economic
23   measure relief is the cost of the chief's time,
24   one hour, spent on opioids.

55 (Pages 214 to 217)

Highly Confidential - Subject to Further Confidentiality Review

Page 218

BY MR. KEYES:
1  Q.  Okay.  So you acknowledge that in that
2  situation, the switch from eight hours to seven
3  for non-opioid-related activities and one for
4  opioid-related activities does not cause his
5  employer any out-of-pocket cost, any increased
6  out-of-pocket costs?
7      MR. SOBOL:  Objection.
8      A.  Even if the spending is fixed, then
9  the appropriate economic measure of the cost is
10  the value of the chief's time
11  associated/attributable to opioids.
12  BY MR. KEYES:
13  Q.  Sir, you've said that in your report,
14  and you said it several times today, so I think
15  you're covered on that point.
16  A.  Okay.  Good.
17  Q.  I'd ask you to answer my question.
18  You keep referring to even if it is fixed.
19      I'm asking, because it's fixed, even
20  though the sheriff switches how he spends those
21  eight hours a day, his employer is not incurring
22  any additional out-of-pocket cost, correct?
23      MR. SOBOL:  Objection, asked and

Page 219

1  answered.  Objection, asked and answered.
2      A.  The assumption in the -- my
3  hypothetical is that the spending is fixed.
4  BY MR. KEYES:
5  Q.  Which means there's no additional
6  out-of-pocket expense?
7      MR. SOBOL:  Are you finished with your
8  answer?
9  BY MR. KEYES:
10  Q.  That's what my question is about.
11  A.  Well, it puzzles me a little why you
12  have to ask a question if I think I stated
13  extremely clearly in my report that the spending
14  is fixed.
15      But the point of the example is that
16  that does not imply that there's no economic
17  cost to the opioid activities.
18  Q.  Right.  So answer my question.  You
19  keep saying it's fixed.  You're an economist,
20  you're familiar with fixed, not necessarily
21  everybody is familiar with fixed.  And another
22  way of phrasing that is the amount that his
23  employer spends is set, it is fixed, and it will
24  not change.  His employer will not spend any

Page 220

1  more money because he changes how he spends
2  those eight hours a day, correct?
3      MR. SOBOL:  Objection.
4  Mischaracterizes the testimony.
5      A.  I just want to read this back here.
6  In this example the government is paying for one
7  hour of the chief's time to deal with opioids.
8  What is fixed in this example is the total work
9  time of and spending on the chief.
10      I'm mystified why you have to ask me a
11  question that is the spending on the chief
12  fixed, and --
13  BY MR. KEYES:
14  Q.  Because you've already said that in
15  your report and I'm trying to put -- I'm trying
16  to see if that's the same as saying there's no
17  additional out-of-pocket expenditure by his
18  employer.  Yes or no.
19      MR. SOBOL:  Objection.  Asked and
20  answered.  It's not a yes-or-no question.
21  BY MR. KEYES:
22  Q.  He did not answer that question.
23      MR. SOBOL:  He didn't answer it the
24  way you want him to answer the question, but

Page 221

1  he's the one who is testifying, not you.
2  BY MR. KEYES:
3  Q.  My question is, is there an additional
4  out-of-pocket expenditure by his employer when
5  the make-up -- how he spends his eight hours
6  changes?  That's a yes-or-no question.  It's not
7  about fixed.  It's about whether there's an
8  additional out-of-pocket expenditure when he
9  goes from eight hours on non-opioid to seven
10  hours on non-opioid and one hour on opioid.  You
11  can say no, you can say yes, and then you can
12  explain your answer.  Yes or no, is there an
13  additional out-of-pocket expenditure?
14      MR. SOBOL:  So which question do you
15  want him to ask and -- be asked now?  You asked
16  two questions in that paragraph.
17  BY MR. KEYES:
18  Q.  In your hypothetical, when he goes
19  from eight hours on non-opioid-related
20  activities to seven hours on non-opioid related
21  activities and one hour on opioid-related
22  activities --
23      A.  I think we got that -- sorry to
24  interrupt.

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    Q.  -- does his employer have any
2   additional out-of-pocket expense as compared to
3   when he spent all eight hours on
4   non-opioid-related activities?
5        MR. SOBOL: Objection. Asked and
6   answered.
7        A.  This is going to be two sentences.
8   The paragraph makes the assumption that the
9   spending on the chief is fixed.  That does not,
10  however, imply that there is no economic cost to
11  the diversion of the chief's time to the opioid
12  crisis.
13  BY MR. KEYES:
14       Q.  And you didn't say a word about
15  out-of-pocket expense, which is what my question
16  is about.
17       So in that hypothetical, is there an
18  additional out-of-pocket expenditure by his
19  employer?
20       MR. SOBOL: I instruct you not to
21  answer.
22  BY MR. KEYES:
23       Q.  Yes or no?
24       MR. SOBOL: He's answered the question

Page 223

1   five times already.
2   BY MR. KEYES:
3        Q.  Are you saying you can't answer my
4   question yes or no? Is that your position?
5        MR. SOBOL: Which question do you want
6   him to answer yes or no?
7        MR. KEYES: Whether there's an
8   additional out-of-pocket expenditure in that
9   scenario.
10       MR. SOBOL: He's given the answer
11  several times.
12       (Phone interruption.)
13       MR. KEYES: Will you mark this point
14  in the transcript?
15       MR. SOBOL: What was that?
16       MR. KEYES: I think it's an
17  internal --
18       MR. SOBOL: Sorry.
19  BY MR. KEYES:
20       Q.  Okay.  Now I'm going to change your
21  hypothetical.
22       What if the chief is paid to work
23  eight hours a day but actually only does work
24  five hours a day, okay, and the rest is leisure

Page 224

1   time, downtime, where he's not actually working,
2   in that case --
3        MR. SOBOL: So he's getting paid to
4   work but he's not working?
5        MR. KEYES: He's getting paid for
6   eight hours, and only working for five hours,
7   and the rest is downtime.
8   BY MR. KEYES:
9        Q.  In that case, having to spend an hour
10  on opioid-related issues does not take away any
11  of the time he needs to spend on
12  non-opioid-related issues, correct?
13       MR. SOBOL: Objection.
14       A.  No, I disagree with that.
15  BY MR. KEYES:
16       Q.  If he only works five hours and he's
17  paid to work eight hours, then how does working
18  an hour on opioid-related activities take away
19  from the time he's actually spending on
20  non-opioid-related activities?
21       MR. SOBOL: Objection.
22       A.  Well, this is something I explicitly
23  addressed in my report, which is that it's not
24  realistic to expect that each individual or each

Page 225

1   department is fully occupied at all times.  And,
2   in fact, it's not even optimal from the
3   standpoint of the government not to have some
4   slack capacity in activities of especially a
5   public safety official.
6        The demands on these officials are
7   stochastic, which -- by which I mean it kind of
8   can be up and down, and you want to have some
9   slack capacity.  The diversion of an hour of the
10  chief's time from slack capacity doesn't mean
11  it's not coming at a cost to the government.
12  BY MR. KEYES:
13       Q.  My question didn't pose that.  I'm
14  posing a hypothetical.  You're an expert.  I get
15  to ask you hypothetical questions, and I'd ask
16  you to answer the hypothetical.
17       In my hypothetical he doesn't actually
18  work eight hours a day.  He's paid to work eight
19  hours a day.  He's on the job eight hours a day,
20  actually only does work five hours a day, and
21  the other four hours are downtime.  Okay?
22  That's the hypothetical.
23       In that hypothetical situation, asking
24  him to spend an hour each day on opioid-related

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1  activities does not take away any time, any of
2  the five hours he has to spend on
3  non-opioid-related activities, correct?
4       MR. SOBOL:  Objection.  Asked and
5  answered.
6       A.  Well, I think it's, you know, simply a
7  farfetched and unrealistic hypothetical with
8  respect to staff of a -- any government
9  department in which the efficient level of
10  staffing would imply that people don't sit
11  around half of the day doing nothing, and it
12  does imply that there's excess capacity in
13  especially public safety related positions.
14  BY MR. KEYES:
15       Q.  Sir --
16       A.  So I'm just not prepared to agree with
17  you that you can make up an hour without having
18  it come out of some capacity of the chief to do
19  something else.
20       Q.  It might come out of his capacity, it
21  might come out of his downtime, it might come
22  out of his leisure time, but it is not taking
23  away from the five hours that he has to spend on
24  non-opioid-related activities precisely because

Page 227

1  he has that capacity, correct?
2       MR. SOBOL:  Objection.  Asked and
3  answered.  I've counted four times now.
4       A.  Which I don't agree with that
5  depiction of the role of staffing in a city
6  government, or any government, or really any
7  position at all.
8  BY MR. KEYES:
9       Q.  Sir, you can call my hypotheticals
10  whatever you want.  You can affix whatever
11  adjective.  I'm asking you within the parameters
12  of that hypothetical whether you agree with it,
13  because it is a matter of logic that if you're
14  only spending five hours and you're not doing
15  any work with the other three hours, then asking
16  someone to spend one of those three hours on
17  opioid-related activities is not pulling away
18  from the five hours on non-opioid-related
19  activities.  Do you agree with me as a matter of
20  logic within that hypothetical?
21       MR. SOBOL:  Wait.  Objection.  Asked
22  and answered five times.
23       You want him to give the same answer,
24  you want to --

Page 228

1       MR. KEYES:  I want him to answer my
2  question.
3       MR. SOBOL:  Yes, I understand.  But do
4  you want him to give the same answer again, or
5  what do you want to do?
6       MR. KEYES:  I'd like you to object,
7  and then he can answer my question.
8       MR. SOBOL:  Okay.  I object.
9  BY MR. KEYES:
10       Q.  You've made your distaste clear,
11  that's fine, but it's my hypothetical.  I want
12  you -- I don't --
13       MR. SOBOL:  He's telling you your
14  hypothetical doesn't make any sense.
15  BY MR. KEYES:
16       Q.  I'm not asking you to handicap whether
17  my hypothetical is correct or not.  I'm asking
18  you to answer within the scope of my
19  hypothetical, logically asking him to spend one
20  more hour on opioid-related activities does not
21  take away from the five hours that he's been
22  spending on non-opioid-related activities,
23  correct, as a matter of logic?
24       MR. SOBOL:  Objection.  Asked and

Page 229

1  answered.
2       Go ahead, Tom.
3       A.  I think the -- another way to kind of
4  go at this from the standpoint of an answer is
5  that the hypothetical is really incomplete.  It
6  doesn't recognize the stochastic nature of
7  demands on a public safety official that imply
8  there always will be downtime, or almost always
9  will be downtime for a public official.  And
10  it's just simply not correct as a matter of
11  logic that devoting an extra hour to
12  opioid-related activities has no cost to a local
13  government in terms of other things personnel
14  might do.
15  BY MR. KEYES:
16       Q.  You keep reverting to the opinions you
17  want to offer in this case, and you're offering
18  them, and you're entitled to offer them.  I'm
19  not asking you to repeat your opinions.  I'm
20  asking you to answer my hypothetical.  My
21  hypothetical wasn't about whether there was a
22  cost to local government or not.
23       My question was, if he spends that one
24  hour on opioid-related activities, it does not

58 (Pages 226 to 229)

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    take away from the five hours that he's spending
2    on non-opioid-related activities, because by
3    definition he's on the job for eight hours. It
4    may take away from his leisure time. It may
5    take away from his excess capacity. It does not
6    keep him from doing the five hours of work on
7    non-opioid-related activities. Do you agree
8    with that as a matter of logic?
9         MR. SOBOL: Objection.
10         This is the seventh time, and unless
11   the witness has any more to say in response to
12   the question, I suggest that he just say that.
13        A. I don't have anything new to add. If
14   you would like me to go back over my answer,
15   I'll do so.
16   BY MR. KEYES:
17        Q. Okay. Now I'm going to change the
18   hypothetical, and again I'm going to ask you to
19   stick with my hypothetical, whether you think
20   it's realistic or not. Okay?
21        A. Okay.
22        MR. SOBOL: No, that's not okay. Hold
23   on a second. He's not to instruct you how to
24   answer the questions. I do.

Page 231

1         MR. KEYES: No, you're not to instruct
2    him now to answer the questions either. And
3    I've been rather permissive. You can object.
4    You can instruct him not to answer. You cannot
5    instruct him how to answer. And I'd ask you to
6    stop doing it.
7         MR. SOBOL: You're right. You're
8    right about that.
9         But he is not to tell you -- instruct
10   you how to answer the question. If you think
11   that that hypothetical is unrealistic and you
12   can't answer the question as it's framed, then
13   you answer truthfully as you have been, okay,
14   and not if he tells you, you know, accept my
15   unrealistic hypothetical. That's not what
16   you're supposed to be doing. You're supposed to
17   answer the questions truthfully.
18   BY MR. KEYES:
19        Q. A new hypothetical.
20        The chief works very inefficiently for
21   those eight hours a day. He takes eight hours
22   to do the work, but he could easily get it done
23   in five hours, and he could use the rest of that
24   time for leisure or downtime. Okay?

Page 232

1         Now, in that hypothetical, in that
2    hypothetical, if he worked efficiently and got
3    the non-opioid-related activities done in five
4    hours, then spending an hour on opioid-related
5    issues would not take away from the work on
6    non-opioid-related activities, correct?
7         MR. SOBOL: Is that a question?
8         Objection to the form.
9    BY MR. KEYES:
10        Q. Correct. The logic of a hypothetical.
11        MR. SOBOL: Objection to form.
12        A. I kind of get what you're driving at,
13   but I didn't get -- if you wouldn't mind giving
14   me the hypothetical again.
15   BY MR. KEYES:
16        Q. Sure. I've got -- in my hypothetical
17   you have a chief that works very inefficiently
18   for eight hours a day, and he takes eight hours
19   to do the work on the job for eight hours a day,
20   and he takes the eight hours to do the work, but
21   he could easily get it done in five hours and he
22   could spend the other three on leisure or
23   downtime.
24        If he worked efficiently and got his

Page 233

1    work done in five hours instead of taking the
2    full eight hours, then he would have three hours
3    of leisure, or if he were asked to spend an hour
4    of those three hours on opioid-related
5    activities it still wouldn't take away from him
6    getting the non-opioid-related work done,
7    correct?
8         MR. SOBOL: Object to the form.
9         A. Well, I think this is also an
10   inappropriate way to characterize the economics
11   of this situation. Let me go about this by
12   making an analogy for you.
13        Suppose you were talking about
14   consumers instead of local government, and you
15   were asked to -- say someone bangs up my car and
16   I have to pay $75 to fix the car. So I don't
17   make any more. My income is fixed. And I have
18   to take 75 of my dollars and use it to fix my
19   car.
20        What is the cost to that consumer of
21   having to fix the car? What I say it is, is
22   $75. It doesn't matter from an economic
23   standpoint that if you look at some other item
24   of the budget I spend my money on -- suppose I

59 (Pages 230 to 233)

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    go to restaurants with some other part of my
2    money and I don't make a very good choice of
3    restaurants, I choose food inefficiently, I
4    don't get the most calories per dollar or
5    however you want to -- however you want to
6    characterize the efficiency with which I spend
7    the rest of my money, it's still $75.
8         That's the kind of mainstream economic
9    way to quantify the cost, even if you start
10   putting in stuff about he's not spending his
11   money efficiently on his restaurants.
12   BY MR. KEYES:
13   Q.  You're completely changing the
14   hypothetical.  In your hypothetical he has to
15   spend the $75 on one thing or another thing, and
16   you've already admitted in my hypothetical that
17   his employer is going to spend the same amount
18   because it's paying him a salary regardless of
19   how he spends the time.  So I don't want to
20   spend time on your hypotheticals.  They're
21   completely different than mine.
22        In my hypothetical, if he works more
23   efficiently and, therefore, he gets his
24   non-opioid-related work done in five hours and

Page 235

1    he has three extra hours, he has three hours of
2    leisure time, or if he's asked to spend an hour
3    on opioid-related activities he still gets the
4    five hours of work done on non-opioid-related
5    activities and he's got two hours left for
6    leisure time, do you disagree with the logic of
7    that?  You can tell me it's not realistic, but
8    do you disagree with the logic of that
9    hypothetical?
10        MR. SOBOL:  Objection.
11   A.  I do disagree with the logic of that
12   hypothetical.
13   BY MR. KEYES:
14   Q.  In my hypothetical the only
15   opportunity cost is the chief loses leisure
16   time --
17        MR. SOBOL:  Object.
18   BY MR. KEYES:
19   Q.  -- because instead of three hours of
20   leisure time, now he only has two, with that
21   third hour being spent on opioid-related
22   activities.
23        MR. SOBOL:  Objection.  Asked and
24   answered.

Page 236

1    A.  I don't agree with that.
2    BY MR. KEYES:
3    Q.  And you've counted that lost leisure
4    time as damages to his employer.
5         MR. SOBOL:  Objection.
6    A.  I don't agree with that at all.
7    BY MR. KEYES:
8    Q.  Have you heard of Parkinson's law?
9    A.  Parkinson's law?
10   Q.  Yes.
11   A.  I have.  Give me a hint.
12   Q.  Well, what does Parkinson's law say,
13   as you remember it?
14   A.  I need a hint.  I know I've heard of
15   it, but --
16   Q.  Have you heard of Parkinson's law
17   saying that work expands to fill the time
18   available for its completion?
19   A.  I have heard of that, yes.
20   Q.  Have you done any studies of
21   Parkinson's law?
22   A.  Well, I would say yes, I have.
23   Q.  Okay.  What have you done to study
24   Parkinson's law?

Page 237

1    A.  A form of Parkinson's law which is in
2    my -- part of my research that has to do with
3    healthcare payment.
4         So the analogy to Parkinson's law here
5    would be if a healthcare provider, say a
6    hospital, were given a prospective payment, it's
7    called, for taking care of a patient within a
8    hospital, the fixed payment might be $4,000,
9    just to choose a number, and the pressure of the
10   market with hospitals competing for patients
11   would imply that hospitals would spend up to
12   $4,000 to take care of that patient, which is a
13   version of Parkinson's law.
14   Q.  Is that study referenced anywhere in
15   your CV?
16   A.  Many, many times in my -- I've studied
17   that many times.
18   Q.  And what is that study called, if we
19   look for it in your CV?
20   A.  There would be the words prospective
21   payment.  I work on capitation payments to
22   health plans, I work on physician payments and
23   fixed pricing to physicians, hospitals, and
24   other healthcare providers, all of which have

60 (Pages 234 to 237)

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    this element of the effect of competition,
2    implying that plans and providers will tend to
3    spend so as to use the budget they're offered.
4        Q.  And is that a study of how they use
5    time, or how they use dollars?
6        A.  That's a big part of their providers'
7    budgets are the time that they and their workers
8    spend.
9        Q.  Have you studied the application of
10   Parkinson's law in the workplace?
11       A.  Well, these are workplaces.  I'm
12   talking about hospitals, doctors' offices.
13       Q.  You're talking about places where
14   people work.  I'm asking, have you studied the
15   application of Parkinson's law to how people
16   spend their time in the workplace?
17           MR. SOBOL:  Objection.  Asked and
18   answered.
19       A.  How people spend their time?  I'm not
20   sure what you're getting at here.
21   BY MR. KEYES:
22       Q.  Well, have you conducted a study of
23   Parkinson's law as applied to how employees
24   spend their time in the workplace?

Page 239

1           MR. SOBOL:  Objection.  Asked and
2    answered.
3        A.  The Parkinson's law is the time -- the
4    work fills the time available.  The how they
5    spend their time is not a Parkinson's law
6    question.  It's a question about the nature of
7    their work.
8            I'm just trying to understand what
9    your next hypothetical is about.
10   BY MR. KEYES:
11       Q.  So have you studied the application of
12   Parkinson's law to see how employees spend their
13   time in the workplace during the workday?
14           MR. SOBOL:  Objection.  Asked and
15   answered again.
16       A.  Well, I'm going to say yes, although I
17   think it's -- the analogy to Parkinson's law is
18   not as close.
19           The term in economics for this area of
20   inquiry would be the multi-tasking problem in
21   which an employee has a job to do, but that job
22   involves a number of different goals or
23   activities.  And the objective of the employer,
24   or in some cases the regulator or the payer, is

Page 240

1    to convey to the employee, healthcare provider,
2    incentives so they address the multi-tasking
3    problem in a way that is in the interest of the
4    regulator.
5            So this -- that's a little abstract,
6    but it has to do with things like pay for
7    performance, has to do with whether that matters
8    to providers, in what ways pay for performance
9    affects providers.
10           I've done this even in the substance
11   abuse area to evaluate state-based pay for
12   performance systems in substance abuse to see
13   how providers respond to that and address the
14   multiple objectives the state has in that
15   context.
16       Q.  Have you read any studies of the
17   application of Parkinson's law in the workplace
18   as applied to how employees spend their time?
19       A.  Well, if you permit me to include the
20   studies I've just been referring to as falling
21   within the broad category of the level of
22   resources available and the activities of
23   workers, then yeah, I read all kinds of things
24   in this area.

Page 241

1        Q.  But your answer is yes with that broad
2    category that you've just described?
3        A.  Well, I'm a health economist, so I
4    tend to read things in the health economics
5    world.
6        Q.  Under Parkinson's law, you cannot
7    conclude that the chief needs eight hours to do
8    his work just because he spent eight hours on
9    it, correct?
10       A.  Under Parkinson's law.  Maybe you
11   could be specific about what you mean by "under
12   Parkinson's law."
13       Q.  Well, given Parkinson's law, which
14   says the time it takes to complete work expands
15   to fill the time allotted, if Parkinson's law
16   holds true, you can't conclude that the chief
17   needs eight hours to do his work just because he
18   spent eight hours doing it --
19           MR. SOBOL:  Objection.  Form.
20   BY MR. KEYES:
21       Q.  -- correct?
22           MR. SOBOL:  Objection.  Form.
23       A.  I know you get to ask the questions,
24   but under my interpretation of Parkinson's law

61 (Pages 238 to 241)

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1  here, it would be something like the work
2  expands to fill the time available. And I'm
3  kind of like that at the office. I will go in
4  and plan to leave at a certain time, and I'll
5  work the whole time that I'm there. So the work
6  expands, but it's not like I'm not working. And
7  if somebody asks me to do something over here
8  that's different, then I do something less over
9  there.
10  BY MR. KEYES:
11      Q.  Under the application of Parkinson's
12  law, the chief may have taken eight hours to do
13  his work because he had eight hours available to
14  do it, so he was going to be on the job for
15  eight hours.
16          MR. SOBOL: Objection. Form.
17  BY MR. KEYES:
18      Q.  Right?
19      A.  I don't know about the "right."
20      Q.  Well, correct? Do you agree with that
21  proposition?
22          MR. SOBOL: Objection to form.
23      A.  I'm going to withhold agree or
24  disagree until you go on a little bit.

Page 243

1  BY MR. KEYES:
2      Q.  Well, under the application of
3  Parkinson's law, if it holds true, the chief may
4  have taken eight hours to do the work just
5  because he was going to be on the job for eight
6  hours, not because he actually needed eight
7  hours to get all that work done.
8          MR. SOBOL: Objection.
9          Is there a question before him?
10  BY MR. KEYES:
11      Q.  I asked you before, do you agree with
12  that statement?
13      A.  I don't agree with that statement.
14      Q.  And you can't rule out that if the
15  chief were only given seven hours to do his work
16  he could get it done in seven hours?
17          MR. SOBOL: Objection.
18          Is there a question.
19  BY MR. KEYES:
20      Q.  Correct?
21          MR. SOBOL: Objection.
22      A.  This is an improper economic
23  application of the concept of opportunity cost.
24  The basic idea of opportunity cost is you devote

Page 244

1  resources. It could be money, it could be time
2  or something over here, and there's stuff lost
3  because of that. It's why in my restaurant
4  example I didn't need to tell you what I didn't
5  buy in order to be confident that the cost of
6  fixing my car was $75. Why didn't I need to
7  tell you that? Why -- and aren't their
8  hypotheticals that you could make up that would
9  interfere with that inference? But you just
10  don't need to do it in an economic opportunity
11  cost approach. It comes out of something.
12  It's -- some other activities are there, and
13  there's a cost.
14  BY MR. KEYES:
15      Q.  Or it could come out of leisure. It
16  doesn't necessarily come out of other work,
17  right?
18          MR. SOBOL: Objection.
19      A.  You're trying to get -- to avoid the
20  opportunity cost approach. It's not the way
21  opportunity cost is thought about in economics.
22  BY MR. KEYES:
23      Q.  No, sir. I understand from economics
24  that everything has an opportunity cost,

Page 245

1  literally everything, right, because when you
2  make one choice, you're by definition not
3  choosing other things. I'm not debating whether
4  it has an opportunity cost.
5          I am trying to get you to answer my
6  question whether that opportunity cost can be
7  someone's leisure time or someone's downtime, or
8  it can be excess capacity, it doesn't mean that
9  other work necessarily doesn't get done. And
10  you seem to be wrestling with that proposition
11  suggesting that, no, the opportunity cost is
12  that other work necessarily does not get done,
13  and I'm trying to understand why you're
14  wrestling with that.
15      A.  I think you said that backwards, but I
16  know what you're getting at.
17          Because it's not the conventional
18  application of the economics of opportunity
19  cost, which is a very time-honored approach to
20  asking the cost of things, as in my car example
21  and the restaurant example. There's an
22  opportunity cost to that money, there's an
23  opportunity cost to the time, and that tells me
24  what I need to know.

62 (Pages 242 to 245)

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    Q.  Okay.  So in my hypothetical where it
2  doesn't take the chief eight hours to do his
3  non-opioid-related work and he has at least an
4  hour of downtime or leisure time, if he is then
5  asked to spend an hour on opioid-related work,
6  the opportunity cost is giving up that leisure
7  or downtime?
8      MR. SOBOL:  Objection.
9    A.  That's not the way I would approach it
10  as an economist, which is my approach is
11  grounded in the idea of opportunity cost.  When
12  I spend $75 on my car, I don't need to be
13  quizzed about where that $75 comes from.
14  BY MR. KEYES:
15    Q.  Are you just as productive every
16  single day, or are there some days when you're
17  more productive and some days when you're less
18  productive?
19      MR. SOBOL:  Objection.  Scope.
20    A.  That's a subjective thing, but I
21  sometimes feel more or less productive.
22  BY MR. KEYES:
23    Q.  And so in the same block of time,
24  sometimes you get more done and sometimes you

Page 247

1  get less done?
2    A.  Yeah, broadly speaking, of course,
3  these days one does more than one thing in the
4  same block of time.
5    Q.  Have you studied -- in order to
6  evaluate whether this hypothetical of the chief
7  is accurate, you'd need to go talk to the chief
8  more and say, how much time do you spend, are
9  you working productively, are you working
10  efficiently, do you have downtime, in order to
11  resolve this debate we're having about whether
12  working on opioid-related activities takes away
13  from non-opioid-related activities?
14    A.  No, I wouldn't need to do that.
15    Q.  You wouldn't need to do that.
16      And so in this case, not in the
17  hypothetical, in order to determine what people
18  are giving up in terms of the activities they're
19  spending during the day, you wouldn't talk to
20  any employees of Summit County or any employees
21  of Cuyahoga County?
22      MR. SOBOL:  Objection.
23      Is there a question?
24  BY MR. KEYES:

Page 248

1    Q.  Is that right?
2      MR. SOBOL:  Objection.
3    A.  You went very general right at the end
4  of that question.  With respect to?
5  BY MR. KEYES:
6    Q.  With respect to what people are giving
7  up when they spend their time on one activity
8  versus the other.  If you don't want to talk to
9  the chief in my hypothetical or your
10  hypothetical, then I take it you don't want to
11  talk to any of the employees of Summit County or
12  Cuyahoga County.
13    A.  No, I do.
14      MR. SOBOL:  Wait a second.  Objection.
15      MR. KEYES:  Okay.
16      MR. SOBOL:  I don't understand the
17  question.
18    A.  I'm also a bit lost.
19  BY MR. KEYES:
20    Q.  Okay.  I asked in the hypothetical --
21  take your hypothetical or my hypothetical.  We
22  have a disagreement over whether the chief
23  actually needs all eight hours, whether the
24  chief could get the same amount of work done in

Page 249

1  less time, whether working on opioid-related
2  activities would take away from
3  non-opioid-related activities.  You said that's
4  not a realistic hypothetical.  I say it is a
5  realistic hypothetical.
6      In that hypothetical we could go talk
7  to the chief to figure out whether the chief
8  does have leisure time, whether the chief does
9  have downtime, whether the chief is working
10  efficiently, correct?
11      MR. SOBOL:  Objection.
12      Don't answer the question.
13  BY MR. KEYES:
14    Q.  We could do that?
15      MR. SOBOL:  Objection.  I instruct him
16  not to answer.  I have no idea what you asked
17  him.  You just talked for eight lines and then
18  are asking the word "correct."  Makes no sense.
19  BY MR. KEYES:
20    Q.  We could go talk to the chief to learn
21  more about how the chief spends his time,
22  correct?
23      MR. SOBOL:  Objection.  Objection.
24      Who is "we"?

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1          MR. KEYES:  The professor and I as we
2    debate our hypothetical.
3          A.  Our team.
4    BY MR. KEYES:
5          Q.  So it is -- we could do that.  You
6    can't disagree.  Now, you may choose not to do
7    it, and I asked would you, and you said no, so
8    now I'm moving from the hypothetical to the
9    facts of this case.
10         A.  Okay.
11         Q.  Is it the case, then, that you see no
12   need to talk to the employees of Summit County
13   or Cuyahoga County to figure out how they're
14   actually spending their time and whether they
15   have excess time that could be spent on
16   opioid-related activities?
17         MR. SOBOL:  Objection.  Asked and
18   answered.
19         A.  I think our disagreement is more
20   fundamental.  It's about whether the economic
21   concept of opportunity cost is the right way to
22   go here, which I assume it is, as I state in my
23   report.  And once I make a determination that
24   opportunity cost is the way to go, then I'm able

Page 251

1    to identify what the opportunity cost of a
2    resource is in terms of dollars or in terms of
3    time by saying this resource is less available
4    to other things.
5          And just to -- if I were to try to
6    convince a fact-finder about this, I think the
7    analogy to consumers is extremely appropriate,
8    that we don't ask individuals what would you
9    have done with that $75 and expect an answer
10   that is -- that you approve of to say that they
11   spent it efficiently, or that they had leisure
12   time and they could have worked more and made
13   the $75.  We don't do that.  And the reason we
14   don't do it is because the idea of opportunity
15   cost as it comes out of them either in terms of
16   money or time, and that's a good solid economic
17   measure of what the value of the resource is.
18   BY MR. KEYES:
19         Q.  Have you studied whether the personnel
20   of any of the affected divisions had excess
21   capacity?
22         A.  I'm going to ask you to define "excess
23   capacity."
24         Q.  You talk about excess capacity in your

Page 252

1    report.
2          A.  Okay.  So...
3          Q.  Using excess capacity as defined in
4    your report, did you interview -- did you study
5    whether the personnel of any of the affected
6    divisions had excess capacity?
7          MR. SOBOL:  Objection.
8          A.  I discussed excess capacity in my
9    report, for the purpose of explaining why the
10   presence of excess capacity does not imply that
11   the opportunity cost concept here doesn't work.
12   It does work.
13         And as I said a few minutes ago when
14   we started on this discussion, especially for
15   public safety, there's excess capacity in a
16   sense sometimes when people aren't fully busy,
17   but that's not inefficient.  We have to have
18   that.
19   BY MR. KEYES:
20         Q.  Have you studied whether any of the
21   personnel for any of the affected divisions had
22   excess capacity?
23         MR. SOBOL:  Objection.  Asked and
24   answered.

Page 253

1          A.  This wasn't necessary for me to be
2    able to do my -- to apply my opportunity cost
3    analysis.
4    BY MR. KEYES:
5          Q.  So you didn't study it, correct?
6          MR. SOBOL:  Objection.  Asked and
7    answered.
8          A.  It wasn't necessary that I study it.
9    BY MR. KEYES:
10         Q.  Whether it's necessary or not, did you
11   study it?
12         MR. SOBOL:  Objection.
13         That's the fourth time, maybe the
14   third, but certainly more than two.
15         A.  I just want to be clear about the role
16   of excess capacity, and why if the logic I'm
17   applying to it is correct, which I believe it
18   is, then I don't need to be able to make a
19   judgment about the EMS personnel and how much
20   time they sit around the fire station, and is
21   that excess capacity or is that appropriate
22   capacity to be able to respond to stochastic
23   healthcare events.
24   BY MR. KEYES:

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1      Q.  Do you believe that there is such a
2   thing as optimal excess capacity where you have
3   just enough, but not too much?
4      A.  If you're able to write down a problem
5   sort of completely, then there are ways to
6   characterize what optimal capacity would mean
7   in, for example, say, a bridge or something like
8   that.
9      Q.  Do you believe that there is such a
10  thing as efficient excess capacity and such a
11  thing as inefficient excess capacity?
12     A.  Well, these things would be connected,
13  the concepts you're asking about.  If there's an
14  optimal excess capacity that's a certain level
15  of excess capacity, one could call that the
16  efficient level of excess capacity.  You might
17  be a little more generous with respect to your
18  application depending on what the context is and
19  say there's kind of a range of things we would
20  regard to be efficient in this context, and then
21  you might be able to sometimes determine if
22  there's inefficient excess capacity.
23     Q.  Did you study whether any of the
24  personnel of any of the affected divisions had

Page 255

1   suboptimal or inefficient excess capacity?
2      A.  Well, this -- as I answered a few
3   minutes ago, this is not something I need to do
4   to be able to apply the concept of opportunity
5   cost.
6      Q.  So you didn't do it?
7         MR. SOBOL:  Objection.
8      A.  I didn't need to know what I would
9   have spent with that $75 to be able to answer
10  that it cost me $75 to fix the car.
11  BY MR. KEYES:
12     Q.  Does every municipal government
13  division need excess capacity?
14     A.  I think probably in some sense yes,
15  but it would vary according to the division.
16     Q.  So you would expect that every
17  municipal government division did have excess
18  capacity?
19        MR. SOBOL:  Objection.
20     A.  In the sense that I answered a few
21  minutes just this previous question, it would be
22  a yes, without any implication that excess
23  capacity was inefficient.
24  BY MR. KEYES:

Page 256

1      Q.  Did you study whether any of the
2   affected divisions was short-staffed because of
3   opioid-related needs and, therefore, couldn't
4   respond to an emergency?
5         MR. SOBOL:  Objection.
6      A.  There is evidence in the record for
7   that effect of -- by short-staffing, for
8   example, I mean, police who would have been
9   forced to work on opioid-related activities and
10  could not continue to do some things they'd done
11  previously.
12  BY MR. KEYES:
13     Q.  Anything else?
14     A.  I think it's true in family services,
15  in the medical examiner office.  They weren't
16  able to continue to take contracted work from
17  outside the county.  There may be other
18  examples.
19     Q.  My question was, did you study whether
20  any of the affected divisions was short-staffed
21  because of opioid-related needs and, therefore,
22  couldn't respond to an emergency?
23     A.  Oh, an emergency.
24     Q.  Did you study that?

Page 257

1      A.  I think in many cases crime is an
2   emergency, so short-staffing of police probably
3   would fit there.
4      Q.  Anything else?
5      A.  Nothing that comes to mind.
6      Q.  Okay.  And what evidence can you point
7   to in this record that there was short-staffing
8   of the police such that the police could not
9   respond to emergencies?
10     A.  Well, I would say there's two types of
11  evidence.  One is the lessened ability of police
12  to respond to emergencies that just logically
13  follows from the fact that police have fewer
14  hours that are not devoted to opioids.  So it
15  seems clear that if, say, 20 percent of police
16  time is devoted to opioids over here, then
17  there's a smaller amount of police time that is
18  available to respond to emergencies with respect
19  to other public safety issues.  And there's some
20  specific testimony in the record also about
21  activities the police had done before, and with
22  opioids now they're not able to do.
23     Q.  Well, you gave an example that said if
24  you're spending, say, 20 percent of police time

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    devoted to opioids over here, then there's a
2    smaller amount of police time that is available
3    to respond to emergencies, so that would draw
4    down on any excess capacity.
5           My question is, are you aware of any
6    evidence that the police of either county were
7    short-staffed such that they could not respond
8    to any emergencies?
9           MR. SOBOL:  Objection.
10          A.  Could not respond.  They could
11   certainly respond less quickly and less well.
12   Was it impossible?  I don't know.
13   BY MR. KEYES:
14          Q.  Are you aware of any evidence that the
15   police of either Summit County or Cuyahoga
16   County were short-staffed such that they did not
17   respond to any emergencies?
18          A.  Well, again, here there's two forms of
19   evidence.  The first one is my inference from
20   the less time police would have to respond to
21   other non-opioid emergencies.  It seems obvious
22   to me that they would be less able to respond to
23   those kind of emergencies.
24          And there's also evidence in the

Page 259

1    record of -- I'm not sure what official was
2    saying this -- of how police were diverted to
3    opioids and could not respond to homicides and
4    rapes, which I consider to be emergencies.
5           Q.  And whose testimony are you referring
6    to there?
7           A.  See, I don't -- I know I read it.  I
8    don't know if I cite it or it's in the
9    depositions that I read or what exactly.
10          Q.  You cited that deposition testimony
11   and then you cited the inference.  But you're
12   making an assumption that the excess capacity
13   was so drawn down that they were so
14   short-staffed that, in fact, they did not
15   respond to any emergencies, but you can't point
16   to any emergencies they did not respond to,
17   right?
18          MR. SOBOL:  Objection.
19          Which question?
20   BY MR. KEYES:
21          Q.  You can answer.
22          A.  Well, there was two aspects of support
23   I mention with respect to the inference.  One is
24   the less time being available, which seems --

Page 260

1    I'm not sure why you would not agree with that.
2    And the other is kind of anecdotes of local
3    officials that specifically mention homicides
4    and rapes that would go uninvestigated because
5    police are diverted into opioids.
6           Q.  You cite in your report "the well
7    accepted analogy between government and consumer
8    decision-making with respect to resource
9    allocation."
10          Do you recall that?
11          A.  I do.  If you wouldn't mind --
12          Q.  It's on Page 14 of your report.
13          A.  -- telling me the page.
14          Q.  Do you see that?
15          A.  I do.
16          Q.  And in your discussion you cite
17   Professor Gruber and Professor Rosen and
18   Professor Mikesell?
19          A.  Yes.
20          Q.  And so when you refer to them, do you
21   consider them to be knowledgeable about this
22   analogy and whether this analogy holds?
23          A.  I do, yes.
24          Q.  Do you consider them to be

Page 261

1    authoritative about this analogy and whether
2    this analogy holds?
3           A.  I do, yes.
4           Q.  On Page 15 you say "Government" --
5    this is at the top of the page, "Governments
6    maximize the welfare of their constituents when
7    resources are allocated to their most highly
8    valued use, leading to a budgetary allocation in
9    which the social value of an additional dollar
10   is equal across services."
11          Do you see that?
12          A.  Yes, I see it.
13          Q.  And you say "Governments maximize,"
14   not governments can maximize.  You say
15   "Governments maximize."  So you're positing that
16   governments in practice maximize the welfare of
17   their constituents when they allocate resources
18   to their most highly valued use, right?
19          A.  Well, this is in the context of the
20   analogy you mentioned a moment ago between
21   government behavior and consumer behavior, and
22   what do we say about consumers when we regard
23   how we approach the question of how consumers
24   behave?  We say they maximize utility, which

66 (Pages 258 to 261)

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    means they make choices on their own behalf that
2    are in their own best interest as they see it.
3        Q.  Where consumer is the solitary single
4    decision-maker of his or her own welfare,
5    correct?
6        A.  Not always, but sometimes.  That's the
7    accepted model of consumer behavior, and we're
8    talking here about the analogy between the model
9    of consumer behavior and the model of government
10   behavior, and that's the analogy.
11          The analogous approach to government
12   would be they have a kind of budget, they have
13   alternative uses for that budget, and they use
14   that budget in order to maximize, which is
15   really the same nature of assumption as you are
16   getting involved in when you say consumers
17   maximize the value of the budget, which has the
18   implication that the resources at the margin are
19   -- held the same value.
20       Q.  Did you study if Summit County and
21   Cuyahoga County governments allocated their
22   resources to the most highly valued use when
23   they allocated their budget dollars?
24          MR. SOBOL:  Objection.

Page 263

1        A.  This is why I included this material
2    right here, so the reader would understand the
3    economic approach that I'm applying to resource
4    allocation, which is a conventional economic
5    approach that has analogies to consumer behavior
6    and that underlies the idea of opportunity cost.
7    BY MR. KEYES:
8        Q.  Did you study if Summit County and
9    Cuyahoga County governments allocated their
10   resources to the most highly valued use when
11   they allocated their budget dollars?
12          MR. SOBOL:  Objection.  Asked and
13   answered.
14       A.  Using this approach to government
15   behavior, the application to any particular
16   government is that yes, they are doing that.
17   BY MR. KEYES:
18       Q.  But that's an ipse dixit.  I posit a
19   theory, therefore it must hold true here.
20          I'm asking you, did you study, did you
21   conduct any investigation of facts and gather
22   empirical evidence to confirm that the theory
23   holds true here such that Summit County and
24   Cuyahoga County allocated their resources to

Page 264

1    maximize their welfare and allocating them to
2    the most highly valued use?  Did you do any kind
3    of study here as to Summit County and Cuyahoga
4    County?
5           MR. SOBOL:  Objection.  Asked and
6    answered twice before.
7        A.  The purpose of this section is to lay
8    out the economic approach to understanding that
9    resource allocation.
10          And the direct answer to your question
11   here, and I'm going to rely on the analogy to
12   consumers again, so the $75 which I've been fond
13   of talking about as the cost to the consumer of
14   fixing their car, do I have to assume that that
15   consumer is maximizing utility in where they
16   took that money from in order for you or some
17   other reasonable person to conclude that $75 is
18   what the cost to them of fixing the car is?
19   Kind of.  I mean, you need to have a conception
20   that consumers are doing something in their
21   self-interest.
22          And the same -- exactly the same
23   analogy is true for the governments here.
24   They're spending their resources, the time of

Page 265

1    their personnel on something, within an economic
2    framework in which opportunity cost is the
3    appropriate way to judge the value of resources.
4    It's not necessary for me to make an assessment
5    of whether you are maximizing utility at the
6    time you spend $75 to fix your car, and it's not
7    necessary for me to make an investigation of the
8    optimal resource allocation that governments are
9    deciding about in the context of -- we're
10   talking about here today.
11   BY MR. KEYES:
12       Q.  I asked a yes-or-no question.  Did you
13   study if Summit County and Cuyahoga County
14   governments allocated their resources to the
15   most highly valued use when they allocated their
16   budget dollars?  Yes, they did, or no, they
17   didn't?
18          MR. SOBOL:  Or you can't answer the
19   question.
20   BY MR. KEYES:
21       Q.  Yes, you studied, no, I didn't study
22   it, and then if you didn't study it you can tell
23   me why you think it was unnecessary.  But did
24   you study it?

67 (Pages 262 to 265)

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1          MR. SOBOL:  Object to the form.  I'm
2   not sure which question you're asking him.
3          And if you can't answer the question
4   yes or no, he's not required to.  Asked and
5   answered, also, four times.
6   BY MR. KEYES:
7      Q.  Is that a question you can't answer,
8   did you study it or not?
9          MR. SOBOL:  Well, now I don't know
10  what question you're asking.  Are you pressing
11  the one before?  Are you withdrawing that and
12  asking a new one?
13  BY MR. KEYES:
14     Q.  Go ahead.
15         MR. SOBOL:  Go ahead what?
16  BY MR. KEYES:
17     Q.  Answer the question I just posed.
18         MR. SOBOL:  You just posed four of
19  them.
20         MR. KEYES:  You can do your best to
21  interfere.  We're going to just keep going
22  through it.
23         MR. SOBOL:  I know.  I'm just trying
24  to get -- have a clear question and answer.

Page 267

1   Maybe ask a new question.
2   BY MR. KEYES:
3      Q.  My question is, did you study whether
4   the Cuyahoga County or Summit County governments
5   allocated their resources to the most highly
6   valued use when they allocated their budget
7   dollars?  Yes or no.
8          MR. SOBOL:  Objection.  Asked and
9   answered three times.
10         If you cannot answer the question yes
11  or no, answer the question truthfully.
12     A.  I don't feel like I can answer that
13  question yes or no.
14  BY MR. KEYES:
15     Q.  Okay.  Did you study whether --
16         MR. SOBOL:  Well, you've interrupted
17  him.
18     A.  There is an important sense in which I
19  studied this, which is to consider the
20  appropriate economic framework for understanding
21  local government behavior, relying on the
22  analogy to consumer behavior, which I won't go
23  through again but which you've heard, and using
24  that to enable me to infer from resources

Page 268

1   allocated to a particular use the opportunity
2   cost of those resources elsewhere.  That's
3   mainstream economics, application of opportunity
4   cost.  Economists do it all the time in consumer
5   and other areas.  That's what it is.
6   BY MR. KEYES:
7      Q.  Did you study whether efficiency drove
8   the Cuyahoga County or Summit County government
9   decision-making in their budget process?
10         MR. SOBOL:  Objection.  Asked and
11  answered.
12     A.  It's a slightly different form of the
13  same question, as I interpret it.  And the
14  nature of my study is to identify the
15  appropriate economic framework for inferring the
16  value of resources in alternative uses in the
17  context of reallocation of resources to the
18  opioid crisis, and just -- excuse me -- that's
19  the opportunity cost approach, it's mainstream
20  economics, and that's exactly what I do here.
21  BY MR. KEYES:
22     Q.  Did you study the impact of other
23  factors on the Cuyahoga County and Summit County
24  government budget setting?

Page 269

1          MR. SOBOL:  Objection.  Asked and
2   answered.
3      A.  I'm not sure what you mean with this
4   question.
5   BY MR. KEYES:
6      Q.  Well, you're positing without actually
7   looking at the specifics of Cuyahoga County or
8   Summit County that efficiency drove the budget
9   process.  And I'm asking, did you study the
10  impact of other factors on the budget process
11  that would explain why dollars were allocated
12  the way they were in the budget?
13         MR. SOBOL:  Objection.  Asked and
14  answered.
15     A.  You know, I don't have a lot to add to
16  what I've mentioned already, that within the
17  conventional economic framework of government
18  behavior, then identification of the resources
19  devoted to a particular use is the measure of
20  opportunity cost.
21  BY MR. KEYES:
22     Q.  Can you identify what factors other
23  than efficiency might drive or influence the
24  budget process for a municipality?

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1     A.  The budget process?  I'm sorry, what
2  do you mean by "the budget process" here?
3     Q.  The process by which decisions are
4  made as to how to allocate dollars in the
5  budget.
6     A.  I think I discuss this a bit in my
7  report.  In some cases governments are
8  constrained by inability to raise additional
9  revenue.  They might, if they're attempting to
10 benefit the citizens, raise more revenue and
11 spend even more than they're able to with their
12 limited budget on some particular application.
13 So there the other factor might be something
14 that makes it difficult or even constrains a
15 local government from raising revenue or
16 borrowing funds, for example.
17    Q.  What if revenue cannot be increased
18 such that the total amount of revenue is fixed,
19 can you identify what factors besides efficiency
20 may drive or influence how those dollars are
21 allocated in the budget?
22    A.  Well, I have a framework for that,
23 which is that the government is using funds in
24 order to benefit the citizens, and that's -- I

Page 271

1  realize that's a general statement.  Excuse me,
2  one more sec.  There are factors that would play
3  into that which have to do with, say, changes in
4  the population composition that may require more
5  spending on public schools or some other
6  government activity.
7     Q.  Did you study the influence of
8  politics on how Summit County and Cuyahoga
9  County allocated dollars in their budgets?
10    A.  What do you mean "in this case"?  I
11 know what politics is, but what do you mean
12 here?
13    Q.  I mean political considerations.  I
14 mean appeasing certain groups, punishing other
15 groups, maximizing chances of being
16 re-elected --
17    A.  I realize --
18    Q.  -- any of those factors.  Do you
19 understand any of those factors?
20    A.  I realize that elected officials are
21 human beings, but still the accepted economic
22 approach to this is to regard these things as
23 playing out in a way to -- so the funds are used
24 for the benefit of the citizens.

Page 272

1     Q.  You keep saying the accepted approach.
2  I'm not asking about theory.  I'm asking about
3  Summit County and Cuyahoga County.
4        Did you study, for instance, the
5  impact of lobbying or the influence of interest
6  groups and how Summit County and Cuyahoga County
7  allocated dollars in their budget?
8     A.  Well, that's an example of a factor
9  that would be involved in expression of the
10 interest of the citizens, and it may well
11 influence the budget allocation, but it doesn't
12 change the ability to use opportunity cost as a
13 framework for assessing the impact of opioids.
14    Q.  Did you study the impact of corruption
15 on the decision-making of the Summit County or
16 Cuyahoga County government officials in
17 allocating dollars in the budget?
18       MR. SOBOL:  Objection.  Assumes a fact
19 not in evidence.
20    A.  I don't know that there were -- that
21 there was corruption.  I'm going to stop there,
22 see if you let me get away with that.
23 BY MR. KEYES:
24    Q.  You don't know because you didn't

Page 273

1  study it, right?  I mean, you didn't know
2  because you didn't study it.  My question wasn't
3  whether there was.  My question is, did you
4  study it?  Did you study whether corruption had
5  any impact on the decision-making of Cuyahoga
6  County or Summit County government officials
7  when they were deciding how to allocate dollars
8  in their budget?
9        MR. SOBOL:  Objection.  Assumes a fact
10 not in evidence.
11    A.  That would have been outside the scope
12 of my report.
13       MR. SOBOL:  I could have said that,
14 too, but I was leaving that to you.
15 BY MR. KEYES:
16    Q.  Are you aware of whether there have
17 been issues of corruption in either Summit
18 County or Cuyahoga County?
19    A.  I'm not aware.
20    Q.  Did you look into that at all?  Did
21 you ask the question, has there been a problem
22 with corruption in Cuyahoga County or Summit
23 County?
24       MR. SOBOL:  Objection.

69 (Pages 270 to 273)

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1      A.  It wasn't part of my assignment.
2  BY MR. KEYES:
3      Q.  Did you do any research into whether
4  there had been problems with political
5  corruption in either Summit County or Cuyahoga
6  County?
7          MR. SOBOL:  Objection.
8      A.  It wasn't part of my assignment.
9  BY MR. KEYES:
10     Q.  Are you aware that there have been
11  high-level Cuyahoga County officials who have
12  been indicted?
13         MR. SOBOL:  Objection.
14     A.  I'm not aware.
15  BY MR. KEYES:
16     Q.  Are you aware that some of them have
17  pled guilty?
18         MR. SOBOL:  Objection.
19     A.  I'm also not aware of that.
20  BY MR. KEYES:
21     Q.  Are you aware that there are several
22  Cuyahoga County officials who are currently
23  indicted, who are being prosecuted for political
24  corruption?

Page 275

1      A.  I'm not aware of that.
2          Can I ask my able assistant to get me
3  some water?
4          MR. SOBOL:  Yes, you may.  You can ask
5  all you want.  I'll have my assistant get your
6  water for you.
7  BY MR. KEYES:
8      Q.  You say -- on Page 15 in Paragraph 24,
9  you talk about what efficiency requires.
10         Do you see that?
11     A.  Yes.
12     Q.  Again that's the theory, what
13  efficiency requires?
14     A.  Yes.
15     Q.  But not something that you've studied
16  with respect to Summit County or Cuyahoga County
17  in this engagement, because you're sticking with
18  the theory and you think the theory holds,
19  right?
20     A.  I'm probably going to disagree with
21  you, but why don't you go on a little bit and
22  I'll chime in.
23     Q.  Well --
24         MR. SOBOL:  Well, how about this,

Page 276

1  rather than him going on a while and you chiming
2  in, questions --
3  BY MR. KEYES:
4      Q.  I'm not going to table questions.  You
5  can answer or not, but --
6          MR. SOBOL:  How about you ask
7  questions and you give answers.
8      A.  I'll be a better witness.
9          I disagree.
10  BY MR. KEYES:
11     Q.  Okay.  Why do you disagree?
12         MR. SOBOL:  Well, wait.  I don't even
13  know what's going on right now.  I don't know
14  that you're disagreeing or agreeing or whether
15  it's supposed to be --
16         MR. KEYES:  Stop coaching him.
17  BY MR. KEYES:
18     Q.  Why do you disagree?
19         MR. SOBOL:  I'm not coaching him, but
20  I am giving him instructions that he's not to be
21  chiming in or having conversation.  He has to
22  ask questions, and you give an answer.
23         THE WITNESS:  My bad.
24  BY MR. KEYES:

Page 277

1      Q.  Why do you disagree?
2          MR. SOBOL:  Objection.
3          To what?
4      A.  It's not solely a theoretical
5  exercise.  The increased demands that I'm
6  referring to here are the opioid crisis.
7  BY MR. KEYES:
8      Q.  Okay.  You say "This reallocation of
9  resources is the cost of providing Bellwether
10  government services in response to the opioid
11  crisis."  Right?
12     A.  Yes, I say that.
13     Q.  Okay.  What dollars were reallocated
14  to the opioid crisis?
15     A.  The ones that are contained in my
16  report.
17     Q.  Away from what?
18     A.  Away from other activities of the
19  division.
20     Q.  What activities of the division?
21     A.  This is the opportunity cost question
22  again.  I don't need to know where that $75
23  comes from, and I don't need to know what
24  exactly was done less.

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    Q.  Okay.  So if I go through your tables
2   and you point me to dollars that you say are the
3   opportunity cost and are damages in your
4   framework, and I ask you what would those
5   dollars have been spent on if they weren't spent
6   on the opioid crisis, are you going to tell me
7   every time that you don't know and you don't
8   need to know?
9         MR. SOBOL:  Objection.
10        A.  I'm going to tell you that these
11  dollars are a valid measure of opportunity cost.
12  And if you ask me, well, what exactly,
13  Professor McGuire?  It came out of the budget
14  available for other things, and I can't tell you
15  what the mix of those things are, just like --
16  just like if I spend $75 fixing my car, what
17  exactly did that come out of, Tom, when you
18  spend that money?  I may not even know, and it's
19  not important for assessing the opportunity cost
20  of that spending.
21  BY MR. KEYES:
22        Q.  For any affected division, did you
23  attempt to determine what the dollars have been spent on if
24  describe as damages would have been spent on if

Page 279

1   they weren't spent on opioid services?
2         MR. SOBOL:  Objection.
3         A.  I do think I answered that question.
4   BY MR. KEYES:
5         Q.  You said it's not important for
6   assessing the opportunity cost to that spending,
7   so I'm asking, did you attempt to look at it?
8         MR. SOBOL:  Objection.
9         A.  I didn't need to in order to apply the
10  opportunity cost framework.
11  BY MR. KEYES:
12        Q.  So you didn't?
13        MR. SOBOL:  Objection.  Asked and
14  answered.
15  BY MR. KEYES:
16        Q.  Go ahead, you can finish.
17        A.  Because I didn't need to.
18        Q.  You say on Page 18 of your report,
19  Paragraph 30, you say, "the damage analysis
20  presented in this report focuses on the value of
21  resources that the Bellwether jurisdictions
22  shifted from alternative uses to combat the
23  opioid epidemic."
24        Do you see that?

Page 280

1         MR. SOBOL:  That was a part of the
2   sentence?
3         MR. KEYES:  Yes, it's the part I'm
4   asking the question about, yes.
5         A.  I do see that, yes.
6   BY MR. KEYES:
7         Q.  Okay.  And the resources that you say
8   were shifted from alternative uses are the
9   dollars that you have described as damages --
10        MR. SOBOL:  Objection.
11  BY MR. KEYES:
12        Q.  -- correct?
13        MR. SOBOL:  Objection.
14        A.  Are measured by the dollars.
15  BY MR. KEYES:
16        Q.  And you say that those are resources
17  that were shifted from alternative uses.  What
18  were the alternative uses that would have
19  received those dollars but for the opioid
20  epidemic and the defendants' conduct?
21        A.  It would have been a
22  division-by-division question, and it would
23  consist of the other activities of the division.
24        Q.  And are you able to tell me with any

Page 281

1   specifics what those are for any division?
2         A.  It does depend on the division.
3         Q.  Did you talk to anyone at Summit
4   County or Cuyahoga County in any division about
5   what they would have done with the dollars that
6   you say were shifted away towards opioid-related
7   services?
8         A.  This relates to what we spoke about
9   earlier this morning and the question of
10  diversion.  And it's something that I was
11  interested in from the get-go, and asked my
12  staff to be on the lookout for evidence of
13  diversion both in terms of their interviews and
14  in terms of the record here, including the
15  deposition.  So in many of these contexts, yes,
16  there was.
17        Q.  In the answer you just gave, you're
18  talking about diversion of dollars, not
19  diversion of opioids, correct?
20        A.  Yes, diversion of resources of the
21  local government, not diversion of the drugs.
22        Q.  If you turn again to the last three
23  tables in your report, these are the total
24  damages that you attribute to the defendants'

71 (Pages 278 to 281)

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1  misconduct.
2      A.  Okay.
3      Q.  Have you calculated the total damages
4  that you attribute to the defendants' misconduct
5  that results from people using or abusing
6  illicit opioids as distinct from prescription
7  opioids?
8      A.  Yes, I think I understand the
9  question.
10       The inputs to my analysis in the form
11  of Professor Cutler's share don't make that
12  distinction, so in my work I don't calculate
13  those separately, which is to say that I don't
14  calculate the harms appearing either through the
15  proximal cost of illicit or licit opioids.
16      Q.  You don't distinguish between illicit
17  opioids and prescription opioids for purposes of
18  your calculation of damages, right?
19      A.  In the sense of the production of
20  these tables, the -- I use the share that David
21  Cutler gives me, and that share is the share of,
22  for example, opioid deaths that could be because
23  of illicit or licit opioids that are
24  attributable to the defendants' misconduct, and

Page 283

1  in that share of death are both.
2      Q.  You reference these tables.  I should
3  expand my question.
4       Anywhere in your report do you offer
5  calculations of damages that distinguish between
6  damages arising from people's use or abuse of
7  illicit opioids as distinct from people's use or
8  abuse of prescription opioids?
9      A.  I believe this is where I do damages
10  in my report, so it would be here, and that
11  distinction is --
12      Q.  Is not here?
13      A.  -- not made here.
14      Q.  Similarly, anywhere in your report do
15  you offer calculations of damages that
16  distinguish between damages arising from people
17  using prescription opioids that were prescribed
18  to them versus damages arising from people using
19  prescription opioids that were diverted and
20  weren't prescribed to them?
21      A.  I understand the question.
22       The similar answer, the numbers I'm
23  provided by Professor Cutler are total numbers
24  that include whatever route of harm there is

Page 284

1  from prescription opioids, either through
2  affecting the person directly, through
3  diversion, or through moving on to illicit
4  drugs. It's all in one number.
5      Q.  So you do not offer calculations that
6  distinguish between those two?
7      A.  I don't break it out into those
8  categories.
9      MR. KEYES:  Okay.  Why don't we take a
10  ten-minute break.
11      THE VIDEOGRAPHER:  The time is
12  3:21 p.m., and we're off the record.
13      (Whereupon, a recess was taken.)
14      THE VIDEOGRAPHER:  The time is
15  3:46 p.m., and we're on the record.
16  BY MR. KEYES:
17      Q.  Professor McGuire, I put in front of
18  you a laptop, and on the laptop and on the
19  various screens in the room is a copy of an
20  Excel spreadsheet that was produced by Summit
21  County.  The Bates number of that Excel
22  spreadsheet in native version is
23  SUMMIT_001952976.
24       Do you see that on your screen?  Do

Page 285

1  you see the Bates number at the top?
2      A.  At the top.  Oh, yes, okay.  I do.
3      Q.  Okay.  And if you'd open your report
4  to Page 35, at the top of Page 35 you say,
5  "Expenditure data for Summit County were
6  provided by the county government."  You drop a
7  footnote, footnote 83 --
8      MR. SOBOL:  I'm sorry, where?  Okay.
9  Go ahead, sorry.
10  BY MR. KEYES:
11      Q.  You drop a footnote.  It's number 83,
12  and it references SUMMIT_001952976.
13       Do you see that?
14      A.  I do.
15      Q.  And that matches the Bates number of
16  the Excel spreadsheet on your screen?
17      A.  Yes.
18      Q.  Earlier you said you couldn't recall
19  the expenditure data and you didn't know what
20  this Bates number referred to.  Does this
21  refresh your recollection?
22      A.  Yes.
23      Q.  So you said in your report that from
24  these expenditure data, identify those costs

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    that would be expected to vary in response to
2    changes in the services provided by these
3    divisions.  Now that you have this expenditure
4    data in front of you, can you walk me through
5    how you identified what you've called affected
6    costs and how you identified for affected costs
7    whether they were overhead or non-overhead?
8        MR. SOBOL:  Objection.
9        A.  All right.  This is the original
10   document from Summit County?
11   BY MR. KEYES:
12       Q.  Yes.
13       A.  Okay.  There's a number of components
14   to it.  Just give me a second here to see what
15   else you've got for me.
16       And these charts, were they -- this is
17   all Summit County stuff, not after it's been
18   worked over by Compass Lex?
19       Q.  This is the document as it was
20   produced in discovery, same Bates number as
21   referenced in your report.
22       A.  Okay.
23       Q.  I take it Compass Lexecon worked it
24   over at some point?

Page 287

1        MR. SOBOL:  Objection.
2        MR. KEYES:  Why?  It's the phrase he
3    just used.
4        MR. SOBOL:  Well, because you asked
5    one question, then you asked another question,
6    so now it's compound.  You didn't let him answer
7    the first question.
8        A.  Okay.
9        MR. SOBOL:  See, I'm on top of it.  I
10   know what I'm doing sometimes.
11       MR. KEYES:  Actually that was only one
12   question, but we'll let the record speak for
13   itself.  I think Mr. McGuire is still
14   familiarizing himself with this spreadsheet.
15       A.  Yeah, making -- it's a very long
16   spreadsheet.  So let's take an example here.
17       MR. SOBOL:  Before you do, is it
18   recorded what he's looking at, or -- it is,
19   okay.  Thank you.
20       A.  Okay.  I'm just -- I'm just going down
21   until I find what I think will be a good example
22   to talk about.  Maybe the mental health board.
23   BY MR. KEYES:
24       Q.  If we take the -- what's on the screen

Page 288

1    right now, can you walk me through for any
2    particular account on this screen whether it's
3    an affected cost or not and whether you classify
4    it as overhead or not?
5        A.  Yeah.  The ADM Board, which is what
6    we're looking at now, is a little bit different
7    than a regular division of one of the counties,
8    that it receives funding from the county as well
9    as from the state and the federal government, so
10   that's kind of a special case.
11       I prefer to talk about a more typical
12   case.
13       Q.  Well, can you answer my question as to
14   the ADM Board?  If not, say so.  We'll move to
15   something else.
16       A.  All right, I'll go back to ADM.
17       All right.  So the allocation of costs
18   of expenditures is not done in the revenue
19   lines.  So, for example, row 217, I suppose it
20   is, is a revenue line.
21       Q.  How do you know that?
22       A.  Property taxes, revenue, pool budget.
23       Q.  By the name of the account?
24       A.  Yes, it could be a heading.  So it's

Page 289

1    historical revenues and expenditures through
2    lines 12, yeah, by the name.  These are revenue
3    categories.
4        Q.  Okay.
5        A.  They may become relevant here, but
6    it's not in the allocation that you asked me
7    about, which is the designation of fixed and
8    variable.  Okay.  So...
9        Q.  You're scrolling through a whole bunch
10   of what appear to be expenses, correct?
11       A.  These are expense categories.
12       Q.  Right.
13       A.  I'm just trying to get a general feel
14   for what these categories are before I go back
15   and answer your question.
16       Okay.  So there's a lot of categories
17   here.  So we've got some -- these are some
18   summaries, I think.  All right.  We're not going
19   to go with the dog kennel, forget dog kennel.
20       All right.  Let me start with account
21   type, 77, where I'm in row --
22       Q.  373?
23       A.  -- 373.  And these would be the form
24   of expenditures that would be in the fixed

73 (Pages 286 to 289)

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    category.
2        Q.  You say "these," referring to what?
3        A.  373.
4        Q.  Okay.  How do you know that?
5        A.  This is my recollection.  I'm going to
6    be --
7        Q.  It's your recollection of the
8    treatment you gave it?
9        A.  That's correct.
10        Q.  Okay.  But when you were first
11    deciding what treatment to give it, how did you
12    know what bucket to put it in?
13        A.  Well, this was the process we
14    discussed earlier.  Some of these will be, I
15    think, best regarded as fixed, things like
16    building rental, that kind of -- it's a pretty
17    big expense category.  That would always be in
18    the fixed category.  I'm not going to be
19    100 percent.  If you go back to whatever was
20    produced for you and say, well, I'm
21    Professor McGuire, you got that one wrong or
22    that one wrong, I will get things wrong.  But
23    what I can tell you here is looking at these to
24    give you a sense of how it was done and what

Page 291

1    some of the allocation decisions were made.
2        Q.  Why would you get it wrong if we went
3    through line by line right now?
4        A.  Well, I just don't guarantee with
5    going through 100 categories here.  Then it's
6    kind of a memory test which I won't get
7    100 percent on.
8        Q.  But I thought you said that there were
9    a number of categories where you've looked at
10    the account title, you could use your judgment,
11    and you were very confident you didn't need any
12    discussion, you didn't need to follow up with
13    anyone at Summit County, right?
14            MR. SOBOL:  Objection.
15        A.  Well, I remember that discussion, yes.
16    BY MR. KEYES:
17        Q.  So if it's so clear, then why would
18    you get it one way when you did it before and
19    get it a different way now?
20            MR. SOBOL:  Objection.  Misstates his
21    testimony.
22        A.  I'll get some right.  I'm not saying I
23    won't get many, but I'm only saying I won't get
24    100 percent right.  And the reason being is

Page 292

1    that, you know, it wasn't an operation that,
2    okay, Professor McGuire, you have a few minutes
3    now, take a look at this spreadsheet that I
4    haven't seen for months and tell me which goes
5    into which category.  It was a more extended, I
6    would say, thoughtful and in some case
7    team-based decision about where some of these
8    things would go.  So I'll do the best I can
9    sitting here today.
10            Would it be helpful, then, for me to
11    keep going in these account types?  I'm not sure
12    whether I'm helping you or not.
13    BY MR. KEYES:
14        Q.  Well, I'd like to understand, now that
15    you've seen the document -- before you said you
16    didn't remember what that Bates number referred
17    to.  Now that you've seen the document and you
18    see the way it's laid out, explain to me how you
19    could make a determination for each account
20    based just on the account title, or whether
21    there are specific accounts you can identify
22    that would require more homework, discussion
23    among your team at Compass Lexecon and then
24    obviously following up with someone at county

Page 293

1    personnel who can explain what these accounts
2    even cover.
3            MR. SOBOL:  Objection.
4    BY MR. KEYES:
5        Q.  So I'm not trying to quiz you about
6    any particular line.
7        A.  I understand.
8        Q.  I'm trying to understand the process.
9        A.  All right.  I think I understand.
10            The process is something similar to
11    what we're doing now in which I examine these
12    budget documents, some of which were in Excel,
13    some of which were hard copies, and made a
14    judgment about where some of these things would
15    go, and then, you know, worked with my team and
16    gathered further information and made a final
17    decision.
18        Q.  I know you've said before that you
19    used your judgment.  Well, what criteria are you
20    using?  Is it an objective process, or is it
21    subjective where you reach the best you can
22    based on a conversation with your colleagues?
23            MR. SOBOL:  Objection.
24        A.  Well, I think it's a reasonable

74 (Pages 290 to 293)

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1   process. Publications, fixed. Equipment,
2   fixed. Data processing, fixed. Research
3   project equipment, fixed. Anything like
4   miscellaneous, I'm not going to throw it into
5   the variable category.
6   BY MR. KEYES:
7       Q.  Could you go to Children and Family
8   Services, then, within this document?
9       A.  Give me a row there.
10      Q.  I don't have a row. Can you find it
11  using this document?
12      A.  Oh, gosh. This is a very long
13  document.
14          Does anybody know the answer here in
15  the room? Give me a hint.
16          MR. SOBOL: Why don't you "control F
17  family" and see if that helps.
18          THE WITNESS: I'm not so good at these
19  sort of things, Tom.
20          MR. PENDELL: Take your time.
21      A.  Okay. I got it.
22          MR. SOBOL: Even I want this to move
23  along.
24      A.  "Casey family expenditures."

Page 295

1           MR. SOBOL: Go "find next."
2           THE WITNESS: Maybe this is the family
3   services, Tom.
4           MR. SOBOL: Sorry.
5           THE WITNESS: I need to check.
6           MR. KEYES: I appreciate you want to
7   speed it, but I'd like to know what he can do
8   with this Excel spreadsheet and what he can't,
9   not what lawyers can instruct him to do.
10          (Whereupon, McGuire Exhibit Number 2
11          was marked for identification.)
12  BY MR. KEYES:
13      Q.  If you can't, you can't.
14      A.  Well, you're watching it, it's on
15  video.
16      Q.  Okay. Can you minimize this file for
17  the moment? Can you close out this little box?
18      A.  Up there?
19      Q.  No, in the middle of the screen, can
20  you close it out, the search box?
21      A.  Yes.
22      Q.  And then can you go to the upper
23  right-hand corner and minimize this file?
24          Okay. Now what's on the screen is a

Page 296

1   native version of an Excel spreadsheet that was
2   produced by Cuyahoga County, and the Bates
3   number at the top of the screen is
4   CUYAH_014627783.
5       A.  Right.
6       Q.  Do you see that?
7       A.  Yeah.
8       Q.  Then if you'd go back to your report
9   to footnote 82.
10      A.  Yes.
11      Q.  Are you there?
12      A.  I am.
13      Q.  Do you see that's the same Bates
14  number that you referenced in footnote 82 as
15  being the detailed expenditure data for Cuyahoga
16  County that you obtained from the Cuyahoga
17  County budget? Okay?
18      A.  I see that, yes.
19      Q.  Same question. Does this refresh your
20  recollection as to what the expenditure data
21  that you reference in your report looks like?
22      A.  Yes.
23          MR. SOBOL: Objection. Form.
24  BY MR. KEYES:

Page 297

1       Q.  Did you look at this Excel spreadsheet
2   yourself, or did you delegate that to others?
3       A.  It would have been both.
4       Q.  Did you go through account by account
5   to identify affected costs, and then for
6   affected costs whether they were overhead or
7   non-overhead?
8       A.  I did.
9       Q.  How did you do that for this data for
10  Cuyahoga County?
11      A.  Well, the process is the same.
12          Also "county executive," that's not a
13  good example for an affected division. "County
14  law department." I'm finding it a little
15  difficult to give you complete answers to your
16  questions without information to remind me about
17  the functions of these departments.
18      Q.  But what information did you have at
19  your fingertips when you first went through this
20  spreadsheet, when you first did this sorting
21  between affected and non-affected and the
22  sorting between overhead and non-overhead?
23      A.  It was information about the
24  activities of the units that would help me make

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    a determination of compensation costs, for
2    example, which is the -- usually the biggest
3    category.
4        Q.  What was the source of this other
5    information that you used to help you in this
6    sorting process?
7        A.  Statements about the activities that
8    the division undertakes.
9        Q.  Statements from -- in what document?
10   Where did you get those statements?
11       A.  These are also in budget and --
12       Q.  The annual budget documents for the
13   county?
14       A.  I believe that's what they're referred
15   to, yes.
16       Q.  Showing you what has been marked as
17   McGuire Exhibit Number 3.
18           (Whereupon, McGuire Exhibit Number 3
19           was marked for identification.)
20       MR. SOBOL:  Perhaps I dosed off, was
21   the spreadsheet, both of those spreadsheets
22   Number 2?
23       MR. KEYES:  Yes, we'll put a slip
24   sheet in and mark them.

Page 299

1    BY MR. KEYES:
2        Q.  Okay.  Do you recognize McGuire
3    Exhibit 3?
4        A.  This is the kind of thing I looked at,
5    yeah.
6        Q.  The kind of thing, or the thing you
7    did look at?
8            This is the operating budget for 2017
9    for Summit County, correct?
10       A.  Yes.  There were a series of these.  I
11   looked at for both counties.
12       Q.  Okay.  And so when you say "a series,"
13   you mean one for each year?
14       A.  Yes.
15       Q.  So you would have looked at the
16   operating budget for Summit County from 2006
17   through 2018?
18       A.  Yes.
19       Q.  And same thing for Cuyahoga County, an
20   annual operating budget from 2006 to 2018?
21       A.  Yes.
22       Q.  Okay.  So you've referenced using this
23   document to help you identify what the affected
24   divisions were, and within the affected

Page 300

1    divisions what the affected costs were, correct?
2        A.  Yes.
3        Q.  Can you identify for me where in the
4    operating budget you were able to identify which
5    are the affected divisions?
6        A.  I won't go through page by page, I
7    promise.
8        MR. SOBOL:  Well, then how are you
9    going to answer the question?
10       A.  All right.  So, for example, medical
11   examiner is in a -- the table of contents.
12   BY MR. KEYES:
13       Q.  What page are you on?
14       A.  I'm still on the table of contents
15   here.
16       Q.  What's the Bates number at the bottom
17   so we have a clean record?
18       A.  This is SUMMIT, and then 000007557 is
19   the table of contents that identifies where
20   information in this bigger document rests with
21   respect to the different divisions.
22       Q.  Okay.
23       A.  And so this is the kind of thing I
24   would do, say okay, medical examiner looks like

Page 301

1    it could be a possibility.
2        Q.  So then would you go to the Pages 195
3    to 198 for medical examiner?
4        A.  Yes.
5        Q.  Okay.  Can you take us to Pages 195
6    through 198?
7        A.  That's what I'm doing.
8            Okay.  On Page 196 of the budget
9    document that has a Bates number -- do you want
10   me to read the Bates number?
11       Q.  SUMMIT_7746?
12       A.  Yes.
13       Q.  Okay.
14       A.  On that page there's a program
15   description which indicates the activities of
16   medical examiner office, which is to provide
17   quality forensic death investigation services
18   when persons die suddenly, unexpectedly, which
19   is the case in some opioid-related deaths.  So
20   the medical examiner will be spending some
21   resources dealing with opioid-related deaths.
22       Q.  So based on this program description
23   on Page 196, you then said the Office of Medical
24   Examiner is an affected division for Summit

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    County?
2        A.  It's a potentially -- so it's -- so
3    McGuire is looking at it.  McGuire looks at the
4    functions, seems like reasonable, then if it's
5    somehow in doubt, which I don't think this in
6    particular is in doubt, what the medical
7    examiner might be doing with respect to opioids.
8    And if confirmation is needed, then confirmation
9    is needed.  But this is the kind of indication
10   of the activities of this particular division
11   which I took to be this is a likely affected
12   division.
13       Q.  Was confirmation needed for the Office
14   of Medical Examiner for Summit County?
15       A.  Well, it's -- I don't -- I feel
16   confident this would be correct.  I don't -- I
17   don't recall.  I'm sure I talked to Compass Lex
18   about this, but I don't recall whether there was
19   any confirmation beyond that.
20       Q.  Was there anything else in this
21   description of the Office of Medical Examiner
22   within this operating budget that allowed you to
23   either identify it as an affected division or
24   confirm your belief that it was affected

Page 303

1    division?
2        A.  Let me see.  I think that was what I
3    needed in this case.
4        Q.  Okay.  Then sticking with the Office
5    of the Medical Examiner example, while you have
6    it in front of you, did you use this document to
7    also identify whether costs were affected or not
8    affected?
9        A.  This is the kind of document, so again
10   I -- my memory will be a little bit uncertain,
11   but here are staff information of what the
12   functions of different staff are.  This is on
13   7747.
14       The next page, 7748, it gives
15   information about the general nature of
16   services.
17       Q.  Back on 7747, what tells you the
18   function of any position?
19       A.  Well, there's a description of the
20   job.
21       Q.  Okay.
22       A.  Chief deputy medical examiner.  That
23   person, I infer, is a medical examiner, forensic
24   investigator.

Page 304

1        Q.  So you would infer from the titles.
2    There's no narrative to this that describes the
3    function of any particular position, correct?
4        A.  In this document I don't see one.  I
5    don't remember whether there was other documents
6    that might have helped with that.
7        Q.  Okay.  So for the Office of Medical
8    Examiner for Summit County, you read the program
9    description.  You believed that it was an
10   affected division.
11       How, if at all, did you use these
12   pages to identify specific accounts for the
13   Office of Medical Examiner that were affected
14   costs?
15       A.  Okay.  These are -- I think you should
16   think of them as potentially affected costs.
17   But it involves this allocation between costs
18   that were unlikely to be affected and those that
19   are likely to be affected by the degree of harm
20   in opioid.  I think we're talking about the same
21   thing.
22       And what I did was to take a category
23   like salaries, employees, and go back to the job
24   descriptions and make a determination of which

Page 305

1    of these employees was in each of those two
2    categories.  And this is referred to in my
3    report as the overhead adjustment to
4    compensation costs.
5        Q.  Okay.
6        A.  Very briefly, in the example we went
7    through this morning there was compensation
8    costs.  That would be compensation costs, but
9    all compensation costs shouldn't be counted.
10   The ones that have to do -- that are fixed or
11   with overhead are not counted, and that's
12   referred to as the overhead adjustment here.
13   That's expressed in percentage terms.
14       Q.  Sticking with the list of positions in
15   the Office of Medical Examiner that are on
16   Page 197 of this budget document, which of those
17   did you treat as overhead, and which of those
18   did you treat as non-overhead?
19       A.  Okay.  The approach I took to doing
20   this would have classified sort of the first
21   batch as potentially affected, and things like
22   secretarial, senior administrative, support
23   services administrator, they would have been put
24   into the overhead category.

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1      Now, again, I want to acknowledge that
2  if you go back to my report and see what exactly
3  did Professor McGuire do, there's going to be
4  some slippage for the scores of departments and
5  scores of years, scores of categories.  But I
6  didn't do it on the fly.  I didn't do it in a
7  short time frame like this, but that was the
8  general approach.
9      Q.  Okay.  And did you use any other
10 documents, then, besides the expenditure data we
11 saw on the laptop in the Excel file and these
12 annual operating budgets?
13         MR. SOBOL:  Objection.  Asked and
14 answered.
15     A.  I remember looking at some documents
16 that had detail on the salaries of different
17 personnel.  I just don't remember whether they
18 were Cuyahoga or whether they were Summit.
19 BY MR. KEYES:
20     Q.  Anything else?  I'm trying to
21 understand the universe of documents you looked
22 at and consulted in order to identify affected
23 costs versus non-affected costs, overhead costs
24 versus non-overhead costs.

Page 307

1      You've identified the detailed
2  expenditure data, which is the Excel
3  spreadsheets on the computer.  You've identified
4  these operating budgets, and we just went
5  through a sample of that exercise.  And I asked
6  you whether there's anything else, and you said
7  that you remember there was some detail on
8  salaries, but you don't know where that data is.
9      A.  But I don't remember what exactly that
10 applied.
11     Q.  Okay.  So besides those three sets of
12 documents, did you look at anything else as part
13 of this exercise?
14     A.  I very likely did, but I don't
15 remember what it would be as I sit here today.
16     Q.  Did you consider any other approach to
17 quantifying damages in this case besides your
18 opportunity cost approach?
19         MR. SOBOL:  Objection.
20         You may answer.
21     A.  Well, the opportunity cost is so
22 natural.  No, I don't think so.
23 BY MR. KEYES:
24     Q.  And have you used that opportunity

Page 308

1  cost approach in any other case where you were a
2  testifying expert quantifying damages?
3      A.  It's really implicit in using
4  expenditures as a quantification of damages.
5  That's the whole idea of doing it that way.
6      Q.  Did you use someone else's internal
7  costs to identify opportunity costs, and then
8  use those opportunity costs as damages in any
9  other case where you've been a testifying
10 expert?
11     A.  The application of opportunity costs
12 that comes to mind in other contexts of damages
13 would have been from the standpoint of a
14 purchaser, extra money that someone has to spend
15 because of something.  It's an opportunity cost
16 concept still.
17     Q.  Did you consider using an incremental
18 cost approach in this case?
19     A.  I'm not sure what you mean by that.
20     Q.  Have you heard of incremental cost
21 approach before to calculating damages?
22     A.  I have heard of incremental cost many
23 times, but it can be used differently in
24 different contexts.

Page 309

1      Q.  Okay.  So in the context of
2  quantifying damages, have you ever seen someone
3  use an incremental cost approach?
4      A.  I don't recall.
5      Q.  Have you ever seen someone compare
6  what the incremental costs are as a result of
7  something relative to what the costs would be
8  absent that something?
9      A.  Well, I think that's often a good
10 question of what are the costs but-for
11 something, and that could well be called
12 incremental costs.  Maybe that's how you're
13 using it.
14     Q.  Well, do you agree that when you're
15 quantifying damages you're supposed to compare
16 the world as it is versus the world as it would
17 be absent the conduct being challenged?
18     A.  Well, I'd say, broadly speaking, that
19 makes sense to me.  In this case my instructions
20 from counsel were to quantify the costs to the
21 bellwether governments due to the opioid crisis,
22 and that would be regarded as damages.
23     Q.  You were told that that would be
24 called damages in your report, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1      MR. SOBOL:  Objection.
2      A.   This is in the front page.  I probably
3  should get this wording correct, but let me just
4  double-check.
5  BY MR. KEYES:
6      Q.   If you'd like some help, it's on
7  Page 4.  It's the end of Paragraph 6.
8      A.   Okay.
9      Q.   You say, "Finally, upon instruction
10  from counsel, I refer to the cost consequences
11  of harms to the Bellwether governments due to
12  defendants' misconduct as damages," right?
13      A.   That's what I was looking for.
14      Q.   That was the instruction you were
15  given?
16      A.   That was the instruction I was given,
17  yes.
18      Q.   And so you were told by counsel to
19  refer to the cost consequences as damages?
20      A.   Yes, that's what the sentence says.
21      Q.   And the cost consequences you're
22  talking about are the opportunity costs of
23  spending dollars on something related to opioids
24  versus something else?

Page 311

1      A.   Broadly speaking.
2      Q.   So did you attempt to identify any
3  additional dollars that either Summit County or
4  Cuyahoga County spent because of the opioid
5  crisis that it would not have spent absent the
6  opioid crisis?
7      MR. SOBOL:  Objection.
8      A.   Well, embedded in my approach here,
9  any such dollars would have been captured.
10      For example, suppose the budget of the
11  medical examiner was deemed to be insufficient
12  because of the opioid crisis, and that budget
13  allocation was increased by the county, I would
14  see that, and I would count that.
15  BY MR. KEYES:
16      Q.   I understand you would count that.
17  I'm not asking about different ways an existing
18  set of dollars were spent.
19      I'm asking, did you identify any
20  dollars that Summit County or Cuyahoga County
21  spent because of the opioid crisis that it would
22  not have spent absent the opioid crisis?
23      A.   Well, as I explained, to the degree
24  that that happened, in the example of in the

Page 312

1  absence of the opioid crisis they might not have
2  directed additional funds to the medical
3  examiner office, so the medical examiner's
4  budget did go up as a result of the opioid
5  crisis.  I'm giving you this as an example.
6  Then the degree to which the expenditure was
7  devoted to opioids that are a component of that
8  are captured in my analysis, as well as, as well
9  as any expenditures that are taken from other
10  things the examiner would have otherwise done.
11      Q.   But you're bringing it down to a
12  division level.  I'm asking at the county level.
13      A.   At the county level?
14      Q.   Yes.  Did Summit County or Cuyahoga
15  County spend any additional dollars because of
16  the opioid crisis that they would not have spent
17  absent the opioid crisis?
18      MR. SOBOL:  Objection.
19      A.   That's a very difficult counterfactual
20  for me.  Since I do work at the division level,
21  which is where the method we've been talking
22  about is properly applied, it might be that, I
23  don't know, some additional borrowing, some
24  additional revenue.

Page 313

1      What matters is where it's spent and
2  how it's spent, not the source of the revenue.
3  So I capture that in the method I've been
4  talking about.
5  BY MR. KEYES:
6      Q.   Okay.  You're not engaging in the
7  question I asked.
8      If Cuyahoga County had $100, you're
9  saying that it might have spent those $100
10  differently because of the opioid crisis
11  relative to what it would have done absent the
12  opioid crisis, right?
13      A.   That's the kind of reasoning that I'm
14  applying, yes.
15      Q.   Did you identify any instance where
16  because of the opioid crisis Summit County or
17  Cuyahoga County spent more than $100, whereas
18  absent the opioid crisis it would have only
19  spent $100?
20      MR. SOBOL:  Objection.
21      A.   See, my job here is to identify the
22  costs to the counties that take the form of
23  additional spending in divisions due to the
24  presence of the opioid problem.

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1 BY MR. KEYES:
2      Q.  Additional spending on the division
3 level.
4      A.  I shouldn't have said additional.  Let
5 me strike additional.
6      Q.  Because it's not additional.
7      A.  See, it may or may not be additional.
8      Q.  Do you know one way or the other?
9      A.  The -- what I'm answering is that I
10 capture both.  So the degree to which there's
11 more given to a division that wouldn't have
12 otherwise been given in the absence of the
13 opioid crisis, which I think is the point of
14 your hypothetical, if they spend it on
15 opioid-related problems, then I'm going to count
16 it.  It's the same opportunity cost as if they
17 took the money from something else the police
18 chief was doing.
19      Q.  But it's an opportunity cost; it's not
20 an additional dollar spent by either county
21 relative to what it would have spent absent the
22 opioid crisis?
23           MR. SOBOL:  Objection.
24      A.  I wouldn't make that distinction.

Page 315

1 They're both opportunity costs, whether the
2 dollars come from additional taxes or whether
3 they come from diversion.
4 BY MR. KEYES:
5      Q.  But you looked at one and not the
6 other?
7      A.  I looked at both.  That's what I need
8 to do, to look at both together.  By looking at
9 a budget of a division and what share of that
10 budget goes to different kind of activities, to
11 the degree that budget is going up for some
12 reason, then I'm able to capture that in the
13 accounting I did.
14      Q.  Right.
15           And you capture it as an opportunity
16 cost because those dollars -- those additional
17 dollars are spent by that division rather than
18 someone else within the county, right?
19      A.  Well, the general approach in
20 economics is opportunity cost, so I don't know
21 if you're trying to establish some spending does
22 not have an opportunity cost.
23      Q.  No, I'm trying to identify whether
24 there are incremental costs at the county level

Page 316

1 because of the opioid crisis, not whether the
2 existing pie was divvied up different ways, but
3 whether the pie chart that reflects spending is
4 bigger because of the opioid crisis.  Did you do
5 that?
6           MR. SOBOL:  Objection.  Asked and
7 answered several times.
8      A.  What I did was fulfill my assignment,
9 which required me to consider both of those
10 sources of funds devoted to the opioid crisis.
11 It need not only be a matter of reallocation of
12 existing resources.  Some budgets of some
13 divisions may have been increased due to the
14 opioid crisis.  That's, I think, the spirit of
15 what you're asking.
16           And to the degree that happened and
17 the degree to which those were devoted to
18 opioids, then I count them, as I should.
19 BY MR. KEYES:
20      Q.  In 2006, how much less would Summit
21 County or Cuyahoga County have spent if there
22 had been no opioid crisis compared to what it
23 did spend?
24           MR. SOBOL:  Objection.  Asked and

Page 317

1 answered several times.
2 BY MR. KEYES:
3      Q.  Total dollars.
4           MR. SOBOL:  Objection.  Asked and
5 answered several times.
6      A.  The answer I have for that is the
7 spending at the division level on services
8 related to opioids, which had that been freed
9 up, which I think is the nature of your
10 question.
11 BY MR. KEYES:
12      Q.  You keep talking about the division
13 level.  I didn't ask about the division level.
14           I asked on the county level, in 2006,
15 how much less would Summit County or Cuyahoga
16 County have spent if there had been no opioid
17 crisis compared to what it did spend that year?
18           MR. SOBOL:  Objection.  Asked and
19 answered.
20      A.  This is kind of the inverse of your
21 earlier question.  Now we're taking the opioid
22 crisis away, and we're freeing up funds that
23 also have these two destinations.  Previously I
24 talked about this in terms of sources to say

Page 318

1    that the sources of funds could either be
2    diversion or new funds, and I want to count both
3    of those with respect to quantifying the
4    opportunity cost of spending on opioids.
5            Now the question is kind of the
6    opposite, suppose you take the opioids spending
7    away, there's two destinations for those funds.
8    They could be in some kind of reallocation in
9    which they went to other services that the
10   county provided, or they could also be
11   associated with a fall in the total budget of
12   the county.
13           So it's really the same answer in
14   reverse, that -- and it's kind of the forward
15   direction, yes, I want to count both, I do count
16   both.  In the backward direction, the amount I
17   want to take away, it could be diverted or it
18   could have led to fewer revenue collections for
19   the county.
20   BY MR. KEYES:
21       Q.  Referring you again to the last three
22   charts in your report, it's Tables IV.12, IV.13
23   and IV.14.
24       A.  Okay.

Page 319

1        Q.  Are you there?
2        A.  Yes.
3        Q.  These are the damages you calculated?
4        A.  Yes.
5        Q.  And these are the only damages you
6    calculated in this engagement on damages,
7    correct?
8        A.  That's correct.
9        Q.  Okay.  The dollars that you say are
10   total dollars are dollars that you say would
11   have been spent by the bellwether governments on
12   something else if there was no opioid problem,
13   correct?
14       A.  Is that a quote from me?
15           MR. SOBOL:  Objection.
16   BY MR. KEYES:
17       Q.  No, I think that's what you've been
18   saying.  It's not a quote.
19           MR. SOBOL:  Objection.
20   BY MR. KEYES:
21       Q.  Is it accurate to say that the dollars
22   that you say are total damages are dollars that
23   would have been spent by Summit County or
24   Cuyahoga County on something else if there was

Page 320

1    no opioid problem?
2            MR. SOBOL:  Objection.
3        A.  All right.  We've been talking about
4    this the last few minutes, and I think I've
5    clarified that the dollars spent on the opioid
6    crisis could be taken from other activities in
7    that division, or even conceivably activities of
8    some other division, or could be associated with
9    increased budgets of the affected divisions, and
10   both of those are opportunity costs, both of
11   those should be counted, and I count both of
12   them.  So I...
13   BY MR. KEYES:
14       Q.  Are you offering an opinion that if
15   there had been no opioid problem the dollars you
16   list as total damages would not have been spent
17   by the Summit and Cuyahoga Counties?
18           MR. SOBOL:  Objection.  Asked and
19   answered.
20       A.  That's not my testimony.
21   BY MR. KEYES:
22       Q.  Are you offering the opinion that the
23   dollars that you describe as total damages are
24   monies that the bellwether government spent only

Page 321

1    because of the opioid problem?
2            MR. SOBOL:  Objection.  Asked and
3    answered.
4        A.  That's also not an accurate statement.
5    BY MR. KEYES:
6        Q.  So you are not offering that opinion,
7    correct?
8            MR. SOBOL:  Objection.
9        A.  That's an inaccurate statement.
10   BY MR. KEYES:
11       Q.  Did you examine what dollars Summit
12   County or Cuyahoga County spent in excess of
13   their budgets because of the opioid problem?
14           MR. SOBOL:  Objection.  Same, that's
15   his answer.
16       A.  This is a version of the earlier
17   discussion, and any, any additional funding for
18   a division that may have come from going over
19   budget, which I have a general understanding of
20   what that would imply, are properly counted, and
21   yes, I counted them as part of my cost analysis.
22   BY MR. KEYES:
23       Q.  Did you examine what dollars Summit
24   County or Cuyahoga County spent in excess of

81 (Pages 318 to 321)

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1    their budgets because of the opioid problem?
2         MR. SOBOL: Objection. Asked and
3    answered.
4         A. My accounting of funds included funds
5    that would have been diverted from some other
6    use, and any additional funds that would be
7    coming from funds over budget that were devoted
8    to the opioid crisis.
9    BY MR. KEYES:
10        Q. Where in your report do you identify
11   the dollars that Summit County or Cuyahoga
12   County spent in excess of their budgets because
13   of the opioid problem?
14        A. That's not necessary for me to do, to
15   be able to count the opportunity costs of
16   dealing with the opioid crisis.
17        Q. Okay. So did you -- do you set forth
18   anywhere from your report a quantification of
19   the dollars that Summit County or Cuyahoga
20   County spent in excess of their budgets because
21   of the opioid problem?
22        A. What I did is take the total
23   opportunity cost, which could have come from
24   different sources, as I've said a number of

Page 323

1    times in the last few minutes, additional
2    budgets from alternative additional budget
3    sources including unanticipated spending or
4    other additional budget sources and from
5    anything that takes the form of diversion.
6         Q. Your answer says "could have come from
7    different sources." You're acknowledging the
8    possibility, right?
9         MR. SOBOL: Objection.
10   BY MR. KEYES:
11        Q. "Could have come from other sources."
12        MR. SOBOL: Objection.
13        A. Maybe ask a question so I'm
14   understanding what I'm answering.
15   BY MR. KEYES:
16        Q. I'm not asking whether some of the
17   dollars somewhere in your quantification might
18   have come from somewhere else.
19        I'm asking you, do you set forth
20   anywhere in your report a quantification of the
21   dollars that Summit County or Cuyahoga County
22   spent in excess of their budgets because of the
23   opioid problem?
24        MR. SOBOL: Objection. Asked and

Page 324

1    answered.
2         A. I didn't need to identify any sources
3    of additional budgets for divisions in order to
4    make a quantification of the opportunity cost of
5    the funds.
6    BY MR. KEYES:
7         Q. Do you set forth anywhere in your
8    report a quantification of the dollars that
9    Summit County or Cuyahoga County spent in excess
10   of their budgets because of the defendants'
11   conduct?
12        MR. SOBOL: Objection.
13        I think you just asked that question.
14        MR. KEYES: No, I asked because of the
15   opioid problem. This one is because of the
16   defendants' conduct.
17        A. This is new.
18        Yes, I do.
19   BY MR. KEYES:
20        Q. And so show me --
21        A. I'm sorry.
22        Q. Yeah, you keep saying I don't need to,
23   so I thought you were going to say --
24        A. I forgot the first part of your

Page 325

1    question, so --
2         Q. Let me ask it again.
3         A. Thank you.
4         Q. Do you set forth anywhere in your
5    report a quantification of the dollars that
6    Summit County or Cuyahoga County spent in excess
7    of their budgets because of the defendants'
8    conduct?
9         MR. SOBOL: Objection. Asked and
10   answered.
11        A. There is a similar answer to the
12   question, even though it's a different question.
13   I realize it's a different question.
14   BY MR. KEYES:
15        Q. You're going to tell me you didn't
16   need to.
17        A. I'm going to tell you that --
18        MR. SOBOL: Why are you asking the
19   questions if you know the answers?
20        MR. KEYES: Because he won't give me a
21   yes-or-no answer.
22   BY MR. KEYES:
23        Q. I know you won't.
24        A. I lost my train of thought. So in

82 (Pages 322 to 325)

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1 order to --
2 Q. It's a yes-or-no question.
3 MR. SOBOL: He has to remember what
4 the question was.
5 BY MR. KEYES:
6 Q. Well, it's a yes-or-no question. I
7 appreciate you being candid in saying you're not
8 going to give me a yes-or-no answer. I think
9 the record bears it out today, even though it's
10 a yes-or-no question. But I'm going to ask it
11 of you, and I'm going to ask for your answer.
12 Do you set out anywhere in your report
13 a quantification of the dollars that Summit
14 County or Cuyahoga County spent in excess of
15 their budget because of the defendants' conduct?
16 MR. SOBOL: Objection. Asked and
17 answered.
18 A. Such funds would be reflected in the
19 budgets that I looked at by division and
20 allocated to defendants' misconduct.
21 BY MR. KEYES:
22 Q. So tell me where in your report I go
23 to find that, to find the dollars that Summit
24 County or Cuyahoga County spent in excess of

Page 327

1 their budgets because of the defendants'
2 conduct.
3 A. I didn't need to make that
4 quantification.
5 Q. Did you study what the normal costs
6 are to be incurred by Summit County or Cuyahoga
7 County because of opioids?
8 A. The normal costs. I'm sorry, what
9 might you mean by "normal costs"?
10 Q. The typical or ordinary costs in a
11 given year.
12 A. I studied costs. I didn't try to
13 determine what was typical.
14 Q. Or normal or ordinary, correct?
15 A. I would have a hard time interpreting
16 that from an economic standpoint.
17 Q. Did you identify any costs that were
18 incurred by Summit County or Cuyahoga County
19 because it was participating in the marketplace?
20 A. I'm sorry, I don't understand what
21 you're getting at.
22 Q. Did you attempt to identify or
23 quantify costs that were incurred by Summit
24 County or Cuyahoga County participating in the

Page 328

1 marketplace and having to spend money in the
2 marketplace?
3 MR. SOBOL: Objection.
4 BY MR. KEYES:
5 Q. Perhaps be overcharged.
6 MR. SOBOL: Objection.
7 A. I don't think I get your question.
8 But just to move along a little bit, the cost
9 components of the division that we discussed
10 earlier are payments to what an economist would
11 call resources that are traded in, for example,
12 labor markets, so yes.
13 BY MR. KEYES:
14 Q. Did you attempt to identify instances
15 where Cuyahoga County or Summit County was
16 overcharged in the marketplace?
17 A. Overcharged.
18 MR. SOBOL: Objection.
19 A. Help me by defining what overcharge
20 is, what you mean by overcharge.
21 BY MR. KEYES:
22 Q. Well, you told me this morning that
23 you've calculated overpayments as an expert in
24 other cases before, right?

Page 329

1 A. Yes.
2 Q. So paying more than someone says is
3 the right benchmark. Right?
4 A. Well, normally the right benchmark is
5 a competitive price.
6 Q. Okay. So if we use a competitive
7 price, did you undertake to identify any costs
8 that were incurred by Summit County or Cuyahoga
9 County by spending money in the marketplace
10 above a competitive price?
11 A. Let me tell you why I didn't need to
12 do that.
13 Q. Well, first just say yes or no. You
14 can say no, and then you can tell me why you
15 didn't need to do it. I know you've been
16 trained in your years to never say no, but
17 you're essentially saying no every time you say
18 "I don't need to."
19 For the sake of a clean record, can
20 you say, no, I didn't do that, and here's why I
21 didn't need to?
22 MR. SOBOL: Objection.
23 Whatever, go ahead.
24 BY MR. KEYES:

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1    Q.  Did you do that?
2        MR. SOBOL:  Now, what's the question?
3  I was almost letting you go forward, and then
4  you did that.
5  BY MR. KEYES:
6    Q.  Did you undertake to identify any
7  costs that were incurred by Summit County or
8  Cuyahoga County by spending money in the
9  marketplace above a competitive price?
10       MR. SOBOL:  Objection.
11       You may answer.
12   A.  This was irrelevant, and I'll explain
13  by example.
14       Suppose there were market power in the
15  labor market, and we're talking about, I don't
16  know, some category of workers that are able to
17  extract a wage that's above the competitive
18  wage, but the county has to pay this because
19  they -- well, they just have to pay it.  They
20  pay it.  It still has the same opportunity cost.
21       If I pay my $75 and, oh, my gosh, the
22  auto repair company is a monopolist in my town
23  and the competitive price would have been $35, I
24  end up paying $75.  It's the same, the same from

Page 331

1  my standpoint.  The opportunity cost is the
2  same.
3  BY MR. KEYES:
4    Q.  In your report you claim that by
5  incurring opioid-related expenditures the
6  quality of other services provided by Summit
7  County and Cuyahoga County was reduced.  Is that
8  your opinion?
9    A.  In some cases that would be correct,
10  yes.
11   Q.  Okay.  So what other services are you
12  referring to such that the quality went down?
13   A.  I think I discuss an example, maybe
14  two examples, of the quality of police services.
15  What do you mean by "the quality of police
16  services"?  You mean things like response time?
17  You mean things like they're able to handle this
18  category of offense?  You mean things like
19  officers have adequate time to pursue an
20  investigation, and the degree to which those
21  things are interfered with because of officer
22  time that needs to be devoted to the opioid
23  crisis?  That's an effect on the quality of
24  police services.

Page 332

1        I think the other example that I
2  mention somewhere in the report is Division of
3  Family Services, that if there's more children
4  who need attention because of the opioid crisis,
5  the parents are dying, the kids have to be taken
6  care of, there's other kids who would have been
7  referred to family services anyway, and there's
8  less time for those kids.
9        So in an important sense, much of what
10  public service is about is time.  And to the
11  degree to which that time is interfered with by
12  anything in this case, the opioid crisis, it's a
13  deterioration in the quality of the public
14  services.
15   Q.  Those are the two examples you had in
16  mind when you made that statement in your
17  report?
18   A.  I believe those are examples that we
19  discussed in my report, or mentioned in my
20  report.  The -- probably division by division it
21  would be, you know, because I already talked
22  about what kind of quality deterioration as
23  workers have less time to devote to other things
24  that would have been due to the opioid crisis.

Page 333

1    Q.  Did you measure the quality of the
2  police services provided by either Summit County
3  or Cuyahoga County?
4    A.  This is one of those categories that
5  trusting the concept of opportunity cost, the
6  value of any reduced services is indicated by
7  the dollars devoted to opioids.
8    Q.  So you have a theory of calculating
9  damages where the theory does it all.  By
10  definition the theory gives you what you want.
11  You don't need to study the real world, you've
12  got the theory, right?
13       MR. SOBOL:  Objection, objection,
14  objection, to each of the three questions.
15   A.  I wouldn't put it that way, no.
16  BY MR. KEYES:
17   Q.  Well --
18       MR. SOBOL:  You don't even let me do
19  my objection thing.
20       THE WITNESS:  Pardon me.
21       MR. SOBOL:  You're not even letting me
22  do my objecting thing.
23       THE WITNESS:  I'm trying to.
24  BY MR. KEYES:

84 (Pages 330 to 333)

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1      Q.  Did you study the quality of police
2  services before the opioid epidemic?
3      A.  The --
4      Q.  I don't want you to tell me in theory
5  what happens.  I want to know whether you
6  actually studied it with respect to Summit
7  County or Cuyahoga County police.
8      A.  You need to know and understand in
9  answering this question that the deterioration
10  and the time that police have to do things is
11  associated with a decline in that quality.
12  That's the thing that's important to me.  That's
13  the thing -- if you want to call that an
14  assumption, all right, but that's the important
15  element that you need to understand in
16  understanding my answer to that question.
17      Q.  Okay.  So you think it's important for
18  me to know that.
19      Separate from that, did you measure
20  the quality of the police services before the
21  opioid crisis?
22      A.  What dates are you talking about here?
23      Q.  Well, before 2006.
24      A.  My work began with spending in 2006,

Page 335

1  so...
2      Q.  Did you measure the quality of police
3  services in 2006 or any subsequent year?
4      A.  Any subsequent year.  I measured the
5  resources available for police services in those
6  years.
7      Q.  That's not my question.
8      A.  I know.
9      Q.  Did you -- okay, well, if you know it,
10  then answer the question I'm posing.
11      My question is, did you measure the
12  quality of police services in 2006 or any
13  subsequent year?
14      A.  See, this wasn't necessary for me to
15  conduct my assignment, so I didn't do that.
16      Q.  Is it accurate to say that you never
17  measured the quality of police services for
18  Summit County or Cuyahoga County at any point
19  before 2006 -- in 2006 or any year after 2006?
20      A.  The application of the theory of
21  opportunity cost didn't require me to do that.
22      Q.  Did you measure the quality of the
23  services provided by the Department of family --
24  Children and Family Services at any point in

Page 336

1  time?
2      A.  It would have been the same answer.
3      Q.  You didn't need to?
4      MR. SOBOL:  Objection.
5      A.  I didn't need to in order to identify
6  the opportunity cost of the funds devoted to
7  opioids.
8  BY MR. KEYES:
9      Q.  Is it accurate to say that you never
10  measured the quality of services provided by the
11  Department of Children and Family Services for
12  Summit County or Cuyahoga County at any point
13  before 2006, in 2006, or any year after 2006?
14      MR. SOBOL:  Objection.  Asked and
15  answered, compound.
16      A.  I think it's the same answer for
17  police, that it wasn't necessary for me to
18  fulfill my assignment.
19  BY MR. KEYES:
20      Q.  And for any period of time from before
21  2006 through the present, have you measured any
22  or quantified any change in the quality of the
23  services provided by the police or the
24  Department of Children and Family Services?

Page 337

1      MR. SOBOL:  Objection.  Asked and
2  answered.
3      A.  What I studied was the resources
4  available to deal with other services.  The
5  connection to quality is, I think, clear.
6  BY MR. KEYES:
7      Q.  Not my question.
8      My question is, for any period of
9  time, have you measured or quantified any change
10  in the quality of the services provided by the
11  police or the Department of Children and Family
12  Services for either Summit County or Cuyahoga
13  County?
14      MR. SOBOL:  Objection.  Asked and
15  answered, compound.
16      A.  My answer is the same, because I want
17  the reader of this to understand why it is, that
18  for me to identify the opportunity cost didn't
19  require me to make that quantification.
20  BY MR. KEYES:
21      Q.  So you didn't do it?
22      MR. SOBOL:  Objection.  Asked and
23  answered.
24  BY MR. KEYES:

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1      Q.  I mean, typically when someone says
2  did you do X, the witness, particularly an
3  expert witness who has been through the drill
4  before, can say yes, I did, and no, I didn't,
5  and the reason I didn't is the following.  You
6  won't even say yes or no.  I don't know what
7  you're trying to muddle here.  I just want a
8  clean answer to all these questions about did
9  you do this or not.
10      Do I understand, though, that every
11 time I've asked you did you do something and you
12 say it wasn't necessary, that means you didn't
13 do it?
14      MR. SOBOL:  Objection.  To which time
15 he said that?
16      A.  Yeah, I would have to see what you're
17 talking about in that context.
18      MR. KEYES:  Okay.  Why don't we take a
19 break.
20      THE VIDEOGRAPHER:  The time is
21 4:49 p.m., and we're off the record.
22      (Whereupon, a recess was taken.)
23      THE VIDEOGRAPHER:  The time is
24 5:12 p.m., and we're on the record.

Page 339

1      (Whereupon, McGuire Exhibit Number 4
2      was marked for identification.)
3  BY MR. KEYES:
4      Q.  Professor McGuire, I'm showing you
5  what has been marked as McGuire Exhibit 4.  Do
6  you know what this document is?
7      A.  Yes.
8      Q.  What is it?
9      A.  It's the -- contains budget
10 information for the ADAMHS Board.
11     Q.  For what period of time?
12     A.  There's 2009 to -- 2009 to 2020.
13     Q.  And it shows actuals for 2009 through
14 2017, correct?
15     A.  That's correct.
16     Q.  And then budgeted amounts from 2018
17 through 2020?
18     A.  That's correct.
19     Q.  Okay.  And if you look at the bottom
20 of the chart, there's a line that says "Ending
21 Cash Balance."
22     Do you see that?
23     A.  I do.
24     Q.  What is the ending cash balance, as

Page 340

1  you understand it, for the Summit County ADM
2  Board?
3      A.  That would be how much money they have
4  available at the end of the year.
5      Q.  So these are excess, unused funds as
6  of the end of each year?
7      A.  Something like that.  Well, they're
8  available for future years.
9      Q.  So it's calculated as of the end of
10 each year, and it's the unused funds that are
11 available for expenditures going forward?
12     A.  Yeah, something like that.
13     Q.  And so those are funds that could be
14 spent on an unmet need?
15     A.  Well, they could be spent on anything.
16     Q.  Including whatever the ADM Board
17 identifies as an unmet need?
18     A.  Yes.  I mean, yes.
19     Q.  And do you see that the excess funds
20 for the Summit County ADM Board as of the end of
21 2009 was 17.7 million?
22     A.  I do see that, yes.
23     Q.  It increased at the end of 2010 to
24 28.3 million?

Page 341

1      A.  Yes.
2      Q.  Increased at the end of 2011 to
3  35.9 million?
4      A.  Yes.
5      Q.  And then increased in 2012 to
6  40.3 million?
7      A.  Yes.
8      Q.  Increased in 2013 to 41.2 million?
9      A.  Yes.
10     Q.  Increased to 45.8 million as of the
11 end of 2014?
12     A.  Yes, I see.
13     Q.  And then it was still around
14 $48 million in 2015 and 2016?
15     A.  I see that, yes.
16     Q.  And in most of those years, the excess
17 funds were enough to cover an entire year's
18 worth of ADM Board expenses, correct?
19     A.  Most of those years.  Well, by the
20 time you get to 2013, the ending cash balance is
21 about the same as the annual total expenditures.
22     Q.  Did the Summit ADM Board ever seek
23 authorization to spend the extra funds that are
24 reflected in the ending cash balance?

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1    A.  I'm not sure.
2    Q.  Did you look into that?
3    A.  My staff may have.  I don't recall
4  looking into it myself.
5    Q.  Do you know whether there was a
6  requirement for the fund balance for the Summit
7  ADM Board?
8    A.  I'm not aware of any.
9    Q.  Do you know whether there was any
10  requirement at all, separate from what that
11  requirement level was?
12    A.  I'm not aware of the existence of one.
13    Q.  So the ending cash balance identifies
14  the amount of money that was available to the
15  ADM Board to spend on other things if it wanted
16  to do so, correct?
17    A.  Well, I'm not familiar with whatever
18  budget rules they have, but broadly speaking,
19  something like that would be correct.
20    Q.  Can you go back to McGuire Exhibit 3,
21  which is the operating budget for 2017 for
22  Summit County?
23    A.  Okay.
24    Q.  And would you turn to page

Page 343

1  SUMMIT_7600?  Are you there?
2    A.  I'm there.
3    Q.  And the title of this page that's part
4  of the budget is "County of Summit 2017 Budget
5  Total Expenditures."
6    Do you see that?
7    A.  I do.
8    Q.  And it lists a series of funds, and
9  for each fund it shows what the adopted budget
10  is for 2017?
11    A.  I see that.
12    Q.  And do you see that there's a specific
13  line that shows the 2017 adopted budget for the
14  Alcohol, Drug & Mental Health Board for Summit
15  County?
16    A.  I see that.
17    Q.  And what's the amount that the Summit
18  County ADM Board could spend per the 2017
19  adopted budget?
20    A.  According to this document, the entry
21  is $47,729,340.
22    Q.  Can you go back to McGuire Exhibit 4
23  which shows the actual expenditures for the
24  Summit County ADM Board?

Page 344

1    A.  I'm looking at that.
2    Q.  And if you look in the column that
3  says "2017 Actual."
4    Do you see that?
5    A.  I do.
6    Q.  And if you go to the -- close to the
7  bottom it shows "Total Expenditures"?
8    A.  I see that.
9    Q.  What are the total expenditures by the
10  Summit ADM Board in 2017?
11    A.  45,430,368.
12    Q.  Okay.  So that's less than the amount
13  that it was authorized to spend in 2017,
14  correct?
15    A.  It appears to be.
16    Q.  By about $2.3 million?
17    A.  It appears to be.
18    Q.  So in 2017, the Summit ADM Board
19  didn't even spend $2.3 million that it was
20  authorized to spend on needs that it was charged
21  with addressing, correct?
22    MR. SOBOL:  Objection.
23    A.  Well, I think the arithmetic here is
24  all perfectly fine.  Interpreting it in terms of

Page 345

1  their behavior and so on, I'm not sure.
2  BY MR. KEYES:
3    Q.  Well, it doesn't require any
4  interpretation of the behavior.
5    It shows that they were authorized to
6  spend 47.7 million, they only spent
7  45.4 million, which leaves 2.3 million, roughly,
8  in monies that were specifically authorized, put
9  into their budget that the ADM Board did not
10  spend that year, correct?
11    A.  The gap between the budget and the
12  expenditures is, as you described, around
13  $2 million.
14    Q.  So these are dollars that the Summit
15  ADM Board could have spent on another need, but
16  didn't for whatever reason?
17    MR. SOBOL:  Objection.
18    A.  Well, that would be an assumption.  I
19  don't know that for sure.
20  BY MR. KEYES:
21    Q.  Going back to McGuire Exhibit
22  Number 3, same page.  What did the Summit County
23  adopt as the 2017 budget for the Children's
24  Services Board?

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1      A.  This is 51,914,589.
2          (Whereupon, McGuire Exhibit Number 5
3          was marked for identification.)
4   BY MR. KEYES:
5      Q.  Showing you what has been marked as
6   McGuire Exhibit 5.  What is McGuire Exhibit 5?
7      A.  It's the Summit County Children's
8   Services Operating Forecast as of December 31,
9   2018.
10     Q.  And it's Bates number
11  SUMMIT_002057610, correct?
12     A.  That's correct.
13     Q.  And does it show the actual
14  expenditures for the Summit County Children's
15  Services Board in 2017?
16     A.  It appears to, yes.
17     Q.  And what is that amount for 2017?
18     A.  That amount is 47,960,000.
19     Q.  Whereas it was authorized to spend in
20  2017 51.9 million, it only spent 47.9 million,
21  correct?
22     A.  Well, this is -- yeah, this is what
23  was budgeted.  I'm just looking at the documents
24  and confirming what they appear to be.

Page 347

1      Q.  Right.
2          So one is the amount that it was
3   budgeted to spend for 2017, the other shows what
4   it actually spent in 2017, right?
5      A.  That's true.
6          You know, we haven't talked about the
7   revenues.  And in 2017, for example, the
8   Children's Services was running a deficit, and
9   I, you know, don't know without more
10  investigation whether the presence of that
11  deficit would have led to spending more than it
12  was budgeted.
13     Q.  But comparing what it was authorized
14  to spend in the budget versus what it actually
15  spent in 2017, it did not spend roughly
16  $3.9 million that it was authorized to spend on
17  the needs it was charged with addressing,
18  correct?
19     A.  Well, I don't know that for sure.
20  This is budgeted.  I'm not sure what may have
21  been authorized, what contingencies there might
22  have been on revenue with respect to that, so I
23  can only answer about what I see before me.
24     Q.  Did you look into this kind of issue

Page 348

1   to see whether any of the so-called affected
2   divisions had monies that were approved to spend
3   in a particular year that they did not spend?
4          MR. SOBOL:  Objection.
5      A.  This is another version of the -- what
6   I need to do in order to address my assignment.
7   These funds that are the ending balance carrying
8   forward can be used for other services as you
9   established, I think, in your preface to these
10  set of questions.  They could be used for other
11  services next year or the year after that.
12          What is the value of those other
13  services?  A good measure of that is the
14  dollars.  So anything that takes away from or
15  diverts funds from other categories, including
16  the operating surplus or deficit, is measured by
17  opportunity cost.
18  BY MR. KEYES:
19     Q.  Even if the ADM Board or the
20  Children's Services Board had additional dollars
21  available to it and did not spend them?
22     A.  Well, I think the --
23          MR. SOBOL:  Objection.
24     A.  No, I'll just disagree with that.

Page 349

1   BY MR. KEYES:
2      Q.  On what basis?
3      A.  It's not a sound economic -- not sound
4   economic logic.  These funds have other
5   purposes, other potential uses.
6      Q.  Aren't you positing that the dollars
7   that you've quantified as damages have an
8   opportunity cost because by being spent on
9   opioid-related services they were not available
10  to be spent on something else?
11          MR. SOBOL:  Objection.  Form.
12     A.  Well, broadly speaking, there was the
13  diversion part, and any increase in spending
14  part due to the opioid crisis that would have
15  fed into the opportunity cost accounting.
16  BY MR. KEYES:
17     Q.  So what basis do you have in fact for
18  positing that if those dollars were not spent on
19  opioid-related services, they, in fact, would
20  have been spent on something else when the
21  evidence we have is that these boards didn't
22  even spend the dollars they had?
23     A.  Well, you're looking at a bunch of
24  categories that have to add up in the way that

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1  we've been discussing. Could I say that if
2  whatever opioid-related expenditures were not
3  here, I would know that other would go up, or
4  paid placements would go up, or any of these
5  individual categories would change in any way,
6  including the last one we've been talking about,
7  which you have to consider that to be a change
8  in fund balance which is what might be affected
9  by any spending on opioids.
10      And the whole kind of emphasis of some
11 of our discussions earlier was that it's not
12 necessary for me to be able to determine where
13 that money came from in order to attribute the
14 opportunity cost of how the dollars I do.
15     Q. Do you agree a carry-forward balance
16 is fairly characterized as a surplus?
17     A. It sometimes -- at least in this
18 document the surplus is more of an annual flow
19 concept, whereas the balance is a stock concept.
20 But I'm not sure what you're then asking.
21     Q. My question is, when it refers to the
22 ending carry-forward balance here for Summit
23 County Children's Services in McGuire Exhibit 5,
24 could that fairly be characterized as a surplus

Page 351

1  that existed as of year-end each year?
2      A. If you define "surplus" to be the
3  balance, this exhibit doesn't seem to use the
4  term that way. But I understand what you're
5  asking.
6      Q. So what's the answer? You said you
7  understand what I'm asking. Could the
8  carry-forward balance shown on McGuire Exhibit 5
9  be fairly characterized as a surplus that the
10 Summit County Children's Services had?
11     A. That's not the way the term is used in
12 this document.
13     Q. Did you look at any deposition
14 testimony from anyone who worked for Summit
15 County Children's Services about the ending
16 carry-forward balance?
17     A. Oh, I don't remember.
18     Q. And do you know what anyone who
19 actually worked for Summit County Children's
20 Services said about how the carry-forward
21 balance could be characterized?
22     A. I don't remember.
23     Q. Did you look?
24     A. I don't remember that either. I'm

Page 352

1  sorry.
2      Q. I asked you earlier whether you had
3  ever testified using a theory of calculating
4  damages where internal costs were provable as
5  damages.
6      Do you remember that?
7      A. I don't remember the internal word,
8  but I do remember the general nature of the
9  question.
10     Q. And I think you responded that those
11 internal costs were similar, in your words, to
12 an increased purchase price.
13     A. I actually don't recall this, what I
14 was saying about that, so I'm sorry.
15     Q. Okay. Well, have you ever testified
16 as an expert in a case where you have quantified
17 damages as being the opportunity costs
18 associated with the expenditures of a
19 municipality?
20     A. Possibly. And what I mean by that is
21 there have been cases in which purchasers are
22 sometimes labor funds and may have been
23 government self-insured healthcare costs, but I
24 can't be sure.

Page 353

1      Q. You say it may be. If you did, what
2  case or cases would that have been in?
3      A. That's what I can't tell you.
4      Q. So sitting here today, can you
5  identify any case where you've said that?
6      MR. SOBOL: Objection.
7      A. I can't tell you which case this would
8  have come up. I just don't remember.
9  BY MR. KEYES:
10     Q. Have you ever testified as an expert
11 where you claim that the internal compensation
12 costs of a municipality or a company were
13 claimed as damages as distinguished from
14 payments to an outside party?
15     A. Compensation costs are normally
16 considered to be wages and benefits, and the
17 degree to which this government entity, that I'm
18 not remembering the details about, was paying
19 for healthcare, that would be part of a
20 compensation to the workers. So in that sense,
21 yes.
22     Q. Did you treat those compensation costs
23 as damages?
24     A. They would have been spending -- extra

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1  healthcare spending due to whatever it was, and
2  that would have been damages, yes.
3     Q.  And were those dollars paid to the
4  employees or paid to third parties in connection
5  with employees?
6     A.  They would have been paid to third
7  parties.
8     Q.  Okay.  So my question was about
9  internal compensation costs where you are paying
10  your own employees.
11        Have you ever testified as an expert
12  where those internal compensation costs, what
13  you're paying to employees, is claimed as
14  damages?
15     A.  I have to ask you to clarify.  By
16  "internal compensation cost," do you mean wages
17  only, or do you mean something else?
18     Q.  Well, I mean any compensation paid to
19  employees.
20     A.  Any compensation, so it includes
21  employer contribution to health insurance
22  premiums?
23     Q.  Paid to employees, any compensation
24  paid to employees, not paid to third parties on

Page 355

1  behalf of employees.
2     A.  I can't think of anything.  But this
3  gets to be a little bit of a gray area about
4  employer payments that have to do with
5  healthcare costs that take the form of extra
6  compensation for workers, so I'll leave it at
7  that.
8     Q.  So your recollection is fuzzy as to
9  whether you've ever done this before?
10     A.  I think fuzzy would be a perfectly
11  good word to characterize my recollection here.
12  This is something I may have done, but I can't
13  point to particular examples.
14     Q.  Does Summit County pay reimbursements
15  for prescription opioids through their
16  healthcare plans for county employees?
17     A.  Can you read me that again, please?
18     Q.  Sure.
19        Does Summit County pay reimbursements
20  for prescription opioids through their
21  healthcare plans for county employees?
22        MR. SOBOL:  Sorry.  Objection.
23        Go ahead.
24     A.  Reimbursements to whom?

Page 356

1  BY MR. KEYES:
2     Q.  Either the insurer or the employee.
3     A.  It would be very unlikely to the
4  employee.  Modern health insurance doesn't work
5  that way.
6     Q.  Okay.  Do you know what Summit County
7  does?
8     A.  I do know some things about what
9  Summit County does.
10     Q.  Okay.  So tell me what it does.
11     A.  There's more than one plan that
12  applies to employees in Summit County, and some
13  of the plans change over time, sometimes
14  different groups of workers.  Some of those, I
15  think the largest bulk of those would be
16  considered to be self-insured, in which most of
17  the risk would have been borne by the employer,
18  in this case the city government.
19        When you say self-insured, though,
20  it's not a clean yes, they bear the risk versus
21  insured, no, they don't bear the risk.  It's
22  typical that there's some risk-sharing between a
23  third-party administrator and the government in
24  this case.

Page 357

1        So what all this means is that the
2  county government would be on the hook for and
3  pay part of healthcare costs on behalf of its
4  workers.  I guess in that case reimbursement is
5  a little bit of a funny word, but they would be
6  paying healthcare costs on behalf of their
7  workers.
8     Q.  Do you calculate as alleged damages in
9  this case any of those payments?
10     A.  I believe that this is part of
11  compensation from the standpoint of the
12  counties, and the degree to which health
13  insurance costs were included in compensation
14  for the portion of workers that are not set
15  aside by the overhead adjustment, yes, I do.
16     Q.  So where would we find that in your
17  work product?
18     A.  It would be under compensation.
19  There's wages and salaries and there's other
20  categories, and in the other category.
21     Q.  Okay.  And is the same true for
22  Cuyahoga County or not?
23     A.  The same would be true, yeah.
24     Q.  So for both Summit County and Cuyahoga

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1  County, to the extent that either of the
2  counties is making payments in connection with
3  prescription opioids written to county
4  employees, those expenses are included in your
5  calculations as non-overhead affected costs, and
6  they are included in your damages?
7      A.  Yes, for employees that are in the
8  variable cost category, I examine their
9  compensation package, which is wages plus
10  benefits, and health insurance costs are
11  comprehensive and include prescriptions for the
12  workers.
13      Q.  What about payments made by Summit
14  County or Cuyahoga County on behalf of injured
15  workers that are attributable to opioids?
16      A.  You're asking about the health
17  insurance payments in this context?
18      Q.  Well, I'm trying to be broad to make
19  sure I cover it.  Yes.
20      A.  I'm sorry, so ask me again, please?
21      Q.  Well, I'm asking about health
22  insurance payments made by Summit County or
23  Cuyahoga County on behalf of injured workers
24  that are attributable to opioids, are those

Page 359

1  included in your calculations?
2      A.  I would have to check to see if the
3  workers' comp costs are included in the variable
4  category, and I don't remember.  But it's in my
5  material.  We could figure that out if we wanted
6  to.  If it is, then I would again -- the
7  workers' comp costs include health insurance
8  costs, so they would be included.
9      Q.  Sitting here today, do you think you
10  included it as an affected non-overhead cost or
11  not?
12      A.  I don't remember.
13      Q.  Well --
14      A.  Sorry.
15      Q.  You don't remember what you did, but
16  I'm asking you, sitting here today, as you
17  approach it, what do you think you should do?
18          MR. SOBOL:  Objection.
19          He said he didn't remember.
20          MR. KEYES:  I understand he doesn't
21  remember what he did.
22  BY MR. KEYES:
23      Q.  I'm not asking about what you did.
24      I'm asking, sitting here today, what

Page 360

1  do you think you should do?  Should it be
2  included in your total damages, or excluded?
3      A.  It probably depends on the context and
4  the division.  If it's reasonable to believe
5  that some of the on-the-job injuries are part of
6  the normal course of work, then probably it
7  should be included.  But truthfully, I would
8  have to go back and try to reconstruct what I
9  did in that case.
10      Q.  Okay.  But again, to be clear, I'm not
11  asking what you did before.  I realize you don't
12  remember that.
13          Sitting here today, as you approach it
14  as a specific example of figuring out whether
15  something is an affected cost or not, whether
16  it's an overhead cost or not, how do you think
17  you treated these payments?  How do you think
18  you should treat these payments?
19      A.  Well, I should make a judgment about
20  whether they belong in one category or the
21  other.  I'm not --
22      Q.  So what judgment do you think you
23  should draw today?
24      A.  Well, I said it would probably depend

Page 361

1  on the division and whether I thought it was
2  likely that the workers' comp costs were part of
3  what workers might be exposed to in the normal
4  course of their work.
5      Q.  That's the criteria you would use?
6      A.  That's the criteria I would use.
7      Q.  Who are the manufacturer defendants in
8  this case?
9          MR. SOBOL:  Off the top of his head?
10      A.  Off the top of my head, I know Teva,
11  Mallinckrodt, Purdue, Endo.  I'm sure there are
12  others.  I don't want to make a slur on some
13  manufacturer's name if I'm not sure.
14  BY MR. KEYES:
15      Q.  Do you identify the manufacturer
16  defendants --
17          MR. SOBOL:  Is this deposition
18  transcript confidential?
19          MR. KEYES:  I have not designated it
20  so, no.
21          MR. SOBOL:  Okay.  So don't slur
22  anybody then.
23          THE WITNESS:  That's what I thought I
24  should do.

91 (Pages 358 to 361)

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1    BY MR. KEYES:
2        Q.  Do you identify in your damages report
3    who the manufacturer defendants are?
4        A.  I don't think I do.
5        Q.  Do you identify in your damages report
6    who the distributor defendants are?
7        A.  I don't think I do that either.
8        Q.  Or any of the retail pharmacy
9    defendants?
10       A.  Same answer.
11       Q.  Okay.  Are any of your analyses set
12   forth in your damages report defendant-specific?
13           MR. SOBOL:  Objection.  Asked and
14   answered.
15       A.  No, in the sense that the damages I
16   estimate are in total those due to defendants'
17   misconduct, defendants', plural, misconduct.
18   BY MR. KEYES:
19       Q.  And what is the misconduct by the
20   manufacturing defendants?
21       A.  The component of misconduct that
22   Rosenthal studies in her report is misleading is
23   advertising, but there's more to it than that.
24       Q.  Your understanding is that what

Page 363

1    Professor Rosenthal is measuring as the
2    manufacturers' misconduct is misleading
3    advertising?
4        A.  Well, yes, that's what I understand to
5    be the case.
6        Q.  What is your basis for that
7    understanding?
8        A.  My familiarity with the Rosenthal
9    report.
10       Q.  And what do you mean by "advertising"?
11       A.  What Rosenthal does is count detailing
12   visits.
13       Q.  What is detailing?
14       A.  Detailing is a practice by which sales
15   reps from drug manufacturers pay face-to-face
16   visits to doctors' offices and help inform and
17   persuade physicians to use their employer's
18   product.
19       Q.  And what does Professor Rosenthal
20   assume about that detailing or promotion?
21           MR. SOBOL:  Objection.
22       A.  Well, there's a set of things.  Not
23   sure what -- where you want me to go off and
24   talk here.

Page 364

1    BY MR. KEYES:
2        Q.  Well, does she identify a particular
3    promotion by particular manufacturing defendants
4    that she says was unlawful?
5        A.  She is able to identify particular
6    defendants' detailing activities, which I
7    understand she makes a determination, I believe,
8    on the basis of counsel instructions of whether
9    that is misconduct.
10       Q.  Does she identify a subset of the
11   promotion by the manufacturing defendants that
12   she assumes is or concludes is unlawful?
13           MR. SOBOL:  Objection.
14       A.  My understanding is that she -- in
15   relating the total volume of detailing visits to
16   shipments, on instruction from counsel,
17   Professor Rosenthal attributes that portion of
18   shipments to defendants' misconduct.  That
19   probably wasn't very clear.
20   BY MR. KEYES:
21       Q.  I'd like to know your understanding.
22           Does she say that all promotion by the
23   manufacturing defendants was unlawful, most of
24   it, some of it, a particular type of promotion

Page 365

1    was unlawful?  What is your understanding of
2    what she assumes for purposes of her analyses?
3        A.  My understanding is what she assumes
4    on the basis of what I believe to be instruction
5    from counsel is that all her measured
6    advertising activities are misconduct --
7    represent misconduct.
8        Q.  All measured advertising activities?
9        A.  Detailing visits.
10       Q.  Right.
11           So does she assume that for purposes
12   of conducting her analysis all or virtually all
13   promotion by the manufacturer defendants from
14   1995 to the present was unlawful?
15           MR. SOBOL:  Objection.
16       A.  My understanding is that she was asked
17   to assume that.
18   BY MR. KEYES:
19       Q.  And because your opinions and your
20   quantification of damages relies on Rosenthal's
21   conclusions, your opinions also rely on that
22   assumption, correct?
23           MR. SOBOL:  Objection.
24       A.  The particular damages numbers that I

92 (Pages 362 to 365)

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1    present in my report depend on the results of
2    both Professor Rosenthal and Cutler's work.
3    BY MR. KEYES:
4        Q.  And, therefore, your particular
5    damages numbers that you present in your report
6    depend on the assumptions that Professor
7    Rosenthal and Professor Cutler make in doing
8    their work, correct?
9        A.  All the things that feed into their
10   conclusions in some sense I depend on.
11       Q.  But I was asking specifically about
12   assumptions.
13           Your particular damages numbers that
14   you present in your report depend on the
15   assumptions that Professor Rosenthal and
16   Professor Cutler make in doing their work,
17   correct?
18           MR. SOBOL:  Objection.
19       A.  That's a little too broad to give a
20   yes answer to, but a number of their assumptions
21   that underlie their empirical work would
22   influence their empirical estimates which would
23   then feed into affecting my damages.
24   BY MR. KEYES:

Page 367

1        Q.  What assumptions do Professor
2    Rosenthal and Professor Cutler make in doing
3    their work that do not impact your damages
4    quantification?
5            MR. SOBOL:  Objection.  Scope.
6            He doesn't have the reports in front
7    of him.
8        A.  I would have to -- I think it might
9    help or it might not give me an answer to this.
10   I was just kind of noting that your original
11   question was too broad, that there's a number of
12   assumptions that are made in the report that
13   don't affect the empirical results, and I didn't
14   want to say that every assumption that Meredith
15   Rosenthal or Cutler makes would affect their
16   results.  That's all I'm saying.
17       Q.  Professor Rosenthal and
18   Professor Cutler did make assumptions that do
19   affect their empirical results, correct?
20       A.  I agree with that.
21       Q.  Those assumptions also have an impact
22   on the damages quantification that you did,
23   correct?
24       A.  That would be correct.  So if there

Page 368

1    were an assumption that affected their
2    estimates, then it would feed through and affect
3    my quantification.
4        Q.  So now can you identify for me
5    assumptions that either Professor Rosenthal or
6    Professor Cutler made that did not affect their
7    empirical results?
8            MR. SOBOL:  Same objection as
9    previously when the question was asked.
10       A.  There probably are some.  I don't have
11   any off the top of my head.
12   BY MR. KEYES:
13       Q.  Can you identify a single one, a
14   single assumption they made in their work that
15   does not affect their empirical work?
16           MR. SOBOL:  Objection.  Same objection
17   as previously.
18       A.  That's not quite the same question,
19   but nothing occurs to me.
20   BY MR. KEYES:
21       Q.  Can you identify a single assumption
22   that Professor Rosenthal or Professor Cutler
23   made in their work that does not affect their
24   empirical results?

Page 369

1            MR. SOBOL:  Objection.  Same objection
2    as before.
3        A.  Same answer.
4    BY MR. KEYES:
5        Q.  Have you done any independent
6    examination of the opioid manufacturer
7    defendants' marketing?
8        A.  I'm familiar with material in this
9    case that plays into my public nuisance report.
10       Q.  But I'm asking about whether you've
11   done any examination, not just familiarity.
12           Have you studied or examined the
13   opioid manufacturer defendants' marketing?
14           MR. SOBOL:  Objection.
15       A.  I've examined.  That seems to be -- to
16   me to be studied.
17   BY MR. KEYES:
18       Q.  And you did that in connection with
19   your nuisance report?
20       A.  Yes.
21       Q.  Did you do any examination of the
22   opioid manufacturer defendants' marketing in
23   connection with your damages report?
24       A.  No, I don't think so.

93 (Pages 366 to 369)

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1      Q.  Did you do any examination of the
2  opioid manufacturer defendants' promotion in
3  connection with your damages report?
4      A.  No, I don't think so.  That's a
5  Rosenthal thing.
6      Q.  Did you do any examination of the
7  opioid manufacturers' detailing in connection
8  with your damages report?
9      A.  That's also the Rosenthal thing.
10     Q.  Is that a no?
11     A.  That's I didn't do it.  Progress.
12     Q.  Do you believe that all of the
13  promotion conducted by manufacturer defendants
14  is false?
15         MR. SOBOL:  Objection.
16     A.  I didn't study it.
17  BY MR. KEYES:
18     Q.  So do you have that belief or not?
19         MR. SOBOL:  Objection.
20     A.  I don't know.
21  BY MR. KEYES:
22     Q.  Do you believe that all of the
23  promotion conducted by the manufacturer
24  defendants was unlawful?

Page 371

1          MR. SOBOL:  Objection.
2      A.  As we -- as you established a few
3  moments ago, I didn't study it.
4  BY MR. KEYES:
5      Q.  In connection with your work on your
6  nuisance report, do you believe all of the
7  promotion conducted by manufacturer defendants
8  was false?
9          MR. SOBOL:  Objection.
10     A.  I don't need that belief in the sense
11  of to be -- it wasn't necessary for me to come
12  to a judgment that 100 percent of the
13  advertising was false.
14  BY MR. KEYES:
15     Q.  In connection with your work on your
16  nuisance report, do you believe that all of the
17  promotion conducted by manufacturer defendants
18  was unlawful?
19         MR. SOBOL:  Objection.  Asked and
20  answered.
21     A.  I didn't need to come to a
22  determination of that.  It wasn't part of my
23  assignment, for one thing.
24  BY MR. KEYES:

Page 372

1      Q.  For purposes of your damages report,
2  have you analyzed how your calculations would
3  change if, in fact, the defendant manufacturers
4  had marketed their products in a lawful way?
5          MR. SOBOL:  Objection.
6      A.  This is something that would be -- let
7  me take an example, I think, of what you're
8  asking about.
9          Suppose one manufacturer were
10  determined to be completely lawful, and those
11  detailing visits were then not deemed to be
12  inappropriate, that's something that Professor
13  Rosenthal could readily calculate, and then the
14  proportionality of that affect would flow
15  through Cutler and would flow through to my
16  damages report.  So it's something that the
17  methodology is capable of doing.
18  BY MR. KEYES:
19     Q.  Has Professor Rosenthal done that?
20     A.  She's done some analysis of the affect
21  on share of shipments attributable to misconduct
22  under assumptions of different compositions in
23  the defendant pool, so yes, I think she has.
24     Q.  You said that's something she could

Page 373

1  do.  So has she performed calculations on the
2  assumption that one manufacturer's conduct was
3  completely lawful and the detailing visits were
4  not deemed to be inappropriate?
5      A.  I believe she has, yes.
6      Q.  Okay.  For which manufacturer?
7      A.  She did it for a series of them.
8      Q.  Okay.  And have you seen that in her
9  report?
10     A.  I have.
11     Q.  Your work in your report relies on the
12  work of Professor Rosenthal and Professor
13  Cutler, correct?
14     A.  That's correct.
15         MR. SOBOL:  Object.
16  BY MR. KEYES:
17     Q.  So before --
18         MR. SOBOL:  I'm getting a little slow
19  here, but objection, asked and answered.
20         Go ahead.
21  BY MR. KEYES:
22     Q.  So before you issued your damages
23  report on March 25th, how did you know what
24  Professor Cutler's work was, and how did you

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1  know what Professor Rosenthal's work was?
2      A.  Well, we all needed one another.
3  David needed to know -- David Cutler needed to
4  know which divisions were likely to be affected
5  by opioids, so I had to tell him that.  I had to
6  tell him that ahead of March 25.  And then so I
7  could do my work, he needed to tell me what the
8  content of essentially the Excel spreadsheets
9  where there's a share of harms associated with
10 misconduct, what those numbers would look like.
11 And then we could do the rest of our reports
12 sort of on our own.
13     Q.  So how did you communicate to
14 Professor Cutler which divisions were affected?
15     A.  I let counsel know what I'm going to
16 be saying about that, and then they told David.
17     Q.  Did you share a draft of your
18 conclusions and your discussion about which
19 divisions were affected with Professor Cutler?
20     MR. SOBOL:  I thought that drafts were
21 off limits in this case.
22     MR. HALLER:  Not if Cutler is relying
23 on it.
24     MR. SOBOL:  But Cutler identifies what

Page 375

1  he relies upon in his report, and there's no
2  draft he identifies as relying on in his report.
3      MR. KEYES:  I'm asking the question
4  what was shared.  I'm not even asking for a copy
5  of it at this point.
6      MR. SOBOL:  I'm going to instruct him
7  not to answer until I know better, and we'll
8  reserve until the next time.
9  BY MR. KEYES:
10     Q.  Well, to be clear, did you share a
11 draft of your conclusions and your discussion
12 about which divisions were affected with
13 Professor Cutler?
14     MR. SOBOL:  Yes, I'm instructing him
15 not to answer until I have a better clarity
16 where this line gets drawn.
17 BY MR. KEYES:
18     Q.  Well, you said Professor Cutler relied
19 on your determination of which divisions were
20 affected, to use your terminology, right?
21     A.  I said something like that, yes.
22     Q.  Okay.  So if Professor Cutler is
23 relying on your determination of which divisions
24 are affected, I need to know how he learned what

Page 376

1  divisions were affected.  He learned it from
2  you?
3      A.  That's correct.
4      Q.  So did you send him a draft report or
5  a draft discussion that identified which
6  divisions were affected?
7      MR. SOBOL:  Same instruction.
8      MR. KEYES:  Even though he's just said
9  that Professor Cutler relied on it?
10     MR. SOBOL:  He doesn't know what
11 Professor Cutler relied on or not.  Professor
12 Cutler knows what he relied upon.  And I've read
13 Professor Cutler's report, and Professor
14 Cutler's report has materials that he
15 considered, and there's no draft of McGuire
16 report in there.
17     MR. KEYES:  Well, with respect, you're
18 not the witness, you're not the expert, and what
19 you believe is irrelevant, given that Professor
20 McGuire, who is the expert and is the witness,
21 just said that he understands that Professor
22 Cutler relied on his determination of which
23 divisions were affected.
24 BY MR. KEYES:

Page 377

1      Q.  So given your testimony, Professor
2  McGuire, that you did something that Professor
3  Cutler relied on, I'd like to know, did you send
4  him a draft or some discussion relating to which
5  divisions were affected to Professor Cutler so
6  that he could do the work he said depended on
7  it?
8      MR. SOBOL:  To the extent the question
9  asks about whether you sent him a draft, I
10 instruct you not to answer.  To the extent that
11 it asks differently as to whether or not you had
12 a discussion with him, you may answer yes or no.
13 BY MR. KEYES:
14     Q.  How did you communicate to
15 Professor Cutler your analysis and your findings
16 about which divisions were affected?
17     MR. SOBOL:  I instruct you not to
18 answer if it's by way of a draft.
19     A.  It was a very simple list of nine and
20 ten divisions in two different counties.  It
21 didn't require a lot of prose backup.  Here they
22 are.
23 BY MR. KEYES:
24     Q.  So how was that communicated to

95 (Pages 374 to 377)

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1    Professor Cutler?
2        A.  I would have given him that list.
3        Q.  How?
4        A.  I don't remember.
5        Q.  Now, you said that Professor Cutler's
6    percentages were something you needed to rely on
7    for your work?
8        A.  Yes.
9        Q.  Did you look at drafts of
10   Professor Cutler's report?
11       MR. SOBOL:  Again, I instruct him not
12   to answer.
13       MR. RICE:  Counsel, can I have your
14   basis for the objection, please?
15       MR. SOBOL:  It's not clear to me
16   whether, under the existing rules for these
17   depositions, whether it is fair game for people
18   to be talking about drafts of various expert
19   reports.
20       MR. RICE:  So is it attorney/client
21   privilege-based concern?
22       MR. SOBOL:  No.  It's whether or not
23   the orders that apply to this case and drafts of
24   expert reports are to be discussed by the

Page 379

1    experts.  I think this comes very close to the
2    line.  Since Professor McGuire will be back next
3    week, I've indicated that I'm instructing him
4    now not to answer until I have better direction
5    from others.
6        MR. KEYES:  Seems like your concern is
7    whether the draft report is discoverable.  I'm
8    not asking for a copy of the draft report at
9    this time.  I just want to know whether
10   Professor McGuire received it and saw it.
11       MR. SOBOL:  That's not my concern.  I
12   mean, I've stated my concern.  I don't know
13   whether or not discussions about drafts, not the
14   drafts themselves, but whether discussions of
15   drafts are discoverable or not.
16       MR. KEYES:  I haven't asked about
17   discussions about drafts.  You're jumping the
18   gun.  I'm asking, did he get a draft of
19   Professor Cutler's report that provided the
20   percentages upon which Professor McGuire has
21   expressly said he relied.
22       MR. SOBOL:  Okay.  Well, like I said,
23   the instructions there, I'm not worried at all
24   about the instruction.  If you guys want to

Page 380

1    bicker about it, fine, but you're running out of
2    time for the day.
3    BY MR. KEYES:
4        Q.  How do you know what Professor
5    Cutler's percentages are?
6        MR. SOBOL:  Other than drafts, you may
7    answer.
8        A.  It takes the form of Excel tables that
9    are reproduced in my report.  And it's also not
10   a prose issue, it's here is the Excel
11   spreadsheet, here are the percentages, then I'm
12   off and running.
13   BY MR. KEYES:
14       Q.  And when did you get those
15   percentages, the Excel spreadsheet that lists
16   the percentages?
17       A.  Not the night before, not too much
18   earlier than the deadline date, so it would have
19   been a few days ahead, something like that.
20       Q.  And upon receipt of those percentages
21   from Professor Cutler, who inputted them into
22   your spreadsheets for purposes of running your
23   calculations?
24       A.  Compass Lex would have done that.

Page 381

1        Q.  And what steps did you take to
2    double-check that the percentages were entered
3    correctly and that the math was correct in your
4    own calculations?
5        A.  Well, I spot-check these things.
6        Q.  What do you mean you spot-check them?
7        A.  Just look at some of the products,
8    does it look right, and then --
9        Q.  What do you mean does it look right?
10   What benchmarks, criteria, standards are you
11   using to determine whether it looks right?
12       A.  You're multiplying two numbers in each
13   year for each division, it's not a complicated
14   mathematical operation.  The numbers are pretty
15   small in most cases, by which I mean that the
16   percent of harms attributable to misconduct are
17   pretty small numbers, sometimes they're around
18   1, 2, 3, 4, 5 percent.  So what I do is look at
19   the damages result to see if it seems to be 1,
20   2, 3, 4, 5 percent of the potentially affected
21   costs.
22       Q.  Would you turn to Appendix IV.C-1.1 in
23   your report?
24       MR. KO:  Sorry, Andrew, which --

96 (Pages 378 to 381)

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1     MR. KEYES: Appendix IV.C-1.1.
2     MR. KO: Thanks.
3  BY MR. KEYES:
4     Q. Are you there?
5     A. Yes.
6     Q. Okay. This is a spreadsheet showing
7  damages that you calculated for the Cuyahoga
8  ADAMHS Board, correct?
9     A. That's correct.
10    Q. And I just want to confirm line 2 is
11 titled "Opioid-Related Percentage of Services"?
12    A. Right.
13    Q. Do you see that?
14    A. I do, yes.
15    Q. And did you get those percentages from
16 Professor Cutler?
17    A. No, those are budget information that
18 I put together.
19    Q. Okay. Can you look at the sources and
20 notes for number 2?
21    A. Yeah, that's a metric analysis in the
22 Cutler report, but it applies the metric
23 analysis to the numbers in the budget. This
24 isn't -- these numbers don't depend on Cutler's

Page 383

1  empirical results about the effective shipments
2  or Meredith's results, this particular line.
3     Q. Okay. Now turning to line 5, there's
4  a series of percentages.
5     Do you see that?
6     A. I see it, yes.
7     Q. Did you get those from
8  Professor Cutler?
9     A. Yes.
10    Q. Do you see that line 7, the
11 percentages?
12    A. I do.
13    Q. Did you get those from
14 Professor Cutler?
15    A. Those are Cutler.
16    Q. Line 9, do you see those percentages?
17    A. I do.
18    Q. Those are percentages from Professor
19 Cutler?
20    A. Those are also Cutler.
21    Q. Line 11, there are percentages there,
22 you got those percentages from Professor Cutler?
23    A. Yes.
24    Q. Line 13, do you see those percentages?

Page 384

1     A. I do.
2     Q. You got those percentages from
3  Professor Cutler?
4     A. Also, yes, from Professor Cutler.
5     Q. Line 15, do you see those percentages?
6     A. I do.
7     Q. Did you get those from Professor
8  Cutler?
9     A. Yes.
10    Q. Line 17, do you see those percentages?
11    A. Also from Professor Cutler.
12    Q. Line 19?
13    A. Same answer.
14    Q. Okay. So on this chart, all of the
15 percentages that are listed in lines 5, 7, 9,
16 11, 13, 15, 17, and 19 are percentages that you
17 received from Professor Cutler?
18    A. That's right.
19    Q. And for any of those percentages, did
20 you tinker with them, modify them, change them
21 before you inputted them into your calculations?
22    A. No.
23    Q. You accepted them as accurate by
24 relying on Professor Cutler's work?

Page 385

1     A. Yes.
2     Q. And if I went through the same
3  exercise for each chart for each affected
4  division for Cuyahoga County and each chart for
5  each affected division of Summit County, would
6  you give me the same answers?
7     MR. SOBOL: Well, objection.
8  BY MR. KEYES:
9     Q. That is, the opioid-related percentage
10 of services is something you prepared based on
11 Professor Cutler's metric analysis, correct?
12    A. It would differ division by division,
13 but at some point when we start talking about
14 the rows following something like approach one,
15 that's where the Cutler percentages start coming
16 in.
17    Q. And again, all of those percentages
18 come from Professor Cutler. You accepted them
19 without modifying, tinkering them, you accepted
20 them as-is based on Professor Cutler's work?
21    A. Yes.
22    MR. SOBOL: How are we doing with
23 time?
24    MR. KEYES: I have a note we have five

97 (Pages 382 to 385)

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1  minutes remaining. And unless there are any
2  objections, I'm happy to call it quits today.
3          MR. SOBOL: Just tack it onto the next
4  time.
5          MR. KEYES: Sure.
6          THE VIDEOGRAPHER: The time is
7  6:09 p.m.
8          MR. KEYES: Does anyone else have
9  questions they want to use for the five minutes?
10 No? Okay.
11         THE VIDEOGRAPHER: The time is
12 6:09 p.m. This day of deposition has concluded,
13 and we are off the record.
14         (Whereupon, the deposition was
15         adjourned.)
16
17
18
19
20
21
22
23
24

Page 388

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8          After doing so, please sign the
9  errata sheet and date it. It will be attached
10 to your deposition.
11         It is imperative that you return
12 the original errata sheet to the deposing
13 attorney within thirty (30) days of receipt of
14 the deposition transcript by you. If you fail
15 to do so, the deposition transcript may be
16 deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24

Page 387

1  COMMONWEALTH OF MASSACHUSETTS )
2  SUFFOLK, SS.                )
3          I, MAUREEN O'CONNOR POLLARD, RMR, CLR,
4  and Notary Public in and for the Commonwealth of
5  Massachusetts, do certify that on the 23rd day
6  of April, 2019, at 9:02 o'clock, the person
7  above-named was duly sworn to testify to the
8  truth of their knowledge, and examined, and such
9  examination reduced to typewriting under my
10 direction, and is a true record of the testimony
11 given by the witness. I further certify that I
12 am neither attorney, related or employed by any
13 of the parties to this action, and that I am not
14 a relative or employee of any attorney employed
15 by the parties hereto, or financially interested
16 in the action.
17         In witness whereof, I have hereunto
18 set my hand this 25th day of April, 2019.
19
20         _____
21         MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
22         Realtime Systems Administrator
23         CSR #149108
24

Page 389

1          - - - - - -
                 E R R A T A
2          - - - - - -
3  PAGE LINE CHANGE
4  ____ ____ _____
5      REASON: _____
6  ____ ____ _____
7      REASON: _____
8  ____ ____ _____
9      REASON: _____
10 ____ ____ _____
11     REASON: _____
12 ____ ____ _____
13     REASON: _____
14 ____ ____ _____
15     REASON: _____
16 ____ ____ _____
17     REASON: _____
18 ____ ____ _____
19     REASON: _____
20 ____ ____ _____
21     REASON: _____
22 ____ ____ _____
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1
2     ACKNOWLEDGMENT OF DEPONENT
3
4          I, _____ , do
      Hereby certify that I have read the foregoing
5     pages, and that the same is a correct
      transcription of the answers given by me to the
6     questions therein propounded, except for the
      corrections or changes in form or substance, if
7     any, noted in the attached Errata Sheet.
8
9     _____
      THOMAS G. MCGUIRE, Ph.D.    DATE
10
11
12
13
14
15
16    Subscribed and sworn
      To before me this
17    _____ day of _____ , 20____ .
18    My commission expires: _____
19
      _____
20    Notary Public
21
22
23
24

Page 391

1         LAWYER'S NOTES
2     PAGE  LINE
3     ____  ____  _____
4     ____  ____  _____
5     ____  ____  _____
6     ____  ____  _____
7     ____  ____  _____
8     ____  ____  _____
9     ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____

Highly Confidential - Subject to Further Confidentiality Review

Page 392

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL | ) | |
| PRESCRIPTION | ) | MDL No. 2804 |
| OPIATE LITIGATION | ) | |
| _____ | ) | Case No. |
| THIS DOCUMENT RELATES TO: | ) | 1:17-MD-2804 |
| | ) | |
| The County of Summit, Ohio | ) | Hon. Dan A. |
| et al. v. Purdue | ) | Polster |
| Pharma L.P., et al. | ) | |
| Case No. 17-OP-45004 | ) | |
| | ) | |
| The County of Cuyahoga v. | ) | |
| Purdue Pharma L.P., et al. | ) | |
| Case No. 18-OP-45090 | ) | |

TUESDAY, APRIL 30, 2019

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW
- - -

Videotaped deposition of Thomas G.
McGuire, Ph.D., Volume II, held at the offices
of Robins Kaplan LLP, 800 Boylston Street,
Suite 2500, Boston, Massachusetts, commencing
at 8:31 a.m., on the above date, before
Carrie A. Campbell, Registered Diplomate
Reporter and Certified Realtime Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

| Page 393 |
| --- |

```
 1        A P P E A R A N C E S :
 2
      HAGENS BERMAN SOBOL SHAPIRO LLP
 3    BY:  THOMAS M. SOBOL
           Tom@hbsslaw.com
 4    55 Cambridge Parkway, Suite 301
      Cambridge, Massachusetts 02142
 5    (617) 482-3700
 6
      KELLER ROHRBACK LLP
 7    BY:  DAVID KO
           dko@kellerrohrback.com
 8         (VIA TELECONFERENCE)
      1201 Third Avenue, Suite 3200
 9    Seattle, Washington 98101
      (206) 623-1900
10
11    MOTLEY RICE LLC
      BY:  ANDREW P. ARNOLD
12         aarnold@motleyrice.com
      28 Bridgeside Boulevard
13    Mount Pleasant, SC 29464
      (843) 216-9000
14    Counsel for Plaintiffs
15
16    NAPOLI SHKOLNIK PLLC
      BY:  SHAYNA SACKS
17         ssacks@napolilaw.com
      360 Lexington Avenue, 11th Floor
18    New York, New York  10017
      (212) 397-1000
19    Counsel for Cuyahoga County
20
21    WILLIAMS & CONNOLLY LLP
      BY:  J. ANDREW KEYES
22         akeyes@wc.com
           JOSEPH S. BUSHUR
23         jbushur@wc.com
      725 Twelfth Street, N.W.
24    Washington, DC 20005
      (202) 434-5331
25    Counsel for Cardinal Health, Inc.
```

| Page 394 |
| --- |

```
 1    COVINGTON & BURLING LLP
      BY:  JOHN W. ZIPP
 2         jzipp@cov.com
           (VIA TELECONFERENCE)
 3    850 Tenth Street, NW
      Washington, DC 20001-4956
 4    (202) 662-5518
 5    and
 6    COVINGTON & BURLING LLP
      BY:  DAVID HALLER
 7         dhaller@cov.com
      620 Eighth Avenue
 8    New York, New York 10118
      (212) 841-1000
 9    Counsel for McKesson Corporation
10
11    REED SMITH LLP
      BY:  BRIAN T. HIMMEL
12         bhimmel@reedsmith.com
      225 Fifth Avenue
13    Pittsburgh, Pennsylvania 15222
      (412) 288-4058
14    Counsel for AmerisourceBergen
15
16
17    BARTLIT BECK LLP
      BY:  SHARON DESH
           sharon.desh@bartlit-beck.com
18         (VIA TELECONFERENCE)
      54 West Hubbard Street, Suite 300
19    Chicago, Illinois  60654
      (312) 494-4400
20    Counsel for Walgreens
21
22    CAVITCH FAMILO & DURKIN, CO., LPA
      BY:  ERIC WEISS
23         eweiss@cavitch.com
           (VIA TELECONFERENCE)
      1300 East 9th Street, 20th Floor
24    Cleveland, Ohio 44114
      (216) 621-7860
25    Counsel for Discount Drug Mart, Inc.
```

| Page 395 |
| --- |

```
 1    JONES DAY
      BY:  CLAIRE E. CASTLES
 2         ccastles@jonesday.com
      555 South Flower Street, 15th Floor
 3    Los Angeles, California 90071-2300
      (213) 489-3939
 4
 5    and
 6    JONES DAY
      BY:  EDWARD M. CARTER
           emcarter@jonesday.com
 7    325 John H. McConnell Boulevard, Suite 600
      Columbus, Ohio 43125-2673
 8    (614) 469-3939
      Counsel for Walmart
 9
10
11    BARNES & THORNBURG LLP
      BY:  MONIQUE A. HANNAM
12         monique.hannam@btlaw.com
           (VIA TELECONFERENCE)
      11 South Meridian Street
13    Indianapolis, Indiana  46204-3535
      (317) 231-7776
14    Counsel for H.D. Smith
15
16    MARCUS & SHAPIRA LLP
      BY:  RICHARD I. HALPERN
17         halpern@marcus-shapira.com
           (VIA TELECONFERENCE)
18    301 Grant Street, 35th Floor
      Pittsburgh, Pennsylvania 15219-6401
19    (412) 338-4690
      Counsel for HBC
20
21
22    ROPES & GRAY LLP
      BY:  CHRISTINE D'AURIA
23         Christine.DAuria@ropesgray.com
      800 Boylston Street
24    Boston, Massachusetts 02199-3600
      (617) 951-7000
25    Counsel for Mallinckrodt
```

| Page 396 |
| --- |

```
 1    ARNOLD & PORTER KAYE SCHOLER LLP
      BY:  SAMUEL LONERGAN
 2         samuel.lonergan@arnoldporter.com
           REBECCA E. ZOLLER
 3         rebecca.zoller@arnoldporter.com
      250 West 55th Street
 4    New York, New York  10019
      (212) 836-7568
 5    Counsel for Endo Pharmaceuticals
      Inc., and Endo Health Solutions Inc.
 6
 7
 8    MORGAN, LEWIS & BOCKIUS LLP
      BY:  MARTHA A. LEIBELL
           martha.leibell@morganlewis.com
 9         (VIA TELECONFERENCE)
      200 South Biscayne Boulevard, Suite 5300
10    Miami, Florida  33131-2339
      Counsel for Teva Pharmaceuticals
11    USA, Inc., Cephalon, Inc., Watson
      Laboratories, Inc., Actavis LLC,
12    Actavis Pharma, Inc., f/k/a Watson
      Pharma, Inc.
13
14
15    MORGAN, LEWIS & BOCKIUS LLP
      BY:  ELIZABETH I. BUECHNER
16         elizabeth.buechner@morganlewis.com
           (VIA TELECONFERENCE)
17    101 Park Avenue
      New York, New York 10178-0060
18    (212) 309-6769
      Counsel for Rite Aid
19
20    LOCKE LORD LLP
      BY:  MADELINE E. BRUNNER
21         madeline.brunner@lockelord.com
           (VIA TELECONFERENCE)
22    2200 Ross Avenue, Suite 2800
      Dallas, Texas 75201
23    (214) 740-8445
      Counsel for Henry Schein, Inc., and
24    Henry Schein Medical Systems, Inc.
25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 397

1    ALSO PRESENT VIA STREAM:
2        CATE BREWER, Keller Rohrback
         JUSTIN TAYLOR, Bailey Wyant
3
         ERICA BENTON, Compass Lexecon
4        ALICE KAMINSKI, Compass Lexecon
         HAL SIDER, Compass Lexecon
5
6
     VIDEOGRAPHER:
7        ROBERT MARTIGNETTI,
         Golkow Litigation Services
8
9                   - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 398

1                    INDEX
2                    PAGE
3    APPEARANCES................................. 393
4    EXAMINATIONS
5    BY MR. KEYES............................. 400
6    BY MR. LONERGAN........................... 730
7    BY MR. CARTER............................. 788
8    BY MR. HALLER............................. 835
9    BY MR. SOBOL.............................. 846
10   BY MR. HALLER............................. 847
11
12               EXHIBITS
13   No.    Description              Page
14   McGuire 6   Report of Professor Thomas    606
              McGuire Regarding Public
15            Nuisance, March 25, 2019
16
17
18
19
20
21
22
23
24
25

Page 399

1        VIDEOGRAPHER:  We are now on
2    the record.  My name is Robert
3    Martignetti.  I'm a videographer for
4    Golkow Litigation Services.
5        Today's date is April 30, 2019,
6    and the time is 8:31 a.m.
7        This continued video deposition
8    of Thomas McGuire is being held in
9    Boston, Massachusetts, in re: National
10   Prescription Opiate Litigation.
11       Will counsel that was not
12   present for the first part of this
13   deposition please identify themselves.
14       MR. ARNOLD:  Andrew Arnold from
15   Motley Rice for plaintiffs.
16       MS. SACKS:  Shayna Sacks,
17   Napoli Shkolnik, for Cuyahoga County.
18       MR. CARTER:  Ed Carter for
19   Walmart.
20       VIDEOGRAPHER:  The court
21   reporter is Carrie Campbell.
22       Professor McGuire, do you
23   understand that you're still under
24   oath?
25       THE WITNESS:  Yes, I do.

Page 400

1        DIRECT EXAMINATION (CONTINUED)
2    QUESTIONS BY MR. KEYES:
3        Q.   Good morning, Professor
4    McGuire.  This is day two of your deposition.
5    Day one was last Tuesday, April 30th {sic}.
6        Do you understand you're still
7    under oath today?
8        A.   I do understand, yes.
9        Q.   What, if anything, did you do
10   in connection with your engagement in this
11   case since you finished your testimony on day
12   one?
13       A.   I continued to study my
14   reports.  I had a phone call with staff
15   Compass Lexecon.  I requested and reviewed as
16   best I could several of the depositions that
17   took place since my initial day, and I met
18   with Tom Sobol yesterday, and I had a brief
19   call with David Ko yesterday as well.
20       Q.   Anything else?
21       A.   No, that's all that I can
22   recall.
23       Q.   You said you continued to study
24   your reports.
25       Do you mean both your report on

Page 401

1  what you call damages and your report on what
2  you call the public nuisance?
3       A.    Yeah, those are the two reports
4  I'm referring to.
5       Q.    And did you read them in their
6  entirety?
7       A.    I would say, yes, I read them
8  in their entirety.
9       Q.    How much did you spend, quote,
10  studying your two reports in the last week?
11      A.    I would say I spent maybe six
12  to eight hours.
13      Q.    You said you had a phone call
14  with come Compass Lexecon?
15      A.    That's right.
16      Q.    Who did you speak with at
17  Compass Lexecon?
18      A.    I spoke with Alice Kaminski.
19  And there was another Compass Lex staff
20  person in the room, but I didn't catch her
21  name.
22      Q.    And this was a phone call --
23      A.    Yes.
24      Q.    -- as opposed to as in-person
25  meeting?

Page 402

1       A.    Yes, it was a phone call.
2       Q.    How long was the call?
3       A.    It was less than half an hour,
4  I would say.
5       Q.    And when was the call?
6       A.    I spoke with Alice yesterday.
7       Q.    Did anyone participate in this
8  call besides you, Alice Kaminski and this
9  other person from Compass Lexecon whose name
10  you don't know?
11      A.    No, there was no other person
12  on the call.
13      Q.    Just the three of you?
14      A.    Just the three of us.
15      Q.    Who initiated this phone call?
16      A.    Do you mean who requested the
17  phone call or who --
18      Q.    Yes.
19      A.    -- actually dialed the number?
20      Q.    Who requested the phone call?
21      A.    I requested the phone call.
22      Q.    Why?
23      A.    Because I had a question about
24  some part of the calculations.
25      Q.    Okay.  And what was your

Page 403

1  question?
2       A.    My question was I wanted to
3  review the OUD, opioid use disorder,
4  prevalence estimates.
5       Q.    What was your specific question
6  about the OUD prevalence estimates?
7       A.    I just wanted to review the
8  entire section, so we just went through --
9  it's a certain appendix to my report.  We
10  just went through it again.
11      Q.    And did you ask her to explain
12  it to you?
13      A.    Well, we just -- we reviewed
14  it, so she helped me remember some of the
15  stuff that was done there.
16      Q.    What did she help you remember?
17      A.    Really the entire operation.
18      Q.    What do you mean "the entire
19  operation"?
20      A.    I mean the procedure by which I
21  estimated prevalence.
22      Q.    Can you be more specific about
23  what she helped you remember about the
24  procedure by which you estimated the
25  prevalence of OUD?

Page 404

1       A.    Well, as I said, we went
2  through the entire appendix step by step,
3  so...
4       Q.    And she helped you reconstruct
5  the various steps that were taken in your
6  report to estimate the prevalence of OUD?
7            MR. SOBOL:  Objection.
8            THE WITNESS:  Well, we
9       discussed the -- and reviewed the
10      attachment to my report, Attachment D
11      or whatever it is.
12  QUESTIONS BY MR. KEYES:
13      Q.    Did you talk to Ms. Kaminski
14  and this other person from Compass Lexecon
15  about anything else during your call
16  yesterday?
17      A.    Actually, we did.
18            I asked them a question about
19  the crime estimates to remind me of the
20  nature of the -- some of the data I used in
21  the report.
22      Q.    Okay.  And what specific data
23  are you referring to?
24      A.    There's an abbreviation for the
25  data.  It's NIBRS, national institute --

4  (Pages 401 to 404)

Highly Confidential - Subject to Further Confidentiality Review

Page 405

1   sorry, National Incident Based Reporting
2   System.  It's maintained by the FBI.
3       Q.    Okay.  But what was your
4   specific question?
5           Did you ask her what NIBRS
6   stands for?
7       A.    No.  No.  I could look up that
8   easy enough.
9       Q.    Then what was your specific
10  question?
11      A.    My specific question was the --
12  to remind me about the coverage of that data
13  set, which is incomplete.
14      Q.    How was it incomplete?
15      A.    The data set includes units
16  that report, and not all units report data
17  into the reporting system.
18      Q.    Which units do not report into
19  that system?
20      A.    Well, I think it varies across
21  the country, really.
22      Q.    You said you asked the
23  question.
24          Did she give you an answer?
25      A.    Well, she reminded me that that

Page 406

1   was true, for example, and that the coverage
2   in our counties was -- while not 100 percent,
3   was good.
4       Q.    And can you quantify good, if
5   not 100 percent?
6       A.    I think around 80 percent.
7       Q.    Did you talk to Ms. Kaminski or
8   the other person from Compass Lexecon about
9   anything else regarding the crime estimates
10  set forth in your report?
11      A.    No, I didn't.  That was the
12  only question I asked about crime.
13      Q.    Okay.  Besides the questions
14  you asked about how you had estimated the
15  prevalence of OUD and the question you asked
16  about the crime estimates in your report, did
17  you cover any other topics with Ms. Kaminski?
18      A.    No, those were the only two
19  topics that we covered.
20      Q.    And separate from that phone
21  call with Ms. Kaminski and this other unnamed
22  person from Compass Lexecon yesterday, did
23  you speak with anyone from Compass Lexecon
24  about this engagement since your first day of
25  deposition last Tuesday?

Page 407

1           MR. SOBOL:  Objection.
2           THE WITNESS:  The phone call
3       yesterday was the only conversation I
4       had with anyone at Compass Lexecon.
5   QUESTIONS BY MR. KEYES:
6       Q.    In your first day of deposition
7   testimony, you mentioned a number of other
8   people on the Compass Lexecon team that
9   assisted you.
10          Do you remember that?
11      A.    I do remember that.
12      Q.    Did you speak with any of those
13  other people since your deposition last
14  Tuesday?
15      A.    The only people from Compass
16  Lex I spoke to were Alice and her colleague
17  yesterday.
18      Q.    And did Ms. Kaminski give you
19  anything in writing either before or after
20  yesterday's call?
21      A.    No, Alice gave me nothing in
22  writing in the week since.
23      Q.    How about the other person on
24  this call yesterday?
25      A.    No, nothing.

Page 408

1       Q.    How about anyone else from
2   Compass Lexecon?
3       A.    There was no one else from
4   Compass Lex that sent me any written
5   material.
6       Q.    You said you studied
7   depositions since your first day of
8   deposition testimony; is that correct?
9       A.    I'm not sure I used the word
10  "studied."  I requested depositions and
11  looked at them as best I could.
12      Q.    What depositions did you
13  request?
14      A.    I requested depositions of
15  Dr. Schumacher, Professor Cutler and
16  Professor Gruber.
17      Q.    Did you request any other
18  deposition transcripts?
19      A.    No, I didn't.  Those were the
20  only depositions I requested.
21      Q.    Did you get all three?
22      A.    I did get all three, yes.
23      Q.    Who did you get them from?
24      A.    I got them from counsel.  I
25  think there probably were more than one

5 (Pages 405 to 408)

Highly Confidential - Subject to Further Confidentiality Review

Page 409

1    source. I'm not -- I don't remember who sent
2    what.
3        Q.    And you say you looked at the
4    depositions.  What do you mean?
5        Did you read them?
6        A.    Well, I didn't read them in
7    their entirety.  As my mother would say about
8    something like this, my eyes were bigger than
9    my stomach.
10        They're about 400 pages, and
11    I -- "studied them" is too strong a word.
12    Something like "reviewed them" would be a
13    good word.
14        Q.    Okay.  And if you didn't review
15    them in their entirety, how did you decide
16    what parts to read and what parts to skip
17    over?
18        A.    I just -- I looked at the
19    pages.  I seemed -- I tried to look for
20    things that seemed that might be relevant to
21    me, and I did the best I could in the time
22    that I had.
23        Q.    Well, how much time did you
24    spend reviewing these three deposition
25    transcripts?

Page 410

1        A.    In total?
2        Q.    In total.
3        A.    I would say about three hours
4    in total.
5        Q.    And how much of that three
6    hours did you spend reviewing
7    Dr. Schumacher's deposition testimony?
8        A.    I would say maybe it wasn't
9    quite an hour for each deposition, but maybe
10    a bit more for Schumacher and a bit less for
11    the other two.
12        Q.    And why is that?  Why did you
13    spend more time on Dr. Schumacher's
14    deposition transcript than the other two?
15        A.    The reason I spent more time
16    with that -- ideally, of course, I'd have all
17    the time in the world.  It had to do with
18    when I received them and how much time I
19    could set aside at the time I got the
20    depositions.
21        Q.    So when did you review the
22    three transcripts?
23        A.    I believe I reviewed all three
24    transcripts yesterday.
25        Q.    Did you request the deposition

Page 411

1    testimony of anyone else besides these three
2    people?
3        A.    Those were the only three
4    depositions I requested.
5        Q.    Did you request the deposition
6    testimony of any fact witness in the case?
7        A.    In the time between my last
8    meeting with you and today?
9        Q.    Yes.
10        A.    No.  These were the only three
11    depositions I requested, period.
12        Q.    Did you speak with
13    Dr. Schumacher since the first day of your
14    deposition?
15        A.    No, I did not speak with
16    Dr. Schumacher.
17        Q.    How about Professor Cutler?
18        A.    I did speak with Dr. Cutler.
19        Q.    How about Professor Gruber?
20        A.    No, I didn't speak with
21    Professor Gruber.
22        Q.    So in addition to the things
23    you list before that you had done since your
24    first day of deposition, you also spoke with
25    Professor Cutler, correct?

Page 412

1        A.    I did speak with Professor
2    Cutler but not about my testimony.
3        Q.    Okay.  What did you speak with
4    Professor Cutler about?
5        A.    We were at a dinner together.
6    It's called a program dinner.
7        David Cutler is the head of the
8    Ph.D. training program for Ph.D. in health
9    policy at Harvard University.  I'm the
10    director of admissions of that, and I was
11    among the faculty that attended the dinner.
12    There were some students, and I spoke with
13    David at the dinner.
14        Q.    Did you speak with him about
15    his deposition?
16        A.    No, I didn't.
17        Q.    Did you speak with him about
18    your deposition?
19        A.    Not at all, no.
20        Q.    Did you speak with him about
21    any of the work that either of you had
22    performed in this case?
23        A.    There was no substantive
24    discussion -- excuse me.  There was no
25    substantive discussion of any kind of the

6 (Pages 409 to 412)

Highly Confidential - Subject to Further Confidentiality Review

| Page 413 | Page 415 |
|---|---|
| 1    material in this case or really any other<br>2    area of economic research.<br>3       Q.   Since you finished your<br>4    deposition testimony last Tuesday, did you<br>5    speak with any other expert who either is<br>6    offering opinions in this case or who<br>7    provided an expert report in this case?<br>8       A.   Since Tuesday, I don't think<br>9    I've spoken with anyone else.<br>10       Q.   And did you speak with any fact<br>11   witness in this case since your first day of<br>12   deposition?<br>13       A.   No, I spoke to no fact witness<br>14   since last Tuesday.<br>15       Q.   You also mentioned that you had<br>16   met with Mr. Sobol, and you had a brief call<br>17   with Mr. Ko?<br>18       A.   That's right.<br>19       Q.   How long was your meeting with<br>20   Mr. Sobol?<br>21       A.   It was about an hour, I would<br>22   say.<br>23       Q.   How long was your call with<br>24   Mr. Ko?<br>25       A.   My call with David was less | 1       Do you see that?<br>2       A.   I do see that.<br>3       Q.   Okay.  And then it lists a<br>4   percentage for each year from 2006<br>5   through 2017.<br>6       Do you see that?<br>7       A.   I see that, too.<br>8       Q.   And then there's a note for<br>9   note 2 that says, quote, "Based on metric<br>10   analysis in the Cutler report, see Table 3.5<br>11   sub 3."<br>12       Do you see that?<br>13       A.   I also see that, yes.<br>14       Q.   Okay.  And when you say "based<br>15   on the metric analysis in the Cutler report,"<br>16   you mean you took the percentage from Cutler<br>17   report Table 3.5 sub 3 and you just put it<br>18   into your calculations, correct?<br>19       MR. SOBOL:  Objection.<br>20       THE WITNESS:  Well, it's based<br>21      on.  It doesn't -- I would have to<br>22      remind myself what 3.5.3 that Cutler<br>23      did to be -- to refresh my memory<br>24      about -- of what percent this is.<br>25 |

| Page 414 | Page 416 |
|---|---|
| 1    than half an hour.<br>2       Q.   And were both the meeting with<br>3   Mr. Sobol and the call with Mr. Ko yesterday?<br>4       A.   They were both yesterday, yes.<br>5       Q.   So you had a long day yesterday<br>6   in this case to prepare for today's<br>7   deposition?<br>8       A.   Well, that only accounts for<br>9   about six hours in total.<br>10       Q.   Would you open your report on<br>11   damages to -- which is Exhibit Number 1,<br>12   giving you back the original, and would you<br>13   turn to Appendix 4.C-1.1?<br>14       A.   Okay.<br>15       Okay.  I think I'm there.<br>16       Q.   Do you have Appendix 4.C-1.1 in<br>17   front of you?<br>18       A.   I do, yes.<br>19       Q.   Okay.  And this is titled<br>20   "Cuyahoga ADAMHS Board damages."<br>21       Correct?<br>22       A.   I see that, yes.<br>23       Q.   Okay.  Turn your attention to<br>24   line 2.  There's a line that says,<br>25   "Opioid-Related Percentage of Services." | 1   QUESTIONS BY MR. KEYES:<br>2       Q.   Well, he had a percentage in<br>3   that table, correct?<br>4       MR. SOBOL:  Objection.<br>5   QUESTIONS BY MR. KEYES:<br>6       Q.   That was titled "Opioid-Related<br>7   Percentage of Services"?<br>8       MR. SOBOL:  Objection.  The<br>9      document's not in front of him.<br>10      THE WITNESS:  Yeah, I'd have to<br>11      take another look to remind myself<br>12      what this refers to exactly.<br>13      Excuse me.  This shows you the<br>14      source, and, you know, I would need to<br>15      see the source in order to make a<br>16      determination.<br>17   QUESTIONS BY MR. KEYES:<br>18       Q.   Okay.  Sitting here right now,<br>19   do you know whether you just took the<br>20   calculation -- the percentage that Professor<br>21   Cutler had in that table and put it in your<br>22   table or whether you did something else to<br>23   his percentage?<br>24       MR. SOBOL:  Objection.  Asked<br>25      and answered. |

7 (Pages 413 to 416)

Highly Confidential - Subject to Further Confidentiality Review

Page 417

1         THE WITNESS:  Well, this number
2    is based on Professor Cutler's
3    analysis, and to be able to
4    reconstruct where this came from, I
5    would need to look at what David
6    actually reported.
7    QUESTIONS BY MR. KEYES:
8         Q.    So sitting here right now, when
9    you offered this opioid percentage of
10   services, you can't tell me how you arrived
11   at that number?
12        MR. SOBOL:  Objection.  Asked
13   and answered.
14        THE WITNESS:  This note
15   explains the source.  And I'm happy,
16   if you have happen to have that
17   report, that I can take a look at it
18   and make a determination.
19   QUESTIONS BY MR. KEYES:
20        Q.    Okay.  I understand that if you
21   read Cutler's report, it may refresh or
22   remind you --
23        A.    Yeah, it certainly will.
24        Q.    -- but I'm entitled to probe
25   what you know without looking at a document

Page 418

1    or some kind of cheat sheet.
2         MR. SOBOL:  I disagree with
3    that about his entitlements or not.
4    And you're not to listen to what he
5    says about what he's entitled to or
6    not entitled to do.
7    QUESTIONS BY MR. KEYES:
8         Q.    So sitting here today, can you
9    tell me what you did to take the percentages
10   that you say are in the Cutler report at
11   Table 3.5 sub 3 to arrive at the percentages
12   you list here on line 2?
13        MR. SOBOL:  Objection.  Asked
14   and answered.
15        THE WITNESS:  Well, what note 2
16   says is it's based on the metric
17   analysis in the Cutler report.  As I'm
18   sitting here today, I can't
19   reconstruct where these numbers came
20   from based on that analysis.
21   QUESTIONS BY MR. KEYES:
22        Q.    Would it surprise --
23        MR. SOBOL:  He hasn't finished
24   his answer.
25

Page 419

1    QUESTIONS BY MR. KEYES:
2         Q.    Did you finish your answer?
3         A.    I don't think I need to say
4    anything more.
5         Q.    Okay.  Would it surprise you if
6    you just took the percentages in
7    Professor Cutler's table and incorporated
8    them here as line 2?
9         Would that surprise you?
10        MR. SOBOL:  Objection.  Asked
11   and answered.
12        THE WITNESS:  Well, I don't
13   know if it would surprise me or not.
14   There are aspects of Cutler's
15   percentages that I did take and use
16   directly, but I don't want to -- I
17   don't feel like I can commit myself to
18   doing that unless I actually refresh
19   my memory about the Cutler report.
20   QUESTIONS BY MR. KEYES:
21        Q.    Okay.  Would you return to
22   Appendix 4.C-2.1.
23        Are you there?
24        A.    I'm there, yes.
25        Q.    And this is titled "Cuyahoga

Page 420

1    Division of Children and Family Services
2    Damages"?
3         A.    Yeah, I see that.
4         Q.    And do you see line 9 says,
5    "Opioid-Related Percentage of Removals"?
6         A.    I see that, yes.
7         Q.    And it then has a note 9.
8    Note 9 says, "Based on metric analysis in the
9    Cutler report, see Table 3.6 sub 1"?
10        A.    I see that.
11        Q.    Okay.  So did you take the
12   percentages that were in that referenced
13   Cutler table and incorporate in this line, or
14   did you do something additional to those
15   percentages?
16        A.    This is the same situation for
17   me.  It's based on the metric analysis in
18   Cutler's report, but for me to determine
19   whether there -- I just kind of took them in
20   a sense or whether I had to do something
21   else, I really would need to refresh my
22   memory about.
23        Q.    So you can't explain sitting
24   here right what, quote, "based on" means?
25        MR. SOBOL:  Objection.  Asked

8 (Pages 417 to 420)

Highly Confidential - Subject to Further Confidentiality Review

Page 421

1  and answered.
2        THE WITNESS:  I can explain
3  what "based on" means.  You know, it's
4  a typical form of academic citation
5  that if you use something, you make a
6  reference to the source of that thing
7  without going through necessarily all
8  the manipulations that led to that
9  QUESTIONS BY MR. KEYES:
10       Q.   You say it's a typical form of
11 academic citation.
12       When you take a figure from
13 another source and you incorporate that into
14 your work, do you cite the source, or do you
15 say "based on" the source --
16       MR. SOBOL:  Objection.
17 QUESTIONS BY MR. KEYES:
18       Q.   -- as a matter of your general
19 practice?
20       MR. SOBOL:  Objection.
21       THE WITNESS:  If I understand
22 your question, you're asking about an
23 academic article that wouldn't be
24 necessarily part of a litigation.

Page 422

1  QUESTIONS BY MR. KEYES:
2        Q.   Well, let's take them one at a
3  time.
4        In your nomenclature, when you
5  say "based on," is that saying "I got the
6  figure from the cited source and here it is,"
7  or are you saying "I got information from the
8  cited source and then I did something else to
9  arrive at the number I'm listing here"?
10       MR. SOBOL:  Objection.  Asked
11 and answered.
12       THE WITNESS:  When I say "based
13 on" -- and I think this would apply
14 here as well as it would apply if I
15 were doing an academic paper -- it
16 could refer to either.  It doesn't say
17 it is the number, it doesn't say
18 describe the calculation, but it
19 points the reader to where one would
20 need to look in order to figure it
21 out.
22 QUESTIONS BY MR. KEYES:
23       Q.   Did you do any independent work
24 to arrive at what you list here as the
25 opioid-related percentage of removals?

Page 423

1        MR. SOBOL:  Objection.  Asked
2  and answered.
3        THE WITNESS:  Well, I think
4  the -- so we're -- are we -- Table
5  4.C-2.1 is what we're talking about?
6  QUESTIONS BY MR. KEYES:
7        Q.   We're still on
8  Appendix 4.C-2.1, line 9, where you list
9  percentages for each year for, quote,
10 opioid-related percentage of removals.
11       Did you do any independent work
12 to arrive at those figures?
13       MR. SOBOL:  Objection.  Asked
14 and answered again.
15       THE WITNESS:  Well, these are
16 based on Professor Cutler's report, so
17 they would derive from Professor
18 Cutler's work, not derive from my own.
19 QUESTIONS BY MR. KEYES:
20       Q.   So is that to say, no, I did
21 not do any independent work?
22       MR. SOBOL:  Objection.
23 QUESTIONS BY MR. KEYES:
24       Q.   I'm trying to understand what
25 you did, Professor McGuire.

Page 424

1        So when you list opioid-related
2  percentage of removals and you give a
3  percentage for each year, I want to know:
4  Did you just take that from Professor Cutler,
5  or did you do some work yourself to arrive at
6  those percentages?
7        MR. SOBOL:  Objection.  I
8  instruct you not to answer.
9        MR. KEYES:  Really.  On what
10 basis?
11       MR. SOBOL:  Move on.
12 QUESTIONS BY MR. KEYES:
13       Q.   Are you refusing to answer the
14 question of whether you did any independent
15 work to arrive at line 9 on this chart?
16       A.   I'm following directions.
17       Q.   Okay.  Would you turn to
18 Appendix 4.C-3.1?
19       A.   Okay.
20       Q.   Are you there?
21       A.   I am.
22       Q.   And this is titled "Cuyahoga
23 Office of Prosecutor Damages"?
24       A.   I see that.
25       Q.   And line 10 says,

9 (Pages 421 to 424)

Highly Confidential - Subject to Further Confidentiality Review

Page 425

1    "Opioid-Related Percentage of Charges"?
2         A.   I see that, yes.
3         Q.   And you list a percentage for
4    each year from 2006 to 2017, correct?
5         A.   Yes, I see that.
6         Q.   And line 10 has a cite which
7    says, "Based on metric analysis in the Cutler
8    report, see Table 3.4 sub 3."
9              Do you see that?
10        A.   I do, yes.
11        Q.   Okay.  Did you just take the
12   percentages that Professor Cutler had
13   calculated and incorporate them here, or did
14   you do something to those percentages?
15        A.   I would have to answer in the
16   same way that I've answered your previous
17   questions about the previous two tables.  In
18   order to be sure, I would like to -- I would
19   need to refresh myself about what David's
20   Table 3.4.3 consisted of.
21        Q.   Did you do any independent work
22   to determine the, quote, "opioid-related
23   percentage of charges" that you list here for
24   each of those years?
25             MR. SOBOL:  Objection.  Asked

Page 426

1    and answered.
2              MR. KEYES:  No, I haven't asked
3    him that.  This is a different line.
4              MR. SOBOL:  No, you have.
5              THE WITNESS:  Well, as note 10
6    says, this is based on the analysis in
7    Professor Cutler's report.
8              To be able to reconstruct it,
9    I'd have to go back and see what David
10   had done.
11   QUESTIONS BY MR. KEYES:
12        Q.   Okay.  Would you turn to
13   Appendix 4.C-4.1.
14             Are you there?
15        A.   I'm there, yes.
16        Q.   And this is titled "Cuyahoga
17   Office of Public Defender Damages."
18             Correct?
19        A.   Yes, it is.
20        Q.   Do you see line 9?
21        A.   I see line 9.
22        Q.   It's titled "Opioid-Related
23   Percentage of Charges."
24        A.   Yes, it is.
25        Q.   And it lists percentages for

Page 427

1    each year from 2006 to 2017?
2         A.   Yes, it does.
3         Q.   Okay.  And this lists as its
4    cite, based on metric analysis in the Cutler
5    report, "see Table 3.4 sub 3."
6              Do you see that?
7         A.   Yes, I see that.
8         Q.   Did you take the percentages
9    from that cited table that had been
10   calculated by Professor Cutler and
11   incorporate them into your line 9 here, or
12   did you do something else to those
13   percentages?
14        A.   I have to answer this in the
15   same way I would answer the questions about
16   your previous three tables.  It's based on
17   the analysis in the Cutler report, and in
18   order to reconstruct these numbers, I would
19   need to refresh myself about what David's
20   report contained.
21        Q.   Did you do any independent work
22   to arrive at the figures that you list here
23   as, quote, "opioid-related percentage of
24   charges"?
25             MR. SOBOL:  Objection.  Asked

Page 428

1    and answered.
2              THE WITNESS:  Well, I don't
3    really have anything to add to what I
4    answered, you know, 30 seconds ago.
5    It's based on Cutler's report, and I'd
6    need to see that in order to
7    reconstruct how -- where these numbers
8    came from.
9    QUESTIONS BY MR. KEYES:
10        Q.   Would you turn to
11   Appendix 4.C-5.1?
12        A.   Okay.  I'm there.
13        Q.   It's titled "Cuyahoga Court of
14   Common Pleas Damages"?
15        A.   Yes, it is.
16        Q.   If you turn to line, it says,
17   "Opioid-Related Percentage of Adult Charges."
18             Do you see that?
19        A.   Yes.
20        Q.   And it lists percentages for
21   each year from 2006 to 2017 --
22        A.   Yes, it does.
23        Q.   -- correct?
24             And it says that this is "based
25   on metric analysis in the Cutler report, see

10 (Pages 425 to 428)

Highly Confidential - Subject to Further Confidentiality Review

Page 429

1    Table 3.4 sub 6," correct?
2         MR. SOBOL:  Is there a
3    footnote?
4         You said, "it says."  Was there
5    a footnote, or did the table say that?
6         MR. KEYES:  The footnote 10
7    says, "Based on metric analysis in the
8    Cutler report, see Table 3.4 sub 6."
9    QUESTIONS BY MR. KEYES:
10        Q.    Do you see that?
11        A.    I see that.
12        Q.    Okay.  Did you take the
13   percentages that Professor Cutler listed in
14   that reference table and incorporate them
15   into your line 10, or did you do something
16   additional to those percentages before you
17   included them?
18        A.    Well, I have to answer this
19   question in the same way I've answered the
20   question about the previous three tables.
21        The note notes that this is
22   based on the metric analysis conducted in the
23   Cutler report, and to refresh myself about
24   what was done there and where these -- and
25   how to reconstruct these, I'd need to be able

Page 430

1    to remind myself what David did in
2    Table 3.4.6.
3         Q.    Did you do any independent work
4    to arrive at the figures that you list here
5    as, quote, "Opioid-Related Percentage of
6    Adult Charges"?
7         MR. SOBOL:  Objection.  Asked
8    and answered.
9         THE WITNESS:  Well, I don't
10        really have anything to add to my
11        previous answer, that this is based on
12        analysis that David did, and I'd need
13        to remind myself what that
14        analysis was and what was contained in
15        the table in order to tell you where
16        these numbers came from.
17   QUESTIONS BY MR. KEYES:
18        Q.    Would you turn to
19   Appendix 4.C-6.1?
20        A.    I'm there.
21        Q.    Do you see line 9 says,
22   "Opioid-Related Percentage of Juvenile
23   Cases"?
24        A.    I see that yes.
25        Q.    And it lists a percentage for

Page 431

1    each year from 2006 to 2017?
2         A.    Yes, it does.
3         Q.    And it says in a footnote,
4    "Based on metric analysis in the Cutler
5    report, see Table 3.7 sub 1."
6         A.    I see that, too.
7         Q.    Okay.  Did you take the
8    percentages that Professor Cutler had
9    reported in the reference table and include
10   them here on your line 9, or did you do
11   something else to those percentages before
12   you included them here?
13        A.    I knew you were going to ask
14   that.  The note explains that this is based
15   on the analysis in the Cutler report, and I
16   have to answer the same way I've answered
17   about the previous four tables you've asked
18   about.
19        In order to reconstruct these
20   numbers, I'd need to remind myself about what
21   David did in the table referenced here.
22        Q.    Did you do any independent work
23   to arrive at the percentages you list here
24   as, quote, "Opioid-Related Percentage of
25   Juvenile Cases"?

Page 432

1         MR. SOBOL:  Objection.  Asked
2         and answered.
3         THE WITNESS:  I don't have
4         anything to add to my previous answer
5         to this.  It's based on the Cutler
6         analysis, and I'd need to see that
7         again in order to remind myself about
8         how it was done.
9    QUESTIONS BY MR. KEYES:
10        Q.    Would you turn to
11   Appendix 4.C-7.1?
12        A.    Okay.  I'm there.
13        Q.    It's titled "Cuyahoga Sheriff's
14   Office Damages"?
15        A.    I see that.
16        Q.    Would you turn to line 10,
17   "Opioid-Related Percentage of Charges"?
18        A.    I see that.
19        Q.    Lists a percentage for each
20   year from 2006 to 2017?
21        A.    I see that.
22        Q.    It has a footnote that says,
23   "Based on metric analysis in the Cutler
24   report, see Table 3.4 sub 3"?
25        A.    I see that, too.

11 (Pages 429 to 432)

Highly Confidential - Subject to Further Confidentiality Review

Page 433

1      Q.    Did you take the percentages
2   that Professor Cutler arrived at and reported
3   in the reference table and include them here,
4   or did you do anything to those percentages
5   before you listed them here?
6          Same answer?
7      A.    Well, I have to answer this in
8   the same way I've answered about the previous
9   five tables you've asked about.
10          This is based on analysis that
11  David did, and I need to refresh myself about
12  that report in order to see where these
13  numbers came from.
14     Q.    Did you do any independent work
15  to arrive at the figures you list here on
16  line 10 as, quote, "Opioid-Related Percentage
17  of Charges"?
18          MR. SOBOL:  Objection.  Asked
19          and answered.
20          THE WITNESS:  I don't really
21          have anything to add to my previous
22          answer to this question.  It's based
23          on the analysis in the Cutler report,
24          and I'd need to take another look at
25          that in order to determine where these

Page 434

1          numbers came from.
2   QUESTIONS BY MR. KEYES:
3      Q.    Would you turn to
4   Appendix 4.C-8.1?
5      A.    Okay.  I'm there.
6      Q.    This is Cuyahoga County Jail
7   Damages, correct?
8      A.    I see that.
9      Q.    Line 9 reports, "Opioid-Related
10  Percentage of Adult Charges"?
11     A.    I see that.
12     Q.    And it lists a percentage for
13  each year from 2006 to 2017?
14     A.    Yes, it does.
15     Q.    And it has a footnote that
16  says, "Based on metric analysis in the Cutler
17  report, see Table 3.4 sub 6"?
18     A.    I see that, too.
19     Q.    Okay.  Did you simply take the
20  percentages that Professor Cutler had arrived
21  at and reported in the reference table and
22  include them here on line 9, or did you do
23  something to those percentages before you
24  listed them here?
25     A.    Well, I have to give the same

Page 435

1          answer to this question as to the previous
2   six tables you've asked about.
3          The note indicates it's based
4   on the metric analysis in the Cutler report,
5   and in order to determine the source of these
6   numbers, I'd need to go back and remind
7   myself about what David's Table 3.4.6 did.
8      Q.    Did you do any independent work
9   to arrive at the figures that you list here
10  on line 9 as, quote, "Opioid-Related
11  Percentage of Adult Charges"?
12          MR. SOBOL:  Objection.  Asked
13          and answered.
14          THE WITNESS:  Well, I don't
15          have anything to add to my previous
16          answer on this.
17          They're based on the analysis
18          in the Cutler report, and I'd need to
19          go back and see what was done there to
20          remind myself how these numbers were
21          constructed.
22  QUESTIONS BY MR. KEYES:
23     Q.    Would you turn to
24  Appendix 4.C-9.1?
25          Are you there?

Page 436

1      A.    I'm there, yes.
2      Q.    This is titled, "Cuyahoga
3   Office of Medical Examiner Damages."
4   Correct?
5      A.    I see that.
6      Q.    Line 9 says, "Opioid-Related
7   Percentage of Autopsies"?
8      A.    I see that.
9      Q.    It lists a percentage for each
10  year from 2006 to 2017?
11     A.    Yes, it does.
12     Q.    And it has a note that says,
13  "Based on metric analysis in the Cutler
14  report, see Table 3.8 sub 1"?
15     A.    I see that.
16     Q.    Did you simply take the
17  percentages that Professor Cutler arrived at
18  and reported in the reference table and
19  include them here on line 9, or did you do
20  something to those percentages?
21     A.    Well, I have to give the same
22  answer here that I've given to a similar
23  question in the previous seven tables, which
24  is that as the note indicates, it's based on
25  the analysis in the Cutler report.  And in

12 (Pages 433 to 436)

Highly Confidential - Subject to Further Confidentiality Review

Page 437

1  order to remind myself about the derivation
2  of these numbers, I would need to take
3  another look at Table 3.8.1.
4       Q.    Did you do any independent work
5  to arrive at the figures that are listed on
6  line 9 as, quote, "Opioid-Related Percentage
7  of Autopsies"?
8            MR. SOBOL: Objection. Asked
9  and answered.
10           THE WITNESS:  I don't really
11      have anything to add to my previous
12      answer to this question.
13           These numbers are based on the
14      analysis in the Cutler report, and I'd
15      need to remind myself about that
16      before I could give you a precise
17      answer about where these numbers came
18      from.
19  QUESTIONS BY MR. KEYES:
20      Q.    Now, if I go through the same
21  exercise with your appendices that are about
22  affected divisions for Summit County as
23  opposed to Cuyahoga County, will your answers
24  be the same?
25           MR. SOBOL: Objection.

Page 438

1       Which?
2  QUESTIONS BY MR. KEYES:
3      Q.    That every time you list an
4  opioid-related percentage of something, where
5  it lists in a footnote that it's based on the
6  metric analysis in the Cutler report, see
7  table such-and-such in the Cutler report,
8  you're going to tell me you can't tell me
9  whether you just took Professor Cutler's
10 numbers or whether you did something to them
11 before you included them in your appendix?
12           MR. SOBOL: Objection.
13 QUESTIONS BY MR. KEYES:
14      Q.    Is it fair to say you're going
15 to give me the same answer for each one of
16 those?
17           MR. SOBOL: Objection.
18           Answer it, if you can.
19           THE WITNESS:  It's a little
20      hard to anticipate how I would answer
21      questions that haven't been asked yet.
22           But there's -- I see a pattern
23      here in what I'm able to tell you
24      about -- this was all Cuyahoga?  Yeah,
25      right.

Page 439

1       You'll have to make an
2       inference, if you would like.
3  QUESTIONS BY MR. KEYES:
4      Q.    So in the appendices we've
5  reviewed so far for Cuyahoga County, can you
6  tell me anything about the opioid-related
7  percentage of services that you listed beyond
8  the fact that it's somehow based on what
9  Professor Cutler did?
10           MR. SOBOL: Objection.
11           Is that a yes or a no question?
12           MR. KEYES: Yeah.
13           THE WITNESS:  Would you mind
14      reading it back to me?  I'm sorry.
15 QUESTIONS BY MR. KEYES:
16      Q.    Sure.
17           We've reviewed a series of
18 appendices for the different affected
19 divisions for Cuyahoga County.
20           Can you tell me anything about
21 the, quote, "Opioid-Related Percentage of
22 Services" that you listed in the appendix
23 beyond the fact that it's somehow based on
24 what Professor Cutler did?
25           MR. SOBOL: Objection. Form.

Page 440

1            THE WITNESS:  Yes.
2  QUESTIONS BY MR. KEYES:
3      Q.    What can you tell me?
4      A.    Well, I can tell you a number
5  of things.
6            Which table would you like me
7  to talk about?
8      Q.    Well, let's go back to the
9  first one.  There's go back to
10 Appendix 4.C-1.1.
11           Are you there?
12      A.    I'm -- yes, I'm at 4.C-4.1
13 {sic}, yes.
14      Q.    Okay.  Line 2 says,
15 "Opioid-Related Percentage of Services."
16      A.    Wait a second.  That's not
17 line 2 here.  I'm -- 4.C-4.1?  Or 1 -- I'm
18 sorry.
19      Q.    No. 4.C-1.1.
20           Do you have that in front of
21 you?
22      A.    I do, yeah.
23      Q.    Okay.  And line 2 says,
24 "Opioid-Related Percentage of Services."
25           Correct?

13 (Pages 437 to 440)

Highly Confidential - Subject to Further Confidentiality Review

Page 441

1    A.    Yes, it does.
2    Q.    Okay.  Can you tell me anything
3  about how that was arrived at, other than it
4  is somehow based on what Professor Cutler
5  did?
6         MR. SOBOL:  And without putting
7  Professor Cutler's report in front of
8  him, correct?  Correct?
9         MR. KEYES:  Correct.
10        THE WITNESS:  Well, I can tell
11  you some things about this.
12        I understand what the task was
13  that Professor Cutler undertook, which
14  was to determine a percent of the
15  ADAMHS -- this is ADAMHS Board? --
16  yeah, the ADAMHS Board activities that
17  were attributable to opioids.
18        And that involved a two-step
19  process:  determining how much of
20  those services were drug-related and
21  then how much of the drug-related were
22  opioid-related.
23  QUESTIONS BY MR. KEYES:
24    Q.    And did you do anything
25  yourself beyond take the percentages from

Page 442

1  Professor Cutler?
2    A.    Well, this sounds like the
3  first set of questions you asked.  And what I
4  can tell you, based on note 2 here, is that
5  this is based on the metrics in Cutler's
6  report.  And in order to be more specific
7  about that, I'd have to tell you -- I'd have
8  to take a look at what David did and remind
9  myself.
10    Q.    Would you turn to
11  Appendix 4.D-1.1?
12        Are you there?
13    A.    Yes.
14    Q.    This says the "Summit ADM Board
15  Damages"?
16    A.    Yes.
17    Q.    Line 2 says, "Opioid-Related
18  Percentage of Services"?
19    A.    I see that.
20    Q.    It has a percentage for each
21  year from 2006 to 2017?
22    A.    Yes, it does.
23    Q.    And it, like every other chart,
24  says, "based on metric analysis in the Cutler
25  report."

Page 443

1         This time it references Cutler
2  report Table 3.5 sub 6?
3    A.    Yeah, I see that.
4         MR. SOBOL:  Which other chart?
5         Objection to the form.  You
6  said "like every other chart."
7         Which other chart?
8         MR. KEYES:  Like every other
9  chart we've reviewed in the deposition
10  today.
11  QUESTIONS BY MR. KEYES:
12    Q.    Did you do any independent work
13  to arrive at the opioid-related percentage of
14  services that you list on line 2?
15        MR. SOBOL:  Objection.
16        THE WITNESS:  Well, my answer
17  here is going to be the same as it was
18  for Cuyahoga in this case:  that as
19  the note indicates, it's based on the
20  metric analysis in the Cutler report,
21  and in order to determine where these
22  numbers came from more precisely, I'd
23  need to be able to remind myself about
24  what that -- what happened in that
25  table from David's report.

Page 444

1  QUESTIONS BY MR. KEYES:
2    Q.    Would you turn to
3  Appendix 4.D-2.1?
4    A.    Okay.  I'm there.
5    Q.    Do you see line 9 says,
6  "Opioid-Related Percentage of Custodies"?
7    A.    I see that, yes.
8    Q.    And it lists a percentage for
9  each year from 2006 to 2017?
10    A.    Yes, it does.
11    Q.    And it has a footnote that also
12  says, "Based on metric analysis in the Cutler
13  report," and it references Cutler report
14  Table 3.6 sub 2?
15    A.    I see that, yes.
16    Q.    Did you do any independent work
17  to arrive at the figures listed here on
18  line 9 as, quote, "Opioid-Related Percentage
19  of Custodies"?
20    A.    I have to answer this in the
21  same way that I've answered this series of
22  questions about other appendix tables.  And
23  what I can tell on the basis of note 9, which
24  I knew, is that it's based on the analysis in
25  the Cutler report.

14  (Pages 441 to 444)

Highly Confidential - Subject to Further Confidentiality Review

Page 445

1    In order to figure out more
2  precisely what these percentages correspond
3  to, I'd need to go back and see -- remind
4  myself about what happened in Cutler 3.6.2.
5    Q.    Would you turn to
6  Appendix 4.D-3.1?
7    A.    Okay.  I'm there.
8    Q.    Are you there?
9    A.    I'm there.
10    Q.    This is titled "Summit
11  Prosecutor Damages."
12    Correct?
13    A.    I see that, yes.
14    Q.    Line 10 says, "Opioid-Related
15  Percentage of Crimes"?
16    A.    I see that.
17    Q.    It lists a percentage for each
18  year from 2006 to 2017?
19    A.    Yes, I see that.
20    Q.    And it has a note that says,
21  "This is based on the metric analysis in the
22  Cutler report, see Table 3.4 sub 9."
23    A.    I see that, too.
24    Q.    Did you do any independent work
25  to arrive at the figures that you list here

Page 446

1  on line 10 as being, quote, "Opioid-Related
2  Percentage of Crimes"?
3    A.    I have to answer this in the
4  same way I've answered the series of previous
5  questions about different appendix tables,
6  which is that as the note indicates, it's
7  based on the metric analysis in the Cutler
8  report.  And in order to determine more
9  precisely where these figures came from, I
10  would need to go back and remind myself about
11  what happened in Table 3.4.9.
12    Q.    Could you turn to
13  Appendix 4.D-4.1?
14    A.    Okay.  I'm there.
15    Q.    Okay.  Line -- this is titled
16  "Summit Court of Common Pleas Damages"?
17    A.    That I see.
18    Q.    Line 10 says, "Opioid-Related
19  Percentage of Crimes"?
20    A.    I see that.
21    Q.    You going to tell me the same
22  thing about how those percentages were
23  arrived at?
24    MR. SOBOL:  Objection.
25    THE WITNESS:  Well, the table

Page 447

1  is constructed in the same way.  I'm
2  not sure what you're asking.
3  QUESTIONS BY MR. KEYES:
4    Q.    I'm asking, is this also
5  based -- somehow based on what Professor
6  Cutler did?
7    A.    Well, as the note says, yes,
8  this is based on the metric analysis in the
9  Cutler report.
10    Q.    Did you do any independent work
11  to arrive at the figures listed on line 10
12  as, quote, "Opioid-Related Percentage of
13  Crimes"?
14    A.    Well, I have to answer this in
15  the same way that I've answered questions
16  about a series of other appendices that we've
17  talked about this morning.  And the note
18  indicates it's based on the metric analysis
19  in the Cutler report, and in order to
20  determine more precisely where these
21  particular percentages came from, I'd need to
22  go back and remind myself what happened in
23  Table 3.4.9.
24    Q.    Okay.  Would you turn to
25  Appendix 4.D-5.1?

Page 448

1    A.    Okay.  I'm there.
2    Q.    This is Summit Juvenile Court
3  Damages?
4    A.    I see that.
5    Q.    Do you see line 9 says,
6  "Opioid-Related Percentage of Juvenile
7  Cases"?
8    A.    I see that.
9    Q.    And it again lists a percentage
10  for each year from 2006 to 2017?
11    A.    I see that.
12    Q.    And it also, like every other
13  chart that we've reviewed, says, "Based on
14  metric analysis in the Cutler report"?
15    A.    I see.
16    Q.    And this time it references
17  Table 3.7 sub 2?
18    A.    I see that.
19    Q.    Did you do any independent work
20  to arrive at the percentages you list here on
21  line 9 as, quote, "Opioid-Related Percentage
22  of Juveniles Cases"?
23    A.    Well, I have to answer this in
24  the same way that I've answered questions
25  about a series of other tables you've asked

15 (Pages 445 to 448)

Highly Confidential - Subject to Further Confidentiality Review

Page 449

1  about this morning. And as the note
2  indicates, it's based on the metrics in the
3  Cutler report, and in order to determine more
4  precisely where these numbers came from, I'd
5  need to remind myself about what happened in
6  Cutler 3.7.2.
7      Q.    Would you turn to
8  Appendix 4.D-6.1?
9      A.    Okay. I'm there.
10     Q.    This is Summit Sheriff's Office
11 Damages, correct?
12     A.    Yes.
13     Q.    Line 10 says, "Opioid-Related
14 Percentage of Crimes"?
15     A.    I see that.
16     Q.    Lists a percentage for each
17 year from 2006 to 2017?
18     A.    I see that.
19     Q.    And it, like every other chart,
20 references that it's based on the metric
21 analysis in the Cutler report, and it says,
22 "See Table 3.4 sub 9 in the Cutler report,"
23 correct?
24     A.    Yes, it does.
25     Q.    Did you do any independent work

Page 450

1  to arrive at the figures listed on line 10
2  as, quote, "Opioid-Related Percentage of
3  Crimes"?
4      A.    Well, I have to answer this in
5  the same way I've answered questions about a
6  series of other tables we've talked about
7  this morning.
8          As the note indicates, my work
9  is based on the metrics in the Cutler report,
10 and in order to determine more precisely
11 where these percentages came from, I'd need
12 to be able to review what happened in Cutler
13 3.4.9.
14     Q.    Would you turn to
15 Appendix 4.D-7.1?
16     A.    Okay. I'm there.
17     Q.    Do you see that it's titled
18 "Summit County Jail Damages"?
19     A.    I see that.
20     Q.    And you have line 9,
21 "Opioid-Related Percentage of Prisoners"?
22     A.    I see that.
23     Q.    It lists a percentage for each
24 year from 2006 to 2017?
25     A.    I see that, too.

Page 451

1      Q.    And it also references in
2  footnote 9 that it's based on the metric
3  analysis in the Cutler report, and it says,
4  "see Table 3.4 sub 12"?
5      A.    I see that.
6      Q.    Okay. Did you do any
7  independent work to arrive at the percentages
8  that are listed on line 9 as, quote,
9  "Opioid-Related Percentage of Prisoners"?
10         MR. SOBOL: Objection.
11         THE WITNESS: Well, I have to
12 answer this in the same way that I've
13 answered questions about previous
14 tables.
15         The note indicates that line 9
16 is based on the metric analysis in the
17 Cutler report and makes a reference to
18 a particular table there. And in
19 order for me to reconstruct where
20 these percentages came from, I'd need
21 to go back and take a look at the
22 table referred to in note 9.
23 QUESTIONS BY MR. KEYES:
24     Q.    Please turn to
25 Appendix 4.D-8.1.

Page 452

1      A.    Okay.
2      Q.    This is titled "Summit
3  Alternative Corrections Damages"?
4      A.    I see that.
5      Q.    Line 5 says, "Opioid-Related
6  Percentage of Prisoners"?
7      A.    I see that.
8      Q.    It has a percentage for each
9  year from 2006 to 2017?
10     A.    Yes, it does.
11     Q.    And it also has a footnote that
12 references being based on the metric analysis
13 in the Cutler report: "See Table 3.4 sub 12
14 of the Cutler report"?
15     A.    I see that, too.
16     Q.    Did you do any independent work
17 to arrive at the percentages that are listed
18 on line 5 as, quote, "Opioid-Related
19 Percentage of Prisoners"?
20         MR. SOBOL: Objection.
21         THE WITNESS: Well, I have to
22 answer that in the same way that I've
23 answered questions about a series of
24 other tables we've talked about this
25 morning.

16 (Pages 449 to 452)

Highly Confidential - Subject to Further Confidentiality Review

Page 453

1        And as the note says, these
2    percentages are based on the metric
3    analysis in the Cutler report, and in
4    order to figure out more precisely
5    where these numbers come from, I'd
6    need to be able to remind myself about
7    what happened in Table 3.4.12.
8    QUESTIONS BY MR. KEYES:
9        Q.    Could you turn to
10   Appendix 4.D-9.1?
11       A.    I'm there.
12       Q.    This is titled "Summit Adult
13   Probation Damages"?
14       A.    I see that.
15       Q.    Line 10 says, "Opioid-Related
16   Percentage of Crimes"?
17       A.    I see that.
18       Q.    It lists a percentage for each
19   year from 2006 to 2017?
20       A.    Yes, it does.
21       Q.    And it, like every other chart,
22   has a footnote that says, "Based on metric
23   analysis in the Cutler report.  See Table 3.4
24   sub 9 of the Cutler report," correct?
25       A.    I see that.

Page 454

1        Q.    Did you do any independent work
2    to arrive at the figures that you list here
3    as being, quote, "the opioid-related
4    percentage of crimes"?
5        A.    Well, I have to answer this in
6    the same way I've answered questions about a
7    series of other tables we've talked about
8    this morning.
9            And as the note indicates, it's
10   based on the metric analysis in the Cutler
11   report and references a particular table.
12   And for me to be able to reconstruct these
13   percentages, I'd need to go back and remind
14   myself what happened in Table 3.4.9.
15       Q.    Would you turn to
16   Appendix 4.D-10.1?
17       A.    Okay.
18       Q.    This is titled "Summit Medical
19   Examiner Damages."
20           Correct?
21       A.    I see that.
22       Q.    Line 9 says, "Opioid-Related
23   Percentage Autopsies"?
24       A.    I see that, too.
25       Q.    It lists a percentage for each

Page 455

1    year from 2006 to 2017?
2        A.    Yes, it does.
3        Q.    And it references in a footnote
4    that it's "Based on the metric analysis in
5    the Cutler report.  See Table 3.8 sub 2 of
6    the Cutler report."
7            Correct?
8        A.    I see that.
9        Q.    Did you do any independent work
10   to arrive at the percentages that you list on
11   line 9 as being "Opioid-Related Percentage of
12   Autopsies"?
13           MR. SOBOL:  Objection.
14           THE WITNESS:  Well, I have to
15       answer this in the same way I've
16       answered questions about a series of
17       other tables we've talked about this
18       morning.
19           And as the note indicates, the
20       percentages here are based on the
21       analysis in a particular place in the
22       Cutler report, and in order to
23       reconstruct my numbers, I'd need to
24       remind myself about what happened in
25       Cutler 3.8.2.

Page 456

1    QUESTIONS BY MR. KEYES:
2        Q.    Earlier today you said you
3    talked to Ms. Kaminski at Compass Lexecon to
4    remind you about certain things you had done
5    to calculate crime statistics or the
6    prevalence of OUD.
7            MR. SOBOL:  Objection.
8    QUESTIONS BY MR. KEYES:
9        Q.    Would you also talk to
10   Ms. Kaminski to remind you how you arrived at
11   these various percentages that we've covered
12   in these various charts?
13           MR. SOBOL:  Objection.  Form.
14       Asked and answered.  Compound.
15           THE WITNESS:  There was a verb
16       in there I didn't hear.
17           Was it could, would or did?
18   QUESTIONS BY MR. KEYES:
19       Q.    Would.
20       A.    Would I talk to her?
21           MR. SOBOL:  Why don't we get a
22       fresh question.
23   QUESTIONS BY MR. KEYES:
24       Q.    Well, would you talk to
25   Ms. Kaminski to figure out how you arrived at

17 (Pages 453 to 456)

Highly Confidential - Subject to Further Confidentiality Review

Page 457

1  the percentages that you list here on the
2  lines that we've just spent the last
3  30 minutes covering?
4          MR. SOBOL:  Objection.
5          THE WITNESS:  Would I?  That's
6  conditional.
7  QUESTIONS BY MR. KEYES:
8      Q.    If you wanted to know the
9  answer, in that condition, would you go to
10  Ms. Kaminski?
11          MR. SOBOL:  Objection.
12          THE WITNESS:  Okay.  So what's
13  the question?
14  QUESTIONS BY MR. KEYES:
15      Q.    If you wanted to know where
16  these percentages came from and what you did
17  with these percentages, would you go to
18  Ms. Kaminski to remind you what you did?
19          MR. SOBOL:  Objection.
20          THE WITNESS:  No.
21          MR. SOBOL:  Which percentages?
22          MR. KEYES:  All of the
23  percentages we've talked about this
24  morning.
25          MR. SOBOL:  I don't know which

Page 458

1      those are.  From Cutler or from
2  McGuire?
3  QUESTIONS BY MR. KEYES:
4      Q.    You can answer.
5          MR. SOBOL:  Well, I don't
6  understand the question.
7          MR. KEYES:  Then you can
8  object.  You did.  Now he can answer.
9          MR. SOBOL:  If he can.
10          THE WITNESS:  Well, I have to
11  say it depends.
12  QUESTIONS BY MR. KEYES:
13      Q.    On what?
14      A.    On what exactly you're talking
15  about in terms of what I'm refreshing myself
16  about.
17      Q.    Well, I've just gone through a
18  bunch of charts, some for Cuyahoga County,
19  some for Summit County, and every single
20  chart has a line that says "opioid-related
21  percentage of" something.
22          And every single time there's a
23  footnote, and every single time that footnote
24  says it's based on Professor Cutler's
25  metrics, and every single time it references

Page 459

1  a chart or a table from Professor Cutler.
2          And every single time you gave
3  me your answer:  I'll have to give me the same
4  answer that I gave the last time, which is,
5  I'd have to go look at Professor Cutler's
6  report to figure out where these percentages
7  came from.
8          And every time I asked you,
9  "Did you do any independent work?" you said,
10  "I'd have to give you the same answer:  'I
11  don't know.'"
12      A.    I'm laughing with you.
13      Q.    Okay.  So you could go look at
14  Professor Cutler's report, but I'm asking you
15  questions about your report.
16      A.    All right.
17      Q.    And your report says nothing
18  other than "I am doing something based on
19  Cutler's metrics."
20          My question is:  If you want to
21  figure out what you did for this report to
22  get these percentages, who would you go to to
23  get that answer?
24          MR. SOBOL:  Objection.
25

Page 460

1  QUESTIONS BY MR. KEYES:
2      Q.    Would it be Ms. Kaminski or
3  someone else at Compass Lexecon?
4          MR. SOBOL:  Objection.
5          Is there some part of the
6      question that you'd like the witness
7      to agree with your speech about, or do
8      you want him to answer your questions
9      that you put?
10          THE WITNESS:  Well, it depends
11  on what the particular percentage is.
12  QUESTIONS BY MR. KEYES:
13      Q.    So would you go to Ms. Kaminski
14  for some percentages but someone else at
15  Compass Lexecon for other percentages?
16          MR. SOBOL:  Objection.
17          If you can answer it, fine.  I
18      don't know what he's talking about.
19      If you can figure it out --
20          MR. KEYES:  Enough of the
21      speaking objections.  If he doesn't
22      know what I'm talking about, he's
23      perfectly capable of saying that.
24  QUESTIONS BY MR. KEYES:
25      Q.    I need your testimony, not what

18  (Pages 457 to 460)

Highly Confidential - Subject to Further Confidentiality Review

Page 461

1   you're coached to say.
2         MR. SOBOL:  Well, you can call
3   me Coach Belichick, and I would be
4   flattered, but that's not what I'm
5   doing.
6         I'm just trying to figure out
7   what it is that you're asking and
8   making sure that the witness
9   understands it, too.
10        If you don't want to make
11  yourself better understood, then go
12  for it, but then we'll end up with a
13  fairly inadequate transcript on your
14  part.
15        Do you understand the question
16  before you, Mr. Witness?
17        THE WITNESS:  I think I can be
18  somewhat responsive, which is to say
19  in many cases this is something I
20  would be capable of doing myself.
21        And I might need to ask some --
22  at Compass Lex for some clarification,
23  but it really depends on what
24  you're -- more specifically you're
25  talking about.

Page 462

1   QUESTIONS BY MR. KEYES:
2         Q.    Last week you described your
3   approach for identifying so-called affected
4   costs?
5         A.    Yes.
6         Q.    And you attempted to articulate
7   your approach for identifying affected costs?
8         A.    Yes.
9         Q.    And a number of times you cited
10  the police as an example of how you would go
11  about identifying an affected cost,
12  identifying whether it was fixed or variable,
13  identifying if it was overhead.
14        Do you recall that?
15        A.    I do, yes.
16        Q.    Okay.  So can you identify for
17  me what the responsibilities of the Cuyahoga
18  County Police Department are?
19        A.    In total?  All the
20  responsibilities of the Cuyahoga County
21  Police Department?
22        Q.    Well, your general
23  understanding of the Cuyahoga County Police
24  Department's responsibilities.
25        A.    Okay.  Well, my understanding

Page 463

1   is their primary responsibility is public
2   safety, which involves a number of
3   safety-related activities.
4         They're also responsible for
5   traffic control, if I could use kind of a
6   layperson's word about that.  And some
7   community education, community relations.
8         Q.    Did you talk to anyone who
9   works for the Cuyahoga County Police
10  Department?
11        A.    I don't recall.
12        Q.    Did you read the deposition
13  testimony of anyone who works for the
14  Cuyahoga County Police Department?
15        A.    I may have.  I don't recall.
16        Q.    Do you have an understanding as
17  to what the responsibilities of the Summit
18  County Police Department are?
19        A.    Isn't it sheriff?
20        Q.    Is there a police department in
21  Summit County?
22        A.    I don't remember the title.  I
23  thought it might have been sheriff, but...
24        Q.    Okay.  So for Summit County you
25  think there's a sheriff?

Page 464

1         A.    I'm -- I guess I'm asking, but
2   I know I can't do that, so...
3         I guess if I can -- see if I
4   understand where the question is.  The
5   question is, did I speak to someone in Summit
6   County law enforcement?
7         MR. SOBOL:  Objection.
8   QUESTIONS BY MR. KEYES:
9         Q.    No.
10        My question was:  Did you
11  speak -- do you have an understanding of what
12  the responsibilities are of a Summit County
13  Police Department?
14        A.    Responsibilities.  The
15  responsibilities would be very similar.
16        Q.    Did you talk to anyone who
17  works for a Summit County Police Department?
18        A.    I don't recall.
19        Q.    Did you read the deposition
20  testimony of anyone who works for a Summit
21  County Police Department?
22        A.    I may have.  I don't remember.
23        Q.    Okay.  And does Summit County
24  have a police department?
25        A.    They have a -- I don't remember

19 (Pages 461 to 464)

Highly Confidential - Subject to Further Confidentiality Review

Page 465

1    whether it's called sheriff or police
2    department, but they have a function that
3    would have gone under one of those two names.
4         Q.    Does Cuyahoga County have a
5    police department?
6         A.    It's the same.
7         Q.    Okay.  And do you have an
8    understanding as to what the differences are
9    between a police department and a sheriff's
10   department?
11        A.    Not really, no, I don't
12   understand in terms of the -- whatever the,
13   you know, the connotations of the
14   jurisdiction each of those departments would
15   have.
16        Q.    Do you have an understanding as
17   to whether there are differences between a
18   police department and a sheriff's
19   department --
20             MR. SOBOL:  Objection to form.
21   QUESTIONS BY MR. KEYES:
22        Q.    -- in Cuyahoga County?
23        A.    As I said, I don't have an
24   appreciation of the -- whatever the
25   differences are between those two forms of

Page 466

1    law enforcement.
2         Q.    How about Summit County?
3             MR. SOBOL:  Objection.
4             THE WITNESS:  I'm not sure what
5        you're asking.
6    QUESTIONS BY MR. KEYES:
7         Q.    Do you have an understanding as
8    to whether there are differences between a
9    police department and a sheriff's department
10   in Summit County?
11        A.    Well, I would have to give the
12   same answer I gave for Cuyahoga.  I don't
13   have an appreciation of the differences in,
14   you know, authority of the police and
15   sheriff's department.
16        Q.    Okay.  You identified the
17   Summit County ADM Board as an affected
18   division, to use your terminology, correct?
19        A.    Yes, that's correct.
20        Q.    Okay.  So for the Summit County
21   ADM Board, what was the opportunity cost of
22   the opioid-related expenditures that you
23   quantified?
24             MR. SOBOL:  Objection.
25        Do you want him to refer to his

Page 467

1    report, or is this a memory test?
2             MR. KEYES:  I'm asking him to
3        identify what the opportunity costs
4        was.
5             THE WITNESS:  The opportunity
6        costs in economics is measured in
7        dollars, and it's in my report.
8    QUESTIONS BY MR. KEYES:
9         Q.    What activity or activities did
10   the Summit County ADM Board forego because it
11   spent those dollars on opioid-related
12   activities?
13             MR. SOBOL:  Objection.  Asked
14        and answered.
15             THE WITNESS:  This is something
16        that we talked about last time in some
17        detail, and the important thing that I
18        need to say about this from the
19        standpoint of an economist is the way
20        opportunity cost works is that it's
21        not necessary to identify the precise
22        nature of the activities that were not
23        undertaken.
24             And if you remember last time,
25        I gave you the example of the

Page 468

1        household that had an accident with
2        their car and it cost them $75.  The
3        opportunity cost of those funds is
4        $75.  That's the economic approach to
5        opportunity cost.
6             It's not necessary for me as an
7        economist to say, well, they didn't go
8        out to dinner one night or they, you
9        know, didn't do whatever.  The
10       opportunity cost is $75.
11   QUESTIONS BY MR. KEYES:
12        Q.    Did you identify whether Summit
13   County ADM Board suffered any harm because it
14   forewent an opportunity because it was
15   spending dollars on opioid-related
16   activities?
17             MR. SOBOL:  Objection.
18             THE WITNESS:  What do you mean
19        by the board suffering harm?
20   QUESTIONS BY MR. KEYES:
21        Q.    Well, I don't know that I can
22   be more specific.
23             In your work, you identified
24   the dollars that you said were devoted to
25   opioid-related activities.  You said that had

20  (Pages 465 to 468)

Highly Confidential - Subject to Further Confidentiality Review

Page 469

1    an opportunity cost.
2        A.    Yes.
3        Q.    I asked you what the ADM Board
4    forewent, something they didn't do, because
5    they were spending those dollars on
6    opioid-related activities.
7             You said you don't need to look
8    at that.
9             I'm asking:  Did you look at
10   whether the Summit County ADM Board suffered
11   or incurred any harm because it forewent
12   another activity because it was spending
13   dollars on the opioid problem?
14            MR. SOBOL:  Okay.  And
15   objection.
16            There was a speech that I
17   assume that the questioner does not
18   expect you to be buying into, but
19   there was a question at the end of it
20   which I assume the questioner was
21   asking you to respond to.
22            THE WITNESS:  I'm still a
23   little confused about what you mean by
24   the board being harmed.
25            The board is a board, which

Page 470

1        are -- which consists of people on the
2        board.  That's what I understand the
3        board to be.
4             Are you asking how they would
5        be harmed?
6    QUESTIONS BY MR. KEYES:
7        Q.    No.
8             I'm asking how the Summit
9    County ADM Board, as the affected division
10   you identified --
11       A.    Okay.
12       Q.    -- whether it suffered any harm
13   because it forewent another activity because
14   it was spending dollars on opioid-related
15   services.
16            MR. SOBOL:  Objection.
17            THE WITNESS:  Okay.  Well, I am
18   interpreting your question as an
19   opportunity cost question, which is to
20   say something had been foregone
21   because of the funds to go into
22   opioids, and there's a dollar metric
23   of that.
24            And then I'm a little bit lost
25   in the question.  So, sorry.

Page 471

1    QUESTIONS BY MR. KEYES:
2        Q.    But you were talking about
3    opportunity costs.  You've already talked at
4    length about opportunity costs.  I'm asking
5    about harm.
6        A.    Harm.
7        Q.    Harm.
8             Did you identify any harm that
9    the Summit County ADM Board suffered or
10   incurred --
11            MR. SOBOL:  Objection.
12   QUESTIONS BY MR. KEYES:
13       Q.    -- because it didn't spend
14   money on something else because it was
15   spending those dollars on opioid-related
16   activities?
17            MR. SOBOL:  Objection.  Asked
18   and answered now.
19            THE WITNESS:  Okay.  So I
20   understand you're not asking about
21   opportunity costs.  I'm not sure then
22   what harm means in your question.
23   QUESTIONS BY MR. KEYES:
24       Q.    So you can't -- you don't know
25   what harm means; that's your testimony?

Page 472

1            MR. SOBOL:  Objection.  It's
2    not his testimony.
3            He doesn't know what you mean
4    by it.
5            THE WITNESS:  I can't answer
6    until -- if you could just use another
7    example or use another word or help me
8    explain -- help me understand what
9    harm means in the question.
10   QUESTIONS BY MR. KEYES:
11       Q.    How about injury?  Did the
12   Summit County ADM Board suffer any injury
13   because it spent money on opioid-related
14   activities rather than the thing it gave up?
15            MR. SOBOL:  Objection.
16            THE WITNESS:  I'm still having
17   a hard time here.
18            Injury is a kind of metaphor.
19   You know, injury, I know what an
20   injury is.  I interpret you using that
21   term as a kind of metaphor here, but
22   I'm not sure as a metaphor for what.
23            I'm happy to answer the
24   question.  I'm just not sure what the
25   direction is you're trying to get at.

21 (Pages 469 to 472)

Highly Confidential - Subject to Further Confidentiality Review

Page 473

1   QUESTIONS BY MR. KEYES:
2       Q.   In 2006 -- that's one of the
3   years covered by your damages report,
4   correct?
5       A.   Yes.
6       Q.   In 2006, if the Summit County
7   ADM Board did not spend the dollars you
8   quantified on opioid-related work, what would
9   it have spent the money on?
10          MR. SOBOL:  Objection.
11          THE WITNESS:  This gets back to
12      the discussion of opportunity costs
13      and how, from an economist point of
14      view, to be able to quantify in dollar
15      terms the opportunity costs.  It's not
16      necessary for me to know what else
17      they would have done with the money.
18          Just like with the household
19      having to pay the $75 to fix their
20      car, it's not important in assessing
21      opportunity costs to know whether, you
22      know, the teenager spent it, the mom
23      would have spent it, the dad would
24      have spent it.  Those -- I don't need
25      to know those questions.  I don't need

Page 474

1       to know the answers to those
2       questions.
3   QUESTIONS BY MR. KEYES:
4       Q.   Separate from whether you need
5   to know, did you ask the question, and did
6   you look into that as part of your work on
7   this case?
8          MR. SOBOL:  Objection.
9          THE WITNESS:  I looked into
10      what I needed to know in order to
11      identify opportunity costs in a
12      reliable -- a reliable way that's in
13      line with economic practice in this
14      field.
15  QUESTIONS BY MR. KEYES:
16      Q.   Did you conduct any factual
17  inquiry to determine what the Summit County
18  ADM Board would have spent the money on in
19  2006 if it had not spent that money on what
20  you quantified as opioid-related work?
21          MR. SOBOL:  Objection.  Asked
22      and answered.
23          THE WITNESS:  It wasn't
24      necessary for me to be able to
25      determine a reliable estimate of

Page 475

1   opportunity costs for me to know what
2   the alternative -- the money would
3   have been spent on alternatively.
4          Just like in the case of the
5   household, an economist assesses the
6   opportunity cost of spending on
7   something without needing to know what
8   the funds would have been devoted to
9   in the absence of that cost.
10  QUESTIONS BY MR. KEYES:
11      Q.   Would your answer be any
12  different if I picked 2007 instead of 2006?
13          MR. SOBOL:  Objection.
14          THE WITNESS:  I don't see
15      anything that would be different with
16      2007, but your -- are you referring to
17      a series of questions or a particular
18      question?
19  QUESTIONS BY MR. KEYES:
20      Q.   I'll ask you a question about
21  2006.
22      A.   You asked me a series of
23  questions about 2006.
24      Q.   And now I'm saying 2007.
25          MR. SOBOL:  Objection then.

Page 476

1   QUESTIONS BY MR. KEYES:
2       Q.   Did you conduct any factual
3   inquiry to determine what the Summit County
4   ADM Board would have spent the money on in
5   2007 if it had not spent that money on what
6   you quantified as opioid-related work?
7       A.   Okay.  I do have to answer this
8   in the same way that I referred to in the
9   earlier year.  In order to develop a reliable
10  estimate of opportunity costs, it's not
11  necessary for an economist to be able to
12  identify what exactly the funds would have
13  been used for.  They could have been used
14  for, you know, different purposes.
15      Q.   And if I ask the same question
16  using 2008 instead of 2007, would your answer
17  be the same?
18          MR. SOBOL:  Objection.
19          THE WITNESS:  Okay.  The same
20      single question --
21  QUESTIONS BY MR. KEYES:
22      Q.   Yes.
23      A.   -- you're referring to?
24          My answer would be the same for
25  2008.

22 (Pages 473 to 476)

Highly Confidential - Subject to Further Confidentiality Review

Page 477

1      Q.    And would your answer be the
2  same to that question for every year between
3  2006 and 2018?
4          MR. SOBOL: Objection.
5          THE WITNESS: Well, the
6      principles that I articulate in the
7      question are general, and the
8      methodology for opportunity costs and
9      how to assess it and what an economist
10     needs to know would be the same as --
11     across time.
12  QUESTIONS BY MR. KEYES:
13     Q.    For any year between 2006 and
14  2018, did you conduct any factual inquiry to
15  determine what the Summit County ADM Board
16  would have spent the money on if it had not
17  spent the money on what you quantified as
18  opioid-related work?
19         MR. SOBOL: Objection. Asked
20     and answered.
21         THE WITNESS: Okay. In order
22     to develop a reliable estimate of
23     opportunity costs, which was what I
24     was trying to do here, it wasn't
25     necessary for me to determine what the

Page 478

1      funds would have been used for in
2      detail.
3          What's necessary is to know
4      they would have been available to the
5      board to spend on things they thought
6      would be worthwhile.
7  QUESTIONS BY MR. KEYES:
8      Q.    For any year between 2006 and
9  2018, did you conduct any factual inquiry to
10  determine what Summit County Children's
11  Services Board would have spent the money on
12  if it had not spent that money on what you
13  quantified as opioid-related work?
14         MR. SOBOL: Objection.
15         THE WITNESS: Well, as in the
16     case of the previous division we spoke
17     about, in order to reliably estimate
18     opportunity costs, which was my
19     objective here, I did what I needed to
20     do to be able to estimate that.
21         What was not necessary for me
22     to do was to identify a hypothetical
23     counterfactual in which the board --
24     sorry, we're at Children's Family
25     Services now -- in which the funds may

Page 479

1      have been spent differently.
2          And...
3  QUESTIONS BY MR. KEYES:
4      Q.    Okay. So you list a number of
5  other affected divisions for Summit County.
6  You list the Summit County Prosecutor, Court
7  of Common Pleas, Juvenile Court, Sheriff's
8  Office, County Jail, Alternative Corrections,
9  Adult Probation and Medical Examiner.
10         Okay?
11     A.    That sounds right.
12     Q.    So for any of those affected
13  divisions, for any year between 2006 and
14  2018, did you conduct any factual inquiry to
15  determine what that division would have spent
16  the money on if it had not spent the money on
17  what you quantified as opioid-related work?
18         MR. SOBOL: Objection in part.
19     Asked and answered.
20         THE WITNESS: Let me make two
21     comments about this in answer to your
22     question.
23         The first comment is about
24     opportunity costs and the nature of
25     opportunity costs in economics and how

Page 480

1      an economist studies opportunity
2      costs. And a good example is a
3      household which incurs, say, an
4      unexpected expense of car repair. And
5      I'll just pick a number of $75.
6          If the household had not needed
7      to spend that money on car repair, the
8      money would have been available for
9      other things that the household could
10     have purchased. And there's a range
11     of things that obviously they could do
12     with that money.
13         What is the opportunity costs
14     of the $75 needed for car repair?
15     It's $75. That's straightforward.
16     Not only economic opportunity costs,
17     but it's also common sense that that
18     would be the opportunity cost of those
19     funds.
20         So that's what I -- that is the
21     economic principle that I applied in
22     this case, which was to do what I
23     needed to do in order to reliably
24     identify the opportunity costs of the
25     funds devoted to opioids. That's part

23 (Pages 477 to 480)

Highly Confidential - Subject to Further Confidentiality Review

Page 481

1       one of my answer.
2           Part two of my answer is that I
3   did do investigation into the -- into
4   the existence of opportunity costs in
5   the form of confirming that, yes,
6   spending on opioids did divert these
7   funds from other uses.  And it was
8   part of my investigation and part of
9   what we talked about last time, that
10  that confirmatory research was done.
11  QUESTIONS BY MR. KEYES:
12      Q.   Okay.  I asked a yes or no
13  question.  You gave me a long answer.
14          You said that you "did confirm
15  that spending on opioids did divert the funds
16  from other uses."
17          Okay?
18          MR. SOBOL:  In part he said
19      that, yes.
20  QUESTIONS BY MR. KEYES:
21      Q.   So focusing on what you said
22  you did about confirming that spending on
23  opioids did divert the funds from other uses,
24  I want to know for each division what that
25  other use was, what those dollars would have

Page 482

1   been spent on specifically if they had not
2   been spent on opioid-related activities.
3           MR. SOBOL:  Objection.
4   QUESTIONS BY MR. KEYES:
5       Q.   You tell me what those other
6   uses are specifically for the Summit County
7   ADM Board.
8           MR. SOBOL:  Objection.  Asked
9       and answered.
10          THE WITNESS:  Let me clarify
11      what I just said a minute ago about
12      confirming -- and I'll just call it
13      diversion for short.
14          What I was interested in was
15      does diversion take place.  And
16      there's a series of references in my
17      report to some, I think, some news
18      articles, to some deposition
19      testimony, to some other written
20      material, that indicates that, yes,
21      there is diversion.  When funds are
22      devoted to opioids, other things --
23      some other things don't get done.
24          When you asked me to be -- to
25      turn my attention to the ADAMHS Board,

Page 483

1           I think is the question you're
2       asking --
3   QUESTIONS BY MR. KEYES:
4       Q.   Yes.
5       A.   -- to turn my attention to the
6   ADAMHS Board in particular, and asked me to
7   identify the particular services that were
8   not done because the money was spent on
9   opioids, it comes back to the answer I gave a
10  minute ago in the previous question, which
11  is, in order to identify opportunity costs,
12  it's sufficient for an economist to measure
13  the spending on, in this case, opioid-related
14  activities.
15          And as long as -- as long as
16  there are alternative uses for the funds,
17  that spending on opioid-related activities is
18  the reliable, it's the economically
19  principled metric for what opportunity costs
20  consist of.
21      Q.   For the Summit County
22  Children's Services Board, can you tell me
23  what the other use was, what the dollars
24  would have been spent on specifically if they
25  had not been spent on opioid-related

Page 484

1   activities?
2           MR. SOBOL:  Objection.  Asked
3       and answered.
4           THE WITNESS:  Now, this is the
5       same question but for another
6       division --
7   QUESTIONS BY MR. KEYES:
8       Q.   Yes.
9       A.   -- if I understand it?
10          Well, then the answer is going
11  to be the same.
12          With respect to my interest in
13  diversion, I wanted to know and had confirmed
14  in -- with respect to a series of things that
15  I refer to in my report that, yes, diversion
16  is real.  And what I mean by that is that
17  when funds are spent on opioid-related
18  activities, some other things are not done.
19          And when you come to ask me
20  about a particular division, in this case
21  Family Services, then what -- what I did in
22  this case is to identify the opportunity
23  costs of the funds, which is sufficient for
24  an economist to be able to provide a dollar
25  metric of the opportunity cost of the funds.

24  (Pages 481 to 484)

Highly Confidential - Subject to Further Confidentiality Review

Page 485

1    And it's not necessary for me to know
2    precisely what those funds would have been
3    spent on as long as there were alternative
4    use of those funds.
5              That's the economically
6    principled way to go about assessing
7    opportunity costs, and that's what I did.
8        Q.    So if I asked you the same
9    question for each of the other affected
10   divisions for Summit County, is your answer
11   the same?
12             MR. SOBOL:  Objection.
13             THE WITNESS:  My answer would
14       generally be the same, yes.
15   QUESTIONS BY MR. KEYES:
16       Q.    Well, for the Summit County
17   prosecutor, will you tell me what the other
18   use, that is, what the dollars would have
19   been spent on specifically if they had not
20   been spent on opioid-related activities?
21       A.    Well, let me just remind you of
22   the opportunity costs principle here, which
23   is, for an economist to be able to provide a
24   reliable, theory-based metric of the
25   opportunity cost of spending on a particular

Page 486

1    activity, it's not necessary for me to know
2    what particular -- what precise services that
3    those funds would have been devoted to in an
4    alternative world in which the opioid crisis
5    were not here.
6              It's sufficient for me to know
7    that this is what they spent on
8    opioid-related activities, and those funds
9    would have been available for something else.
10       Q.    Did you conduct a factual
11   inquiry for any of the Summit County affected
12   divisions to identify the other use, such
13   that you can tell me what the dollars would
14   have been spent on specifically if they had
15   not been spent on opioid-related activities?
16             MR. SOBOL:  Objection.  Asked
17       and answered.
18             THE WITNESS:  Yeah, for each of
19       the Summit County divisions that
20       you're referring to, my objective was
21       to identify the opportunity cost of
22       funds devoted to opioid-related
23       activity.
24             And the economically principled
25       standard way of assessing opportunity

Page 487

1    costs is to measure the funds devoted
2    to the activity in question, which in
3    this case is opioid-related
4    activities.
5              And so long as there are
6    alternative use of those funds, it's
7    not necessary and it even is just --
8    it's not done to -- it's not necessary
9    to propose a hypothetical world in
10   which something else would have
11   happened.
12             What is sufficient for me is to
13   know that there would have been other
14   uses for the funds of the division,
15   and by devoting them to opioids there
16   was less money available for other
17   things.
18   QUESTIONS BY MR. KEYES:
19       Q.    For any year between 2006 and
20   2018, for any of the Cuyahoga County-affected
21   divisions that you've identified, did you
22   conduct any factual inquiry to identify the
23   other use such that you can tell me what the
24   dollars would have been spent on specifically
25   if they had not been spent on opioid-related

Page 488

1    activities?
2              MR. SOBOL:  Objection.  Asked
3       and answered.
4              THE WITNESS:  The answer for
5       Cuyahoga County would be similar to
6       the answer for Summit County.
7              What I was doing as an
8       economist in this case is to estimate
9       in dollar terms a measure of the
10      opportunity cost of the funds that
11      were devoted to opioid-related
12      activities and applying standard
13      methodology in economics to measure
14      opportunity costs.
15             It's not necessary for an
16      economist to identify specifically the
17      alternative uses of the funds in a
18      hypothetical world in which they had
19      not been spent on opioids.  It's --
20      opioid-related activities.
21             It's sufficient for me to say
22      this -- these were the funds devoted
23      to opioid-related activities.  They
24      would be available for other uses.
25

25 (Pages 485 to 488)

Highly Confidential - Subject to Further Confidentiality Review

Page 489

1    QUESTIONS BY MR. KEYES:
2        Q.   In 2006, did the Summit County
3    ADM Board create and fund any new position
4    because of the opioid problem?
5        A.   I'm not sure.
6        Q.   How about in 2007?
7        A.   I'm not sure.
8        Q.   How about any year between 2008
9    and 2018?
10       A.   I'm not sure.
11       Q.   Did you look into that at all,
12   to see whether in any year the Summit County
13   ADM Board created and funded any new position
14   because of the opioid problem?
15       A.   I may have.  You know, I was
16   interested in material like this, but I don't
17   remember the details of the Summit ADM Board.
18       Q.   Where did you look to answer
19   that question when you were interested in
20   that question?
21       A.   In various county documents for
22   both counties.
23       Q.   And what did you learn?
24           MR. SOBOL:  Objection.
25           THE WITNESS:  Well, it's --

Page 490

1        there was particular cases, you know.
2        You'd just find some particular
3        documents, and that --
4    QUESTIONS BY MR. KEYES:
5        Q.   So can you identify for me any
6    year between 2006 and 2018 when the Summit
7    County ADM Board created and funded a new
8    position because of the opioid problem?
9        A.   I don't remember.
10       Q.   Can you identify for me, for
11   any year between 2006 and 2018, when the
12   Summit County Children's Services Board
13   created and funded a new position because of
14   the opioid problem?
15           MR. SOBOL:  Objection.
16           THE WITNESS:  Okay.  Before I
17       answer your question, I want to
18       clarify, it's not necessary for this
19       to take place in order for there to
20       have been opportunity costs.  And I
21       don't remember whether I saw anything
22       about a creation of a position.
23   QUESTIONS BY MR. KEYES:
24       Q.   Did you look into it?
25       A.   Well, I would have been

Page 491

1    interested in these sort of documents.
2        Q.   Why, if it's not necessary to
3    your inquiry?
4        A.   Well, it just seemed prudent
5    to, you know, be aware of what's going on in
6    the affected divisions.
7        Q.   Did you take any notes as you
8    did this factual inquiry to sort of keep
9    track of what you learned?
10           MR. SOBOL:  Objection.
11           THE WITNESS:  I don't think so,
12       no.
13   QUESTIONS BY MR. KEYES:
14       Q.   Do you talk about it at all in
15   your report?
16           MR. SOBOL:  Objection.
17           THE WITNESS:  Talk about what?
18   QUESTIONS BY MR. KEYES:
19       Q.   About whether the Summit County
20   Children's Services Board created or funded
21   any new position because of the opioid
22   problem in any year between 2006 and 2018?
23       A.   Well, my report contains a lot
24   of details on staffing at all the affected
25   divisions.

Page 492

1        Q.   Do you talk about that at all
2    in your report?
3            MR. SOBOL:  Objection.
4    QUESTIONS BY MR. KEYES:
5        Q.   In the narrative report, you
6    have this --
7        A.   Narrative report.
8        Q.   -- you have this long report.
9            Do you talk about it at all in
10   your report?
11           MR. SOBOL:  Objection.  Asked
12       and answered.
13           THE WITNESS:  Yeah, this is --
14       I'm getting a little lost again.
15           This is ADM?  ADM in a
16       particular county?
17   QUESTIONS BY MR. KEYES:
18       Q.   This is the Summit County
19   Children's Services Board.
20       A.   Summit County Children's
21   Services.
22       Q.   We already covered Summit
23   County ADM Board --
24       A.   Okay.  Sorry.
25       Q.   -- where you said, "I think I

26 (Pages 489 to 492)

Highly Confidential - Subject to Further Confidentiality Review

Page 493

1    learned something, but I don't remember what
2    it is."
3         MR. SOBOL: Objection.
4         Mischaracterizes the answer.
5    QUESTIONS BY MR. KEYES:
6         Q.    Same question for Summit County
7    Children's Service Board.
8         MR. SOBOL: What's the
9    question?
10   QUESTIONS BY MR. KEYES:
11        Q.    You said it's not necessary --
12   I want to be clear. You said it's not
13   necessary, but you still were interested
14   because you thought it was prudent.
15        And I asked what you remember
16   learning, and you said, I don't know.
17        And I said, do you talk about
18   the concept in the narrative report about
19   whether the Summit County Children's Services
20   Board created and funded any new position
21   because of the opioid problem?
22        MR. SOBOL: We don't even need
23   a stenographer, do we?
24        Do you have a question?
25        MR. KEYES: I think the

Page 494

1    stenographer is great.
2         THE WITNESS: I --
3         MR. SOBOL: There's no question
4    before you.
5         He just gave two sentences
6    about what it is that he recalls the
7    testimony being.
8    QUESTIONS BY MR. KEYES:
9         Q.    Do you talk in the narrative
10   section of your report about whether the
11   Summit County Children's Services Board
12   created or funded any new position because of
13   the opioid problem?
14        A.    I don't think that section in
15   my report discusses a new position.
16        Q.    Can you identify for me any
17   year between 2006 and 2018 when the Summit
18   County Prosecutor created or funded a new
19   position because of the opioid problem?
20        MR. SOBOL: Objection.
21        THE WITNESS: Not as I sit here
22   today, as people say.
23   QUESTIONS BY MR. KEYES:
24        Q.    Can you identify for me any
25   year between 2006 and 2018 when the Summit

Page 495

1    County Court of Common Pleas created or
2    funded a new position because of the opioid
3    problem?
4         MR. SOBOL: Objection.
5         THE WITNESS: Again, this is
6    not necessary for an opportunity cost
7    investigation.
8         But in answer to your question,
9    I don't recall.
10   QUESTIONS BY MR. KEYES:
11        Q.    Can you identify for me any
12   year between 2006 and 2018 when the Summit
13   County Juvenile Court created or funded a new
14   position because of the opioid problem?
15        MR. SOBOL: Objection.
16        THE WITNESS: I don't recall.
17   QUESTIONS BY MR. KEYES:
18        Q.    Can you identify for me any
19   year between 2006 and 2018 when the Summit
20   County Sheriff's Office created and funded a
21   new position because of the opioid problem?
22        MR. SOBOL: Objection.
23        THE WITNESS: Again, it's not
24   necessary for an opportunity cost
25   analysis, but I don't recall the

Page 496

1    specifics of your question.
2    QUESTIONS BY MR. KEYES:
3         Q.    Can you identify for me any
4    year between 2006 and 2018 when the Summit
5    County Jail created and funded a new position
6    because of the opioid problem?
7         MR. SOBOL: Objection.
8         THE WITNESS: It's the same
9    answer: It's not necessary for
10   opportunity costs, and I don't
11   remember anything about a new
12   position.
13   QUESTIONS BY MR. KEYES:
14        Q.    Can you identify for me any
15   year between 2006 and 2018 when Summit County
16   Alternative Corrections created and funded a
17   new position because of the opioid problem?
18        MR. SOBOL: Objection.
19        THE WITNESS: It would be the
20   same answer: It's not necessary for
21   opportunity costs, and I don't recall
22   about a new position.
23   QUESTIONS BY MR. KEYES:
24        Q.    Can you identify for me any
25   year between 2006 and 2018 when Summit County

27 (Pages 493 to 496)

Highly Confidential - Subject to Further Confidentiality Review

Page 497

1    Adult Probation created and funded a new
2    position because of the opioid problem?
3         MR. SOBOL: Objection.
4         THE WITNESS: It would be the
5    same answer: It's not necessary for
6    opportunity costs, and I don't recall
7    the specifics of a new position.
8    QUESTIONS BY MR. KEYES:
9         Q.   Can you identify for me any
10   year between 2006 and 2018 when Summit County
11   Medical Examiner created and funded a new
12   position because of the opioid problem?
13        MR. SOBOL: Objection.
14        THE WITNESS: It would be the
15   same answer: It's not necessary for
16   opportunity costs, and I don't recall
17   the specifics of Medical Examiner.
18   QUESTIONS BY MR. KEYES:
19        Q.   Turning then to Cuyahoga
20   County. For any of the divisions that you
21   identified as an affected division, did any
22   of them, in any year between 2006 and 2018,
23   create and fund a new position because of the
24   opioid problem?
25        MR. SOBOL: Objection.

Page 498

1         THE WITNESS: This would be the
2    same answer I gave for the divisions
3    at Summit: It's not necessary to
4    determine opportunity costs to have a
5    division hired new personnel.
6         And then with respect to the
7    specifics about each division and each
8    year, I don't recall.
9    QUESTIONS BY MR. KEYES:
10        Q.   Did the Summit County ADM Board
11   in 2006 shift any personnel from one
12   department to another or from one activity to
13   another because of the opioid problem?
14        MR. SOBOL: Objection.
15   "Shift."
16        THE WITNESS: Well, the funding
17   for staff means they would have
18   devoted their time to opioid-related
19   activities. That's what opportunity
20   cost tells you.
21        Beyond that, I'm not sure how
22   to interpret the nature of your
23   question.
24   QUESTIONS BY MR. KEYES:
25        Q.   In 2006, did the Summit County

Page 499

1    ADM Board reassign any personnel from one
2    department to another?
3         MR. SOBOL: Objection.
4    QUESTIONS BY MR. KEYES:
5         Q.   Because of the opioid problem?
6         MR. SOBOL: Objection.
7         THE WITNESS: Well, this,
8    again, isn't necessary for opportunity
9    cost, and I -- in answer to your
10   question about the assignment, I'm not
11   sure.
12   QUESTIONS BY MR. KEYES:
13        Q.   Okay. In 2007, did the Summit
14   County ADM Board reassign any personnel from
15   one department to another?
16        MR. SOBOL: Objection.
17        THE WITNESS: This would be the
18   same answer as to the previous
19   question: It's not necessary for
20   opportunity costs, and I'm not sure
21   about the reassignment.
22   QUESTIONS BY MR. KEYES:
23        Q.   In any year between 2008 and
24   2018, did the Summit County ADM Board
25   reassign any personnel from one department to

Page 500

1    another because of the opioid problem?
2         A.   This would be the same answer:
3    It's not necessary from the standpoint of
4    opportunity costs, and I'm not sure about
5    reassignment.
6         Q.   Can you tell me for any year
7    between 2006 and 2018 whether Summit County
8    Children's Services Board reassigned any
9    personnel from one department to another
10   because of the opioid problem?
11        MR. SOBOL: Objection.
12        THE WITNESS: This would be the
13   same answer as to the ADAMHS Board:
14   It's not necessary for me to know that
15   in order to estimate opportunity
16   costs.
17        And with respect to your
18   question about reassignment, I'm not
19   sure.
20   QUESTIONS BY MR. KEYES:
21        Q.   For any year between 2006 and
22   2018, did any of the Summit County affected
23   divisions reassign any personnel from one
24   department to another because of the opioid
25   problem?

28 (Pages 497 to 500)

Highly Confidential - Subject to Further Confidentiality Review

Page 501

1      MR. SOBOL: Objection.
2      THE WITNESS:  Again, to
3  estimate opportunity costs, I'm able
4  to do that with the numbers that I
5  have.
6      And with respect to your
7  question about specific reassignments,
8  I'm not sure.
9  QUESTIONS BY MR. KEYES:
10     Q.   In 2000 -- for any year between
11  2006 and 2018, did any of the Cuyahoga County
12  affected divisions reassign any personnel
13  from one department to another because of the
14  opioid problem?
15     A.   This would be the same -- the
16  nature of the answer would be the same as for
17  Summit: For me to do this work in this
18  matter, to be able to quantify opportunity
19  costs, I had what I needed to know.
20     And with respect to your
21  specific question, I'm not sure about
22  reassignment.
23     Q.   In 2006, did the Summit County
24  ADM Board change the job responsibilities for
25  any employee because of the opioid problem?

Page 502

1      MR. SOBOL:  Objection to the
2  form.
3      THE WITNESS:  Well, this is a
4  version of the question you just
5  asked.
6      I wonder if after I answer this
7  question, if we could take a break for
8  a bit.
9      MR. SOBOL:  Whatever.
10     THE WITNESS:  So in order to
11  estimate opportunity costs, it's not
12  necessary for me to know whether job
13  responsibility was changed.  I think
14  that was the question.  I'm still able
15  to do that with the information that I
16  have.
17     And I'm not sure about in a
18  particular year whether they changed
19  job assignments.
20  QUESTIONS BY MR. KEYES:
21     Q.   Okay.  Let me just finish this
22  line of questioning.
23     In any --
24     MR. SOBOL:  Do you want to take
25  a break?

Page 503

1      MR. KEYES:  Can I ask a few
2  questions just to finish this?
3      MR. SOBOL:  He asked for a
4  break.  Let him have a break.
5      It's up to you.
6      THE WITNESS:  Go ahead.
7  QUESTIONS BY MR. KEYES:
8      Q.   Okay.  For any year between
9  2006 and 2018, did the Summit County ADM
10  Board change the job responsibilities for any
11  employee because of the opioid problem?
12     MR. SOBOL:  Objection.  "Job
13  responsibilities."
14     THE WITNESS:  This answer will
15  be similar to a series of answers I've
16  given the last few minutes:  In order
17  to estimate opportunity costs, I had
18  the information I needed in order to
19  estimate that in dollar terms.
20     And with respect to your
21  question about job responsibilities,
22  it wasn't necessary for me to know if
23  there were job responsibilities
24  altered because of the opioid crisis.
25

Page 504

1  QUESTIONS BY MR. KEYES:
2      Q.   Okay.  Last question and then
3  we can take a break.
4      For any year between 2006 and
5  2018, did any of the Summit County affected
6  divisions or any of the Cuyahoga County
7  affected divisions change the job
8  responsibilities for any employee because of
9  the opioid problem?
10     MR. SOBOL:  Objection.
11     THE WITNESS:  Okay.  As an
12  economist, in order to fulfill my
13  assignment in this case, which is to
14  estimate the opportunity cost of these
15  budget funds, I was able to do that
16  based on the information that I had in
17  a reliable and professionally
18  acceptable way.
19     With respect to your question
20  about whether job responsibilities
21  were changed in either county over a
22  11-year period in a total of maybe 19
23  affected divisions, I have to answer
24  that I'm not sure.
25     VIDEOGRAPHER:  The time is

29 (Pages 501 to 504)

Highly Confidential - Subject to Further Confidentiality Review

Page 505

1    10:07 a.m., and we're off the record.
2    (Off the record at 10:07 a.m.)
3    VIDEOGRAPHER:  The time is
4    10:30 a.m., and we're on the record.
5    QUESTIONS BY MR. KEYES:
6    Q.    Professor McGuire, in 2006, did
7    the Summit County ADM Board reallocate any
8    money from one nonopioid-related program or
9    account in order to address an opioid-related
10   need?
11   A.    Nonopioid-related account?
12   I'm not sure if they moved
13   money between accounts.  I'm not sure.
14   Q.    In 2007, did the Summit County
15   ADM Board reallocate any money from one
16   nonopioid-related program or account in order
17   to address an opioid-related need?
18   MR. SOBOL:  Objection.
19   THE WITNESS:  Again, this isn't
20   necessary for me to be able to
21   identify opportunity cost.
22   In answer to your question, I'm
23   not sure what programs and accounts
24   may have been subject to some
25   reallocation.

Page 506

1    QUESTIONS BY MR. KEYES:
2    Q.    For any year between 2006 and
3    2018, did the Summit County ADM Board
4    reallocate any money from one
5    nonopioid-related program or account in order
6    to address an opioid-related need?
7    MR. SOBOL:  Objection.
8    THE WITNESS:  Okay.  This would
9    be a similar answer to I gave a minute
10   ago:  In order to assess opportunity
11   costs, it's not necessary for me to
12   know the kind of program and account.
13   And with respect to your
14   question about program and accounts,
15   I'm not sure if there was reallocation
16   across or within programs and
17   accounts.
18   QUESTIONS BY MR. KEYES:
19   Q.    For any year between 2006 and
20   2018, did any of the Summit County affected
21   divisions reallocate any money from one
22   nonopioid-related program or account in order
23   to address an opioid-related need?
24   MR. SOBOL:  Objection.
25   THE WITNESS:  Okay.  In order

Page 507

1    to estimate opportunity costs, it's
2    not necessary for me to be able to
3    identify specific reallocations
4    between or across programs and
5    accounts.
6    And in answer to your question,
7    I'm not sure if there were a program
8    and/or account-related allocations.
9    QUESTIONS BY MR. KEYES:
10   Q.    For any year between 2006 and
11   2018, did any of the Cuyahoga County affected
12   divisions reallocate any money from one
13   nonopioid-related program or account in order
14   to address an opioid-related need?
15   MR. SOBOL:  Objection.  In
16   part, asked and answered.
17   THE WITNESS:  Again, this is
18   not something I need to know in order
19   to fulfill my assignment here, to
20   estimate opportunity costs.
21   And with respect to your
22   question, I'm not sure about the --
23   your division reallocation across
24   programs and accounts.
25

Page 508

1    QUESTIONS BY MR. KEYES:
2    Q.    You said you didn't need to
3    know.
4    For any year between 2006 and
5    2018, did you attempt to identify whether any
6    of the Summit County affected divisions
7    reallocated any money from one
8    nonopioid-related program or account to
9    address an opioid-related need?
10   A.    Okay.  What I did for all these
11   years, for all these divisions, is to measure
12   with methods that we've discussed at some
13   point today and yesterday {sic} the funds
14   that each division in each year devoted to
15   opioid-related activities.  And the economic
16   principle of opportunity cost means that
17   that's what I need to know:  how much of
18   these funds that had alternative uses were
19   spent on opioid-related activities.
20   Q.    My question was:  For any year
21   between 2006 and 2018, did you attempt to
22   identify whether any of the Summit County
23   affected divisions reallocated any money from
24   a nonopioid-related program or account to
25   address an opioid-related need?

30 (Pages 505 to 508)

Highly Confidential - Subject to Further Confidentiality Review

Page 509

1      MR. SOBOL: Objection. Asked
2  and answered.
3      THE WITNESS: My task was to
4  estimate opportunity costs, which is
5  what I focused on. And the estimate
6  of opportunity cost is based on a
7  measure of the funds devoted to the
8  opioid-related activity.
9      It's sufficient for me as an
10  economist to be able to determine
11  opportunity cost, to measure those
12  funds and to be aware that there are
13  other uses for those funds.
14      In that context, the numbers I
15  came up with are the right ones.
16  QUESTIONS BY MR. KEYES:
17      Q.   What steps did you take to be
18  aware that there are other uses for the funds
19  that you've said were the opioid-related
20  expenditures?
21      MR. SOBOL: Objection.
22      THE WITNESS: Well, to some
23  degree these -- this is based on
24  experience. It would be a rare
25  household, it would be a rare

Page 510

1  department, it would be a rare
2  anything, really, that if an
3  unexpected cost is imposed on the
4  decision-maker that there's nothing
5  else they could do with those funds.
6  That doesn't make a lot of sense to
7  me, just as a microeconomist.
8      And here, as we've discussed, I
9  was interested in confirming that by
10  information related to diversion. And
11  in speaking with and looking for
12  written material and for reading
13  depositions, there's evidence that
14  diversion did take place. Specific
15  examples of if the police are doing
16  this, then they couldn't be doing
17  that.
18      So I find it to be, you know, a
19  conclusion that I hold very firmly
20  that, yes, if you're spending money on
21  one thing, you can't spend it on
22  something else.
23  QUESTIONS BY MR. KEYES:
24      Q.   You believe that to be a
25  truism?

Page 511

1      MR. SOBOL: Objection.
2      THE WITNESS: No, that's not a
3  truism, but it's accurate in lots of
4  contexts.
5  QUESTIONS BY MR. KEYES:
6      Q.   And it's an assumption here on
7  your part?
8      MR. SOBOL: Objection. Asked
9  and answered.
10      THE WITNESS: No.
11  QUESTIONS BY MR. KEYES:
12      Q.   Okay. So tell me the specific
13  steps you took to identify concrete things
14  that any of these divisions would have spent
15  the money on if they did not spend the money
16  on opioid-related activities.
17      MR. SOBOL: Objection. Asked
18  and answered.
19      THE WITNESS: I think this is a
20  version of a similar question I've
21  been asked a few times this morning.
22  And what was necessary for me to do
23  was to identify the funds devoted to
24  opioid-related activities, which are a
25  metric of the opportunity cost of

Page 512

1  those funds so long as there are
2  alternative uses for those funds.
3      You know, as in the case of a
4  household in which, say, $75 is spent
5  on an unexpected car repair, that $75
6  is a good measure of the opportunity
7  cost of those funds. And I can say
8  that with confidence, and I can say
9  that based on sound and well-accepted
10  principles of economics without
11  needing to know whether that $75 would
12  have spent on dog food or whether it
13  would have been, you know, I don't
14  know, spent on anything else.
15      So for me to do my job, it was
16  sufficient for me to measure the funds
17  devoted to the opioid-related
18  activity.
19  QUESTIONS BY MR. KEYES:
20      Q.   I take it you like the $75
21  example. You've used it a number of times as
22  a hypothetical.
23      And if I understand your
24  hypothetical, someone has a damaged car and
25  it's going to cost $75 to repair it?

31 (Pages 509 to 512)

Highly Confidential - Subject to Further Confidentiality Review

Page 513

1     A.   That's the basis of my example,
2  yes.
3     Q.   Okay.  So I take it that in
4  your hypothetical someone has gone to a shop
5  and they've gotten an estimate that says it's
6  going to cost $75.
7           MR. SOBOL:  Objection.
8           Is there a question?
9  QUESTIONS BY MR. KEYES:
10     Q.   Is that correct?
11     A.   Well, not exactly.  It was more
12  what I -- I think what I said in my example
13  is that they had to pay $75 to repair the
14  car.
15     Q.   Okay.  Well, let me refine this
16  hypothetical.
17           I have a car and it's damaged.
18  I take it to a shop, and I get a $75
19  estimate.  $75 to repair the damage.
20           Okay?
21     A.   Okay.
22     Q.   I have a friend who works at
23  another shop, and he says he can do the work
24  for a hundred dollars to repair the same
25  damage.

Page 514

1           Okay?
2     A.   Okay.
3     Q.   And I decide I'm going to have
4  my friend's shop do the repair work because
5  it gets repaired, and I want my friend's shop
6  to get the business.
7           Okay?
8     A.   Okay.
9     Q.   So I spend a hundred dollars to
10  get the car repaired.
11     A.   Yes.
12     Q.   Is my opportunity cost $75 or a
13  hundred dollars in that example?
14     A.   Well, for an economist, the --
15  what you purchase with your funds that have
16  to do with car repair, in this case, are a
17  little more complicated because it's not
18  simply one thing, which is to get your car
19  repaired, but you're also getting value from
20  the transaction with your friend.  And
21  that's -- you know, for whatever reason, you
22  find that to be worthwhile doing.  And you
23  make the decision to pay a hundred dollars to
24  get your car fixed.
25           The opportunity cost of those

Page 515

1  funds is a question about what else could
2  have been done with the money with respect to
3  other things your household could have
4  purchased.  And the answer to that is, you
5  would have had a hundred dollars had you not
6  purchased the car repair from the friend.  So
7  $100.
8     Q.   So in my hypothetical, my
9  opportunity cost is a hundred dollars?
10     A.   In your hypothetical, when
11  you've decided that you want to go to your
12  friend for the transaction and you spend a
13  hundred dollars on that, the opportunity cost
14  of that hundred dollars is a hundred dollars
15  less of other stuff you could buy.
16     Q.   Let me change the hypothetical.
17  I still have gone to the shop down the
18  street.  They've still given me a $75 repair
19  estimate for that damage.
20           My girlfriend works at another
21  shop and --
22     A.   Does your wife know?
23     Q.   -- and she says that her shop
24  can fix it for 200 bucks.
25     A.   Okay.

Page 516

1     Q.   And because I have a crush on
2  her, I decide I'm going to take my car to
3  that shop, and I'm going to spend $200 for
4  that shop to repair it.
5     A.   Okay.
6     Q.   In that hypothetical, my
7  opportunity cost is $75 or $200?
8     A.   Okay.  This hypothetical, to an
9  economist, isn't very different than your
10  first hypothetical.
11           You had a friend whose business
12  you -- giving him the business was worth kind
13  of -- I think the implication of your
14  hypothetical, it was worth $25 to you to be
15  able to give the $100 to your friend and to
16  repair your car.
17           You have another friend who you
18  value more highly.  You're even happier about
19  giving her the business, and you spend
20  $200 to get your car repaired.  But you're
21  kind of buying -- you would call it in
22  economics a joint product.  You're buying a
23  car repair plus you're buying something else,
24  which is the regard with which your friend
25  holds you, or however you want to phrase

32 (Pages 513 to 516)

Highly Confidential - Subject to Further Confidentiality Review

Page 517

1    that, and you spend $200 for that.
2         Then the opportunity cost
3    question is:  How much fewer of other
4    household items would you be in position to
5    buy after you decided to spend $200 for your
6    car repair?  And it's $200 less.
7         So the answer with respect to
8    the opportunity cost of that $200 is $200.
9         Q.    And so the cost consequence of
10   my decision is $200, because that's what I
11   elected to spend, correct?
12        A.    Well, if I could phrase it in
13   my terms, the opportunity cost of those $200
14   is $200.
15        Q.    And to you, it doesn't matter
16   whether I would spend that $200 on something
17   else.  The fact that I have spent $200 means
18   the opportunity cost is $200, correct?
19        MR. SOBOL:  Objection.
20        THE WITNESS:  I'm not sure I'm
21   following what you're trying to get at
22   here.  Sorry.
23   QUESTIONS BY MR. KEYES:
24        Q.    Well, I think you said before
25   it doesn't matter how I would have spent that

Page 518

1    $200 on something else instead of taking this
2    damaged car to my girlfriend's shop.  To you
3    the mere fact that I spent $200 means the
4    opportunity cost is $200, regardless of how I
5    could have spent the money elsewhere.
6         MR. SOBOL:  Objection.
7    QUESTIONS BY MR. KEYES:
8         Q.    Is that correct?
9         MR. SOBOL:  Objection.
10        THE WITNESS:  Well, I think the
11   way to say that in conventional
12   economics terms is that it's not
13   necessary for me, as an evaluator of
14   this opportunity cost, to know
15   precisely what you would have done
16   with the $200.  You might have saved
17   some.  You might have taken your wife
18   out to dinner.
19        In any case, the opportunity
20   cost of whatever that is would be
21   $200.  It's very mainstream,
22   down-the-middle-of-the-plate
23   economics.
24   QUESTIONS BY MR. KEYES:
25        Q.    For any year between 2006 and

Page 519

1    2018, did you attempt to identify whether any
2    of the Cuyahoga County affected divisions
3    reallocated any money from a
4    nonopioid-related program or account to
5    address an opioid-related need?
6         MR. SOBOL:  Objection.  Asked
7    and answered.
8         THE WITNESS:  In order to
9    identify opportunity cost, which is
10   what I needed to do for my report, it
11   was sufficient for me to get good
12   measures of the funds devoted to
13   opioid-related activities.  It wasn't
14   necessary to be able to, you know,
15   describe the ins and outs of that.
16        And so with respect to your
17   question of reallocation on accounts
18   or programs -- I forget how you
19   phrased it -- I'm not sure.
20   QUESTIONS BY MR. KEYES:
21        Q.    My question was:  Did you
22   attempt to do that identification?
23        You said you didn't need to.
24        My question is not whether you
25   needed to.  My question was did you.

Page 520

1         Did you attempt -- for any year
2    between 2006 and 2018 attempt to identify
3    whether any of the Cuyahoga County affected
4    divisions reallocated any money from a
5    nonopioid-related program or account to
6    address an opioid-related need?
7         MR. SOBOL:  Objection.  Asked
8    and answered.
9         THE WITNESS:  Yeah.  So that
10   whoever is watching or reading it
11   understands where I'm coming from on
12   this, I need to explain why I didn't
13   need to do that.
14        And the reason is that my job,
15   as I understood it, was to estimate
16   the opportunity cost of funds devoted
17   to the opioid-related activities.  And
18   that's what I did.  And that told me
19   what I needed to know to be able to
20   get a good measure of the cost to the
21   bellwether counties here.
22        And it wasn't necessary for me
23   to determine what the alternative
24   spending would have been in the
25   affected divisions in either county

33 (Pages 517 to 520)

Highly Confidential - Subject to Further Confidentiality Review

Page 521

1    over the years.
2    QUESTIONS BY MR. KEYES:
3        Q.    You have opined to a reasonable
4    degree of economic certainty that opportunity
5    costs exist for each of the affected
6    divisions, correct?
7            MR. SOBOL: Objection. You may
8        answer.
9            THE WITNESS: I'll say okay.
10   QUESTIONS BY MR. KEYES:
11       Q.    And you have placed the value
12   on those opportunity costs as the dollars
13   that you quantified as being spent on
14   opioid-related activities, correct?
15       A.    That was my measure of
16   opportunity costs, yes, the dollars spent on
17   opioid-related activities.
18       Q.    Okay. For any --
19       A.    Pardon me, just -- I'm sorry,
20   just one qualification of that.
21           Of the potentially affected
22   costs.
23       Q.    For any of the Summit County
24   affected divisions, tell me one concrete way
25   the money would have been spent by that

Page 522

1    division if those dollars were not spent on
2    opioid-related activities.
3            MR. SOBOL: Objection. Asked
4        and answered.
5            THE WITNESS: I'm sorry, do you
6        mean would or could in that question?
7    QUESTIONS BY MR. KEYES:
8        Q.    Would.
9        A.    Would.
10       Q.    Would.
11           For any of the Summit County
12   affected divisions, tell me one concrete way
13   the money would have been spent by that
14   division if those dollars were not spent on
15   opioid-related activities.
16       A.    Okay.
17           MR. SOBOL: Objection. Asked
18       and answered.
19           THE WITNESS: The application
20       of the principle of opportunity costs
21       in this context provides an answer to
22       that in the form that had the money
23       not been devoted to opioid-related
24       activities, it would have been
25       distributed across some other of the

Page 523

1    activities of the division.
2    QUESTIONS BY MR. KEYES:
3        Q.    Can you be any more specific
4    than that?
5            MR. SOBOL: Objection. Asked
6        and answered.
7            THE WITNESS: Well, in order to
8        estimate opportunity cost, which is my
9        assignment here, it's not necessary
10       for me to identify exactly what other
11       program or account would have been --
12       would have had access to the funds
13       that were devoted to opioid-related
14       activities. It's completely
15       sufficient for me to know the
16       opioid-related activity funds.
17   QUESTIONS BY MR. KEYES:
18       Q.    So for any of the Summit County
19   affected divisions, can you give me a single
20   example of what the dollars would have been
21   spent on if they had not been spent on what
22   you identified as the opioid-related
23   expenditures?
24           MR. SOBOL: Objection. Asked
25       and answered.

Page 524

1            THE WITNESS: Well, this is
2        the -- exactly the same question for a
3        different county. And my answer, to
4        the best of my ability, will be the
5        same, which is, for me to do my
6        assignment, what -- you know, and what
7        that involved is application of the
8        principle of opportunity cost, then
9        it's completely sufficient for me to
10       identify the funds that are devoted to
11       opioid-related activities, and it's
12       not necessary for me to identify the
13       particular program or account or
14       activity that any of these divisions
15       would have spent those funds on in the
16       alternative.
17           It's sufficient for me to know
18       they could have spent those on the
19       alternative, and they have, you know,
20       a value in alternative use, which is
21       the idea of opportunity cost.
22   QUESTIONS BY MR. KEYES:
23       Q.    Did you talk to a single person
24   who works for any of the Summit County
25   affected divisions to identify what the

34  (Pages 521 to 524)

Highly Confidential - Subject to Further Confidentiality Review

Page 525

1   dollars would have been spent on in a
2   particular year if they had not been spent on
3   what you identified as opioid-related
4   expenditures?
5           MR. SOBOL: Objection. Asked
6   and answered.
7           THE WITNESS: Well, this
8   follows from the question you asked a
9   minute ago.
10          For me to do what I needed to
11  do, I needed to know what were the
12  funds devoted to opioid-related
13  activities.
14          To identify an alternative
15  world in which those funds were not
16  devoted to opioid-related activities,
17  it wasn't necessary for me to know
18  what a particular official in a
19  particular division in a particular
20  year would have done alternatively.
21          What I needed to establish is,
22  here's what was spent on
23  opioid-related activities, and these
24  funds had alternative uses.
25

Page 526

1   QUESTIONS BY MR. KEYES:
2       Q.    Right. You said you didn't
3   need to do it; you've made that point many
4   times.
5           Did you talk to a single person
6   who works for any of the Summit County
7   affected divisions to identify what the
8   dollars would have been spent on --
9       A.    Yeah.
10      Q.    -- in a particular year if they
11  hadn't been spent on what you identified as
12  opioid-related expenditures?
13          MR. SOBOL: Objection.
14  QUESTIONS BY MR. KEYES:
15      Q.    Did you do it?
16          MR. SOBOL: Objection. Asked
17  and answered.
18          THE WITNESS: In order to have
19  this answer be well-understood by
20  whoever watches the tape or reads the
21  transcript, I think it's important for
22  me to take a minute to explain the --
23  what I needed to do in this case,
24  which is to identify the funds devoted
25  to opioid-related activities.

Page 527

1           And it wasn't necessary for me
2   to come up with a reliable estimate of
3   opportunity cost to know what, in an
4   alternative world, a particular
5   official would have done had some of
6   those funds be freed up for other
7   uses.
8           It was sufficient for me to
9   know that there were alternative uses
10  of those funds, and I have a good
11  economic measure of what the
12  opportunity cost of those funds were.
13  QUESTIONS BY MR. KEYES:
14      Q.    Did you talk to a single person
15  who works for any of the Cuyahoga County
16  affected divisions to identify what the
17  dollars would have been spent on?
18          MR. SOBOL: Objection. Asked
19  and answered.
20  QUESTIONS BY MR. KEYES:
21      Q.    Same answer?
22          MR. SOBOL: Objection. Asked
23  and answered.
24          You may answer.
25          THE WITNESS: Well, I would

Page 528

1   just refer to my previous answer,
2   which would be exactly the same, with
3   a change in the location.
4   QUESTIONS BY MR. KEYES:
5       Q.    Did you review any historical
6   budget or finance or accounting documents to
7   identify what the dollars would have been
8   spent on if they had not spent on what you
9   identified as opioid-related activities?
10          MR. SOBOL: Objection. Asked
11  and answered.
12          THE WITNESS: I have a hard
13  time with a "would" verb here, but let
14  me answer as best I can.
15          In order to do my job of
16  estimating opportunity cost, it was
17  sufficient for me to identify how much
18  of the funds of each division were
19  devoted to opioid-related activities.
20          It wasn't necessary for me to
21  identify what would have happened had
22  an official had more budget
23  flexibility and they might have been
24  able to move funds that -- funds that
25  were not needed for opioid-related

35 (Pages 525 to 528)

Highly Confidential - Subject to Further Confidentiality Review

Page 529

1    activities; only that there would be
2    alternative uses for those funds and
3    they would have been devoted to
4    something.
5        But I don't need to know
6    exactly what the official would have
7    done with those funds.
8    QUESTIONS BY MR. KEYES:
9        Q.    Well, if you haven't talked to
10   anyone and you haven't reviewed any
11   historical budgeting, finance or accounting
12   documents to identify what the dollars would
13   have been spent on, because you say, "I just
14   know they would have been spent on something
15   else," how do you know that they would have
16   been spent on something else?
17       MR. SOBOL:  Objection.  Asked
18   and answered.
19       THE WITNESS:  Well, this partly
20   is -- pardon the expression -- common
21   sense.  For a household, for a
22   corporation, for a government
23   division, for the United Nations, for
24   the federal government, if funds are
25   not devoted to something in

Page 530

1    particular, they have alternative
2    uses.  And in my experience, that's a
3    pretty general characterization of the
4    situation of an economic actor.
5        And a fundamental element of
6    economics is scarcity.  And what
7    scarcity has to do with in this case
8    is funds are limited.  And when funds
9    are limited, they have alternative
10   uses.
11       And just one more quick comment
12   about this.  I was interested in
13   confirming evidence of diversion,
14   which is another --
15   QUESTIONS BY MR. KEYES:
16       Q.    Diversion of funds?
17       A.    Diversion of funds is something
18   we've talked about earlier.
19       And I did speak with and find
20   written evidence of and read deposition
21   testimony of -- that confirmed the presence
22   of, you know, alternative uses of funds.
23       Q.    And when you say "alternative
24   uses," you're saying possibilities; they
25   could have spent the dollars on those other

Page 531

1    things.
2        MR. SOBOL:  Objection.
3    QUESTIONS BY MR. KEYES:
4        Q.    Not that they would have,
5    because I already asked you the "would have"
6    questions, and you said you'd need to look
7    into that.
8        MR. SOBOL:  Objection.
9    QUESTIONS BY MR. KEYES:
10       Q.    So when you say you did speak
11   with and find evidence in the deposition of
12   that -- testimony that confirms the presence
13   of alternative uses, you are flagging
14   alternative possibilities, correct?
15       MR. SOBOL:  Objection.  Asked
16   and answered.
17       THE WITNESS:  Well, there's two
18   things I spoke about.  The first one
19   was more general in a way, the
20   economics of scarcity that talks about
21   the availability of funds devoted to
22   alternative uses.
23       With respect to some of the
24   diversion, there was more specifics in
25   some of the testimony, some of the

Page 532

1    deposition testimony, that had to do
2    with police officers who may have
3    spent -- had to spend time on
4    opioid-related activities, who,
5    according to the testimony that I
6    remember, they not only could have but
7    would have been attending to rapes and
8    murders.
9        So it's -- I mean, the
10   could/would -- I hope I'm answering in
11   the could/would space that you're
12   asking about here.
13   QUESTIONS BY MR. KEYES:
14       Q.    And the deposition testimony
15   that you're referencing now is the deposition
16   testimony you mentioned in your report?
17       A.    That's correct.
18       Q.    And you said a moment ago you
19   spoke with people.
20       Who did you speak with?
21       I thought you said a week ago
22   you spoke with Compass Lexecon, but you
23   didn't speak with anyone from Cuyahoga County
24   or Summit County.
25       A.    Well, I did --

36 (Pages 529 to 532)

Highly Confidential - Subject to Further Confidentiality Review

| Page 533 | Page 535 |
|---|---|

Page 533

1    MR. SOBOL: Objection.
2  What's the question?
3  QUESTIONS BY MR. KEYES:
4    Q.   Who'd you speak with?
5      MR. SOBOL: About?
6      THE WITNESS: I don't remember
7  the names.
8  QUESTIONS BY MR. KEYES:
9    Q.   And you don't remember their
10 titles, correct?
11   A.   No, I'm not so good on that
12 either.  Sorry.
13   Q.   And you don't remember their
14 functions, correct?
15   A.   Well, there was some public
16 safety people.  There was some EMS people.
17 There was some fire department people.
18   Q.   Do you have any better
19 recollection of any of those conversations
20 today than you had a week ago?
21   A.   Not really, no, sorry.
22   Q.   Okay.  And for the example you
23 gave, how many rapes or murders were not
24 investigated because of opioid-related
25 spending?

Page 535

1  you did not talk to anyone who works for
2  Summit County or Cuyahoga County, correct?
3      MR. SOBOL: Objection.  Asked
4  and answered.
5      THE WITNESS: I think we --
6  when we talked about this a week ago,
7  there was some phone calls.  I don't
8  remember the names and dates or even
9  how many I was on.
10 QUESTIONS BY MR. KEYES:
11   Q.   Did you study whether any of
12 the affected divisions in any particular year
13 would have saved the money if they had not
14 spent it on opioid-related expenditures?
15     MR. SOBOL: Objection.  Asked
16 and answered.
17     THE WITNESS: Again, the
18 principle of opportunity costs implies
19 that the right way to go about this
20 from an economic point of view is to
21 identify the magnitude of funds that
22 are devoted to the opioid-related
23 activities.
24     And what the alternatives to a
25 particular division are will vary.

Page 534

1    A.   I'm not sure.
2    Q.   How many rapes or murders were
3  not prosecuted because of opioid-related
4  spending?
5    A.   I'm not sure.
6    Q.   How many rapes or murders were
7  not resolved because of opioid-related
8  spending?
9    A.   I'm not sure.
10   Q.   Can you identify for me a
11 single rape or murder that wasn't
12 investigated, wasn't prosecuted and wasn't
13 resolved because of opioid-related spending?
14     MR. SOBOL: Objection.  Form.
15     THE WITNESS: I'm sorry, I
16 can't name names of the victims here.
17 QUESTIONS BY MR. KEYES:
18   Q.   And when you spoke to people
19 earlier, you listed those interviews in your
20 report, correct?
21   A.   Yes.
22   Q.   And the people you list in your
23 report all work for Cleveland, correct?
24   A.   Yes.
25   Q.   So as we discussed a week ago,

Page 536

1  And so long as they have alternative
2  uses for the funds, the right metric
3  of opportunity cost is the metric that
4  I applied in my report.
5      So I don't need to know whether
6  they saved it or they spent it.
7  QUESTIONS BY MR. KEYES:
8    Q.   For 2006, did the Summit County
9  ADM Board spend all of the money in its
10 approved budget?
11     MR. SOBOL: Objection.
12     THE WITNESS: I would have to
13 go back and look.
14 QUESTIONS BY MR. KEYES:
15   Q.   Was that relevant to your
16 analysis, whether the Summit County ADM Board
17 spent all of the money in its approved budget
18 in 2006?
19   A.   Well, I was able to identify
20 opportunity costs in that case by examining
21 the opioid-related activities and the cost of
22 those activities, without knowing how the
23 funds otherwise would have been used.
24     So just to complete your --
25 complete the answer to the question, it

37 (Pages 533 to 536)

Highly Confidential - Subject to Further Confidentiality Review

Page 537

1    wasn't necessary for me to know whether they
2    spent or overspent their budget.
3        Q.   Did you investigate whether,
4    for any year between 2006 and 2018, the
5    Summit County ADM Board spent all of the
6    money in its approved budget?
7            MR. SOBOL:  Objection.
8            THE WITNESS:  Well, this is
9        similar to the question about a
10       particular year.
11           In order to do my job and
12       estimate opportunity cost, it's
13       sufficient for me to measure the funds
14       devoted to opioid-related activities.
15           How much they were spending on
16       other activities, how much they
17       were -- the budget, the fund balance
18       went up and down, is not something I
19       needed to know in order to come up
20       with reliable, principled, definite
21       measure of opportunity costs.
22   QUESTIONS BY MR. KEYES:
23       Q.   Is it accurate to say that you
24   did not investigate whether, for any year
25   between 2006 and 2018, the Summit County ADM

Page 538

1    Board spent all of the money in its approved
2    budget?
3            MR. SOBOL:  Objection.  Asked
4        and answered.
5            THE WITNESS:  Again, this is --
6        in order for me to do my job and to
7        measure the opportunity cost of funds
8        that were devoted to opioid-related
9        activities, it wasn't necessary for me
10       to investigate what other uses there
11       would have been for those funds, other
12       than to establish, yes, there would be
13       other uses for those funds.
14   QUESTIONS BY MR. KEYES:
15       Q.   And when you --
16       A.   And just -- excuse me.
17           And the details of what the
18   funds would have been devoted to are -- I
19   don't need to know those in order to measure
20   opportunity costs.
21       Q.   When you tell me that it wasn't
22   necessary to do it, you're explaining why you
23   did not do it, correct?
24       A.   Yes.
25       Q.   Is it accurate to say that you

Page 539

1    did not investigate whether, for any year
2    between 2006 and 2018, any of the Summit
3    County affected divisions spent all the money
4    in their approved budgets?
5            MR. SOBOL:  Objection.
6            THE WITNESS:  So in order to
7        make sure someone watching this or
8        reading the transcript has a complete
9        answer and a complete understanding of
10       what I did, to the question, I need to
11       explain briefly that the principle of
12       opportunity cost, which is the way an
13       economist thinks about these kind of
14       situations, implies that what I should
15       investigate and what I should measure
16       are the funds devoted to
17       opioid-related activities.  Then I
18       have what I need to know.
19           And it's not necessary for me
20       to go to an alternative world in which
21       the funds would have been available
22       and might have been spent on something
23       else, other than to establish that
24       they would have been available and
25       could have been spent on something

Page 540

1        else.
2    QUESTIONS BY MR. KEYES:
3        Q.   When you tell me that it wasn't
4    necessary to do it, you're explaining why you
5    did not do it, correct?
6        A.   I thought that would be
7    important for the audience to know.
8        Q.   Is it accurate to say that you
9    did not investigate whether, for any year
10   between 2006 and 2018, any of the Cuyahoga
11   County affected divisions spent all the money
12   in their approved budgets?
13           MR. SOBOL:  Objection.  Asked
14       and answered.
15           THE WITNESS:  Well, the answer
16       to that would be exactly the same as I
17       gave for the other county a few
18       minutes ago.
19   QUESTIONS BY MR. KEYES:
20       Q.   At any time in 2006, did the
21   Summit County ADM Board seek permission to
22   spend dollars beyond its approved budget on
23   any opioid-related need?
24       A.   This is another version of the
25   question we've been discussing today, and in

38 (Pages 537 to 540)

Highly Confidential - Subject to Further Confidentiality Review

Page 541

1  order for me to identify the opportunity
2  costs of the funds they actually spent, it's
3  not necessary for me to know what they may
4  have wished to do, wanted to do, sought
5  permission to do, in order to accurately
6  identify what the opportunity cost of the
7  funds they actually spent are.
8      Q.    And again, when you tell me
9  that it wasn't necessary for me to do, you're
10  explaining why you did not do it, correct?
11      A.    I think that's important for
12  the audience to hear.
13      Q.    At any time between 2006 and
14  2018, did the Summit County ADM Board seek
15  permission to spend dollars beyond its
16  approved budget on any opioid-related need?
17          MR. SOBOL:  Objection.
18          THE WITNESS:  Okay.  So to
19      understand my answer to this question,
20      it's important to keep in mind that
21      I'm applying the well-established
22      economic principle -- pardon me for
23      laughing; it's your fault -- of
24      opportunity cost.
25

Page 542

1  QUESTIONS BY MR. KEYES:
2      Q.    No, you have your speech, and
3  if you're going to give the speech in
4  response to every question, that's fine.  But
5  I'm just trying to get a clear yes or no
6  answer to these questions, and you keep
7  giving me a long explanation why it's not
8  necessary.
9          At any time between 2006 and
10  2018, did the Summit County ADM Board seek
11  permission to spend dollars beyond its
12  approved budget on any opioid-related need?
13          MR. SOBOL:  Asked and answered.
14      Objection.
15          THE WITNESS:  Now, I'm very
16      aware that we've been round and round
17      on versions of this question.  The way
18      I want to answer the question is to
19      make sure that if some viewer or
20      reader sees only a sound bite of my
21      testimony, that they understand what I
22      did and why I did it.
23          And I have said it a number of
24      times today, but, you know, within the
25      context of any particular question, I

Page 543

1  want to make sure it's been stated.
2          And to reiterate, my assignment
3  in this case was to come up with a
4  reliable estimate of the opportunity
5  cost of funds that were devoted to
6  opioid-related activities.  That's
7  what I did.
8          And in order to do that, it
9  wasn't necessary for me to know
10  whether the departments might have
11  preferred to do something else,
12  whether they might have over or
13  underspend on any particular thing,
14  whether they would have changed an
15  account, a program.  All those things
16  are not necessary in order to just
17  follow through in a very common sense
18  thing of how much did they -- what was
19  the cost of opioid-related activities
20  in this division, in this year, is
21  what they spent on those things.
22          If they didn't spend that, they
23  would have had money to do something
24  else.
25

Page 544

1  QUESTIONS BY MR. KEYES:
2      Q.    Did you investigate whether, at
3  any time between 2006 and 2018, any of the
4  Summit County or Cuyahoga County affected
5  divisions sought permission to spend dollars
6  beyond their approved budget on any
7  opioid-related need?
8          MR. SOBOL:  Objection.  Asked
9      and answered.
10          THE WITNESS:  I'd just like to
11      refer to my previous answer, if you
12      find that --
13          MR. SOBOL:  No, if you have --
14      what previous answer?
15          MR. KEYES:  The one you just
16      said was asked and answered.  It
17      wasn't asked and answered.  This is a
18      distinct question.
19  QUESTIONS BY MR. KEYES:
20      Q.    You want to incorporate your
21  last answer, but I want the record to be
22  clear, Professor McGuire.
23      A.    Okay.
24      Q.    So you did not investigate
25  whether at any time, in any year between 2006

39 (Pages 541 to 544)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 545

1  and 2018, any affected division of either
2  Summit County or Cuyahoga County sought
3  permission to spend dollars beyond their
4  approved budget on any opioid-related need,
5  correct?
6        MR. SOBOL: Objection.
7  Objection. Form. Also objection.
8  Asked and answered.
9        You give any form of an answer
10 you would like.
11       THE WITNESS: Okay. I'd like
12 to give a complete answer to the
13 question for a reader to understand my
14 response to your very general
15 question.
16       And my answer is that for me to
17 fulfill my assignment in this case,
18 it's sufficient for me to know what
19 each division, in each year, in each
20 county, spent on opioid-related
21 activities, which was the focus of my
22 report: to identify those funds.
23       It was not necessary for me
24 to know whether any division, in any
25 year, in either of the counties,

Page 546

1  sought to do something different.
2        The opportunity cost is a very
3  common sense approach that says, what
4  is the opportunity cost of the
5  $200,000 that this division spent on
6  opioid-related activities. It's
7  $200,000. They would have had that
8  money to do something else.
9        And it's sufficient to -- in
10 application of the opportunity cost
11 concept to be able to identify the
12 magnitude of those funds and to
13 establish they could have done
14 something else with those funds.
15       And that's what I did.
16 QUESTIONS BY MR. KEYES:
17     Q.   And so that prior answer, you
18 were explaining why you did not conduct that
19 investigation I asked about, correct?
20       MR. SOBOL: Objection. Asked
21 and answered.
22       THE WITNESS: I was trying to
23 give a complete answer so the audience
24 would understand what I did.
25

Page 547

1  QUESTIONS BY MR. KEYES:
2      Q.   Right.
3        And the audience should
4  understand that you didn't do it, and you
5  were giving the reasons why you didn't do
6  it --
7        MR. SOBOL: Objection.
8  QUESTIONS BY MR. KEYES:
9      Q.   -- right?
10       MR. SOBOL: What's the...
11       THE WITNESS: Well, I'm -- I
12 was just trying to give a complete
13 answer. I needed to explain a little
14 bit about what opportunity cost was,
15 what the nature of my assignment was,
16 what I need to know in order to do
17 that.
18       It just doesn't take very long
19 for me to say it. I'm pretty
20 practiced at it now. But I think it's
21 something for the audience that they
22 need to hear.
23 QUESTIONS BY MR. KEYES:
24     Q.   Right.
25       But again, you told me what was

Page 548

1  sufficient. You told me what wasn't
2  necessary.
3        I want to know whether --
4  regardless of whether it's necessary or not,
5  did you do it. Did you investigate at any
6  time, for any year between 2006 and 2018, for
7  any affected division for either Summit
8  County or Cuyahoga County, whether they
9  sought permission to spend dollars beyond
10 their approved budget on any opioid-related
11 need?
12       MR. SOBOL: Objection.
13 QUESTIONS BY MR. KEYES:
14     Q.   Did you do it?
15       MR. SOBOL: Objection. Asked
16 and answered.
17       You may give an answer in any
18 form you think appropriate.
19       THE WITNESS: First of all, I
20 don't see any distinction between the
21 question you just asked and the
22 question I referred to a few moments
23 ago as being a very general question.
24       And it seems like it's an
25 important question, so in order to

40  (Pages 545 to 548)

Highly Confidential - Subject to Further Confidentiality Review

Page 549

1    address it, I want to be sure to give
2    a complete answer to the question.
3         In order for me to do my
4    assignment in assessing the
5    opportunity cost for each division,
6    for both counties, for all the years,
7    it was necessary for me to identify
8    the funds devoted to opioid-related
9    activities.
10        And that's what I did in my
11   report.  And that was sufficient to
12   identify the opportunity cost of those
13   funds.
14        I didn't need to know whether
15   any of those divisions in either of
16   the counties, in any of the years,
17   sought to do something different with
18   their funds.
19        The opportunity cost number is
20   a very common sense concept.  If a
21   division spends $200,000 on
22   opioid-related activities in 2007,
23   they could do something else with that
24   money.  The $200,000 is the
25   opportunity cost of those funds.

Page 550

1    QUESTIONS BY MR. KEYES:
2         Q.   Did you investigate whether at
3    any time, for any year between 2006 and 2018,
4    any of the affected divisions for either
5    Summit County or Cuyahoga County sought
6    permission to spend dollars beyond their
7    approved budget on a need not related to
8    opioids?
9         MR. SOBOL:  Objection.  Asked
10   and answered.
11        You may give an answer in any
12   form that you'd like.
13        THE WITNESS:  I see this
14   question as being slightly different.
15   It's also a general question.
16        The difference here is, it's
17   the non-related activities as opposed
18   to the opioid-related activities, if
19   I'm following.
20   QUESTIONS BY MR. KEYES:
21        Q.   Correct.
22        A.   Okay.  And it's also an
23   important question, one I want to make sure I
24   give a thorough answer to.
25        In order for me to fulfill my

Page 551

1    assignment in this report, which is to
2    identify the opportunity cost of the funds
3    devoted to opioid-related activities, it was
4    sufficient for me to -- in each county, for
5    each division, for each year, to identify the
6    funds that were spent on opioid-related
7    activities for that year.
8         I did not need to know what
9    might else have been done with those funds
10   had their spending not taken place.  So it
11   wasn't necessary for me to know whether the
12   divisions, in the years and the counties, had
13   made some application for additional funds.
14        The money spent on the
15   opioid-related crisis is a very common sense
16   measure of opportunity costs.  If they spend
17   $200,000 on opioid-related activities and
18   they didn't have to spend that money, they
19   would have had $200,000 to spend on something
20   else.
21        That's, you know, in short what
22   I did.
23        Q.   When you said in your prior
24   answer that it wasn't necessary to do it, you
25   were explaining why you did not do it,

Page 552

1    correct?
2         MR. SOBOL:  Objection.  Asked
3    and answered.
4         THE WITNESS:  Well, I was
5    explaining some of the basis for that,
6    that -- what opportunity cost was,
7    what was and was not necessary for me
8    to determine that.  You know, I think
9    it's important for the reader or the
10   viewer to hear that.
11   QUESTIONS BY MR. KEYES:
12        Q.   Did you identify any instance
13   where at any point in time between 2006 and
14   2018 any of the affected divisions for either
15   Summit County or Cuyahoga County sought
16   permission to spend dollars beyond their
17   approved budget on a need related to or not
18   related to opioids?
19        MR. SOBOL:  Objection.  Asked
20   and answered.
21        You may answer.
22        THE WITNESS:  Truthfully -- of
23   course, I've been truthful all
24   morning, but I don't -- this seems to
25   be a compound of two other questions

41 (Pages 549 to 552)

Highly Confidential - Subject to Further Confidentiality Review

Page 553

1    that you asked earlier, those -- the
2    request with respect to opioids and
3    the request with respect to other
4    things.
5    QUESTIONS BY MR. KEYES:
6        Q.    I asked whether you identified
7    any instance, before I asked whether you
8    investigated, and you told me your reasons
9    for not investigating.
10       A.    Oh.
11       Q.    Now I'm asking:  Did you at any
12   point in this engagement identify any
13   instance, at any point in time between 2006
14   and 2018, when any of the affected divisions
15   for either Summit County or Cuyahoga County
16   requested permission to spend dollars beyond
17   their approved budget, either to meet an
18   opioid-related need or to meet a
19   nonopioid-related need?
20           MR. SOBOL:  Objection.  Asked
21   and answered and compound.
22   QUESTIONS BY MR. KEYES:
23       Q.    Any instance?
24           MR. SOBOL:  Objection.  Already
25   asked and compound.

Page 554

1        But you may answer.
2            THE WITNESS:  Well, let me give
3    a fresh answer just to avoid the back
4    and forth about whether I've answered
5    it already.
6        It seems like it's an important
7    question, it's a general question, and
8    I want to make sure I give a complete
9    answer to this.
10       What I needed to do to fulfill
11   my assignment was to identify for each
12   division in each county, for all the
13   years involved, what the
14   opioid-related spending was in that
15   division.  That's the basis for an
16   economist to determine what the
17   opportunity cost of those funds are.
18       What's not necessary for me to
19   do is to know what else might have
20   happened had those funds not been
21   spent on opioid-related activities.
22       So I didn't need to know
23   whether divisions had submitted budget
24   proposals or what particular other
25   activities they would have done in a

Page 555

1    hypothetical had the funds not been
2    spent on opioid-related activities.
3    It was sufficient for me to know the
4    magnitude of those funds.
5        And I think it's a very common
6    sense concept that if a division is
7    spending $200,000 on opioid-related
8    activities in a year, if they don't
9    have to spend that, the $200,000 would
10   be available for something else.
11   That's really all -- that's the kind
12   of main point I'm making with the idea
13   of opportunity cost.
14   QUESTIONS BY MR. KEYES:
15       Q.    Did you find a single example
16   of an affected division saying that it was
17   not able to meet a need because funds had
18   been redirected to cover an opioid-related
19   need?
20           MR. SOBOL:  Objection.  Asked
21   and answered.
22           THE WITNESS:  This is also a
23   pretty general question, and I want to
24   make sure to give a complete answer to
25   the question.

Page 556

1        In order for me to do my work,
2    what I needed to do was identify the
3    opioid-related spending.  To an
4    economist, that opioid-related
5    spending is opportunity cost.  And if
6    those funds had not been devoted to
7    opioid-related activities, they could
8    have been devoted to something else.
9        I don't need to know what
10   officials in the divisions might have
11   identified as their priorities for
12   those funds but only to -- you know,
13   only to note that those funds do have
14   alternative uses.  And if $200,000 is
15   devoted to opioid-related activities
16   in a particular division in a
17   particular year, had those funds not
18   been used for opioid-related
19   activities, they would have been
20   available for something else.
21       It's not rocket science.  It's
22   pretty straightforward that they spent
23   $200,000 on opioids.  If they didn't
24   have to spend that, they would have
25   had the money for something else.

42  (Pages 553 to 556)

Highly Confidential - Subject to Further Confidentiality Review

Page 557

1     That's the idea of opportunity cost.
2  QUESTIONS BY MR. KEYES:
3     Q.    Did the Summit County or
4  Cuyahoga County government incur any injury
5  because it wasn't able to spend money on
6  something because it was spending those
7  dollars on an opioid-related service?
8          MR. SOBOL: Objection.  Asked
9  and answered and form.
10         You may answer.
11         THE WITNESS:  Can you clarify
12  what injury means in this context?
13  QUESTIONS BY MR. KEYES:
14     Q.    Harm.
15     A.    I thought you might say that.
16     Q.    Did Summit County or Cuyahoga
17  County government incur any harm because it
18  wasn't able to spend money on something
19  because it was spending those dollars on an
20  opioid-related service?
21         MR. SOBOL: Objection.  Asked
22  and answered.  Form.
23         THE WITNESS:  I know you've
24  told me injury is the same as harm,
25  and earlier harm was the same as

Page 558

1  injury.  It's a little unclear to me
2  what that means in this context.
3  QUESTIONS BY MR. KEYES:
4     Q.    Are you offering any opinion
5  that Summit County or Cuyahoga County
6  suffered any injury or harm because it wasn't
7  able to spend money on something because it
8  was spending that money on an opioid-related
9  service?
10         MR. SOBOL: Objection.  Asked
11  and answered.
12         THE WITNESS:  I think I can at
13  least somewhat address your question,
14  and if I'm missing in my answer, then
15  please let me know.
16         It's also a very general
17  question, and it sounds like an
18  important question to me, so I want to
19  be sure to give a complete answer to
20  the question.
21         What I needed to do in my
22  report was to identify the opportunity
23  cost of funds that were devoted to
24  opioid-related activity, and that's
25  what I did in my report.

Page 559

1         It was not necessary for me to
2  identify what other activities the
3  funds would have been spent on or what
4  the value of those other activities
5  were; only to note that there are
6  alternative uses for the funds that
7  were devoted to opioid-related
8  activities, and the officials in the
9  division would have done something
10  else with the money.
11         And so an economist is asked:
12  What is the metric or the measure of
13  those opportunity costs?
14         And it's a very natural,
15  down-the-middle-of-the-plate,
16  not-rocket-science part of economics,
17  which is, that if a household spends
18  $75 on a car repair or a division
19  spends $200,000 on an opioid-related
20  activity, that is the opportunity cost
21  of those funds.
22         That told me what I needed to
23  know, and that's what I did.
24  QUESTIONS BY MR. KEYES:
25     Q.    Now, Professor McGuire, you

Page 560

1  know, you've said that, I bet, a few hundred
2  times between last Tuesday and today.  And
3  you're an expert for the plaintiffs, and I'm
4  entitled to probe whether you're offering an
5  opinion or not.
6         So this question is a yes or no
7  question, and I am asking you to answer it
8  yes or no, and then you can provide whatever
9  explanation you think is appropriate.
10         Are you offering an opinion
11  that Summit County or Cuyahoga County
12  suffered any injury or harm because the
13  county wasn't able to spend money on
14  something else because it was spending money
15  on opioid-related services?
16         MR. SOBOL: Objection, first,
17  to the speech.  I'm not sure if in the
18  question you intend the witness to
19  adopt your speech or not.
20         Objection to the form, because
21  you haven't defined injury or harm.
22         And compound.
23         THE WITNESS:  Well, I have been
24  attempting to answer your question as
25  clearly and as completely as I can in

43 (Pages 557 to 560)

Highly Confidential - Subject to Further Confidentiality Review

Page 561

1    the order in which I think it's most
2    informative to provide the
3    information.
4         And that order starts with what
5    was needed for me in order to complete
6    my assignment.  And then when I go on
7    to say -- that's what I need to know.
8    Then I say it was not necessary for me
9    to investigate that.
10        I think -- I didn't mean that
11   to not be answering your question.
12   When I say it wasn't necessary for me
13   to investigate, then I didn't
14   investigate it.
15   QUESTIONS BY MR. KEYES:
16        Q.    So you did not investigate
17   whether either Summit County or Cuyahoga
18   County suffered any injury or harm because
19   they spent money on opioid-related services
20   rather than something else --
21        MR. SOBOL:  Objection.
22   QUESTIONS BY MR. KEYES:
23        Q.    -- correct?
24        MR. SOBOL:  Objection.  Asked
25   and answered.

Page 562

1         Again, you may answer in any
2    format you'd like, despite the speech
3    by counsel.
4         THE WITNESS:  Okay.  This is
5    returning to that very general and, it
6    seems to me, potentially important
7    question; that I think it's important
8    for a viewer or a reader to understand
9    what I did and why I did it.
10        And what I did in order to
11   fulfill my assignment was to identify
12   the funds that were devoted to
13   opioid-related activities.  That's
14   what corresponds to the tried and
15   true, well-accepted, down-the-middle-
16   of-the-plate concept of opportunity
17   cost.
18        The opportunity cost of those
19   funds can be identified and measured
20   without investigating what a
21   particular division in a particular
22   county in a particular year would have
23   done in an alternative world in which
24   those funds were not devoted to
25   opioid-related crises.

Page 563

1         So when I come up with a
2    measure $200,000 were devoted to
3    opioid-related activities in a
4    division in a year, that tells me what
5    I need know.  I don't need to, and I
6    didn't investigate, the particulars of
7    what else they would have done with
8    the funds.
9    QUESTIONS BY MR. KEYES:
10        Q.    You identify that $200,000 as
11   an opportunity cost.
12        MR. SOBOL:  Objection.
13        Is there a question?
14   QUESTIONS BY MR. KEYES:
15        Q.    Correct?
16        A.    Yes.
17        Q.    And you are not offering an
18   opinion that $200,000 is a harm or an
19   injury to either Summit County or Cuyahoga
20   County, correct?
21        MR. SOBOL:  Objection.  Asked
22   and answered.
23        THE WITNESS:  Well, you're
24   coming back to the harm and injury,
25   and you say harm is injury, injury is

Page 564

1    harm.  Neither of those are very
2    helpful to me as an economist.
3         And given the nature of this
4    question, could you please clarify
5    what harm and injury means in this
6    context?
7    QUESTIONS BY MR. KEYES:
8         Q.    Are you saying that harm is not
9    meaningful to you as an economist?
10        MR. SOBOL:  Objection.
11        THE WITNESS:  I'm saying in
12   this context, I'm not sure what you're
13   asking.
14   QUESTIONS BY MR. KEYES:
15        Q.    In the context of this
16   engagement, are you saying that harm is not a
17   meaningful concept to you?
18        MR. SOBOL:  Objection.  Asked
19   and answered.
20        THE WITNESS:  I'm saying in the
21   context of this question, I'm not sure
22   what you're referring to.
23   QUESTIONS BY MR. KEYES:
24        Q.    Well, do you have an
25   understanding of what harm means in the

44  (Pages 561 to 564)

Highly Confidential - Subject to Further Confidentiality Review

Page 565

1  context of the opinions that you're offering
2  regarding damages here?
3      A.    I understand what damages are.
4  I understand what opportunity costs are, as I
5  used it in my report.  But I'm -- if that's
6  what you mean, if you mean harm equals
7  damages, then please tell me.  If you mean
8  harm equals opportunity cost, please tell me.
9  If you mean harm equals something else, then
10  please tell me that.
11      Q.    Well, my question was:  Do you
12  have an understanding of what harm means in
13  the context of the opinions that you're
14  offering regarding damages here?
15          MR. SOBOL:  Objection.  Asked
16  and answered.
17          THE WITNESS:  I don't have
18      anything to add.  This is -- I'm not
19      meaning to be evasive.  I'm just
20      asking:  In this context, what do you
21      mean by harm?
22          I studied damages.  I studied
23      opportunity costs.  Is there something
24      else?
25

Page 566

1  QUESTIONS BY MR. KEYES:
2      Q.    Did you study harm?
3          MR. SOBOL:  Objection.  Asked
4  and answered.
5          THE WITNESS:  Without telling
6      me what it is, I can't tell you.
7  QUESTIONS BY MR. KEYES:
8      Q.    Did you study any harm?
9          MR. SOBOL:  Objection.  Asked
10  and answered.
11          THE WITNESS:  Without you
12      telling me what you mean by the word,
13      I can't tell you.
14  QUESTIONS BY MR. KEYES:
15      Q.    Well, sir, you say on page 4 of
16  your report, you say, quote, "I refer to the
17  adverse health, public welfare, public health
18  and criminal justice consequences of the
19  opioid epidemic as harms."
20          You use the term "harms,"
21  right?  That's in your report.
22      A.    This is Exhibit 1?
23      Q.    Yes, page 4.
24      A.    One second.
25      Q.    Middle of the page, two

Page 567

1  sentences before you begin paragraph 7, you
2  say, "I refer to adverse health, public
3  health, public welfare and criminal justice
4  consequences of the opioid epidemic as
5  harms."
6          Do you see that language?
7      A.    I see that, yes.
8      Q.    You use the term "harms."
9          MR. SOBOL:  Objection.
10  QUESTIONS BY MR. KEYES:
11      Q.    Okay?
12          MR. SOBOL:  Objection.  Asked
13  and answered.
14          You may answer.
15  QUESTIONS BY MR. KEYES:
16      Q.    So when you said before you
17  don't know what harm means, I'm trying to
18  reconcile that with the statements in your
19  own report.
20          MR. SOBOL:  There's no question
21  before you.
22  QUESTIONS BY MR. KEYES:
23      Q.    So are you still saying you
24  don't know what harm means --
25          MR. SOBOL:  Objection.

Page 568

1  QUESTIONS BY MR. KEYES:
2      Q.    -- in the context of this case?
3          MR. SOBOL:  Objection.
4      Misleading, because it
5      mischaracterizes his previous
6      testimony.
7          If you'd like to ask him what
8      is meant by that section of his report
9      regarding the plural harms, you may.
10          THE WITNESS:  I'm sorry, what
11      question is pending?
12  QUESTIONS BY MR. KEYES:
13      Q.    So are you still saying you
14  don't know what harm means in the context of
15  this case?
16          MR. SOBOL:  Objection.  Asked
17  and answered.
18          THE WITNESS:  I think what I
19      said was I didn't understand the way
20      you were using harm in the question.
21  QUESTIONS BY MR. KEYES:
22      Q.    Did you investigate whether
23  Summit County or Cuyahoga County governments
24  suffered any injury or harm because they
25  spent money on opioid-related services rather

Highly Confidential - Subject to Further Confidentiality Review

Page 569

1 than something else?
2         MR. SOBOL: Objection. Asked
3     and answered.
4         THE WITNESS: I remember that
5     question, and I believe my response
6     was to request from you a
7     clarification of what you mean in your
8     question by harms and injury.
9 QUESTIONS BY MR. KEYES:
10    Q.   Using the concept of harms that
11 you discuss in your report, did you
12 investigate whether Summit County or Cuyahoga
13 County governments suffered any injury or
14 harm because they spent money on
15 opioid-related services rather than something
16 else?
17    A.    Okay.
18        MR. SOBOL: Objection.
19    Compound.
20        You can answer.
21        THE WITNESS: All right. So
22    now we're referring to my report,
23    page 4, where I say, "I refer to the
24    adverse health, public health, public
25    welfare and criminal justice system

Page 570

1     consequences of the opioid epidemic as
2     harms."
3         So if I'm interpreting your
4     question correctly, when you say "the
5     county governments," were they
6     affected, governments don't have
7     health.  Governments don't have
8     welfare.  They are engaged in
9     activities related to public health,
10    health and public welfare that
11    involves spending money on those
12    things.
13        So if you're asking me as part
14    of your question, did the health of
15    county government, was that harmed by
16    opioid-related activities, that
17    question doesn't make sense to me.
18        If you're asking me with
19    respect to the activities of the
20    county governments, was their spending
21    on health or public health affected,
22    that question does make sense to me,
23    and I address it in this report in the
24    form of studying opportunity cost.
25

Page 571

1 QUESTIONS BY MR. KEYES:
2    Q.    When you refer to adverse
3 health, public health, public welfare and
4 criminal justice consequences of the opioid
5 epidemic as harms, are you saying that those
6 are harms suffered by Summit County or
7 Cuyahoga County governments?
8    A.    Governments?
9        Well, I tried to address this
10 in my previous answer.  And if we take just
11 the first of these, health, if what you mean
12 by affecting the health of a county
13 government, that doesn't make sense to me
14 because governments don't have health.
15        What governments do is spend
16 money on things.  And if -- let me put it
17 this way.  With respect to the issue of
18 whether the opioid epidemic caused government
19 to spend money on health, then that's what my
20 report is about.
21    Q.    Right.  Right.
22        So when you refer in the
23 sentence to adverse health, public health,
24 public welfare and criminal justice
25 consequences of the opioid epidemic as harms,

Page 572

1 you are not referring to them as harms to the
2 Summit County or Cuyahoga County governments,
3 correct?
4        MR. SOBOL: Objection. Asked
5    and answered.
6        THE WITNESS: No, that's not
7    what I said.
8 QUESTIONS BY MR. KEYES:
9    Q.    You talked about cost
10 consequences of the harms.  I'm asking about
11 the harms that you refer to.  Are those harms
12 to the Cuyahoga County or Summit County
13 governments?
14        MR. SOBOL: Objection. Asked
15    and answered.
16        THE WITNESS: I don't have too
17    much -- I don't have anything new to
18    say about this, but let me say what I
19    said again.
20        With respect to health and
21    whether there were any harms
22    associated with health to county
23    governments, that doesn't make sense
24    to me as a question.  Governments
25    don't have health.  What governments

46 (Pages 569 to 572)

Page 573

1    do is spend money on things and --
2    including spending money on health.
3         So to the extent that your
4    question is about harms in the form of
5    the opioid crisis leading to spending
6    consequences for the county
7    governments, I do address that in my
8    report at some length.
9    QUESTIONS BY MR. KEYES:
10        Q.   When you then refer to the cost
11   consequences of harms to the bellwether
12   governments, you are talking about the cost
13   consequences to the governments, not the
14   harms to the governments, correct?
15        MR. SOBOL:  Objection.  Asked
16   and answered.
17        THE WITNESS:  I don't know.
18   You're attempting to sort of dissect
19   these words.  I'm not -- maybe you
20   could break it down or something.  I'm
21   not really following.
22   QUESTIONS BY MR. KEYES:
23        Q.   I'm looking at two sentences in
24   your report.
25        A.   Yes.

Page 574

1        Q.   You say, "Finally, upon
2    instruction from counsel, I refer to the cost
3    consequences of harms to the bellwether
4    governments due to defendants' misconduct as
5    damages."
6         Do you see that sentence?
7        A.   I see that, yeah.
8        Q.   Did you write that sentence?
9        A.   I absolutely wrote that
10   sentence.
11        Q.   Did you write the prior
12   sentence?
13        A.   I absolutely wrote the prior
14   sentence.
15        Q.   You told me already you wrote
16   the whole report, correct?
17        A.   I did, yes.
18        Q.   Okay.  So focusing on this
19   sentence, "I refer to the cost consequences
20   of harms to the bellwether governments."
21        Do you see that phrase?
22        A.   I see that.
23        Q.   You are talking about the cost
24   consequences to the bellwether governments,
25   not the harms to the governments, correct?

Page 575

1        MR. SOBOL:  Objection.  Asked
2    and answered.
3        THE WITNESS:  I'm -- well, the
4    sentence says what I mean.  I'm not --
5    QUESTIONS BY MR. KEYES:
6        Q.   You're talking about the cost
7    consequences of harms, which consequences you
8    say are borne by the governments.
9        MR. SOBOL:  Objection.
10        THE WITNESS:  The sentence
11   says, "I refer to the cost
12   consequences of harms" as damages.
13   QUESTIONS BY MR. KEYES:
14        Q.   Right.
15        And those cost --
16        A.   Okay.
17        Q.   Those cost consequences that
18   you're referring to are what you've
19   identified as the opportunity costs?
20        MR. SOBOL:  Objection.  Asked
21   and answered.
22        THE WITNESS:  That's generally
23   correct, yes.
24   QUESTIONS BY MR. KEYES:
25        Q.   Okay.  And those are

Page 576

1    opportunity costs that you say were borne by
2    Summit County and Cuyahoga County government
3    as a result of the harms that you say result
4    to the communities of the opioid epidemic?
5        MR. SOBOL:  Objection.
6        THE WITNESS:  Well, you're
7    reading things that I didn't write
8    here.
9    QUESTIONS BY MR. KEYES:
10        Q.   I'm asking you a question about
11   your opinions.
12        A.   Okay.  I thought we were
13   following along with the text here, but,
14   sorry.  Hit me with a question.
15        Q.   Well, you told me you couldn't
16   explain the texts; you could only just keep
17   referring to the text.  So I'm expanding my
18   questioning to give you different words to
19   use.
20        You said you have identified
21   the opportunity costs as the cost
22   consequences, correct?
23        A.   I said that, yes.
24        MR. SOBOL:  Objection.  Asked
25   and answered.

47 (Pages 573 to 576)

Highly Confidential - Subject to Further Confidentiality Review

Page 577

1    QUESTIONS BY MR. KEYES:
2         Q.   And those are the cost
3    consequences of harms, correct?
4              MR. SOBOL: Objection. Asked
5         and answered.
6              Or asked and not understood.
7         But either way, I object.
8              THE WITNESS: I think that's
9         correct, yeah.
10   QUESTIONS BY MR. KEYES:
11        Q.   And those are the cost
12   consequences borne by the Summit County and
13   Cuyahoga County governments, correct?
14        A.   Yes.
15        Q.   And those are the cost
16   consequences of harms that you've identified
17   as adverse health, public health, public
18   welfare and criminal justice consequences of
19   the opioid epidemic, correct?
20             MR. SOBOL: Objection.
21             THE WITNESS: I think so.
22   QUESTIONS BY MR. KEYES:
23        Q.   And those are the harms that
24   you said didn't make any sense as being harms
25   suffered by the Cuyahoga County or Summit

Page 578

1    County government, correct?
2              MR. SOBOL: Objection.
3         Mischaracterizes the testimony.
4              THE WITNESS: No, that's not
5         what I said.
6    QUESTIONS BY MR. KEYES:
7         Q.   When I asked you before when
8    you referred to these adverse health, public
9    health, public welfare and criminal justice
10   consequences of the opioid epidemic that you
11   describe as harms, and so are those harms
12   incurred or suffered by Cuyahoga County or
13   Summit County, you said that didn't make any
14   sense to you, right?
15        A.   Well, when you talk about the
16   Summit or Cuyahoga County governments, there
17   was a sense in which it did not and a sense
18   in which it did that I tried to explain in my
19   answer.
20        Q.   Have you visited Summit County
21   at any point in connection with your work on
22   this engagement?
23        A.   I don't think I have, no.
24        Q.   Have you visited Cuyahoga
25   County at any point in connection with your

Page 579

1    work on this engagement?
2         A.   Yes.
3         Q.   When did you visit Cuyahoga
4    County?
5         A.   Sometime in July.
6         Q.   Is that when you met with
7    officials from Cleveland?
8         A.   Yes.
9         Q.   Did you do anything else on
10   that trip in connection with this engagement,
11   other than meet with officials from
12   Cleveland?
13        A.   Not that I recall.
14        Q.   Have you visited Summit County
15   for any reason since you were hired on this
16   engagement?
17        A.   No, I don't think so.
18        Q.   Have you visited --
19        A.   I'm sure I didn't. I haven't
20   been to Summit County.
21        Q.   Have you visited Cuyahoga
22   County for any reason since you were hired on
23   this engagement besides your meeting with the
24   Cleveland officials?
25        A.   No, I have not.

Page 580

1         Q.   Have you ever been to Summit
2    County?
3         A.   Ever? Oh, gosh. I visited a
4    number of counties in Ohio in some other work
5    I did for the Ohio government. I know I
6    would have been to Columbus. There were
7    others. I can't remember which of the others
8    I visited.
9         Q.   Other than your visit with the
10   Cleveland officials in July, have you ever
11   visited Cuyahoga County?
12        A.   Well, in some previous work I
13   did for the State of Ohio, I did some
14   traveling, and it was at least Columbus, but
15   I don't remember where else I would have
16   visited.
17        Q.   Is Columbus in Cuyahoga County?
18        A.   No, it's not.
19        Q.   What county is it in?
20        A.   Columbus. Is it Columbus
21   County? Sometimes they have the same name.
22        Q.   Do you know?
23        A.   I don't recall the county.
24        Q.   When were you first engaged on
25   this case?

48 (Pages 577 to 580)

Highly Confidential - Subject to Further Confidentiality Review

Page 581

1    A.    Oh, in this case?
2    Q.    Yes.
3    A.    You mean not the thing I was
4  referring to in the past, but --
5    Q.    This case.
6    A.    -- this case.
7          It would have been, I think,
8  maybe late May or June of 2018.
9    Q.    And when did you first start
10 working with Compass Lexecon in this
11 engagement?
12   A.    Soon after that.
13   Q.    So also May or June of 2018?
14   A.    Probably June.
15   Q.    Have you ever used a
16 prescription opioid?
17   A.    Yes, I have.
18   Q.    How many times?
19   A.    What I -- this was in
20 connection with hip surgery.  And I was given
21 some opioids to take home, which are
22 prescription opioids, that I took for about
23 two days, and then I stopped taking them.
24   Q.    What was the particular opioid
25 that you were prescribed?

Page 582

1    A.    I don't remember.
2    Q.    Was it prescribed by your
3  physician?
4    A.    Well, it was given to me -- you
5  know, I don't remember if I had it leaving
6  the hospital, whether I had to pick it up.  I
7  don't remember.  But it was prescribed by a
8  physician in either case.  It would have
9  been, I think, prescribed by my surgeon.
10   Q.    And you took it for two days?
11   A.    Yes.
12   Q.    What was the specific drug?
13   A.    I don't remember.
14         MR. SOBOL:  Objection.  Asked
15 and answered.
16 QUESTIONS BY MR. KEYES:
17   Q.    And why did you take it for
18 those first two days?
19   A.    Because it was prescribed for
20 me by my doctor.
21   Q.    What was it prescribed to you
22 to do, as you understood it?
23   A.    My understanding was that it
24 was prescribed in order to deal with pain.
25   Q.    Did you have pain before you

Page 583

1  took it?
2    A.    I had a lot of pain before I
3  had my surgery, and then, yeah, there was
4  kind of pain throughout the process, yeah.
5    Q.    Did the prescription opioid
6  that you took help with your pain?
7    A.    Well, you know, it's hard to
8  know.  You're asking, you know, if someone
9  takes a drug -- say you take an
10 antidepressant.  Did your antidepressant
11 help?  It's hard to know.  It's not an
12 individual question.
13         Maybe you don't -- still don't
14 feel that great, but how would you have felt
15 had you not taken the pill?  You don't really
16 know.
17         And so in this case I had some
18 pain.  If you asked me the counterfactual
19 question of how much pain I would have had
20 without the opioid, I really can't tell you.
21   Q.    You said you stopped taking it
22 after two days.
23   A.    Yes.
24   Q.    Did you have pain after you
25 stopped taking it?

Page 584

1    A.    I had pain throughout the
2  entire process, yes.
3    Q.    Did your pain increase after
4  you stopped taking the prescription opioid?
5    A.    No, it didn't.
6    Q.    Did you take something else to
7  address the pain when you stopped taking the
8  prescription opioid?
9    A.    I also was, I think,
10 requested -- or recommended to take, I think,
11 ibuprofen.  And I don't remember whether I
12 just continued on the regimen that was
13 recommended to me or whether I increased that
14 in response.  I don't remember.
15   Q.    Why did you stop taking the
16 prescription opioid after two days?
17   A.    I thought it was prudent,
18 frankly.
19   Q.    Why?
20   A.    Because opioids are dangerous
21 drugs, and I didn't want to take it any
22 longer than necessary.
23   Q.    Did you develop an addiction to
24 opioids?
25   A.    No.

49  (Pages 581 to 584)

Highly Confidential - Subject to Further Confidentiality Review

Page 585

1    Q.    How did you know that opioids
2  are dangerous drugs and you shouldn't take it
3  any longer than necessary?
4    A.    I was just aware of that from
5  my work as a health economist.  This would
6  have been, you know, two or three years ago,
7  so well before I got involved in this matter.
8    Q.    Is this the only time you used
9  a prescription opioid?
10    A.    As far as I know, yes.
11    Q.    You can't think of anything
12  before the hip surgery or after the hip
13  surgery where you used a prescription opioid?
14         MR. SOBOL:  Objection.  Asked
15  and answered.
16         THE WITNESS:  No, I didn't use
17  prescription opioids otherwise.
18  QUESTIONS BY MR. KEYES:
19    Q.    Regarding your quantification
20  of the opportunity costs in this case, do I
21  understand you correctly that if either
22  county government had decided to spend its
23  entire budget on opioid-related services,
24  then the opportunity costs that you describe
25  as damages here would be the entire budget of

Page 586

1  the county?
2         MR. SOBOL:  Objection.  Asked
3  and answered.
4         THE WITNESS:  It's kind of a
5  funny question, that among all the
6  things any of these divisions -- or in
7  this case I think you're asking about
8  the entire government -- would have
9  spent only on opioid-related
10  activities, so long as there are
11  alternative uses for those funds, even
12  if the government, in its wisdom,
13  decides only to devote the funds to
14  opioid-related activities, so long as
15  there are other things the government
16  could have done, then it's -- unless
17  I'm misunderstanding your question,
18  then, yes, it's the right measure of
19  opportunity cost.
20  QUESTIONS BY MR. KEYES:
21    Q.    And do I understand that under
22  your approach in quantifying the opportunity
23  costs, that if the county government had
24  decided to spend nothing on opioid-related
25  services, then there would be no opportunity

Page 587

1  costs?
2         MR. SOBOL:  Objection.
3         THE WITNESS:  Of course this
4  is --
5  QUESTIONS BY MR. KEYES:
6    Q.    And no damages using your
7  formulation?
8    A.    Well, this is also a funny
9  question, that they would have spent nothing.
10  But in the case in which they literally spent
11  nothing on opioid-related activities, then
12  there was no sacrifice of other uses of the
13  funds.  So the appropriate measure of
14  opportunity cost in that case would be zero.
15    Q.    And under your approach to
16  quantifying opportunity cost, if the county
17  government had decided to spend 50 percent of
18  its total budget on opioid-related services,
19  then you would say the damages are 50 percent
20  of the budget?
21         MR. SOBOL:  Objection.  Asked
22  and answered.
23  QUESTIONS BY MR. KEYES:
24    Q.    Is that correct?
25         MR. SOBOL:  You may answer, but

Page 588

1  I do object.
2         THE WITNESS:  Well, I think
3  I've spanned the responsibilities from
4  zero to 100 percent, and 50 percent
5  isn't qualitatively different.
6         If they spent -- and let's just
7  use a number.  If they spent
8  $10 million, it represents 50 percent
9  of their budget on opioid-related
10  activities, then that's the right
11  measure of opportunity cost.
12  QUESTIONS BY MR. KEYES:
13    Q.    And so under your approach to
14  measuring opportunity costs, which you say
15  are damages, the value of the damages depends
16  entirely on how much money the county decides
17  to spend on opioid-related services, using
18  your logic, right?
19         MR. SOBOL:  Objection.  Form.
20         You may answer.
21         THE WITNESS:  Well, in my
22  report I'm applying the, you know,
23  well-accepted concept of opportunity
24  cost.  And, yes, it kind of makes
25  sense as a -- you know, just from

50 (Pages 585 to 588)

Highly Confidential - Subject to Further Confidentiality Review

Page 589

1     common sense and certainly is
2     well-supported by economics that if a
3     household, or a government in this
4     case, spends a hundred dollars on
5     something, then they would have had
6     that hundred dollars to spend on
7     something else, and that's the right
8     measure of opportunity cost.
9             Unless I'm missing some
10    subtlety in your question, then the
11    answer is, yes, that's the opportunity
12    cost of the funds.
13    QUESTIONS BY MR. KEYES:
14        Q.    And you equate opportunity cost
15    with damages based on the instruction that
16    you received from plaintiffs' counsel,
17    correct?
18        A.    Well, the opportunity cost is
19    an economic concept, and so that's -- that
20    comes from me, you know, what is the
21    opportunity cost of these funds.  We
22    discussed that today.
23            I put damages in quotes because
24    that's -- on instruction from counsel, I
25    refer to them as damages.

Page 590

1        Q.    Because -- I want to make sure.
2    You quantify opportunity costs, right?
3        A.    Yes.
4        Q.    And you say the opportunity
5    costs are the cost consequences to the Summit
6    County and Cuyahoga County governments as a
7    result of these harms resulting from the
8    opioid epidemic, right?
9            MR. SOBOL:  Objection.  Asked
10    and answered.
11            THE WITNESS:  I think that's
12    correct, yes.
13    QUESTIONS BY MR. KEYES:
14        Q.    And you call those opportunity
15    costs damages because you were instructed to
16    do so by counsel, correct?
17        A.    Let me just make sure.
18            Upon instruction from counsel,
19    I refer to cost consequences as damages, yes.
20        Q.    Going back to your
21    prescription, what was -- how many days was
22    your prescription for for the prescription
23    opioid?
24        A.    Longer, but I don't remember.
25        Q.    What do you mean by "longer"?

Page 591

1    Seven days?
2        A.    More than two.
3        Q.    30 days?  Different?
4        A.    I don't know.  I don't
5    remember.
6        Q.    When you stopped taking the
7    prescription opioid after two days, did you
8    have additional pills left over?
9        A.    Yes.
10        Q.    What did you do with them?
11        A.    Threw them out.
12        Q.    Where?
13        A.    In the trash.
14        Q.    Okay.  How did you know to do
15    that?
16            MR. SOBOL:  Objection.  Assumes
17    a fact not in evidence.
18            THE WITNESS:  Well, I thought
19    it was --
20            MR. KEYES:  He just said he
21    threw them out.
22            THE WITNESS:  Yeah.
23            MR. KEYES:  I'm asking, how did
24    he know to throw them out.
25            MR. SOBOL:  But that assumes

Page 592

1    that he knew to throw them out, rather
2    than something else.
3    QUESTIONS BY MR. KEYES:
4        Q.    Did you throw them out on
5    purpose or by accident?
6        A.    They slipped out of my hand and
7    went in the trash, and they were gone.
8        Q.    No, for real.  Did you throw
9    them out by accident --
10        A.    No, I didn't.
11        Q.    -- or on purpose?
12        A.    I threw them out on purpose.
13        Q.    Okay.  How did you know to
14    throw them out on purpose?
15        A.    Well, as I mentioned a few
16    minutes ago, they're risky drugs, and I
17    thought that whatever pain I had was already
18    well-managed, that it didn't make sense to
19    pop these pills.
20        Q.    If you turn to page 44 of your
21    report.
22        A.    Yes.
23            THE WITNESS:  I'd like to get
24    some water.  We don't need to take a
25    break, but just get some water.

51 (Pages 589 to 592)

Highly Confidential - Subject to Further Confidentiality Review

Page 593

1          MR. KEYES:  Well, why don't we
2    take a break then.
3          VIDEOGRAPHER:  The time is
4    11:56 a.m., and we're off the record.
5          (Off the record at 11:56 a.m.)
6          VIDEOGRAPHER:  The time is
7    12:10 p.m., and we're on the record.
8    QUESTIONS BY MR. KEYES:
9        Q.    Professor McGuire, do you have
10   Exhibit Number 1 in front of you, which is
11   your report on damages?
12       A.    Yes, I do.
13       Q.    And are you at page 44?
14       A.    Yes, I am.
15       Q.    And in paragraph 76, you
16   identify what you claim are damages for
17   Cuyahoga County under Approaches 1 and 2?
18       A.    That's correct.
19       Q.    And you set forth those damages
20   in Table 4.12?
21       A.    That's correct.
22       Q.    And in paragraph 77, you
23   identify what you claim are damages for
24   Summit County under Approaches 1 and 2?
25       A.    That's correct.

Page 594

1        Q.    And you set forth those damages
2    in Table 4.13?
3        A.    That's correct.
4        Q.    And then you aggregate those
5    numbers in Table 4.14 on page 46, correct?
6        A.    That's correct.
7        Q.    Are those the damages
8    calculations that you performed?
9        A.    Yes.
10       Q.    Did you perform any other
11   damages calculations that are not set forth
12   in these tables?
13          MR. SOBOL:  You mean drafts?
14          MR. KEYES:  Of any sort.
15          MR. SOBOL:  Well, then I
16   instruct him not to answer.
17   QUESTIONS BY MR. KEYES:
18       Q.    Well, did you perform any other
19   damage calculations that are not set forth in
20   these tables where you are offering the
21   opinion that those are damages calculations?
22       A.    This is my opinion.  There's no
23   opinions I have other than what you see here.
24       Q.    Okay.  So the opinions that you
25   set forth regarding damages on pages 44, 45

Page 595

1    and 46 are the only opinions you have on
2    damages?
3          MR. SOBOL:  Objection.
4    QUESTIONS BY MR. KEYES:
5        Q.    The quantification of damages?
6          MR. SOBOL:  Objection.
7          THE WITNESS:  I believe that's
8    correct, yes.
9    QUESTIONS BY MR. KEYES:
10       Q.    Okay.  Then would you turn to
11   Appendix 4.E of your report.  It's towards
12   the very back.
13       A.    Okay.  Okay.
14       Q.    Are you on Appendix 4.E?
15       A.    I am, yes.
16       Q.    Okay.  4.E is titled "Damages
17   Due to Shipments."
18          What is Appendix 4.E showing,
19   if you know?
20       A.    I do know.  I tried to explain
21   this in the first couple of sentences there.
22          They show the -- as the title
23   of the tables say, the share of harms due to
24   all shipments.
25       Q.    I must be confused then,

Page 596

1    because I asked you earlier whether the
2    opinions that you set forth regarding damages
3    on pages 44, 45 and 46 are the only opinions
4    you have quantifying damages, and you said,
5    quote, "I believe that's correct, yes."
6          So what is Appendix 4.E
7    intended to show --
8        A.    Okay.
9        Q.    -- if not quantification of
10   damages?
11       A.    Okay.
12          MR. SOBOL:  Objection to the
13   form.
14          You can answer.
15          THE WITNESS:  This appendix was
16   prepared in order to -- just one
17   second.
18          All right.  These were prepared
19   as -- in response to what I needed for
20   the public nuisance report.
21   QUESTIONS BY MR. KEYES:
22       Q.    What do you mean?
23       A.    I mean in the public nuisance
24   report, which we haven't talked about yet,
25   but I think you obviously know what I'm

52 (Pages 593 to 596)

Highly Confidential - Subject to Further Confidentiality Review

Page 597

1  referring to, the charge there was slightly
2  different.  It was in order to assess harms
3  and quantify the harms to the counties from
4  the opioid crisis, from -- due to the
5  shipments, and these tables fed into those
6  opinions.
7       Q.    And when you say "quantify the
8  harms to the counties," you're talking about
9  to the communities or individuals in the
10  communities, not the governments, correct?
11      A.    It's not restricted to the
12  governments.
13      Q.    Okay.  So how are the
14  calculations in Appendix 4.E different than
15  calculations on pages 44, 45 and 46 in
16  your report?
17      A.    Okay.  These are different in
18  that they don't take account of the estimates
19  from the Rosenthal report of the share of
20  shipments due to misconduct.
21          MR. SOBOL:  Let the record
22      reflect that the "these" he was
23      pointing to, Appendix 4.E.
24          THE WITNESS:  The tables in
25      Appendix 4.E that we've been

Page 598

1      discussing.
2  QUESTIONS BY MR. KEYES:
3       Q.    And so which set of
4  calculations do you intend to show a jury:
5  the ones in pages 44 through 46 of your
6  report or the calculations in Appendix 4.E?
7          MR. SOBOL:  Objection.  Form.
8          THE WITNESS:  Well, I think it
9      depends on -- in response to what
10     question I'm asked.
11 QUESTIONS BY MR. KEYES:
12      Q.    Have you performed any other
13  what you call "damages calculations" besides
14  Appendix 4.E and what you list in pages 44
15  through 46 in your report?
16          MR. SOBOL:  Excluding drafts?
17          MR. KEYES:  Excluding drafts.
18          THE WITNESS:  Excluding drafts,
19      no, I don't think so.
20 QUESTIONS BY MR. KEYES:
21      Q.    Okay.  Would you turn to
22  Appendix 4.F.
23          You told me that the only
24  damages calculations you performed were
25  pages 44 through 46.  You said there were no

Page 599

1  others.
2          Then I showed you Appendix 4.E,
3  and you said, yes, those are calculations
4  needed for the nuisance report.
5          I said:  Did you perform any
6  other calculations of what you contend to be
7  damages.
8          You said:  No.
9          What is Appendix 4.F then?
10         MR. SOBOL:  Objection.  I don't
11     think he's asking you, but maybe he
12     is, to adopt his rendition of the
13     prior testimony, which I object to,
14     with the last sentence or -- you can
15     answer:  What is Appendix 4.F?
16         THE WITNESS:  Appendix 4.F is a
17     illustration of how the methodology
18     could be applied to a different
19     question, which would be the share of
20     misconduct attributable to -- this is
21     the distributors.
22 QUESTIONS BY MR. KEYES:
23      Q.    Based on what conduct of the
24  distributors?
25      A.    That's something that I didn't

Page 600

1  deal with in my report.
2       Q.    Okay.  How did you go about
3  arriving at the figures that are in
4  Appendix 4.F?
5       A.    This is, again, in the same way
6  as some of the other figures, that these
7  percentages were provided to me, and then I
8  applied them to the potentially affected
9  costs to get an estimate of damages.
10      Q.    You say "these percentages."
11  Are you referring to the percentages in Table
12  F.1?
13      A.    F.1 and F.2, yes.
14      Q.    Okay.  What about -- and did
15  you apply those percentages to dollar figures
16  to arrive at the dollars shown in Tables F.3
17  and F.4?
18      A.    That's correct, yes.
19      Q.    Okay.  So did you simply take
20  what you identified as the affected costs and
21  multiply them by the percentages in Table F.1
22  and F.2?
23          MR. SOBOL:  Objection.
24          THE WITNESS:  Yeah.  Yes.
25

53 (Pages 597 to 600)

Highly Confidential - Subject to Further Confidentiality Review

Page 601

1   QUESTIONS BY MR. KEYES:
2       Q.   Where did the percentages come
3   from that you used in these calculations and
4   which are set forth in Table F.1 and F.2?
5       A.   These came from Cutler report,
6   Appendix 3.J.
7       Q.   And how do you know that?
8       A.   I looked at it.
9       Q.   Where do you cite 3.J?  In
10  footnote 1?
11      A.   In footnote 1, yeah.
12      Q.   So you received these
13  percentages from Professor Cutler.
14          Did you independently arrive at
15  those percentages or just take the ones you
16  had received from Professor Cutler?
17          MR. SOBOL:  Object to form.
18          You may answer.
19          THE WITNESS:  This was what you
20      would call input from Professor
21      Cutler.
22  QUESTIONS BY MR. KEYES:
23      Q.   Did you do anything to test or
24  validate that input, namely the percentages
25  that Professor Cutler provided?

Page 602

1       A.   No, I depended on him for those
2   percentages.
3       Q.   What is Table 4 -- I'm sorry,
4   Appendix 4.G?
5       A.   Professor Rosenthal conducted
6   her empirical work in two ways, and what 4.G
7   refers to is the same kind of calculations
8   with different Rosenthal estimates.
9       Q.   And then did Professor Cutler
10  take those percentages from Professor
11  Rosenthal and do something?
12      A.   My understanding of what
13  Professor Cutler did was multiply some things
14  together.
15      Q.   What did he multiply, as you
16  understand it?
17      A.   The Rosenthal percent times his
18  own percent of harms due to shipments.
19  Rosenthal was misconduct of the shipments.
20  Cutler was shipments due to harms.  And to
21  attribute the share of harms due to
22  misconduct, he multiplies those two things
23  together.
24      Q.   And then he arrives at a
25  percentage?

Page 603

1       A.   And then he arrives at a
2   percentage.
3       Q.   So he starts with percentages
4   derived by Professor Rosenthal, correct?
5          MR. SOBOL:  Objection.
6          Go ahead.
7          THE WITNESS:  Not maybe start
8   with, but he has them.
9   QUESTIONS BY MR. KEYES:
10      Q.   Okay.  And what testing of
11  Professor Rosenthal's percentages did
12  Professor Cutler do?
13          MR. SOBOL:  Objection.  Scope.
14          THE WITNESS:  Well, that's
15  really a question for Professor Cutler
16  rather than Tom.
17  QUESTIONS BY MR. KEYES:
18      Q.   Do you know what testing, if
19  any, he did?
20          MR. SOBOL:  Objection.  Scope.
21          THE WITNESS:  Well, he would
22  have -- I'm a little reluctant to
23  speak for him subjectively.
24  QUESTIONS BY MR. KEYES:
25      Q.   I'm not asking you to speak for

Page 604

1   him.  I'm asking what you know.
2          What do you know about whether
3   Professor Cutler tested the percentages that
4   he received from Professor Rosenthal?
5          MR. SOBOL:  Objection.  Scope.
6          THE WITNESS:  He would have
7   reviewed them and determined that they
8   were reasonable from his perspective.
9   QUESTIONS BY MR. KEYES:
10      Q.   You say "would have."
11          Did he do that?
12      A.   Yes.
13          MR. SOBOL:  Objection.  Scope.
14  QUESTIONS BY MR. KEYES:
15      Q.   How do you know that?
16          MR. SOBOL:  Objection.
17          Just the -- not the content
18  but -- if counsel were present, but
19  the method.
20          THE WITNESS:  I'm sorry, I
21  didn't hear the objection.
22          MR. SOBOL:  So he just asked
23  you a question.  You could either say
24  it was by telephone or you could give
25  the content of the communication.

Highly Confidential - Subject to Further Confidentiality Review

Page 605

1      If counsel were there, you're
2  not to testify regarding what the
3  content of the communication was.
4      THE WITNESS:  Okay.  Yes, there
5  were, you know, more than one meeting
6  in which the analyses were reviewed.
7  QUESTIONS BY MR. KEYES:
8      Q.   Okay.  And then Professor
9  Cutler separately derived another set of
10 percentages, right?
11     A.   That's correct.
12     MR. SOBOL:  Objection.
13 QUESTIONS BY MR. KEYES:
14     Q.   And did you test that separate
15 second set of percentages?
16     A.   In the same sense that I
17 mentioned for Cutler and Rosenthal.
18     Q.   Okay.  And then you understand
19 that Professor Cutler took the first
20 percentages that he received from Professor
21 Rosenthal and multiplied them by a set of
22 percentages that he had calculated to arrive
23 at a third set of percentages, correct?
24     A.   Correct.
25     Q.   And that third set of

Page 606

1  percentages Professor Cutler provided to you?
2      A.   Correct.
3      Q.   And those are the percentages
4  that you use in Table G.1 and Table G.2?
5      A.   Correct.
6      Q.   To arrive at your figures?
7      A.   Correct.
8      Q.   Did you do any testing of the
9  percentages that you received from Professor
10 Cutler in order to do the calculations that
11 you performed in Appendix 4.G?
12     A.   Only in the sense that I've
13 mentioned so far.
14     Q.   Nothing else, correct?
15     A.   Well, it's a pretty general yes
16 answer, but...
17     Q.   You prepared a second report on
18 public nuisance, correct?
19     A.   That's correct.
20     Q.   And you also issued that report
21 on March 25, 2019?
22     A.   That's correct.
23     (McGuire Exhibit 6 marked for
24 identification.)
25

Page 607

1  QUESTIONS BY MR. KEYES:
2      Q.   I'm showing you what has been
3  marked as McGuire Exhibit 6.
4      Is this your report?
5      A.   Yes, it is.
6      Q.   Would you turn to page 81 of
7  McGuire Exhibit 6?
8      Are you there?
9      A.   I'm there.
10     Q.   There's a signature?
11     A.   I see it.
12     Q.   Is that your signature?
13     A.   Yes, it is.
14     Q.   And by that signature did you
15 intend to confirm that this is your report?
16     A.   Yes.
17     Q.   And it sets forth your
18 opinions?
19     A.   That's correct.
20     Q.   And your calculations?
21     A.   Yes.
22     Q.   And your work?
23     A.   Yes.
24     Q.   And your words?
25     A.   Yes.

Page 608

1      Q.   Did you write this opinion?
2      A.   Yes, I did.
3      Q.   Did anyone else write portions
4  of it for you?
5      A.   No.
6      Q.   Okay.  Who else was involved in
7  the preparation of this report?
8      A.   There would have been support
9  staff from the two firms we spoke about last
10 Tuesday:  Compass Lexecon and Greylock
11 McKinnon Associates.
12     Q.   And who from Compass Lexecon
13 assisted you on this report on public
14 nuisance?
15     A.   It would have been Hal Sider,
16 Alice Kaminski, Evan McKay, and someone I
17 forgot to mention last time that I feel a
18 little bad about is Heather Spang, who
19 assisted on both reports.  I just...
20     Q.   How do you spell Ms. Spang's
21 last name?
22     A.   S-p-a-n-g.
23     Q.   And what was her role on the
24 damages report, if you forget to mention her
25 last week?

55 (Pages 605 to 608)

Highly Confidential - Subject to Further Confidentiality Review

Page 609

1       A.      For a while, she was my first
2   contact if there was something to be done on
3   damages and something she did or she would
4   have enlisted other staff.
5       Q.      And what was her role with
6   respect to the substance of your damages
7   report?
8       A.      Well, I mean, her role was what
9   I just described.  If I needed something or
10  had a question, I would first go to her and
11  she would try to help me.
12      Q.      Did she interview people at
13  Summit County?
14      A.      She may have.  I'm not
15  100 percent sure.
16      Q.      Did she interview people at
17  Cuyahoga County?
18      A.      I'm not sure about that either.
19      Q.      How did you remember that
20  Heather Spang had a role in the damages
21  report when it didn't occur to you last
22  Tuesday?
23      A.      That's -- I don't know.  I
24  just -- I had the feeling when we talked last
25  Tuesday that I was forgetting somebody, and I

Page 610

1   felt bad about it.  And then I went back and
2   checked and I said, "Oh, gosh, I forgot
3   Heather."  So I just forgot.
4       Q.      What did you go back and check?
5       A.      E-mails.
6       Q.      E-mails with Compass Lexecon?
7       A.      Yeah.  Yes.
8       Q.      Okay.  Did anyone else help you
9   on your damages report besides the people
10  you've now mentioned:  Mr. Cider,
11  Ms. Kaminski, Mr. McKay, Ms. Spang?
12      A.      Erica Benton.
13      Q.      And Ms. Benton.
14              Anyone else?
15      A.      Not that I know of.  There may
16  have been other staff that they used, but I
17  don't know.
18      Q.      Okay.  And you mentioned a
19  second firm.
20              Can you spell that for the
21  court reporter?
22      A.      Yeah, it's -- the first name is
23  Greylock, G-r-e-y-l-o-c-k, and it's one word,
24  and then McKinnon, M-a-c-K i-n-n-o-n {sic},
25  Associates.

Page 611

1       Q.      And what was Greylock McKinnon
2   Associates' role on the damages report?
3       A.      Also to help support my report
4   writing.
5       Q.      What did Greylock McKinnon
6   Associates do to help support your report
7   writing?
8       A.      I would identify literature
9   that I needed to understand or information I
10  needed, and they would help me with that.
11      Q.      How many people were on the
12  Greylock McKinnon Associates team helping you
13  on the damages report?
14              MR. SOBOL:  You mean public
15  nuisance?
16              MR. KEYES:  No, damages report.
17              MR. SOBOL:  Okay.
18              THE WITNESS:  On the damages
19  report?
20  QUESTIONS BY MR. KEYES:
21      Q.      Yeah.
22              I asked you before, what did
23  Greylock McKinnon Associates do to help
24  support your report writing with respect to
25  the damages report.

Page 612

1       A.      Oh, okay.
2               MR. SOBOL:  We both flipped out
3   on that.
4               THE WITNESS:  Yeah, sorry.
5   QUESTIONS BY MR. KEYES:
6       Q.      Did Greylock McKinnon
7   Associates help you on the damages report?
8       A.      Much less.  There may have been
9   some --
10      Q.      Much less than Compass Lexecon
11  did --
12      A.      Yes.
13      Q.      -- on the --
14      A.      The damages report was
15  primarily Compass Lexecon.
16      Q.      So I'm asking:  What did
17  Greylock McKinnon Associates do to help you
18  on the damages report?
19      A.      Okay.  You know, part of what I
20  needed to do in the damages report is
21  understand the reports coming before me,
22  which -- by which I mean the Rosenthal report
23  and the Cutler report.
24              The empirical work in the
25  Rosenthal report was primarily supported by

56 (Pages 609 to 612)

Highly Confidential - Subject to Further Confidentiality Review

Page 613

1   staff at Greylock McKinnon, and I had
2   occasion to speak with that staff who, you
3   know, helped me understand these.
4       Q.    Who were the members of the
5   Greylock McKinnon Associates team that helped
6   you on the damages report?
7       A.    The fellow's name is Forrest,
8   and then McCluer, M-c-C-l-e-u-r {sic}.
9       Q.    Did anyone besides Mr. McCluer
10  from Greylock McKinnon Associates help you on
11  the damages report?
12      A.    I don't think so.
13      Q.    What was Greylock McKinnon
14  Associates' role on the nuisance report?
15      A.    There was more individuals
16  involved in supporting, but the role was, as
17  I described earlier, they would help me with
18  information and literature.
19      Q.    And who are the -- who are the
20  specific people at Greylock McKinnon
21  Associates who helped you on the nuisance
22  report?
23      A.    Okay.  There are three:  Renee
24  Rushnawitz, and she's one of the owners of
25  the firm; and Adrian Gonzalez, who's -- I

Page 614

1   think his title is analyst, probably; and
2   then Amanda Kreider, who also is an analyst
3   there.
4       Q.    And how did these three people
5   help you specifically on your public nuisance
6   report?
7       A.    They helped me track down
8   papers and studies.
9       Q.    Just get copies of them or read
10  them?
11      A.    Sometimes they read them.
12      Q.    And did they prepare summaries
13  of them for you?
14      A.    In some cases there were kind
15  of an indication of what the papers were
16  about, so then it would help me figure out
17  where I needed to read more in more detail.
18      Q.    And are these written
19  indications of what certain papers were
20  about?
21          MR. SOBOL:  Just yes or no.
22          THE WITNESS:  Yes.
23  QUESTIONS BY MR. KEYES:
24      Q.    Did you read these written
25  indications you got from the Greylock

Page 615

1   McKinnon Associates team?
2       A.    Mostly, yes.
3       Q.    Did you rely on them to decide
4   what to read yourself?
5       A.    They helped guide me into what
6   I should be looking at in more detail.
7       Q.    So did you rely on them in
8   order to do your work on this engagement?
9          MR. SOBOL:  Objection.
10          THE WITNESS:  Well, I used them
11      in the specific way I just answered.
12      They helped guide what I should pay
13      more attention to.
14  QUESTIONS BY MR. KEYES:
15      Q.    Now, were there times when you
16  read their -- what you describe as a written
17  indication and just use that and not go to
18  the original source?
19      A.    Not that I can think of.
20      Q.    Were there times when you got
21  the written indication of what the paper said
22  and then you actually went to the original
23  source and read it?
24      A.    Many times.
25      Q.    Every time?

Page 616

1          MR. SOBOL:  Objection.
2          THE WITNESS:  I don't know if I
3      would have sometimes decided something
4      was in one of their outlines that I --
5      for whatever reason I decided, no, I'm
6      not going to look at that.  I don't
7      know.  That probably happened.
8   QUESTIONS BY MR. KEYES:
9       Q.    Prior to this engagement, have
10  you ever offered an opinion that a public
11  nuisance existed?
12      A.    Not in any legal sense.
13      Q.    In any case?
14      A.    In any legal -- in some
15  litigation context?
16      Q.    Yeah.
17      A.    No, this is my first public
18  nuisance report.
19      Q.    And prior to this engagement,
20  have you ever offered opinions about the
21  magnitude of harms or costs associated with
22  the public nuisance?
23      A.    This is -- you're also asking
24  in a litigation context?
25      Q.    Yes.

57 (Pages 613 to 616)

Highly Confidential - Subject to Further Confidentiality Review

Page 617

1      A.   No, this is my first public
2  nuisance venture.
3      Q.   Prior to this engagement, have
4  you ever served as a testifying expert
5  offering opinions regarding a public
6  nuisance?
7           MR. SOBOL:  Objection.  Asked
8      and answered.
9           THE WITNESS:  No, this is my
10     first public nuisance venture.
11 QUESTIONS BY MR. KEYES:
12     Q.   Prior to this engagement, has
13 Compass Lexecon ever worked on a case
14 involving whether a public nuisance existed?
15     A.   I don't know.
16     Q.   Prior to this engagement, has
17 Compass Lexecon ever worked on a case
18 attempting to determine the magnitude of
19 harms or costs associated with the public
20 nuisance?
21     A.   I don't know.
22     Q.   Prior to this engagement, has
23 Greylock McKinnon Associates ever worked on a
24 case involving whether a public nuisance
25 existed?

Page 618

1      A.   I don't know.
2      Q.   Prior to this engagement, has
3  Greylock McKinnon Associates ever worked on a
4  case attempting to determine the magnitude of
5  harms or costs associated with the public
6  nuisance?
7      A.   I don't know.
8      Q.   In paragraph 21 of your report
9  on public nuisance --
10          Are you there?
11     A.   Yes, I'm here.
12     Q.   -- you discuss physicians being
13 influenced by, quote, "Detailing visits by
14 representatives of brand drug companies and
15 other promotional activities by drug
16 companies."
17     A.   Excuse me, I think I must be on
18 the wrong page.
19          Can you give me another --
20     Q.   Paragraph 21.
21     A.   Paragraph 21.  Okay.
22          Okay.
23     Q.   Are you there?
24     A.   Yes.
25     Q.   Okay.  In paragraph 21 you

Page 619

1  discuss physicians being influenced by,
2  quote, "Detailing visits by representatives
3  of brand drug companies and other promotional
4  activities by drug companies."
5           Do you see that?
6      A.   I see it.
7      Q.   Have you studied detailing
8  visits by manufacturing defendants to
9  physicians?
10     A.   Well, I've studied in a sense
11 of reading about it as part of my
12 professional --
13     Q.   Reading about them?
14     A.   Yes, that's what I said.
15     Q.   Okay.  Have you done any
16 independent study yourself?
17          MR. SOBOL:  Objection.
18 QUESTIONS BY MR. KEYES:
19     Q.   Of detailing visits?
20          MR. SOBOL:  Objection.
21          THE WITNESS:  Okay.  Well, I --
22 in sort of a general term, that's an
23 independent study.  It's me.  It's
24 reading.  That's a kind of study.
25          What I haven't done is

Page 620

1  independently assessed the empirical
2  connection between detailing visits
3  and sales or shipments.
4  QUESTIONS BY MR. KEYES:
5      Q.   You say in paragraph 21, quote,
6  "In the context of prescription opioids,
7  manufacturers were purveying biased
8  information."
9      A.   I'm sorry, you've lost me
10 again.
11     Q.   You say in paragraph 21, "In
12 the context of prescription opioids" --
13          MR. SOBOL:  It's third line
14     down.
15          THE WITNESS:  Okay.  Okay.
16 QUESTIONS BY MR. KEYES:
17     Q.   Okay.  Have you studied what
18 false information was disseminated by
19 manufacturers to physicians?
20     A.   Well, I'm relying on other
21 experts for making that determination.
22     Q.   Who?
23     A.   Well, as it says in the very
24 next sentence there, "As explained in the
25 expert report of Matthew Perri."

58 (Pages 617 to 620)

Highly Confidential - Subject to Further Confidentiality Review

Page 621

1    Q.    Anyone else?
2    A.    It's also covered in some
3    Kessler stuff and Dr. Parran stuff.
4         Q.    Have you studied what false
5    information was disseminated by manufacturers
6    to patients?
7              MR. SOBOL: Objection. Form.
8              You may answer.
9              THE WITNESS: Well, again, I
10   rely on the reports of these other
11   experts for that.
12   QUESTIONS BY MR. KEYES:
13        Q.    You're relying on the same
14   experts you just mentioned?
15   A.    Yes.
16        Q.    Have you studied what false
17   information was disseminated by manufacturers
18   to consumers?
19   A.    I'd be relying on the same
20   experts for that.
21        Q.    Have you studied what, quote,
22   "systematically and intentionally
23   misleading," quote, information was
24   disseminated by manufacturers to physicians?
25        A.    Is that a quote from me?

Page 622

1    Q.    Yes.  You used the phrase
2    "systematically and intentionally
3    misleading."
4    A.    And where might I find that
5    phrase?
6         Q.    Do you recall using that phrase
7    in your own report?
8    A.    It rings a bell, but I want
9    to -- I'd like to see where you're talking
10   about.
11        Q.    Do you see the sentence that I
12   read you a moment ago about purveying biased
13   information?
14   A.    Yes.
15        Q.    The very next sentence refers
16   to "The information doctors were being given
17   about the dangers of prescription opioids was
18   in most cases false and systematically and
19   intentionally misleading."
20        Do you see that?
21   A.    I do, yes.
22        Q.    Okay.  So have you studied
23   what, quote, "systematically and
24   intentionally misleading," quote, information
25   was disseminated by manufacturers to

Page 623

1    physicians?
2    A.    Well, on -- in this -- on
3    this -- for this statement I also rely on
4    Dr. Perri, as the footnote indicates.
5         Q.    Have you studied what, quote,
6    "systematically and intentionally
7    misleading," end quote, information was
8    disseminated by manufacturers to patients?
9    A.    The same.  I rely on
10   these three other experts for this material.
11        Q.    Have you studied what, quote,
12   "systematically and intentionally
13   misleading," end quote, information was
14   disseminated by manufacturers to consumers?
15   A.    In the same way, this is
16   something I rely on the three experts in my
17   report.
18        Q.    Will you turn to page 6 of your
19   report?
20        Are you there?
21   A.    I'm there, yeah.
22        Q.    In paragraph 10 you say, "I
23   will use the term 'defendants' shipments of
24   prescription opioids,' or sometimes just
25   'shipments,' as a shorthand for the activity

Page 624

1    the bellwether plaintiffs claim constitutes a
2    public nuisance regarding both the marketing
3    and distribution of prescription opioids by
4    defendants."
5         Do you see that?
6    A.    I do see that, yes.
7         Q.    And when you refer to "the
8    bellwether plaintiffs" here, you're referring
9    to Summit County and Cuyahoga County,
10   correct?
11   A.    That's correct.
12        Q.    And only those two counties,
13   correct?
14   A.    That's correct.
15        Q.    And when you refer to the
16   bellwether plaintiffs elsewhere in this
17   report, again, you're referring to Summit
18   County and Cuyahoga County, correct?
19   A.    That's correct.
20        Q.    And only those two counties?
21   A.    That's correct.
22        Q.    And so is it accurate based on
23   this statement to say that every time you
24   refer to, quote, "shipments," you are
25   referring to all of the marketing of

Highly Confidential - Subject to Further Confidentiality Review

Page 625

1   prescription opioids by all of the defendants
2   and all of the distribution of prescription
3   opioids by all the defendants?
4        A.    Can you ask me again?  I'm
5   sorry.
6        Q.    Yeah.
7        A.    I have --
8        Q.    I just showed you the language
9   in paragraph 10.
10       A.    Yeah.
11       Q.    I want to confirm:  Is it
12  accurate based on paragraph 10 to say that
13  every time you refer to, quote, "shipments,"
14  end quote, you're referring to all of the
15  marketing of prescription opioids by all of
16  the defendants and all of the distribution of
17  prescription opioids by all of the
18  defendants?
19       A.    Well, if by "marketing" you
20  mean "sales," then I think that's correct.
21       Q.    Would you turn to page 9 of
22  your report?
23       A.    Okay.
24       Q.    Are you there?
25       A.    I'm there.

Page 626

1        Q.    Okay.  In paragraph 16 you say,
2   "A public nuisance in economic terms is
3   generally observed when an action or set of
4   actions undertaken by a party or group of
5   parties gives rise to overwhelming negative
6   externalities."
7        Do you see that?
8        A.    I do, yes.
9        Q.    And you use this definition
10  when you opine that a, quote, "public
11  nuisance has resulted from the shipment of
12  prescription opioids into the bellwether
13  communities."
14       A.    And where am I reading when I
15  see that?
16       Q.    Well, that's on page 7,
17  paragraph 14.
18       A.    Okay.  So far so good.
19       Q.    So do you see that your
20  reference to "I am of the opinion, to a
21  reasonable degree of certainty in the area of
22  applied microeconomics, that a public
23  nuisance has resulted from the shipment of
24  prescription opioid products into the
25  bellwether communities"?

Page 627

1        Do you see that language?
2        A.    I see that, yes.
3        Q.    And when you offer that
4   opinion, referring to a public nuisance, you
5   are using the definition that you provided in
6   paragraph 16 on page 9, correct?
7        MR. SOBOL:  Objection.
8        THE WITNESS:  Well, I wouldn't
9   call this a definition.
10  QUESTIONS BY MR. KEYES:
11       Q.    What would you call it?
12       A.    It's a statement.
13       Q.    Okay.
14       A.    I'm not sure -- it doesn't say
15  definition.  It doesn't mean to be an
16  if-and-only-if statement.
17       Q.    Well, when you are talking in
18  this report about a public nuisance in
19  economic terms, are you using some different
20  standard for public nuisance than what you
21  describe here?
22       A.    Well, this --
23       Q.    Paragraph 16?
24       A.    The definition of public
25  nuisance that I'm using is set out here.

Page 628

1   It's probably -- a little bit earlier.  It
2   was given to me by counsel.  That's contained
3   in paragraph 7, which I then interpreted for
4   my purposes as containing three components.
5   And if you ask me for a definition, that's
6   what I would give you.
7        Q.    Okay.  So you're using the
8   legal definition that you say was provided to
9   you by plaintiffs' counsel as set forth in
10  paragraph 7?
11       MR. SOBOL:  Objection.
12       Mischaracterizes his testimony.
13       THE WITNESS:  Well, this is --
14       I was instructed to be guided by this
15       definition, which I was.  And then in
16       order to evaluate whether a public
17       nuisance existed, I used that
18       definition to identify three things
19       that I should study, and the three
20       things are on page 21.
21  QUESTIONS BY MR. KEYES:
22       Q.    Right.
23       So, Professor McGuire, when you
24  are offering the opinion that there is a
25  public nuisance, are you using the definition

60 (Pages 625 to 628)

Highly Confidential - Subject to Further Confidentiality Review

Page 629

1    provided by counsel in paragraph 7, or are
2    you using what you say is a public nuisance
3    in economic terms as described in
4    paragraph 16?
5            MR. SOBOL: Objection. Form.
6            THE WITNESS: See, I wouldn't
7        put it that way. I was guided by the
8        legal instruction. Paragraph 38 uses
9        the word "definition." So this is
10       what I would point you to in terms of
11       where it's defined. I consider the
12       elements of a definition, so this is
13       where the definition takes place.
14   QUESTIONS BY MR. KEYES:
15       Q.   So when you offer the opinion
16   that there was a public nuisance, are you
17   using the definition in paragraph 38, or are
18   you using what you describe as a public
19   nuisance in economic terms as set forth in
20   paragraph 16?
21           MR. SOBOL: Objection.
22       Mischaracterizes.
23           THE WITNESS: This is the --
24       paragraph 38 uses the word
25       "definition." So this is where I

Page 630

1        define what I'm -- definition --
2        definition of a public nuisance.
3        There it is. And this is what I do in
4        my report.
5    QUESTIONS BY MR. KEYES:
6        Q.   Okay. And going back to
7    paragraph 16 of your report --
8        A.   Okay.
9        Q.   -- where you describe what a
10   public nuisance in economic terms, do you
11   see that language?
12       A.   I do.
13       Q.   Okay. And you describe it as
14   something that gives rise to overwhelming
15   negative externalities?
16           MR. SOBOL: Objection. That's
17       not the whole sentence.
18           THE WITNESS: Well, the
19       sentence is what I say, but I'm sure
20       you have a question in mind.
21   QUESTIONS BY MR. KEYES:
22       Q.   You say, "A public nuisance
23   gives rise to overwhelming negative
24   externalities."
25           MR. SOBOL: Objection. That's

Page 631

1        not what the sentence says.
2            MR. KEYES: I already read what
3        the sentence says.
4    QUESTIONS BY MR. KEYES:
5        Q.   Do you disagree with the
6    concept that a public nuisance gives rise to
7    overwhelming negative externalities?
8        A.   The entire sentence says, "A
9    public nuisance in economic terms is
10   generally observed when an action undertaken
11   by a party or a group of parties gives rise
12   to an overwhelming negative externality."
13       Q.   So in economic terms, does a
14   public nuisance gives rise to overwhelming
15   negative externalities?
16           MR. SOBOL: Objection.
17       Mischaracterizes his testimony.
18           MR. KEYES: I'm not
19       characterizing anything. I'm asking
20       him a question.
21           MR. SOBOL: Well, leave your
22       words out of it.
23           MR. KEYES: You're the
24       economist.
25           MR. SOBOL: Leave your words

Page 632

1        out of it.
2            MR. KEYES: You're the
3        economist.
4    QUESTIONS BY MR. KEYES:
5        Q.   So in economic terms, does a
6    public nuisance give rise to overwhelming
7    negative externalities?
8            MR. SOBOL: Objection.
9        Mischaracterizes his testimony.
10           THE WITNESS: Generally
11       observed, when an action -- well, I
12       don't know if there's any point in
13       reading the sentence, which we've done
14       already, but you're changing the
15       meaning.
16   QUESTIONS BY MR. KEYES:
17       Q.   Does an action -- in economic
18   terms, does an action have an externality
19   even if it harms or imposes costs on just one
20   other person?
21           MR. SOBOL: Objection.
22           THE WITNESS: Let me see if I
23       follow.
24           Now we're -- you're not using
25       the word "public nuisance" in that

61 (Pages 629 to 632)

Highly Confidential - Subject to Further Confidentiality Review

Page 633

1     question.  You're asking a question
2     about whether an externality in
3     economic terms can fall on just one
4     other person?
5     QUESTIONS BY MR. KEYES:
6         Q.    Yes.
7         A.    The answer to that is yes.
8         Q.    Okay.  In economic terms, does
9     an action have an externality even if it does
10    not interfere with individuals in their
11    exercise of public rights?
12            MR. SOBOL:  Objection.  Form.
13            THE WITNESS:  Trying to make
14        sure I...
15            Does an action have an
16        externality even if it does not
17        interfere with exercise of public
18        rights?
19            So the answer to that question
20        is that, yes, an externality can
21        involve some other form of negative
22        effect on a second party that could
23        take different forms.
24            So I'm not sure whether it's
25        yes or no, but that's the way I would

Page 634

1         put it.
2     QUESTIONS BY MR. KEYES:
3         Q.    Well, when you describe a
4     public nuisance in paragraph 16, in economic
5     terms, you say, "When an action or set of
6     actions undertaken by a party or group of
7     parties gives rise to overwhelming negative
8     externalities," correct?
9             MR. SOBOL:  Objection.  That
10        mischaracterizes the testimony, and
11        it's been asked and answered about
12        four times.
13            I don't know what you don't
14        like about the word "generally."
15            THE WITNESS:  Well, that's the
16        sentence I say, but -- so I'm not sure
17        what the question is then.
18    QUESTIONS BY MR. KEYES:
19        Q.    And when you give that sentence
20    where you're describing a public nuisance in
21    economic terms, it says nothing about
22    interfering with a public right, correct?
23        A.    Well, I don't know.  It says
24    what it says here.
25        Q.    What do you mean you don't

Page 635

1     know?
2             Look at the -- look at
3     paragraph 16 and tell me whether it says
4     anything about interfering with public
5     rights.
6             MR. SOBOL:  Objection.
7             THE WITNESS:  Well, you
8         wouldn't need to ask that question if
9         you looked at paragraph 16.
10            No, it doesn't.
11    QUESTIONS BY MR. KEYES:
12        Q.    Okay.  It refers to giving rise
13    to overwhelming negative externalities.
14            What are the criteria in the
15    field of economics for determining whether
16    negative externalities are, quote,
17    "overwhelming," end quote?
18        A.    Well, there's no, I would say,
19    hard-and-fast definition of what overwhelming
20    means.  I guess, you know, it means very
21    large.
22            And where I do get around to
23    defining what a public nuisance is, in
24    paragraph 38 I use words that are, you know,
25    similar:  "continuing, long-lasting effects"

Page 636

1     and "significantly interfere."
2             That's what I was asked to
3     assess, and when the numbers run into the
4     billions for two counties, it satisfies my
5     definition of what overwhelming is.
6         Q.    I didn't ask about
7     paragraph 38.  I asked about the language you
8     used in paragraph 16.
9             In paragraph 16 in your report
10    that you say you wrote, you say, "A public
11    nuisance gives rise to overwhelming negative
12    externalities."
13            My question is:  What are the
14    criteria in the field of economics for
15    determining whether negative externalities
16    are, quote, "overwhelming"?
17            MR. SOBOL:  Okay.  First, I
18        object --
19    QUESTIONS BY MR. KEYES:
20        Q.    And you said, "very large."
21            Can you be more specific about
22    the criteria in the field of economics for
23    determining what, quote, "overwhelming"
24    means?
25            MR. SOBOL:  Well, first, I

62 (Pages 633 to 636)

Highly Confidential - Subject to Further Confidentiality Review

Page 637

1    object to the speech beforehand. I
2    don't know whether or not you're
3    asking the witness to adopt the speech
4    or not.
5         But I take it that what you are
6    asking is the end question alone,
7    which is, can you be more specific
8    about the criteria in the field of
9    economics for determining what
10   overwhelming means.
11        THE WITNESS: Well, I think I
12   interpret this question as another
13   version of the question I had earlier,
14   and as I said there, the term
15   "overwhelming" is one that doesn't
16   have a bright-line criteria of what is
17   overwhelming and not overwhelming. It
18   depends on the context.
19        What is significant, that's
20   where large is.
21        Continuing, that has to deal
22   with time.
23        Long-lasting, that has to deal
24   with how long negative effects
25   persist. And that was the charge I

Page 638

1    had here in order to evaluate that.
2         And when you say Table 1, I
3    thought, okay, yes, $20 billion in two
4    counties due to shipments, that meets
5    my criteria.
6    QUESTIONS BY MR. KEYES:
7         Q.    Can you point me to any sources
8    that you would rely on for identifying the
9    criteria for determining whether a negative
10   externality is overwhelming?
11        A.    I don't have anything more than
12   I told you in answer to the last question.
13        Q.    Okay. Would you turn to
14   page 37?
15        A.    Okay.
16        Q.    You have a section titled "The
17   Interference from Shipments was
18   Unreasonable."
19        Do you see that?
20        A.    I do, yeah.
21        Q.    Now, in offering your opinion
22   that the interference with shipments was
23   unreasonable, you offer the opinion that the
24   number of shipments was unreasonable,
25   correct?

Page 639

1         A.    Yeah, or -- well, I have a
2    criteria for what unreasonable means, which
3    is that -- what do I say here?
4         Q.    Well, are you able to tell me
5    without looking at your report?
6         A.    It helps me to be more specific
7    to look at the report, and it's right here,
8    so it won't take much time.
9         So it's not, I wouldn't say,
10   number. It's the shipments were unreasonable
11   if they're not justified by clinical need.
12   And it wasn't really a count that I looked
13   at. I looked at more of a share.
14        Q.    Okay. I want to be clear that
15   I understand the logic.
16        You say the interference from
17   shipments was unreasonable, right?
18        A.    Yes.
19        Q.    And you're talking about the
20   interference with a public right, correct?
21        A.    Well, I'm talking about exactly
22   what I said earlier, with interference with
23   applicable health and safety.
24        Q.    And you're saying that that
25   interference with those things was

Page 640

1    unreasonable because the volume of shipments
2    was unreasonable --
3         MR. SOBOL: Objection.
4    QUESTIONS BY MR. KEYES:
5         Q.    -- right?
6         MR. SOBOL: Objection.
7         THE WITNESS: That's close.
8    It's not exactly what I was doing.
9         But I have a definition of
10   unreasonable laid out in paragraph 62
11   on instruction from counsel --
12   QUESTIONS BY MR. KEYES:
13        Q.    Right, but that --
14        A.    -- and -- excuse me one sec.
15        I attempted to evaluate whether
16   that was satisfied by the large majority of
17   shipments.
18        Q.    To determine whether the
19   shipments were reasonable or not, using the
20   definition that you just described, which is
21   not justified by a clinical need?
22        A.    I think that's correct.
23        Q.    Okay. And you were instructed
24   by counsel to assume that unreasonable is, in
25   substance, not justified by clinical need,

63 (Pages 637 to 640)

Highly Confidential - Subject to Further Confidentiality Review

Page 641

1   correct?
2        MR. SOBOL: Objection.
3        THE WITNESS: Basically
4   correct, yes.
5   QUESTIONS BY MR. KEYES:
6        Q.   Okay. And then you opine that
7   shipments were unreasonable in this case
8   because most shipments were not used for
9   clinically justified treatment, correct?
10        A.   The large majority of shipments
11   were not used for scientifically, yes,
12   acceptable, yes, treatment.
13        Q.   Did you do any independent
14   examination of which shipments were used for
15   clinically justified treatment and which were
16   not?
17        A.   By which you mean in a
18   particular year in a particular county of all
19   the shipments, to sort them into two buckets?
20        Q.   Yes.
21        A.   No, I didn't do that.
22        Q.   Who did that?
23        A.   You mean classify or do you
24   mean -- I'm lost about -- excuse me. Go
25   ahead. Ask a question.

Page 642

1        Q.   Who studied which shipments
2   were used for clinically justified treatment?
3        A.   What I rely on and what I
4   understand about this, in the sense in
5   which -- there's a which here -- is there's a
6   count of opioid shipments that -- this comes
7   from the Rosenthal report -- in kind of
8   theoretical maximum could have been used for
9   appropriate medical treatment. That's -- the
10   result of that is a kind of share. It's
11   not as I -- I think I misunderstood the
12   first -- when -- the time you asked the
13   question.
14        It's not saying this shipment
15   yes; this shipment no. It was looking at of
16   all the shipments, how many of them could
17   have been justified by clinical criteria.
18        Q.   Well, did Professor Rosenthal
19   look at particular shipments to determine
20   whether they were justified -- clinically
21   justified treatment?
22        A.   This is where I make sure I'm
23   not confused again here.
24        By particular shipments,
25   what -- my understanding is that what she did

Page 643

1   not do was examine, you know, particular --
2        MR. SOBOL: John Doe.
3        THE WITNESS: -- shipments to a
4   particular patient or through a
5   particular distributor or through a
6   particular drugstore, but it was to
7   identify in a time period and a
8   location what share of the total
9   shipments could have been attributed
10   to appropriate clinical treatment.
11   QUESTIONS BY MR. KEYES:
12        Q.   What test did she use for that?
13        A.   She relied on -- primarily on
14   expertise of some of the medical experts.
15        Q.   Who?
16        A.   Primarily on Schumacher and
17   Dr. Parran.
18        Q.   Did you examine which shipments
19   for a particular time period in a particular
20   location could be attributed to appropriate
21   clinical treatment?
22        A.   Well, again, the which in the
23   sense of which patient, which outlet, I
24   didn't examine that, but I, you know, applied
25   the estimates from Rosenthal's report about

Page 644

1   the share of the total that could be put in
2   the clinically acceptable/not clinically
3   acceptable categories.
4        Q.   Okay. So are you relying on
5   Professor Rosenthal then to determine which
6   shipments are for clinically acceptable
7   treatment and which ones are not?
8        A.   Well, two nos there. Two nos
9   to this question.
10        It's which share, if you
11   would -- if you were to substitute which
12   share of shipments, then I would -- that
13   would be the kind of thing I investigated.
14   And it's not only on Professor Rosenthal.
15   There's other material that supports that.
16        Q.   Okay. Well, I just want to
17   make sure I understand.
18        You say that counsel instructed
19   you to use not justified by clinical need as
20   the standard for unreasonable, correct?
21        A.   Correct.
22        Q.   And you did not independently
23   examine the extent to which shipments were or
24   were not justified by clinical need, correct?
25        A.   Well, I took the same

64 (Pages 641 to 644)

Highly Confidential - Subject to Further Confidentiality Review

Page 645

1    percentages and the same other inputs that go
2    into that calculation.  I used Professor
3    Rosenthal's numbers for those.
4         Q.    Right.
5              So you're relying on Professor
6    Rosenthal's numbers --
7         A.    One sec, though.
8              What I did, read the backup
9    that she used, and I did, you know, study the
10   other parts of the Cutler and Gruber report
11   that also support that analysis.
12        Q.    Did you independently test
13   Professor Rosenthal's work or conclusions
14   about the share of shipments that were not
15   justified by clinical need?
16        A.    Well, in the sense of checking
17   it against the other evidence in the case,
18   such as the clinical opinions and the work by
19   Gruber and Cutler.
20        Q.    Have you done your own study of
21   the share of prescriptions that are
22   clinically appropriate?
23        A.    Well, what I did is in the
24   report, and I used Professor Rosenthal's
25   estimates in order to apply them to the

Page 646

1    bellwether counties.
2         Q.    And what is -- what standard
3    did Professor Rosenthal use to determine
4    which shares of shipments were clinically
5    justified treatment?
6         A.    She relied on medical experts
7    for that.
8         Q.    Which experts?
9         A.    Schumacher and Parran, I
10   believe.
11        Q.    Okay.  And does Professor
12   Rosenthal take a position in running those
13   calculations on whether prescription opioids
14   are a clinically appropriate use for chronic
15   pain?
16        A.    I would have to go back and see
17   exactly what she said about that.  She has a
18   qualifier in there, but she did not include
19   any estimates of chronic pain in her
20   clinically appropriate categories.
21        Q.    If people do obtain pain relief
22   from chronic pain when they use prescription
23   opioids, would that change your opinion --
24        MR. SOBOL:  Objection.
25

Page 647

1    QUESTIONS BY MR. KEYES:
2         Q.    -- as to which share of
3    shipments were for clinically justified
4    treatment?
5              MR. SOBOL:  Objection.
6              You may answer.
7              THE WITNESS:  No.
8    QUESTIONS BY MR. KEYES:
9         Q.    Why not?
10        A.    Well, my opinion about this
11   has, I think, a pretty good basis, and it
12   doesn't depend on a -- you know, a single
13   aspect of the situation.
14             I would say in summary that the
15   weight of clinical evidence is that, in fact,
16   there's no studies that I'm aware of that
17   demonstrate that opioids are effective for
18   long-term clinical pain.
19        Q.    What is the FDA --
20             MR. SOBOL:  He hasn't finished
21   his answer.
22             THE WITNESS:  So that's -- so
23   that's one.
24             You see that in the CDC, and
25   you see that in the medical experts as

Page 648

1    well.  That's number one.
2              Number two is the CDC and the
3    medical experts and other papers say
4    these are dangerous drugs.  That's
5    number two.
6              And number three, in almost all
7    cases, opioids are a third-line
8    treatment for long-term chronic pain.
9              Just one -- I'm wrapping up
10   here.
11             So you put those statements
12   together, and they provide a strong
13   basis for saying that the share of
14   appropriate treatments in the chronic
15   pain category is going to be really
16   small.
17   QUESTIONS BY MR. KEYES:
18        Q.    What does the FDA say about
19   whether prescription opioids can be used for
20   chronic pain?
21             MR. SOBOL:  Objection.
22             THE WITNESS:  I'm not sure.
23   QUESTIONS BY MR. KEYES:
24        Q.    Did you look into that?
25        A.    Well, for that sort of thing is

65 (Pages 645 to 648)

Highly Confidential - Subject to Further Confidentiality Review

Page 649

1   what I rely on medical experts for, to read
2   labels and tell me what is the appropriate
3   and not appropriate categories.
4       Q.   Does Medicare cover
5   prescription opioids?
6           MR. SOBOL:  Objection.
7           THE WITNESS:  Yes, I think they
8   do.
9   QUESTIONS BY MR. KEYES:
10      Q.   Does Medicare cover
11  prescription opioids for chronic pain?
12          MR. SOBOL:  Objection.
13          THE WITNESS:  Well, normally
14      when you write a prescription as a
15      doctor, you don't even put the
16      diagnosis down.  So the prescription
17      would go through the system, as it
18      were, without a diagnosis.
19  QUESTIONS BY MR. KEYES:
20      Q.   Does Medicare cover
21  prescription opioids that are specifically
22  prescribed for chronic pain?
23          MR. SOBOL:  Objection.
24          THE WITNESS:  Well, Medicare
25      wouldn't know.  They don't get a

Page 650

1       diagnosis on a claim form.
2   QUESTIONS BY MR. KEYES:
3       Q.   Well, you can say that.  That's
4   not my question.
5           My question was:  Does Medicare
6   cover prescription opioids that are
7   specifically prescribed for chronic pain?
8           MR. SOBOL:  Objection.  Asked
9       and answered.
10          THE WITNESS:  Let me try to
11      answer it another way.
12          If a physician were to
13      prescribe a prescription opioid for a
14      stomach upset or for a sore foot, that
15      physician could write that
16      prescription and it would be filled at
17      the pharmacy.  Medicare does not know
18      what the particular indication is that
19      the doctor is prescribing that opioid
20      for.
21  QUESTIONS BY MR. KEYES:
22      Q.   Has Medicare made a
23  determination as to whether it will cover
24  prescriptions for opioids that are expressly
25  for the purpose of treating chronic pain?

Page 651

1           MR. SOBOL:  Objection.  Asked
2       and answered.
3           THE WITNESS:  I'm not sure.
4   QUESTIONS BY MR. KEYES:
5       Q.   Did you look into that?
6       A.   That's also something that I --
7   that's obviously a clinical question of what
8   is the appropriate use of opioids, and that's
9   something that there are other experts who
10  will be in a good position to talk about.
11      Q.   Has Medicaid made a
12  determination as to whether it will cover
13  prescriptions for opioids that are expressly
14  for the purpose of treating chronic pain?
15          MR. SOBOL:  Objection.
16          THE WITNESS:  Well, Medicaid is
17      in the same position as Medicare when
18      it comes to what information it knows
19      as a claim comes in for a
20      prescription.
21          So if a physician in Medicaid
22      were to prescribe opioids totally
23      inappropriately, Medicaid wouldn't
24      know that.
25          So they're not in a position to

Page 652

1       make a determination claim by claim
2       what is being -- the use of the opioid
3       is for.
4   QUESTIONS BY MR. KEYES:
5       Q.   My question was:  Has Medicaid
6   made a decision to cover opioids that are
7   written expressly for the purpose of treating
8   chronic pain?
9           MR. SOBOL:  Objection.  Asked
10      and answered.
11          THE WITNESS:  I was answering
12      that question in the context of a
13      particular prescription and pointing
14      out that Medicaid, which -- are we
15      talking about in the abstract, is not
16      in a position to make that
17      determination claim by claim.
18          Medicaid is not just one thing
19      in the United States.  There are 50
20      flavors, depending on the state, and
21      even in the state there are different
22      plans that participate in Medicaid,
23      that have formularies that they
24      determine on their own.
25          So it's --

66 (Pages 649 to 652)

Highly Confidential - Subject to Further Confidentiality Review

Page 653

1    QUESTIONS BY MR. KEYES:
2        Q.    Have you looked at the
3    formularies for any Medicaid or Medicare
4    plan?
5        A.    As part of this, no.  That's
6    also the -- within the clinical realm of
7    determining what is the appropriate use of
8    opioids.
9        Q.    Have any private insurers made
10   a decision to cover opioids that are written
11   expressly for the purpose of treating chronic
12   pain?
13           MR. SOBOL:  Objection.
14           THE WITNESS:  You know, it's
15       not so different for the private
16       insurers either.  A claim comes in;
17       they don't have a diagnosis on the
18       claim.  So it's -- they're not in a
19       position on a claim-by-claim basis to
20       make a determination of whether the
21       use of the opioid is appropriate or
22       inappropriate.
23   QUESTIONS BY MR. KEYES:
24       Q.    My question was: Have any
25   private insurers made a decision to cover

Page 654

1    opioids that are written expressly for the
2    purpose of treating chronic pain?
3           MR. SOBOL:  Objection.  Asked
4       and answered.
5           THE WITNESS:  Well, it's not
6       possible on a claim-by-claim basis.
7       And then, you know, we have many
8       private insurers in the United States,
9       so I'm really not in a position to
10      answer.
11   QUESTIONS BY MR. KEYES:
12       Q.    Have you looked at the
13   formulary for any private insurer as to
14   whether it covers prescription opioids for
15   chronic pain?
16       A.    Now, this is the realm of the
17   P & T committee at the health plan, which is
18   a clinically driven decision.  And for me as
19   an economist, I'm very happy to rely on the
20   expert, the medical experts, to tell me about
21   this.
22       Q.    In your report regarding the
23   public nuisance, you are attempting to
24   quantify costs incurred by communities and
25   individuals as a result of the opioid

Page 655

1    problem, correct?
2        A.    That's generally correct, yes.
3        Q.    Okay.  Do you understand that
4    individuals in these communities are not
5    parties to this lawsuit?
6        A.    Well, my understanding is the
7    plaintiffs are the county governments.
8        Q.    Okay.  So do you understand
9    that individuals in Summit County and
10   Cuyahoga County are not parties to this
11   lawsuit?
12       A.    Well, I understand the
13   plaintiffs to be the two county governments.
14       Q.    And not individuals?
15           MR. SOBOL:  Objection.  Asked
16       and answered.
17           THE WITNESS:  And, yes, in that
18       those are the plaintiffs, period.
19   QUESTIONS BY MR. KEYES:
20       Q.    Okay.  And do you understand
21   that the communities in the Summit County and
22   Cuyahoga County are not parties to this
23   lawsuit?
24           MR. SOBOL:  Objection.  Form.
25           THE WITNESS:  In the same way,

Page 656

1       the same answer.  I understand the
2       plaintiffs to be the two county
3       governments, period.
4    QUESTIONS BY MR. KEYES:
5        Q.    So when you attempted to
6    quantify the costs in the areas of mortality,
7    morbidity, NAS, crime and child maltreatment,
8    you are quantifying the costs borne by
9    individuals and communities in those areas,
10   correct?
11       A.    They would be borne by a range
12   of actors.  That would include the
13   governments, but also would include
14   individuals and other members of the
15   community.
16       Q.    You've done specific
17   calculations of the costs borne by Summit
18   County and Cuyahoga County, correct?
19       A.    I've done in my first report,
20   or my damages report, I did do specific
21   calculations of that, yes, that's correct.
22       Q.    Right.
23           But I'm not asking about the
24   damages report now.  I'm asking about the
25   work you did in the public nuisance report.

67 (Pages 653 to 656)

Highly Confidential - Subject to Further Confidentiality Review

Page 657

1    A.    Okay.  I understand.
2    Q.    Okay.  And there, where you are
3  quantifying costs in the five areas I listed,
4  you were quantifying the costs that are borne
5  by individuals or communities other than
6  Summit County and Cuyahoga County
7  governments?
8    A.    Well, you know, I wouldn't
9  necessarily say that.
10    Q.    Because?
11        MR. SOBOL:  Objection.
12        THE WITNESS:  Because I don't
13    think it's true.
14  QUESTIONS BY MR. KEYES:
15    Q.    Where have you in your report,
16  your public nuisance report, have you
17  quantified the costs borne by the Summit
18  County or Cuyahoga County governments as a
19  result of the public nuisance that you say
20  exists?
21    A.    Where in my report have I
22  quantified those things?
23    Q.    Yes.
24    A.    The most obvious component of
25  costs that I quantify that are borne by the

Page 658

1  county governments are in the sixth category
2  that I apply, which is an importation from my
3  earlier report of the damages associated with
4  shipments as opposed to the shipments'
5  misconduct attribution.
6        That doesn't mean that some of
7  the costs in the other categories would not
8  have been borne by the county government.
9    Q.    Professor McGuire, at this
10  point we may be seeking a third day from the
11  special master because you're not answering
12  the questions that are posed, and you keep
13  giving the same kinds of speeches.
14        So we've already covered what
15  you quantified as the costs borne by the
16  Cuyahoga County and Summit County
17  governments.  That's in your damages report,
18  correct?
19        MR. SOBOL:  Objection.
20        The speech should be completely
21    ignored, including the implicit
22    threat, if it's an effort to try and
23    manipulate the truthfulness of your
24    testimony and should be disregarded.
25        You can answer, however --

Page 659

1        THE WITNESS:  I'll focus on the
2    question.
3        MR. SOBOL:  -- the question.
4  QUESTIONS BY MR. KEYES:
5    Q.    You already quantified what you
6  said are the costs borne by Summit County and
7  Cuyahoga County, and you set forth those
8  calculations in your damages report, correct?
9        MR. SOBOL:  Objection.  Asked
10    and answered.
11        THE WITNESS:  Well, the costs
12    here are ones due to shipments, not
13    due to misconduct.
14        So report 1, Exhibit 1,
15    damages, assessed costs due to
16    misconduct.
17        This is a different
18    calculation.  And all I was answering
19    in response to your question was
20    clarifying that as a starting point
21    for how I -- for the -- you know,
22    where these costs would land.
23        And that was not a definitional
24    statement, it wasn't a repetition what
25    I did in the first report.  It's an

Page 660

1    explanation of the differences between
2    what was done in the first report and
3    this report.
4  QUESTIONS BY MR. KEYES:
5    Q.    And those costs that you say
6  were borne by the Summit County and Cuyahoga
7  County governments you say were imported into
8  your public nuisance report?
9        MR. SOBOL:  Objection.  Asked
10    and answered.
11  QUESTIONS BY MR. KEYES:
12    Q.    Correct?
13    A.    Well, go on.  I mean...
14    Q.    Well, go to page 80 of your
15  report.
16        Are you there?
17    A.    Yes.
18    Q.    You have a Table 13.
19        Do you see that?
20    A.    Yes.
21    Q.    Okay.  You have a summary of
22  monetary value of harms due to prescription
23  opioid shipments based on Dr. Cutler's
24  Approach 2.
25    A.    Right.

68  (Pages 657 to 660)

Highly Confidential - Subject to Further Confidentiality Review

Page 661

1   Q.   Okay?
2        Now, go to the prior page.
3        You have a Table 12, correct?
4   A.   Yes.
5   Q.   Summary of harms due to
6   shipments from 2006 to 2016, correct?
7   A.   That's correct.
8   Q.   And in each of these two
9   tables, Tables 12 and Table 13, you have six
10  different forms of harm, correct?
11  A.   Correct.
12  Q.   The sixth form of harm in each
13  table is titled "Bellwether Government
14  Costs," correct?
15  A.   That's correct.
16  Q.   And you're referring to Summit
17  County and Cuyahoga County, correct?
18  A.   That's correct.
19  Q.   And the numbers that you list
20  here in each chart as being bellwether
21  government costs are calculations that you
22  imported from your damages report?
23       MR. SOBOL:  Objection.
24       THE WITNESS:  You will find --

Page 662

1   QUESTIONS BY MR. KEYES:
2   Q.   Correct?
3        MR. SOBOL:  Objection.
4        THE WITNESS:  You will find the
5   basis for these numbers in my damages
6   report.
7   QUESTIONS BY MR. KEYES:
8   Q.   Okay.  Turning to the fifth --
9   the first form of harm, mortality deaths,
10  correct?
11       MR. SOBOL:  Well, in these two
12  tables?
13       MR. KEYES:  Yes.
14  QUESTIONS BY MR. KEYES:
15  Q.   The costs that you are
16  quantifying regarding mortality deaths are
17  costs borne by individuals or communities,
18  not costs borne by Summit County or Cuyahoga
19  County, correct?
20  A.   See, that's not correct.
21  Q.   Where do you show the mortality
22  deaths form of harm as causing specific costs
23  borne by Summit County or Cuyahoga County?
24       MR. SOBOL:  Objection.
25       THE WITNESS:  I didn't do that.

Page 663

1   I didn't -- in each of these other
2   harm categories --
3        MR. SOBOL:  There's no
4   question.  You answered the question.
5        MR. KEYES:  Don't interrupt
6   him.  Let him finish his answer.
7        Keep going.
8        MR. SOBOL:  Well, I think he
9   did, and then he started volunteering
10  stuff.
11       MR. KEYES:  No, sir.  He's
12  answering the question.  Please stop
13  interrupting him when he says
14  something that perhaps you don't like.
15       Continue, please.
16       MR. SOBOL:  I love it.  I love
17  everything he has to say.  I just
18  don't want him volunteering things
19  when I'm hungry and want to go to
20  lunch.
21       But go ahead --
22  QUESTIONS BY MR. KEYES:
23  Q.   You were saying?
24       MR. SOBOL:  -- Professor
25  McGuire.

Page 664

1        THE WITNESS:  I was saying, in
2   these categories I estimated the total
3   costs without necessarily attributing
4   them to who bore those costs.
5   QUESTIONS BY MR. KEYES:
6   Q.   Okay.  So in your Tables 12 and
7   13, when you are talking about the form of
8   harm being mortality and deaths, have you
9   quantified the portion of the costs you've
10  calculated as being attributable or borne by
11  Summit County or Cuyahoga County government?
12  A.   That was not my assignment
13  here.  And if I can volunteer an example, at
14  the risk of irritating my counsel, with
15  respect to something like NAS costs --
16  Q.   My question has nothing to do
17  with NAS.  I'm asking about mortalities and
18  deaths.  Answer the question posed.
19       MR. SOBOL:  Now you're
20  interrupting him.
21       MR. KEYES:  I am, because he's
22  talking about something that the
23  question didn't address at all.
24       MR. SOBOL:  All right.  We're
25  going to take a lunch.  We're going to

69 (Pages 661 to 664)

Highly Confidential - Subject to Further Confidentiality Review

Page 665

1     take lunch.
2     QUESTIONS BY MR. KEYES:
3        Q.    In Tables 12 and 13 --
4        A.    I don't mind.  I don't mind.
5     Let's finish this.
6        Q.    In Tables 12 and 13, when
7     you're talking about --
8        A.    Let's talk about morbidity.
9        Q.    -- the form of harm being
10    mortality and death, have you quantified
11    anywhere in your report --
12           MR. SOBOL:  You got overridden
13           on it.  Start the question again.  You
14           got overridden.  Just start the
15           question again.
16           He wants a clean question.  He
17           wants to continue.  Start with a clean
18           question.
19    QUESTIONS BY MR. KEYES:
20       Q.    In Tables 12 and 13, when you
21    were talking about the form of harm being
22    mortality and deaths, have you quantified
23    anywhere in your report the portion of those
24    costs that you say were borne by Summit
25    County or Cuyahoga County governments?

Page 666

1            MR. SOBOL:  Objection.  Asked
2            and answered.
3            THE WITNESS:  I thought in
4            previous you had also asked about
5            morbidity.  Well, I was going to give
6            you an example of morbidity.  This
7            will clear it up in one minute.
8            With respect to morbidity
9            costs, what I estimate are --
10    QUESTIONS BY MR. KEYES:
11       Q.    I didn't ask about morbidity,
12    sir.  I've asked you about mortality and
13    deaths.
14           MR. SOBOL:  I told you --
15    QUESTIONS BY MR. KEYES:
16       Q.    Okay.  Please answer the
17    question.
18       A.    Okay.
19           MR. SOBOL:  So which question?
20    QUESTIONS BY MR. KEYES:
21       Q.    In Tables 12 and 13, when you
22    were talking about the form of harm being
23    mortality and deaths, have you quantified
24    anywhere in your report the portion of those
25    costs that you say were borne by the Summit

Page 667

1     County or Cuyahoga County governments?
2            MR. SOBOL:  Objection.  Asked
3            and answered.
4            THE WITNESS:  Okay.  This
5     question is part of a discussion we've
6     had about whether or not the, as I
7     understand it, the bellwether
8     government costs line is a complete
9     identification of the cost borne by
10    the plaintiffs in the categories that
11    I've put forth in these tables.
12           The answer to that is, no, it's
13    not the case.
14           And you then asked me, have I
15    done a specific allocation of some of
16    these costs to the plaintiffs.
17           And what I did was to look at
18    the total.  But if you are familiar
19    with what the components of that total
20    are, you would see some of those would
21    be borne by the governments.  You
22    know, for example, some of the people
23    who die would have been government
24    employees.  Some of the other people
25    who die would have paid taxes to the

Page 668

1     governments.
2            So the total lost productivity,
3     which is a component of the value of
4     statistical life, is a very good
5     example of a cost that is borne by
6     different agents.
7            Now, my assignment, as I
8     understood it, was to give the total.
9     You're asking if that total contains
10    things by the governments.  The answer
11    is yes.
12    QUESTIONS BY MR. KEYES:
13       Q.    No, I didn't ask that.  I
14    didn't ask whether the total contains that.
15           I asked you specifically:  Have
16    you quantified anywhere in your report the
17    portion of those costs that you say were
18    borne by the Summit County or Cuyahoga County
19    governments specific to mortality and deaths
20    anywhere in your report?
21           MR. SOBOL:  Objection.  Asked
22    and answered.
23           THE WITNESS:  Okay.  I just
24    gave what I thought is an important
25    and thorough answer to that question,

70  (Pages 665 to 668)

Highly Confidential - Subject to Further Confidentiality Review

Page 669

1      which is that these cost categories
2      contain many components. And what I
3      did is estimate the total. And those
4      components would be borne by -- some
5      for the individual, some for other
6      members of the community, some by the
7      county governments.
8           What I did not do, which is a
9      more direct answer to your question,
10     is I didn't allocate those costs in
11     each of these categories to any of
12     those agents.
13  QUESTIONS BY MR. KEYES:
14     Q.    And the same is true for
15  mortality deaths, morbidity, babies with NAS,
16  crimes and child maltreatment, correct?
17          MR. SOBOL: Objection. Form.
18     Compound.
19          THE WITNESS: The same is true
20     with respect to my work in this
21     report, which was to identify the
22     total of those costs and then -- I
23     mean, in answer to your question, some
24     of those costs do fall on different
25     agents, including the governments, but

Page 670

1      I didn't attempt to break out the --
2      what you would call in economic terms
3      the incidence of those costs according
4      to the various actors.
5           MR. KEYES: Okay. Why don't we
6      take a break for lunch.
7           VIDEOGRAPHER: The time is
8      1:24 p.m., and we're off the record.
9      (Off the record at 1:24 p.m.)
10          VIDEOGRAPHER: The time is
11     2:08 p.m., and we're on the record.
12  QUESTIONS BY MR. KEYES:
13     Q.    Professor McGuire, do you have
14  McGuire Exhibit 6 in front of you, which is
15  your report regarding nuisance?
16     A.    Yes, I do.
17     Q.    Is it accurate to say that in
18  this report you attempt to measure the costs
19  of harms that result from the use or abuse of
20  all opioids in Summit County and Cuyahoga
21  County?
22     A.    No, that wouldn't be accurate.
23     Q.    Do you attempt to distinguish
24  between the costs attributable to the use or
25  abuse of illicit opioids versus the use or

Page 671

1      abuse of prescription opioids?
2      A.    Well, I'm interested in harms
3      and costs in either case.
4      Q.    In your report, do you attempt
5  to distinguish between the costs attributable
6  to the use and abuse of illicit opioids
7  versus the use and abuse of prescription
8  opioids?
9           MR. SOBOL: Objection. Asked
10     and answered.
11          THE WITNESS: I'm interested in
12     the sum of the effects of both of
13     those.
14  QUESTIONS BY MR. KEYES:
15     Q.    Okay. But in your
16  calculations, do you break out the costs that
17  you quantify between the costs that are
18  attributable to the use or abuse of illicit
19  opioids versus the costs resulting from the
20  use or abuse of prescription opioids?
21          MR. SOBOL: Objection. Asked
22     and answered.
23          THE WITNESS: Generally I just
24     look at the total.
25

Page 672

1  QUESTIONS BY MR. KEYES:
2      Q.    Okay. In fact, if you look at
3  paragraph 39 on page 22...
4      A.    I'm there.
5      Q.    The last paragraph you say, "As
6  a reminder, the harms I attribute to
7  shipments of prescription opioids includes
8  harms due to the subsequent use of other
9  opioids, e.g., heroin, fentanyl, caused by
10  the shipments."
11          Correct?
12     A.    That's correct.
13     Q.    Okay. So anywhere in your
14  report do you separate out the costs that you
15  quantify based on harms resulting from the
16  use or abuse of illicit opioids from the use
17  or abuse of prescription opioids?
18          MR. SOBOL: Objection. Asked
19     and answered several times now.
20          THE WITNESS: I think I just
21     look at the totals.
22  QUESTIONS BY MR. KEYES:
23     Q.    Anywhere in your report do you
24  separate out the costs that you quantified
25  based on harms resulting from the use or

71 (Pages 669 to 672)

Highly Confidential - Subject to Further Confidentiality Review

Page 673

1      abuse of prescription opioids that were
2      diverted from the harms resulting from the
3      use or abuse of prescription opioids that
4      were used by the people to whom they were
5      prescribed?
6          A.    I understand what you mean by
7      diverted.
8              Do you mean -- it's hard to
9      give a clear answer to that question.
10             I looked at the total about
11     whether the harm came from a diversion or
12     whether the harm came from the direct
13     consumption of the person who was prescribed
14     the opioids.
15         Q.    You looked at the total,
16     including both of those categories?
17         A.    It could have been in either
18     category, yes.
19         Q.    Did you separately measure the
20     costs of the harms resulting from people
21     using or abusing prescription opioids that
22     were diverted as opposed to prescription
23     opioids that were used by the people to whom
24     they were prescribed?
25         A.    Yeah.

Page 674

1              MR. SOBOL: Objection. Asked
2      and answered.
3              THE WITNESS: I think it's the
4          same question, but I just looked at
5          the total, which could have been due
6          to either diversion or consumption of
7          the person to whom it was prescribed.
8      QUESTIONS BY MR. KEYES:
9          Q.    Do you separately measure the
10     cost of the harms resulting from people using
11     or abusing prescription opioids that were
12     either made or distributed by the defendants
13     versus harms resulting from people using or
14     abusing prescription opioids that were made
15     or distributed by entities other than the
16     defendants?
17         A.    I don't attempt to distinguish
18     those made or distributed by the defendants
19     from shipments that were made or distributed
20     by those who might not have been a defendant.
21         Q.    Do you, anywhere in your
22     report, Exhibit Number 2, measure the costs
23     resulting from harms that are attributable to
24     the defendants' misconduct?
25         A.    No, I don't attribute these

Page 675

1      harms to misconduct.
2          Q.    In fact, if we look at page 27,
3      note 57, you say, quote, "In this report, I
4      assess the external costs associated with
5      prescription shipments without regard to
6      whether they were due to defendants'
7      misconduct."
8              Correct?
9          A.    That's what I say there, yes.
10         Q.    And that's an accurate
11     statement?
12         A.    That's an accurate statement.
13         Q.    And you say, quote, "I thus use
14     the share of harms due to shipments without
15     multiplying by Professor Rosenthal's estimate
16     of the share of shipments due to misconduct,"
17     end quote.
18             Do you see that?
19         A.    I do, yes.
20         Q.    And is that an accurate
21     statement?
22         A.    Yes, it is.
23         Q.    You state in your report that
24     you were advised by counsel for the
25     plaintiffs that they intend to prove that the

Page 676

1      public nuisance regarding the shipment of
2      prescription opioids arose in substantial
3      part from the unlawful conduct by the
4      defendants.
5          A.    I'm sorry, where are you now?
6          Q.    Page 16, paragraph 28.
7          A.    Okay. I see.
8          Q.    Okay. Do you see that
9      sentence?
10         A.    I see the sentence.
11         Q.    Okay. What does, quote, "in
12     substantial part" mean?
13         A.    In large part.
14         Q.    And what specific objective
15     criteria do you -- would you use to capture
16     the notion of "in substantial part"?
17             MR. SOBOL: Objection.
18             THE WITNESS: Well, this is
19         something that I've been advised by
20         counsel that they intend to do. It's
21         not something that I intend to do.
22     QUESTIONS BY MR. KEYES:
23         Q.    Which counsel advised you of
24     this?
25         A.    I don't remember.

72 (Pages 673 to 676)

Highly Confidential - Subject to Further Confidentiality Review

Page 677

1    Q.    Okay.  But you don't quantify
2  in this report the cost of harms from the
3  public nuisance that are linked up with
4  defendants' unlawful conduct, right?
5         MR. SOBOL:  Objection.
6         THE WITNESS:  Yeah, that's
7    correct.  That's correct.
8  QUESTIONS BY MR. KEYES:
9    Q.    Did you attempt anywhere in
10  your report to quantify the cost of harms
11  from the public nuisance that did not arise
12  from the defendants' unlawful conduct?
13         MR. SOBOL:  Objection.
14         THE WITNESS:  I was trying to
15    make sure I get the logic of your
16    question correct.
17         The application of the
18    Rosenthal share, which I did not do in
19    this report in terms of quantifying
20    harms, can be interpreted as some that
21    were due to misconduct and the balance
22    not due to misconduct.
23         So in that I sum both those
24    things, I do count both those due to
25    misconduct in the Rosenthal sense as

Page 678

1    well as those not due to misconduct.
2  QUESTIONS BY MR. KEYES:
3    Q.    And so anywhere in your report
4  do you quantify the cost of harms from the
5  public nuisance that did not arise from the
6  unlawful conduct of the defendants?
7         MR. SOBOL:  Objection.
8         You can answer.
9         THE WITNESS:  Okay.  Well, I
10    think I was answering your question in
11    perhaps a too narrow way.  I was
12    answering it with respect to the
13    Rosenthal question of the -- that
14    particular unlawful -- what will be
15    alleged unlawful act, which is the
16    misleading advertising.
17         What other lawful/unlawful
18    elements of a definition here, I'm not
19    in a position to say.
20  QUESTIONS BY MR. KEYES:
21    Q.    Okay.  You said before that you
22  didn't quantify the cost of the harms from
23  the public nuisance that were due to
24  defendants' misconduct.
25         MR. SOBOL:  Objection.  Asked

Page 679

1    and answered.
2         THE WITNESS:  I didn't separate
3    those out from the total.  They would
4    be included in the total.
5  QUESTIONS BY MR. KEYES:
6    Q.    Right.
7         So my question was:  Anywhere
8    in your report do you quantify the cost of
9    harms from the public nuisance that did not
10    arise from the defendants' unlawful conduct?
11    A.    In answering, I'm not equating
12    misconduct as studied by Professor Rosenthal
13    with unlawful contact -- sorry, unlawful
14    conduct, which I understand to be a broader
15    term.
16         So if I answer it in the sense
17    of Rosenthal, I count both:  those
18    attributable to Rosenthal misconduct and
19    those not attributable to Rosenthal
20    misconduct.  That's an element of lawful.
21         There may well be other
22    elements of what is lawful and unlawful that
23    apply here that I'm not in a position to talk
24    about.
25    Q.    And the costs that you have

Page 680

1    quantified in this report are the costs of
2    harms in Summit County and Cuyahoga County,
3    correct?
4    A.    That's generally correct.
5    Q.    Did you back out of those cost
6    calculations the cost of harms that occurred
7    in Akron or Cleveland?
8    A.    My estimates were county-level
9    only, without attributing them to
10    jurisdictions within the county.
11    Q.    Right.
12         So did you back out of those
13    calculations at any point the cost of harms
14    that occurred in the cities of Akron or
15    Cleveland?
16    A.    I would say no, they were
17    county-based calculations.
18    Q.    Even though the City of Akron
19    and the City of Cleveland have been
20    specifically excluded from the track 1 case,
21    correct?
22         MR. SOBOL:  Objection.
23         THE WITNESS:  Well, I'm just
24    following what I was asked to do.  And
25    the reasons, I don't know.

73 (Pages 677 to 680)

Highly Confidential - Subject to Further Confidentiality Review

Page 681

1    QUESTIONS BY MR. KEYES:
2        Q.    You do recognize that
3    prescription opioids can confer positive
4    benefits on particular individuals when used
5    in accordance with scientifically acceptable
6    clinical criteria?
7        A.    Yes.
8        Q.    What are those positive
9    benefits?
10       A.    Well, there could be a
11   reduction in pain.  There could be an
12   improvement in function.
13       Q.    Anything else?
14       A.    Those are the primary ones.
15       Q.    Do you at any point in your
16   report quantify the benefit of prescription
17   opioids in pain reduction?
18           MR. SOBOL:  Objection.
19           You can answer.
20   QUESTIONS BY MR. KEYES:
21       Q.    Not discuss it; quantify it.
22           MR. SOBOL:  Objection.
23           THE WITNESS:  What I do in my
24   report is an assessment of the
25   quantification of the amount of time

Page 682

1        or days for which clinically
2        appropriate use of opioids would
3        reduce pain, which is a kind of
4        quantification.
5    QUESTIONS BY MR. KEYES:
6        Q.    Where in your report do you
7    have a chart that shows the quantification of
8    the benefit of prescription opioids in the
9    form of pain reduction?
10       A.    I don't think I have a chart.
11       Q.    Where is the number that you
12   calculated to show the dollar benefit of
13   prescription opioids in the form of pain
14   reduction?
15       A.    Okay.  So you're changing the
16   question a little bit.
17           Quantification isn't
18   necessarily a dollar.  Quantification can be
19   done in other units.  And I responded by --
20   part of what I did, which was a
21   quantification in terms of days of -- days
22   with improved pain.
23           Do you want to see where that
24   is?  Is that -- I'm not sure what the
25   question is now.

Page 683

1        Q.    Where in your report do you
2    show the dollar value of the benefit of
3    prescription opioids in the form of pain
4    reduction?
5            MR. SOBOL:  Objection.
6            THE WITNESS:  In terms of the
7        question of pain reduction, I didn't
8        need to go so far as to quantify it in
9        terms of dollars.
10   QUESTIONS BY MR. KEYES:
11       Q.    Do you at any point in your
12   report quantify the benefit of prescription
13   opioids in increased productivity?
14       A.    I analyze studies on the effect
15   of opioids on what I -- by productivity, I
16   mean workforce productivity, and determine
17   that whatever benefits there are are less
18   than costs, which is sufficient for me to be
19   able to say that with respect to this
20   category of potential benefits and costs, the
21   costs exceed the benefits.
22       Q.    Did you at any point in your
23   report quantify the benefit of prescription
24   opioids in the form of increased
25   productivity?

Page 684

1            MR. SOBOL:  Objection.  Asked
2        and answered.
3            THE WITNESS:  I think this is
4        the same question.
5            And my answer, I hope, will be
6        the same, which is that I studied the
7        research literature on the effects of
8        prescription opioids on workforce
9        productivity, and as a result of that
10       study, concluded that the positive
11       effects on productivity are outweighed
12       by the negative effects on
13       productivity.
14           So there's no net benefit to be
15       had in the benefit column in terms of
16       dollars or in terms of anything else
17       with respect to opioids on that score.
18       And that was enough for me to be able
19       to say I'm going to be conservative
20       and not count those additional costs
21       that exceed the benefits.
22   QUESTIONS BY MR. KEYES:
23       Q.    Anywhere in your report do you
24   show the dollar value of the benefit of
25   prescription opioids in the form of increased

74  (Pages 681 to 684)

Highly Confidential - Subject to Further Confidentiality Review

Page 685

1  productivity?
2          MR. SOBOL:  Objection.  Asked
3  and answered.
4          THE WITNESS:  I understand this
5  to be the same question, and if for
6  some reason it's a different question,
7  I'm happy to try to answer that new
8  question.
9          What I did in my report was to
10  investigate the research literature on
11  the effects of opioid prescriptions on
12  workforce productivity and determined
13  that the negative effects of opioid
14  prescriptions outweighed the positive
15  effects in terms of productivity.
16          So once that's established,
17  quantification in dollar terms isn't
18  necessary in order to say that the
19  costs exceed the benefits.
20          So as long as, you know, costs
21  are greater than benefits, it's not --
22  I don't need to know exactly the
23  dollar benefits in order to make a
24  determination of my assignment in the
25  report.

Page 686

1  QUESTIONS BY MR. KEYES:
2      Q.    Did you examine any indirect
3  benefits from the use of prescription
4  opioids?
5      A.    I'm sorry, what do you mean by
6  "indirect benefits"?
7      Q.    Nondirect.
8      A.    Do you have another synonym you
9  can give me?
10      Q.    No.
11          You would agree that increased
12  productivity and reduction of pain are direct
13  benefits from the use of prescription
14  opioids?
15          MR. SOBOL:  Objection.
16          THE WITNESS:  Well, people use
17  these terms in different ways, so I'm
18  just trying to find out -- even the
19  word "indirect" in the literature is
20  used in different ways by different
21  people.
22  QUESTIONS BY MR. KEYES:
23      Q.    Did you examine any indirect
24  savings to Summit County or Cuyahoga County
25  from the mortality that results from the use

Page 687

1  or abuse of opioids?
2          MR. SOBOL:  Objection.
3          THE WITNESS:  Well, I'm still
4  not sure what you mean by "indirect"
5  here, so if you can help me with that,
6  I'll give it a shot.
7  QUESTIONS BY MR. KEYES:
8      Q.    Sure.
9          I thought you mentioned earlier
10  in the deposition in response to a question
11  that as a result of the mortality, there
12  would be dollar impacts -- there could be
13  dollar impacts on Summit County or Cuyahoga
14  County?
15      A.    Yes, I did that.
16      Q.    And some of those could be
17  positive dollar impacts, and some of those
18  could be negative, correct?
19      A.    Well, that's not what I said
20  earlier.  I used an example of what I would
21  call a negative impact, which is if someone
22  dies, then -- I think the example I used was
23  tax revenue, that if there's, for example, a
24  local income tax or even a sales tax, some of
25  a person's income would not be available for

Page 688

1  their consumption.  They would be
2  contributing to public revenues.
3      Q.    And why do you call that a
4  negative effect?
5      A.    Well, it's a negative effect on
6  the county because the income is gone from
7  the individual, and that means less tax
8  collections.
9      Q.    And could there be positive
10  dollar impacts on Summit County or Cuyahoga
11  County from the mortality that you attempt to
12  quantify?
13          MR. SOBOL:  So is the county
14  better off with the people being
15  killed by opioids?
16          MR. KEYES:  That's not my
17  question.
18          You can answer my question, not
19  his.  He can ask you questions later.
20          THE WITNESS:  No, generally
21  not.
22  QUESTIONS BY MR. KEYES:
23      Q.    When you referred earlier to
24  studying the economic literature on workforce
25  productivity and the impact of opioids on

75 (Pages 685 to 688)

Highly Confidential - Subject to Further Confidentiality Review

Page 689

1   that productivity, what studies did you look
2   at?
3        A.    There's a set of studies that I
4   refer to in my report, are the ones I looked
5   at.
6        Q.    Okay.  Can you name any of
7   them?
8        A.    Right now?
9        Q.    Yeah.
10       A.    Yes.  The authors include
11  Kilby, I think Angela is her first name;
12  Janet Currie and Molly Schnell; Alan Krueger;
13  a first authored paper by Aliprantis.  And
14  there's one or two more that I can't remember
15  right now.
16       Q.    Did any of the studies you just
17  listed examine the impact of prescription
18  opioids on worker productivity in Summit
19  County or Cuyahoga County?
20       A.    I think they would have --
21  there're broader studies that would have
22  included -- I'd have to go back and check
23  study by study, but most of them were
24  broad-based studies that might have been the
25  whole United States or perhaps large counties

Page 690

1   in the United States that likely would
2   have -- some of them, I'm sure, included
3   Summit and Cuyahoga.
4        Q.    Why are you so sure?
5        A.    Because it's my understanding
6   what the studies did.
7        Q.    Did you look at any studies
8   that examined the data specific to Summit
9   County and Cuyahoga County?
10       A.    Examined the data with respect
11  to what?
12       Q.    Did you look at any studies
13  that examined data specific to Summit County
14  or Cuyahoga County regarding the impact of
15  prescription opioids on worker productivity?
16       A.    One of the Ohio reports that --
17  I think it's -- I refer to it as a Swank
18  report -- is Ohio-specific, and it talks
19  about productivity for Ohio.  And I don't
20  remember whether it broke down its findings
21  county by county, but it would have applied
22  to our bellwether.
23       Q.    In your report you reference
24  alcohol as a potential analogy.
25            Do you recall that?

Page 691

1            MR. SOBOL:  Objection.
2            THE WITNESS:  I do.
3   QUESTIONS BY MR. KEYES:
4        Q.    Yes?
5            MR. SOBOL:  Objection.
6   QUESTIONS BY MR. KEYES:
7        Q.    Do you recall that?
8            MR. SOBOL:  Objection.
9            THE WITNESS:  I do recall that.
10  QUESTIONS BY MR. KEYES:
11       Q.    And do you remember saying that
12  alcohol yields a, quote, "overwhelming net
13  cost to society"?
14       A.    I was --
15            MR. SOBOL:  No, that's a
16  mischaracterization of the report.
17            Are you referring to either
18  report?
19            MR. KEYES:  I'm referring to a
20  specific statement he made.
21            THE WITNESS:  Yeah, let me take
22  a look.  I think that would clear up
23  any confusion here.
24            Okay.  So this is paragraph 27.
25  I think there's just one paragraph,

Page 692

1   yeah, where it's not exactly an
2   analogy, but it's a kind of
3   clarification that the -- another, you
4   know, potential in this case, I guess
5   the substance that might be considered
6   a -- that may have overwhelming costs
7   versus benefits, is what I'm
8   mentioning here, is not sufficient for
9   it to be regarded as a public
10  nuisance.
11  QUESTIONS BY MR. KEYES:
12       Q.    I'm not sure I understood your
13  answer.
14            You said that even though
15  alcohol may cause overwhelming net costs to
16  society, it is not necessarily a public
17  nuisance?
18            MR. SOBOL:  Objection.  That's
19  a misreading of the report.
20            MR. KEYES:  I'm not asking
21  about the report.  I'm asking about
22  your answer.
23            THE WITNESS:  What I -- my
24  answer is that I didn't use it as an
25  analogy.  I use it as an illustration

76  (Pages 689 to 692)

Highly Confidential - Subject to Further Confidentiality Review

Page 693

1        of a situation in which the costs may
2      be overwhelming in relation to the
3      benefits.  And that's a hypothetical,
4      as I say here.  I'm sure you know.  I
5      didn't do that analysis.  I'm just
6      saying, well, this might be true.
7            Society might decide to condone
8      that and not pursue any legal theory
9      of fault related to alcohol.
10   QUESTIONS BY MR. KEYES:
11        Q.    Because society has determined
12   that buying and selling and consuming alcohol
13   within certain constraints is permissible?
14        A.    That might be part of it.
15        Q.    And yet selling and
16   distributing prescription opioids is legal
17   within certain constraints, correct?
18        A.    Well, I don't like to talk too
19   much about what is legal and illegal, but my
20   understanding is that some of that is fine.
21        Q.    And if I understand you
22   correctly, you're saying alcohol, because of
23   society's determination that it can be a
24   legal activity, it is not a public nuisance
25   even though it can create an overwhelming net

Page 694

1      cost to society, right?
2            MR. SOBOL:  Objection.
3      Mischaracterizes the testimony.
4            THE WITNESS:  Yeah, that's not
5      exactly what I said.
6      QUESTIONS BY MR. KEYES:
7        Q.    You said, "An economic weighing
8      of the benefits versus costs of the
9      prevalence of alcohol could yield an
10   overwhelming net cost to society, yet for
11   myriad reasons, society condones the
12   prevalence of alcohol, and subject to its
13   regulation and appropriate use, selling,
14   buying and consuming alcohol are legal
15   activities."
16        A.    Yes.
17            MR. SOBOL:  Objection.
18      Mischaracterizes the testimony.  It's
19      only one portion of the answer that
20      you just read back.
21   QUESTIONS BY MR. KEYES:
22        Q.    I just read you what you said
23   in your report.
24        A.    I understand that.
25        Q.    Okay.

Page 695

1        A.    And as that sentence says "that
2      for myriad reasons."
3            So I understood your question
4      to be asking about the lawful/unlawful, the
5      condonence of selling alcohol, but there's
6      other things that may factor into that.
7        Q.    What differentiates alcohol
8      from prescription opioids if they can both
9      create an overwhelming net cost to society
10   yet be condoned by society and be legal
11   activities within certain constraints?
12            MR. SOBOL:  Objection.
13            THE WITNESS:  Okay.  First of
14      all, I'm -- I don't know that that's
15      true with respect to alcohol.  I'm
16      only using that as an illustration to
17      capture that the overwhelming cost
18      versus benefits isn't a sufficient
19      condition in order to have something
20      qualify from a legal perspective as a
21      public nuisance.
22   QUESTIONS BY MR. KEYES:
23        Q.    And if it's not sufficient,
24   then what else do you need to qualify from a
25   legal perspective as a public nuisance as you

Page 696

1      approach it as an expert in this case?
2            MR. SOBOL:  Objection.  Scope.
3            THE WITNESS:  Well, I
4      understood my assignment to be guided
5      by a definition of public nuisance
6      that is based on the law, that I
7      interpreted as having three components
8      that we discussed earlier today.
9      QUESTIONS BY MR. KEYES:
10        Q.    And that's the legal definition
11   that you're applying that you got from
12   counsel, correct?
13        A.    Well, the legal definition is
14   in paragraph 7 or something in this second
15   report.  And my interpretation of that in
16   terms that an economist can work with are, I
17   think, in paragraph 38.
18        Q.    So in determining that there's
19   a public nuisance, you are applying your
20   interpretation in paragraph 38 of a legal
21   definition that you were supplied in
22   paragraph 7?
23        A.    Well, I broke down the -- what
24   I thought to be the essential elements of
25   paragraph 7, which is a legal definition, and

Highly Confidential - Subject to Further Confidentiality Review

Page 697

1   I said, here's what I think I need to do.
2   And that's -- I am being transparent.  That's
3   what I said I needed to do; that's what I
4   did.
5       Q.    And you're not applying the
6   standard for a public nuisance that you
7   described in economic terms in paragraph 16
8   of your report?
9       MR. SOBOL:  Objection.
10  QUESTIONS BY MR. KEYES:
11      Q.    Correct?
12      MR. SOBOL:  Objection.
13  Mischaracterizes the testimony.
14      THE WITNESS:  Well, I think as
15  we discussed earlier, this is not a
16  definition.  If you want a definition,
17  it's paragraph 38 where I use the word
18  "definition" and I think explain quite
19  clearly how I define a public
20  nuisance.
21  QUESTIONS BY MR. KEYES:
22      Q.    You calculate what you think
23  are the costs of mortality as a result of the
24  opioid epidemic in Summit County and Cuyahoga
25  County, correct?

Page 698

1       A.    That's not correct.
2       Q.    How is that incorrect?
3       A.    Because that's not what I do.
4       Q.    You have an entire Appendix C
5   on mortality, correct?
6       A.    Correct.
7       Q.    And you identify mortality as
8   one of the harms that results from the opioid
9   epidemic, correct?
10      A.    That's correct.
11      Q.    And then you quantify the costs
12  of that harm, correct?
13      A.    Yes.
14      Q.    Okay.  And --
15      A.    But still, I'm not confirming
16  your question.
17      Q.    When you quantify the costs of
18  mortality as a harm that results from the
19  opioid epidemic, you include all deaths
20  attributable to overdoses on opioids?
21      A.    First of all, that's not what I
22  do.
23      Q.    Why not?
24      How is it wrong?
25      A.    Because it's not what I do.

Page 699

1       Q.    Tell me how it's wrong then.
2       A.    I do not -- it's wrong to say
3   that I quantify mortality costs due to the
4   opioid epidemic.  I don't do that.
5       Q.    What do you do?
6       A.    What I do is contained in my
7   report, which is to quantify the harm due to
8   shipments.
9       Q.    Okay.  You purport to quantify
10  the costs of mortality as a harm attributable
11  to shipments of opioids, correct?
12      MR. SOBOL:  Objection.
13  QUESTIONS BY MR. KEYES:
14      Q.    Is that correct?
15      MR. SOBOL:  Objection.
16      THE WITNESS:  Do you mind
17  reading it to me again?  Sorry.
18  QUESTIONS BY MR. KEYES:
19      Q.    You purport to quantify the
20  costs of mortality as a harm attributable to
21  shipments of opioids, correct?
22      MR. SOBOL:  Objection.
23      THE WITNESS:  Yeah, that sounds
24  right to me.
25

Page 700

1   QUESTIONS BY MR. KEYES:
2       Q.    And in doing so, your
3   calculations include deaths from overdoses on
4   opioids that you say are attributable to
5   shipments of opioids, correct?
6       A.    That's correct.
7       Q.    And those deaths include
8   overdoses on illegal opioids as well as
9   deaths on -- from overdoses of prescription
10  opioids, correct?
11      A.    That's also correct.
12      Q.    And those deaths include
13  overdoses on prescription opioids that were
14  diverted as well as deaths from overdoses on
15  prescription opioids that were prescribed to
16  the person who died?
17      A.    They would include deaths for
18  the person who received the prescription as
19  well as someone who might have taken those
20  pills if they were resold or diverted in some
21  way.
22      Q.    In your calculations, do you
23  account for the fact that some of the
24  opioid-related deaths in your calculations
25  would have occurred at some point in the

78  (Pages 697 to 700)

Highly Confidential - Subject to Further Confidentiality Review

Page 701

1    absence of the users ever using prescription
2    opioids?
3         MR. SOBOL:  Objection.
4         THE WITNESS:  What I do by
5    attributing deaths to shipments, I
6    address this issue by asking the
7    question that -- asking the -- that
8    logical question:  If the shipments
9    had been higher or lower, would the
10   death rates have been higher or lower.
11        And the empirical connection
12   that's established between that means
13   that the deaths that I count are
14   caused by the shipments.
15   QUESTIONS BY MR. KEYES:
16        Q.   Now when you say you "addressed
17   that issue," you're saying you address that
18   issue by using percentages you receive from
19   Professor Cutler, correct?
20        A.   That's correct, yes.
21        Q.   Okay.  So does that methodology
22   account for the fact that if there had been
23   no prescription shipment -- opioid shipment,
24   some people still would have used an illegal
25   drug and still would have died?

Page 702

1         A.   It does, yes.
2         Q.   How so?
3         A.   Well, Professor Cutler's
4    method, which is what we're talking about
5    here, attributes a share of opioid-related
6    deaths to shipments, not 100 percent.  So
7    it's not attributing -- sorry -- not
8    attributing all deaths to opioids to
9    shipments.
10        In fact, the methodology is
11   designed to be able to distinguish between
12   deaths that might have occurred otherwise and
13   those that can be reliably attributed to
14   shipments.
15        Q.   And in quantifying what you say
16   are the costs of mortality, you use the VSL,
17   correct?
18        A.   I do, yes.
19        Q.   What is the VSL?
20        A.   VSL is an abbreviation for
21   something called the value of a statistical
22   life.
23        Q.   And you cite six studies in the
24   section where you attempt to quantify the
25   costs of mortality, correct?

Page 703

1         MR. SOBOL:  Objection.
2         THE WITNESS:  I would have to
3    look to see how many I cited.
4    QUESTIONS BY MR. KEYES:
5         Q.   Which of those six studies uses
6    the VSL, if any?
7         A.   Well, some do.  I'd have to go
8    back and look.
9         Would you like me to do that?
10        Q.   Why don't you look at page 61.
11        A.   All right.  So what are you
12   asking me?
13        Q.   I asked you which of the
14   studies you cite in your discussion actually
15   uses the VSL.
16        A.   All right.  Well, the one I
17   discuss in the paragraph on page 61 uses the
18   VSL.
19        Q.   Is it your understanding that
20   the VSL is usually used for regulatory
21   purposes?
22        A.   Well, it's used for many
23   purposes, but including regulatory purposes,
24   yes.
25        Q.   Have you ever used the VSL to

Page 704

1    quantify costs in a lawsuit?
2         A.   I don't think I have, no.
3         Q.   You calculated the costs of
4    morbidity in your report?
5         A.   Aspect of the cost of
6    morbidity.
7         Q.   That aspect being the number of
8    people who have opioid use disorder?
9         A.   That aspect being the elevated
10   health care costs associated with opioid use
11   disorder.
12        Q.   And you calculate what you
13   think are the number of people with opioid
14   use disorder arising from shipments?
15        A.   I, again, apply results from
16   Professor Cutler to make that determination,
17   yes.
18        Q.   In your calculations of the
19   number of people with opioid use disorder as
20   a result of shipments, you do not distinguish
21   between people who used illicit opioids
22   versus prescription opioids, correct?
23        A.   Well, this is the same issue
24   that you asked about with respect to
25   mortality.  The methodology applied by

79 (Pages 701 to 704)

Highly Confidential - Subject to Further Confidentiality Review

Page 705

1   Professor Cutler is explicitly designed to
2   sort that out and attribute the, in this
3   case, disease due to the shipments.
4       Q.    But you don't distinguish
5   between people who have the disease as a
6   result of using an illicit opioid versus
7   people who have the disease as a result of
8   using prescription opioids --
9           MR. SOBOL: Objection.
10  QUESTIONS BY MR. KEYES:
11      Q.    -- correct?
12          MR. SOBOL: Objection. Asked
13  and answered.
14          THE WITNESS:  Well, what is
15      important for me is to distinguish
16      those that are due to shipments and
17      not due to shipments, and due to
18      shipments could have different routes
19      of cause.
20          And what -- I have that -- the
21      precise answer that I need from
22      Professor Cutler's report.
23  QUESTIONS BY MR. KEYES:
24      Q.    So your calculations include
25  people who have opioid use disorder,

Page 706

1   regardless of whether they used an illicit
2   opioid or a prescription opioid, correct?
3           MR. SOBOL: Objection. Asked
4   and answered several times.
5           THE WITNESS:  Well, it's -- the
6       question I'm called to answer is how
7       much of the opioid disease is due to
8       shipments, and I have very good
9       estimates of that from Professor
10      Cutler.
11  QUESTIONS BY MR. KEYES:
12      Q.    Right.
13          But in doing your calculations
14  and identifying the people with opioid use
15  disorder, did you limit yourself to people
16  who have opioid use disorder as a result of
17  using prescription opioids?
18          MR. SOBOL: Objection. Asked
19  and answered.
20          THE WITNESS:  I began with a
21      total number and then took a share of
22      that total number that's attributable
23      to shipments.  That share could have
24      come from either of those groups.
25

Page 707

1   QUESTIONS BY MR. KEYES:
2       Q.    Did you look at any data sets
3   specific to Summit County or Cuyahoga County
4   regarding the prevalence of opioid use
5   disorder?
6           MR. SOBOL:  Final or draft?
7       Not drafts.
8   QUESTIONS BY MR. KEYES:
9       Q.    Did you look at any data sets
10  specific to Summit County or Cuyahoga County
11  regarding the prevalence of opioid use
12  disorder?
13      A.    I'm not 100 percent sure.  The
14  NSDUH -- sorry.  A data set that's National
15  Survey on Drug Use and Health, affectionately
16  called NSDUH, has some sub-national and, I
17  think for some years, some sub-state
18  information.  I may have looked at that at
19  some point.
20      Q.    Can you be any more specific
21  other than "may have looked at"?
22      A.    Not right now, sorry.
23      Q.    Did you look at any Medicaid
24  data regarding the prevalence of opioid use
25  disorder in Summit County or Cuyahoga County?

Page 708

1       A.    Yes.
2       Q.    What data did you look at?
3       A.    There was at one point
4   consideration of a claims data set that
5   included some Medicaid.
6       Q.    What data set are you referring
7   to?
8       A.    Well, it was a data set that
9   was available by a claims processer, and I
10  don't remember the name.
11      Q.    Where did you get that data?
12      A.    I didn't ever get it.
13      Q.    You considered looking at it
14  but did not look at it?
15      A.    Well, by "look at data" I mean
16  look at, in some cases, summaries of data.
17  And with respect to Medicaid, the coverage
18  was poor and unreliable for a basis for
19  estimates.
20      Q.    What makes you say it was poor
21  and unreliable?
22      A.    Looking at the tables that had,
23  you know, for example, number of people who
24  were covered by Medicaid in different parts
25  of the state.

Highly Confidential - Subject to Further Confidentiality Review

Page 709

1    Q.    What criteria did you use to
2  decide it was, quote, poor and unreliable?
3    A.    Well, my professional
4  experience in doing empirical work, you need
5  a certain amount of observations before you
6  can really say anything.
7    Q.    Did you analyze any data from
8  the Summit County ADM Board to determine the
9  prevalence of opioid use disorder in that
10 county?
11   A.    I'd have to go back and see
12 what I did with the ADM Board.
13   Q.    Well, sitting here today, did
14 you look at that data at any point?
15        MR. SOBOL:  Objection.  Asked
16    and answered.
17        THE WITNESS:  I would have to
18    go back and take a look to remind
19    myself.
20 QUESTIONS BY MR. KEYES:
21   Q.    If you had used it, you would
22 have cited it in your report, correct?
23   A.    Yes, I believe I would have.
24   Q.    Did you analyze any claims data
25 from the Cuyahoga County ADAMHS Board to

Page 710

1  determine the prevalence of opioid use
2  disorder in that county?
3    A.    No, I didn't analyze any claims
4  data for that purpose.
5    Q.    In your calculations, you
6  assume that the prevalence of opioid use
7  disorder in Cuyahoga County and Summit County
8  is the same as the national rate of
9  prevalence, correct?
10   A.    Yes, it's a general assumption,
11 which is widely regarded as being
12 conservative.
13   Q.    Widely regarded by whom as
14 being conservative?
15   A.    By people who -- researchers
16 who study this field.
17   Q.    Can you point me to someone
18 specific who says that by looking at national
19 data you're being conservative?
20   A.    Well, there's two senses in
21 which it's conservative.  One sense in which
22 NSDUH is conservative, it misses people who
23 may be institutionalized.  Respondents may be
24 reluctant to acknowledge all their drug
25 history.  Both of those things would lead to

Page 711

1  undercounts.
2         And then with respect to the
3  local jurisdictions here, if you look at the
4  death rate from opioids, the rate is greater
5  in our bellwethers than the difference in the
6  rates of opioid use disorder, implying that
7  the local counts for opioid use disorder are
8  also underestimates for our bellwethers.
9    Q.    To estimate the excess costs
10 attributable to opioid use disorder in Summit
11 County and Cuyahoga County, you used the
12 Florence study findings?
13        MR. SOBOL:  Objection.
14 QUESTIONS BY MR. KEYES:
15   Q.    Is that correct?
16        MR. SOBOL:  Objection.
17        THE WITNESS:  Well, if you look
18    at the report, I considered a number
19    of similar studies and then ended up
20    using the Florence numbers for various
21    categories of beneficiaries, depending
22    on what their health insurance
23    coverage was.
24        But these numbers are not very
25    much different in all the studies I

Page 712

1  reviewed.
2  QUESTIONS BY MR. KEYES:
3    Q.    Did you do anything to validate
4  the Florence study?
5         MR. SOBOL:  Objection.
6         THE WITNESS:  Well, one form of
7     validation is checking to see whether
8     the literature, as we call it,
9     contains other papers that seem to
10    come to similar findings, and that's
11    exactly what validation means.
12 QUESTIONS BY MR. KEYES:
13   Q.    You attempt to calculate the
14 number of NAS cases that are attributable to
15 opioid shipments, correct?
16   A.    I do.
17   Q.    And you first took data from
18 the Ohio Department of Health website on the
19 total hospitalizations among Ohio resident
20 newborns for NAS, neonatal abstinence
21 syndrome, correct?
22   A.    That's correct.
23   Q.    And you assumed that all NAS
24 cases were related to opioids, correct?
25   A.    Well, that's based on data from

81 (Pages 709 to 712)

Highly Confidential - Subject to Further Confidentiality Review

Page 713

1   Ohio.
2       Q.    What do you mean it's based
3   on --
4       A.    Well, it's based -- I didn't
5   make that up.  I referred to -- I'd have to
6   again look to see what the specific reference
7   is.
8       Q.    Well, you --
9       A.    But the information I had
10  indicated that almost all cases of NAS in
11  Ohio were due to opioids.
12      Q.    What is your authority for that
13  proposition, that almost all cases of NAS in
14  Ohio were due to opioids?
15      A.    I'd need to look.  I don't know
16  if it's in the appendix or the text, so...
17            According to the Ohio
18  Department of Health, virtually all cases of
19  NAS are due to opioids.  That's paragraph 53.
20      Q.    Did you consider Professor
21  Young's opinions on NAS in doing your
22  calculations?
23      A.    I don't think I needed
24  Professor Young to do this.  I had Ohio data
25  for a count.  I had this information from

Page 714

1   Ohio about what those NAS cases were due to.
2   I had data on the relative charges of cases
3   with and without NAS.  I confined my
4   assessment to only those costs, which I
5   consider to be probably the most conservative
6   part of this report.  And those were the
7   elements of my calculation regarding the
8   costs due to shipments of extra NAS -- of the
9   harms due to NAS in our bellwethers.
10      Q.    What is the correct term and
11  diagnostic category for infants that
12  experience withdrawal from opioids?
13      A.    I think it's a -- it's within
14  the NAS category.
15      Q.    Is neonatal abstinence
16  syndrome, NAS, the correct term and
17  diagnostic category for infants who
18  experience withdrawal from opioids?
19            MR. SOBOL:  Objection.
20            THE WITNESS:  You're outside my
21      expertise.  Sorry.
22  QUESTIONS BY MR. KEYES:
23      Q.    Did you do any research into
24  whether the correct term and diagnostic
25  category for infants who experience

Page 715

1   withdrawal from opioids is neonatal
2   abstinence syndrome?
3       A.    I think this sentence addresses
4   that.  "According to the Ohio Department of
5   Health, virtually all cases of NAS are due to
6   opioids."
7             That's what I needed to know.
8       Q.    Okay.  Do you have an
9   understanding as to whether practitioners
10  distinguish between neonatal abstinence
11  syndrome and neonatal opioid withdrawal?
12      A.    Distinguish in what way?
13      Q.    When classifying or reporting
14  incidence, whether they appropriately
15  distinguish between neonatal abstinence
16  syndrome and neonatal opioid withdrawal?
17            MR. SOBOL:  Objection.
18            THE WITNESS:  Again, that's
19      outside my expertise.
20  QUESTIONS BY MR. KEYES:
21      Q.    Did you look into that?
22            MR. SOBOL:  Objection.  Asked
23      and answered.
24            THE WITNESS:  I think the
25      statement that virtually all cases of

Page 716

1   NAS are due to opioids is exactly what
2   I need to know.
3   QUESTIONS BY MR. KEYES:
4       Q.    In your calculations on the
5   cost of crime that you say results from
6   shipments, you used NIBRS data?
7       A.    That's correct.
8       Q.    Did you look at any data
9   specific to Summit County or Cuyahoga County?
10      A.    Yes.
11      Q.    What data did you look at that
12  was specific to Summit County or Cuyahoga
13  County?
14      A.    The data in the NIBRS includes
15  the county indicator.  Those were the crime
16  counts I used.
17      Q.    Did you consider whether the
18  crime rate has stayed the same, fallen or
19  risen in recent years?
20      A.    Yes.
21      Q.    What did you conclude?
22      A.    Well, I concluded very
23  specifically what the rates were in different
24  years.
25      Q.    And has the rate fallen in the

82 (Pages 713 to 716)

Page 717

1    last two years in either Summit County or
2    Cuyahoga County?
3        A.   I'd have to go back and check,
4    but I have the numbers, which is what I need.
5        Q.   Based on NIBRS, you're saying?
6        A.   That's right.
7        Q.   Did you --
8            MR. SOBOL:  Do you want him to
9    look or not?
10           MR. KEYES:  No.  If he has it
11   in his report, then I can look at the
12   report.
13   QUESTIONS BY MR. KEYES:
14       Q.   Did you look at any databases
15   specific to Summit County and Cuyahoga County
16   regarding crimes such as the LERMS database?
17       A.   Well, I did look at
18   county-specific data, yes, in the form of the
19   NIBRS.
20       Q.   Did you look at the LERMS
21   database that is specific to Summit County or
22   Cuyahoga County?
23       A.   No, I used the NIBRS.
24       Q.   When you attempted to quantify
25   the costs that you attribute to children

Page 718

1    being mistreated as a result of opioid
2    shipments, am I correct in understanding that
3    you rely on Dr. Young to identify the number
4    of children who are subject to maltreatment
5    in Summit County and Cuyahoga County?
6        A.   Yes, I believe that's correct.
7        Q.   And you rely on Cutler's
8    percentage to estimate the share of
9    maltreated children due to opioid shipments?
10       A.   That's also correct.
11       Q.   And by taking those two
12   figures, you can identify, you think, the
13   number of children whose parents mistreated
14   them as a result of opioid shipments?
15       A.   That's correct.
16           MR. SOBOL:  Objection.
17           THE WITNESS:  That's correct.
18   QUESTIONS BY MR. KEYES:
19       Q.   For purposes of your
20   calculations, you assume that if parents had
21   not used opioids, they would not have
22   mistreated their children, correct?
23           MR. SOBOL:  Objection.
24   Objection.
25           THE WITNESS:  This is a -- this

Page 719

1    is a part of the David methodology,
2    David Cutler's methodology.
3    QUESTIONS BY MR. KEYES:
4        Q.   So you again refer to Professor
5    Cutler and what he did?
6        A.   I do refer to Professor Cutler
7    and what he did.  This is a question he
8    addressed.
9        Q.   You say in your report that
10   based on the Perri, Kessler and Egilman
11   reports, quote, "The manufacturing defendants
12   knew or should have known that they were
13   making misleading statements about the safety
14   and efficacy of the prescription opioids they
15   manufactured."
16       A.   Do you mind pointing to where
17   you're reading?
18       Q.   Page 50, paragraph 90.
19       A.   Okay.  I'm there.
20       Q.   And you continue that, quote,
21   "Marketing by the defendants was consistent
22   in conveying the message that the risk of
23   addiction in patients taking opioids for pain
24   was minimal, the tolerance, dependence and
25   addiction were not serious concerns, and that

Page 720

1    opioids were the safest and most effective
2    treatment for chronic/long-term pain."
3            Do you see that?
4        A.   I do see that.
5        Q.   And that statement is --
6            MR. SOBOL:  Misquoted.
7    QUESTIONS BY MR. KEYES:
8        Q.   That statement is also based on
9    the Perri, Kessler and Egilman report?
10       A.   Yes.
11       Q.   Okay.  Which defendants engaged
12   in this marketing with misleading statements?
13           MR. SOBOL:  Objection.  Scope.
14           THE WITNESS:  It wasn't
15   something that I studied.
16   QUESTIONS BY MR. KEYES:
17       Q.   Which marketing of the
18   defendants included these misleading
19   statements?
20           MR. SOBOL:  Objection.  Scope.
21           THE WITNESS:  That's also not
22   something I studied.
23   QUESTIONS BY MR. KEYES:
24       Q.   So you're relying entirely on
25   what those three other experts have said when

83 (Pages 717 to 720)

Highly Confidential - Subject to Further Confidentiality Review

Page 721

1    you make these two statements?
2            MR. SOBOL: Objection.
3            THE WITNESS: That's not what I
4    said, no.
5            If you go on in the section,
6    you'll see more.
7    QUESTIONS BY MR. KEYES:
8        Q.   Well, I asked you what your
9    basis -- which defendants you were talking
10   about and which marketing you were talking
11   about, and you said, "That's also not
12   something I studied."
13           I'm asking: Are you relying --
14   when you make those statements, are you
15   relying on what the three experts said?
16           MR. SOBOL: Objection.
17           THE WITNESS: Well, I'm not
18   sure -- what "those statements" you're
19   referring to.
20   QUESTIONS BY MR. KEYES:
21       Q.   The two statements that I just
22   read from your report.
23       A.   Okay.
24           MR. SOBOL: Objection. I don't
25   know which two statements you're

Page 722

1    talking about. I see several
2    statements.
3            MR. KEYES: The two statements
4    I read.
5            THE WITNESS: Well, what I
6    said --
7            MR. SOBOL: Well, one of them
8    you misread, and the other one -- are
9    you talking about the sentences or the
10   things within the sentence? What are
11   you talking about?
12   QUESTIONS BY MR. KEYES:
13       Q.   Go ahead and answer.
14       A.   Just to be sure about
15   interpreting my answer, I interpret your
16   question as being asking about the statements
17   that I made in response to your questions.
18           If I have that wrong, please
19   let me know.
20       Q.   You say at paragraph 90, "As
21   explained in the expert reports of Dr. Perri,
22   Dr. Kessler and Dr. Egilman, the
23   manufacturing defendants knew or should have
24   known that they were making misleading
25   statements about the safety and efficacy of

Page 723

1    the prescription opioids they manufactured."
2            Then you say, "Marketing by the
3    defendants was consistent in conveying the
4    message that the risk of addiction in
5    patients taking opioids for pain was minimal,
6    the tolerance, dependence and addiction were
7    not serious concerns, and that opioids were
8    the safest and most effective treatment for
9    chronic/long-term pain."
10           Those are statements in
11   paragraph 90 by you.
12           MR. SOBOL: Objection.
13   Misstatement.
14   QUESTIONS BY MR. KEYES:
15       Q.   I asked you what manufacturing
16   defendants you were talking about. You said
17   you didn't know.
18       A.   I said I didn't study it.
19       Q.   Okay.
20           I asked you what specific
21   statements were misleading, and you said you
22   didn't study that.
23           MR. SOBOL: Objection.
24           THE WITNESS: Yes.
25

Page 724

1    QUESTIONS BY MR. KEYES:
2        Q.   Then you say in the next
3    paragraph that based on your own examination
4    of publicly available documents and discovery
5    produced in this litigation, "defendants had
6    clear knowledge that the shipments had
7    negative impacts on the public health and
8    safety of communities across the nation,
9    including in the bellwether communities."
10           Do you see that?
11       A.   I do.
12       Q.   Okay. Which defendants are you
13   talking about there?
14           MR. SOBOL: Objection. Scope.
15           THE WITNESS: Well, I go on in
16   this section to give, for example.
17   QUESTIONS BY MR. KEYES:
18       Q.   Okay.
19       A.   And the "for example" refers to
20   Purdue. And then additionally in the next
21   paragraph I talk about Mallinckrodt. And
22   then in the next paragraph I talk about
23   Cardinal and McKesson.
24       Q.   Okay. So in the sentence that
25   I just read to you from paragraph 91 where

84 (Pages 721 to 724)

Highly Confidential - Subject to Further Confidentiality Review

Page 725

1   you talk about defendants having clear
2   knowledge, you're talking about those four
3   defendants?
4           MR. SOBOL:  Objection.
5       Mischaracterizes the testimony.
6           THE WITNESS:  No.
7   QUESTIONS BY MR. KEYES:
8       Q.   You don't cite any evidence for
9   that statement other than the four examples
10  you just listed?
11          MR. SOBOL:  Objection.
12          THE WITNESS:  Well, when you
13      say "for example," it doesn't mean
14      you've listed the universe of
15      activities of something.
16  QUESTIONS BY MR. KEYES:
17      Q.   In your report, do you list
18  anything other than the four examples you
19  just reviewed?
20          MR. SOBOL:  Objection.
21          THE WITNESS:  Examples of what?
22  QUESTIONS BY MR. KEYES:
23      Q.   Do you cite any evidence as
24  support for your statement that I read to
25  you, other than the four you just listed:

Page 726

1   Purdue, Mallinckrodt, Cardinal and McKesson?
2           MR. SOBOL:  Objection.
3           THE WITNESS:  I believe I do.
4   QUESTIONS BY MR. KEYES:
5       Q.   In this section, what other
6   evidence do you cite --
7       A.   In this --
8       Q.   -- as support for your
9   statement that, quote, "Defendants have clear
10  knowledge that the shipments had negative
11  impacts on the public health and safety of
12  communities across the nation, including in
13  the bellwether communities"?
14          MR. SOBOL:  Objection.
15          THE WITNESS:  I have two
16      answers to that question.
17          One is in other sections of my
18      report I discuss various public
19      documents that call attention to the
20      opioid crisis that are something that
21      defendants would have knowledge of.
22          And then the second answer to
23      the question is when a company like
24      Purdue, who I suppose we could call an
25      industry leader in opioids, has a

Page 727

1   public settlement of hundreds of
2   millions of dollars, that's something
3   that I would expect other similar
4   companies would have clear knowledge
5   of and understand.
6   QUESTIONS BY MR. KEYES:
7       Q.   What did Purdue's 2007
8   settlement with the United States say about
9   Summit County?
10      A.   I'm not sure.
11      Q.   What did Purdue's 2007
12  settlement with the United States say about
13  Cuyahoga County?
14      A.   I'm not sure.
15      Q.   What did that settlement say
16  about negative impacts on the public health
17  and safety of Summit County or Cuyahoga
18  County?
19          MR. SOBOL:  Objection.
20          THE WITNESS:  I'm not sure.
21  QUESTIONS BY MR. KEYES:
22      Q.   What did the Mallinckrodt 2017
23  settlement with DOJ say about Summit County
24  or Cuyahoga County?
25          MR. SOBOL:  Objection.

Page 728

1           THE WITNESS:  I'm not sure.
2   QUESTIONS BY MR. KEYES:
3       Q.   What did the Mallinckrodt 2017
4   settlement with DOJ say about negative
5   impacts on the public health and safety of
6   Summit County or Cuyahoga County?
7       A.   I'm not sure.
8       Q.   What did the Cardinal
9   settlement agreement with DOJ say about
10  Summit County or Cuyahoga County?
11      A.   I'm not sure.
12      Q.   What did the Cardinal
13  settlement agreement with DOJ say about the
14  public health and safety of -- negative
15  impacts on the public health and safety of
16  Summit County or Cuyahoga County?
17      A.   I'm not sure.
18      Q.   What did the McKesson
19  settlement agreement with DOJ say about
20  Summit County or Cuyahoga County?
21      A.   I'm not sure.
22      Q.   What did the McKesson
23  settlement agreement with DOJ say about
24  negative impacts on the public health and
25  safety of Summit County or Cuyahoga County?

85 (Pages 725 to 728)

Page 729

1        MR. SOBOL:  This is a lot of
2    settlements.
3        THE WITNESS:  I'm not sure.
4    QUESTIONS BY MR. KEYES:
5        Q.    That's the four settlements you
6    reference in your report.
7        So sitting here today, you
8    don't know what any of them said about any
9    public health impacts in Summit County or
10   Cuyahoga County --
11       MR. SOBOL:  Objection.
12   QUESTIONS BY MR. KEYES:
13       Q.    -- correct?
14       MR. SOBOL:  Objection.  That's
15   misleading -- I mean, misstates the
16   testimony.
17       THE WITNESS:  I'm not sure what
18   the degree to Summit and Cuyahoga were
19   referred to in these settlements.
20       MR. KEYES:  Okay.  Why don't we
21   take a break.
22       VIDEOGRAPHER:  The time is
23   3:09 p.m., and we're off the record.
24       (Off the record at 3:09 p.m.)
25       VIDEOGRAPHER:  The time is

Page 730

1    3:23 p.m., and we're on the record.
2        CROSS-EXAMINATION
3    QUESTIONS BY MR. LONERGAN:
4        Q.    Good afternoon, Professor
5    McGuire.  My name is Sam Lonergan.  I'm with
6    the law firm Arnold & Porter Kaye Scholer.  I
7    represent defendants Endo and Par in this
8    litigation.
9        A.    Good afternoon.
10       Q.    I'm going to do my best not to
11   ask any of the questions that Mr. Keyes asked
12   you, but he asked you a lot of questions over
13   the last 12 hours or so, and I can make no
14   guarantees.
15       But I do want to circle back to
16   an issue that you all were discussing right
17   before we just took our last break, and that
18   is the opinions at paragraphs 90 and 91 of
19   your nuisance report.
20       Do you recall that line of
21   questioning?
22       A.    I will when I look at the --
23   remind myself about the paragraphs.
24       Yes.
25       Q.    What did you rely on --

Page 731

1    generally speaking, what information did you
2    rely on in forming your opinion in
3    paragraph 91 that defendants had clear
4    knowledge that shipments had negative impacts
5    on the public health and safety of
6    communities across the nation, including the
7    bellwether communities?
8        A.    Well, the material that I
9    relied on is contained in this section,
10   Section D, which is made up of several
11   paragraphs.
12       Q.    So the material you're
13   referring to are the four settlements that
14   you describe in paragraphs 92 through 94?
15       A.    Well, as well as the expert
16   reports.
17       Q.    What expert reports?
18       A.    Dr. Perri, Dr. Kessler and
19   Dr. Egilman.
20       Q.    Anything else?
21       A.    Well, I also, I think in
22   response to an earlier question, mentioned
23   the -- in another section of the report
24   discussion of public reports on the opioid
25   crisis that would have fed into the knowledge

Page 732

1    that someone in the business would have about
2    what's happening.
3        Q.    Anything else?
4        A.    That's all I can think of.
5        Q.    And are those answers the same
6    if I'm asking you about the opinion you issue
7    in paragraph 90 of your nuisance report where
8    you say the manufacturing defendants knew or
9    should have known that they were making
10   misleading statements about the safety and
11   efficacy of the prescription opioids they
12   manufacture?
13       A.    Yes, it would.
14       Q.    You didn't rely on any other
15   information for that opinion?
16       MR. SOBOL:  Objection.
17       THE WITNESS:  Well, I noted
18   this section and then made reference
19   to the public reports, you know.
20   QUESTIONS BY MR. LONERGAN:
21       Q.    Did you rely on any firsthand
22   information that you have in forming either
23   of those opinions?
24       A.    No, I would say not.
25       Q.    Do you believe a juror could

Highly Confidential - Subject to Further Confidentiality Review

Page 733

1    reach the same opinions as you've reached in
2    paragraph 90 and 91 of your nuisance report
3    if they reviewed the same materials that you
4    reviewed?
5         MR. SOBOL: Objection. Scope.
6         THE WITNESS: I'm not sure.
7    QUESTIONS BY MR. LONERGAN:
8         Q.   Do you have any reason to
9    believe that a juror could not reach those
10   opinions reviewing those same materials?
11        MR. SOBOL: Objection. Scope.
12        THE WITNESS: I really don't
13   know one way or the other.
14   QUESTIONS BY MR. LONERGAN:
15        Q.   What expertise did you apply in
16   reaching those opinions?
17        A.   Primarily it's relying on the
18   very explicit statements of experts who are
19   medical experts with respect to the
20   manufacture and marketing of opioids.  So
21   it's, you know, directly from people who know
22   about this that I drew my conclusions.
23        And then I think the -- with
24   respect to the other material referenced in
25   this section, it's -- I don't know if you

Page 734

1    need to be an economist.  And you probably
2    don't need to be an economist to say that,
3    for example, in the case of Purdue, when
4    there's a multi-hundred million dollar
5    settlement that acknowledged misleading
6    advertising, that that would reasonably have
7    been known by other industry participants.
8         Q.   Are you done?
9         A.   Yeah.
10        Q.   So is what you're saying that
11   if somebody can read the same materials that
12   you read, that you think they could come to
13   the same conclusions without any additional
14   economic expertise that you may have?  Is
15   that correct?
16        MR. SOBOL: Objection.
17        THE WITNESS: No, that's not
18   what I said.
19   QUESTIONS BY MR. LONERGAN:
20        Q.   What's wrong about what I said?
21        MR. SOBOL: Objection.
22   He didn't say it was wrong.
23        THE WITNESS: Well, I mean, I
24   would ask somewhat different questions
25   when I tried to answer them.  I'm not

Page 735

1    sure what you're asking me to say,
2    actually.
3    QUESTIONS BY MR. LONERGAN:
4         Q.   Let's back up.
5         The question I want an answer
6    to is what expertise did you apply in
7    reaching the opinions in paragraphs 90 and 91
8    of your nuisance report?
9         A.   Okay.  And I believe I answered
10   that I relied on the expertise of the three
11   named medical experts here.
12        Q.   Meaning you read their reports,
13   right?
14        A.   Well, I read their reports and
15   understood what their conclusions would be.
16        Q.   Okay.
17        A.   And then also made reference to
18   two things: the studies discussed earlier in
19   my report, and these prominent legal
20   decisions that would have been known to
21   members of the industry.
22        Q.   They're all materials you
23   reviewed, right?
24        A.   Yes.
25        Q.   At what point did the

Page 736

1    manufacturer defendants become aware that
2    their marketing for opioids was misleading?
3         MR. SOBOL: Objection. Hold on
4    one second.
5         It's been brought to my
6    attention that there's apparently some
7    limitation about follow-up questions,
8    that they need to be specific to a
9    manufacturer.
10        Do I have that wrong?
11        MR. HALLER: That's wrong.
12        MR. LONERGAN: Why don't we go
13   off the record.  I don't want to waste
14   time with this.
15        VIDEOGRAPHER: The time is
16   3:29 p.m., and we're off the record.
17   (Off the record at 3:29 p.m.)
18        VIDEOGRAPHER: The time is
19   3:33, and we're on the record.
20   QUESTIONS BY MR. LONERGAN:
21        Q.   Sir, at what point did the
22   manufacturer defendants become aware that
23   their marketing was misleading?
24        MR. SOBOL: Objection. Scope.
25        THE WITNESS: I'm not sure.

87 (Pages 733 to 736)

Highly Confidential - Subject to Further Confidentiality Review

Page 737

1  QUESTIONS BY MR. LONERGAN:
2      Q.   Is it the same date for each
3  defendant?
4          MR. SOBOL: Objection. Scope.
5          THE WITNESS: I'm not sure.
6  QUESTIONS BY MR. LONERGAN:
7      Q.   Is it your opinion that each
8  marketing manufacturer -- each manufacturer
9  defendant was aware of what the other
10  defendants were aware of?
11         MR. SOBOL: Objection. Scope.
12         THE WITNESS: I'm not sure.
13  QUESTIONS BY MR. LONERGAN:
14     Q.    At what point did my client,
15  Endo, become aware that its marketing was
16  misleading?
17         MR. SOBOL: Objection. Scope.
18         THE WITNESS: I'm not sure.
19  QUESTIONS BY MR. LONERGAN:
20     Q.    When did you become aware of
21  the fact that the manufacturer defendants'
22  marketing for prescription opioids was
23  misleading?
24         MR. SOBOL: Objection. Scope.
25         THE WITNESS:  I would say when

Page 738

1      I -- it was within the time period of
2      this report, of my work on this
3      report.
4  QUESTIONS BY MR. LONERGAN:
5      Q.    You mean since you started
6  working on this report in May of 2018?
7      A.    Yes.
8      Q.    You were the editor of the
9  Journal of Health Economics from 2001 to
10  2011, right?
11     A.    That's correct.
12     Q.    And during the period -- during
13  that period of time, is it correct that the
14  Journal of Health Economics published a
15  number of articles concerning prescription
16  opioids?
17     A.    Probably correct, yes.
18     Q.    And as the editor of that
19  journal, did you familiarize yourself at that
20  time with those publications?
21     A.    No, not necessarily.  There
22  were numerous editors during that time
23  period, at least three, and the way the
24  editorial process worked was there was a kind
25  of delegation of different articles to

Page 739

1  different editors.
2          And the assigned editor would
3  have been, you know, paying careful attention
4  to the paper at issue, but the editors who
5  were editors that were not assigned would not
6  necessarily have paid close attention.
7      Q.    From 2001 to 2011, were you
8  ever an editor assigned to an article
9  concerning prescription opioids?
10     A.    You know, I don't remember.
11     Q.    You're no longer affiliated
12  with the Journal of Health Economics?
13     A.    I may be an associate editor.
14  I'm a subscriber.
15     Q.    You consider it to be a
16  reputable journal?
17     A.    I do, yes.
18     Q.    Trustworthy?
19     A.    Yes.
20     Q.    And so the information that it
21  publishes you would expect to be accurate,
22  correct?
23     A.    Well, there's a process by
24  which authors submit; it's reviewed by
25  reviewers; editors help make a determination.

Page 740

1  So the editorial staff does its best to make
2  sure that the papers are accurate and
3  reliable, which is not to say that there
4  aren't sometimes things that are incorrect in
5  the papers.
6      Q.    For the most part, your
7  expectation is that articles published in the
8  Journal of Health Economics are accurate,
9  correct?
10         MR. SOBOL:  Objection.
11         THE WITNESS:  Well, subject to
12     my previous answer that -- I'm not
13     sure what "for the most part," but
14     the editorial staff does its best to
15     make sure things are accurate.
16  QUESTIONS BY MR. LONERGAN:
17     Q.    Well, "for the most part" was
18  really me responding to you, and you're
19  waffling a little.
20         I guess what percentage of
21  articles published by the Journal of Health
22  Economics do you think are accurate?
23         MR. SOBOL:  Objection to the
24     statement.
25         But you can answer the

88  (Pages 737 to 740)

Highly Confidential - Subject to Further Confidentiality Review

Page 741

1    question.
2        THE WITNESS:  It's an odd
3    question.  I know, I'll answer it
4    anyway.
5        It's not so much that articles
6    are accurate or inaccurate, but
7    sometimes statements within articles
8    are accurate or inaccurate.
9        I'm sure all articles have some
10   accurate stuff and, you know, some
11   articles have some inaccurate stuff.
12   It's really impossible for me to put a
13   percentage on.
14   QUESTIONS BY MR. LONERGAN:
15       Q.   Do you agree that there's been
16   a significant number of articles concerning
17   opioid addiction that have been published in
18   any journal dating back to the 1960s?
19       A.   In any journal?
20       Q.   Yeah.
21       A.   I'm sure there have been
22   research papers on it.  I'm not sure what you
23   mean by "significant" in this context, but...
24       Q.   Well, do you agree that there
25   have been articles published dating back to

Page 742

1    the 1960s concerning the risks of addiction
2    associated with prescription opioids?
3        MR. SOBOL:  Objection.
4        THE WITNESS:  There may well
5    be.  You know, I couldn't name -- name
6    them for you.
7    QUESTIONS BY MR. LONERGAN:
8        Q.   It's not something you
9    familiarized yourself with for purposes of
10   your work on this case, correct?
11       A.   No, this is -- that's something
12   I relied on medical experts for.
13       Q.   When did the defendants become
14   aware of the fact that the shipments was
15   having a negative impact on public health and
16   safety?
17       A.   I'm not sure.
18       Q.   Is it the same for each
19   defendant?
20       A.   In the sense that, yes -- yes,
21   I would not be sure for each defendant when
22   they became aware.
23       Q.   So you don't know when my
24   client, Endo, became aware that its shipments
25   of prescription opioids was having a, in your

Page 743

1    term, negative impact on the public health
2    and safety, correct?
3        MR. SOBOL:  Objection.
4        THE WITNESS:  I'm not aware
5    when Endo would have become aware of
6    that.
7    QUESTIONS BY MR. LONERGAN:
8        Q.   In reaching the opinions set
9    forth in paragraphs 90 and 91 of your
10   nuisance report, did you make any assessment
11   of what other non-defendant participants in
12   the prescription drug market knew concerning
13   misleading marketing of prescription opioids?
14       A.   No.
15       Q.   Did you make an assessment of
16   what other non-defendant participants in the
17   opioid prescription drug market knew
18   concerning the negative impacts on public
19   health and safety?
20       A.   It was the same.  I didn't
21   investigate what non-defendants would have
22   known or not known.
23       Q.   You didn't make an assessment
24   of what the FDA knew about those things and
25   when?

Page 744

1        MR. SOBOL:  Objection.  Scope.
2        THE WITNESS:  I'm not privy to
3    what the FDA knew and when.
4    QUESTIONS BY MR. LONERGAN:
5        Q.   You didn't make an assessment
6    of what PBMs knew about those things and
7    when?
8        A.   It would be the same.
9        Q.   You didn't make an assessment
10   of what prescription opioid patients knew
11   about those things and when?
12       MR. SOBOL:  Objection.
13   QUESTIONS BY MR. LONERGAN:
14       Q.   Correct?
15       A.   These are things I didn't
16   study.
17       Q.   You didn't make an assessment
18   of when prescribing physicians became aware
19   of the risks associated with prescription
20   opioids and when, correct?
21       MR. SOBOL:  Objection.
22       THE WITNESS:  Well, that's also
23   something I didn't study.
24   QUESTIONS BY MR. LONERGAN:
25       Q.   Did you study when Summit

Highly Confidential - Subject to Further Confidentiality Review

Page 745

1  County became aware of misleading marketing
2  concerning prescription opioids?
3         MR. SOBOL: Objection. Scope.
4         THE WITNESS: No, I didn't
5     study that.
6  QUESTIONS BY MR. LONERGAN:
7     Q.  Do you have an opinion on when
8  that was?
9         MR. SOBOL: Objection. Scope.
10        THE WITNESS: I didn't study
11    it.
12 QUESTIONS BY MR. LONERGAN:
13    Q.  Did you study when Cuyahoga
14 County became aware of prescription opioid
15 misleading marketing?
16        MR. SOBOL: Objection. Scope.
17        THE WITNESS: I didn't study
18    that.
19 QUESTIONS BY MR. LONERGAN:
20    Q.  Do you have an opinion on when
21 Cuyahoga County became aware of the
22 misleading marketing?
23        MR. SOBOL: Objection. Scope.
24        THE WITNESS: I didn't study
25    that.

Page 746

1  QUESTIONS BY MR. LONERGAN:
2     Q.  Did you study when Summit or
3  Cuyahoga County became aware of the negative
4  impacts that prescription opioids were having
5  on the public health and safety?
6         MR. SOBOL: Objection. Scope.
7         THE WITNESS: I also did not
8     study that.
9  QUESTIONS BY MR. LONERGAN:
10    Q.  Is it correct that you do not
11 know when Summit or Cuyahoga County became
12 aware of the negative impacts on public
13 health and safety?
14        MR. SOBOL: Objection. Scope.
15        THE WITNESS: I didn't study
16    that.
17 QUESTIONS BY MR. LONERGAN:
18    Q.  Do you have any reason to
19 disagree with the follow statements: Medical
20 professionals have known for a long time that
21 opioids are addictive?
22        MR. SOBOL: Objection. Scope.
23        THE WITNESS: I -- no, I have
24    no reason to agree or disagree.
25

Page 747

1  QUESTIONS BY MR. LONERGAN:
2     Q.  Sir, yesterday you were asked a
3  couple of questions about -- I'm sorry, last
4  week you were asked --
5     A.  That's what I thought you
6  meant.
7     Q.  I don't know where you were
8  yesterday.
9         MR. SOBOL: He said last month.
10        MR. LONERGAN: Strike
11    everything I just said, and him.
12        MR. SOBOL: Certainly mine.
13 QUESTIONS BY MR. LONERGAN:
14    Q.  Last week you were asked a few
15 questions about prior consulting work that
16 you've done for manufacturers, I think,
17 manufacturers and maybe wholesalers.
18        I've only had a chance to
19 review the rough transcript of that
20 deposition, and it's a little fuzzy. No
21 offense.
22    A.  It was somebody else. She
23 wasn't here.
24    Q.  So you can object as asked and
25 answered, but I'm going to circle back.

Page 748

1         Have you ever consulted for a
2  pharmaceutical manufacturer?
3     A.  Yes.
4     Q.  What manufacturer?
5     A.  There were a couple of one-day
6  consultancies that I engaged in some time
7  ago. One of them I remember was at Johns
8  Hopkins. It had to do with schizophrenia
9  drugs, but I don't remember the manufacturer
10 involved for that.
11        The other was I think in
12 Chicago, and it was convened by someone
13 interested in using claims-like data for
14 marketing purposes to assess potential sales
15 of a drug by -- I don't remember the drug and
16 I don't remember the manufacturer. It was
17 about the methodology that one could use with
18 respect to that.
19    Q.  And do you recall how you
20 advised that nameless manufacturer about how
21 claims data could be used to conduct analyses
22 concerning sales?
23    A.  I don't remember.
24    Q.  And do you recall what you were
25 brought in to consult on concerning the

Highly Confidential - Subject to Further Confidentiality Review

Page 749

1    schizophrenia drug?
2         A.    Sorry, I don't remember.
3         Q.    What about pharmacies?  Have
4    you ever consulted for a pharmacy?
5         A.    No, I have not.
6         Q.    Have you ever consulted for a
7    wholesaler?
8         A.    Wholesalers may have been in a
9    class in something I was involved in, but
10   never directly with a wholesaler.
11        Q.    You mean they may have been in
12   a class of plaintiffs --
13        A.    Yes.
14        Q.    -- in a litigation you were
15   consulting on?
16        A.    Yes.
17        Q.    Outside of the litigation
18   context, have you ever consulted for a
19   wholesaler?
20        A.    No, I haven't.
21        Q.    Have you ever consulted for an
22   insurer?
23        A.    Yes.
24        Q.    What insurer?
25        A.    Well, many.  Many.  You know,

Page 750

1    my main line of work -- or one of my main
2    lines of work is health insurance, health
3    plan payment, health insurance payment
4    design.  So I think you wouldn't want to go
5    through my CV and hear all these.
6         MR. SOBOL:  I would.
7    QUESTIONS BY MR. LONERGAN:
8         Q.    In general terms, when you're
9    advising an insurer concerning their health
10   insurance payment design, what types of
11   things are you advising them on?
12        A.    It would be within the realm of
13   the parameters that they set in their
14   coverage.  You know, something very simple
15   and straightforward would be the degree of
16   coverage for mental health and substance
17   abuse treatment.  I might advise them on what
18   the cost implications would be of doing so.
19        Q.    Do you ever provide them with
20   advice concerning the clinical implications?
21        A.    Well, in the sense that
22   coverage for something like mental health
23   care has implications not just for cost but
24   also for the health and mental health of the
25   enrollees.  And this is something that I know

Page 751

1    about, something that I study, and I get
2    asked about that and I give my opinion on
3    that.
4         Q.    Have you ever advised an
5    insurer concerning their coverage of
6    prescription opioids?
7         A.    No, I don't think I have.
8         Q.    Have you ever consulted for a
9    pharmacy benefits manager?
10        A.    No, I never have.
11        Q.    You're familiar with what a
12   pharmacy benefits manager is?
13        A.    Yes.
14        Q.    What is a pharmacy benefits
15   manager?
16        A.    It would be a specialized firm
17   that takes responsibility for managing a
18   pharmacy benefit.
19        So what benefit means in this
20   context as part of a health insurance
21   benefit, that there might be a, you know,
22   single large insurer that has responsibility
23   for the overall picture but then writes
24   contracts with specialized firms, of which a
25   PBM, or a pharmacy benefit manager, is one,

Page 752

1    but there are other types of these
2    specialized firms, and either on a cost or a
3    risk basis or some kind of combination of a
4    cost and a risk basis, makes a contract with
5    a PBM.
6         And then the PBM has the
7    responsibility for helping the client select
8    the drugs on the -- to be offered in the
9    formulary, would have responsibility to share
10   with a client of the tiering and the cost
11   responsibility of the enrollees, and would be
12   responsible for doing negotiation with
13   manufacturers around procurement of the drugs
14   for the client, as well as conducting some
15   utilization management activities that might
16   influence actual drug utilization.
17        Q.    And a PBM's customers, are
18   those insurers, either insurance companies or
19   self-insured entities?
20        A.    That would be generally
21   accurate, yes.
22        Q.    Okay.  And what is a
23   self-insured employer?
24        A.    Self-insured refers to the --
25   the practice of an employer who in simple

91 (Pages 749 to 752)

Highly Confidential - Subject to Further Confidentiality Review

Page 753

1  terms pays claims directly. Now that's kind
2  of a simplification.
3        They may contract with a
4  third-party administrator to actually receive
5  the bills, maybe help negotiate the prices
6  for the services, maybe even decide the
7  network of different providers that would be
8  available to a firm's employees.
9        So the TPA would be responsible
10  for some part of the -- you know, in a
11  broader sense the design of the benefit.
12        But then the cost risk
13  associated with that, when you say
14  self-insurance, that falls on the employer.
15        One more quick sentence about
16  this. It's not always a black and white
17  world in which all the risk is with the
18  insurer, all the risk is with the employer.
19  It's often a shared risk situation.
20     Q.    And a self-insured employer
21  and/or an insurance company, is it correct
22  that they rely on a PBM to administer the
23  pharmacy benefits for their covered lives?
24     A.    Well, they'll partially rely on
25  a PBM, yes. It wouldn't be entirely.

Page 754

1     Q.    Would that be the norm?
2        MR. SOBOL: Objection.
3        THE WITNESS: Well, if you --
4  you may not even choose to use a PBM,
5  for example. You may self-administer
6  your benefit, which a number of
7  insurers do.
8        So PBMs are, number one,
9  optional. And then the nature of the
10  PBM contract and what you -- what you
11  decide about as an employer or an
12  insurer can vary by PBM and it can
13  vary by contract within the PBM. So
14  it's hard to generalize.
15  QUESTIONS BY MR. LONERGAN:
16     Q.    Do you have a sense of
17  approximately how many people in the United
18  States today receive their pharmacy benefits
19  through a PBM?
20     A.    A very large number.
21     Q.    Do you have a sense of what
22  percentage of the country it is?
23     A.    Percentage of the country? Oh,
24  I don't know. Of the number of people in the
25  country, maybe 70 percent or 80 percent.

Page 755

1     Q.    Would you consider that
2  significant?
3        MR. SOBOL: Objection.
4        THE WITNESS: That's a pretty
5  big number, yeah. That's why we pay
6  attention to these in my work.
7  QUESTIONS BY MR. LONERGAN:
8     Q.    I know we had the back and
9  forth on what significant meant before. I'm
10  just wondering if that's significant.
11     A.    Yeah, that meets my criteria.
12     Q.    Have you had the opportunity to
13  examine Summit County and Cuyahoga
14  County's --
15     A.    This has nothing to do with
16  you. Sorry. There was just something in my
17  water. We're going to put this right over
18  here.
19        MR. SOBOL: I think it's
20  swimming the backstroke.
21        THE WITNESS: Sorry.
22        MR. LONERGAN: It's quite all
23  right.
24  QUESTIONS BY MR. LONERGAN:
25     Q.    Have you had a chance to review

Page 756

1  how Summit County and Cuyahoga County's
2  insurance plans work for their covered county
3  employees?
4     A.    Yes, generally.
5     Q.    And do they both rely on the
6  services of a PBM?
7     A.    You know, I don't know that I
8  examined that aspect of it.
9     Q.    What aspect of it did you
10  examine?
11     A.    I was -- first of all, my
12  understanding is there's more than one
13  involved in each of the counties, more than
14  one insurer involved, depending -- and they
15  cover different --
16     Q.    Presently or historically?
17     A.    Certainly historically, and
18  there could have even been some years where
19  there was more than one active in any one
20  year.
21        I was more interested when I
22  looked at this stuff in the self-insured
23  versus risk-based contracting.
24     Q.    And what did you find?
25     A.    It's a mix.

Highly Confidential - Subject to Further Confidentiality Review

Page 757

1    Q.    What do you mean by that?
2    A.    Huh?
3    Q.    What do you mean by that?
4    A.    I mean there are some of both,
5  and even within contracts that are labeled
6  self-insured, there's some risk, sure.
7    Q.    Did you have an opportunity to
8  review any of the counties' contracts that
9  they've entered into with PBMs?
10    A.    I don't recall. I don't think
11  so.
12    Q.    Would it surprise you to learn
13  that those contracts gave the counties the
14  ultimate right to make determinations
15  concerning the formulary for the covered
16  patients?
17         MR. SOBOL: Objection.
18         THE WITNESS: Yeah, as I said
19      when we were discussing this more
20      generally, the division of labor
21      between what a PBM decides and what an
22      employer, in this case the county
23      government, decides is not fixed in
24      stone, and it varies across different
25      contractual arrangements. So, no, it

Page 758

1      wouldn't surprise me.
2  QUESTIONS BY MR. LONERGAN:
3    Q.    Are you familiar with the term
4  "pharmacy and therapeutics committee"?
5    A.    Yes, I am.
6    Q.    Otherwise known as a P & T
7  committee?
8    A.    Yes.
9    Q.    What is a P & T committee?
10    A.    A P & T would be a committee
11  that's part of either a PBM or perhaps an
12  insurer that makes recommendations regarding
13  the formulary coverage of alternative drug
14  products.
15    Q.    Have you ever served on a P & T
16  committee?
17    A.    No, I never have.
18    Q.    Do you know what types of
19  professionals typically serve on a P & T
20  committee?
21    A.    Generally, yes.
22    Q.    What types of professionals?
23    A.    There would be physicians, of
24  course, of different types. There would be
25  pharmacists.

Page 759

1    Q.    How about medical ethicists?
2    A.    Medical ethicists? There may
3  well be. Some probably have, and some
4  probably don't.
5    Q.    I think you already said this,
6  but in your experience both PBMs and insurers
7  typically have P & T committees; is that
8  correct?
9    A.    That's what I said, yes.
10    Q.    And what types of information
11  do P & T committees typically rely on when
12  evaluating a drug or a class of drugs?
13    A.    They are -- typically evaluate
14  evidence that they find in their research
15  literature on -- mostly on effectiveness.
16    Q.    So they review medical
17  literature; is that correct?
18    A.    That's correct.
19    Q.    Do they review FDA-approved
20  product labels?
21    A.    Yes, I think they do.
22    Q.    Do they, in your experience,
23  review proprietary data concerning their
24  customers' use of products?
25         MR. SOBOL: Objection.

Page 760

1         THE WITNESS: You see, in my
2      experience, I didn't mean to imply a
3      personal experience with a P & T
4      committee.
5         My knowledge about this comes
6      from my work on health plans and my
7      knowledge about that.
8         And then do they what? I'm
9      sorry.
10  QUESTIONS BY MR. LONERGAN:
11    Q.    Rely on their proprietary
12  data --
13    A.    Proprietary data?
14    Q.    -- concerning their customers'
15  use of pharmaceuticals.
16         MR. SOBOL: Objection.
17         THE WITNESS: I'm not sure.
18  QUESTIONS BY MR. LONERGAN:
19    Q.    Okay. How about clinical
20  guidelines? Do P & T committees rely on
21  clinical guidelines in making assessments of
22  pharmaceuticals or classes of
23  pharmaceuticals?
24    A.    Clinical guidelines, published
25  clinical guidelines, would be part of the

Highly Confidential - Subject to Further Confidentiality Review

Page 761

1    research literature.
2         Q.    What is a formulary?
3         A.    A formulary is a listing of
4    pharmaceutical products that are eligible for
5    some coverage in a particular health
6    insurance plan.
7              It typically would have, say,
8    three tiers, in which tier 1 is typically
9    generic tier, and that's where the copayment
10   obligations of the enrollees are the least.
11   You know, just, for example, it might be $10
12   would be the co-pay on tier 1.
13             Tier 2 would be typically
14   the -- what would be called preferred brand
15   drugs for which there would be some coverage,
16   but the coverage would be not -- would
17   require more than a $10 co-pay.  Maybe, say,
18   a $25 co-pay.
19             And then a third tier would be
20   typically referred to as nonpreferred brand
21   drugs.  These would have some coverage but
22   even higher rates of co-pay.
23             And there may be some products
24   that aren't even on the formulary.  So it's
25   not -- you know, all drugs aren't classified

Page 762

1    in all tiers, and formularies may well have
2    more than one -- many have more than three
3    tiers, some of them have one tier.  So
4    there's a range of arrangements.
5         Q.    And in your work consulting for
6    health insurance companies, have you worked
7    with them to devise strategies concerning
8    formularies?
9         A.    I'm just thinking.  No, I don't
10   think I have.
11        Q.    Okay.  In your experience, do
12   PBMs and insurers typically employ
13   formularies for the customers they're
14   serving?
15        A.    Yes.
16        Q.    Have you had the opportunity to
17   review or examine the role that formularies
18   may have played in connection with the use of
19   prescription opioids?
20             MR. SOBOL:  Objection.
21             THE WITNESS:  Well, not beyond
22        my general understanding of how
23        formularies work.
24   QUESTIONS BY MR. LONERGAN:
25        Q.    Okay.  In your experience, are

Page 763

1    drug formularies an effective means of
2    influencing patient behavior concerning
3    selection of prescription pharmaceuticals?
4             MR. SOBOL:  Objection.  Scope.
5             THE WITNESS:  It's not
6        something I studied here.
7    QUESTIONS BY MR. LONERGAN:
8         Q.    So you don't know?
9         A.    Well, it's not something I
10   studied.
11             MR. SOBOL:  Objection.  Scope.
12   QUESTIONS BY MR. LONERGAN:
13        Q.    No, I understand, but -- and
14   I'm not asking if you studied it here.  I'm
15   asking you, in your experience and given that
16   you're a health care economist, are drug
17   formularies an effective means of influencing
18   patient behavior with respect to the
19   selection of prescription pharmaceuticals?
20             MR. SOBOL:  Objection.  Scope.
21             THE WITNESS:  Well, it's part
22        of the intention of formularies to
23        influence not just patients but to
24        influence doctors in what they
25        recommend.  And, yes, formularies can

Page 764

1        affect selection of drugs.
2    QUESTIONS BY MR. LONERGAN:
3         Q.    And given that you haven't
4    examined the role of formularies with respect
5    to prescription opioids, you have no basis
6    upon which to opine that that was not the
7    case with respect to prescription opioids,
8    correct?
9             MR. SOBOL:  Objection.  Scope.
10             THE WITNESS:  There's a couple
11        of negatives in there.  I'm sorry.  If
12        you don't mind, you can ask it again.
13        I'll get it the second time.
14             MR. LONERGAN:  I'll do my best.
15   QUESTIONS BY MR. LONERGAN:
16        Q.    Given that you haven't examined
17   the role of formularies with respect to
18   prescription opioids, you have no basis upon
19   which to opine that formularies were not
20   effective in influencing the behavior of
21   patients with respect to prescription
22   opioids, correct?
23             MR. SOBOL:  Objection.  Scope.
24             THE WITNESS:  That's something
25        I didn't study.

94  (Pages 761 to 764)

Highly Confidential - Subject to Further Confidentiality Review

Page 765

1    QUESTIONS BY MR. LONERGAN:
2        Q.    So --
3        A.    However, the negative or
4    positives work out there.
5        Q.    So you have no basis upon which
6    to have an opinion one way or the other on
7    the influence of formularies on the use of
8    prescription opioids, right?
9            MR. SOBOL: Objection. Scope.
10           THE WITNESS: I didn't study
11       that.
12   QUESTIONS BY MR. LONERGAN:
13       Q.    Okay. Outside of formularies,
14   PBMs and insurers also employ utilization
15   management tools to influence patient
16   behavior, correct?
17       A.    That's correct.
18           MR. SOBOL: Objection. Scope.
19           THE WITNESS: I think I
20       mentioned that earlier.
21   QUESTIONS BY MR. LONERGAN:
22       Q.    I think you did.
23           I just want to be a little more
24   specific about what a utilization management
25   tool is.

Page 766

1            Is a quantity limit, in your
2    mind, a utilization management tool?
3        A.    That would be an example of a
4    utilization management tool.
5        Q.    And what is a quantity limit?
6        A.    It would be a -- you know, kind
7    of rule that a PBM might administer to say
8    that there's a maximum number of, say, pills
9    that would be covered under the formulary.
10       Q.    And in your experience, are
11   quantity limits typically effective at
12   influencing patient behavior with respect to
13   prescription drugs generally?
14       A.    I've never explicitly studied
15   quantity limits.
16       Q.    Okay. How about step therapy?
17   Is that a utilization management tool?
18       A.    Yes, it is.
19       Q.    What is step therapy?
20       A.    Step therapy refers to another
21   kind of protocol that a PBM would implement
22   that says step 1 might be where a patient
23   with a certain health condition is required
24   to start in terms of treatment.
25           And then to get step 2 to go in

Page 767

1    an alternative, there would be some
2    conditions under which a patient could move
3    from step 1 to step 2.
4        Q.    Have you studied the
5    effectiveness of step therapy protocols in
6    influencing patient behavior?
7        A.    No, I haven't.
8        Q.    What about prior authorization,
9    is that a utilization management tool?
10       A.    Yes, it is.
11       Q.    And what is prior
12   authorization?
13       A.    Prior authorization refers to
14   another protocol that a PBM or insurer might
15   use to require that before a service is
16   delivered to a patient, which could be some
17   kind of physician procedure or a
18   hospitalization or, in this case,
19   pharmaceuticals, a call needs to be made to
20   someone from the insurer, from the PBM, to
21   authorize the coverage for that service or
22   product.
23       Q.    Earlier today I think you
24   testified that PBMs won't know why a patient
25   is receiving a prescription opioid because

Page 768

1    they don't receive the diagnosis; is that
2    correct?
3        A.    That's -- generally, that's
4    correct.
5        Q.    If prior authorization were
6    required for the distribution or dispensation
7    of a prescription opioid, you'd agree in that
8    instance a PBM or an insurer would be
9    well-aware of the diagnosis code, correct?
10       A.    Well, I think that's, you know,
11   a different mechanism than getting a claim.
12   And if you ask me in general terms what
13   happens during prior authorization, someone
14   familiar with the medical condition of the
15   patient would make a call and explain the
16   reasons why this product were needed, and it
17   would include a description of the health --
18   you know, what is the basis of the health
19   needs of the patient.
20       Q.    Do you know the extent to which
21   any of these utilization management tools,
22   quantity limits, step therapy or prior
23   authorization, were employed historically in
24   connection with the prescription opioids?
25           MR. SOBOL: Objection. Scope.

95 (Pages 765 to 768)

Highly Confidential - Subject to Further Confidentiality Review

Page 769

1    Go ahead.
2         THE WITNESS:  I didn't study
3    that.
4    QUESTIONS BY MR. LONERGAN:
5    Q.    So you don't know?
6         MR. SOBOL:  Objection.  Scope.
7         THE WITNESS:  I didn't study
8    it.
9    QUESTIONS BY MR. LONERGAN:
10   Q.    Do you have any reason to
11   believe that these utilization management
12   tools were not available to be employed by
13   PBMs or insurers with respect to prescription
14   opioids?
15        MR. SOBOL:  Objection.  Scope.
16        THE WITNESS:  I don't really
17   have any reason to believe one way or
18   the other.
19   QUESTIONS BY MR. LONERGAN:
20   Q.    Are you familiar with the NCPDP
21   protocol?  NCPDP standing for National
22   Council of Prescription Drug Programs.
23   A.    I'm not familiar with that.
24   Q.    Okay.  Are you familiar with
25   how pharmacies communicate with PBMs and

Page 770

1    insurers in connection with the distribution
2    of prescription drugs?
3         MR. SOBOL:  Objection.  Scope.
4         THE WITNESS:  Well, in some
5    ways I'm generally familiar.
6    QUESTIONS BY MR. LONERGAN:
7    Q.    But you're not an expert in
8    terms of what information gets transferred
9    back and forth; is that correct?  Or what
10   protocol is used for that?
11        MR. SOBOL:  Objection.  Scope.
12        THE WITNESS:  Well, I think it
13   depends on what you ask specifically
14   whether I'm likely to know it or not.
15   QUESTIONS BY MR. LONERGAN:
16   Q.    Okay.  So in a hypothetical,
17   let's say your lawyer goes to the pharmacy to
18   pick up a prescription drug, what information
19   does that pharmacy communicate to his insurer
20   and the PBM, and on what protocol is it used
21   to do that?
22        MR. SOBOL:  Objection.
23   Compound.  Scope.
24        THE WITNESS:  I will probably
25   just get this partially right, which

Page 771

1    is --
2    QUESTIONS BY MR. LONERGAN:
3    Q.    Okay.  He will tell you not to
4    guess, but...
5    A.    The pharmacy would communicate
6    electronically with the PBM or the health
7    insurer about the -- who is being --
8    requested the prescription on behalf of whom,
9    that is, what patient, possibly the doctor,
10   and what the prescription -- what the
11   prescription is.
12   Q.    Is any other information
13   transferred at that time?
14   A.    There may be.
15   Q.    You don't know?
16   A.    That's -- I told you what I
17   know.
18   Q.    Okay.  And you don't know what
19   protocol is used for that communication,
20   correct?
21   A.    I'm sorry, by "protocol" you
22   mean electronic something or the other?
23   Q.    You've already testified you
24   don't know what the NCPDP protocol is, so I
25   probably don't need to ask that question.

Page 772

1    A.    All right.
2    Q.    At paragraph 23 of your public
3    nuisance report, you refer to scientifically
4    acceptable clinical criteria with respect to
5    prescription opioids.
6         Do you see that?
7    A.    Yes.
8    Q.    What are the scientifically
9    acceptable clinical criteria you're referring
10   to in that paragraph?
11   A.    This is a little more general.
12   It says "like prescription opioids," but the
13   scientifically acceptable clinical criteria
14   would be -- you know, medical justification
15   would be another way to -- medically justify
16   would be another way to say it.
17   Q.    Fair.
18        But my question is a little
19   more specific.
20        Is there a specific criteria
21   you believe is the scientifically acceptable
22   criteria for the use of prescription opioids?
23   A.    Well, this is what doctors know
24   about --
25   Q.    Uh-huh.

96 (Pages 769 to 772)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 773

1    A.    -- what are the medically
2    appropriate treatments based on science, and
3    the science comes from research studies.
4       Q.    What have you done to
5    understand the scientifically acceptable
6    clinical criteria for the use of prescription
7    opioids?
8       A.    I've -- for this I rely on the
9    medical expert reports that I mentioned
10   earlier: Schumacher, Parran, Egilman.
11      Q.    Anything else?
12      A.    I've read things, researched
13   literature.
14      Q.    Is all of the research
15   literature that you've read in connection
16   with this cited or noted in your expert --
17   one of your -- either of your expert reports?
18      A.    The ones I relied on, yes.
19      Q.    Okay.  Anything else?
20      MR. SOBOL:  Objection.
21      THE WITNESS:  Not that I can
22   think of.
23   QUESTIONS BY MR. LONERGAN:
24      Q.    You also in your public
25   nuisance report conduct a cost/benefit

Page 774

1    analysis concerning the quality of life
2    attributes of prescription opioids.
3       Correct?
4       A.    Well, I wouldn't quite call it
5    that, but I do an analysis of quality of
6    life.
7       Q.    What would you call it?
8       A.    I would call it an economic
9    assessment of the pluses and minuses of the
10   effect of opioid shipments on quality of
11   life.
12      Q.    And in doing that, you had to
13   identify the instances where you believed
14   that the use of prescription opioids was
15   scientifically acceptable, correct?
16      A.    That's right.
17      Q.    Do you agree that chronic pain
18   is a serious mental, medical condition?
19      A.    I'm sure it is.
20      Q.    Do you agree that chronic pain
21   affects millions of people in the United
22   States?
23      MR. SOBOL:  Objection.  Scope.
24      THE WITNESS:  I see that in
25   things I read.

Page 775

1    QUESTIONS BY MR. LONERGAN:
2       Q.    Do you agree that chronic pain
3    affects residents of Summit County, Ohio?
4       MR. SOBOL:  Objection.  Scope.
5       THE WITNESS:  Well, I didn't
6    study that, but I'm sure that's true.
7    QUESTIONS BY MR. LONERGAN:
8       Q.    Do you agree that chronic pain
9    affects residents of Cuyahoga County, Ohio?
10      MR. SOBOL:  Objection.  Scope.
11      THE WITNESS:  That's, again,
12   something I didn't study, but I'd be
13   surprised if it weren't true.
14   QUESTIONS BY MR. LONERGAN:
15      Q.    Do you agree that there are
16   risks associated with untreated chronic pain?
17      MR. SOBOL:  Objection.  Scope.
18      THE WITNESS:  I really don't
19   know.
20   QUESTIONS BY MR. LONERGAN:
21      Q.    So you don't know?
22      A.    I don't know.
23      Q.    It's not something you took
24   into account doing your cost/benefit
25   analysis?

Page 776

1       A.    I didn't think I needed to.
2       Q.    Do you agree that every --
3       A.    Excuse me.  By the way, I
4    wouldn't call it a cost/benefit analysis.  I
5    know what you're referring to.
6       Q.    What's the term?  I'll use your
7    term.  I just don't remember what you said.
8       A.    It's an economic assessment of
9    the effect of shipments on quality of life.
10   You call it --
11      Q.    Can we agree to call it a
12   cost/benefit analysis --
13      MR. SOBOL:  Objection.
14   QUESTIONS BY MR. LONERGAN:
15      Q.    -- for short?
16      MR. SOBOL:  Objection.
17      THE WITNESS:  It kind of
18   bothers me to use the wrong words in
19   that, but you can shorten it to "your
20   analysis of quality of life."
21      MR. SOBOL:  Is that -- "your
22   analysis," is that one word or two?
23      THE WITNESS:  It's your
24   analysis.
25      MR. SOBOL:  It's your analysis.

97 (Pages 773 to 776)

Highly Confidential - Subject to Further Confidentiality Review

Page 777

1    QUESTIONS BY MR. LONERGAN:
2        Q.   Do you agree --
3             MR. LONERGAN:  I'm running
4    against the clock here.  I would love
5    to engage with you guys.
6    QUESTIONS BY MR. LONERGAN:
7        Q.   Do you agree that no single
8    treatment option will be appropriate for
9    every chronic pain patient?
10       A.   I really don't know.  It's
11   not --
12       Q.   It's not something you --
13       A.   -- not my --
14       Q.   -- considered in your economic
15   analysis --
16       A.   It's not my --
17       Q.   -- correct?
18       A.   Yeah, it's not my expertise.
19       Q.   Do you agree that it is
20   important for physicians to have a variety of
21   treatment options to choose from when
22   treating a medical condition?
23            MR. SOBOL:  Objection.  Scope.
24            THE WITNESS:  I really --
25   generally, options are good.  I really

Page 778

1    don't have a specific opinion about
2    particular medical options.
3    QUESTIONS BY MR. LONERGAN:
4        Q.   Do you agree that all
5    treatments for chronic pain have risks?
6             MR. SOBOL:  Objection.  Scope.
7             THE WITNESS:  I don't know.
8    QUESTIONS BY MR. LONERGAN:
9        Q.   It's not something you
10   considered as a part of conducting your
11   economic analysis, correct?
12            MR. SOBOL:  Objection.  Scope.
13            THE WITNESS:  Yeah, I didn't
14   study that.
15   QUESTIONS BY MR. LONERGAN:
16       Q.   Do you agree that it's the role
17   of the prescribing physician to weigh the
18   risks and benefits of any pain medication
19   when treating an individual patient?
20            MR. SOBOL:  Objection.  Scope.
21            THE WITNESS:  Well, ideally an
22   agent, which is what the economic
23   literature refers to physicians as --
24   an agent is somebody acting on behalf
25   of the patient -- should help the

Page 779

1    patient in making the right decision
2    for them.
3    QUESTIONS BY MR. LONERGAN:
4        Q.   And you believe --
5        A.   Considering --
6        Q.   You believe that didn't happen
7    here, correct?
8        A.   Considering the pluses and
9    minuses.
10            Could you be more specific
11   about what you're asking?
12       Q.   Well, strike that.
13            In paragraph 22 of your public
14   nuisance report, you opined that physicians
15   were misled by defendants' marketing,
16   correct?
17       A.   That's what I say in the last
18   sentence.
19       Q.   And that's your opinion?
20       A.   Well, it's my opinion.  It's,
21   again, based on the reports of the medical
22   experts.
23       Q.   You're not an expert on the FDA
24   regulations concerning prescription
25   pharmaceutical marketing, are you?

Page 780

1        A.   I know something about them.
2    It depends on what you ask.
3        Q.   Do you hold yourself out to be
4    an expert on the FDA regulations concerning
5    prescription pharmaceutical marketing?
6        A.   Well, it again depends.  In my
7    work, I need to know some things.  So it's
8    not zero.  It's not 100 percent.  It really
9    depends on the particular area you're asking
10   about.
11       Q.   Well, the particular area I'm
12   asking about are the FDA regulations
13   concerning prescription pharmaceutical
14   marketing.
15       A.   Yes.
16       Q.   Do you consider yourself to be
17   a 100 percent expert on those regulations?
18            MR. SOBOL:  Objection.  Asked
19   and answered.
20            THE WITNESS:  No, I don't
21   consider myself to be a 100 percent,
22   but I'm also not a zero percent.
23   QUESTIONS BY MR. LONERGAN:
24       Q.   Do you have an opinion in this
25   litigation as to whether defendants'

98  (Pages 777 to 780)

Highly Confidential - Subject to Further Confidentiality Review

Page 781

1    prescription opioid marketing violated the
2    FDA regulations concerning prescription
3    pharmaceutical marketing?
4            MR. SOBOL: Objection. Scope.
5            THE WITNESS:  That's not
6        something that I studied.
7    QUESTIONS BY MR. LONERGAN:
8        Q.    Are you able to point to any
9    physician who was actually misled by the
10   opioid manufacturers' marketing?
11           MR. SOBOL:  Objection. Scope.
12           THE WITNESS:  That's not
13       something that I studied.
14   QUESTIONS BY MR. LONERGAN:
15       Q.    Do you agree that physicians
16   are learned intermediaries?
17           MR. SOBOL:  Objection. Scope.
18           THE WITNESS:  Well, I agree
19       that physicians have medical knowledge
20       that patients generally do not know,
21       and I agree that they're
22       intermediaries in a number of ways
23       between patients and the patients'
24       needs and the health care services and
25       products that patients require.

Page 782

1    QUESTIONS BY MR. LONERGAN:
2        Q.    What do you understand the term
3    "learned intermediary" to mean?
4        A.    Well, I explained my -- I don't
5    have a specialized legal understanding.  I
6    only explain what the two words mean to me in
7    this context.  I don't know if that was
8    clear.
9            But learned is specialized
10   medical knowledge that patients don't have,
11   and intermediary means they assist the
12   patients in provide -- in getting access to
13   services that the patients needs.
14       Q.    Fine.
15           Using your definition of
16   learned intermediary, do you consider doctors
17   who prescribe prescription opioids to
18   patients to be learned intermediaries?
19           MR. SOBOL:  Objection. Scope.
20       Form.
21           THE WITNESS:  Well, I think in
22       general doctors are learned
23       intermediaries, and so that covers
24       doctors and, you know, the tasks that
25       they have.

Page 783

1    QUESTIONS BY MR. LONERGAN:
2        Q.    Sir, is it your understanding
3    that each prescription opioid at issue in
4    this litigation carries with it an
5    FDA-approved label or package insert?
6            MR. SOBOL:  Objection. Scope.
7            THE WITNESS:  Yeah, I do
8        understand that.
9    QUESTIONS BY MR. LONERGAN:
10       Q.    And you understand that the
11   pharmaceutical manufacturers' employees who
12   detailed doctors provided those labels to
13   physicians during those detail visits?
14           MR. SOBOL:  Objection. Scope.
15           THE WITNESS:  Well, I don't
16       know what the transaction was between
17       the detail people and the doctors.
18   QUESTIONS BY MR. LONERGAN:
19       Q.    Do you have an opinion as to
20   whether the FDA-approved labels for the
21   prescription opioids at issue in this
22   litigation were misleading?
23           MR. SOBOL:  Objection. Scope.
24           THE WITNESS:  I don't have an
25       opinion about that.  I didn't study

Page 784

1        it.
2    QUESTIONS BY MR. LONERGAN:
3        Q.    In your opinion, is it possible
4    for an opioid manufacturer to appropriately
5    market a prescription opioid?
6            MR. SOBOL:  Objection. Scope.
7            THE WITNESS:  Well, it might
8        be.  I didn't study it.
9    QUESTIONS BY MR. LONERGAN:
10       Q.    Well, you did -- I mean, you
11   did opine that the opioid manufacturers
12   misled physicians, correct?
13           MR. SOBOL:  Objection. Scope.
14           THE WITNESS:  Yeah, based on
15       other reports, yes.
16   QUESTIONS BY MR. LONERGAN:
17       Q.    Right.
18           But based on your understanding
19   that the manufacturing was misleading, right?
20           MR. SOBOL:  Objection. Scope.
21           THE WITNESS:  Yes.
22   QUESTIONS BY MR. LONERGAN:
23       Q.    And so here we are.  Now I'm
24   asking:  Is it possible for a prescription
25   opioid manufacturer to, in your mind,

99  (Pages 781 to 784)

Highly Confidential - Subject to Further Confidentiality Review

Page 785

1  appropriately market a prescription opioid?
2       MR. SOBOL: Objection. Scope.
3  Form.
4       THE WITNESS: It might be on --
5  I really didn't study it. I don't
6  know.
7  QUESTIONS BY MR. LONERGAN:
8       Q.   Is it possible for an opioid
9  manufacturer to market a prescription opioid
10 in a way that expands the market for
11 prescription opioid and still be appropriate?
12      MR. SOBOL: Objection. Scope.
13 Form.
14      THE WITNESS: I don't know.
15 QUESTIONS BY MR. LONERGAN:
16      Q.   As a health care economist, are
17 you familiar with the economic literature
18 concerning the factors that influence
19 physician prescribing?
20      A.   Yes.
21      Q.   And is one of those factors
22 manufacturer marketing?
23      A.   Yes.
24      Q.   Is one of those factors the
25 overall cost to the patient?

Page 786

1       A.   Probably sometimes. Not always
2  as much as it should be.
3       Q.   Is one of those factors the
4  applicable formulary?
5       A.   Sometimes, probably.
6       Q.   Is one of those factors
7  applicable utilization management protocols?
8       A.   Well, generally.
9       Q.   Is one of those factors known
10 to be a physician's experience with a
11 particular medication?
12      A.   That's also one of the factors.
13      Q.   Is one of those factors known
14 to be a physician's experience with a
15 particular disease state?
16      A.   That's also a factor.
17      Q.   Is one of those factors known
18 to be a physician's overall years of
19 experience?
20      A.   Generally a physician's
21 experience affects how they treat patients.
22      Q.   Are there any other factors
23 that you're aware of that are known to affect
24 a physician's prescribing?
25      MR. SOBOL: Objection. Scope.

Page 787

1       THE WITNESS: You gave a pretty
2  long list there.
3       Well, at least there's also
4  financial incentives to physicians --
5  QUESTIONS BY MR. LONERGAN:
6       Q.   Anything else?
7       A.   -- that would also affect it.
8       I think within the buckets you
9  gave, it would capture most of what I can
10 think of.
11      Q.   Given all of the different
12 factors we've just walked through that are
13 known in the economic literature to affect a
14 physician's prescribing, would you agree that
15 marketing would affect a prescribing
16 physician differently from other prescribing
17 physicians?
18      MR. SOBOL: Objection.
19 QUESTIONS BY MR. LONERGAN:
20      Q.   I can ask that question in a
21 better way.
22      A.   Thank you.
23      Q.   Is it fair to say that
24 detailing would be expected to affect
25 different physicians differently?

Page 788

1       MR. SOBOL: Objection. Scope.
2       THE WITNESS: It might. I'm
3  not sure.
4  QUESTIONS BY MR. LONERGAN:
5       Q.   It's not something you have an
6  opinion on?
7       A.   I haven't studied it, no.
8       MR. LONERGAN: Why don't we
9  take a break.
10      VIDEOGRAPHER: The time is
11 4:19 p.m., and we're off the record.
12      (Off the record at 4:19 p.m.)
13      VIDEOGRAPHER: The time is
14 4:32 p.m., and we're on the record.
15      CROSS-EXAMINATION
16 QUESTIONS BY MR. CARTER:
17      Q.   My name is Ed Carter. I
18 represent Walmart, and I have some questions
19 for you.
20      All right?
21      A.   That's fine. Yeah, sure.
22      Q.   Who are the retail pharmacy
23 defendants in this case?
24      A.   I can name some.
25      Q.   Which ones can you name?

100 (Pages 785 to 788)

Highly Confidential - Subject to Further Confidentiality Review

Page 789

1      A.    I can name CVS.  I can name
2  Rite Aid.  I guess Walmart would be a retail.
3      Q.    Any others?
4      A.    Those are the only ones I can
5  name.
6      Q.    What consideration, if any, did
7  you pay to the retail pharmacy defendants in
8  preparation of your damages report?
9      A.    I made sure to mention the
10  defendants included signatories to the CSA.
11      Q.    Anything else in your damages
12  report that takes the retail pharmacy
13  defendants into specific consideration?
14      A.    No, there's nothing else in the
15  damages report that gives special attention
16  to the retail pharmacies.
17      Q.    So nothing beyond their status
18  as CSA signatories?
19      A.    That's correct, no other
20  special attention.
21      Q.    Same question for the nuisance
22  report:  What specific attention did you pay
23  to the retail pharmacy defendants in the
24  course of preparing your nuisance report?
25      A.    There was no special attention

Page 790

1  to the retail pharmacy defendants in the
2  public nuisance report.
3      Q.    What role in terms of conduct
4  do the retail pharmacy defendants play in the
5  context of your damages report?
6      A.    They distribute shipments of
7  opioids.
8      Q.    Do you know to whom they
9  distribute those shipments?
10      A.    Well, to patients.
11      Q.    Do you know whether they --
12  whether the retail pharmacy defendants ever
13  distribute outside of their own corporate
14  network?
15          MR. SOBOL:  Objection.
16          THE WITNESS:  I'm not sure what
17      you mean.
18  QUESTIONS BY MR. CARTER:
19      Q.    So do you know where Walmart --
20  for example, when Walmart distributed
21  opioids, do you know to whom Walmart
22  distributed opioids?
23      A.    Well, they would have sold some
24  from their stores.  I don't know of any other
25  outlet for their opioids.

Page 791

1      Q.    Do you know whether Walmart
2  ever distributed to a non-Walmart pharmacy?
3      A.    No, I don't know that.
4      Q.    Do you know whether any CVS
5  distribution ever went to a non-CVS Pharmacy?
6      A.    I'm not familiar with where
7  else the CVS shipments might have gone.
8      Q.    Same question for Rite Aid?
9      A.    Same answer:  I'm not sure
10  where the Rite Aid shipments would have gone,
11  aside from Rite Aid pharmacies.
12      Q.    Do you know whether any of the
13  retail pharmacy defendants currently
14  distribute opioids?
15          MR. SOBOL:  Objection. Scope.
16          THE WITNESS:  I haven't studied
17      that.
18  QUESTIONS BY MR. CARTER:
19      Q.    Will you identify for me all
20  allegedly wrongful conduct on the part of the
21  retail pharmacy defendants that factors into
22  your damages report?
23          MR. SOBOL: Objection. Scope.
24          THE WITNESS:  I didn't study
25      that.

Page 792

1  QUESTIONS BY MR. CARTER:
2      Q.    Okay.  Identify for me all
3  wrongful conduct on the part of the pharmacy
4  defendants that factors into your nuisance
5  report.
6          MR. SOBOL: Objection. Scope.
7          THE WITNESS:  I didn't study
8      that.
9  QUESTIONS BY MR. CARTER:
10      Q.    In your damages report, is it
11  possible that there are some defendants in
12  this case that are not responsible for any
13  damages -- any of your damages estimates?
14          MR. SOBOL: Objection. Scope.
15      Form.
16          THE WITNESS:  I'm not sure how
17      to even answer that.  I didn't study
18      it.
19  QUESTIONS BY MR. CARTER:
20      Q.    So in the course of preparing
21  your damage reports, is it accurate to say
22  that you did not make any calculation or
23  apportionment of the damages in your estimate
24  to any particular defendant?  Is that a true
25  statement?

101 (Pages 789 to 792)

Highly Confidential - Subject to Further Confidentiality Review

Page 793

1     A.    That's generally a true
2  statement.
3         As I'm sure you know, the work
4  in my report was to identify the potentially
5  affected costs, and then I had input,
6  primarily from Professor Cutler, about the
7  share of those costs that could be attributed
8  to misconduct.
9         Now, the nature of the overall
10  enterprise is that the attribution to
11  particular defendants becomes possible at the
12  Rosenthal stage, depending on some things,
13  but it's not an input that would come into
14  play in my stage.
15     Q.    So putting to one side inputs
16  from Cutler or from Rosenthal, you,
17  personally, you have not conducted an
18  independent assessment of damage estimates
19  apportioned to a particular defendant?
20     A.    That's correct, my damage
21  estimates apply to shipments due to
22  misconduct where I got the inputs from other
23  experts.
24     Q.    Same question for your nuisance
25  report.  Do the estimates in your nuisance

Page 794

1  report turn in any way on a specific
2  defendant?
3         MR. SOBOL:  Objection.  Form.
4         THE WITNESS:  Can you --
5  QUESTIONS BY MR. CARTER:
6     Q.    Sure.
7     A.    -- explain what you mean by
8  "turn in any way"?  I'm not sure what you're
9  asking.
10     Q.    In looking at your public
11  nuisance report, can anyone pull from that a
12  specific apportionment of damages that you
13  would attribute to an individual defendant?
14     A.    Well, this is a similar answer
15  to the damages report:  that my estimates are
16  aggregate, and against which shares are
17  applied from the Cutler report.
18         So if those shares change
19  because of some other counterfactual, then
20  they would flow through into my public
21  nuisance.
22     Q.    Okay.  Do you know how many
23  defendant parties are in the case currently?
24     A.    I'm not sure.
25     Q.    Okay.  If five defendants left

Page 795

1  the case tomorrow, would any of the numbers
2  in your damages report change?
3         MR. SOBOL:  Objection.  Scope.
4  Form.
5         THE WITNESS:  I'm not sure.  It
6  depends.  I would have to -- I'd have
7  to know more.  I'd have to probably
8  get some guidance from legal.
9  QUESTIONS BY MR. CARTER:
10     Q.    Okay.  So, for example, if all
11  of the retail defendants were dismissed from
12  the case tomorrow, would you amend or need to
13  change your damages calculations in your
14  report?
15         MR. SOBOL:  Objection.  Scope.
16  Form.
17         THE WITNESS:  I'm not sure.  I
18  didn't study that.
19  QUESTIONS BY MR. CARTER:
20     Q.    Okay.  If five defendants left
21  the case tomorrow, would you need to make any
22  changes to your public nuisance report?
23         MR. SOBOL:  Objection.  Scope.
24  Form.
25         THE WITNESS:  I would have

Page 796

1  to -- I'm not sure.  I didn't study
2  that, and I probably need guidance
3  from legal.
4  QUESTIONS BY MR. CARTER:
5     Q.    In describing marketing
6  conduct, do you agree that a defendant who
7  never marketed or advertised opioids is not
8  responsible for any alleged harms caused by
9  such marketing?
10         MR. SOBOL:  Objection.  Scope.
11         THE WITNESS:  I'm not really
12  sure about that.
13  QUESTIONS BY MR. CARTER:
14     Q.    Okay.
15     A.    I'm sorry.
16     Q.    So you think it's possible that
17  someone who didn't engage in marketing or
18  advertising could still be responsible from
19  an economic perspective for any such harms
20  caused by that marketing?
21         MR. SOBOL:  Objection.  Form.
22  Scope.
23         THE WITNESS:  I -- I'm not --
24  I'm not sure.
25

102 (Pages 793 to 796)

Highly Confidential - Subject to Further Confidentiality Review

Page 797

1   QUESTIONS BY MR. CARTER:
2       Q.    Okay.  Do you have an expert
3   opinion one way or another on that?
4           MR. SOBOL: Objection. Scope.
5       Form.
6           THE WITNESS: I'm not sure.
7   QUESTIONS BY MR. CARTER:
8       Q.    Okay.  So you don't --
9       A.    I don't have an opinion one way
10  or the other whether that's true or false.
11      Q.    Okay.  You were asked some
12  questions about pages 90 and 92 of your
13  nuisance report.  If you turn to that section
14  with me, please, I just want to orient you.
15          You see the paragraphs 90 and
16  92?
17      A.    Yeah.  Okay.  Good.
18      Q.    The one question that didn't
19  get a form objection.
20          MR. SOBOL: Well, I was still
21      confused.
22          MR. CARTER: Fair.
23  QUESTIONS BY MR. CARTER:
24      Q.    So you recall discussing with
25  counsel the defendant -- the Subheading D,

Page 798

1   defendants were or should have been aware of
2   the interference?
3       A.    I do recall that, yes.
4       Q.    Okay.  Do you know whether any
5   of the retail pharmacy defendants are --
6   well, strike that.
7           Do you intend to include any of
8   the retail pharmacy defendants in the
9   statements that you offer in this section of
10  your report?
11          MR. SOBOL: Section D?
12          MR. CARTER: Yes.
13          THE WITNESS: Yeah,
14      potentially.
15  QUESTIONS BY MR. CARTER:
16      Q.    Okay.  Do you provide any
17  examples that specifically identify retail
18  pharmacy defendants in this section?
19      A.    No, I don't think so.
20      Q.    Did you conduct any separate
21  analysis of the alleged conduct of the retail
22  pharmacy defendants in connection with
23  forming the opinions in Subsection D of this
24  report?
25      A.    The analysis I conducted are

Page 799

1   contained in the report.  There was nothing
2   specific to the retail defendants.
3       Q.    You were asked a question about
4   whether you knew when the counties first were
5   aware of -- or should have been aware of the
6   various harms referenced in this section of
7   the report.  I want to follow up on that
8   series of questions.
9       A.    Okay.
10      Q.    You indicated that you didn't
11  know when they were first aware.  I want to
12  ask a different question.
13          Is there a time period by which
14  you can opine to a reasonable degree of
15  economic certainty that more likely than not
16  by day X Summit County was aware that it was
17  being harmed as a result of misleading
18  marketing?
19          MR. SOBOL: Objection. Scope.
20          THE WITNESS: I don't think I
21      could do that.  I wasn't asked to
22      study it.
23  QUESTIONS BY MR. CARTER:
24      Q.    Okay.  Same question for
25  Cuyahoga County.

Page 800

1           MR. SOBOL: Same objection.
2       Scope.
3           THE WITNESS: Same answer: I
4       wasn't asked to study it.  I don't
5       think I could do that.
6   QUESTIONS BY MR. CARTER:
7       Q.    Is there a date by which you're
8   willing to opine more likely than not Summit
9   County was aware that it was incurring harms
10  to the public health and welfare as a result
11  of opioid-related expenses?
12          MR. SOBOL: Objection. Scope.
13          THE WITNESS: I wasn't asked to
14      study that.  I don't think I could
15      answer that question.
16  QUESTIONS BY MR. CARTER:
17      Q.    Same question for Cuyahoga
18  County.
19      A.    Same answer:  I wasn't asked to
20  study it.  I don't think I could answer that
21  question.
22      Q.    Is it your opinion that when
23  Summit County was expending its budget for
24  2006, did the county have any idea that it
25  was making expenditures that were related to

103 (Pages 797 to 800)

Highly Confidential - Subject to Further Confidentiality Review

Page 801

1    opioids?
2         A.    I would be speculating, and
3    what is the county here?
4         Q.    Summit.
5         A.    I know.  I meant when you say
6    "Summit County," that kind of knowledge is
7    something that people have, so I would expect
8    it would depend.
9         Q.    So do you know -- do you have
10   an expert opinion one way or the other as to
11   whether in 2006, when expending its budget in
12   the various divisions that you studied,
13   whether Summit County was aware that it was
14   spending even a dollar on opioid-related
15   costs?
16        MR. SOBOL:  Objection.  Scope.
17   Form.
18        THE WITNESS:  Well, I didn't
19   study that.
20   QUESTIONS BY MR. CARTER:
21        Q.    Would that --
22        A.    Just -- excuse me, one more
23   comment.
24        Q.    Sure.
25        A.    It's -- I find it a little odd

Page 802

1    to ask about the county as being aware of
2    something.
3         I assume what you mean by that
4    is something about the people who work in the
5    county.  And since there are many, that would
6    have probably been a different answer for
7    different groups of people.
8         Q.    In your review of the case
9    materials, did you come across individuals in
10   Summit County who were aware of making
11   opioid-related expenditures in 2006?
12        A.    I don't remember talking to
13   anyone about 2006.
14        Q.    What about 2007?  And this is
15   focused on your review of the case materials,
16   whether you're aware of individuals in Summit
17   County reflecting awareness that they were
18   making opioid-related expenditures in 2007.
19        A.    I don't remember anything,
20   sitting here.
21        Q.    Okay.  Do you remember anything
22   for 2008?
23        A.    Same answer: I don't remember
24   anything sitting here.
25        Q.    2009?

Page 803

1         A.    Same answer: I don't remember
2    anything.
3         Q.    Same answer the rest of the
4    years through 2018?
5         MR. SOBOL:  Objection.  Scope.
6         THE WITNESS:  Do you mind
7    repeating the question for the block
8    of years there?
9    QUESTIONS BY MR. CARTER:
10        Q.    Sure.  Yes.
11        The last one I did was 2009.
12   So from 2010 to 2018, did you see anything in
13   your review of the case materials reflecting
14   an understanding on the part of individuals
15   in Summit County that they were making
16   opioid-related budget expenditures?
17        A.    I'm pretty sure I did.
18        Q.    Okay.  And what is the first
19   year that you recall seeing something in the
20   case materials reflecting that understanding
21   from an individual in Summit County?
22        A.    I don't remember.
23        Q.    Okay.  What about Cuyahoga
24   County?
25        And I'm asking this question at

Page 804

1    the county level.  Do you know whether the
2    county, in making its budget expenditures for
3    2006, if the county was aware that it was
4    spending even a single dollar on
5    opioid-related expenses?
6         MR. SOBOL:  Objection.  Scope.
7         THE WITNESS:  I didn't study
8    that.  I'm not sure.
9    QUESTIONS BY MR. CARTER:
10        Q.    Okay.  Did you study the
11   county's awareness for any period from 2007
12   to 2018 on that same issue?
13        A.    Well, I would have encountered
14   evidence for that.
15        Q.    Okay.  And what do you -- what
16   did you do when you encountered such
17   evidence?
18        How did you factor it into your
19   economic analysis, if at all?
20        MR. SOBOL:  Objection.  Form.
21        THE WITNESS:  Well, I found it
22   to be confirmatory that these are
23   opioid-related expenditures.  I don't
24   remember when, in each of the
25   counties, I heard -- or talked to

Highly Confidential - Subject to Further Confidentiality Review

Page 805

1    someone that they acknowledged, yes,
2    these are opioid-related expenditures.
3         But, I don't know, just in the
4    course of conversation, that became
5    clear.
6    QUESTIONS BY MR. CARTER:
7         Q.   To the extent you came across
8    confirmatory evidence, what value, what
9    weight, would you assign that in the course
10   of your economic analysis?
11            MR. SOBOL:  Objection.
12            THE WITNESS:  I'm not sure how
13   to answer that.
14   QUESTIONS BY MR. CARTER:
15        Q.   So do you know what proportion
16   of -- because we were talking about Cuyahoga
17   County.
18        Do you know what proportion of
19   Cuyahoga County's expenditures you found
20   equivalent, confirmatory evidence that the
21   individuals running those divisions were
22   aware of opioid-related expenditures?
23        A.   I'm not sure.
24            MR. SOBOL:  Objection.
25

Page 806

1    QUESTIONS BY MR. CARTER:
2         Q.   Do you know whether it was more
3    than 50 percent of the expenditures you
4    studied?
5         A.   It could -- it could be or
6    maybe not -- it could be yes or could be no.
7    I'm not sure.
8         Q.   Do you know the percent of
9    instances in Summit County where you found
10   confirmatory evidence that the individuals in
11   the county in the various divisions were
12   aware that they were making opioid-related
13   expenditures?
14            MR. SOBOL:  Objection.
15            THE WITNESS:  I don't remember
16   one way or the other.
17   QUESTIONS BY MR. CARTER:
18        Q.   Okay.  Does the absence of any
19   such confirmatory evidence give you pause
20   in the course of your economic analysis?
21        A.   Not really.  The work that I
22   did in identifying opioid-related
23   expenditures is a reliable way to get an
24   opportunity cost, as we discussed quite a bit
25   this morning.  And that is the opportunity

Page 807

1    cost with respect to what else those funds
2    could have been used for.  So it was -- I
3    mean, that's what I needed to know.
4         Q.   In the course of your example
5    about getting the car fixed and whether
6    somebody has $75 in car repairs, I want to
7    apply that to what we're discussing here.
8         Would it be possible to have an
9    opportunity cost for car repairs if the
10   individual didn't even understand that they
11   were spending $75 on car repairs?
12            MR. SOBOL:  Objection to the
13   form.
14   QUESTIONS BY MR. CARTER:
15        Q.   How does the concept of
16   opportunity cost apply when someone doesn't
17   know what they're spending the money on?
18        A.   I think it still applies.
19        Q.   How so?
20        A.   Why not?
21        Q.   So you think that -- well,
22   strike that.
23        Would a reasonable and rational
24   economic actor spend millions of dollars on
25   something without knowing they're spending

Page 808

1    that money on something?
2         A.   They probably would not, but
3    that's different than whether -- what the
4    opportunity costs of that fund -- or those
5    funds are.
6         Q.   So to the extent -- well,
7    strike that.
8         Did you see evidence in the
9    record you reviewed where individuals in
10   various divisions of the county disavowed any
11   opioid-related expenditures prior to, say,
12   2012?
13        Did you see that testimony?
14            MR. SOBOL:  Objection.
15            THE WITNESS:  I don't recall
16   it.
17   QUESTIONS BY MR. CARTER:
18        Q.   Okay.  Do you recall when --
19   well, do you know who Thomas Gilson is?
20        A.   No, sorry.
21        Q.   Do you know who Hugh Shannon
22   is?
23        A.   No, I don't.
24        Q.   Do you know the names of any of
25   the individuals in the Cuyahoga County's

105 (Pages 805 to 808)

Highly Confidential - Subject to Further Confidentiality Review

Page 809

1  Medical Examiner's Office, other than the two
2  I just gave you?
3      A.   Not as I sit here today.
4      Q.   Okay.  Do you know when
5  Cuyahoga County Medical Examiner's Office
6  first identified an opioid-related problem?
7      A.   An opioid-related problem?
8          Problem in what sense here
9  today?  A death due to opioids, or what are
10  you asking?
11      Q.   What they defined as a crisis.
12          Do you know when --
13      A.   They defined as a crisis.
14      Q.   -- they first identified a
15  crisis?
16      A.   I'm not sure --
17          MR. SOBOL:  Well, wait, wait.
18  Objection.  Scope.
19          THE WITNESS:  I didn't study
20  that.
21  QUESTIONS BY MR. CARTER:
22      Q.   Okay.  Do you believe it's
23  possible that the Summit County -- or excuse
24  me, strike that.
25          Do you believe it's possible

Page 810

1  that the Cuyahoga County Medical Examiner's
2  Office spent millions of dollars on
3  opioid-related expenditures for years before
4  they realized they had an opioid-related
5  crisis?
6          MR. SOBOL:  Objection.  Scope.
7  Form.
8          You can answer.
9          THE WITNESS:  I believe it's
10  possible.
11          Was that a question?
12          Well, I think maybe it's
13  possible.  I didn't study it.
14  QUESTIONS BY MR. CARTER:
15      Q.   Okay.  On page 12 of your
16  nuisance report, if you turn with me.
17          Okay.  Is your measure of
18  opioid-related expenditures an objective or a
19  subjective measure?
20      A.   With respect to the damages
21  report or -- I thought we were in the public
22  nuisance report.
23      Q.   We're going back to the damages
24  report.
25      A.   And in general in the damages

Page 811

1  report, opioid-related expenditures you're
2  asking about?
3      Q.   Yes.
4          Is it an objective or
5  subjective measure?
6      A.   It's an objective measure.
7      Q.   Okay.  Are opioid-related
8  expenditures ever self-evident to the people
9  making them?
10      A.   Sometimes, yes.
11      Q.   Are you a political economist?
12      A.   I border on that, yeah.  Some
13  cases.
14      Q.   Do you hold yourself out as an
15  expert political economist?
16      A.   Well, it's something I've done
17  research on, so, again, depending on what the
18  question is, I have some expertise in that,
19  yes.
20      Q.   In your prior litigation
21  experience, have you ever been offered as an
22  expert political economist?
23      A.   Political economist?  I don't
24  think I've conducted a litigation-related
25  investigation that you would call political

Page 812

1  economy.
2      Q.   Okay.  In the course of your
3  report, you rely on data from Professor
4  Cutler from the National Center of Health
5  Statistics, correct?
6      A.   Yes.
7      Q.   Okay.
8      A.   I believe so.  Or maybe is it
9  Rosenthal?
10          Can you -- I'm sorry, can you
11  let me know where you're talking about so I
12  can take a look?
13      Q.   Let me ask you this:  Are you
14  aware that there are some NCHS data that's
15  considered restricted data?
16      A.   Yeah, I'm generally aware of
17  this sort of issue, yeah.
18      Q.   Did you personally sign a data
19  use agreement with NCHS for your work in this
20  engagement?
21      A.   No, I did not.
22      Q.   Okay.  When you were working
23  with Greylock McKinnon Associates for the
24  nuisance report, do you know whether the
25  staff at Greylock McKinnon signed a data use

Highly Confidential - Subject to Further Confidentiality Review

Page 813

1   agreement with NCHS?
2           MR. SOBOL: Objection. Scope.
3           THE WITNESS: As far as I know,
4       they did not.
5   QUESTIONS BY MR. CARTER:
6       Q.   Okay. As part of your
7   supervision of their work, were you concerned
8   whether they were using restricted data
9   appropriately?
10          MR. SOBOL: Objection.
11          THE WITNESS: My understanding
12      of where the NCHS data came in was via
13      Rosenthal report. If there's -- and
14      that's how I'm answering the question.
15      And any data use arrangements wouldn't
16      have been -- I wouldn't have known
17      about them.
18          If there's some other NCHS
19      piece, then let's take a look.
20  QUESTIONS BY MR. CARTER:
21      Q.   You cited in your nuisance
22  report on page 13, I believe, Dr. Perri's
23  report, and you discussed that a little bit
24  today.
25      A.   I see that.

Page 814

1       Q.   Okay. And you were asked
2   specifically about the question -- or excuse
3   me, the statement contained in there where it
4   says, "Information doctors were being given
5   about the dangers of prescription opioids was
6   in most cases false and systematically and
7   intentionally misleading."
8           Do you recall that?
9       A.   I do recall that.
10      Q.   Did you read in preparation for
11  your deposition today Dr. -- Professor
12  Perri's deposition?
13      A.   No, I did not.
14      Q.   If Professor Perri's testimony
15  was that he has not made any determination
16  whether specific marketing was unlawful,
17  false and misleading or whether it was lawful
18  and appropriate, if he's made no such
19  determination and only looked at the
20  marketing in the aggregate, does that impact
21  your reliance on his report on page 13 of
22  your report?
23          MR. SOBOL: Objection. Assumes
24      a fact not in evidence.
25          You can answer.

Page 815

1           THE WITNESS: It's something I,
2   of course, would benefit from seeing
3   what Dr. Perri said, but it doesn't
4   seem to be in conflict with what I say
5   here.
6   QUESTIONS BY MR. CARTER:
7       Q.   Are you aware of Professor
8   Perri's testimony that regardless of the
9   various input, regardless of the marketing,
10  at the end of the day, physicians have the
11  ultimate responsibility for selecting
12  medications to prescribe?
13          MR. SOBOL: Objection. Scope.
14          THE WITNESS: I'm sorry, was I
15      aware of what Dr. Perri -- was that
16      the question?
17  QUESTIONS BY MR. CARTER:
18      Q.   Yes.
19      A.   Was I aware of what he said
20  about that?
21      Q.   Yes.
22      A.   I'm not aware of what he said
23  about that.
24      Q.   Do you agree that regardless of
25  the marketing input physicians have the

Page 816

1   ultimate responsibility for selecting
2   medications to prescribe?
3           MR. SOBOL: Objection. Scope.
4           THE WITNESS: Well, generally
5       physicians help patients determine
6       what is the appropriate course of
7       treatment.
8   QUESTIONS BY MR. CARTER:
9       Q.   Okay.
10      A.   In -- you know, not just drugs,
11  but in other things, too.
12      Q.   You were asked about your
13  definition of opioids, and it including
14  all-comers, prescription opioids, illicit
15  opioids. I want to follow up on other
16  illicit drugs.
17          Do overdose deaths and abuse
18  for nonopioid illicits, such as cocaine or
19  methamphetamine, do those factors in any way
20  into your damages report?
21      A.   I don't think directly, no.
22      Q.   Okay. You agree it would be
23  improper to include estimates in your
24  opinions of damages chargeable to the
25  defendants on account of cocaine abuse and

107 (Pages 813 to 816)

Highly Confidential - Subject to Further Confidentiality Review

Page 817

1    overdose deaths, correct?
2              MR. SOBOL: Objection. Scope.
3              THE WITNESS: Well, you know, I
4    interpreted my task as identifying
5    opioid-related deaths due to
6    shipments. And people die from other
7    things, but that's what I attempted to
8    identify.
9    QUESTIONS BY MR. CARTER:
10       Q.    Does your nuisance report
11   include any damages related to cocaine abuse
12   and overdose?
13             MR. SOBOL: Objection. Form.
14             You can answer.
15             THE WITNESS: I'm thinking
16   where it might come in.
17             You know, if, in the elevated
18   health care costs section, any of
19   those elevated costs are associated
20   with, you know, a range of other
21   health care treatments, then different
22   things could have figured into that
23   estimation.
24   QUESTIONS BY MR. CARTER:
25       Q.    Do you -- sitting here today,

Page 818

1    did cocaine costs find their way into your
2    economic analysis for your nuisance report?
3              MR. SOBOL: Objection. Form.
4              You can answer.
5              THE WITNESS: Yeah, cocaine
6    costs -- what do you mean by "cocaine
7    costs"?
8    QUESTIONS BY MR. CARTER:
9        Q.    Costs that any of the divisions
10   of either of the counties incurred as a
11   result of addressing cocaine.
12       A.    Addressing. Oh, you mean
13   government expenditures?
14       Q.    Yes.
15       A.    So we're talking damages now.
16             So in terms of damages, I don't
17   think so.
18       Q.    Do you know -- well, strike
19   that.
20             When you were coming up with
21   your division costs for the jail, do you know
22   the rate of expenditures related to dealing
23   with cocaine -- crimes involving cocaine?
24       A.    The rate of expenditures. I
25   didn't investigate that.

Page 819

1        Q.    Do you know how those rates
2    compare historically over the years to the
3    rates dealing with prescription opioids?
4              MR. SOBOL: Objection. Asked
5        and answered. Scope.
6              THE WITNESS: I didn't study
7        that.
8    QUESTIONS BY MR. CARTER:
9        Q.    Okay. What about with respect
10   to the indigent defendant category? Do you
11   know the costs to the indigent defendant with
12   those division expenditures related to
13   cocaine abuse?
14             MR. SOBOL: Objection. Scope.
15             THE WITNESS: I missed -- the
16   indigent what?
17   QUESTIONS BY MR. CARTER:
18       Q.    The indigent defendants?
19       A.    Indigent defendants.
20       Q.    Yes.
21             One of the divisions that you
22   deal with in the court system, one of those
23   line item costs is indigent defendant cases,
24   correct?
25       A.    Oh, okay.

Page 820

1              MR. SOBOL: You don't mean the
2        distributors and manufacturers that
3        are indigent here.
4              THE WITNESS: Okay. That's
5        where I was confused here.
6              So it's not -- I thought it was
7        defendants in this litigation, but you
8        mean defendants in the legal process.
9    QUESTIONS BY MR. CARTER:
10       Q.    Yes.
11       A.    So would you mind asking me
12   again?
13       Q.    Sure.
14             One of the divisions that you
15   looked at in the counties related to
16   expenditures in indigent defendant cases in
17   the counties, correct?
18       A.    Yes.
19       Q.    Okay. Do you know the rate of
20   expenditures related to cocaine abuse in
21   either county for any year that you looked
22   at?
23             MR. SOBOL: Objection. Scope.
24        Form.
25             THE WITNESS: I didn't study

108 (Pages 817 to 820)

Highly Confidential - Subject to Further Confidentiality Review

Page 821

1    that.
2    QUESTIONS BY MR. CARTER:
3        Q.    Okay.  I want to go back to
4    what I was trying to find earlier.  It was
5    page 12 of your damages report.
6            And at the top of the page, the
7    paragraph that continues from the previous
8    page, towards the end, the second to the last
9    sentence of that paragraph reads as follows:
10   "This, in turn, implies that some harms, and
11   thus damages to bellwether governments, could
12   have been avoided if distributor defendants
13   had not acted improperly."
14           Did I read that correctly?
15       A.    Yes, you did.
16       Q.    So do you stand by that
17   statement?
18       A.    Let me just take a look at the
19   paragraph since there's some thuses in there.
20           Yes, I do stand by it.
21       Q.    Okay.  So do you agree that if
22   the defendant distributors in this case had
23   only and exclusively acted in a way that you
24   would consider to be compliant with the law
25   and had done nothing allegedly improper, that

Page 822

1    there would still be damages in this case?
2            MR. SOBOL:  Objection.  Scope.
3        You can answer.
4            THE WITNESS:  I'm not sure.
5    QUESTIONS BY MR. CARTER:
6        Q.    Do you agree that illicit
7    fentanyl is the overwhelming cause of
8    overdose death in Summit County currently?
9            MR. SOBOL:  Objection.
10           THE WITNESS:  "Cause" is an
11       important word here, and it's the
12       proximate cause.  It may not be the
13       ultimate cause.
14   QUESTIONS BY MR. CARTER:
15       Q.    Okay.  So what's the ultimate
16   cause, if not illicit Chinese fentanyl, in
17   Summit County currently?
18       A.    Well, this is something that
19   Professor Cutler studied, very explicitly.
20       Q.    Do you have an expert opinion
21   as to the ultimate cause?
22       A.    Well, with respect to the
23   ultimate cause, Professor Cutler looked
24   directly at illicit drugs in a post-2010
25   period, including up through -- I guess his

Page 823

1    empirical work didn't cover 2018, but it went
2    up to 2016.  And he estimated the share of
3    illicit deaths that were attributable to
4    shipments.
5            And that's an analysis about
6    the ultimate cause, which is going back to
7    what set the chain of events in motion.  That
8    was what he determined.
9        Q.    And I want to put Professor
10   Cutler out of my question.
11           My question is:  Do you have an
12   expert opinion as to the ultimate cause?
13           MR. SOBOL:  Objection.  Scope.
14           THE WITNESS:  Well, I would
15       rely on Professor Cutler for that.
16   QUESTIONS BY MR. CARTER:
17       Q.    Okay.  Do you have any
18   separate, independent opinion to add, or
19   would you just repeat what Professor Cutler
20   would have on that point?
21           MR. SOBOL:  Objection.  Scope.
22           THE WITNESS:  Well, I didn't
23       study that personally.  He did a very
24       good job, and I'm very happy to rely
25       on what he did.

Page 824

1    QUESTIONS BY MR. CARTER:
2        Q.    Same question for Cuyahoga
3    County:  Do you yourself have an opinion
4    regarding the overwhelming cause of overdose
5    death currently in Cuyahoga County?
6        A.    Well, in that case as well, I
7    didn't conduct an independent study.  I
8    relied on the opinions of Professor Cutler.
9        Q.    Okay.  With respect to your
10   damages calculations, do the estimates in
11   your damage report account for any progress
12   increased deficiencies in opioid-related
13   expenditures on behalf of the county?
14       A.    I'm not sure what you mean by
15   that.
16       Q.    For example, does it take into
17   account whether, over the years, Cuyahoga
18   County, for example, improved its addiction
19   interventions related to opioids?
20           MR. SOBOL:  Objection.
21           THE WITNESS:  And then the
22       question was, does my analysis take
23       that into account?
24   QUESTIONS BY MR. CARTER:
25       Q.    Yes.

109 (Pages 821 to 824)

Highly Confidential - Subject to Further Confidentiality Review

Page 825

1    A.    The approach of opportunity
2  costs, again, doesn't require me to determine
3  the -- whatever value is received for the
4  services -- for the dollars that were
5  directed to opioid-related activities.  So I
6  don't need to do that.
7    Q.    Does your approach to
8  opportunity costs require any assessment of
9  the propriety of the spending?
10   A.    By "propriety" you mean --
11   Q.    Whether it's done efficiently,
12  whether it's done as an appropriate steward
13  of the county's money or whether it's
14  wasteful.
15        Does it make any normative
16  judgment as to the propriety of the
17  expenditures that are made?
18   A.    The judgment is that, you know,
19  whether you got -- coming back to my car
20  example, whether or not the car repair shop
21  did a very good job or did a very bad job, it
22  still cost you $75 to get that, and the $75
23  could have been devoted to something else.
24        And so I think then in answer
25  to your question, if you consider propriety

Page 826

1  to be what -- how good a job they did, then
2  it's not part of what I needed to know.
3    Q.    Switching gears.
4        In the course of your analysis
5  of the medical examiner division, is one of
6  the things you looked at autopsies related to
7  opioid-related incidents?
8    A.    That was part of the data that
9  fed in, yes.
10   Q.    In the course of analyzing that
11  data, did you control for suicides caused by
12  opioids?
13   A.    I wasn't controlling for
14  things, so I'm not sure what you're getting
15  at here.
16   Q.    So did you exclude from the
17  data of opioid-related deaths, opioid-related
18  deaths caused by suicide?
19        MR. SOBOL: Objection. Asked
20  and answered.
21        THE WITNESS: Okay. It wasn't
22  necessary for me to exclude suicides
23  given the methodology I was applying,
24  which relied on the share of deaths
25  attributable to shipments from the

Page 827

1  report of Professor Cutler.
2  QUESTIONS BY MR. CARTER:
3    Q.    Switching gears to the Summit
4  County indigent defendants' point.
5        Do you know what rate the State
6  of Ohio reimburses the county for the outside
7  appointed counsel?
8    A.    No, I'm sorry, I don't know
9  that.
10   Q.    Do you know that the State of
11  Ohio does, in fact, reimburse Summit County
12  for the expenditures to outside counsel
13  appointed in indigent defendant cases?
14   A.    I'm not aware of that.
15   Q.    Are you aware that the State of
16  Ohio also reimburses Cuyahoga County for
17  appointment of counsel in indigent defendant
18  cases?
19   A.    I'm not aware of that.
20   Q.    If the State of Ohio reimburses
21  Summit County and Cuyahoga County between 40
22  and 50 percent for the cost of those
23  expenditures, would you make any adjustments
24  to that category of division expenditures in
25  your damages report?

Page 828

1    A.    Well, I think as you know, the
2  damages methodology was intended to identify
3  expenditures by the bellwether governments on
4  opioid-related activities.
5        And I investigated the degree
6  to which some of those expenditures would
7  have been supported by other levels of
8  government.  I found some, and I deducted
9  them.
10        I'm -- I think your -- if what
11  you're saying has some basis, then it's
12  something I would want to look at.
13   Q.    So to use your car example, if
14  you paid $75 to repair your car, walked out
15  of the dealer and I gave you $75, would that
16  still be an opportunity cost?
17        MR. SOBOL: Objection. Form.
18        THE WITNESS: The -- it
19  would -- the $75 would still be an
20  opportunity cost. The question would
21  be who bears that opportunity cost.
22        And just to change your example
23  slightly, which I think is also in the
24  spirit of your question, suppose you
25  were insured and your insurer paid up

Highly Confidential - Subject to Further Confidentiality Review

Page 829

1      to $50 for a repair, and then you only
2      paid $25.  So the opportunity cost
3      from the standpoint of you, the
4      household, would be $25.
5   QUESTIONS BY MR. CARTER:
6      Q.    Thank you.
7            You also discussed earlier
8   today the national rates of opioid use
9   disorder.  I want to follow up on it.
10           Do you know the criteria for an
11  opioid use disorder?
12     A.    The medical criteria?
13     Q.    Yes.
14     A.    Broadly.
15     Q.    Okay.  What is your
16  understanding of those criteria?
17     A.    Well, this is similar to many
18  mental health diagnoses.  There's a set of
19  kind of questions, there may be even
20  something like 12, which you could call
21  criteria for receiving a diagnosis.
22           And then if the respondent has
23  a yes to some subset of those, perhaps, say,
24  7 of the 12, and this interferes with their
25  normal activities and they occur over a

Page 830

1   sufficient period of time, then the
2   individual would be diagnosed.
3            Of course, doctors do the
4   diagnosis.  But there's a protocol by which
5   this diagnosis takes place that indicate that
6   the person has opioid use disorder.
7      Q.    Have you ever made a diagnosis
8   of opioid use disorder?
9      A.    Well, I'm not a physician, so
10  I'm not -- I was never asked to diagnose
11  anyone.
12           But this is the kind of thing
13  that if I'm studying an area -- mental health
14  and substance abuse is something that I
15  studied a lot, and not only those areas --
16  then this is the kind of thing you need to be
17  at least somewhat familiar with.
18     Q.    And if someone asked you --
19     A.    And -- I'm sorry.  I have one
20  more thing to add.
21     Q.    Sure.
22     A.    I've done research on the
23  criteria that would be used to identify
24  people with disease.  A lot of these
25  protocols are based on a question, so a

Page 831

1   doctor might ask a patient a question about
2   something.  And the design of that question
3   pattern is something I've done research on
4   for mental health and substance abuse
5   diagnoses.
6      Q.    You indicated that you've never
7   been asked to make a diagnosis.  So if
8   someone did ask you to make a diagnosis, you
9   would decline to do so, correct?
10     A.    If someone asked me to make a
11  medical diagnosis, I would say, "You need to
12  talk to a physician."
13     Q.    Okay.  And the criteria for
14  opioid use disorder was first articulated in
15  the DSM-V, correct?
16     A.    Oh, I'm not sure where it was
17  first articulated.
18     Q.    The portion cited in your
19  report cites the DSM-V articulation, correct?
20     A.    That sounds right.
21     Q.    And are you aware that the
22  DSM-V articulation of an opioid use disorder
23  has three different severity classifications
24  of an opioid use disorder?
25     A.    Generally I was familiar with

Page 832

1   that, yes.
2      Q.    Do you know what the three
3   classifications of severity are in DSM-V?
4      A.    One of them's severe.
5      Q.    That's correct.
6            Do you know the other two?
7      A.    I would be guessing.  I would
8   say mild?  Yes?
9      Q.    That is correct.
10     A.    And not otherwise classified?
11     Q.    Yeah.  So mild, moderate and
12  severe.
13     A.    Okay.
14     Q.    In the course of using the
15  statistics for the opioid use disorder
16  prevalence in the counties, did you identify
17  or quantify in any way the breakdown within
18  that prevalence of those that would have a
19  mild opioid use disorder, those who would
20  have a moderate opioid use disorder, and
21  those who would have a severe opioid use
22  disorder?
23     A.    Well, yes, my analysis was
24  based on the SOUD, which is a severe opioid
25  use disorder.

111 (Pages 829 to 832)

Highly Confidential - Subject to Further Confidentiality Review

Page 833

1    Q.    Okay.
2    A.    So and that's important,
3  because that is one area in which my work is
4  very conservative, to not take into account
5  any effects that are working through people
6  who might have mild or a moderate disorder.
7    Q.    Do you know the prevalence rate
8  based on the national data for mild or
9  moderate opioid use disorder?
10   A.    You know, I'm not sure.
11   Q.    Based on your studies, do you
12  know -- are you familiar with DSM-V's
13  guidance to professionals using DSM-V in a
14  forensic setting?
15   A.    In a forensic setting?
16   Q.    Well, you didn't use it in this
17  case in a clinical setting, did you?
18   A.    I used it in a epidemiology --
19  epidemiologic setting, I would say.
20   Q.    And so in a forensic setting,
21  are you familiar with the guidance for how
22  DSM-V is to be used?
23   A.    In general?
24   Q.    Yes.
25   A.    No, I don't know the

Page 834

1  distinction.
2    Q.    Are you familiar with the
3  guidance in DSM-V that the diagnostic codes
4  contained within are not to be used in a
5  checklist or a cookbook fashion?
6    A.    Can you repeat that?
7    Q.    Are you familiar with DSM-V's
8  guidance that the criteria contained within
9  it are not to be used as a checklist or a
10  cookbook?
11   A.    In a forensic context or in
12  just a general --
13   Q.    In all contexts.
14   A.    Well, I told you what I was
15  familiar with, that there is a, you know, a
16  set of questions and there's time period and
17  there's severity.
18   Q.    Okay.  Do you know in your
19  research on DSM-V that it's meant to be used
20  with the application of clinical judgment?
21   A.    Generally that's the case, yes.
22   Q.    Okay.  And in adopting the
23  prevalence rate from the national data that
24  you reviewed, did you apply any independent
25  clinical judgment to the populations in

Page 835

1  Cuyahoga or Summit County to lead to the
2  conclusion that it was appropriate to use in
3  this case?
4    A.    Well, I didn't apply
5  independent clinical judgment.
6      MR. CARTER:  Okay.  Based on
7  time, those are the questions I have
8  for you.  I'm going to hand the mic to
9  another attorney.
10     Can we go off the record?
11     VIDEOGRAPHER:  The time is
12  5:17 p.m., and we're off the record.
13     (Off the record at 5:17 p.m.)
14     VIDEOGRAPHER:  The time is
15  5:19 p.m., and we're on the record.
16     CROSS-EXAMINATION
17  QUESTIONS BY MR. HALLER:
18   Q.    Professor McGuire, I'm David
19  Haller of Covington & Burling.
20     Are you able to point me to any
21  accounting records or budget requests from
22  either county which documented any
23  reallocation of resources, either of employee
24  time or other recourses, from one area to be
25  redirected to opioid-related activities?

Page 836

1      MR. SOBOL:  Objection.  Asked
2  and answered.
3      THE WITNESS:  This is a
4  question we spent quite a bit of time
5  on this morning, and it's important to
6  keep in mind that my objective in this
7  report is to identify the funds
8  devoted to opioid-related activities
9  and interpret those as economic
10  opportunity costs, which is what I
11  tried to do in my report.
12     And the question of whether
13  there may or may not have been a
14  budget document requesting
15  reallocation isn't necessary for me to
16  be able to make that determination.
17  QUESTIONS BY MR. HALLER:
18   Q.    My question wasn't whether it's
19  necessary, just whether you did it.
20     MR. SOBOL:  Objection.
21  QUESTIONS BY MR. HALLER:
22   Q.    Did you look for any such
23  documents?
24     MR. SOBOL:  Objection.  Asked
25  and answered.

Highly Confidential - Subject to Further Confidentiality Review

Page 837

1        THE WITNESS:  In order to give
2  a clear and complete answer to this
3  question, I think it's important,
4  rather than just say yes or no --
5  QUESTIONS BY MR. HALLER:
6        Q.   Can you include yes or no in
7  your answer, at least?
8        MR. SOBOL:  Do you want to
9  withdraw the question?  You want to
10  ask him a question?  Do you want to
11  interrupt him?  What do you want to
12  do?
13        MR. HALLER:  He's going to give
14  a very long question -- a very long
15  response, and I'd like to make sure
16  yes or no is somewhere in there.
17        MR. SOBOL:  Well, he'll answer
18  the question as he can truthfully tell
19  it, not without any coaching by you.
20        MR. HALLER:  I think coaching
21  is your primary domain.
22        MR. SOBOL:  I'm Bill Belichick,
23  so I don't mind being called a coach.
24        Go ahead, Professor.  If you
25  can answer the question in a truthful

Page 838

1  way, go ahead.
2        THE WITNESS:  I think I can
3  answer the question.
4        But it is important to know,
5  for an audience or a reader of my
6  deposition transcript, to understand
7  that my objective in conducting my
8  report was to identify spending by the
9  bellwethers on opioid-related
10  activities, which is -- which
11  corresponds to the very well-regarded,
12  down-the-middle-of-the-plate concept
13  of economic opportunity costs.
14        And using that well-accepted
15  approach does not require me to
16  identify what other services the
17  bellwether counties did or would have
18  wanted to spend those funds on.
19        So, no, it was not necessary
20  for me to do that.
21  QUESTIONS BY MR. HALLER:
22        Q.   And, no, you did not do that;
23  is that right?
24        MR. SOBOL:  Objection.  Asked
25  and answered.

Page 839

1  QUESTIONS BY MR. HALLER:
2        Q.   I asked you to include
3  somewhere in your long speech a yes or no
4  response to my question, which was whether
5  you did it.
6        MR. SOBOL:  Well, again, he
7  gets to answer the question as best he
8  can and not --
9        MR. HALLER:  If you have an
10  objection, say objection and then
11  leave it at that.
12        MR. SOBOL:  No, I'll say
13  whatever I feel like.
14        MR. HALLER:  You're going to
15  continue being the bully you've been
16  for two days?  Is that what you're
17  going to do?
18        Objection.  Yes or no?
19        MR. SOBOL:  Professor, you can
20  answer the question as truthfully as
21  you can without having to include
22  words that are required by the
23  examining attorney.
24        THE WITNESS:  I think I can be
25  completely responsive to your

Page 840

1  question.
2        MR. HALLER:  Thank you.
3        THE WITNESS:  And I regard it
4  to be an important question since it
5  was asked so many times.
6        And the answer is the same:
7  that the purpose of my report was to
8  identify the opioid-related spending
9  of the various divisions in the
10  bellwether governments for various
11  years, and that's what I did.
12        The interpretation of that
13  spending is economic opportunity
14  costs.  That tells me what I need to
15  know in order to answer my assignment.
16        It was not necessary for me to
17  know how else the funds might have
18  been used and what other possible
19  desired targets that the bellwether
20  divisions had to for those funds.
21        So it was not necessary, and I
22  didn't do it.
23  QUESTIONS BY MR. HALLER:
24        Q.   Thank you.
25        You started out today talking

113 (Pages 837 to 840)

Highly Confidential - Subject to Further Confidentiality Review

Page 841

1    about a conversation you had had with Compass
2    Lexecon about OUD prevalence between the time
3    of your first day of deposition and today.
4        Do you remember that?
5        A.    I do, yeah.
6        Q.    I take it before you made that
7    call, you reviewed your report section
8    concerning OUD prevalence; is that right?
9        A.    Yes, that's right.
10       Q.    And what was it that was in --
11   how was it that your report wasn't
12   sufficiently clear to you such that you
13   needed clarification from Compass Lexecon?
14       What was it that wasn't
15   sufficiently clear?
16       A.    Well, I -- there's lots of
17   things that one has to keep in mind in a
18   deposition.  And what is clear, you know, to
19   me in rereading my report -- what I said to
20   myself is, well, let's go over this again
21   verbally so I'm in a better position to
22   answer questions about it.
23       So I just wanted to go over the
24   calculations of the OUD rate again so I would
25   be able to answer questions more carefully

Page 842

1    and more completely.
2        Q.    Sorry.
3        Do you remember what in
4    particular in your report wasn't sufficiently
5    clear to you such that you needed
6    clarification?
7        A.    Well, I wouldn't put it that
8    way.  It wasn't that there was something that
9    wasn't clear to me.  I just found it helpful
10   to talk through some of the operations.  It
11   helps set things in my mind.
12       Q.    Now, in reference to mortality,
13   earlier today you stated that some of the
14   people who died in the two counties would
15   have been county employees.
16       Do you remember that?
17       A.    Yes, I do remember that.
18       Q.    Do you in fact know whether or
19   not anyone who died in Summit or Cuyahoga
20   from an opioid overdose was in fact a county
21   employee?
22       A.    I think you're -- I mean, the
23   point of your question seems correct, that
24   that was an inference on my part, that there
25   were thousands of people who died, and

Page 843

1    chances are very good that one of them or
2    more was a county employee.
3        Q.    But you don't know for a fact
4    whether any were; is that right?
5        A.    No.  As I said, this was, I
6    think, a reasonable inference on my part.
7        Q.    But do you know for a fact
8    whether any of them were?
9        MR. SOBOL:  Objection.  Asked
10   and answered already.
11       THE WITNESS:  I thought it was
12   a reasonable inference on my part.
13   QUESTIONS BY MR. HALLER:
14       Q.    Do you know the difference
15   between drawing a reasonable inference and
16   knowing something for a fact?
17       MR. SOBOL:  Objection.
18       You can answer --
19   QUESTIONS BY MR. HALLER:
20       Q.    Are those the same things to
21   you?
22       A.    No, I understand the
23   difference.
24       Q.    Okay.  So I want to just know
25   whether you know for a fact whether any of

Page 844

1    the employees -- whether any of the opioid
2    overdose victims were in fact county
3    employees.
4        MR. SOBOL:  Objection.  Asked
5    and answered four times.
6        THE WITNESS:  My statement,
7    when that was brought about -- we just
8    discussed that today -- was an
9    inference on my part.  It was not a
10   fact.
11   QUESTIONS BY MR. HALLER:
12       Q.    Okay.  Are you aware whether
13   the statistics given to you from Professor
14   Cutler and Professor Rosenthal on which you
15   relied were national statistics or whether
16   they were Cuyahoga or Summit County-specific?
17       MR. SOBOL:  Objection.  Form.
18       Which statistics?
19       MR. HALLER:  The harm
20   percentages.
21       THE WITNESS:  Well, there
22   are -- it still depends on what
23   statistics you're talking about.
24   QUESTIONS BY MR. HALLER:
25       Q.    The Cutler harm percentages, do

114  (Pages 841 to 844)

Highly Confidential - Subject to Further Confidentiality Review

|  | Page 845 |
|---|---|

1   you know whether those were national
2   statistics or Summit and Cuyahoga-specific?
3          MR. SOBOL: Objection. Form.
4          THE WITNESS: The Cutler
5   statistics, of which there's more than
6   one in the report -- more than one set
7   in the report, were primarily based on
8   an econometric analysis of what he
9   referred to in his report as large
10  counties that included Cuyahoga and
11  Summit. And in total, I think it was
12  around 300 counties or so.
13         And his estimated shares of
14  harms due to shipments was a -- kind
15  of a summary number coming from that
16  set of counties.
17  QUESTIONS BY MR. HALLER:
18      Q.   And similarly with regard to
19  Professor Rosenthal, are you aware of whether
20  her misconduct percentages, whether those
21  were in relation to national detailing
22  efforts or whether those were specific to
23  Cuyahoga and Summit?
24         MR. SOBOL: Objection. Form.
25  Which?

|  | Page 846 |
|---|---|

1          But you can answer.
2          THE WITNESS: Well, Rosenthal's
3   statistics are somewhat different.
4   She used national statistics on
5   shipments and as her dependent
6   variable, and then national-level
7   information on detailing as her key
8   independent variable.
9          So her percentages were based
10  on a kind of national average.
11         MR. SOBOL: Okay. I think
12  that's it.
13         MR. HALLER: Well, I have many
14  more questions. I do think you used
15  up, Counsel, a good 30-plus minutes in
16  speaking objections and snide remarks,
17  and I think we have a right to
18  another, at least, 30 minutes.
19         MR. SOBOL: Well, that's -- no,
20  you don't.
21         CROSS-EXAMINATION
22  QUESTIONS BY MR. SOBOL:
23      Q.   Professor McGuire, I have a
24  couple of questions for you.
25         You testified several times

|  | Page 847 |
|---|---|

1   yesterday -- last week and today regarding
2   certain quantitative inputs you received from
3   Dr. Cutler's report, correct?
4       A.   Yes.
5       Q.   Does your model depend upon the
6   particular quantification of Dr. Cutler's
7   shares in order for it to be operative?
8          MR. KEYES: Objection. Form.
9          THE WITNESS: Can I answer?
10         MR. SOBOL: Yes.
11         THE WITNESS: My model would
12  work as well with other estimated
13  shares from Cutler.
14         MR. SOBOL: Nothing further.
15         RECROSS-EXAMINATION
16  QUESTIONS BY MR. HALLER:
17      Q.   Does your report reflect that
18  additional work you'd need to do, or is that
19  work you would have to do subsequently?
20      A.   It's very straightforward math.
21  So, I mean, I didn't do alternative
22  calculations except with regard to Cutler
23  Approach 1 and Cutler Approach 2. That, I
24  think, illustrates exactly the thing we're
25  talking about now: that if the percentages

|  | Page 848 |
|---|---|

1   were somewhat different, as they were in the
2   two approaches, then it's -- you know, it's
3   an Excel operation, really, to be able to
4   determine damages.
5       Q.   But that doesn't appear in your
6   report, correct?
7          MR. SOBOL: Objection.
8          THE WITNESS: Yes, it does.
9   QUESTIONS BY MR. HALLER:
10      Q.   The alternative calculations
11  appear in your report or they don't?
12      A.   Yes, they do.
13      Q.   Where are they?
14      A.   This is what's referred to as
15  Approach 1 and Approach 2.
16      Q.   No, I'm saying apart from
17  Approach 1 and Approach 2. If there were
18  additional -- initial quanti --
19  quantification done by Professor Cutler, you
20  would need to do additional work yourself,
21  right?
22      A.   What I indicated was that
23  the -- and I thought the question was, does
24  my report -- do my damages estimates apply --
25  could they be determined with other Cutler

Highly Confidential - Subject to Further Confidentiality Review

Page 849

1  percentages.
2      And the answer is, yes, it's
3  easy.  And the fact that I did it for
4  Approach 1 and Approach 2, which involved
5  different Cutler numbers, indicates the
6  readily available calculations I could make.
7      MR. SOBOL:  Time's up.  Thank
8  you very much, everybody.
9      VIDEOGRAPHER:  The time is 7 --
10  or 6:30 p.m., and this deposition has
11  concluded and we're off the record.
12  5:30.
13      MR. CARTER:  Obviously, you
14  know, defendants reserve the right to
15  seek additional time based on the
16  extensive speeches by the witness and
17  the speaking objections, but we'll
18  deal with that offline.
19  (Deposition concluded at 5:31 p.m.)
20  — — — — — — —
21
22
23
24
25

Page 851

1      INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8      After doing so, please sign the
9  errata sheet and date it.  You are signing
10  same subject to the changes you have noted on
11  the errata sheet, which will be attached to
12  your deposition.
13      It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt
16  of the deposition transcript by you.  If you
17  fail to do so, the deposition transcript may
18  be deemed to be accurate and may be used in
19  court.
20
21
22
23
24
25

Page 850

1          CERTIFICATE
2
3      I, CARRIE A. CAMPBELL, Registered
  Diplomate Reporter, Certified Realtime
4  Reporter and Certified Shorthand Reporter, do
  hereby certify that prior to the commencement
5  of the examination, Thomas G. McGuire, PhD,
  was duly sworn by me to testify to the truth,
6  the whole truth and nothing but the truth.
7      I DO FURTHER CERTIFY that the
  foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
  before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
  ability.
10
11      I DO FURTHER CERTIFY that I am
  neither a relative nor employee nor attorney
12  nor counsel of any of the parties to this
  action, and that I am neither a relative nor
13  employee of such attorney or counsel, and
  that I am not financially interested in the
  action.
14
15
16
           _____
17      CARRIE A. CAMPBELL,
       NCRA Registered Diplomate Reporter
18      Certified Realtime Reporter
       Notary Public
19      Dated:  May 1, 2019
20
21
22
23
24
25

Page 852

1      ACKNOWLEDGMENT OF DEPONENT
2
3
4      I,_____, do
  hereby certify that I have read the foregoing
5  pages and that the same is a correct
  transcription of the answers given by me to
6  the questions therein propounded, except for
  the corrections or changes in form or
7  substance, if any, noted in the attached
  Errata Sheet.
8
9
10
11
12  _____
  Thomas G. McGuire, Ph.D.        DATE
13
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 _____.
17  My commission expires: _____
18
19  Notary Public
20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

Page 853

1          - - - - - - -
             ERRATA
2          - - - - - - -
3     PAGE  LINE  CHANGE/REASON
4     _____ _____ _____
5     _____ _____ _____
6     _____ _____ _____
7     _____ _____ _____
8     _____ _____ _____
9     _____ _____ _____
10    _____ _____ _____
11    _____ _____ _____
12    _____ _____ _____
13    _____ _____ _____
14    _____ _____ _____
15    _____ _____ _____
16    _____ _____ _____
17    _____ _____ _____
18    _____ _____ _____
19    _____ _____ _____
20    _____ _____ _____
21    _____ _____ _____
22    _____ _____ _____
23    _____ _____ _____
24    _____ _____ _____
25

Page 854

1          - - - - - - -
           LAWYER'S NOTES
2          - - - - - - -
3     PAGE  LINE
4     _____ _____ _____
5     _____ _____ _____
6     _____ _____ _____
7     _____ _____ _____
8     _____ _____ _____
9     _____ _____ _____
10    _____ _____ _____
11    _____ _____ _____
12    _____ _____ _____
13    _____ _____ _____
14    _____ _____ _____
15    _____ _____ _____
16    _____ _____ _____
17    _____ _____ _____
18    _____ _____ _____
19    _____ _____ _____
20    _____ _____ _____
21    _____ _____ _____
22    _____ _____ _____
23    _____ _____ _____
24    _____ _____ _____
25

Highly Confidential - Subject to Further Confidentiality Review

1

- - - - - -

ERRATA

2

- - - - - -

3   PAGE   LINE   CHANGE/REASON

4   <u>508</u>   <u>13</u>   "Yesterday" should be "last week" / Clarification

5   <u>610</u>   <u>10</u>   "Cider" should be "Sider" / Transcription error

6   <u>627</u>   <u>15</u>   "doesn't mean" should be "isn't meant" / Clarification

7   <u>673</u>   <u>10</u>   drop word "about" / Clarification

8   <u>690</u>   <u>22</u>   add "s" to bellwether / Transcription error

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

1   ACKNOWLEDGMENT OF DEPONENT

2

3

4           I, Thomas G. McGuire, Ph.D.        , do

    hereby certify that I have read the foregoing

5   pages and that the same is a correct

    transcription of the answers given by me to

6   the questions therein propounded, except for

    the corrections or changes in form or

7   substance, if any, noted in the attached

    Errata Sheet.

8

9

10

11

12                                                  May 28, 2019

    Thomas G. McGuire, Ph.D.              DATE

13

14

15  Subscribed and sworn to before me this

16  28th day of May          , 20 19 .

17  My commission expires: July 27, 2023

18

19  Notary Public

20

21

22

23

24

25