# EXHIBIT 12

Highly Confidential - Subject to Further Confidentiality Review

Page 477

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) ) ) | MDL No. 2804 Case No. 1:17-MD-2804 |
| THIS DOCUMENT RELATES TO ALL CASES | ) ) ) | Hon. Dan A. Polster |

— — —

Sunday, May 5, 2019

— — —

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

— — —

    Videotaped Deposition of MEREDITH B. ROSENTHAL, Ph.D., VOLUME 2, held at Robins Kaplan LLP, 800 Boylston Street, Suite 2500, Boston, Massachusetts, commencing at 8:04 a.m., on the above date, before Michael E. Miller, Fellow of the Academy of Professional Reporters, Registered Diplomate Reporter, Certified Realtime Reporter and Notary Public.

— — —

GOLKOW LITIGATION SERVICES
877.370.3377 ph | fax 917.591.5672
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 746

1  THE VIDEOGRAPHER:  The time is
2  1:56 p.m.  We're now off record.
3  (Recess taken, 1:56 p.m. to
4  1:58 p.m.)
5  THE VIDEOGRAPHER:  The time is
6  1:58 p.m.  We're back on the record.
7  EXAMINATION
8  BY MR. METZ:
9  Q.  Good afternoon, Professor
10  Rosenthal.
11  A.  Good afternoon.
12  Q.  My name is Carl Metz.  I
13  represent Cardinal Health, which is one of
14  the distributor defendants in this case.
15  A.  I apologize for forgetting the
16  name of your employer as it were.
17  Q.  That's all right.  You're
18  referring to testimony yesterday where you
19  were asked about the distributor defendants,
20  you named two companies, and the third name,
21  Cardinal, eluded you.  Yes?
22  A.  Exactly, yes.
23  Q.  Okay.  At various places in
24  your report, you refer to marketing
25  defendants, correct?

Page 747

1  A.  Yes, I do.
2  Q.  And then in other places, and
3  I'm sure this is not by design, you refer to
4  the word "defendants" without
5  differentiation.
6  MR. SOBOL:  Objection to the
7  form.
8  You can answer.
9  A.  Yes, I believe I use that term.
10  We could look to see how I use it.
11  BY MR. METZ:
12  Q.  For example, in paragraph 64,
13  which you're welcome to look at, and I'll
14  quote this just partially.  You say, quote:
15  A causal relationship between the
16  defendants', possessive, promotion and
17  prescriptions of opioids.
18  Do you see that?
19  A.  Yes.
20  Q.  And do I understand based on
21  your testimony over the last two days that
22  despite using the singular term "defendants,"
23  we should not read that as referring to all
24  defendants, correct?
25  MR. SOBOL:  Objection.

Page 748

1  A.  In this paragraph in
2  particular, I'm talking about the defendants
3  who have detailing that I'm measuring in my
4  data, so those would be the marketing
5  defendants.
6  BY MR. METZ:
7  Q.  Okay.  And by marketing
8  defendants, you're not including any of the
9  distributor defendants, correct?
10  A.  I don't believe that they have
11  marketing data in my data, so there may be
12  places in my report where I refer to
13  defendants where it's appropriate to talk
14  about them more generally, for example, when
15  I'm summarizing the complaint, but here I
16  intend to describe the defendants who have
17  detailing that is measured in the IQVIA data.
18  Q.  Okay.  So just to be clear,
19  not -- as you believe it, not -- that does
20  not include the distributor defendants,
21  correct?
22  MR. SOBOL:  Objection, asked
23  and answered.
24  A.  I believe that is true.
25  ///

Page 749

1  BY MR. METZ:
2  Q.  Okay.  And it also does not
3  include the pharmacy defendants, correct?
4  MR. SOBOL:  Objection, asked
5  and answered.
6  A.  Yes, that is correct.
7  BY MR. METZ:
8  Q.  So we take another example,
9  paragraph 78, where you say, quote:  An
10  alternative method of identifying the impact
11  of the defendants', possessive, misconduct,
12  is to use an indirect method.
13  Do you see that?
14  A.  Yes.
15  Q.  And there again, you're using
16  the term "defendants," but how we should
17  understand that is the marketing defendants,
18  correct?
19  A.  Well, the -- in -- excuse me,
20  the indirect approach -- it is getting to be
21  late -- is, as you know, a residual approach,
22  so it inherently is looking at all of these
23  demographic, socioeconomic and healthcare
24  factors that could have driven higher opioid
25  use and attributes that which is left to the

