Exhibit 2

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL          )   MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION               )   Case No.
                              )   1:17-MD-2804
 5                            )
     THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6   ALL CASES                )   Polster
                              )
 7
 8
 9                    __ __ __
10            Saturday, May 4, 2019
                      __ __ __
11
12        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
                      __ __ __
13
14
15
16        Videotaped Deposition of MEREDITH B.
     ROSENTHAL, Ph.D., held at Robins Kaplan LLP,
17   800 Boylston Street, Suite 2500, Boston,
     Massachusetts, commencing at 8:04 a.m., on
18   the above date, before Michael E. Miller,
     Fellow of the Academy of Professional
19   Reporters, Registered Diplomate Reporter,
     Certified Realtime Reporter and Notary
20   Public.
21
22
23                    __ __ __
24          GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
25               deps@golkow.com
```

Page 2

```
1   A P P E A R A N C E S :
2     HAGENS BERMAN SOBOL SHAPIRO LLP
      BY:  THOMAS M. SOBOL, ESQUIRE
3       tom@hbsslaw.com
      55 Cambridge Parkway
4     Suite 301
      Cambridge, Massachusetts 02142
5     (617) 482-3700
      Counsel for MDL Plaintiffs
6
7     BRANSTETTER STRANCH & JENNINGS PLLC
      BY:  ANTHONY ORLANDI, ESQUIRE
8       aorlandi@bsjfirm.com
        (via teleconference)
9       TRICIA HERZFELD, ESQUIRE
        triciah@bsjfirm.com
10      (via teleconference)
      223 Rosa L. Parks Boulevard
11    Suite 200
      Nashville, Tennessee 37203
12    (615) 254-8801
      Counsel for Tennessee Plaintiffs
13
14    KIRKLAND & ELLIS LLP
      BY:  MARTIN L. ROTH, ESQUIRE
15      martin.roth@kirkland.com
      300 North LaSalle
16    Chicago, Illinois 60654
      (312) 862-2000
17    Counsel for Allergan Finance LLC
18
19    KIRKLAND & ELLIS LLP
      BY:  CATIE VENTURA, ESQUIRE
20      catie.ventura@kirkland.com
      1301 Pennsylvania Avenue N.W.
21    Washington, D.C. 20004
      (202) 879-5000
22    Counsel for Allergan Finance LLC
23
24
25
```

Page 3

```
1   A P P E A R A N C E S :
2     O'MELVENY & MYERS LLP
      BY:  CHARLES C. LIFLAND, ESQUIRE
3       clifland@omm.com
        MATTHEW KAISER, ESQUIRE
4       mkaiser@omm.com
      400 South Hope Street
5     18th Floor
      Los Angeles, California 90071
6     (213) 430-6000
      Counsel for Janssen Pharmaceuticals Inc.
7
8     COVINGTON & BURLING LLP
      BY:  RONALD G. DOVE, JR., ESQUIRE
9       rdove@cov.com
      850 Tenth Street, NW
10    Washington, D.C. 20001
      (202) 662-5575
11    Counsel for McKesson Corporation
12
13    ROPES & GRAY LLP
      BY:  NICHOLAS BRADLEY, ESQUIRE
14      nick.bradley@ropesgray.com
      1211 Avenue of the Americas
15    New York, New York 10036
      (212) 256-9000
16    Counsel for Mallinckrodt
      Pharmaceuticals
17
18
19    BARTLIT BECK LLP
      BY:  PETER B. BENSINGER, JR., ESQUIRE
20      peter.bensinger@bartlit-beck.com
      54 West Hubbard Street
21    Suite 300
      Chicago, Illinois 60654
22    (312) 494-4400
      Counsel for Walgreens Company
23
24
25
```

Page 4

```
1   A P P E A R A N C E S :
2     JONES DAY
      BY:  STEVEN N. GEISE, ESQUIRE
3       sngeise@jonesday.com
      4655 Executive Drive
4     Suite 1500
      San Diego, California 92121
5     (858) 314-1200
      Counsel for Walmart Corporation
6
7     DECHERT LLP
      BY:  WILL W. SACHSE, ESQUIRE
8       will.sachse@dechert.com
      Cira Centre
9     2929 Arch Street
      Philadelphia, Pennsylvania 19104
10    (215) 994-4000
      Counsel for Purdue Pharma
11
12    ARNOLD & PORTER KAYE SCHOLER LLP
      BY:  SAMUEL N. LONERGAN, ESQUIRE
13      samuel.lonergan@arnoldporter.com
      250 West 55th Street
14    New York, New York 10019
      (212) 836-8000
15    Counsel for Endo Health Solutions
      Inc., Endo Pharmaceuticals, Inc., Par
16    Pharmaceutical, Inc. and Par
      Pharmaceutical Companies, Inc.
17
18    MORGAN LEWIS & BOCKIUS LLP
      BY:  WENDY WEST FEINSTEIN, ESQUIRE
19      wendy.feinstein@morganlewis.com
      One Oxford Center
20    Thirty-Second Floor
      Pittsburgh, Pennsylvania 15219
21    (412) 560-3300
      Counsel for Teva Pharmaceuticals USA
22    Inc., Cephalon Inc., Watson
      Laboratories Inc., Actavis LLC, and
23    Actavis Pharma Inc. f/k/a Watson
      Pharma Inc.
24
25
```

Page 5

```
1   A P P E A R A N C E S :
2     REED SMITH LLP
      BY:  LOUIS W. SCHACK, ESQUIRE
3       lschack@reedsmith.com
      1717 Arch Street
4     Suite 3100
      Philadelphia, Pennsylvania 19103
5     (215) 851-8100
      Counsel for AmerisourceBergen Drug
6     Corporation
7
8     WILLIAMS & CONNOLLY LLP
      BY:  CARL R. METZ, ESQUIRE
9       cmetz@wc.com
      725 Twelfth Street, N.W.
10    Washington, D.C. 20005
      (202) 434-5000
11    Counsel for Cardinal Health Inc.
12
13    MORGAN LEWIS & BOCKIUS LLP
      BY:  CATHERINE ESCHBACH, ESQUIRE
14      ceschbach@morganlewis.com
        (via teleconference)
15    1000 Louisiana Street
      Suite 4000
16    Houston, Texas 77002
      (713) 890-5000
17    Counsel for Rite Aid
18
19    LOCKE LORD LLP
      BY:  ANNA K. FINGER, ESQUIRE
20      anna.k.finger@lockelord.com
        (via teleconference)
21    2200 Ross Avenue
      Suite 2800
22    Dallas, Texas 75201
      (214) 740-8000
23    Counsel for Henry Schein, Inc. and
      Henry Schein Medical Systems, Inc.
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
1              PROCEEDINGS
2         (May 4, 2019 at 8:04 a.m.)
3         THE VIDEOGRAPHER:  We're now on
4    record.  My name is Vince Rosica.  I'm
5    a videographer for Golkow Litigation
6    Services.  Today's date is May 4th,
7    2019 and the time is 8:04 a.m.
8         This video deposition is being
9    held in Boston, Massachusetts in the
10   matter of National Prescription Opiate
11   Litigation, MDL No. 2804, for the
12   Northern District of Ohio, Eastern
13   Division Court.  The deponent is
14   Meredith Rosenthal.
15        Counsel will be noted on the
16   stenographic record.  The court
17   reporter is Mike Miller and will now
18   swear in the witness.
19     MEREDITH B. ROSENTHAL, Ph.D.,
20        having been duly sworn,
21        testified as follows:
22           EXAMINATION
23   BY MR. ROTH:
24   Q.    Good morning, Professor
25   Rosenthal.
```

Page 11

```
1    A.    Good morning.
2    Q.    My name is Martin Roth.  We met
3    off the record.  I'll be taking your
4    deposition here today.
5         Can you please state your full
6    name for the record?
7    A.    Meredith Beaven Rosenthal.
8    Q.    And do you understand you're
9    testifying under oath here today?
10   A.    I do.
11   Q.    And you've testified at
12   depositions and in court and before Congress
13   in the past?
14   A.    I have.
15   Q.    Approximately how many times
16   altogether have you testified?
17   A.    Perhaps 30 or 35.
18   Q.    There's nothing that would
19   prevent you from testifying truthfully here
20   today?
21   A.    There is not.
22   Q.    If I ask you a question and you
23   give me an answer, I'm going to assume you
24   understood my question.
25        Is that fair?
```

Page 12

```
1    A.    Yes.
2    Q.    And if for some reason you
3    don't understand one of my questions, you'll
4    ask me for clarification?
5    A.    Yes, I will.
6    Q.    Okay.  I'm going to start by
7    marking as Exhibit 1 to your deposition your
8    expert report, and I'm also going to
9    simultaneously give you Exhibit 2, which is
10   the errata sheet we received on Thursday
11   night.
12        (Whereupon, Deposition Exhibit
13   Rosenthal-1, 3/25/19 Expert Report,
14   was marked for identification.)
15        (Whereupon, Deposition Exhibit
16   Rosenthal-2, Errata to Expert Report,
17   was marked for identification.)
18   BY MR. ROTH:
19   Q.    So first, if you could look at
20   Exhibit 1 and just confirm that that appears
21   to be your expert report in this case along
22   with Attachments A through D.
23   A.    It is correct.
24   Q.    And if you look at page 75, is
25   that your signature on the report?
```

Page 13

```
1    A.    Yes, it is.
2    Q.    Exhibit 2 is a memo dated
3    May 2nd from Forrest McCluer at GMA to
4    yourself and Mr. Tom Sobol, your -- the
5    attorney sitting with you; is that correct?
6    A.    That's correct.
7    Q.    And GMA is Greylock McKinnon?
8    A.    That's correct.
9    Q.    And who is Mr. McCluer?
10   A.    Mr. McCluer is a senior
11   economist there who worked with me on this
12   matter.
13   Q.    And I take it, given that
14   Mr. McCluer went through the report to error
15   check, that you believe that your report,
16   along with the errata sheet, is accurate as
17   of today?
18   A.    I do.
19   Q.    You didn't see any other errors
20   that aren't contained in the errata?
21   A.    I have not.
22   Q.    And all of the opinions that
23   you plan to give at trial in this matter are
24   contained in your report as corrected by your
25   errata?
```

Page 14

1    A.    That's correct.

2    Q.    Professor Rosenthal, you're a
3  healthcare economist; is that correct?

4    A.    Yes, that's right.

5    Q.    You're not a medical doctor?

6    A.    I am not.

7    Q.    You're not an expert in the
8  treatment of addiction?

9    A.    I am not.

10   Q.    You're not an expert in opioid
11 use disorder?

12   A.    I am not.

13   Q.    And I looked at your CV.  I
14 don't think you've published on either
15 addiction or opioid use disorder; is that
16 correct?

17   A.    I don't believe I have.

18   Q.    You're not an expert in
19 pharmacology?

20   A.    I am not.

21   Q.    You're not an expert in
22 epidemiology?

23   A.    I am not, although I do have
24 some knowledge of epidemiology.

25   Q.    You've reviewed epidemiological

Page 15

1  studies, but you're not an epidemiologist?

2    A.    That's correct.  An
3  epidemiology class was required for my Ph.D.,
4  so I took an epidemiology class.  I operate
5  in the environment of public health research
6  where epidemiology is an important strand
7  that I frequently encounter, but I'm not an
8  epidemiologist.

9    Q.    And you're not a toxicologist?

10   A.    I am not a toxicologist.

11   Q.    You're not a pain management
12 physician?

13   A.    I am not.

14   Q.    You don't diagnosis or treat
15 pain?

16   A.    No, I do not.

17   Q.    You're not an expert in the
18 FDA?

19   A.    I am not an expert in the FDA,
20 although, again, as you know, my work has
21 frequently concerned FDA rules.

22   Q.    But you've never worked for the
23 FDA?

24   A.    I have not.

25   Q.    And you've never consulted a

Page 16

1  company regarding the meaning of FDA
2  regulations or regulatory requirements?

3    A.    I have not.

4    Q.    You do understand that
5  prescription opioids are FDA-approved
6  products?

7    A.    Yes, I do.

8    Q.    And, in fact, if you look at
9  your report, at paragraph 19, which is the
10 bottom of page 15.  Let me know when you're
11 there.

12   A.    Yes.

13   Q.    You acknowledge that since 1962
14 the FDCA and related regulations have
15 required sponsors of new drug products to
16 present scientific evidence of both efficacy
17 and safety before a new product can be
18 marketed.

19        Do you see that?

20   A.    Yes, I do.

21   Q.    And you cite to the FDA website
22 when you write that?

23   A.    That's right.

24   Q.    And then turning the page, you
25 say in paragraph 20:  By regulation,

Page 17

1  prescription drug labels indicate the
2  diseases, conditions and/or patients for
3  which the sponsor has presented
4  scientifically required evidence to the FDA.

5        Right?

6    A.    Yes, that's what it says.

7    Q.    And for that proposition, you
8  cite to a number of federal regulations in
9  footnote 31?

10   A.    I do.

11   Q.    You're not an expert on drug
12 labeling.

13   A.    I am not.

14   Q.    In paragraph 21 of your report,
15 you say:  FDA regulations specify that
16 promotional materials may only make claims
17 that are supported by scientific
18 evidence, i.e., supported by studies meeting
19 scientific standards, and they may not be
20 false or misleading.

21        Did I read that correctly?

22   A.    You did.

23   Q.    And you're not an expert on FDA
24 regulations, are you?

25   A.    I am not.

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  Q.  And then in paragraph 22 you
2  say:  FDA oversight of drug promotion is
3  intended to ensure that physicians and
4  consumers understand both the benefits and
5  risks of a drug.  FDA regulations call for
6  fair balance in all promotional claims and
7  materials.  The risks as well as the benefits
8  must be clearly identified and risks must be
9  given appropriate prominence.
10         Do you see that?
11     A.  Yes, I do.
12     Q.  And there's another citation to
13  a Code of Federal Regulations section for
14  that paragraph, correct?
15     A.  Yes.
16     Q.  You understand that the FDA
17  regulates labeling for prescription drugs,
18  based on what you've said in your report?
19     A.  I do.
20     Q.  And the FDA approves
21  prescription drugs even if they have known
22  risks?
23     A.  Yes.
24     Q.  Do you understand that the FDA
25  also regulates promotional materials for

Page 19

1  prescription drugs?
2         MR. SOBOL:  Objection.
3     A.  Yes, I do.
4  BY MR. ROTH:
5     Q.  And the FDA has authority to
6  police advertising that it believes would
7  result in prescription drugs being misbranded
8  under the federal regulations?
9         MR. SOBOL:  Objection.
10     A.  I'm not sure exactly what you
11  mean by "police," but as I've described in my
12  report, I understand that materials are
13  reviewed by the FDA.
14  BY MR. ROTH:
15     Q.  And the FDA has the authority
16  to tell a drug manufacturer to either modify
17  or refrain from using materials that it may
18  review?
19     A.  I just want to be careful that
20  I don't try to convey any legal expertise
21  here, but I am aware that the FDA, for
22  example, issues warning letters pertaining to
23  specific marketing tactics and messages.  If
24  that's what you're referring to then, yes, I
25  understand that.

Page 20

1     Q.  Well, more than warning
2  letters, the FDA may tell a manufacturer when
3  it reviews draft promotional materials, for
4  example, that it does not approve their
5  dissemination.
6         Are you aware of that?
7         MR. SOBOL:  Objection, asked
8     and answered.
9     A.  I guess I would have thought of
10  that as similar -- again, not being a legal
11  expert -- similar to those warning letters
12  that say that you may not do this.  The
13  specifics of how the enforcement flows after
14  that, what the FDA can and can't do in terms
15  of enforcement, I'm a little less clear on.
16  BY MR. ROTH:
17     Q.  Okay.  And I appreciate that
18  you're not a legal expert, but do you
19  understand that in addition to issuing
20  warning letters after materials may have gone
21  out, the FDA, sometimes before materials are
22  utilized, may give input and feedback to
23  manufacturers about the materials that they
24  plan to use?
25     A.  Yes, I believe that's true.

Page 21

1     Q.  And you did not study which, if
2  any, of the promotional materials for
3  prescription opioids were submitted to FDA
4  for its review before they were used?
5         MR. SOBOL:  Objection.
6     A.  I did not study that, no.
7  BY MR. ROTH:
8     Q.  And you did not study which of
9  the detailing contacts in your regression
10  models, which we'll talk about, involve
11  promotional materials that had been submitted
12  for FDA review?
13         MR. SOBOL:  Objection.
14     A.  I did not, no.
15  BY MR. ROTH:
16     Q.  Do you agree that opioids have
17  legitimate medical uses for certain diseases
18  and conditions?
19     A.  Yes, I would say that's true.
20  According to their label, yes.
21     Q.  And you understand that the FDA
22  has approved opioids for certain of these
23  conditions in their labels?
24     A.  Yes, I understand that the
25  approved labels include those conditions for

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  which the FDA has deemed them appropriate.
2      Q.    Did you review any drug labels
3  in connection with your work in this case for
4  prescription opioids?
5      A.    I have looked at some of the
6  drug labels, yes.
7      Q.    Do you recall which drug labels
8  you reviewed?
9      A.    I believe for OxyContin and
10 hydrocodone.
11     Q.    Did you review any labels
12 beyond that that you recall?
13     A.    Not that I recall.
14     Q.    And I've looked at
15 Attachment B.  I don't think I saw drug
16 labels on your reliance list; is that
17 correct?
18     A.    That's correct.
19     Q.    Do you understand that
20 prescription opioids are approved in their
21 labels for the treatment of chronic pain?
22         MR. SOBOL:  Objection.
23     A.    As I sit here, I couldn't tell
24 you which drugs have approvals for chronic
25 pain on their labels, no.

Page 23

1  BY MR. ROTH:
2      Q.    Do you recall whether the
3  OxyContin and hydrocodone labels you reviewed
4  contained approvals for chronic pain for
5  those drugs?
6         MR. SOBOL:  Objection, scope.
7      A.    I do not.
8         MR. SOBOL:  Just give me a
9      little bit of a chance to get my
10     objections in, Professor.  Just a
11     nanosecond.
12     A.    I do not recall.
13 BY MR. ROTH:
14     Q.    Have you ever taken a
15 prescription opioid before?
16     A.    I have not.
17     Q.    Have you reviewed any medical
18 literature or guidelines on which uses
19 prescription opioids are FDA approved for?
20     A.    In the context of my report, I
21 discuss some of the guidelines, so I -- and
22 I've certainly reviewed those, for example,
23 the CDC guidelines.  I don't know if that's
24 what you're referring to.  I'm not
25 specifically myself offering an opinion on

Page 24

1  those guidelines.  As you know, as we just
2  discussed, I'm not a clinical expert or a
3  pharmacologist, but I'm certainly aware of
4  guidelines that talk about the appropriate
5  uses of opioids.
6      Q.    Do you know the most common
7  uses of opioids for which health insurers and
8  federal Medicare or state Medicaid agencies
9  reimburse use?
10         MR. SOBOL:  Objection.
11     A.    As I sit here, do I know which
12 uses are most prevalent across all those
13 payors?  No.  No, I do not.
14 BY MR. ROTH:
15     Q.    Do you know whether Medicare,
16 for example, reimburses patients for the use
17 of prescription opioids for the treatment of
18 chronic pain?
19         MR. SOBOL:  Objection.
20     A.    Well, I think you would be
21 talking about Medicare Part D.  Just to be
22 clear, those are private insurers that are
23 acting in the service of Medicare
24 beneficiaries, and each, of course, has a
25 different formulary and may use different

Page 25

1  mechanisms to ensure appropriate drug use.
2         So I think it would be hard to
3  characterize that as Medicare as a whole.
4  BY MR. ROTH:
5      Q.    Do you know whether any of the
6  Medicare Part D insurers approve the use of
7  opioids on their formularies for the
8  treatment of chronic pain?
9         MR. SOBOL:  Objection.
10     A.    I do not know one way or the
11 other.  I do not believe that -- I do not
12 know one way or the other whether there are
13 restrictions relative to the uses of
14 particular drugs for particular indications.
15 BY MR. ROTH:
16     Q.    Okay.  I'm going to mark as
17 Exhibit 3 to your deposition a document that
18 I pulled from your reliance list.  It's
19 titled Medicare Program Policies and
20 Procedures, and it was linked to the Excellus
21 Blue Cross Blue Shield page.
22         (Whereupon, Deposition Exhibit
23     Rosenthal-3, Medicare Program
24     Policies & Procedures, was marked for
25     identification.)

Page 26

BY MR. ROTH:

Q.   Do you see that document?

A.   I do.

Q.   And do you recognize this document as one that you reviewed?

A.   I do.

Q.   Okay.  So why did you have your team pull this document and why did you review it in your work in this case?

A.   I'd actually have to look in my report to see what I cite it for specifically.

Q.   Okay.  If you look on the first page, it says:  Summary of Formulary Level Opioid POS for Calendar Year 2019.

Do you see that?

A.   I do.  And just to be clear, this is a single Medicare Part D carrier.  This is not official Medicare policy per se.

Q.   Right.

A.   But yes.

Q.   So if you look at page 3 of this document, it talks about the review criteria for Blue Cross Blue Shield for opioid, seven-day supply limits.

Page 27

Do you see that?

A.   I do.

MR. SOBOL:  Objection.

BY MR. ROTH:

Q.   And then the first bullet -- or it says before the bullets:  An exception to the seven-day quantity limit of a shorter long-acting opioid may be permitted in patients who meet one of the following criteria, A through F below.

Do you see that?

A.   I do.

Q.   And then the first bullet says:  Approval will be a 30-day override for scenarios A, B, C, D and E below.

And then there's a second bullet below that.  Do you see that?

A.   Yes.

Q.   And it says:  Approval will be a 30-day override for scenario F below.

Do you see that?

A.   I do.

Q.   And then under that bullet is E where it says:  The requesting physician provides a supporting statement/attests that

Page 28

a prescription for greater than a seven-day supply is medically necessary to manage the patient's pain.

Do you see that?

A.   I do.

Q.   And so at least for Blue Cross Blue Shield, it appears in their formulary they have a mechanism for approving the use of opioids to treat pain for longer than seven days?

MR. SOBOL:  Objection.  Blue Cross Blue Shield of?  Question mark.

THE WITNESS:  Are you waiting for me to answer your question?

MR. ROTH:  I was.

A.   This -- in this Excellus formulary, they do indicate -- obviously this is 2019.  They do indicate that mechanism.  You had asked me before about chronic pain.  I don't know if you're trying to infer that anything longer than seven days is chronic.  I think that's not exactly the definition of chronic pain, so...

BY MR. ROTH:

Q.   We'll get there.

Page 29

A.   Okay.

Q.   I promise.

MR. SOBOL:  I'll write that down.

BY MR. ROTH:

Q.   Your direct and indirect regressions do not make any attempt to differentiate legitimate prescriptions from medically unnecessary ones; is that correct?

MR. SOBOL:  Objection.

A.   The goal of my analysis is to examine the impact of the alleged misconduct, and so I appropriately quantify all prescriptions caused by the alleged unlawful marketing.

BY MR. ROTH:

Q.   You're not an expert in pharmaceutical marketing practices, correct?

A.   I am not an expert in pharmaceutical marketing practices, although, again, I have studied pharmaceutical marketing and its effects and so I have a high degree of familiarity.

Q.   But you're not opining on which of defendants' marketing practices were

Page 38

1      MR. SOBOL: Objection.
2  Objection, asked and answered.
3      A.   I did not evaluate the
4  distributors' conduct, no.
5  BY MR. ROTH:
6      Q.   So your models provide no
7  analysis of causation by distributors or
8  pharmacies for what plaintiffs allege is the
9  opioid epidemic, correct?
10     MR. SOBOL: Objection, asked
11  and answered.
12     A.   The distributors' conduct was
13  outside the scope of my report.
14  BY MR. ROTH:
15     Q.   I want to take a look at the
16  complaints you site in footnote 18 and 19. I
17  assume you looked at those complaints?
18     A.   I did.
19     Q.   Okay. So I'm going to mark as
20  Exhibit 4...
21     A.   That is clearly not the whole
22  complaint because I happen to know that it's
23  several inches thick.
24     Q.   Correct. You're right. I'm
25  going to mark as Exhibit 4 just the cover

Page 39

1  page and the paragraph I want to ask you
2  about, from the Second Amended Complaint
3  filed by Summit County.
4      (Whereupon, Deposition Exhibit
5      Rosenthal-4, Second Amended Complaint
6      and Jury Demand, was marked for
7      identification.)
8  BY MR. ROTH:
9      Q.   Do you have that in front of
10  you?
11     A.   I do.
12     Q.   And if you look at
13  paragraph 10, which I excerpted from the
14  complaint. Do you see it?
15     A.   Yes.
16     Q.   It says: On the demand side,
17  the crisis was precipitated by the defendants
18  who manufacture, sell and market prescription
19  opioid painkillers, defined as the marketing
20  defendants.
21     Do you see that?
22     A.   I do.
23     Q.   And then it says: Through a
24  massive marketing campaign premised on false
25  and incomplete information, the marketing

Page 40

1  defendants engineered a dramatic shift in how
2  and when opioids are prescribed by the
3  medical community and used by patients.
4      Do you see that?
5      A.   I do.
6      Q.   What do you understand to be
7  the false and incomplete information that the
8  alleged marketing campaign was premised on?
9      A.   There are a number of
10  components. At a high level, the main issue
11  as I understand it as a health economist, not
12  as a clinician, is -- was the -- that it was
13  conveyed to physicians and to the public that
14  opioids were safe; that the possibility of
15  addiction was relatively low; that these
16  drugs were effective, not just for cancer
17  pain, but for a wide variety of acute and
18  chronic pain.
19     And then there were other
20  messages that were conveyed that supported
21  those general premises, including the fact
22  that extended release formulations of opioids
23  would smooth out the peaks and valleys of
24  pain control; that as patients became
25  tolerant to these drugs, that this was a

Page 41

1  natural phenomenon and not a sign of
2  addiction.
3      There were certain notions such
4  as pseudoaddiction that were promoted through
5  communication by the marketing defendants.
6  And at the same time, it was also conveyed
7  that physicians could identify some small
8  group of patients who might be more likely to
9  abuse opioids and prevent and control abuse,
10  that this was an issue related to the
11  individual characteristics and not to the
12  products themselves.
13     Q.   Okay. What analysis did you do
14  to test whether the detailing visits you
15  analyzed communicated that false and
16  incomplete information as you just described
17  it during those visits?
18     A.   Well, I think you misunderstand
19  the entire premise here. As I noted earlier,
20  detailing, while it is the promotional tactic
21  that I can best measure and use in my
22  analysis, the allegations suggest that this
23  campaign of misinformation permeated through
24  many other vehicles.
25     And so it's not in my view,

Page 42

1 again, as a health economist, a question of
2 ascertaining what was in a particular detail,
3 but what was available in -- through key
4 opinion leaders, what was available through
5 professional guidelines, all of that setting
6 the context. So it's not so much about
7 looking for one co-mission as a much broader
8 picture of what the information was that was
9 conveyed.
10     Q.    Okay.  You've testified as a
11 causation or damages expert before, correct?
12         MR. SOBOL:  Objection.
13     A.    I have.
14 BY MR. ROTH:
15     Q.    And in general, you understand
16 that to opine on causation or damages, you
17 have to tie the theory of liability to
18 damages?
19         MR. SOBOL:  Objection.
20     A.    Yes, and I have done that in my
21 report.
22 BY MR. ROTH:
23     Q.    Okay.  The complaint defines a
24 theory of liability here as false and
25 incomplete information, correct?

Page 43

1     A.    Yes, correct.
2     Q.    What have you done to confirm
3 that the detailing visits you analyzed
4 actually contained false and incomplete
5 information as the complaint or you define
6 it?
7         MR. SOBOL:  Objection, just
8     asked and answered.
9     A.    As we talked about earlier,
10 I've been asked to assume that counsel will
11 prove that all or virtually all marketing
12 during the period from 1995 to the end of my
13 data was unlawful.
14         So I have tested the
15 reasonableness of that assumption in the
16 review of the documents that we've talked
17 about, in the review of other expert
18 opinions.
19         I have not, nor do I believe
20 it's necessary to make that causal step,
21 looked at individual details throughout the
22 period for my analysis.
23 BY MR. ROTH:
24     Q.    You would agree that detailing
25 in and of itself is not unlawful?

Page 44

1         MR. SOBOL:  Objection.
2     A.    Well, again, if that detailing
3 is conveying false and misleading
4 information, I understand -- I'm not a
5 lawyer, but I understand that it would be
6 unlawful.  And so, you know, I do not -- I am
7 not making an assumption that detailing in
8 general is unlawful but that this detailing
9 can be proved to be unlawful.
10 BY MR. ROTH:
11     Q.    A pharmaceutical rep going to a
12 doctor to drop off a pizza could be
13 considered a detailing visit, correct?
14         MR. SOBOL:  Objection.
15     A.    A detailing visit generally
16 involves the conveyance of some information,
17 maybe a pizza in addition, but the details
18 that I'm looking at, there is a specific
19 product mentioned.
20 BY MR. ROTH:
21     Q.    But detailing visits can take
22 many forms, correct?
23         MR. SOBOL:  Objection.
24     A.    Well, I'm not sure exactly what
25 you mean by it.  There's information conveyed

Page 45

1 about a product or a set of products, and
2 detailing visits are face-to-face visits
3 between the salesperson and someone in the
4 physician's office.
5 BY MR. ROTH:
6     Q.    But you know that detailing
7 could just be the sales rep dropping off a
8 placard with the product's label on it?
9         MR. SOBOL:  Objection.
10     A.    I think you misunderstand,
11 again, the interconnectedness of all of this.
12 And so if a detail were something like you
13 just described -- I don't know about a
14 placard, how about a coffee mug -- those
15 details are intended to reinforce messages
16 that have been conveyed in previous details
17 that have been conveyed by key opinion
18 leaders.
19         I don't think it's appropriate
20 to pull these individual pieces out as if
21 they were not part of an integrated marketing
22 scheme, which is really precisely what
23 Dr. Perri talks about in his report.
24 BY MR. ROTH:
25     Q.    But you're not offering the

Page 46

1  opinion that every time a sales rep detailed
2  a doctor for an opioid product, that was
3  unlawful?
4      MR. SOBOL:  Objection.
5      A.   I am not offering any opinion
6  about the unlawfulness of detailing, as we
7  have spoken about before.  I was asked to
8  assume that plaintiffs' counsel would prove
9  that marketing was unlawful.
10  BY MR. ROTH:
11     Q.   We'll come back to this, but
12  I'll give you a break from it.
13         If you look back at
14  paragraph 7, you say in paragraph 7 of your
15  report -- sorry:  In this report I refer to
16  the manufacturers' deceptive marketing
17  strategy and tactics as manufacturer
18  misconduct.  This report does not address
19  nonmarketing misconduct.
20         Do you see that?
21     A.   Yes.
22     Q.   What is your definition of
23  nonmarketing misconduct?
24     A.   By that, I mean to describe
25  misconduct related to identifying and

Page 47

1  intervening with suspicious shipments, the
2  distributor misconduct, as I understand it,
3  yes.
4      Q.   Okay.  And then in paragraph 8
5  you say:  My assignment is to answer the
6  following questions framed by plaintiffs'
7  counsel.
8          Do you see that?
9      A.   I do.
10     Q.   And each of the bullets is
11  bounded -- I guess with the exception of the
12  sensitivity -- each of the first three
13  bullets is bounded by the year 1995.
14         Do you see that?
15     A.   Yes.
16     Q.   So since 1995 I'm going to look
17  at causation.
18         Can you explain why 1995 was
19  selected?
20     MR. SOBOL:  Objection.
21         No discussions with counsel,
22     but if you have a general
23     understanding, that's fine.
24     A.   My general understanding is
25  that counsel for plaintiffs intend to prove

Page 48

1  that marketing since 1995 was unlawful.
2  BY MR. ROTH:
3      Q.   Do you have any independent
4  understanding as to why that would be a good
5  measuring date?
6      A.   As I sit here specifically, no.
7  It will get into the specific facts that I
8  describe in my report in terms of what is
9  happening in opioid prescribing in the world
10  in 1995, and that is certainly a turning
11  point in the -- in opioid use, as you can see
12  from the sales data I have.
13     Q.   Is there a specific event that
14  happened in 1995 that you believe was the
15  start of the unlawful marketing scheme
16  alleged in the complaint?
17     A.   As I sit here, I can't think of
18  anything specifically, no.
19     Q.   Okay.  I'm sure we'll talk
20  about this later, but I know from sitting
21  through Professor McGuire's deposition and
22  Professor Cutler's deposition, that as
23  Professor McGuire described it, there was a
24  triumvirate of damages experts in this case?
25     A.   Quadrumvirate.

Page 49

1      Q.   If you include Professor
2  Gruber?
3      A.   Yes.
4      MR. SOBOL:  You can't forget
5      John.
6  BY MR. ROTH:
7      Q.   So you understand, I take it,
8  that Professor Cutler calculates harms
9  beginning in 2006?
10     A.   Yes.
11     Q.   And did you review his report
12  before finalizing your report?
13     A.   Before finalizing my report, I
14  believe I did.
15     Q.   And you had conversations with
16  him about your models and I assume about his
17  models as well?
18     A.   With counsel present, we talked
19  about the work as a whole.
20     Q.   Okay.  Do you know why
21  calculating a harm from 2006 forward as he
22  does requires looking at misconduct dating
23  back to 1995?
24     MR. SOBOL:  You can answer only
25     if it's not based on counsel.

Page 50

1    A.    Based on my understanding of
2 the economic phenomena of interest, yes.  So,
3 as I'm sure we will discuss and you know, my
4 model examines the effects of marketing over
5 time, and marketing has long-lasting effects.
6 So what happened in 1995 is still affecting
7 the world in 2006.
8         Moreover, of course, harms such
9 as overdose deaths are lagged somewhat to the
10 start of someone's experience taking an
11 opioid.  So it's important to take a look at
12 the entire time period.
13 BY MR. ROTH:
14    Q.    And we will talk about the
15 stock of promotion and how you calculate
16 that.
17         But the way you calculate that,
18 if you started back in 1990 or 1985, it would
19 still have an impact on 2006; isn't that
20 right?
21         MR. SOBOL:  Objection.
22    A.    What's important is when the
23 but-for marketing departs from actual
24 marketing, so that is why those earlier
25 periods matter and going back to 1985

Page 51

1 wouldn't matter because but-for and actual
2 marketing are the same.
3 BY MR. ROTH:
4    Q.    And the reason you say but-for
5 and actual marketing are the same is the
6 assumption that the scheme started in 1995?
7         MR. SOBOL:  Objection.
8    A.    Yes, the assumption that I used
9 to calculate but-for marketing is that the
10 defendants' marketing after 1995 was
11 unlawful.
12 BY MR. ROTH:
13    Q.    You have not done any analysis
14 of causation as to non-defendant
15 manufacturers; is that correct?
16         MR. SOBOL:  Objection.
17    A.    Well, my model includes all
18 opioids in this category.  We can talk about
19 I exclude the injectables.  There's some
20 exclusions.
21         But I examined the effect of
22 marketing on sales beyond the defendants, so
23 I provide causal estimates of the effective
24 marketing on sales for non-defendants.  And
25 then separately, again, I'm sure we will get

Page 52

1 to this, I break out non-defendant marketing
2 on behalf of defendants in my Table 3.
3         So I am looking at causation
4 for non-defendants.  I'm simply not
5 attributing it to misconduct and therefore
6 passing it on to Professor Cutler.
7 BY MR. ROTH:
8    Q.    And with respect to the
9 non-defendants, you're doing it on an
10 aggregate basis as opposed to specific
11 companies; is that correct?
12    A.    My main analysis is on an
13 aggregate basis, and then I do some
14 sensitivity analysis where I remove
15 individual defendants and then all the
16 non-defendants' marketing on behalf of
17 defendants.
18    Q.    Do you know whether any of the
19 non-defendant manufacturers utilize similar
20 messaging in their promotional visits to the
21 ones that the defendant manufacturers did
22 that you described as the fraudulent scheme
23 earlier?
24    A.    I have not examined that
25 question, no.

Page 53

1    Q.    And if a court or jury were to
2 find that those types of messages were
3 unlawful for defendants, how would that
4 affect how you calculate causation with
5 respect to the non-defendants?
6         MR. SOBOL:  Objection.
7    A.    That seems to me to be a legal
8 question.  This matter has a specific set of
9 defendants, and I am calculating impact for
10 those defendants.  I'm not sure if you're
11 suggesting if I could include other
12 manufacturers in those calculations?
13 Absolutely.  But that seems like it would be
14 outside the scope of this matter.
15 BY MR. ROTH:
16    Q.    And I think we talked about the
17 illegal drug trade, but specifically, have
18 you done any analysis as to causation with
19 respect to pill mills?
20         MR. SOBOL:  Objection.
21    A.    No, I have not.
22 BY MR. ROTH:
23    Q.    Or cartels or Internet sales of
24 opioids?
25    A.    No, I have not.

Page 54

1 Q. You've done no analysis as to
2 causation due to changes in reimbursement
3 policies for prescription opioids?
4 MR. SOBOL: Objection.
5 A. I have not looked at changes in
6 reimbursements specifically, no.
7 BY MR. ROTH:
8 Q. You've done no analysis as to
9 causation as to changes in medical guidelines
10 for the use of opioids?
11 A. Well, I do, as you know, in one
12 model look at the effects of certain
13 guideline-related events, so that happens in
14 my Model C. But aside from that, I have not
15 modeled other changes in guidelines, but to
16 some extent there, yes.
17 Q. You've done no analysis of
18 causation as to patients or users of
19 prescription opioids?
20 MR. SOBOL: Objection.
21 A. I'm not really sure what you
22 mean by that. My analysis is an
23 industry-level analysis, so the patients of
24 course are the ones filling the prescriptions
25 that I'm counting and measuring.

Page 55

1 So in the indirect analysis, I
2 look at population characteristics as they
3 are associated with shipments,
4 cross-sectionally, so that is in some sense a
5 patient-level analysis. I'm not entirely
6 sure what you had in mind, however.
7 BY MR. ROTH:
8 Q. You don't attribute any
9 causality to prescribing doctors?
10 MR. SOBOL: Objection.
11 A. Again, I am -- marketing is to
12 doctors, and the doctors have to write the
13 prescriptions, so they are in the causal
14 chain of my analysis.
15 The mechanism is a detailing
16 contact. If doctors did not respond to those
17 details, then they -- my results would be
18 quite different.
19 BY MR. ROTH:
20 Q. I understand they're in the
21 causal chain. What I'm trying to understand
22 is how your models assign a percentage of
23 causality to prescribing doctors.
24 MR. SOBOL: Objection.
25 A. Again, from my point of view,

Page 56

1 the question doesn't make a lot of sense to
2 me because of the fact there is this causal
3 chain, and what I've been asked to undertake
4 is an analysis of the impact of the allegedly
5 unlawful marketing.
6 It goes through doctors, so
7 there -- the idea that there's a separate
8 analysis of the effect of doctors on
9 prescribing, they're already in my analysis.
10 The question about parsing liability for
11 those groups, I have not undertaken that
12 because I'm not a lawyer, and I was not asked
13 to offer an opinion on that.
14 BY MR. ROTH:
15 Q. And when you say the doctors
16 are already in the analysis, they're in the
17 analysis to the extent you're talking about
18 detailing, but other factors that may
19 influence the doctors' prescribing decision
20 are not accounted for in your analysis,
21 correct?
22 MR. SOBOL: Objection.
23 A. Well, again, I would say that's
24 not entirely correct because these other
25 factors that I capture in my model using

Page 57

1 those eras, in addition in Model C, using the
2 specific dummy variables, those operate
3 through physicians.
4 And again, because these are
5 prescribed products, the doctor has to write
6 the prescription in every case, so even, you
7 know, efforts, for example, to change the way
8 state medical boards enforce prescribing
9 around opioids, that's -- that's ultimately
10 directed at doctors.
11 BY MR. ROTH:
12 Q. You agree that doctors act as a
13 trusted intermediary when it comes to
14 prescribing opioids?
15 MR. SOBOL: Objection.
16 A. As a matter of the way this
17 market works, yes, that doctors are intended
18 to be the agents of their patients.
19 BY MR. ROTH:
20 Q. You say in your report,
21 paragraph 14: Physicians act as a trusted
22 intermediary in prescription drug
23 decision-making.
24 MR. SOBOL: Objection.
25 A. Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 question, which is: An individual doctor's
2 prescribing habits can be confounded by other
3 unobserved characteristics?
4 MR. SOBOL: Objection.
5 A. I don't know what you mean by
6 confounded. When you say confounded, I am
7 assuming -- and please correct me if I'm
8 wrong -- that you're asking that in a sort of
9 statistical sense.
10 BY MR. ROTH:
11 Q. Yeah. Okay. So, I am.
12 (Whereupon, Deposition Exhibit
13 Rosenthal-5, 2016 Datta and Dave
14 Publication, was marked for
15 identification.)
16 BY MR. ROTH:
17 Q. Let me mark as Exhibit 5 is
18 Datta and Dave study --
19 A. I keep thinking it's "Dah-vay."
20 Q. You know, I did too. Well,
21 however you pronounce the gentleman's name, I
22 apologize, Effects of Physician-directed
23 Pharmaceutical Promotion on Prescription
24 Behaviors: Longitudinal Evidence.
25 Do you have that in front of

Page 75

1 you?
2 A. I do.
3 Q. And this is a study you rely on
4 and cite in your report?
5 A. That's correct.
6 Q. And this study actually looked
7 at longitudinal evidence and developed a
8 regression to determine the effect of
9 marketing and other behaviors?
10 A. Yes. But just to be clear,
11 when they say longitudinal, they're not
12 wrong, but they're talking about two years of
13 data. This is -- this is a bit different
14 than the aggregate time series that I used.
15 So just to be clear, they have multiple
16 observations per physician over a two-year
17 period.
18 Q. Okay. If you turn to page 456,
19 and at the bottom of the page -- or sorry,
20 let me get myself to the right place. Sorry,
21 it's -- yeah, it's 456, bottom of the page.
22 A. Okay.
23 Q. The very last sentence, it
24 says: Furthermore, the link between DTPP and
25 prescribing habits may be confounded by other

Page 76

1 unobserved physician-specific characteristics
2 such as inertia in prescribing patterns,
3 brand loyalty, patient mix, tolerance for
4 risks and preferences toward trade-offs
5 between efficacy, contraindications and
6 long-term use for prophylactic purposes.
7 Do you see that?
8 A. Yes. And again, those are all
9 cross-sectional concerns, so when one is
10 doing an analysis, as they do, that
11 incorporates both cross-sectional and time
12 series variation, so they have a panel of
13 physicians that they're looking at their
14 prescribing for a particular herpes drug and
15 its competitors.
16 And when you're looking
17 cross-sectionally like that at
18 physician-level data, you would need to
19 account for those physician characteristics
20 when you're looking at aggregate data over
21 time that you would not need to look for
22 those characteristics.
23 Q. And you look at aggregate data?
24 A. That's correct.
25 Q. Did you try to look at

Page 77

1 physician-specific cross-sectional data?
2 MR. SOBOL: Objection.
3 A. Unlike Datta and Dave, I do not
4 have promotional data at the individual
5 physician level. As you no doubt noted in
6 their literature review, it's fairly uncommon
7 to be able to get data that have
8 physician-level detailing, which is what they
9 use, as well as prescribing habits. So there
10 are a few marketing scholars who essentially
11 have had good relationships with companies
12 and have been able to get those kinds of
13 data. I don't have access to those data.
14 BY MR. ROTH:
15 Q. Well, you understand that all
16 these companies are defendants in the case
17 and have produced documents as part of the
18 lawsuit, correct?
19 MR. SOBOL: Objection.
20 A. I understand that these
21 companies have produced documents as part of
22 the lawsuit. They have not produced data
23 with detailing information by physician that
24 can be identified and linked to prescribing.
25 ///

Page 78

BY MR. ROTH:
1. Q.   And --
2. A.   I did look for those data.
3. Q.   You did look for it.  And that's true of every single manufacturer defendant, there is no physician-level detailing data available?
4. MR. SOBOL:  Objection.
5. A.   There were no physician-level detailing data for any manufacturer that covered the period of interest.  So in order for me to do my analysis, I would need those data for all the defendants for the entire time period.
6. So where -- to the extent that we found any data, they were bits and pieces of contact registries, essentially sales databases, which are not the same level as what these folks have -- they have actual linked data, linkable.
7. BY MR. ROTH:
8. Q.   But you didn't take the specific data you had for individual defendants for whatever time period you had to test the results of your regression

Page 79

against a model you could do on just that data?
MR. SOBOL:  Objection, form and asked and answered.
A.   There would be no such test.  These -- the goal of my analysis and the goal of Datta and Dave's analysis are completely different.  So there -- there would be no point in comparing those results.
They are trying to ascertain the extent to which detailing across physicians drives marketing impact, so they're really interested in questions like, you know, what -- how -- how much does it make sense for a company to detail high prescribers versus low prescribers to a greater degree.
I'm interested in the aggregate impact, and so that is what my model does best.  Their model would not be appropriate for ascertaining the aggregate impact.
BY MR. ROTH:
Q.   I understand you're interested in the aggregate impact, but if one were interested in the individual impact of any

Page 80

single manufacturer's detailing, you could run an analysis similar to Datta and Dave using whatever data were available for that manufacturer?
MR. SOBOL:  Objection.
A.   There are two levels of aggregation here.  One is from the doctors up to the total product level, and the other is from the product to the defendant to the whole class, if I can use that term to describe all the opioids that we're interested in here.
So Datta and Dave are at the most granular level, the individual doctor prescribing for an individual drug.
I am interested in understanding how marketing as a whole drove sales in this market and I want to capture all of the spillover effects.  They're trying to tease out other kinds of effects.
This analysis could not be used to get an answer to the question what would have happened if these manufacturers had not marketed their products.
///

Page 81

BY MR. ROTH:
Q.   And the reason you're interested in the aggregate question is that was the charge you were given by plaintiffs' counsel was to look at the aggregate impact as opposed to an individual defendant-specific impact?
A.   Well, again, there are multiple levels of aggregation here, so if I -- my model, as you know, can be used to parse out individual defendants as I have done in Table 3 of my report, so it can look at an individual defendant, and I've shown you results excluding individual defendants.  So it is already doing that.
It's the cross-sectional nature of what they're modeling here with the physician-fixed effects.  They're really trying to tease apart how manufacturers go about targeting doctors for marketing and what effect that has.
I'm not interested in that effect, and so it wouldn't be appropriate even if I were only looking for one defendant.

Page 82

1  Q.   So you're not interested in
2  trying to ascertain how manufacturers'
3  targeting for marketing has an effect.
4      What is the question you're
5  seeking to answer?
6      MR. SOBOL:  Objection.
7  A.   The question that I'm seeking
8  to answer is what is the effect of marketing
9  by defendants for opioid products on their
10  sales, and if that effect --
11  BY MR. ROTH:
12  Q.   I'm sorry to stop you.  At an
13  aggregate level, I assume you mean?
14  A.   At an aggregate level.  Again,
15  my model can look -- pull out the effect for
16  individual defendants, but at an aggregate
17  level.
18      And so all I'm saying is that
19  if that effect comes because one manufacturer
20  targets just the high prescribers and is very
21  effective there and another manufacturer
22  details everybody, that is not relevant to
23  what I have been asked to undertake in this
24  case, and so I don't go into the level of --
25  the physician level the way Datta and Dave do

Page 83

1  because it's -- it's not relevant to my
2  conclusions.
3  Q.   Have you tried, for any of the
4  individual manufacturers for which you have
5  specific data, to pressure test your
6  conclusions in Table 3, from removing them
7  from the aggregate data to see if those hold?
8      MR. SOBOL:  Objection, form.
9  A.   Can you repeat?  Because I just
10  want to make sure I understand the question
11  you're asking.
12  BY MR. ROTH:
13  Q.   Yeah.  So as I understand your
14  model -- and again, we will get into the
15  details, I promise -- but you essentially
16  back out from the aggregate model individual
17  defendants, and you present those in Table 3.
18      MR. SOBOL:  Objection.
19  A.   That's correct.
20  BY MR. ROTH:
21  Q.   So my question is:  Have you
22  run a Datta and Dave type of analysis for any
23  of the individual manufacturers listed in
24  Table 3 to compare how the aggregate results
25  in Table 3 hold compared against the Datta

Page 84

1  and Dave type analysis we've been discussing?
2      MR. SOBOL:  Objection, asked
3  and answered.
4  A.   I think, again, you
5  misunderstand what the utility of the Datta
6  and Dave analysis is.  It is an analysis that
7  is designed to dig into how marketing works
8  and not whether.
9      There would be no utility in
10  comparing results of a Datta and Dave
11  analysis, if one were possible, with my
12  aggregate results because the questions
13  they're looking at are entirely different.
14  BY MR. ROTH:
15  Q.   And why is the question you
16  answer only about how marketing works as
17  opposed to whether?
18  A.   No.  Sorry.  Their how.
19  Q.   Okay.  Why is -- So how are you
20  answering the question through your aggregate
21  model whether marketing works if you're not
22  looking at it on an individualized
23  doctor-specific level?
24      MR. SOBOL:  Objection.
25  A.   My analysis is a model of the

Page 85

1  effect of detailing as a whole for this
2  class, its effect on sales in the form of
3  milligrams of morphine equivalent, just to be
4  clear.
5      So my right-hand side variable
6  is detailing.  My left-hand side variable is
7  MMEs.  Datta and Dave -- so that tells me, if
8  marketing increases in this area as a whole,
9  what happens to MMEs?  That's the question
10  that relates to my assignment.
11      Datta and Dave are asking, you
12  know, can we examine and tease out to what
13  extent manufacturers target specific types of
14  physicians and whether the prescribing of
15  physicians is more driven by this targeting
16  question or by the marketing effectiveness.
17      They're doing so on a very
18  short time period in the scheme of things,
19  right?  So two years of data doesn't --
20  doesn't allow them to look, for example, at
21  what happened before that two-year time
22  period in terms of the buildup of knowledge
23  about these products, all of those things
24  that are captured in the stock of detailing
25  that I use.

Page 86

1  And so they have this
2  interesting work that tells us something
3  about responsiveness of physicians, but it
4  doesn't get us to the aggregate question
5  about how -- to what extent does marketing
6  across all of their drugs affect the size of
7  the market.
8  BY MR. ROTH:
9      Q.    What have you done to answer
10 the individualized question of whether
11 targeting certain physicians by the
12 manufacturers in this case was the cause of
13 additional MMEs as opposed to the
14 effectiveness of the marketing overall?
15         MR. SOBOL:  Objection.
16     A.    That question is not relevant
17 to my charge.  I want to understand what is
18 the total effect.  I have -- I do not know
19 why the court would want to understand what
20 aspects of the targeting of specific
21 physicians that drive marketing increases.
22 BY MR. ROTH:
23     Q.    What have you done to answer
24 the individualized question of whether
25 certain messaging by individual manufacturers

Page 87

1  led to an increase in MMEs?
2          MR. SOBOL:  Objection.
3      A.    As we have discussed, I am
4  taking an assumption from counsel, as experts
5  always do, that they will prove their case,
6  and specifically, the relevant assumption I
7  have made is that all or virtually all
8  marketing by defendants from 1995 to the end
9  of my data was unlawful.
10         I have reviewed documents and
11 other expert reports.  I have not parsed out
12 individual messages and in any way parsed out
13 the marketing that I assume to be unlawful in
14 my model to differentiate from one to
15 another.
16 BY MR. ROTH:
17     Q.    Do you agree that standards of
18 care influence prescribing decisions?
19     A.    What -- do you mean by
20 standards of care something very general or
21 do you mean that in the sort of the
22 negligence sense, since you're a lawyer?
23     Q.    That's fair.  You've done this
24 a lot because you went somewhere that I
25 wasn't going.

Page 88

1  I meant the more general.  Do
2  you agree that sort of the prescribing and
3  treatment standards of care can influence
4  prescribing decisions?
5      A.    Again, I would say if we looked
6  at my ecosystem, I don't know that I call out
7  standards of care specifically, but if those,
8  for example, are set in part by what your
9  peers are doing, if those are set in part by
10 professional guidelines, then, yes, I believe
11 that those are relevant determinants of
12 physician behavior.
13         And as I said earlier, I also
14 believe that those would be affected by the
15 alleged misconduct.
16     Q.    Although detailing is not the
17 same as affecting the standards of care,
18 right?  Those are two different marketing
19 channels?
20     A.    It's not clear to me that
21 detailing would not affect the standards of
22 care.  Detailing could, for example, try to
23 convince individual physicians that it's okay
24 to prescribe opioids more broadly by citing
25 guidelines, by citing peers and key opinion

Page 89

1  leaders.  So I think it could well be wrapped
2  up.  I don't know why they'd be independent.
3      Q.    Do you agree that patient
4  preference can affect a physician's
5  prescribing decision?
6      A.    Yes, of course patient
7  preference can affect a physician's
8  prescribing decision.
9      Q.    Loyalty to certain drugs can
10 affect a physician's prescribing decision?
11     A.    Physicians -- it has been found
12 in the literature that physicians have a
13 tendency to prescribe a particular drug once
14 they've gotten used to it, so in the
15 antidepressant class, for example, that's
16 been shown.
17     Q.    Drug reimbursement policy can
18 affect physician's prescribing decisions?
19         MR. SOBOL:  Objection.
20     A.    Yes, all of these factors, the
21 last two factors, I would say they're most
22 likely to affect physician prescribing
23 patterns by the specific brand or brand -- in
24 the case of reimbursement, brand versus
25 generic as opposed to whether the physician

Page 90

1  prescribes an opioid.
2  BY MR. ROTH:
3      Q.   And we'll get to this later,
4  but to the extent you're looking at detailing
5  visits, you don't differentiate between
6  detailing visits that are just driving at
7  rivalrous marketing to get a prescriber to
8  switch opioids versus detailing visits that
9  are trying to get doctors to prescribe
10  opioids as a class of therapy?
11      A.   I don't differentiate on the
12  right-hand side, and so if, in fact,
13  detailing was all rivalrous, my results would
14  show that marketing doesn't affect sales.  So
15  that is the point of the analysis, is to
16  ascertain.
17          So you could imagine doing an
18  analysis in a market that has a fixed size,
19  where all marketing is rivalrous, and there's
20  some discussion for other drugs where
21  marketing appears to be more about market
22  share and not about driving the size of the
23  market as a whole.
24          But, in fact, my analysis shows
25  that the market expansion effects were

Page 91

1  important, whether or not there was also
2  rivalry.
3      Q.   You agree, though, that if a
4  manufacturer was only engaged in rivalrous
5  marketing, for example, that would be
6  qualitatively different than trying to make
7  the market and convince prescribers to move
8  patients on to opioids?
9      A.   I don't believe in the
10  conceptual premise that you have just put
11  forth that there's such a thing as purely
12  rivalrous marketing, in the case where the
13  market is not fixed by some reason.
14          So even if, you know, I go and
15  I market for Coke and it's not that I'm
16  trying to get you to drink more
17  sugar-sweetened beverages, I just want you to
18  stop drinking Pepsi, that will still remind
19  some people that, oh, yeah, I should think
20  about having a Coke this afternoon instead of
21  my usual coffee.
22          So I think there will be
23  market-increasing spillovers even from purely
24  rivalrous marketing.
25      Q.   The economic literature doesn't

Page 92

1  agree with you on that, though?
2      A.   I'm not sure that that's true.
3      Q.   We'll look at it.
4          A doctor's own medical judgment
5  can affect prescribing decisions?
6      A.   I think it would be very
7  difficult to say that that was not true.
8      Q.   And in fact, I think Professor
9  Cutler has got a working paper where he draws
10  that conclusion.  Have you studied that or
11  read that paper?
12      A.   You'd have to put it in front
13  of me.
14      Q.   We can look at it quickly.
15          (Whereupon, Deposition Exhibit
16      Rosenthal-6, 2015 Cutler et al Working
17      Paper, was marked for identification.)
18  BY MR. ROTH:
19      Q.   So I'll mark as Exhibit 6
20  Physician Beliefs and Patient Preferences:  A
21  New Look at Regional Variation in Health Care
22  Spending.
23          And if you look at page 5, do
24  you see in the middle of the page there's a
25  paragraph that starts with "Ultimately"?

Page 93

1      A.   Uh-huh.
2      Q.   He says --
3          MR. SOBOL:  Wait, is this an
4      excerpt or is this the whole article?
5          THE WITNESS:  It's an excerpt.
6          MR. ROTH:  It's an excerpt.
7      It's an excerpt.
8      A.   I just want to just review the
9  front piece so I can --
10  BY MR. ROTH:
11      Q.   Sure.
12      A.   -- understand what it's about.
13          (Document review.)
14      A.   Okay.
15  BY MR. ROTH:
16      Q.   So in the paragraph I was
17  pointing you to, it says:  Ultimately, the
18  largest degree of residual variation appears
19  to be explained by differences in physician
20  beliefs about the efficacy of particular
21  therapies.  Physicians in our data have
22  starkly different views about how to treat
23  the same patients.  These views are not
24  strongly correlated with demographics,
25  financial incentives, background or practice

Page 94

1 characteristics and are often inconsistent
2 with evidence-based professional guidelines
3 for appropriate care.
4      Do you see that?
5      A.    Yes, I do.
6      Q.    And do you have any reason to
7 believe that is not true of physicians when
8 they prescribe opioids?
9      MR. SOBOL:  Objection.
10      A.    Well, just to be clear, the
11 context that they're looking at is not one
12 that's subject to marketing, but in any case,
13 there's no presumption here that those
14 beliefs are not set by some other factors,
15 right.
16      So they're -- they're --
17 they're trying to identify all the forces
18 that they can measure, including financial
19 incentives and other characteristics, and so
20 they're putting in beliefs everything else.
21      But that's not to say that
22 those beliefs couldn't be shaped by
23 marketing.  So I think it would be a mistake
24 to consider beliefs as independent.  I
25 wouldn't say that they're a hundred percent

Page 95

1 set by marketing, but they're clearly
2 influenced by marketing.  That's really the
3 issue at hand here.
4 BY MR. ROTH:
5      Q.    Are there physicians in the
6 world who don't allow detailing in their
7 offices?
8      MR. SOBOL:  Objection.
9      A.    Yes.  But again, I think
10 conceptually, that's the wrong way to look at
11 this, as I have noted in my report, that even
12 if you never have someone detail you,
13 you're -- you're connected with peers, you
14 are getting messages through professional
15 societies.
16      It would be hard to imagine a
17 physician who's completely untouched by the
18 alleged misconduct in this matter.
19 BY MR. ROTH:
20      Q.    Do you agree that
21 characteristics of individual patients can
22 obviously affect prescribing decisions?
23      A.    Yes.  I would hope that
24 physician characteristics matter to -- sorry,
25 patient characteristics matter to physicians

Page 96

1 when they're prescribing.
2      Q.    And then you also mentioned
3 this earlier, but risk aversion or potential
4 medical malpractice liability could also
5 influence prescribing decisions?
6      A.    That is possible.  That is
7 possible, and I believe that is part of what
8 the model guidelines for state medical boards
9 is intended to address.
10      Q.    Okay.  And just so I understand
11 your position on this, do you believe there
12 are aspects of a doctor's prescribing
13 decision that are unaffected by marketing, or
14 is it your view that marketing infiltrates
15 everything in their mind at the time they
16 decide to prescribe a product like a
17 prescription opioid?
18      MR. SOBOL:  Objection.
19      A.    I don't know exactly what you
20 mean by that, but I can tell you what I
21 believe.  I believe that modern
22 pharmaceutical marketing, including the
23 tactics that are described in the complaint
24 in this matter, is comprehensive and
25 ubiquitous.

Page 97

1      Does that mean it is strictly
2 determinative of what every physician does
3 for every patient?  No, I do not believe
4 that.  I do believe that marketing, it can't
5 be teased out in terms of looking just at
6 what physicians were detailed, but it has an
7 influence that is quite broad.
8      Other factors will certainly be
9 important, but the question here is really
10 what is the incremental effect of marketing
11 on the prescriptions that physicians write.
12 BY MR. ROTH:
13      Q.    Have you reviewed the facts of
14 any prescription by a doctor of an opioid in
15 this case?
16      A.    I don't think so, no.
17      Q.    And you don't know how, on an
18 individual level, a specific doctor was
19 affected by a detailing visit in your model
20 because you haven't done that analysis?
21      A.    I have not looked at individual
22 physician-level data as we discussed, and I
23 do not believe it is the most appropriate
24 path to fulfilling my assignment.
25      Q.    Okay.  And your model does not

Page 98

1 attribute any percentage of causality to
2 prescribing doctors for the increased volume
3 of MMEs that you calculate?
4         MR. SOBOL:  Objection, asked
5     and answered.
6     A.    As we've discussed earlier,
7 that notion, just conceptually, I struggle
8 with the idea that you're asking me to
9 consider.  Every prescription in my data was
10 written by a physician.
11 BY MR. ROTH:
12     Q.    Right.  But I asked a little
13 bit of a different question.
14         You don't have a percentage
15 line in your report for doctors the way you
16 do in Table 3?
17         MR. SOBOL:  Objection, asked
18     and answered.
19     A.    Well, again, just that would
20 make no sense to me, so the marketing in
21 question operates through doctors.
22         MR. ROTH:  Why don't we take a
23     five-minute break.
24         MR. SOBOL:  Okay.
25         THE VIDEOGRAPHER:  The time is

Page 99

1     9:31 a.m.  We're now off the record.
2         (Recess taken, 9:31 a.m. to
3     9:46 a.m.)
4         THE VIDEOGRAPHER:  The time is
5     9:46 a.m.  We're back on the record.
6 BY MR. ROTH:
7     Q.    Professor Rosenthal, if you
8 could turn to page 13 of your report,
9 paragraph 16, and tell me when you're there.
10     A.    Yes.
11     Q.    You've got a heading, The Role
12 of Public and Private Health Insurance.
13         Do you see that?
14     A.    Yes.
15     Q.    And you say in paragraph 16:
16 Another distinguishing feature of
17 pharmaceutical demand is the widespread
18 presence of insurance coverage.  As of 2017,
19 approximately 88% of nonelderly adults have
20 insurance coverage through a private or
21 public health insurance plan.
22         Do you see that?
23     A.    I do.
24     Q.    And then you go on to talk
25 about the Affordable Care Act and then you

Page 100

1 say:  Insurance coverage among the elderly is
2 virtually universal, and among those enrolled
3 in Medicare, the vast majority have
4 prescription drug coverage either through
5 Medicare Part D or retiree plan.
6         Do you see that?
7     A.    Yes.
8     Q.    We talked about this a little
9 bit earlier, but are you aware of pharmacy
10 benefit managers?
11     A.    Yes, I am.
12     Q.    What are they?
13     A.    Pharmacy benefit managers are
14 essentially specialty health insurers.  They
15 manage only the pharmaceutical part of the
16 health benefit, and they typically contract
17 either with a primary health insurer or a
18 self-insured employer.
19     Q.    And what role do they play in
20 providing insurance coverage or approving
21 prescriptions of opioids?
22     A.    Pharmacy benefit managers, they
23 have pharmacy networks, so they negotiate
24 contracts with pharmacies.  They adjudicate
25 claims electronically.  They typically define

Page 101

1 formularies, so which drugs are covered, and
2 they offer employers and health plans
3 alternative copayment structures.  So those
4 are their main roles.
5     Q.    And you just mentioned
6 formularies.  How would you define what a
7 formulary is?
8     A.    A formulary is a list of
9 covered drugs.  An open formulary means that
10 the list is preferred drugs, but other drugs
11 are still eligible for reimbursement.  A
12 closed formulary is a list of drugs that are
13 exclusively covered by a health plan.
14     Q.    Given the pervasiveness of
15 insurance and the role that PBMs and
16 formularies play, what analysis did you
17 perform on the role of insurers in assessing
18 the volume of MMEs in your models?
19     A.    Well, if I understand you
20 correctly, I think we have a very similar
21 situation conceptually to the one we talked
22 about earlier with physicians, not a hundred
23 percent the same.
24         But PBMs and health insurers
25 adjudicate and pay for claims associated with

Page 114

1  opposed to the uncovered therapy, recognizing
2  as you did that there may be other reasons
3  why she might have a preference?
4      A.    Such as addiction risk and the
5  like.  I think the out-of-pocket cost will be
6  relevant to that decision.
7      Q.    I promise we're almost to your
8  models.  Just one more general area first.
9          Your direct model is based on
10  national data with respect to detailing,
11  correct?
12      A.    Yes, it is.
13      Q.    And nationwide data with
14  respect to MMEs dispensed as well?
15      A.    Yes, it is.
16      Q.    Your indirect model is based on
17  the ARCOS data, which you describe as county
18  level, and we can talk about that later; is
19  that right?
20      A.    Yes.
21      Q.    Okay.  That was a terrible
22  question.
23          So your indirect model is based
24  on the ARCOS data, which is then subdivided
25  into county-level data.

Page 115

1      A.    It is.  I guess when you say
2  subdivided, I think it comes that way, but
3  yes, right.
4      Q.    And your indirect model does
5  not have a detailing variable because you're
6  essentially solving for marketing by
7  including other variables in that approach?
8      A.    Yes.  The purpose of the
9  indirect model is to go another way around
10  and ignore the detailing data.
11      Q.    If you take out -- put another
12  way, if you take out everything else that
13  would be relevant, what is left is detailing
14  in the indirect model?
15      A.    Yes.
16      Q.    Okay.  So the only model with
17  detailing data is the direct model, and for
18  that you use national data?
19      A.    That's correct.
20      Q.    So you don't have any model
21  that measures the effect of detailing within
22  either Summit or Cuyahoga County?
23          MR. SOBOL:  Objection.
24      A.    My model looks at detailing as
25  a national phenomenon, which as I note in my

Page 116

1  report, detailing is generally a national
2  phenomenon.
3          And I take the relationship
4  between detailing and sales, and I apply it
5  to Summit and Cuyahoga, or it ultimately gets
6  applied downstream rather, but I do not have
7  detailing at a level other than national and
8  so cannot run a model at a lower level of
9  geography.
10          It's my belief that these
11  patterns are the same across the country, and
12  I believe there's some testimony to that
13  effect.
14  BY MR. ROTH:
15      Q.    So you did not model marketing
16  within either Summit or Cuyahoga County
17  against MMEs within Summit or Cuyahoga
18  County?
19      A.    As we've discussed, my model
20  looks at these relationships at a national
21  level because that is really the level at
22  which manufacturers set their strategy and
23  the appropriate level to look at the
24  effectiveness of marketing.
25      Q.    Do you know how many of the

Page 117

1  detailing visits in your data occurred in
2  Summit County or Cuyahoga County?
3      A.    In the IMS -- or, rather,
4  excuse me, the IQVIA data specifically, there
5  is not a method for apportioning those from
6  county to county.
7      Q.    Did you do any analysis as to
8  whether the impact of defendants' marketing
9  varied by county, or was it not done because
10  you assumed it was national in scope?
11          MR. SOBOL:  Objection.
12      A.    I believe that is appropriate
13  to assume that the effectiveness, the
14  relationship between marketing and sales is
15  the same across counties, and -- and again,
16  my data do not allow me to parse out
17  detailing at a county level.
18          So where -- where it is
19  possible to parse out sales at a county
20  level, it is not possible to do so for
21  detailing.  So I did not test that.
22  BY MR. ROTH:
23      Q.    Okay.  Professor Cutler takes
24  your percentage, though, and applies it to
25  his regression, which is done at a county

Page 118

1  level; is that right?
2       MR. SOBOL:  Objection.
3    A.    Professor Cutler's
4  calculations, once he has looked at the
5  effect of shipments on harms, he then applies
6  my percentage to that, yes.
7  BY MR. ROTH:
8    Q.    Did you have any conversations
9  with Professor Cutler about the fact that he
10 was taking your national model and then
11 applying it to his county model and what that
12 might mean for his results?
13      MR. SOBOL:  That's a yes or a
14   no.
15   A.    Yes.
16 BY MR. ROTH:
17   Q.    Did you have any of those
18 conversations outside of the presence of
19 counsel?
20   A.    No.
21   Q.    Do you have any view about the
22 propriety of taking a national model as
23 you've done and then inputting that into a
24 county-specific model as Professor Cutler has
25 done?

Page 119

1    A.    Yes.  I believe the national
2  model is appropriate.  Again, because
3  marketing strategy is a national phenomenon,
4  the national data are a reliable way to
5  ascertain the relationship between marketing
6  and sales.
7       I have used the same
8  methodology, for example, in the Neurontin
9  matter concerning Kaiser.  We used a national
10 model to estimate the relationship between
11 marketing and sales and applied that to a
12 single healthcare system.
13   Q.    So if marketing is, in your
14 view, nationally done and substantially
15 similar, why is there a difference in
16 shipments on a county level the way Professor
17 Cutler's modeled it?
18      MR. SOBOL:  Objection, scope.
19   A.    This of course is the subject
20 of Professor Cutler's report, and I -- I'm
21 not sure as I sit here I could tell you
22 exactly the factors, but it is obviously
23 counties are situated differently in ways
24 that he captures in his cross-sectional model
25 of harms that could absolutely affect the

Page 120

1  shipments in that county, conditional on
2  marketing.
3  BY MR. ROTH:
4    Q.    Put another way, though, you
5  would not expect differences in shipments
6  across counties to be caused by marketing
7  where you presume all marketing is national
8  in scope?
9       MR. SOBOL:  Objection.
10   A.    I don't believe that that's the
11 right way of looking at it.  So if there's a
12 specific relationship between marketing and
13 sales and -- it could well be that counties
14 start at different levels of use, and so the
15 incremental effect of those relationships, as
16 you see in Professor Cutler's analysis,
17 materializes differently in those counties.
18      That doesn't mean the effect of
19 marketing was different.  It's just the
20 baseline was different.
21 BY MR. ROTH:
22   Q.    But I think you said that's an
23 issue you would defer to Professor Cutler.
24 You don't have an opinion on how your
25 national model plugs into his county model

Page 121

1  and why the differences may occur in
2  shipments?
3       MR. SOBOL:  Objection.
4    A.    It's my opinion that it's
5  appropriate to take my national estimates.
6  National-level analysis is the most robust
7  analysis.  It's the place where the data are
8  really reliable.  I think it's appropriate
9  for Professor Cutler to use those estimates
10 in the way that he has.
11 BY MR. ROTH:
12   Q.    But you have no opinion that
13 explains why we may be seeing variation
14 between county-level shipments in his model
15 despite him using your national model on
16 marketing?
17      MR. SOBOL:  Objection, asked
18   and answered.
19   A.    I do not have an opinion
20 specifically on that, no.
21 BY MR. ROTH:
22   Q.    You do not attempt to link any
23 specific prescription to any specific
24 defendant's marketing; is that fair?
25   A.    Are you asking me whether I'm

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1  looking prescription by prescription, these
2  ones were caused and those ones were not?
3  The analysis -- the but-for analysis is a
4  world that did not occur, of course. Would
5  you agree?
6          The but-for world where the
7  marketing didn't happen, didn't happen. So
8  my analysis can tell me about the correct
9  aggregate amount. It does not identify one
10 prescription at a time.
11     Q.    Okay. Yeah. Just so the
12 record is clear, we've been through this, but
13 you did an aggregate model. You didn't build
14 it from the ground up on a
15 prescription-by-prescription,
16 detail-by-detail basis?
17        MR. SOBOL: Objection.
18     A.    Right. If I may, the -- I did
19 an aggregate model. The aggregate sales of
20 course are the sum of individual
21 prescriptions, but I am looking at the
22 national level at total marketing on total
23 sales.
24        It's not that it's unknowable
25 what those prescriptions were underneath the

Page 123

1  sales data. That's not the -- that's not the
2  challenge. The challenge is a conceptual
3  one.
4          The but-for scenario didn't
5  happen, so I cannot say precisely which
6  prescriptions would not have been written,
7  only that there is some group of them.
8  BY MR. ROTH:
9      Q.    I know you said earlier you
10 looked for manufacturer-specific detailing
11 notes and marketing information. Did you
12 find or learn of any manufacturer-produced
13 data on detailing to specific doctors within
14 Summit or Cuyahoga County?
15     A.    I don't recall.
16     Q.    And it's fair to say if that
17 does exist, it's not something you reviewed
18 or relied on for Attachment B?
19        MR. SOBOL: Objection.
20     A.    I did not use individual
21 physician-level data, no.
22 BY MR. ROTH:
23     Q.    And individual physician-level
24 data, as you may have used in other cases,
25 would be drug specific and doctor specific,

Page 124

1  correct?
2          MR. SOBOL: Objection.
3      A.    Well, it depends on really what
4  you're talking about. When I have had
5  individual physician-level data in the past,
6  they are sales data. So again, I think the
7  challenge is not disaggregating the sales
8  data.
9          There are products that exist;
10 sometimes they require subpoenas to get them,
11 but there are products that exist that allow
12 us to look at prescribing at a physician
13 level, but not at detailing at a physician
14 level. So those data I have not used because
15 I have not seen them.
16     Q.    Well, but, for example, an
17 individual manufacturer may keep detailed
18 call notes of the doctor visits that their
19 sales representatives engage in, correct?
20     A.    Well, I have seen call notes in
21 the past, and I have always found them to be
22 unusable.
23     Q.    And why is that, out of
24 curiosity?
25     A.    They often do not include

Page 125

1  provider identifiers, so they can't be linked
2  to other data. They are incomplete, and
3  they -- they are often produced -- so
4  incomplete in the sense of the call notes
5  have a lot of blank fields, and they're often
6  produced for short time periods.
7      Q.    But you didn't look at any
8  individual manufacturer call notes in this
9  case in conjunction with your expert report
10 or opinions?
11     A.    I looked to see if there was a
12 source of complete data for -- in order to do
13 such an analysis, and my staff worked with
14 counsel to identify documents or databases
15 and did not find any.
16     Q.    Pivoting back to Professor
17 Cutler for one more second. Have you worked
18 as an expert in other cases where you've only
19 modeled causation and then another expert has
20 taken that forward and put into it a damages
21 model as Professor Cutler has done here?
22     A.    Yes.
23     Q.    And what case was that or
24 cases, if there's more than one?
25     A.    Yes. In Neurontin, I did the

Page 126

1  same, in that order.  In other cases I've
2  done the reverse where I've done damages and
3  someone else has done causation.
4      Q.    Okay.  And in Neurontin or
5  those other cases, whether you were on the
6  causation side or the damages side, have you
7  before encountered the issue you have here
8  where you have a national model and then a
9  localized model communicating with each other
10 to calculate damages?
11         MR. SOBOL:  Objection.
12     A.    Yes.  As I noted earlier, in
13 Neurontin, I used a national model to connect
14 to damages for Kaiser.
15 BY MR. ROTH:
16     Q.    And the damages -- you used a
17 national model, but what was the damages
18 model based on?  What was it localized, or
19 was it also national?
20     A.    It was localized.  It was based
21 on Kaiser.
22     Q.    Based on a single company it
23 sounds like you're saying.  When you say
24 Kaiser, what do you mean?
25     A.    Yes, that's right.  Kaiser was

Page 127

1  the plaintiff in that matter.
2      Q.    Right.  But that wasn't a model
3  of geography.  That was a model of damages to
4  a particular company's sales, I would assume?
5         MR. SOBOL:  Objection.
6  BY MR. ROTH:
7      Q.    So for a typical -- an insurer,
8  right.  Kaiser is an insurer?  Am I right
9  about that?
10     A.    Kaiser is a group health plan,
11 so it is both a delivery system and an
12 insurer, all rolled into one, and it is
13 geographically distinct.
14        So Kaiser is not like United.
15 It is not everywhere diffusely.  It is
16 largely in California and the Pacific
17 Northwest with a few smaller sites elsewhere.
18        So again, those were national
19 estimates and those were connected to damage
20 calculations for a particular payer and
21 delivery system.
22     Q.    And do you recall how they were
23 connected in that case?  Were there any kind
24 of localization factors taken into account or
25 any way to differentiate the national level

Page 128

1  marketing from where the damages were being
2  calculated?
3      A.    As I sit here, I can't recall
4  all the calculations.  I believe, again, I
5  produced the same kinds of but-for
6  percentages and passed those along to the
7  damage model.
8      Q.    Okay.  Other than the Kaiser
9  case, can you think of any other examples
10 like that one?
11     A.    Not absolutely, but it wouldn't
12 surprise me if I had done something like this
13 before.  I have been involved in some state
14 cases.  I just can't recall.
15     Q.    Okay.  What is regression
16 analysis?
17     A.    Regression analysis is a
18 statistical methodology that uses data to try
19 to understand the relationships among
20 variables, and in particular, to identify the
21 effects of certain explanatory variables on
22 some dependent variable of interest.
23     Q.    And what is a time series
24 regression?
25     A.    A time series regression is a

Page 129

1  model that looks at these patterns over time,
2  so how -- how changes in these explanatory
3  variables over time explain changes in the
4  dependent variable over time.
5      Q.    Your direct model in this case
6  is a time series regression?
7      A.    That's correct.
8      Q.    When is it appropriate to use a
9  time series regression model?
10     A.    As in cases like this one where
11 there are dynamic relationships among the
12 variables of interest, and what I mean by
13 that is that marketing has an effect that is
14 path dependent.  It depends on what happened
15 in the last period as well as this period.
16     Q.    What are the other types of
17 regressions you could run, apart from a time
18 series regression?
19        MR. SOBOL:  Objection.  You
20     mean like here or like is she capable
21     of?
22        THE WITNESS:  I was going to
23     ask you that question.
24 BY MR. ROTH:
25     Q.    Generally in the world --

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1  generally in the world, you've got a time
2  series -- so the way I think about this,
3  right, you've got regression analysis, and
4  one type of regression analysis is a time
5  series regression, okay? Are you with me so
6  far?
7      A.    Okay. I'm with you.
8      Q.    What are the other types of
9  regression analyses that one could perform?
10 I'm not asking specific to this case. Just
11 in the universe.
12     A.    There are cross-sectional
13 regressions, panel data regressions. There's
14 machine learning.
15     Q.    Okay. And what is a
16 cross-sectional regression?
17     A.    A cross-sectional regression is
18 like the one we run in the indirect model,
19 which is looking at a set of observations
20 where there's no time dimension. We're just
21 looking across observations at a point in
22 time.
23     Q.    That Datta and Dave article we
24 looked at, how would you classify that
25 regression they ran?

Page 131

1      A.    That's a panel model.
2      Q.    Okay. And what --
3      A.    They call it longitudinal, but
4  I would call it panel.
5      Q.    And what is a longitudinal or
6  panel model, assuming those two things are
7  the same?
8      A.    It has multiple observations
9  per unit of time, but also multiple units of
10 time.
11     Q.    And when is it appropriate to
12 use a cross-sectional model?
13     A.    Well, I think it's sort of hard
14 to say in general, but, I mean, it's hard to
15 say without being reductive. We run
16 cross-sectional models when we want to
17 understand cross-sectional relationships. So
18 there may be things like gender, for example,
19 that typically don't vary over time. I
20 should say sex doesn't vary over time.
21         So we may want to understand
22 the relationship between sex and wages. We
23 would run that cross-sectionally. That's not
24 something where we necessarily need a time
25 dimension.

Page 132

1          So cross-sectional models are
2  often used for these kinds of immalleable
3  features that we're trying to understand as
4  opposed to things that can change.
5      Q.    When would it be appropriate to
6  use a panel data model?
7      A.    You know, in theory, you can
8  answer many of the same questions with all of
9  these models, but a panel data model allows
10 one, as we were looking at with the Datta and
11 Dave paper, allows one to understand the
12 effects of the individual units, particularly
13 in the way that they do, which is mostly by
14 looking at the variance around those
15 individual units as opposed to the
16 characteristics of the physicians, and
17 looking at decomposing that -- that variance
18 against something that's operating in a time
19 series way and being able to tease those two
20 things apart as they do.
21     Q.    Did you consider running either
22 a cross-sectional model or a panel data model
23 in this case?
24     A.    My belief is that an aggregate
25 time series model is the appropriate model

Page 133

1  for the question at hand, so as I have done
2  in other cases, I selected the aggregate time
3  series model.
4          MR. SOBOL: You both just meant
5      on the direct side, right?
6          MR. ROTH: Correct. Good
7      clarification.
8  BY MR. ROTH:
9      Q.    Why did you believe that the
10 aggregate time series model was the
11 appropriate model for your direct approach
12 for the question at hand?
13     A.    Because, as I mentioned in
14 describing the general purposes of these
15 alternative types of models, the key
16 relationship I'm interested in is this
17 path-dependent relationship between marketing
18 and sales, and aggregate time series model
19 is -- zones right in on that. So that's
20 exactly what it's looking at.
21         It's not trying to understand
22 some of the mechanisms that Datta and Dave
23 are looking at. I want a model that will
24 capture this total effect as reliably as
25 possible.

Page 134

1  Q.  Do you agree with the statement
2  that although a time series correlation may
3  be striking, it does not necessarily
4  determine a causal effect?
5  A.  With any regression model,
6  economists will need to use theory and tests
7  and judgment to determine causality.  So
8  there may be time series relationships that
9  are not causal, yes, that is correct.
10  Q.  And do you agree that when
11  there's a slow-moving trend in one variable
12  through time, it is very difficult to infer
13  its causal effects on another variable?
14  MR. SOBOL:  Objection.
15  You can answer.
16  A.  I believe that you're
17  describing again the well-known limitations
18  of any time series model, and there are ways
19  to examine those challenges.
20  So again, we first have to
21  start with an appropriate theoretical model.
22  Of course, you could put two variables that
23  trend together in a model and there's no
24  sensible relationship, and clearly that would
25  be spurious.

Page 135

1  On the other hand, marketing is
2  clearly designed to increase sales, so we
3  start with the theory.  And in developing the
4  model, we examine the kinds of time series
5  questions that you just raised with that
6  comment.
7  BY MR. ROTH:
8  Q.  I mean, in some ways the
9  conclusion that marketing influences sales is
10  tautological, right?  If you're marketing
11  correctly, you should be increasing sales.
12  MR. SOBOL:  Objection.
13  You can answer.
14  A.  I don't think that's
15  tautological.  It is -- to an economist,
16  again, we would start with economic theory,
17  and if you take the theory of profit
18  maximization and put marketing in that
19  context, it would only make sense for
20  marketing to be undertaken if it increased
21  sales.
22  I think as a noneconomist, if
23  you grab someone on the street in Boston and
24  ask them why do companies market, they would
25  agree with that basic premise, right?  So

Page 136

1  that's -- that's the starting place.
2  It's not where we end the
3  discussion, but I wouldn't say it's
4  tautological.  I would say it's theoretically
5  consistent.
6  BY MR. ROTH:
7  Q.  As an economist, if companies
8  are rational actors, they're not going to
9  spend money on marketing if they don't have
10  some sales increase.
11  A.  I would agree with that
12  statement, yes.
13  Q.  What are the standard
14  diagnostic tests you perform in running time
15  series regressions?
16  A.  In this model, of course, you
17  can see that we looked particularly about the
18  fit of the model over time and where -- I'm
19  picturing in my head the chart with Model A
20  on it where we had a single coefficient for
21  promotional effectiveness, and clearly we
22  were departing from the underlying data, so
23  those kinds of tests we conducted Wald tests,
24  two-dimensional Wald tests to examine the
25  appropriate turning points, and likewise,

Page 137

1  because part of this time series model of
2  course is the stock of marketing and its
3  appropriate depreciation rate, we conducted
4  statistical tests around that as well.
5  Q.  So you answered about this
6  model, which I want to get to.
7  A.  Sure.
8  Q.  But I'm talking generally when
9  you do time series models, what are the
10  standard diagnostic tests you might be
11  perform, whether or not you actually did it
12  in this case?
13  A.  Right.  I don't believe that
14  they're reported here, but early on in
15  looking at the data, we looked for -- we
16  looked at a Dickey-Fuller test, which is
17  basically testing for unit roots.
18  I'm thinking about the simple
19  explanation goes to what you said before
20  about two slow-moving trends and whether
21  there might be spurious correlation, and we
22  found that those concerns were not warranted
23  based on the Dickey-Fuller results.
24  MR. SOBOL:  Can you spell that?
25  THE WITNESS:  Dickey,

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    D-I-C-K-E-Y, dash, Fuller.
2        MR. ROTH:  F-U-L-L-E-R?
3    A.    Yes.
4  BY MR. ROTH:
5    Q.    What is nonstationarity?
6    A.    Nonstationarity relates to that
7  unit root.  It has to do with the trends --
8  that these two trends are moving together.
9    Q.    The mean or variance of the
10  variable is not constant over time?
11    A.    It's -- again, it's related to
12  the way the variable of interest and the
13  right-hand side variable are regressing
14  together, so it has to do with the variance
15  over time.
16    Q.    And why is nonstationarity an
17  issue with time series models?
18    A.    If you have this problem, which
19  again, we do not, then you can get spurious
20  results.
21    Q.    Do you know when your team or
22  you performed the Dickey-Fuller test?
23    A.    I believe it was early on in
24  the analysis that we were doing.
25    Q.    Okay.  And do you have the

Page 139

1  results of those tests somewhere that you
2  could produce to us?
3    A.    I do not.
4    Q.    And why is that?  Is it a
5  computer model test that...
6    A.    Generally we don't save the log
7  files for those kinds of tests.
8    Q.    Okay.  Could one be performed
9  using the backup data you've produced?
10        MR. SOBOL:  Objection.
11    A.    Yes, I believe so.
12  BY MR. ROTH:
13    Q.    Do you know if the MME
14  prescriptions in your model are stationary?
15    A.    As I sit here, no.
16    Q.    Do you know if the stock of
17  detailing variable is stationary?
18    A.    Again, as I sit here, no.
19    Q.    And would the presence of
20  nonstationarity lead you to overstate the
21  impact of promotion in your direct model?
22    A.    Well, again, if the -- if there
23  was a unit root problem, then it could
24  overstate the results, yes.
25    Q.    And I assume because your

Page 140

1  Dickey-Fuller test showed no unit root
2  problem, you did not make any effort to
3  correct for nonstationarity?
4    A.    That's correct.
5    Q.    What is autocorrelation?
6    A.    Autocorrelation is essentially
7  when the residuals from one time period are
8  correlated with the residuals from the next
9  time period, so autocorrelation from period
10  to period.
11    Q.    And autocorrelation can
12  overstate the impact of a predictor variable?
13    A.    No, that's not quite correct.
14  Autocorrelation can affect the standard
15  errors.  It does not bias the coefficient.
16    Q.    Could the presence of
17  autocorrelation lead to an overstatement of
18  the impact of an independent variable?
19    A.    No, the presence of
20  autocorrelation could lead to an
21  overstatement of the statistical significance
22  of an independent variable, but not its
23  effect.
24    Q.    Did you run any tests to detect
25  autocorrelation in your direct model?

Page 141

1    A.    I believe there were some tests
2  for autocorrelation also early on when we
3  were beginning our work, and we found that,
4  particularly in the late period, that while
5  there was some early autocorrelation, that
6  the autocorrelation goes away in a later
7  period of the data, and we did not correct
8  for it.
9    Q.    Is that a Durbin-Watson test?
10    A.    I believe that is a
11  Durbin-Watson.
12    Q.    Do you have the results of that
13  test readily available, or no, because you
14  didn't save the log file?
15    A.    As far as I know, the log file
16  was not saved.
17    Q.    But again, that's a test that
18  could be replicated on your model with the
19  backup data that you've provided?
20    A.    Yes, it could be.
21    Q.    When is it appropriate to
22  aggregate versus utilizing cross-sectional
23  information in putting together a regression?
24        MR. SOBOL:  Generally?
25        MR. ROTH:  Correct.

Page 142

1    A.    Well, aggregation has a number
2  of advantages in specific contexts.  I would
3  say -- go back to my first answer, which is
4  we are interested here in an aggregate
5  question.  If you were interested in an
6  individual question, you wouldn't aggregate.
7          So we are at first principles
8  interested in the -- I am interested in the
9  impact of opioid marketing in this class on
10 sales, and so I start there.
11          Aggregation can provide
12 benefits in that it cuts down on certain
13 kinds of noise, and it also -- it steps away
14 from certain kinds of endogeneity problems,
15 but I'm sure we will talk more about -- but
16 we talked a little bit about --
17 BY MR. ROTH:
18   Q.    How did you know?
19   A.    -- in terms of Datta and Dave,
20 the endogeneity problem that they're
21 interested in is that physicians who have a
22 propensity to prescribe your drug are the
23 ones you detail.  But when we aggregate, when
24 we go up to the aggregate level, we don't
25 have that same endogeneity problem, so...

Page 143

1    Q.    Thank you for saying
2  endogeneity before I did so I made sure I got
3  it right.  And we will talk about it.
4          But is it also true that
5  aggregation can sometimes mask patterns in
6  the data?
7    A.    Well, yes, but you have to be
8  interested in those patterns for that to be a
9  problem.  So if, in fact, there are patterns
10 in the data, my task as I understand it is to
11 look at the aggregate effect of marketing, so
12 that's just not a question that I was
13 particularly interested in here.
14          It's true that an average
15 effect will mask differences, if there are
16 any.
17   Q.    Okay.  So going back to
18 paragraph 11 of your report.
19   A.    Yeah.
20   Q.    This is your summary of
21 opinions.  Do you see that?
22   A.    Yes.
23   Q.    And you also have a handy
24 chart, which we'll talk about later, but I
25 just want to focus on paragraph 11 first.

Page 144

1    A.    Yeah.
2    Q.    So the last bullet on page 8
3  says:  Using econometric models, I
4  demonstrate that I can reasonably identify
5  the extent to which the sale of prescription
6  opioids measured by the number of milligrams
7  of morphine equivalents, or MMEs, was caused
8  by any quantum of the defendants' promotional
9  efforts that counsel can prove was unlawful.
10          Do you see that sentence?
11   A.    I do.
12   Q.    And we'll get more into the
13 specifics on that, but how is that so, where
14 your assumption was that everything was
15 unlawful?  How could you particularize your
16 model to any quantum that counsel proves?
17          MR. SOBOL:  Objection.
18   A.    Sure.  My Table 3 does that,
19 for example, by backing out individual
20 defendants and saying, okay, let's just
21 assume that, in fact, defendant X was not
22 involved.  So it can be done that way.
23          It could be done
24 propositionally.  It could be done by saying,
25 no, it wasn't 1995; it really didn't start

Page 145

1  until 2000.  That's what I mean by "any
2  quantum," is that we could divide the
3  marketing in any measurable way over my
4  model.
5  BY MR. ROTH:
6    Q.    What if the quantum of
7  promotional efforts that counsel proved
8  unlawful was influencing key opinion leaders
9  to change prescribing standards, how would
10 your model be used to evaluate conduct in
11 that situation?
12   A.    I haven't been asked to look at
13 that, so I'd need to really give that some
14 thought.  I wouldn't call that a quantum.  I
15 would call that something else, and I'm not
16 going to make up words, but that's more of a
17 sort of qualitative piece.  But in theory,
18 that's possible.  I have not looked at that.
19   Q.    And that's a good
20 clarification.  When you say quantum, you
21 mean quantitative, not qualitative, right?
22   A.    That's what I meant, yes.
23   Q.    So you could take out specific
24 defendants or percentages, but you could not
25 modify your model using a qualitative test

Highly Confidential - Subject To Further Confidentiality Review

Page 146

1  for unlawfulness to determine what the impact
2  is?
3          MR. SOBOL:  Objection.
4      A.   I would not conclude that
5  without giving some thought.  I'm sure it
6  couldn't be done for every qualitative
7  example that you could come up with, but I
8  think that there are ways of doing it
9  qualitatively, as I, again, did in the
10 Neurontin matter, looking at promotion to
11 psychiatrists as opposed to other physicians.
12 BY MR. ROTH:
13     Q.   But since you have an aggregate
14 national model with aggregate detailing, is
15 there a way to go, for example, and figure
16 out where the details only to dentists were
17 if the court concludes that that was the
18 unlawful activity as opposed to detailing
19 writ large?
20     A.   I'm not a hundred percent sure
21 about dentists, but as I used in the
22 Neurontin matter, there are detailing data
23 available that would allow you to look
24 nationally by specialty.
25     Q.   But the detailing data you used

Page 147

1  in the Neurontin matter for that exercise is
2  not the same detailing data you used in this
3  matter for your direct model, correct?
4      A.   It's not exactly the same
5  because it was disaggregated by specialty,
6  but I believe those -- that is possible to
7  disaggregate by specialty.  I've not done
8  that here.
9      Q.   And you haven't even tested
10 whether it can be done yet, right?
11         MR. SOBOL:  Objection.
12     A.   I have not.
13 BY MR. ROTH:
14     Q.   I'll give you a quantitative
15 measure.  What if the court concludes that
16 any detail over five minutes in length were
17 presumed unlawful, but anything shorter than
18 that isn't?  How can you quantify the impact
19 of the over-five-minute visits in your model?
20     A.   As I sit here, I don't know
21 because I haven't thought about it.  Clearly
22 I would need some data on the length of
23 details.
24     Q.   We'll come back to this, I
25 promise, but back to paragraph 11 for a

Page 148

1  minute.
2          So on page 9, the bullet says:
3  Based upon my analyses and assumptions from
4  counsel about the extent of promotion that
5  can be proven to be unlawful, I can
6  reasonably identify approximately ███████
7  of MMEs during the period of my analysis as
8  caused by unlawful promotion.
9          Did I read that correctly?
10     A.   You did.
11     Q.   And the ██ is the direct
12 number, and the ██ is the indirect number
13 from your models?
14     A.   That's correct.
15     Q.   Okay.  And then if you look at
16 paragraph 75 -- and we talked about this
17 earlier already.  But paragraph 75, which is
18 on page 50 under Calculation of But-For MMEs.
19         Do you see that?
20     A.   Yes.
21     Q.   You say:  I have been
22 instructed by counsel to assume in my but-for
23 scenarios that the fact finder, judge or
24 jury, finds that all or virtually all
25 promotion by the manufacturer defendants from

Page 149

1  1995 to present was unlawful.
2          Do you see that?
3      A.   Yes.
4      Q.   And then after the parentheses,
5  it says:  Thus, to calculate impact for the
6  purpose of damages beginning in 2006, I
7  modeled a world in which this promotion did
8  not occur, i.e., but-for promotion equals
9  actual promotion for opioids, less all
10 promotion for opioids by the defendants and
11 their surrogates.
12         Do you see that?
13     A.   I do.
14     Q.   And then in Table 2 on the next
15 page, there's actually a note that says:  The
16 percent of MMEs attributable to challenged
17 promotion is calculated as the difference
18 between predicted actual and predicted
19 but-for MMEs, assuming all defendants'
20 promotion is set to zero starting in 1995
21 divided by predicted actual MMEs.
22         Do you see that?
23     A.   Yes.
24     Q.   So your model assumption is
25 actually, not virtually, all promotion by

Page 150

1  defendants is unlawful; it's that all
2  promotion by defendants is unlawful?
3      A.    Yes.  I guess the -- sort of
4  the legal formulation of that, I'm repeating
5  there when I say all and virtually all.  I'm
6  not sure what virtually all would be
7  quantified as, 99%, but I do all, yes.
8      Q.    Okay.  And does that not equate
9  to assuming that all MMEs prescribed due to
10 defendants' promotion were medically
11 unnecessary?
12     A.    No, that does not equate to
13 that.
14     Q.    So in your model, you could
15 have unlawful promotion that leads to
16 medically necessary scripts still?
17     A.    I was asked to quantify the
18 impact of the alleged unlawful promotion, not
19 to examine that question about whether that
20 prescription itself was medically
21 unnecessary, so -- so it's something I
22 haven't looked at and I don't believe it's
23 related to my charge.
24          The fact that the promotion was
25 unlawful to me does not equate to the fact

Page 151

1  that a prescription was medically
2  unnecessary.
3      Q.    So if promotion, whether lawful
4  or unlawful, results in a medically necessary
5  prescription, how does that prescription
6  cause damage?
7          MR. SOBOL:  Objection, scope.
8      A.    I'm not a lawyer, as you know.
9  And sort of what the theory of liability is
10 and what -- what plaintiffs can recover for
11 and what they can't is -- I do not know.
12          I have only been asked to
13 examine the extent to which this unlawful
14 conduct caused sales.
15 BY MR. ROTH:
16     Q.    Okay.  You're not a lawyer, but
17 you're a good economist.  You've testified a
18 lot about causation and damages, okay, and
19 you're familiar with what a but-for world is,
20 right?
21     A.    Yes.
22     Q.    You have one here?
23     A.    I do.
24     Q.    So how does your but-for world
25 treat medically necessary prescriptions?

Page 152

1      A.    Again, this is --
2          MR. SOBOL:  Objection.
3          But go ahead.
4          THE WITNESS:  Sorry.
5      A.    The model treats the right-hand
6  side variable as the thing that will be
7  proven to be unlawful, and any sales gained
8  from that unlawful conduct as subject to
9  recovery.  This I know as a, thank you, good
10 economist and someone who's done that, that
11 downstream of my analysis there's a damage
12 number that plaintiffs I believe will try to
13 recover.
14          So as an economist, to me, the
15 theory is that any gains, whether or not they
16 resulted in medically necessary
17 prescriptions, are subject to recovery.  As
18 an economist, that seems like a reasonable
19 theory if we wanted to deter fraudulent and
20 misleading information.  This is the same
21 analysis that I did in the Neurontin case.
22 BY MR. ROTH:
23     Q.    Stated differently, your model
24 will calculate causation by defendants'
25 marketing even for medically necessary

Page 153

1  prescriptions?
2      A.    It does not distinguish.  And
3  to be clear, whether or not there were
4  medically necessary prescriptions caused by
5  the misconduct, I can't say for sure.
6      Q.    And as an economist, is that
7  not something you think you should take into
8  account in your but-for world where you're
9  opining that but for the defendants' conduct,
10 fewer of these MMEs would be out in the
11 world?
12     A.    Absolutely not.  Again, as an
13 economist, to me, if the allegations are
14 true, I can see a strong economic rationale
15 for ensuring that liability is attached to
16 all these ill-gotten gains from the alleged
17 misconduct.
18     Q.    But there is a parallel world
19 where a manufacturer may promote lawfully and
20 that lawful promotion would result in
21 medically necessary prescriptions, correct?
22          MR. SOBOL:  Objection.
23     A.    I -- you have a lot of parallel
24 worlds I've noticed, but yes, I think we
25 agreed at the beginning of the day that there

Page 154

1 is such a thing as lawful marketing, and it
2 does generate sales.
3        Some of those sales may be
4 medically necessary, some may be medically
5 unnecessary, even if there's no unlawful
6 conduct.
7 BY MR. ROTH:
8    Q.   I asked some of these
9 questions, but I did promise I'd come back.
10        How would your model work if
11 the court finds that only detailing visits
12 where the representative spoke about
13 addiction risk were unlawful?
14    A.   I don't know the answer to that
15 question.  I have not thought about how one
16 could parse that out, so I don't know as I
17 sit here.
18    Q.   You did mention time could be
19 quantified, so I guess to clarify, would you
20 be able to calculate causation if the court
21 found, for example, that only detailing that
22 happened between 1996 and 2000 were unlawful?
23    A.   Yes, my model is capable of
24 doing any combination of manufacturer and
25 time.

Page 155

1    Q.   What about drug?
2    A.   And drug.
3    Q.   Okay.  So you could do -- you
4 could take out manufacturers, right?
5    A.   Yes.
6    Q.   You could take out drugs?
7    A.   Yes.
8    Q.   And you could take out years?
9    A.   Yes.
10    Q.   Okay.  Beyond that, is there
11 anything you can take out of your model?
12        MR. SOBOL:  Objection.
13    A.   Well, as I said earlier, I
14 believe that it's possible to take out
15 physician specialties.
16 BY MR. ROTH:
17    Q.   Right.  And we talked about
18 that.  But you're not certain it can be done,
19 and you haven't tested it yet?
20        MR. SOBOL:  Objection.
21    A.   I haven't tested that.
22 BY MR. ROTH:
23    Q.   What if the court finds that
24 only off-label marketing was unlawful?  Is
25 there any way your model can be adjusted to

Page 156

1 account for just the unlawful off-label
2 detailing?
3    A.   I assume that you're talking
4 about specific off-label messages.  Again, I
5 haven't -- I haven't thought about how the
6 detailing itself could be parsed in that way.
7 There would need to be another source of
8 information for that to be possible.
9    Q.   You need a different dataset
10 basically?
11    A.   Yes.  The thing with detailing
12 is that it's a face-to-face visit, so we can
13 see what messages the detailer brought on
14 paper with them but not what came out of
15 their mouths.
16    Q.   What if the court finds that
17 only journal advertising were unlawful?  How
18 would your model account for that?
19    A.   Well, as I believe I say in my
20 report, the journal advertising data is very
21 spotty for these drugs, so I've not included
22 that as a separate factor.  It's already out
23 of my model.  I would have to give that some
24 consideration.
25    Q.   Okay.  If we look at

Page 157

1 Attachment D, which is towards the back, I
2 want to go to page D6.  And there's a section
3 at the bottom --
4        MR. SOBOL:  I'm sorry.  Wait.
5        MR. ROTH:  D6 of Attachment D.
6        MR. SOBOL:  Is it the table?
7        MR. ROTH:  No, it's the text.
8 It's the technical write-up of the
9 regression.
10        THE WITNESS:  Yeah.
11        MR. ROTH:  I feel like it's
12 always Attachment D in every case, by
13 the way.
14        THE WITNESS:  Is it?
15 Interesting.
16 BY MR. ROTH:
17    Q.   Are you in Attachment D, D6?
18        MR. SOBOL:  It's just the same
19 attachment.
20    A.   I am.
21 BY MR. ROTH:
22    Q.   It's all in the same report,
23 right?
24    A.   You didn't notice?  Yeah.
25    Q.   Well, Tom is involved for sure.

Page 158

1  All right.
2          So looking at Attachment D,
3  page D6. This may be from one of the same
4  attachments. I don't know. Do you see
5  there's a section that says Comcast
6  Considerations?
7      A.    Yes, I do.
8      Q.    What is the reference to
9  Comcast there?
10     A.    Well, again, I'm not lawyer,
11 but I understand that there was a case
12 involving Comcast, and that the -- what it
13 concerns, again, from a layperson's
14 understanding, is about the ability of the
15 damages as presented to the court to conform
16 to different conclusions about the but-for
17 scenario.
18     Q.    Essentially the issue we've
19 been talking about for the last --
20     A.    The issue we've been talking
21 about.
22     Q.    And why were you concerned
23 about the application of Comcast to this
24 case?
25          MR. SOBOL: Objection, assumes

Page 159

1  a fact not in evidence.
2  BY MR. ROTH:
3      Q.    Assuming you were.
4      A.    As you recall, the last part of
5  my assignment was to report on how my
6  conclusion would be different if there were
7  different considerations with regard to who's
8  in, who's out by defendant, for example. So
9  yes.
10     Q.    Okay. I'm trying to streamline
11 here because we've covered more ground --
12     A.    We're going to cover 14 hours
13 no matter what --
14     Q.    That's true.
15     A.    -- so streamlining may be good
16 for you, but it's not good for me.
17         MR. ROTH: I'm having fun. I
18 think you are too.
19         THE WITNESS: Of course.
20         MR. LONERGAN: What about us?
21 BY MR. ROTH:
22     Q.    Do you agree that your model
23 does not measure the impact -- we went over
24 this. I'm not going to ask that again.
25 Strike that.

Page 160

1          Could you have modeled an
2  individual manufacturer separately?
3          MR. SOBOL: Objection, asked
4      and answered.
5      A.    It was not something I
6  attempted to do. I think mechanically it is
7  possible. But as I noted, one of the reasons
8  for using an aggregate time series is that we
9  smooth over a lot of noise in the data, so I
10 don't know whether an individual
11 manufacturer-level model would be feasible.
12 BY MR. ROTH:
13     Q.    Okay. In a but-for world,
14 where all of the unlawful detailing, which is
15 your assumed all defendants' detailing, were
16 replaced with lawful detailing, would there
17 be any change in overall prescribing?
18     A.    Sorry. I just -- so the model
19 doesn't itself have a presumption about
20 lawful and unlawful. The but-for scenario is
21 where that presumption is incorporated, so
22 the model is the model.
23     Q.    I asked a bad question and you
24 properly called me on it. Let me ask a
25 better question.

Page 161

1          If we assume that all unlawful
2  detailing is lawful, then the actual
3  prescribing and the but-for prescribing in
4  your models would be equal to each other?
5      A.    Yes, that's correct. Those two
6  predicted values would be identical.
7      Q.    So the percent of MMEs
8  attributed to unlawful detailing in that
9  scenario would be zero percent.
10     A.    Yes. If marketing were the
11 same in both scenarios, then there would be
12 no difference.
13     Q.    Assume for a minute that a
14 manufacturer's detailing is found to be
15 unlawful but it did not engage in any of the
16 other marketing misconduct alleged by
17 plaintiffs with respect to the key opinion
18 leaders, journal advertising and the other
19 factors.
20         How would your model account
21 for harm for that specific manufacturer?
22         MR. SOBOL: Objection.
23     A.    In my opinion, that would be a
24 legal question because, again, all the
25 manufacturers are operating in the same

Page 162

ecosystem. According to the complaint and
everything I know as a health economist, the
effects of one manufacturer's unbranded
marketing -- I use that to refer to the
guidelines and those kinds of activities --
will spill over on to another manufacturer,
and I don't know whether it would be
appropriate to pull that out or not.
BY MR. ROTH:
    Q.    That's a long answer.  I want
to -- I think I asked a more specific
question.
    A.    Sure.
    Q.    So if detailing is unlawful --
    A.    Yes.
    Q.    -- and let's say also the other
stuff, okay, key opinion leaders influencing
standards of care is also unlawful, and a
manufacturer just detailed, they're going to
have the same percentage of liability in your
direct model whether or not they engaged in
the other unlawful conduct, correct?
        MR. SOBOL:  Objection.
    A.    Yes, that's true.  Although
it's true in terms of what I calculate in

Page 163

Table 3.  Just to be clear, I don't have an
opinion on liability.  That's a legal matter.
But what I do in Table 3 is I say, okay,
well, what would happen if we said the
detailing by Purdue were lawful, what would
happen there?
        So whether or not that quantum
is exactly what liability is, I don't -- I
don't really know how the court is going to
see that, and so that's why I don't really
know if you would need to say, well, some of
why your detailing was so productive was
caused by somebody else's activity.  I don't
know whether it would make sense to back that
out.
BY MR. ROTH:
    Q.    So let's take the opposite.
    A.    Yeah.
    Q.    Someone's detailing is entirely
lawful.  There's no issue there.  But they've
influenced the standards of care through key
opinion leaders, they've paid off doctors,
they've done all of the parade of horribles
that the plaintiffs allege, and the court
finds that that in fact is unlawful.  In your

Page 164

model, that manufacturer has no liability,
correct?
        MR. SOBOL:  Objection.
    A.    Well, again, my model is
looking at the aggregate causation between
marketing and sales; it is not designed to
assign liability to individual manufacturers
nor, again, am I certain how counsel or the
courts would do so.
        The purpose of Table 3 is to
show that I can back out individual levels of
detailing, not to assign liability.  So I --
I don't know exactly how that would proceed,
even -- even without having these variable
assumptions across defendants.  I have not
looked defendant by defendant at something
like liability.
BY MR. ROTH:
    Q.    Okay.  So let's look aggregate.
        If for all the manufacturers
the conclusion is that the detailing is
entirely lawful, but the manufacturers
engaged in other conduct that the court finds
is unlawful, what would the result of your
model be in that world?

Page 165

        MR. SOBOL:  Objection.
    A.    I would have to give it some
thought, but again, my preferred model
ultimately captures the effect of all that
other stuff that we're calling as really is
the what happens -- in part, a chunk of it is
what happens to the promotional effectiveness
after the first turning point and before the
second turning point.  And so in theory, one
could look at that, but it would really
depend on the specific set of facts.
BY MR. ROTH:
    Q.    It would require a new model
probably?
        MR. SOBOL:  Objection.
    A.    I don't know that it would
require a new model.  It would require a new
but-for analysis.
BY MR. ROTH:
    Q.    Back to your body of your
report, paragraph 64.  You say: The
econometric analyses serve two purposes.
First, they indicate that in economic terms
there is a causal relationship between the
defendants' promotion and prescriptions of

Page 166

1 opioids so that if the allegations of
2 misconduct are proven true, impact can be
3 found.
4 　　　　Do you see that?
5 　　A.　Yes.
6 　　Q.　But you actually didn't assess
7 specifically a causal relationship between
8 promotion and prescriptions, right?  Those
9 are not the two variables on your X and Y
10 axis?
11 　　　　MR. SOBOL:  Objection.
12 　　A.　Well, I look at the stock of
13 detailing, which I argue and believe is a
14 reasonable proxy for promotion.  It is not,
15 strictly speaking, all promotion.  To the
16 extent that it is measured with error, it
17 understates the effect of promotion.
18 BY MR. ROTH:
19 　　Q.　If we wanted to be precise,
20 though, what your model actually shows is a
21 correlation between detailing and MMEs?
22 　　　　MR. SOBOL:  Objection.
23 　　A.　Well, as we talked about
24 earlier and will no doubt talk about again,
25 any regression analysis can have a causal

Page 167

1 interpretation or not, depending on a number
2 of factors.
3 　　　　I interpret this regression
4 analysis as showing causation between
5 marketing and sales, and it does, in fact,
6 use detailing contacts as the measure of
7 marketing.
8 BY MR. ROTH:
9 　　Q.　And if we want to be even more
10 precise, when we're talking about defendants
11 detailing, we're talking about all detailing
12 without distinguishing between lawful and
13 unlawful as we've talked about?
14 　　　　MR. SOBOL:  Objection, asked
15 　　and answered.
16 　　A.　For the purposes of my
17 analysis, I've been asked to assume that all
18 detailing in this period was unlawful, so
19 that distinction is not relevant.
20 BY MR. ROTH:
21 　　Q.　So your model does not analyze
22 causation between the false promotion as
23 alleged in the complaint and the number of
24 MMEs prescribed?
25 　　　　MR. SOBOL:  Objection.

Page 168

1 　　A.　I would disagree.  That is
2 exactly what my model does.  Again, we can
3 agree that I have not separately proven that
4 that detailing was unlawful, but I understand
5 that counsel for plaintiffs intend to prove
6 that, and so I have undertaken to examine the
7 causal effect of that allegedly unlawful
8 conduct.
9 BY MR. ROTH:
10 　　Q.　Which is all promotion by
11 defendants?
12 　　A.　Which is all promotion by
13 defendants from 1995 to the end of my data.
14 　　Q.　And when does your data end?
15 　　A.　Mid 2018.
16 　　Q.　Okay.  Do you plan on updating
17 it if we go to trial in 2019 to take us
18 through today?
19 　　　　MR. SOBOL:  Objection.
20 　　A.　I haven't been asked to do
21 that.  I don't know if I would be asked to do
22 that.
23 　　　　MR. ROTH:  Why don't we take a
24 　　break, because I realize we've
25 　　probably covered some of these next

Page 169

1 questions and I can streamline.
2 　　　　THE WITNESS:  Okay.
3 　　　　THE VIDEOGRAPHER:  The time is
4 10:58 a.m.  We're now off the record.
5 　　　　(Recess taken, 10:58 a.m. to
6 11:13 a.m.)
7 　　　　THE VIDEOGRAPHER:  The time is
8 11:13 a.m.  We're back on the record.
9 BY MR. ROTH:
10 　　Q.　Professor Rosenthal, if you
11 would please turn to paragraph 59, which is
12 on page 42.  All right.  So we're going to go
13 step by step here.
14 　　A.　Okay.
15 　　Q.　You say:  My primary dependent
16 variable, the outcome to be explained, is the
17 number of MMEs for all drugs at issue in this
18 matter.
19 　　　　Do you see that?
20 　　A.　Yes.
21 　　Q.　Okay.  Why did you look at MMEs
22 as opposed to prescriptions or some other
23 measure?
24 　　A.　Sure.  Because, as I note in
25 this paragraph, the intensity of the medicine

Page 190

1  of promotion are correlated?
2      A.    Well, as I mentioned, when I
3  looked at the IQVIA data for journal
4  advertisements, direct-to-consumer
5  advertising, sampling, there was very little
6  data there. I have no reason to believe that
7  they're just not measuring it. It may be
8  that there are some kinds of advertising that
9  we see in the marketing budgets that IQVIA
10 doesn't capture. But to the extent that the
11 IQVIA data are complete, it was not really
12 possible to do a correlation analysis because
13 there was so little data for these other
14 tools.
15     Q.    So when you say it's a
16 reasonable expectation that other forms of
17 marketing follow detailing, that's really
18 just an assumption based on your experience
19 with other drugs in other cases?
20     A.    It's based on my experience
21 with very similar kinds of analyses with
22 other drugs. And again, I cite to
23 Dr. Perri's report at the beginning of this
24 where he talks about the coordination of
25 marketing mechanisms, so it's very consistent

Page 191

1  with his opinions as well.
2      Q.    Yeah. But to be clear, that's
3  an assumption you're making that's not
4  supported by any specific work you've done to
5  confirm it's true that detailing and other
6  forms of promotion are correlated for
7  opioids?
8          MR. SOBOL: Objection, asked
9      and answered.
10     A.    Again, the analysis -- the
11 correlation analysis was not possible here,
12 so I'm relying on my past experience and
13 Dr. Perri's expertise.
14 BY MR. ROTH:
15     Q.    Okay. Then you say: Third,
16 alternative measures of promotion that I
17 could obtain from available sources have
18 substantial missing data, e.g., estimates of
19 payments to pain advocacy groups can only be
20 obtained from the records of some, but not
21 all manufacturers.
22         Do you see that?
23     A.    Yes.
24     Q.    And that's what we've been
25 talking about.

Page 192

1      A.    Yes.
2      Q.    Are you certain that every
3  manufacturer in this case has made payments
4  to pain advocacy groups for opioids?
5      A.    Well, given -- that's -- it's
6  hard to be certain about something for which
7  I have incomplete data, so I -- there are a
8  number of documents that I cite to that show
9  these kinds of payments, and I believe other
10 experts have tracked these payments as well.
11         But am I certain that every
12 defendant has evidence of that type? No, I'm
13 not certain.
14     Q.    And then you wrap up this
15 paragraph saying: Note that in this case
16 there appears to be substantial evidence that
17 through means other than promotional
18 spending, the defendant manufacturers
19 fundamentally changed opioid prescribing
20 standards. The direct approach does not
21 calculate the efforts -- the effects,
22 sorry -- of the nonpromotional marketing and
23 is thus conservative.
24         Do you see that?
25     A.    Yes.

Page 193

1      Q.    But that's not universally true
2  for all manufacturers, is it?
3          MR. SOBOL: Objection.
4      A.    Again, my opinions here really
5  are to look at the market as a whole, and
6  even if there were a defendant that did not
7  incur this kind of spending, the effects of
8  changing things like guidelines would --
9  would flow through to everyone's drugs,
10 right.
11         So these are sort of broad
12 changes in the environment of prescribing,
13 and so again, I don't have an opinion on the
14 liability question of whether there's a
15 defendant who has not undertaken the
16 unbranded advertising, whether they therefore
17 should not be liable for its effects. I
18 don't know the answer to that.
19 BY MR. ROTH:
20     Q.    What if a manufacturer engages
21 only in limited detailing and not other types
22 of promotional activities? It would not be
23 conservative for that manufacturer to only
24 look at detailing, correct?
25     A.    The purpose of my analysis is

Page 194

1  not to assign liability to individual
2  defendants. It's to look at the aggregate
3  effect. So I don't know what would be
4  appropriate. That to me seems like a legal
5  question.
6      Q. Would it be conservative from
7  an economic perspective if a manufacturer
8  purchases an opioid product in, say, 2008 and
9  engages in detailing but no other marketing?
10     A. I do not calculate any
11 estimates at the individual defendant level,
12 so I cannot characterize them as conservative
13 or otherwise. I'm only looking at aggregate
14 effects.
15     Q. Okay. I'm just trying to get
16 at what you mean when you say the direct
17 approach is conservative. It strikes me that
18 for a defendant who didn't participate in the
19 market ecosystem until late in the game and
20 only detailed, it's actually the opposite of
21 conservative the way your model calculates
22 damages.
23         MR. SOBOL: Objection.
24     A. I believe that is inaccurate.
25 My model does not calculate damages for any

Page 195

1  individual defendant, period.
2  BY MR. ROTH:
3      Q. Causation, sorry, I should have
4  said.
5      A. So again, because I am not
6  looking at impact for an individual
7  defendant, we cannot characterize my analysis
8  as conservative or otherwise for an
9  individual defendant. It is for the market
10 as a whole.
11     Q. Okay. So when you say in
12 paragraph 56 that the approach is
13 conservative, you mean on an aggregate basis
14 it is conservative because it looks at
15 detailing and not other things?
16     A. That's correct.
17     Q. Okay. Sort of implicit in that
18 statement and other things you've said today
19 is an assumption that all manufacturers
20 market opioids the same way.
21         MR. SOBOL: Objection.
22 BY MR. ROTH:
23     Q. Do you agree with that?
24     A. I don't believe so. Again, I
25 include in my model detailing. To the extent

Page 196

1  that there's variation in the way
2  manufacturers detail, the specific details
3  may generate more prescriptions or fewer, and
4  my model captures the average effect. That's
5  what the coefficients basically tell us is
6  the average effects.
7          So there may be variation in
8  there, but for the purposes of calculating
9  aggregate impact, the average is appropriate.
10     Q. So for manufacturers who have
11 detailing that's below average, they're being
12 brought up to the average by the way you've
13 aggregated the model in terms of causation?
14     A. Well, by definition, an average
15 will be not the same as all the individual
16 components unless there's no variation, and
17 so there will be some who are brought up and
18 some who are brought down.
19         It's my belief, as we talked
20 about before, that this aggregate model is
21 the most reliable model; because there's
22 substantial spillover effects, because there
23 can be noise in the data when we try to
24 disaggregate it too much. I think for that
25 reason, the aggregate model is preferable.

Page 197

1      Q. You know, though, that not
2  every manufacturer markets products the same
3  way?
4      A. I guess -- I'm not exactly sure
5  how to answer that question. As we've talked
6  about before, I am not a pharmaceutical
7  marketing expert. I leave that to Dr. Perri.
8  I think it's reasonable to assume that there
9  is some variation in tactics and the like
10 across manufacturers and perhaps across
11 products.
12     Q. Well, let's look at one thing
13 you do talk about. So there's a difference
14 in the way promotion is engaged in by brand
15 companies and marketing may be engaged in by
16 generic companies, correct?
17     A. Yes, brand companies are
18 primarily the ones that engage in marketing.
19     Q. A generic company might still
20 detail but may just talk about price and
21 formulary status?
22         MR. SOBOL: Objection.
23     A. Generally, manufacturers will
24 not detail physicians for generics. They may
25 have other sales force activities that they

Page 198

1  do that relate to price, but individual
2  physicians are not generally making a
3  decision about one generic versus the other.
4  That decision happens at the pharmacy.
5  BY MR. ROTH:
6      Q.    But Attachment C contains a
7  slew of generics on that list?
8      A.    That's correct.  Some of them
9  have contacts related to them.  Some of them
10  don't.  Some of those contacts relate to
11  marketing agreements that are really for
12  brand drugs.
13      Q.    So how do you square your
14  testimony a minute ago that generics
15  generally don't detail with the fact that you
16  have a lot of promotional contacts in your
17  model for generic drugs?
18          MR. SOBOL:  Objection.
19      A.    I believe I just squared it.  I
20  think a lot of those contacts relate to
21  marketing agreements.
22  BY MR. ROTH:
23      Q.    And so if there's marketing
24  under a marketing agreement, that gets
25  attributed to the generic drug, even though

Page 199

1  it may be different in kind than a branded
2  drug promotional visit?
3          MR. SOBOL:  Objection.
4      A.    No.  The marketing of a
5  particular drug is identified, and if the
6  drug is sold by a defendant manufacturer,
7  even if it's detailed by a different
8  manufacturer, that gets counted in my model.
9  And then in Table 3, I take out those
10  marketing agreement related drugs.
11          So -- so it's -- the marketing
12  is associated with -- I mean, I look at
13  aggregate marketing, so it's all in the
14  aggregate marketing.  But I do have a
15  mechanism for pulling out marketing that's
16  for someone else's drug.
17  BY MR. ROTH:
18      Q.    So if that's the mechanism
19  you're using, how are any of these detailing
20  contacts being attributed to generic drugs in
21  your model?
22          MR. SOBOL:  Objection.
23      A.    I think you misunderstand the
24  nature of the model.  The model uses
25  aggregate MMEs and aggregate detailing, so

Page 200

1  there's not an attribution underneath that.
2          And furthermore, as we know,
3  that detailing for the brand drug will spill
4  over to the generic drugs too, and so it's
5  entirely appropriate that the model allows
6  that to happen.
7      Q.    So maybe we're talking past
8  each other.
9          I understand the model works
10  that way.
11      A.    Yeah.
12      Q.    What I'm talking about, which
13  we'll get to later, is your Table 3 allocates
14  drugs to specific manufacturers, including
15  generic manufacturers, and I'm just trying to
16  understand how that works in a world where we
17  agree that generic drugs generally aren't
18  detailed.
19      A.    So Table 3, it sits on top of a
20  somewhat more complicated analysis, but what
21  it in effect does is it takes the detailing
22  associated with each of those defendants and
23  treats it separately, depending on where we
24  are in the table.
25          So, you know, at the top for

Page 201

1  Actavis, to the extent that Actavis has
2  detailing in my data, the row that says,
3  well, what would the damages look like or
4  what would impact look like if Actavis'
5  detailing were deemed to be lawful?  Basically
6  we've taken out their detailing, out of --
7  we've left it in basically in a but-for
8  world.  It happens because it's lawful.
9          So that's how -- that's how the
10  allocation works, is in Table 3, it's by
11  manufacturer.
12      Q.    Okay.  We'll get there.
13      A.    Okay.
14      Q.    But that's helpful.
15          If you look back at
16  paragraph 55, I mean, you acknowledge that
17  detailing is undertaken by the brand name
18  drugs in the class, typically peaks during
19  initial launch, and ceases shortly before or
20  after the AB-rated bioequivalent generic
21  drugs enter.
22      A.    That's correct.
23      Q.    And how does your model account
24  for detailing at different points of a
25  product's life cycle, close-to-launch

Page 202

1 detailing versus the period right before
2 generic entry?
3      A.    My model is an aggregate model,
4 so I'm looking across drugs in the entire
5 market, and those drugs are at different
6 stages in their life cycle.  And so the
7 important input to my model is the level of
8 detailing, not where it is in the course of a
9 product's life cycle.
10      But we know that the bolus of
11 detailing happens for these new products, and
12 so that is incorporated into the data.
13      Q.    So it's incorporated in the
14 sense that you'll see more contact at the
15 beginning of the life cycle than at the end
16 of the life cycle?
17      A.    That's correct.
18      Q.    But the detailing that happens
19 at the beginning of the life cycle could be
20 qualitatively different than the detailing
21 that happens at the end of the branded life
22 cycle.
23      Would you agree with that?
24      MR. SOBOL:  Objection.
25      A.    I don't know that to be true.

Page 203

1 BY MR. ROTH:
2      Q.    As an economist, I mean, when a
3 product is launched, you would expect more
4 detailing about clinical studies and things
5 designed to promote a new product that
6 physicians might be unaware of, right?
7      A.    It may be that there is more of
8 that sort of baseline information at the
9 beginning.
10      Q.    Right.  And at the end of a
11 product's life cycle, when the generics are
12 about to come on the market, you might expect
13 the detailing to focus more on things like
14 price and availability and formulary status
15 and things of that nature, right?
16      A.    I have seen no detailing
17 information that pertains to price.  I can't
18 say that it never happens, but I've certainly
19 never seen that.
20      What that sort of -- what
21 you've just described here is on the one hand
22 saying, hey, there's this new drug early on,
23 and don't forgot your old friend at the end,
24 something to that effect.  Those -- those
25 differences are not relevant to the question

Page 204

1 of does the detail generate more MMEs.
2      So for my purposes, I really
3 only want to understand does the detail
4 generate more MMEs.  And again, because I'm
5 looking at the aggregate, the fact that some
6 drugs are ending and others are beginning,
7 that -- that sort of -- that mix, it may
8 change a little bit over time, but I'll be
9 looking across a set of drugs at different
10 stages.
11      Q.    Okay.  But what I described
12 might be relevant to the question of whether
13 the detailing was lawful, correct?
14      A.    I don't know what you mean by
15 that.
16      Q.    Right.  So we've established
17 this, I think, but just to try it one more
18 time:  Because your model is just focusing on
19 whether detailing impacts the aggregate
20 number of MMEs, you don't evaluate any
21 qualitative difference in the kind of
22 detailing that is occurring?
23      MR. SOBOL:  Objection, asked
24 and answered.
25      ///

Page 205

1 BY MR. ROTH:
2      Q.    Is that a fair statement?
3      MR. SOBOL:  Asked and answered.
4      A.    I -- you had a "because" at the
5 beginning of that sentence, which doesn't
6 make sense to me.  I am not looking at the
7 content of the detailing as we talked about
8 this morning.  I am assuming the plaintiffs
9 will prove their case.
10      I understand that you think
11 differently and you're trying to probe
12 whether I've tried to disaggregate the
13 detailing.
14      I have not tried to
15 disaggregate the detailing by drug or over
16 time.  It is possible to do that, but I have
17 not done that.
18 BY MR. ROTH:
19      Q.    So in your direct model, just
20 like all MMEs are created equal, all
21 detailing contacts are created equal?
22      MR. SOBOL:  Objection.
23      A.    Again, I would acknowledge that
24 there's variation in detailing and that my
25 model captures the average effect.

Page 206

BY MR. ROTH:

1  Q.    And it captures the average
2  effect by treating each contact the same?
3       MR. SOBOL:  Objection.
4       A.    Well, I guess sort of an
5  average effect means that sort of
6  tautologically, I'm summing up all of the
7  effects.

BY MR. ROTH:

8       Q.    Does your model account for
9  rivalrous marketing?
10      A.    I'm so happy that we've gotten
11 back to this.
12      MR. SOBOL:  That makes one of
13 us.
14      A.    The aggregate model that I put
15 forth is intended to essentially obscure the
16 rivalrous marketing, so to the extent that
17 marketing only moves people from hydrocodone
18 to oxycodone or the other direction, whatever
19 it is, that will show up as a noneffect in my
20 model.
21      So I'm only looking at market
22 expansion because the question I care about
23 is market expansion.

Page 207

BY MR. ROTH:

1       Q.    I'm not sure I followed your
2  answer.  So how does it show up as a
3  noneffect if you're including that contact in
4  your regression analysis, whether it was new
5  drug promotion or rivalrous marketing?
6       A.    I think the way you're looking
7  at rivalrous marketing is a bit different
8  than the way I would look at it.  And this
9  goes back to a conversation we had before
10 where I think there was a little bit of a
11 disconnect.
12      So it may well be that you go
13 to the detail and what you want to talk about
14 is why you're better than the other guy.  But
15 still, what happens is you actually increase
16 the use of any product in this class.
17      So what I'm concerned about is
18 not the intent of the marketing but the
19 effect of the marketing.  You seem focused on
20 the intent.
21      Q.    I do.  But now I think you've
22 helped me, and your answer is actually the
23 opposite of what I understood it to be
24 before.

Page 208

1       When you say that rivalrous
2  marketing is a noneffect, what you mean is
3  you don't assess whether the marketing was
4  rivalrous or not, because in either case,
5  your view is it will potentially lead to
6  increased MMEs, so it gets counted?
7       MR. SOBOL:  Objection, form,
8  asked and answered.
9       A.    I am interested only in a
10 particular kind of impact, and that impact is
11 an increase in the number of MMEs.  If there
12 is marketing that changes the drug people
13 take without affecting their MMEs, then I
14 ignore that.
15      Let's just say there's unlawful
16 conduct and you earn money off of it, but
17 it's really only because you've switched
18 brands.  That, I'm not counting, so that's a
19 kind of rivalrous marketing effect that's not
20 being counted in my impact assessment.
21      I'm only concerned about market
22 expansion by definition.  Economists can be
23 interested in both of those things, but for
24 my purpose, I'm only interested in market
25 expansion.

Page 209

BY MR. ROTH:

1       Q.    I'm just trying to understand
2  functionally how that happens.
3       So the reason you're saying
4  that is because you're only looking at the
5  delta, the change in MMEs, and so if there's
6  no change, then the rivalrous marketing
7  doesn't get counted?  I'm just struggling
8  with the mechanics.
9       A.    Sure.  Let me try to explain.
10      If we had two drugs in the
11 market and we looked at their marketing
12 separately, we could ascertain whether your
13 marketing increases your sales, right, and --
14 and then what we wouldn't know is, is that
15 increase coming from new patients, or is it
16 coming from the decrease in someone else's
17 sales.  So we could use a system kind of
18 analysis to show what's happening.
19      So people have done this in
20 prescription drugs.  I know you've spent some
21 time with the literature, and they're curious
22 about when you increase your sales, does it
23 come at someone else's expense or are you
24 just growing the market.  And in different

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1  drug classes, those two things seem to
2  operate differently.
3        But if you were to add those
4  two drugs together and say, okay, for any
5  herpes treatment, what's the total effect of
6  marketing?  Then what you would get is only
7  the market expansion effect.  You would wash
8  out any of the market stealing because your
9  gain is my loss.  And so those two things
10  would net out and you'd only get the net
11  result.  So that's what I'm doing here.
12      Q.    So the mechanics are because
13  it's an aggregate model that's aggregating
14  all contacts and aggregating all scripts, it
15  comes out in the wash if it's rivalrous?
16      A.    Exactly.  Rivalrous, again, my
17  definition of rivalrous is my sales come from
18  you and that those two things fully offset.
19      Q.    Okay.  But the detail itself is
20  still counted in the model, because you're
21  not actually looking substantively at the
22  detail to determine what happened?
23        MR. SOBOL:  Objection.
24      A.    That is correct.  The detail is
25  still in the model, and where the rivalrous

Page 211

1  piece shows up is that it dampens the
2  effectiveness of marketing that we measure.
3  BY MR. ROTH:
4      Q.    Okay.  We're finally on the
5  same page then.
6        How does your model account for
7  unbranded marketing?
8      A.    Well, in two ways.  In Model C,
9  I explicitly put in some of those events.  We
10  can look at exactly which ones they are.
11      Q.    I was saving this for later,
12  but we can --
13      A.    I know, it sounds like an
14  after-lunch conversation, but the consensus
15  statement from the American Academy of Pain
16  Management and the American Pain Society, the
17  Federation of State Medical Boards
18  Guidelines, the JCAHO pain standards
19  released.
20        So these, I understand that
21  plaintiffs intend to prove they were
22  manipulated by the defendants.  So I put
23  those explicitly in Model C.
24        And then as I describe Model B
25  and my rationale and the way I interpret the

Page 212

1  turning points is that they -- that is
2  incorporating these many different events and
3  tactics.
4      Q.    So the unbranded marketing is
5  captured by the way you do the breaks and the
6  way you test for these five events in
7  Model C, correct?
8      A.    That's correct.
9      Q.    But the unbranded marketing is
10  not captured in the detailing contacts you
11  use for your stock of promotion?
12      A.    That's correct.
13      Q.    How does your model account for
14  the peer-to-peer marketing that I think you
15  or Dr. Perri describes as a contagion
16  phenomenon in paragraph 25?
17      A.    Yeah.  So that phenomenon will
18  get picked up in marketing effectiveness,
19  because again, we're looking at aggregate
20  prescribing and not just the prescribing of
21  the targeted physicians.
22        So, you know, as -- we can go
23  back to our favorite paper by Datta and Dave,
24  they're looking at individual physicians.
25        It could well be, of course,

Page 213

1  detailing physician A causes physician B's
2  prescribing to increase; they're not really
3  looking at that because they're only looking
4  within physician.  But we, for the same
5  reasons that I can capture market expansion
6  appropriately, aggregating up across doctors
7  here allows me to capture that contagion
8  effect.
9      Q.    We do agree, though, that at an
10  individual prescriber, individual detail
11  visit level, there could be variation in the
12  impact that visit has?
13      A.    There may be variation in the
14  impact of detailing on an individual
15  prescriber and her network and my model will
16  average that, will generate a result that
17  captures the average.
18      Q.    And we talked a little bit
19  earlier about some of the variability in the
20  way detailing occurs.  I think I used the
21  pizza example.
22        Do you remember that?
23      A.    I remember pizza.
24      Q.    Okay.  I want to come back to
25  that for a minute maybe because it's

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1 lunchtime.
2         Not every detail visit occurs
3 the same way in terms of time spent and what
4 is disseminated from the pharmaceutical sales
5 representative to the doctor, correct?
6         MR. SOBOL:  Objection, asked
7     and answered.
8     A.    I would not disagree that
9 details can be different day of the week,
10 whether there's food involved, how much time.
11 BY MR. ROTH:
12     Q.    And frankly, who is detailed,
13 because it could be a prescribing doctor or
14 it could be a nurse practitioner, it could be
15 some other healthcare professional in the
16 doctor's office, right?
17     A.    Yes, that's correct.
18     Q.    And does the IQVIA data you've
19 looked at distinguish between the target of
20 the detail?
21     A.    It distinguishes between
22 office-based and hospital-based physicians,
23 but it does not distinguish by licensure as
24 you've just described.
25         And again, what I'm interested

Page 215

1 in is the aggregate impact, and therefore,
2 the average across that variation is
3 appropriately subsumed in my analysis.
4     Q.    Right.  And because you used
5 the average, whether the sales rep makes
6 contact with the prescribing doctor and
7 spends 15 minutes discussing the virtues of
8 opioids or whether the sales rep quickly
9 speaks to a nurse practitioner to leave the
10 coffee mug will get treated the same as an
11 average in your model?
12     A.    Yes.  And that is appropriate
13 if you're interested in the aggregate effect.
14 If I were interested in comparing the
15 difference between a detail with pizza versus
16 a detail without pizza, then I would want to
17 look at them.  But I'm only interested in the
18 aggregate effect.
19     Q.    Are you aware that detailing
20 could be limited to simply providing
21 literature that contains information
22 contained in the package insert or approved
23 by the FDA in promotional materials?
24         MR. SOBOL:  Objection.
25     A.    I'm not exactly sure what you

Page 216

1 mean by simply.  I think we're getting into a
2 question about what and how will be proven to
3 be unlawful.  And if the question is was
4 certain information omitted, then the fact
5 that the information that was provided was in
6 some way not challenged, to me, seems like it
7 could still be a problem.
8         But the larger issue is that I
9 think it's not appropriate to try to pull
10 these detail visits off one at a time.  If
11 there was some messaging around the utility
12 of treating patients with opioids at an
13 earlier visit and these later visits are just
14 reminder visits, again, I'm not -- I'm not
15 trying to prove liability here, but to me as
16 an economist, it seems like they could well
17 be connected.
18 BY MR. ROTH:
19     Q.    And they all count the same way
20 as the average?
21     A.    All -- all details in my data
22 are included in the right-hand side, and they
23 produce an average effect, and then I back
24 out those particular ones deemed unlawful.
25     Q.    And similarly, if the detail is

Page 217

1 corrective messaging designed to dampen the
2 effects of some prior materials that FDA has
3 issued a warning letter on, those detail
4 visits get picked up by your data as well?
5         MR. SOBOL:  Objection.
6     A.    I think you need to understand
7 what the regression is doing.  It is not just
8 saying sales are strictly promotional to
9 detailing.  It's trying to look at that
10 effect, and, in fact, in the last period of
11 my three-period model, the effective
12 promotion is declining.
13         To the extent that there's
14 corrective messaging, that may be one of the
15 factors that is decreasing the effectiveness
16 of promotion, and so there are not MMEs
17 assigned to have been produced by that
18 detail.
19 BY MR. ROTH:
20     Q.    Let me just ask a simpler
21 question:  Yes or no, are details that are
22 simply designed to provide corrective
23 messaging included in your stock of
24 promotion?
25         MR. SOBOL:  Objection, asked

Page 218

1  and answered.

2     A.   I really have no idea about

3  whether such details exist. My model

4  includes all detailing over the period from

5  1995 to 2018 based on the instruction that I

6  was given to consider that unlawful.

7  BY MR. ROTH:

8     Q.   Okay. Without distinguishing

9  between the quality or extent of those

10  detailing visits?

11       MR. SOBOL:  Objection, asked

12    and answered.

13     A.   I do not distinguish among

14  those details, no.

15  BY MR. ROTH:

16     Q.   And I think we talked about

17  this, but I'm not sure.

18       You don't differentiate between

19  which physician practice groups were targeted

20  by the details in your model?

21       MR. SOBOL:  Objection, asked

22    and answered.

23     A.   As I noted, my detailing

24  measure is national. It's aggregate. It

25  does not distinguish at a level below that.

Page 219

1  BY MR. ROTH:

2     Q.   Do you have any view as to

3  whether allegedly deceptive marketing is more

4  impactful than truthful marketing?

5     A.   I think I do discuss this in my

6  report, and there's an economic theory

7  related to the profitability of fraud and

8  some evidence from other sectors that suggest

9  that for something unlawful to be undertaken

10  when lawful activities are possible, that it

11  must be more profitable because there's some

12  cost associated with matters such as this

13  one. And so that would suggest that that

14  kind of marketing must be more profitable

15  than marketing to other physicians.

16       I think this is -- it depends

17  on what assumptions we're making about the

18  intention and knowledge of the various

19  actors. So I think it could go either way.

20     Q.   But within your model, within

21  the time periods of your model, you treat

22  each of the details equally because in your

23  view, you assume them all to be equally

24  unlawful at this point in time?

25       MR. SOBOL:  Objection.

Page 220

1     A.   I am, as we've noted earlier,

2  operating on the assumption that the

3  defendants' conduct during the relevant

4  period was unlawful, and my model uses a

5  single measure of detailing and therefore

6  averages across allegedly lawful and unlawful

7  details.

8  BY MR. ROTH:

9     Q.   Let's look back at Datta and

10  Dave because you asked to.

11     A.   Okay.

12     Q.   It's Exhibit 5, for the record,

13  and I -- can you turn with me to page 454.

14     A.   Okay.

15     Q.   So at the top of the page it

16  says: Thus, detailing plays a role in

17  educating providers about newer drugs and

18  their attributes and may have information

19  value early in a product's life cycle,

20  whereas later in the life cycle, its role can

21  be predominantly persuasive and chiefly

22  relegated to delivering samples and

23  reminders.

24       Do you see that?

25     A.   I do.

Page 221

1     Q.   And then at the end of the

2  paragraph, they say: Because detailing can

3  affect both selective (brand centric) and

4  primary (market) demand under these views --

5  citation to Dave and Kelly, 2014 -- the

6  question cannot be resolved based on theory

7  alone, and empirical evidence needs to bear

8  upon the question.

9       Do you see that?

10     A.   Yes. Just to be clear, what

11  they're talking about there is the welfare

12  effects of marketing, and that is a separate

13  question than the one that we're discussing

14  here.

15     Q.   It's the same issue that we've

16  been going around on, right? You're not

17  looking at the welfare, you're not looking at

18  the quality; you're just looking to see if

19  there's a correlation between detailing

20  visits as a stock of promotion against

21  MMEs --

22       MR. SOBOL:  Objection, asked

23    and answered.

24  BY MR. ROTH:

25     Q.   -- on an aggregate basis.

Page 250

1  rate is about here.
2  BY MR. ROTH:
3      Q.   So is your suggestion that the
4  doctors are addicted to writing
5  prescriptions?
6          MR. SOBOL: Objection.
7      A.   I didn't say that.
8  BY MR. ROTH:
9      Q.   So when you say it's the
10 addictiveness, your suggestion is because the
11 patient may become addicted, the doctor is
12 going to continually ratchet up the dosage
13 for that patient?
14         MR. SOBOL: Objection.
15     A.   You make it sound like the
16 opioid epidemic is speculative. It is
17 clearly true that patients who started on a
18 particular dose of opioids get higher and
19 higher doses. That has -- that is just
20 common knowledge, and other experts have
21 opined on that.
22         And so it is a fact of the
23 matter that some patients will require
24 escalating values in terms of the number of
25 MMEs, whether they're addicted or not, and

Page 251

1  then also it is true that some of those
2  patients will become addicted. I think
3  there's no question in the literature about
4  whether prescribed opioids cause addiction.
5  So that is true.
6          And the fact of the matter is
7  that I'm not describing physician behavior as
8  addictive; but if those patients come back to
9  their physician and say, "My pain is getting
10 worse, I need another prescription," then in
11 some instances it will be filled.
12 BY MR. ROTH:
13     Q.   What percentage of patients
14 need escalating doses of opioids?
15         MR. SOBOL: Objection, scope.
16     A.   I'm not a clinical expert. My
17 analysis is entirely empirical. If this were
18 not happening, my analysis would not find
19 that these MMEs are inflating over time in
20 the way they are.
21 BY MR. ROTH:
22     Q.   I know you're not a doctor, so
23 I'm just trying to understand, like what --
24 you say it's common knowledge.
25         What basis in science or

Page 252

1  literature do you have to opine that the
2  addictiveness of opioids means that doctors
3  are prescribing higher and higher dosages to
4  their patients?
5          MR. SOBOL: Objection, asked
6  and answered.
7      A.   If you look at Figure 3, this
8  is where I empirically demonstrate what's
9  happening with the strength --
10         MR. SOBOL: Page?
11         THE WITNESS: Oh, sorry.
12     Page 37.
13 BY MR. ROTH:
14     Q.   Right. That's on an aggregate
15 basis. I asked you a different question.
16 With --
17     A.   No, no, no. I'm sorry, but the
18 aggregate basis means that the average MMEs
19 per prescription is escalating at this very
20 high rate. That means that some large number
21 of patients under it -- for it to increase at
22 this rate, it cannot be that just a handful
23 of patients are getting more.
24     Q.   It could just be, though, that
25 stronger drugs are prescribed. It doesn't

Page 253

1  mean that a specific patient is getting
2  higher and higher doses because of the
3  addictiveness of opioids.
4          MR. SOBOL: Objection.
5      A.   I do not derive that -- these
6  data really show that higher and higher doses
7  of MM- -- of opioids are being prescribed. I
8  mean, that's just literally what they show.
9  The MMEs per prescription is increasing.
10         So that is showing that --
11 whether it's addiction or not, that patients
12 are getting higher and higher doses. That
13 mechanically will have the effect of making
14 it look like past promotion is suddenly more
15 effective today than it was yesterday.
16 BY MR. ROTH:
17     Q.   And so, in effect, your
18 depreciation rate is an appreciation rate in
19 your model.
20         MR. SOBOL: Objection.
21     A.   You may use that term. I think
22 it's more standard to call it a depreciation
23 rate. Also, as you know, I estimate multiple
24 models, and they don't all have a negative
25 depreciation rate.

Page 254

BY MR. ROTH:

Q. What do your models say about a single detailing visit in January 1995 with regard to its impact today?

MR. SOBOL: Objection.

A. Can you explain what you mean by that?

BY MR. ROTH:

Q. Yeah.

So the way your stock of promotion is calculated, it keeps aggregating. So would a visit in January 1995 still be growing in impact in your model?

A. In the fact -- in the models with the negative depreciation rates, the past promotion continues to grow, yes.

Q. And at what point does it reach its maximum impact?

A. Well, I think you should not try to extend the analysis out of sample. Again, what I show in my model is while on average, because I estimate a single negative depreciation rate, we see this negative depreciation rate, but we also find that the

Page 255

effectiveness of promotion is falling.

And so while the stock may be increasing, its effectiveness is decreasing.

Q. Yeah, and we'll get to the other adjustments. I just want to talk about the depreciation rate first.

So under your model, the detailing that happens today is 8.3% more impactful next year than it is today?

MR. SOBOL: Objection. Objection.

A. For a given quarter, after a year, the appreciation is 8.3%, yes.

BY MR. ROTH:

Q. And after ten years, detailing that happens today would be 223% more impactful than it was today?

A. I think you'd have to give me a calculator, but I'm willing to trust your math.

And just to be clear, it's not exactly impactful because, again, you have to recognize that the coefficient on promotion is changing over this same period, and because that -- that coefficient is dropping,

Page 256

we're actually seeing reductions in sales.

Q. You agree that an appreciating depreciation rate is at odds with the usual marketing literature in economics?

MR. SOBOL: Objection.

A. I don't know that it's at odds with the underlying theory of marketing. Because this is an addictive good, I think it's a very different set of circumstances.

Usually we do see depreciation falling, but I would note also that this is a special case, as we've talked about many times today. I'm interested in this entire market and not one drug.

And so usually when the marketing literature is looking at this, they're looking at an individual drug, maybe even an individual physician. And here we're really talking about the growth of an entire set of practices around the use of opioids.

BY MR. ROTH:

Q. You say in your report: A negative depreciation rate indicates that the stock of promotion grows over time.

Correct?

Page 257

A. Yes.

Q. And then you say: This prediction may be at odds with the usual marketing literature.

A. Yes. But I want it to be clear, however, that it's not a theoretical, the theory that I've just described, whereby the role of addiction is entirely consistent with a negative depreciation rate.

Q. And in your report, where you say that, you've got a footnote and you cite to Perri's report?

A. Yes.

Q. And you quote him in saying: Additionally, because prescription opioids may result in tolerance, dependence, and/or addiction, the overall demand for opioids is distorted by pharmaceutical marketing aimed at increasing the use of these drugs. I refer to this as a distortion because, whether due to tolerance, dependence, or addiction, some patients who use opioids require and/or seek more opioids over time.

Did I read that correctly?

A. You know, I thought I saw that

Page 258

1 correct footnote, and then I was looking at
2 the wrong one.
3      Q.   Sorry.  It's page 49, 103.
4      A.   49.
5           Yes.
6      Q.   And based on that statement,
7 you believe that a negative depreciation
8 rate, although at odds with the usual
9 marketing literature, is perfectly consistent
10 in this case?
11      A.   Just to be clear, I'm not
12 relying on Dr. Perri for my understanding
13 that opioids are addictive.  I'm relying on
14 the broad facts of this case, my knowledge in
15 public health, and that is the reason why I
16 think, while marketing studies that have
17 looked at other goods have not found this, it
18 is entirely theoretically consistent that we
19 would find a negative depreciation rate here.
20      Q.   Have you looked at marketing
21 studies relating to other addictive goods?
22      A.   I don't know of any other
23 marketing studies related to addictive goods.
24      Q.   Tobacco?
25      A.   Yes, I have -- I'm certainly

Page 259

1 familiar with the tobacco literature.  That
2 literature, as you may know, focuses largely
3 on taxes and the effect of a marketing ban in
4 terms of broadcast advertising.
5           I don't know that the
6 literature has looked at the stock of
7 promotion at all.
8      Q.   What about marketing literature
9 related to alcohol?
10      A.   I have not seen any of that
11 literature, no.
12      Q.   What about marketing literature
13 related to marijuana?
14      A.   I --
15           MR. SOBOL:  Wait.  Is that
16 addictive?
17           THE WITNESS:  Wait, is there
18 marketing?  But now, you're right,
19 there may be a market.
20           I would be interested to know
21 if such literature exists.  I'm not
22 familiar with any literature like
23 that.
24 BY MR. ROTH:
25      Q.   Okay.  As you sit here right

Page 260

1 now, do you know of any literature, whether
2 related to nonaddictive or addictive
3 products, that has a negative depreciation
4 rate?
5      A.   I cannot point to any other
6 study, no.
7      Q.   Let's look at the Datta and
8 Dave study again.  So if you look at page --
9      A.   Sorry, I lost Datta and Dave.
10      Q.   Sorry, it's okay.
11      A.   Yeah.  Okay.  I got it.
12      Q.   Page 457, footnote 23.
13           Do you see that?
14      A.   Yes.
15      Q.   So in this study, it says:  We
16 chose to rely on the literature for fixed
17 estimates of the depreciation rate rather
18 than estimate it as an unknown parameter.
19      A.   Yes.
20      Q.   And they say:  An unbiased
21 estimate of the depreciation rate would
22 require a detailed structural modeling of
23 promotion and prescription behaviors, without
24 which it would be difficult to disentangle
25 the coefficient of the detailing stock from

Page 261

1 the depreciation rate.
2           And there's then a cite to
3 Iizuka and Jin.
4           Do you see that?
5      A.   I do.
6      Q.   And in what way did you
7 structurally model prescription behaviors in
8 your model?
9      A.   Well, I followed the same
10 practice that Professor Berndt and others
11 have used, which in effect simultaneously
12 estimates the two parameters.  It's not,
13 strictly speaking, a structural model.  It
14 really requires that we reestimate the model
15 with a whole range of estimates and then see
16 which one has the best fit.  It's an
17 alternative approach to the structural
18 modeling approach.
19      Q.   Datta and Dave go on to say:
20 Prior research on consumer behavior suggests
21 that advertising effects fully depreciate
22 within six months to a year, consistent with
23 decay rates of 0.1 to 0.2, which have also
24 been found to apply to pharmaceutical
25 advertising.

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1      Do you see that?
2      A.    I do.
3      Q.    Okay.  And then --
4      A.    I would note that Professor
5  Berndt's article that you shared with me
6  earlier finds a depreciation rate of zero,
7  and he concludes there and elsewhere that
8  it's consistent with our understanding that
9  pharmaceutical marketing is long-lived
10  because of the habit formation, so there's
11  clearly some disagreement in the literature
12  about what's the right answer.
13      Q.    Right.  But he has no
14  depreciation rate.  He doesn't have an
15  appreciation rate in his study.
16      A.    The difference between zero and
17  a small negative is -- they're both kind of
18  getting at the same notion, which is that
19  marketing from many periods ago is still
20  persistent today.
21      Q.    And the Berndt study you're
22  citing predated this Datta and Dave study; is
23  that right?
24      A.    I believe it did, yes.  It's an
25  earlier study.

Page 263

1      (Whereupon, Deposition Exhibit
2      Rosenthal-9, 2004 Mizik and Jacobson
3      Publication, was marked for
4      identification.)
5  BY MR. ROTH:
6      Q.    Okay.  And now I'm going to
7  show you Exhibit 9, which is the Mizik and
8  Jacobson study, Are Physicians "Easy Marks"?
9  Quantifying the Effects of Detailing and
10  Sampling on New Prescriptions.
11      Do you have Exhibit 9 in front
12  of you?
13      A.    I do.
14      Q.    And this is another document
15  you relied on and quoted in your report.
16      A.    Yes.
17      Q.    And if you look at page 1710,
18  under the chart, do you see there's a heading
19  Detailing?
20      A.    Under -- in Table 2?
21      Q.    Yes.  There's a Detailing
22  heading on the column underneath Table 2.
23      A.    I'm sorry.
24      Q.    Sorry, I'm below Table 2.  Left
25  side.

Page 264

1      A.    Oh, yes.  In the text.
2      Q.    In the text.
3      A.    I'm sorry, I was looking in the
4  table for a column heading.  Yes.  Yes.  I'm
5  sorry.
6      Q.    Okay.  So in the column heading
7  in the text, it says Detailing, and then it
8  says: For each of the three drugs in the
9  study, we observed statistically significant
10  positive albeit modest effects of detailing
11  on prescriptions.
12      Do you see that?
13      A.    Yes.
14      Q.    And then it says: Both current
15  term and carryover effects exist.  For
16  drug A, statistically significant positive
17  effects are present contemporaneously and for
18  the subsequent four months.
19      Do you see that?
20      A.    Yes.
21      Q.    And then if you jump to the
22  next column, the bottom paragraph says: The
23  estimated response to a change in PSR visits
24  for drug B is similar to drug A in that we
25  observe a statistically significant response

Page 265

1  the month of the visit that diminishes over
2  the subsequent six months.
3      Do you see that?
4      A.    Yes.
5      Q.    And then you referred already
6  to the Berndt study, which I believe you have
7  there.
8      A.    Yes.
9      Q.    If we look at that at
10  page 104 -- it's Exhibit 8 -- I thought you
11  said the depreciation rate was zero, but
12  looking at page 104 on the second column, it
13  actually looks like it's 0.03.
14      A.    It may be there's another
15  Berndt paper that I believe that I cite.  I
16  know there's a zero depreciation rate in one
17  of them.  That may be -- if we look at my
18  literature summary, it may be clearer.
19      Q.    Okay.  We can do that on the
20  next break, but for now let me just mark
21  Exhibit 10.
22      A.    Okay.
23      (Whereupon, Deposition Exhibit
24      Rosenthal-10, 2001 G?n?l et al
25      Publication, was marked for

Page 266

1    identification.)
2    BY MR. ROTH:
3        Q.    Which is the G?n?l study,
4    Promotion of Prescription Drugs and Its
5    Impact on Physicians' Choice and Behavior.
6        A.    I'm sorry, were you going to
7    ask me a question about this study?
8        MR. SOBOL:  Which one?
9    BY MR. ROTH:
10       Q.    I think I did.  I was just
11   asking what the depreciation rate was and you
12   said --
13       A.    I'd just like to remind you,
14   when we talk about these marketing studies,
15   and Mizik and Jacobson is similar to the
16   Datta and Dave one, it's a short period of
17   time for a few select drugs.  It doesn't have
18   the ability to look over the long term the
19   way we do.
20       Q.    No, I understand.
21           And for those drugs, the
22   depreciation happened within months.  In your
23   model, the appreciation happens forever.
24       A.    Yes.
25       Q.    So if we look at Exhibit 10,

Page 267

1    the G?n?l study, if you look at page 85,
2    there's a paragraph, Cumulative Discounted
3    Sums of Detailing and Samples.
4           Do you see that?
5        A.    You're on 85?
6        Q.    85.
7        A.    Yes.
8        Q.    And in that paragraph it says:
9    For each prescription physicians write, they
10   are likely to be influenced by past personal
11   selling efforts.  We discount the cumulative
12   personal selling effort consistently with the
13   methods used in the advertising literature.
14   The major premise of these methods is that
15   physicians are influenced by the recent
16   visits of sales representatives more than by
17   the distant ones.
18           Do you see that?
19       A.    I do.
20       Q.    And it looks like in this
21   study -- well, maybe you can help me find it.
22   I don't know if it's on this page.
23       A.    They don't -- they don't
24   estimate a depreciation rate.  It says they
25   set one.

Page 268

1        Q.    Got it.
2        A.    I think it must be in the
3    footnote.  Yes.
4        Q.    Yeah.  I don't see the exact
5    number.  But in any event, they depreciated
6    their stock somehow, and if we took the time
7    to review this, we could probably find the
8    exact number.
9           So switching gears for a
10   second.  So you said you're not aware of any
11   article.  Have you ever done any work in your
12   litigation consulting or expert practice
13   where you've modeled a negative depreciation
14   rate before this case?
15       MR. SOBOL:  Objection, asked
16   and answered.
17       A.    I would return to the fact that
18   this matter concerns a class of drugs that is
19   different from any other class of drugs for
20   which I have looked at marketing, and I
21   believe that the negative depreciation rate
22   is entirely consistent with that underlying
23   phenomenon.
24           I have not worked on opiate
25   addiction in the past.  I have not worked on

Page 269

1    a marketing study for an addictive product.
2    BY MR. ROTH:
3        Q.    Okay.  And as you sit here now,
4    you're not aware of any peer-reviewed
5    publication or study that suggests that a
6    negative depreciation rate is ever
7    appropriate?
8        MR. SOBOL:  Objection, asked
9    and answered.
10       A.    It's my belief that a negative
11   depreciation rate is entirely theoretically
12   consistent with this product.  I cannot cite
13   a paper that has estimated one, but I do not
14   find it surprising.
15   BY MR. ROTH:
16       Q.    Okay.  Let's look at
17   paragraph 55 of your report and Figure 4
18   below that.  Are you there?
19       A.    I'm sorry, you're at
20   paragraph 55 -- I'm sorry, I went to the next
21   page.
22       Q.    Yeah, and it spills -- sorry,
23   it spills to the next page, which is
24   Figure 4.
25       A.    Yes.

Page 270

1    Q.    Are you there?
2    A.    Uh-huh.
3    Q.    And in this chart it looks like
4  you actually model your depreciation rate in
5  red against what your model would look like
6  with no depreciation rate or even a small
7  positive depreciation rate.
8    A.    I show you what that would look
9  like, yes.
10    Q.    So with even a very slight
11  positive depreciation rate, the line looks
12  almost flat.
13    A.    You mean the .01?
14    Q.    Correct.
15    A.    Yes.
16    Q.    And if you hold the
17  depreciation rate at zero, it's got a small
18  increase, but not anywhere close to what you
19  show with your negative depreciation rate?
20        MR. SOBOL:  Objection.
21    A.    But as you've described the
22  lines, the line that represents the
23  depreciation rate I estimated grows more
24  rapidly, as would be expected because of
25  compounding.

Page 271

1        Just to be clear, the fact that
2  the stock of promotion grows in this pattern,
3  that is a question of fitting the model
4  appropriately.  It's not driving my results
5  in that same relationship.
6  BY MR. ROTH:
7    Q.    I'm not sure I understood your
8  last answer.  What do you mean it's not
9  driving your results?
10    A.    Well, the results aren't
11  inflated in the same way that the stock of
12  promotion is inflated.  The estimate in my
13  model, again, where I have promotional
14  effectiveness coefficients, they're now
15  responding -- they'll be lower than otherwise
16  because the average level of promotion is
17  higher, and so it effectively makes promotion
18  look less effective on an incremental basis.
19        And this is really a question
20  of just getting the best fit in terms of the
21  timing.
22    Q.    Okay.  The blue line on this
23  line graph you describe as the flow of the
24  data.  Can you explain what that means?
25    A.    Sure.  Those are the monthly

Page 272

1  levels of contacts.
2    Q.    So with no adjustment for a
3  stock, this is just the ebb and flow of where
4  the IQVIA data shows promotion is?
5    A.    Yes, it's the unadjusted IQVIA
6  total detailing contacts.
7    Q.    So it spikes up and down over
8  the course of the entire period?
9    A.    It does have the pattern that
10  you see there.
11    Q.    Okay.  Have you run your models
12  with positive depreciation rates other than
13  the 0.01 you depict on Figure 4?
14        MR. SOBOL:  Objection.
15    A.    That's not running the model.
16  That's just showing you what the stock would
17  look like.
18  BY MR. ROTH:
19    Q.    Okay.  So have you even run the
20  model with the stock at 0.01?
21    A.    I have not.
22    Q.    Okay.  So you don't know what
23  that would look like, and you don't know what
24  it would look like if we used a higher
25  depreciation rate?

Page 273

1        MR. SOBOL:  Objection.
2    A.    I don't.
3  BY MR. ROTH:
4    Q.    And I think you said this, but
5  your model selects the depreciation rate that
6  produces the best fit?
7    A.    Yes, that's correct.  It uses a
8  Wald test.
9    Q.    Okay.  We'll come back to the
10  Wald test.  But let's look at Figure 2,
11  which, I believe, is a few pages earlier.
12    A.    Page 36?
13    Q.    You got it.  So Figure 2 is a
14  line graph of the MMEs over time.
15    A.    That's correct, and it also
16  includes extended units in blue.
17    Q.    And what does that mean,
18  "extended units"?
19    A.    Extended units are pills.
20    Q.    Okay.  So you've got both the
21  pills and the MMEs on this graph?
22    A.    Yes, and you can see they track
23  almost perfectly.
24    Q.    And you can tell, I think, the
25  first thing I see when I look at this graph

Page 274

1 is a pretty stark decline that starts in
2 2010.
3        Do you see that?
4    A.    It does have a clear peak, both
5 of those trends.
6    Q.    And do you have any
7 understanding as to why MMEs began to drop
8 off starting in 2010?
9    A.    Well, I think I write about
10 that pretty extensively in my report.
11    Q.    In paragraph 46 -- yeah, let's
12 look at paragraph 46.
13    A.    Maybe not 46.  Maybe 56?
14    Q.    Oh, you know what, that's
15 Gruber 46.  We'll get to him next.
16    A.    I'm sorry.  Okay.
17    Q.    Sorry, which paragraph were you
18 taking me to?
19    A.    I am looking for where I
20 discuss the peak.
21    Q.    All of your reports magically
22 have the same font and type space, so it's
23 hard to differentiate.
24    A.    I think it's later when I talk
25 about --

Page 275

1    Q.    67 --
2    A.    -- estimating the breaks.
3    Q.    67.
4    A.    Yeah?
5    Q.    Yeah.  I think I found it.
6    A.    Yes.
7    Q.    Okay.
8    A.    So that's sort of the -- that's
9 where I talk about the first break.
10    Q.    Yeah.  So you say:  The
11 accelerated growth in opioid prescribing that
12 followed the guideline and messaging changes
13 continued for approximately a decade before
14 it was finally arrested and ultimately
15 reversed by the cumulative effects of
16 physician leadership, media attention, public
17 health surveillance and regulation.
18        Do you see that?
19    A.    I do.
20    Q.    And you agree that all of those
21 efforts, doctors, media and public health,
22 did not just simultaneously happen in
23 August 2010?
24    A.    They did not, which is why I
25 don't assume that.

Page 276

1    Q.    And when you refer to
2 regulation in that paragraph, what
3 specifically are you talking about?
4    A.    Well, so, for example, certain
5 states required that physicians use a
6 database to look at prescribing for the
7 patient before they could write a
8 prescription, so prescription drug monitoring
9 programs and educational requirements around
10 those prescription drug monitoring programs.
11        In some places there are --
12 like Massachusetts, for example, there have
13 also been prescribing limits that were
14 passed.  So those kinds of things.
15    Q.    And then did you review
16 Professor Gruber's report?
17    A.    I did.
18    Q.    Before yours was finalized or
19 at some point after?
20    A.    Perhaps before.
21    Q.    Okay.  So I'll -- I could mark
22 it, but I'm just going to read to you from
23 it.  And if you want me to mark it, I will.
24        But he says in paragraph 46:
25 Beginning around 2010, increased enforcement

Page 277

1 actions by DEA and DOJ, criminal actions and
2 litigation, the growth of state PDMP laws and
3 increased awareness of addiction risks
4 associated with prescription opioids
5 contributed to a reduction in aggregate
6 shipments of prescription opioids after more
7 than 20 years of rapid growth.
8        Are you aware of that passage
9 in his report?
10    A.    Yes, and I think that there's
11 absolutely nothing inconsistent with what he
12 says.  He uses a couple of different
13 examples, but we're in agreement that it's
14 multifactorial and gradual.
15    Q.    Agree.  And you both mention
16 PDMP laws, and I think he's got a couple of
17 other examples about the DEA and DOJ.
18        But that was what I was going
19 to ask you is, are you in agreement with him
20 that these multifactorial events contributed
21 to the decline in 2010?
22    A.    That is the environment that I
23 capture using that third era in which these
24 events are essentially reducing the
25 effectiveness of promotion.

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    Q.   Okay.  So let's talk about your
2  eras.  So if you go to paragraph 71, you're
3  talking about Model B, and I think you called
4  this in your report your preferred model.
5    A.   I do.
6    Q.   Okay.  And just so we
7  differentiate, we'll get to Model C.
8         Model A, as you describe it in
9  paragraph 70, is assuming the effectiveness
10  of detailing is constant, so meaning, if I
11  look at Table 1, you just used the stock of
12  promotion and the depreciation rate without
13  adjusting for different eras in Model A.
14    A.   Yes, that's correct.  I mean,
15  they both have a single depreciation rate,
16  but there's a single stock of promotion in
17  Model A, and the price index, of course.
18    Q.   And then in Model B, it's those
19  two things plus you've added these two eras
20  in?
21    A.   That's correct.
22    Q.   And in Model C, it's Model B
23  with the five events mapped onto it?
24    A.   That's correct.
25    Q.   Okay.  So let's start with

Page 279

1  Model B.  71 says:  Model B allows the
2  effectiveness of promotion to change at two
3  points in time, determined using
4  specification tests.  Thus, this model
5  captures three different periods or eras of
6  the opioid market: the initial era, an
7  increase in MME sales during the second era,
8  and a third era marking the gradual decline
9  of MME sales.
10         Do you see that?
11    A.   Yes.
12    Q.   What do you mean, "determined
13  using specification tests"?
14    A.   Well, we essentially -- we do
15  much the same as what Professor Cutler does
16  in his report, which is basically conduct an
17  F-test, which is looking at the fit of
18  alternative models, and we have these -- we
19  have two time points, so we're looking at a
20  two-dimensional space and looking to see
21  which model fits the data best by, again,
22  iterating over -- I think it says in --
23    Q.   Yeah, let's look at Attachment
24  D5.  I'll help you out.
25    A.   That's right, iterating over, I

Page 280

1  don't know, 1600 models, something like that.
2    Q.   You get how this goes.  I get
3  your memory first, and then we can look at
4  the report.
5    A.   Yes.  I know I should just tell
6  you that I don't remember.
7    Q.   That's okay.  All right.  D5,
8  Determining Turning Points in Effectiveness
9  of Promotion.
10    A.   Okay.
11    Q.   Tell me when you're there.
12    A.   D5.  Okay.  Yes.
13    Q.   So it says:  In Model B, the
14  two dates that would delineate the early and
15  late change in the effectiveness of
16  promotional stock were determined through a
17  two-dimension search.  The first turning
18  point was chosen between January 1999 and
19  January 2003, and the second turning point
20  was chosen with the date between January 2010
21  to December 2011.
22         Do you see that?
23    A.   Yes.
24    Q.   So let me stop there.
25         So when you say "it was

Page 281

1  determined between," were you just conducting
2  the searches within those date ranges?
3    A.   Yes, that's right.
4    Q.   So you didn't just search the
5  whole model for the breaks; you limited the
6  dimensions you were looking for?
7    A.   Well, as you can see, there
8  were 1,176 combinations already, so there's a
9  bit of a scale issue in looking at every
10  combination.
11         And also, the way the tests
12  work out, it seemed fairly clear that we
13  weren't getting better and better fit by
14  going out further, that the solutions were
15  closer to the middle, and so that's why we
16  didn't feel like we needed to go outside of
17  those ranges.
18    Q.   How long did it take the
19  computer to run 1,176 combinations?
20    A.   Fortunately, I did not have to
21  run those myself.  Probably not that long.
22    Q.   I feel bad for Greylock.
23         And so you ultimately chose
24  these two breaks based on the maximum Wald
25  statistic produced from running the model

Page 282

1 almost 11 -- 1,176 times?
2    A.   That's correct.
3    Q.   And what is a Wald statistic?
4    A.   It's -- like I said, it's like
5 an F-test that's looking at the joint
6 significance.  We talk about an F-test
7 elsewhere in this model, looking at the joint
8 significance -- actually, in my errata you
9 see I talk about the F-test, doing
10 significance of a set of variables and seeing
11 the formulation in which those variables
12 explain -- effectively explain the model
13 best.
14    Q.   And is it a common practice in
15 econometrics to choose a model based on
16 maximum fit?
17    A.   It's one of the considerations
18 that one does in a model.  And here we're
19 talking about a set of parameters that we're
20 trying to optimize with regard to
21 depreciation.  It's not the only thing that
22 we use to select the model.
23        As you know, I also report the
24 adjusted R-squared, and that was part of my
25 decision-making across models.  And there are

Page 283

1 other factors.
2    Q.   Okay.  If we turn back to the
3 body of the report, paragraph 57 introduces
4 Figure 5.
5        Do you see that?
6    A.   Uh-huh.
7    Q.   So you say:  Figure 5 -- which
8 is on the next page -- is a timeline of key
9 events.  According to plaintiffs' experts and
10 the published literature, the perceptions of
11 physicians and the public evolved as a direct
12 result of the alleged misconduct.
13        Do you see that?
14    A.   Yes.
15    Q.   You cite Dr. Perri.
16    A.   Yes.
17    Q.   And then you say:  These
18 changes, which were the result of the
19 defendants' actions, would have affected the
20 receptiveness of prescribers and patients to
21 promotional messages about the safety and
22 effectiveness of opioids.
23        Do you see that?
24    A.   Yes.
25    Q.   And then you describe how the

Page 284

1 key events identified by plaintiffs that
2 helped promote expanded prescribing are in
3 green and the subsequent public health and
4 regulatory events that signaled the growing
5 realization about the dangers are in red.
6    A.   Yes.
7    Q.   All right.  So let's look at
8 Figure 5 on page 41, and we're going to do
9 our best job to articulate on the deposition
10 transcript the picture that we're looking at.
11        So it looks to me like Figure 5
12 is --
13        MR. SOBOL:  Why don't you show
14 it to the camera for a second.
15 Seriously.  Just get a shot of that.
16        MR. ROTH:  It's a work of art.
17        THE WITNESS:  It is a work of
18 art.
19        MR. SOBOL:  Christmas.
20 BY MR. ROTH:
21    Q.   So if you look at Figure 5,
22 you've got the MME trend graph that we looked
23 at in Figure 4 with a timeline and the events
24 described in the paragraph above it, right?
25    A.   That's correct.

Page 285

1    Q.   And so we'll talk about the
2 five you picked to test in Model C, but did
3 you think about using any of the events on
4 this timeline to choose where you do your
5 testing for the breaks?
6    A.   I considered and rejected that
7 idea for reasons I think I do describe in my
8 report.  And I'm happy to explain further.
9    Q.   Yeah, if you don't mind.
10    A.   So as you can see from the
11 timeline, there are a number of discrete
12 events.  They're marked on the timeline at
13 the time they were either announced or passed
14 or in some way published, and still, they are
15 clearly events that could have had both
16 anticipation effects and sort of long
17 adoption curves.
18        And so just the notion that
19 these -- any one of these points would have
20 determined a break in the promotional
21 effectiveness, it seems like it was not quite
22 the right model.  Although, again, I included
23 them in Model C to explore this further.
24        It's my opinion that these
25 should be treated more cumulatively and that

Page 286

1 is why I used the multi-era model, and I
2 think that's entirely consistent with the way
3 Dr. Perri describes the events, particularly
4 the green ones, the ones that were
5 influencing the adoption of opioids.
6     Q.    Just so I understand it, your
7 break based on the Wald statistic is sometime
8 in early 2002; is that right?
9     A.    It's probably not a good idea
10 ever for me to trust my memory, so I'm going
11 to go and look at that.
12     Q.    Yeah.  It's in the report.
13     A.    Yes, it is, it's absolutely in
14 the report.
15     Q.    And it may be in the errata,
16 because I saw some of the dates changed a
17 little bit last night.
18     A.    Paragraph 71.
19     Q.    Paragraph 71, yeah.
20     A.    Right.  So March 2002 is the
21 first break.
22     Q.    In the report it says
23 April 2002.  That was one of the errata?
24     A.    Yes.  I think someone was
25 reading the first month versus the last

Page 287

1 month, the first of the old era versus the
2 last of the -- first of the new era.
3     Q.    So it changes as of April 1st?
4     A.    It changes as of March 1st.  I
5 mean, the data are monthly, so -- not daily,
6 so it changes as of March.
7     Q.    Okay.
8     A.    And then the second turning
9 point changes as of August.
10     Q.    So if we were to plot
11 March 2002 on Figure 5, it would be after the
12 first five events in green but before the
13 last two events in green?
14     A.    That -- I can affirm that.
15     Q.    And then if we were to plot the
16 August 2010 break on the curve in Figure 5,
17 it would be -- it looks like after maybe
18 three or four of the red events but before
19 the other six or seven.
20     A.    I -- that may be true.  I think
21 it's a lot harder to say.  That's just a
22 dense part of the chart, and I wouldn't trust
23 my eyeballs on it.
24     Q.    Okay.  But again, as we
25 discussed, those breaks are not correlated

Page 288

1 with these events; they're the function of
2 searching using the Wald statistic for where
3 the curve breaks?
4     A.    Yes.  And again, to be clear,
5 they're telling us where the relationship
6 between the stock of detailing and sales
7 seems to change in a statistically
8 significant way.  And they're entirely
9 consistent with some kind of S-curve at the
10 beginning, when we think about a standard
11 diffusion curve, that there -- there is sort
12 of a point at which diffusion accelerates,
13 and that is what we're estimating on the
14 first one.
15         And the second turning point I
16 guess would be a reverse diffusion curve.  I
17 think de-innovation is a word, and not one
18 that I use a lot, but that seems to be what's
19 happening.  And again, it's not like you've
20 turned on a light switch and everyone
21 changes, but cumulatively over time, that's
22 putting the brakes on.
23     Q.    Okay.  But your model, the way
24 you account for that is you do actually turn
25 on the light switch and change the stock of

Page 289

1 promotion as of those dates?
2     A.    I -- no.  That's not -- that's
3 not true.  So what I do is I allow for the
4 promotional effectiveness to change in the --
5 in the first instance as a level shift and in
6 the second instance as a trend shift.
7     Q.    And so we'll talk about each of
8 those, but in paragraph 68 you talk about how
9 this led you to adopt a piecewise model.
10 What is a piecewise model?
11     A.    Well, it's essentially where I
12 assume there's a linear relationship between
13 the stock of promotion and sales that differs
14 over these different eras.
15     Q.    And when is it appropriate to
16 use a piecewise model in econometrics?
17     A.    Well, in this case, this is an
18 aggregate time series model, and we believe
19 that the fundamentals of that relationship
20 are changed by something in the environment.
21     Q.    So in addition to your
22 appreciating depreciation rate, we now have
23 adjustments in these two eras to fit the MME
24 curve.
25         MR. SOBOL:  Objection to form.

Page 290

1    A. Just to be clear, it's about
2 fitting -- the R-squared is about fitting the
3 MME curve, but really, the test that we're
4 doing is about understanding the relationship
5 between detailing and sales and fitting that.
6 BY MR. ROTH:
7    Q. I understand that, but you're
8 making modifications to the detailing stock
9 that is allowing it to fit better with the
10 MME curve?
11    A. Well, the detailing stock
12 and -- you're talking about the depreciation
13 rate. That is being determined, again, based
14 on the fit of the overall statistical model.
15 It's not just trying to make it fit the shape
16 of the MMEs, which I think is what you said.
17    Q. Right. But when you make the
18 depreciation rate change to the stock of
19 promotion and then you allow the model to
20 tell you where the effectiveness of promotion
21 also changes, are you not then essentially
22 fitting the detailing curve to the MME curve?
23    A. I do not believe so, no.
24 That's not what I'm doing. What I'm trying
25 to do is establish a relationship that best

Page 291

1 fits the data. Over time, that relationship
2 could be that promotion has very little
3 effect on sales. And so the quantum of the
4 impact here is not what I'm fitting the data
5 to.
6    Q. Okay. As you describe it in
7 your report, the coefficients on the stock of
8 detailing are estimated separately during
9 each of the three eras; is that correct?
10    A. Well, in effect, we can look at
11 the results, so maybe it will be a little
12 clearer than my hand-waving without having it
13 in front of me.
14    Q. Table 1, is that what you
15 wanted or do you want --
16    A. Yes, Table 1, that's right. So
17 we have the stock of promotion through --
18    MR. SOBOL: I'm sorry, page?
19    THE WITNESS: Oh, sorry.
20    Page 47. Sorry.
21    A. We have the stock of promotion
22 that is the continuous series that we saw
23 plotted in that other figure, and then in
24 Model C, I interact that with the dummy
25 variable for the first era.

Page 292

1    And then I also -- I interact
2 that separately with the variable from
3 March 2002. So those two are essentially
4 separate estimates over those two time
5 periods, but in -- in the third period,
6 because we're looking at an erosion curve,
7 that's just literally what's happening here
8 is opioid prescribing is eroding. I enter
9 the interaction with that era as a trend, so
10 then that's the sum of the stock of promotion
11 from 2002 and the dummy trend.
12 BY MR. ROTH:
13    Q. All right. So you're jumping
14 ahead of me. I'm going to ask you about the
15 dummy trend.
16    A. Okay.
17    Q. But the stock in period 3 is
18 actually overlapping with the stock in period
19 2; is that right?
20    A. Yes, the stock of promotion --
21 again, because the third period basically is
22 adding on to the second period, they're being
23 estimated -- I mean, the model of course is
24 estimating over the entire period, but the
25 variables are separated such that we have one

Page 293

1 variable that's the stock of promotion times
2 a dummy variable, so it becomes zero at March
3 of 2002. That's beta-1.
4    And then beta-2 goes a variable
5 that's zero before 2000- -- that break
6 date -- now I can't remember if March is
7 the -- oh, yeah, it is March of 2002, so
8 Table 1 was always right -- up to 2002, and
9 then it becomes whatever the stock of
10 promotion is, right?
11    And so beta-3 has that same
12 stock of promotion and it has this multiplier
13 effect for the trend.
14    Q. So what I'm trying to
15 understand is before you put in your trend
16 into period 3, if we recognize that there's a
17 period, according to you, of rapid growth
18 after efforts to market --
19    A. Yes.
20    Q. -- followed by a period of
21 decline after growing realization about the
22 dangers, why are those starting from the same
23 baseline and adding a trend as opposed to
24 having some other variable applied to the
25 stock in Era 3?

Page 294

1    A.    Yeah, let me try to explain
2  that.  And just to be clear, I know you know
3  this, but let me just remind you that the
4  turning point in the MME trend is not the
5  turning point that marks off Era 3, right?
6    Q.    Right.
7    A.    That starts earlier.
8          One thing one could have done
9  is just say, okay, we're going to split the
10  model at that turning point, and so that is
11  the light switch notion, rather than looking
12  to see where the relationship seems to
13  change.
14          And we know the relationship is
15  such that it's -- we know conceptually, based
16  on the other evidence, that -- and just from
17  reading the news, that public health
18  authorities are trying to limit opioid
19  prescriptions and they're having some
20  success, and so that we know that we need to
21  put in a trend that will capture when that
22  happens.
23          There's no way to have
24  something that is an increasing trend go
25  south without giving it the opportunity to

Page 295

1  have a second coefficient.  And by using a
2  trend and allowing the break to happen
3  whenever it happens, I can actually allow the
4  data to tell me at what pace that erosion
5  happened.
6          Otherwise, I would have to sort
7  of, again, plug it at the top and just
8  measure the relationship on that second bar.
9  So this was the most flexible way to use the
10  data to look at what's happening to promotion
11  over time.  It's entirely flexible.  If, in
12  fact, you know, promotion kept going up and
13  it was just not explaining that trend, then
14  the model would have told me that.
15    Q.    Okay.  So now I want to get to
16  the dummy trend.
17    A.    Yeah.
18    Q.    So what support do you have for
19  using the dummy trend only in Era 3 as
20  opposed to before?
21    A.    Yeah, for sure.  So again,
22  because in Era 2 what we're looking at was a
23  growing acceptance of the idea that opioids
24  were safe, that we could have used a trend
25  there.

Page 296

1          A linear shift is the simplest
2  way of capturing that, and essentially, what
3  will happen is then in that case, by using a
4  shift rather than a trend, what we'll get is
5  an average effect as opposed to one that --
6  where we can plot out the changes over time,
7  if there were changes over time, but it would
8  capture that increase either way.
9          When we're looking at the
10  erosion side, however, just picking --
11  putting an additive effect in like the first
12  trend, would require that we fix that really
13  to the peak of the model in order to make any
14  sense of -- of the way the trend reverses,
15  and yet again, we don't -- we don't change
16  the underlying stock of promotion.  That is
17  what it is.
18          If, in fact, that relationship
19  can't be explained by the stock of promotion,
20  then we would -- we would not get a
21  significant coefficient on that.
22    Q.    When you implement the dummy
23  trend incremented by month in the third era,
24  that means the effect of the third period
25  stock is increasing over time still, right?

Page 297

1    A.    Well, the effect of the stock
2  is what it is with the negative depreciation
3  rate.  So the effect -- the stock continues
4  to increase, as we discussed earlier, and
5  nonetheless, the productivity of a given unit
6  is decreasing.  So relative to the previous
7  period, the average productivity of a unit of
8  the stock of promotion is lower.
9    Q.    Did you try to run the model
10  using a dummy incremented by months in the
11  first two eras?
12    A.    I don't believe so.  Again, the
13  simplest -- the simplest way to think about
14  that was a slope change, and that's what we
15  did there.  It was really only when we came
16  to trying to figure out how best to let the
17  data tell us about this turning point that a
18  trend seemed like the best approach.
19    Q.    If the effectiveness of
20  promotion is changing in each of the eras,
21  why did you keep the depreciation rate
22  constant the whole time?
23    A.    We used a single depreciation
24  rate because we think that it is something
25  more structural.  As I've talked about, the

Page 318

1  discrete events, all of which are picking up
2  on broader phenomena, either a loosening of
3  restrictions around opioids or a tightening
4  of restrictions, and just conceptually,
5  trying to pin any one of them to have begun
6  at a discrete point in time seems
7  problematic; and likely, the reason that I
8  get a counterintuitive result is that there
9  are other correlated -- for example, putting
10 both the OxyContin reformulation and the
11 hydrocodone rescheduling may have caused some
12 interaction between the two.
13         And so that's also why I didn't
14 then just try to keep adding events with the
15 notion that this was not the right modeling
16 approach for what was going on in this
17 market.
18     Q.   Okay.  And then if you look
19 back at Table 1, you mention the OxyContin
20 reformulation, which does not look like it
21 was statistically significant, but also
22 resulted in estimating ████████ additional
23 MMEs?
24     A.   That's correct.  It's zero, but
25 positive.

Page 319

1     Q.   Are you aware that Professors
2  Cutler and Gruber opined that the 2010
3  OxyContin reformulation led to an abrupt
4  market shift that thickened the market for
5  illicit heroin?
6         MR. SOBOL:  Objection to the
7     form.
8     A.   I am aware of their general
9  opinions.  I could not have quoted them.  But
10 I'm aware that it's more broadly understood
11 that the reformulation of OxyContin caused a
12 number of opioid users to switch to illicit
13 opioids.  I believe that's been shown in
14 other literature.
15 BY MR. ROTH:
16     Q.   So how do you reconcile your
17 model showing that there's actually no effect
18 on MMEs from the reformulation of OxyContin
19 with their opinion that it led to some
20 massive shift of opioid users to illegal
21 drugs like heroin?
22         MR. SOBOL:  Objection.
23     A.   Well, a couple of things.
24 First, I believe the model that I put forward
25 in Model B, which captures the environment,

Page 320

1  the environment I've generally been thinking
2  about in the third era is one in which public
3  health restrictions are tamping down on
4  opioid use.
5         That's already being captured
6  in that dummy trend that we talked about
7  earlier, so some of that is getting picked
8  up, as opposed to being able to pull it out
9  separately just at that moment in time when
10 the OxyContin reformulation occurred.  So my
11 model is already picking that up.
12        You know, I think the other
13 thing is, of course, I'm looking at the
14 opioid market as a whole, not just OxyContin
15 on its own, and so there are -- there are
16 other factors happening for other opioids.
17 BY MR. ROTH:
18     Q.   But your model suggests that
19 there was still a supply of opioids and
20 prescribing driven by promotion whereas
21 they're suggesting that the supply was drying
22 up to the extent that users evaded the legal
23 prescription market and turned to illegal
24 drugs.
25     A.   I don't believe you're correct

Page 321

1  in that statement.  These models are looking
2  at two very different things.  I'm not
3  looking at the use of illicit opioids.  The
4  data show decreasing use of legal opioids.
5  That's -- that's just the underlying MMEs, so
6  that is happening.
7         My model is looking at the
8  portion of that that's explained by
9  promotion, so there's no way that this is
10 disproving people had left OxyContin.
11     Q.   But it is showing that
12 according to your model, the OxyContin
13 reformulation did not have a statistically
14 significant impact on the MMEs prescribed?
15     A.   Once you control for the
16 variables that I've controlled for, including
17 price, including promotion, and accounting
18 for the change in promotional effectiveness,
19 I don't separately find an effect here.  That
20 is not the same as saying that OxyContin
21 reformulation had no effect.
22     Q.   Okay.  So now I want to go back
23 to Appendix D, and I want to start with
24 Table D.1.
25     A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1  Q.   All right.  So Table D.1 --
2  A.   Oh.  I'm on page D1.
3  Q.   Yeah, you've got to go past
4  that.
5  A.   Keep going.
6  Q.   Talk about your charts and
7  graphs.
8  A.   It's okay.  Excellent.
9  MR. SOBOL:  This one?
10  THE WITNESS:  All right.
11  MR. ROTH:  Yeah, the table.
12  BY MR. ROTH:
13  Q.   So first the chart, okay.  So
14  Table D.1 is a chart that I think explains
15  Model A; is that right?
16  A.   That's correct.
17  Q.   And maybe just explain to me
18  what is on here, because if I try to ask you
19  a question, I'm not going do as good of a job
20  as if you just tell me what this is showing.
21  MR. SOBOL:  If you just ask a
22  direct question.
23  A.   Sure.  These are SAS output
24  made slightly prettier, and so at the top --
25  the top box there is describing the model

Page 323

1  overall, degrees of freedom, the total error,
2  the sum of squared errors you see there, the
3  mean squared error.  After that, the square
4  root of the mean squared error.  These are
5  all sort of talking about the variability in
6  the data and the explanatory power of what's
7  included.  The R-squared and the adjusted
8  R-squared are -- the adjusted R-squared
9  accounts for the degrees of freedom, the
10  number of covariants.
11  BY MR. ROTH:
12  Q.   And what is in the bottom chart
13  titled Nonlinear OLS Parameter Estimates?
14  A.   Yes, so those the coefficient
15  standard error, t statistic, p values.  Those
16  are reported way back in Table 1.  They've
17  just cleaned up a little bit.
18  So the coefficient estimate is
19  the one that we're interested in, and then
20  we'll mostly just focus on the p value.
21  Q.   Okay.  So if we flip to Figure
22  D.1 --
23  A.   Yeah.
24  Q.   -- which is the line graph
25  that's an output, I was perplexed when I saw

Page 324

1  this because the green line is predicted
2  but-for; is that right?
3  A.   That's correct.
4  Q.   So you're showing negative
5  but-for in the early '90s and again starting
6  around 2012.
7  Do you see that?
8  A.   Yes, that's correct.
9  Q.   So what does that mean, that,
10  you know, people were returning opioids?  I
11  don't even understand how that conceptually
12  works.
13  A.   Yes.  Well, remember how I said
14  that Model A uses a single promotional
15  effectiveness and it doesn't fit the data
16  very well?  So it's an average that's
17  smoothing over this long period and doesn't
18  fit the data well, so that's what these
19  predictions tell you.  It's the same thing,
20  in effect, as looking at the adjusted
21  R-squared.  This is just what it looks like
22  in predicted values.
23  Q.   So for this reason, Model A is
24  not your preferred approach?
25  A.   This is not my preferred model,

Page 325

1  that's correct.
2  Q.   Yeah.  I mean, conceptually,
3  having a negative but-for doesn't actually
4  make sense, right?
5  A.   Conceptually, it's unappealing.
6  Q.   How would you even calculate
7  the difference with a negative but-for?
8  A.   The same way.  It's -- the
9  difference would be just the space between
10  the two lines.  I have not done that here.
11  Q.   Okay.  So now if you flip the
12  page to Table D.2, you'll see another set of
13  charts.
14  And I think this correlates to
15  your Model B; is that right?
16  A.   That's correct.
17  Q.   And I assume your description
18  of what Table D.1 is would describe D.2,
19  although this second chart has additional
20  labels for the stock of promotion trends that
21  we talked about earlier?
22  A.   That's correct.
23  Q.   Why is the stock of promotion
24  dummy trend from August 2010 a negative
25  number?

Page 326

1  A.   Again, it's an erosion rate
2  over the promotional effectiveness in b2, and
3  so the promotional effectiveness is b2 plus
4  the number of months from -- from that time
5  break, August 2010, times b3.  So it
6  increments.  You see what I'm saying?
7  Q.   Yeah.
8  A.   So every month, it's like b2 is
9  reduced by 8.
10  Q.   Right.  And this is your time
11  trend essentially that we talked about
12  before?
13  A.   It's sort of an erosion trend,
14  yes.
15  Q.   Okay.  And why is it -- how did
16  you come up with that number, like how do we
17  get negative 7.97362?
18  A.   It comes out of the regression
19  model.  It's estimated like all the other
20  coefficients using OLS.
21  Q.   And what is it doing?  It's not
22  like a Wald statistic?  Or is it -- how does
23  it mechanically estimate that coefficient?
24  A.   Well, technically through
25  matrix algebra.  I mean, it's essentially

Page 327

1  picking up the association between, in this
2  case, the stock of promotion times the dummy
3  trend and sales.  Like all the other
4  coefficient estimates, the tests relate to
5  the statistical properties of those
6  estimates, but the coefficients really come
7  from the correlations.
8  Q.   All right.  And then if we turn
9  the page to D.2, this is the line graph from
10  your Model B, which maps almost perfectly
11  onto the blue flow of the data.
12  A.   Yes.
13  MR. SOBOL:  A thing of beauty.
14  MR. ROTH:  Almost as if it
15  fitted like a glove.  All right.
16  BY MR. ROTH:
17  Q.   Let's look at Table D.3.
18  A.   Uh-huh.
19  Q.   The last one of these.  So this
20  is -- well, it's not the last one of these,
21  we'll ask about that in a second, but this
22  is, I think, Model C.
23  A.   That's right.
24  Q.   Okay.  So the same concept as
25  D.1 and D.2 we just walked through?

Page 328

1  A.   Yes.
2  Q.   And then if you look at the
3  second page, it looks like this one has
4  something that says Type, Wald Test -- Test
5  and Test0.  What is that?
6  A.   That's the joint test of
7  significance of those events.
8  Q.   Got it.  Okay.
9  So when you say in your report
10  jointly they're not statistically
11  significant, it's based on this output?
12  A.   Yes, except that that was in
13  the errata, that that should have said they
14  were significant.
15  Q.   I saw that.  That was the one
16  errata where it changed like a no to a yes
17  and there was --
18  A.   Yes.  It does not change my
19  conclusions, but yes, you can see here the p
20  value is .0176.
21  Q.   Okay.  So just to be clear,
22  your opinion is that jointly the five events
23  are actually statistically significant?
24  A.   That's correct.
25  Q.   Okay.  And then if we look at

Page 329

1  D.3, Figure D.3, this is what your curve
2  looks like in Model C?
3  A.   Yes.
4  Q.   Okay.
5  A.   Not very different from
6  Model B.
7  Q.   Which makes sense because the
8  baseline is Model B; you're just inserting
9  five events and measuring those?
10  A.   Yes.  If they had had some
11  effect, it might have looked different.
12  Q.   Okay.  You can -- looking at
13  your report again, so we talked about this
14  earlier, but you cited Datta and Dave, and we
15  talked about that article this morning.
16  Do you remember that?
17  A.   I do.
18  Q.   So let's pull it out one more
19  time.  Probably the last one.
20  A.   Let me make sure that I get the
21  right...
22  Q.   It's Exhibit...
23  A.   5.  Got it.
24  Q.   5.
25  So if you look with me at

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1  page 452 again, we're now going to get to
2  talk about endogeneity.
3      A.    Excellent.
4      Q.    You knew it was coming.
5      A.    I did.
6      Q.    So at the top of the page, they
7  say: A key empirical concern in this
8  literature relates to potential targeting
9  bias, which physicians who already have a
10 history of prescribing a particular drug or
11 who have a higher unobserved likelihood of
12 prescribing the drug (for instance, due to
13 their patient population or practice type)
14 more likely to be targeted by detailers.
15      Do you see that?
16      A.    I do.
17      Q.    And is that an empirical
18 concern that you as an econometrician or
19 economist would have?
20      A.    If I were doing a
21 physician-level study, yes.
22      Q.    And one could describe this
23 issue as something called endogeneity?
24      A.    Yes.
25      Q.    And can you define endogeneity

Page 331

1  for us?
2      A.    Well, in effect, what they're
3  talking about here, I described earlier this
4  morning the endogeneity they're concerned
5  about is of the type that physicians who are
6  more likely to be detailed are already more
7  likely to be open to prescribing or are, in
8  fact, high prescribers already.
9      Q.    And it's called endogeneity
10 because that's an endogenous problem?
11      A.    Yes.  The level of detailing is
12 endogenously determined with the level of
13 prescribing.
14      Q.    So continuing on their paper,
15 they say "Addressing such endogeneity is a
16 vital issue in identifying plausibly causal
17 effects of advertising, which would otherwise
18 lead to overestimates of the advertising
19 response.
20      Do you see that?
21      A.    I do see that.
22      Q.    And --
23      A.    And as I said before, it's
24 because they're talking about physician-level
25 data.

Page 332

1      Q.    Which you didn't look at?
2      MR. SOBOL:  Objection, asked
3  and answered.
4      A.    It was not relevant to my
5  report because I have been asked to conduct
6  an aggregate analysis.
7  BY MR. ROTH:
8      Q.    And then they say:  Studies
9  that address this endogeneity in most cases
10 have done so through an instrumental
11 variables-based methodology, although as
12 Bronnenberg caution, many of the instruments
13 employed have limited variation and may not
14 fully satisfy the validity requirements.
15 This caveat notwithstanding, these studies
16 generally find a smaller marginal effect of
17 detailing relative to those that do not
18 account for endogeneity.
19      Do you see that?
20      A.    I do.
21      Q.    Now, what about having an
22 aggregate macro analysis means that
23 endogeneity is no issue for you?
24      MR. SOBOL:  Objection.
25      A.    Well, endogeneity is something

Page 333

1  different in every context, so what they're
2  describing specifically here, I mean, I think
3  they say that they're talking about targeting
4  bias, so that's the physician-level concern.
5      It simply doesn't exist in my
6  data because I'm not looking at
7  physician-level data.  I cannot mistake the
8  fact that Doctor A has high prescriptions
9  compared to Doctor B, not because she's been
10 detailed before, but she's been detailed
11 before because she has high prescriptions.
12 Because I'm only looking at the aggregate.
13 So the only kind of endogeneity there, it
14 can't be related to targeting.  It has to be
15 related to something else.
16      In other instances people have
17 looked at endogeneity when it comes to a
18 specific product.  They said, well, you know,
19 we knew that this product was going to be a
20 blockbuster so we put our detailing on
21 product A versus product B, and so that's the
22 nature of the endogeneity.  But again, I
23 don't have that here because I'm aggregating
24 across products.
25      ///

Page 334

BY MR. ROTH:
1  Q.   It's a convenient answer to
everything, but I want to dissect that.
      The data you're looking at --
      MR. SOBOL:  Well, objection to
that.
BY MR. ROTH:
      Q.   The data you're looking at from
IQVIA is an aggregation of detailing contacts
to doctors, correct?
      A.   The details were made to
doctors, yes.
      Q.   Or healthcare providers.
Actually, could have been nurse
practitioners, as we talked about earlier?
      A.   Yes.
      Q.   Why is it that adding up a
whole suite of contacts to doctors is any
less susceptible to the fact that certain
doctors are more likely to be detailed in the
first place than looking at it on a
disaggregated individualized basis?
      A.   You're making me feel like I'm
failing as a teacher.  Let me try again.
      MR. SOBOL:  Yeah.

Page 335

1      A.   It's the fact of measuring,
detailing and prescribing at the doctor level
and trying to examine that specific
relationship that's causing the endogeneity
problem.
      So imagine that -- I'm trying
to give a work example for you, but I mean,
the concern again is that the patterns of
high prescribing that we're observing between
doctors are really causing detailing and not
the other way around.
      But if I am ignoring those
patterns, the only thing that I'm looking at
is increases over time.  Those -- the forces
that say which doctors get detailed are just
not -- they're not in my data.
      So it's like doing an
intent-to-treat analysis, if that means
anything to you.  We have clinical studies
where we know that some patients will be
compliant and some won't, and if we only look
at the effect of the drug on the compliant
patients, we're going to misstate its
population effect, so we look at all
patients.

Page 336

1      That's basically what I'm doing
is it may well be that targeting is happening
here.  If that is true, then the aggregate
effect will be small.  In the extreme, where
promotion doesn't work at all, it just --
detailing -- we just, you know, detail the
doctors we know are going to prescribe, then
I would find no effect in the aggregate.
Even though you would find an effect in the
cross-section, you won't find it in the
aggregate.
BY MR. ROTH:
      Q.   We may have to agree to
disagree on this one for now.  I can't
promise we won't come back.
      Do you agree that when
endogeneity is an issue, it's typically
handled through instrumental variables?
      A.   Yes, that is a classic
approach.  In effect, the instrumental
variables are trying to step back from --
from that targeting to get to something that
is, in fact, exogenous.
      Q.   Are there other options for
addressing endogeneity?

Page 337

1      A.   Well, generally, there's sort
of broader research design, so ultimately,
endogeneity concerns some kind of unmeasured
third variable.  I mean, there's simultaneity
that has to do with sort of a different
interpretation of endogeneity, but what we're
talking about here is something else that
we're not measuring.  So endogeneity can be
addressed by measuring whatever that thing
is.  So in the case of Datta and Dave, it
could be historic prescribing.
      Q.   Did you take any effort to test
for endogeneity issues or address endogeneity
issues in your regression analyses?
      A.   Again, conceptually, I don't
believe this is an issue looking at the
overall opioid market over time, so I did not
address endogeneity in my model.
      Q.   Do you know if anyone on your
team did?
      A.   I do not.
      Q.   You've used the instrumental
variables methodology to correct for
endogeneity in other models you've developed
for litigation, correct?

Page 338

1  A.  In looking at a single drug,
2 yes.  As I mentioned, there's another version
3 of the endogeneity story that makes sense for
4 a single drug.
5  Q.  So in Zyprexa, I think, for
6 example, you used instrumental variables?
7  A.  I'm afraid that was a long time
8 ago.  I didn't review that report for that.
9  Q.  I can mark it just so we have
10 it in the record.
11      (Whereupon, Deposition Exhibit
12   Rosenthal-12, Rosenthal Declaration
13   re: Zyprexa, was marked for
14   identification.)
15 BY MR. ROTH:
16  Q.  Exhibit 12 is your --
17  A.  Wow.
18  Q.  -- declaration from Zyprexa,
19 Analysis of Class-Wide Impact and Estimation
20 of Damages.
21      MR. SOBOL:  Oh, wow.  Memories.
22  A.  I'm trying to -- do you know
23 what the date on this is?
24 BY MR. ROTH:
25  Q.  It is February 2007.

Page 339

1  A.  Wow.
2  Q.  12 years ago.
3  A.  That is a really long time ago.
4 Yes.
5  Q.  Okay.  And if you look at your
6 Zyprexa declaration -- and I will stipulate
7 this is an excerpt, we didn't print the whole
8 thing, but at paragraph 35 you talk about the
9 fact that you developed a regression model,
10 and then the equations in paragraph 37.
11      Do you see that?
12  A.  Yeah, I was just looking at --
13 I was trying to remember whether this is a
14 panel data model or not, but --
15      MR. SOBOL:  Well, take your
16   time then to refresh your recollection
17   of your model from 12 years ago.
18      THE WITNESS:  I will.  Yes.
19  A.  Yes, this is a panel data model
20 for the atypical antipsychotic class.
21 BY MR. ROTH:
22  Q.  And if you were to try to
23 assess the effect of any individual
24 defendants' promotion in this case, would you
25 put together a panel data model similar to

Page 340

1 the one you used in Zyprexa to do that?
2  A.  I have not thought about doing
3 defendant-by-defendant analysis in this case.
4 It was not part of my assignment.  I'm not
5 sure if that would be appropriate, again,
6 because the interest here, even if we're
7 looking at individual defendants, is on the
8 overall -- on the market expansion aspect of
9 their marketing.
10      Whereas in Zyprexa, we were
11 very interested in the -- I'm trying to
12 remember what words we used this morning --
13 business dealing is the way economists
14 usually describe it.  Marketers describe it
15 something differently, but the market share
16 shifts, those were relevant in Zyprexa
17 because the question was not so much that
18 Zyprexa was trying to grow the market,
19 although there was some of that.  It was
20 about trying to encourage doctors to
21 substitute Zyprexa in place of
22 first-generation antipsychotics.
23  Q.  For a manufacturer that was not
24 part of the market before it grew and came
25 into the market after it had been expanded,

Page 341

1 why is it the case in your model that that
2 manufacturer is part of the aggregate
3 analysis and not subject to some other type
4 of causation allocation?
5      MR. SOBOL:  Objection, asked
6   and answered.
7  A.  Nowhere in my assignment was I
8 asked to look at liability for individual
9 manufacturers.  I'm only trying to quantify
10 aggregate impact.  To the extent that I
11 subtract individual defendants, it's really
12 only to get to a different whole, it's not to
13 assign liability to an individual defendant.
14 BY MR. ROTH:
15  Q.  So looking at the Zyprexa
16 declaration, paragraph 42, you say:  For
17 purposes of the regression, the promotional
18 variables for Zyprexa and its competitors
19 were entered as discounted stocks following
20 the tendency of the published literature and
21 in accordance with the theory that promotions
22 to physicians is habit building.
23      Do you see that?
24  A.  I do.
25  Q.  So you used a stock of

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1 promotion with a depreciation rate similar to
2 here?
3     A.    At least I'm consistent, yes.
4     Q.    No doubt.
5         And then you also used a Fisher
6 Ideal Price Index in that case too?
7     A.    I did.
8     Q.    But you weren't consistent
9 next, because then you say:  In addition, the
10 estimation deals with two important issues,
11 serial correlation in the error terms and the
12 endogeneity of price and promotion.  Serial
13 correlation in the error terms require the
14 use of time series methods to produce
15 reliable estimates.  The endogeneity of price
16 and promotion was handled using the standard
17 instrumental variables approach.
18         Did I read that correctly?
19     A.    Yes, you did.
20     Q.    And if endogeneity is an issue
21 for you -- I understand you don't think it
22 is -- but if it is an issue for you, your
23 regression may lead to overestimating the
24 response to promotion?
25         MR. SOBOL:  Well, then,

Page 343

1     objection.
2     A.    I do not believe endogeneity is
3 an issue in my model for the reasons that
4 I've described.  But in particular, what
5 we're looking at is an aggregate phenomenon,
6 and so the theory of endogeneity that we
7 would have to have requires this reverse
8 causation on a month-by-month basis for the
9 market as a whole, and I do not believe
10 that's a plausible notion.
11 BY MR. ROTH:
12     Q.    Okay.  Don't fight the
13 hypothetical, though.
14         Assume endogeneity is an issue
15 with your model.  What impact would it have?
16         MR. SOBOL:  Objection, asked
17     and answered.
18     A.    I cannot imagine a form of
19 endogeneity that would make sense in this
20 case.  I cannot understand how it could be
21 that one month's sales could have caused the
22 next month's detailing to change in the way
23 that endogeneity requires.  It's simply not a
24 plausible set of ideas in this context.
25         ///

Page 344

1 BY MR. ROTH:
2     Q.    And why is that again?
3     A.    Because we're looking at the
4 market as a whole, and not individual
5 manufacturers or individual drugs, where
6 those decisions are made.
7     Q.    I guess I'm confused, because
8 earlier you talked about us as this
9 manufacturing ecosystem that all kind of acts
10 together, but now for purposes of
11 endogeneity, you're saying there are no
12 issues because we're not looking at it on an
13 individualized basis, and I can't square
14 those two things.  Maybe you can help.
15     A.    Sure.
16         MR. SOBOL:  I'll object to the
17     form, but go for it.
18     A.    Sure.  I think where you're
19 confused is the ecosystem is causing
20 prescribing in a way that may be concerted,
21 but I -- I don't believe anywhere I have said
22 that the defendants are aligning, explicitly,
23 their marketing efforts.
24 BY MR. ROTH:
25     Q.    Okay.  Do you remember if you

Page 345

1 used an instrumental variables approach to
2 address endogeneity in Neurontin?
3     A.    All not quite 12 years ago, 17,
4 however many, but I believe the answer is
5 yes, in the circumstance of -- thank you, can
6 you remind me -- the circumstance is very
7 similar to the Zyprexa matter.
8     Q.    Yes, so we can do this one
9 quickly.
10     A.    Yes.
11     Q.    But Exhibit 13 is your
12 Neurontin declaration, excerpted.
13         (Whereupon, Deposition Exhibit
14     Rosenthal-13, Rosenthal Declaration
15     re: Neurontin, was marked for
16     identification.)
17     A.    It's in Calibri too.
18 BY MR. ROTH:
19     Q.    It must be the Greylock
20 computers.  Did Greylock McKinnon assist you
21 there?
22     A.    Yes.
23     Q.    August 2008.
24         So looking at your Neurontin
25 declaration, you were addressing alleged

Page 346

1 fraudulent promotion on behalf of the class
2 plaintiffs; is that right?
3 　　　　MR. SOBOL: Actually, may I
4 just interrupt one second? Sorry.
5 　　　　So is this pulled online or --
6 it indicates confidential in the
7 bottom left-hand corner.
8 　　　　MS. VENTURA: It's available
9 online.
10 　　　　MR. ROTH: Yeah, we got it
11 online.
12 　　　　MR. SOBOL: Okay, go ahead.
13 　　　　THE WITNESS: Zyprexa too?
14 　　　　MR. ROTH: I think so. I did
15 ask that question.
16 　　　　MR. SOBOL: Zyprexa had at the
17 top an ECF thing. This one didn't.
18 That's why I asked. I'm sorry. Go
19 ahead.
20 BY MR. ROTH:
21 　　Q.　So in Neurontin, you offered
22 opinions on behalf of the class plaintiffs
23 related to the defendants' promotion; is that
24 right?
25 　　A.　And coordinated plaintiffs -- I

Page 347

1 was just trying to see -- yes, that's right.
2 　　Q.　And then your regression is in
3 paragraph 34.
4 　　A.　Yes.
5 　　Q.　And then in paragraph 40, under
6 Prices, there's a sentence toward the end
7 that says: The endogeneity of price and
8 promotion was handled using the standard
9 instrumental variables approach.
10 　　A.　Yes, that's correct.
11 　　Q.　And that's actually a different
12 endogeneity than what Datta and Dave were
13 describing.
14 　　A.　That's correct.
15 　　Q.　And is that endogeneity an
16 issue for you here?
17 　　A.　I think again, because we're
18 looking at a market average set of prices,
19 that that is not the same as thinking about
20 the simultaneity of price and quantities for
21 an individual manufacturer.
22 　　Q.　Okay. I've got one more source
23 for you. We're just taking the time machine
24 into the farther back.
25 　　A.　Oh my gosh, is there farther

Page 348

1 back? Yes.
2 　　　　(Whereupon, Deposition Exhibit
3 Rosenthal-14, 2003 Kaiser Family
4 Foundation Report, was marked for
5 identification.)
6 BY MR. ROTH:
7 　　Q.　Exhibit 14, Demand Effects of
8 Recent Changes in Prescription Drug
9 Promotion, the Kaiser Family Foundation, and
10 you are one of the authors.
11 　　　　Do you see that?
12 　　A.　I do.
13 　　Q.　And Professor Berndt is a
14 co-author of yours.
15 　　A.　That is correct.
16 　　Q.　And in this article, it looks
17 like you're analyzing whether increases in
18 direct-to-consumer advertising increased the
19 market share of an entire therapeutic class,
20 right?
21 　　A.　Yes. So maybe just briefly,
22 this analysis is a panel data study. We have
23 a couple of years of data, I think three
24 years of data, for five different classes of
25 drugs. And we do the analysis both at the

Page 349

1 class level and then at the individual
2 product level.
3 　　Q.　But at least a part of this was
4 aggregated, correct?
5 　　A.　At the class level, yes.
6 　　Q.　Okay. Let's look at page 14.
7 　　　　MR. SOBOL: What about page 1?
8 It's got a quote from Kessler on it.
9 　　　　MR. ROTH: Look at that,
10 David A. Kessler, along with laureates
11 Thomas Jefferson and F. Scott
12 Fitzgerald.
13 　　　　THE WITNESS: It would not be
14 appropriate to comment on the
15 quotations in this paper.
16 BY MR. ROTH:
17 　　Q.　So page 14 --
18 　　　　MR. ROTH: Hold on.
19 　　　　(Comments off the stenographic
20 record.)
21 BY MR. ROTH:
22 　　Q.　Hold on, Professor. I am on
23 the wrong page, I think.
24 　　A.　Okay.
25 　　Q.　Or hopefully not on the wrong

Page 382

1 prescribing?
2     A.    I'm sorry, can you explain
3 what -- what that would look like?
4     Q.    You're the economist.  You
5 probably have a better idea of how to put
6 that into a study.  But is that something you
7 considered doing?
8     A.    What is --
9         MR. SOBOL:  Objection to the
10     form.
11         You're the lawyer.  What's
12     illegal?
13         THE WITNESS:  Yes, sorry,
14     that's my question.
15         MR. ROTH:  I asked both of you.
16     A.    Well, as I understand this
17 case, it is not about illegal prescribing but
18 illegal promotion, and those are two
19 different things.
20 BY MR. ROTH:
21     Q.    Right.  But you understand that
22 there are doctors who have been criminally
23 convicted for illegally prescribing opioid
24 products?
25     A.    I -- yes, I do know there have

Page 383

1 been some prosecutions.
2     Q.    And you don't have any variable
3 in your model to account for that?
4     A.    I do not account for that in my
5 model, no.
6     Q.    You don't have any variable in
7 your model to account for diversion of
8 lawfully prescribed drugs to someone other
9 than the intended user?
10         MR. SOBOL:  Objection to the
11     form.
12     A.    Just to be clear, when -- when
13 thinking about what to put in a model, one
14 reason we might do it is we want to say this
15 is something separate from the variable of
16 interest.
17         But if, in fact, the allegedly
18 unlawful marketing caused diversion, then it
19 would not be appropriate to pull it out from
20 the model.
21 BY MR. ROTH:
22     Q.    Right.  But you could conceive
23 of a set of facts where diversion occurs in
24 the setting of perfectly lawful marketing and
25 prescribing?

Page 384

1     A.    Well, my model is currently
2 agnostic as to whether the prescriptions
3 caused by the unlawful conduct were diverted
4 or not.  It seems to me that it's a legal
5 question about, you know, whether it would be
6 appropriate to separately identify those.
7         As we started out our
8 conversation today, it makes sense to me as
9 an economist that what -- whatever happened
10 with those prescriptions after they left the
11 pharmacy, the fact that they generated
12 profits for the defendants is a reasonable
13 basis for recovery, again, on the notion that
14 recovery is intended to deter this kind of
15 conduct in the future.
16     Q.    Does your direct model have any
17 variable for formulary placement status?
18     A.    It does not.
19     Q.    Your direct model does not have
20 any variable for prescription drug coverage?
21     A.    As we discussed earlier, these
22 are not factors that I would expect to be
23 changing over time in a way that would
24 predict the sales of opiates as a class, so
25 if there are formulary changes, that may

Page 385

1 result in more generics, more of the
2 preferred brand versus the nonpreferred
3 brand.  I don't believe that those are
4 appropriately captured in a model like this.
5     Q.    Okay.  Why do you prefer
6 Model B to Model C?
7     A.    In part, because of that
8 counterintuitive effect that we talked about
9 before, with -- now I can't remember if it
10 was oxycodone or hydrocodone.
11     Q.    I think it was the hydrocodone
12 rescheduling.
13     A.    I think it was hydrocodone,
14 yes.
15         So that suggests to me that
16 that's -- whatever it's doing, it's not
17 picking up what I think it's supposed to be
18 doing.
19         It makes almost no difference
20 in the predictions, we looked at those
21 charts before, and you can see in the
22 adjusted R-squared there's almost no
23 difference, but it's -- to me it looks
24 like it's not the right way to capture
25 the effect of these events.

Page 386

BY MR. ROTH:

Q. And, actually, I think Model C has a slightly higher adjusted R-squared than Model B.

A. Yeah, just to be clear, it's one ten-thousandth of a point.

Q. But it is higher.

A. It is technically higher.

Q. If you were to put more of the events from Figure 5 into what is Model C, would that not be a fairly robust test of the predictiveness of Model B since Model C is really just Model B with the events added?

A. I guess I don't understand your question. If I were to put more events in Model C, would that be another test of Model B?

Q. Right.

A. I think the fact that -- that adding a subset of events that were, you know, displaced over time doesn't change ultimately the predictions in Model B, suggests to me that it's not going to be worthwhile.

And again, the counterintuitive

Page 387

coefficient on the hydrocodone rescheduling suggest to me also, as we continue to add more events, we'll get a certain amount of gobbledygook. I mean, that's just going to be true in a time series model.

In any econometric model, the goal is to include the important factors but be as parsimonious as possible. Adding all these events would not be parsimonious.

Q. I think I heard you a minute ago say that you rejected Model C in favor of Model B in part because of the hydrocodone rescheduling. Is there anything else that led you to make the decision that Model B was preferred?

A. It adds almost nothing.

Q. So it's really a function of almost essentially the same R-squared and you get this wonky result with hydrocodone's rescheduling that leads you to prefer Model B?

MR. SOBOL: Objection, asked and answered.

A. That's -- yes, that is in effect correct. I look at the two models, I

Page 388

see that they give almost the same predictions, the same actual predicted and but-for predicted, and it seems to me that Model C is not well specified in those five events, that they don't seem to work in the way that they're specified there, which is that they start happening at a point in time.

BY MR. ROTH:

Q. And yet, your breaks also occur at a point in time?

MR. SOBOL: Objection.

A. The breaks are doing something entirely different because they're interacting with promotion. They're saying, you know, we've estimated this underlying effectiveness of promotion and does that relationship shift at a point in time.

BY MR. ROTH:

Q. Okay. Model B suggests an R-squared of 99.36%.

A. Yes.

Q. So your model explains more than 99% of the variation in MMEs with promotion?

A. That's correct, and price.

Page 389

Q. So less than 1% of opioid MMEs are explained by anything but price and promotion?

A. That's correct.

Q. And you conclude that the predictive power of Model B is shown to be quite good?

A. Yes.

Q. Have you tried running your model removing promotion and just having price in the model?

A. I have not.

Q. If it showed negative MMEs, what would that mean for your model?

A. If we're removing promotion and -- I mean, I guess as we talked about in looking at Model A, it would suggest that there was something that's missing from the model. When we looked at the but-for MMEs as negative, that clearly it is not doing a good job of predicting the real world in which there were positive MMEs.

Q. What is overfitting?

A. Overfitting is when you include factors in the model such that you perfectly

Page 390

1  predict the dependent variable, that you've
2  saturated the model, which is why I don't add
3  more events to this model, where it's already
4  high.  Having an adjusted R-squared as high
5  as we do in this case in a time series model
6  is quite common.
7      Q.   How do you tell to see if a
8  model is overfit?
9      A.   I don't actually, as I sit
10  here, recall the specific test for
11  overfitting, but usually it's about
12  predicting out of sample and looking at how
13  well the model forecasts.
14      Q.   How does the R-squared of your
15  model in this case compare to R-squareds you
16  have from other models you've done of
17  promotion against sales?
18      A.   I don't recall specifically,
19  but I think we probably have a few in front
20  of us that we could look at.
21      Q.   Yeah.  I mean, does 99.36
22  strike you as one of the higher R-squareds
23  you've had or are all of your models perfect
24  in their predictions --
25      A.   Model A has an R-squared of

Page 391

1  88 -- well, 87.99, the adjusted R-squared.
2  So we have a range here.  Again, time series
3  models do typically have very high
4  R-squareds.  I don't know what they've been
5  in other models.
6          As we talked about before, this
7  is unlike the model, for example, that we did
8  in the Kaiser Family Foundation report where
9  we're looking at a couple of years for about
10  25 drugs and exploiting both time series and
11  cross-sectional variation.
12      Q.   You understand from the
13  literature that a very high R-squared in the
14  presence of substantial unmodeled
15  autocorrelation can be an issue?
16      A.   I think we've already talked
17  about the error structure here, and my
18  understanding is that my team looked at that
19  early on and concluded that it was not a
20  problem here.
21      Q.   Who from your team did that
22  work?
23      A.   That would be Forrest McCluer.
24      Q.   And what specifically did
25  Mr. McCluer do to test for autocorrelation?

Page 392

1      A.   Well, as we were talking
2  before, he was looking at the correlation
3  over time of the errors in the model.
4      Q.   And did you see the results of
5  his work?
6      A.   I did not see the results
7  specifically, no.
8      Q.   Is your direct model a linear
9  model or a nonlinear model?
10      A.   Well, it's nonlinear because of
11  the depreciation rate.  It is effectively run
12  using ordinary linear -- ordinary least
13  squares, but it's nonlinear because of the
14  interaction of the depreciation rate.
15      Q.   Is R-squared an appropriate
16  measure for nonlinear models in econometrics?
17      A.   The adjusted R-squared that we
18  report here is appropriate for this model.
19      Q.   Okay.  Let me mark as
20  Exhibit 18 an article from Spiess and
21  Neumeyer, An evaluation of R-squared as an
22  inadequate measure for nonlinear models in
23  pharmacological and biochemical research.
24          (Whereupon, Deposition Exhibit
25          Rosenthal-18, 2010 Spiess and Neumeyer

Page 393

1          Publication, was marked for
2          identification.)
3  BY MR. ROTH:
4      Q.   Do you see that?
5      A.   I do.
6      Q.   The title sounds pretty
7  relevant.
8          Were you aware of this paper?
9      A.   Not specifically.
10      Q.   Okay.  So this is a 2010 paper
11  in BMC Pharmacology.  It looks like Spiess
12  and -- is from the Department of Andrology at
13  the University Hospital Hamburg-Eppendorf in
14  Germany.
15          Do you see that?
16      A.   I don't actually see where the
17  authors --
18      Q.   I'm looking at the footnote.
19      A.   Uh-huh, yeah.
20      Q.   Okay.  So at page 1, at the
21  very bottom of the first column under
22  Background, it says:  Although it is known
23  now for some time that R-squared is an
24  inadequate measure for nonlinear regression,
25  many scientifics and also reviewers insist on

Highly Confidential - Subject to Further Confidentiality Review



Page 430

1  Do you see that?
2  A.  Yes.
3  Q.  Which is zero percent of the
4  contacts because it's obviously lower than
5  one-hundredth of a decimal place of the
6  contacts?
7  A.  Yes.
8  Q.  And still there's ▮▮▮▮▮
9  MMEs that are associated with oxycodone.
10  Do you see that?
11  A.  Yes.  It's --
12  Q.  Go ahead.
13  MR. SOBOL:  There's no question
14  before you.
15  A.  Yes.
16  BY MR. ROTH:
17  Q.  Well, and then we can see like
18  in Kadian, you've got ▮▮▮ contacts which
19  is ▮▮, and that's associated with
20  ▮▮▮▮▮ MMEs, right?
21  A.  Yes.
22  Q.  And you're not drawing any
23  conclusion about the effect of this extremely
24  small percentage of promotion and the number
25  of MMEs prescribed for those drugs, are you?

Page 431

1  A.  I think I've been extremely
2  clear that my analysis is an aggregate
3  analysis of the entire opioid class.
4  Q.  So where it says ▮▮▮▮▮
5  MMEs for oxycodone, what is that number?  Is
6  that all generic oxycodone from 1993 to 2018?
7  A.  Sold by Actavis.
8  Q.  Okay.  So all oxycodone sold by
9  Actavis based on counsel and Mr. McCluer's
10  assignment of drugs is in the MME column, and
11  there's ▮ promotional contacts in the data?
12  MR. SOBOL:  Objection.
13  A.  Well, again, instruction from
14  counsel identified the defendants.  You can
15  see here that oxycodone is -- the
16  manufacturer is just Actavis.  It seems
17  uncontroversial to me.  But yes, there are
18  ▮▮▮▮▮ MMEs of oxycodone that Actavis
19  sold between 1993 and 2018.
20  BY MR. ROTH:
21  Q.  So can you tell without digging
22  into the guts of the model what share Actavis
23  is being allocated for its ▮ oxycodone
24  contacts in your model?
25  MR. SOBOL:  Objection.

Page 432

1  Objection.
2  A.  Well, you can see it rounded
3  here to two decimal places.  The share of
4  contacts is obviously de minimis.
5  BY MR. ROTH:
6  Q.  But in terms of the way the
7  shares work in your Table 3, are you looking
8  at percent contacts to come up with that
9  number?  You're not; you're doing a revised
10  but-for analysis.
11  MR. SOBOL:  Objection.
12  A.  Yes, but the two things are not
13  disconnected.  So the way I construct
14  Table 3, as I mentioned before, is not
15  allocating on the basis of MMEs.  It's about
16  rerunning the but-for model and altering the
17  inputs in terms of detailing.
18  So the ▮ contacts for Actavis
19  are backed out when I back Actavis out of the
20  model in Table 3, so that all of the contacts
21  that you see here associated with Actavis,
22  that is what gets backed out of the model.
23  BY MR. ROTH:
24  Q.  So the ▮▮▮▮ of promotional
25  contacts?

Page 433

1  A.  ▮▮▮▮ yes.
2  Q.  So how is that resulting in an
3  overall allocation in Table 3 of ▮▮▮
4  MR. SOBOL:  Objection.
5  A.  ▮▮▮ -- well, I'm sorry.  I'm
6  afraid I misunderstand Table 3.  So let me
7  go back and explain Table 3 again.
8  So Table 3 starts out with the
9  same aggregate impact measure that I
10  calculate in Table 2, right, so that's the --
11  if all defendant promotion did not occur,
12  here's what percent of units would not have
13  been sold.
14  And then in Table 3, then I
15  say, okay, well, what if, in fact, the ▮▮▮▮
16  of detailing that Actavis was responsible for
17  according to my analysis -- what if that's
18  actually -- that doesn't get affected.  That
19  stays in the model.  Then I run another
20  prediction.  These are econometric
21  predictions based on Model B, and so the ▮▮▮
22  whatever percent ▮▮▮▮ now that's the
23  aggregate percent of all MMEs if Actavis'
24  conduct is no longer subject to recovery.
25  ///

Page 434

¹ BY MR. ROTH:
²    Q.    So to figure out what
³ percentage of causation each manufacturer's
⁴ having, you actually have to subtract the
⁵ percentage that you come up with from that
⁶ analysis from the baseline?
⁷       MR. SOBOL:  Objection,
⁸    mischaracterizes the testimony.
⁹    A.    If you wanted to know how
¹⁰ much -- how many MMEs Actavis' conduct
¹¹ specifically caused in the market overall,
¹² you would subtract those two numbers.
¹³ BY MR. ROTH:
¹⁴    Q.    So you would get ███ which is
¹⁵ close to the ███ of promotional contacts?
¹⁶       MR. SOBOL:  Objection.
¹⁷    A.    That's correct.
¹⁸ BY MR. ROTH:
¹⁹    Q.    So essentially -- and we can do
²⁰ this defendant by defendant, but it looks
²¹ like your allocations are just mirroring how
²² much each of these defendants promoted?
²³       MR. SOBOL:  Objection.
²⁴    A.    Well, they are not, but -- but
²⁵ it should be obvious that because the

Page 435

¹ challenged conduct is promotion, that if we
² look at taking defendants out of the impact
³ analysis, that the results would be
⁴ proportional to promotion, because that's the
⁵ thing that's being challenged.
⁶ BY MR. ROTH:
⁷    Q.    So whoever has the most
⁸ detailing contacts in the IPS data is going
⁹ to get the highest share under your Table 3?
¹⁰       MR. SOBOL:  Objection.
¹¹    A.    Well, again, Table 3 is not
¹² framed or interpreted as telling you how to
¹³ allocate damages.  It is intended for the
¹⁴ court to see, A, that it's possible to move
¹⁵ defendants in and out of the analysis, and,
¹⁶ B, what those effects would be.
¹⁷       Whether or not damages are
¹⁸ allocated on the same basis, that is
¹⁹ something about which I know nothing.
²⁰ BY MR. ROTH:
²¹    Q.    Okay.  So we talked about
²² allocating the detailing contacts, and I
²³ assume the questions I asked you about the
²⁴ process for doing that would be true whether
²⁵ we're talking about between defendants or

Page 436

¹ between defendants or non-defendants, it was
² Mr. McCluer with instruction from counsel
³ reviewing the sort of documents we just
⁴ reviewed here today?
⁵       MR. SOBOL:  Objection.  What's
⁶    the question?
⁷    A.    The --
⁸       MR. SOBOL:  No, I don't know
⁹    what the question is.  Is there a
¹⁰    question?  Or you want to just say
¹¹    "correct" at the end?
¹²       MR. ROTH:  I mean, come on.
¹³    All right.
¹⁴ BY MR. ROTH:
¹⁵    Q.    I asked you questions about how
¹⁶ detailing contacts were allocated.  Is the
¹⁷ process you described the same whether we're
¹⁸ talking about allocating among the defendants
¹⁹ or between the defendants and non-defendants?
²⁰    A.    The process of identifying
²¹ what -- in effect, what contacts should be
²² assigned to defendants was with counsel, and
²³ it was ultimately counsel's advice.
²⁴ Mr. McCluer assisted because he had the
²⁵ granular data, but ultimately, the

Page 437

¹ identification -- I mean, I'm not sure why
² it's different to say the identification of
³ what pieces of -- what products belong with
⁴ what defendants and what products belong to
⁵ non-defendants.  That's all one process.
⁶    Q.    Okay.  How does your model
⁷ allocate generic drugs?
⁸       MR. SOBOL:  Objection.
⁹ BY MR. ROTH:
¹⁰    Q.    The same way as we just
¹¹ discussed?
¹²       MR. SOBOL:  Objection.
¹³    A.    I don't know what you mean by
¹⁴ allocate.  My model measures the aggregate
¹⁵ impact of the challenged --
¹⁶ BY MR. ROTH:
¹⁷    Q.    I should say it differently.
¹⁸ How does Table C identify and associate
¹⁹ generic drugs with manufacturers?
²⁰       MR. SOBOL:  Objection.
²¹    A.    Table C, I mean, the process
²² for identifying the manufacturers and the
²³ drugs is the same for generics as it is for
²⁴ brand name drugs.  Those generic
²⁵ manufacturers are identified in the IPS --

Page 438

1 sorry, in both the IPS and the NPA data.
2 BY MR. ROTH:
3    Q.    And then looking back on
4 Exhibit 19, you reference that the marketers
5 were associated with entities pursuant to
6 marketing arrangements.  What did you review
7 on that score?
8    A.    I relied on counsel for that
9 information.
10        MR. ROTH:  I tell you what, why
11    don't we take five more minutes,
12    because I think it would benefit for
13    streamlining.
14        THE WITNESS:  Okay.
15        THE VIDEOGRAPHER:  The time is
16    4:57 p.m.  We're now off the record.
17        (Recess taken, 4:57 p.m. to
18    5:15 p.m.)
19        THE VIDEOGRAPHER:  The time is
20    5:15 p.m.  We're back on the record.
21 BY MR. ROTH:
22    Q.    To close the loop on this,
23 Professor Rosenthal, Table 3 is the output of
24 Appendix C and the way that promotional
25 visits and MMEs are affiliated with the

Page 439

1 defendants or non-defendants; is that right?
2        MR. SOBOL:  Objection.
3    A.    I guess I wouldn't say that
4 exactly.  Table C reflects the underlying
5 data structure that allows us to parse
6 defendants individually and collectively from
7 non-defendants in the promotional data.
8        Table 3 then relies on that
9 structure to produce alternative but-for
10 percentages.
11 BY MR. ROTH:
12    Q.    The purpose of putting Table C
13 together was to create Table 3?
14        MR. SOBOL:  Objection.
15    A.    I'm not sure that was its sole
16 purpose.  It was to be transparent about how
17 we are allocating drugs and their associated
18 promotion to defendants.
19 BY MR. ROTH:
20    Q.    Table 3 does not allow for a
21 defendant-specific breakdown of the effect of
22 that defendant's promotion, correct?
23        MR. SOBOL:  Objection.
24    A.    Table 3 provides an aggregate
25 measure of impact associated with defendants'

Page 440

1 promotion; it does not disaggregate that
2 across sales.
3 BY MR. ROTH:
4    Q.    And I think you said earlier,
5 for that you would have to do a disaggregated
6 model, and that's not something you were
7 asked to do, nor something you did?
8        MR. SOBOL:  Objection, form,
9    mischaracterizes the prior testimony.
10        MR. ROTH:  Okay.  Let me try it
11    again.
12 BY MR. ROTH:
13    Q.    In order to analyze the effect
14 of a specific defendant's promotion, you
15 would need to look at a defendant-specific
16 model to correlate its promotion to MMEs?
17        MR. SOBOL:  Objection,
18    mischaracterizes prior testimony.
19    A.    Well, I don't think so.  What I
20 have done, as you know, in the aggregate is
21 to look at all promotion and the extent to
22 which it impacted all sales.
23        And then in Table 3, the only
24 thing I'm trying to do is to identify if we
25 moved some set of promotion from the okay

Page 441

1 column -- from the not okay column back into
2 the okay column, how that would affect my
3 aggregate impact.
4        So I am looking discretely at
5 defendants' promotion.  But because I'm
6 interested in impact, whether or not it was
7 increasing my sales or increasing your sales,
8 I have, appropriate to my assignment,
9 included both of those things in that impact
10 analysis.  I have not been asked anywhere to
11 calculate the effect only on own sales.
12 BY MR. ROTH:
13    Q.    Table 3 allows you to assess
14 the impact of an individual defendant's
15 promotional contacts on the aggregate
16 promotion and aggregate MMEs?
17        MR. SOBOL:  Objection, asked
18    and answered.
19    A.    Yes, that's correct.  And just
20 to be clear, as we talked about before, the
21 purpose of Table 3 is not to allocate to
22 defendants.  I don't know how damages
23 ultimately will be allocated, but to
24 demonstrate that I could remove the conduct
25 of one of the defendants and still calculate

Page 442

1  aggregate impact.
2  BY MR. ROTH:
3      Q.    And, in fact, Table 3 does not
4  even allow you to isolate the impact of an
5  individual defendant's promotion alone on the
6  aggregate; it simply shows you the proportion
7  of that individual defendant's promotion to
8  the aggregate?
9          MR. SOBOL:  Objection, form,
10     asked and answered.
11     A.    I don't think that's correct.
12  As we talked about before, this is not the
13  purpose of the table.  But if you were to
14  look at the but-for percentage including
15  Purdue versus the but-for percentage
16  excluding Purdue, you would see the increment
17  that is due to Purdue's conduct.
18  BY MR. ROTH:
19     Q.    And that's essentially based on
20  Purdue's share of the promotional contacts in
21  the data?
22         MR. SOBOL:  Objection, asked
23     and answered.
24     A.    That is the way the aggregate
25  model works, yes.  It looks at all detailing

Page 443

1  and their effect on all sales.
2  BY MR. ROTH:
3      Q.    It's akin to a market share
4  analysis on the promotional data and the
5  number of contacts a given defendant has?
6          MR. SOBOL:  Objection, form,
7      asked and answered.
8      A.    Well, it's not strictly
9  speaking because the model has this time
10  series structure that marketing that occurs
11  at one point in time is not the same as
12  marketing that occurs at a different point in
13  time.  So it's not, strictly speaking,
14  proportional.
15  BY MR. ROTH:
16     Q.    But it is essentially a market
17  share analysis of each defendant's share of
18  contacts as modified by the time series
19  structure that you've imposed that we talked
20  about earlier today?
21         MR. SOBOL:  Objection.
22     A.    I just can't agree with that
23  statement.  It's not a market share analysis.
24  It is the result, the output of a time series
25  analysis of the effect of marketing on sales,

Page 444

1  and -- and then I alter a set of underlying
2  assumptions about what is in and what is out.
3          But it comes out of -- out of
4  this econometric model.  It doesn't -- it's
5  not simply a market share analysis.
6  BY MR. ROTH:
7      Q.    If you took all of the
8  defendants out of the model except for one,
9  what would the result of your table be?
10         MR. SOBOL:  Objection.
11     A.    Another number.  I haven't done
12  that.
13  BY MR. ROTH:
14     Q.    I mean, would that defendant
15  not just get the entire ███ or would there
16  be some other...
17     A.    No, that's not the way the
18  model works.
19         MR. SOBOL:  Objection.
20  BY MR. ROTH:
21     Q.    Okay.  But it wouldn't be --
22  that would not be a defendant-specific model;
23  that would just be isolating how your
24  aggregate model works when you just consider
25  one defendant's promotion?

Page 445

1      A.    Well, again, the aggregate
2  model would be the same, and if we said that
3  all the defendants were no longer going to be
4  subject to recovery except one, then we would
5  be left with the -- whatever the effect of
6  that defendant's promotion on sales was.
7      Q.    Have you compared the results
8  of altering your aggregate model using
9  Table 3 on a defendant-by-defendant basis
10  with each defendant's share of promotional
11  contacts in the data?
12         MR. SOBOL:  Objection, asked
13     and answered.
14     A.    Well, I think when you and I
15  were talking before the break, you made some
16  observation, but I have not, no.
17  BY MR. ROTH:
18     Q.    Okay.  When were you retained
19  by the plaintiffs in this case?
20     A.    In the summer.  I'm not sure
21  the date on the letter, but in the summer of
22  2018, sorry, to be clear.
23     Q.    Who was it that retained you?
24     A.    I was retained by co-counsel.
25  There are two Pauls and Joe Rice, and one of

Page 446

1  them is a Hanly, but I can't remember all
2  their names.
3      Q.   Okay.  Did you personally draft
4  your expert report?
5      A.   I did.
6      Q.   And did anyone else assist you
7  in the drafting of the report?
8      A.   I had some assistance from my
9  staff, yes.
10      Q.   And you've mentioned your
11  staff.  We said that was Greylock.  Can you
12  just give us the names of all the people who
13  were on your staff?
14      A.   Sure.  Yes, of course.  Forrest
15  McCluer, who is the senior economist they
16  mentioned earlier, particularly around the
17  technical aspects of the report.  I believe I
18  would have had some assistance, for example,
19  in summarizing the complaint from Renee
20  Rushnawitz.
21      Q.   Can you spell that?
22      A.   Yes, R -- well, Renee, is
23  R-E-N-E-E, and then Rushnawitz,
24  R-U-S-H-N-A-W-I-T-Z.
25      Q.   Okay.  Anyone else?

Page 447

1      A.   Not that I know of, but there
2  are -- there are junior staff, for example,
3  who work with Forrest and Renee, so I think
4  if you looked, you might see that there were
5  junior staff pulling articles, doing that
6  kind of thing, but not involved in drafting.
7      Q.   So I understand from earlier
8  today and attending their depositions that
9  there was some amount of coordination you did
10  with Professors Cutler, Gruber and McGuire
11  filing these reports; is that right?
12      A.   Yes.
13      Q.   Did you meet with each of the
14  three other professors about your reports in
15  person before March 25th?
16      A.   Yes, we had meetings with
17  counsel.
18      Q.   Do you recall how many meetings
19  you had with one or more of the Professor
20  Cutler group or McGuire try up frustrate
21  prior to March 25th with or without counsel
22  present?
23      A.   I believe there were perhaps
24  four face-to-face meetings from the time I
25  was retained to the filing of the report.  It

Page 448

1  may have been five.
2      Q.   And in addition to the four to
3  five face-to-face meetings, did you speak
4  with Professors Cutler, Gruber or McGuire
5  about either your work or their work on this
6  case?
7      A.   We had conference calls with
8  that group and with counsel for a period that
9  were weekly.
10      Q.   And do you recall how long the
11  in-person meetings were?
12      A.   Those in-person meetings I
13  think were -- they were largely half day
14  meetings.
15      Q.   And during those meetings, did
16  you present your analyses to each other on
17  slides or were they just conversations?  How
18  did those meetings work?
19          MR. SOBOL:  Just generally,
20      without the content.
21      A.   Generally there were high-level
22  presentations and discussions.
23  BY MR. ROTH:
24      Q.   And did you discuss with them
25  in general terms the analyses that ultimately

Page 449

1  became the output of your expert report?
2      A.   Yes.
3      Q.   And the models you would run
4  and the approaches you would take?
5      A.   Yes.
6      Q.   And I assume they shared their
7  approaches and models and general report
8  structures with you too?
9      A.   Yes.
10      Q.   Did you review drafts of any of
11  their reports and did they review drafts of
12  your reports?
13      A.   I -- what was the question.
14          MR. SOBOL:  With or without
15      counsel?
16      A.   Review drafts with or without
17  counsel?
18          MR. SOBOL:  Well --
19  BY MR. ROTH:
20      Q.   Were there drafts reviewed?  I
21  know I'm not going to get the drafts.  I just
22  want to know if you reviewed each other's
23  drafts?
24          MR. SOBOL:  Sure.
25          MR. ROTH:  And did the realtime

Page 462

1    Q.    And then the bureau of labor
2    statistics that's also used in the indirect
3    model?
4        A.    Yes.
5        Q.    The ARCOS data is in the
6    indirect model.  What is this health
7    resources services administration Area Health
8    Resource File?
9        A.    The Area Health Resource File
10   is sort of a metadata file.  It includes data
11   from other sources to describe various
12   dimensions of county-level health systems,
13   health measures.  So we also used that in the
14   indirect model, and I actually have to look
15   to see if we used in the Section X.
16       Q.    And then what about the CDC
17   surveillance epidemiology and end result
18   dataset?
19       A.    Those data track cancer, cancer
20   epidemiology.
21       Q.    How did you get access to the
22   electronic data that you list in
23   Attachment B?
24       A.    Attachment B includes some
25   publicly available data that anyone can

Page 463

1    obtain through the Internet, so that would
2    cover the ARC data, the ASEC data, the SEER
3    results, because we're not getting the SEER
4    microdata; they're aggregated.  And certainly
5    the morphine milligram equivalence from the
6    CDC is publicly available data, the Area
7    Health Resource File is publicly available
8    data.
9        The ARCOS data we obtained
10   through compass lexicon, the IQVIA data
11   counsel purchased on our behalf.  They won't
12   sell it to us directly for litigation
13   purposes.  They will sell to counsel.
14       Q.    And the --
15       A.    And the INCB are public.
16       Q.    And did you discuss with
17   counsel purchasing any additional IQVIA data
18   than the three set that you analyzed, IPS,
19   NPA or NSP?
20       MR. SOBOL:  I instruct her not
21   to answer.
22       MR. ROTH:  I asked her if she
23   talked about it.
24       MR. SOBOL:  Well, it would
25   carry the implication of the content

Page 464

1    of the conversation.
2    BY MR. ROTH:
3        Q.    Are you aware that you've sells
4    data beyond those three datasets that were
5    purchased?
6        A.    Yes.  I am aware they sell
7    other datasets.
8        Q.    Okay.  Did you sign any
9    protective orders to get access to the ARCOS
10   data?
11       A.    I did not, no.
12       Q.    And have you signed any data
13   use agreements related to any of the data you
14   looked at?
15       A.    No, but I don't know to what
16   extent, for example, the people who actually
17   have the data have signed those data use
18   agreements so I don't touch the data.
19       Q.    I didn't see any depositions
20   from any of the Cuyahoga or Summit County
21   witnesses on Attachment B, so I assume you
22   didn't review those?
23       A.    I did not.
24       Q.    Did you interview any of the
25   employees with other Summit or Cuyahoga

Page 465

1    County?
2        A.    My analysis is a national
3    analysis of the effect of detailing on sales,
4    so interviewing people in the bellwether
5    counties would if the really not make sense
6    as part of what I'm trying to do.
7        Q.    And you didn't rely beyond the
8    seven depositions you list any other
9    depositions in this case related to
10   defendants' marketing efforts?
11       A.    Again, I -- I don't find those
12   to be relevant to the main affect the here,
13   which is a quantitative analysis, and as I
14   noted in my report, economists generally
15   proceed using data to tell what people have
16   done in response to a stimulus rather than by
17   asking them to talk about it.
18       Q.    What did you do to prepare for
19   your deposition today?
20       A.    I reviewed my report, the
21   documents I rely on, including the articles,
22   basically everything in this Attachment B,
23   and I had conversations with counsel.
24       Q.    Okay.  Turning back to page 10
25   of your report, which is the handy summary

Page 466

1  chart?
2      A.    Yes.
3      Q.    Do you do this for every
4  report?
5      A.    I -- it's -- I like a handy
6  summary table.  It's something that is --
7  that we do often in writing federal grants.
8      Q.    I will tell you this is
9  excellent and I'm going to start forcing some
10  of the experts that we have to start doing
11  this?
12        MR. SOBOL:  It's the only thing
13  I understand in the whole report.
14        MR. ROTH:  It's nice, it's a
15  one-pager.
16  BY MR. ROTH:
17      Q.    So recognizing there's a lot of
18  nuance here, and we've already been through
19  your direct model fairly exhaustively and
20  we'll do the same for the indirect and the
21  Section X analysis tomorrow?
22      A.    Yes.
23      Q.    I want to touch briefly on
24  Section VII for a minute?
25      A.    Okay.

Page 467

1      Q.    Okay.  So Section VII, you
2  reviewed literature on the marketing of
3  opioids and shared examples from discovery
4  that corroborate the economic theory and
5  evidence on pharmaceutical marketing.  That's
6  what you said, right?
7      A.    Yes.
8      Q.    And we've talked about some of
9  that literature here today?
10      A.    We have.  We haven't gone into
11  detail on the transfers of value literature
12  related to opioids, but we can.
13      Q.    It's a tomorrow topic, unless
14  you want to stay late?
15      A.    No, that's fine.
16      Q.    But then on the discovery
17  materials, you know, you said you had very
18  specific requests for what you looked at.
19        Are those the documents you
20  looked at to come to the conclusions you do
21  in Section VII of your report?
22      A.    Yes.  The documents that I cite
23  in Section VII -- and again can you tell that
24  my quantification of the effect of promotion
25  on sales doesn't rely on some measure from

Page 468

1  this analysis, but this serves to give some
2  justification for the theory that I'm
3  pursuing that promotion affects sales and
4  that there are multiple mechanisms involved.
5        So I review them, I would say
6  in Section VII with that purpose in mind, not
7  with the purpose of being exhaustive.
8      Q.    Yeah.  And I think you said
9  earlier you're not marketing expert, right?
10        MR. SOBOL:  Objection.
11      A.    I am not here to offer an
12  expert opinion on marketing.  I think
13  Dr. Perri does that.
14  BY MR. ROTH:
15      Q.    Okay.  And to the extent that
16  you're offering comments in Section VII.B of
17  your report from paragraphs 43 to 48 related
18  to defendants' marketing documents, that's
19  really did you know with an eye toward
20  corroborating what the economic literature
21  shows in -- as you analyze in Section VI
22  about the relationship between promotion and
23  sales?
24      A.    Again, this was not intended to
25  be an exhaustive analysis, but to show that

Page 469

1  the documents provide examples both of the
2  economic idea that promotion is intended to
3  grow sales and of the multiple marketing
4  mechanisms that defendants use, so it
5  corroborates other -- other ways that I have
6  described the mechanism of interest here.
7      Q.    Beyond reading the documents
8  themselves, what other analytical approach
9  did you take to assessing defendants'
10  materials regarding the effects of promotion?
11      A.    Well, as I just said, I don't
12  use this analysis as an input in a
13  quantitative way to my subsequent analysis.
14  It is relate intended as you would see in any
15  economic paper as a review of the
16  institutional landscape that justifies the
17  particular model and sets up the empirical
18  analysis in a more qualitative way.
19      Q.    It's not really a separate
20  opinion as you bulleted it out.  It's more
21  context for the opinions that follow; is that
22  fair?
23        MR. SOBOL:  Objection.
24      A.    Again, I think an institutional
25  analysis is a part of most -- most reports

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL           )   MDL No. 2804
     PRESCRIPTION OPIATE       )
 4   LITIGATION                )   Case No.
                               )   1:17-MD-2804
 5                             )
     THIS DOCUMENT RELATES TO  )   Hon. Dan A.
 6   ALL CASES                 )   Polster
                               )
 7

 8

 9                    __ __ __
10             Sunday, May 5, 2019
                      __ __ __
11

          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12               CONFIDENTIALITY REVIEW
                      __ __ __
13

14

15

16        Videotaped Deposition of MEREDITH B.
     ROSENTHAL, Ph.D., VOLUME 2, held at Robins
17   Kaplan LLP, 800 Boylston Street, Suite 2500,
     Boston, Massachusetts, commencing at
18   8:04 a.m., on the above date, before
     Michael E. Miller, Fellow of the Academy of
19   Professional Reporters, Registered Diplomate
     Reporter, Certified Realtime Reporter and
20   Notary Public.
21

22

23                    __ __ __
24          GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
25               deps@golkow.com
```

Page 490

1 is not actually an industrywide model, is it?
2    A.    Again, industrywide for the
3 opioid industry?
4    Q.    Well, except you take out all
5 of the non-defendants from your model?
6    A.    Well, that's not true. The
7 model is all of the -- all of the opioids.
8 The but-for scenario takes -- leaves the
9 non-defendants as they were, but the model
10 concludes all of them.
11    Q.    Right. So in the but-for
12 scenario where you take out the
13 non-defendants, what did you do to compare
14 their promotional activities to the
15 defendants' promotional activities?
16        MR. SOBOL: Objection.
17    A.    Well, such a comparison is not
18 part of the overall analysis. Again, we've
19 talked about the Table C, which presents the
20 marketing by defendants and non-defendants,
21 so the data are in there.
22        The model itself includes
23 marketing for all opioids, and the but-for
24 scenario simply disaggregates and identifies
25 as a part of that process the marketing of

Page 491

1 non-defendants, but it does so only to
2 generate different predictions of what sales
3 would have been, so there -- I did not make a
4 statistical comparison between non-defendant
5 and defendant promotion.
6 BY MR. ROTH:
7    Q.    When you removed the
8 non-defendants, what did you do to confirm
9 that that did not take out, for example, the
10 non-rivalrous marketing and leave you with a
11 set of just the rivalrous marketing?
12        MR. SOBOL: Objection.
13    A.    What I'm examining in my
14 aggregate model is the net effect, rivalrous
15 market expanding of promotion, and so the
16 model calculates that average market
17 expansion effect and essentially all of the
18 rivalrous marketing, it nets out by
19 definition because to the extent that we're
20 talking about rivalrous marketing as defined
21 as moving market shares from one drug to the
22 other, which is basically the definition of
23 rivalrous marketing, all the pluses have to
24 net out with the minuses.
25        And so that -- that does not

Page 492

1 appear in the output of my model because it's
2 not relevant to my assignment. So by taking
3 out all of the -- actually, technically, it's
4 sort of a double negative. I actually leave
5 in all of the non-defendant promotion in the
6 but-for scenario because it would have
7 happened regardless of whether the
8 allegations are true or not.
9        By leaving that in, if it has
10 rivalrous components to it, if it has market
11 expanding components to it, whatever that is
12 will show up in my predictions.
13 BY MR. ROTH:
14    Q.    Yeah. What I'm trying to
15 understand is I think we agree that when you
16 look at an individual manufacturer there
17 could be endogeneity issues in the form of
18 price or in the form of detailing physicians
19 who are predisposed to prescribe their
20 product?
21    A.    If we were looking at an
22 individual manufacturer, we could have some
23 of those endogeneity concerns, but I do not
24 look at an individual manufacturer.
25    Q.    I understand that.

Page 493

1        Even if we look at a group of
2 manufacturers, we would still have
3 endogeneity concerns to a degree?
4        MR. SOBOL: Objection. Excuse
5 me. Asked and answered.
6    A.    It's my opinion that in this --
7 when we're looking at the level of the entire
8 opioid industry, that the conceptual basis
9 for such endogeneity concerns is really not
10 there, and even -- even if at the second
11 stage of my analysis I parse out some subset
12 of defendant, of manufacturers, sorry,
13 non-defendants, in particular, that in and of
14 itself doesn't raise a new endogeneity
15 concern. The model is estimated on the
16 marketwide effects.
17 BY MR. ROTH:
18    Q.    I'm trying to figure out where
19 the line is though. So like how many
20 manufacturers need to be included for all of
21 the endogeneity and rivalrous marketing
22 issues to just net out and show market
23 expansion as opposed to the effects of just
24 the subset you're looking at?
25        MR. SOBOL: Objection to the

Page 494

1  form.
2       You can answer.
3       A.   The rivalrous marketing will
4  always net out.  Again, it's just
5  mathematically true that by definition,
6  marketing that only moves market share, it
7  has to net out.  So that's just an identity.
8       That will always be true when
9  we look at any subgroup of products that
10  we -- that the rivalrous piece will net out.
11  It just has to.
12  BY MR. ROTH:
13      Q.   What about endogeneity?
14      A.   The endogeneity issue in my
15  opinion is where we have the entire opioid
16  class in the analysis.  It does not make
17  sense to think about this month-to-month
18  reverse causality for marketing as a whole
19  for the industry, relative to sales as a
20  whole for the industry.  It's not how
21  individual companies set their marketing
22  budgets.
23      It just doesn't make economic
24  sense to me, so for the analysis at hand,
25  looking at the entire opioid industry, I do

Page 495

1  not believe that there's a conceptual basis
2  for the same endogeneity concerns that we
3  might have with an individual drug or an
4  individual company.
5       Q.   Your analysis compares your
6  industrywide but-for scenario against a
7  scenario with just the defendant
8  manufacturers, correct?
9           MR. SOBOL:  Objection.
10      A.   So my analysis ultimately
11  compares the predicted -- the actual
12  predicted sales, so that's leaving everything
13  the same with a world in which we pull out
14  some subset of the marketing.
15  BY MR. ROTH:
16      Q.   So what I'm trying to
17  understand is I understand your position on
18  the big but-for scenario with the whole
19  industry, but why is endogeneity not a
20  concern for the pulled-out set of
21  manufacturers?
22          MR. SOBOL:  Objection.
23      A.   There's no estimation that's
24  going on there, so endogeneity is a concern
25  when we're estimating parameters using a

Page 496

1  regression model.  It is not -- the second
2  stage of my analysis is simply employing
3  those parameters to predict a different
4  scenario, and so endogeneity, it's -- it's
5  not a relevant construct for that prediction
6  piece.
7  BY MR. ROTH:
8       Q.   If you look at Exhibit 14, this
9  was the article you prepared for the Kaiser
10  Family Foundation in 2003, and if you look at
11  page 2, the last paragraph on the page, you
12  say:  In this paper, we examine the effects
13  of two types of promotional spending for
14  brands in five therapeutic classes of drugs,
15  using monthly aggregate data from August 1996
16  through December 1999.
17      Do you see that?
18      A.   I do.
19      Q.   So you actually looked at five
20  different classes of drugs.  Do you recall
21  what drugs they were?
22      A.   Antidepressants, nasal sprays,
23  nonsedating antihistamines, PPI's, which are
24  proton pump inhibitors, and number 5, let me
25  just look at -- there are some tables that

Page 497

1  are probably the easiest place.  I'm blanking
2  on the fifth one.  Cholesterol,
3  anticholesterol drugs.
4       Q.   Turn to page 14, please.
5       A.   Okay.
6       Q.   And on page 14 you say:  We
7  take account of the possibility that spending
8  on direct-to-consumer advertising and
9  physician promotion and product sales are
10  jointly determined by estimating instrumental
11  variables, IV, models where all three
12  variables are assumed to be endogenous.
13      Do you see that?
14      A.   Yes.
15      Q.   And I think you said yesterday
16  this article only solved for endogeneity at
17  the product level?
18      A.   I believe so, yes.
19      Q.   Okay.  And if you look at the
20  bottom of page 9, in the last paragraph it
21  says:  At the top level of the tree, which
22  represents the therapeutic class of drugs, we
23  estimate the impact of DTCA spending and
24  detailing in the context of a Cobb-Douglas
25  demand specification, double logarithmic.  In

Page 498

1  the analysis of competition at the individual
2  product level within each class we specify
3  and estimate three alternative models: 1, an
4  AIDS-type specification; 2, a logit model
5  with log of quantity share divided by, one
6  minus quantity share, on the left-hand side,
7  and prices and promotional spending on the
8  right-hand side; and 3, a Cobb-Douglas model
9  in log levels.
10      Do you see that?
11  A.   Yes, I do.
12  Q.   And then on page 15, under
13  Econometric Results, it says: We begin by
14  presenting results in Table 3 for the top of
15  the tree structure in Figure 2, the class
16  level quantity equations.
17      Do you see that?
18  A.   I do.
19  Q.   And then if you look at
20  Table 3, which is on page 25, the top two
21  lines say:  Class DTC and Class Detail, and
22  they have an asterisk that says Endogenous,
23  IV Estimated.
24      Do you see that?
25  A.   Yes, I do.  Actually, I can

Page 499

1  keep reading, but I think essentially the
2  class level estimates are the sum of the
3  individual product level estimates.  So
4  again, the instrumentation was at a product
5  level.
6  Q.   And then applied to the class
7  level through aggregation?
8  A.   That's right.
9  Q.   Okay.  And if you had
10  disaggregated individual drugs or
11  manufacturers in this case, you could have
12  applied an instrumental variables method to
13  each and aggregated them similarly here?
14      MR. SOBOL:  This case, the
15      opioids case, not this?
16      MR. ROTH:  Correct, so let me
17      reask it.
18      MR. SOBOL:  Yeah.
19  BY MR. ROTH:
20  Q.   If you had used disaggregated
21  individual drugs or manufacturers in the
22  opioids case we're talking about now, you
23  could have applied an instrumental variables
24  model to each individual drug and then
25  aggregated them as you did in this article?

Page 500

1  A.   Unlike the research question in
2  this paper, my assignment asks me to compute
3  the impact of the alleged misconduct at the
4  level of the class, the industry, opioid
5  industry as a whole.  And so it was not
6  appropriate for me to look at individual drug
7  level analyses.
8      I maintain that at that class
9  level, industry level, these endogeneity
10  questions do not pertain.
11  Q.   Did you test that hypothesis by
12  looking at an individual defendant or two to
13  see how the issues there compare to how your
14  model handles endogeneity?
15  A.   Since my assignment was an
16  aggregate assignment, I have conducted my
17  analysis at the aggregate level.  I have not
18  conducted my analysis at the level of an
19  individual defendant.
20  Q.   And, in fact, to confirm,
21  you've not reviewed any individual
22  defendant's marketing materials for any drug
23  at issue in this case?
24      MR. SOBOL:  Objection, asked
25      and answered.

Page 501

1  A.   I'm not sure what you mean by
2  that exactly.  I reviewed the documents that
3  you see I relied on in my report.  I would
4  consider those to be marketing materials.
5  BY MR. ROTH:
6  Q.   You've not reviewed any
7  manufacturer's marketing plan for any drug at
8  issue in this case?
9      MR. SOBOL:  Objection.
10  A.   Again, I'm not sure that that's
11  entirely correct.  I do cite to what I would
12  consider to be marketing plans.
13  BY MR. ROTH:
14  Q.   Okay.  Aside from the documents
15  reflected in Attachment B or cited in your
16  report, you've not reviewed any marketing
17  materials for any drugs at issue in this
18  case?
19  A.   Aside from materials cited in
20  my report, I've certainly not relied on any
21  of those marketing materials.
22  Q.   And aside from the depositions
23  reflected in Attachment B, you've not
24  reviewed any depositions from any
25  manufacturer's sales representatives?

Page 502

1   A.   Aside from the depositions that
2  I cite in my report, I'm not relying on any
3  other deposition testimony, no.
4   Q.   You've not reviewed any
5  testimony or other direct evidence from
6  doctors about how they were affected by a
7  given manufacturer's promotion?
8      MR. SOBOL:  Objection.
9   A.   As I note in my report, as an
10 economist, asked to examine the impact of the
11 alleged marketing misconduct, interviewing
12 physicians would not be a scientifically
13 appropriate methodology to ascertain impact.
14     We know that self-report is
15 unreliable, particularly when it comes to
16 behavior that may be socially unacceptable.
17 BY MR. ROTH:
18  Q.   So if doctors from Summit or
19 Cuyahoga County testified at trial that they
20 were detailed but it didn't affect them, as
21 an economist, you would dismiss that
22 testimony?
23     MR. SOBOL:  Objection.
24  A.   As an economist, I would rely
25 on the evidence about what people do and not

Page 503

1  what people say.  It's been demonstrated in
2  the literature, literature that I cite in my
3  report, that again, that self-report is not a
4  reliable basis for ascertaining impact, so I
5  would not rely on physician self-report.
6  BY MR. ROTH:
7   Q.   If defendants presented
8  testimony from 15 doctors at trial who all
9  said their prescribing practices were
10 unaffected by opioids promotion, would your
11 position be different?
12  A.   I do not believe that numeracy
13 overcomes bias.  There's no scientific basis
14 for such a conclusion, so no, I do not
15 believe that physician self-report is
16 reliable, even if there are 15 physicians.
17  Q.   So in your view as an
18 economist, the testimony of any number of
19 doctors regarding how they viewed the effect
20 of defendants' promotion has no relevance?
21  A.   I would not draw any conclusion
22 from such testimony for the purposes that my
23 report has been set forth.
24  Q.   You did not review any
25 manufacturer's disaggregated marketing data

Page 504

1  for the purpose of your analysis?
2      MR. SOBOL:  Objection, form.
3   A.   Again, in my report I cite
4  certain documents that have data in them
5  related to marketing.  I do not use those
6  data in my calculations.
7  BY MR. ROTH:
8   Q.   And I think you said yesterday,
9  you made a very specific request to look for
10 such data.  Do you remember that?
11  A.   I did, yes.
12  Q.   And why did you ask for that?
13  A.   When I started my work, I
14 wanted to know about what all the possible
15 data sources that would be available were.
16  Q.   And if you had a more robust
17 source of disaggregated marketing data across
18 defendants, would you have used that to model
19 promotion instead of the IQVIA data that you
20 used?
21     MR. SOBOL:  Objection.
22  A.   I can't say for sure, but I
23 wanted to find all the data that I could
24 from -- from discovery.
25     ///

Page 505

1  BY MR. ROTH:
2   Q.   You did not review any
3  manufacturer's detailing call notes?
4   A.   I did not review any detailing
5  call notes, no.
6   Q.   And I think you said this
7  yesterday, but just to confirm, you did not
8  comprehensively review all of any given
9  manufacturer's marketing budgets for a
10 specific drug in this case?
11     MR. SOBOL:  Objection, asked
12    and answered.
13  A.   I did not systematically review
14 those marketing budgets, no.
15 BY MR. ROTH:
16  Q.   And so when you calculate the
17 percentages in Table 3 of your report, as we
18 discussed, that's just a comparison of
19 removing each defendant's promotional
20 contacts in the data from the aggregate
21 model?
22     MR. SOBOL:  Objection, asked
23    and answered.
24  A.   Table 3 presents alternative
25 simulations of but-for scenarios in effect,

Highly Confidential - Subject to Further Confidentiality Review

Page 518

1  grow is not conceptually inconsistent.
2  BY MR. ROTH:
3      Q.   We agree that all detailing is
4  not equally effective?
5          MR. SOBOL:  Objection.
6      A.   I -- here I am trying to
7  estimate -- I am estimating the average
8  effect of detailing.  There may be some
9  variation in that effect, but I'm interested
10  in the aggregate impact.
11         And so the fact that my
12  analysis averages across some -- some
13  variation is not mathematically a problem.
14  It will still lead me to the right answer in
15  terms of the aggregate impact.
16  BY MR. ROTH:
17     Q.   I assume you agree based on the
18  way you've constructed Model B that the
19  effectiveness of detailing changes over time?
20     A.   That is what Model B captures.
21     Q.   Right.  Detailing that may have
22  been effective earlier in time may become
23  less effective over time as new information
24  comes to light?
25     A.   Well, I think the premise

Page 519

1  you're suggesting there is, again, it ignores
2  the addictive nature of the product, so once
3  a patient is using opioids and has increasing
4  needs for higher doses; whether or not the
5  specific messages are still in the mind of
6  their physician, they are nonetheless
7  addicted to the product or tolerant of the
8  product and requiring higher and higher doses
9  which will show up in my data as higher and
10  higher MMEs.
11         So I can't quite agree with the
12  premise and its relevance to the analysis.
13     Q.   Based on your last answer, I
14  assume you'd agree that when a patient
15  receives higher doses of opioids, that may be
16  a sign of tolerance as opposed to addiction?
17     A.   Yes, higher doses may be
18  tolerance and not necessarily addiction.
19  Again, I'm not a clinical expert, so I want
20  to be careful not to go too far with that.
21     Q.   In fact, a patient who is being
22  successfully treated with opioids for chronic
23  pain may become tolerant and need a higher
24  dose to achieve the same pain deterrent
25  effect?

Page 520

1      A.   I think we're getting a little
2  too far out of my expertise and into clinical
3  questions.
4      Q.   Do you believe that promotion
5  has a greater impact on the very first
6  prescription a physician writes for a therapy
7  like opioids or for subsequent prescriptions
8  the physician may write for the same drug?
9          MR. SOBOL: Objection.
10     A.   I'm not sure it makes
11  conceptual sense to distinguish that.  I
12  think that there is a -- there is an inherent
13  connection that happens when someone starts
14  on a medicine.  They have a higher
15  probability of being on that medicine next
16  month than someone who didn't start, right,
17  so that -- that would be a natural underlying
18  connection between the two things.
19         It may be that promotion also
20  has a reminder effect, and so that would be
21  an increment in addition to the fact of that
22  patients once on a drug may be likely to stay
23  on a drug.
24         I have not tried to distinguish
25  those factors.

Page 521

1  BY MR. ROTH:
2      Q.   Is that an issue that you have
3  studied or seen economic literature on,
4  whether promotion is more effective at
5  getting doctors to initiate a therapy versus
6  maintain a therapy they've already used in
7  the past?
8      A.   Again, for the purposes of my
9  analysis, I had no need or wish to
10  distinguish between those things.  I can't
11  point to a paper right now, but I believe
12  that maybe someone has done that.
13     Q.   I assume you're aware there are
14  different classes of opioids, correct?
15     A.   There are different molecules,
16  like oxycodone and hydrocodone, is that what
17  you're referring to when you say classes?
18     Q.   Well, there are different
19  molecules, that's one thing.
20     A.   Yes.
21     Q.   There are different
22  formulations, right?
23     A.   Yes.
24     Q.   There are different methods of
25  administration?

Highly Confidential - Subject to Further Confidentiality Review

Page 522

1　A.　Yes.

2　Q.　There's a patch, right?

3　A.　Yes.

4　Q.　There's that sublingual spray?

5　A.　Yes.

6　Q.　And then there's pills and

7　injectables, for example?

8　A.　Yes.

9　　　MR. SOBOL:　Film.

10　BY MR. ROTH:

11　Q.　Film?

12　A.　Yes, I'm aware that there are

13　different formulations.

14　Q.　And there's also

15　immediate-release opioids and

16　extended-release opioids, correct?

17　A.　Yes, that's correct.

18　Q.　And for the purpose of your

19　models, apart from the injectables, all of

20　those various forms of opioids are included?

21　A.　Yes, that's correct.

22　Q.　Did the manufacturers'

23　marketing budgets that you reviewed show

24　increased marketing spending over time?

25　A.　As I sit here, I don't recall.

Page 523

1　Q.　Would you agree that if the

2　depreciation rate augments the stock of

3　detailing over time, it would be irrational

4　to keep spending money on promotion?

5　　　MR. SOBOL:　Objection.

6　A.　No, I don't think that that

7　would be a conclusion that I would agree

8　with.

9　BY MR. ROTH:

10　Q.　And why not?

11　A.　The more effective your

12　marketing is, the more you want to spend on

13　it.

14　　　MR. SOBOL:　An answer I

15　　　understood.

16　BY MR. ROTH:

17　Q.　We spoke briefly about your

18　errata yesterday.　Can you just tell me how

19　did that errata come about?

20　A.　That came about from review

21　partly, my very careful review as I was

22　preparing for this deposition, and the staff

23　doing the same.

24　Q.　Got it.

25　　　And then why did it come in the

Page 524

1　form of a memo from Mr. McCluer to you and

2　Mr. Sobol?

3　A.　I'm not sure I can answer that

4　question.

5　Q.　But it sounds like the errors

6　were identified some by you and some by the

7　staff?

8　A.　Yes, that's correct.

9　Q.　Do you know who caught the

10　Table 3 error?

11　A.　That was me.

12　Q.　I feel bad for the staff on

13　that one.　And what about the --

14　A.　I'm not the yelling type.

15　Q.　And what about the statistical

16　significance error, was that you or the

17　staff?

18　A.　That was the staff.

19　Q.　Let's turn to your indirect

20　model.

21　A.　Okay.

22　Q.　So you talk about your indirect

23　model beginning at paragraph 78 of your

24　report.

25　　　And I guess just taking a step

Page 525

1　back before we get into specifics:　Do you

2　have a preference for your direct over your

3　indirect model in this case?

4　A.　I believe they have strengths.

5　Each of them has strengths, so in my

6　opinions, I have not favored one over the

7　other.

8　Q.　In general when you perform

9　regression analysis, do you have any

10　preference for a direct approach versus an

11　indirect approach?

12　A.　No preference.　I think these

13　kinds of models are really context specific.

14　Q.　And if you look at page 53,

15　paragraph 78, you start by saying: As noted

16　earlier, the direct method of estimation is

17　limited in part by the extent to which we can

18　measure and include in the models all of the

19　tactics allegedly employed by defendants,

20　including manipulation of various

21　professional societies and accrediting

22　bodies.

23　　　Did I read that correctly?

24　A.　Yes, you did.

25　Q.　And that's based on the

Page 526

1 allegations that you reviewed?

2     A.    That's correct.

3     Q.    Would you agree that if a

4 defendant did not engage in promotion other

5 than the detailing measured by the IPS data,

6 the direct model would be a more appropriate

7 measure of that particular defendant's impact

8 on the aggregate MMEs?

9     A.    My assignment was to calculate

10 aggregate impact, so I have not considered

11 how to calculate impact for a single

12 defendant.

13     As we talked about yesterday, I

14 think there are some complicated questions

15 about how to deal with the spillover effect,

16 so I have not undertaken to do that.

17     Q.    As we've discussed fairly

18 exhaustively, your direct Model B explains

19 over 99% of the variation in MME sales based

20 on the detailing data in IQVIA.

21     A.    Yes, it does.

22     Q.    Does that not suggest that the

23 effect of all of these other types of

24 promotion is negligible at best?

25     A.    It may well be the case that

Page 527

1 the amount of variation that is picked up by

2 a broader measure of promotion would not be

3 so much more.  The indirect model is

4 conceptually quite different, however.

5     Q.    So if you compare Table 5,

6 which is on page 61 -- let's take a step

7 back, lay some foundation.

8     A.    Sure.

9     Q.    So Table 5 on page 61 is the

10 output of your indirect model, correct?

11     A.    It is.

12     Q.    Okay.  We talked yesterday

13 about Table 2, which is the output of your

14 direct model and appears on page --

15     A.    Should I bend the corner so we

16 can go back and forth?

17     Q.    Yes, good idea.

18     So I want to compare the direct

19 output in Table 5 on page 61 -- sorry, strike

20 that.

21     I want to compare the indirect

22 model output in Table 5 on page 61 with the

23 direct model output in Table 2 on page 51.

24     A.    Okay.

25     MR. SOBOL:  Do we have a graph

Page 528

1 of this somewhere?

2     THE WITNESS:  Not in my report.

3     MR. ROTH:  Just for you.  I

4 don't think we've seen that.  I would

5 love to see it.

6 BY MR. ROTH:

7     Q.    So looking at the two tables

8 next to each other, I guess just first taking

9 the bottom line, in Table 2, the direct Model

10 B estimates that ████ of MMEs are

11 attributable to defendants' detailing.

12     Do you see that?

13     A.    Yes.

14     Q.    And in Table 5, the indirect

15 method suggests that ████ of MME shipments are

16 attributable to defendants' detailing; is

17 that right?

18     A.    That's correct.

19     Q.    So that's a ████ delta -- well,

20 that's a bad question because that's not how

21 math works.

22     MR. SOBOL:  Right.

23 BY MR. ROTH:

24     Q.    It's ████ higher -- well, the

25 numbers are what they are, but it's ████

Page 529

1 and ████ -- it's actually ████ higher, I think,

2 if I'm doing the math right.

3     A.    It is ████ percentage points or

4 about ████ higher than the direct estimate.

5     Q.    You said it better than I

6 could.

7     How is that possible given that

8 you had a 99% R-squared in the direct model

9 that your indirect model could estimate twice

10 as much impact by defendants' promotion?

11     A.    As I mentioned, they are

12 conceptually very different kinds of

13 analyses, so whether or not detailing

14 explains the vast majority of the variation

15 in sales, it does not account for -- it

16 accounts for a smaller percentage of total

17 sales, so the magnitude of effect is not the

18 same thing as the amount of variation

19 explained, right?

20     And the indirect model takes

21 the position that there are these long run

22 factors that may -- that we can see are

23 relevant to demand in -- across areas, and if

24 we extend those forward, looking at the

25 growth in MMEs only as a result of those

Highly Confidential - Subject to Further Confidentiality Review

Page 530

1 factors, that's another version of what the
2 world would have been like.
3         It assumes, again, that the
4 drivers of the massive growth we saw were
5 only related to defendant promotion, and so
6 it allows defendant promotion to affect sales
7 in a broader way than the direct model does.
8     Q.    In the direct model, I believe
9 you went through 2018; is that right?
10     A.    Yes.  There were differences in
11 data availability, so yes.
12     Q.    Right.  So that was what I was
13 going to ask you.
14         Direct goes through 2018,
15 indirect only goes through 2016?
16     A.    Yes.  And as I'm sure we'll get
17 to also, because the ARCOS data start in
18 1997, I do, I backcast for '95 and '96, but
19 really I'm starting in 1997.
20     Q.    Got it.  So direct, you go '95
21 to 2018; indirect, you go from '97 to 2016.
22     A.    That's correct.
23     Q.    Okay.  And that's just because
24 of just data limitations?
25     A.    That's correct.

Page 531

1     Q.    If you had the other years, you
2 would use them in the indirect model?
3     A.    That's correct.
4     Q.    If you look at paragraph 82 of
5 your report, you describe your indirect model
6 as a form of residual analysis.
7         Do you see that?
8     A.    Yes.
9     Q.    And can you explain what a
10 residual analysis is?
11     A.    Well, a residual is the
12 leftover part, and so a residual analysis is
13 an analysis that draws inferences not from
14 something included, but something excluded.
15     Q.    Sort of like in accounting,
16 when you depreciate something, what's left
17 after you've depreciated it is the residual?
18     A.    Is it?  Yeah, perhaps.
19     Q.    Except if the depreciation
20 somehow appreciates, but we won't go there
21 again.
22         What is the baseline of your
23 indirect model?
24     A.    The baseline for the indirect
25 model as I just mentioned is the 1997 level

Page 532

1 of MMEs.
2     Q.    And you chose that because that
3 was the earliest year available in ARCOS?
4     A.    Yes, that's correct.
5     Q.    How did you construct the
6 explanatory variables you used in the
7 indirect model?
8     A.    The explanatory variables come
9 from a variety of sources that I think we
10 reviewed at a very high level yesterday.
11 They're county level -- we haven't exactly
12 talked about.  So this is a county level
13 cross-sectional analysis and we bring in data
14 from a variety of government economic sources
15 and other sources to capture county-level
16 information.
17     Q.    And we spoke about this a
18 little yesterday with respect to Professor
19 Cutler.
20     A.    Yes.
21     Q.    But the same question for you:
22 Why did you decide to use national data and
23 do a national model for direct regression,
24 but then do your indirect regression analysis
25 based on county-level data?

Page 533

1         MR. SOBOL:  Objection, asked
2 and answered.
3     A.    Sure.  The time series analysis
4 that I did is appropriately done at the
5 national level.  We're trying to calculate
6 national aggregate impact and the factors
7 that drive sales over time make sense to do
8 in -- at a national level there.  We don't
9 have promotional data at a county level, so
10 it would not be possible to do a direct model
11 at this level.
12         On the other hand, and this is
13 why the indirect model complements the direct
14 model, we can look cross-sectionally at
15 variation in these socioeconomic and
16 demographic variables because there's a fair
17 amount of cross-sectional variation, and get
18 reasonably precise estimates of the effect of
19 those factors on MMEs.
20         And so the cross-sectional
21 model works at the county level, and then
22 rather than having to estimate the effects of
23 those variables over time, we can trend them
24 forward based on the cross-sectional
25 analysis.

Page 554

BY MR. ROTH:

Q.   That's right.  So let's look at Exhibit 22, which is the data appendix that I believe you shared with Professors Cutler and Gruber?

A.   That's right.  As I mentioned, the ARCOS data for me come through Compass Lexecon.

Q.   Okay.  So we spoke yesterday about who helped you with your report, and it was Greylock McKinnon.  Other than giving you the ARCOS data, did Compass Lexecon have any role in the preparation of your expert report?

A.   No role in the preparation of my expert report, no.

Q.   And did you speak with anyone from Compass Lexecon directly?

A.   Yes, we talked about those meetings, and perhaps some of the calls, there were people from Compass Lexecon on those.

Q.   But in terms of your regression analyses and running the Wald statistical tests, that was all Greylock and yourself;

Page 555

that was not Compass Lexecon?

A.   Yes, that's correct, my staff ran these.

Q.   Okay.  So if we look at Exhibit 22, turn to page 11, and it's a section on the ARCOS prescription shipment data.

Do you see that?

A.   Yes.

Q.   Do you know who prepared this document?

A.   I do not, no.

Q.   It was not you or your staff as far as you know?

A.   It was not me or my -- it certainly was not me.  I do not believe it was my staff.

Q.   So on the top of page 12, it says:  The Drug Enforcement Agency, DEA, provides data on shipments of prescription opioids over time and across geographies.  This appendix describes the source of these data and the steps taken to process and set up the data for analysis.

Do you see that?

Page 556

A.   Yes.

Q.   Then also on page 12, we'll get to this later, but it shows the DEA drug codes and names in the ARCOS data which are at the molecule level.

A.   That's right.

Q.   And that was why you couldn't separate out the Schedule IIIs, as we discussed?

A.   That's correct.

Q.   And then if you turn to page 13, the next page.

A.   Yeah.

Q.   Sorry, it's actually on page 14.  That's my errata.

Do you see the section mapping shipments from three-digit ZIP codes to counties?

A.   Yes, I do.

Q.   It says:  As noted above, the most detailed geographic area reported in the public ARCOS reports is the three-digit ZIP code.  Three-digit ZIP codes are based on the first three digits of standard U.S. postal ZIP codes.  These areas typically, but not

Page 557

exclusively, span across more than one county and thus are not directly comparable to the county level of data available for mortality, crime and geographic -- I'm sorry, crime and demographic and economic statistics.

Do you see that?

A.   I do.

Q.   And were you aware of that issue?

A.   I was at one level.  I had forgotten that there was a cross-walk from three-digit ZIPs, which themselves, again, are geographic areas that vary in terms of how big they are.

Q.   Do you know how Cuyahoga County compares to the three-digit ZIPs that are reflected in the ARCOS data for that area?

A.   I'm sorry, I do not.

Q.   Do you know how Summit County compares to the three-digit ZIPs for that part of Ohio?

A.   No, I did not.

Q.   And if you look at page 15, it says:  In order to link the ARCOS shipments data to the other county data, we have

Highly Confidential - Subject to Further Confidentiality Review

Page 558

1 allocated shipments based on the weighted
2 average population of census block centroids,
3 center points that fall within each county
4 that a three-digit ZIP code crosses. And
5 then this means that when a three-digit ZIP
6 code crosses county boundaries, we use the
7 population at the census block level to
8 estimate the share of population across
9 counties for the three-digit ZIP.
10     Do you see that?
11     A.   I do.
12     Q.   An underlying assumption to
13 this approach is that the shipments per
14 capita within a three-digit ZIP code are the
15 same across census blocks.
16     Do you see that?
17     A.   Yes.
18     Q.   And when it says "we have
19 allocated," do you know who did that work?
20     A.   Compass Lexecon, but I don't
21 know who in particular.
22     Q.   And did you do anything to test
23 Compass Lexecon or whomever's underlying
24 assumption that shipments per capita within a
25 three-digit ZIP code are the same across

Page 559

1 census blocks?
2     A.   I did not, no. I don't think
3 it's possible to do that with these data
4 because there aren't census block level data
5 in ARCOS.
6     Q.   And then they explain their
7 methodology below with the mathematical
8 formula of how they allocated ARCOS drug
9 shipment totals to the counties based on
10 population share?
11     A.   That's right.
12     Q.   And that's not an analysis
13 you've seen before?
14     A.   I'm sorry, what do you mean?
15 I've seen this data appendix.
16     Q.   Have you seen the analysis for
17 how Compass Lexecon allocated ARCOS shipments
18 to the counties?
19     A.   I guess I don't know what you
20 mean by "seen." I understand that they
21 allocated based on population using this
22 formula, so have I seen the individual
23 calculations, is that what you're asking?
24     Q.   Correct.
25     A.   No, I have not.

Page 560

1     Q.   Okay. And you would agree that
2 just because a product is shipped to certain
3 counties does not mean it's consumed there?
4     MR. SOBOL:  Objection, asked
5     and answered.
6     A.   I think as explained in -- in
7 the Cutler report, and Gruber may have said
8 it also, to the extent that shipments are
9 moving from one county to another, this
10 regression methodology will -- it will just
11 contribute to noise essentially in the
12 regression.
13     So it's -- that -- the fact
14 that there may be understatement of shipments
15 in Ohio -- I think that's the premise here --
16 because there's overstatement somewhere else
17 because they moved from one place to another,
18 that itself won't bias this analysis. It may
19 create some noise.
20 BY MR. ROTH:
21     Q.   What is your basis for thinking
22 there's an understatement of shipments to
23 Ohio in the ARCOS data?
24     A.   Well, again, it's really
25 reading Cutler and Gruber's reports and the

Page 561

1 notion of the -- I guess it was the
2 Oxy Express, so the shipments go to Florida,
3 but they ultimately end up in Ohio and
4 Kentucky and places like that.
5     Q.   And have you done any analysis
6 as to how the Oxy Express influenced
7 consumption of prescription opioids in Ohio?
8     A.   No, I have not.
9     Q.   Do you agree that the census
10 data on population is not necessarily
11 connected to where opioids are consumed?
12     A.   Allocating shipments based on
13 population is a reasonable approach, and I
14 think, you know, as they say in footnote 24,
15 this is -- it's very common that we make such
16 geographic cross-walks just because the way
17 data are presented. It's a reasonable basis
18 for allocating shipments in my opinion.
19     Q.   I understand you think it's a
20 reasonable basis. I'm not asking that.
21     I'm just asking the factual
22 question. Where the population is shown in
23 the census data is not necessarily correlated
24 to where the shipments are consumed?
25     MR. SOBOL:  Objection.

Page 562

1    A.    Well, it almost --
2          MR. SOBOL:  Asked and answered.
3    A.    It almost certainly is
4    correlated because you need peoples -- people
5    to have consumption, but exactly what the
6    relationship is, I can't say for sure.  But
7    again, it almost surely is a major factor in
8    determining where the consumption is.  It may
9    not be perfectly correlated.
10   BY MR. ROTH:
11   Q.    And people don't necessarily
12   consume prescription opioids in their homes,
13   right?
14         MR. SOBOL:  Objection.
15   A.    Well, I don't think that that's
16   the -- that's the relevant question for my
17   analysis.  Again, I'm really looking at what
18   factors predict shipments so, wherever
19   people consume them.
20   BY MR. ROTH:
21   Q.    But you understand that your
22   analysis is feeding into Professor Cutler's
23   analysis and Professor McGuire's analysis who
24   are trying to compute harms and damages
25   occurring within Summit and Cuyahoga County?

Page 563

1    A.    It's true, but the way my
2    indirect analysis feeds into Professor
3    Cutler's analysis is in the aggregate.
4    Q.    If you turn to paragraph 84,
5    that lists, all the variables you
6    include in the indirect model; is that
7    correct?
8    A.    Yes.
9    Q.    So you've got three categories,
10   demographic, economic and healthcare
11   variables.
12   A.    That's right.
13   Q.    Let's take those one at a time.
14         So the demographic variables
15   you include are essentially gender, male
16   versus female?
17   A.    Yes.
18   Q.    The percent in different age
19   groups set out in your report as to how you
20   divided them, it looks like into five
21   different age -- six different age group --
22   five different age groups?
23   A.    Sure.  Sorry, these are just
24   standard census categories.
25   Q.    Okay.  Another demographic

Page 564

1    factor you included is the percent of the
2    population that is white, black and
3    Hispanic --
4    A.    Yes.
5    Q.    -- so race.
6          And then the share of the
7    population in four different education
8    groups, correct?
9    A.    Yes.
10   Q.    And the percent of the county
11   identified as urban, correct?
12   A.    That's right.
13   Q.    And are all of those census
14   categories?
15   A.    I believe so, yes.  I think
16   they all come from the ASEC that we talked
17   about.
18   Q.    Okay.  And then in the second
19   category, economic variables, you included
20   the unemployment rate?
21   A.    Yes.
22   Q.    You included
23   employment-to-population ratio?
24   A.    Yes.
25   Q.    You included the distribution

Page 565

1    of employment by major industry sector?
2    A.    Yes.
3    Q.    You included median household
4    income?
5    A.    Yes.
6    Q.    You included the poverty rate?
7    A.    Yes.
8    Q.    And you included the county's
9    population?
10   A.    Yes.
11   Q.    And then for healthcare, you
12   only included two variables, correct?
13         MR. SOBOL:  Objection.
14         You can answer.
15   A.    Yes, I included two healthcare
16   variables.
17   BY MR. ROTH:
18   Q.    And one was the percentage of
19   the population without insurance, correct?
20   A.    That's correct.
21   Q.    And the second variable is the
22   number of cancer deaths, correct?
23   A.    That's correct.
24   Q.    Why did you include a variable
25   to account for the percentage of the

Page 566

1 population without insurance?
2     A.    I included that variable
3 because I thought that there might be
4 relatively widespread coverage differences
5 across counties and that that might explain,
6 as I think we talked a little bit about
7 yesterday, the extent to which people go to
8 the doctor and therefore get a prescription,
9 and also, their likelihood of filling a
10 prescription.
11     Q.    Insurance coverage, though, is
12 not a variable you included in your direct
13 model?
14     A.    That's correct.  And I'm sure
15 we'll continue to come back to this, but the
16 cross-sectional variation, insurance coverage
17 is a lot more substantial across counties
18 than it is over time.
19     Q.    In your -- what I'll call
20 thought experiment, which we'll talk about in
21 a minute, you include as potentially
22 medically allowable prescriptions, surgery
23 and trauma; is that right?
24     A.    Yes.  I guess we'll discuss the
25 right words to describe that, but yes, so as

Page 567

1 the potentially appropriate uses, something
2 like that I think is what I say, that
3 surgical and trauma conditions, yes.
4     Q.    But in your indirect model you
5 don't have any variables for either surgery
6 or trauma?
7     A.    I do not, no.
8     Q.    And why is that?
9     A.    Well, the data from the
10 healthcare utilization project that we
11 will -- we'll talk about later, those cannot
12 be disaggregated.  There are some state-level
13 data, but they're considered to not be
14 reliable for that purpose, so those are
15 national data only.
16         And ultimately, the trends in
17 those -- sorry, wrong question, I was
18 answering the direct model.
19         And ultimately, those factors,
20 the numbers there, I don't believe that we
21 have reliable estimates across counties over
22 the entire time period.
23     Q.    I'm a little confused because
24 you just said the surgery and trauma
25 figures --

Page 568

1     A.    Yeah.
2     Q.    -- cannot be disaggregated, but
3 I thought in your last section you have a
4 disaggregation of potentially appropriate
5 MMEs for Summit and Cuyahoga that includes
6 trauma and surgery.
7     A.    Yeah, the HCUP data, those data
8 are not at the county level.  The other data
9 are at the county level, the Area Health
10 Resources File.  So I was distinguishing
11 between those two.
12         And in general, you can see,
13 when we get to the appropriate uses, that
14 the -- those trend downwards, and so even if
15 we were to include those in the model and
16 they had a cross-sectional relationship, it
17 would not cause the indirect estimate to be
18 increasing.
19     Q.    But you didn't actually include
20 those in the model?
21     A.    I didn't, no.
22     Q.    Did you consider any other
23 variables to include in any of the three
24 categories, demographic, economic or
25 healthcare, in your indirect model, aside

Page 569

1 from the ones we've discussed?
2     A.    No, these are the variables --
3 these variables are based on previous
4 literature, all of those demographic and
5 socioeconomic variables come from an
6 assessment of what has been shown to be
7 associated with opioid use.
8     Q.    And what literature assessing
9 the variables associated with opioid use are
10 you relying on?
11     A.    Well, I don't think I have a
12 citation in here, so I don't know a specific
13 paper as I sit here.  Again, these are --
14 these are variables that economists studying
15 opioid use have used from the census data.
16         This is the source of data that
17 have been used by researchers.  I think most
18 of that literature is cited in Professor
19 Cutler's report.
20     Q.    Okay.  And is -- was the list
21 of variables you would use in your indirect
22 model a subject of discussion between
23 yourself and Professor Cutler?
24     A.    I can answer that if counsel
25 were present?

Page 570

1　　　　MR. SOBOL: Well, yes or no.
2　　A.　Yes.
3　BY MR. ROTH:
4　　Q.　So if you look --
5　　　　MR. SOBOL: You got so used to
6　　just running on that you forgot you
7　　could answer yes or no.
8　BY MR. ROTH:
9　　Q.　If you look at page 25 of
10　Exhibit 22.
11　　A.　Okay. This is the data
12　appendix?
13　　Q.　Yes.
14　　A.　Yeah. The Table 2?
15　　Q.　Yes.
16　　　　So this is a table that
17　reflects economic and demographic variables
18　with data sources and years reported.
19　　A.　Uh-huh.
20　　Q.　And this is the shared
21　appendix, but I assume these are the
22　variables we've been discussing that you used
23　in your indirect regression?
24　　A.　Yes, they are.
25　　Q.　Okay. So if you look at

Page 571

1　several of the rows, there's a shaded gray
2　bar that says Interpolated.
3　　　　Do you see that?
4　　A.　Yes, that's right.
5　　Q.　And what does that mean?
6　　A.　Well, some of the variables
7　come only from the decennial census, so we
8　have them for every ten years, so a linear
9　interpolation was used between those ten-year
10　points.
11　　Q.　And how do you know it was a
12　linear interpolation?
13　　A.　Well, I should read more
14　closely. I believe it is a linear
15　interpretation, but my memory is not to be
16　trusted.
17　　Q.　You know what, you're right.
18　Actually, it says that at the bottom of the
19　chart. Interpolated values are a linear
20　interpolation between the preceding and
21　following measured value.
22　　A.　Someone should do something
23　about that font size.
24　　Q.　Who performed the linear
25　interpolation on the census data for the

Page 572

1　variables that were interpolated?
2　　A.　I do not know the specific
3　individual. These were constructed by
4　Compass Lexecon.
5　　Q.　Did you consider picking a year
6　where you did not need to do interpolation,
7　such as the year 2000, as your baseline?
8　　A.　No, I did not consider that.
9　　Q.　Are you using interpolated
10　values for these variables in your 1997
11　baseline?
12　　A.　Yes, I am.
13　　Q.　Is it possible the interpolated
14　variables affect the baseline estimated
15　relationship between the explanatory
16　variables and shipments per capita per day?
17　　　　MR. SOBOL: Objection to form.
18　　A.　These socioeconomic and
19　demographic variables change very slowly, and
20　I believe the linear interpolation method is
21　entirely appropriate.
22　　　　I do not believe that they are
23　likely to cause any impact on my analysis,
24　but if any, they would be a source of
25　mismeasurement, which would dampen -- which

Page 573

1　would basically cause noise, but not bias.
2　BY MR. ROTH:
3　　Q.　Have you studied the linear
4　interpolation that was done and how it might
5　impact your analysis?
6　　A.　Well, I'm not exactly sure how
7　one would study such a thing. Again, we
8　undertake the interpolation because those
9　data were not captured in those years, so
10　there's not a gold standard to compare the
11　linear interpolation to.
12　　Q.　But what you could do is pick a
13　year where no interpolation were needed and
14　compare the results from that year, say 2000,
15　against '97 with the interpolation?
16　　　　MR. SOBOL: Objection.
17　　A.　Well, as we discussed earlier,
18　my effort was to undertake the
19　cross-sectional analysis in a year that was
20　unaffected by the alleged misconduct, and
21　1997, while imperfect, is a bit closer to
22　that.
23　　　　2000 would be a time period in
24　which the alleged misconduct was well under
25　way, so I did not consider such an analysis.

Page 622

1    A.    Sure.

2    Q.    And what papers would I read to

3 describe how to conduct a proper simulation

4 in economics?

5    MR. SOBOL:  This one.

6    A.    Simulations are used in a whole

7 variety of settings.  In general, the

8 cost-effectiveness literature uses simulation

9 as a primary methodology.

10 BY MR. ROTH:

11    Q.    Okay.  As you sit here now, can

12 you think of a specific economics

13 peer-reviewed paper that uses a simulation

14 approach akin to the approach you take in

15 Section X of your expert report?

16    A.    As I sit here, I couldn't come

17 up with a citation for you.  My -- my recall

18 for article names is not that good, but this

19 is -- this is a pretty common approach,

20 particularly when it comes to looking at the

21 effects of policies, proposed policies.

22    Q.    Have you published any research

23 yourself that utilizes the same type of

24 simulation approach that you outlined in

25 Section X of your expert report?

Page 623

1    A.    I have a recent paper that

2 simulates a policy proposal that would, in

3 effect, tax companies that raise their

4 prescription drug prices above either the CPI

5 or some other particular threshold, so that

6 uses a simulation approach.

7    Q.    And if we look at Attachment A,

8 which is your CV, can you show me which paper

9 you're talking about?

10    A.    Yeah, let me just see.  It was

11 just published this year, but I think it

12 should be on there.  Sorry, that's my other

13 documents.

14    It's article 119.

15    Q.    Article 119.  Generic

16 prescription drug price increases, which

17 products will be affected by proposed

18 anti-gouging legislation?

19    A.    That's correct.

20    Q.    Beyond that article in -- 119

21 that you just identified, can you think of

22 any other peer-reviewed publications you've

23 authored that utilize the same type of

24 approach you outline in Section X of your

25 report?

Page 624

1    A.    There is another one.  Let me

2 see if -- I just need to figure out what year

3 it was.

4    Article 34.

5    Q.    It's helpful that you number

6 things, by the way.

7    So that's State and Federal

8 approaches to health reform:  What works for

9 the working poor?

10    A.    That's correct.

11    Q.    Okay.  Anything beyond those

12 two?

13    A.    I think that -- well, actually,

14 I mention cost-effective analysis, and the

15 article 115 is a cost-effectiveness analysis

16 that uses a microsimulation model.

17    Q.    Cost-effectiveness of Financial

18 Incentives for Patients and Physicians to

19 Manage Low-Density Lipoprotein Cholesterol

20 Levels?

21    A.    That's correct.

22    Q.    Okay.  So now we have three.

23 Any others?

24    A.    As far as I know, those are the

25 relevant articles on my CV.  Again, a

Page 625

1 simulation is commonly used as either a whole

2 analysis or as part of an analysis.

3 Sometimes researchers will take parameters

4 that they estimate and then use them to

5 simulate a policy change.

6    Q.    And you've said a couple of

7 times now, it's used to simulate a policy

8 change.

9    Can you explain what you mean

10 by that?

11    A.    Well, in the case of the last

12 article that we just talked about that we

13 undertook a randomized control trial of

14 financial incentives for doctors and patients

15 to control cholesterol better, and we took

16 what we learned in that randomized control

17 trial and said what would happen basically if

18 employers were to adopt this widely or if

19 health insurance companies were to adopt this

20 widely, what would happen to cholesterol

21 control and downstream healthcare

22 expenditures that would result.

23    Q.    And to do that, you used a

24 simulation similar to the one you used in

25 Section X of your report?

Highly Confidential - Subject to Further Confidentiality Review

Page 626

1    A.    Yes, it's based on the same
2  premise.  We have some epidemiologic data and
3  then some information about the relevant
4  behaviors, and in this case, the treatment
5  patterns for the patients.
6    Q.    And you call this analysis a
7  simulation study or is there some other term
8  I should be using?
9    A.    I call it a simulation, and as
10 you can see, I then call it a thought
11 experiment.
12   Q.    Yeah.  And it's simple
13 simulation and a thought experiment, so I
14 wasn't sure which is best.  We may use both
15 interchangeably, if that's okay.
16   A.    Sure.
17   Q.    What is the appropriate
18 methodology in economics for conducting a
19 simulation study such as the one that you
20 have in paragraph 10 of your report?
21   A.    Well, again, as I mentioned, a
22 simulation generally involves some relevant
23 population and then some behavioral
24 parameters.  And, I mean, the context will
25 vary.

Page 627

1         In other contexts, we're
2  looking at patients and their health
3  behaviors.  Simulations are frequently done
4  around tax policy, so the relevant behaviors
5  have to do with labor supply, for example.
6         And I do call this a simple
7  simulation here because the only parameters
8  I'm looking at are treatment patterns.
9    Q.    If I wanted to find some
10 peer-reviewed treatise or article that told
11 me what the appropriate methodology is for a
12 simple simulation such as the one you conduct
13 in Section X of your report, where would I
14 look?
15   A.    I am not sure that there would
16 be a single treatise.  I think to the extent
17 that there are methodological frameworks, I
18 think they're likely context specific.
19   Q.    So to figure out what the
20 appropriate generally accepted economic
21 methodology is for a simulation, I would have
22 to review a bunch of articles that run
23 simulations and determine the best approach
24 myself?
25   A.    I don't know if there's a

Page 628

1  single methodological paper that would apply
2  here.
3    Q.    Okay.  So back to
4  paragraph 91 --
5    A.    Okay.
6    Q.    -- you say at the end of the
7  paragraph:  In this section, I use
8  epidemiological data and a simple simulation
9  approach.
10        We talked about that.
11        And then the rest of the
12 sentence says:  To approximate the portion of
13 the increased prescribing caused by the
14 allegedly unlawful promotion -- I think I
15 meant "that could possibly be associated."
16   A.    Yes.
17   Q.    Okay.  So when you say
18 promotion that could possibly be associated
19 with using opioids, as we discussed, you're
20 not a medical doctor, right?
21   A.    That's correct.
22   Q.    So you're relying on
23 plaintiffs' medical experts to tell you what
24 those parameters should be?
25   A.    That's correct, in part, yes.

Page 629

1    Q.    You did not make any
2  independent assumptions about the type of
3  patients that could have benefited medically
4  from using opioids?
5         MR. SOBOL:  Objection.
6    A.    I -- as you can see and will
7  note I talk about, I cite to a number of
8  guidelines and articles, and I rely on
9  plaintiffs' clinical experts to validate my
10 assumptions.
11 BY MR. ROTH:
12   Q.    Right, but since you're not a
13 doctor, when you read the guidelines and
14 articles, I take it you took direction from
15 either a doctor or from counsel about what to
16 take out of those articles?
17        MR. SOBOL:  Objection.
18   A.    Yes, that's correct.
19 BY MR. ROTH:
20   Q.    Okay.  And you don't have any
21 medical expertise that you would need to make
22 your own independent assumptions about the
23 type of patients that could benefit from
24 using opioids?
25   A.    I am not a medical expert.

Highly Confidential - Subject to Further Confidentiality Review

Page 630

1    Q.    I want to look at paragraph 94.
2  So towards the bottom of that paragraph, you
3  say:  Note that because I am not documenting
4  the diagnoses and dosing associated with
5  actual uses of opioids, I am not able to
6  calculate how much of the increased use of
7  opioids during the period in which the
8  alleged misconduct occurred was in fact for
9  clinically appropriate indications, dosages
10  and durations.
11        Did I read that correctly?
12    A.    You did.
13    Q.    And that's similar to what we
14  discussed yesterday.  None of your analyses
15  attempt to parse out whether the excess MMEs
16  you identified were for medically appropriate
17  uses?
18    A.    Yes.  Again, here I'm trying to
19  calculate this maximum, just say let's just
20  assume that, in fact, some portion of this
21  growth is driven by better treating cancer
22  patients, how much could that possibly be?
23  But I have not been -- I do not have
24  diagnosis codes that would allow me to
25  precisely capture that in the data.

Page 631

1    Q.    Do you know whether data with
2  diagnosis codes for Cuyahoga and Summit
3  County exists that you could use to do an
4  actual analysis?
5    A.    I don't know about whether data
6  are available for Cuyahoga and Summit
7  Counties specifically, no.
8    Q.    And I read the sentence that I
9  just took from paragraph 94 which you have
10  emphasized a few times with italics as a
11  limitation on your analysis, correct?
12    A.    It's a kind of a limitation.
13  It's just a really important clarification
14  because I would not want someone reading my
15  report to interpret the numbers that I've
16  simulated to be actually representative of
17  how prescriptions were -- you know, according
18  to what diagnoses prescriptions were written.
19        So it's not really a
20  limitation.  The purpose of my analysis is to
21  do something different, but it should not be
22  interpreted as showing how much was actually
23  used to address cancer pain.
24    Q.    Your simulation is a
25  hypothetical analysis based on assumptions

Page 632

1  you made from plaintiffs' experts'
2  explanation of appropriate uses as opposed to
3  a factual assessment of which prescriptions
4  were medically necessary?
5    A.    Yes.  I mean, it is based on a
6  set of facts, but it does not compute the
7  share of prescriptions that were actually
8  used for these indications.
9    Q.    So let's look at kind of the
10  foundational assumptions you've got in
11  paragraph 92.
12    A.    Okay.
13    Q.    You say first:  I conduct a
14  thought experiment that allows me to
15  calculate, in scare quotes, upper bound of
16  how much of the growth in MMEs could be
17  attributable to more intensive pain
18  management for patient groups that according
19  to plaintiffs' experts could have benefit
20  from treatment of -- with opioids.
21        Do you see that?
22    A.    Yes.
23    Q.    And then you say:  All of the
24  underlying assumptions in this section have
25  been developed in reference to the opinions

Page 633

1  of the plaintiffs' clinical experts,
2  including Dr. Schumacher and Dr. Parran.
3        Do you see that?
4    A.    Yes.
5    Q.    Are there any plaintiffs'
6  clinical experts who you rely on that are not
7  Dr. Schumacher and Dr. Parran?
8    A.    Not specifically that I rely
9  on, no.
10    Q.    Okay.  I just was confused,
11  because you say including, but you only named
12  two of them, so I didn't know if there was
13  someone else that's missing here.
14    A.    I understand that there are
15  other clinical experts.  These are the
16  clinical experts that I rely on.
17    Q.    Did you review or rely on
18  Dr. Ballantyne's report?
19    A.    I did not, no.
20    Q.    Are you aware that plaintiffs
21  have withdrawn Dr. Parran's expert report?
22    A.    I was not aware of that, no.
23    Q.    Do you know which of the
24  assumptions you made based on Dr. Parran's
25  report in this section of yours?

Highly Confidential - Subject to Further Confidentiality Review

Page 634

1  A.  I don't believe any of the
2  assumptions were solely based on Dr. Parran.
3      MR. ROTH:  And so the record is
4  clear for the reporter, we're actually
5  talking about Parran, P-A-R-R-A-N, who
6  is actually different than Perri,
7  P-E-R-R-I.  And Schumacher is
8  S-C-H-U-M-A-C-H-E-R.
9  BY MR. ROTH:
10  Q.  Okay.  So based on the opinions
11  of Dr. Schumacher and Dr. Parran, you next
12  set forth the assumptions you make about what
13  could possibly have been an appropriate
14  medical use in paragraph 92?
15      MR. SOBOL:  Objection.
16  A.  Yes, I put forth those three
17  categories of conditions that I understand
18  have clear benefit from opioids.
19  BY MR. ROTH:
20  Q.  Okay.  So the first category is
21  short-term treatment of severe acute pain,
22  e.g., trauma or postsurgical pain,
23  end-of-life pain/hospice care and cancer pain
24  from active malignant disease.
25  A.  That's right.

Page 635

1  Q.  The second category you list
2  based on Dr. Parran and Dr. Schumacher is
3  actually sort of a noncategory, right?
4  A.  Yes.
5  Q.  Which --
6  A.  Again, I'm sorry to interrupt
7  you.  Please finish.
8  Q.  What you say in (ii) is:
9  Chronic opioid therapy is not recommended for
10  most common chronic pain conditions, defined
11  as moderate to severe pain lasting beyond 60
12  to 90 days, including low back pain,
13  centralized pain such as fibromyalgia and
14  headache pain.
15      Do you see that?
16  A.  I do.
17  Q.  And we'll talk about this in a
18  minute, but you actually exclude that from
19  your thought experiment?
20  A.  That's correct.
21  Q.  And then the third category
22  which is included is less common chronic pain
23  conditions such as pain from advanced
24  multiple sclerosis, sickle cell disease, pain
25  following spinal cord injury and paraplegia

Page 636

1  or post-herpetic neuralgia, which comprise a
2  small percentage of chronic pain patients and
3  for which opioids may be considered a
4  third-line therapy?
5      Do you see that?
6  A.  I do.
7  Q.  And actually, really, the only
8  ones you include in your thought experiment
9  are Romanette (i), which are trauma or
10  postsurgical pain and cancer pain?
11  A.  Yes, just -- I was going to
12  just clarify.  In this section in
13  paragraph 92, I'm summarizing what I
14  understand the opinions of the clinical
15  experts have put forward in terms of
16  appropriate uses broadly, and you're correct
17  that when I go to implement my analysis, I'm
18  focusing really on section (i), and I try to
19  explain why.
20  Q.  Okay.  And we'll get there.
21  A.  Yeah.
22  Q.  So when you read plaintiffs'
23  medical experts' reports, what you gleaned
24  from those reports was that the only
25  conditions they believed opioids are

Page 637

1  indicated properly to treat are those
2  conditions listed in paragraph 92?
3      MR. SOBOL:  Objection.
4  A.  When I read those reports, I
5  gleaned everything that I said in that -- in
6  that extremely long sentence, which is a
7  little more nuanced than I think what you
8  just said.
9  BY MR. ROTH:
10  Q.  Do you know whether plaintiffs'
11  medical experts' positions regarding the
12  proper indication of opioids today were the
13  prevailing medical guidelines for use of
14  opioids from 1995 to the present?
15      MR. SOBOL:  Objection.
16  A.  I am probably not the person to
17  best characterize that, but I have looked at
18  some of those guidelines, and I also have
19  read the complaint, and I know that
20  plaintiffs intend to prove that part of the
21  misconduct influenced guidelines that were
22  broader than these opinions.
23      So I believe by extension it
24  must be true that there are guidelines from
25  that period that suggest that it is safe to

Page 638

1 use opioids for things like chronic pain.
2 BY MR. ROTH:
3     Q.    And you also understand that
4 medical guidelines are not static, correct?
5     A.    I understand that medical
6 guidelines are not static.
7     Q.    I mean, as a healthcare
8 economist, I'm sure you've studied lots of
9 drugs where indications and warnings and
10 appropriate uses change over time?
11     A.    Well, more specifically, I know
12 in this case that there were updated
13 guidelines issued.
14     Q.    But in your thought experiment,
15 you're imposing plaintiffs' experts' 2019
16 framework on opioid use from the entire
17 period from 1995 to the present?
18     A.    I think you mistake the purpose
19 of my thought experiment.  It is not to say
20 what would happen if we imposed 2019 beliefs
21 by these clinical experts, but rather to say
22 in a world in which there was no misconduct,
23 to what extent might the appropriate -- sort
24 of appropriate efforts to address
25 undertreated pain have led to similar

Page 639

1 patterns.
2     Q.    So if I understand you then,
3 your simulation is predicated on plaintiffs
4 proving that the existing medical guidelines
5 between 1995 and today were wrong as a result
6 of defendants' misconduct?
7     A.    Well, I think that you're
8 giving a legal interpretation to my analysis
9 that I'm not really in a good position to
10 judge.
11         What -- the purpose of my
12 analysis is to examine whether there might
13 have been legitimate clinical drivers of the
14 increase in opioids that could have explained
15 a similar pattern of growth.
16         Again, as I understand it,
17 defendants in related matters have said, you
18 know, physicians began using opioids more
19 heavily in the 1990s because of the
20 recognition that pain was undertreated, so
21 I'm simply examining that premise.
22     Q.    But if your premise is to try
23 to understand whether there were legitimate
24 clinical drivers, why would you not use the
25 clinical standards in existence at the time

Page 640

1 of prescription?
2         MR. SOBOL:  Objection, asked
3     and answered.
4     A.    Those clinical standards are
5 influenced by the misconduct.
6 BY MR. ROTH:
7     Q.    So that goes back to my
8 question.
9         An underlying assumption of
10 Section X, your simulation analysis, is that
11 plaintiffs can prove that defendants'
12 misconduct influenced the extant clinical
13 standards from 1995 until the present?
14         MR. SOBOL:  Objection, asked
15     and answered.
16     A.    Again, I think that you're --
17 you're putting a sort of liability
18 interpretation on this that -- that -- this
19 is not a but-for analysis.  You sound like
20 you're describing it as a but-for analysis.
21         It's a thought experiment that
22 says what if we use opioids to perfectly
23 treat the patients that we know can be safely
24 and effectively treated, what would that look
25 like in comparison to the growth that we

Page 641

1 actually saw.
2 BY MR. ROTH:
3     Q.    It's a thought experiment that
4 says if the plaintiffs' experts are right
5 about what opioids can be used for, then this
6 shows how prescriptions compare to what they
7 say opioids should be used for?
8         MR. SOBOL:  Objection.
9     A.    The thought experiment does
10 depend on the assumptions about which groups
11 could be appropriately treated.  That is
12 correct.
13 BY MR. ROTH:
14     Q.    Put another way, your thought
15 experiment does not measure opioid usage
16 against the existing clinical standards in
17 place at any point in time?
18         MR. SOBOL:  Objection.
19     A.    The thought experiment measures
20 the level of opioid use that would have
21 occurred -- sort of the highest level of
22 opioid use that would have occurred according
23 to what I believe plaintiffs' experts intend
24 to prove is appropriate.
25         It is not based on any

Page 666

1   Professional organizations, states and
2   federal agencies, e.g., the American Pain
3   Society/American Academy of Pain Medicine,
4   the Washington Agency Medical Directors Group
5   and the U.S. Department of Veteran
6   Affairs/Department of Defense have developed
7   guidelines for opioid prescribing.
8           Do you see that?
9       A.   I do.
10      Q.   And why do you think the
11  Department of Veteran Affairs and Department
12  of Defense has their own guidelines for
13  opioid prescribing?
14          MR. SOBOL:  Objection, scope.
15      A.   Because they provide medical
16  care or reimburse medical care for active
17  duty -- what is the general word -- military,
18  active duty military as well as veterans.
19  BY MR. ROTH:
20      Q.   And then it says:  Existing
21  guidelines share some common elements,
22  including dosing thresholds, cautious
23  titration and risk mitigation strategies such
24  as using risk assessment tools, treatment
25  agreements and urine drug testing.  However,

Page 667

1   there is considerable variability in the
2   specific recommendations, e.g., range of
3   dosing thresholds of 90 morphine milligram
4   equivalents a day to 200 morphine milligram
5   equivalents a day, audience, e.g., primary
6   care physicians versus specialists, use of
7   evidence, e.g., systematic review, grading of
8   evidence and recommendations and role of
9   expert opinion, and rigor of methods for
10  addressing conflict of interest.
11          Do you see that?
12      A.   I do.
13      Q.   And then it says:  Most
14  guidelines, especially those that are not
15  based on evidence from scientific studies
16  published in 2010 or later, also do not
17  reflect the most recent scientific evidence
18  about risks related to opioid dosage.
19          So not only is there regional
20  variation, but actually in the medical
21  community, there's variation in prescribing
22  standards for opioids?
23          MR. SOBOL:  Objection, scope.
24  BY MR. ROTH:
25      Q.   Do you agree that's what the

Page 668

1   CDC is saying?
2           MR. SOBOL:  Objection, scope.
3       A.   I think what the CDC is saying
4   is that both across professional
5   organizations -- I think it's a little
6   broader than the medical community, since
7   we're talking about agencies, that guidelines
8   vary.
9   BY MR. ROTH:
10      Q.   And I assume, based on your
11  testimony throughout the last two days and
12  this sort of contagion effect that Dr. Perri
13  coined, your view would be that those medical
14  associations are influenced by the effect of
15  manufacturers' promotion as well?
16      A.   I believe that plaintiffs
17  specifically point to those influences in the
18  complaint, and so, of course, that is --
19  between that and Dr. Perri's report is where
20  I get my information.  I have not made an
21  individual assessment of this.
22      Q.   Again I ask, if promotion is
23  this unifying thing that influences all
24  physicians equally, why is there a
25  variability in the guidelines that

Page 669

1   professional organizations come out with for
2   the prescription and use of opioids?
3           MR. SOBOL:  Objection,
4   mischaracterizes prior testimony.
5       A.   As I noted earlier, promotion
6   will have effects that are different for
7   different physicians, no doubt different
8   professional organizations.
9           Because it has the same
10  direction of effect doesn't mean they all
11  start in the same place or end in the same
12  place, and so guidelines vary across a number
13  of seemingly well-accepted clinical areas.
14  BY MR. ROTH:
15      Q.   And the effect that promotion
16  has, if any, on those guidelines will also
17  vary?
18      A.   The effect of promotion on
19  those guidelines may also vary.
20      Q.   And neither your direct nor
21  indirect regression models do anything to
22  measure the effect of medical guidelines on
23  the prescription and use of opioids?
24          MR. SOBOL:  Objection, asked
25  and answered, mischaracterizes prior

Page 670

1 testimony.
2     A.    The direct model, Model C,
3 includes events for guideline dissemination,
4 and -- and the guidelines are not included in
5 the indirect model.
6 BY MR. ROTH:
7     Q.    In Model C you've got the five
8 events -- I don't remember all of them from
9 memory.  I probably will soon.  I think one
10 was the joint consensus statement, which was
11 a guideline; is that right?
12     A.    Yes, that's correct.
13     Q.    Were any of the others
14 guidelines?
15     A.    The JCAHO standards are similar
16 to guidelines in they set expectations for
17 hospitals.
18     Q.    Okay.  And beyond those two, I
19 don't think the other three events were
20 guideline related.
21     A.    Federation of State Medical
22 Boards, those, I believe, are focused really
23 on liability issues.
24     Q.    Did you consider using, for
25 example, the CDC guidelines or other

Page 671

1 guidelines to test how your model would
2 respond in Model C?
3         MR. SOBOL:  Objection.
4     A.    The CDC guidelines come out in
5 2016, which is at the tail end of my data,
6 and as we talked about before, it was
7 apparent to me when I included five events
8 that simply adding more effects was not going
9 to improve the performance of the model.
10 BY MR. ROTH:
11     Q.    It wouldn't improve the
12 performance of the model, but it might show
13 that the performance of the model didn't
14 stand up once you added multiple events?
15         MR. SOBOL:  Objection, asked
16     and answered.
17     A.    Well, the fact that a model
18 with more events did not look good doesn't
19 mean the model that I chose with no events
20 was unreliable.
21 BY MR. ROTH:
22     Q.    If you look at page 17 of the
23 CDC guidelines --
24     A.    Incidentally by the way, I
25 didn't try that model, so I don't know what

Page 672

1 it looks like.
2     Q.    Good clarification.
3         So page 17 is the start of a
4 long discussion of 12 bolded points that
5 clinicians should consider when prescribing
6 opioids for chronic pain.
7         Do you see that?
8     A.    I see -- let's see.
9     Q.    There are headings in
10 between --
11     A.    Yes.
12     Q.    -- so it's hard to track,
13 but --
14     A.    I see 12, yes.
15     Q.    Okay.  And again, this is not
16 consistent with the view that no patients
17 should ever receive opioid for chronic pain;
18 it just highlights thing clinicians should
19 consider before prescribing opioids for
20 chronic pain?
21         MR. SOBOL:  Objection, scope.
22     A.    I don't believe anywhere in my
23 report I summarize a clinician's opinion that
24 no patients should receive opioids for
25 chronic pain.

Page 673

1 BY MR. ROTH:
2     Q.    I don't want to go through all
3 12, but I do want to ask about a couple.
4     A.    Okay.
5     Q.    So if you look at page 21.
6     A.    Sure.
7     Q.    Number 4 in the section Opioid
8 Selection, Dosage, Duration, Follow-Up and
9 Discontinuation.
10         Do you see that?
11     A.    I do.
12     Q.    It says:  When starting opioid
13 therapy for chronic pain, clinicians should
14 prescribe immediate-release opioids instead
15 of extended-release/long-acting, ER/LA,
16 opioids, recommendation category A, evidence
17 type, 4.
18         Do you see that?
19     A.    I do.
20     Q.    So the CDC is making some
21 distinction between immediate-release and
22 extended-release long-acting opioids.
23         Do you agree with that?
24     A.    Yes, this recommendation
25 specifically applies to immediate-release

Page 674

1  opioids, yes.
2      Q.    And your models don't
3  distinguish between immediate-release or
4  extended-release opioids or any other
5  distinguishing characteristics of opioids
6  other than calibrating them based on MMEs?
7          MR. SOBOL:  Objection.
8      A.    In order to accurately capture
9  the impact of the alleged misconduct, I
10  include all forms of opioids, including
11  short- and long-acting.
12          My model is intended to capture
13  any spillover effects, and to the extent that
14  marketing of one product affects use of
15  another, it appropriately captures those
16  spillover effects.
17          To the extent that marketing
18  does not have spillover effects, they won't
19  be detected inappropriately.
20  BY MR. ROTH:
21      Q.    Number 5 says -- it's on
22  page 22 -- when opioids are started,
23  clinicians should prescribe the lowest
24  effective dosage.  Clinicians should use
25  caution when prescribing opioids of any

Page 675

1  dosage, should carefully reassess evidence of
2  individual benefits and risks when
3  considering increasing dosage to greater than
4  or equal to 50 MME per day, and should avoid
5  increasing dosage to greater than or equal to
6  90 MME per day, or carefully justify a
7  decision to titrate dosage to greater than or
8  equal to 90 MME per day.
9          Do you see that?
10      A.    I do.
11      Q.    So the CDC seems to be making a
12  distinction in terms of potency with respect
13  to the clinical guidelines.
14          MR. SOBOL:  Objection.
15      A.    Okay.
16          MR. SOBOL:  Scope.
17      A.    So they're talking about
18  effective dosing.
19  BY MR. ROTH:
20      Q.    And again, that's not something
21  you control for in your regression models?
22      A.    That doesn't make any sense as
23  something to control for.  Again, I
24  appropriately used the number of MMEs as the
25  dependent variable, so that is recognizing

Page 676

1  that the number of MMEs is what is clinically
2  relevant when it comes to ultimately the
3  harms that Professor Cutler looks at.
4          And so I do, in fact, capture
5  MMEs in my model.
6      Q.    Okay.  So we had an extended
7  conversation yesterday about the depreciation
8  factor, and you said it was justified because
9  opioids are addictive and patients need to
10  titrate up.
11          Do you remember that?
12      A.    Yes.
13      Q.    How does that assumption hold
14  in light of the CDC's clinical guidelines
15  suggesting that physicians should maintain
16  patients on lower doses?
17          MR. SOBOL:  Objection, form.
18          You can answer.
19      A.    Are you suggesting that because
20  the 2016 guidelines warn physicians on not
21  increasing doses that none of that happened
22  during the period of my analysis, 1995 to
23  2018?
24  BY MR. ROTH:
25      Q.    Well, I'm asking the questions,

Page 677

1  but I'm just suggesting that you didn't
2  account for it in your analysis, including
3  after 2016 when these guidelines were
4  published.
5          MR. SOBOL:  Objection.
6          You can answer.
7      A.    I would respectfully disagree
8  with that characterization.  My analysis
9  incorporates exactly that, and yesterday we
10  had a brief conversation about a chart that
11  shows the increasing MMEs per prescription
12  that demonstrate that doctors were clearly
13  not following this guideline.
14          This is precisely the concern
15  with the opioid epidemic is that dosing has
16  continued to ramp up, and, you know, whether
17  or not this guideline has influenced
18  physicians to date, there's certainly plenty
19  of evidence that there were increased dosing
20  patterns over time for patients who were on
21  opioids.
22          MR. ROTH:  Okay.  Why don't we
23  stop for a minute.  I don't know if
24  lunch is here, but this would not be a
25  bad time to break since it's around

Page 702

1    Q.    Okay.  So in this analysis, you
2  include all of the IDC-9 trauma codes except
3  for the one specified on page D9?
4    A.    That's correct.
5    Q.    And apart from what you told me
6  that the clinicians stated these would not be
7  appropriate uses of opioids, you did not have
8  any other basis for excluding them from your
9  trauma numbers?
10    A.    Well, I'm not a clinical
11  expert, but I would say, on the face of it,
12  the notion that opioids would be appropriate
13  for adverse effects of medical care or drugs
14  or poisoning is not something I would expect
15  to be true, but I'm not a clinical expert, so
16  I certainly use my judgment as a starting
17  point.
18    Q.    And certain opioids like
19  Suboxone or naloxone might be, but are those
20  taken out of this simulation as well?
21    A.    They are not in my analysis.
22    Q.    Okay.  So back to paragraph 98.
23    A.    Yeah, way back.
24    Q.    So essentially, to measure the
25  incidence of trauma, you use the data with

Page 703

1  the codes removed as specified in
2  Attachment D?
3    A.    That's correct.
4    Q.    And you assume that a hundred
5  percent of those patients are treated with
6  opioids?
7    A.    That's correct.
8    Q.    And then you assume, according
9  to paragraph 98, that each of these patients
10  is treated with 30 MMEs of immediate-release
11  opioids for three to seven days?
12    A.    Correct.
13    Q.    And for that statement, it
14  looks like you are relying on a white paper
15  from the American Academy of Emergency
16  Medicine, and then the CDC guidelines that we
17  reviewed earlier.  Or is it just from the
18  AAEM white paper?
19    A.    I think they agree on these
20  points.
21    Q.    Okay.  So let's look at the
22  AAEM white paper, which I'll mark as
23  Exhibit 26.
24        (Whereupon, Deposition Exhibit
25    Rosenthal-26, AAEM White Paper on

Page 704

1  Acute Pain Management in the Emergency
2    Department, was marked for
3    identification.)
4  BY MR. ROTH:
5    Q.    And this is the white paper you
6  rely on as support for using 30 milligrams
7  for three to seven days for trauma patients.
8    A.    You've printed it very small,
9  so --
10    Q.    I did not, but someone did, and
11  I apologize.
12    A.    That's okay.
13    Q.    Do we need a magnifying glass?
14    A.    I'm not bothering your glasses.
15  I'm going to hold it two feet in front of me.
16    Q.    Well, then my next question is
17  going to be particularly hard for you to
18  answer.
19        MR. SOBOL:  Is there a footnote
20    on this?
21  BY MR. ROTH:
22    Q.    I was going to ask where you
23  see the 30 milligrams of an immediate-release
24  opioid such as hydrocodone, because I didn't,
25  but you may not be able to see even the text,

Page 705

1  so that might be a bigger problem.
2    A.    Yeah, I'm -- I believe the
3  guidelines -- some of the guidelines say
4  start at the lowest possible dose.  I'm not
5  sure the 30 milligrams is in this guideline.
6        I believe that they all say use
7  immediate release.  Here, the second bullet
8  under Upon Discharge From the ED:  Emergency
9  medicine clinicians should prescribe only
10  immediate-release formulations at the lowest
11  effective dose and for the shortest course,
12  generally two to three days' supply.
13        I think the CDC guidelines say
14  three to seven.
15  BY MR. ROTH:
16    Q.    And is the 30 also in the CDC
17  guidelines or is that somewhere else?
18    A.    I don't think it actually is,
19  and when I referred clinicians to this
20  language, around the lowest effective dose, I
21  believe that the 30 milligrams comes from
22  getting a translation from clinical experts
23  of what that lowest effective dose is.
24    Q.    Okay.  So that's clear now.
25        So now as I understand it, your

Page 706

1 assumption for 30 morphine milligram
2 equivalents for trauma patients comes from
3 Dr. Parran and Dr. Schumacher telling you
4 that's what you should use?
5        MR. SOBOL: Objection.
6    A.    There's some other guidelines
7 that we'll get to around surgery that have
8 some more specific doses, where I had those
9 numbers to say, you know, should I use one of
10 these. But they're not in this document.
11 We'll get to them in the next section.
12 BY MR. ROTH:
13    Q.    So for trauma, your dosage
14 assumption comes from plaintiffs' experts?
15    A.    It is -- yes. The -- the
16 assumption, again, I did -- I used the
17 guidelines to have that qualitative
18 assumption, and I required assistance from
19 clinical experts to make sure that I
20 understood how to translate that.
21        But there were other guidelines
22 that had some quantitative starting points,
23 but not in these ones.
24    Q.    And when you say clinical
25 experts, that's Drs. Schumacher and Parran?

Page 707

1    A.    That's correct.
2    Q.    So for one patient receiving
3 treatment for trauma in an emergency room
4 setting, you assume 210 MMEs, which is 30
5 times the 7?
6    A.    And which we do without a
7 calculator, yes.
8    Q.    That's true.
9        And so to calculate the total
10 number of MMEs for all patients who visited
11 an emergency room for trauma, you multiplied
12 the patients in the data times 210?
13    A.    The patients in the data times
14 210, yes.
15    Q.    With the patients in the data
16 being the page D9 description of which
17 patients you looked at for trauma?
18    A.    That's correct.
19    Q.    Okay. So now let's talk about
20 surgery, which is paragraph 99. So to
21 identify patients treated with opioids
22 related to surgery, you say the universe is
23 patients who underwent surgery on either an
24 inpatient or an outpatient basis.
25    A.    That's correct.

Page 708

1    Q.    And according to studies
2 published around the time of the alleged
3 misconduct, 41% -- sorry. Let me reread
4 that.
5        According to studies published
6 around the time the alleged misconduct began,
7 41% of postsurgical inpatients experienced
8 moderate to severe pain.
9        Did I read that correctly?
10    A.    Yes, you did.
11    Q.    What do you mean by the time
12 the alleged misconduct began?
13    A.    Again, where I reference
14 literature on undertreatment -- well, it's
15 upset, so now I have to go back. I was
16 looking for literature that predated the
17 alleged misconduct, so that -- I just have to
18 see where I first cite the Marks and Sachar
19 paper in that footnote 117. So those are the
20 studies that we talked about at the very
21 beginning of this analysis.
22    Q.    Is there any allegation that
23 you're aware of that the alleged misconduct
24 influenced the prescribing of opioids for
25 surgical patients?

Page 709

1        MR. SOBOL: Objection.
2    A.    I -- as I understand the
3 misconduct, the misinformation would affect
4 the treatment of patients being discharged
5 from surgery like any other patients, yes.
6 BY MR. ROTH:
7    Q.    So in your view, discharging
8 patients from surgery with opioid
9 prescriptions beyond those prescriptions that
10 you classify as potentially acceptable would
11 be something that plaintiffs are trying to
12 recover for?
13        MR. SOBOL: Objection.
14    A.    Well, it sounds like there's
15 both a clinical and nonclinical opinion
16 there, but again, remember this analysis is
17 not decomposing actual use but trying to
18 build up to a set of uses that according to
19 clinical experts could have reasonably
20 consumed opioid quantities over this period.
21        So again, we're not -- we're
22 not sort of looking at what was done and
23 parsing between appropriate and
24 inappropriate. Just say, okay, well, there's
25 going to be a set of people with surgery, and

Page 710

1 those people surely will have opioid use for
2 some period of time.  What would it look like
3 if they all got treated.
4 BY MR. ROTH:
5     Q.    So in paragraph 99, you again
6 come up with 30 MMEs and seven days for
7 surgery.
8     A.    Yes, that's correct.
9     Q.    So same as trauma?
10     A.    Yes, the guidelines are quite
11 similar.
12     Q.    And for that conclusion that 30
13 MMEs each day is appropriate, you cite the
14 MD Anderson Cancer Center Postoperative Pain
15 Management Guidelines.
16     A.    That's right.  So that's the --
17 the document that I mentioned did have some
18 quantitative benchmarks in it.
19         (Whereupon, Deposition Exhibit
20     Rosenthal-27, MD Anderson Cancer
21     Center Postoperative Pain Management
22     Guidelines, was marked for
23     identification.)
24 BY MR. ROTH:
25     Q.    So let me mark as Exhibit 27

Page 711

1 the MD Anderson Cancer Center Postoperative
2 Pain Management Guidelines.
3         And is this the document you
4 were citing in your report?
5     A.    It is.
6     Q.    So it looks like this was
7 approved, if you look at the bottom of the
8 page, on October 30th, 2018.
9     A.    Yes, that's correct.
10     Q.    And are you aware that the
11 algorithm used by MD Anderson to evaluate
12 doses of pain management is what was used to
13 come up with the dosage number?  Strike that.
14 That's not a good question.  Let's just turn
15 to page 3.
16     A.    Okay.  At some point, I would
17 direct you to page 10, but we can go to
18 page 3 first.
19     Q.    Okay.  We will get to page 10,
20 I promise.  It's in here.
21     A.    Okay.  Good.
22     Q.    So it looks like they have sort
23 of like a decision tree flow as to how
24 they're going to come up with dosing for
25 surgical patients, based on pain score.

Page 712

1     A.    That's right.
2     Q.    And it identifies different
3 types of pain and the recommended treatment
4 options.
5     A.    Yes.
6     Q.    So if you look at page 5,
7 Appendix A describes the pain score, and it
8 may or may not have highlighting on it.
9     A.    It does.  I appreciate the
10 highlighting.
11     Q.    Now you can see where we're
12 going.
13     A.    That's great.
14     Q.    So if you look at page 5 in
15 Appendix A, it says no pain is zero, mild is
16 1 to 3, moderate is 4 to 6 and severe is 7 to
17 10.
18         Do you see that?
19     A.    I do.
20     Q.    And then if you go back to
21 page 3.
22     A.    To page 3, okay.
23     Q.    So for patients with a pain
24 score of less than 3 who are not currently
25 taking opioids, they recommend using

Page 713

1 nonopioids or weak opioids.
2         Do you see that?
3     A.    Yes.
4     Q.    And then for opioid treatment
5 they refer to Appendix E, which is page 10,
6 which we'll talk about in a minute.
7     A.    Okay.
8     Q.    Correct?
9     A.    Yep.
10     Q.    For patients with a pain score
11 less than 3 who are currently taking opioids,
12 MD Anderson recommends continuing the use of
13 opioids and again refers to Appendix E.
14     A.    Yes.
15     Q.    For patients with a pain score
16 greater to or equal than 4 and who are not
17 taking opioids, MD Anderson recommends
18 short-acting opioids.
19         Do you see that?
20     A.    I do.
21     Q.    And again refers to Appendix E,
22 correct?
23     A.    Yes.
24     Q.    And then for patients with a
25 pain score greater than or equal to 4 who are

Highly Confidential - Subject to Further Confidentiality Review

Page 714

1 currently taking -- who are not currently
2 taking opioids, MD Anderson recommends
3 short-acting opioids -- we just did that one.
4 Okay. Strike that. I'm getting tired.
5        For patients with a pain score
6 greater than or equal to 4 who are currently
7 taking opioids, MD Anderson recommends
8 increasing the scheduled opioid dose.
9    A.    Yes.
10   Q.    All right. So now let's go to
11 Appendix E on page 10. And we've
12 conveniently highlighted this for you.
13        So if you look at
14 hydrocodone --
15   A.    Yes.
16   Q.    -- it recommends 30 milligrams
17 a day, right, 5 to 10 milligrams every six
18 hours?
19   A.    Yes. So 5 would be 20, right?
20   Q.    Sorry, let me back up the
21 truck. Okay. This is wrong.
22   A.    Yes.
23   Q.    So first we need to look at
24 codeine, which is on the top of the page. So
25 for codeine, it recommends 30 to

Page 715

1 60 milligrams.
2        Do you see that?
3    A.    Yes. I did not consider
4 codeine in the simulation per se, but go
5 ahead.
6    Q.    Okay. And now if we look at
7 hydrocodone, it says for short-acting
8 opioids, it's 5 to 10 milligrams every six
9 hours.
10   A.    Correct.
11   Q.    Which if we do the math on that
12 would be between 20 to 40 a day.
13   A.    Yes. And 30 is right in the
14 middle.
15   Q.    Okay. And for long-acting
16 opioids, 20 milligrams a day of Hysingla or
17 10 milligrams every ten hours.
18   A.    I think in the flowchart we
19 just looked at -- and again, according to
20 clinical experts in this case, long-acting
21 opioids are not recommended.
22   Q.    Right. So it's 20 to 40 for
23 immediate-release hydrocodone?
24   A.    That's right, and 30 is in the
25 middle of that.

Page 716

1    Q.    It's the average.
2    A.    It's the midpoint, it's the
3 average. Yes.
4    Q.    But then if you look at
5 morphine, which is on the next page, that's
6 also a short-acting opioid?
7    A.    Yes.
8    Q.    And it's 5 to 10 milligrams
9 every four hours, which by math would get you
10 30 to 60.
11   A.    Yes.
12   Q.    So I guess what I'm trying to
13 understand is how you get to 30 when one
14 range is 20 to 40 and the other range is
15 all -- is 30 to 60.
16   A.    Sure. Again, that's why --
17 because the guidelines don't give one number,
18 I referred this question to the clinical
19 experts through counsel, and -- and was
20 advised to focus on hydrocodone and was told
21 that 30 milligrams was a reasonable baseline.
22        Again, assuming that there's
23 some patients who will only get 20, some
24 patients who will get more.
25   Q.    So again, like with trauma for

Page 717

1 surgical pain, your decision to take 30
2 morphine milligram equivalents per day was
3 driven by plaintiffs' experts' advice?
4    A.    And it's grounded in these
5 guidelines. And again, while the other
6 guidelines that we looked at are qualitative
7 in nature, as I understand the notion of
8 starting with the lowest dose, that seems
9 quite consistent with choosing 30.
10   Q.    And so like with trauma, 30
11 times seven is 210, and then you multiply 210
12 for surgery with the number of surgical
13 patients in the data?
14   A.    That's correct.
15   Q.    And then we should maybe just
16 close the loop on this. So if we go back to
17 the Attachment D.
18   A.    Sure.
19   Q.    Just to understand what data
20 you're looking at for surgery.
21   A.    Yeah.
22   Q.    So it looks like page D10.
23   A.    Oh, you're in -- it's page D14.
24 I think we're on the same page. Aren't we?
25   Q.    Page D10 talks about surgery.

Highly Confidential - Subject to Further Confidentiality Review

Page 718

1    A.    Oh.

2    Q.    Page D14 is surgery in Cuyahoga
3  and Summit.

4    A.    I see. I was ahead of you.
5  We'll get to that, I'm sure.

6    Q.    Yes.

7    A.    Yes. Yes. So Table D(b),
8  which is also terrible labeling.

9    Q.    Yes, so Table D(b) explains how
10  you identified surgical procedures, and it
11  says they're identified from the Area Health
12  Resource File and the Health Resources &
13  Services Administration data.

14        Do you see that?

15    A.    Yes, that's correct.

16    Q.    But then data was only
17  available for 2005, 2010 and 2014?

18    A.    That's correct.

19    Q.    And so you had to linearly
20  interpolate all the other values.

21    A.    Yes, and as you can see, they
22  barely change.

23    Q.    But in any event, you only had
24  data for three years, and so the rest of it
25  was interpolated with the data that you had?

Page 719

1    A.    I did interpolate.

2    Q.    Okay. And so if you go back to
3  the body of your report, Table 6, which is at
4  page 70, essentially presents the math
5  exercise we've been talking about, correct?

6    A.    That's correct.

7    Q.    It has kind of the cancer,
8  trauma and surgical MMEs by year from 1995 to
9  2018 based on the inputs and assumptions
10  we've been discussing.

11    A.    Yes.

12    Q.    And so according to Table 6,
13  just looking at 1995, for example, there were
14  ████████████ MMEs potentially clinically
15  justifiable?

16    A.    Yes.

17    Q.    And then the next column is
18  your sensitivity where you just multiply that
19  number by 50%?

20    A.    Correct.

21    Q.    And so for 1995, your
22  sensitivity shows ██████ -- sorry,
23  ██████████ -- start over.

24        For 1995, your sensitivity
25  shows ██████████ MMEs were potentially

Page 720

1  clinically justifiable with the 50% increase?

2    A.    Yes.

3    Q.    And that's actually higher than
4  the actual MMEs sold in that year?

5    A.    That's correct. So that first
6  number should be a negative.

7    Q.    The first number should be a
8  negative? I'm not sure I follow.

9    A.    Well, of the total plus 50%, I
10  guess the first -- the percentage there is of
11  the -- of the unadjusted one, so it's
12  correct, but --

13    Q.    Yeah, it's correct. And
14  what --

15    A.    It actually would be negative
16  if you did the plus 50%.

17    Q.    Right. Okay. Thank you for
18  that clarification.

19    A.    It shows up in the chart more
20  clearly.

21    Q.    And actually, if we just look
22  at '95 alone, even under your methodology,
23  75% of the actual MMEs sold -- or nearly 75%,
24  would be potentially clinically justifiable?

25    A.    Could have been accounted for

Page 721

1  justifiable use by -- by justifiable uses,
2  right? So again, just to be clear that I'm
3  not saying that 75% of actual uses were --
4  were delivered in that way, but they could
5  have been.

6        The level of use was reasonably
7  explained by this measure of need, if you
8  would allow me to use that shorthand.

9    Q.    And so if you use your
10  potentially justifiable use methodology,
11  including your 50% sensitivity analysis, it's
12  not until 1997 that you start seeing more
13  than a small departure from the actual MMEs
14  sold?

15    A.    Right. So in 1997, the actual
16  is about ████ higher than the -- those
17  justified by need.

18    Q.    And then where is this actual
19  MMEs sold number coming from? The IQVIA data
20  it looks like? It says: Actual MMEs
21  nationally from IQVIA, NPA, ARCOS, CDC.

22        (Clarification requested by the
23  reporter.)

24        MR. ROTH: Okay. Sorry.

25  BY MR. ROTH:

Page 734

1 promotion of prescription opioids since 1995
2 was a substantial contributing factor to the
3 increase in the use of prescription opioids
4 in the bellwether communities.
5         Did I read that correctly?
6     A.    You did.
7     Q.    And that is based largely on
8 the econometric models?
9     A.    It's based on all the
10 foregoing.
11     Q.    Okay.  And I noticed the way
12 you worded that sentence was that the
13 promotion was a substantial contributing
14 factor; is that right?
15     A.    That's right.
16     Q.    Not that the unlawful promotion
17 was a substantial contributing factor,
18 because as we've discussed, you have no
19 opinion on whether defendants' promotion was
20 unlawful or not; you're relying on counsel's
21 assumption.
22         MR. SOBOL:  Objection, asked
23     and answered.
24     A.    Again, I -- perhaps I should
25 have repeated the unlawful promotion, if

Page 735

1 proven.  So as you say, I demonstrate that
2 promotion caused sales, and I assume that
3 plaintiffs will prove that all promotion was
4 unlawful.
5         MR. SOBOL:  By the defendants.
6     A.    All promotion by the defendants
7 was unlawful.
8 BY MR. ROTH:
9     Q.    And because you assumed that
10 all promotion by the defendants was unlawful,
11 that assumption would include promotion even
12 if a sales representative only dropped off
13 peer-reviewed literature at a doctor's
14 office?
15         MR. SOBOL:  Objection, asked
16     and answered.
17     A.    My analysis includes all
18 promotion by defendants.  When I calculate
19 the but-for scenario, I remove that
20 regardless if some of that promotion used
21 materials that were FDA approved.
22 BY MR. ROTH:
23     Q.    Your analysis also includes
24 promotion by defendants even if the sales
25 representative had no interaction with the

Page 736

1 prescriber?
2         MR. SOBOL:  Objection, asked
3     and answered.
4     A.    I think what you're suggesting
5 is that detailing may involve an interaction
6 with someone else in the office?  Is that
7 what you're referring to?
8         And, yes, as I understand the
9 matter at hand, that the entire promotional
10 enterprise is what is at issue here, and so I
11 have appropriately captured all detailing in
12 my econometric model.
13 BY MR. ROTH:
14     Q.    Your analysis includes all
15 promotion by defendants even if that
16 promotion did not result in any change in the
17 prescriber's behavior after they were
18 detailed?
19     A.    Well --
20         MR. SOBOL:  Objection.
21     A.    -- actually, I would
22 respectfully disagree with that.  My analysis
23 only attributes impact where promotion
24 resulted in an increase in sales.
25             ///

Page 737

1 BY MR. ROTH:
2     Q.    But you include in your
3 analysis details that may have had no effect
4 on the particular prescriber's behavior?
5         MR. SOBOL:  Objection, asked
6     and answered.
7     A.    And if that is the case, then
8 it reduces the incremental effectiveness of
9 promotion that I observe, and therefore, the
10 calculated impact.  The possibility that some
11 details did not produce change is
12 incorporated into the estimates.
13 BY MR. ROTH:
14     Q.    You include in your analysis
15 detailing where the prescriber's rate of
16 prescription may have actually decreased
17 after the detail?
18         MR. SOBOL:  Objection, asked
19     and answered.
20     A.    My analysis will incorporate
21 the effects, negative or positive.  Obviously
22 on average they're positive.  If there are
23 some negative changes after a detail for some
24 reason, those again will reduce the measure
25 of impact.

Page 738

BY MR. ROTH:
1. Q.    You include in your analysis
2. detailing even if the prescriber never
3. prescribed the medicine he or she was
4. detailed on?
5.        MR. SOBOL:  Objection.
6. A.    Yes.  Again, just like the --
7. any detailing that has no effect or a lower
8. effect, I guess that would be a version of no
9. effect, if the individual detailed never
10. prescribed.  And again, that will reduce the
11. impact of detailing in my model.
12. BY MR. ROTH:
13. Q.    You include in your analysis
14. detailing to prescribers who were already the
15. lead authors of journal articles on the
16. addiction risk of opioids at the time they
17. were detailed?
18.        MR. SOBOL:  Objection.
19. A.    If there is such detailing in
20. my data, again, my estimates will
21. appropriately reflect a reduced effectiveness
22. of promotion for those details.
23. BY MR. ROTH:
24. Q.    Your analysis includes

Page 739

1. detailing to oncologists prescribing for
2. end-of-life cancer pain?
3. A.    Again, to the extent that my
4. analysis does not grow the size -- sorry, to
5. the extent that promotion does not grow the
6. size of the market by expanding the use of
7. opioids, detailing, for example, to
8. oncologists who may already have been
9. prescribing opioids will not result in
10. impact.
11. Q.    Your analysis includes
12. detailing to prescribers who are hospice
13. specialists for end-of-life pain?
14. A.    To the extent that there is
15. detailing to hospice providers in my data and
16. those uses would have occurred regardless of
17. the promotion, my analysis will appropriately
18. capture those effects.
19. Q.    Your analysis includes
20. detailing to prescribers who may be
21. performing surgery or trauma intervention in
22. the emergency room?
23. A.    Again, to the extent that
24. those -- my analysis will calculate the uses
25. that occurred in this market as a result of

Page 740

1. the alleged misconduct.  Regardless of how
2. those opioid prescriptions were used in
3. practice, as I understand, is appropriate to
4. my assignment.
5. Q.    Stated differently, your
6. analysis includes any detailing in the data
7. regardless of to whom it was -- let me start
8. over.
9.        Stated differently, your
10. analysis -- can we just get a clean question
11. and answer.  Say something.
12. A.    Yes.  What was the question?  I
13. don't know what the question is.
14. Q.    Stated differently, your
15. analysis includes any detail in the data,
16. regardless of who was detailed, what was said
17. or what behavior changed or did not after the
18. detail?
19. A.    So my analysis is consistent
20. with my assignment in that I examine and
21. quantify the aggregate market expansion that
22. occurred as a result of defendants' promotion
23. during the period from 1995 to the end of my
24. data in 2018.  I do not disentangle the types
25. of detailing; however, to the extent there

Page 741

1. are differential effects of detailing across
2. groups, those will be incorporated into the
3. estimates.
4.        MR. ROTH:  Our time may be
5. done.  Let's take a quick break.  And
6. I may have more questions or someone
7. else may.
8.        THE WITNESS:  Okay.
9.        THE VIDEOGRAPHER:  The time is
10. 1:35 p.m.  We're now off the record.
11.        (Recess taken, 1:35 p.m. to
12. 1:51 p.m.)
13.        THE VIDEOGRAPHER:  The time is
14. 1:51 p.m.  We're back on the record.
15. BY MR. ROTH:
16. Q.    Professor Rosenthal, in Table 2
17. you calculate the total percent of MMEs
18. attributable to defendants' promotion to be
19. ███ of MMEs; is that right?
20. A.    That's right.
21. Q.    To what do we owe the other
22. ███ of MMEs?
23. A.    The other ██ -- excuse me ███
24. percent of MMEs are owed to the promotion
25. that is not excluded in the but-for scenario,

|  | Page 742 |
| --- | --- |

1  so again, because I start my data as early as
2  I can in '93, there's a stock of promotion
3  that builds up, and then there's
4  non-defendant promotion.  So all those things
5  are left in the model.
6      Q.    So it's promotion prior to '95
7  by anyone and non-defendant promotion
8  thereafter?
9      A.    That's correct.
10      Q.    And that explains ███ of the
11  MMEs with the remainder being explained by
12  defendants' promotion from 1995 to 2018?
13      A.    That's generally correct.  You
14  know, there's a constant in the model, which
15  I think we could go to Table 1 and in
16  Model B, so there's a baseline level of
17  ███████ MMEs.
18      Q.    Okay.
19      A.    So that's in there as well.
20      Q.    And then the same question for
21  the indirect model, you calculate ███ of MMEs
22  due to excess shipments, so is it fair to say
23  based on your approach that the other ███ is
24  due to the demographic and socioeconomic and
25  other factors you model for?

|  | Page 743 |
| --- | --- |

1          MR. SOBOL:  Objection.
2      A.    That would be due to the
3  changes in all of those factors.  Again,
4  price actually has a negative effect, but the
5  trend which is intended to proxy for
6  non-defendant promotion and those other
7  demographic, socioeconomic and healthcare
8  variables.
9  BY MR. ROTH:
10      Q.    Okay.  And then if you look
11  back at page 19 of your report, Figure 1.
12      A.    Sorry, excuse me.  I should
13  just say again, in the indirect model as in
14  the direct model there's also a baseline,
15  right, so we're projecting growth from '95
16  forward.  So there's a baseline level.
17      Q.    Got it.
18          So if you look on Figure 1 on
19  page 19, we haven't actually talked about
20  this diagram yet.
21      A.    Okay.  Page 19.  Yes.
22      Q.    And is this a diagram you've
23  used in other expert reports before?
24      A.    I tailored this one
25  specifically for this report, but I have used

|  | Page 744 |
| --- | --- |

1  similar kinds of diagrams.
2      Q.    And if we look at your diagram,
3  you have the ecosystem of promotion in all of
4  the lines between the various constituencies,
5  and in the box in the middle, there's
6  detailing, professional journals, samples,
7  and meetings and events.
8          Do you see that?
9      A.    Yes.
10      Q.    And as we discussed, your model
11  only accounts for detailing promotion, not
12  for any of the other items in the box or any
13  of the other boxes on Figure 1?
14          MR. SOBOL:  Objection,
15          mischaracterizes the testimony, asked
16          and answered.
17      A.    The direct model includes the
18  measure of detailing only.  The indirect
19  model is intended to capture all of these
20  kinds of marketing tools.
21  BY MR. ROTH:
22      Q.    And then Table 3, which we've
23  been round and around on, to the extent that
24  you used Table 3 to assess the delta between
25  a defendant's promotion percentage and the

|  | Page 745 |
| --- | --- |

1  baseline percentage, that delta is capturing
2  how that defendant's promotion relates to the
3  aggregate average; is that right?
4          MR. SOBOL:  Objection, asked
5          and answered.
6      A.    As we discussed earlier, I
7  don't use the table in that way.  I'm using
8  it to narrow the aggregate by excluding
9  individual defendants.
10          And when I do that, for
11  example, to exclude Aventis, just as an
12  alphabetically first choice, I am excluding
13  ultimately the effect that I observe in the
14  econometric model of Aventis' marketing,
15  whether that generates sales for its product
16  or someone else's product.
17          MR. ROTH:  Okay.  I think with
18  that I am done for the time being.
19          It's been a pleasure.  I believe
20  Mr. Metz has some questions, so I will
21  be passing the microphone to him.  And
22  I can't promise I won't come back,
23  depending on what else happens, but
24  thank you so much.
25          THE WITNESS:  Okay.  Thank you.

Page 746

1    THE VIDEOGRAPHER:  The time is
2  1:56 p.m.  We're now off record.
3    (Recess taken, 1:56 p.m. to
4  1:58 p.m.)
5    THE VIDEOGRAPHER:  The time is
6  1:58 p.m.  We're back on the record.
7    EXAMINATION
8  BY MR. METZ:
9    Q.   Good afternoon, Professor
10  Rosenthal.
11    A.   Good afternoon.
12    Q.   My name is Carl Metz.  I
13  represent Cardinal Health, which is one of
14  the distributor defendants in this case.
15    A.   I apologize for forgetting the
16  name of your employer as it were.
17    Q.   That's all right.  You're
18  referring to testimony yesterday where you
19  were asked about the distributor defendants,
20  you named two companies, and the third name,
21  Cardinal, eluded you.  Yes?
22    A.   Exactly, yes.
23    Q.   Okay.  At various places in
24  your report, you refer to marketing
25  defendants, correct?

Page 747

1    A.   Yes, I do.
2    Q.   And then in other places, and
3  I'm sure this is not by design, you refer to
4  the word "defendants" without
5  differentiation.
6    MR. SOBOL:  Objection to the
7  form.
8    You can answer.
9    A.   Yes, I believe I use that term.
10  We could look to see how I use it.
11  BY MR. METZ:
12    Q.   For example, in paragraph 64,
13  which you're welcome to look at, and I'll
14  quote this just partially.  You say, quote:
15  A causal relationship between the
16  defendants', possessive, promotion and
17  prescriptions of opioids.
18    Do you see that?
19    A.   Yes.
20    Q.   And do I understand based on
21  your testimony over the last two days that
22  despite using the singular term "defendants,"
23  we should not read that as referring to all
24  defendants, correct?
25    MR. SOBOL:  Objection.

Page 748

1    A.   In this paragraph in
2  particular, I'm talking about the defendants
3  who have detailing that I'm measuring in my
4  data, so those would be the marketing
5  defendants.
6  BY MR. METZ:
7    Q.   Okay.  And by marketing
8  defendants, you're not including any of the
9  distributor defendants, correct?
10    A.   I don't believe that they have
11  marketing data in my data, so there may be
12  places in my report where I refer to
13  defendants where it's appropriate to talk
14  about them more generally, for example, when
15  I'm summarizing the complaint, but here I
16  intend to describe the defendants who have
17  detailing that is measured in the IQVIA data.
18    Q.   Okay.  So just to be clear,
19  not -- as you believe it, not -- that does
20  not include the distributor defendants,
21  correct?
22    MR. SOBOL:  Objection, asked
23  and answered.
24    A.   I believe that is true.
25    ///

Page 749

1  BY MR. METZ:
2    Q.   Okay.  And it also does not
3  include the pharmacy defendants, correct?
4    MR. SOBOL:  Objection, asked
5  and answered.
6    A.   Yes, that is correct.
7  BY MR. METZ:
8    Q.   So we take another example,
9  paragraph 78, where you say, quote:  An
10  alternative method of identifying the impact
11  of the defendants', possessive, misconduct,
12  is to use an indirect method.
13    Do you see that?
14    A.   Yes.
15    Q.   And there again, you're using
16  the term "defendants," but how we should
17  understand that is the marketing defendants,
18  correct?
19    A.   Well, the -- in -- excuse me,
20  the indirect approach -- it is getting to be
21  late -- is, as you know, a residual approach,
22  so it inherently is looking at all of these
23  demographic, socioeconomic and healthcare
24  factors that could have driven higher opioid
25  use and attributes that which is left to the