# Exhibit 4

Highly Confidential - Subject to Further Confidentiality Review

```
  1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF OHIO
  2                        EASTERN DIVISION

  3

     IN RE NATIONAL PRESCRIPTION   | MDL No. 2804
  4                                |
     OPIATE LITIGATION             | Case No. 17-MD-2804
  5                                |
     APPLIES TO ALL CASES          | Hon. Dan A. Polster
  6

  7                             - - -

  8                   Tuesday, April 23, 2019

  9                             - - -

 10         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

 11                     CONFIDENTIALITY REVIEW

 12                             - - -

 13

 14

 15         VIDEOTAPED DEPOSITION of MATTHEW PERRI, III,
     BS Pharm, Ph.D., RPh, held at Jones Day,
 16  1420 Peachtree Street, N.E., Suite 800, Atlanta,
     Georgia, commencing at 9:28 a.m., on the above date,
 17  before Susan D. Wasilewski, Registered Professional
     Reporter, Certified Realtime Reporter and Certified
 18  Realtime Captioner.

 19

 20

 21                             - - -

 22               GOLKOW LITIGATION SERVICES

 23           877.370.3377 ph | 917.591.5672 fax

 24                   deps@golkow.com

 25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
 1  APPEARANCES:
 2  Counsel for Plaintiffs:
 3    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
       BY:  MARK P. CHALOS, ESQUIRE
 4        mchalos@lchb.com
       222 2nd Avenue South, Suite 1640
 5     Nashville, Tennessee 32701-2379
       Phone: (615) 313-9000
 6
 7    CRUEGER DICKINSON LLC
       BY:  KRISTA K. BAISCH, ESQUIRE
 8        kkb@cruegerdickinson.com
       4532 North Oakland Avenue
 9     Whitefish Bay, Wisconsin 53211
       Phone:  (414) 210-4367
10
11    Counsel for Endo Health Solutions Inc.,
12  Endo Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
     Par Pharmaceutical Companies, Inc., f/k/a Par
13  Pharmaceutical Holdings, Inc.
14    ARNOLD & PORTER KAYE SCHOLER LLP
       BY:  SEAN HENNESSY, ESQUIRE
15        sean.hennessy@arnoldporter.com
       601 Massachusetts Avenue, NW
16     Washington, D.C. 20001-3754
       Phone:  (202) 942-5000
17
18
     Counsel for Walgreens Defendants:
19
       BARTLIT BECK LLP
20     BY:  LESTER C. HOUTZ, ESQUIRE
           lester.houtz@bartlit-beck.com
21     1801 Wewatta Street, Suite 1200
       Denver, Colorado 80202
22     Phone:  (303) 592-3100
23
24
25
```

Page 3

```
 1  APPEARANCES:
 2  Counsel for McKesson Corporation:
 3    COVINGTON & BURLING LLP
       BY:  MEGAN L. RODGERS, ESQUIRE
 4        mrodgers@cov.com
       3000 El Camino Real
 5     5 Palo Alto Square, 10th Floor
       Palo Alto, California 94306-2112
 6     Phone:  (650) 632-4700
 7
 8  Counsel for Purdue Pharma L.P., Purdue Pharma Inc.,
     and The Purdue Frederick Company:
 9
       LYNN PINKER COX HURST
10     BY: JOHN VOLNEY, ESQUIRE
           jvolney@lynnllp.com
11     2100 Ross Avenue, Suite 2700
       Dallas, Texas 75201
12     Phone:  (214) 981-3800
13
14  Counsel for Walmart Inc., f/k/a Wal-Mart Stores,
     Inc.:
15
       JONES DAY
16     BY:  EDWARD M. CARTER, ESQUIRE
           emcarter@jonesday.com
17     325 John H. McConnell Boulevard, Suite 600
       Columbus, Ohio 43215
18     Phone:  (614) 649-3939
19
20  Counsel for Allergan Finance, LLC:
21     KIRKLAND & ELLIS LLP
       BY:  ERICA B. ZOLNER, ESQUIRE
22        erica.zolner@kirkland.com
           ZACHARY A. CIULLO, ESQUIRE
23        zac.ciullo@kirkland.com
       300 North LaSalle Street
24     Chicago, Illinois 60654
       Phone:  (312) 862-3247
25
```

Page 4

```
 1  APPEARANCES:
 2  Counsel for Teva Pharmaceuticals USA, Inc.,
     Cephalon, Inc., Watson Laboratories, Inc., and
 3  Actavis LLC:
 4    MORGAN LEWIS & BOCKIUS, LLP
       BY:  MELISSA M. COATES, ESQUIRE
 5        melissa.coates@morganlewis.com
