# Exhibit 5

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION
 3                          - - -
 4    IN RE:  NATIONAL      :
      PRESCRIPTION OPIATE   :     MDL NO. 2804
 5    LITIGATION            :
      ---------------------------------------------
 6                          :     CASE NO.
      THIS DOCUMENT         :     1:17-MD-2804
 7    RELATES TO ALL CASES:      Hon. Dan A. Polster
 8                          - - -
 9                   Friday, April 26, 2019
10                          - - -
11       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12                 CONFIDENTIALITY REVIEW
13                          - - -
14           Videotaped deposition of DAVID A.
15    KESSLER, M.D. (Day 2), taken pursuant to
16    notice, was held at Baron & Budd, 600 New
17    Hampshire Avenue NW, Floor G, Washington, DC
18    20037, beginning at 8:07 a.m., on the above
19    date, before Lisa V. Feissner, RDR, CRR, Notary
20    Public.
21
22                          - - -
23              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
24                   deps@golkow.com
```

Page 421

```
 1  APPEARANCES:
 2  LEVIN PAPANTONIO THOMAS MITCHELL
    RAFFERTY & PROCTOR PA
 3  BY: TROY A. RAFFERTY, ESQUIRE
    316 South Baylen Street - Suite 600
 4  Pensacola, Florida 32502
    (850) 435-7163
 5  trafferty@levinlaw.com
    -- Representing Plaintiffs
 6
    SEEGER WEISS LLP
 7  BY: PARVIN K. AMINOLROAYA, ESQUIRE
    BY: KSENIYA LEZHNEV, ESQUIRE
 8  77 Water Street - 8th Floor
    New York, NY 10005
 9  212-584-0700
    paminolroaya@seegerweiss.com
10  klezhnev@seegerweiss.com
    -- Representing Plaintiffs
11
    LIEFF CABRASER HEIMANN & BERNSTEIN
12  BY: LEXI J. HAZAM, ESQUIRE
    275 Battery Street - 29th Floor
13  San Francisco, CA 94111-3339
    (415) 956-1000
14  lhazam@lchb.com
    -- Representing Plaintiffs
15
16  SPANGENBERG SHIBLEY & LIBER LLP
    BY: PETER H. WEINBERGER, ESQUIRE
17  1001 Lakeside Avenue East - Suite 1700
    Cleveland, OH 44114-1149
18  (216) 600-0114
    pweinberger@spanglaw.com
19  -- Representing Plaintiffs
20
21
22
23
24
```

Page 422

```
 1  APPEARANCES:  (Continued)
 2  BARON & BUDD P.C.
    NOAH RICH, ESQUIRE
 3  (via video stream / realtime stream)
    600 New Hampshire Avenue, NW
 4  The Watergate, Suite 10-A
    Washington, DC 20037
 5  (202) 333-4562
    nrich@baronbudd.com
 6  -- Representing Plaintiffs
 7  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
    BY: MATIAS BUSTAMANTE, ESQUIRE
 8  (via video stream / realtime stream)
    275 Battery Street - 29th Floor
 9  San Francisco, CA 94111
    (415) 956-1000
10  mbustamante@lchb.com
    -- Representing Plaintiffs
11
    DECHERT LLP
12  BY: HOPE S. FREIWALD, ESQUIRE
    Cira Centre
13  2929 Arch Street
    Philadelphia, PA, 19104-2808
14  (215) 994-2514
    hope.freiwald@dechert.com
15     and
    DECHERT LLP
16  ALEJANDRO HERRERA, ESQUIRE
    Three Bryant Park
17  1095 Avenue of the Americas
    New York, NY 10036-6797
18  (212) 698-3500
    alejandro.herrera@dechert.com
19  -- Representing the Purdue Defendants
20
21
22
23
24
```

Page 423

```
 1  APPEARANCES:  (Continued)
 2  ARNOLD & PORTER KAYE SCHOLER LLP
    BY: JOSHUA M. DAVIS, ESQUIRE
 3  601 Massachusetts Avenue, NW
