# Exhibit 6

```
  1                UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
  2                      EASTERN DIVISION
  3     *************************

        IN RE:  NATIONAL
  4     PRESCRIPTION OPIATE        MDL No. 2804
        LITIGATION
  5                                Case No.
        This document relates to:  17-MD-2804
  6
        The County of Summit,
  7     Ohio, et al v. Purdue      Hon. Dan A. Polster
        Pharma L.P., et al
  8     Case No. 1:18-OP-45090
  9
        The County of Cuyahoga v.
 10     Purdue Pharma L.P., et al
        Case No. 17-OP-45004
 11
        *************************
 12          HIGHLY CONFIDENTIAL - SUBJECT TO
 13            FURTHER CONFIDENTIALITY REVIEW
 14       VIDEOTAPED DEPOSITION OF DAVID CUTLER, Ph.D.
 15
 16            Friday, April 26th, 2019
 17                  9:00 a.m.
 18
 19     Held At:
 20        Robins Kaplan LLP
           800 Boylston Street
 21        Boston, Massachusetts
 22
 23     REPORTED BY:
 24     Maureen O'Connor Pollard, RMR, CLR, CSR
```

Page 2

```
 1  APPEARANCES:
 2
    FOR THE PLAINTIFFS and THE DEPONENT:
 3
 4     DAVID J. KO, ESQ.
       DEREK W. LOESER, ESQ.
 5        KELLER ROHRBACK, LLP
          1201 Third Avenue
 6        Seattle, Washington 98101
          206-623-1900
 7        dko@kellerrohrback.com
 8         -and-
 9     THOMAS M. SOBOL, ESQ.
          HAGENS BERMAN SOBOL SHAPIRO LLP
10        55 Cambridge Parkway
          Cambridge, Massachusetts 02142
11        617-482-3700
          tom@hbsslaw.com
12
             -and-
13
       HOLLY DOLEJSI, ESQ.
14        ROBINS KAPLAN LLP
          800 LaSalle Avenue
15        Minneapolis, Minnesota 55402
          612-349-8500
16        hdolejsi@robinskaplan.com
17
18  FOR CAYAHOGA COUNTY:
19     SALVATORE C. BADALA, ESQ.
          NAPOLI SHKOLNIK PLLC
20        400 Broadhollow Road
          Melville, New York 11747
21        631-224-1133
          sbadala@napolilaw.com
22
23
24
```

Page 3

```
 1  APPEARANCES (Continued):
 2
    FOR PURDUE PHARMA:
 3
       WILL SACHSE, ESQ.
 4        DECHERT LLP
          2929 Arch Street
 5        Philadelphia, Pennsylvania 19104
          215-994-4000
 6        will.sachse@dechert.com
 7
 8  FOR McKESSON CORPORATION:
 9     DAVID HALLER, ESQ.
       FATMATA S. KABIA, ESQ.
10        COVINGTON & BURLING LLP
          620 Eighth Avenue
11        New York, New York 10118
          212-841-1000
12        dhaller@cov.com
13
14  FOR AMERISOURCEBERGEN DRUG CORPORATION:
15     BRIAN T. HIMMEL, ESQ.
          REED SMITH LLP
16        225 Fifth Avenue
          Pittsburgh, Pennsylvania 15222
17        412-288-4058
          bhimmel@reedsmith.com
18
19
    FOR WALGREENS:
20
       MATTHEW BREWER, ESQ.
21        BARTLIT BECK LLP
          54 West Hubbard Street
22        Chicago, Illinois 60654
          312-494-4445
23        matthew.brewer@bartlitbeck.com
24
```

