# Exhibit 7

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3                        - - -
 4   IN RE:  NATIONAL           )
     PRESCRIPTION OPIATE        )  MDL No. 2804
 5   LITIGATION                 )
     _____)  Case No. 1:17-MD-2804
 6                              )
     THIS DOCUMENT RELATES      )
 7   TO ALL CASES               )  Hon. Dan A. Polster
 8
 9
10                        - - -
11             Thursday, June 6, 2019
12            - HIGHLY CONFIDENTIAL -
13      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
14                        - - -
15
16       Videotaped deposition of Henry Grabowski,
17   Ph.D., held at Alston & Bird, 555 Fayetteville
18   Street, Raleigh, North Carolina, 27601, commencing at
19   9:34 a.m., on the above date, before Karen Kidwell,
20   Registered Merit Reporter, Certified Realtime
21   Reporter.
22                        - - -
23
24            GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

APPEARANCES:

On behalf of the Plaintiffs:
    ROBINS KAPLAN LLP
    BY: TARA D. SUTTON, ESQUIRE
       tsutton@robinskaplan.com
       GARY L. WILSON, ESQUIRE
       gwilson@robinskaplan.com
    800 LaSalle Avenue
    Suite 2800
    Minneapolis, MN 55402
    612.349.8500

On behalf of Endo Pharmaceuticals, Inc., and Endo Health Solutions Inc. and Par:

    ARNOLD & PORTER KAYE SCHOLER LLP
    BY: SEAN MORRIS, ESQUIRE
       sean_morris@arnoldporter.com
    777 South Figuero Street
    44th Floor
    Los Angeles, CA 90017
    213.243.4222

On behalf of Johnson & Johnson and Janssen Pharmaceuticals:

    O'MELVENY & MYERS LLP
    BY: ANNE T. MARCHITELLO, ESQUIRE
       amarchitello@omm.com
       (Via Videoconference)
    1625 Eye Street NW
    Washington, DC 20006
    202.383.5329

Page 3

APPEARANCES CONTINUED:

On behalf of the Cardinal Health, Inc.:
    WILLIAMS & CONNOLLY LLP
    BY: MICHAEL R. FISHMAN, ESQUIRE
       mfishman@wc.com
       (Via Videoconference)
    725 Twelfth Street, NW
    Washington, DC 20005
    202.434.5702

On behalf of Purdue Pharma:
    DECHERT LLP
    BY: WILL SACHSE, ESQUIRE
       will.sachse@dechert.com
       (Via Videoconference)
    2929 Arch Street
    Philadelphia, PA 19104
    215.994.2496

On behalf of Walgreens:
    BARTLIT BECK LLP
    BY: KASPAR STOFFELMAYR, ESQUIRE
       kaspar.stoffelmayr@bartlit-beck.com
       (Via Videoconference)
    54 West Hubbard Street
    Suite 300
    Chicago, IL 60654
    312.494.4434

ALSO PRESENT: Trae Howerton, Videographer

Page 4

INDEX

| WITNESS/EXAMINATION | Page |
|---|---|
| HENRY GRABOWSKI, Ph.D. | |
|   By Ms. Sutton | 6 |

EXHIBITS

| Number | Description | Page |
|---|---|---|
| Exhibit 1 | Plaintiffs' Notice of oral Videotaped Expert Deposition of Henry Grabowski | 7 |
| Exhibit 2 | Expert Report of Henry Grabowski, Ph.D., May 10, 2019, Confidential | 7 |
| Exhibit 3 | Supplemental Expert Report of Henry Grabowski, Ph. D., June 4, 2019, Confidential | 7 |
| Exhibit 4 | Invoices of Henry Grabowski to Samuel Lonergan, Arnold & Porter, Re: National Prescription Opiate Litigation, 4 pages | 96 |
| Exhibit 5 | Invoices, In re National Prescription Opiate Litigation, beginning August 2018, from Cornerstone Research, Confidential | 105 |
| Exhibit 6 | Analysis Group page of Henry G. Grabowski experience and education, 1 page | 109 |
| Exhibit 7 | Declaration of Henry G. Grabowski, Ph.D., March 28, 2013 | 119 |

