# Exhibit 9

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3

      --------------------------    )
 4    IN RE: NATIONAL                ) MDL No. 2804
      PRESCRIPTION OPIATE            )
 5    LITIGATION                     ) Case No.
      --------------------------    ) 1:17-MD-2804
 6                                   )
      THIS DOCUMENT RELATES TO       ) Hon. Dan A. Polster
 7    ALL CASES                      )
      --------------------------    )
 8
 9                    HIGHLY CONFIDENTIAL
10         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
12                  VIDEOTAPED DEPOSITION OF
13                    MARGARET KYLE, Ph.D.
14                       June 5, 2019
15
16                     Chicago, Illinois
17
18
19
20
21
22              GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
23                   deps@golkow.com
24
```

Page 2

```
 4   The videotaped deposition of MARGARET KYLE, Ph.D.,
 5   called by the Plaintiffs for examination, taken
 6   pursuant to the Federal Rules of Civil Procedure of
 7   the United States District Courts pertaining to the
 8   taking of depositions, taken before CORINNE T.
 9   MARUT, C.S.R. No. 84-1968, Registered Professional
10   Reporter and a Certified Shorthand Reporter of the
11   State of Illinois, at the offices of Kirkland &
12   Ellis LLP, Suite 700, 300 North LaSalle Street,
13   Chicago, Illinois, on June 5, 2019, commencing at
14   9:13 a.m.
```

Page 3

```
 1   APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
         250 Hudson Street, 8th Floor
 4       New York, New York  10013-1413
         212-355-9500
 5       BY:  RACHEL GEMAN, ESQ.
              rgeman@lchb.com
 6
 7       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
         275 Battery Street, 29th Floor
 8       San Francisco, California  94111-3339
         415-956-1000
 9       BY:  VALERIE COMENENCIA ORTIZ, ESQ.
              vcomenenciaortiz@lchb.com
10
11
12    ON BEHALF OF ALLERGAN PLC and
      ALLERGAN FINANCE, LLC:
13
         KIRKLAND & ELLIS LLP
14       300 North LaSalle Street
         Chicago, Illinois  60654
15       312-862-3429
         BY:  DONNA WELCH, ESQ.
16            dwelch@kirkland.com
              TIMOTHY W. KNAPP, ESQ.
17            timothy.knapp@kirkland.com
18
19    ON BEHALF OF PURDUE PHARMA, L.P.,
      PURDUE PHARMA, INC. and THE PURDUE FREDERICK
20    COMPANY, INC.:
21       DECHERT LLP
         35 West Wacker Drive, Suite 3400
22       Chicago, Illinois  60601
         312-646-5800
23       BY:  ALISON COONEY, ESQ.
              alison.cooney@dechert.com
24
```

Page 4

```
 1   APPEARANCES (Continued):
 2    ON BEHALF OF JOHNSON & JOHNSON and
      JANSSEN PHARMACEUTICALS, INC.:
 3
         O'MELVENY & MYERS LLP
 4       Two Embarcadero Center, 28th Floor
         San Francisco, California  94111
 5       415-984-8700
         BY:  DANIEL LEIGH, ESQ.
 6            dleigh@omm.com
                (via telephone and livestream)
 7
 8
 9    ON BEHALF OF McKESSON CORPORATION:
10       COVINGTON & BURLING LLP
         The New York Times Building
11       620 Eighth Avenue
         New York, New York  10018-1405
12       212-841-1104
         BY:  FATMATA S. KABIA, ESQ.
13            fkabia@cov.com
                (a.m. session)
14
15       COVINGTON & BURLING LLP
         3000 El Camino Real
16       5 Palo Alto Square, 10th Floor
         Palo Alto, California 94306-2112
17       650-632-4700
         BY:  MEGAN L. RODGERS, ESQ.
18            mrodgers@cov.com
                (p.m. session - via
19              telephonic communication)
20
21
22
23
24
```

Page 5

```
 1   APPEARANCES (Continued):
 2    ON BEHALF OF WALMART:
 3       JONES DAY
         555 South Flower Street, 50th Floor
 4       Los Angeles, California  90071
         213-489-3939
 5       BY:  CLAIRE E. CASTLES, ESQ.
              ccastles@jonesday.com
 6
 7
 8
 9   VIDEOTAPED BY:  ANTHONY MICHELETTO
10
11   REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
```

Page 146

1 what's called a first differences model and next by
2 taking logs.
3 So, both of these data transformations
4 are ways that we eliminate the stationarity problem
5 in the data. And then I rerun her analysis,
6 keeping everything else the same except for making
7 these two different data transformations.
8 And when I do that in the first
9 differences model, there is no statistical
10 significance in the regression results between the
11 stock of marketing and sales. So, that's, again,
12 that's a core estimate for her. And the
13 statistical significance falls apart when this
14 correction is made.
