# EXHIBIT 1

Highly Confidential - Subject to Further Confidentiality Review

0    01


2      `          IN THE UNITED STATES DISTRICT COURT

3              FOR THE NORTHERN DISTRICT OF OHIO

4                    EASTERN DIVISION

5      ----------------------------X

       IN RE: NATIONAL PRESCRIPTION  MDL No. 2804

6      OPIATE LITIGATION,

                                Case No. 17-MD-2804

7      This document relates to:

8      All Cases                  Hon. Dan A. Polster

9      ----------------------------X

10                  * HIGHLY CONFIDENTIAL *

11     * SUBJECT TO FURTHER CONFIDENTIALITY REVIEW  *

12              VIDEOTAPED DEPOSITION

13                      OF

14              LACEY R. KELLER

15              New York, New York

16              Thursday, June 13, 2019

17

18

19  .

20

21

22

23

       Reported by:

24     ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

25

1

2

3

4

5                          June 13, 2019

6                          9:10 a.m.

7

8              HIGHLY CONFIDENTIAL - SUBJECT TO

9         FURTHER CONFIDENTIALITY REVIEW

10        videotaped deposition of LACEY R.

11        KELLER, held at the offices of

12        KIRKLAND & ELLIS LLP, 601 Lexington

13        Avenue, New York, New York, pursuant to

14        Notice, before Annette Arlequin, a

15        Certified Court Reporter, a Registered

16        Professional Reporter, a Realtime

17        Systems Administrator, a Certified

18        Realtime Reporter, and a Notary Public

19        of the State of New York and New

20        Jersey.

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

1

2       A P P E A R A N C E S:

3

4       SIMMONS HANLY CONROY LLC

5       Counsel for Plaintiffs

6           112 Madison Avenue, 7th floor

7           New York, New York  10016-7416

8       BY: JAYNE CONROY, ESQ.

9           JConroy@simmonsfirm.com

10      BY: LAURA L. FITZPATRICK, ESQ.

11          Lfitzpatrick@simmonsfirm.com

12              - and -

13      MOTLEY RICE LLC

14      Counsel for Plaintiffs

15          28 Bridgeside Boulevard

16          Mt. Pleasant, South Carolina  29464

17      BY: JAMES W. LEDLIE, ESQ.

18          Jledlie@motleyrice.com

19

20

21

22

23

24

25

```
 1

 2       A P P E A R A N C E S(Cont'd.):

 3

 4     KIRKLAND & ELLIS LLP

 5     Counsel for Allergan Finance

 6         1301 Pennsylvania Avenue, N.W.

 7         Washington, D.C. 20004

 8     BY: JENNIFER LEVY, ESQ.

 9         Jennifer.levy@kirkland.com

10     BY: CATIE VENTURA, ESQ.

11         Catie.ventura@kirkland.com

12

13     O'MELVENY & MYERS LLP

14     Counsel for Janssen Pharmaceutical and

15       Johnson & Johnson

16         1999 Avenue of the Stars - 8th Floor

17         Los Angeles, California  90067-6035

18     BY: AMY R. LUCAS, ESQ.

19         Alucas@omm.com

20     BY: J. KEITH KOBYLKA, ESQ.

21         (Telephonically/realtime stream)

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2       A P P E A R A N C E S(Cont'd.):

 3

 4     MORGAN LEWIS & BOCKIUS LLP

 5     Counsel for Teva, Cephalon and Actavis

 6          1701 Market Street

 7          Philadelphia, Pennsylvania  19103-2921

 8     BY: ADAM HAMMOUD, ESQ.

 9          Adam.hammoud@morganlewis.com

10

11     ARNOLD & PORTER KAYE SCHOLER LLP

12     Counsel for Endo Health Solutions Endo

13        Pharmaceuticals, Inc.; Par Pharmaceutical

14        Companies, Inc. f/k/a Par Pharmaceutical

15        Holdings, Inc.

16          601 Massachusetts Avenue N.W.

17          Washington, D.C.  20001-3743

18     BY: JOANNA PERSIO, ESQ.

19          Joanna.persio@arnoldporter.com

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2      A P P E A R A N C E S(Cont'd.):

 3   DECHERT LLP

 4   Counsel for Purdue Pharmaceuticals

 5        Three Bryant Park

 6        1095 Avenue of the Americas

 7        New York, New York  10036-6797

 8   BY: DEBRA D. O'GORMAN, ESQ.

 9        Debra.ogorman@dechert.com

10

11   ZUCKERMAN SPAEDER LLP

12   Counsel for CVS Indiana, LLC and CVS RX

13     Services, Inc.

14        1800 M Street N.W. - Suite 1000

15        Washington, D.C.  20036-5807

16   BY: PAUL B. HYNES, JR., ESQ.

17        Phynes@zuckerman.com

18

19   MORGAN LEWIS & BOCKIUS LLP

20   Counsel for Rite Aid of Maryland

21        1701 Market Street

22        Philadelphia, Pennsylvania  19103-2921

23   BY: JOHN P. LAVELLE, JR., Partner

24        John.lavelle@morganlewis.com

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2        A P P E A R A N C E S (Cont'd.):

 3     ROPES & GRAY LLP

 4     Counsel for Mallinckrodt

 5          Prudential Tower

 6          800 Boylston Street

 7          Boston, Massachusetts   02199

 8     BY: JOSH GOLDSTEIN, ESQ.

 9          Joshua.goldstein@ropesgray.com

10     BY: FEIFEI (ANDREA) REN, ESQ.

11          Andrea.Ren@ropesgray.com

12

13     COVINGTON & BURLING LLP

14     Counsel for McKesson

15          One CityCenter

16          850 Tenth Street, N.W.

17          Washington D.C. 20001-4956

18     BY: CLAIRE CATALANO DEAN, ESQ.

19          ccdean@cov.com

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2      A P P E A R A N C E S(Cont'd.):

 3      BARTLIT BECK LLP

 4      Counsel for Walgreens

 5          54 West Hubbard Street - Suite 300

 6          Chicago, IL 60654

 7      BY: PETER B. BENSINGER, JR., ESQ.

 8          Peter.bensinger@bartlitt-beck.com

 9          (Telephonically/realtime stream.)

10

11      FOLEY LARDNER LLP

12      Counsel for Anda, Inc.

13          111 Huntington Avenue - Suite 2500

14          Boston, MA 02199-7610

15      BY: GRAHAM D. WELCH, ESQ.

16          Gwelch@foley.com

17          (Telephonically/realtime stream.)

18

19      BARNES & THORNBURG LLP

20      Counsel for H.D. Smith

21          11 South Meridian Street

22          Indianapolis Indiana  46204-3535

23      BY: KATHLEEN L. MATSOUKAS, ESQ.

24          Kathleen.matsoukas@btlaw.com

25          (Telephonically/realtime stream.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2        A P P E A R A N C E S(Cont'd.):

 3

 4     LOCKE LORD LLP

 5     Counsel for Henry Schein, Inc. and

 6        Henry Schein Medical Systems, Inc.

 7         2200 Ross Avenue - Suite 2800

 8         Dallas, Texas   75201

 9     BY: BRANDAN MONTMINY, ESQ.

10         Brandan.montminy@lockelord.com

11         (Telephonically/realtime stream.)

12

13     ALSO PRESENT:

14

15     VINCE ROSICA, Golkow, Legal Video Specialist

16     DAN LAWLOR, Golkow, Legal Video Specialist

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2              IT IS HEREBY STIPULATED AND

 3        AGREED by and between the attorneys for

 4        the respective parties herein, that

 5        filing and sealing be and the same are

 6        hereby waived;

 7              IT IS FURTHER STIPULATED AND

 8        AGREED that all objections, except as

 9        to the form of the question, shall be

10        reserved to the time of the trial;

11              IT IS FURTHER STIPULATED AND

12        AGREED that the within deposition may

13        be sworn to and signed before any

14        officer authorized to administer an

15        oath, with the same force and effect as

16        if signed and sworn to before the

17        Court.

18

19                      - oOo -

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2              THE VIDEOGRAPHER:  We are now on

 3      the record.  My name is Vince Rosica.

 4      I'm a videographer for Golkow

 5      Litigation Services.

 6              Today's date is June 13, 2019,

 7      and the time is 9:10 a.m.

 8              This video deposition is being

 9      held in New York, New York, in the

10      matter of National Prescription Opiate

11      Litigation, MDL No. 2804, for the

12      United States District Court for the

13      Northern District of Ohio, Eastern

14      Division.

15              The deponent is Lacey Keller.

16              Counsel will be noted on the

17      stenographic record.

18              The court reporter is Annette

19      Arlequin and will now swear in the

20      witness.

21              *           *           *

22      L A C E Y   R.   K E L L E R,   called as a

23          witness, having been duly sworn by a

24          Notary Public, was examined and

25          testified as follows:
```

