# EXHIBIT 2

Highly Confidential - Subject to Further Confidentiality Review

1          IN THE UNITED STATES DISTRICT COURT
2           FOR THE NORTHERN DISTRICT OF OHIO
3                    EASTERN DIVISION
4                     -   -   -
5     IN RE:  NATIONAL          :  HON. DAN A.
      PRESCRIPTION OPIATE       :  POLSTER
6     LITIGATION                :
                                :
7     This document relates to: :  NO.
                                :  1:17-MD-2804
8     County of Cuyahoga, et    :
      al. v. Purdue Pharma L.P.,:
9     et al., Case No. 17-OP-   :
      45004 (N.D. Ohio)         :
10                              :
      County of Summit, Ohio et :
11    al. v. Purdue Pharma L.P.,:
      et al., Case No. 18-OP-   :
12    45090 (N.D. Ohio)         :
                      -   -   -
13

              - HIGHLY CONFIDENTIAL -
14    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
15              April 25, 2019
16              Videotaped deposition of
      JONATHAN GRUBER, Ph.D., taken pursuant to
17    notice, was held at the law offices of
      Robins Kaplan, 800 Boylston Street,
18    Boston, Massachusetts, beginning at 10:06
      a.m., on the above date, before Michelle
19    L. Gray, a Registered Professional
      Reporter, Certified Shorthand Reporter,
20    Certified Realtime Reporter, and Notary
      Public.
21
                      -   -   -
22
              GOLKOW LITIGATION SERVICES
23     877.370.3377 ph │ 917.591.5672 fax
                  deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2

 3    KELLER ROHRBACK, L.L.P.
      BY:  DAVID J. KO, ESQ.
 4    1201 Third Avenue, Suite 3200
      Seattle, Washington 98101
 5    (206) 623-1900
      Dko@kellerrohrback.com
 6
            - and -
 7

      ROBINS KAPLAN, LLP
 8    BY:  TARA D. SUTTON, ESQ.
      800 LaSalle Avenue
 9    Suite 2800
      Minneapolis, Minnesota 55402
10    (612) 349-8577
      Tsutton@robinskaplan.com
11
            - and -
12

      NAPOLI SHKOLNIK, PLLC
13    BY:  JOSEPH L. CIACCIO, ESQ.
      400 Broadhollow Road, Suite 305
14    Melville, New York 11747
      (631) 224-1133
15    Jciaccio@napolilaw.com
      Representing the Plaintiffs
16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Cont'd.)
 2

     JONES DAY
 3   BY:  STEVEN N. GEISE, ESQ.
     4655 Executive Drive, Suite 1500
 4   San Diego, California 92121
     (858) 314-1200
 5   Sngeis@jonesday.com
 6        - and -
 7   JONES DAY
     BY:  CLAIRE E. CASTLES, ESQ.
 8   555 South Flower Street
     Fiftieth Floor
 9   Los Angeles, California 90071
     (213) 489-3939
10   Ccastles@jonesday.com
     Representing the Defendant, Walmart
11
12   COVINGTON & BURLING, LLP
     BY:  DAVID W. HALLER, ESQ.
13   MEGAN L. HARE, ESQ.
     620 Eighth Avenue
14   New York, New York 10018
     (202) 841-1000
15   dhaller@cov.com
     mhare@cov.com
16   Representing the Defendant, McKesson
     Corporation
17
18   MARCUS & SHAPIRA, LLP
     BY:  RICHARD I. HALPERN, ESQ.
19   One Oxford Centre, 35th Floor
     Pittsburgh, Pennsylvania 15219
20   (412) 338-3990
     Halpern@marcus-shapira.com
21   Representing the Defendant, HBC
     Service Company
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:   (Cont'd.)
 2

      BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
 3    BY:  MATTHEW BREWER, ESQ.
      Courthouse Place
 4    54 West Hubbard Street, Suite 300
      Chicago, Illinois 60654
 5    (312) 494-4440
      Matthew.brewer@bartlit-beck.com
 6    Representing the Defendant, Walgreens
 7

      REED SMITH, LLP
 8    BY:  ANNE E. ROLLINS, ESQ.
      Three Logan Square
 9    1717 Arch Street, Suite 3100
      Philadelphia, Pennsylvania 19103
10    (215) 851-8226
      arollins@reedsmith.com
11    Representing the Defendant,
      AmerisourceBergen Drug Corporation
12
13    KIRKLAND & ELLIS, LLP
      BY:  MARTIN L. ROTH, ESQ.
14    300 North LaSalle Street
      Chicago, Illinois 60654
15    (312) 862-7184
      martin.roth@kirkland.com
16    Representing the Defendant, Allergan
      Finance
17
18    ZUCKERMAN SPAEDER, LLP
      BY:  DANIEL P. MOYLAN, ESQ.
19    100 East Pratt Street, Suite 2440
      Baltimore, Maryland 21202
20    (410) 949-1159
      dmoylan@zuckerman.com
21    Representing the Defendant, CVS
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:   (Cont'd.)
 2
      DECHERT LLP
 3    BY:  KATHERINE UNGER DAVIS, ESQ.
      Cira Centre
 4    2929 Arch Street
      Philadelphia, Pennsylvania 19104
 5    (215) 994-4000
      katherine.ungerdavis@dechert.com
 6    Representing the Defendant, Purdue
      Pharmaceuticals
 7
 8    ARNOLD & PORTER KAYE SCHOLER LLP
      BY:  ALLISON B. RUMSEY, ESQ.
 9    601 Massachusetts Avenue, NW
      Washington, D.C. 20001
10    (202) 942-5095
      allison.rumsey@arnoldporter.com
11    Representing the Defendants, Endo Health
      Solutions Endo Pharmaceuticals, Inc.; Par
12    Pharmaceutical Companies, Inc. f/k/a Par
      Pharmaceutical Holdings, Inc.
13
14    O'MELVENY & MYERS LLP
      BY:  MATTHEW KAISER, ESQ.
15    400 South Hope Street, 18th Floor
      Los Angeles, California 90071
16    (213) 430-6665
      mkaiser@omm.com
17    Representing the Defendants, Janssen and
      Johnson & Johnson
18
19    ROPES & GRAY LLP
      BY:  JENNIFER PANTINA, ESQ.
20    800 Boylston Street
      Boston, Massachusetts 02199
21    (617) 951-7234
      Jennifer.pantina@ropesgray.com
22    Representing the Defendant, Mallinckrodt
      and Spec GX
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    TELEPHONIC/STREAMING APPEARANCES:
 2    MORGAN, LEWIS & BOCKIUS, LLP
      BY:  JOHN M. MALOY, ESQ.
 3    101 Park Avenue
      New York, New York 10178
 4    (212) 309-6692
      John.maloy@morganlewis.com
 5    Representing the Defendant,
      Rite Aid of Maryland
 6
 7    MORGAN, LEWIS & BOCKIUS LLP
      BY:  VALERIE M. TOTH, ESQ.
 8    200 S. Biscayne Boulevard
      Suite 5300
 9    Miami, Florida 33131-2339
      (305) 415-3413
10    Valerie.toth@morganlewis.com
      Representing the Defendants, Teva
11    Pharmaceuticals, Inc. Cephalon Inc,
      Watson Laboratories, Actavis LLC, Actavis
12    Pharma, Inc.
13
      LOCKE LORD, LLP
14    BY:  BRANDON MONTMINY, ESQ.
      2200 Ross Avenue
15    Suite 2800
      Dallas, Texas 75201
16    (214) 740-8445
      Brandon.montminy@lockelord.com
17    Representing the Defendant,
      Henry Schein, Inc.
18
19
      ALSO PRESENT:
20
21    Evan McKay
      (Via stream)
22
      VIDEO TECHNICIAN:
23    Robert Martignetti
24
```

```
 1                          -   -   -
 2                      I N D E X
 3                          -   -   -
 4

    Testimony of:   JONATHAN GRUBER, Ph.D.
 5

 6

    By Mr. Geise                           15
 7

    By Mr. Haller                   390, 486
 8

    By Ms. Rumsey                          459
 9

    By Ms. Unger Davis                     444
10

    By Mr. Ko                              470
11

12

13                          -   -   -
14                      E X H I B I T S
15                          -   -   -
16

17  NO.              DESCRIPTION           PAGE
18  Gruber-1         Expert Report of      19
                     Professor Jonathan
19                   Gruber, 3/25/19
20  Gruber-2         Pain Management       92
                     And Opioid Epidemic
21                   Balancing societal
                     And Individual
22                   Benefits and Risks of
                     Prescription Opioid Use
23

