# EXHIBIT 2

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE NORTHERN DISTRICT OF OHIO

3   EASTERN DIVISION

4   - - -

5

| | | |
|---|---|---|
| IN RE:  NATIONAL | : | HON. DAN A. |
| PRESCRIPTION OPIATE | : | POLSTER |
| LITIGATION | : | |
| | : | MDL NO. 2804 |
| APPLIES TO ALL CASES | : | |
| | : | CASE NO. |
| | : | 17-MD-2804 |
| | : | |

6

7

8

9

10   - HIGHLY CONFIDENTIAL -

11   SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

12   VOLUME I

13   - - -

14   May 16, 2019

15   - - -

16   Videotaped deposition of
DR. SETH B. WHITELAW, taken pursuant to

17   notice, was held at the offices of Golkow
Litigation Services, One Liberty Place,

18   1650 Market Street, Philadelphia,
Pennsylvania beginning at 9:18 a.m., on

19   the above date, before Michelle L. Gray,
a Registered Professional Reporter,

20   Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

21

- - -

22

GOLKOW LITIGATION SERVICES

23   877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

24

Highly Confidential - Subject to Further Confidentiality Review

1  questions, and you'll answer the

2  questions.  I'll let you finish your

3  answers, but please let me finish my

4  questions first.

5          Your counsel's probably

6  asked you to pause for a few seconds so

7  he can get an objection in.

8          Plaintiffs' counsel -- or

9  excuse me.  If -- if you have any --

10 please ask me a question if you have any

11 time -- if you have any at any time.  If

12 you don't -- if you don't have any

13 concerns or questions with my questions,

14 I'll assume you understood them.

15          And if you need to take a

16 break at any time, just go ahead and ask

17 and we'll -- we can take a break.  I just

18 ask that if a question is pending, that

19 you answer the question before we take a

20 break.

21          Sound good?

22      A.    Sounds very good.

23      Q.    When were you first

24 contacted by the plaintiffs about

1  participating as an expert in this

2  litigation?

3          A.    It would have been November,

4  December time frame, 2018.  I can't be

5  precise on the date, but to the best of

6  my recollection.

7          Q.    This was last year?

8          A.    Yeah.  This would have been

9  last year.

10          Q.    And who contacted you?

11          A.    I honestly don't remember

12  the first contact.  But contact came from

13  the law firm of Seeger Weiss.

14          Q.    Did you work with anyone on

15  Seeger Weiss on -- on your report, on

16  preparing your report?

17          A.    Other than providing

18  invoices and things back and forth, no.

19          Q.    Which plaintiffs' counsel

20  have you been working with?

21          A.    I've worked with a number of

22  them --

23                MR. BOGLE:  Object to form.

24                You can answer.

Highly Confidential - Subject to Further Confidentiality Review

1   hour for your work on this litigation?

2         A.    $400 an hour, sir, which is

3   my standard rate.

4         Q.    And is that hourly rate,

5   does it apply to preparation of your

6   report and testifying?

7         A.    Yes, sir, it does.

8         Q.    How much time have you spent

9   on this case so far?

10        A.    I have probably almost

11  1200 hours in.

12        Q.    So you've billed

13  approximately $480,000 to this case so

14  far; is that right?

15        A.    If you count both billed and

16  unbilled time, yeah, that would be about

17  the right number.

18        Q.    In these 1200 hours, what

19  have you done?

20        A.    In these 1200 hours I've

21  actually produced a 300 -- the report

22  that you have in front of you which you

23  are well aware of.  I have looked at six

24  different defendants, from a federal

1    followed the same uniform approach that I

2    do when I do any kind of a compliance

3    investigation, or compliance assessment.

4              I use the federal sentencing

5    guidelines as my sort of framework.  And

6    I asked counsel, in this case, serving

7    like I would a client, I need documents

8    in these particular areas, could you

9    please provide me with information that

10   relates to these particular areas.  And

11   they provided me with those documents.

12             If I was unclear or I didn't

13   get exactly -- it is an iterative

14   process.  So if I was unclear or I didn't

15   get what I was looking for, I asked

16   further follow-up questions.  I asked for

17   further information.  Once I got that

18   information, I then reviewed it.

19        Q.    What were the original

20   categories of documents that you

21   requested from plaintiffs' counsel?

22        A.    We can turn to my report and

23   we can go down the eight elements of the

24   federal sentencing guidelines if you'd

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Have you spoken with any of

2  plaintiffs' other experts?

3    A.    Yes, I have.

4    Q.    Who have you -- which --

5  which other plaintiffs' experts have you

6  spoken with?

7    A.    I spoke at length with

8  Mr. Rafalski.  We had several

9  conversations.  Again, his expertise as a

10  DEA agent and certainly what DEA was

11  thinking at the time and how an inspector

12  would approach the controlled substances

13  regulations, were of particular

14  importance and use to me as far as

15  understanding what I was looking at, and

16  having an understanding of the DEA's

17  positions on certain topics.

18    Q.    Did you speak with any of

19  other -- any other of plaintiffs'

20  experts?

21    A.    Not that I can recall, sir.

22    Q.    Do you know Craig McCann?

23    A.    I don't know Craig McCann.

24  I know of Craig McCann.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Have you spoken with

2  Mr. McCann?

3    A.    No, sir, I have not.

4    Q.    Did you provide Mr. McCann

5  with any of your analysis or work?

