# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**  )  )  ) | |
| This document relates to:  ) ) | |
| *The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*  ) )  Case No. 18-op-45090  )  ) | **MDL No. 2804**  **Case No. 17-md-2804**  **Judge Dan Aaron Polster** |
| and  )  ) | |
| *The County of Cuyahoga v. Purdue Pharma L.P., et al.*  ) )  Case No. 1:18-op-45004  )  ) | |

**<u>MEMORANDUM IN SUPPORT OF DEFENDANT JANSSEN PHARMACEUTICALS, INC. AND JOHNSON AND JOHNSON'S MOTION FOR SUMMARY JUDGMENT</u>**

I.      **INTRODUCTION**

For nearly two years, Plaintiffs have trafficked in sweeping, unsubstantiated claims about the responsibility Janssen and other Defendants bear for Ohio's opioid abuse crisis. The time for sweeping, unsubstantiated claims is now over. To survive summary judgment, Plaintiffs must satisfy the bedrock requirement of causation by tying Janssen's challenged conduct to their alleged injuries with concrete evidence. *See Wilson v. Columbus Bd. of Educ.*, 589 F. Supp. 2d 952, 972 (S.D. Ohio 2008). They cannot.

Janssen designed the three opioid medications at issue in this litigation to deliver critical relief to patients experiencing pain, while also limiting the risk of abuse. Duragesic, a transdermal patch that entered the market in 1990, offered 72-hour relief in a formulation that was thought to be more difficult to abuse and less attractive to abusers than orally administered opioids. Nucynta, an immediate-release opioid that entered the market in 2009, contained a new dual-acting active ingredient that was thought to be less attractive to abusers than existing opioid pills. Nucynta ER, its extended-release counterpart, was released in 2011 with a crush-resistant coating to further minimize the drug's attractiveness to patients without legitimate pain-relief needs.

Plaintiffs cannot show that Janssen's conduct in connection with these FDA-approved, DEA-regulated products caused Ohio's opioid abuse crisis. Plaintiffs premise their claims against Janssen on two categories of alleged wrongdoing: (i) allegedly fraudulent marketing of these medications, and (ii) alleged failure to prevent diversion of these medications. But neither of these theories can support Plaintiffs' claims.

First, the undisputed evidence shows that Janssen's marketing could not have caused the opioid abuse crisis because Janssen's products were not used—much less abused—by a significant percentage of people who took opioids. Indeed, Janssen's opioid products accounted for a

1

minuscule sliver of the Track One market for opioid medications (between 0.1% and 0.9%) and an equally negligible share of doctor-shopping reports (0.13%). Further, Janssen's unbranded marketing materials were not even published until years after Ohio had declared an opioid abuse crisis. And the First Amendment protects the speech of third-party organizations and individuals that Janssen supported, rendering inactionable their statements about matters of public concern, such as pain relief.

Plaintiffs' second theory of liability, that Janssen failed to prevent diversion of its opioid medications, fares no better. Janssen's suspicious order monitoring system has been inspected by more than a dozen separate diversion investigators from the Drug Enforcement Agency over the years and maintains a perfect compliance record. In addition, Plaintiffs have no competent evidence that Janssen failed to identify any suspicious order or that a single Janssen order was actually diverted.

Although they have received nearly five million pages of Janssen documents and deposed Janssen witnesses for more than 100 hours,[1] Plaintiffs have failed to develop evidence that can sustain their claims against Janssen. The time has come and gone for Plaintiffs to prove their case. Because there is no evidence from which any reasonable juror could conclude that Janssen caused Ohio's opioid abuse crisis, the Court should grant summary judgment in Janssen's favor.

II.     **ARGUMENT**

    A.     **Janssen's Marketing Did Not Cause the Opioid Abuse Crisis in Ohio.**

As outlined in the Manufacturer Defendants' joint motion for summary judgment on causation grounds, Plaintiffs have made no effort to show that a single physician prescribed a single opioid medication because of Janssen's—or any other Manufacturer Defendant's—alleged

---

[1] This figure excludes depositions of Janssen witnesses taken in Oklahoma for which transcripts were produced to Plaintiffs.

