# EXHIBIT 5

```
 1              IN THE DISTRICT COURT OF CLEVELAND COUNTY
                         STATE OF OKLAHOMA
 2     - - - - - - - - - - - - - - - - - - - - - - - -x
       STATE OF OKLAHOMA, ex rel.,
 3     MIKE HUNTER, ATTORNEY GENERAL
       OF OKLAHOMA,
 4
                         Plaintiff,
 5                                        No. CJ-2017-816
          vs.
 6
       (1) PURDUE PHARMA, L.P.,
 7     (2) PURDUE PHARMA, INC.,
       (3) THE PURDUE FREDERICK COMPANY;
 8     (4) TEVA PHARMACEUTICALS USA, INC.;
       (5) CEPHALON, INC.;
 9     (6) JOHNSON & JOHNSON;
       (7) JANSSEN PHARMACEUTICALS , INC.;
10     (8) ORTHO-McNEIL-JANSSEN
       PHARMACEUTICALS, INC. n/k/a
11     JANSSEN PHARMACEUTICALS, INC.;
       (9) JANSSEN PHARMACEUTICA, INC.,
12     n/k/a JANSSEN PHARMACEUTICALS, INC.;
       (10) ALLERGAN, PLC, f/k/a ACTAVIS, PLC,
13     f/k/a ACTAVIS, INC., f/k/a WATSON
       PHARMACEUTICALS, INC.;
14     (11) WATSON LABORATORIES, INC.;
       (12) ACTAVIS LLC; and
15     (13) ACTAVIS PHARMA, INC.;
       f/k/a WATSON PHARMA, INC.;
16
                         Defendants.
17     - - - - - - - - - - - - - - - - - - - - - - - -x

18

19           Videotaped deposition of GARY VORSANGER, M.D.,

20     Ph.D., taken pursuant to Notice, was held at the Law

21     Offices of DRINKER BIDDLE & REATH, LLP, 105 College Road

22     East, Princeton, New Jersey, commencing January 17,

23     2019, 9:08 a.m., on the above date, before Amanda

24     McCredo, a Court Reporter and Notary Public in the State

25     of New Jersey.
```

```
 1   A P P E A R A N C E S:

 2   NIX, PATTERSON & ROACH, LLP
               3600 North Capital of Texas Highway
 3             Suite 350B
               Austin, Texas 78746
 4   BY: TREY DUCK, ESQ.
     tduck@nixlaw.com
 5   (512)328-5333
     Attorneys for Plaintiff
 6

 7   LYNN PINKER COX & HURST, LLP
               2100 Ross Avenue, Suite 2700
 8             Dallas, Texas 75201
     BY: JERVONNE NEWSOME, ESQ.
 9   jnewsome@lynnllp.com,
     (214)292-3607
10   Attorneys for Purdue Defendants

11
     MORGAN, LEWIS & BOCKIUS, LLP
12             1701 Market Street
               Philadelphia, Pennsylvania 19103
13   BY: MARK A. FIORE, ESQ.
     mark.fiore@morganlewis.com
14   (215)963-5000
     Attorneys for Teva, Watson, Cephalon, and Actavis
15   defendants

16
     O'MELVENY & MYERS, LLP
17             400 South Hope Street
               18th Floor
18             Los Angeles, California 90071-2899
     BY: CHARLES LIFLAND, ESQ.
19       VINCENT S. WEISBAND, ESQ.
     clifland@omm.com
20   vweisband@omm.com
     (213)430-6000
21   Attorneys for Johnson & Johnson and Janssen defendants
     and the Witness
22

23   ALSO PRESENT:

24   James Soto - videographer

25   Maria Gomez - Nix, Patterson & Roach, LLP
```

```
 1        THE VIDEOGRAPHER:  Good morning.  We're on
 2   the record.  The time is 9:08 a.m.  Today is
 3   the 17th day of January, 2019.
 4        We're here at 105 College Road East,
 5   Princeton, New Jersey, for the purpose of
 6   taking the videotape deposition of Dr. Gary
 7   Vorsanger in the matter of the State of
 8   Oklahoma versus Purdue Pharma, LP, et al.
 9        The videographer is James Soto, the court
10   reporter is Amanda McCredo, both with U.S.
11   Legal Support.
12        Counsel please identify yourselves for the
13   record.
14        MR. DUCK:  Trey Duck, from Nix, Patterson,
15   and Maria Gomez, from Nix, Patterson, on behalf
16   of the State of Oklahoma.
17        MR. LIFLAND:  Charles Lifland, O'Melveny &
18   Myers, for Johnson & Johnson and Janssen
19   Pharmaceuticals.
20        MR. WEISBAND:  Vincent Weisband, O'Melveny
21   & Myers, for Johnson & Johnson and Janssen
22   Pharmaceuticals.
23        MR. FIORE:  Mark Fiore, Morgan, Lewis &
24   Bockius, on behalf of the Teva defendants.
25        MS. NEWSOME:  Jervonne Newsome, with Lynn
```

