**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090<br><br>and<br><br>*The County of Cuyahoga v. Purdue Pharma L.P., et al.*<br>Case No. 1:18-op-45004 | MDL No. 2804<br><br>Hon. Dan A. Polster |

**MEMORANDUM IN SUPPORT OF
DISTRIBUTOR DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON PROXIMATE CAUSATION GROUNDS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 5

I.     THERE IS NO EVIDENCE THAT DISTRIBUTORS CAUSED ANY HARM
ARISING OUT OF GOOD-FAITH PRESCRIBING BY DOCTORS. ........................... 6

    A.     Plaintiffs Have No Fact or Expert Evidence That Distributors' Alleged
Failure To Conduct Due Diligence Caused Their Injuries. ................................. 7

    B.     Plaintiffs' Injuries Are Impermissibly Remote From Distributors' Alleged
Wrongdoing And Depend on Third-Party Criminal Conduct.............................. 14

II.     THERE IS NO EVIDENCE THAT DISTRIBUTORS CAUSED ANY HARM
ARISING OUT OF "ROGUE" DISPENSING AND PRESCRIBING........................... 19

III.     THERE IS NO EVIDENCE THAT DISTRIBUTORS CAUSED ANY HARM
ARISING OUT OF ILLICIT NON-PRESCRIPTION OPIOIDS. .................................. 21

CONCLUSION..................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................................5

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006)..............................................................................17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)................................................................................5

*Chaz Concrete Co., LLC v. Codell*,
    No. 3:03–52–KKC, 2010 WL 1227750 (E.D. Ky. Mar. 29, 2010) .......................18

*Cincinnati v. Beretta U.S.A. Corp.*,
    768 N.E.2d 1136 (Ohio 2002) ...............................................................14

*Cleveland v. Ameriquest Mort. Secs., Inc.*,
    615 F.3d 496 (6th Cir. 2010) ...............................................................14, 18, 19

*Cleveland v. JP Morgan Chase Bank, N.A.*,
    2013-Ohio-1035, 2013 WL 1183332 (Ohio Ct. App. 2013) ..................................14

*Click v. Georgopoulos*,
    No. 08 MA 240, 2009 WL 4263521 (Ohio Ct. App. Nov. 20, 2009)........................5

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).................................................................................13

*Copeland v. Univ. Radiologists of Cleveland, Inc.*,
    No. 62332, 1993 WL 127083 (Ohio Ct. App. Apr. 22, 1993).................................5

*Dragich v. Taubman Co., Inc.*,
    No. 96APE06-732, 1996 WL 737541 (Ohio Ct. App. Dec. 24, 1996)......................5

*Empire Title v. Fifth Third Mortg. Co.*,
    No. 1:10cv2208, 2013 WL 1337629 (N.D. Ohio Mar. 29, 2013) ..........................19

*Fidelity Interior Constr., Inc. v. Se. Carpenters Reg'l Council of the United Bhd.*
    *Of Carpenters and Joiners of Am.*,
    675 F.3d 1250 (11th Cir. 2012) .............................................................13

*Heinrich v. Waiting Angels Adoption Servs., Inc.*,
    668 F.3d 393 (6th Cir. 2012) ...............................................................18

*Hemi Group, LLC v. City of New York, N.Y.*,
   559 U.S. 1 (2010) ..................................................................................14, 15, 17, 19

*Holmes v. Sec. Inv'r Prot. Corp.*,
   503 U.S. 258 (1992) ..........................................................................................14, 18

*Perry v. Am. Tobacco Co.*,
   324 F.3d 845 (6th Cir. 2003) .................................................................................14

*Vaughn v. Konecranes, Inc.*,
   642 F. App'x 568 (6th Cir. 2016) ...........................................................................5

*Volter v. C. Schmidt Co.*,
   598 N.E.2d 35 (Ohio App. 1991) ..........................................................................19

**Statutes**

21 U.S.C. § 826 ............................................................................................................9

**Other Authorities**

21 C.F.R. § 1301.74 ....................................................................................................5

21 C.F.R. § 1306 ........................................................................................................15

28 C.F.R. § 0.100 .........................................................................................................9

Ohio Admin. Code § 4729:6-3-05(D) ..........................................................................5

## INTRODUCTION

Under settled law, it is not enough for Plaintiffs to prove that they were injured as a result of the opioid crisis, or that Distributors[1] had inadequate suspicious-order monitoring systems or failed to halt shipment of particular pharmacy orders.[2]  Plaintiffs also must prove proximate causation—that is, a ***direct*** connection between Distributors' alleged wrongdoing and their injury. While this Court declined to dismiss Plaintiffs' claims on proximate causation grounds at the pleadings stage, the question now before the Court is whether Plaintiffs can ***prove*** causation as to Distributors.  Eight months of discovery, the production of more than 150 million pages of documents, and more than 400 fact and expert depositions confirm that they cannot.

Plaintiffs claim as injuries, and seek as damages, costs they purportedly incurred in: (1) policing drug crimes committed by County residents and visitors; (2) caring for resident children removed from the care of opioid-addicted parents; (3) treating the addiction of County residents; and (4) performing autopsies on individuals who overdosed in the County.[3] Distributors' alleged wrongdoing consists of failing to create and implement adequate due-diligence systems to flag, report and halt shipments of suspicious pharmacy orders, and, as a result, shipping an "excessive" number of prescription opioid medicines.  An examination of the evidentiary record developed by Plaintiffs shows that no reasonable jury could conclude that Distributors were the proximate cause of Plaintiffs' injuries.  This is true regardless of whether the injuries flow from (1) legitimate opioid prescribing (which Plaintiffs' experts say accounts for the

---

[1] AmerisourceBergen Drug Corporation, Cardinal Health, Inc., H. D. Smith, LLC f/k/a H. D. Smith Wholesale Drug Co., H. D. Smith Holdings, LLC, H. D. Smith Holding Company, Henry Schein, Inc., Henry Schein Medical Systems, Inc., McKesson Corporation and Prescription Supply Inc.

[2] While Henry Schein, Inc. does not sell to pharmacies, the logic and arguments herein apply equally to Henry Schein, Inc.'s sales to practitioners.

[3] *See* Ex. 1 ¶ 20, ¶¶ 34–46.  All Appendix and Exhibit references are to the declaration of Christian J. Pistilli, submitted herewith.

lion's share of Plaintiffs' injuries), (2) illicit dispensing or prescribing by "rogue" pharmacists or doctors, or (3) the illicit trafficking of non-prescription opioids such as heroin and illicit fentanyl.

***Legitimate Prescribing.***  According to Plaintiffs' experts, the opioid crisis has its origin in allegedly false and misleading statements made by the defendant opioid manufacturers ("Manufacturers")—statements that were conveyed through multiple channels over an extended period of time, such that virtually every source of information relied on by doctors was tainted. Of particular significance for this motion, Plaintiffs' experts opine that Manufacturers' allegedly deceptive marketing scheme (in which Distributors played no role) changed the treating guidelines—and thus the standard of care—for prescribing opioids.  The new guidelines—issued by the Federation of State Medical Boards, among others, and expressly endorsed by the federal Drug Enforcement Administration ("DEA")—approved the long-term use of prescription opioids for the treatment of chronic pain.  As a result, according to Plaintiffs' experts, general practitioners, family doctors and internists began to write vastly more opioid prescriptions, in higher doses and for longer periods of time, than they did under the old guidelines—causing opioid prescriptions to skyrocket.  Although Plaintiffs' experts opine that, in retrospect, a large percentage of those prescriptions were medically unnecessary, they opine that, at the time, the prescriptions conformed to the prevailing standard of care.

