# EXHIBIT 5

Page 1

1 UNITED STATES DISTRICT COURT
2 NORTHERN DISTRICT OF OHIO
3 EASTERN DIVISION
4 * * *
5
6 IN RE:
7 NATIONAL PRESCRIPTION          MDL 2804
8 OPIATE LITIGATION              Case No. 1:17-md-2804
9
10 * * *
11 Deposition of ERIC A. GRIFFIN,
12 Witness herein, called by the Defendants for
13 cross-examination pursuant to the Rules of Civil
14 Procedure, taken before me, Christine Gallagher,
15 a Notary Public and Registered Professional
16 Reporter in and for the State of Ohio, at the
17 Sheraton Columbus at Capitol Square, 75 East
18 State Street, Judicial Board Room, Columbus,
19 Ohio, on Wednesday, the 23rd day of January,
20 2019, at 8:48 a.m.
21 * * *
22
23
24
25

Page 43

1  Q.  When you say you were seeing
2  various drug trends that would make you believe
3  that, what do you mean?
4  A.  Sure.  So an example of it would
5  be at the time we were seeing a massive amount
6  of Florida prescriptions coming to the State of
7  Ohio from what was labeled as pill mills down
8  in the Florida, Broward County area, and
9  massive amounts of prescriptions.
10  Q.  Do you know the types of
11  prescriptions that were coming in from Florida?
12  A.  Most of the time they were for
13  hydrocodone, oxycodone, Soma, alprazolam.
14  Q.  And do you have an understanding
15  that hydrocodone, oxycodone are opioids?
16  A.  Yes, ma'am.
17  Q.  And alprazolam is a benzodiazapine?
18  A.  Yes, ma'am.
19  Q.  What is Soma?
20  A.  A muscle relaxer or a mild -- it
21  can also be used as a mild pain reliever.
22  Q.  Have you ever used the term
23  diversion in your work at the board?
24  A.  Yes, ma'am.
25  Q.  What is your understanding of the

Page 44

1  term diversion?
2        A.  My understanding of diversion is
3  when a pharmaceutical prescription is in any
4  way redirected from its legitimate medical use
5  to an illicit use, whether that's to an
6  individual or being sold or being stolen, when
7  it's essentially taken out of the legitimate --
8  the legitimate medical use system to be used
9  illicitly.
10       Q.  So do you agree that the transfer
11 from a DEA registered and Ohio licensed entity
12 to another DEA registered and Ohio licensed
13 entity is not diversion?
14       A.  Correct, it would be a normal
15 course of business.
16       Q.  And do you agree that transfer
17 from a DEA registered and Ohio licensed
18 dispenser to an outpatient who presents a legal
19 prescription written by a licensed prescriber
20 is not diversion?
21       A.  As long as it's a legal
22 prescription, yes, ma'am.
23           MS. BROWNE:  Can I get AA, please?
24           (Thereupon, Defendants' Exhibit
25 Number 3, Letter Dated September 27, 2006 from

Page 47

1      Q. Okay. On page 2 of Exhibit 3, the
2 second paragraph reads, DEA recognizes that the
3 overwhelming majority of registered
4 distributors act lawfully and take appropriate
5 measures to prevent diversion.
6      Did I read that correctly?
7      A. Yes, ma'am.
8      Q. Has that been your experience in
9 your time at the board, that the overwhelming
10 majority of registered distributors act
11 lawfully?
12      A. Yes, ma'am.
13      Q. On the third page of this document
14 under the heading circumstances that might be
15 indicative of diversion, under number 1 is
16 ordering excessive quantities of a limited
17 variety of controlled substances, open parens,
18 e.g. ordering only phentermine, hydrocodone and
19 alprazolam, closed parens, while ordering few,
20 if any, other drugs.
21      Did I read that correctly?
22      A. Yes, ma'am.
23      Q. When we were talking about the
24 drugs coming from Florida, you mentioned
25 hydrocodone and alprazolam, correct?

Page 267

1  purpose in the usual course of professional
2  practice are prescribers, mostly doctors, and
3  pharmacists; is that right?
4          A.   I believe so.
5          Q.   Is it also true that it is only
6  those -- those two entities, the prescriber who
7  is treating the patient and the pharmacist who
8  is asked to fill the prescription, who can make
9  and are legally obligated to make a
10 determination that the prescription is for a
11 legitimate medical purpose?
12         A.   Yes, sir.
13         Q.   And there isn't anybody else in
14 the system that can prospectively make that
15 decision; it's made on the spot by the doctor
16 prescriber and by the dispenser, the
17 pharmacist, correct?
18         A.   Yes, sir.
19         Q.   Now, to go to the Section 1 that
20 we were looking at, this chart, number 1 that's
21 there, goes back to 2011, and would I be
22 correct that if we move backwards in a previous
23 OARRS report, a similar chart exists in those
24 reports for 2010, 2009?
25         A.   I would assume so.