# **EXHIBIT 33**

```
 1                UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF OHIO

 3                        EASTERN DIVISION

 4

 5    IN RE:  NATIONAL PRESCRIPTION )

 6    OPIATE LITIGATION             ) MDL NO. 2804

 7    ------------------------------) HON. DAN A. POLSTER

 8    THIS DOCUMENT RELATES TO      ) Case No. 1:17-md-2804

 9    ALL CASES                     )

10    ------------------------------)

11

12                    HIGHLY CONFIDENTIAL

13         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

14

15              The videotaped 30(b)(6) deposition of H.D.

16    SMITH by and through GEORGE EUSON, called for

17    examination, taken pursuant to the Federal Rules of

18    Civil Procedure of the United States District Courts

19    pertaining to the taking of depositions, taken before

20    JULIANA F. ZAJICEK, a Registered Professional Reporter

21    and a Certified Shorthand Reporter, at the offices of

22    Brown, Hay & Stephens, LLP, Suite 800, 205 South Fifth

23    Street, Springfield, Illinois, on November 27, 2018,

24    at 9:13 a.m.
```

```
 1      Q.    And -- and you can go ahead and finish it?
 2      A.    "And we at H.D. Smith hope to work in
 3   collaboration with the DEA to help address the
 4   issues."
 5      Q.    That seems to be a larger reference than
 6   just the pharmacy customers the DEA identified
 7   prescribing issues in Florida.
 8            Do you know whether or not those concerns
 9   are what informed Chris Smith's decision to no longer
10   sell oxycodone in Florida?
11      A.    I believe that what they were referencing
12   was the issue with pain clinics, the proliferation of
13   pain clinics in Florida.  We never sold directly to
14   pain clinics, but prescriptions that were written by
15   those pain clinic doctors would have filtered out and
16   been filled by some of our customers.  So -- and the
17   reason why we, you know, were insistent on looking at
18   prescription data, so that we could identify doctors
19   that may have questionable prescribing habits that
20   would be filled at our pharmacies.
21      Q.    You had access to the data to be able to
22   identify the providers that were writing the
23   prescriptions?
24      A.    Sometimes we did, sometimes we didn't.
```

Highly Confidential - Subject to Further Confidentiality Review

1  We -- we could not go in to a pharmacy and look at
2  prescriptions, that's a HIPAA violation.
3     Q.   Would a DUR report contain the prescriber
4  DEA number?
5     A.   It depended.  At this time -- it depends
6  on the timing.
7     Q.   In -- in 2010?
8     A.   Sometimes a pharmacy could give us that
9  information, sometimes it was not easy to discern the
10 prescriptions or the combinations.  We could get a
11 list of doctors that they were filling for, but not
12 the detail.  Some pharmacies were able to give that to
13 us, some only gave us utilization reports that didn't
14 have any doctor information on it and we had to ask
15 them and hope that they were telling us the truth
16 because we didn't have access to those records.
17          Once we were a -- you know, able to get
18 Pro Compliance reports, that does identify the doctor
19 that prescribes by prescription and that de-identifies
20 any of the HIPAA information so there is no HIPAA
21 violations.
22    Q.   Were these issues isolated in a particular
23 geographic region of Florida or was it just endemic to
24 Florida?