# EXHIBIT 7

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                    -   -   -
 5
        IN RE:  NATIONAL      :  HON. DAN A.
 6      PRESCRIPTION OPIATE   :  POLSTER
        LITIGATION            :
 7                            :
        APPLIES TO ALL CASES  :  NO.
 8                            :  1:17-MD-2804
                              :
 9

             - HIGHLY CONFIDENTIAL -
10
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                    VOLUME I
12
                    -   -   -
13
                April 17, 2019
14
                    -   -   -
15
16           Videotaped deposition of
     THOMAS PREVOZNIK, taken pursuant to
17   notice, was held at the law offices of
     Williams & Connolly, 725 12th Street,
18   Washington, D.C., beginning at 9:11 a.m.,
     on the above date, before Michelle L.
19   Gray, a Registered Professional Reporter,
     Certified Shorthand Reporter, Certified
20   Realtime Reporter, and Notary Public.
21                    -   -   -
22
            GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

1          order in which the recipient of

2          the order detects through their

3          suspicious order monitoring

4          system, a reason or reasons that

5          may indicate that that order may

6          be -- that order may be diverted

7          outside the legitimate scientific,

8          medical, and industry channels.

9          That's what it is.

10              So the subjectivity would be

11         not just us looking at it.  I

12         mean, we would look at it.  They

13         would look at it.  And that's why

14         many have gotten in trouble,

15         because they didn't look at it and

16         changed stuff.  So, you know, when

17         we get -- if we go to court or

18         whatever, it's going to be up to

19         the jury and the judge to decide.

20    BY MS. MAINIGI:

21         Q.    Because it's subjective,

22    right?

23              MR. FINKELSTEIN:  Objection.

24         Vague.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Yeah, it can

2     be subjective.

3          MS. MAINIGI:  Let's take a

4     break.

5          THE VIDEOGRAPHER:  All

6     parties agree to go off the

7     record?

8          MR. FINKELSTEIN:  Yes.

9     Thank you.

10          THE VIDEOGRAPHER:  Thank

11     you.  12:24, we are off the video

12     record.

13               -  -  -

14          (Lunch break.)

15               -  -  -

16     A F T E R N O O N   S E S S I O N

17               -  -  -

18          THE VIDEOGRAPHER:  1:32, we

19     are on the video record.

20 BY MS. MAINIGI:

21     Q.   Good afternoon.  Let me hand

22 you Exhibit 6 to take a look at.

23          (Document marked for

24     identification as Exhibit

Highly Confidential - Subject to Further Confidentiality Review

1    it the CSA.   The CSA does not require

2    distributors to report the suspicious

3    orders of other distributors, does it?

4            A.    Correct.

5            Q.    And the CSA does not require

6    distributors to share information with

7    each other about suspicious orders,

8    correct?

9            A.    Correct.

10           Q.    Now, similarly, the

11   regulations do not require distributors

12   to report suspicious orders of other

13   distributors, correct?

14           A.    Correct.

15           Q.    And the regulations do not

16   require distributors to communicate with

17   each other about suspicious orders,

18   correct?

19           A.    Correct.

20           Q.    In fact, the regulations

21   only apply to the suspicious orders that

22   a distributor receives from its own

23   customers, correct?

24           A.    You lost me on the

Highly Confidential - Subject to Further Confidentiality Review

1    at a number and say that's too big.

2              MR. O'CONNOR:  Whoever is on

3         the phone needs to go on mute.

4              MR. FINKELSTEIN:  Whoever is

5         on the phone please mute your

6         phone.

7    BY MR. O'CONNOR:

8         Q.    Before we get back to my

9    question, I just want to be clear.

10   Are -- are vets required to obtain a DEA

11   registration before they order controlled

12   substances?

13        A.    Yes.

14        Q.    And the DEA issues some

15   veterinarians registrations to allow them

16   to purchase controlled substances?

17        A.    Correct.

18        Q.    Okay.  I do -- I do want to

19   get back to my original question though,

20   which was, is an order that is unusually

21   large, does that order necessarily lead

22   to diversion?

