# EXHIBIT 22

Page 1

```
 1
              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
 3
 4      _____

 5      IN RE:  NATIONAL PRESCRIPTION      MDL No. 2804
        OPIATE LITIGATION                  Case No. 17-md-2804
 6
 7      This document relates to:          Judge Dan
                                           Aaron Polster
 8
        The County of Cuyahoga v. Purdue
 9      Pharma, L.P., et al.
        Case No. 17-OP-45005
10
        City of Cleveland, Ohio vs. Purdue
11      Pharma, L.P., et al.
        Case No. 18-OP-45132
12
        The County of Summit, Ohio,
13      et al. v. Purdue Pharma, L.P.,
        et al.
14      Case No. 18-OP-45090

        _____
15
16
17                         VOLUME I
18         Videotaped Deposition of Kyle J. Wright
19                    Washington, D.C.
20                   February 28, 2019
21                       9:33 a.m.
22
23
24      Reported by:  Bonnie L. Russo
25      Job No. 3244302
```

Page 84

1            MR. MIGLIORI:  Objection.
2            THE WITNESS:  There was a lot of
3    paper.  It took a lot of time to go through it.
4            BY MS. MAINIGI:
5       Q.   And I would imagine that it was
6    sometimes difficult to keep up with review of
7    all of the paper; is that fair?
8       A.   Yes.
9       Q.   And I believe you testified before,
10   in your personal experience reviewing these
11   Excessive Sales Reports, that half to
12   three-quarters of them sometimes went into the
13   trash can; is that right?
14           MR. BENNETT:  Do you have a page and
15   line in the testimony you're talking about,
16   please?
17           MS. MAINIGI:  I can give you one.
18   But I'm just asking if he remembers that.
19           MR. BENNETT:  Well, you're -- you
20   can answer her question if you can.
21           THE WITNESS:  Yes.
22           BY MS. MAINIGI:
23      Q.   Is it fair to say then that the
24   Excessive Purchase Reports were not very useful
25   to DEA because it was difficult to distinguish

Page 89

1      A.    No, ma'am.
2      Q.    Now, when you arrived -- or shortly
3    after you arrived at the DEA, would it be fair
4    to say that Internet pharmacies were
5    overwhelming the DEA and exhausting field
6    resources?
7      A.    They were taking up a great deal of
8    our time.
9      Q.    And is one of the reasons for that,
10   that every time the DEA was successful in
11   taking out an Internet pharmacy, within a few
12   weeks it was replaced by another Internet
13   pharmacy?
14           MR. SHKOLNIK:  Objection to form.
15           THE WITNESS:  Yes.
16           BY MS. MAINIGI:
17     Q.    And by 2005, in your mind, as I
18   think you previously testified, the biggest
19   problem facing the DEA was, in fact, Internet
20   pharmacies.
21     A.    Yes.
22     Q.    Recognizing the problem of Internet
23   pharmacies, did you and Mr. Mapes develop a
24   PowerPoint presentation for the distributor
25   briefings that addressed the problem of

Page 106

1  some of the -- with the criteria of the
2  definition of the law -- or the regulation by
3  volume, by size and quantity and things like
4  this.  And that was it.
5             BY MS. MAINIGI:
6       Q.    The DEA didn't provide guidance on
7  how to apply the criteria in the regulation; is
8  that right?
9             MR. BENNETT:  Object.  Objection.
10 Form.
11            THE WITNESS:  It couldn't provide
12 that.  Because it is fluid, and there are too
13 many variables, too many anomalies, too many
14 situations.  And what is the drug tomorrow?
15 What is the problem tomorrow?
16            Right now we started this Internet
17 with Hydrocodone.  You tell me what the problem
18 is today.
19            BY MS. MAINIGI:
20      Q.    It shifted, right?
21      A.    Well, it's certainly not
22 Hydrocodone.
23      Q.    Now, under the new Suspicious Order
24 Guidance, once a registrant deemed an order to
25 be suspicious, DEA did not want that order

