# EXHIBIT 29

MEMORANDUM FOR ASA HUTCHINSON
ADMINISTRATOR
DRUG ENFORCEMENT ADMINISTRATION


FROM:              GLENN A. FINE
                   INSPECTOR GENERAL

SUBJECT:           Review of the Drug Enforcement Administration's
                   Investigations of the Diversion of Controlled
                   Pharmaceuticals, Report Number I-2002-010


        Attached is the final report covering our review of the Drug Enforcement
Administration's (DEA) efforts to investigate cases of controlled pharmaceutical
diversion.  We found that the DEA has dedicated only 10 percent of its field
investigator positions to diversion investigations.  We also found that the DEA
has failed to provide sufficient DEA special agents to assist diversion
investigators in conducting investigations of controlled pharmaceutical
diversion.  This situation has had a negative impact on the quality and
timeliness of diversion investigation cases.  In addition, we found that the DEA
provides minimal intelligence support to its diversion investigators, instead of
focusing its intelligence efforts on developing and analyzing intelligence
information on illicit drug trafficking.

        The report contains four recommendations to improve the DEA's ability
to investigate the diversion of controlled pharmaceuticals, including providing
additional intelligence support to the Office of Diversion Control to enhance its
ability to detect and investigate diversion cases.

        We sent copies of the draft report to your office on August 26, 2002 with
a request for comments.  Your September 26, 2002 response addressed each of
the report's four recommendations.  We have included your response in the
report as Appendix IV.

        Our analysis of your response describes the additional information we

need to close each of the recommendations and can be found in Appendix V. Please provide the additional information by January 17, 2003.

We look forward to working with you and assisting the DEA in resolving these issues.  If you have any questions about this report, please feel free to contact me or Paul A. Price, Assistant Inspector General for Evaluation and Inspections, on (202) 616-4620.

Attachment

cc:    Marjorie Snider
       Liaison
       Drug Enforcement Administration

       Vickie L. Sloan
       Director
       Departmental Audit Liaison Office

# EXECUTIVE SUMMARY

The Office of the Inspector General, Evaluation and Inspections Division, reviewed the Drug Enforcement Administration's (DEA) Office of Diversion Control (OD).  Our objective was to assess the DEA's investigative response to the diversion of controlled pharmaceuticals.

Diversion occurs when legally produced controlled pharmaceuticals are illegally obtained for non-medical use.  Diversion commonly involves physicians or pharmacists selling prescriptions to drug dealers or abusers, employees stealing from drug inventories, individuals improperly obtaining multiple prescriptions from different doctors, individuals forging prescriptions, or individuals robbing pharmacies.

According to the DEA, although the quantity of controlled pharmaceuticals diverted is unknown, controlled pharmaceuticals account for 30 percent of all reported deaths and injuries associated with drug abuse.[1]  In addition, the DEA Administrator, in a speech to the American Pain Society in March 2002, noted that the number of people who abuse controlled pharmaceuticals each year approximately equals the number who abuses cocaine – 2 to 4 percent of the U.S. population.  Further, a recent study conducted by the Department of Health and Human Services identified controlled pharmaceuticals as factors in 25 percent of all reported overdose deaths and 20 percent of all emergency room visits relating to drug abuse.

Within the DEA, the OD is responsible for overseeing the distribution system for controlled pharmaceuticals and regulated chemicals, and for preventing the diversion of those substances.  The Controlled Substances Act of 1970 requires all businesses that manufacture or distribute controlled pharmaceuticals; all health professionals who dispense, administer, or prescribe controlled pharmaceuticals; and all pharmacies that fill prescriptions to register with the DEA.  At DEA field offices throughout the United States, diversion investigators review applications of potential registrants,

---

[1] Drug abuse is not always associated with the diversion of controlled pharmaceuticals.  The data available for our analysis does not specifically identify what percentage of the problem is attributable to diversion of controlled pharmaceuticals versus the abuse of legally obtained prescriptions.

monitor existing registrants through cyclical investigations, and investigate allegations of diversion of controlled pharmaceuticals and regulated chemicals.[2]

Our review found that DEA's enforcement efforts have not adequately addressed the problem of controlled pharmaceutical diversion.  Despite the widespread problem of pharmaceutical abuse, the DEA has dedicated only 10 percent of its field investigator positions to diversion investigations.  Since 1990, the number of diversion investigators as a percentage of total DEA investigators has decreased by 3 percent.

We also found the DEA has failed to provide sufficient DEA special agents to assist diversion investigators in conducting investigations of controlled pharmaceutical diversion.  Diversion investigators lack law enforcement authority and therefore must request either DEA special agents or local law enforcement officers to perform essential activities such as conducting surveillance, issuing search warrants, managing confidential informants, and performing undercover drug purchases.  We found that difficulties in obtaining law enforcement assistance have caused delays in developing cases for prosecution.  The quality of investigations also has suffered because of the need to use investigators external to the diversion control program who lack experience in conducting controlled pharmaceutical investigations, which often require establishing the criminal intent of doctors, pharmacists, and other medical professionals.  Over the past 25 years, DEA officials have acknowledged these problems and proposed solutions ranging from vesting diversion investigators with criminal investigative authority to assigning special agents to diversion units on a full-time basis.  However, the DEA still has not implemented an effective solution.

In addition, we found that the DEA provides minimal intelligence support to its diversion investigators, instead focusing its intelligence efforts on developing and analyzing intelligence information on illicit drug trafficking.  The one potential intelligence resource currently available to diversion investigators is the Automation of Reports and Consolidated Orders System (ARCOS).  However, diversion investigators stated that ARCOS reports are limited in their value as an intelligence resource because of problems of completeness, accuracy, and timeliness. Diversion staff at Headquarters and in the field offices told the OIG that

---

[2] Diversion investigators are not criminal investigators.  They do not have arrest authority and cannot perform law enforcement functions such as serving warrants, conducting surveillance, managing confidential informants, and working undercover.

they do not have the adequate resources to analyze and develop ARCOS data into useful intelligence products.

Despite limitations with ARCOS, we found that the DEA is in the process of increasing its intelligence support to diversion investigators in other ways.  It is currently developing the Internet Online Investigations Project, which will aid in the identification of web sites that are possibly involved in the diversion of controlled substances.  In addition, the DEA intends to establish a diversion intelligence group by the end of fiscal year 2002.

While the DEA has traditionally focused the bulk of its resources on disrupting illicit drug trafficking operations, we believe it is critical for the DEA to devote more resources to counteract the widespread controlled pharmaceutical diversion problem.  We recommend the DEA:

- Increase investigative resources devoted to the controlled pharmaceutical diversion problem;

- Clarify the roles, responsibilities, and law enforcement authorities of diversion investigators;

- Ensure adequate training for DEA special agents in diversion investigation procedures; and

- Fully implement the Online Investigations Project and the diversion intelligence group to provide effective intelligence support to the OD.  Also, the DEA should continue to explore additional intelligence capabilities to support the diversion investigator.

