EXHIBIT 1

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION

 3    IN RE:  NATIONAL       :  MDL No. 2804
      PRESCRIPTION OPIATE    :
 4    LITIGATION             :  Case No. 17-md-2804
                             :
 5    APPLIES TO ALL CASES   :  Hon. Dan A. Polster
                             :
 6                           :

 7

 8                   HIGHLY CONFIDENTIAL

 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                       - - - -

12                    JANUARY 22, 2019

13                       - - - -

14      VIDEOTAPED DEPOSITION OF WALTER WAYNE DURR,

15    taken pursuant to notice, was held at Marcus &

16    Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17    Pennsylvania 15219, by and before Ann Medis,

18    Registered Professional Reporter and Notary Public in

19    and for the Commonwealth of Pennsylvania, on Tuesday,

20    January 22, 2019, commencing at 8:57 a.m.

21                       - - - -

22             GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
23                    deps@golkow.com

24

25
```

20

1    subject is Pharmacy Controllable Substance

2    Location.

3         Was that an email sent to you back in July of

4    2009?

5         A.   Yes.

6         Q.   And was this during the timeframe when

7    you, Mr. Carlson and others were getting prepared

8    for HBC to become a distributor of controlled

9    substances?

10        A.   Yes.

11        Q.   And if you could, just tell me who was

12   Joseph Hurley.

13        A.   Joseph Hurley, at that time, I believe

14   he was the vice president of distribution.  He's

15   currently our senior vice president of

16   distribution and logistics.

17        Q.   How about Andy Zelaski?

18        A.   Andy Zelaski was a manager who reported

19   to me and was the manager that I put in charge of

20   the pharmacy area.

21        Q.   And then I think we know who Mr. Carlson

22   is.

23        How about the -- it looks like there's three

24   individuals who were copied.  If you could, just

25   tell me who those three individuals are.

31

1    facility to comply with the Controlled Substances

2    Act?

3            MR. BARNES:  Object to form.

4            THE WITNESS:  I'll say no.  We would

5    have a hand in devising or working with Greg and

6    his group on making sure or ensuring that we were

7    following the proper process and procedures.

8    BY MR. HUDSON:

9       Q.  Well, that's what I'm trying to

10    understand.  You've testified that from a

11    compliance perspective, it was a joint effort

12    between the facility and Mr. Carlson's group.

13       And I guess what I'm trying to figure out is

14    within that joint responsibility, were there

15    certain responsibilities that fell on the facility

16    versus Mr. Carlson's group?

17       How do I figure out who was responsible for

18    what?

19       A.  Yes.  So an example would be cameras and

20    the loss prevention piece that fell to Andy

21    Zelaski and myself, primarily Andy, and working in

22    connection with the DEA on what are either best

23    practices or what was regulatory and needed.

24       Again, that was just an example.

25       Q.  Sure.  And if you could, just walk

32

1    through what you believed to be the obligations

2    that arose in 2009 when that facility became a

3    distributor of controlled substances.

4        And just, if you could, describe what you

5    recall about the steps taken by your team or

6    Mr. Carlson's team to put policies, procedures or

7    things in place to comply with the Controlled

8    Substances Act.

9        A.   So we had -- we knew to bring in

10   controlled substances, we had to have a specific

11   area.  And it had to meet DEA requirements of the

12   gauge of steel in the wire for the cage, whether

13   there was a roof on it or not, or ceiling I guess

14   I should say.  It had to be bolted down to the

15   floor.  We had to ensure that the seams were

16   tack-welded and not just bolted.

17       And our Sonitrol system, we had to work with

18   our loss prevention to set that up, ensuring that

19   background checks were covered, drug and alcohol

20   screens were covered.

21       Those are all the things that -- again,

22   working jointly with Greg Carlson and the DEA to

23   get that information to know what direction we

24   should go to properly set up this facility.

25       Q.   Did you personally have any

33

1    communications or discussions with the DEA at this

2    time in 2009 when the facility was being set up?

3          A.   I would have.

4          Q.   And who did you speak with at the DEA?

5          A.   I don't fully remember his last name.

6    His first name was Lou.  I think it started with a

7    C.  It's been quite a few years since.

8          Q.   Sure.  No, I understand.  And I'm just

9    trying to get your best testimony on the record.

10         How many times would you say you spoke to

11   Lou C at the DEA or of the DEA?

12         A.   I would say leading up to opening or

13   starting the operation, maybe two times, maybe

14   three.  I can't speak for how many times he may

15   have spoke with anyone in corporate.

16         Q.   Were those discussions focused on the

17   security requirements, making sure that the

18   facility was meeting the DEA security

19   requirements?

20         A.   Yes.

21         Q.   Do you know if you reached out to him or

22   if he reached out to you?

23         A.   I can't.  I don't remember.

24         Q.   Anything else you can think of that the

25   HBC warehouse did as part of its process of

34

1    becoming a distributor of controlled substances?

2         A.   Not top of mind, no.

3         Q.   Is it fair to say that the measures or

4    the steps or the plan that you implemented for the

5    warehouse were focused on the security

6    requirements of the Controlled Substances Act?

7         A.   It was one of our focuses.

8         Q.   Well, so far you've talked about

9    security cameras being installed; right?

10        A.   Yes.

11        Q.   And then you talked about creating a

