# EXHIBIT 3

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | | |
|---|---|---|
| IN RE: NATIONAL | : | HON. DAN A. |
| PRESCRIPTION OPIATE | : | POLSTER |
| LITIGATION | : | |
| | : | |
| APPLIES TO ALL CASES | : | NO. |
| | : | 1:17-MD-2804 |
| | : | |

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

VOLUME I

- - -

April 17, 2019

- - -

    Videotaped deposition of THOMAS PREVOZNIK, taken pursuant to notice, was held at the law offices of Williams & Connolly, 725 12th Street, Washington, D.C., beginning at 9:11 a.m., on the above date, before Michelle L. Gray, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

103

1  system in use by wholesale drug
2  distributors for controlled substances,
3  do you see that reference that you just
4  read?
5         A.    Yes.
6         Q.    Is it fair to say then,
7  there was in fact at this point in time,
8  in 1998, a DEA-approved suspicious order
9  monitoring system for controlled
10 substances?
11        A.    I would say no, because
12 there was never a -- DEA never had an
13 approved system. The system that the
14 statute requires and the regulations
15 require is the registrant is to design
16 and operate that system.
17              They come to us and they
18 say, here's our system, and we may have
19 discussions with them about it. So you
20 can have a great system in paper, but
21 when you implement it, are you actually
22 implementing what you say.
23              So that's part of our job,
24 when we go out there for schedule

104

1   investigation, is to look at that program
2   and are they doing what they're saying,
3   is it actually detecting suspicious
4   orders.
5        Q.   So, Mr. Prevoznik, try to
6   listen to my question and answer it.  I
7   realize that you would like to speechify
8   a little bit and get out your talking
9   points, but please restrain --
10              MR. FINKELSTEIN:  Try not to
11          argue with the witness.
12  BY MS. MAINIGI:
13       Q.   -- from doing that.
14              MR. FINKELSTEIN:  You can
15          ask your questions.  And you're
16          not here to abuse him.
17  BY MS. MAINIGI:
18       Q.   So, Mr. Prevoznik, let's
19  back up.  The DEA helped to write this
20  report, right?
21       A.   Correct.
22       Q.   And someone from the office
23  of diversion control at the DEA was in
24  fact the chair of the group that wrote

108

1    Q.   And did you read far enough
2    in the report to see that there was, in
3    fact, an algorithm that was contained as
4    an exhibit to the report?
5    A.   Do you have a page number?
6    Q.   Sure:  Bates Number 2247.
7         Did you review this page
8    previously?
9    A.   Yes.
10   Q.   Okay.  And -- and this page
11   essentially contains a calculation or
12   algorithm for both List I chemicals and
13   Schedule II controlled substances,
14   correct?
15   A.   Correct.
16   Q.   Now, DEA did not require
17   distributors to use a particular
18   algorithm or metric to identify excessive
19   purchases of controlled substances,
20   correct?
21   A.   Could you please repeat
22   that?
23   Q.   DEA did not require that a
24   distributor use a particular calculation

[4/17/2019] Prevoznik 4-17-19

109

1   or algorithm to identify excessive
2   purchases of controlled substances,
3   correct?
4          A.   Correct.
5          Q.   But, the DEA was aware that
6   certain registrants were using a
7   calculation or metric or algorithm to
8   identify an excessive purchase, correct?
9               MR. FINKELSTEIN:  Objection.
10          Vague as to time.
11              THE WITNESS:  I -- I just
12          want to make sure I'm clear on
13          this.  We're talking about
14          excessive purchases or are we
15          talking about suspicious orders?
16  BY MS. MAINIGI:
17         Q.   Well, right now I'm talking
18  about excessive purchase reports in this
19  time period.
20              Was the DEA aware that in
21  approximately the 1998 time period, that
22  distributors were using a particular
23  algorithm or calculation to identify
24  excessive purchases of controlled

[4/17/2019] Prevoznik 4-17-19

128

```
1              Was the DEA aware that
2    certain employees had, in fact, blessed
3    the excessive purchase reporting systems?
4              MR. FARRELL:  Objection.
5         Foundation.
6              THE WITNESS:  I don't know
7         which employees you're speaking
8         of.
9    BY MS. MAINIGI:
10        Q.   Just employees.  Is -- is it
11   fair to say that the DEA did, in the late
12   '90s and early aughts, from time to time
13   review the reporting systems of
14   distributors and essentially give them a
15   yay or nay as to whether they thought
16   that the reporting system was suspicious?
17             MR. FARRELL:  Objection.
18        Foundation.
19             MR. FINKELSTEIN:  Objection.
20        Vague.
21             THE WITNESS:  You lost me on
22        the last part.
23   BY MS. MAINIGI:
24        Q.   Okay.  Let me start over.
```

