EXHIBIT 5

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION

 3   IN RE:  NATIONAL      :  MDL No. 2804
     PRESCRIPTION OPIATE   :
 4   LITIGATION            :  Case No. 17-md-2804
                           :
 5   APPLIES TO ALL CASES  :  Hon. Dan A. Polster
                           :
 6                         :

 7

 8                  HIGHLY CONFIDENTIAL

 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                      - - - -

12                  JANUARY 8, 2019

13                      - - - -

14        VIDEOTAPED DEPOSITION OF GREGORY CARLSON,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on Tuesday,

20   January 8, 2019, commencing at 9:06 a.m.

21                      - - - -

22              GOLKOW LITIGATION SERVICES
           877.370.3377 phone | 917.591.5672 fax
23                  deps@golkow.com

24

25
```

86

1    was complying with the Controlled Substances Act

2    between 2009 and 2014 whether HBC had any policies

3    in writing during that timeframe?

4              MR. BARNES:  Object to form.

5              THE WITNESS:  They had procedures in

6    writing.

7    BY MR. ROTTINGHAUS:

8         Q.  Now you're using procedures, not

9    policies.  So I want to make sure I'm not getting

10   confused.

11        A.  It's a definition from a Giant Eagle

12   definition standpoint.  So you can define policies

13   and procedures however you want.  We had

14   procedures documented.

15        When we went to get our DEA license, we had

16   to have procedures documented.  Otherwise, they

17   would not have approved.  The DEA approved our

18   facility to be licensed.  We had to have the

19   required documentation and procedures put together

20   on paper, and we showed them to the DEA officers

21   who came in and inspected the facility prior to

22   using it.  And all of our procedures matched up

23   with the Controlled Substances Act.

24        Q.  And these are in writing?

25        A.  They were in writing.

141

1    weekly movement, monthly movement, things like

2    that.

3         Q.   Were you personally tasked with the

4    responsibility to review the daily movement

5    reports to identify any movements of suspicious

6    quantities of substances, or was there some other

7    place to assist you in that?

8              MR. BARNES:  Object to form.

9              THE WITNESS:  There were other systems.

10   I can't remember which reports that would flag

11   certain things.  The one I was speaking of was

12   just a general second level safeguard where I can

13   see if any movements were out of line from

14   previous history.

15        But there were other reports -- I can't think

16   of the names of those reports -- that were out

17   there that would look at movements of therapeutic

18   categories of drugs specifically.

19   BY MR. ROTTINGHAUS:

20        Q.   So you at this point in time, from 2009

21   to 2014, sometime during that timeframe, you

22   became a senior director of pharmacy?

23        A.   Yes.

24        Q.   And when you became the senior director

25   of pharmacy, were you overseeing all 200 something

142

1    Giant Eagle stores?

2         A.   No, not the stores.  I was overseeing

3    all of corporate functions at that point.  So

4    Anthony Mollica was still in charge of the

5    operations of the stores.  I was responsible for

6    the contract management of any vendors, the

7    managed care side, which is the insurance

8    contracting piece of it kind of rolled up

9    underneath me as well.  So it was more at that

10   level.

11        Q.   And I just want to make sure I

12   understand.  During this timeframe from 2009 to

13   2014, you're telling us that one of the processes

14   in place was you would get a sheet of daily

15   movement of all of your medications, including

16   controlled substances, and you would personally

17   look through that to try to identify any orders

18   that seemed out of the ordinary?

19        A.   We had buyers.

20        Q.   First of all, am I correct in what I

21   said?  If I'm not, just correct me.

22        A.   Oh, no, I mean, I didn't daily look at

23   those reports.  We had buyers in place at that

24   time.  We had a category manager in place at the

25   time.  So they would use that to generate their --

143

1    as part of their reordering process.  So when we

2    reviewed that, they could also see any out of the

3    norm patterns in that process.

4         Q.   And you're saying you're one of the

5    individuals that was reviewing and tasked and

6    responsible for reviewing for any out of the norm

7    patterns?

8         A.   I didn't.  When you mentioned senior

9    director of pharmacy, no, I was not reviewing the

10   reports at that time.

11        Q.   And that would have been between 2005 --

12        A.   Right.

13        Q.   I'm sorry.  2007 and 2012.

14        A.   No senior director of pharmacy.

15        Q.   2012 to 2014.

16        A.   Correct.

17        Q.   You were not doing so?

18        A.   I was not reviewing the daily reports

19   back at that point.

20        Q.   Who was reviewing the daily reports at

21   that time, if anyone?

22        A.   Kris Remas would have been reviewing

23   reports as part of -- again, our daily process was

24   to review the reports.

25        Q.   Now, when those reports would get

150

1   certain, but I do remember threshold emails coming

2   from McKesson.

3   BY MR. ROTTINGHAUS:

4       Q.   And actually threshold criteria started

5   to get set for HBC as of 2013; is that right?

6       A.   There was a report created, an automated

7   report created at that time.

8       Q.   Whose idea was it to create that report?

9       A.   I'm not sure who came up with the idea,

10  but it was a team that kind of worked on how do we

11  come up with a process to do that.

12      Q.   Why was the team trying to come up with

13  a process to identify thresholds at HBC warehouse?

14      A.   We were trying to enhance and improve

15  our process along the way.

16      Q.   The process of identifying orders that

17  might be in excess of ordinary?

18      A.   It would be targeting not orders

19  specifically.  Thresholds don't catch one order.

20  Thresholds capture patterns of orders.  So one

21  large is not, unless it exceeds the threshold, is

22  not going to be caught by the threshold.

23      Q.   What if it exceeded the threshold, what

24  did you expect to happen?

