# EXHIBIT 10

```
                                                               1
 1          IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION

 3   IN RE:  NATIONAL       :  MDL No. 2804
     PRESCRIPTION OPIATE    :
 4   LITIGATION             :  Case No. 17-md-2804
                            :
 5   APPLIES TO ALL CASES   :  Hon. Dan A. Polster
                            :
 6                          :

 7

 8                   HIGHLY CONFIDENTIAL

 9      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                        - - -

12                  JANUARY 22, 2019

13                        - - -

14      VIDEOTAPED DEPOSITION OF FRED BENCIVENGO,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor,

17   Pittsburgh, Pennsylvania 15219, by and before Ann

18   Medis, Registered Professional Reporter and Notary

19   Public in and for the Commonwealth of

20   Pennsylvania, on Tuesday, January 22, 2019,

21   commencing at 2:08 p.m.

22                        - - -

23            GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
24                 deps@golkow.com

25
```

38

1  they may not be valid or they'd be at risk of
2  diversion?
3         MR. KOBRIN:  Object to form.
4         THE WITNESS:  Yes.
5  BY MR. HUDSON:
6     Q.   How many times would you say that
7  happened?
8     A.   Again, with the new law being capped, I
9  couldn't even speculate.  I know that it happens.
10    Q.   Do you remember any of the details
11 around any times where pharmacists ever raised
12 concerns with you?
13    A.   The majority of the time, if the doctor
14 has a bad name in the area.  So they wanted to
15 know if they could not fill any prescriptions from
16 Dr. Bencivengo.  We don't -- we support them a
17 hundred percent on their decision to fill or not
18 fill, but we don't support just blankly saying
19 we're not filling any prescriptions from a doctor.
20       We have a process in place.  You do your due
21 diligence.  You make a decision that way.  If part
22 of the due diligence says this guy doesn't need a
23 script, he's a bad doctor, then send them on the
24 way.  We don't have any list of doctors that we
25 don't fill for.

[1/22/2019] Bencivengo012219

39

1   Q.  In your territory in Ohio, from time to
2   time were there doctors identified by pharmacists
3   that they believe to be bad doctors?
4   A.  Yes.
5   Q.  Did you or anyone else at Giant Eagle
6   keep a log or a record of bad doctors in Ohio that
7   a prescription being written by them at least
8   raised a red flag of concern?
9   A.  Again, no official log.  I've walked
10  into many stores and saw something hand scribbled
11  on a bulletin board, be careful of these three
12  doctors; not do not fill, just but be careful.
13  Q.  Was that more of an individual store to
14  individual store?
15  A.  An FYI.  If I'm coming in as a floater
16  that day, this is what I should look for.
17  Q.  Was there any sort of log or -- I'm
18  trying to think of a good -- report, any way that
19  Giant Eagle is memorializing diversion risks at
20  the pharmacy level in terms of bad doctors or
21  anything else that would cause there to be a
22  concern about the diversion of controlled
23  substances?
24      MR. KOBRIN:  Object to form.  What do
25  you mean by bad doctors?

50

1   using the term suspicious orders and flagged
2   orders concurrently or interchangeably.
3           MR. HUDSON:  Because they are.
4           MR. KOBRIN:  I don't think they are to
5   the witness.  I think you're causing confusion
6   with him regarding flagged and suspicious orders.
7           THE WITNESS:  Okay.  That makes sense.
8           MR. HUDSON:  I'll let you clear that up.
9           MR. KOBRIN:  Well, I'm flagging that
10  issue for you.
11      Should we take a break?
12          MR. HUDSON:  Yeah, that's fine.  Take a
13  quick break.
14          THE VIDEOGRAPHER:  We are going off the
15  record.  The time is 3:11 p.m.
16          (Recess from 3:11 p.m. to 3:42 p.m.)
17          THE VIDEOGRAPHER:  We're going back on
18  the record.  The time is 3:42 p.m.
19  BY MR. HUDSON:
20      Q.   Welcome back, Mr. Bencivengo.  Before
21  the break, we were talking about pharmacists and
22  potential red flags for diversion, and you had
23  made reference to OARRS reports and CBTs, and that
24  kind of took us down this road.
25      So I want to go back to my original question

