# EXHIBIT 16

```
                                                                    1

      IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF OHIO
                 EASTERN DIVISION

IN RE:  NATIONAL           :  MDL No. 2804
PRESCRIPTION OPIATE        :
LITIGATION                 :  Case No. 17-md-2804
                           :
APPLIES TO ALL CASES       :  Hon. Dan A. Polster
                           :
                           :


              HIGHLY CONFIDENTIAL

     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW



                    - - -

              JANUARY 16, 2019

                    - - -

    VIDEOTAPED DEPOSITION OF GEORGE CHUNDERLIK,

taken pursuant to notice, was held at Marcus &

Shapira, One Oxford Center, 35th Floor, Pittsburgh,

Pennsylvania 15219, by and before Ann Medis,

Registered Professional Reporter and Notary Public in

and for the Commonwealth of Pennsylvania, on

Wednesday, January 16, 2019, commencing at 9:04 a.m.

                    - - -

           GOLKOW LITIGATION SERVICES
      877.370.3377 phone | 917.591.5672 fax
               deps@golkow.com
```

185

1   A.   A copy -- I don't know if was a
2   formalized policy as on Exhibit 18.  My
3   recollection is that we would have provided a
4   summary of our program versus a written policy as
5   shown in Exhibit 18.
6   Q.   And what is your recollection of -- at
7   this time in January of 2014, what was the system
8   or what was the suspicious order monitoring?  What
9   was happening at that time?
10  A.   At that point in time, as we've seen, we
11  had daily reports based upon stores that may have
12  exceeded the threshold that we had set up, and if
13  stores flagged on those reports, they were
14  followed up on, and that was part of the
15  explanation in this document.
16  Q.   So at this point in time in January of
17  2014, to the best of your recollection, the system
18  that was in place was the daily threshold reports
19  that you've talked about; correct?
20  A.   Correct, yes.
21  Q.   Now, at some point in 2015, did Giant
22  Eagle take steps to open a new distribution
23  facility where Giant Eagle was going to become a
24  distributor of Schedule II controlled substances?
25  A.   Yes.  We began processes.  We began the

214

1  already discussed.
2  BY MR. HUDSON:
3      Q.  Other than store number 8, any other
4  investigations you recall?
5      A.  There were some.  I can't remember
6  specific stores.
7      Q.  Do you remember who you talked to at
8  those stores?
9      A.  I would talk to the pharmacy manager.
10     Q.  Do you remember the names of anybody in
11 particular that you talked to between 2009 and
12 2014?
13         MR. KOBRIN:  Object to form.
14         THE WITNESS:  I would have talked to the
15 pharmacy manager.  Whether they've changed from
16 that point in time, I'm not sure, but I don't
17 recall the specific pharmacist that I talked to.
18 When I make a call to the pharmacy, I always ask
19 for the pharmacist in charge or the pharmacy
20 manager.
21 BY MR. HUDSON:
22     Q.  What particular information did you ask
23 for when you made those calls?
24         MR. KOBRIN:  Object to form.
25         THE WITNESS:  I would ask about if there

[1/16/2019] Chunderlik011619

215

1   is any -- some of the questions that we had on
2   our -- on one of the previous forms that we
3   discussed that had some of those six questions on
4   there.
5   BY MR. HUDSON:
6       Q.   Did you ask the same questions every
7   time, or did they change?
8       A.   They may have change a little bit.
9       Q.   As you sit here today, can you remember
10  any specific questions that you asked any
11  pharmacist at any particular store between 2009
12  and 2014?
13      A.   Some of the things that I was most
14  interested in when I asked were information on
15  pain clinics, if there were any new physicians in
16  the area.
17      Q.   Anything else that you asked?
18      A.   There may have been, but I can't recall
19  specifically.
20      Q.   Did you ever uncover that there were
21  ever pain clinics or new physicians in the area?
22      A.   Yes.
23      Q.   And would that cause you to have a
24  suspicion that there would be a heightened risk
25  for diversion?

