# EXHIBIT 17

1

```
 1                UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF OHIO
 3                      EASTERN DIVISION
 4
 5    ------------------------) MDL No. 2804
 6    IN RE:  NATIONAL        )
 7    PRESCRIPTION OPIATE     )
 8    LITIGATION              )
 9    ------------------------) Case No. 17-md-2804
10    THIS DOCUMENT RELATES TO:)
11    ALL CASES               )
12    ------------------------) Hon. Dan A. Polster
13
14                     HIGHLY CONFIDENTIAL
15        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
16
17                   VIDEOTAPED DEPOSITION OF
18                         RANDY HEISER
19
20                      February 19, 2019
21
22                   Pittsburgh, Pennsylvania
23
24
```

18

1  distributor of controlled substances for a little less
2  than two years while you were still there?
3       A.   That's -- well, I don't recall when we
4  actually brought the controls in.  I know that we
5  started with generics and then my recollection is at
6  some point we added the controls.  That dating sounds
7  about correct, but I don't recall the exact date.
8       Q.   Sure, sure.
9            And the records will reflect what they
10 were.  And, again, I'll -- I'll represent to you that
11 they show that -- that the -- the controlleds started
12 in -- in about November of 2009 --
13      A.   Okay.
14      Q.   -- so...
15           During that time period, do you have any
16 recollection of whether or not HBC designed a system
17 to identify suspicious orders of controlled
18 substances?
19      A.   We had an integrated system in place to
20 monitor the movement of all controls.  It started as
21 we received product from the warehouse.  It was
22 scanned and electronically recorded.  When it was
23 placed on the shelves, again, it was scanned and
24 electronically recorded.  When it was dispensed or

19

1    when it was -- an order was picked based upon a
2    store's order, it was scanned and electronically
3    recorded.  When the totes were placed in a truck, it
4    was scanned and electronically recorded.  When those
5    delivery vehicles arrived at the Giant Eagle location,
6    the totes were scanned and electronically recorded.
7    When the merchandise was unpacked, it was, again,
8    scanned and electronically recorded.  When we
9    dispensed the product through our dispensing system,
10   the product was scanned and electronically recorded.
11   When we gave the medicine to the patient, it went
12   through our cash register, it was scanned and
13   recorded.
14           We also had corporate oversight of both
15   the stores and the warehouse.  The warehouse had
16   buyers that were monitoring from a human perspective
17   the orders that were placed by the stores and also the
18   orders that were placed to the manufacturers.  The
19   system to monitor the store activity involved our
20   pharmacists who are required to on a monthly basis
21   compare dispensing activity to purchase activity,
22   identify discrepancies, and try to find out what
23   those -- why those discrepancies occurred.
24           Our district managers were responsible to

20

1  verify that that analysis of dispensing activity
2  versus purchasing activity was being conducted
3  properly. And our vice president of pharmacy
4  operations was responsible to see that our district
5  managers were performing those particular follow-ups.
6         So we had a -- a fully integrated system
7  of controls in place to be sure that we were trying to
8  detect and prevent any type of theft or diversion.
9     Q.   My question was more specific. My
10 question was: Did HBC design a system to identify
11 suspicious orders of controlled substances?
12        So my question is what -- to you, what is
13 a suspicious order of a controlled substance?
14    A.   I mean, we -- me -- our integrated system
15 looked for, you know, any -- any types of -- of
16 deviations. Our focus was on theft and the -- you
17 know, ways to -- to get it -- get it out if anyone was
18 taking it out of the system.
19        The buyers were looking at, you know,
20 orders as they were coming in. So if someone, you
21 know, was on -- if they saw something that came in and
22 they said they wanted 40 pieces and they have never
23 ordered 40 pieces, they would typically call to see if
24 it was a -- a fat finger situation or if the system,

[2/19/2019] Heiser021919

35

```
1    10, the companies responded, and do you see at the
2    bottom of Page 9, the first written policy identified
3    is there at that Bates range and then it says it's
4    effective from 8/1 of 2014.
5            Do you see -- do you see that at the
6    bottom?
7        A.   I see the sentence:  "Apparent version of
8    HBC policy effective 8/1 of 2014."
9        Q.   Okay.  And then if we look to the next
10   page, I think you'll see that the rest of the written
11   policies identified become later, you know, later in
12   time as opposed to earlier in time.
13           My -- my -- given that the company has
14   identified the first written policy as being
15   August 1st of 2014, my question is simply:  Do you
16   have any recollection of any written policies or
17   procedures relating to suspicious order -- a
18   suspicious order monitoring system that were in effect
19   prior to August 1st of 2014?
20       A.   I mean, I think I've already described
21   these integrated systems that were in place to monitor
22   the movement of all products throughout the Giant
23   Eagle supply chain.
24       Q.   And can you say under oath today whether
```

[2/19/2019] Heiser021919

36

1    or not that integrated system had components that were
2    specifically designed to identify suspicious orders of
3    controlled substances?
4        MR. KOBRIN:  Object to form.
5    BY THE WITNESS:
6        A.    I think I've already described how the
7    system was in place to -- to monitor the movement and
8    to identify anything that was out of line.
9    BY MR. HUDSON:
10       Q.    Right.  And as part of that, do you know
11   as you sit here today whether or not that involved
12   monitoring and identifying orders of controlled
13   substances of unusual size?
14       MR. KOBRIN:  Object to form, asked and answered.
15   BY THE WITNESS:
16       A.    I -- I think I've already answered the
17   fact that we had people at a corporate level that were
18   monitoring the orders that were sent from the store to
19   the HBC warehouse.  Those buyers were also monitoring
20   the orders that were sent from the warehouse to the
21   manufacturers.
22   BY MR. HUDSON:
23       Q.    So who -- who at corporate was monitoring
24   orders of controlled substances to identify those of

[2/19/2019] Heiser021919

37

1 unusual size?

2     MR. KOBRIN: Object to form.

3 BY THE WITNESS:

4     A. I think I already -- I already stated they

5 were -- they were pharmacy buyers that were

6 responsible for monitor -- monitoring those orders.

7 BY MR. HUDSON:

8     Q. And who were the pharmacy buyers, what

9 were their names?

10     A. I don't recall.

11     Q. What did the pharmacy buyers do to monitor

12 the orders to try to identify those of unusual size?

13     A. They are -- they are looking at the orders

14 that came from the pharmacies before they actually

15 submit their orders into the manufacturers.

16     Q. How often did they review those orders?

17     A. I don't recall.

18     Q. Well, what was the criteria being applied

19 to try to determine whether it was an order of unusual

20 size?

21     A. I don't recall.

22     Q. How many orders did the pharmacy buyers

23 identify during the time that you were there that --

24 that were identified as being potentially suspicious