# EXHIBIT 4

"

```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3    IN RE: NATIONAL          )   MDL No. 2804
      PRESCRIPTION OPIATE      )
 4    LITIGATION,              )   Case No.
                               )   1:17-MD-2804
 5                             )
      THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6    ALL CASES                )   Polster
                               )
 7

 8                     __ __ __
 9             Thursday, April 25, 2019
                       __ __ __
10

         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11                CONFIDENTIALITY REVIEW
                       __ __ __
12

13

14

15        Videotaped Deposition of DAVID S.
      EGILMAN, M.D., MPH,  held at the Providence
16    Marriott Downtown, 1 Orms Street, Providence,
      Rhode Island, commencing at 9:08 a.m., on the
17    above date, before Debra A. Dibble, Certified
      Court Reporter, Registered Diplomate
18    Reporter, Certified Realtime Captioner,
      Certified Realtime Reporter and Notary
19    Public.
20

                       __ __ __
21

22

23           GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
24              deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

1          the videographer has a mic.

2                     UNIDENTIFIED SPEAKER:  It's

3          very difficult to hear on the phone.

4                     MR. DONOHUE:  Let's go off the

5          record for a second and see if we can

6          fix this.

7                     THE VIDEOGRAPHER:  Off the

8          record.  The time is 9:16.

9                     (Recess taken, 9:15 a.m. to

10         9:24 a.m.)

11                    THE VIDEOGRAPHER:  We are back

12         on the record at 9:25.

13         Q.    (BY MR. DONOHUE)  Dr. Egilman,

14    before the break, you had testified that

15    Ms. Conroy retained you in the second or

16    third week of November 2018 for this

17    engagement.  Do I have that right?

18         A.    Yes.

19         Q.    And how did Ms. Conroy retain

20    you?

21         A.    I think it was a phone call.

22         Q.    And what were you retained to

23    do?

24         A.    Somewhere here I have printed

Highly Confidential - Subject to Further Confidentiality Review

1    interest.  And he wrote an e-mail back saying

2    no, amongst other things.

3              The other things where he

4    criticized him -- the general anticorporate

5    construct in the -- and cynical views of the

6    medical and scientific views toward

7    corporations.

8         Q.    And do you have that e-mail

9    still?

10        A.    I don't know if I have it, but

11   Dan probably has it.

12        Q.    As part of this engagement,

13   have you kept copies of the e-mails that

14   either the students or staff have sent and

15   received?

16        A.    No, I don't keep any e-mails.

17              You know Jones Day is in the

18   room, right?

19              MR. DONOHUE:  I'll move to

20         strike as nonresponsive.

21        Q.    (BY MR. DONOHUE)  A number of

22   the students that you have had assisting you

23   in the -- in this engagement, how many hours

24   would you estimate that they have worked in

Highly Confidential - Subject to Further Confidentiality Review

1        A.      I don't think so.

2                MS. CONROY:  Objection.

3                THE WITNESS:  I don't know if

4        they've given her --

5                I don't think they've given her

6        the hours.  So they each have their

7        own hours.

8        Q.      (BY MR. DONOHUE)  And what

9   would you estimate the number of hours that

10  your students have worked on this engagement?

11       A.      Same thing.  I don't have a

12  good idea about that.  But mostly -- I mean,

13  they work -- they work, you know, around 15

14  to 30 hours for three or four weeks in

15  January, and then after that, you know, five

16  to 15 hours, maybe -- I doubt it -- in the

17  next couple of months.

18       Q.      How much of your income last

19  year was from expert work in the litigation?

20       A.      Probably half.

21       Q.      What were your other sources of

22  income for last year?

23       A.      Consulting for companies.

24       Q.      Is that non-litigation

1    consulting?

2        A.    It's confidential consulting.

3        Q.    Any other sources of income for

4    last year?

5        A.    Sure.

6        Q.    What else?

7        A.    Investments.

8            That's about it.

9        Q.    Does Brown pay you anything?

10        A.    A library card.  Discount on

11    that.

12            The library card is probably

13    worth about $50,000 to me, just to give you a

14    number.

15            The year before I got free

16    parking, when I was teaching a course.  They

17    paid for the parking.

18        Q.    Are you currently teaching any

19    courses at Brown?

20        A.    Not this semester.

21        Q.    Do you plan on teaching next

22    semester?

23        A.    I do.  Well, no.  I plan on

24    teaching -- because of this case, I plan on

Highly Confidential - Subject to Further Confidentiality Review

1      teaching the next spring.

2           Q.     Are you still practicing

3      medicine?

4           A.     I still have a license to

5      practice, and I still occasionally see

6      patients.

7           Q.     How many patients would you say

8      you now see?

9           A.     Well, when I'm doing -- I

10     probably see 10 or 15 consulting patients a

11     year and maybe one or two regular patients

12     who call me up or something I've seen them

13     before for.

14          Q.     Do you have an office where you

15     practice medicine?

16          A.     I do.

17          Q.     Is it the same office you use

18     for your expert litigation?  Or different?

19          A.     It's a slightly different

20     suite.

21                 I have -- in my office I have

22     about eight rooms.  In one of the rooms I

23     have a medical setup.

24          Q.     Speaking of the protective

Highly Confidential - Subject to Further Confidentiality Review

1    recollection when you go back to your office?

2         A.    If I went back to my office, I

3    could find the document and I could refresh

4    my recollection.

5         Q.    And what is it that you need to

6    refresh your recollection about with respect

7    to the settlement agreement before answering?

8         A.    Well, that was a finely crafted

9    document.  And I need to recall exactly what

10   was in it.  And I can't recall exactly what

11   was in it.  It's been 9 -- 12 years.  So

12   before I answer questions about that, I want

13   to refresh my recollection of what actually

14   was signed and what happened.

15        Q.    All right.  Are there any other

16   instances you recall where you have violated

17   a Court's order?

18        A.    No.

19        Q.    Do you recall the Ballinger v.

20   Brush Wellman, Incorporated case?

21        A.    Correct.

22        Q.    Do you recall posting materials

23   in violation of the Court's order in that

24   case?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      That's not what happened.

 2            Q.      What did happen?

 3            A.      Jones Day hacked my computer,

 4     downloaded materials from my computer,

 5     illegally, then -- pardon me.  Keller and

 6     Heckman in Washington, representing the

 7     Society for the Plastic Industries, hacked my

 8     computer in a case -- in the Staples case,

 9     the vinyl chloride case in Texas.  They then

10     shared the password with Kelly Stewart at

11     Jones Day.  Kelly Stewart of Jones Day then

12     hacked my computer, downloaded materials that

13     were not publicly available because my

14     computer was password-protected.

15                  Went to the judge, told the

16     judge I had violated a gag order.  He lied to

17     the judge.  And the judge believed him.

18     Okay?  The judge issued a sanction.  The

19     sanction was more or less reversed by the

20     Colorado Appellate Court, cert. denied to the

21     Supreme Court of Colorado.

22                  I filed a lawsuit against

23     Keller and Heckman, and it was thrown out on

24     the law.  It's the lead case in the
```

1    Millennium hacking statute.  It's Egilman

2    versus Keller and Heckman.

3              I then filed a bar complaint

4    against Kelly Stewart in Dallas.  Kelly

5    Stewart, at the bar complaint, admitted that

6    he had illegally hacked my computer, a

7    federal felony, 10 years in jail and a

8    $50,000 fine, on videotape.  No written

9    record.

10              The bar in Dallas issued a

11    written sanction to him, which was not to be

12    publicly disclosed, for counseling, and found

13    that -- I think the language was that my

14    complaint had merit.  The vote was 4 to 1.

15              So that's what happened in that

16    case.

17        Q.    When is the first time that you

18    gave expert testimony in support of

19    litigation?  Do you recall your first case?

20        A.    Yeah, my first case is Time

21    versus OCF.  It's a Third Circuit case.

22        Q.    What year was that?

23        A.    Third Circuit decision, I think

24    it was '87 or '88.  The case was, I think, in

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Turning your attention to

 2     page 139 of your expert report.

 3                     In each of these listed cases,

 4     have you testified on behalf of the

 5     plaintiffs?

 6              A.     No.

 7              Q.     So --

 8              A.     I don't testify on behalf of

 9     anybody.

10              Q.     Let me rephrase the question.

11                     With respect to the cases

12     listed on page 139 of your report, were you

13     retained by the plaintiffs in each and every

14     one of those cases?

15              A.     I believe so.

16              Q.     You previously testified that

17     you'd estimate you've been retained 4 to 500

18     times as an expert; do you remember that?

19              A.     Yes.

20              Q.     Out of the 4 to 500 times

21     you've been retained as an expert, in each of

22     those cases have you been retained by the

23     plaintiff?

24              A.     No.
```

1    are cases I gave testimony in.  Okay?  The

2    100 to 150, or whatever I gave for a number

3    for the defense cases, the cases I've been

4    retained in, in most of those cases, aside

5    from two or three of those cases, maybe four

6    of them, maybe five, I did not give testimony

7    in those cases.  Those cases settled.  But I

8    was retained and gave reports in all those

9    cases.

10        Q.     Okay.  So let me go back.

11               Out of the 4 to 500 cases where

12   you have testified as an expert, how many of

13   those cases have you testified when you've

14   been retained by a defendant?

15        A.     Probably 10 or so.

16               Well, no, wait.  I gave you

17   some others.  So maybe 10 to 15.

18        Q.     And you mentioned that you

19   believe, putting aside whether you testified

20   as an expert or not, "I've been retained by

21   defendants in 150 to 200 cases"; do I have

22   that right?

23        A.     Correct.  Or more.  I currently

24   have about 50 or 60 cases for Viking Pump.

Highly Confidential - Subject to Further Confidentiality Review

 1    your opinions are in this report so we make

 2    sure we're all on the same page.

 3              Let's start with the

 4    definitions that you use which are on page 51

 5    of your report.

 6         A.    Okay.

 7         Q.    Now, with respect to definition

 8    4.4, which is the, quote, Venture, capital V,

 9    end quote, you write that "The Venture refers

10    to all defendants in the opioid litigation."

11              Do you see that?

12         A.    I do.

13         Q.    What do you mean by "the opioid

14    litigation"?

15         A.    Well, I mean this case.

16         Q.    Now, are you aware of the

17    opioid manufacturers that are named as

18    defendants in this case?

19         A.    Yes.

20         Q.    What about -- are you aware

21    that there are opioid manufacturers that are

22    not named as defendants in this case?

23         A.    Yes.

24         Q.    Are the opioid manufacturers

1    answer, okay, but --

2         Q.    Let me withdraw that and ask a

3    different question.

4         A.    Okay.

5         Q.    Did you consider the TIRF REMS

6    program in rendering the expert opinions in

7    your report?

8         A.    I think so.

9         Q.    You testified that you consider

10   yourself an expert in warnings.  What other

11   areas do you believe you have expertise in?

12   If any.

13        A.    Well, do you want to define

14   "expert"?

15        Q.    What other areas do you believe

16   you're qualified to testify as an expert in

17   litigation other than warnings?

18        A.    That's the --

19             MS. CONROY:  Objection.  Legal

20        opinion.

21             THE WITNESS:  -- up to the

22        judge.  If you don't want to define

23        expert, I will.

24             My understanding of the

Highly Confidential - Subject to Further Confidentiality Review

1    definition of expert in this context

2    is that I know more than the layman

3    and can assist the jury in

4    understanding the issues in the case

5    beyond the ability of the normal

6    layman to understand the material that

7    I read, review, consider, and

8    generally summarize.  So that -- if

9    that's the definition of expert, I'll

10   go ahead and answer that question.

11        So an expert in internal

12   medicine.  Occupational environmental

13   medicine and toxicology.  I'm an

14   expert in molecular biology.  I'm an

15   expert in warnings and risk

16   communication.

17        All aspects of public health.

18   Public health includes two, kind of,

19   components.  The first component of

20   public health is trying to figure out

21   what makes people sick, and the second

22   is what makes people healthy.

23        Actually, that's two components

24   of the first question of the public

Highly Confidential - Subject to Further Confidentiality Review

1      health.

2            The second issue with respect

3      to public health is getting people to

4      change their behavior to use the

5      information in part one.

6            I am an expert in the aspects

7      of part one.  Those aspects being,

8      generally, molecular understanding of

9      cause-effect relationships, the

10     epidemiology, toxicology.  The -- then

11     at a higher level, a social and

12     cultural aspects of the causes of

13     disease.

14           So there's -- which is not a

15     lot of academic work in that area.

16           Then the other part of public

17     health is to take the information that

18     we've gathered from part one, and try

19     to get people to change their

20     behavior, to stop doing things that

21     you've determined cause disease, and

22     to get them to do things that promote

23     health and longevity.

24           And at a patient level -- and

Highly Confidential - Subject to Further Confidentiality Review

1            there are two levels for those

2            interventions.  At least two levels.

3                 One level is with respect to

4            things that impact on the individual

5            at an individual level.  So that

6            involves -- I'll give you the

7            occupational environmental construct

8            of that in hierarchy.

9                 So the first thing to do -- and

10           I'll try to give you some relevant

11           examples as we go along.

12                 MR. DONOHUE:  I'm only

13           interested in what you think you're as

14           an expert.  So you seem to be straying

15           into a long explanation about those.

16           Can you do it more briefly, please?

17                 MS. CONROY:  Objection.

18                 THE WITNESS:  Is that -- is

19           that an objection to the answer -- I

20           don't understand what that was.

21           Q.    (BY MR. DONOHUE)  I'm asking

22    you to summarize instead of giving detailed

23    answers in the areas where you believe you

24    have expertise.  So I understand you have

Highly Confidential - Subject to Further Confidentiality Review

1    expertise, you believe, in public health, and

2    you explained that.

3         A.    I didn't finish explaining

4    that.  There's many aspects of public health,

5    and I've given you the aspects of public

6    health, which --

7         Q.    If you could do it in list

8    form, that would be more helpful and

9    efficient.

10              MS. CONROY:  Objection.

11              THE WITNESS:  Okay.  Well, I'm

12         going to try to give it to you in the

13         form that I understand it.  Okay?  And

14         so they have -- this is how I explain

15         it when I'm in court, for example.

16              So the hierarchy from the --

17         and because this is -- it's an

18         expertise -- the expertise -- I'll

19         start making sense with expertise, to

20         make sure it's exactly relevant.  The

21         expertise is in the first hierarchy of

22         changing what people do is

23         substitution of a safer, for a more

24         dangerous product.

