# EXHIBIT 14

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br>*This document relates to:*<br><br>*City of Cleveland, et al. v. Purdue Pharma L.P.*, *et al.*, Case No. 18-OP-45132;<br><br>*County of Cuyahoga, et al. v. Purdue Pharma L.P., et al.*, Case No. 17-OP-45004;<br><br>*County of Summit, et al. v. Purdue Pharma, L.P. et al.*, Case No. 18-OP-45090 | MDL 2804<br>Case No. 17-md-2804<br>Hon. Dan Aaron Polster<br>Mag. Judge David A. Ruiz |

## PLAINTIFFS SUMMIT COUNTY, CUYAHOGA COUNTY, AND THE CITIES OF AKRON AND CLEVELAND'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO MANUFACTURER DEFENDANTS' INTERROGATORY NOS. 28/29

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Case Management Order in *In re National Prescription Opiate Litigation*, No. 1:17-cv-2804 (Dkt No. 232), Summit County, Cuyahoga County, and the Cities of Akron and Cleveland ("Plaintiffs") hereby supplement their responses to Manufacturer Defendants' Interrogatory 28 to Summit County and City of Cleveland and the substantively identical Interrogatory 29 to Cuyahoga County as follows:

### OBJECTIONS

Plaintiffs repeat and reassert their prior general objections to the Manufacturers Second Set of Interrogatories.

1

## SPECIFIC RESPONSES AND OBJECTIONS

.

**Interrogatory 27/28:** Identify and describe any specific efforts or activities on behalf of each Manufacturer Defendant to "work[] together to inflate the quotas of opioids" (as those terms are used in Plaintiff's Second Amended Corrected Complaint in the heading above paragraph 526). For each Manufacturer Defendant for which plaintiff can identify no such specific effort or activity, please so state.

*Supplemental Response:*

Plaintiffs repeat and reassert their prior objections and adopt their prior responses to this Interrogatory. In addition, Plaintiffs respond as follows:

1.      The discovery request is a contention interrogatory. "Contention" interrogatories seek to clarify the basis for or scope of an adversary's legal claims. *Starcher v. Corr. Med. Sys., Inc.*, 144 F.3d 418, fn. 2 (6th Cir. 1998), aff'd sub nom. *Cunningham v. Hamilton Cty., Ohio*, 527 U.S. 198, 119 S. Ct. 1915, 144 L. Ed. 2d 184 (1999). To be clear it is the position of the Plaintiffs answering herein, that the answer to this contention interrogatory does not limit their ability to further support their allegations through discovery.

2.      Plaintiffs further object to this interrogatory to the extent that responsive information is at least as available to Manufacturer Defendants as to Plaintiffs. Indeed, information necessary to respond fully to this Interrogatory is more readily available to Manufacturer Defendants, who are well aware of their own activities, and as explained in Plaintiffs' complaints, each specific action taken and each misrepresentation, or material omission is too numerous to set forth.

3.      In a good faith effort to meet their discovery obligations, the Plaintiffs state that Plaintiffs contend that:

When evaluating production quotas, the DEA was instructed to consider the following information:

a. Information provided by the Department of Health and Human Services;

b. Total net disposal of the basic class [of each drug] by all manufacturers;

c. Trends in the national rate of disposal of the basic class [of drug];

d. An applicant's production cycle and current inventory position;

e. Total actual or estimated inventories of the class [of drug] and of all substances manufactured from the class and trends in inventory accumulation; and

f. Other factors such as: changes in the currently accepted medical use of substances manufactured for a basic class; the economic and physical availability of raw materials; yield and sustainability issues; potential disruptions to production; and unforeseen emergencies.

4.      Finding it impossible to legally achieve their ever-increasing sales ambitions, Defendants engaged in the common purpose of increasing the supply of opioids and fraudulently increasing the quotas that governed the manufacture and distribution of their prescription opioids.

5.      The Defendants' scheme had a decision-making structure driven by the Marketing Defendants and corroborated by the Distributor Defendants.  The Marketing Defendants worked together to control the state and federal government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion, and identify suspicious orders and report them to the DEA.

6.      The Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the DEA in order to ensure that the DEA had no basis for refusing to increase or decrease production quotas due to diversion.

