# Exhibit 2

Highly Confidential - Subject to Further Confidentiality Review

```
 1            THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3                       - - -
 4   IN RE:  NATIONAL     :
     PRESCRIPTION OPIATE  :    MDL NO. 2804
 5   LITIGATION           :
     ---------------------------------------------
 6                        :    CASE NO.
     THIS DOCUMENT        :    1:17-MD-2804
 7   RELATES TO ALL CASES:    Hon. Dan A. Polster
 8                       - - -
 9             Thursday, April 25, 2019
10                       - - -
11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12                CONFIDENTIALITY REVIEW
13                       - - -
14         Videotaped deposition of DAVID A.
15   KESSLER, M.D. (Day 1), taken pursuant to
16   notice, was held at Baron & Budd, 600 New
17   Hampshire Avenue NW, Floor G, Washington, DC
18   20037, beginning at 9:28 a.m., on the above
19   date, before Lisa V. Feissner, RDR, CRR, Notary
20   Public.
21
22                       - - -
23             GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
24                 deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              You know, obviously I was doing
 2   other things, so I couldn't do anything, but I
 3   sort of tried to revitalize that division
 4   within CDER.
 5         Q.   Sir, it's a simple question.
 6              I understand you were Commissioner.
 7   And as Commissioner, the buck stopped with you,
 8   correct?
 9         A.   That's fair.
10         Q.   And you had oversight over all the
11   divisions?
12         A.   You're missing my point.
13         Q.   No.  I want to be clear what my
14   question is.
15         A.   Okay.
16         Q.   Were you ever within the division
17   that was once called DDMAC and is now called
18   OPDP?
19              MR. RAFFERTY:  Object to the form.
20         A.   And I think I --
21              MR. RAFFERTY:  Asked and answered.
22         A.   I think I answered that.  I think
23   if you ask Lucy Rose or Ann Witt, who ran that,
24   they would say that I was pretty tied to that
```

```
 1   division for a period of time.  Certainly not
 2   on everything.
 3           Obviously if you looked at my
 4   organizational chart, it didn't say DDMAC,
 5   right.  But I did meet with them, and I did --
 6   I put them in as leaders, and they, in
 7   essence -- we worked together was probably a
 8   best way to characterize it.
 9       Q.  There's no org chart that would
10   ever show you as part of DDMAC?
11       A.  It would show me -- as reporting to
12   me.
13       Q.  Okay.  And you started doing
14   litigation work after you left FDA?
15       A.  I use the term "litigation work" --
16   actually, is that correct?
17           I was the expert witness in the
18   Department of -- I'm just trying to think --
19   for the Department of Justice initially.  So I
20   testified there.  I have testified, I think is
21   the right way to say it.
22       Q.  How much money over the last
23   20-some years have you made testifying as a
24   witness for plaintiffs' lawyers?
```

1      A.   Well, again, for plaintiffs'
2  lawyers, I don't -- I'm not sure.  I testified
3  for certain clients, but -- on certain -- a
4  majority of that is on the plaintiffs' side, a
5  substantial majority.  I've made millions of
6  dollars.
7      Q.   10, 20, 30?
8      A.   I have no idea, but I would not
9  think that it would be that high.  But I have
10 no idea.  I have no idea.
11     Q.   You have no idea how much money
12 you've made over the last ten years?
13          MR. RAFFERTY:  Object to the form.
14     A.   No, I certainly don't have any idea
15 of that.
16     Q.   I want to show you --
17          MS. FREIWALD:  Can I get a --
18          (Exhibit Kessler-1 marked for
19          identification and attached to the
20          transcript.)
21 BY MS. FREIWALD:
22     Q.   Exhibit 1 is your report.  It
23 looked to me like you have a copy of your
24 report with you.  Or do you not?

Highly Confidential - Subject to Further Confidentiality Review

1   marketed in 2001?

2           MR. RAFFERTY:  Object to the form.

3        A.   So in talking, again, to -- Jenkins
4   was there in 2001.  And I certainly recall that
5   those meeting minutes talking about --
6   Cynthia McCormick saying, we don't want this
7   being used for any type of lumbago or -- I
8   mean, I think was her quote.

9           And I think she -- I take it that
10  they had some sense that it was being marketed
11  for that.  But I can't quite tell you -- well,
12  that's not true.  I apologize.  Let me just
13  check one thing, if I may.

