# Exhibit 4

```
 1              IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3

    IN RE NATIONAL PRESCRIPTION  | MDL No. 2804

 4                               |

    OPIATE LITIGATION            | Case No. 17-MD-2804

 5                               |

    APPLIES TO ALL CASES         | Hon. Dan A. Polster

 6

 7                         - - -

 8                 Tuesday, April 23, 2019

 9                         - - -

10          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

11                 CONFIDENTIALITY REVIEW

12                         - - -

13

14

15          VIDEOTAPED DEPOSITION of MATTHEW PERRI, III,

    BS Pharm, Ph.D., RPh, held at Jones Day,

16  1420 Peachtree Street, N.E., Suite 800, Atlanta,

    Georgia, commencing at 9:28 a.m., on the above date,

17  before Susan D. Wasilewski, Registered Professional

    Reporter, Certified Realtime Reporter and Certified

18  Realtime Captioner.

19

20

21                         - - -

22             GOLKOW LITIGATION SERVICES

23        877.370.3377 ph | 917.591.5672 fax

24                  deps@golkow.com

25
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   I -- in connection with rendering your

2    opinions in this case, do you intend to render an

3    opinion that any particular defendant in this case

4    violated FDA regulations?

5          MR. CHALOS:   Object to the form.

6      A.   So I don't -- I don't think -- I don't think

7    that opinion is one that I've expressed in my

8    report, but there are opinions that come kind of

9    close to that, and I'm sure we'll get to that at

10   some point.

11     Q.   Have you had any professional experience

12   dealing with FDA warning letters or notices of

13   violation?

14     A.   I have been exposed to FDA warning letters

15   through my work on a couple of cases like this one.

16   I've also been made aware of warning letters through

17   the process of the Drug Utilization Review Board.

18   As I recall, there had been times when warning

19   letters had been discussed at that board.

20          So -- so through the media as well, where

21   I -- where there have been companies that -- that

22   received warning letters or other types of actions

23   by the FDA that's been publicized, I would be

24   exposed to it through that as well.

25     Q.   But in terms of interfacing directly with

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that I applied in this case.

 2        Q.    And are these -- I know this is a synopsis

 3    of the seven opinions you intend to offer, but does

 4    this cover the waterfront in terms of the opinions,

 5    at least the high level waterfront?

 6        A.    Yes, it does.

 7        Q.    So if I want to know Dr. Perri's opinions in

 8    this case, I would just have to look at this report,

 9    and the entire -- all of his opinions are included

10    somewhere in this report?

11        A.    All of them are included in this report, and

12    they are summarized on Page 7, 8, and 9.

13        Q.    And are there any other opinions that you

14    intend to offer that aren't in this report?

15            MR. CHALOS:  Object to the form.

16        A.    Not that I'm aware of.

17        Q.    Okay.  I mean, obviously, your report is

18    really long.  So it's chock-full of stuff, but

19    let's -- in terms of your discussion of marketing,

20    did you pull that from any particular resource?  Is

21    that pulled from your Pharmaceutical Marketing

22    textbook?

23        A.    It's pulled from 30 years of experience, and

24    most of it was just drafted, supplemented with

25    citations, and tweaked, so I honestly can't tell you
```

Highly Confidential - Subject to Further Confidentiality Review

1    that -- I know I didn't take anything from the

2    marketing textbook, but I'm sure that -- because

3    I've written over the years, that -- that my writing

4    is going to begin to sound just alike or it's going

5    to be pretty close to the same thing.

6        Q.    Let's look at Paragraph 29.

7        A.    Paragraph 29?

8        Q.    Yeah.  We're on Page 13.  When you -- when

9    you talk about pharmaceutical marketing having a

10   heightened standard -- do you see that -- is that

11   heightened standard published anywhere?

12       A.    So I think this is a generally accepted

13   principle, that prescription pharmaceutical products

14   are, by nature, more dangerous and require a more

15   careful approach to their marketing than other

16   products, like bubble gum or baseball cards.

17            I don't know that -- that it's published in

18   a formal way, but I know that certainly, if you read

19   the introductory paragraphs to just about any of the

20   research that's cited here, they'll talk about the

21   importance of the prescription marketplace, and

22   that -- that drugs carry risks and benefits for

23   patients.

24       Q.    Right, but if I'm a pharmaceutical company

25   and want to write some marketing for my new patent

1    medicine, is there anyplace I can look to determine,

2    like, what the -- what the rules are?  Like, is

3    there an FDA regulation, a publication?

