# EXHIBIT 4

"

```
 1        IN THE DISTRICT COURT OF CLEVELAND COUNTY

 2                   STATE OF OKLAHOMA

 3                   No. CJ-2017-816

 4  - - - - - - - - - - - - - - - - X

 5  STATE OF OKLAHOMA, ex rel.,

 6  MIKE HUNTER, ATTORNEY GENERAL

 7  OF OKLAHOMA,

 8                    Plaintiff,

 9      v.

10  (1)  PURDUE PHARMA, L.P., et al.,

11                    Defendants.

12  - - - - - - - - - - - - - - - - X

13  COMPLETE CAPTION ON PAGE 2

14  - - - - - - - - - - - - - - - - X

15   VOLUME I                          Pages 1-542

16

17         DEPOSITION OF RUSSELL PORTENOY, M.D.

18         Thursday, January 24, 2019, 10:49 a.m.

19                Shaheen & Gordon, P.A.

20                  107 Storrs Street

21             Concord, New Hampshire 03301

22

23   -- Reporter: Kimberly A. Smith, CSR, CRR, CRC, RDR --

24             Realtime Systems Administrator

25                 U.S. Legal Support
```

 1    conferences, which amounted, I believe, to eight

 2    large conferences over ten years, were focused on

 3    this interface between chronic pain and chemical

 4    dependency.  And typically more than half of that

 5    two-and-a-half-day conference was focused on

 6    addiction issues.

 7        Q.  How about issues of diversion?

 8        A.  At those conferences?

 9        Q.  Yes.

10        A.  To my recollection, we invited speakers to

11    those conferences, individuals from law enforcement

12    that would help educate the audience, which the

13    audience comprised professionals, mostly physicians.

14            And the goal was to try to enhance

15    communication between law enforcement and physicians

16    so that physicians would understand what law

17    enforcement's expectations were with respect to

18    monitoring for diversion and what to do if it was to

19    occur, and reciprocally to try to educate people in

20    law enforcement about the medical community's issues

21    in trying to treat chronic pain.

22        Q.  So would it be fair to say that the opioid

23    manufacturer provided you or your institutions

24    funding to facilitate education that directly went

25    to the risk associated with opioid prescribing?

```
 1              MR. BECKWORTH:  Objection.

 2              MS. SPENCER:  You can answer.

 3              THE WITNESS:  Yes.  That's true.

 4   BY MR. EHSAN:

 5      Q.  So that would be focusing on the negative

 6   or the risk side of chronic opioid use, correct?

 7      A.  Yes.

 8      Q.  Now, doctor, we've gone through a whole lot

 9   of science nerdy stuff, so I will try to distill

10   some of that down because sometimes I get into that

11   conversation and now it's just the two of us talking

12   and no one else understands what we're saying.  But

13   maybe others do.

14              MR. BECKWORTH:  Objection.  Disrespectful

15   to the 12 people in the jury box.

16   BY MR. EHSAN:

17      Q.  Doctor, would it be fair to say that at all

18   times, you provided the best possible and most

19   accurate information in your speaking -- Strike

20   that.  Let me start more broadly.

21              You received money from opioid

22   manufacturers, correct?

23      A.  Yes.

24      Q.  It never influenced anything you said with

25   respect to saying something you didn't believe was
```

1   accurate, correct?

2        A.  Correct.

3        Q.  You also received funding for publications,

4   correct?

5        A.  When you say "publications," you need to be

6   more specific.

7        Q.  Sure.  You received funding for studies,

8   correct?

9        A.  Yes.  Research studies.

10       Q.  Research studies.  And those fundings never

11   dictated to you anything about the conclusions or

12   your findings, correct?

13       A.  That's correct.

14       Q.  You gave a significant number of talks

15   related to opioid use; is that correct?

16       A.  Yes.

17       Q.  And in all of those talks, you tried to

18   present a fair and balanced presentation of the

19   science as we understood it at the time, correct?

20       A.  Yes.

21       Q.  Likewise, you never attended any speaking

22   engagement regardless of the context in which a

23   speaker provided information related to the use of

24   opioids that you did not find -- that you found to

25   be problematic or inappropriate or inaccurate,

 1    correct?

 2         A.   I don't recall any.

 3         Q.   You have, in fact, given talks about

 4    addiction, abuse, and diversion, correct?

 5         A.   I have given talks that have included

 6    information about those areas, yes.

 7         Q.   Well, you have put on talks or conferences

 8    that address abuse, addiction, and diversion,

 9    correct?

10         A.   Yes.

11         Q.   And some of those talks were funded by

12    opioid manufacturers, correct?

13         A.   Yes.

14         Q.   As best as you recall, the labeling for

15    opioid medications included a section on the risks

16    and the benefits of the medication, correct?

17         A.   Yes.

18         Q.   And those included, at least in the 2000s

19    time period that we specifically talked about, a

20    discussion about addiction, diversion, and abuse,

21    correct?

22         A.   Yes.

23         Q.   And at least in the couple of instances

24    that you recalled, in a boxed warning, correct?

25         A.   Yes.