# EXHIBIT 18

Highly Confidential - Subject to Further Confidentiality Review

```
 1               UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
 3                          - - -
 4    IN RE:  NATIONAL           )
      PRESCRIPTION OPIATE        )   MDL No. 2804
 5    LITIGATION                 )
      _____)      Case No. 1:17-MD-2804
 6                               )
      THIS DOCUMENT RELATES      )
 7    TO ALL CASES               )   Hon. Dan A. Polster
 8
 9                          - - -
10               Friday, January 25, 2019
11        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12                 CONFIDENTIALITY REVIEW
13              ATTORNEYS' EYES ONLY PORTIONS
14                          - - -
15
16        Videotaped deposition of Bruce Ritchie,
17   held at Robbins Geller Rudman & Dowd LLP, 120 East
18   Palmetto Park Road, Suite 50, Boca Raton, Florida,
19   33432, commencing at 8:40 a.m., on the above date,
20   before Karen Kidwell, Registered Merit Reporter,
21   Certified Realtime Reporter.
22                          - - -
23
24               GOLKOW LITIGATION SERVICES
                877.370.3377 ph | 917.591.5672 fax
25                    deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. ACKERMAN:

2    Q.  When that vendor suggested topics for the
3  advisory board, did the vendor also suggest
4  presenters who would present on those topics?

5    A.  Yes.

6    Q.  Did you personally attend presentations at
7  the advisory boards?

8    A.  Yes.

9    Q.  All of them?

10   A.  The majority.

11   Q.  How many prescribers would attend a
12  typical advisory board meeting?

13      MS. STRONG:  Objection to form.

14      THE WITNESS:  I'm not sure of an exact
15  number.  Round about 30 to my best recollection.

16  BY MR. ACKERMAN:

17   Q.  So typically, these were gatherings of
18  less than 100 prescribers?

19   A.  To my best recollection, yes.

20   Q.  Did sales representatives typically attend
21  the advisory board meetings?

22      MS. STRONG:  Objection to form.

23      THE WITNESS:  No.

24  BY MR. ACKERMAN:

25   Q.  Did district managers typically attend the

```
 1   advisory board meetings?
 2        A.   Not at any of the ones I was at.
 3        Q.   Did the advisory boards have a name?
 4        A.   No.  The --
 5        Q.   I didn't mean to interrupt you.
 6        A.   No.  The "advisory board" was the name,
 7   yeah.
 8        Q.   Okay.  And that is how individuals at
 9   Janssen referred to this type of gathering, as an
10   "advisory board"?
11        A.   Members of the brand, yes.
12        Q.   So the next topic says "Business plan
13   development" on Exhibit 1.  Do you see that?
14        A.   Yes.
15        Q.   What was your involvement with business
16   plan development?
17        A.   So in one of the years, and I'm not sure
18   which one it was, I was responsible for coordinating
19   the plan.  So it was more the -- it was sort of
20   essentially compiling the different inputs from a
21   variety of people into the finished version.
22        Q.   Okay.  And then if you move to bullet
23   points underneath "Product director for analgesia,"
24   it says:  "Created and implemented strategies that
25   helped the brand maintain significant market share
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   even while facing generic competition."
 2          Do you see that?
 3      A.  I do.
 4      Q.  Is that an accurate description of your
 5   job performance as product director of analgesia?
 6      A.  For one of the years, yes.
 7      Q.  And what were these strategies that you
 8   created and implemented that are -- that you're
 9   referring to, that are referred to in this document?
10      A.  The biggest campaign was a grow and defend
11   campaign.
12      Q.  And what was the grow and defend campaign?
13      A.  It was designed to maintain Duragesic
14   market share while generic products came to market.
15   But there was a second phase.  There was a unique
16   situation that the generic was a different
17   formulation to the branded product, and we had
18   customers that liked a reservoir patch, and you had a
19   matrix patch coming into the mix, so there was
20   uncertainty as to how that product would work when it
21   was different to what they were used to using.
22      Q.  So the -- at this time, the Duragesic was
23   a reservoir patch; is that correct?
24      A.  That's correct.
25      Q.  And what does that mean, a "reservoir
```

```
 1   patch"?
 2       A.   The construction of the patch is that
 3   there's multiple layers in the patch.  One of those
 4   layers is fentanyl, but there are some other mixes in
 5   there.  The -- so the reservoir -- that reservoir
 6   formulation allowed for a steady state of drug
 7   delivered over a period of time.
 8            It also, due to the reservoir nature, was
 9   a lot more difficult to extract any fentanyl out of
10   the patch with a needle because you wouldn't show you
11   where it was or how much you could get, so it
12   became -- it was a formulation that doctors trusted.
13       Q.   And the generic was a matrix patch; is
14   that correct?
15       A.   There were two generics:  One was a matrix
16   patch, and one was a reservoir patch.
17       Q.   What is a "matrix patch"?
18       A.   I'm no scientist, but it's essentially
19   just a single layer.  There's no reservoir.  It's
20   just a transfer, like a sticker.
21       Q.   Was it -- was the matrix patch
22   cross-hatched in any way?
23            MS. STRONG:  Objection to form.
24            THE WITNESS:  I have no idea.
25
```