# EXHIBIT 24

**OPINIONS OF THE COUNCIL ON ETHICAL AND JUDICIAL AFFAIRS**

The following opinions, 1–2, were presented by Sharon P. Douglas, MD, Chair:

**1. FINANCIAL RELATIONSHIPS WITH INDUSTRY IN CONTINUING MEDICAL EDUCATION**

*Reference committee hearing: see report of [Reference Committee on Amendments to Constitution and Bylaws](#).*

**HOUSE ACTION:    FILED**
                   See Opinion [E-9.0115](#).

INTRODUCTION

At the 2011 Annual Meeting, the American Medical Association House of Delegates adopted the recommendations of Council on Ethical and Judicial Affairs Report 1-A-11, "Financial Relationships with Industry in Continuing Medical Education." The Council issues this Opinion, which will appear in the next version of AMA PolicyFinder and the next print edition of the *Code of Medical Ethics*.

E-9.0115 Financial Relationships with Industry in Continuing Medical Education

In an environment of rapidly changing information and emerging technology, physicians must maintain the knowledge, skills, and values central to a healing profession. They must protect the independence and commitment to fidelity and service that define the medical profession.

Financial or in-kind support from pharmaceutical, biotechnology or medical device companies that have a direct interest in physicians' recommendations creates conditions in which external interests could influence the availability and/or content of continuing medical education (CME). Financial relationships between such sources and individual physicians who organize CME, teach in CME, or have other roles in continuing professional education can carry similar potential to influence CME in undesired ways.

CME that is independent of funding or in-kind support from sources that have financial interests in physicians' recommendations promotes confidence in the independence and integrity of professional education, as does CME in which organizers, teachers, and others involved in educating physicians do not have financial relationships with industry that could influence their participation. When possible, CME should be provided without such support or the participation of individuals who have financial interests in the educational subject matter.

In some circumstances, support from industry or participation by individuals who have financial interests in the subject matter may be needed to enable access to appropriate, high-quality CME. In these circumstances, physician-learners should be confident that vigorous efforts will be made to maintain the independence and integrity of educational activities.

Individually and collectively physicians must ensure that the profession independently defines the goals of physician education, determines educational needs, and sets its own priorities for CME. Physicians who attend CME activities should expect that, in addition to complying with all applicable professional standards for accreditation and certification, their colleagues who organize, teach, or have other roles in CME will:

(a)  be transparent about financial relationships that could potentially influence educational activities.

(b)  provide the information physician-learners need to make critical judgments about an educational activity, including:

    (i)   the source(s) and nature of commercial support for the activity; and/or

    (ii)  the source(s) and nature of any individual financial relationships with industry related to the subject matter of the activity; and

© 2012 American Medical Association. All rights reserved.

    (iii) what steps have been taken to mitigate the potential influence of financial relationships.

  (c) protect the independence of educational activities by:

    (i) ensuring independent, prospective assessment of educational needs and priorities;

    (ii) adhering to a transparent process for prospectively determining when industry support is needed;

    (iii) giving preference in selecting faculty or content developers to similarly qualified experts who do not have financial interests in the educational subject matter;

    (iv) ensuring a transparent process for making decisions about participation by physicians who may have a financial interest in the educational subject matter;

    (v) permitting individuals who have a substantial financial interest in the educational subject matter to participate in CME only when their participation is central to the success of the educational activity; the activity meets a demonstrated need in the professional community; and the source, nature, and magnitude of the individual's specific financial interest is disclosed; and

    (vi) taking steps to mitigate potential influence commensurate with the nature of the financial interest(s) at issue, such as prospective peer review. (I, V)

## 2. AMENDMENT TO OPINION E-2.146, "RESEARCH WITH STEM CELLS"

*Ethical opinion; no reference committee hearing.*

**HOUSE ACTION:     FILED**
                        *See Opinion E-2.146.*

INTRODUCTION

At the 2011 Annual Meeting, the American Medical Association House of Delegates adopted the recommendations of Council on Ethical and Judicial Affairs Report 5-A-11, "Amendment to Opinion E-2.146, 'Cloning for Biomedical Research.'" The Council issues this Opinion, which will appear in the next version of AMA PolicyFinder and the next print edition of the *Code of Medical Ethics*.

E-2.146 Research with Stem Cells

  Human stem cells are widely seen as offering a source of potential treatment for a range of diseases and are thus the subject of much research. Clinical studies have validated the use of adult stem cells in a limited number of therapies, but have yet to confirm the utility of embryonic stem cells.

  Physicians who conduct research using stem cells obtained from any source (established tissue, umbilical cord blood, or embryos) must, at a minimum:

a.  adhere to institutional review board (IRB) requirements;

b.  ensure that the research is carried out with appropriate oversight and monitoring;

c.  ensure that the research is carried out with appropriate informed consent. In addition to disclosure of research risks and potential benefits, at minimum, the consent disclosure should address:

    (i) for a donor of cells to be used in stem cell research:

      (a) the process by which stem cells will be obtained;

© 2012 American Medical Association. All rights reserved.

    (b)  what specifically will be done with the stem cells;

    (c)  whether an immortal cell line will result; and

    (d)  the primary and anticipated secondary uses of donated embryos and/or derived stem cells, including potential commercial uses.

(ii) for a recipient of stem cells in clinical research:

    (a)  the types of tissue from which the stem cells derive (e.g., established tissue, umbilical cord blood, or embryos); and

    (b)  unique risks posed by investigational stem cell products (when applicable), such as tumorigenesis, immunological reactions, unpredictable behavior of cells, and unknown long-term health effects.

The professional community as well as the public remain divided about the use of embryonic stem cells for either research or therapeutic purposes. The conflict regarding research with embryonic stem cells centers on the moral status of embryos, a question that divides ethical opinion and that cannot be resolved by medical science. Regardless whether they are obtained from embryos donated by individuals or couples undergoing in vitro fertilization, or from cloned embryos created by somatic cell nuclear transfer (SCNT), use of embryonic stem cells currently requires the destruction of the human embryo from which the stem cells derive.

The pluralism of moral visions that underlies this debate must be respected. Participation in research involving embryonic stem cells requires respect for embryos, research participants, donors, and recipients. Embryonic stem cell research does not violate the ethical standards of the profession. Every physician remains free to decide whether to participate in stem cell research or to use its products. Physicians should continue to be guided by their commitment to the welfare of patients and the advancement of medical science.

Physicians who conduct research using embryonic stem cells should be able to justify greater risks for subjects, and the greater respect due embryos than stem cells from other sources, based on expectations that the research offers substantial promise of contributing significantly to scientific or therapeutic knowledge. (V)

© 2012 American Medical Association. All rights reserved.

