# **EXHIBIT 34**

# EXPERT REPORT, ANNA LEMBKE, M.D.

**March 25, 2019**

**MDL No. 2804**

Relating to Case Nos. 17-OP-45004 and 18-OP-45090

*Confidential – Subject to Protective Order*

Comment: As detailed in the Report at Section C7, pseudo-addiction is not a reliable diagnosis; the term pseudo-addiction was developed by a physician (Haddox) who became an executive at Purdue, and a review article found that impartial scientists criticize its usage, whereas authors affiliated with the opioid sellers advocate the concept.

**5.    Opioid dependence is easily reversible**

Comment: Dependence and tolerance are serious physical conditions in themselves, leading to increased doses and addiction in a subset of patients, and to long, slow, and often failed attempts at tapering. The rate of reduction described above, "10% dose reduction per week to more rapid 25% to 50% reduction every few days," would cause extreme suffering in the majority of patients on chronic opioid therapy, and may even lead some to experience suicidal thoughts and/or turn to illicit sources of opioids.

# Anna Lembke, M.D. Report

# APPENDIX II

Summary of Documents from the University of Wisconsin Pain and Policy Study Group (PPSG)

**Anna Lembke, MD**

**APPENDIX II: Documents from the University of Wisconsin Pain and Policy Study Group**

    1.    Documents produced by the University of Wisconsin Pain and Policy Studies Group (PPSG) in this case are supportive of Dr. Joel Saper's statements concerning the relationship between "narcopharma," as he referred to the Industry, and David Joranson, who was Director of the PPSG.  (*See* Report at section C4.) These documents provide evidence that the Industry funded PPSG over a period of many years, and that PPSG, in turn, carried out programs that benefitted the Industry by increasing access to opioids and limiting regulatory scrutiny of prescribing doctors.

    2.    On September 9, 1996, John Stewart wrote an email to Robert Kaiko of Purdue Pharma, recounting a discussion with David Joranson and Sophie Colleau at a pain conference in Vancouver, and Dr. Colleau's follow-up letter that included a reference to a UN report concluding that "the medical need for opioids is far from being met, and recommend[ing] specific steps that should be taken by governments, non-governmental organizations and health professionals- to increase the availability and use of opioids." Stewart informs Kaiko that "In the past, we have provided modest financial support for the Wisconsin Pain Research Group (in the form of annual corporate membership) and would be inclined to provide same ($1,000 to $2,000) toward this activity." Kaiko wrote back "They are seeking support that will not only cover this, but also, subsequent issues of the publication. To date I believe they are planning for 5k from Janssen and from Purdue 4k (2k in basic support and 2k for ?# copies in Spanish for our use in Latin America.)" PPLPC013000017513.

    3.    On December 20, 1996, PPSG Director Joranson and several others wrote a letter to "Dear Colleague," to inform about "the new Pain & Policy Studies Group (PPSG)," following the departure of the former head of the Pain Research Group to a new position. The letter advised that, "In the US, our group will continue its work to identify and address regulatory barriers to pain management…. We will expand our work with cancer and palliative care organizations and governments in a number of countries in order to achieve more balanced opioid regulation and improved availability of opioid analgesics." PDD1701481531. The stated goals of PPSG thus included making opioids more available for treatment of pain, an objective that matched well to those of the sellers of such drugs.

    4.    On October 5, 2000, Director Joranson sent an email to David Haddox and Robert Kaiko of Purdue Pharma, enclosing four items that Joranson had been working on, including a document titled, "Evaluating federal and state policy for balance," which had also been sent to Dr. Sackler. Dr. Joranson's email closed with, "Hope to have a cocktail or something with you in not too long!" Haddox replied, "I think it is an excellent work product." WIS_PPSG_001791. As noted throughout the PPSG documents, the principle of "balance" asserts that efforts to control diversion and abuse should not interfere with access to prescription opioids for pain; this principle was central to the Pharmaceutical Opioid Industry's ability to achieve widespread opioid use.

