# EXHIBIT 43

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
                        - - -
 3
     IN RE:  NATIONAL         :   HON. DAN A.
 4   PRESCRIPTION OPIATE      :   POLSTER
     LITIGATION               :
 5                            :
     APPLIES TO ALL CASES     :   NO.
 6                            :   1:17-MD-2804
                              :
 7
                 - HIGHLY CONFIDENTIAL -
 8
       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 9
10                      VOLUME I
11
                         - - -
12
                   November 13, 2018
13
                         - - -
14
15             Videotaped deposition of
     BRUCE L. MOSKOVITZ, M.D., taken pursuant
16   to notice, was held at the law offices of
     Drinker Biddle & Reath, 105 College Road
17   East, Princeton, New Jersey, beginning at
     10:07 a.m., on the above date, before
18   Michelle L. Gray, a Registered
     Professional Reporter, Certified
19   Shorthand Reporter, Certified Realtime
     Reporter, and Notary Public.
20
                         - - -
21
22         GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
23              deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

1  up-and-coming KOLs."  Why would that be
2  done?
3          A.   Well, again these are
4  individuals who are becoming recognized
5  for their expertise in the area and for
6  which they may be developing insights
7  into areas that we don't have the
8  expertise to reach out to at the time so
9  we wanted to make sure that we remained,
10 as much as possible, on the cutting edge
11 of -- of where new information was going
12 to be coming from and -- and new
13 research.
14         Q.   Did you have a list of KOLs
15 when you were the head of pain?
16         A.   Did we have -- well, we
17 certainly had a list of whom the medical
18 science liaisons were calling on.  So we
19 knew who they were seeing.  To my
20 recollection, that's the basic list that
21 we had.  We're certainly aware of others
22 who might be considered experts in their
23 area, but wouldn't necessarily call on
24 them for input.  So the best I can come

Highly Confidential - Subject to Further Confidentiality Review

1  to in terms of lists were those
2  individuals who -- who we had our MSLs
3  call on.
4        Q.    When you talk about call on,
5  you are not talking about call on in --
6  in a sales --
7        A.    No, absolutely not.
8        Q.    I mean, you are talking
9  about call on for information or
10 whatever?
11       A.    Correct.  For the most part,
12 the key opinion leaders that we saw,
13 first of all, they certainly didn't have
14 to be physicians, so they couldn't write
15 a prescription anyway.  But even if they
16 were physicians, they might be department
17 heads and generally they wouldn't be
18 involved in day-to-day care of the
19 patient or -- or writing prescriptions.
20       Q.    Did -- did you have a list
21 of up-and-coming KOLs, do you know, or
22 did anyone keep a list or a running list?
23       A.    Not to my knowledge, no.
24       Q.    Did you or did your medical

1 science liaisons have a list of your
2 competitors' KOLs?
3      A.   No, we did not because we
4 could never do that exhaustively.  And I
5 mean we were aware that some of the key
6 opinion leaders we called on were also --
7 we would also see their names in an
8 advisory role for other companies,
9 particularly when they had to disclose
10 financial ties.  So -- but we didn't have
11 a list of who was working for what
12 company, no.
13      Q.   Did you have to be concerned
14 for example, if you were going to talk to
15 a KOL about something that might be in
16 the Janssen pipeline for example, did you
17 need to be concerned about whether you
18 could talk to that KOL if they also were
19 a KOL for a competing company?
20      A.   It was probably a concern,
21 but in instances where we were going to
22 be disclosing sensitive information, they
23 would sign a nondisclosure agreement.
24      Q.   And would that be something

Highly Confidential - Subject to Further Confidentiality Review

1  that medical affairs would deal with, or
2  would that go to -- I think you had told
3  me earlier there was some other --
4        A.    It would probably be
5  through -- well, compliance would put
6  together the nondisclosure agreement.
7        Q.    The role of outcomes
8  research slide here, which is the next
9  one, lists the focus on the generation
10 and dissemination of outcomes research
11 data as cost effectiveness.  Do you see
12 that?
13       A.    Yes.
14       Q.    Quality of life.  Do you see
15 that one?
16       A.    Yes.
17       Q.    Economic and budget impact
18 models.  Do you see that?
19       A.    Yes.
20       Q.    Patient satisfaction.  What
21 does that include?
22       A.    A preference for one drug
23 over another.
24       Q.    And then I think it should