# EXHIBIT 48

```
 1     IN THE DISTRICT COURT OF CLEVELAND COUNTY
                  STATE OF OKLAHOMA
 2
       STATE OF OKLAHOMA, ex rel.,
 3     MIKE HUNTER,
       ATTORNEY GENERAL OF OKLAHOMA,
 4
                  Plaintiffs
 5
       vs.                    Case No. CJ-2017-816
 6
       (1) PURDUE PHARMA, L.P.;
 7     (2) PURDUE PHARMA, INC.;
       (3) THE PURDUE FREDERICK COMPANY;
 8     (4) TEVA PHARMACEUTICALS USA, INC.;
       (5) CEPHALON, INC.;
 9     (6) JOHNSON & JOHNSON;
       (7) JANSSEN PHARMACEUTICALS, INC.;
10     (8) ORTHO-McNEIL-JANSSEN
       PHARMACEUTICALS, INC., n/k/a
11     JANSSEN PHARMACEUTICALS, INC.;
       (9) JANSSEN PHARMACEUTICA, INC.,
12     n/k/a JANSSEN PHARMACEUTICALS, INC.;
       (10) ALLERGAN, PLC, f/k/a ACTAVIS PLC,
13     f/k/a ACTAVIS, INC., f/k/a WATSON
       PHARMACEUTICALS, INC.;
14     (11) WATSON LABORATORIES, INC.;
       (12) ACTAVIS, LLC; and
15     (13) ACTAVIS PHARMA, INC.,
       f/k/a WATSON PHARMA, INC.,
16
                  Defendants.
17

18     VIDEOTAPED DEPOSITION OF LYNN WEBSTER, M.D.

19          TAKEN ON BEHALF OF THE PLAINTIFF

20     ON FEBRUARY 18, 2019, BEGINNING AT 9:11 A.M.

21              IN SALT LAKE CITY, UTAH

22

23

24     REPORTED BY:  VICKIE LARSEN, CSR/RMR

25
```

1  so-called KOLs have given depositions,
2  testimony in this case; right?
3          MR. ROBINSON:  Objection.  To
4      the extent you know anything
5      personally outside of any
6      communications you've had with
7      counsel.
8          THE WITNESS:  I do not.
9          MR. EHSAN:  Objection to the
10     form.
11         MR. ERCOLE:  Same objection.
12         THE WITNESS:  I do not know.
13     Q.    BY MR. DUCK:  Would it surprise
14 you to learn that other KOLs that have
15 testified in this case feel that they were
16 used by the pharmaceutical companies --
17         MR. EHSAN:  Objection.
18     Q.    BY MR. DUCK:  -- that are
19 defendants in this case?
20         MR. ERCOLE:  Objection.
21         MR. ROBINSON:  Objection.
22         THE WITNESS:  I'd be surprised
23     if that's what they thought.
24     Q.    BY MR. DUCK:  You would be?
25     A.    Uh-huh.

1        Q.    Because you don't feel that
2    way?
3        A.    No.
4        Q.    You don't feel like they used
5    your influence to increase prescriptions of
6    their drugs?
7        A.    No, I do not.
8        Q.    You don't feel that they asked
9    you to be a key opinion leader or presenter
10   for them to increase peer to peer influence
11   opportunities?
12       A.    No, I think that that might be
13   true.
14             MR. EHSAN:  Objection.  Form.
15             THE WITNESS:  I mean, I think
16         that I'm well respected in my field,
17         and so to ask me to be involved in
18         anything that they're doing would
19         probably be something useful to them.
20         But that doesn't mean that I -- I did
21         anything to help them.
22       Q.    BY MR. DUCK:  Well, that may
23   not have been your intent, and that's not my
24   question.
25             My question is, you would agree

1  that -- I think this is what you just said --
2  that these defendants asked you to do things
3  because they perceived a business positive?
4              MR. EHSAN:  Objection to form.
5              MR. ERCOLE:  Same objection.
6      Mischaracterizes testimony.
7              MR. EHSAN:  Object to form.
8              THE WITNESS:  I've never
9      perceived it that way.  I've always
10     perceived it that they respect what I
11     stand for and they appreciate my
12     views, and so they've asked me to
13     give -- probably be engaged because of
14     that.
15     Q.     BY MR. DUCK:  Now, if your
16 views were that opioids were terrible drugs
17 that should never be prescribed, these
18 defendants probably wouldn't have had you
19 speak for them, would they?
20             MR. HOFFMAN:  Object to form.
21             MR. ERCOLE:  Same objection.
22             THE WITNESS:  I always lectured
23     about how harmful they were.
24     That's -- that's what I lectured
25     about.  I rarely said anything other

1    A.    Yes.
2    Q.    Okay.  Is that -- that's a
3    patient advocacy group too?
4    A.    Yes.
5    Q.    Are you still a member of that
6    particular foundation?
7    A.    Well, I've never been a member,
8    really.  I mean, I support the organization.
9    Q.    Any other patient advocacy
10   groups that you've been a member of?
11   A.    Yeah, the American Chronic Pain
12   Association.
13   Q.    Are you aware of -- are you
14   aware of any efforts by pharmaceutical
15   companies to -- strike that.
16         Are you aware of -- of any
17   instances where pharmaceutical companies have
18   influenced the opinions put forward by the
19   American Chronic Pain Association?
20         MR. DUCK:  Objection to form.
21         THE WITNESS:  You know, I don't
22      have any knowledge of the management
23      of the -- of those advocacy groups.
24   Q.    BY MR. ERCOLE:  Sitting here
25   today -- maybe we can just do this in a

1   broad -- broad way -- sitting here today,

2   with respect to any of the patient advocacy

3   groups or the consumer -- or the physician

4   advocacy groups that you've either been a

5   member with or been involved in, are you

6   aware of any instance where any

7   pharmaceutical company has -- has influenced

8   the content of any opinions or publications

9   put forward by those associations?

10              MR. DUCK:  Objection to form.

11              THE WITNESS:  I'm not aware of

12       any.

13       Q.    BY MR. ERCOLE:  Dr. Webster,

14  you mentioned before that -- before getting

15  into more clinical research you were a

16  practicing physician; correct?

17       A.    Correct.

18       Q.    And how long again were you a

19  practicing physician?

20       A.    Started in 1980, so 30 years,

21  basically.  30 years is when I started

22  practice as an anesthesiologist.  By the end

23  of the '80s, so 20-some-plus years, I was

24  practicing chronic pain and cancer pain

25  management.

1    Q.    And it's fair to say that
2    during that time period you prescribed
3    opioids for noncancer pain?
4    A.    Most of that time was for
5    noncancer pain.
6    Q.    And what are the -- can you
7    give me examples of some of the conditions
8    for which you've prescribed opioids for
9    noncancer pain?
10   A.    The most common reason or the
11   most common pain complaint is low back pain,
12   and -- and patients I would see, most of them
13   have had -- had had previous back operations.
14   Most of them had several back operations.
15         So it would be failed back
16   syndrome.  I took care of a lot of Complex
17   Regional Pain Syndrome, which is a neurologic
18   disease.  I took care of other neuropathies.
19   Peripheral neuropathy, pancreatitis,
20   interstitial cystitis, trigeminal neuralgia.
21   Yeah, ulcerative colitis, Crohn's Disease.
22   So a host of -- arthritis, rheumatoid
23   arthritis.  So a large number.
24   Q.    And, in your view, opioids were
25   appropriate to treat those conditions;