# EXHIBIT 49

```
 1        IN THE DISTRICT COURT OF CLEVELAND COUNTY

 2                    STATE OF OKLAHOMA

 3   STATE OF OKLAHOMA, ex rel.
     MIKE HUNTER, ATTORNEY GENERAL
 4   OF OKLAHOMA,
              Plaintiff,
 5
         vs.                    Case No. CJ-2017-816
 6
     PURDUE PHARMA, L.P.; PURDUE
 7   PHARMA, INC.; THE PURDUE
     FREDERICK COMPANY; TEVA
 8   PHARMACEUTICALS USA, INC.;
     CEPHALON, INC.; JOHNSON &
 9   JOHNSON; JANSSEN PHARMACEUTICALS,
     INC.; ORTHO-McNEIL-JANSSEN
10   PHARMACEUTICALS, INC., n/k/a
     JANSSEN PHARMACEUTICALS, INC.;
11   JANSSEN PHARMACEUTICA, INC.;
     ALLERGAN, PLC, f/k/a ACTAVIS,
12   INC., f/k/a WATSON
     PHARMACEUTICALS, INC.; WATSON
13   LABORATORIES, INC.; ACTAVIS, LLC
     and ACTAVIS PHARMA, INC., f/k/a
14   WATSON PHARMA, INC.,
              Defendants.
15   _____

16     VIDEOTAPED DEPOSITION OF SCOTT FISHMAN, M.D.

17              February 26, 2019

18                 9:43 a.m.

19

20          4860 Y Street, Suite 3020

21            Sacramento, California

22

23   REPORTED BY:

24   MARYANN H. VALENOTI

25   CSR #11266, RPR, CRR
```

```
 1   fair, I don't want to misstate anything?
 2            MS. BALDWIN:  Objection, leading,
 3   misstates testimony.
 4            THE WITNESS:  Definitely correct.
 5   BY MR. ERCOLE:
 6      Q.   When you say "definitely correct," what do
 7   you mean by that?
 8            MS. BALDWIN:  Objection.
 9            THE WITNESS:  I don't recall a time that I
10   spoke for pharmaceutical companies, that I worked
11   for pharmaceutical companies and represented them.
12   Pharmaceutical companies may have supported the
13   programs that I participated in, but my
14   participation was my independent work and my
15   independent thoughts.
16   BY MR. ERCOLE:
17      Q.   Some of those programs that were supported
18   by pharmaceutical companies involved programs about
19   the risks of opioids; correct?
20      A.   Yes.
21      Q.   And some of those programs supported by
22   pharmaceutical companies involved programs about
23   responsible opioid prescribing; correct?
24            MS. BALDWIN:  Objection, leading.
25            THE WITNESS:  Yes.
```

```
 1   BY MR. ERCOLE:
 2      Q.   And some of those programs sponsored by
 3   pharmaceutical companies involved programs about
 4   the risks of addiction associated with opioids;
 5   correct?
 6           MS. BALDWIN:  Objection, leading.
 7           THE WITNESS:  Yes.
 8   BY MR. ERCOLE:
 9      Q.   And some of those programs that we've been
10   talking about that were supported indirectly by
11   pharmaceutical companies involved programs about
12   the risks of diversion of opioids; correct?
13           MS. BALDWIN:  Objection, leading.
14           THE WITNESS:  Correct.
15   BY MR. ERCOLE:
16      Q.   Did pharmaceutical companies, including
17   any of the Defendants here, ever control the
18   content of any publication or speech that you've
19   ever been involved with?
20           MS. BALDWIN:  Objection.
21           THE WITNESS:  Not that I know of.
22   BY MR. ERCOLE:
23      Q.   We've referred to the -- strike that.
24           Have you ever heard of the acronym CME?
25      A.   Yes.
```

