# EXHIBIT 53

Page 1

1      IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF OHIO
3              EASTERN DIVISION
4
5           ~~~~~~~~~~~~~~~~~~~~
6
    IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
7   OPIATE LITIGATION
                                     Case No. 17-md-2804
8
                                     Judge Dan Aaron
9                                    Polster
10  This document relates to:
11
    The County of Summit, Ohio v. Purdue Pharma
12  L.P., et al.
13
14  Case No. 18-OP-45090
15
            ~~~~~~~~~~~~~~~~~~~~
16
17          Videotaped deposition of
               LISA KOHLER, M.D.
18
19             July 31, 2018
                9:15 a.m.
20
21              Taken at:
          Brennan Manna & Diamond
22         75 East Market Street
              Akron, Ohio
23
24
25       Renee L. Pellegrino, RPR, CLR

Page 46

1  to this. That is kept in a separate file and
2  not in the case file.
3      Q.   Do you know what was searched for
4  and produced in this litigation?
5      A.   Specifically, no.
6      Q.   Do you know if all those different
7  areas were searched for?
8      A.   I do not know.
9      Q.   And prior to 2015, or 2015 and
10 prior, this was mostly paper?
11     A.   Yes. It was largely -- well, we
12 have the electronic version or the final version
13 of the autopsy report. I don't recall the year
14 that we started saving those electronically, but
15 it's definitely -- as I mentioned, the paper
16 versions are there and we have them in our
17 office going back many years.
18     Q.   How many years?
19     A.   I do not know exactly at this time.
20 I would have to go back and look.
21     Q.   Ten?
22     A.   At least a decade, but I don't
23 recall an exact number of years.
24     Q.   And do you know if those have been
25 searched and produced?

Page 47

1      A.   I know that based upon printouts
2  similar to this, any of the drug overdose cases
3  have been produced.
4      Q.   But what about the underlying
5  records that are in the paper form?
6      A.   Those were produced.
7      Q.   Okay. So let's just use this one as
8  an example, if we could. Is it fair to say that
9  if we discussed the process for 56510, it's
10 going to be applicable to all of these others?
11     A.   Yes. It's 54510, but yes.
12     Q.   I'm sorry. I need to put my glasses
13 on, I think. You can correct me if I read it
14 wrong.
15          So this information, as you said,
16 would be acquired from multiple sources,
17 including an investigation, probably records
18 that could have been found at the house, a
19 driver's license, maybe talking to a family
20 member as well as talking to healthcare
21 providers and others who might have information
22 about this individual; is that fair?
23     A.   Yes, sir.
24     Q.   And then we have a cause of death.
25 Do you see that? It's in the --

Page 48

1      A.   Yes.
2      Q.   And this one says, "Doxepin
3  overdose"?
4      A.   Yes,sir.
5      Q.   And then next to it, it says that
6  there's doxepin and nordoxepin?
7      A.   Correct.
8      Q.   And it has amounts, I take it, that
9  were found in that decedent?
10     A.   Yes, sir.
11     Q.   And is that the main way that -- I'm
12 sorry. Toxicology results in connection with
13 drug overdoses, is that a primary way of
14 determining the cause of death?
15          MR. McCONNELL: Objection.
16     A.   Could you rephrase that, please?
17     Q.   Sure.
18          Well, I mean, the cause of death is
19 listed as doxepin overdose?
20     A.   Yes.
21     Q.   And then the tox results show that
22 there's doxepin and nordoxepin?
23     A.   Correct.
24     Q.   Let me ask you maybe a better
25 question. How is it that you -- a determination

