# EXHIBIT 54

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4             ~~~~~~~~~~~~~~~~~~~~
 5   IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
     OPIATE LITIGATION
 6                                    Case No.
                                      17-md-2804
 7
                                      Judge Dan Aaron
 8                                    Polster
 9   This document relates to:
10   The County of Cuyahoga v. Purdue Pharma, et
     al., Case No. 17-OP-45004
11
     City of Cleveland, Ohio v. Purdue Pharma L.P.,
12   et al., Case No. 18-OP-45132
13   The County of Summit, Ohio, et al. v. Purdue
     Pharma L.P., et al., Case No. 18-OP-45090
14
               ~~~~~~~~~~~~~~~~~~~~
15
16
             Videotaped Deposition of
17              CLARENCE I. TUCKER
18               January 10, 2019
                    9:01 a.m.
19
20                  Taken at:
21            Brennan Manna & Diamond
               75 East Market Street
22                 Akron, Ohio
23
24
25          Stephen J. DeBacco, RPR
```

Page 134

1   A.  The content?  No.
2   Q.  That's -- that's delegated to the
3 medical director?
4   A.  That is the medical director, and
5 that is District Chief Joe Natko.
6   Q.  So you're not required to approve
7 or not what medicines are carried on the
8 ambulances?
9   A.  No.  The actual medical director
10 approves the drug list.
11   Q.  And -- and it's under the medical
12 director's license that AFD paramedics and
13 EMTs --
14   A.  That is their function.
15   Q.  -- administer care --
16   A.  That is correct.
17   Q.  Chief, sitting here today, do you
18 know how many prescriptions for opioids were
19 written in Akron last year?
20   A.  No idea.
21   Q.  Do you have any way to -- any sense
22 of how you could figure that out?
23       MS. LEYIMU:  Object to the form.
24   A.  I don't know if we have access to
25 that information or not.  You talking about

Page 135

1 overall --
2   Q.  Yes.
3   A.  -- the number of opiate
4 prescriptions?  That's never been a question
5 that has been brought to my attention, and I
6 don't know.
7   Q.  Let me narrow it, then, a little
8 bit.  How about, do you know last year how many
9 times AFD personnel dispensed an opiate to a
10 patient?
11   A.  No.
12   Q.  Is that data available?
13   A.  I don't know.  That's something I'd
14 have to ask District Chief Joe Natko.
15   Q.  Chief Natko would be the right
16 person?
17   A.  Correct.
18   Q.  And just a slight tweak on that
19 question.  Do you know how many times AFD
20 personnel dispensed Narcan last year?
21   A.  No.
22   Q.  Ask Joe Natko?
23   A.  Yes.
24   Q.  Do you know one way or the other
25 whether Chief Natko could -- could generate

Page 136

1 those numbers?
2       MS. LEYIMU:  Object to the form.
3   A.  I don't know.
4   Q.  Chief, do you know anybody in your
5 friends or family network who has had an issue
6 with dependency on opiates?
7   A.  Yes.
8   Q.  May I ask, without names, the
9 relationship?
10   A.  One was another City employee that
11 was equal to my rank at that time but not a
12 member of the Akron Fire Department.  What he
13 described for me was having a motor vehicle
14 accident and opiates were prescribed for him as
15 part of his pain management.  He said he took
16 the drugs -- drugs as prescribed until the
17 point -- he reached a point where he was no
18 longer needing to take those drugs.
19       He then said that he couldn't
20 figure out what was wrong with him.  He -- he
21 felt sick, he couldn't function, and he had no
22 idea what was wrong with him, and then he
23 realized, "You know what?  I think I'm addicted
24 to this substance."
25       So, yes, I've -- I have that as

Page 137

1 someone that I've spoken to personally, that
2 person, about his addiction, and he had to
3 fight to get back, you know, to -- to not being
4 addicted to be able to function.
