EXHIBIT 56

Page 1

```
1           IN THE UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF OHIO
3                   EASTERN DIVISION
4                       - - -
5    In Re National        :
     Prescription Opiate   :
6    Litigation            :
                           :  MDL No. 2804
7                          :
     This document relates :  Case No. 17-md-2804
8    to:                   :
                           :  Judge Dan Aaron
9    The County of Summit, :  Polster
     Ohio, et al., v. Purdue :
10   Pharma L.P., et al.   :
     Case No. 1:18-OP-45090 :
11
12           Transcript of the video deposition of
13   Julie Barnes, a witness herein, called by the
14   Track One Defendants for examination under the
15   applicable rules of Federal Civil Court
16   Procedure, taken before me, Linda D. Riffle,
17   Registered Diplomate Reporter, Certified Realtime
18   Reporter, Certified Realtime Captioner, and
19   Notary Public in and for the State of Ohio,
20   pursuant to notice and agreement, at the Akron
21   Bar Association, 57 South Broadway Street, Akron,
22   Ohio, on Monday, December 3, 2018, beginning at
23   8:59 a.m. and concluding on the same day.
24
25
```

Page 66

1  BY MR. ALEXANDER:
2      Q.  As far as you know.
3      A.  Well, I think an opiate, specifically,
4  is a certain type.  An opioid is a more -- the
5  more general, broad perspective.
6      Q.  What's heroin?  Where does that fit into
7  the scheme that you've been describing?
8      A.  You know, heroin is a synthetic type of
9  drug that is an opiate, but not a prescription.
10     Q.  What about fentanyl or carfentanil?  Do
11  you know where those fit into this?
12     A.  Carfentanil is also a synthetic type of
13  drug or can be.  It can be a prescription drug.
14  I know there are definitely -- fentanyl can be
15  prescribed for pain management as well.
16  Carfentanil, my understanding, is really a pain
17  drug for large animals.
18     Q.  What about, like, fentanyl analogs?
19  Have you ever heard of that term?
20     A.  I have, yeah.
21     Q.  Okay.  And what's your understanding of
22  what that means?
23     A.  I don't know that I have a good
24  understanding of what it means other than there
25  are different types of fentanyls and different

Page 67

1  makeups and -- so, no, I --
2      Q.  Where does cocaine fit into this?  Is
3  that an opioid or opiate, as far as you're
4  concerned?
5      A.  Not to my knowledge, no.
6      Q.  Okay.  What about methamphetamine?  Is
7  that opioid or opiate or something else?
8      A.  No.
9      Q.  Something else?
10     A.  It's something else.  It's not an
11  opiate.
12     Q.  Okay.  Do you know anything about the
13  importation of heroin from other countries that
14  eventually makes its way into Summit County?  Any
15  personal knowledge about that at all?
16     A.  No.
17     Q.  Anything about data that would relate to
18  heroin usage trends within Summit County?
19         MS. FLOWERS:  Object to the form.
20         THE WITNESS:  Yeah, I don't really
21  understand the question.
22  BY MR. ALEXANDER:
23     Q.  Okay.  Do you -- in connection with your
24  job --
25     A.  Yeah.

Page 68

1      Q.  -- have you gained information about the
2  role of heroin in Summit County in terms of
3  either substance abuse or overdose deaths or any
4  other problem that affects Children's Services?
5         MS. FLOWERS:  Objection.
6         THE WITNESS:  Yeah.  I mean, heroin is a
7  drug that is used by some of the clients that we
8  serve, yes.
9  BY MR. ALEXANDER:
10     Q.  Is it one of the biggest problems in
11  terms of substance of abuse right now?
12         MS. FLOWERS:  Object to the form.  Lack
13  of foundation.
14         THE WITNESS:  It is a very big problem
15  for many of the clients that we serve, yes.
16  Uh-huh.
17  BY MR. ALEXANDER:
18     Q.  Has heroin been passed in the last year
19  or so by cocaine and methamphetamine with an
20  uptick in Summit County --
21         MS. FLOWERS:  Object to the form.
22  BY MR. ALEXANDER:
23     Q.  -- as far as you know?
24         MS. FLOWERS:  Lack of foundation.
25         THE WITNESS:  Passed by?  Say -- please

Page 69

1  say it again.
2  BY MR. ALEXANDER:
3      Q.  Has heroin, as a drug of abuse impacting
4  Children's Services, been passed by cocaine and
5  methamphetamine within the last year or so?
6         MS. FLOWERS:  Same objection.
7         THE WITNESS:  Heroin -- from my
8  perspective and what I've seen in my agency,
9  heroin surpassed cocaine at some point and was
10  a -- a primary issue for many of our clients.  We
11  have seen a resurgence of meth more recently.
12         I think much of that is really education
13  that's been done around use of opioids and heroin
14  and, you know, the many drug overdoses and deaths
15  that have occurred.  I think we're seeing many
16  clients that are switching to using meth because
17  they feel it's a more controlled substance that
18  they can manage better.
19  BY MR. ALEXANDER:
20     Q.  So let's go back a little bit.  So back
21  when you were with Summit County in the past, was
22  that during when cocaine was at its peak --
23         MS. FLOWERS:  Objection.
24  BY MR. ALEXANDER:
25     Q.  -- in the early to mid 2000s?

18 (Pages 66 - 69)

Page 70

1        MS. FLOWERS:  Object to the form.
2        THE WITNESS:  I don't remember exactly
3    when cocaine was at its peak.  That may be
4    accurate.  I just -- I don't remember the year
5    the cocaine peaked but --
6    BY MR. ALEXANDER:
7        Q.  Let me just ask in general.  Do you
8    remember a time when the -- the drug of abuse or
9    the substance of abuse that was having the
10   biggest impact on Children's Services was cocaine
11   and crack?  Was that during your time?
12       A.  Yes.  Uh-huh.
13       Q.  Okay.  And there were issues like
14   offspring of people who were addicted to cocaine
15   in various forms having additional Children's
16   Services needs affecting the entire range of
17   services provided by Children's Services,
18   correct?
19       A.  Yes.
20       MS. FLOWERS:  Object to the form.
21       THE WITNESS:  Uh-huh.  Yes.
22   BY MR. ALEXANDER:
23       Q.  And there were also adults who
24   interacted with Children's Services where their
25   needs were exacerbated or created because of

Page 71

1    addiction or even overdose to cocaine in various
2    forms, correct?
3        MS. FLOWERS:  Objection.  Form.
4        THE WITNESS:  Our clients?
5    BY MR. ALEXANDER:
6        Q.  Yes.
7        A.  Yes.  I mean, addiction has always been
8    an issue for many of the clients that we serve.
9    I think what we have seen more recently is that
10   the addiction has increased.  So roughly
11   estimating, I would say, you know, we've always
12   dealt with maybe a third of our population or a
13   quarter of our population having some type of
14   addiction issue, but they were often issues like
15   alcoholism and they were sometimes able to
16   function, sometimes able to manage their
17   parenting.
18       As we saw addiction change to opiates
19   and heroin, we see our clients struggling more
20   with their addiction.  So addiction has certainly
21   changed over time in my career.  I -- you know,
22   alcohol was the primary issue when I was a
23   caseworker.  Cocaine became an issue at some
24   point.  Opiates became an issue several years
25   ago.  So it has certainly changed over time.

Page 72

1        I would say in my 28-year career,
2    dealing with opiates has been one of the greatest
3    challenges that we've had with our clientele.
4        Q.  So going back to the 28 years, viewing
5    it kind of overall, tracking the substance of
6    abuse, what the trends are within that, which
7    ones are having the greatest impact and how they
8    might change how you provide children's services,
9    your budgetary needs, have always been a part of
10   your job?
11       A.  Yes.
12       MS. FLOWERS:  Object to the form.
13   BY MR. ALEXANDER:
14       Q.  And as you've moved into management and
15   pay attention to staffing needs and budget needs,
16   you have to track that in kind of a -- not just
17   anecdotal way but looking for data analysis and
18   more reliable ways to look at the drug of abuse
19   or substance of abuse that's impacting the
20   provision of children's services, correct?
21       MS. FLOWERS:  Object to the form.
22       THE WITNESS:  We -- if you're asking me
23   about tracking, I think is the question, we have
24   always had some trouble tracking substance abuse
25   or type of substances over the years, I mean,

Page 73

1    historically, because there are many places
2    throughout a case where substance use can become
3    an issue.
4        So it could be reported to us at day
5    one.  It could be something that's identified at
6    our disposition of the case.  It could be
7    something that is identified later in the case if
8    we're continuing to serve a family.  So there are
9    various points and places where addiction and
10   type of substance can become an issue.
11   BY MR. ALEXANDER:
12       Q.  Okay.  So it's been a challenge to
13   accurately track and do data analysis of the drug
14   of abuse over time, correct?
15       MS. FLOWERS:  Objection.  Misstates the
16   testimony.
17       THE WITNESS:  Yes, that is correct.
18   BY MR. ALEXANDER:
19       Q.  And over the last several years, there
20   have been efforts on a statewide basis, at least,
21   to try to improve the data, which has led to kind
22   of an increase of the estimate of drug of abuse
23   within Children's Services?  Clients of
24   Children's Services, not employees.
25       A.  There have been changes to the system

19 (Pages 70 - 73)

Page 74

1  over time to try and more accurately reflect
2  substance use and type of drug.
3      Q.  Like there's a caseworker blitz a couple
4  years ago with the SACWIS system to try to make
5  sure people were more systematic and thorough in
6  putting in drug of abuse or substance of abuse,
7  correct?
8      A.  Yes.
9      Q.  Okay.  And so before roughly 2016, the
10  data on which drug of abuse was at issue and how
11  often a drug of abuse or substance of abuse
12  played a role in a particular case was less
13  reliable?
14      MS. FLOWERS:  Object to the form.
15      THE WITNESS:  I don't know that I would
16  say it's less reliable.  I would say it was
17  harder to obtain.  So if you obtained substance
18  use through a particular field and it, you know,
19  had it listed in that particular field, that's
20  probably accurate data.
21      It's -- the issue is when we get into an
22  underrepresentation because we don't
23  necessarily -- we have to look in so many
24  multiple places to identify it.  So that's --
25  that's where I think often our data is not

