# EXHIBIT 57

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4            ~~~~~~~~~~~~~~~~~~~~
 5
 6   IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
     OPIATE LITIGATION
 7                                    Case No.
                                      17-md-2804
 8
                                      Judge Dan Aaron
 9                                    Polster
10   This document relates to:
11   The County of Summit, Ohio, et al. v. Purdue
     Pharma L.P., et al., Case No. 18-OP-45090
12
13             ~~~~~~~~~~~~~~~~~~~~
14
15
16            Videotaped Deposition of
17            GRETA JOHNSON, 30(b)(6)
18
                  January 15, 2019
19                   8:30 a.m.
20
                    Taken at:
21
                Sheraton Suites Akron
22       1989 Front Street - Portage Room
                 Cuyahoga Falls, Ohio
23
24
25            Stephen J. DeBacco, RPR
```

Page 190

1 Have you thought about it?
2   A.  No.  Again, to me, it is an
3 aggregate harm to the community.
4   Q.  All right.  I'd like you to pull
5 back out --
6       MS. WINNER:  Oh, no, we didn't.  I
7 thought we already marked this.  Did we mark
8 this already?  I thought we did mark this.
9       Could I just see the --
10      THE WITNESS:  Sure.
11      MS. WINNER:  -- exhibits quickly?
12 My apologies.
13      THE WITNESS:  I'm sorry.  They're
14 not in order.
15      MS. WINNER:  That's all right.
16 You're not required to keep them in order.
17      MS. KEARSE:  You're working hard
18 enough.
19      MS. WINNER:  Oh, here it is,
20 Exhibit 7.  I think this is Exhibit 7.
21  Q.  If you pull out Exhibit 7.
22  A.  Sure.
23  Q.  And look at page 14.
24  A.  Okay.
25  Q.  And you see at the bottom there's

Page 191

1 Interrogatory 18 --
2  A.  I do.
3  Q.  -- which asks for categories of
4 injury.
5  A.  Uh-huh.
6  Q.  And then for some other
7 information.  But then -- if you then go to the
8 response, and there's a bullet point list of
9 categories of injury.
10      Do you see that?
11  A.  I do.
12  Q.  Do you -- is this one of the
13 interrogatory answers that you reviewed?
14  A.  It is.
15  Q.  Does this list look familiar to
16 you?
17  A.  Yes.  Sorry.
18      MS. WINNER:  Are you okay?  Do you
19 need a break?
20      THE WITNESS:  No, I'm okay.
21  Q.  As you understand it, does -- is
22 this a -- does this -- is everything on this
23 list -- let me strike that.
24      Is this a -- an accurate list of
25 the injuries that Summit County has -- claims

Page 192

1 to have suffered in this case?
2  A.  Okay.  Let me take a look.
3  Q.  Sure.  Go ahead.
4  A.  I've reviewed it.  Could you
5 restate the question?
6  Q.  Sure.  Is this an accurate list of
7 the injuries that Summit County claims to have
8 suffered in this case?
9  A.  I -- I feel that it's missing some
10 of the major losses that we've incurred.
11  Q.  Okay.  What's missing?  I want to
12 go back through the list, but before we do
13 that, why don't you tell me what's missing from
14 the list.
15  A.  The loss of human capital.  And
16 certainly there's not a dollar figure you can
17 put on the thousands of lives we've lost.
18  Q.  Is that an injury for which Summit
19 County is seeking damages in this case?
20  A.  It is, because we're seeking
21 damages due to the total harm caused by this
22 epidemic.  The loss of life that really
23 exploded in 2016 created another loss, and that
24 was a loss of a sense of community.  And when
25 you talk about the aggregate harm, that is a

Page 193

1 harm that we will be trying to recover from for
2 decades.
3       To declare a state of emergency in
4 Summit County was not something that was easily
5 reached, because it sends an alarm bell to
6 businesses and to people seeking to relocate
7 that we have a problem.  And we're no different
8 than anyone else, but we were the grownups in
9 the room enough to acknowledge what the problem
10 was and use the platform of the executive's
11 office to bring attention to it.
12      So the losses that are monetized
13 certainly here, I know that Brian can speak to
14 those directly and that Ms. Miller-Dawson can
15 as well.
16      But the aggregate loss is -- is not
17 limited to what you can put on a paper.  The
18 overwhelming sense of hopelessness that took
19 over this community in 2016, you can't monetize
20 that.  Every single day the newspaper was
21 reporting on the overdose death rates.  You
22 could not go into a community setting where
23 there were not weeping mothers talking about
24 their children.
25      So you asked me before if I had

Page 194

1 personal contact with it, and I'm lucky. I'm
2 lucky in that my family has not. But it is
3 personal to me when parents and community
4 members come to their government looking for
5 answers, looking for help, those can't be
6 monetized. Those can't be bullet-pointed,
7 because that loss of human capital and the loss
8 of trust in the community, in doctors, in
9 patient care, because they know now how their
10 kids started. They know what caused this,
11 and -- and that is a harm that this community
12 will be trying to rebuild for decades.
13     Q.   Okay. Ms. Johnson, what I'm asking
14 you right now is whether there are any injuries
15 for which Summit County is seeking damages in
16 this case that are not listed in the response
17 that appears on pages 15 to 17 of this exhibit.
18     A.   The medical --
19        (Telephonic interruption.)
20        MS. WINNER: If you're on the
21 phone, if you would please put yourself on
22 mute.
23     A.   Are the increased costs to the
24 medical examiner's office listed here?
25     Q.   I'm sure it is. If not, we'll come

Page 195

1 back to it.
2     A.   The other costs that I think should
3 be reflected -- and again, probably tough to
4 monetize -- is the compassion fatigue that our
5 first responders and treatment providers are
6 incurring, and sort of the resources that we're
7 trying to put toward that effort of making sure
8 that those folks are supported, that they don't
9 become overwhelmed by hopelessness, and that
10 they don't become overwhelmed by the sheer
11 volume and turn cold to it.
12        So there have been efforts to try
13 and address that, both through the medical
14 community and through the first responder
15 community and all of those things. Any time
16 there's an investment of time, there's an
17 investment of treasure, and I think that that
18 is something that's missing.
19     Q.   Anything else?
20     A.   I think that there's also -- the
21 portion that talks about the loss of tax
22 revenue due to the decreased efficiency and
23 size of the working population, I read that as
24 we had a lot of people die, so our population
25 decreased.

Page 196

1        The other part of that, opioid
2 epidemic that impacts that, is that we have
3 created a new class of felons who cannot seek
4 certain employment and might not be able to
5 seek the employment they had prior to falling
6 victim to addiction.
