# EXHIBIT 58

```
                                                              Page 1

 1             UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4
 5           ~~~~~~~~~~~~~~~~~~~~
 6
 7  IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
    OPIATE LITIGATION
 8                                  Case No.
                                    17-md-2804
 9
                                    Judge Dan Aaron
10                                  Polster
11  This document relates to:
12  The County of Summit, Ohio, et al. v. Purdue
    Pharma L.P., et al.
13
    Case No. 18-OP-45090 (N.D. Ohio)
14
15
             ~~~~~~~~~~~~~~~~~~~~
16
            Videotaped Deposition of
17
               JEFFREY STURMI
18
             November 15, 2018
19                9:09 a.m.
20
21
               Taken at:
22
            Hilton Garden Inn
23        1307 East Market Street
              Akron, Ohio
24
25       Stephen J. DeBacco, RPR
```

Page 130

1 to the number of clients that are screened for
2 the program, the number of clients that
3 declined the program, number of clients that
4 were found ineligible for the program,
5 certainly clients that are admitted to the
6 program, and then general tracking data as far
7 as retention success rates, graduation, you
8 know, rates, that type of data.
9     Q.  Do you have access to that data
10 maintained by Oriana House for the recovery
11 court?
12         MS. LEYIMU:  Object to the form of
13 the question.
14     A.  I have access to it, so if I have
15 specific data questions, then, yes, I would
16 contact the Oriana House to make whatever
17 request, you know, was necessary.
18     Q.  Do you know in what format they
19 maintain the recovery court data?
20         MS. LEYIMU:  Object to the form.
21     A.  I have no knowledge of what their
22 database is or their capabilities.
23     Q.  Does Oriana House have any
24 requirements for providing reports to the
25 recovery court?

Page 131

1         MS. LEYIMU:  Object to the form.
2     A.  I'm not aware of specific
3 requirements other than, you know, if the judge
4 or myself, you know, requests data, that it's
5 provided in a timely manner.
6     Q.  To whom do you make data requests
7 at Oriana House?
8     A.  Typically to Emily Beers, who is
9 the Oriana House program manager for drug
10 court.
11     Q.  Now, Mr. Sturmi, if I could ask you
12 to turn to the next page, which ends in 3387.
13     A.  Okay.
14     Q.  About halfway through the last
15 paragraph it says, "Many of our clients are
16 dually diagnosed and so we welcome the
17 opportunity to partner with our Summit County
18 mental health treatment providers."
19         Have I read that correctly?
20     A.  Yes.
21     Q.  How do you understand the reference
22 to dually diagnosed?
23         MS. LEYIMU:  Object to the form.
24     A.  My understanding of that term would
25 be someone that is diagnosed with both a

Page 132

1 substance abuse and a mental health disorder.
2     Q.  Do you know what proportion of the
3 current recovery court population would qualify
4 as dually diagnosed?
5         MS. LEYIMU:  Object to the form.
6     A.  I would say a lot.
7     Q.  Could you give us a percentage?
8         MS. LEYIMU:  Object to the form.
9     A.  It would be difficult for -- for me
10 to -- to give a percentage, but I would say
11 it's the majority.  It's a lot.
12     Q.  Where would that dual diagnosis be
13 reported?
14         MS. LEYIMU:  Object to the form.
15     A.  Primarily the initial assessment,
16 which not only provides a diagnosis of a
17 person's substance abuse, but it would also
18 provide a diagnosis for mental health disorder.
19     Q.  Does the recovery court provide
20 referrals for mental health services in
21 addition to addiction treatment services?
22     A.  We --
23         MS. LEYIMU:  Object to the form.
24         You can answer.
25     A.  We do.

