# EXHIBIT 61

Page 1

1      IN THE UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF OHIO
3                EASTERN DIVISION
4
              ~~~~~~~~~~~~~~~~~~~~
5
6    IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
     OPIATE LITIGATION
7                                     Case No. 17-md-2804
8                                     Judge Dan Aaron
     This document relates to:        Polster
9
     The County of Cuyahoga v. Purdue
10   Pharma L.P., et al.
     Case No. 18-OP-45090
11
12              ~~~~~~~~~~~~~~~~~~~~
13            Videotaped deposition of
                THOMAS GILSON, M.D.
14                   30(b)(6)
15
16              January 14, 2019
                   9:07 a.m.
17
18
19                  Taken at:
20       Climaco, Wilcox, Peca & Garofoli
21         55 Public Square, Suite 1950
22              Cleveland, Ohio
23
24
25        Renee L. Pellegrino, RPR, CLR

Page 246

1  review.  So this paper mentions some things from
2  2013, but I think the gist of the bulk of it is
3  about the 2012 review that we did in the office.
4      Q.   The paper referring to Exhibit 10,
5  right?
6      A.   Exhibit 10, yes.
7      Q.   Okay.  Fair enough.
8           The next bullet point there under
9  the Heroin Epidemic title is "2013 prospective
10 review of heroin mortality done with ME staff,"
11 et cetera, et cetera, right?
12     A.   Right.  We assembled people within
13 the room at the ME's office in a committee that
14 I called together to review that data, and the
15 goal was -- for example, in law enforcement we
16 had the sheriffs there, a county officer.  He
17 had a representative who could provide
18 information to us, partly on arrests but mostly
19 on incarceration data, because what we were
20 trying to do in this was to identify
21 intervention points, and one of the risk factors
22 for fatal overdose was somebody who was coming
23 out of incarceration or a treatment facility.
24 So that was kind of the makeup of this.
25     Q.   So if you go to the next page, we're

Page 247

1  talking about a set of 194 overdose fatalities,
2  right?
3      A.   Right.
4      Q.   And that's 2013, right?
5      A.   Right.
6      Q.   And then if you go three more pages,
7  it says, "PDR Findings."  It looks like that
8  (indicating).
9      A.   Yes.
10     Q.   It says here 73 percent of heroin
11 overdose victims had a file with OARRS, right?
12     A.   Right.  About three-fourths.
13     Q.   Now, we've also seen that number, 73
14 percent, in other documents associated with you
15 or your office.  And when we see that, 73
16 percent of heroin overdoses who had an OARRS
17 file, that refers to this 2013 data set, right?
18     A.   Right.
19          MR. BORANIAN:  I'm told the phone
20 isn't working.  I'm not sure what to do about
21 that.
22          MR. GALLUCCI:  I think that's
23 probably from before when we heard it right
24 before we took a break.
25          MR. BORANIAN:  Okay.  Let's take a

Page 248

1  break, but if you could indulge me, don't go
2  away, Doctor.
3          THE VIDEOGRAPHER:  Off the record at
4  3:09 p.m.
5           (Short recess had.)
6          THE VIDEOGRAPHER:  Back on the
7  record at 3:10 p.m.
8  BY MR. BORANIAN:
9      Q.   This is Exhibit 12.  Oops.  I marked
10 the wrong one.  Hang on.
11          - - - - -
12          (Thereupon, Gilson Deposition
13          Exhibit 12, Document Entitled
14          "Opioid Crisis Response:  Examining
15          Overdose Deaths at Cuyahoga County
16          Medical Examiner's Office," with
17          Attached Sheet Bates Numbered
18          CUYAH_001684555 - Marked
19          Confidential, was marked for
20          purposes of identification.)
21          - - - - -
22     Q.   This is Exhibit 12, Dr. Gilson.
23 This appears to be a presentation, or maybe a
24 poster, with your name on it, along with
25 Dr. Deo.  Can you tell us what this is, Doctor?

