# EXHIBIT 62

Page 1

1              IN THE UNITED STATES COURT
2               NORTHERN DISTRICT OF OHIO
3                   EASTERN DIVISION
4
5             ~~~~~~~~~~~~~~~~~~~~~
6   IN RE:  NATIONAL PRESCRIPTION
7   OPIATE LITIGATION            MDL No. 2804
8                                Case No.
9                                17-mdl-2804
10                               Judge Dan Polster
11
12  This document relates to:
13  The County of Cuyahoga, Ohio, et al., v.
14  Purdue Pharma L.P., et al.,
15  Case No. 1:17-OP-45004 (N.D. Ohio)
16
17             ~~~~~~~~~~~~~~~~~~~~~
18          30(b)(6) videotaped deposition of
19                    HUGH SHANNON
20                 January 15, 2019
21                     9:05 a.m.

                      Taken at:
22    Climaco, Wilcox, Peca & Garofoli Co., L.P.A.
             55 Public Square, Suite 1950
23                  Cleveland, Ohio
24              Wendy L. Klauss, RPR
25

Page 6

INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 1 | Amended Notice of Videotaped 30(b)(6) Deposition of the County of Cuyahoga | 12 |
| Exhibit 2 | Black Binder Containing Tabs 1 Through 5 | 17 |
| Exhibit 3 | Plaintiff the County of Cuyahoga, Ohio and the State of Ohio Ex Rel. Prosecuting Attorney of Cuyahoga County, Michel C. O'Malley's Second Supplemental Responses and Objections to Distributor Defendants' Interrogatory No. 18 Pursuant to the Court's November 21, 2018 Order | 24 |

Page 7

INDEX OF VIDEO OBJECTION

| OBJECT | PAGE |
|---|---|
| object | 25 |
| objection | 29 |
| objection | 29 |
| objection | 29 |
| objection | 31 |
| object | 32 |
| objection | 38 |
| objection | 40 |
| objection | 46 |
| objection | 52 |
| objection | 55 |
| object | 55 |
| objection | 69 |
| objection | 70 |
| objection | 73 |
| objection | 73 |
| objection | 74 |
| objection | 74 |
| objection | 75 |
| objection | 75 |
| objection | 76 |
| objection | 76 |
| objection | 77 |

Page 8

| objection | 77 |
|---|---|
| objection | 79 |
| objection | 80 |
| objection | 81 |
| objection | 82 |
| objection | 82 |
| objection | 83 |
| objection | 88 |
| object | 89 |
| objection | 89 |
| objection | 90 |
| objection | 91 |
| objection | 92 |
| objection | 92 |
| objection | 103 |
| objection | 104 |
| objection | 105 |
| objection | 105 |
| objection | 105 |
| objection | 106 |
| objection | 115 |
| objection | 116 |
| objection | 116 |
| objection | 117 |
| objection | 117 |

Page 9

| objection | 119 |
|---|---|
| objection | 120 |
| objection | 135 |
| objection | 136 |
| objection | 137 |
| objection | 138 |
| objection | 139 |
| objection | 142 |
| objection | 142 |
| objection | 144 |
| objection | 145 |
| objection | 146 |
| objection | 147 |

Veritext Legal Solutions
www.veritext.com                                        888-391-3376

Page 10

1  THE VIDEOGRAPHER: We are now on
2  the record. The date is January 15, 2019. The
3  time 9:05 a.m. The caption of this case is In
4  Re National Prescription Opiate Litigation.
5  The name of the witness is Hugh Shannon.
6       At this time the attorneys present
7  and those attending remotely will identify
8  themselves and the parties they represent.
9       MR. CIACCIO: I'll start. Joseph
10 Ciaccio, Napoli Shkolnic, Cuyahoga County.
11      MR. GALLUCCI: Frank Gallucci,
12 Plevin & Gallucci, Cuyahoga County.
13      MR. CASPARY: Chris Caspary, Zashin
14 & Rich, City of Cleveland.
15      MS. JAMES: Erica James, Tucker
16 Ellis, Janssen Pharmaceuticals and Johnson &
17 Johnson.
18      MR. PADUKONE: Assem Padukone,
19 Covington & Burling, on behalf of McKesson
20 Corporation.
21      MS. HARTMAN: Ruth Hartman, Baker
22 Hostetler, on behalf of the Endo defendants.
23      MR. KEYES: Andrew Keyes, Williams
24 & Connolly, on behalf of Cardinal Health.
25      MS. ROITMAN: Sara Roitman, from

Page 11

1  Dechert, on behalf of Purdue.
2       MR. CARTER: Ed Carter, Jones Day,
3  for Walmart.
4       MS. ZERRUSEN: Sandy Zerrusen, from
5  Jackson Kelly, on behalf of AmeriSourceBergan.
6       MR. BORANIAN: Steven Boranian,
7  from Reed Smith, for defendant
8  AmeriSourceBergan.
9       THE VIDEOGRAPHER: People on the
10 phone?
11      MR. PORTER: Luke Porter, with Reed
12 Smith, on behalf of AmerisourceBergen.
13      MS. HANNAM: Monique Hannam, from
14 Barnes & Thornburg, on behalf of HD Smith.
15      MR. BADALA: Salvatore Badala, on
16 behalf of plaintiff, Cuyahoga County.
17      THE VIDEOGRAPHER: Will the court
18 reporter please swear in the witness.
19      HUGH SHANNON, of lawful age, called
20 for examination, as provided by the Statute,
21 being by me first duly sworn, as hereinafter
22 certified, deposed and said as follows:
23      EXAMINATION OF HUGH SHANNON
24 BY MR. BORANIAN:
25   Q.  Good morning, Mr. Shannon. How are

Page 12

1  you today?
2    A.  Good morning. I'm well, thank you.
3    Q.  Do you understand that you are here
4  today to testify as a representative of
5  Cuyahoga County under Federal Rule of Civil
6  Procedure 30(b)(6)?
7    A.  I do.
8       - - - - -
9       (Thereupon, Deposition Exhibit 1,
10      Amended Notice of Videotaped
11      30(b)(6) Deposition of the County of
12      Cuyahoga, was marked for purposes of
13      identification.)
14      - - - - -
15   Q.  Take a look at what we have marked
16 as Exhibit 1. This is the notice for today's
17 deposition. Can you take a look at the topics
18 that are listed on pages 2 and 3 of Exhibit 1,
19 and when you are done with that, just look up
20 at me.
21      So, Mr. Shannon, the notice lists
22 topics 10, 12, 17, 23, 24, 25 and 31. Are
23 those the topics that you understand that you
24 are here to testify about today?
25   A.  Yes.

