# EXHIBIT 63

Page 1

1    IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION

MDL No. 2804

2    Case No. 17-md-2804

3    THIS RELATES TO:

4

5    CITY OF CLEVELAND, OHIO, ETAL VS. PURDUE PHARMA L.P.

6    ET AL CASE NO. 18-OP-45132

7

8    THE COUNTY OF CUYAHOGA, OHIO, ET AL VS. PURDUE

9    PHARMA L.P., ET AL CASE NO. 18-OP-45090

10

11    THE COUNTY OF SUMMIT, OHIO, ET AL VS. PURDUE PHARMA

12    L.P., ET AL CASE NO. 17-OP-45004

13

14

15    VIDEO DEPOSITION OF

16

17    MAGGIE KEENAN

18

19

20    JANUARY 18, 2019

21

22    DEPOSITION HELD AT CLIMACO, WLICOX, PECA & GAROFOLI

23    55 PUBLIC SQUARE

24

25    CLEVELAND, OH 44113

Page 2

```
 1
 2                    APPEARANCES
 3
 4  Mr. J. Andrew Keyes, Mr. Paul Boehm & Ms. Melinda
 5  Johnson
 6  William & Connolly, LLP
 7  725 12th Street, N.W.
 8  Washington, D.C. 20005
 9  (202) 434-5584
10  For Cardinal Health
11
12  Mr. Salvatore C. Badala
13  Napoli Shkolnik, Pllc
14  400 Broadhollow Road, Suite 305
15  Melville, NY 11747
16  (631) 224-1133
17  For Cuyahoga County
18
19  Mr. Frank L. Gallucci, III
20  Plevin Gallucci
21  55 Public Square, Suite 2222
22  Cleveland, OH 44113
23  (216) 863-0804
24  For Cuyahoga County
25
```

Page 3

```
 1                APPEARANCES CONTINUED
 2
 3  Ms. Maria Fleming
 4  Napoli Shkolnik
 5  600 Superior Avenue East, Suite 1300
 6  Cleveland, OH 44114
 7  (212) 397-1000
 8  For Cuyahoga County
 9
10  Ms. Sarah Conway
11  Jones Day
12  555 South Flower Street
13  Los Angeles, CA 90071
14  (213) 489-393
15  For Wal-mart
16
17  Mr. Justin E. Rice
18  Tucker Ellis
19  950 Main Avenue, Suite 1100
20  Cleveland, OH 44113
21  (216) 696-3670
22  For Janssen and Johnson and Johnson
23
24
25
```

Page 4

```
 1              APPEARANCES CONTINUED
 2
 3  Mr. David Haller
 4  Covington & Burling
 5  620 Eighth Avenue
 6  New York, NY 10018
 7  (212) 841-1000
 8  For McKesson
 9
10  Ms. Monique Hannam  (By phone)
11  Barnes & Thornburg
12  11 South Meridian Street
13  Indianapolis, IN 46204
14  (317) 231-7776
15  For HD Smith
16
17  Mr. Kenneth Prabucki  (By phone)
18  Baker Hostetler
19  127 Public Square, Suite 2000
20  Cleveland, OH 44114
21  (216) 861-7718
22  For Endo Pharmaceutical
23
24
25
```

Page 5

```
 1              APPEARANCES CONTINUED
 2
 3  Mr. Steven Boranian  (By phone)
 4  Reed Smith
 5  101 Second Street, Suite 1800
 6  San Francisco, CA 94105
 7  (415) 543-8700
 8  For AmeriscourceBergen
 9
10  THE VIDEOGRAPHER:
11      Mr. John Stringer
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1                    INDEX
2                         PAGE
3              EXAMINATION
4 QUESTIONS BY MR. KEYES                    8
5 QUESTIONS BY MR. BADALA                 184
6
7              EXHIBITS
8 Deposition Exhibit 1 notice            9
9 Deposition Exhibit 2 binder           68
10 Deposition Exhibit 3 supplemental response 78
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1              VIDEO DEPOSITION
2         THE VIDEOGRAPHER:  It is 9:09 a.m.  We're
3 on the record.  Would the court reporter please
4 swear in the witness.
5              MAGGIE KEENAN,
6 of lawful age, having been first duly sworn to
7 testify the truth, the whole truth, and
8 nothing but the truth in the case aforesaid,
9 deposes and says in reply to oral
10 interrogatories, propounded as follows, to-wit:
11         MR. KEYES:  Andrew Keyes with Williams &
12 Connolly for Cardinal Health.
13         MS. JOHNSON:  Melinda Johnson also with
14 Williams & Connolly for Cardinal Health.
15         MS. CONWAY:  Sarah Conway for Jones Day do
16 for Wal-Mart.
17         MR. RICE:  Justin Rice from Tucker Ellis
18 on behalf of Johnson and Johnson and Janssen.
19         MR. HALLER:  David Haller of Covington and
20 Burling for McKesson.
21         MS. FLEMING:  Maria Fleming of Napoli
22 Shkolnik on behalf of the plaintiff.
23         MR. GALLUCCI:  Frank Gallucci of Plevin
24 Gallucci for plaintiff Cuyahoga County.
25         MR. BADALA:  Salvatore Badala on behalf of

Page 8

1 plaintiff Cuyahoga County.
2         MR. KEYES:  Will counsel please enter
3 their appearances?
4         MS. HANNAM:  Monique Hannam Barnes &
5 Thornburg for HD Smith.
6         MR. PRABUCKI:  Kenneth Prabucki of Baker
7 Hostetler representing the Endo defendant.
8         MR. BORANIAN:  Steven Boranian from Reed
9 Smith for defendant AmerisourceBergan.
10         MR. BADALA:  Is that everyone on the
11 phone?  We just have a standing objection for the
12 record for the involvement of Baker Hostetler in
13 this litigation as well as Miss Cal Rendo.
14              EXAMINATION
15 BY MR. KEYES:
16     Q    Good morning, Miss. Keenan.  My name is
17 Andrew Keyes.  Is it your understanding that you are
18 testifying today as a corporate representative for
19 Cuyahoga County?
20     A    Yes.
21     Q    And is it your understanding that as the
22 court representative, you are testifying today not
23 as an individual, but as Cuyahoga County itself?
24     A    Yes.
25     Q    And is it your understanding that as the

Page 9

1 corporate representative for the topics for which
2 you have been designated.  You will be testifying as
3 Cuyahoga County based on the information known and
4 the information reasonably available to Cuyahoga
5 County?
6     A    Yes.
7     Q    Showing you what has been marked as Keenan
8 30 (b)(6) Exhibit No. 1.
9              (Deposition Exhibit Number 1
10              marked for identification.)
11     Q    (Mr. Keyes) Do you have that in front of
12 you?
13     A    Yes.
14     Q    And this is titled, The Second Amended
15 Notice of Videotaped Deposition of Maggie Keenan and
16 it continues for two pages.  If you turn to the
17 second page towards the top, do you see that you
18 have been designated as the corporate representative
19 for Cuyahoga County on topics 11, 21, 22, 37 and 38
20 of defendants original 30 (b)(6) notice?
21     A    Yes.
22     Q    Are you prepared then to testify today as
23 the corporate representative for Cuyahoga County on
24 those topics?
25     A    Yes, I am.

3 (Pages 6 - 9)

Page 10

1    Q   Did you prepare for today's deposition?
2    A   Yes, I did.
3    Q   What did you do to prepare?
4    A   Um, I reviewed county budget documents.
5  So budget plans that have been prepared for previous
6  years recommended budget books.
7            I communicated with the Office of
8  Budget Management where I work has seven analysts
9  who have a collection of agencies that they work
10 for. So I communicated with all of our analysts
11 just to review revenue, budgets, expenses related to
12 county agencies and departments.
13           I did confer with the county fiscal
14 officer to make sure that his understanding was the
15 same as mine.
16           And I reached out to some of the
17 agencies directly, Felicia Harrison who is the
18 finance director at the ADAMHS Board just to talk a
19 little bit about their revenue sources.
20           That's what I can think of off the
21 top of my head. And I, of course, did meet with the
22 county's attorneys.
23   Q   How many times did you meet with the
24 counties attorneys to prepare for today's
25 deposition?

Page 11

1    A   I believe we had two in person meetings
2  and then we communicated via phone probably five or
3  six times.
4    Q   Who did you meet with the first time?
5    A   Sal Badala.
6    Q   Any other lawyers?
7    A   No, not the first meeting.
8    Q   And did anyone else besides you and
9  Mr. Badala participate in that first meeting?
10   A   No.
11   Q   How long was that meeting?
12   A   I can't recall. I can't recall, sorry.
13   Q   Can you give me your best estimate how
14 long that first prep meeting was with Mr. Badala?
15   A   Under two hours.
16   Q   Did you review documents in that meeting?
17   A   I reviewed the county's response to
18 Interrogatory Number 18. I reviewed the topics that
19 I was assigned for this deposition. You know, each
20 one of these 11, 21, 22, just to review what was
21 going to be discussed.
22   Q   Did you review any other documents in that
23 first prep meeting with Mr. Badala?
24   A   I don't believe so.
25   Q   When was your second prep meeting?

Page 12

1    A   Yesterday.
2    Q   Who did you meet with?
3    A   Sal Badala and Frank Gallucci.
4    Q   Did you meet with any other lawyers in
5  that meeting?
6    A   No.
7    Q   Did you meet with anyone else besides
8  Mr. Badala and Mr. Gallucci in that meeting?
9    A   No.
10   Q   How long was that meeting?
11   A   About five hours.
12   Q   Where was the meeting?
13   A   In the offices of Gallucci and Plevin,
14 Plevin and Gallucci, upstairs.
15   Q   Did you review documents during that
16 meeting?
17   A   Again, we reviewed the plaintiff's
18 response to Interrogatory Number 18. And, um, just
19 reviewing the topics that might be covered today.
20   Q   Anything else?
21   A   No.
22   Q   So did you review the same material in
23 both the first prep meeting and the second prep
24 meeting?
25   A   Yes.

Page 13

1    Q   Did you have any other prep meetings with
2  the lawyers to get ready for today's deposition?
3    A   Not in person meetings. We have had phone
4  calls.
5    Q   And you said earlier you had phone calls
6  maybe five or six times?
7    A   Yes.
8    Q   When was the first of those five or six
9  times?
10   A   I can't recall.
11   Q   When was the most recent of those five or
12 six times?
13   A   Um, I believe we talked Monday, but I
14 honestly can't recall, this past Monday.
15   Q   And did you review documents during those
16 phone conversations with the lawyers?
17   A   There was at least one phone call where we
18 reviewed the same documents that I've already
19 identified.
20   Q   The plaintiff's response to Interrogatory
21 Number 18?
22   A   That's correct.
23   Q   And the topics that were assigned to you?
24   A   That's correct.
25   Q   Anything else?

4 (Pages 10 - 13)

Page 14

```
 1    A   No.
 2    Q   You said that part of your preparation for
 3  today's deposition was to review budget documents.
 4  Which specific budget documents did you review?
 5    A   Um, I know I was looking at 2017 and 2018.
 6  But the other years that I looked at I can't recall
 7  which specific years.
 8    Q   Did you look at budget documents for years
 9  prior to 2017?
10    A   I did.
11    Q   Which ones?
12    A   I can't recall which specific years.
13    Q   How far back did you look at budget
14  documents?
15    A   2010.
16    Q   How many different years worth of budget
17  documents did you the review?
18    A   I'm sorry, I can't recall.
19    Q   Why did you review these budget documents?
20    A   Um, because one of the topics, well, two
21  of the topics that I'm talking about, were likely to
22  talk about today are revenue, sources of revenue and
23  the county's overall budget.
24        I'm assuming you are aware we
25  provided the budget documents.  The county has a
```

Page 15

```
 1  very large annual budget, it is about $2 billion.
 2  So I try to keep it all straight in my head of
 3  course, but I just wanted to look at a couple of
 4  prior year documents to refresh my memory.
 5    Q   Why did you look at 2010 budget documents
 6  in particular?
 7    A   I don't believe I said I look specifically
 8  at 2010, I just know that I didn't look at anything
 9  older than 2010.
10    Q   Did you look at 2010?
11    A   I can't recall, I'm sorry.
12    Q   Why didn't you look at any budget
13  documents prior to 2010?
14    A   I don't know, time.
15    Q   How much time did you spend reviewing
16  these budget documents?
17    A   Collectively probably about two hours.
18    Q   And we have been talking about budget
19  documents, earlier I believe you said you looked at
20  the budget plans and then the recommended budget
21  books?
22    A   Uh-huh.
23    Q   Is that what you meant by the budget
24  documents that you reviewed?
25    A   That's correct.
```

Page 16

```
 1    Q   What is the difference between budget plan
 2  and a recommended budget book?
 3    A   So when the county system under our
 4  charter government, the county executive recommends
 5  a budget to the county council.  It is not unlike
 6  the state, how the state or federal government
 7  operates.
 8        The Office of Budget Management,
 9  where I work, we will put together a comprehensive
10  rather voluminous book that details the county's
11  recommended budget.
12        So we include pages specific to all
13  agencies and departments so that we can provide the
14  council and the public some detail on how the county
15  is spending its resources.
16        That budget recommended book is
17  presented to the council, but then after county
18  council holds its hearings, they invariably will
19  make amendments to the budget.  They adopt a plan
20  that differs somewhat from the recommended budget
21  book.  So we will create a new book that is the
22  budget plan, which will detail what has been adopted
23  by county council.
24        The recommended budget book you
25  cannot rely on as the actual budget.  Parts of it
```

Page 17

