EXHIBIT 64

Page 1

1              IN THE UNITED STATES COURT

2               NORTHERN DISTRICT OF OHIO

3                   EASTERN DIVISION

4                ~~~~~~~~~~~~~~~~~~~~

5   IN RE:  NATIONAL PRESCRIPTION

6   OPIATE LITIGATION              MDL No. 2804

7                                  Case No. 17-md-2804

8                                  Judge Dan Polster

9   This document relates to:

10  The County of Summit, Ohio, et al., v.

11  Purdue Pharma L.P., et al.,

12  Case No. 1:18-OP-45090 (N.D. Ohio)

13

14

15

16        VIDEOTAPED DEPOSITION OF MOLLY LECKLER

17           November 19, 2018, at 10:00 a.m.

18                  Cleveland, Ohio

19

20

21

22

23  Reported by:

24  Anne E. Vosburgh, CSR-6804

25  Job No. 3113667

Page 38

1 gathered from the client themselves?
2     A.   Mostly.  It also entails other --
3 for example, like I said before, if somebody
4 is currently involved in a treatment agency,
5 that client will sign a release of
6 information and the assessor will then obtain
7 information from that agency, whether it be
8 substance abuse or mental health.
9     Q.   Okay.
10         And you said one of the things
11 that is assessed is history of drug use; is
12 that right?
13     A.   That is correct.
14     Q.   And is there a time period for
15 which you're gathering information?  Is it
16 drug use in the last three years, five years?
17 Or is it as far back as --
18         MR. BADALA:  Objection to form.
19         THE WITNESS:  It's a lifetime.
20 BY MR. RUIZ:
21     Q.   And is that provided by the
22 client?
23     A.   Yes.
24     Q.   And is anything done to verify
25 that information that is provided by the

Page 39

1 client?
2     A.   The only thing that's verified by
3 the client is if they are out on bail, there
4 could be some drug tests on record.
5     Q.   Okay.
6         And what level of detail, if you
7 know, is gathered about prior drug use?
8         MR. BADALA:  Objection to form.
9         THE WITNESS:  How they started,
10     how much their current use is, if they
11     needed to use more to get the same high,
12     what form they use, how they use.
13 BY MR. RUIZ:
14     Q.   What do you mean by "what form
15 they use"?
16     A.   If they use pills, they snort
17 pills, or if they inject pills.
18     Q.   Is any effort made to determine
19 how they acquire drugs?
20         MR. BADALA:  Objection to form.
21         THE WITNESS:  I don't know.
22 BY MR. RUIZ:
23     Q.   Turning back to the document, that
24 same second bullet near the top says:
25         "Drug Court is set up to treat

Page 40

1     drug-dependent individuals, those
2     meeting criteria from the DSM-IV for
3     drug dependence and is not
4     appropriate for those merely abusing
5     drugs."
6     A.   Yes.
7     Q.   To your knowledge, what's the
8 difference between someone who is drug
9 dependent and someone who is merely abusing
10 drugs?
11         MR. BADALA:  Objection to form.
12         THE WITNESS:  I am not a licensed
13     independent social worker so therefore I
14     cannot make particular diagnoses in an
15     individual, if that makes sense.
16 BY MR. RUIZ:
17     Q.   I totally get that, but if you
18 have an understanding, what's the difference
19 between someone who is drug dependent and
20 someone who abuses drugs?
21         MR. BADALA:  Objection to form.
22         THE WITNESS:  So this
23     participation agreement is also done for
24     the previous version of the DSM
25     diagnoses, so they clinically do not use

Page 41

1     "drug dependent" any longer.  It is now
2     referred to as mild, moderate, and
3     severe diagnoses.
4         So we wouldn't use that
5     terminology any longer.  We do, however,
6     look at cases that are moderate and
7     severe diagnoses because it's a very
8     strict program and it's designed to
9     treat those that have a significant
10     problem with pills.
11 BY MR. RUIZ:
12     Q.   So if you -- I'm hearing you
13 right, someone who has a mild diagnosis is
14 ineligible for Drug Court?
15     A.   That is correct.  I work for a
16 court that has other diversionary programs,
17 so we will at times request to the court that
18 they review the case for eligibility for
19 those other programs that are more designed,
20 less intense.
21     Q.   And to your knowledge, is it
22 possible for individuals to use drugs without
23 developing any kind of use disorder?
24         MR. BADALA:  Objection to form.
25         THE WITNESS:  I don't know.

11 (Pages 38 - 41)

Page 42

1  BY MR. RUIZ:
2      Q.    The employees at TASC who do the
3  drug-dependence assessment, what occupation
4  are they?
5          MR. BADALA:  Objection to form.
6  BY MR. RUIZ:
7      Q.    If you know.
8      A.    What occupation?
9      Q.    Are they social workers?  Are they
10  doctors?  Are they something else?
11     A.    They are social workers, and
12  there's different levels.
13     Q.    And what are those different
14  levels?
15     A.    So you have a licensed social
16  worker, and you have those that also have
17  obtained a chemical dependence lead
18  counselor's license, and then you have those
19  that have an independent license, and those
20  are the individuals that can make clinical
21  recommendations per the DSM Manual.
22          So, for example, if someone that
23  works for TASC that is just a licensed social
24  worker goes in and does an assessment, that
25  assessment has to be signed off by an

Page 43

1  independent licensed individual in order to
2  make recommendations in the state of Ohio.
3      Q.    So we've talked about the referral
4  process.  After the referral, there's a
5  screening for background and drug dependence;
6  is that right?
7      A.    There's a screening.  The second
8  part is now -- not dependence, like we said.
9  Now it's to determine the level of substance
10  use.
11     Q.    Right.  Okay.
12          What happens after those -- after
13  the assessment and the initial screening?
14     A.    Like I stated before, the
15  probation officer will then go over what a
16  potential case plan will look like, and they
17  will have the client sign a participation
18  agreement to make sure that they understand
19  what the rules of the Drug Court program will
20  be.
21          And then they will email me to say
22  this case is ready to go forward.  And then I
23  will do what I need to do on my end to get
24  the case ready.
25     Q.    And what's that?  What would you

Page 44

1  do on your end?
2      A.    So every case needs to be
3  administratively transferred over to the
4  specialty docket judge.  So, therefore, I
5  would request to the administrative and
6  presiding judge that the case has been
7  reviewed, deemed eligible, and request that
8  it be transferred to the specialty docket
9  judge.
10     Q.    And who is the -- talking just for
11  Drug Court, the specialty docket judge is
12  Judge Matia?  Is that how you say his name?
13     A.    It's actually Judge David T.
14  Matia.
15     Q.    Matia.  Thank you.
16     A.    Yes.  People do that often.
17     Q.    I will try to keep that straight
18  throughout the day.
19          And everything that we've talked
20  about so far, is that process the same for
21  the Recovery Court?
22     A.    That is correct.
23     Q.    Okay.
24          And which judge oversees the
25  Recovery Court?

Page 45

1      A.    Judge Joan Synenberg.
2      Q.    And is there a -- after you have
3  transferred the docket, is there anything
4  else that happens before formal acceptance
5  into the program?
6      A.    At times, there could be some more
7  discussion with the defense counsel.  They
8  are informed when the case has been deemed
9  eligible.  And then I put them on the next
10  scheduled docket that we have scheduled.  And
11  we typically have three dockets a month, both
12  in the morning and the afternoon.
13          And then on Recovery Court side,
14  same deal, three dockets a month, just in the
15  morning time.  So that entails me then going
16  and obtaining the criminal file from the
17  current assigned judge, and then just some
18  paperwork.
19     Q.    And when you say there are three
20  dockets a month, that's -- there are three
21  essentially hearing dates?
22     A.    Correct.
23     Q.    And what goes on at those
24  hearings?
25     A.    There's a lot that goes on in

12 (Pages 42 - 45)

1   those hearings. So they're called status
2   review hearings. And, on average, we see
3   about 30 cases per docket session.
4       We have cases that will go in
5   front of the judge for just a compliance
6   hearing, meaning that the client is doing
7   very well. They are going to their meetings,
8   they're going to treatment, they're testing
9   negative, they are participating.
10      So part of the standards is that
11  the judge have that one-on-one interaction
12  with the client, an average of three minutes.
13  And we have violation hearings. So,
14  therefore, you would have some clients that
15  tested positive, failed to show, failed to go
16  to group. And then we also, in that session,
17  we have cases that will be formally accepted
18  into the program.
19      So, depending on where the case
20  process is, they could plead and be
21  sentenced. We could just welcome them into
22  the program if they're already on community
23  control supervision. So a lot of things.
24      Q.   And who determines whether a
25  client will be formally accepted into the

1   Drug Court program?
2       A.   So the judge has the final
3   discretion to accept or deny a case.
4       Q.   And once a client is accepted into
5   the program, is there an initial court
6   hearing that happens?
7       A.   Yes.
8       Q.   And you talked a little bit about
9   what goes on generally at the docket
10  hearings. But for someone who -- this is
11  their first time into the program, they've
12  just been admitted, what goes on at that
13  first status hearing?
14      A.   So like I said, it depends on
15  where their case process is, if it's pre-plea
16  or post disposition. So if it's pre-plea,
17  then they will plead to the case and they
18  will be sentenced. And if they are already
19  on community control supervision, depending
20  on if the previous court held them in
21  violation, if they're referred to the program
22  at a violation.
23      So it just depends on what
24  happened prior, what exactly the criminal
25  proceedings would look like.

1       Q.   Do you know what portion of Drug
2   Court participants are -- enter the program
3   pre-plea versus post plea?
4       A.   I do not have the exact number. I
5   would say majority.
6       Q.   Do you think it's more than
7   75 percent?
8           MR. BADALA: Objection to form.
9           THE WITNESS: I don't know the
10      number. I'm sorry.
11  BY MR. RUIZ:
12      Q.   Okay.
13          If you turn to the page that has
14  Bates Number 218 at the bottom, under
15  "Supervision and treatment requirements," it
16  lists a number of requirements in bullet form
17  there.
18          And one of them is -- it's about
19  three-quarters of the way down the bullets on
20  the page. And it says that Drug Court
21  participants are required to pay court fines,
22  restitution, if applicable, and supervision
23  fees.
24          Do you see that?
25      A.   Yes.

