# EXHIBIT 66

Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION
 3

     IN RE: NATIONAL        )
 4   PRESCRIPTION           )   MDL No. 2804
     OPIATE LITIGATION      )
 5   _____    )   Case No.
                            )   1:17-MD-2804
 6                          )
     THIS DOCUMENT RELATES  )   Hon. Dan A.
 7   TO ALL CASES           )   Polster
 8
               TUESDAY, JULY 31, 2018
 9
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                    - - -
12          Videotaped deposition of Nathan J.
13   Hartle, held at the offices of Covington &
14   Burlington, LLP, One City Center, 850 Tenth
15   Street Northwest, Washington, DC, commencing
16   at 9:04 a.m., on the above date, before
17   Carrie A. Campbell, Registered Diplomate
18   Reporter, Certified Realtime Reporter,
19   Illinois, California & Texas Certified
20   Shorthand Reporter, Missouri & Kansas
21   Certified Court Reporter.
22                    - - -
             GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24

25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1  MS. HENN: Objection to form.
2  THE WITNESS: All I can tell
3  you is I -- what I've heard is that
4  it's the term that came from DEA.
5  QUESTIONS BY MR. FARRELL:
6  Q. On page 2, it identifies
7  several different topics: public health
8  issue, DEA focus, McKesson involvement,
9  current status, and Lifestyle Drug Monitoring
10 Program. So these will be our jeopardy
11 questions today.
12 Public health issues. Can you
13 read what the very -- on page 3, can you read
14 what the first item is?
15 A. "Abuse of prescription drugs
16 has risen 66 percent since 2000."
17 Q. So this is McKesson telling
18 McKesson employees that we're in the business
19 of selling opium pills, and abuse has risen
20 66 percent since 2000.
21 Does that not give you,
22 Mr. McKesson Corporation, pause to think
23 about whether or not your role in the chain
24 of distribution is contributing to the abuse?
25 MS. HENN: Objection to form.

Page 219

1  THE WITNESS: Can you ask that
2  again, please?
3  QUESTIONS BY MR. FARRELL:
4  Q. This is McKesson telling
5  McKesson employees that abuse of prescription
6  drugs has risen 66 percent since the year
7  2000.
8  Does that not give you,
9  Mr. McKesson Corporation, pause to think
10 about whether or not your role in the chain
11 of distribution is contributing to such
12 abuse?
13 MS. HENN: Objection to form.
14 THE WITNESS: I think it's --
15 it should give everybody pause that
16 that was the trend that was going on,
17 and it's a piece of information shared
18 with leaders to inform them. So --
19 QUESTIONS BY MR. FARRELL:
20 Q. But not everybody is selling
21 opium pills; McKesson is.
22 MS. HENN: Counsel, can we just
23 make sure we let the witness finish
24 his answers?
25 MR. FARRELL: Sure. I was

Page 220

1  trying to make a snarky remark.
2  MS. HENN: Thank you.
3  QUESTIONS BY MR. FARRELL:
4  Q. Not everyone is engaged in the
5  chain of distribution of opium pills, though?
6  MS. HENN: Objection to form.
7  THE WITNESS: Agree.
8  QUESTIONS BY MR. FARRELL:
9  Q. So I'm asking you, McKesson
10 Corporation, whether or not you have any
11 regrets about selling so many opium pills.
12 MS. HENN: Objection to form.
13 Outside the scope.
14 THE WITNESS: Back to your
15 question about this, I would -- sure
16 that gives you pause, I mean, to
17 understand that there's an epidemic
18 out there. And clearly there's many
19 players involved in the flow of
20 distribution.
21 QUESTIONS BY MR. FARRELL:
22 Q. As of 2007, McKesson is
23 recognizing that opioid painkillers kill more
24 than cocaine and heroin combined, agreed?
25 MS. HENN: Objection to form.

Page 221

1  THE WITNESS: Agree.
2  QUESTIONS BY MR. FARRELL:
3  Q. And these are McKesson's words.
4  Where is McKesson getting this
5  data from?
6  MS. HENN: Objection to form.
7  Outside the scope.
8  THE WITNESS: I don't know
9  specifically where they -- their
10 source of data for that particular
11 line, but information from different
12 sources. Could be DEA, could be CDC,
13 it could be wherever.
14 QUESTIONS BY MR. FARRELL:
15 Q. It says here, "Rogue Internet
16 pharmacies distributing oxycodone,
17 hydrocodone, phentermine and alprazolam," yet
18 McKesson was selling to rogue Internet
19 pharmacies, true?
20 MS. HENN: Objection to form.
21 Outside the scope.
22 THE WITNESS: Can you ask that
23 again, please?
24 QUESTIONS BY MR. FARRELL:
25 Q. McKesson is noting that rogue

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1  Internet pharmacies are selling oxycodone and
2  hydrocodone, yet what's missing from this
3  slide is the fact that McKesson was supplying
4  the pills to the rogue Internet pharmacies.
5      MS. HENN:  Objection to form.
6      THE WITNESS:  And what's your
7  specific question again?
8  QUESTIONS BY MR. FARRELL:
9      Q.   What gives?
10     MS. HENN:  Objection to form.
11     THE WITNESS:  I don't know what
12  type of response a "what gives"
13  question is.
14  QUESTIONS BY MR. FARRELL:
15     Q.   Yeah.  You're noting that
16  people are dying, and part of the reason is
17  that rogue Internet pharmacies are out there.
18  Yet McKesson, during this time frame, is
19  selling to some of those very same Internet
20  pharmacies, and that's what the DEA fined you
21  for.
22     So is this ignorance of who
23  you're selling to?  Is this repackaging,
24  reframing the issue?  Or is it just flat out
25  a misrepresentation?

