EXHIBIT 68

Highly Confidential - Subject to Further Confidentiality Review

1                 UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF OHIO

3                      EASTERN DIVISION

4

5       ----------------------------x

6     IN RE: NATIONAL PRESCRIPTION    ) Case No.

7     OPIATE LITIGATION               ) 1:17-MD-2804

8     APPLIES TO ALL CASES            ) Hon. Dan A. Polster

9       ----------------------------x

10

11

12

              VIDEOTAPED DEPOSITION OF GARY L. BOGGS

13

                      WASHINGTON, D.C.

14

              THURSDAY, JANUARY 17, 2019

15

                      9:07 A.M.

16

17

18

19

20

21

22

23    Pages: 1 - 429

24    Reported by: Leslie A. Todd

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    I do not.

 2        Q    And then it goes on to say:  "'We have

 3   to investigate things in a different manner than a

 4   company that can act on a suspicious order.  We

 5   have to meet constitutional and legal

 6   requirements.  They don't have to sell to

 7   someone,' Boggs said.  'They have a moral

 8   obligation as keepers of powerful and dangerous

 9   substances to make sure those substances are used

10   for legitimate medical purposes.'"

11             Do you have any reason to dispute having

12   made those statements?

13        A    I do not.

14        Q    Looking at the context of these

15   statements and in terms of what this article is

16   reported to be about, would it be fair to say that

17   you as a DEA agent at the time were expressing

18   dissatisfaction or frustration with certain

19   distributors as to their failure to maintain

20   effective controls to prevent the diversion of

21   controlled substances?

