# EXHIBIT 70

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3                        - - -
 4   IN RE:  NATIONAL              )
     PRESCRIPTION                  )  MDL No. 2804
 5   OPIATE LITIGATION             )
     _____ )  Case No.
 6                                 )  1:17-MD-2804
     THIS DOCUMENT RELATES         )
 7   TO ALL CASES                  )  Hon. Dan A. Polster
 8                        - - -
 9           THURSDAY, NOVEMBER 15, 2018
10      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW
11
                          - - -
12
13        Videotaped deposition of Mark Hartman,
14   held at the offices of BakerHostetler, 200 Civic
15   Center Drive, Suite 1200, Columbus, Ohio, commencing
16   at 9:06 a.m., on the above date, before Carol A. Kirk,
17   Registered Merit Reporter and Notary Public.
18
19                        - - -
20
21
22
23            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
24                  deps@golkow.com
```

Page 126

1 if we connect.
2     From the enactment of the
3 requirement to identify suspicious orders, you
4 would agree that we should not -- we should not
5 ship any orders that we deem suspicious,
6 correct?
7     MR. PYSER: Object to form.
8     Vague.
9   A.  Yes.
10  Q.  Okay.
11     MR. FULLER: We'll mark that as
12  Plaintiff's 6.
13         - - -
14  (Cardinal-Hartman Exhibit 6 marked.)
15         - - -
16 BY MR. FULLER:
17  Q.  All right. Mr. Hartman, when you
18 were filling this regulatory role and when --
19 the little look back you did, you're aware that
20 there were budgetary battles, correct, with
21 trying to secure sufficient resources for the
22 regulatory department, right?
23     MR. PYSER: Object to form.
24  A.  Boy, there were -- there's always

Page 127

1 budgetary battles.
2  Q.  Particularly with regulatory,
3 right?
4  A.  That -- I don't know that. I
5 wasn't in role. I was in a -- in corporate
6 functions. So I -- I didn't spend time there.
7 That could be true.
8  Q.  So did you ever hear of budgetary
9 battles going on with regulatory and them not
10 getting what they believe the resources they
11 needed to do their job with anti-diversion?
12  A.  In my time period, I not only got
13 everything I wanted, I had the support of the
14 CEO on that.
15  Q.  What about outside your time
16 period? Are you aware of budgetary battles and
17 regulatory not getting what they needed to do
18 their job?
19  A.  I was not aware of regulatory. I
20 was certainly aware of --
21  Q.  What were you aware of?
22  A.  Well, I was on the corporate
23 functions. It's a corporate -- it's a
24 corporate -- budget battles happen all the time.

Page 128

1  Q.  I want to know with QRA --
2  A.  I was not knowledgeable of that.
3  Q.  -- or supply chain integrity, if
4 you were ever made aware of budget battles
5 occurring before, after, at any time?
6  A.  Any time? Yes. After I left
7 Cardinal, Michael had communicated with me.
8  Q.  That's Mr. Moné, correct?
9  A.  Yes, Michael Moné. Had
10 communicated with me that they were at budget
11 time. I was not at Cardinal. And I responded
12 to him, basically to "Stay tough. Stick with
13 it."
14  Q.  Because it's a budgetary battle?
15  A.  Budgetary battle.
16  Q.  Let's look at that. It's 3904.
17         - - -
18  (Cardinal-Hartman Exhibit 7 marked.)
19         - - -
20 BY MR. FULLER:
21  Q.  And who was the -- you said the
22 CEO even approved your budgets. Who were you
23 referring to? Or you had the support.
24  A.  When I went into role, the -- one

Page 129

1 of the meetings I had prior to taking the role
2 was with Kerry Clark, and we talked about the
3 role, and I talked about the fact that I would
4 need his support before I accepted the role.
5  Q.  Right.
6  A.  I would need his support to get
7 whatever I needed to do whatever I needed to do.
8  Q.  Because from the information that
9 you already knew, you knew it was going to
10 require additional resources and additional
11 staff to be able to do the job the way you
12 wanted it to be done, correct?
13  A.  For my time period, that's
14 correct.
15  Q.  Okay. So let's look at --
16     MR. FULLER: Is this Number 7?
17     MS. QUEZON: Yes.
18 BY MR. FULLER:
19  Q.  All right. So let's look at
20 Exhibit Number 7. It's 3904 in the upper right;
21 is that correct, Mr. Hartman?
22  A.  Yes.
23  Q.  Okay. And this is that e-mail
24 between you and Mr. Moné, isn't it?

Page 130

1  A. Correct.
2  Q. And it was sent back and forth
3 between your personal accounts. That's not your
4 Cardinal e-mail account, is it?
5  A. Correct.
6  Q. And Mr. Moné, what's his e-mail
7 address there?
8  A. J-a-t-r-o --
9  Q. I think it's a G.
10  A. I'm sorry.
11 G-a-t-o-r-x-j-d1210@msn.com.
12  Q. Is he a Gator fan?
13  A. He is a big Gator fan.
14  Q. Well, me and him may get along
15 because I went to the University of Florida.
