# EXHIBIT 71

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                    -   -   -
 5   IN RE:  NATIONAL      :  MDL NO. 2804
     PRESCRIPTION OPIATE   :
 6   LITIGATION            :
     ------------------------------------------
 7                         :  CASE NO.
     THIS DOCUMENT         :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                           :  Hon. Dan A.
 9                         :  Polster
10                    -   -   -
           Thursday, December 13, 2018
11                    -   -   -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
13
                      -   -   -
14
              Videotaped deposition of
15   SHAUN ABREU, taken pursuant to notice,
     was held at the law offices of Locke
16   Lord, LLP, Brookfield Place, 200 Vesey
     St., 20th Floor, New York, New York
17   10281-2101, beginning at 9:06 a.m., on
     the above date, before Amanda Dee
18   Maslynsky-Miller, a Certified Realtime
     Reporter.
19
                      -   -   -
20
21
22
23         GOLKOW LITIGATION SERVICES
        877.370.3377 ph| 917.591.5672 fax
24              deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1  (Whereupon, Exhibit
2  Schein-Abreu-6, Verification Team
3  Overview; July 2015, was marked
4  for identification.)
5  - - -
6  BY MR. MIGLIORI:
7  Q. Elia.
8  Who is she?
9  A. She works on my team.
10 Q. Do you recall -- it's a
11 July -- it's Exhibit Number 6. It's a
12 July 2015 PowerPoint, verifications team
13 overview.
14 Do you remember preparing
15 this?
16 A. 2015? I'm sure I did. I
17 don't recall specifically.
18 Q. That's you on the front
19 cover, anyway?
20 A. Yes.
21 Q. And it really goes into the
22 verification component of suspicious
23 orders, right? The second page is the
24 licensing requirements?

Page 163

1  A. Yes.
2  Q. And so part of verification
3  is that you have to make sure that your
4  doctors and customers, where applicable,
5  maintain state licensure, correct?
6  A. Correct.
7  Q. Do you know if Ohio -- it
8  says here, Example, Ohio.
9  Are you familiar with the
10 additional state requirements of state
11 licensure in Ohio?
12 A. Yes.
13 Q. What are they?
14 A. That a customer maintain a
15 terminal distributor of dangerous drugs
16 license, Category III, for controlled
17 substances.
18 Q. And does that change -- is
19 that any -- strike that.
20 Are your reporting
21 requirements different in Ohio because of
22 that requirement?
23 A. Sorry, I'm not sure I
24 understand the question.

Page 164

1  Q. Do you understand, as you
2  sit here today, that you have additional
3  reporting requirements to Ohio?
4  A. For?
5  Q. For controlled substances,
6  for the sale.
7  A. To report transactions?
8  Q. Yes.
9  A. Yes.
10 Q. Do you know how long that's
11 been in existence in Ohio?
12 A. No, I'm not sure.
13 Q. And, to your knowledge, has
14 Schein complied with that requirement?
15 A. Yes.
16 Q. Does Ohio have a suspicious
17 order monitoring -- a suspicious order
18 reporting requirement?
19 A. I believe so.
20 Q. And for all times that
21 you've -- that you -- going back to 1996,
22 or whenever the requirements started, has
23 Schein complied with the Ohio suspicious
24 order requirements?

Page 165

1  MR. JONES: Object to the
2  form. Scope. Calls for a legal
3  conclusion.
4  THE WITNESS: Yeah, I'm not
5  sure, going back.
6  BY MR. MIGLIORI:
7  Q. Have you looked for those
8  reporting -- that reporting data in Ohio?
9  A. No.
10 Q. All right. There's a
11 controlled substance state licensure and
12 then a federal DEA licensure.
13 So that's part of your
14 verification team?
15 A. Correct.
16 Q. You also state here that, on
17 the next page, in your suspicious order
18 monitoring due diligence process, Henry
19 Schein has a Know Your Customer DEA
20 overview.
21 What is that?
22 A. It's just something that we
23 provide to customers to explain our
24 process.

