EXHIBIT 72

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4                    -    -    -

 5    IN RE: NATIONAL PRESCRIPTION

 6    OPIATE LITIGATION              Case No.

 7                                   1:17-MD-2804

 8    APPLIES TO ALL CASES           Hon. Dan A.

 9                                   Polster

10    Case No. 1:17-MD-2804

11                    -    -    -

12              January 30, 2019

13     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

14            CONFIDENTIALITY REVIEW

15            Videotaped deposition of JEFFREY

16    S. PEACOCK, held at 200 Vesey Street, New York,

17    New York, commencing at 9:16 a.m., on the

18    above date, before Marie Foley, a Registered

19    Merit Reporter, Certified Realtime

20    Reporter and Notary Public.

21                    -    -    -

22            GOLKOW LITIGATION SERVICES

23       877.370.3377 ph | 917.591.5672 fax

24              Deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

Page 92

Page 93

```
20        MR. MIGLIORI:  Okay.  Let's take
21   a break and see if I can get my voice
22   back.
23        THE VIDEOGRAPHER:  All right.
24   The time is 10:29 a.m.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1    Going off the record.
2    (Recess taken.)
3    THE VIDEOGRAPHER: We are back
4  on the record.
5    The time is 10:48 a.m.
6    MR. MIGLIORI: I appreciate the
7  education you gave me on the systems
8  of the company. I want to take a step
9  back and talk about opioids
10 specifically and your obligations on
11 opioids.
12    Let me show you Exhibit
13 Number 5.
14    (Peacock Exhibit 5, Title 21
15 United States Code Annotated Section
16 801, was marked for identification, as
17 of this date.)
18 BY MR. MIGLIORI:
19    Q.   As the vice-president of, among
20 other things, Regulatory Affairs, you
21 agree with me that it's within your
22 department ultimately that you are
23 responsible for compliance with the
24 Controlled Substance Act, correct?

Page 95

1    A.   Yes, sir.
2    Q.   And Congress made certain
3  findings about controlled substances, like
4  opioids.
5    Have you ever seen these before?
6    MR. McDONALD: In this form?
7    MR. MIGLIORI: And I'm referring
8  to Exhibit 5 is the -- is the direct
9  Congress findings in the Controlled
10 Substance Act relative to controlled
11 substances.
12    A.   I have not.
13    Q.   Let's see if you understand that
14 this is part of your charge and
15 responsibility within Regulatory Affairs
16 at Henry Schein.
17    It says Congress --
18    MS. BORSAY: I'm sorry to
19 interrupt. This is Casteel Borsy with
20 Jones Day on the phone.
21    I'm having a really difficult
22 time hearing the questions now. I
23 could hear them before the break. So
24 I don't know if you moved or don't

Page 96

1    have a microphone.
2    MR. MIGLIORI: As I was saying
3  at the break, I developed a cold and
4  my voice is starting to fade.
5    So, I will try to talk louder,
6  but it -- I feel like I'm screaming.
7  But I'll keep -- there's no way to
8  move the phone. The microphones are
9  built into the table.
10    MS. BORSAY: Okay. Thank you.
11    MR. MIGLIORI: But I'll do my
12 best.
13 BY MR. MIGLIORI:
14    Q.   It says: Congress makes the
15 following findings. Many of the drugs
16 included within the subchapter have a
17 useful and legitimate medical purpose and
18 are necessary to maintain the health and
19 general welfare of the American people.
20    You understand that to be true
21 for controlled substances?
22    A.   Yes, sir.
23    Q.   The illegal importation,
24 manufacture, distribution or possession of

Page 97

1  improper use of controlled substances have
2  a substantial and detrimental effect on
3  the health and general welfare of the
4  American people.
5    Do you agree with that
6  statement?
7    A.   I do.
8    Q.   Do you believe today that we are
9  in an epidemic with respect to the abuse
10 and misuse of opioids?
11    A.   I --
12    MR. McDONALD: Object to the
13 form.
14    Go ahead.
15    A.   I do.
16    Q.   We talked about this a little
17 earlier, but controlled substances have a
18 schedule. Schedule II opioids are, A, the
19 drug or other substance -- are classified
20 as this: The drug or other substance has
21 a high potential for abuse.
22    You understand that to be true
23 for opioids, correct?
24    A.   That's correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    Q.   The drug or other substance has
2  a currently accepted medical use in
3  treatment in the United States or
4  currently accepted medical use with severe
5  restrictions.
6         Do you appreciate that?  Do you
7  agree with that?
8    A.   Accepted medical use, yes.
9    Q.   And that there are severe
10 restrictions on that use, correct?
11        MR. McDONALD:  Object to the
12 form.
13        If you know, tell him.
14   A.   In terms of -- not -- I don't --
15 I'm not following what it says.
16   Q.   That there are severe
17 restrictions placed on the use of --
18   A.   In the ability to acquire them?
19   Q.   And distribute them.
20   A.   Yep.  Yes.
21   Q.   Okay.  The abuse of the drug or
22 other substance may lead to severe
23 psychological or physical dependence.
24        Do you understand that to be

Page 99

1  part of the classification of a Schedule
2  II drug?
3    A.   Yes, sir.
4    Q.   Is there somebody at Henry
5  Schein that is specifically tasked with
6  overseeing the compliance with Schedule II
7  controlled substances, or is that a
8  general obligation within your department,
9  of all people that work for you?
