# EXHIBIT 82

Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3

      IN RE NATIONAL PRESCRIPTION    Hon. Dan A. Polster
 4    OPIATE LITIGATION
                                     MDL No. 2804
 5    THIS DOCUMENT APPLIES TO ALL   No. 17-MD-2804
      CASES
 6    _____/
 7
 8                  HIGHLY CONFIDENTIAL -
          SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 9
                         --  --  --
10
                  THURSDAY, JANUARY 17, 2019
11
                         --  --  --
12
            Videotaped Deposition of ARTHUR F. MORELLI,
13    held at the Law Offices of ROBBINS GELLER RUDMAN &
      DOWD LLP, 655 West Broadway Street, Suite 1900,
14    San Diego, California, beginning at 9:10 a.m., before
      Sandra Bunch VanderPol, FAPR, RMR, CRR, CALIFORNIA
15    CSR #3032
16                       --  --  --
17
18
19
20
21
22   _____
23             GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
24                   Deps@golkow.com
25
```

Page 126

1       THE WITNESS:  They sold them to other
2  manufacturers.
3       BY MR. SAMSON:
4       Q.    Do you know whether they sold any
5  through distribution centers --
6       MR. DAVISON:  Objection to form.
7  BY MR. SAMSON:
8       Q.    -- for patient use?
9       MR. DAVISON:  Sorry.  Objection to form.
10      THE WITNESS:  So you started talking about
11 API, and then you moved over to dosage form.  So you
12 want to know about the API?
13 BY MR. SAMSON:
14      Q.    No.  Dosage.
15      A.    Oh, dosage.
16      Q.    The API, that's just obviously --
17 that's just going out in bulk powder and is going to
18 get made into whatever somebody else makes it into?
19      A.    Yes.  And that was a business they
20 had.  So the Tylenol that you buy in the store, that
21 API is Mallinckrodt's -- or acetaminophen.
22      Q.    They were, in fact, the world's
23 largest manufacturer of it; correct?
24      A.    As far as other API, I don't know.
25 As far as dosage form of finish product or

Page 127

1  semi-finish product, I don't know.
2       Q.    Okay.  So you don't even know if
3  Mallinckrodt distributed, sold to distributors for
4  ongoing sale to patients, generics, opioids?
5       A.    No.
6       MR. DAVISON:  Objection to form.
7  BY MR. SAMSON:
8       Q.    When you joined Mallinckrodt, had you
9  ever heard the term Oxy Express?
10      A.    No.
11      Q.    When did you first hear that term?
12      A.    Right now.  Today.
13      Q.    Okay.  You have no idea what that
14 means?
15      A.    I have an idea what it means, but I
16 don't know if it's accurate or not.
17      Q.    Okay.  Tell me what you think it
18 means.
19      MR. DAVISON:  Objection to form.
20      THE WITNESS:  What I have a picture in my
21 mind of is, you know, a string, a linkage of people
22 diverting and abusing drugs.  That's the painting --
23 the picture it paints to me.
24 BY MR. SAMSON:
25      Q.    All right.  And you never heard of it

Page 128

1  applied to Florida pill mills and other sources, and
2  being driven up I-75 to the upper Midwest as well as
3  to Appalachia?
4       MR. DAVISON:  Objection.
5       THE WITNESS:  I am aware of pill mills, the
6  existence of pill mills, but I wasn't aware of the
7  term Oxy Express.
8  BY MR. SAMSON:
9       Q.    Did anyone at Mallinckrodt, while you
10 were there, discuss especially Florida pill mills or
11 pill mills in general with you?
12      A.    Absolutely.
13      Q.    Who?
14      A.    Oh, let me think.  Well, we -- in our
15 training of sales reps, we train them as part of the
16 Medical Affairs portion of the training, we educated
17 them on what to look for in terms of pill mills; to
18 report those, and to stay away from those.
19      Q.    Okay.  And what were the indicia of
20 pill mills?
21      A.    Generally speaking, lines out the
22 doors, license plates from various states in the
23 parking lot, doctor's office next to a pharmacy,
24 patients going through one after another, bing, bing,
25 bing, bing, in short periods of time.  High patient

Page 129

1  flow, those types of things.
2       Q.    Okay.  Did you at Medical Affairs
3  follow up to see whether or not that instruction was
4  put to use?
5       MR. DAVISON:  Objection to form.
6       THE WITNESS:  We received reports, yeah.  We
7  received such -- those reports.
