# EXHIBIT 86

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF OHIO

 3                  EASTERN DIVISION

 4                      - - -

 5    IN RE:  NATIONAL            :

      PRESCRIPTION                :   MDL No. 2804

 6    OPIATE LITIGATION           :

      _____ :   Case No.

 7                                :   1:17-MD-2804

      THIS DOCUMENT RELATES       :

 8    TO ALL CASES                :   Hon. Dan A. Polster

 9                      - - -

10                HIGHLY CONFIDENTIAL

11     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

12

                          - - -

13

14       Videotaped deposition of  ERIN M. COX, held at

15    the offices of Spangenberg Shibley & Liber LLP,

16    1001 Lakeside Avenue, Suite 1700, Cleveland, Ohio

17    44114, on January 17, 2019, commencing at

18    8:58 a.m., before Carol A. Kirk, Registered Merit

19    Reporter and Notary Public.

20

21                      - - -

22

23            GOLKOW LITIGATION SERVICES

           877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 materials that you would have received from
2 Mallinckrodt with regards to educate and inform?
3     MR. TSAI: Object to the form.
4         Go ahead.
5     A.    That's apples and oranges. These
6 were skin conditions. It was vastly different.
7     Q.    Okay. But to be clear, you would
8 have received written materials from
9 Mallinckrodt during your term there which talked
10 about educate and inform, correct?
11     A.    That's correct.
12     Q.    Your compensation at JSJ, was
13 there a salary?
14     A.    There was a salary.
15     Q.    Was there a bonus program?
16     A.    There was.
17     Q.    Okay. And how was the bonus
18 computed?
19     A.    We were paid on a draw, so it was
20 a quarterly draw depending on what you brought
21 into the territory. I don't remember the
22 specifics. It was a convoluted bonus program, I
23 think by design.
24     Q.    Yeah. Let me ask you this way.

Page 39

1 If the healthcare professionals that you were --
2 if I say "targeting," do you -- are you familiar
3 with that?
4     A.    I am.
5     Q.    All right. If it was -- if the
6 healthcare professionals that you were targeting
7 purchased more product, more JSJ product, would
8 you receive more of a bonus?
9     A.    The physicians never purchased any
10 product from us.
11     Q.    Okay. If the physicians who you
12 targeted wrote prescriptions to patients who
13 filled prescriptions for JSJ products, would
14 that reflect in your bonus?
15     A.    It depended on -- the answer is
16 yes, however, there was more to it. It had to
17 do with attainment to goal and things like that.
18 And truly, I don't remember the specifics of
19 this bonus plan. I remember it being
20 complicated.
21     Q.    Okay. If doctors that you had
22 been targeting your territory wrote less
23 prescriptions month over month over month, would
24 you -- would your bonus increase?

Page 40

1     A.    It would not.
2     Q.    Okay. Why is it you left JSJ?
3     A.    They went out of business. We all
4 left JSJ.
5     Q.    Okay. And then from JSJ, where
6 did you go?
7     A.    I went to Mallinckrodt, which was
8 then Covidien.
9     Q.    Okay. I'm going to refer to it as
10 Mallinckrodt; is that okay?
11     A.    That's fine.
12     Q.    All right. And how long were you
13 at Mallinckrodt?
14     A.    A month after I left JSJ. So I
15 think it was April 2010 until September --
16 August, September of 2014.
17     Q.    All right. Did you know anybody
18 at Mallinckrodt before going over there?
19     A.    I didn't know anyone.
20     Q.    How is it that you became aware of
21 a position at Mallinckrodt?
22     A.    A recruiter. I submitted my
23 resumé as I was looking for a job, and a
24 recruiter contacted me about an opening in

Page 41

1 Cleveland.
2     Q.    Okay. And what position were you
3 hired in?
4     A.    I was hired in the Cleveland west
5 territory.
6             - - -
7     (Mallinckrodt-Cox Exhibit 3 marked.)
8             - - -
9 BY MR. DEARMAN:
10     Q.    I'm going to show you what I'm
11 going to mark as Exhibit 3, which is Bates range
12 8510 through 8515.
13         Are you familiar with this
14 document?
15     A.    I am, yeah.
16     Q.    Okay. It indicates that you were
17 offered, back in April of 2010, a pharmaceutical
18 sales specialist position --
19     A.    Mm-hmm.
20     Q.    -- in the specialty
21 pharmaceuticals business. Does that sound
22 accurate?
23     A.    It is.
24     Q.    Okay. It refers to your salary of

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    █████ annualized?
2        A.    Mm-hmm.
3        Q.    Underneath that first paragraph it
4    talks about "variable compensation," and it says
5    you that -- it says that you will be eligible to
6    participate in the sales incentive compensation
7    program, the SICP?
8        A.    Yes.
9        Q.    The SCIP, was that the bonus
10   program?
11       A.    As far as I can remember, yes.
12       Q.    What were your duties and
13   responsibilities as a -- well, first, who did
14   you report to when you started as a
15   pharmaceutical sales specialist?
16       A.    Kevin Becker, the re -- district
17   manager, I think, at the time was his title.
18       Q.    Were there other sales specialists
19   that reported to Kevin?
20       A.    There was probably a team of ten.
21       Q.    Okay.  What was your -- I know you
22   probably mentioned it already, but what was your
23   territory when you started?
24       A.    My territory when I started was --

