# EXHIBIT 89

```
  1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF OHIO
  2                         EASTERN DIVISION
  3   IN RE NATIONAL PRESCRIPTION   |   MDL No. 2804
                                    |
  4   OPIATE LITIGATION             |   Case No. 17-MD-2804
                                    |
  5   This Document Relates to:     |   Hon. Dan A. Polster
                                    |
  6   APPLIES TO ALL CASES          |
                                    |
  7                                 |
  8                    Monday, January 7, 2019
  9                             - - -
 10         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
 11                    CONFIDENTIALITY REVIEW
 12                             - - -
 13
 14         Videotaped deposition of CATHERINE JACKSON,
      held at Foley & Lardner LLP, One Biscayne Tower, 2
 15   Biscayne Boulevard, Suite 1900, Miami, Florida,
      commencing at 9:27 a.m., on the above date,
 16   before Susan D. Wasilewski, Registered
      Professional Reporter, Certified Realtime
 17   Reporter, Certified Realtime Captioner.
 18
 19
 20
 21
 22
                                - - -
 23
                      GOLKOW LITIGATION SERVICES
 24         877.370.3377 ph | 917.591.5672 fax
                        deps@golkow.com
 25
```

Page 22

1 opioids there was appropriate use and disposal and
2 weaning and there is many issues related with
3 opioids, and so we were responsible to make sure
4 that we were doing our part to educate. Our role
5 was, in my opinion, down the chain and small, but
6 whatever we could do to give back to the community
7 was an important piece of what I felt was our
8 responsibility.
9   Q.  And why would you describe your role as
10 "down the chain and small?"
11   A.  Because we -- many people don't utilize --
12 manufacturers sources of their information, so even
13 though we can put out information, many -- many
14 groups won't even use it because it's got the name
15 of a company.
16     When you look at the fact that we were --
17 that we are a manufacturer, it takes so many more
18 steps to get to the patient, so I -- when I say
19 small, I mean it's -- unfortunately we don't have
20 the voice that -- that would allow us to make -- do
21 a lot of work in education and awareness and make a
22 huge impact.  So what we do is we do -- we know that
23 there is multifaceted stakeholders involved in any
24 issue and we're one of them.  So we do what we can
25 and I feel we should and then everybody else does it

Page 23

1 but we're not the sole source of information.
2   Q.  Okay.  And what are some of those things
3 that you said "you do what we can and what you feel
4 you should?"
5   A.  Uh-huh, sure.
6   Q.  What are some of those things?
7     MR. DAVISON:  Objection to form.
8   A.  Patient education, caregiver education,
9 healthcare provider education, and patient education
10 to make sure that they understand whatever disease
11 state, with the course of the disease state, where
12 treatments work in the disease state, how to discuss
13 to their physicians about options when they are
14 getting into trouble with their treatments, when
15 they are no longer working.
16     For caregivers, it's to help them with
17 resources to give them support, because that is --
18 for many patients, caregivers play a huge role.
19     For the healthcare provider, it's ensuring
20 that the products that we manufacture are used in an
21 appropriate way with the appropriate patient.  They
22 are dosed appropriately, and then also at the end,
23 that when there is -- when everything -- when the
24 dose -- when the patient is no longer using those
25 medications, are they appropriately taken off, like

Page 24

1 they need to be weaned, different drugs require
2 different ways of stopping.  Some you can just stop
3 but not -- especially not opioids.
4     And then also safe disposal, because we know
5 that there are -- that improper disposal, drugs can
6 lead to diversion.
7   Q.  Okay.  So flipping to the section of the
8 slide deck that's the Care Alliance presentation
9 that you would give, this here, as you pointed out,
10 it says managed care team presentation.  So do I
11 understand that correctly that it's an internal
12 Mallinckrodt presentation to people who are working
13 on managed care accounts?
14   A.  Yes.
15   Q.  Okay.
16   A.  Exactly.
17   Q.  And what is the CARES Alliance?
18   A.  So the CARES Alliance was a -- the
19 Mallinckrodt had started CARES Alliance in 2010 as
20 their efforts on risk evaluation and mitigation, and
21 so there was no official risk of the REMS program
22 prior to that, which are when Exalgo, which is one
23 of their drugs that was a long-acting pain
24 medication was made, and so the thought at the time
25 was that we really need to have a risk evaluation

