EXHIBIT 92

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

 2                   EASTERN DIVISION

 3

    **************************

 4

    IN RE:  NATIONAL          MDL No. 2804

 5  PRESCRIPTION OPIATE

    LITIGATION                Case No.

 6                            1:17-MD-2804

    **************************

 7

    THIS DOCUMENT RELATES TO    Hon. Dan A. Polster

 8  ALL CASES

 9  **************************

10

11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12              CONFIDENTIALITY REVIEW

13     VIDEOTAPED DEPOSITION OF EILEEN SPAULDING

14

15          Tuesday, February 5th, 2019

16                 9:06 a.m.

17

18      Held At:

19          Ropes & Gray LLP

20          800 Boylston Street

21          Boston, Massachusetts

22

23  REPORTED BY:

24  Maureen O'Connor Pollard, RMR, CLR, CSR
```

Page 2

```
1  APPEARANCES:
2
3  FOR THE PLAINTIFFS:
4      GARY A. GOTTO, ESQ.
5      CHANELE REYES, ESQ.
6      DAVID KO, ESQ. (Remotely)
7         KELLER ROHRBACK, LLP
8         3101 North Central Avenue
9         Phoenix, Arizona 85012
10        ggotto@kellerrohrback.com
11        creyes@kellerrohrback.com
12
13 FOR THE TENNESSEE PLAINTIFFS:
14     BENJAMIN A. GESTEL, ESQ.
15        BRANSTETTER, STRANCH & JENNINGS, PLLC
16        223 Rosa L. Parks Avenue
17        Nashville, Tennessee 37203
18        615-254-8801
19        bgestel@bsjfirm.com
20
21
22
23
24
```

Page 4

```
1  APPEARANCES (Continued):
2  FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
   SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES,
3  INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.):
4      ERICA GUTHRIE, ESQ. (Remotely)
5      HEATHER A. HOSMER, ESQ. (Remotely)
6         ARNOLD & PORTER KAYE SCHOLER, LLP
7         601 Massachusetts Avenue, NW
8         Washington, DC 20001-3743
9         202-942-5000
10        erica.guthrie@arnoldporter.com
11        heather.hosmer@arnoldporter.com
12
13 FOR MALLINCKRODT, LLC and SPECGX, LLC, and THE
   DEPONENT:
14     ANDREW O'CONNOR, ESQ.
15     KAITLIN A. BERGEN
16     JENNIFER S. PANTINA, ESQ.
17        ROPES & GRAY LLP
18        800 Boylston Street
19        Boston, Massachusetts 02199-3600
20        617-951-7000
21        andrew.oconnor@ropesgray.com
22        kaitlin.gergen@ropesgray.com
23
24 VIDEOGRAPHER: Robert Martignetti
```

Page 3

```
1  APPEARANCES (Continued):
2  FOR McKESSON CORPORATION:
3      ALEJANDRO BARRIENTOS, ESQ. (Remotely)
4         COVINGTON & BURLING LLP
5         One CityCenter
6         850 Tenth Street, NW
7         Washington, DC 20001-4956
8         202-662-5518
9         abarrientos@cov.co,
10
11 FOR WALMART:
12     CHRISTOPHER MARKHAM, ESQ.
13        JONES DAY
14        100 High Street
15        Boston, Massachusetts 02110
16        617-960-3939
17        cmarkham@jonesday.com
18
19 FOR PERNIX:
20     BRUCE CLARK, ESQ. (Remotely)
21        CLARK MICHIE LLP
22        220 Alexander Street
23        Princeton, New Jersey 08540
24        bruce.clark@clarkmichie.com
```

Page 5

