# EXHIBIT 94

Highly Confidential - Subject to Further Confidentiality Review

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF OHIO
 2                          EASTERN DIVISION
 3
       IN RE:  NATIONAL PRESCRIPTION    ) No. 17-md-2804
 4     OPIATE LITIGATION NO. 2804       )
                                        )
 5     APPLIES TO ALL CASES             ) Hon. Dan A. Polster
                                        )
 6
 7                        HIGHLY CONFIDENTIAL
 8           SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 9
                  VIDEO DEPOSITION OF TIFFANY KILPER
10
                           February 9, 2019
11                            9:05 a.m.
12
13
14
15
              Reporter:  John Arndt, CSR, CCR, RDR, CRR
16                       CSR No. 084-004605
                           CCR No. 1186
17
18
19
20
21
22
23
24
```

Page 54

1 　　　　MR. DAVISON: Objection to form.
2 　　A.　That's what I remember, yeah.
3 BY MS. GAFFNEY:
4 　　Q.　And what was Jim Rausch's role at
5 Mallinckrodt?
6 　　A.　I know he was in customer service. I
7 don't know if he was manager or director or -- but
8 he -- I just know he was in customer service.
9 　　Q.　To your knowledge, after you left
10 Mallinckrodt, did Mallinckrodt continue to generate
11 those peculiar order reports?
12 　　A.　I have no --
13 　　　　MR. DAVISON: Objection to form.
14 　　A.　Got no idea.
15 BY MS. GAFFNEY:
16 　　Q.　You mentioned that they restructured after
17 you left. Do you know how they restructured?
18 　　　　MR. DAVISON: Object --
19 　　A.　No, I don't know.
20 BY MS. GAFFNEY:
21 　　Q.　This has been marked as Exhibit 11.
22 　　　　[Exhibit Mallinckrodt-Rowley-Kilper-011
23 　　　　marked for identification.]
24 　　Q.　It's also about IntegriChain. It's an

Page 55

1 e-mail with an attached PowerPoint, so I'll give you a
2 moment to flip through it. And for the record, the
3 Bates number on this Exhibit 11 ends in 274486.
4 　　A.　You want me to look through it all?
5 　　Q.　No, I don't think you need to look through
6 it all. I can ask you just a few targeted questions
7 about it. So the slideshow appears to be a
8 presentation prepared by IntegriChain. Is that fair to
9 say?
10 　　　　MR. DAVISON: Objection to form.
11 　　A.　That's what it looks like.
12 BY MS. GAFFNEY:
13 　　Q.　That's what it looks like? It's very hard
14 to read the title of this slideshow from how it
15 printed, but it is titled IntegriChain-Covidien proof
16 of concept channel integrity reporting, Phase 1.
17 　　　　And I'm just going back to the cover to
18 place this in time. The subject of this e-mail is July
19 15th IntegriChain meeting, and it's from July 15th,
20 2008. You said you remembered sitting in a meeting.
21 　　　　Do you think it might have been this July
22 15th meeting?
23 　　　　MR. DAVISON: Objection.
24 　　A.　I have no recollection.

Page 56

1 BY MS. GAFFNEY:
2 　　Q.　And going back to the previous exhibit,
3 the IntegriChain project history, it looked like there
4 were multiple meetings starting in -- excuse me --
5 starting in 2007 and going into 2008.
6 　　　　Does that seem accurate according to your
7 recollection?
8 　　　　MR. DAVISON: Objection to form.
9 　　A.　That's what it looks like in the document.
10 BY MS. GAFFNEY:
11 　　Q.　Okay. Okay, so going through the slides
12 in the -- from the IntegriChain July 15th meeting, in
13 the background it says Covidien has engaged
14 IntegriChain in a proof-of-concept program that
15 leverages Covidien's channel data to proactively
16 monitor channel integrity.
17 　　　　What's your understanding of what that
18 means?
19 　　　　MR. DAVISON: Objection to form.
20 　　A.　I really have no idea. Sorry.
21 BY MS. GAFFNEY:
22 　　Q.　That's fine. Is it your understanding
23 that when IntegriChain is proposing to leverage
24 Covidien's channel data, it means it's proposing to use

Page 57

1 Mallinckrodt's own data?
2 　　　　MR. DAVISON: Objection to form.
3 　　A.　I'm not sure.
4 BY MS. GAFFNEY:
5 　　Q.　So just -- you can go ahead and skip past
6 the slides that are the retail inventory analysis
7 slides to the slide titled wholesale inventory analysis
8 overview. And here it reads most wholesalers have
9 committed to exclusively source pharmaceuticals
10 directly from the manufacturer and to maintain
11 inventory levels within prespecified parameters.
