Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3

     IN RE: NATIONAL        )
 4   PRESCRIPTION           )  MDL No. 2804
     OPIATE LITIGATION      )
 5   _____)  Case No.
                            )  1:17-MD-2804
 6                          )
     THIS DOCUMENT RELATES  )  Hon. Dan A.
 7   TO ALL CASES           )  Polster
 8
             TUESDAY, FEBRUARY 12, 2019
 9
      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10             CONFIDENTIALITY REVIEW
11                   - - -
12          Videotaped deposition of Bonnie
13   New, held at the offices of BRYAN CAVE
14   LEIGHTON PAISNER LLP, One Metropolitan
15   Square, Suite 3600, St. Louis, Missouri,
16   commencing at 9:18 a.m., on the above date,
17   before Carrie A. Campbell, Registered
18   Diplomate Reporter and Certified Realtime
19   Reporter.
20
21
22                   - - -
          GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
24
25
```

Page 2

A P P E A R A N C E S :

KELLER ROHRBACK LLP
BY: GARY GOTTO
    egotto@kellerrohrback.com
    CHANELE REYES
    creyes@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
(206) 623-1900
Counsel for Plaintiffs

BRANSTETTER STRANCH & JENNINGS, PLLC
BY: JOE P. LENISKI, JR.
    joeyl@bsjfirm.com
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
Counsel for the Tennessee Action

ROPES & GRAY, LLP
BY: WILLIAM DAVISON
    william.davison@ropesgray.com
    CASSANDRA LARUSSA
800 Boylston Street
Boston, Massachusetts 02199-3600
(617) 951-7000
Counsel for Mallinckrodt


ARMSTRONG TEASDALE, LLP
BY: JULIE FIX MEYER
    jfixmeyer@armstrongteasdale.com
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
(314) 621-5070
Counsel for Cardinal Health, Inc.

Page 3

JACKSON KELLY PLLC
BY: GRETCHEN M. CALLAS
    gcallas@jacksonkelly.com
    (VIA TELECONFERENCE)
500 Lee Street East, Suite 1600
Charleston, West Virginia 25301
(304) 340-1169
Counsel for AmerisourceBergen


JONES DAY
BY: SARAH G. CONWAY
    sgconway@jonesday.com
555 South Flower Street, 15th Floor
Los Angeles, California 90071-2300
(213) 489-3939


ARNOLD & PORTER KAYE SCHOLER, LLP
BY: DAVID E. KOUBA
    david.kouba@arnoldporter.com
    (VIA TELECONFERENCE)
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
Counsel for Endo Pharmaceuticals
Inc., and Endo Health Solutions Inc.

VIDEOGRAPHER:
    JAMES ARNDT
    Golkow Litigation Services


— — —

Page 4

INDEX
                                        PAGE
APPEARANCES...................................   2
EXAMINATIONS
  BY MR. GOTTO..............................  11
  BY MR. LENISKI............................ 270
  BY MR. GOTTO............................. 319

        EXHIBITS
No.      Description              Page
Mallinckrodt  Plaintiffs' Notice of Oral      14
New 1    Videotaped Deposition of
         Bonnie New and Request for
         Production of Documents

Mallinckrodt  Tyco Healthcare February 21,    38
New 2    2006 offer to Bonnie New,
         MNK-T1_0008393345 -
         MNK-T1_0008393346
Mallinckrodt  E-mail(s),                      116
New 3    MNK-T1_0000264194 -
         MNK-T1_0000264195
Mallinckrodt  E-mail(s),                      126
New 4    MNK-T1_0004888161 -
         MNK-T1_0004888162
Mallinckrodt  E-mail(s),                      134
New 5    MNK-T1_0006283056 -
         MNK-T1_0006283062
Mallinckrodt  E-mail(s),                      140
New 6    MNK-T1_0004878533 -
         MNK-T1_0004878536
Mallinckrodt  E-mail(s),                      152
New 7    MNK-T1_0004155440 -
         MNK-T1_0004155441

Page 5

Mallinckrodt  E-mail(s),                      158
New 8    MNK-T1_0001140522 -
         MNK-T1_0001140526
Mallinckrodt  E-mail(s),                      164
New 9    MNK-T1_0004903077 -
         MNK-T1_0004903078
Mallinckrodt  E-mail(s),                      166
New 10   MNK-T1_0000368650

Mallinckrodt  PowerPoint,                     170
New 11   MNK-T1_0001531370
Mallinckrodt  PowerPoint,                     176
New 12   MNK-T1_0002714634

Mallinckrodt  E-mail(s),                      179
New 13   MNK-T1_0005539361 -
         MNK-T1_0005539363

Mallinckrodt  PowerPoint,                     181
New 14   MNK-T1_0004292574
Mallinckrodt  E-mail(s),                      184
New 15   MNK-T1_0002737439 -
         MNK-T1_0002737440
Mallinckrodt  PowerPoint,                     189
New 16   MNK-T1_0001455032

Mallinckrodt  E-mail(s),                      197
New 17   MNK-T1_0001373610 -
         MNK-T1_0013736124

Mallinckrodt  Pain Management Pocketcard      201
New 18   Set,
         MNK-T1_0002159713 -
         MNK-T1_0002159716
Mallinckrodt  E-mail(s),                      210
New 19   MNK-T1_0005764398 -
         MNK-T1_0005764399
Mallinckrodt  E-mail(s),                      213
New 20   MNK-T1_0005762756 -
         MNK-T1_0005762757

Page 6

```
 1   Mallinckrodt   E-mail(s),              215
 2   New 21          MNK-T1_0004779439 -
                    MNK-T1_0004779442
 3   Mallinckrodt   Script for pharmacy calls -   221
 4   New 22          Draft Version 11/28/11,
                    MNK-T1_0000460028 -
 5                  MNK-T1_0000460029
 6   Mallinckrodt   E-mail(s),              223
     New 23          MNK-T1_0000455771 -
 7                  MNK-T1_0000455774
 8   Mallinckrodt   US Department of Justice   229
     New 24          Drug Enforcement
 9                  Administration September 27,
                    2006 letter,
10                  MNK-T1_0000447932 -
                    MNK-T1_0000447935
11   Mallinckrodt   Mallinckrodt DEA Controlled   230
     New 25          Substance Compliance
12                  Training for Distributor
                    Registrants prepared for
13                  Commercial Group 03/23/11
                    PowerPoint,
14                  MNK-T1_0008001114
15   Mallinckrodt   E-mail(s),              231
     New 26          MNK-T1_0007729353 -
16                  MNK-T1_0007729354
17   Mallinckrodt   E-mail(s),              235
     New 27          MNK-T1_0005911712 -
18                  MNK-T1_0005911714
19   Mallinckrodt   E-mail(s),              236
     New 28          MNK-T1_0007076152 -
20                  MNK-T1_0007076153
21   Mallinckrodt   E-mail(s),              239
     New 29          MNK-T1_0008001120 -
22                  MNK-T1_0008001122
23   Mallinckrodt   E-mail(s),              242
     New 30          MNK-T1_00000491217
24
25
```

Page 7

```
 1   Mallinckrodt   E-mail(s),              248
     New 31          MNK-T1_0006258783 -
 2                  MNK-T1_0006258785
 3   Mallinckrodt   E-mail(s),              250
     New 32          MNK-T1_0007721020 -
 4                  MNK-T1_0007721024
 5   Mallinckrodt   E-mail(s),              253
     New 33          MNK-T1_0007984606 -
 6                  MNK-T1_0007984609
 7   Mallinckrodt   E-mail(s),              255
     New 34          MNK-T1_0008396040 -
 8                  MNK-T1_0008396043
 9   Mallinckrodt   E-mail(s),              258
     New 35          MNK-T1_0001519326 -
10                  MNK-T1_0001519327
11   Mallinckrodt   E-mail(s),              260
     New 36          MNK-T1_0008409479 -
12                  MNK-T1_0008409480
13   Mallinckrodt   E-mail(s),              262
     New 37          MNK-T1_0007729179 -
14                  MNK-T1_0007729182
15   Mallinckrodt   E-mail(s),              264
     New 38          MNK-T1_0008409661 -
16                  MNK-T1_0008409662
17   Mallinckrodt   E-mail(s),              267
     New 39          MNK-T1_0004849397 -
18                  MNK-T1_0004849403
19   Mallinckrodt   PowerPoint,              269
     New 40          MNK-T1_0007728133
20
21   Mallinckrodt   National Sales Meeting,   285
     New 41          Bonnie New - Territory 5000,
22                  October 26-30, 2014
                    PowerPoint,
23                  MNK-T1_0006264226
24   Mallinckrodt   E-mail(s),              296
     New 42          MNK_TNSTA001117304 -
25                  MNK_TNSTA001117311
```

Page 8

```
 1   Mallinckrodt   Mallinckrodt Controlled   310
     New 43          Substance
 2                  Compliance/Suspicious Order
                    Monitoring Distributor
 3                  Customer Audit Checklist,
                    MNK-T1_0006464828 -
 4                  MNK-T1_0006464836
 5   Mallinckrodt   E-mail(s),              319
     New 44          MNK-T1_0005649068 -
 6                  MNK-T1_0005649072
 7   (Exhibits attached to the deposition.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 9

```
 1        VIDEOGRAPHER:  We are now on
 2   the record.  My name is James Arndt.
 3   I'm a videographer for Golkow
 4   Litigation Services.
 5        Today's date is February 12,
 6   2019, and the time is 9:18 a.m.
 7        This video deposition is being
 8   held in St. Louis, Missouri, in the
 9   matter of the National Prescription
10   Opiate Litigation, for the United
11   States Circuit Court for the Northern
12   District of Ohio, Eastern Division.
13        The deponent is Bonnie New.
14        Will counsel please identify
15   themselves.
16        MR. GOTTO:  Gary Gotto, Keller
17   Rohrback, LLP, for the plaintiffs.
18        MS. REYES:  Chanele Reyes,
19   Keller Rohrback, LLP, for plaintiffs.
20        MR. LENISKI:  Joe Leniski,
21   Branstetter, Stranch & Jennings for
22   Tennessee plaintiffs.
23        MS. CONWAY:  Sarah Conway from
24   Jones Day for Walmart.
25        MS. FIX MEYER:  Julie Fix
```

Highly Confidential – Subject to Further Confidentiality Review

Page 10

1 Meyer, Armstrong Teasdale, for
2 Cardinal Health.
3     MS. LARUSSA:  Cassandra
4 LaRussa, Ropes & Gray, for
5 Mallinckrodt, LLC, SpecGx and the
6 witness.
7     MR. DAVISON:  William Davison
8 of Ropes & Gray for Mallinckrodt, LLC,
9 SpecGx, LLC, and the witness.
10     VIDEOGRAPHER:  Will counsel
11 present by phone please identify
12 themselves.
13     MR. KOUBA:  Good morning.  This
14 is David Kouba of Arnold & Porter on
15 behalf of the Endo and Par
16 Pharmaceutical defendants.
17     MS. CALLAS:  This is Gretchen
18 Callas with Jackson Kelly for
19 AmerisourceBergen.
20     VIDEOGRAPHER:  The court
21 reporter is Carrie Campbell, and she
22 will now swear in the witness.
23
24     BONNIE NEW,
25 of lawful age, having been first duly sworn

Page 11

1 to tell the truth, the whole truth and
2 nothing but the truth, deposes and says on
3 behalf of the Plaintiffs, as follows:
4
5     DIRECT EXAMINATION
6 QUESTIONS BY MR. GOTTO:
7   Q.    Good morning, Ms. New.
8   A.    Good morning.
9   Q.    As you heard when we went on
10 the record, my name is Gary Gotto, and I'm
11 one of the lawyers representing plaintiffs in
12 the opioid litigation.
13     We've never met before just a
14 few minutes before we went on the record this
15 morning, correct?
16   A.    That is correct.
17   Q.    Could you tell me by whom are
18 you employed?
19   A.    I was employed by Mallinckrodt
20 Pharmaceuticals.
21   Q.    Okay.  And when did you leave
22 Mallinckrodt?
23   A.    My job was eliminated on --
24 effective June 1st of 2018.
25   Q.    And are you currently employed?

Page 12

1   A.    No, I am not.
2   Q.    Okay.  What is your residence
3 address?
4   A.    ███████████████████████
5 ███████████████████████████.
6   Q.    Thank you.
7     Have you ever given a
8 deposition before?
9   A.    No, I have not.
10   Q.    Okay.  I'm sure your counsel
11 has given you a sense of what to expect here
12 today, but I'll be asking questions, some of
13 the other counsel may ask you some questions.
14     The court reporter will prepare
15 a transcript of everything we say while we're
16 on the record.  You'll have an opportunity to
17 review that transcript after it's prepared
18 for corrections.
19     If we try to avoid speaking
20 over each other, that will make the court
21 reporter's job a little easier.  I'll do my
22 best to do that.
23     If any of my questions are
24 unclear to you in any way, please let me
25 know, and I'll do my best to clarify them.

Page 13

1   A.    Yes, sir.
2   Q.    We'll take breaks about every
3 hour or so, but if you need a break before
4 then, just let me know, and as long as
5 there's not a question pending, I'm sure
6 we'll be able to accommodate you.
7     Okay?
8   A.    Thank you.
9   Q.    Are you on any medication
10 today?
11   A.    I take -- yes, I do take
12 medication.
13   Q.    Anything that might affect your
14 ability, your memory or your ability, to
15 clearly recollect events from several years
16 ago?
17   A.    No.
18   Q.    Okay.  Great.
19     Any other reason you wouldn't
20 be able to testify truthfully and fully
21 today?
22   A.    No, sir.
23   Q.    Great.
24     I asked you about deposition
25 testimony.  Have you ever testified at a

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 trial?
2      A.    No, sir.
3           (Mallinckrodt-New Exhibit 1
4      marked for identification.)
5 QUESTIONS BY MR. GOTTO:
6      Q.    Okay.  Let me hand you what
7 we've marked as Exhibit 1, which is the
8 notice of deposition for today's deposition.
9           Have you seen that document
10 previously?  And take your time to look
11 through it.
12     A.    Okay.
13     Q.    Great.  Have you seen the
14 document before?
15     A.    No.
16     Q.    Okay.  When did you first learn
17 of today's deposition?
18     A.    I don't remember the specific
19 date.  I would say it was about four or five
20 weeks ago.
21     Q.    Okay.  And I don't want you to
22 divulge the substance of any communication
23 with counsel, but how did you learn of the
24 deposition?
25     A.    Phone call.

Page 15

1      Q.    Okay.  From the law firm?
2      A.    Yes.
3      Q.    Okay.  If you turn to
4 Schedule A on Exhibit 1, there are a series
5 of definitions followed by Roman Numeral II
6 on the second page are instructions, followed
7 by Roman Numeral III, documents to be
8 produced.
9           And if you look under request
10 for production number 2, it requests all
11 documents, including electronic data and
12 e-mail, in your possession related in any way
13 to any defendants' manufacture, marketing, et
14 cetera.  I won't read the whole sentence.  It
15 goes on from there.
16           Have you brought any documents
17 with you today that are responsive to this
18 request?
19     A.    No.
20     Q.    Okay.  Did you make an effort
21 to identify any documents that you have in
22 your personal possession or control that
23 would be responsive to this request?
24     A.    I have.  And when I
25 terminated -- I was terminated, I turned in

Page 16

1 everything I had.
2      Q.    Okay.  So you don't have any --
3      A.    To our legal department.
4      Q.    Okay.  So you don't have any
5 hard copy of any Mallinckrodt-related
6 materials in your personal possession or
7 control?
8      A.    No.
9      Q.    Okay.  Or any computer drives
10 that have any electronic --
11     A.    No, sir.
12     Q.    Anything of that nature?
13     A.    No, I turned all equipment in.
14     Q.    Okay.  How about did you use a
15 cell phone for your Mallinckrodt-related work
16 while you were at Mallinckrodt?
17     A.    Yes, I did.
18     Q.    And did you retain that cell
19 phone?
20     A.    No.
21     Q.    Okay.  Okay.  Great.  You can
22 set that aside.
23           I'd like to understand what you
24 did to prepare for today's deposition.
25 Again, in answering these questions, I don't

Page 17

1 want you to divulge the substance of any
2 communication you've had with counsel.
3           And incidentally, you are
4 represented by counsel here today, correct?
5      A.    Yes.
6      Q.    And are you paying for that
7 representation?
8      A.    No, sir.
9      Q.    Do you know who is?
10     A.    Yes.
11     Q.    And who is that?
12     A.    Mallinckrodt.
13     Q.    Okay.  Are you being
14 compensated in any way for your attendance
15 here today?
16     A.    No, sir.
17     Q.    Or for your preparation for the
18 deposition?
19     A.    Not at this time.
20     Q.    Okay.  So tell me what you did
21 to prepare for today's deposition.
22     A.    I met with my attorney.
23     Q.    Okay.  And once?  More than
24 once?  How many times?
25     A.    Twice.

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 Q. Okay. And when did those
2 meetings occur?
3 A. One was yesterday, and the
4 other was approximately three weeks ago.
5 Q. And were those personal
6 meetings?
7 A. Yes.
8 Q. And who was present at those
9 meetings?
10 A. Bill Davison, and yesterday --
11 I forget her name -- Carrie {sic}, and Toren
12 from Ropes & Gray, previously.
13 Q. Okay. How long did each of
14 those meetings last?
15 A. Approximately six and a half
16 hours, seven.
17 Q. Okay. Did you bring any
18 materials to those meetings to review during
19 the meetings?
20 A. No, sir.
21 Q. And did you review some
22 documents at the meetings?
23 A. Yes, sir.
24 Q. Okay. Did your review of those
25 documents refresh your recollection in any

Page 19

1 regard?
2 A. In some cases.
3 Q. Can you tell me the -- any
4 subject matters as to which you can recall
5 your recollection being refreshed by document
6 review?
7 A. Compensation, bonus plans, some
8 e-mails regarding different accounts or
9 subjects.
10 Q. Okay. Any particular accounts
11 you can recall your recollection being
12 refreshed?
13 A. Morris & Dickson came to mind.
14 Nothing specific at this time stands out.
15 Q. Okay. Have you reviewed any
16 transcripts of any other depositions given in
17 this litigation?
18 A. No, sir.
19 Q. Have you reviewed any
20 transcripts of any court proceedings that
21 occurred in this litigation?
22 A. No, sir.
23 Q. Have you reviewed any
24 complaints filed by any of the plaintiffs in
25 this litigation?

Page 20

1 A. Not that I can recall.
2 Q. Have you reviewed any other
3 materials that have been filed with the court
4 in this litigation?
5 A. Not that I can recall.
6 Q. Have you had occasion to have
7 any conversations with any other individuals
8 who have given testimony in connection with
9 this litigation?
10 A. No, sir.
11 Q. Do you have an understanding of
12 the nature of the claims that are asserted in
13 this litigation?
14 A. Somewhat, yes, sir.
15 Q. And what is that understanding?
16 A. That state, local, counties are
17 approaching various pharma companies in
18 regard to cost associated with opiate
19 addiction.
20 Q. So I understand you left
21 Mallinckrodt last June.
22 When did you start working for
23 Mallinckrodt?
24 A. November 10, 1989.
25 Q. Okay. So you were there for

Page 21

1 quite a while.
2 A. Yes, sir.
3 Q. Before we get into your
4 Mallinckrodt employment, maybe you could
5 briefly describe for me your post-high school
6 education.
7 A. I have an MBA.
8 Q. When did you obtain your MBA?
9 A. In 2000.
10 Q. And from what institution?
11 A. Lindenwood University,
12 St. Charles, Missouri.
13 Q. And when did you obtain your
14 undergraduate degree?
15 A. 1995.
16 Q. And from what institution?
17 A. Lindenwood College at the time.
18 Q. And a BA? A BS? What was it?
19 A. Business administration, BA.
20 Q. Okay. So I take it you -- were
21 you employed by Mallinckrodt while you were
22 matriculating through your undergraduate
23 degree and for your MBA?
24 A. Correct.
25 Q. Okay. Did Mallinckrodt

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  subsidize or pick up the cost of your
2  education?
3      A.    Yes, sir, they did.
4      Q.    Great.
5          Prior to joining Mallinckrodt
6  in 1989, did you have any employment
7  background that was related in any way to the
8  pharmaceuticals industry?
9      A.    No, sir.
10         MR. DAVISON:  Objection to
11     form.
12  QUESTIONS BY MR. GOTTO:
13     Q.    Okay.  Tell me the
14  circumstances under which you came to be
15  employed by Mallinckrodt.
16     A.    There was a job opening for a
17  traffic expediter in their nuclear medicine
18  department, and I applied and was hired.
19     Q.    And what was a traffic
20  expediter's role?
21     A.    To get nuclear medicine to
22  hospitals by 5 a.m. so tests could be ran on
23  patients.
24     Q.    Did you have any background or
25  training that was adapted to that particular

Page 23

1  job?
2          MR. DAVISON:  Objection to
3      form.
4          THE WITNESS:  No, sir.
5  QUESTIONS BY MR. GOTTO:
6      Q.    And for how long did you serve
7  in that capacity?
8      A.    I was in nuclear medicine for
9  five years.
10     Q.    In the traffic expediter role?
11     A.    Role, yes, sir.
12     Q.    And so what did you move into
13  after that five-year period?
14     A.    The next five years were in the
15  imaging and respiratory department.  I did
16  customer service for a short time and then
17  did membership and contracting.
18     Q.    And what does membership and
19  contracting consist of in this context?
20     A.    It was in regard to setting up
21  GPO accounts using our products.
22     Q.    And a GPO account is what?
23     A.    A group purchasing
24  organization.
25     Q.    And you were in that capacity

Page 24

1  for about five years?
2      A.    Yeah, a combination of roles.
3      Q.    Okay.  So that should take us
4  to about 1999 or so?
5      A.    Correct.
6      Q.    Okay.  Where did you -- what
7  did you move into at that point?
8      A.    I moved to the pharmaceutical
9  division.  They were investigating the
10  possibility of an inside sales team.
11     Q.    Okay.  And when you moved into
12  the pharmaceutical division, what role did
13  you take?
14     A.    Ultimately I ended up being
15  marketing.
16     Q.    When you say they were
17  investigating a possibility of an inside
18  sales team, does that mean they didn't have
19  an inside sales team before then?
20     A.    Once they did the due diligence
21  and talked to retail chain headquarters, it
22  was determined that they did not want inside
23  sales calling their pharmacies.  They didn't
24  have time to be bothered, basically.  And so
25  we decided that that wasn't an avenue that we

Page 25

1  wanted to go down.
2      Q.    Okay.  And so who was involved
3  in making that decision?
4      A.    Upper management.
5      Q.    Okay.  What caused you to move
6  to the pharmaceutical division in
7  approximately 1999?
8      A.    There was a person in the group
9  that I had been working for when I started in
10  1989.  She was an inside sales rep, and she
11  recommended me.
12     Q.    Okay.  Who was that?
13     A.    Kathy Westbrook.
14     Q.    So describe for me what your
15  role was in marketing when you joined the
16  pharmaceuticals division.
17     A.    We had contracts with customers
18  that were not meeting the goals as far as
19  their volume.
20     Q.    Okay.  And you had
21  responsibilities in connection with that?
22     A.    Right.  It was a program to
23  help the pharmacists understand what generic
24  products were on contract.  And in a
25  partnership with the headquarters of the

Page 26

1 chain drugstore, we worked with them to help
2 get contract compliance.
3    Q.    Okay.  And contract compliance
4 in this setting means what?
5    A.    It means because of the strict
6 allocation from the DEA, we had to monitor
7 our forecast and ensure that we could supply
8 if we set up a contract.
9        So a customer would give us the
10 estimated volumes, and we would monitor that
11 and -- to make sure that they stayed within
12 the guidelines.  And when something changed
13 on a contract, it was a challenge.  So by
14 providing them with a helpful guide, we were
15 able to help drive contract compliance to
16 improve.
17    Q.    Okay.  So when you first joined
18 the pharmaceutical division, what was your
19 title?
20    A.    That's a good question.
21    Q.    Okay.
22    A.    You're talking 1999, right?
23 Yeah.
24    Q.    I understand.  This is not a
25 memory test today.

Page 27

1    A.    Thank you.
2    Q.    I completely understand.  And
3 the only rule is you can't ask me what I was
4 doing in 1999.
5    A.    Fair enough.
6    Q.    Okay.  So do you remember who
7 you reported to?
8    A.    Initially I reported to Tricia
9 Wetzel.
10    Q.    And do you remember -- is that
11 a man or woman?
12    A.    It's a woman.
13    Q.    Okay.  Do you remember what her
14 position was?
15    A.    Honestly, I don't remember.
16    Q.    I mean, can you describe it,
17 even if you don't remember the title?
18    A.    She was in marketing.  I don't
19 know if she was potentially a marketing
20 manager.  I don't know.
21    Q.    So prior to joining the
22 pharmaceutical division, did your employment
23 at Mallinckrodt require you to have any
24 familiarity with the Controlled Substances
25 Act?

Page 28

1        MR. DAVISON:  Objection to
2    form.
3        THE WITNESS:  Prior to that
4    time?
5 QUESTIONS BY MR. GOTTO:
6    Q.    Yeah.
7    A.    No, sir.
8    Q.    Okay.  And again, prior to
9 joining the pharmaceutical division, did your
10 employment at Mallinckrodt require you to
11 have any familiarity with any DEA
12 regulations?
13        MR. DAVISON:  Objection to
14    form.
15        THE WITNESS:  Not that I
16    recall.
17 QUESTIONS BY MR. GOTTO:
18    Q.    Okay.  Now, once you joined the
19 pharmaceutical division, did your employment
20 require you to have some familiarity with the
21 Controlled Substances Act?
22        MR. DAVISON:  Objection.
23        THE WITNESS:  Yes, sir.
24 QUESTIONS BY MR. GOTTO:
25    Q.    And with DEA regulation?

Page 29

1        MR. DAVISON:  Objection.
2        THE WITNESS:  Yes, sir.
3 QUESTIONS BY MR. GOTTO:
4    Q.    So how did you become familiar
5 with the Controlled Substances Act and the
6 applicable DEA regulation that you needed to
7 have familiarity with for your employment?
8        MR. DAVISON:  Objection to
9    form.
10        THE WITNESS:  We had ongoing
11    training sessions originally, I think,
12    offline, and then as it evolved, it
13    was online training along with
14    in-person training.
15 QUESTIONS BY MR. GOTTO:
16    Q.    So the training sessions that
17 you're referring to, were they some sort of
18 classroom, presentation-type sessions?
19    A.    Varied.  And to be honest,
20 starting -- I don't recall.
21    Q.    Were they in-house Mallinckrodt
22 presentations?
23    A.    To the best of my knowledge.
24    Q.    Okay.  You don't recall
25 taking -- attending a seminar given by a

Page 30

1  third party elsewhere, that sort of thing?
2      A.   I don't recall.
3      Q.   Okay.  At any time or -- I'm
4  really focused now on the -- you know, when
5  you first joined pharmaceutical --
6      A.   Right.
7      Q.   -- and became familiar with the
8  applicable regulatory environment.
9      A.   Right.  I honestly don't
10  recall.
11      Q.   Okay.  Do you remember who
12  conducted the training sessions that you
13  attended?
14      A.   No, sir.
15      Q.   And do you remember the subject
16  matters that were covered in those training
17  sessions?
18      A.   In the early 1990 time frame?
19      Q.   Yes.
20      A.   No, sir.
21      Q.   When you first joined the
22  pharmaceuticals division -- and you mentioned
23  pharmacies.
24          Were there pharmacies among the
25  Mallinckrodt customers that you had

Page 31

1  responsibilities for?
2          MR. DAVISON:  Objection to
3      form.
4          THE WITNESS:  I dealt with the
5      chain drug headquarters, not with the
6      individual pharmacies.
7  QUESTIONS BY MR. GOTTO:
8      Q.   Okay.  Apart from the chain
9  pharmacies that you dealt with, what other
10  customers did you have responsibilities for?
11      A.   In the 1990 time frame?
12      Q.   Yes, when you first joined the
13  pharmaceutical division.
14      A.   The major account that I had
15  was Kroger.  You said other than -- we tried
16  to do a program with AmerisourceBergen and
17  that didn't work out very well.
18      Q.   Okay.  So the major account you
19  personally had responsibility for, at least
20  early on, was Kroger?
21      A.   Yes, sir.
22      Q.   And where were they based; do
23  you recall?
24      A.   Cincinnati, Ohio.
25      Q.   And I take it you also had some

Page 32

1  dealings with some of the other chain
2  pharmacies?
3      A.   Yes, sir.
4      Q.   Can you recall any others?
5      A.   In that same early marketing
6  role?
7      Q.   Right.
8      A.   Not off the top of my head, no.
9      Q.   Okay.
10      A.   Sorry.
11      Q.   Okay.  And AmerisourceBergen,
12  what was the nature of their business at that
13  time?
14          MR. DAVISON:  Objection to
15      form.
16          THE WITNESS:  That was, again,
17      trying to do a marketing program
18      through them for their customers to
19      get compliance to their contract, and
20      that was unsuccessful.
21  QUESTIONS BY MR. GOTTO:
22      Q.   Okay.  And so
23  AmerisourceBergen, were they a customer of
24  Mallinckrodt's at that time?
25      A.   Yes, sir.

Page 33

1      Q.   Okay.  Were they a distributor?
2      A.   A wholesaler.
3      Q.   A wholesaler.
4          Okay.  And what's the
5  distinction, at least at that time in your
6  mind, between a wholesaler and a distributor?
7      A.   A wholesaler -- at that time,
8  my understanding was a wholesaler carried a
9  full line of products, both brand and
10  generic, along with DME and other medical
11  supplies.
12          And a distributor was a smaller
13  form of that and normally carried maybe just
14  brand and generic drugs.
15      Q.   Okay.
16      A.   It varied.
17      Q.   Okay.  And the
18  AmerisourceBergen relationship that you said
19  didn't work out, was this a new relationship?
20      A.   No.  For the program that I was
21  managing, it was.
22      Q.   And again, the nature of that
23  program was what?
24          MR. DAVISON:  Objection.
25          THE WITNESS:  It was called

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 Comply Right, and it was to help drive
2 contract compliance for ABC,
3 AmerisourceBergen.
4 QUESTIONS BY MR. GOTTO:
5 Q. And so -- and when you say
6 "drive compliance" in this setting, I think
7 you testified a little earlier that was for
8 their customers to comply with the projected
9 sales levels in their contracts?
10 MR. DAVISON: Objection to
11 form.
12 THE WITNESS: Yes, sir.
13 MS. CALLAS: Object to form.
14 QUESTIONS BY MR. GOTTO:
15 Q. And so what was the -- what
16 were the kinds of things that you worked on,
17 understanding that the program didn't work
18 out? But what was -- what are the kinds of
19 things that you worked on to try to help them
20 drive compliance?
21 MR. DAVISON: Objection to
22 form.
23 THE WITNESS: We had a binder
24 that had a list of the products that
25 were contracted with us and a

Page 35

1 perpetual inventory section, and it
2 was just a tool for the pharmacist to
3 use to know what products were on
4 contract and perpetual inventory
5 keeping.
6 QUESTIONS BY MR. GOTTO:
7 Q. Okay. Did you have similar
8 tools that you used with the pharmacies that
9 were Mallinckrodt direct customers?
10 MR. DAVISON: Objection.
11 THE WITNESS: That's the same
12 program we used with Kroger.
13 QUESTIONS BY MR. GOTTO:
14 Q. Okay. When you first joined
15 the pharmaceutical division, how were you
16 compensated?
17 A. Salary.
18 Q. And did you receive any -- were
19 you eligible for any bonus or supplemental
20 compensation?
21 A. I had a salary. I don't recall
22 any additional compensation or options, et
23 cetera.
24 Q. Okay. Did you have any goals
25 that were expressed in terms of sales levels

Page 36

1 for any particular customers?
2 A. No.
3 Q. Okay. So how long did you stay
4 in the marketing role that we've been
5 discussing?
6 A. Approximately five years. I
7 honestly don't recall.
8 Q. Okay. During that time period
9 that you were in that marketing role, what
10 were the principal products that Mallinckrodt
11 was -- manufactured or had available for sale
12 that you had responsibilities for?
13 A. Any -- all products that we had
14 on -- available at that time, because as time
15 evolved, things changed.
16 Q. Sure.
17 So what were some of the
18 principal products that you can recall being
19 available at that time?
20 A. Oxycodone, hydrocodone,
21 oxy/APAP, methadone and methylphenidate.
22 Q. Okay. So what was the next
23 position at Mallinckrodt that you moved into?
24 A. I don't remember the
25 progression, I'm sorry.

Page 37

1 Q. Okay. Can you describe how
2 your responsibilities changed from this
3 marketing responsibilities that you held for
4 around five years?
5 A. I know at one point we went
6 back to trying an inside sales position, and
7 to tell you the truth, I don't remember
8 exactly who we tried to call on at that
9 point.
10 Q. Okay. And you don't know when
11 that occurred?
12 A. I don't recall.
13 Q. Okay.
14 A. Honestly.
15 Q. Well, can you recall what other
16 positions you've held at Mallinckrodt after
17 the initial --
18 A. Initial marketing position?
19 Q. Yeah.
20 A. Somewhere along there I moved
21 to a regional account manager, and six months
22 after I was a regional, I became a national
23 account manager. And then I became a
24 director for the last four years, maybe. So
25 it was all title changes.

Page 38

1     (Mallinckrodt-New Exhibit 2
2   marked for identification.)
3 QUESTIONS BY MR. GOTTO:
4    Q.   Let me hand you what we've
5 marked as Exhibit 2, which is a two-page
6 document beginning at Bates
7 MNK-T1_0008393345. It appears to be a
8 February 21, 2006 letter offering you a
9 position as regional account manager.
10     Could you take a moment and
11 look through that document and tell me if you
12 recognize it?
13    A.   Obviously I signed it, so...
14     I didn't recall it. It's kind
15 of nice to see it.
16    Q.   Okay. Great.
17     So it's dated February 21,
18 2006, approximately consistent with your
19 recollection of approximate time periods that
20 you were in your various other positions at
21 Mallinckrodt.
22     So is this -- does this refresh
23 your recollection as to when you became a
24 regional account manager?
25    A.   Yes, sir.

Page 39

1    Q.   Okay. And that is your
2 signature on the offer accepted line?
3    A.   Yes, sir.
4    Q.   And signed by Sabrina Hairston.
5     Do you remember who Sabrina
6 Hairston was?
7    A.   She was a recruiter in our
8 human resources department.
9    Q.   Okay. Do you recall the
10 circumstances under which you came to be a
11 regional account manager?
12     MR. DAVISON: Objection to
13   form.
14     THE WITNESS: I asked to move
15   to the sales department.
16 QUESTIONS BY MR. GOTTO:
17    Q.   Okay. And what was the reason
18 for that?
19    A.   I had been traveling with the
20 national account managers and liked meeting
21 customers and felt like I could do the job.
22    Q.   Okay. Did you view it as a
23 career advancement?
24    A.   Absolutely.
25    Q.   Okay. The letter indicates

Page 40

1 that your starting salary on an annualized
2 basis was ▓▓▓▓ with a potential year-term
3 increase to ▓▓▓▓.
4     Do you see that?
5    A.   Yes, sir.
6    Q.   Is that consistent with your
7 recollection as to your compensation levels?
8    A.   Yes, sir.
9    Q.   And then indicates variable
10 compensation, you'll be eligible to
11 participate in the generic sales incentive
12 compensation program.
13     Do you see that?
14    A.   Yes, sir.
15    Q.   And did you participate in that
16 program?
17    A.   Yes, sir.
18    Q.   How did that program work?
19     MR. DAVISON: Objection to
20   form.
21     THE WITNESS: This was under
22   Tyco Healthcare. So it was whatever
23   management provided at the time, but
24   it changed consistently through time.
25

Page 41

1 QUESTIONS BY MR. GOTTO:
2    Q.   Okay. In general, was it a
3 program that was based on sales levels?
4     MR. DAVISON: Objection to
5   form.
6     THE WITNESS: No, sir. That
7   was one component, but there were
8   multiple components to each bonus
9   plan.
10 QUESTIONS BY MR. GOTTO:
11    Q.   Okay. So this initial pro --
12 the generic sales incentive compensation
13 program that's referred to in this letter, do
14 you recall approximately how long you
15 participated in that program?
16    A.   They were generally for fiscal
17 year. So fiscal year ended September 30th,
18 so it was probably for that time frame.
19    Q.   Okay. And do you remember what
20 the components were, apart from sales
21 levels --
22    A.   No, sir.
23    Q.   Okay. Do you recall if you
24 continued to participate in the generic sales
25 incentive compensation program after fiscal

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1  2006?
2      A.    Until what period?
3      Q.    Well, why don't we just --
4  let's go at it this way.
5          For how long were you a
6  regional account manager?
7      A.    Six months.
8      Q.    Okay.  And so you're a regional
9  account manager through summer of '06 or so?
10     A.    Yes, sir.
11     Q.    Okay.  And then you moved to
12  being a national account manager?
13     A.    Yes, sir.
14     Q.    Okay.  What were the
15  circumstances under which you moved from
16  regional to national?
17          MR. DAVISON:  Objection to
18     form.
19          THE WITNESS:  I met
20     expectations and was promoted.
21  QUESTIONS BY MR. GOTTO:
22     Q.    Okay.  When you became a
23  national account manager, did you -- you
24  received a salary at that point?
25     A.    Yes, sir.

