# EXHIBIT 97

Highly Confidential - Subject to Further Confidentiality Review

```
  1                UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
  2                      EASTERN DIVISION
  3
       IN RE: NATIONAL         )
  4    PRESCRIPTION            )   MDL No. 2804
       OPIATE LITIGATION       )
  5    _____  )   Case No.
                               )   1:17-MD-2804
  6                            )
       THIS DOCUMENT RELATES   )   Hon. Dan A.
  7    TO ALL CASES            )   Polster
  8
                     MONDAY, APRIL 1, 2019
  9
          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
 10                 CONFIDENTIALITY REVIEW
 11                         - - -
 12          Videotaped deposition of Kathe A.
 13    Sackler, M.D., held at the offices of DEBEVOISE
 14    & PLIMPTON LLP, 919 Third Avenue, New York,
 15    New York, commencing at 11:02 a.m., on the
 16    above date, before Carrie A. Campbell,
 17    Registered Diplomate Reporter, Certified
 18    and Realtime Reporter.
 19
 20
 21                         - - -
 22
                  GOLKOW LITIGATION SERVICES
 23         877.370.3377 ph | 917.591.5672 fax
                      deps@golkow.com
 24
 25
```

Page 222

```
 1      target.  Here it's called forecast.
 2          You know, if I studied it for a
 3      little while, maybe I could try to
 4      figure out what it was I was trying to
 5      figure out or what it was I was
 6      analyzing, but -- what it was I was
 7      computing --
 8   QUESTIONS BY MR. HANLY:
 9      Q.   Well, my question really --
10      A.   -- or calculating.  But
11   what's --
12      Q.   -- is --
13      A.   What's the difference?  I was
14   learning about the sales, and these are the
15   notes.
16      Q.   And you set forth very detailed
17   notes concerning the sales, right?
18           MS. MONAGHAN:  Objection.
19           THE WITNESS:  I do everything
20      in detail, great detail.  Okay?  So...
21   QUESTIONS BY MR. HANLY:
22      Q.   By the way, did --
23      A.   Detail, yes.
24      Q.   -- Purdue distribute
25   calculators as part of its marketing plan?
```

Page 223

```
 1           MS. MONAGHAN:  Objection.
 2           MR. CHEFFO:  Objection.
 3           Is that a serious question?
 4           THE WITNESS:  I guess I didn't
 5      get one.
 6   QUESTIONS BY MR. HANLY:
 7      Q.   Well, that's my question.
 8      A.   I know.
 9      Q.   But actually, then, I don't
10   have an answer to the actual question.
11           Did Purdue, as part of its
12   marketing activities, distribute to
13   physicians calculators?
14      A.   I don't know.  I don't recall.
15      Q.   Purdue distributed to
16   physicians as part of its marketing other
17   kinds of products, right?
18           MS. MONAGHAN:  Objection.
19   QUESTIONS BY MR. HANLY:
20      Q.   Other kinds of items.  Not
21   drugs, but things like pens and plush toys.
22           Is that true, if you know?
23           I'm finished with that
24   document, by the way, Doctor.
25      A.   I think -- I wonder if there
```

Page 224

```
 1   was someone in the room with me when I was
 2   doing these calculations or if I was on the
 3   phone with someone and jotting all this down
 4   and discussing something.
 5      Q.   Doctor, thank you for that, but
 6   I've moved beyond that --
 7      A.   All right.  I'll let it go.
 8      Q.   -- and so I asked you a
 9   different question.
10      A.   That's fine.
11      Q.   Did Purdue --
12      A.   Yes.
13      Q.   -- as part of its marketing --
14      A.   Yeah.
15      Q.   -- distribute other kinds of
16   items, things like pens and plush toys, in
17   connection with the marketing of --
18      A.   I don't remember seeing a lot
19   of toys or pens or -- they may have.  I
20   don't...
21      Q.   OxyContin was marketed as a
22   12-hour -- Q12 medication, right?
23      A.   Yeah.
24      Q.   But in fact --
25      A.   Well, with the -- I mean, yeah,
```

