# EXHIBIT 98

```
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4                      -  -  -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                         :  Hon. Dan A.
 9                       :  Polster
10                      -  -  -
            Tuesday, January 8, 2019
11                      -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
13
                        -  -  -
14
                  Videotaped deposition of
15   DEBORAH BEARER, taken pursuant to notice,
     was held at the offices of Golkow
16   Litigation Services, One Liberty Place,
     1650 Market Street, Suite 5150,
17   Philadelphia, Pennsylvania 19103,
     beginning at 9:30 a.m., on the above
18   date, before Amanda Dee Maslynsky-Miller,
     a Certified Realtime Reporter.
19
                        -  -  -
20
21
22
23        GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24            deps@golkow.com
```

Highly Confidential – Subject to Further Confidentiality Review

---

**Page 2**

1   APPEARANCES:
2
3        WAGSTAFF & CARTMELL, LLP
         BY: SARAH S. RUANE, ESQUIRE
4        BY: BRIAN J. MADDEN, ESQUIRE
         4740 Grand Avenue
5        Suite 300
         Kansas City, MO 64112
6        (816) 701-1100
         Sruane@wcllp.com
7        Bmadden@wcllp.com
         Representing the Plaintiffs
8
9
10       BRANSTETTER, STRANCH & JENNINGS, PLLC
         BY: BENJAMIN A. GASTEL, ESQUIRE
11       223 Rosa L. Parks Avenue
         Suite 200
12       Nashville, Tennessee 37203
         (877) 369-0267
13       Beng@bsjfirm.com
         Representing the Staubus Plaintiffs
14
15
16       MORGAN, LEWIS & BOCKIUS LLP
         BY: REBECCA J. HILLYER, ESQUIRE
17       1701 Market Street
         Philadelphia, Pennsylvania 19103
18       (215) 963-4824
         Rebecca.hillyer@morganlewis.com
19       Representing the Defendant,
         Teva Corporation
20
21
22
23
24

---

**Page 3**

1   APPEARANCES: (Continued)
2
3        PIETRAGALLO GORDON ALFANO BOSICK &
         RASPANTI, LLP
4        BY: LESLIE A. MARIOTTI, ESQUIRE
         1818 Market Street
5        Suite 3402
         Philadelphia, Pennsylvania 19103
6        (215) 320-6200
         LAM@pietragallo.com
7        Representing the Defendant,
         Cardinal Health, Inc.
8
9
10       JONES DAY
         BY: SHUBHA M. HARRIS, ESQUIRE
11       90 South Seventh Street
         Suite 4950
12       Minneapolis, MN 55402
         (612) 217-8800
13       Shubhaharris@jonesday.com
         Representing the Defendant,
14       Walmart
15
16
17       ARNOLD & PORTER KAYE SCHOLER LLP
         BY: TIFFANY M. IKEDA, ESQUIRE
18       44th Floor
         777 South Figueroa Street
19       Los Angeles, California 90017
         (213) 243-4000
20       Tiffany.ikeda@arnoldporter.com
         Representing the Defendant,
21       Endo Pharmaceuticals, Endo Health,
         and Par Pharmaceuticals
22
23
24

---

**Page 4**

1   APPEARANCES: (Continued)
2   VIA TELEPHONE/LIVESTREAM:
3
4        ALLEGAERT BERGER & VOGEL, LLP
         BY: LOUIS A. CRACO, JR., ESQUIRE
5        BY: LUCY N. ONYEFORO, ESQUIRE
         111 Broadway
6        20th Floor
         New York, New York 10006
7        (212) 571-0550
         Lcraco@abv.com
8        Lonyeforo@abv.com
         Representing Rochester Drug
9        Cooperative
10
11       JACKSON KELLY PLLC
         BY: JON L. ANDERSON, ESQUIRE
12       500 Lee Street East
         Suite 1600
13       Charleston, West Virginia 25301
         (304) 340-1288
14       Representing the Defendant,
         AmerisourceBergen
15
16
         ALSO PRESENT:
17       David Lane, Videographer
18
19
20
21
22
23
24

---

**Page 5**

1                   - - -
2                 I N D E X
3                   - - -
4
5   Testimony of: DEBORAH BEARER
6   By Ms. Ruane              10, 308
    By Mr. Madden             284
    By Ms. Hillyer            303, 373
7   By Mr. Gastel             313
8
9                   - - -
10              E X H I B I T S
11
    NO.      DESCRIPTION          PAGE
12
    Teva-Bearer
13  Exhibit-1   No Bates
                Notice of Deposition      13
14
    Teva-Bearer
15  Exhibit-2   TEVA_MDL_A_09144727    18
16  Teva-Bearer
    Exhibit-3   TEVA_MDL_A_00873333-335   38
17
    Teva-Bearer
18  Exhibit-4   TEVA_MDL_A_04838673-677   79
19  Teva-Bearer
    Exhibit-5   TEVA_MDL_A_04838485-490   86
20
    Teva-Bearer
21  Exhibit-6   TEVA_MDL_A_04484212-214   102
22  Teva-Bearer
    Exhibit-7   TEVA_MDL_A_04478352-356   113
23
    Teva-Bearer
24  Exhibit-8   TEVA_MDL_A_10070409-410   119

---

Highly Confidential - Subject to Further Confidentiality Review

---

Page 6

```
 1           - - -
 2       E X H I B I T S
 3           - - -
 4   NO.      DESCRIPTION          PAGE
 5   Teva-Bearer
     Exhibit-9   TEVA_MDL_A_04426360-362   122
 6
     Teva-Bearer
 7   Exhibit-10  TEVA_MDL_A_10105779-782   137
 8   Teva-Bearer
     Exhibit-11  TEVA_CHI_00036903-930   140
 9
     Teva-Bearer
10   Exhibit-12  TEVA_CHI_00036931-955   153
11   Teva-Bearer
     Exhibit-13  TEVA_MDL_A_03272381-391   170
12
     Teva-Bearer
13   Exhibit-14  TEVA_MDL_A_04481825   191
14   Teva-Bearer
     Exhibit-15  TEVA_MDL_A_09457158-159   206
15
     Teva-Bearer
16   Exhibit-16  TEVA_MDL09451760   219
17   Teva-Bearer
     Exhibit-17  TEVA_MDL_A_04420139-141   227
18
     Teva-Bearer
19   Exhibit-18  TEVA_MDL_A_04848188-191   231
20   Teva-Bearer
     Exhibit-19  TEVA_MDL_A_01204074-092   243
21
     Teva-Bearer
22   Exhibit-20  TEVA_MDL_A_09191592-593,
         With attachment        249
23
24
```

---

Page 7

```
 1           - - -
 2       E X H I B I T S
 3           - - -
 4   NO.      DESCRIPTION          PAGE
 5   Teva-Bearer
 6   Exhibit-21  TEVA_MDL_A_09165564-565,
         With attachment        262
 7
     Teva-Bearer
 8   Exhibit-22  TEVA_MDL_A_09218160-165   320
 9   Teva-Bearer
     Exhibit-23  TEVA_MDL_A_03967973-979   335
10
     Teva-Bearer
11   Exhibit-24  TEVA_MDL_A_03551263-266,
         With attachment        343
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 8

```
 1           - - -
 2   DEPOSITION SUPPORT INDEX
 3           - - -
 4
 5   Direction to Witness Not to Answer
 6   Page Line   Page Line   Page Line
 7   None
 8
 9
10   Request for Production of Documents
11   Page Line   Page Line   Page Line
12   None
13
14
15   Stipulations
16   Page Line   Page Line   Page Line
17   12    1
18
19
20   Question Marked
21   Page Line   Page Line   Page Line
22   None
23
24
```

---

Page 9

