# EXHIBIT 99

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                    - - -
 5   IN RE: NATIONAL      :  MDL NO. 2804
     PRESCRIPTION OPIATE  :
 6   LITIGATION           :
     ----------------------------------------
 7                        :  CASE NO.
     THIS DOCUMENT        :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                          :  Hon. Dan A.
 9                        :  Polster
10                    - - -
            Tuesday, December 4, 2018
11                    - - -
12    HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
               CONFIDENTIALITY REVIEW
13
                      - - -
14
              Videotaped deposition of
15   LISA WALKER, taken pursuant to notice,
     was held at Golkow Litigation Services,
16   One Liberty Place, 1650 Market Street,
     Suite 5150, Philadelphia, Pennsylvania
17   19103, beginning at 9:12 a.m., on the
     above date, before Amanda Dee
18   Maslynsky-Miller, a Certified Realtime
     Reporter.
19
                      - - -
20
21
22
23          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24              deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1  Q. And then do you see below
2  that Mr. Shaffer has reproduced the
3  customer questionnaire, and he's got some
4  comments in there as well?
5     Do you see that?
6  A. Selling products -- yes, I
7  see that.
8  Q. And it seems that Mr.
9  Shaffer left you a voicemail with his
10 comments as well?
11 A. That's what the e-mail
12 states.
13 Q. Did you have interactions
14 with regulatory and Qualitest relating to
15 suspicious order practices?
16 A. Not that I recall.
17 Q. Is Mr. Shaffer in regulatory
18 at Qualitest?
19 A. I do not believe he was, no.
20 Q. What group was he in?
21 A. I believe he was part of
22 transportation or security, if I remember
23 correctly.
24 Q. Okay.

Page 271

1  A. I could be wrong. But I
2  don't know.
3  Q. If we scroll down, do you
4  see the version of the questionnaire that
5  Mr. Shaffer commented on, correct?
6  A. Uh-huh.
7  Q. In his e-mail to you dated
8  July 25, 2012, right?
9  A. Yes.
10     MR. LIMBACHER: Object to
11     form. It's an e-mail to Tracey
12     Hernandez.
13     MR. BUCHANAN: I'm sorry.
14     THE WITNESS: Sorry.
15 BY MR. BUCHANAN:
16 Q. It was an e-mail from Mr.
17 Shaffer to Tracey Hernandez that was
18 forwarded to you a few weeks later,
19 correct?
20 A. Yes.
21 Q. Okay. All right. So in
22 this e-mail between Mr. Shaffer and Ms.
23 Hernandez that was forwarded to you, Mr.
24 Shaffer has got some comments on the

Page 272

1  questionnaire, fair?
2  A. Based on what the e-mail
3  states.
4  Q. I want to go down to
5  hotspots, Item 3. By 2012, the CDC had
6  already identified the opioid crisis as
7  an epidemic.
8     Are you aware of that,
9  ma'am?
10    MR. LIMBACHER: Object to
11    form.
12    THE WITNESS: I knew there
13    was an epidemic. I couldn't tell
14    you the year.
15 BY MR. BUCHANAN:
16 Q. By 2012, had you, within
17 Endo, identified hotspots for
18 diversion-related activity?
19    MR. LIMBACHER: Object to
20    form.
21    THE WITNESS: I can't speak
22    to other parts of Endo.
23 BY MR. BUCHANAN:
24 Q. I'm just asking within --

Page 273

1  A. But, I mean, yes, we knew --
2  I knew --
3  Q. Let me ask the question.
4  A. -- that there was an opioid
5  epidemic, but I can't speak to other
6  areas within Endo.
7  Q. This particular
8  questionnaire, 3, What geographic areas
9  will you be primarily distributing
10 product to, hotspot locations, Florida,
11 et cetera, equals H.
12    Do you see that?
13 A. I do.
14 Q. Did you recognize Florida as
15 a hotspot with regard to the opioid
16 epidemic in 2012, ma'am?
17    MR. LIMBACHER: Object to
18    form.
19    THE WITNESS: This
20    information that you're looking at
21    is regarding to our generics
22    division. I can't speak to
23    anything. This is generics.
24    Larry and Tracey are part of

Page 274

1  our generics division. I can't
2  speak to any of this.
3  BY MR. BUCHANAN:
4  Q.  So stay with me just on the
5  branded side, then.
6  As just a factual matter, in
7  2012, had you in the branded side
8  identified Florida as a hotspot location?
9  MR. LIMBACHER: Object to
10  form.
11  THE WITNESS: We knew that
12  there was opioid epidemics
13  throughout the country. I can't
14  confirm or deny -- I can't confirm
15  if we identified Florida back in
16  2012.
17  BY MR. BUCHANAN:
18  Q.  Okay. Larry's comment here
19  says, Suggest: Hotspot locations, and he
20  lists Florida.
21  Do you see that?
22  A.  I do see Florida.
23  Q.  Texas?
24  A.  Yes.

