# EXHIBIT 101

Highly Confidential - Subject to Further Confidentiality Review

```
 1           IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF OHIO
 3                      EASTERN DIVISION
 4                          -  -  -
 5
      IN RE:  NATIONAL         :   HON. DAN A.
 6    PRESCRIPTION OPIATE      :   POLSTER
      LITIGATION               :
 7                             :
      APPLIES TO ALL CASES     :   NO.
 8                             :   1:17-MD-2804
                               :
 9
                  - HIGHLY CONFIDENTIAL -
10
        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                           -  -  -
12
                      February 15, 2019
13
                           -  -  -
14
15              Videotaped deposition of
      GEORGE STEVENSON, taken pursuant to
16    notice, was held at the offices of
      McCarter & English, LLP, 1600 Market
17    Street, Philadelphia, Pennsylvania,
      beginning at 9:11 a.m., on the above
18    date, before Michelle L. Gray, a
      Registered Professional Reporter,
19    Certified Shorthand Reporter, Certified
      Realtime Reporter, and Notary Public.
20
                           -  -  -
21
22            GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
23                  deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1 hell and not a godsend, right?
2      MS. VANNI: Object to form.
3      THE WITNESS: Well, yeah, I
4   just -- for the record, I think
5   it's pure speculation to know
6   whether they abused a product or
7   didn't abuse a product, whether
8   they took an opioid like
9   OxyContin, drank alcohol, or -- or
10  did other nefarious things that
11  were contra to the indication on
12  the label.
13     So the title could be
14  misleading. I don't know what
15  caused their hell, the 12 hours of
16  hell, just for the record.
17 BY MS. SCULLION:
18  Q.  Now, going back to
19 Exhibit 19.
20  A.  19.
21  Q.  Yep.
22  A.  Be good at numbers.
23  Q.  I'm getting better.
24      Same page we were just on,

Page 323

1 which discusses the AP article that came
2 out, second AP article after Endo
3 coordinated an interview between
4 Dr. Galer and the AP reporter.
5      The third bullet point with
6 respect to balanced messages in that
7 article says, "The company, Endo, plans
8 to monitor for prescription data for
9 signs of abuse and tell doctors that the
10 medication should not be overprescribed."
11     Do you see that?
12  A.  Yes.
13  Q.  Now, I think you've
14 mentioned and testified to rather a
15 number of times, with respect to generic
16 oxycodone ER, Endo wasn't going to be
17 telling doctors anything, right? Endo is
18 not directly communicating with
19 physicians concerning that generic
20 product, right?
21     MS. VANNI: Object to form.
22     THE WITNESS: They were not
23  promoting it. I do not know if
24  they sent out informational

Page 324

1   material to doctors. That I don't
2   recall.
3 BY MS. SCULLION:
4   Q.  Did you ever see any
5 informational materials that went out
6 directly to doctors concerning --
7   A.  I don't recall --
8   Q.  Sorry.
9       -- concerning generic
10 oxycodone ER?
11  A.  I don't recall any.
12  Q.  Do you recall seeing any
13 "Dear Doctor" letters concerning generic
14 oxycodone ER that told the doctors
15 that -- that that medication should not
16 be overprescribed?
17  A.  I don't recall any.
18  Q.  Okay. And turn the page --
19  A.  But I -- can I -- I do want
20 to stipulate though, it says --
21  Q.  I'm so sorry, I apologize,
22 Mr. Stevenson. Your counsel will have
23 the opportunity to ask you questions, and
24 I'm certain that she will. So I'm trying

Page 325

1 to move on to the next part of this
2 document. Sorry.
3       The recommendations section
4 on -- starts with communications
5 imperatives. Do you see that?
6   A.  Yes.
7   Q.  And do you see that one of
8 the communications imperatives identified
9 a must have as part of a crisis
10 preparedness program is, looking at the
11 third bullet point, "A strategy to
12 neutralize critics/activists."
13     Do you see that?
14  A.  Yes.
15  Q.  Those are pretty strong
16 words, right, neutralize?
17     MS. VANNI: Object to form.
18     THE WITNESS: I didn't write
19  them. They were written by a PR
20  firm.
21 BY MS. SCULLION:
22  Q.  Well -- just to make sure we
23 are on the same page. This was, in fact,
24 a PR firm that Endo hired. But I -- I

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1  will show you. I know you said you don't
2  remember. Let me show you, so you know
3  the basis on which we are saying that.
4  You don't have to take my word for it.
5      (Document marked for
6      identification as Exhibit
7      Endo-Stevenson-22.)
8  BY MS. SCULLION:
9      Q.  Let me show you what's been
10 marked as Exhibit 22.
