# EXHIBIT 102

Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
                          -   -   -
 3
      IN RE:  NATIONAL              :  HON. DAN A.
 4    PRESCRIPTION OPIATE           :  POLSTER
      LITIGATION                    :
 5                                  :
      APPLIES TO ALL CASES          :  NO.
 6                                  :  1:17-MD-2804
 7              - HIGHLY CONFIDENTIAL -
        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 8                        -   -   -
                     JANUARY 22, 2019
 9                        -   -   -
10              Videotaped sworn deposition of
11        BRIAN LORTIE, taken pursuant to notice,
12        was held at McCARTER & ENGLISH, LLP,
13        1600 Market Street, Suite 3900,
14        Philadelphia, Pennsylvania, beginning at
15        9:06 a.m., on the above date, before
16        Margaret M. Reihl, a Registered
17        Professional Reporter, Certified
18        Shorthand Reporter, Certified Realtime
19        Reporter, and Notary Public.
20
                          -   -   -
21
              GOLKOW LITIGATION SERVICES
22        877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
23
24
```

Page 526

1  it is, yes.
2      Q.   Okay. And then going to the
3  first page of the exhibit, which is Bates
4  stamped 01563548?
5      A.   Before I do, I think you read --
6  I just want too make sure we're correct, so you
7  talked about the bill -- or sorry -- the subject
8  of the e-mail from Burt Rosen to the long number
9  of addressees, and then it says "Please see this
10 request from Wade at the American Society for
11 Pain Management Nursing. Wade is requesting a
12 timely reply from your organization." Is that
13 the -- that's what you wanted me to see, right?
14     Q.   Right. I want to see that that's
15 identifying -- you asked who Mr. Delk was, and
16 it's identifying him as being from the American
17 Society For Pain Management Nursing.
18     A.   Thank you. Yep.
19     Q.   Do you see that?
20     A.   Yes.
21     Q.   And then on the very first page
22 of the exhibit, you see that -- so Mr. Munroe
23 has forwarded this communication to you, among
24 others, at Endo, correct?

Page 527

1      A.   Munroe to me and others, yes.
2      Q.   And your response at the very top
3  of the page, Exhibit 47, was what?
4      A.   I sent a note to Brian, Deb
5  Logan, Neil Shusterman, Matt Maletta, Jen Dubas,
6  John Harlow, Timothy Byrne, Keri Mattox and
7  Andrew Scott, and I wrote "well done."
8      Q.   So you're congratulating
9  Mr. Munroe on this coordinated effort through
10 the Pain Care Forum members to communicate their
11 opposition to implementation of the CDC
12 guidelines as set forth in the draft
13 communication we looked at, the last two pages
14 of the exhibit?
15          MR. LIMBACHER: Object to form.
16          THE WITNESS: Is that a question?
17 BY MS. SCULLION:
18     Q.   Is that what you were
19 congratulating him on?
20     A.   No, I don't believe that's the
21 case. I can't draw that conclusion from reading
22 what you've presented to me.
23          MS. SCULLION: Okay. We can take
24     a break.

Page 528

1          MR. LIMBACHER: Thank you.
2          THE VIDEOGRAPHER: Off the
3     record, 4:16.
4          (Brief recess.)
5          THE VIDEOGRAPHER: We are back on
6     the record at 4:33.
7  BY MS. SCULLION:
8      Q.   Mr. Lortie, asking you in your
9  capacity as a corporate representative, with
10 respect to the effectiveness of Endo's
11 anti-diversion procedures, did Endo ever
12 determine that any prescriptions of Opana ER
13 were medically unnecessary?
14     A.   Is your question did Endo ever
15 determine that any individual prescription was
16 medically unnecessary?
17     Q.   We can start with that.
18     A.   I'm not aware of whether the
19 company did or did not. That's a level of
20 detail I'm not familiar with.
21     Q.   Same question, though, but with
22 respect to did Endo -- strike that.
23          Did Endo ever determine that any
24 prescriptions of Opana ER were medically

Page 529

1  unnecessary at some higher level, not just
2  individually, but at a higher level?
3          MR. LIMBACHER: Object to form.
4          THE WITNESS: Yes, I'm sure that
5     there were cases that would fall under
6     that heading, yes.
7  BY MS. SCULLION:
8      Q.   Does Endo have records indicating
9  findings that certain cases I think as you said
10 were determined to be medically unnecessary?
11         MR. LIMBACHER: Object to form.
12         THE WITNESS: I don't know
13     specifically, but I would -- I would
14     think that our pharmacovigilance and
15     drug safety department would have
16     maintained such records.
17 BY MS. SCULLION:
18     Q.   Did you review any such records
19 in preparation for today's deposition?
20     A.   No, not specifically at that
21 level of detail, no.
22     Q.   Okay. As part of Endo's
23 anti-diversion efforts, did Endo monitor for
24 signals that Opana ER had street value?

Page 530

1  MR. LIMBACHER: Object to form.
2  THE WITNESS: I believe that
3  whether it was actively -- as a result
4  of active monitoring or as a result
5  of -- well, let me restate that.
6  As part of the internet
7  surveillance and other surveillance of
8  media and chat rooms and the like that
9  are part of the RiskMAP and subsequently
10  added to by the REMS, that that was part
11  of what the team did, and then those
12  things were reviewed at the -- my
13  understanding is reviewed at the Risk
14  Management Committee level.
15 BY MS. SCULLION:
16  Q. And in terms of the effectiveness
17 of Endo's procedures you just described, did
18 Endo, in fact, see evidence that Opana ER had a
19 street value?
20  MR. LIMBACHER: Object to form
21  and to the extent it falls outside the
22  scope of the topics he's been
23  designated.
24  THE WITNESS: Yeah, my answer was

Page 531

1  regarding the question of did Endo
2  monitor for that.
3 BY MS. SCULLION:
4  Q. Yes.
5  A. And the answer was yes. Beyond
6 that, I don't know.
7  Q. That's what I'm asking. In terms
8 of understanding the effectiveness of its
9 monitoring, do you know whether those -- that
10 monitoring was, in fact, effective to pick up
11 signals that Opana ER had street value?
