# EXHIBIT 103

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                      - - -
 5
    IN RE:  NATIONAL         :  HON. DAN A.
 6  PRESCRIPTION OPIATE      :  POLSTER
    LITIGATION               :
 7                           :
    APPLIES TO ALL CASES     :  NO.
 8                           :  1:17-MD-2804
                             :
 9
                  - HIGHLY CONFIDENTIAL -
10
    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                        - - -
12
                   March 15, 2019
13
                        - - -
14
15            Videotaped deposition of
    STEPHEN C. MACRIDES taken pursuant to
16  notice, was held at the offices of
    McCarter & English, LLP, 1600 Market
17  Street, Philadelphia, Pennsylvania,
    beginning at 9:05 a.m., on the above
18  date, before Michelle L. Gray, a
    Registered Professional Reporter,
19  Certified Shorthand Reporter, Certified
    Realtime Reporter, and Notary Public.
20
                        - - -
21
22        GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
23             deps@golkow.com
24
```

Page 50

1  the years that Endo, Qualitest and Par's
2  products were abused and diverted,
3  correct?
4         MS. VANNI:  Objection.
5         THE WITNESS:  I don't know
6     to what degree Endo and Qualitest
7     products were diverted.
8  BY MR. BUCHANAN:
9     Q.   I didn't ask you to what
10 degree.  We can agree that Endo and
11 Qualitest opioid products were abused and
12 diverted, correct, sir?
13        MS. VANNI:  Objection.
14        THE WITNESS:  We can agree
15    that if these products are not
16    properly controlled, they can be
17    diverted and abused.
18 BY MR. BUCHANAN:
19    Q.   That's not my question.
20        Sitting here today, as the
21 corporate representative for Par, Endo
22 and Qualitest, is it your testimony, sir,
23 that no -- and we're looking at hundreds
24 of millions of pills and dosage units for

Page 51

1  each year, that none of the Endo opioids,
2  of the Par opioids, of the Qualitest
3  opioids, were abused or diverted, is that
4  your testimony, sir?
5         MS. VANNI:  Objection.
6         THE WITNESS:  I can't -- I
7     cannot speak to the degree to
8     which Endo or Qualitest opioid
9     products may or may not have been
10    abused.
11        What I can testify to is
12    that if these products are not
13    properly controlled, they -- they
14    can be abused and diverted.
15 BY MR. BUCHANAN:
16    Q.   Right.  And again, you keep
17 coming back to the degree, which I guess
18 does answer my question, sir.
19        Because you do agree that
20 Endo, Qualitest and Par products were
21 abused and diverted?
22    A.   I agree that these
23 products --
24        MS. VANNI:  Objection.

Page 52

1         Objection.  Misstates his
2     testimony.
3         Go ahead.  Give me a second
4     to object.
5         THE WITNESS:  I -- sorry.
6         MS. VANNI:  It's okay.
7  BY MR. BUCHANAN:
8     Q.   You can answer.
9         MS. VANNI:  You can answer.
10        THE WITNESS:  I'm testifying
11    that these products, if not
12    properly controlled, can be abused
13    or diverted.
14 BY MR. BUCHANAN:
15    Q.   I'm just trying to get an
16 answer, sir, to a very, I think, simple
17 question.
18        Is it the testimony of Endo,
19 Par and Qualitest corporate designee that
20 Endo, Qualitest, and Par's opioid
21 products were not abused or diverted?
22        MS. VANNI:  Objection.
23 BY MR. BUCHANAN:
24    Q.   Is that your testimony, sir?

Page 53

1         MS. VANNI:  Objection.
2     Asked and answered.
3         THE WITNESS:  My testimony
4     is that if these products are not
5     properly controlled, they can be
6     abused or diverted.
7  BY MR. BUCHANAN:
8     Q.   Okay.  I don't think we're
9  communicating, are we?
10        MS. VANNI:  Objection to
11    colloquy.
12 BY MR. BUCHANAN:
13    Q.   This feels like a Sunday
14 morning talk show five minutes in.
15        Are you having a problem
16 understanding my question?
17        MS. VANNI:  Objection.
18        THE WITNESS:  I don't --
19    I -- I'm not having a problem
20    understanding your question.
21 BY MR. BUCHANAN:
22    Q.   Okay.  So my question, sir,
23 and just as a -- it will really help us,
24 I think, throughout the day, if I

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  understand really the point of view of
2  the company with regard to whether or not
3  its drugs have been -- have been abused
4  or diverted.
5         MS. VANNI:  Objection.
6         Asked and answered.
7  BY MR. BUCHANAN:
8      Q.   Is it the companies'
9  understanding that its drugs have not
10 been abused or diverted?
