# EXHIBIT 108

Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) ) ) ) ) | MDL No. 2804<br>Case No.<br>1:17-MD-2804 |
| THIS DOCUMENT RELATES TO ALL CASES | ) ) | Hon. Dan A. Polster |

THURSDAY, NOVEMBER 8, 2018

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of Steven Mills, held at the offices of BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP, 54 West Hubbard, Suite 300, Chicago, Illinois, commencing at 9:07 a.m., on the above date, before Carrie A. Campbell, Registered Diplomate Reporter and Certified Realtime Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1  MR. ERB: And this is Chip Erb
2  with Cavitch, Familo & Durkin
3  representing Discount Drug Mart.
4  MR. WEEKS: Paul Weeks for
5  Allergan Finance.
6  MS. KLOCKENGA: Jodi Klockenga
7  with Napoli Shkolnik.
8  MS. MITCHELL: Wendy Mitchell
9  with Napoli Shkolnik.
10
11  STEVEN MILLS,
12  of lawful age, having been first duly sworn
13  to tell the truth, the whole truth and
14  nothing but the truth, deposes and says on
15  behalf of the Plaintiffs, as follows:
16
17  DIRECT EXAMINATION
18  QUESTIONS BY MR. SHKOLNIK:
19  Q.  Mr. Mills, my name is Hunter
20  Shkolnik. I'm going to be asking you a
21  series of questions here today, but anytime
22  you don't understand me, please let me know.
23  I have a tendency to sometimes
24  talk fast. Usually by the time it starts
25  affecting you, the court reporter usually

Page 11

1  throws something at me and stops me. But if
2  at any time I start going too fast, just tell
3  me to slow down.
4  If you don't understand a
5  question, let me know. I try my best, but
6  every once in a while I do ask a bad
7  question. So if you don't understand it,
8  just say. I'll rephrase the question.
9  Okay?
10  A.  Okay.
11  Q.  And whenever there's a
12  question, it has to be a verbal answer. A
13  nod doesn't -- doesn't help. May show up on
14  the video but not on the transcript.
15  Okay?
16  A.  Got it.
17  Q.  Sir, you work for Walgreens at
18  the current time?
19  A.  I do.
20  Q.  And how long have you worked
21  for Walgreens?
22  A.  The past 13 years.
23  Q.  So over the 13 years you've
24  been working at Walgreens, do you have an
25  understanding that there was an opioid

Page 12

1  epidemic developing in the United States?
2  A.  I have an understanding, yes.
3  Q.  When did you first become aware
4  that there was an opioid epidemic developing
5  in the United States?
6  MR. HILL: Object to the form.
7  THE WITNESS: 2012.
8  QUESTIONS BY MR. SHKOLNIK:
9  Q.  So what happened in 2012 that
10  made you come to a realization that there was
11  an opioid epidemic in the United States?
12  A.  There was a creation of the RX
13  integrity team, which I'm currently a member
14  of.
15  Q.  And prior to 2012, were you
16  involved in any capacity with prescription
17  integrity at Walgreens?
18  MR. HILL: Object to the form.
19  THE WITNESS: No.
20  QUESTIONS BY MR. SHKOLNIK:
21  Q.  Was prescription integrity a
22  new department that was developed at some
23  point in time at Walgreens while you were
24  there?
25  A.  Yes.

Page 13

1  Q.  So before the company developed
2  prescription integrity department -- withdraw
3  that.
4  Was it called the prescription
5  integrity department?
6  A.  Pharmaceutical integrity.
7  Q.  Okay. Pharmaceutical integrity
8  department.
9  Prior to the development of the
10  pharmaceutical integrity department at
11  Walgreens in 2012, was there any other
12  department in existence at Walgreens that had
13  the same responsibilities as the now new
14  pharmaceutical integrity group --
15  MR. HILL: Object to the form.
16  QUESTIONS BY MR. SHKOLNIK:
17  Q.  -- or department?
18  A.  I don't know.
19  Q.  Did you do anything prior to
20  2012 in terms of pharmaceutical --
21  pharmaceutical integrity work, the type
22  you're doing after 2012 prior to 2012?
23  A.  No.
24  Q.  What type of work did you do
25  before 2012?

