# EXHIBIT 109

Highly Confidential - Subject to Further Confidentiality Review

Page 1

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  understand what we needed to do.
2  BY MR. MOUGEY:
3     Q.  The question I asked you was a little
4  different.  What I asked was:  Is it important for you
5  as a manager of the southern operation to have an
6  understanding of the regulatory framework covering
7  Walgreens' responsibilities in relation to monitoring
8  of Schedule II and Schedule III opiates?
9        MR. HILL:  Object to the form.
10  BY THE WITNESS:
11     A.  I -- I don't know how to answer that
12  question.
13  BY MR. MOUGEY:
14     Q.  What's confusing to you about that
15  question?  Is it important that you understand the
16  regulatory framework?
17        MR. HILL:  Same objection.
18  BY THE WITNESS:
19     A.  I think I have a general concept, but I
20  don't think I'm an expert on all of the issues at
21  every level of government, no.
22  BY MR. MOUGEY:
23     Q.  Yeah, I don't -- I don't think I asked you
24  about whether you were an expert at every level of

Page 55

1  government.  What I asked was is it important as a
2  manager of the southern operation for Walgreens in
3  pharmaceutical integrity to understand, just
4  generally, the regulatory framework covering
5  Walgreens' responsibilities in relation to monitoring
6  Schedule II and Schedule III opiates?
7        MR. HILL:  Objection to the form.
8  BY THE WITNESS:
9     A.  I'm not sure.
10  BY MR. MOUGEY:
11     Q.  Has someone instructed you to -- to say
12  "I'm not sure" to questions about what Walgreens'
13  responsibilities were?
14     A.  No.
15     Q.  Have you been told just to -- if -- if
16  anyone asks you about what Walgreens' responsibilities
17  were, just to say I'm not sure?
18     A.  I'm trying to answer truthfully.
19     Q.  Well, let's go back to Bratton 1, okay.
20        Manager of pharmaceutical integrity,
21  southern operation, February 2013 to the present,
22  right?
23     A.  Um-hum.
24     Q.  Okay.  Now, you -- you put this next

Page 56

1  paragraph in your LinkedIn profile, correct?
2     A.  This is copied from my job posting.
3     Q.  Yes, sir.  So you put this in there,
4  right?
5     A.  I copy and pasted, yes.
6     Q.  You copied it.  And it's accurate,
7  correct?
8     A.  I believe so.
9     Q.  So Bratton 1, your profile:  "Responsible
10  for managing, creating, and maintaining controlled
11  substance dispensing, monitoring and reporting
12  programs."
13        Is that accurate, sir?
14     A.  Yes.
15     Q.  And that was part of the scope of your
16  responsibilities from February '13 on?
17     A.  Correct.
18     Q.  Second sentence:
19        "Developed, recommends, implements
20  programs, procedures and techniques which will
21  identify and minimize loss of company assets and
22  ensure the safety, compliance and security of the
23  ordering and dispensing of controlled substances,"
24  correct?

Page 57

1     A.  Correct.
2     Q.  Now, when you say controlled substances
3  in -- in this paragraph, that is a number of different
4  types of drugs, correct?
5     A.  Correct.
6     Q.  And you understand that this litigation is
7  about Schedule II and Schedule III opiates, correct,
8  sir?
9     A.  Correct.
10     Q.  And you understand, sir, in your role as
11  manager of the southern operation that those
12  Schedule II and Schedule III opiates are highly
13  addictive, correct?
14        MR. HILL:  Object to the form.
15  BY THE WITNESS:
16     A.  My understanding is they can be addictive
17  for some people.
18  BY MR. MOUGEY:
19     Q.  Yes, sir, they can be addictive to some
20  people.
21        And did you understand in February
22  of 2013, that the country was in the midst of an
23  opiate crisis?
24        MR. HILL:  Object to the form.

15 (Pages 54 to 57)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  BY THE WITNESS:
2      A.  I believe that I was becoming aware of it,
3  yes.
4  BY MR. MOUGEY:
5      Q.  And how did you become aware of that in
6  February of 2013?
7      A.  Partially through my -- my work,
8  partially, you know, you -- the news and things you
9  see on television.
10     Q.  Well, let's talk about the partially
11 because of your work.
12         How at work did you become aware that in
13 2013 the country was in the middle of an opiate
14 crisis?
15     A.  I don't recall the specific details.  I
16 know that we -- it was something that was, you know,
17 in our minds as we were drafting our policies and
18 procedures.
19     Q.  It was in your mind.
20         Help -- help me to understand how it got
21 in your mind?
22     A.  Direction from my boss --
23     Q.  Ms. Polster?
24     A.  Yes.

Page 59

1      Q.  And when you say "direction," what do you
2  mean?
3      A.  We would meet in meetings with our -- my
4  peers or our team members and discuss issues and she
5  would provide direction as to programs we should work
6  on.
7      Q.  Did anybody ever tell you that there had
8  been ongoing congressional investigations into the
9  opiate crisis almost 13 years by the time you started
10 in 2013?
11     A.  No.
12     Q.  Did anybody tell you that there was year
13 upon year upon year increase in the amount of opiates
14 dispensed across the country?
15     A.  I knew that.  I don't know that anyone at
16 work told me that.
17     Q.  Did anyone ever as part of your training
18 advise you that the amount of deaths had increased,
19 overdose deaths related to Schedule II and
20 Schedule III opiates had increased exponentially
21 beginning in late '90s, early 2000s?
22     MR. HILL:  Objection to the form.
23 BY THE WITNESS:
24     A.  I don't recall.

Page 60

1  BY MR. MOUGEY:
2      Q.  You don't recall.  You don't recall
3  walking in the first month of my job and somebody
4  saying, We are in the middle of an opiate crisis,
5  people are dying every day, Florida is the hot bed,
6  you are in charge of the southern operation, there is
7  drugs migrating up to Ohio, and it is our job as
8  distributors to monitor and identify controlled
9  substances?
10         Anything along those lines?
11     MR. HILL:  Objection to the form.
12 BY THE WITNESS:
13     A.  I don't recall.
14 BY MR. MOUGEY:
15     Q.  Anything saying this is -- this is very,
16 very, very important that we are on the front line of
17 defense for Walgreens and we dispense as -- as many --
18 or more opiates than anyone in the country?
19     A.  I don't recall.
20     Q.  You don't recall any meetings with a sense
21 of urgency like that?
22     A.  I -- when I first was in the role, we were
23 very focused on the settlement with the DEA and the
24 provisions that our legal teams had outlined that we

Page 61

1  needed to implement.  That was one of the critical
2  focuses at that time.
3      Q.  And the -- in the midst of the
4  investigations by the DEA, what are you referring to?
5      A.  The -- when I was there, it was the
6  settlement agreement that we had signed and so we
7  received a laundry list of -- of tasks and programs
8  and changes that we were working to implement.
9      Q.  And that was in -- the agreement was
10 signed.
11         Do you have a recollection of when the
12 agreement was signed?
13     A.  Shortly after I started.
14     Q.  Like in June of 2013?
15     A.  That sounds right.
16     Q.  Were -- did anyone alert you or notify you
17 from your date in February of '13 until the date the
18 agreement was signed about the ongoing investigations?
19     A.  We were in discussions about the terms of
20 the settlement and what that might include.  Some of
21 the things that the government had already outlined
22 that we had committed to.
23     Q.  Including the closing of six Walgreens'
24 stores in Florida, correct?

16 (Pages 58 to 61)