Highly Confidential - Subject to Further Confidentiality Review

Page 750

1  misconduct.
2      I think it's a little bit less
3  clear about how that analysis might be used
4  to assess liability for distributors.  I have
5  not been asked to do that, but the indirect
6  analysis, because it's not measuring the
7  conduct of a specific group, could be open to
8  a broader interpretation.
9      Q.  Have you disclosed any opinions
10 that, based upon your indirect model, you
11 draw conclusions about distributor
12 defendants' conduct?
13     A.  I have not.  I have not drawn
14 those conclusions.
15     Q.  And you mentioned the detailing
16 data, but just to be clear, you did not
17 include in your direct model any data series
18 that you understood were measuring the
19 conduct of the distributor defendants; is
20 that correct?
21         MR. SOBOL:  Objection, asked
22     and answered.
23     A.  I have not measured the conduct
24 of the distributors or included that in my
25 model.

Page 751

1  BY MR. METZ:
2      Q.  And the same would be true of
3  the pharmacy defendants, correct?
4          MR. SOBOL:  Objection, asked
5      and answered.
6      A.  I have not measured the conduct
7  of the pharmacies and included that in my
8  models.
9          MR. METZ:  Just so it's not
10     recurring, I'm five questions in.
11     What have I asked and answered?  Or
12     what have I asked previously?
13         MR. SOBOL:  All of this was
14     covered by Mr. Roth this morning and
15     yesterday.
16         MR. METZ:  Okay.  I disagree.
17 BY MR. METZ:
18     Q.  You testified at several points
19 that the design of your model is intended to
20 capture an aggregate effect on MMEs sold,
21 correct?
22     A.  That's correct.
23     Q.  And in part what that means is
24 you've not reported your results in a way
25 that allows you to identify any particular

Page 752

1  set of prescriptions that combine to make up
2  the additional MMEs you've identified in your
3  analysis, correct?
4      A.  The way my analysis works is to
5  analyze the actual data and identify a
6  quantity of prescriptions in aggregate that
7  would not have been filled absent the
8  promotional misconduct.
9          As I noted yesterday, because
10 the but-for scenario did not occur, we cannot
11 explicitly observe which individual
12 prescriptions would not have been filled.  So
13 there's a conceptual impossibility to the
14 statement that you're describing.
15     Q.  Okay.  So just to be clear,
16 your answer is yes, but for the reason that
17 it would be impossible?
18         MR. SOBOL:  Objection, asked
19     and answered.
20     A.  Yes, and my analysis -- as you
21 know, my assignment was to estimate the
22 impact of the alleged misconduct and to
23 quantify that in aggregate.
24 BY MR. METZ:
25     Q.  I understand.  The alleged

Page 753

1  marketing misconduct, correct?
2      A.  The alleged marketing
3  misconduct.
4      Q.  And am I correct that the data
5  that you use in your calculation does not
6  contain identifying information for
7  individual prescriptions, correct?
8      A.  My data do not contain
9  individual prescription identifiers.  I
10 assume by that you mean something like a
11 member identifier.
12     Q.  Anything that would enable you
13 to identify a specific prescription that's
14 within the sum of your conclusions?
15     A.  No.  Again, because of -- for
16 privacy reasons, my data are deidentified.
17     Q.  Okay.  Now, you testified
18 yesterday that you have not formed any
19 opinions about the separate role of doctors
20 in causing an increase in the MMEs that you
21 measured.
22         Do you recall that testimony?
23     A.  I believe I described the fact
24 that of course doctors are in the causal
25 chain, they're the ones writing the

70 (Pages 750 to 753)