       200 South Biscayne Boulevard, Suite 5300
 6     Miami, Florida 33131
       Phone:  (305) 415-3000
 7
 8
     Counsel for Rite Aid:
 9
       MORGAN LEWIS & BOCKIUS, LLP
10     BY:  MATTHEW R. LADD, ESQUIRE
           matthew.ladd@morganlewis.com
11     101 Park Avenue
       New York, New York 10178-0060
12     Phone:  (212) 309-6000
13
14  Counsel for AmerisourceBergen Corporation and
     AmerisourceBergen Drug Corporation:
15
       REED SMITH LLP
16     BY:  JOSEPH MAHADY, ESQUIRE
           jmahady@reedsmith.com
17     1717 Arch Street, Suite 3100
       Philadelphia, Pennsylvania 19103
18     Phone:  (215) 851-8100
19
20  Counsel for Johnson & Johnson and the Janssen
     Pharmaceuticals Defendants:
21
       O'MELVENY & MYERS LLP
22     BY:  ROSS B. GALIN, ESQUIRE
           rgalin@omm.com
23     7 Times Square
       New York, New York 10036-6537
24     Phone:  (212) 326-2000
25
```

Page 5

```
 1  APPEARANCES:
 2  Counsel for Cardinal Health, Inc.:
 3    WILLIAMS & CONNOLLY LLP
       BY:  JOSHUA D. TULLY, ESQUIRE
 4        jtully@wc.com
       725 Twelfth Street, N.W.
 5     Washington, D.C. 20005
       (202) 434-5000
 6
 7
 8  Counsel for Mallinckrodt LLC:

       ROPES & GRAY LLP
 9     BY:  ELIZABETH BIERUT, ESQUIRE
           elizabeth.bierut@ropesgray.com
10     1211 Avenue of the Americas
       New York, New York 10036-8704
11     Phone:  (212) 596-9000
12
     APPEARANCES VIA TELEPHONE AND STREAM:
13
     Counsel for the Henry Schein Defendants:
14
       LOCKE LORD LLP
15     BY:  BRANDAN MONTMINY, ESQUIRE
           brandan.montminy@lockelord.com
16     2200 Ross Avenue, Suite 2800
       Dallas, Texas 75201
17     Phone:  (214) 740-8445
18
19  Counsel for H.D. Smith LLC:
20     BARNES & THORNBURG LLP
       BY:  MONIQUE HANNAM, ESQUIRE
21        hannam@btlaw.com
       11 South Meridian Street
22     Indianapolis, Indiana 46204
23  ALSO PRESENT:
24     JOSHUA COLEMAN, Videographer
25     JONATHAN JAFFE, jjaffe@its-your-internet.com
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

```
 1                    ---
 2              I N D E X
 3                    ---
 4  Testimony of:  MATTHEW PERRI III, BS Pharm, Ph.D., RPh
 5                              PAGE
 6    DIRECT EXAMINATION BY MR. VOLNEY............   9
 7    CROSS-EXAMINATION BY MS. RODGERS............ 204
 8    CROSS-EXAMINATION BY MR. LADD............... 309
 9    CROSS-EXAMINATION BY MR. CARTER............. 337
10
11            E X H I B I T S
12        (Attached to transcript)
13   MATTHEW PERRI DEPOSITION EXHIBITS          PAGE
14  Perri Exhibit 1   Expert Report of Matthew Perri    11
                      III, BS Pharm, PhD, RPh
15                    March 25, 2019
16  Perri Exhibit 2   Curriculum Vitae             11
                      Matthew Perri III
17
    Perri Exhibit 3   Schedule 2:  Perri Prior     11
18                    Testimony and Depositions
19  Perri Exhibit 4   Chapter 5 - Place:  The     207
                      Pharmaceutical Industry Supply
20                    Chain
21  Perri Exhibit 5   Schedule 10: Marketing Messages  247
22
23
24
25
```

Page 7

```
 1            E X H I B I T S
 2        (Attached to transcript)
 3   MATTHEW PERRI DEPOSITION EXHIBITS          PAGE
 4
    Perri Exhibit 6   A Practical Introduction to the   247
 5                    Use of Opioids for Chronic Pain
                      By Jennifer P. Schneider, MD
 6                    MCKMDL00578003 through 578009
 7  Perri Exhibit 7   PBI Prescribing Course Module    247
                      1:  Principles of Pain
 8                    Management & Ethical Treatment
                      11-15-14
 9                    Jennifer P. Schneider
                      MCKMDL00577963 through 577991
10
    Perri Exhibit 8   E-mail - Subject:  Campaign     253
11                    3578-AMI-Mallinckrdt
                      Hydrocodone has been Released!