    Washington, DC 20001-3743
 4  (202) 942-5743
    joshua.davis@arnoldporter.com
 5  -- Representing the Endo and Par Defendants
       and
 6  ARNOLD & PORTER KAYE SCHOLER LLP
    BY: JOHN CELLA, ESQUIRE
 7  (via video and realtime stream)
    601 Massachusetts Avenue, NW
 8  Washington, DC 20001-3743
    (202) 942-5743
 9  john.cella@arnoldporter.com
    -- Representing the Endo and Par Defendants
10
11  KIRKLAND & ELLIS LLP
    BY: JENNIFER LEVY, ESQUIRE
12  1301 Pennsylvania Avenue, NW
    Washington, DC 20004
13  (202) 389-5211
    jennifer.levy@kirkland.com
14     and
    KIRKLAND & ELLIS LLP
15  BY: MICHAEL LeFEVOUR, ESQUIRE
    300 North LaSalle
16  Chicago, IL 60654
    (312) 862-3728
17  michael.lefevour@kirkland.com
    -- Representing the Allergan Defendants
18
    MORGAN LEWIS & BOCKIUS LLP
19  BY: WENDY WEST FEINSTEIN, ESQUIRE
    One Oxford Centre
20  Thirty-Second Floor
    Pittsburgh, PA 15219-6401
21  (410) 560-7455
    wendy.feinstein@morganlewis.com
22  -- Representing the Teva Defendants
23
24
```

Page 424

```
 1  APPEARANCES:  (Continued)
 2  O'MELVENY & MYERS LLP
    BY: AMY LAURENDEAU, ESQUIRE
 3  610 Newport Center Drive
    17th Floor
 4  Newport Beach, CA 92660
    (949) 823-7926
 5  alaurendeau@omm.com
       and
 6  O'MELVENY & MYERS LLP
    BY: VINCENT S. WEISBAND, ESQUIRE
 7  Times Square Tower
    7 Times Square
 8  New York, NY 10036
    (212) 326-2228
 9  vweisband@omm.com
    -- Representing the Janssen Defendants
10
    MORGAN LEWIS & BOCKIUS LLP
11  BY: JOHN P. LAVELLE, JR., ESQUIRE
    (via video and realtime stream)
12  1701 Market Street
    Philadelphia, PA 19103-2921
13  (215) 963-4824
    john.lavelle@morganlewis.com
14  -- Representing the Defendant
       Rite-Aid of Maryland, Inc.
15
    REED SMITH LLP
16  BY: STEVEN J. BORANIAN, ESQUIRE
    101 Second Street - Suite 1800
17  San Francisco, CA 94105
    (415) 659-5980
18  sboranian@reedsmith.com
       and
19  REED SMITH LLP
    BY: LUKE PORTER, ESQUIRE
20  (via teleconference)
    101 Second Street - Suite 1800
21  San Francisco, CA 94105
    (415) 659-5980
22  lsmith@reedsmith.com
    -- Representing the Defendant
23     AmerisourceBergen Drug Corporation
24
```

Page 425

APPEARANCES: (Continued)

JONES DAY
BY: BRANDY H. RANJAN, ESQUIRE
325 John H. McConnell Boulevard
Suite 600
Columbus, OH 43215-2673
(614) 469-3939
branjan@jonesday.com
-- Representing the Defendant Walmart Inc.,
   f/k/a Wal-Mart Stores, Inc.

ROPES & GRAY LLP
BY: RICHARD L. GALLAGHER, ESQUIRE
Three Embarcadero Center
San Francisco, CA 94111-4006
(415) 706-1033
richard.gallagher@ropesgray.com
   and
ROPES & GRAY LLP
BY: CHRISTINE D'AURIA, ESQUIRE
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
(617) 235-4741
christine.dauria@ropesgray.com
-- Representing the Defendant
   Mallinckrodt LLC

WILLIAMS & CONNOLLY LLP
BY: PAUL E. BOEHM, ESQUIRE
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5366
pboehm@wc.com
-- Representing the Defendant
   Cardinal Health, Inc.

FOX ROTHSCHILD LLP
BY: ZACHARY MARTIN, ESQUIRE
(via teleconference)
Stone Manor Corporate Center
2700 Kelly Road - Suite 300
Warrington, PA 18976
(215) 918-3680
zmartin@foxrothschild.com
-- Representing the Defendant
   Prescription Supply, Inc.