Page 4

```
 1  APPEARANCES (Continued):
 2
    FOR H.D. SMITH:
 3
       ALICE SPRINGER, ESQ. (Remotely)
 4        BARNES & THORNBURG LLP
          100 North Michigan
 5        South Bend, Indiana 46601-1632
          574-237-1120
 6        alice.springer@btlaw.com
 7  FOR WALMART:
 8     CLAIRE CASTLES, ESQ.
          JONES DAY
 9        555 South Flower Street
          Los Angeles, California 90071-2300
10        213-489-3939
          ccastles@jonesday.com
11
             -and-
12
       STEVEN N. GEISE, ESQ.
13        JONES DAY
          4655 Executive Drive, Suite 1500
14        San Diego, California 92121-3134
          858-314-1170
15        sngeise@jonesday.com
16
17  FOR CVS INDIANA, LLC and CVS RX SERVICES, INC.:
18     DANIEL P. MOYLAN, ESQ.
          ZUCKERMAN SPAEDER, LLP
19        100 East Pratt Street
          Baltimore, Maryland 21202-1031
20        410-949-1159
          dmoylan@zuckerman.com
21
22
23
24
```

Page 5

```
 1  APPEARANCES (Continued):
 2
    FOR ANDA, INC.:
 3
       KATY E. KOSKI, ESQ.
 4        FOLEY & LARDNER LLP
          111 Huntington Avenue
 5        Boston, Massachusetts 02199-7610
          617-342-4000
 6        kkoski@foley.com
 7
 8  FOR ALLERGEN FINANCE:
 9     TIMOTHY W. KNAPP, ESQ.
       JOHN BAILEY, ESQ.
10        KIRKLAND & ELLIS LLP
          300 North LaSalle
11        Chicago, Illinois 60654
          312-862-7170
12        timothy.knapp@kirkland.com
          john.bailey@kirkland.com
13
14
    FOR JANSSEN and JOHNSON & JOHNSON DEFENDANTS:
15
       MATTHEW KAISER, ESQ.
16        O'MELVENY & MYERS LLP
          400 South Hope Street
17        Los Angeles, California 90071-2899
          213-430-8117
18        mkaiser@omm.com
19
20  FOR HBC SERVICE, INC.:
21     RICHARD I. HALPERN, ESQ.
          MARCUS & SHAPIRA LLP
22        One Oxford Centre, 35th Floor
          301 Grant Street
23        Pittsburgh, Pennsylvania 15219-6401
          412-338-4690
24        halpern@marcus-shapira.com
```

Page 174

1  BY MR. KNAPP:
2  Q. With respect to the final -- strike
3  that.
4      For purposes of this question I want
5  to focus on the final regression model that
6  Dr. Rosenthal -- strike that.
7      I want to focus on the final
8  regression models that Dr. Rosenthal built for
9  purposes of her report. Did you identify any
10 issues associated with those models?
11     MR. SOBOL: I instruct him not to
12 answer, because you've got embedded in the
13 question the communications.
14     If you want to ask him just if he has
15 an opinion about it, I'm not going to instruct
16 him not to answer about that, but it sounds like
17 right now, to me, what you're asking about is
18 what was discussed at meetings with the lawyers,
19 which is not appropriate.
20     You can ask questions anyway. I'm
21 actually trying to be helpful here.
22 BY MR. KNAPP:
23 Q. So, Professor Cutler, I'm asking about
24 the final regression model that Professor

Page 175

1  Rosenthal put together. Do you believe that the
2  regressions that she ran were appropriate?
3  A. Yes, I do believe that the regressions
4  Professor Rosenthal ran are appropriate.
5  Q. And you've adopted them as your own
6  for purposes of incorporating the outputs into
7  your model?
8  A. I have incorporated the outputs of
9  Professor Rosenthal as an input into my model,
10 with the understanding that I believe that
11 they're appropriate.
12 Q. Did you run any sensitivity tests to
13 see how her results would be impacted?
14 A. I did not run any sensitivity analysis
15 on her models.
16 Q. What are the standard diagnostic tests
17 that you would run when running a time series
18 regression?
19     MR. SOBOL: Objection. Scope.
20     You can answer.
21 A. In any regression that one runs there
22 are several diagnostics. One thing that one
23 would do would be to look at the R-squared
24 statistic or the adjusted R-squared statistic as