Page 5

EXHIBITS (Cont'd)

| Number | Description | Page |
|---|---|---|
| Exhibit 8 | Tufts Center for the Study of Drug Development, Tufts University, Corporate Sponsorship, July 8-9, 2019 | 129 |
| Exhibit 9 | Financial Disclosure of Tufts Center for the Study of Drug Development | 130 |
| Exhibit 10 | Journal of Health Economics article, Innovation in the pharmaceutical industry: New estimates of R&D costs | 132 |
| Exhibit 11 | Henry George Grabowski, Vita, filed 2/15/08 | 147 |
| Exhibit 12 | 2010 Curr. Vitae LEXIS 13752, Henry George Grabowski, Durham, N.C. | 155 |
| Exhibit 13 | Reply Declaration of Henry G. Grabowski, Ph.D. | 163 |

Page 34

1  A. No.
2  Q. Do you know Mark Murtha?
3  A. No.
4  Q. Okay. Have you had any e-mails, meetings
5  or discussions with Dr. Doug Tucker?
6  A. No.
7  Q. Do you know Dr. Doug Tucker?
8  A. No.
9  Q. Have you had any e-mails, discussions, or
10 meetings with a Dr. Robert Lyerla at Western Michigan
11 University?
12 A. No.
13 Q. Do you know -- do you know him?
14 A. No.
15 Q. Have you had any e-mails, meetings, or
16 discussions with a Dr. Bruce Michael Bagley at the
17 University of Miami?
18 A. No.
19 Q. Okay. Do you know him?
20 A. No.
21 Q. All right. Thank you.
22     Do you plan to testify at the Summit and
23 Cuyahoga trial in October?
24 A. If I'm asked to testify, I will. You
25 know.

Page 35

1  Q. Have you been -- have you been asked?
2  A. Not to this point, no.
3  Q. Do you have it blocked out on your
4  calendar?
5  A. I have it blocked out, yes.
6  Q. Okay. Besides the attorneys at Arnold &
7  Porter, have you been in touch with any other lawyers
8  about your expert work in this case?
9  A. No.
10 Q. Do -- if -- if you testify at trial, do
11 you plan to use any demonstratives?
12    MR. MORRIS: Objection to form.
13    THE WITNESS: Quite possibly, yes.
14 BY MS. SUTTON:
15 Q. Okay. Have those demonstratives been
16 made?
17 A. No.
18 Q. Would you make them, or would someone else
19 do it?
20 A. They would be made under my direction by
21 someone who does software.
22 Q. Okay. Would -- would those folks be at
23 Cornerstone?
24 A. Cornerstone or another related
25 technological company.

Page 36

1  Q. So turning back to your expert report, I
2  wanted to turn to Appendix 3, which you have titled
3  "Materials Considered."
4     Did you put together Appendix 3, or did
5  someone else do that for you?
6  A. It was put together under my direction. I
7  didn't type it out, but I -- this is -- I indicated
8  to Cornerstone to put down all of the material that
9  we had considered in the report, including all of the
10 references.
11 Q. Okay. So this Appendix 3 was created by
12 Cornerstone?
13    MR. MORRIS: Objection to form.
14    THE WITNESS: Well, I wouldn't
15    characterize it that way. I -- I created it.
16    They did the actual typing of it, but it was
17    created under my direction.
18 BY MS. SUTTON:
19 Q. Did Cornerstone keep track of, along the
20 way, all the materials that you were considering for
21 your expert report?
22 A. They -- you know. Yes, I would say they
23 kept track of materials, but I initiated much of
24 the -- the documents to look at.
25 Q. Okay. So -- so is this Appendix 3, is

Page 37

1  this a full and complete listing of every document
2  you have reviewed and considered in preparing your
3  report?
4     MR. MORRIS: Objection. Form.
5     THE WITNESS: It looks to be a complete
6     documentation of materials considered. Of
7     course, I rely also on my 50-years-plus of doing
8     research in economics of the pharmaceutical
9     industry.
10 BY MS. SUTTON
11 Q. Is there anything you would want to add as
12 you sit here today?
13 A. No.
14 Q. Let's take a look at first -- the first
15 section of materials considered, which are the
16 academic articles.
17    I counted this up, and it looked like that
18 there were 38 articles. You would agree that there
19 are more than 38 academic articles on the
20 relationship between the promotion and sale of
21 pharmaceuticals, wouldn't you?
22 A. Yes.
23 Q. So how did you go about selecting -- well,
24 first, did Cornerstone find any of these 38 articles
25 for you?