15 In the other sensitivity check, so the
16 other transformation using log-logs, the
17 coefficients are statistically significant but the
18 calculation of the impact of Defendant promotion on
19 MMEs drops to less than 3%.
20 So, it's a much smaller estimated effect
21 with making -- after making that change.
22 Q. So, it's statistically significant but
23 in your view it's not practically significant?
24 A. It's certainly much smaller in

Page 147

1 magnitude. And I also want to make clear that I
2 don't view that as the only problem with this
3 model.
4 So, I'm just pointing out that her
5 estimate is not robust to making these necessary
6 changes to address stationarity, not because I
7 think that these are necessarily valid estimates
8 either.
9 Q. Sorry. But you've -- just so the record
10 is clear, the answer to the question is you agree
11 that the results were indeed statistically
12 significant?
13 A. In the sensitivity analysis where I use
14 a log-log model, the coefficients that result are
15 statistically significant. They imply a much, much
16 smaller percentage of Defendant promotion on MMEs.
17 But, again, I don't want to affirm that
18 these are the correct estimates of the relationship
19 between detailing and sales.
20 Q. But just stated more clearly to sort of
21 fill in what the coefficients are, in your log-log
22 model -- and, by the way, that's a common model, is
23 that correct?
24 A. That's a standard transformation of data

Page 148

1 to deal with stationarity issues.
2 Q. So, you found a statistically
3 significant relationship between Defendant's
4 promotion on the one hand and what on the other?
5 A. Without making any other of the changes
6 to the model that I think are necessary in order to
7 provide some confidence in establishing a causal
8 relationship between detailing and sales, then,
9 yes, that is the result. That's why I have
10 included the table here.
11 But, again, I want to make it very clear
12 that I do not affirm that I think this is a correct
13 estimate either.
14 MS. GEMAN: Move to strike as non-responsive
15 everything after "Yes, that is the result."
16 BY MS. GEMAN:
17 Q. Okay. Any other bases of your opinions
18 in paragraph 23?
19 A. Yes. Another issue in the model that
20 Professor Rosenthal has used is that she has
21 ignored the endogeneity of detailing on sales.
22 Q. So, let me ask you a question about
23 that.
24 There is -- you understand, I think,

Page 149

1 that the relationship of promotion to sales is
2 studied all the time?
3 MS. WELCH: Objection to form.
4 BY THE WITNESS:
5 A. You mean in the academic literature, is
6 there a large literature on the relationship
7 between detailing and sales? Yes, I understand
8 that.
9 BY MS. GEMAN:
10 Q. And so describe -- I didn't mean to cut
11 you off. You were saying that the basis for your
12 opinion in paragraph 23 is you believe
13 Dr. Rosenthal's models, I don't know if you mean
14 both her models, but at least one has, in your
15 view, endogeneity bias?
16 A. Yes. The direct model, which relates
17 detailing to sales, has an endogeneity problem.
18 Q. And do you think that what you as
19 Allergan's expert consider the stationarity problem
20 applies to both of Dr. Rosenthal's models?
21 A. No. It applies to the direct model,
22 which relies purely on time series variation.
23 Q. So, to be clear, you are not issuing a
24 criticism that Dr. Rosenthal's indirect model has a

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1 stationarity problem?
2   A.  That's correct. I have not stated in my
3 report that there is a stationery problem with the
4 indirect model. I have other criticisms of that
5 model, but it isn't stationarity.
6   Q.  Okay. So, going back to endogeneity,
7 which model do you think has this problem?
8   A.  Again, the direct model, because just to
9 be clear, the indirect model does not -- is by
10 definition indirect. So, there is no detailing in
11 the indirect model.
12      So, when I refer to the endogeneity of
13 detailing and sales, I refer to a specification in
14 which detailing appears as an explanatory variable.
15   Q.  I understand. But that's -- that is, in
16 your view, the only source of endogeneity bias,
17 correct?
18   A.  That's the one that -- that I'd like
19 to -- in terms of endogeneity of sales and
20 detailing, that exists in the direct model.
21   Q.  Well, hang on. That is the only
22 endogeneity issue that you identify in your report.
23 Are you now offering new opinions?
24   A.  So, to be more precise, the indirect

Page 151

1 model has an omitted variable problem, which is
2 related to endogeneity.
3   Q.  Okay. We can talk about that.
4      So, do you have any other bases for your
5 opinions in paragraph 23?
6   A.  Yes. So, in addition to the endogeneity
7 issue, my criticism is that Professor Rosenthal has
8 introduced enough flexibility into the direct model
9 that it is essentially too flexible. It's capable
10 of fitting many time series that move together
11 without having any economic justification for that
12 relationship.
13      And, so, I specifically experimented
14 with using her approach to explain sunspots, and I
15 could show that using that level of flexibility in
16 the direct model also produces what she would -- if
17 you take her model seriously, would be a causal
18 relationship between detailing and sunspots.