Highly Confidential - Subject to Further Confidentiality Review

1

2          THE WITNESS:  I do.

3          Lacey Rae Keller.

4   EXAMINATION BY

5   MS. LEVY:

6          Q.   Good morning, Ms. Keller.  My

7   name is Jenny Levy, and I'm an attorney

8   here at Kirkland & Ellis.  I represent the

9   Allergan defendants in this case.

10          Thank you for being here today.

11   Apologies in advance for my scratchy voice

12   and sniffles.  I'm feeling very under the

13   weather, so I will do my best to keep my

14   germs away from you.

15          Have you ever had your deposition

16   before?

17          A.   Good morning, Jenny.  Thanks for

18   having me.  And no.

19          Q.   This is the first deposition

20   experience you've ever had?

21          A.   Correct.

22          Q.   In the course of your work either

23   at the New York Attorney General's Office

24   or previously with SEIU, did you sit in on

25   any depositions or is this the first time

1

2       law, right?

3            A.   I am not an expert in the law.

4            Q.   And you don't intend to offer any

5       legal opinions in this case?

6            A.   I do not.

7            Q.   You have not ever worked in drug

8       enforcement, have you?

9            A.   No, I have never worked in drug

10      enforcement.

11           Q.   You are not an expert on the

12      Controlled Substances Act, are you?

13           A.   That is correct, I am not an

14      expert in the Controlled Substance Act.

15           Q.   You have not ever worked with the

16      DEA, have you?

17           A.   I have not.  I have not worked

18      with the DEA.

19           Q.   And you are not an expert in DEA

20      requirements and regulations, correct?

21           A.   That is correct.

22           Q.   You are not an expert or don't

23      intend to offer yourself as an expert in

24      what the DEA regulations actually mean,

25      correct?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   That is correct.

3          Q.   You do not intend to offer

4     yourself as an expert in what DEA

5     registrants should or are supposed to do in

6     accordance with those guidance and

7     regulations, correct?

8          A.   That is correct.

9          Q.   And from a big picture level, if

10    I understand your report correctly, what

11    you have done is offer -- is do analyses

12    offering 16 different metrics and

13    illustrate what the results of those

14    metrics would show at a high level.

15             Do you agree with me that that's

16    what your report does?

17         A.   Yes.  I didn't actually count how

18    many metrics, so I'm taking your word that

19    there are 16.

20         Q.   I will represent to you that I

21    count 16.  But what I'm trying to parse

22    out, I don't mean to be mysterious, is I

23    want to make sure that I understand the

24    expertise you do intend to offer and the

25    expertise you don't intend to offer.

Highly Confidential - Subject to Further Confidentiality Review

1

2            So as I understand your opinions,

3     they are opinions from a data science point

4     of view that say if you ran these metrics,

5     here's what the results would look like.

6            Is that a fair assessment at a

7     very, very high level?

8            MS. CONROY:   Objection.

9            You can answer.

10     A.    I would say that's a fair

11     assessment.  I was asked to apply the

12     compliance metrics to the labeler's data,

13     including chargebacks and IMS, IQ, yeah.

14     Q.    And you don't intend to offer any

15     opinions about which one of those metrics

16     is the right one, do you?

17     A.    That is correct.  I don't endorse

18     any of the metrics or not endorse.

19     Agnostic would be the correct term, yeah.

20     Q.    Okay.  And you're not going to

21     offer any opinions that a particular

22     registrant should have or is required to

23     employ which ones of the metrics?  That is

24     not what you were retained to do, correct?

25     A.    That is correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2          Q.    And that is beyond your expertise

 3     to do.

 4                Do you agree with that?

 5          A.    That is correct.

 6          Q.    And I think, if I'm reading your

 7     report correctly, you don't take any

 8     opinion as to what the DEA or the

 9     Controlled Substances Act means when it

10     talks about suspicious orders.

11                You are not taking a position as

12     to what specifically the DEA means, right?

13          A.    Yes, I believe that's right.

14          Q.    And I think it can make our day

15     easier if I understand the scope of this.

16                What you have done is you've used

17     a number of different metrics to show that

18     if a particular defendant had looked at the

19     data this way, this is what that defendant

20     would have seen.

21                Is that fair?

22          A.    Yes.

23          Q.    And when you use the term

24     "suspicious," which you do quite a number

25     of times in your report, what you mean by
```

Highly Confidential - Subject to Further Confidentiality Review

1

2     that is the result of your own metrics,

3     right?

4          A.   Yes, you can characterize it that

5     way.

6          Q.   You don't mean to use

7     "suspicious" as a technical term meaning

8     suspicious under the Controlled Substances

9     Act, right?

10               MR. LEDLIE:   Object to the form.

11               You can answer.

12          A.   Yes, when I say "suspicious," I

13     mean that they have either triggered one of

14     the metrics, which are -- I'll leave it at

15     that.

16          Q.   Okay.  And you haven't, you

17     haven't gone -- have you ever met with

18     anyone from DEA about this case and your

19     report?

20          A.   I have not met with anyone about

21     this case or my report from the DEA.

22          Q.   Okay.  Why do you hesitate?

23          A.   I have spoken to DEA officials

24     about the ARCOS data and how to process it,

25     but clarifying questions of what does an S

Highly Confidential - Subject to Further Confidentiality Review

1

2      labeler impact, in your own words, you

3      phrase it as a hypothetical, right?

4            A.    Correct.

5            Q.    You aren't suggesting -- the

6      defendant that's subject to the small

7      labeler impact is Janssen, correct?

8            A.    Yes, I believe so.

9            Q.    And what you do in that section

10     is you model, hypothetically, if Janssen

11     had looked at the data this way, then

12     hypothetically, orders could have been

13     stopped, right?

14           A.    That is correct.

15           Q.    But you do not go further in this

16     report to opine that Janssen had an

17     obligation to do that or should have done

18     that or that the DEA expected Janssen to do

19     that.

20                 That's beyond your expertise,

21     right?

22           A.    That is beyond, yes.

23           Q.    Okay.  And, also, you don't know

24     or you don't have the expertise to know --

25     you don't consider yourself an expert in

Highly Confidential - Subject to Further Confidentiality Review

1

2      DEA reporting requirements, do you?

3          A.   No.

4          Q.   And you don't know what triggers

5      a reporting requirement for a manufacturer?

6          A.   No.

7          Q.   You don't know what triggers a

8      reporting requirement for a distributor, do

9      you?

10         A.   No.

11         Q.   And you don't know what triggers

12     reporting requirements for pharmacies?

13         A.   No.

14         Q.   It is beyond the scope of your

15     expertise to opine on what triggers a

16     reporting responsibility specifically?

17     That's beyond what you have been asked to

18     do here, correct?

19         A.   Correct.

20         Q.   And also just to make sure we

21     narrow in on what your opinions are, you

22     are not an expert in what DEA does with

23     suspicious reports?  That is beyond your

24     expertise as well, right?

25         A.   That is correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2          Q.   And I think there are places in
 3     your report where you talk about orders
 4     that could have been stopped.  And I just
 5     want to make sure that I understand the
 6     parameters of what you intend to say about
 7     that.
 8               When you talk about orders that
 9     could have been stopped, you mean from a
10     data perspective hypothetically, correct?
11          A.   Yes.  I mean that the compliance
12     metrics showed that order or that triggered
13     that order and so, yes, it could have been
14     stopped.
15          Q.   So someone, somewhere could have
16     stopped those orders?
17          A.   Yes, they could have seen it or
18     stopped it.
19          Q.   But beyond what the data shows,
20     do you have any opinions whatsoever on how
21     that would work in the real world?
22               MS. CONROY:  Objection.
23               You can answer.
24          A.   No, I have no opinions on the
25     real world.
```