24
```

```
 1                    -   -   -
 2            E X H I B I T S   (Cont'd.)
 3                    -   -   -
 4
 5    NO.            DESCRIPTION            PAGE
 6    Gruber-3      Public Finance          100
                    And Public Policy
 7                  Fifth Edition
 8    Gruber-4      How Increasing          214
                    Medical Access to
 9                  Opioids Contributes
                    To the Opioid Epidemic
10                  (Powell)
11    Gruber-5      Relationship Between    252
                    Nonmedical Prescription
12                  Opioid Use and Heroin
                    Use
13                  (Compton)
14    Gruber-6      HHS Public Access       269
                    US Regional and
15                  Demographic
                    Differences in
16                  Prescription Opioid
                    And Heroin-Related
17                  Overdose Hospitalizations
                    (Unick)
18
      Gruber-7      Increased Use           272
19                  Of Heroin as an
                    Initiating Opioid
20                  Of Abuse
                    (Cicero)
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2             E X H I B I T S  (Cont'd.)
 3                    -   -   -
 4
 5    NO.             DESCRIPTION          PAGE
 6    Gruber-8        Nonmedical          283
                      Prescription Opioids
 7                    And Pathways of Drug
                      Involvement in the
 8                    US Generational
                      Differences
 9                    (Wall)
10    Gruber-9        Heroin Use and      293
                      Heroin Use Risk
11                    Behaviors Among
                      Nonmedical Users of
12                    Prescription Period
                      Pain Relievers
13                    (Jones)
14    Gruber-10       Associations of     299
                      Nonmedical Pain
15                    Relievers Use and
                      Initiation of Heroin
16                    Use in the United States
                      (Muhuri)
17
      Gruber-11       The Changing Face   308
18                    of Heroin Use in the
                      United States:
19                    A Retrospective
                      Analysis of the Past
20                    50 Years
                      (Cicero)
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2              E X H I B I T S   (Cont'd.)
 3                        -   -   -
 4
 5     NO.              DESCRIPTION              PAGE
 6     Gruber-12        Injection and           318
                        Sexual HIV/HCV Risk
 7                      Behaviors Associated
                        With Nonmedical Use
 8                      Of Prescription Opioids
                        (Mateu-Gelabert)
 9
       Gruber-13        Abuse-Deterrent         324
10                      Formulations and the
                        Prescription Opioid
11                      Abuse Epidemic in the
                        US:  Lessons Learned
12                      From OxyContin
                        (Cicero)
13
       Gruber-14        How the                 346
14                      Reformulation of
                        OxyContin Ignited
15                      The Heroin Epidemic
                        (Evans)
16
       Gruber-15        Supply-Side Drug        372
17                      Policy in the
                        Presence of Substitutes
18                      Evidence from the
                        Introduction of
19                      Abuse-Deterrent Opioids
                        (Alpert)
20
       Gruber-16        A Transitioning         382
21                      Epidemic:  How the
                        Opioid Crisis is
22                      Driving The Rise
                        In Hepatitis C
23                      (Powell)
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2            E X H I B I T S   (Cont'd.)

 3                    -   -   -

 4

 5    NO.             DESCRIPTION            PAGE

 6    Gruber-17       Letter, 12/16/13      455
                      To Dr. Hamburg
 7

      Gruber-18       Changing Dynamics     460
 8                    of the Drug Overdose
                      Epidemic in the
 9                    United States from 1979
                      Through 2016
10                    (Jalal)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2            DEPOSITION SUPPORT INDEX
 3                    -   -   -
 4
 5    Direction to Witness Not to Answer
 6    PAGE    LINE
      None.
 7
 8    Request for Production of Documents
 9    PAGE    LINE
      None.
10
11    Stipulations
12    PAGE    LINE
      None.
13
14    Questions Marked
15    PAGE    LINE
      None.
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

1    the term "defendants."  Can you define

2    how you use that term?

3         A.    I use that term in my

4    understanding to refer to the set of

5    entities that are being -- that are

6    defendants in this litigation.

7         Q.    Can you identify the set of

8    entities that are being sued in this

9    litigation?

10        A.    Not completely, no.

11        Q.    How many of the entities

12   that have been sued in this litigation

13   can you name?

14        A.    It depends how long you want

15   to give me.  But I can certainly name a

16   number of them.

17        Q.    Now, your recitation of the

18   two economic questions that arose, that

19   you address in your report, it does not

20   include an evaluation to the extent which

21   the actions of a specific entity who has

22   been sued in this case contribute to what

23   you call an epidemic, correct?

24               MR. KO:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1                THE WITNESS:   That's

2          correct.

3    BY MR. GEISE:

4          Q.    Similarly, your recitation

5    doesn't include an estimate of damages

6    that result from a specific entity's

7    actions, correct?

8          A.    The report includes the

9    damages that result from the collective

10   set of actions of the defendants.

11         Q.    And when you speak of the

12   collective set of actions, you have not

13   done anything to parcel out damages

14   attributable to a specific defendant,

15   correct?

16         A.    Correct.

17         Q.    Neither as a contributor to

18   the epidemic as you call it, correct?

19              MR. KO:   Object to the form.

20              THE WITNESS:   Correct.

21   BY MR. GEISE:

22         Q.    And -- and not as to the

23   question of damages, correct?

24         A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Is it accurate to say that

2     you do not intend to offer an opinion in

3     this case regarding a specific defendant?

4          A.     Yes, that's accurate.

5          Q.     Turning to Page 8 of your

6     report in Paragraph 15.  You set out what

7     you've been asked by counsel for the

8     bellwether plaintiffs to specifically

9     address.

10               Do you see that?

11          A.     Yes, I do.

12          Q.     First it says you've been

13     asked to provide, from the perspective of

14     accepted principles of economics, an

15     overview of the nation's opioid crisis.

16               Do you see that?

17          A.     Yes, I do.

18          Q.     Does that reflect your

19     understanding of that part of your

20     assignment?

21          A.     Yes, it does.

22          Q.     In connection with that

23     section of your report are you providing

24     those opinions to a reasonable degree of

Highly Confidential - Subject to Further Confidentiality Review

1    certainty in the field of economics?

2         A.    That -- yes.  I'm an

3    economist.  So that's what I'm doing.

4         Q.    Look at the second part of

5    Paragraph 15.  You write, "Second, I have

6    been asked whether, to a reasonable

7    degree of certainty in the field of

8    economics, the defendants' shipments of

9    prescription opioids contributed in whole

10   or part to the growth in the misuse of

11   opioids and the increases in licit and

12   illicit opioid-related mortality over the

13   past 20 years and to explain the bases

14   for my opinion."

15            Do you see that?

16        A.    Yes.

17        Q.    And does that accurately

18   reflect your understanding of that part

19   of your assignment?

20        A.    Yes, it does.

21        Q.    Professor Gruber, was

22   your -- were you requested to form an

23   opinion regarding shipments to Cuyahoga

24   County and Summit County in particular?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     I don't quite understand the

2    question.

3        Q.     Sure.  So you indicate that

4    you were asked whether shipments of

5    prescription opioids contributed to the

6    growth and the misuse of opioids and

7    increases in licit and illicit

8    opioid-related mortality, right?

9        A.     Right.

10        Q.     Were you asked to focus

11    specifically on Cuyahoga and Summit

12    County for purposes of that question?

13        A.     I was asked to focus

14    specifically on them in terms of

15    documenting the, as you'll see in the

16    report, the underlying change in both

17    shipments in harms in Cuyahoga and Summit

18    as well as nationally.

19        Q.     When you say as well as

20    nationally, are Cuyahoga and Summit part

21    of the national picture?

22        A.     Yes.

23        Q.     And as part of your

24    analysis, did you look at the national

1   picture and then apply that to Cuyahoga

2   and Summit?

3               MR. KO:  Object to the form.

4               THE WITNESS:  I looked at

5         the national picture and

6         separately the Cuyahoga and Summit

7         situation.