6    A.    No.

7    Q.    Did you provide Mr. Rafalski

8  with any of your analysis or work?

9    A.    No, I did not provide

10 Mr. Rafalski with any of my analysis or

11 work.  I asked him questions, we had

12 telephone conversations.

13   Q.    In preparing your report or

14 reaching any of your opinions, did you

15 speak with anyone from the DEA?

16   A.    Well, I would assume

17 Mr. Rafalski counsel's former DEA, but if

18 you're asking me anybody -- are you

19 asking me the question of anybody

20 currently employed by DEA?

21   Q.    Yes, sir.

22   A.    No, sir, I did not speak to

23 anybody who is currently employed with

24 the Drug Enforcement Administration.

1          Q.     And other than Mr. Rafalski,

2    did you speak with anyone who was

3    formerly employed by the DEA in reaching

4    your opinions?

5          A.     No, sir, he was the only one

6    I spoke with.

7          Q.     Last summer did you attend a

8    meeting with plaintiffs' counsel and

9    several of the other expert witnesses in

10   this case?

11         A.     Last summer?

12         Q.     Last summer.

13         A.     Can you -- can you be more

14   specific on last summer?

15         Q.     June 2018.

16         A.     No, sir, I did not.  As I

17   said to you, I wasn't -- they didn't

18   reach out to me until November 2018.

19         Q.     Have you attended any -- any

20   meetings with plaintiffs' counsel and

21   other plaintiffs' experts in this case

22   since you were retained in November of

23   2018?

24         A.     Could you say that question

Highly Confidential - Subject to Further Confidentiality Review

1    A.    DEA compliance programs, as

2  we will -- as noted in my report, are a

3  subset of the larger corporate compliance

4  program.

5           So you have a corporate

6  compliance program.  You have an

7  anti-diversion program under that.  You

8  have a suspicious order monitoring

9  program under that.

10          So it's all sort of a

11  subsumed in the bigger picture.  We are

12  talking compliance, we are talking

13  compliance with all laws and regulations,

14  the systems and processes designed at the

15  corporate level.

16     Q.    Have you designed a DEA

17  compliance program before?

18     A.    I have not designed a DEA

19  compliance program in the sense of a

20  controlled substances.  I have designed a

21  sample and sample accountability PDMA

22  compliance programs.  As you know, those

23  are substantially similar programs.  You

24  need to know who you are selling -- you

Highly Confidential - Subject to Further Confidentiality Review

1    would have been a long time ago.  First

2    time I read it?  A long time ago.

3           Q.    You worked as an intern at

4    the office of chief counsel at FDA?

5           A.    I did for a period of time.

6           Q.    It was for one year,

7    correct?

8           A.    Correct.

9           Q.    That was from 1988 to 1989?

10          A.    That is correct.

11          Q.    And then you took an

12   associate position at Fox Bennett &

13   Turner?

14          A.    Mm-hmm.

15          Q.    That was your first position

16   after law school, right?

17          A.    Yeah.  That would have been

18   correct.

19          Q.    And Fox Bennett & Turner is

20   a private law firm?

21          A.    Yes.  Was originally Fox

22   Weinberg & Bennett.  Is now -- it was

23   then Fox Bennett & Turner.  I have no

24   idea what it's evolved into now, If the

1    firm is even still in existence at this

2    point.

3         Q.    Your work at the Fox Bennett

4    & Turner firm was on food, drug, and

5    environmental issues, correct?

6         A.    Correct.

7         Q.    After a year at Fox

8    Bennett & Turner, you moved to the

9    company of FD Inc.?

10        A.    Mm-hmm.

11        Q.    And you were the head of

12   sales and marketing?

13        A.    I did.

14             MR. BOGLE:  Make sure you

15        say yes or no rather than

16        "mm-hmm," just sort of -- so the

17        record is clear.  The court

18        reporter will get onto you a

19        little.

20             THE WITNESS:  Thank you.

21             MR. BOGLE:  She's nice,

22        but...

23             THE WITNESS:  I'll try to do

24        better.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Never -- my time, never

2  manufactured stents.  Surgical catheters,

3  yes.  Feeding tubes, yes.  Urological

4  catheters, yes.  Other specialty

5  catheters, yes.  And electrophysiology

6  devices.  It was a whole host of devices.

7      Q.    C.R. Bard is not a wholesale

8  drug distributor, is it?

9      A.    Not by the definition of

10  what a wholesale drug distributor is, no.

11      Q.    C.R. Bard does not

12  manufacture opioids?

13      A.    At least not when I was

14  there, no they did not.

15      Q.    C.R. Bard does not

16  distribute opioids?

17      A.    Not when -- during the time

18  that I was present.

19      Q.    Or any other controlled

20  substance?

21      A.    To the best of my knowledge,

22  again, not when I was there.

23      Q.    Did you provide any

24  compliance advice regarding the

1    Q.    But the policies focus on

2    providing samples to physicians, that's

3    true, correct?

4        A.    That -- that is true.

5        Q.    Now, SmithKline was --

6        A.    Or other -- other

7    prescribers, so let's be clear.  You can

8    have nurse practitioners, or physician's

9    assistants, who also have prescribing

10   privileges.  We could provide samples to

11   them.