2

misrepresentation. *See* Joint Causation Motion for Summary Judgment. And Plaintiffs' intended aggregate proof of causation—the analysis of their expert Meredith Rosenthal—cannot establish that the Manufacturer Defendants collectively, or Janssen specifically, caused any increase in opioid prescriptions in the relevant jurisdictions. *Id.*

These failures of proof are even more stark as to Janssen. In support of their contention that Janssen caused the opioid abuse crisis, Plaintiffs have cited several obscure statements that allegedly misrepresented the risks and benefits of long-term opioid therapy. *See infra* at 4-9. But a closer look at Janssen's position in the market and the challenged statements shows that no reasonable juror could conclude these statements caused the opioid abuse crisis.

The challenged statements fall into three groups—(1) Janssen's branded marketing of its opioid medications; (2) Janssen's unbranded marketing; and (3) third-party speech about opioids—none of which supports Plaintiffs' claims.

No reasonable juror could conclude that Janssen's *branded marketing* of Nucynta and Duragesic caused the opioid abuse crisis because these medications' market share was minuscule and they were rarely abused. Nor could any reasonable juror conclude that Janssen's *unbranded marketing* caused the crisis because it occurred well after Ohio's opioid abuse crisis was already underway. And the challenged *third-party speech about opioids* is not actionable because it is protected by the First Amendment. In sum, there is no evidence from which a rational factfinder could conclude that Janssen's marketing caused the opioid abuse crisis.

> 1. **Janssen's Branded Marketing Did Not Cause the Opioid Abuse Crisis Because Janssen Medications Were Not Widely Sold or Abused.**

Janssen's branded marketing—by definition—promoted only Janssen's medications. And the uncontroverted evidence shows that these medications played no actionable role in the opioid abuse crisis. Janssen's branded marketing therefore cannot support Plaintiffs' claims, because

3

there is no evidence supporting the implausible inference that the marketing of medications that played no actionable role in the opioid abuse crisis somehow caused that crisis.

According to Plaintiffs' own expert, the DEA's ARCOS database reveals that Janssen's opioid medications accounted as little as 0.1% and no more than 0.9% of the Track One market for opioid medications. Cardelus Decl. Ex. 1 (Keller Report) at 16; Cardelus Decl. Ex. 2 (Keller Tr.) at 221:18-222:16.

Plaintiffs also have no evidence that Duragesic or Nucynta were widely abused. Duragesic is a transdermal patch, not a pill. Patches are, by nature, more difficult to abuse than pills—they cannot, for instance, be crushed and snorted for a quick high—and reports unanimously show that abuse rates for Duragesic have consistently been far lower than for opioid pills. Cohen Decl. Ex. A (expert report) at 40; Cardelus Decl. Ex. 3 (Okla. Moskowitz Tr.) at 223:24-224:7. Abuse rates for Nucynta and Nucynta ER, which contained an active ingredient designed to be abuse-deterrent, were likewise much lower than for other opioid pills. Cohen Decl. Ex. A (expert report) at 40; Cardelus Decl. Ex 4 (Moskowitz Tr.) at 684:4-17; Cardelus Decl. Ex. 5 (Okla. Vorsanger Tr.) at 280:25-282:9, 298:21-299:4.[2] Fewer than 1% of patients who took Nucynta in clinical trials reported experiencing euphoria, and post-market surveillance data confirms that abuse of the Nucynta products is uncommon.[3] And Plaintiffs have offered no evidence to contradict these statistics: In fact, Plaintiffs' expert James Rafalski testified that he had no knowledge of Nucynta and Duragesic diversion rates, or any instance of

---

[2] Pursuant to the Court's Discovery Ruling No. 9, depositions taken in state actions before January 25, 2019, have been produced in the MDL. *See* Dkt. No. 1118.