1       Pinker Cox & Hurst, on behalf of the Purdue
2       defendants.
3              THE VIDEOGRAPHER:  Thank you.
4              Please administer the oath.
5   GARY VORSANGER, the witness herein, after having been
6              first duly sworn by a Notary Public of the
7              State of New Jersey, was examined and
8              testified as follows:
9                         * * *
10             MR. LIFLAND:  So, we -- before we went on
11      the record, we discussed a stipulation
12      regarding objections.  And the stipulation is
13      that, my objections will also apply for the
14      other parties here, Purdue and Teva, but not
15      vice versa.  If they object and I want to
16      object, I will make that objection on the
17      record separately.
18             MR. DUCK:  Great.  Thank you.
19  EXAMINATION BY
20  MR. DUCK:
21      Q    Good morning, Dr. Vorsanger.
22      A    Good morning.
23      Q    How are you doing?
24      A    I'm doing okay, thanks.
25      Q    Can you please introduce yourself to the

1   to fill out a med watch form, as well; so, we could
2   capture it formally.
3       Q   Did Janssen receive any input directly from
4   patients about euphoria or feeling good?
5       A   So, my experience, what I had heard, was
6   indirectly, but it relates to patients.  I don't
7   know if you'd want to hear that or not, Counselor.
8       Q   Sure.
9       A   All right.  So, early on, when tapentadol
10  was first introduced into the U.S. marketplace, we
11  became aware that there were some reports of
12  patients noting that -- it's actually almost the
13  reverse of what you're asking me.  So, patients were
14  taking the medication, and they were describing as
15  not getting the buzz, not getting the euphoria.  And
16  so, they had interpreted that as indicating that
17  the, that the drug was not working.
18          I had reached out to the individuals in the
19  field and said, "Do you know whether the healthcare
20  providers had actually done an assessment of pain
21  control or reduction in pain?"
22          And they went back, and, as it turned out,
23  they did.
24          So, for example, if a patient had a pain
25  level of level eight, and they did an -- they did

1   a -- asked the patient what the level of pain was

2   after they started the medication, and had it

3   dropped from eight to six, then, assuming no other

4   side effects, that that would be a successful

5   treatment for that patient.

6          So, we came to understand, at least early

7   on in the U.S. marketplace, that, in fact,

8   tapentadol wasn't giving the type of euphoria that

9   patients may have been -- experienced with drugs

10  like hydrocodone or oxycodone.

11         So, we were -- in answer to your question,

12  we are aware of euphoria, we did get that feedback.

13  But in this case, it was not euphoria, it was

14  absence of euphoria that we've heard about.

15         But it gets anecdotal.  So, I want to make

16  sure that's clear.

17     Q   You also received -- Janssen also received

18  reports about patients experiencing euphoria with

19  its drugs?

20     A   Yes.

21     Q   And patients saying they felt good on the

22  drug; it made them feel good, right?

23     A   Presumably "feel good" would have been a

24  term -- one of the terms that people might use.

25         "Feel good" and other descriptions would

```
 1  so, they talk about the level of evidence that they
 2  have -- "and long-term studies are needed to
 3  identify the patients who are most likely to benefit
 4  from treatment."
 5      Q    Let's switch gears and talk about Nucynta.
 6           What were your responsibilities for
 7  Nucynta?
 8      A    So, I was a senior medical director when
 9  Nucynta was approved, working at the U.S. medical
10  affairs group at Janssen.  And my responsibilities
11  were similar to what I've already described.  I was
12  responsible for the design of clinical studies, if
13  we had decided that we wanted to have studies; to
14  review data that had come in from the studies that
15  were done by our research and development group.
16           I published a number of post hoc analysis
17  from the data that were done by R&D group.  I
18  continued to work with our outcomes research group.
19  I continued to work with our pharmacovigilance
20  group.  I continued to do some work -- do work on
21  the promotional review committee, as I had
22  mentioned.  And then continued to run the active
23  surveillance program, amongst other activities, as
24  well.
25      Q    What is Nucynta?
```

1    A    Nucynta is an opioid analgesic.

2    Q    And is it different from other opioid
3    analgesics?

4    A    Yes.  An analgesic is a pain medication.

5         Nucynta is different from other pain
6    medications.  It's a semisynthetic opioid pain
7    medication.  Although its exact mechanism of action
8    is unknown, the preclinical studies suggest that it
9    has two mechanisms of action:  One is a typical
10   opioid-type effect, and the second one is a
11   norepinephrine reuptake inhibitory effect.  And it's
12   believed that both of those mechanisms provide pain
13   control.