Plaintiffs' account of the origins of the opioid crisis—specifically, the effect of the allegedly deceptive marketing campaign on the prevailing standard of care—has profound implications for what Plaintiffs must prove to establish proximate causation as to Distributors. Plaintiffs contend that Distributors served as a "last, clear chance" to block excessive pharmacy orders based on suspect prescriptions.  But Plaintiffs' experts opine that there was very little suspect prescribing when viewed through the contemporaneous lens of then-prevailing treatment

guidelines.  Indeed, Plaintiffs' experts state affirmatively that prescribing by "pill mills" contributed to the crisis only insignificantly.

There is no record evidence—including from any Plaintiff expert—that Distributors' alleged failure to conduct adequate due diligence regarding pharmacy orders resulted in any orders being shipped that would not have been shipped if there had been adequate due diligence.  There certainly is not any quantification of the orders that would not have shipped, or any linkage of such orders to specific Distributors.  Indeed, Plaintiffs' evidence points in the other direction—showing that no matter how much diligence Distributors conducted, it would have revealed that pharmacy orders were overwhelmingly based on prescriptions written by "well-intentioned and compassionate"[4] doctors who were prescribing opioids in accordance with the prevailing treatment guidelines.

In any event, even were there proof that adequate due diligence would have stopped some number of shipments, that still would not prove that Distributors' conduct was a ***direct*** cause of Plaintiffs' injuries.  The pills Distributors ship to pharmacies would sit on the shelf, causing harm to no one, but for the intervening acts of (1) doctors who write opioid prescriptions for their patients and (2) pharmacists who dispense opioid medicines to patients.  In addition, before prescription opioid pills can be diverted to an illegal secondary market and cause harm, at least ***two intervening criminal acts*** are required (as Plaintiffs' own law enforcement officials have testified).  First, the pills must be diverted to the illicit market, either by a patient who sells or gives away his medicines (a crime), or by a third party who steals them (a crime).  Second, the diverted pills must be used by a County resident or visitor for non-medical purposes in the absence of a valid prescription (also a crime).  Thus, the independent acts of at least four different individuals,

---

[4] Ex. 2 at 91:22–23.

at least two of which involve criminal wrongdoing, stand between Distributors' purported wrongdoing and Plaintiffs' injuries. *See* Appendix A (documenting approximately 1,200 separate examples of drug diversion by third parties in Summit and Cuyahoga Counties).

*Improper Dispensing and Prescribing.*  Plaintiffs allege that Distributors facilitated diversion and the creation of an illegal secondary market for opioids by selling to pharmacies they knew or should have known were improperly dispensing opioids or filling prescriptions written by "pill mill" doctors who were knowingly prescribing opioids in the absence of a legitimate medical need.  But there is no evidence supporting Plaintiffs' assertion that this alleged conduct caused any portion of Plaintiffs' purported injuries.  Plaintiffs make no effort, for example, to connect their injuries to particular shipments that they claim a Distributor should not have made because it knew (or should have known) that its pharmacy customer was dispensing in the absence of legitimate prescriptions.  Nor do Plaintiffs' experts fill this evidentiary gap.  Indeed, the experts do not even attempt to do so—they mention improper dispensing and prescribing only briefly, and only then to opine that it is ***not*** a significant source of the opioid use and abuse problem in the Plaintiff Counties.

*Illicit Drug Use.*  The majority of Plaintiffs' claimed harm results not from the use and abuse of prescription opioids, but from the use of illegal drugs such as heroin and illicit fentanyl.  Distributors play no role in the supply chain for these non-prescription narcotics.  And the connection between Distributors' allegedly wrongful shipments of prescription opioids and any harm to Plaintiffs resulting from the abuse of illegal drugs by County residents and visitors is particularly remote and attenuated.

4

## ARGUMENT

To avoid summary judgment, Plaintiffs "may not rest upon" the "allegations" of their Complaints.  Fed. R. Civ. P. 56(e).  Instead, they must come forward with "specific facts showing that there is a genuine issue for trial" on the question of proximate causation.  *Id.*[5]  Plaintiffs have no such evidence.[6]

Plaintiffs contend that Distributors failed to prevent "diversion"—*i.e.*, the "transfer of any legally prescribed controlled substance from the person for whom it was prescribed to another person for any illicit use," Ex. 3 at Glossary 2—by "flooding Ohio with more opioids than could be used for legitimate medical purposes" and failing to identify and report or halt "suspicious" opioid orders.[7]  As their experts explain, diversion occurs in two main ways.[8]  First, diversion occurs

---

[5] *See also Vaughn v. Konecranes, Inc.*, 642 F. App'x 568, 569–70 (6th Cir. 2016) (affirming grant of summary judgment because plaintiff "did not produce any evidence . . . of proximate cause"); *Click v. Georgopoulos*, No. 08 MA 240, 2009 WL 4263521, *5 (Ohio Ct. App. Nov. 20, 2009) ("Click's failure to produce evidence relating to proximate cause was fatal and supports the trial court's decision to grant summary judgment in [defendant's] favor."); *Copeland v. Univ. Radiologists of Cleveland, Inc.*, No. 62332, 1993 WL 127083, *6 (Ohio Ct. App. Apr. 22, 1993) (affirming summary judgment for defendants where "plaintiff failed to produce any evidence to establish the . . . necessary element of proximate cause"); *Dragich v. Taubman Co., Inc.*, No. 96APE06-732, 1996 WL 737541, *2 (Ohio Ct. App. Dec. 24, 1996) ("[I]n order to defeat summary judgment in a negligence action, the plaintiff must . . . present evidence that defendant's breach of duty was the proximate cause of the plaintiff's injury . . . . ").

[6] On summary judgment, the moving party need not prove the absence of a genuine issue of material fact, but may instead discharge its burden by pointing out the absence of evidence to support the nonmovant's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "The mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[7] *See, e.g.*, Cuyahoga TAC ¶¶ 486, 502; Summit TAC ¶¶ 502, 518.  Federal regulations define "suspicious" orders as "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74.  Prior to 2019, no federal or Ohio statute or regulation required wholesale distributors to "halt" or "refuse to ship" suspicious orders—a fact confirmed by Ohio legislation adding such a requirement for the first time effective April 30, 2019.  *See* Ohio Admin. Code § 4729:6-3-05(D).

[8] Diversion can also occur if wholesalers deliver to non-registrants.  But there is no evidence that Distributors ever diverted a single opioid or distributed to anyone other than DEA-registered and State-licensed retailers.  *See, e.g.*, Ex. 4 at 89:1–90:5; Ex. 5 at 47:1–12; Ex. 6 at 75:2–6 ("We sold only to licensed pharmacies who had a licensed physician's prescriptions.").

when pills dispensed pursuant to a doctor's legitimate prescription make their way into an illicit, secondary market.[9]  Second, diversion occurs when "pill mills" or "rogue" doctors prescribe contrary to the standard of care or "illicit" pharmacies dispense to "drug dealers and customers" in the absence of a legitimate prescription.[10]  Diversion does not occur if a patient becomes addicted while under the care of a doctor who legitimately prescribes opioids pursuant to the prevailing standard of care.[11]

*Part I* demonstrates that there is no record evidence that Distributors were the cause of any injuries to Plaintiffs arising out of legitimate prescribing—let alone a direct cause.  *Part II* shows that there likewise is a failure of proof that Distributors caused any injuries to Plaintiffs arising out of illegitimate dispensing or prescribing.  And *Part III* demonstrates that Distributors were not the direct cause of any injuries to Plaintiffs stemming from the use and abuse of illegal, non-prescription opioids such as heroin and fentanyl.