23              MR. FINKELSTEIN:  Objection.

24        Vague.

Highly Confidential - Subject to Further Confidentiality Review

```
1                    THE WITNESS:  It may or

2          may -- it may or may not.

3  BY MR. O'CONNOR:

4          Q.    Would the same be true of an

5  unusually frequent order?

6                    MR. FINKELSTEIN:  Same

7          objection.  You can answer.

8                    THE WITNESS:  Correct.  It

9          may or may not.

10  BY MR. O'CONNOR:

11          Q.    And the same would be true

12  of an order that deviates substantially

13  from the normal pattern?

14                    MR. FINKELSTEIN:  Same

15          objection.  You can answer.

16                    THE WITNESS:  Correct.  It

17          may or may not.

18  BY MR. O'CONNOR:

19          Q.    Okay.  And putting that

20  together, that means that not every

21  suspicious order leads to diversion,

22  correct?

23                    MR. FINKELSTEIN:  Objection.

24          Scope.  You can answer.
```

Highly Confidential – Subject to Further Confidentiality Review

1    Q.    But to my question, has the

2  DEA ever provided any kind of guidance to

3  manufacturers informing them that they

4  were to know their customers' customer?

5    A.    No, not to my knowledge.

6    Q.    Okay.  Let's talk for a

7  minute about ARCOS.

8         Generally speaking, what

9  sorts of information does ARCOS contain?

10   A.    ARCOS contains the

11  manufacturers and distributors that are

12  to report all transactions for

13  Schedule I, Schedule II, Schedule III

14  narcotics, and GHB, and manufacturers

15  also have reported -- additional

16  reporting requirements for some

17  psychotropics.

18   Q.    Okay.  Would ARCOS contain

19  all of the distributions of prescription

20  opioids by manufacturers to distributors?

21   A.    So the transactions for

22  manufacture -- yes, manufacturer to a

23  distributor?  Yes.

24   Q.    Would ARCOS contain all the

Highly Confidential - Subject to Further Confidentiality Review

1    distributions of prescription opioids

2    from distributors to pharmacies or other

3    retail outlets?

4           A.    For those items, yes.

5           Q.    Does ARCOS data provide any

6    details about those transactions, like

7    the amount, the recipients --

8           A.    Yes, it tracks the quantity.

9    It has the DEA number of the registrant

10   that -- whether it's a sale.  It could be

11   a sale, it could be a purchase.  It could

12   be a disposition of, you know, getting

13   wasted.  Any transaction that -- that

14   could fall within the system that --

15   that's trackable, that would be in there,

16   for those items.

17          Q.    Okay.  Through ARCOS, can

18   DEA see the type of medication that's

19   being purchased?

20          A.    Well, it's in there by NDC

21   number.

22          Q.    Okay.  And the NDC number

23   would -- would allow the DEA to determine

24   which product we are talking about?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2    Q.    So whether that was a -- the

3  DEA would know whether it was a oxycodone

4  5-milligram tablet, for example?

5    A.    Correct.

6    Q.    That level of detail?

7    A.    Yes.

8    Q.    Okay.  And the DEA receives

9  that information for each tablet that the

10  manufacturers sell to distributors,

11  correct?

12    A.    Each tablet?

13    Q.    Yes.

14    A.    It's by bottle size, because

15  NDC code also has the bottle size within

16  it.

17    Q.    Got it.  So -- so the DEA

18  can see each and every bottle that's

19  shipped between a manufacturer and a

20  distributor?

21    A.    As long as that's what they

22  are reporting, yes.

23    Q.    Okay.  And through ARCOS,

24  DEA can also see each and every bottle of

Highly Confidential - Subject to Further Confidentiality Review

1    opioids that's transmitted from a

2    manufacturer -- I'm sorry.  Strike that.

3              And through ARCOS, DEA can

4    see each and every bottle of opioids

5    that's transferred from a distributor to

6    a pharmacy for example, correct?

7         A.    Correct.

8         Q.    And they'll know the

9    location of that pharmacy?

10        A.    Correct.

11        Q.    Do they have the address for

12   the pharmacy?

13        A.    Yes.  It's linked to the DEA

14   registration.

15        Q.    Okay.  So through ARCOS, the

16   DEA has precise information about how

17   much of certain products is being shipped

18   to which geographic areas, correct?

19        A.    Correct.

20              Could I get a clarification

21   on what time frame you're talking about?

22        Q.    Sure.  So I would say 1996

23   to the present.  Does the answer change

24   at all during that time period?

1    to my instruction too.

2           Q.    Understood.

3                 Has DEA identified sources

4    of diversion based on information DEA has

5    received in suspicious order reports?