Page 146

1    that extent.  As to what -- headquarters never
2    directed and said, "You have to start an
3    investigation.  You have to do -- go do this,"
4    or whatever.  Because they may have other
5    priorities or other things going on.
6              But we -- we tried to keep -- I
7    guess you could say a similar closed system of
8    distribution, in other words, tried to keep
9    everybody informed.  And everything could take
10   the actions that's they wanted to that they
11   deemed appropriate.
12             BY MS. MAINIGI:
13       Q.    So when you say referrals were made,
14   who were the referrals made to?
15       A.    To the office.  Wrights Pharmacy is
16   in Bangor -- Bangor, Maine.  Whoever's got
17   Maine.
18       Q.    To the particular field office?
19       A.    Yes, ma'am.
20       Q.    Okay.  And so you know referrals
21   might have been made out of headquarters; you
22   don't know what the field offices did with
23   those referrals.
24       A.    No, ma'am.
25       Q.    Okay.  Now, the e-mails that you had

Page 162

1  context of that document was asking for
2  something about suspicious orders that would
3  cause me to make this statement.
4             BY MS. MAINIGI:
5       Q.   Once a suspicious order is reported
6  to the DEA, is it fair to say that the
7  resolution of the suspicious order is under the
8  purview of the DEA?
9             MR. BENNETT:  Object to form.
10            MR. MIGLIORI:  Objection.
11            THE WITNESS:  No.
12            BY MS. MAINIGI:
13      Q.   Why is that?
14      A.   Because what's resolution?  Means I
15  have to resolve it.
16      Q.   Well, you used the word
17  "resolution," right?
18      A.   I -- I did in response to a FOIA,
19  which I have no idea what it was.
20      Q.   Well, let -- let's -- let's go in a
21  different -- let's go to the paragraph before
22  it.
23            In that paragraph you say:  "Just
24  because a customer has been identified as
25  having transacted one or more purchases which

Page 163

1  the manufacturer or the distributor deems
2  suspicious, does not mean that activity was
3  illicit in any manner."
4           Is that a statement with which you
5  agree?
6           MR. BENNETT:  Objection to form.
7           THE WITNESS:  Yes.
8           BY MS. MAINIGI:
9      Q.   Do you also agree with the statement
10 that comes right after:  "It is an issue for
11 DEA to resolve through appropriate
12 investigation"?
13          MR. BENNETT: Objection.  Form.
14          THE WITNESS:  It is -- in that
15 context it's leading me to -- again I -- I can
16 only go back to what the FOIA was -- was asking
17 or referring to to make it in this connote --
18 to respond in this way.
19          It -- it- - I'm reading this is that
20 I'm responding to something in a FOIA that was
21 quite specific, whatever.  This could have been
22 a registrant asking about activity -- a
23 downstream registrant.  I have no idea.  And so
24 I -- I -- I don't know why --
25          BY MS. MAINIGI:

Page 164

1  Q. So let me -- let me keep going.
2  We're going to come back to that statement.
3      After a distributor notifies DEA of
4  a suspicious order, DEA has no obligation to
5  investigate, correct?
6      MR. BENNETT: Objection. Form.
7      THE WITNESS: No.
8      BY MS. MAINIGI:
9  Q. Can you -- are you agreeing with me?
10     Maybe I asked the question poorly?
11     Does DEA have an obligation to
12 investigate a suspicious order after it is
13 reported by a distributor?
14     MR. BENNETT: Objection. Form.
15     THE WITNESS: No.
16     BY MS. MAINIGI:
17 Q. DEA can take the reported suspicious
18 order and compound it with other intelligence
19 that the DEA has and make an assessment about
20 what to do with a suspicious order, correct?
21     MR. BENNETT: Object to form.
22     THE WITNESS: That's one thing they
23 could potentially do.
24     BY MS. MAINIGI:
25 Q. And then there are a myriad of other

Page 167

1    reported to the DEA, the DEA certainly has
2    control over the resolution of that suspicious
3    order, correct?
4             MR. BENNETT:  Objection to form.
5             THE WITNESS:  To whom?  I'm -- I'm
6    -- I'm sorry.  I'm understanding that we report
7    back to the person that made the suspicious
8    order and tell them, "Oh, no.  This isn't
9    suspicious"?
10            That's the context I hear of your
11   question.
12            BY MS. MAINIGI:
13      Q.    Well, what do you think the DEA's
14   obligation is when it gets a suspicious
15   order --
16            MR. BENNETT:  Objection.
17            BY MS. MAINIGI:
18      Q.    -- reported it to?
19            MR. BENNETT:  Oh, I'm sorry.
20            Objection.  Form.
21            THE WITNESS:  A lot of it is up to
22   the discretion of the field office, their
23   manning capability, their workload and all this
24   other kind of stuff.  Its priority and its
25   importance, where it ranks.