# TABLE OF CONTENTS

**INTRODUCTION** ......................................... 1

    Inspection Scope and Methodology.................................. 1

**BACKGROUND** ......................................... 3

    Diversion Control Program Organization and Staffing.................... 5
    Diversion Investigator Responsibilities .......................... 7
    Diversion Control Program Funding .............................. 8

**RESULTS OF THE INSPECTION** .......................... 9

    Insufficient Allocation of Investigative Resources to Controlled
    Pharmaceutical Diversion ........................................ 10
        **Recommendation 1** ................................... 13

    Lack of Law Enforcement Authority for Diversion Investigators....... 14
        Current DEA Policy Regarding the Role of the Diversion
        Investigator ............................................ 16
        Effect on the Quality of Diversion Investigations ................. 18
        Effect on the Timeliness of Diversion Investigations ............. 19
        Improving Investigative Capability ....................... 20
        **Recommendation 2** ................................... 22
        **Recommendation 3** ................................... 22

    Insufficient Intelligence Support.................................... 22
        **Recommendation 4** ................................... 25

**CONCLUSION** ......................................... 26

**APPENDIX I:**  Diversion Investigator work years for all types of
investigations, 1993-2001 ..................................... 27
**APPENDIX II:**  Diversion Investigator and Special Agent work years for
controlled pharmaceutical and illicit drug investigations, 1993-2001....... 28
**APPENDIX III:**  Percentage of time spent by Diversion Investigators on
all types of investigations, 1993-2001..................................... 29
**APPENDIX IV:**  DEA Management Response .......................... 30
**APPENDIX V:**  Office of the Inspector General's Analysis of the DEA's
Management Response......................................... 32

# INTRODUCTION

Diversion occurs when legally produced controlled pharmaceuticals are illegally obtained for non-medical use.  Diversion commonly involves physicians or pharmacists selling prescriptions to drug dealers or abusers, employees stealing from drug inventories, individuals improperly obtaining multiple prescriptions from different doctors, individuals forging prescriptions, or individuals robbing pharmacies.

The number of dosage units of controlled pharmaceuticals dispensed in the United States has grown at an average annual rate of 6 percent since 1992 to a total of nearly 3 billion dosage units in 2000.  Along with this growth, non-medical use of controlled pharmaceuticals has increased, especially narcotics, stimulants, depressants, and anabolic steroids.  Overall, according to the Drug Enforcement Administration (DEA), the number of people who use controlled pharmaceuticals for non-medical purposes each year approximately equals the number who uses cocaine – 2 to 4 percent of the U.S. population.  Due to the far-reaching effect of the controlled pharmaceutical diversion problem, it is critical for the DEA to devote sufficient resources to investigate diversion of controlled pharmaceuticals.  It is also important for the DEA to recognize emerging trends and patterns of controlled pharmaceutical diversion and to respond quickly where significant problems are developing.

The Office of the Inspector General, Evaluation and Inspections Division, reviewed the DEA's Office of Diversion Control (OD).  Our objective was to assess the DEA's investigative response to the diversion of controlled pharmaceuticals.

**Inspection Scope and Methodology**

We conducted our fieldwork from August 2001 to July 2002.  At DEA headquarters, we reviewed policies and procedures and interviewed DEA officials, including the DEA Deputy Administrator, Chief of the Operations Division, Chief of the Intelligence Division, and Deputy Assistant Administrator of the Office of Diversion Control, to obtain information on the DEA's efforts to investigate the diversion of controlled pharmaceuticals.  In addition to its investigative duties, the OD is responsible for registering manufacturers and distributors of controlled pharmaceuticals and regulated chemicals, conducting cyclical investigations of manufacturers and distributors of controlled

pharmaceuticals and regulated chemicals, and investigating the diversion of regulated chemicals.  Our review did not examine these latter areas of responsibility.

To review OD investigations, we conducted site visits at DEA field offices in Washington, D.C.; Baltimore, Maryland; Philadelphia, Pennsylvania; and Boston, Massachusetts.  While on-site, we interviewed diversion personnel and DEA special agents, reviewed criminal diversion case files, and obtained workload statistics.  At these locations, we also interviewed Assistant United States Attorneys (AUSAs) to obtain their feedback on the effectiveness of diversion investigators in performing criminal diversion investigations, the adequacy of current DEA policy for performing diversion criminal investigations, and the quality and timeliness of the investigative casework submitted to AUSAs by diversion investigators.

We obtained additional information from 11 DEA field office diversion program managers through a telephone survey.  We also conducted interviews with five state and local police officers who conduct investigations jointly with DEA diversion investigators.  To obtain information on drug abuse trends, we interviewed Department of Health and Human Services (HHS) officials from the NIDA and the Substance Abuse and Mental Health Services Administration (SAMHSA).

# BACKGROUND

The Drug Abuse Prevention and Control Act (Act) was enacted on October 27, 1970. The Act initiated the "war on drugs" and focused on stemming the rising tide of illicit drug abuse and associated violence. Title II of the Act, known as the Controlled Substances Act (CSA), gave the Bureau of Narcotics and Dangerous Drugs (BNDD) the authority to regulate pharmaceuticals. The BNDD developed the policies and procedures for what was to become the OD when the DEA was established on July 1, 1973. Today, the OD regulates the distribution system for controlled pharmaceuticals and regulated chemicals, and is charged with preventing the diversion of those substances.

Over the past 30 years, controlled pharmaceutical use has dramatically increased. From 1973 to 2002, the number of controlled pharmaceuticals approved for sale by the Food and Drug Administration increased from 2,036 to 15,776. In 1970, individuals spent $5.5 billion on controlled pharmaceuticals in the United States. By 1999, this expenditure had increased to $99.6 billion.

With the rise in the manufacture and sale of controlled pharmaceuticals came the inevitable abuse and diversion of these beneficial drugs. According to the Acting Administrator of NIDA, the incidence of non-medical use of controlled pharmaceuticals has doubled over the last 10 years. The DEA reports that controlled pharmaceutical abuse now accounts for 30 percent of all reported deaths and injuries associated with drug abuse. According to the DEA, the most commonly diverted substances are narcotics, stimulants, depressants, and anabolic steroids. Additionally, HHS's Drug Abuse Warning Network (DAWN) study on overdose deaths shows controlled pharmaceuticals are factors in 25 percent of all reported overdose deaths and 20 percent of all emergency room visits relating to drug abuse. Further, as shown in Chart 1 on the next page, over the past 15 years the estimated number of first-time abusers of pain relievers, tranquilizers, stimulants, and sedatives has increased.

**Chart 1. Estimated Number (in Thousands) of First-Time Non-Medical Users of Certain Categories of Controlled Pharmaceuticals, 1985-1999**



Source: 1999-2000 National Household Survey on Drug Abuse, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services.

According to a September 2001 DEA report, hydrocodone products remain the most commonly diverted category of controlled pharmaceuticals.[3]  All 21 DEA domestic field division offices mentioned this drug in their third quarter fiscal year (FY) 2001 reports as one of the most commonly diverted controlled pharmaceuticals.  Hydrocodone diversion has been escalating over the past decade.  In 1994, 7 million dosage units were illegally diverted; this increased to 11 million in 1997. Since 1990, the number of hydrocodone prescriptions increased by

---

[3] Hydrocodone is an opiate, used as an anti-cough agent, that is an effective analgesic for mild to moderate pain control.  It is abused for its opiate-like effects.  It is commonly sold under the trade names Vicodin (the most prescribed pain reliever in the United States), Lorcet, and Lortab.

300 percent, while during the same period emergency room visits attributed to hydrocodone abuse increased by 500 percent.  OxyContin diversion has also become an increasing problem.[4]

## Diversion Control Program Organization and Staffing

The OD is located at DEA Headquarters in Washington, D.C.  It provides policy direction, program guidance, and support to DEA diversion staff in the field.  The OD is a subcomponent of DEA's Operations Division, which is one of six major organizational elements at DEA Headquarters.  DEA special agents head both the Operations Division and the OD.  According to the OD Deputy Assistant Administrator, a proposal to elevate the OD to a division is currently under review by DEA's Office of Legal Counsel and the Department of Justice (DOJ).