12   specific area in the warehouse for controlled

13   substances that was enclosed with steel and bolted

14   down to make sure that it was a secured area;

15   right?

16        A.   Yes.

17        Q.   And then you talked about background

18   checks for employees who would be dealing with the

19   controlled substances; right?

20        A.   Yes.

21        Q.   So can we agree that all of those were

22   steps taken to address either security or theft

23   controls -- I'm sorry -- security or theft

24   concerns?

25        A.   Yes.

35

1      Q.   Anything else you can think of -- I just

2  want to make sure that I've exhausted this

3  topic -- that either your group or Mr. Carlson's

4  group did to prepare the warehouse to become a

5  distributor of controlled substances?

6      A.   One is, as stated in one of the

7  exhibits, was just inventory controls.

8      Q.   And tell me what steps HBC did to

9  address inventory controls.

10      A.   Well, we implemented a more robust

11  counting system than we had out in, I'll say, the

12  general HBC warehouse.

13      Example, and I don't know that I'll get the

14  numbers exactly right, but for the narcotics cage

15  as we refer to it, we would count that prior to

16  anybody selecting every day.  We would count it

17  after -- as the team members were leaving to go to

18  break, the selectors.

19      We would count it before each route left.

20  And then that was for the pick slots.  And then we

21  would count the reserves once a month unless we

22  saw any discrepancies in our pick location.

23      Q.   So the inventory controls that were put

24  in place involved more rigorous and more regular

25  counting of the inventory to make sure that the

36

1    inventory that was supposed to be there was, in

2    fact, there?

3         A.   Yes.

4         Q.   Anything else that you can think of in

5    terms of controls or steps taken at the HBC

6    warehouse to become a distributor of controlled

7    substances?

8         A.   As we talked, our security, we had a fob

9    system around the entire building.  Like we had a

10   specific fob system, Sonitrol system.

11        We regulated who had access to the room

12   itself.  And then we had even more limited access

13   to the narcotics cage itself along with locks, and

14   the cage itself had its own sensors and alarm

15   system specific to the cage.

16        Q.   Anything else you can think of?

17        A.   Not at this time.

18        Q.   I'm going to switch gears a little bit

19   and hand you what I've marked as Exhibits 3 and 4.

20             (HBC-Durr Exhibits 3 - 4 were marked.)

21   BY MR. HUDSON:

22        Q.   Mr. Durr, I'll represent to you that

23   Exhibit 3 is some responses to questions that the

24   plaintiffs asked HBC.

25        And I'm going to turn to page 8 of these

63

1       A.   I'm not aware of any from the corporate.

2   That doesn't mean there weren't any.  I'm just not

3   aware of them.

4       Q.   Would it be fair to say then that

5   between 2009 and 2016, there was no coordination

6   between yourself and the Giant Eagle corporate

7   office in terms of using Giant Eagle systems to

8   monitor suspicious orders of controlled

9   substances?

10      A.   That would not be fair.  We -- "we"

11  being my team, Andy Zelaski and Christy Hart --

12  had daily communications with the corporate team

13  via phone and/or through our systems monitoring

14  inventory and communicating inbound/outbound

15  shipments.

16      So we believe we had a system in place.

17      Q.   Yourself, Mr. Zelaski and Erin Hart?

18      A.   Christy Hart.

19      Q.   I'm sorry.  Christy Hart.

20      Was there anyone else at the HBC facility who

21  was involved in communicating with the compliance

22  group?

23      A.   Those were the primaries.  On a day off

24  we had a backup for Christy.  It was typically

25  Dominique McFann.  But Christy and Andy were the

64

1   primaries.

2        Q.   And when did these communications begin?

3        A.   From the moment we opened operations.

4        Q.   From the moment that you began acting as

5   a distributor of controlled substances?

6        A.   Yes.

7        Q.   So from November of 2009 until the

8   present?

9        A.   I would say probably even before that,

10  as you've seen, as we were setting up to go into

11  distribution.

12       Q.   And I guess what I'm focused on is

13  suspicious order monitoring of controlled

14  substances shipments that were going in and out of

15  the warehouse.

16       Is that your understanding of suspicious

17  order monitoring?

18       A.   Yes.

19       Q.   We've looked at -- if we go back to

20  Exhibits 5 and 6 -- well, actually, and Exhibit 4

21  as well, can we agree that HBC did not have any

22  written policies or procedures in effect at least

23  prior to August 1, 2014?

24       A.   No.  We can't agree on that.

25       Q.   Are you aware of written policies or

65

1    procedures that existed prior to August 1, 2014

2    relating to monitoring of suspicious orders of

3    controlled substances?

4         A.   I would say we had a system in place as

5    it related to suspicious order monitoring.

6         Q.   Okay.  And my question though is more

7    specific.  And we'll get there, and I'll ask you

8    more questions about what that program or system

9    looked like.

10        I guess what I'm focused on right now are

11   just written policies or procedures.  Okay?

12        A.   I believe we had those policies.  Where

13   they are or what happened to them through time, I

14   can't answer that.

15        Q.   You believe that the HBC warehouse had

16   suspicious order monitoring policies or procedures

17   that existed prior to August 1, 2014?

18        A.   I can't say that we had a policy

19   specifically as you're stating it, but I believe

20   we had a system in place and processes and

21   procedures.

22        Q.   Did you have those in writing?

23        A.   I would say that we did, but I don't

24   have them.

25        Q.   When were those policies or procedures

66

```
1     put into writing?