[4/17/2019] Prevoznik 4-17-19

129

1           We -- we established before
2    that the DEA today does not review
3    reporting systems, right?
4           MR. FINKELSTEIN:  Objection.
5       Mischaracterizes the witness's
6       testimony.
7           THE WITNESS:  I mean, we --
8       we reviewed McKesson's, the new
9       one.
10   BY MS. MAINIGI:
11       Q.    And you left it --
12       A.    -- we reviewed it, we -- we
13   did not -- we --
14           MR. FINKELSTEIN:  Let the
15       witness answer the question.
16           THE WITNESS:  I don't know
17       what you mean by the term
18       "blessing it."
19   BY MS. MAINIGI:
20       Q.    Okay.
21       A.    Because as I had said
22   previously, that you -- you can write the
23   best system in the world, but if you
24   don't implement it and you don't stick to

[4/17/2019] Prevoznik 4-17-19

130

1    it, it doesn't mean anything.
2              So that's part of our
3    review, when we go out and do schedule
4    investigations, is to review, are they
5    factually, in fact -- did -- is -- are
6    they operating a system that can detect a
7    suspicious order.
8    BY MS. MAINIGI:
9         Q.   And that's something that
10   the DEA reviews periodically as part of
11   its auditing process, correct?
12        A.   Correct.
13        Q.   So as part of the audit
14   process, operating systems that are
15   designed to review suspicious orders are
16   reviewed by the DEA?
17        A.   Well, it's not just the
18   schedule.  I mean it could be a
19   pre-registration, somebody is coming on
20   and they have -- we have to go through
21   the whole public interest of, you know,
22   what do you have in place to operate and
23   detect a system.  So it's not just a
24   schedule investigation.  There are

131

1   schedule investigations that we follow
2   up, and we do that as well.  So it comes
3   in -- it comes in various times that
4   we're going to review somebody's
5   operating system, whether we're on
6   schedule investigation, or whether we're
7   doing an investigation on a pharmacy or
8   something like that, where we're going to
9   look at how many SORs were submitted or
10  not submitted, or we're going to look at
11  the ARCOS data, how much did they buy.
12          We're going to look at
13  various things to make the determination
14  on what is going on.
15       Q.   And if either in the
16  pre-registration process or in the audit
17  process the DEA determines that a
18  registrant's system is not adequately
19  detecting suspicious orders, is that
20  something that is conveyed to the
21  registrant?
22       A.   Yeah, we -- we would tell
23  them, you need to add something.
24       Q.   It's clear in the Rannazzisi

179

             the characterization.
                  THE WITNESS:  Nationwide,
         correct.
    BY MS. MAINIGI:
         Q.   Instead, one-off guidance
    was perhaps provided in the context of
    individual distributor meetings, correct?
         A.   Yes.  Along with the MOAs
    and the settlements that were done.
         Q.   And is there documentation
    of what was said at the individual
    distributor meetings?
         A.   It would be the PowerPoints
    and the report -- after report.
         Q.   And this is an internal DEA
    report?
         A.   Yes.
         Q.   And have you reviewed those
    internal DEA reports for the purpose of
    preparing for your testimony today?
         A.   Some of them.
         Q.   Now, does the DEA agree that
    there's more than one way to design and
    operate a system that can identify and

180

1  report suspicious orders?
2      A.  Yes.
3      Q.  And there's no single
4  feature that makes a suspicious order
5  monitoring system compliant, correct?
6      A.  Correct.
7      Q.  And the DEA leaves it up to
8  the registrant to design a system that
9  works with its own business model and
10 customer base, correct?
11     A.  Correct.
12     Q.  Does it matter to the DEA
13 whether a registrant reviews orders
14 manually or uses an automated system?
15     A.  No, it doesn't matter.
16     Q.  Other than requiring that
17 the report, suspicious order report
18 clearly indicate that the order is
19 suspicious, does DEA require suspicious
20 order reports to follow a particular
21 format?
22     A.  That's correct.
23     Q.  Let me ask the question
24 again.  The DEA does not require

181

1    suspicious order reports to follow a
2    particular format, correct?
3         A.   Well, I mean, they have to
4    follow what the regs say about unusual
5    size, unusual patterns, or frequency.  I
6    mean, that's in there.  We also ask that
7    the red flags and, you know, looking at
8    newspapers articles to see, you know,
9    what the overdoses are.  You know, are
10   they looking at more than just the data,
11   because the data is only as good as --
12   you know, you can set the threshold too
13   high, you can set it too -- it's never
14   going to pick up something, or you're not
15   going to see patterns, because it's a new
16   customer that gets onboarded, and they're
17   already high, and you don't question it
18   or you don't look at it, you don't see
19   the population size, you don't see what's
20   their percentage of control versus not
21   control.  I mean, there's a lot of
22   different factors that go in it.  So
23   however they design it, they need to get
24   the big picture so that they truly know

[4/17/2019] Prevoznik 4-17-19

182

1  what is their customer doing.
2         Q.   Is there --
3              MR. FINKELSTEIN:  Hang on.
4         Five minutes ago, I asked for a
5         break.  We've been on the record
6         for more than an hour and a half.
7         Can you tell us when you are going
8         to be done?
9              MS. MAINIGI:  Just a couple
10        more minutes.
11 BY MS. MAINIGI:
12        Q.   Is the review -- is it fair
13 to say then that the identification of
14 suspicious orders can be a subjective
15 process?
16             MR. FINKELSTEIN:  Objection.
17        Vague.
18             THE WITNESS:  What do you
19        mean by "subjective"?
20 BY MS. MAINIGI:
21        Q.   Well, do you understand the
22 meaning of the word "subjective"?
23        A.   I'm asking you in terms of
24 this, what do you mean by subjective?