25      A.   The order would be investigated.

151

1     Q.   How would it be investigated?

2     A.   There would be a number of people that

3  would find out what was going on with that store

4  in particular that would do -- down at the PDL

5  level, district leader level investigating what

6  was going on at that particular store.

7     Q.   So this level started below you where

8  the investigation would start?

9     A.   Below me and the operations department

10  would go and look at what's going on in the store.

11     Q.   That's what I want to understand, is

12  what your system was, who the people were that

13  were eyeing these threshold reports and then

14  reporting to whoever they reported to if there

15  were orders exceeding thresholds and then what due

16  diligence was done.

17     A.   So the overall security efforts of the,

18  you know -- to meet the needs of this particular

19  act or regulation encompassed many different parts

20  of the whole process.  So it would be -- we looked

21  at ourselves as a self distributor.  We had owned

22  the product, and we're basically handing it off to

23  another location within our chain.

24     Unlike a wholesaler, which is selling to a

25  new customer, a different customer, self

152

1    distribution, we knew our customers because they

2    were us.  So we were very familiar with our

3    customers.  We knew exactly what was going on.

4    Each of these prescriptions were dispensed with a

5    valid prescription.  So those were kind of the

6    added security measures that met the needs of the

7    requirement.

8          Q.   Are you able to sit here under oath

9    today and tell us that every one of the

10   prescriptions that HBC warehouse filled were

11   filled with a valid prescription?

12              MR. BARNES:  Object to form.

13              THE WITNESS:  The HBC warehouse filled?

14   BY MR. ROTTINGHAUS:

15         Q.   Yes.

16         A.   You mean the product coming from HBC

17   warehouse?

18         Q.   Yes.

19         A.   I can't state, you know, something like

20   that.

21         Q.   I thought I heard you say that.  I

22   understand that you can't say that.  I'm just

23   wondering -- if you're able to say it, I wonder

24   how.

25         A.   We act under the guise that our process

200

1    BY MR. ROTTINGHAUS:

2        Q.    Would one benefit of the documentation

3    be the ability to show any regulatory body that

4    HBC did indeed take steps to maintain a system, to

5    implement, design and operate a system to disclose

6    the presence of suspicious orders?

7        A.    When we opened HBC, we received our DEA,

8    we were inspected by the DEA.  They came in.  They

9    looked at all of our security features related to

10   this Controlled Substances Act, looked at all of

11   our processes.

12       Our security, according to them, fit all

13   requirements, all the needed necessary steps.  We

14   were acting upon that.  There was nothing in the

15   provision that said we had to keep documentation

16   for any period of time on any investigation.

17       We did our process.  If there was any

18   suspicion come up, we investigated it thoroughly,

19   made our decision.  And I can't even think of a

20   time where we -- maybe there was a couple, but not

21   that I can recall, an example when there was a

22   suspicious order that we actually defined.  I'm

23   not saying it didn't happen, but I can't recall an

24   example.

25              MR. ROTTINGHAUS:  Object and move to

222

1    did you understand that to include an overall

2    evaluation of the adequacy of the controls at the

3    HBC and store levels?

4         A.   Yes.

5         Q.   Do you understand that the regulation

6    that you were shown by plaintiffs' counsel is just

7    one small aspect of the overall security

8    requirement?

9         A.   Correct, yes.

10        Q.   And do you understand that 1301.74

11   requires that HBC operated a system to disclose

12   suspicious orders?

13        A.   Yes.

14        Q.   Did you ever understand it to require

15   any type of formulaic or threshold system?

16        A.   No.

17        Q.   At the warehouse level, I just want to

18   explore what you do understand.  You mentioned

19   cages, things of that nature.

20        Were these control IIIs, IVs, and Vs kept in

21   locked cages?

22        A.   Yes, per the DEA requirements of

23   specifically around the cage.

24        Q.   You said the DEA actually reviewed the

25   HBC security system before it opened and started

223

1    distributing control IIIs, IVs, and Vs?

2        A.   Yes, before they approved our DEA

3    license.

4        Q.   And did they come in from time to time

5    to reaudit and inspect?

6        A.   Yes.

7            MR. ROTTINGHAUS:  Objection.  Leading.

8    BY MR. BARNES:

9        Q.   At any time, did the DEA ever advise HBC

10   that there was anything lacking in their control

11   system?

12           MR. ROTTINGHAUS:  Objection.

13   Foundation.

14           THE WITNESS:  There was nothing pointed

15   out within our security measures that didn't meet

16   the requirements.

17   BY MR. BARNES:

18       Q.   Did Giant Eagle ever distribute to

19   internet pharmacies?

20       A.   No.

21       Q.   By Giant Eagle I'm including HBC.

22       A.   No, we did not.

23       Q.   But you've also told us that you don't

24   really know the details -- you said the pickers

25   were regulated in terms of access to the cages; is

224

1    that right?

2         A.   Yes.

3         Q.   But the detailed procedures of how they

4    actually did their picking and the forms they

5    filled out, that wasn't part of your job?

6         A.   No, it was not.

7         Q.   Were inventories conducted at HBC?

8         A.   Yes.

9         Q.   Regular inventories?

10        A.   Yes.

11        Q.   Was the HBC warehouse overseen by Giant

12   Eagle's internal audit and accounting department?

13            MR. ROTTINGHAUS:  Objection.  Leading.

14            THE WITNESS:  Yes.

15   BY MR. BARNES:

16        Q.   You were asked a lot of questions today

17   about the development of a so-called SOM system in

18   2013 or 2014.  Do you recall that?

19        A.   Yes.

20        Q.   Was that threshold system I'll call it,

21   was that developed because there was any view that

22   the currently existing controls that you describe