51

1   which was:  For Giant Eagle pharmacists, was there
2   any sort of uniform criteria that existed to apply
3   to try to determine whether to fill a prescription
4   or not?
5           MR. KOBRIN:  Object to form.
6           THE WITNESS:  We have document control
7   dispensing.  In that document it lists the red
8   flags, what to look for to do the due diligence
9   and to make that decision.
10  BY MR. HUDSON:
11      Q.  As you sit here today, do you have a
12  recollection of what those red flags are?
13          MR. KOBRIN:  Object to form.  Do you
14  want to show him the document?
15          MR. HUDSON:  I don't have it.
16          THE WITNESS:  I mean, I can't name every
17  single one of them, but obviously the age, the
18  distance, the distance they drive, the distance
19  from the doctor to the pharmacy and the distance
20  where they live and to the pharmacy.  If they
21  mention the drugs by the street names, Percs,
22  Vics.  Any kind of combination product, the
23  trinities, the pain reliever, the muscle relaxer,
24  those are usually a sign that calls might need to
25  be made.

```
                                                              52
1    BY MR. HUDSON:
2        Q.   And in Ohio in your 12 years there, in
3    your experience, were there patients coming into
4    pharmacies that were trying to get drugs that
5    weren't for medically necessary purposes?
6             MR. KOBRIN:  Object to form.
7             THE WITNESS:  Yes.
8    BY MR. HUDSON:
9        Q.   And how did you come to that opinion?
10       A.   As a practicing pharmacist or as a
11   person in my role right now?
12       Q.   Yeah, just as a whole, in other words,
13   really through those 12 years in your role as a
14   PDL.
15       A.   By doing the due diligence we needed to
16   do to fill those prescriptions, by viewing the red
17   flags, and then once it was determined, that's
18   when it was determined this wasn't necessary.
19       Q.   Did you have enough interaction with
20   pharmacists and just the communities of Ohio to
21   get a sense of whether or not opioid diversion or
22   opioid abuse was a problem in the communities
23   where your territory existed?
24            MR. KOBRIN:  Object to form.
25            THE WITNESS:  Enough with the
```

158

1   those doctors as a matter of policy or how you
2   kept track of those doctors or which scripts were
3   refused.  Do you recall that?
4       A.   Yes.
5       Q.   If a doctor was identified as a licensed
6   doctor who was causing concern for pharmacists,
7   what steps would your pharmacists take in your
8   pharmacies?
9       A.   Well, I think, for the most part, you go
10  in the stores and see a doctor's name on a cork
11  board, taped to a monitor so that anybody that
12  comes in there is aware that we're not not filling
13  all scripts from this doctor, but we're going to
14  scrutinize and drag that prescription through the
15  mud as much as possible to make sure it's for a
16  legitimate purpose.
17       A guy comes in.  It's after the hours.  We
18  can't get ahold of the doctor.  It's not getting
19  filled.  What we normally do after that is send an
20  email out at times or call the local stores and
21  say we just turned this guy away and this is the
22  reason.  It goes out to the stores.  I've had
23  times or I've heard of times where other stores,
24  CVS, has called us.  If we have a store across the
25  street, a competitor, we may call the competitor