[1/16/2019] Chunderlik011619

216

1        A.   I wouldn't necessarily say a heightened
2   risk.  I knew that there were probably going to be
3   more prescriptions coming from those facilities.
4   We look to fill prescriptions, legitimate
5   prescriptions.  I had no reason to believe that if
6   a physician has written a prescription, that the
7   pharmacy was going to do their due diligence to
8   determine if that was a legitimate prescription or
9   not.
10       Q.   Other than asking the pharmacist whether
11  there were new physicians or pain clinics in the
12  area, anything else that you can recall doing your
13  due diligence to investigate flagged orders?
14            MR. KOBRIN:  Object to form.  Asked and
15  answered.
16            THE WITNESS:  Other than that, there may
17  have been situations where I had asked about
18  specifically what types of prescriptions that they
19  were seeing from the pain clinic or from the
20  physician's offices and if there was any reason
21  why they had a reason -- if there weren't any pain
22  clinics or new offices being opened, what the
23  pharmacy would have thought was a reason for the
24  increase in purchases in prescriptions.
25

235

1  parentheses it says CSOS.  Right?
2       A.   Yes.
3       Q.   When was the CSOS system implemented, if
4  you know?
5       A.   At the retail location, my recollection
6  is around April of 2015.
7       Q.   Then the next bullet point is the OMS.
8  Is that a reference to the order monitoring
9  system?
10      A.   Yes.
11      Q.   Is that the new system that's going to
12  be implemented --
13      A.   Yes.
14      Q.   -- in conjunction with this policy?
15      A.   Yes.
16      Q.   The OMS uses algorithms to identify
17  controlled substance orders that require
18  investigation and documentation before releasing
19  the order for distribution.
20           Then there's a sub-bullet there.  The OMS
21  algorithm generates limits based on monthly
22  thresholds and ordering characteristics specific
23  to the following.  Then it lists pharmacy
24  location, chemical, generic product indicater,
25  National Drug Code and ordering pattern; correct?

[1/16/2019] Chunderlik011619

236

1  A. Yes.
2  Q. If you could, just compare for me how
3  comprehensive these algorithms are for monitoring
4  orders compared to the previous daily threshold
5  reports that we talked about.
6  A. I think we modified the algorithm to --
7  we modified the algorithm that we were using to
8  identify any type of suspicious order or any type
9  of order.
10 Q. So now the monitoring is going to be
11 specific to the actual pharmacy location; right?
12 A. Yes.
13 Q. That was not something that -- the daily
14 threshold reports that were implemented in October
15 of 2013, not something they were able to do;
16 right?
17 A. That's correct.
18 Q. And then here it also indicates that
19 this monitoring is going to involve not just
20 monthly thresholds, but also ordering
21 characteristics; correct?
22 A. That's correct.
23 Q. That's something that the prior daily
24 threshold reports were not able to do; right?
25 A. Which bullet are you referring to?

237

1     Q. The clear bullet, the first.

2     A. I wouldn't necessarily say that our
3 previous system was not able to do some of these
4 things as well.

5     Q. We've looked at the reports before, but
6 the daily threshold reports that began being
7 generated in October of 2013, those were monthly
8 or those were thresholds of orders based upon
9 monthly rolling data; right?

10     A. Right, but they were chemical, generic
11 product indicator, National Drug Code as well. I
12 kind of want to make that distinction there. We
13 have bullets that look like we've added these
14 types of things, but they were part of the
15 original one as well.

16     Q. The original one in October of 2013
17 created thresholds based on GPI; right? The
18 generic product indicator was --

19     A. At the GPI 10 level.

20     Q. Right. And then it was specific that
21 thresholds were company-wide, but not store or
22 location specific; right?

23     A. Correct.

24     Q. And then the daily threshold reports,
25 those didn't include -- there was no data that was

238

1    being mined to create algorithms to flag or
2    monitor ordering characteristics, right, or
3    ordering patterns?
4             MR. KOBRIN:  Object to form.
5             THE WITNESS:  We have those reports
6    where we could -- I mean, they do show pattern.
7    They have the potential to show patterns.
8    BY MR. HUDSON:
9         Q.   They show a pattern as it relates to
10   orders, but only the subset of orders that would
11   be exceeding a threshold; right?
12        In other words, the only thing being flagged
13   in the daily threshold reports that were in
14   existence from October of 2013 were orders that
15   were exceeding the threshold; right?
16            MR. KOBRIN:  Object to form.
17            THE WITNESS:  Those are the orders.
18   When a store -- the first time a store went over
19   the threshold, they would flag on the report, and
20   they could have the potential to stay on that
21   report till the end of the month, yes.
22   BY MR. HUDSON:
23        Q.   Right.  But if there wasn't an order
24   going from HBC to a pharmacy that tripped over the
25   threshold, that order would not be on those daily