```
 1              So in the case of opioids, it

 2         would be the study of the various ways

 3         that one could treat pain that would

 4         not -- that would diminish the risk of

 5         addiction.  That's an expertise.

 6         That's a way of looking at

 7         cost-benefit analyses, looking at all

 8         the side effects, et cetera.

 9              So if you don't substitute,

10         then the next level down, which I have

11         expertise in, is in trying to avoid

12         the exposures in an administrative

13         fashion.  And so that would be -- in

14         the case of opioids, figuring out how

15         you can control the use of opioids by

16         controlling physician prescriptions,

17         educating the public, et cetera.

18              And I have expertise in that

19         with respect to opioids and general

20         expertise with respect to public

21         health.

22              So that -- pretty much from an

23         opioid perspective, those are the

24         expertises from public health.  That's
```

```
 1          at the micro level as it applies to

 2          the patient.

 3                  Then at the macro level, that's

 4          changing policy.  Okay?  And so I have

 5          some expertise in social change, how

 6          social change occurs at a macro level.

 7                  And I teach about that.

 8                  And that means how you create

 9          social movement to change ideas in the

10          society.  And those general ideas

11          might change the effect of how people

12          get treated in this case for pain.

13          And that involves legislative

14          interventions, community organizing,

15          et cetera.  I have expertise in that.

16                  And it also involves, at a

17          macro level, trying to influence ideas

18          in a society about appropriate care

19          and appropriate achievement.

20                  And that's done through a

21          variety of mechanisms, the current era

22          that involves an element of social

23          media and academic publication and

24          some combination thereof.
```

Highly Confidential - Subject to Further Confidentiality Review

1       So that's roughly the public

2       health expertises that relate to this

3       case.

4       For example, you know, I gave

5       the presentation to the FDA that

6       involves both understanding the

7       mechanism of addiction from a --  the

8       way that -- the relationship of the

9       dosing system to the addiction.  And

10      also I went to the FDA to try to

11      impact on policy.

12      So I'm working on policy issues

13      with respect to talc and other things

14      at a state and local and national

15      level.  So I have expertise in that

16      and I teach about that.

17      I'm an expert in Hill

18      considerations in epistemology,

19      E-P-I-S-T-E-M-O-L-O-G-Y.  And that's

20      how we know what we know.

21      From a scientific perspective.

22      Then this how we know what we believe,

23      that's involves sociology,

24      anthropology aspects and public policy

Highly Confidential - Subject to Further Confidentiality Review

1          issues.

2                    I'm an expert in pharmaceutical

3          and other medical products of

4          marketing practices, and I've

5          published on that.

6                    Of course I think we went

7          through I'm an expert on warnings.

8                    I'm an expert on evaluating the

9          side effects of pain medications, and

10         using secret corporate documents and

11         data.  That, per se, is an expertise,

12         to try to get information out about

13         the health effects and side effects of

14         pain medications.

15                   And I've done a little bit with

16         respect to opioids, to the extent that

17         the documents are not confidential,

18         and I've done a lot with respect to

19         other pain medicines, like Vioxx.

20                   I'm also an expert in how

21         corporations evaluate the efficacy of

22         their market and control and follow

23         what they and their competitors say

24         about their products.

Highly Confidential - Subject to Further Confidentiality Review

1          So, for example, I've reviewed

2      PMRD and research data, analyzed that

3      data and published on that data.

4          I'm an expert --

5          MR. DONOHUE:  I'm going to

6      object.  Special Master Cohen, I'm

7      going to ask you to direct the witness

8      to answer the question in a summary

9      fashion without -- for using words

10      like, "for example," in an attempt to

11      filibuster a question.  Which,

12      although I recognize, as stated was

13      somewhat broad, I have also made it

14      clear that I'm interested in a summary

15      of the areas he believes he has

16      expertise in, not on a what has now

17      been a 15-minute speech.

18          MS. CONROY:  Your Honor, this

19      was not a speech.  It was an answer to

20      a question that was asked by a

21      defendant, and I would also comment

22      that the defendants have made it very

23      clear there will be Daubert motions

24      filed in this case that will directly

```
 1              bear on the expertise of a witness.

 2                   And so to try to cut down an

 3              answer that you asked with respect to

 4              expertise is rather alarming, given

 5              what's coming in June.

 6                   SPECIAL MASTER COHEN:  So the

 7              defendants are free to ask no

 8              questions and get no information.  And

 9              if they choose to ask a question and

10              limit it, they're allowed to do that.

11                   What I think happened here was

12              that the defendant asked for a list of

13              areas of expertise.  Two examples are

14              social policy and epistemology.  I

15              can't say that.  I just said that in

16              five words.

17                   So somewhere between a short

18              list and a long explanation of what

19              each one of those means is how this

20              has to happen.

21                   They're entitled to ask you to

22              restrict your answers, Dr. Egilman, in

23              a way that provides only what they're

24              asking.  That's their choice.
```

Highly Confidential - Subject to Further Confidentiality Review

1       Frankly, maybe it would be better for

2       them to get more information from you,

3       but they're entitled not to do that.

4       So if they want succinct answers,

5       that's what you need to give them.

6       Okay?

7               THE WITNESS:  Okay.

8               MS. CONROY:  Thank you.

9               SPECIAL MASTER COHEN:  Okay.

10      Q.      (BY MR. DONOHUE)  Do you have

11  any other additional areas to list to

12  complete your answer with respect to your

13  expertise?

14      A.      Why don't you go back and

15  re-ask the question.

16      Q.      The question was what areas do

17  you believe that you have expertise in.  And

18  I had asked for a list of those areas.

19      A.      Here, I'm having a little

20  trouble given the ruling.

21              So, you know, I've published on

22  a lot of health effects of a lot of different

23  substances, peer-reviewed papers.  Okay?  So

24  you want me to just say that I've published

1    on the health effects of a lot of substances

2    and the side effects of a lot of things?  Is

3    that all you want?

4            Q.     If that is responsive to the

5    question, if it's true.

6            A.     Well, what's responsive to the

7    question I'm going to give you the detail of

8    each of the substances that I'm an expert in.

9    I'm not an expert in every toxic substance.

10   Okay?  I'm an expert in the ones that I have

11   studied, reviewed, published on.  So

12   that's --

13                  I mean, I don't --

14                  I mean, I can just -- I mean, I

15   can refer you to my CV.  Why don't I

16   incorporate my CV, and that saves a lot of

17   time?

18           Q.     Okay.

19           A.     In addition to that, I'm an

20   expert on international health and the

21   development of medical schools in developing

22   countries.

23                  I'm an expert in minority

24   recruitment to medical schools.

Highly Confidential - Subject to Further Confidentiality Review

1                    I'm an expert in the

2    organization of non-profits, the rules and

3    regulations of non-profits.

4                    I think that's it for general

5    categories.

6         Q.    Do you consider yourself an

7    expert on the FDA's regulations concerning

8    pharmaceutical marketing?

9         A.    Yes.

10        Q.    Do you consider yourself an

11   expert in pain management?

12                MS. CONROY:  Objection.

13                THE WITNESS:  Well, I consider

14        myself an expert in treating people

15        who have pain for diseases.

16                Certain diseases.  Not all

17        diseases.

18        Q.    (BY MR. DONOHUE)  Do you have

19   any clinical experience in pain management?

20        A.    Well, I have a lot of clinical

21   experience treating people for pain from

22   various diseases, yes.

23        Q.    Have you done any research

24   relating to pain management and the use of

1    you do?

2        A.    Well, I reviewed the ROI data

3    and the detailed reports from many of the

4    defendants.  And that -- that all -- some of

5    it was specific to specific physicians.

6            I remember it was -- it was one

7    physician whose name came up in the SIG

8    affiliated with impact who was a high user,

9    and somebody saw his name and sent marketing

10   people to that person.  There's the document

11   that talks about no sex, no prostitutes.  So

12   that refers to successful marketing

13   intervention with a particular doctor's name.

14   I don't remember.

15           I don't think that was a

16   formula.  I think it was a particular doctor.

17           So there is a whole slew of --

18   and also some of this is in Perri's report,

19   of indications from detail reps that their

20   work with a rep, with a physician increased

21   that physician's prescribing of opioids.

22       Q.    Are you board certified in

23   internal medicine in preventive occupational

24   medicine?

Highly Confidential - Subject to Further Confidentiality Review

 1          A.      Yes.

 2          Q.      And I see from page 30 of your

 3    expert report that you say you ran a clinic

 4    for 12 to 13 years.

 5          A.      Right.

 6          Q.      What years were those that you

 7    ran the medical clinic?

 8          A.      '89 to 2002.

 9          Q.      Were you a family medicine

10    doctor during that time in clinic?

11          A.      In part.  I had three general

12    activities.

13          Q.      What were the three general

14    activities?

15          A.      Internal medicine, family

16    medicine, consulting for companies in

17    occupational environmental health issues.

18          Q.      As a doctor, have you treated

19    patients for pain from cancer?

20          A.      Yes.

21          Q.      And as a doctor, have you

22    treated patients for pain for -- or excuse

23    me.  Strike that.

24                  Have you treated patients with

Highly Confidential - Subject to Further Confidentiality Review

1    histories.

2         Q.    Do you know the volume of

3    medical literature that you considered, read,

4    or reviewed in rendering your opinions in

5    this engagement?

6         A.    By search I think it's about

7    35,000 articles that I produced to you.  So I

8    searched over them, for example, for any

9    documents that related to studies of the

10   efficacy of narcotics, opioids for pain, and

11   a variety of other topics.  So I searched

12   over all of those for most of the things I

13   gave opinions on.  And then the ones that

14   came out, I read the abstracts.  If I thought

15   they were relevant, they got into the

16   article.

17        Q.    And how did you conduct the

18   search through the medical literature?  Is

19   that through a database?

20        A.    PubMed.

21        Q.    PubMed?

22        A.    PubMed.

23        Q.    And do you have any idea of the

24   volume of documents that you've considered as

1    part of this engagement?

2         A.    Well, it's 90 million documents

3    of database.  I did similar searches over the

4    database.  And then there's the 35,000

5    articles in PubMed, and then there's

6    additional documents that I reviewed

7    available.  Some web documents.  Some --

8    there were other documents I think that were

9    produced in the litigation:  the FDA

10   meetings, the two reports on the FDA,

11   government -- GAO report on the FDA.  And

12   there was another report on the FDA that I

13   read.  So there are other documents I read in

14   addition to the database in the medical

15   literature.

16              And of course we did a -- we

17   did a deep dive for that -- for that poster

18   presentation.  Trying to find all those

19   citations because they weren't PubMed, and

20   they -- we went to -- we went to like several

21   different libraries to do that -- to do the

22   dive for the Fishbain missing materials.

23              MR. DONOHUE:  I think now would

24        be a good time to take a lunch break,

1    minutes, memos, depositions, and review

2    documents related to the corporate conduct,

3    that would be under the general category of

4    grounds or methodology.

5         Q.      What you just described is not

6    written anywhere in your report, is it?

7         A.      Well, no, that's not correct.

8         Q.      Sir, nowhere in your report do

9    you say this opinion is based on grounded

10   theory approach, or this opinion is based on

11   evidence-based medicine methodology; correct?

12        A.      By opinion, do you mean?

13        Q.      Correct.

14        A.      That's correct.  I do not refer

15   back to a particular -- to grounded theory

16   when I use grounded theory in the report,

17   that's correct.

18        Q.      So there's no way for anyone

19   other than you to look at your report and

20   know which methodology you used for each

21   opinion; correct?

22        A.      Wrong.

23        Q.      Where in your report have you

24   provided those bases?

Highly Confidential - Subject to Further Confidentiality Review