7.      In addition, and on an even broader level, all Defendants took advantage of the industry structure, including end-running its internal checks and balances, to their collective advantage. Defendants agreed among themselves to increasing the supply of opioids and

fraudulently increasing the quotas that governed the manufacture and supply of prescription opioids. Defendants did so to increase sales, revenue, and profit from their opioid products.

8.     The interaction and length of the relationships between and among the Defendants reflects a deep level of interaction and cooperation between Defendants in a tightly knit industry. The Marketing and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

9.     Wholesale distributors such as the Distributor Defendants had close financial relationships with both Marketing Defendants and customers, for whom they provide a broad range of value added services that render them uniquely positioned to obtain information and control against diversion.  These services often otherwise would not be provided by manufacturers to their dispensing customers and would be difficult and costly for the dispenser to reproduce.  For example, "[w]holesalers have sophisticated ordering systems that allow customers to electronically order and confirm their purchases, as well as to confirm the availability and prices of wholesalers' stock." *Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 41 (D.D.C. 1998).  Through their generic source programs, wholesalers are also able "to combine the purchase volumes of customers and negotiate the cost of goods with manufacturers."  Wholesalers typically also offer marketing programs, patient services, and other software to assist their dispensing customers.

10.     Distributor Defendants had financial incentives from the Marketing Defendants to distribute higher volumes, and thus to refrain from reporting or declining to fill suspicious orders. Wholesale drug distributors acquire pharmaceuticals, including opioids, from manufacturers at an established wholesale acquisition cost.  Discounts and rebates from this cost may be offered by

4

manufacturers based on market share and volume.  As a result, higher volumes may decrease the cost per pill to distributors.  Decreased cost per pill in turn, allows wholesale distributors to offer more competitive prices, or alternatively, pocket the difference as additional profit.  Either way, the increased sales volumes result in increased profits.

11.    The Marketing Defendants engaged in the practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids as a way to help them boost sales and better target their marketing efforts.  The *Washington Post* has described the practice as industry-wide, and the HDA includes a "Contracts and Chargebacks Working Group," suggesting a standard practice.  Further, in a recent settlement with the DEA, Mallinckrodt acknowledged that "[a]s part of their business model Mallinckrodt collects transaction information, referred to as chargeback data, from their direct customers (distributors)."  The transaction information contains data relating to the direct customer sales of controlled substances to 'downstream' registrants," meaning pharmacies or other dispensaries, such as hospitals. Marketing Defendants buy data from pharmacies as well.  This exchange of information, upon information, and belief, would have opened channels providing for the exchange of information revealing suspicious orders as well.

12.    The contractual relationships among the Defendants also include vault security programs.  Defendants are required to maintain certain security protocols and storage facilities for the manufacture and distribution of their opioids.  The manufacturers negotiated agreements whereby the Marketing Defendants installed security vaults for the Distributor Defendants in exchange for agreements to maintain minimum sales performance thresholds.  These agreements were used by the Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

13.     In addition, the Defendants worked together to control the flow of information and influence state and federal governments to pass legislation that supported the use of opioids and limited the authority of law enforcement to rein in illicit or inappropriate prescribing and distribution.  The Marketing and Distributor Defendants did this through their participation in the Defendants worked together to achieve their common purpose through trade or other organizations, such as the Pain Care Forum ("PCF") and Healthcare Distribution Management Association ("HDMA," now known as the Healthcare Distribution Alliance ("HDA")).

14.     The PCF has been described as a coalition of drug makers, trade groups and dozens of non-profit organizations supported by industry funding, including the Front Groups described in this Complaint.  The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

15.     The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drug makers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[1]  Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[2]

16.     The Defendants who stood to profit from expanded prescription opioid use are members of and/or participants in the PCF.[3]  In 2012, membership and participating organizations included Endo, Purdue, Actavis and Cephalon.[4]  Each of the Marketing Defendants worked

---

[1] Matthew Perrone & Ben Wieder, *Pro-Painkiller Echo Chamber Shaped Policy Amid Drug Epidemic*, The Ctr. for Pub. Integrity, https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic (last updated Dec. 15, 2016, 9:09 AM) (emphasis added).
[2] *Id.*
[3] *PAIN CARE FORUM 2012 Meetings Schedule*, (last updated December 2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings-Schedule-amp.pdf
[4] Mallinckrodt became an active member of the PCF sometime after 2012.

together through the PCF.  But the Marketing Defendants were not alone.  The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA.[5]  The Distributor Defendants participated directly in the PCF as well.