14          So we have to look exactly at
15  the --

16       Q.   We'll do that all --

17       A.   Hold on a second.  But what we can
18  do very well is probably make sense to pull --
19  and I have them right behind me -- the DDMAC
20  letters will tell you what FDA was on the
21  record saying.  And I think your client had
22  four -- we can go -- warning letters and we
23  can -- that probably reflects at least some
24  extent what the company knew.

1     A.    And the...

2     Q.    DDMAC letters, whether untitled or
3  warning letters, would be another source of
4  information about what FDA knew?

5     A.    Correct.

6     Q.    Discussions about labeling changes
7  would be another potential source of
8  information about what FDA knew?

9     A.    They tend to -- they're very hard
10 to read.  Those back-and-forth label
11 indications don't really give you a sense of --
12 unless there's a comment that is written,
13 rarely, about that, it doesn't give you a lot
14 of what they were thinking.

15    Q.    So somebody who wasn't there at the
16 time can't really fairly interpret them after
17 the fact.  Is that your testimony?

18    A.    No.

19          MR. RAFFERTY:  Object to the form.

20    A.    That's not -- you asked me what FDA
21 was thinking.  No one can do -- no one should
22 be able to tell you what FDA was thinking
23 because that's a subjective state.  I can tell
24 you what the record reflects.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.   Okay.  So you're not going to
 2   testify as to what FDA was thinking if you
 3   weren't there.
 4            MR. RAFFERTY:  Object to the form.
 5            A.   I'm going to answer the questions
 6   you ask me the best I can.  I'm certainly not
 7   going to -- I would advise you not to ask me
 8   what somebody was thinking because that's a
 9   subjective state of mind.
10            If you ask me about what the record
11   shows and there's a document, I'm happy to talk
12   about it.
13            Q.   Okay.  So -- but you -- but you're
14   not going to testify to what individuals,
15   reviewers, knew or didn't know unless there's
16   some concrete evidence of that?
17            MR. RAFFERTY:  Object to the form.
18            A.   I'm going to answer questions that
19   are asked fully, based on the evidence that I
20   have.
21            Q.   Okay.  And you're not -- you don't
22   have any special training or knowledge that
23   lets you interpret what somebody was thinking
24   at any point in time?
```

 1                MR. RAFFERTY:  Object to the form.
 2        A.    I am not a mind reader, and I would
 3   never want to do that in any form of testimony.
 4   If you ask me a question, I'll try my best to
 5   answer it.
 6        Q.    And that would be true not just
 7   with regard to what FDA was thinking, but it
 8   would be true with regard to what anybody at
 9   any of the companies were thinking as well?
10                MR. RAFFERTY:  Object to the form.
11        A.    So obviously the word "thinking," I
12   would agree with you.  But I think when there's
13   an objective record -- so I can tell you what
14   is stated, okay --
15        Q.    But you're not going to purport to
16   interpret somebody's intent or their state of
17   mind?
18                MR. RAFFERTY:  Object to the form.
19        A.    I will never go to intent.
20        Q.    Okay.  When were you first
21   contacted in this case?
22        A.    I don't mean to be technical on
23   this.  Define "this case," please.
24        Q.    Well, to offer an opinion with

1  looked at those extensively.  They were
2  provided in discovery.
3           So there's a whole host of entities
4  that were looked at.
5      Q.   Internal documents from DEA?
6      A.   Internal documents from DEA?  I've
7  looked at -- I've looked at some documents from
8  DEA.  I wouldn't think that they're internal
9  necessarily.  They tended to be the more public
10 documents from DEA that I saw or DEA
11 presentations that I -- that I saw.
12     Q.   What about internal documents from
13 any manufacturer not part of who you're looking
14 at?
15     A.   So there were -- there were
16 subsidiaries of your client, for example,
17 Rhodes, others that I looked at in studying the
18 raw materials and the finished products, but
19 they were sort of -- I don't know whether
20 they're separate entities, you would consider
21 them, or they're the same as Purdue.
22          But certainly with Rhodes, I
23 studied Rhodes's manufacture of API.  I've
24 looked at, for example, Noramco,

Highly Confidential - Subject to Further Confidentiality Review

1  Tasmanian Alkaloids.  I mean, if you look at
2  the -- if you look at super poppy and the
3  production of super poppy and your client's
4  buying super poppy and the high alkaloid --
5         Q.   That's not what I asked.  I asked
6  about outside this.
7         A.   Yes.  Well, that's outside.  So
8  that -- if you look at Tasmanian -- the company
9  called Tasmanian Alkaloids that is owned by
10 Noramco that is owned by Johnson -- by
11 Johnson & Johnson, that Tasmanian Alkaloids,
12 for example, fed -- OxyContin would not have
13 been driven without Tasmanian Alkaloids and
14 super poppy.  So I looked at that.  Those were
15 entities maybe other than the six.
16        Q.   So, sir, at the time that you were
17 at FDA, was looking at internal company
18 documents part of anything the agency did?
19        A.   You're using internal company
20 documents?
21        Q.   Yeah, other than -- yes.  You
22 wouldn't look at internal sales and marketing
23 documents, would you?
24        A.   No.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.   Has FDA ever been willing to limit
2    extended-release opioids to cancer pain?
3          A.   I think I testified --
4          Q.   With the exception of the couple --
5    the couple of things you've talked about.
6               MR. RAFFERTY:  Object to the form.
7          Q.   And I'm focusing on the
8    extended-release.
9          A.   So Duragesic was extended-release,
10   and I -- and I read you the statement this
11   morning that I was not willing to limit it just
12   to cancer.  I thought there would be some few
13   patients beyond cancer.
14              But again, your question is
15   somewhat confounding, because it's backwards.
16         Q.   It's actually very -- very simple.
17   There have been requests since 1996 --
18              I'm in the post-you-as-Commissioner
19   time period.
20         A.   Right.
21         Q.   There have been requests, I think
22   we should be able to agree, to limit
23   extended-release opioids to cancer pain, and
24   the FDA has declined, correct?
```