4        A.    I think all of the above.  I think certainly

5    the FDA has rules and guidelines and regulations.  I

6    think that you could look to pharmaceutical

7    marketing literature that is -- has got plenty of

8    information regarding, sort of the -- the dos and

9    don'ts.

10           If you look at the Pharmaceutical Research

11   and Manufacturers Association, they have guidelines

12   that they've promulgated, as have other similar

13   organizations around the world.

14       Q.    Do you know what the FDA regulations are

15   related to prescription drug advertisements?

16       A.    I mean, in general, yes.

17       Q.    I mean, specifically.  I mean, you know that

18   the FDA regulates prescription drug advertising.

19   I'm asking, what do you know about that

20   specifically?

21           MR. CHALOS:  Object to the form.

22       A.    Well, if you're talking about -- that's --

23   that's really a broad question.  I mean, it's hard

24   to answer.  I could start at the top and work my way

25   down with that.

Highly Confidential - Subject to Further Confidentiality Review

1    This is the end of Media Number 3.

2        (Recess from 2:03 p.m. until 2:15?p.m.)

3        THE VIDEOGRAPHER:  We are now back on the

4    video record with the beginning of Media

5    Number 4.  The time is currently 2:15 p.m.

6    BY MR. VOLNEY:

7    Q.   So let's -- let's move to Page 53, Paragraph

8    89, which is your discussion of marketing messages

9    are different from the package insert.

10   A.   Right.

11   Q.   I think you earlier testified that in

12   connection with a new drug application, one of the

13   things that the FDA looks at and ultimately approves

14   is the package insert for a particular drug.

15   A.   Yes.

16   Q.   Are you just generally familiar with that?

17   A.   Generally, yes.

18   Q.   You yourself haven't had any particular

19   direct involvement in getting a package insert

20   approved; fair?

21   A.   I have not.

22   Q.   And you would agree with me that a package

23   insert is part of a company's marketing?

24   A.   A package insert is part of a company's

25   marketing.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And I think you testified that on the DURB,

2    that's not something that's put in the sort of

3    clinical information and clinical binder you

4    receive?

5    A.   That's correct.  We don't -- we don't see

6    package inserts as part of what we review.

7    Q.   Who are the package inserts provided to?

8    A.   Generally, a package insert has to be

9    provided any time a drug name and its indication are

10   mentioned at the same time.  So if a sales rep is,

11   you know, back in the olden days, giving you a cup

12   that says OxyContin on it, and he mentions the

13   indication, he's got to give you a package insert

14   attached to that cup.

15        And so in today's world, I think anytime

16   that the two are together, the indication in the

17   product name, the package insert is still required.

18   Q.   So is that just for in-person meetings, or

19   is it also for, like, mail pieces?

20   A.   Yeah.  I'm pretty sure it applies to any

21   time, Internet, mail, in-person.  Even if a -- if an

22   article is being distributed by a drug rep and that

23   article mentions the indication and the name of the

24   medication, I'm pretty sure they'd have to include a

25   package insert at that time, too.

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.   So when we're looking at the physician

 2   prescriber model, which I conveniently took off this

 3   ELMO, it -- one of the things that will be in the

 4   total mix of information would be the package

 5   insert, at least it will be available to the

 6   prescriber?

 7       A.   Yes.   Thank you for that, because it's

 8   available.   It doesn't mean -- and as you -- as my

 9   opinion states, it's not often relied upon.

10       Q.   And is that based on anecdotal information,

11   or what?

12       A.   Well, it's -- I don't think it's anecdotal.

13   I think it's the way marketing is conducted.   The

14   package insert is -- I know I don't get to ask the

15   questions, but I'm sure we've all seen a package

16   insert.   It's folded up in a little -- you know,

17   stuck to the prescription bottle or taped to the

18   bottom of the coffee mug or whatever, or it can be a

19   bigger piece, you know, 8?-by-11.   So they come in

20   all different shapes and sizes.   Some are more

21   useful than others.