Case: 1:17-md-02804-DAP  Doc #: 1930-26  Filed: 07/19/19  6 of 17.  PageID #: 98683

**REPORTS OF THE COUNCIL ON ETHICAL AND JUDICIAL AFFAIRS**

The following reports, 1–2, were presented by Sharon P. Douglas, MD, Chair:

**1. PHYSICIAN STEWARDSHIP OF HEALTH CARE RESOURCES**

*Reference Committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:    REFERRED**

US health care spending reached 17.6 percent of gross domestic product (GDP) in 2009,[1] almost double that of other industrialized countries.[2] This level of spending presents an enormous burden for federal and state governments, businesses, families, and individuals.[2] The high cost of health care imperils access to care,[3,4] and access is likely to worsen if costs continue to outpace incomes.[5]

This report by the Council on Ethical and Judicial Affairs (CEJA) examines the role physician treatment decisions play in overall health care costs and analyzes physicians' obligation to manage health care resources wisely. It provides ethical guidance to support physicians in making fair, prudent, cost-conscious decisions for care that meet the needs of individual patients and help to ensure availability of health care for others.

The focus of the report is on physicians' recommendations and decisions in everyday situations that are often overlooked, in which physicians' choice of one among several reasonable alternatives can affect the availability of resources across the community of patients or the aggregate cost of care in the community. (For example, ordering a serum pregnancy test instead of a urine pregnancy test, which costs substantially more but for the majority of patients does not provide significant additional benefit.)

These everyday decisions are distinct from triage decisions, in which multiple patients compete for a clearly defined set of limited resources—e.g., in a pandemic or natural disaster. Decision making under such conditions has been discussed at some length in the literature and is addressed in Opinion E-9.067, "Physician Obligation in Disaster Preparedness and Response" (AMA Policy Database). Everyday choices are also distinct from "high stakes" decisions about interventions that can mean life or death for patients or forestall extremely poor outcomes, such as decisions to initiate mechanical ventilation in emergent circumstances when the patient's prognosis is uncertain. Arguably, in situations when there is significant risk of harm, cost considerations, if they play a role at all, are better addressed through collectively designed policy than left to individual decisions physicians must grapple with at the bedside.

TREATMENT DECISIONS, HEALTH CARE SPENDING & BENEFIT TO PATIENTS

Numerous factors drive the overall cost of health care, many of which are beyond the control of individual physicians. These include high administrative costs;[2,7] population trends (such as aging or obesity[2]); malpractice liability costs; patient expectations and demands; and high prices of drugs, devices, and hospital and professional services.[2,7] Other cost drivers, however, such as extensive use of new technologies[8] and high intensity of services provided at each patient encounter,[2,7] are influenced by physician choices.

Physician orders and recommendations play a significant role in determining which services and how many services patients receive; without a physician's assent clinical orders or policies generally cannot be implemented.[9] To this extent, physicians have an opportunity to affect health care spending overall. Documented regional variations in Medicare spending are explained in part by variations in physician practice patterns.[10,11] Higher spending regions and institutions have been shown to have higher intensity care, greater use of hospitals and intensive care units, and more utilization of specialists, tests, and minor procedures.[12-14] Practice differences seem to be less for interventions for which there are established guidelines, and more for the "discretionary" interventions that physicians recommend.[11]

More intensive and/or costlier services do not necessarily lead to better health outcomes.[12-17] In fact, lower spending regions appear to have better outcomes on certain measures, such as those developed by the Medicare Quality Improvement Organization.[8,10,15,17,18] In many domains, the services that yield the greatest benefits to

© 2012 American Medical Association. All rights reserved.

health are not the factors that drive up costs, and the services that tend to drive up costs are not the ones that yield the greatest benefits to health, at least when measured at the population level.[18]

STEWARDSHIP AS AN OBLIGATION OF PROFESSIONAL ETHICS

Stewardship refers to the obligation to provide effective medical care through prudent management of the public and private health care resources with which physicians are entrusted.[6] This obligation flows both from the influence that physician decisions and recommendations have on health care costs and from core ethical obligations of physicians as professionals.

Physicians' primary ethical obligation, of course, is to protect and promote the well-being of individual patients (Principle VI, AMA Principles of Medical Ethics). However, it has long been recognized that physicians also have a responsibility to patients in general, to promote the public health (Principle VII) and access to care for all patients (Principle IX).

Historically, medicine as a learned profession has been understood to have a social responsibility to use knowledge and skills to enhance the common good,[21-23,24] including obligations to protect public health and safety, even if this might require restricting the liberties of individual patients (Opinion E-2.25, "The Use of Quarantine and Isolation as Public Health Measures"; Opinion E-2.24, "Impaired Drivers and Their Physicians"). Similarly, the *Code of Medical Ethics* recognizes that without compromising their primary obligation, physicians should be conscious of the costs of care (Opinion E-2.09, "Costs"); that they should consider the needs of broader patient populations (Opinion E-8.054, "Financial Incentives and the Practice of Medicine"); and that they should not provide treatment that is "willfully excessive" (Opinion E-4.04, "Economic Incentives and Levels of Care"). The profession's authority rests on fulfillment of these commitments.[25]

Arguments that physicians should never allow considerations other than the welfare of the patient before them to influence their professional recommendations and treatment[19,20] do not mesh with the reality of clinical practice. Physicians regularly work with a variety of limits on care: clinical practice guidelines, patient preferences, availability of certain services, the benefits covered by a patient's insurance plan, and the time physicians and nurses can spend caring for a patient all influence what interventions physicians recommend and what care they provide. Physicians also regularly confront the effects of uneven or unfair distribution of health care resources in their day-to-day practice. They express moral distress about having to provide different levels of care for those who are uninsured or grossly underinsured than they provide for patients with adequate insurance coverage. They witness the adverse consequences for their patients when needed resources (e.g., particular specialists, hospital beds, imaging equipment) are too scarce.[27] As frontline providers, physicians are in a position to identify unacceptably restricted resources in their community.

MAKING COST-CONSCIOUS DECISIONS

There is broad consensus that physicians should first take medical need into consideration when making recommendations and providing care. Physicians are expected to refrain from offering or acceding to patients' requests for interventions or diagnostic tests that are medically unnecessary (E-2.19, "Unnecessary Medical Services") or that cannot reasonably be expected to benefit the patient (E-2.035, "Futile Care"). Physicians are likewise expected to provide—or advocate vigorously for—interventions that will clearly benefit the patient or clearly avert significant harm. However, between these two ends of the spectrum, physicians face decisions about whether to recommend or provide interventions that offer some increment of benefit, but which perhaps pose additional risks or substantial additional financial cost.[29] It is in this grey zone of marginal benefit that principles for wise stewardship should help shape decisions about care.