5.      On August 30, 2001, Joranson wrote to Chris Neumann, Senior Director of Medical Education at Purdue Pharma, to acknowledge receipt of a $75,000 grant to "help us maintain our program and accomplish our pain and policy goals." WIS_PPSG_013938.

6.      On September 9, 2002, Joranson wrote to Robert Kaiko of Purdue, regarding "the points I would make about the value of our work: … 2. "We have improved state medical board policies: … Many states now have improved pain/opioid policies that address concerns about regulatory scrutiny; we developed much of it from behind the scenes, we wrote the two models that states have used, the medical board guidelines from CA and the model guidelines of the federation of state medical boards… 4. Evaluation of state policies for impediments to the use of opioids for pain." WIS_PPSG_006938

7.      On October 9, 2002, Joranson again wrote to Mr. Kaiko, expressing appreciation for support provided by Purdue "for the past several years. Without your support, some of the progress reported below would not have been possible." Joranson then asked for an additional grant of $175,000 for this year, renewable for two more years. WIS_PPSG_006457.

8.      On February 21, 2005, PPSG Director Joranson/PPSG gave a presentation to the American Pain Society, entitled, "Pain Policy in the U.S.: Are We Moving Forward?" The presentation included slides providing results of 3 national surveys of medical board members, in 1991, 1997, and 2004, under the heading "Education and research with medical regulators." The next slide stated that "Prescribing an opioid analgesic for more than several months to treat a patient with Chronic non-cancer pain was "Lawful/generally accepted medical practice for 12% (1991), 33% (1997) and 67% (2004) of surveyed medical boards. WIS_PPSG_000703, produced natively at *6.  PPSG's Industry-funded efforts to remove prescribing restrictions significantly contributed to this drastic change in the acceptability of opioid treatment of chronic non-cancer pain.

9.      Joranson's 2005 presentation continued with a description of PPSG's Model Policy Development, in particular, the FSMB Model Guidelines (1998) and FSMB Model Policy (2004), adopted in full by 13 states and in part by 12 states. The Model Policy advanced by PPSG "Recognizes need for opioids;" "Pain relief part of quality medical practice;" "Should not fear investigation;" and that "Inappropriate tx [treatment] includes over, under, non-treatment, continued ineffective tx." (Id. at *8-*10). The designation of "undertreatment" of pain as "inappropriate" was a common theme in the promotion of opioids as the solution. The question of undertreatment of pain and the scope of the population arguably affected vary widely according to how the terms are defined. Regardless, the use of long-term opioid therapy is not and has never been the solution to chronic non-cancer pain.

10.     Joranson' presentation included a slide on "The Principle of Balance," which stated, "Central to protecting public health and safety: Opioids are safe and effective, necessary," and that "Opioids have potential for abuse, pose risks." (Id. at *16). Reliable scientific evidence demonstrates that opioids are dangerous and deadly, not "safe;" no reliable scientific evidence demonstrated that opioids were effective for the treatment of chronic non-cancer pain. Joranson's industry-funded presentation was misleading.

2

11.     Another of Joranson's February 2005 presentation slides listed "16 States Improved Pain Policies (2000-2003), including Ohio among them. "Examples of Policy Changes" included "Encourage pain management, pain management part of quality professional practice, address fear of regulatory scrutiny." (Id. at *18-*19). Eight slides are devoted to the topics of diversion and abuse (Id. at 23*-*30). The presentation stated, "The reasons for increased abuse should be studied, taking into consideration all the sources of abused opioids, including deliberate criminal activities to divert opioids from all levels of the distribution system. Source and amount matter. Meanwhile, we should ensure that efforts to address abuse and diversion do not interfere in pain management." (Id. at *31). No slides in the presentation are devoted to risk of addiction or the powerful addictive properties of prescription opioids, including the risk to individuals who are receiving opioids as medical treatment, and not only to "abusers."