1    Q.   What is a CME?
2    A.   Continuing Medical Education, which is
3  credit that's required to maintain a state medical
4  license.
5    Q.   And we'll get into some of those issues
6  before, but you've provided CME presentations about
7  opioids; correct?
8    A.   Yes.
9         MS. BALDWIN:  Objection, leading.
10  BY MR. ERCOLE:
11   Q.   Have you also provided CME presentations
12  about nonopioids?
13   A.   Yes.
14   Q.   And were some of those CME presentations
15  about nonopioids also sponsored by pharmaceutical
16  company?
17        MS. BALDWIN:  Objection, leading.
18        THE WITNESS:  Yes, if you -- if I can
19  expand.
20  BY MR. ERCOLE:
21   Q.   Please.
22   A.   The thing about CME programs is that they
23  should be -- the speaker and the content by rule
24  should be separated from any funders.  So I often
25  have no idea who's funding a CME program that I

1  will give regardless of what the topic is.
2       Q.   And to the best of your knowledge, that
3  level of independence that you just described with
4  respect to CMEs has always existed with respect to
5  any of the articles or publications that you've
6  presented?
7       A.   It didn't always --
8            MS. BALDWIN:  Sorry to interrupt, if you
9  could just wait.
10           THE WITNESS:  I'm sorry.
11           MS. BALDWIN:  Objection, leading.
12           THE WITNESS:  Did you want -- I'm sorry,
13 I'll try to remember.
14           It didn't always exist, and it's evolved
15 over my career, from when I started there was
16 nothing.  There really were very few lines, and
17 there was a blurred overlap of pharmaceutical
18 companies, middle managing, kind of media companies
19 and speakers and academics who were teaching and
20 sharing information together in a way that wouldn't
21 be acceptable today.  So over the past, you know,
22 25, 30 years, I've seen this evolution where we are
23 in a better place, but we are still in a very
24 flawed place today.
25

```
1   BY MR. ERCOLE:
2      Q.   Okay.  I'm just asking about with respect
3   to the CME presentations that you've provided,
4   okay.  Is it fair to say the CME presentations that
5   you've provided, have always reflected your
6   independent opinions?
7            MS. BALDWIN:  Objection to form.
8            THE WITNESS:  Yes, I think it's been
9   easier as times have changed to maintain that, but
10  yes, I think that they've always -- they've always
11  reflected my independent beliefs.  Even early in my
12  career I remember pharmaceutical companies coming
13  up to me after my talks and saying they didn't
14  agree with me and challenging some of the things
15  that I've said.
16  BY MR. ERCOLE:
17     Q.   And is it fair to say that if you
18  disagreed with anything that a pharmaceutical
19  company may have asked of you with respect to a
20  presentation, that you would have said, "I'm not
21  going to include that in my presentation"?
22           MS. BALDWIN:  Objection, leading.
23           THE WITNESS:  Correct.
24  BY MR. ERCOLE:
25     Q.   I think you mentioned now and you also
```

1  mentioned earlier, it was your belief in some
2  instances pharmaceutical companies may not like
3  some of your opinions regarding opioids; is that
4  correct?
5           MS. BALDWIN:  Objection, leading.
6           THE WITNESS:  Well, I think at some times.
7  You know, my overall opinion is that I've
8  never been a proponent of opioids.  I've not been
9  an opponent of them.  You know, I don't think
10 anybody should be for or against them.  Personally,
11 I think we should be for them when the benefits
12 outweigh the risks, and against them otherwise.
13 Sometimes people have different views on, you know,
14 when that is and isn't.  But I've always been
15 clear, that's -- that's where I take a stand, that
16 opioids are just one tool, and they've been
17 excessively used because we've lost sight of that
18 risk benefit analysis largely because we -- the big
19 "we," you know, the education hasn't been there,
20 and other things have happened to drive this.
21          But in my presentations I feel like I've
22 always anchored in exactly that position, that you
23 need to understand the risks and the benefits to
24 know whether a treatment's appropriate, and if you
25 do that, you won't have used opioids like people