Page 49

1  is made about the cause of death?
2      A.   The determination of the cause of
3  death is made based upon the investigation, the
4  autopsy examination and the testing results, in
5  this case the toxicology. All of that is taken
6  together, evaluated, and a cause and manner of
7  death are ascribed to the case at that time.
8      Q.   In this case the manner is suicide?
9      A.   Yes, sir.
10     Q.   There are multiple, I guess, manners
11 that a doctor or investigator could assign,
12 right?
13     A.   The physician assigns it, yes.
14     Q.   So what would lead someone to make a
15 manner suicide?
16     A.   There are multiple indicators that
17 we would look at for a suicide death. We would
18 look to see intent to cause self-harm. That can
19 show up in many forms. It could be that when my
20 investigator arrived at the scene, there was a
21 farewell note out at the scene. It could be
22 that they have laid out their funeral clothing.
23 There could be a farewell note in the form of a
24 voice mail message, an e-mail, some sort of
25 digital message along those lines. In some

13 (Pages 46 - 49)

Page 50

1  cases it's the quantity of drug in their system
2  that speaks for itself, that it was -- would not
3  be where someone said, "To work, let's take
4  three or four." This is the result of a handful
5  of pills being taken at one time, showing that
6  they intended to cause self-harm.
7      Q.  Is it fair to say that this
8  determination is not a precise science, it's
9  more of a compilation of information and a
10 judgment call?
11     A.  Yes, it is an opinion. It's a
12 medical opinion as to the manner of death.
13     Q.  And I take it you would freely admit
14 that many or some of these could be wrong,
15 right?
16         MR. McCONNELL: I'll object.
17     A.  Based upon the information that was
18 provided to us at the time, we support the
19 manners of death that are listed here. If
20 additional information becomes available at a
21 later date, we do review cases and can amend
22 death certificates at that time based on the new
23 information. But based upon the information
24 provided to us at the time the assessment was
25 made, we would believe that all of these are

Page 51

1  correct.
2      Q.  Sure. I wasn't implying that anyone
3  would intentionally put something wrong, but,
4  for example, someone could intend to commit
5  suicide without any indicia, right, no note, no
6  laying out their clothes, no voice mails, and
7  without that, they may just be classified as an
8  accident, unless you had something else that was
9  an outward indicia?
10     A.  Right. And, actually, with a drug
11 overdose, we favor accidental death as opposed
12 to suicide unless we have some sort of
13 indication that it was an intent to cause
14 self-harm.
15     Q.  So if in doubt, accidental death,
16 unless you have something that would
17 substantiate a suicide?
18     A.  With regards to overdose, yes.
19     Q.  Now, have you looked at this prior
20 to today?
21     A.  I have scanned it in the past. I do
22 not know details of it.
23     Q.  If you look at the last page,
24 there's a tally of 213. Do you see that?
25     A.  Yes, sir.

Page 52

1      Q.  So am I correct that this is a
2  collection of the overdose deaths that were
3  processed by your department in the calendar
4  year 2015?
5      A.  Based upon how the database provided
6  that information, yes, there were 213 overdose
7  deaths between January 1 of 2015 and December
8  31st of 2015.
9      Q.  And you're free to look through
10 this, and I'm not going to ask you percentages,
11 but would you agree, if I flipped through these
12 and looked at each entry, the vast majority of
13 them are through fentanyl or heroin deaths? Is
14 that consistent with your understanding?
15         MR. McCONNELL: I'll object.
16     A.  In the deaths where drugs are
17 specifically mentioned in the cause of death
18 statement, heroin and fentanyl are very well
19 represented. I can't give you a percentage.
20     Q.  And based on your experience, when
21 it lists fentanyl, that's more likely or most
22 likely to be illicit fentanyl; isn't that right?
23         MR. McCONNELL: I'll object.
24     A.  It depends upon the year in which
25 you are looking as to the likelihood of illicit

Page 53

1  versus prescription.
2      Q.  Well, let's talk about 2015.
3      A.  I can't tell from what is here
4  whether it's illicit versus prescription, but
5  it's been the trend in the recent years that it
6  is illicit fentanyl.
7      Q.  So let's start with this document.
8  Are you able to differentiate between illicit
9  fentanyl or any other type of fentanyl from
10 looking at this document?
11     A.  From this document, no.
12     Q.  Do you have basic expertise in
13 learning and other information from your
14 experience that in 2015 illicit fentanyl was a
15 significant, if not very substantial driver of
16 the overdose deaths in your county?
17         MR. McCONNELL: Objection.
18     A.  With regard to the fentanyl
19 specifically, we will check OARRS to see if they
20 have a prescription source of fentanyl before we
21 will state that it is illicit. That was
22 something that was a common practice in 2015,
23 was to check OARRS for a prescription source. I
24 don't have anything here to indicate which cases
25 would be illicit versus prescription, but the