5       The other -- the other person that
6 I know that has had an issue with opiates is
7 one of my neighbors.  A neighbor that's lived
8 in my neighborhood for a couple of years.  They
9 have a -- a son who our EMS units respond to on
10 a routine basis.
11   Q.  For overdoses?  Overdosing?
12   A.  For overdoses.
13   Q.  Starting with the City employee you
14 mentioned, you mentioned he was equal to your
15 rank at that time.  What --
16   A.  Correct.
17   Q.  What year are we talking about,
18 approximately?
19   A.  2016.
20   Q.  This individual had an accident and
21 was prescribed an opiate.  Do you know which
22 one?
23   A.  I'm sorry.  Say again.
24   Q.  I'm sorry.  The -- you said the
25 individual had an accident and was prescribed

35 (Pages 134 - 137)

Page 138

1  an opiate for pain management?
2  A. Correct.
3  Q. Do you -- do you know which opiate
4  in particular?
5  A. No.
6  Q. Prior to that prescription, do you
7  know if this individual had used opiates
8  before?
9  A. I do not know.
10 Q. You -- you said, Chief, that he
11 reached the point where he no longer needed to
12 take the drugs and then he started to feel --
13 A. What he described as sick.
14 Q. As sick. Is it at that point that
15 he -- he sought help? Do you know?
16     MS. LEYIMU: Object to the form.
17 A. We did not get into the details of
18 how he was able to either get treatment or seek
19 treatment. We didn't talk about that aspect.
20 We were simply talking about the ease in which
21 he found himself addicted to prescription
22 drugs.
23 Q. And it was his assessment that --
24 that he -- strike that.
25     Do you know if he at any point used

Page 139

1  an illegal or illicit opiate?
2  A. I don't believe so. I don't know
3  for a fact because, again, I haven't known this
4  individual my entire life, but that didn't
5  strike me as the case.
6  Q. So this is an individual who used
7  prescription opiates, and -- and at that point,
8  after ceasing the use, in his judgment, needed
9  help?
10 A. Yes.
11 Q. Does this individual still work --
12 does this individual still work for the City?
13 A. No.
14 Q. How did it come to be that this
15 topic came up with him?
16 A. Honestly, I don't remember.
17 Q. Your son -- I'm sorry, your
18 neighbor's son --
19 A. Yes.
20 Q. -- do you know what opiate he's
21 using that's precipitating the overdoses?
22 A. No.
23 Q. When you said that the EMS units
24 are responding to -- to the son on a routine
25 basis, what does "routine" mean?

Page 140

1  A. It's like I kind of described
2  before, in waves. Sometimes only once or twice
3  a month, other times once or twice a week. It
4  just depends.
5  Q. Responding to -- to the son?
6  A. That is correct.
7  Q. As often as once or twice a week?
8  A. Yes.
9  Q. The EMS personnel are administering
10 Narcan?
11 A. I did not get into the details of
12 the treatment for this particular individual.
13 Q. Understood.
14     Besides the City employee and your
15 neighbor's son, any other -- any other
16 individuals you've known to have an issue with
17 opiate dependency?
18 A. No.
19 Q. Chief, do you think Akron has a
20 cocaine problem right now?
21 A. I think that's a very unorthodox
22 question to ask when you -- does Akron have a
23 cocaine problem? That's like saying does Akron
24 have a heart attack problem. Well, if you're
25 the person having a heart attack, it's a big

Page 141

1  problem.
2      So at least -- if -- are you
3  talking about numbers? How many?
4  Q. I understand it's a subjective
5  term.
6  A. Yes, yes.
7  Q. So let's put it this way. We've
8  talked about a crisis in other context today.
9  A. Yes.
10 Q. Do you think that Akron has an
11 opiate crisis, as you use that term?
12 A. I do.
13 Q. I'm sorry. Has a cocaine crisis?
14 A. No.
15     And my reason for using the word
16 "crisis" when describing the opiate issue, you
17 know, I described it as a wave, but I don't
18 know. It might even be more -- 2016 seemed
19 more like a tsunami than -- than a wave. It
20 was -- it was really bad.