Page 75

1  inaccurate, but it's underrepresented.
2  BY MR. ALEXANDER:
3      Q.  That's the word I was about to ask you
4  about.
5      A.  Yeah.
6      Q.  Before 2016 or so, when you were looking
7  at the incidents of substance abuse playing a
8  role in Children's Services' case and identifying
9  the specific substances that were at issue, that
10  would be underrepresented data?
11      MS. FLOWERS:  Object to the form.
12      THE WITNESS:  I would --
13  BY MR. ALEXANDER:
14      Q.  Or underestimated?
15      A.  Yeah, I -- I believe it's
16  underestimated.  Yes.
17      Q.  Okay.  And keeping that caveat in mind,
18  there have been, at different times over your
19  28-year careers, different drugs or groups of
20  drugs that were essentially the biggest concern,
21  the primary culprit from your perspective or that
22  of your colleagues, about what was driving
23  Children's Services' needs, correct?
24      A.  Correct.
25      Q.  And we talked about there was a time

Page 76

1  when that was cocaine, which included overdose
2  deaths, correct?
3      MS. FLOWERS:  Object to the form.
4      THE WITNESS:  I'm -- I'm sure -- I don't
5  remember the data around cocaine and overdose
6  deaths, so I -- you know, I -- I can't speak to
7  that really, I guess.
8  BY MR. ALEXANDER:
9      Q.  There would have been children who
10  entered foster care or had to go through the
11  system in one form or another because of
12  questions about the ability of their parents to
13  take care of them because of cocaine abuse,
14  correct?
15      A.  Correct.
16      MS. FLOWERS:  Objection.
17      THE WITNESS:  Yeah.
18  BY MR. ALEXANDER:
19      Q.  And that's still the case today,
20  unfortunately, correct?
21      A.  About cocaine?
22      Q.  Yes, ma'am.
23      A.  Yeah.  We still have some cocaine use
24  that we deal with, yes.
25      Q.  And, in fact, what we've been describing

Page 77

1  as the trend is that the impact of heroin peaked
2  around 2016.  And since then, heroin has dropped,
3  while cocaine and methamphetamine have come back
4  up; is that correct?
5      MS. FLOWERS:  Object to the form.  Lack
6  of foundation.
7      THE WITNESS:  I think we have seen meth
8  recurrence very recently.  I -- I mean, I can't
9  put a -- I can't pinpoint a time for you but,
10  primarily, I would say that's more this year.
11  That's more very recent.
12  BY MR. ALEXANDER:
13      Q.  And there was a time in the past when
14  meth was at its peak, correct, like mid 2000s?
15      MS. FLOWERS:  Object to the form.
16      THE WITNESS:  Uh-huh.  Yes, there was a
17  time when meth was at its peak, and it's probably
18  mid 2000s.  Yes.
19  BY MR. ALEXANDER:
20      Q.  Including the time when you had your
21  prior Summit County position as director of
22  foster care and adoption, correct?  That would
23  have been during that time period of 2002 to
24  2007?
25      MS. FLOWERS:  Object to the form.

20 (Pages 74 - 77)

Page 82

1    A.  No, I don't --
2        MS. FLOWERS:  Object to the form.  Lack
3  of foundation.
4        THE WITNESS:  I don't remember
5  specifically anything about cocaine being on an
6  uptick but . . .
7  BY MR. ALEXANDER:
8    Q.  And when we talk about any of these
9  drugs being a drug of abuse or a substance of
10  abuse impacting your clients or the -- the
11  children in your system, they can all --
12  whichever the drug is or the substance of abuse,
13  they can all affect the -- the clients in terms
14  of impacting child custody, child support, the
15  need for foster care, protective services, the
16  full range of services that your group provides,
17  correct?
18        MS. FLOWERS:  Object to the form.
19        THE WITNESS:  Substance abuse can
20  certainly impact our clients' ability to take
21  care of their children, depending on many other
22  factors, of course.  So, you know, there are
23  behavioral factors and environmental factors that
24  go into that, genetic factors that go into that.
25  So there's many reasons that substances can

Page 83

1  affect an individual in a different way.
2  BY MR. ALEXANDER:
3    Q.  Okay.  Let me ask it this way:
4  Children's Services provides a range of services,
5  correct?
6    A.  That's correct, yes.
7    Q.  And each service that Children's
8  Services provides can be impacted by a substance
9  of abuse, whether it be alcohol, or marijuana,
10  cocaine, heroin, methamphetamine, or something
11  else?
12        MS. FLOWERS:  Object to the form.
13        THE WITNESS:  Well, our clients might
14  need different services based on having a
15  substance use disorder.
16  BY MR. ALEXANDER:
17    Q.  Okay.  So let's go back to 2013 when you
18  took the executive director position because
19  maybe it will be helpful --
20    A.  Okay.
21    Q.  -- to just kind of walk through what's
22  gone on each of these last couple of years.
23    A.  Uh-huh.
24    Q.  You said that when you came in in 2013,
25  you were aware that the methamphetamine and

Page 84

1  cocaine use had been lower than it had been at
2  some of the peaks in the past.  Is that right so
3  far?
4        MS. FLOWERS:  Objection.
5        THE WITNESS:  I believe so, yes.
6  BY MR. ALEXANDER:
7    Q.  And I'm not just talking about use in
8  the community.  I mean use within your clients or
9  within the family units that affect your clients,
10  correct?
11    A.  I believe so.
12    Q.  And, therefore, it would impact the need
13  for children's services and the cost of
14  children's services.
15        MS. FLOWERS:  Object to form.
16        THE WITNESS:  The lack of -- or -- I
17  don't understand the question.
18  BY MR. ALEXANDER:
19    Q.  The use of cocaine and methamphetamine
20  or marijuana or alcohol that you're tracking over
21  time, part of the impact that you're tracking is
22  whether they affect your need for additional
23  staffing, the quality of services that you're
24  providing, the number of clients in the system?
25        MS. FLOWERS:  Object to the form.

Page 85

1  BY MR. ALEXANDER:
2    Q.  Correct so far?
3    A.  Not necessarily.  You know, I don't know
4  that we really did any cost analysis, for
5  example, on meth use.  I mean, it was certainly a
6  factor.  We knew we had clients that used meth,
7  just as at some point we had clients that used
8  cocaine.
9        As I said, we've always had clients that
10  have had substance use disorder.  I don't know
11  that we tracked it specifically around costs
12  related to those drugs.
13  BY MR. ALEXANDER:
14    Q.  Let's set aside cost.  When you say
15  "staffing," one of the things you pay attention
16  to as executive director is if you have
17  appropriate staffing both in terms of overall
18  levels and hiring at different positions to end
19  up with appropriate caseloads and quality of
20  services that could be provided; is that fair?
21    A.  Yes.  We staff according to the number
22  of cases that we're serving so we have -- can
23  maintain our caseloads at a manageable level.
24    Q.  You also track the number of cases that
25  are open at any given time to look at whether the

22 (Pages 82 - 85)

1 staffing is appropriate, correct?
2     A.  Yes.  Uh-huh.
3     Q.  And within that, you also look at
4 whether there are particular drivers of the cases
5 or the needs of cases, whether they be, like,
6 substance of abuse or language barriers or other
7 factors that might affect the need for and amount
8 of services on a individual or overall basis --
9         MS. FLOWERS:  Object --
10 BY MR. ALEXANDER:
11     Q.  -- correct?
12        MS. FLOWERS:  Object to the form.
13        THE WITNESS:  That's correct.  Yes.
14 Uh-huh.
15 BY MR. ALEXANDER:
16     Q.  So there would have been analyses done
17 on, essentially, the different substances of
18 abuse that were driving Children's Services need,
19 not just starting in 2014, '15, or '16, but over
20 the years before that as well, correct?
21        MS. FLOWERS:  Object to the form.  Lack
22 of foundation.
23        THE WITNESS:  I don't know that there
24 were analyses conducted specifically related to
25 the use of meth or cocaine.  I don't know that.

1 BY MR. ALEXANDER:
2     Q.  What about alcohol or drugs in general
3 or -- or marijuana?
4        MS. FLOWERS:  Object to the form.
5        THE WITNESS:  I don't know that there
6 were any specific analyses related to cost
7 conducted on those types of drugs.
8        You know, they may have increased
9 caseloads, so caseloads may -- we may have had
10 more cases, for example, which would have
11 required us to hire more staff or to alter our
12 services, for example.
13        So we -- we may -- we do things like
14 train staff specifically around a type of issue
15 that the clients may be having.  We may try to
16 put programs in place for our staff on a certain
17 type of issue.  So trainings related to heroin
18 and opiates, for example.  We've done a
19 substantial amount of that over the last few
20 years for staff so that they understand it
21 better.
22 BY MR. ALEXANDER:
23     Q.  And -- and I said for these questions
24 just for now I was -- I was setting aside costs.
25 The analyses that you were doing before, let's

1 say, 2014 relating to other drugs or that people
2 within Children's Services were doing looked at
3 things like staffing needs and caseloads, how
4 they would be affected by the -- the substances
5 of abuse, correct?
6        MS. FLOWERS:  Object to the form.
7        THE WITNESS:  Yeah, I -- I don't know --
8 I feel like you asked me the same question, and I
9 don't know how to answer it differently.
10        We always look at whatever the issues
11 are that are impacting our clients when we're
12 doing our staffing needs and our program needs,
13 yes.
14 BY MR. ALEXANDER:
15     Q.  And there would have been programs
16 instituted before 2014 that tried to improve the
17 performance of children's services being provided
18 to clients to account for the different
19 substances of abuse and trends within substances
20 of abuse at any given time, correct?
21     A.  Correct.
22     Q.  And you said that in 2014 is when you
23 recall starting to notice that there was an
24 uptick in Children's Services' needs based upon
25 the use of heroin, opiates or opioids.  I'm not