7        So I think there's -- there is a
8 loss that's beyond just the physical presence
9 of people we've lost, but also the ability of
10 people to work in certain fields because of the
11 felonization of -- of this epidemic.
12     Q.   Anything else that's not on the
13 list? An injury for which Summit County seeks
14 damages in this case?
15     A.   I think it could be argued that --
16 the very last bullet point is cost for child
17 services and foster care for opioid-dependent
18 babies and foster children, so that's just a
19 really small portion of it.
20        Our -- our Children's Service Board
21 had to seek an increase in their levy this
22 year. And levy campaigns cost money. And the
23 driving factor behind the request for increase
24 is the opioid epidemic. And so the costs of
25 that campaign really to try and support this

Page 197

1 fundamental service I feel like could be
2 included with the Children's Services portion.
3     Q.   Anything else? I'm not asking you
4 to explain anything that's here. I'm going to
5 go --
6     A.   Sure.
7     Q.   -- through each item that's on the
8 list. I just wanted to know if there's
9 anything else that's not on the list.
10     A.   I don't see anything that's
11 standing out right now.
12     Q.   Okay. Well, let's go back to the
13 top of the list, then.
14     A.   Okay.
15     Q.   The first item is, "Losses caused
16 by the decrease in funding available for
17 Plaintiff's public services for which funding
18 was lost because it was diverted to other
19 public services designed to address the opioid
20 epidemic."
21        What public services -- for what
22 public services was funding lost because it was
23 diverted to other public service?
24     A.   Well, specifically in Summit County
25 we have deferred capital improvements. We've

50 (Pages 194 - 197)

Page 198

 1  deferred, you know, what I would call
 2  enhancement projects, things meant to enhance
 3  our community because our resources were
 4  laser-focused on the opioid epidemic.
 5         So where public health, for
 6  instance, really would like to spend their time
 7  promoting this T21 initiative that they have,
 8  eliminating the ability for our youth to buy
 9  tobacco products.  A lot of science behind how
10  tobacco can change your brain makeup and how
11  it's important to not do that at an early age.
12  I know that that is an initiative they take
13  really seriously and wanted to promote, but it
14  really takes a back seat to the opioid
15  strategies and -- and programs.
16         Additionally, in Summit County
17  we've got health issues like anyone else.  I
18  didn't know that diabetes was such a huge
19  health issue in Summit County.  It is.  It's
20  our number one health issue, outside of
21  addiction, that -- that public health was
22  targeting.  And -- and all of those things get
23  pushed to the side.  Those important community
24  initiatives get pushed to the side, because
25  when people are dying immediately, you know,

Page 199

 1  it's -- it's all hands on deck for that.
 2     Q.   So --
 3     A.   Obvious- --
 4     Q.   Go ahead.
 5     A.   With law enforcement, we have
 6  detectives who are, you know, responding to
 7  overdose cases frequently.  And those, as we've
 8  discussed, are incredibly difficult to
 9  investigate for a myriad of reasons, and their
10  time is, therefore, tied up in those cases
11  rather than, you know, folks who have had their
12  home burglarized or their car stolen.
13         And we also have a lot of our
14  resources being put into things like our Quick
15  Response Teams that we never had to do before,
16  but we know that Quick Response Teams are
17  effective, and so we put money toward them.  So
18  the number of other things that don't get the
19  attention or the money that they typically
20  would or should get because we're busy trying
21  to save people's lives with -- with these
22  efforts.
23         I know that in the medical
24  examiner's office we have lost a stream of
25  revenue.  Our medical examiner's office used to

Page 200

 1  perform several autopsies for outside agencies
 2  for cost, and that was a stream of revenue that
 3  we were able to help fund some of -- of the
 4  operations there.  Can no longer do that
 5  because we don't have the capacity to do it,
 6  and our -- and the funds there have to go to
 7  what's happening in front of them.
 8         I know that we have used grant
 9  dollars to help support the expansion of our
10  drug courts, that perhaps those dollars could
11  have been used in a prevention setting or could
12  have been used for some other law enforcement
13  purpose, but because of the need for increased
14  capacity in drug courts, we -- we have
15  designated grant dollars for that as well.
16         And -- and likewise, those judges,
17  their time that would normally have been spent
18  on a variety of different cases is focused
19  on -- on drug cases, and certainly a huge
20  percentage of which are opioids.
21         I'm trying to go around the county
22  in my mind.
23         I -- that's -- that's -- I think
24  that's where I'm at on that.
25     Q.   Well, you said -- let me take you

Page 201

 1  through some of these.  This was -- has money
 2  been taken away -- that was already allocated
 3  to T21 taken away from it?
 4     A.   I don't know that money was taken
 5  away, but certainly focus.
 6     Q.   How about money that was dedicated
 7  to diabetes, whatever was going to be done
 8  about diabetes, has anything been taken away
 9  from that?
10     A.   I -- again, I think where you've
11  got time invested, you know, from people,
12  that's money.  So when you take people off of,
13  you know, particular initiatives and refocus
14  them on something else, that is a diversion
15  of -- probably not the right word -- that's a
16  shift in dollars.
17     Q.   Were specific people taken off
18  diabetes?
19     A.   I don't know that for sure.  I just
20  know that that's not something that they are
21  focused on.  I shouldn't say that.  That's
22  unfair.
23         I know that what is coming out of
24  public health frequently, and investments of
25  new dollars are going into are ways to mitigate

Page 202

1  harm, harm -- harm reduction for the opioid
2  crisis.
3      Q.   Okay.  What -- but this bullet
4  point talks funding being diverted to other
5  public services --
6      A.   Right.
7      Q.   -- so my question is, what was
8  their -- what was the specific funding or -- or
9  resources, whether it was particular people,
10 that -- that was supposed to be -- you know,
11 was allocated out for diabetes and got diverted
12 elsewhere?
13     A.   I don't -- I don't know how to
14 specifically answer what was allocated for
15 diabetes, but I know we spent $10,000 on
16 fentanyl strips.  $10,000 that could have been
17 spent on diabetes prevention.  $10,000 that
18 could have been spent on T21.  But because harm
19 reduction is so critical in our community,
20 $10,000 was spent on fentanyl strips.
21          The increase in dollars that are
22 being spent on the needle exchange.  Certainly
23 those are dollars that weren't previously being
24 spent on needle exchange, but because the
25 demand is so high and the harm reduction

Page 203

1  benefit of that is so great, that those dollars
2  are not being spent on those other things.
3      Q.   What -- in a -- in a law
4  enforcement category, you say that there are
5  people who are investigating over- --
6  overdoses.  Were those people who were
7  previously assigned to do something else
8  specifically, and if so, what?