Page 133

1     Q.  Who are the providers with whom you
2 partner for mental health services?
3     A.  It's expanded, you know, over the
4 years.  Primarily in Summit County, it's two
5 agencies.  Community Support Services, they
6 primarily work with clients that have a severe
7 or serious mental health disorder.  The second
8 agency that we work with quite a bit is called
9 Portage Path Behavioral Health, but there have
10 been some additional vendors that have started
11 to be added to the Akron area.
12     Q.  In connection with your work for
13 the recovery court, have you kept any data
14 which tracks the number of clients who are
15 dually diagnosed with addiction and mental
16 health illness?
17         MS. LEYIMU:  Object to the form of
18 the question.
19     A.  Not to my knowledge, no.
20     Q.  Do you know where we could look if
21 we wanted to find that information?
22         MS. LEYIMU:  Object to the form.
23     A.  I'm not aware, you know, of -- of
24 where that particular, you know, data could be
25 obtained, other than, you know, the Oriana

Page 134

1  House, you know, Incorporated.  Again, if the
2  client is diagnosed with a mental health
3  disorder, that would be recorded on their
4  substance abuse assessment.
5      Q.   Are you aware of any literature
6  which links substance abuse with mental
7  illness?
8          MS. LEYIMU:  Object to the form of
9  the question.
10     A.   I'm not sure what you mean by that.
11     Q.   Are you aware of any literature
12 which finds a cause between mental health
13 illnesses and addiction?
14         MS. LEYIMU:  Object to the form of
15 the question.
16     A.   I'm not aware of any specific
17 documentation.  I think that there's general
18 consensus that often those run hand in hand.
19     Q.   And when you reference general
20 consensus, whose consensus are you referencing?
21         MS. LEYIMU:  Object to the form.
22     A.   Oh, the various training workshops,
23 you know, that I've attended, you know, have
24 spoken to that.  Just by my experience by
25 interviewing the number of clients that I've

Page 135

1  interviewed, seeing the increase in high-risk,
2  high-need offenders whom we are targeting, you
3  know, in recovery court.  The clients that
4  we're serving today are much more in need of
5  services than they were 10 years ago.
6      Q.   To what do you account that
7  increase in the need for services in the
8  recovery court client population?
9      A.   At the present time?
10     Q.   Well, do you track the reason for
11 increases in client needs?
12     A.   Not --
13         MS. LEYIMU:  Object to the form of
14 the question.
15     A.   Not in a -- in a data-related
16 manner, but certainly in the multitude of
17 interviews that me and our staff conducts, you
18 know, that's certainly always a part of those
19 questions.
20     Q.   So you're talking about an
21 impressionistic view of the increase in needs;
22 is that right?
23         MS. LEYIMU:  Object to the form.
24     A.   What I would say is myself and
25 members of our recovery court team are

Page 136

1  consistently, constantly asking questions with
2  our clients to determine their needs, because
3  their needs change.  Their needs change from
4  the date of the assessment to the next month
5  and the month thereafter.
6          So that is where, you know, I base
7  that response on.
8      Q.   Over what period of time have you
9  observed an increase in the needs of the
10 recovery court population?
11     A.   Well, I don't think, you know,
12 from -- from my perspective, my opinion is
13 they've significantly increased since we've had
14 to deal with the opiate epidemic that is
15 present here in Summit County.
16     Q.   What do you mean by "opiate
17 epidemic" in that last response?
18     A.   As our -- as numbers -- well, just
19 in reference to when the Summit County ADM
20 Board and our treatment providers started to
21 see a significant increase in the amount of
22 clients that we serve with an opiate use
23 disorder, as that related to increase in
24 arrests, as that related to, sadly, a huge
25 increase in overdose and deaths in Summit

Page 137

1  County, that -- that information, obviously,
2  was available, and once it started to become an
3  issue, then our county, you know, helped, you
4  know, to -- to identify that.
5      Q.   Was there ever a time that opiate
6  use, to use your term, was not a problem in
7  Akron?
8          MS. LEYIMU:  Object to the form.
9      A.   I'm sure there's always been some
10 level of an opiate, you know, use issue in
11 Summit County.  However, that dramatically
12 changed here in Summit County, you know,
13 roughly six years ago, in that ballpark, we
14 started to see those increases.
15         In particular, you know, the Summit
16 County ADM Board formed an Opiate Task Force.
17 I believe that started in 2014.  So that was a
18 pretty clear sign, you know, when the agency
19 that is charged with that task to help all of
20 our treatment providers, when they formed the
21 Summit County Opiate Task Force, that was a
22 clue, you know, that we had a major issue going
23 on.
24     Q.   What is the dramatic change that
25 happened around 2012 that you referenced in