Page 249

1      A.   I'm not completely certain, but I
2  think this was a poster that Dr. Deo, who is a
3  student at the Case Western School of Public
4  Health, produced based on research he was doing
5  at our office.
6      Q.   So it's entitled "Opioid Crisis
7  Response:  Examining Overdose Deaths at Cuyahoga
8  County Medical Examiner's Office," with a Bates
9  number noted on the second page as 001684555,
10 and if you look over at the far right column,
11 Doctor, it says, "OARRS Data, Fentanyl Overdose
12 Deaths February 2017," right?
13     A.   Right.
14     Q.   Is this part of the analysis of
15 fentanyl deaths in connection with OARRS that
16 you've described before?
17     A.   Yes.
18     Q.   It says, "55 fentanyl overdose
19 deaths in February 2017," right?
20     A.   That was one of the worst months in
21 Cuyahoga County, yes.
22     Q.   And the fourth bullet point says
23 that 41 out of 55 had an OARRS file, right?
24     A.   That's correct.
25     Q.   That's about 80 percent, right?

Page 250

1  A. Yes.
2  Q. Now, you've mentioned earlier in the
3  deposition that same number, 80 percent. Is
4  this the source for your citation of the 80
5  percent figure?
6  A. No.
7  Q. Okay. Has the medical examiner's
8  office done any analysis of fentanyl overdose
9  deaths other than what's represented here on
10 Exhibit 12?
11 A. Yes, we have.
12 Q. What is the source of your stated
13 opinion that 80 percent of fentanyl deaths have
14 a history of prescription medication?
15 A. It's this information. I thought
16 you said 80 percent of our opioid deaths, heroin
17 deaths.
18 Q. Maybe I misspoke. I'm sorry,
19 Doctor. I haven't looked at the transcript, but
20 I think you said earlier today that 80 percent
21 of fentanyl deaths have a recent history or a
22 history of a prescription drug prescription,
23 right?
24 A. No. What I said earlier today was
25 that approximately 80 percent of the heroin

Page 251

1 overdose deaths that we had in that phase of the
2 crisis had an OARRS file, and that was the 73
3 percent that I'm referencing here.
4  Q. Okay. So that's where I'm confused
5 then. Okay. So what I was seeing for heroin
6 deaths is 64 percent based on the 2012
7 retrospective data.
8  A. Sure.
9  Q. I have seen 73 percent based on the
10 194 cases in 2013. Doctor, where do you get 80
11 percent of heroin-related deaths have an OARRS
12 file?
13 A. Sure.
14     My estimate, if I might say, is that
15 we estimated approximately 80 percent of the
16 heroin overdose victims had a history of
17 receiving prescription pain relievers. I take
18 that from this data, the 73 percent. And I'm
19 not parsing that for, you know, this is closer
20 to what I want.
21     The 2012 data, where the 66 percent
22 came from, was actually limited in the time of
23 look-back because we had delay in getting access
24 to OARRS to do the look-back. So some of the
25 look-backs we did on heroin overdoses in 2012

Page 252

1 were as short as six months and, at the longest,
2 18 months. So I thought that number -- and this
3 was one of the reasons I wanted to continue to
4 collect the data -- was potentially an
5 underestimate.
6     When I saw this number, this still
7 actually represents, to some extent, a, you
8 know, initial period look-back of about two
9 years for virtually all of these cases in 2013.
10 That was a better look-back period.
11 Q. Let me stop you there. When you say
12 "this number," which number?
13 A. 73 percent.
14 Q. Okay. Continue.
15 A. Is better data, and that's really
16 what we were striving to get to see if we could
17 tie the heroin crisis back to opioid pain
18 relievers.
19     At the time we were collecting this
20 data, there was really very little, other than
21 anecdotal reports, to say this heroin phase of
22 the crisis represented a transition.
23     In 2013 substance abuse and mental
24 health services published a bulletin, where they
25 had gone back and talked to actual heroin users