Page 13

1    Q.  And have you prepared to testify
2  about those topics today?
3    A.  I have.
4    Q.  What have you done to prepare for
5  today's deposition?
6    A.  A lot of review of materials,
7  mainly from past years; materials from other
8  county agencies that I'm not a part of but work
9  with, to familiarize myself more with these
10 topics and how they may have affected the
11 operations of those agencies; discussions with
12 some of those directors.
13      I have had discussions with members
14 of the task forces that are in effect right now
15 to deal with the opioid crisis in our
16 community.
17   Q.  How did you select the documents
18 and materials that you reviewed for today?
19   A.  Most of it was just a general
20 re-review of, you know, information that our
21 office has produced and shared and provided to
22 members of the community and the task forces
23 over the years.
24      Most of, you know, the discussions
25 with the attorneys about these specific topics,

Page 14

1  once we have had those discussions, maybe start
2  to zero in on specific documents that we may
3  have created out of our office or out of other
4  agencies of the county.
5      Q.  Did you make a list of the
6  documents or, otherwise, take notes --
7      A.  No.  The --
8      Q.  I wasn't --
9          MR. CIACCIO:  Make sure you --
10     Q.  I didn't go through the standard
11 instructions, but have you been deposed before,
12 Mr. Shannon?
13     A.  No.
14     Q.  Okay.  The person sitting to your
15 left is taking down everything that we say, so
16 it is more that we not talk at the same time.
17 I promise to not cut you off if you promise to
18 not cut me off, and that goes for all of the
19 attorneys here in the room.
20     A.  I apologize.
21     Q.  If you need a break at any time,
22 just let us know.  If we have -- if you don't
23 understand any question that I've asked you,
24 please let me know and I will do my best to ask
25 you a better question, okay?  Are those

Page 15

1  instructions clear?
2      A.  Yes.
3      Q.  Okay.  Thank you.  So we were
4  talking about the documents.  I think my
5  question was did you keep any list or tally of
6  the documents that you reviewed for today's
7  deposition?
8      A.  I did not.
9      Q.  Okay.  Did you take any notes, when
10 you were preparing for today's deposition?
11     A.  I did not.
12     Q.  Did counsel provide any materials
13 for you to review?
14     A.  Just what's in this binder in front
15 of me.
16         MR. BORANIAN:  Do you have a copy
17 of the binder for us?
18         MR. CIACCIO:  Sure.
19     Q.  Do you have that binder in front of
20 you right now, Mr. Shannon?
21     A.  I do.
22     Q.  So tell me what's in the binder.
23     A.  So tab 1, I believe tab 1 deals
24 with what they call -- what they have named
25 interrogatory number 18, which deals

Page 16

1  specifically with the categories of injury and
2  our attorneys' response.
3      Tab 2 is titled the Second Amended
4  Corrected Complaint.
5      Q.  It looks like there are excerpts of
6  that complaint in tab 2, correct?
7      A.  I didn't write this document, so
8  I'm not sure, specifically, if it's an amended
9  version or a condensed version.
10     Q.  Okay.  For the record, it's not all
11 there, but that's fine.  What's the next tab?
12     A.  Tab 3, this is the Medical
13 Examiner's of Cuyahoga County report on updated
14 fentanyl, heroin and cocaine deaths, related
15 deaths in Cuyahoga County from June 1 of 2018.
16     Tab 4 is titled the Amended Notice
17 of Videotaped 30(b)(6) Deposition of Cuyahoga
18 County.
19     And tab 5 looks like the
20 organizational chart of Cuyahoga County.
21     Q.  Okay.  Did you take any handwritten
22 notes on any of those documents?
23     A.  I did not.
24     Q.  Okay.  We will mark that as Exhibit
25 2.  If you can just hand it over to me, or you

Page 17

1  can just put the sticker on yourself.
2          - - - - -
3          (Thereupon, Deposition Exhibit 2,
4          Black Binder Containing Tabs 1
5          Through 5, was marked for purposes
6          of identification.)
7          - - - - -
8          MR. GALLUCCI:  I think we did it on
9  the outside yesterday.
10         MR. CIACCIO:  We did.
11     Q.  Now, other than the documents in
12 that binder, Exhibit Number 2, are there any
13 other documents that you reviewed that you
14 physically have that you collected in a file or
15 anywhere else?
16     A.  Most of our files we put online,
17 because it's information that we are sharing
18 with the community.  I do have files on my hard
19 drive that I've collected over the years, which
20 were turned over during discovery.
21     Q.  Okay.  So specifically for
22 preparation for today's deposition, do you have
23 a file or a box of documents or anything in
24 physical or hard copy?
25     A.  No.  I try not to waste paper.  I

Page 18

1  just reviewed what I was looking for in my
2  files and on the website, just to refamiliarize
3  myself.
4      Q.   Who did you speak with to prepare
5  for today's deposition?
6      A.   Well, obviously Dr. Gilson and I
7  have spoken at length.  I'm his administrator
8  at the medical examiner's office.  So during
9  the course of the day, we are always talking.
10 Occasionally, what we are doing during the day
11 also crosses over into preparation of what we
12 are doing for this action.
13     Q.   Did you talk to Dr. Gilson between
14 his deposition yesterday and this morning?
15     A.   Yes.
16     Q.   Okay.  And what did you discuss
17 with him?
18     A.   Well, he was here late yesterday,
19 and I was his ride, so I took him back to the
20 office, and we were basically talking about
21 what had happened at the office while we were
22 gone, and that he needed to get home and have
23 dinner and see his kids.
24     Q.   And did you discuss his deposition
25 or the case during that conversation?