```
 1  will remain the same, but not all of it.  It just
 2  depends on what council decides to amend.
 3    Q   Is the Cuyahoga County for each year
 4  reflected in the budget plan document?
 5    A   Yes, it is.
 6    Q   And the budget plan document is the actual
 7  budget that has been approved by city council?
 8    A   County council.
 9    Q   County council.
10    A   Yes.
11    Q   And that typically has differences from
12  the budget book that has been recommended by the
13  county executive?
14        MR. BADALA:  Objection to form.
15    Q   (Mr. Keyes) Correct?
16    A   That is correct.
17    Q   Does the county put together each year a
18  document that describes the differences between the
19  county executive's recommended budget and the final
20  budget plan that has been adopted by the county
21  council?
22    A   The county will prepare a, usually it is a
23  memo that outlines the differences between the
24  recommended budget and the final budgets.
25        That memo is prepared by me and it is
```

5 (Pages 14 - 17)

Page 18

1 submitted to county council when we submit to them
2 the budget that they will ultimately adopt.
3        So the county council will say we
4 want to change this agency, change this agency, and
5 then it ultimately does come back to the office of
6 budget management to physically make those changes,
7 prepare the new documents. I will submit a cover
8 memo that says here is what differs.
9        We do not provide a book as
10 comprehensive as, for example, the State of Ohio,
11 which also has a very voluminous document that
12 detail the changes. We don't do that, I summarize
13 it.
14   Q   You said you prepare this memo. Do you
15 have others who assist you in the preparation of
16 this memo that outlines the changes from the county
17 executive's recommended budget book to the final
18 budget plan that is being submitted to the county
19 council for approval?
20   A   So as I mentioned previously, we do have
21 seven analysts that work in the office of budget
22 management. They assist me by way of providing data
23 and if the numbers have changed and I'm unaware of
24 why the number have changed. They will tell me oh,
25 it was this, but I write the memo myself.

Page 19

1   Q   Is there a process by which the county
2 executive, or anyone on the county executive's
3 behalf, reviews and approves your memo before it
4 submits to county council?
5       MR. BADALA: Objection to form.
6   A   Absolutely.
7   Q   (Mr. Keyes) What is that process?
8   A   I prepare the memo and any supporting
9 documents and I will always submit that to Dennis
10 Kennedy who is my supervisor in the county fiscal
11 office, as well as Armond Budish, the county
12 executive for review and approval before I send to
13 council.
14   Q   Has that been your practice every year?
15   A   Yes, it has absolutely.
16   Q   Are there occasions when Mr. Kennedy will
17 requests that you make changes to the cover memo
18 before it is submitted to the county council?
19   A   No.
20   Q   There has never been a time where
21 Mr. Kennedy has requested that a change be made to
22 the cover memo before it is submitted to the county
23 council?
24   A   No.
25   Q   Has there been a time where Mr. Budish has

Page 20

1 requested that any changes be made to your memo
2 before it is submitted to the county council?
3   A   Yes.
4   Q   Can you describe for me the circumstances
5 when Mr. Budish has requested changes to your cover
6 memo before it is submitted to county council?
7   A   The county executive never makes
8 substantive changes, he is quite a stickler for
9 grammar.
10        So he will sometimes place in a coma
11 or words. So, for example, if I write an agency is
12 getting more money, development is getting $100,000
13 to make loans, the county executive might add
14 because this is the county executive's priority. He
15 will add statements like that that aligns with the
16 strategic plan.
17        They're usually a particular cosmetic
18 changes.
19   Q   You said earlier that to prepare for
20 today's deposition you communicated with the seven
21 analysts in the office of budget and management?
22   A   That's correct.
23   Q   Did you speak with all seven of them?
24   A   Yes.
25   Q   Okay. And what was your purpose in

Page 21

1 reaching out to the seven analysts?
2   A   To, I conferred with them to receive
3 confirmation that my understanding of budget revenue
4 was accurate.
5   Q   Did you speak with any of the analysts
6 about specific expenses incurred by Cuyahoga County
7 because of the opioid problem?
8       MR. BADALA: Objection to form.
9   A   Are you asking solely in preparation for
10 this deposition?
11   Q   (Mr. Keyes) Yes.
12   A   No, I did not.
13   Q   Did you speak with any of the analysts
14 about the categories of expenses incurred by
15 Cuyahoga County because of the opioid problem?
16       MR. BADALA: Objection to form.
17   A   No, I did not.
18   Q   (Mr. Keyes) Did you speak with any of the
19 analysts about any impact that the opioid problem
20 had on Cuyahoga County's revenues?
21   A   No, I did not.
22   Q   Did you speak with any of the analysts
23 about any particular expenditures that related to
24 opioid use, misuse, abuse, addiction or deaths?
25       MR. BADALA: Objection to form.

6 (Pages 18 - 21)

Page 22

1  A  No.
2  Q  (Mr. Keyes) How much time did you spend
3 speaking with these seven analysts?
4  A  Collectively, probably about an hour.
5  Q  And that's an hour for your conversations
6 with all seven of them?
7  A  That's correct.
8  Q  Did you speak with the seven analysts
9 together at the same time or individually?
10  A  Individually.
11  Q  Can you review with me the names of the
12 seven analysts with whom you spoke to prepare for
13 today's deposition?
14  A  Absolutely. Anthony Henderson, Yvonne
15 Gibson, Chris Coston, Danielle Clark, Brian Witt,
16 Wendy Feinn, F-E-I-N-N and Greg Byer.
17  Q  What is Anthony's Henderson area of
18 specialty?
19  A  Anthony's assigned agencies include the
20 County Medical Examiner, the Court of Common Pleas,
21 the Department of Development, the Office of
22 Internal Audit, and I believe that's it.
23  Q  You are reading from a particular
24 document?
25  A  I'm sorry, yes.

Page 23

1  Q  What is that document?
2  A  I am looking at the county org chart, just
3 using this to make sure I'm covering all the
4 agencies.
5  Q  That's in a binder that you brought with
6 you to today's deposition?
7  A  Yes, it is.
8  Q  Is that a set of materials that you put
9 together to assist you in offering testimony on
10 these topics today?
11  A  The county's attorneys put this together
12 for me, but these are documents that I requested to
13 have available so that I could make sure that I'm
14 answering questions.
15  Q  Did you review the material in the binder
16 to prepare for today's deposition?
17  A  Um, I did.
18  Q  Can you tell me what is in the binder?
19  A  Absolutely. So there are six sections of
20 this binder. The first section is, um, I'm sorry,
21 the first section is the county's response to
22 Interrogatory Number 18, and there are two related
23 exhibits to that response.
24      The second section is the county org
25 chart.

Page 24

1      The third section are county's record
2 retention policies specific to each agency.
3      The fourth section is an excerpt from
4 the complaint that the county filed.
5      The fifth is my Notice of Deposition.
6 This is what you provided me also this morning.
7      And the sixth section identifies the
8 topics that I am covering today.
9  Q  Is there anything else in the binder?
10  A  No, sir.
11  Q  Are there any handwritten notes on any of
12 the documents in the binder?
13  A  No.
14  Q  You were explaining before the areas of
15 responsibility for Mr. Henderson?
16  A  Yes.
17  Q  You said Medical Examiner, Court of Common
18 Pleas, the Department of Development and Internal
19 Audit. Does he have any other areas of
20 responsibility as a budget analyst?
21  A  No.
22  Q  The second person --
23  A  I'm sorry, Anthony also is our systems
24 administrator. So we have budget and reporting
25 system that we use. The acronym is BRASS,

Page 25

1 B-R-A-S-S, and Anthony does maintain that for us.
2  Q  What do you mean he maintains BRASS?
3  A  So the county has a financial system, the
4 acronym is FAMIS, F-A-M-I-S, and then we have BRASS,
5 which is budget and reporting.
6      We receive downloaded data FAMIS,
7 like actuals of revenue and expenditures that get
8 exported into BRASS. Anthony manages those exports.
9 Every year BRASS has to be, we have to do like a
10 rollover process, which he is doing probably as I
11 speak, to close out the previous year and then
12 establish the databases for the current year. He
13 does all of that work for us.
14      If we have any issues, if the system
15 goes down, it is not working like it is supposed to,
16 that is his area of responsibility.
17  Q  What are Yvonne Gibson's areas of
18 responsibility as a budget analyst?
19  A  Yvonne Gibson works with the Domestic
20 Relations Court, the Prosecutor's Office, the HHS
21 Division of Job and Family Services, the HHS
22 Division of Child Support Services, the Department
23 of Public Justice Services and Public Safety, and I
24 believe that's it.
25  Q  And if I ask you the same question for the

7 (Pages 22 - 25)

Page 26

1 other five budget analysts namely, what is the area
2 or areas of responsibility for each, would you also
3 refer to that same work chart?
4    A  I likely would, yes.
5    Q  Okay.  You said you also spoke with
6 Mr. Kennedy to prepare for today's deposition.  What
7 was your purpose in speaking with Mr. Kennedy?
8    A  Um, excuse me.  So I just, I do all the
9 time anyway, would just run things by him to make
10 sure that my understanding is in line with his
11 understanding.  That I'm accurate, that I'm not
12 misunderstanding anything, misrepresenting anything.
13    Q  So how many times did you speak with
14 Mr. Kennedy then to run things by him and make sure
15 that you're understanding was in line with his
16 understanding in advance of today's deposition?
17    A  Specific to this deposition, I believe I
18 only did that one time.
19    Q  When?
20    A  That I can't recall, I'm sorry.
21    Q  Was it within the past week?
22    A  No.
23    Q  Past two weeks?
24    A  Likely, but I can't say specifically.
25    Q  For how long did you speak with him?

Page 27

1    A  Ten minutes.
2    Q  And what was the topic where you were
3 running things by him to make sure you're
4 understanding was in line with his understanding?
5    A  I can't recall that, I'm sorry.
6    Q  You don't remember the topic?
7    A  I don't.
8    Q  Can you provide any details at all about
9 your conversation with Mr. Kennedy that you had for
10 the purpose of preparing to testify today where you
11 wanted to make sure that your understanding was the
12 same as his understanding?
13    A  I can't.
14    Q  When you ran things by him, did he confirm
15 that the two of you had the same understanding or
16 did he have a different understanding?
17    A  He confirmed that we had the same
18 understanding.
19    Q  Did you learn anything from Mr. Kennedy in
20 this conversation?
21    A  No.
22    Q  Okay.  So you said he confirmed you had
23 the same understanding, same understanding of what?
24    A  Again, I can't recall the specifics of
25 what we were talking about.  I can't recall the

Page 28

1 subject.
2    Q  Was it, did it have to do with budgeting?
3    A  I can't recall.
4    Q  Did it have to do with revenues or
5 expenditures?
6       MR. BADALA:  Objection to form.
7    A  I can't recall.
8    Q  (Mr. Keyes) Did it have to do with
9 financial reporting?
10    A  I can't recall.
11    Q  Did it have to do with any particular
12 agency or department?
13    A  I can't recall.
14    Q  You can't recall any details?
15    A  No, I cannot.
16    Q  You do remember you spoke with him?
17    A  Yes.
18    Q  Okay.  You said that as part of your
19 preparation for today's deposition, you reached out
20 to agencies, did I get that right?
21    A  That's correct.
22    Q  What agencies did you reach out to?
23    A  The ADAMHS Board, their business manager
24 is Felicia Harrison.
25    Q  What other agencies did you reach out to?

Page 29

1    A  I did talk to the sheriff's office.  Their
2 business manager is Donna Kaleal, K-A-L-E-A-L.
3    Q  What other agencies did you reach out to
4 besides the ADAMHS Board and the sheriff's office?
5    A  Those are the only two that I can recall
6 specifically that analysts likely would have reached
7 out to some -- they may have reached out to some
8 agencies, but I don't know.
9    Q  Was it your idea to reach out to the
10 ADAMHS Board and to the sheriff's office?
11    A  It was.
12    Q  Or was that something you did at someone
13 else's request?
14    A  No, that was my idea.
15    Q  Why did you reach out to the ADAMHS Board?
16    A  The ADAMHS Board is, they don't have the
17 same relationship to the county that the other
18 agencies and departments have.  The office of budget
19 management doesn't, we don't really work with the
20 ADAMHS Board because the county council does not
21 appropriate for the board.
22       Their board of directors has the
23 authority to establish appropriation levels, they
24 get their authority directly from the State of Ohio.
25 So we don't have to work with them as closely as we

8 (Pages 26 - 29)

Page 30

1  do because they're not part of our budget.
2       The county does give a subsidy to the
3  ADAMHS Board totally approximately $39 million a
4  year. So I have an analyst who is assigned to
5  ADAMHS Board to manage that subsidy. He will try to
6  stay on top of just basics of what's happening at
7  the ADAMHS Board, what their needs are, but we just
8  don't follow them as closely.
9       Most the other agencies I'm looking
10 at their revenue and their expenses daily. I don't
11 do that for ADAMHS. So I just wanted to double
12 check that I have the right understanding of where
13 they get their money from, how they're spending
14 their money. I don't monitor them as closely as I
15 do everybody else.
16   Q   Who is the budget analyst in your office
17 who has the responsibility for the ADAMHS Board?
18   A   Greg Byer.
19   Q   You said you spoke with Felicia Harrison
20 who business manager for the ADAMHS Board?
21   A   Yes, she is, yes.
22   Q   Did you speak with anyone else at the
23 ADAMHS Board to prepare for today's deposition?
24   A   No.
25   Q   When did you speak with Felicia Harrison?

Page 31

1   A   I can't recall specifically. Within the
2  last two weeks.
3   Q   And did you speak with her in person or
4  speak with her over the phone?
5   A   Phone.
6   Q   How long did you speak with her?
7   A   Ten minutes.
8   Q   Did you send her any documents in advance
9  of the call?
10  A   No, I did not.
11  Q   Did she send you any documents in advance
12 of the call?
13  A   Felicia sent an email to Greg Byer that
14 was forwarded to me that identified their source of
15 revenue by percentage. So how much federal, how
16 much state, how much county.
17  Q   What were those percentages according to
18 the email from Miss Harrison?
19  A   The county was within 60 to 65 percent. I
20 don't recall the specific break out of the other
21 two.
22  Q   So in this email from Miss Harrison it
23 identified three sources of revenue. Cuyahoga
24 County, Ohio and the federal government?
25  A   That's correct.

Page 32

1   Q   And you recall the email reporting that 60
2  to 65 percent of the ADAMHS Board's revenue comes
3  from the county?
4   A   That's correct.
5   Q   And the remainder comes from Ohio and the
6  federal government?
7   A   Federal government/grants, but yes.
8   Q   What else did this email from
9  Miss Harrison say or report?
10  A   That was it.
11  Q   And then did you look at any documents as
12 you were speaking with Miss Harrison?
13  A   No.
14  Q   After your call with Miss Harrison, did
15 she send you any documents?
16  A   No.
17  Q   Did you send her any documents?
18  A   No.
19  Q   So tell me what did you learn during this
20 ten minute call with Miss Harrison to prepare for
21 today's deposition?
22  A   Um, that their funding is almost, with the
23 exception of some grants, exclusively government
24 funding and that the county makes up the majority of
25 where they get their revenue. That's that

Page 33

1  $39 million subsidy.
2   Q   Did you learn any in the call with
3  Miss Harrison that went beyond what was in this
4  email that you had already received from her?
5   A   No.
6   Q   And the 60 to 65 percent of its annual
7  revenue that comes from Cuyahoga County is typically
8  around $39 million?
9   A   It has been 39 million for the last
10 several years, yes.
11  Q   And prior to the last several years?
12  A   It was absolutely higher. So they had
13 been in the $40 million range. We have been cutting
14 budgets almost every year since 2008. But we do try
15 to provide funding to the ADAMHS Board in light of
16 what their mission is.
17  Q   What does the ADAMHS Board do with the
18 $39 million that Cuyahoga County provides on average
19 each year?
20  A   The county subsidy is largely to cover the
21 cost associated with treatment services for both
22 mentally ill and individuals that are suffering from
23 addiction who are under insured or uninsured. The
24 county subsidy also covers Medicare match. So there
25 is a requirement if you are drawing down Medicaid

9 (Pages 30 - 33)

Page 34

1  dollars, to have a match and the county subsidy is
2  included in that, but largely it is their charity
3  care. Individuals who need behavior health services
4  who don't have insurance, whose coverage doesn't
5  cover what they need will be covered by the subsidy.
6     Q   How much of the $39 million on average is
7  attributable to the Medicaid match?
8     A   That I can't say specifically, but it
9  would be nominal at best.
10    Q   And the remainder is then used by the
11  ADAMHS Board to cover the cost of treatment for
12  people who are mentally ill or who have addiction?
13    A   That's correct.
14    Q   Does the ADAMHS Board itself. I'm sorry,
15  were you done?
16    A   I'm sorry. I just want to be clear that
17  treatment services can encompass more than just
18  being a psychologist, a therapist. The ADAMHS board
19  will include comprehensive services which includes
20  CPST. I'm totally blanking on the acronym, but
21  that's essentially case management services, housing
22  services, um, some job readiness assistance. We
23  recognize all of those services lead to people
24  living largely self-sufficient lives.
25        So it is not just treatment in the

Page 35

1  form of I'm coming in for NA, AA, medically
2  assistive treatment, although it does cover that.
3     Q   Does the ADAMHS Board itself provide these
4  services or does it distribute funds to third
5  parties to provide the services?
6     A   The ADAMHS Board largely distributes
7  funding to a myriad of nonprofit entities throughout
8  the county who provide the direct services.
9        So ADAMHS Board the means by which
10  the dollars get to the agencies that provide
11  services and they're also responsible for overall
12  coordination planning, identifying what the needs
13  are, identifying where gaps are, they provide
14  advocacy services.
15    Q   What reports, if any, does the ADAMHS
16  Board provide to Cuyahoga County to account for the
17  services that have been provided for the funding
18  that it received from the county?
19    A   The ADAMHS Board does not submit financial
20  reports to the county
21    Q   Does it provide any kind of reports on the
22  services that have been provided?
23        MR. BADALA: Objection to form.
24    A   Not as a matter of, not as a requirement
25  or as a practice. The ADAMHS Board does prepare

Page 36

1  annual, annual plans, look backs so we will look at
2  those, we get them off their website, we'll ask
3  them. But they don't submit as a matter of routine
4  specific reports to the county.
5     Q   (Mr. Keyes) If the county executive or
6  the county council asked you what is Cuyahoga County
7  getting for the $39 million it spends each year on
8  the ADAMHS budget, what would you do to answer that
9  question?
10        MR. BADALA: Objection to form and do you
11  know what topic you are on right now?
12        MR. KEYES: Damages.
13        MR. BADALA: Which topic specifically?
14        MR. KEYES: 11.
15        MR. BADALA: Is it 11? I'm going to
16  object to outside the scope.
17    A   I'm sorry, can you repeat the question
18  again?
19        MR. KEYES: Sure.
20    Q   (Mr. Keyes) If the county executive or
21  county council asks you what is Cuyahoga County
22  getting for the $39 million it spends each year on
23  the ADAMHS budget, what would you do to answer that
24  question?
25        MR. BADALA: Same objection.

Page 37

1     A   I would first contact ADAMHS directly and
2  ask them that question. And, um, I mean, I would
3  get the response from them because I can't answer
4  that question on my own. I would have to go to the
5  ADAMHS Board.
6     Q   (Mr. Keyes) If you were asked that
7  question by the county executive or county council
8  right now, would you be able to answer that
9  question?
10        MR. BADALA: Objection to form. Also
11  object, outside the scope.
12    A   I would provide the answer that I gave
13  you, but I would end it with I'm going to contact
14  ADAMHS and ask them directly.
15    Q   (Mr. Keyes) And who specifically would
16  you ask at ADAMHS Board?
17    A   Likely I would start with Felicia
18  Harrison, who is their business manager, but if the
19  question was coming directly from an elected
20  official, I would contact Scott Osiecki as well.
21  He's the executive director or CEO, I'm not entirely
22  sure of his title, of the ADAMHS board.
23    Q   How much of the 39 million dollars that
24  Cuyahoga County pays to the ADAMHS Board each year
25  goes to treating people with mental illness and no

Veritext Legal Solutions

www.veritext.com                                        888-391-3376

1 addiction issues?

2   A  I can't answer that question.

3   Q  How much of the $39 million that Cuyahoga
4 County pays to the ADAMHS Board each year goes to
5 treating people who have addiction issues that do
6 not involve opioids?

7   A  I can't answer that question.

8   Q  How many people each year does the ADAMHS
9 Board provide services to who are mentally ill, but
10 do not have an addiction problem?

11   A  I can't answer that question.

12   Q  How many people each year does the ADAMHS
13 Board provide services to who have addiction issues
14 that do not involve opioids?

15   A  I can't answer that question.

16   Q  What is the reason for the county council
17 each year giving $39 million to the ADAMHS Board?

18     MR. BADALA: Objection to form. Outside
19 the scope.

20   A  ADAMHS is the, the ADAMHS Board is the
21 overarching behavioral health entity in Cuyahoga
22 County. County council and the county executive
23 recognize that behavioral health, which includes
24 both addiction and mental health services, is in a
25 crisis right now and is an underfunded area.

1     So the county is committed to
2 providing funds to the ADAMHS Board so that people
3 who lack resources to seek treatment on their own
4 through insurance, through some other source can
5 actually get treatment.

6     When people, I think it is important
7 to keep in mind, I mean, you have been talking to
8 the county, so you understand what it is that we do,
9 but the county's mandate is largely to deal with the
10 end result of when people are in crisis.

11     So I'm looking at the justice center
12 behind you, our mandate is the jail, our mandate is
13 children in foster care. The county is trying with
14 limited resources recognizing that we have been
15 overwhelms increasing cost of this epidemic to
16 provide funding on the front end in the hopes of
17 bringing down not only the cost of our mandated
18 service, but improving quality of life.

19     So when people don't get the mental
20 health services they need, they might end up in the
21 homeless systems, when they don't get addiction
22 services they need, they end up in our jail. And we
23 end up having, I mean, we end up having to care for
24 them anyway one way or another. Worse case scenario
25 they end up in the medical examiner's office when

1 they overdose.

2   Q  (Mr. Keyes) You said for the last several
3 years Cuyahoga County has given $39 million each
4 year to the ADAMHS Board, correct?

5   A  That's correct.

6   Q  Was that at the county executive's
7 recommendation?

8   A  So the county adopts a biannual budget.
9 In 2017 the executive recommended 39 million for
10 2018 and 2019.

11     In 2015 we were faced with
12 significant shortfalls in both our general fund and
13 our HHS levy fund, which is supported by two voted
14 levies, and that is how we fund the ADAMHS Board.
15 We had a shortfalls because our costs were
16 increasing largely related to prescription opiates.
17 But the county executive in 2015 did recommend to
18 cut the subsidy ADAMHS by approximately $6 million.
19 It was a little bit more than 6 million. That is
20 what was in the recommended budget.

21     And then when we went through the
22 budget hearings, the ADAMHS Board came, they
23 presented to council, they had a compelling
24 presentation and the council restored their subsidy.
25 So they were not cut. But that year it was not

1 recommended by the executive, or I should say for
2 those years.

3   Q  Okay. So for 2018 and 2019, the executive
4 recommended $39 million, correct?

5   A  Yes, that's correct.

6   Q  And what was the county's recommendation
7 for 2016 and 2017?

8   A  Do you mean the executive's recommendation
9 or the council.

10   Q  What was the county executive's
11 recommendation for 2016 and 2017?

12   A  It was approximately 33 or 32 million and
13 change, because the cut was a little bit more than
14 6 million.

15   Q  And not withstanding the county
16 executive's recommendation after presentation by the
17 ADAMHS Board, the county council decided to keep the
18 funding at $39 million for 2016 and 2017, correct?

19   A  Yes, we cut other entities to make up for
20 the 6 million.

21   Q  What was the county executive's
22 recommendation for ADAMHS funding for 2014 and 2015?

23   A  Um, I believe it was no cut. That would
24 have been Executive Fitzgerald.

25   Q  When you say no cut, the county executive

11 (Pages 38 - 41)

Page 42

1  recommended $39 million for 2014 and 2015?
2      A   That's correct.
3      Q   And did the county council accept that
4  recommendation and fund it $39 million per year
5  level for 2014 and 2015?
6      A   That's correct.
7      Q   What is the county executive's