1       Q.   Okay.
2           And how are the court fines -- are
3   the court fines set by statute or rule?
4           MR. BADALA: Objection to form.
5           THE WITNESS: It depends. Most of
6       the court fines are what happened prior
7       to their case coming to us.
8   BY MR. RUIZ:
9       Q.   So they don't continue to accrue
10  court fines or fees?
11      A.   No. And the great thing about
12  Drug Court is as long as you are doing what
13  you're supposed to and you're in what we call
14  the honor box, meaning doing well, you get to
15  sit like where a jury would sit in a
16  courtroom. They receive an incentive in the
17  sense that we deduct $20 off their court
18  costs. And that's a way for us to provide
19  more incentive to stay on the right track.
20      Q.   And what about restitution? Is
21  that restitution that is ordered as part of
22  their -- the disposition of the case?
23          MR. BADALA: Objection to form.
24          THE WITNESS: Restitution is
25      determined by the prosecutor. The

13 (Pages 46 - 49)

Page 50

1    client is aware of that, and that's
2    something that defense counsel discusses
3    with the client.
4    BY MR. RUIZ:
5       Q.   Do you have any knowledge of to
6    whom that restitution is paid?
7       A.   It's always stated on the record.
8    And it's in the journal entry.
9       Q.   Does restitution ever get paid to
10   the court?
11      A.   The restitution gets paid to --
12   they submit their restitution to the
13   probation department, which is underneath the
14   court, and then is then provided to the
15   victim.
16      Q.   In the -- in the case in which
17   someone is arrested for a drug crime, do you
18   know if there's ever an instance in which
19   someone is ordered to pay restitution to the
20   court system or to the Drug Court program?
21          MR. BADALA:  Objection to form.
22          THE WITNESS:  I don't know.
23      Typically drug cases do not have
24      restitution.  Those are theft and
25      robbery cases.

Page 51

1    BY MR. RUIZ:
2       Q.   Okay.
3           And you said that for clients that
4    are in the honor box, they get $20 off their
5    court costs?
6       A.   That is correct.
7       Q.   How often does -- assuming that
8    the client is -- stays in the honor box, how
9    often is the $20 deducted?
10      A.   Every time they're in court.  So
11   it depends on what phase they're in.
12      Q.   Because during different phases,
13   they might be coming to court more often or
14   less often?
15          MR. BADALA:  Objection to form.
16          THE WITNESS:  That is correct.
17   BY MR. RUIZ:
18      Q.   And earlier I asked you about the
19   number of participants that enter the program
20   pre-plea versus post plea.  Is that recorded
21   anywhere?
22      A.   It's in our criminal dockets.  So,
23   yes.
24      Q.   Is there any way -- is there
25   anywhere where that information is kept in an

Page 52

1    aggregated form?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  I don't know.
4    BY MR. RUIZ:
5       Q.   Do you have any idea what the
6    average court costs are per person?
7          MR. BADALA:  Objection to form.
8          THE WITNESS:  I don't know.  I
9      know that majority of cases do not have
10     much court costs when they graduate.
11   BY MR. RUIZ:
12      Q.   And is there a maximum deduction
13   that they can achieve?
14      A.   Is there a maximum deduction that
15   they can attain, meaning like is there -- do
16   we like only allow them $100 maximum to get
17   deducted?
18      Q.   Right.
19      A.   No.
20      Q.   So they can go all the way to
21   zero?
22      A.   That is correct.
23      Q.   As a client is going through the
24   process and has a background check done, a
25   drug-dependence assessment, or -- I'm sorry.

Page 53

1    What is it called now instead of a
2    drug-dependence assessment?
3       A.   They just don't use the word
4    "dependence."  They use diagnoses.  So either
5    mild, moderate, or severe.
6       Q.   So a drug diagnosis assessment, is
7    that information -- where is that information
8    kept?
9          MR. BADALA:  Objection to form.
10         THE WITNESS:  The information or
11     the assessment?
12   BY MR. RUIZ:
13      Q.   If I wanted to look at a record of
14   the assessment for a Drug Court client, where
15   would I go to find it?
16      A.   You would not be able to.
17      Q.   Why not?
18      A.   Because of HIPAA.
19      Q.   So assuming HIPAA was not an
20   issue, where would you go to find that
21   document?
22      A.   You would have to go to the TASC
23   department who did the assessment.
24      Q.   And so you don't have a copy of
25   that, as Drug Court coordinator, in your

14 (Pages 50 - 53)

Page 54

1    files anywhere?
2        A.    Absolutely.
3        Q.    I'm sorry.  Absolutely you do or
4    you do not?
5        A.    Absolutely I do.
6        Q.    Okay.
7            So you have access to that file as
8    well?
9        A.    Absolutely.
10       Q.    And for any given client, what
11   other information are you keeping -- either
12   electronically or in hard copy -- about that
13   patient throughout the program?
14           MR. BADALA:  Objection to form.
15           THE WITNESS:  What kind of
16       information am I keeping document-wise?
17   BY MR. RUIZ:
18       Q.    Yes.
19       A.    Progress reports, progress reports
20   given by the case manager, progress reports
21   given by the probation officer, record of
22   drug tests, releases of information, maybe a
23   mental health assessment if they need mental
24   health linkage.
25       Q.    And do you keep that information

Page 55

1    after a client has graduated from the
2    program?
3        A.    Yes.
4        Q.    And how long do you keep that
5    information?
6        A.    Forever.
7        Q.    So you haven't destroyed or
8    deleted files of clients that have graduated
9    from the program?
10           MR. BADALA:  Objection, form.
11           THE WITNESS:  No.
12   BY MR. RUIZ:
13       Q.    At some point a treatment plan is
14   created for the client; is that right?
15       A.    That is correct.
16       Q.    And how is that created?
17       A.    A treatment plan is created by the
18   case manager.  And treatment plans are
19   created with the client.
20       Q.    And the case manager is the TASC
21   case manager; is that right?
22       A.    Correct.
23       Q.    And how many different TASC case
24   managers are there?
25       A.    Which docket?

Page 56

1        Q.    Let's start with Drug Court.
2        A.    Okay.  So in Drug Court, in our
3    morning docket, we have two case managers.
4    In the afternoon docket, we have one.
5        Q.    And how many clients do they
6    manage at a given time?
7        A.    They manage about 40 cases at any
8    given time.
9        Q.    Okay.
10       A.    Our afternoon docket generally is
11   a little bit -- a little bit more of a
12   strenuous -- they have a little bit more
13   cases.  That's all opiate abuse cases.
14       Q.    And the -- so it's three separate
15   people, the three case managers?
16       A.    That is correct.
17       Q.    Switching over to the Recovery
18   Court, how many case managers are there?
19       A.    We have two.
20       Q.    And how many clients do each of
21   those case managers serve?
22       A.    Those also have about 40 cases
23   each.
24       Q.    Now, in terms of the treatment
25   plan -- what are the different treatment

Page 57

1    options that the Drug Court program offers?
2        A.    Do you mean like level of
3    treatment, like where they go for treatment,
4    like residential or IOP, which is intensive
5    outpatient treatment, and then there would be
6    non-intensive outpatient treatment.
7        Q.    Well, let me back up, actually.
8            When a treatment plan is
9    developed, what is part of that plan?
10           MR. BADALA:  Objection, form.
11           THE WITNESS:  Part of that plan is
12       what form of treatment they're going to
13       start.
14   BY MR. RUIZ:
15       Q.    What do you mean by that?
16       A.    So there's different levels of
17   treatment.  So one could go into residential
18   treatment, one could go into intensive
19   outpatient treatment, and one could go into
20   outpatient treatment.  So that would be a
21   part of the case plan.
22       Q.    Okay.
23       A.    Also, any other needs that need to
24   be addressed, anywhere from going to take,
25   you know, HIV testing to linkage with mental

15 (Pages 54 - 57)

1  health counseling.  So there's a lot of
2  services that is -- that a client may
3  participate in, and it changes as different
4  goals are met.
5      Q.   And for the different treatment
6  options that you have, how do those get
7  fulfilled?  Do you have contracts with
8  providers, treatment providers?
9      A.   Yes.
10     Q.   And what are the different
11  treatment providers that you have contracts
12  with?
13     A.   We have treatment -- contracts
14  with numerous providers:  Catholic Charities,
15  Community Assessment & Treatment Services,
16  Stella Maris, and with TASC itself that runs
17  some intensive outpatient treatment groups.
18     Q.   And how is it determined where a
19  client goes?
20     A.   So -- a lot of different things:
21  Where they've been previously, what needs
22  they have, medication-assisted treatment
23  recommendations, and some other things.
24     Q.   Okay.
25          And what is medication-assisted

1  treatment?
2      A.   Medication-assisted treatment is
3  basically -- just kind of like it says,
4  basically those that want to participate in
5  medication to help them deal with their
6  opiate use.
7          So, for example, Vivitrol,
8  Subutex, methadone.
9      Q.   And you said -- what you just said
10  was that you could use medically-assisted
11  treatment for people that have -- that use
12  opioids, opiates; is that right?
13     A.   That is correct.
14     Q.   Are there also clients within the
15  Drug Court program that are admitted for
16  non-opiate-related diagnoses?
17          MR. BADALA:  Objection to form.
18          THE WITNESS:  Yes.
19  BY MR. RUIZ:
20     Q.   And do you have a sense of what
21  percentage of Drug Court program participants
22  are -- have opiate versus non-opiate
23  diagnoses?
24     A.   I can give you an estimate, and
25  it's about 85 percent are opiate.

1      Q.   And is that for the Drug Court?
2      A.   That is correct.  The Recovery
3  Court is all opiate.  The afternoon docket is
4  all opiate.  So just that morning docket.
5          We also have those that have
6  opiate-use disorder.  However, keep in mind,
7  Recovery Court is just opiate.  The afternoon
8  docket is just opiate.
9      Q.   So when you say "opiate," I want
10  to make sure that we're talking about the
11  same things.
12          What is an opiate, to your
13  knowledge?
14     A.   To my knowledge, an opiate is a
15  painkiller.
16     Q.   Okay.
17          And what is the basis for your
18  knowledge about opioids?
19     A.   I've attended training, both local
20  and -- about every other year, I attend
21  training, the NADCP, which is National
22  Association of Drug Court Professionals.
23     Q.   And what kind of trainings have
24  you attended?
25     A.   All different kinds.