Page 223

1      MS. HENN:  Objection to form.
2  Outside the scope.
3      THE WITNESS:  This is raising
4  awareness in -- about the issues that
5  are the public health issues,
6  communicating with leaders and sharing
7  the -- where McKesson is enhancing the
8  program.
9  QUESTIONS BY MR. FARRELL:
10     Q.   But you understand that the
11  rogue Internet pharmacies were getting their
12  pills from, among other people, McKesson,
13  agreed?
14     A.   I understand.
15     MS. HENN:  Objection to form.
16  QUESTIONS BY MR. FARRELL:
17     Q.   Agreed?
18     A.   I understand.  Agreed.
19     Q.   I'm asking if you understand.
20  I want you to confirm that the rogue Internet
21  pharmacies were in fact getting some of their
22  pills from McKesson.
23     MS. HENN:  Objection to form.
24     THE WITNESS:  I don't have
25  specific details on that, but --

Page 224

1  QUESTIONS BY MR. FARRELL:
2      Q.   You understand that to be true?
3      A.   -- I understand that to be
4  true.
5      Q.   So McKesson Corporation admits
6  it was selling oxycodone and hydrocodone to
7  rogue Internet pharmacies in and around 2007?
8      MS. HENN:  Objection to form.
9  Outside the scope.
10     THE WITNESS:  Again, I don't
11  know the specific examples and --
12  QUESTIONS BY MR. FARRELL:
13     Q.   I'm not asking for specific
14  examples.
15     A.   Right.
16     Q.   I'm asking you to confirm that
17  in 2007, McKesson Corporation was selling
18  oxycodone and hydrocodone to rogue Internet
19  pharmacies.
20     MS. HENN:  Objection to form.
21     And, Counsel, I'll just ask you
22  to let him finish his answers so that
23  he can get his answers out.
24     MR. FARRELL:  Yes, ma'am.
25     THE WITNESS:  Again, I don't

Page 225

1  have the specific examples.  I believe
2  that to be true, but I don't know the
3  specific details.
4  QUESTIONS BY MR. FARRELL:
5      Q.   The next page, page 4,
6  "Internet pharmacies."  It says,
7  "Investigative work hours have doubled."
8      Do you know what it doubled
9  from or to?
10     A.   I do not.
11     Q.   "Cutting supply critical to
12  success."
13     What does that mean?
14     A.   I don't know.  I don't know
15  what the speaking points or -- it's one
16  bullet.  I'm not sure how it was represented
17  or communicated.
18     Q.   Do you know what price
19  diversion is?
20     A.   Not specifically.
21     Q.   Was McKesson at this time
22  considering that some of the Internet
23  pharmacies were competing with McKesson for
24  business?
25     MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    THE WITNESS: I do not know.
2    Pricing is not my area.
3    QUESTIONS BY MR. FARRELL:
4    Q.   Okay. It says, "Wholesalers.
5    DEA expects that you know your customers."
6    What does that mean? It's in
7    quotations.
8    A.   Right.
9    MS. HENN: Objection to form.
10   MR. FARRELL: Well, it is in
11   quotations, isn't it?
12   MS. HENN: I was objecting to
13   asking what DEA means when they said
14   "know your customers." That was what
15   was my objection.
16   QUESTIONS BY MR. FARRELL:
17   Q.   So McKesson is writing a slide
18   following a meeting with the DEA, reporting
19   to the DEA employees what the DEA's focus
20   was, and what McKesson is reporting is that
21   the DEA expects you to know your customers.
22   Is that fair?
23   A.   That's fair.
24   Q.   And when we do, quote, "know
25   our customers," end quote, that's a tag line

Page 227

1    for distributors with regard to knowing the
2    customers you're selling opium pills to?
3    MS. HENN: Objection to form.
4    THE WITNESS: That is a DEA tag
5    line.
6    QUESTIONS BY MR. FARRELL:
7    Q.   And then the next sentence, can
8    you read it out loud, please?
9    A.   The next bullet?
10   Q.   Yes.
11   A.   "Wholesalers accountable for
12   controlling quantities shipped."
13   Q.   Is that true or not true?
14   MS. HENN: Objection to form.
15   THE WITNESS: Can you add a
16   little more context to your question?
17   I know it's a true/false question,
18   but --
19   QUESTIONS BY MR. FARRELL:
20   Q.   Yes.
21   The DEA expects the wholesalers
22   to be accountable for controlling quantities
23   that they ship.
24   Is that fair or unfair?
25   MS. HENN: Objection to form.

Page 228

1    Go ahead.
2    THE WITNESS: That's what
3    the -- that's what the DEA expects, I
4    guess, yeah.
5    QUESTIONS BY MR. FARRELL:
6    Q.   Does McKesson acknowledge that
7    it is accountable for controlling the
8    quantities of opium pills shipped to American
9    pharmacies?
10   A.   We're accountable as a
11   distributor.
12   Q.   The next thing says, "5,000
13   dose units is average."
14   The average American pharmacy
15   in 2007, as reported by the DEA to McKesson,
16   was that 5,000 doses of oxycodone or 5,000
17   doses of hydrocodone was average.
18   A.   That's what the DEA -- DEA
19   calculations.
20   Q.   And McKesson at least validated
21   that number by repeating it on a slide to the
22   national operations conference in 2007.
23   MS. HENN: Objection to form.
24   QUESTIONS BY MR. FARRELL:
25   Q.   Agreed?