22             MR. STANNER:  Object to the form.

23             MR. SATIN:  And I -- objection.  I'm

24   objecting pursuant to Touhy.
```

Highly Confidential - Subject to Further Confidentiality Review

1           I don't quite understand the question.

2    You can ask him about what he said but not why he

3    said it or what was going on at DEA at the time

4    that may have informed this statement.

5           MR. HAWAL:  Counsel, this -- this is --

6    he clearly made a public statement, and I believe

7    that the Touhy requirements allow me to explore

8    the circumstances of this public statement.  I

9    don't understand how you can object in the context

10   of what he says here.

11          MR. SATIN:  So I -- I had a conversation

12   with the AUSA, Mr. Bennett, on this subject, and

13   while it's permissible to ask about the fact of

14   those public statements, but what is behind those

15   statements, the circumstances, the motives, the

16   background material, that is off-limits.  That's

17   an issue you'll have to take up with the

18   government.

19          MS. KASWAN:  We've been going quite a

20   while.  Can we take a break?

21          MR. STANNER:  The witness is fine, so

22   we're happy to keep going.  Obviously, people

23   should feel free to use the restroom.

24          MS. KASWAN:  I could use a break.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE VIDEOGRAPHER:  The time is

 2    11:24 a.m.  We're going off the record.

 3                    (Recess.)

 4                    THE VIDEOGRAPHER:  The time is

 5    11:41 a.m., and we're back on the record.

 6    BY MR. HAWAL:

 7         Q    Mr. Boggs, continuing on with the

 8    USA Today article that we've been discussing,

 9    there's another statement that is attributable to

10    you, and it says:  "'You can have the ostrich

11    approach.  You can stick your head in the sand and

12    ignore blatant signs,' Boggs said."

13                    And then it goes on to say:  "This

14    company is sitting in a state that has been the

15    epicenter of the problem.  It's no secret that the

16    drug of choice is oxycodone.  I don't think you

17    have to be that strong of an investigator to put

18    two and two together," close quote.

19                    Are those statements that you would have

20    made?

21                    MR. STANNER:  Object to the form of the

22    question, the word "attributable."

23                    THE WITNESS:  I -- I believe that

24    they're correct, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HAWAL:

 2       Q    Were these -- were these the kinds of

 3   statements that are attributive -- attributed to

 4   you in this article that you would have been

 5   generally making during this frame?

 6              MR. STANNER:  Object to the form of the

 7   question.

 8   BY MR. HAWAL:

 9       Q    In 2012.

10              MR. STANNER:  Same objection.

11              THE WITNESS:  I don't know that I

12   understand your question when you say --

13   BY MR. HAWAL:

14       Q    Well --

15       A    -- "generally making."

16       Q    Well, were these the kinds of statements

17   that you were generally making to individuals who

18   would have been inquiring about the opioid crisis

19   and certain distributors not living up to their

20   obligations under federal regulations?

21              MR. SATIN:  Counsel, I'm sorry to

22   interrupt.  Are you asking about statements he was

23   making --

24              MR. HAWAL:  In the public domain.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. SATIN:  -- in the public domain?

 2                    MR. HAWAL:  Yes, sir.

 3                    THE WITNESS:  This is a statement I made

 4      in this particular article.  I don't recall every

 5      statement that I made during that time frame.

 6      BY MR. HAWAL:

 7           Q    Let me ask you this:  When you left DEA,

 8      did you get some type of clearance from the DEA to

 9      go work for McKesson?

10           A    I believe that I was interviewed by

11      McKesson counsel on -- on that.

12           Q    Well, I'm not so concerned about

13      McKesson's counsel.  But did you seek clearance

14      from the DEA to go work for a distributor?

15           A    I don't recall doing that, no.

16           Q    So you don't have any type of written

17      agreement with the DEA that allowed you to go work

18      for McKesson?

19           A    I do not.

20           Q    Okay.  So as far as you know, there were

21      no restrictions placed upon you by the DEA as to

22      what you could or could not communicate with

23      McKesson about as it relates to your pre, or --

24      prior employment with the DEA?
```

```
 1                   MR. STANNER:  Object to the form of the

 2       question.

 3                   THE WITNESS:  I don't have any

 4       restrictions that I'm aware of, no, other than

 5       what we're talking about today.

 6                   MR. STANNER:  Mr. Hawal, I think someone

 7       on the phone is complaining about the microphones.

 8                   Can the people on the phone hear us?

 9                   (UNIDENTIFIED SPEAKER):  It sounds like

10       the mics have been turned down a little bit.  I

11       don't know if there's a way to adjust the volume.

12       We were fine before the break.

13                   MR. STANNER:  I think we just tried to

14       do that.  Has there -- have you -- have you

15       noticed any change?  We just tried -- we just

16       changed the volume.

17                   (UNIDENTIFIED SPEAKER):  No, not yet.

18                   THE VIDEOGRAPHER:  Do you hear anything

19       better now?

20                   (UNIDENTIFIED SPEAKER):  Yes.  Much

21       better.  Thank you.

22                   MR. STANNER:  Great.  If people on the

23       phone could mute their phones, that would be very

24       helpful.  Thanks.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Plaintiffs' Exhibit No. 7 was

 2              marked for identification.)

 3    BY MR. HAWAL:

 4         Q    Mr. Boggs, I'm handing you what has been

 5    marked as Plaintiffs' Exhibit 7, which is a

 6    different article but also from 2012.  And this

 7    was published in Bloomberg Businessweek.  The

 8    title of the article is "American Pain:  The

 9    Largest U.S. Pill Mill's Rise and Fall."  "There

10    were 335 million prescriptions for painkillers

11    written in 2011.  Is it any wonder some of them

12    were from criminals?"

13              And my question is, do you recall being

14    interviewed by someone from Bloomberg Businessweek

15    at or around this time where you made certain

16    statements that were -- that appeared in this

17    article?

18         A    I do not.

19         Q    I'm going to put on the screen a

20    paragraph that has certain statements that are

21    attributable to you.  And it says:  "Gary Boggs,

22    Special Agent with the DEA's Office of Diversion

23    Control says, 'The cases that the DEA has brought

24    in recent years involved wholesalers knowingly
```

Highly Confidential - Subject to Further Confidentiality Review

1   making enormous sales to customers that were

2   per se in violation of DEA rules.  The notion put

3   out by HDMA that somehow or another the DEA is not

4   providing essential information to them is simply

5   not accurate,' says Boggs.  'It's a smoke screen.

6   It's a step out of desperation.'"

7             Do you remember making such statements

8   in 2012?

9             MR. STANNER:  Object to the form,

10  compound.  Vague if you're referring to the

11  quotation on the preceding sentence.

12            MR. HAWAL:  Yes.

13  BY MR. HAWAL:

14       Q    Do you -- do you remember making such

15  statement?