16  A. I hope you do. He's a good guy.
17  Q. Good. It seems like you guys got
18 along even outside of work; is that right?
19  A. Oh, yes.
20  Q. And is he still with the company?
21  A. Yes.
22  Q. And what is his position
23 currently, if you know?
24  A. I don't know the title. I believe

Page 131

1 he's in regulatory, the regulatory office.
2  Q. Okay. And this is sent to you
3 shortly after you leave; isn't that true?
4  A. May 26, 2010. I had been gone
5 about a quarter.
6  Q. So -- because you left in
7 February --
8  A. Yes.
9  Q. -- right?
10    So March, April, and then May?
11  A. Yes.
12  Q. Okay. And so we lay the
13 groundwork here, the budgetary time frame runs
14 from July 1 to June 30, correct?
15  A. Yes.
16  Q. That's the fiscal year?
17  A. That's the fiscal year, yes. At
18 that time, it was. I suppose it still is.
19  Q. Sure.
20    And the budgetary process,
21 therefore, takes part in probably the first and
22 second quarter of the year, right?
23  A. Yeah. Budgetary -- yeah, they go
24 all year long.

Page 132

1  Q. I can imagine so. I can imagine
2 so.
3    All right. So let's take a look
4 at this. Mr. Hartman says, "Hey, Mark" -- or
5 excuse me. Mr. Moné says, "Hey Mark." And then
6 read the second sentence there.
7  A. "We lost in the budget defense big
8 time and Giacomin is mounting an attack on QRA
9 and we don't seem to have a strategy or at least
10 we are not being kept informed."
11  Q. Who is Giacomin? Tell the jury
12 who Giacomin is.
13  A. John, I believe at that time, was
14 the president of the pharma division at
15 Cardinal.
16  Q. And I'll represent to you that
17 documents are a little unclear, but it indicates
18 from 2008 to sometime in 2010 he was executive
19 vice president of operations.
20  A. Yes.
21  Q. And then in 2010, he became
22 president of U.S. pharmaceutical.
23    Does that seem to coincide with
24 your recollection?

Page 133

1  A. When in 2010 did he --
2  Q. That's the part that's unclear.
3 I'm not sure.
4  A. Yeah, so I'm not sure what role
5 John was in here. But to your point, I do
6 recall he was executive vice president of
7 operations later on somewhere in 2010 time
8 frame.
9  Q. Right. So he's either executive
10 VP of ops or he was president of pharmaceutical,
11 right?
12  A. Yeah.
13  Q. Fair enough.
14    And he apparently -- or at least
15 according to Mo- -- and did you actually speak
16 to Mr. Moné about this?
17  A. I don't recall any live
18 conversations. I think --
19  Q. Just the e-mail?
20  A. Just the e-mail.
21  Q. And he indicates that "We lost the
22 budget defense big time." Which indicates his
23 budget got cut, right?
24    MR. PYSER: Object to form.

Page 134

1  A. Yes. So --
2  Q. They cut his budget.
3  A. -- I think you have to put it in
4  context of "big time." What Michael was
5  fighting for, as you'll see in a later e-mail,
6  was one position that they were fighting for,
7  which was an administrative position. And the
8  argument was, I believe at the time -- again, my
9  recollection is that the system was now doing
10 that work and they would use that head count,
11 that person, in another role someplace else.
12     Q. And he goes on to say, that
13 "Giacomin is mounting an attack on QRA."
14     A. Yes.
15     Q. I mean, the guy in operations --
16     A. Right.
17     Q. -- right?
18        And you had a little bit of a
19 concern about reporting to people in operations
20 at one time, too, didn't you?
21     A. Well, I made sure, based on my
22 role, that I stayed independent from anybody
23 else to influence me.
24     Q. Particularly operations, because

Page 135

1  what are they going to want to do? Just what
2  they did here --
3     A. Well, they didn't --
4     Q. -- is attack?
5     A. I think in the later e-mail you'll
6  find that didn't happen.
7     Q. We'll see. We'll see. Let's keep
8  going.
9     A. You have all my documents, right?
10    Q. I -- we have them all. Your
11 counsel has them all, right?
12    A. Yes. Everything I -- I gave him
13 everything that I have.
14    Q. Okay.
15    A. So -- and later on he addresses
16 that he kept the head count. And that was the
17 whole commentary there about this.
18    Q. Let's keep going.
19       "Giacomin is mounting an attack on
20 QRA. We don't have a strategy or at least we
21 are not being kept informed. And it's because
22 we have no presence on the fourth."
23       What's "the fourth"? Tell the
24 jury what "the fourth" is.

Page 136

1  A. The fourth -- the fourth floor was
2  where the leadership team for pharma was
3  officed. I was there. In my tenure, I moved us
4  off of the fourth to the third floor where the
5  regulatory group had been. So they remained --
6  evidently they remained on the third floor. So
7  when he says "on the fourth floor," he's talking
8  about physical proximity, I believe.