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1  Q. And is it a document?
2  A. Yes.
3  Q. Is it, like, a pamphlet? Is
4  it a booklet? What does it look like?
5  A. It's just a two-page, or a
6  one-page, front-and-back, document.
7  Q. Did you look at that in
8  preparation for today?
9  A. No.
10 Q. But it exists? If I were to
11 say, can you send me over the Henry
12 Schein Know Your Customer DEA overview as
13 of 2015, that exists in your files,
14 right?
15 A. Yes.
16 Q. Okay. The suspicious order,
17 due diligence suspicious order
18 monitoring, these are different things
19 that you look for, for verification,
20 correct?
21 A. Yes.
22 Q. One of them says, License
23 background review, disciplinary actions.
24     You do, at least as of 2015,

Page 167

1  look back to see whether or not there
2  have been any disciplinary, whether it be
3  licensure or, I assume, criminal
4  disciplinary actions for your customers,
5  correct?
6  A. Correct.
7  Q. And that information would
8  be in the due diligence file that we've
9  already talked about, right?
10 A. Right.
11 Q. You have an online
12 controlled substances form.
13     So you create an
14 Internet-based interface with the
15 clients, correct?
16 A. Correct.
17 Q. And there's a requirement
18 that the customer, at least as of 2015,
19 have a complete form, all fields are
20 filled in and an E-signature, right?
21 A. Right.
22 Q. And so for every customer,
23 in some accounting, for example, today,
24 there would be an online file relative to

Page 168

1  the due diligence for each and every
2  customer, correct?
3  A. Could be a paper version as
4  well.
5  Q. Okay. It wasn't always the
6  case that every customer had a due
7  diligence file, correct?
8  A. That's correct.
9  Q. We'll get into that.
10     And then onboarding is
11 bringing on a new client, right?
12 A. Right.
13 Q. On Page 4 of Exhibit-6,
14 there are some additional due diligence
15 requirements for bringing on a new client
16 as of 2015.
17     It says, Speaking with the
18 sales team and attending onboarding
19 conference calls.
20     So the sales team is part of
21 the onboarding process, right? They
22 bring in the new client?
23 A. Yes.
24 Q. And then you interact with

Page 169

1  the sales team in whether or not that
2  client, in fact, can be onboarded after
3  some due diligence, correct?
4  A. Correct.
5  Q. In 2015, the elements of
6  that due diligence for onboarding
7  included the questionnaire, correct?
8  A. And licensing.
9  Q. And licensing.
10     So they would have to fill
11 out a one-page questionnaire?
12 A. It became two pages.
13 Q. And then that questionnaire
14 goes in the due diligence file
15 immediately?
16 A. Yes.
17 Q. And then you would have to
18 go through a verification of the various
19 licenses for that state and federally,
20 correct?
21 A. Correct.
22 Q. And then, finally, on this,
23 this is a list, at least in 2015, of the
24 people within verification. It lists you

Page 170

1 as the verifications manager.
2 Q. What does Maggie Wilding do?
3 A. She is the supervisor of our
4 team in Reno for verifications.
5 Q. Does she report to you?
6 A. Yes.
7 Q. So Reno reports, generally,
8 to the Melville facility?
9 A. To me, yes.
10 Q. You oversee all the
11 verifications?
12 A. Yes.
13 Q. Christine Stratton, she is a
14 suspicious order monitoring team lead.
15 What department is she in?
16 A. She is still in
17 verifications.
18 Q. And what does she do? What
19 does a team lead do?
20 A. So, currently, she actually
21 is a supervisor. But it would be her
22 role to assist in the SOM and Know Your
23 Customer processes.
24 Q. Is she a supervisor in New

Page 171

1 York?
2 A. Yes.
3 Q. But she still reports to
4 you?
5 A. Yes.
6 Q. And Maggie, is she still the
7 supervisor in Reno?
8 A. Yes.
9 Q. How about Leah Mannino?
10 A. She is no longer with the
11 company.
12 Q. But she would have done the
13 same things that Christine was doing with
14 respect to team lead?
15 A. Yes.
16 Q. And she was in New York?
17 A. Yes.
18 Q. Has somebody filled in for
19 her now, that's there now?
20 A. Yes.
21 Q. Who is that?
22 A. BriAnne Elia.
23 Q. Judy Labarbera, a licensing
24 team lead.