10   A.   In the Regulatory Department,
11 it's general.
12   Q.   And you understand that you have
13 a registration that is given by the
14 attorney general of the United States to
15 distribute Schedule II controlled
16 substances which requires you to be in
17 compliance with the Controlled Substances
18 Act, correct?
19   A.   That is correct.
20   Q.   And that failure to comply with
21 the Controlled Substances Act could cause,
22 among other things, the suspension or
23 revocation of that DEA registration,
24 correct?

Page 100

1    A.   Correct.
2    Q.   And part of that obligation of
3  Henry Schein is to maintain an effective
4  control against diversion of particular
5  controlled substances into other than
6  legitimate medical, scientific and
7  industrial channels.
8         Do you understand that to be
9  Henry Schein's obligation as a DEA
10 registrant?
11   A.   Yes, sir.
12   Q.   In carrying out that obligation,
13 do you understand that there's a specific
14 provision of the Controlled Substance Act,
15 this is Exhibit Number 6, that requires
16 Henry Schein, as a DEA registrant, to
17 design and operate a system to disclose to
18 the registrant suspicious orders of
19 controlled substances?
20        Do you understand that is the
21 obligation of Henry Schein to design and
22 operate that system?
23   A.   Yes, sir.
24        (Peacock Exhibit 6, Title 21

Page 101

1     Code of Federal Regulations Section
2     1301.74, was marked for
3     identification, as of this date.)
4  BY MR. MIGLIORI:
5    Q.   (Reading)  The registrant shall
6  inform the field office -- field division
7  office of the administration in his area
8  of suspicious orders when discovered by
9  the registrant.
10        Do you understand that
11 suspicious orders are to be, and have been
12 since 1971, reported to the DEA field
13 office when they are discovered?
14        MR. McDONALD:  Object to the
15 form.
16   A.   Yes, sir.
17   Q.   (Reading)  Suspicious orders
18 include orders of unusual size, orders
19 deviating substantially from a normal
20 pattern, and orders of unusual frequency.
21        Do you understand that to be, in
22 part, the definition of a suspicious
23 order?
24        MR. McDONALD:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1     form.
2     A.   I do.
3     Q.   So, an order that deviates from
4 a prior order in size, in pattern, or in
5 frequency, by this definition, is presumed
6 suspicious until determined otherwise,
7 correct?
8        MR. McDONALD:  Object to the
9     form.
10     A.   Yes.  Yes.
11     Q.   In your review of the historical
12 suspicious ordering monitoring programs of
13 Henry Schein, did you ever learn that the
14 suspicious order monitoring program
15 through 2009, at least, did not measure
16 deviations in frequency or pattern?  Did
17 you ever learn that fact?
18     A.   I did not.
19     Q.   Okay.
20     A.   I had no understanding, no.
21     Q.   And, to the extent that that is
22 true or not, that is something you leave
23 to those that were there at the time,
24 correct?

Page 103

1     A.   I would have to investigate.
2 Can't really make a determination, sir.
3     Q.   I guess my question is more
4 simple then.  You're not the person to
5 either refute that or affirm that
6 statement, correct?
7     A.   That's correct.
8     Q.   Are you aware that in Ohio, in
9 searching for suspicious orders in this
10 case, Henry Schein represented and
11 represents that it found no suspicious
12 orders reported to the DEA from 2009 to
13 the present, that is during the period of
14 time that it had transactional
15 information?
16        MR. McDONALD:  Object to the
17     form; mischaracterizes and misstates
18     the assertions of Henry Schein in this
19     case.
20 BY MR. MIGLIORI:
21     Q.   Were you aware of that?
22        MR. McDONALD:  Object.  Same
23     objection.
24

Page 104

1 BY MR. MIGLIORI:
2     Q.   You can answer.
3     A.   Could you reclarify or restate,
4 please?
5        I'm sorry.
6     Q.   Were you asked to help prepare
7 answers to interrogatories in this case,
8 or provide information so that the company
9 could respond to written questions in this
10 case?
11     A.   No, I was not.
12     Q.   Did you review yesterday any of
13 the written responses of the company in
14 this case?
15     A.   No, I did not.
16     Q.   Did they show you that Henry
17 Schein has not produced any suspicious
18 orders for Ohio in this case?
19     A.   No, they had not.
20     Q.   Does it surprise you that there
21 are no suspicious orders reported to the
22 DEA by Henry Schein in this case?
23        MR. McDONALD:  Object to the
24     form.

Page 105

1     A.   I would have to see what the
2 ordering patterns are, how much the
3 volumes were.  There's no way I could make
4 a determination just without any
5 information, sir.
6     Q.   You would agree with me that if
7 there were no suspicious orders for Ohio
8 from 2009 to present, it would mean that
9 there were no orders that deviated in
10 size, frequency, or pattern, by
11 definition, correct?
12        MR. McDONALD:  Object to the
13     form.
14     A.   So, I think, you know, I'd have
15 to understand what the -- what the scope
16 of this, you know, question is.
17        So, if we looked at sales
18 volumes, numbers, et cetera, what's the
19 practices are there, what's the percentage
20 of our total sales, et cetera, I'd be
21 better apt to answer that question.
22     Q.   Fair enough.  But I'm not asking
23 you about reporting.
24        I'm just simply saying that if