8  BY MR. SAMSON:
9       Q.    And did you receive both reports of
10 salespeople calling on pill mills and having to be
11 reinstructed, so to speak, that a place they were
12 going was a pill mill?
13      A.    No.
14      MR. DAVISON:  Objection.
15      THE WITNESS:  We received reports of they
16 walked up -- or walked in and walked out.
17 BY MR. SAMSON:
18      Q.    Ms. Cathy Jackson, who you remember,
19 maybe?
20      A.    I don't, actually, but --
21      Q.    Okay.
22      A.    Yeah.
23      Q.    -- told us --
24      A.    Our paths may have crossed.  I don't
25 know.

Page 130

1  Q. -- told us last week that she thought
2  the ability of Florida physicians to both prescribe
3  and dispense opioids was one reason why Florida was a
4  hotbed for diversion.
5      Did you even know about that?
6      MR. DAVISON: Objection to form.
7      THE WITNESS: I know that the prescribing
8  and dispensing linkage, there was a big problem,
9  yeah. But I don't know about the legal -- legality
10 of it.
11 BY MR. SAMSON:
12     Q. And I think you testified earlier
13 that you really didn't even know how Exalgo sales
14 were going; is that --
15     A. That's true.
16     Q. -- correct?
17     Okay. And didn't have any sense of how many
18 Mallinckrodt generic oxy opioids were being sold in
19 Florida or anywhere else?
20     A. True.
21     Q. True for the entire time you were
22 there?
23     A. Yeah.
24     Q. Never any conversations with
25 Mr. Neuman, perhaps, or anyone else in Medical

Page 131

1  Affairs about the opioid epidemic, whether your
2  guys's fault or other manufacturers' fault?
3      MR. DAVISON: Objection to form.
4      THE WITNESS: So I wasn't focused on fault.
5  I was focused on solutions and prevention, not on
6  fault. There's plenty of fault, you know, that
7  people like to spread around and blame. I'm focused
8  on solutions.
9      I'm not focused on why the -- who was
10 responsible for the cars crashing into one another.
11 I want antilock brakes and seatbelts and driver
12 training.
13 BY MR. SAMSON:
14     Q. I understand that. But you're also
15 not living outside of this world, and in particular
16 the United States, and you're working for a
17 pharmaceutical company. It doesn't seem possible
18 that you did not have discussions while you were at
19 Mallinckrodt, slash, Covidien with other people in
20 Medical Affairs about the opioid epidemic?
21     A. No, we discussed --
22     MR. DAVISON: Objection to form.
23     THE WITNESS: We discussed the opioid -- the
24 problems that existed in society related to opioids.
25     MR. SAMSON: Okay.

Page 132

1      THE WITNESS: And that's why we created the
2  C.A.R.E.S. Alliance, to help try to solve that
3  problem. Because my experience with the opioid,
4  so-called opioid crisis, is it was another report,
5  another report, and another report as to how many
6  people are dying. Not a report about what we are
7  going to do about it. That's what I wanted to
8  create. Do something about it.
9  BY MR. SAMSON:
10     Q. It's fair to say, then, that what you
11 picked up, both inside and outside Mallinckrodt
12 during your time on Medical Affairs, convinced you
13 that the effects of whatever was happening in the
14 opioid space were enough to require you to try and
15 develop a countermeasure against it?
16     MR. DAVISON: Objection to form.
17     THE WITNESS: We have a massive problem. We
18 have a massive problem that is taking place in this
19 country that's killing people. Yes. But sitting
20 here, and if it -- if the discussion, you know, in
21 some company somewhere never goes further than that,
22 we didn't do any good about it. Right? We just --
23 another rearticulation of the problem.
24     I was tired of rearticulating and
25 complaining about a terrible problem without trying

Page 133

1  to fix it. I was going to be the start, an alliance,
2  of companies to work together to try to effect a
3  solution.
4  BY MR. SAMSON:
5      Q. And Mallinckrodt supported it for
6  awhile; true?
7      A. They supported it while I was there,
8  yes.
9      Q. And yet you were only there a couple
10 of years?
11     A. I can only do what I can do when I'm
12 there with the support of my team, Herb Neuman, and
13 the CEO, who supported it.
14     Q. He did support it?
15     A. He did. That's why we got the budget
16 that we got.