Page 43

1    and it remained the same throughout my tenure
2    there, Cleveland west, which was mostly Lorain
3    County, and parts of Cuyahoga County.  The
4    Lorain County portion would have been Lorain,
5    Elyria, Oberlin, Avon, Avon Lake.  And Cuyahoga
6    County would have been Westlake and a portion of
7    Cleveland.
8        Q.    Did your territories change from
9    2010 to 2014?
10       A.    My territory never changed.
11       Q.    Did your duties and
12   responsibilities, while you were at Mallinckrodt
13   from 2010 to 2014, change during that period of
14   time or did they remain the same?
15       A.    They remained the same.
16       Q.    Okay.  And what were your duties
17   and responsibilities?
18       A.    I was responsible for the
19   promotion of Pennsaid and Exalgo mostly.
20       Q.    And when you say "mostly," were
21   there other --
22       A.    Yeah.  We had two products,
23   Sumavel DosePro and Duexis, that we promoted for
24   a very short period of time.  Part of it was

Page 44

1    when I was on maternity leave, so I didn't have
2    much -- it was a very short period of time.
3        Q.    What kind of attorney is your
4    husband?
5        A.    A corporate capital markets
6    attorney.
7        Q.    Does he litigate, if you know?
8        A.    He does not.
9        Q.    Was this the first time that
10   you -- well, when you got to Mallinckrodt, were
11   you involved with products that were controlled
12   substances?
13       A.    I was, yes.
14       Q.    And which of the products that you
15   were responsible for were controlled substances?
16       A.    I was responsible for Exalgo and
17   Pennsaid.  Exalgo was the Schedule II
18   medication.
19       Q.    That was the only Schedule II
20   medication that you were responsible for?
21       A.    It was.
22       Q.    What was Pennsaid?
23       A.    Oh, I'm sorry.  And Xartemis.
24       Q.    Okay.

Page 45

1        A.    I was only there for a few months
2    during Xartemis and then I left and went to a
3    different company.
4        Q.    Okay.
5        A.    I usually -- I forget that I
6    even -- was even a part of that.
7        Q.    All right.  So Exalgo and XXR were
8    the two Schedule IIs?
9        A.    They were.
10       Q.    All right.  What was Pennsaid?
11       A.    A topical NSAID for osteoarthritis
12   of the knee.
13       Q.    Would you agree that there is an
14   opioid epidemic in this country?
15       A.    I would agree there is an opioid
16   epidemic.
17       Q.    Would you agree that there has
18   been an opioid epidemic for some time in this
19   country?
20       A.    There has, yes.
21       Q.    How far back would you say that
22   there's been an opioid epidemic, in your
23   opinion?
24       A.    I can't really say.

Page 46

1    Q.   Okay.  Would you say 2000?
2    A.   Probably 2000- -- probably 2005.
3    Q.   Are you familiar with the term
4  "CSA"?
5    A.   CS -- I am not familiar with that
6  term.
7    Q.   Are you familiar with the term
8  "Controlled Substances Act"?
9    A.   Not really, no.
10   Q.   Okay.  What -- "not really" leads
11  me to believe that maybe --
12   A.   I may have heard it, but I don't
13  know what it is, yeah.
14   Q.   Okay.  Did you receive any
15  training at Mallinckrodt regarding the
16  Controlled Substances Act?
17   A.   We received a lot of training at
18  Mallinckrodt.  I really can't -- it would have
19  been during -- the bulk of my training would
20  have been in 2010.  I'm sure it included the
21  CSA.  I can't really remember what any of that
22  is, though.
23   Q.   Okay.  Why are you sure that your
24  training back in 2010 would have included the

Page 47

1  CSA?
2    A.   We had a two-week very
3  comprehensive training program with PharmDs,
4  along with a national sales meeting that was
5  very comprehensive.  We received a lot of
6  training.
7    Q.   I asked you earlier if you were
8  familiar with the Controlled Substances Act and
9  you said "not really, no."  So again,
10  notwithstanding your current answer, what was it
11  that leads you to believe -- or what is it that
12  leads you to believe that back in 2010 you would
13  have received training on the Controlled
14  Substances Act?
15   A.   We received a lot of training, a
16  lot of different training.  There were a lot of
17  things going on.  REMS programs, Cares Alliance
18  programs.  I can't recall specifically CSA, but
19  we were -- we were well trained.
20   Q.   Okay.  And so I appreciate your
21  response, but, again, do you know whether or not
22  you received training on the Controlled
23  Substances Act back in 2010?
24   A.   I can't recall it.