Page 25

1 mitigation strategy that we share.
2     And so that was -- that's CARES Alliance.
3   Q.  Okay.  How does -- so is that particular to
4 Exalgo or what's the connection between CARES
5 Alliance and Exalgo?
6     MR. DAVISON:  Objection to form.
7   A.  Exalgo is a drug that was manufactured by
8 the Mallinckrodt section of Covidien, because that
9 was the thing, and so it worked -- it was in the
10 disease state of chronic pain and cancer pain, and
11 so it's really about disease state.  The drugs that
12 we manufacture, lead us into the disease states that
13 we work in, if that makes sense, so whatever the FDA
14 approves for the disease state is the areas that we
15 will focus on for advocacy.  We have to stay -- we
16 have to really stay in our lanes on disease state
17 because we -- we have -- I often worry that if we go
18 into a different area, that we may be considered --
19 even though we don't do anything with marketing,
20 marketing off-label.  So we stay in the disease
21 state and at the time in 2010, it was in chronic
22 pain and cancer pain.
23   Q.  Okay.  And how does that bring about CARES
24 Alliance?
25     MR. DAVISON:  Object to form.

Page 26

1  A.  So CARES Alliance was an -- was a -- the
2  idea -- and I can only give you what I was told when
3  I first started the company.  So I don't have a lot
4  of detail to that, but Art Morelli and Lisa Saki
5  started CARES Alliance and so it was -- the goal was
6  to be a coalition to collaborate and act responsibly
7  to ensure safety, exactly what it was.
8      Q.  Okay.  And what does acting responsibly mean
9  in the context of the CARES Alliance?
10         MR. DAVISON:  Objection to form.
11     A.  I think the same thing that we just
12 discussed, making sure that people are educated
13 about the side effects of drugs, about the -- about
14 proper use, proper disposal, proper management of
15 drugs.
16     Q.  Okay.  Flip and look at the next two slides
17 together.  So these two slides describe two
18 epidemics.  The epidemic of pain and the epidemic of
19 prescription drug abuse.
20         What's the definition of epidemic?
21         MR. DAVISON:  Objection to form.
22     A.  So epidemic is something that involves the
23 public health of a large group.  At this point, it's
24 the United States because this is a -- this was a
25 problem that was going across in different regions,

Page 27

1  a little more than others.
2      Q.  And which epidemic are you speaking about?
3      A.  Both, actually.  Yeah, they are both public
4  health issues that we -- unfortunately one affects
5  the other.
6      Q.  And which of these epidemics concerns you
7  more?
8          MR. DAVISON:  Objection to form.
9      A.  Oh, my goodness, as a nurse, the epidemic of
10 pain is devastating.  People who have -- I was a
11 pain management nurse for many years at Johns
12 Hopkins and saw people debilitated, unable to hold
13 their kids, unable to hold their jobs, just crushed
14 by chronic pain.
15         The epidemic of prescription drug abuse is
16 equally upsetting.  We have people who are dying and
17 who are turning to opioids for uses other than pain.
18 It's -- both of them are equally disturbing,
19 haunting, and of concern to the medical community.
20     Q.  And personally, if you had a loved one swept
21 up in one of these epidemics, would you rather that
22 loved one be experiencing chronic pain or
23 prescription drug abuse?
24         MR. DAVISON:  Objection to form.
25     A.  I can't answer that.

Page 28

1      Q.  Really?
2          MR. DAVISON:  Objection.
3      Q.  Truthfully?
4          MR. DAVISON:  Objection.
5      A.  Truthfully?  No, because have you ever had
6  pain?  Do you -- I don't know if you've had pain.
7  The kind of pain that's debilitating.
8  
9  Luckily, we're blessed that nobody has pain, other
10 than, I think, one of my brothers has chronic back
11 pain, but I think both of them can be debilitating,
12 life ending.  People commit suicide due to pain, so
13 I'm not quite sure.  Maybe you can explain to me why
14 you seem to be leading me, I'm not quite sure where
15 that's coming from, because I've worked in pain
16 management for 13 years and that's -- you don't get
17 to work in pain without looking at prescription drug
18 abuse, so I've seen both issues in the course of my
19 treatment, I would not want -- I would not wish
20 either one of them on my worst enemy.
21     Q.  If you keep going through the slide, there's
22 a graph showing national rates of opioid overdose
23 deaths, treatment, admissions and sales from 1999 to
24 2010.  The graph shows all three steadily climbing
25 throughout that decade; is that correct?