```
1              INDEX
2  EXAMINATION              PAGE
3  EILEEN SPAULDING
4  BY MR. GOTTO              10
5  BY MR. GESTEL             274
6  BY MR. O'CONNOR           326
7
8
9        E X H I B I T S
10 NO.    DESCRIPTION        PAGE
11 Mallinckrodt-  11/11/09 e-mail, Bates
   Spaulding-1    MNK-T1_0000278740............ 111
12
   Mallinckrodt-  Document titled FY '10
13 Spaulding-2    Assessment, Bates
                  MNK-T1_0000490704 through
14                720......................... 115
15 Mallinckrodt-  E-mail chain, Bates
   Spaulding-3    MNK-T1_0007026254 and 255.... 121
16
   Mallinckrodt-  E-mail chain, Bates
17 Spaulding-4    MNK-T1_0007730928 through
                  930......................... 133
18
   Mallinckrodt-  E-mail chain, Bates
19 Spaulding-5    MNK-T1_0000274080 and 4081... 136
20 Mallinckrodt-  1/31/11 e-mail with
   Spaulding-6    attached PowerPoint, Bates
21                MNK-T1_0005187729............ 140
22 Mallinckrodt-  Document titled Oxycodone
   Spaulding-7    Extended Release Risk Map
23                Action Plan, Bates
                  MNK-T1_0000448773 through
24                780......................... 144
```

**Page 6**

Mallinckrodt-Spaulding-8  E-mail chain, Bates MNK-T1_0006443249............ 150
Mallinckrodt-Spaulding-9  E-mail chain, Bates MNK-T1_0000492214 and 215.... 153
Mallinckrodt-Spaulding-10  E-mail chain, Bates MNK-T1_0001792949 through 951........................ 159
Mallinckrodt-Spaulding-11  12/27/07 letter from DEA, Bates MNK-T1-0000270069 and 70.......................... 166
Mallinckrodt-Spaulding-12  Document titled Suspicious Order Monitoring Team Charter, Bates MNK-T1_0000496062............ 172
Mallinckrodt-Spaulding-13  E-mail chain with attachment, Bates MNK-T1_0007026341 and 342.... 174
Mallinckrodt-Spaulding-14  E-mail chain, Bates MNK-T1_0004282621............ 178
Mallinckrodt-Spaulding-15  E-mail chain, Bates MNK-T1_0000274399 and 400.... 180
Mallinckrodt-Spaulding-16  E-mail with attachment, Bates MNK-T1_0002940798...... 184
Mallinckrodt-Spaulding-17  E-mail chain, Bates MNK-T1_0005663239 through 242.......................... 188
Mallinckrodt-Spaulding-18  E-mail chain, Bates MNK-T1_0000280632 and 633.... 194
Mallinckrodt-Spaulding-19  Document titled Suspicious Order Monitoring Program, Bates MNK-T1_0000477900 through 912................. 195

**Page 7**

Mallinckrodt-Spaulding-20  Document titled Notes from Meeting at DEA Albany Office, 11/01/10, Bates MNK-T1_0002357150 and 151.... 198
Mallinckrodt-Spaulding-21  11/30/10 e-mail, Bates MNK-T1_0000270021............ 202
Mallinckrodt-Spaulding-22  E-mail chain, Bates MNK-T1_0001519526 and 527.... 204
Mallinckrodt-Spaulding-23  10/18/11 e-mail with attachments, Bates MNK-T1_0000289371, and MAL-MI000030498 through 502.. 206
Mallinckrodt-Spaulding-24  3/15/11 e-ail with attachment, Bates MNK-T1_0000282467 through 474.......................... 209
Mallinckrodt-Spaulding-25  4/28/11 e-mail with attachment, Bates MNK-T1_0000283244 through 248.......................... 211
Mallinckrodt-Spaulding-26  11/1/10 letter, Bates MNK-T1_0000288483 and 484.... 215
Mallinckrodt-Spaulding-27  E-mail chain, Bates MNK-T1_0000422189 through 192.......................... 221
Mallinckrodt-Spaulding-28  E-mail chain, Bates MNK-T1_0000485790 and 791.... 223
Mallinckrodt-Spaulding-29  E-mail chain with attachment, Bates MNK-T1_0000561060 through 1062.......................... 227
Mallinckrodt-Spaulding-30  E-mail chain, Bates MNK-T1_0000371673 and 674.... 229
Mallinckrodt-Spaulding-31  E-mail chain, Bates MNK-T1_0005424123 through

**Page 8**

Mallinckrodt-Spaulding-32  E-mail chain, Bates MNK-T1_0000282686 and 687.... 239
Mallinckrodt-Spaulding-33  E-mail chain, Bates MNK-T1_0000290887............ 242
Mallinckrodt-Spaulding-34  E-mail chain, Bates MNK-T1_0003044340............ 242
Mallinckrodt-Spaulding-35  E-mail chain, Bates MNK-T1_0000283719 through 721.......................... 246
Mallinckrodt-Spaulding-36  E-mail chain, Bates MNK-T1_0006055924 through 926.......................... 248
Mallinckrodt-Spaulding-37  E-mail chain, Bates MNK-T1_0006056192............ 249
Mallinckrodt-Spaulding-38  E-mail chain, Bates MNK-T1_0005641401 through 403.......................... 249
Mallinckrodt-Spaulding-39  Clawed back - E-mail chain, Bates MNK-T1_0007729523...... 250
Mallinckrodt-Spaulding-40  7/17/08 e-mail with attachment, Bates MNK-T1_0006442504 and 505.... 253
Mallinckrodt-Spaulding-41  Administrative Memorandum of Agreement................ 256
Mallinckrodt-Spaulding-42  Spreadsheet titled Oxy Percent of Sales by Dist by State, Bates MNK-T1_0008434332............ 284
Mallinckrodt-Spaulding-43  E-mail chain with attachment, Bates MNK-T1_0007898862 through 864.......................... 287

**Page 9**

Mallinckrodt-Spaulding-44  6/29/12 e-mail with attachment, Bates MNK-T1_0007053962 through 960.......................... 298
Mallinckrodt-Spaulding-45  CSC Steering Committee Meeting Notes, 12/12/12, Bates MNK-T1_0006967775 through 777................. 304
Mallinckrodt-Spaulding-46  Document titled HZQS - Controlled Substances Compliance Responsibilities Associated with Anti-Diversion, Bates MNK-TNSTA05335585 through 589.......................... 317
Mallinckrodt-Spaulding-47  Document titled HZQS - Identification, Investigation, and Reports of Controlled Substances Suspicious Orders, Bates MNK-TNSTA05335590 through 593.......................... 318
Mallinckrodt-Spaulding-48  Document titled HZQS - Controlled Substances Compliance Responsibilities Associated with Suspicious Order Monitoring, Bates MNK-TNSTA05335581 through 584.......................... 319
Mallinckrodt-Spaulding-49  E-mail chain with attachment, Bates MNK-T1_0007898351 through 354.......................... 320

Highly Confidential - Subject to Further Confidentiality Review

Page 10

P R O C E E D I N G S

1
2
3      THE VIDEOGRAPHER:  We are now on the
4  record.  My name is Robert Martignetti, I'm a
5  videographer for Golkow Litigation Services.
6  Today's date is February 5, 2019, and the time
7  is 9:06 a.m.
8      This video deposition is being held in
9  Boston, Massachusetts, In Re:  National Opiate
10  Litigation.
11      The deponent is Eileen Spaulding.
12      Counsel will be noted on the
13  stenographic record.
14      The court reporter is Maureen Pollard,
15  and will now swear in the witness.
16
17      EILEEN SPAULDING,
18  having been duly identified and sworn, was
19  examined and testified as follows:
20      EXAMINATION
21  BY MR. GOTTO:
22      Q.  Good morning, Ms. Spaulding.
23      A.  Good morning.
24      Q.  My name is Gary Gotto.  We met briefly

Page 11

1  just before we went on the record.  We've never
2  met before today, correct?
3      A.  Correct.
4      Q.  Have you ever given a deposition
5  previously?
6      A.  No.
7      Q.  Okay.  Well, we will -- just a few
8  items by way of background.  Please let me
9  finish my questions if you can, and I'll
10  certainly try to let you finish your answers
11  before so we don't speak over each other.
12      If any of my questions are unclear to
13  you in any way, let me know and I'll do my best
14  to clarify them.
15      A.  Okay.
16      Q.  If you answer a question without
17  asking for a clarification, I'll assume you felt
18  like you understood it.  Okay?
19      A.  Yes.
20      Q.  And this is kind of a large table so
21  I'll try to keep my voice up so we can all hear
22  each other.  But I'm not shouting, I'm just
23  trying to --
24      A.  I understand.

Page 12

1      Q.  I'm pretty sure we can all be heard.
2      We will take breaks periodically
3  today, but if you need a break at any point, as
4  long as there's not a question pending, just let
5  me know, and we'll accommodate that.  Okay?
6      A.  Okay.
7      Q.  By whom are you employed?
8      A.  Mallinckrodt.
9      Q.  And what's your business address?
10      A.  172 Railroad Avenue, Hobart, New York
11  13788.
12      Q.  And when did you first become employed
13  at Mallinckrodt?
14      A.  December of 1998.
15      Q.  Before we get into your Mallinckrodt
16  employment, just a little bit of background.
17  Describe for me briefly your post-high school
18  education.
19      A.  So I have an associate's in computer
20  information systems technology from BYU.  And I
21  went into the workforce for Elastic Stop Nut for
22  approximately two years after graduation.  I
23  then worked for J.L. Hammett School Supplies as
24  a customer service rep for ten years, PSE&G as a

Page 13

1  customer service rep for approximately two
2  years, and then I relocated to New York and
3  started with Mallinckrodt.
4      Q.  Okay.  What is PSE&G?
5      A.  Public Service Electric & Gas.  It's
6  the electric company for the State of New
7  Jersey.
8      Q.  Okay.  And do you hold any
9  professional licenses or certifications?
10      A.  No.
11      Q.  Approximately when did you get your
12  associate's degree?
13      A.  I graduated in 1990.
14      Q.  Okay.  All right.  And prior to
15  Mallinckrodt did you have any employment history
16  that was related in any way to the
17  pharmaceuticals industry?
18      A.  No.
19      Q.  In your undergraduate work did you
20  take any coursework that related to the
21  pharmaceuticals industry?
22      A.  No.
23      Q.  Have you done any other formal --
24  apart from on-the-job training or internal

Page 14

1  training programs provided at Mallinckrodt, any
2  other educational programs that you've taken
3  that relate in any way to the pharmaceuticals
4  industry?
5      A.  Not sure I understand what you mean.
6  Like DEA training seminars?
7      Q.  That would be -- let me -- the
8  pharmaceuticals industry -- well, let's be as
9  broad as we can.  That relate to pharmaceuticals
10 in any way, so that would include anything
11 related to DEA training or the Controlled
12 Substances Act, anything of that nature.
13     A.  Yes.  So I've attended several DEA
14 pharmaceutical training seminars sponsored by
15 the DEA; pharmaceutical industry conferences
16 also sponsored by DEA; HDMA, which is now known
17 as HDA, two of their conferences; and
18 BuzzeoPDMA, now IQVIA, I've attended multiple
19 industry conferences.
20     Q.  Okay.  And have those all been during
21 the time you were employed by Mallinckrodt?
22     A.  Yes.
23     Q.  Okay.  We'll get into that in just a
24 bit.

Page 15

1      Tell me what you did -- and I don't
2  want you to disclose any communications with
3  your counsel, but what did you do to prepare for
4  today's deposition?
5      A.  I met with my counsel.
6      Q.  Okay.  And how many times did you meet
7  with counsel?
8      A.  Three.
9      Q.  And approximately when did you meet
10 with counsel?
11     A.  Two in January, and one yesterday.
12     Q.  And were those personal meetings or
13 telephonic?
14     A.  Personal.
15     Q.  And who was present?
16     A.  Kate and Andrew.
17     Q.  No one else?
18     A.  No.
19     Q.  Approximately how long did each one of
20 the meetings last?
21     A.  Seven to eight hours.
22     Q.  And you can just answer this yes or
23 no.  Did you review any documents during those
24 meetings?

Page 16

1      A.  Yes.
2      Q.  And did any of those documents refresh
3  your recollection in any regard?
4      A.  Yes.
5      Q.  And in what regards can you recall
6  your recollection being refreshed?
7      A.  Well, once I'd read the e-mail, then
8  it would remind me of what the topic or the
9  subject matter was.
10     Q.  Okay.  Was there any particular matter
11 you can recall reviewing a document and having
12 that document refresh your recollection as to a
13 specific subject matter or event?
14         MR. O'CONNOR:  I'm going to object,
15 and instruct the witness not to answer to the
16 extent it would get into which particular
17 documents we were looking at which would be
18 protected by the attorney/client communication
19 privilege and work product doctrine.
20 BY MR. GOTTO:
21     Q.  So again, and I think this is
22 consistent with your counsel's instruction, I'd
23 like you to tell me not the document itself but
24 just the subject matter, what the event or the

Page 17

1  subject matter as to which you can recall your
2  recollection being refreshed by reviewing a
3  document.
4         MR. O'CONNOR:  You can answer at a
5  general level.
6      A.  Whatever the subject was of the
7  particular document I would remember upon
8  reading it.
9  BY MR. GOTTO:
10     Q.  Sure.  Okay.
11         Fair to say, then, there's not a
12 specific thing that comes to your mind as you're
13 sitting here today of, for example, reviewing a
14 document and having the sensation of oh, gee, I
15 forgot all about that meeting but now that I
16 review this document I remember there was such a
17 meeting, or anything of that nature that would
18 be more specific than just a general, well, I
19 see a document and that at some level, you know,
20 causes me to better remember something that
21 happened some years back?
22     A.  No.
23     Q.  Okay.  Have you reviewed any
24 transcripts of any deposition testimony given by

Page 18

1 any of the witnesses in this matter?
2    A.   No.
3    Q.   Have you had -- well, have you spoken
4 to anyone who has given a deposition in this
5 matter with respect to their deposition?
6    A.   Only that they had been deposed.
7 Nothing of the subject matter.
8    Q.   Okay.  And who did you speak to in
9 that regard?
10    A.   Karen Harper.
11    Q.   Anyone else?
12    A.   No.
13    Q.   Have you reviewed any of the papers
14 that have been filed in court related to this
15 litigation, including any of the complaints
16 filed by any of the plaintiffs?
17    A.   No.
18    Q.   Are you aware that there's in excess
19 of a thousand complaints that have been filed by
20 various governmental entities, counties,
21 municipalities, etcetera, relating to the opioid
22 epidemic?
23    A.   Yes.
24    Q.   And again without divulging any

Page 19

1 communications with counsel, how did you first
2 become aware of that?
3    A.   It's only through counsel that I am
4 aware of that.
5    Q.   Is it a subject -- the litigation, is
6 that a subject that you've had any conversations
7 with anyone else at Mallinckrodt, again apart
8 from communications with counsel?
9    A.   No.
10    Q.   Have you taken any steps to preserve
11 any documents that might in any way relate to
12 the subject matter of the opioid litigation?
13    A.   So we have a document preservation
14 notice that's been issued, so all documents have
15 been preserved.
16    Q.   Okay.  But -- and that would apply to
17 documents that, for example, are on Mallinckrodt
18 servers or on your work computer, that sort of
19 thing?
20    A.   I can only speak to my work computer.
21    Q.   Okay.  In terms of -- do you have a
22 personal computer at home?
23    A.   Actually, no, I don't.
24    Q.   You don't.

Page 20

1    Okay.  Do you have at home any paper
2 files that in any way relate to your work at
3 Mallinckrodt?
4    A.   No.
5    Q.   And have you at any time?
6    A.   No.  I apologize, I step back.  I have
7 taken work home previously to complete and bring
8 back to work the next day.
9    Q.   Okay.  But in terms of maintaining a
10 file in a file --
11    A.   No, absolutely --
12    Q.   -- cabinet at your home or anything
13 like that, that's not something that you do?
14    A.   No, absolutely not.
15    Q.   Okay.  Well, let's talk about your
16 employment at Mallinckrodt.  I'd like first to
17 just get a general sense of the positions that
18 you've held over the years.  I realize you've
19 been there a long time and you may be a little
20 fuzzy on particular dates, and that's fine.
21 This isn't a memory contest.  And we'll look at
22 some documents that may pin down some dates from
23 time to time as we go through today.
24    But just at a general level, if you

Page 21

1 can tell me the positions that you've held over
2 the years at Mallinckrodt.
3    A.   Sure.  I started in their packaging
4 department as a packaging operator in 1998.  I
5 was in that department for approximately a year
6 and a half, and I transitioned into the
7 validations department.  And I was with
8 validations for approximately two years.  And
9 then in April of 2001, I transitioned into the
10 compliance role.
11    Q.   Okay.  So prior to April of '01, in
12 the packaging and validations positions, just
13 tell me generally what responsibilities you had
14 in those positions.
15    A.   In packaging it was working on the
16 line that puts the tablets and capsules into the
17 bottles, running the machinery.
18    And then in validations it was
19 executing protocols and taking samples to
20 validate products for FDA approval.
21    Q.   Okay.  And did you receive any
22 training with respect to either of those
23 positions?
24    A.   Yes.

Page 22

1    Q.   What was the nature of the training?
2    A.   So in packaging would have been
3  on-the-job training, classroom training, SOP
4  training.
5        The same for validations.
6  Validations, I had in the beginning a one-on-one
7  trainer that would show me how to take samples
8  and execute the protocols, how to write reports.
9    Q.   And what is SOP training?
10   A.   Reading SOPs, standard operating
11 procedures.  We have a computer system that
12 assigns us SOPs based on our curriculum, and we
13 read those, and in some cases take -- there's a
14 quiz associated with those SOPs.
15   Q.   Okay.  You said April of '01 you
16 transitioned to a compliance role.  What was the
17 compliance role that you transitioned into?
18   A.   So in April of 2001, the reason I
19 remember the date is because that's when our
20 distribution center opened, and a newly created
21 position of compliance investigator -- excuse
22 me, compliance investigator was created in which
23 I did the ARCOS reporting.  I would investigate
24 any losses in transit with the carriers, made

Page 23

1  sure our reports were filed on time, handled
2  destruction of the pharmaceutical waste, and any
3  other tasks as assigned.
4    Q.   Okay.  And you indicated this was a
5  new position that was created in '01, is that
6  correct?
7    A.   Yes.
8    Q.   And it was related to the
9  establishment of the distribution center?
10   A.   Yes, it was an additional license that
11 was started at the Hobart site.
12   Q.   And what was the nature of the
13 additional license?
14   A.   A distribution center.  So previous to
15 that we had only had a manufacturing DEA license
16 and an analytical license.  The addition of the
17 distribution center in Hobart created the need
18 to have a DEA distributor license and a DEA
19 exporter license.
20   Q.   And so the DEA distributor license,
21 what did that permit Mallinckrodt to do that it
22 hadn't done previously?
23   A.   To distribute either Mallinckrodt-made
24 products or products that were made by other

Page 24

1  manufacturers on behalf of Mallinckrodt.
2    Q.   So prior to having the distributor
3  license, Mallinckrodt had a license to
4  manufacture controlled substances, correct?
5    A.   Yes.
6    Q.   And so it would then -- what would it
7  then do with the controlled substances after it
8  manufactured them?
9    A.   It would send them to St. Louis for
10 distribution.
11   Q.   And did Mallinckrodt in St. Louis have
12 a distribution license?
13   A.   Yes.
14   Q.   Okay.  So the distributor license that
15 was obtained in '01 was for the Hobart facility?
16   A.   Yes.
17   Q.   Okay.  So when you took the position
18 of compliance investigator, to whom did you
19 report at that time?
20   A.   Liz McPhail.
21   Q.   And what was her position?
22   A.   Purchasing manager.
23   Q.   And for how long did that reporting
24 relationship continue?

Page 25

1    A.   I don't recall exactly.
2    Q.   Was it some number of years?
3    A.   A few years.
4    Q.   Okay.  And to whom did you report
5  after you no longer reported to Ms. McPhail?
6    A.   To the materials manager.
7    Q.   And who was that?
8    A.   Tim Bach, and then later Aaron
9  Nikolaus.
10   Q.   And for how long did those reporting
11 relationships continue?
12   A.   Again, a few years.
13   Q.   And after that to whom did you report?
14   A.   Karen Harper.
15   Q.   Do you recall approximately when you
16 began reporting to Ms. Harper?
17   A.   2008 sometime.
18   Q.   And do you recall what her position
19 was at that time?
20   A.   Senior manager of controlled
21 substances compliance.
22   Q.   And for how long did your reporting
23 relationship with Ms. Harper continue?
24   A.   I'm still reporting to Karen Harper.

Page 26

1     Q. Okay. The position compliance
2 investigator which you indicated was a new
3 position when you took it in '01, did you
4 receive a written job description or a list of
5 responsibilities?
6     A. I don't remember.
7     Q. How did you come to have that
8 position? Did you apply for it?
9     A. Yes. There was a posting internally
10 which I applied and was interviewed and awarded
11 the position.
12     Q. Do you recall by whom you were
13 interviewed?
14     A. Liz McPhail was one of them. I don't
15 remember who the others were.
16     Q. And did you have an understanding at
17 the time as to what in your background qualified
18 you for that position?
19     A. I guess just being an operator and
20 familiar with our processes and our products.
21     Q. And you listed a few items that you
22 had responsibility for, for example, ARCOS
23 reporting. What was ARCOS reporting?
24     A. ARCOS reporting is -- at that time we

Page 27

1 were reporting quarterly all of our
2 distributions to our next downstream direct
3 customer.
4     Q. And those reports went to whom?
5     A. DEA.
6     Q. Okay. And so was it your -- you had
7 responsibility for completing those reports, is
8 that right?
9     A. For the distributor license.
10     Q. And do you continue to have that
11 responsibility today?
12     A. Yes.
13     Q. Tell me what the -- just in general
14 what the ARCOS report reports to the DEA?
15     A. So ARCOS is Automation Reports
16 Consolidated Ordering System, and it is all of
17 our receipts, so any product that we bring in we
18 record and any product we ship out we record,
19 and so it's acquisitions and dispositions.
20     Q. And how do you go about gathering the
21 data that you include in that report?
22     A. For what time period? Because it's
23 changed.
24     Q. Okay. Fair enough. Maybe you can

Page 28

1 tell me at the beginning how you did it, and
2 then how that process changed over the years.
3     A. So at the beginning it was a --
4 basically a -- we call it DDS, dangerous drug
5 system, would compile all of the data for the
6 receipts, and the shipments, and download it
7 into ARCOS format, which is -- I don't know,
8 it's a specific format, and then we would
9 download it onto disk and mail that disk to DEA
10 quarterly. Over time we started reporting
11 monthly at the request of DEA. And then in time
12 DEA had enhanced their systems to be able to
13 report online.
14     So now we have two computer systems
15 that we merged together, our manufacturing and
16 our distribution center inventory systems, we
17 merged those together into a file that converts
18 to ARCOS format, and we upload it via a portal
19 on a monthly basis.
20     Q. Okay. When did it -- did the reports
21 convert from quarterly to monthly, if you
22 remember?
23     A. I don't remember exactly when.
24     Q. Is there anyone else involved in the

Page 29

1 process of compiling the data and transmitting
2 the ARCOS reports?
3     A. For which DEA license?
4     Q. Well, are you involved in the ARCOS
5 reporting for other than the Hobart distribution
6 license?
7     A. Now I am. Back at the beginning of my
8 role I was not. Now, as manager, there's
9 another person that works under me, and she does
10 the manufacturing DEA ARCOS, and I do the
11 distributor ARCOS.
12     Q. Okay.
13     A. And we're backup for each other.
14     Q. Okay. And when did that come to be
15 that you had someone working under you that you
16 just described?
17     A. In April of 2017.
18     Q. So prior to the time that you had this
19 person working under you on the manufacturing
20 license, was there anyone else involved in
21 compiling or transmitting the ARCOS reports that
22 you had responsibility for?
23     A. No.
24     Q. Was there any process in place to

Page 30

1  review the ARCOS reports that you prepared for
2  accuracy or completeness?
3      MR. O'CONNOR: Object to form.
4      A. I'm not sure I understand. It's a
5  computer download.
6  BY MR. GOTTO:
7      Q. Okay. So let's go back to when it was
8  a physical report that you were preparing and
9  sending to the DEA. There was an actual paper
10  report at some point, correct?
11      A. No, it was a file that we just put
12  onto a disk. But ARCOS requires it in a
13  specific format, and it's not human readable.
14  It's a number of fields all pressed together.
15      Q. Okay. So you would input the data
16  into that format, is that how it would be
17  prepared?
18      A. It would -- we have a computer program
19  that downloads it into that format.
20      Q. And so your personal involvement in
21  the preparation of the reports, what does it
22  consist of?
23      A. Executing those -- a series of steps
24  that allows the computer to pull down the sales

Page 31

1  data and convert it to ARCOS format, and then if
2  there's any manual transactions or errors or
3  returns, I would enter those into the computer
4  system which would download into that ARCOS
5  format.
6      Q. Okay. So, and is that a description
7  that's still current?
8      A. Yes.
9      Q. Okay.
10      A. And it's the same for both DEA
11  licenses.
12      Q. Okay. So is there any process in
13  place at Mallinckrodt, or has there been at any
14  point, to review any of the steps that you take
15  that you just described for accuracy, errors,
16  completeness, etcetera?
17      MR. O'CONNOR: Object to form.
18      A. Not that I'm aware of.
19  BY MR. GOTTO:
20      Q. Okay. Is the ARCOS reporting function
21  something that is a subject of any annual goals
22  that you set or reviews that you receive?
23      A. It was earlier in my career.
24      Q. Okay. Goals or reviews or both?

Page 32

1      A. Both, you know, that the reports were
2  filed on time.
3      Q. Okay. And other than timeliness, any
4  other aspect of the reporting that was subject
5  of any goals or reviews?
6      A. Not that I can recall.
7      Q. Do you have an understanding of the
8  purpose of the -- from the DEA's standpoint, do
9  you have an understanding of the purpose for the
10  ARCOS reports?
11      MR. O'CONNOR: Objection to form.
12      A. At a very high level.
13  BY MR. GOTTO:
14      Q. And what's that understanding?
15      A. Is that it reports all of the
16  acquisitions and distributions. My ARCOS report
17  tells DEA everything we've acquired and
18  everything we've distributed. And then if
19  there's error reports, DEA will send us -- after
20  we file the report, DEA sends us an error
21  report, and if there's errors in the ARCOS data,
22  then we fix those errors on the next quarterly
23  report, or now monthly report.
24      Q. And does that happen regularly, that

Page 33

1  there are errors?
2      A. Not regularly, but on occasion.
3      Q. And what's the nature of the errors
4  typically?
5      A. If there's a keypunch of a wrong digit
6  and a wrong character that the system has
7  downloaded, or if a DEA number has been -- was
8  missed.
9      Q. Okay. And the nature of the
10  information that you submit in the ARCOS report,
11  you indicated it's -- what you acquired and what
12  you distributed, at what level of detail is that
13  information? Is it by, for example, API, or how
14  is it categorized?
15      MR. O'CONNOR: Object to form.
16      A. For which license?
17  BY MR. GOTTO:
18      Q. The distributor license.
19      A. So it's by finished goods, SKU, so the
20  individual number of bottles, packaged unit, and
21  so the number of bottles received and number of
22  bottles shipped, if there was any returns from a
23  customer for any reason, or if there's been any
24  waste, scrap.

Page 34

1    Q.   Okay.  And the bottles received in the
2  case of the Hobart facility, from whom would
3  they be received?
4    A.   They could be received from the Hobart
5  manufacturing facility, or from an external
6  manufacturer.
7    Q.   Okay.  And so that manufacturer,
8  whether it's Mallinckrodt Hobart or another
9  manufacturer, they would be reporting on a
10  separate ARCOS report their receipt and then
11  sale of those manufactured goods, correct?
12    A.   Yes.  Correct.
13    Q.   And that's not a process you're
14  involved in in the Hobart facility, correct, or
15  at least until April, 2001 -- 2017, you were not
16  involved in that process?
17        MR. O'CONNOR:  Object to form.
18    A.   No, I misunderstand.
19  BY MR. GOTTO:
20    Q.   The process I'm referring to is
21  whatever ARCOS report related to Hobart's
22  manufacturing activities, that report is not
23  something that at least until April of 2017 you
24  had any involvement in, is that correct?

Page 35

1    A.   I was aware of it.  I would help if
2  there was a problem.  But I was not the primary
3  person responsible for reporting.
4    Q.   Okay.  Do you know who was the primary
5  person responsible for reporting?
6    A.   Prior to 2005 was Sabrina Fountain,
7  After 2005 was Carrie Johnson.
8    Q.   Okay.  And currently the person who
9  does that reporting reports to you, is that
10  correct?
11    A.   Yes.
12    Q.   And who is that?
13    A.   Carrie Johnson.
14    Q.   So since April of 2017, are you
15  involved in actually working on the preparation
16  of the manufacturing license ARCOS report for
17  the Hobart facility?
18    A.   No.
19    Q.   Do you, in your capacity supervising
20  Ms. Johnson, do you review anything -- any of
21  the work that she does relative to that ARCOS
22  reporting?
23    A.   No.
24    Q.   You indicated that prior to 2017, if

Page 36

1  there was a -- if there was an issue or problem
2  with the manufacturing license ARCOS reporting
3  at Hobart you would sometimes get involved in
4  that.  Do you recall any particular issues or
5  problems that arose from time to time?
6        MR. O'CONNOR:  Objection to form.
7    A.   Nothing particular.  If there was --
8  an error on the report came back and Carrie
9  couldn't figure out what it was, I would help
10  her.
11  BY MR. GOTTO:
12    Q.   In any of the -- you indicated early
13  on that there have been a number of
14  DEA-sponsored seminars or other training
15  sessions that you've attended.  Has ARCOS
16  reporting been a subject of any of those
17  sessions?
18    A.   Yes.
19    Q.   And what's been the substance of that,
20  that you can recall?
21    A.   It was DEA training on the transaction
22  codes and the format.  That's where they
23  introduced us to the new ARCOS portal for us to
24  be able to upload and what direction they were

Page 37

1  moving in and, you know, what transaction codes
2  to use for what specific business activity.
3    Q.   Okay.  One of the other subject
4  matters you indicated you had responsibility for
5  is losses in transit.  What did you mean by that
6  phrase?
7    A.   So if the carrier -- if there was
8  damage or a loss while the product was in
9  transportation to the customer.
10    Q.   Okay.  And is that something that's
11  the subject of a regular report, or is it
12  something that's just reported on as it occurs?
13    A.   Reported on as it occurs.
14    Q.   And how do you -- how would you become
15  aware of the circumstances that would then give
16  rise to such a report?
17    A.   We're either notified by the carrier
18  that they have a box that was damaged in
19  transit, or a customer may contact our customer
20  service department and say they received a box
21  that was damaged in transit.
22    Q.   Okay.  And so once you receive word of
23  such an event, what do you do to act on that?
24    A.   If there's just damage only, then we

Page 38

1 would notify the carrier, give them the tracking
2 information, make them aware of the damage.
3 Corporate tracks them on a scorecard. I don't
4 know the details to that.
5     And if there was contents missing,
6 then we would work with the carrier to find out
7 what happened to those contents and if they can
8 be recovered.
9     Q. And is that something you personally
10 are involved in, working with the carrier when
11 there's missing contents?
12     A. Yes.
13     Q. And so how do you go about determining
14 whether those contents can be recovered?
15     A. We will contact our security contacts
16 with the carrier, initiate an investigation,
17 they will start looking for the product in their
18 facilities and everywhere that package
19 transitioned. And it's typically the box has
20 busted open while handling on their automated
21 machinery and a case has become separated, in
22 which it goes to overgoods, and then overgoods
23 notifies me that they have Mallinckrodt product.
24 We bring it back to the distribution center and

Page 39

1 send it for destruction.
2     Q. And overgoods is what?
3     A. Overgoods is the department in which
4 our specific carrier -- any loose box that's
5 found anywhere within their system and they
6 can't determine where it was coming from or
7 where it was going to because it's not in its
8 original shipping container with the labels goes
9 to overgoods, and then they inventory it, and
10 we'll have dedicated trace agents to be able to
11 try to locate who was either the shipper or the
12 recipient of that product.
13     Q. Okay. So if the -- do losses in
14 transit ever result in a report that goes to the
15 DEA?
16     A. Yes.
17     Q. Under what circumstances?
18     A. If the material is not located in
19 overgoods we will file a DEA 106 report, notify
20 them immediately.
21     Q. Okay. And is that something that
22 you're responsible for preparing?
23     A. Yes.
24     Q. And what does the 106 report report to

Page 40

1 the DEA?
2     A. It's their loss/theft report. It
3 gives the details around the shipment and the
4 product and quantity that is unaccountable.
5     Q. And is there such a report prepared
6 any time any amount of controlled substances is
7 lost in transit and not otherwise accounted for?
8     A. I don't understand the question.
9     Q. Well, so the 106 report, let me ask it
10 a different way, is that prepared on an
11 event-by-event basis that there was a particular
12 loss in transit that where a product cannot be
13 accounted for ultimately and, therefore, that
14 gives rise to a particular 106 report that goes
15 to the DEA?
16     A. Yes.
17     Q. And would that be -- is there any
18 minimum amount of missing product that if you
19 fall below the minimum you don't have to do the
20 106 report, anything like that?
21     A. Mallinckrodt's policy is to report any
22 controlled substances not accounted for.
23     Q. Okay. Even if it was one bottle?
24     A. Yes.

Page 41

1     Q. Or one pill?
2     A. Yes.
3     Q. Can you give me a sense for the
4 frequency, and if this changed over time how it
5 changed over time, the frequency of filing 106
6 reports with the DEA that you worked on?
7     A. There's not a frequency. It's if you
8 have a loss that can't be accounted for, you
9 report it.
10     Q. Sure. I understand.
11     In a typical, say, month period, do
12 you have an estimate of how many 106 reports on
13 average you would have filed?
14     A. In what time frame?
15     Q. Well, again, if it changed over
16 time -- really the entire time that you've been
17 responsible, but if it's changed over time, you
18 know, how that's changed.
19     MR. O'CONNOR: Objection to form.
20     A. We had more frequent losses in transit
21 when we were using one particular carrier
22 service, so I don't remember exactly. I know
23 that there was more, which is the reason we
24 changed the carrier service and upgraded to an

Page 42

1 express service in which our packages got more
2 prioritized handling and pre-alerts so that each
3 station knew when a Mallinckrodt package was
4 coming through so that they could watch it and
5 make sure it was under CCTV coverage, and our
6 106s dropped dramatically. Currently I file
7 maybe, rough estimates, I don't have my records
8 in front of me, four to five a year.
9 BY MR. GOTTO:
10    Q.  So the carrier that you changed from,
11 who was the carrier that you had more loss
12 experience with?
13    A.  It was FedEx Ground service, which
14 back in that -- in the early time was formerly
15 known as RPS, Roadway Packaging Services.  And
16 they weren't handling our product appropriately
17 and we were experiencing a lot of damages, so
18 our corporate transportation team transitioned
19 to FedEx Express services.
20    Q.  Okay.  Do you recall when that --
21 about when that transition occurred?
22    A.  I don't recall exactly.
23    Q.  Was it, say, before 2012?
24    A.  Yes.

Page 43

1    Q.  Before 2010?
2    A.  It was mid 2000s.  Could have been '5,
3 '6, '7, '8.
4    Q.  So probably before 2010?
5    A.  Yes.
6    Q.  Okay.  And were the problems primarily
7 damage, or were they losses that ultimately
8 couldn't be accounted for?
9       MR. O'CONNOR:  Object to form.
10    A.  They were predominantly damages.
11 BY MR. GOTTO:
12    Q.  Okay.  And so am I understanding
13 correctly if there's damage but the product is
14 all accounted for, that doesn't result in a 106
15 report, correct?
16    A.  It depends on whether it was recovered
17 quickly, because we have to report within
18 24 hours.  So if we could report -- if we could
19 recover within FedEx within 24 hours and we knew
20 they had the product, it was in as overgoods,
21 then we would not file.  If we couldn't locate
22 the product within 24 hours, we would file.
23    Q.  Okay.  And what would happen if you
24 couldn't locate within 24 hours so you filed the

Page 44

1 106, and then you subsequently find out from
2 FedEx that they're able to locate the product,
3 do you then update the DEA on that, or --
4    A.  Yes.  We file an amended DEA 106 and
5 send the DEA a cover letter stating that the
6 material has been recovered and brought back to
7 the distribution center and destroyed.
8    Q.  Okay.  So your estimate, I realize
9 it's a rough estimate, of four to five 106
10 reports a year for the last several years, are
11 those 106 reports as to which ultimately the
12 product was never actually recovered?  Is that
13 fair?
14    A.  I don't know without looking at the
15 records.
16    Q.  Okay.  That estimate of roughly four
17 to five a year, would that go back to as far
18 back as whenever it was that you made the
19 transition away from FedEx Ground?
20    A.  I'd have to look at the records.  I
21 know what currently, they're approximately four
22 to five years -- or four to five a year.  I
23 don't recall specifically what they are prior,
24 for past years.

Page 45

1    Q.  Okay.  So, for example, let's say that
2 2010 to 2014 time frame, do you have any sense
3 of how -- of the average number of 106 reports
4 that were filed in that time frame?
5    A.  No, I don't.
6    Q.  Okay.  During the period of when you
7 were using FedEx Ground, do you have a sense for
8 approximately how many, on average, how many
9 106s on average were filed annually?
10    A.  Not an exact number.  It was
11 significantly higher than what we currently
12 have.
13    Q.  Was it twice as many?
14    A.  I don't remember exactly.
15    Q.  Okay.  I'd like to understand, and I
16 realize since 2001 we're dealing with a long
17 time period here and some of this is going to
18 necessarily be, you know, a little fuzzy perhaps
19 as to specific dates and that sort of thing, but
20 I'd like to understand how your job
21 responsibilities changed over the years, if they
22 have changed.  So if you can just -- let's start
23 with sort of a general description of how those
24 responsibilities have changed over the years.

Page 46

1    A.  So I have received promotions
2  throughout the years into different levels
3  within the compliance group.  I started out with
4  just basic clerical, the ARCOS reporting, data
5  entry of waste transactions, discrepancy
6  reporting with the carriers.  Then my
7  responsibilities increased in which I took on
8  facilitating and organizing the destruction of
9  the waste, not just doing the data entry.  Took
10  on more responsibility in terms of just
11  workload, still doing the clerical but then
12  doing -- more involved with walk-throughs
13  through the facility, learning more about CFR
14  and the regulations, attended the training
15  seminars, learned about quota, and then I was a
16  compliance analyst for a length of time, and
17  then promoted into senior controlled substance
18  compliance coordinator, facilitated DEA audits,
19  was the DEA contact, was on the CSOS working
20  team when DEA was instituting CSOS to our
21  electronic 222 forms, and then was promoted into
22  the role of manager in April of 2017.
23    Q.  Great.  Thank you.  Let's go through
24  some of those items.

Page 47

1       I think we've -- the ARCOS reporting
2  responsibility, I think you've already
3  described, is a continuing one that you still
4  have for the distribution license at Hobart,
5  correct?
6    A.  Yes.
7    Q.  Apart from the testimony you've
8  already given us this morning, is there any
9  other aspect of ARCOS reporting that's been your
10  responsibility?
11    A.  Currently?
12    Q.  Or at any time.
13    A.  Well, currently the manufacturing is
14  done by a person who reports to me, so I oversee
15  that.  But nothing else in regards to ARCOS.
16    Q.  Okay.  And waste data entry, which
17  you'd indicated was an early on responsibility,
18  is that something you still have responsibility
19  for?
20    A.  My team, but not myself.
21    Q.  And what does that waste data entry
22  consist of?
23    A.  So we track every single tablet,
24  powder, capsule of waste that's a controlled

Page 48

1  substance, and those get -- they're documented,
2  weighed, documented on our destruction reports.
3  We enter -- our team enters that into our
4  computer system, which then currently sends all
5  of the waste to a waste distributor for
6  destruction by incineration.
7    Q.  And you indicated your team still
8  does -- is still responsible for that.  Who on
9  your team currently has that responsibility?
10    A.  Carrie Johnson has the data entry
11  portion.
12    Q.  Okay.  Next item you indicated was
13  discrepancy reporting.  What's that?
14    A.  So that's what we were talking about
15  earlier with the carriers -- excuse me, with the
16  carriers that if there's any discrepancies in
17  what we ship versus what the customer ordered,
18  or if the customer ordered a wrong product or we
19  shipped a wrong product in error, any difference
20  than what was intended to be ordered.
21    Q.  Okay.  And so some of those
22  discrepancies are the result of damage in
23  transit, the sort of thing you discussed --
24  described a little earlier today.  It sounds

Page 49

1  like sometimes there's a misfilling of an order,
2  though.  What happens in those situations?
3       MR. O'CONNOR:  Objection to form.
4    A.  Because of our cycle count program in