12 　　　　Is that statement consistent with your
13 experience dealing with wholesale customers?
14 　　　　MR. DAVISON: Objection to form.
15 　　A.　I really can't speak to whether or not
16 it's accurate or not. I mean, it's just not my slide
17 deck and I don't really know what it means.
18 BY MS. GAFFNEY:
19 　　Q.　Sure.
20 　　A.　Sorry.
21 　　Q.　Okay. You can go -- let's see -- past the
22 wholesale inventory analysis to the slide titled orders
23 from high-risk channels. Here it reads wholesaler
24 sales to certain channels pose a higher risk of product

Page 58

1 diversion than others and lists two examples, sales to
2 internet pharmacies and distributor sales to other
3 wholesalers.
4     Do you agree that those categories of
5 sales pose a higher risk of product diversion?
6     MR. DAVISON: Objection to form.
7  A.  I really don't know enough to say. This
8 isn't my area of expertise at all, so --
9 BY MS. GAFFNEY:
10  Q.  And earlier we talked about how the
11 chargeback system will not process chargebacks for
12 wholesaler-to-wholesaler transactions. You mentioned
13 that with wholesaler-to-wholesaler transactions, it's
14 difficult for Mallinckrodt to know where that product
15 goes eventually; is that accurate?
16     MR. DAVISON: Objection to form.
17  A.  Yeah, that's, I think, a true statement.
18 Yeah. I mean, I really only dealt with the data of
19 those transactions, so to speak at a high level of
20 whether or not it's a higher risk of product diversion,
21 I just can't really speak to that.
22     Our system had a way to identify those
23 distributors-to-distributor sales and deny them, is
24 what I was referring to, I guess.

Page 59

1 BY MS. GAFFNEY:
2  Q.  Understood. Okay. So if you keep going
3 through the slide deck, it looks like IntegriChain
4 included examples of mail-order pharmacies, internet
5 pharmacies, examples of wholesaler-to-wholesaler
6 purchases, and then examples of wholesalers with
7 counterfeiting/diversion ties purchasing Covidien
8 products.
9     To your knowledge, did Mallinckrodt do
10 anything with the information flagged by IntegriChain
11 in this presentation?
12     MR. DAVISON: Objection to form.
13  A.  I don't know.
14 BY MS. GAFFNEY:
15  Q.  Okay. If you can keep flipping through to
16 the slide titled order diversion risk analysis. It has
17 oxycodone customers with the largest relative growth,
18 so it appears that IntegriChain analyzed relative
19 growth, and then the text back here -- box here
20 explains that most of these were new customers with
21 minimal orders in the first three months of the
22 analysis.
23     But if you flip to the next slide, there
24 are a few examples of oxycodone customers with

Page 60

1 established order history and high growth. Do you see
2 that?
3     MR. DAVISON: Objection to form.
4 BY MS. GAFFNEY:
5  Q.  Oops. There you go.
6  A.  Okay.
7  Q.  And the text box reads a smaller number of
8 facilities flagged for high relative growth did not
9 appear to be new customers and still demonstrated
10 significant order growth. So if you can take a look at
11 the graph that's included here, there's a line for the
12 three pharmacy examples -- for each of the three
13 pharmacy examples.
14     What's your interpretation of this graph
15 as you look at it today?
16     MR. DAVISON: Objection. Form.
17  A.  I really can't comment on it because I
18 don't remember this presentation. I don't remember
19 this data at all, so I don't feel like I can speak to
20 it.
21 BY MS. GAFFNEY:
22  Q.  How about just looking at the graph?
23 What's your understanding of the information that's
24 represented there?

Page 61

1     MR. DAVISON: Objection to form.
2  A.  I mean, I can tell that there's sales data
3 for this pharmacy -- for these three different
4 pharmacies, and they're trying to convey something, but
5 I really can't speak to it. I just have no idea.
6 BY MS. GAFFNEY:
7  Q.  Would you agree that this graph shows a
8 significant increase in oxycodone sales by Gompers
9 Pharmacy in a one-month time period?
10     MR. DAVISON: Objection to form.
11  A.  That's what it looks like it's conveying,
12 yeah.