Page 43

1      Q.    And was it increased from what
2  it had been originally?
3      A.    I'm sure, yes, sir.
4      Q.    Do you recall approximately by
5  how much?
6      A.    No, sir.
7      Q.    Okay.  And was there a variable
8  component to your compensation at that point
9  as well?
10          MR. DAVISON:  Objection to
11     form.
12          THE WITNESS:  I'm sure there
13     was.
14  QUESTIONS BY MR. GOTTO:
15     Q.    Okay.  Do you recall how it
16  worked?
17     A.    No, sir.
18     Q.    Was it based on sales levels?
19          MR. DAVISON:  Objection to
20     form.
21          THE WITNESS:  Again, multiple
22     components comprised the bonus plans.
23  QUESTIONS BY MR. GOTTO:
24     Q.    Okay.  Did the components
25  include sales levels for any particular

Page 44

1  customers?
2          MR. DAVISON:  Objection to
3     form.
4          THE WITNESS:  It varied by
5     management, company, et cetera.
6  QUESTIONS BY MR. GOTTO:
7      Q.    Okay.  So you became a national
8  account manager mid to late '06?
9      A.    Right.
10     Q.    Some period after that,
11  Mallinckrodt was spun off from Tyco, correct?
12     A.    That's correct.
13     Q.    Okay.  Did you continue to be a
14  national account manager after that spin-off?
15     A.    Yes, sir.
16     Q.    And so that was the Covidien
17  period after the spin-off, right?
18     A.    Yes, sir.
19     Q.    Okay.  And so during the
20  Covidien period, did you receive a fixed
21  salary and a variable -- with an eligibility
22  for variable compensation?
23     A.    Yes, sir.
24          MR. DAVISON:  Objection to
25     form.

Page 45

1  QUESTIONS BY MR. GOTTO:
2      Q.    Okay.  So during the Covidien
3  period, tell me what you can recall about how
4  the variable compensation worked that you
5  were eligible for.
6      A.    Every management change had
7  different components, but it was always
8  complex and multiple components.
9      Q.    Okay.  So tell me what you can
10  recall being among the components.
11          MR. DAVISON:  Objection to
12     form.
13          THE WITNESS:  It varied, again,
14     depending on management.
15  QUESTIONS BY MR. GOTTO:
16     Q.    Okay.  So initially when the
17  spin-off happened --
18     A.    Right.
19     Q.    -- and the Covidien period
20  began --
21     A.    Right.
22     Q.    -- you were a national account
23  manager from the beginning, correct?
24     A.    Yes, sir.
25     Q.    And to whom did you report at

Page 46

that point?

A. I believe it was Mitchell Goldberg; although to be honest, I don't recall. I had multiple management changes.

Q. Okay. Tell me who you can recall reporting to during the Covidien period in your role as national account manager.

A. I apologize. These business names kind of run together.

John Adams potentially was during that period. I believe -- I don't know who else was in the Covidien time frame. I think John was, but I don't remember anybody else.

Q. Okay. And the Covidien time frame ran till 2013; is that your recollection?

A. You're probably right.

Q. Okay. And it was then Mallinckrodt became an independent company, independent of Covidien, correct?

A. Correct.

Q. Okay. Can you -- irrespective of whether it was during the Covidien period

Page 47

or the independent period, who else can you recall reporting to in your role as national account manager?

A. Kian Kazemi. Jane Williams. I -- I'm blank.

Q. Okay. And you indicated early on there was a point in which you became a director, correct?

A. Correct.

Q. When was that?

A. It was under Kian, and it was just basically a title change.

Q. Okay. Any sense of the time frame?

A. Perhaps four or five years ago. Four years. I honestly don't recall.

Q. Okay. Approximately 2015, something like that?

MR. DAVISON: Objection.

THE WITNESS: Yeah. I honestly don't recall.

QUESTIONS BY MR. GOTTO:

Q. Okay. During the time you were national account manager, either Covidien or post-Covidien period, describe for me

Page 48

generally what your duties were.

A. Account management, basically.

Q. And did you have specific accounts assigned to you?

A. Yes, sir.

Q. And tell me who you can recall being the principal accounts that were assigned to you during that period.

A. Kroger became my account. Thrifty White. Schnucks. HEB. SuperValu. That's all that come to mind immediately.

Q. Okay.

A. Now, that changed periodically, so eventually I did have the Walmart account. At the end I had the Cardinal account.

Q. Do you remember approximately when the Walmart account became yours?

MR. DAVISON: Objection to form.

THE WITNESS: No.

QUESTIONS BY MR. GOTTO:

Q. How about the Cardinal account?

A. That was probably 2015. I'm -- I don't know.

Q. How were -- the accounts that

Page 49

you were responsible for, how were they assigned to you?

A. Management made those decisions.

Q. And do you recall approximately how many national account managers there were from time to time?

MR. DAVISON: Objection to form.

THE WITNESS: When I first started, it was five, I believe.

QUESTIONS BY MR. GOTTO:

Q. And did that change over time?

A. Yes.

Q. And how much did it change, if you recall?

MR. DAVISON: Objection.

THE WITNESS: It went down to four at some point, and then for just the national account managers handling retail and wholesale, there were three of us. There was a government person, too, but...

QUESTIONS BY MR. GOTTO:

Q. Did you not handle government

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  accounts?
2      A.    No, sir.
3      Q.    Okay.  And in this setting,
4  retail and wholesale, would wholesale include
5  distributors?
6      A.    You could say yes.
7      Q.    Okay.
8      A.    It's confusing.
9      Q.    Confusing in what sense?
10     A.    Just -- the words can be
11  interchanged.
12     Q.    Okay.  I'm just getting at --
13  you said retail and wholesale.  There wasn't
14  someone else who had distributor
15  responsibility, correct?
16     A.    Oh, correct.
17     Q.    Okay.
18     A.    Correct.
19     Q.    And retail in the setting of
20  the national account manager
21  responsibilities, would that be for chain
22  drugstores?
23     A.    Primarily, yes, sir.
24     Q.    Were there individual
25  drugstores that you had responsibilities for?

Page 51

1          MR. DAVISON:  Objection to
2      form.
3          THE WITNESS:  Let me restate
4      that.
5  QUESTIONS BY MR. GOTTO:
6      Q.    Sure.
7      A.    Would have included chain
8  drugstores but also retail chains that had
9  drugstores.
10     Q.    Such as a Kroger or Walmart or
11  something like that?
12     A.    Right.  Right.
13     Q.    Okay.  But it didn't include
14  individual, freestanding, single-location
15  pharmacies, correct?
16     A.    No, sir.
17     Q.    Did you have an understanding
18  from time to time as to why particular
19  accounts that were assigned to you had been
20  assigned to you as compared to one of the
21  other national account managers?
22          MR. DAVISON:  Objection.
23          THE WITNESS:  Not necessarily.
24  QUESTIONS BY MR. GOTTO:
25     Q.    Okay.  Well, was it common for

Page 52

1  an account to change from one national
2  account manager to another?
3      A.    Yes.
4      Q.    And under what circumstances
5  would that happen?
6          MR. DAVISON:  Objection.
7          THE WITNESS:  Management
8      decisions, variables in the market.
9  QUESTIONS BY MR. GOTTO:
10     Q.    Do you recall occasions under
11  which an account that had been yours was
12  moved to another of the national account
13  managers?
14     A.    Yes.  The Walmart account was
15  moved from me to another salesperson when
16  Walmart began an agreement with McKesson.
17     Q.    Okay.  And were you given an
18  explanation for the reason for that move?
19     A.    That particular rep had the
20  McKesson account, so it made sense due to
21  that new relationship.
22     Q.    Okay.  Other recollections of
23  accounts being moved from you to other of the
24  national account managers?
25     A.    Yes.  We had a new rep, and so

Page 53

1  I turned over some of my accounts to her
2  because when we lost a rep, I got additional
3  accounts.  So we got her and then we
4  transferred, you know, certain accounts to
5  her.
6      Q.    Okay.  How about were there
7  occasions when an account was moved to you
8  from another national account manager that
9  you can recall?
10     A.    Yes.  In the case of Walmart
11  going to the girl who handled McKesson, then
12  I took over the Cardinal, CVS account.
13     Q.    Other occasions where that
14  happened?
15     A.    Those were the most recent that
16  I recall.
17     Q.    Okay.  When you were a national
18  account manager, did you have personnel who
19  reported to you?
20     A.    No.
21     Q.    Were there regional account
22  managers at that time when you were a
23  national account manager?
24     A.    When I was a national account
25  manager, Lisa Cardetti was hired as a

Page 54

1 regional account manager --
2    Q.    Okay.
3    A.    -- and grew from there.
4    Q.    Okay.  And -- but I take it
5 Ms. Cardetti did not report to you?
6    A.    No, sir.
7    Q.    Do you know if she reported to
8 one of the other national account managers?
9    A.    No.  We all reported to a VP of
10 sales.
11    Q.    So as you understood it, what
12 was the distinction between regional account
13 manager, national account manager?
14    A.    Regional account manager
15 managed smaller accounts, and as your
16 expertise increased, you were given the
17 larger accounts to manage.
18    Q.    Okay.  During the time you were
19 national account manager, did you interact
20 with the other national account managers?
21    A.    Yes, sir.
22    Q.    What was the nature of that
23 interaction?
24        MR. DAVISON:  Objection.
25        THE WITNESS:  Meetings, sales

Page 55

1    meetings, national conferences, NACDS,
2    ECRM, we would all be together for
3    those meetings.
4 QUESTIONS BY MR. GOTTO:
5    Q.    We talked a little earlier
6 today about some of the training sessions
7 that you participated in with respect to the
8 Controlled Substances Act and DEA regulation.
9        Did you continue to participate
10 in such training sessions after you became a
11 national account manager?
12    A.    Yes, sir, they were required.
13    Q.    Okay.  And again, during this
14 time that you were national account manager,
15 did you -- were the sessions that you
16 participated in in-house Mallinckrodt
17 sessions?
18    A.    To the best of my knowledge.
19    Q.    Okay.  Do you recall ever
20 attending any conference or DEA or Controlled
21 Substances Act seminar or educational program
22 of any type conducted by a third party?
23        MR. DAVISON:  Objection.
24        THE WITNESS:  I do not recall.
25

Page 56

1 QUESTIONS BY MR. GOTTO:
2    Q.    And I should have asked you
3 this earlier:  Do you hold any professional
4 licenses or certifications?
5    A.    No, sir.
6    Q.    So it sounds like Kroger was
7 one of your main accounts for quite a period
8 of time, correct?
9    A.    Yes.
10    Q.    So could you describe for me
11 generally -- and let's use Kroger as an
12 example to try to trigger as many memory
13 neurons as we can here.
14    A.    I understand.
15    Q.    The -- this -- day to day what
16 was your -- what was your interaction with
17 Kroger in your capacity as a national account
18 manager?
19        MR. DAVISON:  Objection to
20    form.
21        THE WITNESS:  Managing customer
22    expectations, primarily,
23    troubleshooting any delivery problems,
24    quality questions, anything to do with
25    Mallinckrodt's business and our

Page 57

1    products.
2 QUESTIONS BY MR. GOTTO:
3    Q.    So managing customer
4 expectations, what does that entail?
5    A.    Being responsive and accurate
6 in your response to them.  If I didn't know
7 the answer, I had to find the answer for
8 them.
9    Q.    Did you have any principal
10 points of contact with the Kroger
11 organization?
12    A.    My primary contact was the
13 buyer for Kroger.  He was -- I think his
14 title was merchandiser coordinator.  I'm not
15 sure.
16    Q.    Okay.  And relative to the
17 Kroger business, who were Mallinckrodt's
18 competitors?
19        MR. DAVISON:  Objection to
20    form.
21        THE WITNESS:  Every retail
22    chain and every drugstore chain out
23    there.
24 QUESTIONS BY MR. GOTTO:
25    Q.    Maybe I misspoke.

Page 58

1　　　　Mallinckrodt's competitors to
2　get Kroger's business.
3　　　　A.　　Oh.
4　　　　Q.　　Who were you competing with as
5　a Mallinckrodt national account manager in
6　trying to get Kroger business?
7　　　　　　MR. DAVISON:　Objection.
8　　　　　　THE WITNESS:　Thank you.
9　　　I mean, every pharmaceutical
10　　company that was manufacturing
11　　products that were like ours.
12　QUESTIONS BY MR. GOTTO:
13　　　　Q.　　And who were the principal
14　other manufacturers who were manufacturing
15　competitive product?
16　　　　　　MR. DAVISON:　Objection.
17　　　　　　THE WITNESS:　I can remember
18　　some of the old names.
19　QUESTIONS BY MR. GOTTO:
20　　　　Q.　　Okay.
21　　　　A.　　Endo and Watson.　Gosh, Endo,
22　Watson, those are the two that come to mind.
23　Qualtest at the time.　That's it.
24　　　　Q.　　Okay.　In terms of annual
25　dollar volume with the accounts that you

Page 59

1　managed, what was the largest account?
2　　　　　　MR. DAVISON:　Objection.
3　QUESTIONS BY MR. GOTTO:
4　　　　Q.　　I don't need the dollar amount.
5　I'm just ranking --
6　　　　A.　　Right.
7　　　　Q.　　-- what was the largest --
8　　　　A.　　The largest account that I
9　managed for any length of time was Walmart.
10　　　　Q.　　Okay.　How about after Walmart?
11　　　　A.　　Kroger and Walmart were pretty
12　close to each other.　At the end, I had the
13　Cardinal account but lost the Walmart
14　account, so it just varied --
15　　　　Q.　　Okay.
16　　　　A.　　-- depending on the day and
17　year.
18　　　　Q.　　Okay.　And in terms of the
19　products that your accounts were purchasing
20　from Mallinckrodt, were they all generics?
21　　　　A.　　Yes.
22　　　　Q.　　Okay.　So you never had
23　responsibility for sales of any branded
24　product; is that correct?
25　　　　A.　　No, sir.

Page 60

1　　　　Q.　　Relative to Mallinckrodt's
2　other customers, the accounts you didn't have
3　responsibility for, did you have an
4　understanding, for example, when you had
5　Walmart responsibility where Walmart ranked
6　as far as a Mallinckrodt customer for
7　generics?
8　　　　　　MR. DAVISON:　Objection to
9　　form.
10　　　　　　THE WITNESS:　They were a
11　　primary customer.
12　QUESTIONS BY MR. GOTTO:
13　　　　Q.　　And by primary, do you mean the
14　largest?
15　　　　　　MR. DAVISON:　Objection.
16　　　　　　THE WITNESS:　I can't answer
17　　that.　I knew about my accounts at the
18　　time, but I don't recall who ranked
19　　where.
20　QUESTIONS BY MR. GOTTO:
21　　　　Q.　　Okay.　You didn't have an
22　understanding of what the top five overall
23　Mallinckrodt generic customers were?
24　　　　A.　　I'm sure I did at one point.
25　　　　Q.　　Okay.

Page 61

1　　　　A.　　I don't recall it.
2　　　　Q.　　Okay.　But fair to say that
3　Walmart was one of the most significant --
4　　　　A.　　Yes.
5　　　　　　MR. DAVISON:　Objection.
6　QUESTIONS BY MR. GOTTO:
7　　　　Q.　　-- generic customers?
8　　　　　　MR. DAVISON:　Let him finish
9　　the question.
10　　　　　　THE WITNESS:　Okay.
11　QUESTIONS BY MR. GOTTO:
12　　　　Q.　　One of the most significant
13　generic customers.
14　　　　　　MR. GOTTO:　Thank you.
15　　　　　　MR. DAVISON:　Objection.
16　　　　　　THE WITNESS:　Yes.
17　QUESTIONS BY MR. GOTTO:
18　　　　Q.　　Okay.　And also Kroger, were
19　they one of the most significant generic
20　customers of Mallinckrodt?
21　　　　　　MR. DAVISON:　Same objection.
22　　　　　　THE WITNESS:　In my mind they
23　　were.
24　QUESTIONS BY MR. GOTTO:
25　　　　Q.　　Okay.　So you described

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1 generally kind of your day-to-day interaction
2 with Kroger.
3        Would you have had similar
4 day-to-day interaction with your other
5 principal accounts that you had
6 responsibility for?
7    A.    Yes, sir.
8    Q.    Did your -- did your job
9 involve traveling to visit customers from
10 time to time?
11    A.    Yes, sir.
12    Q.    About how much traveling did
13 you do as a national account manager for that
14 purpose?
15    A.    I would say between 50 and
16 75 percent of my time was spent traveling,
17 depending on the season and the year.
18    Q.    Okay.  And so, for example,
19 say, Kroger, which I understand was one of
20 your principal accounts, about how many times
21 a year would you visit them?
22    A.    At their headquarter level?
23    Q.    Well, anytime you were
24 traveling to visit Kroger, whether it was
25 headquarters or somewhere else.

Page 63

1    A.    I would try to visit them on a
2 quarterly basis in the beginning, but then
3 their business model changed and that got cut
4 back significantly, and I would see them at
5 ECRM or NACDS, and maybe once a year at their
6 headquarters.
7    Q.    What is ECRM?
8    A.    I can't remember what it stands
9 for, but it's a business conference for the
10 industry.
11    Q.    Okay.  And NACDS?
12    A.    Same thing.
13    Q.    Okay.
14    A.    And that's national chain drug
15 symposium or something.
16    Q.    Okay.  So there came a time
17 when your kind of face-to-face contact with
18 Kroger was principally at those -- at those
19 conferences?
20        MR. DAVISON:  Objection.
21        THE WITNESS:  With the Kroger
22    headquarters, yes.
23 QUESTIONS BY MR. GOTTO:
24    Q.    Okay.  So did you visit
25 Kroger -- other Kroger facilities other than

Page 64

1 headquarters?
2    A.    Kroger is divided into
3 divisions, and the divisions would have
4 annual pharmacy meetings depending on the
5 division.  And I, in the beginning, attended
6 those meetings.
7    Q.    Okay.  How about your other
8 accounts?
9        Obviously if you're spending 50
10 to 75 percent of your time traveling, I take
11 it you were visiting other accounts fairly
12 regularly?
13    A.    Correct.  Right.
14    Q.    Did you have a sequence or a
15 frequency that you tried to visit the various
16 accounts?
17        MR. DAVISON:  Objection.
18        THE WITNESS:  It depended on
19    the actual account and the needs of
20    the customer.
21 QUESTIONS BY MR. GOTTO:
22    Q.    Okay.  Would you typically
23 visit each of your principal accounts at
24 least annually?
25    A.    Generally, yes.

Page 65

1    Q.    Okay.  And where can you recall
2 them being located where you went to visit
3 them?
4        MR. DAVISON:  Objection.
5        THE WITNESS:  Fargo, North
6    Dakota.
7 QUESTIONS BY MR. GOTTO:
8    Q.    And who was that?
9    A.    Thrifty White.  They also were
10 based in Minnesota, so between the two.
11        Schnucks Markets here in
12 St. Louis.  Giant Eagle in Pennsylvania.  HEB
13 in Texas.  SuperValu in Arizona at the time.
14 Those are the ones that stand out.
15    Q.    And did you visit Walmart from
16 time to time?
17    A.    Yes, sir.
18    Q.    In Bentonville?
19    A.    Yes, sir.
20    Q.    Did you visit Cardinal after
21 you had that account?
22    A.    Yes.
23    Q.    And where were they located?
24    A.    In Ohio, in Dublin.
25    Q.    Okay.  Did you have to get

Page 66

1  prior approval for expenses for travel to
2  visit accounts?
3      A.    We had a budget, and we had
4  guidelines on expenses.
5      Q.    Okay.  How did the guidelines
6  work?
7      A.    I don't remember the numbers,
8  but basically we had a meal budget,
9  breakfast, lunch and dinner, and we worked
10 through different programs to schedule our
11 flights and rental cars, and there were
12 guidelines to follow.
13     Q.    Okay.  So as long as you kept
14 within a -- well, strike that.
15         Was it an annual budget that
16 you had?
17     A.    Yes.
18     Q.    Okay.
19     A.    Somewhat.
20     Q.    Okay.  So as long as you kept
21 within the budget, did you have discretion to
22 decide how many trips to make and where to
23 go?
24     A.    Yes, sir.
25         MR. GOTTO:  Okay.  All right.

Page 67

1      Why don't we take a short break.
2          VIDEOGRAPHER:  We are going off
3  the record at 10:15 a.m.
4  (Off the record at 10:15 a.m.)
5          VIDEOGRAPHER:  We are back on
6  the record at 10:37 a.m.
7  QUESTIONS BY MR. GOTTO:
8      Q.    Ms. New, during the time that
9  you were a national account manager, did you
10 receive periodic performance reviews?
11     A.    Yes, sir.
12     Q.    How often were you reviewed?
13     A.    Annually.
14     Q.    Okay.  And by whom were you
15 reviewed?
16     A.    Whomever I reported to at the
17 time.
18     Q.    Okay.  Did you receive a
19 written performance evaluation?
20     A.    As I recall, yes.
21     Q.    Okay.  Were there particular
22 metrics on which you were reviewed?
23     A.    Various goals and objection --
24 objections.
25     Q.    Objectives?

Page 68

1      A.    Objectives.  Thank you, sir.
2      Q.    What can you recall some of
3  those goals and objectives being?
4          MR. DAVISON:  Objection to
5  form.
6          THE WITNESS:  It varied with
7  management and companies.
8  QUESTIONS BY MR. GOTTO:
9      Q.    Okay.  Well, understanding it
10 varied, do you recall what any of them were
11 from time to time?
12     A.    No, sir.
13         MR. DAVISON:  Objection.
14 QUESTIONS BY MR. GOTTO:
15     Q.    Were any of them specific to
16 particular accounts?
17         MR. DAVISON:  Objection.
18         THE WITNESS:  Possibly, yes.
19 QUESTIONS BY MR. GOTTO:
20     Q.    Okay.  So what accounts can you
21 recall any specific objectives being
22 associated with?
23         MR. DAVISON:  Objection.
24         THE WITNESS:  Probably my
25     primary accounts.

Page 69

1  QUESTIONS BY MR. GOTTO:
2      Q.    Okay.  And what would be the
3  nature of the objectives as to a specific
4  account that you would be evaluated on?
5      A.    They varied by management.
6      Q.    Okay.
7      A.    And their goals and objectives.
8      Q.    Would it be related -- would
9  one of things that it would be related to
10 sales levels?
11         MR. DAVISON:  Objection.
12         THE WITNESS:  Potentially.
13 QUESTIONS BY MR. GOTTO:
14     Q.    Okay.  And apart from sales
15 levels, what other sorts of objectives can
16 you recall there being with respect to any
17 particular account?
18         MR. DAVISON:  Objection.
19         THE WITNESS:  I don't recall.
20 QUESTIONS BY MR. GOTTO:
21     Q.    When you became a director, did
22 you have anyone who reported to you?
23     A.    No, sir.
24     Q.    And to whom did you report
25 after you became a director?

Page 70

1    A.    I remember Kian and Jane. I
2 don't know if there was anybody else. Well,
3 Jake at the end, Jake Longenecker.
4    Q.    Now, I know you said earlier
5 you become a director; there was a change in
6 title.
7         Were there any changes in your
8 job responsibilities when you became a
9 director?
10   A.    No.
11   Q.    During the time you were a
12 national account manager or a director, can
13 you recall any occasions in which you
14 received what you understood to be a negative
15 performance evaluation?
16        MR. DAVISON:  Objection to
17 form.
18        THE WITNESS:  No.
19 QUESTIONS BY MR. GOTTO:
20   Q.    Did your periodic performance
21 evaluations entail any formal formula or
22 scoring or any arithmetic type of evaluation?
23        MR. DAVISON:  Objection.
24        THE WITNESS:  Various systems
25    were used during the time frame, and

Page 71

1    they may or may not have included
2    metrics.
3 QUESTIONS BY MR. GOTTO:
4    Q.    Okay.  You don't recall any?
5    A.    No.
6    Q.    Okay.  Now, during the time you
7 were a national account manager, I think you
8 testified that your -- part of your
9 compensation was variable compensation,
10 correct?
11   A.    Correct.
12   Q.    And can you recall -- and tell
13 me if this varied from time to time --
14 approximately what percentage of your overall
15 compensation annually was variable?
16        MR. DAVISON:  Objection to
17 form.
18        THE WITNESS:  Again, it varied
19    from year to year.
20 QUESTIONS BY MR. GOTTO:
21   Q.    Okay.  So --
22   A.    I can't tell you.
23   Q.    So can you recall the greatest
24 percentage, approximately, that your variable
25 compensation consisted of?

Page 72

1    A.    No, sir.
2    Q.    Can you recall approximate
3 levels of your fixed salary during the time
4 you were national account manager?
5        MR. DAVISON:  Objection to
6 form.
7        THE WITNESS:  Can you restate
8 it?
9 QUESTIONS BY MR. GOTTO:
10   Q.    Yeah.  Just what the
11 approximate levels were of your salary,
12 putting the variable compensation aside for
13 now, during the time you were a national
14 account manager.
15        MR. DAVISON:  Objection to
16 form.
17        THE WITNESS:  Again, it varied.
18 QUESTIONS BY MR. GOTTO:
19   Q.    Can you give me a sense of the
20 range that it varied within?
21   A.    No. No.
22   Q.    Okay.  Was there ever a time,
23 any year, where you can recall your variable
24 compensation exceeding your fixed salary?
25   A.    No, sir.

Page 73

1    Q.    Was there ever a time that you
2 can recall your variable compensation
3 exceeding 50 percent of your fixed salary?
4    A.    Yes.
5    Q.    Okay.  Was there a time you can
6 recall your variable compensation exceeding
7 75 percent of your fixed salary?
8    A.    No, sir.
9    Q.    Okay.  You were a national
10 account manager for, what, approximately
11 12 years or so?
12   A.    Yeah, if you count the regional
13 to director, that time frame, yes.
14   Q.    Okay.
15   A.    About 12 years.
16   Q.    And so in that approximate
17 12-year period -- and I understand -- if you
18 can just give me an estimate, how many of
19 those years would you say your variable
20 compensation exceeded 50 percent of your
21 fixed salary?
22        MR. DAVISON:  Objection to
23 form.
24        THE WITNESS:  I can't answer
25 that.

Page 74

1  QUESTIONS BY MR. GOTTO:
2      Q.   Did it happen more than once?
3          MR. DAVISON:  Objection.
4          THE WITNESS:  I would say yes.
5  QUESTIONS BY MR. GOTTO:
6      Q.   Okay.  But you don't know how
7  many times more than once?
8      A.   No.
9      Q.   Okay.  Was there ever a year in
10 which you did not receive any variable
11 compensation?
12     A.   No.
13     Q.   Understanding that you don't
14 recall exactly how many times you received
15 variable compensation that was more than
16 50 percent of your fixed salary, were there
17 more years that you received variable
18 compensation that exceeded 50 percent of your
19 fixed salary than there were years in which
20 you received variable compensation that was
21 less than 50 percent of your fixed salary?
22         MR. DAVISON:  Objection to
23     form.
24         THE WITNESS:  I can't answer
25     that.

Page 75

1  QUESTIONS BY MR. GOTTO:
2      Q.   Okay.  During your time as a
3  regional or national account manager or a
4  director, did you receive any commendations
5  or awards from Mallinckrodt?
6      A.   I did.
7      Q.   What did you receive?
8      A.   I was President's Club for
9  2012, 2013 and 2015.
10     Q.   And what is -- what qualified
11 you to be in the President's Club?
12         MR. DAVISON:  Objection to
13     form.
14         THE WITNESS:  Meeting goals and
15     objectives.
16 QUESTIONS BY MR. GOTTO:
17     Q.   And were there any particular
18 goals and objectives you can recall that --
19 the meeting of which qualified you for
20 President's Club?
21     A.   Overall just doing a good job.
22     Q.   And who made the determination
23 that you qualified for the President's Club
24 for those years?
25     A.   Upper management.

Page 76

1      Q.   Was it the person you directly
2  reported to or someone else; did you know?
3      A.   I believe it was a combination
4  of several positions.
5      Q.   Okay.  Did you receive any
6  explanation as to why it was that you were
7  determined to be qualified for the
8  President's Club for those years?
9      A.   No, sir.
10     Q.   And the President's Club
11 distinction, what did that entail?
12         MR. DAVISON:  Objection.
13         THE WITNESS:  It included a
14     trip as a group and meals, et
15     cetera --
16 QUESTIONS BY MR. GOTTO:
17     Q.   Okay.
18     A.   -- hotel.
19     Q.   So there were a group of people
20 who were designated as the President's Club
21 for a given year?
22     A.   Right.
23     Q.   And there was a trip.
24         Do you recall what trips that
25 you took for those three years?

Page 77

1      A.   Yes, sir.
2      Q.   Where'd you go?
3      A.   Mexico, Maui and St. Thomas.
4      Q.   And about how many people were
5  President's Club qualified those years?
6      A.   It varied per year.
7      Q.   Can you give me an
8  approximation of --
9      A.   I honestly don't know the
10 number.
11     Q.   Was it more than a dozen?
12     A.   Yes, sir.
13     Q.   Okay.  Was it more than 30?
14     A.   Each year varied.
15     Q.   But I take it each year it was
16 more than a dozen?
17     A.   I would say yes.
18     Q.   Okay.  And sometimes more than
19 30 and sometimes less than 30?
20     A.   Yes.
21     Q.   Okay.  Who else can you recall
22 being in the President's Club in any of the
23 three years that you qualified for it?
24     A.   Lisa Cardetti.  There were
25 multiple -- do you just want to know the

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  salespeople that went?
2      Q.    Yeah, let's start with the
3  salespeople, sure.
4      A.    I remember Lisa Cardetti.  I
5  believe Steve Becker.  That's all I recall.
6      Q.    Okay.  How about anyone outside
7  of sales that you can recall?
8      A.    Occasionally marketing folks
9  would go.
10     Q.    Do you remember any
11 individuals?
12     A.    No.
13     Q.    Apart from President's Club,
14 any other commendations or awards you
15 received at Mallinckrodt?
16     A.    Not that I recall.
17     Q.    I think you testified you were
18 terminated on -- last June 1st; is that
19 correct?
20     A.    Correct.
21     Q.    And what were the circumstances
22 of that termination?
23         MR. DAVISON:  Objection to
24     form.
25         THE WITNESS:  They decided that

Page 79

1      I was done.
2  QUESTIONS BY MR. GOTTO:
3      Q.    Okay.  How were you informed of
4  that?
5      A.    I was told on March 1st that I
6  had 90 days and that my last day would be
7  June 1st.
8      Q.    Okay.  Did you receive a
9  severance package?
10     A.    Yes, sir.
11     Q.    And what did that consist of?
12     A.    12 months' severance.
13     Q.    And did you have an
14 understanding as to whether someone else
15 would replace you in your position?
16     A.    I did not.
17     Q.    Did you have an understanding
18 as to whether the position was being
19 eliminated?
20     A.    That's what I was told.
21     Q.    And what was that position?
22     A.    Director of national accounts.
23     Q.    And how many directors of
24 national accounts were there at that time?
25     A.    Three and then a government

Page 80

1  person.
2          Is that right?  Strike that.
3          I don't recall.
4      Q.    Okay.  Were all the director of
5  national accounts' positions eliminated, to
6  your knowledge?
7      A.    No.
8      Q.    Okay.  Do you remember the
9  names of any of the other directors of
10 national accounts during this 90-day period
11 leading up to your termination?
12     A.    Elva Ramsaran.  And Trudy
13 Nickelson, her job was also eliminated.  And
14 I believe her title was director, too, but
15 she was government.
16     Q.    Okay.  When you became director
17 of national accounts, were there still
18 national account managers or did -- or was it
19 a change in title for all of them?
20         MR. DAVISON:  Objection.
21         THE WITNESS:  It was across the
22     board.
23 QUESTIONS BY MR. GOTTO:
24     Q.    Okay.  Now, during the time you
25 were either regional account manager,

Page 81

1  national account manager or director, you
2  described for me earlier some of the products
3  that Mallinckrodt sold to various of your
4  accounts.
5          Did those -- did the products
6  that Mallinckrodt sold to your -- the
7  accounts you had responsibility for include
8  noncontrolled substances?
9      A.    Yes.
10     Q.    And what would be some examples
11 of those?
12     A.    Benzonatate.  I can't remember
13 the names of all the products.  We had a
14 significant line of products at that time.
15     Q.    Okay.  And did your
16 responsibilities, either as regional or
17 national account manager or director, require
18 you to develop familiarity with the various
19 products that Mallinckrodt was selling to
20 your accounts?
21     A.    Yes.
22     Q.    And how did you go about
23 developing that familiarity?
24     A.    We would get background on the
25 product as far as who the innovator was and

Page 82

1 various specifications about the product
2 through a binder.
3     Q.    Okay.  And do you know who
4 would provide those binders to you?
5     A.    The product manager.
6     Q.    With respect to the -- the
7 controlled substances that Mallinckrodt sold
8 to the customers you had a responsibility
9 for, from whom can you recall receiving
10 information about those products that you
11 needed to do your job?
12         MR. DAVISON:  Objection to
13     form.
14         THE WITNESS:  Various product
15     managers that managed the specific
16     product line at the time.
17 QUESTIONS BY MR. GOTTO:
18     Q.    Okay.  Do you remember the
19 names of any of those folks?
20     A.    Product managers were Lisa
21 Cardetti at one point, Sylvia Elmore,
22 Jennifer Bullerdick, Jake Longenecker.  Those
23 are the ones I recall.
24     Q.    Okay.  Were there any policies
25 or procedures at Mallinckrodt that you

Page 83

1 followed that pertained particularly to the
2 sale of controlled substances to Mallinckrodt
3 customers?
4         MR. DAVISON:  Objection to
5     form.
6         THE WITNESS:  We could not make
7     a decision to sell a product unless we
8     had approval due to the strict DEA
9     quota grants and the manufacturing of
10     the opioids.
11         So it was a team effort when we
12     chose a customer to target.
13 QUESTIONS BY MR. GOTTO:
14     Q.    Okay.  So -- and who did you
15 have to get approval from?
16     A.    Upper management, the SOMS
17 team.  There were a lot of decisions made
18 before we actually could sell a product to a
19 particular account.
20     Q.    Okay.  And so you said it was a
21 team effort to choose a customer to target.
22         Tell me how that process would
23 unfold.
24     A.    It would -- if I had a customer
25 that had a competitor product and I wanted to

Page 84

1 try to target that business, I would talk to
2 upper management, the sales team.  It had to
3 be approved by the API team, active
4 pharmaceutical ingredients.  There was a huge
5 approval process to sell any opioids,
6 especially because of the DEA regulations.
7     Q.    And who in upper management
8 would you interact with to seek that kind of
9 approval?
10     A.    It could go all the way up to
11 the top, depending on the amount and the
12 customer.
13     Q.    Do you recall instances where
14 you targeted a customer that -- where in fact
15 the decision went all the way up to the top?
16     A.    Not specifically, no.
17     Q.    Okay.  Can you recall any
18 particular instances in which you targeted a
19 customer where you were unable to get
20 approval from upper management that you were
21 seeking?
22     A.    Yes.
23     Q.    When can you recall that
24 happening?
25     A.    I can't recall specifics, but

Page 85

1 if there was a product that was at risk that
2 we would not be able to supply, the answer
3 was no.
4     Q.    Okay.  Any other circumstances
5 other than concerns about ability to meet
6 their customers' demands that you can recall
7 causing approval to be withheld?
8     A.    No, sir.
9     Q.    How frequent was it -- and I
10 understand, you know, you may only be able to
11 answer this question by giving me a range,
12 but how frequent was it, approximately, over
13 the years for you to obtain approval for new
14 business of the type you're describing?
15         MR. DAVISON:  Objection to
16     form.
17         THE WITNESS:  Can you ask that
18     again?
19 QUESTIONS BY MR. GOTTO:
20     Q.    Sure.
21         I understand to get new
22 business, you just described a fairly
23 elaborate process that you had to go
24 through --
25     A.    Right.