Page 225

```
 1   the label for OxyContin is the -- the dosing
 2   instructions on the label instructs that it
 3   be given twice a day, yes.
 4           But there's also provision in
 5   the language, I believe, you know, to -- I
 6   forgot what -- to -- because there was
 7   variability in patients is the way I was
 8   told, explained to me, the way I understood
 9   this.  There's a certain amount of
10   variability in patients, it's true with most
11   medicines, that -- that there -- some --
12   that -- I think it's in the label, but I
13   can't pull up the language right now.
14           I think the -- there's --
15   sorry, I can't recall this part of the
16   labeling.  I'm trying to remember.
17      Q.   Well, I'm asking you about the
18   marketing.
19      A.   It speaks about titration.  It
20   speaks about -- okay.
21      Q.   All right.
22      A.   Go to marketing.
23      Q.   The drug was marketed as a
24   12-hour analgesic; isn't that true?
25           MS. MONAGHAN:  Objection.
```

Page 226

1  THE WITNESS: It was
2  marketed -- it was dosed BID.
3  That's -- I think that's how it's --
4  QUESTIONS BY MR. HANLY:
5  Q. Or Q12?
6  A. Or Q12, yeah.
7  Q. Right.
8  A. Sure. Yeah.
9  Q. Okay. But in fact, many
10 patients needed immediate-release opioids
11 during the course of that 12-hour period
12 because the analgesia -- the Q12 drug had
13 worn off; isn't that true?
14  MS. MONAGHAN: Objection.
15  THE WITNESS: There's a certain
16  variability in patients, from patient
17  to patient, that's not uncommon with
18  analgesics across the board. It's not
19  only OxyContin. Other -- and it's --
20  you know, it's true of other -- other
21  medications as well.
22  So it's not...
23 QUESTIONS BY MR. HANLY:
24  Q. So the answer to my question is
25 with respect to certain patients, the drug

Page 227

1  didn't work --
2  A. Yes, with respect to certain
3  patients -- it's not that the drug didn't
4  work; it's that individuals metabolize drugs
5  with variability. It's not the same in every
6  human body. So you can't have 100 percent
7  the same duration of efficacy in every
8  person.
9  So in some patients, physicians
10 would use immediate-release opioids to -- but
11 it was -- I think it's described in the
12 label, but I don't know why I can't remember
13 that part of the label right now. I think
14 I'm getting a little tired.
15  MS. MONAGHAN: All right. I
16  think, if possible, now would probably
17  be a good time for a break, which I
18  think will be the last one, probably.
19  MR. HANLY: That's fine.
20  MS. MONAGHAN: Okay.
21  THE WITNESS: Okay.
22  VIDEOGRAPHER: Okay. Remove
23  your microphones, please. Doctor,
24  your microphone.
25  The time is 4:22 p.m. Off the

Page 228

1  record.
2  (Off the record at 4:22 p.m.)
3  VIDEOGRAPHER: We are back on
4  the record. The time is 4:33 p.m.
5  QUESTIONS BY MR. HANLY:
6  Q. Dr. Sackler, does Purdue bear
7  any responsibility for the opioid crisis
8  facing us in America today?
9  MR. CHEFFO: Objection.
10  MS. MONAGHAN: Objection.
11  THE WITNESS: I don't believe
12  Purdue has a legal responsibility, but
13  I think that Purdue, as well as all
14  other stakeholders in health care and
15  in medicine and in pharmaceuticals and
16  law enforcement and the FDA, the DEA,
17  everyone has a responsibility,
18  clearly.
19  And Purdue has a
20  responsibility, clearly, to do
21  everything it can to find and
22  participate and contribute to whatever
23  we can hopefully build as solutions so
24  that no one has to suffer this kind of
25  tragedy again. Or at least we can...