```
 1           - - -
 2      (It is hereby stipulated and
 3   agreed by and among counsel that
 4   sealing, filing and certification
 5   are waived; and that all
 6   objections, except as to the form
 7   of the question, will be reserved
 8   until the time of trial.)
 9           - - -
10      VIDEO TECHNICIAN:  We're now
11   on the record.  My name is David
12   Lane, videographer for Golkow
13   Litigation Services.  Today's date
14   is January 8th, 2019.  The time is
15   9:30 a.m.
16      This deposition is taking
17   place in Philadelphia,
18   Pennsylvania, in the matter of
19   National Prescription Opioid
20   Litigation.  Our deponent today is
21   Deborah Bearer.  Counsel will be
22   noted on the stenographic record.
23   The court reporter is Amanda
24   Miller and will now swear in our
```

---

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1 witness.
2         - - -
3         DEBORAH BEARER, after having
4 been duly sworn, was examined and
5 testified as follows:
6         - - -
7         VIDEO TECHNICIAN:  Please
8 begin.
9         - - -
10         EXAMINATION
11         - - -
12 BY MS. RUANE:
13     Q.   Can you state your name for
14 the record, please?
15     A.   Deborah Bearer.
16     Q.   Ms. Bearer, my name is Sarah
17 Ruane.  We met briefly before the
18 deposition.  I'm here representing the
19 plaintiffs.
20         And we talked about the fact
21 that you actually have laryngitis right
22 now; is that correct?
23     A.   Correct.
24     Q.   So I apologize in advance.

Page 11

1 You've been kind enough to still agree to
2 move forward with the deposition right
3 now.  I feel like asking you questions --
4 it sounds like it's painful.
5         Is it painful for you?
6     A.   No.  No, it just sounds bad.
7     Q.   Okay.  So if there are any
8 accommodations we can make that help you,
9 just let me know that, all right?
10     A.   Sure.  Thank you.
11     Q.   We will probably take breaks
12 about every hour anyway.
13     A.   Okay.
14     Q.   But if you need a break at
15 any time, just let me know.
16     A.   Sure.
17     Q.   Have you given a deposition
18 before?
19     A.   No.
20     Q.   A couple of ground rules,
21 just to make sure we're all
22 communicating, and some of them you may
23 have already heard from your attorney.
24         But the best way to get a

Page 12

1 clean record is for me to ask a question,
2 full stop, and then you give your answer,
3 rather than speak over each other.
4     A.   Right.
5     Q.   Do you understand that?
6     A.   I do.
7     Q.   And so if any of us start to
8 do that, I may do it as well, somebody
9 will jump in and let us know.  We're not
10 trying to be rude, you know, we just want
11 to make sure we get a clean record.
12         Is that fair?
13     A.   That's fair.
14     Q.   Likewise, you understand
15 you're under oath today, just like if you
16 were before a judge and a jury in a
17 courtroom?
18     A.   Yes.
19     Q.   And that your testimony can
20 be used and played in court?
21     A.   Correct, I understand.
22     Q.   And along those lines, my
23 goal here today is to make sure I leave
24 understanding what you know and what you

Page 13

1 remember.
2         So I'm going to try to ask
3 good questions, but at some point I will
4 likely ask something that doesn't make
5 sense to you.
6         If I do that, will you let
7 me know?
8     A.   Yes.
9     Q.   And I will try to restate it
10 and make sure we get on the same page.
11         But if you answer a question
12 I've asked, I'll assume you've understood
13 it; is that fair?
14     A.   That's fair.
15     Q.   Okay.  Let's go ahead and
16 mark as Exhibit-1 your deposition notice.
17         - - -
18         (Whereupon, Teva-Bearer
19     Exhibit-1, No Bates, Notice of
20     Deposition, was marked for
21     identification.)
22         - - -
23 BY MS. RUANE:
24     Q.   And while I'm doing that,

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 let me ask you, what is your current
2 address?
3 　　　A.　27 Post Road, Newtown
4 Square, Pennsylvania 19073.
5 　　　Q.　And where is Newtown Square?
6 　　　A.　Pennsylvania.
7 　　　Q.　About how far away -- we're
8 in Philadelphia, right?
9 　　　A.　Sorry, sorry.
10 　　　　　It is -- it's a 40-minute
11 drive.  I will say that it's probably 20
12 miles.
13 　　　Q.　And are you here pursuant to
14 that Exhibit-1 notice to take your
15 deposition?
16 　　　A.　Yes.
17 　　　Q.　Are you represented by
18 counsel today?
19 　　　A.　Yes.
20 　　　Q.　I think Ms. Hillyer is here
21 acting as your attorney?
22 　　　A.　Yes.
23 　　　Q.　And the attorney for Teva?
24 　　　A.　Yes.

Page 15

1 　　　Q.　Do you currently work for
2 Teva?
3 　　　A.　Yes.
4 　　　Q.　And what did you do to
5 prepare for your deposition today?
6 　　　A.　I met with my counsel
7 yesterday.  Since I had not been deposed
8 prior, it was just to give me some
9 expectations --
10 　　　　MS. HILLYER:  Just make sure
11 　　　that you don't disclose anything
12 　　　that we discussed.
13 　　　　THE WITNESS:  No, no.
14 　　　　Just expectations for the
15 　　　day.
16 BY MS. RUANE:
17 　　　Q.　Got it.
18 　　　　　And that's a good point that
19 Ms. Hillyer made.  I don't intend to ask
20 you anything about what the two of you
21 discussed.
22 　　　　　So if you interpret my
23 question that way, it's never intended
24 to --

Page 16

1 　　　A.　Right.
2 　　　Q.　-- to seek that information.
3 　　　　　But let me ask you this:
4 Prior to meeting with Ms. Hillyer, did
5 you do anything to refresh your memory
6 about the events in question?
7 　　　A.　No.
8 　　　Q.　When you met with Ms.
9 Hillyer yesterday, how long did you all
10 meet?
11 　　　A.　I'll say eight hours.
12 　　　Q.　And was there anyone else
13 present?
14 　　　A.　Yes.
15 　　　Q.　Were they all attorneys?
16 　　　A.　Yes.
17 　　　Q.　Okay.  All attorneys with
18 Ms. Hillyer's office?
19 　　　A.　Yes.
20 　　　Q.　Got it.
21 　　　　　During that meeting, did you
22 review documents?
23 　　　A.　Yes.
24 　　　Q.　What types of documents do

Page 17

1 you recall reviewing?
2 　　　A.　Primarily e-mails and some
3 presentations.
4 　　　Q.　Did you -- were you provided
5 a copy or a set of those to take home and
6 review?
7 　　　A.　No.
8 　　　Q.　And what was, just kind of
9 the estimated range of time that those
10 e-mails and presentations encompassed?
11 　　　A.　If I -- I'm not quite sure,
12 but I would have to say probably 2003 to
13 2014, '15, possibly.
14 　　　Q.　So it's fair to say that
15 within the documents you reviewed
16 yesterday, you saw documents referring to
17 Actiq and Fentora and likely Vantrela as
18 well?
19 　　　A.　Yes.
20 　　　Q.　Did you review any
21 deposition testimony?
22 　　　A.　No.
23 　　　Q.　Did you review any summaries
24 of depositions?

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    A.   No.
2    Q.   Okay.  Have you spoken with
3  anyone at Teva about the testimony
4  they've given or the --
5    A.   No.
6    Q.   Have you spoken with anybody
7  outside of Teva about depositions that
8  have occurred in this case, that aren't
9  attorneys?
10   A.   No.
11   Q.   Okay.  Let's back up a
12 little bit.  I just want to make sure,
13 since you and I are meeting for the first
14 time, that I have a good understanding of
15 your background.
16       So I'm going to mark as
17 Exhibit-2 a document.  This one is really
18 just --
19       MS. RUANE:  For the record,
20    it's TEVA_MDL_A_09144727.
21          - - -
22       (Whereupon, Teva-Bearer
23    Exhibit-2, TEVA_MDL_A_09144727,
24    was marked for identification.)

Page 19

1          - - -
2  BY MS. RUANE:
3    Q.   And I'll tell you, it's
4  titled, Talent Management Biography.
5  It's a document that was in the
6  production set that I thought may help us
7  kind of more efficiently go through your
8  time with Teva and, I guess, potentially
9  with Cephalon as well.
10       MS. RUANE:  You know what,
11    I'm sorry, I gave you the wrong
12    copy, that's my fault.  I should
13    have pulled that one out first.
14       Becca, would you mind
15    putting the sticker on that?
16    Thank you.
17       MS. HILLYER:  I wrote 2 on
18    that, but I can cover it up.
19       MS. RUANE:  Eventually I'll
20    get my system figured out.
21       MS. HILLYER:  It says 2 -- I
22    mean, I'm sure this will come off.
23 BY MS. RUANE:
24    Q.   So this is a document that

Page 20

1  was produced to us in the litigation.  If
2  you'll turn to Page 2 on it, you'll see,
3  is that a picture of you and some
4  description?
5    A.   Yes, it is.
6    Q.   My first question for you,
7  there's a career overview there.  And I
8  just want to make sure that, to you, that
9  looks accurate as far as your time at
10 different companies.
11   A.   Yes.
12   Q.   Where it says, National
13 account manager, was that -- were you
14 serving as national account manager at
15 that point for Cephalon?
16   A.   Yes.
17   Q.   And when did Cephalon become
18 Teva?
19   A.   I believe it was six years
20 ago, seven.
21   Q.   So it's fair to say that
22 your time, as well, as the director of
23 healthcare systems management, was with
24 Cephalon?

Page 21

1    A.   Correct.
2    Q.   And then you took over as
3  the director of healthcare systems
4  marketing when it was Cephalon and
5  maintained that title after the company
6  became Teva?
7    A.   Yes.
8    Q.   Okay.  Backing up a little
9  bit, what's your educational background?
10   A.   Bachelor of Science degree.
11   Q.   A Bachelor of Science?
12   A.   In business management.
13   Q.   Bachelor of Science in
14 business management.
15       And then did you start right
16 away, after graduation, as a sales rep in
17 1983?
18   A.   No.  I had a brief time
19 working in retail, commission sales.
20   Q.   Were those pharmaceutical
21 retail?
22   A.   No, no.
23   Q.   So was your first time
24 working in pharmaceuticals -- well,

Page 22

1  strike that.
2       Let me ask you, when was
3  your first time working in
4  pharmaceuticals?
5       A.   1983.
6       Q.   Got it.
7           And during your time as a
8  sales rep there, what were you doing?
9  What were you selling?
10      A.   I was -- we had -- oh, gosh,
11 I'm trying to remember how many products,
12 a broad spectrum of antibiotics, prenatal
13 vitamins, generics.
14          It was -- back in those
15 days, we carried quite a few products in
16 the bag, if you will.
17      Q.   Did you sell any opioids at
18 that time?
19      A.   No.
20      Q.   And was it at -- I apologize
21 if I'm mispronouncing it, is it
22 Sanofi-Aventis, was that the first time
23 that you had a role in the managed care
24 department?

Page 23

1       A.   No.  I'm sorry, wait a
2  minute.
3           Actually, this is not
4  completely correct.  At Dupont, when I
5  went to Dupont, so I went from Lederle to
6  Dupont.  Being that this is an internal
7  document, this was sort of just --
8       Q.   Yeah.  No worries.
9       A.   -- a brief abbreviation.
10          So I went to Dupont after
11 Lederle, and I was a rep.  And then while
12 I was at Dupont, I did about a year of
13 managed care market access.  Dupont --
14 yes, at Dupont.
15      Q.   And it looks like, to me,
16 you've stayed in the managed care arena
17 throughout the rest of your career?
18      A.   Yes, that's correct.  Since
19 about 1999 at some point I had a touch
20 point with managed care.
21      Q.   So it's fair to say from
22 1999 to today, your primary focus of
23 employment is managed care?
24      A.   Correct.

Page 24

1       Q.   And managed care -- well,
2  strike that.
3           Let me ask this: Can you
4  describe for the jury what managed care
5  is?
6       A.   So the words are
7  interchangeable between market access and
8  managed care, because there's been an
9  evolution over time as to what that
10 actually is.
11          But, basically, what it
12 involves is insurance companies taking
13 ownership and responsibility or financial
14 risk on behalf of the patient or the
15 employee for the employer.
16          So, for example, Aetna
17 gathers its medical benefits, pharmacy
18 benefits, so there are probably over 100
19 managed care organizations in the U.S.
20 This continues to evolve over time.
21          During that time, they make
22 formulary decisions around the access for
23 pharmaceuticals that an employee may
24 have.  So if a physician prescribes a

Page 25

1  medication that's not available, say,
2  through Aetna as your pharmacy, then
3  oftentimes it will be denied and other
4  products will be recommended.
5           That's just a very
6  simplified version.
7       Q.   That's helpful.  And I
8  appreciate it.
9           So during your time -- well,
10 let me ask this first.
11          When you moved over to
12 Cephalon --
13      A.   Yes.
14      Q.   -- as a national account
15 manager --
16      A.   Yes.
17      Q.   -- was that still in the
18 managed care arena?
19      A.   That is national -- so
20 national account managers are regional
21 account managers for pharmaceuticals with
22 reference to the CLI, calling on managed
23 care organizations, either PBMs, pharmacy
24 benefit managers, or managed care HMOs,

Page 26

1 things of that nature.  Not unlike a
2 sales rep would call on a physician.
3        So it's basically a selling,
4 promoting -- it's a promotional activity.
5 It falls under commercial.
6    Q.   Got it.  Okay.
7        And so at the time that you
8 moved over to Cephalon in 2003, you were
9 doing promotion to managed care entities?
10    A.   Correct.
11    Q.   And in -- am I right that in
12 2003, then, one of the drugs that you
13 would have been promoting to managed care
14 facilities would have been Actiq?
15    A.   Correct.
16    Q.   And, of course, over time is
17 it -- am I right that it's the kind of
18 2007-2008 time frame, then, when you all
19 would have started promoting Fentora to
20 managed care facilities?
21    A.   When it was launched it's my
22 understanding it was 2007.  I'm not 100
23 percent certain.  It seems correct.
24    Q.   And that's fair.  So I

Page 27

1 should have -- let me ask a better
2 question.
3        We can look up precisely
4 when it was launched, but around that
5 time frame --
6    A.   Yes.
7    Q.   -- whenever it was launched,
8 then, the role of the managed care team
9 was to promote Fentora, amongst others,
10 to the managed care entities?
11        MS. HILLYER:  Objection to
12    form.
13        You can answer.
14        THE WITNESS:  What?
15        MS. HILLYER:  You can
16    answer.
17        THE WITNESS:  That's -- I
18    want to clarify something.
19        In 2007, I was not in a
20    payer-facing, customer-facing
21    role.
22 BY MS. RUANE:
23    Q.   Thank you.  And that's a
24 good distinction.  So let's clarify that.

Page 28

1        In 2005, you moved over and
2 became the director of healthcare systems
3 management?
4    A.   Yes.
5    Q.   And so -- and was that a
6 supervisory role over national account
7 managers?
8    A.   No, no.  That was moving
9 into a home office type of position
10 working with the brand teams, not just
11 for this product but others as well, on
12 the strategy and some of the tactics for
13 each of the products as related to
14 reimbursement.
15    Q.   Got it.  So let me try to
16 ask a better question, then.
17    A.   Okay.
18    Q.   In your role, then, from
19 2007, or whenever Fentora launched, in
20 your role as director of healthcare
21 systems, one of your responsibilities
22 would have been to weigh in on strategy
23 and tactics to improve reimbursement of
24 the drug Fentora?

Page 29

1    A.   That's correct.
2    Q.   And one way to do that is to
3 help managed care entities understand,
4 from your perspective and from the
5 company's perspective, that a broader
6 group of indications for prior
7 authorization would be useful and
8 appropriate?
9        MS. HILLYER:  Objection to
10    form.
11        You can answer if you
12    understand.
13        THE WITNESS:  Could you
14    rephrase it a little bit?  Because
15    I --
16 BY MS. RUANE:
17    Q.   Yes.  This is perfect.
18 You're doing the right thing.  This is
19 what's going to happen, I'm going to ask
20 bad questions, because I'm in my own
21 head, and I'll rephrase them and we'll
22 get through it together.  So let me ask
23 this differently.
24        What was the change in your

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 role after -- from director of healthcare
2 systems management to director of
3 healthcare systems marketing?
4     A.   Okay.  You're right.  When I
5 was director of healthcare systems
6 management, I managed -- I need to
7 correct something I said earlier, my
8 timeline here.
9         As the director of
10 healthcare systems management, I was
11 managing six account managers, and they
12 called on the payers.
13         When I moved into the
14 healthcare systems marketing, that's when
15 I became a home office.  So I apologize
16 for that.
17         The home office position,
18 which -- to state what I stated earlier,
19 worked with the brand team, looked at the
20 strategies related to reimbursement; not
21 only reimbursement in talking with
22 payers, but also reimbursement support
23 services for patients, et cetera.
24     Q.   Got it.  Okay.  That's

Page 31

1 helpful.  And I appreciate that
2 distinction.
3         And so during the time from
4 2005 to 2007 --
5     A.   Yes.
6     Q.   -- when you were supervising
7 six account managers --
8     A.   Correct.
9     Q.   -- those account managers
10 would have been calling on managed care
11 entities --
12     A.   Correct.
13     Q.   -- to promote Actiq and
14 then, once the launch date occurred, to
15 promote Fentora?
16     A.   That's correct.
17     Q.   Okay.  On that same sheet,
18 if you look under current
19 responsibilities, the first bullet point
20 indicates that you provide market access,
21 marketing support and strategic planning.
22     A.   Yes.
23     Q.   Is that kind of what we've
24 been discussing before --

Page 32

1     A.   That's what we've been
2 talking about.
3         MS. HILLYER:  Make sure she
4     finishes the question.
5         THE WITNESS:  I apologize.
6         MS. HILLYER:  That's okay.
7         MS. RUANE:  It's okay.
8         THE WITNESS:  It was 20
9     minutes before I did that.  Sorry.
10 BY MS. RUANE:
11     Q.   So the market access,
12 marketing support and strategic planning
13 is kind of that brand team strategy and
14 tactics that you've been discussing?
15     A.   Yes.
16     Q.   And you did that for the
17 Fentora product?
18     A.   Yes.
19     Q.   And the second bullet point
20 indicates that you lead cross-functional
21 market access for the Vantrela launch
22 teams?
23     A.   Yes.
24     Q.   Can you explain to me what

Page 33

1 that means?
2     A.   In preparation for the
3 launch, the brand team, the commercial
4 team, has various subteams that feed into
5 the overarching brand strategy.
6         So market access is one of
7 them.  You would have, say,
8 direct-to-consumer, you would have HCP
9 and you would have market access, you
10 might have sales and distribution.
11         So I led that functional
12 subteam supporting the development of the
13 payer strategy for the launch of
14 Vantrela.
15     Q.   Got it.  For the launch of
16 Vantrela.
17         And on the fourth bullet
18 point there, it indicates that you
19 develop and manage reimbursement support
20 programs.
21     A.   Yes.
22     Q.   What are the reimbursement
23 support programs?
24     A.   And this was a

Page 34

1 collaboration, by the way. Most of the
2 things are -- you know, are in a matrix
3 organization at Teva, so.
4         Reimbursement support
5 programs, there's a patient assistance
6 program, which is not under my purview,
7 but it is something that I have knowledge
8 of when it comes to the overarching
9 reimbursement and assistance for
10 patients.
11         There's also the
12 reimbursement hotline, which is for
13 patients and physicians. And I helped
14 facilitate -- there's a vendor, of
15 course, a third party that handles that.
16 So I'm the liaise between the brand,
17 those services, and being, more or less,
18 the content expert for market access and
19 reimbursement.
20     Q.   So it sounds like if there
21 are questions or concerns about the
22 hotline, they would be referred to you as
23 the --
24     A.   Yeah, as the --

Page 35

1         MS. HILLYER: Just let her
2     finish.
3         MS. RUANE: Sorry. I have a
4     tendency in my questions to trail
5     off as I'm thinking. So that's
6     not your fault, that's my fault.
7     I'll try to fix it.
8         THE WITNESS: That's okay.
9 BY MS. RUANE:
10     Q.   Let me restate it.
11         So it's fair to say that if
12 there were questions or concerns about
13 the hotline program, that they would be
14 referred to you as kind of the leader of
15 that entity?
16     A.   Yes. As with any company,
17 though, obviously, roles and
18 responsibilities often shift a bit.
19         The brand has a lot of
20 responsibility as well, you know. So
21 we're a support system for the marketing
22 team, the brand team.
23     Q.   And you work pretty closely
24 with the marketing team and brand team?

Page 36

1     A.   Yes.
2     Q.   Are some of the individuals
3 on those teams that you work with Matt
4 Day and Randy Spokane, or am I getting my
5 teams mixed up?
6     Q.   Can you --
7         MS. HILLYER: Objection to
8     form. When are you talking about?
9         MS. RUANE: That's a good
10     point.
11         MS. HILLYER: And which
12     product?
13 BY MS. RUANE:
14     Q.   Let's see. Since you've
15 been there since 2003 and we're sitting
16 here in 2018, it's fair to say that over
17 time your roles changed and other
18 people's roles have changed?
19     A.   Correct.
20     Q.   During the time that Actiq
21 was being promoted to managed care
22 entities, did you have interactions with
23 people like Matt Day and Randy Spokane?
24         MS. HILLYER: Objection to

Page 37

1     form.
2         You can answer.
3         THE WITNESS: What do you
4     mean "interactions"? Can you
5     clarify what you mean,
6     "interactions"?
7 BY MS. RUANE:
8     Q.   Sure.
9         You mentioned you work
10 closely with the marketing and brand
11 teams.
12     A.   Yes.
13     Q.   Would that have been
14 something that you would have done during
15 that time that Actiq was being promoted
16 to managed care entities?
17     A.   No. Because marketing -- I
18 was in the field, at that time with
19 Actiq, and I was an account manager.
20         Now, I -- and, by the way,
21 Randy Spokane is not marketing, he's
22 sales. And, yes, I did work with Randy
23 Spokane.
24     Q.   Got it.

Page 38

1  A.  Matt Day was in the home
2  office.
3       MS. RUANE:  I'm going to go
4  ahead and mark as Exhibit-3 an
5  employee self-appraisal.
6       MS. HILLYER:  Are we done
7  with 2?
8       MS. RUANE:  Yes.
9       - - -
10      (Whereupon, Teva-Bearer
11  Exhibit-3,
12  TEVA_MDL_A_00873333-335, was
13  marked for identification.)
14      - - -
15  BY MS. RUANE:
16   Q.   And I know how people love
17  to fill out self-appraisals, so I thought
18  maybe sitting here, 11 years later, we
19  would talk about it again.
20      But I really actually just
21  pulled it because I think it's a good way
22  for us to just review a couple of the
23  things you were doing around that time.
24      So this is dated October

Page 39

1  15th, 2007.
2       MS. RUANE:  And, for the
3  record, this is
4  TEVA_MDL_A_00873333 through 3335.
5  BY MS. RUANE:
6   Q.   A lot of this we've already
7  talked about.
8       Under objectives and
9  accomplishments, you identify the fact
10  that you're implementing managed care and
11  reimbursement strategy and tactics for
12  optimizing access for all Cephalon
13  products.
14      Is that consistent with what
15  we talked about, as far as the goal to
16  optimize access to Actiq during the time
17  frame it was involved, and then Fentora?
18      MS. HILLYER:  Hold on a
19  second.
20      Objection to form.
21      But you can answer.  And
22  take your time to look through it
23  if you need to.
24      THE WITNESS:  I'd like you

Page 40

1       to restate it for me, please.
2  BY MS. RUANE:
3   Q.   Sure.
4       We talked about the fact,
5  one of the goals of your role as a -- I
6  guess at this point you would have been a
7  director of healthcare systems marketing,
8  right?
9   A.   Yeah -- no.  Let me just
10  make sure.  Hold on.
11   Q.   I guess it's the year you
12  switched over, so --
13   A.   Yeah, probably.  Because it
14  mentions that I also managed.  So I was
15  probably transitioning.  I don't really
16  remember, to be honest with you.
17   Q.   Okay.  In any event, by
18  October of 2007, one of the things that
19  you defined as an objective and
20  accomplishment was implementing -- and
21  this is just part of that line right
22  under it -- implementing managed care and
23  reimbursement strategy and tactics for
24  optimizing access for all Cephalon

Page 41

1  products?
2   A.   Yes.
3   Q.   And down below, you kind of
4  call out, in a bullet point, Fentora as
5  one of the products that you're tasked
6  with optimizing access to, correct?
7   A.   Correct.
8   Q.   And you include there, in a
9  couple of the bullet points, the things
10  that you're doing as it relates to
11  Fentora.
12      One of those is, like we
13  talked about, optimizing access and
14  reducing barriers; is that correct?
15   A.   Yes.
16   Q.   The last bullet point under
17  Fentora indicates, Maintained access, 90
18  percent target accounts.
19      MS. HILLYER:  Where are you?
20      MS. RUANE:  I'm sorry.  The
21  last bullet point under Fentora.
22      The top of 34.
23  BY MS. RUANE:
24   Q.   Can you explain to me what

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 that's referring to?
2     A.   I need to define access for
3 you, because there's different levels of
4 access.  It means the patient -- the
5 prescription is prescribed, there may be
6 paperwork involved, et cetera, but at the
7 end of the day, the patient has access to
8 the product.
9          Sometimes a prescription can
10 be written and it just goes to the
11 pharmacy and you walk away.  Other times,
12 there's more hurdles involved.
13          So what this means is that
14 of the target accounts, this would be
15 referring to when I was managing the
16 account management team, which were those
17 six account managers, and what we were --
18 we identified target accounts.  And of
19 those targets, we wanted to ensure that
20 patients have access to Fentora.
21     Q.   And so how did you identify
22 target accounts?
23     A.   There's many ways in which
24 this is done.  Oftentimes, it's done in

Page 43

1 collaboration with the home office
2 marketing team, where you look at the
3 number of covered lives, the geographic
4 footprint, there's -- an example might be
5 in Pittsburg, Highmark is one of the
6 target accounts.  It influences a lot of
7 prescriber behavior, because many
8 patients are enrolled in Highmark.
9          So there is a strategy --
10 there is a method to identifying.  Most
11 often, it really is related, though, to
12 where the most number of commercial
13 covered lives are.
14          Sorry, I'm trailing off.
15          Many times, it's obviously
16 based on enrollment, the larger the plan,
17 the more patients they have.  They become
18 a target.
19     Q.   And so you mentioned
20 Highmark as an example in the Pittsburg
21 area.
22          But when you would identify
23 managed care entities who had a large
24 enough either geographic footprint or,

Page 44

1 you know -- what did you say about lives?
2 I want to make sure I use the right term.
3     A.   Covered lives.
4     Q.   Covered lives.
5     A.   Think of it as enrollment,
6 same thing, covered lives.
7     Q.   So, basically, the largest
8 numbers of enrollment or covered lives
9 are going to be targets because there's
10 quite a few people who, potentially,
11 could receive access to a drug like
12 Fentora, for example?
13          MS. HILLYER:  Objection to
14     form.
15          You can answer.
16          THE WITNESS:  My answer is
17     that that's true of any drug,
18     correct.
19 BY MS. RUANE:
20     Q.   And the way that the managed
21 care team worked on maintaining access to
22 those drugs is kind of detailed in the
23 strategy and tactics for reimbursement
24 that you were involved in?

Page 45

1          MS. HILLYER:  Objection to
2     form.  What strategies and tactics
3     are you referring to?
4          MS. RUANE:  Let me rephrase
5     that question.
6 BY MS. RUANE:
7     Q.   We talked about, for
8 example, reimbursement support programs
9 like hot lines, correct?
10     A.   Yes.
11     Q.   Would those be one form of
12 maintaining access?
13     A.   No.
14     Q.   Okay.  So what would be
15 forms of maintaining access?  What do you
16 do?
17     A.   You call on -- so you
18 provide -- you determine, say, a payer,
19 the account manager goes in, speaks to
20 the plan, provides the clinical
21 information about the product.
22          The plan can request
23 additional information.  They can request
24 information that's non-promotional

Page 46

1 through a medical information request
2 form. Basically, it's negotiating the
3 unmet need -- the benefits of the product
4 and working with the plan to ensure that
5 patients -- that they place it on the
6 formulary so that patients, appropriate
7 patients, have access.
8     Q.   Is it correct that the
9 ultimate goal is to have the medication
10 placed on the formulary?
11     A.   Yes.  The alternative is
12 it's blocked.
13     Q.   What is the difference
14 between -- I've also seen reference to
15 prior authorization --
16     A.   Yep.
17     Q.   -- and appeals and letters
18 of medical necessity.
19     And I'm going to ask you
20 some questions about that in a little
21 bit.
22     A.   Okay.
23     Q.   My first question is, what
24 is the distinction between a drug being

Page 47

1 placed on a formulary and a drug
2 receiving prior authorization?
3     MS. HILLYER:  Objection.
4 That's kind of broad.
5     But you can answer if you
6 can briefly.
7     THE WITNESS:  I can answer
8 it?
9     So in order to -- the goal
10 is to get the drug placed on
11 formulary, that's the first step.
12     There are other things that
13 I'll talk about, if you need more
14 detail.  But the -- to answer your
15 question on prior authorization,
16 once the product is on formulary,
17 the plan may determine a prior
18 authorization is required, that
19 the physician fills out, based on
20 the criteria the plans deem
21 appropriate for covering that
22 drug.
23     It's an administrative
24 effort, most of the time, where

Page 48

1 the doc fills out the form, it's
2 reviewed by the plan, they
3 determine whether it's covered or
4 not; they either say yes or no.
5     And then if it's yes, the
6 patient has access to the product;
7 if the answer is no, a physician
8 can appeal.
9 BY MS. RUANE:
10     Q.   Thank you.  I appreciate
11 that.
12     I also wanted to ask, the
13 bullet point just above that indicates,
14 Collaboration and communication with
15 sales teams to identify KOLs.
16     What are KOLs?
17     A.   Key opinion leaders,
18 physicians.
19     Q.   And did the brand -- strike
20 that.
21     Did the managed care team
22 utilize key opinion leaders?
23     MS. HILLYER:  Objection to
24 form.

Page 49

1 BY MS. RUANE:
2     Q.   As it relates to Actiq
3 and/or Fentora?
4     A.   Define "utilize."
5     Q.   Did the managed care team
6 have key opinion leaders that spoke to
7 managed care entities?
8     A.   There was a managed care
9 speaker bureau of which, if a plan
10 requested a clinical presentation or a
11 presentation from a clinician, typically
12 those would be considered KOLs.  So, yes.
13 In a limited fashion, but yes.
14     Q.   So Teva maintained a managed
15 care speaker bureau, which was kind of a
16 database of key opinion leaders who, at
17 the request of a managed care entity,
18 could be brought in to speak to that
19 entity; am I understanding that
20 correctly?
21     A.   That's correct.
22     MS. HILLYER:  Objection to
23 form.
24     Go ahead.

Page 50

BY MS. RUANE:

Q. Am I understanding that correctly?

A. Restate it, because I --

Q. Sure.

So Teva maintains a managed care speaker bureau of key opinion leaders that they identified. And at the request of a managed care entity, Teva would facilitate one of those key opinion leaders to come in and speak to the managed care entity?

A. Yes.

Q. Okay. Were you involved -- like sitting here right now, offhand, do you know the names of the key opinion leaders that would speak?

MS. HILLYER: Objection to form. When and which product? And which entity?

MS. RUANE: Thank you.

BY MS. RUANE:

Q. With Fentora.

A. Any names?

Page 51

Q. Any names.

Do any names come to mind?

A. One name comes to mind, Jeff Gudin.

Q. And were you personally involved in establishing or setting up those key opinion leaders to go in and speak?

A. I was aware. I don't recall being a facilitator of it.

Q. What about during the time that managed care entities were being called on to promote Actiq, are you -- just sitting here today, do you have a memory of the names of any of the key opinion leaders who spoke to managed care entities?

A. During that time, I don't believe any did, that the speaker bureau that we're referring to came later.

So that's why the timing of your question is important. There's been an evolution.

Q. Thank you.

Page 52

So if I'm understanding correctly, the managed care speaker bureau is something that applied to the time frame after Fentora was launched?

A. To the best of my recollection, yes.

Q. And when -- if you know, when key opinion leaders were brought in to speak to managed care entities, were they compensated by Teva?

A. Yes.

Q. When -- whether it's the key opinion leader or just a representative from Teva calling on managed care entities, who were the individuals in the managed care entities who were present at those meetings? What roles?

MS. HILLYER: Objection to form. That's compound. You're asking two different scenarios. And it's confusing, because key opinion leaders didn't call on managed care.

MS. RUANE: Let me divide

Page 53

them up.

BY MS. RUANE:

Q. When key opinion leaders would come in to speak to managed care entities, as facilitated by Teva, who would be in the audience, if you know?

A. Typically, it would be a pharmacy director, a pharmacy -- clinical pharmacists and medical directors.

Q. And when Teva employees would simply call on managed care entities in order to explain and try to maintain access to their products, who would be in the audience, typically, if you know?

A. Pharmacy directors. Some plans have trade pharmacy contracting. So you have pharmacy and then there would be a contracting arm as well, potentially. And, occasionally, clinical pharmacists. Same audience.

Q. Would the medical directors be present at those as well?

A. That's a broad question.

Page 54

1  Sometimes, I guess, the answer would be.
2      Q.   And, I guess, I kind of
3  assumed this in my question, but I should
4  clarify, just to point out, the managed
5  care entities, we're talking about them
6  as entities, but, obviously, they have
7  employees, some of whom are physicians
8  and some of whom are pharmacists, in your
9  experience?
10     A.   They have both.  And in
11  addition to a number of other
12  responsible -- you know, employees.
13     Q.   And the reason I ask is just
14  because I think some people hear managed
15  care entity and they assume it's just a
16  whole bunch of business people.
17          So in your experience in the
18  managed care entities that you've called
19  on and that you've supervised people
20  calling on, the managed care entities,
21  the decision-makers include physicians
22  and pharmacists as well, correct?
23     A.   Correct.
24     Q.   Okay.  And it's fair to say,

Page 55

1  when you were involved in marketing and
2  promoting products like Fentora, that
3  marketing and promotion was going to --
4  in part, to physicians and pharmacists
5  employed by those managed care entities?
6          MS. HILLYER:  Objection to
7      the form.
8          You can answer if you
9      understand.
10         THE WITNESS:  Just clarify
11     for me, if you would --
12 BY MS. RUANE:
13     Q.   Sure.
14     A.   -- what you're asking.
15     Q.   As an example, we've talked
16  about the fact that you all might come up
17  with, you know, a new presentation to
18  give to a managed care entity.
19          And when you go in to give
20  that presentation, people in the audience
21  included physicians and pharmacists,
22  correct?
23     A.   They could, yes.
24     Q.   They could.

Page 56

1          That was generally your
2  experience?  I mean, I get every audience
3  is different.  But, generally speaking,
4  that was your experience?
5          MS. HILLYER:  Objection to
6      form.
7  BY MS. RUANE:
8      Q.   Am I correct?
9      A.   Generally.  I would say --
10  if you're asking me to be general, I
11  would say the majority of times the
12  medical directors were not present, but
13  they could be.
14     Q.   And are the medical
15  directors -- if you know, are the medical
16  directors the ultimate determinate of
17  prior authorization?
18          MS. HILLYER:  Objection.
19      Calls for speculation.
20          THE WITNESS:  I don't know.
21  BY MS. RUANE:
22     Q.   Okay.  Just a couple quick
23  things, and then we'll move on.
24          On Page 35, so the last page

Page 57

1  of Exhibit-3, under, Fentora brand
2  team --
3          MS. HILLYER:  She's talking
4      about these, 35.
5          THE WITNESS:  Oh, I see.
6  BY MS. RUANE:
7      Q.   -- it indicates that you
8  participated in the managed care working
9  group for the FAST team, 2008 brand
10  strategy.
11     A.   Yes.
12     Q.   Can you describe for me what
13  that is?
14     A.   I hadn't seen it in a while.
15  I think it was just an acronym for the
16  Fentora action strategic something or
17  other.
18          It was just -- you know,
19  these are marketing people, they like to
20  name things.  But, basically, it was the
21  brand strategy team.
22     Q.   There's a lot of marketing
23  lingo.  So I appreciate you know some of
24  it, because it's taken me a while to

Page 58

1  learn some of these.
2        So the FAST team was kind of
3  one of the names that marketing gave the
4  Fentora launch?
5      A.   As I recall.  And as I
6  described earlier, the working group was
7  the subteam that I referred to.
8      Q.   Got it.
9        And you also participated --
10  as a result of being part of that Fentora
11  brand team, you participated in the
12  development and review of the Fentora
13  dossier and NAM slide deck?
14      A.   Yes.
15        That would be the NAM,
16  national account manager, just so you
17  know.
18      Q.   So that was my question.  Is
19  the national account manager -- well,
20  strike that.  Let me ask this first.
21        The Fentora dossier and the
22  NAM slide deck, are those specific to
23  managed care?
24      A.   Yes.

Page 59

1      Q.   And so prior to Fentora, was
2  there an Actiq dossier or was this a new
3  way of marketing?
4        MS. HILLYER:  Let her
5  finish.
6        THE WITNESS:  I was going to
7  cough.
8        MS. HILLYER:  I thought you
9  were about to answer.
10        THE WITNESS:  No, no.
11        To the best of my
12  recollection, there was not one
13  for Actiq.  This -- as we talked,
14  there's an evolution through
15  managed care.  Dossiers became
16  more recognized by plans during
17  this time.
18        So it's, basically, an AMCP,
19  Academy of Managed Care Pharmacy,
20  dossier format.
21        And often a company -- now
22  they're electronic, all pharma
23  companies typically, when they're
24  launching a product, provide a

Page 60

1  dossier, upon request, to a plan.
2  BY MS. RUANE:
3      Q.   You mentioned the -- are you
4  okay?
5      A.   Yes.
6      Q.   Just let me know if you need
7  a break.
8      A.   I will.  I'm not shy.
9      Q.   You mentioned in there AMCP.
10        What's AMCP?
11      A.   Academy of Managed Care
12  Pharmacy.  It's an organization, like
13  some of the others, that have membership
14  of all the managed care companies,
15  individual membership.
16        They are like a so-called
17  overseer.  They have a journal they
18  produce.  They have a large meeting twice
19  a year for pharmacy students.  It's not
20  unlike some of the other professional
21  organizations.
22      Q.   Are you a member of that
23  professional organization?
24      A.   No.

Page 61

1      Q.   So the -- it sounds like
2  with Fentora -- because of the shift as
3  you described, with Fentora, a dossier
4  and a NAM slide deck was created that
5  would be provided, upon request, to the
6  managed care entities?