Page 275

1  Q.  Kentucky?
2  A.  I see that on your document.
3  Q.  Tennessee.
4  Do you see that?
5  A.  Yes.
6  Q.  California?
7  A.  Yes.
8  Q.  Illinois?
9  A.  Correct. I see it.
10  Q.  Nevada?
11  A.  Yes. But this is generics,
12  again.
13  Q.  All equals high, correct?
14  A.  But this is generics.
15  Q.  Do you understand that
16  there's only an opioid epidemic with
17  regard to generic drugs, ma'am?
18  MR. LIMBACHER: Object to
19  form. Argumentative.
20  THE WITNESS: No. What I'm
21  trying to tell you is I can't
22  speak to this document. This has
23  to do with generics.
24  BY MR. BUCHANAN:

Page 276

1  Q.  I'm asking you a question,
2  though.
3  Do you understand that
4  there's only an opioid epidemic with
5  regard to generic drugs?
6  A.  I know --
7  MR. LIMBACHER: Object to
8  form.
9  THE WITNESS: I know that
10  there's an opioid epidemic
11  throughout the country.
12  BY MR. BUCHANAN:
13  Q.  And you all were making
14  opioid branded drugs, right, in the Endo
15  Pharmaceuticals arm, correct?
16  MR. LIMBACHER: Object to
17  form.
18  THE WITNESS: There's
19  branded opioid products, correct.
20  BY MR. BUCHANAN:
21  Q.  At this point in time, you
22  were making Opana ER, right?
23  A.  Yes.
24  Q.  Opana?

Page 277

1  A.  Yes.
2  Q.  Percocet?
3  A.  Yes.
4  Q.  Selling hundreds of millions
5  of pills every year?
6  A.  I can't speak to the
7  number --
8  MR. LIMBACHER: Object to
9  form.
10  THE WITNESS: -- to the
11  number of pills.
12  BY MR. BUCHANAN:
13  Q.  Would you dispute that you
14  were selling hundreds of millions of
15  pills every year, ma'am?
16  A.  I don't --
17  MR. LIMBACHER: Object to
18  form.
19  THE WITNESS: I don't know
20  the number of pills.
21  BY MR. BUCHANAN:
22  Q.  As part of your suspicious
23  order monitoring practice, ma'am, did you
24  look at hotspot locations and evaluate

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1  your customers in particular with regard
2  to hotspot locations?
3      MR. LIMBACHER: Object to
4      form.
5      THE WITNESS: We had an SOM
6      program in place at both Endo and
7      UPS at that 2012.
8  BY MR. BUCHANAN:
9      Q. Okay. For example, did you
10 do any due diligence on your customers in
11 Florida?
12     A. We had our SOM program in
13 place that looked at all orders.
14     Q. Did you go and visit any
15 customers in Florida?
16     MR. LIMBACHER: Object to
17     form.
18     THE WITNESS: Did Endo?
19     Endo did not. But as I stated
20     before, our Qualitest group
21     visited customers.
22 BY MR. BUCHANAN:
23     Q. Not in 2012?
24     MR. LIMBACHER: Object to

Page 279

1      form.
2      THE WITNESS: I don't know
3      the exact date when they did.
4  BY MR. BUCHANAN:
5      Q. Right. Well, do you know
6  any of what Qualitest did, ma'am, other
7  than what you've been told in connection
8  with getting ready for today?
9      MR. LIMBACHER: Object to
10     form.
11     MR. BUCHANAN: I don't want
12     privileged.
13     MR. LIMBACHER: I would
14     object to the statement by
15     counsel.
16 BY MR. BUCHANAN:
17     Q. I'm assuming you spoke to
18 counsel to get ready for today, right?
19     MR. LIMBACHER: And we've
20     covered that already. Just, if
21     you could, rephrase your question,
22     please, counsel.
23 BY MR. BUCHANAN:
24     Q. I don't want you to tell me

Page 280

1  what your counsel -- you and your counsel
2  discussed getting ready for today.
3      What's the earliest point in
4  time you have knowledge about Qualitest's
5  SOM practices, ma'am?
6      MR. LIMBACHER: Object to
7      form.
8      THE WITNESS: I can't speak
9      to Qualitest's SOM practice.
10 BY MR. BUCHANAN:
11     Q. That's what I thought.
12     So with regard to branded's
13 practices, as of 2012, were you all
14 conducting due diligence visits on the
15 Florida customers?
16     MR. LIMBACHER: Object to
17     form. Asked and answered.
18     THE WITNESS: As I stated
19     before, we had an SOM program in
20     place at both Endo and at UPS, and
21     that's how we reviewed our orders.
22 BY MR. BUCHANAN:
23     Q. Okay. And to answer my
24 question, though, were you conducting due

Page 281

1  diligence visits on your Florida
2  customers in 2012?
3      MR. LIMBACHER: Object to
4      form. Asked and answered.
5      THE WITNESS: And within my
6      role, no. But I can also not -- I
7      cannot speak to if anybody else
8      within Endo did anything within
9      the state of Florida.
10 BY MR. BUCHANAN:
11     Q. Okay. As I understand it
12 with regard to suspicious order
13 monitoring, that was your function within
14 the branded side, correct?
15     A. Right.
16     MR. LIMBACHER: Object to
17     form.
18 BY MR. BUCHANAN:
19     Q. Did you ever conduct any due
20 diligence visits to Texas in 2012?
21     MR. LIMBACHER: Object to
22     form. Asked and answered.
23     THE WITNESS: Within my
24     role, no. But that doesn't