11     And Exhibit 22 is a copy of
12 Endo Health Solutions Inc. and Endo
13 Pharmaceutical Inc.'s -- excuse me, Endo
14 Pharmaceuticals Inc.'s supplemental
15 objections and responses to plaintiffs'
16 second set of interrogatories numbers --
17 and I'm not going to read the series of
18 numbers.
19     If you'll go to Page 35.
20     A.  Can I just ask a question?
21     Q.  Absolutely.
22     A.  What -- what is the date of
23 this document?
24     Q.  Sure. The date of this

Page 327

1  document is November 15, 2018.
2      A.  2018, okay.
3      Q.  Correct. If you'll go to
4  Page 34.
5      A.  34.
6      Q.  And I'm looking at
7  Interrogatory Number 31.
8      A.  34, okay.
9      Q.  Okay. And this is an
10 interrogatory, you can see, that asks
11 Endo to identify all vendors, including
12 but not limited to, public relations
13 firms you have retained for purposes
14 relating to opioids. And it -- it asks
15 for certain details.
16     And on the next page, 35,
17 you see listed under vendor, Cohn &
18 Wolfe. It says, "/GCI Health." And it
19 identifies the purpose for hiring that
20 vendor as marketing and promotional
21 materials, public relations.
22     Do you see that?
23     A.  Yes.
24     Q.  Okay. So let's go back

Page 328

1  to --
2      A.  But Cohn & Wolfe did not do
3  any marketing or promotional materials
4  for the generic business, just for --
5      Q.  That's fine.
6      A.  For the record.
7      Q.  That's fine.
8      Here, here we're looking in
9  Exhibit 19 at what is more traditionally
10 called public relations.
11     A.  Yes.
12     Q.  Okay. So let's -- we were
13 on the page communications imperatives.
14     A.  Yes.
15     Q.  And the strategy to
16 neutralize critics/activists, right?
17     A.  Yes.
18     Q.  Just getting us back to
19 where we are.
20     Now, again, what's written
21 here is to neutralize the critics and
22 activists. It doesn't say for example,
23 engage in a thoughtful debate, right?
24     MS. VANNI:  Object to form.

Page 329

1       THE WITNESS:  I had no way
2       of controlling what somebody
3       writes in a PowerPoint
4       presentation who worked for
5       another firm.
6  BY MS. SCULLION:
7      Q.  Just asking. It doesn't say
8  that, right, it doesn't say engage in a
9  thoughtful debate, right?
10      MS. VANNI:  Object to form.
11      THE WITNESS:  No, it says
12      neutralize, as we've already said
13      five times.
14 BY MS. SCULLION:
15     Q.  It doesn't say give
16 considered attention to the concerns of a
17 community devastated by the opioid
18 epidemic, it doesn't say that, right?
19     MS. VANNI:  Objection to
20     form.
21     THE WITNESS:  No, it doesn't
22     say that.
23 BY MS. SCULLION:
24     Q.  Says neutralize the critics

Page 330

1 and -- and activists, right?
2    A.   Yes, that's what it says.
3    Q.   Right.  And common
4 understanding of the term "neutralize"
5 means to stop something from being
6 effective, right?
7        MS. VANNI:  Object to form.
8        THE WITNESS:  I don't know
9    how the -- what the intent of the
10   meaning was in the PowerPoint
11   presentation, since I didn't write
12   it.
13 BY MS. SCULLION:
14   Q.   That's -- that's an
15 understanding of what the -- the term
16 "neutralize" does mean:  Stop something
17 from being effective?
18       MS. VANNI:  Object to form.
19       THE WITNESS:  One could have
20   numerous, numerous definitions.
21   Who knows what was in the state of
22   mind of the individual who wrote
23   it.
24 BY MS. SCULLION:

Page 331

1    Q.   Well, the one thing we do
2 know is they -- they wrote that there
3 must -- the must have was a strategy to
4 neutralize critics and activists.  That's
5 what they did write, right?
6        MS. VANNI:  Object to form.
7        THE WITNESS:  That's what
8    they wrote, yes.
9 BY MS. SCULLION:
10   Q.   Okay.  And then if you'll go
11 two more pages in.  This is part of the
12 presentation of options for media
13 strategy for the 3218 launch.
14       Do you see that?
15   A.   What does it say at the top?
16   Q.   Media strategy for 3218
17 launch, three options?
18   A.   Media -- media launch tab,
19 do you reckon that is what it is?
20       MS. VANNI:  It's not up on
21   the screen.
22 BY MS. SCULLION:
23   Q.   Oh.  That's the one.  Media
24 strategy for 3218 launch, three options.

Page 332

1 I probably told you to go back too far.
2 I apologize.
3    A.   Okay.  Let's start over
4 again.
5    Q.   Yeah.
6    A.   Oh, is that it?
7    Q.   That's it.  Thank you.  I
8 apologize, we don't have page numbers.