12  MR. LIMBACHER: Same objections.
13  THE WITNESS: I don't know. I
14  mean, the monitoring was done. I'm not
15  sure how you quantify effectiveness of
16  monitoring. By virtue of monitoring,
17  you see things that are posted, and
18  that's reviewed by the Risk Management
19  Committee, but I don't know beyond that
20  how to quantify the effectiveness in
21  that context.
22 BY MS. SCULLION:
23  Q. Do you understand, though, that
24 Endo did, in fact, see evidence that Opana ER

Page 532

1 early on had street value?
2  MR. LIMBACHER: Object to form.
3  THE WITNESS: I don't recall that
4  specifically. I didn't sit on that
5  committee, so I, you know, wasn't
6  familiar with that.
7  MS. SCULLION: Can I have E1585,
8  please.
9  (Document marked for
10  identification as Endo-Lortie Deposition
11  Exhibit No. 48.)
12 BY MS. SCULLION:
13  Q. I'm going to hand you what's been
14 marked as Exhibit Number 48.
15  And Exhibit 48 is Bates stamped
16 ENDO-OPIOID_MDL-00774063, and we've marked it
17 E1585 in the top right-hand corner.
18  Mr. Munroe, I'd like to direct
19 your attention to page E1585.3.
20  A. I think you mean Mr. Lortie but
21 --
22  Q. I am so sorry.
23  A. He's the other Brian.
24  Q. Thank you, Mr. Lortie. I direct

Page 533

1 your attention to page E1585.3. You see at the
2 bottom, there's an e-mail from John Bullock to
3 Sherri Ferstler. And the content of that e-mail
4 starts at the bottom of 1585.3 and continues all
5 the way through 1585.5. I just want to orient
6 you to the document.
7  MR. LIMBACHER: Are we asking him
8  now in his capacity as a fact witness?
9  MS. SCULLION: Sure.
10  THE WITNESS: Okay. So I see
11  that e-mail that starts on the bottom of
12  1585.3. Would you like me to read that?
13 BY MS. SCULLION:
14  Q. Sure. You can go ahead and read
15 through that.
16  A. Okay. Thank you. Give me a
17 moment to do that.
18  (Witness reviews document.)
19 Okay. I've read that e-mail. Thank you.
20  Q. Okay. And do you see the e-mail
21 is forwarding on an article from the Paducah Sun
22 dated December 10th, 2007 concerning an overdose
23 death being investigated by the Marshall
24 sheriff's office?

Page 534

1  A. Yes, December 10th is on the next
2 page.
3  Q. Right.
4  A. It evidently refers to it in the
5 e-mail as December 11th, but, yes, it appears to
6 be following -- sorry -- forwarding along that
7 newspaper article.
8  Q. And if you go down on page 1585.4
9 within the body of the article, go towards the
10 last quarter of that page where it begins the
11 words Miranda Minter-Banister.
12    Do you see that?
13  A. Yes, I do.
14  Q. Do you see this is conveying that
15 Miranda Minter-Banister, age 27, of Benton,
16 Kentucky died at her home and it was after using
17 an Opana pill purchased, says Minter-Banister
18 bought a second Opana pill for $30 from
19 Spiceland that Minter-Banister and her husband
20 later inhaled.
21    Do you see that?
22    MR. LIMBACHER: Object to form.
23    THE WITNESS: I mean, you've
24   picked a couple of lines out of that --

Page 535

1   out of that paragraph, but I see where
2   you're reading that, yes.
3 BY MS. SCULLION:
4  Q. So this is referring to a
5 purchase of Opana other than through a
6 prescription, correct?
7  A. It could be. I mean, I'm reading
8 it at the same time you are.
9  Q. Right. It's referring to someone
10 buying an Opana pill from another person, a
11 neighbor or a friend, correct?
12    MR. LIMBACHER: Object to form.
13    THE WITNESS: It appears that
14   that could be the case.
15 BY MS. SCULLION:
16  Q. Okay. And then if you go right
17 above that paragraph, you see the paragraph that
18 says Opana is similar to the painkiller
19 OxyContin and it goes by the street name.
20    And what's the street name
21 indicated here for Opana?
22  A. You're asking me that?
23  Q. Yeah.
24  A. You'd like me to read that?

Page 536

1  Q. Yeah.
2  A. It has the words stop sign in
3 quotation marks.
4  Q. Right. So by this time Opana --
5 at least by this time, Opana is not only being
6 sold but, in fact, has a street name; that's
7 what the article is conveying, right?
8    MR. LIMBACHER: Object to form.
9    THE WITNESS: It is -- it is
10   suggesting that for some reason the
11   author is reporting that it goes by the
12   street name stop sign. That's what it
13   says.
14 BY MS. SCULLION:
15  Q. And you saw other similar media
16 reports during your time at Endo, correct,
17 conveying that Opana ER was being bought and
18 sold on the street, had street value, had a
19 street name, was resulting in overdose deaths,
20 correct?
21    MR. LIMBACHER: Object to form
22   and foundation.
23    THE WITNESS: I don't recall
24   that. That was certainly not a regular

Page 537

1   part of my responsibilities.
2 BY MS. SCULLION:
3  Q. You don't recall ever seeing any
4 media reports about Opana ER contributing to the
5 opioid epidemic?
6  A. From time to time I'm sure things
7 were forwarded along, as this one appears to
8 have been. This one actually predates me by
9 some time, but I don't recall any specific ones,
10 and it was not a routine part of my job
11 responsibilities to review media reports.
12  Q. And you recall, though, that you
13 were employed by Endo in 2011, correct?
14  A. Yes.
15  Q. And where was your office?
16  A. In 2011 where was my office? It
17 was in --
18  Q. What town?
19  A. Chaddsford.
20  Q. Pennsylvania?
21  A. Yes.
22  Q. That's just outside of
23 Philadelphia?
24  A. It's 15 or 20 miles outside of

Page 538

1 Philadelphia.
2  Q. And do you recall in 2011 that
3 the Philadelphia office of the DEA specifically
4 issued an alert with respect to Opana's -- Opana
5 ER's street use and its contribution to the
6 opioid epidemic?
7  MR. LIMBACHER: Object to form.
8  THE WITNESS: Do I recall that?
9 BY MS. SCULLION:
10  Q. Yes.
11  A. I do not recall that.
12  MS. SCULLION: Can I have E563,
13  please.