11        MS. VANNI:  Objection.
12        THE WITNESS:  I'm saying
13     that it's the companies'
14     understanding that if its products
15     are not properly controlled and
16     kept within a closed system, that
17     they can be abused or diverted.
18     That's how I'm answering the
19     question.
20 BY MR. BUCHANAN:
21     Q.   I -- I understand that, as
22 a -- as a speaker of the English
23 language, do you understand my question?
24        MS. VANNI:  Objection to

Page 55

1     form.  Argumentive.
2  BY MR. BUCHANAN:
3      Q.   Do you understand what I'm
4  asking?
5      A.   I understand what you're
6  asking.
7      Q.   And you're electing not to
8  answer it?
9      A.   You're asking me if I have
10 specific knowledge that our products have
11 been abused, and I'm telling you that I
12 do not.
13     Q.   No, no.
14     A.   What I -- what I'm telling
15 you is that I have an understanding that
16 if our products are not properly
17 controlled, they can be abused or
18 diverted.
19     Q.   Would it surprise you to
20 learn, sir, that, in fact, Endo's,
21 Qualitest's, and Par's products were
22 indeed abused and diverted?
23        MS. VANNI:  Object to form.
24 BY MR. BUCHANAN:

Page 56

1      Q.   Would that surprise you?
2      A.   As I stated, if our products
3  are not properly controlled, they can be
4  diverted.
5      Q.   I'm asking you whether you'd
6  be surprised to learn that your products
7  were abused and diverted?
8         MS. VANNI:  Object to form.
9         THE WITNESS:  I would be
10     surprised in the context that we
11     have proper controls in place to
12     prevent abuse and diversion.
13 BY MR. BUCHANAN:
14     Q.   I -- what does that mean?
15 I'm just asking you as a fact.
16        As a fact, would it be
17 surprising to you, sir, that drugs were
18 not used for legitimate medical need
19 pursuant to proper prescription, would
20 that surprise you?
21        MS. VANNI:  Object to form.
22        THE WITNESS:  I understand
23     that there is an opioid abuse
24     epidemic in this country.

Page 57

1  BY MR. BUCHANAN:
2      Q.   Okay.
3      A.   And I understand that opioid
4  products are making their way out of the
5  closed system and are subject to abuse
6  and diversion.  Yes, I understand that.
7      Q.   Okay.  Okay.  So we can
8  agree on a few things then.
9         There's an opioid epidemic.
10        MS. VANNI:  Object to form.
11        THE WITNESS:  Opioid abuse
12     epidemic.
13 BY MR. BUCHANAN:
14     Q.   Okay.  So, meaning opioids
15 are being abused that were made for
16 medical purposes, but are, in fact, being
17 abused and used in illicit ways, fair?
18     A.   I understand that there is
19 abuse of opioids.
20     Q.   You are, you, speaking for
21 the company, are a very large
22 manufacturer and distributor of opioid
23 products, correct?
24        MS. VANNI:  Object to form.

Page 58

1        THE WITNESS:  We are a
2    manufacturer and distributor of
3    opioid products.
4  BY MR. BUCHANAN:
5      Q.   Okay.  Looking at our chart
6  here, we see billions and billions and
7  billions of pills for one of the three
8  entities that were made over the years of
9  opioid products, correct?
10        MS. VANNI:  Objection.  Also
11    objection to the use of this
12    demonstrative with this witness.
13    You're asking him to authenticate
14    your demonstrative.  I think it's
15    an improper use.
16        MR. BUCHANAN:  Well, that's
17    interesting, because we've asked
18    you to authenticate things and you
19    just consistently refuse to do so.
20        So I do have a corporate rep
21    who is here so...
22  BY MR. BUCHANAN:
23      Q.   So are you aware of anything
24  that's wrong with this chart, sir?

Page 59

1      A.   What I see with this chart
2  is an average of about 440 million
3  tablets per year being distributed.
4      Q.   Consistent with your
5  knowledge and understanding of Endo's
6  production of opioids over the years,
7  sir?
8      A.   It is.
9      Q.   Okay.  So we see all the way
10 back in 1999 hundreds of millions of
11 opioid pills being made by Endo and
12 entering the market, correct?
13        MS. VANNI:  Object to form.
14        THE WITNESS:  We see pills
15    being distributed to customer to
16    be distributed to patients who
17    need them.
18 BY MR. BUCHANAN:
19     Q.   Mm-hmm.  And answering my
20 question: Hundreds of millions of pills,
21 correct?
22     A.   Is there a specific --
23     Q.   Back in 19 --
24     A.   Is there a specific year you

Page 60

1  want me to?
2      Q.   I was referring to 1999 to
3  orient you.
4      A.   1999, 357 million.
5      Q.   And we can go forward to
6  2000 and we see, I guess, business has
7  grown, right?