Page 14

1  A. Prior to 2012, I was working in
2  the pharmacy inventory group where we manage
3  item vendor catalog setup so our stores can
4  order product accordingly. If the item's not
5  set up, then our stores don't have the
6  ability to order it per our ordering system.
7  Q. Was there any specific aspect
8  of that job that dealt with opioids or
9  Class II, Class III pharmaceuticals?
10 A. Can you rephrase your question?
11 Q. Sure.
12    Was any aspect of your job
13 prior to 2012 dealing with the distribution
14 of opioids?
15 A. To answer your question, yes, I
16 would be responsible for setting up items to
17 be available for ordering through our catalog
18 for opioids, C-II, C-III. I believe that's
19 what you're asking.
20 Q. Okay. Tell me what you did
21 with respect to setting up and cataloging of
22 opioid, C-II, C-III, drugs prior to 2012.
23 A. So it would be logging into a
24 computer system, to a web UI, setting up the
25 NDC codes, setting up the UPC numbers and

Page 15

1  then loading that into our ordering system so
2  stores would be able to get replenishment.
3  Q. So it was a job that focused
4  more on the logistics aspect of the
5  pharmaceutical side of the company or just --
6  withdraw that.
7     So was your job dealing more
8  with logistics, making sure that product was
9  available and product could be shipped?
10 A. Nothing to do with product
11 availability.
12 Q. Okay.
13 A. It was more data entry and item
14 maintenance.
15 Q. What is your background in
16 terms of education, sir?
17 A. Communications degree from
18 Northeastern University.
19 Q. And when you were at
20 Northeastern, did you work for Walgreens as
21 part of any of the -- they have the work
22 study programs there. Did you start with
23 Walgreens back then?
24 A. I started with Walgreens while
25 I was in college, yes.

Page 16

1  Q. Like the co-op programs they
2  had back then?
3  A. I didn't take advantage of any
4  programs.
5  Q. So you've been with Walgreens
6  ever since Northeastern up until the present
7  time?
8  A. Yes.
9  Q. Now, going back to the issue of
10 opioid epidemic, tell me what it was that
11 triggered in your mind that 2012 there was an
12 opioid epidemic in the United States.
13    MR. HILL: Object to the form.
14    THE WITNESS: Due to the
15    information that was available around
16    the DEA visits to our Jupiter DCs
17    around opioid dispensing.
18 QUESTIONS BY MR. SHKOLNIK:
19 Q. And other than the fact that
20 the DEA came down on Walgreens through its
21 Jupiter distribution facility, you had not
22 been aware that there was a problem with
23 opioids in the United States and it was at
24 epidemic level before that?
25    MR. HILL: Object to the form.

Page 17

1     Assumes facts.
2     THE WITNESS: I don't know. It
3     wasn't part of my job responsibilities
4     prior.
5  QUESTIONS BY MR. SHKOLNIK:
6  Q. Well, I mean, did people talk
7  about it at Walgreens prior to 2012, there's
8  an opioid problem in the United States?
9     MR. HILL: Object to the form.
10    THE WITNESS: I can't remember.
11 QUESTIONS BY MR. SHKOLNIK:
12 Q. Did you know any people that
13 had suffered from the ill effects of opioids
14 prior to 2012?
15 A. No.
16 Q. Prior to 2012, to your
17 knowledge, did -- withdraw that.
18    Part of your job is suspicious
19 order monitoring work; am I correct?
20    MR. HILL: Object to the form.
21    THE WITNESS: That is a part of
22    my job, yes.
23 QUESTIONS BY MR. SHKOLNIK:
24 Q. Prior to 2012, had you ever
25 heard of the phrase "suspicious order