12                    MCKMDL00546914 through 546916
13  Perri Exhibit 9   E-mail - Subject:  Pain Care    266
                      Forum
14                    PPLP004086826 and 4086827
15  Perri Exhibit 10  Expert Report of Matthew Perri   286
                      III, BS.Pharm, Ph.D., R.Ph.
16                    JM Smith Corporation v Cherokee
                      Pharmacy, et al.
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1                    ---
 2      THE VIDEOGRAPHER:  We are on the record.  My
 3  name is Josh Coleman.  I'm the videographer for
 4  Golkow Litigation Services.  Today's date is
 5  April 23rd, 2019.  The time is approximately
 6  9:28 a m.
 7      This deposition is being held in Atlanta,
 8  Georgia, in the matter of In Re:  National
 9  Prescription Opiate Litigation for the United
10  States District Court, Northern District of Ohio,
11  Eastern Division.
12      The deponent is Matthew Perri.  Counsel will
13  be noted on the stenographic record.
14      The court reporter is Susan Wasilewski, who
15  will now swear in the witness.
16      THE COURT REPORTER:  Would you raise your
17  right hand?
18      Sir, do you solemnly swear or affirm the
19  testimony you're about to give will be the truth,
20  the whole truth, and nothing but the truth?
21      THE WITNESS:  Yes, I do.
22      THE COURT REPORTER:  Thank you.
23      MATTHEW PERRI, III, BS Pharma, Ph.D., RPh,
24  called as a witness by the Track One Defendants,
25  having been duly sworn, testified as follows:
```

Page 9

```
 1         DIRECT EXAMINATION
 2  BY MR. VOLNEY:
 3     Q.  Dr. Perri, my name is John Volney.  I
 4  represent Purdue Pharma in this case.  I'm here to
 5  take your deposition as an expert for the plaintiffs
 6  in the matter.  You understand that?
 7     A.  I do.
 8     Q.  Have you given a deposition before?
 9     A.  Yes, I have.
10     Q.  How many times?
11     A.  In matters like this, three, I believe,
12  three times.
13     Q.  So --
14     A.  Possibly four.
15     Q.  So you understand how the process works?
16     A.  Yes, I do.
17     Q.  So it's going to be important today that you
18  let me finish my question before you begin your
19  answer.  Understand?
20     A.  I do.
21     Q.  And I'll do the same.  I will try to provide
22  you the courtesy of letting you finish your question
23  before I ask my next question.  Is that fair?
24     A.  It's fair, and I appreciate that.
25     Q.  And you understand that it's your obligation
```

Page 102

1 that -- that it was the opioid marketing that began
2 in and around that time period that created that
3 sustained increase in utilization of opioids.
4   Q.  Let's move on to -- let's see.  We've talked
5 a little bit about Paragraph 29 and the heightened
6 standards that you've identified in your -- the
7 heightened standards for pharmaceutical marketing in
8 Paragraph 29, but then in Paragraph 35, you talk
9 about basic standards.
10      Do you see that?
11  A.  Let me get there.  So just a small
12 distinction there.  The heightened standards apply
13 for prescription drugs over other consumer goods,
14 and then these are additional standards that apply
15 to pharmaceutical marketing above and beyond.