Page 426

APPEARANCES: (Continued)

BARTLIT BECK LLP
BY: SHARON DESH, ESQUIRE
(via teleconference)
54 West Hubbard Street
Suite 300
Chicago, IL 60654
(312) 494.4445
Sharon.Desh@BartlitBeck.com
-- Representing the Defendant
   Walgreens

ALSO PRESENT:

CHRIS RITONA, Videographer
Golkow Litigation Services
GERARD MAGLASANG, Legal Assistant
SEEGER WEISS LLP

ALSO PRESENT via video stream/realtime stream:

GRETCHEN KEARNEY
EMMA KABOLI
Baron & Budd P.C.

CHARLES BACHMANN
Seeger Weiss LLP

Page 427

- - -
I N D E X
- - -

Testimony of: DAVID A. KESSLER, M.D.
  By Mr. Davis         432
  By Ms. Laurendeau    525
  By Mr. Gallagher     633
  By Ms. Feinstein     659
  By Ms. Levy          697

- - -
E X H I B I T S
- - -

KESSLER
EXHIBIT NO.   DESCRIPTION                       PAGE

12   Clinical Development & Education,          456
     1998 Mid-Year Update on Goals &
     Objectives, Linda A. Kitlinski
     ENDO-OPIOID_MDL-05967764 - 05967774

13   Clinical Development & Education,          461
     1999 Objectives, Linda A. Kitlinski
     ENDO-OPIOID_MDL-03258200 - 03258202

14   Kessler large-format sheets                466
     Endo

15   Opana ER label                             485
     dated February 2008

16   Opana ER Kit                               489
     ENDO-CHI_LIT-00541205 - 00541210

17   Letter from Skariah to Best                499
     re: NDA #201655
     Reference ID: 3124026
     ENDO-OR-CID-000768706 - 00768711

Page 428

- - -
E X H I B I T S
(cont'd)
- - -

KESSLER
EXHIBIT NO.   DESCRIPTION                       PAGE

18   Letter from Best to CDER                   501
     dated February 29, 2012
     with attachments
     END00590895, END00590891 - 00590894
     END00590896 - 00590897
     END00591163 - 00591164

19   Duragesic label                            535
     Revised: 09/2018
     Reference ID: 4320698

20   Letter from Strickland to                  547
     The Honorable Connie Mack
     dated Jan 18 1994

21   Duragesic label                            551
     dated August 1990

22   Associated Press article, FDA              556
     Says Some Doctors Dangerously
     Misusing Potent Painkiller,
     dated January 18, 1994

23   Cumulative Review of Iatrogenic            573
     Addiction Associated with the
     Use of Transdermal DURAGESIC
     (fentanyl) Patch
     JAN-MS-02754767 - 02754783

24   Warning Letter re: NDA # 19-813            625
     JAN-MS-00291331

25   Kessler large-format sheets                697
     Janssen - Duragesic

26   Kessler large-format sheets                697
     Janssen - Nucynta

Page 753

1     MR. RAFFERTY: Object to the form.
2     A. I would agree with that.
3     Q. Okay. You always have and continue
4 to have every reason to trust the judgment of
5 officials of the FDA; is that correct?
6     MR. RAFFERTY: Object to the form.
7     A. I wouldn't -- sitting here today, I
8 wouldn't say it like that.
9     Q. Okay.
10     A. I said I have enormous respect for
11 the people who work at the agency, but like any
12 other organization that has 10,000 people,
13 there are people whose judgment I would trust
14 with my life, and there are -- like any
15 organization, there are clunkers.
16     And so I would not make a blanket
17 statement across the board. I have enormous
18 respect.
19     Q. Janet Woodcock, the head of CDER,
20 you would put her in the category of someone
21 you have enormous respect for?
22     A. I appointed Janet.
23     Q. That's not the question I asked.
24     Do you have enormous respect for

Page 754

1 Janet Woodcock?
2     A. Respect? Sure. I appointed her.
3 I picked her out. She was a, you know,
4 three-level medical reviewer, and I made her
5 the head of the center ten years ahead of when
6 she was supposed to be. I have enormous
7 respect.
8     Do I agree -- I have enormous
9 respect for her contribution to service, to her
10 integrity. Has she made mistakes? Absolutely.
11 Do I disagree with her? Absolutely. Have we
12 had conversations like that? Absolutely.
13     I defended Janet Woodcock, I mean,
14 you know, pretty vigorously because I thought
15 people at the agency should get defended in
16 certain circumstances.
17     Q. What about Carl Peck? Would you
18 say the same about him?