Page 176

1  a measure. That is a measure of the goodness of
2  fit of the model.
3      In addition, one would look at the
4  predictions of the model relative to the actual
5  data, so does the model seem to be fitting the
6  data well, or are there aspects of the data that
7  the model cannot fit well, and if so, that
8  suggests that the model is not accurate and
9  needs to be revised in some way.
10 BY MR. KNAPP:
11 Q. Based upon what you know from -- well,
12 strike that.
13     Is a negative depreciation rate
14 inconsistent with the literature on regressions?
15     MR. SOBOL: Objection. Scope.
16     You can answer.
17 A. Actually in a model of addiction, a
18 negative depreciation rate would not be
19 inappropriate at all. In fact, one way to
20 interpret addiction is that the effects build up
21 over time, so being -- having taken a drug
22 first, one then needs an increasing amount of it
23 over time, and that's going to show up as a
24 negative depreciation rate; that is, the impact

Page 177

1  of actions build over time rather than
2  depreciating over time.
3  BY MR. KNAPP:
4  Q. Is there any specific literature that
5  you're relying on for the statement that you
6  just made?
7  A. There is theoretical literature in the
8  economics of rational addiction that addresses
9  it. I don't know offhand whether there are any
10 empirical papers that would -- that estimate a
11 negative depreciation rate, and I don't know in
12 the sense that I just have not reviewed the
13 literature. So it's not that I've reviewed the
14 literature and I -- that is not a disguised way
15 of saying no. That's just me saying I have not
16 reviewed that literature well enough to see if
17 anyone has estimated negative depreciation rate.
18 Q. Is there a particular paper that
19 you're referring to in the economics of rational
20 addiction that you think addresses this topic?
21 A. There are. I'm trying to remember if
22 any of the papers have phrased it as in terms of
23 a negative depreciation rate or whether instead
24 they've just phrased it as -- mostly what they

Page 178

1 phrased it as is complementary consumption over
2 time, that is complementarity of consumption, so
3 consuming more of the good today increases my
4 margin utility of the good tomorrow.
5     In that framework, that is -- it's
6 typically done through the utility function
7 preferences that way rather than through the
8 discount rate, in part because one wants to do
9 welfare analysis, and so you really are thinking
10 about a positive discount rate from the
11 individual utility point of view.  So I think
12 most of the studies have not put it in the
13 discount rate because they're not doing
14 empirical analysis for which they're then saying
15 what would be the impact on the estimated
16 depreciation rate.  They're doing theoretical
17 analysis that says how would addiction show up
18 in such a model.
19     Q.  Sitting here today, there's not
20 particular papers that you can identify?
21     MR. SOBOL:  Objection.  Asked and
22 answered.
23     A.  I don't have a specific paper that has
24 translated it into a depreciation rate for a

Page 179

1 regression like what Professor Rosenthal has
2 run.
3 BY MR. KNAPP:
4     Q.  Now, did -- strike that.
5         Professor Rosenthal estimated the
6 impact of promotion in three different time
7 periods, right?
8     A.  That's correct, yes.
9     Q.  And did you agree with that approach?
10     A.  Yes, I did agree with Professor
11 Rosenthal's approach.
12     Q.  And is the reason that she looked at
13 three different time periods because she assumed
14 that there were three different structural
15 breaks in the market?
16     A.  She assumed that there were two
17 different structural breaks in the market which
18 led to three different time periods.
19     Q.  Thank you.  Good clarification.
20         Your model assumes that there's only a
21 single structural break in the market, right?
22     A.  That's correct, my model has only one
23 structural break.
24     Q.  If Dr. Rosenthal concluded that there

Page 180

1 were two structural breaks, why does your model
2 only account for one structural break?
3     A.  The reason for the difference is that
4 we're modeling two different things.  So
5 Dr. Rosenthal is modeling prescription drug
6 shipments as the outcome variable, and the
7 misconduct on the part of defendants as the
8 explanatory variable.  In that case one needs to
9 think about how many breaks are there in the
10 shipment variable, and she identifies those two
11 break points, as we were talking about.
12         In my case the issue is not so much
13 was there a change in the slope of shipments
14 over time, but rather what impact does -- do the
15 shipments of drugs have on the mortality
16 outcome, and that doesn't necessarily have a
17 break at any particular point in time when, for
18 example, shipments of a particular set of
19 medications ramp up.  The model says that that
20 has the same impact.  It's only when the
21 mortality framework changes, not so much the
22 shipment framework, but it's only when the
23 mortality framework changes that there would be
24 a break in the mortality relationship.