Page 38

1  A. A few, you know. I -- I gave them the
2 articles that I thought were most relevant from my
3 experience, and then I asked them to see if there
4 were any other references that were in the literature
5 that seemed relevant to the report at hand.
6  Q. Can you identify the articles that you
7 provided to Cornerstone?
8  A. Not off -- most of these were ones that I
9 mentioned, but I -- you know, I -- I don't have a
10 memory of which ones they followed up on or suggested
11 I look at.
12  Q. So what kind of instructions did you give
13 Cornerstone with respect to adding to this list of
14 academic articles beyond what you provided them?
15  A. I said there is a -- a literature here on
16 the effects of promotion. And particularly, you
17 know, I -- I have done work in this area, so I know
18 the literature well. But for instance, Dr. Rosenthal
19 has found a negative depreciation rate, which I said
20 I never have seen this in my professional experience.
21 And she claims it's due to -- it can be explained by
22 the fact that opioids are addictive, but there are
23 other work on addictive substances, marketing of
24 addictive substances, like cigarettes and alcohol,
25 that has been undertaken, some by me and some by

Page 39

1 others. And I want you to see if I'm right, that
2 there -- that you can find anything in the literature
3 that has a negative depreciation rate.
4     And in the context of that, they looked at
5 stuff -- some more articles. They searched the
6 literature diligently, but they could not find
7 anything.
8  Q. And when you say "they," you're referring
9 to Cornerstone?
10  A. Yes, the team at Cornerstone.
11  Q. Did you conduct any of your own searches
12 of the medical literature?
13  A. Of this literature, yes.
14  Q. Oh. And when did you do that?
15  A. Started when -- back in -- when I was
16 first retained, and it continued through when I
17 submitted my report.
18  Q. So you did searches, and you also asked
19 Cornerstone to do searches?
20  A. Yes. They're another set of eyes.
21  Q. And so this list of academic articles
22 reflects both articles you found and articles that
23 Cornerstone found?
24  A. Yes. Primarily that I found or knew
25 about, and a few that they added to, had me look at.

Page 40

1  Q. Now, you're aware that Dr. Rosenthal has
2 published in the area of promotion and the sale of
3 pharmaceutical products, correct?
4  A. Yes.
5  Q. And in fact you have cited to her in some
6 of your academic research, correct?
7  A. Yes.
8  Q. Okay. So when you would receive
9 materials -- oh, one other question. With respect to
10 these academic articles, or actually any of the other
11 things that are listed in Appendix 3, were -- were
12 any of these items provided to you by the attorneys?
13  A. No.
14  Q. Okay. So when you would receive materials
15 from Cornerstone, how would they send it to you?
16 Electronic or hard copy?
17  A. Electronic, usually.
18  Q. Like a PDF?
19  A. Yes.
20  Q. Okay. Do you keep a file for this case in
21 your office, or in your home?
22     MR. MORRIS: Objection to form.
23     THE WITNESS: No, not really.
24 BY MS. SUTTON:
25  Q. Okay. How do you organize the materials

Page 41

1 that you considered for your report?
2  A. You know, they're all available pretty
3 much online, so I looked online at a lot of them. So
4 a lot of them were not literally a PDF. There may
5 have been a few like that, that I wanted us -- them
6 to produce, but I -- I have access to Medline through
7 Duke University, so I can pull up an article and look
8 at it.
9  Q. Okay. Now, in this case, you're
10 testifying on behalf of Endo or Par, correct?
11  A. Yes.
12  Q. All right. And how many Endo and Par --
13 strike that.
14     Endo and Par produced documents in this
15 litigation as part of the discovery process; are you
16 aware of that?
17  A. Yes.
18  Q. And I -- looking at your "Materials
19 Considered" list, under "Produced Documents," it
20 looks like you looked at three documents that were
21 produced by Endo. Is that correct?
22  A. Yes.
23  Q. Did you -- did you review any more than
24 the three documents that are described here?
25  A. No.