19      And that's to illustrates that this is a
20 problem. The model is essentially -- has too much
21 flexibility to establish this relationship.
22   Q.  So, you agree with the economic
23 justification that she has or you disagree with the
24 economic justifications that she has?

Page 152

1   A.  She doesn't have very many economic
2 justifications.
3   Q.  Okay. But she has them and you disagree
4 with them. Is that fair?
5   A.  So, to the extent that she introduced
6 economic justifications for model C, for example,
7 so this is where she includes a number of events
8 that she explains could influence sales of opioids
9 during this time period, even she agrees that the
10 results on the coefficients that she obtains from
11 including those events don't make a lot of economic
12 sense, which again suggests that there are problems
13 with the model.
14      I don't disagree with her hypotheses
15 that, for example, changing the guidelines would
16 have an effect on sales. My concern is that she
17 doesn't obtain the coefficients that she expects,
18 and the rest of the coefficients move around
19 sufficiently that it throws the entire model into
20 doubt.
21   Q.  Do you think you're better situated to
22 opine on the economic justifications that she
23 offers than she is? Do you think you have sort of
24 greater knowledge or background?

Page 153

1   A.  So, again, I don't disagree with her
2 ex-ante hypotheses about, for example, the
3 different events or the effect of price on sales.
4 On that we agree.
5      My issue is that her model then
6 generates estimates which are inconsistent with
7 that economic -- the economic hypotheses that
8 underlie them, which for me creates some
9 credibility issues with the model. It suggests
10 that this isn't the right model.
11   Q.  What is the right model?
12   A.  That, I have provided some evidence
13 about the relationship between Allergan detailing,
14 shipments and mortality elsewhere in the report.
15      Frankly, I don't think that using
16 aggregate data and the approach taken here has --
17 even if I do all of these other fixes, I still
18 think we're left with a problem of too little
19 information to work with.
20   Q.  How would you study the effect of
21 Allergan, Allergan's detailing of opioids on sales?
22   A.  So, I did that. I did it very directly
23 by trying to relate Allergan detailing at the
24 county level to shipments and to mortality.

Page 154

1 Q. And those were your -- some of those
2 were the sort of merely descriptive statistics,
3 right?
4 A. No, there are regressions as well. This
5 is in Section V.B.
6 Q. Let's just go one at a time.
7 The first -- the first few of those were
8 merely descriptive statistics, correct?
9 A. I show some figures, too, to make the
10 point visually but then I also have regression
11 analyses.
12 Q. Okay. But talking about the figures
13 that you claim make the point.
14 A. Okay.
15 Q. There is no inferential statistics in
16 those, correct?
17 A. No. It's to illustrate a relation --
18 that there is no obvious relationship apparent in
19 the data, and then I go on to verify that with
20 regression analyses.
21 Q. And would those regression -- you
22 describe -- have you accurately described all the
23 specifications of those -- I believe you did a --
24 you put a yearly dummy, right, every -- for between

Page 155

1 2009 and 2012. Maybe you can point me to the page.
2 I think we're talking about the same thing.
3 A. Sure. I'm looking at page 71.
4 Q. Okay. Thank you.
5 Does footnote 224 completely and
6 accurately describe the analysis that you did as
7 in -- underlying the, I guess, graphs or figures
8 that are listed as Figure 28?
9 A. It accurately describes the results from
10 all of the sensitivity analyses that we did. The
11 ones that I specifically list here are some subset
12 of all that were tried.
13 So, just as an example, we tried with
14 zero percent depreciation and a depreciation --
15 depreciated stock using 5% annual depreciation.
16 It's -- I don't recall exactly how many
17 other specifications we ran with alternative
18 depreciation rates. But since they all pointed in
19 the same direction, I didn't see -- consider it
20 necessary to list every single one here.
21 Q. Are they in your backup?
22 A. Yes. Well, are the regressions
23 themselves in the backup? No. But the data is
24 available for anyone to run such sensitivity checks

Page 156

1 if they're worried about it.
2 Q. Does the backup contain all the model
3 specifications that you employed, someone could
4 easily replicate your analysis?
5 A. Someone could easily replicate the
6 analysis, yes.
7 Q. And who chose these particular outputs
8 for Figure 28? Who at Bates White?
9 A. Oh, I chose the outputs.
10 Q. You chose these outputs. And you chose
11 these out of how many?
12 A. So, we had data on detailing for 2009
13 through 2013 I believe. So, it was a question of
14 choosing which year. And we settled on 2010
15 because that was the first full year of Allergan
16 detailing I believe.
17 I think, if I recall correctly, somebody
18 on the team at Bates White generated the figures
19 for every year and they all looked about the same.
20 So, it didn't seem necessary to add to the number
21 of figures here.