Highly Confidential - Subject to Further Confidentiality Review

1
2      last person that put that, if you will, a
3      box together.
4               So I don't know how often that
5      box was created by somebody else and
6      labeled by someone else.  They might always
7      be the same.  But to be most correct, I
8      wanted to use the DEA's and the FDA's
9      terminology.  I'm not sure which one, where
10     that term came from, but I saw that as part
11     of the data set.
12          Q.   And so going back to the small
13     labeler impact, when you talk about orders
14     that could have been stopped, you did not
15     analyze how that would have happened, who
16     would have stopped the orders, who had a
17     duty to stop the orders, what would have
18     had to happen to stop the orders?  You
19     didn't do any of that work, did you?
20          A.   Correct.
21          Q.   And you certainly don't intend to
22     opine that Janssen, in particular, should
23     have stopped those transactions.  That is
24     beyond what you're saying.  You're simply
25     saying it could have happened, correct?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.    That is correct.

3          Q.    And really, as you sit here, you

4     don't even know how Janssen or any other

5     registrant would actually stop those orders

6     in practice in the real world?  That is not

7     something that you have ever studied or

8     know if it would even be possible, right?

9          A.    That's correct.

10          Q.    Okay.  So let's go to the

11    summary.  Let me mark your report as

12    Exhibit 5.

13               (Keller Exhibit 5, Expert

14          Analysis of Lacey R. Keller, not

15          Bates-stamped, marked for

16          identification, as of this date.)

17    BY MS. LEVY:

18          Q.    Do you recognize what we've

19    handed you as Exhibit 5?

20          A.    I do.

21          Q.    What is that?

22          A.    That is my report.

23          Q.    How did this document spring

24    forth into the world?  What -- who typed

25    it?  Whose computer was it on?  How did it

Highly Confidential - Subject to Further Confidentiality Review

 1

 2        didn't -- you were not asked to and you

 3        didn't look specifically at Allergan?

 4                MS. CONROY:  Objection.

 5            A.   As far as we were presenting

 6        results, let's say, ala, table 1 and 2,

 7        correct.

 8            Q.   Now beginning on page 16 in

 9        Section J, you describe your compliance

10        metric application.

11                Are you with me?

12            A.   Yes.

13            Q.   And you state in paragraph 51, "I

14        was instructed by counsel to apply metrics

15        derived and used by any manufacturer or

16        distributor and also to apply metrics

17        applied in enforcement actions, McKesson

18        and Masters, to all data sets to detect

19        prescribing and purchasing patterns of

20        unusual size, frequency and pattern."

21                Do you see that?

22            A.   I do.

23            Q.   When you say "I was instructed by

24        counsel," who does that refer to?  What

25        counsel?

Highly Confidential - Subject to Further Confidentiality Review

1

2            You are not aware of any specific

3     rules or regulations for a registrant on

4     how to calculate patterns of unusual size

5     or frequency, correct?

6            A.   So I think, as I stated earlier,

7     that's not my area of expertise.

8            Q.   And you're not aware of any?

9            A.   I wouldn't be able to say, but...

10           Q.   Okay.  The first metric that you

11    employ is double the national average.  And

12    I'm looking now on page 17.

13           A.   Correct.

14           Q.   Are you with me?

15                And that metric, again, was one

16    that Linda Singer asked you to do, correct?

17           A.   Correct.

18           Q.   And you didn't find it in any DEA

19    regulations?

20           A.   Correct.

21           Q.   You are not aware of any place in

22    the real world where this metric is used,

23    correct?

24                MS. CONROY:   Objection.

25           A.   I wouldn't know for sure.

Highly Confidential - Subject to Further Confidentiality Review

1

2      I have there, that's where it would have

3      been derived from.

4            Q.    And beyond that, you don't know

5      anything other than you were asked to run

6      it, correct?

7            A.    Yeah, I was asked to review the

8      metric and implement it on the data.

9            Q.    With respect to the Qualitest

10     Endo 25/50 percent national average, that

11     metric also came -- that metric was

12     presented to you by the attorneys as

13     something that you should run based on

14     documents that you were provided, correct?

15           A.    It was either a metric that we

16     found or the attorneys provided.  I

17     honestly can't remember.

18           Q.    And for this metric, which was

19     it?  Did you stumble across a document and

20     say, hey, we should run this?  Or did the

21     attorneys provide you documents and say

22     based on these documents, we'd like for you

23     to run it as if this were the law of the

24     land?

25                 MS. CONROY:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.    I don't know.

3          Q.    Do you have a supplemental report

4     in process?

5          A.    No.

6          Q.    Okay.  And if your opinions

7     change in any way as a result of additional

8     analysis of the 2000 [sic] data or for any

9     other reason, we would ask that you bring

10     that to the attention of counsel.

11          A.    Of course.

12          Q.    Okay.  Page 27 of the report,

13     paragraph 76, heading No. 1 at the top of

14     page 27.

15               Are you with me?

16          A.    I am.

17          Q.    It says, "Defendant access to

18     IQVIA data."

19               And then down in paragraph 78 you

20     make the statement that "Each of the

21     defendant labelers had access to IQVIA

22     XPONENT data."

23               Do you see that?

24          A.    I do.

25          Q.    That is an assumption that you

Highly Confidential - Subject to Further Confidentiality Review

1

2          were asked to make.  You did not look at

3          each labeler and do an analysis of what

4          data each labeler had during what time

5          periods in the real world?  You did not do

6          that, did you?

7                    A.    I would say it's a mix.

8                    Q.    Okay.

9                    A.    It was an assumption that we made

10         at the beginning of the report.  But we

11         also, in part of the reliance materials

12         that are provided to you today, also

13         include dates in which we identified

14         defendant access to -- defendant labeler

15         access, I should be more specific, to the

16         IQVIA XPONENT data or purchase.  I should

17         say purchase, not access.

18                    Q.    So let's go through on page 28 in

19         table 6.

20                    For Endo, did you an analysis of

21         what IQVIA data Endo had in its files, what

22         type of IQVIA data Endo actually had, and

23         for what years in the 20-year time period

24         that you looked at?  Is that something that

25         you did?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   I would say yes.

3          Q.   Okay.  And what is the answer for

4    Endo?

5          A.   I'd have to pull up my files to

6    look specifically.

7          Q.   You don't know?

8          A.   I don't remember, no.

9          Q.   Okay.  Do you know -- can you

10   say, as you sit here, are you going to give

11   the opinion that Endo actually had the full

12   set of IQVIA data in its files for the

13   whole 20-year period?  Is that an opinion

14   you intend to offer in this case?