8   BY MR. GEISE:

9         Q.    Have you made any effort to

10  determine the specific shipments of

11  prescription opioids from any particular

12  defendant in this case?

13              MR. KO:  Object to the form.

14              THE WITNESS:  No, I have

15        not.

16  BY MR. GEISE:

17        Q.    Have you made any effort to

18  determine a specific defendants'

19  shipments of opioids to Cuyahoga or

20  Summit County?

21              MR. KO:  Object to the form.

22              THE WITNESS:  No, I have

23        not.

24  BY MR. GEISE:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    As you mentioned before,

2   does your analysis only consider the

3   impact of aggregate opioid shipments?

4                MR. KO:  Objection.

5                THE WITNESS:  As laid out in

6         the report, we define both

7         aggregate opioid shipments, and in

8         some places we parse out different

9         types of opioids.  So -- but

10        that's the finest detail we go

11        into.

12   BY MR. GEISE:

13      Q.    You don't go into a detail

14   with respect to a particular defendants'

15   shipment of opioids, correct?

16      A.    Correct.

17      Q.    And if I wanted to ask you

18   today about if you had any opinions about

19   any specific defendant with regard to

20   their shipments, you're not prepared to

21   address that?

22      A.    I'm not, no.

23      Q.    You agree that prescription

24   opioids come in many different forms,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2           A.    Yes.

3           Q.    And you agree that different

4    pharmaceutical manufacturers make

5    different prescription opioids?

6           A.    Yes.

7           Q.    Your analysis did not

8    differentiate between different

9    pharmaceutical manufacturers, correct?

10                MR. KO:  Objection.

11                THE WITNESS:  That's

12          correct.

13   BY MR. GEISE:

14          Q.    And you didn't -- did you do

15   anything to limit your analysis to

16   shipments by pharmaceutical manufacturers

17   who are defendants in this lawsuit?

18          A.    I'll just need one minute to

19   check the appendix.

20                No, I didn't.

21          Q.    Similarly, did you do

22   anything to limit your analysis to

23   shipments by distributors who are

24   defendants in this lawsuit?

1    A.    No, I didn't.

2    Q.    With respect to the entities

3  who are defendants in this lawsuit,

4  you're not saying that each defendant is

5  jointly and severally liable for the

6  damages to the bellwether government

7  entities, are you?

8         MR. KO:  Object to the form.

9         THE WITNESS:  I'm not really

10        speaking to that issue.

11  BY MR. GEISE:

12    Q.    You don't have an opinion on

13  that, correct?

14         MR. KO:  Same objection.

15         THE WITNESS:  I'm an

16        economist.  That's a legal

17        question.

18  BY MR. GEISE:

19    Q.    If I can turn your attention

20  to Paragraph 16 of your report that spans

21  from Page 8 to Page 10.  Look at the

22  first bullet point on Paragraph 16.  You

23  write, "There is a direct causal

24  relationship between defendants'

Highly Confidential - Subject to Further Confidentiality Review

1    shipments of prescription opioids and the

2    misuse and mortality from prescription

3    opioids with geographic areas that

4    received higher volumes of per capita

5    shipments of prescription opioids

6    experiencing significantly higher rates

7    of opioid-related misuse and mortality,

8    including the bellwether jurisdictions."

9              Do you see that?

10        A.    Yes, I do.

11        Q.    As stated in this paragraph,

12   does prescription opioids include

13   prescription opioids that are used both

14   for medical purposes and those that are

15   not used for medical purposes?

16              MR. KO:  Object to the form.

17              THE WITNESS:  This uses data

18        from ARCOS shipments, which I do

19        not believe distinguishes the

20        purpose of the prescription

21        opioid.

22   BY MR. GEISE:

23        Q.    If you look at the next

24   bullet point on the top of Page 9, you

Highly Confidential - Subject to Further Confidentiality Review

1   write, "There is a direct causal

2   relationship between defendants'

3   shipments of prescription opioids and the

4   misuse of and mortality from illicit

5   opioids, including heroin and fentanyl,

6   which accelerated rapidly after 2010."

7               Do you see that?

8         A.    Yes, I do.

9         Q.    When you used the term

10  "illicit opioids" here, are you excluding

11  the nonmedical use of prescription

12  opioids in that definition?

13              MR. KO:  Object to the form.

14              THE WITNESS:  Yes, I am.

15  BY MR. GEISE:

16        Q.    And again, with respect to

17  both of these bullet points in Paragraph

18  16 of your report, you've done nothing to

19  establish a direct causal relationship

20  between a specific defendant's shipment

21  of prescription opioids and the harm that

22  you say follows, correct?

23        A.    That's correct.

24        Q.    Look at the next sentence in

Highly Confidential - Subject to Further Confidentiality Review

1    that top bullet point on Paragraph 9 of

2    your expert report.  You write, "As has

3    been widely recognized in the economic

4    literature, the growth in the dependence

5    on prescription opioids from the early

6    1990s to 2010, coupled with a variety of

7    factors starting in and around 2010,

8    created an increased demand for illicit

9    opioids, including heroin and later

10   fentanyl.

11                 "These factors included the

12   release of an abuse-deterrent formulation

13   of OxyContin, the increase in state level

14   prescription drug monitoring programs,

15   caps on opioid prescribing, and law

16   enforcement investigation and

17   prosecutions against pill mills

18   throughout the country."

19                 Do you see that?

20        A.    Yes, I do.

21        Q.    Professor Gruber, is it your

22   opinion that the release of an

23   abuse-deterrent formulation of OxyContin

24   caused an increased demand for illicit

Highly Confidential - Subject to Further Confidentiality Review

1   opioids, including heroin and fentanyl?

2            MR. KO:  Object to the form.

3            THE WITNESS:  Yes, it is.

4   BY MR. GEISE:

5        Q.    Is it your opinion that the

6   increase in state level prescription drug

7   monitoring programs caused an increased

8   demand for illicit opioids including

9   heroin and fentanyl?

10            MR. KO:  Same objection.

11            THE WITNESS:  Yes, it is.

12   BY MR. GEISE:

13        Q.    Is it your opinion that caps

14   on opioid prescribing cause an increased

15   demand for illicit opioids, including

16   heroin and fentanyl?

17            MR. KO:  Same objection.

18            THE WITNESS:  Yes, it is.

19   BY MR. GEISE:

20        Q.    And is it your opinion that

21   law enforcement investigations and

22   prosecutions caused an increased demand

23   for illicit opioids, including heroin and

24   fentanyl?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. KO:  Same objection.

2           THE WITNESS:  Yes, it is.

3  BY MR. GEISE:

4      Q.    Professor Gruber, have you

5  apportioned how each of those causal

6  factors contributed to illicit opioid

7  use?

8      A.    No, I have not.

9      Q.    And the list that you

10  provide of factors in that second bullet

11  point on paragraph -- in Paragraph 16 of

12  your report, that's not an exhaustive

13  list of factors that contribute to an

14  increased demand for illicit opioids, is

15  it?

16      A.    No.

17      Q.    Other factors could include

18  the ease of accessibility to illicit

19  opioids, correct?

20           MR. KO:  Object to the form.

21           THE WITNESS:  That's

22      correct.

23  BY MR. GEISE:

24      Q.    Internet availability for

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Professor Gruber, I'm

2   handing you an excerpt from the book

3   Public Finance and Public Policy that you

4   might recognize since you wrote it.

5            Do you see that?

6        A.    Yes, I do.

7        Q.    And this is not the entire

8   book.  This is just an excerpt.  I want

9   to ask you about some specific passages

10  in your book.  First, if I can turn your

11  attention to Page 66.

12            MR. KO:  This is Exhibit 3?

13            MR. GEISE:  It is Exhibit 3.

14       Yes.

15            THE WITNESS:  Okay.

16  BY MR. GEISE:

17       Q.    At the top of Page 66, you

18  write, "In this chapter, we review these

19  empirical methods and encounter the

20  fundamental issue faced by those doing

21  empirical work in economics,

22  disentangling causality from

23  correlation."

24            Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes, I do.

2          Q.     And is it your opinion that

3   this is a fundamental issue faced by

4   those doing empirical work in economics?