12       Q.    Thank you for that.

13            SmithKline was a

14   pharmaceutical manufacturer, right?

15       A.    That is correct.

16       Q.    SmithKline was not a

17   wholesale drug distributor?

18       A.    No, sir, it was not.

19       Q.    SmithKline did not

20   manufacture opioids, correct?

21       A.    No.

22       Q.    SmithKline did not

23   distribute opioids?

24       A.    To the best of my knowledge,

Highly Confidential - Subject to Further Confidentiality Review

1    no.  I don't believe we had any products

2    that were opioids.

3           Q.    And SmithKline did not

4    distribute controlled substances?

5           A.    Again, to the best of my

6    recollection, we did not distribute any

7    controlled substances.

8           Q.    Now, you were promoted -- or

9    excuse me.  Let me strike that.

10              At some point SmithKline

11   merged with Glaxo, correct?

12          A.    That is correct.

13          Q.    And you became the

14   compliance officer?

15          A.    I became the compliance

16   officer for the global R&D business unit.

17          Q.    You ensured that Glaxo --

18   and the new company was known as

19   GlaxoSmithKline?

20          A.    That's correct.

21          Q.    And you ensured in your

22   position that GlaxoSmithKline's global

23   research and development operations

24   complied with international regulatory

Highly Confidential - Subject to Further Confidentiality Review

1    requirements?

2          A.    Domestic and international,

3    yes.

4          Q.    Now, GlaxoSmithKline is a

5    pharmaceutical manufacturer, correct?

6          A.    Yes, sir, it is.

7          Q.    GlaxoSmithKline is not a

8    wholesale drug distributor?

9          A.    That is correct.

10         Q.    GlaxoSmithKline does not

11   manufacture opioids?

12         A.    No.  GlaxoSmithKline does

13   not manufacture opioids.  But let us be

14   clear, and especially in the research and

15   development arm, they use opioids.

16   Opioids are used in the testing.  So,

17   therefore, DEA compliance such as

18   security controls, vaults, sign-ins, all

19   that is absolutely relevant.  And yes, I

20   did work in that space.

21         Q.    But -- and I appreciate that

22   distinction.  But GlaxoSmithKline does

23   not manufacture opioids, correct?

24         A.    That is correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    GlaxoSmithKline does not

2  distribute opioids, correct?

3    A.    Correct.

4    Q.    GlaxoSmithKline does not

5  distribute controlled substances?

6    A.    That is correct.

7    Q.    After GlaxoSmithKline, you

8  became a director in the life sciences

9  compliance department at Deloitte &

10  Touche?

11    A.    I did.

12    Q.    Your LinkedIn page states

13  that you had a special focus on bribery

14  and corruption issues pertaining to

15  research trials, and grants, medical

16  affairs and medical science liaisons?

17    A.    That was certainly one of

18  the focuses.  But I had -- again, my

19  duties as a director of life sciences

20  buttoned up around a bunch -- bunch of

21  duties.

22          But, yes, my specialty was

23  that particular area.  I had a lot of

24  expertise in that space.

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Misonix.

2        Q.      Misonix.  I butchered that

3    one, didn't I?

4                You became the interim chief

5    compliance officer at Misonix?

6        A.      I was interim chief

7    compliance officer.

8        Q.      You were there for about

9    seven months?

10       A.      Yes.

11       Q.      And why -- why did you leave

12   after seven months?

13       A.      Because they no longer

14   needed the services that I was providing.

15   My job was to stand up and get the

16   compliance program running for that -- it

17   was a small company.

18       Q.      It was a medical device

19   company?

20       A.      Medical device company on

21   Long Island.

22       Q.      Misonix is not a wholesale

23   pharmaceutical distributor?

24       A.      No, sir.

1    Q.    Misonix does not manufacture

2    opioids?

3         A.    No.

4         Q.    Misonix does not manufacture

5    controlled substances, correct?

6         A.    No, sir, it does not.

7         Q.    Following your time at

8    Misonix, you started the Whitelaw

9    Compliance Group?

10        A.    No, actually the Whitelaw

11   Compliance Group predates my job -- my

12   job at Misonix.  And Misonix was part

13   of -- was a consulting gig.

14        Q.    Your current position is the

15   president and CEO of Whitelaw Compliance

16   Group, correct?

17        A.    Correct.  It's my company.

18        Q.    Your company is described in

19   your CV, as, "Focused exclusively to

20   small to medium-sized FDA-regulated

21   companies."  Is that right?

22        A.    That's -- that's the general

23   direction that I work in, yes.

24        Q.    You focus on small and

Highly Confidential - Subject to Further Confidentiality Review

1    medium-sized FDA regulatory companies?

2        A.    I do focus on them.

3        Q.    Your company does not focus

4    on compliance at large companies,

5    correct?

6            MR. BOGLE:  Object to form.

7            THE WITNESS:  Typically,

8        Chris, it doesn't, although I will

9        do work for large companies.

10       Typically the larger companies are

11       looking for the Deloitte &

12       Touches, the Pfizers.  And the

13       Pfizers of the world, GSKs of the

14       world are looking for the large

15       big four.  I'm not trying to

16       compete with the big four.  That's

17       not the services that I provide.

18   BY MR. EPPICH:

19       Q.    I was looking at your

20   company's website, specifically the

21   advertised services that you advertise.