[3] *See* Cardelus Decl. Ex. 5 (Okla. Vorsanger. Tr.) at 112:3-113:16, 280:25-280:25; Cardelus Decl. Ex. 6 (Nucynta ER label) at 16; Cardelus Decl. Ex. 7 (Nucynta label) at 11; Cardelus Decl. Ex. 8 (Eric Galia *et al.*, *Evaluation of the tamper-resistant properties of tapentadol extended-release tablets: Results of in vitro laboratory analyses*, J. Opioid Mgmt. 10:3, at 150 (2014)); Cardelus Decl. Ex. 9 (Nucynta ER: Fourth Safety Surveillance Plan Progress Report) at 81.

diversion of those medications in the Track One jurisdictions. *See* Cardelus Decl. Ex. 10 (Rafalski Tr.) at 631:13-634:2; 734:10-17, 735:19-736:1.

Consistent with these low abuse rates, available data from by the Ohio Board of Pharmacy reveals a negligible rate of doctor-shopping for Janssen opioid medications. Marais Decl. Ex. A at ¶ 46 & Table 2 (analyzing 2008-2018 data from Ohio Automated Rx Reporting System). Even under a broader definition of doctor-shopping than the State of Ohio uses, only **0.28% of prescriptions** for Duragesic, Nucynta, and Nucynta ER were associated with a doctor-shopping episode. *Id.* ¶ 45 (2008-2018 data). These prescriptions represent **0.13%** of all prescriptions involved in a doctor-shopping episode. *Id.*

Ohio's opioid abuse crisis has nothing to do with Janssen's products—there is no such thing as a patch mill, and there has never been a Nucynta epidemic. Plaintiffs attempt to shoehorn Janssen into this case by using a causation model that lumps Janssen in with every other manufacturer, but they cannot escape the reality that Janssen's products were rarely abused, and that Janssen could not have caused the opioid crisis by promoting them.

    2.    **Janssen's Unbranded Marketing Was Too Obscure and Occurred Too Late to Have Caused Ohio's Opioid Abuse Crisis.**

Janssen did not publish the challenged unbranded marketing materials until 2008—long after opioid abuse had become a crisis in Ohio. As early as the 1990s, abuse of prescription opioids emerged as a significant problem across Ohio, and by the 2000s, it had reached epidemic levels. As one Cuyahoga County prosecutor testified, prescription opioids "absolutely" became a "problem" by the "early '90s." Cardelus Decl. Ex. 30. The Chief Toxicologist of Summit County recalled that, "in the early 2000s," "all I saw … at the coroner's office were prescription meds." *Id.* Ex. 31. During their depositions, police officials and other first responders around the state chronicled the emergence and spread of the opioid abuse crisis in the mid-1990s into the mid-

5

2000s. *Id.* Ex. 32-34. And DEA data from a report upon which Plaintiffs rely indicates that "[f]rom 1997 to 2007, there was a 506 percent increase in the amount of prescription opioid grams per 100,000 population distributed to retail pharmacies in Ohio." *Id.* Ex. 35; *see also id.* Ex. 36 (email from Cuyahoga official attaching report).

These undisputed facts have not stopped Plaintiffs from claiming that Janssen somehow caused the opioid abuse crisis by publishing a handful of statements in obscure unbranded marketing documents[4] that did not appear until years later. Janssen continues to dispute that any of its marketing was misleading, but Plaintiffs' chronology of facts, which must be construed in their favor for purposes of this motion, simply cannot support the conclusion that Janssen's marketing activities caused a crisis that had already been well underway for years. *See Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1029 (9th Cir. 1999) ("[E]vents which occur after the injury has occurred cannot be said to have caused the injury."). The five unbranded marketing documents Plaintiffs cite were all produced between 2008 and 2011—far too late to have fueled an opioid abuse crisis in Ohio. "Prescribe Responsibly" was not published until 2011;[5] "Let's Talk Pain" was not published until 2009;[6] "Neopathways" was not published until 2009;[7] "Exit Wounds" was not published until 2009;[8] and "Finding Relief" was not published until 2008.[9] Plaintiffs have no evidence to suggest any of these achieved a substantial audience, in Ohio or elsewhere—let alone that they were influential enough to move the needle