14   Q    And what's the significance of having two
15   mechanisms of action?

16   A    Well, the opioid effect from Nucynta is
17   weaker from -- than some of the other strong
18   opioids, such as oxycodone or morphine.

19        But by having the two mechanisms -- and in
20   clinical studies, we were able to show that the
21   product delivered very effective -- was both -- the
22   efficacy was similar to oxycodone, although the
23   studies weren't powered specifically to look at
24   that, but we certainly saw that in our studies, and
25   had -- was quite effective.

1    Q    What about with regard to adverse event
2  profile?
3    A    So, because the effect that the opioid
4  receptor is -- was postulated or hypothesized, and
5  certainly thought to be -- from other studies, to be
6  weaker than a strong opioid, we thought that it
7  might be likely that there may be less abuse
8  associated with tapentadol compared to some of the
9  stronger opioids, such as oxycodone or morphine.
10   Q    How about other adverse events?
11   A    So, in addition to that, we saw -- because,
12 again, less of an effect on the opioid receptor
13 relative to the other ones, we saw some potential GI
14 benefits, as well, which, which -- the reason was
15 that we talked about.
16   Q    And what's the approved indication for
17 Nucynta immediate-release version?
18   A    So, Nucynta immediate-release is approved
19 for the treatment of acute pain.  What we're -- and
20 I'm paraphrasing it now -- for moderate to severe
21 acute pain in patients requiring opioid analgesics,
22 where medications of -- that were -- and I'm just
23 describing what's in the package insert -- where
24 lesser medications would be inadequate to provide
25 pain control to those patients.

```
 1  self-reported data in near real time on respondents
 2  from a network of facilities across the United
 3  States.  These facilities utilize the assessment for
 4  treatment planning and triage in relation to
 5  substance abuse problems."
 6      Q    And how about in the prior section there,
 7  on the top of 81, the last sentence, again, of the
 8  carryover product [sic]?
 9      A    In this report?
10      Q    No.  Before that.
11      A    Oh.
12      Q    The last sentence there.
13      A    The last sentence, sure.
14           "The various data sources are intended to
15  complement each other; an indication of increased
16  abuse of a particular product found in one data
17  source can be examined and evaluated with other
18  sources within NAVIPPRO.  Continuous examination of
19  these data streams allows monitoring of trends over
20  time for drug abuse at a product-specific level."
21      Q    And what did the surveillance show, again,
22  over the years that the company looked at it, for
23  the Nucynta products?
24      A    For the Nucynta products, the data from the
25  NAVIPPRO system was very similar in conclusion to
```

```
 1  what I had also reported for the work that came out
 2  of RADARS.
 3           And both systems, together, identified, in
 4  general, low mentions of abuse of Nucynta.
 5      Q    Now, counsel showed you a -- an exhibit --
 6  I think it was marked as Exhibit 10.  Do you still
 7  have that?
 8      A    Let's see.  What number, I'm sorry?
 9      Q    Ten.
10      A    Okay.
11                    (Exhibit 10 was shown to the
12                    witness.)
13      Q    Could you explain what that data is?
14      A    So, these are data that were generated for
15  SCEPTRE.  These look like raw data to me.  These are
16  data that describe reports of Nucynta with the
17  reaction of drug abuse.  These may be -- this is
18  information that would come into the company.  Some
19  of it may have come in from RADARS; it may have come
20  in from other sources, as well.  And these data
21  would be analyzed, duplications would be removed.
22  And then, for the information, where we had
23  information, we would generate reports.  And those
24  reports would be put as part of a safety -- put
25  information as part of a submission for a safety
```

C E R T I F I C A T E

I, AMANDA McCREDO, a Shorthand Reporter and Notary Public of the State of New Jersey, do hereby certify:

That the witness whose examination is hereinbefore set forth, was duly sworn, and that such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

*Amanda McCredo*

AMANDA McCREDO