## I.    THERE IS NO EVIDENCE THAT DISTRIBUTORS CAUSED ANY HARM ARISING OUT OF GOOD-FAITH PRESCRIBING BY DOCTORS.

According to Plaintiffs' own experts:  (1) most doctors most of the time prescribed opioids pursuant to the prevailing standard of care, which approved the long-term use of opioids for the treatment of chronic pain; and (2) "pill mills" accounted for an insignificant part of the excessive

---

[9] *See, e.g.*, Ex. 7 at 6, 16–17 ("[P]rescription opioid diversion is common, especially unused prescriptions that were overprescribed to friends and family members of the non-medical users.").

[10] *See* Cuyahoga TAC ¶¶ 16, 507; Summit TAC ¶¶ 17, 523; *see also* Ex. 7 at 16–18 (diversion occurs when pills are taken "from medical facilities and pharmacies for sale to the black market" or when physicians intentionally prescribe opioids for "non-medical[]" use).

[11] *See, e.g.*, Ex. 5 at 43:25–44:22 (Director of Compliance and Enforcement for the Ohio State Board of Pharmacy testifying that "diversion is when a pharmaceutical prescription is in any way redirected from its legitimate medical use to an illicit use," and that diversion does not occur when a registered dispenser transfers prescription opioids to an outpatient who presents a legal prescription written by a licensed prescriber).

prescribing that created the opioid crisis.  Where such legitimate prescribing is concerned, Distributors are entitled to summary judgment for the two separate reasons explained below.

### A.    Plaintiffs Have No Fact or Expert Evidence That Distributors' Alleged Failure To Conduct Due Diligence Caused Their Injuries.

Distributors are entitled to summary judgment because Plaintiffs have ***no evidence*** that Distributors' alleged failure to identify "suspicious" orders and conduct adequate due diligence caused their injuries.  During the course of discovery, Plaintiffs suggested that they would prove causation through expert testimony and "aggregate proof."  But it is now clear that Plaintiffs' experts do not demonstrate causation ***as to Distributors***.[12]  Indeed, the proffered testimony of Plaintiffs' experts—that the opioid crisis resulted from an allegedly fraudulent marketing scheme designed to promote the long-term use of opioids for the treatment of chronic pain[13]—establishes that Distributors were ***not*** the cause of Plaintiffs' injuries.

According to Plaintiffs' experts, "[t]he consensus among medical professionals for most of the 20th century was that opioids should not be used for the management of chronic pain" due to risk of addiction and lack of evidence regarding effectiveness.  Ex. 8 ¶ 32; *accord* Ex. 9 ¶ 67. During this time period, "doctors used opioid pain relievers sparingly," and "only for the short term in cases of severe injury or illness, during surgery, or at the very end of life."  Ex. 10 at 10.

---

[12] Plaintiffs' experts attempt to demonstrate, using statistical analysis, the portion of the total number of opioid prescriptions that were not "medically necessary" but were instead a result of Manufacturers' purported marketing fraud.  Their attempt to prove a causal relationship between Manufacturer marketing and their harm fails for the reasons explained in Manufacturers' separate submission regarding causation. But even if Plaintiffs' "aggregate proof" were sufficient to establish causation as to Manufacturers, they offer no comparable aggregate proof *as to Distributors*.

[13] *See, e.g.*, Ex. 8 ¶ 8 (opining that Manufacturer marketing of opioids was "the driving force of this national catastrophe"); Ex. 10 at 75, 97 (opining that misconceptions caused by misleading marketing were the "single most significant factor giving rise to the massive increase in the sale of opioids and the resulting epidemic of dependence and addiction").

Beginning in the mid-1990s, according to Plaintiffs, Manufacturers sought to expand the market for prescription opioids.  To that end, Plaintiffs assert:

- Manufacturers developed a multi-pronged marketing scheme to promote the long-term use of opioids for the treatment of chronic pain.  Manufacturers allegedly disseminated their misrepresentations about the risks and benefits of such use "by directly targeting doctors, by promoting key opinion leaders, by infiltrating continuing medical education courses, by supporting professional medical societies, and by co-opting medical watchdog organizations like The Joint Commission."[14]

- Through these methods, the marketing scheme achieved the adoption and promulgation of treatment guidelines that recommended the use of opioids for chronic pain.  Most significantly, it influenced the Federation of State Medical Boards ("FSMB"), of which the Ohio Board of Medicine is a member.  The FSMB issued model treatment guidelines in 1998 "urg[ing] state medical boards to punish doctors for under-treating pain," and in 2007, published a book, *Responsible Opioid Prescribing:  A Physician's Guide*, that "promot[ed] the use of opioid painkillers."[15]

- DEA in 2001 endorsed the FSMB's guidelines—which taught "that opioids were 'essential' for treatment of chronic pain," *see* Summit TAC ¶ 374—as "consistent with . . . DEA's pain management position," Ex. 11.  DEA subsequently issued further guidance

---

[14] Ex. 10 at 4; *see also* Ex. 8 ¶ 59 ("Purdue and other Defendants utilized a number of approaches to encourage physicians to prescribe opioids broadly for the treatment of chronic pain.  They engaged in direct-to-consumer marketing.  They marketed directly to physicians through sales representatives.  They funded research, pain-related medical societies, and continuing medical education, lobbied medical boards and agencies responsible for pain-related treatment guidelines, and lobbied state and local government to remove barriers to broader use of opioids for the treatment of pain.").

[15] Ex. 10 at 78–79.

proclaiming that "nearly every prescription" for opioids issued by a U.S. physician was "legitimate."  Ex. 12 at 52,721.[16]

- The alleged scheme allegedly also influenced the American Academy of Pain Medicine's 1997 "consensus" statement that endorsed opioids to treat chronic pain, as well as its 2009 Guidelines that recommended the use of opioids to treat chronic pain.[17]  The scheme similarly influenced the American Pain Foundation, and other professional societies.[18]

With this imprimatur, according to Plaintiffs' experts, the "cautious and conservative approach to the use of opioids for the treatment of pain was replaced with much more liberal prescribing practices."[19]  In other words, the standard of care for the prescribing of opioids was changed, and as a result, "[o]pioid prescribing . . . became prolific in the 1990's and the early part of the 21st century."[20]  Multiple Plaintiff experts endorse this causal narrative:

- Dr. Katherine Keyes, Associate Professor of Epidemiology at Columbia University, opines that "the rapid increase in total opioid prescribing levels after the introduction of

---

[16] DEA's actions during this time-period were consistent with its public statements.  DEA is tasked with setting an aggregate production quota for controlled substances.  *See* 21 U.S.C. § 826; 28 C.F.R. § 0.100. That quota represents the amount that DEA determines is needed for "legitimate, medical, scientific, [and] research needs" during a given year.  *See, e.g.*, Ex. 13 at 35:1–5.  Based on its expert judgment that there was an increasing legitimate medical need for opioids throughout the United States, between 1993 and 2015, DEA authorized a 39-fold increase of the manufacturing quotas for prescription opioids.  *See* Ex. 14; *see also* Ex. 15; Ex. 16; Ex. 17; Ex. 18 at 31:8–10 (former head of the DEA's Office of Diversion Control testifying that quota levels for opioids "constantly increased" under his watch).  Distributors play no role in setting, advocating for or increasing DEA production quotas.  *See, e.g.*, Ex. 13 at 111:12–18, 112:9–12, 112:20–113:7.