6           A.    Yes.

7           Q.    Okay.  When DEA identifies a

8    source of diversion via information in a

9    suspicious order report, does DEA want to

10   stop the supply of opioids to that source

11   of diversion?

12          A.    Yes.

13          Q.    And does DEA want to stop

14   the supply of opioids to that source of

15   diversion as soon as DEA learns the

16   identity of the suspected diverter?

17                MR. FINKELSTEIN:  Vague.

18                THE WITNESS:  Yes.

19   BY MR. STEPHENS:

20          Q.    All right.  Between 2007 and

21   2018, DEA received over 1.2 million

22   electronic suspicious order reports from

23   registrants.

24          A.    Is that a -- it sounds like

1    it was a statement.  I'm sorry.

2           Q.    It's a question.  Is that

3    true?

4           A.    Could you -- could you

5    repeat the question.

6           Q.    Sure.

7                 Between 2007 and 2018 DEA

8    received over 1.2 million electronic

9    suspicious order reports from

10   registrants, true?

11          A.    Yes.

12          Q.    Let me -- if I could point

13   you back to Exhibit 17, which is the

14   transcript from March -- or the senate

15   congressional record from March 20, 2018.

16                Do you have that in front of

17   you?

18          A.    Yes.

19          Q.    I direct you to Page 93,

20   Mr. Prevoznik.

21          A.    Okay.

22          Q.    And this is a Q&A, written

23   Q&A between Congress and DEA, right?

24          A.    That's what it looks like.

Highly Confidential - Subject to Further Confidentiality Review

1    analyzes those SORs -- analyzed SORs

2    between 2006 and 2015.

3                Is it fair to say that DEA's

4    current leadership has been working hard

5    to improve how DEA reviews suspicious

6    order reports?

7          A.    Yes.

8          Q.    Between 2006 and 2015 under

9    Mr. Rannazzisi's leadership, did DEA have

10   a published policy that ensured that

11   someone at DEA would investigate every

12   suspicious order report that DEA

13   received?

14               MS. SINGER:  Objection.

15         Lack of foundation.

16               THE WITNESS:  Not that I'm

17         aware of.

18   BY MR. STEPHENS:

19         Q.    Okay.  Was there any policy

20   at DEA that would have prevented

21   Mr. Rannazzisi, who ran the diversion

22   control group, from instituting a

23   practice or policy that ensured that

24   someone from DEA would investigate every

Highly Confidential - Subject to Further Confidentiality Review

1          to show cause, and perhaps they

2          got suspended.  There was some

3          administrative action because they

4          did not report them.

5     BY MR. STEPHENS:

6          Q.    All right.  But my point,

7     Mr. Prevoznik, is simply that the 254

8     immediate suspension orders that are

9     listed here between 2007 and 2017, not

10    every one of them was the result of DEA

11    following up on a suspicious order report

12    that had been sent to DEA; is that fair?

13             MR. FINKELSTEIN:  Are you

14          representing to the witness that

15          these numbers add up to 254?

16             MR. STEPHENS:  Yes.

17    BY MR. STEPHENS:

18          Q.    I will represent to you that

19    for the immediate suspension orders, the

20    totals from 2007 to 2017, is 254.  I will

21    represent to you that the order to show

22    cause filed from 2007 to 2017 is 638.

23    And I'll also represent to you that the

24    total column from 2007 to 2017 is 9,851.

Highly Confidential - Subject to Further Confidentiality Review

1    Okay?

2         A.    Okay.

3              MR. FINKELSTEIN:  Counsel is

4         telling you that.

5              THE WITNESS:  Okay.

6              MR. FINKELSTEIN:  We haven't

7         checked his math.

8              MR. STEPHENS:  You're

9         welcome to do so.

10   BY MR. STEPHENS:

11        Q.    So my question,

12   Mr. Prevoznik, was, would you agree with

13   me that the 254 suspension orders that

14   are listed here from 2007 to 2017, not

15   every one of them was generated as the

16   result of DEA following up on an

17   investigation of a SOR report the DEA had

18   received; is that fair?

19              MR. FINKELSTEIN:  Asked and

20        answered.

21              THE WITNESS:  Yes.

22   BY MR. STEPHENS:

23        Q.    Okay.  For today's purposes,

24   let's assume that every one of these 254

1    was generated by the -- were all the

2    result of DEA receiving and investigating

3    a suspicious order report.  All right.