Page 171

1               MR. BENNETT:  Objection to form.  I
2     also will remind the witness that the witness
3     is not authorized to disclose investigative
4     techniques, the effect of -- effectiveness of
5     which would be impaired by his answer.
6               THE WITNESS:  Data is data.
7     Extrapolate.  Extrapolate the data.
8               BY MS. MAINIGI:
9        Q.    Okay.  So the ARCOS data could be
10    utilized in different ways through different
11    reports, correct?
12       A.    At the a very beginning of this
13    deposition, you talked about this.  And you
14    even said and commented that, at the end of it,
15    was data specific.
16       Q.    Yes.
17       A.    That is what we did.
18       Q.    Okay.  So for different purposes you
19    extracted ARCOS data in different ways?
20       A.    Yes.
21       Q.    And I think what you told me at the
22    beginning of this deposition was that for
23    particular distributors, for example, you were
24    able to identified outliers and aberrations,
25    correct?

Page 172

1  A. Correct.
2  Q. And on a routine basis, did DEA do
3  that?
4  MR. BENNETT: Objection. Form.
5  THE WITNESS: Routine basis of what?
6  BY MS. MAINIGI:
7  Q. Well, the distributor initiatives
8  were somewhat unique and part of an ongoing
9  process.
10  On some sort of regular or
11  semiregular basis, did DEA endeavor to identify
12  outliers and aberrations in the ARCOS data?
13  MR. MIGLIORI: Objection to form.
14  MR. BENNETT: Objection to form.
15  BY MS. MAINIGI:
16  Q. I'm sorry. Did you answer the
17  question?
18  A. No. And now I forgot your question.
19  MS. MAINIGI: Sorry. My fault.
20  Can we read that back, please.
21  (The record was read as requested.)
22  MR. MIGLIORI: Objection.
23  THE WITNESS: Yes.
24  BY MS. MAINIGI:
25  Q. At a high level, can you explain

Page 208

1  objection was to his question?
2           MR. SHKOLNIK:  Yes.
3           MR. O'CONNOR:  All right.
4           BY MR. O'CONNOR:
5      Q.   With respect to the suspicious
6  orders that were reported to DEA, is it fair to
7  say that there were a large number of false
8  positives?
9           MR. BENNETT:  Objection to form.
10          THE WITNESS:  Because a suspicious,
11 there could be a false positive.  As to the
12 quantity, I cannot stipulate.
13          BY MR. O'CONNOR:
14     Q.   Isn't it true that there were a
15 large number of suspicious orders that were
16 reported to DEA that were not, in fact, likely
17 to be diverted?
18          MR. BENNETT:  Objection to the form.
19          THE WITNESS:  I know --
20          BY MR. O'CONNOR:
21     Q.   You can answer the question.
22     A.   I know that there was a quantity.
23 As to the extent of that quantity being large
24 or not large, I don't know.
25          MR. O'CONNOR:  All right.  I'm going

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 537

1  data provided by distributors, by
2  manufacturers, and -- and you were using it
3  to -- to combat diversion.
4       Do I have that right?
5       MR. MIGLIORI: Objection. Misstates
6  testimony.
7       THE WITNESS: Yes, sir.
8       BY MR. EPPICH:
9  Q.  Now, you -- you've testified that
10 manufacturers and distributors, they report all
11 of their acquisitions, their dispositions, the
12 inventories of controlled substances into
13 ARCOS; is that right?
14 A.  Who?
15 Q.  Manufacturers and distributors?
16 A.  Yes, sir.
17 Q.  And manufacturers and distributors
18 have been submitting this data into ARCOS since
19 you joined with DEA in 1995; isn't that right?
20 A.  Correct, sir.
21 Q.  And the controlled substances, they
22 were reported in this ARCOS data, and those
23 controlled substances included data on
24 Hydrocodone, oxycodone, fentanyl, other
25 opioids.