The DEA field structure includes 21 domestic field division offices headed by a Special-Agent-in-Charge (SAC) and 214 sub-offices.  Although the staff at DEA field offices are predominantly DEA special agents, with full law enforcement authority, every field division office and 51 of the sub-offices have a diversion control unit.  These units are staffed by diversion investigators, who do not have law enforcement authority, and are typically headed by a diversion investigator supervisor.  Diversion program managers at each of the 21 field divisions supervise diversion control operations within their geographical area of responsibility.

---

[4] OxyContin, introduced in 1995, has a time-release feature that controls pain over an extended period of time.  When abused, the drug is crushed to negate the time-release design, thereby providing an immediate full dose of oxycodone, giving the abuser a heroin-like high.  From 1995 to 2000, OxyContin prescriptions increased by 1,800 percent to 5.8 million per year.

Serious problems with OxyContin abuse were initially noticed in 1998 in depressed rural eastern areas of the United States including sections of Maine, Virginia, and Kentucky.  By the early fall of 2000, OxyContin abuse rapidly increased and spread to other areas of the country, especially in Maryland, West Virginia, Florida and urban areas such as Philadelphia, Pennsylvania and Boston, Massachusetts.  Among other places, OxyContin has been identified as a serious problem in Arizona, Louisiana, and Ohio.

**Figure 1. Organizational Chart for Drug Enforcement Administration**



Source:  DEA

The DEA also has established Tactical Diversion Squads (TDS) at selected field locations.  As of July 2002, TDSs were located at field offices in Boston, Denver, Houston, New Orleans, Seattle, and St. Louis. The TDSs consist of a combination of federal, state, and local law enforcement officers.  The mission of these multi-agency squads is to detect, investigate, disrupt, and refer for prosecution violators of the CSA and similar state statutes; in short, to curtail the diversion of controlled pharmaceuticals and regulated chemicals within a geographic area.  The TDSs currently operate under the supervision of a special agent, but were formerly supervised by a diversion program manager.

Diversion investigators represented 10 percent, or 523, of the DEA's 5,124 authorized investigator positions in FY 2001.  The authorized diversion investigator positions were assigned as follows: 55 at headquarters, 455 at domestic field offices, and the remaining 13 at overseas offices.  At the end of FY 2001, actual on-board staffing consisted of 43 diversion investigators at OD headquarters and 424 diversion investigators at DEA domestic field and overseas offices.

**Diversion Investigator Responsibilities**

The CSA requires all businesses that manufacture or distribute controlled pharmaceuticals; all health professionals who dispense, administer, or prescribe controlled pharmaceuticals; and all pharmacies that fill prescriptions to register with the DEA.  At DEA field offices, diversion investigators are responsible for investigating applications of potential registrants, monitoring existing registrants through cyclical investigations, and investigating allegations of the diversion of controlled pharmaceuticals and regulated chemicals.  According to the DEA's Work Hours Reporting System, during FY 2001 field diversion investigators spent 20 percent of their time on processing registrant applications, 13 percent on cyclical investigations, 66 percent on investigations of criminal complaints or alleged criminal activity, and 1 percent on other activities.[5]

Diversion investigators in DEA field offices review and approve applications submitted by potential registrants.  Prior to approving an application, diversion investigators conduct a background review of the criminal histories of the applicant, the applicant's company, and company employees; ensure the applicant has not had similar federal or state licenses revoked in the past; and inspect the applicant's security measures to protect the controlled pharmaceuticals from theft.  Once approved, the applicant is assigned a DEA registration number and is permitted to manufacture and/or distribute controlled pharmaceuticals.

As part of the registrant monitoring process, diversion investigators conduct investigations of registrants every five years to ensure they are complying with federal law and regulations.  For example, during a review of a drug manufacturer the diversion investigator ensures that the amounts of specific controlled pharmaceuticals produced are within the DEA's prescribed limits and that the manufacturer is complying with regulatory requirements relating to physical security, records accountability, and adherence to CSA standards.  Violations of regulations may result in administrative, civil, or criminal action, depending on the severity of the infraction.

With respect to investigations of diversion of controlled pharmaceuticals, examples of DEA cases include:

---

[5] Of the 66 percent, 48 percent of the investigative time related to controlled pharmaceuticals and 18 percent related to regulated chemicals.  See Appendix 1 for a detailed breakout of the number of diversion investigator work years spent on each activity.

- Physicians who sell prescriptions to drug dealers or abusers;

- Pharmacists who falsify records and improperly sell the drugs;

- Employees of manufacturers, distributors, and pharmacies who steal from drug inventories;

- Individuals who forge prescriptions;

- Individuals who rob pharmacies and drug distributors;

- Individuals who routinely visit multiple doctors with the same ailment in order to obtain multiple prescriptions for controlled pharmaceuticals; and

- Criminal organizations that divert and sell controlled pharmaceuticals.

Diversion investigators learn of possible diversion of controlled pharmaceuticals through information received from the public, local police, or DEA informants. Because diversion investigators do not have arrest authority or carry weapons, they must rely on the assistance of DEA special agents or other law enforcement officers, such as state or local police, to assist them in their investigations.

**Diversion Control Program Funding**

Public Law 102-395 required that effective October 1, 1993, the DEA collect fees (both initial and renewal fees) to ensure the recovery of the full costs of operating the OD. The legislation required that registration fees collected by the DEA be deposited into a Diversion Control Fee Account within the general fund of the U.S. Treasury. At least quarterly, the U.S. Treasury is required to provide funds from this account to reimburse the DEA for expenses involving controlled pharmaceutical diversion operations.

The registrant fees collected by the DEA support only the registering, monitoring, and investigating activities associated with controlled pharmaceuticals. The other function of the OD – registering, monitoring, and investigating activities associated with regulated chemicals – is funded by direct appropriations. In FY 2001, the DEA expended approximately $65.7 million out of its registrant fee account for

controlled pharmaceutical diversion operations.  During this same period, the DEA was appropriated $16.1 million to fund its regulated chemical diversion operations.

# RESULTS OF THE INSPECTION

## INSUFFICIENT ALLOCATION OF INVESTIGATIVE RESOURCES TO CONTROLLED PHARMACEUTICAL DIVERSION

**Despite the widespread problem of controlled pharmaceutical diversion and abuse, the DEA has been slow to commit sufficient resources to address the problem.  The DEA continues to devote a significantly lower percentage of its criminal investigation resources to criminal investigations of controlled pharmaceutical diversion than to criminal investigations of illicit drugs, such as cocaine, heroin, and methamphetamines.**

Various studies have documented the prevalence of non-medical use of controlled pharmaceuticals.  For example:

- The National Household Survey on Drug Abuse (NHSDA), conducted by the SAMHSA in 2000 identified 13.1 million people, aged 12 and older, who had abused drugs other than marijuana in the past year.  These drugs included controlled pharmaceuticals used non-medically and all illicit drugs such as heroin, cocaine, hallucinogens (e.g., LSD, PCP, and Ecstasy), and methamphetamine.  Of the nearly 13.1 million drug users, over 8.8 million (67 percent) were non-medical users of controlled pharmaceuticals.