2          A.   I would say in 2009, as we were working

3     to set up the facility.

4          Q.   So I asked you previously questions

5     about all the steps that HBC took to prepare the

6     warehouse to become a distributor of controlled

7     substances.

8          Do you remember that?

9          A.   I do.

10         Q.   And I asked you, I think, three or four

11    times because I wanted to try, as best I could, to

12    get an exhaustive list.

13         You talked about securities and cameras.  You

14    talked about the fob that had limited access.  You

15    talked about controlling the specific area with a

16    cage of steel that's bolted down.  You talked

17    about background checks.  And you talked about

18    inventory controls that were put in place to make

19    the counting more robust and more regular at the

20    facility, specifically for controlled substances.

21         Do you remember that testimony?

22         A.   I do.

23         Q.   And at that time, when I asked you those

24    questions, you didn't identify suspicious order

25    monitoring of controlled substances as one of the
```

86

1    Manhattan that we would use for cycle counting,

2    inventory reconciliation, entering purchase

3    orders, but they were all housed under the

4    Manhattan.

5         Q.   Am I correct though that Manhattan did

6    not have any functionality where the warehouse

7    could set thresholds or quantities of suspicious

8    orders of controlled substances using historical

9    ordering patterns or things of that nature?

10        A.   Not to my knowledge, no.

11        Q.   So in terms of monitoring suspicious

12   orders of controlled substances, is it fair to say

13   that the HBC warehouse did not have any computer

14   systems that were utilized on a systematic -- in a

15   systematic way to monitor orders?

16        A.   No.  I don't believe that's fair to say

17   that.  We could monitor orders.  We knew exactly

18   what was coming in from the stores.  We also knew

19   exactly what was coming in from the vendors.  And

20   there were checks and balances in place.

21        In addition, the corporate team had full

22   visibility of our inventory at all times and could

23   see if there was any fluctuation whatsoever.

24        Q.   So what I'm trying to separate out is

25   corporate, because it's my understanding -- is it

90

1    suspect at the time within our walls.  On a

2    grander scale, I don't know that I can put the

3    framework to that.

4        But if we at HBC saw anything I'll say out of

5    the ordinary, our first communication is to the

6    pharmacy group to understand what we're seeing.

7    I'm not saying that we did, but...

8        Q.   And that's, I guess, what I'm trying to

9    get an idea of, is what would be -- what criteria

10   would the warehouse apply under your system or

11   program to try to figure out whether a shipment is

12   out of the ordinary.

13       A.   So we still see it today even outside of

14   the pharmacy area.

15       Our team members in that specific area, the

16   narcotics room, we were very limiting on who went

17   in there.  Typically, no more than two team

18   members a night would be in that room, and most

19   times we tried to keep it to one.

20       They would get attuned to the normalcies, if

21   you will, of orders going in and out of that room,

22   because they're picking the same items over and

23   over again day in and day out.

24       So, for instance, if they see a store

25   typically would get ten selling units of a

1     particular item, and now all of a sudden the store

2     has 50 selling units going out, the team members

3     would bring it to our attention, either Christy

4     Hart or whoever the supervisor is.  And our first

5     call would be to the pharmacy, is this truly an

6     order that was placed and are those quantities

7     that you absolutely want?

8          Q.   So tell me then how HBC is able to

9     figure out that that particular store usually

10    orders ten of that item, and now they're ordering

11    50?

12         A.   A lot of that is just -- I'll categorize

13    it as empirical from the team members -- not from

14    the data, but from the team members working so

15    closely with those products and being in that same

16    area on a regular basis.

17         Q.   So there's not -- so the identifying the

18    suspect orders or the orders that are not

19    ordinary -- I think your words were out of the

20    ordinary -- that would fall on the particular

21    pickers that are working at the facility to fill

22    the orders, and they'd be relying on their

23    experience and knowledge from doing that day in

24    and day out filling orders?

25         A.   As a first line.  I can't answer for

121

1    Exhibit 11?

2        A.   To a small degree.

3        Q.   Do you know -- assuming that any of

4    these numbers are correct, and I'm qualifying

5    that, but we're not sure -- what happened to these

6    hydrocodone combination products shipped by HBC to

7    the Giant Eagle pharmacies?

8        A.   They would have gone into our

9    pharmacies.

10       Q.   And what happened to them after they

11   went to the pharmacies?

12       A.   They would have filled legal

13   prescriptions.

14       Q.   So, to your knowledge, were they

15   diverted in any way?

16       A.   Not to my knowledge.

17       Q.   Do you know the difference between -- or

18   do you know what the term diversion means?

19       A.   I do.

20       Q.   What does it mean to you?

21       A.   I believe that something is being pulled

22   in a different direction than its intended purpose

23   or intended sale or use.

24       Q.   You mentioned a couple of times in your

25   testimony that HBC -- it's a single warehouse; is

122

1  that correct?

2      A.   Yes.

3      Q.   Located in Washington, PA?

4      A.   Yes.

5      Q.   Do you know what the size of that

6  warehouse is?

7      A.   305,000 square feet.

8      Q.   And of that 305,000 square feet, how

9  much is dedicated to pharmacy operations?

10     A.   There was 12,000 square feet and an

11  additional 2,000 for a receiving area.  So 14,000

12  total.

13     Q.   14,000 for pharmacy?

14     A.   Yes.

15     Q.   Including all pharmaceutical products,

16  even noncontrolled?

17     A.   Yes.

18     Q.   What portion of that 12,000 square feet

19  were dedicated -- was the narc room, so-called

20  narc room?

21     A.   Maybe 2,000 square feet.

22     Q.   Was the narc room partitioned off in

23  some secure way from even the pharmacy room?

24     A.   Yes.

25     Q.   And was the pharmacy room partitioned

123