395

1 that this is outside the scope.
2 I'll let the witness answer for
3 now if you have understanding.
4 THE WITNESS: Yes.
5 BY MR. STEPHENS:
6 Q. Is it also true under -- you
7 testified earlier today about the C.F.R.
8 regulations, correct?
9 A. Correct.
10 Q. And under Title 21 -- or I'm
11 sorry, under 21 C.F.R. 1301.71(b), it's
12 true that the regulation regarding
13 suspicious order monitoring does not
14 require strict compliance, it requires
15 substantial compliance?
16 MR. FINKELSTEIN: Did you
17 mean 74?
18 MR. STEPHENS: It might be
19 74.
20 MR. FARRELL: 1301.74(b)?
21 MR. STEPHENS: Yes. No,
22 actually -- here. Let me just
23 mark it.
24 (Document marked for

396

```
 1              identification as Exhibit
 2              DEA-Prevoznik-13.)
 3     BY MR. STEPHENS:
 4         Q.   I'll show the witness what's
 5     been marked as Exhibit 13.
 6         A.   So, (b)?
 7         Q.   (B), right.
 8         A.   Okay.
 9         Q.   So (b) states substantial
10     compliance with the standards set forth,
11     right?
12         A.   Yes.
13         Q.   Okay.  And that could be
14     deemed sufficient, correct?
15         A.   Yes.  That's what it says.
16         Q.   It does not say strict
17     compliance, correct?
18         A.   Correct.
19         Q.   Like manufacturers and
20     distributors, DEA also considers doctors
21     who prescribe opioids to their patients
22     to be registrants?
23         A.   Correct.
24         Q.   Okay.  The prescribing
```

[4/17/2019] Prevoznik 4-17-19

410

```
        IN THE UNITED STATES DISTRICT COURT

       FOR THE NORTHERN DISTRICT OF OHIO

                  EASTERN DIVISION

                      - - -


 IN RE:  NATIONAL           :   HON. DAN A.
 PRESCRIPTION OPIATE        :   POLSTER
 LITIGATION                 :
                            :
 APPLIES TO ALL CASES       :   NO.
                            :   1:17-MD-2804
                            :

           - HIGHLY CONFIDENTIAL -

  SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

                    VOLUME II

                      - - -

                April 18, 2019

                      - - -


            Continued videotaped
 deposition of THOMAS PREVOZNIK, taken
 pursuant to notice, was held at the law
 offices of Williams & Connolly, 725 12th
 Street, Washington, D.C., beginning at
 8:16 a.m., on the above date, before
 Michelle L. Gray, a Registered
 Professional Reporter, Certified
 Shorthand Reporter, Certified Realtime
 Reporter, and Notary Public.

                      - - -

          GOLKOW LITIGATION SERVICES
     877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
```

446

1            speculating on that, but, yes.
2    BY MR. STEPHENS:
3            Q.   Okay.  I'd like to continue
4    by asking you some additional questions
5    about interpretation enforcement of
6    Title 21 U.S.C. 23, the regulations and
7    how those relate to the design of a
8    reasonable SOMs system.  Okay?
9            A.   Yes.
10           Q.   Okay.  So yesterday you --
11   you testified about different
12   distributors having different business
13   models, right?
14           A.   Correct.
15               MR. FINKELSTEIN:  Objection.
16       Scope.  Characterization.
17   BY MR. STEPHENS:
18           Q.   Is it fair to say that a
19   SOMs systems is not a one-size-all
20   proposition, one-size-fits-all
21   proposition?
22           A.   Correct.
23           Q.   And DEA understands that not
24   all registrants distribute opioids to the

447

1  same customers, right?
2      A.   Correct.
3      Q.   DEA understands that
4  registrants have different business
5  models?
6      A.   Correct.
7      Q.   And DEA expects that each
8  registrant will review its own business
9  model and design a SOM system that fits
10 its specific method of distribution?
11         MR. FINKELSTEIN:  Objection.
12     Vague.
13         THE WITNESS:  That's correct
14     as -- as per the regulations.
15 BY MR. STEPHENS:
16     Q.   Okay.  Some registrants
17 distribute to hospitals?
18     A.   Correct.
19     Q.   Some don't?
20     A.   Correct.
21     Q.   Some registrants distribute
22 to hospice centers?
23     A.   Correct.
24     Q.   Some don't?

[4/18/2019] Prevoznik 4-18-19