23   were viewed as inadequate in any way?

24        A.   No.  They were put together as an

25   enhancement to the current process.

225

1        Q.   And that process, that threshold process

2   began in or about 2013?

3        A.   About per my recollection.

4        Q.   And were enhancements made to that

5   process over time?

6        A.   Yes.

7        Q.   Are you familiar with the CSOS system?

8        A.   Yes.

9        Q.   Is that one of the enhancements?

10        A.   CSOS was a system that just assisted in

11   ordering CII through at the time it was the

12   wholesaler process, but it was -- it helped us --

13   it was an enhancement for ordering CIIs, so from

14   that perspective.

15        Q.   Are you familiar with Supply Logics?

16        A.   Yes.

17        Q.   Was that an enhancement to the threshold

18   system?

19        A.   Yes.

20        Q.   What did Supply Logics allow you to do?

21        A.   Supply Logics had a couple components to

22   it that could allow us to audit and monitor.  So

23   it would -- I can't remember.  I'm trying to

24   visualize what this report looked like, but it

25   would -- it basically would pull out -- allow us

226

1    to evaluate, investigate stores that were -- you

2    know, that stuck out in some fashion.

3        Q.   At the pharmacy level you talked a

4    little bit about some of the controls at that

5    level.

6        I just want to ask you generally.  Were all

7    of the pharmacies staffed by licensed and trained

8    pharmacists?

9        A.   Yes.

10       Q.   Were they staffed by trained

11   technicians?

12       A.   Yes.

13       Q.   Were all of those individuals trained

14   with respect to diversion?

15       A.   There was a component of the training --

16   I don't know specifically, but I know there were

17   some discussions in the training around that.

18       Q.   Were there policies and procedures,

19   written policies and procedures in place at the

20   pharmacy level that assisted the pharmacists and

21   technicians with respect to filling appropriate

22   prescriptions?

23       A.   Yes.

24       Q.   Are you familiar with the DEA pharmacist

25   manual?

227

1              MR. ROTTINGHAUS:  Objection.  Relevance.

2              THE WITNESS:  I may have seen it.  I

3     can't recall.

4     BY MR. BARNES:

5         Q.   Do you recall if that was located at the

6     pharmacies or accessible by the pharmacies?

7         A.   Yeah.  That should have been at each

8     location, I believe.

9         Q.   Did Giant Eagle have controlled

10    substance dispensing guidelines?

11        A.   There were guidelines around controlled

12    substances, yes.

13        Q.   Did it include things like red flags,

14    things to look out for before dispensing and

15    filling a prescription?

16        A.   Yes.

17             MR. ROTTINGHAUS:  Are you talking about

18    at the pharmacy level or HBC level?

19             MR. BARNES:  Pharmacy level.

20    BY MR. BARNES:

21        Q.   Are you familiar with the so-called

22    OARRS system?

23        A.   Yes.

24        Q.   What is that?

25        A.   It's an Ohio system to monitor

228

1   prescription dispensing across the whole state.

2        Q.   Is that something to your knowledge the

3   Giant Eagle pharmacists would access when filling

4   a prescription as necessary?

5        A.   Yes, as required.

6             MR. ROTTINGHAUS:  I didn't want to

7   interrupt.  I'm interposing an objection on

8   relevance grounds.

9   BY MR. BARNES:

10       Q.   Did the pharmacists or do the pharmacies

11  report their transactions to the DEA?  I think you

12  already testified to that concerning the ARCOS

13  system.

14       A.   The ARCOS was one way.  We also reported

15  dispensings through like the OARRS system and all

16  that.  That was done at corporate level, but all

17  that information about the stores came from

18  corporate that was provided.

19       Q.   Did Giant Eagle have written fraud,

20  waste and abuse guidelines and procedures that

21  were at the pharmacies?

22       A.   Yes.

23       Q.   The record keeping at the pharmacies,

24  are you familiar with the term controlled

25  substance boxes that maintain records?

229

1        A.    Yes.

2        Q.    Is that something when you were a PDL

3   you had to make sure every pharmacy complied with?

4        A.    The boxes either came out like right

5   when I was going onto my other position, the

6   physical boxes that you're talking about.  It

7   was -- I didn't physically do that as a PDL.  I

8   think it came out just as I went on to my next

9   position.

10       Q.    But in your next position, did you learn

11  what those were?

12       A.    Yes.

13       Q.    What were they for generally?

14       A.    Just to kind of keep everything in one

15  place around controlled substances.

16       Q.    Would those include DEA forms, records

17  of invoices and transactions on controlled

18  substances?

19       A.    DEA 222 forms, invoices, anything

20  regarding controlled substances.

21       Q.    At the pharmacy level, were the

22  controlled substances handled any differently than

23  any other drug?

24       A.    Were they handled differently?  Yes.

25       Q.    Were they kept in a secure location?

230

1          A.   Any of the Schedule II were kept in a

2     locked location that only the pharmacist had

3     access to.

4          Q.   And who could fill a controlled

5     substance II level prescription at the pharmacies?

6     Could a tech do it, or was it a pharmacist

7     required?

8               MR. ROTTINGHAUS:  Objection.  Relevance.

9               THE WITNESS:  A pharmacist was required

10    to do that process.

11    BY MR. BARNES:

12         Q.   And how were incoming orders of

13    controlled substances handled?  Were there special

14    procedures for those?

15         A.   Yeah.  We had formalized processes or

16    procedures drawn up on how to receive an order,

17    and it even broke out controlled substances and

18    how to handle those orders specifically.

19         Q.   Were those orders checked against

20    invoices and immediately logged into inventory?

21         A.   Yes.

22         Q.   Were there regular and then perpetual

23    inventories of all controlled substances?

24         A.   Yes.  There were Schedule IIIs through

25    Vs were part of our perpetual.  The CIIs were done

231