159

1  and say, you know what, we just sent this guy
2  there with a script.  He took it back.  He may be
3  coming over to you now and this is why.  But
4  they're in the same area, so they have all the
5  same docs anyway.
6      Q.   So even if the person with a script from
7  the doctor who's kind of identified by the
8  pharmacy, even if that particular person bringing
9  that particular script in didn't raise any red
10 flags, you would still scrutinize that script?
11          MR. HUDSON:  Object to the form.
12 BY MR. KOBRIN:
13     Q.   Would you still scrutinize the script
14 even if the patient bringing in the script from a
15 doctor who had caused some concern for your
16 pharmacists?  Would you still scrutinize it even
17 if there were no red flags?
18          MR. HUDSON:  Object to the form.
19          THE WITNESS:  If it's from that doctor,
20 is that what you're asking?
21 BY MR. KOBRIN:
22     Q.   Yes.
23     A.   We would scrutinize it.
24     Q.   How would you scrutinize it?
25     A.   Reading the OARRS report, calling for

[1/22/2019] Bencivengo012219

160

1   the diagnosis whether he wants to give it to us or
2   not, and only filling it during his business
3   hours.  And if you can't get ahold of him to
4   verify that he even wrote the script, then we
5   would either give it back or -- it all depends.
6        There's two options.  We'll call the doctor
7   in the morning for you.  Come back and get it.  Or
8   the guy might say, no, just give it to me.  Then
9   we would try to call CVS or send an email out and
10  warn we just gave the script back.  This is why.
11       Q.   You said that anyone who comes in can
12  see the name on the cork board.  By that do you
13  mean anyone, customers?
14       A.   No.  It's back in the pharmacy facing
15  us.
16       Q.   So everyone at the store would know to
17  scrutinize this doctor's script?
18       A.   The pharmacists, yes.
19       Q.   We talked earlier in relation to your
20  testimony about doctors who were licensed but
21  still caused some concern to your pharmacists
22  about rejecting scripts.  Do you recall that?
23       A.   Yes.
24       Q.   And I know you said that you were -- I
25  believe your testimony was that you were a hundred

161

1  percent certain that it happened and the scripts
2  were rejected, but you couldn't give an exact
3  description of when that happened.  Do you recall
4  that?
5      A.   Yes.
6      Q.   Is that accurate?
7      A.   It's an inexact number.  I would say
8  that it happens weekly for the main reason, which
9  hasn't changed, is they always need it two or
10 three days early, early, early.  So you start
11 billing.  It comes back too soon.  You look at the
12 OARRS report.  You see the last time it was
13 filled, and we don't fill it.
14     Q.   So it did happen regularly, we'll say,
15 that scripts were rejected at the pharmacy that
16 you oversaw?
17     A.   Correct.
18          MR. HUDSON:  Object to the form.
19 BY MR. KOBRIN:
20     Q.   Did it happen regularly?
21     A.   Yes.
22     Q.   You testified a little bit about
23 thresholds and the thresholds, whether they be
24 from McKesson or Anda or HBC.  Do you remember
25 that?

170

1  Q. And you mentioned LP. What is LP?
2  A. Loss prevention.
3  Q. And they're the people who kind of help
4  you research all these issues at the next level?
5  A. Yes.
6  Q. I think we're all set.
7  MR. KOBRIN: Pass the witness.
8  RE-EXAMINATION
9  BY MR. HUDSON:
10  Q. In terms of scripts rejected, you
11  testified that it happens weekly. Is that just
12  your sense from, as you sit here today, the best
13  of your recollection?
14  A. It's my sense of just from me being in
15  the store from the time period we're talking, to
16  conversations about compliance with my team
17  members, what are some of the reasons we're
18  turning away scripts.
19  Q. Is there any reason why Giant Eagle
20  couldn't have kept a scripts rejected log or
21  written down on the computer system or somewhere
22  each instance where a prescription was rejected
23  and the reason it was rejected?
24  MR. KOBRIN: Object to the form.
25  THE WITNESS: There would be no reason