259

1   over the receipt of controlled substances it was
2   handling when it determined it was in compliance
3   with the security requirements?
4        A.   Yes.
5        Q.   Did HBC consider the physical security
6   features of its facility --
7        A.   Yes.
8        Q.   -- when it determined it was in
9   compliance with the security requirements?
10       A.   Yes.
11       Q.   Did HBC get frequent visits from the
12  DEA?
13       A.   They got visits from the DEA, yes.
14       Q.   What was the purpose of those visits?
15       A.   To do reconciliation audits to see if we
16  were also complying with the security requirements
17  that were required as part of the Act and that we
18  had controls in place.
19       Q.   Did the DEA ever tell HBC that they were
20  not meeting the security requirements under the
21  regulations, under the regulation related to the
22  Controlled Substances Act?
23       A.   Not that I know of, no.
24       Q.   With respect to the HBC warehouse that
25  you visited, do you recall whether it had a locked

260

1  cage?
2      A.   Yes, it did.
3      Q.   Was there controlled access to that
4  cage?
5      A.   There was controlled access, yes.
6      Q.   Do you know whether that cage was
7  inspected and approved by the DEA?
8      A.   It was, yes.
9      Q.   Do you know if admittance to that cage
10 was controlled and limited to only certain
11 personnel?
12     A.   Yes.
13     Q.   When you visited HBC warehouse, was it
14 clear that they had taken any steps in order to be
15 compliant with the Controlled Substances Act?
16     A.   Yes.
17     Q.   So the people at the HBC warehouse were
18 aware of the Controlled Substances Act?
19          MR. HUDSON:  Object to the form.
20          THE WITNESS:  Yes.
21 BY MR. KOBRIN:
22     Q.   Do you know whether the people at the
23 warehouse were aware of the Controlled Substances
24 Act?
25     A.   Yes.

[1/16/2019] Chunderlik011619

264

1  monitored by loss prevention?
2      A.  Yes.
3      Q.  Are the pharmacies monitored by loss
4  prevention?
5      A.  Yes.
6      Q.  Are there internal audits of the
7  pharmacies?
8      A.  Yes.
9      Q.  Are the pharmacists and the pharmacy
10  techs trained and supervised?
11      A.  Yes, they are.
12      Q.  In fact, you were involved in the
13  supervision of those pharmacy techs, weren't you?
14      A.  That's correct.
15      Q.  Does Giant Eagle impose policies and
16  procedures on pharmacists and pharmacy techs with
17  respect to the way it dispenses controlled
18  substances?
19          MR. HUDSON:  Object to the form.
20          THE WITNESS:  No, we do not.
21  BY MR. KOBRIN:
22      Q.  You don't impose any policies and
23  procedures about how they dispense prescriptions?
24      A.  We have a controlled drug dispensing
25  guideline that we have communicated out to our

265

```
 1   pharmacists and pharmacy team members.
 2       Q.   And do you also have a DEA pharmacist
 3   manual that you communicate out to your
 4   pharmacists and team members?
 5       A.   Yes, we do.
 6       Q.   Is that available in every Giant Eagle
 7   pharmacy?
 8       A.   It is readily available at each Giant
 9   Eagle pharmacy.
10       Q.   And you mentioned that Giant Eagle has
11   controlled substance dispensing guidelines.
12       A.   Yes, that's correct.
13       Q.   Does it include red flags, things to
14   watch for in terms of whether a prescription is
15   legitimate or not?
16       A.   That is correct, yes.
17       Q.   Could you look at Exhibit 10.  I'll find
18   it, too.  Earlier today opposing counsel had you
19   looking at the risk assessment red and green flags
20   that are listed under Section 3(b) in the email
21   from Joseph Millward in this exhibit.  Do you see
22   that?
23       A.   Yes, I do.
24       Q.   Are those red flags for the pharmacy or
25   are they for the warehouse?
```

266

1     A.    They would be for the pharmacy.
2     Q.    They would apply to the manner in which
3  pharmacists are judging potential customers who
4  come in; correct?
5     A.    That's correct.
6     Q.    Is that a kind of pharmacy control that
7  would be listed in the controlled substance
8  dispensing guidelines that are at every Giant
9  Eagle pharmacy?
10    A.    Yes; yes, sir.
11    Q.    To your knowledge, has the DEA ever
12 raised an issue about a pharmacy store's
13 compliance, a Giant Eagle pharmacy store's
14 compliance with the Controlled Substances Act?
15         MR. HUDSON:  Object to the form.
16         THE WITNESS:  No.
17 BY MR. KOBRIN:
18    Q.    We talked a little bit about controls at
19 pharmacies.  Are pharmacists required to
20 immediately update a store's controlled substance
21 inventory when it receives incoming orders?
22         MR. HUDSON:  Objection.  No foundation.
23         THE WITNESS:  The system can do that
24 whenever they receive the order into the pharmacy.
25