```
1                    And you said no.
2                    And I asked you, why do you say
3    that's not correct?
4         A.    I say that's not correct
5    because an expert who is familiar with
6    grounded methods will recognize which
7    opinions in this report were based in
8    grounded methods rather than something else.
9    Like math.
10        Q.    So, sir, what you're saying is
11   that if there is an opinion in this report
12   that's based on math, then it's not based on
13   the grounded theory approach?
14        A.    That was exactly the example I
15   was going to give, yes.
16        Q.    And, sir, nowhere in your
17   report do you lay out which opinion uses
18   which method, do you?
19        A.    Not explicitly.
20        Q.    Now, I want to start with the
21   evidence-based medicine method.  I'd like to
22   ask you some questions about your
23   methodology; okay?
24                    You say that the first step in
```

Highly Confidential - Subject to Further Confidentiality Review

1    with me all of that is qualified by the

2    paragraph that you start with that

3    specifically identifies unpublished studies

4    as what you were looking for?

5         A.    I do not agree with you,

6    because that is a second -- a different

7    sentence.

8         Q.    Okay.

9         A.    I had a "none" once and I'd

10   have to defer to the "none" as to whether or

11   not the sentence before the definition of

12   search terms is an independent clause rather

13   than the initial paragraph which is separated

14   from that sentence by a list of companies

15   whose documents were produced.

16        Q.    Let's look at your search

17   terms, sir.

18              You would agree with me that

19   it's important to get key terms right,

20   because otherwise you might miss relevant

21   documents in your searches?

22        A.    Well, if you limit it to terms,

23   that would be true.  I didn't limit it to

24   those terms.

Highly Confidential - Subject to Further Confidentiality Review

 1    Q.    So there are other terms that
 2    you used that you did not list here in your
 3    report?
 4    A.    Sure.  It's an iterative
 5    search.  I mentioned the -- when the lawyer
 6    for Insys was asking.  We did all kinds of
 7    sex terms.  And I didn't mention that in here
 8    either.  This is an iterative process.
 9    That's what grounded theory is.  You find
10    something, then you pursue other things
11    related to what you found.  And you do a
12    variety of searches based on what you find in
13    previous searches.
14    Q.    Sir, I'm looking at the
15    evidence-based medicine methodology right
16    now, not the grounded theory methodology.
17    A.    That's fine.  I'm just telling
18    you what -- that that's what I did.  The
19    grounded theory applies to how I reviewed
20    this evidence-based medicine.  Remember,
21    evidence-based medicine is pretty much
22    limited to evidence, not as it's written.  So
23    I'm adopting that method as a basis for using
24    grounded theory method, which allows me to do

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.      Well, I discussed them all with
2     the staff, so we had a group discussion.  But
3     I think pretty much these are mine.
4           Q.      Okay.
5                   And --
6           A.      It could be that one of my
7     staff suggested one or another one.
8           Q.      And you just told me there are
9     a number of other terms that you used; right?
10          A.      Sure.
11          Q.      But you don't list them here?
12          A.      Correct.
13          Q.      And you don't list them
14    anywhere else in the report?
15          A.      That's correct.
16          Q.      And so there's no way for us to
17    know what other search terms you used; right?
18          A.      That's correct.
19          Q.      Now, is it the case --
20          A.      I got a list of the sex terms,
21    I think.
22          Q.      Sir, I understand that you want
23    to talk about the sex terms, but I'd like to
24    talk about your report.
```

Highly Confidential - Subject to Further Confidentiality Review

1    because I don't -- they're billed at a fixed

2    rate.

3         Q.    Okay.  In addition to that, you

4    have previously testified that you've made

5    certainly more than 5 million, probably more

6    than $6 million from testimony that you have

7    given for plaintiffs over the years; right?

8         A.    Well, in litigation, I think

9    it's both at the request of plaintiffs and

10   defendants, yes.

11        Q.    Well, earlier you said that of

12   your -- I think you said 4 to 500 times

13   testifying, although previously you've said 6

14   to 700 times testifying -- that the vast

15   majority of that was testimony that the

16   plaintiffs had been retained -- had retained

17   you to do; right?

18        A.    That's correct.

19        Q.    And you've previously testified

20   to that as well; right?

21        A.    Yes.

22        Q.    Now, you've never testified on

23   behalf of a pharmaceutical company in

24   litigation, where a plaintiff is alleging a

Highly Confidential - Subject to Further Confidentiality Review

1    cases where you've testified holds no

2    relationship to your beliefs that we just

3    recounted?

4         A.    No.  It doesn't relate to my

5    beliefs.  That's correct.  It relates to the

6    fact that led to my beliefs.

7         Q.    I see.  And so isn't it true,

8    though, sir, based on your own logic that you

9    explain in your report, that all of the

10   hundreds of thousands of dollars you've made

11   in this case and the millions of dollars

12   you've made over the years, testifying for --

13   as having been retained by plaintiffs'

14   lawyers is a factor that should lead jurors

15   to decrease their confidence in the evidence

16   that you present?

17        A.    It's certainly something they

18   should consider in evaluating my testimony.

19        Q.    Okay.

20        A.    There is a difference between

21   this and the other biases discussed in the

22   medical literature.  That difference is this

23   process, and it is not a trivial difference.

24        Q.    When you say "That difference

```
1            Q.     And step 5 is a

2    self-evaluation; right?  An evaluation of

3    performance?

4            A.     Correct.

5            Q.     And you say, "Guidelines exist

6    for self-evaluation of each of the previous

7    steps of EBM practice"; right?

8            A.     Right.

9            Q.     And then you said -- you then

10   list seven questions for self-evaluation of

11   finding the best external evidence; right?

12               Or sorry -- for ask -- you

13   start with asking answerable questions.

14   There's a self-evaluation for that; right?

15               I apologize.  I skipped ahead.

16           A.     You skipped a section.  That's

17   right, yes.

18           Q.     Right.  So you start with your

19   self-evaluation for answering answerable

20   questions; right?

21           A.     Right.

22           Q.     You then list a number of

23   questions, but you say, "Not all of these

24   questions applied to my practice of EBM in
```

1    this context.  Of those which did apply, I

2    found that my performance was satisfactory";

3    right?

4         A.    Correct.

5         Q.    Which ones applied?

6         A.    Am I asking any clinical

7    questions at all that apply?  And am I asking

8    well-formulated questions based on the

9    guidance reviewed above?  I think I apply.

10   Am I using a map to locate my knowledge gaps

11   and articulate questions?  I didn't do that

12   explicitly.  I don't think that's doable in

13   this situation because of the grounded theory

14   method doesn't really apply to that kind of

15   construct.

16             Can I get myself unstuck when

17   asking questions?  Doesn't really apply.

18   More clinical -- limited clinical stuff.

19             Am I modeling the asking of

20   answerable questions for my learners?  I did

21   not do that.  That's really related to

22   teaching.

23             Am I writing any educational

24   prescriptions in my teaching?  Are they being

1    filled?  I didn't do that.  It's not part of

2    my role here.

3                Are we incorporating questions

4    asking and answering it to everyday

5    activities?  No.  Not part of my role here.

6    Well, because I'm blocked from doing that

7    because of the confidentiality orders.

8                How well am I guiding my

9    learners in the questions that -- in their

10   question asking?  Well, I did discuss the

11   assignment, and when they got my report, the

12   plaintiff lawyers asked a lot of questions

13   about the report and the -- we discussed the

14   nature of the report.

15               Are my learners writing

16   educational prescriptions for me?  No.  The

17   plaintiff lawyers didn't write me any

18   educational prescriptions.  So those are the

19   ones that didn't.

20        Q.    So of your one, two, three,

21   four, five, six, seven, eight, nine, ten

22   questions here, three of them applied in this

23   context?

24        A.    I guess so, if you counted

Highly Confidential - Subject to Further Confidentiality Review

1    right.

2         Q.    And you chose, however, to list

3    all of these questions and not give us any

4    indication of which ones you were actually

5    using.

6         A.    Correct.  I didn't explicitly

7    state.

8         Q.    Now, you have a -- the next

9    self-evaluation is finding the best external

10   evidence, which I accidently skipped to

11   earlier; right?

12        A.    Correct.

13        Q.    Okay.

14        A.    No demerit points for that.  Go

15   ahead, skip anything you want.

16        Q.    And you list a number of

17   questions here; right?

18        A.    Correct.

19        Q.    Now, here you just say, "I

20   found that my performance was satisfactory";

21   right?

22        A.    Right.

23        Q.    So you didn't skip any of

24   those?

```
 1                  MS. CONROY:  Objection.
 2          Q.     (BY MS. SAULINO)  And then
 3    self-evaluation for applying results in
 4    practice; right?
 5          A.     Right.
 6          Q.     And again, not all of them
 7    applied.  You wrote them all down and didn't
 8    give us any indication of which ones you
 9    used; right?
10          A.     None of these apply to practice
11    because there's a confidentiality order in
12    the case.
13          Q.     Well you say here of those
14    which did apply, I found that my performance
15    was satisfactory.
16          A.     Let me just --
17                 Well, the second one applies,
18    but it's not really relevant to this process.
19                 It does apply, but not relevant
20    to what we're doing here today.
21          Q.     All right.  Well, let me ask
22    you:  Your evaluations, your self-evaluations
23    that you performed here, where are those
24    documented?
```

```
 1                    Nowhere in this report do you

 2       provide us the ability to replicate what you

 3       did in order to come to any particular

 4       opinion.

 5            A.      Wrong.

 6            Q.      Nowhere in this report do you

 7       provide us the ability to look at one opinion

 8       and know what you looked at, what iterative

 9       searches you made, what conclusions you came

10       to, how you challenged them, how you

11       self-appraised them, none of that; right?

12            A.      In detail, that's correct.

13            Q.      Okay.  That's all I was asking.

14            A.      All right.

15                    THE WITNESS:  Can we take a

16            break?

17                    MS. SAULINO:  Yeah, I think now

18            is a good time for a break.

19                    THE VIDEOGRAPHER:  Off the

20            record.  2:41.

21                    (Recess taken, 2:41 p.m. to

22            3:10 p.m.)

23                    THE VIDEOGRAPHER:  We are back

24            on the record at 3:11.
```

Highly Confidential - Subject to Further Confidentiality Review

1    searches.

2         Q.     Okay.

3         A.     And then those searches

4    resulted in a subset of other items, not --

5    this is not a complete list of all the other

6    items but many of these.  And then all of

7    these then resulted in opinions.

8         Q.     Okay.  And what I'm looking for

9    is where you list the subset of other items

10   that you were just talking about.  Some of

11   them are listed here, as you just

12   acknowledged, but not all of them.

13        A.     I don't think all of them, but

14   I -- you know, it's possible that all of the

15   opinions are subsets of these opinions.

16        Q.     You don't know one way or the

17   other sitting here today?

18        A.     I haven't evaluated it for that

19   question.  That's not something I did.

20        Q.     And then you say, "Additional

21   searches were conducted to explore these and

22   other more specific topic areas as they

23   arose."  Right?

24        A.     Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You don't give us any search

2    terms or parameters for those additional

3    searches that you conducted; right?

4    A.    That's correct.

5    Q.    Okay.  So there's no way for us

6    to know what those were?

7    A.    That's correct.

8    Q.    Okay.  And then you say, "This

9    iterative analysis formed the basis for my

10   state-on-the-art opinions in this case."

11   A.    That's correct.

12   Q.    Did you mean "state of the

13   art"?

14   A.    Yes.

15   Q.    Okay.  And you believe that

16   your opinions are state of the art; right?

17   A.    What do you mean by "state of

18   the art"?

19   Q.    I'm using your words, sir.

20   A.    My words are they're state of

21   the art -- there's various definitions of

22   state of the art.  There's a medical state of

23   the art, and then there's this -- this

24   description of state of the art which

Highly Confidential - Subject to Further Confidentiality Review

1    report.

2        Q.    You don't tell us in any of

3    your opinions that this opinion also relies

4    on evidence related to another opinion;

5    right?