17.    Additionally, the HDA led to the formation of interpersonal relationships and an organization among the Defendants.  Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and several of the Marketing Defendants, including Actavis, Endo, Purdue, Mallinckrodt, and Cephalon, were members of the HAD.[6]  Additionally, the HDA and each of the Distributor Defendants, eagerly sought the active membership and participation of the Marketing Defendants by advocating for the many benefits of members, including "strengthen[ing] . . . alliances."[7]

18.    Beyond strengthening alliances, the benefits of HDA membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."[8]  Clearly, the HDA and the Defendants believed that membership in the

---

[5] *Id*.; The Executive Committee of the HDA (formerly the HDMA) currently includes the Chief Executive Officer, Pharmaceutical Segment for Cardinal Health, Inc., the Group President, Pharmaceutical Distribution and Strategic Global Source for AmerisourceBergen Corporation, and the President, U.S. Pharmaceutical for McKesson Corporation. *Executive Committee*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/about/executive-committee (last accessed Apr. 25, 2018).
[6] *Manufacturer Membership*, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/membership/manufacturer.
[7] *Manufacturer Membership*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/about/membership/manufacturer (last accessed Apr. 25, 2018).
[8] *Id*.

HDA was an opportunity to create interpersonal and ongoing organizational relationships and "alliances" between the Marketing and Distributor Defendants.

19.     The application for manufacturer membership in the HDA further indicates the level of connection among the Defendants and the level of insight that they had into each other's businesses.[9]  For example, the manufacturer membership application must be signed by a "senior company executive," and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its company.

20.     The HDA application also requests that the manufacturer identify its current distribution information, including the facility name and contact information.  Manufacturer members were also asked to identify their "most recent year end net sales" through wholesale distributors, including the Distributor Defendants AmerisourceBergen, Anda, Inc., Cardinal Health, Henry Schein, McKesson, Miami-Luken, Prescription Supply, Inc. and their subsidiaries.

21.     The closed meetings of the HDA's councils, committees, task forces and working groups provided the Marketing and Distributor Defendants with the opportunity to work closely together, confidentially, to develop and further the common purpose and interests of the enterprise.

22.     The HDA also offers a multitude of conferences, including annual business and leadership conferences.  The HDA and the Distributor Defendants advertise these conferences to the Marketing Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[10]   The conferences also gave the Marketing and Distributor Defendants

---

[9] *Manufacturer Membership Application*, Healthcare Distribution Alliance,
https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-application.ashx?la=en.
[10] *Business and Leadership Conference—Information for Manufacturers*, Healthcare Distribution Alliance,
https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/blc-for-manufacturers.

"unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[11]  The HDA and its conferences were significant opportunities for the Marketing and Distributor Defendants to interact at a high-level of leadership.  It is clear that the Marketing Defendants embraced this opportunity by attending and sponsoring these events.[12]

23.    Publications and guidelines issued by the HDA nevertheless confirm that the Defendants utilized their membership in the HDA to form agreements.  Specifically, in the fall of 2008, the HDA published the Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances (the "Industry Compliance Guidelines") regarding diversion.  As the HDA explained in an amicus brief, the Industry Compliance Guidelines were the result of "[a] committee of HDMA members contribut[ing] to the development of this publication"  beginning in late 2007.

24.    The Defendants worked together to control the flow of information and influence state and federal governments to pass legislation that supported the use of opioids and limited the authority of law enforcement to rein in illicit or inappropriate prescribing and distribution.  The Marketing and Distributor Defendants did this through their participation in the PCF and HDA.

25.    Defendants utilized their membership in the HDA and other forms of collaboration to form agreements about their approach to their duties under the CSA to report suspicious orders. The Defendants overwhelmingly agreed on the same approach—to fail to identify, report or halt suspicious opioid orders, and fail to prevent diversion. Defendants' agreement to restrict reporting provided an added layer of insulation from DEA scrutiny for the entire industry as Defendants

---

[11] *Id.*
[12] *2015 Distribution Management Conference and Expo*, Healthcare Distribution Alliance, https://web.archive.org/web/20160119143358/https://www.healthcaredistribution.org/events/2015-distribution-management-conference.

were thus collectively responsible for each other's compliance with their reporting obligations. Defendants were aware, both individually and collectively aware of the suspicious orders that flowed directly from Defendants' facilities.