1                If I had any idea, right, that that
2    was the intended population and they would try
3    to drive a truck through that indication,
4    right, I mean, I -- I'm not sure I would have
5    shut down the product entirely, because again,
6    I'm not in favor of that, but I would have
7    called them in and said, what in the world are
8    you thinking?
9         Q.   Okay.  My question is -- I
10   appreciate that.  My question is a little
11   different.
12              Are you offering an opinion that at
13   no time between 1994 and 2017 or '18 or '19 did
14   the FDA understand how -- the patient types to
15   which the products were being marketed?  It's a
16   very specific question.
17              MR. RAFFERTY:  It's a -- objection.
18       It's a very broad question.
19        Q.   I just want to know, are you -- is
20   it your testimony that at no time between 1994
21   and basically present, the FDA understood the
22   patient types to which the products were being
23   marketed?
24              MR. RAFFERTY:  Same objection.

```
 1          A.    "He didn't seem to believe me that
 2   OxyContin had no buzz.  Will try on some
 3   junkies."
 4          Q.    Sir --
 5          A.    The FDA had no --
 6          Q.    Sir, I'm going to --
 7          A.    The FDA had no sense of that
 8   patient type that -- that it was being sold to.
 9          Q.    Okay.
10          A.    "Stating that he agrees with using
11   oxy for PRN and chronic pain."
12          Q.    Sir --
13          A.    FDA had no understanding that your
14   company was marketing for that.
15          Q.    Sir, you said to osteoarthritis
16   patients, to patients who had all kinds of
17   disease states.
18                MR. RAFFERTY:  Once again --
19          Q.    That's what you --
20                MR. RAFFERTY:  Let the record
21          reflect that once again counsel is
22          interrupting him when she asked a very
23          broad question about what the entire FDA
24          knew over the -- from 1997 until today
```

Highly Confidential - Subject to Further Confidentiality Review

1              about the patient populations.
2                     The doctor is answering your
3              question, and then you interrupt him.
4              That's exactly what's been going on all
5              day.
6         A.   "Using it in lower doses for milder
7    pain."
8         Q.   Okay.
9         A.   I don't think the FDA to this day,
10   right --
11                    If you take these call notes, 1996,
12   1997, right, in different ERs -- "Oxy has a
13   street value," dated 1996.
14        Q.   Sir --
15        A.   I don't think FDA has an
16   understanding.  Your company has stated that it
17   did not know about the street value of oxy
18   until 2000, 2001.
19        Q.   Sir --
20        A.   This is 1996.  I don't think FDA
21   has a complete picture to this day.
22        Q.   Sir, did you review the Senate
23   hearings in 2001 to know what was discussed
24   about abuse and misuse?