22            But when the package insert is delivered,

23   it's not necessarily delivered as, oh, here is your

24   package insert, this contains all the prescribing

25   information, but rather, it's delivered as part of
```

Highly Confidential - Subject to Further Confidentiality Review

 1    the obligation to deliver the package insert.

 2          And what -- for example, we're talking about

 3    the personal selling effort.  It would be the sales

 4    rep's job to then figure out what in that package

 5    insert or what in their sales call today is most

 6    important to convey to that prescriber and to

 7    communicate that information.

 8          And in marketing, we know that what works

 9    best is to communicate product benefits and turn

10    those -- product features and turn those product

11    features into product benefits.  So, you know, to

12    the extent that a package insert supports that, it

13    would be relied on by the sales rep.  To the extent

14    that it doesn't, it may not be.

15          Now, just an example of that is, early on in

16    the OxyContin marketing, the reps frequently

17    referred to -- when doctors had concerns about

18    addiction, the reps frequently referred to the less

19    risk of addiction in the package insert that we now

20    know was changed later on.

21          So the package insert is variable.  It's not

22    necessarily something that is relied on.  It's

23    certainly not something that's focused on, but it is

24    provided.

25    Q.   Do you know whether the original OxyContin

Highly Confidential - Subject to Further Confidentiality Review

1    package insert had a warning on each page that the

2    drug may be habit-forming?

3        A.   I don't know if it had that on it or not.

4    I've read the original package insert, but I don't

5    recall that.

6        Q.   If a -- if a doctor wanted to get the

7    pharmaceutical manufacturer's disclosures related to

8    a -- the particular risks of a drug, would the

9    doctor -- could the doctor look at the package

10   insert?  Let me ask a different question, because

11   that's a bad question.

12            Is the package insert intended to provide

13   information about the risks of a particular drug?

14       A.   I think it's fair to say that the package

15   insert is intended to provide a balanced picture of

16   the drug, including the benefits and the risks, and

17   all the information a doctor would need to know,

18   whether or not they would want to consider

19   prescribing it.

20       Q.   And do you know whether doctors consider the

21   package insert to be useful for that purpose?

22            MR. CHALOS:  Object to the form.

23       A.   So my opinion about package inserts is that

24   they are not heavily relied upon.  There are a lot

25   better sources of information that doctor would use

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that are much more concise and available, especially

 2    in today's technology information world.

 3            You probably recall the PDR, which was a

 4    Physician's Desk Reference, which contained

 5    basically all the package inserts for all the drugs

 6    that were available.  And so doctors might look up a

 7    drug and get package insert information from that,

 8    but as time and technology changed, the reliance on

 9    the package insert has as well.

10    Q.   What other sources of information out

11    there -- are there out there that are more concise

12    and available?

13    A.   In today's drug information world, there is

14    a number of drug information services, from

15    Epocrates and Micromedex and UpToDate and several

16    other sources that are -- that information is culled

17    from a lot of different sources and summarized for

18    prescribers, pharmacists, nurses, formulary

19    managers, et cetera.

20    Q.   So that more -- that more available and

21    concise information that you're talking about is

22    also information that would go into the total mix of

23    things a prescriber would consider or could

24    consider?

25            MR. CHALOS:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

1   was out there, it would be leaving some questions

2   unanswered.

3       Q.   But in terms of your description here of

4   what motivated Purdue to develop OxyContin and what

5   Purdue's intent was with respect to development of

6   OxyContin, that's information that you've gleaned

7   from the documents you've looked at in this case;

8   fair?

9       A.   That, in particular, came from the OxyContin

10  launch plan in 1993 or '94, I believe.

11      Q.   So this is a -- is this, in essence, a

12  paraphrase of that?

13      A.   A paraphrase or just a summary of it, yes,

14  summary of what I learned from it.

15      Q.   And you also talk in here, in this section

16  of your report, about your -- about Endo's launch of

17  the varying strengths of Percocet.

18           Do you see that?  I'm looking at Page 108.

19      A.   Paragraph 108?

20      Q.   67, 108, yes.

21      A.   Yeah.

22      Q.   How long has Percocet been on the market?

23      A.   Percocet, I am pretty sure, was on the

24  market when I started working in '77 or '78.  So

25  that would be the earliest I know.  Well, that was

Highly Confidential - Subject to Further Confidentiality Review