Making cost-conscious decisions is not far removed from the professional judgments physicians already make. Physicians routinely decide whether interventions with small benefits are worthwhile, whether diagnostic tests need to be STAT or routine, whether a patient needs to be seen urgently or routinely, whether the public health impact of a broad spectrum antibiotic is justified for a certain infection, and whether patient requests for expensive interventions are justified.[30-31] Reasonable criteria to guide cost-conscious decisions in routine care include the likelihood of benefit for the patient and the anticipated degree and duration of benefit, including change in quality of life (E-2.03, "Allocation of Limited Medical Resources").

© 2012 American Medical Association. All rights reserved.

Physicians should be aware of the relative strength of the evidence for anticipated benefits. Well-designed clinical practice guidelines, such as those available through the National Guideline Clearinghouse,[32] or quality measures, such as those developed by the AMA-convened Physician Consortium for Performance Improvement® (PCPI™),[33] should provide a baseline for treatment recommendations.

But guidelines should never simply supplant professional judgment. Physicians have a responsibility to argue for the course of care they judge most appropriate for the individual patient based on the patient's unique clinical circumstances (e.g., E-8.13, "Managed Care"; E-8.135, "Cost Containment Involving Prescription Drugs in Health Care Plans"). Even the most evidence-based guidelines cannot take into account the tremendous variety physicians encounter caring for individual patients.[28] A guideline that suggests a particular service is not "needed" may be well justified for most patients, but physicians will inevitably care for patients who qualify as legitimate, justifiable exceptions, clinically and ethically.

Similarly, for a specific patient, guidelines or standards of care might describe services that are unnecessary because of individual patient details. For example, current quality measures stipulate the frequency of lipid testing and use of lipid-lowering medication for diabetics. However, as is often mentioned in guidelines, co-morbid conditions (e.g., a life-limiting disease not related to diabetes or heart disease) can justify less testing or discontinuation of medication. Conversely, younger diabetics, who have more years in which to develop end-organ damage, might be treated more aggressively in many ways than older ones, sometimes more aggressively than guidelines (or quality measures) describe for the "average" diabetic. Likewise, screening that may be generally recommended for various cancers (especially slowly developing cancers) may have less clinical value for patients of advanced age or who have significant co-morbidities than for younger or healthier patients, for whom earlier detection and intervention may offer greater clinical benefit or may be better able to bear the burdens of treatment.[29]

When guidelines are not available, determining whether a particular intervention is worthwhile for an individual patient necessarily rests heavily on physicians' professional judgment. Such determinations may differ from patient to patient and for an individual patient as his or her clinical situation changes. To the extent that physicians' primary task at each patient encounter is to heal, physicians should judge the necessity of an intervention based on its ability to cure, to relieve suffering, or to cultivate health—but always to care.[34]

While the default presumption is that physicians should honor patients' wishes with respect to treatment (E-10.01, "Fundamental Elements of the Patient-Physician Relationship"), patient values and preferences should be balanced against considerations of stewardship. Patients with health care insurance rarely face the entire cost of their care, and in any individual situation they may not recognize or value the need to restrain spending. When patients or their families argue for an intervention the physician deems to offer marginal benefit, physicians should strive to help them articulate goals for care and to help them form realistic expectations about whether the intervention is likely to achieve those goals.

For example, a particular patient or family might request off-label use of an expensive chemotherapeutic agent as an adjunct to standard therapy.[35] Physicians should be mindful that patient expectations for particular treatments or procedures can be shaped by many influences, including the advice of family and friends, online information, direct-to-consumer advertising,[36,37] and, of course, a wish to do "something" that might increase their overall survival. Many of these influences are not tailored to the patient's immediate clinical needs, and naturally most are not sensitive to considerations of cost or fairness.

Physicians' knowledge of what care their patients need (and how urgently they may need it), along with their firsthand experience with the consequences for patients when those needs are not met, means physicians can well appreciate the importance of allocating health care resources responsibly. In making treatment recommendations for individual patients, physicians should be aware of and consider the level of resources needed to achieve the patient's goals. When alternative courses of action offer similar likelihood and degree of benefit but require different levels of resources, choosing the less costly course of action can help preserve resources for the benefit of patients overall (E-8.135; E-8.054, "Financial Incentives and the Practice of Medicine").

Physicians should take the time to be transparent and honest in counseling patients about alternatives—including less costly care—instead of deferring to patients' requests for care that are not consistent with the physician's considered professional judgment. Honesty and transparency are critical to maintaining patient trust; patients are vulnerable and rely heavily on the physician's competence and good will.[38] In today's busy practice environment,

© 2012 American Medical Association. All rights reserved.

it may be expedient for physicians simply to provide what a patient asks for regardless of medical need. Yet such expediency does not serve patient interests well, because it often does not lead to more efficient or higher quality care.

Physicians should make all reasonable efforts to resolve persistent disagreements about whether a particular treatment or procedure is cost worthy in the patient's situation. Physicians should consider consulting with a colleague or seeking an ethics consultation, for instance. If all efforts to resolve the disagreement fail, the patient may wish to seek care elsewhere. While it may be justifiable to terminate the patient-physician relationship, this should be a last resort and appropriate measures should be taken to ensure continuity of care (Opinions E-8.115, "Termination of the Patient-Physician Relationship"; E-8.11, "Neglect of Patient"; E-10.01, "Fundamental Elements of the Patient-Physician Relationship").[39-41] Physicians are under no obligation to provide interventions simply because patients request them (E-2.035).

OBSTACLES TO PHYSICIAN STEWARDSHIP: A ROLE FOR THE PROFESSION

Many physicians generally recognize an obligation to distribute limited resources responsibly, but struggle with when and how to take this into account when considering individual treatment decisions.[42] They face a variety of obstacles in trying to fulfill the ethical obligation to be prudent stewards, including lack of knowledge about the costs of interventions and the impact of their individual recommendations and decisions, the complexity of the systems in which health care is delivered, and concerns about potential medical liability if they fail to order a test or intervention.[43] Individual physicians cannot and should not be expected to resolve the challenges of wisely managing health care resources and rising health care costs solely "at the bedside." Medicine as a profession has an equal obligation to help create conditions for practice that make it feasible for physicians to be prudent and trustworthy stewards.