12.     On June 6, 2005, PPSG Director David Joranson and Assistant Director Aaron Gilson wrote to Robert Kaiko, VP of Clinical Research at Purdue and Pamela Bennett, Purdue, Director of Advocacy, to express appreciation for "the last three years of financial support that Purdue Pharma has provided to [PPSG], amounting to $100,000 annually for the US program and $175,000 annually for the international program." This amounts to $825,000 of financial support to PPSG from Purdue alone, in that 3-year period. The letter summarized PPSG's "recent achievements" and requested an additional $2.2 million from Purdue for the years 2006-2010. The first listed "achievement was as follows: "In the USA, between 2000 and 2003, 16 States took legislative and regulatory actions to improve their pain policies. Many of these actions were based on our evaluations, recommendations and technical assistance and were accomplished in collaboration with many governmental and nongovernmental groups which use PPSG policy evaluations as a road map." WIS_PPSG_008286.

13.     In an August 2005 email thread referencing the enactment of the "North Dakota Pain Bill," an email was sent to Aaron Gilson, Assistant Director of PPSG, asking: "Did you guys have a hand in this one? This is certainly what I've espoused for years, since we realized intractable pain acts weren't really that helpful—that all we needed in statute was a statement that practitioners could legally prescribe opioids for pain." WIS_PPSG_000026; WIS_PPSG_000036. Gilson responded, "I'm impressed that you could detect our finger prints...I'll wear gloves next time. Yes, we worked with Bruce Levi, Executive Director of the North Dakota Medical Association, to change ND's IPTA[Intractable Pain Treatment Act] to a general pain statute, which also removed the prescribing restriction for 'addicts.'" WIS_PPSG_000026; WIS_PPSG_000036. This exchange is indicative of not only the type of PPSG projects that benefited the Industry by easing prescribing restrictions and penalties, but also shows the surreptitious, behind-the-scenes nature of PPSG's efforts.

14.     In a November 2005 "Prospectus," PPSG listed a number of policies and programs to attract financial support. The Prospectus described PPSG's promotion of "the principle of 'balance' which recognizes that policies aimed at preventing drug abuse must not interfere with medical practice and patient care." To promote that policy, PPSG published "State Profiles that identify provisions in each state that have the potential to enhance or impede pain management. … PPSG assigns grades to each state to draw attention to the need to improve pain policy. … A Progress Report Card compared the policies in 2003 with those in 2000 and found that many states had improved the degree of balance in their pain and regulatory policies. PPSG

3

identifies and recommends 'best' or model policies and assists in their development." WIS_PPSG_008292 at pp. 2-3. The "Accomplishments" section of the Prospectus stated, "PPSG played a central role in revising the Federation of State Medical Board's Model Guidelines on the Use of Controlled Substances for Pain Management, now entitled Model Policy for the Use of Controlled Substances for Pain Management." (Id. at p. 4). The FSMB Model Guidelines played a significant role in exacerbating the prescription opioid epidemic, by eliminating or reducing restrictions on use of opioids for pain, and by threatening regulatory action for 'undertreated pain.'

15. PPSG also worked with the FSMB to develop and present an educational program for "workshops for state medical board members held across the U.S.; PPSG staff served as faculty, and administered a pre- and post-test survey to evaluate changes in knowledge and attitudes as a result of workshop participation." WIS_PPSG_008292, 11/30/2005.

16. On December 1, 2005, Joranson and Gilson of PPSG wrote to Bobbie Sue Brown, Clinical Development & Education Manager-Southwest, at Endo Pharmaceuticals, recounting the work of PPSG and requesting $225,000 for the period 2006-2008. WIS_PPSG_007994.