14 (Pages 50 - 53)

Page 54

1  general trend over the previous years has been
2  that it is illicit.
3     Q.   So if we wanted to actually know --
4  if it says -- let's take the second one.  It
5  says, "Accident drug overdose, fentanyl
6  overdose," and there's "fentanyl 9.4 nanograms
7  per millimeter"?
8     A.   I'm sorry.  Which one are you
9  looking at?
10    Q.   I'm sorry, Doctor.  The second one.
11  Sorry.  Let me apologize.  Let me find one
12  that's easy here or easier.  If you go to -- I'm
13  trying to find one that just has fentanyl.
14  Let's look at the second -- the second one on
15  the first page.  So this basically has fentanyl
16  and morphine.  Do you see that?
17    A.   Yes, sir.
18    Q.   It says "morphine," in parentheses,
19  "free."  What does that mean?
20    A.   My toxicologist would differentiate
21  between free and bound.  He reports out free
22  morphine.
23    Q.   And what's the significance to a
24  layperson?
25    A.   You would need to talk with my

Page 55

1  toxicologist for that.
2     Q.   Okay.  And does it have any
3  indication about whether it's a prescription
4  medicine or illicit medicine?
5     A.   Without pulling the file and looking
6  through it, I can't comment as to whether this
7  is fentanyl and heroin as a source of morphine
8  or whether it is morphine on its own.
9     Q.   I see.  So the morphine -- actually,
10  when it's listed as free or it's not listed as
11  free, the morphine could actually be indicating
12  that it's heroin?
13    A.   Yes, sir.
14    Q.   Because that's how it might show up
15  on a tox screen?
16    A.   In the blood heroin shows up as
17  morphine.  We need to look in the urine to find
18  the 6-monoacetylmorphine to indicate it's a
19  heroin source.
20    Q.   And is that something that you do?
21    A.   Yes, sir.
22    Q.   And so that would mean that when it
23  says "morphine," we could in some other records
24  figure out if that, in fact, is someone who has
25  either taken or abused morphine or whether the

Page 56

1  morphine is showing up because it was actually
2  from illegal heroin?
3           MR. McCONNELL:  Objection.
4     A.   We could determine if there are
5  markers for the use of heroin or not and then
6  we're left with is it morphine from either
7  morphine itself or that we are unable to
8  substantiate that it's heroin or that we can
9  substantiate that it's heroin, and that goes,
10  again, into the investigation as well.
11    Q.   And if we were to take this
12  particular case, the second case, 54514, using
13  some other tox data, we would be able to combine
14  that with this chart and determine, based on the
15  urine or some other testing, whether the
16  morphine was more likely from heroin or from
17  morphine; is that right?
18    A.   Yes, sir.
19    Q.   And with respect to fentanyl, could
20  we also do the same; could we determine in some
21  way whether it was illicit fentanyl or
22  prescription fentanyl?
23    A.   That would require that we look on
24  the OARRS report to see if this person was
25  prescribed fentanyl or not, and I don't know if

Page 57

1  in each individual case that we make a specific
2  statement that OARRS was checked, but that is a
3  part of the protocol to look.
4     Q.   In 2015 that was part of your
5  protocol?
6     A.   Yes, sir.
7     Q.   And so there would be some document
8  contained somewhere in your department or a
9  database or on paper that would show whether
10  there was OARRS data, and if there was no OARRS
11  data showing if there was a lawful prescription
12  for fentanyl, the assumption would be it's
13  illicit fentanyl; is that right?
14          MR. McCONNELL:  I'll object.
15    A.   The paperwork for OARRS may or may
16  not be in the file.  We are not permitted to
17  keep that for an extended period of time.  And I
18  know in my practice many times I am looking it
19  up and making a notation rather than printing
20  out the OARRS report.
21    Q.   Fair enough.  But the point was at
22  the time -- or you could go back and check and
23  make that determination whether it was more
24  likely to be illicit fentanyl or prescription
25  fentanyl by looking at the OARRS data and using