21 Q. That was for the -- for the
22 opiate -- what you called an opiate crisis?
23 A. That is correct.
24 Q. Do your EMS paramedics or fire
25 medics treat individuals for cocaine overdoses?

Page 142
1   A.   Sure.
2   Q.   But in your estimation, that
3 doesn't rise to the level of the crisis that
4 you described --
5   A.   It absolutely has not.
6   Q.   Has cocaine been -- have -- have
7 your para- -- fire medics been treating cocaine
8 incidents for as long as you've worked at Akron
9 Fire Department?
10  A.   Yes.
11  Q.   Were there particular periods when
12 cocaine issues spiked or -- or hit a peak, as
13 you've said before?
14       MS. LEYIMU:  Object to the form.
15  A.   Not where it was brought to my
16 attention.
17  Q.   In the '80s there wasn't a
18 cocaine -- cocaine epidemic?
19       MS. LEYIMU:  Object to the form of
20 the question.
21  A.   I wouldn't refer to it as an
22 epidemic because it never reached the levels of
23 what we're talking about, like for 2016.
24       Has there been a cocaine problem?
25 Not just in Akron, but seems like everywhere,

Page 143
1 sure.  Lots of other issues as well.
2       The opiate issue is one issue, but
3 it just seemed to raise to the level of just
4 overwhelming our ability to respond.
5       The other types of emergencies, be
6 it cocaine, heart attack, be it bath salts,
7 whatever, have we had those calls?  Yes, but
8 they have never overwhelmed our resources like
9 this opiate issue has.
10  Q.   So the distinction is cocaine,
11 heart attacks, bath salts, those types of
12 incidents have remained largely stable?
13       MS. LEYIMU:  Object to the form of
14 the question.
15  A.   I don't have the numbers to tell
16 you exactly what they were, but again, nothing
17 has -- as I stated before, nothing has risen to
18 the -- the level of -- of -- of being a true
19 what I would call disaster almost as the opiate
20 crisis has in 2016.  Starting around 2014, and
21 it just built from there.  To the point where
22 it was really -- it has been really stressing
23 our resources, our ability to respond,
24 overwhelming our personnel.
25  Q.   How about meth?

Page 144
1   A.   Meth, okay.
2   Q.   Is meth a problem in Akron?
3   A.   Meth is a problem everywhere.
4   Q.   Has it been getting worse?
5       MS. LEYIMU:  Object to the form of
6 the question.
7   A.   It's difficult for me to answer,
8 not being involved in the EMS system as -- as I
9 was back when I was a paramedic, but it hasn't
10 spiraled out of control.
11  Q.   Sitting here today, you don't have
12 a sense of whether the number of meth-related
13 incidents has been increasing or decreasing or
14 staying the same?
15  A.   I do not have that --
16       MS. LEYIMU:  Object to the form.
17  A.   I do not have that data.
18  Q.   Any -- any anecdotal sense of the
19 trend line for meth-related incidents?
20  A.   I'm sorry.  Say that again, please.
21  Q.   I understand you may not have the
22 data in front of you for the number of
23 meth-related incidents, but I'm asking
24 anecdotally if you have a general sense of
25 whether the number of incidents has been

Page 145
1 increasing or decreasing or otherwise.
2   A.   I really couldn't tell you.  I
3 have -- I have no recollection of anyone
4 mentioning anything about the increase of meth
5 calls in Akron.
6   Q.   It's not -- not something that
7 comes up in your weekly meetings with --
8   A.   No.
9   Q.   Casting back to when you started at
10 Akron Fire --
11  A.   Yes.
12  Q.   -- was -- were there meth-related
13 incidents even that far back?
14  A.   Yes.
15  Q.   Is it a heroin crisis in Akron?
16       MS. LEYIMU:  Object to the form of
17 the question.
18  A.   There is heroin use in Akron just
19 like there is everywhere.  Is it an issue?