1 trying to characterize exactly which drug it was.
2        But is that right so far?
3     A.  Yes.
4     Q.  Okay.  And what was your assessment as
5 to within that, was that driven by heroin? was
6 that driven by illegally obtained drugs? or was
7 that driven by some other category of drugs?
8        MS. FLOWERS:  Object to the form.
9        THE WITNESS:  I don't know that I have
10 an answer for that.  I mean, I think we have
11 talked about opiates and heroin together.  They
12 seem to be very strongly linked for our clients.
13 Many started on an opiate of some kind that led
14 to heroin.  So I don't know that in our
15 conversations we really deciphered heroin from
16 the opiate specifically or a specific type.
17 BY MR. ALEXANDER:
18     Q.  Do you remember -- do you remember
19 having specific discussions in 2014 or before
20 about this issue of heroin, opiates, or opioids
21 impacting children's services in Summit County?
22     A.  Well, heroin certainly isn't a new
23 phenomenon.  I mean, it -- that's been, you know,
24 something that's been an issue since I've, you
25 know, been in child welfare.  I don't remember it

Page 90

1  being a problem specifically that was coming to
2  my attention until around 2014 and really --
3  real -- much more so in 2015.  I think we started
4  to hear about our clients using heroin and
5  opiates in 2014 is when those conversations
6  started to occur.  The problem really sort of hit
7  us in 2015.
8  BY MR. ALEXANDER:
9      Q.  The conversations from 2014 that you
10  just referenced --
11      A.  Uh-huh.
12      Q.  -- were they between you and other
13  people within Children's Services?
14      A.  Yes.
15      Q.  With whom?
16      A.  Caseworkers and supervisors and, you
17  know, various level of primarily social service
18  staff who were seeing issues with their clients
19  that were heroin related or opiate related, and
20  some of the struggles that they were having in
21  trying to find the right treatment and service
22  plan for those clients because they were really
23  struggling and very difficult to service.
24      Q.  So back in 2014 when you started having
25  these discussions with your colleagues, did you

Page 91

1  ask for there to be any sort of analyses done or
2  proposals put together to look at how to improve
3  the provision of children's services given this
4  change in drug use patterns?
5      A.  I know that I did start asking some of
6  those questions from our QI staff, for example,
7  maybe as early as 2014.  Uh-huh.
8      Q.  Who's QI?
9      A.  Quality improvement.  Yeah.
10      Q.  And who would be the folks in there that
11  you would have been having these discussions with
12  about initiating these sorts of analyses back in
13  2014?
14      A.  We had a analyst who worked in our
15  quality improvement department.  His name is
16  Kevin Brown.  But Kevin passed away, so -- but he
17  was, you know, our primary researcher and he did
18  all of our -- he pulled all the data for us and
19  did all of our research.  So Kevin Brown did
20  primarily all of the research for us until he
21  passed away.
22      Q.  When did he pass away?
23      A.  He passed away in -- I believe it was
24  December of 2017.
25      Q.  Before then, so going back to 2014, '15,

Page 92

1  '16, who was working with Kevin in QI on these
2  sorts of projects that you were initiating?
3      A.  We have a department director over our
4  quality improvement department.  It is currently
5  Elizabeth Mangon, I mentioned earlier, because
6  she's also over our records department.  And
7  prior to -- I don't know when she started because
8  it's been within the last couple of years.  We
9  had a prior director over quality improvement who
10  retired.
11      Q.  And who was the prior director from,
12  like, the 2014 time frame?
13      A.  Her name is Nealya Carter.  Again, I
14  don't know when Nealya Carter left and Liz took
15  over specifically.  It was probably after 2014.
16      Q.  Is that with an "N" or an "M" in her
17  first name?  I couldn't quite hear you.
18      A.  Nealya, you mean?  Nealya, N-e-a-l-y-a.
19      Q.  Okay.  So in addition to the initiatives
20  with Kevin Brown in QI, were there another --
21  were there other measures that you initiated or
22  discussions, at least, that you initiated about
23  ways to make things better or ways to assess what
24  the -- what the problem was, what its impact was?
25      MS. FLOWERS:  Object to the form.

Page 93

1      THE WITNESS:  There were many, many
2  conversations that were beginning to happen
3  community-wide.  I mean, so it really was not
4  just in the agency, but we were having community
5  discussions with law enforcement, with our mental
6  health board, with the medical examiner's office,
7  with the courts.
8      So there were many discussions that were
9  beginning to pop up throughout the community as
10  early as 2014 about, you know, what was happening
11  and what we were seeing as a community serving
12  clients with substance use disorder and
13  specifically opioid epidemic.
14  BY MR. ALEXANDER:
15      Q.  Including the statewide efforts, task
16  forces, that sort of thing initiated by the
17  governor?
18      A.  That's right, yes.
19      Q.  Do you remember participating in that or
20  at least seeing the output of some of those
21  statewide efforts back in 2014?
22      A.  I don't remember so much about statewide
23  efforts in '14.  I -- I do remember some
24  statewide efforts that occurred a little later
25  than that.  They were probably in '15 and '16.

24 (Pages 90 - 93)

Page 94

1 We have an association that has been very
2 involved from looking at this issue statewide and
3 started really trying to do some tracking of how
4 opiates were impacting our system as a whole
5 statewide has really been an issue statewide and
6 probably nationwide. So they were looking at it
7 from a statewide perspective.
8     There were some things certainly that
9 was going on, I think, you know, throughout other
10 administrations at the state level. The attorney
11 general's office did some work around this issue,
12 as well, I think, in 2016.
13     Q. The organization you're talking about,
14 what was the name of it?
15     A. Public Children's Services Association
16 of Ohio.
17     Q. PCSAO?
18     A. PCSAO. They are the directors
19 association for Children's Services.
20     Q. And you've been involved with them going
21 back to 2013?
22     A. Yes. I have been involved with them
23 long-term. I'm on their board, actually.
24     Q. Okay. So we'll talk about the
25 coordination within counties and states and all

Page 95

1 of those sorts of things over the course of the
2 day. I want to go back to kind of the time frame
3 of where we are.
4     Were there -- were there other efforts,
5 whether it data collection analysis or looking at
6 ways to improve or assess the impact, any other
7 efforts that you initiated within your group back
8 in the 2014 time frame?
9     MS. FLOWERS: Object to the form.
10     THE WITNESS: We were part of a grant,
11 for example. It did not initiate in 2014, but it
12 was certainly ongoing in 2014. We had a federal
13 grant that started in 2012 that is the STARS
14 grant.
15     And if you ask me what that stands for,
16 I won't be able to repeat it. I apologize. It's
17 a very long acronym. But it is related to
18 substance abuse and not specific to opiates, but
19 it is for any type of substance abuse. So that
20 was one of the programs that we had implemented
21 and were continuing to work on throughout 2014
22 until it ended this July.
23 BY MR. ALEXANDER:
24     Q. Okay. We'll go over that.
25     A. Okay.

Page 96

1     Q. We do have some information about STARS.
2     A. Okay.
3     Q. Not to be confused, but there's a whole
4 other thing called START.
5     A. START. We have that as well, yes.
6     Q. So let's go back to -- to where we were.
7 I was asking about initiatives that you started,
8 anything you set in motion back in 2014. Was
9 there anything else that -- that you started or
10 that you know came to pass because of efforts
11 that you took in 2014 in terms of analyses,
12 projects, changes to best practices, anything
13 like that?
14     MS. FLOWERS: Object to the form.
15     THE WITNESS: You know, I'm struggling
16 with the year. I don't -- you know, you're --
17 you're pinning it to 2014, and I don't know that
18 I can separate out what initiatives occurred in
19 '14 versus '15. So I'm not sure I can answer
20 that accurately.
21 BY MR. ALEXANDER:
22     Q. Let me just maybe bracket it. Did your
23 ballot initiative pass last month?
24     A. Our levy?
25     Q. Yes.

Page 97

1     A. Oh. Yes. Our levy passed last month.
2     Q. Okay.
3     A. Yes.
4     Q. And that, itself, was a
5 close-to-two-year process of seeking to get it on
6 the ballot and to try to increase your levy to
7 make sure you have, essentially, the major source
8 of your funding going forward, correct?
9     MS. FLOWERS: Object to the form. Lack
10 of foundation.
11     THE WITNESS: Correct. It's been an
12 ongoing process, actually, for many years.
13 BY MR. ALEXANDER:
14     Q. And there are a lot of moving pieces to
15 all of the budgeting --
16     A. Yes.
17     Q. -- state, federal, private, local
18 levies, correct?
19     A. Yes.
20     Q. They're --
21     MS. FLOWERS: Objection.
22 BY MR. ALEXANDER:
23     Q. So I know that when we talk about
24 budgeting, it can be a long time frame until you
25 actually see that money is coming in through one

25 (Pages 94 - 97)

Page 98

1  of these and some of them involve renewals.  So I
2  want to go back to where we were.
3        Were there specific, like, budget
4  requests or efforts made to get additional
5  funding that were initiated back in 2014 or 2015
6  as -- as a result of these observations from 2014
7  that you described?
8        MS. FLOWERS:  Object to the form.
9        THE WITNESS:  Well, if I understand your
10  correct -- your question, I believe 2015 -- no --
11  it was 2016 we did a budget adjustment related to
12  placement because of things that had occurred,
13  really, in the prior year.
14  BY MR. ALEXANDER:
15    Q.  Okay.  Were there changes to best
16  practices that were initiated within Children's
17  Services as a result of these observations or
18  efforts from 2014?
19        MS. FLOWERS:  Object to the form.
20        THE WITNESS:  You know, there -- there
21  have been a lot of changes to best practices.
22  Again, I -- you're tying it to a specific time
23  period, so that's where I'm struggling to answer
24  your question.  I'm -- I'm trying to answer your
25  question.  I just don't really -- you're asking