9      A.   Well, there are two detectives in
10 the Summit County Sheriff's Office who are
11 general division detectives, but they respond
12 to any fatal overdose scene.  So that means
13 they leave their desk and whatever rape,
14 robbery or homicide they're working on and
15 their attention has to be focused on -- on this
16 overdose.
17          I know the City of Akron had two
18 detectives who were working in, you know,
19 the -- the drug unit who were earmarked
20 specifically to investigate overdose deaths
21 because there were so many.
22          That's to say nothing of all of the
23 other police officers throughout the county who
24 would be proactively policing and are spending
25 lots of time on calls for service regarding

Page 204

1  overdoses.
2      Q.   Are there any -- is -- is the -- is
3  Summit County seeking damages in this case for
4  injuries suffered by the City of Akron?
5          THE WITNESS:  Thank you.
6      A.   Well, I mean, we don't -- we are
7  separate entities, certainly.  Akron's in
8  Summit County, and what happens in Akron does
9  affect Summit County.  So an arrest that's made
10 in the City of Akron by Detective Leonard, that
11 becomes a Summit County case.  It's a felony.
12         So the City of Akron arrest goes
13 through Akron Municipal Court, comes to Summit
14 County Common Pleas court, goes through our
15 prosecutor's office, goes through our Common
16 Pleas court system, our drug court.  Our ADM
17 provides services.  Our health department
18 provides services.
19         So we're certainly separate
20 entities, but what happens with nearly half of
21 our population impacts what goes on in Summit
22 County.
23     Q.   Is Summit County seeking damages in
24 this case for injuries suffered by the City of
25 Akron?

Page 205

1          MS. FLOWERS:  Objection.  Asked and
2  answered.
3      A.   We're -- we're both independently
4  seeking our own damages, is the way I
5  understand the -- the case.
6      Q.   So if the -- if the City of Akron
7  police department suffers an injury, that's not
8  part of the injury for which Summit County is
9  seeking damages, correct?
10         MS. KEARSE:  Objection.
11     A.   Again, it's tough because you get
12 arrested in the city of Akron, you're coming to
13 the Summit County Jail.  So I -- I know that
14 they're -- that we're seeking -- we're two
15 separate plaintiffs, certainly, but the
16 aggregate harm, to me, is what I always come
17 back to.
18         You know, I will leave to the
19 lawyers to make the determination of -- of
20 where that line separates, but to me it's
21 difficult for me to separate out what happens
22 in Akron from what happens in Summit County
23 because they're the same thing.  Everything in
24 Akron is in Summit County.
25     Q.   Is the --

Page 206

1  MS. KEARSE: And, Counselor, just
2 again for the record, we've got 30(b)(6)
3 representatives who are going to go
4 specifically to the dollar figures for the City
5 of Akron and for the County of Summit, so I
6 think those questions are probably more
7 appropriate for the 30(b)(6) representatives
8 who will deal specifically with the costs and
9 dollars associated with the recovery.
10  Q. Are there any statistics maintained
11 or -- by Summit County concerning any changes
12 in law enforcement activities in areas other
13 than drug enforcement that you attribute to the
14 opioid problem?
15  A. I'm sorry. Could you say that
16 again, please?
17  Q. Sure. Are there any statistics
18 maintained by Summit County concerning any
19 changes in law enforcement activity in areas
20 other than drug enforcement that you attribute
21 to the opioid problem?
22  MS. KEARSE: Object to form.
23  A. I -- I feel like I'm -- I'm sorry.
24 I feel like I'm still missing it. Changes
25 in --

Page 207

1  Q. Well, you say that -- you say that
2 these people who were investigating drug
3 overdoses are not investigating something else.
4 Was there -- are there any statistics that are
5 maintained on what other crime is out there
6 and -- and whether it's being addressed at a
7 different level than it was before?
8  A. I see what you're saying.
9  Certainly the -- the sheriff's
10 department has its annual report, as does the
11 Akron Police Department.
12  But again, it's hard to measure the
13 crime we don't catch. We're so focused on
14 opioids and the havoc that they have caused
15 that it would be difficult to graph the crime
16 that they're not catching because of the -- the
17 attention being paid to opioids.
18  Q. Do you know whether clearance rates
19 have changed?
20  A. I don't know that. I -- I don't --
21 I don't know that.
22  Q. Now, you said that the medical
23 examiner's office is no longer able to earn
24 income for doing autopsies for other people,
25 for other counties. Was that, like, other

Page 208

1 counties?
2  A. Yes.
3  Q. Okay. So this is just -- this is
4 just a money-making proposition for the County
5 that you're not able to do anymore; is that
6 right?
7  MS. KEARSE: Object to form.
8  A. Yeah, it wasn't just about making
9 money. We have highly skilled physicians who
10 have different certifications in our medical
11 examiner's office. I believer Dr. Kohler is
12 one of only -- it's either 150 or 200 in the
13 country with certain qualifications. So often
14 her expertise was helpful in difficult cases.
15  Q. Well, and the -- the Quick Response
16 Teams, were the- -- are these people who were
17 diverted from other activities, and if so,
18 what?
19  A. Well, any time a police officer is
20 responding to an overdose, they're not
21 proactively policing. They're not being
22 present in the community. They're taken out of
23 the community for a specific purpose. So
24 again, it's one of those it's hard to quantify
25 because it's the stuff you don't catch.

Page 209

1  But any time a police officer is
2 dispatched as a part of a QRT, that's a police
3 officer who's not enforcing traffic laws.
4 That's a police officer who's not able to
5 respond to a domestic violence call. It's --
6 it's more officers who have to respond solo and
7 without, you know, a second officer present to
8 those types of cases.
9  Q. And -- and again, am I correct that
10 you're not aware of any statistics, hard
11 statistics, about the activities that those
12 officers did not do because they were involved
13 in the Quick Response Teams?
14  A. No. It's hard to quantify what you
15 didn't do, I guess.
16  Q. All right. Then you say there that
17 you used grant dollars for drug court
18 expansion.
19  A. Uh-huh.
20  Q. So this was grant -- grant dollars
21 received from a third party?
22  A. From the federal government.
23  Q. From the federal government. Okay.
24 So this is not -- this is not Summit County tax
25 money you're talking about?

53 (Pages 206 - 209)

Page 210

1  A.  No, but they're dollars that might
2 have otherwise been used for other
3 opportunities in the County.
4  Q.  Were -- was that in the grant
5 documents?  Is that money tailored for other --
6 excuse me -- targeted for other uses?
7  A.  That was a DOJ grant that was -- I
8 don't -- it was not specifically for drug
9 courts, but it was fashioned by Summit County
10 employees in an effort to make our needs meet
11 the requirements of the grant, as I recall.
12      Like, it was a pretty broad one.
13 You could apply for many different reasons.
14 But as I recall, it was -- we tailored it to --
15 to expand drug court.