Page 138

1 your last answer?
2     MS. LEYIMU: Object to the form of
3 the question.
4     A.  I would say when courts, treatment
5 agencies started to identify more and more
6 clients that were coming to their attention for
7 having an opiate use disorder, that was
8 exacerbated by overdose, whether that client
9 lived or died, you know.  So data has always
10 been received by the -- by the coroner's
11 office, but that information started that
12 process.
13     Q.  What data are you referring to
14 which reflects an increase in the number of
15 individuals with an opiate use disorder?
16     MS. LEYIMU: Object to the form.
17     A.  The data that -- that I would --
18 would come back to is, again, the countless
19 interviews that I've conducted or our recovery
20 court staff have conducted with clients that
21 are reporting opiate use disorders.
22         Combine that with arrest rates,
23 charges, and in particular, overdose data,
24 that's what led, I would think, the Summit
25 County ADM Board, you know, to sound the alarm.

Page 139

1     Q.  When you said the Summit County ADM
2 Board sounded the alarm, what specific actions
3 are you referencing?
4     A.  The -- the start of -- of the
5 Summit County Opiate Task Force.
6     Q.  Other than the start of the Summit
7 County Opiate Task Force, what facts do you
8 reference in connection with your statement
9 that the opiate epidemic started in 2012?
10     MS. LEYIMU: Object to the form.
11     A.  Again, I would just come back to
12 what I've already indicated.  You know, we saw
13 a marked increase in arrests.  We saw a marked
14 increase in clients that were reporting opiate
15 use disorders.  And that information, you know,
16 was supported by data that we received from
17 Summit County ADM Board as it related to
18 overdoses.
19     Q.  Mr. Sturmi, you mentioned a marked
20 increase in arrests.  Do you mean arrests
21 related to opioid substances?
22     A.  Certainly in some occasions, yes.
23     Q.  Where would we look at data which
24 tracks an increase in arrests related to opioid
25 encounters?

Page 140

1     MS. LEYIMU: Object to the form.
2     A.  I would think the Akron Police
3 Department or the Akron Municipal Court's
4 Information System.  We term that as AMCIS.
5     Q.  Do you personally have access to
6 AMCIS?
7     A.  Yes.
8     Q.  To your knowledge, does AMCIS
9 categorize law enforcement encounters by the
10 type of drug involved?
11     A.  No, not to my knowledge.  It's a --
12 it's an older, somewhat antiquated database.
13     Q.  So if we wanted to verify the
14 number of arrests that involved an opioid
15 substance, how would we do that?
16     MS. LEYIMU: Object to the form of
17 the question.
18     A.  That would be a question you'd have
19 to ask an IT person.
20     Q.  Do you know of any system to which
21 you have access, which tracks law enforcement
22 encounters based on the drug involved?
23     MS. LEYIMU: Object to the form.
24         You can answer.
25     A.  I don't have knowledge of that, no.

Page 141

1     Q.  You also mentioned reported opioid
2 use disorders by clients.  Can you identify any
3 aggregate data source which reflects the number
4 of reported opioid -- op- -- excuse me, opioid
5 use disorders by recovery court clients?
6     MS. LEYIMU: Object to the form of
7 the question.
8     A.  Not a specific database, no.
9     Q.  Is there anywhere that we could
10 look in order to identify the number of
11 recovery court reported -- recovery court
12 client opioid use disorders?
13     MS. LEYIMU: Object to the form.
14     A.  I can't speak to whether the Oriana
15 House does or does not track that information.
16     Q.  Does the recovery court track that
17 information?
18     A.  Not specifically, no.
19     Q.  Does it generally?
20     MS. LEYIMU: Object to the form.
21     A.  Not at the present time.
22     Q.  The last data source that you
23 referenced was ADM overdose death reports; is
24 that right?
25     A.  That's correct.