Page 253

1 and said, "How did you get started abusing
2 opioids," and that number was 79.5 percent, 80
3 percent of those addicts said I started using
4 opioid pain relievers. And when they looked the
5 other direction, most of the people who were
6 abusing opioid pain relievers said no, I never
7 started with heroin, I'm abusing this substance.
8     So when I saw that number in
9 conjunction with this -- and this is again as
10 more data is becoming involved -- that's where I
11 draw that number of about 80 percent of our
12 addicted population come from that transition.
13 I can't talk to the people after they died to
14 ask them how did you get started, but somebody
15 did that, we didn't duplicate that effort, but
16 we used this data as a support to that to say,
17 listen, almost 80 percent of our overdoses have
18 been using prescription opioids, some of them
19 with very long track records and, in fact, you
20 know, that number is very close to what's being
21 quoted from the interviews with the living
22 individuals who are abusing heroin currently.
23 Q. The 80 percent, then, comes from a
24 bulletin that you read, right?
25 A. From the substance abuse and mental

Page 254

1 health services.
2  Q.  Have you reviewed the data upon
3 which they base that bulletin?
4  A.  Yes, I did.
5  Q.  And what form did that data take?
6  A.  They're interviewing heroin addicts,
7 current heroin addicts, with the question that I
8 said, you know, how did you get started abusing
9 opioids, and 80 percent, 79.5 percent said that
10 they had started abusing prescription
11 medications.
12  Q.  Did those interviews take into
13 account whether those individuals had a
14 prescription for the opioid that they say they
15 initiated with?
16  A.  They talked about non-medical pain
17 reliever use.  I do not know that I remember
18 enough detail to say whether they had, in fact,
19 obtained those legally or by diversion.
20  Q.  So you can't tell from those data
21 whether the use of prescription opioids was
22 legal or illegal for that population, true?
23  A.  I don't remember exactly the -- what
24 that metric was.
25       The other thing I wanted to add --

Page 255

1  Q.  They didn't ask about that in their
2 survey, did they?
3  A.  Pardon?
4     MR. BADALA:  Were you done?
5  Q.  They didn't ask about that in their
6 survey, did they?
7  A.  Could I finish the previous thought,
8 though?
9  Q.  Sure.
10  A.  The other thing I wanted to add
11 about that study is they did a ten-year
12 look-back.  Basically they wouldn't trust the
13 addict's memory beyond ten years, so they were
14 looking back further than we were with our data.
15 So I thought that might have explained some of
16 the smaller discrepancy, the 73 percent versus
17 the 79 percent, but statistically they were very
18 close.
19  Q.  In what form was that data provided
20 to you?
21  A.  What data was that?
22  Q.  The data that supported the bulletin
23 that you reviewed.  You said you reviewed the
24 data.  In what form was it?
25  A.  I reviewed the bulletin.  I didn't

Page 256

1 go back to review the original research data.  I
2 didn't understand you if that was what you were
3 saying.
4  Q.  Okay.  My question was if you had
5 reviewed the data, so I'll ask again.
6       Did you review the original research
7 data for that bulletin?
8     MR. BADALA:  Objection to form.
9 Outside the scope.
10  A.  No.  I reviewed the bulletin and the
11 methods that were spelled out in it.
12     MR. BADALA:  Do you have to take a
13 break or anything?
14     THE WITNESS:  Sure.  Okay.
15     MR. BADALA:  Why don't we take a
16 five-minute break.
17     THE VIDEOGRAPHER:  Off the record at
18 3:19 p.m.
19       (Recess had.)
20     THE VIDEOGRAPHER:  Back on the
21 record at 3:26 p.m.
22 BY MR. BORANIAN:
23  Q.  So, Dr. Gilson, we've been
24 discussing the investigation of diversion and
25 overprescription and the use of the OARRS

Page 257

1 database.  Has the county made any other uses of
2 the OARRS database beyond what we've already
3 discussed?
4     MR. BADALA:  Objection to form.
5  Q.  Not just your office, the whole
6 county.
7  A.  We're obviously sharing our data at
8 these task forces, including the data that we've
9 gleaned from OARRS -- by "we" in this case, I'm
10 putting on my medical examiner hat -- and
11 impacts that could have on law enforcement,
12 prosecutions, things like that.  I can't
13 necessarily quantitate, but the collaborative
14 effort that we created I think with this data
15 and pointing it back towards opioid pain
16 relievers I think is kind of a ripple effect of
17 using the OARRS system.
18       Specifics in terms of using the
19 OARRS system, I'm aware some jurisdictions use
20 it to identify doctors to sign death
21 certificates.  We have not done that.
22  Q.  Do you know who the OARRS
23 registrants are within the county, people who
24 actually have an OARRS access set of
25 credentials?