Page 19

1      A.   Only to the extent that it lasted
2  longer than he thought it would.
3      Q.   Who else did you talk to for
4  today's deposition?
5      A.   We have had a number of discussions
6  by phone with other directors.  The HHS
7  director, David Merriman, talked to us a little
8  bit about the impacts on child and family
9  services.  Vince Caraffi, at the board of
10 health, he ran the Opiate Task Force for the
11 board of health.  Dr. Joan Papp, at
12 MetroHealth, we had a brief conversation,
13 updates about the Dawn program.
14          It's hard to really say I talked
15 specifically to this person about this specific
16 topic, because my work with the medical
17 examiner's office, as well as with the various
18 task forces that we participate in, kind of,
19 brings me into contact with these folks about
20 the general topic of the opioid crisis on a
21 daily basis.
22          So I wouldn't seek people out
23 necessarily to prepare but, as we were talking
24 during the normal course of business, things
25 that I learned from them getting regular

Page 20

1  updates, like I normally would, actually helped
2  me in preparation as well.
3      Q.   When did you learn that you would
4  be a representative of the county for
5  deposition?
6      A.   I think there was a general
7  understanding that there was going to be a
8  deposition at some point.  I don't believe I
9  could pick a specific date.
10     Q.   Well, when did you learn that you
11 would testify on these specific topics?
12     A.   For the 30(b)(6) deposition, I
13 think that might have been more recent, maybe
14 two months.
15     Q.   Okay.  So I understand that you
16 deal with these folks in the regular course of
17 business.
18     A.   Sure.
19     Q.   But I just want to complete getting
20 a description of how you prepared for the
21 deposition.
22          So since you learned that you would
23 testify on these enumerated topics, who else
24 have you spoken to, for the purpose of
25 educating yourself and preparing yourself to

Page 21

1  testify for the county on these topics.  We
2  have Dr. Gilson, Mr. Merriman, Mr. Caraffi, Dr.
3  Papp.  Who else?
4      A.   I would say -- I would say members
5  of law enforcement: Commander Gingell from the
6  City of Cleveland, he runs the HIDI task force,
7  among other things, for the City of Cleveland;
8  agent Martin from the DEA, I had a brief
9  conversation; Derek Siegle, he's the director
10 at the High Intensity Drug Trafficking Agency.
11     Q.   You mentioned you spoke to some
12 task force members.  Does that jog your memory
13 at all?
14     A.   Judge Synenberg and Judge Matia,
15 they were on the drug and recovery courts.  As
16 I said, it is difficult to differentiate
17 between my normal course of business.
18     Q.   If anyone else comes to mind, just
19 let us know.
20     A.   Sure.
21     Q.   Did you meet with attorneys to
22 prepare for today's deposition?
23     A.   I did.
24     Q.   And how many times?
25     A.   It would be hard for me to put a

Page 22

1 number on it. It's been a busy two months.
2 Q. Is it more than once?
3 A. Yes.
4 Q. Is it more than five times?
5 A. I would say, yes.
6 Q. Is it more than ten times?
7 A. Very likely.
8 Q. So you have met with attorneys. Is
9 it more than 15 times?
10 A. As I said, we have met in person,
11 we have talked on the phone. It's been a busy
12 two months. I would say dozens of times, yes,
13 at least.
14 Q. Okay. So if you can, how many
15 times did you meet with attorneys for the
16 purpose of preparing for today's deposition to
17 testify on these enumerated topics?
18 A. It's probably a dozen -- dozens of
19 times, yeah, right.
20 Q. How many hours total do you think?
21 A. Like I said, over the course of my
22 normal business, I'm constantly dealing with
23 these issues, so it's hundreds of hours, I
24 would think. Specifically saying, let's start
25 with the 30(b)(6) topics, at least 100 and

Page 23

1 maybe more.
2 Q. When was the last time you met with
3 attorneys to prepare for today's deposition?
4 A. You mean besides this morning?
5 Q. Was this morning the last time?
6 A. Yes.
7 Q. Then before this morning, when was
8 the last time you met with attorneys?
9 A. Yesterday.
10 Q. And how long did that meeting take
11 place?
12 A. Several hours.
13 Q. More than four?
14 A. About four maybe.
15 Q. And who was there?
16 A. The gentleman seated to the right
17 of me.
18 Q. Mr. Ciaccio?
19 A. Mr. Ciaccio and Mr. Gallucci.
20 There were other attorneys coming in and out.
21 Q. Okay. Let me ask you about topic
22 10, Mr. Shannon. Topic 10 is the harm that
23 plaintiff has incurred from the promotion,
24 marketing, distribution, dispensing and/or
25 diversion of prescription opioids.

Page 24

1 Mr. Shannon, does the county -- got
2 it?
3 Mr. Shannon, does the county
4 contend that it has incurred harm resulting
5 from the promotion, marketing, distribution
6 and/or diversion of prescription opioids?
7 A. Yes, it does.
8 Q. Let me show you Exhibit 3. This
9 might speed things along a little bit.
10      - - - - -
11 (Thereupon, Deposition Exhibit 3,
12 Plaintiff the County of Cuyahoga,
13 Ohio and the State of Ohio Ex Rel.
14 Prosecuting Attorney of Cuyahoga
15 County, Michel C. O'Malley's Second
16 Supplemental Responses and
17 Objections to Distributor
18 Defendants' Interrogatory No. 18
19 Pursuant to the Court's November 21,
20 2018 Order, was marked for purposes
21 of identification.)
22      - - - - -
23 Q. Mr. Shannon, Exhibit 3 is
24 Plaintiff, The County of Cuyahoga, the second
25 supplemental responses and objections to

Page 25

1 distributor defendants' interrogatory number 18
2 pursuant to the Court's order of November 21,
3 2018.
4 This was in the binder that we
5 marked as Exhibit 2, correct?
6 A. Yes.
7 Q. And this is an interrogatory
8 response that deals with the damages that the
9 county is claiming in this lawsuit, true?
10 A. Yes.
11 Q. So let's go to Exhibit 2 within
12 Exhibit 3, this response. It's a chart that
13 looks like this. Okay.
14 So Mr. Shannon, does the county
15 contend that it has incurred harm that has had
16 an impact on the ADAMHS Board?
17 MR. CIACCIO: Object to the form.
18 A. Yes, it does.
19 Q. What does ADAMHS Board stand for?
20 A. The ADAMHS Board is the Alcohol
21 Drug and Mental Health Services Board.
22 Q. And what harm does the county
23 contend was incurred that had an impact on the
24 ADAMHS Board?
25 A. So in responding to the opioid