8  recommendation for 2012 and 2013?
9      A   I can't remember.
10     Q   Would that be reflected in the county
11 executive's recommended budget?
12     A   It would be.
13     Q   You said you don't remember what the
14 county executive recommended for 2012 and 2013, what
15 was actually appropriated by the county council for
16 those two years?
17     A   That would be identified in the county's
18 budget plan, which I know we have turned over.  I
19 don't recall, it would have been close to 39 million
20 because prior to the 39 million, I believe they were
21 receiving like 40 million or 41.  So we might have
22 cut them slightly, but it wasn't as significant as
23 when we had to ask them for six.
24     Q   Earlier you said that for the last several
25 years the county has given $39 million per year to

Page 43

1  the ADAMHS Board, but before that, it was in the 40s
2  if I understood you correctly.
3          So when was the funding level for the
4  ADAMHS Board in the 40s?
5      A   I can't recall the specific year.  It
6  would be in the documents that we have provided.
7      Q   You said you also reached out to the
8  sheriff's office to prepare for today's deposition?
9      A   That's correct.
10     Q   Why?
11     A   Um, the sheriff's office has been hit very
12 hard as a result of this opiate epidemic and their,
13 the sheriff is our largest in terms of dollars
14 entity in the general fund.  So they are a bit of a
15 beast in the terms of their budget.
16          I wanted to confirm again that my
17 understanding relative to their sources of revenue,
18 which they have very few actually, and their
19 expenditures was accurate.
20     Q   And you spoke with Donna Kaleal, the
21 business manager for the sheriff's office?
22     A   That's correct.
23     Q   What did you learn from Miss Kaleal about
24 the sources of revenue for the sheriff's office?
25     A   I didn't learn anything I didn't already

Page 44

1  know.
2      Q   So did she confirm your understanding?
3      A   That's correct.
4      Q   And what is your understanding then that
5  she confirmed regarding the sources of revenue for
6  the sheriff's office?
7      A   The sheriff's office is supported by a
8  handful of revenue sources, the largest of which is
9  the county's general fund.  General fund derives
10 revenue from county sales tax, property tax revenue,
11 charges for services.  We get some reimbursements
12 from the State of Ohio, investment income and then
13 some miscellaneous income.
14          So all of that combined goes into the
15 general fund and then the sheriff's office is a
16 general fund entity.
17     Q   What percentage of the sheriff's --
18         MR. BADALA:  Were you done sorry?
19     Q   (Mr. Keyes) -- comes from the general?
20         MR. BADALA:  I don't think she was done
21 with her previous answer.
22     A   I'm not, but I can work that all in.  So
23 the sheriff's budget is largely 85 percent general
24 fund.
25          They also receive approximately two

Page 45

1  to two and a half million dollars from the county's
2  two voted levies.  We have two levies for Health and
3  Human Services.  One is a 3.9 mil, the other is a
4  4.8 mil.  We allocate approximately two and a half
5  million dollars to the sheriff's office, which
6  covers the cost of some of the mental health care in
7  the county jail.  So that's nurses, medical
8  expenses.
9          The sheriff's office also receives
10 revenue from what we call internal service fund,
11 which means they charge other entities for their
12 services and that's for the cost of protection and
13 security for county owned and operated buildings.
14 So these are the security guards.  They operate
15 under the authority of the county sheriff, and that
16 is approximately $10 million a year.
17          And then they have some other nominal
18 sources of revenue.  We collect fees from
19 individuals who are on home detention if they have
20 the ability to pay.  We collect fees for conceal
21 carry applications and licenses, but those are less
22 than 1 percent of their budget.
23     Q   (Mr. Keyes) You said that the sheriff's
24 office gets to two and two and a half million dollar
25 two vote levies.  How does that translate into a

12 (Pages 42 - 45)

Page 46

1 percentage of the budget?
2    A    Maybe three, well, 3 percent.
3    Q    And you said that the sheriff's office
4 receives about $10 million from the internal
5 services fund?
6    A    10 to $11 million that's correct.
7    Q    How does that translate into percentage of
8 the sheriff's office budget?
9    A    That's approximately 10 percent of their
10 budget.
11    Q    So you say roughly 85 percent of the
12 sheriff's budget comes from the general fund, about
13 10 percent comes from the internal services fund,
14 about 3 percent from the two voted levies and the
15 remainders from these nominal fees?
16    A    That's correct.
17    Q    And what did you learn from Miss Kaleal
18 about the sheriff's offices expenditures?
19    A    I didn't learn anything that I didn't
20 already know.
21    Q    Did Miss Kaleal confirm your understanding
22 of the expenditures?
23    A    That's correct.
24    Q    What understanding did she confirm?
25    A    So the sheriff's office has primarily four

Page 47

1 divisions. One of which is the law enforcement
2 division, so that's our deputy sheriff's. The other
3 is the jail and the jail is the largest division
4 within the sheriff's office.
5        So when confirming what expenses
6 might have been attributed to the opiate epidemic,
7 we are largely looking at the jail, and the deputies
8 law enforcement division.
9        You said sheriff's office has four
10 divisions. Are you saying two divisions that did
11 not incur expenditures because of the opioid
12 problem?
13    A    The Protective Services Division is one of
14 them. And then what we would call operations, which
15 is effectively the sheriff himself and the cost of
16 their building.
17    Q    And so is it the county's position that
18 the proactive services and operation divisions did
19 not incur expenditures because of the opioid
20 problem?
21    A    So if you look at the county's response to
22 the Interrogatory Number 2, or 18, I'm sorry.
23 Exhibit 2 details what budgets have been affected by
24 the opiate epidemic. And the county has identified
25 the jail and the sheriff where it says sheriff only

Page 48

1 in parentheses, that is the law enforcement
2 division.
3    Q    So in that chart where it refers to jail,
4 that's referring to the jail division of the
5 sheriff's office?
6    A    That is correct.
7    Q    And where it refers in that chart to
8 sheriff only, that's referring to the law
9 enforcement division of the sheriff's office?
10    A    That is correct.
11    Q    Is there any listing in that chart for the
12 protective services or operations division of the
13 sheriff's office?
14    A    No, there's not.
15    Q    And did you speak with Miss Kaleal about
16 your understanding about how the law enforcement or
17 jail divisions of the sheriff's office have incurred
18 expenses because of the opioid problem?
19    A    The jail division, yes.
20    Q    Did you speak with her about the law
21 enforcement division incurring expenses because of
22 the opioid problem?
23    A    No, I did not.
24    Q    Did you have an understanding about
25 whether or how the law enforcement division of the

Page 49

1 sheriff's office has incurred expenses because of
2 the opioid problem?
3        MR. BADALA:  Objection to form.
4    A    Um, the law enforcement division is, those
5 are our deputies. Those are the ones who deal with
6 criminal investigations, criminal, so they do
7 investigations that's our civil, they have a civil
8 division as well.
9        How these specific numbers were
10 derived is not something that the county does. This
11 is not something that the county came up with. I do
12 not have a specific understanding of what costs in
13 the law enforcement division are specifically a
14 attributable to the opiate epidemic, no.
15    Q    (Mr. Keyes) I'm not asking about the
16 chart, I'm asking about your understanding. Do you
17 have an understanding as to how the law enforcement
18 division of the sheriff's office has incurred
19 expenses because of the opioid problem?
20    A    My understanding is that they have
21 incurred expenses, yes. But I do not have the
22 detail on what those expenses are.
23    Q    Okay. Even if you don't have the detail,
24 can you identify for me the categories of expenses
25 that have been incurred by the law enforcement

13 (Pages 46 - 49)

Page 50

1 division because of the opioid problem?
2   A   The category would be personnel expenses,
3 law enforcement is that division is 99 percent
4 personnel costs. So the cost of the deputies, their
5 salary, their benefits, the overtime.
6   Q   What do these deputies do. You said they
7 were involved in investigations?
8   A   Yes.
9   Q   What else do they do?
10   A   Um, I can't tell you exactly what the job
11 responsibilities of the deputies are.
12   Q   Even if you can't tell me exactly, can you
13 tell me generally what the deputies do besides being
14 involved in investigations?
15   A   No.
16   Q   What is the role of the deputies in these
17 investigations?
18   A   I can't answer that question.
19   Q   Are these criminal investigations?
20   A   I can't answer that question.
21   Q   Are these investigations into whether
22 people have committed crimes?
23       MR. BADALA: Objection, outside the scope.
24   A   I'm sorry, I can't answer that question.
25   Q   (Mr. Keyes) Okay. So your understanding

Page 51

1 is that the law enforcement division of the
2 sheriff's office has incurred expenses because of
3 the opioid problem, correct?
4   A   That is my understanding.
5   Q   That the law enforcement division is
6 essentially the personnel of the sheriff's office;
7 correct?
8   A   Well, they're not just the personnel of
9 the sheriff's office, but their budget is personnel,
10 that's correct.
11   Q   And that this is the cost of the
12 personnel, the deputies?
13   A   That's correct.
14   Q   And you know that the deputies are
15 involved in investigations?
16   A   Yes.
17   Q   But you don't know anything about the
18 investigations, correct?
19   A   That's correct.
20   Q   And you don't know what the deputies do
21 besides they're somehow involved in investigations,
22 correct?
23   A   That's correct.
24   Q   Okay. And then do you have an
25 understanding as to how or whether the jail division

Page 52

1 of the sheriff's office incurs expenses because of
2 the opioid problem?
3   A   Yes, I do. And actually, if I can just,
4 one of the responsibilities of the deputies that I
5 do know is transporting prisoners.
6       So by law, when prisoners have to be
7 transported, it has to be a deputy, has actually to
8 be two deputies, it can't be a corrections officer.
9 So I do know that there have been costs incurred
10 because of the prisoners in the jail when we have to
11 take them to outside medical facilities to get their
12 treatment, that will be deputies, not correction
13 officers.
14       So we have seen an increase in
15 overtime expenses attributed to the deputies.
16   Q   You said the deputies are involved in
17 transporting prisoners. Are these prisoners who
18 have been convicted of a crime?
19       MR. BADALA: Objection to form, outside
20 the scope.
21   A   They are not prisoners who have been
22 convicted of a crime.
23       So the county jail houses prisoners
24 who are both pre and post-adjudication. Majority of
25 our prisoners are pre-adjudication. They have not

Page 53

1 been convicted of a crime.
2       We do have some prisoners who are
3 sentenced to the county jail through what's called a
4 local incarceration program, but the majority of
5 them, I believe, approximately 80 to 85 percent,
6 have not been convicted of any crime.
7   Q   (Mr. Keyes) Have the other 15 to
8 20 percent been convicted of a crime?
9       MR. BADALA: Objection to form, outside
10 the scope.
11   A   The other 15 percent have been convicted
12 of a crime and they are either serving a sentence in
13 our county jail, or they're awaiting transport to a
14 prison.
15       So they don't always move to the
16 prison the day that they're found guilty.
17   Q   (Mr. Keyes) And the other 80 to
18 85 percent of prisoners who are being transported
19 are people who have been accused of a crime and are
20 awaiting trial?
21       MR. BADALA: Objection to form, outside
22 the scope.
23   A   That is correct.
24   Q   (Mr. Keyes) Okay. So you, you mentioned
25 that the deputies in the law enforcement division of

14 (Pages 50 - 53)

Page 54

1 the sheriff's office not only are involved in
2 investigations, they are involved in transporting
3 prisoners, correct?
4    A   They are, yeah.
5    Q   With respect to transporting prisoners,
6 those prisoners are of two types, correct? They are
7 either, you quantify them as 15 to 20 percent of the
8 prisoners. Those are people who have been convicted
9 of a crime and are either serving a sentence or
10 awaiting transfer to some other facility where they
11 will serve their sentence, correct?
12    A   That's correct.
13    Q   And the 80 to 85 percent of these
14 prisoners who are being transported by deputies are
15 people who have been accused of a crime and are
16 being held as they wait for their trial, correct?
17    A   That is correct.
18    Q   And what percentage of these prisoners are
19 either accused of or convicted of a drug crime?
20        MR. BADALA: Objection to form.
21    A   What topic are we talking about? I'm just
22 unclear.
23    Q   (Mr. Keyes) We are talking about damages.
24    A   Correct.
25    Q   You referred me to this chart.

Page 55

1    A   Okay.
2    Q   And you said this chart shows the damages.
3 And you said that the line item sheriff only is for
4 this law enforcement division and I'm asking what do
5 the people do in the law enforcement division?
6    A   Okay.
7    Q   So we are still on topic 11.
8    A   Okay.
9    Q   Which is damages.
10       So what percentage of these prisoners
11 who are being transported by sheriff's deputies you
12 are either accused of or convicted of a drug crime?
13    A   I don't have that data.
14    Q   What percentage of these prisoners are
15 either accused of or convicted of a crime involving
16 opiates?
17    A   I don't have that data.
18    Q   What percentage of these prisoners are
19 either accused of or convicted of a crime based on
20 their use, misuse or abuse of a prescription opioid?
21       MR. BADALA: Objection to form.
22    A   I don't have that data.
23    Q   (Mr. Keyes) Okay. Turning your attention
24 then to the jail division of the sheriff's office.
25 What expenses have been incurred by the jail

Page 56

1 division because of the opioid problem?
2    A   So the jail budget is largely comprised,
3 the overwhelming of the expenses are personnel, of
4 course. So, again, that's salaries, wages
5 associated with corrections officers, medical
6 personnel, cooks, some other personnel.
7        And then we have the fixed cost of
8 the facility itself. Medical expenses, which
9 include both the cost of providing health care,
10 inside the jail we have an outfitted clinic. We
11 contract with the Metro Health System to provide
12 physicians and other medical services in the jail.
13 So that's included in their medical line item, as
14 well as the cost of what we refer to as outside
15 medical, which is when we have to take a prisoner.
16       If there is some medical issue that's
17 presenting that we cannot handle in the clinic or it
18 is an emergency, we have to take them to the nearest
19 hospital.
20       That the cost of that outside medical
21 care is captured in the jail budget as well.
22    Q   So you have described for me what is in
23 the budget of the jail division of the sheriff's
24 office, correct?
25    A   That's correct.

Page 57

1    Q   And so these are the costs incurred by
2 Cuyahoga County in running the jail?
3    A   That's correct. They are also the costs
4 incurred by Cuyahoga County as a result of the
5 opiate epidemic because A, the number of people in
6 our jail has increased, and also the medical
7 expenses. The number of inmates presenting to the
8 county jail who are opiate addicted has increased
9 dramatically over the last several years.
10       So that presents a number of issues
11 medically that the county by law is required to deal
12 with. But also for a period of time these inmates
13 were receiving medically assisted treatment. I
14 forget specifically the name of the medicine that
15 they had to be given, but the county was not
16 equipped to do that in the jail.
17       So we were transporting opiate
18 addicted inmates every day to get their treatment
19 and that was extremely expensive.
20    Q   Ma'am, I asked you with respect to, listen
21 to the question and answer the question because you
22 are giving me speeches. Now my question was --
23       MR. BADALA: She has answered your
24 question.
25    Q   (Mr. Keyes) These costs occurred by

15 (Pages 54 - 57)

Page 58

1 Cuyahoga County in running the jail, yes or no,
2 correct. You said that's correct and then you
3 launched into a long answer. We are on the clock
4 here. So with respect, I ask you to listen to the
5 question and answer the question.
6     MR. BADALA: Which she's doing.
7     Q    (Mr. Keyes) You have already described
8 the prisoners who are in this jail these two type of
9 prisoners, correct?
10    A    That's correct.
11    Q    So these are prisoners who by definition
12 are either who have been convicted of a crime and
13 serving a sentence, or have been convicted of a
14 crime and are awaiting transfer to another facility
15 where they can serve out their sentence, or they
16 have been accused of a crime and are a waiting
17 trial, correct?
18    A    That's correct.
19    Q    And so the prisoners who are at this jail
20 fall into one of those three categories?
21    A    That's correct.
22    Q    And there is no fourth category?
23    A    That's correct.
24    Q    Okay. Now, you said that the number of
25 people in the jail has increased because of the

Page 59

1 opioid problem?
2     A    That's correct.
3     Q    When did the opioid problem cause the
4 number of the people in the jail to increase?
5     MR. BADALA: Objection to form, outside
6 the scope.
7     A    Um, I can't. So the county I know saw
8 that the opiate epidemic was affecting our systems
9 and our budget in 2016.
10    After that time, once we became aware
11 of the issue and the county was connecting the dots,
12 we had traced that impact of this epidemic on our
13 systems and our budget to at least 2006, perhaps
14 earlier. I cannot give you a specific date as to
15 when the number of prisoners increased specific to
16 the opiate epidemic, but I can say that ADP, so the
17 average daily population, the ADP has increased and
18 the number of opiate addicted inmates has increased.
19    Q    (Mr. Keyes) What is the percentage
20 increase in prisoners at the jail who are there
21 because they've been accused of or convicted of a
22 drug crime?
23    MR. BADALA: Objection to form.
24    A    As I indicated earlier, I don't have that
25 data.

Page 60

1     Q    (Mr. Keyes) What is the percentage of
2 increase in prisoners at the jail who are they
3 because they've been accused of or were convicted of
4 a crime involving illicit opioids?
5     A    I don't have that data.
6     Q    What is the percentage increase in
7 prisoners at the jail who are there because they've
8 been accused of were convicted of a crime involving
9 their use or misuse or abuse of prescription
10 opioids?
11    MR. BADALA: Objection to form.
12    A    I don't have that data.
13    Q    (Mr. Keyes) You also said that the costs
14 of providing medical care to prisoners at the jail
15 has increased over time?
16    A    That is correct.
17    Q    When did those costs increase because of
18 the opioid problem?
19    MR. BADALA: Objection to form.
20    A    The county, as I mentioned, the county has
21 identified an impact on our budget going back to
22 2006. That is what is in Exhibit 2. It could have
23 gone back further. We have seen that this has
24 affected our systems and our budget going back to
25 2006, including the jail.

Page 61

1     Q    (Mr. Keyes) What is the percentage
2 increase in the prisoners and jail who are getting
3 medical care because they have an opioid use
4 disorder or an addiction to opioids?
5     MR. BADALA: Objection to form.
6     A    I don't have that data, the jail does.
7     Q    (Mr. Keyes) What is the percentage
8 increase in the prisoners at the jail who are
9 getting medical care because they have an opioid use
10 disorder or addiction to opioids arising from their
11 use only of prescription opioids?
12    MR. BADALA: Again --
13    A    I don't have that data.
14    Q    (Mr. Keyes) To answer these questions
15 about the population in the jail the circumstances
16 of the prisoners at the jail, where would you go for
17 that information?
18    A    To answer a question like the crimes that
19 they have been accused of?
20    Q    The crimes they have been accused of?
21    A    Convicted of.
22    Q    The reason they're in jail, whether they
23 have medical issue, whether their medical issue is
24 attributable to opioids, whether their medical issue
25 is attributable to their use, misuse or abuse of

16 (Pages 58 - 61)

Page 62

1 prescription opioids.
2      MR. BADALA: Objection to form.
3      Q    (Mr. Keyes) Any of those questions, where
4 would you go?
5      MR. BADALA: Same objection.
6      A   I have to go to a number of sources to
7 determine why the people are in the jail. So the
8 charges that have been filed against them would be a
9 question for the court.
10        The jail does have access to the
11 court system. As to what they're medical conditions
12 are, the reason for their medical condition, that
13 would be a question for the Metro Health facility.
14      Q    (Mr. Keyes) Are those questions you have
15 asked of anyone before today?
16      A   I have not asked what percentage of people
17 are in the jail because of specific crimes. I do
18 care, for reporting service I do check in relatively
19 routinely on the number of people that are
20 pre-adjudication, post-adjudication. Theoretically
21 we would like the number to be mostly
22 pre-adjudication.
23        But for the medical cost, I do ask as
24 well because it informs not only, you know, why our
25 projections are what they are in terms of what

Page 63

1 they're spending, but helps us make a determination
2 of whether this is going to continue.
3        But my job largely is to manage the
4 budget in a sense we do monitor, we do cost
5 projections, but part of my job is to do forecasting
6 to inform the elected officials here is where we are
7 going to stand at the end of the year. Here is what
8 you are going to have for next year. Here is what
9 you are going to have four years from now.
10        So included in that is to try to
11 understand what are our costs and why are they
12 higher in the jail, how come the deputies are
13 working so much overtime, is this going to last
14 forever.
15        So I do ask those questions, but not
16 really to the level of detail that you are asking me
17 today.
18      Q    As far as you know, has anyone undertaken
19 to answer those questions?
20      A   Um, I believe that the county attorneys
21 are looking into that and working with experts to
22 answer those questions.
23      Q    Separate from the county's attorneys in
24 this lawsuit working with experts in this lawsuit,
25 has anyone at the county ever otherwise undertaken

Page 64

1 to answer any of those questions?
2      MR. BADALA: Objection to form.
3      Q    (Mr. Keyes) To identify costs that are
4 specific to opioids or specific to the use, abuse or
5 misuse or prescription opioids?
6      MR. BADALA: Objection to form.
7      A   No, that's not the county's business.
8 That's not what we do on a day-to-day basis. So,
9 no, we have not done that.
10      MR. BADALA: Sorry, just before you start
11 we have gone over an hour now. Do you need a break?
12      MR. KEYES: We can take a break in a
13 moment, but let me just follow up on a question or
14 something you said before about preparing forecasts
15 for the county executive and the county council?
16      A   Uh-huh.
17      Q    (Mr. Keyes) How often do you prepare
18 these forecasts?
19      A   We prepare and publish forecasts on a
20 quarterly basis. So those are formal because we
21 produce books.
22        More informally we prepare forecasts
23 on a monthly basis and then we will also prepare
24 them as needed if an elected official, a director,
25 anybody comes to me and says, hey, look at this.

Page 65

1 You know, we can do it on demand, but the
2 analysts are looking at it more informally on a
3 monthly basis and then formally we do very extensive
4 review.
5      Q    Have any of the forecasts that you have
6 prepared to date looked at the projected future
7 costs to be incurred by Cuyahoga County because of
8 the opioid problem or epidemic?
9      MR. BADALA: Objection to form.
10      A   Yes. So we do take into consideration the
11 impact that this epidemic has had on Cuyahoga County
12 and we have extrapolated that out to future years.
13        For example, the number of children
14 in foster care has increased quite significantly
15 over the last several years.
16        We are not assuming that we've
17 plateaued. So we are not assuming that we are going
18 to go down again. So our forecasts assumes we are
19 going to spend slightly more than we have been
20 spending over the last several years because we
21 think we are going to keep rising.
22        Similarly the medical examiner, they
23 have pathologists on staff, we have forecasted in
24 previous years that we're going to have to add a
25 pathologist because the number of autopsies has kept

17 (Pages 62 - 65)

Page 66

1 rising. And according to the medical examiner's
2 data, it is directly attributed to the opioid
3 epidemic. And we have since hired a new
4 pathologist. So two years ago we were assuming we
5 were going to probably have to do that, it is
6 included in our forecasts, yes.
7    MR. BADALA: Just before we go again, do
8 you need a break? We have been going over an hour.
9    A  I would like a break.
10    MR. BADALA: So we can go off the record.
11    THE VIDEOGRAPHER: It is 10:28 time, we
12 are going off 10:22, going off the record.
13        (Recess)
14    THE VIDEOGRAPHER: It is 10:39. We are
15 back on the record.
16    MR. BOEHM: I wasn't in the room when we
17 started the deposition, I am just noting my
18 presence. Paul Boehm from Williams and Connolly for
19 Cardinal.
20    Q  (Mr. Keyes) Miss Keenan, did you reach