1      Q.   The trainings that you have
2  attended, are they for a specific license
3  that you have, or just in connection with
4  your position in the Drug Court?
5          MR. BADALA:  Objection to form.
6          THE WITNESS:  It's just connection
7      with the profession that I work with.
8  BY MR. RUIZ:
9      Q.   And these trainings that you go
10  to, are they related to substance abuse,
11  generally?
12          MR. BADALA:  Objection to form.
13          THE WITNESS:  Mostly.
14  BY MR. RUIZ:
15     Q.   Are any of them specific to
16  opiates or opioids?
17          MR. BADALA:  Objection to form.
18          THE WITNESS:  Yes.
19  BY MR. RUIZ:
20     Q.   And can you recall any of them
21  that were specific to opiates?
22     A.   Yes.  I attend different
23  presentations that courts may do -- what
24  they're doing to treat opiate use, from the
25  initial -- like an Opiate 101 to the

16 (Pages 58 - 61)

Page 62

1    innovative programs that other things --
2    services that other programs have done, how
3    they started expanding their services, and
4    different things that they've done to monitor
5    those that suffer from opiate-use disorder.
6        Q.   What's the most recent one that
7    you can remember that you've attended?
8        A.   So last month -- well, yeah, last
9    month.  The Ohio Supreme Court puts on a
10   specialized docket conference.  So I attended
11   that conference.
12       Q.   And how did that relate to
13   opiates?
14       A.   I had the opportunity to witness
15   Summit County's presentation.
16       Q.   And Summit County made a
17   presentation.  What was their presentation
18   about?
19       A.   So they presented on -- they have
20   a drug therapy dog.  They also have
21   collaboration with their local YMCA.  So it
22   was just kind of a neat conversation with
23   them to see what they're doing.
24           Also, with their forms of
25   medication as to treatment, what they use,

Page 63

1    their different treatment options that they
2    have.
3        Q.   Prior to the conference that you
4    went to last month, what's the most recent
5    one that you can remember that you attended
6    relating to opioids?
7        A.   I don't remember.
8        Q.   How many would you say that you
9    have attended relating to opioids?
10           MR. BADALA:  Objection, form.
11           THE WITNESS:  I don't know.
12   BY MR. RUIZ:
13       Q.   Would you say it's more than five?
14           MR. BADALA:  Objection to form.
15           THE WITNESS:  I don't know.
16   BY MR. RUIZ:
17       Q.   Do you -- when you attend these
18   conferences or trainings, do you get written
19   materials?
20       A.   Yes.
21       Q.   Do you keep those materials?
22       A.   Yes.
23       Q.   Do you also sometimes get
24   materials electronically?
25       A.   I may at times -- like, for

Page 64

1    example, the specialized docket conference, I
2    was unable to attend some other training that
3    was going on in the same session.  So you can
4    go onto the website and obtain their
5    PowerPoints.
6        Q.   Is it ever the case where
7    conference or training materials are provided
8    to you electronically to download to your
9    computer?
10           MR. BADALA:  Objection, form.
11           THE WITNESS:  Anyone can.
12   BY MR. RUIZ:
13       Q.   Would you have copies of those
14   trainings on your computer?
15           MR. BADALA:  Objection to form.
16           THE WITNESS:  Yes.
17   BY MR. RUIZ:
18       Q.   Okay.
19           Can you give me an example of an
20   opioid?
21       A.   An example of an opioid.
22   Percocet, OxyContin, Vicodin.  Also heroin,
23   fentanyl.  Those are just some examples.
24       Q.   Drugs like cocaine,
25   methamphetamine, marijuana, Xanax, Adderall,

Page 65

1    those aren't opioids, to your knowledge,
2    right?
3            MR. BADALA:  Objection, form.
4            THE WITNESS:  That is correct.
5    BY MR. RUIZ:
6        Q.   And you understand that some
7    opioids have legitimate medical purposes?
8            MR. BADALA:  Objection to form.
9            THE WITNESS:  I don't know.
10   BY MR. RUIZ:
11       Q.   You don't know?
12       A.   I don't know.  I'm not a doctor.
13   I don't know.
14       Q.   Well, do you know that opioids are
15   sometimes prescribed to individuals?
16           MR. BADALA:  Objection, form.
17           THE WITNESS:  Yes.  I know that
18       opioids are prescribed to those -- to
19       people.
20   BY MR. RUIZ:
21       Q.   And do you know that opioids --
22   certain opioids have been approved by the
23   FDA?
24           MR. BADALA:  Objection, form.
25           THE WITNESS:  I do not.  I'm not a

17 (Pages 62 - 65)

Page 66

1   physician.
2   BY MR. RUIZ:
3      Q.   Do you know that the DEA regulates
4   opioids?
5          MR. BADALA:  Objection, form.
6          THE WITNESS:  I do not.  I do not
7   work for the DEA.  I just work in the
8   Drug Court.  So I just work with what
9   happens after those have substance-abuse
10  disorders, including opiates.
11  BY MR. RUIZ:
12     Q.   I know you don't work for the DEA.
13  I'm just wondering if you know that the DEA
14  regulates opioids.
15         MR. BADALA:  Objection, form.
16         THE WITNESS:  No, I do not.
17         MR. RUIZ:  Okay.
18         MR. BADALA:  Is it a good time to
19  take a five-minute break?  We've been
20  going about an hour.
21         MR. RUIZ:  Yeah.
22         THE VIDEOGRAPHER:  Off the record.
23  11:25.
24         (Recess taken.)
25         THE VIDEOGRAPHER:  We're back on

Page 67

1   the record.  11:38.
2   BY MR. RUIZ:
3      Q.   Ms. Leckler, I asked you earlier
4   if you knew that some opioids have legitimate
5   medical uses, and you said you're not a
6   doctor.  But you know that some opioids are
7   legal, right?
8          MR. BADALA:  Objection to form.
9          THE WITNESS:  I know that some
10  opiates are legal.
11  BY MR. RUIZ:
12     Q.   Yes.  That's my question.
13         MR. BADALA:  Same objection.
14         THE WITNESS:  Rephrase it?
15  BY MR. RUIZ:
16     Q.   Do you know that it is possible
17  for a person to legally get an opioid?
18         MR. BADALA:  Objection to form.
19         THE WITNESS:  Yes.
20  BY MR. RUIZ:
21     Q.   What do you know about the
22  circumstances under which someone could
23  legally obtain an opioid?
24         MR. BADALA:  Objection to form.
25         THE WITNESS:  Meaning they would

Page 68

1   obtain a prescription from a physician.
2   BY MR. RUIZ:
3      Q.   Okay.
4          So they obtain a prescription from
5   a physician and then what?
6          MR. BADALA:  Objection to form.
7          THE WITNESS:  Then I don't know.
8   BY MR. RUIZ:
9      Q.   Okay.
10         And you don't know how opioids are
11  regulated at the federal level?
12         MR. BADALA:  Objection to form.
13         THE WITNESS:  I do not.
14  BY MR. RUIZ:
15     Q.   Do you know anything about how
16  they're regulated at the state level?
17     A.   I do not.
18     Q.   You're not familiar with how the
19  Ohio Board of Pharmacy regulates opioids?
20         MR. BADALA:  Objection to form.
21         THE WITNESS:  I do not.
22  BY MR. RUIZ:
23     Q.   Okay.
24         You understand that some opioids
25  can be obtained by prescription and others

Page 69

1   cannot?  Do you know that?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  Do I understand that
4   some opiates can be -- opioids can be
5   obtained by prescription and some
6   cannot?
7   BY MR. RUIZ:
8      Q.   Right.
9          MR. BADALA:  Same objection.
10         THE WITNESS:  Yes.
11  BY MR. RUIZ:
12     Q.   For instance, Vicodin, you could
13  obtain a prescription for Vicodin?
14         MR. BADALA:  Objection to form.
15         THE WITNESS:  Someone could.
16  BY MR. RUIZ:
17     Q.   Someone could?
18     A.   Yes.
19     Q.   But no one can obtain a
20  prescription for heroin?
21     A.   That is correct.
22     Q.   But those are both opioids?
23     A.   That is correct.
24     Q.   Right.  Okay.
25         Now, for prescription opioids, do

18 (Pages 66 - 69)

Page 70

1  you have any understanding of how those drugs
2  make their way from a manufacturer to a
3  patient?
4      A.   I do not.
5      Q.   Okay.
6          So you don't know -- do you know
7  that manufacturers make opioids?
8          MR. BADALA:  Objection to form.
9          THE WITNESS:  I do not.
10  BY MR. RUIZ:
11      Q.   Do you know that certain
12  distributors distribute opioids?
13          MR. BADALA:  Objection to form.
14          THE WITNESS:  I do not.
15  BY MR. RUIZ:
16      Q.   But you do know that doctors can
17  prescribe opioids?
18      A.   Yes.
19      Q.   Do you know that pharmacies can
20  dispense opioids?
21          MR. BADALA:  Objection to form.
22          THE WITNESS:  Yes.
23  BY MR. RUIZ:
24      Q.   Okay.
25          Do you know that insurance can

Page 71

1  reimburse for opioid prescriptions?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  I do not.
4  BY MR. RUIZ:
5      Q.   Do you know if Medicaid reimburses
6  for opioid prescriptions?
7          MR. BADALA:  Objection to form.
8          THE WITNESS:  I do not.
9  BY MR. RUIZ:
10      Q.   Or if they cover opioid
11  prescriptions?
12          MR. BADALA:  Objection to form.
13          THE WITNESS:  I do not.
14  BY MR. RUIZ:
15      Q.   You said that a person might be
16  able to obtain a prescription for an opioid
17  from a physician.
18          Do you know who else a person
19  might be able to obtain a prescription for an
20  opioid from?
21          MR. BADALA:  Objection to form.
22          THE WITNESS:  I do not.
23  BY MR. RUIZ:
24      Q.   Would you agree that a prescriber
25  is the one who determines whether a given

Page 72

1  medicine is appropriate for a patient?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  I do not.  Like I
4  said before, I am not a physician.  I do
5  not know.
6  BY MR. RUIZ:
7      Q.   I'm not asking if you're a
8  physician.  I'm not asking for your medical
9  opinion.  I'm just asking for your opinion as
10  someone who works in the Drug Court for
11  almost ten years --
12      A.   Uh-huh.
13      Q.   -- and has a lot of knowledge
14  around substance abuse and has gone to
15  opioid-specific trainings.
16          Do you agree that a prescriber is
17  the one who determines whether a medication
18  is appropriate for someone or not?
19          MR. BADALA:  Objection to form.
20  Asked and answered.
21          THE WITNESS:  I don't know.
22  BY MR. RUIZ:
23      Q.   Do you know whether it's up to the
24  prescriber to weigh the risks and benefits of
25  a particular medication for a patient?