Page 229

1    A.   I wouldn't say that they
2    validated. We just repeated what was shared.
3    Q.   Did McKesson undertake any
4    investigation to determine what the average
5    was itself?
6    A.   I believe they did. I can't
7    speak to the examples, but we've used
8    analysts and reviewed data when developing
9    thresholds and...
10   Q.   Does McKesson acknowledge that
11   in 2007 5,000 dose units was average in the
12   United States of America?
13   MS. HENN: Objection to form.
14   Outside the scope.
15   THE WITNESS: We acknowledge
16   that's what the DEA shared. I mean,
17   there's many ways to get averages.
18   QUESTIONS BY MR. FARRELL:
19   Q.   Sitting here today, does
20   McKesson Corporation have any reason to
21   disagree or dispute the DEA's estimation of
22   what the average dose unit was?
23   MS. HENN: Objection to form.
24   Outside the scope.
25   THE WITNESS: What I would

Highly Confidential - Subject to Further Confidentiality Review

```
1          share is I believe that average is a
2          very rudimentary average, all
3          pharmacies divided by pills, and so it
4          doesn't account for different pharmacy
5          size.  So it's the number that is the
6          result of that basic calculation.
7   QUESTIONS BY MR. FARRELL:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





12    QUESTIONS BY MR. FARRELL:

13         Q.    As of April of 2007, which we

14    believe to be the date of this conference,

15    have you seen any documentation anywhere in

16    the records of McKesson Corporation that

17    indicate that any message from the DEA to

18    date had been unclear?

19              MS. HENN:  Objection to form.

20         Outside the scope.

21              THE WITNESS:  Have I seen

22         formal documentation where somebody

23         said DEA was unclear?

24    QUESTIONS BY MR. FARRELL:

25         Q.    That was my question, yes.

Highly Confidential - Subject to Further Confidentiality Review



    1        A.    I have not seen any of that
    2   documentation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13            (McKesson-Hartle Exhibit 19

14      marked for identification.)

15  QUESTIONS BY MR. FARRELL:

16      Q.    We'll mark as 19, top

17  right-hand corner is 2007_5_15, Bates-stamped

18  MCKMDL00337303.

19            Is this, in fact, the Lifestyle

20  Drug Monitoring Program at McKesson?

21      A.    Yes.

22      Q.    Do you recognize this document

23  as a true and authentic version of the

24  Lifestyle Drug Monitoring Program?

25      A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    And is it a document kept in

2    the regular course of business and produced

3    by your lawyers in this litigation?

4               MS. HENN:  Objection to form.

5               THE WITNESS:  Yeah.

6    QUESTIONS BY MR. FARRELL:
```