16            MR. HAWAL:  I'm sorry?

17            MR. STANNER:  I'm sorry, you said,

18  "Yes."  Do you mean -- are you referring just to

19  the quotation --

20            MR. HAWAL:  Yes.

21            MR. STANNER:  -- or to the entire --

22            MR. HAWAL:  Yeah, quotations.

23            THE WITNESS:  I -- I don't recall making

24  them.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. HAWAL:

 2         Q     Were these statements that were

 3    consistent with statements that you would have

 4    been making at that time in the public domain?

 5         A     It appears a statement that I made for

 6    this article.

 7         Q     Okay.  And in -- in June of 2012, were

 8    you still a DEA employee or had you retired as of

 9    that time?

10         A     I retired at the end of that month.

11         Q     Okay.  I'm going to hand you another

12    exhibit.  I think we're at Exhibit 8.

13               (Plaintiffs' Exhibit No. 8 was

14               marked for identification.)

15    BY MR. HAWAL:

16         Q     With regard to the statement that was in

17    the Bloomberg publication, you referred to HDMA.

18    HDMA is the trade association for pharmaceutical

19    wholesalers like McKesson and Cardinal and

20    AmerisourceBergen?

21         A     It was formerly HDA -- or HDMA.  Now

22    it's HDA.  Yes, it is.

23         Q     And you have attended HDMA meetings?

24               MR. SATIN:  Are you asking about since
```

Highly Confidential - Subject to Further Confidentiality Review



1    he left the government or before?

2    BY MR. HAWAL:

3         Q    Well, let's talk about since you left

4    the DEA, have you attended HDMA meetings?

5         A    I don't believe I have, no.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



8    BY MR. HAWAL:

9        Q    Well, would you agree with me that it

10   would be difficult to make improvements if one

11   didn't go back and determine where improvements

12   were necessary or needed?

13           MR. STANNER:  Object to the form,

14   misstates the testimony.

15           THE WITNESS:  I -- I think in some times

16   that's an opportunity to do that.  I think other

17   times you have to take into consideration that,

18   you know, what may or may not have led to some

19   issues that, you know, many years ago was for a

20   different time and different type of diversion

21   scheme where the red flags may have been different

22   than what they are today.

23           So I want to make sure that I'm not

24   looking at things that are no longer valid in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    today's environment, so I'm looking more forward

 2    and what is today's thread, if you will, of

 3    diversion, and how best that we can identify that.

 4    Not necessarily looking retrospective to schemes

 5    that are no longer a relevant factor.

 6    BY MR. HAWAL:

 7         Q    Well, you would agree generally that if

 8    one doesn't look at past mistakes, one won't learn

 9    from their past mistakes.  Is that true?

10              MR. STANNER:  Object to the form of the

11    question.

12              THE WITNESS:  I think that that's

13    generally a -- a solid thing.

14              (Plaintiffs' Exhibit No. 9 was

15              marked for identification.)

16              MR. HAWAL:  Evan, 880.

17    BY MR. HAWAL:

18         Q    Mr. Boggs, I've handed you what has been

19    marked as Plaintiffs' Exhibit 9, bearing Bates

20    stamp MCK-AGMS-0060000880.
```

```
 1              Do you recall this PowerPoint

 2   presentation?

 3        A    I do.

 4        Q    Did you have a chance to review this

 5   when you were preparing for this deposition with

 6   your counsel?

 7        A    I --

 8              MR. STANNER:  Objection to the extent it

 9   calls for privileged information.

10   BY MR. HAWAL:

11        Q    Did you review this?

12        A    I've looked at this document, yes.

13        Q    As part of your preparation for this

14   deposition?

15        A    I did.

16        Q    And this was prepared -- what does

17   "Olive Branch" mean?

18        A    Olive Branch is where the McKesson's

19   national redistribution center is.  It's Olive

20   Branch, Mississippi.

21        Q    Okay.  And this would have been prepared

22   after you left the DEA?

23        A    It would.

24        Q    Did it contain information that you
```

Highly Confidential - Subject to Further Confidentiality Review

 1    would have learned or become aware of when you

 2    worked for the DEA?