9     Q. Right. To decision-makers?
10    A. I suppose.
11    Q. And it's the lack of visibility,
12 just what you mentioned, down on the third --
13 listen. Maybe you've forgotten.
14    A. You're in the -- you're in the
15 budget battle -- you know, got to have what you
16 need, and we had gotten everything we needed.
17 And he was fighting for one head count. To him,
18 that was big. We had talked about it before I
19 left. You know, keep that position.
20    Q. And this is Moné. So this is the
21 QRA side, right, quality regulatory affairs?
22    A. Well, and he was specifically the
23 anti-diversion side.
24    Q. The anti-diversion?

Page 137

1  A. Yes.
2  Q. And how many people did he
3  actually have?
4  A. At that time, I don't know, but --
5  I'd have to see his org chart. I mean, when we
6  built it out, we had six, seven, eight in his
7  group, between the pharmacists --
8     Q. Right.
9     A. -- the investigators and the
10 administrative staff that supported that whole
11 group on his side.
12    Q. Sure.
13    A. And then there was Steve Reardon's
14 side.
15    Q. Which is -- what do you call that
16 side?
17    A. He was -- he was regulatory
18 affairs.
19    Q. Regulatory affairs.
20       So on Moné's side, if you take
21 away one of seven, that's a pretty big cut.
22 Greater than 10 percent at least, right?
23    A. Well, just for perspective, what
24 we had talked about is that our systems had

Page 138

1 begun to do lots of the administrative work as
2 opposed to human beings. So in my view, as you
3 can -- I think you can see through my e-mail,
4 you know, it's a budget battle. You could lose,
5 but stay after it. Don't lose it. Which he
6 didn't.
7    Q.   Well, you're telling him, "Keep up
8 the good fight."
9    A.   Which he didn't. And he retained
10 his positions, and he retained what he needed.
11    Q.   So we'll talk about that. But you
12 also are aware that prior to your taking this
13 position, there are also budget battles and
14 deficiencies in what the regulatory department
15 had as well, aren't you?
16    A.   When you said -- before my time, I
17 was not intimately involved with regulatory
18 affairs, so I -- I'm not aware of the budget
19 battles, if you will, that they had. I wasn't
20 aware. I wasn't with them. I didn't
21 participate in their parts of the meetings where
22 we'd go through the budget, you know, the budget
23 needs, the budget requirements, the things we
24 were going to do for the next year.

Page 139

1    Q.   Let me ask, when you came into the
2 department, clearly needed to make changes,
3 didn't you?
4    A.   Again, when I was just coming into
5 the department, I didn't understand what was
6 happening. I didn't know much about it.
7    Q.   But didn't you already know that
8 you needed more resources?
9    A.   But I -- well, when I talked to
10 Kerry, that's exactly what any good executive
11 would do. The first thing they do is --
12    Q.   Absolutely.
13    A.   -- ask for the money, ask for the
14 support, and that's what I got during my time
15 frame.
16    Q.   And you weren't going to do it to
17 be wasteful, were you?
18    A.   You don't do that.
19    Q.   Fair enough.
20         Keep reading on -- "after the lack
21 of visibility." What does Mr. Moné says -- say?
22    A.   "We are about to find out that
23 some of our recent unpopular decisions were
24 correct, though the yelling continues. Issues

Page 140

1 at borschow have created another firestorm on
2 the price diversion side."
3    Q.   It says "our unpopular decisions
4 were correct." Do you know what he's referring
5 to?
6    A.   I have -- I have no knowledge what
7 he's referring to. I can surmise that. In our
8 role as an anti-diversion, we made plenty of
9 calls, and we certainly discussed it. And the
10 calls that we made were debated, at the end of
11 the day. What Michael said we were going to do,
12 and I supported, or if I was going to be the
13 decision-maker on it, which a few of them I
14 was -- I don't recall which ones -- we called
15 the shot.
16    Q.   And it was the unpopular call
17 related to anti-diversion in not shipping
18 controlled substances, right?
19         MR. PYSER: Object to form.
20    Speculation.
21    Q.   Those were the tough calls?
22    A.   Well, the tough calls are anytime
23 you have a -- certainly anytime you have a
24 customer and they hit a threshold and then

Page 141

1 you're making -- doing the review around, is
2 that a suspicious order, what other information
3 is there? And do -- and then does it -- do we
4 need to deem it a suspicious order? They're all
5 tough calls.
6    Q.   Absolutely. And that was y'all's
7 obligation -- I say y'all, regulatory's
8 obligation was to make those tough decisions,
9 those unpopular-by-everybody-else decisions,
10 correct?
11    A.   And we did.
12    Q.   And that's why you wanted to work
13 out from underneath operations or anybody else
14 who you mentioned may have influence upon you,
15 correct?
16    A.   That's correct.
17    Q.   Because you didn't want that to
18 happen because you saw and you know that it
19 wouldn't be the best way to run the regulatory
20 department; isn't that true?
21    A.   Being separate, have a completely
22 independent voice around what actions we took
23 was how I saw to get the job done, and during my
24 time frame, that's what we did.