Page 172

1 First of all, is Judy still
2 there?
3 A. No.
4 Q. Does somebody else have that
5 role?
6 A. Yes.
7 Q. Who is that?
8 A. George Rodriguez.
9 Q. And what does a licensing
10 team lead do?
11 A. They work with the team on
12 verification for licensing credentials.
13 Q. And BriAnne is now a team
14 lead, an SOM team lead, but here it says,
15 Verifications, manage accounts.
16 What is that job title?
17 A. That was part of the
18 onboarding that we spoke of earlier. So
19 she would engage with the customer to set
20 expectations for coming over.
21 Q. Who is doing that now?
22 A. Brian Fishman.
23 Q. None of those folks have any
24 responsibilities with respect to the

Page 173

1 database that you also manage, correct?
2 A. That's correct.
3 Q. I'll show you Exhibit Number
4 7.
5     - - -
6     (Whereupon, Exhibit
7     Schein-Abreu-7,
8     HSI-MDL-00000086-103, was marked
9     for identification.)
10    - - -
11 BY MR. MIGLIORI:
23 Q. And you've seen forms like
24 this? Every change to the standard

Page 174

1 operating procedures of Schein relative
2 to suspicious order monitoring is
3 reflected somehow -- to the extent that
4 it's a change that goes into the books,
5 is reflected in one of these forms,
6 correct?
7     A.    Correct.
8     Q.    We'll get into different
9 things here, but this is an SOM from this
10 year.  It talks about some of the things
11 that we've already talked about today.
12        But for this purpose right
13 now, I just want to bring you to the page
14 that ends in 98.  There's a list of
15 states that have reporting requirements.
16 And it appears that this has been added
17 to the SOP for Henry Schein for Ohio.
18        Have you reviewed this in
19 preparation for today?
20     A.    Yes.
21     Q.    So you'll see that the Ohio
22 requirements are separate and apart from
23 the DEA requirements.
24        You agree with that, right?

Page 175

1     A.    Yes.
2     Q.    And here is the citation,
3 and it's a requirement for wholesalers.
4        You understand that Schein
5 is considered a wholesaler in this
6 context, correct?
7     A.    Correct.
8     Q.    And that the reporting
9 requirement is to the Ohio Board of
10 Pharmacy in Columbus, Ohio.
11        Do you see that?
12     A.    Yes.



Page 176

Page 177

1        So if the board asks for
2 something, you have to respond.
3        Do you recall ever having to
4 do that at Schein, that is, provide a
5 report to the board specifically upon
6 their request?
7     A.    Not to my recollection, no.

Page 178

[redacted]

20  MR. JONES: Object to the
21  form. Misstates the document.
22  THE WITNESS: Are we talking
23  with respect to Summit County or
24  Ohio as a whole?

Page 179

1  BY MR. MIGLIORI:
2  Q. I'm asking for Ohio.
3  But if you only did it for
4  Summit, you can tell me that.
5  A. Yes, I did, I searched for
6  Summit County.
7  Q. And did you find any in
8  Summit County?
9  A. No.
10 Q. And folks that would fall
11 into the category of not being authorized
12 to use drugs would include, for example,
13 an orthodontist should not be ordering
14 things like anti-anxiety medication,
15 correct? Is that within the system?
16 MR. JONES: Objection to
17 form. Lack of foundation. Calls
18 for a legal conclusion.
19 THE WITNESS: Arbitrarily or
20 regarding that specific example
21 you gave?
22 BY MR. MIGLIORI:
23 Q. Isn't that -- I'm giving you
24 an example as something in the standard

Page 180

1  operating procedures of your company as
2  being an unauthorized purchase.
3  A. We have --
4  MR. JONES: Same objections.
5  THE WITNESS: We have
6  restrictions in place.
7  BY MR. MIGLIORI:
8  Q. Yes.
9  And one of the restrictions
10 is, dentists don't normally prescribe
11 anti-anxiety medications, correct?
12 MR. JONES: Objection to
13 form.
14 THE WITNESS: Specifically
15 to that example?
16 BY MR. MIGLIORI:
17 Q. Yes.
18 A. Potentially.
19 Q. In fact, there is a standard
20 operating procedure that says that if a
21 dentist is ordering anti-anxiety and
22 controlled substances, like a morphine
23 equivalence, that that is a red flag,
24 correct?