17     Q. And why did you leave?
18     A. Frankly, I had had enough of living
19 in St. Louis when I was supporting a home in
20 San Diego. And my wife, being in the Bay Area
21 helping with our daughter's childcare and
22 triangulate, you know, three households, I was
23 frankly tired of it. And I hated St. Louis. So I
24 wanted to get back to San Diego.
25     So I figured -- I felt that I had made a big

Page 134

1 impact. I had done what I could do. I got this
2 program developed, launched, implemented. I had a
3 well-trained team that could carry on. So I figured
4 it was time. I'm not so young that I'm building my
5 career, you know.
6     Q.   Okay.
7     MR. DAVISON: Mark, we have been going a
8 little over an hour. It is time for a break.
9     MR. SAMSON: Yes. Let's take a break.
10    THE VIDEOGRAPHER: We are going off the
11 record. The time is 12:14 p.m.
12    (Recess taken.)
13    THE VIDEOGRAPHER: We are back on the
14 record. The time is 12:30 p.m.
15        (Exhibit No. 6 was marked.)
16 BY MR. SAMSON:
17    Q.   Mr. Morelli, you have in front of you
18 what has been marked as Exhibit 6, in which says that
19 it's a, "Sales Force Training REMS and Safe Use." Do
20 you see that?
21    A.   Yes, I do.
22    Q.   And your name is down there, along
23 with a Mr. Holman. Does that indicate you were
24 either the authors of this slide set or was going to
25 speak from it whenever it was in use this day?

Page 135

1     A.   Yes. We were the authors of this
2 slide set, and Kevin reported to me. He was a member
3 of my team.
4     Q.   Would this be a slide set and a
5 presentation that you gave only once, so that you
6 might remember the time and date, or would this have
7 been given several times?
8     MR. DAVISON: Objection to form.
9     THE WITNESS: So I would say this is -- as
10 it is right now, it may have been something we gave
11 once or a couple times. But pieces of this were
12 given multiple times.
13 BY MR. SAMSON:
14    Q.   And as you were leafing through it,
15 you saw, as I did, there's a C.A.R.E.S. Alliance
16 portion near the end of it; correct?
17    A.   That's right.
18    Q.   And can you recall a time when you
19 gave the "Sales Force Training REMS and Safe Use,"
20 and specifically added a C.A.R.E.S. Alliance piece to
21 it for one reason or another?
22    A.   Yes.
23    Q.   When was that, and what was the
24 event?
25    A.   So when -- when -- I don't remember

Page 136

1 the event. But when the program was fully flushed
2 out, fully ready to go, ready to launch, that's when
3 we added the C.A.R.E.S. Alliance. That was after the
4 REMS and the Exalgo, launch of Exalgo.
5     Q.   Okay. And that date, launch of
6 Exalgo, 2010; if you recall?
7     A.   I don't recall. I don't recall.
8     Q.   Okay. I think we may run into it.
9     A.   Yeah. Yeah.
10    Q.   In a numbered form.
11    And when Exalgo launched in 2010, it was a
12 Covidien/Mallinckrodt-branded analgesic?
13    A.   Yes.
14    Q.   And an opioid?
15    A.   Yes.
16    Q.   Extended-release hydromorphone?
17    A.   Yes.
18    Q.   And was the OROS delivery system that
19 it was in, the way in which it became an extended
20 release instead of an immediate release?
21    A.   Yes.
22    Q.   And that was because the OROS system
23 created a hard shell capsule, not like a contact, but
24 something that was difficult to bite through at
25 least; correct?

Page 137

1     MR. DAVISON: Objection to form.
2     THE WITNESS: Yes, there's some data to
3 indicate it was quite hard to bite through.
4 BY MR. SAMSON:
5     Q.   And then what it would do is allow --
6 once it was swallowed and into the digestive tract,
7 allow water to come in osmotically, which would then
8 expel the drug through a tiny laser-drilled hole
9 through the shell?
10    A.   Yes.
11    Q.   And some engineer figured out the
12 diameter so that that push of essentially IR,
13 immediate release, immediate activity, hydromorphone
14 would be bled out over a long time?
15    A.   Yes. It wasn't the pharmacokinetics
16 of the molecule, it was the release kinetics from the
17 capsule.
18    Q.   Perfect. So all I need to ask you --
19 and I get the engineering explanation.
20    So the REMS were part of -- which is risk,
21 evaluation, and mitigation strategy?