Page 48

1    Q.   Okay.  Did you ever become aware
2  while you were at Mallinckrodt that Mallinckrodt
3  had a duty to monitor and implement a system to
4  identify suspicious orders?
5    A.   No.  I was not part of that.  I
6  was only the commercial side.  We had no part in
7  ordering of any type of product.
8    Q.   So you were not aware of that
9  duty?
10   A.   I was not aware of that duty.
11   Q.   Were you aware of a duty to
12  maintain effective controls against diversion?
13   A.   I was not.  That's not -- that was
14  not part of my job responsibilities.
15   Q.   Was detecting diversion part of
16  your job responsibility?
17   A.   It was not.
18   Q.   Are you aware there's a case
19  pending against pharmaceutical manufacturers and
20  distributors involving the opioid crisis?
21   A.   Just from what my attorneys have
22  shared with me.  That's all I know.
23   Q.   Okay.  Other than what your
24  attorneys provided you, do you have any

Page 49

1  knowledge of the existence of the litigation?
2    A.   I don't, no.
3    Q.   We talked about the training that
4  you received.  So there was training when you
5  started at Mallinckrodt?
6    A.   There was.
7    Q.   And where did that training take
8  place?
9    A.   St. Louis, Missouri.
10   Q.   And how long was that training?
11   A.   I believe the first round was two
12  weeks, maybe a week.  I can't really specify,
13  but it was over a week.
14   Q.   Okay.  And how about -- since you
15  said "first round," I'm assuming there was a
16  second round?
17   A.   Yeah.  We had training throughout,
18  which was another week, and then every time we
19  got together at national sales meetings, a --
20  the bulk of that -- that week would be spent
21  reviewing and retraining and updating us on
22  different themes in the industry, making sure
23  we're staying informed, compliant.  Yeah.
24   Q.   And when you say "themes," what do

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1 you mean by "themes"?
2     A.   If there had been any changes to,
3 you know -- if there were certain medications
4 that were no longer available, we would be, you
5 know, informed of, you know, why they weren't
6 available or things like that.
7     Q.   And that would be referred to as a
8 theme?
9     A.   I mean, not -- they would
10 probably -- I'm just calling it a theme. That's
11 just sort of ...
12     Q.   The first week training that you
13 received, was it classroom-type training?
14     A.   It was.
15     Q.   Did you receive materials from
16 Mallinckrodt?
17     A.   A binder, I believe, yes.
18     Q.   Do you know who performed the
19 training?
20     A.   The training department.
21     Q.   Okay. Were there other
22 pharmaceutical sales specialists in that
23 training?
24     A.   There were.

Page 51

1     Q.   Were there other employees other
2 than pharmaceutical sales, or was this just for
3 pharmaceutical sales?
4     A.   It was just for the sales team,
5 new sales members.
6     Q.   Future training that you
7 mentioned, additional training after that first
8 week, was there any training that would be done
9 on a computer or a Mallinckrodt portal, like a
10 website where you'd sign in?
11     A.   There were. There were
12 different -- there were lots of different
13 opportunities to engage us in training. I do
14 believe there was a portal. I can't recall the
15 specifics of it, but there were opportunities
16 to, you know, gain our commitment to staying on
17 label, refreshing our memory, just making sure
18 that we're staying compliant with what was on
19 label for both products.
20     Q.   Do you own any Mallinckrodt stock?
21     A.   I do not.
22     Q.   Does your husband own any
23 Mallinckrodt stock?
24     A.   He does not.

Page 52

1     Q.   Did your position ever change
2 from -- I understand your duties and
3 responsibilities were constant, but did your
4 position change from that initial position?
5     A.   I think I was given like a
6 different title. I went from like sales
7 representative to sales specialist, something
8 like that, over a period of time, but my duties
9 and responsibilities never changed.
10           - - -
11     (Mallinckrodt-Cox Exhibit 4 marked.)
12           - - -
13     Q.   Let me show you Exhibit Number 4,
14 which is Bates range 8506, 8507.
15     It mentions -- this letter -- are
16 you familiar with this letter, March 24, 2014?
17     A.   Yeah, I'm -- sure.
18     Q.   All right. Do you know who Tamara
19 Jordan is?
20     A.   I don't.
21     Q.   Okay. Field sales specialist,
22 would that have been your second title at
23 Mallinckrodt?
24     A.   I believe so, yes.

Page 53

1     Q.   Again, duties and responsibilities
2 are the same?
3     A.   Correct.
4     Q.   You were reporting to Kevin Becker
5 before. Are you still reporting to Kevin Becker
6 at this point?
7     A.   I am.
8     Q.   Who's Tim Dress?
9     A.   Tim Dress is -- he was a colleague
10 of mine and he was the district manager. I
11 would have reported to him for a short period of
12 time before I left Mallinckrodt.
13     Q.   Okay. Currently it's still Kevin
14 Becker, though?
15     A.   At my new company, it's Kevin
16 Becker, yes. Currently, yeah, my current
17 company.
18     Q.   Okay. So the company that you're
19 at now, the new company, Kevin Becker is your --
20     A.   Yes.
21     Q.   Okay. But while you were a field
22 sales specialist, it was also Kevin Becker?
23     A.   It was.
24     Q.   Okay. And here it talks about