Page 29

1      A.  Yes.
2      Q.  And if the graph were to continue to the
3  present year, we would see the line for opioid
4  overdose death rates continuing to climb; is that
5  correct?
6          MR. DAVISON:  Objection to form.
7      A.  You can't make that statement.  I don't know
8  what the data is.  I don't know if the data supports
9  your statement.
10     Q.  You personally are not familiar with the
11 overdose death rate annually?
12         MR. DAVISON:  Objection.
13     A.  Not any longer.  I haven't done pain
14 medicine, I haven't done advocacy and pain since
15 2015, so it's been three years since I've actually
16 worked in the area of pain medicine.  I'm in the
17 other therapeutic areas of our business.
18     Q.  Your current position at Mallinckrodt is in
19 government affairs and advocacy?
20     A.  It is.
21     Q.  And you would agree that there is a national
22 opioid epidemic currently?
23         MR. DAVISON:  Objection.
24     A.  I would agree that there is definitely a
25 problem with opioid.

Page 30

1  Q.  You work for a company that manufactures
2  opioids?
3  A.  Uh-huh.
4  Q.  In the area of government affairs and
5  advocacy, but you're not aware of the opioid
6  overdose death rate?
7  A.  I am not.
8      MR. DAVISON:  Objection to form.
9  A.  No longer, I am not.
10 Q.  When is the last year for which you were
11 aware of it?
12     MR. DAVISON:  Objection to form.
13 A.  It would probably be about 2014, 2015, but I
14 don't remember what it was.  I might -- I am now in
15 10 other therapeutic areas other than pain, so my
16 areas of focus now are off of this and that's my
17 colleague Kevin Webb's area.  So we take this very
18 response -- very -- we haven't stepped away from it.
19 We have just changed with who would be focused on
20 it, and it's solely Kevin's area now for advocacy.
21 Q.  Do you ever read news articles about the
22 opioid epidemic?
23     MR. DAVISON:  Objection to form.
24 A.  I do but I can't quote rates.
25 Q.  So you think it may be that the death rate

Page 31

1  has plateaued since 2010?
2      MR. DAVISON:  Objection to form.
3  A.  I can't answer that.  I don't know what the
4  numbers are.  If you want to share with me another
5  graph, I'd be happy to speak to what is actually
6  happening, but I don't think that's -- I don't want
7  to speak, it could plateau, it could fall a little
8  bit, increase a little bit, it could be -- I don't
9  know.
10 Q.  I just want to make sure that testimony is
11 clear that in your position in Mallinckrodt, you
12 don't know what's happened to overdose death rates
13 since 2010, you think they may have fallen, they may
14 have plateaued, you don't know?
15     MR. DAVISON:  Objection.
16 A.  For the record, I do not know the actual
17 statistics.  I do know it's still a national problem
18 but I do not know the statistics, you're absolutely
19 right.  I don't know them.  I apologize, I don't
20 stay on top of every statistics having to do with
21 it.
22 Q.  Do you stay on top of trends?
23 A.  I -- if it's in my area of working.  I mean
24 I stay -- I'm still -- still connected to many
25 people in the pain management, and I would say that

Page 32

1  the trends are that there is increased opioid abuse.
2  I mean -- I'm sorry.  That there is continued opioid
3  abuse.  I'm not sure how much it's increased or
4  changed from these numbers but I can also tell you
5  that there is a huge trend in patients with pain
6  that are not getting treatment, none, people that
7  are going to the pharmacist with cancer, with other
8  sorts of pain who are unable to get their pain
9  treatment because of this hypervigilance on overdose
10 death.
11     I think both of them are equally important.
12 I think we absolutely need to do something about
13 both of them, but I do know that there is increased
14 problems on both parts.  So -- but I believe now
15 it's not as -- from what I'm reading and this is,
16 once again -- you know, I really, probably, should
17 not answer that because, it's really just my
18 thoughts, but heroin is now also a growing
19 addiction, growing and so this is a very bad
20 situation for this country and for people who are in
21 pain and for people who are addicted.
22 Q.  So you just described as equally important,
23 the undertreatment of pain and opioid overdose
24 deaths.  Is that correct?
25     MR. DAVISON:  Objection to form.