5  the processes in the distribution center, we
6  have not had in the last ten years a shipping
7  error where we meant to ship sugar-free and we
8  shipped cherry or something, because of the bar
9  coding system.
10       Prior to that there could have been an
11  instance where the wrong product was shipped,
12  and then the customer would say, hey, we've
13  received the wrong product, we'd make
14  arrangements to issue them a 222 form, we would
15  document what happened, that it was our mistake,
16  how we fix it, and then would make sure that the
17  customer had all of the documentation they
18  needed to document what happened, that they
19  received the wrong item, it was returned back to
20  Mallinckrodt, we received the incorrect item, we
21  sent it for destruction.
22  BY MR. GOTTO:
23    Q.  Okay.  And you also indicated
24  sometimes the customer may have ordered the

Page 50

1  wrong item.
2      A.  Frequently we have situations where a
3  customer will enter the wrong item in their
4  order entry screen.  They want buprenorphine
5  8.2-milligram and they ordered buprenorphine
6  2.5-milligram and they get it and it's the wrong
7  product and they have to send it back to us.
8  And that's frequent we have customer ordering
9  errors.
10     Q.  Okay.  And in that situation, is there
11 any sort of report that gets generated when that
12 happens, or --
13     A.  The --
14     Q.  -- how is it handled?
15     A.  I apologize.
16     The discrepancy report would document
17 what transpired, and then we would document
18 appropriately what actions we took to rectify.
19     Q.  Okay.  And that discrepancy reporting,
20 is that something that you're personally
21 involved in?
22     A.  Yes.
23     Q.  Another item you mentioned was
24 destruction of waste.  Is that the process you

Page 51

1  have described a few moments ago where you
2  shipped the waste to a reverse distributor for
3  destruction?
4      A.  Yes.
5      Q.  And is that -- shipment of that waste,
6  is that documented with the DEA somehow?
7      A.  It's -- if they're C1 and 2s, they are
8  documented by a 222 form; 3, 4s and 5s, a
9  transfer of controlled substance form, and it is
10 ARCOS reported as well.
11     Q.  Okay.  So the -- either the 222 form
12 or the transfer form that you mentioned, are
13 those things that you have responsibility for?
14     A.  Yes.
15     Q.  Is there a regular process for the
16 destruction of waste, or is it handled on an
17 as-needed basis?
18     A.  Monthly we schedule a pickup by the
19 reverse distributor to take care of all of the
20 waste generated from the previous month because
21 it has to be stored in cages and vaults, so if
22 we don't have it removed monthly, we tend to run
23 into space problems.
24     Q.  Okay.  Another thing you mentioned

Page 52

1  were walk-throughs.  What did you mean by that?
2      A.  So we go up on the manufacturing floor
3  and just walk through the facility daily to make
4  sure that materials are being stored in
5  compliance with the regulations, there's nothing
6  being left out, there's no residual powders
7  anywhere they shouldn't be, everything is
8  sealed.  Just being there for questions for the
9  floor, if somebody has a question, how do they
10 handle something.
11     Q.  Okay.  And so when you say we do that
12 daily, who is "we" in that setting?
13     A.  I do it daily.  When I'm not there, a
14 member of my team will do it.
15     Q.  So describe for me, if you would, the
16 Hobart facility, just the physical setup
17 relative to your office.  For example, since you
18 walk through it daily, about how large is the
19 facility?
20     A.  I'm not -- I don't know square footage
21 or any of that kind of thing.  It's a big
22 facility, but I don't know the square footage.
23     Q.  Is it multi-story?
24     A.  Yes, there are multiple floors.

Page 53

1      Q.  Okay.  So the walk-through that you do
2  every day, how long does it take you?
3      A.  45 minutes to an hour.
4      Q.  Okay.  Are there particular things you
5  look for when you're doing the walk-through?
6      A.  Just to make sure everything is stored
7  appropriately and within compliance.
8      Q.  And one of the -- actually right after
9  the walk-throughs you indicated learning more
10 about the CFRs and regulations, and part of your
11 walk-through, I take it, is to satisfy yourself
12 that the facility is in compliance with
13 applicable regulations, correct?
14     A.  To ensure we're always in compliance,
15 yes.
16     Q.  And so describe for me the process
17 you've gone through over the years to learn
18 about and stay current on the applicable
19 regulations.
20     A.  So I've read CFR a number of times.  I
21 refer to it often if there's questions.  If we
22 were unsure of an interpretation of CFR, we may
23 have reached out for DEA to their field office
24 for interpretation or asked them while they were

Page 54

1 on-site for an audit, so I've learned from DEA
2 what their expectations are, what they want. I
3 attended the DEA training seminars that are
4 sponsored by DEA in which they go over their
5 expectations or break down CFR into more detail.
6     We do practice exercises on quota at
7 those training seminars, they talk about imports
8 and exports, how to fill out the forms, and how
9 to do the calculations in the way that they want
10 them so that they can process them more
11 efficiently.
12   Q. Okay. Is that a -- do you still go to
13 the seminars that DEA sponsors?
14   A. When they have them. They haven't
15 been having them as more -- as frequently as
16 they did. They used to have them every other
17 year, and it's been a couple of years since
18 they've had them.
19   Q. Okay. So during the time since 2001
20 when you became involved in compliance, about
21 how many DEA-sponsored trainings have you been
22 to?
23   A. More than a dozen.
24   Q. And are these multi-day programs?

Page 55

1   A. Usually they're two days.
2   Q. And you also indicated you attended
3 the Buzzeo training, correct?
4   A. Yes.
5   Q. How often have you done that?
6   A. Just about every year.
7   Q. Up to the current?
8   A. Yes.
9   Q. What's the subject matter that's
10 typically covered at the Buzzeo conferences?
11   A. They usually have a DEA speaker that's
12 talking about NPRMs and what's on their agenda
13 and what they're working on. They'll have
14 subject matter experts on state licensing, and
15 different laws that individual states are
16 enacting in regards to controlled substances.
17 They'll have roundtable discussions on industry
18 topics. It's usually a two-and-a-half-day
19 conference.
20   Q. Okay. Are there particular, for
21 example the roundtable discussions, particular
22 ones that you make a point of participating in
23 at these conferences?
24   A. Yes.

Page 56

1   Q. Which are those?
2   A. Suspicious order monitoring, state
3 licensing, exports. DEA has an initiative with
4 streamlining the Customs documentation through a
5 database with exports.
6   Q. So let me be sure -- I just want to be
7 sure I've covered all the various sort of formal
8 DEA-related training conferences and seminars
9 that you've gone to.
10     You indicated about a dozen or so of
11 the DEA-sponsored programs, although there
12 hasn't been one in the last at least couple of
13 years, correct?
14   A. Correct.
15   Q. And the Buzzeo, those are one a year?
16   A. Annual, yeah.
17   Q. Okay. Are there other training
18 programs of that type that you've attended?
19   A. NADDI, but not -- NADDI, they have DEA
20 speakers sometimes, but it's more about what's
21 going on in the industry.
22   Q. And do you attend the NADDI
23 conferences regularly?
24   A. I have occasionally.

Page 57

1   Q. About how many times?
2   A. Half dozen roughly.
3   Q. How recently can you recall going to
4 one?
5   A. Last year. I went to a NADDI
6 conference last year.
7   Q. Are they annual?
8   A. They are.
9   Q. Okay. Apart from NADDI, Buzzeo, and
10 the DEA-sponsored, any other ones you can think
11 of?
12   A. Years ago I attended the
13 Pharmaceutical Security Coalition, PSC, many
14 years ago, and it was only once. It was more
15 geared towards physical security.
16   Q. In one of your answers a moment ago
17 you made reference to NPRM?
18   A. Notice of proposed rulemaking.
19   Q. Okay. Thank you.
20     Do you recall any particular proposed
21 rules that were covered in any of the
22 conferences you attended?
23   A. Recently there is one for paper.
24 They're trying to eliminate the carbon 222

Page 58

1 forms, so there's been a Notice of Proposed
2 Rulemaking for one-page 222 forms. And there
3 was a recent one, but off the top of my head
4 it's escaping me.
5    Q. Okay.
6    A. Quota, there's a recent NPRM regarding
7 quota.
8    Q. You've mentioned quota a couple of
9 times. What's been your responsibility over the
10 years with respect to quota?
11    A. Initially I had very little to do with
12 quota. In more recent years I've been involved
13 with compiling and reviewing the quota letters
14 for increases throughout the year. The initial
15 quota requests are prepared by my team, and I
16 review.
17    Q. When you say "quota," what do you --
18 just so the record is clear what we're talking
19 about here, what do you mean by quota?
20    A. Quota is the DEA allocation system
21 to -- for the manufacturing of controlled
22 substances.
23    Q. And would your involvement be with
24 respect to the manufacturing activities at the

Page 59

1 Hobart facility?
2    A. Yes, quota only applies to the
3 manufacturing license. It doesn't apply to the
4 distributor license.
5    Q. And is it specific to facility by
6 facility?
7    A. Yes.
8    Q. Okay. And so to the extent there's a
9 quota for Mallinckrodt St. Louis facility,
10 that's not something you have involvement with,
11 is that correct?
12    A. Correct.
13    Q. Okay. Do you know who has the
14 corresponding role, the role that corresponds to
15 your role at Hobart with respect to the
16 St. Louis quota for manufacturing?
17    A. That would be my counterpart, Dave
18 Hunter.
19    Q. Okay. And the quota that -- focusing
20 on the Hobart-related quota that you do have
21 responsibility for, when did you first have
22 responsibility for quota?
23    A. So it was predominantly overseen by
24 Karen Harper, it was compiled by Carrie Johnson,

Page 60

1 I would assist and review for a second set of
2 eyes, and then Karen Harper ultimately approved
3 the letter for submission. Carrie at that time
4 prior to 2017 reported directly to Karen Harper.
5    Q. Okay. And so the actual submission,
6 has that always been Ms. Harper's
7 responsibility?
8    A. To review -- I need clarification of
9 actual submission, entering into the database
10 or --
11    Q. Yeah. Well, let me back up.
12       You said -- you made reference to your
13 involvement being a second set of eyes. Was
14 there any time when you had more involvement
15 than simply being a second set of eyes?
16    A. Currently I do.
17    Q. Okay. And so when did you take on
18 that additional responsibility?
19    A. When Carrie Johnson started reporting
20 to me.
21    Q. In 2017?
22    A. Yes.
23    Q. Okay. So prior to 2017 when
24 Ms. Johnson started to report to you, in the

Page 61

1 second set of eyes role that you mentioned, what
2 did your activities consist of with respect to
3 quota?
4    A. Remote -- reviewing it for grammatical
5 content in terms of if I had heard through my
6 role maybe we had taken on a new contract or
7 been awarded business and Carrie hadn't included
8 that in a request, I would remind her about that
9 or let her know about that so it could be
10 inclusive in the request advising DEA of all the
11 information that we had available to us.
12    Q. Okay. And you indicated that
13 initially you had very little responsibility
14 for -- with quota, and that changed over time.
15 Did you have more responsibility when you began
16 reporting to Ms. Harper?
17       MR. O'CONNOR: Objection to form.
18    A. I don't understand the question.
19 BY MR. GOTTO:
20    Q. I'm just trying to understand when you
21 started to have this additional responsibility,
22 the second eyes review of the quota
23 applications.
24    A. So that would have been -- I got more

Page 62

1 involved in roughly '14, '15, 2014, 2015.
2 Carrie and I both reported to Karen. Carrie had
3 her set of responsibilities. I had my set of
4 responsibilities. But in roughly '14 or '15, I
5 was cross-training more and taking on more
6 responsibilities to advance to manager, so in
7 that learning I needed to learn more about
8 quota, so then I started getting more involved
9 in quota.
10     Q. Okay. So what did you do to learn
11 more about quota?
12     A. More thorough on the letters,
13 understanding them, learned more about the
14 market and the dynamics that go on in the supply
15 chain, and the quota section training on the --
16 from the DEA seminars.
17     Q. And so the DEA seminars on quota
18 training, what are the topics they cover in that
19 context?
20     A. Research versus manufacturing, where
21 does the quota belong, when do you start needing
22 quota. Karen mentored me because she had a lot
23 of experience with quota.
24     Q. So when you say "research versus

Page 63

1 manufacturing," what did you mean by that?
2     A. So there's researcher license and
3 there's manufacturing licenses, and quota is not
4 required on a research license but it is
5 required on a manufacturing license, so what
6 project development work can be executed under a
7 research license not requiring quota, and what
8 project development work needs to be executed on
9 a manufacturing license that does require quota.
10     Q. Okay. And is that also what you meant
11 when you said when you start needing quota, is
12 that this research versus manufacturing
13 distinction?
14     A. No, when we start needing quota is
15 when the current quota is not sufficient for our
16 demand plan and we need to ask for more quota,
17 reviewing the market demand, the -- what's
18 needed, and how much we have will last us.
19     Q. Describe for me generally how the
20 quota process works from your perspective. The
21 DEA provides a quota allocation for the Hobart
22 manufacturing facility from time to time,
23 correct?
24     A. Yes. We have an initial grant, and

Page 64

1 then if that initial grant is not enough to
2 support, get you through the full calendar year,
3 you can ask for more quota throughout the year.
4     Q. Okay. And so that initial grant is
5 granted with respect to an upcoming calendar
6 year?
7     A. Yes, it's applied for on April 12th of
8 the preceding year, so we take -- for example,
9 this April 1st coming up we will take our supply
10 plan for 2020 of what's needed in the market and
11 convert that into API, so how much API we need,
12 and then that will be applied for with DEA by
13 April 1st for 2020.
14     Q. Okay. And then the DEA acts on that
15 application at some point prior to the upcoming
16 January 1, provides the quota allocation for the
17 upcoming calendar year, correct?
18     A. Yes.
19     Q. And so the quota allocation -- when
20 you say API, I mean, that's active
21 pharmaceutical ingredient, correct?
22     A. Yes.
23     Q. And so is the quota for -- that the
24 DEA grants for the upcoming year, is that on an

Page 65

1 API by API basis?
2     A. Yes.
3     Q. And is it --
4     A. By molecule.
5     Q. By molecule.
6         Okay. So it isn't with respect to a
7 particular dosage, for example, is that right?
8     A. I don't understand what you mean.
9     Q. So, for example, would you have a
10 certain allocation of oxycodone for the calendar
11 year as compared to an allocation of
12 20-milligram tablets, 30-milligram tablets,
13 etcetera?
14     A. Yes, your application is submitted by
15 dosage form.
16     Q. Okay. So for each API, the API is
17 then broken down to -- in different dosages?
18     A. Yes.
19     Q. And that's how, ultimately the DEA
20 when they grant the quota, that's how it's
21 granted?
22     A. I don't know what formula DEA uses to
23 grant it. We fill our application, and we tell
24 DEA what we want and what we're going to make

Page 66

1 with it. Very, very seldom do we get a
2 100 percent grant.
3    Q. Okay. But whatever grant you get, it
4 is expressed in terms of by API by dosage?
5    A. When we are given the grant we are
6 given just the total API, so we apply for it
7 specifying the dosage, but when the grant comes
8 there's no dosage specified, and if they haven't
9 given us 100 percent we don't know what they're
10 expecting us to make with it.
11    Q. Okay. So let's just use oxycodone for
12 an example, that's an API, correct, oxycodone?
13    A. Yes.
14    Q. Okay. And so when you submit the
15 application, you would have that broken down in
16 various dosages?
17    A. Yes.
18    Q. And a certain number of tablets in
19 each dosage, correct?
20    A. Yes.
21    Q. And you could add up how many
22 molecules are in all those tablets and then come
23 up with a gross amount of oxycodone API that's
24 covered by your application, correct?

Page 67

1    A. That's what the application amount was
2 for, what all those dosage units compile total.
3    Q. Okay. But then when the DEA actually
4 grants the quota, it's simply an amount of that
5 API?
6    A. Yes.
7    Q. Okay. And so -- and that grant, as
8 you indicated, may -- or frequently is less than
9 the gross amount that was applied for, correct?
10    A. Correct.
11    Q. And so when that happens, do you have
12 an understanding once you have that quota grant
13 and, let's say, it's less than the gross amount
14 that was applied for, what that -- what the
15 Hobart facility is permitted to then manufacture
16 in terms of different dosages under that quota
17 grant?
18    A. So the business will decide based on
19 the demand plan and the market demand what we'll
20 make with the quota that we've been granted.
21    Q. Okay. And so is there any need to go
22 back to the DEA for any further update on the
23 quota or clarification once you make the
24 determination of what to manufacture in light of

Page 68

1 the quota that was granted?
2    A. No.
3    MR. GOTTO: Okay. Why don't we take a
4 short break. We've been going for over an hour.
5    THE VIDEOGRAPHER: The time is
6 10:13 a.m., and we're off the record.
7    (Whereupon, a recess was taken.)
8    THE VIDEOGRAPHER: The time is
9 10:31 a.m., and we're on the record.
10 BY MR. GOTTO:
11    Q. Ms. Spaulding, before we broke we
12 were -- you were testifying about the quota
13 process and some aspects of it. And if I
14 understand correctly, from time to time there
15 can be applications for an update to the quota
16 during the calendar year, is that correct?
17    A. An increase, yes, we can request an
18 increase at any time.
19    Q. And is that a process that you're
20 involved in?
21    A. What time frame?
22    Q. Well, have you been involved in it at
23 any time frame since you've been at
24 Mallinckrodt?

Page 69

1    A. Yes.
2    Q. Okay. And what's been your
3 involvement in that process?
4    A. As we discussed earlier, began as a
5 second set of eyes, then took on additional
6 responsibilities, and now currently I oversee
7 the person who compiles them, and I review them
8 before submission.
9    Q. Okay. In your experience, is it --
10 what's the frequency with which there are --
11 Mallinckrodt with respect to the Hobart facility
12 has made application for increase in quota?
13    A. Depends on the molecule. Some
14 molecules we get enough for our demand, and some
15 molecules we have to ask. Depends on the market
16 and disruptions. If another manufacturer is out
17 of supply, the distributors could be attempting
18 to get for us, so we're going to consume our
19 quota faster than anticipated. There's many
20 different factors.
21    Q. Okay. Is it -- has it ever been your
22 experience since you've been at Mallinckrodt
23 that with respect to -- well, strike that.
24    When you have worked on an application

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  for a quota increase, what are the steps that go
2  into that process?
3      A.  We first take a look at what we've
4  sold versus what we need to make for the rest of
5  the year.  We subtract out what we've been
6  granted, and DEA has a formula that involves
7  what you have on your end inventory, what you
8  were granted, minus what you've sold in your
9  forecast, and we will run those formulas to see
10 if we have justification to have an increase for
11 that calendar year.  If a justification, meaning
12 this formula, shows that we have a shortfall and
13 that based on our sales we are entitled to more
14 quota, then we will submit a request.
15     Q.  Okay.  And I think you testified
16 before the break that it is sometimes the case
17 that the quota that's granted for a calendar
18 year is less than what was applied for, correct?
19     A.  Yes, and many times it's less.
20     Q.  Okay.  And so if the quota -- let's
21 say the quota was granted for less than what was
22 applied for, and sales of that particular API
23 are consistent with what the forecast had been,
24 so as the year is unfolding, consistent with

Page 71

1  what your application originally showed, you'd
2  be running short, correct, if the quota was less
3  than what you applied for, correct?
4      A.  Correct.
5      Q.  And so in that situation, would you
6  apply for increased quota?
7      A.  Yes.
8      Q.  Okay.  So it could sometimes be the
9  case that the application for increased quota
10 could show sales consistent with what had
11 previously been forecast, but the shortage
12 arising from the fact that the quota that was
13 granted was less than had been applied for?
14     A.  Yes.
15         MR. O'CONNOR:  Object to form.
16 BY MR. GOTTO:
17     Q.  And then sometimes it may be the case
18 that sales were actually greater than what had
19 been forecast for one reason or another, and a
20 shortage from the quota results, correct?
21     A.  Yes.
22     Q.  Okay.  In your experience, what's the
23 time frame approximately for the DEA to act on a
24 request for increased quota?

Page 72

1      A.  Currently?
2      Q.  Sure, start with currently.
3      A.  It's in the neighborhood of six to
4  eight weeks.
5      Q.  Okay.  Has that changed over the
6  years?
7      A.  Yes.  Several years ago it was in
8  excess of 12 to 16 weeks, which is very
9  difficult on the manufacturers because of lead
10 times when we have to wait so long to get a
11 quota grant, or to even know if we're going to
12 get quota, to be able to plan our pipeline and
13 our manufacturing, so when there was greater
14 review within DEA and it could take four to six
15 -- 14 to 16 weeks.  Currently we're experiencing
16 about six to eight weeks.
17     Q.  And approximately what was the time
18 frame when the longer time period applied?
19     A.  I don't remember the years, but it was
20 when Joe Rannazzisi was head of DEA and was
21 reviewing and signing all quota requests.
22     Q.  Okay.  So it was your understanding
23 there was a period of time when the actual head
24 of the DEA personally reviewed and signed off on

Page 73

1  each quota request?
2      A.  Yes.
3      Q.  And do you know currently what the --
4  who at the DEA reviews and signs off on quota
5  requests?
6      A.  No, I don't.
7         MR. GOTTO:  Can we go off the record
8  one second?
9         THE VIDEOGRAPHER:  The time is
10 10:37 a.m., and we're off the record.
11         (Pause.)
12         THE VIDEOGRAPHER:  The time is
13 10:38 a.m., and we're on the record.
14 BY MR. GOTTO:
15     Q.  So, Ms. Spaulding, when -- currently
16 when there's a request for a quota increase, is
17 that typically made as to one specific API?
18     A.  Each quota request is by molecule.
19     Q.  Okay.  And is there, in your
20 experience, is there a process of any sort of
21 interaction with the DEA when the quota request
22 is made?  Is there back and forth with the DEA,
23 or do you simply wait for them to act on it and
24 see what they do?

Page 74

1    MR. O'CONNOR: Object to form.
2    A.  Sometimes, sometimes, most commonly we
3  just have to wait until we receive a letter.
4  But if DEA wants additional information, like
5  who we're selling to or detailed sales
6  information, they'll e-mail us and ask for
7  whatever additional information they want for
8  use in reviewing our request.
9  BY MR. GOTTO:
10    Q.  Okay.  And is it your experience that
11  generally do they ask for more information, or
12  is that kind of an exceptional circumstance when
13  they do that?
14    A.  It's an exception to the rule.
15    Q.  With respect to the Hobart
16  manufacturing quota, who is it at Mallinckrodt
17  that's had primary responsibility for submitting
18  the applications and any applications for
19  increased quota?
20    A.  Primary responsibility is Carrie
21  Johnson.  She makes the application in the
22  database, and drafts the letters of which myself
23  and Karen review prior to submitting.
24    Q.  Okay.  And who is it at Mallinckrodt

Page 75

1  that has the authority to determine the amount
2  of quota that will be requested from time to
3  time?
4    A.  I'm not sure I understand.  Who is
5  signing the letters?
6    Q.  Well, that would be -- one question
7  would be who signs the letters, sure.
8    A.  Carrie Johnson is the applicator,
9  because we have log-ins with DEA, so as she's
10  the person filling in the data using her log-in
11  to DEA's database, she is the person that signs
12  the letters.
13    Q.  Okay.  Does she have the authority to
14  make the decision as to the amount of quota that
15  will be requested of the DEA either in an annual
16  request or request for increase?
17    A.  No, they're all reviewed, and either
18  Karen or myself would approve them.
19    Q.  Okay.  Do you have an authority to
20  approved without Ms. Harper's authorization?
21    A.  For routine requests such as the
22  initial, which there's no extraordinary
23  circumstances, yes.  If there's anything
24  unusual, extraordinary, any outlying factors,

Page 76

1  then Karen would be -- would review and approve.
2    Q.  Okay.  So the initial, when you say
3  "the initial," you mean the calendar year
4  requests that you described was due April 1st of
5  each year?
6    A.  Yes.
7    Q.  And so what's the process that you go
8  through to compile that annual request?
9    A.  So my team will generate all of the
10  forecast data for the next year, because that's
11  all we have at that time for a future year's
12  forecast, and number of bottles to be sold, and
13  then convert that back to amount of API, and
14  account for processing waste, samples, and then
15  determine a number to meet the demand plan.
16    Q.  Okay.  And when you say your team, who
17  is participating in that process?
18    A.  Carrie is the primary person.
19    Q.  And the time period during which
20  you've had that responsibility for the annual
21  quota request, what's that time period?
22    A.  When Carrie started reporting to me in
23  April of 2017.
24    Q.  Okay.  Prior to that time, who was

Page 77

1  performing the corresponding duties with respect
2  to the annual requests?
3    A.  Karen.
4    Q.  And did you assist in that other than
5  the second pair of eyes role that you described?
6    A.  I was copied on e-mails and was
7  informed, but I didn't approve.
8    Q.  Okay.  The sales -- I'm sorry.  The
9  forecast data that supports the quota request,
10  how is that compiled?
11    A.  It's provided to us by our corporate
12  planning team.
13    Q.  Okay.  And I think you've already
14  testified that it's often the case that the
15  quota that's actually granted by the DEA is less
16  than what's applied for, is that fair?
17    A.  Yes.
18    Q.  So would there -- would it be possible
19  to factor that in when you make the application,
20  right, apply for more than you think you might
21  need on the expectation that the DEA is going to
22  grant less than you asked for?
23    MR. O'CONNOR:  Objection to form.
24    A.  It's an estimate.  It's not hard

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 numbers of what we're going to produce because
2 it's a projection.
3 BY MR. GOTTO:
4     Q.  So is there any negative consequence
5 of if you were to apply for -- if you were to
6 receive quota that exceeded what you ultimately
7 turn out to need during that year, is there any
8 negative consequences to that?
9         MR. O'CONNOR:  Objection to form.
10    A.  I don't think I understand what you're
11 asking.
12 BY MR. GOTTO:
13    Q.  Okay.  Well, you make your quota
14 application for the year, and if you receive
15 quota that's less than what you actually need,
16 obviously there's a potential negative
17 consequence there that you can't fill the orders
18 that you get?
19    A.  Right.
20    Q.  And you have to update that and try to
21 get an increase during the year, right?  That's
22 one scenario.  Sounds like that's not an
23 uncommon scenario, right?
24    A.  It's not.  If we have excess quota at

Page 79

1 the end of the year, we review as part of our
2 annual process in September and October if we
3 are going to have excess quota, and we'll
4 relinquish to DEA and let them know that the
5 market has changed, or we had a project we
6 didn't need the quota for, or any number of
7 things that we're going to have excess quota.
8         Now, quota factors in a year-end
9 inventory because of timelines.  If you don't
10 get your next calendar year quota on January 1,
11 you're going to be out of supply for two months
12 if you have a product that takes eight weeks to
13 make, so they allow you to have a year-ending
14 inventory so that you have API to start
15 producing to allow for continuous supply.  So
16 we'll find out how much we need for a
17 year-ending inventory and what we need to meet
18 our plan, and if we have excess we'll relinquish
19 it to DEA.
20    Q.  And does that happen frequently that
21 you have excess quota as you're approaching the
22 year end?
23         MR. O'CONNOR:  Objection to form.
24    A.  It happens occasionally.  I wouldn't

Page 80

1 say frequently.  Depends on the molecule.
2 BY MR. GOTTO:
3     Q.  And apart from this year-end
4 straddling you described where they allow you to
5 have a certain amount to keep your production
6 straddling the year-end, is there any carryover
7 from year to year of unused quota from one year
8 to the next?
9     A.  No, absolutely not.  It has to be
10 consumed by 12/31.  The API has to be at your
11 facility.  If it's not at your facility on
12 12/31, it's use it or lose it.
13    Q.  Going back to your -- earlier today
14 you gave me a description of how your
15 responsibilities evolved over the years, and
16 we've been talking about the quota component of
17 that.  You indicated that at some point you
18 became a compliance analyst, correct?
19    A.  Yes, but it was a title.  It wasn't --
20 I wasn't really an analyst.  That was under the
21 Tyco days, and they only had certain job
22 descriptions, so I was the only one in the
23 company who did what I did.  They didn't really
24 have a job title for controlled substances

Page 81

1 compliance associate or coordinator, so I was
2 assigned a job title of analyst because that's
3 where I fit within their career band.
4     Q.  Okay.  So that was pre-'07, then, if
5 that was during the Tyco time?
6     A.  Yeah, roughly.  I don't remember
7 exactly, but...
8     Q.  And then after Mallinckrodt spun off
9 from Tyco, what -- did you keep the compliance
10 analyst title at that point?
11    A.  Under Covidien I believe I was.
12    Q.  And I've seen some documents where I
13 think you signed as a compliance investigator.
14 Did you have that title at some point?
15    A.  That was the initial role in 2001.  I
16 was hired as a compliance investigator.  Again,
17 it was a title.  I would investigate losses in
18 transit, but I had many responsibilities.
19    Q.  Okay.  And then you indicated at some
20 point you became the senior controlled substance
21 compliance coordinator?
22    A.  Yes.
23    Q.  When was that?
24    A.  I don't remember exactly when.

Page 82

1    Q.   Do you have an approximate?
2    A.   Before I was manager.
3    Q.   Okay.
4    A.   Sorry, I don't.
5    Q.   And when did you become manager?
6    A.   That, I remember, was April of 2017.
7    Q.   Okay.  But in terms of title, it was
8  compliance analyst and then compliance
9  coordinator and then ultimately manager, is that
10 fair?
11   A.   Yes.
12   Q.   Okay.  Now, you indicated one of the
13 things you had responsibility for are DEA
14 audits?
15   A.   Yes.
16   Q.   Tell me what the DEA audit process is
17 that you had responsibility with respect to.
18   A.   So when DEA came on-site to conduct an
19 inspection, there's point of contacts that
20 interact with the DEA, so there was -- it was
21 typically myself and the security manager at the
22 time were the two main points of contact with
23 the DEA that facilitated the audit, so we would
24 be in the front room with the DEA as they were

Page 83

1  doing their inspection, and they'd ask us for
2  records, and we would go to our teams and get
3  the records and bring them back.  So we were
4  considered the audit leads.
5    Q.   Okay.  And who were the persons who
6  were in the role of security manager from time
7  to time?
8    A.   Rich Nikolaus prior to 2015, I
9  believe, and currently Edward Egan.
10   Q.   Any other roles with respect to the
11 DEA audits apart from this process you described
12 of retrieving records that were requested by
13 DEA?
14   A.   So I answered all of their questions
15 in regards to our processes in the plant, how we
16 handle -- facilitated the reconciliation,
17 provided them with reports.  Anytime that DEA
18 came on-site, I was the point of contact.
19 Whether it was for an inspection or to approve a
20 cage or a vault or to do any type of anything on
21 the site, I was the point of contact.
22   Q.   Okay.  Does this go back to 2001 that
23 you were the point of contact for DEA visits?
24   A.   2001 I was what we call the back room,

Page 84

1  so I was the person pulling the records.
2  Elizabeth McPhail would have been the front room
3  person.  And then after I started reporting to
4  the materials manager, I became the front room
5  person because Elizabeth McPhail was pulled out
6  of the DEA role and I became the lead.
7    Q.   Was there a reason for that change?
8    A.   Not that I can remember specifically.
9    Q.   Do you remember approximate time frame
10 when that occurred?
11   A.   Not exactly, no.
12   Q.   So in terms of responding to questions
13 that the DEA would pose during these audits,
14 what sorts of questions can you recall the DEA
15 posing to you?
16   A.   Pretty standard audit questions, who
17 do you use for your carrier, what is your
18 business hours of operation, how many employees
19 do you have, your power of attorneys, who can
20 sign 222 forms.  They have a binder of 66
21 questions that are all specific to that license
22 that they're auditing.
23   Q.   Okay.  And were they typically things
24 that you would be able to answer off the top of

Page 85

1  your head, or normally are they things that you
2  needed to go back and research?
3    A.   Most of the time I could answer them.
4  I knew the processes, the plant inside and out
5  and could answer most of their questions.  If I
6  couldn't, I didn't guess or speculate.  I'd tell
7  them I'd get the answer and get back to them.
8    Q.   And the DEA audit, is it a regularly
9  scheduled event with a regular frequency, or was
10 it just whenever they happen to tell you they're
11 going to do it?
12   A.   They're typical actually unannounced,
13 so it's whenever DEA shows up at our door.  We
14 need to be ever constantly ready for the DEA
15 audit at any time, which we are.
16   Q.   Is it ordinarily done -- even though
17 it may be unannounced, is it approximately an
18 annual event, or is it done more frequently than
19 that?
20   A.   The past audits have no rhyme or
21 reason to any type of frequency.
22   Q.   Does the DEA after their audit provide
23 you with any sort of report or their feedback as
24 to the results of the audit?

Page 86

1    A.  There's never a DEA report.  If they
2  have concerns, they will discuss them with you
3  at the time of the audit.  They may direct us --
4  they may ask us a process, and I explain it, and
5  they go, yeah, we're not comfortable with that,
6  we want you to do it this way.  And so we always
7  do whatever DEA directs us because they have
8  jurisdiction over us.
9    Q.  Can you recall specific examples of
10  any sort of negative feedback you got from the
11  DEA as to a process or other matter that came up
12  in the course of their audit?
13    MR. O'CONNOR:  Objection to form.
14    A.  A negative, I'd say no.  They, you
15  know, may, well, we don't really like that, or
16  we think you should do it this way, or it will
17  make it -- you know, if you give us a report in
18  this format it makes it easier for us to
19  reconcile.
20    Negative, I don't -- I don't know what
21  would be considered negative.  Any feedback they
22  gave us was always constructive.
23    Q.  Sure.  Maybe negative is a bad word.
24    For example, you said they might from

Page 87

1  time to time say, well, we don't really like
2  that, do it this way.  Can you think of specific
3  examples where that sort of comment came back to
4  you?
5    A.  We would stage material in our
6  manufacturing hallway if it was getting ready to
7  go into production within a day, and they said,
8  well, we don't really like that, we'll let you
9  stage it for up to a shift, so then we
10  immediately changed all our processes that said
11  we couldn't stage material for any longer than a
12  shift.
13    Q.  Anything else of that nature you can
14  recall?
15    A.  We wanted to store material from our
16  manufacturing license in our distributor vault,
17  and they said, no, they wanted us to write for a
18  waiver.  We couldn't -- it was -- it's in the
19  regulations that we could do it, but they asked
20  us to get a waiver on file, so we wrote for a
21  waiver on file.
22    Q.  You mentioned one of the topics that
23  you have attended trainings on is state
24  licensing?

Page 88

1    A.  Yes.
2    Q.  So in what aspects of state licensing
3  did you have responsibility for from time to
4  time at Mallinckrodt?
5    A.  I don't have any responsibility for
6  state licensing.  I'm aware of it.  I'd go to
7  the trainings so that we're aware of any states
8  that require us to report losses, or some states
9  have additional reporting requirements, so we
10  would attend the training to make sure we're
11  aware of any individual state requirements --
12    Q.  Okay.
13    A.  -- that may impact the site.
14    Q.  When you say "we," who else from
15  Mallinckrodt attends those types of trainings?
16    A.  It depends.  So Karen Harper, my
17  manager/director will attend, and Dave Hunter
18  and myself will swap out.  So we all can't leave
19  all at the same time, there's got to be somebody
20  at home, so we alternate and we'll take turns at
21  conferences.  That's why, for example, when I
22  said the IQVIA conferences, you know, a half
23  dozen because we alternate years of who attends.
24    Q.  And how about, you indicated exports

Page 89

1  was another topic that you attend trainings on
2  from time to time.  What aspect of exports do
3  you have responsibility for?
4    A.  That I do have responsibility for
5  applying for the 161 application to export our
6  products, so I get the import permit from our
7  customer service department who liaisons with
8  our international customers, and then I file for
9  the export permit.  When the expert permit is
10  received, I notify distribution and customer
11  service that the order can be released, we have
12  the permits.
13    Q.  And you indicated the suspicious order
14  monitoring was one of the topics that you
15  attended trainings on.  What aspects of
16  suspicious order monitoring do you have
17  responsibility for?
18    A.  Currently that is done by my group.  I
19  have a data analyst auditor that reports to me,
20  and she is the primary contact for part of our
21  suspicious order monitoring program and our
22  anti-diversion program.  She does the daily
23  orders review.
24    Q.  And who is that?

Page 90

1    A.   Rachelle Rogers currently.
2    Q.   And what is the aspect of the SOM
3  program that your team has responsibility for?
4    A.   So we review the orders that are held
5  for review that meet the algorithm criteria, we
6  do Google searches, we do chargeback reviews, we
7  respond to the DEA for shipping history
8  verifications, we're in the process of
9  transitioning the customer checklists to Hobart,
10  off the top of my head.
11    Q.   That customer checklist transitioning,
12  what -- it's being transitioned from where?
13    A.   It's currently residing with the --
14  our customer data integrity group, and we're
15  going to be reviewing them in Hobart as opposed
16  to out at corporate.
17    Q.   And for how long has your team had
18  these responsibilities with respect to SOM?
19    A.   Since April of 2017.
20    Q.   So before that time, what
21  responsibilities did you have with respect to
22  SOM?
23    A.   I was a backup reviewer to the auditor
24  analyst who was located in St. Louis, and I was

Page 91

1  a member of the SOM team.
2    Q.   As a backup reviewer, what was your
3  role there?
4    A.   So if the primary reviewer was on
5  vacation or out of the office, then I would
6  conduct -- excuse me, I would conduct the daily
7  reviews.
8    Q.   And what do those reviews consist of?
9    A.   Orders that have gone -- orders that
10  have met the algorithm hit and have gone on
11  hold, to review and determine if they're
12  appropriate to release.
13    Q.   And when did you first have that
14  backup responsibility?
15    A.   Roughly 2012.
16    Q.   And you've made reference a couple
17  times to the algorithm hit.  When was the
18  algorithm implemented, do you recall?
19    A.   There's always been an algorithm in
20  place since I went into the role.  We've
21  constantly enhanced the algorithm.  But the
22  exact formula of it, I don't remember the
23  specifics.
24    Q.   And when you say since you went into

Page 92

1  the role, what do you mean by that?
2    A.   So when the distribution center was in
3  St. Louis, they had a program in place, and when
4  it moved to Hobart in 2001 that program
5  transferred over to Hobart.
6    Q.   Okay.  So there was an algorithm in
7  place from 2001 at Hobart for SOM?
8    A.   To the best of my knowledge, yes.
9    Q.   Do you recall what that algorithm
10  consisted of in any regard going back to 2001?
11    A.   I know it had something to do with
12  sales history, but I don't remember the exact
13  formula.
14    Q.   Did you have an understanding of how
15  the algorithm changed over time?
16    A.   Not really, not until I was involved
17  in it in 2012.
18    Q.   So since 2012, has the algorithm
19  changed?
20    A.   Yes.
21    Q.   And have you had an understanding of
22  how it has changed since then?
23    A.   Yes.
24    Q.   And what -- tell me what you can

Page 93

1  recall as to how it's changed since 2012.