13 BY MS. GAFFNEY:
14  Q.  Gompers Pharmacy is in West Virginia.
15 I'll represent to you that it is in Wheeling, West
16 Virginia, which borders Ohio. It's right on the Ohio
17 River in Appalachia.
18     Is it your understanding that there is an
19 opioid crisis in this country?
20     MR. DAVISON: Objection to form.
21  A.  I'm aware of that, yeah.
22 BY MS. GAFFNEY:
23  Q.  How did you become aware of that?
24  A.  Just the media.

Page 62

1 Q. Is it your understanding that the opioid
2 crisis has particularly affected Appalachia and West
3 Virginia?
4     MR. DAVISON: Objection.
5 A. I didn't know that, no.
6 BY MS. GAFFNEY:
7 Q. This slideshow is from 2008. If someone
8 had asked you in 2008 to look back at sales of
9 Mallinckrodt oxycodone to these three pharmacies listed
10 here as indirect customers, would you have been able to
11 access that information?
12     MR. DAVISON: Objection to form.
13 A. For the data that was submitted to us from
14 the distributor, yeah.
15 BY MS. GAFFNEY:
16 Q. And would the data submitted to you from
17 the distributor have shown an increase in sales from
18 month to month, if that's what the transaction --
19 scratch that.
20     What would the data from the distributor
21 have shown?
22     MR. DAVISON: Objection to form.
23 A. I can't be sure what it would have shown.
24 BY MS. GAFFNEY:

Page 63

1 Q. Would you have been able to see the amount
2 of product ordered each month or purchased each month
3 by the indirect customer?
4     MR. DAVISON: Objection to form.
5 A. Only what the distributors submitted to us
6 on a chargeback, yeah.
7 BY MS. GAFFNEY:
8 Q. Would the sales tracing have covered sales
9 to indirect customers that wouldn't have been submitted
10 through the chargeback system?
11     MR. DAVISON: Objection to form.
12 A. Again, just not being sure about the full
13 meaning of a tracing, I can't really comment if that
14 would be comprehensive or not. I'm not sure.
15 BY MS. GAFFNEY:
16 Q. Do you remember if anyone at Mallinckrodt
17 following this presentation asked you to pull data on
18 the three pharmacies listed here?
19     MR. DAVISON: Objection.
20 A. I don't recall, no.
21     [Discussion off the record.]
22 BY MS. GAFFNEY:
23 Q. Do you remember what happened after this
24 July 15th meeting in terms of Mallinckrodt working with

Page 64

1 IntegriChain?
2     MR. DAVISON: Objection to form.
3 A. No idea.
4 BY MS. GAFFNEY:
5 Q. Okay. I'm going to hand you what's marked
6 as Exhibit 12.
7     [Exhibit Mallinckrodt-Rowley-Kilper-012
8     marked for identification.]
9 Q. Bates number ends in 457251, and it's an
10 e-mail chain from July 2008. The most recent e-mail in
11 this chain is you forwarding it to Victor Borelli on
12 July 29th, 2008, but if you go back to the first e-mail
13 in the chain, it is an e-mail from Kimberly France to
14 the IntegriChain representatives on July 17th, so just
15 after this meeting from the presentation we were just
16 looking at.
17     And it appears that she's forwarded an
18 article about Cardinal Health being fined by the Ohio
19 Pharmacy Board for allegedly neglecting suspicious
20 orders, and then read through the e-mail chain.
21 Someone from IntegriChain replies with thanks for the
22 meeting on Tuesday, and then some follow-up items.
23 Kimberly France replies and adds Sue Werder to the
24 e-mail.

Page 65

1     And you said earlier that you worked with
2 Sue Werder; is that correct?
3 A. Correct.
4     MR. DAVISON: Objection.
5 BY MS. GAFFNEY:
6 Q. She was in the contract administration
7 department with you? Or no?
8 A. No, she was who I went to work for when I
9 got promoted out of contract administration into trade
10 compliance.
11 Q. So if you keep following this e-mail
12 chain, Sue Werder on July 23rd e-mails Gordon Cummins,
13 who's one of the IntegriChain representatives. She
14 asks him for more information about NuCare. It is a
15 pharmacy highlighted as questionable in the
16 IntegriChain presentation.
17     Do you see that e-mail?
18 A. I do, yeah.
19 Q. And then following the e-mail chain,
20 there's some back and forth, and IntegriChain sends her
21 briefing on the company, on NuCare, which she then
22 forwards to you.