Page 86

Q. -- and sometimes you didn't get the approvals.

Now focusing on when, in fact, you got approval for a new business that you were seeking, about how often did that happen?

MR. DAVISON: Objection.

THE WITNESS: I have no -- nothing to gauge that on. I can't say specifically any percentage.

QUESTIONS BY MR. GOTTO:

Q. Well, in a typical year, would it happen once? Twice?

A. I can't answer that.

Q. Was it -- would it be uncommon for a year to go by where it didn't happen at all?

A. Potentially, yes.

Q. It could happen --

A. Yes.

Q. -- a year would go by?

A. Yes.

Q. Okay. Was successfully targeting and obtaining approval for new business one of the metrics you were

Page 87

evaluated on?

MR. DAVISON: Objection.

THE WITNESS: The metrics that we were evaluated on were very complex, and there were multiple variables. So no one specific thing, but a multiple.

QUESTIONS BY MR. GOTTO:

Q. I understand there are many --

A. Yeah.

Q. -- many pieces --

A. Right.

Q. -- to that puzzle.

Was one of the pieces the targeting and -- successful targeting a new business?

A. Yes.

Q. Okay. Were there times when -- for any of the accounts you had responsibility for when you experienced a loss of existing business?

A. Yes.

Q. And can you recall some examples of that?

A. When a competitor took our

Page 88

business because we had a supply situation and couldn't supply them, that was always a frightening experience.

Q. Okay. Apart from the inability to meet supply, were there other examples that you can think of of losing existing business?

A. Contract changes. I mean, it was similar situation. They'd put their products out to bid, and we didn't always win.

Q. Somebody might just undercut you on price?

A. Right. Right.

Q. Okay. Apart from challenges of meeting supply and being undercut on price by other competitors, were there other circumstances you can recall that you understood led to customers you had responsibility for cutting back existing business for Mallinckrodt?

MR. DAVISON: Objection to form.

THE WITNESS: I don't recall.

Page 89

QUESTIONS BY MR. GOTTO:

Q. Okay. Was the loss of existing business among your accounts one of the circumstances that was taken into account in your periodic reviews?

MR. DAVISON: Objection.

THE WITNESS: Not sure.

QUESTIONS BY MR. GOTTO:

Q. Okay. In performing your duties at Mallinckrodt, did you do your best to follow Mallinckrodt's rules and regulations?

A. Absolutely.

Q. And do your best to do your job in a way that you understood Mallinckrodt to be expecting you to do it?

A. Yes, sir.

Q. And was there ever a time in any of your periodic reviews when any issue was raised with you regarding your following any Mallinckrodt procedures or rules?

A. Not that I recall.

Q. And would you characterize yourself as a detail-oriented person?

A. To a degree.

Q. Okay. You listed for me a

Page 90

1 number of accounts that you had
2 responsibility for over time. At any given
3 time, approximately how many accounts did you
4 have responsibility for?
5     A.   20.
6     Q.   Okay.
7     A.   25.
8     Q.   Okay. And did you take steps
9 to become familiar with the business of the
10 20 or 25 accounts that you had at any given
11 time?
12     MR. DAVISON: Objection to
13   form.
14     THE WITNESS: Yes.
15 QUESTIONS BY MR. GOTTO:
16     Q.   What did you do in that regard?
17     A.   Met with my primary contact to
18 determine their goals and objectives and how
19 we could align to meet those goals and
20 objectives.
21     Q.   Okay. Did you take steps to
22 become familiar with who the customers to
23 whom your accounts sold were?
24     MR. DAVISON: Objection to
25   form.

Page 91

1     THE WITNESS: No.
2 QUESTIONS BY MR. GOTTO:
3     Q.   And why not?
4     MR. DAVISON: Objection.
5     THE WITNESS: It would have
6   been impossible for me to do that
7   personally.
8 QUESTIONS BY MR. GOTTO:
9     Q.   And would have been impossible
10 because -- would they not have responded to
11 inquiries, your accounts, if you made inquiry
12 in that regard?
13     MR. DAVISON: Objection to
14   form.
15     THE WITNESS: The amount of
16   account -- pharmacies, for example,
17   that Walmart had, approximately 4,000,
18   approximately 2,000 for Kroger,
19   there's no possible way.
20 QUESTIONS BY MR. GOTTO:
21     Q.   So your accounts from time to
22 time -- well, let's talk about Kroger, for
23 example.
24     So Kroger's pharmacies, actual
25 retail pharmacies, were they all affiliated

Page 92

1 with Kroger, to your knowledge?
2     MR. DAVISON: Objection.
3     THE WITNESS: Yes, sir.
4 QUESTIONS BY MR. GOTTO:
5     Q.   Okay. And the same for
6 Walmart?
7     MR. DAVISON: Objection.
8     THE WITNESS: Yes, sir.
9 QUESTIONS BY MR. GOTTO:
10     Q.   Okay. Did you have accounts
11 from time to time who resold product to
12 unaffiliated retailers?
13     MR. DAVISON: Objection.
14     THE WITNESS: I can't answer
15   that.
16 QUESTIONS BY MR. GOTTO:
17     Q.   You don't know?
18     A.   I don't know.
19     Q.   Okay. And you didn't know at
20 the time?
21     A.   No, sir.
22     Q.   Not something that you made an
23 effort to ascertain?
24     A.   It would fall in an area under
25 our suspicious order monitoring people to go

Page 93

1 to any level other than the headquarter level
2 where I was.
3     Q.   Okay. In any event, you
4 personally didn't make any effort to
5 ascertain whether any of your accounts resold
6 Mallinckrodt product to unaffiliated third
7 parties?
8     MR. DAVISON: Objection.
9 QUESTIONS BY MR. GOTTO:
10     Q.   For resale, not to customer --
11 end customers.
12     MR. DAVISON: Objection.
13     THE WITNESS: We had contracts
14   that would have covered that, I
15   believe.
16 QUESTIONS BY MR. GOTTO:
17     Q.   Okay. I'm just trying to
18 understand what you personally had an
19 understanding of at the time as you were
20 doing your day-to-day job.
21     Did you have an understanding
22 with respect to each of your accounts as to
23 whether they would be reselling Mallinckrodt
24 product to unaffiliated third parties for
25 resale by those third parties?

Page 94

1      MR. DAVISON:  Objection.
2      THE WITNESS:  It wasn't
3   allowed, as I recall.
4   QUESTIONS BY MR. GOTTO:
5      Q.   Okay.  So did you have any
6   wholesaler clients?
7      A.   Yes.
8      Q.   So they were buying for
9   purposes of reselling to third parties,
10  right?
11     MR. DAVISON:  Objection.
12     THE WITNESS:  They were selling
13  to their customers, yes.
14  QUESTIONS BY MR. GOTTO:
15     Q.   Okay.  And that was allowed,
16  right?
17     A.   Yes.
18     Q.   Okay.  And so you understood --
19  to the extent you had wholesaler customers,
20  you understood they were buying for the
21  purpose of reselling to someone else,
22  correct?
23     A.   Correct.
24     Q.   And as compared to, for
25  example, Kroger, that was buying for the

Page 95

1   purpose of distributing through their
2   affiliated pharmacies, correct?
3      A.   Yes.  Yes.
4      Q.   And so with respect to the
5   wholesaler accounts that you had, did you
6   develop any understanding as to who their
7   customers were?
8      A.   The wholesalers that I dealt
9   with, yes, had their buying group or their
10  particular customers that they sold to.
11     Q.   Okay.  And so did you have an
12  understanding as to the identity of who any
13  of those customers were?
14     A.   Minimal.
15     Q.   And when you say "minimal,"
16  what do you mean?
17     A.   Depending on the wholesaler,
18  you know, their customer base could vary, but
19  I knew generally the quantity of their
20  customers as far as how many customers they
21  served, but did not look into the detail of
22  those customers unless there was a problem.
23     Q.   Now, you mentioned earlier a
24  suspicious order monitoring group at
25  Mallinckrodt.

Page 96

1      Did your job responsibilities
2   in any way entail any aspect of the
3   suspicious order monitoring function at
4   Mallinckrodt?
5      MR. DAVISON:  Objection to
6   form.
7      THE WITNESS:  Yes.
8   QUESTIONS BY MR. GOTTO:
9      Q.   And in what way?
10     A.   If there was something
11  suspicious of concern, either they would
12  contact me based on their system that there
13  was a concern, and then my obligation was to
14  contact the customer, my primary contact, and
15  understand why, for example, the order
16  increased amount was there.
17     Q.   Okay.  And when you said "they"
18  in your answer, you're talking about the
19  suspicious order monitoring --
20     A.   Right.
21     Q.   -- folks at Mallinckrodt?
22     A.   Right.  I reference them as
23  SOMS.
24     Q.   Okay.
25     A.   Okay?

Page 97

1      Q.   And who do you recall --
2   individuals who would contact you who were
3   involved in the SOMS process at Mallinckrodt?
4      A.   Karen Harper was always copied,
5   but it usually was some of her team.
6      Q.   Okay.  And do you recall any
7   particular circumstances in which you were
8   contacted by the SOMS team for -- with a
9   question or an issue that you then pursued?
10     A.   It varied.  Particular
11  customer, Morris Dickson, a wholesaler I had
12  at the time, that's the only one I recall.
13     Q.   Do you recall any occasion in
14  which an order from any account that you had
15  responsibility for was declined by
16  Mallinckrodt on the basis of it being a
17  suspicious order?
18     A.   Absolutely.
19     Q.   And when can you recall that
20  happening?
21     A.   It was evaluated on a regular
22  basis through the SOMS team, and whenever
23  anything suspicious came forward -- I don't
24  remember a specific date or time, but it
25  happened.

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1  Q.  Do you remember a particular
2 account where an account -- where an order
3 was declined?
4  A.  I do not.
5  Q.  Were there marketing materials
6 that you provided to your -- the accounts you
7 had responsibility for, particularly with
8 respect to Mallinckrodt controlled
9 substances?
10  MR. DAVISON:  Objection to
11  form.
12  THE WITNESS:  What time frame
13  are you speaking of?
14 QUESTIONS BY MR. GOTTO:
15  Q.  Well, at any time.
16  MR. DAVISON:  Same objection.
17  THE WITNESS:  Yes.
18 QUESTIONS BY MR. GOTTO:
19  Q.  What kinds of marketing
20 materials can you recall providing to your
21 accounts?
22  A.  Like I stated earlier, we
23 would -- if we had a contract with a
24 customer, as an aid, based on feedback from
25 their headquarters, they would -- we would do

Page 99

1 a sheet that showed the contracted items and
2 the wholesaler item number that matched that
3 so that they knew what was on contract and
4 potentially could be aware.
5  Q.  Okay.  Were there materials
6 that contained information with respect to
7 Mallinckrodt's products that you provided to
8 your accounts?
9  MR. DAVISON:  Objection to
10  form.
11  THE WITNESS:  I don't recall.
12 QUESTIONS BY MR. GOTTO:
13  Q.  Did you participate in trade
14 shows from time to time?
15  A.  Yes, sir.
16  Q.  About how often would you
17 participate in a trade show?
18  A.  There were two annual trade
19 shows generally that I'd participate in,
20 NACDS and ECRM.  There were various ones that
21 I attended was sick or left the
22 company or whatever.  It just varied from
23 year to year.
24  Q.  Okay.  In terms of the two that
25 you regularly participated in, what was the

Page 100

1 nature of your participation?
2  A.  Meeting with my customers,
3 discussing any business topics, any new
4 products to the market, et cetera.
5  Q.  And I think you indicated, for
6 example, Kroger eventually became the case
7 that those trade shows were the principal
8 contact that you had with that account.
9  Was that true with other of
10 your accounts as well?
11  MR. DAVISON:  Objection to
12  form.
13  THE WITNESS:  Restate it,
14  please.
15 QUESTIONS BY MR. GOTTO:
16  Q.  Sure.
17  Well, apart from Kroger,
18 just -- were there accounts for whom meeting
19 at trade shows was your principal
20 face-to-face contact with those accounts?
21  A.  Yes.
22  Q.  And did you take orders at
23 those accounts -- or at those conferences
24 or --
25  A.  No, no.

Page 101

1  Q.  And about how many people from
2 Mallinckrodt would participate in the two
3 main conferences that you referred to?
4  MR. DAVISON:  Objection.
5  THE WITNESS:  It varied from
6  year to year depending on management,
7  depending on sales budgets, marketing
8  budgets.  It varied.
9 QUESTIONS BY MR. GOTTO:
10  Q.  Okay.  But did you attend those
11 two essentially every year?
12  A.  There were a couple of years
13 that they cut back and I did not attend.
14  Q.  But as a general matter, you
15 attended them both?
16  A.  Yes.  Yes.
17  Q.  Okay.  What about the other
18 national account managers, did they attend
19 both of those conferences as well?
20  A.  Yes.
21  Q.  Now, from the time you became a
22 regional account manager and thereafter, you
23 understood that Mallinckrodt's opioid
24 products were narcotics, correct?
25  A.  Yes, sir.

Page 102

1    Q.    And you understood that they
2  were subject to the Controlled Substances
3  Act, correct?
4         MR. DAVISON:  Objection to
5  form.
6         THE WITNESS:  Yes, sir.
7  QUESTIONS BY MR. GOTTO:
8    Q.    Are you familiar with the term
9  "closed system" under the Controlled
10 Substances Act?
11        MR. DAVISON:  Objection to
12 form.
13        THE WITNESS:  I am not.
14 QUESTIONS BY MR. GOTTO:
15   Q.    Okay.  Are you familiar with
16 the concept under the Controlled Substances
17 Act that controlled substances could only be
18 sold by Mallinckrodt to parties who were
19 registered with the DEA?
20   A.    Yes.
21        MR. DAVISON:  Objection.
22 QUESTIONS BY MR. GOTTO:
23   Q.    Were you familiar with the term
24 "diversion" under the Controlled Substances
25 Act?

Page 103

1         MR. DAVISON:  Objection.
2         THE WITNESS:  Yes.
3  QUESTIONS BY MR. GOTTO:
4    Q.    What did you understand
5  diversion to mean?
6    A.    Anything that was outside of
7  selling directly to a DEA account, DEA
8  authorized account.
9    Q.    Okay.  And did you understand
10 that as a manufacturer of controlled
11 substances Mallinckrodt had an obligation to
12 take steps to avoid diversion of its product?
13        MR. DAVISON:  Objection.
14        THE WITNESS:  Absolutely.
15 QUESTIONS BY MR. GOTTO:
16   Q.    And what steps did you
17 understand Mallinckrodt took in that regard?
18   A.    All necessary steps that DEA
19 required.
20   Q.    Okay.  Do you have -- do you
21 have any particular procedures or policies in
22 mind that Mallinckrodt had in place during
23 your time as a regional or national account
24 manager or director aimed at reducing or
25 avoiding diversion?

Page 104

1         MR. DAVISON:  Objection.
2         THE WITNESS.  Actually, that
3  question would be better posed to
4  Karen Harper or the manager of the --
5  the SOMS team.
6  QUESTIONS BY MR. GOTTO:
7    Q.    Sure.  I'm just asking for your
8  understanding of --
9    A.    Yeah.  Yeah.
10   Q.    You know, just whatever you
11 understood the company to be doing.
12        You understood diversion was a
13 significant consideration with respect to
14 narcotics, right?
15   A.    Absolutely.  Absolutely.
16   Q.    And so I'm just asking for your
17 understanding of what steps the company was
18 taking in that regard.
19   A.    We were very, very strict about
20 who we sold to.  All licenses were checked,
21 many on-site visits, if necessary.  We always
22 tried to make sure that everything was done
23 within the rules and regulations of the DEA
24 and that we followed them precisely.
25   Q.    And you understood that if, in

Page 105

1  fact, narcotics were diverted, that created
2  the potential for misuse or abuse, correct?
3         MR. DAVISON:  Objection to
4  form.
5         THE WITNESS:  Yes, sir.
6  QUESTIONS BY MR. GOTTO:
7    Q.    And that could lead to
8  overdoses and deaths, correct?
9         MR. DAVISON:  Objection.
10        THE WITNESS:  There is a lot of
11 risk associated with it.  I don't know
12 all of them, but it's not a good
13 thing.
14 QUESTIONS BY MR. GOTTO:
15   Q.    And you already made reference
16 to suspicious order monitoring.
17        Did you understand that that
18 was something that was required by the
19 Controlled Substances Act as well?
20        MR. DAVISON:  Objection.
21        THE WITNESS:  I know that we
22 always had it, and I know that we did
23 it.  I don't know that I knew it was a
24 requirement.
25

Page 106

QUESTIONS BY MR. GOTTO:

Q.    Okay.  Did you ever receive any training with respect to Mallinckrodt's suspicious order monitoring program?

A.    Yes.

Q.    What's the nature of the training you can recall?

A.    I'm sure there was group training, and we had several online classes that we took.

Q.    Okay.  And again, were these in-house presentations?

A.    To my knowledge.

Q.    Okay.  And do you recall who conducted those presentations?

A.    I do not know.

Q.    Do you recall approximate frequency of those presentations?

A.    I do not recall.

Q.    What can you recall learning from those presentations with respect to the components of Mallinckrodt's suspicious order monitoring program?

A.    That we only sold to customers who were licensed and that, you know, we

Page 107

never were able to make a decision to sell to somebody on our own.  It was a group effort.  Everything had to be vetted.

Q.    Okay.  And did you understand -- did you have an understanding as to whether each order for a controlled substance was evaluated by Mallinckrodt to determine if it was a suspicious order?

MR. DAVISON:  Objection.

THE WITNESS:  Suspicious order monitoring team monitored them.  I don't know any of the details of that monitoring.

QUESTIONS BY MR. GOTTO:

Q.    And you've already testified that from time to time someone from the SOM team might contact you to get some further information when an order had been identified as potentially suspicious, correct?

A.    Yes, sir.

Q.    Did you have an understanding during the time you were regional or national account manager or director as to the basis on which the SOM team would identify an order as potentially suspicious?

Page 108

A.    My understanding, it was an algorithm and a system that flagged suspicious orders.

Q.    And how did you gain that understanding?

A.    They would call me and tell me that this particular customer, you know, was ordering a quantity that wasn't understandable and they needed to know why.

Q.    Okay.  Did you have an understanding as to whether the algorithm that was employed to identify potentially suspicious orders changed over time?

A.    I'm sure it was constantly changing, but you'd have to ask that team.

Q.    Okay.  You didn't know the details of it?

A.    No.

Q.    Did you have an understanding as to whether the accounts for which -- for whom you had responsibility maintained their own suspicious order monitoring programs?

MR. DAVISON:  Objection to form.

THE WITNESS:  Yes.

Page 109

QUESTIONS BY MR. GOTTO:

Q.    And how did you gain that understanding?

A.    Just in conversation.  We had a responsibility and they had a responsibility, so we did the best we could.

Q.    Okay.  So you understood that your accounts had their own independent suspicious order monitoring responsibility, correct?

A.    It varied by account.

Q.    In terms of what their program consisted of?

A.    Right.

Q.    But you understood they all had some responsibility in that regard?

A.    I understood that.

Q.    And did you make an effort to ascertain with respect to each account what their suspicious order monitoring program consisted of?

A.    No.

Q.    Do you know if anyone else at Mallinckrodt did that?

A.    I know that the suspicious

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 order monitoring team met with customers
2 periodically.
3    Q.    Do you know if they met with
4 each of your accounts?
5    A.    I don't.
6    Q.    Do you recall any occasion on
7 which anyone from the suspicious order
8 monitoring team at Mallinckrodt contacted you
9 and raised any concerns regarding the
10 suspicious order monitoring program of any of
11 your accounts?
12    A.    It happened, yes.
13    Q.    Can you recall any specifics?
14    A.    No, sir.  Other than I
15 mentioned Morris & Dickson earlier.
16    Q.    And so with Morris & Dickson,
17 that was an issue regarding Morris &
18 Dickson's suspicious order monitoring
19 program?
20    A.    No.  It was a suspicious order.
21    Q.    Sure.
22        Okay.  Let me rephrase my
23 question.  Maybe it wasn't clear.
24        I'd like to know if there
25 were -- are there any occasions you can

Page 111

1 recall someone on the SOM team at
2 Mallinckrodt contacting you and saying
3 there's an issue with respect to the
4 suspicious order monitoring program that --
5 at one of your accounts that we'd like you to
6 get some information on?
7        MR. DAVISON:  Objection.
8        THE WITNESS:  That was outside
9    of my area of responsibility.
10 QUESTIONS BY MR. GOTTO:
11    Q.    Okay.  So you don't recall that
12 ever happening?
13    A.    No, sir.
14    Q.    Okay.  Do you recall there ever
15 being an occasion which anyone from the SOM
16 team at Mallinckrodt contacted you and
17 expressed any concern that one of your
18 accounts was engaged in practices that
19 created a risk for diversion?
20        MR. DAVISON:  Objection.
21        THE WITNESS:  I do not recall a
22    situation like that.
23 QUESTIONS BY MR. GOTTO:
24    Q.    Do you recall becoming aware at
25 any point of any particular concerns

Page 112

1 regarding opioid distribution in the state of
2 Florida?
3        MR. DAVISON:  Objection.
4        THE WITNESS:  I did not have
5    any customers in the state of Florida.
6 QUESTIONS BY MR. GOTTO:
7    Q.    Okay.  And so since -- apart
8 from whether you had any customers in the
9 state of Florida, do you recall becoming
10 aware of any concerns at any point regarding
11 opioid distribution in Florida?
12    A.    What was in the press.
13    Q.    Okay.  Do you recall anyone at
14 Mallinckrodt ever raising with you any issues
15 regarding your accounts that pertained to
16 the -- pertained to concerns regarding opioid
17 distribution in Florida?
18        MR. DAVISON:  Objection.
19        THE WITNESS:  No, sir.
20 QUESTIONS BY MR. GOTTO:
21    Q.    Do you recall ever engaging in
22 any steps to evaluate whether any of your
23 accounts were reselling Mallinckrodt opioid
24 products into the state of Florida?
25        MR. DAVISON:  Objection.

Page 113

1        THE WITNESS:  No, sir.
2 QUESTIONS BY MR. GOTTO:
3    Q.    Do you recall anyone at
4 Mallinckrodt ever requesting you to engage in
5 any such analysis?
6    A.    No, sir.
7    Q.    If there had been a concern
8 regarding whether -- strike that.
9        If Mallinckrodt had wished to
10 obtain information regarding the extent to
11 which any of your accounts were reselling
12 Mallinckrodt opioid product into the state of
13 Florida, would you have been the best person
14 to come to to get that information?
15        MR. DAVISON:  Objection to
16    form.
17        THE WITNESS:  No, sir.
18 QUESTIONS BY MR. GOTTO:
19    Q.    Who would have been?
20    A.    I believe it would have been
21 the SOMS team.
22    Q.    The SOMS team would have been
23 in a better position to get the information
24 regarding the activities of your accounts?
25    A.    Because they had the data, the

Page 114

1 algorithm, the program.
2    Q.   Okay.  So if I was at
3 Mallinckrodt and I was trying to ascertain
4 the extent to which one of your wholesaler
5 accounts was reselling into the state of
6 Florida, if I came to you and said, "Can you
7 get that information for me," would you have
8 been in a position to get that?
9         MR. DAVISON:  Objection to
10        form.
11        THE WITNESS:  I probably would
12        have turned to one of the analyst to
13        pull that data.
14 QUESTIONS BY MR. GOTTO:
15    Q.   When you say "the analyst," who
16 would they be?
17    A.    Generally they were under the
18 marketing department, and they had access to
19 more data for analysis.  I could get the
20 data, but I didn't have the time to do it, so
21 an analyst would pull that information.
22    Q.   Okay.  And so that analyst,
23 they would be looking at Mallinckrodt
24 internal information, correct?
25        MR. DAVISON:  Objection.

Page 115

1        THE WITNESS:  I don't know what
2        they looked at, to be honest.
3 QUESTIONS BY MR. GOTTO:
4    Q.   Okay.
5    A.    I don't know what their program
6 gave them access to.
7    Q.   Okay.  So if, for example, in
8 2010 someone at Mallinckrodt had come to you
9 and said -- trying to evaluate the extent to
10 which your wholesaler accounts are reselling
11 into the state of Florida, what would you
12 have done to respond to that request?
13        MR. DAVISON:  Objection to
14        form.
15        THE WITNESS:  I would have
16        probably gone to the marketing manager
17        and asked him which analyst he would
18        recommend and what they were looking
19        for and had them pull that data.
20 QUESTIONS BY MR. GOTTO:
21    Q.   Okay.  Would it have been
22 possible for you to go to your contact at the
23 account to request that information?
24        MR. DAVISON:  Objection.
25        THE WITNESS:  I don't know.

Page 116

1 QUESTIONS BY MR. GOTTO:
2    Q.   Okay.  In any event, no one
3 ever made that sort of request of you --
4    A.   No.
5    Q.   -- back in 2010 or --
6    A.   Not -- not that I recall.
7    Q.   Or at any time; is that
8 correct?
9    A.   Not that I recall.
10    Q.   Do you recall -- from time to
11 time you made mention to press reports --
12    A.   Right.
13    Q.   -- regarding concerns about --
14 about Florida.
15        Do you recall reviewing any
16 such press reports when they were current?
17        MR. DAVISON:  Objection.
18        THE WITNESS:  No.
19 QUESTIONS BY MR. GOTTO:
20    Q.   Okay.  What can you recall in
21 that regard?
22    A.    Whatever was relevant at the
23 time, if I had time, I would read it.
24        (Mallinckrodt-New Exhibit 3
25        marked for identification.)

Page 117

1 QUESTIONS BY MR. GOTTO:
2    Q.   Let me hand you what we've
3 marked as Exhibit 3, which is a two-page
4 document beginning at Bates
5 MNK-T1_0000264194.  It appears to be an
6 e-mail from Karen Harper to a number of
7 persons, including yourself, forwarding a
8 November 20, 2009 press account bearing the
9 headline "Grand Jury Wants to Crack Down on
10 Pill Mills."
11        Take a minute to look at that
12 document, if you would, and tell me if you
13 recognize.
14    A.    Is there a particular section
15 that you want me to read or...
16    Q.    I have some questions for you
17 on two or three of the paragraphs, but you
18 can just tell me if you recognize it
19 initially, that would be a good starting
20 place.
21    A.    I don't recall this specific
22 document, but I'm sure I was copied at the
23 time.
24    Q.   Okay.  And so if -- in this
25 time frame, 2009, if you received an e-mail

Page 118

1  like this from Karen Harper forwarding a
2  press account, would you have read it?
3      MR. DAVISON:  Objection.
4      THE WITNESS:  I would have done
5  my best to read it.
6  QUESTIONS BY MR. GOTTO:
7      Q.    Okay.  And Ms. Harper's role at
8  Mallinckrodt at this time was what, to your
9  knowledge?
10     A.    It's not on this document.
11 She's always been in the compliance
12 department, but I don't know her title.
13     Q.    Okay.  So the article, the
14 first paragraph of it says, "Broward County
15 has become known as the pill mill capital of
16 the United States."
17     Do you recall back in this time
18 frame, 2009, hearing this term "pill mill"?
19     A.    Yes.
20     Q.    And what did you understand a
21 pill mill to be?
22     A.    It was a place distributing
23 product in a way that wasn't maybe in
24 compliance with the DEA.
25     Q.    Okay.  And if you look at the

Page 119

1  last paragraph on the first page of
2  Exhibit 3, it says, "Oftentimes people come
3  from outside Florida to pain clinics because
4  it's so easy to obtain prescription drugs.
5  Those people then take the pills back to
6  their home states and sell the drugs for
7  inflated sums on the black market."
8      Do you see that?
9      A.    Yes, sir.
10     Q.    And do you recall being
11 familiar with that circumstance back in 2009?
12     MR. DAVISON:  Objection.
13     THE WITNESS:  Yes, sir.
14 QUESTIONS BY MR. GOTTO:
15     Q.    And on the next page of the
16 exhibit, the third paragraph down from the
17 top that begins with "according to the
18 report," do you see that?
19     A.    It begins where?
20     Q.    "According to the report."
21     A.    Yes.
22     Q.    Okay.  It says, "According to
23 the report, in the past two years the number
24 of pain clinics in south Florida mushroomed
25 from four to 176, dumping 9 million dose

Page 120

1  units of oxycodone in our community every six
2  months.  Although the pain clinics originated
3  in Broward County, they have spread north
4  quickly throughout the rest of Florida,
5  particularly in the major metropolitan
6  areas."
7      Did I read that correctly?
8      A.    Yes, sir.
9      Q.    And do you recall being aware
10 of that circumstance back in 2009, namely the
11 increase in the number of pain clinics in
12 south Florida and spreading throughout the
13 state of Florida?
14     MR. DAVISON:  Objection.
15     THE WITNESS:  I remember it in
16 general.  I don't remember the
17 specifics.
18 QUESTIONS BY MR. GOTTO:
19     Q.    Okay.  And so this article is
20 dated in November of 2009.
21     Do you recall being aware
22 generally of the subject matter that's
23 addressed in this article, namely the pill
24 mill phenomenon in Florida and the expansion
25 in opioid distribution in Florida prior to

Page 121

1  this article in late 2009?
2      MR. DAVISON:  Objection to
3  form.
4      THE WITNESS:  Yes, I'm familiar
5  with it, but not with all the details.
6  QUESTIONS BY MR. GOTTO:
7      Q.    Sure.
8      Did you have an understanding
9  back in 2009 as to whether the opioids that
10 were distributed through pill mills in
11 Florida included any opioids that were
12 manufactured by Mallinckrodt?
13     MR. DAVISON:  Objection.
14     THE WITNESS:  I don't recall.
15 QUESTIONS BY MR. GOTTO:
16     Q.    Okay.  Do you recall in 2009 --
17 well, strike that.
18     So Ms. Harper forwarded this
19 article to a number of folks.  Let's take a
20 look at who they were.  John Adams, I think
21 you indicated, may have been the person you
22 reported to at this time, correct?
23     A.    Correct.
24     Q.    Robert Lesnak, do you recall
25 who he was?

Page 122

1    A.    He was in charge of the
2  addiction treatment group.
3    Q.    Okay.  Tim Berry, do you recall
4  who he was?
5    A.    He was an account manager.  Not
6  sure of the title.
7    Q.    Okay.  Yourself.
8        Dave Irwin?
9    A.    Yes.
10   Q.    Do you recall who he was?
11   A.    Account manager.
12   Q.    Okay.  Steven Becker, he was
13 national account manager, correct?
14   A.    Right.
15   Q.    As was Victor Borelli, correct?
16   A.    Correct.
17   Q.    Do you have an understanding as
18 to why Ms. Harper forwarded this article to
19 this group?
20        MR. DAVISON:  Objection.
21        THE WITNESS:  I guess you'd
22    have to ask her that question.
23 QUESTIONS BY MR. GOTTO:
24   Q.    Okay.  So when you would have
25 received this back in November of 2009, would

Page 123

1  you have had an understanding as to whether
2  reviewing this article and being familiar
3  with the circumstances that are described in
4  this article were part of your job
5  responsibility?
6        MR. DAVISON:  Objection to
7    form.
8        THE WITNESS:  I needed to be
9    aware of what was going in the market,
10    and I'm sure she -- for that -- it was
11    relevant, and she sent it for that
12    reason.
13 QUESTIONS BY MR. GOTTO:
14   Q.    Okay.  So being aware of what
15 was going in the market in the context of the
16 circumstances that are described in this
17 article --
18   A.    Right.
19   Q.    -- why did you need to be aware
20 of that for your job as a national account
21 manager?
22        MR. DAVISON:  Objection.
23        THE WITNESS:  Because it was
24    relevant at the time.
25

Page 124

1  QUESTIONS BY MR. GOTTO:
2    Q.    And relevant to what aspect of
3  your job?
4    A.    It was to create awareness so
5  that we knew what was going on.
6    Q.    So in this time frame of late
7  2009, were there any steps you took in your
8  day-to-day job as a national account manager
9  that were influenced in any way by your
10 knowledge of the circumstances of opioid
11 distribution in Florida that are described in
12 this article?
13        MR. DAVISON:  Objection to
14    form.
15        THE WITNESS:  Due diligence.
16    Just make sure your account is
17    diligent and in compliance --
18 QUESTIONS BY MR. GOTTO:
19   Q.    Okay.
20   A.    -- with the law.
21   Q.    Okay.  And so what did you do
22 in regards to due diligence in that -- in
23 this time frame?
24   A.    I knew my accounts, I was aware
25 of my accounts, and I had no concerns.  And

Page 125

1  if I did, I brought them to upper
2  management's attention.
3    Q.    Okay.  So in this time frame --
4  and when I say "this time frame," I mean late
5  2009.
6    A.    Right.
7    Q.    Were there any accounts that
8  you had as to whom you had any concerns
9  regarding Florida opioid distribution that
10 you brought to upper management?
11   A.    No.
12   Q.    Okay.  In this late 2009 time
13 frame, were there any steps you took to
14 attempt to ascertain whether any of your
15 accounts were reselling Mallinckrodt opioid
16 products into the state of Florida?
17        MR. DAVISON:  Objection to
18    form.
19        THE WITNESS:  I didn't have
20    access to that data to know that.
21 QUESTIONS BY MR. GOTTO:
22   Q.    Okay.  So you didn't take any
23 steps to ascertain whether any of your
24 accounts were selling Mallinckrodt --
25   A.    I do not recall if I did or did

Page 126

1 not.
2          (Mallinckrodt-New Exhibit 4
3     marked for identification.)
4 QUESTIONS BY MR. GOTTO:
5     Q.    Okay.  Ms. New, we just marked
6 as Exhibit 4 a two-page document beginning at
7 Bates MNK-T1_0004888161.  It appears to be an
8 e-mail from you dated June 16, 2011,
9 forwarding a press article.
10          Take a look at that and tell me
11 if you recognize that document.
12     A.    Only in the fact that I signed
13 it.
14     Q.    Okay.  So it's an article that
15 you forwarded to a number of folks.  Let's
16 look at the folks you sent it to in terms of
17 people we haven't previously talked about
18 here today.
19          There's a Lisa Lundergan.  Who
20 is that?
21     A.    Lisa Cardetti.
22     Q.    Okay.
23     A.    That was her maiden name.
24     Q.    Okay.  And Ginger Collier was
25 the marketing director for generics, correct?