Page 229

1 QUESTIONS BY MR. HANLY:
2  Q. My question, however, is
3 whether Purdue's conduct was a cause of the
4 opioid epidemic in America today.
5  MR. CHEFFO: Objection.
6  MS. MONAGHAN: Objection.
7  MR. CHEFFO: Form and
8  foundation.
9  THE WITNESS: I think it's a
10  very complex set of factors and
11  confluence of different circumstances
12  and societal issues and problems and
13  medical issues and regulatory gaps in
14  different states across the country,
15  without any national system that would
16  correct those gaps. And, I mean, it's
17  very, very, very complex, and I think
18  that all of that has brought this
19  about.
20  I don't see that one
21  pharmaceutical company or one product
22  has a causative relationship to the
23  opioid epidemic that we're suffering
24  now.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1  QUESTIONS BY MR. HANLY:
2      Q.   There was no opioid --
3      A.   Everyone has to be responsible.
4      Q.   There was no opioid epidemic of
5  the current proportions prior to the
6  invention of OxyContin; isn't that true?
7           MS. MONAGHAN: Objection.
8           MR. CHEFFO: Objection.
9           THE WITNESS: No, I don't -- I
10     don't think that's correct.  I think I
11     remember in my lifetime there was a
12     heroin epidemic not that long ago.
13 QUESTIONS BY MR. HANLY:
14     Q.   And do you know the numbers of
15 victims of heroin at whatever period of time
16 that was?
17     A.   Well, it seemed horrific then,
18 too, you know.  So I'm not sure that the
19 numbers are the same, but I -- I don't think
20 we should satisfy -- be satisfied with that
21 either.  I mean, I think -- and, you know,
22 the numbers -- are we talking about numbers
23 of addiction, or are we talking about numbers
24 of overdose and death?
25          Because I am shocked by the

Page 231

1  overdose and death situation that has just
2  exploded in the last five, seven years,
3  something like that.  It's been extraordinary
4  from -- and I'm just seeing it from -- you
5  know, I'm not involved in it professionally,
6  but I see it, I read about it, I hear about
7  it.  I have friends, relatives.  I mean, I
8  know people, individual people, who have
9  suffered and who have died.  And it touches
10 everyone's life.  It's terrible.
11          But that's different.  That's a
12 different epidemic, I think, than what we
13 had -- you know, than -- than the
14 prescription opioid epidemic or crisis or
15 whatever, which has more to do, I think, with
16 failure -- with too much product being out
17 there beyond the needs of the patients it's
18 prescribed for, and also the -- the lack of
19 access to treatment.  People can't access
20 treatment once they -- you know.
21          So it's very complex.  It's
22 hard to answer that question simply or at
23 all.
24     Q.   Do you recognize that hundreds
25 of thousands of Americans have become

Page 232

1  addicted to OxyContin?
2           MS. MONAGHAN: Objection.
3           MR. CHEFFO: Objection.
4  QUESTIONS BY MR. HANLY:
5      Q.   Do you recognize that or not?
6  Simple question, yes or no?
7      A.   I don't know --
8           MR. CHEFFO: Objection.
9           THE WITNESS: I don't know the
10     answer to that.
11          MR. CHEFFO: Excuse me.  I'd
12     like the special master's ruling.
13          You know, we can't ask
14     open-ended questions and then instruct
15     a witness only to say yes or no.  It's
16     just not fair.
17          SPECIAL MASTER COHEN: I think
18     it was a yes or no question.
19          MR. HANLY: It was a yes or no
20     question.
21          MR. CHEFFO: Note my objection
22     to the form and the foundation.
23 QUESTIONS BY MR. HANLY:
24     Q.   As the owners of Purdue, the
25 Sackler family could have directed changes in