7      A.   No.  The dossier, yes.
8        The NAM slide deck is a
9  promotional piece, not unlike a sales
10  aid, that the account manager would use
11  in presenting or talking with a health
12  plan, a payer.
13      Q.   Got it.  I feel like it's
14  catching.
15        So thank you.  Let me ask
16  this question again, just to make sure
17  we're clear, and then we'll move on.
18        So the dossier would be
19  provided, upon request, to the managed
20  care entity.  The NAM slide deck was
21  something that was simply used during
22  presentations to managed care entities
23  from a Teva employee?
24        MS. HILLYER:  Objection to

Page 62

1  form.
2       You can answer.
3       THE WITNESS:  Is that
4  because it's compound?
5       MS. HILLYER:  Yes.
6  BY MS. RUANE:
7       Q.  I can divide them up --
8       A.  That's okay.
9       Q.  -- if it makes you feel
10 better.
11      A.  The dossier was upon
12 request.  The NAM presentation was as you
13 stated.
14      Q.  Got it.
15          And you participated in the
16 development of those documents, according
17 to --
18      A.  Yes, it says that.  But the
19 dossier is typically developed under the
20 medical team.
21          The only thing that I would
22 say to that, it's probably incorrectly
23 referenced, is it's a compilation of
24 study -- clinical data, any health

Page 63

1  economics data, et cetera.  It's not a
2  promotional piece.
3          I was privy to what was
4  included in the dossier.  This NAM slide
5  deck is a promotional piece.
6       Q.  And so dividing them up, you
7  were privy to the information that was
8  contained in the Fentora dossier?
9       A.  Yes.
10      Q.  And you were also -- and am
11 I understanding you correctly that your
12 memory is you did not actually
13 participate in the development of the
14 dossier --
15      A.  No.
16      Q.  -- you just knew what was in
17 it because you were on the e-mails?
18      A.  Yes.
19      Q.  Got it.
20          With the NAM slide deck, you
21 did participate in the development of the
22 NAM slide deck, correct?
23      A.  As I recall, yes.
24      Q.  Let's move on -- actually,

Page 64

1  before we do, a couple of things I just
2  want to make sure.
3          I've asked several questions
4  of you already about kind of marketing
5  terms or things that I don't understand
6  within this, and you've been kind enough
7  to define them so far.
8          There's a couple of other
9  things I want to make sure we're on the
10 same page about.
11          Do you agree that during the
12 time -- well, actually, the entire time
13 that Actiq was being sold that the
14 indication for Actiq was for breakthrough
15 pain in cancer patients?
16      A.  That's the label.
17      Q.  And I guess the full title
18 would be, For breakthrough pain in cancer
19 patients who are opioid tolerant,
20 correct?
21      A.  Correct.
22      Q.  Okay.  And that was true the
23 entire time that Actiq was being sold,
24 correct?

Page 65

1       A.  Correct.
2       Q.  Do you also agree that the
3  indication for Fentora was for
4  breakthrough cancer pain in patients who
5  are opioid tolerant?
6       A.  Cancer pain, yes.
7       Q.  For breakthrough cancer
8  pain, correct?
9       A.  Yes.
10      Q.  And so you understood that
11 it was illegal to market or promote those
12 products off label?
13          MS. HILLYER:  Objection.
14 Calls for a legal conclusion.
15          MS. RUANE:  You can answer.
16          THE WITNESS:  I'm not an
17 attorney.
18 BY MS. RUANE:
19      Q.  In your role working with
20 managed care entities, you had an
21 understanding about what on label was,
22 correct?  We just talked about it.
23          MS. HILLYER:  Objection to
24 form.

Page 66

1      But you can answer.
2      THE WITNESS:  I understand
3 what the label -- I understand
4 what the indication in the label
5 stated, yes.
6 BY MS. RUANE:
7      Q.   And the indication of the
8 label would be on-label use of those
9 products.
10      So that would be if a
11 physician prescribed -- let's take
12 Fentora, for example.  If a physician
13 prescribed Fentora for breakthrough pain
14 in a patient that he or she had who had
15 cancer and was opioid tolerant, that
16 would be on-label prescribing, correct?
17      A.   Correct.
18      Q.   Okay.  You also understood
19 that there was the potential for
20 off-label prescribing by physicians to
21 prescribe the product for breakthrough
22 pain in a patient who didn't have cancer,
23 for example, correct?
24      A.   Correct.

Page 67

1      Q.   And you --
2      A.   Sorry.
3      Q.   Sorry?
4      A.   Correct.
5      Q.   And you understood, in your
6 role with both Cephalon and Teva, that it
7 would be illegal to market or promote the
8 use of Actiq and Fentora for anything
9 other than on-label use?
10      MS. HILLYER:  Objection.
11 Asked and answered.  And calls for
12 a legal conclusion.
13      MS. RUANE:  You can answer.
14      THE WITNESS:  Say it again.
15 Sorry.
16 BY MS. RUANE:
17      Q.   Sure.
18      You understood --
19      A.   Right.
20      Q.   -- during the time that
21 you've been employed by Cephalon and then
22 Teva --
23      A.   Right.
24      Q.   -- that it is illegal to

Page 68

1 promote products off label, correct?
2      MS. HILLYER:  Same
3 objection.  Asked and answered.
4 And calls for a legal conclusion.
5      You can answer if you can.
6      THE WITNESS:  Based on the
7 way you phrased the question, I
8 would answer yes.
9 BY MS. RUANE:
10      Q.   And you knew that the reason
11 it was illegal to promote Fentora, as an
12 example, off label, was because the FDA
13 indication was limited to breakthrough
14 cancer pain in opioid-tolerant patients,
15 correct?
16      MS. HILLYER:  Objection to
17 form.  And calls for a legal
18 conclusion.
19      MS. RUANE:  Would you like
20 me to rephrase it, or are you able
21 to answer?
22      THE WITNESS:  I think the
23 answer is -- rephrase it, because
24 I want to make sure I answer

Page 69

1 correctly.
2 BY MS. RUANE:
3      Q.   Sure.
4      So we know that you
5 understood off-label marketing, marketing
6 or promoting a product like Fentora for
7 something beyond breakthrough cancer pain
8 in opioid-tolerant patients, was against
9 the law, right?
10      MS. HILLYER:  Same
11 objection.  Asked and answered.
12 And calls for a legal conclusion.
13 BY MS. RUANE:
14      Q.   That's correct?
15      A.   Yes.
16      Q.   And describing pain as, pain
17 is pain, or breakthrough cancer pain is
18 the same thing as breakthrough pain is
19 off-label marketing, isn't it?
20      MS. HILLYER:  Objection to
21 form.
22      THE WITNESS:  I don't -- I
23 don't -- I don't think that you're
24 accurate, no.

Page 70

1 BY MS. RUANE:
2    Q.   You agree that the only
3 on-label use for both Actiq and Fentora
4 was breakthrough cancer pain, correct?
5          MS. HILLYER:  Objection to
6    form.
7          You can answer.
8          THE WITNESS:  The
9    indication, you're correct.
10 BY MS. RUANE:
11    Q.   And so any promotion or
12 marketing which attempted to expand the
13 idea of pain from breakthrough cancer
14 pain to breakthrough pain would be
15 off-label marketing, wouldn't it?
16          MS. HILLYER:  Objection to
17    form.  That's confusing.
18          THE WITNESS:  I mean, that's
19    too vague.
20 BY MS. RUANE:
21    Q.   Do you believe that
22 marketing a product like Fentora for
23 breakthrough pain, without any reference
24 to cancer, is off-label marketing?

Page 71

1          MS. HILLYER:  Objection to
2    form.  It calls for a legal
3    conclusion.
4          THE WITNESS:  In the context
5    that you're stating, which I think
6    is pretty broad, I would agree
7    with you.
8 BY MS. RUANE:
9    Q.   And so it's important that
10 the phrase "pain is pain" be well
11 defined; because if "pain is pain" is
12 actually addressing the argument that
13 breakthrough cancer pain and breakthrough
14 pain of any other sort are the exact same
15 thing, that would be off-label marketing,
16 wouldn't it?
17          MS. HILLYER:  Objection to
18    form.  Calls for legal conclusion.
19    Argumentative.  And vague.
20          You can answer if you
21    understand the questions.
22          THE WITNESS:  I'm not
23    familiar with the "pain is pain"
24    relative to any of my experience

Page 72

1    within the organization.  So I
2    can't answer it.
3 BY MS. RUANE:
4    Q.   Okay.  Thank you.  And
5    that's a fair point.
6          So in your memory, you have
7 never used the phrase "pain is pain" --
8    A.   No.
9          Sorry.
10    Q.   And let me ask it again,
11 just to make sure we're not stepping on
12 each other.
13          In your memory, you have not
14 used the phrase "pain is pain" in the
15 promotion or marketing of an opioid
16 product?
17    A.   Not to my recollection.
18    Q.   And using the phrase "pain
19 is pain" in marketing an opioid product
20 like Fentora would be off-label
21 marketing, wouldn't it?
22          MS. HILLYER:  Objection.
23    Very vague.  And calls for a legal
24    conclusion.

Page 73

1          Any opioid product?
2          MS. RUANE:  I said Fentora.
3          MS. HILLYER:  You said like
4    Fentora.
5          MS. RUANE:  Let me ask it
6    again.
7 BY MS. RUANE:
8    Q.   Would you have allowed, in
9 your role as managed care -- as -- excuse
10 me.
11          Would you have allowed, in
12 your role as director of healthcare
13 systems marketing, to -- an employee of
14 yours to market to a managed care entity
15 the use of Fentora with the description,
16 pain is pain?
17          MS. HILLYER:  Objection to
18    form.
19          THE WITNESS:  There was no
20    direction from me to any of my
21    team to make that statement, ever.
22 BY MS. RUANE:
23    Q.   And you wouldn't direct
24 anyone to make that statement because

Page 74

1 that would be off-label marketing,
2 wouldn't it?
3      A.   It's vague.
4           MS. HILLYER:  Objection to
5 form.
6           THE WITNESS:  In context, I
7 don't -- I don't think I can agree
8 with you.
9 BY MS. RUANE:
10     Q.   You don't think -- I want to
11 make sure I understand.  If you're not
12 agreeing with me, I want to make sure I
13 understand why.
14          In your role as director,
15 you would not have authorized, and you
16 don't believe you would -- you did ever
17 authorize, the use of the phrase "pain is
18 pain" in promotion or marketing of
19 Fentora?
20     A.   That's correct.
21     Q.   And the reason -- I mean,
22 you obviously have no memory of it.
23          But the reason -- am I
24 correct that the reason you think you

Page 75

1 would not have authorized that is because
2 that would be marketing the product
3 beyond its indication of breakthrough
4 cancer pain?
5           MS. HILLYER:  Objection to
6 form.
7           THE WITNESS:  I could see a
8 situation in which you're
9 having -- you're just making a
10 statement of what I would say is
11 context, or maybe opportunities to
12 have a conversation, in which
13 you're talking about pain
14 management.
15          But we always stuck to the
16 label, as far as what the
17 indication is for our product.
18          So there's, obviously,
19 conversations that people have
20 relative to pain management.  But
21 in terms of actually promoting and
22 recommending it, as it relates to
23 Fentora, that would not happen.
24 BY MS. RUANE:

Page 76

1      Q.   Okay.  And if it did happen,
2 it would have been off-label marketing,
3 correct?
4           MS. HILLYER:  Objection to
5 form.
6           THE WITNESS:  Again, there's
7 various types of pain.  You're
8 probably aware.  There's
9 nociceptive pain, neuropathic
10 pain.
11          So, again, I see this as a
12 very strong, broad statement.  If
13 you want to get specific about all
14 the different types of pain, low
15 back pain and all that, then we
16 can talk about that.
17 BY MS. RUANE:
18     Q.   And there are.
19          And, in fact, at some point,
20 Teva authored and issued letters of
21 medical necessity on different types of
22 pain, correct?
23           MS. HILLYER:  Objection.
24 BY MS. RUANE:

Page 77

1      Q.   Including back pain?
2           MS. HILLYER:  Objection.
3           Assumes facts not in evidence.
4 BY MS. RUANE:
5      Q.   We can look at them in a
6 little bit.  I'm just asking if you
7 remember.
8      A.   I believe so, yes.
9      Q.   My question for you is a
10 little bit different.
11          If the description of "pain
12 is pain" was being used in reference to
13 breakthrough cancer pain, and any other
14 breakthrough pain in a patient who
15 doesn't have cancer, is the same because
16 all pain is pain, that would have been
17 off-label marketing, correct?
18          MS. HILLYER:  Objection to
19 form.
20          THE WITNESS:  Again, I
21 feel -- I'm going to give you a
22 yes, in the sense of you're
23 pushing me to state something that
24 I believe is somewhat out of

Page 78

1  context.
2       Because I have not seen
3  anything specific to pain is pain.
4  BY MS. RUANE:
5       Q.   But given the information I
6  provided you, you would agree with that
7  statement?
8       A.   I'm not an expert on all the
9  nuances of off-label promotion.
10      But based on the way you
11 have asked me, a number of times, I would
12 answer, to the best of my knowledge, the
13 way that you've asked the question, yes.
14      Q.   Okay.  Let's move on to
15 Exhibit-4.
16      MS. HILLYER:  We've been
17 going about an hour.  Do you want
18 to take a quick break?
19      MS. RUANE:  That's perfect.
20 Let's take a break.
21      VIDEO TECHNICIAN:  Going off
22 record.  10:29 a.m.
23           - - -
24      (Whereupon, a brief recess

Page 79

1  was taken.)
2           - - -
3       VIDEO TECHNICIAN:  Back on
4  record.  10:42 a.m.
5  BY MS. RUANE:
6       Q.   Back on record after a short
7  break.
8       You understand you're still
9  under oath?
10      A.   I do.
11      Q.   Okay.  We're going to hand
12 you Exhibit-4, Bates range
13 TEVA_MDL_A_04838673 to 77.
14           - - -
15      (Whereupon, Teva-Bearer
16      Exhibit-4,
17      TEVA_MDL_A_04838673-677, was
18      marked for identification.)
19           - - -
20 BY MS. RUANE:
21      Q.   This is a document you
22 authored as the national account
23 manager --
24      A.   Okay.

Page 80

1       Q.   -- correct?
2       MS. HILLYER:  Take your time
3  to look it through.
4       THE WITNESS:  Okay.  Yes, my
5  name is on it, and it looks
6  familiar.
7  BY MS. RUANE:
8       Q.   The first page, Page 73,
9  you'll see an advocacy bullet point
10 there?
11      A.   Yes.
12      Q.   That indicates,
13 Advocacy-cultivate key physicians in each
14 target market to assist in influencing
15 key account formulary committees,
16 establishing PA criteria and guidelines,
17 challenging existing restrictions, et
18 cetera.
19      And then, Coordinate
20 peer-to-peer discussions and share best
21 practices.
22      Is that correct?
23      A.   That's what it says, yes.
24      Q.   Got it.

Page 81

1       We talked about the goal to
2  get, I guess at this point it would have
3  been Actiq, on to the formulary?
4       MS. HILLYER:  Objection to
5  form.
6  BY MS. RUANE:
7       Q.   We talked about that, prior?
8       A.   You're implying that it
9  wasn't on formulary.  This is -- these
10 are global objectives for all brands.
11      Q.   Okay.  One of the goals with
12 Actiq was to make sure that -- or to get
13 it on to formulary, if it wasn't,
14 correct?
15      A.   Yes.
16      Q.   And so you influenced --
17 your goal was to cultivate key physicians
18 to assist in influencing key account
19 formulary committees for that purpose,
20 correct?
21      A.   That's correct.
22      Q.   We've also talked about
23 prior authorization and you explained how
24 that works.

Page 82

1       One of the goals was to
2 establish prior authorization criteria
3 and guidelines and to challenge existing
4 restrictions, correct?
5       A.   This is a broad statement.
6 We don't know what the
7 restrictions are. In general. It's a
8 broad objective.
9       Q.   And that would have been
10 true as it relates to Actiq, to challenge
11 whatever existing restrictions there were
12 regarding prior authorization, correct?
13       MS. HILLYER: Objection to
14       form.
15       THE WITNESS: Again, a broad
16       statement. There may be
17       restrictions that are appropriate.
18       So just to make a blanket
19       statement about restrictions
20       doesn't imply that some -- prior
21       authorizations often include very
22       appropriate restrictions as well,
23       like, for example, tolerance to
24       opioid, opioid tolerance. That

Page 83

1       would be considered a restriction
2       that is appropriate.
3 BY MS. RUANE:
4       Q.   What about cancer pain, was
5 that considered a restriction that was
6 appropriate for Actiq?
7       MS. HILLYER: Objection to
8       form.
9       THE WITNESS: That is -- let
10       me state first that for both
11       Actiq, as it evolved in the
12       marketplace, prior authorizations
13       were required. Often they default
14       to label. Often they can include
15       beyond label. It depends.
16       So there's not one answer to
17       your question.
18 BY MS. RUANE:
19       Q.   Okay. My question for you,
20 as the national account manager who
21 drafted this document --
22       A.   Yes.
23       Q.   -- was, you gave the example
24 of opioid-tolerant patients as an

Page 84

1 appropriate indication that wouldn't --
2 that you wouldn't attempt to establish
3 prior authorization criteria beyond; is
4 that correct?
5       MS. HILLYER: Objection to
6       form. Mischaracterizes testimony.
7       THE WITNESS: That's not
8       what I said.
9 BY MS. RUANE:
10       Q.   What was your example for
11 opioid-tolerant patients? What were you
12 referring to?
13       A.   What I'm referring to is,
14 for everyone's edification, prior
15 authorizations often have very specific
16 requirements, it's called criteria, not
17 necessarily restrictions, criteria that
18 the plan determines.
19       Each plan makes their own
20 determination, based on the clinical data
21 and what's available to them from what's
22 going on in the marketplace.
23       If they choose to cover it
24 beyond label, that's their privilege to

Page 85

1 do so.
2       And each plan, if you were
3 to look at a prior authorization form,
4 might have very specific criteria that
5 varies from one plan to another. And
6 that is up to the P&T committee and the
7 clinical team for that health plan.
8       Q.   And one of the goals, as a
9 national account manager at that time,
10 was to assist in establishing that prior
11 authorization criteria, correct?
12       A.   It depends. It's part of
13 the -- you have a clinical discussion
14 with the team -- with the plan. And they
15 write their PA criteria, we do not.
16       Q.   And at least at that time,
17 on Page 74, under, Anthem pharmacy
18 services --
19       A.   Yep.
20       Q.   -- the fourth bullet point
21 down, it looks like, to the extent Actiq
22 had updated clinical information, that
23 was going to be provided?
24       A.   That's what it says, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    Q.   Let's turn to Page 77, it's
2 the last page.
3         You'll see there, there's a
4 heading, Manage resources effectively?
5    A.   Uh-huh.
6    Q.   The second-to-last bullet
7 point indicates, Learn and utilize Actiq
8 white paper, when available, to present
9 data to plans.
10    A.   That's what it says.
11    Q.   Is the Actiq white paper the
12 same as the dossier?
13    A.   No.
14    Q.   What was the Actiq white
15 paper?
16    A.   I honestly don't remember.
17 I remember there was one, but I don't
18 recall specifically what it was.
19    Q.   Do you recall who was
20 involved in creating it?
21    A.   I honestly don't.
22         - - -
23         (Whereupon, Teva-Bearer
24    Exhibit-5,

Page 87

1    TEVA_MDL_A_04838485-490, was
2    marked for identification.)
3         - - -
4 BY MS. RUANE:
5    Q.   I'm going to hand you what's
6 been marked as Exhibit-5.
7         This is a similar document,
8 just for 2005, correct?
9         MS. HILLYER:  Take your time
10    to look it over.
11 BY MS. RUANE:
12    Q.   And I'll tell you -- I mean,
13 take the time you need.  But I'll tell
14 you I'm just going to ask you one or two
15 questions, and then we'll move on.
16    A.   Okay.
17    Q.   On Page 2 of that document,
18 86, it's, I guess, the -- it's hard to
19 describe, right above Cigna, I guess, the
20 last bullet point right above Cigna, one
21 of the things included was to broaden the
22 Actiq prior authorization criteria?
23    A.   Yep.
24    Q.   And below that is an MEP on

Page 88

1 pain management, correct?
2    A.   Correct.
3    Q.   What's an MEP?
4    A.   Medical education program.
5    Q.   And so medical education
6 programs would be provided to managed
7 care entities with the goal of broadening
8 the Actiq prior authorization criteria,
9 correct?
10    A.   Not necessarily.  Managed
11 care organizations don't treat patients,
12 so we spend a lot of time with medical
13 education programs, particularly in the
14 pain area.
15         And you give them -- it's
16 like a disease state type of presentation
17 to educate them, because we can't assume
18 that every pharmacy director has working
19 knowledge of all the different
20 therapeutic areas or all the medications.
21    Q.   And in this case, the pain
22 management education is referenced, below
23 the goal, to broaden Actiq prior
24 authorization criteria; you would agree?

Page 89

1    A.   That's what it says.
2    Q.   Okay.  And there's also an
3 indication that the team is going to work
4 with the field to drive appeals and
5 letters of medical necessity, correct?
6    A.   That's what it says.
7    Q.   That's also under the
8 heading of, Broaden Actiq prior
9 authorization criteria, correct?
10    A.   Correct.
11    Q.   And the field would be
12 individuals -- sales representatives
13 calling on physicians, correct?
14    A.   Let me make sure I'm
15 answering you correctly.
16         Field -- yes.
17    Q.   And the sales
18 representatives calling on the field --
19 or within the field would be tasked with,
20 rather than having their -- the
21 physicians they call on accept a denial,
22 to undergo the appeal process and, if
23 necessary, submit a letter of medical
24 necessity, correct?

Page 90

1      MS. HILLYER: Objection.
2 Calls for speculation. Lack of
3 foundation.
4      THE WITNESS: Why don't you
5 rephrase?
6 BY MS. RUANE:
7    Q.  Sure.
8      When it says, Work with the
9 field to drive appeals and letters of
10 medical necessity, that is to drive an
11 increase in the number of appeals and
12 letters of medical necessity, correct?
13      MS. HILLYER: Objection.
14 Calls for speculation.
15      THE WITNESS: This was a
16 time when prior authorizations,
17 letters of medical necessity, was
18 not as commonplace for many
19 offices.
20      The idea behind prior
21 authorizations and letters of
22 medical necessity was to ensure
23 that the office staff was familiar
24 with the process, to ensure

Page 91

1 appropriate patients, as deemed
2 appropriate by the physician, had
3 access to Fentora.
4 BY MS. RUANE:
5    Q.  And so to drive the number
6 of appeals and letters of medical
7 necessity would have the effect of
8 increasing, potentially, the number of
9 patients who, although they were first
10 denied, upon appeal and submission of a
11 letter of medical necessity, were able to
12 receive the opioid, correct?
13      MS. HILLYER: Objection to
14 form.
15      THE WITNESS: While I'll
16 state that you're -- the prior
17 authorization, the reasons for
18 denials of prior authorizations
19 are many, many; not just based on
20 diagnosis and indication. So I
21 want to clarify that.
22 BY MS. RUANE:
23    Q.  And I appreciate that.
24      The practical effect of a

Page 92

1 denial is that medication is not going to
2 be paid for and the patient won't receive
3 the medication, correct?
4    A.  That's part of it. It could
5 be that the information is not complete,
6 the requirement for prior therapies is
7 not documented.
8      So, like I say, there are
9 many reasons why prior authorizations are
10 denied.
11    Q.  And my question was a little
12 different.
13      The practical effect of
14 that, if there's a denial, is that
15 medication is not going to be paid for,
16 the patient is not going to receive that
17 medication, correct?
18    A.  The patient can pay cash,
19 but the payer is not going to pay for it.
20    Q.  If the patient doesn't pay
21 cash, excluding an out-of-pocket payment,
22 then the practical effect would be the
23 patient doesn't receive the medication --
24 that medication, correct?

Page 93

1    A.  Correct.
2    Q.  And so Teva, or Cephalon, I
3 guess at this time --
4    A.  Right.
5    Q.  -- doesn't receive that
6 profit, correct?
7    A.  The script won't be filled.
8    Q.  And Teva, or Cephalon at
9 that time, doesn't receive the profit for
10 that script, correct?
11      MS. HILLYER: Objection to
12 form.
13      But you can answer.
14 BY MS. RUANE:
15    Q.  That's a true statement,
16 isn't it?
17      MS. HILLYER: Same
18 objection.
19      THE WITNESS: That sales --
20 sale would not be recognized by
21 Teva or Cephalon.
22 BY MS. RUANE:
23    Q.  The sale wouldn't be
24 recognized, and Teva or Cephalon wouldn't

Page 94

1 receive the money, correct?
2   A.   Unless the patient paid
3 cash.
4   Q.   And so one of the goals, in
5 order to increase the profits, would be
6 to utilize appeals and letters of medical
7 necessity in order to drive and increase
8 the number of patients who receive, at
9 this time, Actiq, correct?
10     MS. HILLYER:  Objection to
11     form.
12     THE WITNESS:  The premise
13     for driving appeals and/or
14     educating the staff is to ensure
15     the patient had access.  The
16     result of that, of course, would
17     be Cephalon would receive a sale.
18 BY MS. RUANE:
19   Q.   Okay.
20   A.   Appropriate patients having
21 access.
22   Q.   And that process has
23 continued, as far as -- strike that.
24     Let me ask a better

Page 95

1 question.  The process of utilizing
2 appeals and letters of medical necessity
3 in order to assist in patients receiving
4 the medication continued with Fentora,
5 correct?
6     MS. HILLYER:  Objection to
7     the form.
8     THE WITNESS:  I'm trying to
9     remember.  There were various
10     discussions around what letters of
11     medical necessity would be
12     available.
13     I believe we did have them
14     for Fentora, as I recall.
15 BY MS. RUANE:
16   Q.   Okay.
17   A.   And mind you, letters of
18 medical necessity are managed through our
19 medical department, not me.
20   Q.   On Page 87, toward the very
21 bottom, it's actually the second bullet
22 point above Eckerd Health Services, it
23 indicates, Continue to develop
24 relationships with local Actiq advocates.

Page 96

1   A.   Yep.
2   Q.   So the -- are "local Actiq
3 advocates" physicians who prescribe
4 Actiq?
5   A.   Yes.
6   Q.   And one of the things you
7 were tasked with, in your role, was to
8 continue to develop those relationships,
9 correct?
10   A.   Typically, working with
11 sales teams not individually.
12   Q.   So what you would do would
13 be to coordinate with the sales teams in
14 order to ensure that they were developing
15 positive relationships with the
16 physicians who you all considered to be
17 Actiq advocates?
18   A.   That's true with every
19 product.
20   Q.   That's also true with the
21 Fentora product, correct?
22   A.   It's true with any -- that's
23 a standard practice in the industry.
24     And I'll clarify.  When

Page 97

1 products may or may not be added to
2 formulary, many times pain specialists
3 are not a part of their P&T, so they rely
4 on those physicians we're referring to
5 for input in the decision-making.
6     Rarely have I ever seen or
7 heard of a pain specialist sitting on a
8 P&T committee that ultimately makes the
9 decision as to whether it's on formulary
10 and what the criteria covered -- what the
11 coverage criteria is.
12   Q.   So breaking that up, the P&T
13 committee is the committee that decides
14 whether a drug ends up on formulary,
15 correct?
16   A.   They make a recommendation.
17 And then there's a financial piece to it
18 that the contracting side or the trade
19 side of the plan makes a determination,
20 based on the cost of the drug, et cetera.
21   Q.   So the P&T committee makes
22 the recommendation on whether a drug
23 should end up on formulary, correct?
24   A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1   Q.   And Cephalon, and then Teva,
2  recognized that utilizing physician
3  advocates who advocate for their products
4  was a helpful step in obtaining formulary
5  status for their products?
6        MS. HILLYER:  Objection to
7    form.
8        THE WITNESS:  It's a broad
9    statement, because there's no
10   suggestion of -- I mean, if a plan
11   decides not to cover it at all,
12   you need an advocate to say, we
13   need this product.
14       It has nothing to do with
15   what the indication is, or what
16   have you, at that point.
17 BY MS. RUANE:
18   Q.   I'm sorry?
19   A.   So what I'm trying to say
20 is, yes, physicians are often tasked,
21 with their expertise in certain specialty
22 areas, for making -- giving opinions to
23 the P&T committee, clinical -- based on
24 their practice.

Page 99

1    Q.   And the role that Teva plays
2  in that is to maintain relationships with
3  those physicians?
4        MS. HILLYER:  Objection to
5    form.
6        THE WITNESS:  Teva?
7  BY MS. RUANE:
8    Q.   And Cephalon.
9    A.   But you're -- it's a
10 broad -- I mean, who?  Who in Teva?
11   Q.   Well, my question is,
12 because on your managed care and
13 reimbursement objectives, one of your
14 bullet points is to continue to develop
15 relationships with local Actiq advocates.
16   A.   Yes.
17   Q.   So my question is posed to
18 you because that's in a document that has
19 your name on it.
20   A.   Okay.
21   Q.   Would you agree --
22   A.   That was an objective.
23   Q.   -- that was an objective?
24   A.   Sorry.

Page 100

1    Q.   And that was also an
2  objective with the Fentora product,
3  correct?
4        MS. HILLYER:  Asked and
5    answered.
6        You can answer again.
7        THE WITNESS:  Again, going
8    back to the timeline, the majority
9    of my involvement with Fentora was
10   not customer-facing.
11 BY MS. RUANE:
12   Q.   But in your role at Teva,
13 you were aware of the fact that the goal
14 of maintaining relationships with patient
15 advocates in order to make sure there's
16 somebody to advocate for Fentora on the
17 formulary maintained a goal of the
18 organization, correct?
19   A.   You stated patient --
20       MS. HILLYER:  Objection to
21   form.
22       THE WITNESS:  You stated
23   patient advocate.  You said
24   patient advocate.

Page 101

1  BY MS. RUANE:
2    Q.   Let me ask the question
3  again.
4        In your role, though your
5  position changed, but you're aware of the
6  fact that it maintained -- that Teva
7  maintained, as a goal, to develop
8  relationships with advocates for Fentora
9  in order to, hopefully, provide somebody
10 to advocate for the use of Fentora on the
11 formulary?
12   A.   So as I stated in previous
13 comments relative to the landscape of
14 managed care, back when Actiq was
15 promoted, many times the role of an
16 account manager was just as you stated in
17 the objectives.
18       That evolved into a very
19 relatively ineffective way to have
20 physician advocates.  It's really up to
21 the sales representatives in the
22 marketplace to promote the product
23 appropriately to all physicians, whether
24 they are KOLs or not.

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    So the practice of -- of an
2 account manager personally getting to
3 know a KOL was really not the norm in the
4 Fentora time frame.
5    Q.   So that was a shift from a
6 practice that occurred with Actiq?
7    A.   Yes, I would say it is.
8    Q.   Okay.
9    A.   And -- yes.
10    Q.   All right.
11         - - -
12    (Whereupon, Teva-Bearer
13    Exhibit-6,
14    TEVA_MDL_A_04484212-214, was
15    marked for identification.)
16         - - -
17    MS. RUANE:  I'm going to
18    hand you what's been marked as
19    Exhibit-6.  For the record, this
20    is TEVA_MDL_A_04484212 through 14.
21 BY MS. RUANE:
22    Q.   If you look down to the
23 second message there, the e-mail from
24 Terry Terifay.

Page 103

1    Are you cc'd on this e-mail?
2    A.   The second one, yes.
3    Q.   And this is referencing that
4 Actiq white paper --
5    A.   Okay.
6    Q.   -- that we talked about
7 earlier?
8    MS. HILLYER:  Take your time
9    to look through it if you need to.
10    THE WITNESS:  Okay.  Yes.
11 BY MS. RUANE:
12    Q.   Terry's e-mail, on which you
13 were cc'd, indicates that, in the first
14 line, This document is going to be a
15 great initiative as we roll out our 2005
16 tactics to address issues around
17 reimbursement for Actiq.
18    Did I read that correctly?
19    A.   Wait a minute.  This one
20 here?
21    Sorry.  I was looking --
22 yes, that's what it says.  Sorry.
23    Q.   So this Actiq white paper
24 was going to be used with managed care

Page 104

1 entities, correct?
2    A.   Yes.
3    Q.   And the Actiq white paper
4 was circulated to a certain set of
5 Cephalon employees, some of whom provided
6 feedback, correct?
7    A.   I don't, truthfully, recall
8 this.  Now that I'm reading it, it's
9 familiar.
10    Q.   Okay.  And you were included
11 on the e-mail chain with the feedback,
12 correct?
13    A.   That was routine, to be
14 cc'd.
15    Q.   I'm sorry, what did you say?
16    A.   It was -- it was routine
17 for -- you notice I was cc'd by Terry
18 because I was more of the marketing.
19    So he would automatically
20 copy me on things.
21    Q.   And in the message below, on
22 which you're cc'd, Bill Cunningham --
23 it's the last sentence on Page 212.
24    A.   Yep.

Page 105

1    Q.   We'll talk about the
2 feedback itself in a minute.
3    But Bill indicates,
4 Essentially, the reason behind the need
5 to have the commentary section worded in
6 such a way to ensure that managed care
7 clearly understands the nature of what is
8 being discussed and does not attempt to
9 misconstrue or misinterpret the
10 information.
11    Do you see that?
12    A.   I see that.
13    Q.   He goes on and talks about
14 the fact that he doesn't want managed
15 care to attempt to turn the intent of the
16 information around and possibly use it to
17 their own advantage.
18    Do you see that?
19    A.   I see that.
20    Q.   Do you have an understanding
21 of what he meant by that?
22    A.   I do not.
23    MS. HILLYER:  Objection.
24    Calls for speculation.

Page 106

BY MS. RUANE:

Q.   You do not?

A.   No, I don't know.

Q.   Okay.  Feedback was provided, below that, by Joseph -- I may be mispronouncing it -- Duarte.

A.   Correct.

Q.   Do you know Joseph Duarte?

A.   Yes.

Q.   Does he have any medical or pharmaceutical training, to your knowledge?

A.   I don't know.

Q.   One of the things -- do you know what Joseph's role was with the company?

Actually, I say that.  Look on Page 214, he's listed as a national account manager?

A.   Yes.  He was a national account manager.

Q.   And do you know what bucket, I mean, what -- do you know, was he in managed care?  Strike that.  Let me ask

Page 107

it that way.

Was he in the managed care group?

A.   Yes.  National account manager.

Q.   For managed care?

A.   Yes.

Q.   He, it looks like, offices out of California?

A.   Correct.

Q.   To your knowledge -- well, strike that, let me ask this.

Joe had reviewed the Actiq white paper.  And under Number 2, so I'm on Page 213, in bold, he gives his suggestions.  And he is talking about Module 1.

It looks like it said, Breakthrough pain, defined as a transient flare in pain of moderate-to-severe intensity occurring in conjunction with persistent pain, is a prevalent form of pain in patients with cancer or other terminal diseases.

Page 108

Do you see that?

A.   I see.  Yes.  I'm sorry, yes, I do.

Q.   Do you see the suggestion -- he gave a couple different suggestions.  One was just to omit the whole thing and end that sentence with, you know, Persistent pain is a prevalent form of pain in patients.

Do you see that?

MS. HILLYER:  Objection.  I just want to be clear that it looks like other people may have commented.  And because this isn't in color, it's not clear whose comments are whose.

MS. RUANE:  That's fair.

MS. HILLYER:  But go ahead.

BY MS. RUANE:

Q.   So within the -- the only reason I ask it that way is because at that point it looks like it's an e-mail just with Bill and Joe.

But there may have been

Page 109

others.

MS. HILLYER:  Terry had comments, it looks like, perhaps.

BY MS. RUANE:

Q.   On that July 12th, 2004 e-mail, he gives three suggestions, correct?

MS. HILLYER:  Same -- same objection.

Go ahead.

BY MS. RUANE:

Q.   Do you see that he gives three suggestions there?

A.   I see there are three suggestions there.

I also notice that the font is different on C, so I don't know, based on what I'm reading here, if, in fact, that is actually what -- his comment.  I don't know.

Q.   Got it.

Whoever's suggestions they are, every -- all three suggestions do not limit that definition of breakthrough

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 pain to patients with cancer; is that
2 correct?
3      A.   That's correct.
4      Q.   If you'll flip the page to
5 Page 214, Number 6 there on Module 2,
6 there's a question about whether they can
7 include the Turk editorial titled,
8 Remember the Distinction Between
9 Malignant and Benign Pain?  Well, forget
10 it.
11      Do you see that?
12      A.   Yes, I see it.
13      Q.   So those were requests made
14 by somebody within the Cephalon company,
15 as far as edits to the Actiq white paper,
16 correct?
17      MS. HILLYER:  Objection to
18 the form.
19      You can answer.
20      THE WITNESS:  What I don't
21 remember is if this was more or
22 less a disease state type of
23 document.  I don't remember.
24      If it was, then it would

Page 111

1 make sense to have a distinction,
2 you know, between -- there's
3 malignant and nonmalignant pain,
4 more of an education.  That's what
5 I don't remember.
6      So just looking at this, I
7 can't answer your question
8 specifically.
9 BY MS. RUANE:
10      Q.   We know it's titled, The
11 Actiq White Paper --
12      A.   Yes.
13      Q.   -- right?
14      Is that correct?
15      A.   Yes.
16      Q.   And so the Actiq white
17 paper --
18      A.   Okay.
19      Q.   -- would reference the drug
20 Actiq rather than a more general disease
21 state.
22      Do you agree?
23      A.   I think if -- without seeing
24 the deck itself in the context of the

Page 112

1 flow, oftentimes we would have
2 promotional decks or decks that would
3 give disease state awareness up front,
4 that's very common, and then go into the
5 product.  I have examples currently that
6 I use.
7      The slides themselves -- and
8 I don't remember, but I'm just educating
9 you, the slides themselves, anything that
10 is nonbranded would have a different
11 template, and then transition into a
12 branded template when you start speaking
13 about the product.
14      Q.   And --
15      A.   So --
16      Q.   And you don't remember, one
17 way or another, with this Actiq white
18 paper?
19      A.   I really don't, sorry.
20      Q.   Based on the names included
21 on this e-mail, if you just look at Page
22 2, I think all the names are included in
23 the July 20th, 2004 portion of the
24 e-mail, on Page 212, where Terry sends it

Page 113

1 out and cc's you, can you tell me, based
2 on your knowledge, whether anyone on that
3 e-mail has any medical training as a
4 physician or a pharmacist?
5      A.   I know for a fact Susan
6 Larijani does, she's in medical services.
7 I don't know the background of Joe, other
8 than my relationship with him at
9 Cephalon.
10      Andy Pyfer is -- I don't
11 believe has medical.  Nor Bill.
12      Q.   Do you happen to know what
13 Susan's training is?
14      A.   No.
15      MS. RUANE:  I'm going to
16 hand you Exhibit-7, which, for the
17 record, is TEVA_MDL_A_04478352
18 through 356.
19      - - -
20      (Whereupon, Teva-Bearer
21 Exhibit-7,
22 TEVA_MDL_A_04478352-356, was
23 marked for identification.)
24      - - -

Page 114

1    MS. HILLYER:  This is 7, you
2    said?
3    MS. RUANE:  Yes.
4  BY MS. RUANE:
5    Q.   This is a follow-up e-mail.
6    Susan indicates, on the
7  first page in the first sentence, Q and I
8  have reviewed your collective comments