9    A.   That's all right.  No
10 problem.  My mistake.
11   Q.   This section is talking
12 about three options for a media strategy.
13 And again, this is for the launch of
14 generic oxycodone ER product, right?
15   A.   Yes.
16   Q.   Okay.  And then if you go to
17 the next page, in discussing the pros and
18 cons of one option, which is to conduct
19 top tier briefings, do you see under the
20 cons section, fourth bullet point down
21 is, "Endo 'blues' story emerges."
22       Do you see that?
23   A.   Yes.
24   Q.   And if you go to the next

Page 333

1 page, which is discussing another
2 potential media strategy option.  Again,
3 under the cons we see listed, "Endo
4 'blues' story emerges."
5        Do you see that?
6    A.   Yes.
7    Q.   And same thing on the last
8 potential strategy under the cons, "Endo
9 'blues' story emerges."
10       Do you see that?
11   A.   Yes.
12   Q.   And that was a reference to
13 the history of abuse of the oxymorphone
14 pills in the '60s and '70s, right?
15       MS. VANNI:  Objection,
16   foundation.
17       THE WITNESS:  I have no
18   knowledge what it is.  I've never
19   heard of it before.
20 BY MS. SCULLION:
21   Q.   You never heard anyone talk
22 about a prior version of oxymorphone
23 being called "the blues"?
24   A.   No.  I have never heard that

Page 334

1  before.
2      Q.  Okay.
3          MS. SCULLION:  Can I have
4      tab -- Tab 74 and 72.
5          (Document marked for
6      identification as Exhibit
7      Endo-Stevenson-23.)
8  BY MS. SCULLION:
9      Q.  Let me first hand you what's
10 been marked Exhibit 23.
11         Exhibit 23 is an excerpt
12 from a book called "Drug Abuse:  Current
13 concerns and research."
14     A.  What is the date of this
15 document?
16     Q.  If you'll turn to the second
17 page of the exhibit, you can see that
18 this was a book that was copyrighted in
19 1972.
20     A.  Okay.  Thank you.
21     Q.  Okay.  And again I don't
22 have all the page numbers, so it's a
23 little bit hard to direct you.  But,
24 yeah, in the upper right-hand corner we

Page 335

1  have numbers E137.  Do you see those
2  numbers?
3      A.  I'm sorry, I don't see them.
4  Do you see them?
5          MS. VANNI:  Where is it?
6      I'm sorry.
7          MS. SCULLION:  Sure.  You
8      have these -- upper right-hand
9      corner.
10         THE WITNESS:  I have to get
11     through the --
12         MS. SCULLION:  You have
13     these little numbers that say
14     E137.
15         THE WITNESS:  Oh, at the
16     back.  I see.
17         MS. SCULLION:  Yeah.
18         THE WITNESS:  Okay.  Sorry.
19 BY MS. SCULLION:
20     Q.  Sure.  And so --
21     A.  I'm sorry.  What is the
22 page?
23     Q.  E137.1.
24     A.  Yeah.

Page 336

1      Q.  And this is indicated to be
2  Chapter 35 of this book.  And it is
3  entitled "Oxymorphone Abuse Among
4  Narcotic Addicts."
5          Do you see that?
6      A.  Yes.
7      Q.  And it discusses in the
8  first line, "Numorphan (oxymorphone), a
9  narcotic analgesic developed and first
10 marketed by Endo Laboratories in 1966 has
11 become a drug abuse" -- "a drug of abuse
12 among a sizable segment of the narcotic
13 addict population."
14         Do you see that?
15     A.  Yes.
16     Q.  Okay.  And I think we
17 discussed earlier, oxymorphone was the
18 opioid Endo used in the Opana IR and ER
19 products, right?
20         MS. VANNI:  Object to form.
21         THE WITNESS:  It was a brand
22     product, which I had no
23     involvement.
24 BY MS. SCULLION:

Page 337

1      Q.  I'm just asking the -- you
2  understand that was the same opioid,
3  right?
4          MS. VANNI:  Object to form,
5      foundation.
6          THE WITNESS:  To be honest,
7      you know, I haven't done -- what
8      the derivative is or what was the
9      predecessor of it, I really don't
10     know.  It wasn't my focus.
11 BY MS. SCULLION:
12     Q.  Sure.  We saw earlier in the
13 10-K though that oxymorphone was listed
14 as one of the products that Endo was
15 marketing during your time there?
16     A.  Oh, yeah.  They were
17 marketing several products when I was
18 there.
19     Q.  Okay.  And then if you look
20 under the heading "Background," you'll
21 see in the second paragraph, it says, "On
22 the street Numorphan can be identified by
23 its various subculture names Numorphine,
24 Blue Morphine, Blue Morphan, or Blues."