14  (Document marked for
15  identification as Endo-Lortie Deposition
16  Exhibit No. 49.)
17 BY MS. SCULLION:
18  Q. I hand you what's been marked as
19 Exhibit Number 49.
20  And Exhibit 49 is Bates stamped
21 ENDO-OR-CID-00694084. And, Mr. Lortie, it bears
22 number E563 at the top right-hand corner,
23 correct?
24  A. Yes, I have that document.

Page 539

1  Q. Okay. In 2011 did you have any
2 responsibilities as part of your product
3 portfolio for Opana ER?
4  A. I had commercial
5 responsibilities, yes, I think we've already
6 established that.
7  Q. If you go to page E563.2, do you
8 see this is a Drug Intelligence Brief from the
9 Philadelphia Division Intelligence Program for
10 Drug Enforcement Administration?
11  A. That's how it's titled, yes. I
12 see that on the top of the document.
13  Q. And what is the title of this
14 Drug Intelligence Brief itself?
15  A. Underneath the header that says
16 "Drug Intelligence Brief," it says "Opana
17 (Oxymorphone) Abuse."
18  Q. And can you read the summary of
19 this Drug Intelligence Brief, please.
20  A. You'd like me to read what the
21 summary statement is?
22  Q. Yeah, what the DEA has stated in
23 its summary here?
24  A. So underneath the headline it

Page 540

1 says, "Summary, the Philadelphia Division
2 Intelligence Program received information on a
3 possible emerging trend in the region;
4 Oxymorphone (brand name Opana) has been reported
5 by several sources of information as the 'big
6 thing right now' in pharmaceutical drug abuse in
7 the region."
8  Q. And Endo was aware in at least
9 May 2011 that, in fact, Opana ER was being
10 reported as the big thing right now in
11 pharmaceutical drug abuse, at least in the
12 Philadelphia region; is that correct?
13  MR. LIMBACHER: Object to form
14  and foundation.
15  THE WITNESS: So I have not seen
16  this before. At least I don't recall
17  seeing it before, so I can't attest to
18  whether or not the company saw this.
19  I can say that I don't recognize
20  seeing it.
21 BY MS. SCULLION:
22  Q. You don't recall ever, as someone
23 with commercial responsibility for Opana ER in
24 May of 2011, ever being told that the

Page 541

1 Philadelphia Division Intelligence Program, the
2 DEA was issuing a brief indicating that the
3 product you had commercial responsibility for
4 was the big thing right now in pharmaceutical
5 drug abuse in the region?
6  MR. LIMBACHER: Object to form.
7 BY MS. SCULLION:
8  Q. It never came to your attention?
9  A. I don't recall seeing this, no.
10  Q. Okay. And among other things,
11 this Drug Intelligence Brief confirms, if you
12 look in the details section below the summary --
13  A. Still on the same page, .2?
14  Q. Correct.
15  You see the details section
16 confirms that not only is Opana being reported
17 as of May 2011 as the big thing right now in
18 pharmaceutical drug abuse, but that "in the
19 early 1970s, oxymorphone in the form of
20 Numorphan instant-release tablets was one of the
21 most sought-after and well-regarded opioids of
22 the class IV community."
23  Do you see that?
24  A. Yes, I see the sentence that you

Page 542

1  just read.
2      Q.   And then it goes -- and it goes
3  on to explain that oxymorphone in the form of
4  Numorphan instant-release tablets, in fact, had
5  a street name popularly known as "blues" for
6  their blue coloring.
7           Do you see that?
8           MR. LIMBACHER:  Object to form.
9           THE WITNESS:  I see the line you
10      just read, it's a part of the next
11      sentence.
12 BY MS. SCULLION:
13     Q.   Okay.  So, again, so the DEA is
14 not only confirming that as of May 2011 Opana ER
15 is being abused as a street drug, but, in fact,
16 oxymorphone had a history of such abuse,
17 correct?
18          MR. LIMBACHER:  Object to form.
19          THE WITNESS:  You read the
20      summary, you read the details, so I
21      think the text explains apparently what
22      the DEA was reporting.
23 BY MS. SCULLION:
24     Q.   And you don't have any reason to

Page 543

1  dispute what the DEA, the federal agency charged
2  with enforcement of laws concerning Opana ER and
3  other narcotics, you don't dispute their
4  assessment of Opana ER's street use, do you?
5           MR. LIMBACHER:  Object to form.
6           THE WITNESS:  Providing this is
7       truly a DEA brief, no, I don't have any
8       grounds to dispute DEA actions.
9  BY MS. SCULLION:
10     Q.   Okay.
11          MR. LIMBACHER:  Counsel, Exhibit
12      49 has on the first page "Attachment
13      16."  Was this part of a larger
14      document?
15          MS. SCULLION:  I will tell you it
16      was produced to us this way, so I do not
17      know.
18          MR. LIMBACHER:  Would it be with
19      other attachments?
20          MS. SCULLION:  I do not know,
21      sitting here.
22          MR. LIMBACHER:  So you don't know
23      to what it was attached to --
24          MS. SCULLION:  Or not attached.

Page 544

1           MR. LIMBACHER:  -- or what it was
2       part of?
3           MS. SCULLION:  I do not.
4  BY MS. SCULLION:
5      Q.   You said that in connection with
6  your preparation for the deposition, you did
7  review some of the RiskMAP updates that Endo
8  submitted for Opana ER to the FDA, right?
9      A.   Yes.
10     Q.   And do you recall that those
11 RiskMAP updates did include discussions of cases
12 of apparent abuse of Opana ER from time to time?
13     A.   Generally, from time to time,
14 yes.  Again, I didn't review every single one,
15 but just to refresh my recollection or to
16 understand that these were regular part of the
17 risk management team's activities.
18     Q.   And those reports also showed
19 from time to time overdoses from Opana ER,
20 correct?
21          MR. LIMBACHER:  Object to form.
22          THE WITNESS:  I would put those
23      under the same heading as adverse
24      events.