8        MS. VANNI:  Object to form.
9        THE WITNESS:  We see --
10 BY MR. BUCHANAN:
11     Q.   Did you see more or less in
12 2000?
13     A.   We see 545 million in -- I'm
14 sorry, 2000?
15     Q.   2000, what do you see?
16     A.   452 million.
17     Q.   Yeah.  And my question was,
18 was it growing over 1999?
19        MS. VANNI:  Object to form.
20        THE WITNESS:  2000 is a
21    higher number than 1999.
22 BY MR. BUCHANAN:
23     Q.   That would mean it's
24 growing?

Page 61

1      A.   There's growth.
2      Q.   Okay.  And let's see, how
3  did we do from 2000 to 2001, sir?
4    Doing better?
5        MS. VANNI:  Object to form.
6  BY MR. BUCHANAN:
7      Q.   Selling more?
8        MS. VANNI:  Objection.
9        THE WITNESS:  We're shipping
10    more product to patients who need
11    them.
12 BY MR. BUCHANAN:
13     Q.   Okay.  500 plus million,
14 half a billion pills; is that right?
15     A.   516 million.
16     Q.   Okay.
17        MS. VANNI:  Also note my
18    objection that he is not a
19    30(b)(6) on sales history.
20 BY MR. BUCHANAN:
21     Q.   Okay.  I believe, in fact,
22 you are a designee on suspicious order
23 monitoring, correct?
24     A.   Correct.

Page 62

1  Q. Okay. Each of the shipments
2 that are memorialized in shipping records
3 followed an order, right?
4      MS. VANNI: Object to form.
5      THE WITNESS: You need an
6   order to ship a product.
7 BY MR. BUCHANAN:
8  Q. Understood. Since the
9 beginning of Endo's existence, Endo has
10 been charged with maintain -- maintaining
11 effective controls against diversion,
12 correct?
13     MS. VANNI: Object to form.
14     THE WITNESS: The
15  regulations state that we need to
16  have controls to prevent
17  diversion.
18 BY MR. BUCHANAN:
19  Q. Not just any controls,
20 right?
21  A. Can you clarify what you
22 mean by that?
23  Q. You have to have effective
24 controls, right?

Page 63

1  A. Yes. We have to have
2 controls in place to prevent diversion.
3  Q. You have to have -- what's
4 the word you dropped?
5     MS. VANNI: Object to form.
6 BY MR. BUCHANAN:
7  Q. Effective controls, right?
8  A. That those controls should
9 be effective.
10  Q. That's right.
11  A. I don't disagree with you.
12  Q. Okay. So from the
13 beginning, from 1999 till today, Endo has
14 been responsible for ensuring it has
15 effective controls to prevent diversion,
16 correct?
17  A. By the regulations, that's
18 what we need to do.
19  Q. As a reasonable company,
20 that's what you need to do --
21     MS. VANNI: Object to form.
22 BY MR. BUCHANAN:
23  Q. -- right?
24  A. We have a responsibility to

Page 64

1 abide by the regulations and make sure we
2 have effective controls in place to
3 prevent the abuse and diversion of our
4 products, and that's what we've done.
5  Q. As a human being or a
6 company that's supposed to be acting like
7 a human being, you have an obligation to
8 keep this stuff in its channel, right?
9     MS. VANNI: Object to form.
10     THE WITNESS: I don't know
11  what you mean by acting like a
12  human being. That's very vague.
13  What I can tell you is that
14  we have a responsibility to abide
15  by the regulations that are in
16  place to prevent the abuse and
17  diversion of our products.
18 BY MR. BUCHANAN:
19  Q. Is there any doubt in your
20 mind, sir, that this stuff is dangerous?
21     MS. VANNI: Object to form.
22     THE WITNESS: These
23  products, if not properly
24  controlled and kept within the

Page 65

1  controlled system, can be abused
2  and diverted and in that context
3  could be dangerous.
4 BY MR. BUCHANAN:
5  Q. Dangerous how?
6     MS. VANNI: Object to form.
7     THE WITNESS: I understand
8  they can lead to addiction which
9  can lead to other problems.
10 BY MR. BUCHANAN:
11  Q. Like what?
12     MS. VANNI: Objection. It's
13  beyond the scope of his 30(b)(6).
14     THE WITNESS: It can lead to
15  all kinds of problems. I'm not a
16  doctor, so I can't necessarily
17  speak to the specifics of that.
18 BY MR. BUCHANAN:
19  Q. As a -- as an executive in a
20 pharmaceutical company making opioids in
21 2019, what are some of those dangers,
22 sir?
23     MS. VANNI: Object to form.
24     THE WITNESS: Opioid