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  approved, someone in charge of inventory, the
2  sales inventory of the company, was approving
3  the bonuses for the sale of controlled
4  substance pills at the pharmacy level; fair
5  statement?
6          MR. HILL: Same objections, and
7      asked and answered.
8          THE WITNESS: I don't know.
9  QUESTIONS BY MR. SHKOLNIK:
10     Q.  Do you think it's right for a
11 pharmacist to get a bonus based on how many
12 opioid pills they distribute?
13         MR. HILL: Object to the form.
14         THE WITNESS: I don't know.
15 QUESTIONS BY MR. SHKOLNIK:
16     Q.  And you wouldn't like -- you
17 don't approve of that yourself, do you?
18         MR. HILL: Same objections.
19 QUESTIONS BY MR. SHKOLNIK:
20     Q.  Forget about Walgreens.
21 Yourself.
22         Do you approve of the fact that
23 a pharmacist would get a bonus on how many
24 opioid pills they sell?
25         MR. HILL: Same objections.

Page 171

1          THE WITNESS: I don't know.
2  QUESTIONS BY MR. SHKOLNIK:
3      Q.  We know there was an opioid
4  epidemic at least in 2012, according to your
5  testimony, correct?
6          MR. HILL: Object to the form.
7          THE WITNESS: I was aware of an
8      opioid epidemic.
9  QUESTIONS BY MR. SHKOLNIK:
10     Q.  At that time?
11     A.  At that time.
12     Q.  And do you think getting a
13 bonus on how many pills you could sell --
14 when I say "pills," opioids. Do you think
15 the incentive of getting a bonus for how many
16 pills you sell may play a role in whether or
17 not you dispense the drug and try to get
18 overrides to get more of the drug to sell?
19         MR. HILL: Object to the form.
20     Foundation. Asked and answered.
21         THE WITNESS: I don't know.
22 QUESTIONS BY MR. SHKOLNIK:
23     Q.  Human nature, isn't it? You
24 sell more pills, you make more money.
25 Wouldn't that be an incentive to many people?

Page 172

1          MR. HILL: Same objections.
2          THE WITNESS: I don't know.
3  QUESTIONS BY MR. SHKOLNIK:
4      Q.  Let's go down to the next
5  section on Exhibit 7.
6          Do you think it's a good idea
7  to pay a bonus to a pharmacist to sell
8  prescription opioids?
9          MR. HILL: Same objections.
10         THE WITNESS: I don't know.
11 QUESTIONS BY MR. SHKOLNIK:
12     Q.  I mean, we're not talking
13 Pampers. We're not talking household
14 products. We're talking addictive opioid
15 pills.
16         Do you think it's appropriate
17 for a company to be paying the pharmacist a
18 bonus for that by the pill?
19         MR. HILL: Asked and answered
20     many times.
21         MR. SHKOLNIK: And it will be
22     asked again.
23         THE WITNESS: I don't know.
24 QUESTIONS BY MR. SHKOLNIK:
25     Q.  Let's go to history of SOM

Page 173

1  daily reporting.
2          "Beginning October 2012,
3  Cardinal Health has been providing a daily
4  list of pharmacy orders that have triggered a
5  SOM event from the previous order day. The
6  SOM report is reviewed by RX inventory to
7  identify any red-flagged Florida pharmacies
8  blocked from ordering controlled substances.
9  Also identified are any large orders that the
10 system generated or manually keyed by the
11 pharmacy that are not red-flag locations."
12         First of all, do you know what
13 a red flag means?
14     A.  Red flag can mean anything.
15     Q.  What did it mean in the sense
16 of SOM daily reporting when you took over
17 integrity in December of 2012?
18     A.  A red flag could be an order
19 that was of interest.
20     Q.  Did you ever have any dealings
21 with Cardinal over their SOM policy and the
22 reporting to your company?
23     A.  Can you rephrase that question?
24     Q.  Yeah.
25         Did you ever have any