16  Q.  I notice that in Footnote 35, which is the
17 backup for the basic standards comment, you've
18 identified a number of articles.
19  A.  Yes.
20  Q.  And it looks like most of those articles
21 come from medical journals or publications from
22 places outside of the United States; is that right?
23  A.  I specifically wanted to -- opioids are a
24 drug that are used worldwide.  And they -- there are
25 agencies, associations, and so forth worldwide

Page 103

1 that -- that have published opinions and so forth,
2 and recommendations, guidelines, if you will.  So I
3 wanted to be sure to be as complete as possible
4 there, but there are also those cited from the
5 United States as well.
6   Q.  Which are which ones?
7   A.  That would be the PhRMA citation.
8   Q.  Oh, the Pharmaceutical Research and
9 Manufacturing Association's Code on Interaction With
10 Healthcare Professionals?
11  A.  Yes.
12  Q.  Are there any others that come from the US?
13  A.  So to the extent that US manufacturers are
14 also involved in some of these other countries, for
15 example, just in general, the World Health
16 Organization, you know, being involved in -- at the
17 global level, there may be some overlap there, but
18 I'm pretty sure that's the only one that is specific
19 to the US.  I mean, yeah, that's --
20  Q.  Is that right?
21  A.  It is.  I -- I just was -- you know, I was
22 looking at it.  It just struck me that, you know,
23 several defendants are, you know, multinational
24 firms, and some of these citations actually come
25 from their home countries, so --

Page 104

1   Q.  Was that your intent to --
2   A.  I just wanted to be as complete as possible.
3   Q.  So why don't we take a break, have lunch,
4 come back at 12:30.  Is that cool?
5   A.  That's fine.  Thank you.
6      THE VIDEOGRAPHER:  We are now going off the
7 video record.  The time is currently 11:45 a.m.
8 This is the end of Media Unit Number 1 -- Number
9 2.
10   (Recess from 11:45 a.m. until 12:59?p.m.)
11     THE VIDEOGRAPHER:  We are now back on the
12 video record with the beginning of Media Number
13 3.  The time is currently 12:59 p.m.
14 BY MR. VOLNEY:
15  Q.  Okay.  Let's -- let's get back to it.  I
16 have some questions -- I want to return to Figure 2
17 in your report, which is Exhibit 1, so maybe you
18 could turn to that.  Frankly, I'm hoping that you
19 can help me understand what this Figure 2 is
20 intended to show.
21     So what is Figure 2 intended to show?
22  A.  Sorry.  Figure 2 is a graphic representation
23 of the decision process that physicians use --
24 actually, any -- anyone would use in deciding
25 whether or not to purchase a product or to utilize a

Page 105

1 product.  That's the -- I'm looking over to my left
2 to see.  It's the blue -- the blue boxes.
3   Q.  The blue boxes show what?
4   A.  So that is sort of the -- it's the -- the
5 short version of the information processing model.
6 It's where the actual decision or product choice
7 gets made.  And that is the -- begins with a
8 patient's need.
9     It's adapted in this case.  This is a model
10 that has been utilized in marketing for literally
11 decades.  It's adapted in this case to apply
12 specifically to the physician prescribing decision.
13     But it begins with patient's need or a
14 recognized -- problem recognition or need
15 identification, and then that's followed by product
16 information search, an evaluation of alternatives by
17 the prescriber, and then choice of a prescription
18 medication, the patient's eventual use of that
19 medication, and then some outcome from that.
20     The patient either was satisfied with the
21 result or not.  In this case, they either found that
22 it relieved their pain or it doesn't.  They found
23 that it made them nauseous or it didn't.  And that
24 information then feeds back into the repeat process
25 for when a repeat use is necessary.  So that's the

Page 106

1  bottom -- that's the mainstay of the decision
2  process.
3      What's important about this model is it
4  shows you how the information that's available in
5  the marketplace relates to the -- the blue boxes
6  where the decision is made.  So if you look to the
7  right, we have a lot of external influences, things
8  that are innate to the prescriber, perhaps, such as
9  culture or other issues, other -- other
10 characteristics like that.