19     A. Carl Peck, you have to love. Carl
20 Peck -- I would trust Carl Peck with
21 pharmacokinetics because he sees
22 pharmacokinetics in everything. And I think he
23 contributed and we worked mightily together.
24     Do I agree with him on everything?

Page 755

1 Absolutely not. Do I think every question can
2 be answered by a PK analysis? Absolutely not.
3 Did he make a mistake on pilot drug, et cetera?
4 We could spend hours talking. But I love Carl
5 Peck, and enormous respect for Janet.
6     Q. The FDA has the highest safety and
7 efficacy studies in the world, right?
8     A. Studies in the world, no. FDA
9 doesn't do studies. The manufacturers does the
10 studies. So I'm not sure what that -- the
11 question means.
12     Q. The doctors and scientists at FDA
13 are as smart and talented as any you've ever
14 seen; is that right, sir?
15     MR. RAFFERTY: Object to the form.
16     A. That's exactly the kind of
17 statement that I made earlier. If you're
18 asking me, there are those who are very
19 talented, and there are those who are clunkers,
20 and there are those who could earn umpteen
21 dollars times their salary on the outside and
22 are pure gold, and there are others who make
23 mistakes. And even those who you trust
24 sometimes make mistakes. And we all do that.

Page 756

1     Q. Do you agree that the United States
2 food and drug laws have the highest safety and
3 efficacy standards in the world?
4     MR. RAFFERTY: Object to the form.
5     A. I did at a point in time.
6     Q. Do you agree now, as you sit here
7 today?
8     A. I think in certain areas, we may be
9 being usurped by certain of the European -- in
10 certain areas. I think that was probably true
11 at a point in time, but I have some concerns in
12 certain areas.
13     Q. If a company gets a warning letter
14 and the company wanted to be a model citizen,
15 one thing it would do -- the first thing it
16 would do is immediately stop using the
17 offending promotional materials. That's one
18 thing you would want to see a company that got
19 a warning letter do, correct?
20     A. Sure. But I think there would be
21 something you'd want to do first.
22     Q. Another thing you would want a
23 company to do when it gets a warning letter
24 from the FDA about promotional materials is to

Page 757

1 work with the FDA to formulate a corrective
2 action plan, right?
3    A.  Sure.  But I would think there
4 would be something even more important.
5    Q.  What first?  What would one want to
6 do first?
7    A.  You'd want to look and see not just
8 what this promotional material was or what your
9 corrective action plan, you would want to
10 understand the corporate strategy or the
11 corporate culture that contributed to that
12 warning letter, and you would want to make sure
13 you would change that corporate culture or that
14 corporate strategy rather than just discarding
15 X piece of paper or coming up with a plan.
16 That's what I think it is more important when
17 you got a warning letter.
18    Q.  So if you're advising a company as
19 to how to be a model citizen and do the right
20 thing when you get a warning letter, you need
21 to figure out why the statement got in and
22 correct that as a matter of corporate conduct?
23 Is that what you're saying?
24    A.  Sure.  But you'd have to ask

Page 758

1 yourself -- there's a term -- and I'm not a big
2 fan of it, the term.  It's a little bit of a
3 slogan, but it's a culture of compliance.  And
4 is there anything in that culture of compliance
5 that is off, that begat that warning letter.
6    Q.  You'd also want to work with the
7 FDA and create a corrective action plan that
8 was effective, correct?  Yes or no?
9    A.  Sure, yes.
10    Q.  And you are aware that Actavis got
11 a warning letter with respect to Kadian.
12 That's something that you talk about in your
13 report, right?
14    A.  2010, I believe, yes.
15    Q.  And, in fact, Actavis did
16 immediately stop using the materials.  You're
17 aware of that?
18    A.  I am.
19    Q.  And Actavis also worked with the
20 FDA to create a corrective action plan,
21 correct?
22    A.  Correct.
23    Q.  And you are aware that the FDA
24 agreed with and said it appreciated the

Page 759

1 corrective action plan, correct?  Are you aware
2 of that?
3    A.  I'm not sure the word
4 "appreciated," but I'll take your stipulation
5 to that.  I don't recall, but I'll -- I'm sure
6 the FDA said something akin to that.
7    Q.  And part of the corrective action
8 plan was to send Dear Healthcare Professional
9 letters to every physician who had received the
10 projects materials.
11    Are you aware of that?
12    A.  Correct.
13    Q.  In addition, part of the corrective
14 action plan was to send additional letters out
15 to consumers, correct?