Page 181

1     Q.  You understand that Dr. Rosenthal's
2 measurement of the percent of MME's that were
3 attributable to challenge promotion is a
4 national average effect, right?
5     A.  Yes, I do understand that.
6     Q.  In your -- what your regression
7 analyses do is you look at the geographic
8 variation in shipments per capita to evaluate
9 the relationship between shipments and
10 mortality, right?
11     A.  That's correct.  I'm using a
12 geographic level analysis.
13     Q.  So if the marketing effects are
14 national, to what would you attribute the
15 geographic variation that you're analyzing?
16     MR. SOBOL:  Objection.
17     A.  We were talking earlier about the fact
18 that the regression averages over, for example,
19 shipments that may be more or less causing of
20 harm.  In the same way here, the regression is
21 taking all shipments to the area and it's not
22 making a -- it's not saying that -- I have no
23 way to say, were the shipments in one county
24 more or less caused by misconduct than shipments

Page 182

1  in another county.
2       To the extent that they were, then
3  there would be measurement error in the
4  shipments variable; that is, some would be
5  differentially due to misconduct and others
6  might not be differentially due to misconduct.
7  If those two are differentially associated with
8  harms, I would then estimate an impact of
9  shipments on mortality that was too low; that
10 is, would not show an appropriate impact of
11 inappropriate shipment of harms because it would
12 be bringing in different outcomes in different
13 counties that were -- that -- for which the
14 effects are bigger and smaller.
15 BY MR. KNAPP:
16     Q.  I want to hand you -- now, have you
17 studied the different factors that motivate
18 doctors to write prescriptions, or the
19 variations in treatment among particular
20 doctors?
21      MR. SOBOL:  Objection to the form.
22      You can answer.
23     A.  In this analysis I have not done that.
24 As part of my academic work I both do some

Page 183

1  analyses, and I teach about factors that
2  motivate behavior of physicians.
3       So the answer is yes, in general, but
4  no in this specific report.
5  BY MR. KNAPP:
6     Q.  And you understand that in connection
7  with the studying that you've done that doctors
8  are strongly motivated to write prescriptions
9  based upon their own belief about the
10 appropriateness of treatment, right?
11      MR. SOBOL:  Objection.
12     A.  That's correct, that's one of the
13 factors that enters into physicians'
14 prescriptions is their own belief about
15 effectiveness.
16 BY MR. KNAPP:
17     Q.  And you've written about that in your
18 paper "Physician Beliefs and Patient
19 Preferences, A New Look At Regional Variation in
20 Healthcare Spending," right?
21     A.  I'm glad you've read it.  I like that
22 paper.  Yes, I have.
23     Q.  Okay.  Would you agree that physicians
24 are also motivated by prescribing standards of

Page 184

1  care in terms of determining what types of
2  prescriptions they write?
3     A.  In general there are a lot of
4  influences on physicians, one of which will be
5  prescribing standards of care and one of which,
6  as you said, was the physicians' perception
7  about the effectiveness of a class of
8  medications or a single medication within a
9  class.
10     Q.  And patient preference also impacts a
11 doctor's motivations to write prescriptions,
12 right?
13      MR. SOBOL:  Objection.
14     A.  The economic literature -- so I'm not
15 testifying about it here.  If you're asking
16 about the economic literature, the economic
17 literature does suggest that patient preferences
18 are important, although the economic literature
19 suggests that physician factors are far more
20 important, supply side factors are far more
21 important than are patient preferences.
22 BY MR. KNAPP:
23     Q.  Drug reimbursement policy also impacts
24 the types and volume of prescriptions that