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1  Q. Were you given access to the Endo and Par
2  document productions that were made in the opioid
3  litigation?
4  A. Yes.
5  Q. And how were you given access?
6  A. In the sense that we went through a
7  process where -- you know, initially I wasn't --
8  initially the scope of my participation was to
9  characterize the pharmaceutical industry and its
10 complexities, which I've done in the report, and to
11 await what would be produced by the economist on the
12 plaintiffs' side that I would -- could be asked to
13 rebut.
14      And so I asked Cornerstone to look at what
15 data was available that might be used either by the
16 plaintiffs or by us, and what documents internally
17 might be useful in this task. So they screened some
18 documents, but then we received Rosenthal's report,
19 which was focused on statistical analysis between
20 marketing and opioid utilization, and that one became
21 my focus after receiving Rosenthal's report.
22      So I had all the documents I needed to do
23 my two main tasks, which were to characterize the
24 industry complexity and dynamic nature, and second,
25 to focus on the limitations of Rosenthal's analysis.

Page 43

1  Q. Okay. So if I understand -- that was kind
2  of a long answer. If I understand it correctly, when
3  I had asked you, did you -- were you given access to
4  the millions of documents that Endo and Par produced
5  in discovery, and if I heard you right, I think you
6  were saying Cornerstone had that access?
7  A. Cornerstone and myself. But I -- I
8  delegated to Cornerstone to look through this
9  material to see if it was anything that was useful in
10 supporting my analysis of, you know, the way the
11 industry works. But I primarily relied on my own
12 experience and knowledge. And second of all,
13 depending on what we were going to be asked to do in
14 terms of a rebuttal, was there useful information.
15      So yes, they -- they were screening a lot
16 of the documents, looking through them, and I relied
17 on them to call to my attention anything that would
18 be supportive of my main assignment.
19 Q. So do you know how many of Endo and Par's
20 internal documents that Cornerstone would have looked
21 at?
22 A. No.
23 Q. And do you know how many Endo and Par
24 discovery documents you looked at? Is it just the
25 three that are listed here?

Page 44

1  A. It's just the three here.
2  Q. Okay. Did you ever perform any searches
3  of -- on any database that contained Endo and Par
4  internal documents?
5  A. No.
6  Q. Do you know if Cornerstone did?
7  A. I think they made -- I think they may have
8  looked at what documents -- what data might -- data
9  exists, both externally and internally, that might
10 support a statistical analysis by the plaintiffs or
11 in rebuttal to the plaintiffs economics analysis.
12 Q. Did you ever ask them what Cornerstone
13 found when they looked at the Endo and Par documents?
14 A. We had some discussions of that, yes.
15 Q. And how would those discussions occur?
16 A. Well, I would ask, is there claims data
17 available? Is there data about potentially marketing
18 contacts in Cuyahoga and Summit County? Is there
19 data on prescriptions in those counties? What
20 information, either external or internal, is
21 available that would -- could shed light on issues of
22 marketing and sales in a -- at a county level?
23 Q. So would you have those discussions via
24 e-mail, or over the phone? Can you just tell me
25 how -- what format they took?

Page 45

1  A. Over the phone.
2  Q. Okay. And did -- did Cornerstone point
3  you to any internal documents that spoke to the
4  subject you just described?
5  A. No, I think basically they said there's
6  not any information that would provide a basis for a
7  statistical analysis.
8  Q. Did you have -- did you review any
9  documents that were produced by the Plaintiffs,
10 Cuyahoga and Summit County, in this case?
11 A. I don't recall doing so.
12 Q. Do you know if you had access to the
13 documents that were produced by the plaintiffs in
14 this case?
15 A. What I did is I reviewed any references
16 that I felt were important to review in Rosenthal. I
17 don't know that she cited any government documents.
18 Q. And when you say "government documents,"
19 documents produced by Cuyahoga and Summit County?
20 A. That's what I understood your query, yes.
21 Q. Just wanted to make sure we were using the
22 same terminology.
23     Did you review any internal documents
24 produced in discovery by any of the other defendants
25 in this case?

Golkow Litigation Services                Page 12 (42 - 45)