22 Q. Okay. Back to paragraph 23. Anything
23 else about the bases for your opinions in paragraph
24 23?

Page 157

1 A. So, I've talked about stationarity.
2 I've talked about endogeneity. I have talked about
3 some of the issues with aggregation.
4 There was also an issue with the price
5 index that Professor Rosenthal used. So, making a
6 correction to her price index also altered the
7 results that one obtains in a way that calls into
8 question the reliability of the model.
9 Q. So, is the -- now, this is leading into
10 another of your criticisms.
11 But you're referring to Dr. Rosenthal's
12 model about the collective marketing, is that
13 correct?
14 A. Her -- her direct model of aggregate
15 detailing and aggregate shipments or aggregate
16 sales.
17 Q. Now, is this criticism or is this basis
18 of your criticism in connection with the price
19 index applicable to both of her models?
20 A. I'm trying to remember now the details
21 of her indirect model.
22 No. It only pertains to the direct
23 model because she does not actually include a
24 measure of price in the indirect model, if I recall

Page 158

1 correctly, because in the indirect model she's
2 relying on cross-sectional variation across
3 counties and she wouldn't have county-specific
4 prices in order to include there.
5     Q.   Okay.  Any other bases for paragraph 23?
6     A.   Yes.  I can go into more details about
7 the issues of having too much flexibility built
8 into the model, but the fact that she allows the
9 model to determine these turning points in sales
10 without any economic justification for those
11 specific turning points is one issue.
12         The way that she's introduced the
13 splines for different effects in different time
14 periods is also not the standard way that an
15 economist would do this.
16         I've mentioned the price index issue.
17         More generally, again, in a model that
18 uses only time series variation, it's very
19 difficult to include lots of other controls, things
20 that would also be changed -- potentially driving
21 sales of opioids, so, things like variation across
22 counties in the extent of prescription drug
23 coverage or -- or all sorts of other
24 characteristics at an even more micro level.

Page 159

1     Q.   I mean, all sorts of characteristics at
2 an even more micro level.  Are you opining that
3 there are material omitted variables in
4 Dr. Rosenthal's direct model or is your concern
5 about so-called omitted variable bias focused only
6 on the indirect model?
7     A.   Well, both.  In particular, the direct
8 model.  The issue is that she -- that it's not
9 possible to include a lot of other control
10 variables in a dataset that has only time series
11 variation.
12     Q.   What I'm -- what I'm asking you is where
13 in this report do you set forth the specific
14 variables that you think are omitted, not just all
15 the variables out there like the color of shirts
16 that people were wearing in the county.  I mean,
17 things that matter.
18     A.   So, by the way, I'm not the only person
19 to identify those as potential effects.  They're
20 also listed by Plaintiff experts as potential -- as
21 potentially important omitted variables in their
22 reports.  But let me just identify where.
23     Q.   No, but I'm asking you.
24     A.   So, one important class of omitted

Page 160

1 variables is physician characteristics, just to
2 take one example.
3         So, there is a large literature
4 explaining that physician characteristics can be
5 more important than detailing in understanding
6 sales, and it's impossible for Professor Rosenthal
7 to include any kind of control for physician
8 characteristics when she aggregates up to this
9 level.  That's one example.
10     Q.   And just to be clear, I want to make
11 sure that you've listed everything that you claim
12 is a material omitted variable in your report.
13     A.   I don't think that I would claim to have
14 listed an exhaustive set of omitted variables.
15 I've identified a number of factors which is --
16 factors identified by the existing literature as
17 well as factors that even the Plaintiffs list as
18 potentially important in understanding opioid
19 sales.
20     Q.   So, are you intending to revise and make
21 new opinions about allegedly new omitted variables
22 that you have sort of just come up with?
23     A.   Just to be clear, it's not -- I didn't
24 view it as my responsibility to come up with an

Page 161

1 exhaustive list of omitted variables.
2         The presence of any omitted variables
3 that bias the signs of the coefficients and
4 therefore the validity of the results that
5 Professor Rosenthal is providing and which are
6 being used as inputs into the other expert reports,
7 that's enough for me.
8     Q.   So, if -- if you have a disagreement
9 about whether an omitted variable is material,
10 you're sort of assuming that your view is correct,
11 that you didn't need to sort -- that you didn't
12 sort of need to go beyond that?
13     A.   Well, I couldn't go beyond it using the
14 data that she was using.
15         Again, my criticism is that the model
16 that Professor Rosenthal used here at an aggregate
17 level using only time series variation masks -- it
18 is not possible with such a limited dataset to
19 include the controls and account for these other
20 omitted factors in a way that would fix her model.
21         So, that's -- my criticism is that the
22 model itself is so deeply flawed that it's not even
23 possible to include -- I can't say, oh, she should
24 have put this into that model.  It wouldn't be