15         A.   So I would say it's an assumption

16   of the report but not an opinion, yes.

17         Q.   Okay.  And so I just want to --

18   I'm not trying to be tricky.  I'm looking

19   at the first statement in 78.  You say,

20   "Each of the defendant labelers had access

21   to IQVIA XPONENT data."

22              What you mean by that is they

23   could have purchased that data, right?

24         A.   I would say that's correct, if

25   they didn't already purchase some form of

Highly Confidential - Subject to Further Confidentiality Review

1
2      it, yes.
3          Q.   And in -- some of the labelers or
4      some of the defendants in this case might
5      have purchased some data for some time
6      periods.  And you do not know and did not
7      do a deep analysis of every single labeler,
8      every single time period?  You didn't do a
9      look at what each labeler had in the real
10     world, right?
11         A.   We had a -- we had a high level
12     review, but I couldn't write a report on
13     each labeler's access on every year, no.
14         Q.   And the metrics that you run that
15     flow from the IQVIA data are based on the
16     assumption that any of these labelers could
17     have had it all, but not assuming that they
18     actually did have it all in the real world?
19         A.   Yes.
20         Q.   And --
21         A.   When you say "it all," I would
22     say -- I want to clarify that, if you're
23     saying that the Allergan data is it all.  I
24     don't know what the "all" could be from
25     IQVIA.  You know, I know only what Allergan

Highly Confidential - Subject to Further Confidentiality Review

1

2      triple national average, from McKesson

3      8,000, and from common sense.

4              Each of these metrics generates a

5      different number of flags, right?

6         A.   Correct.

7         Q.   You do not intend to offer any

8      opinion in this case as to which one of

9      these is right.  I think you've told us

10     that, correct?

11        A.   Right.

12        Q.   And relatedly, you don't intend

13     to offer any opinion that any particular

14     set of these prescriptions are suspicious

15     prescribing as the DEA would define it?

16     That is not what you're here to do,

17     correct?

18        A.   Correct.  Whenever we use the

19     word "suspicious," we mean that it tripped

20     one of the metrics.

21        Q.   When you use the term

22     "suspicious," you mean flagged by your

23     metrics?

24        A.   That's precisely what we mean.

25        Q.   And that is all that you mean by

Highly Confidential - Subject to Further Confidentiality Review

1

2      that?

3          A.   Correct.

4          Q.   And so under your metrics, in

5      table 10, we can see the number of

6      physicians in Summit and Cuyahoga County

7      who would have been flagged by the

8      compliance metrics that you use, right?

9          A.   Correct.

10         Q.   And depending on which metric you

11     use, your metrics would generate thousands

12     and thousands of physicians in these two

13     counties who get flags, right?

14         A.   I would say they're not my

15     metrics, but by applying these metrics,

16     yes, you would have.

17         Q.   And I think I know the answer

18     now, but you are not suggesting that there

19     are actually, looking at the first row,

20     4,207 family or general physicians in

21     Summit and Cuyahoga County that are

22     actually prescribing suspiciously?  That is

23     not what you mean to suggest here, correct?

24         A.   Correct.  What I mean to say is

25     that they were -- they tripped one of the

Highly Confidential - Subject to Further Confidentiality Review

1

2      on row 15.  I'm taking your math for it,

3      but it looks to be generally right.  Row 11

4      and row No. 4.

5           Q.   And you don't intend to offer any

6      opinion that actually in the real world,

7      these were suspicious orders or DEA would

8      consider these suspicious orders, correct?

9           A.   Correct.

10          Q.   Okay.  And the same analysis,

11     this one in Exhibit 6 is unique to

12     Allergan.

13               Did you isolate for any other

14     labeler the exact number of chargebacks in

15     Cuyahoga and Summit County?

16          A.   Where we would, like, create a

17     table like 34 for Summit and Cuyahoga, no.

18          Q.   Okay.  Why didn't do you that?

19     There are many other places in your report

20     that you looked specifically at Cuyahoga

21     and Summit County.  Why did you not do that

22     for purposes of table 34?

23          A.   Honestly, I have no idea, but

24     it's easy to run and could be done no

25     problem, and I'd be happy to do that for

Highly Confidential - Subject to Further Confidentiality Review

1

2          of these and two they hit on any flag.

3                   Is that a correct reading of this

4          table?

5               A.   Correct.

6               Q.   And again, I think you've now

7          said this many, many times, but it's not --

8          you do not intend to offer any opinion that

9          these are, in fact, suspicious orders or

10         suspicious purchases by buyers.  That is

11         beyond what you are able to do and beyond

12         your expertise, correct?

13                   MS. CONROY:   Objection.

14              A.   Correct.

15              Q.   And that's true for Allergan, but

16         also all of the other labelers on the

17         left-hand column?

18              A.   I would say so, yes.

19              Q.   Okay.  And the same with table 39

20         and the dosage units, I think generally the

21         same thing applies.

22                   The number of flagged dosage unit

23         changes, depending on which one of your

24         metrics are applied, correct?

25              A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

1

2      employed, right?

3                MS. CONROY:   Objection.

4           A.   Yes, I think that's a correct

5      characterization.

6           Q.   And your analysis does not

7      include, for example, an analysis of

8      Allergan and a look at every single order

9      that it did investigate.

10               You didn't conduct such an

11     analysis for Allergan or any other labeler,

12     correct?

13          A.   Let me think about that for a

14     second just to make sure I'm clear.

15               I was... I think that is correct.

16     I didn't look at the practices, I didn't

17     evaluate the practices of Allergan.  I

18     didn't look at how each process was -- how

19     each order was processed, monitored,

20     flagged, unflagged or released, et cetera.

21          Q.   And to be clear, you had some

22     information about suspicious order

23     monitoring programs for the various

24     labelers.  You had some information, but

25     you didn't do an analysis of which ones of

Highly Confidential - Subject to Further Confidentiality Review

1

2      the orders were investigated versus weren't

3      investigated.

4             That was beyond what you did,

5      right?

6      A.   I think -- I think that's

7      correct.

8      Q.   Yeah, I'm not trying to be

9      tricky.  I just want to make sure.

10            You never looked at for any of

11     the flags that came up for any of your

12     metrics in the real world whether a labeler

13     actually did investigate those particular

14     transactions?  That, you never looked at,

15     right?

16            MS. CONROY:  Objection.

17     A.   I think that's correct.  I did

18     have access to the Mallinckrodt peculiar

19     orders data, but I didn't go as far as

20     beyond looking at that data set.

21     Q.   And so for the set of

22     transactions that are flagged under

23     different matrices, you can't say which

24     ones of those actually got investigated,

25     which ones didn't, which ones were

Highly Confidential - Subject to Further Confidentiality Review

1

2      legitimate, which ones weren't legitimate?

3      That is not something that you did in

4      connection with your work in this case,

5      right?

6          A.   Yes, I would not be able to state

7      which ones were legitimate or not.

8          Q.   Okay.  And the extension of that

9      is, you have no opinion, you cannot opine

10     on what the impact would have been if a

11     labeler had investigated because you don't

12     know what those investigations would have

13     found, what would have happened after that,

14     correct?

15         A.   Yes, I think we've covered this

16     one earlier, but with the exception of the

17     hypothetical Janssen analysis, that is a

18     correct statement.

19         Q.   Okay.  I forgot to talk to you

20     about your addendum.  You provided an

21     addendum to your expert report.

22              Do you know what I'm talking

23     about when I say the addendum?

24         A.   Yes, I do.

25         Q.   So how did this addendum come

Highly Confidential - Subject to Further Confidentiality Review

1

2      Q.   Do you know what makes an order

3   reportable to the DEA as a suspicious

4   order?

5      A.   No, I do not.  As we discussed

6   earlier, outside of my expertise.