5          A.     Yes, it is.

6          Q.     That paragraph continues,

7   "We say that two economic variables are

8   correlated if they move together, but

9   this relationship is causal only if one

10  of the variables causes the movement in

11  the other."

12                Do you see that?

13         A.     Yes, I do.

14         Q.     You continue, "If instead

15  there is a third factor that causes both

16  to move together, the correlation is not

17  causal."

18                Do you see that?

19         A.     Yes, I do.

20         Q.     Do you agree that there is a

21  difference between correlation and

22  causation?

23         A.     Yes, I do.  That's what we

24  just covered.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     You agree that correlation

2   does not equal causation, correct?

3      A.     That's -- once again, that's

4   what we just -- yeah, that's what's in

5   the paragraph.

6      Q.     And next to the paragraph in

7   the margin you have two highlighted

8   terms.  First you have "correlated" and

9   you write, "Two economic values are

10  correlated if they move together."

11             And causal, "Two economic

12  variables are causally related if the

13  movement of one causes movement of the

14  other."

15             Do you see that?

16     A.     Yes, I do.

17     Q.     And that basically repeats

18  what you have in the substance of the

19  paragraph, correct?

20     A.     That's correct.

21     Q.     And you agree that the

22  distinction between correlation and

23  causality is an important distinction,

24  correct?

Highly Confidential - Subject to Further Confidentiality Review

1       A.    Yes, I do.

2           Q.    In fact, that's the title of

3   Section 3.1 of your book, "The important

4   distinction between correlation and

5   causality," right?

6       A.    Yes.

7           Q.    I want to also draw your

8   attention to a cartoon that is included

9   on Page 66 of your book in the lower

10  left-hand corner.

11              Do you see that?

12      A.    Yes, I do.

13          Q.    Professor Gruber, did you

14  select this cartoon to be included in

15  your book?

16      A.    Yes, I did.

17          Q.    And the cartoon depicts a

18  man sitting at a desk and another man

19  standing next to the desk, and the

20  caption is, "That'S the gist of what I

21  want to say, now get me some statistics

22  to base it on."

23              Do you see that?

24      A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Why did you include this

2  cartoon in your book?

3      A.    I'm trying to -- in my

4  textbook, I'm trying to find ways to get

5  students to understand and remember

6  important empirical concepts.  The

7  cartoons are not to be definitional or

8  dispositive.  But rather to get them to

9  sort of have some graphical associations

10  with thinking about the important issues

11  in the book.

12      Q.    What association do you want

13  the students to take away from this

14  particular cartoon?

15      A.    From this cartoon I want

16  them to take away the distinction that

17  just having data about something does not

18  imply causation.

19      Q.    And similarly, correlation

20  does not equal causation, correct?

21          MR. KO:  Objection.  Asked

22          and answered.

23          THE WITNESS:  That's

24          correct.

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. GEISE:

2         Q.    I want to direct your

3   attention to the next page of your book.

4   You see there's a heading, "The Problem"?

5         A.    Yes, I do.

6         Q.    You write in the first

7   sentence, "In all of these examples, the

8   analysis suffered from a common problem:

9   The attempt to interpret a correlation as

10  a causal relationship without sufficient

11  thought to the underlying process

12  generating the data."

13              Do you see that?

14        A.    Yes, I do.

15        Q.    And do you agree that

16  correlation should not be interpreted as

17  a causal relationship without analysis of

18  the underlying process generating the

19  data?

20        A.    Yes, I do.

21        Q.    If you look at the last

22  sentence of that paragraph on Page 67,

23  you write, "Once the data are available

24  on any two measures, it is easy to see

Highly Confidential - Subject to Further Confidentiality Review

1    whether or not they move together, a

2    characteristic we call being correlated."

3            Do you see that?

4        A.    Yes, I do.

5        Q.    You continue, "What is

6    harder to assess is whether the movements

7    in one measure are causing the movements

8    in the other."

9            Do you see that?

10       A.    Yes, I do.

11       Q.    And then you continue, "For

12   any correlation between two variables, A

13   and B, there are three possible

14   explanations, one or more of which could

15   result in the correlation:  A causes B, B

16   causes A, some third factor causes both."

17           Do you agree with that?

18       A.    Yes, that's what I wrote.

19       Q.    And on the next page you

20   also wrote in the first sentence of the

21   last paragraph, in Section 3.1, "The

22   general problem that empirical economists

23   face in trying to use existing data to

24   assess the causal influence of one factor

Highly Confidential - Subject to Further Confidentiality Review

1    on another, is that one cannot

2    immediately go from correlation to

3    causation.  This is a problem for policy

4    purposes because what matters most is

5    causation.  Policymakers typically want

6    to use the results of empirical studies

7    as a basis for predicting how government

8    interventions will affect behaviors.

9    Knowing that two factors are correlated

10   provides no predictive power; prediction

11   requires understanding the causal links

12   between the factors."

13            Do you see that?

14       A.    Yes, I do.

15       Q.    Now, in the context of your

16   book, are you using the term "factors" to

17   mean the same as a variable?

18       A.    That would be another word

19   for typically what's used in economic

20   studies.

21       Q.    You are familiar with the

22   term "dependent variable"?

23       A.    Yes, I am.

24       Q.    How would you define that

Highly Confidential - Subject to Further Confidentiality Review

1      I gave previously.

2              THE WITNESS:  I once again

3      would just say broadly we

4      discussed how we were going to

5      measure these things.

6   BY MR. GEISE:

7         Q.    Were you requested for

8   purposes of your analysis to use

9   shipments as a proxy for consumption?

10        A.    No.

11        Q.    I'm going to ask you to turn

12  to Paragraph 72 in your expert report.

13  You see this is the first paragraph in

14  Roman Numeral IV, entitled "Impact of

15  Shipments on Opioid Dependence."

16             Do you see that?

17        A.    Yes, I do.

18        Q.    And directing your attention

19  to the first sentence in that paragraph,

20  you write, "In this section and the next,

21  I show that the increases in shipments of

22  prescription opioids was a direct and

23  substantial cause of the rapid growth in

24  mortality for both licit and illicit

Highly Confidential - Subject to Further Confidentiality Review

1    opioid-related mortality in the past

2    20 years."

3              Do you see that?

4         A.    Yes, I do.

5         Q.    Now, for purposes of your

6    analysis, are shipments your independent

7    variable?

8         A.    Yes.  Okay.  Well, let me

9    clarify that answer.  Shipments are one

10   of the set of independent variables that

11   we look at.

12        Q.    What other independent

13   variables did you look at for part of

14   your analysis?

15        A.    Well, as you can see later

16   in the report, I looked at measures of

17   demographics in the county, measures of

18   economic activity, and measures of

19   non-opioid mortality.

20        Q.    We'll talk about those other

21   variables in a moment.  But are there any

22   other variables in addition to the

23   demographics, economics activity, and

24   non-opioid mortality that you looked at?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I don't think so.

2          Q.     Specifically with respect to

3    your opinion in Paragraph 72 that there

4    is a direct and substantial -- that

5    shipments of prescription opioids was a

6    direct and substantial cause of the rapid

7    growth in mortality for both licit and

8    illicit opioid-related mortality, are you

9    attributing responsibility for increases

10   in shipments to conduct by any of the

11   individual entities in this lawsuit?

12              MR. KO:  Object to the form.

13              THE WITNESS:  I'm

14         attributing this to the

15         consequence of the behavior of a

16         variety of entities who are

17         defendants in this lawsuit.

18   BY MR. GEISE:

19         Q.     But you have not attributed

20   responsibility to a specific defendant in

21   this lawsuit, correct?

22         A.     That is correct.

23              MR. KO:  Object -- object to

24         the form.  Objection, asked and

Highly Confidential - Subject to Further Confidentiality Review

1           answered.

2    BY MR. GEISE:

3           Q.    Your opinion in Paragraph 72

4    is based on shipments in the aggregate;

5    is that correct?

6                 MR. KO:  Objection.  Asked

7           and answered.

8                 THE WITNESS:  That is

9           correct.

10                MR. KO:  Actually I

11          apologize to you.  I didn't see

12          that you asked about Paragraph 72.

13   BY MR. GEISE:

14          Q.    Professor Gruber, if a

15   defendant in this case was dismissed,

16   would your opinion set forth in

17   Paragraph 72 change at all?

18          A.    I haven't really focused on

19   that.  I don't know.