22   And I saw that you -- you do not

23   advertise services for pharmaceutical

24   wholesale distributors, correct?

Highly Confidential - Subject to Further Confidentiality Review

1   experiences or services concerning DEA on

2   your website, do you?

3          A.    Not that I rightly recall.

4          Q.    Mr. Whitelaw, you never

5   worked at the DEA, did you?

6          A.    No, sir.  I didn't.  I

7   didn't have the honor.

8          Q.    You've never worked at a

9   wholesale distributor?

10         A.    No.

11         Q.    Do you know how many

12  wholesale distributors are in the United

13  States right now?

14         A.    No.  Afraid I don't have a

15  hard count for you.

16         Q.    And you testified earlier

17  that you've never designed a compliance

18  program for wholesale distributor that's

19  currently in use, correct?

20         A.    No.  That's not what I

21  testified to.  You asked me if I did

22  controlled substances work.  As far as

23  designing compliance programs for others,

24  yes, I have.

1    at any of the defendants named in this

2    litigation?

3           A.    Yes.

4           Q.    Have you ever worked at a

5    chain pharmacy?

6           A.    No, sir.

7           Q.    Have you ever designed a

8    compliance program for a large chain

9    pharmacy that is currently in use?

10          A.    No, sir.

11          Q.    Have you ever designed a

12   controlled substance compliance program

13   for a pharmaceutical manufacturer that is

14   currently in use?

15               MR. BOGLE:  Object to form.

16               THE WITNESS:  Again, I can't

17          answer that for you.  I don't

18          know.

19   BY MR. EPPICH:

20          Q.    On your CV, I notice that

21   your CV does not mention the Controlled

22   Substances Act; is that true?  Would you

23   agree?

24          A.    I would have to read it all

1    over again.  Do you want to give me a

2    minute to read it to make sure that I can

3    answer that honestly?

4              MR. BOGLE:  If you need to

5         read it, you can read it.

6              THE WITNESS:  No, it doesn't

7         say the magic word "controlled

8         substances" in my resumé.

9    BY MR. EPPICH:

10        Q.    Your CV doesn't mention

11   opioids, does it?

12        A.    No, it doesn't have that

13   magic word in there either.

14        Q.    And it doesn't mention

15   controlled substances?

16        A.    I believe I just answered

17   that question, and the answer is no, it

18   does not.

19        Q.    Your CV doesn't mention

20   diversion of opioids at all either, does

21   it?

22        A.    No, sir, it does not.

23        Q.    The DEA and the FDA, you're

24   familiar with those agencies?

1    A.    DEA and FDA?

2    Q.    Yes, sir.

3    A.    Yes, sir, I'm familiar with

4  both agencies.

5    Q.    And the DEA and the FDA are

6  different federal agencies, correct?

7    A.    Yes, that is correct.

8    Q.    DEA and FDA have different

9  regulatory focuses?

10         MR. BOGLE:  Object to form.

11         THE WITNESS:  So they have

12         different regulatory focuses, but

13         I would also qualify that there's

14         overlap between the two, and the

15         two work together in certain

16         instances, controlled substances

17         being an excellent example of

18         that.

19  BY MR. EPPICH:

20    Q.    Well, the DEA is the agency

21  with primary responsibility for enforcing

22  the Controlled Substances Act, correct?

23    A.    With the Controlled

24  Substances Act, yes.

1    Q.    And the FDA is not the

2  government agency charged with enforcing

3  the Controlled Substances Act, correct?

4    A.    That is --

5         MR. BOGLE:  Object to form.

6         THE WITNESS:  That is

7    correct.

8  BY MR. EPPICH:

9    Q.    FDA does not promulgate

10  regulations under the Controlled

11  Substances Act?

12    A.    I'm sorry.  Say that again,

13  please.

14    Q.    Does the FDA promulgate

15  regulations under the Controlled

16  Substances Act?

17    A.    Not usually.

18    Q.    Not ever, correct?

19    A.    To the best of my knowledge,

20    no.

21         MR. BOGLE:  Chris, if you're

22    shifting to another area, we've

23    been almost an hour ten I think.

24         MR. EPPICH:  Maybe ten more

1       A.    To my knowledge, no, it's

2   not a criminal case.

3       Q.    And under the guideline's

4   own applicability section, the guidelines

5   are not applicable to this civil

6   litigation.

7               Would you agree?

8               MR. BOGLE:  Objection.

9               THE WITNESS:  No, sir, I

10          would not agree.  I fundamentally

11          disagree with where you are going

12          with this.

13              The guidelines are the basic

14          framework.  They are where

15          everybody starts.  It's where

16          industry starts.  It's where

17          compliance professionals start.

18          It's where good companies start,

19          et cetera.

20              It is the baseline.  It has

21          become the de facto set of

22          standards that you start with when

23          you're looking at and assessing

24          corporate compliance programs.

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes.

2       Q.      The OIG guidances were not

3    issued by DEA, correct?

4       A.      No, they weren't.

5       Q.      And the OIG guidances don't

6    address the Controlled Substances Act or

7    suspicious order monitoring?

8               MR. BOGLE:  Object to form.

9               THE WITNESS:  Could you

10          rephrase the question, please?

11   BY MR. EPPICH:

12      Q.      Do the OIG guidances address

13   the Controlled Substances Act or discuss

14   the Controlled Substances Act?