---

[4] As used here, "unbranded marketing" includes two third-party documents that Plaintiffs have labeled—but that are not in fact—Janssen unbranded marketing: "Exit Wounds" and "Finding Relief."
[5] Cardelus Decl. Ex. 11 (cited in Cardelus Decl. Ex. 16 (Kessler Report) ¶¶ 318-318.2).
[6] Cardelus Decl. Ex. 12 (cited in Cuyahoga 3AC ¶¶ 195-196, 232).
[7] *See* Cardelus Decl. Ex. 17 (Egilman Report) at Ex. B.381.
[8] Cardelus Decl. Ex. 14 (cited in Cuyahoga 3AC ¶ 453).
[9] Cardelus Decl. Ex. 15 (cited in Cardelus Decl. Ex. 18 (Schumacher Report) ¶¶ 76-77).

6

on a crisis that, by the State's account, began more than a decade before they were published. Because none of these publications even existed before the opioid abuse crisis was well underway, they cannot support the inference that Janssen caused the crisis.[10]

### 3. Janssen Is Not Liable for Third-Party Speech Protected Under the First Amendment.[11]

The First Amendment protects the third-party speech Plaintiffs cite as a basis to blame Janssen for the opioid abuse crisis. For example, Plaintiffs premise their claims on prescribing guidelines published by various professional organizations in peer-reviewed medical journals. They allege that these guidelines misled doctors and the public, including by "endors[ing] opioids to treat chronic pain and claim[ing] that the risk that patients would become addicted to opioids was low." Cuyahoga 3ACompl. ¶ 348; Cardelus Decl. Ex. 16 (Kessler Report) ¶¶ 447-454. Their position is apparently that Janssen bears responsibility for this alleged deception because Janssen contributed to the organizations that issued the guidelines. *See, e.g.*, Cardelus Decl. Ex. 16 (Kessler Report) ¶¶ 447-454. Similarly, Plaintiffs have suggested that Janssen's liability stems from the speech of prominent doctors (so-called "key opinion leaders") who had a consulting relationship with Janssen. *See, e.g.*, Summit 3ACompl. ¶¶ 346, 391-398. But the First Amendment fully protects these statements, and Janssen cannot be held liable for them.

---

[10] This is also true of branded marketing of Nucynta, which was not released until 2009 or marketed until then. *See, e.g.*, Cardelus Decl. Ex. 16 (Kessler Report) ¶¶ 270, 295-299 (citing marketing from 2009-2015); Cardelus Decl. Ex. 20 (Perri Report) ¶ 124 (citing marketing from 2011 or later). Kessler himself concedes the alleged Janssen misstatements come too late: "By the time of Nucynta's approval, ***there was a growing public health crisis of opioid abuse***, particularly of OxyContin/oxycodone, as documented and discussed by many news reports from wide-ranging geographic areas, by FDA in Advisory Committee meetings, by legal filings, and by medical journal articles." Cardelus Decl. Ex. 16 (Kessler Report) ¶ 309 (emphasis added).

[11] Janssen also contends that all other statements challenged by Plaintiffs are protected by the First Amendment. *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011).

The First Amendment strictly protects speech "relating to any matter of political, social, or other concern to the community," *Snyder v. Phelps*, 562 U.S. 443, 453 (2011), including speech with "serious … scientific value," *Miller v. California*, 413 U.S. 15, 34 (1973). With the exception of a few "historic and traditional categories … including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct," the government cannot target speech on such matters, *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) (citations omitted), and states cannot impose tort liability for it, *Snyder*, 562 U.S. at 460-61. The third-party speech at issue here concerns medical questions of undisputable public interest and therefore receives the highest protection under the First Amendment. *See Bd. of Trustees of Leland Stanford Jr. Univ. v. Sullivan*, 773 F. Supp. 472, 474 (D.D.C. 1991) ("It is . . . settled . . . that the First Amendment protects scientific expression and debate just as it protects political and artistic expression.").