[17] *See* Cuyahoga TAC ¶¶ 348, 354; Summit TAC ¶¶ 360, 366; *see also* Ex. 8 ¶ 49.

[18] *See, e.g.*, Ex. 10 at 18; Cuyahoga TAC ¶¶ 335–78; Summit TAC ¶¶ 347–90.

[19] Ex. 8 ¶ 60.

[20] Ex. 10 at 9.

OxyContin . . . was driven by marketing and sales of opioids to physicians due to downplaying risks of harms associated with prescribing."[21]

- Dr. David Kessler, the former head of the Food and Drug Administration, opines that Manufacturers' "aggressive marketing of a new generation of opioids . . . understate[d] . . . their risks and overstate[d] . . . their benefits," and that "opioid manufacturers contributed to altering the standard of care for the treatment of pain by encouraging healthcare providers to view pain as a 'fifth vital sign' that demanded aggressive treatment with opioids."[22]

- Dr. Mark Schumacher, Professor and Chief of the Division of Pain Medicine at the University of California, San Francisco, opines that "the medical standard of care for treating both chronic and acute pain was changed as a result of widespread promotion and marketing of opioids . . . that trivialized the risk of addiction and exaggerated the benefits of long-term opioid use"[23]—marketing he attributes solely to Manufacturers.

- And Dr. Anna Lembke, Associate Professor and Medical Director of Addiction Medicine at Stanford University School of Medicine, opines that "the increase in opioid prescribing in this country has been primarily driven by all types of doctors across all types of specialties because of the major paradigm shift in the use of opioids for minor and chronic pain conditions as a result of misrepresentation of the evidence on the part of the defendants."[24]

---

[21] Ex. 7 at 11.

[22] Ex. 9 ¶ 74, Conclusions ¶ 47.

[23] Ex. 8 ¶ 8.

[24] Ex. 2 at 219:17–220:1.

Plaintiffs' experts, with the benefit of hindsight, now characterize much of this increased prescribing as "unwarranted" and "medically unnecessary."[25]  And they claim that as a result of this change in doctors' prescribing habits, an excessive number of pills got into patients' hands, and a portion of those pills were then diverted to an illegal, secondary market.[26]

**_Distributors are notably absent from this narrative._**  There is **no evidence** that Distributors made any misrepresentations regarding the risks, benefits, or addictive properties of opioid medications, or conspired with Manufacturers to promote opioid medications fraudulently.[27]  Perhaps for this very reason, Plaintiffs' marketing experts offer "no opinions on distributors."[28]

Instead, Plaintiffs suggest that Distributors caused their alleged injuries merely by failing to prevent some portion of the "medically unnecessary" prescriptions from reaching pharmacies and patients.  And their experts purport to identify the number of orders that Distributors should have initially flagged as "suspicious"—orders for which Distributors then should have done

---

[25] _See, e.g._, Ex. 8 ¶ 54 (opining that marketing led to "an unwarranted increase in prescription opioids"); Ex. 19 ¶¶ 155–158 (opining that between 58.6% and 77.3% of opioid prescriptions written from 1998 to 2017 were not "medically necessary").

[26] _See, e.g._, Ex. 7 at 3 (opining that "the widespread availability of prescription opioids . . . originally dispensed for medical uses, often in greater quantities and doses than needed, le[ft] a surplus of opioids that could be diverted for non-medical uses").

[27] _See_ Distributors' Conspiracy Brief at 10–14.

[28] _See_ Ex. 20 at 94:19–21 ("I have no opinions on distributors").  Similarly, Dr. Mark Schumacher opines that "[t]he medical standard of care for treating both chronic and acute pain was changed because of widespread promotion and marketing of opioids," Ex. 8 ¶ 27, but attributes this change only to Manufacturers, _see_ Ex. 21 at 186:5–24.  Dr. Anna Lembke offers the opinion that "[o]pioid overprescribing … has been driven by a wholesale shift in medical practice," Ex. 10 at 12, but limits her opinions to Manufacturers, Ex. 2 at 274:12–20, 275:7–13.  Dr. Meredith Rosenthal opines that the "unlawful" marketing by Manufacturers caused opioid prescribing to increase, Ex. 22 ¶ 11, but her analysis does not focus on Distributors, Ex. 23 at 750:2–6.  Even Dr. Matthew Perri, who purports to offer an opinion about Distributor "marketing," clarified at his deposition that Distributors did not engage in marketing intended to drive demand of opioids, but rather focused on informing _pharmacies_ about the "price, quality, [and] availability" of drugs in their formularies.  Ex. 24 at 217:13–218:6.  Dr. Perri further confirmed that he has _no opinions specific to any particular Distributor_.  _See_ Ex. 24 at 204:18–205:14.

additional "due diligence" before shipping any pills.[29]   But Plaintiffs cannot prove that Distributors' alleged failure to conduct adequate due diligence resulted in too many shipments without evidence that establishes which pharmacy orders would have been viewed, at the time, as illegitimate.   And ***Plaintiffs have no expert who (1) opines that, had Distributors conducted additional due diligence, it would or should have resulted in materially fewer pills reaching Ohio pharmacies, or (2) identifies which orders (or even what portion of orders in the aggregate) were inappropriate*** <u>***under then-prevailing treatment guidelines***</u>.[30]

One plaintiff expert—James E. Rafalski—purports to opine on the total number of orders that Distributors should have flagged as "suspicious," and thus as requiring additional due diligence.[31]   But neither Mr. Rafalski nor any other expert opines that a material portion of those orders would have been identified as improper had additional due diligence been conducted. Indeed, Mr. Rafalski readily concedes that he cannot "identify the number of opioid pills that entered Cuyahoga and Summit Counties unlawfully."   Ex. 27 at 46; *see also* Ex. 28 at 208:5–17.

The entire thrust of Plaintiffs' expert case, moreover, is that additional diligence would ***not*** have made a difference.   While Plaintiffs now contend that a substantial portion of the pills shipped

---

[29] Dr. Craig J. McCann purports to identify certain transactions that Distributors should have or could have "flagged" for further due diligence.   *See* Ex. 19 ¶¶ 130–52, 160.   But he does so using five different methodologies that were provided to him by counsel, and does not himself opine on the correctness of those methodologies.   *See* Ex. 25 at 132:15–134:17, 136:1–21.   Dr. David Cutler then attempts to estimate the "portion of the harm" resulting from "marketing misconduct" that "could have been avoided" had Distributors acted to "prevent" shipments "unrelated to medical need" using figures supposedly provided by Dr. McCann.   Ex. 1 Appendix III.J; *see also* Ex. 26 at 80:5–21, 84:20–22, 594:11–595:3.   But the figures used by Dr. Cutler do not appear anywhere in Dr. McCann's report, and Dr. McCann testified at his deposition that he was not the source of those figures.   *See* Ex. 25 at 522:7–11.