4    I'll give you the benefit of that, okay?

5            A.    Okay.

6            Q.    If you take 254 against the

7    one point -- against the 1,204,400 SORs

8    reports the DEA received, that would

9    equate to something along the lines of

10   2/100 of 1 percent.  Do you agree with

11   that?

12           A.    I didn't do the math, but

13   I'll go with -- I'll go with you.

14           Q.    Okay.  So would you agree

15   the DEA would have obtained less than

16   1 percent of immediate suspension orders

17   off the 1.2 million suspicious order

18   reports that DEA received?

19                 MR. FARRELL:  Objection.

20           Foundation.  And I think you just

21           bait and switched here a little

22           bit.

23                 MR. STEPHENS:  I didn't mean

24           to.  So let me check my question.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. STEPHENS:

2         Q.    So my question is this:

3    Assuming that all 254 of the immediate

4    suspension orders that DEA received from

5    2007 to 2017 were based off of suspicious

6    order reports, and DEA received

7    1.2 million suspicious order reports, you

8    would agree with me that the percentage

9    of suspicious order reports that DEA

10   converted into immediate suspension

11   orders was less than 1 percent?

12              MR. FINKELSTEIN:

13        Foundation.  Misstates prior

14        testimony.

15              THE WITNESS:  Well, I mean,

16        I think that's a unique way to

17        look at it.  You can also do the

18        flip side and say how many weren't

19        reported that we had cases on.

20        And to just limit it to the ISOs

21        doesn't take you to putting people

22        in compliance, whether through

23        letters of admonition or MOAs that

24        we've come to with companies

1              regarding that.

2                    I mean, it's a hypothetical.

3       BY MR. STEPHENS:

4              Q.    Between 2007 and 2017, the

5       percentage of suspicious order reports

6       the DEA received and converted into

7       immediate suspension orders is less than

8       1 percent, true?

9              A.    Yes.  In your hypothetical,

10      true.

11             Q.    All right.  So between 2007

12      and 2017, the percentage of suspicious

13      order reports that DEA converted into

14      orders to show cause, the 638 here,

15      that's also less than 1 percent.  It is

16      .005 or 5/100 of 1 percent?

17                   MR. FARRELL:  Objection.

18             Foundation.

19                   MR. FINKELSTEIN:

20             Foundation.  Misstates prior

21             testimony.

22                   THE WITNESS:  It's a

23             hypothetical.  I'll go with you.

24

1    BY MR. STEPHENS:

2         Q.    Okay.  Between 2007 and

3    2017, if you include everything in the

4    table, orders to show cause, immediate

5    suspension orders filed, voluntary

6    surrenders, the 9,851 totaled from 2007

7    and 2017, the percentage of those against

8    the 1.2 million of suspicious order

9    reports would result in a conversion rate

10   of less than 1 percent?

11             MR. FARRELL:  Objection.

12        Fuzzy math.

13             MR. FINKELSTEIN:  Which rule

14        is that?

15             Foundation.  Misstates prior

16        testimony.

17             You can answer if you

18        understand.

19   BY MR. STEPHENS:

20        Q.    Let me ask you a more

21   precise question.

22        A.    All right.

23        Q.    Okay.  What I want you to

24   do, is I'm going to ask about the 9,851,

Highly Confidential - Subject to Further Confidentiality Review

1  the full total, okay.  Are you with me?

2         A.    I'm with you.

3         Q.    Okay.  So between 2007 and

4  2017, if you include the voluntary

5  surrenders, immediate suspension orders,

6  the order to show causes, the percentage

7  of suspicious order reports that DEA

8  converted of the suspicious order reports

9  is less than 1 percent?

10              MR. FINKELSTEIN:

11         Foundation.  Misstates prior

12         testimony.

13              THE WITNESS:  In your

14         hypothetical situation, yes.

15  BY MR. STEPHENS:

16         Q.    Okay.  Do you know what

17  percentage of suspicious order reports

18  DEA converted into criminal indictments

19  between 2007 and 2017?

20              MR. FINKELSTEIN:  Vague.

21              THE WITNESS:  I do not.

22  BY MR. STEPHENS:

23         Q.    Do you know -- okay.  So

24  between 2007 and 2017, would you know