Page 538

```
 1                Do I have that right?
 2        A.      You have it right.
 3        Q.      So this -- this ARCOS system, it's a
 4   -- it's a robust system, isn't it?
 5                MR. BENNETT:  Objection to form.
 6                BY MR. EPPICH:
 7        Q.      It has a lot of data in it, doesn't
 8   it?
 9                MR. SHKOLNIK:  Objection to form.
10                THE WITNESS:  Yes, sir.
11                BY MR. EPPICH:
12        Q.      ARCOS tells you how many pills a
13   manufacturer makes, right?
14        A.      How many they sell, yes.
15        Q.      How many they sell.
16                ARCOS tells you how many pills have
17   been distributed by a distributor to a
18   pharmacy, doesn't it?
19        A.      Correct.
20        Q.      And using ARCOS, DEA can generate
21   statistical reports showing drug distributions
22   in grams and in dosage units.
23                They can do that, right?
24                MR. BENNETT:  You can answer that
25   question.
```

Page 539

1       THE WITNESS:  Okay.  And after that,
2  can you tell me what you asked?
3       BY MR. EPPICH:
4       Q.    I can.
5             Using ARCOS, DEA can generate
6  statistical reports showing drug distribution
7  in grams and dosage units.
8       A.    Correct.
9       Q.    Now, you've -- you've provided
10 trainings on these statistical reports in the
11 past, haven't you?
12      A.    Correct.
13            MR. EPPICH:  I'd like to mark as
14 Exhibit No. 49 presentation titled "ARCOS
15 Automation of Reports and Consolidated Order
16 Systems."
17            (Deposition Exhibit 49 was marked
18 for identification.)
19            MR. MIGLIORI:  I'm going to object
20 to the question as outside the scope of the
21 direct.
22            BY MR. EPPICH:
23      Q.    Now, Mr. Wright, you've seen Exhibit
24 49 before, haven't you?
25      A.    I'm looking at it.

Page 542

1      THE WITNESS: I don't know if it's
2　　Arkansas. But it looks like a state because --
3      BY MR. EPPICH:
4      Q. The -- the -- but the point is is
5　　ARCOS reports -- ARCOS reports can be generated
6　　to show counties having an above-average
7　　distribution of controlled substances as
8　　compared to other counties in the state and the
9　　national average; isn't that true?
10     A. Counties --
11     MR. SHKOLNIK: Objection. Outside
12　　the scope.
13     THE WITNESS: You -- your question
14　　is counties in comparison to other counties
15　　within a state?
16     MR. EPPICH: Yes, sir.
17     THE WITNESS: Yes.
18     BY MR. EPPICH:
19     Q. And ARCOS reports can be generated
20　　to show the number of dosage units dispensed by
21　　a single pharmacy and compared that -- compare
22　　that to average pharmacy purchases in the state
23　　and across the United States; isn't that true?
24     A. Yes, it can.
25     Q. And ARCOS reports can be generated

Page 543

1     to show the number of dosage units supplied by
2     each distributor to a single pharmacy; isn't
3     that true?
4              MR. SHKOLNIK:  Objection to form.
5     And outside the scope.
6              THE WITNESS:  Yes, sir.
7              BY MR. EPPICH:
8        Q.    Now, you've been able to generate
9     these types of reports using ARCOS since at
10    least 2005, correct?
11       A.    Yes, sir.
12       Q.    And in -- in 2005, when you were
13    preparing for distributors briefings, you were
14    using these ARCOS reporting tools to identify
15    pharmacies having extraordinarily large
16    prescriptions of narcotics, weren't you?
17             MR. SHKOLNIK:  Objection to form.
18             THE WITNESS:  I'm sorry.  I lost
19    the -- the last part of your question.  Can you
20    repeat that, please.
21       Q.    Let me -- let me try it again.
22       A.    Thank you, sir.
23       Q.    In -- when you were preparing for
24    the distributor briefings --
25       A.    Yes, sir.

Page 544

1  Q. -- you were using these ARCOS
2  reporting tools to identify pharmacies having
3  extraordinarily large prescriptions in
4  narcotics, and you present that data to the
5  distributors, correct?
6  A. Yes, sir.
7  Q. You didn't -- you didn't need
8  distributors' suspicious order reports to do
9  that analysis, did you?
10  MR. MIGLIORI: Objection. Scope.
11  THE WITNESS: No, sir.
12  BY MR. EPPICH:
13  Q. Now, while you were in the targeting
14  and analysis group, one of your
15  responsibilities was to analyze the trends of
16  controlled substances -- excuse me --
17  controlled substance distributions on national,
18  state and local levels, correct?
19  A. It was one of our functions. I
20  don't know if it was a defined responsibility.
21  Q. It was one of your functions.
22  How were you and your staff using
23  ARCOS to conduct and analyze trends of
24  controlled substance distributions on a
25  national, state and local level, just -- just