- HHS's 1999 DAWN study on drug overdose deaths indicated controlled pharmaceuticals were mentioned as a factor in 25 percent of reported deaths and 20 percent of emergency room visits related to drug abuse.

- Two reports issued by the Florida Department of Law Enforcement indicated that from 2000 to 2001, the number and percent of deaths attributable to controlled pharmaceuticals as compared to illicit drugs dramatically increased.[6]  During 2000, of the 773 deaths caused by drugs, 284 (37 percent) were caused by controlled pharmaceuticals and 489 (63 percent)

---

[6] 2000 "Report of Drugs Identified in Deceased Persons by Medical Examiners" and 2001 "Report of Drugs Identified in Deceased Persons by Florida Medical Examiners."

were caused by illicit drugs.  In 2001, of the 1,657 deaths caused by drugs, 943 (57 percent) were attributed to controlled pharmaceuticals and 714 (43 percent) were attributed to illicit drugs.

Despite the widespread misuse of controlled pharmaceuticals, field diversion investigators, whose goal is to prevent the diversion of controlled pharmaceuticals, constitute only 10 percent of the DEA's total field investigator positions.  The chart below shows not only that this percentage has actually declined from a high of 13 percent in FY 1990, but also demonstrates the significant difference in the number of DEA diversion investigators compared to special agents over the past 12 years.

**Chart 2. Special Agent and Diversion Investigator Staffing, 1990-2001**



Source:  DEA

In FY 2001, at DEA domestic field offices, diversion investigators and DEA special agents spent approximately 187 investigator work years on criminal investigations and complaints related to controlled pharmaceuticals compared to over 2,229 work years on criminal investigations related to illicit drugs (excluding marijuana), such as

heroin, cocaine, hallucinogens, and methamphetamine.[7]  This means that of the total 2,416 work years spent by DEA domestic field investigators (including both diversion investigators and special agents) on drug investigations (excluding marijuana), only 7.7 percent of the total time was spent on investigations related to controlled pharmaceuticals.  In fact, as shown in Chart 3, since FY 1993 investigative resources allocated for investigations of controlled pharmaceuticals actually decreased.

**Chart 3. Work Years Spent on Illicit Drugs and Controlled Pharmaceuticals**



|  | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|---|
| Diversion Investigator/ Special Agent Work Years Spent on Controlled Pharmaceuticals | 229.4 | 222.4 | 211.8 | 196.8 | 186.7 | 188.9 | 197.4 | 196.4 | 187.4 |
| Special Agent Work Years Spent on Illicit Drugs | 2015.7 | 1976.0 | 1779.6 | 1686.1 | 1794.8 | 1951.9 | 2208.4 | 2290.5 | 2229.0 |

Source: DEA Work Hours Reporting System, 1993-2001.

---

[7] Work years pertaining to criminal investigations and complaints of controlled pharmaceuticals include time spent by both diversion investigators and special agents. We were unable to determine actual hours spent by special agents on diversion investigations because this is not categorized in the special agents' time records.  DEA officials told us that a reasonable estimate would be 1 to 3 percent of the agent's total time.  As a conservative estimate, we used 3 percent in our calculations.  See Appendix 2 for details.

As previously noted, the 2000 NHSDA study found that 67 percent of the 13 million people who had used drugs other than marijuana in the past year were abusing controlled pharmaceuticals.  Yet, in FY 2001, only 7.7 percent of DEA investigator time was spent on investigations relating to controlled pharmaceuticals.

In July 2002, the DEA Deputy Administrator, the OD Deputy Assistant Administrator, and the DEA Chief of Operations, told us that they recognized the need for additional diversion investigator positions. The OD Deputy Assistant Administrator cited DEA's FY 2003 budget request for an additional 75 diversion investigator positions, a 14 percent increase in authorized positions, as an indication of the DEA's intent to expand its diversion program.[8]  The DEA Deputy Administrator also cited the budget request as a positive step in addressing the imbalance in DEA resources allocated to investigations of illicit drugs versus the diversion of controlled pharmaceuticals.[9]

**Recommendation 1:**  The DEA Administrator should increase investigative resources devoted to the controlled pharmaceutical diversion problem.

---

[8] The DEA is proposing to assign 40 of these positions to field offices experiencing OxyContin diversion problems.

[9] At the end of FY 2001, the DEA had 56 unfilled diversion investigator positions.

## LACK OF LAW ENFORCEMENT AUTHORITY FOR DIVERSION INVESTIGATORS

**Diversion investigators do not have law enforcement authority even though they are responsible for investigating suspected sources of diversion and for initiating administrative, civil, or criminal action against these sources.  As a result, diversion investigators are precluded from conducting surveillance and undercover work, directing and/or paying confidential informants, and serving arrest and search warrants.  Because these law enforcement activities are frequently needed to build an effective case, diversion investigators must rely on assistance from DEA special agents or state and local law enforcement officers.  This reliance on other investigators has detrimentally affected the timeliness and quality of diversion cases.**

In the early years of the OD, the focus of diversion investigators' work was on regulatory activities.  Because the diversion of controlled pharmaceuticals has become more widespread, diversion investigators now spend the majority of their time on investigative activities.  According to DEA's Work Hours Reporting System, from FY 1993 through FY 2001 diversion investigators spent from 64.8 percent to 74.5 percent of their time on controlled pharmaceutical and regulated chemical investigations.  See Appendix 3 for details.

The DEA periodically has reassessed the role of diversion investigators in conducting criminal investigations.  According to the DEA, it has variously considered modifying the diversion investigator's role from conducting only regulatory activities to full conversion to special agents.

For example, in January 1977 the DEA Acting Deputy Administrator issued a memorandum clarifying DEA's policy relating to the duties of the diversion investigators (who were then classified as compliance investigators).  This memorandum stated that diversion investigators were prohibited from making undercover purchases of evidence; directing, registering, and paying informants; conducting moving surveillance; conducting arrests; and executing search warrants.  The memorandum also directed regional managers to ensure that DEA special agents were available to assist diversion investigators in these activities.  However, according to DEA officials we interviewed, DEA

managers at some field offices independently allowed diversion investigators to perform some surveillance, manage confidential informants, and participate in arrests.

The DEA considered providing diversion investigators with special agent authority in 1991.  On December 23, 1991, the DEA Administrator issued a memorandum to the Assistant Administrator for Operational Support directing the DEA to create a new core series for diversion investigators to expand and enhance their responsibilities by empowering them to "carry firearms, make arrests, handle informants, conduct stationary and moving surveillances, and perform undercover work."  The new series investigators would be responsible for conducting both criminal diversion investigations and cyclical investigations.  The memorandum further stated that while current diversion investigators could choose to remain in their existing job series, all future investigators would be hired under the new core series.

DEA's Deputy Assistant Administrator for Personnel officially notified field diversion investigators of this change of policy on June 30, 1992.  On October 2, 1992, DEA's Deputy Assistant Administrator for Operational Support prepared a written plan for converting the diversion positions.  The cost to complete the conversion was estimated at $10 million.  The DEA also estimated that only half of the 412 diversion investigators on board met the eligibility requirements for conversion to the new core series.

In November 1993, the Deputy Assistant Administrator for Operations sent a memorandum to the Acting Administrator requesting that he intervene with the DOJ to facilitate the diversion investigator conversion process.  In November 1994, the Assistant Administrator for Operations sent a memorandum to diversion investigators querying them on their interest in converting to criminal investigators.