```
1    off from the rest of the warehouse?

2         A.   Yes.

3         Q.   And what was the rest of the warehouse,

4    the other 292,000 square feet, what was that

5    dedicated to?

6         A.   That's health/beauty care items,

7    cigarettes, tobacco, candy, mints.

8         Q.   Okay.

9         A.   General merchandise.

10        Q.   And was all that product shipped to

11   Giant Eagle grocery stores?

12        A.   Yes.

13        Q.   Did the HBC warehouse ship to any

14   entities other than affiliated Giant Eagle grocery

15   stores and Giant Eagle pharmacies?

16        A.   Pharmacies, only Giant Eagle.  For the

17   grocery side, we did have some nonbanners and

18   independent stores.

19        Q.   Independent Giant Eagle stores?

20        A.   Yes.

21        Q.   All right.  But for the pharmacy --

22        A.   Giant Eagle only.

23        Q.   -- was that Giant Eagle only?

24        A.   Yes.

25        Q.   And would that be to pharmacies
```

124

 1    throughout the Giant Eagle regional chain?

 2         A.   Yes.

 3         Q.   Do you know approximately how many

 4    pharmacies are in the Giant Eagle regional chain?

 5         A.   I believe 200.

 6         Q.   About 200?

 7         A.   Yeah.

 8         Q.   Did Giant Eagle ever -- did the HBC

 9    warehouse ever supply any internet pharmacies?

10         A.   No.

11         Q.   Did the HBC pharmacy ever supply

12    Schedule II opioids to any entity, including Giant

13    Eagle?

14         A.   No.

15         Q.   Did the HBC warehouse -- with respect to

16    the drugs at issue in this case, do you understand

17    those to be Schedule II opioids?

18         A.   Yes.

19         Q.   And when Giant Eagle distributed --

20    well, let me back up.

21         Giant Eagle never or the HBC warehouse never

22    distributed Schedule II opioids; is that correct?

23              MR. HUDSON:  Object to form.

24              THE WITNESS:  No.

25

125

1   BY MR. BARNES:

2       Q.   Did you understand hydrocodone

3   combination products to be a Schedule III for a

4   period of time before it was reclassified as a II?

5       A.   Yes.

6       Q.   And did the HBC warehouse, while it was

7   a Schedule III, distribute hydrocodone combination

8   products to Giant Eagle pharmacies only?

9       A.   Yes.

10      Q.   And when it was reclassified to a

11  Schedule II, did HBC stop distributing that

12  product?

13      A.   Yes.

14      Q.   Was that approximately in October of

15  2014?

16      A.   I believe so.  Again, I was not there at

17  that time.

18      Q.   You talked a lot about the so-called

19  inbound and outbound controls at the HBC

20  warehouse.  And I want to follow up a little bit

21  on that.

22      By inbound, do you mean the purchasing into

23  the warehouse?

24      A.   Yes.

25      Q.   Now, I want you to focus solely on

126

1    controlled substances.

2         Were you there when the cage system was set

3    up at the HBC warehouse in 2009?

4         A.   Yes.

5         Q.   And did you have responsibilities in

6    that role --

7         A.   Yes.

8         Q.   -- in getting ready to distribute

9    Schedule III and IV and V controlled substances?

10        A.   Yes.

11        Q.   And you said that you had some

12   interaction with DEA when doing that?

13        A.   Correct.

14        Q.   Does the name Lou Colissimo ring a bell

15   to you?

16        A.   It does.

17        Q.   And who is he?

18        A.   I believe he was the DEA inspector at

19   the time.

20        Q.   Was he from the regional DEA Pittsburgh

21   office?

22        A.   I believe so, yes.

23        Q.   And did he come out to the facility to

24   assist with setting up the facility for the

25   distribution of Schedule III, VI, and V controlled

127

 1   substances?

 2        A.   Yes.

 3        Q.   Did he assist with providing DEA input

 4   as to what the DEA wanted the warehouse to do in

 5   order to get a registration and license to

 6   distribute Schedule III, IV, and Vs?

 7        A.   Yes.

 8        Q.   And did that involve -- first, I'll

 9   break it down -- the physical plant itself, what

10   the DEA wanted and required to distribute IIIs,

11   IVs, and Vs?

12        A.   Yes.

13        Q.   And did you meet all those requirements

14   with Agent Colissimo?

15        A.   We did.

16        Q.   Did he or his team inspect the facility

17   before, during, and after construction?

18        A.   Yes.

19        Q.   Did they approve the facility in those

20   inspections?

21        A.   Yes.

22        Q.   Now, beginning in 2009, when HBC first

23   began distributing Schedule III, IV, and V

24   controlled substances, you mentioned the so-called

25   warehouse management system was called Manhattan?

128

1          A.   Yes.

2          Q.   How long had that -- that was a

3     computerized system?

4          A.   It was and is.

5          Q.   And how long had that computerized

6     system been in effect at the warehouse in 2009?

7          A.   2005, we brought that onboard.

8          Q.   And does that control the inventory at

9     the warehouse from beginning to end?

10         A.   Yes.

11         Q.   And does it also interface with the

12    Giant Eagle pharmacy ordering system?

13         A.   It does.

14         Q.   Does the Manhattan system inside the

15    warehouse, does it involve the use of scanners?

16         A.   Yes.

17         Q.   And is that given to all of the pickers?

18         A.   Yes, it is.

19         Q.   And, again, I'm just talking about the

20    pharmacy area.

21         The Vocollect system, is that at the

22    warehouse itself?

23         A.   Yes.

24         Q.   Does that interface with Manhattan?

25         A.   Correct.

129

1          Q.   And does the Vocollect system provide

2      direction electronically to pickers for each order

3      that has come in from the pharmacies?

4          A.   Yes.

5          Q.   And can you explain to us a little bit

6      more in detail how the Vocollect system works.

7          A.    The orders come from the stores.  Again,

8      they come through our system, routing first, and

9      then into the Manhattan system.  They interface

10     with Vocollect.

11         The team members are assigned a particular

12     area in the building, pharmacy being one of those

13     areas, and the narcotics cage being a specific

14     area.

15         The team member would state that they were

16     ready to work in a particular region.  Once they

17     identify the region, they would also identify what

18     printer they were going to work from.

19         From there, the system -- based on some

20     controls, meaning everything in the building is

21     weighed and measured so that we can properly cue

22     the totes in the trailers, the team members would

23     then be given a set of labels that are specific to

24     what should go in that tote.

25         Q.   And what is a tote?  Is that a box of

130

1   some sort?

2       A.   You could call that a plastic box, if

3   you will, with a lid that folds in from both

4   sides.

5       Q.   Okay.

6       A.   Once they identified the region, the

7   printer, and get their set of labels, then we

8   would dictate how many labels they would get so

9   that we could maintain balance in selection.  We