```
 1    in a manual fashion.  So we're talking 2009 to
 2    '14.  It became part of the perpetual throughout
 3    that time period.
 4         Q.   You mentioned monthly narc audits.  Was
 5    that for all controlled substances?
 6         A.   Yes.
 7         Q.   And were there also annual controlled
 8    substance inventories on top of the monthly narc
 9    audits?
10              MR. ROTTINGHAUS:  Objection.  Leading.
11              THE WITNESS:  I'm sorry.  Say that
12    again.
13    BY MR. BARNES:
14         Q.   In addition to the monthly narc audits,
15    were there regular annual inventories?
16              MR. ROTTINGHAUS:  Same objection.
17              THE WITNESS:  Yeah.  We were required to
18    do an every two-year inventory.  We actually did
19    ours on an annual basis.
20    BY MR. BARNES:
21         Q.   While controlled substance prescriptions
22    were being filled, were there special accounting
23    procedures employed to maintain control over every
24    pill?
25         A.   Yes.
```

232

1           MR. ROTTINGHAUS:  Objection.  Leading.

2     BY MR. BARNES:

3           Q.   Did the Ohio -- not only Ohio, but did

4     the state Boards of Pharmacy come into the

5     pharmacies on a random and unannounced basis and

6     perform surprise inspections on a routine basis?

7           A.   Yes.

8           Q.   Were there ever any problems that you

9     can recall involving controlled substances or

10    opioids?

11          A.   Nothing specific to an inspection

12    regarding those products.

13          Q.   And you were a PDL for a while?

14          A.   Yes.

15          Q.   And you had a region where you regularly

16    visited all your stores?

17          A.   Yes.

18          Q.   Were all of the pharmacies supervised by

19    a PDL in some way?

20          A.   Yes.

21          Q.   And did they regularly visit the store

22    and conduct audits from time to time?

23          A.   Yes.

24          Q.   And did that include controlled

25    substance procedures?

233