[1/22/2019] Bencivengo012219

171

1  to keep a log like that.  You're determining
2  whether you're going to fill something or not fill
3  it.  You make the determination.  You can put into
4  the computer refilled too soon or whatnot.  If you
5  take the script back, there's no record in the
6  computer of the script.
7  BY MR. HUDSON:
8      Q.   Right.  All I'm saying is in the
9  computer system or somewhere could Giant Eagle
10  keep a log of scripts that were rejected due to
11  suspicion of diversion?
12          MR. KOBRIN:  Object to form.
13          THE WITNESS:  No, because some of those
14  don't even get into our system.  If you bring a
15  piece of paper to me and I do everything that we
16  spoke about here for the last -- since 1:00 or
17  2:00, that prescription might not get dropped
18  through our system and even get in the system.  So
19  there's no record of the prescription even there.
20  We just hand it back to you.  You take it away.
21  BY MR. HUDSON:
22      Q.   Right.  I guess what I'm saying is, is
23  there any reason why Giant Eagle couldn't keep a
24  log of some kind or a repository, like you take
25  the script and you go, this thing, this just

172

1   doesn't look right to me.  I'm not filling this
2   script.  In my professional judgment, this isn't
3   legitimate.  Here's the name and what they were
4   trying to fill and then the reason for rejecting
5   it is because this doesn't look legitimate to me
6   and I think it's a possible risk of diversion.
7        Is there any reason why Giant Eagle
8   pharmacists couldn't as a matter of practice have
9   kept a log of prescriptions where they decided not
10  to fill them?
11           MR. KOBRIN:  Object to form.
12           THE WITNESS:  I don't know.  I don't
13  know why we would ever look at that log.  I do not
14  know what purpose it would serve.  We've already
15  determined we're not filling it.
16  BY MR. HUDSON:
17       Q.   Well, one purpose would just be to have
18  some sense, as we sit here today, of how many
19  prescriptions there were that were at risk of
20  diversion that were rejected; right?
21           MR. KOBRIN:  Object to form.
22           THE WITNESS:  It would help you here
23  today, yes.  It would help what you're trying to
24  go after.  It would help.  But it wouldn't give us
25  anything.

173

1  BY MR. HUDSON:
2      Q.  Well, it would help Giant Eagle, too,
3  because if you said that weekly -- it's your sense
4  that weekly pharmacists within your territory are
5  rejecting filling prescriptions, you could go to
6  that rejected prescription log and look at it.
7  And then we'd be able to say, yeah, Pennsylvania
8  is right.  Look down the log.  Every week there's
9  a pharmacist that's not filling a prescription.
10         MR. KOBRIN:  Object to form.
11  Argumentative.
12         THE WITNESS:  That was my response.  It
13  would help your case, but it wouldn't do anything
14  for me.  I would never have to see that.  They
15  didn't fill the script.  They did what they're
16  supposed to do.
17  BY MR. HUDSON:
18      Q.  Were you ever concerned or to your
19  knowledge was anyone at Giant Eagle ever concerned
20  about diversion of opioids?
21      A.  All of Giant Eagle is concerned.  Any
22  pharmacist, any pharmacy is concerned about
23  diversion of opioids.
24      Q.  Would keeping records and trying to
25  track the reasons why prescriptions are not filled

174

1  potentially serve a role to Giant Eagle in
2  becoming better at preventing diversion?
3           MR. KOBRIN:  Object to form.
4           THE WITNESS:  I don't believe it would.
5  BY MR. HUDSON:
6      Q.   Similarly, on Exhibits 11 and 12, when
7  you look at the line items, there's well over a
8  hundred, probably a couple hundred line items from
9  pharmacies in your territory of inventory
10 discrepancies just for these two months, right --
11          MR. KOBRIN:  Object to form.
12 BY MR. HUDSON:
13     Q.   -- that we've looked at?
14     A.   We looked at about 20 discrepancies.
15 The rest of the report are all resolved issues.
16     Q.   Well, let's look at back then at
17 Exhibit 11.  We looked at 20 discrepancies where
18 the reason for it was unknown; right?
19          MR. KOBRIN:  Object to form.  If we're
20 going to say 20, we should know what we're talking
21 about here.
22 BY MR. HUDSON:
23     Q.   We went through.  The record is what is.
24 We went through them; right?  Whatever it is it
25 is.