[1/16/2019] Chunderlik011619

267

1   BY MR. KOBRIN:
2       Q.   When a pharmacist fills a controlled
3   substance prescription, is the store inventory
4   immediately updated for outgoing prescriptions?
5       A.   Yes.
6       Q.   At the end of the day, is there a check
7   of remaining balances of the controlled substance
8   at the stores?
9       A.   In controlled substances and Schedule II
10  items, the pharmacy does a perpetual back count of
11  what should be remaining on the shelf after they
12  dispense a prescription.
13      Q.   What does that mean, a perpetual back
14  count?
15      A.   After each time a prescription goes
16  through the filling process, the pharmacist is
17  required to go back and count the remaining
18  inventory that's in the -- for that product and
19  log it into the electronic database within our
20  pharmacy data management system.
21      Q.   Are you familiar with the term monthly
22  narc audit?
23      A.   I am, yes.
24      Q.   What is a monthly narc audit?
25      A.   The monthly narc audit is a program that

268

1  was developed by Giant Eagle to reconcile
2  inventory.  It will show the purchases for a given
3  time period as to when the audit was conducted and
4  show all dispensing.  And at the end of doing that
5  calculation, there is an actual -- there is an
6  expected on-hand count that is shown to the
7  pharmacy.
8       They do the count, and then they update it
9  with the actual count that is remaining in
10 inventory.
11      Q.   Do you also have annual audits of
12 inventories at Giant Eagle pharmacies?
13      A.   We do annual inventory counts at each
14 pharmacy, yes, of all controlled substances.
15      Q.   Can you tell me what a PDL is?
16      A.   PDL is an acronym at Giant Eagle for
17 pharmacy district leader.
18      Q.   What do the PDLs do?
19      A.   The PDLs -- each PDL has roughly 29 to
20 33 stores that they are responsible for business
21 oversight of a particular region.
22      Q.   Do they regularly visit the stores?
23      A.   They do regularly visit the stores, yes.
24      Q.   When the compliance team did due
25 diligence on any orders that flagged or any orders

269

1  that they wanted to investigate further, would the
2  PDLs be a good source of information as to what
3  was going on --
4      A.   The PDL is a very good source of
5  information, yes.
6      Q.   Did you and others at Giant Eagle
7  corporate office utilize the PDLs when doing due
8  diligence at stores and on orders?
9      A.   Yes, sir; yes.
10     Q.   Do PDLs conduct audits or inquiries
11 concerning procedures at the stores?
12     A.   They do.
13     Q.   Do they supervise the training of
14 pharmacists at all?  Are they involved in the
15 supervising and training of pharmacists?
16     A.   They do have a part in supervising the
17 training.  As part of their audit, they would look
18 to see if required training was being conducted by
19 the pharmacist or that team members were doing
20 some computer-based training programs that had
21 been assigned to them.
22     Q.   That would be like continuing education?
23     A.   Possibly, yes.
24     Q.   Do the stores, do the Giant Eagle
25 pharmacy stores work with local law enforcement?

270

1       A.      Yes, they do.
2       Q.      Do the Giant Eagle pharmacy stores work
3   with local police departments?
4       A.      Yes.
5       Q.      Do the Giant Eagle pharmacy stores work
6   with the Board of Pharmacy inspectors in each
7   state?
8       A.      Yes, they do.
9       Q.      Do the Giant Eagle pharmacy stores and
10  their employees work with DEA agents?
11      A.      They have, yes.
12      Q.      Would you characterize that relationship
13  between the stores and these law enforcement
14  agencies as a cooperative working relationship?
15      A.      Yes, I would, very cooperative.
16      Q.      In working with local law enforcement
17  and the DEA, has Giant Eagle been able to uncover
18  people who are attempting to pass bad scripts?
19      A.      Yes, we have.
20      Q.      Does Giant Eagle have a pharmacy
21  investigator?
22      A.      Yes, we do.
23      Q.      And does he also work with local law
24  enforcement in trying to apprehend people who are
25  passing bad scripts?