6              There's no -- there's no

7    opinion that says that?

8        A.    There's no cross-reference

9    opinion.  I think that's -- I think there are

10   a couple of cross-reference opinions, but in

11   general that's correct.

12       Q.    And there's no way for us to

13   know if we're looking at any one opinion,

14   that this happens to be one of the opinions

15   that lists all of the information that you

16   relied on?

17       A.    Well, that's true.  Absolutely.

18   Because all of the opinions -- all of the

19   information I relied on is all the

20   information that I reviewed, all of the

21   database.  I didn't put that in every

22   opinion.

23       Q.    You relied on the entire

24   database to come to each and every one of

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    (BY MS. SAULINO)  And again,

2    here, for Opinion 100, you cite a single

3    exhibit; right?

4    A.    Well, I cite a single exhibit,

5    but it references several FDA documents.

6    Q.    Your opinion does not reference

7    several FDA documents; right?  The exhibit

8    itself does?

9         MS. CONROY:  Objection.

10         THE WITNESS:  The exhibit,

11         which is the basis of the opinion,

12         references several FDA documents.

13    Q.    (BY MS. SAULINO)  And when I

14    say, "The exhibit itself does," I mean not

15    your writing, but in fact the e-mail chain

16    dated Monday April 27, 2009.

17    A.    That's correct.

18    Q.    Okay.  So you're saying that

19    the FDA documents that are referenced in the

20    document that you have screenshotted into

21    Exhibit 100 should also be considered part of

22    the basis of your opinion?

23    A.    Yes.

24    Q.    Okay.  And that's everything

```
1     that is the basis of your Opinion 100?

2          A.     Correct.

3          Q.     And so there were no other

4     interviews that supported this opinion?

5          A.     Correct.  I didn't know I could

6     interview your personnel.

7          Q.     No deposition testimony?

8          A.     Correct.  I can't take

9     depositions for sure.

10         Q.     Well, you said you read a

11    number of them, sir.

12         A.     Right.  There's no deposition

13    testimony on this issue.

14         Q.     Did you look?

15         A.     Yes.

16         Q.     And so you don't cite any

17    deposition testimony about the HDMA at all

18    here, right?

19         A.     Not on this opinion.  That's

20    right.

21         Q.     Okay.

22                There's no other data listed

23    here; right?

24                MS. CONROY:  Objection.
```

1                THE WITNESS:  Correct.

2        Q.    (BY MS. SAULINO)  No documents

3    other than those we've just talked about;

4    right?

5        A.    Correct.

6        Q.    There's no way that we can see

7    your original question or hypothesis for this

8    opinion; right?

9        A.    Right.  You'd have to put a

10   "did" in front of the opinion.

11       Q.    But you don't tell us here;

12   right?

13       A.    I didn't put the "did" in.

14       Q.    You didn't give us any

15   indication that we were supposed to assume a

16   "did"; right?

17       A.    Correct.

18       Q.    And there's no indication here

19   that you've revised your hypothesis or

20   ensured it held true under repeated study;

21   right?

22       A.    Except for checking the

23   underlying of FDA documents, right.

24       Q.    So by checking the underlying

1    FDA document, we would know that you started

2    with a different original hypothesis and

3    revised it?

4           A.     No.

5           Q.     Okay.  Well, that was my

6    question.

7           A.     No, it wasn't.

8           Q.     There's no way for to us know

9    if you started with a different original

10   hypothesis and revised it; right?

11          A.     That's correct.

12          Q.     And you say checking the

13   underlying FDA documents.  What do you

14   believe that would provide us?

15          A.     Well, that was under the

16   question about whether you'd done -- checked

17   other supporting documents or contradictory

18   evidence that indicated that this was not

19   true.

20          Q.     And so you're saying you

21   checked the FDA documents that were cited in

22   this e-mail --

23          A.     Correct.

24          Q.     -- as contradictory evidence?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      Okay.
2          Q.      Do you see Opinion 7.21?
3          A.      I do.
4          Q.      And your opinion there is
5    "Walgreens' solution to red flag stores was
6    to find a distributor who would sell to them.
7    All three Walgreens distributor facilities
8    failed to implement SOM procedures"; right?
9          A.      Correct.
10         Q.      Okay.  And then you refer to
11   Exhibit B.21; right?
12         A.      Correct.
13         Q.      Okay.  I have a copy if you
14   would like it.
15         A.      Okay.  I'll use yours.
16         Q.      Okay.  I'm handing you what's
17   been marked as Exhibit 11.
18                 (Whereupon, Deposition Exhibit
19          Egilman 11, Opinion - WAG solution to
20          red flagged stores was to find a
21          distributor who would sell to them.
22          All 3 WAG distributor facilities
23          failed to implement SOM procedures,
24          was marked for identification.)
```

1        Q.      (BY MS. SAULINO)   And looking

2    at Exhibit 11 --

3        A.      Okay.

4        Q.      -- it appears that you cite for

5    this opinion one document; right?

6        A.      Correct.

7        Q.      And it is an e-mail that you

8    have screenshotted onto the page; right?

9        A.      Correct.

10       Q.      Okay.   And you provided some

11   red arrows there; right?

12       A.      Correct.

13       Q.      You don't list any other

14   documents; right?

15       A.      Not for this opinion -- not in

16   this -- not in Opinion B.21, but there are a

17   lot of other documents that relate to this

18   issue in the other opinions.

19       Q.      Okay.   You don't provide any

20   cross-referencing of those other opinions;

21   right?

22       A.      Correct.   You'd have to read

23   them.

24       Q.      You don't provide any way --

1    any roadmap that would tell us precisely

2    which of your other 490 opinions we should be

3    looking at; right?

4                    MS. CONROY:  Objection.

5                    THE WITNESS:  No.

6                    I think it's pretty clear when

7            you look at the documents that they

8            relate to the -- this situation

9            between Walgreens, Jupiter, Cardinal,

10           and ABC.  You know, there's a whole

11           narrative there.

12           Q.    (BY MS. SAULINO)  You don't

13   write anywhere in this report or its attached

14   exhibits what you believe is obvious about

15   the situation you just described; right?

16           A.    No.

17           Q.    You don't provide any kind of

18   roadmap to your initial hypotheses; right?

19                    MS. CONROY:  Objection.

20                    THE WITNESS:  That's true.

21           Q.    (BY MS. SAULINO)  You don't

22   provide the question that you were looking to

23   answer; right?

24           A.    That comes under the assignment

Highly Confidential - Subject to Further Confidentiality Review

1  question generally, so that's -- that's where

2  that question is.

3       Q.     Well, you didn't provide the

4  assignment question in your report either,

5  did you?

6       A.     That's correct.

7       Q.     Okay.

8              You don't show us any

9  re-evaluation from other data or documents in

10 this opinion; right?

11      A.     No.  There are other documents

12 that relate to this situation.

13      Q.     But you don't list them here;

14 right?

15      A.     They're not listed in B.21, but

16 they are otherwise in the report, including

17 reference to Jupiter Walgreens.

18             I cite the Walgreens

19 $80 million payment for violating DEA rules

20 on selling and a variety of other documents.

21      Q.     You don't cite that here?  In

22 Exhibit B.21?

23      A.     I do not cite those other

24 opinions that relate to this opinion in this

1    agreement.  That is correct.

2         Q.     Nowhere do you tell us that

3    those other opinions relate to this opinion,

4    explicitly in your report.  Right?

5         A.     That's correct.

6         Q.     You don't cite any deposition

7    testimony here; right?

8         A.     Correct.

9         Q.     Okay.  And this single document

10   that we're looking at right here, that you

11   provide here, as support for your opinion,

12   doesn't even mention anywhere in it SOM

13   procedures; right?

14        A.     By name, correct.

15             MS. SAULINO:  Okay.  We can go

16        off the record.

17             THE VIDEOGRAPHER:  Off the

18        record.  4:13.

19             (Recess taken, 4:12 p.m. to

20        4:25 p.m.)

21             THE VIDEOGRAPHER:  We are back

22        on the record at 4:26.

23        Q.     (BY MS. SAULINO)  Okay.

24   Dr. Egilman, a number of your opinions in

1    your report pertain to what you call "the

2    venture."  Correct?

3          A.    Yes.

4          Q.    And on page 51 of your report,

5    you define the venture at 4.4; right?

6          A.    Correct.

7          Q.    And you say, "As referred to

8    herein, 'the venture' refers to all

9    defendants in the opiate litigation,

10   including their associated individuals and/or

11   organizations acting in a concerted fashion

12   separately or together to effect a particular

13   objective"; right?

14         A.    Correct.

15         Q.    That's a definition that you

16   came up with; right?

17         A.    I'm sure I discussed it with

18   the lawyers.

19         Q.    Okay.  Do you remember when

20   that was?

21         A.    Over the last two or three

22   months.

23         Q.    And was that a definition that

24   you came up with or that they gave you?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      It was a discussed definition

2    between the two of us.  I don't know -- I

3    can't tell you which words came from whom.

4          Q.      Okay.  So this definition is

5    not something that was the result of your

6    iterative process of research?

7          A.      Well, that's not necessarily

8    true, no.

9          Q.      Well, you just said that it

10   came from a discussion with the plaintiffs'

11   lawyers; right?

12         A.      Yeah, but it also -- my part of

13   that came from reading the documents and

14   trying to figure out what had gone on.

15         Q.      Are discussions with

16   plaintiffs' lawyers typically a part of your

17   expert process?

18         A.      Certainly they are.  Depends on

19   what the issues are.  For example, I was

20   asking for depositions --

21         Q.      Okay.

22         A.      -- to be taken.  I was asking

23   for further discovery to be taken.

24         Q.      You've answered my question,

1    literature here, right?

2           A.     Not in this opinion, not in

3    473.  There's other literature cited to that

4    describes the same activity by Saper.

5    Saper's speech.

6           Q.     Okay.

7           A.     He didn't call it a venture.

8    He called it a narco pharma.

9           Q.     Okay.  And you don't link that

10   citation to this definition; right?

11          A.     I didn't use "narco pharma."

12          Q.     So you don't link that citation

13   to this definition in your report; right?

14          A.     Correct.  But he describes the

15   same activities in his 2008-2009 talk, where

16   he calls what I call the venture, narco

17   pharma.

18          Q.     So you don't provide anywhere

19   in either of the places where you cite the

20   definition nor in Exhibit B.473, anywhere to

21   look to see how you came to the conclusion

22   that this was the definition for venture;

23   right?

24          A.     No, it's my definition for

Highly Confidential - Subject to Further Confidentiality Review

1  venture.

2      Q.    Well, it's yours and the

3  plaintiffs' lawyers; right?

4      A.    Yeah, they agreed with this

5  definition of venture.

6      Q.    And if they had disagreed, you

7  would have changed it?

8      A.    No.  You don't know me very

9  well.

10      Q.    Well, you told me just a couple

11  of minutes ago that this was a definition

12  that was created in combination with them;

13  right?

14      A.    In conversation with them, but

15  if they disagreed with something that I

16  thought should be here, I wouldn't change it.

17          MS. SAULINO:  Whoever is on the

18      phone, can you mute, please?

19      Q.    (BY MS. SAULINO)  Well, now,

20  let's look at --

21      A.    Are you done with this one?

22      Q.    For now, but don't give it

23  away.  Keep it nearby.

24          MS. SAULINO:  And, Debbie,

Highly Confidential - Subject to Further Confidentiality Review

1    that got you to your conclusion; right?

2         A.    Wrong.

3         Q.    You don't explicitly in writing

4    provide any way to do that, do you?

5         A.    No, that's not exactly true

6    either.  I gave you the methodology.  If you

7    look at the grounded method, there's the

8    methodology there, there's the beginning of

9    search terms.  You could then do the same

10   iterative process I did.

11        Q.    Absolutely, sir.  You and I

12   have talked at length today about the

13   processes that you used and how you didn't

14   document many steps of those processes;

15   right?

16        A.    Right.

17        Q.    Okay.

18              So there's no way for us to

19   pick up your report and recreate what brought

20   you to this conclusion.

21        A.    Well, it's an iterative

22   process.  It's never going to be the same.

23              We do it two or three times,

24   and there will be certainly minor differences

Highly Confidential - Subject to Further Confidentiality Review

1    in what search terms you come up with and

2    what you pursue.

3              So you know, there's -- there's

4    no way to have a -- you can reproduce the

5    method.  You can reproduce the search terms,

6    and you can then look at the documents and

7    then do other iterative searches.

8         Q.    By my count, more than a third

9    of your 489 or 490 opinions pertain to the

10   venture.  Do you have any reason to disagree

11   with that?

12        A.    No reason to agree or disagree.

13        Q.    Is it your view that each and

14   every one of the opinions that is cited for

15   the venture applies to each and every

16   defendant in the opiate MDL?

17        A.    I'm not sure.

18              In the aggregate, yes.  I don't

19   know about each --

20              Well, here's a situation.

21   Depends how you define "applied to."

22              I can give you a definition

23   where I think the answer would be yes, and if

24   that's the definition you accept, the answer

Highly Confidential - Subject to Further Confidentiality Review

1    is yes.

2         Q.    Why don't we start with my

3    first question.  Is it your view that each

4    and every one of the opinions that is cited

5    for the venture applies to each and every

6    defendant in the opiate MDL?

7         A.    Based on my understanding of

8    membership in the venture, participation in

9    the venture, yes.

10        Q.    So if we look at any one

11   opinion about the venture, we should be able

12   to find support for every defendant in the

13   opiate MDL for that opinion?

14        A.    Oh, no.  Not necessarily.

15   That's not how it works.

16        Q.    Well, so how is there any way

17   for us to understand how you applied that

18   opinion to every member of the venture?

19        A.    Works like a bank robbery.  One

20   person -- or a series -- a bank robbery

21   network.

22             So you have lots of different

23   people.  You have the guy outside watching.

24   You've got the guy inside with the gun.

Highly Confidential - Subject to Further Confidentiality Review

1    You've got the teller who may be complicit.

2    You've got the guys in the car, the getaway

3    car, and you've got some people looking out

4    for the cops.  Okay?

5                So they're all 100 percent

6    responsible for robbing that bank.  And in

7    this case, that means destroying these

8    communities, costing them misery and some

9    money.

10                And then it goes forward and

11    back.  So in other words, that bank -- that

12    group of bank robbers, okay?  One of those

13    guys was robbing banks since 1984, okay?

14                But the other bank robbers

15    joined 1996, 1997.  Once they agree to the

16    same purpose of continuing to rob banks,

17    they're also responsible for the bank

18    robberies that go back to 1994.  And the same

19    thing going forward.

20                So by that definition of

21    concerted action, they're all participants.

22    They all don't have to hold a gun to the

23    teller's head.  They didn't all have to be

24    the guard.  They're all 100 percent

Highly Confidential - Subject to Further Confidentiality Review

1    responsible.

2         Q.    The definition of concerted

3    action that you just laid out in your

4    testimony is not stated anywhere in your

5    report, is it?

6         A.    Correct.

7         Q.    And you haven't provided

8    anywhere in your report your basis for

9    believing that that definition applies to the

10   defendants in the opiate MDL; right?

11        A.    That's correct.

12        Q.    I'd like to look at some of

13   your venture opinions.

14             Let's look at Opinion 81 which

15   is on page 75 of your report.

16        A.    Why don't you wait a second

17   while he yanks the whole opinion.

18        Q.    Well, I can give you a copy of

19   the whole exhibit.

20        A.    Yeah.  But the exhibit books

21   have got --

22        Q.    This is the exhibit.  It's one

23   page.  Would you like it?

24        A.    I don't think so.

Highly Confidential - Subject to Further Confidentiality Review

1    Exhibit B.81, is that the basis for your

2    opinion, "The venture should have known that

3    higher doses kill and warned about this"?

4          A.     Correct.

5          Q.     Okay.  And let's mark that as

6    Exhibit 16 to your deposition.

7          (Whereupon, Deposition Exhibit

8          Egilman 16, The "venture" should have

9          known that higher doses kill and

10         warned about this, was marked for

11         identification.)

12        Q.     (BY MS. SAULINO)  You can mark

13    both pages.  And so as I just explained, the

14    first page was what was reproduced to us.

15    The second page is what we originally got,

16    which was cut off.

17         It's my understanding those

18    were supposed to be the same.

19          A.     Yes.  Okay.  I'm not fighting.

20          Q.     Okay.  So what we have here as

21    the basis for Opinion 81, first, let's look

22    at what Opinion 81 is, and that is "The

23    venture should have known that higher doses

24    kill and warned about this"; right?