26.    Defendants knew that their own conduct could be reported by other Defendants and that their failure to report suspicious orders they filled could be brought to the DEA's attention. As a result, Defendants had an incentive to communicate with each other about the reporting or suspicious orders to ensure consistency in their dealings with DEA.

27.    The Defendants also worked together to ensure that the opioid quotas allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the DEA in order to ensure that the DEA had not basis for refusing to increase or decrease production quotas due to diversion.

28.    The desired consistency, and collective end goal was achieved. Defendants achieved blockbuster profits through higher opioid sales by orchestrating the unimpeded flow of opioids.

29.    The scheme required the participation of all.  If any one member broke rank, its compliance activities would highlight deficiencies of the others, and the artificially high quotas they maintained through their scheme would crumble.  But, if all the members of the enterprise conducted themselves in the same manner, it would be difficult for the DEA to go after any one of them.  Accordingly, through the connections they made as a result of their participation in the HDA, the RICO Supply Chain Defendants chose to flout the closed system designed to protect the citizens.  Publicly, in 2008, they announced their formulation of "Industry Compliance Guidelines: Reporting Suspicious Orders and Prevention Diversion of Controlled Substances."  But, privately, the RICO Supply Chain Defendants refused to act and through their lobbying efforts, they

10

collectively sought to undermine the impact of the CSA.  Indeed, despite the issuance of these Industry Compliance Guidelines, which recognize these Defendants' duties under the law, as illustrated by the subsequent industry-wide enforcement actions and consent orders issued after that time, none of them complied.  John Gray, President and CEO of the HDA said to Congress in 2014, it is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications."  Yet, the RICO Supply Chain Defendants apparently all found the same profit-maximizing balance -- intentionally remaining silent to ensure the largest possible financial return.

30.    As described above, at all relevant times, the RICO Supply Chain Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by fraudulently increasing the quotas set by the DEA that would allow them to collectively benefit from a greater pool of prescription opioids to manufacture and distribute.  In support of this common purpose and fraudulent scheme, the RICO Supply Chain Defendants jointly agreed to disregard their statutory duties to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs into the illicit market so that those orders would not result in a decrease, or prevent an increase in, the necessary quotas.

31.    At all relevant times, as described above, the RICO Supply Chain Defendants exerted control over, conducted and/or participated in the Opioid Supply Chain Enterprise by fraudulently claiming that they were complying with their duties under the CSA to identify, investigate and report suspicious orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market, and to halt such unlawful sales, so as to increase production quotas and generate unlawful profits, as follows:

32. The RICO Supply Chain Defendants disseminated false and misleading statements to state and federal regulators claiming that:

a. the quotas for prescription opioids should be increased;

b. they were complying with their obligations to maintain effective controls against diversion of their prescription opioids;

c. they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids;

d. they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids; and

e. they did not have the capability to identify suspicious orders of controlled substances.

33. The Defendants applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied Congress to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act."[13]

34. The CSA and the Code of Federal Regulations, require the RICO Supply Chain Defendants to make reports to the DEA of any suspicious orders identified through the design and operation of their system to disclose suspicious orders. The failure to make reports as required by the CSA and Code of Federal Regulations amounts to a criminal violation of the statute.

---

[13] *HDMA is Now the Healthcare Distribution Alliance*, Pharmaceutical Commerce, http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/ (last updated July 6, 2016); Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post (Oct. 22, 2016), https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post (Mar. 6, 2017), https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail (Feb. 18, 2017), http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

35.     The RICO Supply Chain Defendants knowingly and intentionally furnished false or fraudulent information in their reports to the DEA about suspicious orders, and/or omitted material information from reports, records and other document required to be filed with the DEA including the Marketing Defendants' applications for production quotas.  Specifically, the RICO Supply Chain Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market, and failed to report this information to the DEA in their mandatory reports and their applications for production quotas.