1          A.   I mean, there's no substantial
2    evidence for some of that.
3          Q.   You're not offering an opinion that
4    the company had information about tolerance and
5    physical dependence that the FDA did not have?
6          A.   Not -- not specifically.  I think
7    that the -- not that specific sentence, but if
8    you go down later in that paragraph, I would
9    have an opinion.
10         Q.   Okay.  What is it that you're
11   saying there isn't substantial evidence about?
12         A.   Well, this using higher doses to
13   overcome tolerance is not -- there's not
14   substantial evidence that higher doses increase
15   therapeutic efficacy in the case of tolerance.
16   And, in fact, one -- I mean, many addiction
17   experts would say that you want to lower the
18   dose, and that's the appropriate treatment.  So
19   there's not substantial evidence for that.
20              Moreover, what wasn't disclosed to
21   the agency was the game plan to significantly
22   increase the dose beyond what American medicine
23   was using.
24         Q.   This is -- this is a discussion on

Highly Confidential - Subject to Further Confidentiality Review

1  are certain other requirements that States may
2  impose.
3      Q.  Okay.  So if a doctor is
4  prescribing prescription opioids, he or she is
5  taking on an additional level of responsibility
6  and knows that?
7      MR. RAFFERTY:  Object to the form.
8      A.  That was what was changed.
9      Q.  So then it goes on to show the box
10 warning, OxyContin is an opioid agonist and a
11 Schedule II controlled substance with an abuse
12 liability similar to morphine.
13     Did I read that correctly?
14     A.  That's what that says.
15     Q.  So when you say that the product --
16 that Purdue did not advise of an abuse
17 liability similar to morphine, sir, it said it
18 right in the label, correct?
19     MR. RAFFERTY:  Object to the form.
20     A.  Oh, I -- go look at your
21 promotional materials.  Your -- all marketing
22 campaigns were to distinguish and to remove the
23 stigma associated with morphine.  That was a
24 very explicit strategy that was carried out.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.   Dr. Kessler, I'm Amy Laurendeau.  I
2    represent Janssen Pharmaceuticals.  I'm going
3    to use the time allotted to me to ask you about
4    your numerous opinions regarding Janssen in
5    your report and do the best we can to get
6    through as many as we possibly can in the next
7    few hours.
8               Okay?
9          A.   Yes.
10         Q.   With respect to Janssen, the
11   opinions you're offering are limited to its
12   three opioid products, Duragesic, Nucynta IR,
13   and Nucynta ER, correct?
14         A.   I think that's -- I think that's
15   correct in general with regard to -- I think
16   that's -- with respect to Janssen -- the reason
17   I'm having a little trouble answering that
18   question are some of the facts.
19              Janssen provided, for example, the
20   narcotic for Purdue for OxyContin, and the
21   facts in Janssen's own documents show that it
22   drove the increase in oxycodone.  I don't think
23   that's an opinion; I think that's a fact.
24              So I just think that should be

Highly Confidential - Subject to Further Confidentiality Review

1  on -- that's -- it's clear that, again, from
2  the documents -- the budget documents in Purdue
3  and Janssen's own documents from Noramco --
4  that you developed a super poppy that Purdue
5  bought and, I think it's fair to say, in
6  Janssen's own words, enabled oxycodone to --
7  the extent of oxycodone to be produced.
8         You also affect a significant
9  amount of -- you're the number one narcotic raw
10 material distributor in the world, so there are
11 a lot of -- if we're talking about generic
12 oxycodone and others, I have those sales
13 figures.
14         So again, I think you're relatively
15 right with opinions, but I just want to make
16 sure the record reflects that these
17 relationships among defendants are complex and
18 interconnected, and Oxy would never have --
19 OxyContin would never have flourished the way
20 it did but for Janssen.
21     Q.   These aren't issues you intend to
22 testify to at trial, though, are they?
23     A.   I'll answer the questions that I'm
24 asked.

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.   You haven't said a word about
 2   Noramco in your 300-plus page expert report,
 3   have you?
 4         A.   You're right.  The documents are on
 5   my reliance list.
 6         Q.   In the 315 pages in which you've
 7   listed the facts and opinions to which you
 8   testified in this litigation, you haven't said
 9   anything about Noramco other than to list it as
10   a defendant, correct?
11         A.   I think -- I mean -- I think that's
12   correct on the report.  But certainly those
13   documents are on my reliance list and things
14   that I've considered.
15         Q.   Are you intending to offer opinions
16   about Noramco and API and Janssen's role with
17   respect to production of API at trial?  Yes or
18   no.  I need to know today.
19         A.   I'm not -- I'm going to answer the
20   questions that I'm asked.  Those are facts.  I
21   don't think I'm going to -- I'm not going to
22   offer any opinions, necessarily.  But those are
23   facts.
24         Q.   Well, I'll tell you that Janssen
```