```
 1   will anticipate this, is I think I can read these
 2   documents and categorize them by themes just as well
 3   as you can.  I just don't know that you're actually
 4   providing some added benefit as an expert to the
 5   jury.  I'm trying to understand, from your
 6   perspective, what you think you're -- what you're
 7   adding as a pharmaceutical expert.
 8         MR. CHALOS:  Object to the form.
 9   A.   So do you want me to answer that, or was
10   that just a --
11   Q.   Well, it's kind of a statement, but I also
12   want you to answer it.
13         What are you providing that any other person
14   in this room or on the jury couldn't come to their
15   own conclusion about?
16         MR. CHALOS:  Object to the form.
17   A.   So I think there's a number of things, and
18   I'm going to reserve the right to add to my list as
19   we go on.
20   Q.   Sounds good.
21   A.   But at the very highest level, you can look
22   at any advertisement -- and you mentioned you're a
23   consumer, and you get advertised to all the time.
24   You can look at any advertisement and find out what
25   the message or the theme is, and potentially any
```

Highly Confidential - Subject to Further Confidentiality Review

1    consumer can do that for any product.

2         The problem in this analysis would be how to

3    know whether or not that -- those themes are

4    consistent with the theory of marketing, which --

5    the theoretical basis of marketing that says

6    delivery of that message via this mechanism will

7    provide the biggest bang for our buck.

8         The use of that theme in combination with

9    another theme that is designed to complement it, so

10   integrating the marketing messages, and the

11   consumers, while they can maybe identify a message,

12   they may not be able to synthesize those messages

13   and understand they are part of a bigger picture of

14   marketing.

15        The integration of the various marketing

16   efforts, the use of peer-to-peer influence, I mean,

17   you've asked me many questions today about

18   peer-to-peer marketing, peer-to-peer influence.  So

19   I may be one up on you on that one.

20        But the idea of, can the average person just

21   look at a brochure designed for patients and be able

22   to assess from that what the purpose of a

23   well-orchestrated, well-defined, and aggressive

24   marketing promise might have been, I don't think so.

25        I think it takes somebody that can -- that

```
 1    can deconstruct the marketing, break it down into

 2    its component parts, and understand how each of

 3    those component parts relates to the overall purpose

 4    of that marketing and what impact that marketing

 5    had.

 6         And certainly a consumer who is able to

 7    identify a marketing message has no way of knowing

 8    whether that was successful or not in achieving its

 9    goal.  They may not even understand the concept

10    behind an every 12-hour dosing, and why that would

11    be an effective marketing message for a doctor.

12         So when you add the layer of a physician or

13    the other customers to it, when you add the

14    comprehensive nature of marketing practices to it,

15    when you add that there are very strong theoretical

16    underpinnings that describe why what we do is

17    effective, that's at least the beginnings of the

18    list of why I think you need a pharmaceutical

19    marketing expert.  And I haven't even touched on the

20    issue of standards and regulation and so forth.

21    Q.   So you think it -- does it take a

22    pharmaceutical marketing expert to understand what's

23    included -- what the intent is behind these

24    particular marketing pieces?

25    A.   Let me give you one example.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. CHALOS:  Object to the form.
 2       A.   Let me give you one example.  If you give a
 3   patient a PI, it's useless.
 4       Q.   If you give a doctor a PI, is it useless?
 5       A.   It can be.  If they don't read it, it was
 6   useless.
 7       Q.   The same -- the same is true for any piece
 8   of marketing information you give to a prescriber.
 9   If they don't read it, it's useless.
10       A.   Which is exactly --
11       Q.   Fair?
12       A.   Which is exactly why you need a marketing
13   expert to help you understand how this marketplace
14   works.  Do doctors read it or not?  And there is
15   evidence to support the contention that they don't.
16   They don't rely on the package insert, not the way
17   they do on other pieces of information.  And this
18   is -- again, we'll keep adding to the list, but --
19       Q.   I'm -- I guess I'm confused.  Is there -- is
20   there research that -- or have you done any -- have
21   you done any research to identify what percentage of
22   doctors do or do not rely on the PI, what percentage
23   of doctors do or do not rely on advertising, and
24   what percentage of doctors do or do not -- are or
25   are not influenced by key opinion leaders, that sort
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of thing?

 2         A.    I have --

 3              MR. CHALOS:   Object to the form.

 4         A.    I have not undertaken analysis to assign

 5    percentages to any of those characteristics.

 6    However, there are -- in the report, there is

 7    literature cited that reflects on the use -- the

 8    usefulness of the package insert and reliance on the

 9    package insert.

10              Also in the report is information on the

11    categories that the pharmaceutical companies spend

12    on the various forms of advertising that they do;

13    for example, detailing or personal selling being the

14    biggest category and the highest expenditure.

15              So if you are a student of marketing, you

16    understand that marketers spend their dollars where

17    they get the most return.  And so if we're spending

18    the most money on detailing, then we know the

19    detailing is providing the most return in most

20    cases.