Physicians need to be knowledgeable about health care costs and how their individual decisions can affect overall health care spending (Policy H-155.998, "Voluntary Cost Containment"). Education for medical students and practicing physicians alike should include discussion of costs. Physicians also need to understand how their individual decisions affect institutional resources in the aggregate. Health care administrators and organizations should make costs transparent to participating physicians to enable them to make well-informed decisions as stewards.

Other systemic factors, such as the perceived need to practice "defensive medicine," also work to undermine stewardship. The professional responsibility and ethical duty to practice medicine in a manner that is respectful of the finite nature of health care resources does not confer a legal duty to withhold or administer any particular treatment or diagnostic procedure. Rather, responsible stewardship upholds the principle that clinical expertise should be integrated with the best information from scientifically based, systematic research and applied in light of the patient's values and circumstances.[26] Medicine as a profession has an important role to play in advocating for policies that address concerns about medical liability and other systemic factors that impede responsible stewardship.

Every physician must be able to trust that the colleagues to whom he or she refers patients will exercise prudent stewardship in making recommendations about a patient's care. Given the complex structures in which health care is now delivered, responsible stewardship by one will have little overall effect if responsible stewardship is not practiced by all. Medicine must commit itself to nurturing a culture of accountability, in which health care expenditures are directed toward providing high quality care to meet the needs of individual patients in ways that preserve resources to enable physicians to better meet the needs of all.

RECOMMENDATION

The Council recommends that the following be adopted and the remainder of this report be filed:

> Physicians' primary ethical obligation is to promote the well-being of individual patients. Physicians also have long-recognized responsibilities to patients in general, to promote public health and access to care for all patients. These responsibilities require physicians to be prudent stewards of the shared societal resources with which they are entrusted. This ethical obligation to manage health care resources responsibly is compatible with the professional commitment to serve the interests of individual patients.

© 2012 American Medical Association. All rights reserved.

To fulfill their obligation of stewardship physicians should:

(a)  Base recommendations and decisions on patients' medical needs;

(b)  When available, use scientifically grounded evidence to inform professional decisions;

(c)  Help patients articulate their goals for care and help patients and their families form realistic expectations about whether a particular intervention is likely to achieve those goals;

(d)  Endorse recommendations that offer reasonable likelihood of achieving the patient's goals;

(e)  When alternative courses of action offer similar likelihood and degree of benefit but require different levels of resources, choose the course of action requiring fewer resources;

(f)  Be transparent about alternatives, including disclosing when resource constraints play a role in decision making; and

(g)  Participate in efforts to resolve persistent disagreement about whether a costly intervention is worthwhile, which may include seeking second opinions or consulting with an ethics committee or other appropriate resource.

Physicians are in a unique position to affect health care spending. But individual physicians cannot and should not be expected to address the systemic challenges of wisely managing health care resources. Medicine as a profession must create conditions for practice that make it feasible for individual physicians to be prudent stewards by:

(h)  Ensuring that physician education enables physicians to be informed about health care costs and how their behavior can affect overall health care spending;

(i)  Encouraging health care administrators and organizations to make cost data transparent (including cost accounting methodologies) so that physicians can exercise well-informed stewardship; and

(j)  Advocating for policy changes, such as medical liability reform, that promote professional judgment and address systemic barriers that impede responsible stewardship.

REFERENCES

1. Centers for Medicare & Medicaid Services, Office of the Actuary, National Health Statistics Group; and U.S. Department of Commerce, Bureau of Economic Analysis and Bureau of the Census. *National Health Expenditure Data: Historical.* 2009.
2. Peterson C, Burton R. U.S. *Health Care Spending: Comparison with Other OECD Countries*. Washington, D.C.: Congressional Research Service; 2007.
3. Schoen C, Doty MM, Collins SR, Holmgren AL. Insured but not protected: how many adults are underinsured: *Health Aff (Millwood)*. Jan-Jun 2005;Suppl Web Exclusives: W5-289-W285-302.
4. Bodenheimer T. High and rising health care costs. Part 1: seeking an explanation. *Ann Inter Med.* May 17 2005;142(10):847-854
5. Centers for Medicare & Medicaid Services. *National Health Expenditure Projections 2008-2018: Forecast Summary* 2007.
6. Larkin GL, et al. Resource utilization in the emergency department: the duty of stewardship. *J Emerg Med*. 1998;499-503.
7. Bodenheimer T. High and rising health care costs. Part 3: the role of health care providers. *Ann Intern Med*. Jun 21 2005;142(12 Pt 1):996-1002.
8. Bodenheimer T. High and rising health care costs. Part 2: technologic innovation. *Ann Intern Med*. Jun 7 2005;142(11):932-937
9. Pellegrino E, Thomasma D. *The Virtues in Medical Practice*. New York: Oxford University Press; 1995.
10. Fisher ES, Bynum JP, Skinner JS. Slowing the growth of health care costs-lessons from regional variation. *N Engl J Med*. Feb 26 2009;360(9):849-852.
11. Sirovich B, Gallagher PM, Wennberg DE, Fisher ES. Discretionary decision making by primary care physicians and the cost of U.S. health care. *Health Aff (Millwood)*. May-Jun 2008;27(3):813-823.
12. Yasaitis L, Fisher ES, Skinner JS, Chandra A. Hospital quality and intensity of spending: is there an association? *Health Aff (Millwood)*. Jul-Aug 2009;28(4):w566-572

© 2012 American Medical Association. All rights reserved.