17. A document titled, "U.S. Program Accomplishments: July 2009-June 2010," stated: "PPSG remains a member of the Federation of State Medical Boards Research and Education Foundation's advisory committee that recently developed a handbook to educate physicians about the Federation's Model Policy to promote safe and effective prescribing and reduce the risk of abuse, addiction, and diversion of opioids and other controlled substances in office-based pain management; the Handbook was published mid-2007 and is being made available to state medical boards to distribute to their licensees. [Fishman SM. Responsible opioid prescribing: A physician's guide. Washington, DC: Waterford Life Sciences; 2007.]" WIS_PPSG_007680, 02/07/2011, at p. 3.

18. The 2007 Fishman Handbook encouraged use of prescription opioids for chronic pain, despite absence of reliable evidence of long-term efficacy. Dr. Fishman's disclosure for a Continuing Medical Education (CME) program based on the Handbook listed Purdue Pharma, Endo, Janssen and Cephalon among his financial supporters. https://archive.org/stream/279187-responsible-opioid-prescribing-info/279187-responsible-opioid-prescribing-info_djvu.txt. The CME website listed the consortium members who supported publication of the Handbook, including Purdue Pharma, Endo, Cephalon, Alpharma, and the PPSG; the CME target audience was described as "Physicians who prescribe opioid analgesics as part of pain management strategies in their clinical practice." (Id.) In short, PPSG cooperated with the Pharmaceutical Opioids Industry to produce a Handbook funded by the Industry to promote its views of "responsible prescribing;" that book was then used to "educate" physicians for CME credit, to be earned by reading the book and passing an online test on its contents.

19. The "U.S. Program Accomplishments: July 2009-June 2010" document also included the following entry: "PPSG published a review article describing the implications of inaccurate addiction-related terminology, contained in current federal and state laws, regulations, and guidelines/policy statements, on effective pain management and patient care; data used to inform sections of this manuscript was obtained through a recently-completed grant to examine the legislative and regulatory origins of restrictive policy language that currently is present in

4

state law and has a potential to interfere with the adequate and effective use of controlled substances for pain management. [Gilson AM. The concept of addiction in law and regulatory policy: A critical review. Clinical Journal of Pain. 2010; 26(1):70-77.]" WIS_PPSG_007680 (Emphasis added). Removing restrictions and interference with opioid prescribing were the stated goals of PPSG and aligned with its Industry funders.

20. A PPSG Spreadsheet lists financial contributions from the Pharmaceutical Opioid Industry between November 2000 and August 2007, as follows: Purdue Pharma, $1,256,500; Janssen/J & J: $238,990; Endo, $140,000; Ortho-McNeil, $125,000; Cephalon, $25,000; Alpharma, $25,000; Roxane, $15,000; and Abbott, $15,000 for a total of $1,840,490. The spreadsheet lists 27 separate contributions by Purdue, and 10 each by Janssen/J&J and Endo; the frequency and collegial nature of the communications between PPSG and company representatives like David Haddox suggests a cooperative relationship. Additional payments occurred outside of the years covered by the spreadsheet. WIS_PPSG_007783.

21. A presentation by Joranson on February 16, 2008 disclosed financial relationships with Abbott, Alpharma, Cephalon, Endo, Ortho-McNeil and Purdue Pharma.WIS_PPSG_007991. However, Joranson's presentation slides did not include such disclosures in February 2005. WIS_PPSG_000703.

22. A 2011 spreadsheet lists the following contributions as "Pending": Actavis, "to be $55k;" Allergan $50,000; Endo, $46,106; $649,779; $46,057; and $75,000; Janssen Ortho Pricara, $50,000; and $10,000; and Purdue, $50,000. WIS_PPSG_003892.

23. These documents provide supportive evidence for my opinion that one of the ways that the Pharmaceutical Opioid Industry created the opioid epidemic in the United States was by funding the PPSG to "educate" the medical community as to the "necessity" for such drugs, to influence state legislatures to increase access while loosening restrictions on prescribing, and to change the very culture of opioid prescribing, by suggesting that failing to prescribe opioids was tantamount to 'undertreating' pain and violating a patient's 'rights.'

# Anna Lembke, M.D. Report

# EXHIBIT A

Curriculum Vitae and List of Publications