Page 58

1  that data to make a considered judgment?
2      A.   Yes.  At the time we made the
3  ruling, we would have looked, yes.
4      Q.   And whether the actual documents or
5  your notations were just left, that would be
6  somewhere in files or paperwork at your
7  department?
8      A.   Yes.
9      Q.   And based, again, just as a general
10 matter, right, in 2015 do you have a general
11 understanding of fentanyl overdoses, what
12 percentage are from illicit fentanyl versus
13 prescription fentanyl?
14     A.   In general the illicit fentanyl is
15 more frequent than prescription fentanyl.
16     Q.   Ninety percent?
17     A.   I cannot give a number.
18     Q.   And even when we talk about --
19 there's a further description, right?  There's
20 illicit fentanyl, which is fentanyl that was
21 created, prepared somewhere, that never had a
22 pharmaceutical use, right?
23     A.   Yes, there is illicit that was not
24 meant for pharmaceutical use.
25     Q.   And on the other hand, there is --

Page 59

1  fentanyl can be used, you know, in an approved
2  medicine prescribed by a doctor, right?
3      A.   Yes, sir.
4      Q.   And then there's situations where
5  someone could have a prescription fentanyl
6  product but it's actually unlawful because it
7  wasn't prescribed for them and they somehow are
8  abusing it; is that right?
9      A.   Yes, sir.
10     Q.   So certainly I suspect you wouldn't
11 know these answers right now, but do you believe
12 that in 2015 or 2016, or even your current
13 cases, you would be able to answer questions
14 such as whether a person was prescribed a lawful
15 opioid medicine at some point in the future --
16 at some point in the past?
17     A.   Could you rephrase that?
18     Q.   Sure.
19          Can you -- can you tell by looking
20 at any of this information or -- whether someone
21 had been ever prescribed a lawful opioid?
22     A.   I can't know their full history
23 because we don't necessarily ask for their
24 entire life's history of opiate use.
25     Q.   And you -- but, again, these are the

Page 60

1  kind of questions that, if you wanted to, you
2  could go and talk to a doctor for any one of
3  these folks and ask questions like, Did you ever
4  prescribe an opioid for this patient, right?
5          MR. McCONNELL:  Objection.
6      A.   If we know the physician who was
7  treating the patient, we can request information
8  on what medications were prescribed to this
9  patient.  We do not always know the full lineage
10 of physicians that this patient has seen and we
11 may not have any information towards physicians
12 they were seeing.
13     Q.   But if you have it, you could do
14 that, right?  In fact, you do do it?
15     A.   We will make requests, but, again,
16 we don't ask for their entire life's history of
17 opiate prescription.  We're looking to the
18 relevance to the cause and manner of death.
19     Q.   Not entire life history.  If you had
20 a doctor's name, you could go -- and, in fact,
21 it's your protocol to go to the doctor and ask
22 some basic questions about the patient, what
23 medicines they're taking, whether they had any
24 illnesses, right, what other medicines they
25 might have been using, whether they had

Page 61

1  depression, correct?
2      A.   We will be asking for typically the
3  most recent progress notes for that -- from that
4  patient, their list of medications, and their
5  problem list.  That would be the information we
6  would gather.
7      Q.   And that would typically -- in most
8  doctors' notes it would have medicines that the
9  doctor prescribed, right?
10     A.   Yes.  That would be the medication
11 list.
12     Q.   And I think as you said, probably if
13 we were to go back and look at all of the
14 information that's currently in your office, to
15 the extent it wasn't shredded, that information
16 would still be there for some of the doctors you
17 contacted, right?
18         MR. McCONNELL:  I'll object.
19     A.   The information that is in the file
20 currently will still be there, yes.
21     Q.   And some of that would have
22 prescription medicine information, the notes
23 you're talking about?
24     A.   Yes, sir.
25     Q.   I think you told us, and maybe