20 Yes.
21       But when I talk about a crisis, I'm
22 talking about something that's causing
23 large-scale numbers of both close calls and
24 deaths.  When I call something a crisis, I'm
25 talking about something that for whatever

Page 146

  1  reason we as a community haven't been able to
  2  solve, and it seemed -- seemed to have been
  3  spiraling up and out of control.  And I'm
  4  referring to the opiate issue, and specifically
  5  starting and up around 2014 is when it really
  6  began to ramp up.
  7         So what I call -- and I'm sorry.
  8  Which -- you're talking about -- you weren't
  9  talking about meth; you were talking about
 10  what?
 11      Q.   Heroin.
 12      A.   Heroin.  Is it an issue in Akron?
 13  Absolutely.  Is it something where these people
 14  need absolute- -- some help?  Yes, absolutely.
 15  But has it risen to the point where I would
 16  call it a crisis?  No.
 17      Q.   Well, you -- you agree with me,
 18  earlier, that heroin is a type of opiate,
 19  correct?
 20      A.   Yes, it is.
 21      Q.   As is fentanyl and carfentanil?
 22      A.   Correct.
 23      Q.   So I'm trying to understand, when
 24  you've referred repeatedly to an opiate
 25  crisis --

Page 147

  1      A.   Yes.
  2      Q.   -- "opiate" is a diffuse term.
  3  Which opiates in particular are causing or
  4  precipitating the crisis?
  5           MS. LEYIMU:  Object to the form.
  6      A.   I think all of them combined
  7  contribute to what I call a crisis.  But what
  8  seems to have taken things to another level are
  9  the pills.  And I'll give you an example of
 10  what the individual that I described before
 11  described for me.
 12           If you have an individual that goes
 13  to their doctor with a problem and you get
 14  medication for that problem, you assume that I
 15  can safely take this medication.  And then when
 16  I'm done with it, I will -- should have no --
 17  no effects that affect my life.  It's there to
 18  help me; it's not going to hurt me.
 19           In so many cases in this opiate
 20  crisis, it's very easy for someone to take
 21  medication that's prescribed to them from their
 22  doctor, take it exactly as it was prescribed,
 23  and then when you think you're done with it,
 24  now you've got a problem.  You can't walk away.
 25  You're addicted.  And now you have to deal with

Page 148

  1  that.  Some people deal with it appropriately
  2  by going into treatment.  Other people deal
  3  with it in inappropriate ways by trying to get
  4  any medication they can, either over the
  5  counter or other illicit drugs.
  6           And again, I'm not a -- I'm not a
  7  police officer, but we see it.  We see it.
  8      Q.   Besides the individual that you
  9  mentioned --
 10      A.   Yes.
 11      Q.   -- and we talked about before,
 12  what -- what's the other bases, if any, for
 13  your view that the things that took it to
 14  another level are the pills?
 15           MS. LEYIMU:  Object to the form.
 16      A.   I think there are different types
 17  of people in this world that end up getting
 18  addicted to drugs.  There are people that
 19  choose to do something illegal, take some
 20  illegal substance for, you know, whatever
 21  reason:  to get high, to be accepted into
 22  groups, whatever.  And those people frequently
 23  will find themselves addicted.
 24           There's another set of people
 25  that's much larger, that I think includes you

Page 149

  1  and me, that things happen.  You go to the
  2  doctor to try to get help with an issue.  You
  3  take the medication exactly as it was laid out
  4  for you by your physician.  And you assume that
  5  when you're done with it, there's no side
  6  effects.  There's no -- there's no effect to
  7  your -- your body, your ability to live the
  8  rest of your life because you took that
  9  medication.  We assume that.
 10           And I think what we're talking
 11  about is those people finding themselves
 12  trapped.  They're addicted.  They didn't --
 13  they didn't intend to go out and become
 14  addicts.  They didn't intend to go out and do
 15  something illegal or -- or, you know, become
 16  addicted to some drug, but it happens.