Page 99

1  about specifically how do I tie it to '14, and
2  I'm not sure how to do that.
3        But we have done a lot of things in
4  terms of changing practice over several years
5  that started around 2014.  We made a lot of
6  changes to the STARS grant, for example, just in
7  how we implement that.  We did a lot of training
8  for our staff around substance use disorder and
9  opiates specifically.
10        We have a unit of staff who handles our
11  substance use disorder cases.  We've worked a lot
12  with that unit around, you know, their process,
13  their practices.  We've put in place trauma
14  screenings for children because we know that
15  children are very traumatized when they come from
16  homes with any substance use disorder.
17        We have put some screens in place where
18  we do a substance use screening at the beginning
19  of the case on all of our cases.  We have put
20  some in-home services in place for families who
21  are struggling to keep children safe in their own
22  home.  So we have people who go into the homes to
23  assist and support them.  We have a couple
24  different programs that do that.
25        So we've -- we're constantly looking at

Page 100

1  our practice and changing it and trying to react
2  to what we have been seeing.
3  BY MR. ALEXANDER:
4    Q.  Okay.  So I want to make sure we're on
5  the same page when we're talking about 2014
6  because that's when you said you -- although
7  heroin has always been an issue to some extent,
8  you noticed that there was an uptick of heroin
9  and potentially some other drugs that you're
10  lumping together in the opiate and opioid group.
11  That's what we're talking about for 2014.
12        So back then, was there ever a time when
13  you specifically recall you or your staff
14  identifying an uptick in the use of prescription
15  opioids by people who were actually prescribed
16  the opioid and obtained it legally?
17        MS. FLOWERS:  Object to the form.
18        THE WITNESS:  I -- we started trying to
19  run some reports in '14.  I know Kevin was
20  running some reports, and I don't know how good
21  the data is around type of drug in terms of, you
22  know, type of prescription drug.  But there --
23  there definitely were reports that were being
24  looked at as early as 2014.
25  BY MR. ALEXANDER:

Page 101

1    Q.  And you would have received those
2  reports from Kevin Brown back then?
3    A.  Some of them, yes.
4    Q.  So what I'm going to do is say -- so
5  I've given you kind of one category, which is an
6  impact on Children's Service from people who are
7  taking a prescription opioid that was obtained by
8  them legally through a prescription written for
9  them.  Does that make sense as a category?
10    A.  Yes.  Uh-huh.
11    Q.  Okay.  And then another category would
12  be people who obtain prescription opioids
13  illegally.  They steal it, they take somebody
14  else's, they get it on the street, whatever, but
15  they don't have a legal prescription to obtain it
16  legally and don't obtain it legally.  That's a
17  second category.  Does that make sense?
18    A.  Yes.
19    Q.  The third would be somebody who isn't
20  taking a prescription opioid at all, they're
21  taking an opiate:  heroin, an illegal street drug
22  like fentanyl analog obtained through the mail
23  from China, completely illegal opiates.  Does
24  that make sense as a third category?
25    A.  Yes.

Page 154

1    MS. FLOWERS: This witness doesn't need
2  any coaching, sir.  You asked her about the
3  impact on Children's Services.
4    MR. ALEXANDER: Counsel, that's --
5    MS. FLOWERS: That's what she gave you.
6    MR. ALEXANDER: -- a misrepresentation.
7  BY MR. ALEXANDER:
8    Q.  So let's go back.  I was asking you
9  about analysis.  Has there been an analysis of
10  the impact of deaths related to somebody who died
11  while taking or having recently taken such that
12  it might be detectable an opioid or opiate and
13  that that -- the impact of those deaths on
14  Children's Services?  Has there been an analysis?
15    MS. FLOWERS: Objection.  Asked and
16  answered.
17    THE WITNESS: Other than the connection
18  that I've made with what I've already said,
19  there's no specific analysis to did the death --
20  what did the death cost our agency.  No.
21  BY MR. ALEXANDER:
22    Q.  And you said that it would be hard
23  because you'd need to identify in some form or
24  fashion through, you know, Social Security number
25  or name or something the person who was -- died

Page 155

1  and found to have some sort of drug in their
2  system with the clients in your -- in your
3  system, correct?
4    MS. FLOWERS: Object to the form.
5    THE WITNESS: We can't cross-reference.
6  We know our clients that die, they know the --
7  all of the people in the community that die, but
8  I can't cross-reference based with their data.
9  BY MR. ALEXANDER:
10    Q.  Okay.  And so there hasn't been some
11  sort of analysis specifically on financial impact
12  on Children's Services or the clients of
13  Children's Services as a result of deaths
14  associated with opioid or opiate use, correct?
15    A.  Not --
16    MS. FLOWERS: Object to the form.
17  Misstates the testimony.
18    THE WITNESS: Not deaths specifically.
19  BY MR. ALEXANDER:
20    Q.  So it's correct, there has not been an
21  analysis like that?
22    MS. FLOWERS: Objection.
23    THE WITNESS: Correct.
24  BY MR. ALEXANDER:
25    Q.  Now, you mentioned turnover of your

Page 156

1  staff.
2    A.  Uh-huh.
3    Q.  We have seen some discussion of turnover
4  in some of your documents, including that there's
5  been some efforts to increase hiring over the
6  last year or two.
7    A.  Uh-huh.
8    Q.  Are you aware of specific analyses of
9  turnover that tie them to issues with opioids, or
10  is that just your impression?  Opioids or
11  opiates.  I'm sorry.
12    THE WITNESS: I mean, I -- I -- it's
13  certainly more of an impression.  We do
14  conversations with staff when they exit or their
15  supervisors have conversations with them when
16  they exit that they will share, generally, about,
17  you know, the reason that the staff left.  Which,
18  generally, for our young staff who we -- in the
19  first year or so is related to the stress of the
20  job.
21  BY MR. ALEXANDER:
22    Q.  So where would that be memorialized?  Is
23  that just an individual kind of exit interview
24  memoranda or some other sort of document?
25    A.  I mean, we -- we keep turnover

Page 157

1  statistics, of course.  There are exit documents
2  done, if they do one, but the -- generally, the
3  information is coming directly from a supervisor
4  who's had a conversation with a worker about why
5  they're leaving.
6    Q.  So we'll break it up to two parts.
7  Turnover statistics, those are maintained over
8  time, correct?
9    A.  Correct.
10    Q.  Okay.  And we would see those to see if
11  there is some change in turnover in 2016, '17,
12  '18, compared to the years before that.  Those
13  stats should all exist and be maintained for
14  historical reference, correct?
15    MS. FLOWERS: Object to the form.
16    THE WITNESS: Well, I don't know if they
17  did turnover documents prior to my being with the
18  agency, so I don't know that.
19  BY MR. ALEXANDER:
20    Q.  You mean -- you mean since you came as
21  executive director?
22    A.  Right.
23    Q.  Okay.  So just since you started back up
24  in 2013 to present, there would be turnover
25  statistics for every year?

40 (Pages 154 - 157)

1      MS. FLOWERS: Objection. Lack of
2 foundation.
3      THE WITNESS: I don't know if there
4 would be for every year. I don't know.
5 BY MR. ALEXANDER:
6    Q. When do you think you started those
7 being maintained?
8    A. I -- I assume that we probably have done
9 them since 2013, but I don't know that we have
10 every year, so I just can't say that.
11    Q. Okay. So for -- in terms of the reason
12 why somebody might leave, whether they say it's
13 stressful because of just the general dealing
14 with children and these sorts of situations is --
15 is very stressful and very soul wrenching, or
16 whether they have some specific comment about,
17 you know, drug abuse or some other thing, where
18 would that be maintained? Just in individual
19 files, or would it be tracked collectively in
20 some way?
21      MS. FLOWERS: Object to form.
22      THE WITNESS: I don't know that it's
23 tracked anywhere.
24 BY MR. ALEXANDER:
25    Q. Okay. Are there individual exit memos?

1    A. There would be -- if someone completed
2 an exit interview, there would be an exit
3 interview for that individual, yes.
4    Q. Are they supposed to do that?
5      MS. FLOWERS: Object to form.
6      THE WITNESS: Well, they ask them if
7 they would like to.
8 BY MR. ALEXANDER:
9    Q. Okay.
10    A. Yes.
11    Q. But what if the supervisor -- if it's
12 relayed orally, do they -- the supervisor who
13 does the exit interview, are they supposed to
14 write down here is what the person said about the
15 reason why they left?
16    A. No. The supervisor doesn't do an exit
17 interview. Our HR department does exit
18 interviews, not a supervisor.
19    Q. Okay. So when the HR personnel does an
20 exit interview and they're told, "I am leaving
21 because I was traumatized by seeing something in
22 the field, a child who overdosed on heroin," or,
23 you know, some other horror that they might
24 experience, is that memorialized in some form or
25 fashion?