16  Q.  Well, and you don't -- I take it
17 you don't know -- you don't know you would
18 have -- you would have received the grant for a
19 different use for those same funds?
20      MS. KEARSE:  Object to form.
21  A.  I mean, I can't predict the federal
22 government.  I don't think anybody can these
23 days.  So, no, I couldn't say that we would
24 have gotten it or not.
25  Q.  All right.  I think we've covered

Page 211

1 the first -- first bullet --
2  A.  Okay.
3  Q.  -- pretty thoroughly.
4      Is there anything we have- -- we've
5 failed to cover on the first bullet?
6      I -- so maybe we can move to the
7 second one.  "Costs for providing health care
8 and medical care for patients suffering from
9 opioid-related addiction or disease, including
10 overdoses and deaths."
11  A.  I'm sorry.  If I could go back to
12 the first one.
13  Q.  Sure.
14  A.  So because of the prevalence of the
15 opioid epidemic --
16  Q.  Uh-huh.
17  A.  -- lots of tasks -- task forces,
18 boards, commissions, things like that have
19 sprung up in an effort to educate and -- and
20 promote and -- and treat and combat the whole
21 thing, and a lot of person hours are being
22 devoted to those.  So myself, our public safety
23 director, the executive, my staff, the public
24 safety staff have spent countless hours on
25 these boards and commissions trying to

Page 212

1 coordinate efforts and leverage funds, and
2 those are, you know -- personally those are
3 hours that were not spent doing things that
4 could have enhanced our community.  Those
5 are -- those are hours that were spent
6 specifically doing things that we would not
7 have been doing had this epidemic not taken
8 place in Summit County.
9      So public services is -- I guess I
10 sort of was just thinking police, but certainly
11 all of the public servants who work for the
12 County, in addition to public health and ADM,
13 have diverted our personal resources to this
14 issue.
15  Q.  Have you tracked the -- the
16 hours --
17  A.  No.
18  Q.  -- that you spent on this?
19  A.  I have not.
20  Q.  Do you know if anybody else in the
21 County has done that?
22  A.  I don't.  But certainly I can
23 personally tell you I have spent what I am
24 confident are hundreds of hours at boards and
25 commission meetings on behalf of the County for

Page 213

1 this specific purpose.
2  Q.  You were not hired specifically by
3 the County for that purpose, correct?
4  A.  I was not hired by the County?
5  Q.  To -- to deal with opioid issues.
6 Or were you?
7  A.  That wasn't the only reason.  I --
8 I think my knowledge of the criminal justice
9 system and my advocacy platform certainly lent
10 itself to the position that the executive hired
11 me at.
12  Q.  Did the position that you -- that
13 you were hired for exist before you were hired
14 for it?
15  A.  It did the way I was hired.  I was
16 hired in as a deputy director of law, and that
17 was a position that existed.
18      January 1st of last year, the new
19 position of assistant chief of staff was
20 created.
21  Q.  And then -- and you're also the
22 public spokes- --
23  A.  Correct.  Public information
24 officer.
25  Q.  Public information officer.

Page 238

1 for providing mental health services,
2 treatment, counseling, rehabilitation service,
3 and social service to victim of the opioid
4 epidemic and their families."
5     Now, I think a lot of these
6 categories overlap.
7   A.  Yeah.
8   Q.  So I think a lot of this one we've
9 already talked about.
10    Is there anything that fits in this
11 category that you haven't already described for
12 me?
13   A.  I don't know that we've talked a
14 lot about Children's Services and the costs
15 associated with the increased treatment and
16 placement.
17   Q.  We have a whole separate bullet
18 point --
19   A.  Oh, that's right.  Sure.  Okay.
20   Q.  -- for that one later.  So let's --
21    MS. KEARSE:  And I'm -- I'm sorry.
22 Which bullet point are you on?
23    MS. WINNER:  We're on the last one
24 on page 15.
25    MS. KEARSE:  Okay.  All right.

Page 239

1   A.  So directly from the County,
2 because of the increased demand for inpatient
3 treatment, as well as other forms of services
4 and counseling centers, the County donated
5 land.  There are two separate 501(c)(3) groups
6 in Summit County who were working together and
7 are working together.  One called Hope United,
8 which is seeking to create a community center
9 specifically for folks recovering from opioid
10 addiction.
11    The other is called -- I've lost
12 it.  Dan Gregory's group.  It will come to me
13 as I talk about it.  They are looking to build
14 an inpatient facility.  And they approached the
15 County multiple times looking for land or a
16 building that would make sense.
17    Because we could not find the right
18 fit for something they could purchase, we
19 donated over 20 acres of land to these two
20 501(c)(3)s in an effort to co-locate them and
21 provide, really, a campus for treatment.  This
22 was done essentially because we saw the need
23 and --
24    MR. JOHNSON:  They didn't turn the
25 telephone back on.

Page 240

1    MS. WINNER:  Oops.  Okay.
2    MR. JOHNSON:  Oh, now they did.
3    MS. WINNER:  Now we're back on.
4    MR. JOHNSON:  Thank you.
5   A.  So this was done in response to a
6 need for not only more treatment beds, but also
7 a variety of treatment options for folks.  It
8 really -- it's a large tract of land that the
9 County owns and had for sale that we certainly
10 didn't sell to anyone else because we felt it
11 was so imperative to create this availability
12 of space for -- for these treatment providers.
13   Q.  Where is this land located?
14   A.  It's located in Lakemore, which is
15 interesting because it's a landlocked community
16 inside of Springfield, which is just east of
17 Akron.
18   Q.  You said you had it for sale.  How
19 long had it been for sale?
20   A.  I don't know when the last -- when
21 it -- the last tenants.  So it -- I don't know
22 how long it had been for sale.
23   Q.  The -- are these, Hope United and
24 Dan Gregory's group, whatever its name is,
25 limited to opioid addiction treatment?

Page 241

1   A.  I don't think that they are limited
2 to, but they came to us because of.  Both of
3 their families are personally affected by the
4 opioid epidemic.
5    Hope United was founded by Travis
6 and Shelly Bornstein, and they lost their son
7 to an overdose.  And he was a college athlete
8 who became addicted to opioids, and when no --
9 he could no longer get those, he turned to
10 heroin.  And he overdosed, and his body was
11 dumped in a field.  And so they very quickly
12 mobilized their community to support this
13 effort of having a place of hope for people to
14 go to.
15    And Dan's organization, he also has
16 a family member who has been directly impacted
17 by opioid addiction that started with
18 medication and now has turned to heroin.
19   Q.  And what is the source of your
20 information about how his addiction started?