Page 142

1  Q. How is that information reported?
2  A. The Summit County Public Health
3 district collects that data in -- in
4 communication with the Summit County medical
5 examiner's office.
6  Q. Does the overdose data maintained
7 by ADM identify the drugs involved in the
8 overdose?
9     MS. LEYIMU: Object to the form.
10  A. I can't speak to that. You'd have
11 to, you know, inquire with, you know, the
12 agencies that oversee that data.
13  Q. Are there any other sources of data
14 which lead you to formulate your opinion that
15 the opioid -- opiate epidemic began in 2012?
16     MS. LEYIMU: Object to the form.
17  A. I use that as a benchmark. It's
18 very difficult to look at a calendar and
19 pinpoint a specific day, you know, that, you
20 know, this particular issue, you know, started
21 in our community.
22     But as -- as I look at, you know,
23 the calendar and looking at those other factors
24 in speaking with the various colleagues that I
25 work with, and the fact that the Summit County

Page 143

1 ADM Board started an Opiate Task Force in 2014,
2 you know, that's where I base that information
3 from.
4  Q. Earlier today you testified that
5 when you worked as a juvenile probation
6 officer, you had clients that abused opioids;
7 is that correct?
8     MS. LEYIMU: Object to the form of
9 the question.
10  A. That's my recollection, yes.
11  Q. Do you believe that there was a
12 problem with opioid abuse in Akron in the late
13 1990s?
14     MS. LEYIMU: Object to the form of
15 the question.
16  A. I can't speak to that because I
17 didn't work for the City of Akron at that time.
18  Q. I -- I apologize. Let me rephrase
19 that question.
20     Do you believe that there was a
21 problem with opioid abuse in Summit County in
22 the late 1990s?
23     MS. LEYIMU: Object to the form of
24 the question.
25  A. Again, I -- I didn't -- I didn't

Page 144

1 work -- well, I started in '96, you know, so
2 you're saying late 1990s?
3  Q. Correct.
4  A. Okay. I wasn't aware, in the first
5 two or three years of my career with the City
6 of Akron, that it was a specific, you know,
7 problem that it is -- or what I perceive it to
8 be -- today or in the recent past years.
9  Q. But as a probation officer in the
10 late 1990s in Summit County, you had encounters
11 with clients who used opioids, correct?
12     MS. LEYIMU: Object to the form.
13  A. I had clients that -- that used any
14 number, you know, of substances, and opiates,
15 you know, certainly was one of them.
16  Q. In the -- the data sources that you
17 referenced, do you know if there's any
18 reporting or distinction drawn between
19 prescription opioids and non-prescription
20 opioids?
21     MS. LEYIMU: Object to the form.
22  A. I'm not aware of any specific tool
23 that identifies that.
24  Q. Is that -- is that distinction
25 between prescription opioids and

Page 145

1 non-prescription opioids important to your work
2 with the recovery court?
3     MS. LEYIMU: Object to the form.
4  A. I think that any information that
5 we glean from our clients is -- is helpful
6 as -- as we determine the best way to provide
7 services to them.
8     So knowing whether they started,
9 you know, with prescription medication or
10 medications that they purchased on the street
11 is -- is helpful, you know, to our team.
12  Q. Do you have any system for tracking
13 the number of clients that were introduced to
14 prescription opioids with a valid prescription?
15     MS. LEYIMU: Object to the form.
16  A. Not a specific, you know,
17 instrument that we use or a data collection
18 tool, no.
19  Q. Is there a gener- -- general data
20 collection tool you use?
21  A. Not that I'm aware of, no.
22     MS. WU: All right. So I'd like to
23 mark -- have the court reporter mark as
24 Exhibit 6, AKRON 001109379.
25          - - - - -