Page 258

1  A.  Within the county itself?
2  Q.  Yes.
3  A.  As county representatives or just
4  the whole county?
5  Q.  As representatives of the county,
6  for example, the sheriff's office or protective
7  services or the medical examiner.
8  A.  I would know that the physicians at
9  the county hospital would all have OARRS access
10 because that was actually part of an initiative
11 in 2015, to have all of the medical
12 practitioners have access to OARRS, and then I
13 think the pharmacists are similar, that they
14 have to have access, so I would think pharmacy
15 personnel at our county hospital would have
16 that; jail, by extension, as we covered that,
17 would have access.  And we in the medical
18 examiner's office.  The sheriff, unless it's
19 through a law enforcement, which I'm not aware
20 of -- I don't know if they do or do not.  Other
21 law enforcement agencies I believe do, but
22 they're not county representatives.
23 Q.  Does the county sheriff ever
24 directly access the OARRS database?
25 A.  I do not know.  I don't know.  As I

Page 259

1  said, they have access.  They can have access
2  through law enforcement.
3  Q.  So other than your office, are you
4  aware of any other county office that makes
5  direct access to the OARRS database?
6  A.  Oh, I'm sorry if I wasn't clear.
7  The county hospital has to have that access with
8  its practitioners and its pharmacy.
9  Q.  Anyone else?  Any other agencies?
10 A.  Can I look at the org chart?  I
11 can't see anybody here I could say with
12 certainty has access.
13 Q.  Is there any database or central
14 file system for cases investigating drug
15 diversion?
16     MR. BADALA:  Objection to form.
17 A.  At the county level or --
18 Q.  Yes.
19 A.  Unless it's in the county
20 prosecutor's office, I'm not aware of one.  I
21 know they have a unit who would be investigating
22 cases for prosecution, but otherwise, most of
23 the investigation of diversion and things like
24 that I think would be at a state level.
25 Q.  Is there any central database or

Page 260

1  file system for county investigations of
2  overprescribing of medicine?
3  A.  Again, at our county hospital, with
4  the office of opioid affairs that was opened,
5  they review prescribing practices with opioid
6  pain relievers with the idea of addressing
7  apparent overprescribing with practitioners that
8  they identify.
9  Q.  When a physician is under
10 investigation for participating in illegal
11 diversion, does the county take steps to stop
12 the behavior during the investigation?
13 A.  Are we talking -- I'm a little
14 confused -- pill mill scenario or something like
15 that or --
16 Q.  Yeah, any doctor under
17 investigation, whether a county employee or
18 someone running a pill mill, someone running a
19 pain clinic.  If that doctor is under
20 investigation, does the county take any steps to
21 stop the illegal activity while the
22 investigation is going on?
23 A.  I mean, ultimately they would arrest
24 them, I guess, if they were founded in the
25 evidence collection period.  I guess until you

Page 261

1  really know that it's a crime --
2  Q.  Short of arresting somebody, is
3  anything done to stop the behavior that is under
4  investigation?
5  A.  If I can go back to the county
6  hospital, the example with the office of opioid
7  affairs there, yes, they are liaisoned with --
8  through the medical staff and the practices are
9  described.  And I don't think it's an immediate
10 you're doing the wrong thing so much as they
11 require an explanation, and if that explanation
12 isn't satisfactory, then they're remediated to,
13 you know, prescribing practices, maybe
14 reacquaintance with CDC prescribing guidelines
15 from 2016 or something like that as a basis.
16 Q.  Now, Doctor, I'm also going to ask
17 you about topic number 27, which is "Knowledge
18 of and access to data concerning prescription
19 opioid manufacturing, prescribing, distribution,
20 or dispensing."  We've already gone through
21 ARCOS and OARRS and a few others.  I'm not going
22 to repeat that.
23     So here's my question, Doctor:  Are
24 there other databases that the county could use
25 to gain information about the manufacturing,