Page 26

1  crisis, Cuyahoga County and individual agencies
2  within it had been doing work on their own.
3  ADAMHS Board is obviously a frontline agency in
4  dealing with the treatment of people who are
5  addicted to alcohol and drugs.
6       When it became clear that we had a
7  real problem, that some of the services at
8  agencies across the county were being
9  overwhelmed, we needed to really get together
10 to talk about, you know, ways to respond in a
11 more vigorous way.
12      When the Cuyahoga County Medical
13 Examiner's Office was talking about the crisis,
14 we had seen a rise in heroin deaths, and so we
15 called the ADAMHS Board to find out, had they
16 been seeing the same thing.  We called the
17 board of health, we talked to the U.S.
18 Attorney's Office, Steve Dettelbach and Carole
19 Rendon and other people, saying, are you seeing
20 the same things that we are seeing, do we need
21 to sit down and talk about the response.
22      So that was really the creation of
23 the U.S. Attorney's Task Force at that point.
24    Q.  I didn't ask you about the U.S.
25 Attorney's Task Force, Mr. Shannon.

Page 27

1       My question is:  What harm did the
2  county incur that had an impact on the
3  operations of the ADAMHS Board --
4    A.  Understood.
5    Q.  -- that's the question.
6    A.  Understood.  Unfortunately, it's
7  really all tied together.  ADAMHS Board
8  response, the board of health's response, the
9  medical examiner's response, law enforcement's
10 response, we decided that we needed to be
11 working more closely together.
12      So in order to do that, and to your
13 question, everybody suffered harms because of
14 the resources that needed to be expended,
15 because everybody's caseloads were going up,
16 there were, you know, more people needing to
17 get into treatment, the hospitals were starting
18 to get overwhelmed, their emergency rooms, our
19 office was being stressed, the medical
20 examiner's office, and carried down the line.
21 There was a ripple effect.
22      So in enumerating what damages go
23 to what specific agency, I think that will be
24 worked out by their experts that the
25 representation here is working with, but I can

Page 28

1  tell you that in our conversations, when the
2  task force was formed, ADAMHS was there.
3       They were stressed.  They required
4  more resources to respond, same as all the rest
5  of the agencies of the county that are listed
6  here, more people going through the Court
7  system, more people going into the jail.  All
8  of these things, stemming from the opioid
9  crisis, created stresses on local government
10 that required more vigorous response and more
11 resources.
12    Q.  So this chart attached to the
13 interrogatory response purports to list
14 damages.  It is divided into each of these
15 categories, and it is listed out from 2006
16 through 2017.
17      What I want to understand, and
18 there is somebody else designated to testify
19 about the Cuyahoga County's damages, okay?
20 Topic 10 is the harm, the harm resulting in the
21 damages.  We don't need to get into the
22 numbers, all right, we don't have time for that
23 today anyway.
24      What I want to know is, what
25 happened that impacted the ADAMHS Board that

Page 29

1  resulted in the claimed damages of, for
2  example, 6 million dollars in 2006; what is the
3  harm --
4       MR. CIACCIO:  Objection.
5    Q.  -- that that money was incurred to
6  address?
7       MR. CIACCIO:  Objection to the
8  form.
9    Q.  If there is a better way to
10 organize this, I'm open to that, but this is
11 the way that the county set this out for us.
12 This is how we are going to start doing this.
13      You know, what is the harm that
14 occurred to the ADAMHS Board that resulted in
15 these numbers?
16      MR. CIACCIO:  Objection to form.
17    A.  If I understood you, you said you
18 didn't want to talk about the specific numbers,
19 so I'm not sure that I could speak to what you
20 specifically asked, 6 million dollars in this
21 year for that agency.
22    Q.  Well, some harm happened to form
23 the basis for these damages.  Something
24 happened to the ADAMHS Board that was harmful;
25 what was it?

Page 30

1    A.   Right. So that's what I was trying
2 to explain, and maybe I wasn't doing a good
3 job, and I apologize.
4    Q.   Well, I heard greater caseloads, I
5 heard more people in jails, more patients
6 coming through the medical examiner's office,
7 but the county has disclosed numbers in
8 connection with the ADAMHS Board, as well as
9 the medical examiner and others. What's the
10 harm, what's the harm to the ADAMHS Board?
11    A.   So the harm is that more resources
12 are needed when there are more people seeking
13 treatment.
14    Q.   So greater treatment caseloads?
15    A.   Absolutely.
16    Q.   Anything else to the ADAMHS Board?
17    A.   So in familiarizing myself with all
18 of these other agencies and working with them
19 on the task force, all the discussions have
20 really amounted to the same types of things.
21         There are more people who are
22 becoming addicted, there are more people who
23 are dying, there are more people who are
24 seeking treatment, there are more people
25 getting caught up in the justice system because

Page 31

1 of their activities surrounding the opioid
2 crisis, and in order to respond to that, as a
3 local government, it requires additional
4 resources.
5         I am not sure that I can speak to
6 the individual numbers, as you are asking.
7    Q.   I'm not asking for numbers. I'm
8 asking for the harm. I'm asking for what
9 happened to harm the county, starting in 2006
10 and extending until today?
11         For ADAMHS we have established
12 that, you know, greater caseloads for
13 treatment. Let's move on to Children and
14 Family Services, what harm has been incurred by
15 the county that has had an impact on Children
16 and Family Services?
17         MR. CIACCIO: Objection to the
18 form.
19    A.   So the Department of Children and
20 Family Services is, you know, tasked with
21 protecting the children in this community.
22 They have seen a massive upswing of cases due
23 to the fact that people who are caregivers of
24 these children are either being incarcerated,
25 going into treatment or dying because of the

Page 32

1 opioid crisis, and that means more caseloads
2 for caseworkers to go out and do
3 investigations, additional placements in foster
4 care. The costs of these services are not
5 cheap.
6         I mean, often times there are
7 babies that are being born who are already
8 addicted to opiates. So not only are you
9 looking to try to get treatment for parents,
10 but if they die or they lose custody of their
11 children, now we are trying to get treatment
12 for babies who are addicted, born addicted to
13 opiates, and then get them placed in foster
14 care or through the adoption system. So all of
15 these are additional stresses on DCFS.
16    Q.   Are there greater or fewer numbers
17 of placements through DCSF since 2006?
18    A.   Far more.
19    Q.   And who told you that?
20    A.   Director Merriman.
21    Q.   I'm going to take these next few
22 together, Mr. Shannon. First of all, have you
23 identified the harm incurred that has impacted
24 DCSF?
25         MR. CIACCIO: Object to the form.