21 out to any other agencies besides the ADAMHS Board
22 and sheriff's office to prepare for your testimony
23 today?
24    A  No.
25    Q  Did you review any deposition transcripts

Page 67

1 to prepare for today's deposition testimony?
2    A  No, I did not.
3    Q  Did you read your own transcript of your
4 testimony from last month?
5    A  No, I did not.
6    Q  Separate from preparing for today's
7 deposition, have you read that transcript?
8    A  No.
9    Q  Did you you read the transcript of anyone
10 else's testimony in this case?
11    A  No.
12    Q  Did you review any other documents besides
13 the budget documents you previously described?
14    A  To prepare for this deposition?
15    Q  Yes.
16    A  No.
17    Q  Did you speak with anyone else besides the
18 people you have already identified to prepare for
19 today's deposition?
20    A  No.
21    Q  Did you take any notes as you prepared for
22 today's deposition, either as you met with the
23 lawyers, as you spoke with budget analysts or people
24 from certain agencies, or as you reviewed documents?
25    A  No.

Page 68

1        (Deposition Exhibit Number 2
2        marked for identification.)
3    Q  (Mr. Keyes) I'm going to ask you to pass
4 that binder. We will mark that as Exhibit 2.
5        Prior to the break you were
6 describing forecasts that you prepare either on a
7 quarterly or monthly basis for the county executive
8 and the county council, correct?
9    A  Yes.
10    Q  Do any of those forecasts specifically
11 discuss the expenses that you anticipate Cuyahoga
12 County will incur in the future because of the
13 opioid problem?
14    A  Um, documents that go along with the
15 forecasts discuss categories of expenses that are
16 related to the opiate epidemic, but as I've said
17 before, the county is not in the position to
18 identify, you know, what specific costs can be
19 attributed to prescription opiates, so no.
20        But we do discuss environmental
21 factors and that's one of them that would be
22 included.
23    Q  You referenced the opioid epidemic a
24 number of times. When did the opioid epidemic start
25 in Cuyahoga County?

Page 69

1        MR. BADALA: Objection to form, outside
2 the scope.
3    A  The county has identified an impact on its
4 systems and budgets going back to 2006, could be
5 further. The county is not in the position to
6 identify a date of when the epidemic started.
7    Q  (Mr. Keyes) So the opioid epidemic
8 started at least by 2006?
9        MR. BADALA: Objection to form,
10 mischaracterizes the testimony.
11    A  The county recognized that the opiate
12 epidemic had an impact on the systems and budgets
13 beginning at least in 2006, yes.
14    Q  (Mr. Keyes) What was the peak of the
15 opioid epidemic in Cuyahoga County?
16    A  The county is not saying that we've
17 reached the peak, we don't know.
18    Q  What has the peak been between 2006 and
19 present?
20        MR. BADALA: Objection to form, outside
21 the scope.
22    A  I don't have that data. I think the peak,
23 first of all, how is that defined. Is it defined by
24 the number of deaths, is it defined by the number of
25 children we take from their parents who are ill

18 (Pages 66 - 69)

Page 70

1 equipped to care for them. Is it defined by the
2 number of opiate addicted inmates we have. I don't
3 understand the question.
4        So I can't answer the question
5 because I don't know which data source you are
6 referring to.
7    Q    (Mr. Keyes) Were there more deaths from
8 overdoses on opioids in 2017 or 2016?
9        MR. BADALA: Objection to form, outside
10 the scope.
11    A    I don't have that data memorized, so I
12 don't know.
13    Q    (Mr. Keyes) Were there more deaths from
14 overdose on opioids in 2016 or 2015?
15       MR. BADALA: Objection, outside the scope.
16    A    Again, I didn't review deaths. My topics
17 are specific to county revenue and expenses of the
18 county org chart. So I did not review autopsy data.
19    Q    (Mr. Keyes) Were there more overdoses on
20 opioids in 2017 or 2016?
21       MR. BADALA: Objection, outside the scope.
22    A    I believe you asked me that, I don't know
23 the answer.
24    Q    (Mr. Keyes) I asked before about deaths,
25 now I'm asking about overdoses. Overdoses don't

Page 71

1 necessarily lead to death, correct?
2    A    Yes, I understand that.
3    Q    My question was, were there more overdoses
4 on opioids in 2017 or 2016?
5       MR. BADALA: Objection, outside the scope,
6 which topic?
7    A    Again, I didn't review that. That's not
8 one of my topics.
9    Q    (Mr. Keyes) Were there more overdoses on
10 opioids in 2016 or 2015?
11       MR. BADALA: Objection, outside the scope.
12 Which topic are we on?
13       MR. KEYES: We are still on damages,
14 right. We are trying to understand what damages the
15 county is claiming resulted from the opioid problem.
16 She has identified the opioid problem as an opioid
17 epidemic. So I'm trying to understand from the
18 county's perspective what was the course of the
19 opioid epidemic. You said it started in 2006 or
20 earlier and you weren't able to identify the peak
21 because you didn't know what criteria. Now I'm
22 going through some potential criteria to identify
23 what the peak of this opioid epidemic has been in
24 Cuyahoga County. If you don't know, you don't know.
25       So you don't know how the number of

Page 72

1 overdoses compares from year to year, correct?
2       MR. BADALA: Objection, outside the scope.
3    A    Not without seeing the data, no.
4    Q    (Mr. Keyes) You don't know how the number
5 of deaths from overdoses compares from year to year?
6       MR. BADALA: Same objection.
7    A    I need to see the data.
8    Q    (Mr. Keyes) Do you know how 2018 compares
9 to prior years, either in terms of the number of
10 projected overdoses or the number of projected
11 deaths from overdose?
12       MR. BADALA: Again, objection, outside the
13 scope.
14    A    It is my understanding that the number of
15 projected deaths based on the data available to us
16 at the time indicates that the 2018 number is less
17 than the previous year, 2017.
18    Q    (Mr. Keyes) What is your basis for saying
19 that?
20    A    That has been reported.
21    Q    By whom or what?
22    A    By the county. So the medical examiner
23 has provided data and the county reported that
24 publically.
25    Q    You are aware of the reports that the

Page 73

1 medical examiner's office periodically issues with
2 projected overdoses and projected deaths from
3 overdoses, correct?
4       MR. BADALA: Objection, outside the scope.
5    A    That's correct.
6    Q    (Mr. Keyes) And so are you referring to
7 that medical examiner's recent report projecting
8 that the number of overdoses and deaths from
9 overdoses from opioids will be lower in 2018 than it
10 was in 2017?
11    A    I'm not specifically referring to that
12 report. I'm referring to statements that the county
13 has made and there have been, there was an article
14 in the newspaper because the county made a public
15 statement.
16       I know that the medical examiner
17 informed the county's public statements, but I have
18 not seen, um, the reports that you are talking
19 about.
20    Q    Has the county experienced the heroin
21 epidemic?
22       MR. BADALA: Objection to form.
23    A    The county has experienced a heroin
24 epidemic that it believes coincides with and is the
25 result of the prescription opiate epidemic, yes.

19 (Pages 70 - 73)

Page 74

1　Q　(Mr. Keyes) Okay. So it is the county's
2　position that the heroin epidemic begin as early as
3　2006?
4　　　MR. BADALA: Objection to form,
5　mischaracterizes testimony, also outside the scope.
6　A　The county's position is that the
7　prescription opiate epidemic occurred at least going
8　back as far as 2006. The county's position is that
9　heroin abuse is the result of prescription opiates.
10　Q　(Mr. Keyes) So is it the county's
11　position that the heroin epidemic began as early as
12　2006, heroin epidemic?
13　　　MR. BADALA: Objection to form, same
14　objection.
15　A　The county's position is that the opiate
16　epidemic started in 2006. The county does not have
17　a position on specifically when the heroin epidemic
18　started. We recognize that they are all part of the
19　same problem.
20　Q　(Mr. Keyes) The county does not have a
21　position as to when the heroin epidemic started, did
22　I hear you correctly?
23　A　The county has a position when the opiate
24　epidemic started.
25　Q　I understand, but my question is about the

Page 75

1　heroin epidemic. Am I hearing you correctly that
2　the Cuyahoga County does not have a position as to
3　when the heroin epidemic started?
4　　　MR. BADALA: Objection to form, outside
5　the scope.
6　A　The county recognizes that they are one in
7　the same. So the answer is 2006.
8　Q　(Mr. Keyes) Okay. What was the peak of
9　the heroin epidemic?
10　　　MR. BADALA: Objection to form, outside
11　the scope.
12　A　The county doesn't know that we have
13　reached the peak.
14　Q　(Mr. Keyes) Has the medical examiner's
15　office recently issued projections showing that the
16　number of overdoses and the number of deaths from
17　heroin is projected to be lower in 2018 than it was
18　in 2017?
19　　　MR. BADALA: Objection, outside the scope.
20　A　I haven't seen the medical examiner's
21　report, so I can't say definitively that the number
22　of deaths related specific to heroin, prescription
23　opiates are down.
24　　　I do know as I indicated earlier that
25　the number of overdose deaths related to opiates are

Page 76

1　down.
2　　　I can't pinpoint for you specifically
3　which drugs.
4　Q　(Mr. Keyes) Has Cuyahoga County
5　experienced a Fentanyl epidemic?
6　　　MR. BADALA: Objection, outside the scope.
7　A　The county includes Fentanyl in its
8　description of prescription opiates, yes.
9　Q　(Mr. Keyes) So has Cuyahoga County
10　experienced a Fentanyl epidemic?
11　　　MR. BADALA: Same objection.
12　A　Yes, because it recognizes that Fentanyl
13　is included in the prescription opiate epidemic.
14　Q　(Mr. Keyes) When did the Fentanyl
15　epidemic start?
16　　　MR. BADALA: Same objection.
17　A　I'm going to have to give the same answer,
18　that the county has identified 2006, if not earlier,
19　as the time when the opiate epidemic, which includes
20　Fentanyl, heroin, affected its systems and its
21　budget.
22　Q　(Mr. Keyes) Okay. Has Cuyahoga County
23　experienced the carfentanil epidemic?
24　　　MR. BADALA: Objection, outside the scope.
25　A　Carfentanil is included in the opiate

Page 77

1　epidemic.
2　Q　(Mr. Keyes) So if I understand you
3　correctly, Cuyahoga County does not distinguish
4　between opioids, heroin, Fentanyl or carfentanil
5　when it comes to the epidemic, correct?
6　　　MR. BADALA: Objection, outside the scope.
7　A　So to be clear, the county certainly does
8　make that distinction in like the medical examiner's
9　office. They do track all of those separately, but
10　when the county refers to the opiate epidemic that
11　is plaguing us, yes, it includes all of those.
12　Q　(Mr. Keyes) And you said that epidemic
13　started as early as 2006, perhaps before 2006,
14　correct?
15　A　That's correct.
16　Q　That at least as early 2006 that epidemic
17　had an impact on the county system then budgets,
18　correct?
19　A　That's correct.
20　Q　And that impact was a negative impact,
21　correct?
22　A　Yes.
23　Q　And that negative impact included causing
24　Cuyahoga County to spend money because of that
25　epidemic, correct?

Page 78

1   A   Absolutely.

2   Q   As early as 2006 and perhaps before?

3   A   Absolutely.

4         (Deposition Exhibit Number 3

5   marked for identification.)

6   Q   (Mr. Keyes) Showing you what has been

7   marked as Keenan 30 (b)(6) Exhibit Number 3.

8         This is Cuyahoga County's Second

9   Supplemental Responses to Defendants Interrogatory

10  Number 18.

11        Do you see that on the front page?

12  A   Yes.

13  Q   And this is identical to what is tab one

14  in the binder you brought to today's deposition,

15  which we marked as Exhibit 2, correct?

16  A   I'd have to review the document entirely

17  to see if it is identical.

18  Q   Well, it has the same title, correct?

19  A   Well, it does.

20  Q   Same number of pages?

21  A   I haven't gone through every number of

22  pages yet.

23  Q   Okay. Well, I will represent to you it is

24  the same and you can use either what has been marked

25  as Exhibit 3 or you can use what is included in tab

Page 79

1   one of your binder, but I ask you to turn to the

2   chart that you referenced earlier.

3   A   Exhibit 2.

4   Q   Yes.

5   A   Okay.

6   Q   So this is Exhibit 2 to Cuyahoga County's

7   Second Supplemental Responses to Interrogatory

8   Number 18, correct?

9   A   Yes.

10  Q   Which document we have marked in this

11  deposition as Exhibit 3, so the labeling is somewhat

12  confusing. But this is a chart prepared on behalf

13  of Cuyahoga County, correct, identifying its claimed

14  damages in this case, correct?

15  A   These are a portion of the claimed

16  damages, they are not an exhaustive list, but yes,

17  these are damages that the county is claiming.

18  Q   So we are on the same page, what damages

19  is Cuyahoga County claiming that are not reflected

20  in this chart?

21  A   So in this same document that you provided

22  to me, on page seven the county discusses its

23  damages that it is seeking in this case, which

24  reflects both past damages from at least 2006 to

25  present and ongoing damages for at least ten years.

Page 80

1         Investigation of both its past and

2   ongoing costs, expenditures, damages, loss or harms

3   caused by defendant is ongoing. County is seeking

4   past and ongoing lost tax revenue in the amount of

5   approximately 850 million. That's not reflected on

6   this chart that you've provided to me in Exhibit 2.

7         Treble damages or reasonable

8   attorney's fees, maximum amount of punitive damages,

9   again, not covered here. Recovery of costs imposed

10  on it by the defendants' conduct abatement.

11  Q   So you are reading from the list of

12  categories on page eight?

13  A   I am.

14  Q   Let's stick with the first category.

15        MR. BADALA: Were you done with your

16  answer? You asked the question. Were you done with

17  the answer?

18  A   Well --

19        MR. KEYES: I don't need you to read the

20  document out loud to me.

21  A   Okay.

22        MR. BADALA: Are you done with your

23  answer? Only if you are done.

24  A   Yeah, I'm done with my answer, but I want

25  to be clear.

Page 81

1         MR. KEYES: Okay.

2   A   That is not an exhaustive list of what the

3   county council is seeking.

4   Q   (Mr. Keyes) Let's stay with page seven.

5   A   Okay.

6   Q   Of Exhibit 3 which says, plaintiff also

7   seeks the following quote, "past and ongoing loss

8   tax revenue in the amount of approximately

9   $850 million."

10        Do you see that language?

11  A   I do.

12  Q   Did you calculate that figure?

13  A   No, I did not.

14  Q   Who did?

15  A   Um, this figure was calculated by, I

16  believe the county's attorneys were working with

17  experts to come up with this computation.

18  Q   What information did you provide to the

19  lawyers or the experts such that they could arrive

20  at this figure?

21  A   The documents that I provided are

22  identified in Exhibit 1 of this response to

23  Interrogatory Number 18. I can't really translate

24  what these bates number means, but they include the

25  county's annual financial statements, the county

21 (Pages 78 - 81)

Page 82

1 budget plans, the county recommended budget books
2 and some other financial reports.
3    Q    Which of those documents were used by the
4 attorneys or the experts to arrive at an
5 $850 million figure for quote, "past and ongoing
6 loss tax revenue"?
7    A    I can't answer that.  I wasn't part of the
8 calculation.
9    Q    Have you undertaken yourself to calculate
10 the tax revenue that Cuyahoga County lost because of
11 the opioid problem?
12    A    No, I have not.  That's beyond the scope
13 of what the county has done.
14    Q    Have you asked anyone else to do such a
15 calculation?
16    A    The county has asked its lawyers to do
17 that, but nobody else suffered from that.
18    Q    Have you asked anyone else to do such a
19 calculation?
20    A    No, I have not.
21    Q    To your knowledge, has anyone, besides the
22 county lawyer and experts in this case, undertaken
23 to calculate what tax revenue has been lost as a
24 result of the opioid problem?
25    A    Not to my knowledge, no.

Page 83

1    Q    This figure of 850 million is for past and
2 ongoing lost tax revenue.
3        Do you see that?
4    A    I do.
5    Q    How much of that 850 million is past lost
6 tax revenue?
7    A    I don't have that data.
8    Q    How much of that 850 million is ongoing
9 tax revenue that's lost?
10    A    I don't have that data either.
11    Q    What tax revenue is included in this
12 $850 million figure?
13    A    It is my understanding that this is
14 property tax revenue.
15    Q    Do you have an understanding of any other
16 types of tax revenue is included in this figure?
17    A    Not to my knowledge, no.
18    Q    How many properties in Cuyahoga County
19 generated property tax in the past, but are no
20 longer generating property tax?
21    A    I don't have have that data.
22    Q    Which properties in Cuyahoga County are no
23 longer generating property tax even though they did
24 in the past?
25    A    I don't have that data.

Page 84

1    Q    Who does have that data?
2    A    The county treasurer.
3    Q    What specific data does the county
4 treasurer have?
5    A    The county treasurer is responsible for,
6 they mail the tax bills and they collect the taxes.
7        So through their system, which the
8 acronym is MVP, and I'm sorry I don't know what that
9 stands for.  We can determine which properties are,
10 if that's what you're asking, which properties are
11 delinquent in paying their property taxes.
12    Q    No, I'm not asking about which properties
13 are delinquent --
14    A    I'm sorry.
15    Q    I'm asking which property generated
16 property tax revenue in the past, but are not
17 generating property tax revenue now, for any reason?
18    A    Um, I'm honestly, I cannot definitively
19 say they can query that in MVP.  I'm guessing they
20 can, but they would have to know the date, you know,
21 when you say they generated it in the past.  What
22 date are you referring to and then now.  I assume
23 you are talking about 2008.  We need to know the
24 dates, I'm sorry, but I'm not sure that MVP can,
25 that you can query saying show me every property.  I

Page 85

1 think you would have to look it up by parcel number,
2 which is how we identify properties in the county.
3    Q    Because each property has a unique parcel
4 numbers, correct?
5    A    They do, that's correct.
6    Q    So you could look for each period of time
7 for each parcel number what property tax had been
8 collected or not?
9    A    That's correct.
10        MR. BADALA:  Objection, outside the scope.
11    Q    (Mr. Keyes) You mentioned that one reason
12 why a property may not be generating property tax
13 revenue now, even though it did in the past, is
14 because the property owner is delinquent in making
15 payments, correct?
16    A    Yes.
17    Q    Are there other reasons why a property may
18 no longer be generating property tax for Cuyahoga
19 County, even though it did in the past?
20        MR. BADALA:  Objection, outside the scope.
21    A    Yes.
22    Q    (Mr. Keyes) What are those reasons?
23    A    The property could have received an
24 abatement, a tax abatement.  That's a tool that
25 cities use largely as an economic development tool.

22 (Pages 82 - 85)

Page 86

1      The property also could have gone
2  from taxable to not taxable as a result of
3  charitable status. For example, in the last couple
4  of years we have had properties owned by the
5  Cleveland Clinic that went from taxable to
6  nontaxable. So previously those properties would
7  have been generating property taxes, but if you look
8  today, they're not.
9     Q    Any other reasons you can identify?
10    A    Not off the top of my head, but I'm not
11 the county treasurer.
12    Q    And are there additional reasons why
13 properties that generated greater property tax in
14 the past are now generating less property tax?
15         MR. BADALA: Objection, outside the scope.
16    A    I don't believe I have provided any
17 reasons why they would be generating less property
18 tax.
19    Q    (Mr. Keyes) Right. You have given me
20 reasons so far why a property may have generated
21 property tax in the past.
22    A    Right.
23    Q    But is no longer generating property tax,
24 correct?
25    A    Right.

Page 87

1     Q    You have identified, I think, three
2  reasons, correct? You said number one, because the
3  property owner may be delinquent in paying, correct?
4     A    That's correct.
5     Q    A second reason is there may be abatement
6  where the county has made the decision to give the
7  property owner tax relief that excuses it from
8  paying property tax for some period of time?
9     A    Yes, but if I can just correct you, it is
10 not the county that makes that decision, it is the
11 cities.
12    Q    So the cities can do that?
13    A    That's correct.
14    Q    And the third reason you gave me is that a
15 decision could have been made to convert the
16 property status from taxable to nontaxable?
17    A    That's correct.
18    Q    Are there any other reasons you can
19 identify sitting here now why a property that
20 generated property tax in the past is no longer
21 generating property tax?
22    A    No, not to my knowledge.
23    Q    Okay. Then separate from a property going
24 from generating property tax to not generating
25 property tax, you could have properties that are

Page 88

1  generating less property tax now than they did in
2  the past, correct?
3         MR. BADALA: Objection to form, outside
4  the scope.
5     A    Yes, that is correct.
6     Q    (Mr. Keyes) And what are the reasons why
7  that could happen?
8     A    Um, it could be a result of the properties
9  value decreasing. So as an example, five years ago
10 a property had on it a large commercial building
11 that was profitable, profitability is part of the
12 calculation when you are calculating commercial
13 property taxes or property values. And now if the
14 property is dormant or the building has been
15 demolished or in is complete disrepair, the value of
16 the property likely will have gone down. Therefore,
17 the tax receipts are going to go down assuming that
18 the owner is still paying taxes.
19         Um, that's really the only reason I
20 can think of is that the value of the property has
21 decreased.
22    Q    And you have identified several reasons
23 why the assessed value for a particular property
24 could go down, correct?
25         MR. BADALA: Objection, outside the scope.

Page 89

1     Q    (Mr. Keyes) You said the property --
2     A    Yeah, yeah.
3     Q    The property could have been demolished?
4     A    That's correct.
5     Q    You said it could have be dormant?
6     A    That's correct.
7     Q    And for a commercial property, the
8  profitability of the property could go down?
9     A    You're right, that's correct.
10    Q    So those are multiple reasons why
11 particular properties could have a lower assessed
12 valuation than they did in the past?
13    A    Yes, that's correct.
14    Q    Are there also economic factors that can
15 cause the assessed valuation of properties for
16 entire areas to go down?
17         MR. BADALA: Objection, outside the scope.
18    A    That's correct.
19    Q    (Mr. Keyes) What are those reasons or
20 factors?
21    A    When the county does its appraisal, the
22 appraise values do have to fall in line with what
23 the State of Ohio would have. They identify kind of
24 the low and the high. What we come up with does
25 have to fall within here, otherwise, we have issues

23 (Pages 86 - 89)

Page 90

1  with the state.
2      And so the overall economic condition
3  of the county is taken into consideration. Now, I
4  cannot provide you more detail than that. I don't
5  do the appraisals, but certainly if the City of
6  Cleveland, you know, we lose our major businesses
7  that are headquartered here, we lose overall
8  economic activity, that's likely going to be
9  reflected in the value of our property, that's
10  correct.
11    Q    Did Cuyahoga County experience the great
12  recession?
13      MR. BADALA: Objection, outside the scope.
14    A    We did.
15    Q    (Mr. Keyes) When?
16    A    Um, we started experiencing, well, we
17  started to cut budgets beginning in 2008.
18    Q    And when did the great recession end in
19  Cuyahoga County?
20      MR. BADALA: Objection, outside the scope.
21    A    That's not a question, that's a question
22  for an economist, that's not a question I can
23  answer.
24    Q    (Mr. Keyes) Did the great recession have
25  adverse economic impacts on Cuyahoga County?

Page 91

1      MR. BADALA: Objection, outside the scope.
2    A    Absolutely.
3    Q    (Mr. Keyes) What were those adverse
4  economic impacts?
5      MR. BADALA: Same objection.
6    A    That affected the county's, so it affected
7  the county in two ways. One is on our sources of
8  revenue and the other would be on our expenditures.
9      As it relates to revenue, we saw
10  lower than, either a decrease in our sales tax
11  revenue or an increase in sales tax revenue that was
12  less than the State of Ohio or what we would see in
13  other jurisdictions outside of Ohio.
14      We also saw a decrease in our
15  property values, which impacts property taxes
16  generated and the general fund of the county does
17  receive property tax revenue approximately
18  $13 million a year comes from property taxes. We
19  will say the majority of property tax collected by
20  the county are distributed to cities, schools,
21  libraries. We don't retain the majority of property
22  taxes.
23    Q    (Mr. Keyes) You said the great recession
24  had an adverse economic impact on Cuyahoga County's
25  sources of revenues referring to sales tax and

Page 92

1  property tax, correct?
2    A    That's correct.
3    Q    Any other adverse economic impacts that
4  the great recession had on Cuyahoga County's sources
5  of revenue?
6      MR. BADALA: Objection, outside the scope.
7    A    Um, so yes. One of our sources of
8  revenue, a relatively large source of revenue is
9  investment income. When I started with the county
10  back in 2006, we were earning approximately
11  $35 million a year in investment income on our
12  overall portfolio.
13      In the last couple years our income