Page 73

1          MR. BADALA:  Objection to form.
2          THE WITNESS:  I do not know.
3  BY MR. RUIZ:
4      Q.   A prescriber is usually going to
5  know a patient's medical history, right?
6          MR. BADALA:  Objection to form.
7          THE WITNESS:  I have no idea.
8  BY MR. RUIZ:
9      Q.   Well, you've had experience with
10  doctors before?
11          MR. BADALA:  Is that a question?
12          MR. RUIZ:  Yeah.
13  BY MR. RUIZ:
14      Q.   Have you had experience with
15  doctors before?
16          MR. BADALA:  You don't have to
17  disclose your medical history.
18          MR. RUIZ:  I'm not asking her to
19  disclose her medical history.
20          MR. BADALA:  I'm just making it
21  clear.
22          THE WITNESS:  Have I been to the
23  doctor before?
24  BY MR. RUIZ:
25      Q.   Yes.

19 (Pages 70 - 73)

Page 74

1    A.   Yes, I've been to the doctor
2  before.
3    Q.   And do you give medical history
4  when you do that?
5    A.   Sometimes.
6    Q.   Do you give family history, family
7  medical history?
8    A.   I guess.
9    Q.   Sometimes?
10   A.   Yes.
11   Q.   Okay.
12       And do you know that prescription
13 medications come with instructions?
14       MR. BADALA:  Objection to form.
15       THE WITNESS:  I do not know.
16 BY MR. RUIZ:
17   Q.   You don't know if prescription
18 medications come with instructions?
19       MR. BADALA:  Objection to form.
20       THE WITNESS:  I do not know.
21 BY MR. RUIZ:
22   Q.   Do you know if they come with
23 warnings?
24       MR. BADALA:  Objection to form.
25       THE WITNESS:  I do not know.

Page 75

1  BY MR. RUIZ:
2    Q.   Have you ever looked at a
3  prescription medication before?
4        MR. BADALA:  Objection to form.
5        Are we talking about opioids?  I'm
6    confused now.
7        MR. RUIZ:  No.  I'm just talking
8    about prescription medications in
9    general.
10       THE WITNESS:  Have I ever read
11   instructions on prescription
12   medications?  Is that what you're
13   asking?
14 BY MR. RUIZ:
15   Q.   No.  I'm asking if you've ever
16 looked at, for instance, a bottle of
17 prescription drugs.  It doesn't have to be
18 opioids.
19   A.   Yes.  I have looked at a bottle
20 of -- a prescription.
21   Q.   Did that bottle have instructions?
22   A.   Yes.
23   Q.   Did it have warnings?
24   A.   I don't know.
25   Q.   Okay.

Page 76

1        You don't know if prescription
2  opioids have -- come with instructions?
3        MR. BADALA:  Objection to form.
4        THE WITNESS:  Yes.  They would
5    come with instructions.
6  BY MR. RUIZ:
7    Q.   Okay.
8        And when a medication comes with
9  instructions, it's up to the patient to
10 follow those instructions, right?
11       MR. BADALA:  Objection to form.
12       THE WITNESS:  I don't know.
13 BY MR. RUIZ:
14   Q.   Okay.
15       And if a prescription is written
16 for a patient, it's written for that
17 particular patient, right?
18       MR. BADALA:  Objection to form.
19       THE WITNESS:  I guess, yes.
20 BY MR. RUIZ:
21   Q.   If a doctor writes you a
22 prescription, you're not supposed to share
23 that with a family member or a friend?
24       MR. BADALA:  Objection to form.
25       THE WITNESS:  That is correct.

Page 77

1  BY MR. RUIZ:
2    Q.   Okay.
3        And, in fact, someone taking a
4  prescription medication that they have not
5  been prescribed is illegal, right?
6        MR. BADALA:  Objection to form.
7        THE WITNESS:  That is correct.
8  BY MR. RUIZ:
9    Q.   Okay.
10       And is that a form of diversion?
11       MR. BADALA:  Objection to form.
12       THE WITNESS:  I don't know what
13   the term is called.
14 BY MR. RUIZ:
15   Q.   Are you familiar with the term
16 "diversion"?
17   A.   I'm familiar with the term of
18 diversion.  It's used a lot in the courtroom
19 when it's talking about expunging and not
20 expunging cases.
21   Q.   Are you familiar with the term
22 "diversion" as it relates to drug use?
23       MR. BADALA:  Objection to form.
24       THE WITNESS:  No.
25

20 (Pages 74 - 77)

Page 78

BY MR. RUIZ:
Q.   So you have never heard the term "diverted drug"?
A.   I have heard it, but I do not understand the definition.
Q.   Okay.
Do you agree that once -- that someone might have a valid prescription for an opioid and then choose to sell it on the street?
MR. BADALA:  Objection to form.
THE WITNESS:  Say it again?  I'm sorry.
BY MR. RUIZ:
Q.   Do you agree that someone might have a valid prescription for an opioid and then can choose to sell it on the street?
MR. BADALA:  Objection to form.
THE WITNESS:  I don't know.
BY MR. RUIZ:
Q.   Have you ever heard of that happening?
A.   Yes.  Narcotics do have a street value.  All drugs have a street value.
Q.   Have you heard of prescription

Page 79

opioids being stolen from hospitals?
MR. BADALA:  Objection to form.
THE WITNESS:  I don't know.
BY MR. RUIZ:
Q.   Being stolen from medicine cabinets?
MR. BADALA:  Objection to form.
THE WITNESS:  I don't know.
BY MR. RUIZ:
Q.   You haven't heard any stories of people doing that?
MR. BADALA:  Objection to form.
THE WITNESS:  Me personally, in the Drug Court program, I see a lot of cases where one was prescribed opiates and then they needed more of it.  Usually it could lead to them being arrested, which is when they would come across my desk.  So -- if that helps.
BY MR. RUIZ:
Q.   Well, let's walk through that.
When they are arrested, have you ever encountered someone who was arrested for taking a prescription opioid that they were prescribed by a doctor?

Page 80

MR. BADALA:  Objection to form.
THE WITNESS:  Say that again?  I'm sorry.
BY MR. RUIZ:
Q.   Have you ever encountered a client who was arrested for taking a prescription opioid that was prescribed by a doctor?
A.   Have I ever taken a case of someone that was taking a prescription that they were described [sic] for?
Q.   That they were prescribed by a doctor.
A.   Well, yes.
Q.   So they were -- tell me about that.
A.   So, for example, I see a lot of clients that were in a car accident, had dental work, had surgery, they were prescribed opiates, and they've continued to use it well after it was ongoingly being prescribed.  A lot of times you see cases that, unfortunately, start using heroin.
I can give you a specific example, if you would like.
Q.   So that's actually a different

Page 81

scenario than what I'm asking about.
A.   Okay.
Q.   What you just described is someone who at one point had a prescription and then somewhere along the way that prescription ended, and they continued taking opioids.
A.   Well, a number of things can happen.  Drug use -- to get that ceiling effect, it could be -- also, a lot of times what happens is that prescription medication, you're not hitting that ceiling effect.  So you're going to want to look to more of it or to what's more strong.
Q.   So, again, that's not my question, though.  My question is has anyone ever come into the Drug Court program because they were arrested for taking prescription medication that they had a valid prescription for?
MR. BADALA:  Objection to form.
THE WITNESS:  Well, no.  No.
BY MR. RUIZ:
Q.   And after -- strike that.
You realize that some people take -- might take a prescription opioid from a family member's medicine cabinet?

21 (Pages 78 - 81)

Page 226

1  BY MR. RUIZ:
2      Q.   Okay.
3          Earlier today you talked about --
4  you can put that exhibit aside.
5          Earlier today you talked about
6  clients that you have that have started --
7  that allegedly started with prescription
8  opioids and later on moved to heroin or other
9  illegal substances; is that right?
10          MR. BADALA:  Objection to form.
11          THE WITNESS:  Yes.
12  BY MR. RUIZ:
13      Q.   Do you have a sense of --
14          Well, let me start with a baseline
15  question.
16          People who use cocaine, do you
17  think that a hundred percent of them have
18  started with a prescription opioid?
19      A.   No.
20      Q.   So it is possible for someone to
21  have a heroin addiction without ever having
22  used a prescription opioid?
23          MR. BADALA:  Objection to form.
24          THE WITNESS:  That is correct.
25          And I can say that in court -- we

Page 227

1  have a lot of visitors that come to
2  court and we have at times had our
3  clients raise their hand if they suffer
4  from opiate use.  And we have the
5  majority of the court raise their hands.
6          The judge will then ask them to
7  please keep their hand raised if you
8  started from a prescription, and half of
9  them still have their hands raised.
10  BY MR. RUIZ:
11      Q.   So in your experience --
12      A.   It's just -- yeah.  It's not like
13  a statistically-ran study, it's just to
14  demonstrate at that point in time what we
15  currently have in the courtroom.
16      Q.   Well, I want to make sure that
17  we're using the right words here because I
18  thought earlier you said, when you used the
19  word "opiate," that you were talking just
20  about prescriptions, right?
21      A.   Yes.
22      Q.   But in what you just told me, you
23  said that the judge asks for people to raise
24  their hand who have an opiate addiction, and
25  then to keep their hands raised if that

Page 228

1  addiction began with a prescription.
2      A.   If I did, I'm sorry.  I meant to
3  say opioids.
4      Q.   You mean to say -- okay.
5      A.   Thank you.
6      Q.   I just wanted to make sure that
7  we're --
8      A.   No, it's okay.
9      Q.   Got it.  Okay.
10          Let's take a look at Leckler
11  Exhibit 13.
12          (Email chain, RE:  Update from
13          Dr. Gilson, Bates CUYAH_002048206
14          through CUYAH_002048210, marked as
15          Deposition Exhibit 13.)
16          THE WITNESS:  (Reviewing
17          document.)
18  BY MR. RUIZ:
19      Q.   All set?
20      A.   All set.
21      Q.   Let's start on what's page 209,
22  which is the beginning of the first in time
23  email.
24          If you look up at the top, it's
25  "Update from Dr. Gilson."