[lines 7-17 redacted]

```
18              (McKesson-Hartle Exhibit 20

19       marked for identification.)

20    QUESTIONS BY MR. FARRELL:

21          Q.    Exhibit 20, top right-hand

22    corner, 2007_06_12, Bates-stamped

23    MCKMDL00355527.

24              I'll represent to you again,

25    this was produced by your counsel in this
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 270

1       MS. HENN: Objection to form.
2       THE WITNESS: I would say that
3   there -- that, you know, the volume
4   of -- the more pills you have, there
5   could be, could be more to diversion.
6   It doesn't mean that there is. Or I
7   would foresee that just an increase in
8   volume is going to increase diversion.
9   There could be.
10  QUESTIONS BY MR. FARRELL:
11      Q.   The more pills that are
12  diverted -- let me ask you a different way.
13      A.   Okay.
14      Q.   Does McKesson believe that the
15  more pills that get diverted, the more pills
16  get abused?
17      MS. HENN: Objection to form.
18  Outside the scope.
19      THE WITNESS: Sorry, could you
20  rephrase that one again? Let me --
21  QUESTIONS BY MR. FARRELL:
22      Q.   As McKesson Corporation, do you
23  acknowledge that the more pills that get
24  diverted, the more pills get abused?
25      MS. HENN: Same objections.

Page 271

1       THE WITNESS: Again, I'd say
2   what I said previously: It could --
3   that could be a possibility. It
4   depends, but...
5   QUESTIONS BY MR. FARRELL:
6       Q.   Are people diverting pills to
7   engage in lawful conduct?
8       MS. HENN: Objection to form.
9       THE WITNESS: I don't know why
10  everybody is diverting pills every
11  single time, but generally, no.
12  QUESTIONS BY MR. FARRELL:
13      Q.   Right.
14          So in general, the more pills
15  that gets diverted, the more abuse and
16  addiction we find with prescription opium
17  pills?
18      A.   There's that possibility.
19          (McKesson-Hartle Exhibit 27
20  marked for identification.)
21  QUESTIONS BY MR. FARRELL:
22      Q.   I'm going to have marked what
23  is Deposition Exhibit 27. The top right-hand
24  corner is 2012_5_9.
25          This is an amicus brief.

Page 272

1       Do you know what an amicus
2   brief is?
3       A.   I do not. I do not have legal
4   background.
5       Q.   Okay. McKesson Corporation is
6   a member of the Healthcare Distributors and
7   Manufacturers Association, now known as the
8   Healthcare Distributors Association, agreed?
9       A.   Healthcare Distributors
10  Management Association?
11      Q.   Management, I'm sorry, yes.
12      A.   Yes.
13      Q.   Okay. And on May 9, 2012,
14  Cardinal Health had gotten itself into a
15  little trouble with the DEA, hadn't it?
16      MS. HENN: Objection to form.
17      THE WITNESS: I'm aware of that
18  time frame and...
19  QUESTIONS BY MR. FARRELL:
20      Q.   They got in trouble with the
21  DEA, very similar to how McKesson got in
22  trouble with the DEA in 2008, agreed?
23      MS. HENN: Objection to form.
24      THE WITNESS: I haven't
25  reviewed this document or all the

Page 273

1   details, but in spirit, in general.
2   QUESTIONS BY MR. FARRELL:
3       Q.   So in -- on May 9th of 2012,
4   HDMA, the Healthcare Distribution Management
5   Association, wrote a brief to a federal court
6   here in Washington, DC, in support of
7   Cardinal Health and against the DEA.
8       Was McKesson Corporation aware
9   of this amicus brief?
10      MS. HENN: Objection to form.
11  Outside the scope.
12      MR. FARRELL: It's actually
13  not. It's actually referenced
14  directly in the notice.
15      MS. HENN: I'm not sure that's
16  the case, but we can disagree about
17  that.
18      THE WITNESS: I don't know for
19  100 percent certain, but I assume so.
20  QUESTIONS BY MR. FARRELL:
21      Q.   Well, I don't want you to
22  guess. This is relatively important.
23      Have you seen any
24  acknowledgement within McKesson Corporation
25  validating or affirming or reviewing or

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1 participating in this amicus brief?
2     A.   I have not.
3     Q.   Are you aware of McKesson being
4 involved at all in the amicus briefs?
5         MS. HENN:  Objection to form.
6         THE WITNESS:  I'm not.
7         (McKesson-Hartle Exhibit 28
8     marked for identification.)
9 QUESTIONS BY MR. FARRELL:
10    Q.   I'm going to have marked
11 Exhibit 28, 2012_05_05.
12        Are you aware of the Wayback
13 Machine?
14    A.   Excuse me?
15    Q.   Are you aware of the Wayback
16 Machine?
17    A.   I am not.
18    Q.   The Wayback Machine is an
19 Internet service that's free, and what it
20 does is it's able to go and bring up old
21 websites based on dates and time.
22        And it just so happens that the
23 Wayback Machine captured the HDMA website in
24 May of 2012.  This comes from the HDMA
25 website, and this is a list of the board of

Page 275

1 directors.
2        Now, what's an executive
3 committee on a board of directors?
4         MS. HENN:  Objection to form.
5     Outside the scope.
6         THE WITNESS:  That's the senior
7     leaders driving this group.
8 QUESTIONS BY MR. FARRELL:
9     Q.   And, Mr. McKesson Corporation,
10 you were on the executive committee of HDMA
11 of 2012, were you not?
12        MS. HENN:  Objection to form.
13    Outside the scope.
14        THE WITNESS:  One of our senior
15    leaders is.
16 QUESTIONS BY MR. FARRELL:
17    Q.   You're in the senior leadership
18 of HDMA, and you signed off on an amicus
19 brief submitted to a federal court in
20 Washington, DC, in support of one of your
21 colleagues and members, Cardinal Health.
22        MS. HENN:  Objection to form.
23    Outside the scope.
24 QUESTIONS BY MR. FARRELL:
25    Q.   So I'm going to ask you a

Page 276

1 couple of questions about it.
2     A.   Okay.
3     Q.   If you flip to page 3...
4     A.   Of the brief?
5     Q.   Of the brief.
6        The very bottom of the page --
7        MS. HENN:  Are you talking
8     about the Bates numbers or the --
9        MR. FARRELL:  Yeah, the Bates
10    number.
11        MS. HENN:  Thank you.
12 QUESTIONS BY MR. FARRELL:
13    Q.   It says, "HDMA's members have
14 not only statutory and regulatory
15 responsibilities to detect and prevent
16 diversion of controlled prescription drugs,
17 but undertake such efforts as responsible
18 members of society."
19        Do you see that?
20    A.   I do.
21    Q.   Do you recognize this as an
22 acknowledgement that all of the distributors
23 in the country have a common law duty to the
24 people of the United States of America to
25 prevent diversion of controlled substances

Page 277

1 because you're selling controlled substances?
2        MR. SUDDATH:  Objection.
3        MS. HENN:  Objection to form.
4    Outside the scope.
5        THE WITNESS:  Okay.  Could you
6     ask me that again?
7 QUESTIONS BY MR. FARRELL:
8     Q.   Do you recognize this as an
9 acknowledgement that all of the distributors
10 in the country have a common law duty to the
11 American citizens to prevent controlled
12 substances from being diverted into the
13 illicit market?
14        MR. SUDDATH:  Objection.
15        MS. HENN:  Objection to form.
16    Outside the scope.
17 QUESTIONS BY MR. FARRELL:
18    Q.   I mean, isn't this what we
19 talked about earlier?
20    A.   I do.
21    Q.   You do, don't you?  Yes?
22    A.   Yes.
23    Q.   Because it's not just
24 statutory, regulatory.  You're engaged in
25 selling opium pills.  You owe a duty to the