 3         A    It did.  It does.

 4         Q    Did you seek and obtain any clearance

 5    from the DEA to make this presentation or put this

 6    material together?

 7         A    I did not.

 8         Q    Now, when you reviewed this PowerPoint

 9    presentation, did it appear to you to be correct

10    and accurate?  Was there anything -- or was there

11    anything that stood out as being inaccurate or

12    that you deemed required correction?

13         A    I --

14              MR. STANNER:  You're asking -- I'm

15    sorry, Counsel, you're asking at the time it was

16    prepared or since then?

17              MR. HAWAL:  No, when you -- when he

18    reviewed it in preparation for his deposition.

19              MR. STANNER:  My mistake.

20              THE WITNESS:  When I reviewed it, it

21    appeared to be an accurate representation of the

22    presentation that I gave.

23    BY MR. HAWAL:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1    use of prescription painkillers."

2              What did you mean by that statement?

3        A    What I meant by that statement, which is

4    reflected in the -- the next slide, is an example

5    of a manufacturer who was involved in an

6    investigation or a settlement with the government

7    that was about the false or misleading of

8    OxyContin, which was specifically to Purdue

9    Pharma.

10       Q    And the next page references Purdue

11   Pharma in a $635 million fine that was imposed on

12   Purdue for misleading advertising about its

13   OxyContin product?

14       A    That's correct.

15       Q    And you -- you consider that to be one

16   of the causes of the opioid crisis in the United

17   States?

18              MR. STANNER:  Object to the form of the

19   question.

20              THE WITNESS:  I think it has a

21   contributing factor, yes.

22   BY MR. HAWAL:

23       Q    And then the next page, you reference a

24   company, Cephalon, in a $425 million fine, which



1    it ended up agreeing to pay as a result of

2    inappropriate marketing of its drug fentanyl?

3         A    That's correct.

4         Q    Again, a factor that you considered to

5    be contributing to the opioid crisis in the United

6    States?

7              MR. STANNER:  Object to the form.

8              THE WITNESS:  I did.

Highly Confidential - Subject to Further Confidentiality Review

 1 ▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

 2 ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

 3 ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

 4  BY MR. HAWAL:

 5      Q    So are you saying that you do not agree

 6  that as greater amounts of opioid pills are

 7  diverted into the illicit marketplace, that the

 8  probability is that the number of addictions and

 9  deaths will increase?

10          MR. STANNER:  Same -- same objection.  I

11  think it --

12          MR. HAWAL:  I understand.  All you have

13  to do is say, "Objection," Andrew.

14          MR. STANNER:  Okay.

15          MR. HAWAL:  That would be appreciated,

16  because the rules require no speaking objections.

17          MR. STANNER:  I'm just trying to be

18  helpful.

19  BY MR. HAWAL:

20      Q    Sir?

21          MR. HAWAL:  I understand.  Thank you.

22          THE WITNESS:  I -- I think there is a

23  correlation between diversion and -- and

24  associated problems with diversion.

1    BY MR. HAWAL:

2        Q    Well, true.  And the greater the amount

3    of diversion, the greater the likelihood is of

4    ensuing harm, such as addiction and death.  True?

5        A    I believe that's a fair statement, yes.

6        Q    What was the source of this information

7    used to create this graph or chart?

8        A    I -- I don't recall.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21      Q      Have you seen any studies or statistics

22    that reference the cost to communities, both

23    cities and counties and states, as it relates to

24    the economic impact of the opioid crisis?

Highly Confidential - Subject to Further Confidentiality Review



1            MR. STANNER:  Object to the form.

2            THE WITNESS:  Not that I recall

3    specifically that, no.

4    BY MR. HAWAL:

Highly Confidential - Subject to Further Confidentiality Review



13    BY MR. HAWAL:

14        Q    I mean, for example, if a small

15    community in a given state that has, you know, 600

16    adults -- you know, a population of 600 adults and

17    is getting hundreds of thousands of opioid pills

18    provided to one pharmacy in such a small

19    community, that would indicate to you an example

20    of an exorbitant amount of pills going to a

21    potentially suspicious customer.  Fair?

22        A    It could be, yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



9    BY MR. HAWAL:

10        Q    I'm not -- I'm not saying automatically,

11   but generally speaking, would you agree that an

12   exorbitant amount going to a small community that

13   is also in the epicenter of diversion, that that

14   would be consistent with a greater degree of harm?