Page 142

1  Q. And when you came into the
2 department and made those changes, that's not
3 the way it was being done. It was oversaw by
4 those who didn't like unpopular decisions,
5 correct?
6     MR. PYSER: Object to form.
7  A. You know, I don't know where the
8 reporting structure was. Again, I was heads
9 down in a corporate function and some pretty big
10 things we had going on. I was not operating in
11 the division at that time. So I -- you know,
12 Steve Reardon will certainly be able to respond
13 to those questions as to where we were, what we
14 were doing.
15  Q. Now, let's go up to your response.
16  A. Okay.
17  Q. You say, "Wow, an accident" --
18 now, we didn't read the part where Mr. Moné got
19 into a car accident, right?
20  A. Don't want to read that?
21  Q. No, no.
22  A. That's --
23  Q. That's important?
24  A. Well, he takes care of people

Page 143

1 there.
2  Q. I understand. I understand.
3      And then you mentioned the budget
4 battle that we've already talked about, right?
5 That's what you called it?
6  A. Oh, yeah. Well, there isn't --
7 there isn't a -- if you want to define it any
8 different way, any discussion you have around
9 budgets are always battles around what you need
10 and then what you want. And what you try to
11 decipher as a corporation is, the needs, what
12 are the needs to help our business and to move
13 it forward, support our customers?
14      The wants oftentimes get layered
15 in there, and they're difficult to discern. You
16 know, big companies, big budgets. And so I
17 always refer to it as the budget battles.
18  Q. And it clearly was to Mr. Moné.
19 Read what you go on to say.
20  A. "You know there is a likelihood
21 you will not get the head count backfill."
22  Q. Keep going.
23  A. "I would not cave on that, but
24 privately prepare for the worst."

Page 144

1  Q. Finish out.
2  A. "I'll certainly see if I can get
3 those guys a note to support you and thusly
4 Shirlene."
5  Q. And Shirlene is Ms. Justus, right?
6  A. Yes.
7  Q. Okay. And she actually came to
8 that division or that department with you when
9 you took on that role?
10  A. That's right.
11  Q. And she had been working with you
12 previously in your other roles at Cardinal?
13  A. Correct.
14  Q. And is she still there, as far as
15 you know?
16  A. As far as I know.
17  Q. Okay. And it sounds like -- it
18 next goes on to say, "It sounds like the
19 situation is unfolding a bit like we projected."
20 Right?
21  A. That's what I said.
22  Q. Continue reading for us.
23  A. "It's a shame if the department is
24 relegated to less-than-needed authority or

Page 145

1 investment. It will haunt the organization at
2 some point."
3  Q. Now, let me stop you there. Is
4 this the haunting you're referring to?
5     MR. PYSER: Object to form.
6  A. The --
7  Q. The haunting you're referring to.
8 These bad decisions related to regulatory and
9 these lawsuits that have now been brought upon
10 the company for creating this epidemic. Is that
11 the haunting you're referring to?
12  A. No, that's not what I'm referring
13 to.
14  Q. What haunting are you referring
15 to?
16     MR. PYSER: Object to form. And
17     objection on the last one too. Same
18     objection.
19  A. I'm talking about the fact that
20 the haunting is taking away from the
21 organization a head count that we felt we needed
22 badly. Didn't want. We felt we needed. Other
23 people in the organization could think it's a
24 want or a need that we -- excuse me. A want

Page 146

1 that we were just putting forward.
2     We're saying here the haunting
3 part of this is to lose that head count.  So --
4 and if any -- and, of course, it should say -- I
5 wrote that, authority or investment.  The whole
6 point is, while I was there, I had everything
7 that I wanted, and the investment was behind me.
8 And that was -- what I didn't want Michael to
9 lose was that position of investment that he
10 felt he needed.
11     Q.  From others in the organization,
12 right?
13     A.  Sure, yes.
14     Q.  And now he feels like Giacomin is
15 attacking him, and the haunting that's coming,
16 you're right, is the lack of support, the lack
17 of investment.  And the result is what we see
18 here today, an opioid epidemic going on in our
19 country; isn't that true?
20     MR. PYSER:  Object to form.
21     A.  That was not my inference here.
22 My inference was around the budget and what
23 Michael needed in order to do the job for
24 Cardinal Health.  And if you know from further

Page 147

1 e-mails, he retained his position, and budget
2 was good.
3     Q.  And you know we're now facing an
4 opioid epidemic in this country, don't you?
5     MR. PYSER:  Object to form.
6     A.  I sure do.
7     Q.  And we have been for a long time,
8 haven't we?
9     MR. PYSER:  Object to form.
10     A.  I'd agree with "long time."
11     MR. FULLER:  Let's take another
12 break.
13     THE VIDEOGRAPHER:  The time is now
14 11:47.
15     (Recess taken.)
16     THE VIDEOGRAPHER:  The time is now
17 12:00 p.m.  Back on the record.
18 BY MR. FULLER:
19     Q.  All right, Mr. Hartman.  We were
20 talking about the budget battles that were
21 occurring.  How many people were in regulatory
22 when you came into that position in December of
23 2007?