Page 181

1  A. I'm not sure about that.
2  MR. JONES: Objection.
3  BY MR. MIGLIORI:
4  Q. One of the practices, or one
5  of the policies and procedures that
6  Schein adopted more recently is that
7  doctors can't self-medicate or order
8  controlled substances for their own
9  personal use. Isn't that one of the
10 Schein policies?
11 A. That's one of our policies.
12 Q. Did you look, within the
13 Ohio reporting databases, for any reports
14 of doctors that you found, upon due
15 diligence, were using opiates or morphine
16 equivalents for self-medicating purposes?
17 A. With respect to Summit
18 County?
19 Q. I'm asking for Ohio, but you
20 can limit it to what you looked for.
21 A. With respect to Summit
22 County, no.
23 Q. So with respect to Summit
24 County, you did look for it and you did

Page 182

1 not find any?
2    A.   Correct.
3    Q.   If, in fact, though, you had
4 a doctor in Summit County that was
5 self-medicating and you became aware of
6 that, that fact would be, first, in the
7 due diligence file, correct?
8    A.   Yes.
9    Q.   And by operation of law, you
10 would have reported that to Ohio and to
11 the DEA?
12   A.   Yes.
13   Q.   And that would have been
14 reported as a suspicious order, correct?
15   A.   Correct.
16   Q.   And you've looked for both
17 the DEA and Ohio, and you found none for
18 Summit County?
19   A.   That's correct.
20   Q.   From 2009 to present?
21      MR. JONES: Objection.
22      VIDEO TECHNICIAN: The time
23 is now 11:49 a.m. And we are
24 going off the record.

Page 183

1      - - -
2      (Whereupon, a brief recess
3 was taken.)
4      - - -
5      VIDEO TECHNICIAN: The time
6 is now 11:51 a.m. We are back on
7 the record.
8      - - -
9      (Whereupon, Exhibit
10 Schein-Abreu-8,
11 HSI-MDL-00231455-458, was marked
12 for identification.)
13     - - -
14 BY MR. MIGLIORI:
15   Q.   Let me show you -- we talked
16 a little bit about the Rannazzisi
17 letters. Let me show you Exhibit Number
18 8.
19      This is the Dear Registrant
20 letter of September 27th, 2006.
21      Have you reviewed this?
22   A.   Yes.
23   Q.   And you see that this
24 document has actually got an HSI number

Page 184

1 on the bottom? That means we received it
2 from your company.
3      So you'll agree with me that
4 Henry Schein, Inc., in fact, received and
5 maintained in its files a copy of the
6 September 27, 2006 letter -- I'll show
7 the name -- from Joseph Rannazzisi,
8 deputy assistant administrator, Office of
9 Diversion Control?
10   A.   Yes.
11   Q.   As the letter states, it's
12 being sent to every commercial entity
13 registered with the Drug Enforcement
14 Agency to distribute controlled
15 substances.
16      That would have included
17 Schein in 2006, correct?
18   A.   Yes.
19   Q.   The purpose of this letter
20 is to reiterate the responsibilities of
21 controlled substance distributors in view
22 of the prescription drug abuse problem
23 our nation currently faces.
24      You will agree with me that,

Page 185

1 as of 2006, it was understood within the
2 industry that the country was in a
3 drug -- a prescription drug abuse
4 national crisis --
5      MR. JONES: Object to the
6 form.
7 BY MR. MIGLIORI:
8    Q.   -- wouldn't you?
9    A.   Yes.
10   Q.   And that this letter was
11 not, on its face, designed to give new
12 guidance, but it was to, as he puts it,
13 reiterate the responsibilities of
14 controlled substance distributors in view
15 of that crisis.
16      Do you see that?
17   A.   Yes.
18   Q.   All right. Rannazzisi says,
19 As each of you undoubtedly -- is
20 undoubtedly aware, the abuse of
21 controlled prescription drugs is a
22 serious and growing health problem in the
23 country. DEA has an obligation to combat
24 this problem, as one of the agency's core