22    A.   Right.
23    Q.   And at that point those were required
24 for extended-release opioids, like Exalgo was going
25 to be, by the FDA?

Page 138

1    A.   Correct.
2    Q.   Immediate-release formations were not
3  forced to do REMS by the DEA or the FDA --
4    A.   It wouldn't be the DEA.
5    Q.   -- until 2015; do you know?
6    A.   I don't know the date, but it was
7  later.
8    Q.   It was after you left?
9    A.   It was.
10   Q.   And then C.A.R.E.S. Alliance came out
11 in the same general time frame as the launch of
12 Exalgo?
13   A.   Slightly thereafter, I believe.  But
14 I don't know.  Very close, yeah.
15   Q.   Okay.  And was the C.A.R.E.S.
16 Alliance your baby, so to speak, from the initial
17 concept, or was there a C.A.R.E.S. Alliance thought
18 process going on at Mallinckrodt, and then you came
19 and brought it to fruition?
20   A.   No.
21   MR. DAVISON:  Objection to form.
22   THE WITNESS:  It didn't exist until I
23 brought it to existence, yeah.
24 BY MR. SAMSON:
25   Q.   Okay.  And so you were basically the

Page 139

1  one who came up with that strategic vision and then
2  did the tactical, as you earlier said, parts of
3  putting it together, I'm assuming with other aid --
4  help from other people --
5    A.   Absolutely.
6    Q.   -- at Covidien?
7    A.   Right.
8    Q.   And one of the things that I've seen
9  in C.A.R.E.S. documents is that the increase in use
10 of opioids and resulting abuse, addiction, and deaths
11 have led to a backlash against the use of
12 prescription pain medicine and have adversely
13 affected pain treatment for legitimate pain patients.
14   Was that a concept, in your understanding,
15 why C.A.R.E.S. was something that needed to be done?
16   A.   A huge --
17   MR. DAVISON:  Objection to form.
18   THE WITNESS:  -- hugely important concept.
19 BY MR. SAMSON:
20   Q.   As a major manufacturer and seller
21 and even distributor of opioids, Mallinckrodt stood
22 to lose sales as a result of a, quote, backlash
23 against the use of prescription pain medicine, end
24 quote.  Is that true?
25   A.   I assume it could potentially be

Page 140

1  true.  But I can tell you that was not any motivation
2  of doing C.A.R.E.S. Alliance, was related to that
3  whatsoever.  That was not in my -- that was not in my
4  pitch to Herb and, you know, the CEO and the CFO to
5  get the money to do the program because, you know,
6  we're going to lose scripts.  That was not even in my
7  thinking.
8    Q.   Since you left sales long before
9  that, that doesn't surprise me.
10   What was the pitch --
11   MR. DAVISON:  Objection.
12 BY MR. SAMSON:
13   Q.   -- for?
14   MR. DAVISON:  Sorry.  I apologize.
15 BY MR. SAMSON:
16   Q.   What was the pitch to Herb -- and who
17 was the CEO, Mr. Wright?
18   A.   No, he was not the CEO.  It was --
19 his name was Matt Harbaugh, H-a-r-b-a-u-g-h.
20   So the pitch was, if you look at slide, in
21 essence -- these pages aren't numbered, but it's the
22 -847 MK number, that ends in -847.
23   Q.   And what does it --
24   A.   It says, "A concern we all have."
25   Q.   Okay.

Page 141

1    A.   "A responsibility we share and a
2  concern we all can champion."
3    Q.   And that became a fairly frequent
4  opening slide for C.A.R.E.S.?
5    A.   It's part of the essence of
6  C.A.R.E.S.
7    Q.   Okay.  And let me find it.
8    A.   It's about the middle.
9    MS. GAFFNEY:  They have the Bates number.
10   MR. SAMSON:  I don't have them.  That's the
11 real problem when you print them without it.
12   THE WITNESS:  You've got it.
13   MR. SAMSON:  There it is.  Bingo.
14   Q.   So the concern that you were pitching
15 to Mr. Neuman and Mr. Harbaugh was what?
16   A.   We have a -- there's a big problem
17 going on.  We have a big problem going on in this
18 country.  Everybody needs to be aware of the problem,
19 to understand what this problem is all about.  That's
20 the concern.
21   Q.   Okay.
22   A.   If you're not concerned about that,
23 you need to be.
24   Q.   And that --
25   A.   Then there was --