Page 33

1  A.  So these are two separate issues, but they
2  are both very concerning.  They are not -- one is
3  not meant to be put in front of the other.  One is
4  not meant to be pushed out and less important.  Both
5  of these affect our families, our coworkers, our
6  friends, so it's -- it's a -- I don't have the
7  answers.
8  Q.  Okay.  I'm just asking about your testimony.
9  You said, "I think both of them are equally
10 important."
11 A.  I do think they are both equally important.
12     MR. DAVISON:  Objection.
13 Q.  Okay.
14 A.  But they are separate.  One does not -- you
15 don't look at one and say, we need to focus on this
16 and ignore that one.  Unfortunate -- and we have
17 healthcare people looking at both of these issues.
18 Q.  And given that you are equating the two,
19 personally, would you rather have a loved one waking
20 up in pain every day or going to sleep and never
21 waking up?
22     MR. DAVISON:  Objection to form, asked and
23 answered.
24 A.  I think I've already answered that one for
25 you.  I don't want anyone to die, but I also don't

Page 34

1  want someone committing suicide because they can't
2  get out of pain, and that has happened.
3      Q.  Are opioids the only solution for chronic
4  pain?
5          MR. DAVISON:  Objection.
6      A.  Oh, absolutely not.  Absolutely not.  They
7  are one of multi -- they are one of a multifactorial
8  equation in terms of treating pain.  They are just a
9  small piece of it, actually, a very small piece of
10 it.
11     Q.  Okay.  Going a couple slides ahead, the
12 heading CARES Alliance here it says "the CARES
13 Alliance aims to improve pain management outcomes
14 through education and awareness campaigns that are
15 innovative and science based? "
16     A.  Yes.
17     Q.  What does that mean, science based?
18     A.  So it's based in research.  So we did a
19 couple of programs that, with the -- one was with
20 the American Academy of Family Practice where they
21 actually took the -- took some of the forms that
22 were on CARES Alliance, some of the risk management
23 forms, and then they used them in clinics to
24 identify which patient would be at risk for
25 addiction, so that they could be appropriately

Page 35

1  managed with other therapies than opioids, or they
2  could be watched closer, or whatever it would be
3  that the physician would feel like was important.
4          So that is evidence -- what we call -- it's
5  actually that's a poor terminology.  It really is
6  evidence based --
7      Q.  Evidence based?
8      A.  --is the word that we used.  And that means
9  it's research done in a protocol, done strict -- you
10 know, with strict guidelines and it's not just
11 somebody's opinion.
12     Q.  Okay.  And who is the audience for the CARES
13 Alliance education and awareness campaigns?
14     A.  Patients, the public, caregivers, healthcare
15 providers, all stakeholders involved in pain.
16     Q.  The next bullet point on the slide says:
17 "Our goal is to help healthcare professionals and
18 people with pain work together to better assess the
19 risks and benefits of pain medications so more
20 people living in pain can find the relief they
21 need."
22         You mentioned having a background as an RN
23 in practice.  What -- given your experience as an
24 RN, what would you say you need to assess the risks
25 and benefits of medications?

Page 36

1          MR. DAVISON:  Objection to form.
2      A.  So for drugs like opioids, which can
3  cause -- can -- can be misused, you want to make
4  sure that people -- you have to -- there's all sorts
5  of science based guidelines.  You want to look at
6  people who have had a history of addiction, history
7  of misuse, tobacco use is a -- is one of those risk
8  factors, how -- family support, how you -- and I
9  apologize.  I don't remember all of them but those
10 are some of the ones that you would do, but opioids
11 are not for everyone.  Right?  That's the nuance of
12 pain management.  But they are used -- for some
13 people they can make the difference between going to
14 work, not going to work, taking care of their kids,
15 not participating.  And so we've gotten better
16 and -- in developing tools to help identify those
17 patients that may fall into risks with addiction.
18 It's not a perfect situation but I think we're -- I
19 think that the medical community is doing better and
20 better.
21     Q.  Okay.  And you just described the risk
22 information, in terms of balancing risks and
23 benefits.  What sort of information would you need
24 to -- on the benefits side, when you are evaluating
25 a medication?

Page 37

1          MR. DAVISON:  Objection to form.
2      A.  How does it -- does it -- does it actually
3  help you do something, you know.  When people would
4  come into our pain clinic and we would up their dose
5  of any drug, my question was what did you do to --
6  this -- since we've last met with you, and if they
7  would say, well, nothing, my pain is still 10 out of
8  10, I would say to them, well, then maybe these
9  drugs are not working for you.  You know, it's all
10 about when you are looking at benefit you want
11 reduction in pain, but you also want -- you want
12 someone to bring function back, right?  You want
13 people to be able to be participants in their lives.
14 They may not be able to return to work due to
15 injuries beyond -- because of the extent of their
16 injuries, but can they watch their kids, can they
17 get up, take care of the house.  Can you -- you
18 don't want people sitting on the couch all day no
19 matter what you are giving them because then you are
20 really not helping.
21     Q.  What about before a person starts to take
22 medication, you're talking about improvements in
23 function after taking a medication, but would you
24 also want to weigh the risks and benefits before
25 someone starts taking the medication at all?