2    A.   Since 2012, we were initially looking
3  at 18-month history based on the bill to, and
4  now we're looking at the 18-month history based
5  on the ship to.
6    Q.   And so tell me what the difference is
7  between bill to and ship to.
8    A.   So bill to is -- a parent company is
9  where the bills go to, but they may have
10  distribution centers all throughout the United
11  States, and that's the ship to.  So we bill to
12  one location but we physically ship to another
13  location.
14    Q.   Okay.  Any other changes in the
15  algorithm since 2012 that you're aware of?
16    A.   Not that I personally am aware of.
17  But it was overseen by corporate, so I don't
18  know if they may have been making changes to it
19  or not.
20    Q.   Do you have any understanding as to
21  the reason for the change from bill to to ship
22  to?
23    A.   Just to always make it better and
24  thought it would be an improvement.

Page 94

1    Q.   You indicated that you've been a
2  member of the SOM team.  For how long have you
3  been a member of the SOM team?
4    A.   Well, I started doing the backup
5  reviews in 2012, but I don't think I was part of
6  the team until '14 or '15, right around there.
7    Q.   So is the -- was the change to the
8  algorithm that you described something that the
9  SOM team had involvement on?
10    A.   Yes.
11    Q.   Were you involved in discussions of
12  that change?
13    A.   Yes.
14    Q.   And what can you recall of those
15  discussions?
16    A.   Just that we thought it would be
17  better to see the individual distributors versus
18  the parent company to see the amounts going to
19  individual distributors for analysis purposes.
20    Q.   And do you recall why it was thought
21  that that would be better?
22    A.   Initially we thought that looking at
23  the parent company as a whole would be better,
24  because then if a distributor was shuffling

Page 95

1  between their distributions we wouldn't see it
2  if we were looking at individual distributor,
3  but by going -- looking at each distributor,
4  then we could see what we were directly shipping
5  to each location.
6    Q.   You indicated that your team currently
7  has at least some responsibility for the
8  anti-diversion program?
9    A.   Yes.
10    Q.   And what are the responsibilities
11  related to the anti-diversion program?
12    A.   So we answer any DEA or law
13  enforcement requests for shipping history
14  information through our global security
15  director.  We receive -- I may receive a request
16  from a law enforcement agency for placebo
17  tablets for them to use in investigations, and I
18  will facilitate that through the global security
19  vice president.  Anything that we can do to help
20  battle diversion if we're asked upon it.  We
21  keep up-to-date with trends so that we have
22  knowledge and aware of what's being abused so
23  that we can pay particular attention to any
24  specific molecule, drugs of concern.  We sponsor

Page 96

1  drug take-back boxes in our local communities
2  for the community to take back the unwanted
3  medicines.  It's a comprehensive program.  We
4  have disposal pouches that our government
5  regulatory affairs department has provided to
6  pharmacies and customers for people to dispose
7  of unwanted opioids.
8    Q.   To your knowledge, is there someone at
9  Mallinckrodt that has responsibility for the
10  overall comprehensive anti-diversion program?
11    A.   We all have components of it.  It's
12  made up of different departments.  I guess the
13  overarching would be legal, corporate legal.
14    Q.   And when you use the word "diversion,"
15  what do you mean by that?
16    A.   Something taken out of the lifecycle
17  in the hands of where it doesn't belong.
18    Q.   When you say "lifecycle," what do you
19  mean?
20    A.   So we use the term analogy inside of
21  the plant where if it's not in the lifecycle, so
22  if it's not in the process of dispensing,
23  blending, compression or packaging, it's out of
24  the lifecycle.

Page 97

1    Q.   So that lifecycle that you've
2  described, dispensing, blending, compression or
3  packaging, are those all things that occur in
4  the plant?
5    A.   Yes.
6    Q.   Okay.  So is diversion something that
7  occurs in the manufacturing process, as you use
8  the term?
9    A.   There's potential.  We have to
10  maintain effective controls to detect diversion.
11    Q.   And what controls are in place in
12  terms of diversion in the manufacturing process?
13    A.   There's many different controls,
14  security systems, physical securities,
15  tamper-evident bags, seals, two-person
16  verifications.  Every department has individual
17  procedures based on their exposure and
18  processing step.
19    Q.   Okay.  And then is there diversion
20  that can occur after the product leaves the
21  manufacturing facility?
22    A.   Out of our hands?
23    Q.   Yes.
24    A.   I would say yes, there's a lot of

Page 98

1 opportunity for that.
2     Q.  Okay.  And some of the anti-diversion
3 steps that you described, for example placebo
4 tablets, to law enforcement, that would be
5 related to diversion that's occurring after the
6 product leaves your manufacturing facility,
7 right?
8     A.  Yes.
9     Q.  And so diversion in that sense after
10 it's left the manufacturing facility, when you
11 use the term diversion in that context, what
12 does it mean to you?
13     A.  Not where it belongs.
14     Q.  And you're aware that the
15 litigation -- I realize you haven't read any of
16 the operative complaints, but you're aware that
17 the litigation in large part pertains to various
18 opioids that have, to use your term, wound up
19 not where they belong, correct?
20     A.  Yes.
21     Q.  And you're aware that that's become a
22 serious problem over the last period of time,
23 correct?
24         MR. O'CONNOR:  Objection to form.

Page 99

1     A.  Yes.
2 BY MR. GOTTO:
3     Q.  When do you recall first being aware
4 that the diversion of opioids was a serious
5 problem?
6         MR. O'CONNOR:  Objection to form.
7     A.  I don't remember exactly when I --
8 when it started occurring to me.
9 BY MR. GOTTO:
10     Q.  Okay.  When you -- in 2001 when you
11 first had responsibility in compliance, did you
12 view diversion of opioids at that point as a
13 serious problem?
14         MR. O'CONNOR:  Same objection.
15     A.  In 2001?
16 BY MR. GOTTO:
17     Q.  Uh-huh.
18     A.  No, I wasn't aware of it at that time.
19     Q.  How about in 2012 when you indicated
20 you became a member of the SOM team, at that
21 point did you view diversion as a serious
22 problem?
23         MR. O'CONNOR:  Objection.
24     A.  I don't recall if I did or not in

Page 100

1 2012.
2 BY MR. GOTTO:
3     Q.  Do you recall any time at Mallinckrodt
4 receiving any -- well, during the period that
5 you reported to Ms. Harper, was there any --
6 ever a time when Ms. Harper communicated to you
7 that -- a belief that diversion was a serious
8 problem?
9         MR. O'CONNOR:  Objection to form.
10     A.  She may have.  I don't remember any
11 specifically.
12 BY MR. GOTTO:
13     Q.  Okay.  Do you recall anyone else at
14 Mallinckrodt at any point communicating to you a
15 belief that diversion was a serious problem?
16         MR. O'CONNOR:  Objection to form.
17     A.  I remember potentially Bill Ratliff,
18 who was the security director at the time,
19 raising the concern.
20 BY MR. GOTTO:
21     Q.  Okay.  In what context can you recall
22 that?
23     A.  Not specifics.
24     Q.  Do you recall the approximate time

Page 101

1 frame?
2     A.  No.  There was a lot going on.
3     Q.  You indicated that Mallinckrodt has a
4 comprehensive program to try to address
5 diversion, correct?
6     A.  Yes.
7     Q.  And so let's just talk about some of
8 the components of that.  One of them you
9 indicated was providing placebo tablets to law
10 enforcement, correct?
11     A.  Yes.
12     Q.  And do you recall when that began?
13     A.  Approximately 2016.
14     Q.  And you indicated that one of the
15 things that's done with respect to diversion is
16 to keep up-to-date on what the drugs of concern
17 are, correct?
18     A.  Yes.
19     Q.  And I take it in that sense you mean
20 concern to law enforcement?
21     A.  Yes, and to DEA.  DEA uses the
22 terminology drugs of concern.
23     Q.  Okay.  And do you do anything
24 personally to stay up-to-date on what the drugs

Page 102

1  of concern are?
2      A.  I read the DEA's web page frequently.
3  The auditor analyst in our team does social
4  media reviews.  We benchmark amongst our team
5  members between Webster group, St. Louis, and
6  Hobart.  If somebody sees an article that's of
7  concern, they'll share that article so that we
8  can keep up-to-date with what's going on.
9      Q.  Okay.  And this process of being
10  up-to-date on drugs of concern, when did that
11  begin, at least as far as your own involvement
12  in it?
13      A.  With the DEA conferences, that's where
14  we would hear that terminology, and they'd say
15  they're paying particular attention to
16  hydrocodone because it's a drug of concern.
17  That was a comment when the quota reviews were
18  taking an extended amount of time, industry was
19  asking DEA why it's taking so long, and they
20  said they were paying particular attention to
21  drugs of concern.
22      Q.  And when you're aware of a drug being
23  identified as a drug of concern from time to
24  time, what steps would that trigger at

Page 103

1  Mallinckrodt with respect to that particular
2  drug?
3      A.  Nothing different.  We would still do
4  all of our same processes that we always have
5  done, it's just we were more responsive to a
6  molecule that may be more susceptible to
7  diversion.
8      Q.  So more sensitive to it, but how does
9  that sensitivity manifest itself in any
10  particular action?
11      A.  We may escalate quicker if we see a
12  problem, or if I get a call from a law
13  enforcement and they've expressed that they had
14  a drug bust and it was of oxycodone, I would
15  make sure that our security director and global
16  VP were aware of it so that they could reach out
17  and assist to the best of our ability.
18      Q.  So what drugs can you recall being
19  identified as drugs of concern?  You've already
20  mentioned hydrocodone.  What other ones can you
21  recall?
22      A.  Hydrocodone, oxycodone.  When DEA
23  rescheduled hydrocodone from a C3 to a C2, they
24  had said at one of their conferences that they

Page 104

1  were concerned about Codeine because that would
2  remain a 3, and they were concerned that that
3  would start replacing the hydrocodone.  Most
4  recent conference a couple years ago, they said
5  hydromorphine 8-milligram was starting to be
6  abused.
7      Q.  And so the drugs that you can recall
8  being identified as drugs of concern, were they
9  all drugs that Mallinckrodt manufactured?
10      A.  Yes.
11      Q.  And were they all drugs that
12  Mallinckrodt had a significant market share at
13  least of generics?
14          MR. O'CONNOR:  Objection to form.
15      A.  I don't know, have any details on
16  market share.
17  BY MR. GOTTO:
18      Q.  Okay.  Were you aware from time to
19  time that Mallinckrodt was a leading
20  manufacturer of many of the opioid drugs of
21  concern that were identified from time to time?
22          MR. O'CONNOR:  Objection to form.
23      A.  No specific details.  I had heard, you
24  know, our site director refer to us as being one

Page 105

1  of the top manufacturers, but I didn't have
2  firsthand knowledge of that.
3  BY MR. GOTTO:
4      Q.  You've heard reference to an opioid
5  epidemic in this country, correct?
6      A.  Yes.
7      Q.  When do you first recall being aware
8  that there was an opioid epidemic?
9          MR. O'CONNOR:  Objection to form.
10      A.  I don't remember the exact time frame.
11  BY MR. GOTTO:
12      Q.  Is it something that you can recall
13  receiving any information from others at
14  Mallinckrodt about?
15      A.  No.
16      Q.  You'd agree that certain prescription
17  opioids manufactured by Mallinckrodt have been
18  diverted over the years, wouldn't you?
19          MR. O'CONNOR:  Objection to form.
20      A.  Yes.
21  BY MR. GOTTO:
22      Q.  And you would agree that certain
23  opioids manufactured by Mallinckrodt have
24  contributed to the opioid epidemic, wouldn't

Page 106

1 you?
2     MR. O'CONNOR:  Objection to form.
3     A.  I don't know that.
4 BY MR. GOTTO:
5     Q.  You indicated that one of the -- one
6 of your responsibilities has been to learn about
7 applicable regulations that apply to the Hobart
8 facility's manufacturing and distribution
9 licenses, correct?
10     A.  Yes.
11     Q.  And do those include requirements to
12 design and maintain a suspicious order
13 monitoring program?
14     A.  Yes.
15     Q.  And so when did you first become
16 familiar with those regulatory requirements?
17     A.  So I knew that there was a system in
18 place that was being reviewed out at corporate
19 in the early 2000s, and then I recall the
20 letters to industry as calling it out
21 specifically.
22     Q.  The letters from Mr. Rannazzisi?
23     A.  Yes, from DEA.
24     Q.  Did you receive those letters when

Page 107

1 they went out?
2     A.  We received two of them.  There was a
3 third one that we didn't receive, like corporate
4 had it from some avenue.
5     Q.  Okay.  So you were aware of corporate
6 review in the early 2000s.  In terms of your --
7 any personal involvement you had or
8 responsibility that pertained to Mallinckrodt's
9 regulatory obligation to design and maintain an
10 effective SOM program, when did you first have
11 any personal responsibility in that regard?
12     A.  So a transition between Hobart and
13 corporate a few times.  There was a period, I
14 don't remember the exact years, early 2000s, of
15 which I would review the orders that were
16 algorithm hits, and if need be get additional
17 information through customer service.  And then
18 there was a point in time where it had
19 transitioned back to corporate and was being
20 reviewed at the corporate level.
21     Q.  So when you -- during the period of
22 time when you had responsibility to review the
23 orders that were algorithm hits, any
24 approximation what that time period is?

Page 108

1     A.  No, just the early 2000s.  I wouldn't
2 want to guess.  I can't remember exactly.
3     Q.  All right.  What would you do when
4 there was an algorithm hit that -- you indicated
5 you would review it through customer service.
6 What were the specific steps you would take?
7     MR. O'CONNOR:  Objection to form.
8     A.  So if the order was -- on the list was
9 a clinic, and it was a higher than -- order than
10 they had been ordering historically, I would
11 contact customer service, because they had the
12 contacts with the customer, and say can you find
13 out why this customer has ordered X number of
14 bottles.  And very commonly they would come back
15 and they would say, well, the customer is moving
16 and they ordered a double order to get them
17 through until they get to their new location and
18 their new 222 forms, or they were part of a
19 chain and one of their other sister clinics
20 closed so they were taking on those patients.
21 And then I would write on the list of why, and
22 I'd file it.
23     Q.  When you use the term "algorithm hit,"
24 are you familiar with the term "peculiar order"?

Page 109

1     A.  I've heard of that before.
2     Q.  Okay.  Was that a term that was part
3 of the Mallinckrodt SOM process at some point?
4     A.  Yes.
5     Q.  And so was an algorithm hit, as you've
6 used that term, the same thing as an order that
7 was identified as a peculiar order?
8     A.  Could be, yes.
9     Q.  And so if an algorithm hit order was
10 provided to you, or you became aware of it for
11 SOM purposes, and you went through customer
12 service and got an explanation and you noted
13 what that explanation was, what would happen
14 after that with respect to that particular
15 order?
16     A.  It would be released.
17     Q.  It would be filled?
18     A.  No.  I apologize.  So at that time
19 these were excessive order reports, so it had
20 already been shipped, and I was reviewing the
21 orders after they had been shipped.
22     Q.  Okay.  So what would happen?  Would
23 anything happen after that, once you got the
24 response back from customer service and you

Page 110

1 noted whatever the response was that you
2 received? Would anything further happen with
3 that order?
4     A.  Those reports were sent to DEA.  With
5 that order, no, nothing further would happen
6 with that order.
7     Q.  Okay.  But the -- there was a report
8 sent to the DEA?
9     A.  Mm-hmm.
10     Q.  And what was the nature of that
11 report?  Was it a regular monthly report, or was
12 it a particular report with respect to each
13 order?
14         MR. O'CONNOR:  Objection to form.
15     A.  I don't remember if it was monthly or
16 quarterly, but it was a PDF that was sent to DEA
17 and what DEA classified and categorized as
18 excessive order reports.
19 BY MR. GOTTO:
20     Q.  Okay.  And was -- were you the person
21 who submitted those reports to DEA?
22     A.  Yes, at that time.
23     Q.  And again, do you have a time frame in
24 mind when this was the applicable procedure?

Page 111

1     A.  No.  I remember doing it early in my
2 career, and then it was transferred out to
3 St. Louis, out to corporate, and I -- that's why
4 I say early 2000s.  It was the early part of my
5 career, but I don't remember the exact time.
6     Q.  Okay.  So --
7     A.  May I be excused?
8     Q.  Yes.
9         MR. GOTTO:  Let's go off the record.
10         THE VIDEOGRAPHER:  The time is
11 11:26 a.m., and we're off the record.
12         (Whereupon, a recess was taken.)
13         THE VIDEOGRAPHER:  The time is
14 11:40 a.m., and we're on the record.
15         (Whereupon, Mallinckrodt-Spaulding-1
16         was marked for identification.)
17 BY MR. GOTTO:
18     Q.  Ms. Spaulding, we've handed you a
19 document that we marked as Exhibit 1 bearing
20 Bates MNK-T1_0000278740, appears to be an e-mail
21 from Karen Harper to you dated 11/11/09
22 concerning your goal.
23         Would you please take a moment to look
24 at that e-mail?

Page 112

1     A.  Okay.
2     Q.  Do you recognize that e-mail?
3     A.  No.
4     Q.  Did you annually establish goals that
5 you would -- you and Ms. Harper establish what
6 your goals would be for the upcoming year?
7     A.  Yes.
8     Q.  Any reason to think that this e-mail
9 does not accurately describe what your goals are
10 for 2010?
11     A.  No.
12     Q.  Okay.  And among those goals, you'll
13 see it indicates "Continue implementation and
14 ongoing upgrades of the Suspicious Order
15 Monitoring Program by second quarter fiscal year
16 '10"?
17     A.  Yes.
18     Q.  And the fiscal here at Mallinckrodt
19 ends when?
20     A.  At this time our fiscal year was
21 October 1 through September 30 -- 30.
22     Q.  Okay.  So the fiscal year 2010 would
23 be the year ending September 30, 2010?
24     A.  Yes.

Page 113

1     Q.  And so the second quarter of that year
2 would have been ending on March 31, 2010, is
3 that right?
4     A.  Yes.
5     Q.  Do you recall what the implementation
6 and ongoing upgrades tasks were that you -- that
7 your goal included for fiscal year 2010?
8     A.  No.
9     Q.  Fair to say that at this point you
10 would have had an understanding of at least some
11 aspects of the SOM program at this time,
12 correct?
13     A.  Some aspects, yes.
14     Q.  Had you had responsibility for
15 implementation for upgrade of any aspect of the
16 SOM program for fiscal year 2009?
17     A.  I don't remember.
18     Q.  And do you have any recollection of
19 upgrades that you were involved in considering
20 in fiscal year 2010?
21     A.  No, not any specifics.
22     Q.  Do you have any recollection as to any
23 aspects of the SOM program that Ms. Harper
24 indicated to you required upgrading in this time

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 frame?
2     MR. O'CONNOR:  Objection to form.
3     A.  Can you restate that, please?
4 BY MR. GOTTO:
5     Q.  Yes.
6     Do you have any recollection of
7 Ms. Harper in this time frame indicating to you
8 that there were any particular aspects of the
9 SOM program that required upgrading?
10     A.  I don't remember the specifics, no.
11     Q.  Do you have a general understanding of
12 what required upgrading?
13     A.  No.
14     Q.  Do you recall if there was a written
15 SOM program at this point?
16     A.  What do you mean by "written"?
17     Q.  Well, was there a SOM program that was
18 memorialized in any sort of document?
19     A.  Oh, an SOP?
20     Q.  Well, or any sort of document.
21     A.  Not at this time.  I don't remember
22 what was in place at this time.
23     Q.  Okay.  You don't recall one way or the
24 other whether there was a written program or

Page 115

1 not?
2     A.  I don't.
3     Q.  Do you recall working with anyone in
4 fiscal year '10 on the implementation and
5 upgrading of the SOM?
6     A.  In fiscal year '10.  I know there was
7 a review of the program done.  I don't know what
8 year it was.
9     Q.  Okay.  Who can you recall being
10 involved in that review?
11     A.  Karen Harper.
12     Q.  Anyone else?
13     A.  There would have been other
14 stakeholders of the business, but I don't
15 remember the specific people.
16     Q.  And you don't recall what the time
17 frame was of that review?
18     A.  No.
19     (Whereupon, Mallinckrodt-Spaulding-2
20     was marked for identification.)
21 BY MR. GOTTO:
22     Q.  We've handed you what we've marked as
23 Exhibit 2, a multi-page document beginning at
24 MNK-T1_0000490704, appears to be a Fiscal Year

Page 116

1 '10 Assessment.
2     Would you take a look at that document
3 and tell me if you recognize it?
4     (Witness reviewing document.)
5     A.  This is my year-end review for fiscal
6 year '10.
7     Q.  Okay.  Did you receive a similar
8 review each year?
9     A.  There's a review done each year, it's
10 not -- it's a different software program, but
11 yes, there's a review done each year.
12     Q.  Okay.  If you would turn to the page
13 that's numbered 5, it ends in Bates 708.  And
14 the Performance Factor or Target Competency is
15 "DEA Reports."
16     Do you see that?
17     A.  Yes.
18     Q.  Okay.  And in the Expected Results
19 paragraph, the last sentence says "Continue
20 implementation and ongoing upgrades of the
21 Suspicious Order Monitoring Program by second
22 quarter fiscal year '10."
23     That's what we had seen in the prior
24 document, correct, your goals for fiscal year

Page 117

1 '10?
2     A.  Yes.
3     Q.  Now, that was -- was that upgrade
4 accomplished in fiscal year '10?
5     A.  I don't remember what the upgrade was
6 to know whether it was completed that year or
7 not.
8     Q.  So in your "End-of-Year
9 Accomplishments (Employee)" paragraph, the last
10 sentence indicates "Continuing to assist and
11 implement upgrades on the SOM when identified
12 along with generation of a quarterly report to
13 DEA."
14     Do you see that?
15     A.  No.  I'm sorry.  Which one?  Under
16 that same one?
17     Q.  Sure.  Yes, "End-of-year
18 Results/Accomplishments (Employee)," the
19 paragraph that begins "All controlled substance
20 reports."
21     A.  Okay.  My -- that was my feedback.
22 Okay.  I'm sorry.
23     Q.  It's the last sentence of that
24 paragraph.

Page 118

1    A.  Yes.

2    Q.  Okay.  And then if you look at the

3 following paragraph "End-of-Year

4 Results/Accomplishments (Manager)," would that

5 have been Ms. Harper preparing that?

6    A.  Yes.  So the employee was my -- my

7 review of my work throughout the year, and then

8 the next one was Karen's, yes.

9    Q.  Okay.  And under the manager

10 paragraph, the last sentence reads "Eileen

11 volunteered for extra responsibility within the

12 Suspicious Order Monitoring Program in fiscal

13 year '10, enhancements to the system and

14 expansion of Eileen's role will be accomplished

15 in fiscal year '11."

16    Do you see that?

17    A.  Yes.

18    Q.  And so does that indicate that the --

19 whatever the upgrades were that were the subject

20 of your goal for fiscal year '10 were not

21 actually implemented in fiscal year '10,

22 correct?

23    MR. O'CONNOR:  Objection to form.

24    A.  I don't know that.

Page 119

1 BY MR. GOTTO:

2    Q.  Okay.  Well, there's nothing either in

3 your -- the employee end-of-year

4 results/accomplishments or the manager

5 end-of-year accomplishments that indicates that

6 those upgrades were completed in 2010, correct?

7    A.  Correct.

8    Q.  And the manager comments indicate that

9 there will be enhancements and expansion of your

10 role accomplished in fiscal year '11 -- 2011,

11 correct?

12    A.  Yes.

13    Q.  Do you recall what those enhancements

14 to the system or expansion of your role were in

15 2011?

16    A.  No.

17    Q.  Under the paragraph -- the employee

18 feedback paragraph, at the very end there's

19 reference to quarterly report to the DEA.

20    Do you see that?

21    A.  Yes.

22    Q.  What was that quarterly report?

23    A.  So that was the algorithm hits for

24 each month combined by quarter and then

Page 120

1 submitted to DEA.

2    Q.  And so was that a report you were

3 submitting in fiscal year 2010?

4    A.  I don't remember.  "When identified

5 along with generation of quarterly report."

6    Q.  Well, you make reference under your

7 accomplishments to generation of a quarterly

8 report to DEA, correct?

9    A.  Yes.

10    Q.  And that quarterly report would be the

11 algorithm hit or peculiar order hit report that

12 you testified to earlier today, correct?

13    A.  Yes.

14    Q.  Do you know if any orders were

15 identified as suspicious orders in fiscal year

16 2010 by Mallinckrodt?

17    A.  No, I don't know.

18    Q.  Can you recall at any time during your

19 time at Mallinckrodt an order being reported to

20 the DEA by Mallinckrodt as a suspicious order?

21    A.  Yes.

22    Q.  When can you recall that?

23    A.  I don't know when it was for.  I don't

24 know when it was reported.

Page 121

1    Q.  Do you recall any details about the

2 order?

3    A.  Yes, it was for fentanyl that was

4 going to a veterinary clinic or a veterinarian.

5    Q.  Okay.  And was this a single incident?

6    A.  That I was aware of.  I don't -- there

7 was others that were part of the program, and

8 monitoring, they may have reported.

9    Q.  Okay.  As far as your own personal

10 knowledge, you're only aware of the one, right?

11    A.  Yes.

12    Q.  And in terms of have you heard of

13 others at Mallinckrodt -- other than things

14 you've had personal involvement with, have you

15 heard of other orders that Mallinckrodt reported

16 to DEA as suspicious orders?

17    A.  I don't recall.

18    Q.  Okay.

19    (Whereupon, Mallinckrodt-Spaulding-3

20    was marked for identification.)

21 BY MR. GOTTO:

22    Q.  We've marked as Exhibit 3 a two-page

23 document bearing a Bates MNK-T1_000702654.

24 Would you take a moment to look at those

Page 122

1  e-mails, please?
2       (Witness reviewing document.)
3       A.  Okay.
4       Q.  Do you recognize those e-mails?
5       A.  No.
6       Q.  Okay.  These refer to a midyear
7  assessment done in April of 2011, correct?
8       A.  Yes.
9       Q.  Was that a normal process at
10  Mallinckrodt, that you would receive a midyear
11  assessment of your performance?
12      A.  Yes.
13      Q.  Okay.  The e-mail from Ms. Harper on
14  April 7th of 2011 indicates that you took the
15  lead in auditing Cedardale distributor after the
16  program identified that customer as distributing
17  excessive amounts of oxycodone into the State of
18  Florida, correct?
19      A.  Yes.
20      Q.  And that you proofread and edited the
21  three revised SOPs related to SOM, correct?
22      A.  Yes.
23      Q.  Do you recall the Cedardale audit
24  that's referred to?

Page 123

1       A.  Yes.
2       Q.  What can you recall about that audit?
3       A.  The security manager and myself went
4  to Cedardale in New Jersey to perform an on-site
5  audit of their -- it's more a collaboration
6  visit just to review their SOM program.
7       Q.  And what triggered that audit?
8       A.  A report that Karen had in which she
9  saw a high amount of oxycodone, or the team saw
10  a high amount of oxycodone going into the State
11  of Florida.
12      Q.  Okay.  And who was the security
13  manager who performed that audit with you?
14      A.  Rich Nikolaus.
15      Q.  And I take it that was an on-site
16  audit of Cedardale's facility?
17      A.  Yes.
18      Q.  Had you been to that facility
19  previously?
20      A.  No.
21      Q.  Had you had any interaction with the
22  people at Cedardale prior to your audit?
23      A.  No.
24      Q.  Was the audit scheduled, or did you

Page 124

1  just show up?  How did it come to be?
2       A.  It was scheduled.
3       Q.  And how did you know what procedures
4  to follow in conducting that audit?
5       A.  So what our process was, or -- so we
6  -- just through conducting audits, learning from
7  DEA what were drugs of concern, we went and
8  reviewed their SOM program.
9       Q.  Okay.  Well, let me back up.
10      Had you conducted other audits of
11  distributors prior to this one?
12      A.  No.
13      Q.  Okay.  And had you participated in any
14  audits of distributors prior to this one?
15      A.  I hadn't participated in on-site
16  audits, no.
17      Q.  Okay.  So how did you know what to do
18  as part of the audit if you hadn't done one
19  before or participated in an on-site audit?
20      A.  So we had -- we've had collaboration
21  calls with distributors that I had been on, and
22  had heard the questions that the compliance
23  manager and the security director from corporate
24  had been asking.  We had a checklist that we

Page 125

1  used to prompt questions.  We knew what our own
2  program was at the time.  We had gone to
3  trainings and had -- from DEA and who had said
4  from the pulpit that, for example, thresholds
5  are not acceptable as a stand-alone SOM program,
6  that's not an indicator of a good program if
7  it's only based on threshold quantities.
8       Q.  What does that mean, threshold
9  quantities?
10      A.  So a certain limit, they can order up
11  to X amount, and then after that amount, say,
12  per month, the first and the next month they
13  could order that amount again.
14      Q.  Okay.  Were there particular concerns
15  regarding Cedardale that you wanted to be sure
16  you addressed as part of this audit?
17      A.  Well, as a result of whatever the team
18  had discovered, we were wanting to confirm if
19  they did, in fact, have large amount of
20  oxycodone going into Florida.
21      Q.  Okay.  And so what steps did you take
22  to try to confirm that?
23      A.  We just spoke to them.  It was all
24  reliable -- relied on them describing.  We

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 didn't review their records or their policies.
2 We'd ask them if they had policies in place, but
3 we didn't approve or condone or authorize an SOM
4 program.
5     Q.   Okay.  Did you -- did they have a
6 written SOM program that you reviewed?
7     A.   Not that I can recall.
8     Q.   But they described to you what their
9 SOM program was?
10     A.   Yes.
11     Q.   And what can you recall the
12 description?
13     A.   That it was primarily based on these
14 threshold quantities which DEA had said from the
15 pulpit was not sufficient enough.
16     Q.   Okay.  And so when you can recall DEA
17 saying that the threshold quantity approach was
18 not sufficient, did they give any indication of
19 what additional components an SOM program should
20 contain beyond threshold quantities?
21     A.   No.  There's been very lack of
22 guidance from DEA around suspicious order
23 monitoring and what is good and what is not
24 good.  They would tell us things to be aware of

Page 127

1 such as red flags, but they wouldn't tell us
2 what makes a good program or what doesn't make a
3 good program, only to be aware of.
4     Q.   Okay.  So when you conducted the audit
5 at Cedardale, their SOM program as they
6 described it to you simply consisted of this
7 kind of threshold quantity limit that DEA had
8 specifically said was inadequate, is that fair?
9     A.   Yes.
10         MR. O'CONNOR:  Objection to form.
11     A.   Yes.
12 BY MR. GOTTO:
13     Q.   Okay.  And did you tell them that,
14 that your understanding from DEA was that that
15 was not an adequate?
16     A.   We did coach them in that they should
17 have more around their program than just a
18 threshold quantity amount, and that they should
19 be looking at their pharmacies holistically in
20 doing on-site inspections.  It was a
21 recommendation.
22     Q.   When you say "looking at a pharmacy
23 holistically," what do you mean by that?
24     A.   Their amount of controls versus

Page 128

1 non-controls, their amount of cash versus
2 non-cash, their demographics around the area to
3 know whether the quantities that they're
4 shipping to the pharmacy are justified or not.
5     Q.   In the audit you did of Cedardale, did
6 you take any steps to identify who any specific
7 customers of Cedardale were?
8     A.   I don't remember if we had specific
9 names or not.
10     Q.   I take it that the focus of the audit
11 was this question of whether Cedardale was
12 distributing excessive oxycodone to Florida,
13 correct?
14     A.   Yes, because we're concerned about our
15 direct customers, and we were trying to make
16 sure they had a robust program in place.
17     Q.   Okay.  At this time -- well, let me
18 ask you, do you recall when the Cedardale audit
19 was conducted?
20     A.   Early 2011.
21     Q.   Okay.  At that time did you have any
22 information with respect to the identity of any
23 of Cedardale's customers?
24     A.   I don't remember if I did or didn't.

Page 129

1     Q.   Do you recall at any point seeing any
2 reports of analysis of chargeback data that
3 contained information with respect to the
4 ultimate -- with respect to the customers of
5 Mallinckrodt's customers in 2010 or 2011?
6     A.   I remember that there was three
7 customers that we as an SOM team decided that
8 needed to be audited.  I don't remember the
9 specifics behind it.
10     Q.   Okay.  Do you remember who those three
11 customers were?
12     A.   Masters and KeySource in Cedardale.
13     Q.   Do you recall seeing a report at any
14 time in 2010 that identified customers who
15 ordered controlled substances from multiple
16 Mallinckrodt distributors?
17     A.   No.
18     Q.   Do you recall being aware of the
19 existence of such a report?
20     A.   Yes.  I think there was something that
21 prompted the team to review those three
22 customers.
23     Q.   And do you know if that report
24 regarding customers that ordered from multiple

Page 130

1  Mallinckrodt distributors, do you know if that
2  was generated through an analysis of chargeback
3  data?
4      A.  I don't.  Don't remember.
5      Q.  Do you know who Kate Mellencamp was,
6  or Kate Neely?  I think it was the same person.
7      A.  Yeah, I remember the name.  I don't
8  remember the role.
9      Q.  Okay.  How about Ginger Collier?
10     A.  Yes, Ginger I remember.
11     Q.  And who was she?
12     A.  She was in marketing.
13     Q.  Do you recall if Ms. Collier or
14 Ms. Mellencamp had any role in developing this
15 report on multiple orders from multiple
16 distributors?
17         MR. O'CONNOR:  Objection to form.
18     A.  I don't remember specifically
19 anything.
20 BY MR. GOTTO:
21     Q.  Okay.  And so when you conducted the
22 audit at Cedardale, were you aware of whether
23 any of Cedardale's customers had been identified
24 as parties who ordered from multiple

Page 131

1  Mallinckrodt distributors?
2      A.  I don't remember anything about
3  knowing their pharmacies, knowing who they were
4  supplying.
5      Q.  What was the -- what can you recall
6  about the results of the Cedardale audit?
7      A.  I remember that we were not
8  comfortable that they had a robust enough
9  program in place.
10     Q.  Okay.  And as a result, was Cedardale
11 cut off from -- as a Mallinckrodt distributor?
12     A.  I recall that they were -- we stopped
13 shipping to them.  I don't recall if it was
14 before the audit or not, or a result of the
15 audit.
16     Q.  And do you know if Mallinckrodt ever
17 resumed shipping to Cedardale after that?
18     A.  I believe we did with some
19 restrictions.
20     Q.  Do you know what the restrictions
21 were?
22     A.  C3 through 5 only.  We didn't resume
23 shipping C2s.
24     Q.  Exhibit 2 also indicates -- I'm sorry,

Page 132

1  3, not 2, 3 indicates that you proofread and
2  edited the three revised SOPs related to SOM.
3  And again, this is April, 2011.  Do you recall
4  those three revised SOPs?
5      A.  Not which specific SOPs they are.
6      Q.  Do you recall the subject matter of
7  what was addressed in any of those -- by any of
8  those revised SOPs?
9      A.  Well, we have three SOPs that apply to
10 suspicious order monitoring.  I'm not sure that
11 those are the three SOPs that we're talking
12 about.
13     Q.  So the SOPs that apply to SOM, what
14 are the subject matters that they cover?
15     A.  One, how to do the review of the
16 algorithm hits.  And I don't remember exactly
17 what the other two are, not definitely.
18     Q.  And when did these SOPs come into
19 existence, as far as you know?
20     A.  They were drafted by the SOM team and
21 reviewed, so whenever that team took it back
22 from Hobart and was reviewing the program.  I
23 don't remember.  It was before 2011, obviously,
24 but I don't remember when.

Page 133

1      Q.  Okay.
2          (Whereupon, Mallinckrodt-Spaulding-4
3          was marked for identification.)
4  BY MR. GOTTO:
5      Q.  We've marked as Exhibit 4 a multi-page
6  document beginning at Bates MNK-T1_0007730928.
7  Appears to be an e-mail thread from 2013 between
8  you and Ms. Harper.  Would you take a moment to
9  look at that, and tell me if you recognize it.
10         (Witness reviewing document.)
11     Q.  Feel free to look at whatever you
12 want, my only question is on the first page of
13 that document.
14     A.  Okay.
15         (Witness reviewing document.)
16     Q.  Do you recognize that document?
17     A.  No, not exactly.
18     Q.  Okay.  On the first page, the e-mail
19 from you to Ms. Harper, October of 2013, any
20 reason to doubt that you sent this e-mail?
21     A.  No.
22     Q.  Okay.  Under "Suspicious Order
23 Monitoring" in the middle of the page, do you
24 see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    A.  Yes.
2    Q.  "Description.  Support Legal
3  Department Regulatory Compliance in the arena of
4  interaction with the Drug Enforcement
5  Administration by managing and coordinating
6  enhancements with the SOM program."
7        Do you see that?
8    A.  Yes.
9    Q.  Do you recall the enhancements to the
10  SOM program that you managed or coordinated in
11  this time frame?
12    A.  No, we were always constantly trying
13  to change it, make it better, so I don't
14  remember what in specific.
15    Q.  Okay.  The next paragraph says "Ensure
16  all orders placed on SOM hold are reviewed
17  thoroughly and accurately to ensure SOM DEA
18  Compliance."
19        In this time frame in 2013, who was
20  involved in the review of orders that were
21  placed on SOM hold?
22    A.  Jen Buist, but I don't know when she
23  came on board.
24    Q.  And what department did she work in?

Page 135

1    A.  She was under government compliance at
2  that time.
3    Q.  So was she the person who would review
4  an order that was placed on hold to determine
5  whether the order would be released?
6    A.  Yes.
7    Q.  And so in terms of your ensuring that
8  orders were thoroughly and accurately reviewed,
9  did you interact with her?
10    A.  She -- if she was unsure of an order
11  and wanted to know some supporting data, she
12  would reach out to me.  But I was the backup at
13  this time.  So it's referring to any order that
14  I reviewed.
15    Q.  Okay.  But she had the ability to
16  review and release an order without consulting
17  with you, is that correct?
18    A.  Yes.
19    Q.  The next paragraph under "Employee
20  Evaluation" says "Fiscal year '13 has been a
21  challenging year for the Hobart site from the
22  Controlled Substances Compliance aspect."
23        What can you recall that made fiscal
24  year '13 a challenging year as you state in that

Page 136

1  sentence?
2    A.  We had a very intensive DEA inspection
3  that year.
4    Q.  Okay.  And what aspects of the
5  inspection were particularly intensive, as you
6  can recall?
7    A.  Just there was many investigators
8  there for six weeks.
9    Q.  Did that investigation extend to any
10  aspects of the SOM program?
11    A.  Yes.
12    Q.  In what regard can you recall them
13  interacting with you with respect to SOM?
14    A.  They were asking us about our SOM
15  program in which we, as did any other audit,
16  would explain the program at that time.
17    Q.  Do you recall if DEA identified to you
18  any shortcomings or criticisms of the SOM
19  program?
20    A.  Not that I remember.
21        (Whereupon, Mallinckrodt-Spaulding-5
22        was marked for identification.)
23  BY MR. GOTTO:
24    Q.  We've marked as Exhibit 5 a two-page

Page 137

1  document beginning at Bates MNK-T1_0000274080,
2  an e-mail dated -- well, series of e-mails dated
3  May of 2008.  Would you take a moment to look at
4  those e-mails, please?
5        (Witness reviewing document.)
6    Q.  Do you recognize those e-mails?
7    A.  No.
8    Q.  Okay.  The May 12th e-mail from
9  Ms. Harper indicates that she's gathered a group
10  consisting of a few persons that she identifies
11  to review the suspicious order monitoring
12  program with the goal of making it more robust
13  in light of DEA activity, and she asks if you
14  would be willing to review a draft procedure and
15  serve on the team as a Hobart advisor.
16        Do you see that?
17    A.  Yes.
18    Q.  And do you recall her making that
19  request to you in 2008?
20    A.  Based on -- only based on this e-mail.
21  I don't recall it.
22    Q.  All right.  And then you respond
23  "Absolutely - currently at DEA conference,"
24  correct?

Page 138

1   A. Yes.
2   Q. And no reason to doubt that you sent
3 that e-mail, correct?
4   A. No.
5   Q. Okay. In Ms. Harper's e-mail under
6 the dashed lines there are -- as an aside, she
7 mentions in a conference she attended "among the
8 agenda items was Suspicious Order Monitoring."
9     Do you see that?
10  A. Yes.
11  Q. And "Other suggestions included," she
12 states, "On-site visits for all controlled
13 substance customers; Close scrutiny of small,
14 independent pharmacies; Close scrutiny of pain
15 management clinics."
16    Are any of those three steps anything
17 that you can recall being implemented at
18 Mallinckrodt in this time frame in 2008?
19  A. In 2008, no.
20  Q. Do you recall when any of those steps