23     Do you remember if you discussed the
24 NuCare Pharmacy with Ms. Werder at this time?

Page 66

1      MR. DAVISON: Objection to form.
2   A. I don't remember discussing it.
3 BY MS. GAFFNEY:
4   Q. So that brings us up to the top of the
5 document, and you write to Victor Borelli we are fine
6 opening up NuCare and paying chargebacks for sales to
7 them. As you read, it was the CEO back in 2002 that
8 engaged in illegal practices. You can let Master's
9 know they are fine.
10      Do you remember sending this e-mail to Mr.
11 Borelli?
12   A. No.
13   Q. Is it accurate to say that this is an
14 example of Mallinckrodt researching a downstream
15 customer to approve it for chargeback requests?
16      MR. DAVISON: Objection to form.
17   A. I -- that's what it appears.
18 BY MS. GAFFNEY:
19   Q. And is it your understanding that
20 NuCare -- is it your understanding from this e-mail
21 that NuCare was one of Master's customers?
22      MR. DAVISON: Objection to form.
23   A. That's what it appears.
24 BY MS. GAFFNEY:

Page 67

1   Q. Would you agree that the IntegriChain
2 presentation prompted Mallinckrodt to research NuCare
3 Pharmacy?
4      MR. DAVISON: Objection to form.
5   A. Since I don't remember the IntegriChain
6 presentation, I can't really speak to whether or not
7 they're related. I'm not -- I mean, it appears from
8 the chain that they're involved, so -- but other than
9 reading this e-mail, I really don't know.
10 BY MS. GAFFNEY:
11   Q. And is it your recollection that
12 Mallinckrodt did not follow up on the information
13 highlighted about Gompers Pharmacy in the IntegriChain
14 presentation?
15      MR. DAVISON: Objection to form.
16   A. I have no idea if they followed up or not.
17 BY MS. GAFFNEY:
18   Q. Do you remember anyone asking you to run
19 reports on Gompers Pharmacy?
20      MR. DAVISON: Objection to form.
21   A. No.
22 BY MS. GAFFNEY:
23   Q. In your opinion, if that data was accurate
24 and there was a big jump in sales of oxycodone from one

Page 68

1 month to another, would Mallinckrodt have a
2 responsibility to look into that?
3      MR. DAVISON: Objection to form.
4   A. I don't know. I feel like Mallinckrodt
5 always took a very diligent responsibility in our sales
6 and where the product went, so I know that I felt
7 comfortable that they were doing what they needed to
8 do.
9 BY MS. GAFFNEY:
10   Q. And if Mallinckrodt had wanted to research
11 Gompers Pharmacy in 2008 and look into those sales of
12 its oxycodone product to that indirect customer, would
13 it have been able to do that from the data it had?
14      MR. DAVISON: Objection to form.
15   A. I'm not sure if the data had Gompers
16 Pharmacy even in it. I never recall running anything
17 with them, so I have no idea what the data would show.
18 BY MS. GAFFNEY:
19   Q. If they were an indirect customer of
20 Mallinckrodt purchasing Mallinckrodt product, would
21 Mallinckrodt have data showing those purchases?
22   A. Yeah, if we received --
23      MR. DAVISON: Objection to form. Asked
24 and answered.

Page 69

1   A. If we received chargebacks for them, then
2 yeah, the data would be there.
3 BY MS. GAFFNEY:
4   Q. A moment ago you said that you felt
5 Mallinckrodt always took diligent responsibility in its
6 sales and knowing where its product went. What do you
7 base that on?
8   A. Just my working there, and I just know
9 based on my time there that we always were trying to
10 improve the process and work to do whatever we could to
11 ensure that we had done our responsibility in that.
12      So -- I mean, it wasn't something that I
13 was particularly involved with other than those three
14 months, but I felt comfortable that we had a compliance
15 team that was doing their job in that.
16   Q. Okay. This is Exhibit 13.
17      [Exhibit Mallinckrodt-Rowley-Kilper-013
18      marked for identification.]
19   Q. And for the record, the Bates number ends
20 in 563507. It's an e-mail from you to Victor Borelli
21 and Kate Muhlenkamp, July 11th, 2008. I'll give you a
22 moment to look it over.
23   A. Okay.
24   Q. Can you explain to me what happened here,