Page 127

1     A.    Correct.
2     Q.    How about Penny Myers?  Who was
3 that?
4     A.    Penny Myers was in marketing.
5     Q.    Okay.  How about Natalie
6 Kayich?
7     A.    She also was marketing.
8     Q.    And how about Jennifer
9 Bullerdick?
10     A.    She was marketing product
11 manager.
12     Q.    And copied to Michael Gunning.
13 Who was he?
14     A.    He was the general manager.  He
15 probably had another title, but...
16     Q.    Okay.  And the article is from
17 the St. Louis Post Dispatch entitled "New
18 OxyContin Form is Said to Curb Abuse,"
19 correct?
20     A.    Correct.
21     Q.    And in the body of your e-mail
22 you say, "Interesting read.  I think it
23 supports our suspicions in regard to the
24 increased usage of the oxy 30-milligram,"
25 correct?

Page 128

1     A.    Correct.
2     Q.    What did you mean by that?
3     A.    I don't know.
4     Q.    Okay.  Well, in the article
5 itself, the article is talking about a new
6 form of OxyContin.
7          Now, OxyContin was not a
8 Mallinckrodt product, correct?
9     A.    Correct.
10     Q.    And the first paragraph
11 indicates that the reformulated OxyContin
12 pills are harder to crush, turning into a
13 gummy substance that can't easily be snorted,
14 injected or chewed, correct?
15     A.    Correct.
16     Q.    And then in the one, two,
17 three, fourth paragraph, the one that starts
18 with "a powerful narcotic," do you see that?
19     A.    Yes, sir.
20     Q.    And that paragraph says, "A
21 powerful narcotic meant for cancer patients
22 and others with pain, OxyContin is designed
23 to slowly release its active ingredient,
24 oxycodone, over 12 hours.  But after it was
25 introduced in 1996, drug abusers quickly

Page 129

1 discovered that chewing an OxyContin tablet
2 or crushing one and snorting the powder or
3 injecting it with a needle produced an
4 instant high as powerful as heroin."
5          Did I read that correctly?
6     A.    Yes, sir.
7     Q.    Okay.  The next paragraph
8 states that, "Purdue Pharma, the maker of
9 OxyContin, may have succeeded in reducing
10 illicit demand for its reformulated drug, but
11 in several dozen interviews over the last few
12 months, drug abuse experts, law enforcement
13 officials and addicts said the reformulation
14 had only driven up interest for other
15 narcotics."
16          Did I read that correctly?
17     A.    Yes, sir.
18     Q.    And then the next paragraph
19 says, "Demand appears especially high for
20 pure oxycodone that come in 30-milligram
21 pills."
22          Now, Mallinckrodt manufactured
23 pure oxycodone in 30-milligram pills at this
24 time, correct?
25     A.    Yes, sir.

Page 130

1       MR. DAVISON: Objection to
2 form.
3 QUESTIONS BY MR. GOTTO:
4    Q.   It goes on to say, "Opana, a
5 time-release painkiller similar to OxyContin,
6 that's been on market for five years is
7 showing up increasingly in police reports and
8 has been blamed for a rash of overdose
9 deaths, and heroin use has jumped sharply in
10 many regions."
11       Did I read that correctly?
12    A.   Yes, sir.
13    Q.   So in your cover e-mail, when
14 you make reference to "I think it supports
15 our suspicions in regards to increased usage
16 of the oxy 30-milligram," were you referring
17 to the sentence in the article that I read a
18 moment ago regarding "demand appears
19 especially high for pure oxycodone that come
20 in 30-milligram pills"?
21       MR. DAVISON: Objection to
22 form.
23       THE WITNESS: I can't answer
24 that question. I don't recall.
25

Page 131

1 QUESTIONS BY MR. GOTTO:
2    Q.   You don't recall. Okay.
3       Do you recall in this time
4 frame of mid-2011 that there was an increased
5 usage in oxy 30 milligrams?
6    A.   I can't answer that either.
7    Q.   Okay.
8    A.   I don't know.
9    Q.   It appears to be what you're
10 referring to in your e-mail, correct?
11       MR. DAVISON: Objection to
12 form.
13       THE WITNESS: Yes.
14 QUESTIONS BY MR. GOTTO:
15    Q.   Okay. And in your e-mail, you
16 make reference to "supports our suspicions."
17       Do you recall what those
18 suspicions were?
19       MR. DAVISON: Objection to
20 form. Misstates her --
21       THE WITNESS: I do not.
22 QUESTIONS BY MR. GOTTO:
23    Q.   Do you recall, when you used
24 the plural pronoun "our" in that sentence,
25 who you were referring to?

Page 132

1       MR. DAVISON: Objection.
2       THE WITNESS: It could be based
3 on a meeting or a conversation that
4 was relevant at that time.
5 QUESTIONS BY MR. GOTTO:
6    Q.   Now, you didn't copy anyone in
7 the compliance department on your e-mail,
8 correct?
9    A.   That's correct.
10    Q.   Is there a reason for that?
11       MR. DAVISON: Objection.
12       THE WITNESS: I don't know. I
13 could have also sent it in another
14 e-mail. I don't know.
15 QUESTIONS BY MR. GOTTO:
16    Q.   Okay. Do you recall --
17 independent of this e-mail and article, do
18 you recall any discussions, either personal
19 discussions or e-mail exchanges, at
20 Mallinckrodt that you were a party to in the
21 mid-2011 time frame or before that discussed
22 increased usage of oxy 30-milligram tablets
23 and any potential explanations for that?
24       MR. DAVISON: Objection.
25       THE WITNESS: I cannot recall

Page 133

1 anything specific about this.
2 QUESTIONS BY MR. GOTTO:
3    Q.   Okay. Do you recall at any
4 time providing any information to any of your
5 accounts that you're responsible for with
6 respect to -- well, strike that.
7       Do you recall if you forwarded
8 this article that's included in Exhibit 4 to
9 any of the accounts you had responsibility
10 for?
11    A.   I cannot recall that.
12    Q.   Okay. Do you recall at any
13 time communicating with any of your accounts
14 in any regard with -- in the mid-2011 or
15 previous time frame with respect to increased
16 usage of oxy 30 milligrams and any potential
17 explanations for that?
18       MR. DAVISON: Objection.
19       THE WITNESS: I cannot recall
20 any specific conversations.
21 QUESTIONS BY MR. GOTTO:
22    Q.   Do you recall receiving any
23 response from any of the folks you sent this
24 e-mail to with respect to the subject matter?
25    A.   No, sir.

1 Q. Do you recall participating in
2 any meeting among any of the folks that you
3 received -- that you sent this e-mail to and
4 yourself at which the subject of this article
5 was addressed?
6 A. No, sir.
7 Q. Okay. You can set that aside.
8 MR. DAVISON: We've been going
9 a little over an hour. Do you want to
10 take a quick break?
11 MR. GOTTO: Sure.
12 VIDEOGRAPHER: We're going off
13 the record at 11:49 a.m.
14 (Off the record at 11:49 a.m.)
15 VIDEOGRAPHER: We are back on
16 the record at 12:04 p.m.
17 (Mallinckrodt-New Exhibit 5
18 marked for identification.)
19 QUESTIONS BY MR. GOTTO:
20 Q. Ms. New, we've marked as
21 Exhibit 5 a multipage document beginning at
22 Bates MNK-T1_0006283056. It appears to be an
23 e-mail thread forwarding certain press
24 accounts.
25 Would you take a minute to look

1 at that document and tell me if you recognize
2 it.
3 And while it attaches a series
4 of press accounts, I have questions for you
5 only on the first one, the one that's at the
6 bottom of the first page of Exhibit 5
7 carrying over to the top of the second page
8 of Exhibit 5.
9 A. Are you speaking specifically
10 to where "United States and industry news" --
11 there?
12 Q. Yes. Yes. The Albany,
13 New York, dateline.
14 A. Okay.
15 Q. That one particular clipping.
16 A. Okay.
17 Q. Okay. Do you recognize those
18 e-mails or that press clipping?
19 A. No.
20 Q. Okay. So the -- in the middle
21 of the first page of Exhibit 5, there's an
22 e-mail from a Timothy Berry.
23 Do you know who he is?
24 A. He was a former Mallinckrodt
25 account manager.

1 Q. Okay. And he was apparently at
2 Apotex.
3 What was Apotex, if you know?
4 A. One of our competitors.
5 Q. Okay. And he forwarded the
6 press clipping saying, "I thought that you
7 guys might be interested in the first story."
8 And in addition to yourself and
9 Mr. Borelli and Mr. Becker, he forwarded it
10 to Peter Romer.
11 Who was Mr. Romer?
12 A. Romer -- Pete Romer was also a
13 national account manager at one time.
14 Q. Okay. For Mallinckrodt?
15 A. Correct.
16 Q. Yeah.
17 And so the first article, the
18 first story that he's talking about, is the
19 Albany, New York, dateline that's at the
20 bottom of page 1 that says, "Following fatal
21 shootings in two New York pharmacy robberies,
22 a US Senator is warning that a new batch of
23 super painkillers now under review could
24 force repeats of various violent robberies
25 that left six people dead."

1 Do you see that?
2 A. Yes, sir.
3 Q. And if you turn to the second
4 page of the exhibit, from the top of that
5 second page if you go down one, two, three,
6 four, five, six lines, there's a line that
7 starts with "experts say."
8 Do you see that?
9 A. Yes.
10 Q. And it says, "Experts say
11 painkiller addiction has been driven partly
12 by a loophole in the 1970 Controlled
13 Substances Act that classified pure
14 hydrocodone, a super painkiller, as a
15 strictly controlled Schedule II drug. But
16 the law put combination products such as
17 pills containing hydrocodone and
18 acetaminophen into the less strict
19 Schedule III."
20 Did I read that correctly?
21 A. Yes, sir.
22 Q. And you recall being familiar
23 with that circumstance as described in those
24 sentences at this time regarding hydrocodone
25 and hydrocodone combination drugs?

Page 138

1   MR. DAVISON:  Objection to the
2   form.
3   THE WITNESS:  I do not --
4   QUESTIONS BY MR. GOTTO:
5   Q.    Okay.
6   A.    -- recall this.
7   Q.    Do you recall at any time being
8   aware of initiatives to reschedule
9   hydrocodone combination products as
10  Schedule II?
11  A.    Yes, sir.
12  Q.    And what do you recall in that
13  regard?
14  A.    That it was reclassified in
15  October, November time frame of a year.
16  Q.    Okay.
17  A.    And it was changed from a
18  Class II drug to a class -- from a Class III
19  to a Class II drug.
20  Q.    Okay.  And do you recall
21  Mallinckrodt resisting those proposed changes
22  when they were made?
23  MR. DAVISON:  Objection to the
24  form.
25  THE WITNESS:  I do not recall

Page 139

1   that.
2   QUESTIONS BY MR. GOTTO:
3   Q.    Okay.  If you turn back to the
4   first page of Exhibit 5, your e-mail at the
5   top of the first page, second paragraph says,
6   "They keep talking about this, but if things
7   continue as they are with all the bad press,
8   we may see the category change to C-II.
9   Keeps us on our toes, doesn't it?"
10  And so the category change to
11  C-II, that's the schedule under the
12  Controlled Substances Act, correct?
13  MR. DAVISON:  Objection.
14  THE WITNESS:  Right.
15  QUESTIONS BY MR. GOTTO:
16  Q.    And do you recall what you were
17  referring to there that may be recategorized
18  as a C-II?
19  A.    There was talk in the industry
20  of this change for several years.  That's all
21  I recall.
22  Q.    I see.
23  Of the hydrocodone combination
24  drugs?
25  A.    Right.

Page 140

1   Q.    And you said, "Keeps us on our
2   toes, doesn't it?"  What did you mean by that
3   in this context?
4   A.    I don't know.
5   Q.    Okay.  You can set that aside.
6   (Mallinckrodt-New Exhibit 6
7   marked for identification.)
8   QUESTIONS BY MR. GOTTO:
9   Q.    We've marked as Exhibit 6 a
10  multipage document beginning at Bates
11  MNK-T1_0004878533.  It's a series of e-mails
12  forwarding an article regarding Cardinal
13  Health.
14  If you'd take a moment to look
15  at that, the e-mail and the article, tell me
16  if you recognize those.
17  A.    I do not.
18  Q.    Okay.  And at this time, which
19  is May of 2012, was Cardinal an account of
20  yours?
21  A.    No, sir.
22  Q.    Okay.  Do you know who -- whose
23  account it was?
24  A.    I'm not for sure.
25  Q.    Okay.  If you -- so the

Page 141

1   Exhibit 6 begins with an e-mail from -- well,
2   the top of the page is an e-mail from Jane
3   Williams to a number of folks, including
4   yourself.  Looks like the national account
5   managers, correct?
6   A.    Yes, sir.
7   Q.    And she says, "FYI, interesting
8   read."  Correct?
9   A.    Correct.
10  Q.    And she's forwarding an e-mail
11  from Stephen Littlejohn.
12  Do you know who that -- who
13  Stephen Littlejohn was?
14  A.    I do not.
15  Q.    Okay.  Do you know if he was a
16  Mallinckrodt person?
17  A.    I do not know that.
18  Q.    Okay.  In any event, the
19  article is an article concerning -- well, the
20  headline is "Cardinal Health set for DEA
21  showdown over pain pill sales," correct?
22  A.    Correct.
23  Q.    And dated May 10th of 2012.
24  If you look at the one, two,
25  three, four, fifth paragraph, that begins

Page 142

1  with "In February."
2        Do you see that?
3     A.    Yes, sir.
4     Q.    And it says, "In February, the
5  DEA suspended Cardinal's license to ship
6  controlled substances from the Lakeland,
7  Florida facility, which supplies 2,500
8  pharmacies.  The agency allowed" -- I'm
9  sorry, "The agency alleged the company hadn't
10 made sure the drugs went only to legitimate
11 patients and ordered Cardinal to explain why
12 the suspension shouldn't be made permanent."
13       Did I read that correctly?
14    A.    Yes, sir.
15    Q.    Do you recall being aware of
16 this circumstance, namely the suspension of
17 Cardinal back in May of 2012?
18       MR. DAVISON:  Objection to
19 form.
20       THE WITNESS:  I'm not sure.
21 QUESTIONS BY MR. GOTTO:
22    Q.    Okay.  If you turn to the
23 second page of the exhibit, the second
24 paragraph that begins "In the DEA's view."
25       Do you see that?

Page 143

1     A.    Yes, sir.
2     Q.    The second sentence of that
3  paragraph says, "It was also a recidivist.
4  Cardinal settled similar allegations in 2008
5  for $34 million" --
6     A.    Wait a minute.  I lost you.
7  Sorry.
8     Q.    I'm sorry.  Sure.  The --
9     A.    It's "In the DEA's view"?
10    Q.    Yes, the second --
11    A.    Okay.
12    Q.    Second line over toward the
13 right.  "It was also a recidivist."
14       Do you see that?
15    A.    I'm not seeing it.
16    Q.    Second line of that paragraph.
17    A.    Oh, okay.  Yes.
18    Q.    "It was also a recidivist.
19 Cardinal settled similar allegations in 2008
20 for $34 million, then the largest fine under
21 the Controlled Substances Act."
22       Do you see that?
23    A.    Yes, sir.
24    Q.    Do you recall being aware in
25 2012 or before that Cardinal had paid a

Page 144

1  $34 million fine in settlement with the DEA
2  in 2008?
3        MS. FIX MEYER:  Objection.
4  Form.  Foundation.
5        THE WITNESS:  I can't say that
6  I did.
7  QUESTIONS BY MR. GOTTO:
8     Q.    Okay.  If you look toward the
9  bottom of the second page of the exhibit,
10 there's a heading "Epicenter of Abuse."
11       Do you see that?  About nine
12 lines up from the bottom.
13    A.    At -- restate that, please.
14    Q.    The heading is "Epicenter of
15 Abuse."
16    A.    Am I on the right page?
17       MR. DAVISON:  Yeah, it's three
18 paragraphs up.  Right there.
19       THE WITNESS:  Oh, yes.
20 QUESTIONS BY MR. GOTTO:
21    Q.    Okay.  So under that heading --
22    A.    I'm sorry.
23    Q.    -- the text reads, "In Florida,
24 identified by the DEA as the epicenter of
25 illegal use of painkillers, more than 4,000

Page 145

1  people died in 2010 from overdoses associated
2  with oxycodone, methadone, hydrocodone,
3  morphine and benzodiazepines, according to
4  data from the Florida Medical Examiner's
5  Office cited in court documents.  The same
6  year Florida's Surgeon General reported that
7  98 of the 100 doctors dispensing the most
8  oxycodone in the US were located in this
9  state."
10       Do you see that?
11    A.    Yes, sir.
12    Q.    Do you recall being aware of
13 the circumstance described in the last
14 sentence of that paragraph, namely the 98 of
15 the 100 doctors identified by the Florida
16 Surgeon General back in 2012?
17       MR. DAVISON:  Objection to
18 form.
19       THE WITNESS:  I don't recall
20 the specific details or numbers.
21 QUESTIONS BY MR. GOTTO:
22    Q.    Okay.  The next paragraph
23 states that "a prescription of 180 pills of
24 30 milligrams of oxycodone without health
25 insurance retails for about $260.  On the

Page 146

1 street, each pill fetches as much as $30,
2 according to the DEA. Pills bought in
3 Florida are illegally sold along the East
4 Coast and in the Midwest, the DEA reports."
5     Do you see that?
6     A.    Yes, sir.
7     Q.    Do you recall being aware in
8 2012 of the circumstance described in the
9 last sentence of that paragraph, namely that
10 pills bought in Florida were illegally sold
11 along the East Coast and in the Midwest?
12     MR. DAVISON: Objection to
13     form.
14     THE WITNESS: I cannot
15     specifically remember that, no.
16 QUESTIONS BY MR. GOTTO:
17     Q.    Do you recall becoming aware of
18 that circumstance at some point?
19     MR. DAVISON: Objection.
20     THE WITNESS: Yes, sir.
21 QUESTIONS BY MR. GOTTO:
22     Q.    You don't know when though?
23     A.    No, sir.
24     Q.    Do you recall -- apart from
25 this article and the other press clippings

Page 147

1 we've looked at here today, do you recall
2 receiving from anyone else at Mallinckrodt in
3 the 2012 or prior time frame any
4 communications regarding the phenomenon that
5 pills sold in Florida were illegally sold
6 outside of the state of Florida, or resold
7 outside the state of Florida?
8     MR. DAVISON: Objection.
9     THE WITNESS: I cannot recall
10     specifically, sir.
11 QUESTIONS BY MR. GOTTO:
12     Q.    Now, the paragraph that we were
13 just looking at the bottom of the second
14 page of Exhibit 6, it says that "a
15 prescription of 180 pills of 30 milligrams of
16 oxycodone without health insurance retails
17 for about $260," correct?
18     A.    Yes, sir.
19     Q.    And that was a product that
20 Mallinckrodt sold, right, oxycodone
21 30-milligram tablets?
22     A.    Yes, sir.
23     Q.    Do you recall the approximate
24 price that Mallinckrodt at this time was
25 selling oxycodone 30-milligram tablets for?

Page 148

1     MR. DAVISON: Objection.
2     THE WITNESS: No idea.
3 QUESTIONS BY MR. GOTTO:
4     Q.    Of the accounts that you had
5 responsibility for in the 2012 time frame,
6 did all of those accounts purchase oxycodone
7 30-milligram tablets from Mallinckrodt?
8     MR. DAVISON: Objection.
9     THE WITNESS: I don't recall.
10 QUESTIONS BY MR. GOTTO:
11     Q.    Do you recall any accounts that
12 did not?
13     A.    No.
14     MR. DAVISON: Objection.
15     THE WITNESS: I do not.
16 QUESTIONS BY MR. GOTTO:
17     Q.    Okay. And without confining it
18 to the 2012 time frame, at any point that you
19 were regional or national account manager or
20 director, do you recall any of the accounts
21 that you had responsibility for not
22 purchasing oxycodone 30-milligram tablets
23 from Mallinckrodt?
24     MR. DAVISON: Objection.
25     THE WITNESS: I can't say yes

Page 149

1 or no. I don't know. I don't recall.
2 QUESTIONS BY MR. GOTTO:
3     Q.    Okay. In the 2012 time frame,
4 again, among the accounts that you had
5 responsibility for, where would oxycodone
6 30-milligram tablets rank in terms of sales
7 volume from Mallinckrodt to your accounts as
8 compared to other Mallinckrodt products?
9     MR. DAVISON: Objection.
10     THE WITNESS: I can't speak to
11     that, sir. It varied.
12 QUESTIONS BY MR. GOTTO:
13     Q.    Do you know if there were other
14 Mallinckrodt products that outsold oxy 30
15 milligram to any of the accounts for which
16 you had responsibility in 2012?
17     MR. DAVISON: Objection.
18     THE WITNESS: I don't know the
19     answer to that.
20 QUESTIONS BY MR. GOTTO:
21     Q.    Is that something that -- well,
22 strike that.
23     In the 2012 time frame -- well,
24 strike that.
25     At any time as a national

Page 150

1  account manager, did you have a practice of
2  evaluating in any way the relative volume of
3  different Mallinckrodt products that were
4  purchased by your accounts?
5       MR. DAVISON: Objection.
6       THE WITNESS: Restate that.
7  QUESTIONS BY MR. GOTTO:
8       Q.   Sure.
9       So as a national account
10 manager, did you have a practice of
11 evaluating the relative volume of different
12 Mallinckrodt products that were purchased by
13 your various accounts?
14      MR. DAVISON: Objection.
15      THE WITNESS: In doing contract
16 compliance, I would measure their
17 compliance to the contract based on
18 the volumes that they provided.
19 QUESTIONS BY MR. GOTTO:
20      Q.   Okay. So in a contract with a
21 given account, there would be a projected
22 volume of the various Mallinckrodt products
23 that they would be buying, correct?
24      A.   Correct.
25      Q.   And then you monitored that

Page 151

1  over time in an effort to, I think, drive
2  compliance, was the term I saw earlier today.
3       A.   Right.
4       Q.   So among your various
5  accounts -- let's talk about Kroger, for
6  example, just as an example.
7       Oxycodone 30-milligram tablets,
8  in terms of their projected demand, where did
9  that product rank relative to the other
10 products that they projected demand from
11 Mallinckrodt?
12      MR. DAVISON: Objection to
13 form.
14      THE WITNESS: I cannot speak to
15 ranking specific products because
16 contracts changed continuously.
17 QUESTIONS BY MR. GOTTO:
18      Q.   Do you recall in general what
19 you viewed to be the highest volume products
20 that Mallinckrodt -- the highest volume
21 controlled substance products that
22 Mallinckrodt was selling to your accounts?
23      MR. DAVISON: Objection to
24 form.
25      THE WITNESS: Again, not

Page 152

1  specifically. It depended on
2  contracts and customer.
3  QUESTIONS BY MR. GOTTO:
4       Q.   Okay. Is it possible that for
5  given customers it would have been oxycodone
6  30-milligram tablets?
7       MR. DAVISON: Objection.
8       THE WITNESS: I can't answer
9  that.
10 QUESTIONS BY MR. GOTTO:
11      Q.   So as you sit here today, you
12 don't -- you don't -- you can't rule that
13 out?
14      MR. DAVISON: Objection.
15      THE WITNESS: I can't answer
16 it, truthfully.
17 QUESTIONS BY MR. GOTTO:
18      Q.   Okay. You can set that one
19 aside.
20      (Mallinckrodt-New Exhibit 7
21 marked for identification.)
22 QUESTIONS BY MR. GOTTO:
23      Q.   We've marked as Exhibit 7 a
24 two-page document beginning at Bates
25 MNK-T1_0004155440. It appears to be an

Page 153

1  e-mail from Ms. Williams to yourself and
2  others forwarding a Bloomberg Businessweek
3  press account.
4       Take a moment to look at that
5  and tell me if you recognize that document.
6       A.   Yes, sir.
7       Q.   Do you recognize the document?
8       A.   No.
9       Q.   Okay. So Ms. Williams' e-mail
10 is to the national account managers, plus a
11 carbon copy to Ms. Cardetti, correct?
12      A.   Correct.
13      Q.   And she's forwarding an e-mail
14 from Stephen Littlejohn to a large number of
15 persons.
16      I think you already testified
17 you don't know who Mr. Littlejohn was,
18 correct?
19      A.   No.
20      Q.   Could you look at the persons
21 to whom Mr. Littlejohn's e-mail is sent.
22 Tell me if you -- if you recognize any of
23 those names as being any part of
24 Mallinckrodt's compliance department.
25      A.   Yes.

Page 154

1 Q. Who do you recognize?

2 A. John Gillies, Donald Lohman,

3 likely Brian Elsbernd, Stu Kim potentially.

4 Q. Okay.

5 A. Everybody's positions moved

6 around sometimes, so...

7 Q. Okay. So the article is a

8 Bloomberg Businessweek piece that reports on

9 two CVS stores being barred from selling

10 controlled substances, correct?

11 A. Correct.

12 Q. Do you have an understanding as

13 to why Ms. Williams forwarded this article to

14 yourself and the other account managers?

15 A. No.

16 Q. Okay. CVS wasn't an account of

17 yours at this time, correct?

18 A. That is correct.

19 Q. Do you know whose account it

20 was?

21 A. No, I don't recall.

22 Q. Okay. And if you look at the

23 second page of the exhibit, the third

24 paragraph -- well, let's see.

25 So do you see that in the

Page 155

1 middle of the text, the words "eight times"?

2 A. Yes, sir.

3 Q. Okay. So right below that it

4 says, "Cardinal, based in Dublin, Ohio, last

5 week" -- I'm sorry -- "last year supplied

6 enough oxycodone to the two CVS pharmacies in

7 Sanford to supply a population eight times

8 the city's size, according to the US. The

9 DEA alleged in court filings that Cardinal

10 didn't question the orders or heed warnings

11 to conduct on-site audits."

12 Do you see that?

13 A. Yes, sir.

14 Q. Do you recall being aware of

15 that circumstance back in 2012 that's

16 reported in this article?

17 MR. DAVISON: Objection to

18 form.

19 THE WITNESS: Not specifically.

20 QUESTIONS BY MR. GOTTO:

21 Q. Okay. The following paragraph

22 says, "About 5 million Americans use

23 painkillers such as oxycodone, hydrocodone

24 and oxymorphone for nonmedical purposes,

25 according to the Government's 2010 national

Page 156

1 survey on drug use and health."

2 Do you see that?

3 A. Yes, sir.

4 Q. Do you recall being aware of

5 that circumstance back in 2012 or before?

6 MR. DAVISON: Objection to

7 form.

8 THE WITNESS: No, sir, I do

9 not.

10 QUESTIONS BY MR. GOTTO:

11 Q. Okay. And so oxycodone, of

12 course, that was a product that Mallinckrodt

13 manufactured, correct?

14 A. That's correct.

15 MR. DAVISON: Objection.

16 QUESTIONS BY MR. GOTTO:

17 Q. As was hydrocodone, correct?

18 A. Correct.

19 Q. How about oxymorphone?

20 A. It was a product in our

21 portfolio. I do not remember the time frame.

22 Q. Okay. Do you recall back in

23 2012 or before having any concerns personally

24 with respect to which -- with respect to the

25 extent to which Americans were using

Page 157

1 painkillers such as oxycodone, hydrocodone or

2 oxymorphone for nonmedical purposes?

3 MR. DAVISON: Objection.

4 THE WITNESS: Can you please

5 restate that question?

6 QUESTIONS BY MR. GOTTO:

7 Q. Yes.

8 A. It was confusing.

9 Q. Sure.

10 Do you recall in this time

11 frame, 2012 or before, having any personal

12 concerns regarding the extent to which

13 Americans were using painkillers such as

14 oxycodone, hydrocodone and oxymorphone for

15 nonmedical purposes?

16 MR. DAVISON: Objection.

17 THE WITNESS: No.

18 QUESTIONS BY MR. GOTTO:

19 Q. The next paragraph in the

20 article says, "A baby is born every hour in

21 the US addicted to prescription painkillers,

22 according to a study published April 30 in

23 the Journal of the American Medical

24 Association."

25 Do you recall being aware of

Page 158

1  that statistic back in 2012 regarding
2  painkiller-addicted babies?
3        MR. DAVISON:  Objection.
4        THE WITNESS:  No, sir.
5  QUESTIONS BY MR. GOTTO:
6     Q.   Okay.  You can set that aside.
7        (Mallinckrodt-New Exhibit 8
8     marked for identification.)
9  QUESTIONS BY MR. GOTTO:
10    Q.    We've marked as Exhibit 8 a
11 multipage document beginning at Bates
12 MNK-T1_0001140522.  Appears to be an e-mail
13 from Karen Harper to a number of folks,
14 including yourself, or at least you're copied
15 on it, forwarding a press account regarding
16 Cardinal Health.
17        Take a moment to look at that
18 and tell me if you recognize it.
19    A.    I don't recall the document,
20 no, sir.
21    Q.    Okay.  So Ms. Harper sent the
22 e-mail to Tanya Johnson at Thrifty White.
23        Who was Tanya Johnson?
24    A.    My primary contact.
25    Q.    Okay.  And that was one of your

Page 159

1  accounts, right?
2     A.    Yes, sir.
3     Q.    Okay.
4     A.    Now, this account changed.  I
5  assume it was mine in 2013.
6     Q.    Okay.  So Ms. Harper copied you
7  on the e-mail as well as John Gillies.
8        Who was John Gillies?
9     A.    Security.
10    Q.    Okay.  And do you know -- did
11 you have an understanding at this time as to
12 why Ms. Harper was e-mailing something
13 directly to one of your accounts?
14        MR. DAVISON:  Objection.
15        THE WITNESS:  I haven't read
16    the article.  I don't know what's in
17    it, so, no, I do not.
18 QUESTIONS BY MR. GOTTO:
19    Q.    Is that something that you can
20 recall happening on other occasions, where
21 Ms. Harper would be communicating directly
22 with one of your accounts?
23    A.    I don't recall specifically,
24 but it would not be out of the norm for her
25 to communicate with an account.

Page 160

1     Q.    And in what context -- in terms
2  of your own accounts, in what context would
3  you expect her to periodically be
4  communicating directly with your accounts?
5        MR. DAVISON:  Objection to
6     form.
7        THE WITNESS:  Karen was in
8     charge of the SOMS program, and I did
9     not dictate who she could communicate
10    with or not communicate with.
11 QUESTIONS BY MR. GOTTO:
12    Q.    Okay.  So the article -- the
13 headline is "DEA Aims Big in Cardinal Health
14 Painkiller Case."
15        Do you see that?
16    A.    Yes.
17    Q.    And if you turn to the second
18 page of Exhibit 8, up from the bottom, one,
19 two, three, four paragraphs, there's a
20 paragraph that begins "More than 5 million
21 people."
22        Do you see that?
23    A.    Yes, sir.
24    Q.    And similar to the article we
25 just looked at indicates "More than 5 million

Page 161

1  people in the USA abuse narcotic painkillers.
2  The Centers for Disease Control and
3  Prevention classifies prescription drug abuse
4  as an epidemic."
5        Do you recall being aware in
6  2013 that the Centers for Disease Control and
7  Prevention had classified prescription drug
8  abuse as an epidemic?
9     A.    I don't recall specific time
10 frame.
11    Q.    You recall becoming aware of
12 that at some point?
13    A.    Yes, sir.
14    Q.    And the article goes on to say,
15 "More than 27,000 died from prescription drug
16 overdoses in 2007, a fivefold increase since
17 1990, which parallels a tenfold increase in
18 the medical use of painkillers such as
19 oxycodone and hydrocodone, the CDC reports."
20        Do you see that?
21    A.    Yes, sir.
22    Q.    And do you recall in 2013 or
23 before being aware of the increase in
24 prescription drug overdose deaths from 1990
25 to 2007 that's reported in that sentence?

Page 162

1    MR. DAVISON: Objection.
2    THE WITNESS: No, sir, I don't
3 recall the details.
4 QUESTIONS BY MR. GOTTO:
5    Q.    The sentence also indicates
6 that from 1990 to 2007 there was a tenfold
7 increase in the medical use of painkillers
8 such as oxycodone and hydrocodone, according
9 to the CDC.
10    In terms of your experience as
11 a national -- as either a regional or
12 national account manager or director, was it
13 your -- was your experience with respect to
14 the levels of oxycodone and hydrocodone sold
15 by Mallinckrodt to your accounts consistent
16 with the tenfold increase that's reported in
17 this paragraph?
18    MR. DAVISON: Objection to
19 form.
20    THE WITNESS: I don't have
21 enough data to base a reply just on
22 that sentence.
23 QUESTIONS BY MR. GOTTO:
24    Q.    If you turn to the next to last
25 page of the exhibit, in the middle of that

Page 163

1 next to last page there's a paragraph that
2 has bolded "CVS Number 5195" at the heading.
3    Do you see that?
4    A.    Yes, sir.
5    Q.    And the last sentence of that
6 paragraph says, "Although Cardinal's
7 electronic system for monitoring suspicious
8 orders flagged the CVS orders 22 times for
9 further investigation, Cardinal never held a
10 shipment, notified the DEA or sent an
11 investigator to visit the store, the DEA
12 said."
13    Do you see that?
14    A.    Yes, sir.
15    Q.    Do you recall being aware of
16 that circumstance, as reported in that
17 paragraph, in 2013?
18    MR. DAVISON: Objection to
19 form.
20    MS. FIX MEYER: Objection.
21 Foundation.
22    THE WITNESS: No, sir.
23 QUESTIONS BY MR. GOTTO:
24    Q.    You can set that document
25 aside.

Page 164

1    (Mallinckrodt-New Exhibit 9
2 marked for identification.)
3 QUESTIONS BY MR. GOTTO:
4    Q.    We've marked as Exhibit 9 a
5 two-page document, MNK-T1_0004903077, an
6 e-mail from Mr. Adams to yourself and others
7 forwarding a PR Newswire piece from
8 December 1 of 2007.
9    Take a moment to look at that
10 e-mail and the -- and the attached article
11 and tell me if you recognize them.
12    A.    Yes, sir.
13    Q.    Do you recognize those
14 e-mails --
15    A.    No, sir.
16    Q.    -- or the article?
17    Okay. So Mr. Adams sent the
18 e-mail to yourself, Mr. Becker, Mr. Borelli,
19 also Tim Berry.
20    Who was that?
21    MR. DAVISON: Objection.
22    THE WITNESS: Tim Berry was a
23 national account manager.
24 QUESTIONS BY MR. GOTTO:
25    Q.    Okay. And how about Toby Bane?

Page 165

1    A.    A national account manager.
2    Q.    Okay. And the attached article
3 talks about an order that Cardinal Health had
4 received to cease distribution of controlled
5 substances from an Auburn, Washington
6 facility, correct?
7    A.    Yes, sir.
8    Q.    Do you recall being aware of
9 this circumstance in 2007?
10    MR. DAVISON: Objection.
11    MS. FIX MEYER: Objection.
12 Form. Foundation.
13    THE WITNESS: No, sir, I do
14 not.
15 QUESTIONS BY MR. GOTTO:
16    Q.    And was Cardinal your account
17 at that time?
18    A.    No, sir, it was not.
19    Q.    And do you know whose account
20 it was?
21    A.    No, I'm not certain.
22    MR. GOTTO: All right. Why
23 don't we go off the record.
24    VIDEOGRAPHER: We are going off
25 the record at 12:41 p.m.