Page 233

1  the way that OxyContin was marketed; isn't
2  that correct?
3           MS. MONAGHAN: Objection.
4           THE WITNESS: Actually, there
5      have been many changes over the years
6      and huge resources spent to bring
7      about those changes.
8  QUESTIONS BY MR. HANLY:
9      Q.   I asked you about marketing
10 materials or giveaways.
11          Have you ever seen one of these
12 OxyContin pens with a pull-down?
13     A.   No.
14     Q.   All right.  I'd like you to
15 take a look at it.  And we can make
16 photocopies of it or whatever, but I --
17          MS. MONAGHAN: You want to just
18     mark it as an exhibit?  You can stick
19     a sticker on it.
20          MS. CONROY: I'll put it on the
21     screen.
22          MR. HANLY: These are of
23     limited distribution.
24          MS. MONAGHAN: Well, then how
25     are we going to have a clear record of

Page 234

1  what pen was shown to her?
2        MR. HANLY:  It's going to go on
3  the video.
4        MS. MONAGHAN:  Okay.
5  QUESTIONS BY MR. HANLY:
6     Q.   Now, I want to make sure you've
7  got the right side.
8        MR. CHEFFO:  Is this something
9  that was produced to you?
10       MR. HANLY:  No.
11       MR. CHEFFO:  Then have you
12 produced it in response to the
13 discovery requests?
14       MR. HANLY:  This is something
15 that I acquired within the last two
16 weeks of my own accord, not from you.
17 It's work product.
18       MR. CHEFFO:  Well, it's
19 responsive to -- well, if it's work
20 product, then you're waiving it by
21 showing it today?
22       MR. HANLY:  The acquisition is
23 work product.
24       MR. CHEFFO:  Okay.  But I
25 didn't ask that.  If it's ongoing

Page 235

1  discovery, and you have things that
2  are responsive to discovery and you
3  show them to a witness, they should be
4  produced in advance of the deposition.
5        MR. HANLY:  Well, let me
6  continue with the examination, and you
7  can make any application that's
8  appropriate.
9        MR. CHEFFO:  I am going to
10 object to the question of showing --
11 you know, the whole point of discovery
12 here is -- when we've produced 50
13 million pages is to not have exactly
14 this type of surprise.
15       And I don't recall all the
16 discovery requests, but my guess is it
17 probably covers this pen.  But just
18 note my objection.
19       MS. MONAGHAN:  I'm also just
20 going to record my ongoing objection
21 to not marking the pen itself as an
22 exhibit.  I don't think that putting
23 it on the video is sufficient to
24 ensure that we know exactly what pen.
25       I don't know if there were more

Page 236

1  than one version of this.  I don't
2  know how similar they look.  I think
3  we should mark the actual aide as an
4  exhibit.
5        MR. CHEFFO:  It's not even
6  authenticated.
7        MR. HANLY:  Well, that's fine.
8  We can mark -- we can actually mark
9  the one that the witness has.
10       MS. MONAGHAN:  And she said
11 she's never seen it before, so
12 obviously she's not authenticating it.
13       THE WITNESS:  Well, it's
14 interesting.
15 QUESTIONS BY MR. HANLY:
16    Q.   So do you see on one side
17 there's a dosing conversion guide?
18    A.   Yes, it looks like the 2 to 1
19 that we spoke of.
20    Q.   Right.
21       And also to the -- to the right
22 of the middle column there's a column of Oxy
23 IR?
24    A.   Uh-huh.
25    Q.   That's oxycodone immediate

Page 237

1  release?
2     A.   Okay.
3     Q.   Do you agree with that?
4        MS. MONAGHAN:  Objection.
5        THE WITNESS:  Yes, I think it
6  is.
7  QUESTIONS BY MR. HANLY:
8     Q.   All right.  And what is
9  reflected then is that there's a conversion
10 dose.  If you're using another so-called
11 combination opioid and you wished to convert
12 to OxyContin, it shows you that.
13       And then the far right column
14 is the breakthrough dose to be used with
15 OxyContin Q12; is that correct?
16       MS. MONAGHAN:  Objection.
17       THE WITNESS:  I don't know what
18 the -- there are no instructions how
19 to read this, so I don't know if
20 that's the way it's intended or not.
21 But...
22 QUESTIONS BY MR. HANLY:
23    Q.   But you've never --
24    A.   You know, and the -- the...
25    Q.   If you can't read the chart or