9  and I have incorporated most of them in
10 to the final document.
11    Do you see that?
12   A.   I do.
13   Q.   Do you have any idea who Q
14 is?
15   A.   Medical director.
16   Q.   And that would have been the
17 medical director for --
18   A.   Pain.
19   Q.   Pain.
20    What's Q's full name?
21   A.   It's in the cc at the top.
22 They called him Q, but it's K-I-U-M --
23   Q.   Got it.
24    So for the record, that's

Page 115

1  K-I-U-M-A-R-S; last name, V-A-D-I-E-I?
2    A.   Correct.
3    Q.   I'm not going to try to
4  pronounce that.
5    A.   That's why he was called Q.
6    Q.   In any event, in this
7  document Susan includes, for example, on
8  Number 2, Subparagraph D, what the
9  revision is going to be.
10    Do you see that?
11   A.   I do.
12   Q.   And ultimately, after
13 reviewing the comments, the revision to
14 the Actiq white paper referenced,
15 Breakthrough pain, defined as a transient
16 flare in pain of moderate-to-severe
17 intensity occurring in conjunction with
18 persistent pain, is a prevalent form of
19 pain in patients with malignant and
20 nonmalignant diseases.
21    Do you see that?
22   A.   I do.
23   Q.   You would agree that's
24 beyond the scope of breakthrough pain in

Page 116

1  cancer patients?
2    MS. HILLYER:  Objection to
3    form.
4    THE WITNESS:  Again, I would
5    love to see the final deck,
6    because these are only
7    recommendations.
8  BY MS. RUANE:
9    Q.   We'll get there.
10   A.   Good.  Because I don't --
11 I'm answering you based on what I'm
12 seeing here.
13    I'm assuming the highlight
14 is included in the revision, so she added
15 it back in.  Because it seems like the
16 last one was a deletion if it was
17 highlighted, or no?
18   Q.   Yes.  That's correct.  There
19 were several options.
20    The one it appears they
21 landed on referenced a prevalent form of
22 pain in patients with malignant and
23 nonmalignant diseases, correct?
24   A.   That would be appropriate in

Page 117

1  the disease state slide, for example.
2    Q.   And you would agree that
3  that revision references disease states
4  beyond the scope of breakthrough cancer
5  pain, correct?
6    A.   That's what it states.
7    Q.   Okay.  So my statement is
8  correct?
9    A.   Yes.
10   Q.   Under Module 2, it's
11 actually just Number 3 there, the
12 revision that they landed on, it
13 states -- and I apologize, it's a little
14 dark -- The use of opioids for the
15 management of cancer pain is well
16 accepted and the use of opioids for the
17 management of nonmalignant pain is
18 gaining wider acceptance among pain care
19 specialists.
20    Do you see that?
21   A.   Yes.
22   Q.   And then it goes on, Several
23 professional societies -- but it's not a
24 full sentence, right, at least in this

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 form?

2    A.   Correct.

3    Q.   So this document references

4 the use of opioids for the management of

5 nonmalignant pain, correct?

6    A.   Yep.  Yes.

7    Q.   So that is not just a

8 disease state presentation, correct?

9        MS. HILLYER:  Objection to

10 form.

11        THE WITNESS:  I don't know.

12 BY MS. RUANE:

13    Q.   It is referencing, you would

14 agree, the use of opioids, correct?

15    A.   Yes.

16    Q.   And it's referencing the use

17 of opioids for management of nonmalignant

18 pain, correct?

19    A.   Yes.

20    Q.   And you would agree that

21 that's referencing the use of opioids for

22 something beyond breakthrough cancer

23 pain, correct?

24    A.   Opioids in general, yes.

Page 119

1    Q.   In an Actiq white paper,

2 right?

3    A.   That's what I'd like -- yes.

4 Yes.

5        It's not uncommon to include

6 standards of care, et cetera, in what we

7 would consider -- I'm assuming this is

8 promotion, but it's not uncommon to do

9 that.

10        - - -

11        (Whereupon, Teva-Bearer

12        Exhibit-8,

13        TEVA_MDL_A_10070409-410, was

14        marked for identification.)

15        - - -

16        MS. RUANE:  I'm going to

17        hand you what's been marked as

18        Exhibit-8.  This is

19        TEVA_MDL_A_10070409 to 410.

20 BY MS. RUANE:

21    Q.   The second paragraph -- this

22 one I'll be brief on.

23        But the second entry, I

24 guess, from Joe Duarte again, he's

Page 120

1 requesting the addition of Dr. Tennant's

2 study to the Actiq white paper.  And that

3 study is entitled, The Use of Oral

4 Transmucosal Fentanyl Citrate for

5 Breakthrough Pain in Severe, Nonmalignant

6 Chronic Pain.

7        Do you see that?

8    A.   I do.

9    Q.   And so is that consistent

10 with your memory that the Actiq white

11 papers would provide medical studies?

12    A.   So I remember -- I stated

13 earlier, I don't recall a lot of detail

14 about the white paper.

15        After reading this, when I

16 see professional services, that would

17 come from our medical side, which is

18 where Susan Larijani resided.  Therefore,

19 this is not a promotional piece.

20    Q.   Am I understanding you

21 correctly that what you're saying is the

22 Actiq white paper is not a promotional

23 piece?

24    A.   Right.  Based on my

Page 121

1 recollection now, after referring to

2 professional services.  And, typically,

3 anything coming from professional

4 services would be upon request,

5 unsolicited request from a physician.

6    Q.   So if it's not --

7    A.   I'm sorry.  Not a physician,

8 a plan.  Sorry.

9    Q.   Got it.

10        So if it's not a promotional

11 piece -- the significance to you of the

12 fact that it's -- the Actiq white paper

13 is not a promotional piece is that it

14 means it's not used by you or others when

15 you're calling on --

16    A.   Correct.

17    Q.   -- managed care entities?

18        MS. HILLYER:  Make sure she

19 finishes.

20 BY MS. RUANE:

21    Q.   I'll do it again, just to be

22 sure we're tracking.

23        The significance to you of

24 the fact that, in your mind, the Actiq

Page 122

1 white paper was not a promotional piece
2 is that it was not used by you or others
3 when you're calling upon managed care
4 entities?
5     A.   Correct.
6     Q.   Okay.  Great.
7             - - -
8         (Whereupon, Teva-Bearer
9     Exhibit-9,
10    TEVA_MDL_A_04426360-362, was
11    marked for identification.)
12            - - -
13        MS. RUANE:  I'm going to
14    hand you what's been marked as
15    Exhibit-9.  This is, for the
16    record, TEVA_MDL_A_04426360
17    through 362.
18 BY MS. RUANE:
19    Q.   This is an e-mail chain
20 between you and Bill Cunningham, correct?
21    A.   Yeah.
22    Q.   Who is Bill Cunningham?
23    A.   My manager.
24    Q.   And what was his title?

Page 123

1     A.   Probably director of market
2 access.  We had various titles.
3     Q.   It looks like -- did you and
4 Bill office in the same place?
5     A.   Bill was located in
6 California.
7     Q.   It looks like you were
8 e-mailing Bill to discuss a managed care
9 Actiq presentation, correct?
10    A.   Yes.
11    Q.   And so that would be a
12 promotional piece, correct?
13    A.   If I'm presenting it, yes.
14    Q.   You write, in the first line
15 of your e-mail on Page 361 --
16    A.   Yes.
17    Q.   -- Bill, I wanted to follow
18 up with you about the managed care Actiq
19 presentation.  I think there's a lot of
20 great information in these slides and I'm
21 sure we can consolidate them to address a
22 managed care audience.
23        Do you see that?
24    A.   I do.

Page 124

1     Q.   So that would indicate that
2 this is a promotional piece that you or
3 your team are going to use to present to
4 a managed care audience, correct?
5     A.   Yep.
6     Q.   And your thoughts on that,
7 you define below.
8         There are four topics that
9 the slides could be broken into, which
10 you include there as defining pain,
11 economic impact of pain, pain management
12 and Actiq, correct?
13    A.   Yep.
14    Q.   And you indicate, The story
15 should be built around the objective of
16 explaining why providers want to or
17 should have access to Actiq.
18        Do you see that?
19    A.   Yes.
20    Q.   And this is an e-mail that
21 you drafted, correct?
22    A.   Yep.
23    Q.   And so your plan was to
24 provide a slide set promoting the use of

Page 125

1 Actiq by providers, correct?
2         That's a bad question.  Let
3 me ask it differently.
4         You were speaking to managed
5 care entities who are evaluating the
6 prescriptions for Actiq that prescribers
7 out in the field are prescribing,
8 correct, to determine whether they will
9 be authorized and reimbursed?
10    A.   Under prior authorization,
11 is that -- we talked before about
12 formulary access versus prior
13 authorization.
14        So what is your question?
15    Q.   Let me ask first, you're
16 presenting, at this time, to managed care
17 entities in order to educate them about
18 Actiq and why providers, healthcare
19 providers, either want to or should have
20 access to Actiq, correct?
21    A.   For their patients, correct.
22    Q.   For their patients.
23        And so there may be a couple
24 of things that happen as a result of

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 that, if things go your way.
2 One of them would be that
3 the managed care entity expands the
4 criteria that they would use in order to
5 authorize use of Actiq?
6 MS. HILLYER: Objection to
7 form.
8 THE WITNESS: You're
9 implying that the Actiq coverage
10 was not broad. You're making a
11 broad statement. Each plan had
12 different coverage criteria.
13 BY MS. RUANE:
14 Q. Were there plans who had
15 coverage criteria just for breakthrough
16 cancer pain?
17 A. Yes.
18 Q. And one of things that you
19 were doing, when you were promoting Actiq
20 to the managed care entities,
21 particularly those whose indication was
22 for breakthrough cancer pain, was an
23 attempt to educate them to expand beyond
24 breakthrough cancer pain, correct?

Page 127

1 MS. HILLYER: Objection to
2 form.
3 THE WITNESS: It was to
4 educate them on pain and -- it
5 was, basically, again, talking
6 about pain management.
7 BY MS. RUANE:
8 Q. Okay. And you were
9 educating them on pain well beyond
10 breakthrough cancer pain, correct?
11 A. General pain information,
12 pain management.
13 Q. And so the answer to my
14 question would be, yes, you were
15 educating them on pain beyond
16 breakthrough cancer pain, correct?
17 A. Correct.
18 Q. In this slide set in
19 particular that you're proposing, you
20 start with the overall economic impact of
21 pain --
22 A. Yep.
23 Q. -- setting the stage.
24 And then you move to, What

Page 128

1 does pain look like, correct?
2 A. Yep.
3 Q. And you paint the picture,
4 pain is pain, correct?
5 A. Yes, I do.
6 Q. And so you were using the
7 phrase "pain is pain," while promoting
8 Actiq to managed care entities, correct?
9 MS. HILLYER: Objection to
10 form. Mischaracterizes the
11 document.
12 THE WITNESS: That is not
13 what that says.
14 BY MS. RUANE:
15 Q. Your proposal for the slides
16 to be used in the promotion of Actiq to
17 managed care entities included the phrase
18 "pain is pain," correct?
19 MS. HILLYER: Objection to
20 form. Same objection.
21 THE WITNESS: This is a
22 recommendation on building a slide
23 set. There's nothing in this
24 document that said anyone would

Page 129

1 say "pain is pain."
2 BY MS. RUANE:
3 Q. But you're -- in referencing
4 what your goal was for what the slide set
5 would convey to managed care entities,
6 you define it as painting the
7 picture-pain is pain, correct?
8 A. Based on this document,
9 that's what it says, yes.
10 Q. And you include in there
11 various types of pain, acute, chronic and
12 breakthrough, correct?
13 A. Yes.
14 Q. And that is not limited to
15 breakthrough cancer pain, is it?
16 A. No.
17 Q. You also reference there
18 BTP.
19 That references breakthrough
20 pain, right?
21 A. Yes.
22 Q. And BTCP references
23 breakthrough cancer pain, correct?
24 A. Yes.

Page 130

1     Q.   So there is a distinction
2 between the two acronyms, BTP and BTCP,
3 right?
4     A.   Yes.
5     Q.   The C stands for cancer?
6     A.   Correct.
7     Q.   And within the company, it
8 was understood that BTP meant
9 breakthrough pain and BTCP meant
10 breakthrough cancer pain, correct?
11       MS. HILLYER: Objection.
12   Objection to form.
13 BY MS. RUANE:
14     Q.   In your experience with the
15 company, you would use the phrase BTP to
16 reference breakthrough pain and BTCP to
17 reference breakthrough cancer pain,
18 correct?
19       MS. HILLYER: Objection to
20   form.
21       THE WITNESS: BTP, we
22   often -- in this situation, this
23   shows the two, but oftentimes we
24   got a little lazy with the BTP,

Page 131

1   breakthrough pain. And it didn't
2   suggest that it wasn't -- if it
3   was referencing the product, it
4   didn't suggest that it wasn't
5   relevant to the indication.
6 BY MS. RUANE:
7     Q.   Here --
8     A.   Here.
9     Q.   -- you make the point of
10 distinguishing between BTP, which you use
11 to define breakthrough pain, and BTCP,
12 which you use to define breakthrough
13 cancer pain, correct?
14     A.   Yes, that's what I stated.
15     Q.   I'm sorry. Do you need to
16 take a break?
17     A.   No, I was a little worried
18 about this getting caught. Sorry.
19     Q.   You indicate, Show studies
20 for each - conclusion, pain is pain, not
21 treating underlying condition.
22     Correct?
23     A.   Yep, that's what it says.
24     Q.   The message that you wanted

Page 132

1 to convey with this managed care Actiq
2 presentation was the conclusion that pain
3 is pain, regardless of the underlying
4 condition, correct?
5     A.   What this states is we don't
6 treat the underlying condition. We're
7 not treating the underlying condition.
8     Q.   But the conclusion is pain
9 is pain, correct?
10     A.   Yes, that's what it says.
11     Q.   Because whether -- what
12 you're suggesting there is you show
13 studies for each to indicate that whether
14 you're treating breakthrough cancer pain
15 or another type of pain, what you're
16 treating is the pain itself, correct?
17     A.   Treating pain, correct.
18     Q.   And that is a discussion of
19 the use of Actiq for something other than
20 breakthrough cancer pain, correct?
21       MS. HILLYER: Objection to
22   the form. Mischaracterizes the
23   document.
24       THE WITNESS: Why don't you

Page 133

1   state it a different way?
2 BY MS. RUANE:
3     Q.   Sure.
4     The title that's in bold and
5 underlined there, Why Providers Want to
6 (Or Should) Have Access to Actiq, did I
7 read that correctly?
8     A.   Yes, you did.
9     Q.   So what we're talking about
10 with this document that you also referred
11 to as a managed care Actiq presentation
12 is a presentation on the drug Actiq,
13 correct?
14     A.   Correct.
15     Q.   And one of the bullet points
16 below that talks about the use of studies
17 to be included to reach the conclusion,
18 pain is pain --
19     A.   I see that, yep.
20     Q.   -- correct?
21     A.   That's what it says, yes.
22     Q.   And so the proposal here is
23 for a promotional document to be used in
24 managed care presentations discussing the

Page 134

1 use of Actiq for something other than
2 breakthrough cancer pain, correct?
3      A.   Based on --
4          MS. HILLYER:  Object to the
5      form.
6 BY MS. RUANE:
7      Q.   That's a correct statement?
8      A.   Based on what I'm reading.
9 I have no recollection as to whether we
10 actually put this deck together.  Maybe
11 you have a copy of it.
12          It may not have -- it may
13 not have ended up going through our
14 approval process in this format.  So I
15 don't know.
16      Q.   So my question is a little
17 different, just based on this document.
18      A.   Sure.
19      Q.   And I understand the
20 distinction.  I appreciate that.
21      A.   Okay.
22      Q.   What you were proposing, on
23 October 15th, 2004, was a managed care
24 Actiq presentation to promote the use of

Page 135

1 Actiq for something other than
2 breakthrough cancer pain, utilizing the
3 phrase "pain is pain," correct?
4      A.   I want to make a distinction
5 between promote -- health plans do not
6 prescribe medications.  This was at a
7 time in which, early on, Actiq was not
8 managed by plans, often it was just
9 available.
10          There was a trend to move
11 towards managing -- and when I say
12 "manage," I'm talking about what we said
13 earlier, prior authorizations and
14 criteria.
15          As a result of this, many
16 patients who doctors deemed appropriate
17 were on medications such as Actiq for
18 what they deemed appropriate, whether it
19 be noncancer pain, and that's their
20 prerogative.
21          So this was an effort,
22 albeit looking at it now, I don't know if
23 it ever made it to fruition, to establish
24 what the plan is, again, keeping in mind,

Page 136

1 plans were not experts on pain
2 management.  The majority of products
3 available for pain management were
4 generics, and plans don't pay a whole lot
5 of attention until branded products are
6 available.
7          And with Actiq, it was
8 highly managed across the board, it
9 evolved into that situation.  Ultimately,
10 with Fentora it was the same way.
11      Q.   So with this presentation,
12 your proposal was to present to managed
13 care entities advocating or explaining
14 why providers want to or should have
15 access to Actiq for something other than
16 breakthrough cancer pain, correct?
17          MS. HILLYER:  Objection to
18      form.
19          THE WITNESS:  I prefer the
20      word "explaining."
21 BY MS. RUANE:
22      Q.   Then let me ask it again.
23          The managed care Actiq
24 presentation that you were describing

Page 137

1 here was a proposal to explain to managed
2 care entities why providers want to or
3 should have access to Actiq for something
4 other than breakthrough cancer pain,
5 correct?
6      A.   That's what it states.
7      Q.   You agree?  That's a correct
8 statement?
9      A.   That's exactly what it says.
10      Q.   Okay.
11          MS. RUANE:  All right.
12      Let's take a quick break.
13          VIDEO TECHNICIAN:  Going off
14      the record.  11:39 a.m.
15              - - -
16          (Whereupon, a brief recess
17      was taken.)
18              - - -
19          VIDEO TECHNICIAN:  We're
20      back on record at 11:51 a.m.
21 BY MS. RUANE:
22      Q.   I'm going to hand you
23 Exhibit-10.
24              - - -

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1      (Whereupon, Teva-Bearer
2  Exhibit-10,
3  TEVA_MDL_A_10105779-782, was
4  marked for identification.)
5      - - -
6      MS. RUANE:  For the record,
7  this is TEVA_MDL_A_10105779
8  through 782.
9      MS. HILLYER:  Are they
10 different --
11     MS. RUANE:  Those are -- I'm
12 sorry.  And then -- so the
13 native -- if you look at 782, it's
14 the native attachment for the
15 sheets behind that.  They are the
16 exhibits -- or the attachments to
17 the e-mail.  Does that make sense?
18     MS. HILLYER:  Yes.
19     MS. RUANE:  Okay.
20     THE WITNESS:  Okay.
21 BY MS. RUANE:
22     Q.   This is quick.
23         This is an e-mail showing
24 that all the NAMs should receive a copy

Page 139

1  of the Actiq MCO dossier.
2         Do you see that?
3      A.   Yes.
4      Q.   What are NAMs?
5      A.   National account managers.
6      Q.   And at that point, you were
7  a national account manager, in 2006?
8      A.   No.
9      Q.   No, you weren't.
10     A.   I was a manager.
11     Q.   Got it.
12         You'll see on the
13 attachments, just to the extent it's
14 helpful to you --
15     A.   Yes.
16     Q.   -- you're listed on both of
17 them.
18         Those are the attachments
19 for the individuals who should receive a
20 copy of the Actiq dossier.
21         Do you see that?
22     MS. HILLYER:  Objection to
23 form.
24     THE WITNESS:  Yes.

Page 140

1      MS. HILLYER:  Go ahead.
2      THE WITNESS:  I'm sorry,
3  you're asking me to look at the
4  list -- the roster?
5  BY MS. RUANE:
6      Q.   You see your name is on the
7  list of people to receive an Actiq
8  dossier?
9      A.   Yes.
10     Q.   On the second page, 780, the
11 last sentence of the first paragraph --
12     MS. HILLYER:  Take your time
13 to look through it, if you need
14 to.
15 BY MS. RUANE:
16     Q.   -- indicates, There have
17 been some updates to the Provigil white
18 paper and we have arranged for all the
19 NAMs to receive copies of the Provigil
20 and Actiq white paper.
21         Do you see that?
22     A.   Yes.
23     Q.   So let me hand you
24 Exhibit-11.

Page 141

1      - - -
2      (Whereupon, Teva-Bearer
3  Exhibit-11, TEVA_CHI_00036903-930,
4  was marked for identification.)
5      - - -
6      MS. HILLYER:  Are we done
7  with 10?
8      MS. RUANE:  I think so.
9  For the record, this is
10 TEVA_CHI_00036903 through 930.
11 BY MS. RUANE:
12     Q.   This is an Actiq managed
13 care dossier, correct?
14     A.   Yes.
15     Q.   Are you familiar with this
16 type of document?
17     A.   Yes.
18     Q.   These are documents provided
19 to managed care entities?
20     A.   Upon request of medical
21 services.
22     Q.   If a managed care entity
23 requested information about Actiq, it
24 would -- this managed care dossier would

Page 142

1 be provided to them, correct?
2     A.   Through medical services,
3 correct.
4     Q.   I assume that there were
5 times where managed care entities would
6 request, through medical services, a copy
7 of the dossier, which is why it was
8 created?
9     A.   Correct.
10     Q.   This was the Actiq dossier,
11 correct?
12     A.   That's what it says, yes.
13     Q.   And I'll tell you, there's
14 three modules, they are divided up.
15     A.   I haven't seen this in
16 years, so I'm glad you told me that.
17     Q.   You would have seen it at
18 the time, correct?
19     A.   If it was sent to me, I saw
20 it, yes.
21     Q.   And in your interactions
22 with managed care entities during this
23 time frame, you would have spoken with
24 them about the dossier, if they had

Page 143

1 requested it, correct?
2         MS. HILLYER:  Objection to
3     form.  Assuming facts not in
4     evidence.
5         THE WITNESS:  No.  No.  They
6     would have -- if they asked for a
7     dossier, we would send in a
8     request to medical services,
9     period.  That's all you can say.
10     You're not allowed to discuss
11     what's in the dossier.  It's not a
12     promotional piece.
13 BY MS. RUANE:
14     Q.   I'm sorry, what did you say
15 about promotional piece?
16     A.   This is not a promotional
17 piece.  This is a medical piece.
18     Q.   And in this document, on the
19 second page -- there's little page
20 numbers at the bottom, I'm going to use
21 those, just for ease of reference.
22     A.   I see.  And what page did
23 you say?  I'm sorry.
24     Q.   2.

Page 144

1     A.   2, got it.
2     Q.   This document indicates, in
3 that last paragraph, Breakthrough pain,
4 defined as a transitory flare of
5 moderate-to-severe pain that occurs in
6 patients with otherwise stable,
7 controlled, persistent pain, is a
8 prevalent form of pain in patients with
9 malignant and nonmalignant diseases.
10     Do you see that?
11     A.   Yes.
12     Q.   I'm looking back at 7.
13     MS. HILLYER:  Do you want
14 her to?
15     MS. RUANE:  Yes.
16 BY MS. RUANE:
17     Q.   If you'll pull up Exhibit-7
18 as well.
19     MS. HILLYER:  Give me a
20 second, please.
21     Okay, we're there.
22 BY MS. RUANE:
23     Q.   Exhibit-7 was an e-mail
24 chain regarding feedback on the Actiq

Page 145

1 white paper.
2     Do you see that?
3     A.   Yes.
4     Q.   And the suggestion, under
5 Module 1, which we're looking at Module
6 1, right?
7     A.   So based on what I'm seeing
8 here today, these are two different --
9 two different pieces.
10     This is a dossier.  This is
11 a white paper.
12     Q.   Okay.  That's -- I'm going
13 to ask you --
14     A.   As I recall.  I mean, we
15 would not call a dossier a white paper.
16     Q.   So I want to make sure I'm
17 clear on something as it relates to that.
18     On Number 2, this Actiq
19 white paper feedback e-mail --
20     A.   Yes.
21     Q.   -- if you look at Number 2D,
22 the revision that they ended up with --
23     A.   Right.
24     Q.   -- indicates -- and we're

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1 looking at Exhibit-7 right now, so we're
2 talking about the white paper, right?
3     A.   Yes.
4     Q.   And it indicates,
5 Breakthrough pain, defined as a transient
6 flare in pain of moderate-to-severe
7 intensity occurring in conjunction with
8 persistent pain, is a prevalent form of
9 pain in patients with malignant and
10 nonmalignant diseases.
11         Correct?
12     A.   That's what it says.
13     Q.   Okay.  And that's the same
14 language that's included in the dossier,
15 correct?
16         MS. HILLYER:  Objection to
17     form.  It's not.  I mean, it's
18     not.
19 BY MS. RUANE:
20     Q.   With the exception of
21 "transitory" to "transient"?
22         MS. HILLYER:  There's some
23     different wording, but --
24 BY MS. RUANE:

Page 147

1     Q.   Let's look just at the part
2 that references, Patients with malignant
3 and nonmalignant diseases.
4         The phrase "patients with
5 malignant and nonmalignant diseases"
6 appears in both Exhibit-7 and 11,
7 correct?
8     A.   It's unfortunate -- correct.
9 It's unfortunate these aren't referenced,
10 because in many documents you'll have
11 inconsistent approaches to the way -- I
12 mean, in anything, as long as it's
13 sourced.
14         This is a very old dossier
15 layout.  Currently, you have to annotate
16 the entire thing and then you have
17 actual, you know, verbatim.  So this was
18 sort of in the beginning.  This is not
19 the traditional format that is used
20 today.  So I will just say that part.
21         So it wouldn't be uncommon
22 for one document to have -- as long --
23 because definition can come from one
24 source but reads differently than

Page 148

1 another.  So I can't really comment.
2     Q.   But what we do know, because
3 we have the documents before us, is that
4 the Exhibit-11, the dossier, references
5 breakthrough pain as a prevalent form of
6 pain in patients with malignant and
7 nonmalignant diseases, correct?
8     A.   Yes.
9     Q.   And based on Exhibit-7, we
10 also know that, at least the feedback for
11 the Actiq white paper, and the conclusion
12 that Susan, in medical services, reached
13 was to reference breakthrough pain as a
14 prevalent form of pain in patients with
15 malignant and nonmalignant diseases,
16 correct?
17     A.   Yes.
18     Q.   Okay.  Just a few more
19 questions on Exhibit-11.
20         On Page 10 of Exhibit-11,
21 the second -- or, I guess, the first full
22 paragraph starts, For many patients.
23         Do you see that?
24     A.   I do see that.

Page 149

1     Q.   And the first sentence there
2 says, For many patients, no causative
3 factor can be found for the chronic pain
4 and no specific diagnosis can be made.
5         Do you see that?
6     A.   Yes.
7     Q.   Do you agree that is not
8 referencing breakthrough cancer pain,
9 correct?
10     A.   It does not mention
11 breakthrough cancer pain.
12     Q.   It mentions chronic pain
13 with no causative factor found, correct?
14     A.   Correct.
15     Q.   If you go on in the middle
16 of the paragraph, there's a sentence that
17 starts, However, experts in pain
18 management have recommended that the
19 primary goal of patient care for these
20 patients should be symptom control,
21 including the use of opioids where
22 appropriate.
23         Do you see that?
24     A.   Yes.

Page 150

1   Q.  And then the next -- there's
2  citations.
3       So there were some cites in
4  this white paper?
5       A.  I see that.  I see that.
6       Q.  In the dossier, excuse me.
7       A.  Yeah.  Good.
8       Q.  And then it references,
9  Several professional organizations have
10 published guidelines to guide
11 practitioners in this area.
12      Do you see that?
13      A.  I see that.
14      Q.  And it references
15 specifically the American Academy of Pain
16 Medicine, the American Pain Society, and
17 the Federation of State Medical Boards of
18 the United States.
19      Do you see that?
20      A.  I see that.
21      Q.  So based on Exhibit-11, we
22 know that Cephalon, in its dossier, was
23 referring back to societies, at least as
24 part of the support for the proposition

Page 151

1  that patients with no causative factor
2  for their chronic pain should be treated
3  with opioids?
4       MS. HILLYER:  Objection to
5  form.  Mischaracterizes the
6  document.
7       THE WITNESS:  You'll have to
8  restate that.  I don't agree with
9  what you just said.
10 BY MS. RUANE:
11      Q.  We know that Cephalon was
12 using a dossier and published a dossier
13 that discussed opioid treatment for
14 patients with chronic pain where no
15 specific diagnosis can be made, correct?
16      MS. HILLYER:  Objection to
17 form.
18      You can answer.
19      THE WITNESS:  So I didn't
20 create this document.  But what I
21 will tell you is, for the record,
22 patients who are prescribed a --
23 either Fentora or Actiq, were --
24 had chronic pain, they were on

Page 152

1  chronic pain medications, which
2  sometimes included opioids.  So
3  this is all true.
4       This is more about chronic
5  pain and then, hopefully, it will
6  get to start talking about
7  breakthrough pain.
8       But these are chronic pain
9  patients who have been on a
10 long-acting OxyContin, something
11 of that nature, and they have
12 breakthrough episodes of which the
13 short-actings are appropriate.
14      So, to me, this is just
15 setting the stage in general, in
16 my interpretation.
17 BY MS. RUANE:
18      Q.  And it is referring to
19 patients who have that chronic pain but
20 do not have cancer, correct?
21      A.  It's a general statement
22 about pain.
23      Q.  Yes.
24      But the beginning paragraph

Page 153

1  discusses the fact that these are
2  patients where no causative factor can be
3  found for their chronic pain and no
4  specific diagnosis can be made, correct?
5       A.  That's what it states.
6       THE WITNESS:  Are we
7  finished with this one?
8       MS. RUANE:  Yes.
9       I'm going to hand you what's
10 been marked as Exhibit-12.  This
11 is Module 2 for the Actiq managed
12 care dossier.
13      - - -
14      (Whereupon, Teva-Bearer
15 Exhibit-12, TEVA_CHI_00036931-955,
16 was marked for identification.)
17      - - -
18 BY MS. RUANE:
19      Q.  And I want to make sure I
20 understand this right.
21      Your testimony is, aside
22 from reaching out to medical services to
23 request a dossier, if that conversation
24 was initiated by a managed care entity,

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1  you and your team did not discuss the
2  dossiers with the managed care entities;
3  is that correct?
4      A.   That's correct.  To my
5  recollection, as far as the
6  dissemination.
7           I will say I may -- I recall
8  at one point, I don't recall if it was
9  for Actiq or other products, before they
10 became electronic, which is the norm now,
11 they were hard copies, and they were
12 shrinkwrapped, and we were not able to
13 even open them.
14          And there may have been a
15 vehicle in which an account manager,
16 based on the shrinkwrap, could deliver
17 it.  I vaguely -- I do remember that.
18          I don't recall what product
19 it was, though.
20     Q.   Okay.  But it would have
21 been -- based on your training and time
22 with the company, it would have been
23 inappropriate for an individual to speak
24 to the managed care entities about the

Page 155

1  information in the dossier?
2           MS. HILLYER:  Objection to
3       form.
4           THE WITNESS:  That -- no,
5       there may be information in the
6       dossier which would be part of
7       what we would discuss, not
8       specific to the dossier.  So I
9       don't think that's accurate.
10 BY MS. RUANE:
11     Q.   With that distinction.
12 Obviously, the dossier covers a lot of
13 things.
14     A.   Exactly.
15     Q.   But as far as talking
16 specifically about the dossier and the
17 information in the dossier in front of,
18 you know, the managed care entity, it
19 would have been inappropriate for you or
20 your team to discuss the details of that
21 dossier specifically?
22          MS. HILLYER:  Objection to
23       form.
24          THE WITNESS:  Are you asking

Page 156

1  about the content?
2  BY MS. RUANE:
3      Q.   Yes.
4      A.   Are you asking what is -- if
5  the payer says, what is included, there
6  are several sections?  We would say,
7  well, there's economic information,
8  there's background information.
9  Generally like that.
10     Q.   I'm asking whether, based on
11 your earlier testimony that white papers
12 are one thing but dossiers are another,
13 dossiers go through medical services and
14 you would not have spoken with managed
15 care entities about information in the
16 dossier.
17          Am I -- I want to make sure
18 I understand you correctly.
19     A.   Yes, that is the policy --
20          MS. HILLYER:  Objection.
21       Mischaracterizes the testimony.
22       And objection to form.
23          You can answer.
24          THE WITNESS:  Sorry.

Page 157

1           As I recall -- mind you,
2       this is a long time ago and we've
3       changed, evolved with the dossier.
4           Based on my recollection, we
5       would not have discussed the
6       contents of the dossier.
7       That's my recollection, we would
8       not have.
9  BY MS. RUANE:
10     Q.   Do you have an understanding
11 of why that was the policy?
12     A.   This is not a medical/legal
13 review document.
14     Q.   And what do you mean by
15 that?
16     A.   It's not a promotional
17 piece.
18     Q.   The only documents -- am I
19 correct that the only documents your team
20 was allowed to discuss with the managed
21 care entities were promotional pieces?
22     A.   That's correct.
23     Q.   And am I correct that the
24 promotional pieces would have been

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1 approved by medical/legal?
2     A.   Yes.  Although I'm not
3 remembering about the WL lefts, the
4 reprints that may have been part of that
5 back in those days.
6         Obviously, policies have
7 changed over time.  So I don't recall if
8 there were any clinical reprints that
9 were approved for dissemination.
10     Q.   Okay.  And I appreciate
11 that.  If we get there, we get there; if
12 not, no big deal.
13         But what I want to make sure
14 I understand is, when you talk about the
15 promotional piece, it appears to have
16 some significance, the phrase
17 "promotional piece."  And so I want to
18 make sure I understand what that means to
19 you.
20         It sounds like what it means
21 to you is a piece that has been approved
22 by medical/legal that you can discuss
23 with the managed care entities; is that
24 correct?

Page 159

1     A.   Medical, legal, and
2 regulatory.
3     Q.   Okay.  And your memory is
4 the Actiq white paper, which I know is
5 different in your memory than what we're
6 looking at right now, but your memory is
7 the Actiq white paper was a promotional
8 piece?
9         MS. HILLYER:  Objection.
10 Mischaracterizes testimony.
11         THE WITNESS:  No.
12 BY MS. RUANE:
13     Q.    So the Actiq white paper is
14 not a promotional piece?
15     A.   My memory is based on the
16 e-mail you showed me, which shows
17 professional services.
18         And without specifically
19 remembering the details of the white
20 paper, anything that referenced
21 professional services fell under a
22 nonpromotional piece that was
23 disseminated upon request.
24     Q.   Let's look at -- I gave you

Page 160

1 Exhibit-12, right?  Module 2.
2         MS. HILLYER:  No.
3         I don't think you put it on
4     the record, if you wanted to.
5         MS. RUANE:  Sorry.  Thank
6     you.
7 BY MS. RUANE:
8     Q.   We're now looking at
9 Exhibit-12, which is TEVA_CHI_00036931.
10         Again, there's little
11 numbers on the document, I'm just going
12 to use those because it's easier.
13     A.   I see.
14     Q.   On Page 3 of the document,
15 the last paragraph, about halfway
16 through, there's a sentence that starts
17 with, Addiction?
18     A.   Yes.
19     Q.   It says, Addiction, a
20 disease characterized by behaviors such
21 as compulsion, harm to the user or
22 continued use despite harm, is uncommon
23 in patients using opioids for a medical
24 condition.

Page 161

1         Do you see that?
2     A.   I see that.
3     Q.   What scientific support is
4 there for that statement?
5         MS. HILLYER:  Objection.
6     Lack of foundation.  Calls for
7     speculation.
8 BY MS. RUANE:
9     Q.   Do you see any there?
10     A.   I can't answer that
11 question.
12     Q.   You had mentioned earlier
13 that sometimes there's citations to the
14 studies supporting statements.
15         Do you see any citation
16 there or reference point?
17     A.   Nope.
18     Q.   Do you know, just based on
19 your personal experience in managed care
20 with opioids over time, any -- do you
21 have any support, any scientific support,
22 that you're aware of for that statement?
23         MS. HILLYER:  Objection.
24     Calls for speculation.  Lack of

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 foundation.
2 THE WITNESS: I don't have
3 an opinion about that.
4 BY MS. RUANE:
5 Q. Do you believe that
6 addiction is uncommon in patients using
7 opioids for medical conditions?
8 MS. HILLYER: Objection to
9 form.
10 THE WITNESS: I'm not a
11 physician.
12 BY MS. RUANE:
13 Q. You have no opinion one way
14 or another?
15 A. No.
16 Q. Page 22 references
17 pseudoaddiction.
18 Do you see that?
19 A. Yes, I do.
20 Q. Are you familiar with the
21 term "pseudoaddiction"?
22 A. I don't recall.
23 Q. You agree it's a term that
24 was used in documents provided by the

Page 163

1 company?
2 MS. HILLYER: Objection to
3 form.
4 THE WITNESS: I don't
5 remember seeing pseudoaddiction in
6 any of the pieces that we used
7 with payers.
8 It may have been, I just
9 don't recall.
10 BY MS. RUANE:
11 Q. Pseudoaddiction is in
12 Exhibit-12, which was provided to managed
13 care payers upon request?
14 MS. HILLYER: Objection.
15 Assumes facts not in evidence.
16 BY MS. RUANE:
17 Q. I mean, you see it in
18 Exhibit-12, right?
19 A. I said I don't recall
20 because this is the first time I've seen
21 this in how many years.
22 But your statement is
23 correct. In bold words -- letters, it
24 says, Pseudoaddiction. And it's in a

Page 164

1 module that would have been received by
2 payers.
3 Q. And pseudoaddiction there
4 states, Addiction should be distinguished
5 from pseudoaddiction, which is
6 characterized by drug-seeking behaviors
7 caused by unrelieved pain. Some patients
8 with unrelieved or untreated pain may be
9 aggressive in requesting additional
10 analgesics. When such requests are not
11 related to psychological beliefs nor to
12 psychic effects, but rather to unrelieved
13 pain, the appropriate response is
14 improved pain management.
15 Do you see that?
16 A. I see that.
17 Q. Do you see any scientific
18 support for that statement?
19 MS. HILLYER: Objection. Do
20 you mean in the document?
21 MS. RUANE: In the document.
22 THE WITNESS: I don't see
23 anything.
24 BY MS. RUANE:

Page 165

1 Q. Do you know any
2 scientific -- I'm sorry, I didn't mean to
3 interrupt you.
4 A. I was answering. You just
5 couldn't hear me.
6 Q. Sorry. Go ahead.
7 A. I do not see a reference on
8 this document.
9 Q. Do you know of any
10 scientific support for the theory of
11 pseudoaddiction?
12 MS. HILLYER: Objection to
13 form.
14 You can answer.
15 THE WITNESS: I'm not
16 familiar with this, period.
17 BY MS. RUANE:
18 Q. You're not familiar with
19 pseudoaddiction?
20 A. So I can't answer your
21 question.
22 Q. Given your role with managed
23 care entities assessing reimbursement
24 issues related to Actiq and then

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1  Fentora --
2      A.   Sure.
3      Q.   -- did you receive education
4  and training on issues related to
5  addiction or abuse of opioids?
6      A.   Sure.  I just don't recall
7  if this is what I stated.
8      Q.   And what type of training
9  and education did you receive?
10     A.   There were training modules
11 that all the account managers were
12 required to complete on the disease
13 state, misuse, abuse, diversion, all the
14 things that we're talking about, as far
15 as what you're referring to here, in
16 addition to the mechanism of action of
17 the product, as with any training on a
18 product that any pharmaceutical company
19 would provide, not unlike that.