Page 545

1  BY MS. SCULLION:
2      Q.   So deaths from Opana ER?
3           MR. LIMBACHER:  Object to form.
4           THE WITNESS:  I do think that the
5       one I reviewed that I did see that, but,
6       again, I don't recall the details.  I
7       wasn't reviewing it at that level of
8       detail.
9  BY MS. SCULLION:
10     Q.   And showed reference to street
11 use of Opana ER, correct?
12          MR. LIMBACHER:  Object to form.
13          THE WITNESS:  If there's a
14      specific report that you'd like me to
15      look at, I could probably give you more
16      information.
17 BY MS. SCULLION:
18     Q.   Do you recall those same
19 indications that Opana ER was being abused,
20 including by people buying and selling Opana ER?
21          MR. LIMBACHER:  Object to form.
22          THE WITNESS:  I know in the
23      records that I reviewed, I don't
24      specifically recall that, but, again, as

Page 546

1  I said, I'd be happy to review a
2  specific one, if you'd like, if that
3  would be helpful.
4         MS. SCULLION: Let's see if we
5  can. Can we have the Q1 2008 RiskMAP
6  update.
7         (Document marked for
8         identification as Endo-Lortie Deposition
9         Exhibit No. 50.)
10 BY MS. SCULLION:
11    Q.   Let me hand you what's been
12 marked as Exhibit 50.
13       And Exhibit 50 is Bates stamped
14 ENDO-CHI_LIT-00032209. And, Mr. Lortie, this
15 does not bear an E number.
16    A.   Okay, thank you.
17    Q.   This is the RiskMAP update report
18 for Opana ER dated May 22nd, 2008 covering the
19 period January 1st, 2008 to March 31, 2008,
20 correct?
21    A.   Yes, that's the date that's on
22 the title page.
23    Q.   And if you'll turn to page 20 of
24 the update report, the page numbers are in the

Page 547

1  upper right-hand corner.
2     A.   Yes, got it.
3     Q.   And if you'll go to the section
4  "6. Post Marketing Surveillance," section "6.1
5  Periodic Reports," going down to the subheading
6  "Drug Abuse/Intentional Drug misuse."
7        Are you with me?
8     A.   Yeah, I'm just going to kind of
9  orient myself here.
10    Q.   Yep.
11    A.   (Witness reviews document.)
12       Okay. And you'd like me to look
13 at the subsection?
14    Q.   The subsection "Drug
15 Abuse/Intentional Drug Misuse."
16    A.   Okay.
17    Q.   Are you there?
18    A.   Yes, I'm focused on that.
19    Q.   Okay. And in this update report,
20 Endo has reported to the FDA "There were 7
21 reports related to drug abuse and misuse of
22 Opana ER," correct?
23    A.   That's what the sentence says,
24 yes.

Page 548

1     Q.   That's what Endo told the FDA in
2  this report, correct?
3        MR. LIMBACHER: Object to form.
4        THE WITNESS: Yes, that's what's
5     written in the report.
6  BY MS. SCULLION:
7     Q.   And then Endo further told the
8  FDA, "In all 7 reports, Opana ER was misused by
9  crushing and snorting the tablets," correct?
10    A.   Yes, that's what it says.
11    Q.   And then if you'll go down to the
12 sentence that begins, "another report."
13    A.   Yes.
14    Q.   You see that?
15    A.   On the fourth line.
16    Q.   And this is indicating -- sorry,
17 strike that.
18       In this sentence Endo has told
19 the FDA that "Another report (OPER20080023)
20 involved a 45-year-old man who was a known drug
21 abuser being treated for drug addiction, was
22 purchasing Opana ER 40 mg tablets with a
23 twenty-dollar co-pay and was also buying the
24 product on the streets."

Page 549

1        Do you see that?
2     A.   Yes, I do.
3     Q.   So, I mean, Endo is telling the
4  FDA that it has reports as of at least May 22nd,
5  2008 of Opana ER being purchased on the street,
6  correct?
7        MR. LIMBACHER: Object to form.
8        THE WITNESS: That apparently is
9     what's in the report, yes.
10 BY MS. SCULLION:
11    Q.   So Endo knew at that point, at
12 least, if not earlier, that Opana ER had street
13 value, correct?
14       MR. LIMBACHER: Object to form.
15       THE WITNESS: Well, it's
16    acknowledging and reporting to the FDA
17    that in this case that product was
18    purchased on the street.
19 BY MS. SCULLION:
20    Q.   Which meant it had street value,
21 right?
22       MR. LIMBACHER: Object to form.
23       THE WITNESS: I'm not sure what
24    street value means. It doesn't quantify

Page 550

1    it, but it was purchased, so I imagine
2    there was an exchange of value of some
3    sort.
4  BY MS. SCULLION:
5    Q.  I mean, as your -- in your time
6  with commercial responsibility for Opana ER, did
7  you have any training on the concept of Opana ER
8  or other opioid products being bought and sold
9  on the street and having street value?  Is that
10 something you had training on?
11           MR. LIMBACHER:  Object to form.
12           THE WITNESS:  I don't understand
13     what training would be with regards to
14     street value.
15 BY MS. SCULLION:
16    Q.  Were you given training on the
17 ways in which narcotics like Opana ER could be
18 diverted?
19           MR. LIMBACHER:  Object to form.
20           THE WITNESS:  That's a very
21     different question.
22 BY MS. SCULLION:
23    Q.  I'm asking a different question.
24 Were you given training on that issue?

Page 551

1    A.  All employees, as part of the
2  code of conduct, especially those with
3  involvement in our controlled substances had to
4  undergo periodic training, certify their
5  compliance with that, and within that context,
6  generally, I would say that all employees were
7  aware of the potential for diverse and abuse --
8  or abuse and diversion of the opioid product.
9  So at that level, everyone was aware because it
10 was part of the responsibility to watch out for
11 that, and it's the underpinning of the RiskMAP
12 and the REMS and all of the other documents.
13          Beyond that, I don't recall any
14 specific training on street value or any of the
15 like at that level, I don't.
16    Q.  Putting your 30(b)(6) hat, your
17 corporate representative hat back on, seeing all
18 the reports of abuse, misuse, diversion of Opana
19 ER over the years that were reported to the FDA
20 in the RiskMAP updates, did Endo ever tell the
21 FDA that its RiskMAP was ineffective to combat
22 diversion or abuse?