44 (Pages 170 to 173)

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  interaction with Cardinal Health in 2012 when
2  you took over -- when you and Tasha took over
3  pharmacy integrity about what their process
4  was when they were receiving orders from your
5  stores?
6      A.  I don't know any -- I don't
7  have any information on what Cardinal was
8  doing.
9      Q.  Was Cardinal a distributor that
10 was being utilized by the stores at that
11 time?
12     A.  Yes, one of many.
13     Q.  If Cardinal was the
14 distributor, was the order going through
15 inventory -- inventory management?
16         MR. HILL: Object to the form.
17 Foundation.
18 QUESTIONS BY MR. SHKOLNIK:
19     Q.  In that time?
20     A.  What time? I'm sorry.
21     Q.  In the 2012 time frame before
22 you took over.
23         MR. HILL: Same objections.
24         THE WITNESS: Were orders being
25     transmitted to Cardinal; is that what

Page 175

1  you're asking?
2  QUESTIONS BY MR. SHKOLNIK:
3      Q.  No. No.
4          If a store needed -- needed
5  more opioids and they were utilizing Cardinal
6  Health as a distributor, would the order go
7  through pharmacy management, or would it go
8  directly from store to Cardinal back then?
9          MR. HILL: Same objections.
10         THE WITNESS: I can't recall.
11 QUESTIONS BY MR. SHKOLNIK:
12     Q.  Were stores receiving
13 distribution from Cardinal and Walgreens
14 during the 2012 time frame?
15     A.  I can't recall.
16     Q.  Could a store get multiple --
17 withdraw that.
18         Could stores have multiple
19 sources for opioids when you took over the
20 program?
21         MR. HILL: Object to the form.
22         THE WITNESS: I can't recall.
23 QUESTIONS BY MR. SHKOLNIK:
24     Q.  Are there any documents
25 anywhere that would help -- that you think

Page 176

1  would refresh your recollection as to what
2  was done when you took over?
3          I mean, it seems like you don't
4  recall a lot of this stuff. I'm just trying
5  to figure out what I should be looking at.
6          MR. HILL: Object to the form.
7          MR. SHKOLNIK: I'll rephrase
8      it.
9  QUESTIONS BY MR. SHKOLNIK:
10     Q.  Let's continue looking at this
11 document.
12         It says, "Cardinal Health is
13 providing daily lists of pharmacy orders that
14 have triggered SOM event from the previous
15 order day."
16         Would that be maybe something
17 that refreshes your recollection that
18 Cardinal Health was actually distributing to
19 your pharmacies beginning in October 2012?
20         MR. HILL: Object to the form.
21         THE WITNESS: They may have
22     been dispense -- or distributing, but
23     they -- I can't speculate on the drugs
24     that were flagged.
25

Page 177

1  QUESTIONS BY MR. SHKOLNIK:
2      Q.  Oh, so this is possibly not
3  related to opioids; is that the issue?
4      A.  Yes.
5      Q.  Well, it goes on to show --
6  say -- I'm sorry, it goes on to say, "Also
7  identified are any large orders that the
8  system generated, SIMS, or manually keyed by
9  the pharmacy that are not red-flag
10 locations."
11         Were you aware of red-flag
12 locations in Florida or around the country
13 when you took over?
14     A.  Only the locations that were a
15 part of the seizure of the licensure in
16 Florida.
17     Q.  "SOM daily report is filtered
18 to identify red-flag Florida stores. These
19 orders are reviewed by RX inventory to
20 determine how they were generated."
21         Would that be an indication
22 that these stores may have been requesting
23 fills or orders directly from Cardinal and
24 not going through inventory management?
25         MR. HILL: Object to the form.

45 (Pages 174 to 177)

Golkow Litigation Services - 877.370.DEPS