11     The -- the box below that, individual
12 differences, includes several things that -- that
13 are slightly different, for example, including
14 attitudes and personality.
15     So these -- these factors do play into the
16 decision model because your beliefs, values, your
17 attitudes and perceptions have a big part -- a big
18 part to play in your decision-making.
19     Just -- so, for example, if you held the
20 belief that -- that drug companies were stellar in
21 their -- their research and that the clinical trials
22 that they -- they publish and so forth were just,
23 you know, really the gold standard, then that would
24 positively impact your decisions in this model.
25     If, on the other hand, you thought that

Page 107

1  there was always the potential for commercial bias
2  when a drug company sponsors research, that might
3  flavor you in a negative way.  So these kinds of
4  influences are important.
5      And if you swing over to the -- to the
6  external stimuli completely opposite that on the
7  left side of the model, we see that there are active
8  stimuli in the marketplace that go beyond a patient
9  showing up with a need or your own individual
10 characteristics or the environment surrounding all
11 of it, and that includes marketer-dominated and
12 marketer -- and nonmarketer-dominated influences in
13 the marketplace.
14     These become important when a physician
15 doesn't have all the information that they need and
16 they are searching for more information so they can
17 provide the best care to their patient.
18     So marketer-dominated and
19 nonmarketer-dominated stimuli that are the result
20 of either company marketing efforts or an article
21 that is read or interaction with colleagues, that
22 all then begins to be processed by the physician or
23 prescriber through the green boxes, which model the
24 steps that you go through in incorporating
25 information that's gleaned from the external stimuli

Page 108

1  into your thought processes and cognition.
2      So sort of the right-hand side of the model
3  is more on the affective side, the green boxes are
4  more on the cognitive side, and something ends up in
5  your memory, something ends up as a knowledge that
6  you've gained that when you have a patient that
7  shows up with a need, back to the blue boxes now,
8  you then reach back into your memory and pull that
9  information out and use it.
10     So it is a fairly complete structuring of
11 how different influences impact that ultra-important
12 decision to prescribe a medication for a patient.
13   Q.  Okay.  Looking at this model, where does the
14 physician's training factor in?
15   A.  That could come in a couple of different
16 places.  For example, it could come from memory.
17 They've been taught in school, so they've attended
18 information.  They've understood it or accepted or
19 rejected it, built it into their memory banks.  So
20 it could come under memory.
21     It could also come in terms of their
22 individual differences.  They could have had a
23 professor in medical school that said, hey, never
24 believe anything a drug company tells you, and
25 that's going to impact the way they look at things

Page 109

1  from then on.  So it could affect their perceptions,
2  their attitudes, their beliefs, but it would come
3  into play through one of these avenues in the model.
4   Q.  Okay.  Now, what about a particular
5  practitioner's clinical experience?
6   A.  So if you look at the blue boxes again,
7  where we have a patient outcome, that is -- in
8  marketing we have -- we have two possible outcomes,
9  either satisfied or not satisfied.  There can be
10 ranges of that, but ultimately you either decide to
11 use the product again or not.
12     So that information, if you're a prescriber
13 and your patient is not happy or their pain was not
14 relieved, that means I've got to go back to the
15 drawing board and search for the next best
16 alternative or search for the right answer; for
17 example, increase the dose, change the medication,
18 try some other form of therapy, whether it be drug
19 or nondrug therapy, surgery, whatever it might be.
20     If the patient is satisfied, then that also
21 factors back into the model, if you follow the arrow
22 back up, so that the doctor would then or the
23 prescriber would then know that the patient was
24 happy with that alternative, they got a good
25 outcome, and they continue to prescribe.

Page 110

1 Q. What about the clinical experience that
2 would have been gleaned by a prescriber who
3 regularly prescribed a certain type of medication to
4 a group of patients?
5 A. Well, that -- that's -- this is a -- this
6 model is intended to represent a collection of data
7 points, not just an individual patient, although
8 it -- the decision process could apply to an
9 individual patient.
10     So if a doctor has lots and lots of
11 experience with a particular outcome in his patients
12 or her patients, then that information feeds back
13 into their memory as -- and will flavor their future
14 prescribing decisions.