16    A.  Correct.
17    Q.  Okay.  And you don't have any
18 reason to believe that the FDA was dissatisfied
19 with that corrective action plan, do you?
20    A.  Correct.
21    Q.  Okay.  There was no enforcement
22 action or any further action taken on Kadian by
23 the FDA at any point in time after that,
24 correct?

Page 760

1    A.  Correct.  And we see the decrease
2 in numbers and eventually the decrease in
3 promotion, et cetera, that followed shortly,
4 and we see this inflection point in Kadian's
5 sales.
6    Q.  Do you believe that Actavis did the
7 right thing when it got its warning letter?
8    A.  I have no reason to doubt that.
9    Q.  Okay.  There's another document
10 that you cited in your report in paragraph 520
11 that you take issue with for Actavis.
12    A.  If I can find my report.
13    Q.  Your report is buried in my pile,
14 too.  Let's look together.
15    A.  520?
16    Q.  I think that's correct.  Let me
17 turn to it.
18        MS. LEVY:  There's a request for a
19    break.  Let's go off the record.
20        THE WITNESS:  I think 520 raises
21    some questions.
22        MS. LEVY:  Hang on a second.
23    Let's go off the record.
24        VIDEO OPERATOR:  4:40 p.m., we're

Page 761

1 off the video record.
2     (Recess from 4:40 p.m. until
3 4:53 p.m.)
4     VIDEO OPERATOR: 4:53, we're on the
5 video record.
6 BY MS. LEVY:
7     Q.  Doctor, you once referred to the
8 FDA processes as being the gold standard for
9 drug approval.
10     Do you still have that opinion
11 today?
12     A.  I think so.
13     Q.  How many opioids were approved in
14 the Kessler administration?
15     A.  I don't know -- I mean, the ones
16 obvious -- there were approved -- let me just
17 do it in my head.  Duragesic was approved
18 before me.
19     There were two.  There was Kadian,
20 and as far as brand name drugs, Kadian and
21 Duragesic -- I'm sorry -- Kadian and Oxy were
22 done during that seven-year period.  I'd have
23 to look and see how many on the generic side.
24     Q.  Do you know the number of

Page 762

1 opioids -- just do you know the number of
2 opioids that were approved during the Kessler
3 administration?
4     A.  I can tell you NDAs.
5     Q.  How many?  Number only.
6     A.  I believe there were two NDAs.
7     Q.  How many ANDAs?
8     A.  I don't have that number.
9     Q.  You don't know?
10     A.  I don't know.
11     Q.  The FDA continues to approve opioid
12 products on an ongoing basis, correct?  Let
13 me -- I worded that poorly.
14     The FDA continues to approve new
15 opioid products on an ongoing basis, continuing
16 through today, right?
17     MR. RAFFERTY:  Object to the form.
18     A.  There's an issue with regard to
19 that in my conversations with the Commissioner,
20 but the way the statute is written, there's
21 some discussion of whether that needs to be
22 changed.
23     Q.  Not my question.
24     The FDA continues to approve

Page 763

1 opioids, this year has even approved opioids,
2 correct?
3     A.  This year, it would be fair.  But
4 when you say "continued," you're implying into
5 the future, and I'm just saying there is an
6 issue about that.
7     Q.  Okay.  The FDA approved new opioids
8 in 2015, '16, '17, '18 and '19, correct?
9     A.  And some to great criticism.
10     Q.  No doubt that the FDA has been
11 criticized widely by some folks for doing so.
12     But it continues to approve these
13 products, correct?
14     A.  Including me.
15     MR. RAFFERTY:  Object to the form.
16     Q.  And there have been a number of
17 citizens' petitions and other requests to the
18 FDA to make changes and to make -- to take
19 certain actions with respect to opioids on the
20 market.
21     You're aware of those, right?
22     MR. RAFFERTY:  Objection.
23     A.  We've discussed those in the past
24 two days.

Page 764

1     Q.  And you disagree with the FDA's
2 opinions and outcomes in responding to those
3 petitions?  You disagree with the FDA in that,
4 right?
5     MR. RAFFERTY:  Object to the form.
6     A.  I don't think that's a fair
7 statement.  That's not my testimony.  If you
8 want to show me a specific sentence in FDA, I
9 can tell you what I would agree with and what I
10 disagree.  I won't make a blanket statement --
11     Q.  That's fair.
12     A.  -- that I agree or I disagree.
13     Q.  And I believe we established this
14 earlier in the record, but just in case.