Page 185

1  doctors write?
2      MR. SOBOL:  Objection.  Scope.
3      You can answer.
4     A.  Again, within -- again, with the
5  proviso that I've not offered an opinion about
6  that in this report, I'm going to answer this
7  question as if you're asking me in general about
8  the health economics literature.  And in general
9  within the health economics literature, it shows
10 very much that the -- that insured -- that
11 factors such as the restrictions in terms of
12 prior authorization or costs do influence what
13 physicians prescribe.
14 BY MR. KNAPP:
15     Q.  And similarly, insurers' preferred
16 drug list also influences the types and volume
17 of prescriptions that doctors write?
18      MR. SOBOL:  Objection.  Scope.
19      You can answer.
20     A.  That's correct.  In terms of the
21 general health economics literature, the
22 formularies, the prior authorization, they all
23 influence what physicians prescribe.
24 BY MR. KNAPP:

Page 186

1     Q. And you would agree that prescribing
2 decisions by doctors are complex decisions that
3 are necessarily reliant on the individual
4 examination of a particular patient, right?
5         MR. SOBOL: Objection. Scope.
6         You can answer.
7     A. I don't want to use complex because I
8 don't know relative to simple, so I will just
9 say that there are many factors that go into --
10 that often -- that often go into a physician's
11 decision about prescriptions.
12 BY MR. KNAPP:
13     Q. Other than the factors that we've
14 already talked about, any other factors that
15 you've identified through the economic
16 literature that motivate doctors to write
17 prescriptions?
18         MR. SOBOL: Objection. Scope.
19         You can answer.
20     A. Again, certainly the literature has
21 shown very clearly that promotion activity on
22 the part of manufacturers influences what
23 physicians do, what physicians prescribe, that
24 recommendations from senior colleagues or

Page 187

1 colleagues who are expert in a particular area
2 can influence what physicians do. So I think
3 there are -- there are a number of things
4 associated with beliefs.
5         I group them into categories, maybe
6 beliefs of physicians, financial incentives, and
7 other constraints. And I think those three
8 areas, each of them influence what physicians
9 do.
10 BY MR. KNAPP:
11     Q. Have you determined that Rosenthal's,
12 both of her direct and indirect models are
13 economically sound and reliable?
14     A. I believe that her models are
15 economically sound and reliable.
16     Q. Do you have a view on which model is
17 more reliable?
18     A. I don't have a view as to which model
19 is more reliable. I think in many ways the fact
20 that both Professor Rosenthal and I have
21 different models that reach relatively similar
22 conclusions adds strength to each of the models.
23     Q. Now, if Dr. Rosenthal's opinions on
24 the percentage of shipments that were influenced

Page 188

1 by the defendants' misconduct changed, then your
2 conclusions will change proportionately, right?
3         MR. SOBOL: Objection.
4     A. That -- not necessarily
5 proportionately, in a strict proportional sense.
6         But yes, if Dr. Rosenthal's opinions
7 change, that would influence the results that I
8 present.
9 BY MR. KNAPP:
10     Q. So if the percentage that she's
11 attributing to defendants' misconduct -- strike
12 that.
13         If the percentage of shipments that
14 she's attributing to defendants' misconduct
15 drops from 10 to 5, the input in your model will
16 have to drop from 10 to 5?
17     A. That is correct. If she were to drop
18 her input, then that would directly translate
19 into a reduction in the input I use in my model.
20     Q. And if a jury concludes that her
21 calculations are wrong, then that would
22 necessarily mean that your conclusions are
23 wrong, too, right?
24         MR. SOBOL: Objection.

Page 189

1     A. I don't think about it as a conclusion
2 being wrong. What I have is a model that will
3 translate in input, which is shipments due to
4 misconduct into an output which is harm. That
5 model will still be correct.
6         What one can then do is apply that
7 model to a different estimate about what share
8 of harms are due to misconduct on the part of
9 defendants as a whole or any single defendant.
10 It will yield an answer that's appropriate for
11 that. That answer will not be wrong, no answer
12 is wrong, it's sort of giving you for the
13 appropriate input what is the appropriate
14 output.
15 BY MR. KNAPP:
16     Q. Well, to be clear, if Dr. Rosenthal's
17 opinion is excluded or rejected, you don't offer
18 the court or the jury any way to link any harms
19 to defendants' conduct, correct?
20         MR. SOBOL: Objection.
21     A. In order to calculate the harms, I
22 would need an estimate from the court, from
23 Dr. Rosenthal, from any other expert as to what
24 share of harms are a result of defendants'