7      Q.   Do you know whether DEA expects

8   registrants to conduct due diligence into

9   flagging orders -- into flagged orders to

10  determine whether they're actually

11  suspicious before reporting it?

12     A.   Again, as discussed earlier,

13  outside of my expertise.

14     Q.   Did you ever discuss whether

15  to -- strike that.

16          Did you ever discuss whether to

17  consider due diligence in running the

18  metrics that you ran?

19     A.   So --

20     Q.   Let me start over.

21          You said earlier that in your

22  report, if something is suspicious, you

23  mean it just was tripped by one of the

24  metrics, right?

25     A.   That is correct.

1

2          Q.    And just because you used the

3     word "suspicious" in your report, that

4     doesn't mean it's suspicious as the DEA

5     defines under the Controlled Substances

6     Act, correct?

7          A.    That's accurate.

8          Q.    So did you ever consider whether

9     you should take due diligence into account

10    in creating your definition of suspicious?

11         A.    So I'm pausing for this because

12    there's the addendum that does the

13    persistent flagging which assumes no due

14    diligence because once the flag is

15    triggered, it stays on for the perpetuity

16    of the data set.

17              So in the sphere that is around

18    that, then, yes.  And if we're talking

19    about anything outside of that, then no.

20         Q.    Are you aware whether -- strike

21    that.

22              Did you look at any documents or

23    deposition testimony regarding Janssen's

24    due diligence of flagged orders?

25         A.    I might have read a document or

Highly Confidential - Subject to Further Confidentiality Review

1

2      But I don't believe that we had a Janssen

3      algorithm.

4           Q.    I'll represent to you we haven't

5      found one.

6                 Why is it that you didn't use

7      Janssen's suspicious order monitoring

8      algorithm or compliance metric in your

9      report?

10          A.    If it's not here, then, which I

11     don't think it is, I didn't know of it.  So

12     if there was one, I'd be happy to implement

13     it.

14          Q.    How did you choose the compliance

15     metrics that got included in the report?

16          A.    As we were stating earlier, some

17     were provided by counsel, others we found.

18          Q.    So there was no instruction by

19     anyone to make sure you included all of the

20     defendants' algorithms in your report?

21          A.    Well, I would say that's correct,

22     there was no explicit instruction to

23     include all or exclude all, include what

24     you could find and go from there.

25          Q..   Is it your understanding that

Highly Confidential - Subject to Further Confidentiality Review

1

2      nobody could find Janssen's suspicious

3      order monitoring algorithm?

4              A.    I just wanted to look at one

5      thing really quick.

6                    (Document review.)

7              Q.    What page are you on?

8              A.    I'm trying to find it.  I'm

9      sorry.

10             Q.    Are you looking for the metrics?

11             A.    Yeah.  I'm looking actually for

12     the footnote about Janssen that describes

13     the SOMS program.

14                   (Document review.)

15             A.    Because as I understood it, there

16     wasn't one to implement.  But I just...

17     that's what I wanted to review.

18                   (Document review.)

19             A.    So, yes, it was my understanding

20     that there wasn't a metric.

21             Q.    It was your understanding?

22             A.    Correct.

23             Q.    Did you ask anybody to confirm

24     that?

25             A.    I did.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.    Who did you ask?

3          A.    Evan Janush, I think is his last

4     name.  J-a-n-u s-h.

5          Q.    And your understanding is that

6     Mr. Janush told you that Janssen did not

7     have a suspicious order monitoring

8     compliance metric or algorithm?

9          A.    Correct, that we could implement,

10    yes.

11         Q.    Did you find that footnote?

12         A.    Yes.  I was on page 28 here.

13    Footnote 83 is what I was looking for just

14    to make sure.

15         Q.    And footnote 83 says, "Janssen

16    used chargeback and value track data on

17    occasion for size only."

18              Is that what you were thinking

19    of?

20         A.    That is exactly what I was

21    thinking of.

22         Q.    And what makes you think that

23    that supports the notion that Janssen did

24    not have a suspicious order monitoring

25    algorithm?

Highly Confidential - Subject to Further Confidentiality Review

 1

 2              that it exists.

 3                   MS. LUCAS:  I think Mr. Janush

 4              knows about our -- Janssen's algorithm.

 5    BY MS. LUCAS:

 6         Q.   So I wanted to talk about your

 7    small labeler opinion.

 8                   And that applies only to Janssen,

 9    correct?

10         A.   That is correct.

11         Q.   And why is that?

12         A.   So small labeler, I don't mean

13    any offense to that because I understand

14    Johnson & Johnson is a very large company,

15    but when it comes to opioids, you have very

16    few as it pertains to the market share,

17    right?  You're a much lower market share.

18         Q.   Actually, if you want to turn

19    really quickly to page --

20         A.   16 you're probably looking for.

21         Q.   I am.

22                   Page 16, table 1 and table 2.

23    That reflects Janssen's market share in

24    Summit County and Cuyahoga County, correct?

25         A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1

2        Q.    And the largest percentage on

3    that table is 0.9 percent, and the smallest

4    one is 0.1 percent, correct?

5        A.    That appears to be correct.

6        Q.    Did you calculate those numbers?

7        A.    I didn't do it by hand, but an

8    algorithm did.

9        Q.    How did you do that?

10       A.    SQL query.

11       Q.    And you concluded that Janssen

12   had between 0.1 percent and 0.9 percent

13   market share in Summit and Cuyahoga,

14   correct?

15       A.    Yes, depending on the metric and

16   depending on the county.

17       Q.    And other manufacturers, either

18   defendants or otherwise not named in the

19   complaints, had between 99.1 and 99.9

20   percent of the market share, correct?

21       A.    Yes.  I'm assuming you're taking

22   the hundred minus yourselves and that's

23   everybody else, yes.

24       Q.    So then back to your small

25   labeler opinion, why then did you conduct

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.    I believe so, yes.  I'd have to

3    look at the code to be for certain.

4          Q.    So in order for this analysis to

5    work, you had to assume that the prescriber

6    was taken off-line the moment the metrics

7    used were tripped and there was a flag,

8    correct?

9              MS. CONROY:  Objection.

10         A.    I would say for this hypothetical

11    situation to present itself, yes, once

12    someone was flagged and they were taken

13    off-line, what their, what amount of

14    prescriptions were then taken off-line.

15              I'm trying to say it the best way

16    I can.  I'm sorry if I'm not being clear.

17         Q.    Do you believe that your small

18    labeler impact opinion is an accurate

19    representation of what happens in the real

20    world?

21         A.    I'm not really an expert to say

22    that.

23         Q.    Do you have any beliefs on

24    whether it's an accurate representation of

25    what would happen in the real world?

Highly Confidential - Subject to Further Confidentiality Review

1

2    your opinion of what would happen?

3         A.   So I would say that the change

4    that we made earlier in the corrections

5    where we went from "would" to "could,"

6    those should have been throughout.  I

7    didn't really get to talk about every

8    single change here.  But, again, these are

9    "could" statements, and I think we stated

10   that pretty definitively in the first part

11   of this deposition.

12        Q.   Right.  I asked because I noticed

13   that the corrections didn't apply to this

14   paragraph.  And so you are now saying that

15   you meant to say "could" have happened?

16        A.   I would be most comfortable with

17   saying "could."

18        Q.   And "could" means that it's

19   feasible, correct?

20        A.   I think that's what that word

21   means, yes.

22        Q.   Do you believe that your small

23   labeler impact opinion is feasible in the

24   real world?

25        A.   I'm not here -- I won't talk

Highly Confidential - Subject to Further Confidentiality Review

1

2          about real world.  It's outside of my

3          expertise.