20          Q.    So the removal of a

21   defendant or a group of defendants from

22   this case would not impact your opinion

23   in Paragraph 72; is that correct?

24                MR. KO:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1                    THE WITNESS:  I didn't say

2          that.  I said I don't know.

3    BY MR. GEISE:

4          Q.    Well, can you tell me if you

5    have an opinion with respect to a

6    specific defendant as it relates to your

7    opinion in Paragraph 72?

8          A.    As we discussed, my opinion

9    in Paragraph 72 is about the relationship

10   between aggregate shipments and outcomes.

11                I've not formed any

12   opinions -- opinions with respect to a

13   specific defendant.

14         Q.    So, I think we established

15   before that you don't know if there are

16   other entities who contributed to

17   shipments that aren't part of this

18   lawsuit, correct?

19                MR. KO:  Object to the form.

20                THE WITNESS:  I -- can

21         you -- can you ask again?  I don't

22         quite understand.

23   BY MR. GEISE:

24         Q.    Sure.  You don't -- you're

Highly Confidential - Subject to Further Confidentiality Review

1  looking at shipments in the aggregate,

2  correct?

3       A.    That's correct.

4       Q.    You do not know if the

5  defendants in this lawsuit are

6  responsible for that full aggregate of

7  shipments, correct?

8       A.    That's correct.

9       Q.    So if a defendant were not

10  in the case, current defendant is

11  dismissed, say, would that change the

12  opinion, or is your opinion still based

13  on the aggregate regardless of the

14  underlying individual defendants?

15            MR. KO:  Object to the form.

16            THE WITNESS:  I just, I

17       haven't really worked that out.  I

18       don't know.

19  BY MR. GEISE:

20       Q.    And if you haven't worked it

21  out, you couldn't answer questions about

22  that today, correct?

23            MR. KO:  Object to the form.

24            THE WITNESS:  That's

Highly Confidential - Subject to Further Confidentiality Review

1        correct.

2    BY MR. GEISE:

3        Q.    Continuing in Paragraph 72,

4    you write, "The relationship between the

5    rapid rise in prescription opioid

6    shipments and the increase in

7    opioid-related mortality since the mid

8    1990s is readily apparent when comparing

9    differences across geographic areas and

10   opioid shipments received between 1997 to

11   2010 and the growth of opioid dependence

12   and mortality."

13            Do you see that?

14       A.    Yes, I do.

15       Q.    And then you continue by

16   saying your discussion here identifies

17   and illustrates these major trends,

18   right?

19       A.    That's what it says, yes.

20       Q.    Now, according to the layout

21   in your textbook that we looked at

22   earlier, a correlation between increasing

23   opioid shipments and increasing opioid

24   mortality could have three possible

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Looking at Paragraph 78 of

2   your report, in your first sentence, you

3   wrote, "As these data imply, there are

4   wide differences across counties and the

5   growth of per capita shipments over time.

6   This is demonstrated further in Figure

7   1.16 below which compares high shipment

8   to low shipment areas."

9           Do you see that?

10      A.      Yes, I do.

11      Q.      And you used the comparison

12   for high shipment to low shipment

13   counties for several of your graphs and

14   analysis in your report, correct?

15      A.      That's correct.

16      Q.      Is it true that Cuyahoga

17   County is not in the group of counties in

18   the top 25 percent of shipments?

19      A.      I believe that's true, yes.

20      Q.      And is it also true that

21   Summit County is not in the group of

22   counties in the top 25 percent of

23   shipments, correct?

24      A.      I believe that's true, yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    And is it true that Cuyahoga

2    County is not in the bottom 25 percent of

3    counties?

4          A.    That's correct.

5          Q.    And same for Summit County?

6          A.    That's correct.

7                MR. KO:  Just so the record

8          is clear, Steve, I assume that the

9          top 25 and bottom 25 percent that

10         you're referring to is as

11         Dr. Gruber describes it in his

12         report.

13               MR. GEISE:  Correct.  His

14         chart for bottom 25 percent of

15         shipments and top 25 percent of

16         shipments.

17   BY MR. GEISE:

18         Q.    So you agree that in your

19   charts and figures that use the

20   demarcation of top 25 percent and bottom

21   25 percent that Cuyahoga and Summit

22   County actually are not part of those

23   families of the top and bottom quartile?

24               MR. KO:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1                  THE WITNESS:   The -- the

2           data that's included here, the --

3           so if we look at Figure 1.16, the

4           orange and blue lines do not

5           include Cuyahoga and Summit.

6                  The reason that the -- these

7           figures are constructed is to

8           demonstrate for the -- as a

9           general tendency in the data, the

10          relationship -- the -- the fact

11          that shipments grew much faster in

12          some areas of the country than in

13          others.

14    BY MR. GEISE:

15          Q.    Did you perform the analysis

16    and create a chart for the second

17    quartile of counties that are in that

18    second 25 percent of shipments?

19          A.    No, I did not.

20                MR. KO:   Object to the form.

21    BY MR. GEISE:

22          Q.    Did you perform the analysis

23    for the counties in the third quartile?

24          A.    As I describe in the report,

Highly Confidential - Subject to Further Confidentiality Review

1    there -- since shipments is, as they

2    described, only a proxy for opioid use,

3    we decided the clearest way to make the

4    comparison was to show the very high

5    shipment and the very low shipment

6    places.

7                    If you want to look at a --

8    at an analysis that's county by county,

9    that's what Professor Cutler's regression

10   analysis does.  This is to show clearly

11   and transparently the relationship

12   between places that were high shipment

13   and low shipment places and the resulting

14   outcomes.

15          Q.    Do you agree that your

16   depiction of the difference between high

17   shipment and low shipment outcomes does

18   not specifically apply to Cuyahoga and

19   Summit Counties?

20                 MR. KO:  Object to the form.

21          Mischaracterizes.

22                 THE WITNESS:  No, I don't

23          agree with that.

24   BY MR. GEISE:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  Do you agree that

2     Cuyahoga and Summit Counties would not be

3     included in the red line on Figure 1.16

4     for the top 25 percent shipments?

5          A.     Yes, I agree.

6          Q.     And you agree that they

7     would not be included in the blue line at

8     Figure 1.16 for the bottom 25 percent of

9     shipments?

10         A.     Yes, I agree.

11         Q.     Their category is not

12    depicted in this figure, correct?

13         A.     That's correct.

14         Q.     If I could ask you to look

15    at Section B of your report that begins

16    on Page 55 and covers Paragraphs 79, 80

17    and 81, and direct your attention to the

18    last sentence in Paragraph 79 where you

19    write, "Nonetheless, data are available

20    that can be used to compare OUD" -- which

21    is opioid use disorder?

22         A.     Correct.

23         Q.     -- "as measured from NSDUH

24    data in states with higher and lower

Highly Confidential - Subject to Further Confidentiality Review

1   levels of prescription opioid shipments."

2           Do you see that?

3       A.   Yes.

4       Q.   And NSDUH is the National

5   Survey on Drug Use and Health, correct?

6       A.   I don't recall the exact

7   title of the survey.  I've used the

8   acronym so many times.  I don't

9   believe it's -- I don't know if it's

10  health or households.  I know what -- I

11  don't know what the last H stands for.

12      Q.   Okay.  Let me ask you.

13           In Section B of your report

14  that begins on Page 55, are you analyzing

15  any relationship between shipments as the

16  independent variable and opioid use

17  disorder as the dependent variable?

18      A.   Ask the question again, I'm

19  sorry.

20      Q.   Yeah.  In Section B, it's --

21  it's titled, "Self-Reported OUD is higher

22  in areas with greater shipments."

23           Do you see that heading?

24      A.   Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    But I'm asking, did you

2  analyze any relationship between

3  shipments as the independent variable and

4  opioid use disorder as the dependent

5  variable?

6              MR. KO:  In this report as a

7         whole or in this specific

8         paragraph?

9              MR. GEISE:  In the report as

10         a whole.

11              THE WITNESS:  In this report

12         as a whole, once again what we're

13         doing here is, this is

14         illustrating in a clear and

15         transparent way that when you

16         divide the independent variable

17         into high and low shipment areas,

18         that there is a significant

19         difference in the value of the

20         dependent variable.  And that's

21         what I'm trying to illustrate in

22         this Figure 1.17.