15              MR. BOGLE:  Same objection.

16              THE WITNESS:  Not in so many

17          words, no.  But again, I would go

18          back to the conversation that we

19          had earlier.  You're reading this

20          in a very narrow context.  In the

21          world of compliance, we look at a

22          lot of guidance.

23              The OIG guidance, the Bard

24          case, are all examples of putting

1        Q.    You're fine.  It's hard

2    sometimes.

3              MR. BOGLE:  Can you restate

4         the question for him just so we're

5         clear.  I think he jumped on you.

6              MR. EPPICH:  I will.  I'm

7         trying to restate it in my head

8         first.

9              MR. BOGLE:  Okay.  That's

10        fine.

11   BY MR. EPPICH:

12        Q.    Dr. Whitelaw, are you aware

13   of anyone who has ever used a scale such

14   as the one that you prepared in Figure 2

15   to measure how a distributor complies

16   with the Controlled Substances Act and

17   its associated regulations?

18        A.    Not in that context, no.

19        Q.    Now, looking at -- looking

20   at your model in Figure 2, is there a

21   point system or some other system that

22   you apply to evaluate the maturity of the

23   compliance program?

24        A.    There is not a strict

Highly Confidential - Subject to Further Confidentiality Review

1    quantitative methodology.  It's more of a

2    qualitative assessment.

3         Q.    And does your report reflect

4    the nature of the qualitative assessment

5    to move from say foundational to

6    maturing, to advancing, to leading?

7         A.    Yeah.  I think if you look

8    at the bullet points underneath there,

9    and also if you look at the attributes

10   that we discussed before, you will come

11   up with that.

12        Q.    So the attributes that we

13   reviewed from Pages 28 to 42 and then the

14   bullet points that we see here under

15   Figure 2.

16        A.    Right.  They're all combined

17   together.

18        Q.    Now, have you applied Figure

19   2, your model, to the compliance programs

20   that are used by the defendants in this

21   litigation?

22        A.    Yes.  I believe we can go

23   find the page citations.  Yes, it was

24   used.

Highly Confidential - Subject to Further Confidentiality Review

1    GAO reports or any congressional

2    testimony, to your recollection?

3           A.    I don't recall.  I honestly

4    don't recall at this point.

5           Q.    Now, sir, is it your opinion

6    that companies should look to government

7    guidances from the relevant regulatory

8    agencies when designing their compliance

9    programs?

10          A.    Yes, they should.

11          Q.    That would include the OIG

12   guidances that you discussed in your

13   report?

14          A.    Yes.

15          Q.    And perhaps even the DOJ

16   updated guidance on evaluating corporate

17   compliance programs that you discussed in

18   your supplemental report?

19          A.    Yes.

20          Q.    Is it your opinion that

21   companies should look at settlements and

22   precedents when designing their

23   compliance programs?

24          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    That would include the

2  Rochester Drug Cooperative deferred

3  prosecution agreement that we saw in your

4  supplemental report?

5    A.    Yes, sir.

6    Q.    And the U.S. versus C.R.

7  Bard plea agreement that you discuss in

8  your report?

9    A.    Yes, sir.

10    Q.    And the federal sentencing

11  guidelines that you discuss in your

12  report?

13    A.    Yes, sir.

14    Q.    Have you always held this

15  opinion, these opinions?

16    A.    Have I always held these

17  opinions?

18    Q.    Yes, sir.

19    A.    Ever since I've been a

20  compliance officer, yes.  Again, you use

21  what's available to you to build an

22  effective compliance program.  All this

23  material are data points that you can

24  draw from in building an effective

Highly Confidential - Subject to Further Confidentiality Review

1     compliance program.

2         Q.    Now, you -- you actually

3     held though, the opposite view about

4     these opinions and about the value of

5     looking at guidances from regulatory

6     agencies, settlements, and prior

7     precedents, right?

8         A.    I'm not sure what you're

9     talking about, so I -- you're going to

10     have to be more specific, sir.

11         (Document marked for

12         identification as Exhibit

13         Whitelaw-8.)

14   BY MR. EPPICH:

15         Q.    Let me introduce as Exhibit

16     Number 8. Exhibit Number 8 is an article

17     entitled "Government Standards Undermine

18     Compliance Efforts in Life Science

19     Companies," by Seth B. Whitelaw dated

20     March 7, 2018. I'll hand you that, sir.

21         A.    Yeah, let me see it.

22         Q.    You are familiar with this

23     article, sir?

24         A.    I am. Is there something in

1  particular that we want to look at in it?

2        Q.    Yeah.  So we -- if we turn

3  to Page 2.

4        A.    Mm-hmm.

5        Q.    And I'm looking at the

6  fourth paragraph down.  This was March 7,

7  2018.  This was roughly six months before

8  you were hired by the plaintiffs' counsel

9  for your expert role in this case,

10  correct?

11        A.    That would be about right.

12        Q.    On Page 2 of Exhibit 8,

13  we -- we read, "Although the government

14  remains steadfast, the companies must

15  individually tailor their compliance

16  programs to suit each business and

17  organization.  The OIG, among other

18  enforcement bodies, continue" --

19  "continues to embrace settlement

20  boilerplates and slowly increases the

21  burden and complexity for compliance

22  officers."

23            You previously wrote this

24  sentence, didn't you?