This conclusion does not change in light of Janssen's financial contributions to professional groups or its engagement of prominent doctors as consultants. "[S]peech does not lose its First Amendment protection because money is spent to project it." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976). Janssen's contributions cannot change the conclusion that these individuals' and entities' expression about important public health questions represents core First Amendment speech that plaintiffs cannot challenge in tort. *See Snyder v. Phelps*, 562 U.S. 443, 460-61 (2011).

Because the third-party speech challenged by Plaintiffs concerns matters of clear public interest, it is protected by the First Amendment. Plaintiffs' allegations about this third-party speech cannot cure their failure to create a factual dispute about the effects of Janssen's own marketing.

8

B. **Plaintiffs' Diversion Theory Cannot Support Their Claims.**

The undisputed facts show that Janssen diligently monitored suspicious orders and that the DEA never called into question Janssen's compliance with the CSA. There is also no evidence that Janssen's opioids were diverted or that any harm occurred because of Janssen's alleged failure to monitor suspicious orders. No reasonable finder of fact could conclude that supposed deficiencies in Janssen's suspicious order monitoring system resulted in any diversion of Janssen's opioids, much less caused the opioid abuse crisis.

1. **There Is No Evidence That Janssen's Monitoring of Suspicious Orders Was Deficient.**

Under the Controlled Substances Act ("CSA"), Janssen was required to "maint[ain] . . . effective controls against diversion" and to "design and operate a system to disclose . . . suspicious orders of controlled substances." 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74. Janssen did precisely that.

Janssen's suspicious order monitoring program was reasonably designed and diligently administered. The program incorporated multiple controls to prevent the unlawful diversion of its products from its intended patient population, including an automated algorithm to monitor orders and flag those that were potentially suspicious, *see* Cardelus Decl. Ex. 20 (Dempsey Tr.) at 582:13-583:5, as well as protocols for investigating these flagged orders and reporting to the DEA as appropriate. *See* Cardelus Decl. Ex. 13, Dempsey Dep. Exs. 42-A, B, C.

And it worked. After repeated inspections over the years by the DEA, the federal regulator entrusted with administering the CSA's diversion-control provisions, Janssen's suspicious order monitoring system has had a perfect compliance record since being

implemented.[12] None of the DEA's many inspections revealed a single failure or deficiency in Janssen's suspicious order monitoring. *See supra* n.12; *see also* Cardelus Decl. Ex. 29 (Prevoznik Tr.) at 290:8-20 (testifying that DEA inspectors inform registrants about concerns over any suspicious order monitoring policies identified during inspections). No reasonable juror could conclude that Janssen's suspicious order monitoring program was deficient.[13]

### 2. There is No Competent Evidence that Janssen's Suspicious Order Monitoring Program Failed to Identify Any Suspicious Orders.

Plaintiffs' diversion claims against Janssen fail for the independent reason that Plaintiffs have failed to identify even a single Janssen order for Duragesic or Nucynta that should have been withheld as suspicious and reported to the DEA. Plaintiffs' expert James Rafalski makes no attempt to identify such orders. *See* Cardelus Decl. Ex. 10 (Rafalski Tr.) 631:13-634:2. Nor does their expert Lacey Keller. While Keller's report attempts to identify prescribers and certain transactions from chargeback data that satisfy various algorithms specified by Plaintiffs, Keller

---

[12] *See, e.g.*, Cardelus Decl. Ex. 20 (Dempsey Tr.) at 665:2-666:21, 678:5-23, 687:4-20, 697:4-15, 699:18-700:3; Cardelus Decl. Ex. 21 (email reflecting October 2008 inspection); Cardelus Decl. Ex. 22 (email reflecting July 2013 inspection); Cardelus Decl. Ex. 23 (email reflecting January 2015 inspection); Cardelus Decl. Ex. 24 (email reflecting August 2015 inspection); Cardelus Decl. Ex. 25 (email reflecting August 2015 inspection); Cardelus Decl. Ex. 26 (email reflecting December 2017 inspection; "nothing but positive feedback"); Cardelus Decl. Ex. 27 (email reflecting December follow-up inspection); Cardelus Decl. Ex. 26 (email reflecting September 2018 inspection).