[30] Plaintiffs likewise have no expert who opines (and no other evidence to suggest) that Distributors' alleged failure to report "suspicious" orders to DEA caused their injury.   For the reasons explained in Part II of McKesson, Cardinal and AmerisourceBergen's Motion For Summary Judgment On Plaintiffs' RICO And OCPA Claims, Distributors' alleged regulatory reporting failures did not proximately cause Plaintiffs' injury.

[31] Ex. 27 at 40–41, 46 (adopting one of the five methodologies set out in the McCann report).

by Distributors were used to fill "medically unnecessary" prescriptions, their experts acknowledge that those prescriptions were written by doctors, in good faith, pursuant to the then-prevailing standard of care.  In other words, Plaintiffs' own experts demonstrate that the vast majority of pharmacy orders were not "suspicious" when viewed through a contemporaneous lens.  *See supra* 2–3.  That is why DEA authorized a 39-fold increase in the opioid production quota based on its determination that there was an increasing legitimate medical need over a 22-year period.  *See supra* n.16.

In sum, where legitimate prescribing is concerned, no matter how much diligence Distributors might have done, at the end of the day, the pills would have been shipped because Distributors' contemporaneous investigation would have shown that the orders were being used to fill lawful prescriptions.  It is not Distributors' job to police prescribing or prevent patients from obtaining medicines prescribed in good faith by their doctors, even if some of those prescriptions turned out to have been written because of an alleged fraudulent marketing campaign in which Distributors played no part.  To be clear, "lawful conduct"—such as the distribution of controlled substances to licensed pharmacies in order to fill ***legitimate*** prescriptions written by doctors in accordance with the standard of care—"cannot provide the basis for a damages award."  *Fidelity Interior Constr., Inc. v. Se. Carpenters  Reg'l Council of the United Bhd. Of Carpenters and Joiners of Am.*, 675 F.3d 1250, 1264 (11th Cir. 2012); *see Comcast Corp. v. Behrend*, 569 U.S. 27, 35, 38 (2013) (similar).

Finally, even assuming that Distributors could and should have prevented shipments of some "medically unnecessary" opioids, that would not establish ***proximate*** causation.  If a prescription is written for a medicine in good faith by a doctor as a result of an allegedly fraudulent marketing campaign, and the medicine is diverted to illicit use by a third party sometime after

13

being appropriately dispensed by a pharmacy, and Plaintiffs incur expenses as a result of that illicit use, the fact that Distributors filled the pharmacy's wholesale order for the medicine does not make them a direct cause of Plaintiffs' injuries. *See infra* Part I.B.

### B. Plaintiffs' Injuries Are Impermissibly Remote From Distributors' Alleged Wrongdoing And Depend on Third-Party Criminal Conduct.

Plaintiffs have **no evidence** that Distributors' alleged conduct—*i.e.*, shipping opioid medicines to State-licensed and DEA-registered pharmacies—proximately caused their alleged harm. They cannot point to any evidence drawing a line from an allegedly improper shipment to any expenses incurred by Plaintiffs as a result of the opioids crisis—let alone the **direct** line necessary to establish proximate causation. This wholesale evidentiary failing is dispositive on summary judgment. *See supra* n.5, n.6.

To survive summary judgment on proximate causation, Plaintiffs must establish a "**direct relation** between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).[32] In assessing whether there is a "direct relation" between claimed injury and conduct, "[t]he general tendency of the law . . . is not to go beyond the first step." *Id.* at 271–72. "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (plurality opinion) (quoting *Holmes*, 503 U.S. at 271, 274); *see also Cleveland v. JP Morgan Chase Bank, N.A.*, 2013-Ohio-1035, ¶ 11, 2013 WL 1183332, at *4 (Ohio Ct. App. 2013) ("because the consequences of

---

[32] This requirement applies, under controlling precedent from the Sixth Circuit and the Ohio Supreme Court, to each of Plaintiffs' claims. *See, e.g.*, *Cleveland v. Ameriquest Mort. Secs., Inc.*, 615 F.3d 496, 503 (6th Cir. 2010) (noting that "the Ohio Supreme Court has adopted the *Holmes* Court's proximate cause analysis"); *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1148 (Ohio 2002) (applying the *Holmes* proximate cause test to Ohio state-law tort claims); *see also Perry v. Am. Tobacco Co.*, 324 F.3d 845, 850 (6th Cir. 2003) (noting that "the RICO statute incorporates general common law principles of proximate causation," and applying the *Holmes* proximate cause analysis to Ohio state-law tort claims); *JP Morgan Chase*, 2013 WL 1183332 at *5 ("The same proximate cause requirements … apply to both [RICO and OCPA] causes of action.").

an act go endlessly forward in time and its causes stretch back to the dawn of human history," courts have recognized that proof of proximate causation is "essential").  Thus, it is well-settled that summary judgment is required where, as here, the evidence shows that (1) "[m]ultiple steps . . . separate the alleged [conduct] from the asserted injury," and (2) the plaintiff's "[t]heory of liability rests on the independent actions of third and even fourth parties."  *Hemi*, 559 U.S. at 15.

Within the legitimate supply chain for prescription opioids, the record demonstrates that at least two independent actions are required before the opioids delivered by Distributors could ever reach County residents:

- <u>Prescribing</u>:  Distributors cannot and do not diagnose, treat or prescribe for patients.  *See* Ex. 29 at 68:23–69:2 (agreeing that a Distributor would not know anything about a specific doctor-patient relationship); Ex. 30 at 396:9–13 (agreeing that a Distributor would not have the medical records of patients who are being prescribed medications).  That is the job of a licensed, registered physician who is empowered to exercise medical judgment.  *See* 21 C.F.R. § 1306.04(a).  Distributors have no ability to review or second-guess the validity of any prescription written by a physician.[33]

- <u>Dispensing</u>:  Distributors cannot and do not dispense opioid products to patients.  *See, e.g.*, Ex. 32 at 267:11–15.  That is the job of a licensed, registered pharmacist, who must operate in compliance with their own regulatory duties not to fill illegitimate prescriptions.  *See* 21 C.F.R. §§ 1306.04(a), 1306.11; *see also* Ex. 18 at 196:1–16.

---

[33] Ex. 5 at 267:5–18 (agreeing that "it is only those . . . two entities, the prescriber who is treating the patient and the pharmacist who is asked to fill the prescription, who can make and are legally obligated to make a determination that the prescription is for a legitimate medical purpose"); Ex. 31 at 158:2–11 (a doctor-patient relationship is required to "determine risks" of a prescribing decision); *see also* Ex. 12 at 52,723 ("[E]ach patient's situation is unique" and prescribing should be "based on the physician's sound medical judgment").  Distributors do not know the identity of patients receiving drugs from pharmacists.  *See* Ex. 33 at 247:24–248:2 ("[W]e could not go into a pharmacy and look at prescriptions, that's a HIPAA violation.");  Ex. 35 at 268:13–15; Ex. 34 at 360:5–15; Ex. 30 at 393:22–394:3 ("Q. How do you define legitimate medical prescription for a legitimate medical purpose?  A. Again, this is why we need a medical expert when we do these cases").