In August 1995, the newly appointed DEA Administrator sent a memorandum to diversion investigators stating that, based on conversations he had with numerous diversion investigators, he determined that the solution was not to convert diversion investigators to criminal investigators, but rather to develop a definable career ladder for diversion investigators.  The Administrator said the diversion investigators to whom he had spoken were uninterested in a full-service law enforcement career and expressed concerns that requiring conversion would dilute the technical expertise of the OD.  As a result, the previous plan to convert diversion investigators to law enforcement agents was never implemented.

### Current DEA Policy Regarding the Role of the Diversion Investigator

In August 2001, the DEA's Operations Division issued a policy memorandum to DEA field offices reiterating the restrictions on the role of diversion investigators specified in the January 1977 memorandum. The August 2001 memorandum stated that diversion investigators were prohibited from:

- Directing, registering, or paying confidential informants;

- Participating in routine surveillance activities; and

- Authorizing or controlling undercover purchases of evidence involving direct contact with a suspect.

The memorandum also directed DEA field offices to assign two special agents full time to each field diversion group to provide law enforcement assistance. The memorandum required "duty specific training" for each special agent assigned to diversion groups and specified that only special agents control the circumstances and advisability of undercover purchases. The memorandum also designated an Assistant Special-Agent-in-Charge (ASAC) at each field office to oversee the operational activities of the diversion control program. In addition, a supervisory special agent, not a diversion program manager, would supervise special agents assigned to the diversion group.

According to the OD Deputy Assistant Administrator, this memorandum was issued to standardize field diversion operations nationwide. She stated that over the years some field offices had permitted diversion investigators to perform activities ordinarily performed by special agents such as surveillance and managing confidential informants. She stated that she was concerned that diversion investigators were performing activities they were not properly trained for or authorized to perform. This led to a concern that some investigations could be successfully challenged in court.

The policy memorandum attempted to compensate for the continuing restrictions on diversion investigators by providing diversion investigators full-time access to two special agents at each field location. The policy memorandum also tried to address a common complaint of the diversion investigators – that the special agents assigned to diversion cases lacked the necessary expertise – by establishing specialized training for the special agents in diversion activities.

However, we found that although the DEA has enforced the restrictions on its diversion investigators, it did not provide the full-time special agents to the diversion investigators.  At all four field offices we visited, full-time special agents had not been assigned to diversion investigations.  The SACs at these locations cited a lack of manpower as the prevailing reason for noncompliance with the directive.  Additionally, our survey of 11 diversion program managers found that only one division was in compliance with the August 2001 policy memorandum.

Because of the lack of special agent assistance, the difficulties that diversion investigators historically have had in obtaining investigative assistance continue.  We found that out of necessity diversion investigators relied more on state and local law enforcement officers than on DEA special agents to assist them in their investigations.  Based on estimates provided by DEA field officials, DEA special agents assisted diversion investigators, on average, in 44 percent of their criminal diversion investigations and state or local officers assisted diversion investigators in the other 56 percent of their cases.[10]

Nine of the 11 diversion program managers we surveyed cited the lack of law enforcement authority as the largest obstacle in conducting criminal diversion investigations, and 8 of the 11 stated that the August 2001 policy further inhibited their ability to conduct timely and effective investigations.

We also found that the training requirement specified in the August 2001 memorandum had not been implemented.  According to training staff at the DEA training academy in Quantico, Virginia, a diversion training course for DEA special agents was never developed.

The August 2001 policy memorandum also greatly diminished the role of the diversion program manager.  According to the memorandum, a supervisory special agent, not the diversion program manager, would be responsible for overseeing special agents assigned to the diversion group.  This responsibility includes developing work-plans and preparing annual performance evaluations for both special agents and diversion investigators.  TDS management was shifted from a diversion investigation supervisor to a supervisory special agent.  According to the OD Deputy Assistant Administrator, the purpose of shifting the

---

[10] Eleven diversion program managers were surveyed and provided input that we averaged.

supervisory responsibility to a supervisory special agent was to facilitate the assignment of special agents to assist on diversion investigations.

Nearly all of the diversion investigators we interviewed expressed concern that the August 2001 policy diminished the effectiveness of diversion investigations. According to one diversion program manager, the August 2001 policy had an immediate and negative effect on diversion investigations in his field office. The SAC in this office interpreted the memorandum to mean diversion investigators were not to conduct any investigations of a criminal nature. Consequently, he issued a memorandum on September 12, 2001, directing diversion investigators to concentrate their efforts on registration activities. The diversion program manager stated that because the diversion investigators were pulled off open diversion cases and the field office lacked special agents to take over the cases, action on 20 diversion cases was delayed.

During an interview in July 2002, the OD Deputy Assistant Administrator acknowledged the requirements of the memorandum had not been fully met because the field offices did not assign and did not train special agents to work on diversion investigations. Similarly, the DEA Deputy Administrator also told the OIG in July 2002 that the DEA field offices did not assign special agents to assist in diversion investigations due to resource problems. He said that DEA field offices often do not have enough special agents to conduct illicit drug investigations and are reluctant to assign them to diversion cases. He added that the DEA is still trying to decide how best to provide investigative support for diversion investigations.

Apart from the August 2001 policy memorandum, we found that the DEA is beginning to address some OD personnel issues. The OD Deputy Assistant Administrator stated the DEA has established grade parity for diversion investigators with criminal investigators by establishing a journeyman GS-13 level for diversion investigators. She added that she is working with DEA's Division of Personnel Management to determine whether the grade level for diversion program manager positions could be raised to GS-15.

## Effect on the Quality of Diversion Investigations

The four AUSAs we interviewed who worked with the DEA on diversion prosecutions cited the need for investigators who are familiar with and experienced in conducting diversion investigations. They stated that cases involving controlled pharmaceuticals are more difficult to

prosecute because of the need to prove a subject's intent to use the drug illicitly.  For example, in a case involving a doctor, prosecutors must clearly demonstrate the doctor purposefully diverted a controlled pharmaceutical, as opposed to making a medical misjudgment.  Therefore, they believed it is important that the investigator developing the case possesses a comprehensive knowledge of diversion issues.  They said special agents usually lack the experience required for diversion investigations.  In contrast, the AUSAs stated diversion investigators usually produce high quality cases for prosecution.

We found that significant problems have occurred in cases where diversion investigators had to rely on local or state law enforcement officers for criminal investigative assistance.  One case file we reviewed showed that excessive delays occurred due to constant reassignment of officers, which necessitated additional briefings and training.  In addition, the law enforcement officers' unfamiliarity with the nuances of conducting controlled pharmaceutical buys resulted in several buys having to be repeated because they did not conform with diversion program policies.  According to the case file, local law enforcement officers spent seven months preparing a search warrant.  The AUSA assigned to the case ultimately decided the undercover work performed by the local law enforcement officers was not sufficient to establish criminal intent and requested that a DEA special agent gather the evidence.

**Effect on the Timeliness of Diversion Investigations**

Lack of available special agents also impeded diversion investigations by causing excessive delays.  The AUSAs we spoke to cited frequent case delays due to the need for the diversion investigator who was developing the case to wait for assistance from DEA special agents to perform undercover work, surveillance, or other investigative activities.  Often, special agents were unavailable or lacked diversion investigation expertise.  One AUSA stated that all of the diversion cases he was involved with had been delayed due to the unavailability of DEA special agents.  A case we reviewed that was already delayed nine months due to problems related to the quality of local law enforcement support was delayed an additional four months until a DEA special agent was available to assist in substantiating the evidence.