10  didn't want a particular selector stuck on one

11  store too long, potentially holding up routes.

12      Once that happened, the team member would

13  then be directed to an aisle, a bay, a shelf, a

14  slot.  And then they would be told to pick the

15  quantity that the pharmacy had ordered.

16      As they're picking the quantities, they had a

17  wrist scanner, and they would pass the individual

18  quantities in front of that wrist scanner.

19      Q.   Do you mean the bar codes --

20      A.   Yes.  The bar code.

21      Q.   -- of what was being picked?

22      A.   The bar code of what's being picked.

23      And as they would do that, they would place

24  it in the tote.

25      And then as they were finished, before they

131

1    would get their next order to pick, they would

2    have to scan or call in a check digit of that slot

3    to confirm they were in the right slot.

4         Once they do that, then they would just -- it

5    was redundant after that of selection process.

6         Q.   So is the picking process through

7    Manhattan and the Vocollect system highly

8    computerized and monitored continually throughout

9    the day?

10        A.   Yes.

11        Q.   And does the system specifically tell

12   each picker where exactly -- you said the aisle,

13   the shelf, and the slot -- they're supposed to go

14   to make the pick?

15        A.   Yes.

16        Q.   And as they physically make the pick, it

17   scans right into the system?

18        A.   Yeah.  The team members pushing --

19   pulling it past a scanner.

20        Q.   They scan the bar code on their scanner?

21        A.   Correct.

22        Q.   So then the system knows that it's in a

23   specific tote at that time?

24        A.   Correct.

25        Q.   And what happens to -- when the picker

132

1    is done picking in the narcotics room, what does

2    he do then?

3        A.    So the team members not in the narcotics

4    room would take their tote -- and there was an

5    opening with a conveyor going into the narcotics

6    cage -- they would put their tote on there.  It

7    would go into the narcotics room.  And then the

8    narcotics selector would pick their portion of

9    that order and place it in the tote.

10       Q.    I see.  So not all the pickers in the

11   warehouse were allowed in the narcotics room?

12       A.    Correct.

13       Q.    And you said only one or two at a time?

14       A.    Yes.

15       Q.    And once that picking was done in the

16   narcotics room, what happened -- and it was put

17   into the tote -- what happened to the tote?

18       A.    So once the selection is done and we

19   believe that we are ready to put that on the

20   trailer for shipment, our system has a process

21   where we have to scan every single individual

22   tote.

23       If you for some reason would miss a tote or

24   something was unaccounted for, the system would

25   not allow you to do what's called close load.  It

133

1    then forces you down to a specific tote ID to

2    answer why or where that tote might be.

3        Q.   So did you need to close the load before

4    you shipped?

5        A.   Yes.

6        Q.   And once it was ready for -- the load

7    was closed and was ready for shipment, what

8    happened to the tote?

9        And I guess it was on a pallet of some sort?

10       A.   There would be pallets -- they were

11   already palletized.  The pallet would be

12   shrinkwrapped and then loaded onto the trailer.

13       Q.   And the trailers, who handled the --

14   whose trailers were they?

15       A.   They were Talon Logistic or Giant Eagle

16   trailers.

17       Q.   Did you ever do any shipping with

18   McKesson?

19       A.   McKesson -- we would deliver to

20   McKesson, and then McKesson would deliver out to

21   the pharmacies from there.

22       Q.   Okay.  So that's outgoing inventory.

23       In the process you described, the so-called

24   Manhattan system, through the use of bar codes and

25   scanners, would know every step of the picking

134

1    process all the way up to the close load and is

2    ready for shipment?

3         A.   Yes.

4         Q.   And if there were any discrepancies in

5    that, you couldn't ship?

6         A.   Yeah.  We wouldn't ship.

7         Q.   Now, how about on the inbound side; who

8    determines what's coming into the warehouse?

9         A.   At that time that would have been Greg

10   Carlson's group.

11        Q.   At corporate?

12        A.   At corporate.

13        Q.   And did they manage incoming inventory?

14        A.   Yes.

15        Q.   Corporate?

16        How would the warehouse know what to expect?

17   Trucks just show up or would you be told by

18   corporate that expect --

19        A.   It would be scheduled through the

20   system.  We would know that a vendor or, excuse

21   me, a carrier was coming, and on that particular

22   carrier would be a specific vendor.

23        Q.   By the way, what type of physical

24   barriers or controls did you have for outgoing or

25   incoming shipments of narcotics?

135

1        A.   We had several.  We have the cage

2    itself.  Outside of the cage, we had numerous

3    cameras.  I believe we had probably 30 or 40

4    cameras within that small confine.

5        Q.   30 or 40 cameras --

6        A.   Yes.

7        Q.   -- for the pharmacy room itself?

8        A.   Yes.

9        Q.   How about inside the narc room?

10       A.   I believe we at least had anywhere from

11   eight to 12 different angles looking at it, or

12   beaming into it, or an overlap.

13       Q.   And was that to guard against theft and

14   diversion?

15       A.   Correct.

16       Q.   All right.  And so once it was

17   palletized and ready for shipment, did it just sit

18   in the warehouse next to a crate of oranges?

19       A.    No.  We had two areas that -- it would

20   remain in the pharmacy room or it would be

21   monitored as it was being loaded.

22        Once it was loaded, the door was shut and

23   sealed, and those sealed numbers would be

24   communicated or written down on the outgoing

25   paperwork.

136

1      Q.   You mean shut and sealed inside the

2   tractor-trailer?

3      A.   Correct.  In the trailer at -- while it

4   was stationed in our door.  And from there, it was

5   leaving.

6      Q.   Were there any precautions taken to

7   avoid people being able to slip in alongside the

8   trailer or under the trailer?

9      A.   Yes.  On a standard trailer in our door

10  50 and 51, they butted up very tightly against the

11  building itself.  And they were at the height

12  where there were no gaps around that.

13      If we had an inbound UPS/Fedex load coming

14  in, those are box trucks that are at a lower

15  level, and they can't use those normal dock.  So

16  what we had there was -- we had bollards, steel

17  bollards that were drilled into the ground.  We

18  had a steel plate welded onto those bollards so

19  that no one could slide up under the truck or

20  right into the building.

21      We also had created a cage where, when the

22  UPS driver or Fedex driver would come, they would

23  pull those cages to the sides of the vehicle.

24  Again, to deter anyone from having quick or easy

25  access into the building.

137