```
 1        A.   Yes.

 2        Q.   Did the PDL supervise training at the

 3   pharmacies?

 4        A.   Not directly supervise, but ensure that

 5   all team members within that unit were trained.

 6        Q.   Did the PDLs work with law enforcement

 7   and the Board of Pharmacy to deter diversion and

 8   prosecute criminals?

 9             MR. ROTTINGHAUS:  Objection.  Leading.

10             THE WITNESS:  Yes.

11   BY MR. BARNES:

12        Q.   Did the PDLs exercise red flag awareness

13   training in the pharmacies?

14        A.   Yes.

15        Q.   Would the PDLs have an opportunity to

16   observe while in these pharmacies suspicious

17   activity, such as long lines out the door, things

18   of that nature?

19        A.   Yes.

20        Q.   And I think you said when you were a

21   PDL, you would assist from time to time with

22   threshold increases if the stores needed them;

23   right?

24        A.   When I was a PDL -- that was after I was

25   a PDL when I was actually having the PDLs do the
```

251

```
 1                    RE-EXAMINATION
 2    BY MR. BARNES:
 3        Q.   Just one follow-up question.  After the
 4    threshold daily report was instituted in or about
 5    October of '13, did it reveal anything with
 6    respect to the adequacy of the controls that were
 7    already in place?
 8        A.   Based on --
 9             MR. ROTTINGHAUS:  Let me make a quick
10    objection.  Insufficient foundation.
11        But go ahead.
12             THE WITNESS:  Based on the limited
13    number of suspicious orders that were generated
14    afterwards, I would say, no, it didn't really add
15    a whole lot to the process.  But, again, we looked
16    at it as an enhancement to what we had in place,
17    an extra stopgap.
18    BY MR. BARNES:
19        Q.   Did it indicate one way or the other
20    whether the controls in place were adequate?
21        A.   I would evaluate it --
22             MR. ROTTINGHAUS:  Objection.  Leading.
23             THE WITNESS:  I would evaluate it to
24    show that we did have adequate controls in place
25    from the beginning.
```

252

```
 1   BY MR. BARNES:

 2       Q.   Even after you instituted -- you

 3   enhanced it with the threshold system?

 4       A.   Yes.

 5            MR. BARNES:  Nothing further.

 6               RE-EXAMINATION (Continued)

 7   BY MR. ROTTINGHAUS:

 8       Q.   Prior to 2014, was there ever a system

 9   in place where anyone at HBC was instructed when

10   they had an order that exceeded thresholds to ask

11   any particular questions of the pharmacy to find

12   out and do a little more due diligence as to why

13   the order was exceeding threshold?

14       A.   When you say threshold, HBC wasn't

15   looking at threshold information.  They would look

16   at unusual orders, being a large size, and that's

17   where they would ask the questions from.

18       Q.   And was there ever at any point in time

19   to your knowledge any documented instruction to

20   anyone at or on behalf of HBC as to what specific

21   questions they should be asking of pharmacies when

22   they have an order that they thought was

23   extraordinarily large?

24       A.   Their process was to notify myself or

25   someone else at corporate to do the investigation
```