```
1              A.      Right.

2              Q.      And here you have a screenshot

3      of the first page of an article; right?

4              A.      Correct.

5              Q.      And that's all you provide as

6      the basis for this opinion.  Right?

7              A.      Correct.

8              Q.      Okay.  You don't actually

9      attach the full article; right?

10             A.      That's apparently correct.

11             Q.      Okay.  And your opinion here,

12     the way that you have phrased it said "The

13     venture should have known that higher doses

14     kill and warned about this"; right?

15             A.      Correct.

16             Q.      You don't give a date at which

17     they should have known; right?

18             A.      No.  This is known for a long

19     period of time.

20             Q.      Okay.

21             A.      This is -- I mean, this is

22     known since, you know, probably 3500 in the

23     Greek scrolls, in the Greek, you know,

24     writing.
```

1      Q.      You would agree with me,

2    Dr. Egilman, that the bottom of the first

3    page of this article is cut off; right?

4      A.      Correct.

5      Q.      Okay.  Would you have any

6    reason to doubt me if I told you that this

7    article that you screenshotted here was

8    published in 2016?

9      A.      No.

10     Q.      And that is the only basis that

11   you provide for Opinion 81?

12     A.      That's the only basis listed in

13   this opinion.

14     Q.      And you don't --

15     A.      This is -- I mean, this is just

16   documenting in numbers what's been known

17   forever.

18     Q.      Well, you don't provide any

19   detail about what you believe has been known

20   forever here in Opinion 81; right?

21     A.      That's correct.

22     Q.      You don't provide any roadmap

23   to where we should look to find what you

24   believe has been known forever; right?

1          A.      That's correct.

2          Q.      You don't provide any original

3    hypothesis that you used in order to come to

4    this opinion; right?

5          A.      Correct.

6          Q.      You don't provide us any

7    roadmap of how you tested that hypothesis;

8    right?

9          A.      Correct.

10         Q.      You don't cite to any

11   deposition testimony that discusses this

12   opinion; right?

13         A.      That's correct.

14         Q.      So other than this screenshot

15   of the first page of an article from 2016, we

16   have nothing written in your report that

17   shows us how you came to the opinion in

18   Opinion 81?

19         A.      That's correct.

20         Q.      All right.

21                 All right.  So let's look at

22   Opinion No. 8, which is at page 63 of your

23   report.

24                 Do you have your report?

1          A.      The methodology sections and

2    the other sections in Exhibit 1F.

3          Q.      Right.  Those are already in

4    1F; right?

5          A.      Yeah, but you didn't say it

6    that way.  When you gave your question, you

7    limited it to things called opinions.  And I

8    wanted to make sure that the record was clear

9    that it was everything in 1F.

10          Q.      I appreciate that, Dr. Egilman.

11                  Is there anything else that you

12    consider to be part of your report that is

13    not Exhibit 1F or all of the exhibits

14    attached to Exhibit B and their attached

15    documents?

16          A.      No.

17          Q.      Okay.  Let's look at page 63,

18    Opinion 7.8.

19          A.      Okay.

20          Q.      Opinion 7.8 is "All for one and

21    one for all.  The venture knew collective

22    marketing increased the size of the opioid

23    pie.  Similarly, had any venture member

24    broken ranks, the opioid market would have

1    slowed or if the complete truth was told, no

2    efficacy and high addiction risk, the market

3    would have crashed."

4              Right?

5    A.      Yes.

6    Q.      You wrote that opinion?

7    A.      I did.

8    Q.      Before we even get to

9    Exhibit B8, you hold the opinion that opioids

10   have no efficacy?

11   A.      No efficacy for chronic

12   non-malignant pain.

13   Q.      I see.  You don't say that

14   here, though; right?

15   A.      I left that part out.

16   Q.      All right.  Now let's look at

17   Exhibit B8.  I have a copy here if you need

18   it.

19              Do you want --

20              Okay.  I didn't know if you

21   wanted to use your own copy.

22              THE WITNESS:  Jayne, do you

23        want to see if I've got marks on mine.

24   Q.      (BY MS. SAULINO)  So I'm

Highly Confidential - Subject to Further Confidentiality Review

1    marking this as Exhibit 17 to your --

2                    MS. SAULINO:  There's a

3           different version?

4                    MS. CONROY:  There's an arrow

5           on this one.

6                    (Whereupon, Deposition Exhibit

7           Egilman 17, All for one and one for

8           all - the "venture" knew collective

9           marketing increased the size of the

10          opioid pie.  Similarly had any

11          "venture" member broken ranks, the

12          opioid market would have slowed or if

13          the complete truth was told (no

14          efficacy and high addiction risk) the

15          market would have crashed, was marked

16          for identification.)

17                   Q.    (BY MS. SAULINO)  Okay.  So

18     I've marked as Exhibit 17 to your deposition,

19     our copy of Exhibit B8.  Your copy that

20     Ms. Conroy just handed you has an arrow

21     pointing at the far left -- the far right,

22     sorry.  I had to reverse myself --

23     description under the far right green box; is

24     that right?

1          A.      Right.

2          Q.      And otherwise, they're the

3    same?

4          A.      Right.  But the whole document,

5    I think, is provided.  So here's the whole

6    opinion, I think.  Maybe not.  The whole

7    opinion is the whole document.  Apparently,

8    that wasn't sent, but this is enough.

9          Q.      So Dr. Egilman, your basis for

10   this opinion is again one document; right?

11         A.      Correct.

12         Q.      You don't identify any

13   deposition testimony; right?

14         A.      Correct.

15         Q.      You don't identify any other

16   documents that led to this opinion; right?

17         A.      Correct.

18                 The basis for my opinion as

19   stated in this opinion is one document.

20   There is other bases elsewhere in the report.

21                 But go ahead.

22         Q.      Okay.  But you don't state any

23   of those other bases here under your opinion;

24   right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.       Correct.

2          Q.       You don't provide us any kind

3     of cross-reference that would allow us to

4     know where else in your report you provide

5     bases for this opinion; right?

6                   MS. CONROY:  Objection.

7                   THE WITNESS:  Correct.

8          Q.       (BY MS. SAULINO)  Now, breaking

9     this opinion down, because it seems to have

10    several parts.  Would you agree with me on

11    that?

12         A.       Sure.

13         Q.       Okay.  You first say, "The

14    venture knew collective marketing increased

15    the size of the opioid pie"; right?

16         A.       Correct.

17         Q.       And we've just established you

18    cite one document for that; right?

19         A.       In this opinion, correct.

20         Q.       Okay.  And this document

21    doesn't actually name any members of the

22    venture; right?

23         A.       Well, it's a Janssen document.

24         Q.       Well, it's simply --

Highly Confidential - Subject to Further Confidentiality Review

1          A.      And the name's OxyContin, which

2     is a Purdue product.

3          Q.      Well, sir, when you say it's a

4     Janssen document, all you know is that it was

5     produced by Janssen; right?

6          A.      No, I think it's a Janssen

7     document.  If you look at the document, it's

8     a Janssen document.

9          Q.      Okay.  I'm looking at your

10    Exhibit 8.

11         A.      Yeah.  I say if you look at

12    the -- if you look at the Bates numbered

13    actual document, it's a Janssen document.

14    That's my recollection.

15         Q.      A document that was produced by

16    Janssen?

17         A.      Written -- yeah.  It's not an

18    FDA document produced by Janssen.  It's a

19    Janssen document produced by Janssen.

20         Q.      Do you have any basis for that

21    knowledge?

22         A.      I think it says it on the

23    document.

24         Q.      Did you see any deposition

1    testimony to that effect?

2        A.    No.

3        Q.    Did you do any research to that

4    effect?

5        A.    No.

6        Q.    And you say similar -- your

7    next piece of your opinion is "Similarly, had

8    any venture members broken ranks, the"

9    opinion marked -- I'm sorry -- "Had any

10   venture member broken ranks, the opioid

11   market would have slowed or if the complete

12   truth was told, no efficacy and high

13   addiction risk, the market would have

14   crashed."  Right?

15       A.    Right.

16       Q.    And you base that again on this

17   one screenshotted document that you have here

18   on B8?

19       A.    No.  There's other documents

20   that --

21            MS. CONROY:  Objection.

22            THE WITNESS:  There's other

23       documents that support that as well

24       elsewhere in the report.  But the --

Highly Confidential – Subject to Further Confidentiality Review

```
 1                      So there's other documents.

 2            There's other bases for that opinion.

 3            Q.     (BY MS. SAULINO)   Nothing

 4    listed here; right?

 5            A.      Correct.

 6                      Not in this opinion.

 7            Q.      And there's nothing on this

 8    document that talks about breaking ranks, is

 9    there?

10            A.      That's correct.

11            Q.      Okay.  And you don't cite to

12    any deposition testimony that leads to that

13    conclusion; right?