36.     The RICO Supply Chain Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions regarding their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

37.     The RICO Supply Chain Defendants' use of the mail and wires includes, but is not limited to, the transmission, delivery, or shipment of the following by the Marketing Defendants, the Distributor Defendants, or third parties that were foreseeably caused to be sent as a result of the RICO Supply Chain Defendants' illegal scheme, including but not limited to:

    a.  The prescription opioids themselves;

    b.  Documents and communications that supported and/or facilitated the RICO Supply Chain Defendants' request for higher aggregate production quotas, individual production quotas, and procurement quotas;

    c.  Documents and communications that facilitated the manufacture, purchase and sale of prescription opioids;

    d.  RICO Supply Chain Defendants' DEA registrations;

    e.  Documents and communications that supported and/or facilitated RICO Supply Chain Defendants' DEA registrations;

f. RICO Supply Chain Defendants' records and reports that were required to be submitted to the DEA pursuant to 21 U.S.C. § 827;

g. Documents and communications related to the RICO Supply Chain Defendants' mandatory DEA reports pursuant to 21 U.S.C. § 823 and 21 C.F.R. § 1301.74;

h. Documents intended to facilitate the manufacture and distribution of the RICO Supply Chain Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports and correspondence;

i. Documents for processing and receiving payment for prescription opioids;

j. Payments from the Distributors to the Marketing Defendants;

k. Rebates and chargebacks from the Marketing Defendants to the Distributors Defendants;

l. Payments to the RICO Supply Chain Defendants' lobbyists through the PCF;

m. Payments to the RICO Supply Chain Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;

n. Deposits of proceeds from the RICO Supply Chain Defendants' manufacture and distribution of prescription opioids; and

o. Other documents and things, including electronic communications.

38. The mail and wire transmissions described herein were made in furtherance of the RICO Supply Chain Defendants' scheme and common course of conduct to deceive regulators, the public and the Plaintiffs that these Defendants were complying with their state and federal obligations to identify and report suspicious orders of prescription opioids all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market. The RICO Supply Chain Defendants' scheme and common course of conduct was to increase or maintain high production quotas for their prescription opioids from which they could profit.

39. As described in the operative Complaints, the RICO Supply Chain Defendants were repeatedly warned, fined, and found to be in violation of applicable law and regulations, and yet

they persisted.  The sheer volume of enforcement actions against the RICO Supply Chain Defendants supports this conclusion that the RICO Supply Chain Defendants operated through a pattern and practice of willfully and intentionally omitting information from their mandatory reports to the DEA as required by 21 C.F.R. § 1301.74.

40.    Defendants also worked together through HDA and the National Association of Chain Drugstores ("NACDS").  The respective CEOs of the HDA and NACDS have spoken with one voice with respect to portraying their members as committed to safeguarding the integrity of the supply chain when opposing efforts to promote the importation of prescription drugs as a means of mitigating the escalating costs of medications.  These statements support the inference that Defendants worked together in other ways as well to mislead the public regarding their commitment to complying with their legal obligations and safeguarding against diversion.

41.    Defendants also used other groups, such as the New Jersey Pharmaceutical Industry Group, whose members include, but are not limited to, Purdue Pharma L.P., Rhodes Technologies, Johnson & Johnson, NoramCo, Inc., Teva Pharmaceuticals, Cephalon, Covidien, Watson Pharmaceuticals, Actavis USA, H.D. Smith, and AmerisourceBergen to address "quota issues," PPLPC026000087658, and further the scheme they orchestrated through other channels. Internal documents describe, for example, and effort made "on behalf of industry" to advocate for better "customer service" in quota processing.  This would involve "[i]ndividual companies" taking a consistent message coordinated behind the scenes and using it to "barrage Joe Rannazzisi," whom the document describes as potentially lacking "an appreciation of just how jittery industry is."  *See* PPLPC026000087658.  "Industry" is used as a capitalized term with and documents discuss, for example, this Group's efforts to address "DEA's reluctance to allocate sufficient quota in the initial established quota" and "delay in issuing revised quotas."  PPLP004286750 (stating that, "Industry"

15

is experiencing "extended response times to request for quota increases," in part because of departmental reviews from groups such as "Registration, Suspicious Order Monitoring and potentially other DEA staff" and claiming that the "the DEA's current process, and any changes that would cause further delays in review of initial and revised quota requests . . . affects our ability to meet legitimate patient needs"); *see also* TEVA_MDL_A_01463746 (e-mail stating that: "Industry has become a little complacent again, and we need to give OD a swift kick in the pants.")