21         Q.    When you say opioids should be first line

22    therapy for pain, what does -- what does that mean?

23         A.    Basically, they should -- you should use

24    opioids as soon as possible.  When a patient

25    presents with pain, you should use an opioid.
```

1      Q.   Like, with a toothache or, I mean, just like

2    any -- any type of pain, minor pain?

3      A.   Well, that's not my opinion, but I'm saying

4    that that's what the -- that's what the theme that I

5    saw in the marketing documents certainly suggested.

6      Q.   Okay.  I -- let's go back and look at this

7    chart a little bit more.  I just wanted to clarify

8    something.

9      A.   Are we talking about Table II now?

10     Q.   Yeah, we're back to Table II, the chart.  In

11   terms of the marketing messages that you've

12   identified in this chart, which are A through X --

13     A.   Yes.

14     Q.   And I just want to clarify.  Was it your

15   testimony that it was you, Dr. Perri, who came up

16   with those particular marketing messages

17   categorization?

18     A.   It was the defendants' marketing documents

19   that came up with those categories.

20     Q.   Well, you -- who wrote it down in this

21   report?  Not defendants' marketing documents.

22   You're the one who had to look at everything and put

23   it together.

24          MR. CHALOS:  Object to the form.

25     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Go ahead.

 2      A.   So in terms of these specific categories, it

 3   would have been my assistant that created this

 4   table.  And when we discussed the various categories

 5   and the various messages that -- the A, B, C, D, E

 6   were just intended to summarize the general theme of

 7   the message inside that section of the table.

 8      Q.   Okay.  So it's --

 9      A.   There were iterations of this as well.

10      Q.   Understood.  Understood.  I mean, it was you

11   and your assistant who looked at the documents and

12   pulled the themes out and then categorized them?

13      A.   Essentially, yes.

14      Q.   And the -- it's likely that particular

15   themes would occur in multiple documents?

16      A.   Yes.

17      Q.   Do you -- do you think that the FDA

18   regulations governing and requiring package inserts

19   are useless?

20           MR. CHALOS:  Object to the form.

21      A.   No.  I think my opinion is just a little

22   different than that.  My opinion is, is that they

23   are not heavily relied upon.

24      Q.   And is that based on your understanding that

25   many doctors will look at -- will shortcut that by
```

Highly Confidential - Subject to Further Confidentiality Review

1   looking at references, like the Physician's Desk

2   Reference or other types of references?

3       A.   It's more than that.  It's all the efforts

4   that a pharmaceutical manufacturer -- pharmaceutical

5   marketer undertake to reach a doctor, and the

6   package insert is just one of those.

7           And if you look at the package insert in

8   comparison to detailing, personal selling, journal

9   ads, articles, guidelines, CME, all the other things

10  that are going on, the package insert is just a very

11  small part.  And it's primarily something that's not

12  attractive and not appealing.

13          So compare that package insert to the

14  well-crafted, carefully crafted messages that are

15  built into a personal selling encounter or a CME

16  program.  There's -- it's got a lot of competition,

17  and it just doesn't measure up that well.

18      Q.   I think you testified earlier that you

19  haven't undertaken a study to assign any sort of

20  percentage to the number of doctors who rely on the

21  package insert; fair?

22      A.   I have not.  There is literature cited in

23  the report, though, that assesses that to some

24  extent.

25      Q.   Do you have an opinion on how widely a

1    package insert is relied upon?

2        A.   My opinion is that it's not heavily relied

3    upon.

4        Q.   Okay.  I mean, heavily indicates to me a

5    judgment call in terms of percentage.  20 percent

6    rely on it?  50 percent rely on it?  70 percent rely

7    on it?

8        A.   I think -- I think --

9        Q.   Is there any number you can put on that?

10       A.   I think there's evidence that some doctors

11   don't ever look at it, and some doctors look at it

12   some of the time.  And that's -- that would be

13   reflected in the literature that I cited here.

14       Q.   So in terms of answering my question, that's

15   the best you've got?  Some doctors look at it some

16   of the time?

17       A.   And some never look at it.  Yes.

18       Q.   Is it true that some doctors never look at

19   marketing materials at all?

20       A.   It -- that depends, because as we've

21   mentioned already today a few times, that marketing

22   has lots and lots of ways of reaching a doctor.  And

23   the nonbranded marketing is very effective at

24   reaching doctors -- this is addressed in my

25   report -- very effective at reaching doctors that