13. Fisher ES, Wennberg DE, Stikel TA, Gottlieb DJ, Lucas FL, Pinder EL. The implications of regional variations in Medicare spending. Part 1: the content, quality, and accessibility of care. *Ann Intern Med*. Feb 18 2003;138(4):273-287.
14. Fisher ES, Wennberg DE, Stikel TA, Gottlieb DJ, Lucas FL, Pinder EL. The implications of regional variations in Medicare spending. Part 2: health outcomes and satisfaction with care. *Ann Intern Med*. Feb 18 2003;138(4):288-298.
15. Gawande, A. The cost conundrum: What a Texas town can teach us about health care. *The New Yorker*. Jun 1 2009.
16. Fischer MA, Avorn J. Economic implications of evidence-based prescribing for hypertension: can better care cost less? *JAMA*. Apr 21 2004;291(15):1850-1856.
17. Baiker K, Chandra A. Medicare spending, the physician workforce, and beneficiaries' quality of care. *Health Aff (Millwood)*. 2004;Suppl Web Exclusives:w184-197.
18. Skinner JS, Staiger DO, Fisher ES. Is technological change in medicine always worth it? The case of acute myocardial infarction. *Health Aff (Millwood)*. Mar-Apr 2006;25(2):w34-47.
19. Pellegrino ED. The commodification of medical and health care: the moral consequences of a paradigm shift from a professional to a market ethic. *J Med Philos*. Jun 1999;24(3):243-266.
20. Lauridsen S. Administrative Gatekeeping – a third way between unrestricted patient advocacy and bedside rationing. *Bioethics*. Apr 11 2007.
21. House of Delegates of the American Medical Association. Declaration of Professional Responsibility: Medicine's Social Contract with Humanity; December 4 2001.
22. Medical professionalism in the new millennium: a physician charter. *J Am Coll Surg*. Jan 2003;196(1):115-118.
23. AMA Council on Ethical and Judicial Affairs. *Code of Medical Ethics of the American Medical Association*. 2008-2009 ed. Chicago, IL: American Medical Association; 2008.
24. American Medical Association. *Code of Medical Ethics of the American Medical Association*. 1847.
25. Sullivan W. What is left of professionalism after managed care? *Hastings Cent Rep*. 1999;29(2):7-13.
26. Goold SG. Doctors' views on rationing: commentary. Slides presented to the Council for Ethical and Judicial Affairs of the American Medical Association. June 2009; Chicago, IL.
27. Institution of Organized Medicine. Knowing What Works in Health Care: A Roadmap for the Nation. Washington, DC: National Academies Press;2008.
28. O'Reilly K. Informed consent: Hospitals explore personalizing risks. *A Med News*. May 17 2010
29. Quanstrum KH, Hayward RA. Lessons from the mammography wars. *NEJM*. Sep 9 2010;363(11):1076-1079.
30. Hurst SA, Danis M. A framework for rationing by clinical judgment. *Kennedy Inst Ethics J*. Sep 2007;17(3):247-266
31. Jain MK. For doctors, rationing care is standard practice. *The Washington Post*. Aug 5 2009.
32. Agency for Healthcare Research and Quality. National Guideline Clearinghouse: Mission Statement. http://www.guideline.gov/about/mission.aspx.
33. Physician Consortium for Performance Improvement. http://www.ama-assn.org/ama/pub/physician-resources/clinical-practice-improvement/clinical-quality/physician-consortium-performance-improvement.shtml.
34. Pellegrino ED. Professionalism, profession and the virtues of the good physician. *Mt Sinai J Med*. Nov 2002;69(6):378-384.
35. Fojo T, Grady C. How much is life worth: cetuximab, non-small cell lung cancer, and the $440 billion question. *J Natl Cancer Inst*. Aug 5 2009;101(15):1044-1048.
36. Lurie P. DTC Advertising Harms Patients and Should Be Tightly Regulated. *J Law Med Ethics*. Fall 2009;37(3):444-450.
37. Mintzes B, Barer ML, Kravitz RL, et al. Influence of direct to consumer pharmaceutical advertising and patients' requests on prescribing decisions: two site cross sectional survey. *BMJ*. Feb 2 2002;324(7332):278-279.
38. Goold SD, Lipkin M. The Doctor-Patient Relationship: Challenges, Opportunities, and Strategies. *Journal of General Internal Medicine*. 1999;14(S1):26-33.
39. Council on Ethical and Judicial Affairs. Opinion 8.11, Neglect of Patient. *Code of Medial Ethics of the American Medical Association*. 2008-2009 ed. Chicago, IL: American Medical Association; 2008.
40. Council on Ethical and Judicial Affairs. Opinion 8.115, Termination of the Physician-Patient Relationship. *Code of Medial Ethics of the American Medical Association*. 2008-2009 ed. Chicago, IL: American Medical Association; 2008.
41. Council on Ethical and Judicial Affairs. Opinion 10.01, Fundamental Elements of the Patient-Physician Relationship. *Code of Medial Ethics of the American Medical Association*. 2008-2009 ed. Chicago, IL: American Medical Association; 2008.
42. Campbell EG, Regan S, Gruen RL, et al. Professionalism in medicine: results of a national survey of physicians. *Ann Intern Med*. Dec 4 2007;147(11):795-802.
43. Wynia MK, Hotze T, Clement L, Allen A, Wicher J, Tomaszewski KJ. How do physicians think about stewardship in health care? A qualitative national study. Presented at: Society of General Internal Medicine Annual Meeting; May 9, 2011; Phoenix, AZ.

© 2012 American Medical Association. All rights reserved.

## 2. DEFERRAL OF BLOOD DONATION BY MEN WHO HAVE SEX WITH MEN (MSM)

*Informational report; no reference committee hearing.*

**HOUSE ACTION:   FILED**

Policy D-50.997 ("Societal and Ethical Consequences of a Five-Year Blood Donation Deferral Policy for Men Who Have Had Sex With Men," AMA Policy Database) instructs the American Medical Association to work with relevant organizations and agencies "to analyze the societal and ethical consequences of a shift to a five-year deferral policy for blood donation from men who have sex with men [MSM]." To inform that effort, the Council on Ethical and Judicial Affairs was asked to examine ethical considerations with respect to the proposed change in deferral policy. The AMA's Council on Science and Public Health (CSAPH) previously concluded that such a change is scientifically supportable "based on existing scientific evidence and risk assessment models," but that the ethical and social implications of changing deferral policy warranted further exploration.[1,2]

Calls for revisiting the blanket deferral of donation from MSM have argued that it is discriminatory, perpetuates stereotypes and stigma in relation to gay men, and could adversely affect the availability of blood/blood products by eliminating a population of potential blood donors.[3] The request that CEJA analyze ethical implications of broad questions of public policy calls on the Council to consider issues beyond the usual scope of its deliberations, which focus primarily on providing guidance for practicing physicians and setting ethical standards for the profession of medicine. In first looking at these policy matters, CEJA identified the need for ethical analysis of deferral as a strategy to protect the blood supply and criteria for defining ethically justifiable risk with respect to blood safety.[4] The present report examines key ethical issues germane to these questions and to public policy, namely: blood safety, risk assessment, key ethical considerations in public health, and the effect of public policy in perpetuating or ameliorating stigma.

PROTECTING THE SAFETY OF THE BLOOD SUPPLY: DONOR SCREENING

Donor screening and deferral of prospective donors who are at risk for transmitting blood borne pathogens is a key strategy for protecting the safety of the nation's blood supply and the welfare of patients who receive blood products. Screening is one step in the "multi-barrier" approach used to reduce the risk that an infectious unit of blood will be transfused.[5] Additional safety measures include donor education and voluntary self-deferral, donor health assessment, testing of donated blood for known infectious agents, quarantining donated units from distribution until such testing has been undertaken, and ongoing monitoring for emerging blood borne diseases.[5,6]

Screening questionnaires focus on factors associated with risk of infectious disease, including sexual activity, intravenous drug use, and travel or residence in areas in which bloodborne pathogens are endemic, as well as health history, including prior treatment with human cell or tissue products. Deferral periods vary from as little as 8 weeks to indefinite (effectively lifelong) deferral. (Appendix 1) As a strategy for protecting the blood supply, donor screening is predicated on prospective donors' accurate understanding of screening questions and candid self-disclosure; the more so when there is no method reasonably available to test donated units directly.