16 (Pages 58 - 61)

Page 214
1  there in 2006 is much more potent than it was in
2  1970 and it is very inexpensive relative to what
3  it was in 1970.
4      Q.  And then if you flip to
5  "Prescription Drugs" -- do you see that?
6      A.  Yes, sir.
7      Q.  It says, "67 narcotic pills for each
8  citizen of Ohio"?
9      A.  Yes, sir.
10     Q.  Is this data that you have
11 independent knowledge of or is this information
12 that you pulled from other sources to assist in
13 your presentation?
14     A.  This was pulled from other sources.
15     Q.  Would you agree with me that you
16 were not necessarily an expert on these areas,
17 you were just trying to compile some
18 information?
19         MR. McCONNELL:  Objection.
20     Q.  Or are you an expert?
21     A.  I would consider myself, as a
22 forensic pathologist, an expert in determining
23 drug abuse deaths.  In the situation for what we
24 have here, this is information that was put out
25 by a source here at Ohio, and I don't recall

Page 215
1  that source, that there were 67 narcotic pills
2  prescribed for each man, woman and child in the
3  State of Ohio in the year that this data was
4  collected.  And I don't recall that at this
5  time.  So this is information that was available
6  through the internet and through other sources
7  in describing what was going on with the opiate
8  problem in the State of Ohio.
9      Q.  Though we know from what you wrote
10 in your note and what we've seen in these
11 documents that, I think your word was, the vast
12 majority of opioid deaths don't relate to
13 narcotic pills to the extent at least they're
14 prescriptions, right?
15         MR. McCONNELL:  Objection.
16     A.  Currently the vast majority of the
17 deaths that I see are for illicit drugs.  I do
18 not know if there was a role played with
19 prescription drugs earlier in the life cycle of
20 that individual or not, but at the time that
21 they are dying, the drugs they are dying from
22 are illicit rather than the prescription drugs.
23     Q.  And if you wanted to find out if
24 there was a role, you would go do what you
25 talked about, go and talk to their doctors, look

Page 216
1  at their medical records, and then you might
2  have some more information to make that
3  determination?
4      A.  Yes.  We may determine that this
5  person had prescription opiates in the past, had
6  exposures there, or they may not have.
7      Q.  But without doing the digging, it's
8  guessing, right?
9          MR. McCONNELL:  Objection.
10     A.  It's unknown if we haven't asked the
11 question or the information is not available.
12 We assess cause and manner of death based on
13 what is going on at the time a person dies.
14     Q.  And then the rest of this, kids raid
15 drug cabinet, Skittles parties, is this just
16 taking about children who are using -- kids who
17 are using medicines that they find in their
18 parents' or friends' houses and then taking them
19 for supposed recreational use?
20     A.  Yes, sir.
21     Q.  The next page, "Prescription Drug
22 Medicines," do you see that?
23     A.  Yes, sir.  "Prescription pain
24 medications"?
25     Q.  Yes.  I'm sorry.  Thank you, Doctor.

Page 217
1  Can you just tell us, how would you present this
2  slide?
3      A.  Just making people aware that if you
4  have prescription medications in your home, to
5  make sure that they are not easily accessible to
6  teens.  Going back to the previous slide we just
7  talked about, children had the ability to go
8  into their parents' medicine cabinets and take
9  medications that were not prescribed to them, so
10 be aware that that's a practice.  It's difficult
11 for the addiction potential to know is this all
12 nature versus nurture and environment.  And that
13 it has been called an epidemic.  In 2012, 24
14 percent of teens used prescription drugs without
15 a prescription.  And that's data that was pulled
16 from another source, but I don't recall at the
17 time.
18     Q.  And what do you mean or what does
19 this slide -- or how would you present this
20 nature versus nurture/environment?
21     A.  At the time when I'm presenting
22 this, there were debates is this something that
23 is organic in that individual that caused them
24 to become a drug addict or is it being placed
25 into an environment where these drugs are