 17      Q.   So, Chief, I -- I understand.  I
 18  appreciate your view on those issues.  I guess
 19  my question is somewhat different.
 20      A.   Okay.
 21      Q.   Do you -- have you seen, for
 22  example, any data from your department or
 23  otherwise that would substantiate your view
 24  that pills was a major cause of some of the
 25  overdoses you're seeing?

38 (Pages 146 - 149)

Page 254

1    A.   No.
2    Q.   Are you an expert in mental health?
3    A.   No.
4    Q.   Are you an expert in addiction?
5    A.   No.
6    Q.   Are you an expert in marketing?
7    A.   No.
8    Q.   Are you an expert in evaluating the
9  efficacy of warning label language on consumer
10 products?
11   A.   No.
12   Q.   Are you generally -- well, strike
13 that.
14        Do you agree that there are
15 individuals who take prescription opioids and
16 do not develop an addiction?
17        MS. LEYIMU:  Object to the form of
18 the question.
19   A.   It is an assumption.  Well, I'll
20 take that back.  I have taken an opiate once,
21 and I did not become addicted.  So in
22 reality -- so, yes, I know at least one where
23 it has not occurred.
24        When it comes to others, it would
25 be making an assumption.

Page 255

1    Q.   Right.  And that's not an
2  assumption you're comfortable making?
3    A.   No.
4    Q.   Okay.  Are there people who take
5  opioids by prescription, become addicted, but
6  that do not die as a result of that addiction?
7    A.   That is another assumption.
8    Q.   Okay.  And you're not comfortable
9  making that?
10   A.   No.
11   Q.   Okay.  What about this one.  Do you
12 agree that there are people who take opioids
13 who are addicted but who do not break the law?
14   A.   Yes.
15   Q.   Okay.  You were asked some
16 questions about whether there was a cocaine
17 crisis in Akron or a methamphetamine crisis or
18 a heroin crisis.  Do you remember that topic of
19 discussion from earlier today?
20   A.   Yes.
21   Q.   Okay.  I want to ask about a couple
22 different substances.  Is Akron facing a crisis
23 with related -- or excuse me.  Strike that.
24 I'll ask it again.
25        Is Akron facing an illicit fentanyl

Page 256

1  crisis?
2        MS. LEYIMU:  Object to the form of
3  the question.
4    A.   I would say that fentanyl is one
5  specific opiate, and I would not say that we
6  are experiencing a crisis just to one specific
7  opiate.  But I don't know that to be fact.  But
8  I would --
9        But, again, when you say "crisis,"
10 it's kind of a -- in my opinion, it's a term
11 that what you consider a crisis may not be what
12 I consider a crisis.  So in this case, I would
13 say no.
14   Q.   Okay.  Has Akron previously
15 experienced an illicit fentanyl crisis, in your
16 opinion?
17        MS. LEYIMU:  Object to the form.
18   A.   Not to my knowledge.
19   Q.   Okay.  Has Akron ever experienced a
20 carfentanil crisis?
21   A.   Again, I think our definition of
22 "crisis" could -- is going to vary, but in my
23 personal opinion, no.
24   Q.   Okay.  I want to ask you about a
25 couple numbers to follow up in this area.

Page 257

1        I will represent to you -- and
2  these are, for your edification, coming from
3  Summit County medical examiner annual reports.
4        I'll represent to you that in 2015
5  Medical Examiner Kohler certified that there
6  were 44 deaths in Summit County attributable to
7  cocaine.
8        Do you consider, as Chief of Akron
9  Fire, 44 cocaine deaths to be a crisis?
10       MS. LEYIMU:  Object to the form.
11 Asked and answered.
12   A.   No.
13   Q.   Okay.  The number for cocaine
14 deaths, according to Medical Examiner Kohler,
15 in 2017 was 80 for that year.  Do you consider
16 80 cocaine deaths to be a crisis?