1    A. If they did an exit interview, there is
2 an exit interview document, yes.
3    Q. Do you know if there was some attempt to
4 look at exit interview documents for purposes of
5 production in discovery in this case to try to
6 tie it at all to anything about opioids or
7 opiates or drug abuse or substance abuse?
8      MS. FLOWERS: Objection. Asked and
9 answered.
10      THE WITNESS: I don't know.
11 BY MR. ALEXANDER:
12    Q. But those documents should exist, right?
13      MS. FLOWERS: Objection.
14      THE WITNESS: There would be exit
15 interview documents if they did an exit
16 interview, yes.
17 BY MR. ALEXANDER:
18    Q. Okay. And your basis of saying that you
19 think that your turnover has something to do with
20 that -- the heroin abuse makes doing the job
21 harder than it was before there was such a
22 prevalence of heroin abuse that was seen in 2016,
23 is that based on anything in particular?
24      MS. FLOWERS: Object to the form.
25      THE WITNESS: It's not based on the

1 specific exit interviews, if -- if that's what
2 you mean. It's really based more generally on
3 the population of staff who talk about the stress
4 of dealing with very complex cases.
5      When opiate use is involved, it's --
6 it's the caseworkers who are talking about
7 their -- their client dying. I had a caseworker
8 who talked about having a client die and then,
9 within 24 hours, the spouse of that client died.
10      So, you know, they talk about the
11 stories and how those negatively impact them. I
12 mean, that caseworker was clearly -- she didn't
13 say, "I'm negatively impacted," and she didn't
14 leave the agency, but she was clearly very
15 distraught. And she was a very experienced
16 worker.
17      So I think, you know -- I believe that
18 these younger workers who don't have that same
19 level of experience when they're dealing with
20 some of these very complex issues, they are
21 really struggling with wanting to do the work.
22 So it is -- I think it has been a factor in
23 losing some of our newer staff in that intake
24 area, yes.
25 BY MR. ALEXANDER:

41 (Pages 158 - 161)

Page 162

1    Q.  And are there documents that talk about
2  this, other than just your impression about the
3  way it's gone overall?
4        MS. FLOWERS:  Object to the form.
5        THE WITNESS:  I'm not aware of a
6  document specifically that talks about a specific
7  type of case being the issue why someone left the
8  agency.
9  BY MR. ALEXANDER:
10   Q.  You mentioned the term "secondary
11  impact," meaning that the impact on the employees
12  of Children's Services of doing their job and
13  witnessing things that they experience in
14  connection with that, including abuse of children
15  and spouses and neglect of children, all of that
16  sort of thing -- is that what you're talking
17  about for secondary impact?
18   A.  Yes.  Secondary trauma is, you know, the
19  trauma that the worker or any first responder can
20  experience when they're dealing with traumatic
21  events of the clients or families that they're
22  serving.  And trying to process that and deal
23  with that can be very traumatic to that first
24  responder, whether it's our staff or law
25  enforcement or others.

Page 163

1    Q.  And do you think that that's had some
2  impact on Children's Services other than in
3  relation to turnover that you've been talking
4  about; that there's been some other kind of
5  downstream effect of more secondary impacts that
6  you attribute to increased heroin abuse peaking
7  in, like, 2016?
8        MS. FLOWERS:  Objection to the form.
9        THE WITNESS:  I think there's been a
10  tremendous impact on the entire workforce related
11  to the opiate epidemic.  I have personally talked
12  to supervisors and staff who have experienced
13  very significant trauma when they've lost a child
14  who may have, you know, got into a parents' drugs
15  and overdosed.  Some of them -- we've had some
16  die.  We've had parents who've died.  We have
17  parents who relapse.
18        So it's very hard on a worker if you're
19  working with a case and the family is doing well
20  and you're close to feeling like you can be able
21  to send this child back to live with their
22  family, and then the parent relapses, and they're
23  unable to make that reunification.  There's a
24  sense of failure that goes with that when someone
25  fails or someone dies or someone is harmed.  And

Page 164

1  relapse is very high.  Overdoses are very high.
2  So those have a very traumatic impact on -- on
3  the -- on the staff.
4        And we have really tried to help them
5  with that, do some things, do some trainings for
6  them on secondary trauma.  We have an employee
7  assistance program, for example.  So some of
8  those kinds of things to help to assist them with
9  that.
10  BY MR. ALEXANDER:
11   Q.  And those sorts of issues with secondary
12  impact and the need for training and counseling
13  of your own staff, was that also present before
14  you came back in 2013?
15   A.  You know, secondary trauma is not a --
16  not a new word, certainly.  There's always some
17  level of secondary trauma that can occur.  I
18  mean, you know, you could have secondary trauma
19  occur if a child on your caseload dies because of
20  abuse or neglect.  That's going to have a similar
21  impact for staff members.
22        I think what happened was the frequency
23  of those very traumatic events increased.  So,
24  therefore, the secondary trauma became a bigger
25  issue and a bigger problem for us.

Page 165

1    Q.  And -- and is that the sort of thing
2  where we see a similar trend to what we've seen
3  in the past where there are times when there's
4  more secondary trauma, like during the
5  methamphetamine epidemic or the cocaine epidemic
6  or during other times when things might be
7  particularly bad in terms of other drivers of
8  Children's Services needs?
9        MS. FLOWERS:  Objection to the form.
10        THE WITNESS:  I don't recall, when
11  cocaine was an issue and meth was an issue, that
12  we had the same level of overdoses and deaths
13  that were occurring.  They were -- they were
14  substantially different.
15  BY MR. ALEXANDER:
16   Q.  I'm asking about the secondary impact.
17  So I -- it's probably hard to measure secondary
18  impact over time.
19        You said that your impression is that
20  there was a time period where there was more
21  secondary impact during kind of the height of the
22  heroin epidemic in Summit County in 2016.  Am I
23  right so far?
24        MS. FLOWERS:  Objection.
25        THE WITNESS:  I'm not sure -- I'm not

42 (Pages 162 - 165)

1  sure that's what I said, so I can try to repeat
2  it if you want.  But I think that we have seen a
3  higher level of secondary -- a more -- a higher
4  frequency of secondary trauma to our staff as a
5  result of the opiate epidemic.
6  BY MR. ALEXANDER:
7      Q.  And has there been some metric that you
8  use for that in terms of productivity?  Time off?
9  Anything other than turnover rate to measure the
10  increased frequency of secondary impact related
11  to heroin abuse?
12      A.  I don't know that there's a measure
13  other than really just processing with staff kind
14  of where they are and what they're struggling
15  with.
16      I think turnover's probably a very minor
17  part of it, really.  It's -- we have seen a
18  higher turnover.  I don't think that's the
19  biggest issue.
20      I think the bigger issue is really
21  making sure that people are -- people are okay to
22  be able to do the job and that their needs are
23  being met.  And there's no measure for that.
24  There's not a test that we give them that says,
25  "Are you stressed?"  We don't force those kinds

1  of things on staff.
2      But we know when we hear them or see
3  them crying in their office that they're
4  experiencing stress.  So we have to sit down with
5  them and say, "What is the issue that you're
6  experiencing?  Why are you crying in your
7  office?"  And it is generally about their case
8  having some sort of a trauma -- traumatic issue
9  that has caused them some harm and pain.
10      Q.  And you're not saying all of the trauma
11  is because of heroin, are you?
12      MS. FLOWERS:  Objection.
13      THE WITNESS:  No.  I didn't -- I didn't
14  say that.
15  BY MR. ALEXANDER:
16      Q.  And there are reasons other than drug
17  abuse that might lead to changes in how -- kind
18  of how bad it is, how often you're seeing
19  secondary impacts, right?
20      MS. FLOWERS:  Object to the form.
21      THE WITNESS:  I haven't seen trends.  I
22  -- I think you did ask me that.  I haven't seen
23  trends where we've seen increase in secondary
24  trauma until more recently with the opiate
25  epidemic.  I have always seen secondary trauma

1  and have been aware that it is an issue.
2      If someone has a child die, that's
3  clearly going to cause some secondary trauma for
4  them.  And children have died.  Caseloads have,
5  you know -- parents have died.  But what we've
6  seen is an increase in the frequency of that as a
7  result of the opiate epidemic.
8  BY MR. ALEXANDER:
9      Q.  So are there any documents or types of
10  documents that you could point to where this has
11  been discussed or analyzed over time to look at
12  increased death of children or parents using
13  children's services and how that might have an
14  effect on employee well-being, this sort of
15  secondary impact?
16      MS. FLOWERS:  Object to the form.  Asked
17  and answered.
18      THE WITNESS:  Again, I don't think -- we
19  don't have any documents that we fill out related
20  to that unless there's some specific incident in
21  the case file.  There's nothing that documents
22  secondary trauma.  It's a real issue, but it's
23  not analyzed and documented in a spreadsheet.
24  BY MR. ALEXANDER:
25      Q.  Is it also an issue that's increasingly

1  the subject of awareness within the field of
2  professionals who do children's services?
3      MS. FLOWERS:  Object to the form.
4      THE WITNESS:  Could you say that again?
5  BY MR. ALEXANDER:
6      Q.  Sure.  Is there increasing awareness
7  about secondary impact and secondary trauma
8  within children's services?
9      A.  I believe there is, yes.
10      Q.  All right.  I mean, more broadly, like,
11  within health care professionals, there's more
12  attention now than there was 20 years ago to the
13  impacts on the mental well-being and maybe even
14  the functioning of health care workers by what
15  they experience in their job, correct?
16      A.  I -- can you -- you're going to have to
17  repeat that for me.
18      Q.  Sure.
19      A.  Sorry.
20      Q.  It's probably not necessary.  Why don't
21  we just go on.
22      In terms of the secondary impact and
23  this issue of tying it to the deaths of children
24  or adults who interact with Children's Services,
25  you mentioned something about case files.

43 (Pages 166 - 169)

1      If I can hand that to you to put with
2  it.  That too.  Let me give you -- if you don't
3  mind -- I'm sorry.  I just have to give you
4  that --
5      A.  Okay.  Uh-huh.
6      Q.  -- so that those going together.
7      A.  All right.
8      Q.  Do you see your name on the top of the
9  e-mail September 15th, 2017, sent to Katerina
10  Papas?
11      A.  Yes, I do.
12      Q.  Okay.  And do you recall the attachments
13  to this e-mail?
14      A.  "The attachments" meaning the letter to
15  the president?
16      Q.  Yeah.  And then there's a -- so
17  there's a -- there's a short version of a letter.
18      A.  Okay.  Uh-huh.
19      Q.  And then there's a long version where
20  your name is ended at the end --
21      A.  Yes.
22      Q.  -- your name is added with a whole bunch
23  of other folks.
24      A.  I see that, yes.
25      Q.  It looks like the letter is pretty much

1  the same, though.
2      A.  Yes.
3      Q.  So your letter to Ms. Papas asks her "Do
4  you see any reason I could not sign this on
5  behalf of the agency.  If I thought it was at all
6  controversial, I would want board approval, but I
7  cannot imagine the board would not agree.  What
8  do you think?"
9      Do you see that?
10      A.  I do.
11      Q.  Do you know what her response was?
12      A.  Well, obviously, that's not here, but I
13  believe she agreed with me that this was an
14  appropriate thing to sign and did not need board
15  approval because I don't believe we did take that
16  to the board, is my recollection.
17      Q.  And at the bottom of the cover e-mail
18  from Darlene Migas of ADM board -- that's the
19  Alcohol, Drug Addiction & Mental Health Services
20  Board of Summit County.
21      Do you see that?
22      A.  I do.
23      Q.  We were talking about that acronym
24  earlier, right?
25      A.  Right.  And I couldn't come up with it.