21   A.  I talked with him.
22   Q.  With him?  He told you that?
23   A.  I talked with Dan, and I talked
24 with Shelly and Travis Bornstein.  They lost
25 their son.

Page 242

1  Q. Okay. But my point is, did you --
2 do you have any information, other than what
3 these family members told you about that?
4  A. No. He's dead. I mean, this is
5 what happened to him.
6  Q. Well, but, I -- again, you're --
7 you're a former prosecutor. You know the
8 difference between hearsay and direct -- direct
9 evidence.
10     Do you have any personal knowledge
11 on that point or is it you just know what they
12 told you?
13     MS. KEARSE: Object to form.
14  A. I believe that the parents knew
15 what their child was doing when he was taking
16 prescription medication prescribed to him by
17 his physician after an injury. And they know
18 that he then started seeking heroin. And they
19 know this because he died with a needle in his
20 arm.
21  Q. And that's what they've told you;
22 is that correct?
23  A. That's also what a police report
24 indicates in the way that he died.
25  Q. And does the police report include

Page 243

1 any independent information about the source of
2 his opioid use?
3  A. I don't recall exactly what the
4 police report says.
5  Q. Okay. On this, have we now covered
6 either in our conversation just now or in our
7 conversation before the break, everything
8 that -- that's covered within -- of the last
9 bullet point on page 15?
10  A. That's the best of my ability at
11 this point, yes.
12  Q. Okay. Why don't we skip over the
13 next bullet point and talk about the second
14 bullet point on page 16.
15  A. Uh-huh.
16  Q. Which is costs associated with
17 various public safety and health initiatives
18 related to the opioid epidemic. And again, I
19 don't want us to be repeating ourselves.
20  A. Sure.
21  Q. So is there anything in that
22 category beyond what we've already talked about
23 here today?
24  A. The number of dump sites for
25 medication has increased. I know that most

Page 244

1 police departments in Summit County now have a
2 drop-off box, and --
3  Q. Is that what a dump site is --
4  A. Yeah.
5  Q. -- a drop-off box?
6  A. Yes, yes. And there have been
7 several initiatives, drug take-back days, where
8 there's specified locations for folks to turn
9 in unused medications.
10  Q. Who runs that?
11  A. It depends. Obviously, all of the
12 different police departments monitor their own
13 drop boxes. The DEA certainly has, I think,
14 either one or two specified days per year, but
15 local law enforcement groups have done their
16 own, and it has gone to a point where we've had
17 local high school groups organize some of these
18 sort of take-back or turn-in days.
19  Q. All right. Well, what is --
20 what -- just focusing in on the county again.
21  A. Uh-huh.
22  Q. What -- what has Summit County done
23 in this category?
24  A. Well, the health department
25 participates in those, as well as ADM. Those

Page 245

1 are -- a lot of those initiatives are driven
2 out of the Opiate Task Force meetings. So the
3 health department and -- and the ADM are
4 involved in all of those efforts for those
5 initiatives.
6  Q. Well, other than the -- is there
7 anything else other than the dump sites and the
8 drug take-back days that fits in this category,
9 beyond the things that we've already talked
10 about. I realize some of them would probably
11 fit --
12  A. Yeah.
13  Q. -- into this category also.
14  A. Did we talk about the fentanyl
15 strips and needles with this?
16  Q. You have.
17  A. Okay.
18  Q. Anything else?
19  A. The -- Dr. Smith and Dr. Kohler
20 presenting at continuing medical education
21 programs. As far as initiatives, that's --
22 that's what I can come up with at this point.
23  Q. Now, the -- the dump sites for
24 medication and the drug take-back days, those
25 are not limited to opioids, are they?

Page 246

1  A.  No.
2  Q.  All right.  The costs associated
3  with the increased burden on Plaintiff's drug
4  courts, are there specific initiatives
5  associated with opioids that have been
6  undertaken by the drug courts?
7  A.  They've had to increase capacity.
8  As far as initiatives, I guess I don't know
9  exactly how to frame that other than to say
10 there's been an increase in who becomes
11 eligible for drug court, or I -- we call it
12 "Hope Court" in municipal court.  It's "Turning
13 Point" in common pleas court.  But I guess it's
14 commonly referred to as "drug court."
15       But it used to be, 10 and 15 years
16 ago even, the only courses that went to drug
17 court was drug cases, possession cases, and
18 there's been a shift in policy and in thought
19 that it should be expanded to cover theft cases
20 or other things that were committed as a result
21 of addiction and drug-seeking behavior.
22       So the expansion of and sort of the
23 change in philosophy has certainly required
24 additional probation officers, additional
25 caseworkers.  Common pleas court now has two

Page 247

1  judges.  It expanded from one of our three
2  municipal courts to there's now a second drug
3  court.  And Barberton Municipal Court and the
4  Stow Municipal Court has an agreement with
5  Akron so that some of their defendants can use
6  the services in Akron.
7  Q.  Okay.  But I want to focus again on
8  Summit, what Summit County --
9  A.  Right, and we --
10 Q.  -- has incurred here.
11 A.  -- we -- so the court system is 100
12 percent Summit County, the common pleas court
13 system.
14 Q.  Okay.  I see.
15 A.  Yes.  So that's general fund money
16 for the most part.  Some of the grant funds
17 that we talked about previously helped support
18 drug court, but that -- that is a Summit County
19 cost.
20 Q.  To the extent Summit County --
21 okay, Summit County versus another
22 jurisdiction.  But some of that money may be
23 paid with grant funds?
24 A.  Yes.
25 Q.  Now, this policy change that you

Page 248

1  talk about to incur -- to expand the
2  eligibility, that isn't limited to people with
3  opioid problems, is it?
4  A.  No.  But I really think it was the
5  opioid epidemic that awakened this sort of
6  sensibility about rather than criminalizing
7  this behavior, looking at the root of why this
8  person committed theft or why this person
9  committed forgery of this check, rather than
10 just, you know, the punishment for writing a
11 bad check on, you know, either a closed account
12 or someone else's account.  And -- and seeing
13 that the reason they did it was they were
14 trying to get money to buy opioids.
15       So I think that that created an
16 entire shift in -- in sort of the ideology in
17 our community that -- looking at what we call
18 crime as part of addiction.
19 Q.  Well, let me ask you this.  If --
20 if opioids were to disappear tomorrow so that
21 all you had --
22 A.  Please.
23 Q.  Yeah.  I think we all agree with
24 that.  At least illegal opioids.
25       MS. KEARSE:  Objection.

Page 249

1  Q.  And if the -- if opioids were to --
2  the opioid problem was to disappear tomorrow
3  and all you had left were cocaine addicts, meth
4  addicts, people addicted to other substances, I
5  assume you would still -- you know, Summit
6  County would still want to have a drug court
7  for those people?