Page 306

1  they were intending to purchase and what they
2  got.
3     Q.   How does the county define an
4  epidemic?
5         MR. BADALA:  Objection to form.
6  Outside the scope.
7     A.   With the standard definition, which
8  is an elevated prevalence of a disease beyond
9  its baseline in a community.
10    Q.   So when you were talking about
11 cocaine and the doubling of deaths between, I
12 think it was -- you said it was 2015 and 2016?
13    A.   Right.  Yes.
14    Q.   So do you consider that doubling a
15 cocaine epidemic?
16        MR. BADALA:  Objection to form.
17 Outside the scope.
18    A.   No, for the reason that I am -- that
19 I mentioned, which is that when you factor out
20 the opioid contribution to that elevation, it's
21 not at an increased incidence over baseline.
22    Q.   Would you consider the number of
23 deaths in 2016 where cocaine was adjudicated and
24 certified as the cause of death, is that a
25 crisis for Cuyahoga County?

Page 307

1         MR. BADALA:  Objection to form.
2  Outside the scope.
3     A.   I mean, we were in the midst of an
4  opioid crisis before that.  Certainly there was
5  an acute worsening in 2016 that was driven by --
6  primarily by fentanyl.  That's the position of
7  the county.  The fact that cocaine was pulled
8  back up with that, heroin was pulled back up
9  with that doesn't negate the contribution of
10 fentanyl to that part of the crisis.
11    Q.   So I'm trying to understand, with
12 respect to cocaine specifically, does the county
13 consider itself to be in the middle of a cocaine
14 crisis?
15        MR. BADALA:  Objection to form.
16 Outside the scope.
17    A.   We're in the middle of a drug
18 crisis.  I mean, is cocaine up from where it
19 was, yes, and I think the strategy is all of the
20 above with the drugs.  But if you're asking me
21 is the elevation in cocaine significant relative
22 to the elevation of the opioids, I would say
23 that it's less, because what our data shows in
24 the mortality data is that the elevation in the
25 cocaine is, unfortunately, being pulled up by

Page 308

1  fentanyl.
2     Q.   So before the cocaine doubled
3  between '15 and '16, that previous baseline
4  level of cocaine abuse and death, do you
5  consider -- does the county consider the 2014
6  level of cocaine abuse and use to be a crisis in
7  and of itself?
8         MR. BADALA:  Objection to form.
9  Outside the scope.
10    A.   It's an area of concern.  If you're
11 asking me is it a crisis because it's acutely
12 worsened, the answer to that is no.
13    Q.   So my question is if -- well, how
14 many deaths were there in 2014 caused by
15 cocaine?
16    A.   I can check.  124.
17    Q.   Does Cuyahoga County consider 124
18 deaths to be a crisis?
19        MR. BADALA:  Objection to form.
20    A.   I'm sorry.  You know, we're not
21 turning our back on these folks.  All of these
22 things are sad, that these people are dying, and
23 I think, you know, the overshadowing of this
24 crisis by heroin, fentanyl is just more tragic,
25 but if you're asking me are these folks any less

Page 309

1  valuable or something, like no.  That's not a
2  position.  The county is concerned about all of
3  our citizens, and these 124 folks who died of a
4  cocaine overdose are just as much, you know,
5  missed by their people as the hundreds who died
6  of a fentanyl or heroin overdose.
7     Q.   So from the county's perspective,
8  the 124 deaths in 2014, the county would
9  consider those to be a crisis for cocaine?
10        MR. BADALA:  Objection to form.
11 Outside the scope.
12    A.   I mean, as you use the term
13 "crisis," I think of that in terms of the
14 epidemic, and that is not part of the epidemic,
15 but it's a source of great concern.  We don't
16 like to see our citizens die of any drug
17 overdose, but -- maybe we're parsing over words,
18 but, you know, the crisis is really the opioids,
19 it's not the cocaine here, but that doesn't mean
20 that it's not a source of tremendous concern.
21    Q.   What did Cuyahoga County do in 2014
22 or the years that followed to address the use
23 and abuse of cocaine that resulted in 124 deaths
24 in 2014?
25    A.   The county would have continued its