Page 33

1    Q.   Are you done with that?
2    A.   There may be others. This is what
3 I have been able -- that's the major topic that
4 we discussed with Director Merriman.
5    Q.   You understand you are here to
6 testify about topic 10, harm incurred, true?
7    A.   I do.
8    Q.   Is there anything else you can tell
9 us about DCSF, other than what we have already
10 said?
11    A.   Not at the moment, no.
12    Q.   So let's talk about the prosecutor,
13 the public defender, court of common pleas and
14 juvenile court. Has the county incurred harm
15 that has had an impact on those institutions?
16    A.   It has.
17    Q.   And what is the harm?
18    A.   So again, greater caseloads all the
19 way around, more people going through the
20 justice system. There are more arrests, there
21 is obviously more people going into the jail,
22 both juveniles and adults. This crisis has not
23 spared anybody, based on age, demographics or
24 where they live.
25         So more prosecutions means more

9 (Pages 30 - 33)

Page 34

1  cases for prosecutors, more cases for
2  defenders, busier dockets for the Court.
3      We have special dockets, drug court
4  and recovery court.  Recovery court was created
5  in response to this crisis.  We had already had
6  an operating drug court.  I think there is talk
7  about trying to add another to keep up with
8  caseloads.
9      And those deal specifically with
10 trying to get people out of the jail and into
11 treatment.  They have criteria that they have
12 to meet, and it is a rigorous program, but they
13 see very good results.  But those are also not
14 inexpensive.  So more people going through drug
15 courts, getting into treatment, means more
16 resources.
17    Q.   Has the county incurred harm that
18 has had an impact on the sheriff's office?
19    A.   Yes.
20    Q.   And what would that be?
21    A.   So the sheriff's office, while it
22 is the main law enforcement agency for the
23 county, which means it's doing more
24 investigations based on the opioid crisis, but
25 it also runs the county jail.

Page 35

1      The county jail is now
2  overcrowded -- more overcrowded, it has also
3  become one of, if not the largest drug
4  treatment center in Cuyahoga County.  Research
5  done of local cases by the medical examiner's
6  office, I believe, showed that we had somewhere
7  in the 40 to 50 percent range of folks who were
8  dying of an opioid overdose had had some jail
9  time in the previous two years.
10     So as those numbers go up, you are
11 talking about more and more people going into
12 the jail.  Probably one of the most expensive
13 things that Cuyahoga County does is run that
14 jail.
15    Q.   Has the county incurred harm that
16 had an impact on the medical examiner's office?
17    A.   It has.
18    Q.   And what is that harm?
19    A.   So we have, in identifying this
20 crisis, the medical examiner's office has
21 started to collect and produce reports, collect
22 data, produce reports to get out into the
23 community.  We felt that that was a very
24 important thing to do, that everybody had a
25 common baseline of knowledge about what was

Page 36

1  happening.
2      In order to deal with our increased
3  caseloads, unfortunately, as fatalities were
4  rising faster than we could almost adapt to, we
5  needed to bring on more forensic pathologists
6  to do autopsies, we needed more forensic
7  scientists in the laboratory to do toxicology
8  testing and drug chemistry work.
9      As the investigations grew more
10 elaborate for drug cases than they had in the
11 past, it required additional training.  There
12 were protocols designed with law enforcement,
13 with the prosecutor's office, to instruct
14 people who were going to be on these scenes how
15 to properly collect evidence that they would
16 want to submit for forensic testing.
17     Generally, in a drug case, you
18 wouldn't see a lot of forensic testing done,
19 but these cases now became -- there was a shift
20 in policy both at the prosecutor's and at the
21 U.S. Attorney's Office to be more rigorous with
22 the prosecutions, charging people with
23 manslaughter, death specification cases.  So it
24 required more evidence collected at the scene.
25     So when packaging is found at the

Page 37

1  scene by law enforcement, maybe they want
2  fingerprints done, maybe they want DNA testing
3  done.  Well, you can't just throw a baggy in --
4  or throw packaging, drug packaging into a
5  plastic baggy and seal it up if you want DNA
6  testing.  It ruins it or it has a potential to
7  regrade it.
8      So we had to just kind of brief who
9  would be on scene, these narcotic agents, these
10 detectives, how to properly collect it if they
11 wanted evidence from our office.  So more
12 scientists, more doctors.
13     Obviously, with more case work, we
14 got busier.  We needed to buy more supplies,
15 equipment started to fail, we needed to
16 replenish equipment.  There was a new
17 technology that helps us identify the new
18 strains and analogs of fentanyl that were
19 emerging, help us identify them and identify
20 them quicker.  Over the course of --
21    Q.   I thought you were done.
22    A.   No.  I'm sorry.
23     Over the course of, I would say,
24 the last three years, we've asked for and
25 received an additional 3 million dollars to our

Veritext Legal Solutions
www.veritext.com                                            888-391-3376