14  went down. One year we had negative earnings. This
15  past year we generated approximately 15 million, but
16  we're down substantially from where we were in the
17  past.
18      Also the county receives
19  approximately, in today's amounts about $19 million
20  a year from the local government fund, which comes
21  from the State of Ohio, and that's a percentage of
22  all taxes collected. And when times are tough,
23  people don't always pay their taxes.
24      Again, when I started back in 2006 in
25  the county, we were getting an allocation of about

Page 93

1  $35 million. I think at its high it was about
2  $40 million. And as I said earlier today, last year
3  we received $19 million. So we have seen some
4  pretty substantial losses in revenue.
5    Q    (Mr. Keyes) Is Cuyahoga County claiming
6  as a category of damages in this case lost sales tax
7  revenue?
8    A    No, I don't believe so.
9    Q    For what period of time did Cuyahoga
10  County's assessed valuations of property remain
11  depressed because of the great recession?
12      MR. BADALA: Objection to form, outside
13  the scope.
14    A    So the county conducts appraisals every
15  three years. And then every six years, which is, it
16  is done mostly by computers. It is an in-house
17  appraisal. Then every six years we conduct a
18  comprehensive sexennial appraisal where we go out
19  into the community, they are doing drivebys, they're
20  looking at properties. So we just completed the
21  sexennial appraisal in 2008.
22      The previous one that was completed
23  three years ago, values went down from the last
24  time. And then three years prior to that, values
25  had also decreased. So that would be 2012 we had

24 (Pages 90 - 93)

Page 94

1 decreases in value.
2    Q   Do I understand you correctly that the
3 property values decreased between 2009 and 2012?
4       MR. BADALA: Object to the form, outside
5 the scope.
6    A   Yes.
7    Q   (Mr. Keyes) And the property values
8 continued to decrease between 2012 and 2015?
9       MR. BADALA: Objection, outside the scope.
10   A   Yes.
11   Q   (Mr. Keyes) But that property values
12 increased in Cuyahoga County between 2015 and 2018?
13   A   On a whole they did, yes. Obviously, we
14 have some property that decrease, we have some
15 communities that decrease, but on a whole property
16 values did increase in 2018.
17   Q   When we're talking about property values
18 decreasing or increasing, we're talking about the
19 assessed valuations of those properties, correct?
20   A   That's correct.
21   Q   In the past, have you undertaken any
22 effort to identify the impact of any particular
23 factors on Cuyahoga County's property tax receipts?
24      MR. BADALA: Objection, outside the scope.
25   Q   (Mr. Keyes) The only factor that I will

Page 95

1 collect data on is the delinquency rate. I have not
2 undertaken to research why values go up or down.
3 But in terms of receipts, I do monitor the
4 delinquency rate. That's kind of an indicator of
5 where, how we are doing as a community. If the
6 delinquency rate increases substantially, we know we
7 have a problem.
8    Q   Have you asked anyone else to identify why
9 assessed values in Cuyahoga County go up or down?
10      MR. BADALA: Objection to form.
11   A   No, I have not.
12   Q   (Mr. Keyes) To your knowledge, has anyone
13 else for Cuyahoga County attempted to identify why
14 assessed values in Cuyahoga County go up or down?
15      MR. BADALA: Objection to form.
16   A   So if we're talking about property
17 specifics, the appraisers, of course, do research
18 why values go up or down. And again the factors
19 that I had mentioned before, if you go from taxable
20 to nontaxable, we will look at that. But if you're
21 asking about kind of just an overall how come they
22 went down in 2012, how come they went up in 2018,
23 no, not looking at the overall economy.
24   Q   (Mr. Keyes) Earlier you said you do
25 monitor the delinquency rate. What is the

Page 96

1 delinquency rate?
2    A   The delinquency rate captures what
3 percentage have property owners are delinquent in
4 paying their taxes, their property taxes.
5    Q   How often do you monitor the delinquency
6 rate?
7    A   We collect taxes twice a year. So every
8 time we complete the tax collection, I will ask and
9 I get a report anyway, but that says what the rate
10 delinquency was.
11   Q   Who do you get the report from?
12   A   The budget Commission.
13   Q   Who at that Budget Commission provides
14 this report to you?
15   A   The director of the Budget Commission is
16 Brian Dunn, D-U-N-N.
17   Q   And does the Budget Commission itself
18 prepare the delinquency rate?
19   A   That data is generated by the County
20 Treasurer's Office.
21   Q   The data is generated by the County
22 Treasurer's Office?
23   A   That's correct.
24   Q   Does the County Treasurer then calculate
25 the delinquency rate?

Page 97

1       MR. BADALA: Objection, outside the scope.
2    A   You know, I'm not entirely sure who
3 physically does the percentage calculation.
4    Q   (Mr. Keyes) You don't know sitting here
5 today who calculates the delinquency rate?
6       MR. BADALA: Objection, outside the scope.
7    A   I don't know whether the percentage is
8 calculated by the system or individual, no.
9    Q   (Mr. Keyes) But you get the delinquency
10 rate once it is calculated from Brian Dunn who is
11 director of the budget commission?
12   A   Yes, that's correct.
13   Q   Then every six months you can see what the
14 delinquency rate is and how it compares to prior
15 periods?
16   A   Yes, that's correct.
17   Q   What do you do with the delinquency rate
18 once you see what it is and how it compares to prior
19 periods?
20      MR. BADALA: Objection, outside the scope.
21   A   Um, usually I report it. So as I
22 mentioned before, we prepare quarterly forecasts,
23 that we prepare, you know, books that go along with
24 it. And usually I try to report the delinquency
25 rate so that the county council, the county

25 (Pages 94 - 97)

Page 98

1 executive, and the public, whoever reads it, can see
2 if our property tax collections are going up and
3 down. The delinquency rate is a factor in that.
4    Q    (Mr. Keyes) You say you usually report
5 it, to whom?
6    A    I usually include it in my updates, which
7 are the documents prepared for the quarterly
8 forecasts.
9    Q    And these are the quarterly forecasts that
10 you provide to the county executive and the county
11 council?
12    A    That's correct.
13    Q    Do you undertake any study to determine
14 why the delinquency rate is going up or down
15 compared to prior periods.
16        MR. BADALA:  Object to form, outside the
17 scope.
18    A    No, I don't.
19    Q    (Mr. Keyes) Do you have anyone else
20 conduct such a study?
21        MR. BADALA:  Same objection.
22    A    As to why the delinquency rates might
23 fluctuate.
24    Q    (Mr. Keyes) Yes, ma'am.
25    A    No.

Page 99

1    Q    To your knowledge, does anyone else in the
2 Cuyahoga County government undertake to study why
3 the delinquency rate is going up or down compared to
4 prior periods?
5        MR. BADALA:  Same objection.
6    A    Not to my knowledge.
7    Q    (Mr. Keyes) And do you have an
8 understanding over the past say ten years what
9 factors cause the delinquency rate to go up or down
10 during particular periods?
11        MR. BADALA:  Object to the form.
12    A    The delinquency rate did go up. I can't
13 cite to you specific years, but I would say
14 somewhere between probably 2010 to 2015, within that
15 window of years, the delinquency rate did increase.
16 We just kind of antidotally did have to do with the
17 economy around us.
18        Cleveland has been in a state of
19 rebuilding, so we are a little bit better today than
20 we were in 2009 and 2010, but no, I don't study it.
21 I'm not aware of anyone in the county that does any
22 real analytical research on it.
23    Q    Sitting here today, you recall that the
24 delinquency rate increased at some point between
25 2010 and 2015?

Page 100

1    A    Yes.
2    Q    And you attribute it to the general
3 economy?
4        MR. BADALA:  Objection to form.
5    A    I do.
6    Q    (Mr. Keyes) Has the delinquency rate gone
7 up in any year since 2015?
8    A    So I'm not confident in saying that the
9 rate has gone up since 2015 because it may have been
10 since 2014. But for the last several years the
11 delinquency rate has been, it fluctuates, but it has
12 remained relatively unchanged.
13    Q    We're still on page 17 of Exhibit 3, which
14 is plaintiff also seeks the following past and
15 ongoing lost tax revenue in the amount of
16 approximately $850 million.
17        Are you able to tell me anything
18 about how that number is arrived at by Cuyahoga
19 County?
20        MR. BADALA:  Objection to form.
21    A    The county did not calculate this number,
22 so, no, I can't tell you the methodology.
23    Q    (Mr. Keyes) Do you know any of the inputs
24 that were considered by whoever did prepare this
25 calculation?

Page 101

1        MR. BADALA:  Objection to form.
2    A    I know that one of the inputs would have
3 been our actual tax receipts. I do report property
4 tax revenue in our budget plans, and those were
5 identified in the Exhibit 1 to this document, but I
6 don't know what other data were used to come up with
7 the $850 million.
8    Q    (Mr. Keyes) Would you turn your attention
9 to the chart?
10    A    Yes.
11    Q    Are you there?
12    A    Yes.
13    Q    Okay. And there are dollar figures for
14 each year from 2006 to 2027, correct?
15    A    That is correct.
16    Q    From 2006 to 2017, these are listed as
17 past department related costs, right?
18    A    They are related as department, yeah, past
19 department related costs.
20    Q    And then for 2018 through 2027 they are
21 listed as ongoing department related costs, correct?
22    A    That's correct.
23    Q    Did you prepare this chart?
24    A    No, I did not.
25    Q    Who did?

26 (Pages 98 - 101)

Page 102

1    A    This chart was prepared by the county's
2   attorneys, I believe, working with experts.
3    Q    Have you spoken with the experts about the
4   chart?
5    A    No, I have not.
6    Q    Did you undertake to learn anything about
7   the data in this chart as you were preparing for
8   today's deposition?
9    A    No, I did not.
10    Q    Did you speak with anyone about any of the
11  figures that are listed in this chart?
12        MR. BADALA: Objection, just want to
13  caution the witness not to discuss anything that
14  might have been discussed with attorneys in
15  preparation.
16    A    I spoke to the county's attorneys.
17    Q    (Mr. Keyes) What did you learn from the
18  county's attorney to prepare for the today's
19  deposition as the corporate representative of
20  Cuyahoga County?
21    A    I didn't learn anything in forming my
22  testimony.
23    Q    Okay. So there are a number of line
24  items. Each line item is described as a division,
25  is that a technical term?

Page 103

1    A    That's not a technical term. These, um,
2   this is a combination of both divisions and agencies
3   and departments.
4    Q    Which of the entities listed here are
5   agencies as opposed to divisions?
6    A    The ADAMHS Board is an agency, Children
7   and Family Services is a division of the Department
8   of Health and Human Services, prosecutor and public
9   defender, Common Pleas and juvenile court are all
10  agencies. The sheriff is, these are divisions
11  because it is saying sheriff only and then jail
12  only.
13        The medical examiner is an agency.
14    Q    So if I understand you correctly, the
15  ADAMHS Board, prosecutor, public defender, Court of
16  Common Pleas, juvenile court, and medical examiner's
17  office?
18    A    That is correct.
19    Q    Children and Family Services, sheriff,
20  sheriff only, and sheriff jail only are divisions?
21    A    Yes, that's correct.
22    Q    What is the difference between an agency
23  and a division?
24    A    A division is a lower level of reporting
25  within a larger agency.

Page 104

1    Q    And so Children and Family Services is a
2   division of the Department of Health and Human
3   Services?
4    A    Yes, that's correct.
5    Q    And the sheriff, sheriff only and sheriff
6   jail only divisions are divisions of the sheriff's
7   agency?
8    A    That's correct.
9    Q    Okay.
10    A    Just as an example, like the prosecutor
11  has four divisions, public defender has three
12  divisions. So agencies for ease of reporting and
13  transparency, we do try to break them up based on
14  their activity.
15    Q    Earlier we talked about two of the line
16  items here, right? Sheriff, sheriff only, and
17  sheriff jail only, correct?
18    A    That's correct.
19    Q    Okay. So starting with sheriff jail only,
20  do you see the dollar figures listed for each year
21  from 2006 all the way through 2017?
22    A    Yes.
23    Q    Do you know how those numbers were arrived
24  at?
25    A    No, I do not.

Page 105

1    Q    Do you know what costs are included in the
2   sheriff jail only line item?
3    A    I know that these costs would include both
4   personnel and nonpersonnel expenses. But I don't
5   know, you know, the specific expenditures or
6   transactions, no.
7    Q    How much of each figure is for personnel
8   expenses?
9    A    I can't tell you that. I can just tell
10  you that the jail budget includes, it is largely
11  personnel heavy, but there are other expenses there,
12  but I don't know. For example, in 2017, the number
13  is 8 million. I can't tell you how that's broken
14  out.
15    Q    So you don't know how much of each figure
16  is for personnel versus nonpersonnel experiences?
17    A    No, I don't know that.
18    Q    For the nonpersonnel expenses, what costs
19  or categories of costs are included in that for the
20  sheriff jail only line?
21    A    I can't tell you that.
22    Q    Do you know any of the categories of costs
23  of nonpersonnel expenses or sheriff jail only?
24    A    I know categories of costs in the budget,
25  but not in this $8 million figure. Again, looking

27 (Pages 102 - 105)

Page 106

1 at 2017.
2    Q   What steps were taken to insure that the
3 nonpersonnel expenses that are included in this
4 sheriff jail only line are expenses that are
5 incurred only because of the opioid problem?
6    A   I can't answer that question. I wasn't a
7 part of the calculation.
8    Q   What costs or categories of costs are
9 included in the personal expenses component of the
10 sheriff jail only line?
11    A   Again, you are specifically referring only
12 to this, right? I can't tell you that. I wasn't
13 included in the calculations.
14    Q   What steps were taken to insure that the
15 personnel expenses that are included in this sheriff
16 jail only line, are expenses that were incurred only
17 because of the opioid problem?
18    A   I can't tell you that. I wasn't included
19 in this. I can't even definitively tell you that it
20 includes personnel costs. I can only tell you that
21 the jail budget includes personnel costs.
22    Q   But you did understand that you were
23 testifying as a corporate representative on damages
24 today, right?
25    A   Yes, that's correct.

Page 107

1    Q   And you did understand that part of the
2 damages being claimed by Cuyahoga County are the
3 ones listed in this chart, correct?
4    A   That is correct.
5    Q   And you reviewed the chart to prepare for
6 today's deposition, correct?
7    A   That's correct, I did.
8    Q   In fact, you said you had two prep
9 meetings with the lawyers to prepare for today's
10 deposition and you reviewed this in both meetings,
11 correct?
12    A   Yes.
13    Q   Did you learn anything at all about what
14 is included in the dollars listed for sheriff jail
15 only?
16    A   No, I did not.
17    Q   Did you learn that for any of the lines
18 here?
19    A   No.
20    Q   Okay. So if I ask a series of questions
21 about the dollars listed for any of the other lines,
22 you are going to tell me, again, you don't know?
23    MR. BADALA: Objection to form.
24    A   That's what I'm going to tell you.
25    Q   (Mr. Keyes) If I ask you for any of these

Page 108

1 lines how much of that is for personnel expenses,
2 you are going to tell me, I don't know?
3    A   That's correct.
4    Q   And if I ask you how much of that is for
5 nonpersonnel expenses, you are going to tell me you
6 don't know?
7    A   That's correct.
8    Q   If I ask you what are the specific costs
9 or category of costs within the nonpersonnel
10 expenses of that line item, you are going tell me
11 you don't know?
12    A   That is correct.
13    Q   If I ask you what are the costs or
14 category of costs within the personnel expenses
15 component of the line, you are going to tell me you
16 don't know?
17    A   That's correct. I can only answer those
18 questions, excuse me, as it relates to the total
19 budget.
20    Q   What do you mean as it relates to the
21 total budget?
22    A   I can tell you what personnel expenses are
23 included in the jail budget, I can tell you what
24 nonpersonnel expenses are included in the jail
25 budget. What I cannot tell you is specific to

Page 109

1 opiates and the damages claimed here of that
2 8 million, how much is attributed to personnel and
3 how much is attributed to something else.
4    Q   So why don't we take a step back. You
5 understood that you were here to testify as the
6 corporate representative for Cuyahoga County on the
7 damages claimed by the plaintiffs, correct?
8    A   That's correct.
9    MR. BADALA: I just want to note for the
10 record we had our responses and objections as one of
11 the exhibits in this folder, and Miss Keenan would
12 be deposed subject to her responses and objections.
13    Q   (Mr. Keyes) So what can you tell me about
14 the damages being claimed by Cuyahoga County in this
15 lawsuit?
16    MR. BADALA: Objection to form, asked and
17 answered.
18    A   I can answer questions relative to the
19 county budget. I can answer questions to our
20 sources of revenue. I can answer questions about
21 how we spend our money. I can tell you that a
22 portion of our budget is attributed, excuse me, to
23 the opiate epidemic. I cannot answer for you
24 specific questions about the dollar figures that are
25 included in the table in Exhibit 2.

28 (Pages 106 - 109)

Page 110

1   Q   (Mr. Keyes) My last question is not
2 specific to the dollar figures in the table or even
3 the table. My question is, the damages claimed by
4 Cuyahoga County are a discreet topic, separate from
5 the other topics you listed. So what can you tell
6 me as the Cuyahoga County corporate representative
7 about the damages being claimed by the county in
8 this lawsuit?
9   A   I can tell you how the county spends its
10 money, that's what I can tell you.
11   Q   Okay. So what money has been spent by
12 Cuyahoga County because of the opioid problem?
13   A   A portion of ADAMHS budget has been spent
14 on combating the opioid epidemic. As I mentioned
15 before, ADAMHS provides treatment services, they
16 provide housing. When I say provide, I mean they
17 fund. Housing, job readiness services and other
18 supportive services to assist individuals who are
19 drug dependent.
20        And the county contributes a
21 substantial portion of its health and human services
22 levy revenue to the ADAMHS Board to aid in what they
23 are trying to accomplish.
24        Division of Children and Family
25 Services is approximately a $150 million agency. It

Page 111

1 is a mandated service of the county and we are
2 responsible for providing services and care to
3 children who are at risk of abuse and neglect.
4        Children and Family Services has seen
5 a year over year increase in the number of children
6 that have come into placement and the number of
7 families that the county is serving even while the
8 children are remaining in those homes.
9        Several years ago we were looking at
10 placement counts of approximately 1,200, 1,300, we
11 have gone up to 1,600. That's substantial for the
12 county.
13        The number of children who are
14 eligible for adoption, which means their family are
15 unable to care for them permanent has increased. We
16 are at a record high right now. I believe as of
17 last week we have 600 children in this county alone
18 who cannot go back to their family.
19        Children of Family Services spends
20 about $60 million a year on board and care costs for
21 kids who are taken out of their homes and cannot go
22 to foster homes because they have suffered too many
23 traumas. We also spend millions of dollars a year
24 on foster homes, which is what you typically think
25 of when we pay families to take children. And our

Page 112

1 costs have increased exponentially.
2   Q   Will you keep in my my question?
3   A   I am.
4   Q   So what money has been spent by Cuyahoga
5 County because of the opioid problem?
6        MR. BADALA:  She's answering the question.
7   A   This is money that has been spent by
8 Cuyahoga County because of the opiate epidemic.
9 Every child we take in whose parent tested positive
10 for prescription opiates and cannot care for their
11 children, the county spends money.
12        The prosecutor's office spends money
13 on, they are almost exclusively personnel,
14 prosecutor, but they are spending money not only in
15 the general office on prosecutors who are
16 prosecuting criminal cases. And our criminal case
17 filings have increased every year for the last
18 several years, with the exception of 2018 we
19 remained flat, but three years before that we were
20 increasing substantially in criminal case filings.
21        The prosecutor's office also is the
22 one responsible for taking children legally from
23 their homes and placing them in out of home
24 placements. We have had to add several prosecutors
25 to that division because they can't keep up the

Page 113

1 caseload. We are mandated by law to respond to
2 these cases in a certain period of time.
3        The public defender has incurred
4 costs because, again, as I said the number of cases
5 has increased year over year. The public defender
6 also largely a personnel heavy office. They have
7 approximately, I believe, 100 attorneys working for
8 either the public defender's office. Court of
9 Common Pleas we have had to provide additional
10 funding to cover their expenses. Again, increase in
11 caseloads.
12        We are the busiest court in the State
13 of Ohio, even though we are no longer the most
14 populous county. The Court of Common Pleas has
15 personnel costs and they also have costs for
16 treatment services with nonprofit entities and
17 halfway houses.
18        So that ideally when we have
19 individuals who are presented to the court, who have
20 drug addiction problems and mental health problems,
21 we are not keeping them in the jail. Our jail is
22 the largest mental health facility and we prefer not
23 to have it that way.
24        So the Common Pleas Court spends a
25 considerable amount of money every year on trying to

29 (Pages 110 - 113)

Page 114

1 find other places where these individuals can go so
2 that they're not being denied bail and staying in
3 our jail.
4          Juvenile court has seen a substantial
5 increase in the number of the abuse dependency and
6 neglect filings. So when the county does have to
7 file to take a child from his home, we do that in
8 the juvenile court. Those case filings have
9 increased almost 100 percent over the last couple
10 years.
11         Every child that presents to juvenile
12 court for an ADM case is given a guardian ad litem
13 by law. And our guardian add litem expenses have
14 also increased every year. We are now paying
15 $2 million a year for GAL costs. Those come out of
16 our health and human services levies, devoted levy.
17 We like to think we should be doing something else
18 with that money.
19         Um, the sheriff, as I mentioned
20 before, for sheriff only largely talking about the
21 deputies. The cost of deputy overtime has increased
22 as a direct result of the opiate epidemic due to the
23 number of inmates in our county jail who are coming
24 in opiate addicted and that has increased, again,
25 substantially over the years.

Page 115

1          These are needy inmates. They are
2 medically fragile and the county once they come into
3 our custody, we are responsible for taking care of
4 them.
5          For a period of time they had to go
6 offsite for treatment which requires two deputies to
7 transport them every time they left. If they
8 overdose because they have come into our custody,
9 they are already taking something. We have to take
10 them to the hospital, deputies have to sit on them
11 for 24 hours, you know, if it is at least 24 hours,
12 you have to put more deputies on them. Our costs
13 are going up.
14         In the jail the medical costs, which
15 I just described, has been increasing every year
16 because the inmates that we are seeing they are
17 coming in, we have never experienced the number of
18 addicts coming into our jail that we are
19 experiencing right now and the county has to deal
20 with that once they come into our custody. So our
21 medical costs are through the roof.
22         Finally, in the medical examiner's
23 office we have had to increase funding because we
24 have had to hire additional pathologists. Our
25 medical examiner's office is accredited by the

Page 116

1 National Association of Medical Examiners. That
2 accrediting body requires that pathologists perform
3 no more than 250 autopsies per year. We have been
4 cited in the last couple years because we have had
5 at least three of our pathologists, I believe, who
6 have gone over or very, very, close to going over
7 that 250 number.
8          So we did have to hire a new
9 pathologist. We've also had to provide additional
10 funding to deal with the testing result, the
11 toxicology test. So every time someone comes in on
12 an overdose, we are running toxicology test on them.
13         It is extraordinarily expensive and
14 the medical examiner has had to pay for that and
15 that's coming from the general fund. And these are
16 the are the agencies that we have identified as
17 having incurred costs directly related to the opiate
18 epidemic.
19         MR. BADALA: Okay. So we have gone over
20 an hour, do you want to take a break?
21     A   I'm okay.
22     Q   (Mr. Keyes) Okay. Turning then your
23 attention to the first line here, the ADAMHS Board.
24 For how long has Cuyahoga County been contributing
25 funds to the ADAMHS Board?

Page 117

1          MR. BADALA: Objection to form.
2     A   I can't answer that off the top of my
3 head. I'd have to look at documents, but at least
4 going back to 2006, which is when I started.