Page 229

1          If you look a couple pages before
2  that, it's a very long distribution list, but
3  it's actually from Vince Caraffi.
4      A.   Yes.
5      Q.   Okay.  He says:
6          "Good morning.  Please review the
7          citation below, sent on behalf of
8          Dr. Gilson.  At the April task force
9          meeting, Tom indicated local data was
10          showing an increased trend in the
11          number of overdose fatalities from
12          heroin, fentanyl, with no history of
13          overprescribing pain medication."
14          So that is consistent with what
15  you were saying earlier in which some portion
16  of heroin users might never have -- might not
17  have started with prescription opioids,
18  right?
19          MR. BADALA:  Objection to form.
20          THE WITNESS:  Correct.
21  BY MR. RUIZ:
22      Q.   If you look below that, there's
23  a -- what appears to be a brief synopsis of a
24  study that was done.
25          And Vince Caraffi writes:

58 (Pages 226 - 229)

Page 230

1       "This article supports
2       Dr. Gilson's thoughts and should be
3       included in future prevention
4       messaging."
5           And if you look on the next page,
6   it says that -- under "Results," the second
7   sentence --
8       A.   Uh-huh.
9       Q.   (Reading.)
10          "The use of commonly prescribed
11      opioids, oxycodone and hydrocodone,
12      dropped from 42.4 percent and 42.3
13      percent of opioid initiators,
14      respectively, to 24.1 percent and
15      27.8 percent in 2015, such that
16      heroin as an initiating opioid was
17      now more frequently endorsed than
18      prescription opioid analgesics."
19          Do you see that?
20      A.   I do.
21      Q.   And that seems to back up what
22  you've seen anecdotally, and what Dr. Gilson
23  has seen anecdotally, which is that there are
24  people who are -- who have opioid addictions
25  for whom heroin is the first opioid that they

Page 231

1   use?
2           MR. BADALA:  Objection to form.
3           THE WITNESS:  Yes.  However, it's
4   2015.
5   BY MR. RUIZ:
6       Q.   Right.  So at the time of 2015, is
7   what I'm saying.
8       A.   Which is weird because the email
9   was sent on 2017.
10      Q.   It might be that the study was --
11      A.   Yeah, old.
12      Q.   -- completed --
13      A.   Old.  Okay.
14      Q.   But this is something that
15  Dr. Gilson is seeing -- his email is --
16          He's sending this along saying the
17  local data in 2017, right?
18      A.   Okay, so --
19          MR. BADALA:  Objection to form.
20          THE WITNESS:  I didn't write the
21  email.  I see where it says, "Update
22  from Dr. Gilson."  However, the email is
23  from Vince Caraffi, so I'm just
24  confused.
25

Page 232

1   BY MR. RUIZ:
2       Q.   Right.
3           If you look at the beginning of
4   the email --
5       A.   Yes.
6       Q.   -- Vince Caraffi says:
7           "Please review the citation below
8       sent on behalf of Dr. Gilson.  At the
9       April task force meeting, Tom" --
10          Meaning Tom Gilson, right?
11      A.   Uh-huh.
12  Q.      -- "indicated local data was showing
13      an increasing trend in the number of
14      overdose fatalities from
15      heroin/fentanyl with no history of
16      overprescribing of pain medication."
17      A.   Okay.
18          MR. BADALA:  Objection to form.
19          THE WITNESS:  A few things.  I do
20  not recall fully reading this email,
21  number 1.
22          Number 2, I'm wondering why he
23  sent this when the study was 2015, and
24  he says "recent study."  That's where
25  I'm confused.

Page 233

1           What do you want me to respond to?
2   Because I did not write this email.
3   BY MR. RUIZ:
4       Q.   What I'm asking you is, is this
5   consistent with your experience in the Drug
6   Court that not everyone who has an opioid
7   addiction started with prescription opiates?
8           MR. BADALA:  Objection to form.
9   Misstates prior testimony.
10          THE WITNESS:  Yes.  As I stated
11  previously, not all of the clients that
12  I have that suffer from opioid use
13  resulted in a hundred percent
14  from-prescription medication.
15  BY MR. RUIZ:
16      Q.   And, in fact, what Dr. Gilson
17  appears to be saying is that there's an
18  increasing trend in people who have no
19  history of overprescribing of pain
20  medication, right?
21          MR. BADALA:  Objection to form.
22  BY MR. RUIZ:
23      Q.   Among those who have overdosed.
24          MR. BADALA:  Objection to form.
25          THE WITNESS:  I'm not Dr. Gilson.

59 (Pages 230 - 233)

Page 234

BY MR. RUIZ:
1    Q.   Well --
2    A.   You would have to ask Dr. Gilson.
3    Q.   Okay.
4    A.   Yeah.  Because it's a 2017 email
5 from a 2015 study.
6    Q.   Well, you said that you trusted
7 Dr. Gilson earlier, right?
8        MR. BADALA:  Objection to form.
9        THE WITNESS:  Yes.
10 BY MR. RUIZ:
11   Q.   So if he said it, you're going to
12 take his word for it?
13       MR. BADALA:  Objection to form.
14       THE WITNESS:  Yes.  I'm going to
15   believe Dr. Gilson, with the statistics
16   that he puts out on his medical
17   examiner's office.
18       However, this email is coming from
19   Vince Caraffi on behalf of Dr. Gilson.
20   I can't speak -- I wasn't there, so I
21   don't know.
22 BY MR. RUIZ:
23   Q.   Well, was --
24   A.   Again --

Page 235

1    Q.   Go ahead.
2    A.   And, again, I would refer back to
3 why we are talking about 2017 with a study
4 from 2015.
5    Q.   Let's look at page 207.
6        And if you look there, above all
7 the email addresses --
8    A.   Yes.
9    Q.   -- from Thomas Tallman.
10       Who is Mr. Tallman?
11   A.   It's Dr. Tallman.
12   Q.   Dr. Tallman.
13   A.   He is the medical director in the
14 Cuyahoga County Jail.
15   Q.   Why does he have a MetroHealth
16 email address?
17   A.   Because the --
18       MR. BADALA:  Objection to form.
19       THE WITNESS:  Because MetroHealth
20   oversees the medical in the jail.
21 BY MR. RUIZ:
22   Q.   Okay.
23       And Dr. Tallman says:
24       "I can also add that a
25       significant number of inmates I have

Page 236

1    screened for Vivitrol MAT did NOT
2    have a h/o" --
3        Which means history of?
4        MR. BADALA:  Objection to form.
5        THE WITNESS:  Yes.  But he also
6    says, "It is a small sample size."
7 BY MR. RUIZ:
8    Q.   I know.  I'm going to finish
9 reading.
10   A.   Thank you.
11 Q.      -- "did not have a history of opioid
12       addiction following a Rx for
13       Percocet, OxyContin, et cetera.
14       "It's a small sample size, but
15       out of approximately 150 patients, a
16       majority began using opioids just for
17       recreational purposes."
18       So with the caveat that it's a
19 small sample size, Dr. Tallman seems to be
20 agreeing with Dr. Gilson, right?
21       MR. BADALA:  Objection to form.
22       THE WITNESS:  I have no idea what
23   kind of assessment Dr. Tallman does in
24   the jail.

Page 237

1 BY MR. RUIZ:
2    Q.   Well, I'm not asking what kind of
3 assessment he does.  I'm asking whether it
4 seems like he's agreeing with what Dr. Gilson
5 is saying?
6        MR. BADALA:  Objection to form.
7        THE WITNESS:  I don't know.  I'm
8    not Dr. Tallman.  You would have to ask
9    him.
10 BY MR. RUIZ:
11   Q.   If we go all the way to the front,
12 Lou Lamarca, who is the clinical director at
13 Community Assessment and Treatment Services,
14 which is -- also we've referred to as CATS
15 today; is that right?
16   A.   That is correct.
17   Q.   He seems to also be agreeing.  He
18 says:
19       "This is consistent with what we
20       are seeing as well.  It is rare for
21       one of our clients to have started
22       with a medically-necessary opioid
23       Rx."
24       So we've seen Mr. Lamarca,
25 Dr. Tallman, Dr. Gilson, and the study.  Does

60 (Pages 234 - 237)

Page 238

1  it seem fair that a portion of people who
2  have opioid addiction never started with a
3  prescription?
4      MR. BADALA:  Objection to form.
5      THE WITNESS:  I can speak on my
6  behalf.  I cannot speak on Lou Lamarca's
7  behalf.
8      The clients that I have there
9  represent a very small population of
10  community assessment services.  They
11  have over 100 beds on the male side and
12  about 65 on the female side, so I cannot
13  speak on his behalf.
14  BY MR. RUIZ:
15  Q.   Does it seem like he's agreeing
16  with Dr. Tallman and Dr. Gilson?
17      MR. BADALA:  Objection to form.
18      THE WITNESS:  It's not for me to
19  comment.
20  BY MR. RUIZ:
21  Q.   You just don't know?
22      MR. BADALA:  Objection to form.
23      THE WITNESS:  I don't know.
24  BY MR. RUIZ:
25  Q.   Okay.

Page 239

1      I want to back up and just quickly
2  run through your education.
3      After high school, could you just
4  run through what formal education you've had.
5  A.   I obtained my bachelor's degree
6  from Kent State University.
7  Q.   And what was your degree in?
8  A.   Psychology.
9  Q.   Have you had any postgraduate
10  education?
11  A.   I've had some classes in the
12  public administration field at CSU.  I
13  started to go back for my master's degree,
14  but then I became the coordinator and I could
15  not juggle being a mom, going back to school,
16  and having a full-time job, all together.
17  Q.   And so you've not completed the
18  master's program?
19  A.   I have not.
20  Q.   Do you have any licenses?
21  A.   No, I do not.
22  Q.   Do you have any certifications?
23  A.   I am Gain certified.
24  Q.   And what is that?
25  A.   A Gain-certified assessor means

Page 240

1  Global Appraiser of Individual Needs.
2      It is an assessment that assesses
3  a person's level of care and what their
4  substance abuse need is.
5  Q.   And what was the process for
6  getting that certification?
7  A.   So I had to travel to Normal,
8  Illinois, for five days and go through
9  training, and then do mock assessments that
10  were recorded and taped and audited by a
11  specialist.
12      And then I had to come back to the
13  office and do that in the office as well and
14  submit audiotapes, and do the same thing to
15  obtain my Gain certification.
16      So I also -- at one time when I
17  was a probation officer, I did a lot of
18  motivational interview training to be an
19  expert on motivational interviewing.
20  Q.   Any other certifications?
21  A.   No.
22  Q.   Have you received any training
23  related to law enforcement?
24  A.   I've had defensive tactics, pepper
25  spray training, if that counts.

Page 241

1  Q.   Anything else?
2  A.   No.
3  Q.   What about training related to
4  medicine?
5  A.   No.
6  Q.   Related to pharmacy?
7  A.   No.
8  Q.   What did you do to prepare for
9  today's deposition?
10  A.   I met with my attorneys.
11  Q.   How many times did you meet?
12  A.   Once.
13  Q.   For how long?
14  A.   About three hours.
15  Q.   And which attorneys did you meet
16  with?
17  A.   I met with him and Mr. Gallucci.
18  Q.   Was there anyone in the room who
19  was not an attorney or not employed by
20  Mr. Badala's law firm?
21  A.   No.
22      MR. BADALA:  I like the sound of
23  "Mr. Badala's law firm."
24  BY MR. RUIZ:
25  Q.   Did you review any documents?