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1  American people to do your very best to
2  prevent diversion.
3      MS. HENN: Objection to form.
4  Outside the scope.
5  QUESTIONS BY MR. FARRELL:
6      Q.   Agreed?
7      A.   Agreed.
8      Q.   And this is your trade
9  organization making the same representation
10  to a federal court in Washington, DC?
11      MS. HENN: Same objections.
12  Objection to form. Outside the scope.
13      THE WITNESS: Yes.
14  QUESTIONS BY MR. FARRELL:
15      Q.   Next sentence: "The public
16  health dangers associated with the diversion
17  and abuse of controlled prescription drugs
18  have been well-recognized over the years by
19  Congress, DEA, HDMA and its members, and
20  public health authorities."
21      Is that all true?
22      MS. HENN: Objection to form.
23  Outside the scope.
24      THE WITNESS: Yes.
25

Page 279

1  QUESTIONS BY MR. FARRELL:
2      Q.   The next sentence. This is the
3  part that I'd like to talk to you about, the
4  highlighted part. "The agency," meaning DEA,
5  "has failed to provide meaningful guidance to
6  assist the regulated industry in complying
7  with the DEA's interpretation of its
8  implementing regulations. HDMA respectfully
9  submits that despite the agency's oft-recited
10  refrain that the regulations are clear, the
11  regulated industry does not know the rules of
12  the road because DEA has not adequately
13  explained them."
14      McKesson has said the opposite
15  publicly and to its own people, agreed?
16      MS. HENN: Object to form.
17  QUESTIONS BY MR. FARRELL:
18      Q.   Remember the slide that said
19  clear? Remember your testimony about the
20  letters and the settlement agreement? You
21  said a few minutes ago it was clear.
22      A.   I do remember all of that. I
23  also --
24      MS. HENN: Object to form.
25      Go ahead.

Page 280

1      THE WITNESS: Oh, excuse me.
2      I also remember saying that
3  certain parts of those regulations
4  related to what a suspicious order is
5  is not clear.
6  QUESTIONS BY MR. FARRELL:
7      Q.   Page 7. "The societal costs of
8  prescription drug abuse are" -- what's it
9  say?
10      A.   I flipped to the wrong page.
11  Excuse me.
12      "Huge."
13      Q.   And if a distributor engages in
14  unlawful conduct, should the distributor be
15  held accountable for such societal costs?
16      MS. HENN: Objection to form.
17  Outside the scope.
18      THE WITNESS: Can you repeat
19  that, please?
20  QUESTIONS BY MR. FARRELL:
21      Q.   If a wholesale distributor
22  engages in unlawful conduct, should it be
23  held accountable for the societal costs of
24  prescription drug abuse?
25      MR. SUDDATH: Objection.

Page 281

1      MS. HENN: Same objections.
2      THE WITNESS: I believe
3  distributors have a responsibility in
4  preventing diversion.
5  QUESTIONS BY MR. FARRELL:
6      Q.   So should they be held
7  accountable for the societal costs that are
8  documented in this pleading and referenced as
9  huge?
10      A.   I think it depends.
11      MS. HENN: Objection to form.
12  QUESTIONS BY MR. FARRELL:
13      Q.   Depends on what?
14      MS. HENN: Same objection.
15      Go ahead.
16      THE WITNESS: It depends on the
17  facts and circumstances and, you know,
18  the information about the specific
19  situation.
20  QUESTIONS BY MR. FARRELL:
21      Q.   If a distributor repeatedly
22  fails to report suspicious orders, do you
23  believe it should be held accountable for the
24  societal costs of prescription drug abuse?
25      MR. SUDDATH: Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1     MS. HENN: Objection to form.
2     THE WITNESS: And I believe it
3  depends.
4  QUESTIONS BY MR. FARRELL:
5     Q.    On?
6     A.    The facts and circumstances.
7     Q.    How about the facts and
8  circumstances which led to McKesson paying
9  $150 million fine?
10     MS. HENN: Objection to form.
11     THE WITNESS: Again, I think it
12  depends.
13  QUESTIONS BY MR. FARRELL:
14     Q.    Do you think McKesson is partly
15  responsible for the societal costs of
16  prescription drug abuse in America?
17     MS. HENN: Objection to form.
18     THE WITNESS: Could you ask
19  that one again, please?
20  QUESTIONS BY MR. FARRELL:
21     Q.    Do you think McKesson is partly
22  responsible for the societal costs of
23  prescription drug abuse in America?
24     MS. HENN: Objection to form.
25     THE WITNESS: Again, there's a

Page 283

1  lot of people involved in -- it's a
2  very complicated and multi-faceted
3  issue, so...
4  QUESTIONS BY MR. FARRELL:
5     Q.    We'll get to the other people
6  in a second.
7     MS. HENN: Are you done with
8  your answer?
9     THE WITNESS: I am done.
10     MS. HENN: Okay.
11  QUESTIONS BY MR. FARRELL:
12     Q.    We'll get to the others in a
13  second. I want to talk about McKesson first.
14     This is your opportunity to
15  accept partial responsibility for the
16  societal costs of prescription drug abuse in
17  America; yes or no?
18     MS. HENN: Objection to form.
19  Also outside the scope.
20     THE WITNESS: So again, it
21  depends on -- it depends.
22  QUESTIONS BY MR. FARRELL:
23     Q.    You're McKesson Corporation.
24     A.    Right.
25     Q.    You're sitting here today. You

Page 284

1  have the opportunity to look in the camera
2  and tell the jury whether or not you accept
3  partial responsibility for the societal costs
4  of prescription drug abuse in America.
5     MS. HENN: Objection to form.
6  Outside the scope.
7  QUESTIONS BY MR. FARRELL:
8     Q.    I'd ask you to answer yes or
9  no.
10     MS. HENN: Same objections.
11     THE WITNESS: I'm not sure how
12  to answer that -- that question
13  specifically.
14  QUESTIONS BY MR. FARRELL:
15     Q.    Well, you can say yes or --
16     A.    I understand that.
17     Q.    -- you can say no.
18     A.    I understand that.
19     MS. HENN: Objection to form.
20  QUESTIONS BY MR. FARRELL:
21     Q.    If I asked you the same
22  question in your personal capacity, would
23  that help you answer the question better?
24     MS. HENN: Same objection.
25  Objection to form.

Page 285

1     THE WITNESS: Again, it
2  depends -- I would say it doesn't
3  change my answer. It depends on the
4  role that they played.
5  QUESTIONS BY MR. FARRELL:
6     Q.    Well, back to McKesson
7  Corporation, which is you sitting in the
8  chair today. Knowing what you know as the
9  30(b)(6) representative, the corporate
10  designee, knowing about your past conduct,
11  knowing about the past interactions with the
12  DEA, I'm going to ask you again: Does
13  McKesson Corporation accept partial
14  responsibility for the societal costs of
15  prescription drug abuse in America?
16     MS. HENN: Objection to form.
17     THE WITNESS: Again, you know,
18  I -- we're part of the closed system,
19  so we're responsible for preventing
20  diversion.
21  QUESTIONS BY MR. FARRELL:
22     Q.    So the answer is?
23     MS. HENN: Objection to form.
24     THE WITNESS: Again, I think
25  we're responsible for something. I

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    don't know what -- how you define all
2    societal costs and -- I still believe
3    it depends on different circumstances.
4  QUESTIONS BY MR. FARRELL:
5    Q.   Sir, we're not going to parse
6  out percentages.
7    A.   Yeah.
8    Q.   Let's just talk globally for
9  McKesson Corporation. So I don't want to put
10  words in your mouth because it's got to come