15        A    I think it requires a greater -- you

16   know, more diligence to determine what's going on

17   and what the factors are there, and maybe it's

18   diversion or maybe there's a legitimate reason.

Highly Confidential - Subject to Further Confidentiality Review



14          Q      And these would be red flags that would

15   not have been first known in 2013, but would have

16   been red flags that distributors should have been

17   aware of for many years.   True?

18                  MR. STANNER:   Object to the form.

19                  THE WITNESS:   I don't know that that's

20   necessarily the case.   We're -- we're talking

21   about a couple of significant diversion schemes

22   that occurred at a period of time that have

23   never -- never happened before in this country.

24   So the red flags sometimes are very specific to

Highly Confidential - Subject to Further Confidentiality Review

 1    that criminal scheme that may not be applicable to

 2    other types of schemes or other day-to-day

 3    operations of regular pharmacies or practitioners.

 4    BY MR. HAWAL:

 5        Q    Well, sir, if a -- if a distributor in

 6    2005 was aware that these red flags were occurring

 7    in a given community or related to a given

 8    customer, should these have been red flags in 2005

 9    as well as they were in 2013?

10                MR. STANNER:  Object to the form.

11                MR. SATIN:  And objection.  Don't answer

12    that if you're going to disclose non-public

13    information that you obtained while at the DEA.

14                THE WITNESS:  I think that they are red

15    flags, yes.

16    BY MR. HAWAL:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17    BY MR. HAWAL:

18        Q    Well, it could have been an industry

19    practice earlier than that.  There's nothing

20    unique about setting thresholds that coincides

21    with 2006 and 2007.  True?

22            MR. STANNER:  Object to the form.

23            THE WITNESS:  It -- it's one methodology

24    to identify and report suspicious orders.  There

Highly Confidential - Subject to Further Confidentiality Review

 1    may be others.

 2                  (Plaintiffs' Exhibit No. 10 was

 3                  marked for identification.)

 4    BY MR. HAWAL:

 5        Q    Mr. Boggs, I'm going to hand you what's

 6    been marked as Exhibit 10.  This is 301,

 7    Operations Manual.

 8                  Mr. Boggs, I take it you've seen

 9    McKesson's Operations Manual for the Controlled

10    Substance Monitoring Program?

11        A    I have.

12        Q    If you look at page 13 of 16, and the

13    numbering is at the top right-hand corner, this --

14    is this the -- this is the manual for the

15    Controlled Substance Monitoring Program that was

16    enacted as a part of McKesson's obligations with

17    its 2008 settlement?

18                  MR. STANNER:  Object to the form of the

19    question, foundation.

20                  THE WITNESS:  It -- it was the -- the

21    program for -- that was instituted in 2008 for --

22    BY MR. HAWAL:

Highly Confidential - Subject to Further Confidentiality Review



18              MR. STANNER:  Object to the form of the

19      question.  Calls for speculation, hearsay,

20      foundation.

21              THE WITNESS:  I don't agree with the

22      characterization of that.  I think that the intent

23      is to make sure that we're clear and that there's

24      not a -- a way to misconstrue what's being written

Highly Confidential - Subject to Further Confidentiality Review

1    so that someone -- a third party that may not know

2    anything about what transpired would -- would

3    understand it with -- with some clarity.

4    BY MR. HAWAL:

5        Q    Well, let's go to the next highlighted

6    bullet point.  It says:  "Refrain from using the

7    word 'suspicious' in communications.  Once

8    McKesson deems an order and/or customer

9    suspicious, McKesson is required to act.  This

10   means all controlled substances sales to that

11   customer must cease, and the DEA must be

12   notified."

13           As a former DEA representative, does it

14   trouble you that McKesson is formally instructing

15   its employees to refrain from using the word

16   "suspicious" in communications because of the

17   obligation that follows identifying an order as

18   suspicious?

19           MR. STANNER:  Object to the form of the

20   question on several bases.  I'll avoid a lengthy

21   objection.

22   BY MR. HAWAL:

23       Q    Does that trouble you, sir?

24       A    I think with my understanding and