24     Mr. Reardon was there, correct?

Page 148

1     A.  Oh, yeah.
2     I don't recall.  I'm guessing, but
3 I'm going to assume in the seven, eight, nine,
4 ten range.  I'm not sure.
5     Q.  And now -- and Mr. Moné's side,
6 supply chain integrity, was just being created,
7 right?
8     A.  Yes.
9     Q.  Okay.  And that hadn't been fully
10 staffed yet, correct?
11     A.  No.
12     Q.  No, I'm right, it hadn't been
13 fully staffed, or no, I'm wrong and it had been
14 fully staffed?
15     A.  Ask me the question, and I'll give
16 you that answer.
17     Q.  Fair enough.
18     Mr. Hartman, when you came into
19 the regulatory department, Mr. Moné had already
20 been hired, correct?
21     A.  Yes.
22     Q.  And his section was called what
23 again?
24     A.  Anti-diversion.

Page 149

1     Q.  Anti-diversion.
2     The staffing for his department
3 had not been completed as of that point in time,
4 correct?
5     A.  Correct.
6     Q.  Okay.  So let's go -- and you just
7 testified you're not sure about the staffing
8 when you came in.
9     Did you look at anything to
10 indicate what the staff had been in the past for
11 anti-diversion, the regulatory departments?
12     A.  Like all things, I'm sure we
13 looked back.  We looked at it.  And we just put
14 stakes in the ground and moved forward and what
15 do we need and how do we get those resources.
16 So ...
17     Q.  Let's go to 4765.
18     - - -
19     (Cardinal-Hartman Exhibit 8 marked.)
20     - - -
21 BY MR. FULLER:
22     Q.  Mr. Hartman, as you can see, this
23 is an Operation 1 Cardinal Health quality
24 management meeting document, correct?

Page 150

1  A. Yes.
2  Q. And it's dated January 13, 14 of
3 2005; is that right?
4  A. Yes.
5  Q. Okay. This would have been when
6 you were with the company, just not in
7 regulatory; is that fair?
8  A. Yes.
9  Q. So if you turn all the way back to
10 page 64. We want to take a quick look at just a
11 couple things related to the regulatory
12 department at the time.
13     During that time it was still
14 called QRA or quality regulatory affairs; is
15 that correct?
16  A. I agree with that. I -- probably.
17  Q. Okay. It says here the QRA model.
18     Do you see that?
19  A. Where -- are you on the top side
20 or --
21  Q. Yes, sir. If you look on the
22 screen, because those printouts are hard to
23 read.
24  A. Yeah.

Page 151

1  Q. The screen in front of you may
2 help.
3  A. Oh. Gotcha.
4  Q. She blows it up so our eyesights
5 can work.
6     So, Mr. Hartman, this indicates,
7 on page 64 here, that it's internal client
8 perspective of QRA; is that right?
9  A. Yes.
10  Q. Okay. And it says, "The QRA
11 model." Read the first bullet point to us.
12  A. "Quality is not a mindset at
13 Cardinal Health. We are not proactive. This is
14 not a high enough priority today."
15  Q. Then it goes on to say, "When
16 financials are tight, quality suffers," doesn't
17 it?
18  A. It says that.
19  Q. Now, during this time, you weren't
20 in this department; is that fair?
21  A. That's correct.
22  Q. Now, do you know from your
23 experience in the department that having a
24 regulatory mindset, having a compliance mindset,

Page 152

1 is very important to the operations of the
2 business, isn't it?
3  A. Yes.
4  Q. Having sufficient resources so
5 that people can do their jobs is also
6 detrimental for the compliance department, isn't
7 it?
8  A. It's important to have the right
9 resources to do the regulatory job.
10  Q. And not just the right resources
11 and number of people, but also the right
12 support, like you said? You specifically went
13 to Clark and got his assurance that he would
14 back you on what you needed to be able to do the
15 job the way you saw fit, didn't you?
16  A. I did that.
17  Q. If we go on, it says "Need to
18 understand" -- or excuse me. "Corporate quality
19 organization - not sure what their role should
20 be."
21     And our screen went blank. There
22 we go. Let's try that again.
23     The next line, Mr. Hartman, reads,
24 "Corporate quality organization - not sure what

Page 153

1 the role should be."
2     Corporate quality should have an
3 absolute laser beam on what their role should be
4 in the organization, shouldn't they? They've
5 got to know what their focus is to be able to do
6 their jobs?
7  A. In 2005, I -- again, we were -- we
8 were organizing ourselves differently. I don't
9 know what this document is, so I'd need to take
10 some time on it so that I could -- I won't be
11 able to answer your question because I -- that
12 might be the new organization of a department.
13  Q. And that's fair. But you would
14 agree, would you not, that corporate quality
15 should know what their role is?
16  A. Corporate quality should know what
17 their role is given a new department has time to
18 establish what they're about and the resources
19 that they have and how it was reorganized
20 potentially.
21  Q. Absolutely.
22     Then it says, "Need to understand
23 roles and what will be at Business or Segment
24 level."