Page 186

1 functions is to prevent the diversion of
2 controlled substances into illicit
3 channels. And Congress assigned DEA to
4 carry out this function through the
5 enforcement of the Controlled Substances
6 Act and the DEA regulations to implement
7 that.
8 　　　　So on its face, Schein, you
9 would agree, was aware that in 2006, at
10 least, the purpose of the Controlled
11 Substances Act was to prevent diversion
12 of prescription drugs for illicit use and
13 abuse, correct?
14 　　A.　　Correct.
15 　　Q.　　And, in fact, that
16 relationship between the Controlled
17 Substances Act and the abuse of
18 prescription medications actually went
19 back to 1971, as we saw, correct?
20 　　A.　　When it was initially
21 written?
22 　　Q.　　Correct.
23 　　A.　　Yes.
24 　　Q.　　It says, in the middle of

Page 187

1 the next paragraph, Distributors are, of
2 course, one of the key components of the
3 distribution chain. If the closed system
4 is to function properly, as Congress
5 envisioned, distributors must be vigilant
6 in deciding whether a prospective
7 customer can be trusted to deliver
8 controlled substances only for lawful
9 purposes.
10 　　　　You'll agree with me that
11 Henry Schein understood that the
12 distributors play an important role in
13 the prevention of diversion?
14 　　　　MR. JONES: Object to the
15 　　form. It goes outside the scope.
16 　　　　MR. MIGLIORI: Well, that's
17 　　directly referencing a Rannazzisi
18 　　letter that's specifically
19 　　referenced in the notice. So if
20 　　you don't -- if you don't have an
21 　　opinion on that, you can tell me
22 　　that.
23 　　　　MR. JONES: It's also
24 　　outside the scope, per Special

Page 188

1 　　Master Cohen's ruling in
2 　　September.
3 　　　　MR. MIGLIORI: What part of
4 　　the ruling? Because if I can
5 　　avoid it, I will.
6 　　　　MR. JONES: Asking him about
7 　　his -- about past, present
8 　　interpretation, agreement or
9 　　disagreement with statements made
10 　　in the Rannazzisi letters.
11 　　　　I mean, we'll stipulate that
12 　　that's what the letter says. But
13 　　as far as you're going to ask him
14 　　questions about what Henry Schein
15 　　thinks or believes or disagrees
16 　　with, then we're going to object
17 　　to the scope.
18 BY MR. MIGLIORI:
19 　　Q.　　Well, I'm only going to ask
20 you questions to the extent that this
21 informs what the purpose of your
22 suspicious order monitoring program is,
23 okay? I'm not asking you to confirm that
24 that's what Rannazzisi thought or what

Page 189

1 the company thought back in 2006 or
2 before, okay?
3 　　　　It says that, The Controlled
4 Substances Act uses a concept of
5 registration as a primary means by which
6 manufacturers, distributors, and
7 practitioners are given legal authority
8 to handle controlled substances.
9 　　　　So you understand that the
10 registration of all of those entities is
11 what allows the DEA to require reporting
12 and detection of suspicious orders,
13 right?
14 　　　　MR. JONES: Object to the
15 　　form. Outside the scope.
16 BY MR. MIGLIORI:
17 　　Q.　　Do you understand that? If
18 you're a registrant, that you have to
19 comply with the Controlled Substances
20 Act?
21 　　A.　　Yes.
22 　　　　MR. JONES: Same objection.
23 BY MR. MIGLIORI:
24 　　Q.　　All right. In the middle of

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1 the second page, it says, The DEA
2 regulations require all distributors to
3 report suspicious orders of controlled
4 substances. Specifically, the
5 regulations state the registrant shall
6 design and operate a system to disclose
7 to the registrant suspicious orders of
8 controlled substances. The registrant
9 shall inform the field division of the
10 Office of the Administration in this area
11 of suspicious orders when discovered by
12 the registrant. Suspicious orders
13 include orders of unusual size, orders
14 deviating substantially from normal
15 pattern, and orders of unusual frequency.
16      So we read this earlier.
17 But you'll agree with me that Henry
18 Schein was in receipt of this specific
19 provision and requirement of the CSA of
20 Henry Schein relative to controlled
21 substances and its customers, correct?
22      MR. JONES: We'll stipulate
23   that Henry Schein received this
24   Rannazzisi letter on or about when