21 were implemented at Mallinckrodt?
22  A. We started on-site visits of
23 controlled substance customers in 2010, '11 with
24 the KeySource, Masters, and Cedardale that we

Page 139

1 spoke of.
2   Q. Okay. In Ms. Harper's e-mail to you,
3 she identifies a goal of making the SOM program
4 more robust. Do you recall what the SOM program
5 consisted of in May of 2008?
6   A. Not exactly, no.
7   Q. Do you have a general recollection?
8   A. Generally it was just the algorithm.
9   Q. And do you recall what the components
10 of the algorithm were at this point?
11  A. Only one of them. That was based on
12 their previous order history.
13  Q. Would that be the sort of threshold
14 metric that you understood the DEA said was
15 inadequate?
16    MR. O'CONNOR: Objection to form.
17  A. No. So a threshold is when you say,
18 okay, they can only order up to 5,000 dosage
19 units a month. This was based on what they
20 historically had been ordering to know that --
21 whether they were continuing to order in
22 historical patterns.
23 BY MR. GOTTO:
24  Q. So was it your understanding in 2008

Page 140

1 that the SOM program that was in place at
2 Mallinckrodt complied with DEA requirements?
3   A. Based on the knowledge we had at that
4 time, yes.
5   Q. Did there come a time when you had an
6 understanding that the SOM program in place at
7 Mallinckrodt did not comply with DEA
8 requirements?
9   A. No.
10    (Whereupon, Mallinckrodt-Spaulding-6
11     was marked for identification.)
12 BY MR. GOTTO:
13  Q. Exhibit 6 is a lengthy document
14 beginning at Bates MNK-T1_0005187729. It's an
15 e-mail attaching a PowerPoint presentation, the
16 first page of which contains your name.
17    It's a lengthy document, I can direct
18 you to a few pages that I have some questions
19 for you on rather than have you review the
20 entire document. But certainly feel free to
21 look at any part of it that you need to to
22 answer any of my questions.
23    Do you recall what the purpose of this
24 document was?

Page 141

1   A. Yes.
2   Q. What was it?
3   A. It's what we used for training new
4 employees when they started.
5   Q. Okay. And just for the record, the
6 cover e-mail is dated January of 2011, correct?
7   A. Yes.
8   Q. And did you prepare the portion of the
9 presentation that's the slides that are behind
10 your name?
11  A. It was a combination of Karen Harper
12 and myself.
13  Q. Okay. If you turn to the page --
14 unfortunately these are not numbered. Let me
15 just count pages for you, 1, 2, 3, 4, 5, 6, 7,
16 the eighth page in, there's "Statistics on
17 National Drug Abuse Trends."
18    Do you see that?
19  A. "DEA Regulatory Authority" up on the
20 top?
21  Q. Well, it's immediately behind the
22 slide that says "Security & Controlled Substance
23 Compliance."
24  A. Oh, yes. Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    Q.   So there's "Statistics on National
2  Drug Abuse Trends," and the following slide is
3  "Abuse Trends."  Why was it important to give
4  this information to new hires in their training?
5    A.   Because we wanted them to understand
6  why we have these security policies and
7  procedures around our processes, and why two
8  people have to be present at all times.
9    Q.   Okay.  And so the page -- the slide, I
10 think, the next one after the one you're on,
11 there you go, "Abuse Trends," identifies certain
12 statistical items such as "estimated 48 million
13 people have used prescription drugs for
14 non-medical reasons in their lifetimes."  These
15 abuse trends were something that Mallinckrodt
16 tracked at the time, correct?
17   A.   No.  This is information that we
18 gleaned off of either DEA's website or NIDDA's
19 website.
20   Q.   Okay.  The following slide, "DEA
21 reiterates responsibilities."  Do you see that
22 one?
23   A.   Yes.
24   Q.   And on this slide you make reference

Page 143

1  to certain statements made by DEA in
2  correspondence to Mallinckrodt, correct?
3    A.   Yes.
4    Q.   Are these items of correspondence
5  the -- two of the items you referred to earlier
6  today in your testimony, letters from DEA?
7    A.   The one letter is.  I don't recall the
8  one that was specific for Mark Coverly.
9    Q.   Okay.  The one on the right from
10 Mr. Rannazzisi?
11   A.   Yes.
12   Q.   The following slide "Recent DEA
13 Actions Involving Distributors" which talks
14 about actions involving AmerisourceBergen,
15 Cardinal, and McKesson, why was it important to
16 provide that information to new hires?
17   A.   Because we wanted them to understand
18 the importance of having a DEA license.
19   Q.   And then the following several slides
20 involve specific examples, Masters
21 Pharmaceutical, Rite Aid Issues, CVS Fines.  Why
22 was it important to provide that information to
23 new hires?
24   A.   To show them that DEA can take action

Page 144

1  against a registrant and their registration
2  regardless of who you are.
3    Q.   All right.  You can put that aside.
4       (Whereupon, Mallinckrodt-Spaulding-7
5       was marked for identification.)
6  BY MR. GOTTO:
7    Q.   We've marked as Exhibit 7 a multi-page
8  document beginning at Bates MNK-T1_0000448773.
9  It's entitled "oxycodone Extended Release Risk
10 Map Action Plan."  Let's take a look at that
11 document, and tell me if you recognize it.
12   A.   No.
13   Q.   You don't recall ever seeing this
14 before?
15   A.   No, I don't remember it.
16   Q.   Are you familiar with the -- with
17 Mallinckrodt having a risk map action plan with
18 respect to various products?
19   A.   I'm aware that some products require
20 risk map programs.
21   Q.   Okay.  And do you know which products
22 require those programs?
23   A.   Oxycodone ER was one of them.  There's
24 several others, but I don't know them

Page 145

1  specifically.
2    Q.   And do you know why oxycodone requires
3  a risk map action plan?
4    A.   No, that's an FDA requirement.
5    Q.   Do you know if Mallinckrodt had any
6  other -- Mallinckrodt manufactured any other
7  opioid other than oxycodone that required a risk
8  map action plan?
9    A.   Yes, there were others, but I don't
10 remember specifically which products.
11   Q.   Did you have any involvement in the
12 preparation of the Oxycodone ER risk map action
13 plan?
14   A.   I don't remember it, so I'm not sure.
15   Q.   Okay.  If you turn to Page 3 of the
16 document ending in Bates 775, under "Supply
17 Chain & Security," you see your name appears on
18 several of the entries.
19      Do you see that?
20   A.   Yes.
21   Q.   So one entry, "Provide notification to
22 DEA of any confirmed diversion," and you're one
23 of the persons responsible there, correct?
24   A.   Yes.

Page 146

1    Q.  Do you ever recall that occurring,
2  that you provided notification to DEA of any
3  confirmed diversion?
4    A.  No, that would have been a 106 form.
5    Q.  And do you recall ever providing a 106
6  form to DEA confirming diversion on oxycodone?
7    A.  Oxycodone, or Oxycodone ER?
8    Q.  Oxycodone ER, I'm sorry.
9    A.  No, not without looking at my records.
10   Q.  Next item is "Notify Covidien
11  management...of suspected diversion."
12      Do you see that?
13   A.  Yes.
14   Q.  Do you recall ever doing that
15  notification of Covidien management of suspected
16  diversion of Oxycodone ER?
17   A.  No, I don't remember.
18   Q.  On the next page, Page 4, the -- one,
19  two, three -- fourth item down, "Photographs of
20  drivers authorized to handle controlled
21  substances are maintained on file at the
22  distribution center."  Is that something that
23  was done at Hobart?
24   A.  Yes.

Page 147

1    Q.  Three items down from there, "Audit
2  carrier records annually."  Your name is listed.
3  Is that something that you participated in?
4    A.  At that time, yes.
5    Q.  Do you recall an individual named John
6  Gillies?
7    A.  Yes.
8    Q.  What was his role?
9    A.  He was not here at the time.  This
10  was -- Bill Ratliff was the security director.
11  John Gillies is the vice president of global
12  security.
13   Q.  Currently?
14   A.  Yes.  John Gillies was Bill Ratliff's
15  successor.
16   Q.  Okay.  So to the extent Mr. Ratliff is
17  identified as having responsibilities on this
18  risk map action plan, currently those would be
19  Mr. Gillies responsibilities?
20      MR. O'CONNOR:  Objection to form.
21  BY MR. GOTTO:
22   Q.  As far as you know.
23   A.  Yes.  We don't have this product
24  anymore.

Page 148

1    Q.  Okay.  Do you interact with
2  Mr. Gillies?
3    A.  Yes.
4    Q.  In what capacities?
5    A.  I escalate to him any law enforcement
6  inquiries for either law information or the
7  placebos as we talked about earlier, and if he
8  contacts me for information, I provide it.
9    Q.  Have you ever had any -- has
10  Mr. Gillies ever expressed any dissatisfaction
11  with your work product?
12   A.  Not that I can recall.
13   Q.  Have you had any difficulties in
14  interacting with Mr. Gillies over the years?
15   A.  No.
16      MR. GOTTO:  Let's go off the record.
17      THE VIDEOGRAPHER:  The time is
18  12:32 p.m., and we're off the record.
19      (Whereupon, a luncheon recess was
20      taken.)
21
22
23
24

Page 149

1    AFTERNOON SESSION
2
3      THE VIDEOGRAPHER:  The time is
4  1:15 p.m., and we're on the record.
5  BY MR. GOTTO:
6    Q.  Welcome back, Ms. Spaulding.
7    A.  Thank you.
8    Q.  Before our lunch break you had
9  testified about the one suspicious order you
10  could recall, which I think was a fentanyl order
11  that went to a vet clinic, is that correct?
12   A.  Yes.
13   Q.  Okay.  You'd agree with me that if a
14  vet clinic purchased opioids and then resold
15  them to a human pain clinic or a human
16  physician, that would be a potentially
17  suspicious order, wouldn't it?
18      MR. O'CONNOR:  Objection to form.
19   A.  I wouldn't know if a vet clinic sold
20  it to anybody else.  We would only have the
21  direct sales.  And a vet clinic wouldn't apply
22  with chargebacks.
23  BY MR. GOTTO:
24   Q.  So you're not aware of any situations

Page 150

1  in which Mallinckrodt opioids were purchased by
2  a veterinary supply company and then resold to
3  medical clinics or dispensing physicians?
4      A.  Not that I'm aware of.
5      Q.  And do you know if Mallinckrodt's
6  records would include that information if it
7  had, in fact, occurred?
8      A.  I don't know what our records -- that
9  our records would include that.
10     Q.  In any event, you've never heard of
11 that happening?
12     A.  Correct.
13        (Whereupon, Mallinckrodt-Spaulding-8
14        was marked for identification.)
15 BY MR. GOTTO:
16     Q.  Just one last question on that one
17 before you turn to that document.
18        If you were aware of that happening,
19 that a veterinary supply company purchasing from
20 Mallinckrodt had resold to a medical clinic or
21 dispensing physician, would you have
22 investigated that as a potentially suspicious
23 order?
24     A.  Yes, we would have raised that to the

Page 151

1  suspicious order monitoring team for evaluation.
2      Q.  Okay.  I've just handed you what we've
3  marked as Exhibit 8, which is a single-page
4  document bearing Bates MNK-T1_0006443249, an
5  e-mail thread from 2005.  Take a look at that
6  for a moment, if you would, and tell me if you
7  recognize it.
8      A.  Okay.
9      Q.  Do you recall those e-mails?
10     A.  No.
11     Q.  Okay.  Do you know who Mike Spears
12 was?
13     A.  Yes.
14     Q.  Who was he?
15     A.  Director of what we call PPT, product
16 process technology.
17     Q.  And how about Laura Ashline?
18     A.  She's a project manager.
19     Q.  Okay.  And Jim Walter?
20     A.  He was the site director.
21     Q.  Okay.  Your e-mail to Mr. Spears and
22 Ms. Ashline says "At the request of the DEA they
23 would like to know the timeline for release of
24 Oxycodone ER products (all strengths) into the

Page 152

1  marketplace as MS Contin is extremely abused and
2  they want to know when we are going to start
3  producing from this facility."
4      Do you recall DEA making that inquiry
5  of you?
6      A.  No.
7      Q.  Okay.  Do you recall being aware in
8  2005 that MS Contin was extremely abused?
9      A.  Only based on this e-mail.
10     Q.  Do you recall being aware in 2005 that
11 Oxycodone ER would also have the potential to be
12 abused?
13     A.  Only based on this e-mail.
14     Q.  And Mallinckrodt began manufacturing
15 Oxycodone IR shortly after this, isn't that
16 correct?
17     A.  We were manufacturing -- which
18 strength of IR?
19     Q.  Well, in any strength.
20     A.  So we had been manufacturing oxycodone
21 5-milligram prior to this.  I don't remember
22 when we started manufacturing oxycodone
23 15-milligram or 30-milligram IR.
24     Q.  Okay.  And Oxycodone IR also has the

Page 153

1  potential for abuse, correct?
2      A.  Yes.
3      Q.  And were you aware of that back in
4  2005?
5      A.  I don't remember when I was aware of
6  it.
7      Q.  Okay.  All right.  You can set that
8  aside.
9        (Whereupon, Mallinckrodt-Spaulding-9
10        was marked for identification.)
11 BY MR. GOTTO:
12     Q.  We've marked as Exhibit 9 a two-page
13 e-mail thread beginning at Bates
14 MNK-T1_0000492214.  Take a look at those
15 e-mails, if you would, and tell me if you
16 recognize them.
17        (Witness reviewing document.)
18     A.  Yes.
19     Q.  And do you recognize these as e-mails
20 from April of 2007 involving you and Ms. Harper
21 as well as some others concerning a suspension
22 of AmerisourceBergen by FDA -- by DEA?
23     A.  Yes.
24     Q.  Do you recall that circumstance

Page 154

1 occurring?

2    A.  Yes.

3    Q.  And AmerisourceBergen was a large

4 customer of Mallinckrodt, correct?

5    A.  Yes.

6    Q.  And they, according to this press

7 report, they were temporarily suspended as a

8 result of shipping to certain pharmacies in

9 Florida, correct?

10    A.  Based on this release, yes.

11    Q.  And this is dated in 2007.  Were there

12 any steps taken in 2007 in light of this

13 suspension of AmerisourceBergen to evaluate

14 whether any AmerisourceBergen orders from

15 Mallinckrodt were suspicious?

16    A.  I don't remember if there was any

17 specific steps.

18    Q.  Was there an audit conducted of

19 AmerisourceBergen?

20       MR. O'CONNOR:  Objection to form.

21    A.  Not that I was directly involved in.

22 BY MR. GOTTO:

23    Q.  Were you aware of an audit being

24 conducted of AmerisourceBergen at any time in

Page 155

1 the 2007 time frame?

2    A.  No, not that I can recall.

3    Q.  Or in 2008?

4    A.  No.

5    Q.  Or 2009?

6    A.  No.

7    Q.  Or 2010?

8    A.  No.

9    Q.  Now, in your e-mail, the second one on

10 the first page of the exhibit, you note that

11 AmerisourceBergen had already been reinstated by

12 the DEA.  How did you know that?

13    A.  I don't remember how I knew back at

14 that time.

15    Q.  And Ms. Harper in her April 27th

16 e-mail says "sometimes we are met with internal

17 pushback and the attitude that we are 'such big

18 players' that DEA would never suspend our

19 license."

20       Do you see that?

21    A.  Yes.

22    Q.  Do you recall Ms. Harper expressing

23 that sentiment to you, that sometimes that that

24 attitude was expressed at Mallinckrodt?

Page 156

1    A.  Yes.

2    Q.  And did you ever hear anyone express

3 that attitude?

4    A.  There was internal pushback both ways,

5 so they would push back on us and we would push

6 back as well.

7    Q.  And when you say "they" in that

8 setting, who is the they?

9    A.  Management, stakeholders in the

10 business.

11    Q.  And pushback on whom?

12    A.  The compliance team.

13    Q.  And what would the form of the

14 pushback be?

15    A.  If we wanted to purchase physical --

16 additional equipment for physical security to

17 make us -- to enhance, but at all times it

18 was -- we were always in compliance.  It was

19 always to make us better or to be able to look

20 at things differently.  At no time were we not

21 compliant.  If we were, we -- the business would

22 have given us anything we needed to be

23 compliant.

24    Q.  So one form of pushback that you're

Page 157

1 recalling is where you may have made a request

2 for some sort of enhancement to security and

3 that request was rejected?

4       MR. O'CONNOR:  Objection to form.

5    A.  Was challenged.

6 BY MR. GOTTO:

7    Q.  Do you remember any specific request

8 in that regard?

9    A.  Nothing specific.

10    Q.  So the attitude that Ms. Harper is

11 referring to is one that "we are 'such big

12 players' that DEA would never suspend our

13 license."  If you were in compliance with DEA

14 regulation and you were requesting an

15 enhancement, how would that trigger a response

16 in the nature of "we are 'such big players' that

17 DEA would never suspend our license"?

18       MR. O'CONNOR:  Objection to form.

19    A.  I don't know what example that Karen

20 is referring to in this -- in her comment.

21 BY MR. GOTTO:

22    Q.  You don't recall any discussions with

23 her on that point in this time frame?

24    A.  No.

Page 158

1    Q. Did Ms. Harper ever express to you any
2 frustration with the slow pace of enhancing the
3 SOM program?
4      MR. O'CONNOR: Objection to form.
5    A. Not that I can recall.
6 BY MR. GOTTO:
7    Q. It took quite a while from when you
8 began working on enhancing the program until
9 there actually was an enhanced program in place,
10 wasn't it?
11      MR. O'CONNOR: Objection to form.
12    A. I don't know what that time frame is.
13 I don't know what a while is.
14 BY MR. GOTTO:
15    Q. More than three years?
16    A. I don't know, because they were
17 working on it from the corporate aspect.
18    Q. In terms of when you were first aware
19 of there being work on enhancing the SOM program
20 until the time when the enhanced program was
21 actually implemented, that was more than three
22 years, wasn't it?
23      MR. O'CONNOR: Objection to form.
24    A. I don't remember. We were constantly

Page 159

1 working on it. There was always a program in
2 place, we were just always tweaking it, making
3 it better.
4 BY MR. GOTTO:
5    Q. Were you personally frustrated with
6 the pace at which the enhancement of the SOM
7 program was taking place?
8    A. No, not that I can recall.
9    Q. And you don't recall Ms. Harper
10 expressing any frustration in that regard?
11    A. No, not to me.
12      (Whereupon, Mallinckrodt-Spaulding-10
13      was marked for identification.)
14 BY MR. GOTTO:
15    Q. We've marked as Exhibit 10 a
16 multi-page e-mail thread beginning at Bates
17 MNK-T1_0001792949. Please take a moment to look
18 at those e-mails, and tell me if you recognize
19 them.
20      (Witness reviewing document.)
21    Q. I just have questions for you on the
22 first page.
23      (Witness reviewing document.)
24    A. Okay.

Page 160

1    Q. In your e-mail on June 24th, you
2 indicate "Patti is sharing with her group as
3 well."
4      Who is Patti?
5    A. Patti Woznick was the purchasing
6 manager.
7    Q. Okay. And what was her group?
8    A. The purchasing department, and the
9 ARCOS coordinator at the time was reporting to
10 Patti.
11    Q. Okay. And Ms. Harper was forwarding
12 you some press reports regarding oxycodone and
13 OxyContin, correct?
14    A. Yes.
15    Q. And what would be the reason for Patti
16 sharing that information with her group?
17    A. Because she had a member of compliance
18 on her team.
19    Q. Fair to say that by mid 2008 you were
20 aware of the potential for diversion and abuse
21 of oxycodone, correct?
22    A. Yes. Yes.
23    Q. And fair to say it was a matter of
24 concern for Ms. Harper at that time?

Page 161

1      MR. O'CONNOR: Objection to form.
2    A. I can't speculate on what Karen felt
3 or knew.
4 BY MR. GOTTO:
5    Q. You don't recall her expressing to you
6 at that time any concerns about the potential
7 for diversion or abuse of oxycodone?
8      MR. O'CONNOR: Objection to form.
9    A. Not at this time.
10 BY MR. GOTTO:
11    Q. When can you recall her first
12 expressing any such concerns to you?
13      MR. O'CONNOR: Objection to form.
14    A. I don't remember exact dates or
15 timelines.
16 BY MR. GOTTO:
17    Q. You understood in 2008, didn't you,
18 that as a DEA registrant Mallinckrodt had an
19 obligation to design and implement a suspicious
20 order monitoring program, correct?
21    A. Yes.
22    Q. And you understood that a purpose of
23 that program was to function as an
24 anti-diversion mechanism, correct?

Page 162

1    MR. O'CONNOR: Objection to form.
2    A.  I understood it to be a regulation in
3 the CFR.
4 BY MR. GOTTO:
5    Q.  Did you understand one of the purposes
6 for suspicious order monitoring to deter
7 diversion?
8    A.  Yes.
9    Q.  And you understood in 2008 that as a
10 DEA registrant Mallinckrodt also had the
11 obligation to take steps to protect against
12 diversion of the controlled substances that it
13 manufactured?
14    MR. O'CONNOR: Objection to form.
15    A.  We had to maintain effective controls
16 to detect diversion within the manufacturing
17 site.
18 BY MR. GOTTO:
19    Q.  Did you have an understanding as to
20 whether Mallinckrodt had any duties with respect
21 to controlling against diversion with respect to
22 its products after they left the manufacturing
23 site?
24    A.  No.

Page 163

1    Q.  Did you not have an understanding, or
2 did you understand that it did not have any such
3 obligation?
4    A.  So my understanding was that we had an
5 obligation to maintain effective controls from
6 us to the customer, to our direct customer.
7 Back in 2008 we didn't know about downstream
8 customers, or have the inclination that we
9 needed to be looking at downstream customers.
10    Q.  Okay.  And when you say "downstream
11 customers," you mean your customers' customers,
12 correct?
13    A.  Yes.
14    Q.  And when did you first -- when can you
15 recall first beginning to conduct any inquiry
16 into Mallinckrodt's customers' customers?
17    MR. O'CONNOR: Objection to form.
18    A.  That would have been when we started
19 looking at chargebacks.
20 BY MR. GOTTO:
21    Q.  And do you recall when that was?
22    A.  I don't.
23    Q.  Do you recall what triggered that?
24    A.  I don't.  I don't know if it was

Page 164

1 something that somebody else saw on the SOM team
2 or it was broader.
3    Q.  Was the subject of conducting inquiry
4 into your customers' customers something that
5 was covered in any of the DEA-sponsored
6 educational programs that you attended?
7    A.  I vaguely remember one of the DEA
8 conferences talking about know your customer's
9 customer, but I don't know when that was.
10    Q.  Do you recall if at that time
11 Mallinckrodt was taking steps to know its
12 customer's customer?
13    A.  No, because I don't remember what the
14 correlation time was.
15    Q.  How about the Buzzeo conferences, do
16 you recall that topic, knowing your customer's
17 customer, being covered at any of those
18 conferences?
19    A.  No.
20    Q.  Do you recall that in 2008 there was
21 an initiative at Mallinckrodt to enhance the SOM
22 program?
23    A.  Yes.
24    Q.  And do you recall what triggered that?

Page 165

1    A.  No.
2    Q.  How did you learn about that
3 initiative?
4    A.  The initiative of --
5    Q.  Enhancing the SOM program.
6    A.  Through Karen Harper.
7    Q.  And was one of the reasons for that
8 initiative increased DEA scrutiny with respect
9 to Mallinckrodt's distributors?
10    A.  I don't know that firsthand.
11    Q.  Was one of the reasons any of the
12 letters from Mr. Rannazzisi that you mentioned
13 earlier today?
14    A.  It could be.
15    Q.  But you don't recall?
16    A.  I don't recall exactly, no.
17    Q.  Do you recall in 2008 being aware that
18 diversion of prescription opioids was being
19 identified publicly as a significant health
20 issue?
21    MR. O'CONNOR: Objection to form.
22    A.  I'm aware of it.  I don't remember
23 when I became aware of it.
24    (Whereupon, Mallinckrodt-Spaulding-11

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1        was marked for identification.)
2    BY MR. GOTTO:
3        Q.   We've marked as Exhibit 11 a two-page
4    DEA letter beginning at Bates MNK-T1_0000270069.
5    Take a look at that, and tell me if you
6    recognize that as one of the letters from
7    Mr. Rannazzisi that you testified about earlier
8    today.
9        A.   Yes.
10       Q.   Do you recall seeing this letter in
11   late 2007 or early 2008?
12       A.   I recall seeing it.  I would assume it
13   was when this letter was sent.  I don't remember
14   exactly.
15       Q.   And do you recall who provided it to
16   you?
17       A.   So based on the stamp, this came into
18   our regulatory affairs department, and they
19   probably shared it with me.
20       Q.   Okay.  Do you recall when you first
21   saw this letter if this provided any information
22   with respect to DEA regulation of which you were
23   not aware until you read the letter?
24       MR. O'CONNOR:  Objection to form.

Page 167

1        A.   I remember that the letter called out
2    that they didn't want excessive order reports
3    anymore.  They only wanted orders that were
4    suspicious.
5    BY MR. GOTTO:
6        Q.   Okay.  And excessive order reports
7    were something that you had provided previously,
8    correct?
9        A.   Yes.
10       Q.   And did you stop doing that after
11   receiving this letter?
12       A.   I stopped doing it.  I don't know that
13   it was a result of receiving this letter or
14   when.
15       Q.   The second paragraph of the letter in
16   the second line notes that manufacturers and
17   distributors must maintain effective controls
18   against diversion.
19           Do you see that?
20       A.   Yes.
21       Q.   You were aware of that before you
22   received this letter, correct?
23       A.   Yes.
24       Q.   A little later in that paragraph,

Page 168

1    about halfway through there's a sentence that
2    says "The regulation clearly indicates that it
3    is the sole responsibility of the registrant to
4    design and operate such a system."
5            Do you see that in that system to
6    disclose suspicious orders?
7        A.   Yes.
8        Q.   You were aware of that before you
9    received the letter, correct?
10       A.   Yes.
11       Q.   In the following paragraph, the second
12   sentence says "Filing a monthly report of
13   completed transactions does not meet the
14   regulatory requirement to report suspicious
15   orders."
16           Were you aware of that before you
17   received this letter?
18       MR. O'CONNOR:  Objection to form.
19       A.   I'm not following where you are in the
20   letter.
21   BY MR. GOTTO:
22       Q.   I'm sorry.  The third paragraph,
23   second sentence, "Filing a monthly report."
24       A.   Okay.

Page 169

1        Q.   Were you aware of what that sentence
2    said before you received this letter?
3        MR. O'CONNOR:  Same objection.
4        A.   I don't remember.
5    BY MR. GOTTO:
6        Q.   Two sentences later in that paragraph
7    it says "Registrants must conduct an independent
8    analysis of suspicious orders prior to
9    completing a sale to determine whether the
10   controlled substances are likely to be diverted
11   from legitimate channels."
12           Do you see that?
13       A.   Yes.
14       Q.   Were you aware of that before
15   receiving this letter?
16       A.   I don't remember.
17       Q.   But in any event, you were aware of it
18   after you read this letter, correct?
19       A.   Yes.
20       Q.   Was it your understanding in late
21   2007, early 2008 that Mallinckrodt's procedures
22   complied with that requirement, namely to
23   conduct an independent analysis of suspicious
24   orders before completing a sale to determine

Page 170

1 whether the controlled substances were likely to
2 be diverted from legitimate channels?
3     MR. O'CONNOR: Objection.
4     A. Yes.
5 BY MR. GOTTO:
6     Q. What did that independent analysis
7 consist of in this time frame?
8     A. I don't remember exactly. It was
9 being done at corporate.
10     Q. It's not something you were involved
11 in at this time?
12     A. I don't think so. I don't remember.
13     Q. Do you know who at corporate was
14 involved in that?
15     A. Customer service managers.
16     Q. The next paragraph says "The
17 regulation specifically states that suspicious
18 orders include orders of an unusual size, orders
19 deviating substantially from a normal pattern,
20 and orders of unusual frequency."
21     Do you see that?
22     A. Yes.
23     Q. Were you aware of that before you
24 received this letter?

Page 171

1     A. Yes.
2     Q. On the second page, the first
3 paragraph on that page says "Registrants that
4 rely on rigid formulas to" determine "whether an
5 order is suspicious may be failing to detect
6 suspicious orders."
7     Do you see that?
8     A. Yes.
9     Q. Were you aware of that before
10 receiving this letter?
11     A. I don't remember.
12     Q. The following sentence says "For
13 example, a system that identifies orders as
14 suspicious only if the total amount of the
15 controlled substance ordered during one month
16 exceeds the amount ordered the previous month by
17 a certain percentage or more is insufficient."
18     Do you see that?
19     A. Yes.
20     Q. Were you aware before receiving this
21 letter that a system of the type described in
22 that sentence is insufficient?
23     A. I don't remember.
24     Q. Do you know if at this time

Page 172

1 Mallinckrodt's SOM program -- well, do you know
2 if at the time of this letter the description
3 that I just read from this letter would apply to
4 Mallinckrodt's SOM program as it was followed in
5 this time frame?
6     MR. O'CONNOR: Objection to form.
7     A. I don't know what the algorithm in
8 place was at the time of this letter.
9 BY MR. GOTTO:
10     Q. Okay. You can set that aside.
11     (Whereupon, Mallinckrodt-Spaulding-12
12     was marked for identification.)
13 BY MR. GOTTO:
14     Q. We've marked as Exhibit 11 a one-page
15 document MNK-T1_0000496062, Suspicious Order
16 Monitoring Team Charter.
17     MR. O'CONNOR: Counsel, I think it's
18 12.
19     MR. GOTTO: I'm sorry. Is it 12?
20     MS. REYES: It is 12.
21     MR. GOTTO: Sorry. I apologize.
22 Exhibit 12.
23     MR. O'CONNOR: No problem.
24 BY MR. GOTTO:

Page 173

1     Q. Updated 4/7/11. Take a look at that
2 document, if you would, tell me if you recognize
3 it.
4     (Witness reviewing document.)
5     A. Okay.
6     Q. Do you recognize that document?
7     A. No, I don't remember it.
8     Q. Appears to be a team charter for the
9 SOM team. You're listed on -- as a member of
10 the steering committee.
11     Do you see that?
12     A. Yes.
13     Q. And is that consistent with your
14 recollection that you were a member of the SOM
15 steering committee at least as of April 7 of
16 2011?
17     A. Yes.
18     Q. Do you recall when you became a member
19 of the steering committee?
20     A. No.
21     Q. When you were a member, do you
22 recall -- are you still a member of the steering
23 committee?
24     A. Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  Q. And does the steering committee meet
2  regularly?
3  A. Yes.
4  Q. How frequently?
5  A. Monthly.
6  Q. Has that been the case at least since
7  April of 2011?
8  A. Yes.
9  Q. Does it maintain minutes of meetings?
10  A. Not that I'm aware of.
11  Q. Any other formal documentation of its
12  actions or deliberations?
13  A. No.
14  (Whereupon, Mallinckrodt-Spaulding-13
15  was marked for identification.)
16  BY MR. GOTTO:
17  Q. We've marked as Exhibit 13 a two-page
18  document starting MNK-T1_0007026341. Please
19  take a look at those pages, and tell me if you
20  recognize them.
21  (Witness reviewing document.)
22  A. Yes.
23  Q. And what are they?
24  A. So this is actually -- I know the

Page 175

1  header says suspicious orders, but these are
2  what we call as peculiar or unusual orders, so
3  they're hits to the algorithm.
4  Q. Okay. Your cover e-mail, which is
5  dated in April of 2014 to Ms. Harper, says "I
6  can recall having a suspicious order monitoring
7  system in place of some type with the start of
8  distribution activities from Hobart 2001,
9  however the attached is the earliest SOM report
10  that I have in my e-mail system." And the
11  attachment is from December of 2003, correct?
12  A. Yes.
13  Q. And this identifies four transactions.
14  And I take it from your earlier answer these
15  were identified as peculiar, correct?
16  A. Yes.
17  Q. And is it the case that none of these
18  were ultimately determined to be suspicious?
19  A. Correct.
20  Q. And I think you've testified earlier
21  the only order that you can recall being
22  identified as suspicious was the fentanyl order
23  to the vet clinic, correct?
24  A. The only one I know of, yes.

Page 176

1  Q. Okay. Do you recall why you sent this
2  report to Ms. Harper in 2014?
3  A. She would have had to have requested
4  it is the only reason I would have sent it.
5  Q. Now, in your cover e-mail you mention
6  a suspicious order monitoring of some type from
7  2001. Was there a written suspicious order
8  monitoring program in place before 2008?
9  MR. O'CONNOR: Object to form.
10  A. I don't know that it was written, that
11  there was a written policy on it.
12  BY MR. GOTTO:
13  Q. Okay. So you don't recall seeing a
14  written policy prior to 2008?
15  A. No.
16  Q. How did you come to know what the
17  program was if it wasn't written?
18  A. Because Elizabeth McPhail at the time
19  would have trained me on what to look for in the
20  orders.
21  Q. And what do you recall her training
22  you on in that regard?
23  A. To look at the orders that come out,
24  and if they were of concern to research them

Page 177

1  further.
2  Q. And did she train you as to what
3  characteristics of an order might raise concern?
4  A. No, because we really didn't have a
5  whole lot of information of what was unusual.
6  Q. And so, for example, the orders
7  identified as peculiar in the attachment to
8  Exhibit 13, do you recall how you identified
9  those orders as peculiar?
10  A. So the system would have ran these
11  orders against whatever algorithm was in place
12  at that time, and then these orders, these
13  orders went on hold. So the report is saying
14  their previous year-to-date average is 643, and
15  this order was for 1,380.
16  Q. Okay. So these orders were identified
17  by application of the algorithm that you
18  understand was in place at the time?
19  A. Yes.
20  Q. But you don't know what the components
21  of that algorithm were, correct?
22  A. All I know, it was based on previous
23  history. I don't know the specifics.
24  Q. Okay. You can set that aside.

Page 178

1    (Whereupon, Mallinckrodt-Spaulding-14
2    was marked for identification.)
3 BY MR. GOTTO:
4    Q.  We've marked as Exhibit 14 a
5 single-page document, MNK-T1_0004282621.  It's a
6 2007 e-mail from you to Sarah Heideman.
7    First of all, who was Sarah Heideman?
8    A.  I don't remember.
9    Q.  Okay.
10    A.  I don't know.
11    Q.  In the body of your e-mail -- first of
12 all, no reason to doubt you sent this e-mail,
13 correct?
14    A.  No.
15    Q.  The body of your e-mail, you say "DEA
16 requires us to report any 'suspicious orders'.
17 IS programmed a report that takes last year's
18 average YTD and comes up with a formula and
19 anything outside of that formula shows on this
20 report."
21    Is that the algorithm that you're
22 referring to?
23    A.  Yes.
24    Q.  And you have -- you ask Ms. Heideman

Page 179

1 to take a look and let you know what she thinks.
2    But you don't recall who Ms. Heideman
3 was or why you sent her this e-mail?
4    A.  Based on the context of this e-mail,
5 it leads me to believe Sarah Heideman was the
6 project -- or the account manager for Walmart,
7 because I'm asking her specifically about
8 Walmart orders.
9    Q.  Okay.  And you note in your e-mail,
10 "It appears to me that Walmart is ordering
11 double what was last years' YTD amount, more
12 than the 20 percent market share increase."
13    Your reference there to market share,
14 what are you referring to?
15    A.  So we would have received information
16 from the marketing group as to which customers
17 have -- which have how much of the market share.
18 So at this time I must have been advised by
19 somebody in marketing that Walmart had
20 20 percent market share.
21    Q.  Or 20 percent market share increase?
22    A.  Yeah.  Yes.
23    Q.  Okay.  So you're comparing that
24 increase to the increase in the size of their

Page 180

1 order, is that what you're saying in this
2 sentence?
3    A.  YTD is year-to-date, so the formula at
4 that time was taking the last year's
5 year-to-date average, and this order was double
6 their last year year-to-date average.
7    Q.  And so would this -- is this e-mail an
8 example of your looking at an order that had
9 been identified as peculiar to determine whether
10 it was suspicious?
11    A.  At this time, yes.
12    Q.  And you did that by providing this
13 information to Ms. Heideman and asking her for
14 some feedback on it?
15    A.  Yes.
16    Q.  And do you recall if you ultimately
17 concluded whether this order was suspicious or
18 not?
19    A.  It wasn't reported to DEA, that I'm
20 aware of.
21    Q.  Okay.
22    (Whereupon, Mallinckrodt-Spaulding-15
23    was marked for identification.)
24 BY MR. GOTTO:

Page 181

1    Q.  We've marked as Exhibit 15 a two-page
2 document beginning at MNK-T1_0000274399, an
3 e-mail exchange involving you and Ms. Harper,
4 "Re:  Controlled Substance Suspicious Order
5 Monitoring Team Update."  Take a look at those
6 e-mails, and tell me if you recognize them.
7    (Witness reviewing document.)
8    A.  Okay.
9    Q.  Okay.  Do you recognize those e-mails?
10    A.  No, I don't remember them
11 specifically.
12    Q.  Okay.  The second e-mail on the page
13 from you to Ms. Harper dated June 17, do you see
14 that?
15    A.  Yes.
16    Q.  Any reason to doubt you sent that
17 e-mail?
18    A.  No.
19    Q.  Okay.  You say to Ms. Harper, the
20 first paragraph suggests on the customer
21 checklist, "fill in what type of DEA
22 registration so that we may be able to identify
23 if a customer is ordering a suspicious amount
24 against a specific registration type."

Page 182

1  What did you mean by that?
2  A.  So if a customer that's listed as a
3  researcher is ordering a huge amount of product,
4  that would not be normal for a researcher
5  license.
6  Q.  Okay.  And the customer checklist that
7  you're referring to here, what was that?
8  A.  To the best that I recall, there
9  was -- the SOM corporate team was developing
10  checklists to be sent out to our customers.
11  Q.  Was this part of the enhancement of
12  the SOM?
13  A.  Yes.
14  Q.  The last paragraph of your June 17th,
15  or the last substantive paragraph says "With the
16  new procedures, what kind of report will I send
17  to the DEA?  I realize that we will DEA report
18  any order that is deemed suspicious by yours and
19  Bill's group, but what if we go a quarter
20  without a suspicious order?"
21  Do you see that?
22  A.  Yes.
23  Q.  So was your -- does that indicate that
24  up until this time there was a regular quarterly

Page 183

1  report you were sending to the DEA?
2  A.  It was the excessive orders report.
3  Q.  Okay.  And so does that paragraph
4  indicate that you were not going to be providing
5  that report to the DEA anymore?  Correct?
6  A.  Correct.
7  Q.  And so what was the answer to the
8  question that you posed in that paragraph?
9  A.  I don't remember.
10  Q.  You can set that aside.
11  Do you know who Bill Rausch was?
12  A.  Bill Rausch --
13  Q.  Rausch.
14  A.  -- or Jim Rausch.
15  Q.  Jim Rausch, I'm sorry.
16  A.  Jim Rausch, yes.
17  Q.  Who was he?
18  A.  He was a customer service manager.
19  Q.  Did he have any involvement at any
20  time that you can recall in the SOM process?
21  A.  Yes, he was the customer service
22  manager reviewing the peculiar order report.
23  Q.  Okay.  And did he provide reports to
24  the DEA from time to time that you know of?

Page 184

1  A.  I don't know what he provided.
2  (Whereupon, Mallinckrodt-Spaulding-16
3  was marked for identification.)
4  BY MR. GOTTO:
5  Q.  We've marked as Exhibit 16 a two-page
6  document beginning at Bates MNK-T1_0002940798.
7  Please take a look at those and tell me if you
8  can identify them.
9  (Witness reviewing documents.)
10  A.  Okay.
11  Q.  Do you recognize those documents?
12  A.  Yes.
13  Q.  What are they?
14  A.  These were the quarterly reports that
15  I was combining and sending to DEA.
16  Q.  Okay.  And these were -- what is
17  reported on the report?
18  A.  I'm not sure I understand your
19  question.
20  Q.  I'm sorry.  How does some -- how does
21  an order -- what is it about an order that
22  causes you to include it on this report?
23  A.  So if it hits the criteria for the
24  algorithm.

Page 185

1  Q.  Okay.  So these would be, again,
2  peculiar orders under the Mallinckrodt
3  terminology?
4  A.  Yes.
5  Q.  Okay.  And so did you report all
6  peculiar orders on a quarterly basis to the DEA
7  for some period of time?
8  A.  We reported all orders that -- these
9  are all clinic orders.
10  Q.  Clinic orders that had been identified
11  as peculiar?
12  A.  Yes.
13  Q.  As compared to what other types of
14  orders?
15  A.  So the distributors have been removed.
16  Q.  Okay.  And what was the reason for
17  that?
18  A.  I don't remember specifically.  I
19  remember being told not to include the
20  distributors into the report, but I don't
21  remember who told me not to include the
22  distributors.
23  Q.  Would it have been someone other than
24  Ms. Harper?

Page 186

1    A.  It could have been.
2    Q.  Okay.  And you don't remember -- you
3  weren't given a reason for that, I take it?
4    A.  I know that I was told not to include
5  them, but I can't remember by whom.  It could
6  have been any number of people.
7    Q.  So in Exhibit 15, that was an e-mail
8  in 2008 in which you posed the question about
9  what kind of report will you be sending to the
10  DEA going forward.
11      Do you see that?
12    A.  Yes.
13    Q.  In 2010, judging from Exhibit 16, in
14  2010 you were still providing some sort of
15  quarterly report to the DEA, correct?
16    A.  Yes.  Well, this was -- the last
17  report was 2008.  My e-mail to Karen was 2010,
18  but the last report was 2008.
19    Q.  Okay.  So your 2010 e-mail is
20  attaching a 2008 report?
21    A.  Yes.
22    Q.  Okay.  So the attachment to Exhibit 16
23  is the final report that you sent to the DEA,
24  the final quarterly report?

Page 187

1    A.  Yes.
2    Q.  Okay.  And so after the report that's
3  attached to Exhibit 16, what, if any, report did
4  you provide to the DEA with respect to orders
5  that were identified as peculiar but were not
6  identified as suspicious?
7    A.  So what reports did we make to the DEA
8  that were peculiar but not suspicious?
9    Q.  Yes.
10    A.  In what time frame?
11    Q.  Well, after the report that is
12  attached to Exhibit 16.