Page 166

1    (Off the record at 12:41 p.m.)
2        VIDEOGRAPHER:  We are back on
3    the record at 1:20 p.m.
4        (Mallinckrodt-New Exhibit 10
5    marked for identification.)
6  QUESTIONS BY MR. GOTTO:
7    Q.    Ms. New, we've marked as
8  Exhibit 10 a single-page document bearing
9  Bates MNK-T1_0000368650, an e-mail from Jane
10 Williams to yourself and Mr. Borelli and
11 Mr. Becker, copied to Ginger Collier and Lisa
12 Lundergan.
13       Take a moment to look at that
14 document and tell me if you recognize it,
15 please.
16   A.    I don't recall the document
17 specifically now.
18   Q.    Okay.  So Ms. Williams mentions
19 in her e-mail first that -- asked you to take
20 a look at an attachment focusing on the
21 15-milligram product where she says, "We are
22 trending poorly on that SKU.  Our demand is
23 off by 20 percent pre-November."
24       And I take it if you look at
25 the subject line it's oxy IR 15 milligram

Page 167

1  that she's talking about.
2        Do you recall in 2011 this
3  being an issue, of demand being off for oxy
4  IR 15 milligrams?
5        MR. DAVISON:  Objection to
6    form.
7        THE WITNESS:  Not specifically,
8    no.
9  QUESTIONS BY MR. GOTTO:
10   Q.    Ms. Williams says the market
11 appears to continue to grow.  She asked for
12 ideas as to what's happening.
13       Do you recall taking any steps
14 to evaluate what was happening in the market
15 in mid-2011 with respect to oxy 15 milligram?
16       MR. DAVISON:  Objection to
17    form.
18       THE WITNESS:  I cannot speak to
19    the specific situation, no.
20 QUESTIONS BY MR. GOTTO:
21   Q.    Okay.  Next paragraph she says,
22 "I'm also concerned with the drop in
23 chargebacks on the 30 milligram.  They are
24 9 percent lower than our ship rate in the
25 past six months."

Page 168

1        Do you know what she means by
2  chargebacks in this context?
3        MR. DAVISON:  Objection to
4    form.
5        THE WITNESS:  A standard
6    chargeback, I assume.
7  QUESTIONS BY MR. GOTTO:
8    Q.    And what are standard
9  chargebacks?
10   A.    The wholesaler acquires a
11 product at a price.  A customer purchases at
12 that price.  The customer has a contract with
13 Mallinckrodt and they charge back the data,
14 and we reimburse the customer for the
15 difference between the wholesale price and
16 their actual contract price.
17   Q.    Okay.  And is -- are
18 chargebacks something that you monitored in
19 your role as national account manager?
20   A.    No, sir.
21   Q.    Okay.  Did you ever have
22 occasion to review chargeback information
23 with respect to any of your accounts?
24   A.    No, not specifically.  There
25 was a team of folks that did the chargebacks

Page 169

1  and managed that part of the system.
2    Q.    What team was that?
3    A.    I called it the chargeback
4  team.
5    Q.    Okay.
6    A.    If they had a proper title, I'm
7  not familiar.
8    Q.    Okay.  Is that CDIG?  Is that
9  an acronym that means anything in this
10 context?
11   A.    There's CDIG and PDIG, and I --
12 they were probably part of that group, but
13 the distinction between the two -- it was an
14 acronym.
15   Q.    Okay.  In that second
16 paragraph, at the very end Ms. Williams says,
17 "Our customers are approaching safety stock
18 levels, question mark?"
19       Do you know what that phrase
20 means, "safety stock"?
21       MR. DAVISON:  Objection to
22    form.
23 QUESTIONS BY MR. GOTTO:
24   Q.    Or "safety stock levels"?
25       MR. DAVISON:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 THE WITNESS: I'm not sure
2 about that comment.
3 (Mallinckrodt-New Exhibit 11
4 marked for identification.)
5 QUESTIONS BY MR. GOTTO:
6 Q. The next document is
7 Exhibit 11. We'll actually display on the
8 screen. It was produced in native at
9 MNK-T1_0001531370.
10 MR. DAVISON: Do we have a copy
11 of it? Native?
12 MR. GOTTO: I don't have a
13 printout of it. We have only that.
14 MR. DAVISON: I'm going to
15 object to it then.
16 MR. GOTTO: Okay.
17 QUESTIONS BY MR. GOTTO:
18 Q. And so if we look up on the
19 screen, Ms. New, this appears to be a
20 customer review, Mallinckrodt retail
21 generics, Hobart management team and generic
22 training {sic} from September 15th of 2011.
23 And my first question for you
24 is whether you recognize that document just
25 based on its cover or first slide.

Page 171

1 MR. DAVISON: Objection.
2 THE WITNESS: No.
3 MR. DAVISON: Can I just get a
4 standing objection to the document
5 without having --
6 MR. GOTTO: Sure.
7 MR DAVISON: -- so I'm not
8 interrupting you?
9 Thanks.
10 THE WITNESS: I don't recall
11 this specific document, no.
12 QUESTIONS BY MR. GOTTO:
13 Q. Okay. Why don't we go to the
14 second slide, please.
15 And the second slide says,
16 "Meet the retail team," lists five
17 individuals, including yourself.
18 Do you recall that group being
19 referred to as the retail team at
20 Mallinckrodt from time to time?
21 A. Correct.
22 Q. Let's go to the next slide,
23 please.
24 The next slide, "Retail
25 national account manager, what kind of job is

Page 172

1 that anyway?" And there's several bullet
2 items. Just take a moment to read that slide
3 to yourself.
4 A. Okay.
5 Q. Is that a fair summary of the
6 role of a national account manager?
7 MR. DAVISON: Objection to
8 form.
9 THE WITNESS: During the
10 Covidien time frame and that
11 management, yes.
12 QUESTIONS BY MR. GOTTO:
13 Q. Okay. Do you recall if you had
14 any involvement in the preparation of this
15 summary?
16 A. No, and I don't know if it's a
17 final document or a draft.
18 Q. The very last bullet item,
19 "Responsible for the customer P&L." What
20 does that phrase mean in this context?
21 MR. DAVISON: Objection.
22 THE WITNESS: Making sure that
23 the customer is compliant to their
24 contract and following the terms of
25 their agreement.

Page 173

1 QUESTIONS BY MR. GOTTO:
2 Q. Okay. Next slide, please.
3 Next slide.
4 And actually if you just jump
5 to the pie chart at the end.
6 This is a pie chart, all
7 generics 2011 year-to-date net sales by
8 product family.
9 I don't know, can you read it
10 from over there?
11 A. Yeah, somewhat.
12 Q. Okay. And I can just tell you,
13 in the upper right it's hydrocodone,
14 26 percent; then oxycodone, 19 percent; and
15 then oxycodone/APAP, 14 percent; and then
16 various other products with smaller
17 percentages on the left.
18 Is that consistent with your
19 recollection of approximate relative sales
20 levels in 2011 of hydrocodone being
21 approximately 26 percent, oxycodone
22 approximately 19 percent, oxycodone/APAP
23 approximately 14 percent?
24 A. I can't speak to that
25 specifically. I don't recall the product

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 family percentages.
2     Q.    Okay.  Let's go to the prior
3 slide, please.
4          And this slide is a
5 year-to-date net sales performance for
6 various products, and it shows hydrocodone,
7 93.4 million; oxycodone, 67.2 million;
8 oxycodone/APAP, 50.8 million; and then data
9 on the budget and the variance.
10          Are those figures consistent
11 with your recollection of approximate dollar
12 volumes of those products in 2011?
13          MR. DAVISON: Objection to
14 form.
15          THE WITNESS: I can't speak to
16 that specifically.
17          VIDEOGRAPHER: Can I go off the
18 record for a moment?
19          MR. GOTTO: Sure.
20          VIDEOGRAPHER:  We are going off
21 the record at 1:29 p.m.
22      (Off the record at 1:29 p.m.)
23          VIDEOGRAPHER:  We are back on
24 the record at 1:30 p.m.
25

Page 175

1 QUESTIONS BY MR. GOTTO:
2     Q.    Okay.  In any event, you don't
3 have any reason to doubt the accuracy of
4 these figures, do you?
5          MR. DAVISON: Objection to
6 form.
7          THE WITNESS:  I can't speak to
8 it either way.
9 QUESTIONS BY MR. GOTTO:
10     Q.    Okay.  Go to the retail
11 business segment, please.
12          And so this slide is
13 encaptioned "Retail Business Segment." It
14 says, "Retail generics drive over 70 percent
15 of the total generic sales budget for
16 Mallinckrodt."
17          Do you see that?
18     A.    Yes, sir.
19     Q.    Is that consistent with your
20 recollection from 2011?
21          MR. DAVISON: Objection to
22 form.
23          THE WITNESS:  I don't know that
24 for certain.
25

Page 176

1 QUESTIONS BY MR. GOTTO:
2     Q.    Okay.  What would be the
3 generic sales that are not included among
4 retail generics that would account for the
5 other approximate 30 percent?
6          MR. DAVISON: Objection to
7 form.
8          THE WITNESS:  It doesn't
9 include the addiction treatment
10 business, and I don't -- because I
11 don't have access to the data or any
12 information, I can't really confirm or
13 deny any of it, basically, as far as
14 percentages.
15 QUESTIONS BY MR. GOTTO:
16     Q.    Okay.  All right.  We can go to
17 the next document.
18          (Mallinckrodt-New Exhibit 12
19 marked for identification.)
20 QUESTIONS BY MR. GOTTO:
21     Q.    Next document is Exhibit 12,
22 also produced in native MNK-T1_0002714634.
23 And we also just had --
24          MR. DAVISON:  Do you have
25 copies of this?

Page 177

1          MR. GOTTO:  No, I'm sorry, I
2 don't have any copies of that.
3          MR. DAVISON:  Can we go off the
4 record?
5          VIDEOGRAPHER:  We are going off
6 the record at 1:31 p.m.
7      (Off the record at 1:31 p.m.)
8          VIDEOGRAPHER:  We are back on
9 the record at 1:32 p.m.
10          MR. DAVISON:  And I'm just
11 going to lodge a standing objection
12 against the use of this document
13 without having copies as required by
14 the deposition protocol.
15          MR. GOTTO:  Okay.  Understood.
16 QUESTIONS BY MR. GOTTO:
17     Q.    Ms. New, this is a spreadsheet
18 that -- could you scroll over to the left,
19 please?  A retail F '12 budget document.  And
20 maybe you could shrink it down a little bit
21 to see more of the document.
22          Is this a document that's
23 familiar to you, this retail ledger document?
24          And can you just make it bigger
25 to see from over there.

Page 178

1    A.    I have no idea where the data
2  came from or specifically if it's accurately
3  or not.
4    Q.    Okay.  I'm just going to show
5  you what's on the different tabs to see if
6  that sparks anything in your mind.
7          This is a tab called quota
8  retail NAM which appears to have a series of
9  data regarding different products with a
10 series of columns as you can see.
11         Is this a document, a format,
12 that's familiar to you at all?
13   A.    I'm not sure what this is.
14   Q.    Okay.  This isn't a report that
15 you used regularly in your -- in your duties
16 as a national account manager?
17         MR. DAVISON:  Objection to
18 form.
19         THE WITNESS:  And time frame
20 is?
21 QUESTIONS BY MR. GOTTO:
22   Q.    I believe it's 2012.
23   A.    Yeah, I don't recall.  The
24 process has changed over time.
25   Q.    Okay.  All right.  We can go

Page 179

1  on.
2          (Mallinckrodt-New Exhibit 13
3          marked for identification.)
4  QUESTIONS BY MR. GOTTO:
5    Q.    We've marked as Exhibit 13 a
6  multipage document beginning at Bates
7  MNK-T1_0005539361, a series of e-mails.
8          If you'd take a moment to look
9  at those e-mails and tell me if you recognize
10 them.
11   A.    Do you want me to read it
12 first?
13   Q.    Yeah.
14   A.    All the way through?
15   Q.    Well, whatever you need to do
16 to familiarize yourself with it, just to see
17 if it's familiar to you.
18   A.    Okay.
19   Q.    Do you recognize those e-mails?
20   A.    Somewhat.
21   Q.    Okay.  They concern the Thrifty
22 White account from 2011, correct?
23   A.    Correct.
24   Q.    And I think your -- if you look
25 on the second page of the exhibit, your

Page 180

1  e-mail in the middle of that page provides
2  some background to Ms. Williams about the
3  requests that you're making here for Thrifty
4  White, correct?
5    A.    Correct.
6    Q.    And indicates they're asking
7  for 30 days' extra dating while they test --
8  or their request for 30 days' extra dating
9  while they test is to allow them time to have
10 the inventory, but they don't think they will
11 be able to actually ship until mid-February,
12 correct?
13   A.    Correct.
14   Q.    So the extra 30 days that
15 you're talking about here, an extra 30 days
16 for what purpose?
17   A.    To stock their warehouse and
18 test their system, like it says.
19   Q.    And it would be an extra
20 30 days compared to -- what would be the
21 normal time period that they would be allowed
22 for that purpose?
23   A.    This is a nonscheduled product,
24 naltrexone, so it is dependent on the
25 individual customer and their needs.

Page 181

1    Q.    Okay.  And if you turn to the
2  first page of the exhibit, the e-mail from
3  you at the top, you say, "I talked to Thrifty
4  White.  We're only talking naltrexone, so we
5  agreed we would not pursue the additional
6  30 days' dating, but we will give them the
7  5 percent allowance."
8          Do you know what the 5 percent
9  allowance is that you're discussing?
10   A.    The 5 percent on the naltrexone
11 would have given them time to test their
12 system before they could sell it out to their
13 pharmacies.
14   Q.    Okay.  And was that allowance
15 given to them?
16   A.    Excuse me?
17   Q.    Was that allowance given to
18 them; do you recall?
19   A.    I'm sorry, say one more --
20   Q.    Was that allowance given to
21 them; do you recall?
22   A.    I can't answer that.
23         (Mallinckrodt-New Exhibit 14
24         marked for identification.)
25

QUESTIONS BY MR. GOTTO:

Q. Okay. Let's go to the next one.

The next document is a document that was produced in native MNK-T1_0004292574. It's a spreadsheet. You have two pages in front of you printed out from the spreadsheet.

Is this spreadsheet in a format that you're familiar with?

A. This data was ran by one of our analysts, I believe.

Q. And what causes you to think that?

A. The format.

Q. Okay. Do you know what the purpose would be for the analyst running this data?

MR. DAVISON: Objection. Form.

THE WITNESS: It could be varied.

QUESTIONS BY MR. GOTTO:

Q. Do you recall seeing either this report or other reports in this format?

A. Yes.

Q. And for what purposes did you use such reports?

A. I took the higher-level information from the analyst. I didn't dig down into these kind of details, so I had an overall view.

Q. Okay. So what sort of higher-level information would you get from the analyst on a report like this?

A. Basically the comments would be reviewed.

Q. The comments column?

A. Yes.

Q. Okay. And this particular report appears to deal with Walmart.

Was Walmart your account at this time?

A. Did I see the time frame on this?

Q. Well, there's a promise ship date and a ship date column that have dates in them.

A. Time frame? I cannot be certain that it was the time frame that I had the Walmart account.

Q. Okay. Okay. You can set that aside.

(Mallinckrodt-New Exhibit 15 marked for identification.)

QUESTIONS BY MR. GOTTO:

Q. We've marked as Exhibit 15 a multipage document beginning at Bates MNK-T1_0002737439. It appears to be an e-mail from Ms. Williams attaching a spreadsheet.

You can take a moment to look at those materials and tell me if you recognize it, please.

A. Okay.

Q. Do you recognize the e-mails or the attachment?

A. Not this specific e-mail.

Q. And how about the attachment and its format, is that something you recognize?

A. Again, not this specific one, but similar ones.

Q. Okay. And so this attachment -- two tables. One says oxy 15-milligram end purchaser sale trends; the

other is oxy 30-milligram end purchaser sales trend. Correct?

A. Correct.

Q. And so the -- do you have an understanding as to who the end purchasers -- what's meant by the phrase "end purchaser" on these tables?

MR. DAVISON: Objection.

THE WITNESS: I don't know specifically what they meant by "end purchaser."

QUESTIONS BY MR. GOTTO:

Q. Okay. If you look at the parties identified in the customer columns on those tables --

A. Right.

Q. -- do those appear to you to be Mallinckrodt customers?

A. Yes.

Q. Okay. And so this appears to track orders over the past three months, past six months, past 12 months, and compare the past three-month average to the past 12-month average, correct?

A. Correct.

Page 186

1   Q.   And so is that data that you
2  would -- of the sort that you would regularly
3  look at in your role as a national account
4  manager?
5   A.   Depending on the market.
6   Q.   So this data was forwarded to
7  you by Ms. Williams.
8       Is the sales trend data of the
9  type that's summarized in the attachment, is
10 that something you would sometimes look at on
11 your own initiative, or would you only look
12 at it when provided to you, for example, by
13 Ms. Williams?
14       MR. DAVISON:  Objection to
15      form.
16       THE WITNESS:  If it was
17      provided to me, I would look at it,
18      but it's not something I would pull
19      myself.
20 QUESTIONS BY MR. GOTTO:
21   Q.   Okay.  Did you have access to
22 the data such that you could pull this
23 information yourself if you chose to?
24   A.   I probably did, but I can't say
25 that specifically.

Page 187

1   Q.   Okay.  In her cover e-mail,
2  Ms. Williams, in the next to last paragraph
3  says, "Also, when wholesale -- when
4  wholesaler programs are down, please do your
5  best to verify who is picking up the sales
6  and how have the wholesalers adjusted the
7  price on their program."
8       Do you see that language?
9   A.   Yes.
10   Q.   So how would you go about
11 following through on what Ms. Williams is
12 asking for there, namely doing your best to
13 verify who is picking up the sales and how
14 have the wholesalers adjusted the price on
15 their program?
16       MR. DAVISON:  Objection.
17       THE WITNESS:  Generally I would
18      know that from knowing my account.  If
19      I lost business to a competitor, I
20      generally knew who that competitor
21      was.
22 QUESTIONS BY MR. GOTTO:
23   Q.   And how did you learn that?
24   A.   Competitive intel.
25   Q.   Where would that come from?

Page 188

1   A.   Just -- perhaps my buyer would
2  tell me.  Various sources.
3   Q.   Okay.  So apart from the buyer,
4  who would be some of the -- I understand how
5  the buyer would be in a position to tell you
6  that.
7       Who else would be in a position
8  to give you that information?
9   A.   An analyst.  One of our
10 analysts.
11   Q.   And do you know what
12 information the Mallinckrodt analyst would
13 access to answer that kind of question?
14       MR. DAVISON:  Objection.
15       THE WITNESS:  Yeah, they had
16      various tools that they used.
17 QUESTIONS BY MR. GOTTO:
18   Q.   Okay.  And how about
19 Ms. Williams' point about how have the
20 wholesalers adjusted the price on their
21 program, do you have an understanding as to
22 what she's asking there?
23       MR. DAVISON:  Objection to
24      form.
25       THE WITNESS:  Not specifically.

Page 189

1  QUESTIONS BY MR. GOTTO:
2   Q.   Do you have a general
3  understanding?
4       MR. DAVISON:  Objection.
5       THE WITNESS:  It depends on
6      what's going on in the market.  I
7      can't make any assumptions on this.
8  QUESTIONS BY MR. GOTTO:
9   Q.   So Ms. Williams references that
10 today Steve indicated that Cardinal was
11 stocking Actavis 30 milligram.  Source price
12 for them is 39-16 and for us is 39-44.
13       Do you have -- so the
14 competitive price that's cited in that -- in
15 that sentence, do you know how Mallinckrodt
16 would gain that information?
17       MR. DAVISON:  Objection to
18      form.
19       THE WITNESS:  Because Cardinal
20      was not my account, I can't speak for
21      Steve.  I don't know how he found out.
22 QUESTIONS BY MR. GOTTO:
23   Q.   Okay.  You can set that aside.
24       (Mallinckrodt-New Exhibit 16
25      marked for identification.)

Page 190

1  QUESTIONS BY MR. GOTTO:
2     Q.   Exhibit 16 was produced in
3  native MNK-T1_0001455032.
4          Just take a look at the
5  attached spreadsheet and tell me if that's a
6  document whose format is familiar to you.
7     A.   Yes.
8     Q.   And so what is that document?
9     A.   I'm not sure where the data
10 came from.
11    Q.   Okay.  Is the format of the
12 document familiar to you?
13    A.   Yes, sir.
14    Q.   Okay.  And so have you seen
15 either this report or other similar reports
16 in this format?
17    A.   Sure.
18    Q.   And for what purpose have
19 you -- when you were national account manager
20 or director, for what purpose did you use
21 reports that were in this format?
22    A.   I do not recall.
23    Q.   Okay.  The format has --
24 there's a sales rep name, is the far left
25 column, which has your name in it, correct?

Page 191

1     A.   Correct.
2     Q.   Then there's a series of
3  product families in the next column?
4     A.   Yes, sir.
5     Q.   And reporting parent
6  name/number is the next column.
7          Is that the Mallinckrodt
8  customer?
9     A.   Yes, probably based on DEA
10 number.
11    Q.   Okay.  And then there's a net
12 sales column.  Would that be net sales from
13 Mallinckrodt to that customer of whatever the
14 particular product family is?
15    A.   Right, but no time period's
16 defined.
17    Q.   Okay.  And then there's a sales
18 and marketing net margin.
19         Do you know how that -- well,
20 do you have an understanding of what that
21 means, sales and marketing net margin?
22    A.   Yes.
23    Q.   What is it?
24    A.   I don't feel confident in
25 trying to explain it.  It's a -- it's a

Page 192

1  formula based on products and their cost.
2     Q.   Okay.  So more -- the term
3  "margin" in this context is what one would
4  typically associate with a concept of margin
5  in business?
6          MR. DAVISON:  Objection to
7  form.
8          THE WITNESS:  I would
9  understand it's pretty technical.
10         It's not a simple formula, but...
11 QUESTIONS BY MR. GOTTO:
12    Q.   Sure.
13         The next column is pricing
14 quantity.  Is that how the -- how the unit is
15 priced -- well, what does pricing quantity
16 mean?
17    A.   I'm not sure, based on the fact
18 that I don't know where this data was pulled
19 and the time frame.  I have no idea what it
20 is referring to.
21    Q.   Okay.  And the next column, net
22 sales dollar rank, is that ranking the
23 various customers by net sales for that
24 product family?
25         MR. DAVISON:  Objection to

Page 193

1  form.
2          THE WITNESS:  I don't know the
3  answer to that.
4  QUESTIONS BY MR. GOTTO:
5     Q.   Okay.  So, for example, if we
6  look at the APAP codeine product family, the
7  second one --
8     A.   Yeah.
9     Q.   -- and we see Harvard Drug has
10 the highest net sales dollar entry in that
11 column and is also ranked next -- net sales
12 dollar rank is 1, correct?
13    A.   Yeah.  That's what it says,
14 yes.
15    Q.   Okay.  And that pattern seems
16 to obtain at least in APAP codeine, correct,
17 that the ranking is consistent with the
18 dollar amount of the net sales?
19         MR. DAVISON:  Objection.  Form.
20         THE WITNESS:  That appears to
21 be correct.
22 QUESTIONS BY MR. GOTTO:
23    Q.   Okay.  If you look toward the
24 bottom of the second page of the -- of the
25 spreadsheet, product family hydrocodone?

Page 194

1    A.    Yes.
2    Q.    Indicates Walmart, a net sales
3  number of just slightly under 20 million,
4  correct?
5    A.    That's what it says, yes, sir.
6    Q.    And then the next largest entry
7  in that product family appears to be Econdisc
8  with just under 3.8 million, correct?
9    A.    Correct.
10   Q.    Is that consistent with your
11 recollection of the approximate magnitude of
12 hydrocodone purchases by Walmart relative to
13 other Mallinckrodt family -- Mallinckrodt
14 customers?
15       MR. DAVISON:  Objection to
16   form.
17       MS. CONWAY:  Objection.  Form.
18       THE WITNESS:  Again, there's no
19   time period.  I have no idea -- excuse
20   me, I have no idea.  I can't say if
21   it's accurate or not.
22 QUESTIONS BY MR. GOTTO:
23   Q.    Understanding that you can't
24 verify the data as you sit here today, from
25 your recollection, the approximate comparison

Page 195

1  of Walmart at a roughly $20 million number
2  with, say, the next largest customer being at
3  a slightly under $4 million number, is that
4  consistent with your recollection of relative
5  magnitude of Walmart as a hydrocodone
6  customer?
7        MR. DAVISON:  Objection.
8        THE WITNESS:  I can't
9    truthfully speak to that.  I don't
10   know.
11 QUESTIONS BY MR. GOTTO:
12   Q.    Okay.  Doesn't strike you as
13 out of line as we sit here?
14       MS. CONWAY:  Objection.  Form.
15       MR. DAVISON:  Objection.  Form.
16       THE WITNESS:  Again, can't
17   answer it.
18 QUESTIONS BY MR. GOTTO:
19   Q.    Okay.  So do you recall
20 generally, during the time you were national
21 account manager or director, tracking the
22 levels of purchases of the accounts for which
23 you had responsibility by product family, of
24 the types of product families that are set
25 forth on this exhibit?

Page 196

1        MR. DAVISON:  Objection.
2        THE WITNESS:  That was part of
3    the compliance checking on contracts,
4    so, yes.
5  QUESTIONS BY MR. GOTTO:
6    Q.    Okay.  And if -- if an
7  account -- when you ran such an analysis, if
8  an account was running below its compliance
9  level with its contract, what steps would you
10 take to deal with that situation?
11   A.    First of all, understand if
12 there's something going on in the market to
13 affect it.  There's many variables.  Talk to
14 my contact and find out what's going on.  And
15 then the results were always different.
16 Nothing standard.
17   Q.    So I think we've seen today,
18 and I think I've seen in some other
19 documents, the phrase "drive compliance."
20       What were some of the things
21 you would do to try to drive compliance?
22   A.    Just work with the buyer or the
23 person that I -- my primary contact, again,
24 to find tools that would help them with their
25 pharmacies, and just work with them in

Page 197

1  relationship to helping them improve
2  compliance.
3    Q.    So what sort of tools could
4  help them with their pharmacies?
5        MR. DAVISON:  Objection.  Form.
6        THE WITNESS:  I mentioned
7    earlier, if you have products on
8    contract or we added new products to a
9    contract, we would provide a sheet
10   that showed the product and the item
11   number for the wholesaler.  That was
12   basically it.
13 QUESTIONS BY MR. GOTTO:
14   Q.    Okay.  You can set that aside.
15       (Mallinckrodt-New Exhibit 17
16   marked for identification.)
17 QUESTIONS BY MR. GOTTO:
18   Q.    Exhibit 17 is a multipage
19 document beginning at Bates
20 MNK-T1_0001373610.  Appears to be an e-mail
21 thread from November of 2012.
22       Would you take a moment to look
23 at those e-mails and tell me if you recognize
24 them?
25   A.    I recognize this type of

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 document. I do not recognize this
2 specifically.
3     Q.    Okay. So if you look down
4 toward the bottom of the first page, there's
5 an e-mail from you to Jennifer Buist at
6 October 31 of 2012.
7         Do you see that?
8     A.    Right.
9     Q.    And who was Jennifer Buist?
10     A.    She was in the SOMS
11 committee -- or team.
12     Q.    Okay. And in your e-mail
13 you're explaining to Ms. Buist that you
14 believe "it is due to stocking their
15 warehouse. They just started shipping via
16 CSOS to their pharmacies. If we continue to
17 see it higher, I can call to verify, but
18 they'd be carrying additional inventory to
19 start."
20         Do you see that?
21     A.    Correct.
22     Q.    And do you recall this
23 circumstance back in October, November 2012?
24         MR. DAVISON: Objection.
25         THE WITNESS: Not specifically,

Page 199

1     but -- yeah, not -- not specifically.
2 QUESTIONS BY MR. GOTTO:
3     Q.    Okay. Ms. Buist responds to
4 you, "We're having a hard time understanding
5 this amount based on the amount ordered in
6 anticipated annual volume. This would take
7 them to four years' worth of inventory. We
8 need some additional information, please.
9 Thank you."
10         Do you see that?
11     A.    I'm trying to find it.
12     Q.    It's just above the October 31
13 e-mail.
14     A.    Oh, it's on the first page.
15 That's why I can't find it. Sorry.
16     Q.    It's the one where she's
17 talking about four years' worth of inventory.
18     A.    Yeah, I got to find it.
19         Okay.
20     Q.    Does that refresh your
21 recollection in any way, reading that e-mail,
22 regarding this circumstance?
23     A.    No.
24     Q.    Okay. You respond to Ms. Buist
25 that you will call them in the morning, that

Page 200

1 e-mail directly above that.
2         Do you see that?
3     A.    Yes.
4     Q.    And then the next e-mail is
5 from Ms. Buist to you saying, "The short
6 story is everything is okay. Right order
7 shipped. I'm still working through what
8 showed on my report and will keep you posted,
9 but for now all is well. Enjoy your day."
10         Do you see that?
11     A.    Yes, sir.
12     Q.    Do you recall what happened
13 there? I mean, it seems like -- just judging
14 from the e-mails, you say you will call the
15 customer in the morning, and then the next
16 e-mail is Ms. Buist saying -- apparently
17 saying everything has been resolved. But
18 there's -- it seems like there's an
19 explanation in between here that isn't
20 reflected in these e-mails.
21         Do you recall what the
22 explanation was?
23         MR. DAVISON: Objection.
24         THE WITNESS: I have no idea.
25

Page 201

1 QUESTIONS BY MR. GOTTO:
2     Q.    Do you recall issues with
3 Thrifty White order levels, you know, apart
4 from this series of e-mails?
5         MR. DAVISON: Objection to
6     form.
7         THE WITNESS: I do not recall
8     anything specific, no, sir.
9 QUESTIONS BY MR. GOTTO:
10     Q.    You can set that aside.
11         (Mallinckrodt-New Exhibit 18
12     marked for identification.)
13 QUESTIONS BY MR. GOTTO:
14     Q.    Exhibit 18 is a multipage
15 document beginning at Bates -- I'm having a
16 hard time reading the number because it's --
17 it's --
18         MR. GOTTO: Do we have the
19     number there? Is it on the folder?
20 QUESTIONS BY MR. GOTTO:
21     Q.    Okay. It's Bates
22 MNK-T1_0002159713.
23         If you -- it's a pain
24 management pocket card set.
25         Would you please take a moment

Page 202

1 to look through that and tell me if that's a
2 document you're familiar with?
3     A.    Yes.  This is -- I am familiar
4 with this.
5     Q.    Okay.  And so what do you
6 recognize it to be?
7     A.    Restate that, please?
8     Q.    What do you recognize this
9 document to be?
10     A.    It's -- it was a set of four
11 cards that we used for education in working
12 with pharmacists.
13     Q.    Okay.  And so did you
14 personally use these cards?
15     A.    Yes.
16     Q.    And in what settings would you
17 personally use them?
18     A.    When we would be at trade
19 shows, pharmacy -- retail pharmacy meetings,
20 we would use them.
21     Q.    Okay.
22     A.    I would.
23     Q.    And trade shows, I think I
24 understand, those are the kind of conferences
25 we talked about earlier today, right?

Page 203

1     A.    It could be used there, yes.
2     Q.    And when you say "retail
3 pharmacy meetings," what are you referring
4 to?
5     A.    The Kroger meetings, for
6 example, where I would go to their different
7 divisions and meet with them and support
8 their shows.
9     Q.    Okay.  And so did you
10 participate in the preparation of this pocket
11 card set?
12     A.    No, sir.
13     Q.    And so who would you have
14 received it from?
15     A.    Our marketing, our marketing
16 team or -- at one time it was called PARC.
17     Q.    Okay.
18     A.    And I don't know what that
19 stands for at this time.
20     Q.    Okay.  And so was this -- this
21 pocket card set, was this something you used
22 regularly?
23         MR. DAVISON:  Objection.
24         THE WITNESS:  Yes.
25

Page 204

1 QUESTIONS BY MR. GOTTO:
2     Q.    Were there other similar
3 materials that you used that related to
4 Mallinckrodt products?
5     A.    There was also a pocket set for
6 ADHD --
7     Q.    Okay.
8     A.    -- that we used.
9     Q.    Okay.  In terms of opioid
10 products, though, was there a -- were there
11 any similar materials other than Exhibit 18?
12     A.    We had another cardboard -- or
13 another paper copy that was used on occasion
14 over time.
15     Q.    Okay.  Was it -- the substance
16 of that similar to what's on this pocket card
17 set?
18     A.    I don't recall.
19     Q.    Any other materials of that
20 nature that you can recall?
21     A.    No.
22         It wasn't developed by
23 Mallinckrodt, as it states on the bottom.
24     Q.    Uh-huh.
25         So in a presentation, say, at

Page 205

1 one of the Kroger meetings --
2     A.    Right.
3     Q.    -- how would you use this
4 pocket card set?
5     A.    It would be on the table and
6 "here's a pocket card set.  If you're
7 interested, help yourself."
8     Q.    Okay.
9     A.    Basically that's it.
10     Q.    And as far as representatives
11 from Mallinckrodt, for example, at the Kroger
12 meeting, would it be just you, or would there
13 be other Mallinckrodt people at such a
14 meeting?
15     A.    At that particular meeting, it
16 would be myself.
17     Q.    And for this pocket card set,
18 would you make it available for -- to whom
19 would you make this pocket card set
20 available?
21         MR. DAVISON:  Objection.
22         THE WITNESS:  Anybody that
23 walked by the table.
24 QUESTIONS BY MR. GOTTO:
25     Q.    And what was your expectation

Page 206

1  as to who would walk by the table in terms of
2  were they licensed pharmacists?  Were they
3  other Kroger employees?
4      A.   Be a combina --
5          MR. DAVISON:  Objection.
6          THE WITNESS:  Combination.
7          MR. DAVISON:  Objection to
8  form.
9  QUESTIONS BY MR. GOTTO:
10     Q.   Okay.  Would you expect them
11 all to be Kroger personnel, for example, if
12 you're at a Kroger meeting?
13     A.   Not necessarily.
14     Q.   And so who else would you
15 expect to be there?
16     A.   Sometimes there were students,
17 interns, that would attend.
18     Q.   Okay.  And so you indicated you
19 used these at Kroger meetings.
20         Were there other account --
21 other accounts that you visited personally
22 where you used this pocket card set?
23     A.   Yes.  Thrifty White had
24 pharmacy meetings.  Giant Eagle had pharmacy
25 meetings.  It varied depending on the

Page 207

1  account, depending on the year.
2      Q.   Okay.  So there may have been
3  others as well?
4      A.   Right.
5      Q.   And at any of those pharmacy
6  meetings, do you ever recall any questions
7  that you received with respect to any of the
8  information in this pocket card set?
9      A.   No.
10     Q.   Do you recall any discussion
11 beyond what was contained in the text of the
12 pocket card set?
13     A.   No.
14     Q.   You also mentioned at trade
15 shows you'd use this pocket card set,
16 correct?
17     A.   Yeah.
18     Q.   And in what way would you use
19 it at the trade show?
20     A.   Trade show in my head is
21 comparable to pharmacy meeting.
22 Interchangeable terminology.
23     Q.   Okay.  So you mentioned earlier
24 today the two annual conferences that you
25 would generally attend.

Page 208

1      A.   Correct.  Correct.
2      Q.   Would you use this pocket card
3  set there?
4      A.   I don't recall having this
5  particular pocket card at that meeting.
6      Q.   Okay.
7      A.   But I don't know for sure.
8      Q.   Okay.  And so when you used the
9  term "trade show" earlier in the context of
10 the pocket card set, did you mean visiting
11 accounts for the retail pharmacy meeting?
12         MR. DAVISON:  Objection.  Form.
13         THE WITNESS:  I mean when they
14         had their pharmacy meeting and we were
15         invited to support them, we would take
16         these as an educational material for
17         their use.
18 QUESTIONS BY MR. GOTTO:
19     Q.   Okay.  Do you know if the other
20 national account managers similarly used this
21 pocket card set?
22     A.   I can't speak to them.
23     Q.   Did you ever have any
24 discussion with whoever your direct report
25 was from time to time about using this pocket

Page 209

1  card set in the ways that you used it?
2          MR. DAVISON:  Objection.
3          THE WITNESS:  I never had a
4          direct report.
5          Is that what you just said?
6  QUESTIONS BY MR. GOTTO:
7      Q.   Whoever you reported to.
8      A.   Oh.
9          MR. DAVISON:  Same objection.
10         THE WITNESS:  Restate the
11         question.
12 QUESTIONS BY MR. GOTTO:
13     Q.   Yes.
14         Did you ever have a discussion
15 with the person that you were reporting to?
16 And it -- from time to time I understand that
17 changed over time.
18     A.   Right.
19     Q.   But whoever it was at any given
20 time, did you ever have a discussion with
21 that person about your use of this pocket
22 card set?
23         MR. DAVISON:  Objection to
24         form.
25         THE WITNESS:  Don't recall.