20     Q.   And during your time working
21 with managed care entities on the
22 products Actiq and then Fentora, did you
23 come to any conclusions about the issues
24 of abuse associated with those drugs?

Page 167

1      MS. HILLYER:  Objection to
2  form.
3      THE WITNESS:  No
4  conclusions.
5  BY MS. RUANE:
6      Q.   Sitting here today, have you
7  reached a conclusion as to whether
8  there's an opioid epidemic?
9      MS. HILLYER:  Objection to
10 form.
11     THE WITNESS:  A conclusion,
12 no.
13 BY MS. RUANE:
14     Q.   Page 23 of Exhibit-12 --
15     A.   I'm sorry, you said 23?
16     Q.   Yes, just the next page.
17     The last sentence in the
18 first paragraph indicates, Similarly, the
19 risk of abuse is low in patients with
20 nonmalignant pain, though there is less
21 experience in this patient population.
22     Do you see that?
23     A.   I'm sorry, I wasn't
24 following where it is.

Page 168

1      Q.   Up at the top.
2      A.   Up at the top, sorry.
3      Q.   And then right below that,
4  under, Managing the risk of opioid abuse,
5  in that first sentence, it indicates,
6  Although it is uncommon for chronic pain
7  patients to abuse opioid medications,
8  there is a potential risk associated with
9  the use of all opioids.
10     Do you see that?
11     A.   I see that.
12     Q.   Do you know of any
13 scientific -- well, strike that.
14     First, let me ask you, do
15 you see any scientific support cited in
16 Exhibit-12 for those statements?
17     A.   No.
18     Q.   Do you personally have any
19 scientific support for the idea that it's
20 uncommon for chronic pain patients to
21 abuse opioid medications?
22     MS. HILLYER:  Objection to
23 form.
24     THE WITNESS:  Are you saying

Page 169

1  do I have an opinion?
2  BY MS. RUANE:
3      Q.   Yes.
4      A.   I don't have an opinion.
5      Q.   This is information that was
6  created by, I guess at this time, by
7  Cephalon, correct?
8      A.   It was -- yes.
9      Q.   And Cephalon was also the
10 company that was creating the modules
11 used to train you all on Actiq, correct?
12     MS. HILLYER:  Objection to
13 form.
14     THE WITNESS:  I was not
15 involved with the sales training.
16     I don't know who developed that.
17 BY MS. RUANE:
18     Q.   But Cephalon was the -- I
19 mean, you didn't receive training on
20 issues of opioids and potential abuse or
21 diversion from anyone outside the
22 company, correct?
23     A.   I don't -- no.  No, I don't
24 recall.

Page 170

1    Q.   So it's a correct statement
2  that your training on issues of potential
3  abuse, diversion of opioids would have
4  occurred through your employment with
5  Cephalon and then Teva, correct?
6    A.   That's a true statement.
7        MS. RUANE:  I'm going to
8      hand you what's been marked as
9      Exhibit-13.  And for the record,
10     this is TEVA_MDL_A_03272381.
11            - - -
12       (Whereupon, Teva-Bearer
13     Exhibit-13,
14     TEVA_MDL_A_03272381-391, was
15     marked for identification.)
16            - - -
17 BY MS. RUANE:
18     Q.   This is an e-mail you sent
19 to Terry Terifay regarding an upcoming
20 Actiq speaker training.
21     A.   Yes.
22     Q.   And Page 382, that second
23 page, what you'll see, as you go through
24 it, there's different -- I assume these

Page 171

1  are different managed care entities,
2  right?
3        You've got Blue Cross and
4  Blue Shield of Alabama and then Regents.
5  And you mentioned there's probably over
6  100 in the nation, but these are some you
7  all dealt with, correct?
8    A.   Correct.
9    Q.   Under Blue Cross and Blue
10 Shield of Alabama, the description under
11 primary purpose of the clinical
12 presentation, toward the bottom of the
13 page, this is a document that's providing
14 some managed care Medicaid scenarios for
15 an Actiq speaker training, correct?
16    A.   Yes.
17    Q.   And the Actiq speaker
18 training would be a training of -- well,
19 strike that.
20       Who -- what speakers were
21 being trained?
22    A.   I don't recall.
23    Q.   Are they Cephalon employees
24 or are they the key opinion leaders that

Page 172

1  we discussed earlier, do you know?
2    A.   Speakers -- say the question
3  one more time.
4    Q.   Sure.
5        The speaker training, would
6  it be for employees of Cephalon who are
7  going to do a managed care presentation?
8    A.   I don't recall.
9    Q.   Under the primary purpose of
10 the clinical presentation, the second
11 bullet point there indicates, Explain
12 different utilities for Actiq and reasons
13 why pain management specialists are
14 prescribing it for noncancer breakthrough
15 pain.
16       Do you see that?
17    A.   Yes.
18    Q.   And that's something that
19 would happen at these meetings with
20 managed care entities, correct?
21       MS. HILLYER:  Objection to
22     form.
23       THE WITNESS:  This -- the
24     way -- you're asking if this

Page 173

1        presentation was for -- to payers?
2        Is that what you're -- I'm sorry.
3  BY MS. RUANE:
4    Q.   Let's back up and make sure
5  we're --
6    A.   Let's make sure we're on the
7  same page.
8    Q.   -- on the same page.
9        These are managed care
10 Medicaid scenarios --
11    A.   Yes.
12    Q.   -- provided by national
13 account managers --
14    A.   Yes.
15    Q.   -- for the upcoming Actiq
16 speaker training?
17    A.   Yes.
18    Q.   Okay.  So this is going to
19 be for a speaker training meeting?
20    A.   Right.
21    Q.   Presumably those speakers,
22 their role is then going to be to go out
23 and talk to managed care entities,
24 correct?

Page 174

1    A.   No, I don't interpret it
2  this way.
3      Q.   What would the speaker
4  training be for?
5      A.   Based on what I'm reading
6  here, having -- not recalling this,
7  the --
8         MS. HILLYER:  Then
9  objection.  Calls for speculation.
10        THE WITNESS:  Yeah, I really
11  don't know.
12  BY MS. RUANE:
13     Q.   Let's back up a little bit.
14     A.   Okay.
15     Q.   Look, for example, on Blue
16  Cross and Blue Shield of Alabama, the
17  second heading there is, Key
18  decision-makers who will be attending the
19  clinical presentation.
20         Do you see that?
21     A.   Yes, I do.  Yep.  Yep.
22     Q.   Is that helpful?
23     A.   Yes.
24     Q.   So are we now on the same

Page 175

1  page, that this is information provided
2  in advance of meetings with managed care
3  entities?
4      A.   Hold off.  Let me look.
5         That's the way I would
6  interpret this.
7      Q.   And down below, under
8  primary purpose, there's the bullet point
9  for explaining different utilities for
10  Actiq and reasons why pain management
11  specialists are prescribing it for
12  noncancer breakthrough pain, correct?
13     A.   That's what it says.
14     Q.   Okay.  And you were aware of
15  this at the time, because these were
16  scenarios that you sent to Terry Terifay,
17  correct?
18     A.   Yes.
19     Q.   The bullet point below that
20  indicates that another purpose of the
21  presentation was to convince the plan to
22  consider coverage for any of the above
23  uses, correct?
24     A.   I'm sorry, where are you

Page 176

1  here?
2      Q.   Sorry.  Third bullet point
3  down on primary purpose.
4      A.   Yes, that's what it says.
5  Sorry.
6      Q.   So one of the goals, when
7  you're meeting with these managed care
8  entities, is to convince the plan to
9  consider coverage for any of the above
10  uses, and that's referring to noncancer
11  breakthrough pain uses, correct?
12     A.   That's what it says.
13     Q.   That was one of the goals of
14  you and your team when you were meeting
15  with managed care entities for Actiq and
16  then subsequently for Fentora, correct?
17        MS. HILLYER:  Objection to
18  form.
19        THE WITNESS:  In general.
20  We had different objectives for
21  each plan, depending on the
22  situation, because each plan payer
23  is different.
24  BY MS. RUANE:

Page 177

1      Q.   For Blue Cross and Blue
2  Shield of Alabama --
3      A.   I don't have any direct
4  knowledge of that.  That wasn't a part of
5  my area.
6         That's why I'm hesitating
7  quite a bit, because these are not
8  plans -- I was trying to figure -- that I
9  have direct knowledge of.
10     Q.   And the reason -- I mean, in
11  fairness to you, I understand it was a
12  long time ago, so we'll work through it
13  together.
14        But you are -- you were the
15  one that sent this e-mail, right?
16     A.   Correct.
17     Q.   And one of the things that
18  you just know, in addition to the e-mail,
19  from your own personal experience is that
20  many times when you were meeting with
21  managed care entities, one of the things
22  you were doing was working to convince
23  them to consider coverage for something
24  other than breakthrough cancer pain,

Page 178

1 correct?
2        MS. HILLYER:  Objection to
3 form.
4        THE WITNESS:  We presented
5 information.  As I stated before,
6 many plans -- I don't know the
7 details around these -- did not
8 have a lot of rigor behind Actiq
9 early on.
10        By the time I joined the
11 company in 2004 was when payers
12 were starting to take a look at
13 opioids.  And sometimes by just
14 default they would make decisions
15 on coverage.  I can't speak to
16 what specifically they were.
17        As I mentioned earlier,
18 coverage criteria goes beyond
19 indication.  There are many other
20 requirements in coverage criteria.
21        Additionally, many patients
22 were currently on, as a doctor
23 deemed appropriate, whether it --
24 whether they -- depending on the

Page 179

1 diagnosis, it was up to the doctor
2 as to what product was
3 appropriate.
4        So I view this as more of an
5 education, because many times when
6 restrictions come quickly, it
7 causes a disruption for the
8 patient in treatment.
9        So a lot of this was an
10 education process.  Many of these
11 plans we had not engaged with on a
12 regular basis for Actiq.
13 BY MS. RUANE:
14    Q.   And so the goal was, in
15 those cases, to convince plans to
16 consider coverage for something other
17 than breakthrough cancer pain, correct?
18    A.   The goal is --
19        MS. HILLYER:  Hold on.
20 Objection to form.  And asked and
21 answered.
22        You can answer again.
23 BY MS. RUANE:
24    Q.   I mean, at least as it

Page 180

1 relates to this Blue Cross and Blue
2 Shield of Alabama.
3        Let me ask a different
4 question.
5        You would agree that this
6 document, which you provided to Terry
7 Terifay, indicates that one of the
8 primary purposes of the clinical
9 presentation is to provide -- was to,
10 strike that -- to convince the plan to
11 consider coverage for any of the above
12 uses, which refers to noncancer
13 breakthrough plan?
14        MS. HILLYER:  Objection to
15 the form.  Lack of foundation.
16 And calls for speculation.  She
17 said she didn't cover this
18 account.
19        THE WITNESS:  I don't have
20 direct knowledge of Blue Cross
21 Blue Shield of Alabama.
22 BY MS. RUANE:
23    Q.   Let me ask a different
24 question.

Page 181

1        We know, and we talked about
2 in the first hour of this deposition, the
3 fact that you were -- as a national
4 account manager and then subsequently as
5 you became a director, you met with
6 managed care entities, right?
7    A.   Correct.
8    Q.   And one of the things you
9 did, during your time as a national
10 account manager at Cephalon, was to meet
11 with managed care entities, correct?
12    A.   Yes.
13        MS. HILLYER:  Asked and
14 answered.
15 BY MS. RUANE:
16    Q.   And during that time, one of
17 the products that you would discuss was
18 Actiq, correct?
19    A.   Correct.
20    Q.   And, obviously, it depends
21 on the plan and what their coverage is --
22    A.   Right.
23    Q.   -- at that time, but one of
24 the things that you did was work with

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1 plans who didn't have the coverage
2 criteria for Actiq that would have been
3 most beneficial for purposes of increased
4 prescriptions, would be to work with
5 those plans on convincing them to
6 consider coverage for something other
7 than breakthrough cancer pain, correct?
8      MS. HILLYER:  Objection to
9 form.
10 BY MS. RUANE:
11     Q.   That's a thing that
12 happened, isn't it?
13      MS. HILLYER:  Objection to
14 form.
15      THE WITNESS:  A result --
16      MS. HILLYER:  Go ahead.
17      THE WITNESS:  As I stated
18 previously, much of the
19 interaction, whether it be
20 promotional or from medical, was
21 an educational process where many
22 patients, whatever the physician
23 deemed appropriate, prescribed
24 Actiq for their patients.

Page 183

1     Part of what we discussed
2 was the broad spectrum of pain
3 management, et cetera, as you've
4 seen in all of these documents.
5     If, in fact, they did change
6 criteria, the result would be the
7 patient would have access
8 ultimately at that point, to your
9 point, and Cephalon would have the
10 benefit of the sale of that
11 product.  So that's an accurate
12 statement.
13 BY MS. RUANE:
14     Q.   And it's also an accurate
15 statement that during those times that
16 you were talking to the managed care
17 entities, you were talking to them about
18 the broad spectrum of pain, which
19 included pain beyond breakthrough cancer
20 pain, correct?
21      MS. HILLYER:  Objection to
22 form.
23      THE WITNESS:  Honestly, I
24 don't remember engaging with a

Page 184

1 plan specifically to the question
2 that you've asked me.  I really
3 don't recall specifically.
4     Many times, plans would
5 request information.
6 BY MS. RUANE:
7     Q.   And based on the fact that
8 you've been with the company, you know,
9 for over a decade -- I understand a lot
10 of this was a long time ago.
11     But you've just described
12 for us how you would speak to them about
13 the broad spectrum of pain; that was part
14 of the job, was to educate them on the
15 broad spectrum of pain.
16     And you agree that broad
17 spectrum of pain went beyond breakthrough
18 cancer pain, correct?
19      MS. HILLYER:  Objection to
20 form.  It mischaracterizes
21 testimony.
22 BY MS. RUANE:
23     Q.   That's a correct statement,
24 isn't it?

Page 185

1      MS. HILLYER:  I made my
2 objection.
3     She can answer the question.
4      THE WITNESS:  Again, pain
5 management was not something
6 familiar to payers.  If I -- if I
7 had a conversation with a plan, it
8 would have been based on an
9 approved document that may have
10 had the disease background on pain
11 management.  Because, again, this
12 is for patients suffering from
13 chronic pain who have breakthrough
14 episodes.  So it's very relevant
15 to talk about chronic pain,
16 spectrum of pain, and talk about
17 breakthrough episodes specific to
18 our label, which would then
19 include cancer patients.
20 BY MS. RUANE:
21     Q.   And the conversation about
22 the chronic pain and the breakthrough
23 pain would not necessarily be limited to
24 cancer patients, correct?

Page 186

1     MS. HILLYER:  Objection to
2  form.
3     THE WITNESS:  I don't recall
4  the documents -- maybe you'll
5  provide them to me -- the
6  documents that we used.  I
7  honestly don't remember the
8  content of those.
9     A lot of what we do with
10  payers is educate on disease
11  state, as I've stated before.
12  This is very common in current
13  products that we promote now.
14  It's very common to talk about
15  standard of care.  It's very
16  common to talk about chronic and
17  acute medications.
18     It sets the foundation for
19  the discussion with a payer.
20  BY MS. RUANE:
21     Q.   Okay.  If you look on
22  Exhibit-13, on Page 82 at the bottom, it
23  references several objections from the
24  plan, including the concern over abuse

Page 187

1  and diversion of opioids.
2     Do you see that?
3     A.   I saw it previously.  Is
4  this 82?
5     Q.   82, yes.  At the very
6  bottom.
7     A.   Right.  Sorry.
8     Q.   Do you see that?
9     A.   Yep, yep.
10     Q.   On Page 85, the second
11  bullet point indicates, Physicians are
12  afraid of opioid use.
13     A.   You're saying 85?
14     Q.   Yes.  85.
15     A.   Yes.
16     Q.   Do you see that?
17     A.   Yes, that's what it says.
18     Q.   The last two -- well, strike
19  that.  Let me ask this first.
20     Do you recall receiving
21  feedback from managed care entities
22  regarding fears of opioids and abuse as a
23  reason not to expand the criteria?
24     A.   Schedule II products, many

Page 188

1  of them.  So, of course, we -- they would
2  discuss any scheduled product.
3     Q.   And so it was -- generally
4  speaking, it was a conversation you would
5  have with these managed care entities,
6  because they would bring up the concerns
7  associated with Schedule II products?
8     MS. HILLYER:  Objection to
9  form.
10     THE WITNESS:  Not -- you're
11  making a broad statement, and I
12  can't speak to every conversation
13  that I had with every plan.
14     Misuse, abuse and diversion,
15  we take a responsibility as a
16  company, we are certainly aware of
17  that.
18     So if they asked the
19  question, we would have a
20  conversation about it.
21  BY MS. RUANE:
22     Q.   And as a company, misuse,
23  abuse and diversion are things that the
24  company was aware of and you were aware

Page 189

1  of, correct?
2     MS. HILLYER:  Objection.
3  Calls for speculation.
4     THE WITNESS:  We're aware of
5  because it's a Schedule II
6  product.
7  BY MS. RUANE:
8     Q.   And because of that fact,
9  you found yourself speaking to managed
10  care entities about their questions
11  associated with a Schedule II product and
12  use, abuse and diversion, correct?
13     A.   I don't recall any specific
14  questions around -- I just don't recall
15  any specific questions that I received
16  and having that conversation.
17     Q.   But you would agree that
18  they did occur, at least sometimes,
19  because we've looked at a couple of them
20  in this document, correct?
21     MS. HILLYER:  Objection.
22  Calls for speculation.  Lack of
23  foundation.
24     THE WITNESS:  You do realize

Page 190

1    I did not create this document?
2       This was a compilation of
3  what was sent to me, and I
4  forwarded it on to marketing, it
5  appears.
6  BY MS. RUANE:
7    Q.   It was provided by the
8  national account managers, right?
9    A.   Yes, yes.  I didn't write
10 the document.
11      So when you're asking me
12 specifics around each of these plans, I
13 don't have the context to answer the
14 question.
15   Q.   But at least what we know
16 from Exhibit-13 is that the national
17 account managers were reporting
18 conversations regarding questions on use
19 and abuse of opioids?
20      MS. HILLYER:  Objection.
21 Calls for speculation.
22 BY MS. RUANE:
23   Q.   I mean, would you agree?  We
24 just looked at this.

Page 191

1    A.   Based on this, I would also
2  agree that there are other opioids on the
3  market.  It was a general opioids
4  statement.  Because it's a Schedule II,
5  it's logical to have that -- that's why
6  it's a Schedule II.
7    Q.   Okay.  I'm going to hand you
8  what's been marked as Exhibit-14.
9       - - -
10      (Whereupon, Teva-Bearer
11      Exhibit-14, TEVA_MDL_A_04481825,
12      was marked for identification.)
13      - - -
14      MS. RUANE:  It's
15      TEVA_MDL_A_04481825.
16 BY MS. RUANE:
17   Q.   This is an e-mail from
18 Robert Host to you.
19      Do you see that?
20   A.   Yes.
21   Q.   He references a Dr. Guarino,
22 who is a physician in St. Louis who just
23 presented a poster study at a recent pain
24 meeting on nonmalignant pain for Actiq.

Page 192

1       Do you see that?
2    A.   I see that.
3    Q.   Nonmalignant pain is pain
4  that is not related to cancer, correct?
5    A.   That's correct.
6    Q.   Speaking with Amy Jordheim,
7  the MDM.
8       Who is Amy Jordheim?  What
9  does MDM refer to?
10   A.   I don't remember the acronym
11 now, but it's basically an MSL.  I just
12 don't know what they --
13   Q.   Now I have to ask what an
14 MSL is?
15   A.   Medical science liaison.  So
16 they fall under the medical side.  They
17 deal with KOLs, thought leaders.  They're
18 medical, not sales.
19   Q.   Got it.
20      So she thinks, He --
21 referring to Dr. Guarino -- would be
22 an -- would be excellent to speak to
23 health plans.  And the fact that he has
24 actually completed a study for Actiq in

Page 193

1  nonmalignant pain might be beneficial for
2  other speakers to hear him at our meeting
3  in January.
4       Did I read that correctly?
5    A.   Yes, you did.
6    Q.   Okay.  So you were aware of
7  the use of Actiq by speakers who are
8  physicians?  We've spoken about that
9  before, right?
10   A.   Correct.
11   Q.   Would Dr. Guarino be the
12 type that we talked about before as a key
13 opinion leader?
14      MS. HILLYER:  Objection to
15      the form.
16      THE WITNESS:  I don't know
17      this.
18 BY MS. RUANE:
19   Q.   Because he was published on
20 the use of Actiq in something other
21 than -- in something beyond breakthrough
22 cancer pain, it was thought he might be
23 beneficial for other speakers to hear?
24      MS. HILLYER:  Objection.

Page 194

1    Calls for speculation.
2        THE WITNESS:  I don't know.
3  BY MS. RUANE:
4    Q.   I mean, I'm just reading
5  from what you wrote here.
6        Because he's actually
7  completed a study for Actiq in
8  nonmalignant pain, it might be beneficial
9  for other speakers to hear him at our
10  meeting in January.
11        Do you see that?
12        MS. HILLYER:  Objection to
13    form.  She didn't write this.
14  BY MS. RUANE:
15    Q.   Oh, I see.  You received it.
16  My apologies.
17        Robert wrote to you --
18    A.   Yes.
19    Q.   -- indicating that that
20  might be beneficial, correct?
21    A.   Yes.
22    Q.   What meeting in January is
23  Robb referring to, if you know?
24    A.   I don't recall.

Page 195

1    Q.   I'll tell you, the subject
2  up above indicates, Dr. Guarino for Actiq
3  managed care training.
4    A.   Oh, yeah, it does say that.
5    Q.   So would that have been a
6  meeting for managed care training?
7        MS. HILLYER:  Objection.
8    Calls for speculation.
9        THE WITNESS:  I don't know.
10  BY MS. RUANE:
11    Q.   Is it reasonable to assume,
12  since the subject is Dr. Guarino for
13  Actiq managed care training, that the
14  meeting that's discussed would be a
15  managed care training meeting?
16        MS. HILLYER:  Objection.
17    Calls for speculation.
18        THE WITNESS:  That's what it
19    states.
20  BY MS. RUANE:
21    Q.   Do you know whether -- well,
22  strike that.
23        Who is Robert Host?
24    A.   A national account manager.

Page 196

1    Q.   And at this time, you were
2  also a national account manager?
3    A.   Yes, I believe so, based on
4  the date.  Yes.
5    Q.   Did you have a management
6  role over Robert Host?
7    A.   No, I really don't recall.
8        But they're asking me to
9  speak to marketing.  So there was a point
10  where I was in management and still had a
11  home office, sort of liaise
12  responsibilities.
13        But that's perhaps why I
14  received this.  That's a speculation.  So
15  I don't know for sure.
16    Q.   And when you say they're
17  asking you to speak to marketing, you're
18  referring to his request that you check
19  with Terry --
20    A.   Yes.
21    Q.   Okay.
22        Is this a suggestion from
23  Robert Host that Guarino should be
24  utilized to promote the off-label use of

Page 197

1  Actiq?
2        MS. HILLYER:  Objection to
3    form.
4        THE WITNESS:  I can't -- I
5    can't speculate as to what
6    Robert's intention was.
7  BY MS. RUANE:
8    Q.   But you do agree that the
9  study he completed would be for off-label
10  use of Actiq, correct?
11    A.   It states that he did a
12  study on nonmalignant pain.
13        We often were requested to
14  bring in speakers, as I mentioned, to
15  educate the plan.  If the plan wanted to
16  understand why the prescribers are
17  prescribing Actiq, a request such as this
18  could come in, and we would, if a --
19  particularly if they've published
20  something or have done a study, there's
21  much more credibility, if the plan --
22  these are clinical pharmacists.
23        They may have a need to
24  understand the data associated with

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  nonmalignant pain and Actiq.  So it's
2  very reasonable that you would have
3  someone that has done a study to give
4  that presentation --
5      Q.   And the data --
6      A.   -- upon request.
7      Q.   And the data associated with
8  nonmalignant pain, it would be data
9  associated with off-label use of Actiq,
10  correct?
11      A.   Clinical studies can be done
12  for any reason.
13          But based on what I -- a
14  physician makes a determination on how
15  they want to study the product.  So based
16  on what I'm reading here, this physician,
17  who I don't know, had a poster which
18  suggests that he did a clinical
19  presentation -- a clinical trial of some
20  sort on nonmalignant pain, which is,
21  again, outside the current -- outside
22  that current label.
23      Q.   Yes, outside the indication,
24  so off label, correct?

Page 199

1      A.   It's not in the current
2  indication, yes.
3      Q.   And I just want to be sure
4  we're on the same page.
5          If it's outside the current
6  indication -- inside the current
7  indication is on label?
8      A.   Yes.
9      Q.   Outside the current
10  indication is off label, right?
11      A.   That's correct, yes.
12      Q.   Okay.
13          THE WITNESS:  We're finished
14  with this?
15          MS. RUANE:  Let's take a
16  quick --
17          MS. HILLYER:  It's almost an
18  hour.  We're at 58.
19          MS. RUANE:  That's perfect.
20  Let's do lunch.
21          VIDEO TECHNICIAN:  Going off
22  the record.  12:45 p.m.
23              - - -
24          (Whereupon, a luncheon

Page 200

1  recess was taken.)
2              - - -
3          VIDEO TECHNICIAN:  Back on
4  record at 1:28 p.m.
5  BY MS. RUANE:
6      Q.   We're back on the record
7  after a lunch break.
8          Do you understand you're
9  still under oath?
10      A.   Yes.
11      Q.   Let me ask you, what
12  promotional activities did you perform
13  with regard to managed care for Actiq?
14      A.   In engaging with the payers,
15  we would have approved materials.  In
16  fact, I think we often used sales
17  materials because we didn't have a
18  managed care marker, like I am
19  presenting -- putting together specifics.
20  And there was a presentation, as I
21  recall.
22      Q.   And I apologize, I'm going
23  to repeat some of that to make sure I
24  heard you okay.  All right?

Page 201

1          So one of the things you
2  mentioned were actually using the sales
3  materials that the sales force used?
4      A.   We may have.  There wasn't a
5  managed care marketing department back in
6  those days, which is what I do now.
7  Therefore, managed care-specific pieces
8  were somewhat limited.
9      Q.   Because the managed care
10  team was kind of selling to the managed
11  care entities, while the sales team was
12  out with providers, correct?
13          MS. HILLYER:  Objection to
14  form.
15          THE WITNESS:  Managed
16  care -- the account managers would
17  present to payers if there was an
18  approved document, which, of
19  course, the sales force had
20  approved documents.
21          It's my recollection that,
22  in certain situations, we would
23  use promotional materials that
24  were approved for HCPs in general.

Page 202

BY MS. RUANE:

Q.   And what promotional -- do you remember the names or types of promotional materials?

A.   Honestly, I do not.

Q.   You also mentioned a presentation?

A.   I believe there was a presentation.  I know we were -- I think there was a point where we were asking for input around promotional presentation.  Because the audience is different with payers, oftentimes the information may be different.

I honestly don't recall presenting it, if it was, in fact, approved.

Q.   And would that have been kind of -- is your memory of it a slide deck-type presentation?

A.   It would be, yes.

Q.   Do you have a memory of the name that that type of promotional presentation was given?

Page 203

A.   No.

Q.   What promotional -- well, strike that.

Before I ask, are there any other promotional activities, as it relates to Actiq, that you can recall?

A.   With which audience?

Q.   With the managed care entities.

A.   Not that I can recall.

Q.   Were there other audiences that you were involved in providing promotional activities with regard to Actiq on?

A.   Not that I recall.

Q.   What promotional activities did you perform with regard to managed care for Fentora?

A.   Similar -- similarly, there was a managed care presentation from a promotional -- that would have to go through our medical/legal, you know.

I believe when we launched Fentora, I was transitioning to the other

Page 204

position.  So, again, I don't recall how much interfacing, customer-facing, with Fentora, I personally had.

Q.   Okay.  And so that managed care presentation would be a slide deck as well?

A.   Yes.

Q.   Were there sales materials used in the promotion of Fentora to managed care entities?

A.   I don't -- I don't recall.  Unlikely.

Q.   Was that because at that point the managed care department had its own marketing?

A.   Yes.  So we had payer-specific information.

Q.   So the payer-specific managed care marketing information for Fentora would have been derived in the managed care -- created within the managed care system?

A.   Correct.  No.  Created in the managed care system?

Page 205

Q.   On the managed care team.  Somebody in the -- was there a marketing person within the managed care team?

A.   No -- well, until they moved toward that.  But at that point, if memory serves, typically, the -- there was a marketing brand team member who had responsibility for the payer piece to it.

Q.   Got it.

And do you recall who the marketing brand team payer -- strike that.  Let me start over.

Do you recall who the marketing brand team member who was assigned to managed care was?

A.   I believe it was Matt Falker.

Q.   How do you spell that last name?

A.   F, as in Frank, A-L, as in live, K-E-R.

Q.   Did you -- backing up.

Did you have a hand in the creation of the promotional materials

Highly Confidential – Subject to Further Confidentiality Review

Page 206

1  used for Actiq?
2      A.   No.
3      Q.   Did you have a hand in the
4  creation of the promotional materials
5  used for Fentora?
6          MS. HILLYER:  Objection.
7          THE WITNESS:  For the payer?
8  BY MS. RUANE:
9      Q.   Payer, yes.
10     A.   Yes.
11         Could you define "hand,"
12  though?  What do you mean?
13     Q.   Did you provide content or
14  comments?
15     A.   Comments.
16     Q.   And those promotional
17  materials would be presented to managed
18  care entities and discussed with managed
19  care entities, correct?
20     A.   Yes.  Promotional materials
21  are presented to payers, managed care.
22         MS. RUANE:  I'm going to
23      hand you what's been marked as
24      Exhibit-15.

Page 207

1          - - -
2          (Whereupon, Teva-Bearer
3      Exhibit-15,
4      TEVA_MDL_A_09457158-159, was
5      marked for identification.)
6          - - -
7          MS. RUANE:  The document
8      number is TEVA_MDL_A_09457158.
9  BY MS. RUANE:
10     Q.   This was an e-mail to you.
11  And the subject is, Fentora MCO slides.
12         Do you see that?
13     A.   Yes, I do.
14     Q.   What is MCO?
15     A.   Managed care organization.
16     Q.   So would these be Fentora
17  slides for the managed care entities?
18     A.   I'm going to look at it, but
19  based on the -- yes.
20         MS. HILLYER:  Take your
21      time.
22         You've got two files
23      attached, it looks like, but only
24      one native Bates file attachment.

Page 208

1          MS. RUANE:  Let's see.
2          MS. HILLYER:  I have these
3  two here, right?
4          MS. RUANE:  Right.  Let's
5  look at this.
6          MS. HILLYER:  Are they all
7  part of one Bates?
8          MS. RUANE:  They are all --
9  the Bates numbers are in order.
10         MS. HILLYER:  Right.  I have
11  the e-mail and one native file
12  attachment.  So it looks like I
13  have two native file attachments.
14         MS. RUANE:  I see what
15  you're saying.  The second native
16  file attachment, Bates order-wise,
17  we go from 19457159 to 09457160.
18         MS. HILLYER:  I don't have
19  60 here.
20         MS. RUANE:  If you go -- do
21  you not have that page?
22         MS. HILLYER:  Yes.  That's
23  why I wanted to make sure.  I
24  don't think I do.

Page 209

1          MS. RUANE:  That's a
2  printing issue on our end.
3          MS. HILLYER:  All right.  So
4  we're going to make it -- I don't
5  know if this copy does, then,
6  either.  I just want to make sure
7  it's all -- that we keep track of
8  everything.
9          MS. RUANE:  No, I appreciate
10  it.  And I can explain it for the
11  record as well and get you that
12  native page.
13         MS. HILLYER:  She also
14  doesn't have 60.
15         MS. RUANE:  Then let me
16  explain for the record what it is,
17  just so that when we're looking
18  back later.
19         Thanks for clarifying that,
20  Becca.
21  BY MS. RUANE:
22     Q.   So what you have before you
23  is Exhibit-18.  And there is the native
24  page for the document entitled, Chronic

Page 210

1  Pain, the Breakthrough Pain Component,
2  09457159.
3        The Bates number for the
4  managed care presentation is 09451760.
5        MS. HILLYER:  That's the
6  draft for review?
7        MS. RUANE:  The draft for
8  review.  That's correct.
9  BY MS. RUANE:
10     Q.   So let me ask you --
11        MS. HILLYER:  Sorry, I don't
12  mean to be picky.  But the e-mail
13  only has one attachment, as far as
14  I can tell.
15        MS. RUANE:  And that's
16  where --
17        MS. HILLYER:  So I just want
18  to make sure these really belong
19  together.
20        MS. RUANE:  I understand.  I
21  understand the concern.
22        All I can tell you is -- the
23  managed care speaker deck -- I
24  mean, we can go -- the thing that

Page 211

1  I'll say about it is if you look
2  at the 7158, and then chronic pain
3  is 7159, managed care is --
4        MS. HILLYER:  Not referenced
5  on the title.
6        MS. RUANE:  Okay.  All
7  right.  Let's do this.  Take out
8  managed care.  I don't want to
9  confuse it.  We'll deal with that
10  separately.
11        THE WITNESS:  Okay.
12        MS. HILLYER:  Okay.
13        MS. RUANE:  All right.
14        MS. HILLYER:  So what we
15  have here that says, Chronic Pain,
16  the Breakthrough Pain Component --
17        MS. RUANE:  Yes.
18        MS. HILLYER:  -- that,
19  you're saying, is what is referred
20  to as attachment, Managed Care
21  Speaker Deck Version 2.1 --
22        MS. RUANE:  What I actually
23  think is the speaker deck includes
24  both of them, but I understand

Page 212

1  that it looks like there's one
2  attachment.  I think it's a
3  PowerPoint.  I don't understand
4  why there would be two native
5  images, but they line up in order.
6        MS. HILLYER:  But what are
7  the Bates -- are there two Bates?
8        MS. RUANE:  There's two
9  Bates.
10        MS. HILLYER:  So it could
11  just be a different native file
12  than what was attached.
13        MS. RUANE:  Correct.  So
14  that's why, let's just leave it on
15  its own and we can deal with it --
16        MS. HILLYER:  So Chronic
17  Pain, the Breakthrough Pain
18  Component is TEVA_MDL_A_09457159.
19        MS. RUANE:  Yes.  Correct.
20        MS. HILLYER:  So what we
21  have as Exhibit-15, then, is 7158
22  through 7159?
23        MS. RUANE:  Yes.
24        MS. HILLYER:  We're going to

Page 213

1  set this one aside.  We're going
2  to focus this on the side and
3  focus on those two, the cover
4  e-mail and the attachment.
5        THE WITNESS:  Got it.
6  BY MS. RUANE:
7     Q.   So this is a managed care
8  speaker deck from 2007 regarding Fentora,
9  correct?
10     A.   That's what it says on the
11  e-mail.
12     Q.   You have no reason to
13  disagree or dispute that, correct?
14     A.   I -- there's nothing in this
15  document that says anything about managed
16  care.
17        So I'm -- I have no way of
18  knowing if this e-mail is in conjunction
19  with this deck.
20     Q.   And I'll tell you the way
21  that we, as attorneys, discern that is
22  the number assigned to it, the last two
23  digits there, 58, on the e-mail.  And on
24  that chronic pain document, the last two

Page 214

1 digits are 59.
2      So that's how we discern
3 that that's the attachment that goes with
4 it within our system.
5      But let me just ask you a
6 couple of questions about it.
7    A.   Sure.
8      MS. HILLYER:  And sorry,
9    again, to be picky, but the
10   numbers on the deck, you wrote
11   those in hand, right?
12     MS. RUANE:  Oh, yeah, I'm
13   sorry.  On the page numbers, yes.
14     MS. HILLYER:  Yes.
15 BY MS. RUANE:
16   Q.   I should have clarified.
17     So because this document
18 doesn't have page numbers, just for ease
19 of reference, I added page numbers on the
20 bottom so that we could follow along.
21     So if you turn to Page 5 --
22   A.   I'm tracking with you now.
23   Q.   -- you'll see there, Chronic
24 pain overview?

Page 215

1    A.   Yes.
2    Q.   And below that, a bullet
3 point for, Pain is pain, correct?
4    A.   I see that.
5    Q.   And that -- below that, it
6 says, CA and nonCA patients.
7      That refers to cancer and
8 noncancer patients, correct?
9    A.   That's what it says.
10     MS. HILLYER:  Objection to
11   form.  Calls for speculation.
12 BY MS. RUANE:
13   Q.   That's your understanding of
14 the CA reference within the Fentora
15 documents is cancer, correct?
16   A.   I don't know.  It doesn't
17 say cancer.
18   Q.   Do you understand CA --
19   A.   I do --
20   Q.   -- to be cancer?
21   A.   Oh, I've never seen -- I
22 don't recall seeing this document before.
23   Q.   But you would agree that the
24 CA and nonCA patients'-pathophysiology,

Page 216

1 the same regardless of etiology or
2 underlying disease, that that's
3 referenced under pain is pain on
4 Exhibit-15, correct?
5    A.   I see the reference, yes.
6    Q.   And this is a slide deck
7 regarding Fentora, correct?
8      MS. HILLYER:  Objection to
9    form.
10     THE WITNESS:  I'm just --
11   okay.  There's nothing in this
12   deck, other than the fact that
13   it's on the Fentora template, that
14   I'm seeing that says Fentora.
15 BY MS. RUANE:
16   Q.   There is the reference to
17 FEBT, correct, in the bottom right-hand
18 corner?
19   A.   That's what I just stated.
20 Other than the template itself, as I go
21 through this deck, this is -- it has many
22 topics.
23   Q.   I'm sorry, this is one of
24 those times where it's -- I don't mean to

Page 217

1 be misstating what you're saying, I'm
2 just trying to make sure I understand it
3 and hear you.
4    A.   Ask the question again.
5    Q.   So this is a Fentora
6 template, right?
7    A.   This is a Fentora template,
8 yes.
9    Q.   And it's a slide deck that
10 was provided to you in 2007, correct?
11   A.   It was e-mailed to me.
12   Q.   Yes.
13     It was provided to you via
14 e-mail, correct?
15   A.   It was provided to me, yes.
16 I had a copy of it.
17   Q.   And it references "pain is
18 pain"?
19   A.   In this deck, it does.
20   Q.   And right below that, it
21 references cancer and noncancer patients,
22 correct?
23   A.   Correct.
24   Q.   Okay.  And that would be

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1 beyond the indication for Fentora,
2 correct?
3     A.   This is for speakers.  This
4 is not for promotional use by an account
5 manager.  That's what it states.
6     Q.   Sorry.  Go ahead.
7         My question was a little
8 different.
9         You agree that is beyond the
10 indication for Fentora, correct?
11     A.   For Fentora, yes.
12     Q.   And so Teva would provide
13 speakers with these slide decks to use
14 when speaking with managed care entities?
15         MS. HILLYER:  Objection.
16     Calls for speculation.
17         THE WITNESS:  I don't know.
18 BY MS. RUANE:
19     Q.   Well, it's a speaker deck --
20 you just clarified it's a speaker deck --
21     A.   It is a speaker deck.
22     Q.   -- for a speaker, correct?
23         MS. HILLYER:  Objection to
24     form.

Page 219

1 BY MS. RUANE:
2     Q.   For a physician?
3         MS. HILLYER:  Same
4     objection.
5         THE WITNESS:  It says
6     nothing here stating that.  The
7     only thing it says is -- I'm