23           MR. LIMBACHER:  Object to the
24     form and object as falling outside the

Page 552

1    scope of the topics on which he's been
2    designated.
3           THE WITNESS:  I don't know.
4  BY MS. SCULLION:
5    Q.  Did -- in response to all the
6  evidence of abuse and diversion of Opana ER over
7  a number of years in which the RiskMAP updates
8  were submitted to the FDA, did Endo ever change
9  its policies or procedures with respect to
10 combating diversion of Opana ER in response to
11 that evidence?
12           MR. LIMBACHER:  Same objections.
13           THE WITNESS:  As we've testified
14     before, the RiskMAP formed the basis in
15     2007 of a broad array of activities
16     undertaken by the company.  The RiskMAP
17     report that you just focused me on from
18     2008, reports like that were done
19     periodically as part of that.  The
20     RiskMAP was enhanced in 2012 with the
21     industry-wide REMS, so I would say that
22     constituted a change or an evolution of
23     the policies and procedures.
24           There was a further evolution as

Page 553

1    a result of discussions with the New
2    York Attorney General later, several
3    years later.
4           So I would say that, yes, Endo's
5    policies and procedures did evolve over
6    time, but they were always grounded in
7    the same principles that were put
8    forward back in 2007 in the very
9    comprehensive RiskMAP.
10 BY MS. SCULLION:
11    Q.  So the question is, though,
12 during the period when Endo had its RiskMAP in
13 place, did Endo ever change its anti-diversion
14 procedures in response to the growing evidence
15 that Opana ER was being abused?
16           MR. LIMBACHER:  Same objections,
17     asked and answered.
18           THE WITNESS:  Same answer.  I
19     mean, I can repeat the answer, if you
20     would like.
21 BY MS. SCULLION:
22    Q.  Well, the answer, as I
23 understood, was that the change occurred, in
24 your view, when REMS was implemented.

Page 554

1  Before REMS, if I'm wrong, you'll
2 tell me no, before REMS, did Endo change any of
3 its anti-diversion procedures in response to the
4 evidence of Opana ER abuse?
5  MR. LIMBACHER: Same objections,
6  and I think you misstated his testimony.
7 BY MS. SCULLION:
8  Q. Please let me know if I did.
9  A. You did. So I'll explain again.
10  The principles as put forth in
11 the 2007 REMS were the underpinning of all of
12 the activities.
13  Q. Did you mean RiskMAP?
14  A. What did I say?
15  Q. REMS.
16  A. Strike that, please, or I'll
17 repeat that. Thank you.
18  In the 2007 RiskMAP the
19 principles that were put forward there were the
20 -- formed the foundation of the broad array of
21 activities that continue today. So the RiskMAP
22 was not replaced by the REMS, it was supplanted
23 by or it was supplemented by the REMS.
24  As I said, also, as a result of

Page 555

1 discussions with the New York Attorney General
2 several years later, there was some further
3 evolutions of policies and procedures, but I
4 can't attest that those are in response to any
5 specific trigger or any specific event. They
6 were in response to ongoing focus by a broad
7 array of cross-functional experts within the
8 company to make sure that the company was doing
9 everything within its power to mitigate abuse
10 and diversion. Again, those are the principles
11 as put forward in the 2007 RiskMAP.
12  Q. Well, in response to the evidence
13 of abuse of Opana ER, did Endo ever, for
14 example, say, well, we want to go beyond just
15 monitoring and we want to go out and actively
16 look for pill mills and ensure that our product
17 is not being supplied to pill mills?
18  MR. LIMBACHER: Same objections.
19  THE WITNESS: Endo certainly had
20  safeguards in place to mitigate the
21  chance that its products were being
22  diverted to, as you say, pill mills.
23  Whether that was in response to any one
24  specific trigger, it was in response to

Page 556

1  broad understanding that opioids had the
2  potential of being abused and diverted.
3 BY MS. SCULLION:
4  Q. But can you identify any
5 particular change Endo made to its
6 anti-diversion procedures in response to growing
7 evidence of Opana ER abuse, any specific,
8 concrete changes that Endo made?
9  MR. LIMBACHER: Same objections.
10  THE WITNESS: As I said before,
11  the REMS, industry-wide REMS was part of
12  the evolution of the program. The
13  changes put forward as a result of
14  discussions with the New York Attorney
15  General, the ADD program had several
16  enhancements to it.
17  I would say that one of the
18  changes Endo made in response to
19  knowledge of the growing threat was to
20  formulate a product that was designed to
21  mitigate at least one of the forms of
22  abuse of the product. So, yes, Endo
23  undertook several steps to try and
24  mitigate that problem.

Page 557

1 BY MS. SCULLION:
2  Q. But the FDA didn't agree that, in
3 fact, the reformulated version of Opana ER was
4 any more effective at combating abuse, correct?
5  MR. LIMBACHER: Object to form.
6 BY MS. SCULLION:
7  Q. The FDA never accepted any data
8 that Endo put forward on that point?
9  MR. LIMBACHER: Object to form.
10  THE WITNESS: Oh, FDA accepted
11  all the date we submitted.
12 BY MS. SCULLION:
13  Q. It didn't accept the conclusion
14 that reformulated Opana ER was, in fact, abuse
15 deterrent, right; they never made that finding?
16  MR. LIMBACHER: Object to form.
17  THE WITNESS: Correct. At the
18  end of the submission and the
19  evaluation, the FDA ultimately did not
20  agree, but they accepted everything we
21  submitted.
22 BY MS. SCULLION:
23  Q. Now, you just referenced REMS --
24  A. Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 662

1 clearly that the DEA, first of all, by
2 the fact that they allowed us to have
3 this meeting with the fairly high
4 ranking number of DEA personnel was
5 quite remarkable, and I recall them
6 indicating to us that they were also --
7 they shared our objective of making
8 incremental steps to try and mitigate
9 abuse of in this case -- in our case of
10 Opana. They recognized that crushing
11 and snorting was an important route of
12 abuse and misuse, and they were
13 particularly aligned with our efforts in
14 support of -- in fact, there's some text
15 in here that indicates the DEA being
16 highly aligned with Endo's plan to
17 introduce a new formulation as quickly
18 as possible.