15 Q. So then conversely, if a doctor had a
16 negative experience with a patient with a particular
17 drug, the doctor might decide -- or might be more
18 reluctant to prescribe that to a new patient or a
19 different patient; fair?
20     MR. CHALOS: Object to the form.
21 A. So, again, the -- I can only look at this
22 from the marketing perspective. So if we talk in
23 terms of satisfaction and dissatisfaction, I'd agree
24 with that. If the outcome is one that the patient
25 had a good outcome and the doctor deemed that to be

Page 111

1 a positive, then it would bode well for future use.
2     So within the scope of an individual
3 patient, I can't really comment on that, but within
4 the scope of the marketing outcome, satisfaction and
5 dissatisfaction, I agree with that.
6 Q. I take it what -- or one of the things I
7 gleaned from this particular diagram is that there
8 is a range of information that's in the mix when a
9 person in a clinical setting, a doctor in a clinical
10 setting, decides whether to prescribe a certain
11 medication; fair?
12 A. There is a lot of information that has to be
13 processed. That's absolutely true.
14 Q. And one of the subsets of information that a
15 doctor would have to process would be marketing
16 information?
17 A. Yes, that's true. They would be -- they
18 would need to process that information because --
19 and I -- I'm pretty sure I -- I addressed this to
20 some degree in the report. They've got to stay
21 current on -- with their drug knowledge and their
22 disease knowledge, and one of the ways they do that
23 is the information provided by marketing.
24 Q. And I think you would agree with me that in
25 your experience -- I think you've referenced it here

Page 112

1 today or just now -- that some doctors look down
2 their nose at pharmacy company advertising; fair?
3     MR. CHALOS: Object to the form.
4 A. Yeah. I think that's -- that's something
5 that if you -- if you look at the citations of --
6 that are included in the report, you would see that
7 there are a number of cites, and also agreeing with
8 that proposition that -- that doctors are skeptical
9 about the information they see if it's advertising
10 information.
11 Q. Okay. Let's -- let's continue on our waltz
12 through the report here. Let's go to Paragraph 39.
13 A. Okay. I'm with you.
14 Q. So in terms of the decision-making process
15 before an actual patient gets a drug or medicine,
16 there are a number of different potential -- well, I
17 guess earlier we talked about gatekeepers before a
18 drug makes it from a concept to patient, and those
19 gatekeepers include these gatekeepers that you list
20 here, prescribers, payers, sites of care, and
21 influencers; fair?
22 A. So you refer to them as gatekeepers. I
23 think -- I think the discussion we had this morning
24 was more -- and I'm not -- not necessarily
25 disagreeing with you, but I think the discussion we

Page 113

1 had this morning was more focused on, you know, a
2 checks and balances of a gatekeeper. These are --
3 these -- these customers are -- in this context are
4 facilitators.
5 Q. Facilitators, what do you mean by that?
6 A. So in order to sell a product, the
7 pharmaceutical marketer has to appeal to the
8 interest and the needs of these customers to satisfy
9 the needs that they have, and so they're -- they're
10 really not looking at this as a gatekeeper. It's
11 more of a how do we meet customer needs, and what --
12 who are those customers? And that's what I've
13 identified in this paragraph.
14 Q. Okay. I think you're answering my question
15 from the perspective of the pharmaceutical company;
16 fair?
17 A. Yes.
18 Q. But from the perspective of the customer or
19 the -- ultimately the patient, these will be
20 gatekeepers before the drug makes it from the
21 pharmacy to their medicine cabinet; fair?