15     You are not giving testimony or
16 speaking for the FDA, correct?
17     A.  That's correct.
18     Q.  You haven't been employed by the
19 food -- by the Health and Human Services
20 Department since the -- 21 years; is that
21 right?
22     A.  You can do the math at this hour.
23 But I would certainly -- it's very important,
24 underscore it, put an asterisk, put an

Highly Confidential - Subject to Further Confidentiality Review

Page 765

1 exclamation point. I'm in no official
2 capacity. Sometimes I get put on television
3 because they're not -- sometimes I get put on
4 television because the agency is not speaking.
5 But I have no official capacity.
6     Q.  Okay.  There are plenty of things
7 that you disagree with the FDA on, right?
8     A.  Things I agree with them and things
9 I disagree with them.
10     Q.  Okay.  Now, the -- one of the
11 things you believe is that Kadian should not be
12 prescribed for chronic pain, right?  Or is that
13 an overstatement?
14     A.  So I think if you did that, if you
15 just left it that way, I think that would be
16 inaccurate.
17     Q.  Okay.  Do you have any -- strike
18 that.
19         Kadian was approved by the FDA in
20 1996 for use in patients with chronic moderate
21 to severe pain who require repeated dosing with
22 a potent opioid analgesic, correct?
23     A.  I thought it said continuous,
24 around-the-clock.  Do you want to just give

Page 766

1 me -- maybe I'm misreading.
2     Q.  Let me -- let me read you --
3     A.  Just give me the indication.  I can
4 pull it.  Let me pull it.
5     Q.  I just want to ask -- I'm asking --
6 we're going to do that in a minute, but listen
7 to this specific question, and I would like to
8 know if you agree or disagree.
9     A.  Okay.  I'm just pulling the label
10 so I can be exact.  But go ahead.  I'm
11 listening, ma'am.  I don't want to delay.
12     Q.  No.  Take your time.  Do what you
13 need to do.  Put the label in front of you.
14         And for the record, are you looking
15 at your report?
16     A.  Just looking at the schedules that
17 have the labels, and I'm looking specifically
18 for Kadian and multiple changes, and let's just
19 look at the indications section -- I'm just
20 trying to get the indications section --
21 interactions with alcohol -- go ahead.  Just
22 read me the indications section, or read me
23 whatever you want.
24     Q.  So no, that's not my question,

Page 767

1 actually.  I want to wait until you can pay
2 attention to the question I'm going to ask you.
3     A.  Sure.  And I apologize.  I'm just
4 trying to pull the labeling.
5     Q.  Would you like to see the Kadian
6 current label?
7     A.  I'd love to see it in 1996.  That's
8 what I -- and I apologize --
9     Q.  I'm going to give you just another
10 minute, and then I'm going to move on with my
11 question.
12     A.  Keep going on, please.
13     Q.  Okay.  I'm going to say a
14 statement, and I want to know if you agree.
15 And here is the statement:  Kadian was approved
16 by the FDA in 1996 for use in patients with
17 chronic moderate to severe pain who require
18 repeated dosing with a potent opioid analgesic.
19         That's true, right?
20     A.  No, I'd want to see the label
21 before I'd answer that question.
22         (Exhibit Kessler-45 marked for
23         identification and attached to the
24         transcript.)

Page 768

1 BY MS. LEVY:
2     Q.  Let's mark -- let me hand you what
3 I've marked as Kessler Exhibit 45.
4     A.  Thank you very much, ma'am.
5     Q.  Okay.  And this is a document dated
6 July 11th, 1997.  You see in the top right-hand
7 corner?
8         THE WITNESS:  Can I ask someone
9     just get me the Kadian label, the
10     approved label, please?  Yeah, thank
11     you.
12     A.  I see this.
13     Q.  Okay.  And you recognize the
14 letterhead on this document as FDA Center For
15 Drug Evaluation and Research.  You recognize
16 that letterhead?
17     A.  I know that letterhead.
18     Q.  And the Center For Drug Evaluation
19 and Research is often referred to as CDER,
20 right?
21     A.  Correct.
22     Q.  CDER's understanding on July 11th,
23 1997 was that Kadian was approved by the FDA in
24 1996 for use in patients with chronic, moderate