4              Q.    So you're not offering any

5          opinion about whether your small labeler

6          impact opinion could happen in the real

7          world, right?

8                  MS. CONROY:   Objection.

9              A.    So I think we've said here that

10         this was what could happen.  I'm not

11         offering an opinion about what would happen

12         or should happen.

13             Q.    Right.

14                 But you're also not offering an

15         opinion about what could happen as applied

16         in the real world, right?

17             A.    I guess I'm not really

18         understanding the difference between that

19         question and the one that I just answered.

20             Q.    Well, because you said this is

21         all hypothetical.

22             A.    Sure, but it relies on real-world

23         data.

24             Q.    Which data?

25             A.    The IQVIA data.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.    It is then your opinion that this

3     could happen in the real world, correct?

4          A.    It seems a little... it's a lot

5     of time to spend on a hypothetical, but,

6     yes, if all of the assumptions that were

7     outlined in the report that the labeler was

8     -- or that the labeler identified the

9     prescriber and that all the different steps

10    were taken to take them off-line, then,

11    yes, it could happen in the real world.

12         Q.    Well, the only two assumptions I

13    think I heard were that one of the metrics

14    was tripped and a flag went up, correct?

15         A.    That is one part of the

16    hypothetical.

17         Q.    And Janssen would report that

18    prescriber to law enforcement as

19    suspicious, right?

20         A.    So as part of the hypothetical,

21    they would be tripped, Janssen could report

22    them.  That prescriber, through whatever --

23    or they could be reported, or they could

24    stop prescribing, whatever the means are to

25    get them to stop prescribing.

1

2          But the whole point of the

3   analysis is that that prescriber who was

4   flagged then stops prescribing.  I don't

5   really claim or really fill out the blanks

6   between what gets from A to B.

7          Q.   You said that your assumption is

8   that the prescriber would stop prescribing

9   immediately upon the metric being tripped,

10  right?

11         A.   Correct.

12         Q.   Do you have any basis to believe

13  that those assumptions would happen in the

14  real world?

15         A.   It's really outside of my

16  expertise.

17         Q.   You don't know?

18         A.   I don't know.

19         Q.   Have you ever thought when you

20  were thinking about this analysis whether

21  it was flawed?

22              MS. CONROY:  Objection.

23         A.   I think --

24              MS. CONROY:  Which analysis?  The

25              hypothetical you're talking about or --

Highly Confidential - Subject to Further Confidentiality Review

1

2      only the algorithm?

3            A.   Yes, I think that would be a

4      better characterization.

5            Q.   So you're excluding from

6      suspicious order monitoring program, any

7      follow-up due diligence that the suspicious

8      order monitoring department did when an

9      order was flagged, right?

10           MS. CONROY:   Objection.

11           A.   Yeah, I would say that's outside

12     of the scope.   So to the extent that there

13     was an algorithm that we could implement

14     and chargebacks were used as part of that

15     algorithm, then they get the "yes" here.

16           Q.   Got it.

17                And so...

18                (Document review.)

19           Q.   All right.   Take a look at page 4

20     of the --

21                MS. LUCAS:   Do we have the errata

22           sheet marked?

23                MS. CONROY:   Yes.

24                MS. LUCAS:   From 5/11?

25                Has this been marked?

Highly Confidential - Subject to Further Confidentiality Review

1

2       appeared in the chargeback data.

3           Q.   And for seven of them, you say

4       that seven were flagged by any metric,

5       correct?

6           A.   Sorry, just a second.  I just

7       want to make sure.

8                So your question earlier, it says

9       total buyers, 12.  Yes, total buyers in the

10      chargeback data.  And then seven of which

11      were flagged by any metric.

12          Q.   Did you do any research yourself

13      to determine whether any of those buyers

14      were actually suspicious?

15               MS. CONROY:   Objection.

16          A.   That would be outside of the

17      scope of my expertise.

18          Q.   And if you take a look back at

19      your report in Exhibit 5 at page 28, table

20      6, this is about IQVIA data.

21               I want to confirm what I think is

22      going to be the case based on what you just

23      told me.