23  BY MR. GEISE:

24         Q.    What you're illustrating in

Highly Confidential - Subject to Further Confidentiality Review

1    Figure 1.17, is that more accurately

2    described as a correlation as opposed to

3    causation?

4                    MR. KO:  Object to the form.

5                    THE WITNESS:  This is

6            described as an illustration of a

7            relationship that is -- this is an

8            illustration of a relationship

9            that is consistent with hypothesis

10           I lay out in the data, in the

11           report.

12   BY MR. GEISE:

13           Q.    And while it's consistent

14   with your hypothesis, contained within

15   your report or the appendix, is not a

16   data analysis to prove a relationship

17   between the two, correct?

18                   MR. KO:  Object to the form.

19                   THE WITNESS:  That is

20           correct.

21   BY MR. GEISE:

22           Q.    Looking again at

23   Paragraph 79 of your report.  In the --

24   the second sentence, you say, "As

Highly Confidential - Subject to Further Confidentiality Review

1  isn't?

2  A.    No, I've not.

3  Q.    If we turn to Page 57 of

4  your report in Section C, it is entitled

5  "Opioid-Related Mortality Grew Faster in

6  Areas That Received More Shipments."

7  Do you see that?

8  A.    Yes, I do.

9  Q.    In the last sentence of

10  Paragraph 82, you provide, "In

11  particular, I ask whether areas that

12  received more shipments of prescription

13  opioids have higher rates of growth of

14  opioid mortality."

15  Do you see that?

16  A.    Yes.

17  Q.    So here the independent

18  variables are shipments; is that right?

19  Is that one of them?

20  A.    I'm not estimating

21  regression model here.

22  Q.    Okay.  All right.  So with

23  regard to your analysis of a potential

24  relationship between shipments and opioid

Highly Confidential - Subject to Further Confidentiality Review

1    mortality, did you perform a regression

2    analysis to explore that?

3         A.    In this report, I did not.

4    This uses the kind of illustrative graphs

5    and regression analysis as contained in

6    Professor Cutler's report.

7         Q.    Do you rely on the

8    information contained in Professor

9    Cutler -- Professor Cutler's report for

10   your analysis and conclusions in this

11   section of your report?

12        A.    I do not rely on that, no.

13        Q.    You don't rely on Professor

14   Cutler?

15        A.    In -- I've used Professor

16   Cutler's report in -- I understand

17   Professor Cutler's report.  It influenced

18   in the construction of my report.  But in

19   the conclusions I draw here, I do not

20   rely on his regression estimates.

21        Q.    Why not?

22        A.    Because he has the report.

23   So this -- we decided, as a team, to use

24   my report, this introductory report, to

Highly Confidential - Subject to Further Confidentiality Review

1    clearly and transparently illustrate the

2    causal relationship at hand.  But not to

3    delve into the magnitudes that come out

4    of -- that Professor Cutler produces that

5    then feed into Professor McGuire's

6    report.

7         Q.    And as you've used the term

8    a couple times in answers, through your

9    figures in that, is that what you refer

10   to illustrating the causal relationship?

11              MR. KO:  Object to the form.

12              THE WITNESS:  I, as I've

13         talked -- as you mentioned, in my

14         textbook, I think graphic

15         illustration is a very transparent

16         and clear way to illustrate a

17         relationship.  And that's what I'm

18         doing here.

19   BY MR. GEISE:

20         Q.    But graphic illustrations

21   may also just be demonstrating

22   correlation, not causation, correct?

23         A.    That's possible, yes.

24              MR. GEISE:  I see it's about

Highly Confidential - Subject to Further Confidentiality Review

1      quarter to 1:00.  We've been going

2      for about another hour.  Why don't

3      we take our break for lunch now.

4              THE WITNESS:  Sure.

5              MR. KO:  Okay.

6              THE VIDEOGRAPHER:  The time

7      is 12:44 p.m., and we're off the

8      record.

9                  -   -   -

10              (Lunch break.)

11                  -   -   -

12              THE VIDEOGRAPHER:  The time

13      is 1:30 p.m.  We are on the

14      record.

15   BY MR. GEISE:

16          Q.    Professor Gruber, throughout

17   your report, when you talk about

18   shipments, what is your definition of a

19   shipment?

20          A.    It's what it says.  It's --

21   it's -- the ARCOS collects data on the

22   amount of each prescription drug.  In

23   this case, prescription opioids, that are

24   shipped to -- shipped to distribution

Highly Confidential - Subject to Further Confidentiality Review

1    points in a given county or they measure

2    a final level, we aggregate it up to

3    county.

4         Q.    When you say distribution

5    points, how do you define that?

6         A.    I don't know the precise

7    definition, but it's the places that, to

8    which individuals can go to get their

9    opioids.  So pharmacies and things of

10   that nature.

11        Q.    It would be dispensing

12   locations?

13        A.    Dispensing locations would

14   be a better way to put it.

15        Q.    And did you conduct analysis

16   of that ARCOS data yourself to determine

17   the shipment numbers or did you rely on

18   Compass?

19        A.    As I said before, as is my

20   usual practice in this kind of analysis,

21   when I have very talented research

22   assistants, they handle the data and

23   handle my requests for that information.

24        Q.    The ARCOS data that you

Highly Confidential - Subject to Further Confidentiality Review

1    relied on for the definition of

2    shipments, is that again aggregate for

3    that area, for -- for a county?

4                    MR. KO:  Object to the form.

5                    THE WITNESS:  Yeah.  Can you

6         try -- try that one again.

7    BY MR. GEISE:

8         Q.    Well, sure.  It sounds to me

9    like you looked at the ARCOS data for

10   particular opioids and not necessarily

11   opioids from a particular source.  Is

12   that fair?

13                   MR. KO:  Object to the form.

14                   THE WITNESS:  I don't know

15        what you mean by source.

16   BY MR. GEISE:

17        Q.    Okay.  You didn't look for

18   the amount of shipments associated with a

19   particular manufacturer.

20        A.    That was not the point or

21   purpose of the analysis, no.

22        Q.    Nor did you look for the

23   particular amount of shipments from a

24   distributor?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Once again, we're looking

2    at -- at more aggregated levels of

3    shipments.

4        Q.    And -- and that's fine.  But

5    by looking at the aggregate level, you

6    didn't look at a particular shipment from

7    a particular manufacturer or distributor?

8        A.    I wasn't asked to do that,

9    no.

10        Q.    Looking at Paragraph 83 of

11    your report, you write -- and I'll just

12    read the -- the first sentence -- "While

13    this approach identifies substantial

14    differences in opioid mortality rates  in

15    areas that received higher and lower

16    levels of shipments, it comes with an

17    important challenge:  Comparing shipments

18    across areas does not account for the

19    critical transshipment problem that marks

20    the distribution of prescription opioids

21    in the 2000s."

22            Do you see that?

23        A.    Yes.

24        Q.    Can you please tell me your

Highly Confidential - Subject to Further Confidentiality Review

1    definition of transshipment?

2            A.      Transshipment would mean

3    opioids that were prescribed to

4    individuals at a given -- in a given

5    location or dispensed into this given

6    location, but were not used by those

7    individuals, instead were transported to

8    be used by individuals in other

9    locations.

10           Q.      So consumption of the opioid

11   could take place in a location different

12   than the shipment of the opioid?

13           A.      That is correct.

14           Q.      So where you used shipments

15   as a proxy for consumption, that proxy

16   would not work in the situation of a

17   transshipment?

18                   MR. KO:   Object to the form.

19                   THE WITNESS:   I don't know

20           why it would not work.

21   BY MR. GEISE:

22           Q.      Well, if you're using

23   shipments as a proxy for consumption, are

24   you doing that in a particular area or a

Highly Confidential - Subject to Further Confidentiality Review

1    particular county?

2         A.    Well, as I described, within

3    each county we are proxying for use of

4    opioids with the shipments to that

5    county.

6         Q.    And if the consumption of an

7    opioid, say, in Cuyahoga County is

8    actually an opioid that was shipped to a

9    different county, then shipments would

10   not be a proxy for consumption in that

11   situation, correct?