1   something to have been done about

2   it, and I don't see that.

3   BY MR. EPPICH:

4        Q.    But, sir, you've testified

5   that you have no DEA experience.

6            MR. BOGLE:  Object to form.

7        He said he didn't work for DEA.

8            THE WITNESS:  This is not a

9        DEA-relevant issue.  This is a

10       corporate compliance relevant

11       issue.  And even so, the question

12       is, they were substantially in

13       charge of these programs.  And I

14       have not seen McKesson take any

15       appropriate action to remove the

16       people who were supposed to be

17       running the program correctly and

18       overseeing it, and they're

19       accountable.  There's no

20       accountability that I could see.

21   BY MR. EPPICH:

22       Q.    Sir, you have no experience

23   working in the compliance department at a

24   pharmaceutical distributor, correct?

1      A.     I have not worked for a

2  pharmaceutical distributor, but I'm not

3  sure how that's particularly relevant to

4  this particular -- is particularly

5  germane to this issue.  Holding people

6  accountable who are supposed to be

7  running your compliance programs is

8  pretty germane issue and simple issue

9  across all the boards.

10      Q.     Well, I think it's relevant,

11  sir, because you took it upon yourself to

12  name three of McKesson's employees in

13  your report as employees that McKesson

14  should have taken some form of

15  disciplinary action against.

16           And I would like to know

17  what basis you have for making these

18  allegations in your report, sir?

19           MR. BOGLE:  Object to form.

20           THE WITNESS:  My

21      experience --

22           MR. BOGLE:  Go ahead.

23           THE WITNESS:  My experience

24      sitting here as a compliance

Highly Confidential - Subject to Further Confidentiality Review

1    spot on the nonexistent remedial level of

2    the maturity scale?

3          A.    Again, I'd say by and large,

4    yes.

5          Q.    How can we tell that from

6    your report?  I mean, where do we look in

7    your report to determine how far

8    Walgreens is from making its way onto the

9    foundational level of the compliance

10   maturity scale?

11         A.    I didn't put you -- I didn't

12   put it on a graph, Counselor.

13         Q.    That's why I'm asking the

14   question, sir.

15         A.    No, I did not put it on a

16   graph.

17         Q.    And so how are we supposed

18   to know from your report how far off the

19   scale we are?

20         A.    I think you're missing the

21   point.  Is you're not even moving to the

22   right-hand side of the scale, Counselor.

23   You're not even halfway to moving toward

24   an effective compliance program.  You're

1   sitting at the left-hand edge.  I think

2   you are overcharacterizing it.

3        Q.   I understand that's your

4   position, sir.  And I'm just trying to

5   get an understanding of your opinions.

6   And what I would like to know is, how,

7   from your report, am I supposed to

8   determine how far off to the left-hand

9   side of the scale Walgreens is supposed

10  to be?

11       A.   And I guess what I'm trying

12  to say to you is I'm not sure that being

13  off to the left or how far off, if it's

14  one inch or three inches.  I think you're

15  missing the point.  You shouldn't be off

16  to the left-hand side at all.  You should

17  be more towards the middle, to the

18  right-hand side of the graph.  That's the

19  point.

20       Q.   I understand that's your

21  position, sir.  My question is coming

22  from a different place.  I'm not asking

23  right now what you think we should have

24  done differently.  I'm just trying to

Highly Confidential - Subject to Further Confidentiality Review

1   understand how I'm supposed to know where

2   you think we actually are.

3           A.    I think I told you where I

4   think you actually are.

5           Q.    But there's -- as you said a

6   moment ago, there's no graph or chart

7   that shows where Walgreens falls with

8   respect to the compliance maturity scale,

9   correct?  That's not in the report?

10          A.    There is no point on the

11  graph that I put Walgreens on, if that's

12  what you're asking, Counselor, no.

13          Q.    Turn if you would, please,

14  to Page 183, which is the start of the

15  Walgreens section.

16          A.    I'm here.

17          Q.    I notice you -- the heading

18  on this Section 13 is "Walgreens Boots

19  Alliance."  Is that correct?

20          A.    Correct.

21          Q.    The focus of the first

22  several paragraphs is also on Walgreens

23  Boots Alliance, right?

24          A.    And Walgreens too.  It's a

1    have good quality documentation.  I think

2    that's a requirement.  Otherwise how can

3    you know what you've done or not done?

4         Q.    Sir --

5         A.    I can --

6              MR. BOGLE:  Finish your

7         answer.  Are you done?

8              THE WITNESS:  I'm done.

9    BY MS. SWIFT:

10        Q.    Do you know what the word

11   diversion is?

12        A.    Yeah.  If you want to get

13   the precise definition we can go back to

14   the front of the report.

15        Q.    I'd like to know if you can

16   give me a definition of diversion without

17   looking at something in your report.

18        A.    Again, to be absolutely

19   precise, I would love to give you that.

20   I'm going to go back to my report and

21   rely on my report.

22        Q.    It doesn't have to be that

23   precise.

24        A.    I'm going to rely on my

Highly Confidential - Subject to Further Confidentiality Review

1    report.

2              MR. BOGLE:  You can go to

3         your report.

4              THE WITNESS:  I'm going to

5         go with my --

6              MS. SWIFT:  I don't want to

7         know the definition that he has in

8         his report.