[13] The expert testimony of James Rafalski is insufficient to create a dispute of material fact on this issue because it is inadmissible. As explained in Manufacturer Defendants' joint *Daubert* motion, Rafalski's opinion about the adequacy of Janssen's suspicious order monitoring system is not based on sufficient facts to be considered by the jury. Though Rafalski testified that certain factors must be examined to determine whether a suspicious order monitoring system complies with the CSA, he failed to apply these factors when evaluating Janssen's suspicious order monitoring system. Compare Cardelus Decl. Ex. 10 (Rafalski Tr.) at 729:19-730:3, 732:15-8 (testifying that whether SOMS program is compliant with CSA depends on the nature of the business, including the type of company, scope of the business model and customers, the medications at issue, the abuse rates of those medications, the geographic location where they are being sold, and the sales volume in those locations) with Cardelus Decl. Ex. 10 (Rafalski Tr.) at 733:9-735:13 (admitting lack of familiarity with Janssen's business, including no knowledge of how many customers Janssen sold to, how many orders per month Janssen received, Janssen's market share in the Track One jurisdictions, rates of diversion of Janssen's medications at issue, or even how many orders Janssen flagged and investigated).

does *not* purport to identify any order that should have been flagged and reported to the DEA pursuant to the CSA: she testified that she has no opinion about what any manufacturer should have reported to the DEA or what the DEA required to be reported. *See id.* Ex. 2 (Keller Tr.) at 49:3-8, 55:23-56:25. In other words, there is no evidence from which a jury could conclude that Janssen allowed any suspicious order to slip through the cracks of the CSA.

### 3. There Is No Evidence That a Single Order of Nucynta or Duragesic Was Actually Diverted.

Finally, to survive summary judgment, Plaintiffs must show that there is a legitimate question of fact over whether Janssen's alleged failure to report suspicious orders actually led to diversion that harmed Plaintiffs. They cannot. Just as there is no evidence that Janssen failed to identify and report suspicious orders, there is no evidence that any Janssen drugs were diverted.

Not one of Plaintiffs' experts could identify a single instance of Duragesic or Nucynta being diverted in the relevant jurisdictions. *See, e.g.*, *id.* Ex. 10 (Rafalski Tr.) at 735:19-736:1. Without evidence that any of Janssen's medications were diverted and that Plaintiffs were thereby harmed, Plaintiffs cannot premise their claims on the theory that Janssen's controls were faulty.

## III. CONCLUSION

For all the foregoing reasons, as well as those in Defendants' joint motions for summary judgment, the Court should grant summary judgment in favor of Janssen and Johnson & Johnson.

Dated: June 28, 2019                              Respectfully submitted,

/s/ Charles C. Lifland
Charles C. Lifland
O'MELVENY & MYERS LLP
400 S. Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
clifland@omm.com

*Attorney for Defendants Janssen Pharmaceuticals, Inc., Johnson & Johnson, Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc., and Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

    I, Charles C. Lifland, hereby certify that the foregoing document was served on June 28, 2019 via electronic transfer to all counsel of record, consistent with the Court's order.

| | |
|---|---|
| Dated: June 28, 2019 | /s/ Charles C. Lifland<br>Charles C. Lifland<br>O'MELVENY & MYERS LLP<br>400 S. Hope Street<br>Los Angeles, CA 90071<br>Telephone: (213) 430-6000<br>Facsimile: (213) 430-6407<br>clifland@omm.com<br><br>*Attorney for Defendants Janssen Pharmaceuticals, Inc., Johnson & Johnson, Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc., and Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.* |