Moreover, for the diversion of opioids to cause Plaintiffs any harm, several additional steps—including at least **two illegal acts**—must occur.[34]

First, the pills must be diverted to the illicit market—typically, according to Plaintiffs' experts, by the patient to whom the medicines were legitimately prescribed.[35]  That act of diversion is inherently unlawful.[36]  Indeed, the record is replete with evidence that third parties in Summit County and Cuyahoga County engaged in illegal behavior to divert opioids.  *See, e.g.*, Ex. 30 at 396:9–13 (DEA diversion investigator testifying that he had worked on "close to 50" diversion investigations since 2012); *see also* Appendix A (compilation of record evidence of drug diversion by approximately 1,200 non-distributors in Summit and Cuyahoga Counties).  For example, Louis Eppinger of Cleveland led a conspiracy that forged prescriptions for OxyContin and Percocet pills, hired people to have them filled at pharmacies throughout the region, then sold the pills on the street.  *See* Ex. 39.  Similarly, Heather R. Mitchell directed a conspiracy in Cuyahoga County that obtained prescription narcotics, including Vicodin and Oxycodone, and sold or traded those drugs for heroin.[37]

---

[34] To the extent that Plaintiffs claim harms resulting from the addiction or overdose of patients who were lawfully prescribed opioids by their doctors, that harm does not involve diversion and cannot be a source of liability *as to Distributors*.

[35] According to Plaintiffs' experts, the most "common routes for opioid prescriptions on[to] the illicit marketplace are drug dealers as well as family and friends."  Ex. 7 at 17.  Those experts opine that approximately two-thirds of all "non-medical opioid users … obtained opioids from a friend or relative," either for free or for a fee.  *Id.*  In other words, according to Plaintiffs' experts, the principal pathway for diversion is the transfer of "unused prescriptions that were overprescribed to friends and family members" of the illicit end-user.  *Id.*

[36] *See, e.g.*, Ex. 36 at 187:12–188:10 (Chief of the Cleveland Division of Police stating that it is a crime when someone steals prescription opioids from a pharmacy or from their grandmother's medicine cabinet); Ex. 37 at 58:5–13 (Police Lieutenant with the Cleveland Division of Police stating that people can illegally obtain prescriptions by, *inter alia*, "steal[ing] grandma's prescriptions … [or] buy[ing] illegal prescriptions"); *see also* Ex. 38 at 54:1–55:25 (Narcotics Detective with the Cleveland Division of Police agreeing that distributors are not to blame for diversion that occurs when someone steals unused pills from a family member and them "sells them or uses them themselves").

[37] *See* Ex. 41.

Second, the diverted prescription opioid pills must be consumed by a County resident or visitor for non-medical use.  This, too, is a necessarily criminal act.  *See, e.g.*, Ex. 40 at 86:23–87:6 (Chief Counsel of the Summit County Prosecutor's Office stating that the individual who uses or ingests a drug that ultimately leads to an overdose death would have committed a crime "[h]ad they lived").  Only after these multiple intervening steps, including at least two crimes, can Plaintiffs possibly incur harm—and only then if they happen to incur expense as a result of the end-user's addiction or overdose.

The record evidence thus demonstrates that, insofar as good-faith prescribing is concerned, there are at least ***five steps***—including multiple acts of ***criminal wrongdoing***—standing between Plaintiffs' claimed injury and Distributors' asserted wrongdoing:

<u>Step One</u>:  Distributors ship prescription opioids to licensed pharmacies.

<u>Step Two</u>:  Prescription opioids shipped by Distributors are (a) dispensed to a patient by a pharmacist (b) upon presentation of a bona fide prescription written in good-faith by a doctor based upon the then-prevailing standard of care.

<u>Step Three</u>:  Some portion of the pills are then illegally diverted—*i.e.*, they are sold or given away by the patient or are stolen from the patient's medicine cabinet.

<u>Step Four</u>:  A County resident illicitly uses the diverted opioids.

<u>Step Five</u>:  Plaintiffs suffer injuries (increased costs) as a result, for example, of addressing that individual's illegal activity, dependency addiction or overdose.

In these circumstances, where the evidence reveals an extremely attenuated, multi-step and remote causal chain, Plaintiffs' causation case fails as a matter of law.  *See Hemi*, 559 U.S. at 15 (dismissal warranted where "[m]ultiple steps . . . separate the alleged [conduct] from the asserted injury").[38]

---

[38] *See also Hemi*, 559 U.S. at 9–11 (rejecting causation theory premised on defendant's failure to submit customer information to the State (Step One), which the State could not pass on to the City (Step Two), which prevented the City from identifying citizens who had failed to pay taxes (Step Three), causing injury in the form of lost tax revenue (Step Four)); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457–58 (2006) (rejecting causation theory premised on defendants' fraud against the state tax authority (Step One), which

17

The presence of multiple, independent actors and events—including multiple **criminal** acts—further highlights the infirmity of Plaintiffs' theory of causation.  *See, e.g.*, *City of Cleveland v. Ameriquest Mortg. Secs., Inc.*, 615 F.3d 496 (6th Cir. 2010).   In *Ameriquest*, the City of Cleveland alleged that the defendants' financing of subprime loans led to a foreclosure crisis, which caused homes in the City to become "eyesores, fire hazards, and easy prey for looters and drug dealers," thereby leading to "increased expenditures for fire and police protection and maintenance and demolition costs" on the part of the City.  *Id.* at 499.  Faced with those allegations, the Sixth Circuit held that the City's allegations failed the *Holmes* direct injury test because numerous "independent actors" stood between the defendants' misconduct and the City's injury. *Id.* at 505.

Like the defendants in *Ameriquest*—who "did not directly make subprime loans to the homeowners of Cleveland" but rather securitized the loans for sale to investors, *id.*—Distributors did not directly make opioid medications available to County residents.  Without both a doctor who prescribed the medicine and a pharmacist who dispensed it, the medications supplied to pharmacies by Distributors would have remained on the shelf, reaching no one.  Moreover, like the City in *Ameriquest*—whose harm was directly caused not by the defendants but by the

---

allowed defendants to undercut plaintiff's prices (Step Two), causing injury in the form of lost profits (Step Three));  *Holmes*, 503 U.S. at 271–74 (rejecting causation theory premised on defendants' stock manipulation (Step One), which caused purchasing third-party broker dealers to become insolvent (Step Two), causing injury to customers of those broker dealers (Step Three)); *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 405–06 (6th Cir. 2012) (rejecting causation theory premised on defendant adoption agency's fraudulent conduct in inducing plaintiffs to do business with them (Step One), which allowed the agency to make subsequent false representations (Step Two), which caused plaintiffs to pay various fees (Step Three)); *Chaz Concrete Co., LLC v. Codell*, No. 3:03–52–KKC, 2010 WL 1227750, at *11–13 (E.D. Ky. Mar. 29, 2010) (rejecting causation theory premised on defendants' fraudulent certification of a third-party as a "disadvantaged business" (Step One), which caused contracts to be awarded to that third-party (Step Two), which caused injury to plaintiff in the form of lost profits (Step Three)).