State and local officials we spoke to who work with diversion investigators agreed with the AUSAs' assessment that the lack of DEA

special agent assistance delayed investigations.[11]  Most police officers said they were surprised to discover the restrictions on diversion investigators.  They commended the expertise of DEA diversion investigators and believed they should be empowered to use all routine law enforcement investigative tools.

**Improving Investigative Capability**

Because the diversion of controlled pharmaceuticals is widespread, it is important that the DEA dedicates a sufficient number of qualified personnel to investigating these cases.  It is particularly important that diversion investigators have appropriate investigative support.  We found that the lack of timely and effective support has hurt the effectiveness of diversion investigations.  While the DEA has considered solutions to this problem over the years, the problem has not yet been resolved.  We believe the DEA has several options to improve the quality and timeliness of diversion control investigations.  These include:

- Converting all diversion investigator positions to criminal investigative positions;

- Assigning special agents, in a timely manner, to assist diversion investigators; or

- Establishing a limited number of criminal investigative positions within the field diversion groups and funding these positions out of the diversion fee account.

Most of the diversion investigators we spoke with believed that, at a minimum, diversion investigators need the investigative tools authorized in the past, such as the ability to conduct stationary surveillance and manage confidential informants.  However, they believed the most effective solution would be to create a new occupational category exclusive to the OD that would grant diversion investigators full law enforcement powers.

We found divergent opinions among the SACs and ASACs during our site visits as to whether diversion investigators should be given law

---

[11] Assessments of DEA diversion investigators and their work were provided by city police officers from Philadelphia, Pennsylvania; Boston, Massachusetts; and Alexandria, Virginia; and by state police officers from Maryland, Massachusetts, and Pennsylvania.

enforcement authorities.  Of the two SACs and two ASACs we interviewed, two were in favor and two were not.  The two individuals in favor of the proposal stressed the benefits of having a single individual conduct an investigation from beginning to end.  The two individuals not in favor of the proposal believed that diversion investigators should exclusively focus on regulatory activities.

The OD Deputy Assistant Administrator said she is preparing a proposal with the three options referenced above, along with a fourth option that would restrict the field diversion units solely to performing regulatory activities.  She stated that she will present the proposal to the DEA Administrator within the next few months for a decision.

The OD Deputy Assistant Administrator told us that conversion of diversion investigators to full agent status has both positive and negative aspects.  On the positive side, full conversion would make the diversion investigators more autonomous and would increase their effectiveness. On the negative side, the OD Deputy Assistant Administrator was concerned that the regulatory functions of the program would be neglected in favor of criminal investigations.  She also cited the costs involved and the problem of some current diversion investigators' ability to meet the stricter qualification standards to be special agents.  She said that the diversion investigator positions were initially created because special agents were not interested in performing regulatory work.  She noted that she had been approached by some diversion investigators who indicated that they did not want to become special agents.

The DEA Deputy Administrator acknowledged the need for diversion investigators to have criminal investigative support in conducting diversion investigations.  During his interview with the OIG, he reiterated the positive and negative aspects noted by the OD Deputy Assistant Administrator of providing diversion investigators with law enforcement authorities.  He stated that although the DEA has grappled with this issue for decades, it has been unable to come up with a solution.

We believe that the DEA needs to make a definitive decision on how diversion investigators will obtain the investigative support they need to effectively accomplish their duties and mission.  We favor establishing a limited number of criminal investigative positions, dedicated to diversion investigations, within the field diversion groups and funding these positions out of the diversion fee account.  Since two of the three primary functions of diversion control are regulatory, it does not seem cost-effective to fully staff the OD with criminal investigators.

We also believe that it is important for DEA special agents to be knowledgeable about diversion investigation procedures.  This can be accomplished by incorporating diversion investigation training into the current DEA special agent training program.

**Recommendation 2:**  The DEA Administrator should clarify the roles, responsibilities, and law enforcement authorities of diversion investigators.

**Recommendation 3:**  The DEA Administrator should ensure adequate training for DEA special agents in diversion investigation procedures.

## INSUFFICIENT INTELLIGENCE SUPPORT

**The DEA provides minimal intelligence support to diversion investigators and instead focuses on developing and analyzing intelligence on illicit drug trafficking.**

We found that the intelligence support provided by the DEA to diversion investigators is minimal.  The Operations Planning and Support Unit in the OD provides a twice-yearly national summary report on drug diversion activity compiled from DEA field office reports.  The only other resource available to diversion investigators is the quarterly reports provided by DEA's controlled pharmaceutical tracking system, the Automation of Reports and Consolidated Orders System (ARCOS).[12]

---

[12] The ARCOS reports contain information on the inventories, acquisitions, and dispositions of certain controlled pharmaceuticals, as reported quarterly by manufacturers and distributors.  These reports show transactions for broad categories of controlled pharmaceuticals but not specific drugs.  Annually, 30 million transactions are entered into ARCOS.  ARCOS details the flow of DEA controlled pharmaceuticals from their point of manufacture through commercial distribution channels to the sale or distribution to dispensing or retail outlets (such as pharmacies, health care practitioners, and hospitals).  ARCOS, however, only contains the transactions of the 1,100 manufacturers and distributors of the controlled pharmaceuticals that comprise a small percentage of the 1 million total DEA registrants.

The ARCOS reports provide information on controlled pharmaceutical purchases by region, by company, and by category of controlled pharmaceutical.  Three types of reports are provided:  the largest purchasers of controlled pharmaceuticals by state, the top 100 manufacturers and distributors by state, and the top 13 controlled pharmaceuticals purchased by state.

---

ARCOS was not intended to be an intelligence system and the ARCOS reports are not intelligence products. Rather, they are historical, non-analytical reports that do not identify future trends, methods of operations, or emerging diversion enforcement problems. Further, the ARCOS reports are not coordinated or integrated with other DEA intelligence efforts to identify potential trends or linkages between controlled pharmaceutical diversion and illicit drug trafficking.

The diversion investigators we spoke to commented on the limitations of the ARCOS reports as intelligence resources, citing the lack of analysis, completeness, accuracy, and timeliness of the data. OD officials told us they do not have the resources to analyze the ARCOS data to develop intelligence products that could depict future trends, methods of operations, or emerging diversion enforcement problems. The diversion investigators also told us they do not have the time to fully analyze the ARCOS reports and develop their own intelligence products.

The diversion investigators stated the ARCOS reports can be used only as a starting point for an investigation or as a means to help support a criminal case. The reports can identify "spikes" or other unusual purchasing or distribution patterns of controlled pharmaceuticals, which may require further investigation for potential illegal activity. However, the diversion investigators told us these potential leads often turn into "blind alleys" because the data is unanalyzed, inaccurate, or a logical explanation exists for what first appears as unusual activity.

Further, we found the process of collecting ARCOS data and disseminating reports results in the field receiving ARCOS reports that are four to six months old. ARCOS reports are constructed from data received from individual registrants and it takes the registrant time to collect the data and report it to the DEA. The data must be collated and reviewed at DEA headquarters. If the review process detects problems with the quality of the data, the registrant must be contacted to resolve the issue. The data is manually entered into the ARCOS system. Finally, the ARCOS reports are generated and distributed to the field divisions.