```
 1        If the driver was not delivering something
 2   through that door and they had maybe one or two
 3   cases and they were delivering them, first they
 4   would have to ring a buzzer.
 5        We had a camera right there so we could see
 6   who was out there and if anybody was around or
 7   near them, then make a determination if we were
 8   going to let them into the building.
 9        If we were going to let them into the
10   building, we then had a secondary cage, if you
11   will, at the door.  That was locked at all times
12   and monitored.  Then we would let them into there,
13   and then decide whether we were just going to
14   transact with them in the cage or let them into
15   the room itself.
16        Q.   This is all related to narcotics
17   transactions?
18        A.   This related to any of the pharmacy
19   items.  Again, the narcotics would have been in
20   the cage separate of that.
21        Q.   Okay.
22        A.   So they weren't coming directly into
23   that narcotics cage.
24        Q.   All of these physical controls, were
25   these something that Agent Colissimo from the DEA
```

138

1    had asked HBC to install, or did this include some

2    of his recommendations and then --

3              MR. HUDSON:  Object to form.

4              THE WITNESS:  I would say they included.

5    BY MR. BARNES:

6         Q.   And was he aware during his inspections,

7    before you began distributing controlled

8    substances, about all these safety precautions?

9         A.   Yes.

10        Q.   Would the warehouse get copies of the

11   purchase orders issued by the buyers or the

12   category managers at corporate?

13        A.   Yes.  We had the ability to print those

14   in-house.

15        Q.   And so if a truck pulled up, you would

16   be able to pull the purchase order?

17        A.   Yes.

18        Q.   And were there controls to match what

19   was being delivered to the purchase order?

20        A.   Yes.  Absolutely.

21        So we had a confined area where we would do

22   the pharmacy receiving, whether it be narcotic or

23   otherwise.

24        If it was a temperature-sensitive item, then

25   we would bring it all the way into the room.  If

143

1    shift?

2         A.   As I stated, when the team members would

3    go on their breaks, the support staff would stay

4    and remain back and do a count.

5         When the selection was done for that route,

6    we'd go in and count the cage again.

7         Q.   Oh, at every break and at every

8    shipment?

9         A.   Yes.

10        Q.   And then at the end of the day?

11        A.   Correct.

12        Q.   So how many times, for example, would

13   Vicodin get counted in the specific slot and shelf

14   that it was on in the warehouse in any given day?

15        A.   In a number of routes, anywhere from

16   like four to six times.

17        Q.   Why were you doing all that cycle

18   counting?

19        A.   We wanted to ensure the integrity of

20   our -- of our inventory.  But also it gives you an

21   opportunity to catch anything that may be -- that

22   may be amiss.

23        Q.   Would it give you an opportunity to spot

24   theft and diversion?

25        A.   It would.

1            MR. HUDSON:  Object to the form.

2     BY MR. BARNES:

3            Q.   And was the Manhattan system the

4     computerized system that was monitoring every step

5     of this inbound and outbound process at the

6     warehouse?

7            MR. HUDSON:  Object to the form.

8            THE WITNESS:  Yes.

9     BY MR. BARNES:

10           Q.   Did the DEA come in from time to time

11    and look at the warehouse system and check

12    inventory and ask for records?

13           A.   Yes, they did.

14           Q.   How often did that happen?

15           A.   At least annually.

16           Q.   At least annually.

17           And what would they typically ask for when

18    they came in?

19           A.   They almost always -- I would say they

20    always went to the narcotics cage.  They would

21    show up unannounced, introduce themselves, state

22    the nature of their business.

23           And they would -- I don't know whether they

24    randomly or how they decided on their list, but

25    they would show us or tell us which items they

145