14            A.      Correct.

15            Q.      Okay.  Let's look at

16    Opinion 62, which is on page 71.

17            A.      Okay.

18            Q.      In Opinion 62 you say,

19    "Opinion.  When the FDA tried to limit use in

20    2001 by changing the label from more than a

21    few days to extended period of time, the

22    venture used this language to increase the

23    market"; right?

24            A.      Correct.
```

1     Q.     Okay.

2            And if you then look at

3     Exhibit B62 -- I can hand it to you.

4            Oh.  What do you have there?

5     A.     B62.

6     Q.     All right.  Well, let me make

7     sure that your B62 and mine are the same.

8            You have a Redweld as well?

9            MS. CONROY:  Of the Bates

10           documents.

11           THE WITNESS:  This is the

12           online Bates document.

13    Q.     (BY MS. SAULINO)  Okay.  Let

14    me -- I will hand you the exhibit,

15    Dr. Egilman.  I'm just trying to make sure I

16    understand what you have here.

17    A.     I think I've got a mark on

18    mine, so.

19    Q.     I'm sorry?

20    A.     I've got -- this is the one I

21    read and marked.

22    Q.     Okay.

23           Would you like a sticker?

24    A.     Sure.

```
 1          Q.     You have it for 18?

 2                 (Whereupon, Deposition Exhibit

 3          Egilman 18, Opinion - When the FDA

 4          tried to limit use in 2001 by changing

 5          the label from "more than a few days"

 6          to "extended period of time," the

 7          "venture" used this language to

 8          increase the market, was marked for

 9          identification.)

10          Q.     (BY MS. SAULINO)  Can you show

11   me what you've marked?

12          A.     Okay.

13          Q.     All right.  So looking at

14   Exhibit 62 --

15                 MS. CONROY:  Exhibit 18.  B62.

16                 MS. SAULINO:  Sorry,

17          Exhibit 18.  B62.

18          Q.     (BY MS. SAULINO)  On the first

19   page of Exhibit 18, you quote from a CBS News

20   article; right?

21                 It's the "60 Minutes."

22          A.     Correct, the "60 Minutes"

23   piece.

24          Q.     Right, a "60 Minutes" piece,
```

1    but it's from cbsnews.com; right?

2         A.    Correct.   It's a transcript of

3    the "60 Minutes" TV show.

4         Q.    Well, it's a portion of a

5    transcript; right?

6         A.    Correct.

7         Q.    There's no Bates number listed

8    there; right?

9         A.    Correct.

10        Q.    Okay.

11              And then, you then attach a --

12   one single e-mail chain; right?

13        A.    Correct.

14        Q.    That's an internal e-mail chain

15   from Purdue; right?

16        A.    Correct.

17        Q.    Those are the two pieces of

18   evidence that you cite for saying that the

19   venture used this language to increase the

20   market.

21        A.    Correct.

22        Q.    You don't cite to any other

23   documents; right?

24        A.    Not in this opinion.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And you don't cite to any

2    deposition testimony; right?

3    A.    Correct.

4    Q.    And you don't provide us the

5    question that you were seeking to answer;

6    right?

7    A.    Well, that's again the

8    assignment.

9    Q.    You don't provide us the

10   question that resulted in this opinion;

11   right?

12   A.    Not the specific question that

13   resulted in this opinion.  I gave you the

14   methodology that resulted in this opinion.

15   Q.    Well, sir, you actually haven't

16   given us the methodology that resulted in

17   this opinion.  That's not written here, is

18   it?

19   A.    It's not on the opinion.

20   Q.    And you agreed with me earlier

21   that you used different types of methodology

22   for different opinions; right?

23   A.    No.  It's the same methodology.

24   It's the same search techniques and review of

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2              I, DEBRA A. DIBBLE, Registered
     Diplomate Reporter, Certified Realtime
 3   Reporter, Certified Realtime Captioner,
     Certified Court Reporter and Notary Public,
 4   do hereby certify that prior to the
     commencement of the examination, DR. DAVID
 5   EGILMAN was duly sworn by me to testify to
     the truth, the whole truth and nothing but
 6   the truth.
 7              I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.
10
               I DO FURTHER CERTIFY that pursuant
11   to FRCP Rule 30, signature of the witness was
     not requested by the witness or other party
12   before the conclusion of the deposition.
13             I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor attorney
14   nor counsel of any of the parties to this
     action, and that I am neither a relative nor
15   employee of such attorney or counsel, and
     that I am not financially interested in the
16   action.
17
18
19   _____
     DEBRA A. DIBBLE, RDR, CRR, CRC
20   NCRA Registered Diplomate Reporter
     NCRA Certified Realtime Reporter
21   Certified Court Reporter
22
     Dated: 1 May 2019
23
24
```

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3    IN RE: NATIONAL          )   MDL No. 2804
      PRESCRIPTION OPIATE      )
 4    LITIGATION,              )   Case No.
                               )   1:17-MD-2804
 5                             )
      THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6    ALL CASES                )   Polster
                               )
 7
 8                    __ __ __
 9             Friday, April 26, 2019
                      __ __ __
10
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11               CONFIDENTIALITY REVIEW
                      __ __ __
12
13
14
15        Videotaped Deposition of DAVID S.
      EGILMAN, M.D., MPH, held at the Providence
16    Marriott Downtown, 1 Orms Street, Providence,
      Rhode Island, commencing at 9:08 a.m., on the
17    above date, before Debra A. Dibble, Certified
      Court Reporter, Registered Diplomate
18    Reporter, Certified Realtime Captioner,
      Certified Realtime Reporter and Notary
19    Public.
20
                      __ __ __
21
22
23          GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
24               deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   PROCEEDINGS

 2              (April 26, 2019 at 9:08 a.m.)

 3              THE VIDEOGRAPHER:  Good

 4         morning.  We are back on the record.

 5         Today's date is April 26, 2019, and

 6         the time is 9:08 a.m.

 7              This is the continuation of the

 8         deposition of Dr. David Egilman.

 9         Counsel will be noted on the

10         stenographic record.

11              Sir, I want to remind you you

12         are still under oath.

13              Counsel, please proceed.

14         DAVID S. EGILMAN, M.D., MPH,

15    having been previously duly sworn, was

16    examined and testified as follows:

17              DIRECT EXAMINATION

18    BY MR. BLANK:

19         Q.   Good morning, Dr. Egilman.  I

20    am Tim Blank with the law firm of Dechert.

21    You recognize that you're still under oath.

22    Yes?

23         A.   Yes.

24         Q.   Dr. Egilman, do you purport to
```

1    be an expert on compliance with suspicious

2    order monitoring?

3         A.    By the definition of expert

4    that I gave yesterday?  Yes.

5         Q.    By any other definition?

6         A.    Give me another definition.

7         Q.    So by your definition, you

8    purport to be an expert in suspicious order

9    monitoring?

10        A.    By the definition that I gave

11   yesterday, I'm an expert in suspicious order

12   monitoring.  I'm not an expert in all aspects

13   of suspicious order monitoring, but I'm

14   familiar with any aspects of suspicious order

15   monitoring.

16        Q.    Are you familiar with any

17   regulations that govern the obligations with

18   respect to suspicious order monitoring?

19        A.    The Controlled Substances Act

20   and --

21        Q.    Which section of the Controlled

22   Substances Act?

23        A.    I don't recall.  The Marino

24   bill which modified the DEA's ability to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    actions or inactions in the -- with respect

 2    to the defendants in this case.

 3          Q.    Do you have any experience with

 4    respect to DEA law enforcement?

 5                THE WITNESS:  Do you have

 6          the -- my LiveNote.

 7                (Discussion off the record.)

 8          A.    Do you mean personal

 9    experience?

10          Q.    Yes.

11          A.    No.

12          Q.    Do you know how the DEA applies

13    its regulations concerning suspicious order

14    monitoring?

15          A.    I'm familiar with examples

16    in -- that I've read in its relation to the

17    companies involved in this case.

18          Q.    Do you know what data inputs

19    the DEA looks at and considers in applying

20    the SOMs, suspicious order monitoring

21    regulations?

22          A.    Some of them.  They use the

23    ARCOS database to look at sales and

24    distribution.  They also control the amount
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     No.  It's changed over time.

2          Q.     Are you familiar with the

3    algorithm that is used to detect suspicious

4    orders?

5          A.     No.

6                 MS. CONROY:  Objection.

7          Q.     (BY MR. BLANK)  Do you know how

8    any of the defendants in this case implement

9    their suspicious order monitoring practices?

10         A.     Yes.

11         Q.     Have you spoken to any of the

12   defendants in this regard?

13         A.     No.  I didn't know I was

14   allowed to.  But I would be glad to.

15         Q.     Have you ever consulted for the

16   Drug Enforcement Agency?

17         A.     No.

18         Q.     Have you ever worked for any

19   entity in the capacity of reviewing standard

20   suspicious order monitoring --

21         A.     No.

22         Q.     -- practices?

23         A.     No.  Sorry.

24         Q.     Have you ever assisted anybody

1    in developing a suspicious order monitoring

2    system?

3         A.    No.

4         Q.    Have you ever assisted anybody

5    in interpreting regulations relating to SOMs?

6         A.    No.

7         Q.    What are the U.S. Code sections

8    that apply to SOMs?

9         A.    I do not know.

10        Q.    What are the specific

11   requirements with respect to manufacturers?

12        A.    Manufacturers are responsible

13   to report suspicious orders.  There's no

14   specific delineation, as I understand it, for

15   how that's done.

16        Q.    Have you reviewed DEA guidance

17   on SOM policies?

18        A.    Yes.

19        Q.    When?

20        A.    Over the last several months.

21        Q.    Which ones?

22        A.    I don't recall.

23        Q.    Do you reference them in your

24   report?

```
1          A.      I don't think so.

2          Q.      By being --

3          A.      Well, they are referenced in --

4                  In the report, as you know, I

5   summarize the -- and then I thought provided

6   to the Department of Justice, violations of

7   suspicious order monitoring rules by many of

8   the companies, and some of that information

9   was included in the DOJ decisions.

10         Q.      Yeah, I'm talking about DEA

11  guidance on SOM policies.

12         A.      Right.

13         Q.      Okay.  And then tell me once

14  again, because I can't recall if you told me

15  already.  What is the basis for your claim to

16  be an expert on whether any of these

17  defendants are complying with their SOM

18  obligations?