42.     Efforts were also made, for example, though a "white paper with no author/sponsor," which would "be made available to every company to provide to their key stakeholders and Federal Government Affairs colleagues, etc. – for their lobbying efforts."  TEVA_MDL-A_01453598.  It was contemplated that, in addition to reaching out to the New Jersey Group, the "paper w[ould] also be made available to other groups and audiences besides manufacturers – like the Pain Care Forum."  *Id.*

43.     Manufacturers also worked together to further their business dealings with one another.  An internal Teva document, for example, describes a narrow window for a quota request and approval, and states that: "We also have an anxious API manufacturer, Mallinckrodt, who is waiting for additional codeine production quota."  TEVA_MDL_A_01466063.

44.     To the extent that documents reflecting these details have been produced to the Plaintiffs, Plaintiffs note that, to date, the RICO Defendants have produced 14,776,993 documents, 3,951,036 of which were produced after the October 25 "substantial completion" date. From the current production, which is growing on a daily basis, Plaintiffs have identified a subset, consisting of approximately 1,347,498 documents, that may provide information responsive to this Interrogatory. Plaintiffs are actively engaged in the review of these documents. To the extent that

Plaintiffs have already identified particular documents in which the false and/or fraudulent information was supplied, such information is reflected in <u>Appendix A,</u> attached hereto.

45.     Plaintiffs reserve this right to supplement this answer with additional false and fraudulent information supplied by the Defendants to the DEA with respect to suspicious orders [and/or additional details about Defendants' false statements] supplied, as such additional information becomes available in discovery.

46.     The Plaintiffs reserve the right to supplement this answer if, or when, the Manufacturers fully and transparently respond to discovery. For the purposes of responding to these premature contention interrogatories Plaintiffs have not attempted to identify every possible communication or action through which Defendants worked together to inflate quotas opioids.

**ANSWER:** In a good faith effort to meet their discovery obligations, Plaintiffs hereby identify the specific efforts or activities on behalf of each Manufacturer Defendant to "work[] together to inflate the quotas of opioids" described above and shown in Appendix A, attached hereto.

Dated:  December 28, 2018

/s/ *Mark Pifko*_____
Mark Pifko
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Los Angeles, CA 91436
Tel.: 818-839-2333
Fax: 214-520-1181
mpifko@baronbudd.com

Stephen S. Zashin (Ohio Bar No. 0064557)
Ami J. Patel (Ohio Bar No.0078201)
Christopher S. Caspary (Ohio Bar No. 0091350)
ZASHIN & RICH CO. LPA
950 Main Avenue, 4th Floor
Cleveland, Ohio 44113

Tel: 216-696-4441
Fax: 216-696-1618
ssz@zrlaw.com; ajp@zrlaw.com;
cdc@zrlaw.com

Peter J. Mougey
Jeffrey Gaddy
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR,
P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Tel.: 850-435-7068
Fax: 850-436-6068
pmougey@levinlaw.com;
jgaddy@levinlaw.com

*Counsel for Plaintiff City of Cleveland*

Plevin & Gallucci
*/s Frank Gallucci*
Frank Gallucci (0072680)
55 Public Square, Suite 2222
Cleveland, Ohio 44113
fgallucci@pglawyer.com
Phone: (216) 861-0804

Napoli Shkolnik PLLC
*/s Hunter J. Shkolnik*
Hunter J. Shkolnik (admitted *pro hac vice*)
Salvatore C. Badala (admitted *pro hac vice*)
Joseph L. Ciaccio (admitted *pro hac vice*)
360 Lexington Avenue
New York, New York 10017
hunter@napolilaw.com
sbadala@napolilaw.com
jciaccio@napolilaw.com
Phone: (212) 397-1000

*Counsel for the County of Cuyahoga*

18

By: */s/ Linda Singer*
Linda Singer
Joseph F. Rice
Jodi Westbrook Flowers
Anne McGinness Kearse
David I. Ackerman
Jeffrey C. Nelson
MOTLEY RICE LLC
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel: (202) 232-5504

*Counsel for the County of Summit and the City of Akron*

19

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 28th day of December 2018, the foregoing has been served via email to the Defendants in this action via the following listserv email address designated by Defendants pursuant to Special Master Cohen's September 17, 2018 Order Concerning Service in Track One Cases (Dkt. No. 983):

xALLDEFENDANTS-MDL2804-Service@arnoldporter.com

*/s/ Mark Pifko*