Although intended to pick out behaviors that pose risk for transfusion-transmitted infections, as currently structured screening questions in use in the US de facto define categories of persons as well. Where the behaviors are socially disvalued—such as use of intravenous drugs or (male) homosexuality, as opposed to, say, residence in the UK between 1980 and 1996—screening questions themselves arguably reinforce negative stereotypes and stigma toward individuals.[7,8,9]

ETHICS & PUBLIC HEALTH

Policies affecting public health and safety are often precautionary—the goal is to anticipate and prevent harm[5]—and must balance multiple, sometimes competing considerations.[10] To be ethically sound, public health policies must meet several key "justificatory conditions": effectiveness, proportionality, necessity, least infringement, and public justification.[10,11] That is, policies must be likely to protect public health; offer public health benefits that outweigh the other values at stake in the situation; be essential to achieving the public health goal, with no reasonable alternatives; and minimize the extent to which other values are infringed. Policymakers have a responsibility to "explain and justify" policy decisions to stakeholders, especially decisions that infringe on other

© 2012 American Medical Association. All rights reserved.

values (e.g., when policy restricts individual autonomy). Sound policies, moreover, rest on careful assessment of risks and treat like risks alike.

*Risk Assessment in Public Policymaking*

With respect to the safety of the blood supply, key considerations for policy are the welfare of those who receive blood products, who will uniquely bear the health risks if infectious units are transfused; the welfare of the community at large, for whom ensuring an adequate blood supply and minimizing the incidence of infectious disease are important interests; and the welfare of blood donors themselves. In addition to being rooted in scientifically well-grounded estimations of risk, such policies must take into account the benefits to be gained by a proposed policy (risk-benefit and risk-risk comparisons) and how risks/burdens and benefits will be distributed among stakeholders.[5,12]

Thus a key initial question is whether and to what extent changing deferral policy would increase the risk of transfusion-transmitted infection. A 2007 analysis by the McLaughlin Centre for Population Health Risk Assessment concluded that there was "no clear evidence" of increased risk with a five-year deferral, although the possibility of a small increase could not be ruled out.[5] CSAPH concluded in 2008 that the available data "suggest that men who have abstained from sex with other men for more than 5 years essentially present no greater risk than the general population."[1]

The benefits looked for from reducing the deferral period for men who have sex with men include an increase in the number of blood donors and decrease in the stigmatization of gay men to which lifetime deferral may contribute. Traditionally, gay men have been reliable donors, and estimates in the UK in 2003 suggested that blood donations would increase by two percent if policy there were changed from lifetime to a one-year deferral.[3] The demand for blood has increased five percent in the last decade, while the pool of eligible donors has decreased from 60 percent of the population to less than 40 percent;[13] but there are at present no published data on the likely impact on numbers of donors of changing to a five-year deferral policy. (One study suggested that changing to a one-year deferral would yield an estimated 219,000 additional units of blood annually.[14])

Who will bear a risk, and whether that risk is voluntary or involuntary, is also germane to policy decisions.[5,15] As the New Zealand Blood Service has noted, "In the blood system, the most vulnerable people are the blood recipients … [who] face an 'imposed risk' around safety and find themselves in a position of having to trust decisions on blood safety made by others, as they frequently have no alternatives other than transfusion."[15] For some, any potential increase in risk, especially involuntary risk, is unacceptable. As the McLaughlin Centre noted, "For most members of the public, the formulation beloved of experts, de minimis risk, simply does not apply, where involuntary risk is concerned. And, if one puts a (very low) number on the risk, it will soon become apparent that no number is low enough."[5] The US Food and Drug Administration (FDA) maintains that any change in policy affecting blood safety must ensure improved or equivalent safety.[16]

When significant social and equity factors are at stake, as in the case of deferral of blood donation by MSM, these "deserve at least as careful attention in an uncertainty analysis as do the technical factors."[5] The extent to which negative stereotypes of gay men are reinforced to the public by the current lifetime deferral process has not been explored empirically. Thus, whether changing from a lifetime to a five-year deferral would affect public attitudes is not known, but doing so might remove one channel through which negative stereotypes can be transmitted.[7,9]

*Treating Like Risks Alike*

A fundamental tenet of ethics is that like cases should be treated alike (and different cases differently). This "principle of formal equality" does not delineate criteria for determining when cases (or individuals) are relevantly alike, nor particular respects in which equals must be treated equally, but only asserts that "whatever aspects are relevant, persons equal in those respects should be treated equally."[10, 17]

Arguably, current deferral criteria violate this principle. In part, they reflect not the contemporary realities of HIV/AIDS, but rather the state of knowledge in the early years of the epidemic, before the disease was well characterized epidemiologically and, importantly, before the advent of the highly sensitive and specific methods now used to test all units of donated blood. In the absence of accurate tests, deferring donation by behaviorally defined populations among whom prevalence of a given infectious disease is high can be justified, as can imposing

© 2012 American Medical Association. All rights reserved.

different deferral periods for different populations on the basis of relative prevalence or rate of transmission of the disease across those populations.

When donated blood can be tested directly, how the donor acquired the infection is not relevant in terms of the threat to the blood supply—each infected donor poses the same, detectable risk outside the "window period" for the given disease. With nucleic acid testing (NAT) that period is now 11 days for HIV.[1] Yet despite mandatory NAT screening of all units of donated blood, under current policy men who have had any sexual contact with another male since 1977 are deferred indefinitely, while heterosexuals who have had sexual contact with anyone known to have HIV/AIDS or women who have had sexual contact with a man who has ever had sexual contact with another male are deferred from donating blood for 12 months (from date of last contact).

In a joint statement to the FDA in March 2006, the AABB, America's Blood Centers, and American Red Cross argued for changing the deferral policy for male to male sex to 12 months to "make that deferral period consistent with the deferral period for other high risk sexual exposures," noting that "[i]t does not appear rational to broadly differentiate sexual transmission via male-to-male sexual activity from that via heterosexual activity on scientific grounds." [18]

New Zealand uses behavioral criteria for donation deferral, and in its 2008 report on behavioral criteria for donor deferral, the New Zealand Blood Service noted policymakers' responsibility to justify treating a group differently on behavioral grounds.[15] The report reaffirmed existing New Zealand policy, which imposes 10-year deferrals (from last occasion) for both men who have had sex with another man and all donors who have worked as sex workers or accepted money or drugs for sex.