Page 218
1  readily available and they have the opportunity
2  to try them.  So it's a question of which is the
3  more -- the greater source of the cause for
4  addiction.
5      Q.   And that specifically, the answer to
6  that question or examining that, that's outside
7  your expertise?
8      A.   Correct.
9      Q.   You were just reporting on the
10 nature of the dialogue at the time?
11     A.   Yes, sir.
12     Q.   The next slide, do you know where
13 you got those statistics from in that little pie
14 chart on the top?
15     A.   I don't recall the source of that
16 pie chart.  The bottom chart also does not have
17 the location.
18     Q.   According to the pie chart, people
19 who abuse prescription painkillers get drugs
20 from a variety of the sources, right?
21     A.   Yes.
22     Q.   And it looks like 58 percent, is
23 that right, or is that 56 percent?
24     A.   55 percent obtained free from friend
25 or relative.

Page 219
1      Q.   Thank you.
2           And then 17.3 percent are prescribed
3  by one doctor?
4      A.   Correct.
5      Q.   So am I reading this correctly to
6  say that basically other than 17.3 percent, all
7  of the others -- other than 17.3 percent who are
8  prescribed by a doctor, all of the others who
9  abuse prescriptions, according to this chart,
10 get the drugs from illegal or unlawful places?
11          MR. McCONNELL:  Objection.
12     A.   There is 7.1 percent that say other
13 source.  I don't know if they're getting it from
14 more than one physician or how that is broken
15 down, but it does state that 17.3 percent were
16 prescribed by one doctor, and the other
17 categories other than the other source indicate
18 that they're getting it from a drug dealer,
19 stranger or a friend or relative.
20     Q.   The next slide looks like a
21 screenshot of some sort.
22     A.   Yes.
23     Q.   It says, "Contributing Factors"?
24     A.   Yes, sir.
25     Q.   Do you know where you got this from?

Page 220
1      A.   I don't recall at this time.
2      Q.   Do you recall enough about this to
3  tell us what you would -- how you would have
4  presented this?
5      A.   Just showing that there are multiple
6  factors that are contributing to the opioid
7  epidemic, the central circle showing increased
8  exposure, increased substance abuse, and going
9  on into the epidemic.  And the outer boxes are
10 showing different habits or activities that are
11 believed to have contributed to this epidemic.
12     Q.   So is the point there's no one
13 cause, there's all these different various
14 multiples -- multiple influences that lead to
15 ultimately the epidemic?
16     A.   Yes.  It's a multifactorial problem.
17     Q.   And then if you flip to another
18 page, Doctor, it's the colorful "Annual Summit
19 County Overdose Deaths."  Do you see that?
20     A.   Yes, sir.
21     Q.   Can you tell us what this
22 represents?  The reason why I ask, Doctor, to
23 the extent your memory reflects it, I wasn't
24 clear kind of how the total overdose deaths
25 broke out with the various four other

Page 221
1  categories, whether it was overlapping.  Do you
2  have a recollection, because the numbers didn't
3  seem to add up for me at least?
4      A.   There is overdose -- or overlap
5  here.  We've got just the general total
6  overdoses in that first group of multi-colored
7  columns.  The heroin has shown an increase over
8  time.  I don't recall if -- what the illicit
9  only refers to.  I would have to go back and
10 look at those numbers and compare them to the
11 stats.  There is a group that is both
12 combination of illicit drugs as well as
13 prescription.  And when you look at the
14 prescription only or Rx only, those numbers have
15 been decreasing over the four-year time frame
16 that I was sampling there.  So in the time frame
17 that heroin is increasing, prescription drugs
18 are decreasing.
19     Q.   And that's what your little note
20 says right on the side, not your little --
21 that's what your note says, prescription drug
22 deaths decreasing, heroin deaths increasing?
23     A.   Yes, sir.
24     Q.   And if you flip the page, "Drug
25 Abuse Trends in Summit County"?