17       MS. LEYIMU:  Object to the form.
18 Asked and answered.
19   A.   I think we're starting to get into
20 a gray area.  Again, the definition of -- what
21 is the definition of a crisis?  What are you
22 expect- -- when I say crisis -- or when you
23 say crisis, exactly what do you mean?
24   Q.   Well, the capacity that I'm asking,
25 you are one of the leaders in the community as

65 (Pages 254 - 257)

Page 258

1  the Chief of Akron Fire, right?
2      A.   Correct.
3      Q.   And I think you told counsel
4  earlier that one of your jobs as chief is to
5  set the tone and -- you know, as being the
6  leader for the department, right?
7      A.   That is correct.
8      Q.   So you have an internal role
9  managing Akron Fire and you also have an
10 external role as a liaison between that
11 department and the larger community, correct?
12     A.   That is correct.
13     Q.   And so in exercising that
14 leadership role and setting the tone, I'm
15 asking for your personal view in that
16 leadership role.  When you would message to the
17 citizens of Akron, how you would describe the
18 various issues that they're facing?  Some, I
19 assume, you would think are more pressing than
20 others.
21         So when I ask about a crisis, I'm
22 asking in your capacity as chief of Akron Fire,
23 when you would communicate to the public, would
24 you -- if -- if the public asked you at an --
25 at an event, "Chief Tucker, 2017 we had 80

Page 259

1  deaths from cocaine.  From Akron Fire's
2  perspective, is that a crisis?"
3         MS. LEYIMU:  Object to the form of
4  the question.
5      A.   I would state it as a concern, but
6  not a crisis.
7      Q.   And so for heroin, in 2015,
8  according to the numbers we have, there were
9  144 heroin overdose deaths.  So if asked by a
10 member of the public, "Akron Fire, do you
11 consider" --
12         Well, I won't do 2015 because you
13 weren't the chief.  I'll move forward to 2017,
14 to be fair.
15         So if you were asked in 2017, the
16 58 heroin deaths in Akron, are we dealing with
17 a heroin crisis as a result of those 58 heroin
18 deaths?
19         MS. LEYIMU:  Object to the form.
20     A.   The terminology I would use, to put
21 it in my own words, I would call it a serious
22 concern.  One death is a serious concern.  Any
23 deaths, especially for something that is an
24 ongoing or potentially an increasing problem,
25 something that increases in -- in number, is

Page 260

1  a -- a strong concern.
2         Would I use the term "crisis"?  I
3  think it's -- I think that's more of a personal
4  idea as to whether you consider something a
5  crisis or not.
6         But any death, any fire death, any
7  overdose death, any motor vehicle accident
8  where we have deaths, all of these are concerns
9  and real issues for not just the Akron Fire
10 Department, but for this community as a whole,
11 and we have a responsibility to try to do what
12 we can to decrease -- decrease those numbers.
13        Can I call them a crisis?  In my
14 personal opinion, when you start using the term
15 "crisis," you're talking about something that
16 not only is spiraling out of control, but it is
17 also causing deaths, and I mean many deaths,
18 and it's beginning to be something that you can
19 no longer handle.
20        As in the Akron Fire Department
21 being able to handle the volume of calls that
22 we've been receiving, it's been a real
23 challenge, and it's been something that, again,
24 I would call a strong concern because of our
25 inability to maintain our -- our number of

Page 261

1  resources available to help the public.
2         Does that help?
3      Q.   I think I understand.  Thank you.
4      A.   Okay.
5      Q.   One related question.  Would you
6  ever use the word "epidemic" to describe a
7  situation where there are 80 cocaine deaths in
8  Summit County in 2017 --
9         MS. LEYIMU:  Object --
10     Q.   -- or would your answer be similar
11 to what you just articulated for crisis?
12        MS. LEYIMU:  Object to the form of
13 the question.