1  Yes, that's it.
2      Q.  You were close.
3      So at the bottom of this, it says, "I
4  will submit the letter with all authorized
5  signatures, and will also post the letter on the
6  Opiate Task Force Website."  And it gives a -- a
7  website address for that.
8      Do you see that?
9      A.  I do.
10      Q.  And by this time, were you participating
11  in the Opiate Task Force?
12      A.  I always -- I -- I don't generally go to
13  the Opiate Task Force meetings.  I've been to
14  probably a few.  But I am always aware of what
15  they're doing.  I get their e-mails.  I get their
16  newsletter, stuff like that, so yes.
17      Q.  And do you maintain those documents as
18  part of your business records?
19      A.  Not necessarily unless I need them for
20  something.
21      Q.  But are you participating with the task
22  force in an official capacity or personal
23  capacity?
24      A.  I don't really participate in the task
25  force.  I don't regularly attend those meetings.

1      Q.  When you've gone to the meetings or when
2  you get stuff sent to you, is it because you are
3  the executive director of Summit County
4  Children's Services or because of a personal
5  interest outside of your work position?
6      A.  It's because of my role as the executive
7  director of Summit County Children's Services.
8      Q.  So I -- I won't belabor it, but what --
9  what was the gist, from your perspective, of what
10  you wanted the federal government to do here in
11  September of 2017 to help alleviate the effects
12  of what's described as the opiate epidemic?
13      MS. FLOWERS:  Object to the form.
14      THE WITNESS:  Well, according to the
15  letter, we were asking that they would -- the
16  president would declare a public health emergency
17  with the goal, ultimately, of having some funds
18  to help with the opiate epidemic.
19  BY MR. ALEXANDER:
20      Q.  And we talked about how you had been
21  aware for a while that, from your perspective,
22  the state funding for Summit County Children's
23  Services was not sufficient from your
24  perspective, and that you thought that increased
25  funding would have been helpful to address the

Page 278

1  impact of heroin abuse and other aspects of
2  what's been described as the opiate epidemic.  Do
3  you remember that?
4      A.  Yes.
5      MS. FLOWERS:  Objection.
6      THE WITNESS:  Uh-huh.
7  BY MR. ALEXANDER:
8      Q.  Did you have a similar view about
9  federal government funding or involvement, that
10  more could have been done before September of
11  2017 to help nip this in the bud or limit the
12  effects on the children that were your clients?
13      A.  Generally, I would say yes.  But I --
14  you know, I'm probably not the right person to
15  ask that because we don't -- this funding doesn't
16  come through us.  So, you know, I was really much
17  more focused on our state funding, and that had a
18  direct impact on us.
19      My involvement when the -- with this
20  would be more from a community perspective around
21  making sure that those services that clients need
22  are available in the community, so . . .
23      Q.  So I'm asking about your perspective
24  because, you know, we know what your position is,
25  we have some documents from you that you have

Page 279

1  a -- kind of a role in this because the entity
2  that you oversee is part of what the plaintiffs
3  in this case are seeking damages for.
4      So I'm -- I'm asking you, from your
5  perspective, whether this was your job or not.
6  What is it you think the federal government
7  should have been doing more in terms of funding
8  or other initiatives to help make things better
9  for the children you believe were affected by
10  heroin abuse and other aspects of the opioid or
11  opiate epidemic?
12      MS. FLOWERS:  Object to the form.
13      THE WITNESS:  I think they needed to do
14  more and provide more funding to get the right
15  services out there, to fund the appropriate
16  organizations adequately.  Yes, I think they
17  needed to do more as well.
18  BY MR. ALEXANDER:
19      Q.  What do you mean "fund the appropriate
20  organizations" or fund them appropriately?
21      A.  Whether that would be through Health &
22  Human Services, through those organizations that
23  would through push funding down to the states.
24  Whether that be through mental health boards,
25  through the Office of Children and Families,

Page 280

1  although we, again, don't necessarily get federal
2  money.  I think this -- this is a good example.
3      They -- eventually, there was some money
4  for the Cures Act, is my understanding --
5      Q.  For --
6      A.  -- that went to the mental health
7  boards.
8      Q.  Did you say Cares Act?
9      A.  Cures.
10      Q.  Cures Act.
11      A.  Uh-huh.
12      Q.  When did you start getting that money?
13      A.  We didn't.  I -- I -- I believe that
14  went to mental health boards.
15      Q.  Has there been any increase in funding
16  that's focused on addressing effects of heroin
17  abuse or opiate abuse that's come from federal
18  sources that you've actually received since you
19  became executive director?
20      A.  Not -- not to our agency, no.
21      Q.  What about more generally in terms of
22  funding that's focused on addressing substance
23  abuse?  Has there been any new money that's come
24  to your agency at all since you became executive
25  director in 2013?

Page 281

1      MS. FLOWERS:  Object to the form.
2      THE WITNESS:  Not specifically unless it
3  was a grant, you know.  So, for example, the
4  START grant that we applied for, we'll get some
5  money for that.  The STARS grant was a federal
6  grant that was already in place, as you know.
7      So, no, I'm not aware of anything.
8  BY MR. ALEXANDER:
9      Q.  Okay.  Do you wish there had been?
10      A.  Sure.  Yes.
11      Q.  Is there something in particular other
12  than just more money would have been better to
13  hire more staff and do more training and have
14  more programs?
15      A.  There's a whole lot of things that I
16  would be able to use money for if I had
17  additional money.
18      Q.  Have you committed that list, kind of
19  the wish list of what would help, to writing?
20      A.  Sure.  Not to writing, no, but I've got
21  it.
22      Q.  You have it in your head?
23      A.  Uh-huh.
24      Q.  I don't know if it would take the rest
25  of our time, but can you give me your wish list?

71 (Pages 278 - 281)

Page 282

1    A.  Well, I could give you the short one.
2    Q.  Sure.  Right.
3    A.  But, you know, I think, you know, we
4  need additional funds, obviously, to staff
5  appropriately.  Our cases are too complex for the
6  caseloads that we currently have, so staffing
7  would be probably first and foremost.
8    But I also think we need to have more
9  foster homes, so we would need more money for
10  recruitment, which is very, very costly.
11    We would need additional dollars to
12  really support our staff internally.  I would
13  love to have a clinical person on staff that they
14  could talk to about their case, to staff their
15  cases.  I would also like someone to deal with
16  their secondary trauma issues in-house.  I think
17  that would be very helpful if they had someone
18  that they could process those things with outside
19  of our EOP program, which is not sufficient.
20  Some additional training for them.
21    But, really, a lot of resources for our
22  clients would be very, very helpful.  We have a
23  significant number of families who are placed
24  with the kinship, relatives or nonblood-related
25  people.  Those people struggle very much with the

Page 283

1  resources to take care of children.  Child care
2  is a very substantial issue for them.  They don't
3  have enough money when they take a child into
4  their home to pay the child care costs that go
5  along with that.  We pay a lot of that for them,
6  but that is limited to some extent on how much of
7  that we can do.
8    So I would love to see some additional
9  support.  I would love to have staff who really
10  are focused very much on the kinship family and
11  they're able to be a support person attached to
12  every kinship provider, but we do not have
13  resources to do that and have not been able to
14  provide that service.
15    I have -- I would love to have a trauma
16  expert on staff.  I guess that would be probably
17  another one.  Our children are very, very
18  traumatized by removal from the home, some of the
19  things they've seen in the home.  We know that
20  childhood trauma has a very, very long-term,
21  negative impact on children.  And I am extremely
22  worried about what we don't know yet about what's
23  going to happen with the children who have been
24  traumatized by what's happened to them in their
25  homes.

Page 284

1    I think that the sooner we can address
2  the childhood trauma for children, the better off
3  we're going to be because that is a long-term
4  issue for those children.  It's a long-term
5  resource issue that is an unknown factor at this
6  point.
7    So that's a few.
8    Q.  Is that the short list?
9    A.  That's the short list.
10    Q.  Have you proposed that to anybody of
11  saying, "Here are the things I would like"?
12    A.  No, not particularly.  I mean, there are
13  certain pieces of that that I have proposed and
14  had discussions with my board, but not all of
15  those because I think that they are not a
16  reality; at least, they have not been.  So I
17  think, you know, now that we have our levy
18  passed, we will look at, you know, pieces and
19  parts of that and what are the most critical.
20    I certainly could not afford to do all
21  of those with the levy increase that we have, but
22  I think that we will try to implement a few
23  things, particularly the resources for kinship
24  families, because I think that's very critical,
25  and really looking at our recruitment of foster

Page 285

1  homes and increasing the staff to some extent.
2    Q.  Do you have a price tag for any or all
3  of those measures?
4    MS. FLOWERS:  Object to the form.
5  BY MR. ALEXANDER:
6    Q.  How much it would cost to do them?
7    A.  Oh.
8    MS. FLOWERS:  Same objection.
9    THE WITNESS:  I -- I have not done a
10  financial analysis on how much each of those
11  things would cost, so no.
12    - - -
13    Thereupon, Exhibit 4 was marked for
14    purposes of identification.
15    - - -
16  BY MR. ALEXANDER:
17    Q.  Okay.  I think this will not take long.
18  I have Exhibit 4 for you, which is a two-page
19  e-mail, SUMMIT_001911463 through -464.  And
20  there's a copy for plaintiffs' counsel.
21    And if we -- we start at the back of
22  this, the e-mail chain starts July 5th, 2017.
23    A.  Okay.
24    Q.  So, essentially, two months before the
25  one we were just looking at that was the letter