8  A.  Yes.  We had a drug court before
9  the opioid epidemic.
10 Q.  And this policy change is something
11 you would probably still keep in place?
12 A.  I would certainly hope so.
13 Q.  Okay.  Costs associated with
14 cleanup of public parks, spaces, and facilities
15 of needles and other debris and waste of opioid
16 addiction.  Is this something that's actually
17 tracked somehow in the county?
18       MS. KEARSE:  Object to form.
19 A.  I would suggest that that be
20 referred to Mr. Nelson, that the -- Summit
21 County Metroparks is a separate entity.  They
22 are funded by a levy.  So I don't know what
23 their tracking on that part is.
24 Q.  Do you know anything about this
25 cost category?

Page 250

1  A.  I do not.
2  Q.  Loss of tax revenue due to
3  decreased efficiency and size of the working
4  population in Plaintiff's communities, and due
5  to other impacts on property values and other
6  tax generators for Plaintiff.
7        Has there been any kind of study
8  done to evaluate this category of loss?
9  A.  Not by Summit County.  We do have a
10 division of workforce development, and we also
11 have an economic and community development
12 division within the executive's office.  And
13 part of what we do in that division is make
14 house calls, essentially, to the businesses in
15 Summit County.
16       And the number one complaint or the
17 number one need of employers in Summit County
18 is workforce.  And by and large these are
19 manufacturing jobs.  And going one step
20 further, the number one issue is having folks
21 who can pass a drug test, and there's a lot of
22 concern from our business community that they
23 can't expand because the workforce is not
24 healthy enough to do so.
25       And, again, as I previously said,

Page 251

1  there are a lot of industries that are
2  regulated, either by statute or ordinance, that
3  disallow felons.  And with this epidemic
4  creating a new class of not only sick people,
5  it created a new class of sometimes
6  unemployable people in certain fields because
7  of their felony classification.
8        And again, it's also an issue of
9  how can we measure what we didn't know?  When
10 you couldn't look at a newspaper in 2016
11 without seeing a headline about death and
12 opioid affliction in the community, it's hard
13 to say what we missed when it comes to economic
14 development or tax generators, because, A, we
15 were busy trying to address the issue, and, B,
16 if you were a site selector at that time, I
17 can't imagine that Summit County would have
18 been a desirable location if you were looking
19 to relocate a new manufacturing plant or a
20 headquarters of some type of economic
21 development industry.
22 Q.  What's the unemployment rate in
23 Summit County right now?
24 A.  I think it's right around 4
25 percent.

Page 252

1  Q.  And that is generally considered at
2  the level of full employment, correct?
3  A.  I don't know -- I don't know how to
4  respond to that.
5  Q.  Do you -- but 4 percent is a pretty
6  low unemployment rate, is it not?
7        MS. KEARSE:  Object to form.
8  A.  I think it depends on if you're one
9  of the people who's employed and if you're one
10 of the people who is looking for a workforce.
11 Q.  Well, let me ask you this way.  If
12 you are somebody who is looking for a
13 workforce, you typically will have a much more
14 difficult time filling positions at 4 percent
15 unemployment rate than, say, at 7 or 8 or 10
16 percent unemployment rate, correct?
17 A.  I think it depends on the industry.
18 And the unemployment rate doesn't look at our
19 underemployment, where we've got folks who
20 perhaps were nurses or other professionals that
21 are regulated by the State, who now, with a
22 felony conviction, can no longer practice in
23 the field they were previously, you know,
24 paying income tax and owned a home and now work
25 at minimum wage jobs or a lower paying wage job

Page 253

1  than previously.
2  Q.  How many people are in that
3  category?
4  A.  I don't know.
5  Q.  Are you aware of any specific
6  business investments that businesses have
7  considered making in Summit County but have not
8  made as a result of the opioid crisis?
9  A.  No.  As I said, trying to capture
10 what you never knew was happening is -- is
11 incredibly difficult, at least for us.
12 Q.  And Northeast Ohio has had -- been
13 struggling with attracting investment for a
14 number of years now, hasn't it?
15 A.  I -- I don't really want to speak
16 for Northeast Ohio.  I feel like Summit County
17 has weathered the financial crisis in some
18 better ways than most, but it's because we've
19 been -- we operate with a thousand less
20 employees than we did 10 years ago, so I
21 couldn't say what Northeast Ohio has -- has or
22 has not you attracted.
23 Q.  Well, as the -- was the -- did the
24 financial crisis hit Summit County hard?
25 A.  Yes, it did.

Page 254

1  Q.  Is there -- are there any specific
2 tax revenue streams that you can identify for
3 which you believe there is a quantifiable
4 impact?
5  A.  I would have to defer to -- to
6 Mr. Nelson that, on the tax revenue streams. I
7 mean, we're a sales-tax-based fund, our -- I
8 would defer to Mr. Nelson that one.
9  Q.  So is the answer you don't know?
10     MS. KEARSE:  Object to form.
11  A.  As I sit here today, I -- I can't
12 answer that question.
13  Q.  When it talk -- when you -- when
14 this response talks about tax revenue, is it
15 talking about sales tax revenue?
16  A.  I think it includes sales tax --
17 sales tax revenue, but also income tax revenue.
18 When you're not working, you're not paying
19 income tax, and -- and that can impact the
20 County as well.  While we don't collect income
21 tax, what affects Akron affects Summit County,
22 and when their numbers are down, we have to
23 find ways to help support our 31 communities.
24     And so when, quote-unquote,
25 business is good for the 31 communities,

Page 255

1 business is also good for Summit County.  And
2 likewise, when it's not, the strain and the
3 leveraging of dollars has to become much more
4 creative.
5  Q.  So am I correct that Akron charges
6 income tax, but Summit County does not?
7  A.  Well, that -- that's our primary --
8 the way our general fund is -- is set up is
9 that we operate -- all counties in Ohio operate
10 on sales tax revenue.
11  Q.  Are there any other tax revenues
12 that the County receives that are affected, you
13 believe, by the opioid crisis?
14  A.  Sitting here today, I don't -- I
15 don't know that I can come up with any.
16     MS. KEARSE:  And for the record, I
17 think she already deferred to Mr. Nelson as
18 well, so if there's anything she's missing,
19 Mr. Nelson can fill that in for you.
20     MS. WINNER:  I'm sure Mr. Nelson
21 will be a fount of information.
22     MS. KEARSE:  Save some time.
23     MS. WINNER:  We will.
24  Q.  Okay.  Let me then ask -- go down a
25 couple more, toward the next to last bullet on

Page 256

1 the page, talks about cost associated with
2 impact of opioid epidemic on Plaintiff's
3 vehicle fleets.