Page 310

1  drug treatment services.  The county would have
2  made available things like the START program to
3  those parents.  It wasn't like we exclusively,
4  you know, excluded them.  So we would connect
5  those parents with cocaine issues, with, you
6  know, a mentor in recovery.  The county would
7  have responded to separate families where there
8  potentially was an issue that wasn't resolvable
9  with cocaine.  I think the county, you know,
10 continued its treatment efforts.  Drug court
11 didn't shut cocaine people out.  It's just that
12 the docket became much more tilted towards
13 opioids.
14     Q.   Is that everything you can identify
15 sitting here today the county did in response to
16 the cocaine use and abuse in 2014?
17     A.   If I can look at our organizational
18 chart again.
19          During that time period, around
20 2013, 2014, the sheriff's office instituted
21 strike forces.  They were supposed to supplement
22 local law enforcement so that they could address
23 any multitude of issues.  So it could have been
24 in part, you know, drug trafficking.  Re-entry
25 programs obviously were making efforts to

Page 311

1  reintegrate cocaine addicts.  Workforce
2  development.  Prosecutions of drug dealers by
3  our county prosecutor.  The creation of drug
4  court for the treatment of drug addicts in lieu
5  of incarceration, provision of mental and
6  medical health services in the county jail.
7     Q.   Does the county --
8     A.   There's a lot of things --
9     Q.   I'm sorry.
10    A.   I'm sorry.  I just wanted to sort of
11 close it.
12         This problem touches so many levels
13 of our community, and I think, you know,
14 interventions for some of these things are not
15 necessarily just we shut the door on everything
16 except the opioids.  We're trying to deal with
17 all of them, and I don't want to say that I
18 could be exhaustive.  I think as I run through
19 our org chart, there's a lot of things I can see
20 there.
21    Q.   From the county's perspective, is
22 the use and abuse of methamphetamine at crisis
23 level?
24         MR. BADALA:  Objection to form.
25 Outside the scope.

Page 312

1     A.   Again, you know, with what I've said
2  about crisis, I would say no, it hasn't really
3  escalated to the comparabilities of like being
4  similar to heroin or, especially now, fentanyl.
5     Q.   Has the county done everything in
6  its power to combat the abuse of the illegal
7  drugs identified in topic 18?
8     A.   I think the county has made
9  significant investments to do that.  I think if
10 you ask me are there more things we wish we
11 could do, we do.  But there's -- you know, as
12 much as we can do, I really feel, especially our
13 models of collaboration, cooperation -- they're
14 national models now, and I do feel that this has
15 really been a very exemplary response to this
16 crisis, both this one and the opioid crisis
17 especially.
18    Q.   You talked earlier in the day about
19 Mexican cartels and China with respect to
20 illicit fentanyl.  Do you recall that topic
21 generally?
22    A.   I remember mentioning China, and I
23 think the person who was asking me at the time
24 mentioned Mexico, and that's part of the story I
25 think as well.