Page 38

 1  budget to deal specifically with the opioid
 2  crisis, for equipment, supplies and personnel.
 3  Fortunately, I am familiar with those specific
 4  numbers.
 5      Q.  Has the county incurred any harm
 6  that we haven't already discussed?
 7      A.  For sure.
 8      Q.  What else?
 9      A.  Well, I would start with the 3,000
10  people that have died in the last dozen years
11  or so from an opioid-related drug.
12      Q.  Which is a great loss to their
13  friends and family, true?
14      A.  Correct.
15      Q.  I'm asking about harm to the
16  county.  What other harm has the county
17  incurred because of the promotion, marketing,
18  distribution and/or diversion of opioids?
19          MR. CIACCIO:  Objection to form.
20  Just let him finish the answer before you start
21  interrupting.
22      A.  So as I was saying, there is great
23  harm to the county, because those families who
24  were left behind, our doctors have to talk to
25  those families, Dr. Gilson has to talk to

Page 39

 1  parents who have lost children.
 2          It's not an easy thing to have to
 3  deal with.  You can, you know, only say so much
 4  for someone who has lost a child, and there are
 5  other ripple effects.
 6          We talked about what was to DCSF.
 7  People are also caregiving for their parents,
 8  for their grandparents.  When they lose a
 9  caregiver, those people have to be taken care
10  of.  It goes directly to the harms that ripple
11  out throughout all of the service systems.
12          The county is the last safety net
13  for a lot of people, and so taking 3,000
14  people, often times people who are -- you know,
15  this is not what we remember, you know, from
16  old TV shows.  These are people who are working
17  every day, these are people who are
18  contributing to the tax base, they are working,
19  they are taking care of their parents, they're
20  taking care of their families.  It has a ripple
21  effect.  It is a direct effect on harms to the
22  county.
23      Q.  Mr. Shannon, there is not a person
24  in this room who is not sympathetic to the
25  plight that you have just described.

Page 40

 1          Our task today is to identify the
 2  harms so we can learn with particularity what
 3  we're dealing with here.
 4          So is there any harm to the county
 5  that we haven't already covered that you are
 6  claiming in this lawsuit?
 7          MR. CIACCIO:  Objection to form.
 8  Just objection.  Outside the scope.
 9          MR. BORANIAN:  How could that
10  possibly be outside the scope?
11          MR. CIACCIO:  Well, when you are
12  clarify it with that you are claiming in this
13  lawsuit, I think it starts to go into damages.
14  So I think that is outside the scope.
15          If you are going to ask him the
16  damages -- by claiming, you are saying damages.
17  So that's the part that I think is outside the
18  scope.
19          MR. BORANIAN:  We have your
20  objection.
21      Q.  So, Mr. Shannon?
22      A.  So we have talked about the
23  expansion of treatment both in the jail and
24  other areas.  One of the things that we did
25  early on, the county supported MetroHealth,

Page 41

 1  which is the county hospital, in instituting
 2  the Dawn Program.
 3          Dawn is the Deaths Avoided With
 4  Naloxone Program, and getting that up and
 5  running required an investment of resources
 6  from the county to get started.  It has since
 7  expanded to include increased availability for
 8  needle exchange, they have instituted now a
 9  fentanyl strip program, which they distribute
10  with the kits and with the needles, so folks
11  can use those to identify if their drugs have
12  fentanyl in them.
13          Not everybody who is seeking drugs
14  is looking for fentanyl.  Often times, you
15  know, there is no quality control of it.  So
16  that was an important addition, to help harm
17  reduction.
18          There have been expanded
19  interventions for hep C and HIV.  Obviously,
20  people who are using needles, that's a danger.
21      Q.  Are you talking now about measures
22  the county has taken to address the opioid
23  problem?
24      A.  Well, you were asking about the
25  harm.

Page 42

1  Q. Right.
2  A. And so when we expend resources --
3  Q. Let me just cut you off there. The
4  only reason I asked is because the next topic
5  is topic 12, which is mitigation of harm, which
6  would address what the county does to address
7  the opioid issues. So we're going to get to
8  that, I promise.
9  A. I understand.
10  Q. I want to focus on and finish with
11  identifying the harm that has been incurred by
12  the county because of the marketing, promotion,
13  distribution and diversion of opioids.
14      We have gone through each of the
15  agencies that are listed in the interrogatory
16  response, we have discussed MetroHealth and the
17  Dawn Program. Is there any other harm that you
18  can identify that the county has incurred
19  because of the promotion, marketing,
20  distribution or diversion of prescription
21  opioids?
22  A. So I understand what you are saying
23  that we will get to number 12, but when you are
24  asking about harms, all of these interventions
25  required resources --

Page 43

1  Q. Very well.
2  A. -- to start. So if you are asking
3  me, you know, how this is all getting put
4  together, that's going to be part of it.
5  Q. That's fine. That's fine.
6      Is there any other harm to the
7  county you want to describe, other than what we
8  have already talked about?
9  A. So the county, both the ADAMHS
10  Board and the county itself, embarked on a
11  number of media campaigns, billboards, videos,
12  things like that, to do prevention messaging
13  into the community about the dangers of opioid
14  prescriptions and the opioid crisis.
15      So there was a lot of time, effort,
16  and resources put into those programs to be
17  able to try to stem the tide, make sure that
18  people understood the dangers of prescribed
19  opioids, to understand that they had the power
20  to say to their doctor that they didn't need an
21  opioid prescription, if they didn't want one.
22  This also led to a lot of school-based
23  prevention messaging and programs, again all
24  requiring additional resources.
25      There is a laundry list, I'm sure,

Page 44

1  of the law enforcement resources that are
2  required and needed for expanded
3  investigations.
4  Q. We have covered law enforcement and
5  the sheriff's office and the courts and the
6  prosecutor and the public defender. Anything
7  else?
8  A. Currently trying to put together a,
9  kind of an integrated data system. There is a
10  lot of information that's out there about both
11  prescription opioids and the ensuing heroin and
12  fentanyl crisis, and they are all on different
13  systems, they all come in different formats,
14  and they are all owned by different agencies.
15      Being able to pull a lot of that
16  information together in one place to be able to
17  use it to inform law enforcement
18  investigations, treatment interventions,
19  prevention, it's not an easy task. We are not
20  even sure yet what all is out there, but to be
21  able to bring a lot of different data platforms
22  together under one umbrella is going to be a
23  resource-intensive undertaking, and so we are
24  fortunate to get a Department of Justice grant
25  to start things, but it's really just to get us