5     Q   (Mr. Keyes) And how --
6     A   I'm sorry, I do want to note just for the
7 record that back in 2006 the ADAMHS Board didn't
8 exist. We had mental health board and a drug
9 addiction board, alcohol and drug addiction.
10     Q   Which were combined to perform the ADAMHS
11 Board?
12     A   They were, that's correct.
13     Q   So before the ADAMHS Board existed, there
14 were two prior agencies that also received funding
15 from from Cuyahoga County?
16     A   That's correct. We funded both of them.
17     Q   What steps were taken in arriving at the
18 figures that are listed here for the ADAMHS Board to
19 limit the damages to expenses incurred in providing
20 services to people who had an opioid use disorder or
21 were addicted to opioids because of their use of
22 prescription opioids?
23         MR. BADALA: Objection to form.
24     A   I can't answer that question. I was not
25 involved in the calculation of the portion of the

30 (Pages 114 - 117)

Page 118

1 budget.
2    Q    (Mr. Keyes) What documents do you or does
3 Cuyahoga County have that match up the dollars that
4 Cuyahoga County gives to the ADAMHS Board with the
5 specific services provide the specific people needs
6 specific criteria?
7    A    The county doesn't have any document that
8 has the data you have just identified.
9    Q    So you would have to go to the ADAMHS
10 Board to figure out of the dollars contributed by
11 Cuyahoga County in any particular year, how those
12 dollars were spent and of those dollars which were
13 spent on mental illness versus a non opioid drug
14 addiction versus an opioid addiction, correct?
15       MR. BADALA: Objection to form.
16    A    That is correct, yes.
17    Q    (Mr. Keyes) Turning then to the Children
18 and Family Services line.
19    A    Okay.
20    Q    You said the number of placements has
21 increased over time?
22    A    Yes, absolutely.
23    Q    Okay.  Of the number, what is the
24 placement?
25    A    I'm sorry.  So a placement is when a child

Page 119

1 has been removed from their home.  They will either
2 be in a residential treatment facility for what we
3 refer to as dependent children, who have more severe
4 behavioral problems.  They will be in a group home,
5 they will be in a foster home, or they will be in
6 what's referred to as a kinship placement, which
7 means they are with family who are not licensed
8 foster families.
9    Q    So for the Children and Family Services
10 line item, how much of the dollar figures listed in
11 each year are for staffing of that division?
12       MR. BADALA: Objection to form.
13    A    I can't, um, I can't say that.  Again, I
14 wasn't a part of coming up with these figures.
15    Q    (Mr. Keyes) For the non staffing
16 component of these dollar figures, what are those
17 costs, by description, not necessarily dollar?
18    A    Are you asking me for what the department
19 spends or included in these figures.
20    Q    I want to know for the figures that are
21 listed here for Children and Family Services, what
22 are the non staffing costs included?
23    A    So I cannot confirm that non staffing
24 costs are included in these figures because I wasn't
25 a part of calculating them.  But non staffing costs

Page 120

1 in the Division of Children and Family Services will
2 include the costs of the placements themselves.
3       So we have to pay per diems to the
4 residential treatment facilities, the group homes.
5 We pay monthly stipends to the foster families, we
6 also provide supportive services for the children,
7 which could mean anything from we are paying for
8 their therapy, we are paying for medical care, we
9 are paying for, at one time we had a menu of options
10 where kids could go for dancing or therapeutic
11 horseback riding or just something to help keep them
12 so that we could keep them stable and not disrupt
13 their placement.
14       It also includes, we have contracts
15 throughout the neighborhoods of the City of
16 Cleveland and the inner ring suburbs where foster
17 families can go to receive supportive services.
18       So it is like peer counseling for one
19 thing, but then we also provide money for the kids
20 clothes, for if they need school supplies, whatever
21 they need.  It could even be furniture to keep the
22 kid in that placement and to keep hopefully the
23 foster family from sending them back.
24    Q    And which of all of those expenses are
25 included in these numbers for Children and Family

Page 121

1 Services?
2       MR. BADALA: Objection to form?
3    A    As I said, I can't tell you that because I
4 wasn't a part of calculating these numbers.
5    Q    (Mr. Keyes) You said earlier that
6 sometimes the parents test positive for a
7 prescription opiate, which leads to the removal of
8 the child from the home?
9    A    I don't know if I said that.  I don't know
10 that I specifically said that.
11    Q    I said, so what money has been spent by
12 Cuyahoga County because of the opiate problem.  And
13 you said it has been spent by Cuyahoga County
14 because of the opiate epidemic.  Every child taken
15 from a parent who tested positive for prescription
16 opiates cannot care for their children and the
17 county spends money.
18       So what were you referring to when
19 you talked about parents testing positive for
20 prescription opiates?
21    A    It wouldn't be limited to prescription
22 opiates.  If we have parents who are testing
23 positive for drugs and they are unable to take care
24 of their children, then we will take the children.
25 We don't automatically take children if the parents

31 (Pages 118 - 121)

Page 122

1  are testing positive for drugs if it seems like the
2  parent can adhere to the treatment plan and the
3  child is safe.
4        The worse thing you can do really is
5  to remove a child from their home. But sometimes,
6  of course, if the parent can't take them, we drug
7  test all the parents and they test positive for,
8  some of them are prescriptions opiates and if they
9  have prescriptions and they can demonstrate that
10 they're supposed to be taking this, that's fine.  If
11 they are not taking care of their children, we still
12 have a duty to take the child and then, of course,
13 we have parents who test positive for illegal
14 substances.
15    Q   What is standard for removing the child
16 from the home?
17       MR. BADALA:  Objection, outside the scope.
18    A   I am not qualified to answer that
19 question.
20    Q   (Mr. Keyes) Are children removed from the
21 home and placed out of the home because of parents
22 who are abusive?
23       MR. BADALA:  Objection, outside the scope
24 and form.
25    A   They could be, yes.

Page 123

1    Q   (Mr. Keyes) Or because the parents have a
2  problem with mental illness?
3        MR. BADALA:  Same objection.
4    A   We do not remove children just because
5  their parents are mentally ill.  The parents have to
6  demonstrate abuse, neglect, some other action that
7  demonstrates they are incapable of taking care of
8  their children.
9    Q   (Mr. Keyes) And there are many instances
10 where parents meet that standard, even though the
11 parents do not have a drug addiction, correct?
12       MR. BADALA:  Objection to form, outside
13 the scope.
14    A   Meet the standard for removal?
15    Q   (Mr. Keyes) Yes
16    A   Absolutely.
17    Q   And there are many instances where parents
18 meet that standard for removal, even though the
19 parents have never used prescription opiates,
20 correct?
21       MR. BADALA:  Objection to form.
22    A   Um, I don't know, many is a subjective
23 term, so I don't know about many.  I do think that
24 the majority of our families do have some sort of
25 behavioral health issue. Either they are mentally

Page 124

1  ill, they are drug dependent or still occurring, but
2  yes, we, I'm sure, have removed at least a child
3  whose parent had no issues relative to prescription
4  opiates.
5    Q   (Mr. Keyes) And so who has the records
6  that would need to be reviewed to determine why each
7  child was removed from a home?
8        MR. BADALA:  Objection, outside the scope.
9    A   The Division of Children and Family
10 Services maintains those records until the child is
11 18, unless they are for some reason still have an
12 active plan with us.
13    Q   (Mr. Keyes) And does the Division of
14 Child and Family Services have a single record that
15 tracks the number of children who have been removed
16 from the home because of the parents use of opioids,
17 either illicit opioids or prescription opioids?
18       MR. BADALA:  Objection, outside the scope.
19    A   Um, I have never seen that record.  So I
20 cannot tell you for sure. I do know that they do
21 track, of course, the data on why children are
22 removed because we do try to identify trends or if
23 there's, you know, a certain neighborhood that seems
24 to be, you know, you have an abnormally large number
25 of removal. I have never seen a report like that,

Page 125

1  no.
2    Q   (Mr. Keyes) So what is the tracking that
3  you understand the Division of Children and Family
4  Services does?
5        MR. BADALA:  Objection, outside the scope.
6    A   All I know is that they do track data on
7  why children are being removed.  I know we drug test
8  parents.  And so the results of those drug tests are
9  tracked and kept in the child's file in that we have
10 to keep, we have to keep that for at least 18, until
11 they're 18 like I said.
12       I don't know, the Division of
13 Children and Family Services does have quite an
14 active unit for data analysis, but like I said, I
15 don't know what they do.
16    Q   (Mr. Keyes) Has the Division of Children
17 and Family Services hired additional personnel
18 because of the opioid problem?
19    A   Yes, we believe that we have.  We have
20 hired additional social workers, our social workers
21 are also working records amounts of overtime and
22 that is a direct result of the increase in
23 caseloads, not only of the family served where the
24 children are remaining in the home, but also family
25 served where the children have been removed from

32 (Pages 122 - 125)

Page 126

1 their home. According to the Division of Children
2 and Family Services, opiates are a driving force
3 behind the increase in the number of placements.
4    Q   How many additional social workers did the
5 Division of Children and Family Services hire in
6 2014 because of the opioid problem?
7    A   I don't have that data with me.
8    Q   Were any additional social workers hired
9 in 2014 because of the opioid problem?
10   A   I don't have that data, I can't answer
11 that question, I'm sorry.
12   Q   How about in 2015?
13   A   I don't know.
14   Q   How about in 2016?
15   A   I don't know.
16   Q   How about 2017?
17   A   I don't know.
18   Q   How about this year?
19   A   In 2018, 2019 or 2018?
20   Q   Let's say 2018?
21   A   In 2018, the division was provided funding
22 to hire an additional 12 or 15 social workers. I
23 think it was 12, but I can't say for certain. Um,
24 and that has been in process. So they have hired
25 additional social workers, unfortunately, this is a

Page 127

1 position that has a high rate of turnover, and so we
2 bring them in and it seems sometimes that every time
3 we add a new staff person, we get a resignation from
4 somebody else.
5    Q   There was funding appropriated in 2018 to
6 hire 12 to 15 additional social workers?
7    A   That's correct. In 2018 the department
8 received, well, overall they got more than, almost
9 8 million in additional funding, but they did
10 receive funding specifically for, again, I believe
11 it was 12 to 15 social workers and then we also
12 received funding to hire some additional law
13 enforcement personnel who I believe were going to be
14 contracted, like retired police officers to assist
15 the social workers.
16   Q   And how many of those 12 to 15 slots were
17 filled in 2018?
18   A   I can't definitively say how many were
19 filled in 2018. I know that all of them are at
20 least in the process of being filled and some have
21 been filled, but I couldn't tell you exactly how
22 many have been filled. And I also, I don't think I
23 can tell you, you know, what year because we have
24 some people come on in 2019.
25   Q   If you wanted an accurate answer to the

Page 128

1 question of whether or how many social workers were
2 hired by the Division of Children and Family
3 Services in any particular year because of the
4 opioid problem, where would you go?
5    A   To find out how many social workers were
6 hired, I would go to the department, the Department
7 of Human Resources. Um, whether that's because of
8 the opiate epidemic would be a question for Children
9 and Family Services.
10   Q   And to be clear, it is not who or how many
11 were actually hired, it is how many additional slots
12 were created in any year or social workers because
13 of the opioid problem would you also go to HR?
14   A   No.
15   Q   Where would you go for that answer?
16   A   It is just additional slots that were
17 created. We would know that because we, so we, I'm
18 sorry, I mean the Office of Budget Management.
19   Q   You would know not just how many slots
20 were created with budgeted dollars, you would know
21 actually how many people, how many new slots were
22 created and filled?
23   A   I would know how many slots were created.
24 To know how many slots were filled, I want to
25 defer to the Department of Human Resources because

Page 129

1 the data that I track relative to personnel is
2 hours. So I track FTEs, not bodies.
3    Q   And what has the Division of Children and
4 Family Services done to keep the problem of overtime
5 under control?
6       MR. BADALA: Objection to form, outside
7 the scope.
8    A   They have not kept the problem of overtime
9 under control. Overtime is very high.
10   Q   (Mr. Keyes) Overtime is very high because
11 certain slots have not been filled, correct?
12      MR. BADALA: Objection to form.
13   A   Overtime is very high because the number
14 of families that we are serving right now is at its
15 highest.
16   Q   (Mr. Keyes) And not all the available
17 slots have been filled?
18      MR. BADALA: Objection to form, asked and
19 answered.
20   A   That is correct. Yeah, absolutely.
21      MR. KEYES: Let's take a ten minute break.
22      THE VIDEOGRAPHER: It is 11:53, going off
23 the record.
24      (Off the record.)
25      THE VIDEOGRAPHER: It is 12:14, we are

33 (Pages 126 - 129)

Page 130

1  back on the record.
2  Q    (Mr. Keyes) Miss Keenan, turning your
3  attention to the prosecutor line on this chart.
4  A    Yes.
5  Q    Do you how any of the figures for that
6  line were calculated?
7  A    Um, no, I do not.  I was not part of the
8  calculation.  That was done by the attorneys.
9  Q    This refers to prosecutors who prosecute
10  criminal cases, correct?
11  A    Again, I wasn't part of it, but I do not
12  believe that that would be exclusive to criminals or
13  prosecutors who prosecute criminal defendants.
14  Q    You said there are prosecutors who
15  prosecute criminal cases and prosecutors who are
16  involved in trying to remove children from their
17  homes?
18  A    That's correct.  And we have prosecutors
19  who are involved in tax foreclosures.
20  Q    Is the time spent by prosecutors on
21  prosecuting tax foreclosures included in that line
22  item?
23  A    That I can't answer.
24  Q    Is the time a prosecutor spent prosecuting
25  criminal case included in this line?

Page 131

1       MR. BADALA:  Are you done with that
2  answer?
3  A    No. I can't answer that.  I was not part
4  of this calculation, this was done by the experts.
5  Q    (Mr. Keyes) Okay.  The prosecutors you
6  said though line item includes the personnel cost of
7  prosecutors, correct?
8  A    I can definitively would say this include
9  some personnel cost, yes.
10  Q    The prosecutors you described three
11  things, they prosecute criminal cases, correct?
12  A    That's correct.
13  Q    Where the defendants have been accused of
14  a crime?
15  A    That is correct.
16  Q    They prosecute tax foreclosure cases,
17  correct?
18  A    That is correct.
19  Q    Do the tax foreclosure cases have anything
20  to do with prescription opioids?
21  A    They might.
22  Q    Do you know?
23  A    I do not know for sure, no.
24  Q    And you said the prosecutors are involved
25  in cases to remove children from their homes?

Page 132

1  A    Yes.  They are also involved in cases of
2  child support, and they also, the prosecutor's
3  office has a civil division.  So that's the civil
4  attorneys represent the county.
5  Q    And given the prosecutors fulfill those
6  different functions, what are the specific harms
7  incurred by Cuyahoga County because of the opioid
8  problem related to prosecutors?
9  A    That's identified in this table.
10       So, for example, in 2017, the harm to
11  the county prosecutor's office was $5 million.
12  Q    Okay.  But, ma'am, you keep switching back
13  and forth between the chart.  When I ask you a
14  question about the chart, you say I wasn't involved
15  in the chart, I don't know how the numbers are
16  prepared.
17       So I'm not asking you to look at the
18  chart. I'm saying as the corporate representative
19  on the damages topic, where I ask you to tell me
20  what the damages are.  You went through a list and
21  one of the items on your list was prosecutors.  So
22  I'm asking you with respect to prosecutors, what are
23  the harms incurred by Cuyahoga County relating to
24  the opioid epidemic, tell me what they are?
25       MR. BADALA:  Objection, asked and answered

Page 133

1  just for the record, she was going through the chart
2  and saying she made a list.
3  A    This exhibit identifies the county damages
4  for the prosecutor's office, for the period 2006
5  through 2017.  We have identified $50 million that
6  is the harm that has been caused to the prosecutor's
7  office.
8  Q    (Mr. Keyes) What does that $50 million
9  measure, what is it?
10       MR. BADALA:  Objection to form.
11  Q    (Mr. Keyes) What are the components of
12  the costs that are included in that $50 million?
13       MR. BADALA:  Objection to form, asked and
14  answered.
15  A    I have answered that.  This table was
16  created by experts.  This is not in the county's,
17  this is outside the scope of what my role is as a
18  budget director, I'm sorry to cover that, and what
19  the county does.  We rely on experts.
20  Q    (Mr. Keyes) Okay.  Put the chart to the
21  side.  We don't need to look at the chart since you
22  know nothing about the chart.  So you can put the
23  chart to the side.
24  A    But my topic is damages.  If we are still
25  talking about damages, I'm going to refer to this

34 (Pages 130 - 133)

Page 134

1 chart.
2     Q    I can read the chart, ma'am, I can read
3 the chart.  I know what the chart says.  And you
4 have told me multiple times you can't provide any
5 more detail about any of the dollar figures in this
6 chart, correct?
7         MR. BADALA:  Objection, for the record she
8 has provided detail.  She has referenced a chart.
9 You can reference whatever you like.  You don't have
10 to listen to his instruction.
11    Q    (Mr. Keyes) I don't want you to keep
12 coming back to a chart and rely on a chart when
13 you've already told me you weren't involved in the
14 preparation of the chart and you don't know what the
15 dollars include.  So I don't want you to read me the
16 chart.  I am here to take your testimony as the
17 corporate representative.  So I want to know what
18 you, Cuyahoga County, can tell me are the categories
19 of harm that were suffered by Cuyahoga County with
20 respect to prosecutors because of the opioid
21 problem?
22        MR. BADALA:  Again, for the record, the
23 chart was on behalf of Cuyahoga County, which is
24 mentioned by counsel earlier in this deposition.
25        MR. KEYES:  The chart has a figure and she

Page 135

1 doesn't know anything about the figure.  I'm asking
2 about the categories of harm within the prosecutor
3 line.
4         MR. BADALA:  That completely misstates her
5 testimony.  All the testimony we have gone through
6 already.
7     Q    (Mr. Keyes) You can answer my question.
8     A    The damages are identified in Exhibit 2.
9     Q    What are the categories of harm?  What are
10 the types of expenses that Cuyahoga County has
11 incurred because of the opioid problem relating to
12 prosecutors.  I'm not asking about dollars, I'm
13 asking about the kind of expenses that is incurred.
14 Do you know or not?
15    A    I believe I have answered that.
16    Q    Okay.
17    A    This does include personnel costs.
18    Q    Okay.
19    A    That is a category of an expense.
20    Q    Okay.  And the personnel expenses, is it
21 for everything that the prosecutors do or is it
22 limited to something that the prosecutors do
23 relating to the opioid problem?
24    A    These costs have been identified as
25 relating specifically to the opioid epidemic.  So,

Page 136

1 yes, these costs are personnel costs that relate
2 specifically to the opioid epidemic.
3     Q    And what are those personnel costs that
4 relate to the opioid epidemic?
5         MR. BADALA:  Objection to form, asked and
6 answered.
7     A    Personnel costs include salaries, include
8 benefits, taxes paid by the employer on behalf of
9 the employee, health care costs, that's all
10 encompassed in personnel costs.
11    Q    (Mr. Keyes) Are their nonpersonnel costs
12 included in the prosecutor line item relating to the
13 opioid epidemic?
14        MR. BADALA:  I'm just unclear, you
15 referring back to the chart that you told her not to
16 look at?  You said line item.
17    Q    (Mr. Keyes) You said there's a category.
18 There's a line item here that you keep referring to.
19 And as many times and I have tried, you told me you
20 don't know anything about the dollar figures.  I'm
21 not asking about the dollar figure.  I'm trying to
22 understand, since we have been asking for months and
23 months and months for Cuyahoga County to tell us,
24 what are the damages you are seeking.  And there's a
25 line here that says prosecutor with a bunch of

Page 137

1 dollar figures associated with years.  So I want to
2 know since you are Cuyahoga County here, what is
3 included in that category?
4         MR. BADALA:  And just for the record, and
5 Mr. Keyes said months and months, but the court has
6 approved this response.  You have objected, the
7 court has actually approved this response.
8     A    This is the county's response as to what
9 the damages are.  The county has relied on its
10 attorneys and experts.  This is outside the scope of
11 what the county does.
12    Q    (Mr. Keyes) Okay.  Same answer for public
13 defender?
14    A    That's the same answer for every line in
15 this.  This opiate epidemic is an extraordinary
16 circumstance for Cuyahoga County.  This is beyond
17 anything we have ever experienced before.  It has
18 been more harmful, it has been more damaging, it has
19 been more expensive.  We do not have the expertise
20 to do the sort of analytics that are required to
21 come up with the damages and the harm that has been
22 occurred by Cuyahoga County.
23    Q    You have been experiencing these harms
24 since 2006, correct?
25        MR. BADALA:  Objection to form.

35 (Pages 134 - 137)

Page 138

1     A   As I mentioned before, the county did
2  identify and became aware of the fact that there is,
3  in fact, an opiate epidemic in 2016 and then working
4  with the experts.  We have now been able to trace
5  the impact on its systems and budget going back at
6  least as far as 2006.
7     Q   (Mr. Keyes) You said earlier that the
8  opioid epidemic began in 2006?
9        MR. BADALA:  Object to form, misstates her
10 testimony.
11    A   I do not believe that is what I said.
12    Q   (Mr. Keyes) You said that the opioid
13 epidemic began as early as 2006 and perhaps earlier?
14       MR. BADALA:  Objection to form, misstates
15 her testimony.
16    Q   (Mr. Keyes) Are you taking a different
17 position now?
18       MR. BADALA:  Objection to form, misstates
19 her testimony.
20    A   I believe what I said earlier is
21 consistent with what I'm saying now.  That the
22 county became aware that we have an opiate epidemic
23 in 2016.  And at that time is when we connected all
24 the dots, which I think is literally what I said
25 before.  And now knowing what we know, we can trace

Page 139

1  back the impact on our systems and budget at least
2  to 2006, perhaps earlier.
3     Q   (Mr. Keyes) I asked you before when the
4  opioid epidemic started, and you said 2006, perhaps
5  earlier.  I asked you that several times and you
6  said that earlier, correct?
7        MR. BADALA:  Objection to form, misstates
8  her testimony.
9     A   I cannot say, I do not remember what I
10 said.  I do not believe I said it started in 2006.
11 I said we have traced now the impact, I know I said
12 repeatedly impact on systems and budget going back
13 to 2006.
14    Q   (Mr. Keyes) And Cuyahoga County's
15 position today is that it spent $33 million in 2006
16 because of the opioid epidemic, correct?
17    A   This an estimate, but yes, the estimate of
18 what the damages incurred are.  $33 million in 2006.
19    Q   And it spent another $36 million in 2007
20 because of the opioid epidemic?
21    A   That is correct.
22    Q   And another $38 million in 2008 because of
23 the opioid epidemic?
24    A   That is correct.
25    Q   Another $39 million in 2009 because of the

Page 140

1  opioid epidemic?
2     A   That's correct.
3     Q   Another $41 million in 2010 because of the
4  opioid epidemic?
5     A   That's correct.
6     Q   $42 million in 2011 because of the opioid
7  epidemic?
8     A   That's correct.
9     Q   $47 million in 2012 boss of the opioid
10 epidemic?
11    A   That's correct.
12    Q   $53 million in 2013 because of the opioid
13 epidemic?
14    A   That's correct.
15    Q   $56 million in 2014 because of the opioid
16 epidemic?
17    A   Yes, that's correct.
18    Q   Another $56 million in 2015 because of the
19 opioid epidemic?
20    A   Yes, it has been a substantial impact.
21    Q   All unbeknownst to Cuyahoga County until
22 2016 that none of those figures did it know it was
23 spending money because of the opioid epidemic.  This
24 was all a surprise and a revelation to Cuyahoga
25 County in 2016, is that the county's position?

Page 141

1     A   The county's position is that, yes, it
2  became aware that this was an opiate epidemic in
3  2016.  And then with the data that we now had
4  available to us and we started connecting all of the
5  dots, we can go back and say retrospectively, yes,
6  those expenses were, in fact, attributed to this.
7        You can't realize you have an
8  epidemic all at once.  You need data, you need