61 (Pages 238 - 241)

Page 242

1    A.   Yes.
2    Q.   What kind of documents?
3         MR. BADALA:  I'm just going to
4    object and instruct you not to disclose
5    the documents that you were shown.
6    BY MR. RUIZ:
7    Q.   Did you review the complaint in
8    this case?
9    A.   No.
10   Q.   You haven't seen it?
11   A.   No.
12   Q.   Did you review any of the
13   interrogatories in this case?
14        MR. BADALA:  Are we saying ever,
15   or during the prep?  Because if it's --
16   you're asking during the prep, I'm going
17   to instruct her not to answer.
18        THE WITNESS:  I don't even know
19   what it means, so --
20   BY MR. RUIZ:
21   Q.   Okay.
22        Did you speak with anyone at the
23   courthouse about your deposition today?
24   A.   I let my assistant know that I
25   would be out of the office.

Page 243

1    Q.   Anyone else?
2    A.   I let Judge Matia know that I
3    would be out of the office.
4    Q.   Did you talk to anyone about the
5    substance of this deposition at all?
6    A.   No.
7    Q.   Did you do any research?
8    A.   No.
9    Q.   So you didn't look at the
10   complaint.
11        What do you know about this
12   lawsuit?
13        MR. BADALA:  Objection to form.
14        THE WITNESS:  What do I know about
15   the lawsuit?
16        My understanding of the lawsuit is
17   that the county is suing the
18   pharmaceutical companies for damages
19   that have occurred here in Cuya County.
20   BY MR. RUIZ:
21   Q.   Were you involved at all in the
22   lawsuit before it was filed?
23   A.   No.
24   Q.   Were you asked to provide any
25   information for the complaint?

Page 244

1    A.   Was I asked to provide any
2    information for the complaint?  Yes.
3    Q.   Did you?
4    A.   Yes.
5    Q.   Were you asked to provide any
6    information in response to interrogatories?
7    A.   Again, can you tell me what
8    "interrogatories" means?
9    Q.   I'm guessing probably not, but
10   anyway --
11   A.   Okay.
12   Q.   Interrogatories are questions
13   posed to the parties, written questions posed
14   to the parties from the other side.
15   A.   Okay.  So ask me again.
16   Q.   Were you asked to provide any
17   information to respond to interrogatories?
18   A.   Can you ask it a different way?
19   Q.   It's okay.
20   A.   Okay.
21   Q.   Do you know whether doctors are
22   defendants in this case?
23   A.   I do not know.
24   Q.   Do you think they should be?
25        MR. BADALA:  Objection to form.

Page 245

1        THE WITNESS:  It's not my opinion.
2    BY MR. RUIZ:
3    Q.   What's not your opinion?
4    A.   I do not have an opinion on it.
5    Q.   You don't know have an opinion.
6    A.   No.
7    Q.   Okay.
8        You don't know if they played any
9    role in opioid abuse?
10        MR. BADALA:  Objection to form.
11        THE WITNESS:  I do not.  I don't
12   know what their role played.
13   BY MR. RUIZ:
14   Q.   Have you heard of the term "pill
15   mill"?
16   A.   I've heard of it.
17   Q.   And what do you know -- what is a
18   pill mill?
19   A.   I don't know.
20   Q.   Do you know whether any drug
21   dealers are defendants in this litigation?
22        MR. BADALA:  Objection to form.
23        THE WITNESS:  I have no idea.
24   BY MR. RUIZ:
25   Q.   Do you think they should be?

62 (Pages 242 - 245)

Page 246

1      MR. BADALA:  Objection to form.
2      THE WITNESS:  I have no opinion.
3      (Email with article:  Elyria man
4         charged with distribution of
5         heroin and fentanyl, including
6         fentanyl that caused the death of
7         an Elyria resident, Bates
8         SUMMIT_00912771 through
9         SUMMIT_00912773, marked as
10        Deposition Exhibit 14.)
11   BY MR. RUIZ:
12      Q.  I'm showing you what's been marked
13   as Leckler Exhibit 14, Bates Number
14   SUMMIT_00912771.
15      If you look at the -- I'll start
16   at the top.  This is the second email in
17   time -- sorry, the first email in time is
18   from Vince Caraffi.
19      Do you see that?
20      A.  Yes.
21      Q.  April 9th, 2014.
22      And if you look on the next page,
23   he writes:
24      "Heroin and fentanyl charges were
25      just unsealed five minutes ago

Page 247

1      against" --
2      And how do you pronounce that?  Is
3   it Elyria?
4      A.  Elyria, yes.
5      Q.  -- "against an Elyria man charging
6      him with selling fentanyl that
7      caused the death of an Elyria
8      woman."
9      And that's a press release.
10      Do you think someone like the
11   defendant here should be a part of this
12   lawsuit?
13      MR. BADALA:  Objection to form.
14      THE WITNESS:  I have no idea.
15   BY MR. RUIZ:
16      Q.  If you look at the first in time
17   email, the latest email --
18      A.  Okay.
19      Q.  -- from Doug Smith -- Dr. Doug
20   Smith to Vince Caraffi, he writes:
21      "Interesting.  Hopefully a new
22      approach that will help decrease the
23      amount of heroin on the street."
24      Do you agree that holding drug
25   dealers accountable would help decrease the

Page 248

1   amount of heroin on the street?
2      MR. BADALA:  Objection to form.
3      THE WITNESS:  I have no opinion,
4   and I have no idea who Dr. Smith is.
5      MR. RUIZ:  Okay.
6      We can take a short break?
7      THE VIDEOGRAPHER:  Off the record.
8   4:30.
9      (Recess taken.)
10      THE VIDEOGRAPHER:  We're back on
11   the record, 4:41.
12      MR. RUIZ:  And I have no further
13   questions.  I'll pass the witness.
14      THE VIDEOGRAPHER:  We're off the
15   record.  4:42.
16      (Pause.)
17      THE VIDEOGRAPHER:  We're back on
18   the record.  4:43.
19      ---
20      EXAMINATION
21   BY MS. RENDON:
22      Q.  So good afternoon, Ms. Leckler.
23   My name is Carole Rendon.  And as I mentioned
24   this morning, I represent the Endo defendants
25   in this litigation.  And so I'm just going to

Page 249

1   ask you a few additional questions.
2      And I'd just ask, as you have been
3   doing today, if you don't understand a
4   question that I've asked, please say so and I
5   will try to rephrase it, okay?
6      A.  Okay.
7      Q.  During the course of the day today
8   you've been using the word "opiate" and the
9   word "opioid," correct?
10      A.  Correct.
11      Q.  And I understand that, you know,
12   you have your own sort of personal definition
13   of what those two things mean.  But I'm
14   wondering, for example, the Cuyahoga County
15   Opiate Task Force, its work is not limited to
16   prescription drugs, is it?
17      MR. BADALA:  Objection to form.
18      THE WITNESS:  No.
19      MR. BADALA:  I'm sorry, I just
20   want to put one thing on the record
21   before we still continue.
22      If you could just put a standing
23   objection regarding Ms. Rendon
24   questioning a Cuyahoga witness.  We've
25   exchanged some letters on this before.

Page 250

1    We don't have to get into it any
2  further, but if you could just put a
3  standing objection.
4  BY MS. RENDON:
5    Q.   You've also talked about the fact
6  that in Recovery Court, a hundred percent of
7  the clients have an opiate addiction; is that
8  correct?
9    A.   They have an opioid.
10   Q.   They have an opioid addiction.
11   And with respect to the Drug
12  Court, just so I can make sure that I
13  understand, if you said that 85 percent of
14  the people in Drug Court have an opiate
15  addiction, you misspoke; you meant opioid?
16   A.   That is correct.
17   Q.   So we would basically have to go
18  back through every single question that was
19  asked and answered to figure out when you
20  said opiate, if you meant only prescription
21  drugs, or if you meant both prescription and
22  illegal drugs; is that correct?
23   A.   Okay.
24   MR. BADALA:  Objection to form.
25

Page 251

1    THE WITNESS:  Okay.  I'm ready.
2  BY MS. RENDON:
3    Q.   I think it would take us an
4  awfully long time to do that.
5    But I think maybe what we'll do is
6  we'll take a break at some point and maybe
7  pull out a dozen or so questions and make
8  sure that we can go back, because I think
9  there has been a significant amount of
10  confusion today on the record on that issue.
11   You talked about one of the
12  judges, I believe it was Judge Matia in
13  Drug Court, asking the participants to raise
14  their hand if they're addicted to an opiate
15  or an opioid?
16   MR. BADALA:  Objection to form.
17  Asked and answered.
18   THE WITNESS:  I believe I said
19  "we."  I didn't say Judge Matia.  I said
20  "Judge Matia would then ask..."  But I
21  said "we."  "We would ask."
22  BY MS. RENDON:
23   Q.   "We would ask" what?
24   A.   We would ask clients to raise
25  their hand if they suffered from opioid use.

Page 252

1    Q.   And you said that the majority
2  would raise their hand; is that correct?
3    A.   That is correct.
4    Q.   And then the follow-up question
5  from Judge Matia would be what?
6    A.   Would be, "Keep your hand raised
7  if you started by way of prescription
8  medication."
9    Q.   And is there a third question
10  that's asked after those people keep their
11  hand up, or is that the end of the
12  questioning?
13   A.   That is the end of the question.
14   Q.   So Judge Matia doesn't ask, "Keep
15  your hand up if that prescription was given
16  to you for a medically necessary purpose by a
17  legitimate doctor"?
18   MR. BADALA:  Objection to form.
19   THE WITNESS:  No, it does -- no,
20  we do not.
21  BY MS. RENDON:
22   Q.   And nobody asks them to keep their
23  hands in the air if they took a legitimate,
24  medically-necessary prescription as
25  prescribed?