11  out of your mouth. So the answer is yes or
12  no.
13       MS. HENN: Objection to form.
14       THE WITNESS: I would say yes,
15  partially.
16  QUESTIONS BY MR. FARRELL:
17    Q.   How about Purdue Pharma? Does
18  McKesson Corporation take the position that
19  Purdue Pharma is partially responsible for
20  the societal costs of prescription drug abuse
21  in America?
22       MS. HENN: Objection to form.
23  Outside the scope.
24       THE WITNESS: I'm not going to
25  answer for other companies. I'm --

Page 287

1    it's like I answered my question:
2    Those involved in this space,
3    depending on the facts and
4    circumstances, may be. So, yes.
5  QUESTIONS BY MR. FARRELL:
6    Q.   Flip to page 8, the last
7  paragraph. Your trade organization is saying
8  that the "DEA's goal, the prevention of
9  diversion of controlled prescription drugs,
10  is, of course, a public good."
11       Does McKesson validate,
12  acknowledge and affirm that statement?
13       MS. HENN: Objection to form.
14       THE WITNESS: Absolutely. The
15  prevention of the diversion of
16  controlled substances is good for the
17  public.
18       (McKesson-Hartle Exhibit 29
19  marked for identification.)
20  QUESTIONS BY MR. FARRELL:
21    Q.   Next exhibit I'm going to have
22  marked is Exhibit 29. It's Exhibit
23  2013_09_13. It's Bates stamp
24  MCK-AGMS-006000880.
25       Have you seen this document?

Page 288

1    A.   I have not.
2    Q.   Do you know who Gary Boggs is?
3    A.   I do know Gary.
4    Q.   I'll represent to you that on
5  the metadata that was provided by the --
6  McKesson, indicates that this presentation is
7  dated in late 2012 -- wait, late 2013, I
8  think, probably before Gary Boggs came on to
9  McKesson. We'll ask him when we depose him.
10       But anyway, this is a McKesson
11  spreadsheet from Gary Boggs. Gary Boggs is
12  former DEA.
13    A.   PowerPoint, not spreadsheet.
14    Q.   Yeah, I'm sorry.
15    A.   Okay.
16    Q.   He's former DEA, correct?
17    A.   Correct.
18    Q.   He was the number 2 man on Joe
19  Rannazzisi, yes?
20    A.   Yes.
21    Q.   And as we'll see later, he was
22  actually in the room for one of the
23  presentations when DEA was negotiating with
24  McKesson on the 2008 settlement.
25       Is that your memory as a

Page 289

1  corporate entity?
2       MS. HENN: Objection to form.
3       THE WITNESS: I wasn't aware
4    that he was specifically in the room,
5    but...
6  QUESTIONS BY MR. FARRELL:
7    Q.   The title of this PowerPoint
8  slide is what?
9    A.   Oh, "State of prescription drug
10  abuse."
11    Q.   And on the second page, talks
12  about the impact of effective compliance.
13  And it uses lots of America-related stuff,
14  eagles and flags and such.
15       Do you see that?
16    A.   I do see that.
17    Q.   "Protecting America from
18  Prescription Drug Diversion."
19       The next page is a history of
20  understanding the problem, and on page 4 it
21  talks about a collision course.
22       And presumably this is two
23  planes colliding in the air, and that's
24  OxyContin and Percocet.
25       Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1     MS. HENN: Objection to form.
2     THE WITNESS: I see that.
3 QUESTIONS BY MR. FARRELL:
4     Q.    "In the late 1990s, doctors
5 aggressively prescribing painkillers - a
6 radical change in health care behavior."
7     And that radical change in
8 health care behavior did what to the number
9 of prescriptions?
10     MS. HENN: Objection to form.
11     THE WITNESS: Increased them.
12 QUESTIONS BY MR. FARRELL:
13     Q.    Which resulted in an increase
14 or decrease in the number of pills McKesson
15 sold?
16     A.    I don't know exact numbers, but
17 it increased.
18     Q.    And then the last part,
19 "Manufacturers fueled the use of prescription
20 painkillers."
21     This is coming from your new
22 head of regulatory affairs at McKesson,
23 agreed?
24     MS. HENN: Objection to form.
25     THE WITNESS: Can you say that

Page 291

1 again?
2 QUESTIONS BY MR. FARRELL:
3     Q.    Yeah.
4     A.    He's not -- he wasn't the head
5 of regulatory affairs.
6     Q.    Then, but he is now?
7     A.    He's one of the leaders on the
8 regulatory affairs team.
9     Q.    Okay. And this is his
10 statement that "Manufacturers fueled the use
11 of prescription painkillers."
12     Is that McKesson's position?
13     MS. HENN: Objection to form.
14     THE WITNESS: I don't know if
15 that's his own specific words or he
16 got that from a previous deck from
17 DEA. I'm not sure.
18 QUESTIONS BY MR. FARRELL:
19     Q.    We'll have to ask him.
20     But I'm asking McKesson whether
21 or not it shares this view.
22     MS. HENN: Objection to form.
23 Outside the scope.
24     THE WITNESS: Manufacturers are
25 part of the closed system, like -- and

Page 292

1 played a role.
2 QUESTIONS BY MR. FARRELL:
3     Q.    Does McKesson believe the
4 manufacturers fueled the use of prescription
5 painkillers?
6     MS. HENN: Objection to form.
7 Outside the scope.
8     THE WITNESS: I think they
9 played a role. I think there's many
10 reasons -- many things that fueled the
11 epidemic.
12 QUESTIONS BY MR. FARRELL:
13     Q.    So would you rather just punt
14 on the question?
15     MS. HENN: Objection to form.
16     THE WITNESS: That's what I'm
17 going to share. That's my answer.
18 QUESTIONS BY MR. FARRELL:
19     Q.    So yes or no, does McKesson
20 Corporation believe manufacturers fueled the
21 use of prescription painkillers?
22     MS. HENN: Objection to form.
23 Outside the scope.
24     THE WITNESS: Like I said,
25 my -- they're part of the system.

Page 293

1     They played a role.
2 QUESTIONS BY MR. FARRELL:
3     Q.    So the answer is?
4     A.    They played a role. I wouldn't
5 say -- I wouldn't characterize it as fueled.
6 I don't know that I would use that language.
7     Q.    Fair enough.
8     The next page, 5 and 6,
9 document Purdue Pharma's $635 million fine,
10 Cephalon's $425 million fine.
11     Going to page 7, it's comparing
12 the US rates of opioid overdose deaths, sales
13 and treatment admissions.
14     Do you see that?
15     A.    I see that.
16     Q.    What is the correlation between
17 opioid sales and opioid deaths? Are they
18 related or unrelated?
19     MS. HENN: Objection to form.
20     THE WITNESS: They're both
21 increasing at a similar rate.
22 QUESTIONS BY MR. FARRELL:
23     Q.    So that means they're related
24 or unrelated?
25     MS. HENN: Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  They appear to be
 2        related.
 3   QUESTIONS BY MR. FARRELL:
 4        Q.    Does McKesson believe that
 5   opioid sales are related to opioid deaths?
 6                  MS. HENN:  Objection to form.
 7        Outside the scope.
 8                  THE WITNESS:  Can you ask that
 9        one more time, please?
10   QUESTIONS BY MR. FARRELL:
11        Q.    Does McKesson believe that
12   opioid sales are related to opioid deaths?
13                  MS. HENN:  Objection to form.
14        Outside the scope.
15                  THE WITNESS:  The volume of
16        opioids in the market and diversion is
17        related to opioid deaths, certainly.
18   QUESTIONS BY MR. FARRELL:
19        Q.    Page 8, the Controlled
20   Substances Act, the very last provision says,
21   "Creates checks and balances between
22   registrants to protect the public health and
23   safety."
24                  Again, this is again a
25   reaffirmation from Gary Boggs, who is now one
```