Page 154

1  Do you see that? Do you see that
2 there? Did I read it correctly?
3  A. Yeah, yeah, I see it.
4  Q. Okay. And then, "Corporate
5 Centers of Excellence would be of value."
6  You would agree with that,
7 wouldn't you?
8  A. Yes.
9  Q. And then, "Would like to see
10 stronger regulatory affairs" --
11  A. Let me come back on that.
12 Corporate Centers of Excellence. Okay. If I'm
13 going to respond to this, I need to look at this
14 document. I think I'm aware of the time period
15 we're talking about. And that time period would
16 be the genesis of responses that I can give you
17 as opposed to looking at one segment on here.
18  Can I do that?
19  Q. Well, here's the thing. Your
20 counsel wants to finish by 12:30 to take a lunch
21 break, and that's fine, but I want to finish
22 with this document. And I have a limited amount
23 of time.
24  A. Yes.

Page 155

1  Q. And I'm not going to waste my
2 seven hours that we have letting you go through
3 a big old document that somebody hadn't bothered
4 to show you before.
5  A. I -- can I just take a minute?
6  Q. Absolutely.
7  MR. PYSER: You can take as much
8  time as you want. If he wants to show
9  you a document --
10  MR. FULLER: And we'll go off the
11  record and you'll review it, and then
12  we'll come back on the record.
13  MR. PYSER: Wait till there's a
14  question.
15  A. Yeah.
16  Q. You were the one that said you
17 wanted to take a look at it, Mr. Hartman. Go
18 ahead.
19  A. I'm vaguely in the time frame. I
20 wasn't in quality. I'll take your questions.
21  Q. Okay. So the next section is
22 "People."
23  Do you see that there?
24  A. Yes.

Page 156

1  Q. And read the first bullet point.
2  A. "Under-resourced today."
3  Q. Not enough people, not enough
4 resources. That's what it's saying, correct?
5  MR. PYSER: Object to form.
6  A. Yeah. This is a document in
7 response to the reorganization at Cardinal, and
8 I oversaw and was a part of watching all of
9 these departments. It's a big, big
10 transformation. Big. Lots of involvement.
11 Huge changes. I'll just tell you that I didn't
12 have a function that didn't come in with
13 anything different than this kind of lineup of
14 under-resourced or underfunded or needs money.
15  Q. Okay. We'll -- and we'll deal
16 with that.
17  A. And everybody had -- and that gets
18 back to the budget battle comment where I talked
19 to you about wants -- or needs versus wants.
20 And what we found in all of this, as we moved
21 forward to reorganize and make ourselves more
22 efficient, there were a tremendous number of
23 wants. What we had to get at were the needs,
24 and I don't know how this resulted.

Page 157

1  Q. We'll see. And here's the thing,
2 Mr. Hartman, because Cardinal's entrusted with
3 dealing with what has been labeled and
4 legislatively enacted as dangerous drugs.
5  You're aware of that, right?
6 Control IIs are --
7  MR. PYSER: Object to form.
8  Q. -- by definition dangerous drugs.
9 You're aware of that, correct?
10  A. Yes.
11  Q. This is not a place to skimp. You
12 would agree with that? Regulatory needs to be
13 beefed up so they can do the job they need to do
14 in compliance with the regulations we talked
15 about earlier.
16  We can both agree on that as well,
17 correct?
18  MR. PYSER: Object to form.
19  A. Well, the only -- the only thing I
20 agree with is this is a document that came out
21 in a major transformation from one of the
22 functions about, we need more money, we need
23 more resources. And the way to do that is to
24 highlight things like you're seeing right here,

Page 158

1 and I saw that in every single department that
2 came forward.
3     Q.   Fair enough.
4     A.   And it doesn't mean that they were
5 underfunded or they were under-resourced.  That
6 does not say that here, when you get to the
7 corporate level of looking at the functions.
8     Q.   Hold on.  So you're the doc --
9 saying this document doesn't say they're not
10 under-resourced?
11    A.   No.  I'm saying that what's said
12 here is not necessarily a corporate position or
13 where we were at on quality as to how Cardinal
14 saw it.  This is what the department is saying.
15    Q.   Exactly.  Exactly, Mr. Hartman.
16 It is the QRA department saying we're
17 under-resourced.
18    A.   But it doesn't say it's -- it
19 doesn't mean it's necessarily right or that they
20 are under-resourced as we develop the
21 departments in this new organization.
22    Q.   Sure.  It doesn't mean it's true.
23 It's just what they're saying?
24    A.   Yes.

Page 159

1     Q.   Fair enough.
2          The next bullet point says,
3 "People we have are good.  Don't have enough
4 bench strength."
5          And you would agree again, that in
6 regulatory you have to have the depth.  You have
7 to have the good people up and down the ladder,
8 correct?
9     A.   You have to have good people.
10    Q.   It says then, "Need to upgrade and
11 deepen talent."
12         You don't disagree with that
13 either, do you?