Page 191

1   it was dated.
2      Otherwise, I object --
3      MR. MIGLIORI: You can
4   answer.
5      MR. JONES: Otherwise, I
6   object to the question as outside
7   the scope. The document speaks
8   for itself.
9      MR. MIGLIORI: Okay. And
10   I'll note that.
11 BY MR. MIGLIORI:
12   Q.  You see that, in fact,
13 Schein received this excerpt in 2016 in
14 this Rannazzisi letter, correct?
15   A.  Correct.
16   Q.  You'll also see it says, in
17 the next -- two following paragraphs, it
18 says, Thus, in addition to reporting all
19 suspicious orders, a distributor has a
20 statutory responsibility to exercise due
21 diligence to avoid filling suspicious
22 orders that might be diverted into
23 other-than-legitimate medical, scientific
24 and industrial channels.

Page 192

1      Now, do you understand that
2 to mean that a suspicious order requires
3 due diligence in order for it to be
4 determined to be suspicious?
5      MR. JONES: Object to the
6   form. Object. Goes specifically
7   and expressly outside the scope
8   that is allowed by the special
9   master's order.
10      You can ask him in his
11   individual capacity. But this is
12   going outside the scope for which
13   this witness is here and outside
14   what the court has allowed.
15      MR. MIGLIORI: That's fine.
16   I've got your objection.
17      And if that's what's ruled,
18   that this is his individual
19   capacity, I'm okay with that.
20 BY MR. MIGLIORI:
21   Q.  But I'm asking you, as your
22 capacity here, in regards to the stated
23 area of inquiry about the Rannazzisi
24 letter, would you agree with me that, at

Page 193

1 least as of 2006, Henry Schein was put on
2 notice that the reporting requirement of
3 a suspicious order was separate and
4 distinct from the obligation to perform
5 due diligence?
6      MR. JONES: Objection.
7   Form. Calls for legal conclusion.
8   Outside the scope. Runs afoul of
9   the court's order.
10 BY MR. MIGLIORI:
11   Q.  Sir, you can answer. And
12 the court will determine whether you
13 answer it just for you or for the
14 company.
15   A.  Yes.
16   Q.  Okay. So at least according
17 to this letter that Schein received in
18 2006, once something deviated from an
19 unusual size, pattern or frequency, that
20 was, by the DEA's perspective, a
21 suspicious order that needed to be
22 reported, and that was separate and
23 distinct from the obligation to then do
24 due diligence to see whether or not that

Page 194

1 order could be shipped?
2 Would you agree with me that
3 that's at least what Schein has been put
4 on notice of in 2006?
5 MR. JONES: Object to the
6 form. Object. Compound. Calls
7 for a legal conclusion. Outside
8 the scope. Calls for speculation.
9 The document speaks for itself.
10 BY MR. MIGLIORI:
11 Q. Go ahead.
12 A. I'm sorry, can you restate
13 the question?
14 Q. Sure.
15 MR. MIGLIORI: And I'll
16 accept the objection that comes
17 back as well.
18 BY MR. MIGLIORI:
19 Q. You'll agree with me that at
20 least with respect to this letter that
21 Schein received in 2006, it made it clear
22 that a suspicious order was a deviation
23 of size, frequency and pattern, and that
24 alone had to be reported; separate and

Page 195

1 distinct from that, there was an
2 obligation to then do due diligence?
3 That's at least what the DEA
4 is telling Schein here in 2006, correct?
5 MR. JONES: Same objections.
6 THE WITNESS: Yes.
7 BY MR. MIGLIORI:
8 Q. That system, though, was not
9 put in place at Schein where the
10 reporting occurred before due diligence
11 until, I think you said, after the
12 Masters decision, correct?
13 MR. JONES: Objection.
14 Vague. Objection as to time.
15 THE WITNESS: So what time
16 periods are you referring to?
17 BY MR. MIGLIORI:
18 Q. The Schein system didn't
19 report that way, that is, suspicious
20 orders the way it's described here in the
21 Rannazzisi letter, didn't report that way
22 to DEA until after the Masters decision
23 in 2017, correct?
24 MR. JONES: Object to the