13    A.  Right.  We stopped this because this
14  was basically the excessive order report, and
15  the letter came out that said they didn't want
16  the excessive order report, so that's why we
17  discontinued sending them to DEA.  And then we
18  would have only reported suspicious orders.
19    Q.  Okay.
20    A.  In 2012, one of the iterations in the
21  enhancements involved sending the peculiar order
22  report, at this time we called it unusual order
23  report, to DEA twice daily.
24    Q.  And that was in 2012?

Page 188

1    A.  Roughly, yes.
2    Q.  Okay.  And do you continue -- is that
3  procedure still in place?
4    A.  Yes.
5    Q.  Okay.  So from the attachment to
6  Exhibit 16, after that report and prior to the
7  time when you in 2012 began the twice daily
8  unusual order report to the DEA, was there any
9  other reporting to the DEA other than if a
10  report was -- if an order was determined to be
11  suspicious?
12    A.  Not by me, but I don't know if DEA --
13  or if corporate was sending anything to DEA.
14    Q.  Okay.  But as far as reports that
15  you're aware of, you're not aware of any during
16  that time period?
17    A.  Correct.  2008 was the last of the
18  quarterly excessive order reports.  In 2012
19  started the peculiar order reports.
20    Q.  Okay.  You can set that aside.
21      (Whereupon, Mallinckrodt-Spaulding-17
22      was marked for identification.)
23  BY MR. GOTTO:
24    Q.  We've marked as Exhibit 17 a

Page 189

1  multi-page e-mail thread, MNK-T1_0005663239 is
2  the beginning.  Take a moment to look at those.
3      My questions are principally about
4  your March 5, 2012 e-mail that begins the
5  thread.
6      (Witness reviewing document.)
7    A.  Okay.
8    Q.  Do you recognize those e-mails?
9    A.  I'm sorry?
10    Q.  Do you recognize those e-mails?
11    A.  No.
12    Q.  Okay.  Turning to your March 5, 2012
13  e-mail, which is on the third page, any reason
14  to doubt you sent that e-mail?
15    A.  No.
16    Q.  Okay.  So this is an e-mail that you
17  send to a number of persons regarding an order
18  from Quest Pharmaceuticals, correct?
19    A.  Yes.
20    Q.  And you indicate "I am unsure of the
21  Product Manager for Hydrocodone and the NAM for
22  Quest," correct?
23    A.  Yes.
24    Q.  And that's the reason you sent it to

Page 190

1 all those parties, right?
2    A.  Correct.
3    Q.  Okay.  Was there a -- well, strike
4 that.
5        So the order from Quest had been
6 identified as a peculiar order, is that fair?
7    A.  Unusual, yes.
8    Q.  Peculiar or unusual?
9    A.  Yeah.
10    Q.  Meaning that it triggered the --
11 whatever the algorithm was in place at the time,
12 this triggered it?
13    A.  Yes.
14    Q.  Okay.  And you indicate that the
15 "items are double and in some cases triple the
16 quantity previously ordered."  Would your
17 procedure at this time in 2012 have been to
18 inquire of the product manager or the NAM to get
19 further information with respect to an order
20 that triggered the algorithm?
21    A.  Yes.
22    Q.  Okay.  And here you weren't sure who
23 those individuals were, correct?
24    A.  Correct.

Page 191

1    Q.  Did you have any program in place to
2 be made aware of who the project manager --
3 product manager and NAMs were for particular
4 products or customers?
5    A.  No.
6        MR. O'CONNOR:  Objection to form.
7    A.  Because they could change.  So NAM is
8 national account manager, and the product
9 manager.
10 BY MR. GOTTO:
11    Q.  Okay.  And so when you had a peculiar
12 or unusual order, was it your practice to
13 inquire of both the product manager and the
14 national account manager?
15    A.  Depends on the circumstances and the
16 product.
17    Q.  Okay.  Did you ever have any
18 difficulty in receiving responses either from
19 product managers or national account managers
20 with respect to inquiries that you made
21 regarding peculiar orders?
22    A.  Sometimes we'd have to send them a
23 reminder e-mail if they were travelling that the
24 order was still on hold and we were awaiting

Page 192

1 information.
2    Q.  Did you ever make inquiry of the
3 customer service department to gain further
4 information with respect to orders that had been
5 identified as peculiar?
6    A.  Yes.
7    Q.  And who did you make inquiry of in the
8 customer service department?
9    A.  It depends on the customer service rep
10 assigned to the account.
11    Q.  Okay.  So in this example on March 5th
12 of 2012, are you making inquiry here of customer
13 service?
14    A.  No.
15    Q.  And why not?
16    A.  Because customer service may not know
17 why their order is higher.  The product manager
18 or the account manager may.  I would inquire to
19 customer service if I suspected that an order
20 had been duplicated.  There might have been an
21 order entry error.  But in this case, because of
22 the order quantities, I went to the account
23 manager who would know what the customer was
24 ordering.

Page 193

1    Q.  Okay.  Do you know who Cathy Stewart
2 was?
3    A.  Yes.
4    Q.  Who was she?
5    A.  She was a customer service manager.
6    Q.  Did you interact with her from time to
7 time?
8    A.  Yes.
9    Q.  And she had customer service reps who
10 reported to her, correct?
11    A.  Yes.
12    Q.  And your March 5, 2012 e-mail, one of
13 the persons that you address it to is Victor
14 Borelli, correct?
15    A.  Yes.
16    Q.  And did you deal with Mr. Borelli from
17 time to time?
18    A.  Yes.
19    Q.  Did Ms. Stewart ever express to you,
20 that you can recall, that one or more of the
21 customer service reps who reported to her had
22 expressed the view that Mr. Borelli would tell
23 them anything to get a sale?
24        MR. O'CONNOR:  Objection to form.

Page 194

1    A.  Not that I remember.
2  BY MR. GOTTO:
3    Q.  Okay.  You can set that aside.
4        (Whereupon, Mallinckrodt-Spaulding-18
5        was marked for identification.)
6  BY MR. GOTTO:
7    Q.  We've marked as Exhibit 18 a two-page
8  e-mail thread beginning at Bates
9  MNK-T1_0000280632.  Take a moment to look at
10 those e-mails, if you would.
11       (Witness reviewing document.)
12   A.  Okay.
13   Q.  And do you recall this e-mail
14 exchange?
15   A.  Yes.
16   Q.  Okay.  What do you recall of that?
17   A.  Karen was alerting me to some -- she
18 had compiled a timeline and had sent me the
19 timeline, and then was letting me know that all
20 the orders had been reviewed by the customer
21 service manager, and then later on in the e-mail
22 she corrects terminology listed below.
23   Q.  Okay.  In Ms. Harper's e-mail, she --
24 the first e-mail, October 31, "In an effort to

Page 195

1  provide you with as much information as
2  possible, I have attached a (lengthy) chronology
3  of events relating to Mallinckrodt Suspicious
4  Order Monitoring."
5        Do you see that?
6    A.  Yes.
7    Q.  Let me hand you what we've marked as
8  Exhibit 19, and you can tell me if that's the
9  attachment.
10       (Whereupon, Mallinckrodt-Spaulding-19
11       was marked for identification.)
12 BY MR. GOTTO:
13   Q.  Exhibit 19 is a multi-page document
14 beginning at page MNK-T1_0000477900.  Can you
15 tell me if that's the chronology that Ms. Harper
16 is referring to?
17   A.  Yes.
18   Q.  Okay.  And you're familiar with that
19 chronology, right?
20   A.  At a high level, yes.
21   Q.  Okay.  Did you have occasion ever to
22 provide this chronology to DEA?
23   A.  We met in -- we went and met with DEA.
24 We didn't provide a document, I don't recall.

Page 196

1    Q.  Okay.  And in Ms. Harper's October 31
2  e-mail, she says "during the last two years, all
3  Peculiar Orders...were deemed to be okay and
4  none rose to the level of Peculiar."
5        Do you know if she meant there that
6  none rose to the level of suspicious?
7        MR. O'CONNOR:  Objection.
8    A.  She did.  In the earlier e-mail above
9  she clarifies that --
10 BY MR. GOTTO:
11   Q.  Okay.
12   A.  -- she meant none rose to the level of
13 suspicious.
14   Q.  Okay.  And that's consistent with your
15 recollection you've already testified to in
16 terms of orders being identified as suspicious,
17 correct?
18   A.  Yes.
19   Q.  She gross on to say "It is significant
20 to note that neither Sunrise or Harvard
21 triggered the algorithms that were in place for
22 direct customers because we were looking at
23 overall purchase trends for each distributor,
24 not reviewing where the distributors were

Page 197

1  sending our product (and our program met CFR
2  requirements)."
3        And is that the phenomenon you
4  testified about earlier today, looking at ship
5  to rather than bill to?
6        MR. O'CONNOR:  Objection to form.
7    A.  No, that's different.
8  BY MR. GOTTO:
9    Q.  Okay.  In what way is this different?
10   A.  So Karen is referring to downstream
11 customers, so those wouldn't have triggered
12 because we were only looking at our direct
13 shipments to Sunrise and to Harvard.  We weren't
14 looking at where Harvard was shipping, or
15 Sunrise.
16   Q.  Okay.  And she indicates in the last
17 sentence of that paragraph that the program has
18 now been expanded in October of 2010 to look at
19 customers' customers, correct?
20   A.  Based on this e-mail, yes.
21   Q.  Okay.  And was that your recollection
22 as well, that in late 2010 the SOM program was
23 expanded to include a review of Mallinckrodt's
24 customers' customers?

Page 198

1 MR. O'CONNOR: Objection to form.
2 A. Only based on this e-mail.
3 BY MR. GOTTO:
4 Q. You don't otherwise recall that?
5 A. No.
6 Q. Can you recall at any time in
7 connection with suspicious order monitoring you
8 personally reviewing information regarding
9 Mallinckrodt's customers' customers?
10 A. I was involved in reviewing
11 chargebacks, but I don't remember when that
12 started.
13 Q. And that would have given you
14 information about Mallinckrodt's customers'
15 customers, right?
16 A. If they applied and participated in
17 chargebacks, yes.
18 Q. Okay.
19 (Whereupon, Mallinckrodt-Spaulding-20
20 was marked for identification.)
21 BY MR. GOTTO:
22 Q. We've marked as Exhibit 20 a two-page
23 document beginning at Bates MNK-T1_0002357150,
24 appear to be notes from the 11/1/10 meeting at

Page 199

1 the DEA Albany office.
2 Do you recognize those notes?
3 A. Yes.
4 Q. And it indicates that you and
5 Mr. Nikolaus attended the meeting, correct?
6 A. Yes.
7 Q. And you recall the meeting, correct?
8 A. Yes.
9 Q. Can you recall other similar meetings
10 with the DEA Albany office?
11 MR. O'CONNOR: Objection to form.
12 A. Similar, meeting with them about this
13 topic or about any topic?
14 BY MR. GOTTO:
15 Q. Well, back that up.
16 Did you have regular meetings at the
17 DEA's Albany office?
18 A. No.
19 Q. Okay. So was this meeting requested
20 by the DEA?
21 A. No, this meeting was requested by
22 Mallinckrodt.
23 Q. And for what purpose?
24 A. To explain to them our SOM program.

Page 200

1 Q. And what was the reason that you
2 wanted to explain the SOM program to the DEA at
3 this point?
4 A. I don't remember specifically.
5 Q. Under "General Feedback from DEA
6 Albany," it states "The direct and indirect
7 customer data was presented to DEA. DEA was
8 alarmed by the data but not surprised."
9 Do you see that?
10 A. Yes.
11 Q. And were these your notes or
12 Mr. Nikolaus's notes?
13 A. They were my notes.
14 Q. Okay. So when you say they were
15 alarmed by the data but not surprised, what do
16 you mean? How did they express that?
17 A. I remember them looking at the data
18 and going "wow." And then a comment by someone
19 that was in attendance, I don't remember
20 specifically who, saying they're not surprised
21 by that.
22 Q. What was your reason for providing the
23 direct and indirect customer data to the DEA at
24 this time?

Page 201

1 A. Because we were incorporating
2 chargebacks into our SOM program, so when
3 explaining the SOM program we showed them what
4 we were looking at direct data, and what we were
5 looking at indirect data.
6 Q. And was this the first time that you
7 began to look at the direct and indirect
8 customer data?
9 MR. O'CONNOR: Objection to form.
10 BY MR. GOTTO:
11 Q. In this time frame?
12 A. I don't remember when I started. We
13 were doing it at this time.
14 Q. If you look at Exhibit 18, I believe
15 Ms. Harper indicated in her e-mail dated
16 October 31 that "the program was expanded within
17 the last month to our customers' customers." So
18 would that indicate that this is -- that the
19 meeting occurred on November 1st, right, so
20 would that indicate that at this time this was
21 when you first began looking at the indirect
22 customer data?
23 MR. O'CONNOR: Objection to form.
24 A. Based on this e-mail. But I don't

Page 202

1 remember.
2 BY MR. GOTTO:
3    Q.   Okay.  You can set that aside.
4        (Whereupon, Mallinckrodt-Spaulding-21
5        was marked for identification.)
6 BY MR. GOTTO:
7    Q.   Exhibit 21 is a single-page e-mail
8 thread MNK-T1_0000270021.  Take a look at that
9 e-mail, appears to be an e-mail from you to
10 Heather White, and tell me if you recognize it.
11       (Witness reviewing document.)
12   A.   Okay.
13   Q.   Do you recognize that e-mail?
14   A.   Yes.
15   Q.   And Heather White was at the DEA,
16 correct?
17   A.   Yes.
18   Q.   And what was your reason for providing
19 the information in your November 30th e-mail to
20 Ms. White?
21   A.   Because when we spoke to her at the
22 on-site meeting we advised that we were sending
23 out distributor letters based on the data that
24 we had reviewed.

Page 203

1    Q.   And you talk about three distributors,
2 Masters, KeySource, Cedardale.  I think you
3 indicated earlier in your testimony today that
4 those are three distributors that were audited
5 in approximately this time frame, correct?
6    A.   Yes.
7    Q.   And ultimately all of those
8 distributors had their DEA licenses terminated,
9 didn't they?
10      MR. O'CONNOR:  Object to the form.
11   A.   I don't know that they were
12 terminated.
13 BY MR. GOTTO:
14   Q.   At least suspended?
15   A.   I know of Masters and KeySource.  I
16 don't remember Cedardale.
17   Q.   Do you recall -- you testified a
18 little earlier today regarding the Cedardale
19 audit.  Do you recall if at the time of the
20 Cedardale audit you had any information
21 regarding whether Cedardale had suspended sales
22 to any of its existing customers?
23   A.   I don't remember having any of that
24 information at that time.

Page 204

1    Q.   Would that information have been
2 pertinent to your audit at that time?
3    A.   If Cedardale had been suspended
4 shipping to pharmacies?
5    Q.   If Cedardale itself had determined
6 that it would suspend certain of its customers.
7    A.   We would have documented that in our
8 audit notes.
9    Q.   That would have been of interest to
10 you?
11   A.   It would have been documented.
12   Q.   But you don't recall being aware of
13 that as you sit here today?
14   A.   No.
15   Q.   Do you recall if you made an inquiry
16 in that regard as part of the audit?
17   A.   I'd have to look at my notes.
18   Q.   Okay.
19       (Whereupon, Mallinckrodt-Spaulding-22
20       was marked for identification.)
21 BY MR. GOTTO:
22   Q.   Exhibit 22 is a two-page e-mail thread
23 beginning at Bates MNK-T1_0001519526.  Take a
24 moment and tell me if you recognize those

Page 205

1 e-mails.
2        (Witness reviewing document.)
3    A.   Okay.
4    Q.   Do you recognize those e-mails?
5    A.   I don't remember them, no.
6    Q.   Okay.  The main e-mail, the August 6,
7 2012 e-mail from you to Heather White, "is a
8 list of distributors that we have met with in
9 person or by telephone to discuss SOM issues
10 within the last twelve months."
11       Do you recall having those personal or
12 telephonic meetings with the listed
13 distributors?
14   A.   I remember having telecons, yes.
15   Q.   And what would cause you to have a
16 personal or telephonic meeting with a
17 distributor regarding SOM issues?
18   A.   So the SOM team would decide whether
19 we needed to do an on-site audit or if we could
20 do a telecon in which we'd review with them
21 their orders and the data, their chargeback
22 data.
23   Q.   And what is it that would cause the
24 team to decide that such an audit or

Page 206

1 teleconference was required?

2    A.  I don't remember any specifics why we

3 would.

4    Q.  Of the parties listed in this e-mail,

5 do you recall how any of these were personal

6 meetings as compared to teleconferences?

7    A.  In 2012, no, because some of the

8 on-site audits were conducted by people in

9 corporate, so I don't remember specific.  I

10 remember doing -- I was only involved in the

11 Cedardale audit on-site, and I remember being

12 involved in telecons, but which ones

13 specifically, I'd have to look at notes.

14    MR. GOTTO:  Okay.  Why don't we take a

15 break.

16    THE VIDEOGRAPHER:  The time is

17 2:28 p.m., and we're off the record.

18    (Whereupon, a recess was taken.)

19    THE VIDEOGRAPHER:  The time is

20 2:42 p.m., and we're on the record.

21    (Whereupon, Mallinckrodt-Spaulding-23

22    was marked for identification.)

23 BY MR. GOTTO:

24    Q.  Ms. Spaulding, we've marked as

Page 207

1 Exhibit 23 a multi-page document beginning at

2 Bates MNK-T1_0000289371.  It's an e-mail along

3 with an attachment.  Please take a look at that

4 and tell me if you recognize it.

5    I guess it actually has a series of

6 attachments, I should say.

7    (Witness reviewing document.)

8    A.  Okay.

9    Q.  Do you recognize those documents?

10    A.  No, I don't remember them, only based

11 on the e-mail.

12    Q.  Okay.  So your e-mail, your

13 October 18th e-mail to Ms. Harper, any reason to

14 doubt you sent that?

15    A.  No.

16    Q.  And you make reference in your e-mail

17 to "tried several different ways to make a

18 report that we could use across sites to be

19 consistent in our practices."

20    Do you see that?

21    A.  Yes.

22    Q.  So can you describe for me what you

23 were trying to accomplish in this regard?

24    A.  So we were looking to make a

Page 208

1 centralized place between all three sites to

2 document any correspondence that we had with

3 DEA, so I feel the need to clarify that even

4 though we called them SOM contacts or inquiry,

5 they were not always indicative of a suspicious

6 order.  It was part of the overall umbrella

7 program of suspicious order monitoring.

8    Q.  Okay.  And so what would be an example

9 of something that's under that overall umbrella

10 but was not indicative of the suspicious order?

11    A.  So, for example, in this report 11-01,

12 this was the ARCOS unit contacting me about two

13 NDC errors -- or I'm sorry, contacting Mary

14 Lewis and Webster Groves.  One that was specific

15 to me was line 5, so report 11-03 was to contact

16 DI Heather White because we had a complaint

17 about Methadose 40-milligram bottle complaints.

18    Q.  Okay.  And then one of the attachments

19 is -- it's called a DEA Suspicious Order

20 Monitoring Report?

21    A.  Yes.

22    Q.  And what is that document?

23    A.  So this was a template that we were

24 using to how we would document a formal

Page 209

1 suspicious order.

2    Q.  Okay.  And so this is not a DEA form,

3 right?  This is something you -- or Mallinckrodt

4 created?

5    A.  Correct.  This one is -- it says up at

6 the top is an example only.

7    Q.  Okay.  You can set that aside.

8    (Whereupon, Mallinckrodt-Spaulding-24

9    was marked for identification.)

10 BY MR. GOTTO:

11    Q.  Exhibit 24 is a multi-page document

12 beginning at MNK-T1_0000282467, appears to be an

13 e-mail you prepared attaching the notes of an

14 HDMA conference that you attended.

15    Could you take a look at that and

16 confirm for me, if you can, that that's what the

17 exhibit consists of?

18    (Witness reviewing document.)

19    A.  Yes.

20    Q.  Okay.  Do you recall this conference?

21    A.  Vaguely.  Not in detail, but yes.

22    Q.  Did you make a practice of keeping

23 notes like these at each conference you went to

24 and then memorializing them?

Page 210

1    A.  Not every conference, only if I was
2  asked to produce a conference or a trip report.
3    Q.  Okay.  And who would have asked you to
4  do that?
5    A.  My manager at the time.
6    Q.  If you turn to the next-to-last page
7  of the document, the one that ends in Bates
8  473 -- I guess actually starting at the bottom
9  of the third-to-last page that begins at Bates
10  472, there's a reference to a presentation by a
11  David Durkin regarding controlled substance
12  monitoring, 2011 update.
13    Do you see that?
14    A.  Yes.
15    Q.  And the main bullet items, the third
16  one on the following page is "Reviewed the
17  12/2007 DEA Letter to registrants."
18    Do you see that?
19    A.  Give me one moment, please.
20    Q.  Sure.
21    (Witness reviewing document.)
22    A.  I'm sorry, which bullet were you --
23    Q.  There's -- the second main bullet on
24  the page that ends in 473 says "Reviewed the

Page 211

1  12/2007 DEA Letter to registrants."
2    Do you see that?
3    A.  Yes.
4    Q.  And that's the letter from
5  Mr. Rannazzisi that we looked at a little
6  earlier today, correct?
7    A.  I'm not looking at the date, but I
8  believe so, yes.
9    Q.  Okay.  You can set that aside.
10    (Whereupon, Mallinckrodt-Spaulding-25
11    was marked for identification.)
12  BY MR. GOTTO:
13    Q.  Exhibit 25 is a multi-page document
14  bearing Bates MNK-T1_0000283244, appears to be
15  an e-mail you prepared transmitting notes you
16  took at a Buzzeo webinar in April of 2011.  If
17  you could take a look at that and confirm for me
18  that that's what those materials are.
19    A.  Yes.
20    Q.  Okay.  Do you recall this particular
21  webinar?
22    A.  Not this one, no.
23    Q.  The notes that you took here, did you
24  have occasion to go over these with Ms. Harper

Page 212

1  or anyone else at Mallinckrodt?
2    A.  Go over them?  I sent them to her, but
3  I didn't -- I don't know that I reviewed or
4  discussed them with her.
5    Q.  Okay.  On the second page of your
6  notes up at the top where it says "SOM System
7  Recommendations - Total SOM Solution," do you
8  see that?
9    A.  Yes.
10    Q.  The second item is "Determine
11  legitimacy before shipping for each and every
12  order."
13    Do you see that?
14    A.  Yes.
15    Q.  Did you understand at this time that
16  an SOM program -- that part of an effective SOM
17  program should be that before an order that was
18  identified -- that was questioned in any way
19  shipped, a determination needed to be made as to
20  whether or not it was suspicious?
21    MR. O'CONNOR:  Objection to form.
22    A.  At this time back in 2011 did I know
23  that?
24  BY MR. GOTTO:

Page 213

1    Q.  Yes.
2    A.  I don't know if I knew it at the time.
3  I mean, I understood what it says when they
4  spoke of it.
5    Q.  Okay.  Do you have an understanding as
6  to whether in this time frame in 2011
7  Mallinckrodt had procedures in place to assure
8  that orders that had been identified as peculiar
9  or unusual would not be shipped until it was
10  determined whether or not there would be -- they
11  were suspicious?
12    MR. O'CONNOR:  Objection to form.
13    A.  So based on our review of documents
14  prior to 2010, we discussed that we were
15  reviewing orders before shipping.
16  BY MR. GOTTO:
17    Q.  Do you know if there were ever
18  occasions when an order that was identified as
19  peculiar or unusual was shipped before the
20  determination was made as to whether it was
21  suspicious?
22    A.  Not by me, but I wasn't doing -- I'm
23  not aware.  I wasn't doing the review.
24    Q.  Do you recall in 2010 there being a

Page 214

1  change to the algorithm whereby the comparison
2  of an order to the prior year's ordering pattern
3  was changed from whether it was more than ▮
4  times the average to whether it was more than
5  ▮ times the average?
6      A.  I remember that there was a change.  I
7  don't remember whether it was specifically in
8  2010 or not.
9      Q.  Okay.  But you do remember that ▮ to
10  ▮ change being made at some point?
11      A.  Yes.
12      Q.  Do you remember what the reason was
13  for that change?
14      A.  No.
15      Q.  Were you involved in the decision to
16  make that change?
17      A.  I would have been on the SOM team that
18  discussed the change, but it would have been
19  approved by the management.
20      Q.  Do you remember who suggested the
21  change?
22      A.  No.
23      Q.  And you don't remember any of the
24  reasons that were offered in support of it?

Page 215

1      A.  No, not specifically.
2          (Whereupon, Mallinckrodt-Spaulding-26
3          was marked for identification.)
4  BY MR. GOTTO:
5      Q.  Exhibit 26 is a two-page document
6  beginning at Bates MNK-T1_0000288483, appears to
7  be a letter from you to Heather White at the
8  DEA.  And take a look and tell me if you can
9  confirm that that's a letter that you sent on or
10  about November 1 of 2010.
11          (Witness reviewing document.)
12      A.  Yes, this is a letter I sent.
13      Q.  Okay.  And this is notifying Ms. White
14  of the inclusion in the SOM program of review of
15  chargeback data, correct?
16      A.  Yes.
17      Q.  And do you recall, after the
18  chargeback data review was included as part of
19  the SOM program, were there orders that were
20  identified as peculiar or unusual solely as a
21  result of the chargeback review?
22      A.  So I don't think I understand.
23  Chargeback are not orders.  Chargeback are
24  downstream.

Page 216

1      Q.  Right.  But you were, as of November,
2  2010, you were reviewing chargeback data as part
3  of the SOM process, correct?
4      A.  Yes.
5      Q.  And so my question is, once you
6  started reviewing the chargeback data, did that
7  result in the identification of any orders as
8  peculiar or unusual or suspicious under the SOM
9  program?
10      A.  No, because there's no way to directly
11  tie a chargeback order credit to a direct order.
12      Q.  And so how was the chargeback data
13  used as part of the SOM program from and after
14  November of 2010?
15      A.  To review if a downstream customer, so
16  a customer's customer, may pose a risk to bring
17  that attention to the down-direct customer.
18      Q.  And how would you identify as part of
19  the chargeback review the potential for that
20  downstream customer to pose a risk?
21      A.  So based on the red flags and the
22  enforcement action in comments from DEA at
23  training sessions through the DEA seminars, we
24  developed a red flags list, and we would look at

Page 217

1  chargebacks to see if a pharmacy had a large
2  quantity, we would then ask the distributor for
3  due diligence and ask them to check for any of
4  these red flags as part of the review.
5      Q.  So is it fair to say Mallinckrodt
6  itself would not take any action directly with
7  respect to this indirect customer, but would
8  instead provide information to Mallinckrodt's
9  direct customer?
10          MR. O'CONNOR:  Objection to form.
11      A.  We would do both.  So we would work
12  with the distributor to bring to their attention
13  that we're potentially seeing chargebacks,
14  because a distributor would only see what they
15  sold, they wouldn't see if there was other
16  distributors selling to them.  And if the SOM
17  team determined that the pharmacy was a
18  significant risk, they would issue a restriction
19  in which that pharmacy could no longer apply for
20  chargebacks.
21  BY MR. GOTTO:
22      Q.  Okay.  So the pharmacy would -- it
23  could continue to buy from a Mallinckrodt
24  distributor, but it could not apply for a

Page 218

1  chargeback?
2      A.  Correct.
3      Q.  So the chargebacks, were they applied
4  for by the pharmacies or by the distributor?
5      A.  The chargeback is applied by the
6  distributor to Mallinckrodt on behalf of the
7  pharmacy.
8      Q.  So it would have been possible for
9  Mallinckrodt to inform the distributor that
10  sales should not be made to that pharmacy, as
11  compared to stating that Mallinckrodt would not
12  pay chargebacks to that -- related to that
13  pharmacy, correct?
14      MR. O'CONNOR:  Objection to form.
15      A.  No, we can't dictate who a distributor
16  sells to and who they don't sell to.
17  BY MR. GOTTO:
18      Q.  So if you knew that a distributor, for
19  example, was selling to a non-registrant, you
20  could tell the distributor, you need to stop
21  doing that or we can't sell to you anymore,
22  correct?
23      A.  If we knew that they were selling to a
24  non-DEA registrant, I believe we would alert DEA

Page 219

1  to that.
2      Q.  And so if you knew that a distributor
3  was selling to a pharmacy as to which there was
4  sufficient red flags to where Mallinckrodt
5  decided that it would no longer pay chargebacks
6  with respect to that pharmacy, Mallinckrodt
7  could have notified the distributor that if the
8  distributor continued to sell to that pharmacy
9  Mallinckrodt wouldn't sell to the distributor
10  anymore?
11      MR. O'CONNOR:  Objection to form.
12  BY MR. GOTTO:
13      Q.  Right?
14      A.  No, because then we could potentially
15  jeopardize legitimate people from not getting
16  their medicines.  We prohibited the chargebacks
17  as a financial disincentive to not sell
18  Mallinckrodt to a pharmacy that we considered a
19  risk.  But we can't control the distributors and
20  who they sell to.  We have no influence
21  whatsoever on who the customer base of any one
22  distributor is.  And if we had -- say you can't
23  sell to that pharmacy anymore, that pharmacy
24  could potentially go to another distributor and

Page 220

1  get Mallinckrodt product.
2      Q.  And that's true, though, if you say
3  we're not going to honor chargebacks, that
4  pharmacy can continue to buy Mallinckrodt
5  products even through that distributor, just not
6  going to -- the chargeback won't be honored,
7  correct?
8      A.  Correct.  It's a financial
9  disincentive not to sell Mallinckrodt product,
10  but we can't say who they can or can't sell to.
11      Q.  Was the result of any chargeback data
12  review ever provided to the DEA?
13      A.  Can you say at that again, please?
14      Q.  Yes.
15          So you engaged in -- from November,
16  2010 forward you were reviewing chargeback data
17  as part of an evaluation as to whether there
18  were red flags with respect to some indirect --
19  with respect to indirect customers, correct?
20      A.  Yes.  If we restricted a pharmacy from
21  chargebacks, we notified DEA.
22      Q.  Okay.  And was there any follow-up
23  from DEA that you can recall when there was any
24  such notification given?

Page 221

1      A.  Not that I can think of.
2      Q.  What was the nature of the
3  notification?  What did you tell DEA?
4      A.  We have a letter that we would notify
5  sent to DEA saying these pharmacies have been
6  restricted from Mallinckrodt chargebacks because
7  they exhibit indicators of diversion.
8      Q.  You can set that aside.
9          (Whereupon, Mallinckrodt-Spaulding-27
10          was marked for identification.)
11  BY MR. GOTTO:
12      Q.  Exhibit 27 is a multi-page document
13  beginning at Bates MNK-T1_0000422189.  It's an
14  e-mail thread from late 2010 into January of
15  2011.  Take a moment and tell me if you
16  recognize those e-mails.
17          (Witness reviewing document.)
18      A.  Okay.
19      Q.  Do you recognize these e-mails?
20      A.  No.
21      Q.  Okay.  So the earliest e-mails in the
22  thread are an exchange between Ms. Harper and
23  Carol Svejkosky --
24      A.  Yeah, Svejkosky.

Page 222

1    Q.  Thank you.  S-V-E-J-K-O-S-K-Y, just
2  like it sounds.
3         -- in which Ms. Harper is requesting
4  certain state concentration and customer
5  sourcing data, correct?
6    A.  Yes.
7    Q.  And is that data that ultimately you
8  came to be supplied with regularly?
9    A.  Yes.
10   Q.  Okay.  And did that become part of the
11 SOM program, reviewing that data on a monthly
12 basis?
13   A.  Yes.
14   Q.  What was the state concentration
15 report that Ms. Harper requests?
16   A.  It looks at oxycodone 50-milligram and
17 oxycodone 30-milligram by state instead of by
18 pharmacy.
19   Q.  And do you know what the reason was
20 for conducting that review?
21   A.  Based on at this time the enforcement
22 action and the knowledge around Florida and
23 other states being of concern.
24   Q.  Okay.  All right.  You can set that

Page 223

1  aside.
2         (Whereupon, Mallinckrodt-Spaulding-28
3         was marked for identification.)
4  BY MR. GOTTO:
5    Q.  Exhibit 28 is a two-page e-mail thread
6  beginning at Bates MNK-T1_0000485790, e-mails
7  from November of 2010.  Take a moment and tell
8  me if you recall these e-mails.
9         (Witness reviewing document.)
10   A.  Okay.
11   Q.  Do you recognize these e-mails?
12   A.  I don't remember them.
13   Q.  Okay.  If you look at Ms. White's
14 e-mail at the bottom of the first page to you on
15 November 18th, she says "I know the standard
16 answer regarding lot numbers.  Can you please
17 tell me which distributors this was sent to and
18 if you had any chargebacks for the product in
19 the Fort Lauderdale area?  We can get an
20 Administrative Subpoena if you need one."
21        Do you see that?
22   A.  Yes.
23   Q.  So do you know what she meant by "the
24 standard answer regarding lot numbers"?

Page 224

1    A.  No, I couldn't guess what she was
2  referring to.
3    Q.  Okay.  So if you look at the first
4  e-mail in the thread from Thanh Churchin,
5  "Susan, can you check on this lot number for
6  me," giving a case number.  "The lot number came
7  from a trash pull that IRS did."
8         Do you know what "lot number" means in
9  this context?
10   A.  Yes.  It's the lot number that
11 Mallinckrodt produced for that particular batch.
12   Q.  Okay.  And what would be the reason
13 for using that lot number?
14        MR. O'CONNOR:  Objection to form.
15 BY MR. GOTTO:
16   Q.  What information would that give you?
17   A.  We could trace the lot number to see
18 who we sold it to, but then they would have to
19 go to who we sold it to to trace who they sold
20 it to.
21   Q.  Okay.  And so turning back to
22 Ms. White's e-mail where she says "I know the
23 standard answer regarding lot numbers," was the
24 standard answer that you would give that

Page 225

1  information if there was -- in response to a
2  subpoena?
3    A.  I don't know what she meant.
4    Q.  Do you recall ever informing Ms. White
5  or anyone else at the DEA that certain
6  information they sought would be provided only
7  in response to a subpoena?
8    A.  We usually request a subpoena if they
9  want anything in writing, so it's pretty
10 standard.
11   Q.  Okay.  And so there would be times
12 when you would give them verbal information, but
13 if they wanted that information in writing you'd
14 tell them they needed to issue a subpoena?
15   A.  Not during a -- not a shipping history
16 report.
17   Q.  You would not require a subpoena for
18 that?
19   A.  No.  I'm sorry.  We would require -- I
20 would not give them that information verbally.
21   Q.  Okay.  And what's the reason for that?
22   A.  Just any information that's provided
23 to DEA always goes through our legal department.
24   Q.  Well, there was certain information

Page 226

1 you would give DEA verbally, that if they asked
2 for it in writing you'd require a subpoena,
3 correct?
4    A.  The information that we would give to
5 them verbally would be routine information that
6 they would ask regarding a process or a high
7 level question. Anything that was documented or
8 in detail like a shipping report would require a
9 subpoena.
10    Q.  Okay. So your November 18th e-mail to
11 Karen Harper says "I can run a report on where
12 we ship this lot number to. Does the chargeback
13 system refer to lot numbers? If so" you can get
14 a report, please. I'm sorry, "If so, can you
15 get a report please."
16     So I take it at this time in November
17 of 2010 you didn't know if the chargeback system
18 contained the lot numbers for orders, correct?
19    A.  Correct. Because what we looked at
20 were reports that were generated from the
21 chargeback system.
22    Q.  Okay. And so the -- what information
23 were you able to determine from reviewing a lot
24 number?

Page 227

1    A.  Where we shipped it to.
2     (Whereupon, Mallinckrodt-Spaulding-29
3     was marked for identification.)
4 BY MR. GOTTO:
5    Q.  Exhibit 29 is a multi-page document
6 beginning at Bates MNK-T1_0000561060, appears to
7 be an e-mail exchange between you and
8 Mr. Ratliff concerning a lot trace report. Take
9 a look at those e-mails, tell me if you
10 recognize them.
11     (Witness reviewing document.)
12    A.  Okay.
13    Q.  Okay. And so the first e-mail in the
14 thread is from Mr. Ratliff, down at the bottom
15 of the first page onto the second page, from
16 Mr. Ratliff to you and Mr. Nikolaus, where he
17 says "Oxy, lot," and gives a number, "is being
18 transported from Florida to Eastern Tennessee in
19 fairly significant quantities. They have
20 original bottles and are currently looking for
21 the source of loss in Florida. I will be
22 receiving additional information soon."
23     Do you see that?
24    A.  Yes.

Page 228

1    Q.  Do you recall that e-mail?
2    A.  Vaguely, yes.
3    Q.  Okay. And then you respond to him on
4 July 6th "Would you like me to run a lot trace
5 report ASAP?"
6    A.  Correct.
7    Q.  And he responds "Yes." You run the
8 report. Is the attachment to the e-mail the
9 report?
10    A.  Yes.
11    Q.  And you say in your e-mail total
12 quantity of bottles. You say "Lot beam for
13 release."
14     What does that mean?
15    A.  It means when it is released from our
16 quality control labs and able to be shipped to
17 market.
18    Q.  Okay. And then "Shipped from DC."
19 What is DC?
20    A.  Distribution center.
21    Q.  Okay. On the dates, "and entire lot
22 is depleted. 8 customers in total, 1 in
23 Florida."
24     And then the eight customers are

Page 229

1 listed on the attachment, correct?
2    A.  Yes.
3    Q.  And so the attachment, is this typical
4 of the information that a lot trace report would
5 give you?
6    A.  It's the exact information.
7    Q.  Okay. You can set that aside.
8     (Whereupon, Mallinckrodt-Spaulding-30
9     was marked for identification.)
10 BY MR. GOTTO:
11    Q.  Exhibit 30 is a two-page document
12 beginning at Bates MNK-T1_0000371673, and
13 appears to be an e-mail exchange between you and
14 Ms. Harper in June of 2010 concerning a DEA and
15 local law enforcement inquiry. Tell me if you
16 recognize those e-mails.
17     (Witness reviewing document.)
18    A.  Okay.
19    Q.  Do you recognize those e-mails?
20    A.  Yes.
21    Q.  Okay. So in your June 17th e-mail to
22 Ms. Harper, in the first paragraph you say that
23 in recent months you "received several inquiries
24 from both local law enforcement and DEA...in the

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1 State of Florida and surrounding states
2 regarding lot trace shipping histories."
3 You go on a little later in the
4 paragraph to say "In many of these inquiries, I
5 noticed that Sunrise Wholesalers was one of our
6 customers who had received the lot in question
7 by the investigating officer. I did not always
8 divulge that information unless requested
9 specifically by the individual and never
10 provided any information in writing as they were
11 advised that they would need to send a subpoena
12 to our legal department if they needed
13 documentation of any kind."
14 Do you see that?
15 A. Yes.
16 Q. So what was your reason for not
17 divulging that information to law enforcement
18 unless specifically requested?
19 A. I don't remember the specifics of this
20 situation back in 2010, but it's usually policy
21 we don't discuss that information over the
22 phone.
23 Q. But if you had -- if the law
24 enforcement agent had specifically requested it,

Page 231

1 you would have divulged it over the phone, is
2 that right?
3 A. I may have pointed them in the right
4 direction to help with their investigation.
5 Q. And is there any reason that you would
6 require them to specifically request the
7 information before you would help them with the
8 investigation?
9 MR. O'CONNOR: Object to form.
10 A. Because we didn't want to assume what
11 they were looking for, and they didn't always
12 give us details, so we didn't assume what they
13 were looking for. So unless they specifically
14 asked me, I didn't provide the information.
15 BY MR. GOTTO:
16 Q. Was it your intention to cooperate
17 with law enforcement when you received inquiries
18 of this nature?
19 A. To the best of my ability, yes.
20 Q. And did you feel that requiring them
21 to specifically request the information before
22 you would divulge it was cooperating to the best
23 of your ability?
24 A. Yes.

Page 232

1 Q. You could have informed them of the
2 information without the specific request,
3 though, right?
4 MR. O'CONNOR: Objection to form.
5 A. If they didn't want it, I didn't
6 know what they were looking for, and I didn't
7 assume or presume to know what they were looking
8 for.
9 BY MR. GOTTO:
10 Q. Did Ms. Harper -- we see her e-mail in
11 response. Apart from her e-mail, did she ever
12 communicate with you with respect to your
13 practice of how to respond to law enforcement
14 inquiries as you describe it in that first
15 paragraph?
16 A. I don't understand the question.
17 Q. Sure.
18 You describe in your first paragraph
19 of your June 17th e-mail how you handled
20 inquiries from law enforcement, and this point
21 of not divulging information unless specifically
22 requested. Did Ms. Harper ever respond to you
23 with respect to that practice to say either it
24 was the right way to handle the inquiries or to

Page 233

1 suggest some other way to handle them?
2 MR. O'CONNOR: Objection to form.
3 A. So those were conversations with our
4 legal department.
5 MR. O'CONNOR: And of course, I
6 instruct the witness not to answer to the extent
7 it gets into conversations with legal.
8 BY MR. GOTTO:
9 Q. Okay. So -- and you can just answer
10 this yes or no. Apart from conversations with
11 legal counsel, did you ever have any
12 conversations with Ms. Harper on this topic of
13 how you responded to inquiries from law
14 enforcement of the type you describe in this
15 paragraph?
16 A. Not that I remember.
17 Q. And again, apart from conversations
18 with counsel, did you have discussions with
19 anyone else at Mallinckrodt with respect to how
20 you responded to law enforcement inquiries as
21 you describe in this paragraph?
22 A. With the security director at this
23 time.
24 Q. And who was that?

Page 234

1   A.  Bill Ratliff.

2   Q.  And what can you recall of that

3   conversation?

4   A.  Basically as I previously stated, we

5   don't assume what they're looking for, we don't

6   know the facts of their case, and we answer the

7   questions to the best of our ability.  But we

8   don't always know who we're talking to over the

9   phone, so if they are looking for detailed

10  information or want documentation they have to