Page 210

1 QUESTIONS BY MR. GOTTO:
2      Q.   Okay.  You can set that aside.
3           (Mallinckrodt-New Exhibit 19
4      marked for identification.)
5 QUESTIONS BY MR. GOTTO:
6      Q.   We've marked as Exhibit 19 a
7 two-page document beginning at
8 MNK-T1_0005764398, an e-mail thread from
9 September of 2015.
10          Please take a look at those
11 e-mails.  Tell me if you recognize them.
12     A.   Not specifically.
13     Q.   Okay.  Your June --
14 September 30, 2015 e-mail to Jennifer Block
15 and others at the top of the first page --
16 first of all, who is Jennifer Terp?
17     A.   She was one of our analysts.
18     Q.   Okay.  And in your e-mail you
19 state, "In addition, there is a focus on SOM
20 from the Walmart SOM team per Linda, so she
21 is reluctant to overstock."
22          Do you know who the Linda is
23 that you're referring to in that sentence?
24     A.   She was one of my primary
25 contacts.

Page 211

1      Q.   At Walmart?
2      A.   Yes.
3      Q.   Okay.  And do you recall what
4 the focus on SM -- I'm sorry, the focus on
5 SOM from the Walmart SOM team was that you're
6 referring to in that sentence?
7           MR. DAVISON:  Objection to
8      form.
9           THE WITNESS:  I can't speak to
10     it specifically, no.
11 QUESTIONS BY MR. GOTTO:
12     Q.   Okay.  You go on to say, "We
13 have asked numerous times about ordering more
14 product.  There is always pushback on why
15 they will not increase inventory."
16          Do you recall that circumstance
17 from 2015?
18          MR. DAVISON:  Objection.
19          THE WITNESS:  Not specifically.
20 QUESTIONS BY MR. GOTTO:
21     Q.   Okay.  So in a setting like
22 this where you're -- when you say you asked
23 numerous times about ordering more product,
24 what would be the context in which you would
25 ask an account like Walmart about ordering

Page 212

1 more product?
2           MR. DAVISON:  Objection to
3      form.
4           MS. CONWAY:  Objection.
5           THE WITNESS:  Because we're
6      making sure that we have inventory.
7      And if they're not taking the
8      inventory, then we need to understand
9      why and then take action accordingly.
10 QUESTIONS BY MR. GOTTO:
11     Q.   So this would be a situation
12 where in your view Walmart was ordering at a
13 level below their contractual relationship
14 with Mallinckrodt?
15          MR. DAVISON:  Objection to
16     form.
17          THE WITNESS:  Honestly, I don't
18     know.  I don't know.
19 QUESTIONS BY MR. GOTTO:
20     Q.   Okay.  If you look at Jennifer
21 Block's e-mail in the bottom half of the
22 page, the first sentence says, "Walmart
23 remains consistently low on HB-APAP."
24          What is HB-APAP?
25     A.   Hydrocodone APAP.

Page 213

1      Q.   Do you recall that circumstance
2 back in September of 2015?
3           MR. DAVISON:  Objection to
4      form.
5           THE WITNESS:  No, sir.
6 QUESTIONS BY MR. GOTTO:
7      Q.   Okay.  You can set that aside.
8           (Mallinckrodt-New Exhibit 20
9      marked for identification.)
10 QUESTIONS BY MR. GOTTO:
11     Q.   Exhibit 20 is a two-page
12 document, MNK-T1_0005762756, an e-mail thread
13 from January of 2016.
14          Take a moment to look at those
15 e-mails and tell me if you recognize them.
16     A.   I recognize this format, not
17 this specific document.
18     Q.   Okay.  The e-mail that's at the
19 top of the first page from Randy Meisner?
20     A.   Yes.
21     Q.   Who was Randy Meisner?
22     A.   He was an analyst.
23     Q.   Okay.  And Mr. Meisner says in
24 the second line of his e-mail, "I know you
25 will keep them very compliant as long as we

Page 214

1 have supply."
2      Do you have an understanding as
3 to what he meant by the phrase "keep them
4 very compliant"?
5      MR. DAVISON: Objection to
6      form.
7      THE WITNESS: Gets back to
8      measuring compliance on their
9      contract.
10 QUESTIONS BY MR. GOTTO:
11     Q.  Okay.  And in order for you to
12 keep them very compliant, would those be the
13 kinds of steps you talked about here earlier
14 today?
15      MR. DAVISON: Objection.
16 QUESTIONS BY MR. GOTTO:
17     Q.  What sorts of steps would you
18 take to keep them very compliant?
19      MR. DAVISON: Objection.
20      THE WITNESS: Monitor their
21      numbers and talk to them if there was
22      a problem or concern and take action
23      accordingly.
24 QUESTIONS BY MR. GOTTO:
25     Q.  Okay.  You can set that aside.

Page 215

1      (Mallinckrodt-New Exhibit 21
2      marked for identification.)
3 QUESTIONS BY MR. GOTTO:
4     Q.  Exhibit 21 is a multipage
5 document beginning at Bates
6 MNK-T1_0004779439.  It appears to be an
7 e-mail thread from March of 2016 concerning
8 Kroger.
9      If you'd take a moment to look
10 at those e-mails and tell me if you recognize
11 them.
12     A.  I don't remember this document.
13     Q.  Okay.  It appears to be an
14 e-mail thread that concerns some product
15 issues that Kroger is reporting to
16 Mallinckrodt, correct?
17      MR. DAVISON: Objection to
18      form.
19      THE WITNESS: I don't know that
20      for sure.
21 QUESTIONS BY MR. GOTTO:
22     Q.  Okay.  Well, if you turn to the
23 first e-mail in the thread, there's an e-mail
24 from a Robyn Bodine at Kroger.
25      Do you know who Robyn Bodine

Page 216

1 is?
2     A.  I don't recall her.
3     Q.  Okay.  Well, this appears to be
4 an internal Kroger e-mail attaching a photo.
5      And then if you turn to the
6 next e-mail in time from Douglas Cullet.  Do
7 you know who Douglas Cullet is?
8     A.  I do not.
9     Q.  Okay.  Or Stacy Doyle?
10     A.  I do not.
11     Q.  Okay.  Well, the substance of
12 the e-mail, which is at the top of the last
13 page of that exhibit, says, "Stacy, another
14 Mallinckrodt issue, 99 and one-half tabs on
15 the bottle.  I have yet to hear from them on
16 the big fiasco at 677.  Is it time to call
17 the DEA, question mark?"
18      Do you see that?
19     A.  Yes, sir.
20     Q.  Do you know what he's referring
21 to as "the big fiasco at 677"?
22      MR. DAVISON: Objection to
23      form.
24      THE WITNESS: I have no idea.
25

Page 217

1 QUESTIONS BY MR. GOTTO:
2     Q.  Okay.  Well, let's continue
3 back on the next to last page of the exhibit.
4      The next e-mail above
5 Mr. Cullet's e-mail from Stacy Doyle to Britt
6 Turner and Bob Breetz on March 10th says, "We
7 continue to have issues with Mallinckrodt.  I
8 sent a couple other examples a while back.
9 This has" --
10     A.  Can you wait just a second?
11 I'm --
12     Q.  Oh, sure.  Sure, sure, sure.
13     A.  I need to catch up with you.
14     Q.  Yeah.  Let me know when you're
15 ready.
16     A.  Tell me again where you're at.
17     Q.  I was on the next to last page.
18     A.  This page.
19     Q.  The Thursday, March 10 e-mail
20 that's kind of in the middle of the page from
21 Stacy Doyle.
22     A.  Okay.
23     Q.  Okay.  And she says, "We
24 continue to have issues with Mallinckrodt.  I
25 sent a couple other examples a while back.

Page 218

1  This has become such a regular occurrence it
2  is the norm. Can we do anything about this?"
3  　　　Do you see that?
4  　　A.　Correct. Yes.
5  　　Q.　Okay. And then above that we
6  have an e-mail from Britt Turner to you
7  for -- do you know who Britt Turner is?
8  　　A.　She was one of the contacts at
9  Kroger.
10 　　Q.　Okay. And so she says to you,
11 "Hope vacation was relaxing. Please see
12 below. Are you having many complaints of
13 broken tabs? Picture attached shows
14 bottle/lot/expiration. Our central division,
15 which is out of Indianapolis, is having
16 numerous complaints."
17 　　　Do you see that?
18 　　A.　Yes.
19 　　Q.　Does that refresh your
20 recollection about this circumstance at all?
21 　　MR. DAVISON: Objection.
22 　　THE WITNESS: Not this
23 　　particular situation, but broken
24 　　tablets in a manufacturing plant
25 　　happen.

Page 219

1  QUESTIONS BY MR. GOTTO:
2  　　Q.　Okay. Do you recall receiving
3  complaints or -- strike complaints -- just
4  communications from your accounts regarding
5  broken tablets?
6  　　A.　Yes.
7  　　Q.　Apart from Kroger?
8  　　A.　Yes.
9  　　Q.　Okay. With any -- can you give
10 me any idea of the frequency that you can
11 recall that occurred?
12 　　A.　I cannot.
13 　　Q.　Okay. So the next e-mail on
14 the thread is from you to PM quality.
15 　　　What is PM quality?
16 　　A.　Corporate product monitoring.
17 　　Q.　Okay. And you say, "Please see
18 the below complaint and know there must be a
19 pending complaint regarding pharmacy 677,"
20 right?
21 　　A.　"And note there must be a
22 pending complaint regarding pharmacy 677."
23 　　Q.　I'm sorry, thank you.
24 　　　And you're referring there to
25 the -- whatever the big fiasco was that's

Page 220

1  referred to in the earlier e-mail, right?
2  　　MR. DAVISON: Objection.
3  　　THE WITNESS: Right. Right.
4  　　That's an assumption. That's what it
5  　　says.
6  QUESTIONS BY MR. GOTTO:
7  　　Q.　Okay. So you don't
8  independently recall whatever that pharmacy
9  677 situation was?
10 　　A.　I do not.
11 　　Q.　Okay. And the next e-mail
12 in -- above yours, there's a Kian Kazemi.
13 　　　Is that how it's pronounced?
14 　　A.　What was the question?
15 　　Q.　Just how to pronounce --
16 　　A.　Oh, Kian Kazemi.
17 　　Q.　Kian Kazemi. I got them both
18 wrong.
19 　　　Dated March 10 of 2016 to the
20 product monitoring team: "Do you have any
21 details that can be provided to Bonnie and I
22 regarding the past complaint from Kroger
23 Store Number 677 that is referenced in the
24 e-mail string below?"
25 　　　Then Kian's next e-mail to you

Page 221

1  and PM Quality follows up and notes that
2  Mr. Cullet was the same person who filed the
3  earlier complaint, correct?
4  　　A.　Correct. That's what it says.
5  　　Q.　And then ultimately on the
6  first page of the exhibit we have Angela
7  Clark's March 10th e-mail which says, "We
8  have prepared the response letter. I will be
9  mailing it this afternoon."
10 　　　And it goes on to say, "I have
11 also attached a data search for missing
12 and/or broken complaints received from Kroger
13 in the past six months. I ran a pivot table
14 by reporting city so you can see which
15 locations have reported the most."
16 　　　And then the table is included.
17 Do you see that?
18 　　A.　Yes, sir.
19 　　Q.　Any of that refresh your
20 recollection on the circumstance with Kroger
21 back in March of 2016?
22 　　A.　Not specifically, no.
23 　　Q.　Okay. All right. You can set
24 that aside.
25 　　　(Mallinckrodt-New Exhibit 22

Page 222

1  marked for identification.)
2  QUESTIONS BY MR. GOTTO:
3      Q.    Exhibit 22 is a two-page
4  document MNK-T1_0000460028.  It appears to be
5  a script for pharmacy calls draft version
6  11/28/11.
7          Just take a moment and look at
8  that document and tell me if you're familiar
9  with it.
10     A.    I'm not familiar with this
11 specific document.
12     Q.    Do you have any understanding
13 as to the purpose that a script for pharmacy
14 calls would be created and maintained at
15 Mallinckrodt?
16         MR. DAVISON: Objection.  Form.
17         THE WITNESS: I'm not sure of
18     the circumstances on this document at
19     all.
20 QUESTIONS BY MR. GOTTO:
21     Q.    Okay.  Do you have any
22 understanding as to the personnel at
23 Mallinckrodt who would -- who would use this
24 script for -- in connection with pharmacy
25 calls?

Page 223

1          MR. DAVISON: Objection.
2          THE WITNESS:  I have no idea.
3          MR. GOTTO:  Okay.  You can set
4      that aside.
5          We can go off the record.
6          VIDEOGRAPHER:  We are going off
7      the record at 2:25 p.m.
8       (Off the record at 2:25 p.m.)
9          VIDEOGRAPHER:  We are back on
10     the record at 2:44 p.m.
11         (Mallinckrodt-New Exhibit 23
12     marked for identification.)
13 QUESTIONS BY MR. GOTTO:
14     Q.    Ms. New, Exhibit 23 is a
15 multipage document beginning at Bates
16 MNK-T1_0000455771.  Please take a moment to
17 look at that document and tell me if you
18 recognize any of those e-mails.
19     A.    I don't recognize this specific
20 e-mail.
21     Q.    Okay.  If you'd turn to the
22 next to last page in the exhibit.
23     A.    Okay.
24     Q.    Down toward the bottom of that
25 page there's an e-mail from Tiffany Kilper to

Page 224

1  Jane Williams and yourself.
2          Do you see that?
3      A.    Correct.
4      Q.    And who was Tiffany Kilper?
5      A.    I'm not sure of her title.  She
6  was an analyst or in customer service.
7      Q.    Okay.  And so she says in her
8  e-mail, "Advantage Logistics is set up as a
9  ship to for SuperValu, and we have always
10 shipped to them at SuperValu prices under the
11 assumption that this is their legitimate
12 distribution center."
13         Do you see that?
14     A.    Yes.
15     Q.    And SuperValu was one of your
16 accounts at this time?
17     A.    I can't say for sure this time
18 frame, but it was my account at one time.
19     Q.    Okay.  And is Advantage
20 Logistics a name that's familiar to you?
21     A.    Yes.
22     Q.    And what did you understand
23 Advantage Logistics to be?
24     A.    It was a distribution center
25 for our SuperValu.

Page 225

1      Q.    Okay.  In the next paragraph
2  she says, "If you read Laura's e-mail below,
3  parens, Laura is in customer data integrity,
4  close parens, she indicates they're
5  warehousing for other retail chains as well
6  as SuperValu, which entails they are a true
7  distributor.  This concerns me since we ship
8  to them at SuperValu prices.  Is there any
9  concern about gray market activity if they
10 really are a distributor?"
11         Do you see that language?
12     A.    Uh-huh.
13     Q.    Do you recall this concern
14 being raised by Ms. Kilper back in 2010?
15         MR. DAVISON: Objection.
16         THE WITNESS:  No.
17 QUESTIONS BY MR. GOTTO:
18     Q.    Do you recall at any time
19 anyone raising a question as to whether there
20 was a concern about gray market activity
21 associated with SuperValu?
22         MR. DAVISON: Objection.
23         THE WITNESS:  I do not.
24 QUESTIONS BY MR. GOTTO:
25     Q.    Okay.  Ms. Kilper goes on to

Page 226

1 say, "We made the decision in pharma to bill
2 all distributors at invoice price/WAC some
3 time ago so that we would have visibility in
4 chargebacks to know what our product is
5 going" -- I'm sorry -- "to know where our
6 product is going and eliminate the potential
7 for gray market activity."
8      Do you see that?
9      A.   Where are you, sir?  I'm sorry.
10     Q.   I'm sorry.  It's that same
11 paragraph that began with "If you read
12 Laura's e-mail."
13     A.   Okay.
14     Q.   It was toward the end of that.
15     A.   Okay.
16     Q.   Are you familiar with the
17 decision on billing all distributors at
18 invoice price/WAC that Ms. Kilper is
19 referring to in that sentence?
20         MR. DAVISON:  Objection.
21         THE WITNESS:  Only based on
22     what it says here.
23 QUESTIONS BY MR. GOTTO:
24     Q.   Do you know what WAC is?
25     A.   Wholesaler acquisition cost.

Page 227

1      Q.   Okay.  And do you know how
2 billing all distributors at invoice price/WAC
3 would give Mallinckrodt visibility in
4 chargebacks to know where its product is
5 going?
6      A.   It would give us information
7 for some accounts.  It wouldn't give us
8 information for all accounts.
9      Q.   And why would that be?
10     A.   Because not every customer does
11 chargeback data.
12     Q.   Okay.  So it would give
13 information for any customer that asserts a
14 chargeback?
15         MR. DAVISON:  Objection.  Form.
16         THE WITNESS:  Correct.
17 QUESTIONS BY MR. GOTTO:
18     Q.   Okay.  And then if you turn to
19 the prior page on that exhibit, there's an
20 e-mail from you dated Wednesday, November 17.
21     Do you see that?  Kind of in
22 the middle of the page.
23     A.   Yes, sir.
24     Q.   And you say, "Tiffany" -- and
25 I'll just jump to the last paragraph of your

Page 228

1 e-mail.  "I'm curious.  When a change is made
2 that has such a significant impact, is anyone
3 contacted to make sure the change is valid
4 before it's done?"
5      Do you see that?
6      A.   Yes.
7      Q.   Do you know what change you're
8 referring to there that has such a
9 significant impact?
10     A.   The change that she referenced
11 in her e-mail.  "We made the decision in
12 pharma to bill all distributors at
13 invoice/WAC some time ago so that we would
14 have visibility to chargebacks to know where
15 our product is going and eliminate the
16 potential for gray market activity."
17     Q.   Okay.  So had you not been
18 aware of that change until you received
19 Ms. Kilper's e-mail?
20         MR. DAVISON:  Objection.
21         THE WITNESS:  I -- I can't
22     speak to that.  I don't know for sure
23     what I was aware of at that point.
24 QUESTIONS BY MR. GOTTO:
25     Q.   Okay.  Okay.  You can set that

Page 229

1 aside.
2         (Mallinckrodt-New Exhibit 24
3     marked for identification.)
4 QUESTIONS BY MR. GOTTO:
5      Q.   Exhibit 24 is a multipage
6 document beginning at Bates
7 MNK-T1_0000447932, a letter from the US
8 Department of Justice Drug Enforcement
9 Administration dated September 27, 2006.
10     Can you take a look at that
11 document and tell me if you're familiar with
12 it?
13     A.   I'm not familiar with this
14 particular document, no.
15     Q.   Okay.  Do you -- it's signed by
16 Joseph T. Rannazzisi.
17     Do you know who he is?
18     A.   Only based on what it says.
19 He's from the Office of Diversion Control.
20     Q.   Okay.  Do you recall at any
21 time during your employment at Mallinckrodt
22 reviewing any correspondence from
23 Mr. Rannazzisi?
24     A.   I do not.
25     Q.   Okay.  You can set that aside.

Page 230

1      (Mallinckrodt-New Exhibit 25
2   marked for identification.)
3   QUESTIONS BY MR. GOTTO:
4      Q.   Exhibit 25 is a document that
5   was produced in native at MNK-T1_0008001114.
6   Appears to be a PowerPoint presentation
7   entitled "Mallinckrodt DEA controlled
8   substance compliance training for distributor
9   registrants, prepared for commercial
10  group 3/23/11."
11      Can you take a look at that
12  presentation and tell me if you recognize it?
13      A.   I don't recall this specific
14  document, no, sir.
15      Q.   Okay.  Do you recall
16  participating in a training for the
17  commercial group regarding DEA compliance in
18  March of 2011?
19      MR. DAVISON:  Objection.
20      THE WITNESS:  I have
21  participated in training.  I don't
22  recall the 3/23/11 session.
23  QUESTIONS BY MR. GOTTO:
24      Q.   Okay.  And you don't recognize
25  any of the slides from this presentation?

Page 231

1      A.   No.
2      Q.   Okay.  Okay.  You can set that
3   aside.
4      (Mallinckrodt-New Exhibit 26
5   marked for identification.)
6   QUESTIONS BY MR. GOTTO:
7      Q.   Exhibit 26 is a two-page
8   document beginning at MNK-T1_0007729353.
9   It's an e-mail thread from September of 2012.
10      Just take a moment to look at
11  those e-mails and tell me if you recognize
12  them.
13      A.   I don't recall this specific
14  document.
15      Q.   Okay.  If you look on the
16  second page of the exhibit, there's an e-mail
17  from Karen Harper to you copied -- copying
18  Jim Rausch and Eileen Spaulding in which she
19  says, "During a recent mock DEA audit
20  conducted by consultants, the Drug and
21  Chemical Advisory Group, we presented a
22  general scenario that described a customer
23  business model of purchasing Mallinckrodt
24  generic dosage forms, parens, using a DEA
25  distributor license, close parens, and then

Page 232

1   repackaging the controlled substances in
2   units -- in unit of use or unit dose for sale
3   to doctors, clinics, et cetera.  The
4   consultants advised that the customer type
5   described in the scenario should be
6   registered by DEA as a manufacturer and
7   obtain procurement quota for the purchase of
8   the C-II material if C-IIs are being
9   purchased."
10      Do you see that?
11      A.   Yes, sir.
12      Q.   Do you recall learning from
13  Ms. Harper, whether from this e-mail or
14  otherwise, of this mock DEA audit back in
15  2012?
16      MR. DAVISON:  Objection to
17  form.
18      THE WITNESS:  I don't recall
19  it.
20  QUESTIONS BY MR. GOTTO:
21      Q.   Okay.  Well, if you turn to the
22  first page of the exhibit, toward the bottom
23  of the page there's an e-mail from you to
24  Karen Harper, June 20, 2012.
25      Do you see that?

Page 233

1      A.   Right.
2      Q.   And in the second paragraph you
3   say, "Your below e-mail is going to be
4   difficult to explain since I do not believe
5   any other manufacturer is asking them to do
6   this.  I know that they purchase from
7   wholesalers, too.  They have never mentioned
8   anything to me.  I believe we have others who
9   repack product.  Will we implement this with
10  all customers, question mark?"
11      Do you see that?
12      A.   Yes.
13      Q.   And do you recall if -- if this
14  was implemented with all customers?
15      MR. DAVISON:  Objection to
16  form.
17      THE WITNESS:  I can't -- I
18  don't know.
19  QUESTIONS BY MR. GOTTO:
20      Q.   And the implementation that
21  you're referring to there, is that a
22  requirement that a repacking -- a customer
23  who purchases and repacks would need to have
24  a DEA manufacturer license?
25      A.   I'm not sure.

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    Q.   It appears to be what
2  Ms. Harper is referring to in her e-mail,
3  isn't it?
4        MR. DAVISON:  Objection to
5  form.
6        THE WITNESS:  That's what she's
7    referring to, but I don't know what
8    the results of this was.
9  QUESTIONS BY MR. GOTTO:
10   Q.   Okay.  And in the top e-mail on
11 the first page from Ms. Harper -- well, I
12 guess it's from Ms. Harper to Ms. Harper --
13 it says, "Lake Erie d/b/a Quality Care
14 Products purchases C-II under a DEA
15 manufacturing license."
16       Do you see that?
17   A.   Yes, sir.
18   Q.   And Lake Erie, was that one of
19 your accounts?
20   A.   Yes, sir.
21   Q.   Okay.  And is that consistent
22 with your recollection, that they purchased
23 Schedule II narcotics under a DEA
24 manufacturing license?
25       MR. DAVISON:  Objection.

Page 235

1        THE WITNESS:  I don't recall.
2  QUESTIONS BY MR. GOTTO:
3    Q.   Okay.  You can set that aside.
4        (Mallinckrodt-New Exhibit 27
5    marked for identification.)
6  QUESTIONS BY MR. GOTTO:
7    Q.   Exhibit 27 is a multipage
8  e-mail thread beginning at MNK-T1_0005911712.
9  Take a moment and look at those e-mails and
10 tell me if you recognize them.
11   A.   I don't remember the specific
12 e-mail, but I do remember the red flags
13 video.
14   Q.   Okay.  You've seen that video?
15   A.   Yes.
16   Q.   Okay.  In what context do you
17 remember seeing it?
18   A.   I believe they e-mailed it to
19 us for our personal review.
20   Q.   Okay.  Did you ever provide
21 that video to any of your accounts?
22   A.   Yes, I believe I did.
23   Q.   And did you ever view it with
24 any of your accounts?
25   A.   No.

Page 236

1    Q.   And what was your purpose for
2  providing it to your accounts?
3    A.   To create awareness of
4  potential red flags.
5    Q.   Okay.  Ever get any feedback
6  from any of your accounts about the video?
7    A.   They liked the video.
8    Q.   Okay.  You can set that aside.
9        (Mallinckrodt-New Exhibit 28
10   marked for identification.)
11 QUESTIONS BY MR. GOTTO:
12   Q.   Exhibit 28 is a two-page e-mail
13 thread beginning at Bates MNK-T1_0007076152.
14       Please take a look at those
15 e-mails and tell me if you recognize them.
16   A.   I don't recognize this specific
17 e-mail, but it goes back to broken tablets.
18   Q.   Okay.  Yeah, this is --
19   A.   Quality concerns.
20   Q.   Sure.
21       So the e-mail toward the bottom
22 of the first page from Lynn Popson -- do you
23 know who Lynn Popson is?
24   A.   She was a contact that I had at
25 Hy-Vee.

Page 237

1    Q.   And what sort of customer was
2  Hy-Vee?
3    A.   We did not do direct business
4  with Hy-Vee.  They purchased our product
5  through their wholesaler.
6    Q.   Okay.  And so in that setting
7  where someone is purchasing through a
8  wholesaler, what would be the type of
9  interaction you would have with that
10 person -- with that type of indirect
11 customer?
12   A.   This customer would attend ECRM
13 meetings and NACDS meetings and just meet
14 with us to touch base.  They were using our
15 product, but they were using it through a
16 wholesaler and not directly from us on
17 contract.
18   Q.   So apart from meeting at the
19 conferences of the type you described --
20   A.   Right.
21   Q.   -- would it be -- would you
22 periodically get direct communication,
23 whether e-mail or phone call, from this sort
24 of indirect customer?
25       MR. DAVISON:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    THE WITNESS:  Yes.
2  QUESTIONS BY MR. GOTTO:
3    Q.    And what typically -- what
4  would be the types of things they would call
5  or e-mail you about?
6    A.    Problems.
7    Q.    Okay.
8    A.    I became a primary contact for
9  her because I took her problems and tried to
10  get them resolved for her.
11    Q.    Okay.  And is this an example
12  of such a communication?
13    A.    Yes.
14    Q.    Okay.  Do you recall this
15  particular circumstance?
16    A.    No, I do not.
17    Q.    Any idea how it was ultimately
18  resolved?
19      MR. DAVISON:  Objection to
20    form.
21      THE WITNESS:  I can't answer
22    that.
23  QUESTIONS BY MR. GOTTO:
24    Q.    Okay.  All right.  You can put
25  that aside.

Page 239

1    (Mallinckrodt-New Exhibit 29
2    marked for identification.)
3  QUESTIONS BY MR. GOTTO:
4    Q.    Exhibit 29 is a multipage
5  e-mail thread beginning at MNK-T1_0008001120.
6    Please take a look at those
7  e-mails and tell me if you recognize them.
8    A.    I don't remember this specific
9  e-mail.
10    Q.    Okay.  So on the first page of
11  the exhibit, in the middle of the page
12  there's Karen Harper's e-mail to you dated
13  September 9, 2010.
14    Do you see that?
15    A.    Yes, sir.
16    Q.    And it's concerning a
17  Dr. Balasubramanian.
18    Do you remember any issues
19  regarding Dr. Balasubramanian at any time?
20    A.    No, sir, I do not.
21    Q.    Okay.  In the first paragraph
22  of her e-mail, Ms. Harper -- the last
23  sentence of that paragraph says, "We chose
24  Dr. Balasubramanian for review due to the
25  number of oxycodone 15-milligram and

Page 240

1  30-milligram bottles ordered during 2010."
2    Do you see that?
3    A.    Yes, sir.
4    Q.    Apart from recalling the name
5  of this particular doctor, do you recall any
6  other circumstances where Karen Harper
7  notified you that there was a review of any
8  particular doctor based on their ordering
9  history of oxycodone 15 or 30?
10      MR. DAVISON:  Objection to
11    form.
12      THE WITNESS:  I do not recall
13    any -- anything in regard to that, no.
14  QUESTIONS BY MR. GOTTO:
15    Q.    Okay.  In the top e-mail on the
16  first page of this exhibit, it's from you to
17  Mike Gunning -- and I'm sorry, who was
18  Mr. Gunning again?
19    A.    General manager.
20    Q.    Okay.  So was he someone that
21  you indirect -- was an indirect report for
22  you?
23    A.    During different times, he was
24  in charge of sales off and on.
25    Q.    Okay.  And you say, "Mike, I

Page 241

1  should have said this is one of the doctors
2  on the Lake Erie d/b/a Quality Care Products
3  list that Natalie ran for me."
4    Do you see that?
5    A.    Yes, sir.
6    Q.    Do you know who you mean by
7  "Natalie" in that sentence?
8    A.    That's Natalie Kayich.
9    Q.    Okay.  And do you recall why
10  you had Natalie run for you doctors on the
11  Lake Erie d/b/a Quality Care Products list?
12    A.    She was the analyst, but why I
13  asked for that information, I do not recall.
14    Q.    Okay.  Do you have any
15  recollection as to whether there was ever any
16  DEA action taken with respect to
17  Dr. Balasubramanian?
18      MR. DAVISON:  Objection to
19    form.
20      THE WITNESS:  Based on what
21    this says, his name did not appear in
22    any of the publications, nor is he
23    listed as a registrant with pending
24    action on the DEA website.  So that's
25    all I know based on that.

Page 242

1 QUESTIONS BY MR. GOTTO:
2    Q.   Okay.  Do you have any
3 recollection as to whether there was any
4 action taken subsequent to these e-mails with
5 respect to Dr. Balasubramanian?
6    A.   No, sir.
7    Q.   Okay.  You can set that aside.
8        (Mallinckrodt-New Exhibit 30
9    marked for identification.)
10 QUESTIONS BY MR. GOTTO:
11   Q.   Exhibit 30 is a single-page
12 e-mail thread, MNK-T1_00000491217.
13       Please take a look at those
14 e-mails and let me know if you recognize
15 them.
16   A.   I don't recall this specific
17 document.
18   Q.   Okay.  So the e-mail in the
19 middle of the page from you to Sandi Ivan --
20 Ivancho?
21   A.   Ivancho.
22   Q.   Ivancho.
23       -- dated March 29, 2011.  Who
24 was Sandi Ivancho?
25   A.   She was one of the -- well,

Page 243

1 yeah, she -- she was an analyst, based on
2 this.
3    Q.   Okay.  And the subject matter
4 is Lake Erie Medical d/b/a Quality Care
5 Products, the same group we talked about in
6 the earlier e-mail, correct?
7    A.   Right.
8    Q.   And so you say, "Sandi,
9 attached is a spreadsheet with the customers
10 that the above account services.  They are
11 a -- they are a repackager of product and
12 sell to doctors, clinic and various
13 hospitals.  Can you please run an owner
14 report using these DEA numbers?  We want to
15 see all of their customer sales for our
16 products."
17       Do you see that?
18   A.   Yes.
19   Q.   Okay.  Do you recall sending
20 this e-mail?
21   A.   No, sir.
22   Q.   No reason to doubt you sent it,
23 do you?
24   A.   No reason to doubt.
25   Q.   Okay.  You go on to say, "The

Page 244

1 account does not do chargebacks due to the
2 nature of their business."
3        So let me start with that.  Why
4 would the nature of this account's business
5 mean that they do not do chargebacks?
6        MR. DAVISON:  Objection.
7        THE WITNESS:  Because they were
8    selling to doctors, clinics and
9    various hospitals.
10 QUESTIONS BY MR. GOTTO:
11   Q.   As compared to pharmacies, for
12 example?
13   A.   Correct.
14   Q.   Okay.  In the first paragraph,
15 at the end you say, "We want to see all of
16 their customers' sales for our products."
17       Do you recall why you wanted to
18 see those sales?
19   A.   I don't know the sequence of
20 time, but this goes back to the other e-mail
21 that we just looked at.
22   Q.   The one concerning Dr. B with
23 the long name?
24   A.   Well, that, and the other one
25 that was in regard to their licensing and who

Page 245

1 they were selling to.
2    Q.   Whether it was a distributor
3 versus manufacturer license?
4    A.   Yes.
5    Q.   Okay.  When you -- when you
6 asked Sandi to run an owner report, what is
7 an owner report in this setting?
8        MR. DAVISON:  Objection.
9        THE WITNESS:  She was in charge
10    of the sales tools and reporting.  I
11    believe at that time it was a system
12    called Cognos, and that's where she
13    pulled her data from.
14 QUESTIONS BY MR. GOTTO:
15   Q.   And so what would that -- what
16 were you -- what information were you hoping
17 to get from that owner report that you were
18 asking her to run?
19       MR. DAVISON:  Objection.
20       THE WITNESS:  Exactly what I
21    asked for, the list of end purchasers
22    who they were selling to.
23 QUESTIONS BY MR. GOTTO:
24   Q.   Okay.  So at least in the case
25 of Lake Erie Medical d/b/a Quality Care

Page 246

1 Products, Mallinckrodt had in its records
2 information that allowed it to identify who
3 the end customer of Lake Erie Medical d/b/a
4 Quality Care Products was?
5         MR. DAVISON: Objection to
6     form.
7         THE WITNESS: I cannot speak to
8     that directly. They had access to a
9     lot of information that I don't know
10    how they ran the reports and did the
11    reports.
12 QUESTIONS BY MR. GOTTO:
13    Q.    Okay. In any event,
14 Mallinckrodt had the ability to run a report
15 that would provide it with the identity of
16 who the customers of Lake Erie Medical d/b/a
17 Quality Care Products was; is that right?
18        MR. DAVISON: Objection.
19        THE WITNESS: I can't say that
20    for sure.
21 QUESTIONS BY MR. GOTTO:
22    Q.    Okay. Well, did I
23 misunderstand you? I thought that's what the
24 owner report that you were asking for, you
25 were expecting it to show you.

Page 247

1         MR. DAVISON: Objection.
2         THE WITNESS: But I don't know
3     the circumstances on all customers. I
4     don't know who -- I only know what
5     applied to this request.
6 QUESTIONS BY MR. GOTTO:
7     Q.    Okay. But at least as to this
8 particular customer, Lake Erie Medical d/b/a
9 Quality Care Products, Mallinckrodt had the
10 ability to run a report that showed who that
11 entity's customers were, correct?
12        MR. DAVISON: Objection.
13        THE WITNESS: I don't know that
14    I got a report from her. If I read
15    this correctly, we -- it's the middle
16    of an e-mail chain or the end. I
17    don't which -- which.
18 QUESTIONS BY MR. GOTTO:
19    Q.    Well, if you look above your
20 e-mail, there's a letter -- there's an e-mail
21 from Sandi Ivancho to you two or three days
22 after your March 29th e-mail saying, "I took
23 another stab at this report. This represents
24 total end purchaser sales for the DEA number.
25 Does this look like what you need?"