8     looking at the e-mail --
9     and Darren Keese, I don't even
10     know who that is.
11 BY MS. RUANE:
12     Q.   I'll tell you what, let's do
13 this.  I'm going to mark as Exhibit-16,
14 the managed care presentation draft for
15 review.
16         MS. HILLYER:  We don't have
17     a Bates?
18         MS. RUANE:
19     TEVA_MDL09451760.  And I can get
20     you a native page for that, I
21     apologize it wasn't on it.
22             - - -
23         (Whereupon, Teva-Bearer
24     Exhibit-16, TEVA_MDL09451760, was

Page 220

1     marked for identification.)
2             - - -
3 BY MS. RUANE:
4     Q.   And the first page of this
5 document indicates it's a managed care
6 presentation draft for review, correct?
7     A.   Yes, that's what it says.
8     Q.   So this would be a
9 presentation.
10         It's on a Fentora template,
11 right?
12     A.   Yes, it is.
13     Q.   Page 2 includes disclosures.
14 So there would be -- it references, in
15 the first bullet point, I'm an outside
16 consultant retained by Cephalon, correct?
17     A.   Correct.
18     Q.   So this would be a document
19 used by an outside consultant retained by
20 Cephalon.
21         And this presentation was
22 going to include, based on Exhibit-3,
23 discussion of off-label uses of Fentora,
24 correct?

Page 221

1     A.   Second bullet, in a response
2 to an unsolicited request.
3     Q.   I'm sorry, I meant to say
4 the third bullet.
5     A.   That's what the third bullet
6 says.
7     Q.   And that's a process that
8 you were familiar with in your role with
9 managed care, that physicians would be
10 retained and paid by the company to speak
11 on off-label uses of Fentora?
12         MS. HILLYER:  Objection to
13     form.
14         THE WITNESS:  Upon
15     unsolicited request.
16 BY MS. RUANE:
17     Q.   So if there was an
18 unsolicited request by a managed care
19 entity, the next step would be for the
20 company to have an individual physician
21 retained by them go in to speak to the
22 managed care entity on topics, including
23 off-label use of Fentora?
24     A.   If it was requested.

Page 222

1 Q. So that's a correct
2 statement?
3 A. If they requested broad use
4 of Fentora, a presentation on that, then
5 that would be -- that request would be
6 fulfilled.
7 Q. Fulfilled, okay.
8 So at those presentations,
9 would employees of the company, Cephalon
10 and then subsequently Teva, be present?
11 A. I don't recall who would be
12 present specifically, to be honest with
13 you.
14 Q. Do you have any reason to
15 think that the representative from the
16 company would not have attended those
17 presentations?
18 A. No.
19 Q. Okay.
20 A. Typically, it would be a
21 medical person.
22 Q. Typically --
23 A. As I recall.
24 Q. Sorry. Just to make sure I

Page 223

1 understand.
2 Typically a medical
3 person --
4 A. Accompanying --
5 Q. -- within the company would
6 attend?
7 A. Sorry. Accompanying a
8 speaker.
9 Q. Got it. Accompanying a
10 speaker?
11 A. Yes. Correct.
12 Q. I'm going to say it one last
13 time, just to be sure.
14 A. Please do.
15 Q. So in your memory it would
16 typically be an employee of the company
17 within the medical department who would
18 be accompanying the speaker to the
19 presentation?
20 A. That's what I recall, yes.
21 Q. Got it.
22 Have you seen these managed
23 care program slides before, this
24 Exhibit-16?

Page 224

1 A. It was e-mailed to me, so
2 the answer is yes. But I don't know --
3 again, I'm confused about -- pardon me.
4 MS. HILLYER: Just to be
5 clear, I don't know that this was
6 part of that e-mail.
7 THE WITNESS: In that case,
8 I don't know.
9 BY MS. RUANE:
10 Q. I'll figure that out on my
11 end.
12 If it was e-mailed to you --
13 well, strike that.
14 Let me ask it this way: Do
15 you have a memory of reviewing managed
16 care presentations?
17 MS. HILLYER: For Actiq and
18 Fentora?
19 MS. RUANE: For Fentora.
20 THE WITNESS: For Fentora?
21 For promotion?
22 MS. HILLYER: For promotion,
23 she said.
24 THE WITNESS: For promotion.

Page 225

1 BY MS. RUANE:
2 Q. Let's ask it both ways.
3 Do you have a memory of
4 reviewing managed care presentations for
5 promotion of Fentora?
6 A. Yes.
7 Q. Do you have a memory of
8 reviewing managed care presentations for
9 speakers?
10 A. I don't -- I don't remember,
11 honestly.
12 Q. Exhibit-16 that's before
13 you, did you have any role or
14 responsibility in reviewing or preparing
15 this document?
16 A. Are we talking about this
17 one?
18 Q. Yes.
19 A. Okay. Is there a date
20 associated with this, by the way?
21 Because that will help me give you --
22 Q. I mean, it would have been
23 in the 2007 time frame, as best I can
24 tell. There's citations in here to

Page 226

1  2006 --
2      A.   No, I was not involved with
3  this.  This, again, is the -- for a
4  physician speaker.  I did not -- and my
5  role was not to develop speaker
6  program -- speaker slides for speakers.
7      Q.   How could we tell -- how
8  could we tell when a managed care
9  presentation is for promotion and
10  something that the managed care team
11  would present?  Like, is there a
12  distinction made in the way they're
13  named?
14      A.   There should have been.  If
15  there wasn't, I don't recall.  That's why
16  I previously was asking you about the
17  presentations.  This is not something
18  that an account manager would present.
19  This stack.
20      Q.   Okay.  There's a separate
21  version -- well, there's a separate type
22  of presentation that went through the
23  promotion committee to be approved that a
24  managed care employee would present,

Page 227

1  correct?
2      A.   A managed care employee
3  would present?  You mean a Cephalon
4  employee under managed care would
5  present?
6      Q.   Yes.  Yes.
7      A.   We typically would name them
8  managed care presentation for --
9  presentation for managed care
10  decision-makers, that was the common --
11      Q.   Managed care
12  decision-makers?
13      A.   Yes, that was -- I know of
14  recently that's the way they have been
15  done.
16          MS. HILLYER:  The page
17      numbers on that last one you guys
18      put on, too, right?
19          MS. RUANE:  Yes, correct.
20      I'm going to hand you
21      Exhibit-17.
22              - - -
23          (Whereupon, Teva-Bearer
24      Exhibit-17,

Page 228

1      TEVA_MDL_A_04420139-141, was
2      marked for identification.)
3              - - -
4  BY MS. RUANE:
5      Q.   You were involved in the
6  hotline that was available to healthcare
7  providers attempting to obtain coverage
8  for products like Actiq and Fentora,
9  correct?
10      A.   When you say "involved,"
11  this was work for the entire Cephalon,
12  the hotline.
13      Q.   The hotline, as it relates
14  to you --
15      A.   Yes.
16      Q.   -- we talked earlier about
17  the fact that you were kind of the
18  subject matter expert on managed care
19  issues, right?
20      A.   What time frame are you
21  talking about?
22      Q.   Well, let's talk about this
23  e-mail first.  This was in 2005.
24          That would have been part of

Page 229

1  your role, correct?
2      A.   No.  At this point, I was an
3  account manager in the field.
4      Q.   And you were copied on --
5  well, I guess the e-mail chain includes
6  you?
7      A.   Yes.
8      Q.   And is referencing some
9  questions about the hotline for national
10  account managers.
11          Do you see that?
12          MS. HILLYER:  Give her a
13      minute to look it over.
14          THE WITNESS:  Okay.  Ask
15      your question again.
16  BY MS. RUANE:
17      Q.   Okay.  The hotline possesses
18  tools needed, such as LMN templates and
19  other documents that are a part of
20  creating prior authorization or appeals
21  documentation, right?
22          Is that the way -- I mean, I
23  can --
24          MS. HILLYER:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1 BY MS. RUANE:
2      Q.  -- ask it more generally if
3 it's easier and faster, okay?
4          One of the things that would
5 happen with the hotline was providers
6 could call the hotline and the hotline
7 had tools, like letters of medical
8 necessity templates, correct?
9      A.  Correct.
10     Q.  There may be other documents
11 that help with prior authorization or an
12 appeals documentation issue, right?
13     A.  Correct.
14     Q.  And so what the hotline was
15 intended to do, at least in part, was
16 help patients secure coverage for the
17 products carried by Cephalon and then
18 Teva, right?
19     A.  It was -- the intent of the
20 hotline was to help the physician's
21 office and/or the patient navigate the
22 process to submit prior authorizations
23 for access.
24     Q.  Okay.

Page 231

1      A.  It's about the process.
2      Q.  And sometimes --
3          MS. RUANE:  I'm going to
4      hand you what's been marked as
5      Exhibit-18.
6              - - -
7          (Whereupon, Teva-Bearer
8      Exhibit-18,
9      TEVA_MDL_A_04848188-191, was
10     marked for identification.)
11             - - -
12         MS. RUANE:  For the record,
13     this is TEVA_MDL_A_04848188.
14 BY MS. RUANE:
15     Q.  I'll give you a second to
16 review it.
17         MS. HILLYER:  It's tiny, the
18     print.
19         THE WITNESS:  Okay.  Maybe
20     with your question I'll need to
21     read it again, but go ahead.
22 BY MS. RUANE:
23     Q.  The e-mail chain starts off
24 with an e-mail from -- on Page 89, with

Page 232

1 an e-mail from Alec Burlakoff?
2      A.  Yes.
3      Q.  And he's describing a
4 situation where a call was made to the
5 hotline.
6          And the first question asked
7 was, Does this patient have cancer?
8          Do you see that?
9      A.  Yes, I do.
10     Q.  And the office staff said
11 no.
12         Do you see that?
13     A.  Yes.
14     Q.  And the person from the
15 hotline says, Sorry, we cannot help you,
16 have a nice day, and hung up.
17         Do you see that?
18     A.  Yes, I see that.
19     Q.  The discussion is, it's
20 described as a mishap by Alec, correct?
21         He says, I truly believe
22 these mishaps are partly the reason for
23 the lack of hotline usage.  It is a
24 shame.

Page 233

1      A.  That's his opinion.
2      Q.  The e-mail is then forwarded
3 to you --
4      A.  Yep.
5      Q.  -- from Randy Spokane.  And
6 you forward it on and indicate, I am
7 concerned -- this is at the top of 89.
8          I am concerned about this
9 incident and the possibility of these
10 situations arising.  Fortunately, the
11 representative at the physician office --
12 was at the physician office and was able
13 to address the miscommunication as it
14 occurred.
15         Do you see that?
16     A.  I see that.
17     Q.  And then there's some
18 discussion of different possibilities for
19 why that might have happened that way.
20         But, ultimately, at the top
21 of Page 88, Randy clarifies the initial
22 reason for the call was for a noncancer
23 patient.
24         Do you see that?

Page 234

1    A.   Yes.
2    Q.   So this was a call for a
3  patient who would be receiving Actiq for
4  an off-label purpose, correct?
5    A.   That's what that -- that's
6  what -- I'm sorry.  That's what Randy
7  states.
8    Q.   And so the hotline was
9  correct to ask whether the patient had
10  cancer, because that's the indication for
11  the drug, correct?
12         MS. HILLYER:  Objection to
13    form.
14         THE WITNESS:  That is not
15    correct.
16  BY MS. RUANE:
17    Q.   The question, does this
18  patient have cancer, is intended to
19  determine whether this is a patient
20  within the indication for the label of
21  the drug, correct?
22    A.   No.
23    Q.   Why not?
24    A.   I can't -- if you read Lynn

Page 235

1  Macilwain on the first page, patient
2  assistance program.  Our patient
3  assistance program is different than the
4  hotline, although they facilitated the
5  call.
6         And the patient assistance
7  program was only for patients with
8  breakthrough cancer pain.
9    Q.   But you were concerned about
10  the possibility of patients who don't
11  have cancer not being able to move
12  forward through the hotline and obtain
13  additional information in order to seek
14  reimbursement, correct?
15    A.   No.  The issue would be,
16  based on my recollection, the training of
17  the customer service hotline.
18         The first question you don't
19  have to -- you would not necessarily have
20  to -- you wouldn't ask, is the diagnosis.
21  The hotline is providing reimbursement
22  support services, to include prior auth
23  forms, although we talked about, not
24  based on diagnosis.

Page 236

1    Q.   So it would be your
2  expectation, and the reason you were
3  following up was so that the hotline was
4  not seeking information that would
5  determine whether a patient had cancer --
6         MS. HILLYER:  Objection to
7    the form.
8  BY MS. RUANE:
9    Q.   -- as the initial question
10  on the call?
11    A.   The reason I was following
12  up is if this was a patient assistance
13  program, it may be appropriate to ask
14  that, because the patient wouldn't
15  qualify, you know, for patient
16  assistance.
17         And there was a warm
18  transfer, as I recall, for the patient
19  assistance program, which was sort of
20  there was a firewall between
21  reimbursement hotline services and the
22  patient assistance program, or otherwise
23  referred to as PAP.
24    Q.   And if this wasn't a patient

Page 237

1  assistance program call --
2    A.   Yes.
3    Q.   -- if this was just a call
4  for a patient of any other sort, your
5  expectation is that whether they were a
6  cancer patient would not be relevant to
7  whether the hotline was providing
8  services to them for reimbursement?
9    A.   Correct.
10    Q.   Because the purpose of the
11  hotline was to provide reimbursement
12  services, even if the patient did not
13  have cancer, correct?
14    A.   It was not based on
15  diagnosis.  There may have been prior
16  auth criteria beyond the diagnosis, of
17  which, again, navigating the process for
18  coverage was relatively foreign to a lot
19  of these offices, and that was the intent
20  of the service.
21         It was up to the physician
22  to determine what was an appropriate
23  patient and go through that process.
24    Q.   But the intent of the

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1 service, to the extent possible, was to
2 provide reimbursement services for
3 uses -- for use of the product even if it
4 is beyond the indication on the label,
5 correct?
6          MS. HILLYER:  Objection to
7      the form.
8          THE WITNESS:  Why don't you
9      rephrase that for me so I can give
10     you a concise answer?
11 BY MS. RUANE:
12     Q.   The purpose of the hotline
13 was to provide reimbursement services to
14 a provider, even if the particular
15 patient did not fall within the
16 indication on the label?
17     A.   The diagnosis is not
18 included in a reimbursement support
19 service. It's just not. It's not a
20 screening based on your indication.
21     Q.   So you would agree, then,
22 that the hotline was not screening based
23 on whether a patient was receiving
24 services on indication -- within the

Page 239

1 indication or outside of the indication?
2      A.   They would -- if they wanted
3 reimbursement support services, typically
4 the prior auth form would be sent to the
5 office staff. The office staff includes
6 relevant information, to include
7 diagnosis.
8          And the part of the -- part
9 of the reimbursement support service was
10 to help facilitate that process not
11 specific to diagnosis. There's lots of
12 information required on pre-A forms.
13     Q.   Are you aware of the fact
14 that Burlakoff pled guilty for illegal
15 promotion of a product by your
16 competitor, Subsys?
17          MS. HILLYER:  Objection.
18     Calls for speculation. Assumes
19     facts not in evidence.
20 BY MS. RUANE:
21     Q.   Are you aware of that?
22     A.   No.
23     Q.   Do you know Alec Burlakoff?
24     A.   No.

Page 240

1      Q.   When you received this
2 e-mail, you were -- and received Randy's
3 e-mail indicating the initial reason for
4 the call was for a noncancer patient, you
5 were aware of the fact that that would be
6 a patient, then, who was prescribed the
7 drug for off-label use, correct?
8      A.   Correct.
9      Q.   And you're aware of the fact
10 that for a while, at least, the hotlines
11 had at their disposal letters of medical
12 necessity as one of the tools to
13 facilitate reimbursements?
14     A.   There was a period of time.
15 I don't recall how long it was, actually.
16     Q.   The letters of medical
17 necessity included a range of conditions,
18 and you would agree some of those
19 conditions were off-label uses, correct?
20     A.   As I recall. I don't have a
21 recollection of exactly what they were.
22     Q.   We can get them out if we
23 need to.
24     A.   Okay.

Page 241

1      Q.   But, for example, there
2 might be a letter of medical necessity
3 related to back pain?
4          MS. HILLYER:  Objection.
5      Calls for speculation. She said
6      she doesn't remember the
7      specifics.
8 BY MS. RUANE:
9      Q.   Do you have a memory of
10 that?
11     A.   No.
12     Q.   Okay. Actually, before I
13 bring up another exhibit, let me ask you,
14 those letters of medical necessity were
15 used, I know you don't remember exactly
16 when, it looks to me from 2008 to 2011.
17          Would that be consistent
18 with your memory, or do you know?
19     A.   I don't know the dates.
20     Q.   Okay. Do you know why the
21 letters of medical necessity program was
22 discontinued in 2011?
23     A.   No.
24     Q.   Did anyone ever talk to you

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 about the reason for the discontinuation
2 of that program?
3      A.   No, not -- no, I don't
4 recall having a conversation about it.
5      Q.   Are letters of medical
6 necessity still used for on-label use of
7 the products?
8           MS. HILLYER:  For Actiq and
9      Fentora?
10          THE WITNESS:  For Actiq and
11     Fentora?
12 BY MS. RUANE:
13     Q.   For Fentora.
14          MS. HILLYER:  Objection to
15     form.
16          You can answer if you know.
17          But she's not in that role
18     anymore.
19          THE WITNESS:  We don't
20     support Fentora.
21 BY MS. RUANE:
22     Q.   A better question might be,
23 during the time that Fentora was on the
24 market --

Page 243

1      A.   Yes.
2      Q.   -- being supported, were
3 letters of medical necessity for the
4 within-indication use of Fentora still
5 available, even after the off-label
6 letters of medical necessity had been
7 discontinued?
8      A.   I don't recall.
9      Q.   Okay.  Do you have any
10 reason to think that that didn't continue
11 to occur?
12     A.   I find it interesting that
13 we would need a letter of medical
14 necessity if the patient was eligible for
15 the product.
16          The idea is if there's some
17 reason -- and if there was some reason
18 that they would, then there may be a
19 template to follow.
20          MS. RUANE:  I'm going to
21     hand you what's been marked as
22     Exhibit-19.  For the record, this
23     is TEVA_MDL_A_01204074 through
24     092.

Page 244

1           - - -
2           (Whereupon, Teva-Bearer
3      Exhibit-19,
4      TEVA_MDL_A_01204074-092, was
5      marked for identification.)
6           - - -
7 BY MS. RUANE:
8      Q.   This is a Vantrela strategic
9 brand plan.
10          And you were involved in the
11 strategy associated with the Vantrela
12 project -- product, correct?
13     A.   As it related to market
14 access, yes.
15     Q.   So within market access, one
16 of your jobs was to determine whether
17 managed care would pay for a product like
18 Vantrela?
19     A.   Yes.
20     Q.   Were you involved in the
21 creation of the strategic brand plan for
22 Vantrela?
23     A.   The brand plan itself, no.
24     Q.   What portion of the Vantrela

Page 245

1 strategy would you have been involved in?
2      A.   Payer strategy.
3      Q.   Got it.
4           And the payer strategy would
5 be the strategy for, basically, building
6 the case for payers to understand the
7 benefit of providing coverage for a drug
8 like Vantrela?
9      A.   Correct.
10     Q.   One of the things that is
11 relevant in providing -- making the case
12 to payers for why coverage for a product
13 like Vantrela is important is
14 establishing the need for abuse-deterrent
15 technology in drugs, correct?
16          MS. HILLYER:  Objection to
17     form.
18          THE WITNESS:  A treatment --
19     I would say a treatment option for
20     patients.
21 BY MS. RUANE:
22     Q.   And so in the strategic
23 brand plan that was created by Teva, on
24 Page 4, Number 1, the first topic there

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1  on the executive summary is, Abuse and
2  misuse of opioids.
3      Do you see that?
4  A.  Sorry.
5  Yes.
6  Q.  It talks about, The
7  prevalence of prescription opioid abuse
8  and misuse that has increased in the past
9  decade and poses a serious public health
10  issue.
11      Do you see that?
12  A.  Yes.
13  Q.  Do you agree with that
14  characterization?
15      MS. HILLYER:  Objection to
16      form.  And also lack of
17      foundation.  She testified that
18      she didn't have anything to do
19      with this document.
20  BY MS. RUANE:
21  Q.  We can go on and look at
22  some others that you did.
23      I'm just asking you right
24  now, as it relates to the prevalence of

Page 247

1  opioid abuse and misuse that's increased
2  over the past decade and now poses a
3  serious public health issue, is that
4  something that you personally believe to
5  be true?
6      MS. HILLYER:  Objection to
7      form.
8      THE WITNESS:  I don't
9      have -- I'm not going to offer my
10      opinion.
11  BY MS. RUANE:
12  Q.  Do you hold an opinion?
13      MS. HILLYER:  Objection to
14      form.  It calls for speculation.
15      She's not an expert on this.
16  BY MS. RUANE:
17  Q.  Ms. Bearer, I'm just asking
18  you, do you have an opinion as to whether
19  there's an opioid epidemic that's causing
20  a public health crisis right now in our
21  nation?
22      MS. HILLYER:  Objection to
23      form.
24      THE WITNESS:  As it relates

Page 248

1      to what you were asking me -- I
2      mean, no.
3  BY MS. RUANE:
4  Q.  You don't believe that to be
5  true?
6  A.  I'm answering the question
7  based on what you provided me here.
8  There's no --
9  Q.  I just want to make sure I
10  understand your answer.
11      You don't believe that there
12  is a serious public health issue that's
13  posed by the prevalence of prescription
14  opioid abuse and misuse in our nation
15  over the past decade?
16      MS. HILLYER:  Objection to
17      form.
18      THE WITNESS:  If you're
19      asking -- sorry.
20      There are statistics to
21      suggest that there is an opioid
22      epidemic.  I don't have any -- I
23      did not have anything to do with
24      this document.  So that was my

Page 249

1  previous answer.
2  BY MS. RUANE:
3  Q.  But you have seen the
4  statistics related to the opioid epidemic
5  and the societal cost associated with
6  that?
7  A.  Yes.
8      MS. HILLYER:  Objection to
9      form.
10      THE WITNESS:  Sorry.
11  BY MS. RUANE:
12  Q.  Did you see those documents
13  as you prepared part of the brand plan
14  associated with managed care and
15  Vantrela?
16  A.  It was part of the --
17      MS. HILLYER:  Sorry.
18      Objection.  What documents?
19      THE WITNESS:  Yeah, I mean,
20      what --
21  BY MS. RUANE:
22  Q.  The -- let's do this.
23      - - -
24      (Whereupon, Teva-Bearer

Page 250

1 Exhibit-20,
2 TEVA_MDL_A_09191592-593, with
3 attachment, was marked for
4 identification.)
5         - - -
6        MS. RUANE:  I'm going to
7 hand you what's been marked as
8 Exhibit-20.  For the record, this
9 is TEVA_MDL_A_09191592.
10       THE WITNESS:  Are we
11 finished with this one?
12       MS. RUANE:  For now.
13 BY MS. RUANE:
14    Q.   This document includes a
15 managed care overview for Vantrela on
16 Page 248?
17    A.   Yep.
18    Q.   And this is a document that
19 you --
20       MS. HILLYER:  You said 248?
21       MS. RUANE:  248, yes.
22       MS. HILLYER:  Oh, sorry,
23 hold on.  1592, 1593 -- these are
24 not sequential.  191593, and then

Page 251

1 I jump to 83248.
2        MR. GASTEL:  It's the
3 attachments to previous e-mails.
4        MS. HILLYER:  But this
5 e-mail has several attachments
6 which aren't attached here.
7        MS. RUANE:  Let's do this --
8        MS. HILLYER:  And there's
9 no -- the earlier e-mail doesn't
10 appear to have any attachments.
11 BY MS. RUANE:
12    Q.   Let me ask you this, and
13 then we'll sort out where to go.
14       The document, 248, the
15 managed care overview --
16    A.   Got it.
17    Q.   -- is that a document that
18 you created?
19    A.   Yes.
20    Q.   On Page 252 of that
21 document -- and, again, this is a managed
22 care overview to be provided as it
23 relates to the Vantrela product, right?
24    A.   Correct.

Page 252

1    Q.   Okay.  On 252, you identify
2 the fact that the misuse, abuse and
3 diversion of opioids is a major public
4 health concern, correct?
5    A.   Yes.  And they are all
6 referenced.
7    Q.   And if you look at the
8 bottom, your references are there?
9    A.   Correct.
10   Q.   And you identify the fact
11 that one in twenty Americans over 12
12 abused opioids in 2010, correct?
13   A.   Based on the reference,
14 correct.
15   Q.   You also identify the fact
16 that one in three drug-related emergency
17 room visits were opioid related in 2011,
18 correct?
19   A.   Yep.
20   Q.   And you cited 18,000
21 overdose deaths in 2014, correct?
22   A.   Cited it.
23   Q.   You included it in there
24 with the citation?

Page 253

1    A.   Yes, I'm sorry.  That's what
2 I said.  Sorry.  Cited, yes.
3    Q.   Sorry.  And you also
4 identified a more than 300 percent
5 increase in overdose deaths from 1999 to
6 2014, correct?
7    A.   Correct.
8    Q.   And those are statistics
9 that you identified and chose to put in
10 the managed care overview for Vantrela,
11 correct?
12   A.   Correct.
13   Q.   They were significant
14 statistics to you?
15       MS. HILLYER:  Objection to
16 form.
17       THE WITNESS:  That's an
18 opinion.  They were factual.
19 BY MS. RUANE:
20   Q.   They're factual.
21       And they're persuasive when
22 explaining to a managed care entity why
23 reimbursement for an abuse-deterrent
24 technology would be appropriate, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1 MS. HILLYER: Objection to
2 the form. And calls for
3 speculation.
4 THE WITNESS: They are
5 facts.
6 BY MS. RUANE:
7 Q. And they're facts you chose
8 to put in here for a reason, right?
9 A. They are facts. We are
10 looking at an abuse-deterrent
11 formulation, and these are facts
12 associated with, perhaps, the unmet need.
13 Q. With, I'm sorry?
14 A. These are facts associated
15 with that reference. That's what I'm
16 saying.
17 Q. They're facts associated
18 with the opioid epidemic and opioid
19 abuse, correct?
20 A. The word we use is a misuse,
21 abuse and diversion.
22 Q. Okay. They are facts that
23 are significant to explain to a managed
24 care facility just how dire the opioid

Page 255

1 use, abuse and diversion has become in
2 America, correct?
3 MS. HILLYER: Objection to
4 form.
5 THE WITNESS: They are facts
6 associated with -- they are just
7 facts relative to opioid abuse,
8 diversion and misuse, which is on
9 the next slide, I believe. Unless
10 I'm going backwards.
11 BY MS. RUANE:
12 Q. On Page 255 -- sorry, it's
13 because of the staples --
14 A. I'm going in the wrong
15 direction.
16 Q. It says at the top, Opioid
17 abuse poses a substantial economic
18 burden.
19 Do you see that?
20 A. Uh-huh.
21 Q. That's information -- you
22 typed that in, right, as you created this
23 document, correct?
24 A. I created the document.

Page 256

1 Q. And you chose to define it
2 as, Opioid abuse posing a substantial
3 economic burden, right?
4 A. Economic, yes.
5 Q. And you include the fact
6 that there's, in the United States, in
7 the year 2015 there's $27.6 billion in
8 healthcare costs, correct?
9 A. Yes. And that's a -- yes.
10 Q. You also included $28.3
11 billion in workplace costs?
12 A. Yes.
13 Q. And $5.6 billion in criminal
14 justice costs?
15 A. That's correct.
16 Q. For a total societal cost,
17 in 2015 alone, of $61.5 billion, correct?
18 A. Correct.
19 Q. My question for you is, who
20 do you believe should pay for the $61.5
21 billion per year in total societal cost?
22 MS. HILLYER: Objection to
23 form.
24 THE WITNESS: You're asking

Page 257

1 my opinion?
2 BY MS. RUANE:
3 Q. Yeah. I'm asking whether
4 you believe that it's appropriate and
5 fair for the companies that profited from
6 the use, abuse and diversion of opioids
7 to pay for the societal cost that America
8 is now facing?
9 MS. HILLYER: Objection to
10 the form.
11 THE WITNESS: I don't know.
12 MS. HILLYER: And assumes
13 facts not in evidence.
14 BY MS. RUANE:
15 Q. Is it your belief that
16 American taxpayers should bear that cost?
17 MS. HILLYER: Objection to
18 form.
19 THE WITNESS: I really don't
20 know.
21 BY MS. RUANE:
22 Q. Between American taxpayers
23 and the companies that profited from the
24 sale of opioids, wouldn't you agree that

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1 the appropriate thing to do would be for
2 those companies to forfeit those profits
3 in order to address the societal costs
4 that they have created?
5      MS. HILLYER:  Objection to
6      form.  And assumes facts not in
7      evidence.  And calls for a legal
8      conclusion.
9 BY MS. RUANE:
10     Q.   Wouldn't you agree, Ms.
11 Bearer?
12     MS. HILLYER:  Same
13     objections.
14     THE WITNESS:  I'm not an
15     attorney.  You're asking for me to
16     provide you a response that
17     implies a legal reference that --
18     I'm sorry.  I'm not an attorney.
19 BY MS. RUANE:
20     Q.   And with all respect, I'm
21 not asking for an opinion -- or a legal
22 opinion right now.
23     I'm -- I understand that you
24 identified, as an important thing for

Page 259

1 third-party -- well, strike that -- for
2 managed care entities to know is that
3 there's $61.5 billion a year right now
4 that American society is bearing as a
5 result of the opioid epidemic.
6     A.   Yes.
7     MS. HILLYER:  Objection.
8 BY MS. RUANE:
9     Q.   And because that's a
10 decision -- or that's information that
11 you found significant at the time of
12 working on Vantrela, I'm wondering what
13 your personal opinion is as to who bears
14 the burden for that cost.
15     MS. HILLYER:  Objection to
16     form.  Mischaracterizes the
17     document.  Assumes facts not in
18     evidence.  And same objections I
19     made before.  And asked and
20     answered repeatedly now.  She's
21     answered your question.
22 BY MS. RUANE:
23     Q.   I won't -- you can answer it
24 one more time.  I won't ask it again.

Page 260

1     MS. HILLYER:  Same
2 objections.
3     THE WITNESS:  I'm not an
4 attorney and, therefore, cannot
5 provide an opinion as to -- to
6 answer your question.
7     MS. HILLYER:  Sarah, do you
8 want to separate these as
9 documents, because they don't
10 actually belong together?  Or how
11 do you want to --
12     MR. GASTEL:  They definitely
13 belong together.  There's just
14 numerous attachments and they are
15 all not --
16     MS. HILLYER:  So it's just
17 missing the in-between attachments
18 you're saying?  I see.  As long as
19 we're clear on the record, that's
20 fine.
21     THE WITNESS:  Are we
22 finished with this?
23     MS. HILLYER:  That one goes
24 before that.

Page 261

1     THE WITNESS:  So we're
2 finished with both of them, okay.
3 Sounds good.
4     MS. HILLYER:  We've been
5 going about an hour.  If you have
6 another quick document, we can do
7 it, but --
8     MS. RUANE:  Let's take a
9 quick break.
10     VIDEO TECHNICIAN:  Going off
11 the record.  2:25.
12     - - -
13     (Whereupon, a brief recess
14 was taken.)
15     - - -
16     VIDEO TECHNICIAN:  Back on
17 record at 2:39 p.m.
18 BY MS. RUANE:
19     Q.   We're back on the record
20 after a short break.
21     You understand you're still
22 under oath?
23     A.   I do.
24     Q.   We're going to hand you

Page 262

1  what's been marked as Exhibit-21.
2          - - -
3          (Whereupon, Teva-Bearer
4  Exhibit-21,
5  TEVA_MDL_A_09165564-565, with
6  attachment, was marked for
7  identification.)
8          - - -
9  BY MS. RUANE:
10     Q.   And there's the e-mail
11  itself which, for the record, is
12  TEVA_MDL_A_0916564 to 65, and then the
13  attachment is included on the back there.
14         This is a managed care mag
15  article for opioids.
16         This is an e-mail chain that
17  includes you and Jeff Dierks, at least at
18  the top.
19         Do you see that?
20     A.   I do.
21     Q.   Who is Jeff Dierks?
22     A.   He was the brand director at
23  the time for Fentora.
24     Q.   You said brand director for

Page 263

1  Fentora?
2     A.   Yes.
3     Q.   You wrote Jeff about the
4  article titled, The Societal and Economic
5  Burden of Chronic Pain and Opioid Abuse,
6  correct?
7     A.   Yes.
8     Q.   Do you remember this?
9     A.   It's coming back to me.
10     Q.   In your e-mail to Jeff, you
11  reference the fact that there is no
12  collaboration -- you said, I had no
13  knowledge of this.
14         Are you referring to the
15  article itself?
16     A.   Yes.
17     Q.   That's a yes?
18     A.   Yes.
19     Q.   I didn't hear you.
20         You indicate, There is no
21  collaboration with regard to the market
22  access strategy.
23         Do you see that?
24     A.   Yes.

Page 264

1     Q.   What do you mean by --
2     A.   Sorry.
3     Q.   What do you mean by "market
4  access strategy"?
5     A.   I mean as referenced prior,
6  where I would lead the market access
7  subteam.
8         So Jeff would have been the
9  brand director over the entire brand
10  strategy.  And my portion of the market
11  access strategy was not -- is what, you
12  know, I leaded, like, a subteam, for
13  example, basically.
14     Q.   And so the market access
15  subteam would be dealing with how to
16  properly brand and market to the managed
17  care facility -- or managed care
18  entities, correct?
19     A.   We would provide input, if
20  nothing -- so to be clear, market access,
21  my team still falls under the umbrella of
22  the brand as a total, the brand strategy,
23  minus just a subset.
24     Q.   So your team is actually

Page 265

1  under the brand team for Teva?
2     A.   I did not report in to the
3  brand team.  But I am a dotted line
4  representing the market access payer
5  strategy.
6     Q.   Okay.  What is -- is there a
7  line up above brand?  What does it go to?
8  Or is brand one of the top --
9         MS. HILLYER:  Objection to
10     the form.
11  BY MS. RUANE:
12     Q.   -- entities?
13         I may not be explaining that
14  right.  It may just be a bad question.
15  Let me try again.
16         What about marketing, are
17  marketing and brand on the same level?
18     A.   That's the same thing,
19  sorry.
20         So when we say "brand,"
21  we're saying brand marketing, I
22  apologize.
23     Q.   So your managed care
24  position had a dotted line to

Page 266

1 brand/marketing?
2    A.   Correct.
3    Q.   The market access strategy
4 that's being discussed here as it relates
5 to managed care, were you responsible for
6 managing a budget and --
7    A.   Yes.
8    Q.   -- and implementing certain
9 marketing, as a result, to managed care
10 facilities?
11    A.   We don't market to.  We
12 would have projects associated with
13 developing a strategy.  And that was the
14 budget.
15         That was what the budget was
16 used for, payer research, all sorts of
17 things along those lines.
18    Q.   Do you recall, for example,
19 in the year 2015, the estimate of what
20 your budget was that you were handling?
21         MS. HILLYER:  For Fentora?
22 BY MS. RUANE:
23    Q.   For Fentora.
24         MS. RUANE:  That's a good

Page 267

1    point.  Thanks.
2         MS. HILLYER:  Assumes facts
3    not in evidence.
4         THE WITNESS:  I would be
5    guessing if I told you.  I don't
6    recall specifically.  I had other
7    brands.
8 BY MS. RUANE:
9    Q.   And within your budget, were
10 there line items for sales presentations?
11    A.   No.
12    Q.   What were the line items
13 within your budget?
14    A.   They were extensive.  Can
15 you be more specific of what you're
16 trying to get to?  And I'll be happy --
17    Q.   I'm trying to make sure I
18 understand, when you talk about the
19 market access strategy, what your -- what
20 all the responsibilities were, or
21 potential, you know, marketing, for lack
22 of a better word, that you had at your
23 disposal within your budget.
24         MS. HILLYER:  Objection to

Page 268

1    form.  You mean as to all the
2    products that came under her
3    umbrella?
4         MS. RUANE:  No.
5 BY MS. RUANE:
6    Q.   Is your budget divided up by
7 product?
8    A.   Yes.
9    Q.   So let's take Fentora.
10    A.   Yes.
11    Q.   What were the kind of line
12 items or potential options that you would
13 have under the Fentora budget that you
14 managed for market access strategy?
15         MS. HILLYER:  Objection to
16    form.  Vague as to time frame.
17         THE WITNESS:  So if --
18    specifically, the projects are
19    dependent on the time frame.  So
20    if you want to give me -- if you
21    go to a long strategy, the
22    projects are different as you
23    evolve a strategy.
24 BY MS. RUANE:

Page 269

1    Q.   So in -- when Fentora
2 launched, let's talk about the 2007/2008
3 time frame, what types of line items
4 would have been in that budget?
5    A.   It would have been the
6 development of a payer presentation
7 tactic specifically for -- at the launch,
8 it would be tactics, primarily, for the
9 account management team.
10         If there was a vendor that
11 we needed, and I don't recall, I'm giving
12 an example, for, say, a budget impact
13 model or something of that nature, those
14 are the examples.
15         But I don't have specifics
16 for you for Fentora, frankly.
17    Q.   You mentioned in the e-mail
18 that the market access strategy requires
19 extensive payer research?
20    A.   That's correct.
21    Q.   What do you mean by that?
22    A.   To develop a strategy, you
23 can either have advisory boards, you can
24 do market research, you identify -- you

Page 270

1 have a third party to identify a
2 population representative of, say,
3 commercial payers. It's blinded. The
4 third party engages.
5          There are objectives and
6 research. And that research comes back
7 and it is taken into consideration as
8 you're developing your value proposition
9 for the payer and messaging.
10          That's one example.
11     Q.   And you all engaged in that
12 process with the drug Fentora?
13          MS. HILLYER: Objection to
14     form.
15          THE WITNESS: That would
16     be -- that would be the norm. If
17     you're asking me specifically
18     during that time, it was a
19     partnership between marketing and
20     my role.
21 BY MS. RUANE:
22     Q.   Okay. You also reference
23 targeting patient profile, message
24 testing and positioning, et cetera.

Page 271

1     A.   Yes.
2     Q.   Explain for me what you mean
3 there.
4     A.   The target patient profile,
5 you paint a picture for the physician --
6 sorry, the payer as to the appropriate
7 population where a product would be --
8 would be appropriate -- sorry,
9 appropriate for, you know, characterizing
10 the enrollment within a plan, who is the
11 appropriate patient, based on research.
12 Sometimes analogs are used.
13          I'm sorry, you asked me
14 about target patient population?
15     Q.   Yes.
16     A.   Payers want to quantify how
17 many patients in their plan would be
18 candidates for a therapy. So through
19 research, we're able to at least make
20 some assumptions.
21          And unless you want me to go
22 into all the details of how you do that,
23 it's extensive. You can look at analogs.
24 You can have one-on-one conversations

Page 272

1 with payers. But it's all third-party
2 facilitated.
3     Q.   So one of the things that
4 concerns you about the article that is
5 being referenced in your e-mail is the
6 fact that you weren't consulted on how to
7 appropriately paint the picture or
8 address market access strategy, correct?
9     A.   No.
10          MS. HILLYER: Objection to
11     form.
12 BY MS. RUANE:
13     Q.   You define -- or in your
14 e-mail you describe this article as a
15 promotional tactic?