19         And, again, generally, I recall
20 them recognizing and being in alignment
21 with our recognition of the problem and
22 our plans to try to address it.
23         MS. SCULLION: Note also my
24 objection to the hearsay.

Page 663

1 BY MR. LIMBACHER:
2     Q.   If you have in front of you
3 Exhibit 55. I wanted to ask you a couple of
4 questions about that. That's one of the
5 exhibits that counsel from Tennessee was asking
6 you about.
7     A.   And you said 55?
8     Q.   Yes.
9     A.   Thank you. Sorry about that.
10    Q.   Take a look at Exhibit 55.
11         Do you recall being asked
12 questions about this particular document by
13 counsel representing plaintiffs from Tennessee?
14    A.   Yes, I do.
15    Q.   And do you recall that the
16 questions you were being asked suggested that
17 Endo considered abuse and misuse an issue of
18 mere perception?
19    A.   I do recall that, yes.
20    Q.   Did he show you various pages
21 from the slide deck that is attached to the
22 first page of Exhibit 55?
23    A.   Yes, he did.
24    Q.   Let me refer you to slide number

Page 664

1 6 of Exhibit 55. It has the heading "Abuse &
2 Misuse Overview."
3     A.   Yes, I have slide 6.
4     Q.   Did counsel show this particular
5 slide to you?
6     A.   I do not believe he did, no.
7     Q.   Can you summarize for us what's
8 set forth on this particular slide?
9          MS. SCULLION: Objection to form,
10         foundation. As I recall, the objection
11         was made to the witness testifying about
12         the slide deck on the grounds that he
13         did not recall it.
14 BY MR. LIMBACHER:
15    Q.   You can go ahead and answer the
16 question.
17    A.   Thank you. So what I read on
18 this slide is that it's acknowledging -- that
19 the author is acknowledging after the previous
20 slides to set up whatever the discussion is and,
21 again, just to reinforce, I wasn't part of that
22 discussion, so I don't know who the audience was
23 or the context, but after setting that up with
24 some of the previous slides that I reviewed, the

Page 665

1 author now states that abuse and misuse, at
2 least in the view of the author, is a real
3 public health epidemic, a real public health
4 epidemic and has several points of support for
5 that statement, including number of overdoses,
6 deaths related to overdoses, how many Americans
7 reported nonmedical use of prescription pain
8 medications, emergency department visits,
9 nonmedical use of prescriptions medications
10 costing health insurers billions of dollars.
11         So it puts into context, I think,
12 a view on the seriousness of the abuse and
13 misuse of controlled substances.
14    Q.   We've been here two days and
15 you've answered a lot of questions, Mr. Lortie.
16 I just want to have you step back for just a
17 moment and ask you how would you describe Endo's
18 efforts to minimize the risk of abuse and
19 diversion of Opana?
20         MS. SCULLION: Objection to form.
21         THE WITNESS: I spent seven years
22         or so there in a senior position, always
23         with some close proximity to the pain
24         business, and it was a company that was

Page 666

1  deeply rooted in pain therapeutics and,
2  therefore, believed importantly that
3  patients who suffer from chronic pain
4  deserve access to medicines that help
5  them live as nearly normal a life as
6  possible.
7      The company always also
8  recognized that there's a potential for
9  diversion and misuse and abuse of these
10 medicines. That's been long established
11 long before I got there.
12     And, therefore, always had in
13 place not just policies and procedures
14 and professionals whose job it was to
15 play an important role in making sure to
16 the extent of the company's capabilities
17 that that was taken seriously and
18 necessary steps were taken, but also a
19 company culture of compliance with
20 regulations and the spirit so that there
21 wasn't jeopardy to patients who deserved
22 to have access to important medicines to
23 live their normal lives.
24     So it was not just company

Page 667

1  activity, but it was really a cultural
2  aspect of compliance, and I'm proud of
3  my time there. I really feel that the
4  company did what it could and always
5  took it very seriously.
6      MS. SCULLION: Move to strike as
7  improper narrative.
8      MR. LIMBACHER: Thank you,
9  Mr. Lortie. That's all the questions I
10 have.
11     THE VIDEOGRAPHER: Going off the
12 record at 7:43 p.m.
13     (Brief recess.)
14     THE VIDEOGRAPHER: We are back on
15 the record at 8:01.
16 BY MS. SCULLION:
17     Q.   Mr. Lortie, welcome back.
18     Counsel had asked you to describe
19 Endo's efforts to minimize their risk of abuse
20 and diversion of Opana.
21     Do you remember he asked that
22 question?
23     A.   Yes, I do.
24     Q.   Okay. Now, the fact is that Endo

Page 668

1  withdrew original Opana ER for safety reasons,
2  correct, discontinued for safety reasons?
3      MR. LIMBACHER: Object to form.
4      THE WITNESS: That was our
5  understanding at the time, yes.
6  BY MS. SCULLION:
7      Q.   And the safety reasons for which
8  Endo cited for the withdrawal were that Opana ER
9  was subject to both intentional and inadvertent
10 abuse and misuse, correct?
11     MR. LIMBACHER: Object to form.
12     THE WITNESS: I believe that to
13 be the case at the time. That was the
14 company's understanding, yes.
15 BY MS. SCULLION:
16     Q.   And, in fact, throughout the time
17 that Endo was submitting RiskMAP updates to the
18 FDA, Endo was consistently noting case after
19 case of abuse and misuse of Opana ER, correct?
20     MR. LIMBACHER: Object to form.
21     THE WITNESS: The subject of the
22 RiskMAP -- of the RiskMAP updates would
23 have included that type of information,
24 that is correct.

Page 669

1  BY MS. SCULLION:
2      Q.   Let's look at some of the RiskMAP
3  updates. Can you pull back Exhibit Number 50.
4      A.   I will find it, yes.
5      Q.   Do you have Exhibit Number 50 in
6  front of you?
7      A.   I do have Exhibit Number 50, yes.
8      Q.   Okay. And this is the RiskMAP
9  update report we looked at before dated
10 May 22nd, 2008.
11     Can you turn to page 20 of that
12 exhibit?