22 A. So I think they --
23     MR. CHALOS: Object to the form.
24 A. These would be people that would have an
25 influence over what drug ends up in the patient's

Highly Confidential - Subject to Further Confidentiality Review

| Page 114 | Page 116 |
|---|---|
| 1  hands. I agree with that, yes.<br>2    Q. And then some of these influences that are<br>3  reflected here or influences that these people<br>4  exercise would also go into -- for this physician<br>5  prescribing information processing model; fair?<br>6    A. They would have an entrance to that model,<br>7  yes.<br>8    Q. Okay. So they're in the mix, in other<br>9  words?<br>10    A. Each of these -- each of these customers<br>11  could have, in any instance, an impact on the<br>12  choices available to a -- to a prescriber which<br>13  would affect their decision process.<br>14    Q. Okay. Do you know, was there any<br>15  direct-to-consumer marketing by the defendant<br>16  manufacturers in this case?<br>17    A. Direct-to-consumer marketing, yes.<br>18    Q. Okay. What kind of direct-to-consumer<br>19  marketing are you aware of?<br>20    A. So there were numerous patient brochures and<br>21  patient-oriented materials that were distributed.<br>22  In addition to -- my assessment, in addition to<br>23  that, there was the work through advocacy groups<br>24  that were supported by defendants. And those are<br>25  both forms of direct-to-consumer marketing, which I | 1  changed over time?<br>2    A. Yes, I think I have.<br>3    Q. Are you aware that marketing has changed<br>4  over time?<br>5    A. I think it did -- it did -- there's two<br>6  answers to that. The specific tactics remained<br>7  about the same through the entire period of this<br>8  case, the strategies and so forth. The messages<br>9  changed over time. The products changed somewhat<br>10  over time.<br>11    Q. You mentioned before our lunch break that<br>12  part of the reason you feel comfortable making the<br>13  assumption that defendants' marketing messages at<br>14  large were misleading is because of the existence of<br>15  the FDA warning letters. Is that fair?<br>16    A. Yes.<br>17    Q. Do you know whether any defendant took<br>18  corrective action as a result of any warning letter?<br>19    A. Yes, I think they did.<br>20    Q. Are -- do you know whether that corrective<br>21  action was successful?<br>22    A. I guess it depends on how you define<br>23  successful.<br>24    Q. Well, have you made any effort in your<br>25  analysis to evaluate whether that corrective action |

| Page 115 | Page 117 |
|---|---|
| 1  distinguish in my report from direct-to-consumer<br>2  advertising.<br>3    Q. Okay. What's the difference between<br>4  direct-to-consumer marketing and direct-to-consumer<br>5  advertising?<br>6    A. So marketing is the broad umbrella, and<br>7  advertising would be a very specific -- it's what<br>8  you and I see when we wake up in the morning to<br>9  Ozempic commercials or something else where we're<br>10  seeing advertisements that are aimed at product<br>11  sales directly in the media aimed at consumers.<br>12    Q. Do you consider the activities of advocacy<br>13  groups to be direct consumer marketing by the drug<br>14  manufacturers?<br>15    A. At the end of the day, yes, I do.<br>16    Q. And why is that?<br>17    A. Their activities were part of their<br>18  marketing plans and designed to advance the messages<br>19  and marketing -- and using marketing strategies that<br>20  the defendants sought to advance in the marketplace,<br>21  so it becomes a part of their marketing.<br>22    Q. Okay. Let's see. Have you made an effort,<br>23  in considering the marketing pieces that you've<br>24  included in your report and in your chart, to show<br>25  how -- or take into account how the marketing | 1  was successful in any particular case?<br>2    A. So, I mean, if we take the package insert<br>3  change for OxyContin, and you -- you look at, you<br>4  know, what -- what -- the circumstances surrounding<br>5  that change, the circumstances on -- that<br>6  surround -- which are completely marketing<br>7  behaviors, of getting the information that ended up<br>8  in the original OxyContin package insert into that<br>9  package insert and the negotiations that went on<br>10  with the FDA, where the FDA got their information,<br>11  and how the FDA used that information and how it<br>12  ended up being the way it was, and then you look at<br>13  the change that was made.<br>14         The next step is to say, okay, that's good.<br>15  They made the change to the PI, but what changed in<br>16  the marketing? The PI might have changed, but the<br>17  marketing didn't change.<br>18         So I fail to see how that would -- would<br>19  impact the analysis because what I was looking at<br>20  was the actual messages being used and how those<br>21  messages were being communicated and the strategies<br>22  of how those messages were brought to market.<br>23    Q. Is the PI part of the mix of information<br>24  that a prescriber might consider before prescribing<br>25  a drug to a particular patient? |

```
                                           Page 118
 1    A.   If they reviewed the PI, it would become
 2    part of the mix.