24               In paragraph 80, it says,

25      "Janssen discusses using IQVIA data for

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2    looking for it.
 3        Q.   Well, I guess I'm trying to
 4    understand why this opinion exists if you
 5    can't tell me that there is any evidence in
 6    the record that it reflects things that
 7    actually happened.
 8        A.   I mean, it was a hypothetical
 9    request by -- to me, and so that's what I
10    enacted.  I was asked to enact that.
11        Q.   Quickly, you said that your
12    opinion assumes that the doctor would stop
13    prescribing immediately upon being reported
14    to law enforcement, correct?
15             MS. CONROY:   Objection.
16        A.   I would say the assumption is
17    that they do not have any more
18    prescriptions.  However that comes to be
19    is...
20        Q.   But do you know how long
21    investigations into prescribers take?
22        A.   Outside of my expertise.
23        Q.   Well, if you look at page 40 of
24    your report, on paragraph 96, it's talking
25    about a prescriber named Ronald Celeste.
```

Highly Confidential - Subject to Further Confidentiality Review

1

2          And there was an "...uptick in

3     prescriptions caught the attention of the

4     authorities, who launched a two-year

5     investigation into his practice in 2014."

6               So you know here, in your report,

7     is that the investigation into Mr. Celeste

8     lasted two years, correct?

9          A.   That was what was reported in the

10    news.

11         Q.   And that's in your report, right?

12         A.   It is, but it's one

13    investigation.  I can't say what's typical

14    length of time for an investigation.  It's

15    outside of my expertise.

16         Q.   Yes or no, are you aware of any

17    instance ever in the real world where a

18    prescriber stopped prescribing the moment

19    that an investigation was opened into him

20    or her?

21              MS. CONROY:  Objection.

22         A.   I'm not really here to talk about

23    the real world.  It's outside of my

24    expertise, so I can't answer a "yes" or

25    "no" to that.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.    Well, that's not my question.

3    I'm asking you if are aware of any instance

4    in the real world where a prescriber ever

5    stopped prescribing the moment an

6    investigation was opened.

7          A.    Again outside of my expertise, so

8    I can't speak to something that I know or

9    don't know.

10         Q.    You don't know what you don't

11   know?

12         A.    Actually, I don't know what I

13   don't know?

14         Q.    I mean, I'm -- you're avoiding my

15   question because my question is pretty

16   simple.

17              It's are you aware of any

18   instance where a prescriber stopped

19   prescribing the minute that an

20   investigation was opened into his or her

21   prescribing practices?

22              MS. CONROY:  Objection.

23   BY MS. LUCAS:

24         Q.    Do you know of that, yes or no?

25         A.    I just am not going to answer a

Highly Confidential - Subject to Further Confidentiality Review

1

2    question about something that's not my area

3    of expertise.

4         Q.   Well, refusing to answer

5    something and not knowing are different

6    things.

7              Is it then correct that you don't

8    know of any instance where a prescriber

9    stopped prescribing the minute that an

10   investigation was opened into his or her

11   prescribing practices?

12        A.   Look, I haven't looked at that.

13   It's not part of my expertise.  I would not

14   know because it's not part of my expertise.

15        Q.   But you're offering an expert

16   opinion on this fact that assumes this.

17   And in order to offer this opinion, you

18   have to have some factual basis for it.

19              So do you have a factual basis

20   for this opinion or not?

21        MS. CONROY:   Objection.

22        A.   So what I'm offering is a

23   hypothetical scenario using the data that's

24   been provided to me.  I have no expertise

25   in the real world, due diligence, et

Highly Confidential - Subject to Further Confidentiality Review

1

2     cetera, that goes beyond that.  So there's

3     a set of assumptions that go into this and

4     that is all.

5          Q.   So in order for you to get on the

6     stand and testify about this opinion at

7     trial, you must identify a factual basis.

8               Can you do that today?

9               MS. CONROY:   Objection.

10         A.   I really don't know what will go

11    into that and so I can't answer that.

12         Q.   Is one of the other assumptions

13    in your small labeler impact analysis that

14    the patient who would have gotten the

15    prescription of the flagged doctor does not

16    go to another doctor and get that same

17    prescription?

18         A.   I wouldn't say that we talk about

19    anything about patients in this report.

20         Q.   You didn't consider that?

21         A.   That was not something I would

22    consider as part of this set of

23    assumptions.  The patients are not

24    considered in really anywhere in this

25    report.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.    And you didn't consider also

3     whether or not whether the medical board

4     would revoke prescribing privileges

5     immediately, correct?

6          A.    Again, it was not part of the

7     assumptions yes or no.  It's just we had

8     too make the assumption -- to do the

9     analysis, you make the assumption that the

10    prescriber stopped prescribing.  The steps

11    between medical board, due diligence, et

12    cetera...

13         Q.    Right.  Because it doesn't work

14    unless you assume that the prescriber

15    stopped prescribing immediately, correct?

16         A.    I wouldn't characterize it as it

17    doesn't work.  It's just part of the

18    exercise.

19         Q.    Well, does it work if the

20    prescriber didn't stop prescribing

21    immediately?  Does the result stay the

22    same?

23         A.    So you could create a period of

24    which time -- you know, you could say give

25    them six months after which they were first

Highly Confidential - Subject to Further Confidentiality Review

1

2      flagged and implement that.  It's an

3      analysis.  How I complete the analysis can

4      work -- you can bake in any amount of time

5      you'd like, after which time they're first

6      flagged if that's --

7           Q.   But for this --

8           A.      -- part of this.

9           Q.   Sorry.

10          A.   Yes, but for this, that was not

11    part assumption.

12               MS. LUCAS:  I will reserve my

13          rights given the time constraints and

14          that I have a few more questions or

15          many more questions.  If I were given

16          the time, we could spend much more time

17          together, but subject to that

18          Reservation of Rights, we are done and

19          I will pass the witness.

20               Can we go off the record for just

21          a moment?

22               THE VIDEOGRAPHER:  The time is

23          3:42 p.m.  We are now off the record.

24               (Recess is taken.)

25               THE VIDEOGRAPHER:  The time is

Highly Confidential - Subject to Further Confidentiality Review

1

2     Mr. Buthusiem writes, "Across the

3     pharmaceutical industry, chargeback

4     requests from distributors to manufacturers

5     do not indicate what specific product

6     inventory, i.e. which particular bottles or

7     packages, the distributor used to fulfill

8     the sale to the downstream registrant."

9          Do you see that?

10     A.   I do.

11     Q.   Do you agree with that statement?

12     A.   I really wouldn't know.  It's

13     outside of my expertise.

14     Q.   So you have no reason to disagree

15     with that statement?

16     A.   I wouldn't have the expertise to

17     agree or disagree.

18     Q.   Okay.  Skipping down to the

19     sentence in the middle of the paragraph

20     that starts "As such," do you see that?

21     A.   I do.

22     Q.   And the underlying portion reads.

23     "The manufacturer cannot use chargeback

24     data to trace a downstream sale back to the

25     specific original direct manufacturer to

Highly Confidential - Subject to Further Confidentiality Review

1

2      distributor sale or sales."

3                Do you see that?

4      A.    I do see that.

5      Q.    And do you agree with that

6      statement?

7      A.    I do not.

8      Q.    Which part do you disagree with?

9      A.    Which part?  I'm sorry.  Ask me a

10     different question or --

11     Q.    Sure.

12               What do you disagree with about

13     that statement?

14     A.    So I believe in my report we do

15     trace the chargeback data back to the --

16     for a second.

17               So he refers to sales data.  I

18     didn't review sales data.  So I actually

19     couldn't be certain if you could trace a

20     chargeback back to sales data.

21               What I had available to me was

22     chargeback data and peculiar order data.

23     Q.    Just so the record is clear, what

24     sales data are you referring to that

25     Mr. Buthusiem reviewed that you said you

Highly Confidential - Subject to Further Confidentiality Review

 1

 2    chargeback from the sale from the

 3    manufacturer to a distributor and then from

 4    a distributor to the distributor's

 5    downstream customer.

 6              Do you recall that?

 7         A.   So I think what I was saying is

 8    because I haven't fully reviewed the sales

 9    data, I don't know what would be possible.

10    So that was -- I think I started making a

11    statement but needed to clarify that.

12    Because I haven't used this direct sales

13    data and done this analysis, I don't know

14    the answer.

15         Q.   Okay.  At this point, you're not

16    aware of any information in the direct

17    sales data that would enable you to trace a

18    manufacturer's sale to a distributor, to

19    then a distributor's sale to a downstream

20    customer?

21         A.   I'm really not prepared to answer

22    that either way right now.

23         Q.   So I was just asking if you're

24    aware of any information at this point.

25         A.   I just -- I've reviewed the file

Highly Confidential - Subject to Further Confidentiality Review

1
2      fairly quickly.  I'm just really not
3      prepared to say what's in the file or what
4      data points are there or what would be
5      possible to review.  So I just am not
6      comfortable with saying one way or the
7      other what is possible or not possible.
8          Q.   Oh, I understand.  I think my
9      question is a little different.
10          It's simply, at this point in
11     time sitting here today, if you are aware
12     of any information that would enable you to
13     trace manufacture's sale to a distributor,
14     trace that order from the manufacturer to
15     the distributor to the downstream customer?
16          A.   So, again, the data that I used
17     in my report was peculiar orders and
18     chargebacks.  The data that's mentioned
19     here that I've only briefly reviewed is
20     sales.  So I can't offer an opinion or a
21     statement at this time about sales.
22          Q.   So what I'm trying to understand
23     is that based on your review thus far,
24     understanding that it's incomplete review
25     of the Mallinckrodt direct sales data, if

Highly Confidential - Subject to Further Confidentiality Review

1

2      there's any information that you've come

3      across to date that would enable you to

4      trace the manufacturer's sale to a

5      distributor, to then the sale by the

6      distributor to a downstream customer?

7              MS. CONROY:  Objection.  Apart

8          from her report?

9              MR. GOLDSTEIN:  Based on her

10         review of the Mallinckrodt direct sales

11         data, which is --

12             MS. CONROY:  That's what you're

13         your question is about, the

14         Mallinckrodt direct --

15             MR. GOLDSTEIN:  Correct.

16             MS. CONROY:  Okay.  Why don't you

17         ask it again, then.

18             MR. GOLDSTEIN:  Correct.

19             MS. CONROY:  That's what's

20         confusing.

21             MR. GOLDSTEIN:  Right.  So I

22         understand the testimony to be that

23         Ms. Keller can't say whether the direct

24         sales data that Mr. Buthusiem reviewed

25         would enable or would not enable

Highly Confidential - Subject to Further Confidentiality Review

1

2          someone to trace the order all the way

3          from the manufacturer to the downstream

4          customer.  And so that's where I'm

5          going with that.

6              MS. CONROY:  Okay.

7     BY MR. GOLDSTEIN:

8          Q.  So would you like me to repeat

9     the question?

10         A.  Yes, please.

11         Q.  So based on your review thus far

12    of the Mallinckrodt direct sales data that

13    Mr. Buthusiem cites in his report, do you

14    have any -- are you aware of any

15    information in that data that would enable

16    you to trace a sale from a manufacturer, to

17    a distributor, to then the downstream

18    customer?

19         A.  I mean, again, that is a very

20    long chain that you've outlined here.  I

21    would need to fully review it to make -- to

22    make an actual assertion.

23              I mean, if there's NDC codes in

24    there, that's where we would start.  But

25    beyond that, I don't -- I'm not prepared to

Highly Confidential - Subject to Further Confidentiality Review

1

2    talk about that right now.

3         Q.   So I think I've asked this

4    question about five times.

5              All I'm asking is what you're

6    aware of today, not what you could ever

7    possibly be aware of at some future point

8    down the road.

9              So as far as, as you sit here

10   today what you're aware of and not aware

11   of, it sounds like you're not aware of any

12   information that would enable you to trace

13   an order from a manufacturer, to a

14   distributor, to the downstream customer?

15             MS. CONROY:  Objection.

16        A.   I'm not going to say aware or not

17   aware because I haven't fully reviewed the

18   data set.  If you want to pull it out, I'd

19   be happy to look at it right now, but I

20   don't remember what column headers are in

21   there.  I don't know what fields are in

22   there.  I just -- those are things that I

23   would need to know to be aware or not aware

24   and I just -- I would be happy to look at

25   it right now if you want to pull it up on a

Highly Confidential - Subject to Further Confidentiality Review

1

2      computer, but...

3           Q.   Sitting here today, you don't

4      recall if you're aware or not of whether

5      there is any information in that direct

6      sales data that would change your analysis?

7           A.   So sitting here, I do not have

8      the familiarity with the data set that

9      would allow me to answer the question

10     either way, that I am aware or unaware,

11     because I would just have to look at the

12     data set more closely to be able to answer

13     the full question of being able to trace

14     from here to here to here.

15          Q.   Okay.  Well, let me move on and

16     ask a slightly different question.  I think

17     everyone is growing weary of that one.

18               If you turn to your report,

19     paragraph 158.  It's on page 84.

20          A.   Yes.

21          Q.   And there, you reference roughly

22     2,900, I think if you look at table 74,

23     it's 2,860 peculiar orders, or to be clear,

24     orders that Mallinckrodt had deemed

25     peculiar based on its own monitoring system

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2              MS. CONROY:   Objection.
 3         A.   How they were shipped, like what
 4    was the method that they arrived in Summit
 5    County?
 6         Q.   Yes.   They were shipped there by
 7    a distributor into Summit or Cuyahoga
 8    County.
 9              Is that your opinion?
10         A.   I guess I don't really understand
11    the question.   I'm sorry if I'm -- I'm not
12    trying to be obstinate.   I just don't
13    understand.   Are you asking me -- I just
14    don't understand quite what you're asking
15    me.
16         Q.   What I'm getting at is that, once
17    a, once product is shipped -- I'll start
18    over.
19              Do you have an understanding of
20    whether distributors that receive products
21    from manufacturers typically hold inventory
22    of the product that they are purchasing
23    beyond the single order that was purchased?
24         A.   I have no expertise in what the
25    inventory practices are of distributors.
```