12        A.    No, that's not correct.

13        Q.    Why?

14        A.    Because the word proxy --

15   shipments would not be a perfect --

16   perfect non-error -- yes, the word proxy

17   means a proxy.  It is our -- it is

18   basically our attempt to measure, using

19   available data as well as possible the

20   amount of opioids in the county.

21        Q.    So that is a -- a situation

22   where shipments cannot be a perfect match

23   for consumption in a particular county?

24                MR. KO:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1    THE WITNESS:  They may or

2    may not be.

3  BY MR. GEISE:

4    Q.    You would agree that in a

5  situation of transshipment, that the

6  consumption does not occur in the same

7  county as the shipment?

8    A.    That's the definition of

9  what we mean by transshipment.

10    Q.    How did you account for

11  transshipments in determining shipments

12  in a particular county?

13    A.    So, in determining shipments

14  to a particular county, we simply

15  measured shipments to that county.

16  Transshipments was accounted -- is

17  clearly a factor that happens,

18  particularly from -- from Florida to

19  places like Cuyahoga and Summit.  And

20  that is a reason why it's useful to do

21  the kind of more aggregated analysis that

22  I do in this report to compare very high

23  shipment to very low shipment areas as a

24  factor.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    In Paragraph 83 of your

2    report, in the last two sentences, you

3    write, with respect to transshipment,

4    "This will induce some measurement error

5    into my comparisons, reducing the power

6    of shipments to distinguish high versus

7    low use areas.  To some extent, I address

8    this measurement error by comparing only

9    the highest and lowest shipment areas in

10   the large county sample discussed above."

11             Do you see that?

12        A.    Yes, I do.

13        Q.    How does comparing only the

14   highest and lowest shipment areas correct

15   for the measurement error that is

16   introduced by the transshipment problem?

17        A.    It corrects it because we

18   think that as long as places that have

19   more shipment have more consumption,

20   which then basically -- let me -- let me

21   restart.

22             If there is measurement

23   error in a variable, then comparing two

24   values that are very close to each other

Highly Confidential - Subject to Further Confidentiality Review

1    may be harder to distinguish than two

2    variables that are much farther apart

3    from each other.  So two variables that

4    are very farther apart from each other,

5    we clearly think there's a distinction

6    that places that have high shipments,

7    then at the highest shipments clearly

8    have the highest consumption and places

9    with lower shipments clearly have lowest

10   consumption.  Whether two places that

11   have shipments which are one different

12   from each other have different

13   consumption, is unclear.

14        Q.    When you account for this by

15   comparing only the highest and lowest

16   shipment areas, do you agree that that

17   analysis then doesn't necessarily apply

18   to the two areas in the middle, the

19   middle two quartiles?

20             MR. KO:  Object to the form.

21             THE WITNESS:  The analysis

22        here is our best attempt to

23        represent the central tendency in

24        the data.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. GEISE:

2      Q.    But what you're comparing is

3  only the highest and lowest shipment

4  areas, correct?

5      A.    And as -- as I'm -- as I'm

6  doing, as I explained, the reason I'm

7  doing that is to try to create a format

8  which can illustrate clearly the causal

9  relationship between shipments and harms.

10  And that we think is the best way to do

11  it.

12      Q.    What results would you find

13  if you compared the second and third

14  quartiles as opposed to the highest and

15  lowest shipment areas with regard to

16  addressing the measurement error?

17      A.    I don't know for sure.  But

18  the -- once again, as I described with

19  measurement error, if there's some

20  measurement error, then obviously the

21  more you really distinguish clear groups,

22  like the top and the bottom, the -- the

23  stronger your conclusions can be.

24      Q.    A moment ago in one of your

Highly Confidential - Subject to Further Confidentiality Review

1    answers, you said that there is -- there

2    is higher consumption in areas with

3    higher shipments.  Did I hear that

4    correctly?

5         A.    Yes, yes.

6         Q.    Is that a causal

7    relationship?

8              MR. KO:  Object to the form.

9              THE WITNESS:  I mean they

10        are basically shipments -- yes,

11        it's a causal relationship, yeah,

12        that's right.

13   BY MR. GEISE:

14        Q.    You said that you used

15   shipments as a proxy for consumption.

16   But by that answer you're telling me that

17   consumption is caused by the shipments.

18        A.    That's a good point.

19             MR. KO:  Is there a

20        question?

21             MR. GEISE:  Yes.

22             THE WITNESS:  I guess in

23        this -- the way -- the reason I'm

24        using shipments is as a proxy for

Highly Confidential - Subject to Further Confidentiality Review

1    consumption.

2         I'm not using them because

3    of a particular causal

4    relationship.  I'm using them

5    because they are the best

6    available proxy we have for

7    consumption at the county level,

8    and we wanted to carry out this

9    analysis at the county level.

10   BY MR. GEISE:

11        Q.    Did you have any discussions

12   with Compass Lexecon to see if there were

13   other ways to measure consumption at a

14   county level?

15        A.    Yes.

16        Q.    What ways did you consider?

17        A.    I don't recall.

18        Q.    Did Compass Lexecon report

19   to you about different potential ways to

20   measure consumption at a county level?

21        A.    All I recall is we discussed

22   it at various times.

23        Q.    So sitting here today, you

24   recall a discussion about other ways to

Highly Confidential - Subject to Further Confidentiality Review

1         A.      I don't remember.

2         Q.      Do you know what four

3    counties those were?

4         A.      I've seen the list, but I

5    can't recall it offhand.

6         Q.      Do you know what state they

7    were in?

8         A.      I don't recall.

9         Q.      Do you know either from your

10   own work or from any study, the

11   percentage of people who received a

12   prescription for a medically necessary

13   condition for prescription opioid and

14   later became addicted to heroin?

15              MR. KO:  Object to the form.

16              THE WITNESS:  That was a

17         long question.  Can you either say

18         it again or break it down?

19   BY MR. HALLER:

20         Q.      Do you know either from your

21   own work or from any study the percentage

22   of people who had a prescription opioid

23   for a legitimate medical need and later

24   became addicted to heroin?

Highly Confidential - Subject to Further Confidentiality Review

1              MR. KO:  Object to the form.

2              THE WITNESS:  I don't know

3         that number offhand, although

4         studies we've looked at during

5         today have made reference to

6         computations like that, of that

7         nature, which suggest that a very

8         small minority of people who get

9         prescriptions then transition onto

10        heroin.

11   BY MR. HALLER:

12        Q.    But you don't know what that

13   percentage is?  Do you believe it to be a

14   single-digit percentage?

15        A.    I don't recall the way that

16   you phrased it.  One of the studies -- we

17   can look back at it, in a particular way

18   they phrased it, they had a number of 1

19   percent.  But I don't recall what that

20   was 1 percent of.

21        Q.    To talk a little bit about

22   your Gateway hypothesis, do you know the

23   demographic that's most likely to be

24   prescribed a prescription opioid?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. KO:  Object to the form.

2           THE WITNESS:  I used

3      shipment -- I used -- I have

4      different analyses in the report.

5      So I think you'll have to talk

6      about which particular figure

7      you're referring to or analysis.

8  BY MR. HALLER:

9      Q.    Let's -- I want to refer you

10  to Page 59 of your report.

11     A.    Okay.

12     Q.    With regard to and figure

13  1.18, what shipment data are you using?

14     A.    There we are splitting into

15  counties by whether they have a high or

16  low level of shipments of prescription

17  opioids over the 1999 to 2010 period on

18  average.

19     Q.    Is there a name for the

20  analysis that you're doing here that's

21  reflected in this figure where you

22  have -- you're comparing the highest

23  quartile shipments with the lowest

24  quartile shipments?  What do you call

Highly Confidential - Subject to Further Confidentiality Review

1    that analysis?

2          A.    I would call it a way to use

3    the data to sort of transparently

4    illustrate the causal relationship

5    between shipments and mortality.

6          Q.    Let me -- for the work that

7    Professor Cutler did, I know that's

8    called a multivariate regression

9    analysis.  And I can go into lots and

10   lots of textbooks, and they can talk to

11   me about that, right.

12                But if I want to look for a

13   textbook that discusses -- that discusses

14   the analysis that you're doing on this

15   page, this type of analysis, what do I

16   look for in the index?  What's this

17   called?