9    BY MS. SWIFT:

10        Q.    What I would like to know is

11   if you can give a definition without

12   looking at your report.  Yes or no?

13        A.    I'm going to look at my

14   report.

15        Q.    Okay.

16        A.    I want to look at my report.

17        Q.    That's fine.  We'll move on.

18        A.    Okay.

19        Q.    You haven't done any

20   analysis of any order that Walgreens

21   shipped to one of its pharmacies to

22   determine whether that order led to drugs

23   being diverted, correct, sir?

24             A.    Again, Counselor, I'm not

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE NORTHERN DISTRICT OF OHIO
 3              EASTERN DIVISION
 4                 -  -  -
 5

      IN RE:  NATIONAL       :  HON. DAN A.
 6    PRESCRIPTION OPIATE     :  POLSTER
      LITIGATION              :
 7                            :  MDL NO. 2804
      APPLIES TO ALL CASES    :
 8                            :  CASE NO.
                              :  17-MD-2804
 9                            :
10         - HIGHLY CONFIDENTIAL -
11    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
12                 VOLUME II
13                 -  -  -
14             May 17, 2019
15                 -  -  -
16             Continued videotaped
      deposition of DR. SETH B. WHITELAW, taken
17    pursuant to notice, was held at the
      offices of Golkow Litigation Services,
18    One Liberty Place, 1650 Market Street,
      Philadelphia, Pennsylvania, beginning at
19    8:31 a.m., on the above date, before
      Michelle L. Gray, a Registered
20    Professional Reporter, Certified
      Shorthand Reporter, Certified Realtime
21    Reporter, and Notary Public.
22                 -  -  -
23         GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24            deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Applied to an SOM program

2    alone?

3          Q.     Yes, have you ever found,

4    when you applied it to a SOM program,

5    have you found such a program to score

6    above the foundational level?

7          A.     No, I have not.

8          Q.     Before you were engaged in

9    this case, had you ever used this model

10   to evaluate an SOM program?

11         A.     No, I had not.  But it is a

12   standard compliance maturity model that

13   I've used to evaluate compliance

14   programs.

15         Q.     But not an SOM program

16   before you were --

17         A.     Not an SOM --

18         Q.     -- engaged in this case?

19         A.     -- program, per se.

20         Q.     I want to turn to --

21                MR. BOGLE:  Just wait until

22         he finishes.

23   BY MR. HYNES:

24         Q.     -- CVS's distribution

Highly Confidential - Subject to Further Confidentiality Review

1    reviewed at the Lumberton distribution

2    center, right?

3           A.    That's my recollection.

4           Q.    By Mr. Mortelitti?

5           A.    That is also my

6    recollection.

7           Q.    And you write he had no

8    prior experience with suspicious order

9    monitoring.

10          A.    I can go back and look at

11   the report, but yes, I recall that.

12          Q.    Okay.  But you also don't

13   have any prior experience with suspicious

14   order monitoring, do you?

15              MR. BOGLE:  Object to form.

16          Misstates testimony.

17              THE WITNESS:  I'm not sure I

18          understand what you mean.  I do

19          have experience working in

20          regulated -- I did -- I have

21          reviewed the requirements around

22          being a suspicious order

23          monitoring.  If you asked if I

24          built and designed a system, no, I

1    haven't.  But that's already on

2    the record.

3  BY MR. HYNES:

4        Q.    You've never operated an SOM

5  system either, have you?

6            MR. BOGLE:  Object to form.

7            THE WITNESS:  No.  My role

8    is -- no, I have not.

9  BY MR. HYNES:

10        Q.    You've never audited an SOM

11  system, have you?

12            MR. BOGLE:  Object to form.

13            THE WITNESS:  No, I have not

14    audited an SOM system.  But I

15    have -- I have audited PDMA

16    systems which are substantially

17    similar.

18  BY MR. HYNES:

19        Q.    But not an SOM system?

20        A.    Not an SOM system.

21        Q.    And you write that "CVS had

22  one person doing the daily review of the

23  IRR."

24            But there were people in the

1    A.    I did look at it.  It's

2  footnoted in my report.  So obviously I

3  did look through it and look at it, yes.

4    Q.    All right.  So the

5  compliance program for physicians is

6  footnoted in your report is your

7  recollection?

8    A.    It is.

9    Q.    Okay.  Thank you.  Now, you

10  stated just a little while ago to

11  Mr. Hynes that you've never operated or

12  audited a suspicious order monitoring

13  system; is that correct?

14    A.    That is what I told him,

15  yes.

16    Q.    Okay.  Do you consider

17  yourself an expert on suspicious order

18  monitoring?

19    A.    I believe, based on the work

20  that I have done, my 30 years'

21  experience, all that I have reviewed, all

22  the DEA guidance I have reviewed, my

23  conversations with Mr. Rafalski, yes, I

24  would say that I am qualified to be a

1   SOMs expert.

2          Q.    And prior to your

3   discussions with Mr. Rafalski, all of the

4   documents that you reviewed for this

5   litigation, all of the deposition

6   transcripts, all of that work that you

7   did for this litigation, would you have

8   considered yourself a suspicious order

9   monitoring expert?

10              MR. BOGLE:  Object to form.

11              THE WITNESS:  Could you be

12         more -- again, could you repeat

13         the question?  I'm sorry.  It's

14         been a long day.