18

subsequent actions of homeowners, lenders and the "[d]rug dealers and looters [who] made independent decisions to engage in . . . criminal conduct," *id.*—Plaintiffs' alleged harm was more directly caused by (i) the patients or others who made the independent decision to divert lawfully obtained controlled substances to illegal use, and (ii) the County residents or visitors who used the medicines unlawfully.  Thus, even more so than in *Ameriquest*, "the connection between the [Counties'] alleged harm and [Distributors'] alleged misconduct is too indirect to warrant recovery."[39]

## II.  THERE IS NO EVIDENCE THAT DISTRIBUTORS CAUSED ANY HARM ARISING OUT OF "ROGUE" DISPENSING AND PRESCRIBING.

According to Plaintiffs' experts, illicit dispensing and prescribing by pharmacies and doctors is ***not*** a significant contributor to the opioid epidemic.  *See, e.g.*, Ex. 7 at 18 ("'Pill Mills' do not explain in any significant way the expansion of opioid prescribing and opioid-related harm in the US.").  In any event, where rogue pharmacies and "pill mill" doctors are concerned, there is likewise no record evidence tying Distributors' purportedly wrongful shipments to Plaintiffs' injuries.

First, Plaintiffs have ***no evidence*** that they were harmed as a result of any illicit prescribing or dispensing.  Through discovery in this case, Plaintiffs have been given access to DEA's ARCOS data, *see* ECF No. 233, and each Distributor's shipment data for the Plaintiff Counties, *see* ECF No. 693 at 11.  Plaintiffs bear the burden of proving a direct connection between their claimed injuries and specific conduct on the part of Distributors—that is, specific, allegedly improper

---

[39] *See also Hemi*, 559 U.S. at 11 (proximate causation absent where alleged injury was contingent on non-parties' decisions "not to pay taxes they were legally obligated to pay"); *Empire Title v. Fifth Third Mortg. Co.*, No. 1:10cv2208, 2013 WL 1337629, at *11 (N.D. Ohio Mar. 29, 2013) ("Courts have recognized that when independent actors are present in the causal chain, the injury is too speculative to support recovery."); *Volter v. C. Schmidt Co.*, 598 N.E.2d 35, 37 (Ohio App. 1991) ("Traditionally, an intentional tort committed by a third-party constitutes an intervening act which supersedes the negligence of the party creating the risk of harm, and relieves that party from liability.").

shipments identified in the data.  But Plaintiffs have made no effort to demonstrate a causal relationship between the opioid pills shipped by Distributors and their alleged injuries.  Plaintiffs do not, for instance, identify any "pill mill" doctors supplied by Distributors in the Counties and demonstrate that they were harmed as a result of those shipments.  Nor do Plaintiffs show that they incurred expense as a result of shipments to particular pharmacies in the Counties that Distributors knew (or should have known) were dispensing in the absence of legitimate prescriptions.[40]

Indeed, Plaintiffs' experts do not even purport to demonstrate that Plaintiffs were injured as a result of Distributors' shipments to pharmacies that filled prescriptions written by "pill mill" doctors or otherwise dispensed improperly.  Plaintiffs do not have any expert who attempts to show—in the aggregate or otherwise—that Distributors should have halted particular orders because they knew or should have known that they were the result of improper dispensing by pharmacies or prescribing by doctors.  Nor do they have an expert who attempts to tie any rogue prescribing or dispensing to any portion of their claimed harm.  Instead, their experts discuss the role of such rogue actors only briefly, and in order to emphasize the small role that they played in causing the opioid crisis.  *See, e.g.*, Ex. 10 at 12 (opining that "opioid overprescribing is not the result of a small subset of so-called 'pill mill' doctors . . . but rather has been driven by a wholesale shift in medical practice" caused by Manufacturer marketing).

---

[40] In response to Discovery Ruling No. 12, Plaintiffs identified a limited number of allegedly "suspicious" orders that Distributors shipped into Summit and Cuyahoga Counties.  But there is no evidence that any of the opioids shipped with those orders were ever diverted or ever caused Plaintiffs' any harm whatsoever. Moreover, Plaintiffs do not even *claim* that those orders caused them harm; they merely assert that the orders are "suspicious."  Their identification of the order as "suspicious," standing alone, is not enough to create a triable question of fact.  For example, Plaintiffs identify a February 2012 shipment of hydrocodone from McKesson to a pharmacy in Cuyahoga Falls, Ohio (DEA registrant number BM0509262) as "suspicious."  But Plaintiffs do not offer any evidence that the pills shipped by McKesson were ever diverted or abused.  Nor could they: transactional data produced by McKesson in discovery shows that in March 2012, that same pharmacy returned the hydrocodone to McKesson.  Even if the February 2012 order was "suspicious," pills that sat on the pharmacy's shelf and were later returned to McKesson's vault did not cause Plaintiffs' harm.

Second, the causal chain connecting Distributors' conduct to Plaintiffs' injury is again remote and broken by the intervening conduct of several criminal actors. The relevant causal chain is as follows:

Step One: Distributors ship prescription opioids to licensed pharmacies.

Step Two: Prescription opioids shipped by Distributors reach the secondary market as a result of (a) illegal dispensing by a "rogue" pharmacy or (b) illegal prescribing by a "rogue" doctor.

Step Three: A County resident illicitly uses the diverted opioids.

Step Four: Plaintiffs suffer injuries (increased costs) as a result of, for example, addressing that individual's illegal activity, dependency, addiction or overdose.

That highly attenuated chain of causation is insufficient as a matter of law. *See supra* 14–15.

## III. THERE IS NO EVIDENCE THAT DISTRIBUTORS CAUSED ANY HARM ARISING OUT OF ILLICIT NON-PRESCRIPTION OPIOIDS.

Plaintiffs' purported damages stem in substantial part from the abuse of non-prescription opioids such as heroin and illicit fentanyl. *See, e.g.*, Ex. 1 ¶¶ 54–58, 115; Ex. 42 ¶¶ 45, 49.[41] Insofar as Plaintiffs claim as injury costs they incurred in responding to use of illicit, non-

---

[41] Especially in recent years, the use of illegal street drugs has been the major driver of Plaintiffs' opioid-related injury. *See, e.g.*, Ex. 43 at 93:16–94:2 (Executive Director of the Ohio High Intensity Drug Trafficking Area (HIDTA) testifying that, since 2012, the "most significant drug problem in Ohio HIDTA" has been heroin and fentanyl); Ex. 37 at 304:14–24 (co-commander of the Northern Ohio Law Enforcement Task Force testifying that the greatest drug threats to Cleveland region are fentanyl and heroin); Ex. 44 at 112:20–113:4 (Captain of the Summit County Narcotics Division testifying that the greatest drug threat to Summit County is heroin, fentanyl, cocaine and crystal methamphetamine); Ex. 45 at 178:21–24, 205:22–206:5 (Forensic Toxicologist at the Cuyahoga County Medical Examiner's Office testifying that as of June 2013, heroin was the largest driver of overdose deaths in Cuyahoga County and that the "vast majority" of overdose deaths since 2015 have been caused by heroin, cocaine, carfentanil and fentanyl); *see also* Ex. 10 at 84 ("We are now in the second and third waves of this [opioid] epidemic, with a spike in deaths from illicit opioids, particularly heroin (second wave) and illicit fentanyl (third wave)."); Ex. 7 at 20, 23–24, 26 (opining that "[t]here have been rapid increases in opioid overdose death due to heroin and synthetic opioids, beginning in approximately 2015," that "[i]n recent years, heroin and fentanyl deaths have increased more than any other drug cause" and that "[t]he number of individuals who use heroin has been increasing in the United States"); Ex. 8 ¶ 107 (opining that the steady increase in mortality rates for natural or semi-synthetic opioids such as hydrocodone and oxycodone observed between 1999 to 2010 "has been replaced by climbing rates of heroin and especially synthetics such as fentanyl").

prescription drugs by County residents and visitors, it is especially clear that Distributors are entitled to summary judgment.