Another significant limitation of ARCOS as an intelligence tool is the system does not track controlled pharmaceutical transactions at the retail level. ARCOS does not track transactions between pharmacies, doctors, and hospitals and their respective patients. Under the CSA, the DEA only has the authority to regulate transactions of manufacturers and wholesale distributors. This regulatory limitation creates a gap in

the capability of ARCOS as an effective intelligence tool since much of the diversion of controlled pharmaceuticals occurs at the retail level.

Despite the limitations of ARCOS as an intelligence resource, we found that the ARCOS reports are regularly used by field diversion investigators.  The ARCOS reports can be useful in providing statistics to build cases for prosecution.  Specifically, ARCOS data is used as evidence that a specific pharmacy is buying more of a particular type of drug than other pharmacies in a geographic region.  In addition, the ARCOS reports are used to support routine cyclical investigations of registrants.[13]  While improvements probably could be made to improve the timeliness and accuracy of ARCOS reports, we would not suggest that ARCOS be modified to perform an intelligence function.  Rather, we believe additional intelligence resources should be allocated to the OD.

The DEA is in the process of increasing its intelligence support to the field diversion investigators.  The use of the Internet to market controlled pharmaceuticals has brought a new dimension to the diversion problem.  In the past, diversion investigators conducted their own Internet searches for suspicious controlled pharmaceutical marketing practices.  In FY 2001, the OD's Operations Planning and Support Unit began developing the Internet Online Investigations Project to provide assistance to field diversion investigators in identifying pharmacies, bulk chemical retailers, doctors, and other individuals or businesses conducting illegal transactions via the Internet.  Although many pharmacies and chemical retailers legitimately use the Internet to conduct business, the Internet has been used improperly to sell controlled pharmaceuticals and regulated chemicals to individuals lacking a valid pharmaceutical or chemical certification, and to sell substances that are not legal in the United States.

The DEA's Internet Online Investigations Project involves developing a computer program to search the Internet, using key words or phrases to identify web sites possibly involved in the diversion of controlled substances.  Once these web sites are identified, diversion investigators located at headquarters will manually review these web sites for probable criminal diversion and will refer any viable leads to the applicable diversion field office (i.e., the region in which the site originated).  The DEA anticipates this project will be implemented by the

---

[13] Since April 2001, the DEA has provided ARCOS reports on OxyContin to diversion investigators.  The DEA generates these reports every six months and distributes them to the field divisions via CD-ROM.  OxyContin is the only controlled pharmaceutical for which specific ARCOS reports are generated.

end of calendar year 2002.  DEA's FY 2003 budget request includes the addition of 25 field positions that would be responsible for managing the leads referred to the field.

Finally, the DEA Chief of Intelligence told us the DEA was in the process of establishing a diversion intelligence group to provide intelligence support to the OD.  The group will consist of five or six intelligence analysts who will produce intelligence products on specific topics.  He said he expected the diversion intelligence group to be operational by the end of FY 2002.

**Recommendation 4:**  The DEA Administrator should fully implement the Online Investigations Project and the diversion intelligence group to provide effective intelligence support to the OD.  Also, the DEA should continue to explore additional intelligence capabilities to support the diversion investigators.

# CONCLUSION

The DEA faces a number of significant challenges as it seeks to effectively address the widespread problem of diversion of controlled pharmaceuticals.  The OIG review highlighted several of the major issues confronting the DEA and, specifically, the Office of Diversion Control.

Our review concluded that the DEA's enforcement efforts to date have not adequately addressed the problem of controlled pharmaceutical diversion.  Despite the fact that the number of people who abuse controlled pharmaceuticals each year approximately equals the number who abuse cocaine, the DEA has assigned only 10 percent of its field investigator positions to diversion investigations.  In fact, since 1990, the number of diversion investigators as a percentage of total DEA investigators has decreased by 3 percent.

The OIG review also found that because diversion investigators lack law enforcement authority they must rely on DEA special agents or state and local law enforcement officers to perform essential investigative activity.  The DEA has failed to resolve this longstanding problem by either providing sufficient special agent assistance to diversion investigations, providing diversion investigators with law enforcement authorities they currently lack, or some combination of these solutions.  The lack of special agent assistance has diminished the quality and timeliness of diversion investigations.

The OIG also found that the DEA has yet to develop specialized training for special agents, especially those assigned to assist with diversion investigations.  Finally, we found that the DEA has not provided diversion investigators with consistent or timely intelligence to support their investigative efforts.

The OIG believes that the DEA must address each of these issues in order to more effectively investigate the illegal diversion of controlled pharmaceuticals.

# APPENDIX I:  DIVERSION INVESTIGATOR WORK YEARS FOR ALL TYPES OF INVESTIGATIONS, 1993-2001



| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|---|
| ☐ Controlled Chemical Criminal/Complaint Investigations | 18.5 | 11.9 | 11.1 | 13.3 | 12.9 | 23.8 | 31.2 | 56.1 | 46.1 |
| ☐ Controlled Pharmaceutical Criminal/Complaint Investigations | 168.5 | 162.9 | 161.7 | 148.4 | 134.8 | 132.6 | 134.1 | 130.2 | 123.1 |
| ☐ Cyclical Audits | 39.6 | 36.5 | 37.7 | 35.8 | 33.7 | 26.4 | 26.7 | 24.8 | 33.5 |
| ☐ Registrant Activities | 21.8 | 20.7 | 20.6 | 25.0 | 29.6 | 55.9 | 38.3 | 45.1 | 50.4 |
| ☐ Other Investigations | 2.6 | 2.6 | 2.5 | 2.5 | 2.2 | 2.6 | 2.3 | 2.7 | 3.3 |

**Source: DEA Work Hours Reporting System, 1993-2001.**

## APPENDIX II: DIVERSION INVESTIGATOR AND SPECIAL AGENT WORK YEARS FOR CONTROLLED PHARMACEUTICAL AND ILLICIT DRUG INVESTIGATIONS, 1993-2001

| FY | Number of Work Years Spent on Controlled Pharmaceuticals | | |
|---|---|---|---|
| | Diversion Investigators | Special Agents | TOTAL |
| 1993 | 168.5 | 60.9 | 229.4 |
| 1994 | 162.9 | 59.5 | 222.4 |
| 1995 | 161.7 | 50.1 | 211.8 |
| 1996 | 148.4 | 48.4 | 196.8 |
| 1997 | 134.8 | 51.9 | 186.7 |
| 1998 | 132.6 | 56.3 | 188.9 |
| 1999 | 134.1 | 63.3 | 197.4 |
| 2000 | 130.2 | 66.2 | 196.4 |
| 2001 | 123.1 | 64.2 | 187.4 |

| FY | Number of Work Years Spent on Illicit Drugs | | |
|---|---|---|---|
| | Diversion Investigators | Special Agents | TOTAL |
| 1993 | -- | 2,015.7 | 2,015.7 |
| 1994 | -- | 1,976.0 | 1,976.0 |
| 1995 | -- | 1,779.6 | 1,779.6 |
| 1996 | -- | 1,686.1 | 1,686.1 |
| 1997 | -- | 1,794.8 | 1,794.8 |
| 1998 | -- | 1,951.9 | 1,951.9 |
| 1999 | -- | 2,208.4 | 2,208.4 |
| 2000 | -- | 2,290.5 | 2,290.5 |
| 2001 | -- | 2,229.0 | 2,229.0 |

| FY | Total Number of Work Years Spent on Illicit Drugs and Controlled Pharmaceuticals by Diversion Investigators and Special Agents | Time Spent on Controlled Pharmaceuticals as Percentage of Total Investigations Work Years |
|---|---|---|
| 1993 | 2,245.1 | 10.22% |
| 1994 | 2,198.4 | 10.12% |
| 1995 | 1,991.3 | 10.63% |
| 1996 | 1,882.9 | 10.45% |
| 1997 | 1,981.5 | 9.42% |
| 1998 | 2,140.8 | 8.82% |
| 1999 | 2,405.8 | 8.21% |
| 2000 | 2,486.8 | 7.90% |
| 2001 | 2,416.4 | 7.75% |