```
 1    wanted to do counts on.  And they would also tell

 2    us what dates they want to see our records from.

 3         Q.   So would they take, for example -- I'll

 4    use Vicodin again.  They'll say, we want all your

 5    records on Vicodin for, what, a month or two-month

 6    or three-month period of time?

 7         A.   Each scenario, they would give us a

 8    specific -- I believe a specific date or week in

 9    the past.  Even they'd say, Show me your records

10    from June of 2010.

11         Q.   And would you give them the records?

12         A.   We would.

13         Q.   Did any of these unannounced inspections

14    ever result in the DEA telling you that you're

15    doing something wrong at the warehouse?

16         A.   No, they did not.

17         Q.   Did the DEA ever find any discrepancies

18    with respect to the controlled substances that HBC

19    was distributing?

20         A.   No, they didn't.

21         Q.   Were the pickers in the narc rooms, were

22    they trained on the Manhattan system?

23         A.   Yes.

24         Q.   On how to use the scanners?  How to

25    pick?  Things of that nature?
```

146

```
1        A.   Yes.

2        Q.   The headsets that they were wearing, was

3   Manhattan instructing through the headsets?

4        A.   Vocollect was instructing, yes.

5        Q.   I'm sorry.  Vocollect.

6        I mean, was there like a computerized voice

7   of some sort?

8        A.   Yes.

9        Q.   If I was wearing one, it would say, go

10  to aisle 3, bay 7, shelf 2, slot 7?

11       A.   Yes.

12       Q.   And then as I pick -- I'm a picker -- I

13  go to that slot, and I brush the bar code past my

14  wrist scanner?

15       A.   Correct.

16       Q.   And Manhattan then knows I did what I

17  was just told to do?

18       A.   Correct.

19       Q.   And does Manhattan then track the

20  inventory as it's being loaded into totes and then

21  all the way out the door?

22       A.   Yes.

23       Q.   You talked about the narcotics room

24  pickers.

25       Over time, would they become familiar with
```

162

1    outdated products.

2        Were these policies things that were followed

3    by HBC from 2009 going forward?

4        A.   Yes.

5        Q.   The next policy on page 636 is a damaged

6    and return product policy.

7        Was this a memorialization of a preexisting

8    policy that went all the way back to 2009?

9        A.   Yes.

10       Q.   And what is the purpose of this type of

11   policy?  What is its function?

12       A.   To ensure that any damaged or returned

13   products were being handled properly, and if they

14   required a quarantine, that they were properly

15   quarantined off.

16       Q.   Would this damaged or returned product

17   be monitored by the Manhattan system?

18       A.   Yes.  Just the fact that it says, "All

19   damaged product must be removed from active

20   inventory," you would have to go into Manhattan

21   to remove that from active inventory.

22       Q.   Okay.

23       A.   So there would be a record of that.

24       Q.   The next policy is -- on page 638 is the

25   suspicious order policy.  Do you see that?

163

1      A.   I do.

2      Q.   It says, "Identified individuals from

3  Giant Eagle sourcing, pharmacy compliance, and HBC

4  team members must review pharmacy customer orders

5  and order trends on a regular and for-cause basis

6  to identify suspicious drug orders."

7      Do you see that?

8      A.   I do.

9      Q.   Was that something that was in effect in

10  2009 going forward?

11     A.   Yes.

12     Q.   And were suspicious orders blocked and

13  reported to the appropriate regulatory authority

14  within the timeframe set out in the policy?

15          MR. HUDSON:  Object to the form.

16          THE WITNESS:  I can't say that there

17  were any that were specifically blocked.

18  BY MR. BARNES:

19     Q.   But does this memorialize a preexisting

20  policy?

21     A.   Yes.

22     Q.   Do you know, one way or the other, if an

23  order was flagged as suspicious or as an order of

24  interest to a pharmacy, would the order be held or

25  would it be shipped to the pharmacy?

171

```
 1          A.   Again, getting rusty, but yes.