19         A.      I used the methodology

20  explained in my report to review the

21  documents, to look at that issue.  And I

22  examined, for example, the violations of SOM

23  procedures, e-mails, other documents, and

24  made conclusions about SOM violations based
```

1    on statements made by company officials in

2    e-mails and memos, and in some cases,

3    deposition testimony.  And the compliance

4    enforcement actions of the DEA.

5          Q.     But just because you did that

6    doesn't make you an expert.  I want to know

7    what makes you an expert.

8                 MS. CONROY:  Objection.

9                 THE WITNESS:  Okay.  I'm

10               telling you that what I just said

11               makes me an expert by my definition of

12               an expert.  Very few people,

13               independent of the companies, have

14               been able to review the e-mails,

15               communications, documents, and detail

16               related to the company's lack of

17               adequate enforcement of suspicious

18               order monitoring rules, regulations,

19               procedures.  So that means I know more

20               about it than a layman.  And that

21               means -- and I can explain it to a

22               layman.

23                     So by my definition of an

24               expert, which may be different than

Highly Confidential - Subject to Further Confidentiality Review

1          your definition of an expert, that is

2          my expertise.

3          Q.     (BY MR. BLANK)  Did anybody

4     except the plaintiffs in this case ever ask

5     you for your expert opinion on SOM

6     compliance?

7               MS. CONROY:  Objection.

8               THE WITNESS:  No.

9          Q.     (BY MR. BLANK)  Doctor Egilman,

10    did you do anything to prepare for your

11    deposition today?

12         A.     Yes.

13         Q.     And yesterday?

14         A.     Yes.

15         Q.     What did you do?  Specifically

16    to prepare for the deposition.

17         A.     I reread the report.  Took

18    notes.  Made notes on them.

19               I spent a couple days with the

20    plaintiff lawyers two days before the

21    deposition.

22         Q.     Which -- when did you meet with

23    the plaintiffs' lawyers?

24         A.     On Tuesday and Wednesday.

1    specialist in your view?

2         A.    I manage patients with pain all

3    the time.

4         Q.    Are you a specialist in that

5    field?  "Yes" or "no"?  Or I don't know?

6    Which of those?

7         A.    Do you want a "yes" or "no"?

8    Yes, I manage patients with pain all the

9    time.

10        Q.    Okay.  Listen to my question,

11    then.  Are you a pain management specialist?

12        A.    Yes.  I manage pain all the

13    time in my practice.  When I was practicing.

14        Q.    Are you an addiction expert?

15        A.    Yes.

16        Q.    On what basis?

17        A.    I've taken -- I've learned

18    about addiction in my residency and training.

19    I've treated patients who were addicted.

20    I've developed programs to treat addiction.

21    I've treated a lot of patients with

22    addiction.  I had to get them unaddicted.  On

23    that basis.  And I've studied addiction and

24    addiction issues relatively intensively since

1    the late 1990s.

2           Q.      Are you board certified?

3           A.      Yes.

4           Q.      In addiction?

5           A.      No.

6           Q.      Are you board certified in pain

7    management?

8           A.      No.

9           Q.      Are you a toxicologist?

10          A.      I practice toxicology.  I

11   evaluate toxicology as a part of occupational

12   environmental medicine.

13          Q.      Are you board certified?

14          A.      In toxicology?  I don't -- no,

15   I'm not.

16          Q.      What are you board certified

17   in?

18          A.      Internal and occupational

19   medicine.  In preventive occupational

20   medicine, and I'm board eligible in

21   preventive medicine.

22          Q.      Are you a board-certified

23   epidemiologist?

24          A.      There is no board in

Highly Confidential - Subject to Further Confidentiality Review

1    epidemiology.

2         Q.     Do you consider yourself a

3    regulatory expert?

4         A.     Yes.

5         Q.     On what basis?

6         A.     Well, I took two courses at the

7    Harvard Law School on regulations of

8    occupational environmental health.  That was

9    one course taught by Nick Ashford,

10   A-S-H-F-O-R-D.

11              And a second law school course

12   taught by him on environmental law and

13   regulation and all aspects of those.

14              I teach about FDA regulation in

15   my course.  I've published about FDA

16   regulation or lack thereof in published

17   papers.

18              I've testified in front of FDA

19   regulatory bodies.

20        Q.     More than once?

21        A.     Can I finish my answer before

22   you interrupt?

23              You're a lawyer.  You can cut

24   me off anytime you like, so -- according to

1    the judge's rule, but you can just say you've

2    heard enough and I'll stop.

3         Q.    Are you close to finishing?

4         A.    I don't know.  Probably not.

5         Q.    Okay.  Did you testify -- then

6    I'll -- you -- I'll take what you've said so

7    far.

8         A.    Okay.  Then let me just put on

9    the record that the answer is incomplete.

10        Q.    How many times did you testify

11   before the FDA?

12        A.    I think two or three times.

13        Q.    When was the last time?

14        A.    The last time was 2013.

15        Q.    How long did you testify for?

16        A.    It was testimony by video, so

17   if I remember all the video and PowerPoints,

18   five or ten minutes.

19        Q.    And you included the transcript

20   in your report; correct?

21        A.    Yes.  And the PowerPoint that

22   went with it.

23        Q.    And it looked to me like your

24   testimony lasted maybe ten minutes?  Does

1  yesterday.  Do you want me to repeat that

2  testimony?

3       Q.     No.

4              What are the professional

5  organizations in which you are currently a

6  member?

7       A.     AMA, APHA, AHRP, a couple of

8  geological societies.  I have to look at my

9  CV to remember them all.

10      Q.     But that's where they're

11  listed?

12      A.     They're there.

13             I have my CV here someplace.

14      Q.     I have it too.  It's okay.

15  We'll get to that.

16             Do you consider yourself an

17  expert in marketing?

18      A.     Yes.

19      Q.     And do you consider yourself

20  specifically an expert in pharmaceutical

21  marketing?

22      A.     And device.  Medical marketing.

23      Q.     Medical marketing.  That's

24  pharmaceuticals and devices?

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.      Correct.

2              Q.      And is that because you believe

3    you know more than the layperson in those

4    fields?

5              A.      That would be a beginning.

6    It's also because I've studied marketing

7    practices.  I've published peer-reviewed

8    papers on marketing practices.  I teach on

9    marketing practices.  I give lectures on

10   marketing practice at APHA and other

11   universities.  I've written book chapters on

12   marketing practices in I think two or three

13   books.

14              So there's a lot of different

15   bases for why I think I'm an expert on

16   marketing practices of pharmaceutical

17   companies.

18        Q.      Do you consider yourself an

19   expert in pharmaceutical labeling?

20        A.      Yes.

21        Q.      Do you consider yourself an

22   expert in warnings on such labels?

23        A.      Yes.

24        Q.      On what basis?
```

```
 1          A.      Well, I wrote two chapters in
 2    the book "Handbook of Warnings and Risk
 3    Communication."  And then all the other
 4    things that I just said, which I will be glad
 5    to repeat.  I've published in
 6    peer-reviewed --
 7          Q.      No need.
 8          A.      Okay.  My answer is incomplete.
 9    Go ahead.
10          Q.      No, I said no need to repeat
11    it, because you've referenced it.  You
12    referenced the two chapters.  Anything else
13    besides what you've already testified about?
14          A.      I've given talks on warnings
15    and risk communication.
16          Q.      Do you consider yourself an
17    expert in the drug approval process?
18          A.      Yes.
19          Q.      Do you know which government
20    agencies regulate drug approvals?
21          A.      Yes.
22          Q.      Which ones?
23          A.      FDA.
24          Q.      Any others?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.     Well, for some -- some --

 2     depends what you consider drug, but Consumer

 3     Product Safety Commission might regulate some

 4     over-the -- some cosmetics, which can be

 5     advertised as having medical benefits.

 6     Generally they'd regulate them to say you

 7     can't say that, so they regulate that.

 8            Q.     Are you familiar with the new

 9     drug application process at the FDA?

10            A.     Yes.

11            Q.     We will refer to that as NDA.

12     Is that all right?

13            A.     Yes.

14            Q.     Have you ever worked on a new

15     drug application with the FDA?

16            A.     No.

17            Q.     Have you ever worked with the

18     FDA on any drug approval?

19            A.     No.

20            Q.     Have you ever reviewed a new

21     drug application?

22            A.     For the FDA?

23            Q.     Yes.

24            A.     No.
```

1       Q.     Have you ever been involved in

2    submitting an NDA?

3       A.     No.

4       Q.     Do you know what an NDA

5    submission entails?

6       A.     Yes.

7       Q.     What is required?

8       A.     Well, NDA submissions are

9    hundreds of boxes of material.  So you -- you

10   first of all, before the NDA process starts,

11   the company has to negotiate with the FDA the

12   kinds and quality and size of the studies

13   that are going to be done to get the drug

14   approved.  And that's a negotiated process.

15            Then there's usually three

16   levels of -- three levels of studies that are

17   done.  Some toxicity studies to start, then

18   level two studies, which would involve small

19   trials that might look for benefit, and then

20   the third level would be randomized

21   controlled trials, then you'd focus on

22   benefits.

23            Generally the organization

24   standards would say that those studies have

1    saying it wasn't the question you asked

2    before.

3          Q.    And you understand that the FDA

4    regulates prescription drug promotion in this

5    country?

6          A.    Yes and no.

7          Q.    Have you communicated with

8    anyone at the FDA about Purdue?

9          MS. CONROY:  Objection.

10          THE WITNESS:  Aside from the

11          FDA presentation I gave?  No.

12          Q.    (BY MR. BLANK)  That was the

13    videotaped recording?

14          A.    Right.

15          Q.    Are you aware whether the FDA

16    has found that any manufacturer of any opioid

17    has committed fraud on the FDA with respect

18    to its labeling?

19          A.    Do you mean a labeling that

20    goes in the package?

21          Q.    Correct.

22          A.    No.

23          Q.    Have you ever done any work for

24    the Federal Trade Commission?

1        A.      No.

2        Q.      Do you know what unbranded

3   promotion is?

4        A.      Yes.

5        Q.      Do you know whether the Federal

6   Trade Commission regulates unbranded

7   promotion?

8        A.      Do you mean of drugs?

9        Q.      Yes.

10       A.      Not that I can recall.

11       Q.      Have you ever worked for or

12  consulted with the Federal Trade Commission?

13       A.      No.

14       Q.      Have you ever been employed by

15  a pharmaceutical company?

16       A.      No.

17       Q.      Have you ever consulted for a

18  pharmaceutical company?

19       A.      Kind of, sort of.

20       Q.      Who?

21       A.      Confidential.

22       Q.      You can tell me.  We have a

23  protective order.

24       A.      It doesn't matter.  I don't

1    that organization.

2           Q.     Okay.  So do you know what the

3    new name is?

4           A.     No.

5           Q.     Have you heard of the Office of

6    Prescription Drug Promotion?

7           A.     Yes.

8           Q.     Have you ever worked for DDMAC

9    or OPDP?

10          A.     No.

11          Q.     Have you ever spoken to anybody

12   at DDMAC?

13          A.     Yes.

14          Q.     How many times?

15          A.     That was what I discussed

16   yesterday during the deposition.  I went to a

17   meeting --

18          Q.     You don't need to repeat that.

19   Anything besides what you discussed

20   yesterday?

21          A.     I think that's it.

22          Q.     Have you reviewed any of

23   Purdue's submissions to the FDA regarding

24   pharmaceutical promotion?

1    prescription decisions?

2         A.    No.

3         Q.    Now, I looked at your CV, and

4    you did not go to law school; is that

5    correct?

6         A.    I did not apply to law school.

7    I went -- I took two law school courses.

8         Q.    Do you consider yourself a

9    legal expert?

10        A.    Certain areas of the law, yes.

11        Q.    Do you consider yourself a

12   legal expert in spoliation?

13        A.    I know what it is.

14        Q.    Do you know what the legal

15   elements of spoliation are?

16        A.    It's different in different

17   states.

18        Q.    What is it in Ohio?

19        A.    That, I don't know.

20        Q.    What is it in Massachusetts?

21        A.    I do not know.

22        Q.    What is it in Rhode Island?

23        A.    I do not know.

24        Q.    Do you know what it is in any

1     Q.     So your contention is that

2   Janssen joined the venture in the early

3   1980s; is that correct?

4     A.     Janssen started to sell an

5   opioid which led to the hockey stick in part

6   beginning in the early '80s.

7     Q.     And by "an opioid," you mean

8   Duragesic; correct?

9     A.     Correct.

10    Q.     Was there an objective to the

11  venture?

12    A.     Yes.

13    Q.     What was the objective of the

14  venture in your opinion?

15    A.     Make as much money as possible.

16    Q.     Is that the only objective to

17  the venture in your opinion?

18    A.     Yes.

19    Q.     Other than Janssen, you're also

20  of the opinion that Johnson & Johnson was in

21  the venture; correct?

22    A.     Correct.

23    Q.     What year did Johnson & Johnson

24  join the venture, in your opinion?

1          A.     All of it.  Everybody's

2    responsible for all of it.  Everybody's

3    equally responsible.

4          Q.     Everyone is equally

5    responsible?  Is there any attribution to

6    Endo that you would have -- excuse me, strike

7    that.

8               Are you able to tell me what

9    portion of the opioid crisis was caused by

10   Endo?

11         A.     Everybody is equally

12   responsible.  It's the bank robbery.

13   Somebody's outside watching for the cops.

14   Somebody's inside with the gun.  Everybody is

15   equally responsible for the community being

16   harmed.

17         Q.     Would you mind turning to

18   page 82 of your report and taking a look at

19   opinion 7.136?

20         A.     Got it.

21         Q.     And that opinion states that

22   "Endo sought to influence formulary decisions

23   by finding people to influence"; correct?

24         A.     Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And in support of your opinion,

2    you rely on one cited document; is that

3    right?

4    A.    I need to look at 136 to answer

5    that question.

6              (Whereupon, Deposition Exhibit

7         Egilman 40, Exhibit B.136, David S.

8         Egilman Report Opiate Litigation, was

9         marked for identification.)

10   Q.    (BY MS. NAKAMURA)  And in this

11   e-mail -- or in this exhibit, I'm sorry, you

12   pasted an internal Endo e-mail; correct?

13   A.    Correct.

14   Q.    And other than this e-mail, you

15   cite to no other documents in support of this

16   opinion; right?

17   A.    Not in this opinion, that's

18   correct.

19   Q.    Do you cite to --

20         Okay.  Scratch that.

21         You don't list any interviews

22   that support this opinion; right?

23   A.    No.

24   Q.    You don't cite any deposition

Highly Confidential - Subject to Further Confidentiality Review

1    and not who owned those particular drugs.

2            Is that accurate?

3        A.    No.

4        Q.    Okay.  Would you like to

5    correct your prior testimony?

6        A.    I don't think that's my prior

7    testimony.

8        Q.    Does the definition that you

9    provide of venture only apply to companies

10   and not drugs?

11       A.    No, it applies to the companies

12   I mentioned and the opioid drugs that they

13   manufacture.