Current US criteria are further not able to distinguish between individuals who are at lower or higher risk for infection within, or across, the categories of "at risk" donors the criteria establish. As the Advisory Committee on Blood Safety and Availability (ACBSA) noted in its June 2010 recommendations to the Secretary, Department of Health and Human Services (HHS), "the current donor deferral policies are suboptimal in permitting some potentially high risk donations while preventing some potentially low risk donations" (although the Committee also concluded that current data are not adequate to support a specific policy alternative).[19] To illustrate, known HIV-negative homosexual men in a monogamous relationship are prevented from donating blood, while a woman with multiple partners of unknown status is a high-risk donor for whom there is currently no deferral because this behavior is not targeted by screening questions.

Finally, current deferral criteria may violate the principle of formal equality in construing HIV/AIDS as a uniquely serious health threat to recipients of blood products. HIV infection is hardly insignificant, but with advances in treatment over the past 20 years and more, HIV/AIDS has been transformed from a disease that is lethal in the relatively short term to a chronic illness that can be managed.[20] Yet in this respect, deferral criteria appear still to reflect knowledge—and fears—of the early years of the epidemic. Whether it is justifiable to treat HIV/AIDS differently from, say, Hepatitis C or other chronic illnesses depends on careful comparison not only of risk, but equally of the relative morbidity and mortality associated with each condition and the availability, cost, and burden to patients of treatment.

*Discrimination, Stigma & Public Policy*

It has been argued that lifetime deferral from blood donation wrongfully discriminates against men who have sex with men.[8] It is unclear that current deferral policy is based on illegitimate attitudes (e.g., homophobia) or that it has an unambiguous, decisive discriminatory effect—men who have (or have had) sex with men are at increased risk for HIV.[7] But it has been argued that lifetime deferral does involve discriminatory "expression," that is, it sends a demeaning message; it imparts the idea that "all gay men—including those who practice safe sex and have monogamous relationships—should be treated as if they have HIV."[7]

While there is no "right" to express one's altruism specifically in the form of donating blood, doing so is a "valued social activity,"[15,7] from which men who have (or have ever had) sex with another man are categorically precluded under current deferral policy. Moreover, blood donation campaigns routinely emphasize the "gift of life" and trade in the metaphor that "giving blood makes one morally virtuous," with the corresponding insinuation that "those who do not donate may be morally suspect."[9] Consider that the majority of blood donations occur during

© 2012 American Medical Association. All rights reserved.

drives that take place at workplaces and schools, causing MSM to be concerned about the possible employment or social ramifications of not participating in the process.[21]

Public health policies or programs that arguably create or perpetuate stereotypes give rise to (or sustain) social harms.[11] It has been argued that when policies and practices send the kind of "illegitimate messages" that lifetime deferral does, they "constitute a genuine wrong,"[7] especially when there are other effective methods to achieve the public health goal.

CURRENT POLICY INITIATIVES

In June 2010, the ACBSA declined to recommend changing current deferral policy, but called for further research to "develop and validate candidate alternative policies."[19] The Committee recommended research in several areas, including modifying the donor questionnaire (to better differentiate low versus high risk MSM and heterosexuals), determine the feasibility of donor pre-testing to limit risk, and examine the impact of revised donor criteria on the supply of blood products. Among other efforts, the Committee also recommended linking analysis of demographic, behavioral, and other risk factors to ongoing national hemovigilance for transfusion-transmitted infectious disease markers in donors; adopting pathogen reduction technologies previously recommended; and enhancing donor education programs, especially with respect to high risk behaviors.

In July 2011, HHS outlined actions planned or currently being taken in response to the ACBSA recommendations.[22] These include initiating a baseline study of data on risk of blood transmissible disease in relation to behavioral risk factors in current donors and proposed studies to evaluate donor understanding of the current history questionnaire and to explore attitudes and motivations among men who have a history of sexual contact with men who have donated blood or might donate under a revised deferral policy. Also proposed is design of a screening strategy to permit donation by some MSM through a pilot project involving pre- and post-donation screening for deferred donors. As HHS noted, whether and when proposed research can be implemented is dependent on availability of funding.

CONCLUSION

The foregoing analysis suggests that current US policy and practice with respect to screening and deferral of blood donors is ethically problematic in that it does not clearly treat comparable risks to blood safety in a consistent manner, may unduly restrict the opportunity of some populations to engage in the socially valued activity of blood donation, and perpetuates unfair stereotypes even though it may not be discriminatory in intent or effect.

A comprehensive examination of current policy and practice with respect to blood safety should carefully consider certain key areas, including:

- Comparison of transfusion-transmissible diseases with respect to
    - morbidity & mortality
    - availability of treatment
    - cost of treatment
    - burdens of treatment for the patient
- Likely effects of changes in deferral policy
    - on the donor pool
    - on the adequacy of the blood supply
- Revision of donor screening questions to differentiate low(er) from high(er) risk behaviors
- More thoughtful articulation of deferral criteria to minimize the potential for discrimination

REFERENCES

1. Council on Science and Public Health; American Medical Association. Revision of the lifetime deferral for blood donation of the men who have sex with men (MSM) population. http://www.ama-assn.org/resources/doc/csaph/csaph5a08.pdf. Accessed August 26, 2011.
2. H-50.974, Revision of the lifetime deferral for blood donation of the men who have sex with men (MSM) population, PolicyFinder. Chicago, Illinois: American Medical Association; 2008. https://ssl3.ama-assn.org/apps/ecomm/PolicyFinderForm.pl?site=www.ama-assn.org&uri=%2fresources%2fdoc%2fPolicyFinder%2fpolicyfiles%2fHnE%2fH-50.974.HTM. Accessed August 26, 2011.

© 2012 American Medical Association. All rights reserved.