Page 222

1   A.   Yes, sir.
2   Q.   So in 2014, 144 overdose deaths for
3 the year; of that, 34 were heroin, 45 Fentanyl,
4 and combined were 19?
5   A.   Yes, sir.
6   Q.   And then in 2015 -- so this must
7 have been done at least after -- sometime after
8 September 2015 is when you presented this?
9   A.   Agreed.
10  Q.   Heroin had dropped 25 percent,
11 fentanyl deaths had risen 72 percent?
12  A.   60 percent.
13  Q.   I'm sorry.  Had risen to 60 percent.
14 Thank you.  And the combined use of heroin and
15 fentanyl were up, right?
16  A.   Yes, sir.
17  Q.   And in this time frame is it fair to
18 say that your belief and understanding in the
19 2014-15 period, that the fentanyl deaths that
20 are referenced here were -- the vast majority
21 were illicit fentanyl?
22  A.   I believe so, yes.
23           - - - - -
24           (Thereupon, Deposition Exhibit 8,
25           Article Entitled "Carfentanil and

Page 223

1           Current Opioid Trends in Summit
2           County, Ohio," was marked for
3           purposes of identification.)
4           - - - - -
5   Q.   I'm going to show you in a minute
6 what we're marking Exhibit 8, an article called
7 "Carfentanil and Current Opioid Trends in Summit
8 County, Ohio."  It's one that you were an author
9 on.
10          Can you tell us the circumstances of
11 why you and your colleagues or your co-workers
12 got together and decided to publish this?
13  A.   I believe that was co-authored by
14 Kristy Waite.  Is that correct?
15  Q.   It was.  And I'm going to show it to
16 you in a second.  We got it here.  So I've given
17 you -- this is Exhibit -- what does it say,
18 Doctor?
19  A.   8.
20  Q.   Are you familiar with this article?
21  A.   Yes, sir.
22  Q.   Is this -- is it a peer-reviewed
23 article, if you know?
24  A.   I don't recall if this is a
25 peer-reviewed publication or not.

Page 224

1   Q.   Are all of these -- what's your
2 relation to Ms. -- I don't know if they're
3 doctors.  I'll call them Ms. Waite, Ms. Deeken,
4 Mr. Perch and obviously you.  Who are those
5 people?
6   A.   Dr. Waite at the time was a
7 pathology resident at Summa Health System and
8 she had rotated through our office previously.
9 She has aspirations of becoming a forensic
10 pathologist and is currently completing her
11 forensic fellowship.
12          Amy Deeken is also Dr. Deeken.  She
13 is a member of the staff at Summa in the
14 pathology department.  She was basically
15 Dr. Waite's supervisor.  Because Dr. Waite had
16 aspirations to become a forensic pathologist, as
17 she is currently doing, she wanted to have an
18 opportunity to publish in the forensic field,
19 and between myself, Dr. Waite and Dr. Deeken,
20 this topic was chosen because it was
21 contemporaneous to what was going on in our
22 office with the increase in the carfentanil and
23 we felt that this was a good topic for her to
24 pursue.
25          And then Mr. Perch is my

Page 225

1 toxicologist and he assisted Dr. Waite in
2 understanding his portion of the contribution to
3 this article.
4   Q.   Can you give us kind of a summary of
5 what you saw and how this issue came about?
6   A.   Could you be more specific in your
7 question?
8   Q.   Sure.  I'll tell you how I think
9 it's summarized and you tell me if you agree
10 with it.
11  A.   Okay.
12  Q.   So at some point you saw an increase
13 in overdose deaths and you ultimately were able
14 to attribute it to carfentanil and developed
15 methods to test for carfentanil that were not
16 previously obvious to you and perhaps others in
17 the community and you wrote this piece to tell
18 them about your learning so others might benefit
19 from that?
20  A.   To some degree that's accurate.  The
21 carfentanil issues began in our community the
22 July 4th weekend of 2016 and skyrocketed through
23 the rest of 2016.  This is a drug that we had
24 not seen in our community prior to July 4th
25 weekend of that year.  At that time we did not