14     A.   When I think of the term
15 "epidemic," I think more of something that is a
16 communicable disease.  I think of like a flu
17 epidemic.  Something that is trans- -- you
18 know, transferred from one individual to
19 another.  Never really considered heroin an
20 epidemic.  And again, that's my personal
21 opinion.
22     Q.   Okay.  All right.  And in terms of
23 a crisis, though, I did hear you testify
24 earlier that you think that Akron has
25 experienced an opiate crisis, and then you

Page 262

1  described 2014 and the waves and all of that.
2      A.   Correct.
3      Q.   But you -- you would -- is that one
4  specific area that you are comfortable using
5  the term "crisis"?
6      A.   The opiate issue, I think, is a
7  crisis, simply because, again, the absolute
8  total devastation that we -- and I'm talking
9  about my people on the Akron Fire Department --
10 have witnessed.  The -- the repeat overdoses
11 from the same individual, sometimes on the same
12 day.  The -- just the sheer volume of -- of
13 calls for the same type of an issue, in my
14 personal opinion, has made it a crisis.
15          And then to find out that it's not
16 just Akron.  It's Summit County.  It's Ohio.
17 It's the country.  Those -- those things make
18 me think that it is truly a crisis.  It's not
19 some isolated case that we just hope will go
20 away on its own.  It's something that has been
21 a national problem.
22          And there has been, as we saw in
23 some of the previous documents, speculation as
24 to why.  Or does anyone really know the true
25 cause?  Does anyone really know?  Has

Page 263

1  everything been done to try to stop this thing?
2  We don't -- we have more questions than
3  answers.
4      Q.   Okay.  And -- and that's your
5  perspective, sitting here today as -- as chief
6  of -- chief of Akron Fire, that with respect to
7  opiates, it's a crisis, but there's more
8  questions than answers?
9          MS. LEYIMU:  Object to the form of
10 the question.
11     A.   There are more questions than
12 answers.  Why are we having a wave instead of
13 it just being consistent?  We really don't
14 know.
15          Why did we have the big increase in
16 2016?  We think we may have some ideas, but has
17 anyone actually said this is 100 percent the
18 reason why?
19          I think that's what part of this
20 litigation is about, to try to determine
21 exactly that.  So I think those -- those types
22 of questions are being asked as we speak, and
23 that's, I think, why we're here today, to
24 figure out why.
25     Q.   And you mentioned -- I wrote

Page 264

1  down -- in describing the waves, that you
2  thought, from your opinion, was that pills had
3  taken it to another level.
4          Do you remember saying that?
5      A.   I do.
6      Q.   Okay.  And I think you were also
7  asked if you had specific data to back that up,
8  and my notes say that you said you didn't have
9  the data, but that was your opinion.
10          Am I at least understanding your
11 testimony correct so far?
12          MS. LEYIMU:  Object to the form of
13 the question.
14     Q.   Well, let me ask it this way.  Do
15 you have data to back up your opinion that the
16 pills, quote, "took it to another level"?
17          MS. LEYIMU:  The same objection.
18          You can answer.
19     A.   I do not have documentation that
20 states that, but what I do have is just the
21 interaction I've had with my people.  They've
22 seen it on a daily basis.  They've seen how
23 catastrophic that this particular issue has
24 been on our community, and it is truly
25 devastating.  It truly is.  Which is --

Page 265

1      Q.   Do you --
2      A.   Which is why we have tried to come
3  up with ideas on trying to -- how to make a
4  difference.  And that's -- you know, from those
5  things we have the QRT.  We have the ARV to try
6  to get another unit out there.
7          We are trying to see what can we do
8  that is effective in doing our part to help,
9  because it is a -- not just an Akron crisis,
10 but this is a national crisis.
11     Q.   Now, in terms of pills, was there
12 anything from your perspective that -- that was
13 different in 2014 with respect to opiate pills
14 as opposed to 1990s when you had a
15 prescription?