72 (Pages 282 - 285)

1  to President Trump.
2      A.  Okay.
3      Q.  Do you see that?
4      A.  Uh-huh.
5      Q.  Okay.  And the subject is an "Opioid
6  Survey."  Do you see that?
7      A.  I do.
8      Q.  And we've -- we've talked about whether
9  certain data was generated in connection with
10  opioid surveys that PCSAO was requesting at
11  different points in time.  You remember that
12  discussion?
13      A.  Yes.
14      Q.  Okay.  So first e-mail is from Amy
15  Davidson to Brady Stewart, copying -- copying
16  Elizabeth Mangon?
17          And we talked about Ms. Davidson,
18  correct?
19      A.  Correct.
20      Q.  And who is Brady Stewart and who is
21  Elizabeth Mangon?
22      A.  Brady Stewart is in our quality
23  improvement department.  He is primarily our
24  SACWIS person.  And he -- so he runs reports for
25  us and those kinds of things that come out of our

1  quality improvement department.
2          Liz Mangon is the director of the
3  quality improvement department.
4      Q.  So I gave her a French pronunciation to
5  her last name.  It's just "Mangon"?
6      A.  "Mangon."
7      Q.  Okay.  All right.  So, ultimately,
8  Mr. Stewart writes back to Ms. Davidson later
9  that morning, sends her a spreadsheet about 466
10  removals in 2016 where there was a reunification
11  case plan that had substance use documented as a
12  concern/risk contributor.  Do you see that?
13      A.  Yes.
14      Q.  It's the bottom of the first page.
15      A.  Bottom of the first page.  Uh-huh.  Yes.
16      Q.  Okay.  And is that tied to what we were
17  talking about earlier in terms of looking at
18  people who had a -- a plan in place that
19  identified substance use?
20      A.  Right.  Yes.  Uh-huh.
21      Q.  And do you know if this was done in
22  connection with responding to a PCSAO opioid
23  survey?
24      A.  I believe that's what this is for, yes.
25      Q.  So it continues, "For those cases" -- so

1  out of however many cases there were with a
2  removal in place, there were 466 that had
3  something about substance use as a concern or
4  risk contributor, correct?
5      A.  Correct.
6      Q.  Okay.  It said, "For those cases, I
7  wrote code to programatically pull the Drug Type
8  ('drug choice') from both the linked intakes and
9  parental Characteristics.  Out of 242 cases, we
10  had to physically look at 41 cases to find a
11  documented drug type."
12          Do you know what he means by that?
13          MS. FLOWERS:  Object to the form.
14          THE WITNESS:  I'm not sure what he means
15  by that, no.
16  BY MR. ALEXANDER:
17      Q.  Does that suggest an issue with the data
18  that's in SACWIS of needing to go physically look
19  at case files?
20          MS. FLOWERS:  Object to the form.
21          THE WITNESS:  I -- I -- I guess that
22  what he means is that when he looked at the
23  parental characteristics, he did not see it
24  there.  So he looked into those 41 cases because
25  he knew there was a substance abuse issue, but it

1  wasn't identified.
2  BY MR. ALEXANDER:
3      Q.  When you say "looked into," means looked
4  at the --
5      A.  He looked --
6      Q.  -- actual file, case file?
7      A.  -- at the actual file then.
8      Q.  So in 2017, after the various efforts to
9  upgrade, make more robust the data that's in
10  SACWIS, there's still issues where the specific
11  drug is not specified for some portion of the
12  cases, correct?
13          MS. FLOWERS:  Object to the form.
14          THE WITNESS:  I -- I don't -- I don't
15  know.
16  BY MR. ALEXANDER:
17      Q.  I mean, it says that, basically,
18  one-sixth of the cases they identified didn't
19  have the drug specified without going back to the
20  case file?
21      A.  Right.
22          MS. FLOWERS:  Objection to the form.
23          THE WITNESS:  It wasn't -- sorry.  It
24  wasn't specified in that place in the record is
25  what I'm interpreting this to mean, but I -- I

Page 366

1  talk about individual names, which is why it's a
2  little vague.
3      Does that make sense?
4      A.  Sure.  Yes.
5      Q.  So in terms of --
6      A.  Appreciate that.
7      Q.  -- any of the accounts that have
8  appeared in the press talking about problems with
9  drug exposure of children and the possible role
10  of Summit County Children's Services, you're not
11  critical of the performance of your group,
12  correct?
13      A.  No, I'm not.
14      MR. ALEXANDER:  Okay.  Why don't we take
15  a break, and we'll see whether I have additional
16  questioning or --
17      THE WITNESS:  Okay.
18      MR. ALEXANDER:  -- anybody else does.
19      THE WITNESS:  Okay.
20      THE VIDEOGRAPHER:  Off the record at
21  4:51 p.m.
22      (Recess taken.)
23      THE VIDEOGRAPHER:  Back on the record at
24  5:09 p.m.
25  BY MR. ALEXANDER:

Page 367

1      Q.  Is there any of your testimony thus far
2  you need to change or supplement or -- in any
3  way?
4      A.  I don't believe so.
5      Q.  I'm going to reiterate my position
6  relating to document production, and then I've
7  just got a handful of questions, and then pass
8  you on to the codefendants for their questioning
9  subject to our reservations about documents and
10  some of the other issues that have come up.
11      Now, at the start of this, I asked you
12  about allegations in the case relating to various
13  defendants including the defendants I referred to
14  as the distributors.  Remember those questions?
15      A.  Yes.
16      Q.  Okay.  Do you know, based on your own
17  personal knowledge, any facts at all relating to
18  AmerisourceBergen Drug Corporation?
19      A.  No, I don't.
20      Q.  Do you know who they are?  Do you know
21  what they do?  Do you know anything about them?
22      A.  Not really, no.
23      Q.  Do you know what, if anything, they have
24  to do with the distribution of prescription
25  opioids to Summit County?

Page 368

1      A.  I -- I really don't.
2      Q.  Same questions for Cardinal Health.  Do
3  you know anything about them?
4      A.  Nothing specific.
5      Q.  Do you know anything about what they
6  have to do with the distribution of prescription
7  opioids to Summit County?
8      A.  Not specifically.
9      Q.  Do you know anything about their role in
10  this case at all?
11      A.  Not specifically.
12      Q.  Do you have any personal knowledge of
13  anything that McKesson ever did or didn't do with
14  regard to prescription opioids?
15      A.  Not specifically.
16      Q.  Do you have any knowledge of anything
17  about McKesson in terms of their role in this
18  case?
19      MS. FLOWERS:  Objection.  Asked and
20  answered.
21      THE WITNESS:  Not specifically.
22  BY MR. ALEXANDER:
23      Q.  For any of the distributors, any
24  distributors large and small, any company that
25  ever distributed prescription opioids that they

Page 369

1  didn't manufacture or dispense in a retail
2  fashion, the distributors, do you know anything
3  about any of them in regards to anything about
4  this case?
5      MS. FLOWERS:  Object to the form.
6      THE WITNESS:  Not specifically.
7  BY MR. ALEXANDER:
8      Q.  Okay.  Do you intend to gain information
9  about any of the distributors to be able to offer
10  any testimony specific to them or to the
11  distributors as a whole?
12      MS. FLOWERS:  Objection.  Calls for
13  speculation.
14      THE WITNESS:  Not unless I need to, no.
15  BY MR. ALEXANDER:
16      Q.  Do -- do you -- I -- I know that there
17  may be things that come up and conversations you
18  have with lawyers and all sorts of stuff, but
19  you, to, like, do your job in Summit County
20  Children's Services, do you intend to gain any
21  information to be able to testify about anything
22  relating to anything a distributor ever did or
23  didn't do?
24      MS. FLOWERS:  Object to the form.
25      THE WITNESS:  I don't really think that

Page 370

1  has anything to do with me doing my job.  I'm --
2  I'm really here to talk about how this impacts my
3  system, so I -- no, really, I -- I don't.
4  BY MR. ALEXANDER:
5      Q.  And subject to the documents that we
6  have, I've tried to be thorough in asking you
7  about everything you know and can say and can't
8  say relating to the impact on your job and your
9  department of what you understand to be related
10  to heroin abuse, opiate abuse, and opioid abuse.
11      Do you have anything else to add on any
12  of those subjects that we haven't already
13  covered?
14      MS. FLOWERS:  Object to the form.
15      THE WITNESS:  No.  I mean, I guess the
16  only other thing that I would really add is --
17  since you're just opening the door for me to say
18  whatever I want, I guess -- I -- I feel like, you
19  know, we're really trying to pin this down to
20  data and numbers very specifically, and that's
21  kind of been what this is about.
22      And I really do believe that, you know,
23  my 28 years of experience in working in child
24  welfare and watching what has happened to
25  children and families is a really big piece of

Page 371

1  how we analyze what we do and what's impacting
2  our system.
3  BY MR. ALEXANDER:
4      Q.  And observations that you've had over
5  the last, let's say, 12 years going back to 2006,
6  including the time when you had your prior
7  position with Summit County, any observations you
8  had about what you believe was the impact of
9  opioid use, opiate use, heroin, or any other drug
10  of abuse would be memorialized in documents that
11  you created at the time, correct?
12      MS. FLOWERS:  Object to the form.  Lack
13  of foundation.
14      THE WITNESS:  Not necessarily.  Again,
15  I -- I think this -- you know, it isn't always
16  about documents and data.  It's really, you know,
17  a -- about what I've observed, what I've
18  witnessed, what I've seen in years of experience,
19  what I've heard from my staff, what I see in my
20  caseworkers, the conversations that I have, not
21  only in the community but with my staff,
22  specifically about what they're saying, what
23  they're dealing with every day.
24      And I don't feel like we had any of
25  those conversations, which I understand.  I mean,