4     What does that relate to?
5     MS. KEARSE:  Object to form.
6     MS. WINNER:  Oh, you meant -- you
7 were objecting to my tone of voice.
8     MS. KEARSE:  Well, I didn't want to
9 say it that way, but, yeah.
10     MS. WINNER:  Yeah, okay.  Fair
11 enough.
12     MS. KEARSE:  I guess you were
13 responding to how I said "object to form."
14     (Laughter.)
15     MS. KEARSE:  We got to have some
16 fun at this.
17  A.  So there are multiple fleets of
18 vehicles in the County.  Surprising number of
19 vehicles.  And as I sit here, the -- the thing
20 that really stands out to me is that, you know,
21 buying new vehicles for our sheriff's
22 department, for the investigators and the
23 prosecutor's office, all the way down to the
24 surveyors for the fiscal office, certainly when
25 the bottom line is impacted, the timeliness of,

Page 257

1 you know, replacement -- I certainly hope it's
2 not repair -- but replacement of these vehicles
3 isn't a priority when we're using our funds
4 elsewhere.  Beyond that, I can't speak to that
5 one.
6  Q.  Okay.  Then go on, the next one is
7 costs for Plaintiff to properly and adequately
8 abate the nuisance created by the opioid
9 epidemic.
10     And, again, excluding everything
11 you've already described, is there anything
12 else that falls into this category?
13  A.  This one's hard for me, because
14 there's so much that I cannot, as -- as an
15 attorney and as whatever my hats are, I'm not
16 an economist.  These kids who have gone into
17 our Children's Services system, the babies born
18 addicted, the people who this -- this entire
19 population who is now living with addiction.
20     Luckily, we've gotten better at
21 harm reduction, but what that means is that now
22 we have this population of people who are
23 living with addiction who are going to our
24 community health center for methadone every
25 single day.  The costs for that, to me, are

65 (Pages 254 - 257)

Page 258

1 endless.
2     So, I mean, we've -- as I said,
3 there's always a dead horse that needs to be
4 beaten somewhere, but we have gone over so many
5 of these things, but we haven't talked about
6 the future.  These costs we've been talking
7 about in the past tense.  These are costs that
8 are being incurred today.  They are costs --
9 these same costs are going to be incurred
10 tomorrow.  There are still kids coming into CSB
11 at higher rates than before.
12     And so it's like looking at these
13 numbers from the past and putting them out into
14 when?  I don't know, because the generational
15 addiction that's been created by this epidemic
16 is something that we've never seen before, and
17 so it's hard for me, as an attorney and not an
18 economist, to project what we might need for
19 these kids and for these families.
20   Q.   Is that your full answer?
21   A.   That is.
22   Q.   All right.  Then the last bullet is
23 costs for child services and foster care for
24 opioid-dependent babies and foster children.
25     And you talked a little bit about

Page 259

1 this earlier.  I guess my first question is, to
2 what extent are the -- the -- are child
3 services and foster care services tracked in
4 terms of the extent to which they relate
5 explicitly to opioid addiction?
6   A.   I believe in -- in 2016, our
7 Children's Services Bureau began tracking,
8 like, a specific -- I don't know what they
9 would call it, but I would call it, like, the
10 entrance point, what brought this kid into our
11 system.  And I believe it was in 2016, maybe
12 later in the year, they began specifically
13 identifying those.  And I believe Director
14 Barnes talked about that, that they had seen an
15 increase to the point that it became imperative
16 that they focus on it so that they could
17 quantify and understand how to budget for it.
18     The costs for foster care and
19 placement have grown additionally, because with
20 the prior forms of addiction that we'd seen in
21 Summit County -- crack, methamphetamine,
22 cocaine -- familial placement was always
23 priority.  Can a -- can this child be placed
24 with a family member?
25     And what has been incredibly

Page 260

1 alarming is that that isn't the case with
2 opioids, because it's a familial addiction.
3 Mom is addicted.  Brother is addicted.
4 Grandparent is addicted.  And so the ability to
5 place a child with a family member has
6 decreased.  And when the child has to be placed
7 with a non-family member, the costs of that
8 placement are higher than they are with a
9 family member.
10   Q.   Well, I'm -- one thing that just
11 struck me as you were talking just now is you
12 talked about familial addiction.  When a --
13 when you see, you know, mom, dad, grandma, all
14 addicted to opioids, did all of them start with
15 prescription opioids from a doctor, or does it
16 start with one particular family member and
17 then it spreads to others?
18   A.   My experience has shown me that
19 when one person comes home with a bottle full
20 of 60 or 90 pills and that person either uses
21 or doesn't use them all, the readily available
22 supply in the home is what leads to this
23 familial addiction.  Everybody has access to
24 this oversupply, and it's right there in front
25 of them because there are so many pills.

Page 261

1   Q.   If somebody were able to make -- to
2 wave a magic wand and make heroin and fentanyl
3 disappear, would the opioid epidemic in Summit
4 County look different than it does now?
5     MS. KEARSE:  Object to form.  Calls
6 for speculation.
7   A.   I mean, if I had a magic wand, I'd
8 go back much farther than that and make sure
9 that the doctors and our community was educated
10 about the addiction rates and levels and let
11 people know, if you get addicted to this, you
12 are very likely going to be out in the street
13 looking for heroin.
14   Q.   Okay.  But that wasn't my question.
15 My question was if heroin wasn't available
16 anymore, fentanyl wasn't available anymore,
17 what impact, if any, would that have on the
18 opioid situation in Summit County?
19   A.   If it --
20     MS. KEARSE:  Object to form.
21   A.   If it wasn't available in Summit
22 County and people were addicted to opioids,
23 they'd go someplace else to get it.  That's
24 how -- that's how this addiction is
25 functioning.  The -- it's not like they're

66 (Pages 258 - 261)

Page 262

1  not -- they're going to stay in bed and be
2  like, "Meh, it's not out there, so I'm good."
3  The pill sickness that people get is what
4  drives them out to find that heroin, because
5  the pills were too expensive or harder to get.
6       So, I mean, that magic wand --
7  heroin's been around. It's not like this is
8  the first time heroin has been in Summit
9  County. But it was not so incredibly prevalent
10 until the space created by the opioid industry
11 brought it upon us.
12      So, yeah, it would change if there
13 wasn't any heroin available or fentanyl
14 available, but I still have this huge addicted
15 population who are going to be sick, who are
16 going to be seeking pills or seeking opium in
17 some fashion.
18   Q.   Would you expect overdoses to
19 decline in that situation?
20   A.   Well, certainly the overdoses from
21 fentanyl, if it wasn't available, would go
22 away. But I don't -- I don't know that I
23 can -- can speculate to that.