Page 313

1     Q.   Do you agree that the importation of
2  heroin and illicit fentanyl from other countries
3  into the county could be considered an act of
4  terrorism?
5          MR. BADALA:  Objection to form.
6  Outside the scope.
7          Which topic are we on?
8          MR. CARTER:  We're on 34.
9          MR. BADALA:  If you could just
10 indicate that.
11    A.   I think I made that statement.
12    Q.   You've made that statement.  I'm
13 asking does the county agree with it.
14    A.   I wouldn't want to necessarily put
15 that as the county's position.  It's a personal
16 opinion.  I don't know that I have independent
17 confirmation to say that.
18    Q.   Okay.  In terms of the drivers of
19 the rapid increase in mortality in the county
20 from 2010 through to today, do you agree that
21 it's been heroin, illicit fentanyl, fentanyl
22 analogs and cocaine since 2010?
23         MR. BADALA:  Objection to form.
24    A.   Sure.  I mean, I think that, you
25 know, you can look at this page from Exhibit 13,

Page 314

1 which goes up to 2012. Here's our crack
2 cocaine. There's our prescription opioids.
3 Here's the heroin phase. And if you want to go
4 back to our own charts and graphs, the fentanyl
5 phase was even worse than the heroin escalation.
6 The analogs of fentanyl that we saw,
7 carfentanil, the elephant tranquilizer, those
8 other drugs, all caused significant rises in
9 mortality, and like the opioid pain relievers,
10 heroin, fentanyl, they are illicit opioids that
11 act on the same mechanism in the brain that the
12 opioid pain relievers do.
13    Q.   So I think we're on the same page,
14 but just to be clear then, from 2010 through to
15 today the primary drivers of the increase in
16 mortality in the county have been heroin,
17 illicit fentanyl, fentanyl analogs and cocaine,
18 true?
19    A.   Again, I'd have to put the caveat
20 with cocaine that, by itself, it hasn't
21 dramatically changed, and that the changes that
22 we see in cocaine can be reasonably attributed
23 to fentanyl, as can the changes after 2016 with
24 heroin, but heroin, in the time frame you
25 mentioned, is a significant game changer from

Page 315

1 2012, 2011 onward.
2    Q.   I want to follow up on some
3 questions on topic 19. You talked about the
4 criteria. I'm not going to go through all that
5 again, but I want to focus on the criteria, the
6 third one you identified, people that have been
7 diagnosed with an opioid use disorder, okay?
8         How does the county define an opioid
9 use disorder?
10    A.   The county identified that in
11 consultation with experts beyond what I'm
12 prepared to talk about today.
13    Q.   So sitting here today, can you give
14 me a scientific or a layperson definition that
15 the county used to define opioid use disorder or
16 did you defer to the experts on that?
17    A.   I believe we deferred to the experts
18 on that.
19    Q.   Related, does the county have an
20 official working definition of addiction that it
21 used to identify individuals in response to
22 Exhibit A and Exhibit B that are part of
23 Deposition Exhibit 2?
24    A.   I'm not aware of a working
25 definition the county has for addiction.

Page 316

1    Q.   Do you agree that a diagnosis of
2 addiction is a medical task?
3         MR. BADALA: Objection to form.
4    A.   I mean, the addiction has a
5 definition in medicine.
6    Q.   And there are physicians who provide
7 medical diagnoses of addiction, correct?
8         MR. BADALA: Objection to form.
9 Outside the scope.
10    A.   I don't know if I would say
11 addiction versus substance use or abuse
12 disorder. It's an area of medicine, the
13 terminology of which I am not familiar and I
14 would not think the county would have an opinion
15 on.
16    Q.   Do you know whether there are ICD-10
17 codes to define a substance use disorder?
18         MR. BADALA: Objection to form.
19 Outside the scope.
20    A.   ICD-10?
21    Q.   Yes.
22    A.   I don't think the county knows that.
23 I don't know it myself.
24    Q.   Do you know what ICD codes refer to
25 generally?

Page 317

1    A.   Sure. Sure do. I do I should say.
2 The county may not, but the International
3 Classification of Diseases. As their agent, I
4 would be able to inform them of that.
5    Q.   Do you agree that, from a medical
6 perspective, it's inappropriate to assume a use
7 disorder or an addiction, however you want to
8 use that term -- you would need to look at an
9 individual case, an individual resident story to
10 arrive at a conclusion of a use disorder or
11 addiction, right?
12         MR. BADALA: Objection to form.
13 Outside the scope.
14    A.   Yeah. That's a medical diagnosis
15 again and I don't think the county would express
16 anything about the appropriateness of
17 misclassifying that.
18    Q.   So the county has never -- well, the
19 county has never used its medical examiner data
20 or any other data set that it creates and
21 assigned classification of a use disorder or an
22 addiction based on looking at that data set,
23 correct? That's nothing the county has ever
24 done before?
25         MR. BADALA: Objection to form.