Page 45

1  to the point where we know everything we need
2  to know to start designing that system. And
3  that will be expensive, so...
4  Q. Has the county incurred any harm
5  because of the marketing, promotion,
6  distribution, or dispensing of prescription
7  opioids that we haven't already covered?
8  A. I'm sure there are others. It's a
9  lot, it's a lot of information to try to absorb
10  and take in. I have been doing it for seven
11  years, and I'm sure there are things I really
12  don't know well enough.
13  Q. Well, you understand that you have
14  been designated to testify --
15  A. I do understand that.
16  Q. -- on this topic for the county?
17      Have you given us all the
18  information that you currently have on behalf
19  of the county about the harm that has been
20  incurred?
21  A. I would say that we have gone into
22  discussions with the various hospitals and the
23  medical schools about trying to put together
24  new training programs, new education standards
25  for existing physicians, as well as medical

Page 46

1  students.
2         We see a lot of medical students
3  come through our office, we try to do some of
4  that, but to coordinate with those teaching
5  hospitals, with those medical schools, it takes
6  resources to be able to come up with those new
7  standards, how to prescribe appropriately and
8  responsively.  We have had, you know, many
9  discussions, the medical examiner's office
10 specifically.
11     Q.   Anything else, Mr. Shannon, or can
12 we move on?
13     A.   I'm sure there are more.
14     Q.   Well, now is your chance.  Let me
15 ask you this:  When did the county first
16 experience harm resulting from the promotion,
17 marketing, distribution, dispensing or
18 diversion of prescription opioids?
19         MR. CIACCIO:  Objection to form.
20     A.   Well, that's complicated.  When we
21 had our first discussion about heroin, we
22 didn't have all of the information, I think, we
23 needed to be fully informed, like we are today.
24         Seven years ago, when we saw
25 heroin, we saw it spiking, that was a problem.

Page 47

1  What we didn't realize and what was kind of,
2  you know, hidden from view was that, you know,
3  most of these people started with a prescribed
4  opiate.
5      Q.   The question, Mr. Shannon, is, when
6  did you first incur the harm?
7          MR. CIACCIO:  I think he's
8  answering that question.
9          MR. BORANIAN:  No, I don't think he
10 is.  He is answering -- he's talking about what
11 he understood and what he is learning.
12     Q.   The question is:  When did you
13 first experience the harm?
14         MR. CIACCIO:  If he finishes the
15 question, then you will know whether or not he
16 answered it and you can follow back up.  But,
17 again, I'm going to ask you not to cut him off
18 just because you don't like the answer.
19     A.   So we didn't fully understand, kind
20 of, these underlying issues.  Part of it was
21 that we required more information than we were
22 entitled to at that time legally.
23         Once the medical examiner himself
24 started having conversations with the board of
25 pharmacy to get access to the drug prescription

Page 48

1  monitoring system, OARRS, and that took some
2  time and personal lobbying to get, we were able
3  to do -- start doing lookbacks on people we
4  knew were dying from overdoses.  We set up a
5  poison death review committee.
6      Q.   Mr. Shannon, when did the county
7  incur the harm?  When did it first incur the
8  harm?
9          MR. CIACCIO:  I think he is trying
10 to explain that to you.  He said it is a
11 complicated answer.
12         MR. BORANIAN:  We have a time limit
13 here.
14         MR. CIACCIO:  I understand that.
15         MR. BORANIAN:  You can't
16 filibuster.
17     Q.   The question is, when did the
18 county first experience the harm that you've
19 just described here for the last 45 minutes?
20         MR. CIACCIO:  And I think you are
21 using up time by making him restart his answer
22 every time.
23     Q.   So when?
24     A.   As I said, it's a complicated
25 issue.

Page 49

1      Q.   I don't think it is.  You listed in
2  your discovery response as early as 2006.  So
3  you're testifying for the county here, not as
4  the medical examiner's administrator.
5          MR. CIACCIO:  Outside.
6      Q.   The response starts in 2006.  The
7  question is, when did you first incur the harm
8  for which you are claiming damages in this
9  lawsuit?
10         MR. CIACCIO:  Outside the scope,
11 obviously.
12         MR. BORANIAN:  It is completely
13 within the scope.
14         MR. CIACCIO:  No.  You are using
15 the date the damages started as a date.  You
16 are confusing the two topics, and we didn't
17 write them but their -- but I can understand
18 why you are, but again, and I would ask, if you
19 just let him get the answer out, we probably
20 would have been moved on by now.
21     A.   So when we were able to get this
22 information and be able to look at the people
23 who were dying, look at their histories of
24 prescriptions, we started to find that about 75
25 percent of them had had prescribed opioids

Page 50

1  prior to their death.
2       There were discussions about this
3  in medical literature as well starting to come
4  out. The work that the medical examiner's
5  office did was one of the first concrete
6  studies of linking heroin deaths to previous
7  prescribed opioids. That helped inform the
8  work that we were doing in Cuyahoga County.
9       So while we knew that there were
10 issues, we knew that there were concerns that
11 we had about people dying from heroin
12 overdoses, now we were starting to see, kind
13 of, the genesis of the evolution of the crisis
14 that we were facing. If you don't know all of
15 the factors, you may be trying to, you know,
16 stop one avenue and leave another one wide
17 open.
18      So then, I would say, 2016 is when
19 it became acute. It was then obvious to us,
20 with all the other data we had, there was a
21 starting point to this that -- and the numbers
22 continued to hold up year after year.
23 Three-quarters of the people, roughly, give or
24 take percentage there, had prescription opiates
25 in their OARRS histories.