9  experience, you need time.
10    Q   And so it is Cuyahoga County's position
11 that it didn't know there was a opioid epidemic
12 until 2016.
13       MR. BADALA:  Objection to form, asked and
14 answered?
15    A   That's correct.
16    Q   (Mr. Keyes) It wasn't until 2016 that
17 Cuyahoga County discovered that from 2006, to 2015,
18 it had spent incompetences of $450 million because
19 of an opioid epidemic it didn't know anything about,
20 that's the position of the county?
21    A   Yes.  You might want to put this in
22 perspective.  This county spends $2 billion a year.
23 So to spend 20 million, there's always something
24 going on.  And so it is not, 56 million, you know,
25 you said it with a lot of strenuousness in your

36 (Pages 138 - 141)

Page 142

1 voice, but we spend $2 billion. It is not uncommon
2 to say the costs went up 10 million. I will
3 research everything, but 10 million is a blip when
4 we spend over 2 billion.
5     Q   So as the director of the Office of Budget
6 and Management, during this time frame, you did not
7 know between 2006 and 2015 that Cuyahoga County had
8 spent in excess of $450 million because of an opioid
9 epidemic and furthermore, Cuyahoga County didn't
10 even know there was an opioid epidemic during that
11 time frame. Is that the county's testimony?
12         MR. BADALA: Objection to form.
13     A   That's absolutely the testimony. Now to
14 be clear, I was not the director from 2006 to 2015.
15 I became the director in October of 2015 of the
16 Office and Budget Management. I did work in the
17 Office of Budget Management previous to that.
18         What I know as the director is that
19 we are spending money to autopsy bodies of people
20 who have overdosed. What I know is that we are
21 spending money to take care of children whose
22 parents cannot take care of them or have failed them
23 in the most egregious ways. I don't get the data,
24 as I previously said, why specifically this child
25 has been taken from their home.

Page 143

1         I just get the bill that says this
2 child is costing us $225 a day. I don't get the
3 data that would have allowed me as the director of
4 the Office of Budget Management to connect and say,
5 hey, I bet all of these things in these county
6 systems is connected to this one thing. The county
7 got that data, had that realization and connected
8 all of those dots in 2016.
9     Q   (Mr. Keyes) So it is the county's
10 testimony today that not only you didn't know, but
11 no one in the Office of Budget Management knew, no
12 one in the mayor's office knew and no one on the
13 county council knew that there was an opioid
14 epidemic for the prior nine years, correct?
15     A   I can't speak for the mayor because we
16 don't have a mayor, but nobody in the county knew
17 prior to 2016 that we were, in fact, dealing with an
18 opioid epidemic.
19     Q   No one in Cuyahoga County government,
20 including anyone in the Office of Budget and
21 Management, anyone in the county executive's office
22 and anyone on the county council knew before 2016
23 that there was an opioid epidemic and that it had
24 started as early as 2006, is that the county's
25 testimony today?

Page 144

1         MR. BADALA: Objection to form, asked and
2 answered.
3     A   Yes, and I do want to be clear, that prior
4 to 2011, the county did not have a council or an
5 executive. We were working under a different system
6 of government. So I certainly can't speak for
7 elected officials who didn't exist. But that is
8 correct, the Office of Budget Management lacks the
9 requisite expertise and has no access to the data to
10 say that we had an opiate epidemic. The county did
11 not know that there was an opiate epidemic prior to
12 2016.
13     Q   (Mr. Keyes) Tell me what happened in 2016
14 where Cuyahoga County had an epiphany and realized
15 that unbeknownst to it, there had been an opioid
16 epidemic since 2006, as to which the county had
17 spent in excess of $450 million?
18         MR. BADALA: Objection to form.
19     Q   (Mr. Keyes) What happened in 2016 that
20 Cuyahoga County suddenly realized, oh, we are now in
21 year ten of an opioid epidemic, what happened?
22         MR. BADALA: Which question are you
23 asking? You asked a question and another question,
24 which questions are you asking?
25     Q   (Mr. Keyes) It is all one question.

Page 145

1         MR. BADALA: No, it is not, it's two
2 question.
3     Q   (Mr. Keyes) Tell me what happened in 2016
4 where Cuyahoga County realized, unbeknownst to it
5 for the past nine years, that it was in year ten of
6 an opioid epidemic and that unbeknownst to the
7 county it had spent in excess of $450 million on
8 that opioid epidemic?
9         MR. BADALA: Objection to form.
10     A   Um, it has to just be that the county had
11 access to its data and was analyzing its data. I
12 can't tell you one specific thing. I think it is
13 misrepresenting to say that the county had an
14 epiphany. As if we have been negligent in seeing
15 what's happening in our community for the last
16 ten years. Nobody woke up and said, oh, this is
17 what it is, but it is analyzing all the data
18 available to us.
19         We have 7,000 employees, we have over
20 50 agencies. That's a lot of data to pull together
21 and realize that oh, what's happening over here is
22 directly attributed to what's happening over there,
23 and there and there. That's a lot of agencies,
24 that's a lot of data that you have to analyze.
25     Q   (Mr. Keyes) But in 2016 the county looked

37 (Pages 142 - 145)

Page 146

1 at its data and determined that it spent hundreds of
2 millions of dollars on opioid epidemic that reached
3 back to 2006, correct?
4     MR. BADALA: Object to form, asked and
5 answered.
6     A   That's correct.
7     Q   (Mr. Keyes) And that's data that the
8 county had, correct?
9     A   I can't say that that was data that the
10 county had available to it the whole time.
11    Q   I didn't say that. You said that they
12 looked a data in 2016?
13    MR. BADALA: Are you done with your
14 answer?
15    A   I'm not done with my answer. You asked me
16 if that was data that the county had. And I can't
17 say that that's data that the county had. The
18 county may have had access to data in 2016 that it
19 didn't have in 2015, I don't know.
20    Q   (Mr. Keyes) What data did the county look
21 at in 2016 that brought to its attention this ten
22 year old opioid epidemic that it didn't know about
23 for the prior ten years?
24    MR. BADALA: Objection to form, outside
25 the scope.

Page 147

1     A   I'm going to answer that in two parts.
2         One, I don't know what specific data
3 sources the county got in 2016 that led to the
4 realization that we are in the midst of an opioid
5 epidemic, but I want to point out that in 2007, just
6 as an example, this $36 million, it wasn't
7 necessarily $36 million more than the previous year.
8 But this is 36 million that was attributed to now we
9 know the opiate epidemic. It is not as if the
10 county woke up one day and found that it spent
11 $500 million more than it ever had before, but now
12 we know the cause.
13        Previous to that, we had had no one
14 singular cause why we are taking children into
15 custody. Now we are able to trace back and say,
16 yes, in fact, over the last several years, we have
17 spent between 11 and $23 million taking children as
18 a result of this one singular cause.
19    Q   (Mr. Keyes) So in 2016, Cuyahoga County
20 realized that since 2006, it had spent in excess of
21 $450 million because of an opioid epidemic and
22 didn't know it before then?
23    MR. BADALA: Objection to form, asked and
24 answered.
25    Q   (Mr. Keyes) Correct?

Page 148

1     A   I cannot, first of all, I cannot say that
2 the county new these specific dollar amounts in
3 2016. I did not see this table in 2016. So I don't
4 know when the county knew that it had spent, as you
5 say, hundreds of millions of dollars and wasn't
6 aware of it.
7         I know that we realized we had the
8 opiate epidemic in '16 and then I first saw this
9 table in 2018. So that's when I became aware that
10 this was, in fact, our damage.
11    Q   Prior to 2016, did Cuyahoga County know
12 that it was spending money because of an opioid
13 epidemic?
14    A   No. Prior to that, the county knew it was
15 spending money because people weren't taking care of
16 their children, people were dying, people were
17 coming into the jail and now we have to cart them off to
18 hospitals every other day. We have rising
19 caseloads, but we don't know.
20        You don't know without analyzing all
21 the data A, what is, what's driving that increase
22 and then B, whether it is, in fact, an epidemic or
23 it is a blip or it is this. I mean, you were asking
24 me previously did the numbers of deaths increase
25 this year over this year. We did go down in 2018,

Page 149

1 but we have gone down before and then we dip back
2 up. It would be premature for the county to say in
3 2018 we are healed because that number has gone back
4 up before.
5         You can't take one piece of data
6 point in time and make determinations.
7     Q   Prior to 2016, did Cuyahoga County know
8 that it was spending money because of opioid use,
9 misuse, abuse or addiction?
10    MR. BADALA: Objection to form, asked and
11 answered.
12    A   I don't, I can't say, I don't know the
13 answer to that. I know that the county knows it was
14 spending money on its mandated services to do this.
15 Whether, I do not believe the county knew exactly
16 why, what was the cause. We did not know that,
17 certainly we didn't know there was an epidemic until
18 2016.
19        Did the county know in 2008 that
20 maybe one parent was addicted to something that was
21 an opiate? Probably. I'm sure that in 2008 we took
22 a child from their home because their parent was an
23 addict. But to say this was, in fact, an epidemic
24 did not occur until 2016.
25    Q   (Mr. Keyes) My question didn't say

38 (Pages 146 - 149)

Page 150

1 anything about an epidemic. My question said, prior
2 to 2016, did Cuyahoga County know that it was
3 spending money because of opioid use, misuse, abuse
4 or addiction?
5     MR. BADALA: Objection to form, asked and
6 answered.
7   A   On individual clients, yes.
8   Q   (Mr. Keyes) Prior to 2016, did Cuyahoga
9 County know that it was spending significant money
10 because of opioid use, misuse, abuse or addiction
11 within the county?
12     MR. BADALA: Objection to form, asked and
13 answered.
14   A   I would need a definition of significant.
15   Q   (Mr. Keyes) Millions of dollars?
16     MR. BADALA: Objection to form.
17   A   We define significant as $5 million,
18 $50 million? I don't know what significant means.
19 5 million is not significant to me.
20   Q   (Mr. Keyes) Is $5 million significant to
21 Cuyahoga County?
22   A   $5 million, depending on what we are
23 looking at, might not be enough to raise eyebrows.
24 We spend 2 billion.
25   Q   So at what point are the numbers

Page 151

1 significant enough for Cuyahoga County to pay
2 attention to what it is spending and why, and
3 whether there is spending attributable to a problem
4 of opiates in the community?
5     MR. BADALA: Objection to form.
6   A   To be clear, even if the numbers don't
7 change, the county is monitoring what it is spending
8 money on. My office does that as a matter of
9 routine and I report on it as a matter of routine
10 even if the numbers don't change. That in itself
11 could be significant depending on your definition of
12 significant.
13     County is always monitoring its
14 expenses. The county discovered, if I may, that
15 there was an opiate epidemic that we were spending
16 money in 2016. Substantial money as a result of one
17 cause in 2016.
18   Q   (Mr. Keyes) You say the county is
19 monitoring what it is spending money on. You are
20 talking about currently?
21   A   The county, at least going back to 2006,
22 has always monitored its spending.
23   Q   Carefully?
24   A   Yes.
25     MR. BADALA: Objection to form.

Page 152

1   A   Yes, carefully.
2   Q   (Mr. Keyes) On a department by department
3 and agency by agency basis?
4     MR. BADALA: Objection to form.
5   A   On a division by division basis. In my
6 office very rarely misses the actuals by any more
7 than 3 percent.
8   Q   (Mr. Keyes) So you and in your office
9 since 2006 have been on top of what the county is
10 spending on the division by division, department by
11 department, agency by agency basis, correct?
12   A   That is correct.
13   Q   And that has been without fail since 2006?
14   A   Monitoring expenditures, yes.
15   Q   So there aren't expenditures that are a
16 surprise to your office currently, correct?
17     MR. BADALA: Objection to form.
18   A   There can be expenditures that's a
19 surprise if it posts. I don't know that an
20 expenditure necessarily has existed until it
21 happens.
22   Q   (Mr. Keyes) And are the expenditures that
23 are listed in this chart from 2006 to 2017,
24 authorized or unauthorized expenses?
25     MR. BADALA: Objection to form.

Page 153

1   A   County doesn't spend money without
2 authorization. They are authorized.
3   Q   (Mr. Keyes) Are the expenditures that
4 listed here from 2006 to 2017 budgeted or non
5 budgeted expenditures?
6     MR. BADALA: Objection to form.
7   A   The county has no legal authority to spend
8 unless the dollars are appropriated, which is
9 probably what you mean by budgeted. So everything
10 is appropriated.
11   Q   (Mr. Keyes) So every expenditure that is
12 listed on this chart from 2006 to 2017 was a
13 budgeted expense?
14     MR. BADALA: Objection to form.
15   A   The only exception would be if we have
16 what's called trust and agency accounts. The
17 prosecutor has some, which would be like forfeiture
18 money, seizures, but that would be -- I don't know
19 what's included in here, but for the most part, yes,
20 it would all be budget.
21   Q   (Mr. Keyes) So you identified a possible
22 exception, it is just a possible exception?
23   A   That's correct.
24   Q   Putting that possible exception to the
25 side, is it the county's testimony that every

39 (Pages 150 - 153)

Page 154

1 expenditures that's listed in this chart from 2006
2 to 2017 relating to the opioid problem was a
3 budgeted expense?
4        MR. BADALA: Objection to form.
5     A   What I'm saying is that they are
6 appropriated.
7     Q   (Mr. Keyes) Meaning they were
8 appropriated by county council, correct, or its
9 predecessor?
10    A   That's correct.
11    Q   And therefore were authorized expenditures
12 in advance of being made?
13       MR. BADALA: Objection to form.
14    A   Yes. The authorization could have come a
15 week in advance, but yes.
16    Q   (Mr. Keyes) Okay.
17    A   These are not always, sorry, but, it is
18 not as if, we amend budgets every four weeks. The
19 budget is constantly amended. Every expenditure in
20 2006 was not known or even anticipated for that
21 matter in the 2006 budget, original budget if that
22 makes sense.
23    Q   Okay. But I'm trying to understand. Were
24 the expenses listed in this chart from 2006 to 2017
25 unauthorized or were they appropriated?

Page 155

1        MR. BADALA: Objection to form.
2     A   Expenditures are appropriated.
3     Q   (Mr. Keyes) And so all of the
4 expenditures on this chart from 2006 to 2017 were
5 appropriated, correct?
6     A   That's correct.
7     Q   And they were appropriated in advance of
8 the expenditures being made?
9     A   That's correct. There are some
10 expenditures in the county budget, there are some
11 legal exceptions where you can get approval after
12 the fact.
13       So not for the appropriation, you
14 have to have appropriation, but just as an example,
15 we do have the ability for foster care and adoption
16 as an example. The foster, if you are a foster
17 parent or adoptive parent. You can choose the
18 agency you want to work with. So if you take a
19 child today, and we didn't even know who you were
20 yesterday, and you say I am already working with
21 agency X. We can authorize retroactively an expense
22 to agency X, but the expense itself would have been
23 appropriated.
24    Q   So were any of the expenses listed on this
25 chart from 2006 to 2017 expenses that were incurred

Page 156

1 beyond the budget?
2     A   Absolutely.
3     Q   Okay. Which ones?
4     A   I can't definitively say which ones, but I
5 can tell knowing these individual agencies and the
6 years we are talking about, they exceeded their
7 budget.
8     Q   Okay. You can't tell me which
9 expenditures?
10    A   No, of course not.
11    Q   You can't tell me which line items?
12    A   Line item, do you mean agency?
13    Q   Agency or division?
14    A   Children and Family Services exceeded its
15 budget within this period of time, the public
16 defender exceeded its budget probably every year
17 during this time, juvenile court exceeded its budget
18 during this time period, the sheriff's office
19 exceeded their budget during time period, the
20 medical examiner exceeded its budget during the time
21 period.
22       The ADAMHS Board never did, though as
23 I mentioned, we only give them a subsidy and I'm not
24 mentioning the prosecutor and Court of Common Pleas
25 only because I can't remember.

Page 157

1     Q   In which years and by how much?
2     A   I can't tell you that off the top of my
3 head.
4     Q   Okay. Does the county use FAMIS to track
5 expenditures?
6     A   Yes, it did.
7     Q   And can you run a query against FAMIS to
8 identify all expenditures by a particular account?
9     A   What do you mean by account.
10    Q   I mean, a particular account number?
11       MR. BADALA: Objection, outside the scope.
12    A   So we refer to account number like 50
13 different things. Do you mean an agency, is that
14 what you mean by account?
15    Q   (Mr. Keyes) No, I mean like supplies or
16 postage stamps. What would you call that?
17    A   We call that a subobject. But, yes, we
18 can run -- FAMIS doesn't run queries the way you
19 think, it is a very old system. We are in the
20 process of upgrading it.
21       So I can't say run, you know, run me
22 every supply for in every year. I can do that in
23 BRASS, which is my budget and reporting system.
24    Q   Okay. But if I wanted to identify every
25 expenditures by subobject for every cost center for

40 (Pages 154 - 157)

Page 158

1 a particular period of time, that can be done
2 against FAMIS, correct?
3        MR. BADALA: Objection to form, outside
4 the scope.
5    A   That can be done depending on the year in
6 BRASS, which uses FAMIS data. You can't run that
7 query in FAMIS.
8    Q   (Mr. Keyes) And when you get that export
9 of the data listing all of the expenditures, can you
10 tell from the system what the revenue source was for
11 each expense?
12        MR. BADALA: Objection, outside the scope.
13    A   Not for each expense, no.
14    Q   (Mr. Keyes) So if you look at a
15 particular expense, either in FAMIS or BRASS, and
16 you want to know what dollars were used to cover
17 that expense, how do you determine that?
18        MR. BADALA: Objection, outside the scope.
19    A   So the revenue is tracked by what you are
20 calling a cost center, but any particular, so for
21 example, I will just use the prosecutor's office.
22 The prosecutor's office is largely general fund.
23 They do get some other revenue, but just for the
24 sake of this, I will say they are general fund.
25        If you look at the prosecutor's

Page 159

1 expenses, the revenue will just say general fund.
2 General fund is comprised of, you know, dozens of
3 revenue sources and including, just as an example,
4 sales tax and property tax.
5        I cannot tell you that, you know,
6 this prosecutor is paid by sales tax and this
7 prosecutor is paid by property tax. They are paid
8 by the general fund.
9    Q   (Mr. Keyes) Okay.
10    A   Does that answer your question?
11    Q   Not entirely.
12    A   I don't understand it then.
13    Q   If for any particular expenditure incurred
14 by Cuyahoga County, I want to know where the dollars
15 came from?
16    A   Uh-huh.
17    Q   Whether they came from the federal
18 government, from the state government, from a third
19 party, from a special fund or a general fund, how do
20 I do that?
21        MR. BADALA: Objection, outside the scope.
22    A   So we have reports that can show you by
23 fund and each fund will identified the sources of
24 revenue that are included in that fund.
25    Q   (Mr. Keyes) Okay. But on a particular

Page 160

1 expenditure.
2    A   Uh-huh.
3    Q   How do I match that up, either using BRASS
4 or FAMIS data with the source of the funds that
5 covered that expenditure?
6    A   On a specific expenditure you don't use
7 BRASS or FAMIS. For that you would have to either
8 go to the agency itself, if it's relevant. So, for
9 example, I will use Children and Family Services, so
10 they have, you know, people, boarding care expenses
11 and facilities, right. And on the revenue side they
12 have Health and Human Service levies, a Title 4E,
13 the state child adoption allocation.
14        The agency can tell you by
15 expenditure what revenue source they're hitting. I
16 don't have that level of detail.
17    Q   But the agency can do that?.
18        MR. BADALA: Objection to form.
19    A   For a lot of their expenses, yes.
20    Q   (Mr. Keyes) And how can each agency tell
21 what the revenue source is for a particular
22 expenditure, looking at what record or records?
23    A   I don't know what their records are
24 called, but I know they have it because we report
25 that to some of the agencies where we receive

Page 161

1 revenue. So we get revenue from the State of Ohio
2 and in order to draw down that revenue, they have to
3 report what their expenses are.
4    Q   Okay. So I want to be very clear. If
5 Cuyahoga County points down the road in more detail
6 to specific expenses it incurred.
7    A   Uh-huh.
8    Q   Purportedly because of the opioid problem?
9    A   Uh-huh.
10    Q   For each of those expenses, I want to be
11 able to look at what the source of revenue was for
12 that expenditure. How do I do that?
13    A   So, again, I can tell you the funding
14 source that goes into the fund and then I can tell
15 you each individual revenue source.
16        If you want to know what funding
17 source paid for this paperclip, you can try the
18 agency if they report at that level of detail. Not
19 all of them do because a lot of them we're not
20 required to do that.
21    Q   Well, can you at least tell whether that
22 paperclip was paid for by federal money, state
23 money, grant money, general fund or special fund?
24        MR. BADALA: Objection to form.
25    A   Well, all of that is county money, which

41 (Pages 158 - 161)

Page 162

1 comes into the county budget as either general fund
2 or special fund. So that's the only two options for
3 us, general fund or special revenue fund. Federal
4 money, state money, grant money can flow into one of
5 those two.
6    Q  (Mr. Keyes) Into general fund or special
7 fund?
8    A  That's correct.
9    Q  But then how do you account for the
10 dollars that come in from the state or federal
11 government into a general fund or a special fund?
12    A  We capture our revenue by line item. I
13 mean, very specifically. So I have one particular,
14 again, we use subobject on revenue and I have one
15 subtitle for a Title 4E maintenance, I have one
16 subobject for the local government fund, one for
17 property taxes, one for delinquent property taxes.
18       We get very detailed.
19    Q  (Mr. Keyes) Okay.
20       MR. KEYES: Let's a five minute break.
21       THE VIDEOGRAPHER: It is 12:49. Going off
22 the record.
23       (Off the record.)
24       THE VIDEOGRAPHER: It is 1:03, we are back
25 on the record.

Page 163

1    Q  (Mr. Keyes) What categories of
2 expenditures did the medical examiner's office incur
3 because of the opioid problem?
4    A  I can only tell you the total dollar
5 amount that has been identified in the medical
6 examiner's budget. I cannot tell you categories of
7 expenditures.
8    Q  Can you identify any types of expenditures
9 that the medical examiner's office incurred because
10 of the opioid problem?
11    A  Personnel costs and nonpersonnel costs.
12    Q  What are the personnel costs that were
13 incurred by the medical examiner's office because of
14 the opioid problem?
15    A  I know that specifically they had to hire
16 an additional pathologist. I do not know what other
17 staff have been included in the cost.
18    Q  What pathologist was hired?
19    A  Do you need a name?
20       MR. BADALA: Objection to form.
21    Q  (Mr. Keyes) What was the formal position?
22    A  Pathologist.
23    Q  And who was hired for that slot?
24    A  Well, we have several. I don't know. I
25 don't know any of their names except for Dr. Gilson.

Page 164

1    Q  When was the additional pathologist hired?
2    A  I cannot tell you that.
3    Q  And how much was spent on this new or
4 additional pathologist?
5    A  Well, the pathologists are about 150 to
6 200,000 a year. The last one we hired, I don't know
7 their individual rates of pay, but they are up
8 there.
9    Q  So how many pathologists does the medical
10 examiner's office currently have?
11    A  Oh, goodness. I can't say without looking
12 at an OARRS chart for them.
13    Q  How many did it have in 2018?
14       MR. BADALA: Objection, outside the scope.
15    A  I'm sorry, I can't say.
16    Q  (Mr. Keyes) How about 2017?
17    A  I can't say.
18    Q  How about in any prior year before 2017?
19    A  I know they got an additional one in 2017.
20 But I don't know the base number and then what that
21 one increased it to.
22    Q  You testified before about hiring an
23 additional pathologist that occurred in 2017?
24    A  That's correct.
25    Q  Okay. Other than the medical examiner's

Page 165

1 office hiring an additional pathologist in 2017, can
2 you tell me anything about the categories or types
3 of expenditures that the medical examiner's office
4 incurred because of the opioid problem in the area
5 of personnel costs?
6       MR. BADALA: Objection to form.
7    A  Well, I don't mean to give the impression
8 that the additional pathologist is the only
9 personnel expense. So the number of our
10 pathologists has been increasing over time, and we
11 have other personnel besides pathologists. That's
12 just one example that I can tell you was definitely
13 attributed because the medical examiner had to come
14 in and ask for additional funding mid year.
15    Q  (Mr. Keyes) So I asked you what are the
16 expenses incurred by the medical examiner's office
17 because of the opioid problem. You said personnel
18 costs and nonpersonnel costs. With respect to
19 personnel costs I said, what are the expenditures or
20 types of expenditures? You said they had to hire an