Page 253

1    MR. BADALA:  Objection to form.
2    THE WITNESS:  I'm sorry.  Say that
3  again.
4  BY MS. RENDON:
5    Q.   And nobody also asked the
6  follow-up question to keep their hand in the
7  air if they took a medically-necessary,
8  legitimate prescription, only as directed?
9    MR. BADALA:  Objection to form.
10   THE WITNESS:  No.
11  BY MS. RENDON:
12   Q.   So the only question is, "Was it a
13  prescription?"  Is that right?
14   MR. BADALA:  Objection to form.
15   THE WITNESS:  Yes.
16  BY MS. RENDON:
17   Q.   Does anybody ask the participants
18  when they have their hand in the air whether
19  they got those prescription opioids from a
20  drug dealer as opposed to a doctor?
21   A.   Say that again.
22   (The reporter read back where
23   requested.)
24   MR. BADALA:  Objection to form.
25   THE WITNESS:  No.  Because, like I

Page 254

1    said, we stop at the last question.
2    BY MS. RENDON:
3        Q.   So there's no delving into the
4    source of the prescription medication,
5    correct?
6        MR. BADALA:  Objection to form.
7        THE WITNESS:  No.
8    BY MS. RENDON:
9        Q.   Do you have any information as to
10   what type of prescription drugs those
11   individuals who still have their hand in the
12   air were taking?
13       A.   Do I have any information in
14   reference to the types of drugs --
15       Q.   Yeah.
16       A.   -- that were being prescribed?
17       Q.   So does the judge ask, "Keep your
18   hand in the air if you started by using
19   Percocet"?  "Keep your hand in the air if you
20   started by using Vicodin"?
21       A.   No.  Because, again, I said that
22   the last question is where it ends.
23       Q.   And you indicated earlier in your
24   testimony here today that 85 percent of the
25   participants in Drug Court have an opioid use

Page 255

1    disorder; is that right?
2        A.   That is correct.
3        Q.   Where do you get that number from?
4        A.   An assessment.
5        Q.   Which assessment?
6        A.   The clinical assessment, the
7    second part of the eligibility process that
8    we discussed earlier.
9        Q.   So I'm glad you said that because
10   I'm obviously not being clear on my question.
11       How do you come to the
12   number "85" percent"?
13       What statistical analysis did you
14   do that allows you to say that it's
15   85 percent, as opposed to 87 percent, as
16   opposed to 62 percent?
17       MR. BADALA:  Objection to form.
18       THE WITNESS:  The gentleman had
19       asked me, would I say.  And when I think
20       of "would I say," that gives an
21       estimate.
22       So I said estimately[sic],
23       85 percent of the participants we have
24       in Drug Court are diagnosed with opioid
25       use disorder.

Page 256

1    BY MS. RENDON:
2        Q.   But that's just a ballpark figure?
3        A.   That is correct.
4        Q.   But you could determine an exact
5    number if you wanted to; is that correct?
6        MR. BADALA:  Objection to form.
7        THE WITNESS:  Absolutely.
8    BY MS. RENDON:
9        Q.   And how would you go about doing
10   that?
11       A.   I would look at all the
12   assessments that we have done.
13       Q.   And when you looked at all of the
14   assessments that you had done, how would you
15   make the determination as to how many of the
16   Drug Court participants have an opioid use
17   disorder?
18       A.   In the DSM diagnosis, there is
19   codes, so you could look at the codes.
20       Q.   In the assessment form, you could
21   look at the DSM code; is that correct?
22       A.   That is correct.
23       (Cuyahoga County Common Pleas
24       Court, Case Information, Bates
25       CUYAH_002040381 through

Page 257

1       CUYAH_002040408, marked as
2       Deposition Exhibit 15.)
3    BY MS. RENDON:
4        Q.   I'm showing you what's been marked
5    as Exhibit 15 for your deposition.  And as
6    you'll see at the bottom, it has a Bates
7    number, Cuyahoga 002040381 through 2040408.
8        Is that the assessment form that
9    you've been referring to?  Is that an example
10   of an assessment form?
11       A.   This is an assessment, in front of
12   me.
13       Q.   And the DSM code that you're
14   referring to, is that on page 1 under the
15   DSM-5 diagnostic codes?
16       A.   I'm sorry.  I'm a little taken
17   back because it is an assessment with a
18   client's name on it.
19       Q.   So don't refer to the client's
20   name.  I didn't --
21       A.   Okay.
22       Q.   -- refer to the client's name.
23       I just handed --
24       A.   Okay.
25       Q.   -- you a document that was

65 (Pages 254 - 257)

Page 258

1  produced by Cuyahoga County to us in this
2  litigation.
3      A.  Okay.
4      Q.  It's not our document.  It's your
5  document.
6      A.  Okay.
7      Q.  So I have no need for the
8  individual's name.
9          But do you see on the first page
10  where it says "Diagnostic Codes," is that
11  what you're referring to?
12      A.  Yes, ma'am, that is correct.
13      Q.  So this particular individual was
14  diagnosed with an opioid use disorder, a
15  cannabis use disorder, and a stimulant use
16  disorder; is that correct?
17      A.  This client is -- "opioid use
18  disorder" -- you always kind of want to say
19  "severe."  "Cannabis use disorder, severe.
20  Stimulant use disorder, mild."
21      Q.  So this particular individual has
22  a severe disorder that involves more than one
23  drug?
24      A.  That is correct.
25      Q.  Both an opioid and cannabis?

Page 259

1      A.  That is correct.
2      Q.  Do you know what opioid is
3  involved with this particular individual?
4      A.  I would have to read through the
5  assessment.
6      Q.  Because you can't tell, because
7  whether it's prescription drugs or, for
8  example, heroin, it's the same code; is that
9  right?
10      A.  It is the same code.  It is the
11  same form of treatment.
12      Q.  And so there's no way to just, by
13  looking at the code, figure out whether or
14  not somebody has ever used, let alone, abused
15  a prescription drug; is that right?
16      A.  From the assessment, that is
17  correct.
18      Q.  So let me draw your attention to
19  the page, it's page 3.  The Bates Number at
20  the bottom is 2040383.
21          And I'll direct your attention to
22  the first paragraph -- no, second -- first
23  sentence of the second full paragraph.
24          And do you see there where it
25  says, "The client states that he first used

Page 260

1  heroin at age 16 and first used prescription
2  opiates at age 17"?
3          Did I read that correctly?
4      A.  You did.
5      Q.  And so with this particular
6  individual, he didn't -- or she didn't start
7  with a prescription opioid, their first drug
8  of abuse was heroin; is that correct?
9          MR. BADALA:  Objection to form.
10          THE WITNESS:  Their first drug of
11  use -- I would have to look at the other
12  diagnoses and see -- the other DSM.
13          I believe it says here that he
14  started using marijuana at the age of
15  13.  And I'd have to read through to
16  determine the cocaine, what age that
17  started.
18          So if you talk about substance
19  use, I would have to look at all the
20  substance use, since he uses multiple
21  substances.
22  BY MS. RENDON:
23      Q.  So based on this, it appears that
24  he started using marijuana at age 13 --
25      A.  Let me read the cocaine.  I didn't

Page 261

1  read the cocaine.
2      Q.  Okay.
3      A.  (Reviewing document.)
4          That is correct.  It does --
5      Q.  And when did he report that he
6  started using cocaine?
7      A.  At the age of 14.
8      Q.  And heroin?
9      A.  At the age of 16.
10      Q.  And prescription drugs?
11      A.  At the age of 17.
12      Q.  And so if you were going to do the
13  analysis that we were talking about, you
14  would have to take every one of these
15  assessments that had that diagnostic code for
16  opioid use disorder and read through it to
17  find out if the individual first used a
18  prescription opioid or first used an illegal
19  opioid; is that correct?
20      A.  I'm sorry.  You said a lot in one
21  sentence.  Can you please say that again?
22      Q.  Sure.
23          To do the statistical analysis
24  that we were talking about, to get you to an
25  exact number of Drug Court participants who

66 (Pages 258 - 261)

Page 262

1  began with the misuse or use of a
2  prescription opioid, you would have to not
3  look at the DSM code; you would have to pull
4  everyone who has a diagnostic code for opioid
5  use disorder, correct?
6      A.   That is correct.
7      Q.   And then you would have to read
8  through every one of those assessments, like
9  we just did with Exhibit 15, to see whether
10 the first drug that they used was heroin or
11 prescription drugs, correct?
12     A.   That is correct.
13     Q.   Or to see if they ever even used
14 prescription drugs?
15     A.   That is correct.
16     Q.   How would you know, for example,
17 with the individual whose assessment is
18 Exhibit 15, whether the prescription opiates
19 that this individual used were given to him
20 by a doctor for a legitimate medical need?
21         MR. BADALA: Objection to form.
22         THE WITNESS: I would have to read
23     through the assessment and see if
24     there's any indication.
25

Page 263

1  BY MS. RENDON:
2      Q.   So go ahead and take a second to
3  do that.
4      A.   Do you want me to read it out
5  loud?
6      Q.   No.
7      A.   (Reviewing document.)
8          Okay.  Go ahead with the question.
9      Q.   Is there any indication in this
10 individual's assessment that the prescription
11 opioids he reported using were given to him
12 by a medical doctor for a legitimate medical
13 purpose?
14         MR. BADALA: Objection to form.
15         THE WITNESS: I would have to read
16     through the whole assessment.
17 BY MS. RENDON:
18     Q.   In the section that talks about
19 the diagnosis for opioid use disorder, is
20 there any indication of that fact?
21         MR. BADALA: Objection to form.
22         THE WITNESS: No, there is not.
23 BY MS. RENDON:
24     Q.   Isn't another way to determine
25 whether or not this individual received a

Page 264

1  prescription for opioids, as opposed to
2  obtaining them illegally, to check the OARRS
3  database?
4      A.   If it was properly entered into
5  the OARRS, yes.
6      Q.   And as you understand it, the
7  OARRS database is supposed to contain all
8  prescription opioids when prescribed by a
9  medical doctor, correct?
10         MR. BADALA: Objection to form.
11         THE WITNESS: I believe so.
12 BY MS. RENDON:
13     Q.   And also when prescribed by other
14 medical professionals -- excuse me -- who
15 have a DEA registration and are authorized to
16 prescribe opioids, right?
17         It's not just medical doctors;
18 dentists, for example, can prescribe opioids?
19         MR. BADALA: Objection to form.
20         THE WITNESS: You would have to
21     say it again, I'm sorry.
22         Sorry, you said the DEA --
23 BY MS. RENDON:
24     Q.   So you understand that in order to
25 prescribe an opioid or other controlled

Page 265

1  substance, you have to be licensed and
2  registered with the DEA in order to do that?
3          MR. BADALA: Objection to form.
4          THE WITNESS: I do not know.
5  BY MS. RENDON:
6      Q.   You know that if you checked
7  the OARRS database, you would be able to put
8  this individual's name in the database and
9  see whether or not there was a legitimate
10 prescription for an opioid listed anywhere in
11 that database, correct?
12         MR. BADALA: Objection to form.
13         MS. RENDON: Can I ask what was
14     the problem with the form of that
15     question?
16         MR. BADALA: It's vague and
17     ambiguous, the words, "medically
18     necessary." She's already testified.
19     Foundation, she's not a doctor.  I can
20     keep going.
21         MS. RENDON: Okay.  So I'm just
22     using the terminology from the
23     complaint.
24         MR. BADALA: Well, it's not her
25     words.  She didn't draft the complaint,

67 (Pages 262 - 265)

Page 266

1    so we can keep going through it.
2        MS. RENDON:  She apparently hasn't
3    even read the complaint.
4    BY MS. RENDON:
5        Q.   So, Ms. Leckler, let me put it
6    this way.  You understand that in the OARRS
7    database you can check to see whether or not
8    somebody received a prescription for opioids,
9    correct?
10       A.   Carole, this individual is 21,
11   so -- I believe he said he started using
12   prescriptions at 17.  So I cannot answer that
13   because I do not know how far back the OARRS
14   report goes, so I do not know.
15       Q.   You do know that there is
16   information that you can obtain in the OARRS
17   database regarding prescription opioids,
18   correct?
19       MR. BADALA:  Objection to form.
20       THE WITNESS:  Yes.
21   BY MS. RENDON:
22       Q.   And if anybody had checked
23   the OARRS database with respect to this
24   individual, it would be in this assessment,
25   correct?