Highly Confidential - Subject to Further Confidentiality Review

1   of your senior regulatory affairs management,

2   acknowledging that the registrants and the

3   DEA have a duty to protect the public health

4   and safety, agreed?

5        A.      Agreed.

6        Q.      Page 13.  It says, "What can

7   happen when these checks and balances

8   collapse?"

9                What do you believe this is a

10  picture of?

11               MS. HENN:  Objection to form.

12               THE WITNESS:  It's a building

13       falling down.

14  QUESTIONS BY MR. FARRELL:

15       Q.      A disaster?

16       A.      It's a building that's falling

17  down.  Why it fell down could be a disaster.

18       Q.      What do you infer from

19  Mr. Boggs' implication?

20       A.      That things can go wrong,

21  something can happen.

22       Q.      Page 16, pictures of pain

23  clinics and people waiting in line to

24  purchase pills sold by McKesson to

25  pharmacies.

Highly Confidential - Subject to Further Confidentiality Review

1                    MS. HENN:  Objection to form.

2                    MR. FARRELL:  You're right.

3          That's not necessarily a picture of

4          McKesson.

5    QUESTIONS BY MR. FARRELL:

12   QUESTIONS BY MR. FARRELL:

13          Q.     Page 17, historical comparison.

14   He's comparing the opioid crisis to the BP

15   oil spill where 11 people were killed and BP

16   paid 40 billion, plus 16 billion to the Clean

17   Water Act.

18                  Have more or less than 11

19   people been killed by the opioid crisis?

20          A.     Clearly more.

21          Q.     Have more people died today

22   than 11 people?

23                  MS. HENN:  Objection to form.

24                  THE WITNESS:  Based on the

25          statistics, yes.

Highly Confidential - Subject to Further Confidentiality Review



1    QUESTIONS BY MR. FARRELL:

2        Q.    Page 24.  Does McKesson

3    acknowledge and agree there is a national

4    epidemic of prescription pill addiction,

5    abuse, morbidity and mortality?

6              MS. HENN:  Objection to form.

7              THE WITNESS:  Absolutely.

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1 So we have about an hour left;
2 we've been going about -- almost six
3 hours. So by agreement we've kept the
4 deposition days to seven hours long,
5 and I'll honor that.
6 MS. HENN: More than by
7 agreement. It's also ordered by the
8 judge.
9 MR. FARRELL: No question.
10 MS. HENN: Just a slight
11 clarification.
12 MR. FARRELL: No question.
13 Seven hours of answering questions is
14 enough for anybody.
15 MS. HENN: It is.
16 MR. FARRELL: That being said,
17 I know there's a burden on travel and
18 arrangements; we have a tight
19 schedule. So what I'm going to do is
20 I'm going to finish up some topics,
21 and I'm going to state for the record
22 that I have not been able to get
23 through all of the designated topics
24 today.
25 That being said, there are some

Page 319

1 additional topics that you were not
2 designated for. There's essentially
3 two notices.
4 So what we're -- what I'm going
5 to do is recommend that I finish up
6 the topics that I want to get to, and
7 then tomorrow is your fact deposition.
8 And what we'll do is work out with
9 counsel if there are any of these
10 questions that can be answered in
11 writing to avoid you having to come
12 back and testify on things that can be
13 answered.
14 And then in addition, there are
15 records and there are -- there is
16 transactional data historically and
17 suspicious order report historically
18 that have not been disclosed yet
19 because of our tight schedules that
20 I'll -- I will be going to ask --
21 eventually to ask for some additional
22 time from you to finish the stuff we
23 didn't get to finish and to ask
24 questions about documents that have
25 not been disclosed yet.