14    A.   There isn't a budget discussion, a
15 department I've run, a place I've been, a thing
16 I've actually tried to execute and get done
17 where "need to upgrade" and "deepen talent"
18 doesn't exist.  I agree with it.
19    Q.   And then, "Not enough people"
20 again, right?  That's what it says?
21    A.   It says that, yes.
22    Q.   That's what the QRA department is
23 saying during this time frame?
24    A.   That's what they said.

Page 160

1     Q.   And then go to processes.
2          "The process" -- and you're aware
3 of this.  This is the regulatory department,
4 bullet point 1:  "Keeps us out of trouble but
5 not very proactive or innovative."
6          You would agree, would you not,
7 that you need to be proactive in regulatory?
8     A.   Prior to my time, the "keep us out
9 of trouble," I agree with.  The "not very
10 proactive or interactive," I don't know to agree
11 with you in the matter that we're talking about.
12 Cardinal was a big company.  This is referring
13 to broad specter regulatory groups.
14    Q.   Let's talk about it.
15         Are you aware of the New York AG
16 action for selling and diverting related to
17 price fixing?
18         MR. PYSER:  Object to form.
19    A.   I'm aware of it -- or I'm sorry.
20         MR. PYSER:  Misstates evidence.
21    Q.   Go ahead.
22    A.   Ask me again.
23    Q.   Are you aware of the New York AG
24 action related to diversion and price diversion?

Page 161

1          MR. PYSER:  Same objection.
2     A.   I'm aware of it.
3     Q.   Okay.  And Cardinal then -- after
4 that action happened, then took steps to put
5 policies and procedures into place to react to
6 it, correct?
7     A.   I -- again, it's before my time.
8     Q.   So you don't know?
9     A.   I don't know in that case what was
10 done.
11    Q.   Fair enough.
12         In the 2000- --
13    A.   But understand that the New York
14 Attorney General's action of price diversion is
15 completely separate and different from the
16 matter we're talking about in anti-diversion.
17 Completely separate.  The two do not intermix.
18         There is nothing there that puts
19 the two of those two things together, other
20 than, while I was in role, Michael Moné did have
21 that action put under him for some period of
22 time.  I didn't work on it.  I didn't spend any
23 time on it.  And I think we were downstream on
24 it, if you will.

Highly Confidential - Subject to Further Confidentiality Review

|  | Page 162 |
|---|---|
| 1 | Q. So your understanding is that the |
| 2 | New York AG action didn't involve diversion? |
| 3 | MR. PYSER: Object to form. |
| 4 | Misstates testimony. |
| 5 | A. Price diversion. |
| 6 | Q. Right. |
| 7 | And also divert -- the New York AG |
| 8 | agreement indicates that they are selling to |
| 9 | individuals that they know are diverting |
| 10 | controlled substances. They're selling to |
| 11 | closed-door pharmacies in Arizona that are |
| 12 | turning around and shipping to Kentucky, right? |
| 13 | MR. PYSER: Object to form. |
| 14 | A. I don't know. I was -- I wasn't |
| 15 | involved in the matter. |
| 16 | Q. And then in 2007, you get pulled |
| 17 | into this new position? |
| 18 | A. Yes. |
| 19 | Q. In reaction to what? |
| 20 | A. The immediate suspension orders. |
| 21 | Q. The immediate suspension orders. |
| 22 | The lack of being proactive, |
| 23 | because there was meetings going on with the DEA |
| 24 | all the way back in 2005 warning them about |

|  | Page 163 |
|---|---|
| 1 | Internet pharmacies, which was the main issue in |
| 2 | the immediate suspension orders in 2007, wasn't |
| 3 | it? |
| 4 | MR. PYSER: Object to form. |
| 5 | Q. Do you know? |
| 6 | A. That's a long statement you just |
| 7 | made. What -- I need to hear your question so I |
| 8 | can answer you. |
| 9 | Q. Sure. |
| 10 | You said that you didn't agree |
| 11 | that regulatory wasn't proactive. Proactive |
| 12 | would entail taking steps before being forced |
| 13 | to, right? Reacting, acting in advance of, |
| 14 | correct? |
| 15 | A. If you're asking me if we were not |
| 16 | reactive, this was prior to my time, and what |
| 17 | I've stated to you is that this is a budget |
| 18 | discussion, and as you look at it, this might be |
| 19 | the appropriate -- this might be a -- Gary |
| 20 | Dolch's prep meeting. I have no idea what was |
| 21 | originally -- which was finally presented, if |
| 22 | what I'm looking at here is a document. |
| 23 | So I can't answer you on it. I |
| 24 | don't have knowledge of where they were or where |

|  | Page 164 |
|---|---|
| 1 | they weren't. |
| 2 | Q. Okay. So what we can agree to is |
| 3 | that QRA indicates on this slide that it keeps |
| 4 | us, Cardinal, out of trouble, but is not very |