Page 196

1 form. Lack of foundation. Vague.
2 Outside the scope. Calls for a
3 legal conclusion.
4 BY MR. MIGLIORI:
5 Q. Go ahead.
6 A. We reported orders that were
7 deemed suspicious.
8 Q. Right. I understand that.
9 I'm trying to figure out by which
10 definition.
11 The definition in this
12 Exhibit-7 that I'm reading from right
13 now, where -- I'm sorry, Exhibit-8, where
14 a suspicious order needs to be reported
15 if it's in deviation of size, pattern or
16 frequency at the time that that deviation
17 is discovered, that's what's said here in
18 this letter, correct?
19 MR. JONES: Objection.
20 Form. Document speaks for itself.
21 BY MR. MIGLIORI:
22 Q. Go ahead.
23 A. Correct.
24 Q. Schein reported it as a

Page 197

1 suspicious order to DEA only after it did
2 due diligence and determined that it was
3 suspicious, until the Masters decision in
4 2017, correct?
5 A. Correct.
6 MR. JONES: Asked and
7 answered. Objection. Asked and
8 answered.
9 BY MR. MIGLIORI:
10 Q. Only after Masters did
11 Schein begin to report suspicious orders
12 when they deviated from size, pattern and
13 frequency and then performed due
14 diligence to determine whether or not to
15 ship the order, correct?
16 A. Correct.
17 Q. The letter goes on to say,
18 In a similar vein, given the requirement
19 under Section 823(e) that a distributor
20 maintain effective controls against
21 diversion, a distributor may not simply
22 rely on the fact that the person placing
23 the suspicious order is a DEA registrant
24 and turn a blind eye to the suspicious

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 circumstances.
2     So verification in and of
3 itself is not due diligence; is that a
4 fair statement?
5     MR. JONES: Objection.
6     Form. Vague. Overly broad.
7     Misstates the document.
8 BY MR. MIGLIORI:
9   Q.  Will you agree with that?
10  A.  License verification?
11  Q.  Yes.
12  A.  Yes.
13  Q.  So the fact, merely, that
14 somebody has a DEA registration, one of
15 the customers of Schein, or is registered
16 with the Ohio Board of Pharmacy, that
17 process, while it's part of your due
18 diligence to make sure they, in fact, are
19 licensed, that is not a sufficient amount
20 of due diligence at any time from 1996 to
21 present, that's not enough due diligence
22 at any level, correct?
23     MR. JONES: Object as to
24     form. Overly broad. Vague.

Page 199

1     THE WITNESS: Correct.
2 BY MR. MIGLIORI:
3   Q.  Do you want me to restate
4 it?
5   A.  No.
6     Yes.
7   Q.  So if we were to start in
8 1996, due diligence has always been more
9 than just verification, according to the
10 Controlled Substances Act, correct?
11  A.  Which time are you talking
12 about? The time period from --
13  Q.  From 1996 on.
14  A.  Yes.
15  Q.  That is, because you had a
16 license, you were required to design a
17 system and monitor a system, but the mere
18 fact of a physician or a healthcare
19 provider having a license, that wasn't,
20 by itself, sufficient due diligence with
21 respect to investigating what could
22 potentially be a suspicious order,
23 correct?
24     MR. JONES: Objection.

Page 200

1     Form. Vague. Overly broad.
2     Compound.
3 BY MR. MIGLIORI:
4   Q.  Is that correct?
5   A.  Correct.
6   Q.  All right. And then this
7 same letter in 2006 lists certain
8 activities that should raise suspicions
9 of a concern, at least, for diversion of
10 controlled substances.
11    Do you see that?
12  A.  Yes.
13  Q.  And if you go through some
14 of these, ordering excessive quantities
15 of a limited variety of controlled
16 substances while ordering few, if any,
17 other drugs; that will be a red flag,
18 correct?
19  A.  A potential red flag, yes.
20  Q.  And in terms of putting that
21 into the Henry Schein due diligence
22 program, that really started some time in
23 2011 and '12, correct?
24     MR. JONES: Objection.