11  send a subpoena so that it goes through the

12  proper channels.

13  Q.  Okay.  And did Mr. Ratliff give you

14  any feedback as far as that approach, either

15  confirming it or suggesting a change?

16  A.  I was cautioned not to give out

17  information over the phone because we don't know

18  who we're talking to over the phone.

19  Q.  The practice that you described

20  regarding when you would give information, when

21  you would require a subpoena, was there a

22  written policy in place at Mallinckrodt to that

23  effect?

24  A.  I don't believe there's a written

Page 235

1   policy.  I believe it was through verbal

2   training.

3   Q.  And who gave you that verbal training?

4   A.  Our legal department.

5   Q.  Okay.  You can set that aside.

6   (Whereupon, Mallinckrodt-Spaulding-31

7   was marked for identification.)

8   BY MR. GOTTO:

9   Q.  Exhibit 31 is a multi-page e-mail

10  thread bearing Bates MNK-T1_0005424123.  These

11  are e-mails from July of 2011.  There were

12  several e-mails here.  I have a couple of

13  questions for you really on the first page.

14  (Witness reviewing document.)

15  A.  Okay.

16  Q.  Do you recognize those e-mails?

17  A.  I vaguely recall them, yes.

18  Q.  Okay.  What do you recall about them?

19  A.  This was in the time that we were

20  stopping shipments to Masters and putting their

21  account on hold, and there was a system error in

22  which some material that was shipped was not

23  supposed to be.

24  Q.  Okay.  And how was that error

Page 236

1   uncovered, do you recall?

2   A.  The customer called us and said they

3   had received C2 product.

4   Q.  Okay.  And who was Brenda Rehkop?

5   R-E-H-K-O-P.

6   A.  Customer service rep.

7   Q.  Were you able to determine how it came

8   to be that the product was shipped to Masters

9   after they had been put on hold?

10  A.  It was a timing thing.  There was an

11  order picked and packed in the warehouse already

12  at the time that customer service was notified

13  to put the orders on hold.

14  Q.  So on the first page of the exhibit,

15  your e-mail dated July 13, 2011, you say "I

16  completely understand and will not disclose.

17  It's impossible to manage so many accounts

18  manually due to these circumstances that are

19  beyond our control."

20  What were you referring to there in

21  terms of being impossible to manage so many

22  accounts manually?

23  A.  So it was an assumption on my part

24  that they have multiple accounts in which

Page 237

1   they're releasing orders daily for clinics,

2   because at this time we shipped clinic orders

3   same day.  They had orders that were coming in.

4   This was at the time that there was action going

5   on, I believe, with KeySource and Masters at the

6   same time, and we were trying to stop orders in

7   transit because the ISO had been issued.  And

8   there was just multiple balls in the air

9   juggling all at one time, and this one order

10  fell through the cracks.

11  Q.  When you say that the order fell

12  through the cracks, were you able to ascertain

13  who had authorized the shipment to be made?

14  A.  Yes.

15  Q.  And who was that?

16  A.  It was a CSR who released the order.

17  Q.  And who was it?

18  A.  Cheryl Nelson.

19  Q.  Were there any changes made to

20  practices or policies to assure that this sort

21  of mistake wouldn't happen in the future?

22  A.  Yes.

23  Q.  What were they?

24  A.  So instead of the customer service rep

Page 238

1 changing -- being able to change the credit
2 limit to prevent it from shipping, that now has
3 to be done by a separate department that manages
4 the customer accounts, taking that
5 responsibility off from the CSRs.
6     Q.  Do you recall in any of the
7 DEA-sponsored seminars or Buzzeo programs that
8 you attended discussions regarding the
9 involvement of either customer service personnel
10 or sales personnel in the suspicious order
11 monitoring program?
12     MR. O'CONNOR:  Objection to form.
13     A.  I recall at a Buzzeo conference them
14 saying that it's not in the best interest of a
15 company for finance people to be involved in SOM
16 perspective to eliminate that optic of
17 impropriety.
18 BY MR. GOTTO:
19     Q.  Okay.  And do you recall any similar
20 observation you made with respect to involvement
21 of sales personnel in SOM?
22     A.  No, because we have to rely on sales
23 personnel to provide us information sometimes.
24     Q.  You can set that aside.

Page 239

1         (Whereupon, Mallinckrodt-Spaulding-32
2         was marked for identification.)
3 BY MR. GOTTO:
4     Q.  Exhibit 32 is a two-page e-mail thread
5 with the numbers MNK-T1_0000282686, e-mails from
6 March of 2011 concerning suspicious order
7 monitoring.  Tell me if you recognize those
8 e-mails.
9         (Witness reviewing document.)
10     A.  Yes.
11     Q.  So the earliest e-mail in the thread
12 is from a David Picciano to Karen Harper.
13         And do you know who Mr. Picciano know
14 was?
15     A.  Yes.
16     Q.  Who was he?
17     A.  He's the director of regulatory
18 compliance for Cedardale.
19     Q.  Okay.  And he says this in his e-mail,
20 "Cedardale Distributors...is willing to comply
21 with Covidien's request that we refrain from
22 selling Mallinckrodt's 15-milligram and
23 30-milligram oxycodone tablets to the Florida
24 based pharmacies listed on Attachment 1,"

Page 240

1 correct?
2     A.  Yes, based on this e-mail.
3     Q.  So had Mallinckrodt requested of
4 Cedardale that Cedardale refrain from selling to
5 specific identified pharmacies?
6     A.  Based on this e-mail, yes.
7     Q.  Okay.  You don't independently recall
8 that?
9     A.  No.
10     Q.  Do you recall there being other
11 situations in which Mallinckrodt made requests
12 of its distributors not to sell to particular
13 indirect customers?
14     A.  No.
15     Q.  And then Mr. Picciano goes on to
16 provide information regarding Cedardale's SOM
17 program, correct?
18     A.  Yes.
19     Q.  And this appears to be before you
20 conducted the on-site audit, correct?
21     A.  Yes.
22     Q.  And in your March 23rd e-mail to
23 Ms. Harper, you say you reviewed the attached
24 documents, "continue to believe Cedardale needs

Page 241

1 more work around their SOM program."
2         So was your e-mail prior to the
3 on-site audit?
4     A.  My e-mail, no.  My e-mail was after
5 their audit in which he sent me those SOPs.
6 Because when we were there for the audit we
7 advised him that he might want to look at making
8 them more robust.
9     Q.  Okay.  So the SOPs are -- is that
10 what's referenced in -- are you making reference
11 to what's in the November 15th e-mail?
12     A.  No.  So if you look at the subject
13 line, you can tell it changes with the March,
14 2011 e-mail from my e-mail to Karen with a CC to
15 Rich.
16     Q.  Okay.
17     A.  And that's where I'm sending her the
18 SOPs that David Picciano has sent to me.
19     Q.  I see.  Okay.
20         And at that point you concluded that
21 their SOM program was still insufficient,
22 correct?
23     A.  Still weak, yes.
24     Q.  All right.  You can set that aside.

Page 242

1     (Whereupon, Mallinckrodt-Spaulding-33
2     was marked for identification.)
3  BY MR. GOTTO:
4     Q.  Exhibit 33 is a one-page document,
5  MNK-T1_0000290887, additional e-mails relating
6  to the Cedardale audit, and these are in January
7  of 2011.
8     A.  Yes.
9        MR. O'CONNOR:  Counsel, I apologize,
10 can we go off the record for a minute?
11       MR. GOTTO:  You bet.
12       THE VIDEOGRAPHER:  The time is
13 3:35 p.m., we're off the record.
14       (Off the record discussion.)
15       THE VIDEOGRAPHER:  The time is
16 3:36 p.m., and we're on the record.
17       (Whereupon, Mallinckrodt-Spaulding-34
18       was marked for identification.)
19 BY MR. GOTTO:
20    Q.  Exhibit 34 is a one-page e-mail
21 thread, MNK-T1_0003044340.  Take a moment to
22 look at those e-mails, if you would, and tell me
23 if you recognize them.
24       (Witness reviewing document.)

Page 243

1     A.  Okay.
2     Q.  Do you recognize those e-mails?
3     A.  I don't remember them, no.
4     Q.  Okay.  Who is Kenneth Yamashita?
5     A.  He was a site director at the time.
6     Q.  Okay.  In your June 20th e-mail you
7  say "I briefed Clay on the situation on your
8  absence."
9        Who was Clay?
10    A.  Clay Wagner was the plant controller,
11 so he was the designee when Ken Yamashita was
12 out of the office.
13    Q.  The last sentence of that paragraph
14 says "We have been asked to provide information
15 on our Suspicious Order Monitoring Program and
16 how it relates to quota and ties in with
17 St. Louis plant manufacturing quota."
18       What was that information?  How did
19 the SOM program relate to quota and tie in with
20 the St. Louis plant manufacturing quota?
21       MR. O'CONNOR:  Objection to form.
22    A.  So we explained to DEA, we hosted them
23 on-site, and we explained to them the quota
24 process at a high level, because DI White was

Page 244

1  unfamiliar of the inner workings of quota, and
2  we explained how St. Louis plant receives
3  manufacturing quota, we receive procurement
4  quota, and that our quota ultimately turns into
5  product that we send to the market.
6  BY MR. GOTTO:
7     Q.  Okay.  So how did the suspicious order
8  monitoring program relate to that?
9     A.  So I can't assume what DEA wanted to
10 know or how it ties in.  We could just explain
11 our program.
12    Q.  Okay.  I'm just -- since this is your
13 e-mail, I'm just wondering when you said
14 "provide information on the SOM and how it
15 relates to quota," was there information that
16 comes to your mind as being -- that you provided
17 in response to that request?
18    A.  I don't remember specific information
19 that was provided or if there was a
20 presentation, only that we explained the quota
21 process and we reviewed our suspicious order
22 monitoring program, and that we can't ship
23 anything to the market that we haven't been
24 granted quota for.

Page 245

1     Q.  Okay.  So Mr. Yamashita then responds
2  to you "Great.  Thanks for the update.  Did you
3  get the impression now that if our quota
4  justification and suspicious order monitoring
5  program is good, we will get the quota or at
6  least some portion?"
7        Do you remember what your answer to
8  that was?
9     A.  No.
10    Q.  So Mr. Yamashita seems to be at least
11 questioning whether -- or inquiring into whether
12 the quality of the suspicious order monitoring
13 program could have an effect on the DEA's
14 decision as to quota to grant, is that how you
15 understand his e-mail?
16       MR. O'CONNOR:  Objection to form.
17    A.  I don't know what his thoughts were at
18 that time.
19 BY MR. GOTTO:
20    Q.  Okay.  Was it your belief at this
21 time, or has it been at any time, that the DEA
22 would be more likely to grant a quota request if
23 it were persuaded that the suspicious order
24 monitoring program was of high quality?

Page 246

1    A.  No.  Ken Yamashita was new to the
2  plant at that time, he was probably just
3  learning about how it works and what the
4  expectations are.
5    Q.  Okay.
6      (Whereupon, Mallinckrodt-Spaulding-35
7      was marked for identification.)
8  BY MR. GOTTO:
9    Q.  Exhibit 35 is a multi-page e-mail
10  thread, MNK-T1_0000283719.  These are e-mails
11  from 2011 regarding quota requests.  If you'd
12  take a look at them for just a moment, please.
13  My particular question is on the e-mail that's
14  on the second page.
15      (Witness reviewing document.)
16    A.  Okay.
17    Q.  Do you recognize these e-mails?
18    A.  Vaguely.
19    Q.  Okay.  So the e-mail at the bottom of
20  the first page onto the second page, is that
21  from Frank Sapienza?
22    A.  No, so that's the bottom -- I'm sorry,
23  bottom e-mail of the first page?
24    Q.  Yes, the one that starts "Hi Karen."

Page 247

1    A.  Yes.  What we referred to earlier in
2  which they have to go for additional signatures.
3    Q.  Okay.  And then on the second page,
4  the material in the middle that starts with "One
5  of our industry colleagues forwarded" --
6    A.  Yes.
7    Q.  -- who is it that was sending that
8  e-mail?
9    A.  I have no idea.  Oh, sending it,
10  that's Karen.
11    Q.  Okay.  And so this is information that
12  Ms. Harper received from someone else in the
13  industry in June of 2011, correct?
14    A.  That's my understanding of this, yes.
15    Q.  Okay.  And so in this -- on these
16  eight points, the fifth point is "External
17  review 3:  The suspicious order monitoring group
18  reviews and makes sure our material is not being
19  used to complete suspicious orders."
20      Do you have an understanding as to who
21  the suspicious order monitoring group is that's
22  referred to in that item?
23    A.  No, because this is pulled from
24  somebody else in industry.

Page 248

1    Q.  Do you know if it's a group at the
2  DEA?
3    A.  I don't.
4      (Whereupon, Mallinckrodt-Spaulding-36
5      was marked for identification.)
6  BY MR. GOTTO:
7    Q.  Exhibit 36 is a two-page document
8  beginning at Bates MNK-T1_0006055924.  It
9  appears to be an e-mail exchange in August of
10  2012 concerning safety stock.  Tell me if you
11  recognize those e-mails, please.
12      (Witness reviewing document.)
13    A.  Okay.
14    Q.  Do you recognize those e-mails?
15    A.  No.
16    Q.  Okay.  There is -- the e-mail in the
17  middle of the first page from you to Kevin
18  Hewlett -- first of all, who is Kevin Hewlett?
19    A.  He was the corporate planning manager
20  at the time.
21    Q.  Okay.  You make reference to a formula
22  that was used in favor of the most recent
23  several requests.  Is the formula the formula
24  that's in the attachment?

Page 249

1    A.  Yes.
2    Q.  And is this what you discussed -- you
3  testified to, I think this morning, regarding
4  quota formula?
5    A.  Yes.
6    Q.  So this was the formula that was used
7  back in 2012?
8    A.  Yes.
9    Q.  Has the formula changed since that
10  time?
11    A.  No.
12    Q.  Okay.  You can set that aside.
13      (Whereupon, Mallinckrodt-Spaulding-37
14      was marked for identification.)
15  BY MR. GOTTO:
16    Q.  Exhibit 37 is a one-page e-mail,
17  MNK-T1_0006056192.  This appears to also be the
18  quota formula.  Could you take a look at that
19  and confirm that for me?
20    A.  Yes.  Correct.
21    Q.  Okay.  You can set that aside.
22      (Whereupon, Mallinckrodt-Spaulding-38
23      was marked for identification.)
24  BY MR. GOTTO:

Page 250

1 Q. Exhibit 38 is a multi-page e-mail
2 thread, MNK-T1_0005641401. Again, these are
3 e-mails concerning quota. And my questions for
4 you concern Ms. Johnson's e-mail at the bottom
5 of the first page.
6 A. Okay.
7 Q. She says "Yes, you have it straight.
8 Part of the difference is the formulas are in AA
9 and the quota analysis is in Salt."
10 What does that mean, AA and salt in
11 this context?
12 A. So AA is anhydrous alkaloid, and
13 that's how quota is measured by, the base
14 content. So our analysis, because we receive
15 API in its salt form isomer on the dock, our
16 analysis and what we track is all in salt form.
17 But when we have to request quota from the DEA,
18 we have to convert it back to AA, and every
19 molecule has its own conversion factor to go
20 from salt to AA.
21 Q. Okay. You can set that aside.
22 (Whereupon, Mallinckrodt-Spaulding-39
23 was marked for identification.)
24 BY MR. GOTTO:

Page 251

1 Q. Exhibit 39 is a two-page e-mail
2 beginning at Bates MNK-T1_0007729523, appears to
3 be an e-mail that you sent to Donald Lohman,
4 L-O-H-M-A-N.
5 Who is Mr. Lohman?
6 A. He's our legal counsel.
7 Q. Okay.
8 MR. O'CONNOR: Counsel, maybe now is a
9 good time for a break.
10 MR. GOTTO: Sounds like it might be.
11 THE VIDEOGRAPHER: The time is
12 3:49 p.m., and we're off the record.
13 (Whereupon, a recess was taken.)
14 THE VIDEOGRAPHER: The time is
15 4:04 p.m., and we're on the record.
16 MR. GOTTO: Counsel?
17 MR. O'CONNOR: All right. Counsel,
18 thank you for that break.
19 Just to clarify what's transpired
20 here, with respect to Exhibit 33, that document
21 was clawed back pursuant to a November 27, 2018
22 letter, so we have just gone ahead during the
23 break and replaced the unredacted, clawed back
24 version with the redacted version.

Page 252

1 And with respect to Exhibit 39, we are
2 now making a clawback request with respect to
3 that because this document is protected by the
4 attorney/client privilege as well as the work
5 product protection, and we'll be following up
6 with a letter shortly.
7 MR. GOTTO: Okay. And as to 39,
8 that's the entire document?
9 MR. O'CONNOR: That's correct.
10 MR. GOTTO: Okay. Fair enough.
11 BY MR. GOTTO:
12 Q. Ms. Spaulding, if you'd take the
13 redacted Exhibit 33 that you now have in front
14 of you, I do have a couple questions for you
15 on that. And this is Bates MNK-T1_0000290887.
16 Take a look -- it's a one-page e-mail thread.
17 Take a look at that, if you would, and tell me
18 if you recognize it.
19 A. Yes.
20 Q. And so your e-mail to Mr. Nikolaus on
21 January 14 of 2011 indicates that you "just got
22 off a Suspicious Order Monitoring Steering
23 Committee conference call discussing the SOM
24 audits. I sent Karen the preliminary report

Page 253

1 awaiting any comments from you. Basically the
2 committee has decided to release Masters and
3 KeySource to resume shipping Oxy 15-milligram
4 and 30-milligram when we come out of backorder,
5 but has determined based on our audit that
6 Cedardale does not have a robust enough system
7 in place to resume shipping C2s to them."
8 Correct?
9 A. Yes.
10 Q. Do you recall that decision by the
11 committee?
12 A. Based on this e-mail, yes.
13 Q. So you don't have an independent
14 recollection of what the basis was for the
15 decision to release Masters and KeySource at
16 this point?
17 A. No.
18 Q. Okay. You can set that aside.
19 (Whereupon, Mallinckrodt-Spaulding-40
20 was marked for identification.)
21 BY MR. GOTTO:
22 Q. Exhibit 40 is a two-page document,
23 MNK-T1_0006442504, appears to be an e-mail from
24 you to Richard Nikolaus dated July 17th of 2008

Page 254

1 attaching a letter to Denise Jordan at DEA.
2 Take a moment and tell me if you recognize that
3 e-mail and the attachment.
4    A.  I don't recognize the e-mail, but it
5 is one of my letters.
6    Q.  Okay.  So in your e-mail you say
7 "Rich, Take a look when you get a chance and let
8 me know what you think.  I'm running out of BS
9 to put in these letters, especially this one."
10       And then the letter is to Denise
11 Jordan at the DEA.
12       Who was Denise Jordan?
13    A.  She was the diversion investigator
14 responsible for our site at that time.
15    Q.  And so your letter is in response to
16 an inquiry you received from her, is that right?
17    A.  No, this is attached filing a 106.  So
18 we had a loss in transit, and this is
19 notification to DEA of the details regarding the
20 loss in transit.
21    Q.  Okay.  So judging from your cover
22 e-mail where you say "I'm running out of BS to
23 put in these letters," was there something in
24 the Denise Jordan letter that you were referring

Page 255

1 to in particular by that phrase?
2    A.  No, I was -- it was a poor choice of
3 words basically.  I was running out of
4 explanations to explain why FedEx had lost
5 another package.
6    Q.  And is that because there had been a
7 large number of incidents like that?
8    A.  I don't know how many there had been
9 during this specific time frame.
10    Q.  So were there other communications --
11 when you say "to put in these letters," by
12 "these letters" you mean letters to the DEA
13 dealing with a loss incident?
14    A.  Yes.  Because FedEx would give us very
15 little information, so we were, you know, trying
16 to be factual in what we put to DEA, but DEA
17 would sometimes push back and say, well, what is
18 FedEx doing about it?  And we'd go to FedEx and
19 say, what are you doing about it?  And they'd
20 say, that's an internal investigation, we can't
21 disclose an internal investigation, we can't
22 disclose an internal investigation.  So as -- we
23 were caught between a rock and a hard place.
24    Q.  Okay.  You can put that aside.

Page 256

1       (Whereupon, Mallinckrodt-Spaulding-41
2       was marked for identification.)
3 BY MR. GOTTO:
4    Q.  Exhibit 41 is a copy of the
5 Administrative Memorandum of Agreement between
6 Mallinckrodt and the DEA from 2017.  Take a look
7 at that document, if you would.  First tell me
8 if you've seen it before.
9    A.  Yes.
10    Q.  Okay.  Are you familiar with it?
11    A.  Yes.
12    Q.  When did you first become aware that
13 the DEA was formally investigating Mallinckrodt?
14    A.  During the 2013 inspection.
15    Q.  Okay.  Did you receive copies of
16 subpoenas that were issued by DEA in 2011 and
17 2012?
18    A.  I've received copies of subpoenas.  I
19 don't remember if they were 2011 or 2012.
20    Q.  Okay.  But you recall in 2013 becoming
21 aware of the investigation?
22    A.  Yes, because of the audit that was
23 conducted in March and April of 2013.
24    Q.  Okay.  And what was it about that

Page 257

1 audit that made you become aware of the
2 investigation?
3    A.  They had 15 to 16 agents and were
4 there for 6 weeks, which was unprecedented to
5 any other audit that had ever been done previous
6 to that.
7    Q.  So in previous audits, approximately
8 how many people would be there and for
9 approximately how long?
10    A.  Two to four days and less than a
11 week -- sorry.  Two to four people, and there
12 less than a week.
13    Q.  Okay.  Did you provide any sworn
14 testimony to DEA as part of your investigation?
15    A.  Sworn testimony, no, I don't believe
16 so.
17    Q.  Okay.  No affidavits, anything like
18 that?
19    A.  There was an inspection report that
20 was signed.  There was legal documents provided.
21 But I don't recall signing anything.
22    Q.  Okay.  You do recall receiving a
23 subpoena from the DEA at some point, correct?
24    A.  Yes, I received them frequently for

Page 258

1 shipping verifications.
2    Q.   Okay.  And do you recall receiving a
3 subpoena that you understood to be in connection
4 with the DEA's investigation of Mallinckrodt?
5    A.   No.
6    Q.   Were you aware of anyone else at
7 Mallinckrodt giving a deposition or sworn
8 statement to the DEA in connection with its
9 investigation of Mallinckrodt?
10    A.   Not that I was aware of, no.
11    Q.   Did you have any involvement in the
12 discussions between Mallinckrodt and DEA that
13 led up to the memorandum of agreement?
14    A.   Yes.
15    Q.   What discussions were you involved in?
16    A.   So we were -- we went to Albany DEA
17 and met with them to review the mass balance
18 records after they had taken copies of all of
19 the batch records that were part of the audit.
20 There was follow-up questions from DEA regarding
21 the reports that we had provided, so those were
22 all answered.  That was my direct involvement
23 with DEA.
24    Q.   What are the mass balance records?

Page 259

1    A.   So that's how DEA does an audit of a
2 manufacturer.  They basically take your
3 year-ending inventory, add in all your
4 acquisitions, and subtract out all your
5 dispositions.
6    Q.   And the review that you participated
7 in with the Albany DEA, what was the focus of
8 that review?
9    A.   They audit three major molecules and
10 all products produced within 14 months of
11 oxycodone, hydrocodone, and Methadone.
12    Q.   Did that review disclose any
13 discrepancies?
14        MR. O'CONNOR:  Objection to form.
15    A.   I don't know.  DEA never provides us
16 reports, so I don't know what they came up with.
17 BY MR. GOTTO:
18    Q.   Did you review a draft of the
19 administrative memorandum of agreement before it
20 was signed?
21    A.   Yes.
22    Q.   And what was the purpose of your
23 review?
24    A.   Because I was the key person at the

Page 260

1 Hobart site making sure that anything we agreed
2 to was feasible to manage and manageable.
3    Q.   Okay.  On the first page of the
4 administrative memorandum of agreement, there
5 are a number of numbered paragraphs under
6 "Background."
7        Do you see that?
8    A.   Yes.
9    Q.   And do you recall reviewing those
10 paragraphs when you reviewed a draft of this
11 document?
12    A.   Yes.
13    Q.   And was there any inaccuracy in any of
14 those paragraphs that you can recall from your
15 review?
16    A.   Not that I recall.
17    Q.   In Paragraph 2 it indicates that "From
18 January 1, 2008, through September 30, 2011,
19 there was an epidemic increase in diversion of
20 the controlled substance oxycodone, largely out
21 of the State of Florida."
22        Do you see that?
23    A.   Yes.
24    Q.   Was that a circumstance you were aware

Page 261

1 of during the time period January 1 of '08
2 through September 30th of 2011?
3    A.   I don't know if I was aware of it at
4 that time or not.
5    Q.   Paragraph 3 indicates that "The United
6 States alleges that Mallinckrodt, a manufacturer
7 and distributor of oxycodone, knew about the
8 diversion and sold excessive amounts of the most
9 highly abused forms of oxycodone, 30-milligram
10 and 15-milligram tablets, placing them into a
11 stream of commerce that would result in
12 diversion."
13        Did you believe that that allegation
14 was accurate when you reviewed a draft of this
15 document?
16    A.   No.
17    Q.   What parts of it do you think were
18 inaccurate?
19    A.   That we knowingly sold excessive
20 amounts.
21    Q.   Okay.  Paragraph 4 indicates that
22 "Mallinckrodt had a responsibility to maintain
23 effective controls against diversion, including
24 a requirement that it review and monitor these

Page 262

1 sales and report suspicious orders to DEA."
2     Did you believe that was accurate when
3 you reviewed it?
4     A. Yes.
5     Q. Paragraph 5, the last sentence states
6 "Furthermore, the United States alleges that
7 Mallinckrodt never notified the DEA of the
8 suspicious orders in violation of the CSA."
9     Did you believe that statement was --
10 or that that allegation was accurate when you
11 reviewed a draft of this document?
12     A. No.
13     Q. If you'd turn to Paragraph 3 on Page 2
14 of the document, Paragraph 3(a) states that
15 "With respect to its distribution of oxycodone
16 and hydrocodone products, Mallinckrodt's alleged
17 failure to distribute these controlled
18 substances in a manner authorized by its
19 registration and Mallinckrodt's alleged failure
20 to operate an effective suspicious order
21 monitoring system and to report suspicious
22 orders to the DEA when discovered as required by
23 and in violation of 21 CFR Section 1301.74(b)."
24     Did you believe that the allegations

Page 263

1 described in that sentence were accurate when
2 you reviewed a draft of this document?
3     A. The alleged allegations, yes.
4     Q. You understand --
5     A. Wait a minute. I'm sorry, I don't
6 understand.
7     Q. You understood it was accurate that
8 those allegations were made. My question is,
9 did you believe that the underlying allegations
10 were accurate?
11     A. No.
12     Q. And in what regard did you believe
13 they were not accurate?
14     A. We were reporting any orders that we
15 deemed to be truly suspicious, and I don't
16 believe that we failed to report any suspicious
17 orders. And although there's allegations and we
18 settled with the MOA, we didn't admit any
19 wrongdoing.
20     Q. And under paragraph A, there's
21 specific -- in the Roman Numeral numbered
22 paragraphs, number "i. conduct adequate due
23 diligence of its customers."
24     Do you believe that Mallinckrodt did

Page 264

1 conduct adequate due diligence of its customers?
2     A. Yes.
3     Q. And do you believe -- under Roman
4 Numeral ii, do you believe that Mallinckrodt
5 detected and reported to the DEA orders of
6 unusual size and frequency?
7     A. What is an order of unusual size and
8 frequency? I mean, yes, we did the best with
9 the information we had.
10     Q. You understood that there was a
11 regulatory obligation to report orders of
12 unusual size and frequency, correct?
13     A. Yes.
14     Q. The next paragraph, "detect and report
15 to the DEA orders deviating substantially from
16 normal patterns."
17     Again, you understood that there was a
18 regulatory requirement to detect and report such
19 orders, correct?
20     A. Yes.
21     Q. And do you believe Mallinckrodt did
22 so?
23     A. Yes.
24     Q. Paragraph iv, "use 'chargeback'

Page 265

1 information from its distributors to evaluate
2 suspicious orders."
3     Prior to October of 2010, Mallinckrodt
4 did not use chargeback data as part of its SOM
5 program, correct?
6     A. No, it's not part of the regulations.
7     Q. And Roman Numeral v, "take sufficient
8 action to prevent recurrence of diversion by
9 downstream customers after receiving concrete
10 information of diversion of Mallinckrodt product
11 by those downstream customers."
12     Do you believe that Mallinckrodt was
13 under an obligation to take action to prevent
14 recurrence of diversion in these circumstances?
15     MR. O'CONNOR: Objection to form.
16     A. Not under the regulations, but as part
17 of our MOA, yes.
18 BY MR. GOTTO:
19     Q. Paragraph B has a series of
20 allegations regarding the Hobart facility,
21 correct?
22     A. Yes.
23     Q. And these are matters that you have
24 some personal familiarity with, correct?

Page 266

1    A.   Yes.
2    Q.   And so paragraph "i. failure to take
3  actual weights of controlled substances at all
4  stages of the manufacturing process."
5       Did you feel that was an accurate
6  allegation?
7    A.   Yes.
8    Q.   And what was done to rectify that
9  situation going forward?
10   A.   We immediately at the -- this was
11  discovered during the 2013 audit, and so we
12  immediately updated the records that didn't have
13  complete weights, complete physical inventory of
14  the entire site was taken to make sure we had a
15  complete and accurate inventory, and we changed
16  our receiving process to do a check-weigh on all
17  API coming in, not just a seal verification and
18  label verification.
19   Q.   Okay.  Paragraph ii, Roman ii, "use of
20  a 'target' tablet weight for purposes of
21  reconciling batch records and determining the
22  number of units of finished form manufactured
23  even though the actual average weight of the
24  tablets in any specific batch sometimes deviated

Page 267

1  from the target weight."
2       Did you believe the allegation
3  described in B(ii) was an accurate allegation?
4    A.   Yes.
5    Q.   And what was done to rectify that
6  going forward?
7    A.   Again, immediately during the 2013
8  audit before this MOA, we changed our procedures
9  to calculate an actual weight per lot for each
10  batch produced, and that actual weight per batch
11  is now what's used in reconciliation purposes.
12   Q.   Okay.  And B(iii) related to
13  "commingling of dust collector waste and
14  assignment of dust losses."
15       Did you feel that was an accurate
16  allegation when it was made?
17   A.   No.
18   Q.   What part of it did you think was not
19  accurate?
20   A.   Without confirming how much dust was
21  actually attributable to any specific batch.
22   Q.   Do you know why the DEA alleged that
23  lack of confirmation?
24       MR. O'CONNOR:  Objection to form.

Page 268

1    A.   Because of the way that the dust
2  collectors operate and are designed, there is
3  challenges with being able to account for any
4  specific batch, but it's not a result of not
5  trying to determine how much went into each
6  batch.
7  BY MR. GOTTO:
8    Q.   How about Roman Number iv, "failure to
9  check-weigh controlled substances received into
10  the facility," was that an accurate allegation?
11   A.   Yes.
12   Q.   What was done to rectify that?
13   A.   As mentioned before, the check-weigh
14  of all procedures -- of all controlled
15  substances coming into the facility.
16   Q.   And Roman Numeral v, "failure to
17  maintain accurate records of substances
18  transferred from the manufacturing process to
19  Mallinckrodt's analytical laboratories," did you
20  think that was an accurate allegation?
21   A.   Yes.
22   Q.   And what was done to rectify that?
23   A.   So there was a gap in our record
24  receiving documents within the laboratories, and

Page 269

1  again during the 2013 audit, it was -- DEA had
2  detected that, and we immediately updated our
3  documents to have traceability of all samples
4  coming into the lab regardless of their
5  controlled substance schedule.
6    Q.   Okay.  And Roman Numeral vi, "failure
7  to include substances held in certain
8  vaults/storage as part of the biannual
9  inventory, and records provided for vaults
10  containing discrepancies with respect to weight,
11  missing substances, incorrect lots/batch
12  numbers, and incorrect or incomplete drug
13  names."  Did you believe that was an accurate
14  allegation when it was made?
15   A.   Yes.
16   Q.   And what was done to rectify that?
17   A.   That was part of the complete physical
18  inventory that was taken that same time period
19  of counting and documenting every single
20  controlled substance in the facility.
21   Q.   So the various allegations under
22  paragraph B that you've indicated you believed
23  were accurate allegations when they were made,
24  were those circumstances that came into

Page 270

1  existence during 2013?
2      A.  Came, like had just started?
3      Q.  Yes.
4      A.  No.
5      Q.  Okay.  Do you have any idea when they
6  did start?
7      A.  No, that's just when they were
8  detected.
9      Q.  And what caused them to be detected?
10     A.  Part of the audit that the DEA
11  conducted.
12     Q.  And do you know what was different in
13  the 2013 audit that gave rise to that detection
14  that hadn't caused these circumstances to be
15  detected previously?
16     A.  In the 2000 DEA -- 2013 DEA audit,
17  there was more investigators there, and they
18  were going through the batch records in greater
19  detail than they had in any previous audit.
20     Q.  Okay.  Paragraph 4 states it is not an
21  admission of liability, however, Mallinckrodt
22  agrees that at certain times certain aspects of
23  Mallinckrodt's system to monitor and detect
24  suspicious orders did not meet the standards

Page 271

1  outlined in letters from the DEA deputy
2  administrator from September and December of
3  2006 and 2007 respectively.
4      Do you see that?
5      A.  Yes.
6      Q.  And do you believe that's true, that
7  certain aspects of the SOM program in place at
8  Mallinckrodt prior to January 1, 2012 did not
9  meet standards outlined in those letters?
10     A.  Do I personally?
11     Q.  Yes.
12     A.  No, I believe they did.
13     Q.  Do you know why Mallinckrodt agreed
14  that the SOM did not meet certain of those
15  standards?
16     A.  I do not.
17     Q.  Did you have any discussions with
18  anyone at Mallinckrodt prior to the time this
19  memorandum of agreement was executed with
20  respect to that point?
21     A.  I remember having discussions.  I
22  don't know if it was part of the memorandum of
23  agreement that we were doing the best we could
24  with what we had and the direction we had been

Page 272

1  given.
2      Q.  Did you ever receive any performance
3  evaluation that -- well, strike that.
4      In any of your performance evaluations
5  that you received at Mallinckrodt, was the
6  subject of the suspicious order monitoring
7  program one of the items on which you were
8  evaluated?
9      A.  Yes.
10     Q.  And what evaluations did you receive
11  in that regard?
12     A.  I was always meeting expectations.
13     Q.  And who was it who performed your
14  evaluations?
15     A.  My manager.
16     Q.  Ms. Harper?
17     A.  Yes.
18     Q.  You were familiar with the DEA letters
19  from September of '06 and December of '07 that
20  are referred to in Paragraph 4, correct?
21     A.  Yes.
22     Q.  So if, in fact, aspects of
23  Mallinckrodt's SOM program did not meet the
24  standards outlined in those letters, that

Page 273

1  failure would have indicated, at least to some
2  extent, a personal failure on your regard -- on
3  your part with respect to the SOM program,
4  right?
5      MR. O'CONNOR:  Objection to form.
6      A.  I don't think I understand.  Are you
7  saying that because we admitted that our program
8  wasn't robust I wasn't doing my job?
9  BY MR. GOTTO:
10     Q.  Well, let me put it a little
11  differently.
12     During the period prior to January 1
13  of 2012, did you attempt to cause the SOM
14  program at Mallinckrodt to be in compliance with
15  the standards outlined in the DEA letters of
16  September of '06 and December of '07?
17     A.  I believe I did, yes.
18     Q.  Okay.  And so if, in fact, the program
19  was not in compliance with those standards, then
20  that would have meant that you failed to achieve
21  your objective in that regard, correct?
22     MR. O'CONNOR:  Object to form.
23     A.  I disagree with that.
24  BY MR. GOTTO:

Page 274

1  Q.  You disagree with whether the program
2  met the standards, right?
3  A.  No, I disagree with whether I was
4  doing what was expected of me and met the intent
5  of the letters based on the information and the
6  direction that we have.  DEA gives very little
7  guidance around what is an unusual order, what
8  is a suspicious order, so we have to interpret
9  that the best that we can, and I feel that I've
10  done that.
11  MR. GOTTO:  Okay.  Why don't we go off
12  the record.
13  THE VIDEOGRAPHER:  The time is
14  4:34 p.m., and we're off the record.
15  (Whereupon, a recess was taken.)
16  THE VIDEOGRAPHER:  The time is
17  4:45 p.m., and we're on the record.
18  EXAMINATION
19  BY MR. GESTEL:
20  Q.  Good evening, Ms. Spaulding.
21  MR. GESTEL:  Before I begin, I'll just
22  launch what has become our standard objection
23  without going into the whole basis for that, if
24  you'll let me.  I assume that you'll --

Page 275

1  MR. O'CONNOR:  I'll offer our standard
2  objection to the objection.
3  MR. GESTEL:  All right.  Thank you.
4  BY MR. GESTEL:
5  Q.  Ms. Spaulding, my name is Ben Gestel.
6  I represent a group of plaintiffs in the State
7  of Tennessee that are in a slightly different
8  lawsuit than the lawsuit that Mr. Gotto was
9  asking you questions about this morning.
10  I'll begin by asking you, have you
11  reviewed the complaint in any of the Tennessee
12  cases?
13  A.  No.
14  Q.  I'm going to also sort of back up and
15  do a couple of preliminary things.
16  Where do you live?  What is your
17  residential address?
18  A.  ████████████████████████████
   ████
20  Q.  And how long have you lived there?
21  A.  12 years.
22  Q.  And who lives there with you?
23  A.  Currently alone.
24  Q.  And then do you have any plans to move

Page 276

1  any time soon?
2  A.  Not that I foresee.
3  Q.  And then, if this was covered this
4  morning I apologize, but can you do a -- provide
5  some -- a little bit of your educational
6  background?
7  Did you graduate from college?
8  A.  Again, I have an associate from BYU in
9  computer information systems.
10  Q.  When you say BYU, is that Brigham and
11  Young University?
12  A.  Yes, the Idaho campus.
13  Q.  And how long ago did you receive that
14  degree?
15  A.  1990.
16  Q.  And were you living in Idaho at the
17  time?
18  A.  While I attended college.  No, I lived
19  in New Jersey, went to college in Idaho, and
20  came back to New Jersey.
21  Q.  Got it.  Thank you very much.
22  And what is your current title at
23  Mallinckrodt?
24  A.  Controlled substances compliance

Page 277

1  manager.
2  Q.  And in that role do you have
3  supervisory authority over any employees?
4  A.  Yes, I have two employees on my team.
5  Q.  Who is directly reporting to you?
6  A.  Carrie Johnson and Rachelle Rogers.
7  Q.  And if I'm understanding the testimony
8  earlier, are you continuing to directly report
9  to Karen Harper?
10  A.  I am.
11  Q.  In your work with Mallinckrodt, did
12  you have occasion to travel to the State of
13  Tennessee?
14  A.  I have attended a conference in
15  Tennessee.
16  Q.  Do you remember what conference that
17  was?
18  A.  NADDI conference in Nashville.
19  Q.  Do you remember what year that was?
20  A.  Not the exact.  It's within the past
21  five years.
22  Q.  Apart from attending that NADDI
23  conference in Nashville, do you recall ever
24  travelling to the State of Tennessee for your

Page 278

1  work for Mallinckrodt?
2      A.  No.
3      Q.  So you don't ever recall travelling to
4  a distributor's facility in Tennessee to do an
5  audit?
6      A.  I stand corrected.  I have travelled
7  to Memphis in my role at Mallinckrodt to FedEx.
8  And I've been to a distributor -- no, they're
9  not in Tennessee, sorry.  Just FedEx in Memphis,
10  Tennessee.
11      Q.  And do you recall when it was you went
12  to FedEx?
13      A.  Not exactly.  I've been there three or
14  four times.
15      Q.  When was the most recent trip that you
16  were there?
17      A.  It's been many years.
18      Q.  And can you just provide a general
19  overview of what you were doing at that FedEx
20  facility?
21      A.  We were doing a collaboration visit.
22  They gave us a tour of the facility.  We were
23  conducting an audit because we had had some
24  losses in transit with FedEx, and reviewing

Page 279

1  their security procedures and how they handle
2  Mallinckrodt freight when it goes through the
3  hub.
4      Q.  And was this before the transition
5  over to the FedEx Express service that you
6  talked about this morning?
7      A.  It was after.
8      Q.  It was after that.
9          And you said "we went."  Do you recall
10  who went with you?
11      A.  Security managers, Rich Nikolaus.
12      Q.  Anybody else attend on that trip?
13      A.  No, not that I can recall.
14      Q.  As you sit there today, do you have
15  any understanding of opioid prescription rates
16  in the State of Tennessee?
17      A.  No.
18          MR. O'CONNOR:  Objection to form.
19  BY MR. GESTEL:
20      Q.  I think you testified earlier that you
21  believe that there's a current opioid epidemic
22  going on in this country, is that correct?
23          MR. O'CONNOR:  Objection.
24      A.  I'm aware of it.

Page 280

1  BY MR. GESTEL:
2      Q.  And are you aware that epidemic is
3  particularly acute in some parts of the country
4  compared to other parts of the country?
5          MR. O'CONNOR:  Objection to form.
6      A.  Yes.
7  BY MR. GESTEL:
8      Q.  Do you believe that Tennessee has been
9  particularly hard-hit by the opioid crisis?
10          MR. O'CONNOR:  Objection to form.
11      A.  I don't know how significant or hit
12  any one state is over another.
13  BY MR. GESTEL:
14      Q.  Sure.
15          But do you understand or do you
16  believe that Tennessee has -- is one part of
17  those country -- one part of this country that
18  has been particularly hit by the opioid
19  epidemic?
20          MR. O'CONNOR:  Objection.
21      A.  I'm aware that Tennessee has concerns.
22  I don't know the specific facts to know whether