Page 248

1         Correct?
2     A.    That's what it says.
3     Q.    So she appears to have been
4 able to run a report that showed total end
5 purchaser sales for the DEA number, correct?
6         MR. DAVISON: Objection.
7         THE WITNESS: That's what she
8     says. That's what it says.
9 QUESTIONS BY MR. GOTTO:
10    Q.    Do you recall what you did with
11 that information once you received it?
12        MR. DAVISON: Objection.
13        THE WITNESS: I do not.
14 QUESTIONS BY MR. GOTTO:
15    Q.    Do you recall other
16 circumstances where you requested someone at
17 Mallinckrodt to run an owner report of the
18 type that you requested of Ms. Ivancho?
19    A.    I do not.
20    Q.    Okay. You can set that aside.
21        (Mallinckrodt-New Exhibit 31
22    marked for identification.)
23 QUESTIONS BY MR. GOTTO:
24    Q.    Exhibit 31 is a multipage
25 e-mail thread beginning with

Page 249

1 MNK-T1_0006258783. The e-mail is from
2 October of 2012.
3         Please take a look at those
4 e-mails and tell me if you recognize them.
5     A.    I don't remember this specific
6 e-mail.
7     Q.    Okay. The e-mail thread
8 concerns the level of certain Walmart orders
9 back in October of 2012, correct?
10        MR. DAVISON: Objection.
11        THE WITNESS: Correct.
12 QUESTIONS BY MR. GOTTO:
13    Q.    And the very first e-mail on
14 the first page, from Heather Dodson to you,
15 asks whether you have any insight on why
16 Walmart is ordering so much 063705. They're
17 over the 60 days OH amount now.
18        First of all, who's Heather
19 Dodson?
20    A.    Heather Dodson was an analyst.
21    Q.    Okay. And when she makes
22 reference to 60 days OH amount, what is OH in
23 that setting?
24    A.    On-hand.
25    Q.    Okay. And do you recall

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1 getting back to her with any response on this
2 question she's posing?
3     A.   No. I did not completely read
4 this e-mail but --
5     Q.   Well, go ahead. Take your
6 time.
7     A.   Your question again, please?
8     Q.   Do you recall if you got back
9 to Ms. Dodson with an answer on the question
10 she poses in her October 29 e-mail?
11     A.   No, sir, I do not.
12     Q.   Okay. You can set that aside.
13     (Mallinckrodt-New Exhibit 32
14     marked for identification.)
15 QUESTIONS BY MR. GOTTO:
16     Q.   Exhibit 32 is a multipage
17 e-mail thread beginning at MNK-T1_0007721020.
18     Please take a moment to look
19 through those e-mails and tell me if you
20 recognize them.
21     A.   Is there a specific section you
22 want me to look at or --
23     Q.   Yes. Actually on the second
24 page there's an e-mail from Jennifer Buist to
25 you, and then -- which is following up on an

Page 251

1 e-mail from you to her. Those in particular.
2     A.   Okay.
3     Q.   So in your -- in your e-mail of
4 November 5, 2014, you make reference to a
5 Curascript program.
6     What was that program?
7     A.   Curascript was a customer that
8 was a distributor, I believe.
9     Q.   So in your e-mail you say,
10 "Attached is a list of customers on the
11 Curascript program."
12     So were there customers who
13 were on such a program that you can recall?
14     MR. DAVISON: Objection.
15     THE WITNESS: I can't tell you
16     that for certain.
17 QUESTIONS BY MR. GOTTO:
18     Q.   Okay. On Jennifer Buist's
19 e-mail to you on November 5th at the top of
20 the second page of that exhibit.
21     A.   Yes.
22     Q.   In the second paragraph she
23 states, "Amongst the list you provided, two
24 pharmacies are currently chargeback
25 restricted."

Page 252

1     Do you see that?
2     A.   Yes, sir.
3     Q.   Do you know what she meant by
4 "chargeback restricted" in this setting?
5     MR. DAVISON: Objection to
6     form.
7     THE WITNESS: That was action
8     taken to not honor chargebacks for
9     that particular account, and we
10     notified whoever was selling to them.
11 QUESTIONS BY MR. GOTTO:
12     Q.   Okay. So did you receive
13 notification from someone else at
14 Mallinckrodt when a pharmacy was chargeback
15 restricted?
16     A.   The SOMS team, Karen Harper's
17 team, would notify us if a customer was on
18 chargeback restriction.
19     Q.   Okay. And what would you then
20 do with that information?
21     A.   We would send it to customers
22 that it was meaningful to.
23     Q.   So in other words, the
24 customers that resold to that
25 chargeback-restricted pharmacy?

Page 253

1     A.   Right. Right.
2     Q.   And the chargeback restriction,
3 what was the effect of that chargeback
4 restriction?
5     MR. DAVISON: Objection. Form.
6     THE WITNESS: You would have to
7     ask them. I have -- I don't know the
8     effectiveness of it.
9 QUESTIONS BY MR. GOTTO:
10     Q.   Okay. You can set that aside.
11     (Mallinckrodt-New Exhibit 33
12     marked for identification.)
13 QUESTIONS BY MR. GOTTO:
14     Q.   Exhibit 33 is a multipage
15 e-mail thread beginning at Bates
16 MNK-T1_0007984606.
17     Please tell me if you recognize
18 those e-mails.
19     A.   Your question?
20     Q.   Do you recognize any of those
21 e-mails?
22     A.   I am familiar with it. I'm not
23 familiar with all the details.
24     Q.   Okay. So these e-mails concern
25 an apparently suspicious product that

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1 Albertsons discovered?
2         MR. DAVISON:  Objection to
3     form.
4         THE WITNESS:  The key word is
5     "potential."  It was a picture that as
6     far as our corporate product
7     monitoring group was -- apparently
8     they -- they couldn't see the
9     difference.
10 QUESTIONS BY MR. GOTTO:
11     Q.    Okay.  And so ultimately you
12 know what the -- the resolution of this -- of
13 this situation was?
14         MR. DAVISON:  Objection.
15 QUESTIONS BY MR. GOTTO:
16     Q.    Well, let me ask the question
17 differently.
18         Albertsons had an amount of the
19 product in quarantine, correct?
20     A.    Correct.
21     Q.    And -- because they had some
22 concerns about it?
23         MR. DAVISON:  Objection to
24     form.
25         THE WITNESS:  Correct.

Page 255

1 QUESTIONS BY MR. GOTTO:
2     Q.    And do you know ultimately what
3 happened, whether that product was returned
4 by Albertsons or released from quarantine or
5 what happened?
6     A.    I do not recall how it was
7 resolved.
8     Q.    Okay.  In your e-mail on
9 October 21 in the first page of the
10 exhibit --
11     A.    Yes, sir.
12     Q.    -- when you say, "The pictures
13 came last week when we were at HD Smith.  Jen
14 and Karen both could not really see any
15 difference, but apparently Scott is
16 concerned."
17         The Scott you're referring to
18 there, is that Scott Johnson at Albertsons?
19     A.    Correct.
20     Q.    Okay.  And you don't recall the
21 conclusion of that?
22     A.    No, sir.
23     Q.    Okay.  You can set that aside.
24         (Mallinckrodt-New Exhibit 34
25     marked for identification.)

Page 256

1 QUESTIONS BY MR. GOTTO:
2     Q.    Exhibit 34 is a multipage
3 e-mail thread, MNK-T1_0008396040.
4         Please take a look at those
5 e-mails and tell me if you recognize those.
6     A.    Again, I don't recognize this
7 particular e-mail.
8     Q.    Okay.  So this concerns a new
9 customer, Hometown Pharmacy; is that correct?
10     A.    Yes, sir.
11     Q.    Okay.  And if you look at the
12 top of the -- of the second page of the
13 exhibit, there's an e-mail from you to
14 Heather McKenzie dated August 3rd of 2016.
15         Do you see that?
16     A.    Yes.
17     Q.    And who was Heather McKenzie?
18     A.    According to this, she was
19 controlled substance senior analyst.  So she
20 was in the SOMS team.
21     Q.    Okay.  And you say in your
22 e-mail, "This is a new account for MNK.  I
23 just got" -- I'm sorry.  "Just got DEA
24 approval on their vault.  Karen, Tim and I
25 visited this account.  I will provide volume

Page 257

1 ASAP.  I'm in CA at a meeting away from my
2 computer."
3         Correct?
4     A.    Correct.
5     Q.    And so the Karen, Tim -- the
6 Karen and Tim that you visited the account
7 with, who were they?
8     A.    Karen Harper of our SOMS team,
9 and Tim -- I can't think of his last name.
10 Tim was from our security team.
11     Q.    Okay.
12     A.    Heppermann.
13     Q.    And do you recall where this
14 account was located?
15     A.    In Ohio.
16     Q.    Do you know where in Ohio?
17     A.    Oh, no, I'm sorry.  Strike
18 that.  They're in Wisconsin.
19     Q.    Wisconsin?
20     A.    Yeah, I'm sorry.
21     Q.    In 2016 -- well, were there
22 other occasions where you visited new
23 customer facilities with Ms. Harper?
24     A.    Yes.
25     Q.    About how often can you recall

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1　that happening?
2　　　A.　I can't tell you how often it
3　happened, but anytime there was a new
4　account, I would ask her to join me.
5　　　Q.　And sometimes she would, and
6　sometimes she wouldn't; is that fair?
7　　　　　MR. DAVISON:　Objection.
8　　　　　THE WITNESS:　It -- yes, it
9　　　depended on her availability, but it
10　　　also depended on the due diligence
11　　　that we were going to be doing.
12　QUESTIONS BY MR. GOTTO:
13　　　Q.　Okay.　Okay.　You can set that
14　aside.
15　　　　　(Mallinckrodt-New Exhibit 35
16　　　marked for identification.)
17　QUESTIONS BY MR. GOTTO:
18　　　Q.　Exhibit 35 is a two-page e-mail
19　thread beginning at MNK-T1_0001519326.
20　　　　　Would you please take a look at
21　those e-mails and tell me if you recognize
22　them.
23　　　A.　Again, I don't recall this
24　specific e-mail, but I know it's from me,
25　started with me.

Page 259

1　　　Q.　Okay.
2　　　A.　Or started with Heather.
3　　　Q.　Okay.　So at the bottom of the
4　first page there's an e-mail from Heather
5　McKenzie to you, which carrying over to the
6　second page says, "HD Smith order," it gives
7　a number, "was released from U1 hold for
8　oxycodone HCl 15-milligram tablets, USP, 100
9　count.　Their quantity ordered exceeds their
10　monthly forecasted allocation, which includes
11　an additional 10 percent."
12　　　　　When she uses the expression
13　"U1 hold," do you know what that means?
14　　　A.　No.
15　　　Q.　Okay.
16　　　A.　Because I thought it was U2
17　hold, so I don't know why this says U1.
18　　　Q.　Okay.　And I've seen U2 hold in
19　some other documents, too.
20　　　　　What did you understand that
21　term to mean?
22　　　A.　That they're holding it because
23　they're questioning the allocation on it.
24　　　Q.　Okay.　Based on the SOMS team
25　review?

Page 260

1　　　A.　Uh-huh.
2　　　Q.　And so in this e-mail, Heather
3　McKenzie is saying the order was released
4　from hold, although it exceeded the
5　forecasted allocation, correct?
6　　　　　MR. DAVISON:　Objection to
7　　　form.
8　　　　　THE WITNESS:　"There is no
9　　　question as to the quantity of this
10　　　order.　More so we're requesting an
11　　　updated forecast."
12　　　　　So it wasn't necessarily the
13　　　12 bottles, based on what I'm reading.
14　　　It was the fact that they didn't have
15　　　a forecast that accounted for these.
16　QUESTIONS BY MR. GOTTO:
17　　　Q.　Okay.　Okay.　You can set that
18　aside.
19　　　　　(Mallinckrodt-New Exhibit 36
20　　　marked for identification.)
21　QUESTIONS BY MR. GOTTO:
22　　　Q.　Exhibit 36 is a two-page e-mail
23　thread beginning at MNK-T1_0008409479.
24　　　　　If you'd take a look at those
25　e-mails and tell me if you recognize them.

Page 261

1　　　A.　I do not recognize this
2　specific e-mail.
3　　　Q.　Okay.　So on the bottom of the
4　first page we have an e-mail from Heather
5　McKenzie saying, "Bonnie, Anda
6　Pharmaceuticals order" -- gives a number and
7　a customer PO -- "has been released from U2
8　hold.　The order exceeds the 18-month
9　quantity average star factor; however, it is
10　within their segment."
11　　　　　Do you see that?
12　　　A.　Yes.
13　　　Q.　Do you know what it means in
14　this context for the order to be within the
15　customer's segment?
16　　　　　MR. DAVISON:　Objection.
17　　　　　THE WITNESS:　I'm not sure what
18　　　she meant by that.
19　QUESTIONS BY MR. GOTTO:
20　　　Q.　Okay.　I mean, it appears to be
21　the reason that it was released from hold,
22　correct?
23　　　　　MR. DAVISON:　Objection.
24　　　　　THE WITNESS:　I can't say that.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 262

QUESTIONS BY MR. GOTTO:

Q.   Okay.  So you're not familiar with that terminology of it being within their segment?

A.   Correct.

MR. DAVISON:  Objection.

THE WITNESS:  I'm not sure what she meant by that.

QUESTIONS BY MR. GOTTO:

Q.   Okay.  And your e-mail on the first page from January 17 indicates "we are trying to drive compliance.  Looks like it might be working."

What did you mean by that, by the "looks like it might be working" phrase?

A.   The previous sentence says, "We received an award on this product line in October for members of the TBC," which was a purchasing group.  And so they were buying that product through Anda.

Q.   Okay.  Okay.  You can set that aside.

(Mallinckrodt-New Exhibit 37 marked for identification.)

---

Page 263

QUESTIONS BY MR. GOTTO:

Q.   Exhibit 37 is a multipage e-mail thread beginning at Bates MNK-T1_0007729179.

Please take a look at those e-mails and let me know if you recognize them.

A.   I am not familiar with this e-mail.

Q.   Okay.  Well, on the first page there's an e-mail from Karen Harper to you dated August 24, 2017.

Do you see that?

A.   Yes.

Q.   And she says, "Bonnie, the restriction of fentanyl patch purchases only is that MW1 is selling to veterinary customers.  MNK has declined to sell other opioids such as oxycodone through to vets in the past."

Do you see that?

A.   Yes, sir.

Q.   And apart from this e-mail from Ms. Harper, were you aware of Mallinckrodt declining to sell oxycodone to vets in the

---

Page 264

past?

MR. DAVISON:  Objection.

THE WITNESS:  I did not have any veterinary customers, so I'm not familiar with what action was taken with them.

QUESTIONS BY MR. GOTTO:

Q.   Okay.  So you didn't have an understanding one way or the other about purchases by veterinarians?

A.   Huh-uh, no.

Q.   And you did not have any accounts that were veterinary purchasers, correct?

A.   To my knowledge, no, sir.

Q.   And do you know if any of your accounts resold to veterinary purchasers?

MR. DAVISON:  Objection.

THE WITNESS:  I do not, no.

QUESTIONS BY MR. GOTTO:

Q.   Okay.  Okay.  You can set that aside.

(Mallinckrodt-New Exhibit 38 marked for identification.)

---

Page 265

QUESTIONS BY MR. GOTTO:

Q.   Exhibit 38 is a two-page e-mail thread MNK-T1_0008409661.

Please take a look at those e-mails and tell me if you recognize them.

A.   I don't recall this specific e-mail, but Anda was a secondary supplier for Walgreens, so when they couldn't get product through their primary supplier, they would go to Anda for secondary purchases.

Q.   Okay.  Was Mallinckrodt a primary supplier?

MR. DAVISON:  Objection.

THE WITNESS:  I don't know how to answer that.

QUESTIONS BY MR. GOTTO:

Q.   Okay.  Well, in any event, the question -- well, on the second page of the exhibit, your e-mail to Deidre Ashworth -- and who was Deidre Ashworth?

A.   She was with Anda generics --

Q.   Okay.

A.   -- in Florida.

Q.   And so you're forwarding a question to her saying the order will not

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1 ship until we have your reply; is that right?
2    A.   That's correct.
3    Q.   Okay. And then the reply comes
4 back that the order is due to the recent
5 increase in demand from WAGS.
6      Do you see that?
7    A.   Walgreens.
8    Q.   Okay. "This is a great
9 opportunity if you can support, question
10 mark?"
11    A.   Right.
12    Q.   And then you forwarded that
13 response to Amanda Chase, correct?
14    A.   Yes, sir.
15    Q.   And who was Amanda Chase?
16    A.   Amanda was in the controlled
17 substances with Karen Harper, per her
18 signature on the back.
19    Q.   Okay. And the top e-mail from
20 Lisa Cardetti to you and others states that
21 "Attached is Walgreens' response. Will let
22 you know if I hear anything further. Since
23 Anda's purchases are not made at Walgreens'
24 request, this is something to keep an eye on
25 with a run on our inventory and even

Page 267

1 potential returns."
2      Do you see that?
3    A.   Yes.
4    Q.   Do you know what she meant by
5 that, to "keep an eye on it with a run on our
6 inventory and even potential returns"?
7      MR. DAVISON: Objection to
8    form.
9      THE WITNESS: Have to ask Lisa.
10 QUESTIONS BY MR. GOTTO:
11    Q.   Okay. Okay. You can set that
12 aside.
13      (Mallinckrodt-New Exhibit 39
14    marked for identification.)
15 QUESTIONS BY MR. GOTTO:
16    Q.   Exhibit 39 is a multipage
17 e-mail thread beginning at Bates
18 MNK-T1_0004849397.
19    A.   Yes.
20    Q.   Please take a look at those
21 e-mails and tell me if you recognize them.
22    A.   Yes, sir.
23    Q.   Okay. Do you recognize those
24 e-mails?
25    A.   Not this specific e-mail.

Page 268

1    Q.   Okay. If you turn to the one,
2 two, three -- the fourth page of the exhibit,
3 there's an e-mail from you to Lisa Cardetti
4 and others dated September 19, 2017.
5      Do you see that?
6    A.   Right.
7    Q.   And you say, "I have copied
8 Amanda and Eileen on the SOM team so that we
9 do not experience any problems regarding U2
10 holds on these shipments."
11      So what did you mean by that,
12 and how did copying Eileen and Amanda avoid
13 problems regarding U2 holds?
14      MR. DAVISON: Objection.
15      THE WITNESS: Amanda and Eileen
16    are in the SOMS group, and anytime
17    there's a larger-than-normal order or
18    shipment for whatever reason, it was
19    being proactive and letting them know
20    that they were coming so it
21    wouldn't get stopped in the system.
22 QUESTIONS BY MR. GOTTO:
23    Q.   Okay. And the reason for these
24 larger-than-normal orders was what?
25      MR. DAVISON: Objection.

Page 269

1      THE WITNESS: I'm not sure.
2      (Mallinckrodt-New Exhibit 40
3    marked for identification.)
4 QUESTIONS BY MR. GOTTO:
5    Q.   Okay. Exhibit 40 is a document
6 that was produced in native
7 MNK-T1_0007728133.
8      Please take a look at that
9 attachment and tell me if you're familiar
10 with this report or at least the format of
11 this report.
12    A.   I am not --
13    Q.   Okay.
14    A.   -- familiar with this.
15    Q.   There's a column headed
16 "Action" toward the right-hand side.
17      Do you see that?
18    A.   Yes.
19    Q.   And for almost all of the
20 entries in the report, it indicates closed
21 account, parens, quote D, close quote.
22      Do you know what that means?
23      MR. DAVISON: Objection.
24      THE WITNESS: I don't know.
25

Page 270

1   QUESTIONS BY MR. GOTTO:
2       Q.   Okay.  All right.  You can set
3   that aside.
4           MR. GOTTO:  Let's go off the
5   record.
6           MR. DAVISON:  Before we go off,
7   actually, Mallinckrodt is going to
8   claw back Exhibit 22 for privilege
9   under CMO 2.  Just so everyone has the
10  Bates number, it's MNK-T1_0000460028.
11          And we'll send the appropriate
12  clawback letter to all parties.
13          VIDEOGRAPHER:  We are going off
14  the record at 3:46 p.m.
15   (Off the record at 3:46 p.m.)
16          VIDEOGRAPHER:  We are back on
17  the record at 4 p.m.
18          CROSS-EXAMINATION
19  QUESTIONS BY MR. LENISKI:
20      Q.   Good afternoon, Ms. New.
21      A.   Good afternoon.
22      Q.   We were introduced earlier.  My
23  name is Joe Leniski.  I represent plaintiffs
24  in the state of Tennessee.
25          MR. LENISKI:  And before we

Page 271

1   continue, I've got to state an
2   objection that the Tennessee
3   plaintiffs have to these depositions
4   on the basis that we were not provided
5   adequate notice or sufficient -- or
6   provided the documents sufficiently in
7   advance of the deposition, in addition
8   to the fact that we believe there are
9   different rules which apply, Tennessee
10  rules, to the depositions.
11          But in the spirit of the
12  protocol covering these depositions in
13  the MDL, we agree to be here today and
14  ask you questions.
15          MR. DAVISON:  And Mallinckrodt
16  disagrees with your characterization
17  of the facts, and we reserve all
18  rights.  We think that this is a
19  properly cross-noticed deposition.
20          MR. LENISKI:  Okay.  Thanks.
21  QUESTIONS BY MR. LENISKI:
22      Q.   Ms. New, this morning, do you
23  recall being asked questions about which
24  accounts you were assigned while you worked
25  at Mallinckrodt?

Page 272

1       A.   Yes, sir.
2       Q.   Okay.  And I just want to make
3   sure that there weren't any other accounts,
4   and I just want to run through them real
5   quick and verify the ones you named.
6           You named Kroger.  That was an
7   account, correct?
8       A.   Correct.
9       Q.   Thrifty White?
10      A.   Correct.
11      Q.   Schnucks?
12      A.   Yes.
13      Q.   HAB?
14      A.   HEB.
15      Q.   HEB, sorry.
16           SuperValu?
17      A.   Correct.
18      Q.   And then you also had Walmart?
19      A.   Yes, sir.
20      Q.   And Cardinal?
21      A.   Yes, sir, at the end.
22      Q.   Okay.  Are there any other
23  accounts you can think of that you would have
24  been assigned while you worked at
25  Mallinckrodt?

Page 273

1       A.   Anda I had for a time.  That's
2   all I can recall right this minute.
3       Q.   Okay.  To your recollection,
4   did any of your accounts ship Mallinckrodt
5   opioids to Tennessee?
6           MR. DAVISON:  Objection to
7   form.
8           THE WITNESS:  I can't answer
9   that.
10  QUESTIONS BY MR. LENISKI:
11      Q.   Well, that was something you
12  probably would have been aware of when you
13  worked at Mallinckrodt?
14      A.   Potentially.
15          MR. DAVISON:  Objection.
16  QUESTIONS BY MR. LENISKI:
17      Q.   And you say "potentially."
18          Did your role as accounts
19  director, did that require you to know where
20  your customers' customers were located
21  geographically?
22      A.   No, sir.
23      Q.   Okay.  Is that something that
24  you sought to learn in connection with your
25  responsibilities at Mallinckrodt?

Page 274

1   A.   No, sir.

2   Q.   Okay.  And can you tell me why

3 was the location where your customers'

4 customers were obtaining opioids, why was

5 that something that you just weren't required

6 to concern yourself with while you were at

7 Mallinckrodt?

8       MR. DAVISON:  Objection.

9       THE WITNESS:  Because there

10     were other people that monitored

11     that in -- that data.

12 QUESTIONS BY MR. LENISKI:

13   Q.   So as a national accounts

14 director then, the relative level of opioid

15 abuse or overdoses in a particular geographic

16 area was not something that you were

17 responsible for knowing or addressing in any

18 way?

19       MR. DAVISON:  Objection.

20     THE WITNESS:  I'm not sure I

21     could say that clearly.  I mean, I

22     can't -- I can't state that as being

23     true.

24 QUESTIONS BY MR. LENISKI:

25   Q.   While employed at Mallinckrodt,

Page 275

1 did you have an awareness of the severity of

2 the opioid epidemic in Tennessee?

3       MR. DAVISON:  Objection.

4     THE WITNESS:  I was not aware

5     of it specific to different states.  I

6     just was aware of it in general.

7 QUESTIONS BY MR. LENISKI:

8   Q.   You mean across the nation?

9   A.   Yes, sir.

10   Q.   Okay.  While employed at

11 Mallinckrodt, did you have awareness of the

12 severity of the opioid epidemic specifically

13 in Appalachia?

14       MR. DAVISON:  Objection.

15     THE WITNESS:  No, sir.

16 QUESTIONS BY MR. LENISKI:

17   Q.   When I say "Appalachia," do you

18 know where I'm talking about?

19   A.   Not specifically, no.  I --

20 Florida?  I mean, not Florida.  Tennessee?

21   Q.   Right.  I'm talking about

22 Appalachia representing the region --

23 generally speaking the states that border the

24 Appalachian mountains in the eastern United

25 States.

Page 276

1   A.   Okay.

2   Q.   Are you aware of that?

3   A.   I'm not, sir.

4   Q.   While at Mallinckrodt, were you

5 ever involved in any discussions, to your

6 knowledge, about Mallinckrodt's shipment or

7 distribution of opioids in Appalachia?

8       MR. DAVISON:  Objection.

9     THE WITNESS:  No, sir.

10 QUESTIONS BY MR. LENISKI:

11   Q.   Were you party to any

12 discussions about whether or not Mallinckrodt

13 should be shipping or distributing opioids to

14 customers in Appalachia?

15   A.   No, sir.

16   Q.   Would that have been a

17 discussion you would have been involved in,

18 to your knowledge?

19       MR. DAVISON:  Objection.

20     THE WITNESS:  Not that I

21     recall.

22 QUESTIONS BY MR. LENISKI:

23   Q.   As a national account manager

24 at Mallinckrodt, did you treat distributors

25 shipping to certain geographic areas -- well,

Page 277

1 strike that.

2       As a national account manager

3 at Mallinckrodt, was it relevant to your job

4 duties where your distributors -- where your

5 customers were distributing your product?

6       MR. DAVISON:  Objection.

7     THE WITNESS:  I don't know how

8     to answer that.

9 QUESTIONS BY MR. LENISKI:

10   Q.   Well, let me try to ask it this

11 way.  As national account director or

12 national account manager -- what's more --

13 what's proper, national account manager or

14 national account director?

15   A.   It was -- the director came

16 after the national account, so there were

17 three positions in sales.

18   Q.   Okay.

19   A.   So I -- I understand what

20 you're saying.

21   Q.   Okay.  So in the role of

22 national accounts manager, were there any --

23 was there any consideration given as to

24 whether or not Mallinckrodt should be selling

25 its product to customers in particular

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1 geographic regions?
2        MR. DAVISON: Objection.
3        THE WITNESS: I'm not aware of
4 that.
5 QUESTIONS BY MR. LENISKI:
6    Q.   Do you recall there ever being
7 any discussion while you were employed at
8 Mallinckrodt about how Mallinckrodt handled
9 its sales of its opioid products in the state
10 of Florida?
11       MR. DAVISON: Objection.
12       THE WITNESS: No, sir.
13 QUESTIONS BY MR. LENISKI:
14    Q.   In other words, are you
15 aware -- while you were at Mallinckrodt, were
16 you aware whether Florida was ever treated
17 differently from a national account
18 standpoint?
19    A.   I didn't have Florida
20 customers, so I was not involved in those
21 top-line conversations.
22    Q.   And how do you know you didn't
23 have Florida customers?
24    A.   That was based on geographic
25 location of my accounts and the people that I

Page 279

1 called on.
2    Q.   So where geographically then
3 were your accounts located, to your
4 knowledge?
5    A.   I misspoke. They weren't --
6 the accounts were awarded -- our account
7 responsibility was not geographical. It was
8 based on account by account. And so they
9 would move them, they would change them, so
10 it rotated on a regular basis.
11    Q.   And it was your recollection
12 that none of your accounts to which you were
13 assigned were located in Florida?
14    A.   Not that I can recall, no, sir.
15    Q.   Okay. Did you know whether any
16 of your accounts that you were assigned,
17 whether their customers were located in
18 Florida?
19    A.   I can't answer that. I don't
20 know.
21    Q.   Was that something that you
22 would have been required to know in your role
23 in national accounts?
24       MR. DAVISON: Objection.
25       THE WITNESS: No. That was our

Page 280

1 SOMS team monitoring that.
2 QUESTIONS BY MR. LENISKI:
3    Q.   Okay. So whether or not -- the
4 accounts that you were assigned to, whether
5 or not Mallinckrodt was selling to those
6 accounts and in turn those accounts had
7 customers located in the state of Florida,
8 that was not something that you understood
9 was relevant to your job duties in national
10 accounts?
11       MR. DAVISON: Objection.
12 QUESTIONS BY MR. LENISKI:
13    Q.   Is that fair?
14    A.   I'm not sure.
15    Q.   Did overdose rates in
16 particular areas of the country, was that a
17 factor that you had to be aware of in
18 connection with your role in national
19 accounts?
20    A.   No, sir.
21    Q.   What about per capita
22 prescribing, was that a factor you had to be
23 aware of in connection with your role in
24 national accounts?
25       MR. DAVISON: Objection.

Page 281

1       THE WITNESS: No, sir.
2 QUESTIONS BY MR. LENISKI:
3    Q.   What about dispensing rates,
4 was this a factor you had to be aware of in
5 connection with your role in national
6 accounts?
7       MR. DAVISON: Objection.
8       THE WITNESS: No, sir.
9 QUESTIONS BY MR. LENISKI:
10    Q.   Do you know what neonatal
11 abstinence syndrome is?
12    A.   Not specifically, no.
13    Q.   Did reports of law enforcement
14 actions factor into your responsibilities in
15 national accounts?
16       MR. DAVISON: Objection.
17       THE WITNESS: Reask that
18 question again?
19 QUESTIONS BY MR. LENISKI:
20    Q.   Did reports of law enforcement
21 actions factor into your responsibilities in
22 national accounts?
23    A.   No, it wasn't my
24 responsibility.
25    Q.   From time to time would you be

Page 282

1  included in communications about law
2  enforcement actions affecting customers of
3  Mallinckrodt?
4       MR. DAVISON:  Objection.
5       THE WITNESS:  Yes.
6  QUESTIONS BY MR. LENISKI:
7       Q.    And do you know why you were
8  included this those communications?
9       A.    No, sir.
10      Q.    And I guess I'll ask it this
11  way.  Well, strike that.
12           Can you recall an instance
13  where you took any action in response to
14  receiving a report or a news article about a
15  law enforcement action concerning one of
16  Mallinckrodt's customers?
17      MR. DAVISON:  Objection.
18      THE WITNESS:  No, sir.
19  QUESTIONS BY MR. LENISKI:
20      Q.    To your knowledge, did any --
21  did you or any other national account
22  managers ever express concerns about the
23  relative volume of opioids going into a
24  particular geographic area?
25      A.    No, sir.  I can speak for

Page 283

1  myself.  I can't speak for others.
2       Q.    Well, were you party to any
3  communications that you're aware of from
4  other national account managers in which they
5  were expressing concern about volumes of
6  opioids in a particular geographic area?
7       A.    I'm not aware of any.
8       Q.    As a national account manager,
9  were you trained to report patterns or
10  distributor practices that raised any red
11  flags?
12      MR. DAVISON:  Objection.
13      THE WITNESS:  Not specifically.
14  QUESTIONS BY MR. LENISKI:
15      Q.    To your knowledge, did you ever
16  become aware of any red flags that you ever
17  reported to anyone at Mallinckrodt?
18      A.    Potentially, but I don't
19  recall.
20      Q.    Nothing specific today?
21      A.    Nothing, no.
22      Q.    As a national account manager,
23  were you instructed to monitor for suspicious
24  behavior by distributors?
25      A.    We needed to keep our eyes open

Page 284

1  and watch for things, but I didn't have the
2  detail level that the suspicious order
3  monitoring team had.
4       Q.    And who was it that instructed
5  you to keep your eyes open and watch for
6  things?
7       A.    I think it was general
8  knowledge.
9       Q.    So no one specifically, to your
10  knowledge, gave you that instruction at
11  Mallinckrodt?
12      A.    I would -- Karen Harper did
13  some training with us.  I'm sure it came
14  through that avenue of training.
15      Q.    And when you say you "needed to
16  keep your eyes open and watch for things,"
17  what's your understanding of what those
18  "things" were you needed to watch out for?
19      A.    U2 hold orders would bring to
20  our attention quantities that were outside
21  the norm.
22      Q.    And how would a U2 hold order
23  come to your attention?
24      A.    It would come from the SOMS
25  team asking me about the actual purchase.

Page 285

1       Q.    So when you said "keep your
2  eyes open and watch for things," you meant
3  that -- look for particular items that the
4  SOMS team would bring to your attention; is
5  that correct?
6       MR. DAVISON:  Objection.
7       THE WITNESS:  That, and various
8  other avenues.
9  QUESTIONS BY MR. LENISKI:
10      Q.    Would you come -- would you
11  become aware of any U2 hold order other than
12  through the SOMS team at Mallinckrodt?
13      A.    No, that was the trigger.
14      Q.    Okay.  Other than U2 hold
15  orders, what other things did you understand
16  you were supposed to keep your eye out for?
17      A.    I don't recall specifically.
18      Q.    Do you recall there ever being
19  a list of items that you were supposed to
20  keep an eye out for?
21      A.    No, sir.
22          (Mallinckrodt-New Exhibit 41
23      marked for identification.)
24  QUESTIONS BY MR. LENISKI:
25      Q.    I hand a document identified as

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1  Exhibit 41 to your deposition.  This is a
2  document which is Bates-stamped
3  MNK-T1_0006264226.
4          If you want to look at the
5  document, I'm going to ask you if you
6  recognize the document first.
7      A.    Yes.
8      Q.    What is this document,
9  Exhibit 41?
10     A.    This was presented at our
11 national sales meeting in October of 2014,
12 according to the cover page.
13     Q.    And this says, "Take it to the
14 next level, national sales meeting, Bonnie
15 New - Territory 5000, October 26 through the
16 30th, 2014," correct?
17     A.    Correct.
18     Q.    Did you put together this
19 PowerPoint presentation?
20     A.    I put together the information
21 in the PowerPoint, but the slide deck was
22 given to us, the format.
23     Q.    I see.
24          Territory 5000, what is that?
25     A.    The territory that was assigned

Page 287

1  to me.
2      Q.    If you look at the second page
3  of the PowerPoint, under agenda, second
4  bullet says, "Key accounts business summary,"
5  correct?
6      A.    Yes.  Yes.
7      Q.    Those five accounts, were those
8  all accounts that you were assigned to around
9  this time, 2014?
10     A.    I don't believe so.
11     Q.    Okay.  Were those accounts in
12 Territory 5000?
13     A.    Yes, sir.
14     Q.    Okay.  Do you know whether you
15 were assigned to Walmart around this time in
16 2014?
17     A.    I would say that I was, based
18 on the slide.
19     Q.    Okay.  Were you assigned to
20 Econdisc, the second item --
21     A.    Yes.
22     Q.    -- or second key account listed
23 there?
24     A.    Yes.
25     Q.    Were you assigned to HD Smith?