16     A.   I'm trying to remember where
17 it was published.
18          I'll tell you what I was
19 upset about is it was done in a vacuum,
20 and I wasn't consulted. I didn't have an
21 opinion one way or the other, as I
22 recall, about the content itself.
23          But from a role and
24 responsibility, anything that touched

Page 273

1 managed care would have been -- at least
2 I would have been involved with. And
3 this was done in a silo, and that's
4 really the tone of this.
5          So why wasn't I consulted
6 and I'm hearing about it after the fact?
7     Q.   You do describe the article
8 as a promotional tactic, correct?
9     A.   Well, because, I guess, it
10 went through PARC and it went through --
11 I'm trying to remember where it was
12 published. Disease State Report.
13          So this is not a scientific
14 publication, as I remember. Therefore,
15 it would be considered -- it's not like
16 we would use it in promotion. It's just
17 a matter of certain publications -- our
18 medical team is the publication team. We
19 have nothing to do with that.
20          This is -- if we submit an
21 article or have -- or if there's an
22 article submitted that we had any
23 editorial content with, it's not
24 considered scientific in general.

Page 274

1    Q.   It's considered promotional
2  and it goes through PARC, correct?
3    A.   That's what I'm told here,
4  this went through PARC.
5    Q.   And what is PARC?
6    A.   Promotional advertising
7  review committee.  It's our
8  medical/legal/regulatory.  It's just an
9  acronym.
10    Q.   I'm sorry, say that again.
11  Promotional --
12    A.   We have too many acronyms.
13        Promotion and advertising
14  review committee, I believe.  We just
15  call it PARC.  You get used to it, and
16  you don't know what it means.
17    Q.   So PARC, the promotional
18  advertising review committee, you
19  mentioned medical/legal there.  And I
20  want to make sure I understand what you
21  were saying.
22        Is there a medical review
23  that occurs when items are submitted to
24  PARC?

Page 275

1    A.   So PARC is a committee.  On
2  the committee is an attorney, a regulator
3  and a medical.
4    Q.   But the items that are
5  submitted to PARC are items -- the
6  submission to PARC is separate and apart
7  from items submitted through medical
8  services, correct?
9    A.   Yes.
10    Q.   Okay.  And items submitted
11  through PARC, members of the managed care
12  team may discuss during their
13  interactions with managed care entities,
14  correct?
15    A.   That would depend.
16    Q.   They aren't prohibited from
17  doing so, correct?
18    A.   The way our PARC works is
19  the audience has to be a part of the
20  project.  So there will be sales as the
21  audience -- HCPs, so those will be sales
22  pieces.  There will be managed care
23  decision-makers, that would be a piece
24  that a rep wouldn't have access to.

Page 276

1    Q.   And in the example here,
2  this article was submitted to PARC, was
3  then published, it looks like, maybe in a
4  managed care magazine?
5        MS. HILLYER:  Objection to
6        form.
7        THE WITNESS:  I really don't
8        know.
9  BY MS. RUANE:
10    Q.   The link at the end says
11  Managed Care Mag.com, so.
12        Is Managed Care Magazine
13  something you're familiar with?
14    A.   Yes.  Yes, that would be.
15    Q.   You also criticize the
16  caliber of the managed care experts and
17  indicate they would have been held to a
18  higher standard if you had the
19  opportunity to weigh in.
20        Do you see that?
21    A.   I see it.
22    Q.   What was your criticism of
23  the experts used?
24    A.   I'd have to go back and read

Page 277

1  it.  I apologize, I don't remember.
2    Q.   I'll just tell you, on Page
3  5 you can see who they are.
4    A.   Okay.  Thank you.
5        Well, I was forming an
6  opinion based on the way, at the time, I
7  interpreted the level of knowledge or
8  background and the credibility,
9  potentially.
10        It was probably an emotional
11  response to the fact that I wasn't
12  involved.  But I'm not familiar with
13  either of these two individuals.  And the
14  target audience for an article like this
15  would have been other managed care
16  organizations.
17    Q.   It indicates -- you're
18  familiar with Pain Matters?
19    A.   I'm familiar with it.  I
20  mean, I know of it.  I had nothing to do
21  with any -- no involvement whatsoever
22  with Pain Matters.
23    Q.   Okay.  Who was involved with
24  Pain Matters, if you know, and the

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1 implementation of that?
2     A.   The only individual that
3 comes to mind is Matt Day.  There may
4 have been others.
5     Q.   Did you advise or serve as a
6 supervisory role with Matt Day on Pain
7 Matters?
8     A.   No.
9     Q.   Have you been to the Pain
10 Matters website?
11     A.   No.
12     Q.   This e-mail references the
13 fact that they leverage Pain Matters
14 content.
15          Are you aware of what
16 Jeffrey Dierks was referring to when he
17 said that in his response to you?
18          MS. HILLYER:  Objection.
19 Calls for speculation.
20          THE WITNESS:  No.
21 BY MS. RUANE:
22     Q.   So you hadn't weighed in on
23 any Pain Matters content?
24     A.   No, no.

Page 279

1     Q.   Do you have a general
2 understanding that Pain Matters was used
3 to educate and promote on the issues of
4 chronic pain?
5          MS. HILLYER:  Objection.
6 Calls for speculation.  And lack
7 of foundation.
8          THE WITNESS:  I've not gone
9 on the website and gone through
10 Pain Matters.
11 BY MS. RUANE:
12     Q.   In your role with marketing
13 and strategic planning, did you -- were
14 you -- did you sit in on any meetings
15 addressing Pain Matters and the
16 implementation of Pain Matters?
17     A.   I recall meetings in which
18 it would have been a cross-functional
19 brand team meeting with updates, not
20 content.
21     Q.   And during those updates,
22 did you gain an understanding that Pain
23 Matters was a campaign being launched by
24 the company to educate on the issues of

Page 280

1 chronic pain?
2          MS. HILLYER:  Objection.
3 Calls for speculation.  Lack of
4 foundation.
5          THE WITNESS:  I never saw
6 anything that said, this is
7 what -- you know, the intent.  I
8 don't recall seeing any document
9 that said Pain Matters is intended
10 to.
11 BY MS. RUANE:
12     Q.   Sitting here today, do you
13 have an understanding of what Pain
14 Matters is?
15     A.   It's exactly as you
16 described it, based on what I have heard.
17 But, again, I have not gone through the
18 website.
19          In my role with payers, this
20 is not something that would involve the
21 payer community.
22     Q.   Okay.  But just based on
23 sitting in meetings and hearing updates
24 from different departments, your memory

Page 281

1 is that it's as I described it, a
2 resource to educate on chronic pain?
3     A.   The way I understood it was
4 it was a resource to educate on pain.
5 That was the way I took it.  I don't ever
6 recall specifically chronic pain as being
7 the focus.  I don't recall.
8     Q.   At the time of this e-mail
9 in 2015 --
10     A.   Yep.
11     Q.   -- what branded opioids for
12 chronic pain were being sold by Teva at
13 the time?
14     A.   Are you asking -- oh,
15 branded.  Branded for chronic pain.  We
16 did not have a product for chronic pain.
17     Q.   And how was this piece a
18 promotional tactic if there were no
19 branded chronic pain products on the
20 market from Teva at that time?
21     A.   I can't answer that, because
22 I didn't create the -- I did not create
23 the -- I had nothing to do with the
24 article.  I did not sit on the PARC team.

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1 I don't know how it was presented to
2 PARC. And I don't know what criteria
3 they used for approval.
4     Q.   What you know is that it
5 seemed to you to be a promotional tactic,
6 right?
7     A.   It did seem to be a
8 promotional tactic.
9     Q.   And that was further
10 confirmed to you by the fact that it was
11 submitted to PARC, correct?
12    A.   I have no knowledge of it
13 actually being in PARC. Everything that
14 I reacted to in this is predicated on
15 this e-mail.
16    Q.   And on this e-mail chain --
17 the only reason I ask that is because on
18 this e-mail chain, it indicates Matt Day
19 submitted this to PARC.
20    A.   That's correct.
21    Q.   So that's further indication
22 that it was promotional material being
23 provided in November of 2015, correct?
24    A.   He is a marketer. If he

Page 283

1 submitted it to PARC, it would be my
2 opinion, at the time -- I mean, that's
3 the way I interpreted it.
4     Q.   I'm just wondering what drug
5 was being promoted, then, if there were
6 no branded opioids for chronic pain on
7 the market from Teva?
8         MS. HILLYER:  Objection to
9     form.
10        THE WITNESS:  The way I
11    interpret this it that it was more
12    or less talking about educating on
13    pain, not specific to any product.
14        MS. RUANE:  I don't think I
15    have any further questions, but
16    Mr. Madden is going to get the
17    chance to talk to you now.
18        MS. HILLYER:  Sorry.  So if
19    I have redirect on some of this, I
20    should do that now, or do you want
21    me to do it after?  How do you
22    want me to do that?  I guess it
23    doesn't really matter --
24        MR. MADDEN:  I say we go and

Page 284

1 then you do your redirect.
2         MS. HILLYER:  We can do
3 that.  That's okay by me.
4         VIDEO TECHNICIAN:  Going off
5 the record, 3:00 p.m.
6         - - -
7         (Whereupon, a brief recess
8 was taken.)
9         - - -
10        VIDEO TECHNICIAN:  Back on
11 record at 3:13 p.m.
12        - - -
13        EXAMINATION
14        - - -
15 BY MR. MADDEN:
16    Q.   Ms. Bearer, I'm Brian
17 Madden.  I represent the plaintiffs in
18 this MDL matter.
19        I am not going to ask you
20 questions that prior counsel asked you,
21 but just have a few things for you.
22        You started at Cephalon in
23 2003 --
24    A.   Correct.

Page 285

1     Q.   -- correct?
2     A.   Yes.
3     Q.   And you were in managed care
4 from the beginning?
5     A.   Yes.
6     Q.   You were at Cephalon when
7 the company pleaded guilty with regard to
8 off-label prescription of drugs,
9 including Actiq?
10        MS. HILLYER:  Objection to
11    form.
12 BY MR. MADDEN:
13    Q.   Is that true?
14    A.   I was employed, yes.
15    Q.   Yes.
16        Were you made aware of that
17 guilty plea at the time of your
18 employment?
19    A.   Yes.
20    Q.   And that was in
21 approximately the fall of 2008; is that
22 right?
23    A.   I believe so, yes.
24    Q.   Were you disciplined at all

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1 with regard to that guilty plea for
2 off-label marketing of Actiq?
3     A.   No.
4     Q.   Did you lose your job as a
5 result of that guilty plea?
6     A.   No.
7     Q.   Who did lose their job at
8 Cephalon as a result of that guilty plea?
9         MS. HILLYER:  Objection.
10 Calls for speculation.
11        THE WITNESS:  I really don't
12     know.
13 BY MR. MADDEN:
14    Q.   Do you know of anyone at
15 Cephalon who lost their job as a result
16 of the off-label marketing guilty plea
17 for Actiq?
18        MS. HILLYER:  Objection.
19 Calls for speculation.
20        THE WITNESS:  I really don't
21     know.
22 BY MR. MADDEN:
23    Q.   Prior to 2008, in your role
24 in managed care, were you made aware by

Page 287

1 the company of the rules with regard to
2 off-label marketing versus on-label
3 marketing?
4     A.   Yes.
5     Q.   You were trained on that?
6     A.   Yep.
7     Q.   Did you take modules
8 regarding that?
9     A.   I don't remember
10 specifically.  Most likely, yes.  We take
11 a lot of modules.
12        When you're talking time
13 frame, I just don't have the specific
14 time frame.
15    Q.   But it's fair to say you
16 knew, prior to 2008, what the rules were
17 with regard to legal, on-label marketing
18 of a drug like Actiq; is that true?
19    A.   Yes.
20    Q.   Now, two documents that Ms.
21 Ruane discussed with you, let's first
22 look at Exhibit-12.
23        And I believe you have paper
24 versions, but we can also put them up on

Page 288

1 the screen, if that helps you.
2     A.   It's easier for me, if you
3 don't mind, to read the hard copies.
4         MS. HILLYER:  They are
5     numbered on the bottom.  It should
6     be in order.
7         THE WITNESS:  I see.  I got
8     it.
9         MS. HILLYER:  It's this one.
10        THE WITNESS:  The dossier.
11 BY MR. MADDEN:
12    Q.   Exhibit-12 was marked as the
13 Actiq managed care dossier, correct?
14    A.   That's correct.
15    Q.   And do I recall your
16 testimony correctly that a dossier such
17 as this would be sent to a managed care
18 provider if they requested it?
19    A.   That's correct.
20    Q.   This was not promoted to a
21 managed care entity, but, rather, if they
22 asked for it, this would be sent by the
23 company to them; is that true?
24    A.   Yes.

Page 289

1     Q.   And if any of the issues
2 discussed on Page 1 of Exhibit-12 were
3 requested from Cephalon, this would be
4 sent to the managed care provider,
5 correct?
6     A.   I'm sorry, what?
7     Q.   Bad question.
8         If a managed care provider
9 had a question about any of the subjects
10 on Page 1 of Exhibit-12, they could ask
11 the company for this dossier, correct?
12    A.   Let me rephrase.
13        If they had a question on,
14 say, breakthrough pain specifically --
15    Q.   Yes.
16    A.   -- they wouldn't necessarily
17 know what was in the dossier.  Typically,
18 when they request the dossier, they
19 request the dossier.
20    Q.   Fair enough.
21    A.   Okay.
22    Q.   If a managed care entity or
23 payer had a question under Section 5.0,
24 Risk of opioid abuse by patients with

Page 290

1 chronic pain, and that question were
2 submitted to Cephalon, then Cephalon
3 could send this dossier to that managed
4 care entity, correct?
5      MS. HILLYER:  Objection to
6   the extent it calls for
7   speculation outside her knowledge.
8      THE WITNESS:  I don't know.
9   This was handled through medical,
10   not through my side of the
11   business.
12 BY MR. MADDEN:
13      Q.   We can look at the dossier.
14      And if this dossier went to
15 a managed care entity, it does discuss
16 risk of opioid abuse by patients --
17      A.   Yes, it does.
18      Q.   -- for chronic pain, true?
19      And if we go to Page 23 of
20 this document.
21      MR. MADDEN:  The last
22   sentence, last two sentences
23   before Section 5.2, would you
24   highlight those for me, please?

Page 291

1      THE WITNESS:  I'm sorry, say
2   that again.
3 BY MR. MADDEN:
4      Q.   Beginning with, Extensive.
5      A.   Extensive clinical
6 experience with the use -- you want me to
7 read it?
8      MS. HILLYER:  No.  He was
9   asking him to highlight that.
10   She wasn't aware of that.
11      MR. MADDEN:  I'm actually
12   talking to the tech.
13 BY MR. MADDEN:
14      Q.   Ms. Bearer, I point your
15 attention, in Exhibit-12, to the
16 highlighted language from Page 23 in the
17 Actiq dossier which says, Extensive
18 clinical experience with the use of
19 opioids for patients with cancer pain
20 indicates that the risk of addiction in
21 this population is very low.  Similarly,
22 the risk of abuse is low in patients with
23 nonmalignant pain, though there is less
24 experience in this patient population.

Page 292

1      Do you see that language?
2      A.   Yes, I do.
3      Q.   Now, we also looked at
4 another exhibit that you prepared,
5 Exhibit-20, which was a slide
6 presentation with regard to Vantrela.
7      Do you recall that?
8      A.   Yes.
9      Q.   And you accumulated data and
10 put that data into your slides and cited
11 to that data with regard to --
12      A.   Yes.
13      Q.   -- opioid abuse and
14 diversion, correct?
15      A.   Correct.
16      MS. HILLYER:  Objection to
17   form.
18 BY MR. MADDEN:
19      Q.   So let's pull up Exhibit-20.
20 And I'll reference you to Page 09183260.
21      A.   I'm out of order here.
22      MS. HILLYER:  One second
23   here.
24      260?  Sorry, do you have

Page 293

1 the -- so this is Exhibit-20.  So
2   it should be --
3      - - -
4      (Whereupon, a discussion off
5   the record occurred.)
6      - - -
7 BY MR. MADDEN:
8      Q.   Ms. Bearer, this is part of
9 the slide deck you put together with
10 regard to Vantrela, correct?
11      A.   That's correct.
12      Q.   And Vantrela was an
13 abuse-deterrent opioid that was developed
14 by Teva, correct?
15      A.   Correct.  Yes.
16      Q.   Okay.  This is one of the
17 slides you put together, right?
18      A.   Yes.
19      We're on 60?
20      MS. HILLYER:  Yes.  The
21   Bates number is 60.
22      MR. MADDEN:  Yes, ma'am.
23      THE WITNESS:  Yes.
24 BY MR. MADDEN:

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1    Q.    The top rectangle has some
2  language that says, Opioids have a high
3  rate of abuse and generate enormous
4  costs.  Almost 12 percent of opioid
5  patients become addicted.
6          Do you see that?
7    A.   I do.
8    Q.   Let's compare that with what
9  we saw in Exhibit-12, side by side.
10   A.   Okay.
11         MR. MADDEN:  So if you could
12   go back and highlight the
13   language?
14         MS. HILLYER:  Do you need
15   Exhibit-12?
16         THE WITNESS:  I know what it
17   says.
18 BY MR. MADDEN:
19   Q.   We have this language about
20  a high rate of abuse with opioid use and
21  this language from Exhibit-12, which was
22  the Actiq managed care dossier, which
23  talks about a low risk of abuse.
24         Do you see that?

Page 295

1    A.   I do.
2    Q.   Would you agree with me that
3  those are contradictory messages?
4          MS. HILLYER:  Objection to
5    form.  Lack of foundation as to
6    Exhibit-12.  She testified she had
7    nothing to do with that document
8    and has no knowledge of it.  It
9    calls for speculation.
10 BY MR. MADDEN:
11   Q.   I'll ask the question again.
12         Would you agree with me that
13  those are contradictory messages?
14         MS. HILLYER:  Same
15   objections.
16         THE WITNESS:  I can tell you
17   that the date referenced in the
18   most recent is much -- is recent.
19   I don't know the date of the
20   original document, because I
21   didn't create it.
22         So the data it's talking
23   about in the dossier was several
24   years prior to this information.

Page 296

1  BY MR. MADDEN:
2    Q.   All right.  Would you agree
3  with me that the information is
4  contradictory, regardless of the dates?
5          MS. HILLYER:  Same
6    objections.  And objection to
7    form.
8          THE WITNESS:  I believe
9    it's -- new data is available and
10   it's more up to date and more
11   recent, and it's cited.  There's
12   no citation in the dossier that I
13   can comment on.
14 BY MR. MADDEN:
15   Q.   Let's look -- let's go back
16  to Exhibit-12, that same page, 23.
17   A.   Yep.
18   Q.   Under managing the risk of
19  opioid abuse, the first sentence says,
20  Although it is uncommon for chronic pain
21  patients to abuse opioid medication,
22  there is a potential risk associated with
23  the use of all opioids.
24         Do you see that?

Page 297

1    A.   Yes, I do.
2    Q.   Now, let's look at the slide
3  you put together in the Exhibit-20, the
4  following page, which is the Bates number
5  ending in 61.
6    A.   Yep.  Yes.
7          MR. MADDEN:  So if you can
8    highlight that first sentence for
9    me?
10         THE WITNESS:  Yep.
11 BY MR. MADDEN:
12   Q.   And then the slide we see on
13  the right is a slide you put together for
14  Vantrela, correct?
15   A.   Yep.
16   Q.   And you put in that slide
17  the at-risk subpopulation within chronic
18  pain is estimated to be about 27 percent
19  or 602 members per 100,000 plan members.
20         Do you see that?
21   A.   I do.
22   Q.   And the risk you're talking
23  about there for chronic pain patients is
24  abuse to opioids, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1　A.　Yes.

2　Q.　Would you agree with me that

3　those two messages are contradictory?

4　　　MS. HILLYER: Objection to

5　form. And also lack of foundation

6　as to Exhibit-12.

7　　　THE WITNESS: And I'll

8　repeat my answer, which is the --

9　I don't remember the name, the one

10　to the right of me, the at-risk

11　subpopulation of chronic pain has

12　a reference. It's recent. And I

13　don't know the date of the, or the

14　reference from the previous

15　document, as I did not create it.

16　BY MR. MADDEN:

17　Q.　Did Vantrela launch?

18　A.　No.

19　Q.　Why?

20　　　MS. HILLYER: Objection to

21　the extent it calls for

22　speculation.

23　　　THE WITNESS: Yes. I had no

24　part in that decision --

Page 299

1　BY MR. MADDEN:

2　Q.　Were you a part of that

3　decision-making?

4　A.　No, no.

5　Q.　Would you agree with me that

6　Vantrela was designed, according to your

7　slides, to help reduce the risk of abuse

8　of opioids?

9　A.　It was to illustrate that

10　there was an unmet need, potentially, for

11　treatment options for physicians for

12　patients in which they wanted to

13　prescribe a long-acting opioid in an

14　abuse-deterrent formulation.

15　Q.　Right. But we've looked at

16　two slides in your PowerPoint --

17　A.　Yep.

18　Q.　-- specifically dealing

19　with --

20　　　MS. HILLYER: Let him

21　finish.

22　　　THE WITNESS: Sorry.

23　BY MR. MADDEN:

24　Q.　-- the incidence of abuse

Page 300

1　for opioid users, correct?

2　A.　Correct.

3　Q.　So Vantrela, at least

4　according to your slides, was designed,

5　at least in part, to deal with that risk

6　of abuse, correct?

7　A.　It was designed, yes, to

8　create a treatment option for physicians

9　to prescribe to patients as they deemed

10　appropriate. It was a non -- that was an

11　abuse-deterrent formulation.

12　Q.　Was there a concern that

13　managed care payers wouldn't pay for

14　Vantrela?

15　　　MS. HILLYER: Objection to

16　form.

17　　　THE WITNESS: As with any

18　new product, payers are always

19　scrutinizing whether they'll pay

20　for any branded product.

21　BY MR. MADDEN:

22　Q.　Am I correct that one of the

23　reasons Vantrela did not launch was

24　because there was concern within the

Page 301

1　company, Teva, that third-party payers

2　would not pay for Vantrela?

3　　　MS. HILLYER: Objection.

4　Calls for speculation. And lack

5　of foundation. She testified she

6　didn't know why and she wasn't

7　part of that decision.

8　BY MR. MADDEN:

9　Q.　Do you know one way or the

10　other?

11　A.　I was not part of the

12　decision. I was not part of the

13　decision.

14　Q.　To your knowledge, was the

15　Pain Matters campaign run, in part, to

16　support Teva's generic portfolio?

17　　　MS. HILLYER: Objection to

18　form. Calls for speculation. And

19　lack of foundation. She testified

20　she wasn't part of that.

21　　　THE WITNESS: I have no

22　knowledge of that.

23　BY MR. MADDEN:

24　Q.　So as you sit here today,

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1 you don't know why the Pain Matters
2 campaign was run, as far as supporting
3 any particular product?
4     A.   As far as supporting any
5 particular product, that's correct.
6          MR. MADDEN:  All right.
7 I'll pass the witness.
8          VIDEO TECHNICIAN:  Going off
9 the record --
10         MS. HILLYER:  Can I just do
11 my redirect?  You can stay on the
12 record, unless you need to change
13 anything on the record.
14         THE WITNESS:  Do I look
15 straight ahead?
16         MS. HILLYER:  Yes.  I'm not
17 going to move over there.
18              - - -
19         EXAMINATION
20              - - -
21 BY MS. HILLYER:
22     Q.   Ms. Bearer, earlier you
23 testified about an MEP.
24         Do you recall that?

Page 303

1     A.   I do.
2     Q.   Can you explain again what
3 an MEP is?
4     A.   A medical education program.
5     Q.   And in your work at Teva and
6 Cephalon, that would have been in the
7 context of managed care programs?
8     A.   Yes.
9     Q.   And how would an MEP have
10 come about for a managed care program?
11     A.   If a health plan, payer,
12 requested information on any given
13 product, a MIRF would be submitted.  And
14 at that point, someone from medical is
15 required to present a medical education
16 program.
17     Q.   Would MEPs have been
18 presented by anybody on the market access
19 team?
20     A.   No.
21     Q.   So they would only be
22 presented to managed care upon an
23 unsolicited request?
24     A.   That's correct.

Page 304

1     Q.   Earlier you also testified
2 about the Actiq white paper.
3          Do you recall that?
4     A.   I do.
5     Q.   How, if at all, was the
6 Actiq white paper used in connection with
7 managed care organizations?
8     A.   Again, upon an unsolicited
9 request, if an account manager is
10 speaking to a payer and they had specific
11 questions relative to any given product
12 that was either -- that the -- at the
13 point in time the account manager could
14 not speak to, they would put a MIRF
15 through -- I'm sorry, medical information
16 request form, and which, then, the white
17 paper would be sent directly to the payer
18 who requested it.
19     Q.   And earlier you looked at
20 sections of the Actiq managed care
21 dossier in Exhibits-11 and 12.
22          Do you recall that?
23     A.   I do.
24     Q.   And just to clarify, what,

Page 305

1 if any, involvement did you have in
2 creating those documents?
3     A.   None.
4     Q.   Do you know if the versions
5 that are in Exhibit-11 and 12 are final
6 versions?
7     A.   No, I don't.
8     Q.   Do you know if the versions
9 at 11 and 12, Exhibits-11 and 12, were
10 provided to any payers?
11     A.   I -- no.
12     Q.   And over the course of the
13 day, Ms. Bearer, there was some testimony
14 around discussions you or members of the
15 market access team might have had with
16 managed care payers.
17          Would you or members of
18 managed -- the market access team at Teva
19 or Cephalon ever have substantive
20 discussions concerning the standard of
21 care for disease states other than
22 breakthrough pain in cancer patients who
23 are opioid tolerant in the context of
24 Actiq or Fentora?

Page 306

1    A.   No.
2         MS. RUANE:  Object to the
3    form.
4  BY MS. HILLYER:
5    Q.   Would you have had
6  substantive discussions regarding chronic
7  pain in the context of Actiq or Fentora?
8    A.   No.
9    Q.   Would members of the market
10  access team, to your knowledge, have had
11  substantive discussions concerning
12  chronic pain, in the context of Actiq or
13  Fentora, with managed care entities?
14        MS. RUANE:  Object to form.
15        THE WITNESS:  No.
16  BY MS. HILLYER:
17    Q.   And would you have had
18  substantive discussions concerning acute
19  pain with managed care entities in the
20  context of Actiq or Fentora?
21        MS. RUANE:  Object to form.
22        THE WITNESS:  No.
23  BY MS. HILLYER:
24    Q.   Would members of the market

Page 307

1  access team have had substantive
2  discussions concerning acute pain with
3  managed care entities, in the context of
4  Actiq or Fentora, to your knowledge?
5        MS. RUANE:  Same objection.
6        MS. HILLYER:  You can
7    answer.
8        THE WITNESS:  Not to my
9    knowledge.
10  BY MS. HILLYER:
11    Q.   And did Cephalon or Teva
12  have a policy around those types of
13  discussions with managed care entities?
14    A.   Yes.
15    Q.   What was that?
16    A.   If it was not an approved
17  product and/or approved indication, if a
18  question was raised, the policy states
19  that you would say -- you would respond
20  by saying that we're not indicated for
21  whatever the question was, and if you
22  needed additional information, I'm happy
23  to send a MIRF; again, medical
24  information request form.

Page 308

1    Q.   And then, lastly, we talked
2  a little bit about Exhibit-16, which was
3  titled, Managed Care Presentation, Draft
4  for Review.
5         Just to clarify, did you
6  understand this to be a promotional
7  document?
8    A.   No.  This is, to me,
9  presented by a speaker.
10        MS. HILLYER:  I have no
11    further questions at this time.
12        MS. RUANE:  Just a few
13    follow-up, briefly.
14        - - -
15        EXAMINATION
16        - - -
17  BY MS. RUANE:
18    Q.   To be presented by -- the
19  last document you were looking at, that
20  would be to be presented by a speaker who
21  would be a physician compensated by Teva,
22  correct?
23    A.   Correct.
24    Q.   Do you know how much the

Page 309

1  physicians were compensated for speaking
2  and presenting slide decks like the one
3  before you?
4    A.   Fair market value.  I don't
5  know what that was.
6    Q.   Do you know how fair market
7  value was calculated?
8    A.   No.
9    Q.   You mentioned that there was
10  a policy regarding an approach -- or a
11  response if there were questions about
12  something beyond the indication.
13        Is that a written policy?
14    A.   I can't recall --
15        MS. HILLYER:  Objection to
16    form as to time.
17  BY MS. RUANE:
18    Q.   You can answer if you know.
19    A.   I don't recall -- what time
20  frame are you talking about?  Because --
21    Q.   Let's start during the time
22  frame of Teva.
23        Does Teva have a written
24  policy, to your knowledge, regarding the

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1  approach taken when a managed care entity
2  has questions about something beyond the
3  indication of a drug?
4       A.   We do have a managed care
5  reimbursement policy.
6       Q.   Is that the title of it,
7  managed care reimbursement policy?
8       A.   I don't recall the exact
9  title of it.
10      Q.   Do you believe that that
11 managed care reimbursement policy has,
12 the policy, a written policy within that
13 consistent with what you just described?
14      A.   To the best of my knowledge.
15 I have not read it recently.
16      Q.   What about during the time
17 of Cephalon, was there a written policy
18 at that time?
19      A.   I don't recall if it was
20 written or not.
21      Q.   You don't have a specific
22 memory of a written policy, during the
23 time that the company was Cephalon,
24 instructing the managed care folks on

Page 311

1  what to do if a managed care entity had a
2  question about something beyond the
3  indication?
4       MS. HILLYER:  Objection to
5  the form.  You're talking about a
6  long time frame.
7       But you can answer.
8       THE WITNESS:  You're asking
9  if there was a written policy?
10 BY MS. RUANE:
11      Q.   Yes.
12      A.   I don't recall if it was
13 written.  I just don't recall if it was
14 written.
15      Q.   Is there anything you can
16 think of where we could look to see a
17 document to confirm your memory that that
18 policy would have existed at the time
19 that the company was Cephalon?
20      A.   Old documents.  I don't
21 recall who -- again, we're talking about
22 a long span of time, and there's been an
23 evolution of modules and training and
24 sign-offs on various policies.

Page 312

1       Whoever in the organization
2  is -- compliance, typically, would be
3  the -- I would think -- and, again,
4  that's -- my first answer would be
5  compliance.
6       Q.   Okay.
7       MS. RUANE:  Thank you.
8  Nothing further.
9       VIDEO TECHNICIAN:  Going off
10 record.  3:37 p.m.
11          - - -
12      (Whereupon, a discussion off
13 the record occurred.)
14          - - -
15      VIDEO TECHNICIAN:  Back on
16 record.  3:38 p.m.
17          - - -
18      EXAMINATION
19          - - -
20 BY MR. GASTEL:
21      Q.   Good afternoon.  My name is
22 Ben Gastel, representing the plaintiffs
23 in the Tennessee cases that have been
24 cross-noticed into this deposition today.

Page 313

1       MR. GASTEL:  And I first
2  want to state, for the record,
3  that I object to the deposition,
4  on behalf of my clients, going
5  forward today due to Teva's
6  continuous failures to meet its
7  obligations as set forth in the
8  state and federal cooperation
9  protocol, as laid out in our
10 previous deposition records and
11 our pending motions to quash.
12      With that objection in mind,
13 I do have a handful of questions
14 for you.  Hopefully we will be
15 relatively short.  I assure you, I
16 will not be as long as your
17 previous questioners today.
18 BY MR. GASTEL:
19      Q.   As I stated, Ms. Bearer, the
20 group of plaintiffs that I'm representing
21 are located in Tennessee.
22      So I want to start, in your
23 work with Teva or Cephalon, did you ever
24 have the opportunity to travel to the

Page 314

1  state of Tennessee for your work?
2       A.   Not that I recall.
3       Q.   Would you agree that it's a
4  public health concern whenever
5  prescription opioids are illegally
6  diverted and consumed for nonmedical
7  purposes?
8            MS. HILLYER:  Objection to
9       form.
10           THE WITNESS:  Say it --
11      repeat the question to make sure I
12      answer you correctly.
13 BY MR. GASTEL:
14      Q.   Sure.
15           Would you agree that it's a
16 public health concern whenever
17 prescription opioids are illegally
18 diverted and consumed for nonmedical
19 purposes?
20           MS. HILLYER:  Same
21      objection.
22           THE WITNESS:  Yes.
23 BY MR. GASTEL:
24      Q.   Would you agree that it's a

Page 315

1  public health concern whenever
2  prescription opioids are consumed for
3  nonmedical purposes?
4            MS. HILLYER:  Objection to
5       form.
6            THE WITNESS:  Can you define
7       "nonmedical purposes"?
8  BY MR. GASTEL:
9       Q.   Well, in your mind, what are
10 the nonmedical reasons a person would
11 consume a prescription opioid?
12           MS. HILLYER:  Objection to
13      form.
14           THE WITNESS:  You asked the
15      question, so if you could just
16      give me the context of the
17      question.
18 BY MR. GASTEL:
19      Q.   Well, sure.  And so let's
20 take it in two parts here.
21           In your mind, what are the
22 nonmedical reasons that a person would
23 consume a prescription opioid?
24           MS. HILLYER:  Objection to

Page 316

1  form.  Calls for speculation.
2            THE WITNESS:  That would be
3       speculating.
4  BY MR. GASTEL:
5       Q.   So you don't have in your
6  mind any reason why somebody would
7  consume an opioid for a nonmedical
8  reason?
9            MS. HILLYER:  Objection to
10      form.  Calls for speculation.
11           THE WITNESS:  Again,
12      individuals have different reasons
13      for that behavior.  I can't speak
14      to it.
15 BY MR. GASTEL:
16      Q.   Do you have any
17 understanding about why individuals
18 consume opioids for nonmedical purposes?
19           MS. HILLYER:  Same
20      objections.  And now asked and
21      answered.
22           THE WITNESS:  Again, I
23      could -- there are probably
24      numerous reasons.  And I don't

Page 317

1  have any personal knowledge,
2       personally, of consuming opioids
3       for nonmedical reasons.
4  BY MR. GASTEL:
5       Q.   Can you get high from
6  consuming prescription opioids?
7            MS. HILLYER:  Objection.
8       Calls for speculation.
9            THE WITNESS:  I have no
10      personal knowledge of whether
11      someone can get high or not, based
12      personally on my own experience.
13 BY MR. GASTEL:
14      Q.   And you've never heard of
15 people getting high off of prescription
16 opioids?
17      A.   I hear a lot of things.  So,
18 again, you're asking me specifically
19 about my interpretation of getting high.
20           And I -- as far as having an
21 opinion about that, I know what I hear in
22 the media.  But no personal experience
23 with that.
24      Q.   I'm not asking you if you've

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1  ever been high.
2        I'm asking you if you have
3  an understanding of whether or not people
4  get high from prescription opioids?
5        MS. HILLYER:  Hold on.
6     Asked and answered.  She's
7     testified that she's heard in the
8     news about this, she has no
9     personal experience.
10       She's here as a fact witness
11    to testify about her personal
12    experience.
13       If you want to ask her about
14    that, go ahead.  But she's
15    answered your question.
16       MR. GASTEL:  Are you
17    directing her not to answer?
18       MS. HILLYER:  No.
19 BY MR. GASTEL:
20    Q.   You can answer.
21    A.   I have no personal
22 experience relative to individuals
23 getting high off of opioids.
24    Q.   In 2015, did you believe

Page 319

1  that there was a public health crisis of
2  abuse and addiction as it relates to
3  opioids?
4        MS. HILLYER:  Objection to
5     form.
6        THE WITNESS:  Did I have a
7     personal -- repeat it, I'm sorry.
8     I'm just --
9  BY MR. GASTEL:
10    Q.   In 2015 --
11    A.   2015.
12    Q.   -- did you believe that
13 there was a public health crisis of abuse
14 and addiction as it relates to opioids?
15       MS. HILLYER:  Same
16    objection.
17       THE WITNESS:  Yeah, I
18    don't -- you're asking my personal
19    belief?
20 BY MR. GASTEL:
21    Q.   Yes.
22    A.   Again, with no firsthand
23 knowledge, but data would suggest, in the
24 public domain, that that is correct.

Page 320

1     Q.   I'll show you a document
2  that we'll mark as Exhibit-22.
3        - - -
4        (Whereupon, Teva-Bearer
5     Exhibit-22,
6     TEVA_MDL_A_09218160-165, was
7     marked for identification.)
8        - - -
9        MR. GASTEL:  I've got a copy
10    for you, too.
11       MS. HILLYER:  Thank you.
12 BY MR. GASTEL:
13    Q.   You see that Exhibit-22 is
14 an e-mail that you sent to various
15 individuals on June 4th, 2015?
16       Do you see that?
17    A.   I do see that.
18    Q.   And the subject is the Time
19 Magazine Cover Story, Why America Can't
20 Kick Its Painkiller Problem.
21       Did I read that correctly?
22    A.   Yes.
23    Q.   And then in the subject of
24 the e-mail you write, All, more news

Page 321

1  highlighting the public health crisis of
2  abuse and addiction.  Regards, Deb.
3        Did I read that correctly?
4     A.   You did.
5     Q.   And the e-mail goes on to
6  forward this cover story for Time
7  Magazine.
8        And if we go to the last
9  page of this exhibit, there is a picture
10 of the cover of the Time Magazine
11 article, and the cover says, They're the
12 most powerful painkillers ever invented
13 and they're creating the worst addiction
14 crisis America has ever seen.
15       Did I read that correctly?
16    A.   Yes.
17    Q.   And you forwarded this to
18 some of your colleagues at Teva, correct?
19    A.   Yep.
20    Q.   And it looks like you also
21 included some people from Insight
22 Strategies?
23    A.   Yes.
24    Q.   Who are Steve Reid and Harry

Page 322

1  Schiavi?
2      A.   Yes, Schiavi.
3          They work for a managed
4  care -- they are strategic partners, a
5  third party, that have conducted payer
6  research, analog assessment, et cetera.
7      Q.   So they were a vendor --
8      A.   Correct.
9      Q.   -- that Teva would use as
10  part of its marketing and promotion to
11  managed care organizations?
12      A.   Correct.
13      Q.   And why did you think it was
14  important that they saw this Time
15  Magazine article?
16          MS. HILLYER:  Objection to
17      form.
18          THE WITNESS:  As I stated
19      previously, there was a lot of
20      information in the public domain
21      concerning this.  And, therefore,
22      I felt it was important, as we as
23      an organization were looking at
24      abuse, this was in preparation for

Page 323

1      Vantrela.  That would be the
2      reason.
3  BY MR. GASTEL:
4      Q.   Sure.
5          And then -- now that you've
6  looked at this e-mail, does this refresh
7  your recollection that in 2015 you
8  believed that there was a public health
9  crisis of abuse and addiction?
10      A.   I said this is news
11  highlighting the public crisis, that was
12  in the public domain.
13          You asked me previously if
14  it was my personal.  And I answered the
15  question that I have no personal
16  experience with any individual or
17  individuals experiencing opioid
18  addiction.
19      Q.   And that's fine.
20          But you're the one who chose
21  the language that's used in this e-mail,
22  right?
23      A.   That's correct.
24      Q.   And if you didn't believe

Page 324

1  that we were in the midst of a public
2  health crisis of abuse and addiction, why
3  did you use that in your e-mail?
4      A.   I didn't say that --
5          MS. HILLYER:  Objection to
6      form.