13     A.   Sure.
14     Q.   You see under "Periodic Reports"
15 that Endo reports to the FDA that there were a
16 total of 306 adverse event reports submitted to
17 the agency since approval of the product,
18 correct?
19     A.   Yes, that's correct.
20     Q.   Endo then goes on to state in the
21 last sentence of that paragraph, "Post marketing
22 safety surveillance of Opana ER since launch has
23 not identified any new safety issues," correct?
24     A.   That's what it says, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 670

1  Q. Right. And then that was the
2 update report covering January 1st, 2008 to
3 March 31st, 2008.
4       Let's look at the next year.
5       (Document marked for
6       identification as Endo-Lortie Deposition
7       Exhibit No. 61.)
8 BY MS. SCULLION:
9  Q. Show you what's been marked as
10 Exhibit 61.
11       And Exhibit 61 for the record is
12 Bates stamped EPI000119179, and this is a
13 RiskMAP Update Report covering the period
14 January 1st, 2009 to March 31st, 2009.
15       If you could turn to page 16 of
16 this RiskMAP Update Report. And again looking
17 under "Post Marketing Surveillance," 6.1, do you
18 see the last sentence of that paragraph, Endo
19 once again reports "Post marketing surveillance
20 of Opana ER since launch has not identified any
21 new safety issues."
22       Did I read that correctly?
23  A. Let me just catch up to you here.
24 And that's in paragraph 6.1, correct.

Page 671

1  Q. Last sentence.
2  A. Periodic reports.
3       Yes, I believe you read that
4 accurately.
5  Q. And let's look now at the report
6 for January 1st, 2010 to March 31st, 2010.
7       (Document marked for
8       identification as Endo-Lortie Deposition
9       Exhibit No. 62.)
10 BY MS. SCULLION:
11  Q. It's Exhibit Number 62.
12       And it's Bates stamped
13 ENDO-OR-CID-00681354. And here again, if you'll
14 turn to page 15 of this RiskMAP update, bottom
15 of the page, "Post Marketing Surveillance,
16 Periodic Reports," and the paragraph carries
17 over to the top of the next page, page 16, and,
18 once again, at the end of that paragraph, Endo
19 reports "Postmarketing surveillance of Opana ER
20 since launch has not identified any new safety
21 issues," correct?
22  A. Yeah, I read that as any new
23 safety issues, in other words, any new safety
24 issues that have not been previously described

Page 672

1 in terms of the definition of them.
2  Q. It's the same sentence in every
3 report so far, right?
4       MR. LIMBACHER: Object to form.
5       THE WITNESS: I'm not sure.
6       (Document marked for
7       identification as Endo-Lortie Deposition
8       Exhibit No. 63.)
9 BY MS. SCULLION:
10  Q. So then let's go to the report
11 for the period January 1st, 2011 to March 31st,
12 2011. I hand you what's been marked as Exhibit
13 Number 63.
14       And that is Bates stamped
15 END00308793.
16       And, again, if you'll turn to
17 page 18, section "Post marketing Surveillance,"
18 subsection 6.1, "Periodic Reports."
19  A. Can you just let me catch up to
20 where you are.
21  Q. Sure.
22  A. Okay, thank you. You said 18,
23 correct?
24  Q. Correct. Do you see paragraph

Page 673

1 6.1 Periodic Reports?
2  A. I do.
3  Q. And, again, Endo reports to the
4 FDA "Postmarketing surveillance of Opana ER
5 since launch has not identified any new safety
6 issues."
7       That's what it says, right?
8  A. You read that correctly.
9  Q. Okay. And let's look at the
10 report for the last half of 2011.
11       (Document marked for
12       identification as Endo-Lortie Deposition
13       Exhibit No. 64.)
14 BY MS. SCULLION:
15  Q. Hand you what's been marked as
16 Exhibit Number 64.
17       And Exhibit 64 is Bates stamped
18 EPI000015268.
19       And if you'll turn in this
20 exhibit to page 18, I direct your attention
21 again to the section "Post Marketing
22 Surveillance," paragraph 6.1, "Periodic
23 Reports."
24       Are you with me?

Page 674

1  A. Yes, on the top of 18.
2  Q. And, once again, for the period
3 July 1st, 2011 to September 30th, 2011, Endo's
4 reporting "Postmarketing surveillance of Opana
5 ER since launch has not identified any new
6 safety issues."
7     Did I read that correctly?
8  A. Yes, you did.
9  Q. Now, as we saw earlier in your
10 testimony, as of May 2011, the DEA for the
11 Philadelphia area office had, in fact,
12 identified that there was evidence of widespread
13 abuse of Opana ER, correct?
14     MR. LIMBACHER: Object to form,
15   foundation.
16     THE WITNESS: I'd be happy to
17   look at that document again. We saw it
18   a while ago.
19 BY MS. SCULLION:
20  Q. It's in the record.
21     So now let's turn to the RiskMAP
22 Update Report for the period October 1st, 2011
23 to December 31st, 2011, and I'll note it's dated
24 March 7th, 2012.

Page 675

1     (Document marked for
2     identification as Endo-Lortie Deposition
3     Exhibit No. 65.)
4 BY MS. SCULLION:
5  Q. It's Exhibit 65.
6     And Exhibit 65 is Bates stamped
7 ENDO-OR-CID-01044118.
8  A. Yes, I have that.
9  Q. Okay. Now, if you'll go to page
10 4 of this report, under the heading
11 "Introduction," looking at the second paragraph,
12 and Endo reports to the FDA, "Overall, during
13 this period no safety signals have been
14 identified and no patterns have diversion were
15 observed in the supply chain."
16     Did I read that correctly?
17     MR. LIMBACHER: Object to form.
18     THE WITNESS: That's -- you read
19    the sentence accurately.
20 BY MS. SCULLION:
21  Q. Next sentence, "Based on the
22 available data, no new trends were observed, but
23 abuse and misuse of Opana and Opana ER continues
24 to be a problem."

Page 676

1     Do you see that?
2  A. Yes, again, you read that
3 correctly.
4  Q. Okay. So Endo is acknowledging
5 finally in this report that abuse and misuse of
6 Opana ER is a problem, nonetheless Endo is
7 saying there's no safety signal; is that
8 correct?
9     MR. LIMBACHER: Object to form,
10    misstates the evidence.