 3    Q.   Is it also fair to say that marketing is
 4    only part of the mix to the extent that a particular
 5    prescriber saw the marketing, remembered the
 6    marketing, and sort of put it in his or her brain;
 7    fair?
 8    A.   That is consistent with the information
 9    processioning model and how information is
10    processed, yes.
11    Q.   All right.  So looking at this model, that's
12    what that is sort of intended to show?  If a doctor
13    sees the marketing, is exposed to it, pays attention
14    to it, comprehends it, accept it -- accepts it, and
15    retains it, puts it in his memory, if a particular
16    patient shows up, that particular drug might come to
17    mind as a drug that is appropriate for that patient.
18    Fair?
19         MR. CHALOS:  Object to the form.
20    A.   Yes, I think that's -- that's accurate.
21    The -- I don't want to leave the model completely
22    open, though.  The -- when it says acceptance, there
23    is also the possibility of rejection.  They can
24    reject messages as well.  So acceptance is a -- is a
25    term, it doesn't mean that you will accept every bit
```

```
                                           Page 119
 1    of information that you are provided, and the model
 2    does account for that.
 3    Q.   I think that's a fair point, and I
 4    understand that.  I appreciate your clarification of
 5    that point.  I think that's a -- that's good to
 6    hear.
 7         The -- this physician prescribing
 8    information processing model is not -- what you're
 9    testifying about in this case is the marketing
10    piece, if we look at the stimuli on the left.
11    You're -- you're here to testify about sort of the
12    pharmaceutical marketing input into that prescribing
13    model; is that fair?
14         MR. CHALOS:  Object to form.
15    A.   So my analysis focused on the marketing
16    efforts, the branded and nonbranded marketing, and
17    -- that were designed to influence that memory and
18    cognition, yielding an acceptance, yes.
19    Q.   And so the way you've done that is to
20    identify, through the Relativity database, the
21    various pieces of marketing materials that were
22    produced by the defendants in the case, as well as
23    reading some deposition testimony that was provided
24    to you from the various representatives of the
25    defendant companies; is that fair?
```

```
                                           Page 120
 1    A.   And relying on the literature that provides
 2    a theoretical underpinning for why those techniques
 3    are effective or not effective.
 4    Q.   Okay.  Got it.  Did you see any marketing
 5    from any defendant in this matter that you
 6    considered to be fair and balanced?
 7         MR. CHALOS:  Object to the form.
 8    A.   I think the -- the pieces of marketing that
 9    had more balance to them than less balance would be
10    pieces that were related to the package insert, for
11    example, which is obviously an approved -- an
12    approved document.
13         But when I look at the marketing plans --
14    and there's -- there's a reason why this is true,
15    that when I look the marketing plans, the
16    information in those marketing plans tends to be
17    heavily skewed towards the side of what can we do to
18    sell more product, not what can we do to withhold
19    product or to keep it from selling too fast.
20    Q.   Isn't that the point of a marketing plan, to
21    market?
22    A.   It -- it is the point of a marketing plan,
23    yes.
24    Q.   And you would agree with me that in the
25    great United States of America, drug manufacturers
```

```
                                           Page 121
 1    are allowed to market their products?
 2         MR. CHALOS:  Object to the form.
 3    A.   So as I've -- as I've scoped out in my
 4    report, I think that that is true as long as they
 5    adhere to the standards that have been established
 6    and that exist that relate to the marketing of
 7    pharmaceuticals.
 8    Q.   So the -- the marketing plans themselves are
 9    not documents that are intended to be shared with
10    the prescribers, TPPs, et cetera, fair?
11         MR. CHALOS:  Object to the form.
12    A.   So marketing -- marketing plans are intended
13    for, you know, the internal use of the company, but
14    they -- the value that they bring to the table is
15    that the marketing plans integrate the entire scope
16    of marketing, which is why I always get a little bit
17    nervous when we pick out one thing, like the PI, and
18    try to talk about it.
19         Marketing is a integrative process, and
20    that's another figure in my report, but the idea we
21    can look at any one piece of information and know
22    what's going on with marketing is just not valid.
23    It's the entire scope of activities that are
24    combined to create the product image, the perception
25    in a customer's mind, the -- whether or not doctors
```