1

2          Q.   So you don't know if, for

3     example, if a distributor purchases --

4     places an order with Mallinckrodt for one

5     of its products, you don't know if -- and

6     Mallinckrodt ships it to that distributor,

7     the product that was purchased, you don't

8     know if the distributor would have other of

9     Mallinckrodt's products already in its

10    inventory at the time it places that order?

11         A.   Correct.  I'm not an expert in

12    supply chain, nor am I an expert in

13    distributor LIFO or any of their practices

14    there, nor do I -- you had another point in

15    there, but, no, that would be outside of my

16    expertise.  Actually, nor was I given data

17    on those practices.

18         Q.   Okay.  And if a distributor at

19    the time it placed an order that the

20    distributor deemed -- that that -- strike

21    that.

22              If a distributor in its inventory

23    had product from Mallinckrodt that was

24    purchased via multiple orders --

25              Are you with me so far?

1

2      that's what's stated here.

3           Q.   Okay.  The next sentence says,

4      "The chargeback data submitted with respect

5      to any eligible distributor to downstream

6      registrant sale does not delineate which

7      specific distributor to manufacturer order

8      relates to the chargeback."

9                Do you have any reason to

10     disagree with that statement?

11               (Document review.)

12          A.   I don't understand what the word

13     "eligible" means, so I don't really know if

14     I can agree or disagree with this.

15               And it's also referencing sales

16     data that, again, we've discussed earlier

17     that I haven't reviewed fully.

18          Q.   So let me break that up.  I'll

19     represent to you that eligible distributor

20     to downstream registrant sale simply means

21     a sale for which a chargeback was issued.

22          A.   Sure.

23          Q.   A chargeback eligible sale.

24               Okay.  Does that make sense?

25          A.   Sure.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   Okay.  Now based on the data that

3     you've reviewed to date and as you sit here

4     today, do you have any reason to disagree

5     with the sentence that I just read?

6          A.   And I just assume that there is

7     an order number, an order ID in both data

8     sets, is there?

9          Q.   You assume that there is an order

10    ID in both sets of what?

11         A.   Of both the chargeback data and

12    the sales data.

13         Q.   That is the same order ID, is

14    that what you're saying?

15         A.   I would think that that exists.

16         Q.   Okay.  And so if that is the

17    case -- sorry.  If that is not the case,

18    then you would not be able to delineate

19    which specific distributor to manufacturer

20    order relates to the chargeback?

21         A.   I mean, I'd have to look at the

22    data sets again to see whether or not I

23    could trace it or not.  Again, you're

24    asking me look at data I haven't fully

25    reviewed.

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2          Q.    Sure?

 3          A.    Okay.

 4          Q.    Chargeback data is submitted for

 5     one of those orders.

 6          A.    Sure.

 7          Q.    Are you aware of any information

 8     in the chargeback data that identifies

 9     which order of the two orders in the

10     distributor's inventory that chargeback

11     data pertains to?

12          A.    So the -- I will say what I know

13     that exits in the chargeback data.  I can't

14     talk about the inventory system of the

15     distributor.

16               The chargeback has an NDC number,

17     the distributor that shipped it or that

18     submitted it, I should say, to be most

19     correct, as well as an order number and a

20     date.

21          Q.    And is it your understanding that

22     the NDC code that's included pertains to

23     the product that's being shipped?

24          A.    I would understand the NDC to be

25     the product, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.    And not a particular order that's

3     being shipped?

4          A.    I think you could characterize

5     the NDC is part of a larger order.

6          Q.    I'm not sure I follow.

7               The NDC relates to the type of

8     product that's being shipped?

9          A.    So I have seen the data, have an

10    order number, let's say one, two, three,

11    four, five, have as part of it, and this is

12    a hypothetical, but I've seen real examples

13    of the data, an order for -- the same order

14    number also have oxycodone, morphine and a

15    hydrocodone product as part of that whole

16    order.

17         Q.    And that's all under the same NDC

18    code?

19         A.    No, different NDC codes folded

20    underneath one order.

21         Q.    Okay.  But understood the NDC

22    order only pertains to the product that's

23    being shipped?

24         A.    Yes.  I think we've talked about

25    that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2                    C E R T I F I C A T E
 3
 4    STATE OF NEW YORK        )
 5                             : ss.
 6    COUNTY OF WESTCHESTER    )
 7
 8               I, ANNETTE ARLEQUIN, a Notary
 9          Public within and for the State of New
10          York, do hereby certify:
11               That LACEY R. KELLER, whose
12          deposition is hereinbefore set forth,
13          was duly sworn by me, and that the
14          transcript of such depositions is a
15          true record of the testimony given by
16          such witness.
17               I further certify that I am not
18          related to any of the parties to this
19          action by blood or marriage; and that I
20          am in no way interested in the outcome
21          of this matter.
22               IN WITNESS WHEREOF, I have hereunto
23          set my hand this 14th day of June, 2019.
24          _____
25          ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA
```