18                MR. KO:  Object to the form.

19                THE WITNESS:  I would not

20          say this has a particular

21          methodological name.  You would

22          see, if you looked at many, I

23          might say most, modern empirical

24          economic analyses, they will

Highly Confidential - Subject to Further Confidentiality Review

1    typically include, in addition to

2    multivariate regression analysis,

3    increasingly they're including

4    graphical illustrations of the

5    data so that the reader can -- the

6    reader who is not -- the reader

7    can transparently understand

8    what's going on in the data,

9    rather than to rely on the

10    statistical interpretation.

11          So we typically, you know,

12    so we encourage our students today

13    when they're writing a paper to

14    include both figures that

15    transparently illustrate the story

16    they are trying to tell, as well

17    as using underlying statistical

18    analysis to make that more

19    concrete.

20    BY MR. HALLER:

21          Q.    And I'm not focused so much

22    on the graphic itself as the analysis

23    that underlines -- underlies the graphic,

24    where you've divided -- you take the

Highly Confidential - Subject to Further Confidentiality Review

1    lowest quartile and the highest quartile,

2    and you've shown a difference in terms of

3    mortality, growth between those two

4    quartiles.  What's the name of that

5    analysis so I can find it in a textbook?

6                    MR. KO:  Objection.  Asked

7           and answered.

8                    THE WITNESS:  I don't know

9           that there's a common name for

10          this analysis that you find in a

11          textbook.  I think the right way

12          to think about this is if you look

13          at a, once again, increasingly

14          with modern empirical analysis,

15          this would be a typical way to

16          make an argument and to -- and to

17          illustrate how you've convincingly

18          tested your hypothesis, would be

19          to combine the kind of graphical

20          analysis I have here with the kind

21          of multivariate regression

22          analysis that Professor Cutler

23          does in his report.

24    BY MR. HALLER:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    But what you're showing

2   graphically here is not Professor

3   Cutler's regression, it's something else,

4   right?

5               MR. KO:   Objection.   Asked

6         and answered.

7               THE WITNESS:   This is --

8         this is using the same data

9         Professor Cutler does, the exact

10        same dataset, to show clearly for

11        the reader who wants to go beyond

12        the statistical analysis to

13        actually visualize the data and

14        say, is there a clear indication

15        in the data of what's happening.

16              This is -- I would say this

17        is a compliment using the same

18        data that Professor Cutler does,

19        it's identical dataset.

20   BY MR. HALLER:

21        Q.    If we were -- if we were

22   graphing Professor Cutler's work, we'd

23   have some sort of a line running through

24   400 different dots, right, showing them

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. HALLER:

2          Q.    Can I refer you to Page 43

3    please, in your report.

4          A.    Okay.

5          Q.    So that page includes

6    Figure 1.10, which reflects, does it not,

7    that for the most part, shipments into

8    Summit were above the national average

9    for this time period, whereas shipments

10   into Cuyahoga were below the national

11   average; is that right?

12         A.    Yes, that's correct.

13         Q.    Did you do any investigation

14   into why shipments were, per capita, were

15   significantly lower in Cuyahoga than they

16   were in Summit?

17               MR. KO:  Object to the form.

18               THE WITNESS:  Not that I can

19         recall.

20   BY MR. HALLER:

21         Q.    If we turn the page to

22   Figure 1.11, we can see opioid mortality

23   rates in Summit and Cuyahoga in relation

24   to the national average.  And at least

Highly Confidential - Subject to Further Confidentiality Review

1    through 2010 or 2011, the mortality rates

2    in both counties stayed pretty close to

3    the national average; is that right?

4          A.    That's correct.

5          Q.    Now, if -- if shipments, in

6    your view, drive opioid mortality, how is

7    it that the two counties end up with

8    about the same opioid mortality but there

9    are significantly big differences in the

10   shipments to those two counties?

11               MR. KO:   Object to the form.

12               THE WITNESS:   Can you

13         express that in terms of the

14         graphs?  I don't quite understand

15         what -- what conclusion you're

16         drawing.

17   BY MR. HALLER:

18         Q.    Well, on page -- on Page 43,

19   in Figure 1.10 we can see that the

20   shipments into Summit were much higher

21   than the shipments into Cuyahoga, right?

22         A.    Yes.

23         Q.    But the mortality, as

24   reflected on Figure 1.11, is roughly the

Highly Confidential - Subject to Further Confidentiality Review

1    same as between the two counties.  And I

2    would have thought if shipments, in fact,

3    are driving mortality, that the higher

4    shipments in Summit would have led to

5    higher mortality, but instead, the higher

6    shipments resulted in about the same

7    mortality.  So I'm -- I'm asking if you

8    can square that for me.

9                    MR. KO:  Object to the form.

10                   THE WITNESS:  Sure.  So two

11            answers.  One is about the same

12            until 2014 when -- when Summit

13            does get higher.

14                   And the second answer is, as

15            I said before, we're trying to use

16            these data to explain the central

17            tendencies that both, as I say, if

18            you do a sort of transparent

19            graphical analysis or regression

20            analysis, there's a clear

21            relationship between shipments in

22            2010 and opioid mortality.

23                   That does not mean that that

24            relationship -- that does not mean

Highly Confidential - Subject to Further Confidentiality Review

1          you cannot find an observation of

2          data or two for which that

3          relationship doesn't appear to

4          hold.  You can take any empirical

5          analysis and find a pair of

6          observations where the

7          relationship estimated for the

8          central tendency of the data

9          doesn't hold for that pair of

10         observations.

11    BY MR. HALLER:

12         Q.    And here the pair of

13    observations is Cuyahoga and Summit,

14    right?

15         A.    That's correct.

16         Q.    Now, you've testified -- and

17    I think your report reflects this view,

18    that these various factors that you say

19    happened in or around 2010, in reality

20    those factors didn't all occur in 2010 at

21    a particular point in time; is that

22    right?

23              MR. KO:  Object to the form.

24              THE WITNESS:  That's

1

2                          CERTIFICATE

3

4

5              I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.

7

              It was requested before
8  completion of the deposition that the
   witness, JONATHAN GRUBER, Ph.D., have
9  the opportunity to read and sign the
   deposition transcript.

10

11

12  *Michelle L. Gray*
   _____
   MICHELLE L. GRAY,
13  A Registered Professional
   Reporter, Certified Shorthand
14  Reporter, Certified Realtime
   Reporter and Notary Public
15  Dated:  April 30, 2019

16

17

18              (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

1          INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4     over carefully and make any necessary

5     corrections.  You should state the reason

6     in the appropriate space on the errata

7     sheet for any corrections that are made.

8              After doing so, please sign

9     the errata sheet and date it.

10             You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14             It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1                     _   _   _   _   _   _

                        E  R  R  A  T  A

2                       _   _   _   _   _   _

3

4      PAGE   LINE   CHANGE

5      _____  _____   _____

6           REASON:  _____

7      _____  _____   _____

8           REASON:  _____

9      _____  _____   _____

10          REASON:  _____

11     _____  _____   _____

12          REASON:  _____

13     _____  _____   _____

14          REASON:  _____

15     _____  _____   _____

16          REASON:  _____

17     _____  _____   _____

18          REASON:  _____

19     _____  _____   _____

20          REASON:  _____

21     _____  _____   _____

22          REASON:  _____

23     _____  _____   _____

24          REASON:  _____

Highly Confidential - Subject to Further Confidentiality Review

1

2        ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 496, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    JONATHAN GRUBER, Ph.D.              DATE

17

18

19   Subscribed and sworn

     to before me this

20   _____ day of _____, 20____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Highly Confidential - Subject to Further Confidentiality Review

1                       LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____    _____

4      _____  _____    _____

5      _____  _____    _____

6      _____  _____    _____

7      _____  _____    _____

8      _____  _____    _____

9      _____  _____    _____

10     _____  _____    _____

11     _____  _____    _____

12     _____  _____    _____

13     _____  _____    _____

14     _____  _____    _____

15     _____  _____    _____

16     _____  _____    _____

17     _____  _____    _____

18     _____  _____    _____

19     _____  _____    _____

20     _____  _____    _____

21     _____  _____    _____

22     _____  _____    _____

23     _____  _____    _____

24     _____  _____    _____