15  BY MR. DAVISON:

16         Q.    Understood, sir.  So prior

17  to the work that you did for this

18  litigation, which we've discussed

19  included reviewing, you know, hundreds of

20  thousands of documents, deposition

21  transcripts, discussions with

22  Mr. Rafalski, did you consider yourself a

23  suspicious order monitoring expert?

24              MR. BOGLE:  Same objection.

1      variety of different areas.  I'm

2      not sure that I reflected on it

3      the way you're asking me to.

4   BY MR. DAVISON:

5      Q.   Okay.  Prior to this

6   litigation, have you ever held yourself

7   out to a potential client as a suspicious

8   order monitoring expert?

9      A.   Other than the work that I

10  did on a proposal for Deloitte, which,

11  again, was more of a compliance process

12  assessment for suspicious order

13  monitoring program, I don't recall ever

14  putting that moniker on my name.

15     Q.   So you didn't tell Henry

16  Schein that you were an -- that you were

17  an expert in suspicious order monitoring

18  when you made that pitch, correct?

19          MR. BOGLE:  Objection.

20     Misstates testimony.

21          THE WITNESS:  As I said, I

22     think I answered your question as

23     best I can.  I don't have anything

24     else to add to that answer.

Highly Confidential - Subject to Further Confidentiality Review

1        A.      From time to time, yes.

2        Q.      All right.  So

3  Dr. Whitelaw's expectation is that

4  manufacturers conduct reviews and audits

5  of distributors on top of what DEA does,

6  correct?

7                MR. BOGLE:  Object to form.

8                THE WITNESS:  They -- they

9        are your customers.  You should be

10        aware of what they are doing and

11        comfortable with the way they are

12        acting.  That is just good

13        third-party management, which is

14        part of an effective compliance

15        program.

16                Again, when you go back to

17        the federal sentencing guidelines,

18        the front of the report, if we

19        really want to discuss it in

20        detail, yeah, my expectation was

21        that you manage your own third

22        parties as well and not just

23        simply rely on the DEA.

24  BY MR. DAVISON:

1      What I'm saying is it's up

2  to the manufacturer to incorporate it and

3  they should make an effort to use that

4  data.

5      Q.   And, sir, with respect to

6  using that data, it could be used

7  differently by different manufacturers,

8  correct?

9          MR. BOGLE:  Object to form.

10         THE WITNESS:  Could you --

11     could you restate the question for

12     me, please?

13  BY MR. DAVISON:

14     Q.   Sure.

15         Under the -- the

16  Dr. Whitelaw good manufacturers

17  controlled substances compliance

18  program -- or excuse me, anti-diversion

19  compliance program --

20     A.   You mean under the

21  attributes that I list in my report that

22  I gleaned from experience in the federal

23  sentencing guidelines and Controlled

24  Substances Act, et cetera?  Is that what

1    we're referring to?

2         Q.    The attributes that are

3    listed in your report on Page 36.

4         A.    Okay.  Great.

5         Q.    You don't define a way that

6    you expect manufacturers to monitor

7    chargebacks, correct?

8         A.    No, I do not define a

9    specific way for...

10        Q.    Are you aware of DEA ever

11   suggesting a specific metric or method

12   that manufacturers are to use in

13   analyzing chargeback data?

14             MR. BOGLE:  Object to form.

15             THE WITNESS:  No, I am not

16        aware of DEA ever suggesting a

17        specific methodology to analyze

18        and review chargeback data.

19   BY MR. DAVISON:

20        Q.    So under the expectations

21   that you have for a manufacturer's

22   program, is one way the manufacturer

23   could utilize chargeback data to utilize

24   the data to look at its distributors and

Highly Confidential - Subject to Further Confidentiality Review

1        A.     It does.

2        Q.     And you state that "a

3   manufacturer should instruct and require

4   its sales representatives and inhouse

5   field support and marketing personnel to

6   provide any observations of potential

7   diversionary behavior to their inhouse

8   compliance department for further

9   evaluation and potential action,"

10  correct?

11       A.     That is correct.

12       Q.     And, sir, is -- is this

13  something that's explicitly laid out in

14  the CSA?

15       A.     It is embedded in the CSA.

16       Q.     And it's embedded under

17  those -- those four words of controls

18  against effective diversion, correct?

19            MR. BOGLE:  Object to form.

20            THE WITNESS:  Yes, as well

21       as under the federal sentencing

22       guidelines of what an effective

23       compliance program looks like as

24       well, so...

Highly Confidential - Subject to Further Confidentiality Review

1  somehow monitor physicians, correct?

2       A.    I'm not saying that you have

3  to create a sales force.  I'm saying

4  again the whole gist of this is you have

5  available information, if you have boots

6  on the ground, if you have people out

7  there who are observing behavior and they

8  see something that's troubling, you know,

9  it's about as basic as what you see on

10  Amtrak these days.  If you see something,

11  say something.

12       Q.    And all of that -- that

13  obligation, again, comes from the four

14  words "effective controls against

15  diversion," right?

16       A.    It comes from the federal

17  sentencing guidelines together with the

18  four words of "effective controls against

19  diversion," yes.

20       Q.    You also mention IMS data,

21  correct?

22       A.    Is there a particular

23  section that you're looking at?

24       Q.    Yeah.  Page 43.  At the top.