Distributors' alleged wrongdoing consists of delivering an "excessive" number of FDA-approved opioid medications to State-licensed pharmacies.  They do not supply illicit drugs, either directly or indirectly, to individuals.  Rather, the evidence reflects that these drugs are trafficked into the Counties by illicit drug rings from China and Mexico.[42]  If a Summit or Cuyahoga resident or visitor overdoses on heroin (or another illegal street drug), and that overdose causes Plaintiffs to incur expense, Distributors are plainly not the cause—let alone a ***direct*** cause—of that expense. The attenuated chain of causation in this circumstance is as follows:

> Step One:  A County resident or visitor becomes dependent on prescription opioids.
>
> Step Two:  As part of her transition from prescription opioids to heroin, that individual (illegally) purchases heroin from a dealer who (illegally) acquired it after someone else (illegally) imported it into the United States.
>
> Step Three:  The County resident or visitor (illegally) ingests the heroin.
>
> Step Four:  Plaintiffs suffer injuries (increased costs) as a result of, for example, addressing that individual's illegal activity, dependency, addiction or overdose.

That causal chain is far too attenuated as a matter of law.  *See supra* 14–15.

As an initial matter, for the reasons explained above, there is no evidence that Distributors proximately caused any County resident or visitor to become dependent on prescription opioids in the first place.  *See supra* Parts I and II.  Absent proof of that, Distributors are entirely missing

---

[42]  *See, e.g.*, Ex. 46 at 205:6–206:5 (prosecutor in the Cuyahoga County Prosecutor's Office testifying that most of the illicit fentanyl and carfentanil that enters the United States comes from China); Ex. 47 at 84:3–25 (Sergeant in the Narcotics Unit of the Cleveland Police Department testifying that most of the heroin in Cleveland comes from Mexico and the fentanyl from China); Ex. 43 at 40:5–11, 118:19–120:15 (Executive Director of the Ohio HIDTA testifying that carfentanil in the Ohio HIDTA comes from China and Mexico, heroin comes through the Southwest border, and fentanyl comes from China and Mexico); *see also* Ex. 37 at 131:18–132:4; Ex. 44 at 108:15–24; Ex. 48 at 324:1–8.

from the chain of causation leading from prescription drug use, to illicit drug use, and on to Plaintiffs' injuries.

Even setting that threshold issue aside, the chain of causation separating Distributors' shipments of FDA-approved medicines from the illicit use of illegal street drugs (and attendant government expenditures) is too remote and broken by intervening criminal conduct.  The actors and events standing between an individual's use of lawfully prescribed medicines and Plaintiffs' claimed injury include at least (1) the sale of an *illegal* drug by a dealer and (2) the *unlawful* purchase and use of the drug by the individual.  *See, e.g.*, Ex. 36 at 330:1–21 (Chief of the Cleveland Division of Police admitting that "if somebody has overdosed on heroin, at least two crimes have been committed").

In short, in light of the especially attenuated chain of causation connecting Distributors' allegedly "excessive" shipments of prescription opioids and costs incurred by Plaintiffs in combatting or otherwise dealing with the consequences of illegal drug use, it is particularly clear that Distributors are entitled, at the least, to summary judgment insofar as Plaintiffs' claimed injuries arise from the use of illicit, non-prescription opioids.

## CONCLUSION

Because there is no evidentiary basis on which a reasonable jury could conclude that Distributors proximately caused Plaintiffs' injuries, Distributors are entitled to summary judgment.

Dated:     June 25, 2019                    Respectfully Submitted,


*/s/ Geoffrey E. Hobart*                     */s/ Robert A. Nicholas*
Geoffrey E. Hobart                           Robert A. Nicholas
Mark H. Lynch                                Shannon E. McClure
Christian J. Pistilli                        **REED SMITH LLP**
**COVINGTON & BURLING LLP**                  Three Logan Square
One CityCenter                               1717 Arch Street, Suite 3100
850 Tenth Street NW                          Philadelphia, PA 19103
Washington, DC 20001                         Tel: (215) 851-8100
Tel: (202) 662-5281                          Fax: (215) 851-1420
ghobart@cov.com                              rnicholas@reedsmith.com
mlynch@cov.com                               smcclure@reedsmith.com
cpistilli@cov.com

                                             *Counsel for Defendant AmerisourceBergen*
*Counsel for Defendant McKesson*             *Drug Corporation*
*Corporation*



*/s/ Enu Mainigi*                            */s/ William E. Padgett*
Enu Mainigi                                  William E. Padgett (IN No. 18819-49)
F. Lane Heard III                            Kathleen L. Matsoukas (IN No. 31833-49)
George A. Borden                             **BARNES & THORNBURG LLP**
Ashley W. Hardin                             11 South Meridian Street
**WILLIAMS & CONNOLLY LLP**                  Indianapolis, IN 46204
725 Twelfth Street NW                        Tel: (317) 236-1313
Washington, DC  20005                        Fax: (317) 231-7433
Tel:  (202) 434-5000                         william.padgett@btlaw.com
Fax:  (202) 434-5029                         kathleen.matsoukas@btlaw.com
emainigi@wc.com
lheard @wc.com
gborden@wc.com                               *Counsel for Defendants H. D. Smith,*
ahardin@wc.com                               *LLC f/k/a H. D. Smith Wholesale*
                                             *Drug Co., H. D. Smith Holdings, LLC*
                                             *and H. D. Smith Holding Company*
*Counsel for Defendant Cardinal*
*Health, Inc.*

/s/ John P. McDonald
John P. McDonald (TX Bar # 13549090)
C. Scott Jones (TX Bar # 24012922)
Lauren M. Fincher (TX Bar # 24069718)
Brandan J. Montminy (TX Bar # 24088080)
**LOCKE LORD LLP**
2200 Ross Avenue
Suite 2800
Dallas, TX 75201
Tel:  (214) 740-8445
Fax:  (214) 756-8110
jpmcdonald@lockelord.com
sjones@lockelord.com
lfincher@lockelord.com
brandan.montminy@lockelord.com

*Counsel for Defendants Henry Schein, Inc.*
*and Henry Schein Medical Systems, Inc.*

/s/ John J. Haggerty
John J. Haggerty (0073572)
James C. Clark
Stephan A. Cornell
**FOX ROTHSCHILD LLP**
2700 Kelly Road, Suite 300
Warrington, PA 18976
Tel: (215) 345-7500
Fax: (215) 345-7507
jhaggerty@foxrothschild.com
jclark@foxrothschild.com
scornell@foxrothschild.com

*Counsel for Defendant Prescription*
*Supply Inc.*

## CERTIFICATE OF SERVICE

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via

the Court's ECF system to all counsel of record.

*/s/ Geoffrey E. Hobart*
GEOFFREY E. HOBART