**Source: DEA Work Hours Reporting System, 1993-2001.**

## APPENDIX III:  PERCENTAGE OF TIME SPENT BY DIVERSION INVESTIGATORS ON ALL TYPES OF INVESTIGATIONS, 1993-2001



| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|---|
| ■ Other Investigations | 1.1% | 1.1% | 1.1% | 1.1% | 1.0% | 1.1% | 1.0% | 1.1% | 1.3% |
| □ Registration Activities | 8.7% | 8.8% | 8.8% | 11.1% | 13.9% | 23.2% | 16.4% | 17.4% | 19.7% |
| ■ Cyclical Audits | 15.8% | 15.5% | 16.1% | 15.9% | 15.8% | 10.9% | 11.5% | 9.6% | 13.1% |
| ■ Controlled Chemical/Controlled Pharmaceutical Investigations | 74.5% | 74.5% | 74.0% | 71.9% | 69.3% | 64.8% | 71.1% | 72.0% | 66.0% |

**Source: DEA Work Hours Reporting System, 1993-2001.**

# APPENDIX IV:  DEA MANAGEMENT RESPONSE



**U. S. Department of Justice**
Drug Enforcement Administration

Washington, D.C.  20537

SEP 2 6 2002

TO:       Paul A. Price
          Assistant Inspector General
          for Evaluations and Inspections

FROM:     George J. Cazenavette, III
          Chief Inspector

SUBJECT:  OIG Review of the DEA Office of Diversion Control

The Drug Enforcement Administration has reviewed the Office of the Inspector General's (OIG) final draft audit report titled, ***Review of the Drug Enforcement Administration's (DEA) Control of the Diversion of Controlled Pharmaceuticals*** and submits this memorandum as the DEA's formal written comments.  Overall, the DEA concurs with the findings and recommendations made by the OIG.  The report contained four recommendations for action.  The OIG recommended that the DEA should:

1.  Increase investigative resources devoted to the controlled pharmaceutical diversion problem.

    DEA Response.  Concur.  The last year the Office of Diversion Control (OD) program received any significant increase in diversion investigative resources was for FY 1999, when the program received 50 Diversion Investigator (DI) positions.  The DEA has requested an increase of 75 DI positions and $24.616 million for FY 2003.  The FY 2003 budget is pending in Congress.  An additional 22 DIs have also been requested for FY 2004.  These resource enhancements will be evaluated as part of the budget approval process.

2.  Make a definitive decision regarding the roles, responsibilities, and law enforcement authorities of diversion investigators so that diversion investigations are timely and effective.

    DEA Response.  Concur.  A decision paper on these issues has been prepared by the OD and is currently under review by DEA management.  The decision paper will be provided for review to the Special Agent in Charge (SAC) Advisory Committee for its next meeting, scheduled for October 16, 2002.  After this meeting, the SAC Committee will revise as appropriate and submit the decision paper to the Administrator for his determination on how to address the roles, responsibilities, and law enforcement authorities of diversion investigators.

Paul A. Price                                                                                  Page Two

3.  Train all DEA special agents in diversion investigation operations.

   DEA Response.  Concur.  DEA currently provides a two-hour block of diversion training to
   Special Agents during Basic Agent Training (BAT).  DEA's Office of Training is currently
   assessing whether to institute additional diversion training either through a special course or
   via internet training.  This assessment is in the early development stage.

4.  Ensure that the Online Investigations Project and the diversion intelligence group are
   established as projected and resourced to provide effective intelligence support to the OD.
   Also, the DEA should continue to explore additional intelligence capabilities to support the
   diversion investigators.

   DEA Response.  Concur.  The OD is continuing its development of its Online Investigations
   Project capabilities and has begun testing of the established program.

   The Intelligence Division at DEA Headquarters is in the process of completing a realignment
   of its resources.  In the realignment it has been proposed that the Intelligence Division will
   have two intelligence units which will respond to dangerous drug issues.  There will be a
   strategic and investigative unit which can be accessed by the Office of Diversion Control to
   assist them in strategic projects as well as investigative analysis.

   The DEA will continue to keep the OIG apprised of its actions to implement the report's
recommendations.  If you have any questions regarding this response, please contact Marjorie
Snider, Audit Liaison at 202-307-4119.

# APPENDIX V:  OFFICE OF THE INSPECTOR GENERAL'S ANALYSIS OF THE DEA MANAGEMENT RESPONSE

On August 26, 2002, the Evaluation and Inspections Division sent copies of the draft report to the Administrator, Drug Enforcement Administration (DEA) with a request for written comments.  The Chief Inspector responded by memorandum dated September 26, 2002 (Appendix IV).  The DEA concurred with all four of our recommendations.  Our analysis of the DEA's response follows.

## Recommendations

**Recommendation 1 – Resolved – Open.**  The DEA statement that it has requested an increase of 75 diversion investigator positions and $24.616 million for the diversion program for FY 2003 and an additional 22 diversion investigator positions in the FY 2004 budget is responsive to this recommendation.  Please provide us with a status update of your FY 2003 and FY 2004 budget requests and progress on hiring new diversion investigators by January 17, 2003.

**Recommendation 2 – Resolved – Open.**  The DEA's plan to submit a decision paper regarding the roles, responsibilities and law enforcement authorities of diversion investigators through the Special Agent in Charge (SAC) Advisory Committee to the Administrator is responsive to this recommendation.  Please provide us with a copy of the decision paper and the Administrator's decision by January 17, 2003.

**Recommendation 3 – Resolved – Open.**  The DEA statement that it is currently providing a two-hour block of diversion training to special agents during Basic Agent Training (BAT) and is assessing the need to provide additional training through a special course or via the Internet is responsive to this recommendation.  We want to ensure that special agents assigned to diversion investigations are knowledgeable of current diversion investigation issues and techniques.  We strongly suggest that the DEA include a "mini-course" for special agents assigned to diversion investigations as part of the additional diversion training the DEA is considering.  Please provide us with a copy of the curriculum of the training provided during BAT and the results of the assessment to provide additional diversion training by January 17, 2003.

**Recommendation 4 – Resolved – Open.**  The DEA's statement that it is continuing to develop its Online Investigations Project, and it will provide the OD intelligence support through the new strategic and investigative units is responsive to this recommendation.  Our recommendation was for the DEA to provide a separate intelligence support unit dedicated to the OD.  We want to ensure that the OD intelligence support requirements are met and are not automatically relegated to a lower priority by other intelligence support requirements.  The new strategic and investigative units must have policies and procedures that clearly delineate how the intelligence support requirements for the OD will be prioritized and fulfilled.  Please provide us with a status update on the development of the Online Investigations Project and a copy of the policies and procedures for the new strategic and investigative units which describe how the OD's intelligence requirements will be prioritized and fulfilled by January 17, 2003.