 2          Q.   What is the main purpose of the security

 3     requirement, in your understanding?

 4               MR. HUDSON:  Object to the form.  Lack

 5     of foundation.

 6     BY MR. BARNES:

 7          Q.   What does it require?

 8          A.   Theft diversion and suspicious order.

 9          Q.   And do you know whether or not

10     compliance with that regulation is something that

11     is dependent upon the specific facts of each

12     specific distributor?

13               MR. HUDSON:  Object to the form.

14               THE WITNESS:  I would say yes.

15     BY MR. BARNES:

16          Q.   In working with the DEA and during their

17     multiple inspections before, during, and after the

18     HBC narcotics room was set up or any of their

19     surprise audits, did they at any time ever give

20     you any indication that HBC was not in full

21     compliance with the security requirement?

22          A.   No, they did not.

23               MR. HUDSON:  Object to the form.

24     BY MR. BARNES:

25          Q.   What is your understanding of whether or
```

181

1    investigations discussed?

2         A.   No.

3         Q.   One of the things you were asked about

4    is your opinion of whether or not there could be

5    suspicious orders in the system that Giant Eagle

6    and HBC had.

7         Do you remember those questions by HBC's

8    counsel?

9         A.   I do.

10        Q.   What is your idea or your understanding

11   of what a suspicious order is?

12        A.   It's my own personal view of it.

13   Anything that's not in the quantities or in the

14   format that it was intended to be.  Meaning a

15   store called for two units and discovered that it

16   only got one.

17        In itself, that becomes suspect and requires

18   investigation.

19        Q.   Any other examples you can come up with

20   of suspicious orders?

21        A.   Not specifically.

22        Q.   So are you aware of any time when, at

23   HBC, the inventory counts were off?

24        A.   Again, not specifically.  But I've got

25   to believe through the course of our operation,

182

```
 1    there would have been a time where the inventory

 2    would have been off.

 3        Q.   And in that situation, would that be a

 4    potential risk for diversion?

 5        A.   No.  I don't believe so.  Again, because

 6    of the close circuit or the -- how will I say

 7    it -- the fact that we were distributing to

 8    ourselves, you know, the next stop or step would

 9    have been that it would have gone to a pharmacy,

10    and there were checks and balances at the

11    pharmacy.

12        So there's a lot of layers that it would have

13    to go through.

14        Q.   If a picker went and just went in and

15    took an item and then bar-coded it as if it had

16    or -- in other words, found out some way to -- by

17    the way, was there ever any theft, that you're

18    aware of, that ever occurred at the HBC facility?

19        A.   Yes.

20        Q.   Approximately how many times?

21        A.   One.

22        Q.   And when did that happen?

23        A.   I got to believe it was 2012.

24        Q.   Was that a picker or selector?

25        A.   No.
```

183

```
 1        Q.   Who was that?

 2        A.   It was one of the managers.

 3        Q.   What was his or her name?

 4        A.   Andy Zelaski.

 5        Q.   Andy Zelaski was caught stealing?

 6        A.   Yes.

 7        Q.   Was it controlled substances?

 8        A.   I don't know the form that -- of whether

 9   it was or not.  I don't believe it was.

10        Q.   But he was caught stealing narcotics?

11        A.   No.  I don't believe it was.

12        Q.   What was he caught stealing?

13        A.   It was Viagra.

14        Q.   Viagra?

15        A.   Yes.

16        Q.   And that was a manager?

17        A.   Yes.

18        Q.   How long had that been going on?

19        A.   It happened one time, and he was

20   immediately caught by our systems.

21        Q.   Okay.

22        A.   Christy caught it through the counts and

23   immediately reported him.

24        Q.   Do you see, in your mind, a connection

25   between the security requirements or the inventory
```

184

1   count issues and monitoring for suspicious orders

2   of controlled substances?

3          MR. BARNES:  Object to the form.

4          THE WITNESS:  I'm not sure I'm following

5   you on that.

6   BY MR. HUDSON:

7      Q.  Well, making sure the inventory count is

8   right is one of the things you've talked about a

9   lot today; right?

10     A.  Correct.

11     Q.  But the inventory count can still be

12  right, but you could have a suspicious order;

13  correct?

14         MR. BARNES:  Object to form.

15  BY MR. HUDSON:

16     Q.  Let me try it this way.

17     A.  I would say yes, but through our systems

18  it would still be caught.

19     So if my inventory is correct, the checks and

20  balances on the other side of our closed loop at

21  the pharmacies would detect it.  As soon as they

22  would detect it, because they're checking that

23  inbound order specific to each unit, sell unit,

24  they would call back to us and say, Guys, I was

25  supposed to get two.  I got one.