14       Q.    And if those drugs are

15   manufactured by a non-defendant, they would

16   not apply to the venture?

17       A.    I don't know if they would or

18   wouldn't.  I don't have documents on a

19   company that's not in the litigation.

20       Q.    Now, are you offering a legal

21   opinion of whether the defendants in this

22   litigation are engaged in a venture?

23       A.    I don't know -- if I'm offering

24   an opinion, it's not a legal opinion.  I'm

Highly Confidential - Subject to Further Confidentiality Review

1  not a lawyer or a judge.

2      Q.     Have you ever been provided

3  with a legal definition of the word

4  "venture"?

5      A.     No.

6      Q.     And what about a conspiracy?

7  Are you offering a legal opinion about

8  whether the defendants are engaged in a

9  conspiracy?

10     A.     No, I don't think -- I don't

11 use the word "conspiracy" at all.

12     Q.     And have you ever been provided

13 in connection with your work in this case a

14 legal definition of the word "conspiracy"?

15     A.     No.

16     Q.     Now, you testified earlier --

17 I'm going to hand you what's been marked as

18 Exhibit 5 to your deposition.

19         And that's your assignment in

20 this case; correct?

21     A.     Correct.

22     Q.     And that assignment refers to,

23 in part, analyzing whether defendants worked

24 together and/or separately; do you see that?

1    Q.    I'll represent to you,

2    Dr. Egilman, that these refer to a proposed

3    Kadian speaker's program and a proposed

4    budget.  I just want to make sure that I

5    understand correctly that other than these

6    documents, you have no information to support

7    an opinion that a Kadian speaker's program

8    was actually ever implemented; correct?

9    Other than these documents.

10    A.    I don't think that's correct.

11    I have the KOL opinion, with -- which

12    included some funding from Kadian, which --

13    some of which, I think, went for speakers.

14    Now, whether those speakers were under this

15    program or another program, I don't recall.

16    Q.    I'm going to have you turn to

17    page 129 in your report.  And I want to ask

18    you about opinion 444.  7.444.

19    A.    What page?

20    Q.    129.

21    A.    Okay.

22    Q.    Opinion 444 says "Allergan did

23    many bad things, such as lying about

24    addiction, expanding the opioid market,

1    claimed pain was a disease, and entered into

2    settlements and guilty pleas."

3              Do you see that?

4    A.    I do.

5    Q.    You used the term "many bad

6    things."

7              Is that a term of art in your

8    areas of expertise?

9    A.    No.

10   Q.    Is there some technical

11   definition or meaning to "bad things" that

12   you can explain for me?

13   A.    Sure.  It would be defined by

14   the specific examples listed in the documents

15   that were listed below.

16   Q.    Would you agree with me that

17   your report that has been marked by -- as an

18   exhibit in a case does not contain any

19   written analysis describing how you came to

20   that opinion?

21             MS. CONROY:  Objection.

22             THE WITNESS:  Do you mean by

23        me?

24   Q.    (BY MS. WELCH)  Correct.

1       A.      I think that's correct.

2       Q.      Would you agree with me that

3   your report does not contain any written

4   analysis by you explaining how the referenced

5   or cited documents support the opinion that

6   Allergan did many bad things?

7       A.      Correct.

8       Q.      Would you agree with me that

9   your report does not contain any written

10  explanation by you why you believe that those

11  documents constitute the best evidence

12  regarding your opinion 7.444?

13      A.      Correct.

14      Q.      What was the answerable

15  question that was the underpinning for

16  opinion 7.444?

17      A.      The same issue, the general --

18  my general assignment.

19      Q.      What was the specific

20  uncertainty that you translated to the

21  answerable question for purposes of coming to

22  your expert opinion 7.444?

23      A.      It's my assignment in the case.

24      Q.      The specific uncertainty and

1    happened at the meeting and what was stated

2    at the meeting would come from Mr. Swords,

3    not from you; right?

4         A.    I don't know.

5         Q.    Let me ask you -- you can put

6    that one aside.

7              There's been a lot of -- you've

8    given a lot of testimony about what you've

9    called or termed "the venture," and I don't

10   want to repeat that testimony.

11             Your opinion is that Walgreens

12   is a member of what you call the venture;

13   right?

14        A.    Correct.

15        Q.    And your report doesn't

16   identify it, when it is that you claim

17   Walgreens became a member of what you called

18   the venture; right?

19        A.    Correct.

20        Q.    Do you know when Walgreens

21   became a member of what you call the venture?

22        A.    No.  There's no date specific.

23        Q.    Do you have a year specific?

24        A.    No.  Because the time goes

Highly Confidential - Subject to Further Confidentiality Review

1    forward and back, in my understanding of a

2    bank robbery collective.

3              In other words, if I join a

4    group of bank robbers today, and they've been

5    robbing banks for 20 years, I'm responsible

6    for the 20 years of bank robberies before I

7    joined, and I'm responsible for anything

8    after I join --

9         Q.    I'm going to interrupt you.

10   You gave your answer to a yes-or-no question

11   as no, and I'll move to strike everything

12   after that.

13             What act do you claim --

14             MS. CONROY:  Objection.

15        Q.    (BY MR. SWANSON) --  was the

16   act that brought Walgreens within what you

17   call the venture?

18             What was the initial act?

19        A.    I don't have an initial act.

20        Q.    Do you claim that Walgreens

21   remains a member of what you call the

22   venture?

23        A.    Yes.

24        Q.    What was the last action that

1        A.      No.

2        Q.      Okay.  The record will stand

3   with what you testified to yesterday.

4                Today you're going to be asked

5   some questions about Rite Aid of Maryland,

6   Inc., doing business as Mid Atlanta Customer

7   Support Center.  I'm going to call that

8   Rite Aid.  Okay?

9        A.      Yes.

10       Q.      You understand that's the

11  Rite Aid entity that's been sued in this

12  litigation?

13       A.      I'll take your word for it.

14       Q.      Okay.

15       A.      I have no independent

16  understanding of that.

17       Q.      Have you read the complaint in

18  this case?

19       A.      Yes.

20       Q.      I'd like to direct your

21  attention to Exhibit 1F.  I think that's your

22  report.  You have it in front of you.

23       A.      I do.

24       Q.      And in particular to opinion

Highly Confidential - Subject to Further Confidentiality Review

1      487.

2              A.      What page?

3              Q.      On page 135.

4              A.      Okay.

5              Q.      You'll see it says "Opinion.

6      Rite Aid provided marketing services to

7      Teva," and then there's a cite to

8      Exhibit B487.  Do you see that?

9              A.      I do.

10             Q.      Did I read that correctly?

11             A.      You did.

12                     (Whereupon, Deposition Exhibit

13                     Egilman 50, B.487, was marked for

14                     identification.)

15             Q.      (BY MS. MCENROE)  We're handing

16     you what's been marked as Exhibit 50 which is

17     also Exhibit B487 from your report.  You've

18     been handed two folders; a green folder and a

19     Redweld.  Can you describe to me what's in

20     front of you?

21                     MS. CONROY:  Do you have a copy

22             of the exhibit for me?

23                     MS. MCENROE:  Oh, I do.  Two,

24             if you want.

1           MS. CONROY:  One is fine.

2           MS. MCENROE:  Great.

3        Q.    (BY MS. MCENROE)  What is in

4    front of you, Dr. Egilman, that was handed to

5    you by plaintiffs' counsel?

6        A.    Same exhibits.

7        Q.    Is there anything different

8    about the documents you were handed in those

9    folders?

10        A.    It doesn't appear to be.

11        Q.    And do you have a copy of that

12    exhibit for which you have handwriting or

13    sticky notes like you described yesterday in

14    the box that you have brought with you?

15           MS. CONROY:  There are no notes

16        or stickers on the document.

17           MS. MCENROE:  Great.  Okay.

18        Q.    (BY MS. MCENROE)  So that's the

19    only exhibit you have with respect to opinion

20    487 regarding Rite Aid; correct?

21        A.    Correct.

22        Q.    Do you have any other opinions

23    naming Rite Aid in your report?

24        A.    I don't recall.

1    search, you know, whatever the code is,

2    asterisk, and then find any other Walmart

3    documents that were cited in the report.

4         Q.    So if there's any Walmart

5    documents cited in the report, is it your

6    testimony that that, then, is referring to a

7    Walmart opinion?

8         A.    I don't know.  I'd have to look

9    at them.

10        Q.    So I'll go back to my original

11   question.  In order to determine whether

12   there were any other Walmart-specific

13   opinions in your report, you'd have to review

14   not just the report but all of the documents?

15        A.    Yeah.  The report is the report

16   and the documents, correct.

17        Q.    All right?

18        A.    You'd have to read the whole

19   thing.

20        Q.    Let's look at page 134 of your

21   report.  You cite Exhibit B.480 in support of

22   your opinion that Walmart helped Actavis

23   market opioids; correct?

24        A.    Right.

1    Q.    Do you have a copy?  I do have
2  a copy.  I didn't want to mark it as another
3  exhibit, but I can do so if we need to.
4    A.    I've probably got it in this
5  box here.
6    Q.    And I also just wanted to
7  confirm that I think it's worthwhile to get
8  that to make sure that your copy of
9  Exhibit B.480 is the same that I have.
10        So why don't we go ahead and
11  just mark this, then, as an exhibit?
12        (Whereupon, Deposition Exhibit
13        Egilman 51, Opinion-Walmart helped
14        Actavis Market Opioids, was marked for
15        identification.)
16    Q.    (BY MS. FUMERTON)  Dr. Egilman,
17  is what we just marked as Exhibit 51 the same
18  thing as Exhibit B.480 in your report?
19    A.    Yes.
20    Q.    And is Exhibit B.480 the best
21  evidence that you saw to support your opinion
22  that Walmart helped Actavis market opioids?
23    A.    Yes.
24    Q.    In fact, there was no other

1    evidence that you relied on as the basis of

2    your opinion 7.480; correct?

3         A.    Correct.

4         Q.    Now, Exhibit B.480 is a

5    PowerPoint slide deck dated May 2014 titled

6    "Joint Business Planning" and was produced by

7    ANDA; correct?

8         A.    Correct.

9         Q.    There are no references to

10   marketing opioids in this document; correct?

11        A.    Not correct.

12        Q.    And where are there references

13   to marketing opioids in this document?

14        A.    Bates No. 1126042.

15              That's one place.

16        Q.    And --

17        A.    And then 1126043.  And then

18   1126049.

19              [Document review.]

20        Q.    (BY MS. FUMERTON)  I'm going

21   to, just because I'm so short on time, stop

22   you with those examples right now and we can

23   discuss them.  If we need to go to more, we

24   can do so.

1      Q.    Okay.  And you would agree with

2   me, Dr. Egilman, that in none of your

3   individual opinions do you provide specific

4   information for that opinion about how you

5   retrieved the document or documents that you

6   list as support for that opinion; right?

7      A.    That's correct.  I didn't give

8   you the complete trail of iterative searches

9   for each document.

10     Q.    And you would agree with me,

11  that in none of your individual opinions do

12  you provide specific information about how

13  you determined what constituted the best

14  evidence for that particular opinion; right?

15     A.    Correct.  It's the best

16  evidence that I could find that supported the

17  opinion.

18     Q.    Okay.  Just so I make sure I

19  understand what you're saying, the evidence

20  that you provide in support of any particular

21  opinion is your best evidence for that

22  opinion?

23     A.    It's the best evidence --

24        Well, a lot of the opinions

```
 1                    CERTIFICATE
 2          I, DEBRA A. DIBBLE, Registered
    Diplomate Reporter, Certified Realtime
 3  Reporter, Certified Realtime Captioner,
    Certified Court Reporter and Notary Public,
 4  do hereby certify that prior to the
    commencement of the examination, DAVID S.
 5  EGILMAN, M.D., MPH was duly sworn by me to
    testify to the truth, the whole truth and
 6  nothing but the truth.
 7          I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
 8  testimony as taken stenographically by and
    before me at the time, place and on the date
 9  hereinbefore set forth, to the best of my
    ability.
10
            I DO FURTHER CERTIFY that pursuant
11  to FRCP Rule 30, signature of the witness was
    not requested by the witness or other party
12  before the conclusion of the deposition.
13          I DO FURTHER CERTIFY that I am
    neither a relative nor employee nor attorney
14  nor counsel of any of the parties to this
    action, and that I am neither a relative nor
15  employee of such attorney or counsel, and
    that I am not financially interested in the
16  action.
17
18
19  _____
    DEBRA A. DIBBLE, RDR, CRR, CRC
20  NCRA Registered Diplomate Reporter
    NCRA Certified Realtime Reporter
21  Certified Court Reporter
22
    Dated: 1 May 2019
23
24
```