3. Hurley R. Bad blood: gay men and blood donation. BMJ. 2009; 338.
4. Council on Ethical and Judicial Affairs; American Medical Association. Societal and ethical consequences of a five-year blood donation deferral policy for men who have had sex with men. http://www.ama-assn.org/resources/doc/ethics/ceja-4a11.pdf. Accessed August 26, 2011.
5. Leiss W, Tyshenko M, Krewski, D. Canadian Blood Services. MSM Donor Deferral Risk Assessment: An analysis using risk management principles. http://www.blood.ca/CentreApps/Internet/UW_V502_MainEngine.nsf/resources/Reports/$file/McLaughlin_Report.pdf. Published January 31, 2007. Accessed August 26, 2011.
6. Blood donor screening. FDA Web site. http://www.fda.gov/BiologicsBloodVaccines/BloodBloodProducts/ApprovedProducts/LicensedProductsBLAs/BloodDonorScreening/default.htm. Updated July 21, 2011. Accessed August 26, 2011.
7. Fox D. The expressive dimension of donor deferral. Am J Bioeth. 2010; 10(2): 42-43.
8. Galarneau C. Blood donation, deferral, and discrimination: FDA donor policy for men who have sex with men. Am J Bioeth. 2010; 10(2): 29-39.
9. Klugman CM. Blood donation and its metaphors. Am J Bioeth. 2010; 10(2): 46-47.
10. Childress JF, Faden RR, Gaare RD. Public health ethics: mapping the terrain. J Law Med Ethics. 2002; 30(2): 169-77.
11. Kass NE. An ethics framework for public health and avian influenza pandemic preparedness. Yale J Biol Med. 2005, 78: 235-50.
12. Office of Management and Budget, Office of Science and Technology. Updated principles of risk analysis. Memorandum for the Heads of Executive Departments and Agencies, September 19, 2007. http://www.whitehouse.gov/sites/default/files/omb/assets/regulatory_matters_pdf/m07-24.pdf. Accessed August 29, 2011.
13. Quick Question (Litjen Tan, MS, PhD, email communication, October 15, 2010).
14. Naomi G. Goldberg, Gary J. Gates; the Williams Institute. Effects of lifting blood donation bans on men who have sex with men. http://services.law.ucla.edu/williamsinstitute/publications/FormattedMSM_Goldberg_Gates.pdf. Published June 2010. Accessed August 29, 2011.
15. New Zealand Blood Service. Behavioural donor deferral criteria review. www.nzblood.co.nz. Published April 2008. Accessed August 26, 2011.
16. Food and Drug Administration. Blood donations from men who have sex with men, May 19, 2010. http://www.fda.gov/BiologicsBloodVaccines/BloodBloodProducts/QuestionsaboutBlood/ucm108186.htm. Accessed August 29, 2011.
17. Beauchamp T, Childress J. Principles of Biomedical Ethics. 5th ed. Oxford University Press, Oxford; 2001.
18. AABB. Joint statement before BPAC on behaviour-based blood donor referrals in the era of nucleic acid testing; Blood Products Advisory Committee, March 9, 2006; http://www.aabb.org/pressroom/statements/Pages/bpacdefernat030906.aspx. Accessed August 26, 2011.
19. HHS Advisory Committee on Blood Safety and Availability. Recommendations June 2010. http://www.hhs.gov/ash/bloodsafety/advisorycommittee/recommendations/06112010_recommendations.pdf. Accessed August 26, 2011.
20. Frey JJ. You have no idea. JAMA. 2011;306(5):469–470.
21. Gay Men's Health Crisis. A drive for change: Reforming U.S. blood donation policies. http://www.gmhc.org/files/editor/file/a_blood_ban_report2010.pdf. Accessed August 26, 2011.
22. Health and Human Services (HHS). Activities and Response to Men who have had Sex with other Men (MSM) Blood Donor Deferral Policy Questions. http://www.hhs.gov/ash/bloodsafety/advisorycommittee/recommendations/msm-deferral_qa_20110722-final.pdf. Published July 22, 2011. Accessed August 26, 2011.

APPENDIX

| Deferral of Blood Donation | | |
|---|---|---|
| *Deferral period* | *Risk behavior* | *Disease / pathogen* |
| 8 weeks | Oneself has had<br>• vaccination in the past 8 weeks<br>• contact with someone who had a small pox vaccination in the past 8 weeks | |
| 12 months | Sexual contact with anyone who:<br>• has HIV/AIDS or has had a positive test for HIV<br>• has ever used needles to take drug, steroids, or anything not prescribed by a doctor<br>• has hemophilia or used clotting factor concentrates<br>• has hepatitis | HIV<br>HCV, HBV<br>"(other) infectious diseases" |

© 2012 American Medical Association. All rights reserved.

|  |  |  |
|---|---|---|
|  | • has ever taken money, drugs, other payment for sex<br>• (female) a male who has ever had sexual contact with another mail (from date of last contact) |  |
|  | Oneself had/used:<br>• accidental needlestick<br>• contact with another person's blood<br>• ear / body piercing (except single-use equipment)<br>• tattoo (except sterile needles, non-reused ink)<br>• bone / skin graft<br>• organ, tissue/bone marrow transplant<br>• blood transfusion<br>• syphilis/gonorrhea in the past 12 months | HIV<br>HCV, HBV<br>"(other) infectious diseases" |
|  | Oneself:<br>• lived with a person who has hepatitis<br>• traveled to a country outside US/Canada<br>• traveled to Iraq | Viral hepatitis<br>Malaria<br>Leishmaniasis (Iraq) |
| 3 years | • Is oneself an immigrant / refugee / resident / citizen from outside US / Canada<br>• Has oneself had malaria (3 yrs asymptomatic) | Malaria |
| Indefinite | Is oneself a male who has<br>• had sexual contact with another male since 1977<br>• ever taken money, drugs, other payment for sex since 1977 | HIV<br>HCV, HBV<br>"(other) infectious diseases" |
|  | Oneself has:<br>• ever used needles to take drug, steroids or anything not prescribed by a doctor<br>• used clotting factor concentrates<br>• received a dura matter graft<br>• received a blood transfusion in the UK/France since 1980<br>• spent >/= 3 months (cumulative) in UK, 1980–1996<br>• spent >/= 5 years (cumulative) in Europe since 1980<br>• been a member of the US military/civilian military employee/military dependent, 1980–1996<br>• a relative who has CJD (except neg lab for mutation associated with familiar CJD)<br>• been in juvenile detention / lockup / jail / prison for > 72 hrs<br>• been in Africa | HIV<br>HCV, HBV<br>vCJD<br>CJD<br>"(other) infectious diseases"<br>variant strains HIV (Africa) |
|  | Oneself ever had:<br>• hepatitis<br>• Chagas<br>• babesiosis<br>• malaria<br>• AIDS / positive HIV test<br>• sex with anyone born in/lived in Africa (since 1977) | HCV, HBV<br>Chagas disease<br>Babesiosis<br>Malaria<br>HIV<br>Variant strains HIV (Africa) |

© 2012 American Medical Association. All rights reserved.