Page 226

1 have a method to identify it, and Mr. Perch was
2 able to develop a method so that we could begin
3 to identify it and worked with other toxicology
4 people within the -- within the state to help
5 develop methods that would be reliable for
6 identifying this.
7         And there were other communities
8 throughout the United States that were not
9 seeing carfentanil at all, so we felt that it
10 was important they be aware of the fact that
11 this is a drug out there that they may not be
12 looking for, and because they're not looking for
13 it, would not detect it, and that the detection
14 required special instrumentation to perform.
15    Q.   So just to make sure, you know, the
16 record and everyone is on the same page, my
17 understanding -- tell me if this is right,
18 Doctor -- carfentanil is used literally as an
19 elephant tranquilizer, a large animal
20 tranquilizer, right?
21    A.   Yes, sir.
22    Q.   It's not supposed to be used for
23 people?
24    A.   There's no clinical application in
25 humans.

Page 227

1    Q.   In fact, I've seen information that
2 it's like 10,000 times more powerful than other
3 prescription type pain relievers?
4    A.   Yes.  It is significantly more
5 powerful.
6    Q.   And you saw a spike in July 2016,
7 but because there was no testing methodology at
8 least in Summit, you don't really know or can't
9 tell whether some of the previous overdose
10 deaths had carfentanil involved; is that fair?
11         MR. McCONNELL:  I'm going to object.
12    A.   I believe that once we came up with
13 the testing, we did look back at some of the
14 cases.  I don't recall the details of that.
15    Q.   Do you know how far back you looked?
16    A.   It would just be in the previous
17 months, if I recall correctly, but that would be
18 a question for Mr. Perch.
19    Q.   So if it was the previous months,
20 assuming that was the case, we could ask
21 Mr. Perch, but then it wouldn't get us anything
22 prior to -- 2015 or prior to that?
23    A.   Correct.
24    Q.   And obviously to the extent that
25 you're unable to test for it, you're unable to

Page 228

1 make a determination whether, in fact, it was a
2 causative factor?
3    A.   Correct.
4    Q.   But when it essentially became
5 detected and had its very significant adverse
6 consequences on the community, according to your
7 article, there were a spike of 35 deaths in both
8 July and August, right?  And I'm on the third
9 paragraph of your -- the results.
10    A.   Yes, sir.
11    Q.   So that's 70 people?
12    A.   Yes.
13    Q.   And then it decreased to 12 deaths
14 in December?
15    A.   Yes, sir.
16    Q.   And am I correct that there were
17 also -- in September, October and November there
18 were likely additional deaths from carfentanil?
19    A.   I would have to look at our
20 statistics to know how many were present in
21 those months.
22    Q.   So even if we were to not talk about
23 those, just in the statistics you have here, it
24 looks like there would be 82 deaths, right?
25    A.   Yes, sir.

Page 229

1    Q.   So that spike would, when you look
2 year over year, if we saw an increase from 2015
3 to 2016, we would want to account that at least
4 80, if not more of those, were the result of
5 this, essentially, carfentanil spike?
6    A.   Okay.  Could you restate that
7 question?
8    Q.   Sure.  Sorry.
9         Prior -- you're unaware of whether
10 there was -- let me strike that.
11         Do you know if there continued to be
12 carfentanil related or caused deaths into 2017
13 and '18?
14    A.   Yes, sir.
15    Q.   You still see them?
16    A.   Yes, sir.
17    Q.   Is this an area, this carfentanil
18 death and other fentanyl analogs, where you're
19 working with law enforcement?
20    A.   We work with law enforcement on a
21 regular basis.  I'm not sure what you are asking
22 specifically.
23    Q.   After seeing basically 80 or more
24 people die in six months in 2016, did you do
25 anything above and beyond your normal practices

Veritext Legal Solutions
www.veritext.com                                                                888-391-3376