16     A.   The sheer volume of calls for
17 overdoses.  And as I described when I talked
18 about the -- the individual that was another
19 city employee, the fact that you can do exactly
20 what you're supposed to do, take your
21 medication exactly as prescribed by a doctor,
22 and through no fault of your own find yourself
23 addicted, to me, is -- is not just horrible,
24 but it's -- it's got to be frightening for
25 everybody out there to know that, wow, I could

Page 266

1 do nothing wrong, nothing illegal, and become
2 addicted.
3    Q.  So in terms of the overdose deaths
4 in Summit County --
5    A.  Yes.
6    Q.  -- just looking at Dr. Kohler's
7 numbers, there are roughly 300 cases where
8 cocaine, illicit street fentanyl or heroin were
9 the cause of death, and roughly 33 cases where
10 it was the pills.
11         So when you hear 300 from illegal
12 street drugs and 33 from prescription pills,
13 does that number surprise you, based on your
14 experience on the force in 2015?
15         MS. LEYIMU:  Object to the form.
16    A.  It doesn't, and I'll tell you why.
17 I think there are a number of people that start
18 off taking their medications like I had
19 described before, exactly as it was prescribed.
20 And then they get to a point where, "Okay, I
21 can't get prescription drugs anymore," and a
22 percentage of those people will try to find
23 something else.
24         I think this is something that will
25 get you addicted -- the opiate pills will get

Page 267

1 you addicted, and then in your flurry or in
2 your desperation to try to -- to stop yourself
3 from having the side effects of being an addict
4 that cannot any longer get that drug, they look
5 to something else.
6         Some people may look to going
7 directly into treatment and trying to get help,
8 but a percentage of folks are going to go the
9 illegal route and start trying to use something
10 else that will try to help them get through the
11 fact that they are having these side effects
12 from the drugs.
13    Q.  Now, in terms of trying to
14 understand any individual story, and whether --
15 whether that example you just provided, whether
16 a person that you make a run for at Akron Fire,
17 whether that overdose on cocaine is in any
18 rela- -- any way related to a history of
19 prescription pills and whether there's that
20 kind of progression of addiction that you just
21 described, how would you -- sitting here today,
22 what sources of information would you look to
23 to try to figure out that person's story, that
24 person's death?
25         MS. LEYIMU:  Object to the form of

Page 268

1 the question.
2    Q.  Let me ask a simpler question.
3    A.  Okay.
4    Q.  If I look at the number of run
5 statistics from --
6    A.  Yes.
7    Q.  -- Akron Fire, is there any way,
8 looking at those statistics, where I could
9 identify the number of people who ever had a
10 prescription pill -- ever had a prescription
11 for an opioid pill?
12    A.  When we go out on emergency calls,
13 one of the things that we will do is ask for a
14 list of medications that people are taking.
15 And it's something that the doctors at the
16 hospital want to know.  They want to know what
17 type of medications this particular individual
18 is taking.
19         That is something that may help us
20 determine if this issue started off as a
21 pill -- opiate pill-related problem.  But not
22 always, because people aren't always truthful,
23 for one.  And for someone unresponsive, we may
24 never know what it was that -- that they were
25 taking and if they were on an opiate pill.

Page 269

1    Q.  So tell me if this is a correct
2 understanding.  For some people that Akron Fire
3 goes on runs, you'll never know whether their
4 story started with prescription pills.
5         For others, you could look to the
6 run reports, you could look to the doctor
7 records and the hospital records after you've
8 dropped them off, and if they were forthcoming
9 and provided accurate information in response
10 to your requests, those sources of information
11 may contain medication history.
12    A.  I think it's a much more accurate
13 way of getting information from the hospitals,
14 from the county, from the health department
15 type organizations, that can give us accurate
16 information on this was a -- this was an
17 overdose of this particular chemical or this
18 particular drug or whatever.  I think the Akron
19 Fire Department does not have the ability to
20 tell you, "This was OxyContin; this was
21 Vicodin."
22    Q.  Okay.
23    A.  Et cetera, et cetera.
24    Q.  All right.
25    A.  But I can tell you this, that when