Page 372

1  your questions have been very data driven and
2  document driven, but there is more to the story
3  than the data and documents and statistics.
4  BY MR. ALEXANDER:
5      Q.  Well, I've asked you a number of times
6  if you had specific experiences with patients or
7  with facts relating to what you believe was
8  illustrative of the impact of the heroin epidemic
9  or opiate crisis, however it's been characterized
10  at different points in time, on Cuyahoga -- on
11  Summit County Children's Services.
12      Do you have any examples like that?  Do
13  you have specific instances you can talk about?
14      MS. FLOWERS:  Object to the form of the
15  question.  Asked and answered; lack of
16  foundation.
17      THE WITNESS:  I mean, I have many
18  examples of, you know, very specific situations
19  where I know that children have been harmed.  I
20  know that parents have died.  I know that parents
21  have overdosed frequently.  I know that my
22  caseworkers have struggled with, you know,
23  telling a child that their parent is deceased.
24      Removing a child from a home because
25  their parents have addiction issues and the

Page 373

1  trauma of removal alone is -- is a significant
2  trauma for children.
3      So, yeah, there's -- there's -- there's
4  endless examples of those kinds of scenarios that
5  go into my analysis and my reaction to how I
6  responded to this issue.
7      MR. ALEXANDER:  Okay.
8      MS. NADEL:  Not to interrupt, but
9  someone on the phone can't hear.  Do we know if
10  there's an issue with the audio?  I just got an
11  e-mail that somebody can't hear.
12      MR. ALEXANDER:  Don't know.
13      MS. NADEL:  Is it on mute?
14      MR. ALEXANDER:  It doesn't light up or
15  not light up when you push it.  So I -- I don't
16  think this is a good time to interrupt.
17  BY MR. ALEXANDER:
18      Q.  The examples you just referenced in the
19  abstract, can you say that any of them involved
20  people who were using prescription opioids
21  pursuant to prescription written for them at the
22  time the various adverse health consequences or
23  impact on the children occurred?
24      A.  Well, I mean, I think, as I stated
25  earlier, I don't specifically know -- you know,

94 (Pages 370 - 373)

Page 374

1 I'm talking about opioids generally, and not
2 breaking it down to specific types.
3        You know, have there been cases where
4 I've known the type of drug?  Absolutely.  Was it
5 heroin or was it -- but, generally, we're looking
6 at it in, you know, the totality of the opioid
7 epidemic.
8    Q.  Okay.  So sitting here today, when you
9 think about examples of these sorts of human
10 impacts of heroin abuse and opiate abuse, you
11 can't say that any of them involved somebody who
12 was actually taking a prescription opioid
13 pursuant to a prescription written for them at
14 the time of the events that you're talking about,
15 correct?
16        MS. FLOWERS:  Objection.  Asked and
17 answered -- asked and answered; mischaracterizes
18 the witness's testimony.
19        THE WITNESS:  Again, I -- I don't
20 necessarily know the type of drug or what drug
21 they started with, so I wouldn't necessarily have
22 that.
23        I -- I am aware that it is -- it is
24 different types of drugs.  So it could be
25 prescription drugs.  We do have cases where we

Page 375

1 know it's prescription drugs.  I might
2 necessarily not have that information.
3        When I have conversations with my staff,
4 when we have conversations in the community, we
5 talk about opioids generally.  We don't get into
6 the specifics of that.  So I really can't break
7 that down for you.
8 BY MR. ALEXANDER:
9    Q.  Okay.  So, again, I have another
10 specific focus question about the cases that
11 you're talking about.  Can you say that any of
12 those people, where they were using some illegal
13 drug like heroin later, that any of them actually
14 started with a prescription opioid written for
15 them and taken by them pursuant to a
16 prescription?
17        MS. FLOWERS:  Objection.  Asked and
18 answered.
19        THE WITNESS:  I think, you know, my
20 answer earlier was I don't think necessarily we
21 track that.  Do my staff know that?  Perhaps.  I
22 wouldn't know that.
23        You know, I'm kind of, again, generally
24 applying what we know statistically occurs around
25 heroin, having started with prescription drugs

Page 376

1 for a very high percentage of people.
2 BY MR. ALEXANDER:
3    Q.  So in response to my last question, the
4 answer is:  No.  As I sit here today, I can't
5 tell you that any of these specific cases
6 involved somebody who started with a prescription
7 opioid written for them and then went on to
8 illegal heroin, correct?
9        MS. FLOWERS:  Objection.  Argumentative;
10 misstates the witness's testimony.
11        THE WITNESS:  I can't specifically give
12 you a case example of that myself, no.
13 BY MR. ALEXANDER:
14    Q.  So when you've talked about that you can
15 identify cases where somebody was taking a
16 prescription opioid or where you know specific
17 cases that were -- you know which drug they were
18 taking in specific cases, how would we look at
19 those case files?  How would we be able to
20 evaluate those case files or those case records
21 on SACWIS or some other case file to look at the
22 facts and figure out for ourselves if it supports
23 your recollection?
24        MS. FLOWERS:  Object to the form.
25        THE WITNESS:  I don't think you would,

Page 377

1 frankly, because the information in the case
2 records is confidential and protected in a number
3 of ways.  So I -- we wouldn't provide
4 case-specific information to -- on that.
5 BY MR. ALEXANDER:
6    Q.  Right.  So in federal court like this,
7 where we have discovery, if you want to talk
8 about something that you say occurred and you say
9 the underlying facts of it are confidential, that
10 potentially creates an issue.
11        So I want to make sure that I've
12 explored this adequately so that if we have to
13 file motions and follow-up with the court, we can
14 do so.
15        You believe that any examples that you
16 have in your head of actual cases that you've
17 heard about or you've been involved in where
18 there was something that -- bad happened, like
19 a -- child observing a parent dying or some
20 other bad situation that you would say is an
21 example of the impact of opioids or opiates or
22 heroin on Children's Services would require
23 evaluating confidential information on cases that
24 you could identify but wouldn't be willing to
25 because, from your perspective, it would be a

95 (Pages 374 - 377)

Page 378

1 breach of confidentiality; is that correct?
2      MS. FLOWERS: Object to the monologue
3 and to the characterization of the witness's
4 testimony and the form and lack of foundation.
5      THE WITNESS: Well, let me clarify.
6 I -- I don't have examples for you that are
7 specific to a particular client who started on
8 one drug and ended up on another.
9      I -- I think I said that clearly, that I
10 am making some assumptions, again, statistically
11 based on what I know happens with heroin use. So
12 I don't have specific examples of cases.
13      I believe some caseworkers may have some
14 cases where they know that occurred, but they
15 don't necessarily know that either. So if they
16 have a client who is currently testing positive
17 or admitting to use of heroin, they may not know
18 where that started.
19 BY MR. ALEXANDER:
20      Q. Okay. So for any example based on an
21 individual case where you can say, "I know that
22 in the case of Jane Doe this bad thing happened
23 because of something about drug addiction, and it
24 had a horrible impact on a child or it had a
25 secondary impact on a caseworker or it was some

Page 379

1 other -- in some other way, it was a great
2 example of what I've been talking about," if
3 there are examples like that, you wouldn't be
4 willing to let us look at those case files to
5 figure out what the file actually says, correct?
6      MS. FLOWERS: Object to the form. Lack
7 of foundation; misstates the witness's testimony.
8      THE WITNESS: I wouldn't necessarily
9 know what cases those are, so I --
10 BY MR. ALEXANDER:
11      Q. Okay.
12      A. -- I couldn't say, you know, it's a
13 particular case. So, no, I -- I couldn't say,
14 "This case you can look at; that case you can't,"
15 so I wouldn't be able to do that.
16      Q. So let's make it a two-step process.
17 Can you identify with any degree of
18 particularity, whether they be case file numbers
19 or names, any of the actual cases that you're
20 kind of relying on in your head as examples of
21 the sorts of things that you've been talking
22 about of the -- the human impact of the opiate
23 epidemic?
24      MS. FLOWERS: Form.
25      THE WITNESS: I -- I think I already

Page 380

1 said I don't have examples of that.
2 BY MR. ALEXANDER:
3      Q. Okay. And even if you could identify
4 examples, your view is that you wouldn't be
5 willing to share them because it would involve
6 looking at confidential information like patient
7 names, potentially children names --
8      MS. FLOWERS: Same objection.
9 BY MR. ALEXANDER:
10      Q. -- or client names?
11      A. Correct.
12      Q. So at trial, you don't intend to talk
13 about any specific examples, right?
14      MS. FLOWERS: Object to form. Calls for
15 speculation.
16      THE WITNESS: No, I -- I don't.
17 BY MR. ALEXANDER:
18      Q. I'm sorry?
19      A. I said no, I don't.
20      MR. ALEXANDER: Okay. So subject to our
21 prior reservations and whatever issues we have to
22 deal with on motion, whatever those would be, I
23 was going to pass to the manufacturers and other
24 defendants for their questioning.
25      I would suggest that we just go off the

Page 381

1 record for five seconds while we shift seats.
2      MS. FLOWERS: Okay. Before we go off
3 the record, we'll just state on behalf of the
4 plaintiff that we believe the documents have all
5 been produced for this witness.
6           - - -
7           EXAMINATION
8 BY MS. NADEL:
9      Q. It's been a long day. I just want to
10 remind you of who I am. My name is Heidi Nadel.
11 I represent Insys Therapeutics, Inc. And I only
12 have a couple of questions for you.
13      MS. NADEL: Are we good? Are we good?
14      Okay.
15 BY MS. NADEL:
16      Q. We've talked a lot today about variously
17 called opioid, opiate epidemic or crisis. Is it
18 okay if in my questions I refer to "the opiate
19 epidemic," and it will mean all of the things
20 that have been used today as opioid crisis,
21 opiate epidemic, however it's been used in the
22 documents, we have one term I can use?
23      A. Yes. That's fine with me. That's
24 generally how I have been characterizing it today
25 as well.

96 (Pages 378 - 381)