24   Q.   Okay. That's fair enough. Let me
25 ask you, actually, a different question that I

Page 263

1  intended to ask you earlier, and I forgot.
2       Has Summit County seen an issue
3  with drug dealers selling counterfeit
4  prescription opioids?
5    A.   As far as -- I know that there have
6  been some that were like fentanyl that were
7  being told as -- yes, I'm -- I am aware of
8  that.
9    Q.   Has that been a significant
10 problem?
11   A.   I mean, any time fentanyl is in the
12 community, if it's less than a milligram, it's
13 a significant problem, because we know how
14 potent it is.
15      MS. WINNER: I think I'm going to
16 turn it over to one of my colleagues, so why
17 don't we go off the record so we can switch
18 places and move our boxes around.
19      THE WITNESS: Sure, okay.
20      THE VIDEOGRAPHER: Off the record
21 at 3:15.
22       (A recess was taken.)
23           - - - - -
24       (Thereupon, Deposition Exhibit 10,
25       Summit County and the City of Akron,

Page 264

1  Ohio's Amended Responses and
2  Objections to the Manufacturer
3  Defendants' First Set of
4  Interrogatories and the National
5  Retail Pharmacy Defendants' First
6  Set of Interrogatories Re: 30(b)(6)
7  Topics, was marked for purposes of
8  identification.)
9           - - - - -
10      (Thereupon, Deposition Exhibit 11,
11      Plaintiffs The City of Cleveland,
12      County of Cuyahoga, County of Summit
13      and City of Akron's Supplemental
14      Amended Responses and
15      Objections to the Manufacturer
16      Defendant's First Set of
17      Interrogatories, Submitted Pursuant
18      to Discovery Ruling No. 13, was
19      marked for purposes of
20      identification.)
21          - - - - -
22      (Thereupon, Deposition Exhibit 12,
23      Spreadsheet Titled "Confidential
24      Protected Health Information -
25      Produced Under a Protective Order -

Page 265

1  Attorneys' Eyes Only, was marked for
2  purposes of identification.)
3          - - - - -
4  (Thereupon, Deposition Exhibit 13,
5  Spreadsheet Titled "Confidential
6  Protected Health Information -
7  Produced Under a Protective Order -
8  Attorneys' Eyes Only, was marked for
9  purposes of identification.)
10         - - - - -
11 (Thereupon, Deposition Exhibit 14,
12 1/8/2019 Letter from Atty Linda
13 Singer to Special Master David Cohen
14 Re: Plaintiffs' Response to
15 Manufacturer Defendants' Renewed
16 Motion to Compel Immediate and Full
17 Compliance with Discovery Ruling
18 Nos. 5 and 13, was marked for
19 purposes of identification.)
20         - - - - -
21 (Thereupon, Deposition Exhibit 15,
22 Spreadsheet Titled "Confidential
23 Protected Health Information -
24 Produced Under a Protective Order -
25 Attorneys' Eyes Only, was marked for

Page 266

1  purposes of identification.)
2       - - - - -
3  (Thereupon, Deposition Exhibit 16,
4  Spreadsheet Titled "Confidential
5  Protected Health Information", was
6  marked for purposes of
7  identification.)
8       - - - - -
9  (Thereupon, Deposition Exhibit 17,
10  Document Listing Names and Dates of
11  Summit County Overdose Deaths, was
12  marked for purposes of
13  identification.)
14       - - - - -
15       THE VIDEOGRAPHER:  On the record at
16  3:38.
17       EXAMINATION OF GRETA JOHNSON
18  BY MS. FEINSTEIN:
19  Q.  Good afternoon, Ms. Johnson.
20  A.  Good afternoon.
21  Q.  My name is Wendy West Feinstein.
22  We met briefly this morning before we went on
23  the record.  I represent the Teva Defendants.
24       I'm going to take over the
25  examination now, and a few of my colleagues may

Page 267

1  have some additional questions after I'm done,
2  okay?
3  A.  Sure.
4  Q.  You were designated on a number of
5  topics, and my colleague, Ms. Winner, went
6  through some of those topics with you about
7  your designations.  Four of the topics that
8  were not the in the letter, but that were
9  confirmed by e-mail, were Topics 4, 5, 6, and
10  19.
11  A.  Yes.  I'm familiar with that.
12  Q.  Are you prepared to testify on
13  those topics today?
14  A.  I am.
15       MS. FLOWERS:  To be clear, though,
16  it's not 4, 5, 6 and 19.  It's 4, 5, 6, and 19
17  as rewritten by Special Master Cohen.
18       MS. FEINSTEIN:  Exactly.  Yes.
19  Thank you, Counsel.  And we can read that into
20  the record now.
21       Special Master Cohen, after some
22  back and forth among counsel, revised those
23  topics and directed that with respect to Topics
24  4, 5, 6, and 19, Plaintiffs must designate a
25  person to testify on the criteria that

Page 268

1  Plaintiffs used to identify the information
2  required by the interrogatories at issue in
3  Discovery Ruling No. 5.
4  Q.  Do you understand that ruling?
5  A.  Yes, I do.
6  Q.  Have you had an opportunity to
7  review the Plaintiff's responses pursuant to
8  Special Master Cohen's order?
9  A.  Yes.
10  Q.  And did you do that in preparation
11  for your deposition today?
12  A.  I -- I didn't do it for week -- the
13  weekend.
14  Q.  You didn't do it for fun.
15  A.  Yes, yes.  I absolutely did, yes.
16  Q.  Did you speak with anyone, aside
17  from counsel, to prepare to testify on these
18  topics?
19  A.  No, I -- not specifically about
20  those interrogatories.
21  Q.  Did you talk with anyone at
22  Rawlings about these topics?
23  A.  No.
24  Q.  Did you review any documents
25  specifically to respond to these top- -- or to

Page 269

1  be prepared to testify about these topics?
2  A.  Other than the interrogatories and
3  the responses?  Outside of that, just
4  discussion with counsel.
5  Q.  Did you review Special Master
6  Cohen's order?
7  A.  I've seen it, yes.
8  Q.  And it's attached to Exhibit 1,
9  right?
10  A.  Yes, yes.
11  Q.  Okay, good.  During the break, your
12  counsel and everyone here was very patient as I
13  handed you a series of documents, and I'd like
14  to go through those right now.
15       The -- the first document that we
16  marked as an exhibit and that I put in front of
17  you should be Exhibit 10, which is Summit
18  County and the City of Akron, Ohio's Amended
19  Responses and Objections to the Manufacturer
20  Defendants' First Set of Interrogatories and
21  the National Retail Pharmacy Defendants' First
22  Set of Interrogatories.
23       Do you have that in front of you as
24  Exhibit 10?
25  A.  I do have that in front of me, yes.