Page 318

1    A.   The medical examiner data would not
2  arrive at those diagnoses.  The alcohol, drug
3  addiction and mental health services of the
4  county would arrive at diagnoses like that.  The
5  hospital could arrive at diagnoses like that.
6  Does the county itself, you know, oversee that
7  diagnosis?  No.
8    Q.   You agree that all use -- substance
9  use disorders can be treated, correct?
10        MR. BADALA:  Objection to form.
11  Outside the scope.
12    A.   That's a question outside my area of
13  expertise.
14    Q.   So you do not know whether the
15  county is able to treat substance use disorders
16  for any substance they might classify?
17        MR. BADALA:  Objection to form.
18  Outside the scope.
19    A.   As I understood your question, all
20  substance use disorders being treatable, I don't
21  know that that's something that I could say the
22  county has an opinion on.
23    Q.   What about, does the county agree
24  that, with appropriate support, all addicted
25  individuals can make a recovery?

Page 319

1        MR. BADALA:  Objection to form.
2  Outside the scope.
3    A.   I think the county would like to
4  give all those addicted individuals that
5  opportunity.  Whether or not they can recover
6  would be beyond really the scope of the county's
7  ability to predict that.
8    Q.   Do you agree that there are a number
9  of people who take prescription opioids and do
10  not develop an opioid use disorder?
11        MR. BADALA:  Objection to form.
12  Outside the scope.
13    A.   Again, without having a definition
14  of an opioid use disorder, I could only say that
15  the long-term use of opioids would be expected
16  over time to create dependence on them and
17  physical withdrawal symptoms when they were
18  removed.  Whether that moves into addiction or
19  not, I couldn't really say.
20    Q.   Do you agree there are a number of
21  people who take prescription opioids and never
22  go on to break the law?
23        MR. BADALA:  Objection to form.
24  Outside the scope.
25    A.   I would sure hope so.

Page 320

1    Q.   Are there people who have an opioid
2  use disorder from prescription opioids who do
3  not go on to use illegal narcotics?
4        MR. BADALA:  Objection to form.
5  Outside the scope.
6        Which topic are we on?
7        MR. CARTER:  Topic 19, "The criteria
8  used to identify individuals who overdosed on,
9  or became addicted to, prescription opioids."
10        MR. BADALA:  Objection to form.
11  Outside the scope.
12    A.   Now you guys made me lose the
13  question.
14    Q.   Sure.
15        The question was, are there people
16  who have an opioid use disorder from
17  prescription opioids who nonetheless do not go
18  on to use illegal narcotics?
19        MR. BADALA:  Same objections.
20    A.   I think national data would support
21  that and probably local data, that there were
22  people prescribed who did not go on to become
23  addicted.
24    Q.   With respect to topic 19, has the
25  county itself vetted or confirmed any individual

Page 321

1  diagnosis of an opioid use disorder?
2    A.   That information was submitted to
3  the experts for their interpretation.  The
4  county did not independently vet those experts.
5  They were referred to our attorneys and they
6  consulted with the experts.
7    Q.   In connection with compiling the
8  individuals identified on Exhibit A, did the
9  county conduct any interviews of those
10  individuals?
11    A.   We identified claims data with the
12  criteria that I've mentioned, and that was
13  submitted through to our attorneys, and then
14  they conferred with experts and responded to the
15  interrogatories.  To my knowledge, the county
16  did not conduct independent interviews after
17  that referral.
18    Q.   After that information was referred
19  to the attorneys and the experts, do you know if
20  the attorneys or the experts interviewed the
21  individuals listed on Exhibit 2, sub-Exhibit A?
22  It's the oversized printout.
23    A.   It's the big one, right?
24    Q.   Yes.
25        MR. BADALA:  And I would just