Page 51

1       So that is a big step in helping us
2  to try to design interventions. When we met in
3  2013, we didn't have that information. So the
4  things that we were designing didn't fully
5  address the full scope of the crisis.
6       Q. Mr. Shannon, I didn't ask you when
7  you understood something, I didn't ask you
8  about your review of OARRS data. If you don't
9  answer the question, we can ask for more time,
10 we can come back and do this again. I would
11 rather not do that.
12      The question is, regardless of what
13 the county understood at the time, when did it
14 first incur harm resulting from the promotion,
15 marketing, distribution, dispensing, or
16 diversion of prescription opioids; when did the
17 harm first occur, based on what you know today,
18 as a representative of the county?
19      A. Like I said, it's difficult to say
20 with any specificity. I can only tell you when
21 we had access to information, that we were able
22 to connect those dots, that's when, you know,
23 we put things into motion to act, based on that
24 information. I would say --
25      Q. So would the county's -- the

Page 52

1  county's -- I'm sorry. I thought you were
2  finished.
3       A. That's all right. I would just
4  say, my best guess is by 2016, we had had an
5  analysis of data that we had not previously had
6  to be able to make those links back to
7  prescription opioids and heroin use, and heroin
8  use became fentanyl use, and fentanyl use
9  became carfentanil use.
10      Q. Is the county willing to stipulate
11 that it's not claiming damages for any harm
12 incurred before 2016?
13      MR. CIACCIO: Objection. Outside
14 the scope. He's not going to answer that.
15 That's clearly topic 11. Plus topic 10 is when
16 plaintiff became aware it was incurring the
17 harm. So you are outside of the scope in
18 reframing topic 10, so he has been answering
19 the question.
20      The topic, I didn't write it, it
21 says, "Became aware it was incurring that
22 harm." So you saying when did it suffer the
23 harm is a question that's not being asked in
24 10.
25      MR. BORANIAN: Topic 10 is the harm

Page 53

1  that plaintiff has incurred.
2       MR. CIACCIO: Sure.
3       MR. BORANIAN: That's what I'm
4  asking about, including when it started.
5       MR. CIACCIO: Then you say when
6  plaintiff became aware it was incurring that
7  harm.
8       MR. BORANIAN: That's one thing
9  that we are asking about. I want to know when
10 the harm started.
11      MR. CIACCIO: That's not in the --
12      MR. BORANIAN: We may have to come
13 back and ask him again.
14      MR. CIACCIO: That's not part of
15 topic 10. It doesn't say the harm incurred and
16 when that harm took place. It just says the
17 harm, and then you specify when plaintiff
18 became aware it was incurring that harm. He
19 still answered the question. Either way, he's
20 answered his answer. I'm just putting that on
21 the record that he is answering the question.
22      MR. BORANIAN: The description is
23 illustrative. It doesn't mean that I can't ask
24 him when the harm occurred, in addition to what
25 the harm is.

Page 54

 1    MR. CIACCIO: Okay.
 2    Q.   Mr. Shannon, is it the county's
 3  position that the harm you described has been
 4  incurred exclusively because of the marketing,
 5  promotion, distribution, dispensing or
 6  diversion of prescription opioids?
 7    A.   That is the position of the county.
 8    Q.   So it is your position
 9  that -- well, the county had a sheriff's
10  department before there was a problem with
11  prescription opioids, right?
12    A.   Yes.
13    Q.   And the county had jails, right?
14    A.   Yes.
15    Q.   And the county had drug treatment
16  programs, right?
17    A.   Yes, they did.
18    Q.   And there were placements into
19  foster care and adoption before the current
20  problem, true?
21    A.   That's true.
22    Q.   Are you willing to say, is it your
23  position that none, zero percent of the
24  increased caseloads that you have described are
25  attributable to factors other than prescription

Page 55

 1  opioids?
 2        MR. CIACCIO: Objection to the
 3  form.
 4    A.   The harms that we have seen and the
 5  actions that have needed to be taken are a
 6  direct result from the overprescribing, the
 7  overmanufacturing, the overmarketing, the
 8  aggressive marketing tactics used that are
 9  outlined of prescription opioids. It created
10  the market that we now see that is now being
11  filled with illicit drugs as well.
12    Q.   The increase in caseloads that you
13  have described as the harm incurred by the
14  county, is 100 percent of that increase
15  attributable exclusively to prescription
16  opioids, the distribution, manufacturing,
17  dispensing, promotion, diversion, whatever the
18  topic says, of opioids, 100 percent?
19        MR. CIACCIO: Object to the form.
20    Q.   Is that your position?
21    A.   That is the contention of the
22  county.
23    Q.   We have already bled over into
24  topic 12 a little bit, but let me ask you, Mr.
25  Shannon, what has the county done to address

Page 56

 1  the harm that you have just described, and you
 2  don't need to repeat, it is not so rigid, you
 3  don't need to repeat what we have already
 4  covered.
 5        For example the DAWN Program, the
 6  messaging campaign you described, the
 7  integrated data system, all the stuff that you
 8  have already described, you don't need to go
 9  over it again, but what else has the county
10  done to address the harm that you have just
11  described?
12    A.   So there are several task forces
13  that have been set up, the Opiate Task Force
14  and the board of health. There are programs
15  run out of the ADAMHS Board. We talked about
16  the treatment.
17        There are also housing issues.
18  ADAMHS Board works with people who are in
19  treatment to get them stable housing. That is
20  important in the recovery process, to stabilize
21  that person's life. Having, you know, housing
22  is an important piece of that. We talked
23  about, I think, DAWN and all of the ancillaries
24  that have been added to it.
25        One of the other things that we do

Page 57

 1  with Metro's opioid safety office though is do
 2  reviews of the fatalities, because they use
 3  that to inform their medical staff about
 4  prescriptions they may have been writing to
 5  people who then subsequently have passed away
 6  due to a drug overdose.
 7        Again, the data is something that
 8  we are -- that we think is very important.
 9  It's why our website is filled with reports and
10  research. Providing the community with a solid
11  foundation of information is important, all the
12  way down to the family level, to be able to
13  have them take more control, empower those
14  families to help those whose loved ones they
15  may have that are addicted.
16        The prevention messaging outside of
17  the media campaigns, I think we have had, like
18  I said, hundreds of volunteers go out and do
19  community forums, talks in schools. We also
20  attend conferences, conferences both here in
21  the state, law enforcement, attorney general's
22  office, medical groups, but also we have been
23  invited outside of the state. I believe that
24  the medical examiner was invited to El Paso to
25  talk at a training of their -- all their DEA

Veritext Legal Solutions
www.veritext.com                                                     888-391-3376