21 additional pathologist.
22       What, if any, are the other personnel
23 costs incurred by the medical examiner's office
24 because of the opioid problem?
25    A  It would be their entire staffing. I

42 (Pages 162 - 165)

Page 166

1 don't have all of their job classifications. They
2 have scientists, and data analysts, and
3 pathologists, and clerks, but um, a portion of the
4 medical examiner's workload is attributed to the
5 opioid epidemic. So necessarily a portion of their
6 personnel cost, in addition to just the
7 pathologists, would be.
8    Q   What portion of the personnel costs is
9 attributable to the opioid problem?
10      MR. BADALA: Objection to form.
11    A   I can't answer that question. I was not
12 involved in the calculation of impact to the county
13 budget of the opiate epidemic and I know the figures
14 identified in the Exhibit 2 are totals, but I do not
15 have the breakout of whether that's personnel,
16 nonpersonnel, or for that matter, what kind of
17 personnel costs, whether it is salaries, benefits.
18    Q   (Mr. Keyes) What percentage of the
19 autopsies performed by the medical examiner's office
20 involved the decedents use of prescription opiates?
21    A   Dr. Gilson could best answer that
22 question, I don't have that data.
23    Q   What percentage of the toxicology testing
24 performed by the medical examiner's office involves
25 decedents who use prescription opiates?

Page 167

1    A   Again, I would have to defer to
2 Dr. Gilson, the medical examiner. I know they do
3 track that data because I have seen, they have
4 provided that to me at least a couple times, but I
5 don't have it off the top of my head.
6    Q   You have seen data from the medical
7 examiner's office that shows the percentage of
8 toxicology tests that show the use of prescription
9 opioids by the decedent?
10    A   Yes, the use of, well, yes. They have
11 that data.
12    Q   Prescription opioids?
13    A   Yes.
14    Q   How often do you get that kind of data
15 from the medical examiner's office?
16    A   It is not routine. So I ask for it every
17 once in a while if I see something changing with the
18 projections of the office up or down. They haven't
19 really been going down. Then I might ask because I
20 want to include it in the narrative that we send
21 with the quarterly forecast, but I don't receive it
22 on aw routine basis.
23    Q   What nonpersonnel costs have been incurred
24 by the medical examiner's office because of the
25 opioid problem?

Page 168

1    A   Um, well, they have supply costs related
2 to toxicology testing, there's equipment in the
3 medical examiner's lab that is used for conducting
4 autopsies and other services. Again, I can't tell
5 you a dollar amount because the experts calculated
6 these figures that are referenced here. So I only
7 see the total, but those are the nonpersonnel costs
8 that are in the medical examiner's office.
9    Q   What equipment, if any, do the medical
10 examiner's office buy because of the opioid problem
11 that it otherwise didn't need?
12    A   I would have to defer to Dr. Gilson to
13 answer that question. I don't, I'm not familiar
14 with all of their equipment to be honest. I can
15 only pronounce a little bit of it. So I don't know.
16    Q   What supplies, if any, did the medical
17 examiner's office buy because of the opioid problem
18 that it otherwise didn't need?
19    A   Again, I would defer to Dr. Gilson. I
20 know that they, meaning the medical examiner has
21 reported that their supply costs have increased as a
22 result of the number of opiate cases that are coming
23 through, but he's best to talk about the supplies
24 and equipment that are utilized in that office.
25    Q   Can you connect any of expenditures that

Page 169

1 the county says were incurred because of the opioid
2 problem to the conduct of any particular defendant?
3    A   Um, I don't -- I don't, I cannot. Whether
4 the county's experts are working on that. I don't
5 know. I have not seen any report that connects
6 anything to any of have the defendants.
7    Q   Sitting here today as the corporate
8 representative for Cuyahoga County, can you connect
9 any of the expenditures that the county says were
10 incurred because of the opioid to the conduct of any
11 particular defendant?
12      MR. BADALA: Objection to the form.
13    A   The county can connect its expenses to the
14 conduct of the defendants. At this point I cannot
15 say which defendant for any level of damages, but
16 again, I would defer to the county's attorney and
17 its experts on that. That is certainly beyond the
18 scope of what the county does.
19    Q   (Mr. Keyes) Please identify for me the
20 positions that were created and funded by the
21 Cuyahoga County government because of the opioid
22 problem?
23      MR. BADALA: Objection to form.
24    A   Off the top of my head, and this would not
25 in any way be an exhaustive list. We have created

43 (Pages 166 - 169)

Page 170

1 new positions in the Children and Family Services of
2 Social Workers. We have hired additional correction
3 officers, we have hired, as I said, an additional
4 pathologist. Other than that, I'd have to review
5 hiring requests, but I know those specifically, but
6 that should not be interpreted as an exhaustive
7 list.
8     Q    (Mr. Keyes) And you said earlier the one
9 pathologist was hired in 2017?
10    A    There was one hired in 2017, that is
11 correct.
12    Q    How many correction officer positions did
13 Cuyahoga County government create and fund because
14 of the opioid problem?
15    A    I can't answer that question.
16    Q    When did Cuyahoga County government create
17 and fund additional correction officers positions
18 because of the opioid problem?
19    A    The county hired additional correction
20 officers in 2017 and 2018.
21        Now retrospectively, I cannot say
22 whether the figures identified in Exhibit 2 include
23 correction officers. The county will increase the
24 number of correction staff based on the ADP. So,
25 again, I'm sorry, the average daily population. So

Page 171

1 if that increases, of course we have to hire
2 additional correction officers.
3     Q    How many additional positions for
4 correction officers did Cuyahoga County government
5 create and fund in 2018?
6     A    I can't answer that off the top of my
7 head.
8     Q    How many additional positions for
9 correction officers did Cuyahoga County government
10 create and fund in 2017?
11    A    25.
12    Q    And were all 25 of those additional
13 positions for correction officers that Cuyahoga
14 County government created and funded in 2017 because
15 of the opioid problem?
16    A    I can't answer that question.
17    Q    How many additional positions for
18 correction officers did Cuyahoga County government
19 create and fund before 2017 because of the opioid
20 problem?
21    A    I can't answer that question.
22    Q    How many social workers did the Division
23 of Children and Family Services create and fund in
24 2018 because of the opioid problem?
25    A    In 2018, the county did create new social

Page 172

1 worker positions. How many of them are attributed
2 to the opiate problem I can't specifically say.
3 Again, I'm not in the business, the county is not in
4 the business of doing that kind of computation.
5        So we are relying on the experts to
6 do that for us. I just know what we spent.
7     Q    How many additional social worker
8 positions were created and funded for the Division
9 of Children and Family Services in 2018?
10    A    Um, I believe it was 12.
11    Q    How many of those 12 additional social
12 worker positions were created and funded for the
13 Division of Children and Family Services because of
14 the opioid problem?
15    A    I believe I just answered that. I can't
16 say how many of the positions are created are
17 directly attributed to the opiate.
18    Q    How many social worker positions were
19 created and funded for the Division of Children and
20 Family Services in 2017?
21    A    I'm not aware of enough positions being
22 created in 2017. I believe we were relying on
23 overtime.
24    Q    So is it accurate to say that no --
25    A    Sorry, in 2017 we were cut, we were in the

Page 173

1 second year of a budget. We had cut the budget,
2 2016 and '17 budget. In 2017 we were working on the
3 '18/'19 budget. And everybody was told if you need
4 something, basically don't even ask because we were
5 seeking cuts from all the agencies due to projected
6 operating deficits our costs are increasing. So I
7 don't believe that we created new positions in 2017.
8     Q    Okay. I want to make sure I understand
9 your answer.
10        Is it your testimony that no
11 additional social worker positions were created and
12 funded for the Division of Children and Family
13 Services in 2017?
14    A    That's my understanding.
15    Q    How many additional social worker
16 positions were created and funded for the Division
17 of Children and Family Services in 2016?
18    A    I can't say. I can't recall off the top
19 of my head.
20    Q    Any?
21    A    I don't know.
22    Q    Before 2017, did Cuyahoga County
23 government create any additional social worker
24 positions for the Division of Children and Family
25 Services because of the opioid problem?

Veritext Legal Solutions
www.veritext.com                                                                888-391-3376

Page 174

1    A    Well, before 2017, we wouldn't have done
2  it at the time knowingly because of the opiate
3  problem. Because in those years before 2017, we
4  didn't know what we were dealing with.
5        So whether we created new positions
6  in the Department of Division and Children Family
7  Services, I can't say.
8        But I can say that we would have just
9  requested any positions as a result of rising
10  caseloads.
11    Q    Is it your testimony that before 2017,
12  Cuyahoga County government did not create any
13  additional social worker positions for the Division
14  of Children and Family Services because of the
15  opioid problem?
16        MR. BADALA: Objection to form,
17  mischaracterizes testimony.
18    A    That's not my testimony. So I'm saying A,
19  I can't recall if we created new positions prior to
20  2017 in that division specifically. And I'm saying
21  that certainly before 2016, any new positions
22  created would have been as a result of rising
23  caseloads. It wouldn't have been requested because
24  of the opiate epidemic.
25    Q    (Mr. Keyes) Because your testimony is

Page 175

1  that before 2016, Cuyahoga County was unaware of
2  their being an opioid problem, correct?
3        MR. BADALA: Objection to form.
4    A    That's correct.
5    Q    (Mr. Keyes) What are the total dollars
6  spent by Cuyahoga County in any year in providing
7  services to people who have an opioid use disorder
8  because of their use of prescription opioids?
9        MR. BADALA: Objection to form.
10    A    I can't identify that. What the county
11  has identified is the total dollars spent related to
12  the opiate epidemic. But as I mentioned before,
13  that includes prescription opiates, but that would
14  also tie in Fentanyl is a prescription, carfentanil
15  and heroin.
16        So I can't piece out for you of these
17  totals, how much is prescription, how much is every
18  other category.
19    Q    (Mr. Keyes) What are the total dollars
20  spent by Cuyahoga County in any year in providing
21  services through the Division of Children and Family
22  Services to children or families that involved the
23  parents use or misuse of prescription opioids?
24        MR. BADALA: Objection to form.
25    A    Again, I can't break out that. So we have

Page 176

1  the total amount spent by the Division of Children
2  and Family Services for the overarching opiate
3  epidemic.
4    Q    (Mr. Keyes) What are the total dollars by
5  Cuyahoga County in any year in the prosecutor,
6  public defender, or the Court of Common Pleas
7  agencies in providing services to individuals who
8  are in the criminal justice system because of their
9  use or misuse of prescription opioids?
10        MR. BADALA: Objection to form.
11    A    I don't have that level of detail.
12    Q    (Mr. Keyes) What are the total dollars
13  spent by Cuyahoga County in the juvenile court
14  agency because of juveniles, or their family
15  members, use or misuse of prescription opioids?
16        MR. BADALA: Objection to form.
17    A    I don't have that detail.
18    Q    (Mr. Keyes) Are the total dollars spent
19  by the sheriff's office, either the sheriff's
20  division, law enforcement division or the jail
21  division spending, I'm sorry, strike that.
22        What are the total dollars spent by
23  the law enforcement or jail divisions of the
24  sheriff's agency in providing services to
25  individuals who have been charged with or convicted

Page 177

1  of crimes involving use or misuse of prescription
2  opioids?
3        MR. BADALA: Objection to form.
4    A    I don't have that level of detail. I will
5  point out that it is possible for us to have an
6  inmate in our facility who has an addiction to
7  prescription opiates or any kind of opiates who is
8  not being charged with a drug crime.
9    Q    (Mr. Keyes) What are total dollars spent
10  by law enforcement or jail divisions of the
11  sheriff's agency in providing medical services to
12  individuals who are in the system and have an opioid
13  use disorder because of their use or misuse of
14  prescription opioids?
15        MR. BADALA: Objection to form.
16    A    I don't have that level of detail.
17    Q    (Mr. Keyes) What are the total dollars
18  spent by the medical examiner's office in providing
19  services in connection with deaths that are
20  attributable to the use or misuse of prescription
21  opioids?
22        MR. BADALA: Objection to form.
23    A    Again, I don't have that level of detail.
24  The county recognizes the opiate epidemic all
25  derives from prescription opiates.

45 (Pages 174 - 177)

Page 178

1    Q    (Mr. Keyes) Do you have a factual basis
2  for Cuyahoga County's position that the opioid
3  epidemic is attributable to prescription opioids?
4         MR. BADALA: Objection to form.
5    A  I'm sorry, can you repeat the question?
6    Q    (Mr. Keyes) Sure.  Do you have a factual
7  basis for the position that you just stated of
8  Cuyahoga County that the opioid epidemic is
9  attributable to prescription opioids?
10         MR. BADALA: Objection to form.
11    A  Um, that assertion is based in part on our
12  medical examiner, Dr. Gilson, who has been actively
13  involved in this for sometime, and the county is
14  deferring to its attorneys and the experts as well.
15    Q    (Mr. Keyes) Have you spoken with the
16  experts about this?
17    A  No, I have not.
18    Q    Have you spoken with the lawyers about
19  this?
20    Q    About?
21         MR. BADALA: Hold on.  I'm going to object
22  and instruct you not to disclose any conversations
23  with the lawyers.
24    Q    (Mr. Keyes)  Have you spoken with
25  Dr. Gilson about this, this position that the opioid

Page 179

1  epidemic is attributable to prescription opioids?
2    A  Um, I can't confirm that I have had a
3  specific discussion with him, but Dr. Gilson has, so
4  the directors that work under the authority of the
5  county executive.  We have bimonthly director
6  meetings and Dr. Gilson is a standing agenda item,
7  has been for a couple years, to talk about the
8  opiate epidemic.  So he has communicated that stance
9  through those director meetings, which I attend.
10    Q    So let me make sure I understand your
11  factual basis for what you say is Cuyahoga County's
12  position that the opioid epidemic is attributable to
13  prescription opioids.  And you said, it is based on
14  what Dr. Gilson has said, what Cuyahoga County's
15  lawyers have said, and what Cuyahoga County's
16  experts have said, correct?
17         MR. BADALA: Objection to form.
18    Q    (Mr. Keyes) Is that correct?
19    A  I think that might be slightly
20  misrepresenting because Cuyahoga County is not
21  saying that there is not a problem with heroin or
22  carfentanil or any other kind of illicit opiate that
23  I don't know the name of.  The county's stance is
24  that those issues stem from the use of prescription
25  opiate.

Page 180

1    Q    That position is based on what the lawyers
2  have said, what the experts for the lawyers have
3  said, and what Mr. Gilson has said, correct?
4         MR. BADALA: Objection to form.
5    A  That's correct.
6    Q    (Mr. Keyes) Do you have any other basis
7  besides what the county's experts in this case have
8  said, the county's lawyers have said or Mr. Gilson
9  have said?
10         MR. BADALA: Objection to form, outside
11  the scope.
12    A  The county defers to experts.
13    Q    (Mr. Keyes) But you haven't talked to any
14  of the experts, right?
15    A  But I think I'm speaking for the county
16  and the county is deferring to the experts that have
17  been retained to assist us.
18    Q    Okay.  So what does the county know by
19  talking to experts about this?
20         MR. BADALA: Objection to form.
21    A  The county confers with its attorneys,
22  which I'm not going to disclose what the county
23  discusses with its attorneys.
24    Q    (Mr. Keyes) I didn't ask about the
25  lawyers, I said I asked about the experts.

Page 181

1    A  The county confers with.
2         MR. BADALA: Hold on, give me a second.
3  Objection to form, outside the scope.  Just give me
4  a second, I'm sorry.
5    Q    (Mr. Keyes) You said the county defers to
6  the experts.  You are telling me that position,
7  right?
8    A  That's correct.
9    Q    I asked you the basis for the position and
10  you said Gilson county lawyers and county experts?
11    A  That's correct.
12    Q    And when you are at some pointing to the
13  experts, have you talked to any of the experts?
14         MR. BADALA: Objection to form, outside
15  the scope.
16    A  No, I have not.
17    Q    (Mr. Keyes) So what you know about what
18  the experts say is through the lawyers?
19         MR. BADALA: Objection to form, I'm going
20  to instruct you not to respond to that, don't answer
21  that question.  It is privilege what our discussions
22  with her and the lawyers, that's privileged.
23    Q    (Mr. Keyes) My question was --
24         MR. BADALA: That was your question.
25    Q    (Mr. Keyes) What you know about what the

Page 182

1  experts say is through the lawyers. That's a yes or
2  no question. If the answer is no, there's no
3  privilege. If the answer is yes, I'm not going to
4  ask about it either way. I'm entitled to a yes or
5  no.
6        MR. BADALA: I am going to object and
7  instruct you not to respond to that question.
8    Q    (Mr. Keyes) Separate from what you have
9  learned from the lawyers, do you have any idea what
10 the experts for Cuyahoga County say in this case?
11       MR. BADALA: Objection to form.
12   A    No, I have not communicated with the
13 experts.
14   Q    (Mr. Keyes) So the county's position that
15 the opioid epidemic is attributable to prescription
16 opioids is based on what the county has heard from
17 the lawyers about what the experts say, plus what
18 Dr. Gilson has said, correct?
19       MR. BADALA: I'm going to object again,
20 and as for the lawyer, I'm going to tell you not to
21 confirm or deny that's privileged communication.
22 You can talk about your communication with
23 Dr. Gilson, but not with the lawyers.
24   A    I certainly have discussed the
25 communication with Dr. Gilson. He regularly reports

Page 183

1  out to all the county leadership.
2    Q    (Mr. Keyes) So you are relying on what
3  Dr. Gilson has said?
4    A    Not exclusively.
5    Q    You are relying on what Dr. Gilson has
6  said and what you have learned from the lawyers.
7        MR. BADALA: Again, I'm going to instruct
8  you not to respond regarding the lawyers. You can
9  respond regarding Dr. Gilson.
10       MR. KEYES: I'm trying to understand the
11 basis of your position. What is the basis of your
12 position besides what you have heard from lawyers.
13 I'm not allow to probe that, so I'm not asking what
14 you've heard from lawyers.
15       MR. BADALA: She has told you three times,
16 Dr. Gilson.
17   Q    (Mr. Keyes) What is the basis, Gilson and
18 anything else?
19       MR. BADALA: Again, besides the lawyers if
20 there was anything.
21   A    That's it.
22   Q    (Mr. Keyes) That's it.
23   A    Yes.
24   Q    Thank you.
25       MR. KEYES: I have no further questions.

Page 184

1        MR. BADALA: Hold on one second. Anyone
2  on the defense side have any questions?
3        How about anyone on the phone, anyone have
4  any questions?
5        Let's take a quick two minute break.
6        THE VIDEOGRAPHER: 1:32 going off the
7  record.
8        (Off the record.)
9        THE VIDEOGRAPHER: It is 1:40. We are
10 back on the record.
11       EXAMINATION
12 BY MR. BADALA:
13   Q    Miss Keenan, I just have a couple
14 follow-up questions for you.
15       When did the county first become
16 aware that there was  a heroin epidemic in Cuyahoga
17 County?
18   A    I want to be clear that the county
19 recognizes an opiate epidemic that includes
20 prescription opiates, heroin, Fentanyl and
21 carfentanil. The county realized that we were in
22 the midst of an epidemic in 2016.
23       MR. BADALA: I have no further questions
24       THE VIDEOGRAPHER: It is 1:41. Going off
25 the record.

Page 185

1        (End of video deposition.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

47 (Pages 182 - 185)

Page 186

1  State of Ohio

2           SS.

3  County of Cuyahoga

4      I, Randy R. Dunn, a Licensed Certified Court

5  Reporter by the Supreme Court in and for the State

6  of Missouri, duly commissioned, qualified and

7  authorized to administer oaths and to certify to

8  depositions, do hereby certify that pursuant to

9  Notice in the civil cause now pending and

10  undetermined in the County of Cuyahoga, State of

11  Ohio, to be used in the trial of said cause in said

12  court, I was attended at the offices of Climaco,

13  Wilcox, Peca, Tarantino & Garofoli, 55 Public

14  Square, Suite 1950 in the City of Cleveland, State

15  of Ohio, by the aforesaid attorneys; on the 18th day

16  of January , 2019.

17      The said witness, being of sound mind and being

18  by me first carefully examined and duly cautioned

19  and sworn to testify the truth, the whole truth, and

20  nothing but the truth in the case aforesaid,

21  thereupon testified as is shown in the foregoing

22  transcript, said testimony being by me reported in

23  shorthand and caused to be transcribed into

24  typewriting, and that the foregoing page correctly

25  set forth the testimony of the aforementioned

Page 187

1  witness, together with the questions propounded by

2  counsel and remarks and objections of counsel

3  thereto, and is in all respects a full, true,

4  correct and complete transcript of the questions

5  propounded to and the answers given by said witness;

6      I further certify that I am not of counsel or

7  attorney for either of the parties to said suit, not

8  related to        e parties or

9  their atto

10

11

12  Randy R. Dunn RPR, CRR, CCR No. 193

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 188

1              Veritext Legal Solutions
                1100 Superior Ave
2                   Suite 1820
                Cleveland, Ohio 44114
3                Phone: 216-523-1313
4

5  January 23, 2019

6  To: Salvatore C. Badala

   Case Name: In Re: National Prescription Opiate Litigation v.
7
   Veritext Reference Number: 3182085
8
   Witness: Maggie Keenan      Deposition Date: 1/18/2019
9

10  Dear Sir/Madam:

11  Enclosed please find a deposition transcript. Please have the witness

12  review the transcript and note any changes or corrections on the

13  included errata sheet, indicating the page, line number, change, and

14  the reason for the change. Have the witness' signature notarized and

15  forward the completed page(s) back to us at the Production address

16  shown

17  above, or email to production-midwest@veritext.com.

18  If the errata is not returned within thirty days of your receipt of

19  this letter, the reading and signing will be deemed waived.

20

21  Sincerely,

22  Production Department

23

24

25  NO NOTARY REQUIRED IN CA

Page 189

1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS

2  ASSIGNMENT REFERENCE NO: 3182085

3  CASE NAME: In Re: National Prescription Opiate Litigation v.
   DATE OF DEPOSITION: 1/18/2019

4  WITNESS' NAME: Maggie Keenan

5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of

6  my testimony or it has been read to me.

7      I have made no changes to the testimony
   as transcribed by the court reporter.

8

9  Date _____     Maggie Keenan

10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,

11  the referenced witness did personally appear
   and acknowledge that:

12

        They have read the transcript;

13      They signed the foregoing Sworn
        Statement; and

14      Their execution of this Statement is of
        their free act and deed.

15

        I have affixed my name and official seal

16  this _____ day of _____, 20 ____.

17

18  _____
   Notary Public

19  _____
   Commission Expiration Date

20

21

22

23

24

25

48 (Pages 186 - 189)

Page 190

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
   ASSIGNMENT REFERENCE NO: 3182085
 3 CASE NAME: In Re: National Prescription Opiate Litigation v.
   DATE OF DEPOSITION: 1/18/2019
 4 WITNESS' NAME: Maggie Keenan
 5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
 6 my testimony or it has been read to me.
 7     I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
 8 well as the reason(s) for the change(s).
 9     I request that these changes be entered
   as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13
   Date        Maggie Keenan
14
       Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18 in the appended Errata Sheet;
       They signed the foregoing Sworn
19 Statement; and
       Their execution of this Statement is of
20 their free act and deed.
21     I have affixed my name and official seal
22 this _____ day of _____, 20____.
23
       Notary Public
24
25     Commission Expiration Date
```

Page 191

```
 1        ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS MIDWEST
 2        ASSIGNMENT NO: 1/18/2019
 3 PAGE/LINE(S) /     CHANGE     /REASON
 4     _____
 5     _____
 6     _____
 7     _____
 8     _____
 9     _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19
20 Date        Maggie Keenan
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20____ .
23
       Notary Public
24
25     Commission Expiration Date
```

49 (Pages 190 - 191)