Page 267

1        MR. BADALA:  Objection to form.
2        THE WITNESS:  No.  Because, like I
3    said, the TASC case managers do not have
4    authority to do an OARRS report.
5        I had stated before that is in the
6    second part process, and that's done by
7    the probation staff.
8        And I do not know -- I'm not an
9    OARRS expert.  I do not know how far
10   back it goes, so I don't know if we
11   would be able to look back and see that
12   when he started using opiates at the age
13   of 17, if it would come up in an OARRS
14   report.  I'm sorry.  I do not know that
15   answer.
16   BY MS. RENDON:
17       Q.   And that's true for the entire
18   population of the Drug Court; isn't that
19   correct?
20       MR. BADALA:  Objection to form.
21       THE WITNESS:  I don't know.  I do
22   not know because I'm not an OARRS
23   expert.
24   BY MS. RENDON:
25       Q.   No.  So that's what I'm saying.

Page 268

1        When you say 85 percent of the
2    people in the Drug Court have an opioid use
3    disorder; and, of that group, some subset you
4    believe used a prescription opioid, you have
5    no idea of that universe of Drug Court
6    participants, how many of them had a
7    prescription for an opioid, correct?
8        MR. BADALA:  Objection to form.
9        THE WITNESS:  That is correct.
10   BY MS. RENDON:
11       Q.   You have no idea what percentage
12   of them never had a legitimate prescription,
13   they just bought them from a dealer on the
14   street, right?
15       MR. BADALA:  Objection, form.
16       THE WITNESS:  I have no idea.
17   BY MS. RENDON:
18       Q.   And you have no idea how many of
19   them just took them out of their parents'
20   medicine cabinet?
21       A.   I have no idea, no.
22       Q.   So that universe of people in the
23   Drug Court who have an opioid use disorder
24   that had some connection to a prescription
25   opioid, you would have to do a lot of work to

Page 269

1    figure out how many of those people ever had
2    a prescription for an opioid, correct?
3        MR. BADALA:  Objection to form.
4        THE WITNESS:  The universe of
5    people?  I don't know.
6    BY MS. RENDON:
7        Q.   How would you go about determining
8    how many current clients in the Drug Court
9    ever had a legitimate prescription for an
10   opioid?
11       MR. BADALA:  Objection to form.
12       THE WITNESS:  How would I
13   determine if any individuals currently
14   in the Drug Court program have ever
15   legitimately had a prescription for
16   narcotics?
17       It would be impossible because the
18   OARRS didn't always exist.  If I had an
19   individual that was 51 years old, it
20   would be impossible for me to, for a
21   fact, determine if they had ever been
22   given prescription narcotics.
23   BY MS. RENDON:
24       Q.   So there's literally no way to
25   figure out the answer to that question; is

68 (Pages 266 - 269)

Page 270

1    that right?
2         MR. BADALA:  Objection to form.
3         THE WITNESS:  There's no way for
4    me to figure out the answer to that
5    question.
6    BY MS. RENDON:
7         Q.   Are you aware of anybody else who
8    would have the ability to figure out the
9    answer to that question?
10        A.   I am not.
11        Q.   You were shown not too long ago
12   Exhibit 13, which I think is still in front
13   of you.  It's an email chain from
14   October 10th of 2017.
15        If you could pull that back out
16   again.
17        MR. BADALA:  What exhibit?
18        MS. RENDON:  13.
19        A.   This is the email from Lou Lamarca
20   again?
21        Q.   Correct.  You work with
22   Lou Lamarca, correct?
23        A.   Yes.
24        Q.   Did you ever contact him and
25   question his statement in this email that "it

Page 271

1    is rare for one of our clients to have
2    started with a medically-necessary opioid
3    prescription"?
4         MR. BADALA:  Objection to form.
5         THE WITNESS:  No.
6    BY MS. RENDON:
7         Q.   Did you ever have any conversation
8    with Mr. Lamarca about his statement in this
9    email?
10        A.   I did not.
11        Q.   Did you ever tell him that your
12   understanding of the population of the Drug
13   Court was inconsistent with what he said here
14   in this email?
15        A.   I did not.
16        Q.   The prior email in the email chain
17   came from Tom Tallman, who you also work
18   with, correct?
19        A.   It's Dr. Tallman.
20        Q.   Dr. Tallman.
21        A.   Yes.
22        Q.   I said "Tom Tallman."  That's his
23   first name, right?
24        A.   That is correct.
25        Q.   Did you ever contact Dr. Tallman

Page 272

1    and discuss with him the statement in his
2    email that, "Although it's a small sample
3    size, out of approximately 150 patients" --
4    that he saw -- "a majority began using
5    opioids just for recreational purposes"?
6         A.   I did not.
7         And, Carole, I don't recall
8    reading this email when it came across my
9    email feed.
10        Q.   And that's fine.
11        A.   Okay.
12        Q.   I'm just asking if you ever had
13   any conversation with him about it.
14        Did you ever contact him to let
15   him know that this was inconsistent with your
16   understanding of the population of the
17   Drug Court?
18        A.   I did not.
19        Q.   And the Drug Court size is about
20   the same size as the population that
21   Dr. Tallman was looking at, about 150 people?
22        A.   I did not write it.  I do not
23   know.
24        Q.   No.  I'm just asking you -- not
25   about the email.  Assuming that his statement

Page 273

1    is accurate, that his sample size was 150,
2    that's similar in size to the number of
3    clients in the Drug Court, correct?
4         A.   In the Drug Court program, around
5    about, yes.
6         Q.   That's all I was asking, those are
7    two similar sizes of people?
8         A.   Two similar numbers, yes.
9    Coincidentally, yes.
10        Q.   And then, lastly, the email that
11   started this email chain from Mr. Caraffi.
12        Did you ever have a conversation
13   with Mr. Caraffi about this email and the
14   study that he forwarded onto this group?
15        A.   No.  Because like I said, I do not
16   recall reading through this email.
17        Q.   And did you ever have a
18   conversation with Mr. Caraffi in which you
19   discussed with him the fact that you thought
20   a much higher percentage of the population of
21   the Drug Court population may have started
22   with prescription opioids than is reflected
23   in this email chain?
24        A.   I did not.
25        Q.   Did you ever have a conversation

69 (Pages 270 - 273)

Page 274

1  with Dr. Gilson about that?
2      A.   I did not.
3      Q.   We spent a lot of time today
4  talking about sort of the Drug Court and when
5  it started and how it's developed over time.
6          You were there on day one; is that
7  right?
8      A.   That is correct.
9      Q.   In fact, you were there before day
10  one, because you were working for the
11  Cleveland Drug Court before the county even
12  had its own Drug Court?
13      A.   I was not -- I was there in
14  County's day one, not Cleveland's.  No.
15      Q.   No.  But, I mean, you were
16  involved in a Drug Court program in the
17  county, that being the City of Cleveland's
18  Drug Court program, before the county even
19  had its own county-wide Drug Court?
20      A.   That is correct.
21          (Email chain, RE: Drug Court,
22          Bates CUYAH_010715371 through
23          010715372, marked as Deposition
24          Exhibit 16.)
25

Page 275

1  BY MS. RENDON:
2      Q.   I'm showing you what has been
3  marked as Exhibit 16 for your deposition.
4  And this is another email chain.
5          At the bottom, it bears the Bates
6  stamp CUYAH_010715371, and the backside is
7  15372.  And I'm going to just direct your
8  attention to the front side of this email
9  chain.
10          You've already identified who
11  Greg Popovich is.  You've already identified
12  who Dan Peterca is, correct?
13      A.   That is correct.
14      Q.   And those are the same
15  Greg Popovich and Dan Peterca in this email
16  chain?
17      A.   I believe so.
18      Q.   And there is an indication in the
19  email that's on the bottom half of the front
20  side of this email that there's going to be
21  an application for SAMHSA Drug Court funding;
22  is that right?
23          Do you see that?  "The folks
24  copied on this email" --
25      A.   Yes.  I'm sorry.

Page 276

1      Q.   -- "and I met this morning to
2  review our options to respond to our SAMHSA
3  Drug Court award."
4      A.   Yeah, I'm sorry.  I was still
5  reading it.
6      Q.   Oh, I apologize.  Tell me when
7  you're ready.
8      A.   And you want me to read the last
9  paragraph?
10      Q.   No.  I was just going to ask you a
11  question about the email at the bottom --
12  right here at the bottom of the first page.
13      A.   Okay.  Let me read it through then
14  first.
15      Q.   Okay.
16      A.   (Reviewing document.)  Okay.
17      Q.   Okay.
18          So that email is dated
19  October 25th of 2010; is that correct?
20      A.   That is correct.
21      Q.   And Dan Peterca indicated that, in
22  the Drug Court award:
23          "We explain that in the last six
24          months, the felony Drug Court has
25          seen a dramatic rise in candidates

Page 277

1  with a heroin and opiate diagnoses."
2          It's not grammatically correct,
3  but I read it exactly as it's there, correct?
4      A.   That is correct.
5      Q.   And the felony Drug Court is the
6  County Drug Court?
7      A.   That is correct.
8      Q.   And that's the court where you're
9  the administrator?
10      A.   I'm the coordinator, correct.
11      Q.   Coordinator.
12          And so, as the coordinator of the
13  felony Drug Court in October of 2010, is your
14  memory consistent with what Mr. Peterca wrote
15  in this email at that time that in the prior
16  six months, the felony Drug Court had seen a
17  dramatic rise in candidates with a heroin and
18  opiate diagnosis?
19          MR. BADALA:  Objection to form.
20          THE WITNESS:  Yes.
21  BY MS. RENDON:
22      Q.   And at if top of this email chain,
23  there's an email from Greg Popovich, same
24  day, just a little later in the day, in which
25  he replies and says:

70 (Pages 274 - 277)