Page 320

1 Obviously, it's going to be
2 subject to the objection of your
3 lawyers, and I just wanted to place
4 that on the record.
5 QUESTIONS BY MR. FARRELL:
6 Q. Jumping in real quick, I'm not
7 going to spend a whole lot of time on this; I
8 have a very specific question.
9 Before we get into the
10 document, there's a reference in here about
11 heroin, and I just wanted to see if I could
12 cut to the chase with you.
13 A. Okay.
14 Q. As the McKesson corporate
15 representative, do you acknowledge that abuse
16 of prescription opium pills is a gateway to
17 the initiation of heroin?
18 MS. HENN: Objection to form.
19 Outside the scope.
20 THE WITNESS: Based on
21 everything that I've read and in the
22 media and statistics and discussion, I
23 would agree -- agree to that.
24 QUESTIONS BY MR. FARRELL:
25 Q. If you abuse prescription

Page 321

1 opiates, the CDC says that you're 40 times
2 more likely to initiate heroin use.
3 Does McKesson acknowledge
4 that -- that prescription opiate pill abuse
5 is a driving factor in the heroin epidemic
6 we're also experiencing?
7 MS. HENN: Objection to form.
8 Outside the scope.
9 THE WITNESS: Yeah, it's a
10 factor.
11 QUESTIONS BY MR. FARRELL:
12 Q. That was easy.
13 A. Yeah.
14 Q. All right. Back to this amicus
15 business.
16 (McKesson-Hartle Exhibit 38
17 marked for identification.)
18 QUESTIONS BY MR. FARRELL:
19 Q. I'm going to mark as
20 Exhibit 38, it's 2016_04_04. This is another
21 amicus brief. This one is Masters
22 Pharmaceutical.
23 Does McKesson acknowledge that
24 in 2016 when this amicus brief was submitted
25 that it was still on the executive committee

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. FARRELL:

2        Q.    Do you agree that filling

3    suspicious orders is a direct and proximate

4    cause of prescription opioid abuse,

5    addiction, morbidity and mortality?

6            MS. HENN:  Objection to form.

7            THE WITNESS:  Filling specific

8        orders?

9            MS. HENN:  Suspicious orders is

10       the word he used.

11           THE WITNESS:  Suspicious

12       orders.

13           There's a lot of reasons for --

14       that orders may get flagged as

15       suspicious, so I think it depends.

16   QUESTIONS BY MR. FARRELL:

17       Q.    That's fair.

18       A.    They'll get flagged as an order

19   of unusual size, frequency or pattern and not

20   mean that it's suspicious or

21   diversion-related.

22       Q.    Do you believe the prescription

23   opiate epidemic is an immediate hazard to

24   public health and safety?

25           MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1  THE WITNESS: How do you -- how
2  are you defining "immediate hazard"?
3  QUESTIONS BY MR. FARRELL:
4  Q.  A hazard.
5  A.  A hazard?
6  Sure.
7  MR. FARRELL: Okay. We will
8  adjourn with the reservation of rights
9  for one day, continuing the subject
10 matters that most interest the
11 plaintiffs in the MDL in the 30(b)(6)
12 notices.
13 MS. HENN: And, I mean, we will
14 object to continuing past the limit
15 set by the Court. We feel that there
16 was a lot of time today that was spent
17 asking legal questions that could have
18 been spent on topics.
19 MR. FARRELL: There was also a
20 lot of time spent reading documents
21 that were listed in my 30(b)(6).
22 MS. HENN: Documents that you
23 put in front of the witness and wanted
24 him to read.
25 But more importantly, I wanted

Page 367

1  to ask the court reporter to please
2  designate this transcript
3  provisionally highly confidential,
4  which is required under the deposition
5  protocol, and I also wanted to reserve
6  the right to read and sign.
7  I have no questions, and so I
8  think we are finished.
9  VIDEOGRAPHER: Okay. The time
10 is 5:47 p.m., July 31, 2018. Going
11 off the record completing today's
12 videotaped session.
13 (McKesson-Hartle Exhibit 40
14 marked for identification.)
15 (Deposition concluded at 5:47 p.m.)
16 -------
17
18
19
20
21
22
23
24
25

Page 368

1  CERTIFICATE
2
3  I, CARRIE A. CAMPBELL, Registered
   Diplomate Reporter, Certified Realtime
4  Reporter and Certified Shorthand Reporter, do
   hereby certify that prior to the commencement
5  of the examination, Nathan J. Hartle was duly
   sworn by me to testify to the truth, the
6  whole truth and nothing but the truth.
7  I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
   before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
   ability.
10
11 I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
12 nor counsel of any of the parties to this
   action, and that I am neither a relative nor
13 employee of such attorney or counsel, and
   that I am not financially interested in the
14 action.
15
16
17 CARRIE A. CAMPBELL,
   NCRA Registered Diplomate Reporter
18 Certified Realtime Reporter
   California Certified Shorthand
19 Reporter #13921
   Missouri Certified Court Reporter #859
20 Illinois Certified Shorthand Reporter
   #084-004229
21 Texas Certified Shorthand Reporter #9328
   Kansas Certified Court Reporter #1715
22 Notary Public
23 Dated: August 3, 2018
24
25

Page 369

1  INSTRUCTIONS TO WITNESS
2
3  Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8  After doing so, please sign the
9  errata sheet and date it. You are signing
10 same subject to the changes you have noted on
11 the errata sheet, which will be attached to
12 your deposition.
13 It is imperative that you return
14 the original errata sheet to the deposing
15 attorney within thirty (30) days of receipt
16 of the deposition transcript by you. If you
17 fail to do so, the deposition transcript may
18 be deemed to be accurate and may be used in
19 court.
20
21
22
23
24
25