| 5 | proactive or innovative. That's what it says, |
| 6 | isn't it? |
| 7 | A. That's what it says. |
| 8 | Q. Okay. The next point -- let's go |
| 9 | down to -- yeah, the next one, "Site level |
| 10 | measurements and incentives can hinder |
| 11 | investment and quality." |
| 12 | That's also a concern that -- at |
| 13 | least they were having at this point in time, |
| 14 | right? |
| 15 | A. That's what they said. |
| 16 | Q. Okay. Now, you made a good point, |
| 17 | Mr. Hartman. You said, look, this may have just |
| 18 | been at this one time, this big reorganization. |
| 19 | Were you ever shown anything to |
| 20 | indicate this same problem between 2005 and the |
| 21 | time you came into the position? Did anybody |
| 22 | ever share anything with you that would indicate |
| 23 | this is a systemic problem, a problem with the |
| 24 | entire system? |

|  | Page 165 |
|---|---|
| 1 | A. In my roles, I don't recall |
| 2 | conversation -- a conversation around -- or |
| 3 | conversations around regulatory in my time |
| 4 | period. |
| 5 | Q. So let's go to 36- -- or excuse |
| 6 | me. 3868. |
| 7 | A. Oh, another document? |
| 8 | Q. Yes, sir. |
| 9 | - - - |
| 10 | (Cardinal-Hartman Exhibit 9 marked.) |
| 11 | - - - |
| 12 | MR. FULLER: What number am I up |
| 13 | to? |
| 14 | MS. SHIVERS: This is 9. |
| 15 | MR. FULLER: This is going to be |
| 16 | Plaintiff's Exhibit Number 9. |
| 17 | MR. PYSER: Counsel, do you have |
| 18 | another copy of Exhibit 9? |
| 19 | MR. FULLER: I'm sure we do. |
| 20 | MS. SHIVERS: No. |
| 21 | MR. FULLER: That's the only one |
| 22 | we have, I think. See if we have |
| 23 | another one. We'll check. |
| 24 | MR. PYSER: Well, as you were |

Golkow Litigation Services                                 Page 42 (162 - 165)

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1  pointing out earlier, the depo protocol
2  requires certain things. One of them is
3  that you have a copy for counsel.
4      MR. FULLER: Sure. Why don't we
5  go ahead and take our lunch break now,
6  and we'll go make copies.
7      MR. PYSER: That's fine.
8      THE VIDEOGRAPHER: The time is now
9  12:18. Going off the record.
10         - - -
11  Thereupon, at 12:18 p.m. a lunch
12  recess was taken until 1:23 p.m.
13         - - -

Page 167

1      Thursday Afternoon Session
        November 15, 2018
2           1:23 p.m.
3           - - -
4      THE VIDEOGRAPHER: The time is now
5  1:23. Back on the record.
6      CROSS-EXAMINATION (CONT'D.)
7  BY MR. FULLER:
8  Q.  All right, Mr. Hartman. Before we
9  took the lunch break, we were talking a little
10 bit about the staffing issues and the regulatory
11 department. I think, just so it's clear, we
12 looked previously at the 2005 time frame; is
13 that correct?
14 A.  Yes.
15 Q.  Okay. I'll provide you with 3868.
16 I'll provide it to your counsel, and he can pass
17 it out.
18     Had you seen this document before
19 today?
20 A.  I don't recall seeing it, and --
21 Q.  So you --
22 A.  I don't recall seeing this
23 document. Yeah, this is prior to my time, I
24 think.

Page 168

1  Q.  Fair enough.
2      So you have no recollection and no
3  one showed you this document before today,
4  correct?
5  A.  No.
6  Q.  Fair enough.
7      So this is --
8      MR. FULLER: What number is it?
9  Did we give it a number yet?
10     MS. SHIVERS: It's 9.
11 BY MR. FULLER:
12 Q.  Okay. This is Plaintiff's 3868,
13 but, Mr. Hartman, for the purposes of the
14 deposition, it's going to be Exhibit 9. Now, at
15 the top of this document, it indicates that it's
16 the Drug Distribution Compliance Budget Review,
17 Fiscal Year 2007.
18     Do you see that there?
19 A.  Yes.
20 Q.  And so this is a fiscal year 2007,
21 which is going to start in July of 2006,
22 correct?
23 A.  I think we can assume that, right.
24 Q.  Okay. So this may be sometime,

Page 169

1  like we talked about earlier, the budgetary
2  process in the first part of 2006 before the
3  budget becomes active in July?
4  A.  Sure.
5  Q.  Okay. And this talks about it's
6  the Department Budget Highlights/Assumptions -
7  Bullet Point, budgetary variance from forecast,
8  new hires, organizational chart, expenses, '07
9  budget trend, and the actual/forecast trend from
10 2006; is that correct?
11 A.  Yes.
12 Q.  Okay. So, for example, this would
13 be part of the process you would have gone
14 through after you arrived in December of 2007.
15 You would have went through that process
16 sometime in the first part of 2008; is that
17 fair?
18 A.  Yes, I would have --
19 Q.  Okay.
20 A.  -- in some regard.
21 Q.  So let's turn to the next page.
22 You see the budgetary -- or excuse me --
23 "Compliance Budget Review, Fiscal Budget
24 Highlights and Assumptions."