Page 201

1     Form.
2     THE WITNESS: So when you
3     say "in part of that program"?
4 BY MR. MIGLIORI:
5   Q.  So the initial due diligence
6 program that we talked about was really
7 if an order triggered and became pended
8 in the Henry Schein system, a form -- a
9 one-page form would be mailed out to the
10 doctor -- let's start in 2006 -- a
11 one-page form would be sent out to the
12 doctor, the doctor would send it back
13 filling in the different information
14 requested.
15    And that would be a basis
16 for a determination about whether an
17 order was suspicious; is that true?
18  A.  True.
19  Q.  That system evolved, as you
20 said, over time.
21    And the on-site visits and
22 the phone calls and the Internet
23 searches, that really began around 2012,
24 correct?

Page 202

1  A. That's right.
2  Q. And in 2012, you would look
3  at factors like the -- let's see,
4  ordering excessive quantities of a
5  limited variety of controlled substance
6  in combination with excessive quantity of
7  lifestyle drugs.
8     Sort of the analysis of
9  dispensing history and on-site visits,
10 that really was an evolution of the Know
11 Your Customer policies that began in
12 2012, ramping up to 2015, right?
13    MR. JONES: Objection.
14 Form. Overly broad. Vague.
15 BY MR. MIGLIORI:
16 Q. Is that right?
17 A. It may have been prior to
18 that. I don't remember the exact year.
19 Q. Well, you know that the
20 suspicious order monitoring program
21 revision that started to look at the due
22 diligence component began in 2009.
23    Have you heard of the
24 company Buzzeo?

Page 203

1  A. Yes.
2  Q. Did you ever work with
3  Buzzeo?
4  A. Yes.
5  Q. And Buzzeo was brought in to
6  help redesign the suspicious order
7  monitoring program and develop the Know
8  Your Customer component as part of its
9  charge, correct?
10 A. Yes.
11 Q. And that charge, really, was
12 investigated and analyzed over time; but
13 it really wasn't until 2010, '11, '12,
14 that those aspects of Know Your Customer
15 were codified in changes to the standard
16 operating procedures, correct?
17    MR. JONES: Object to form.
18 Overly broad. Object as to time.
19 BY MR. MIGLIORI:
20 Q. Is that correct?
21 A. Sounds right, yes.
22    MR. JONES: Don, lunch is
23 here, if you're at a transition
24 point.

Page 204

1     MR. MIGLIORI: How about,
2  let me -- just give me one second,
3  because it might cause me to cut
4  out some of these documents.
5     Can you give me ten minutes,
6  does that work?
7     MR. JONES: Ten minutes
8  to --
9     MR. MIGLIORI: Before we
10 break.
11    MR. JONES: Yes.
12    MR. MIGLIORI: Thanks.
13 This is Exhibit Number 9.
14    - - -
15    (Whereupon, Exhibit
16 Schein-Abreu-9,
17 HSI-MDL-000993112-115, was marked
18 for identification.)
19    - - -
20 BY MR. MIGLIORI:
21 Q. This is the February 7, 2007
22 Rannazzisi letter.
23    Again, this was -- if you
24 look at the bottom of this document, it's

Page 205

1  got the HSI number on it. So that's
2  produced to us by Henry Schein.
3     Do you see that?
4  A. Yes.
5  Q. I will simplify this by just
6  simply saying, you'll agree with me that
7  Henry Schein was, in fact, in receipt of
8  this particular Rannazzisi letter,
9  correct?
10 A. Right.
11 Q. And I'll accept that this
12 letter speaks for itself in its contents.
13    It does talk about the
14 obligations, though, of the distributor
15 of controlled substances, correct?
16 A. Yes.
17 Q. It uses the same term here
18 that the letter is to reiterate the
19 responsibilities, correct?
20 A. Yes.
21 Q. Meaning it's to remind the
22 company of the responsibilities, not to
23 state new responsibilities.
24    Do you understand that?