23  it was one of the highest or not or more so than
24  any other state.

Page 281

1  BY MR. GESTEL:
2      Q.  Do you recall during your time with
3  Mallinckrodt ever discussing any specific pill
4  mill operations in the State of Tennessee?
5          MR. O'CONNOR:  Objection to form.
6      A.  Nothing specific, no.
7  BY MR. GESTEL:
8      Q.  Have you ever reviewed IMS Health data
9  regarding the rates of prescribing of opioids
10  related to the State of Tennessee?
11      A.  No.
12      Q.  Have you ever heard of Interstate 75
13  being described as the "Oxy Express"?
14      A.  Yes.
15      Q.  About when did you first hear that
16  term?
17      A.  Several years ago.  I don't remember
18  exactly when.
19      Q.  And I don't mean to test your
20  knowledge of American geography, but are you
21  aware that Interstate 75 runs through the State
22  of Tennessee?
23      A.  At a high level, yes.
24      Q.  In your role as manager of controlled

Page 282

1 substances, did you interact with law
2 enforcement officials in the State of Tennessee?
3    A.  I interact with law enforcement
4 officials.  I don't remember specifically if any
5 of them have been from Tennessee.  They could
6 have, but I don't know specifically.
7    Q.  Did you have occasion to ever just
8 have a conversation with a police officer from
9 Morristown, Tennessee?  Does that ring a bell in
10 your mind at all?
11    A.  I believe the security director had a
12 conversation with someone from Morristown,
13 Morrisville.
14    Q.  But you weren't involved in that
15 conversation, to the best of your recollection?
16    A.  No, not directly.
17    Q.  How did you learn about it indirectly?
18    A.  The security director asked me for
19 shipping information, that he had been contacted
20 by somebody from Morrisville, Tennessee.
21    Q.  And then why would he contact you
22 about that information, if you know?
23    A.  Because I was at the distribution
24 center and could run the reports to know what --

Page 283

1 where we shipped our orders to.
2    Q.  And then did you provide him the
3 report that he asked for?
4    A.  Yes.
5    Q.  And then did you follow up with him at
6 all after providing that report about the status
7 of that Morristown investigation?
8    A.  No.
9    Q.  Have you ever asked any law
10 enforcement official about prescription opioid
11 division -- I'm sorry, strike that.
12        Have you ever asked any law
13 enforcement official where prescription opioid
14 diversion was most prevalent?
15    A.  No, not that I can recall.
16    Q.  During your time with Mallinckrodt,
17 have you ever had occasion to run reports
18 detailing the percentage of oxycodone sales for
19 Mallinckrodt's distributors in certain states?
20    A.  Can you say that again?
21    Q.  Sure.
22        During your time with Mallinckrodt,
23 have you had occasion to run reports detailing
24 the percentage of Oxy sales for Mallinckrodt's

Page 284

1 distributors in certain states?
2    A.  I have not, no.
3    Q.  I'm going to hand you a document that
4 we'll mark as Exhibit 42.
5        (Whereupon, Mallinckrodt-Spaulding-42
6        was marked for identification.)
7        MR. GESTEL:  (Handing).  Sorry, that
8 was a little -- like Tom Brady over here.
9 BY MR. GESTEL:
10    Q.  I hand you a document that's been
11 marked as Exhibit 42.  I'll represent to you
12 that the first page is a cover page carrying the
13 Bates label of this Excel spreadsheet that was
14 sent to us, and it has some what's called
15 metadata showing that it was last modified on
16 September 2, 2011.  The reason why we do that,
17 ma'am, is that the spreadsheet was produced to
18 us in native format so the Bates numbers don't
19 appear, but that's the Bates number of this
20 document.
21        And if you flip to the first page, in
22 the upper left-hand corner there is in column
23 A1, it says "Oxy's percent of sales by state per
24 distributor versus sales in all US by district,"

Page 285

1 I assume.
2        Do you see that?
3    A.  Yes.
4    Q.  Have you ever seen this document
5 before, ma'am?
6    A.  I don't remember if I have or have
7 not.
8    Q.  Do you ever recall doing any training
9 on this document, where you might have trained
10 people to run these reports?
11    A.  No.
12    Q.  Do you see that the state listed here
13 is Florida?
14    A.  Yes.
15    Q.  And then flip to the next page.  Do
16 you see that the state listed there is Texas?
17    A.  Yes.
18    Q.  And flip to the next page.  Do you see
19 that the state listed there is Ohio?
20    A.  Yes.
21    Q.  And flip to the next page.  Do you see
22 that the state listed there is Kentucky?
23    A.  Yes.
24    Q.  And then flip to the next page.  And

Page 286

1 do you see there that the state listed there is
2 Tennessee?
3    A. Yes.
4    Q. And none of this is -- you don't
5 believe you've ever seen this document before?
6    A. I don't remember it.
7    Q. And then flip to the next page. And
8 there's the State of Georgia. Do you see that?
9    A. Yes.
10    Q. And then if you flip to the next page,
11 there's a graph titled "Percent of Oxycodone
12 Sales in Florida."
13       Do you see that?
14    A. Mm-hmm.
15    Q. Do you recall ever seeing a graph like
16 this in your work with Mallinckrodt?
17    A. No, I don't remember.
18    Q. And do you remember why, if at all, in
19 2011 Mallinckrodt might have become interested
20 in tracking oxycodone sales to the states listed
21 in this spreadsheet?
22    A. Only due to DEA activities around that
23 time period.
24    Q. And if you wanted to have a chart like

Page 287

1 this made for you, it sounds like you don't
2 recall running these types of reports, who would
3 you go to within Mallinckrodt in 2011, if you
4 can recall, to run a report like this?
5    A. Oxy sales by state by distributor. It
6 could have been in our finance department, or it
7 would go to our marketing department.
8    Q. And who in those departments would you
9 direct an inquiry to?
10    A. Whoever was the head of the department
11 at the time.
12    Q. Would that have been Jen Buist?
13    A. No. Jen Buist would have gotten it
14 from one of those departments.
15    Q. Would it have been Jen Terp?
16    A. Could have been. I don't know for
17 sure.
18    Q. You can set that aside. Thank you
19 very much.
20       (Whereupon, Mallinckrodt-Spaulding-43
21       was marked for identification.)
22 BY MR. GESTEL:
23    Q. I'm going to hand you a document that
24 we'll mark as Exhibit 43.

Page 288

1       MS HOSMER: Do you have a Bates number
2 for us, please?
3       MR. GESTEL: Sure.
4       MS HOSMER: Thank you.
5 BY MR. GESTEL:
6    Q. This is an e-mail carrying Bates label
7 MNK-T1_0007898862. And then do you see that
8 this is an e-mail dated November 26, 2013 from
9 Jennifer Buist to you carrying a subject "KVK
10 Heat Maps"? Did I read that correctly?
11    A. Yes.
12    Q. Do you recall this e-mail?
13    A. Vaguely.
14    Q. And then, let me put a clean copy up.
15 And the first -- or the last e-mail in that
16 chain says "These may be discussed during our
17 staff meeting."
18       Do you see that?
19    A. Yes.
20    Q. And then a couple e-mails down is an
21 e-mail from Julie Milford to Jacob Longenecker
22 with Jen Terp and Jennifer Buist copied.
23       Do you see that?
24    A. Yes.

Page 289

1    Q. And the body of that e-mail says "Hi
2 Jake, Attached are the heat maps with
3 Mallinckrodt data. I also added a section on
4 per capita usage to negate any effects or
5 questions around population sizes. Similar
6 patterns still exist that suggest relatively
7 high usage in the Pacific Northwest, especially
8 for the 5-milligram tablet. In general, there
9 are still high rates in the KY, WV, and
10 Tennessee area and in Florida."
11       Did I read that correctly?
12    A. Yes.
13    Q. And attached to this e-mail chain is
14 this referenced heat maps, and I think it's just
15 a PowerPoint presentation carrying the title
16 "Volume Heat Maps."
17       Do you see that?
18    A. Yes.
19    Q. Do you recall ever running these heat
20 maps while you were employed at Mallinckrodt?
21    A. No, I didn't run them.
22    Q. Do you recall this spread -- or this
23 PowerPoint presentation as you sit here today?
24    A. Now that I'm looking at it, I vaguely

Page 290

1 remember it, yes.
2    Q.  And then if you flip to the first page
3 of the PowerPoint presentation, it says "MNK
4 geographical patterns are similar to the rest of
5 the market."
6        Did I read that correctly?
7    A.  You said the first page?
8    Q.  The first page of the PowerPoint.
9    A.  Yes.
10    Q.  And then there's two maps.  There's a
11 map carrying the title of "All Strengths -
12 Mallinckrodt."
13        Do you see that?
14    A.  "All Strengths - Mallinckrodt," yes.
15    Q.  And then the second map is "All
16 Strengths - Other Manufacturers."
17        Do you see that?
18    A.  Yes.
19    Q.  And then it appears that based on the
20 legend here at the bottom that the deeper purple
21 you get in an area, the more Oxy prescriptions
22 in that area.  Is that your understanding of
23 this heat map?
24    A.  Well, it's saying "All Strengths," so

Page 291

1 not just oxycodone.
2    Q.  Okay.  But regardless, as you get more
3 purple, you see more -- that's more units going
4 into that geographic territory, right?
5    A.  Based on the legend.
6    Q.  And then if you look here in the area
7 of the country that is Tennessee, you'll see
8 that it's -- do you see that it's purple in the
9 areas around the State of Tennessee?
10    A.  Yes, roughly.
11    Q.  And then also on the Other
12 Manufacturers map, the State of Tennessee is
13 kind of more purple than other areas around it.
14        Do you see that?
15    A.  I wouldn't say it's more purple than
16 other areas around it, but I see it.
17    Q.  But you would agree with me that
18 that's a -- the State of Tennessee is purple in
19 this graph, correct?
20    A.  In which one, the Other Manufacturers
21 or the Mallinckrodt one?
22    Q.  The Other Manufacturers.
23    A.  Yes.
24    Q.  And then do you see here at the bottom

Page 292

1 it says the source is IMS, LRx, Xponent.
2        Do you see that?
3    A.  Yes.
4    Q.  And it's apparently from July, 2012 to
5 June, 2013?
6    A.  Yes.
7    Q.  Do you know what the IMS, LRx, Xponent
8 references?
9    A.  No, I do not.
10    Q.  Do you believe that that could be a
11 reference to IMS Health data?
12    A.  Reasonably.
13    Q.  Are you familiar with IMS Health data?
14    A.  At a very, very high level.
15    Q.  Do you use that at all in suspicious
16 order monitoring program at Mallinckrodt?
17    A.  I do not, no.
18    Q.  Do you know of anybody within the
19 suspicious order monitoring program at
20 Mallinckrodt who uses IMS Health data?
21    A.  Not currently, no.
22    Q.  Well, was it ever used, to the best of
23 your knowledge?
24    A.  So I know at one point in time this

Page 293

1 group may have had access to IMS data in which
2 Jen Buist, who was the SOM auditor analyst at
3 the time, may have reached out to her for
4 information, but I don't know that and I can't
5 speak on her behalf.
6    Q.  And when you say "this group," what do
7 you mean?
8    A.  The commercial marketing.  I don't
9 even know who Ms. Julie Milford is, but her
10 title says she's global business insights and
11 forecasting, commercial analytics.
12    Q.  And you're getting that from the cover
13 of this -- the cover e-mails?
14    A.  Yes.  I don't know who she is.
15    Q.  If you'll flip back, there's a very
16 similar map to the one we just went through
17 carrying the labels of "30-milligram."  It's
18 about halfway back, I apologize.  These
19 PowerPoint presentations aren't numbered.
20 There's a 30-milligram chart.
21    A.  Yes.
22    Q.  And then do you see that this
23 particular chart carries the title "Mallinckrodt
24 and other manufacturers have very similar

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1  geographical dispensing patterns"? Did I read
2  that correctly?
3      A.  "Have very similar geographical
4  dispensing patterns," yes.
5      Q.  And then once again we see a map with
6  the legend that the more purple an area is, the
7  more 30-milligram Mallinckrodt extended units
8  have been sent into that area.
9          Do you see that?
10     A.  Based on the map, yes.
11     Q.  And then do you see the State of
12 Tennessee is purple once again?
13     A.  Yes.
14     Q.  If you flip to the next page, there's
15 a -- it carries the title of "Per Capita Heat
16 Maps."
17         Do you see that?
18     A.  Yes.
19     Q.  And then there are similar maps to the
20 one that we just went through.  The first one
21 listed after that cover page is the one carrying
22 the title "The coasts have more per capita usage
23 than the midwest."
24         Do you see that?

Page 295

1      A.  Yes.
2      Q.  And then again there's another map
3  showing per capita Oxy usage, and it appears
4  that the greener that you get in this map the
5  more per capita usage you see.
6          Do you see that?
7      A.  Based on the map, yes.
8      Q.  And then on the "All Strengths -
9  Mallinckrodt," you'll see that Tennessee, and
10 particularly East Tennessee, is green.
11         Do you see that?
12     A.  I don't know exactly where Tennessee
13 starts and ends, but --
14     Q.  Well, if you go over to the "All
15 Strengths - Other Manufacturers," the outline of
16 the State of Tennessee is a little bit more
17 prevalent there in the southeast portion of the
18 country.
19         Do you see that?
20     A.  Yes.
21     Q.  And then if you -- the area,
22 especially the eastern portion of that area is
23 also lit up on the Mallinckrodt All Strengths
24 map, correct?

Page 296

1      A.  The All Strengths - Other
2  Manufacturers, yes.
3      Q.  And then also on the All Strengths -
4  Mallinckrodt map, the eastern portion of that
5  region is also green.
6          Do you see that?
7      A.  No, because I see darker green spots
8  all throughout Tennessee.
9      Q.  I see.
10         So you would agree with me that the
11 State of Tennessee is green in the All Strengths
12 - Mallinckrodt map?
13     A.  It's a light shade of green, yes.
14     Q.  And then once again if you'll flip
15 back to the 30-milligram page, a very similar
16 heat map showing the -- carrying the title "Per
17 capita usage of the Oxy 30 tablet is lowest in
18 the midwest."  Did I read that correctly?
19     A.  Can you say that again, please?
20     Q.  Sure.
21         The title of the 30-milligram slide is
22 that "Per capita usage of the Oxy 30 tablet is
23 lowest in the midwest."
24         Did I read that correctly?

Page 297

1      A.  I went the wrong way.
2      Q.  I think it's the second-to-last, or
3  might be the very last page.
4      A.  Last page.  Got it, yes.
5      Q.  And then once again on the
6  Mallinckrodt 30-milligram page, we see that
7  Tennessee is green, suggesting once again larger
8  per capita usage.
9          Do you see that?
10     A.  I can't tell where Tennessee starts
11 and ends, but I see that there's green on the
12 map.
13     Q.  Sure.
14         And then also over here on the
15 30-Milligram - Other Manufacturers, you also see
16 in the area of the State of Tennessee green,
17 suggesting greater per capita Oxy 30 usage in
18 the State of Tennessee, right?
19     A.  Based on these maps, yes.
20     Q.  And once again, not to belabor the
21 point, but apparently the source of the per
22 capita map is also this IMS, LRx, Xponent from
23 July 2012 to June 2013.
24         Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    A.  I see it.  I don't know what it is.

2    Q.  Sure.

3        Do you recall using these heat maps at

4  all in the suspicious order monitoring program?

5    A.  I do not, no.

6    Q.  But you don't have a specific

7  recollection as to whether or not the suspicious

8  order monitoring program was generating these

9  heat maps as part of its suspicious order

10  monitoring program?

11    A.  Correct.  Jen Buist was the analyst at

12  the time responsible.

13    Q.  And do you know who Jen reported to?

14    A.  She started out reporting to Gail

15  Tetzlaff, director of government reporting.

16    Q.  Okay.  And then at some point did that

17  change?

18    A.  Yes.  Then she reported to Don Lohman

19  in legal.

20        (Whereupon, Mallinckrodt-Spaulding-44

21        was marked for identification.)

22  BY MR. GESTEL:

23    Q.  Same rules apply, by the way, if you

24  need a break by all means, just say so and we

Page 299

1  can take a break.

2    A.  Thank you.

3    Q.  I can assure you I will be much

4  shorter in my examination than Mr. Gotto was

5  this morning, but...

6        I'll hand you a document that we'll

7  mark as Exhibit 44.  I do this once a deposition

8  where I accidentally mark my copy, so just give

9  me one second and let me flip this over.  I

10  should learn my lesson and that should be the

11  last one that I mismark.

12        This is an e-mail sent on June 29,

13  2012 from you to Karen Harper carrying the

14  subject line "DEA Albany/New York City Meeting

15  notes on SOM/Quota."

16        Did I read that correctly?

17    A.  Yes.

18    Q.  And you ask Karen Harper to "review

19  and make edits/comments as you feel appropriate.

20  Please advise when I may publish to Ken."

21        Did I read that correctly?

22    A.  Yes.

23    Q.  Do you recall what you mean by this

24  "publish to Ken" comment?

Page 300

1    A.  Sent to Ken Yamashita, the site

2  director.

3    Q.  And he was the site director for what

4  site?

5    A.  Hobart.

6    Q.  For Hobart?

7    A.  Yes.

8    Q.  And then if you flip over, this e-mail

9  attaches this Word document carrying the title

10  "Notes from Hobart Meeting with DEA Albany/NYC

11  on SOM and Quota, 6/26/12."

12        Do you see that?

13    A.  Yes.

14    Q.  Do you recall this meeting with the

15  DEA in June of 2012?

16    A.  To be honest, no, I don't.

17    Q.  And that's all right.  But you see

18  that you -- in the Mallinckrodt attendees you're

19  listed there at the bottom, Eileen Spaulding?

20    A.  Yes.

21    Q.  Any reason to doubt that you were

22  there?

23    A.  No, no.  I'm sure I was there.  I just

24  don't remember it.

Page 301

1    Q.  And then apparently there was some

2  question/answer between Mallinckrodt

3  representatives and the DEA, and I want to

4  direct your attention to the bottom of that

5  first page of the Word document.  There's a

6  question there about "How long does it take to

7  process lines?"  Do you see that question?

8    A.  Yes.

9    Q.  And then the answer apparently given

10  was "Reports are run daily at 9:00 a.m. and 3:00

11  Central.  The average time is 10 to 15 minutes

12  to review and process each line that has gone on

13  hold."

14        Did I read that correctly?

15    A.  Yes.

16    Q.  Is that suggesting that processing

17  lines, these are the orders that have been

18  flagged by the suspicious order monitoring

19  algorithm as needing further investigation?

20    A.  Yes.

21    Q.  And then the average time to process

22  those were 10 to 15 minutes to review?

23    A.  Each line.

24    Q.  For each line?

Page 302

1    A.   For each order, yes.
2    Q.   Okay.  Flip to the next page.  Top of
3 the page, the question "When you say 195 lines
4 filed, what does it mean?"  And then the answer
5 is "It means that the line has hit the algorithm
6 and requires review and/or investigation."
7         Did I read that correctly?
8    A.   Yes.
9    Q.   Does that suggest that there's 195
10 lines that are hitting the algorithm?
11   A.   It could.
12   Q.   And is that, do you know, or do you
13 recall, is that 195 lines a month, a week, a
14 day?
15   A.   I don't know the time period that Don
16 was speaking to.
17   Q.   And you don't recall any specifically
18 from this meeting?
19   A.   No.  I mean, as I testified earlier, I
20 remember reviewing our SOM program, but I don't
21 remember specifics of the meeting.
22   Q.   Sure.
23        And then the next question there is
24 "How many orders have been deemed suspicious?"

Page 303

1         Do you see that?
2    A.   Yes.
3    Q.   And then the answer is "None, it was
4 explained that this updated SOM program went
5 into place on 3/1/2012 and no orders have been
6 determined to be suspicious since that date."
7         Did I read that correctly?
8    A.   Correct.
9    Q.   Is that consistent with your
10 recollection that there was no suspicious order
11 reported on the updated SOM program since it
12 went into place on March 1st of 2012?
13   A.   Between March 1st of 2012 and the date
14 of this meeting on June 26th of 2012, correct.
15   Q.   And then does that -- taking that with
16 the previous question, does that suggest to you
17 that the 195 lines that were flagged were in
18 that period between June 1st -- I'm sorry,
19 March 1st, 2012 and the date of this meeting of
20 June 26, 2012?
21        MR. O'CONNOR:  Object to form.
22   A.   I don't know.  I wouldn't want to
23 guess that that is.
24 BY MR. GESTEL:

Page 304

1    Q.   You can set that aside.
2        (Whereupon, Mallinckrodt-Spaulding-45
3        was marked for identification.)
4 BY MR. GESTEL:
5    Q.   I'm going to hand you what's been
6 marked as Exhibit 45.  Sorry, I'm somehow down a
7 copy.
8        Do you see that this is a document
9 Bates stamped MNK-T1_0006967775, and it's
10 carrying the title "CSC Steering Committee
11 Meeting Notes," December 12, 2012.
12        Do you see that?
13   A.   Yes.
14   Q.   And you are on the suspicious order
15 monitoring steering committee at that time,
16 correct?
17   A.   Yes.
18   Q.   And you see that there's a reference
19 to introducing John?
20   A.   Yes.
21   Q.   Do you recall who that was?
22   A.   John Gillies.
23   Q.   And was he just coming on board at
24 this time?

Page 305

1    A.   Yes.
2    Q.   Flip to the second page.  There's some
3 bullet items there, and it says, third one down,
4 it says "We also dropped out," and I think
5 that's a typo, it should be "our multiplier from
6 ███."
7        Do you see that?
8    A.   Yes.
9    Q.   So does that suggest to you that in
10 December of 2012 that the suspicious order
11 monitoring algorithm threshold was lowered from
12 ███?
13   A.   Yes.
14   Q.   And then I believe that you testified
15 earlier that eventually that was also further
16 reduced down to █?
17        MR. O'CONNOR:  Objection to form.
18   A.   I don't remember stating that.  I
19 don't know that it's █.  I know it went from █
20 to █ we spoke about that earlier, but I don't
21 remember that it went from ██ down to █.
22 BY MR. GESTEL:
23   Q.   So is the multiplier currently ██?
24   A.   Yes.

Page 306

1     Q.  And do you believe that that's been
2 the case from December of 2012 to the present?
3     A.  Based on my knowledge, yes.
4     Q.  And then it has a description there,
5 "we multiply the 18 month average of orders on a
6 per customer, per SKU basis and multiply that
7 amount by ▓ to get the level at which orders
8 will trip the volume flag that month.  We do the
9 same for number of orders."
10     Did I read that correctly?
11     A.  Yes.
12     Q.  And is that a description of how the
13 algorithm functionally works?
14     A.  One component of it.
15     Q.  And so is it safe to say that once you
16 move the ▓ multiplier, if an order was within
17 ▓ times the 18-month moving average that that
18 order would not be flagged and would be
19 processed and shipped?
20     MR. O'CONNOR:  Objection to form.
21     A.  If it did not?  Can you repeat that?
22 BY MR. GESTEL:
23     Q.  Sure.
24     Is it safe to say that once you move

Page 307

1 the ▓ multiplier, if an order was within ▓
2 ▓▓▓▓▓▓ the 18-month moving average
3 that order would not be flagged and would be
4 processed and shipped?
5     A.  If it was less than ▓, yes, that's
6 correct.
7     Q.  And that would be the same for the
8 number of orders, right?
9     A.  For this frequency, order frequency,
10 yes.
11     Q.  And then -- and is that how the
12 algorithm continues to operate today?
13     A.  Yes.
14     Q.  For both volume of order and for the
15 number of orders?
16     A.  Yes.
17     Q.  And then if you flip -- continuing on
18 that page, it ends with this reference to "Jen
19 Buist Statistics."
20     Do you see that?
21     A.  Yes.
22     Q.  And then there's a reference to a tier
23 1 and a tier 2.
24     Do you see that?

Page 308

1     A.  Yes.
2     Q.  What is tier 1 and tier 2?
3     A.  Tier 1 is the top three major
4 distributors for Oxy 15-milligram and Oxy
5 30-milligram.  So if there -- it's a
6 multi-layered system.  So tier 1 looks at Oxy 15
7 and Oxy 30s for the big three, and if the order
8 hits the threshold amount, then it will go on a
9 tier 1 hold.  Tier 2 is based on all orders
10 being reviewed by an 18-month history.
11     Q.  Okay.  And am I understanding your
12 testimony correctly that only the big three
13 distributors would be in the tier 1?
14     A.  Yes.
15     Q.  And just for the record, who are the
16 big three?
17     A.  McKesson, AmerisourceBergen, and
18 Cardinal.
19     Q.  And then tier 2, am I understanding
20 your testimony correctly that that's essentially
21 everybody else?
22     A.  That's everybody including the
23 distributors, but it's based on an 18-month --
24 including the big three distributors for all

Page 309

1 products, but it's based on the 18-month
2 history.  So that's where it's referring to the
3 multiplier above.
4     Q.  Got it.
5     And then do you see that there's two
6 columns there of "Order Lines Processed" and
7 "Order Lines Failed"?  Do you see that?
8     A.  Yes.
9     Q.  And in tier 1, just take March of
10 2012, there's 124 order lines processed and 56
11 order lines failed.
12     Do you see that?
13     A.  Mm-hmm.
14     Q.  So does that mean that in March of
15 2012, for tier 1 orders there were 124 of them?
16     A.  There were 124 orders processed.  56
17 went on hold.
18     Q.  And that means that it flagged the
19 algorithm?
20     A.  Yes.
21     Q.  Do you recall what was going on in
22 March of 2012 to suggest that high level of
23 flagging by the algorithm?
24     A.  I don't.  I know it's when the program

Page 310

1 started, so I don't know if there was historical
2 data that needed to be loaded.
3  Q.  Sure.
4  A.  Or I don't remember specifically.
5  Q.  And then you see for the rest of the
6 tier 1, that March of 2012 is an anomaly?  Would
7 you agree with me with that?
8  A.  Yes.
9  Q.  So -- and then there's less orders
10 processed going down the line, and then
11 correspondingly less order fails, correct?
12  A.  Correct.
13  Q.  And again, that's the number of those
14 orders that are being flagged by the algorithm,
15 right?
16  A.  Correct, for tier 1.
17  Q.  So if you just look at the averages
18 here, you take an average, and it does the math
19 for you there, 78 average orders during that
20 time period, on average 7 monthly fails.
21  Do you see that?
22  A.  It's 78 lines, not 78 orders.
23  Q.  Sorry.  Thank you.
24  78 lines, 7 line fails, right?

Page 311

1  A.  Yes.
2  Q.  And just simple math, that suggests
3 that 90 percent of the orders are making its way
4 through the algorithm and being processed and
5 shipped, right?
6  A.  If they don't hit tier 2 metrics, yes.
7  Q.  Sure.
8  And then down on tier 2, it has the
9 same two columns, Order Lines Processed, Order
10 Lines Failed, right?
11  A.  Yes.
12  Q.  I don't want to belabor the point, but
13 again, these are lines that go through the
14 algorithm in tier 2, correct?
15  A.  Mm-hmm.  Sorry, yes.
16  Q.  And then order lines failed are those
17 that are flagged by the algorithm for additional
18 investigation?
19  A.  Yes.
20  Q.  And then again taking the averages
21 here, the sheet does the math for you, that's on
22 average per month 8,436 lines on average are
23 processed per month, correct?
24  A.  Yes.

Page 312

1  Q.  And then 596 average order lines
2 hitting the algorithm, right?
3  A.  Yes.
4  Q.  And so that's approximately, just
5 doing the math, about 93 percent clearing the
6 algorithm and being processed and shipped,
7 right?
8  A.  Yeah, I don't know the math, but --
9 not my thing.
10  Q.  And do you know, apart from sort of
11 that March, 2012 anomaly, do these statistics
12 hold from 2012 to the present, do you know?
13  A.  I don't, not without running reports
14 and looking at them.
15  Q.  And I assume that, again, based on the
16 document here, that Jen Buist must have ran
17 these statistics?
18  A.  She did when she was in that role.
19  Q.  And it sounds like she's no longer in
20 that role?
21  A.  Correct.
22  Q.  Who is in that role?
23  A.  Rachelle Rogers.
24  Q.  Do you know if the SOM steering

Page 313

1 committee is continuing to receive these types
2 of reports showing how many tier 1 and tier 2
3 order lines are being processed and hitting the
4 algorithm?
5  A.  Not recently.
6  Q.  And then we saw in the previous
7 document that when that investigation gets
8 tripped, the investigation takes 10 to
9 15 minutes, right?
10  A.  On average.
11  Q.  And is that continuing the average
12 from 2012 to the present?
13  A.  I'd have to run reports.  It's --
14 every line is thoroughly investigated.
15  Q.  And who would you go to to run that
16 report about how long it's taking to process the
17 orders that are being hit by the algorithm?
18  A.  I would run it.
19  Q.  You would run the report?
20  A.  Mm-hmm.
21  Q.  How would you do it?
22  A.  We have a system.  Well, let me
23 clarify.
24  So how long it takes to review, to

Page 314

1  review and release an order if appropriate?
2      Q.  Yes.
3      A.  So I don't know that we'd have a
4  mechanism to know that.  It's human involvement,
5  and I have an analyst that that's what her
6  full-time job is, and she spends a good part of
7  her day reviewing and releasing, so I don't --
8  we don't have a mechanism that tracks exactly
9  how long it takes.
10     Q.  And who is that analyst?
11     A.  Rachelle Rogers currently.
12     Q.  And how long has she been in that
13 role?
14     A.  Since December.
15     Q.  And did she take over from Jennifer
16 Buist?
17     A.  No.  She took over from Amanda Chase
18 who was in that role for approximately a year
19 and a half.
20     Q.  And did Amanda Chase take over the
21 role from Jennifer Buist?
22     A.  No.  Previous to Amanda Chase it was
23 done out in corporate by Heather McKenzie, and
24 Jen Buist was previous to Heather McKenzie.

Page 315

1      Q.  Just forgive me, just give me one
2  second because I ask a lot of questions that
3  were already covered, and it's a lot easier for
4  me just to look at my notes than to ask you all
5  those questions again.
6          As part of your role on the suspicious
7  order monitoring steering committee, have you
8  had a chance to review some chargeback data?
9      A.  Yes.
10     Q.  And this may have been covered
11 earlier, but do you recall when chargeback data
12 started being used by the suspicious order
13 monitoring program at Mallinckrodt?
14     A.  So we reviewed some e-mails earlier
15 today that gave a ballpark, but I don't remember
16 exactly when.
17     Q.  And have you ever had occasion for
18 yourself to request chargeback data?
19     A.  For myself?
20     Q.  Well, let me back up.
21         Do you maintain the chargeback data?
22     A.  No.
23     Q.  If you needed a chargeback report run,
24 how would you go about effectuating that?

Page 316

1      A.  I would contact the finance analyst
2  that has access to the chargeback system.
3      Q.  And who is that?
4      A.  Currently is Debbie Digby.
5      Q.  And who was it prior to Ms. Digby?
6      A.  I'm not sure who Jennifer was
7  getting -- Jen Buist was getting them from.
8      Q.  And then have you ever had occasion to
9  ask for chargeback data?
10     A.  Yes.
11     Q.  Any time when that request for
12 chargeback data was refused?
13     A.  No.
14     Q.  You testified earlier that when
15 Mallinckrodt terminated chargebacks to a
16 pharmacy you reported this to the DEA and
17 Mallinckrodt would inform the DEA through a
18 letter.  Do you remember that testimony?
19     A.  Yes.
20     Q.  Did Mallinckrodt maintain a copy of
21 the letter that it sent to the DEA?
22     A.  Yes.
23     Q.  And did you send that letter?
24     A.  I send them currently.  Previous to me

Page 317

1  would have been Jen Buist or Heather McKenzie.
2      Q.  Okay.  And when did you start sending
3  them?
4      A.  When SOM program transferred to Hobart
5  back in April of 2017.
6      Q.  Okay.  Thank you.
7          I'm going to hand you a document that
8  we marked as Exhibit 46.
9          (Whereupon, Mallinckrodt-Spaulding-46
10         was marked for identification.)
11 BY MR. GESTEL:
12     Q.  And I promise you that we're near the
13 end.
14         You've been handed a document that's
15 been marked as Exhibit 46.  At the top of it,
16 the title of this document is the "HZQS -
17 Controlled Substances Compliance
18 Responsibilities Associated with
19 Anti-Diversion."
20         Did I read that correctly?
21     A.  Yes.
22     Q.  And you see the revision date is
23 March 11, 2015.
24         Do you see that?

Page 318

1   A.  Yes.
2   Q.  Do you know if this is -- continues to
3 be the current policy?
4   A.  I don't.
5   Q.  Do you maintain the policies?
6   A.  I do not.
7   Q.  But you know that based on the record
8 here that this was at least the portion that was
9 in effect on March 11, 2015?
10   A.  Based on this document, yes.
11   Q.  And then if there are subsequent
12 revisions, does the revision date gets updated
13 and it supersedes the date of the previous
14 revision?
15   A.  Correct, the next revision would move
16 the March -- 03/11/2015 to supersedes date, and
17 then become the new date.
18   Q.  Got it.
19     I've handed you a document that we'll
20 mark as Exhibit 47.
21     (Whereupon, Mallinckrodt-Spaulding-47
22     was marked for identification.)
23 BY MR. GESTEL:
24   Q.  And this document is another SOM

Page 319

1 written policy. This one is entitled
2 "Identification, Investigation, and Reports of
3 Controlled Substances Suspicious Orders."
4     Did I read that correctly?
5   A.  Yes.
6   Q.  I don't want to belabor this too much,
7 but same thing with regard to the effective date
8 and supersede date is the same as the document
9 that preceded this?
10   A.  Yes.
11   Q.  Do you know if this is the current
12 in-force version of this policy?
13   A.  I don't.
14     (Whereupon, Mallinckrodt-Spaulding-48
15     was marked for identification.)
16 BY MR. GESTEL:
17   Q.  You're going to notice a trend here.
18 Exhibit 48 (handing). Once again, another SOM
19 policy, this one entitled "Controlled Substances
20 Compliance Responsibilities Associated with
21 Suspicious Order Monitoring."
22     Did I read that correctly?
23   A.  Yes.
24   Q.  And then there's a revision date of

Page 320

1 February 19, 2015, correct?
2   A.  Yes.
3   Q.  And then a supersedes date of a
4 previous policy of November 14, 2013, right?
5   A.  Yes.
6   Q.  And then once again, we can assume
7 that this is the policy that went into effect on
8 February 19, 2015?
9   A.  Yes.
10   Q.  And then do you know if this is the
11 current policy in effect?
12   A.  I don't.
13   Q.  But if it was revised, there would be
14 a new revision date with the supersede date
15 replaced with this February 19, 2015 date?
16   A.  Correct, if it had been approved.
17   Q.  That was my last policy. I hand you
18 Exhibit Number 49.
19     (Whereupon, Mallinckrodt-Spaulding-49
20     was marked for identification.)
21 BY MR. GESTEL:
22   Q.  This is an e-mail from you dated
23 September 18, 2015 to Carrie Johnson, correct?
24   A.  Yes.

Page 321

1   Q.  And it has -- carries the title
2 "UO" -- or subject "UOR Program Review," right?
3   A.  Yes.
4   Q.  What is the UOR program?
5   A.  Unusual order reports.
6   Q.  And then if you flip back, you see
7 that there are various attachments to this
8 e-mail, right?
9   A.  Yes.
10   Q.  Do you recall sending this e-mail?
11   A.  I don't, no.
12   Q.  Any reason to believe that you did not
13 send the e-mail?
14   A.  No.
15   Q.  And then if you flip back to the last
16 page, there is a document entitled "Excluded
17 Items within the UOR scope of JDE."
18     Did I read that correctly?
19   A.  Yes.
20   Q.  What does that mean?
21   A.  So there's certain products that we
22 make on behalf of other manufacturers, such as
23 this Methylin Chewable, Methylin Oral,
24 Tussicaps, and we do not distribute to the

Page 322

1 market. So we're a contract marketing
2 organization for another manufacturer.
3    Q. Okay. And then do you see there's a
4 chart that says, two columns, "Reason" and then
5 "Definition"?
6    Do you see that?
7    A. Yes.
8    Q. And then there are three reasons
9 listed. Under the second one, there's
10 "Xartemis XR." Did I say that correctly?
11    A. Yeah, Xartemis.
12    Q. Xartemis.
13    And it says "added to table on
14 March 12, 2014. XXR deemed by SOM Team not
15 likely to be diverted into other than legitimate
16 medical channels."
17    Did I read that correctly?
18    A. Yes.
19    Q. What does that mean?
20    A. It's a branded product, and it's very
21 small volume, very expensive, so there's not a
22 lot of it moving.
23    Q. And so what does it mean that "XXR
24 deemed by SOM Team not likely to be diverted"?

Page 323

1    A. It's -- XXR is the abbreviation for
2 Xartemis XR.
3    Q. Got it.
4    Does this mean that orders for this
5 particular item are not being run through the
6 algorithm?
7    A. Yes.
8    Q. And then the same thing here on the
9 next reason, "Generic Exalgo"?
10    A. Correct.
11    Q. It says it's added to the table on
12 May 15, 2014.
13    A. Added to the table, yes.
14    Q. And then "Generic Exalgo deemed by SOM
15 Team not likely to be diverted into other than
16 legitimate medical channels."
17    Did I read that correctly?
18    A. Correct.
19    Q. Does that mean that orders for the
20 generic Exalgo are also not being run through
21 the algorithm?
22    A. For both products until they were
23 removed on January 22, 2015, and then they were
24 being run.

Page 324

1    Q. Got it. Actually that was my next
2 question.
3    So when you say removed from the list,
4 it means removed from this carveout list from
5 the suspicious order monitoring -- or I'm sorry,
6 the algorithm processing?
7    A. Correct, because they were both new
8 products that were launched, so there was no
9 history in the market to be able to measure
10 volumes against for previous orders.
11    Q. Got it.
12    So -- but then beginning on
13 January 22, 2015, these two items were then
14 added to the algorithm?
15    A. Correct, because now we had a history
16 to know what customers would be ordering of it
17 to look at.
18    Q. Got it.
19    And is that true through today, that
20 those are being ran through the algorithm?
21    A. Both products are discontinued, but
22 yes.
23    Q. Got you.
24    You went through with Mr. Gotto

Page 325

1 some -- the memorandum of understanding entered
2 between Mallinckrodt and the United States
3 Department of Justice.
4    Do you recall that testimony?
5    A. The memorandum of agreement, yes.
6    Q. Yes.
7    Were you disciplined at all as a
8 result of the allegations by the Department of
9 Justice that led to that MOA?
10    A. No.
11    Q. Are you aware of anyone at
12 Mallinckrodt that was disciplined as a result of
13 the allegations that gave rise to the July, 2017
14 MOA with the United States Department of
15 Justice?
16    A. No.
17    Q. This must be music to your ears,
18 Ms. Spaulding, but that's all I have.
19    THE VIDEOGRAPHER: The time is
20 5:40 p.m., and we're off the record.
21    (Whereupon, a recess was taken.)
22    THE VIDEOGRAPHER: The time is
23 5:40 p.m., and we're on the record.
24    EXAMINATION

Page 326

BY MR. O'CONNOR:

1 Q. Ms. Spaulding, I promise to be quick.

2 Can you please take a look at Exhibit

3 Number 41, the memorandum of agreement? I just

4 want to make sure we have a very clear record on

5 this.

6 Earlier today Mr. Gotto questioned you

7 with regard to the Background section on Page 1

8 of this agreement.

9 Do you recall that testimony?

10 A. Yes.

11 Q. Again, just so we have a clear record,

12 after you had a chance to review the language of

13 that Background section with Mr. Gotto, do you

14 agree with any of the allegations the United

15 States was making against Mallinckrodt in these

16 paragraphs 1 through 7?

17 A. No.

18 Q. Okay. And specifically you don't

19 agree, or do you agree with the United States --

20 strike that.

21 Do you agree with the allegations the

22 United States is making in paragraph 3

23 specifically?

Page 327

1 A. No.

2 Q. And do you agree with the allegations

3 the United States is making in paragraph 5?

4 A. No.

5 Q. Okay. If you could turn to Page 3,

6 I'll direct your attention to subparagraph B, as

7 in boy, Mr. Gotto asked you a series of

8 questions about paragraph B. Do you recall

9 that?

10 A. Yes.

11 Q. And how would you characterize the

12 issues that are addressed in paragraph B?

13 MR. GOTTO: Object to form.

14 A. They are all documentation --

15 BY MR. O'CONNOR:

16 Q. Okay.

17 A. -- instances.

18 Q. Are you aware of any evidence to

19 suggest that any of the issues described in

20 paragraph B led to any controlled substance

21 leaving the Hobart facility?

22 MR. GOTTO: Object to form.

23 A. No.

24 MR. O'CONNOR: Okay. All right.

Page 328

1 That's it.

2 Go off the record.

3 THE VIDEOGRAPHER: The time is

4 5:43 p.m. This deposition has concluded, and we

5 are off the record.

6 (Whereupon, the deposition was

7 concluded.)

Page 329

1 COMMONWEALTH OF MASSACHUSETTS )

2 SUFFOLK, SS. )

3 I, MAUREEN O'CONNOR POLLARD, RMR, CLR,

4 and Notary Public in and for the Commonwealth of

5 Massachusetts, do certify that on the 5th day of

6 February, 2019, at 9:06 o'clock, the person

7 above-named was duly sworn to testify to the

8 truth of their knowledge, and examined, and such

9 examination reduced to typewriting under my

10 direction, and is a true record of the testimony

11 given by the witness. I further certify that I

12 am neither attorney, related or employed by any

13 of the parties to this action, and that I am not

14 a relative or employee of any attorney employed

15 by the parties hereto, or financially interested

16 in the action.

17 In witness whereof, I have hereunto

18 set my hand this 7th day of February, 2019.

19

20 _____

21 MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC

22 Realtime Systems Administrator

23 CSR #149108

24

Page 330

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. It will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 331

- - - - - -

E R R A T A

- - - - - -

PAGE LINE CHANGE
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____

Page 332

## ACKNOWLEDGMENT OF DEPONENT

I, _____, do Hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
Eileen Spaulding            DATE

Subscribed and sworn
To before me this
_____ day of _____, 20____.
My commission expires: _____

_____
Notary Public

Page 333

## LAWYER'S NOTES

PAGE LINE
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____