Page 288

1      A.    Yes, sir.
2      Q.    Were you assigned to Morris &
3  Dickson?
4      A.    Yes, sir.
5      Q.    And were you assigned to
6  Thrifty White?
7      A.    Yes, sir.
8      Q.    Okay.  If you would, please
9  turn to page 24 of the PowerPoint.
10     A.    It's not numbered.
11     Q.    You might just have to -- let
12 me see if I can find the Bates number for
13 you.
14          MR. DAVISON:  There's no Bates
15     numbers either because it's -- you
16     just have to give us the title.
17 QUESTIONS BY MR. LENISKI:
18     Q.    So about halfway.
19     A.    Okay.
20     Q.    At the top of the slide it
21 reads "Econdisc strategic key objective."
22     A.    Okay.
23     Q.    "Fiscal year '15."
24     A.    Okay.  So --
25          MR. DAVISON:  A little bit

Page 289

1  further.
2          Joe, this one?
3          MR. LENISKI:  That's right.
4  Correct.
5          THE WITNESS:  Okay.
6  QUESTIONS BY MR. LENISKI:
7      Q.    On this slide, the second
8  bullet down says, "Increase core business, 15
9  million plus -- $15 million plus,
10 approximately a 42 percent increase."
11          Do you see that?
12     A.    Yes, sir.
13     Q.    Okay.  And the first sub-bullet
14 there says, "Oxycodone IR 15 milligrams,"
15 correct?
16     A.    Correct.
17     Q.    And then if you look across
18 from that it has $2 million listed there.
19     A.    Right.
20     Q.    Was it your understanding as of
21 the date of this national sales meeting that
22 the key -- strategic key objective with
23 respect to the Econdisc -- I'm sorry,
24 Econdisc at Mallinckrodt was to increase the
25 core business with respect to oxycodone IR

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1  15-milligram product $2 million?
2          MR. DAVISON: Objection.
3          THE WITNESS: So these were key
4    objectives for fiscal year '15. There
5    was a bid process coming up. We knew
6    their volumes for all these products,
7    so we estimated if we won the business
8    what the value would be. That's what
9    that number means.
10  QUESTIONS BY MR. LENISKI:
11     Q.   Okay. And then second bullet,
12  the strategic key objective for fiscal year
13  '15 with respect to oxy/APAP 10 and 325
14  strengths would be to increase that core
15  business by 13 million, correct?
16     A.   Correct.
17     Q.   Were you involved in the bid
18  process at Econdisc where Mallinckrodt was
19  concerned?
20     A.   Yes.
21     Q.   And what did that entail?
22     A.   It included getting the entire
23  marketing folks together, upper management,
24  and determining what product was available
25  based on our DEA quota and what we could

Page 291

1  actually go out and bid. So it was a very
2  complex process.
3      Q.   And what was your role in the
4  bid process, specifically?
5      A.   To manage the process. To make
6  sure that we made our deadlines on the bid
7  dates and that we submitted documentation in
8  a proper fashion.
9      Q.   And do you know who was it that
10 made the forecast or set the goal of
11 increasing your core business for both
12 oxycodone and oxy/APAP products at Econdisc
13 $15 million plus?
14         MR. DAVISON: Objection. Form.
15         THE WITNESS: Can you explain
16     your question again?
17 QUESTIONS BY MR. LENISKI:
18     Q.   Sure.
19         There's a strategic key
20 objective here for fiscal year '15 --
21     A.   Right.
22     Q.   -- that references increasing
23 core business for both the oxycodone IR
24 15-milligram strength and then the oxy/APAP
25 10 and 325 strength --

Page 292

1      A.   Right.
2      Q.   -- a total of $15 million plus,
3  correct?
4      A.   Correct.
5      Q.   And my question is: Do you
6  know who was it at Mallinckrodt that
7  formulated that strategic key objective?
8      A.   This was a combination of
9  working with the product manager and myself,
10 and these were based on the numbers that
11 Econdisc provided to us as far as their
12 volume. This was product that we did not
13 have on contract with them.
14         So based on the volume that
15 they gave us and the -- what we knew to be
16 the market price at the time we were
17 discussing it, that was the value.
18     Q.   Okay. Go to the next slide.
19     A.   Yes, sir.
20     Q.   Under the first bullet it says,
21 "Invest in their business," and it lists the
22 ALL IN program.
23         What is that?
24     A.   The ALL IN program was one that
25 was established as a communication program.

Page 293

1  It was effective for a year, and I think it
2  just kind of went by the wayside.
3      Q.   What was your responsibility,
4  if any, with respect to the ALL IN program?
5      A.   To communicate it to the
6  customer.
7      Q.   And can you give me more detail
8  than it was a communication program?
9      A.   I cannot.
10     Q.   Okay. Was it intended to
11 increase sales to this particular customer of
12 Mallinckrodt?
13         MR. DAVISON: Objection. Form.
14         THE WITNESS: I don't recall.
15 QUESTIONS BY MR. LENISKI:
16     Q.   If you flip forward a few
17 slides, there is a slide that says, "HD Smith
18 strategic objectives, fiscal year '15."
19     A.   Yes, sir.
20     Q.   First bullet says, "Maintain,
21 grow and protect current business"?
22     A.   Yes, sir.
23     Q.   Okay. And who was it at
24 Mallinckrodt that helped formulate that
25 particular strategic objective concerning

Page 294

1  HD Smith for fiscal year '15?
2      A.    Again, group effort, talking
3  with the product team, upper management,
4  specific goals, et cetera.
5      Q.    And what did it mean to grow
6  HD Smith's business as a strategic objective
7  for fiscal year '15?
8      A.    To look for potential products
9  that may be available to contract with them.
10     Q.    Did it also mean increasing
11 sales of existing products that HD Smith was
12 already -- or that Mallinckrodt's already
13 selling through HD Smith?
14     A.    We could not increase their
15 sales. The driver for increasing their sales
16 was their increased demand from their
17 customers. So growing the business was more
18 about looking for opportunity for products
19 that they didn't have on contract with us.
20     Q.    So it was your understanding if
21 HD Smith's customers' demand went up, then
22 Mallinckrodt could potentially increase its
23 sales to HD Smith, correct?
24         MR. DAVISON:  Objection.
25         THE WITNESS:  That's basically

Page 295

1      correct.
2  QUESTIONS BY MR. LENISKI:
3      Q.    And that was true throughout
4  the time you served as a national -- in
5  national accounts at Mallinckrodt, correct?
6          MR. DAVISON:  Objection.
7          THE WITNESS:  I can't state --
8      with a multiple management team, there
9      was a lot of inconsistency.
10 QUESTIONS BY MR. LENISKI:
11     Q.    To your knowledge, was the ALL
12 IN program -- was a goal of that program to
13 help your -- help Mallinckrodt's customers
14 increase demand from their customers?
15         MR. DAVISON:  Objection.
16         THE WITNESS:  No, I would
17     not -- no.
18 QUESTIONS BY MR. LENISKI:
19     Q.    Okay. This morning, do you
20 recall answering questions about
21 Mallinckrodt's suspicious order monitoring
22 function?
23     A.    Yes.
24     Q.    Okay. Do you know what the
25 customer questionnaire that Mallinckrodt gave

Page 296

1  to its customers was?
2      A.    I know that it was a piece
3  developed from our suspicious order
4  monitoring team that needed to be updated
5  periodically.
6      Q.    Okay. Did you ever have any
7  responsibilities with respect to the customer
8  questionnaire that Mallinckrodt utilized?
9      A.    I can't say specifically.
10         (Mallinckrodt-New Exhibit 42
11     marked for identification.)
12 QUESTIONS BY MR. LENISKI:
13     Q.    I've handed the witness
14 Exhibit 42.
15     A.    So this one we're done with?
16     Q.    Correct.
17     A.    Okay.
18     Q.    This is a document
19 Bates-stamped MNK_TNSTA01117304.
20         Take a look at the document,
21 and I'll ask you if you recognize it.
22     A.    This particular document right
23 here? Is that the one you're asking about?
24     Q.    It would be just -- if there's
25 an e-mail at the front -- I think you flip it

Page 297

1  over.
2      A.    Okay.
3      Q.    You're reading it backwards.
4      A.    Right.
5      Q.    There's a cover e-mail, and
6  then what you have is an attachment to the
7  e-mail following it.
8      A.    Okay. Okay. Thank you, sir.
9  Okay.
10     Q.    Do you recognize the e-mail on
11 the document attachment?
12     A.    I recognize the attachments. I
13 don't recognize the specific e-mail.
14     Q.    And the e-mail is from Jane
15 Williams to a number of individuals,
16 including yourself, dated January 24, 2012,
17 correct?
18     A.    Correct.
19     Q.    And the subject is forward,
20 suspicious order monitoring, direct customer
21 questionnaire revision, correct?
22     A.    Correct.
23     Q.    Okay. Did you assist in
24 developing the customer questionnaire --
25     A.    No.

Page 298

Q. -- attached to this exhibit?

A. No, sir, I did not.

Q. Do you know who developed it?

A. I would suspect it's the suspicious order monitoring team.

Q. Okay. Was it part of your responsibilities as national account manager to transmit this customer questionnaire to your customer -- or your accounts, rather?

A. Where applicable, yes.

Q. Okay. And when you say "where applicable," which accounts were required to -- were you required to send for completion --

MR. DAVISON: Objection.

QUESTIONS BY MR. LENISKI:

Q. -- this -- this questionnaire?

MR. DAVISON: Objection.

THE WITNESS: New accounts. I don't know if they also sent them out from the SOMS team. It looks like based on this letter that they may have.

QUESTIONS BY MR. LENISKI:

Q. You said "new accounts."

Page 299

What about accounts that existed prior to the date of this e-mail, 2012, do you know whether existing accounts had to complete this customer questionnaire?

A. I believe all accounts needed to complete them. I'm not sure the process to get all the accounts set up with this document.

Q. So is your testimony then that it's your understanding, even before this e-mail was sent, that all distributors were required to complete a customer questionnaire?

MR. DAVISON: Objection to form.

THE WITNESS: I can't answer that for certain.

QUESTIONS BY MR. LENISKI:

Q. Well, do you know if there was any consequence if a distributor or a wholesaler for Mallinckrodt did not complete the questionnaire?

A. I do not know the answer.

Q. Okay. And did you discuss the questionnaire with your accounts?

Page 300

A. I can't say that I did or did not.

Q. To your knowledge, did you help any of your accounts to fill out the questionnaire?

MR. DAVISON: Objection. Form.

THE WITNESS: No, sir.

QUESTIONS BY MR. LENISKI:

Q. Were you responsible for receiving back the questionnaire from your accounts?

MR. DAVISON: Objection.

THE WITNESS: I don't recall specifically.

QUESTIONS BY MR. LENISKI:

Q. Do you know whether or not you were responsible for reviewing the customer questionnaires when they were received back from your accounts?

MR. DAVISON: Objection.

THE WITNESS: No.

QUESTIONS BY MR. LENISKI:

Q. Do you recall ever doing that, reviewing the customer questionnaires once received back from your accounts?

Page 301

A. No, sir, I do not.

Q. Other than the SOMS group, do you know anyone else at Mallinckrodt who would have received these customer questionnaires?

A. I'm not sure what departments they would have gone to.

Q. Other than the questionnaire, are you aware of any other documentation that distributors were required to provide back to Mallinckrodt?

A. Not specifically, no.

MR. DAVISON: Objection.

QUESTIONS BY MR. LENISKI:

Q. Okay. You testified earlier this afternoon about performing site visits with people from the SOM team.

Do you recall that?

A. Yes, sir.

Q. Okay. Did -- to your knowledge, did you ever perform a site visit with Mallinckrodt's SOM team -- no, strike that.

To your knowledge, did Mallinckrodt only perform site visits for SOM

Page 302

1  purposes with retail pharmacies that had
2  warehouses?
3         MR. DAVISON: Objection.
4         THE WITNESS: I -- I don't know
5     the answer to that.
6  QUESTIONS BY MR. LENISKI:
7     Q.   Well, do you know whether
8  Mallinckrodt performed site visits at all
9  retail pharmacies for the purpose of
10 evaluating their SOM programs?
11        MR. DAVISON: Objection.
12        THE WITNESS: I don't know the
13    answer to that either.
14 QUESTIONS BY MR. LENISKI:
15    Q.   Okay.  And you may have been
16 asked this, but do you recall how many site
17 visits that you ever attended with SOM during
18 your tenure at Mallinckrodt?
19    A.   I do not.
20    Q.   Was it more than five?  More
21 than ten?  Any estimate?
22        MR. DAVISON: Objection.
23        THE WITNESS: I can't speculate
24    on that.
25

Page 303

1  QUESTIONS BY MR. LENISKI:
2     Q.   Okay.
3     A.   I don't recall.
4     Q.   Okay.  What was your role on
5  the site visits that you accompanied SOM --
6  Mallinckrodt's SOM team to?
7         MR. DAVISON: Objection.
8         THE WITNESS: Taking the SOM
9     group and security to the facility,
10    introducing them to the key contacts,
11    basically letting them proceed
12    accordingly.
13 QUESTIONS BY MR. LENISKI:
14    Q.   So a typical site visit, would
15 you accompany the -- Mallinckrodt's SOM team
16 and the security individual along -- during
17 their -- the entirety of their site visit?
18        MR. DAVISON: Objection.
19        THE WITNESS: Only when I
20    requested their review.
21 QUESTIONS BY MR. LENISKI:
22    Q.   And under what circumstances
23 would you request Mallinckrodt's SOM team to
24 perform the review?
25    A.   At a customer's request to get

Page 304

1  feedback on their facility and their security
2  system.
3     Q.   So those -- those are the --
4  strike that.
5         So the only site -- is it your
6  testimony the only site visits that you would
7  accompany Mallinckrodt SOM team on would be
8  those that you specifically requested of the
9  SOM team?
10    A.   Correct.
11        MR. DAVISON: Objection.
12 QUESTIONS BY MR. LENISKI:
13    Q.   Okay.  And you'd only make that
14 request of Mallinckrodt's SOM team for a site
15 visit if your account had requested it?
16        MR. DAVISON: Objection.
17        THE WITNESS: Yes, generally.
18 QUESTIONS BY MR. LENISKI:
19    Q.   Were you ever invited to a site
20 visit where the account or customer did not
21 specifically ask you to set up the site visit
22 with Mallinckrodt's SOM team?
23    A.   Yes.
24    Q.   Can you recall any specific
25 site visits like that?

Page 305

1     A.   HD Smith in Springfield,
2  Missouri.
3     Q.   Okay.  And why do you remember
4  that particular site visit?
5         MR. DAVISON: Objection.
6         THE WITNESS: Because I do.
7  QUESTIONS BY MR. LENISKI:
8     Q.   Do you recall why you were
9  asked to accompany the Mallinckrodt SOM team
10 on that visit?
11        MR. DAVISON: Objection.
12        THE WITNESS: I do not know.
13 QUESTIONS BY MR. LENISKI:
14    Q.   Okay.  Do you know what
15 specific task or responsibilities you had on
16 that particular site visit?
17        MR. DAVISON: Objection.
18        THE WITNESS: Introduction to
19    my contacts.
20 QUESTIONS BY MR. LENISKI:
21    Q.   Okay.  In other words, you
22 didn't have any checklist of items that you
23 were trying to evaluate or monitor with
24 respect to --
25    A.   No.

Page 306

1       Q.    -- that customer's SOM program?
2       A.    Right.  That was outside of my
3  responsibilities.
4       Q.    Okay.  So during the site
5  visits, you relied entirely on Mallinckrodt's
6  SOM team and the individual from the security
7  division to perform the site visit from a
8  substantive point of view?
9       A.    Right.
10      Q.    To your knowledge, did
11 Mallinckrodt check retail pharmacy SOM
12 procedures?
13           MR. DAVISON:  Objection.
14           THE WITNESS:  I don't know the
15      answer to that.
16 QUESTIONS BY MR. LENISKI:
17      Q.    Do you recall ever performing
18 such a site visit to a retail pharmacy
19 yourself?
20           MR. DAVISON:  Objection.
21           THE WITNESS:  I went into a
22      pharmacy, if that's the question.
23 QUESTIONS BY MR. LENISKI:
24      Q.    Well, let me ask about that.
25 What are you talking about there with that

Page 307

1  answer?
2            MR. DAVISON:  Objection.
3            THE WITNESS:  When I was
4       working with Kroger, I went into a
5       pharmacy to understand how they stored
6       their C-IIs and what would help them
7       in regard to the storage of C-IIs.
8  QUESTIONS BY MR. LENISKI:
9       Q.    And did you accompany
10 Mallinckrodt's SOM team --
11      A.    No.
12      Q.    -- on that occasion?
13      A.    No.
14      Q.    Who --
15      A.    Myself.
16      Q.    Okay.  Who requested you to go
17 visit that Kroger pharmacy for that purpose?
18      A.    The -- my primary contact at
19 Kroger said it would be a good idea to see
20 how they do it.
21      Q.    Okay.  And when you went to
22 that pharmacy to try to understand how they
23 stored their C-IIs, what would help them in
24 regard to the storage of C-IIs, what criteria
25 were you using to evaluate that?

Page 308

1            MR. DAVISON:  Objection.
2            THE WITNESS:  Just getting an
3       understanding of how they stored it.
4  QUESTIONS BY MR. LENISKI:
5       Q.    Were you trained specifically
6  with respect to proper storage and handling
7  of C-II by pharmacies?
8       A.    No, not that I recall.
9       Q.    Okay.  Did you draft some
10 report on that occasion that you submitted to
11 someone else at Mallinckrodt?
12      A.    No.  It was for observation.
13      Q.    So this was at the request of
14 the customer that you --
15      A.    Right.
16      Q.    -- went and visited that
17 pharmacy on that occasion?
18      A.    Right.
19      Q.    Okay.  Do you recall how many
20 times that happened during your tenure at
21 Mallinckrodt?
22      A.    Minimal.
23      Q.    Other than what you just
24 testified to with respect to visiting the
25 Kroger pharmacy, can you recall ever

Page 309

1  performing any other site visits at any other
2  retail pharmacies that were -- or while you
3  were at Mallinckrodt?
4            MR. DAVISON:  Objection.
5            THE WITNESS:  On occasion, if I
6       was in a retail store and there was a
7       pharmacy and it was my account, I
8       might say hello to the pharmacist, but
9       basically it was just...
10 QUESTIONS BY MR. LENISKI:
11      Q.    So that would be more of a
12 social visit?
13      A.    Correct.
14      Q.    Okay.  Do you recall ever
15 participating in collaborative SOM meetings
16 between Mallinckrodt and its accounts?
17           MR. DAVISON:  Objection.
18           THE WITNESS:  No.
19 QUESTIONS BY MR. LENISKI:
20      Q.    Do you know what a distributor
21 customer audit is?
22      A.    No, sir.
23      Q.    You never heard that term while
24 you were at Mallinckrodt, to your knowledge?
25      A.    I don't recall the term.

Page 310

1    (Mallinckrodt-New Exhibit 43
2    marked for identification.)
3  QUESTIONS BY MR. LENISKI:
4    Q.    I handed the witness
5  Exhibit 43. It is Bates-stamped
6  MNK-T1_0006464828.
7         Ms. New, do you recognize what
8  I've handed you as Exhibit 43?
9    A.    I don't recognize the document.
10 I recognize the account, so to speak.
11   Q.    Okay. So to your knowledge,
12 did you ever receive a copy of this document
13 or have a chance to review it?
14   A.    I do not recall if I reviewed
15 it or not.
16   Q.    Okay. The document is titled
17 "Controlled Substance Compliance/Suspicious
18 Order Monitoring Distributor Customer Audit
19 Checklist."
20   Correct?
21   A.    Correct.
22   Q.    And it's dated 6/15/2017?
23   A.    Yes, sir.
24   Q.    Your name is listed at the
25 bottom of the first page of Exhibit 43 as

Page 311

1  being one of the Mallinckrodt auditors
2  involved with this customer, correct?
3    A.    That's what it says.
4    Q.    Okay. And the distributor
5  issue is EMED, correct?
6    A.    Yes, sir.
7    Q.    Okay. And was that a new
8  distributor around this time of June of 2017
9  for Mallinckrodt?
10   A.    Yes, sir.
11   Q.    Okay. And was it your
12 practice, to your knowledge, to be involved
13 in audits of new wholesale or distributor
14 customers of Mallinckrodt?
15   MR. DAVISON: Objection.
16   THE WITNESS: No.
17 QUESTIONS BY MR. LENISKI:
18   Q.    Looking at the substance of
19 Exhibit 43 and the ensuing pages and the
20 different sections, do you recall having any
21 involvement in providing the answers that we
22 see in this audit report?
23   A.    No, I do not.
24   Q.    Do you recall doing a site
25 visit out to EMED's location out in Maryland

Page 312

1  Heights, Missouri?
2    A.    Yes, I do.
3    Q.    Okay. Do you recall making any
4  report or other submission following that
5  site visit?
6    A.    No.
7    Q.    So looking at Exhibit 43, can
8  you think of any other role other than
9  accompanying Mallinckrodt's SOM team to
10 EMED's physical location that you would have
11 had with respect to the audit of this new
12 distributor customer for Mallinckrodt?
13   MR. DAVISON: Objection.
14   THE WITNESS: No.
15 QUESTIONS BY MR. LENISKI:
16   Q.    Okay. Was this audit function
17 only something that Mallinckrodt did for new
18 distributor or wholesaler customers?
19   MR. DAVISON: Objection.
20   THE WITNESS: I don't know. I
21   only know about my own accounts.
22 QUESTIONS BY MR. LENISKI:
23   Q.    Well, do you recall such an
24 audit ever being performed on your existing
25 account customers during your tenure at

Page 313

1  Mallinckrodt?
2    MR. DAVISON: Objection.
3    THE WITNESS: I don't know.
4  QUESTIONS BY MR. LENISKI:
5    Q.    Do you recall seeing such a
6  report generated by any of your existing
7  accounts that was titled "Customer Audit"?
8    MR. DAVISON: Objection.
9    THE WITNESS: I -- this is the
10   first time I've seen this document, to
11   my knowledge.
12 QUESTIONS BY MR. LENISKI:
13   Q.    Okay. Does this distributor,
14 to your knowledge, sell to pharmacies?
15   A.    I do not recall.
16   Q.    Okay. On page 2 of the
17 exhibit, do you see the -- about halfway down
18 the page there's a section that starts, "In
19 which states is the distributor licensed to
20 sell."
21   Do you see that?
22   A.    I see that.
23   Q.    The full statement there is,
24 "In which states is the distributor licensed
25 to sell, parens, check specifically for

Page 314

1   Florida, Georgia and Texas, close parens.
2   Ask to see license certificates.  Parens,
3   note, colon, 40 plus of the states now
4   require individual state licensing, close
5   parens."
6           Did I read that correctly?
7       A.   Yes, sir.
8       Q.   Okay.  Do you know why
9   Mallinckrodt was asking this particular
10  distributor whether it was licensed to sell
11  in the states of Florida, Georgia and Texas,
12  in particular?
13          MR. DAVISON:  Objection.
14          THE WITNESS:  I do not.
15  QUESTIONS BY MR. LENISKI:
16      Q.   And do you see right below that
17  it says, "In which states do you sell
18  controlled substances, specifically do you
19  distribute in Florida?"
20          Did I read that correctly?
21      A.   Yes, sir.
22      Q.   Okay.  Do you know the purpose
23  of including that question in the customer
24  audit of this particular distributor?
25          MR. DAVISON:  Objection.

Page 315

1           THE WITNESS:  I do not.
2   QUESTIONS BY MR. LENISKI:
3       Q.   To your knowledge, as a
4   national account manager, did you treat
5   customers who sold in the states of Florida,
6   Georgia or Texas differently from other
7   accounts?
8           MR. DAVISON:  Objection.
9           THE WITNESS:  I did not.
10  QUESTIONS BY MR. LENISKI:
11      Q.   I'm done with that.
12          Are you familiar with the term
13  "volume growth rebate"?
14      A.   Yes, sir.
15      Q.   And what is that?
16      A.   A customer tells us their
17  volumes.  We project how they're going to do
18  and then set up volume growth based on their
19  projected sales.
20      Q.   Okay.  Did Mallinckrodt offer a
21  volume growth rebate to all of its accounts,
22  to your knowledge?
23      A.   No.  No.
24      Q.   Was there particular criteria
25  that determined whether or not an account of

Page 316

1   Mallinckrodt was offered a volume growth
2   rebate?
3           MR. DAVISON:  Objection.
4           THE WITNESS:  I don't recall
5       the details.
6   QUESTIONS BY MR. LENISKI:
7       Q.   Do you recall how many of your
8   accounts while you were at Mallinckrodt were
9   offered a volume growth rebate?
10      A.   No, I cannot.  I cannot.
11      Q.   Were you responsible for
12  implementing the terms of the volume growth
13  rebate for Mallinckrodt's accounts?
14          MR. DAVISON:  Objection.
15          THE WITNESS:  We had a
16      contracting team and legal team that
17      put together the language pertaining
18      to those.
19  QUESTIONS BY MR. LENISKI:
20      Q.   In your role in national
21  accounts or as national account manager, did
22  you have any responsibilities with respect to
23  the volume growth rebate program?
24          MR. DAVISON:  Objection.
25          THE WITNESS:  My responsibility

Page 317

1       was to supply the information, discuss
2       it with the product managers and
3       determine what we can or will do.
4   QUESTIONS BY MR. LENISKI:
5       Q.   And do you recall a time when
6   Mallinckrodt excluded its oxy 15-milligram
7   and 30-milligram products from the volume
8   growth rebate program?
9       A.   Yes.
10      Q.   Do you recall the purpose of
11  that?
12          MR. DAVISON:  Objection.
13          THE WITNESS:  It was direction
14      from upper management.
15  QUESTIONS BY MR. LENISKI:
16      Q.   So you have no understanding,
17  other than it was something directed by upper
18  management, why Mallinckrodt removed oxy 15-
19  and 30-milligram strengths from the volume
20  growth rebate program that it offered its
21  accounts?
22          MR. DAVISON:  Objection.
23          THE WITNESS:  Yes.  I don't
24      know.
25

Page 318

1  QUESTIONS BY MR. LENISKI:
2      Q.    Do you recall a time where
3  Mallinckrodt, as part of the excluding oxy
4  15-milligram and 30-milligram products from
5  the volume growth rebate program, had
6  implemented a manual allocation for those
7  products to their distributor customers?
8          MR. DAVISON:  Objection.
9          THE WITNESS:  I don't remember
10     the details of that.
11 QUESTIONS BY MR. LENISKI:
12     Q.    I guess my question would --
13 were you involved in that process, to your
14 knowledge?
15         MR. DAVISON:  Objection.
16         THE WITNESS:  That was
17     direction from management, and if I
18     was told to do that, that was part of
19     the business process, then I did it.
20 QUESTIONS BY MR. LENISKI:
21     Q.    Okay.  Do you recall whether
22 Mallinckrodt ever ceased doing the manual
23 allocations of oxy 15-milligram and
24 30-milligram strengths for its customers?
25     A.    I don't recall.

Page 319

1          MR. LENISKI:  I don't think I
2      have any further questions.  Thank
3      you.
4          THE WITNESS:  Thank you.
5          MR. DAVISON:  Can we go off the
6      record for a second?
7          VIDEOGRAPHER:  We are going off
8      the record at 4:50 p.m.
9       (Off the record at 4:50 p.m.)
10         VIDEOGRAPHER:  We are back on
11     the record at 4:53 p.m.
12         (Mallinckrodt-New Exhibit 44
13     marked for identification.)
14         REDIRECT EXAMINATION
15 QUESTIONS BY MR. GOTTO:
16     Q.    Ms. New, I'll hand you what
17 we've marked as Exhibit 44, which is a
18 multipage document beginning at Bates MNK --
19         MR. DAVISON:  Do you have a
20     copy, Counsel?
21         MS. REYES:  Oh, I'm so sorry.
22         THE WITNESS:  So we're looking
23     at 44?
24 QUESTIONS BY MR. GOTTO:
25     Q.    Yeah, we're going to get back

Page 320

1  to 9 in just a second.
2          44 is a -- begins with Bates
3  MNK-T1_0005649068.
4          Take a look at those e-mails
5  and tell me if you recognize them, please.
6      A.    Not this specific document, but
7  I'm familiar with the subject.
8      Q.    Okay.  And what is the subject?
9          MR. DAVISON:  Let's go off the
10     record.
11         VIDEOGRAPHER:  We are going off
12     the record at 4:55 p.m.
13      (Off the record at 4:55 p.m.)
14         VIDEOGRAPHER:  We are back on
15     the record at 4:55 p.m.
16 QUESTIONS BY MR. GOTTO:
17     Q.    Ms. New, you were saying you
18 were familiar with the subject matter?
19     A.    Yes.
20     Q.    And what is that subject
21 matter?
22     A.    Oxy/APAP solution.
23     Q.    Okay.  And if you turn to the
24 last page of the exhibit, there's an e-mail
25 from Elva Ramsaran?

Page 321

1      A.    Yes.
2      Q.    And who was she?
3      A.    She's a director of national
4  accounts.
5      Q.    Okay.  And she says, "Bonnie
6  and I just got off the phone with Jodi
7  Cartwright and Jim Langman, Walmart
8  compliance manager," correct?
9      A.    That's what it says, yes, sir.
10     Q.    And it goes on to say,
11 "Walmart's concern isn't that the product
12 won't sell but that the product will sell,
13 and Walmart concerns -- concern for promoting
14 a C-II that had no prior usage could be
15 perceived that the goal was for sales and
16 profits."
17         Do you see that?
18     A.    Yes, sir.
19     Q.    Do you recall the conversation
20 with the Walmart personnel that Ms. Ramsaran
21 mentions in this e-mail?
22     A.    I was copied on this, but
23 Walmart was no longer my account at this
24 time.  I was copied on it because I had
25 the -- set up the contract with them

Page 322

1  originally.
2      Q.    Okay.  Ms. Ramsaran indicates
3  that you and she had a call with the Walmart
4  personnel.
5      A.    That's correct.
6      Q.    Do you recall that call?
7      A.    Somewhat.
8      Q.    And do you recall the concerns
9  that the Walmart personnel expressed in that
10  call?
11      A.    Not specifically.
12      Q.    Okay.  Under Walmart concerns,
13  Ms. Ramsaran lists three bullet items.  If
14  you could take a look at those and tell me if
15  you -- if those are consistent with your
16  recollection of that call.
17          MS. CONWAY:  Objection to form.
18          THE WITNESS:  Yes.
19  QUESTIONS BY MR. GOTTO:
20      Q.    And is that consistent with
21  your recollection?
22      A.    Yes, sir.
23          MR. DAVISON:  Objection.
24  QUESTIONS BY MR. GOTTO:
25      Q.    Okay.  And accurate that

Page 323

1  Walmart -- that Walmart personnel expressed
2  that Walmart did not want to be associated
3  with any type of opioid promotional efforts
4  to physicians?
5          MR. DAVISON:  Objection.
6          THE WITNESS:  That's correct,
7      that's what it states.
8  QUESTIONS BY MR. GOTTO:
9      Q.    Okay.  Do you recall what
10  aspect of the -- the program Walmart felt
11  would be a potential -- could be perceived as
12  a promotional effort to physicians that it
13  didn't want to be associated with?
14          MR. DAVISON:  Objection.
15          THE WITNESS:  Their -- their
16      upper management, SOMS, whomever, made
17      that decision.  I don't know why.
18  QUESTIONS BY MR. GOTTO:
19      Q.    Okay.  Was there a
20  particular -- so this product, was this a new
21  product that was being offered at this time?
22      A.    It was a product, I believe,
23  that was being reintroduced into the market.
24      Q.    Okay.  And do you recall the
25  Walmart personnel expressing any reasons why

Page 324

1  they thought this particular product could be
2  problematic as creating a perception that
3  Walmart's goal was for sales and profits?
4          MR. DAVISON:  Objection.
5          THE WITNESS:  I don't remember
6      that kind of detail.
7  QUESTIONS BY MR. GOTTO:
8      Q.    Okay.  Do you remember what
9  happened with this product with Walmart,
10  ultimately?
11          MR. DAVISON:  Objection.
12          THE WITNESS:  Not without
13      looking at this.
14          Basically it's saying that we
15      agreed for them to return the product.
16  QUESTIONS BY MR. GOTTO:
17      Q.    Okay.  Okay.  You can set that
18  aside.
19      A.    Okay.
20      Q.    If you could look at Exhibit 9
21  now.
22      A.    Okay.
23      Q.    And we looked at this one
24  earlier today.  This is an e-mail from
25  Mr. Adams to the national account managers

Page 325

1  forwarding a press clipping that we looked at
2  earlier today, correct?
3      A.    I don't recall looking at it
4  today, but that's what Mr. Burd says down
5  here, that he's forwarding that.
6      Q.    Okay.  During the time you were
7  national account manager or director, was
8  there any process in place whereby you and
9  the other national account managers shared
10  things like press clippings that were of
11  general interest?
12      A.    Sure.
13      Q.    Was it a formal process or
14  simply if someone chose to circulate
15  something, they'd circulate it?
16      A.    Right.  There was no protocol
17  for who did or did not do it.
18      Q.    Did anyone maintain any kind of
19  central file of press clippings that were
20  circulated among the national account
21  managers, anything like that?
22          MR. DAVISON:  Objection to
23      form.
24          THE WITNESS:  I have no
25      knowledge of that.

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1 QUESTIONS BY MR. GOTTO:
2    Q.   Okay.  Did you have -- did the
3 national account managers have periodic
4 meetings?
5    A.   Yes.
6    Q.   How often would you meet?
7    A.   Varied with management team.
8    Q.   Okay.  So -- well, you met with
9 Mr. Becker with some regularity, correct?
10    A.   If he was in St. Louis and we
11 had a meeting, yes.  Steve's location was
12 Minneapolis, Minnesota.  So, I mean, if we
13 had a meeting and we were all together, yes.
14    Q.   Okay.  How about Mr. Borelli,
15 did you meet with him with some regularity?
16    A.   Yes.  Same thing.  quarterly
17 sales meetings, ECRM, NACDS.
18    Q.   Okay.  Did you have occasion to
19 form any view with respect to Mr. Becker's
20 effectiveness as a national account manager?
21         MR. DAVISON:  Objection.
22         THE WITNESS:  No, sir.
23 QUESTIONS BY MR. GOTTO:
24    Q.   How about Mr. Borelli's?
25         MR. DAVISON:  Objection.

Page 327

1         THE WITNESS:  No, sir.
2 QUESTIONS BY MR. GOTTO:
3    Q.   Did you have occasion to
4 formulate any view as to Mr. Becker's
5 honesty?
6         MR. DAVISON:  Objection.
7         THE WITNESS:  No, sir.
8 QUESTIONS BY MR. GOTTO:
9    Q.   How about Mr. Borelli's?
10         MR. DAVISON:  Objection.
11         THE WITNESS:  No, sir.
12 QUESTIONS BY MR. GOTTO:
13    Q.   Did anyone at Mallinckrodt ever
14 express to you any dissatisfaction with the
15 performance of Mr. Becker?
16         MR. DAVISON:  Objection.
17         THE WITNESS:  No, sir.
18 QUESTIONS BY MR. GOTTO:
19    Q.   How about Mr. Borelli?
20         MR. DAVISON:  Objection.
21         THE WITNESS:  No, sir.
22 QUESTIONS BY MR. GOTTO:
23    Q.   Anyone ever express to you any
24 concern regarding the reliability or
25 truthworthiness of Mr. Becker?

Page 328

1         MR. DAVISON:  Objection.
2         THE WITNESS:  No, sir.
3 QUESTIONS BY MR. GOTTO:
4    Q.   Or Mr. Borelli?
5         MR DAVISON:  Objection.
6         THE WITNESS:  No, sir.
7         MR. GOTTO:  All right.  That's
8 all I have.  Thank you.
9         MR. DAVISON:  I don't have any
10 questions, so...
11         VIDEOGRAPHER:  We are going off
12 the record at 5:02 p.m.
13 (Deposition concluded at 5:02 p.m.)
14         - - - - - - -

Page 329

1         CERTIFICATE
2
3      I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime
4 Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement
5 of the examination, Bonnie New was duly sworn
by me to testify to the truth, the whole
6 truth and nothing but the truth.
7      I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
8 testimony as taken stenographically by and
before me at the time, place and on the date
9 hereinbefore set forth, to the best of my
ability.
10
     I DO FURTHER CERTIFY that I am
11 neither a relative nor employee nor attorney
nor counsel of any of the parties to this
12 action, and that I am neither a relative nor
employee of such attorney or counsel, and
13 that I am not financially interested in the
action.
14
15
16
17     _____
     CARRIE A. CAMPBELL,
     NCRA Registered Diplomate Reporter
18   Certified Realtime Reporter
     Notary Public
19   Dated:  February 17, 2019
20
21
22
23
24
25

Page 330

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

---

Page 331

## ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
Bonnie New          DATE

Subscribed and sworn to before me this
_____ day of _____, 20 _____.
My commission expires: _____

Notary Public

---

Page 332

– – – – – – –
## ERRATA
– – – – – – –

PAGE  LINE  CHANGE/REASON

---

Page 333

– – – – – – –
## LAWYER'S NOTES
– – – – – – –

PAGE  LINE