7          THE WITNESS:  What I'm
8      saying to you is, this is the type
9      of information that payers are
10      also -- it's public information.
11          And as it relates to our
12      customers, they read this
13      information as well.
14  BY MR. GASTEL:
15      Q.   I want to go through some of
16  the things that this article highlights.
17          The last paragraph on the
18  first page ending in 160, do you see
19  where it starts, This is not?
20          Are you with me?
21      A.   That paragraph, yes.  This
22  is not a story.
23      Q.   It says, This is not a story
24  about dark alleys and drug dealers.  It

Page 325

1  starts in doctors' offices with everyday
2  people seeking relief from pain and
3  suffering.  Around the nation, doctors so
4  frequently prescribe the drugs known as
5  opioids for chronic pain from conditions
6  like arthritis, migraines, and lower back
7  injuries, that there are enough pills
8  prescribed every year to keep every
9  American adult medicated around the clock
10  for a month.
11          Did I read that correctly?
12      A.   You did.
13      Q.   When you forwarded this
14  article to your colleagues at Teva and
15  your third-party vendors that you worked
16  with, did you agree with that statement
17  in this article?
18          MS. HILLYER:  Objection to
19      form.
20          THE WITNESS:  That's not
21      referenced.  It's simply what was
22      written.
23          If they put a reference, I
24      would have more reason to have an

Page 326

1    opinion.  I would have an opinion.
2  BY MR. GASTEL:
3    Q.   The paragraph goes on there,
4  The longer patients stay on the drugs,
5  which are chemically related to heroin
6  and trigger a similar biological
7  response, including euphoria, the higher
8  the chances users will become addicted.
9        Did I read that correctly?
10   A.   You did.
11   Q.   When you forwarded this
12 article to your colleagues at Teva and
13 your third-party vendors, did you agree
14 with this statement made in this article?
15       MS. HILLYER:  Objection to
16   form.
17       THE WITNESS:  I didn't have
18   an opinion about this statement
19   when I forwarded the e-mail.
20 BY MR. GASTEL:
21   Q.   Do you have an opinion now?
22   A.   There's no reference here
23 specific to what they're quoting.  And as
24 I mentioned earlier, there's a lot of

Page 327

1  information in the public domain, which
2  we take seriously, and we, obviously,
3  were looking at an abuse-deterrent
4  treatment option for patients physicians
5  deemed appropriate for an abuse-deterrent
6  formulation of opioids.
7    Q.   Are you done?
8    A.   Yeah, I'm sorry.
9    Q.   That's all right.  I was
10 just making sure you were done.
11       The article goes on.  When
12 doctors, regulators and law enforcement
13 officials try to curb access, addicted
14 patients buy pills on the black market,
15 where they are plentiful.
16       Did I read that correctly?
17   A.   Yes, you did.
18   Q.   When you forwarded this
19 article to your colleagues at Teva and
20 your third-party vendors, did you agree
21 with this statement made in this article?
22       MS. HILLYER:  Objection to
23   form.
24       THE WITNESS:  I didn't have

Page 328

1    an opinion about that -- that
2    statement.
3  BY MR. GASTEL:
4    Q.   Going down farther into the
5  next paragraph, the sentence beginning,
6  Of the 9.4 million Americans who take
7  opioids.
8        Do you see that?
9    A.   Where am I looking at?
10   Q.   The third line down,
11 three-quarters of the page over.
12   A.   I see it.  Thank you.
13   Q.   It says, Of the 9.4 million
14 Americans who take opioids for long-term
15 pain, 2.1 million are estimated by The
16 National Institutes of Health to be
17 hooked and are in danger of turning to
18 the black market.
19       Did I read that correctly?
20   A.   Yes.
21   Q.   When you forwarded this
22 article to your colleagues at Teva, did
23 you have any reason to dispute this
24 statistic from The National Institutes of

Page 329

1  Health as relayed by this Time Magazine
2  article?
3        MS. HILLYER:  Objection to
4    form.  Lack of foundation.
5        THE WITNESS:  Did I have any
6    reason to dispute it?
7  BY MR. GASTEL:
8    Q.   Yes.
9    A.   Again, other than the
10 reference to The National Institutes of
11 Health, of which I've not seen the actual
12 data, this is just a statement to me, of
13 which I don't have an opinion if it's
14 accurate or not.
15   Q.   Did you ever tell any of
16 your colleagues that you thought that The
17 National Institutes of Health was
18 overestimating the number of Americans
19 that are hooked and in danger of turning
20 to the black market?
21   A.   I don't have any
22 recollection of having a conversation.
23   Q.   Going down, skipping down
24 two paragraphs with the paragraph

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1 beginning, All now agree.
2        Do you see that?
3    A.   Yes.
4    Q.   About a quarter of the way
5 down the page.
6        All now agree that the
7 opioid epidemic is a terrible problem,
8 but few are taking responsibility.  It
9 has fallen to local law enforcement and
10 health professionals to clean up the mess
11 as addiction and abuse ravage their
12 communities.
13        Did I read that correctly?
14    A.   Yes, you did.
15    Q.   When you forwarded this
16 e-mail to your colleagues at Teva and
17 your third-party vendors, did you have
18 any reason to dispute that claim in the
19 Time Magazine article?
20        MS. HILLYER:  Same
21     objections.
22        THE WITNESS:  Once again,
23     there's no specific reference to
24     where they cite this data.

Page 331

1     Therefore, I don't have an
2     opinion.
3 BY MR. GASTEL:
4    Q.   Did you tell any of your
5 colleagues, or do you recall telling any
6 of your colleagues, that you thought Time
7 Magazine was wrong when they claimed that
8 local law enforcement and health
9 professionals were left to clean up the
10 mess?
11        MS. HILLYER:  Objection to
12     form.
13        THE WITNESS:  I don't recall
14     having any conversation.
15 BY MR. GASTEL:
16    Q.   I'm going to flip over to
17 the next page, the one ending with Bates
18 stamp 162.
19    A.   Okay.
20    Q.   And about halfway down,
21 there's a paragraph beginning, In some
22 cases.
23        Do you see that paragraph?
24    A.   I'll read it here.

Page 332

1        Okay.  Got it.  Thank you.
2    Q.   It says, In some cases,
3 regulators, doctors and patients were
4 criminally misled into believing opioids
5 were safe and effective.  In 2007, the
6 Department of Justice accused Purdue of
7 deceptively telling doctors that
8 OxyContin was safer and less addictive
9 than other drugs.
10        Did I read that correctly?
11    A.   You did.
12    Q.   When you forwarded this to
13 your colleague at Teva and your
14 third-party vendors, did you know about
15 the Department of Justice accusing Purdue
16 of deceptively marketing OxyContin?
17    A.   I don't recall whether I
18 knew at that time or not, when I
19 forwarded the message.  The message was
20 forwarded almost three years ago.  So I
21 don't recall.
22    Q.   Do you -- did you
23 subsequently do research into the
24 Department of Justice's accusations

Page 333

1 against Purdue about its deceptive
2 marketing of OxyContin?
3    A.   I don't recall doing any
4 research into the Department of Justice.
5    Q.   Are you aware of whether or
6 not the Department of Justice brought
7 criminal charges against Purdue in
8 Virginia, near the Tennessee border?
9    A.   I have -- no, I don't know.
10        MS. HILLYER:  Objection.
11     Assumes facts not in evidence.
12 BY MR. GASTEL:
13    Q.   That paragraph goes on to
14 say that, The company and several
15 executives pleaded guilty to misleading
16 doctors and were fined $635 million.
17        Did I read that correctly?
18    A.   You did.
19    Q.   Did you know about Purdue's
20 guilty plea and their fine of $635
21 million when you forwarded this e-mail?
22    A.   I can't speak to what I knew
23 at the time I forwarded the e-mail.
24    Q.   The paragraph goes on to

Page 334

1 talk about something that you probably do
2 have knowledge on.
3      It says, In 2008, Cephalon
4 paid $425 million in fines, partly for
5 marketing its Actiq opioid, which was
6 shaped like a lollipop, for use against
7 migraines and sickle-cell pain,
8 conditions for which the drug had not
9 been found safe and effective.
10      Did I read that correctly?
11   A.  You did.
12   Q.  And then the article goes on
13 to say, Actiq withdrew its lollipop but
14 by then there was no shortage of other
15 opioids available.
16      Did I read that correctly?
17   A.  You did.
18   Q.  When you forwarded this
19 article to your colleagues at Teva and
20 your third-party vendors, you were aware
21 that Cephalon had paid the $425 million
22 fine, correct?
23   A.  Correct.
24   Q.  And that that was, in part,

Page 335

1 due to its marketing of Actiq opioids,
2 correct?
3   A.  In part.
4   Q.  Is that a yes?
5   A.  Yes, in part.
6     I'm sorry.
7   Q.  And in 2008, did you
8 personally have a role in marketing
9 Cephalon's Actiq product?
10     MS. HILLYER:  Objection to
11     the form.
12     THE WITNESS:  2008?
13 BY MR. GASTEL:
14   Q.  Yes.
15   A.  Yes.
16   Q.  I think I'm done with that
17 article.
18       - - -
19     (Whereupon, Teva-Bearer
20     Exhibit-23,
21     TEVA_MDL_A_03967973-979, was
22     marked for identification.)
23       - - -
24     MR. GASTEL:  I'm going to

Page 336

1     hand you another document that
2     we'll mark as Exhibit-23.
3 BY MR. GASTEL:
4   Q.  This is an e-mail from
5 Yousseff Kahn, sent to a variety of
6 people, including you, on August 24th,
7 2015.
8      Do you recall receiving this
9 e-mail?
10   A.  I don't actually recall, but
11 I must have received it.  I'm on the
12 e-mail chain.
13   Q.  Sure.
14      And the subject is, CI news,
15 opioid use disorder, the continued rise
16 of opioid abuse and misuse.
17      Did I read that correctly?
18   A.  You did.
19   Q.  And it appears to be an
20 article written by Bill McCarberg.
21   A.  Yes.
22   Q.  Are you familiar with Dr.
23 McCarberg?
24   A.  I know the name, but I don't

Page 337

1 know specifically Dr. McCarberg.
2   Q.  And going down to the second
3 full paragraph beginning, In 2013.
4      Do you see that?
5   A.  Yes.
6   Q.  The article states, In 2013
7 in the United States, 40,982 deaths by
8 drug overdose occurred.  Of these, 16,235
9 were the result of opioid analgesics.
10      Did I read that correctly?
11   A.  You did.
12   Q.  And the article states that
13 that's equivalent to 46 deaths every day.
14      Did you have any reason to
15 dispute those statistics when you
16 received this e-mail in August of 2015?
17   A.  I don't have the references.
18 If it's referenced, then I would have no
19 reason to dispute it, until I read the
20 reference and determined whether it was
21 appropriate or not.
22   Q.  And the article goes on to
23 state that, While the age-adjusted rate
24 for drug overdose deaths related to

Page 338

1 opioids increased at a rate of 19 percent
2 per year from 2000 to 2006, the rates
3 slow down from 2 percent from 2006 to
4 2013.
5          Did I read that correctly?
6      A.   Yes.
7      Q.   It says, The age-adjusted
8 rate for opioid overdose deaths declined
9 from 5.4 to 5.1 per 100,000 from 2010 to
10 2013.
11          Did I read that correctly?
12      A.   Yes.
13      Q.   Do you have any reason to
14 doubt that those statistics were accurate
15 when you received this e-mail back in
16 2015?
17      A.   Again, I don't recall
18 receiving it.  Therefore, I don't know
19 what my impression was at the time.
20          It appears -- I don't see a
21 reference.
22      Q.   And then --
23      A.   Yes, it is referenced.
24 Sorry.

Page 339

1      Q.   Assuming those statistics
2 are true --
3      A.   Yes.
4      Q.   -- would you characterize
5 that, personally, as an opioid crisis?
6          MS. HILLYER:  Objection to
7      form.  Lack of foundation.  Calls
8      for speculation.
9          THE WITNESS:  Opioid crisis?
10          MS. HILLYER:  And assumes
11      facts not in evidence.
12          THE WITNESS:  Yeah, based on
13      this article, I would not -- I
14      would not -- I don't recall ever
15      having a personal discussion or
16      professional discussion around --
17      based on this article.  The
18      crisis, I don't recall that.
19 BY MR. GASTEL:
20      Q.   And so --
21      A.   The crisis.
22      Q.   -- we've looked now at a
23 couple of articles that you received in
24 2015 as it relates to what you described

Page 340

1 as the public health crisis of abuse and
2 addiction.
3          And I think your testimony
4 previously was that you started receiving
5 these when you were putting together
6 business plans and marketing promotional
7 efforts for Vantrela; is that correct?
8          MS. HILLYER:  Objection.
9      Mischaracterizes testimony on a
10      couple of counts.
11          But you can answer.
12          THE WITNESS:  The way I'm
13      making that -- I'm giving that
14      information is based on the date.
15 BY MR. GASTEL:
16      Q.   Sure.
17      A.   In preparation -- if the
18 date aligned with preparation for the
19 strategy, et cetera, for Vantrela, then
20 the answer would be yes.
21      Q.   And what do you mean by the
22 strategy for Vantrela?
23      A.   The payer strategy, as was
24 described previously for any product.

Page 341

1      Q.   And the payer strategy being
2 the way that you were going to promote in
3 marketing -- and market Vantrela to
4 third-party payers, right?
5      A.   Correct.
6      Q.   And a big part of that was
7 going to be promoting it as an abuse
8 deterrent, correct?
9      A.   Correct.
10      Q.   And you were going to do
11 that because the opioids on the market
12 were subject to abuse and misuse,
13 correct?
14          MS. HILLYER:  Objection to
15      form.
16          THE WITNESS:  There were
17      abuse-deterrent formulations
18      available, as well as
19      nonabuse-deterrent formulations
20      available.
21 BY MR. GASTEL:
22      Q.   Well, we have just gone
23 through some articles going through --
24 that you forwarded and that you received

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1  talking about opioid abuse, right?
2      A.   Right.
3      Q.   And so -- and you believe
4  that you received these articles as part
5  of developing the Vantrela payer
6  strategy, right?
7      A.   Correct.  Yes.
8      Q.   And it would only make sense
9  to market Vantrela as an abuse deterrent
10 to these third-party payers if they were
11 on the market at that time, prescription
12 opioids, that were subject to abuse,
13 right?
14         MS. HILLYER:  Objection to
15     form.
16         THE WITNESS:  Once again,
17     it's a treatment option the
18     physicians would have, based on
19     identifying appropriate patients,
20     that they could then determine if
21     an abuse-deterrent formulation of
22     an opioid was appropriate.
23 BY MR. GASTEL:
24     Q.   And so do you recall the

Page 343

1  active opioid ingredient in Vantrela?
2      A.   Hydrocodone.
3      Q.   And was the purpose of
4  trying to sell Vantrela an attempt to
5  displace some of the current hydrocodone
6  market?
7         MS. HILLYER:  Objection to
8     form.
9         THE WITNESS:  It was, again,
10     another option for physicians,
11     when they determined it was
12     appropriate to prescribe for a
13     patient an abuse-deterrent
14     formulation, which is just another
15     treatment option.
16         - - -
17     (Whereupon, Teva-Bearer
18     Exhibit-24,
19     TEVA_MDL_A_03551263-266, with
20     attachment, was marked for
21     identification.)
22         - - -
23 BY MR. GASTEL:
24     Q.   Let me show you a document

Page 344

1  that we'll mark as Exhibit-24.
2         MR. GASTEL:  This is
3  actually Exhibit-2.
4         MS. HILLYER:  Do you have a
5  copy for me?
6         MR. GASTEL:  Yes, I'm sorry.
7         MS. HILLYER:  That's okay.
8         Thanks.
9  BY MR. GASTEL:
10     Q.   So this is a long e-mail
11 string that begins on March 11, 2016.
12 And it looks like you are eventually
13 forwarded this string on Thursday, April
14 14th, 2016.
15         Do you see that?
16     A.   Yes, I do.
17     Q.   Do you recall receiving this
18 e-mail?
19     A.   I don't recall.
20     Q.   Let's flip through it a
21 little bit and set the stage, if you
22 will.
23         The e-mail chain begins with
24 an e-mail from Jeffrey Callahan --

Page 345

1      A.   Correct.
2      Q.   -- to Dana Kelly on March
3  11, 2016.
4         Do you see that?
5      A.   I do.
6      Q.   Who is Mr. Callahan?
7      A.   He was in forecasting.
8      Q.   And who is Ms. Kelly?
9      A.   Finance.
10     Q.   And it says, Good morning,
11 Dana.  Attached is the template that
12 provides you with units for new IR hydro
13 and oxy scenarios that we constructed
14 yesterday.
15         Did I read that correctly?
16     A.   You did.
17     Q.   And IR hydro and oxy is a
18 reference to immediate-release
19 hydrocodone and Oxycodone?
20     A.   Correct.
21     Q.   And those are prescription
22 opioids, right?
23     A.   Yes.
24     Q.   And it looks like Mr.

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1  Callahan forgot to attach the document.
2        And so he sends another
3  e-mail that says, It would help if I
4  remembered to attach the file.
5        Do you see that?
6     A.  Yes, I do.
7     Q.   And then on March 15th,
8  2016, Ms. Kelly responds, Hello.  Please
9  find the LRP units for IR hydro and oxy
10 attached.
11       Did I read that correctly?
12    A.   Yes.
13    Q.   What does "LRP units" mean?
14       MS. HILLYER:  Objection to
15 the extent it calls for
16 speculation.
17       THE WITNESS:  I don't know.
18 BY MR. GASTEL:
19    Q.   Well, I'm happy that I can
20 also be confused on that term, then, too.
21       Going back up, eventually
22 when you joined the e-mail chain, I
23 believe, on April 14th, 2016, at the top
24 of the second page of this document, with

Page 347

1  Bates stamp ending 264, Mr. Jeffrey
2  Dierks forwards you this e-mail chain.
3        Do you see that?
4     A.   I do.
5     Q.   I think you've previously
6  testified.
7        But just again for the
8  record, who is Mr. Dierks?
9     A.   He was the brand director
10 for Vantrela.
11    Q.   And in his role as brand
12 director for Vantrela, he was the person
13 who was principally involved in
14 attempting to market and develop
15 promotional material for Vantrela; is
16 that fair?
17    A.   His team, yes.
18    Q.   And it says, Deb, welcome
19 any of your thoughts on the below, as we
20 need to finalize some of the assumptions
21 for the development of the IR P&Ls.
22       Did I read that correctly?
23    A.   Yes.
24    Q.   And is the term "IR P&Ls" a

Page 348

1  reference to immediate-release profit and
2  loss?
3     A.   Yes.
4     Q.   So is it fair to say that
5  Mr. Dierks is at least partly trying to
6  figure out with this analysis whether or
7  not Teva could make money from marketing
8  and selling Vantrela?
9        MS. HILLYER:  Objection.
10 Calls for speculation.
11       THE WITNESS:  This, as I
12 read it, is in reference to
13 another product, Valzedo, which we
14 were looking potentially -- and,
15 again, I'm reading this, so I
16 believe this is what it was
17 referring to, not Vantrela --
18 Valzedo, which was an
19 immediate-release version of
20 hydrocodone.
21 BY MR. GASTEL:
22    Q.   And so eventually you,
23 again, flipping over to the next page,
24 you send an e-mail to Joseph Smith.

Page 349

1        Do you see that?
2     A.   Yes.
3     Q.   And it says, What were the
4  assumptions by channel?  I know we
5  typically assume 78 -- 70 to 80 percent
6  commercial.  With the new forecast, did
7  anything change?
8        Did I read that correctly?
9     A.   You did.
10    Q.   What does that mean, that
11 "we typically assume 70 to 80 percent
12 commercial"?
13    A.   Well, when we look at the
14 patient population for branded products,
15 we assume, based on data, that 70 to 80
16 percent of the patients will have
17 commercial insurance for which we are
18 promoting the product.
19       And I'm asking if that
20 changed, because Joe also is a
21 forecaster.
22    Q.   Got it.
23       And then he responds back
24 with this breakdown, right, in the e-mail

Page 350

1  dated April 18th, 2016 at 7:10 a.m.?
2        Do you see that?
3     A.   Yes.
4     Q.   And it says, Was looking for
5  you Friday and just connected with Jeff
6  and found out you were out until
7  Thursday. I'd assume the below splits
8  based off the IMS data, since they
9  probably won't change significantly.
10       Did I read that correctly?
11    A.   Yes.
12    Q.   And then he provides a
13 breakdown between Medicaid, cash,
14 commercial, and Part D --
15    A.   Yes.
16    Q.   -- correct?
17    A.   Yes.
18    Q.   And this is, essentially,
19 various ways that end users of
20 prescription opioids can pay for those
21 opioids, right?
22    A.   That, you know, are
23 reimbursed.
24    Q.   And what do you mean by

Page 351

1  "reimbursed"?
2     A.   Your question, I believe,
3  was about patients. Patients pay cash.
4  Medicaid, commercial and Part D are
5  insurers. Therefore, the insurer
6  reimburses, for the patient, the cost of
7  the drug.
8     Q.   And then the reference to
9  IMS data, that's IMS Health data, right?
10    A.   Yes.
11    Q.   For the record, will you
12 just explain what IMS data is?
13       MS. HILLYER:  Objection to
14    the extent it calls for
15    speculation.
16       THE WITNESS:  They have a
17    variety of data. And its claims
18    data, prescription -- typically,
19    claims data. And it's used for --
20    to assess utilization.
21 BY MR. GASTEL:
22    Q.   Sure. And I want to take a
23 look at some of this IMS data that you
24 were forwarded in this e-mail from Mr.

Page 352

1  Joseph Smith on April 18th, 2016. And
2  it's attached to Exhibit-24.
3     A.   Okay.
4     Q.   And I believe it's the fifth
5  page of this exhibit.
6        And it says, across the
7  top -- it's an Excel spreadsheet --
8        MS. HILLYER:  Sorry, again,
9     just for the record, these are not
10    consecutive Bates.
11       MR. GASTEL:  Yeah, well,
12    it's the attachment to the April
13    18th, 2016 e-mail.
14       MS. HILLYER:  Then it would
15    be consequent -- there's no
16    attachment. Which April 18th?
17       MR. GASTEL:  From Joseph
18    Smith.
19       MS. HILLYER:  So the middle,
20    the second e-mail chain, okay.
21       So do you have that -- it's
22    just not consecutive, so we don't
23    actually have, sitting here
24    today --

Page 353

1        MR. GASTEL:  I don't Bates
2     stamp them, you Bates stamp them.
3        MS. HILLYER:  I do.
4        MR. GASTEL:  If you want the
5     exhibits consecutive with the
6     e-mails they're attached to, Bates
7     stamp them that way.
8        MS. HILLYER:  We do. This
9     is not a consecutive -- there's no
10    attachment to this top e-mail,
11    which has no attachment, so it is
12    consecutively Bates, if it was
13    attached to the second. You just
14    didn't print that out and bring it
15    as an exhibit. And that's not our
16    fault.
17       And I just want to make it
18    clear for the record that there's
19    two different Bates numbers and
20    you should probably put in the
21    record what those Bates numbers
22    are for future reference, so
23    nobody gets confused.
24       MR. GASTEL:  Well,

Page 354

1     regardless, the attachment is --
2 was produced natively to us as
3 Bates stamp document
4 TEVA_MDL_A_03550081.
5 BY MR. GASTEL:
6     Q.   And across the top on this
7 document it says, Product.
8         Do you see that?
9     A.   Yes.
10     Q.   And that would indicate that
11 this is the product of IMS Health data
12 that's been collected, correct?
13     A.   Yes. It would appear that,
14 yes.
15     Q.   And the next column over, it
16 says, MAT, March 2014, Medicaid TRx.
17         Do you see that?
18     A.   I do.
19     Q.   Is that a -- is that a
20 reference to a monthly average total?
21         MS. HILLYER: Objection to
22     the extent it calls for
23     speculation.
24         THE WITNESS: I don't know.

Page 355

1     I didn't run the report.
2 BY MR. GASTEL:
3     Q.   But you received it, right?
4     A.   Well, to the point you made
5 earlier, just because it says -- I don't
6 know -- this was a long trail of
7 forwarded. It doesn't necessarily mean
8 he forwarded me the attachment.
9         I don't recall receiving it,
10 is what I'm trying to say.
11     Q.   Well, let's go back to the
12 e-mail chain there.
13         Because it finishes off with
14 an e-mail from you to Joseph Smith that
15 says, Sorry I missed you on Friday. As
16 of now, I would use these assumptions.
17     A.   Yes.
18     Q.   Right? That's what it says?
19     A.   That has nothing to do with
20 the attachment. That's these assumptions
21 at the bottom here, the channel --
22     Q.   So --
23     A.   -- not at the bottom, the
24 Medicaid, cash --

Page 356

1         MS. HILLYER: Wait. One at
2 a time.
3         THE WITNESS: Pardon me?
4         MS. HILLYER: One at a time.
5 BY MR. GASTEL:
6     Q.   So that doesn't refresh your
7 recollection as to whether or not you
8 looked at the attachment?
9         MS. HILLYER: Objection to
10     form. Improper refreshing. And
11     mischaracterizes the document.
12         THE WITNESS: Typically,
13     this type of data is summarized by
14     either someone in forecasting, et
15     cetera. And this is the summary
16     that I would have looked at,
17     rather than scrutinizing the Excel
18     sheet.
19 BY MR. GASTEL:
20     Q.   Sure. So you would have --
21     A.   They are the experts on IMS
22 data.
23     Q.   So you would have looked at
24 the analysis, is that what you're saying,

Page 357

1 to determine whether or not the
2 assumptions were correct?
3     A.   I don't recall ever
4 receiving this document. These
5 colleagues are the experts in our company
6 that provide forecasting information. I
7 would have no reason to challenge their
8 summary, which, to me, is what I'm
9 looking at here, which is Medicaid, cash,
10 commercial, Part D.
11     Q.   Well, let's go to the last
12 page, then.
13     A.   Okay.
14     Q.   Okay. And you see that the
15 last page of this document has some
16 numbers on it.
17         Let's do the second-to-last
18 page, okay? Do you see that it has --
19 the very bottom page says, Medicaid,
20 4,339,185, 4.62 percent.
21         Do you see that?
22         MS. HILLYER: No.
23 BY MR. GASTEL:
24     Q.   Very last column.

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1     A.  I see that, yes.

2     Q.  So go back to the e-mail

3 that you received --

4     A.  Yes.

5     Q.  -- on April 18th, 2016.

6     And it says, Medicaid, the

7 exact same numbers and exact same

8 percentage.

9     Do you see that?

10     A.  I do.

11     Q.  Let's flip to the last page,

12 the one labeled cash, 6,658,519, 6.99

13 percent.

14     Do you see that?

15     A.  I do.

16     Q.  Let's go back to your e-mail

17 that you received on April 18th, 2016.

18     Exact same numbers for cash,

19 right?

20     A.  Yes.

21     Q.  Commercial, last page,

22 57,485,347, 60.36 percent.

23     Do you see that?

24     A.  I do.

Page 359

1     Q.  And I read that correctly?

2     A.  I believe you did.

3     Q.  And then it's the exact same

4 number in the e-mail of April 18th, 2016,

5 right?

6     A.  Right.

7     Q.  And then Part D, again, on

8 the last page, 26,699,350.

9     Did I read that correctly?

10     A.  You did.

11     Q.  28.03 percent.

12     Did I read that correctly?

13     A.  You did.

14     Q.  And then if you flip back to

15 the e-mail on April 18th, 2016, it's the

16 exact same numbers there in that e-mail,

17 right?

18     A.  Yes.

19     Q.  To which you responded, You

20 can use those assumptions, right?

21     A.  Yes.

22     Q.  And then if you take a look

23 at what that document is summarizing,

24 again, going back to the second-to-last

Page 360

1 page, you see, in what is essentially the

2 product column, it's HYCD/APAP.

3     All the way down.

4     A.  I see.

5     MS. HILLYER:  This is what

6 he's looking at.

7     THE WITNESS:  No, I know

8 what he's looking at.  I'm looking

9 at the previous to see -- yes.

10 Okay.

11 BY MR. GASTEL:

12     Q.  And is it your understanding

13 that that's a reference to hydrocodone

14 with acetaminophen?

15     A.  Yes.

16     Q.  And so according to this IMS

17 Health database that you were forwarded

18 on April 8th, 2016, there were

19 approximately, if I'm doing my math

20 right, 95 million prescriptions for these

21 hydrocodone products?

22     MS. HILLYER:  Objection.

23 Calls for speculation.  Lack of

24 foundation.  She's testified she

Page 361

1 doesn't recall ever receiving

2 this, reviewing it, and had

3 nothing to do with it.

4     MR. GASTEL:  She received

5 the e-mail that has this data in

6 it.  And she told --

7     MS. HILLYER:  She doesn't

8 recall that.  And she said --

9     MR. GASTEL:  And she told

10 her colleague --

11     MS. HILLYER:  Hold on.  Let

12 me state my objection.

13     MR. GASTEL:  -- that she --

14 that he can go ahead and use the

15 assumptions.

16     MS. HILLYER:  For the

17 record, she testified that she

18 doesn't recall receiving this.

19 This document doesn't reflect that

20 she received this.  She testified

21 that the assumptions were in

22 reference to the substance of what

23 he wrote in the underlying e-mail,

24 not in this attachment.

Page 362

1    You can ask your question
2  and she can answer it.  But my
3  objections are on the record.
4    THE WITNESS:  Rephrase,
5  sorry.
6  BY MR. GASTEL:
7    Q.    So if I'm doing my math
8  right, that's 95 million prescriptions,
9  right?
10    MS. HILLYER:  Same
11  objections.
12    THE WITNESS:  Well, I'm not
13  adding it up, so I'll -- if you
14  want to add all this together and
15  it comes to that, I'll believe
16  you.
17  BY MR. GASTEL:
18    Q.    Well, let's just do simple
19  math.
20    What's 56 plus 26?
21    A.    Okay.  I got you.
22    MS. HILLYER:  You're asking
23  her to do the math?
24    THE WITNESS:  You're asking

Page 363

1  me to do the math?
2    MS. HILLYER:  Give her a
3  calculator.  I mean, come on,
4  she's here as a fact witness.
5  This is -- I mean, at some
6  point --
7    MR. GASTEL:  You're the one
8  who is making this hard.  Don't
9  get mad at me.
10    MS. HILLYER:  If you want
11  her to do the math, give her --
12    MS. GASTEL:  You're the one
13  who's making this hard.
14    MS. HILLYER:  -- put the
15  math up there.
16    No, I'm not.  She has
17  nothing to do with this document.
18    And somebody asked for a
19  break.  So after this answer,
20  we'll take a break.
21    And just for the record, Ms.
22  Bearer, why don't you state what
23  you're actually doing, the math.
24    THE WITNESS:  I'm taking the

Page 364

1  totals that were provided on the
2  e-mail for the channels of
3  Medicaid, cash, commercial and
4  Part D, and I'm adding them
5  together.
6    Unless I did it incorrectly,
7  it comes to -- what I show, unless
8  I made a mistake, it's 95,242,401.
9    MS. HILLYER:  Just leave it,
10  in case there's more math.
11  BY MR. GASTEL:
12    Q.    And that was derived,
13  according to this e-mail, from the IMS
14  data that Joe sent to you on April 18th,
15  2016?
16    MS. HILLYER:  Objection to
17  form.  You're asking her whether
18  the number she just put into the
19  calculator was derived from the
20  IMS data in this e-mail?
21    MR. GASTEL:  Yes.
22    MS. HILLYER:  Objection to
23  form.  Same objections.  Lack of
24  foundation.  Calls for

Page 365

1  speculation.  She testified that
2  she doesn't know that she received
3  the attachment.
4    Go ahead.
5    THE WITNESS:  I don't --
6  BY MR. GASTEL:
7    Q.    The e-mail itself references
8  the IMS data, right?
9    A.    So --
10    Q.    And you have no reason to
11  doubt that Joe is -- that Joe, when he
12  forwarded this e-mail on April 18th,
13  2016, was lying to you that the source of
14  this material was IMS data, right?
15    A.    No.
16    MS. HILLYER:  Objection to
17  form.
18    THE WITNESS:  I don't have
19  any reason to suggest he lied.
20  His role is very different than
21  mine.
22  BY MR. GASTEL:
23    Q.    Sure.
24    A.    So if he runs the data, then

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1 I don't go back and do what you asked me
2 to do, which is add it up.
3     Q.   Sure.
4     A.   I don't.
5     Q.   And then you respond that,
6 As of now, I would use those assumptions,
7 right?
8     A.   Yes.
9     Let me be clear. For the --
10 what were the assumptions by channel,
11 we're talking percentages.
12     Q.   Sure. But the percentages
13 are based on these prescription numbers,
14 right?
15     A.   Yes.
16     Q.   And that's 95 million
17 prescriptions, right?
18     MS. HILLYER: Objection to
19     form.
20     THE WITNESS: Based on the
21     calculator that you provided me
22     and my adding it up, that's what
23     the number came to.
24 BY MR. GASTEL:

Page 367

1     Q.   Does that sound like a lot
2 of prescriptions to you, 95 million?
3     MS. HILLYER: Objection to
4     form.
5     THE WITNESS: Compared to
6     what?
7 BY MR. GASTEL:
8     Q.   Compared to anything.
9     MS. HILLYER: Objection to
10     form.
11     THE WITNESS: I don't have
12     a -- I mean, it's a large number,
13     I'll agree to that. It's a large
14     number.
15     MS. HILLYER: Let's go off
16     the record.
17     VIDEO TECHNICIAN: Going off
18     the record. 4:27 p.m.
19     - - -
20     (Whereupon, a brief recess
21     was taken.)
22     - - -
23     VIDEO TECHNICIAN: Back on
24     record. 4:35.

Page 368

1 BY MR. GASTEL:
2     Q.   Going back to the Time
3 Magazine article, flipping to the
4 document Bates labeled 62, which I
5 believe is the third --
6     MS. HILLYER: Which exhibit
7     number?
8 BY MR. GASTEL:
9     Q.   -- the third page.
10     MS. HILLYER: What exhibit?
11     MR. GASTEL: 22. The Time
12     Magazine article.
13     THE WITNESS: What page? I
14     didn't hear you. I'm sorry.
15 BY MR. GASTEL:
16     Q.   162.
17     A.   Okay.
18     Q.   About a little over halfway
19 down the article, it says, By 2011 -- do
20 you see that paragraph beginning?
21     A.   Yes.
22     Q.   By 2011, the number of
23 opioid prescriptions written for pain
24 treatment had tripled to 219 million.

Page 369

1     Did I read that correctly?
2     A.   Yes, you did.
3     Q.   And we just looked at some
4 IMS Health data that suggested that there
5 were 95 million prescriptions for
6 hydrocodone.
7     Does the number 219 million
8 cause you any concern?
9     MS. HILLYER: Objection to
10     form.
11     THE WITNESS: I mean, again,
12     reading this out of context,
13     there's no reference. Therefore,
14     I don't have an opinion.
15 BY MR. GASTEL:
16     Q.   Well, when you forwarded
17 this article to your colleagues at Teva
18 and your third-party vendors and you saw
19 that Time Magazine was reporting
20 prescription rates of 219 million, did
21 that cause you concern at the time?
22     MS. HILLYER: Objection to
23     form.
24     THE WITNESS: This is

Page 370

1  information that was in the public
2  domain that our customers would
3  see. And, therefore, the purpose
4  of forwarding it on was looking at
5  the landscape, we're preparing to
6  launch an abuse-deterrent
7  formulation.
8  BY MR. GASTEL:
9  Q.  And you're preparing to
10 launch an abuse-deterrent formulation
11 because there was widespread abuse and
12 addiction of opioids, right?
13     MS. HILLYER:  Objection to
14 form. And asked and answered.
15     MR. GASTEL:  Let me
16 rephrase.
17     THE WITNESS:  Yeah, okay.
18 BY MR. GASTEL:
19 Q.  You were planning on
20 launching an abuse-deterrent formulation
21 in order -- in response to what you
22 described as the public health crisis of
23 abuse and addiction, right?
24     MS. HILLYER:  Objection to

Page 371

1  form. And mischaracterizes the
2  document and the testimony.
3     You can answer.
4     THE WITNESS:  This was an
5  article on the public health
6  crisis, which we monitored
7  everything that was -- you know,
8  we tried to keep current with what
9  was in the public domain.
10 BY MR. GASTEL:
11 Q.  But the term "public health
12 crisis of abuse and addiction" is your
13 term; it's in your cover e-mail?
14 A.  That's correct.
15 Q.  That was the language that
16 you chose to use, right?
17 A.  That's correct.
18     MR. GASTEL:  Subject to my
19 previous objection -- oh, let me
20 ask -- I'm sorry, let me ask one
21 last question.
22 BY MR. GASTEL:
23 Q.  Where do you live, Ms.
24 Bearer?

Page 372

1  A.  Pennsylvania.
2  Q.  What is your actual address?
3  A.  27 Post Run, Newtown Square,
4  Pennsylvania.
5  Q.  And who lives there with
6  you?
7  A.  No one.
8     MS. HILLYER:  Objection to
9  form.
10 BY MR. GASTEL:
11 Q.  Do you have any plans to
12 move any time soon?
13 A.  I don't really have an
14 opinion, at this point, of whether I'm
15 going to move or not.
16 Q.  Do you own that residence?
17     MS. HILLYER:  Objection.
18     THE WITNESS:  Yes.
19     MR. GASTEL:  All right.
20 Subject to my previous objection,
21 Ms. Bearer, thank you for your
22 time. I have no more questions
23 today.
24     THE WITNESS:  Okay.

Page 373

1     MS. HILLYER:  Just to
2  respond to your previous
3  objection, Teva is not in
4  violation of any protocol or
5  guidance concerning the state and
6  federal protocol.
7     We produced everything in a
8  timely manner and answered all of
9  the questions that you had.
10     I do have a few brief
11 redirect questions for Ms. Bearer.
12     - - -
13     EXAMINATION
14     - - -
15 BY MS. HILLYER:
16 Q.  Ms. Bearer, do you recall,
17 when was the launch of Fentora?
18 A.  2007.
19 Q.  Would you or anyone at Teva
20 have -- or Cephalon, excuse me, have
21 marketed Actiq after the launch of
22 Fentora?
23 A.  No.
24 Q.  Did you ever market or

Page 374

1  promote Actiq for off-label uses?
2      A.  No.
3      Q.  Did you ever market or
4  promote Fentora for off-label uses?
5      A.  No.
6          MS. HILLYER:  I have no
7  further questions.
8          Off the record.
9          VIDEO TECHNICIAN:  This ends
10  today's deposition.  Going off the
11  record at 4:40 p.m.
12              - - -
13          (Whereupon, the deposition
14  concluded at 4:40 p.m.)
15              - - -
16
17
18
19
20
21
22
23
24

Page 375

1              CERTIFICATE
2
3
4          I HEREBY CERTIFY that the
5  witness was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
          Amanda Maslynsky-Miller
11        Certified Realtime Reporter
          Dated:  January 9, 2019
12
13
14
15
16
17          (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)
22
23
24

Page 376

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8          After doing so, please sign
9  the errata sheet and date it.
10          You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14          It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 377

1          - - - - - -
              E R R A T A
2          - - - - - -
3  PAGE  LINE  CHANGE/REASON
4  _____ _____ _____
5  _____ _____ _____
6  _____ _____ _____
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____

Page 378

1
2          ACKNOWLEDGMENT OF DEPONENT

3          I,_____, do
      hereby certify that I have read the
      foregoing pages, 1 - 374, and that the
4     same is a correct transcription of the
      answers given by me to the questions
5     therein propounded, except for the
      corrections or changes in form or
6     substance, if any, noted in the attached
      Errata Sheet.
7
8     _____
      DEBORAH BEARER              DATE
9
10
      Subscribed and sworn
11    to before me this
      _____ day of _____, 20_____.
12
      My commission expires:_____
13
14    _____
      Notary Public
15
16
17
18
19
20
21
22
23
24

Page 379

1          LAWYER'S NOTES
2     PAGE  LINE
3     _____ _____ _____
4     _____ _____ _____
5     _____ _____ _____
6     _____ _____ _____
7     _____ _____ _____
8     _____ _____ _____
9     _____ _____ _____
10    _____ _____ _____
11    _____ _____ _____
12    _____ _____ _____
13    _____ _____ _____
14    _____ _____ _____
15    _____ _____ _____
16    _____ _____ _____
17    _____ _____ _____
18    _____ _____ _____
19    _____ _____ _____
20    _____ _____ _____
21    _____ _____ _____
22    _____ _____ _____
23    _____ _____ _____
24    _____ _____ _____