11     THE WITNESS: Well, you pointed
12    me to a different spot. I'd be happy to
13    go back and look at the other exhibits.
14    We didn't look at the introduction, so I
15    can't comment on the -- whether or not
16    the comment about abuse and misuse of
17    Opana and Opana ER continues to be a
18    problem. I suspect it's in the
19    introduction of the other documents as
20    well.
21 BY MS. SCULLION:
22  Q. Well, if you look at the date for
23 Exhibit 65, this is dated March 7th, 2012,
24 correct?

Page 677

1  A. That's the date of the report,
2 yes.
3  Q. And as of that date, Endo now had
4 FDA approval for its reformulated version of
5 Opana ER, correct?
6  A. Well, as of March 7th it did. Of
7 course, the period is covering December 31st,
8 the product had just received approval, but it
9 was not yet marketed. In fact, in March of 2012
10 it was not on the market.
11  Q. But as of the date of the report,
12 Endo had in hand now approval to launch a new
13 product, correct?
14  A. FDA approval was received in
15 December of 2011, but there was some time to
16 ensure manufacturing of adequate supply before
17 it was put into the marketplace.
18  Q. And the question is, though, as
19 of the date of this report, Endo now had in hand
20 FDA approval for a reformulated version of Opana
21 ER, right?
22  A. As of the time of the report it
23 did, yes.
24  Q. And Endo's intention was to

Highly Confidential - Subject to Further Confidentiality Review

Page 678

1 substitute the reformulated version of Opana ER
2 for the original version, correct?
3     MR. LIMBACHER: Object to form
4   and foundation.
5     THE WITNESS: The plan was to
6   effect as smooth as possible a
7   transition between the original
8   formulation and new formulation, the key
9   objective being to ensure that patients
10   who were titrated to effect were not --
11   didn't experience an interruption in
12   supply. We had some challenges doing
13   that but...
14 BY MS. SCULLION:
15   Q. But Endo intended at the end of
16 that to have the newly reformulated version of
17 Opana ER replace the old version, correct?
18     MR. LIMBACHER: Same objections.
19     THE WITNESS: The ultimate plan
20   was to have only the new version on the
21   market.
22 BY MS. SCULLION:
23   Q. Correct.
24     And, as we discussed before,

Page 679

1 Endo's intent was to have that reformulated
2 version approved as an abuse deterrent
3 formulation, correct?
4     MR. LIMBACHER: Same objections.
5     THE WITNESS: That was the intent
6   and the objective, yes.
7 BY MS. SCULLION:
8   Q. Right, and the FDA never approved
9 the reformulated product as an abuse deterrent
10 formulation, correct?
11     MR. LIMBACHER: Object to form,
12   asked and answered.
13     THE WITNESS: Ultimately, after
14   much deliberation and submission of data
15   and negotiations and discussions, that's
16   correct, they have not yet or they never
17   did finally approve that language.
18 BY MS. SCULLION:
19   Q. And you're aware, are you not,
20 that after a number of years of selling the
21 reformulated product, Endo withdrew that product
22 after the FDA had determined that the abuse of
23 the reformulated product also showed that its
24 risks outweighed its benefits from a safety

Page 680

1 perspective, correct?
2     MR. LIMBACHER: Object to form
3   and outside the scope of the direct.
4     THE WITNESS: I understand that
5   is what eventually happened. That, of
6   course, happened after I left the
7   company, so I wasn't part of that
8   decision.
9 BY MS. SCULLION:
10   Q. So, overall, the original Opana
11 ER proved to be too unsafe because of abuse, and
12 the reformulated version of Opana ER likewise
13 proved to be too unsafe because of abuse,
14 correct?
15     MR. LIMBACHER: Objection, form
16   foundation and misstates the evidence.
17     THE WITNESS: Yeah, I don't think
18   I can agree with that, so I disagree.
19     MS. SCULLION: I have no further
20   questions.
21     THE VIDEOGRAPHER: That concludes
22   today's deposition. The time is
23   8:14 p.m.
24     (Brief recess.)

Page 681

1     (Deposition resumes at 8:15 p.m.)
2     MR. LIMBACHER: We have no
3   questions.
4     (Witness excused.)
5     - - -

Page 682

1  C E R T I F I C A T I O N
2      I, MARGARET M. REIHL, a
3  Registered Professional Reporter,
4  Certified Realtime Reporter, Certified
5  Shorthand Reporter, Certified LiveNote
6  Reporter and Notary Public, do hereby
7  certify that the foregoing is a true and
8  accurate transcript of the testimony as
9  taken stenographically by and before me
10 at the time, place, and on the date
11 hereinbefore set forth.
12     I DO FURTHER CERTIFY that I
13 am neither a relative nor employee nor
14 attorney nor counsel of any of the
15 parties to this action, and that I am
16 neither a relative nor employee of such
17 attorney or counsel, and that I am not
18 financially interested in the action.
19
20
21 ------------------------------
   Margaret M. Reihl, RPR, CRR, CLR
22 CSR #XI01497  Notary Public
23
24

Page 684

1      ACKNOWLEDGMENT OF DEPONENT
2
3      I, BRIAN LORTIE, do hereby
4  certify that I have read the foregoing
5  pages, and that the same is a correct
6  transcription of the answers given by me
7  to the questions therein propounded,
8  except for the corrections or changes in
9  form or substance, if any, noted in the
10 attached Errata Sheet.
11
12
13
   _____
14 BRIAN LORTIE           DATE
15
   Subscribed and sworn to before me this
16
   _____ day of _____, 2018.
17
   My commission expires:_____
18
19 _____
   Notary Public
20
21
22
23
24

Page 683

1       - - - - - -
2         E R R A T A
3       - - - - - -
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6  REASON: _____
7  ____  ____  _____
8  REASON: _____
9  ____  ____  _____
10 REASON: _____
11 ____  ____  _____
12 REASON: _____
13 ____  ____  _____
14 REASON: _____
15 ____  ____  _____
16 REASON: _____
17 ____  ____  _____
18 REASON: _____
19 ____  ____  _____
20 REASON: _____
21 ____  ____  _____
22 REASON: _____
23 ____  ____  _____
24 REASON: _____