HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE NATIONAL PRESCRIPTION
OPIATE LITIGATION

------------------------------------------------------

THIS REPORT RELATES TO:

*Track One Cases*

**MDL No. 2804**
**Case No. 1:17-MD-02804**
**Judge Dan Aaron Polster**

---

**EXPERT REPORT OF**

**ROBERT L. BRUNNER**

May 10, 2019

---

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION and SCOPE OF ASSIGNMENT ........................................................5

II.  PROFFESSIONAL QUALIFICATIONS..........................................................................7

III.  INFORMATION CONSIDERED ......................................................................................8

IV.  SUMMARY OF OPINIONS .............................................................................................9

V.  DETAILS OF OPINIONS WITH SUPPORTING DATA ANALYTICS AND
VISUALIZATIONS .........................................................................................................11

    A.  Opinion No. 1 – Walgreens' Data..........................................................................11

    B.  Opinion No. 2 – The ARCOS Data. ......................................................................12

    C.  Opinion No. 3 – McCann's methodologies for flagging transactions in the
ARCOS and Walgreens' Data do not provide information about any
particular transaction beyond an initial triggering transaction. ............................15

        a)  Maximum Monthly, Trailing Six-Month Maximum Threshold ................16
        b)  Twice Trailing Twelve-Month Average .....................................................18
        c)  Three Times Trailing Twelve-Month Average...........................................20
        d)  Maximum 8,000 Dosage Units Monthly ...................................................22
        f)  Maximum Daily Dosage Units .................................................................25

    D.  Opinion No. 4 – McCann's presentation of data is misleading, and his
aggregation of data prevents analysis at the individual store level......................33

    E.  Opinion No. 5 – McCann's "Excessive Shipments" analysis is
unsupported...........................................................................................................45

    F.  Opinion No. 6 - Comparative Analyses of Walgreens' Distributor
Shipments to Walgreens Pharmacies by Drug Strength .......................................46

    G.  Opinion No. 7 - Additional Tables and Charts Summarizing Walgreens'
Data .......................................................................................................................47

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Appendices**

Appendix A – Curriculum Vitae

Appendix B – Materials Relied Upon

Appendix C – McCann Identified Transactions

Appendix D – Allegedly "Suspicious Order" Analysis

Appendix E – Old Store and New Store Analysis

Appendix F – Reused Buyer DEA Numbers

Appendix G – Drug Strength Charts

Appendix H – Monthly Transaction Summary Charts, by Store

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Table of Figures

Figure 1 - Maximum Monthly, Trailing Six-Month Maximum Threshold (1st)...........17
Figure 2 - Maximum Monthly, Trailing Six-Month Maximum Threshold ..................18
Figure 3 - Twice Trailing Twelve-Month Average (1st) ..............................................19
Figure 4 - Twice Trailing Twelve-Month Average ......................................................20
Figure 5 - Three Times Trailing Twelve-Month Average (1st)....................................21
Figure 6 – Three Times Trailing Twelve-Month Average ...........................................22
Figure 7 - Maximum Monthly Daily Dosage Units (1st)..............................................24
Figure 8 - Maximum Monthly Dosage Units ...............................................................25
Figure 9 - Maximum Daily Dosage Units (1st) ...........................................................27
Figure 10 - Maximum Daily Dosage Units..................................................................28
Figure 11 - One allegedly "suspicious order" identified by Plaintiffs' Counsel
(zoomed) ......................................................................................................................32
Figure 12 - One allegedly "suspicious order" identified by Plaintiffs' Counsel ...........32
Figure 13 - McCann's flagging of both Old Stores and New Stores ...........................34
Figure 14 - Old Stores (dark blue - bottom) and New Stores (teal - top) ....................35
Figure 15 - McCann's mischaracterization of transactions for Store #12444, which
includes distribution activity for two distinct stores, and includes shipments from three Non-
Walgreens distributors .................................................................................................37
Figure 16 - McCann's chart above, excluding Non-Walgreens distributors, but before
correcting for his combination of two distinct stores (#3309 and #12444) .........................38
Figure 17 – Monthly Shipments of Hydrocodone to Old Store at 3415 Clark Ave.
(#3309), which closed on January 28, 2009 .................................................................39
Figure 18 - Monthly Shipments of Hydrocodone to New Store at 3121 Clark Ave.
(#12444), which opened on February 1, 2009 ..............................................................40
Figure 19 - Map showing the locations of the Old Store and New Store that share the
same Buyer DEA Number .............................................................................................40
Figure 20 – McCann's Figure 11 of Aggregated Defendant Data joined with ARCOS,
beneath which is a table showing the start and end dates of each defendants' production of
hydrocodone and oxycodone. .......................................................................................43
Figure 21 – McCann's Aggregated Data for Cuyahoga County (Appendix 9 at 9) ......44
Figure 22 - Annual shipments of Oxycodone by Walgreens Distributors to Walgreens
Stores in Cuyahoga County, by drug strength ..............................................................47
Figure 23 - Hydrocodone to Store #3313 in Cuyahoga (Calculated Base Weight in
Grams)..........................................................................................................................51
Figure 24 - Hydrocodone to Store #3313 in Cuyahoga (Dosage Units)......................52
Figure 25 - Hydrocodone to Store #3313 in Cuyahoga (MME)...................................53
Figure 26 - Hydrocodone to Store #3313 in Cuyahoga (No. of Transactions).............54

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Table of Tables**

Table 1 - Oxycodone shipments from Walgreens' Distributors to Walgreens stores in Cuyahoga County and Summit County, Ohio ....................................................................49

Table 2 – Walgreens Pharmacies in Cuyahoga and Summit County with Open and Close Dates, and Minimum and Maximum Transaction Dates ............................................56

Table 3 – Percentage of Sales of Hydrocodone to Walgreens Pharmacies in Cuyahoga and Summit County, by Year...............................................................................................57

Table 4 – Percentage of Sales of Oxycodone to Walgreens Pharmacies in Cuyahoga and Summit County, by Year...............................................................................................58

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I am a Vice President at Charles River Associates, Inc. ("CRA"), 633 West Fifth Street, Los Angeles, CA 90071.  CRA is a global consulting firm that offers economic, financial and strategic expertise to major law firms, corporations, accounting firms, and governments around the world.

## I.        INTRODUCTION AND SCOPE OF ASSIGNMENT

1.        CRA was engaged by Bartlit Beck LLP ("Counsel"), in connection with its representation of Walgreen Co. and Walgreen Eastern Co. ("Walgreens") in the above-captioned cases.  I was engaged to provide expert opinions and analysis in this matter as set forth below.  I may also offer expert opinions and analysis on behalf of other defendants.

2.        Prior to receiving and reviewing the expert witness report of Craig J. McCann, PhD ("McCann") dated March 25th, 2019 ("McCann Report") and any documents or data, I read and executed the PROTECTIVE ORDER RE: DEA'S ARCOS/DADS DATABASE and the CASE MANAGEMENT ORDER NO. 2: PROTECTIVE ORDER in this case. The staff whom I directed also read and executed the aforementioned documents in this case.

3.        I was asked to review the DEA-produced ARCOS Data from 1/1/2006 through 12/31/2014[1] ("ARCOS Data") and Walgreens' production of transactional data for the period 8/1/2002 through 4/9/2014[2] ("Walgreens' Data") to determine if the two datasets are reliable based on the information made available to me.

---

[1] Automation of Reports and Consolidated Orders System (ARCOS) electronic data, received from the Drug Enforcement Administration ("ARCOS Data").

[2] On February 5, 2019, Walgreens produced transactional data for fentanyl, hydrocodone, hydromorphone, methadone, morphine, oxycodone, oxymorphone, and tapentadol from August 1, 2002 to April 9, 2014.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

4.      I was asked to review the McCann Report (with accompanying data, the "McCann Report"), the first Supplemental Report of McCann dated April 3rd, 2019 (with accompanying data, the "First Supplemental Report"), the second Supplemental Report of McCann dated April 15th, 2019 (with accompanying data, the "Second Supplemental Report"), the first production of additional underlying support of McCann dated April 24th, 2019 ("First Underlying Support"), the second production of additional underlying support dated April 24th, 2019 ("Second Underlying Support"), and the third production of additional underlying support dated May 3, 2019 ("Third Underlying Support").

5.      More specifically, I was asked to focus my review on McCann's methods, calculations, use, results, and presentation of the ARCOS and Walgreens' Data, where Walgreens was a distributor of certain pharmaceutical opioids to Walgreens pharmacies in Cuyahoga County and Summit County, Ohio for the period 8/1/2002 through 4/9/2014.  This included an examination of McCann's figures, charts, graphs, computer code, and underlying data to assess if the information he presented was done so appropriately and accurately, and if appropriate, develop visual depictions that are more accurate and representative of Walgreens' underlying transactional data involving Walgreens' distribution of certain pharmaceutical opioids to Walgreens pharmacies in Cuyahoga County and Summit County, Ohio.

6.      My analyses, conclusions, and opinions are based solely on the work performed by me and those under my supervision, through the date of this expert report.  I reserve the right to supplement the analyses and/or opinions should additional relevant information become available that bears on the analyses, conclusions, or opinions contained herein.

7.      Due to the short time period available to assess McCann's report and underlying data, the late Supplemental Reports, and the fact that we did not receive all of his underlying

6

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

computer code and materials until 5/4/2019, I have done my best to complete my analyses of his methods, results, and data.  That said, there may be other defects in his work or the presentation of his results of which I am not yet aware.  In addition, my report is being submitted without the benefit of, McCann's deposition testimony which is scheduled to occur one day before and on the same day that my report is due.  I will supplement my report as necessary, based on my continued review of McCann's produced materials, McCann's deposition testimony, and to the extent McCann continues to produce additional information that affects my opinions.

## II.     PROFFESSIONAL QUALIFICATIONS

8.      I am a Vice President at CRA and have over 30 years of experience working with complex datasets and transactional databases in class action and other complex lawsuits, government and regulatory investigations, financial and accounting investigations, bankruptcies and other cases requiring complex modeling and the sharing of information. I have significant expertise in the areas of database design and management, complex data modeling and analysis, claims management and administration, and electronic discovery.

9.      Prior to joining CRA, I was the founder and global leader of the Data & Analytics practice at FTI Consulting for more than 15 years.  Before joining FTI Consulting, I was the partner-in-charge of the Class Action/Complex Data Services practice for KPMG. Before joining KPMG in 2003, I was a partner in Arthur Andersen LLP, where I led the firm's Class Action Services and Complex Data Management & Analysis practices, and the Economic and Financial Consulting practice in the Pacific Northwest region.  Prior to joining Arthur Andersen in 1987, I was the Director of Administrative Computing for Scripps Institution of Oceanography from 1985 to 1987.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

10.    Over the past 30 years, I have performed expert data analysis services and / or investigations on behalf of various federal agencies (including the US Dept of Justice, the US Dept of Treasury and the US Dept of Interior), local governments (including Counties, Cities, Transit Districts, etc.), major financial institutions, credit card companies, online retailers, telecommunications companies, corporate boards of directors, receivers, trustees, monitors, and other parties.

11.    This data analysis has typically involved the identifications, extraction, validation, assimilation and analysis of large, complex, and often disparate, databases and/or datasets ranging in size from several thousand transactions to tens of billions of transactions.

12.    I hold B.A. degrees from the University of California at San Diego in mathematics and economics.

13.    I have instructed several mathematics and computer science courses for the University of California at both the undergraduate and graduate level.

14.    I have not been deposed as an expert witness in the last four years.  I have not authored publications in the last ten years.

15.    My curriculum vitae can be found in Appendix A.

16.    CRA is compensated at the rate of $725 per hour for my services in this matter. No portion of my compensation nor my team's compensation is dependent upon the outcome of this case, and no portion of CRA's fees are dependent upon the outcome of this case.


III.    **INFORMATION CONSIDERED**

17.    I have examined certain information of the type and nature customarily relied upon by data analysts/scientists in calculating and analyzing the information presented in this

8

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

report.  I have also had a conversation with John Merritello, Manager - Walgreen Co.  A detailed list of the materials I reviewed is contained in Appendix B.

## IV.  SUMMARY OF OPINIONS

### A.  Opinion No. 1 – Walgreens' Data.

18.  It is my opinion, to a reasonable degree of certainty, that Walgreens' transactional data produced at WAGMDL00773926 is a reliable source of information as it pertains to Walgreens' distribution of eight pharmaceutical opioids to Walgreens pharmacies located in Cuyahoga County and Summit County, Ohio for the period August 1, 2002 to April 9, 2014.

### B.  Opinion No. 2 – The ARCOS Data.

19.  Subject to a small number of adjustments described in more detail in Section V of my report, I conclude with a reasonable degree of certainty that the DEA-produced ARCOS Data is a reliable source of information as it pertains to Walgreens' distribution of certain pharmaceutical opioids to Walgreens pharmacies located in Cuyahoga County and Summit County, Ohio for the periods January 1, 2006 through April 9, 2014.[3]

### C.  Opinion No. 3 – McCann's methodologies for flagging transactions in the ARCOS and Walgreens' Data do not provide information about any particular transaction beyond an initial triggering transaction.

20.  I have reviewed the McCann Report and the work papers and incomplete computer code made available to me one month after McCann issued his first report.  Based on that review, it is my opinion that McCann's five methodologies are arbitrarily applied across all

---

[3] As supplemented by Walgreen's data for October 2007 (*See* McCann paragraph 96 at 39) and adjusted to reflect six Walgreens pharmacies in Cuyahoga County that shared three Buyer DEA Numbers.  The ARCOS Data is through 12/31/2014; however, Walgreens made no shipments of the any of the relevant drugs into Cuyahoga or Summit Counties after April 9, 2014.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of Walgreens pharmacies, regardless of their demographic profiles, geographic locations and other store-specific factors.  Amongst other method-specific infirmities, all of McCann's methodologies employ a cumulative function that flags all transactions on or after the date of a first, triggering transaction being identified by the methodology in question.  McCann does not use his methodologies for anything but identifying the date of the first, triggering transaction, after which all subsequent transactions are flagged.  All flagged transactions for Walgreens are presented in the aggregate, rather than at the store level.

> **D.  Opinion No. 4 – McCann's presentation of data is misleading, and his aggregation of data prevents analysis at the individual store level.**

**21.**  It is my opinion that McCann's aggregation of data without regard for individual store characteristics and often stark differences combined with the aforementioned cumulative flagging function yields misleading results.  McCann aggregates disparate data sets (from different defendants, including varying sub-sets of drugs, and covering different periods of time), into misleading representations in many summary charts.  Because of McCann's mistreatment of the data, the multitude of related summary statistics that McCann cites within the body of his report misrepresent the changes in volume of transactions that were occurring in the real world.

> **E.  Opinion No. 5 – McCann's "Excessive Shipments" analysis is unsupported.**

22.  McCann provides no basis for his purported "medically necessary" baseline of per capita opioid MME, which he asserts in Section X of his report (pp 82-88).  Nor does he provide a basis or reasoning behind his assumptions concerning the "medically necessary" lower and upper bounds of opioid use.  McCann's assumptions applied to his interpolated "medically necessary" estimates are based on simplistic and naive assumptions that are not based on factual evidence or data.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### F. Opinion No. 6 – Comparative Analyses of Walgreens' Distributor Shipments to Walgreens Pharmacies by Drug Strength

23. At the request of counsel, I was asked to prepare charts summarizing the drug strength of hydrocodone and oxycodone shipped by Walgreens' distributors to Walgreens pharmacies into Cuyahoga County and Summit County, Ohio, throughout the timeframe for which data is available.

### G. Opinion No. 7 - Additional Tables and Charts Summarizing Walgreens' Data

24. I have created a series of additional tables and charts that summarize and illustrate Walgreens' transactional data where Walgreens was a distributor of hydrocodone and oxycodone to Walgreens pharmacies in Cuyahoga and Summit County, Ohio during the period August 1, 2002 through April 9, 2014.

**After reviewing the McCann Report, First and Second Supplemental Report, and First and Second Production, I offer the following more detailed observations and opinions.**

## V. DETAILS OF OPINIONS WITH SUPPORTING DATA ANALYTICS AND VISUALIZATIONS

### A. Opinion No. 1 – Walgreens' Data.

25. It is my opinion, to a reasonable degree of certainty, that Walgreens' transactional data produced at WAGMDL00773926 is a reliable source of information as it pertains to Walgreens' distribution of eight pharmaceutical opioids to Walgreens pharmacies located in Cuyahoga County and Summit County, Ohio for the period August 1, 2002 to April 9, 2014. Walgreens' Data shows that Walgreens made no shipments of the relevant eight drugs into Cuyahoga or Summit Counties after April 9, 2014.

26. I spoke with the team that was involved in preparing Walgreens' production of transactional data for discovery, including Sean Barnes and Manvendra Singh, and I understand

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

how it was prepared.  I also understand it was the same data that Walgreens submitted to

ARCOS on a monthly basis, but for the limitation on the production of the eight drug types.  In

addition, Walgreens' transactional data aligns perfectly with the ARCOS Data from 2006-2014,

where that ARCOS Data exists.

27.     For the time periods that overlap, January 1, 2006 through August 9, 2014, for

Cuyahoga County and Summit County in Ohio, and for the drugs fentanyl, dihydrocodeine,

hydromorphone, methadone, morphine, oxycodone, oxymorphone, and tapentadol, I have been

able to verify that all quantities and transactions in the ARCOS Data exist in the Walgreens Data.

28.     For each NDC code, I reviewed the total quantity and number of transactions in

the Walgreens' transactional data to the 59 Walgreens Buyers in Summit and Cuyahoga counties

for overlapping time periods (January 1, 2006 - August 9, 2014).  I also reviewed the NDC

codes, Buyer DEA Numbers, and Reporter DEA Numbers, and found that there were no

discrepancies in the distinct lists of each metric between the two data sources. The overlap of

transactions by NDC code, and the matching list of Buyer DEA Numbers and Reporter DEA

Numbers, lead me to believe the Walgreens' transaction data production is accurate and reliable,

and aligns closely to the ARCOS Data production subset, but for the two issues with ARCOS

described in my next opinion (*i.e.,* October 2007 variance, and overlapping Buyer DEA

Number).

### B.     Opinion No. 2 – The ARCOS Data.

29.     Subject to a small number of distinct adjustments described in more detail below,

I conclude with a reasonable degree of certainty that the DEA-produced ARCOS Data is a

reliable source of information as it pertains to Walgreens' distribution of certain pharmaceutical

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

opioids to Walgreens pharmacies located in Cuyahoga County and Summit County, Ohio for the periods January 1, 2006 through April 9, 2014.[4]

30.     The DEA produced a subset of ARCOS transactional data for fourteen drugs types: buprenorphine, codeine, dihydrocodeine, fentanyl, hydrocodone, hydromorphone, levorphanol, meperidine, methadone, morphine, powdered opium, oxycodone, oxymorphone, and tapentadol from January 1, 2006 through April 9, 2014.

31.     For the same time period, for Cuyahoga County and Summit County, Ohio and for the limited drugs fentanyl, hydrocodone, hydromorphone, methadone, morphine, oxycodone, oxymorphone, and tapentadol, the ARCOS Data appears to be an accurate representation of Walgreens distributions to Walgreens pharmacies, after accounting for the two limitations described below.

32.     As McCann indicates[5] there is a small variance in October 2007, and a small number of transactions (193) with small errors concerning transactions assigned to Buyer DEA Numbers. Additionally, some Buyer DEA Numbers are associated with multiple store numbers and addresses and therefore are subject to some adjustment using Walgreens' production of transactional data.

33.     It appears the DEA used a static lookup table[6] to provide store address and store number information for each Buyer DEA Number.  Certain Walgreens stores closed and a new

---

[4] The ARCOS Data is missing some transactions that appear in the Walgreens distribution data for the period October 2007.  The ARCOS Data is also missing some store numbers and addresses for certain Walgreens pharmacies that shared Buyer DEA Numbers with other stores.

[5] McCann Report at paragraph 96 at 39.

[6] Alternative explanations as to how the DEA pulled the production of ARCOS Data may exist, such as failing to include transaction date references when pulling store address information, but

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

store opened in a different location, but the new store retained the same Buyer DEA Number as the closed store.  The ARCOS dataset contains only the most recent address and store number information for the specified Buyer DEA Number[7], thus the data incorrectly represents the transactions of the closed store as though they were conducted at the new location. This again limits the ability of complete and accurate analyses at the store level.

34.     I have not reviewed this issue for other defendants, but it is possible that this scenario occurred other times throughout the relevant time period, for other distributors, and would lead to additional flawed analyses on a store level.

35.     As stated in my first opinion, for the overlapping time period, Walgreens' transactional data reconciles to the ARCOS Data of the total number of transactions and quantity, where that ARCOS Data exists.

**36.     Utilization of Walgreens' Data instead of ARCOS Data in charts and tables.**

**37.**     Wherever possible, I relied upon Walgreens' transactional data produced on February 5, 2019 instead of the ARCOS Data as it covers a longer period time, beginning in August 1, 2002 as opposed to January 1, 2006, and ends when Walgreens was no longer a distributor of pharmaceutical opioids to Walgreens pharmacies.  In addition, the Walgreens' Data is not subject to the shortfall in ARCOS Data identified by McCann related to October 2007 transactions.

---

the result is the same notwithstanding the cause.  Each transaction in the DEA-produced ARCOS data is associated with the *current* address of the identified Buyer DEA Number, not the address of that Buyer DEA Number *on the date of the transaction*.

[7] McCann Report paragraph 36 at 12 also describes the Buyer Name and Address and that some Buyer DEA Numbers are associated with multiple addresses.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

38.     Lastly, the Walgreens' Data contains a distinct column with complete and

historically accurate Walgreens store numbers, which provide the means to distinguish between

transactions from closed and relocated stores, when those relocated stores maintained the same

Buyer DEA Number[8].  While the ARCOS Data has some store number information within the

address fields, it is static and incomplete.

### C.     Opinion No. 3 – McCann's methodologies for flagging transactions in the ARCOS and Walgreens' Data do not provide information about any particular transaction beyond an initial triggering transaction.

### 39.     Summary of McCann's Five Methodologies for Flagging Transactions

40.     McCann employed five methodologies for flagging transactions.  The purpose,

significance and what McCann's methodologies are intended to measure were not provided in

his report nor were they linked to any regulatory, scientific, medical, or academic foundation or

justification in his report.  Four of the five methodologies in the McCann Report share

characteristics with, but are different than, the methodologies included in Plaintiffs' Responses to

Discovery Ruling 12 Supplemental Interrogatory Issued to Plaintiffs ("Plaintiffs' Interrogatory

Responses")[9].  As discussed below, McCann replaced the fifth methodology included in the

Plaintiffs' Interrogatory Responses with a different methodology ("Maximum Daily Dosage

Units"[10]).  McCann provides no explanation for why his new methodology differs from the

methodologies in the Plaintiffs' Interrogatory Responses.  Of note, the "Exceeding Threshold of

---

[8] Three Walgreens stores in the Walgreen's data closed and three different stores opened in new locations with the same Buyer DEA Number as the three closed stores.  Each new store was assigned a new and unique Walgreens store number.  McCann incorrectly based his analyses solely on the Buyer DEA Number, and thus treated these six distinct Walgreens stores as three stores in his report, which resulted in incorrect and misleading results.

[9] 2019-01-25 Plaintiffs Response to Disc Ruling No 12 as Amended.PDF

[10] McCann Report at paragraph 148-151 at 72-76.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Initial 6 Months and Assuming No Due Diligence" methodology cited in Plaintiffs' Interrogatory Responses was not analyzed by McCann.

41.     Below is a description of each of McCann's five methodologies followed by a list of general and specific observations/critiques of each methodology related to Walgreens' role as a distributor to Walgreens pharmacies in Cuyahoga County and Summit County, Ohio.  Beneath each methodology is an oscillating set of two store-specific charts that highlight the first transaction McCann identified under each of his five methodologies, and then highlight all subsequent transactions flagged regardless of their individual attributes, per instruction to McCann from Plaintiffs' Counsel, measured in dosage units.  These charts serve to illustrate McCann's cumulative flagging function which is addressed after an explanation of McCann's five transaction flagging methodologies.

a)      **Maximum Monthly, Trailing Six-Month Maximum Threshold** – (aka "Previous 6 Months Threshold is Triggered and Assuming No Due Diligence"[11]) – The number of dosage units shipped by a Distributor to a Pharmacy in a calendar month to exceed the highest number of dosage units shipped by the Distributor to the Pharmacy in any one of the six preceding calendar months.

a)      McCann's methodology ignores growing economy, ignores increased demand, and ignores changing demographics.

b)      Twelve stores in Cuyahoga and eight stores in Summit County fail in the **earliest** month possible under this methodology[12].

---

[11] Plaintiffs' Interrogatory Responses at 6

[12] *See* First Fail – All McCann Methods.xlsx

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

     c)     For example, the charts below demonstrate how Buyer DEA Number BW59855998 is flagged in the 7th month of transactions (the earliest month possible).  In Figure 2 below McCann flags all transactions after that first transaction. See Figure 1 and Figure 2.

**Figure 1 - Maximum Monthly, Trailing Six-Month Maximum Threshold (1st)**



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 2 - Maximum Monthly, Trailing Six-Month Maximum Threshold**



The information in Figure 1 above is reproduced for all Walgreens stores in Appendix C.

b)     **Twice Trailing Twelve-Month Average** – (similar to the "Two Times Rule"[13]) –

Identify the transactions that cause the number of dosage units shipped by a

Distributor to a Pharmacy in a calendar month to exceed twice the trailing twelve-

month average dosage units to retail and chain pharmacies served by the

Distributor.

---

[13] The "Two Times Rule" as defined in the Plaintiffs' Interrogatory Responses calculates a nationwide average on a monthly basis by the Defendant, whereas McCann's Twice Trailing Twelve-Month Average is limited to Cuyahoga and Summit counties by the Distributor and calculates on a trailing 12-month basis (**not** monthly).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

a)      No accounting / consideration is given to the unique circumstances of individual stores.

b)      The chart below demonstrates how Buyer DEA Number BW4096358 is flagged in the 13th month of transactions (the earliest month possible).  In Figure 4 below McCann flags all transactions after that first transaction. See Figure 3 and Figure 4.

**Figure 3 - Twice Trailing Twelve-Month Average (1st)**



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 4 - Twice Trailing Twelve-Month Average**



c)  **Three Times Trailing Twelve-Month Average** – (similar to the "Three Times Rule"[14]) – Identify the transactions that cause the number of dosage units shipped by a Distributor to a Pharmacy in a calendar month to exceed three times the trailing twelve-month average dosage units to retail and chain pharmacies served by the Distributor.

a)  No accounting / consideration is given to the unique circumstances of individual stores

---

[14] The "Three Times Rule" as defined in the Plaintiffs' Interrogatory Responses calculates a nationwide average on a monthly basis by the Defendant, whereas McCann's Three Trailing Twelve-Month Average is limited to Cuyahoga and Summit counties by the Distributor and calculates the average on a trailing 12-month basis (**not** monthly).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

b)  The chart below demonstrates how Buyer DEA Number BW4139540 is flagged in the 15th month of transactions. In Figure 6 below McCann flags all transactions after that first transaction. See Figure 5 and Figure 6.

**Figure 5 - Three Times Trailing Twelve-Month Average (1st)**



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 6 – Three Times Trailing Twelve-Month Average**



d) **Maximum 8,000 Dosage Units Monthly** – (similar to the "McKesson 8000 Rule"[15]) – Identify the transactions that cause the number of dosage units shipped by a Distributor to a Pharmacy in a calendar month to exceed 8,000 dosage units.

a) While McCann does not cite any specific documents in his report, according to Plaintiffs' Interrogatory Responses, this methodology was "designed and operated" by McKesson -- not Walgreens.  The program on which this methodology is presumably based, McKesson's Lifestyle Drug Monitoring Program,[16] applied to oxycodone, hydrocodone, alprazolam (non-opioid), and phentermine (non-opioid) and was operational as of

---

[15] As defined in the Plaintiffs' Interrogatory Responses

[16] See MCKMDL00330931 and MCKMDL00330924

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

May 1, 2007, whereas McCann applied it before and long after May 1, 2007.  McCann offers no explanation for why this methodology should apply retroactively, to defendants other than McKesson, or to every subsequent transaction after the first identified transactions.

b)  Whether or not this method was appropriate for McKesson's customer base, or some parts of that customer base, it sets an arbitrary limit for all drugs and all shipments to Walgreens stores.

c)  As a measure of how inappropriate the broad application of this arbitrary methodology is, more than two-thirds of Walgreens stores *average* more than 8,000 dosage units for either oxycodone or hydrocodone, while a low-volume Walgreens store hit 8,000 units only when stocking up for a store opening.

d)  No accounting / consideration is given to the unique circumstances of individual stores.

1.  For example, stores with an average of only 4,000 dosage units per month could increase orders by *nearly* 100% to **7,999** dosage units per month and not flag. In the Walgreens data, there are nine stores that average less than 4,000 dosage units of hydrocodone or oxycodone per month.  At the same time, a store with an average of **8,001** dosage units per month would *always* be flagged under McCann's methodology.  Likewise, a store with an average of **7,800** dosage units per month could have a very small increase and flag consistently.

23

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

    e)    Methodology is ill-suited to high-volume stores, and ill-suited to new stores stocking up.

e)    For example, Figure 7 below demonstrates how BW9507786 is flagged in the 1st month (earliest date possible) as it stocks up its inventory, and never hits 8,000 again.  Figure 8 demonstrates how McCann flagged transactions in that store.

**Figure 7 - Maximum Monthly Daily Dosage Units (1st)**



Source: McCann provided Distributor Transactions with Flag: Walgreens.xlsx produced 3/25/2019.
Use of this data in these reports does not imply Defendant's acceptance or agreement of methodology.
McCann Methodology Description: Identify the transactions that cause the number of dosage units shipped by a Walgreen's Distributor to a Walgreens Pharmacy in a calendar month to exceed 8,000 dosage units.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 8 – Maximum Monthly Dosage Units**



f) **Maximum Daily Dosage Units** – Identify the transaction that cause the number of dosage units shipped by a Distributor to a Pharmacy in a day to exceed a number of dosage units that varies by drug type and within some drug types by formulation.

a) This methodology is based on a DEA Compliance Manual, Exhibit P[17] related to the Controlled Substances Act ("CSA") produced by Cardinal Health. Exhibit P lists a variety of drug products with daily dosage limits for both hospitals and retail. This methodology was not cited in Plaintiffs'

---

[17] Maximum daily dosage units as specified in DEA Compliance Manual, Exhibit P – CAH_MDL_PRIORPROD_DEA07_01384160-R

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Interrogatory Responses concerning the 20 allegedly "suspicious orders", and McCann provides no basis for why he selected this methodology.

b)  As with the McKesson 8000 methodology above, this methodology is particularly ill-suited to high volume stores, with over 50% being flagged in the very first period measured.

c)  No accounting / consideration is given to the unique circumstances of individual stores.

d)  Certain stores *only* trip this threshold as they are new and stocking up on inventory.

e)  This method is ill-suited to new stores stocking up

a)  For example, Figure 9 below demonstrates how Buyer DEA Number BW8393441 is flagged on the 1st day of transactions (the earliest date possible) as it is stocking up its inventory[18].  Due to McCann's cumulative flagging function, every subsequent transaction is also flagged, as shown in Figure 10.

---

[18] While the chart in Figure 9 stacks red transactions on top of blue, the blue transactions followed the red flagged transactions.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### Figure 9 - Maximum Daily Dosage Units (1st)



Source: McCann provided Distributor Transactions with Flag: Walgreens.xlsx produced 3/25/2019.
Use of this data in these reports does not imply Defendant's acceptance or agreement of methodology.
McCann Methodology Description: Identify the transactions that cause the number of dosage units shipped by a Walgreen's Distributor to
a Walgreen Pharmacy in a day to exceed a number of dosage units that varies by drug type and within some drug types by formulation,
per the DEA Compliance Manual (CAH_MDL_PRIORPROD_DEA07_01383895-R).

27

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 10 - Maximum Daily Dosage Units**



42. **Cumulative Flagging Function Applied to ALL of McCann's Five Methodologies.**

43. For each of McCann's five methodologies for flagging transactions, he never uses the methodology to flag more than a single day of transactions, per Walgreens pharmacy, for hydrocodone and oxycodone. All other transactions flagged by McCann were not subject to any algorithm or methodology.  At Plaintiffs' Counsel's instruction[19], McCann simply flags *all transactions* after the first flagged transaction.  Beyond the first triggering transaction, and

---

[19] *"I have been asked by Counsel to assume that the Distributor did not effectively investigate the flagged transactions and so every subsequent transaction of that drug code is also flagged because the Distributor had an unfulfilled obligation to detect and investigate the first flagged transaction."* – McCann Report, paragraph 136 at 60

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

subsequent cumulative flagging, McCann does not present any analysis, charts, or other summaries of his flagging methodologies at the store level.

44.     The application of any broad-based flagging transaction methodology, such as the cumulative flagging function employed by McCann in all five of his methodologies, prevents the identification of any issues at the store level.  The cumulative flagging function prevents analysis based on the specific characteristics of the individual Walgreens pharmacies, the unique demographic profiles of each pharmacy's customers, the geographic location of the pharmacies (including proximity to hospitals, pain centers, urgent care clinics, acute care centers, distribution centers, etc.), the size of the pharmacies, change in a pharmacy's medication needs over time, and possibly other factors.

45.     For example, Walgreens store #12634 located at 1415 Rockside Road Parma, OH 44134 (Buyer DEA Number FW2207125) was shipped its first order for Hydrocodone from a Walgreens distributor on September 9th, 2010, exactly *one week before* the store first opened[20]. Under McCann's Maximum Daily Dosage Units methodology, the first hydrocodone shipment to this store is identified by McCann on September 9th, 2010 as it exceeds the daily limit under this methodology.  Pursuant to Plaintiffs' Counsel's instructions, McCann flags all hydrocodone transactions on this date and all subsequent transactions through April 9, 2014 – nearly 1,200 transactions in total – simply because of a new store opening and stocking its shelves.  I have identified 19 other new stores with similar characteristics where the store is first flagged within eight days of the store opening.  These 20 stores represent 77% of new stores opened by

_____

[20] See Walgreens Open and Close Dates.xlsx from John Merittello

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Walgreens during the period 8/1/2002 to 4/9/2014 in Cuyahoga County and Summit County, Ohio.

46.     To recap, it is my opinion that all five of McCann's transaction flagging methodologies employ a cumulative flagging function that is arbitrarily applied across all Walgreens pharmacies in Cuyahoga and Summit County, regardless of their demographic profiles, geographic locations and other store-specific factors.  Amongst other method-specific infirmities, these aspects of McCann's flagging methodologies prevent any analysis of outlier transactions or outlier pharmacies.

47.     McCann did generate store-specific charts for certain Walgreens pharmacies located in Cuyahoga County in his first supplemental report[21] dated April 10, 2019 (last modified more than eight months prior on August 8, 2018), as well as store-level charts for both Cuyahoga and Summit Counties in his Appendix 9.  However, he did not present any results showing the application of any of his five methodologies for individual Walgreens pharmacies.

48.     **Plaintiffs' identification of 20 allegedly suspicious orders:**  As described above, McCann's methodologies share similarities with the methodologies Plaintiffs employed to identify 20 allegedly "suspicious orders" for each Distributor and National Retail Pharmacy defendant.  Presented below are two charts for one of the 20 allegedly suspicious orders.  I have positioned each allegedly suspicious order among Walgreens' corresponding transactional data in order to provide the context of the preceding and subsequent orders.

49.     I have also presented two tables (See Figure 11 and Figure 12) and 40 charts (Appendix **D**) highlighting all 20 of the allegedly "suspicious orders" identified in the Plaintiffs'

---

[21] See McCann First Supplemental Report, Appendix E (2018.8.21)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Interrogatory Responses (10 for each county)[22].  Each chart presents the weekly quantities of the

drug distributed to the Walgreens pharmacy under one of two different time periods: 1) one year

before and one year after the date of the allegedly suspicious order, and 2) the entire period the

Walgreens pharmacy received the drug from a Walgreens' distributor.  The week containing the

suspicious order is highlighted in red.  A six-week rolling average of sales of the drug to the

pharmacy is represented by an orange line; the rolling average does not start until week six.

---

[22] Supplemental DR 12 Interrogatory: For each National Retail Pharmacy Defendant and
Distributor Defendant, identify 10 Suspicious Orders for Prescription Opioids that you contend
were shipped to Your geographic area during the Relevant Time Period. For each order, identify
the date the order was shipped, the manufacturer, name, and amount of the medication that was
shipped, the name of the defendant that shipped the order, and the name and location of the
person or entity that placed the order. Furthermore, explain in detail all criteria you used to
identify these Suspicious Orders, including whether and why you contend (i) any due diligence
actually conducted was insufficient, and (ii) the order was so suspicious that there was no
amount of due diligence that could have removed every basis to suspect the customer was
engaged in diversion.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 11 - One allegedly "suspicious order" identified by Plaintiffs' Counsel (zoomed)**



**Figure 12 - One allegedly "suspicious order" identified by Plaintiffs' Counsel**





The information in Figures 11 and 12 above is reproduced for all 20 allegedly "suspicious orders" in Appendix D.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### D. Opinion No. 4 – McCann's presentation of data is misleading, and his aggregation of data prevents analysis at the individual store level.

50.     As stated above, McCann's aggregation of data without regard for individual store characteristics and often stark differences yields misleading results.  In addition to aggregating data for all Walgreens pharmacies for purposes of presenting the results of his flagging methodologies, McCann also aggregates disparate data sets (from different defendants, including varying sub-sets of drugs, and covering different periods of time), into misleading representations in many summary charts.  Because of McCann's mistreatment of the data, the multitude of related summary statistics that McCann cites within the body of his report misrepresent the changes in volume of transactions that were occurring in the real world.

51.     **McCann aggregates Old Stores and New Stores[23], suggesting volume increases at individual store where none may exist.**

52.     McCann's charts that aggregate the volume of Walgreens' transactional data mask any information one might be able to glean from the data if examined on a store-by-store basis. For example, the effect that new store openings can have on the volume of sales when they build up inventory, order new drugs, etc. is masked when store data is aggregated.

a)     Below are example charts showing the aggregated volume of shipments of hydrocodone and oxycodone, in dosage units, from Walgreens' distributors to Walgreens pharmacies in Cuyahoga County from August 1, 2002 to April 9, 2014, and transactions identified and flagged by McCann under one of his five methodologies (Maximum Monthly, Trailing Six-Month Maximum Threshold).

---

[23] "Old Stores" have store open dates on or before 8/1/2002 and "New Stores" have store open dates after 8/1/2002.  See Table 2 in Section V.G. below.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

b)      The first chart below (Figure 13) shows transactions flagged by McCann for all Walgreens pharmacies.  The unflagged blue blips that appear in later years are *solely* a function of new stores coming online, stocking their inventory, and that have not had enough months of activity to be flagged under McCann's cumulative flagging methodologies.

**Figure 13 - McCann's flagging of both Old Stores and New Stores**



53.     When disaggregating the Old Stores from the New Stores, it becomes self-evident that a substantial portion of the increase in volume over time results solely from the fact that New Stores opened and began serving patient customers.  The next stacked chart illustrates McCann's aggregation problem in which the bottom section (dark blue) represents the Old Stores and the top section (teal) represents the New Stores that opened after August 2002.  See Figure 14 and Appendix E.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 14 - Old Stores (dark blue - bottom) and New Stores (teal - top)**



54.     By aggregating Old Store and New Store data, McCann's analysis prevents any meaningful review of outlier stores.

55.     In addition, McCann's presentation of Walgreens store-specific summaries includes six stores incorrectly combined due to shared Buyer DEA Numbers.

56.     McCann failed to distinguish between two distinct stores' transactional data where the stores shared the same Buyer DEA Number.  This occurred for six stores in total in the Walgreens data.  (I have not analyzed the extent to which this issue occurs in other defendants' data.)  When I noticed this nuance in the Walgreens produced transactional data, I spoke with

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

John Merritello, a Manager at Rx Inventory Control who has been with Walgreens for 40 years, about what I was seeing in the data.  Mr. Merritello confirmed that during this timeframe it was common practice for Walgreens to close stores in strip centers or other locations and to open new stores on corner lots or freestanding locations nearby.  Walgreens did this for a variety of reasons, including increased customer convenience (*e.g.*, easier ingress/egress, well-lit parking closer to the store, drive-thru service, etc.).  At times, the new store inherited the Buyer DEA Number of the closed store, apparently leading to McCann's misinterpretation of the data.

57.     Below is an example of two of the six stores that share Buyer DEA Numbers in Walgreens' transactional data (Stores **#3309** and **#12444**).  With respect to the remaining four stores, Appendix **F** includes eighteen store-specific charts of monthly shipments of oxycodone and hydrocodone from Walgreens' distributors from August 1, 2002 to April 9, 2014, measured in dosage units.  These charts represent the six distinct stores that McCann incorrectly grouped into three stores based on shared Buyer DEA Numbers.

a)      **McCann's Unadjusted** transactional data for each Buyer DEA Number, including non-Walgreens distributors.  See Figure 15.

b)      **Old Store** and **New Store** transactional data combined. See Figure 16.

c)      **Old Store** - transactional data[24].  See Figure 17.

d)      **New Store** - transactional data.  See Figure 18.

e)      Map view of **Old Store** and **New Store**.  See Figure 19.

---

[24] McCann presented unadjusted ARCOS Data.  Since my analyses of Old Store and New Store are based on the Walgreens' Data, they required no compensating adjustment for this purpose.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 15 - McCann's mischaracterization of transactions for Store #12444, which includes distribution activity for two distinct stores, and includes shipments from three Non-Walgreens distributors**



Data source: ARCOS (2006-2014) and defendant transactional data

253 of 3877

March 2019

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 16 - McCann's chart above, excluding Non-Walgreens distributors, but before correcting for his combination of two distinct stores (#3309 and #12444)**



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 17 – Monthly Shipments of Hydrocodone to Old Store at 3415 Clark Ave. (#3309), which closed on January 28, 2009**



Source: Walgreen's Transactional Data from 8/1/2002 - 4/9/2014, Produced 2/5/2019
Buyer DEA No BW4096360 corresponds to Walgreens Store #3309 at 3415 Clark Avenue, Cleveland, Cuyahoga County OH until 1/28/2009, and Walgreens Store #12444 at 3121 Clark Avenue, Cleveland, Cuyahoga County OH after 2/1/2009.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 18 - Monthly Shipments of Hydrocodone to New Store at 3121 Clark Ave. (#12444), which opened on February 1, 2009**



Source: Walgreen's Transactional Data from 8/1/2002 - 4/9/2014, Produced 2/5/2019
Buyer DEA No BW4096360 corresponds to Walgreens Store #3309 at 3415 Clark Avenue, Cleveland, Cuyahoga County OH until 1/28/2009, and Walgreens Store #12444 at 3121 Clark Avenue, Cleveland, Cuyahoga County OH after 2/1/2009.

**Figure 19 - Map showing the locations of the Old Store and New Store that share the same Buyer DEA Number**



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

58.     Unlike the Old Store #3309, New Store #12444 is on a corner lot.  I understand from Mr. Merritello that relocating to freestanding locations on corner lots was a common business practice for Walgreens in this timeframe, as it increased business both in the front of the store and in the pharmacy.

59.     In addition to stores #3309 and #12444, McCann also conflates the data for two other sets of stores:

- Stores #10033 (which closed on 1/31/2007) and #10220 (which opened on 2/1/2007), and

- Stores #10026 (which closed on 12/31/2009) and #10710 (which opened on 1/1/2010).

See Appendix **F**.

**60.     McCann aggregates disparate datasets that cannot reliably be combined.**

61.     Another example of McCann's misleading presentation of data are Figures 11-20 (pp. 57-74) and corresponding figures and tables in Section IX. Transaction Analysis that present the number of transactions from Distributors to Retail and Chain pharmacies located in Cuyahoga County and Summit County from 1996 to 2018.

62.     The data behind these charts is a mismatched combination of the ARCOS Data from 1/1/2006 to 12/31/2014 and multiple disparate datasets produced by some, but not all, of the Defendants during discovery.  McCann appended and prepended the Defendants' transactional data to the ARCOS Data.  These charts present aggregated datasets with different begin and end dates and that contain different drug types from different defendants over time. As a result, each year from 1996 to 2018 can contain a variety of different drugs from a variety of different defendants.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

63.    McCann's Figures 11-20 show the aggregated results of his flagging methodologies for each county from 1997-2018.  The year-over-year trends and annual volumes of transactional data that McCann presents distort the truth.  For example, Walgreens produced transactional data for eight of the 14 drug types starting in August 1, 2002 – seven years later than the 1996 starting point on McCann's Figures 11-20.  I understand that Walgreens was distributing controlled substances prior to August 1, 2002 but does not retain data earlier than that point in time.  Without this critical insight the reader of McCann's Report is left with the false impression that the volume of transactions spiked at certain points in time.

64.    McCann's charts would look much different (and the volume increases less steep) had there been continuity among datasets, or if McCann presented this information correctly with the appropriate level of detail in the body of his report.  To be clear, the time frame covered by the defendants' data production is not the same as the timeframe for defendants' actual distribution.  Many defendants were distributing opioids in years for which McCann has no data[25].  To illustrate this problem, I have lined up a bar graph depicting the start date and end date of each defendant's production of hydrocodone and oxycodone data beneath McCann's Figure 11 in order to show the changes on his Figure 11 are a result of new data being added to the set, not the sole result of an actual increase in transactions.  See Figure 20.

---

[25] For example, see Deposition of Eric Cherveny on November 9, 2018, 36:18-37:19, 52:10-22 (AmerisourceBergen); Deposition of Steve Reardon on November 30, 2018, 238:19-239:12 (Cardinal); Deposition of Thomas Moffat on January 15, 2019, 18:4-9 (CVS); Deposition of George Euson on November 28, 2018, 22:19-23:18 (H.D. Smith); Deposition of Michael DiBello on February 19, 2019, 88:16-89-16 (HSI); Deposition of Ann Berkey on December 13, 2018, 64:4-23 (McKesson); Deposition of James Schoen on February 27,  2019, 52:14-54:5 (PSI); Deposition of Janet Getzey Hart on January 30, 2019, 74:19-76:23 (Rite Aid); 30(b)(6) Deposition of Susanne Hiland on January 22, 2019, 35:20-36:20 (Walmart).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 20 – McCann's Figure 11 of Aggregated Defendant Data joined with ARCOS, beneath which is a table showing the start and end dates of each defendants' production of hydrocodone and oxycodone.**



65.     McCann presents the data showing that different defendants produced transactional data for different periods of time at page 9 of Appendix 9.  But his presentation is misleading.  He represents that the data shows "All Defendants 12 Opioid Drug Distribution[s]"

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

from 1996-2018.  He does not reference the fact that he does not have data for all defendants over this time period or that certain defendants' data pre/post ARCOS does not include all 12 drugs.

**Figure 21 – McCann's Aggregated Data for Cuyahoga County (Appendix 9 at 9)**



66.     McCann fails to present any summary chart like the above showing that, in addition to providing data for different timeframes, different defendants also produced data for different drugs.  Combining the defendants' transactional data with the ARCOS Data, and presenting the data in aggregate form, creates the false impression that a rapid increase in transaction volume occurred, when in reality the increase was much more gradual; the apparent

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

rapid increase in volume was due to nothing more than the addition of additional data that was missing in earlier periods.

> ### E.  Opinion No. 5 – McCann's "Excessive Shipments" analysis is unsupported.

67.   It is my opinion that McCann's excessive shipments analysis[26] is flawed for several reasons:

68.   Based on my understanding of McCann's professional background and experiences, he does not possess the expertise to make reasonable interpolations that establish the "medically necessary" baseline of per capita opioid MME, which he asserts in Section X of his report (pp 82-88).

69.   In addition, McCann provides no regulatory, scientific, medical, or academic basis or justification for the "medically necessary" baseline of pharmaceutical opioids at any point in time.

70.   Such opinions require supporting evidence regarding several factors, including but not limited to:

- New drug sales / adoption patterns

- Drug efficacy for various purposes

- Epidemiological studies

- Demographic analyses (surrounding areas, other comparable areas nationwide, national statistics, etc.)

- Retail trends for chain pharmacies, both locally and nationally

---

[26] McCann Report at Section X at 82.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

71.     McCann has not presented any of these above sources of information or opinion which would be needed to form a reliable opinion on the "medically necessary" baseline for opioids shipments.  Instead, McCann has merely drawn an interpolation between the level of opioid use in 1997 and the level of opioid use in 2018.  Without any supporting data, he asserts that any shipments above this line are "excessive."

72.     No information is provided regarding Walgreens or any individual distributor's alleged "medically necessary" baseline.  There is therefore no basis provided for extrapolating from McCann's overall numbers to any individual defendant.

> **F.      Opinion No. 6 - Comparative Analyses of Walgreens' Distributor Shipments to Walgreens Pharmacies by Drug Strength**

73.     At the request of counsel, I was asked to prepare charts summarizing the drug strength of hydrocodone and oxycodone shipped by Walgreens' distributors to Walgreens pharmacies into Cuyahoga County and Summit County, Ohio, organized by their strengths (*i.e.,* 0-5mg; 7.5mg; 10mg; 15-20mg; 30-40mg; and 60-80mg) and measured in dosage units.  Below is a sample chart of Oxycodone shipped by Walgreens' distributors to Walgreens pharmacies into Cuyahoga County, organized by strength, from 2006 until 2013.  See Figure 21.  Refer to Appendix **G** for three additional charts.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 22 - Annual shipments of Oxycodone by Walgreens Distributors to Walgreens Stores in Cuyahoga County, by drug strength**



### G.     Opinion No. 7 - Additional Tables and Charts Summarizing Walgreens' Data

74.     Presented below and at Appendix **H** are a series of additional tables and charts that summarize and illustrate Walgreens' transactional data where Walgreens was a distributor of hydrocodone or oxycodone to Walgreens pharmacies in Cuyahoga and Summit County, Ohio during the period August 1, 2002 through April 9, 2014.  Because McCann limited his flagging analyses to hydrocodone and oxycodone, I have done the same with respect to my presentation of data.  Again, Walgreens did not ship any of the relevant drugs into Cuyahoga or Summit County after April 9, 2014.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

a)      Two tables each of the 59 Walgreens pharmacies located in Cuyahoga and

Summit County, OH showing the volume of hydrocodone and oxycodone shipped

by Walgreens' distributors to Walgreens pharmacies for the period August 1,

2002 through April 9, 2014.  See Table 1.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Table 1 - Oxycodone shipments from Walgreens' Distributors to Walgreens stores in Cuyahoga County and Summit County, Ohio

| Summary of Hydrocodone Transactions from Walgreens Distributors to Walgreens Stores in Cuyahoga County, Ohio | | |
|---|---|---|
| Buyer DEA No | Store Number | Buyer County |
| BW4096322 | 3313 | CUYAHOGA |
| BW4096358 | 3307 | CUYAHOGA |
| BW4096360 | 3309 | CUYAHOGA |
| BW4096360 | 12444 | CUYAHOGA |
| BW4108797 | 3234 | CUYAHOGA |
| BW4129842 | 3226 | CUYAHOGA |
| BW4129854 | 3238 | CUYAHOGA |
| BW4129866 | 3326 | CUYAHOGA |
| BW4129878 | 3235 | CUYAHOGA |
| BW4139564 | 3312 | CUYAHOGA |
| BW4147307 | 3310 | CUYAHOGA |
| BW4387759 | 3256 | CUYAHOGA |
| BW4673554 | 3314 | CUYAHOGA |
| BW5624184 | 3308 | CUYAHOGA |
| BW5688176 | 4159 | CUYAHOGA |
| BW5837945 | 4130 | CUYAHOGA |
| BW5961063 | 4202 | CUYAHOGA |
| BW5985998 | 4685 | CUYAHOGA |
| BW6156396 | 4684 | CUYAHOGA |
| BW6577312 | 5030 | CUYAHOGA |
| BW6631560 | 5473 | CUYAHOGA |
| BW6704185 | 5206 | CUYAHOGA |
| BW7200633 | 5550 | CUYAHOGA |
| BW7664130 | 6659 | CUYAHOGA |
| BW8142159 | 6889 | CUYAHOGA |
| BW8393441 | 5031 | CUYAHOGA |
| BW8904206 | 7474 | CUYAHOGA |
| BW8963224 | 2226 | CUYAHOGA |
| BW9066982 | 1234 | CUYAHOGA |
| BW9497327 | 2132 | CUYAHOGA |
| BW9507786 | 10032 | CUYAHOGA |
| BW9507798 | 10030 | CUYAHOGA |
| BW9507837 | 10029 | CUYAHOGA |
| BW9509588 | 10033 | CUYAHOGA |
| BW9509588 | 10220 | CUYAHOGA |
| BW9525176 | 10028 | CUYAHOGA |
| BW9525188 | 10026 | CUYAHOGA |
| BW9525188 | 10710 | CUYAHOGA |
| BW9866863 | 9073 | CUYAHOGA |
| FW0022614 | 10328 | CUYAHOGA |
| FW0329931 | 9407 | CUYAHOGA |
| FW1058557 | 11558 | CUYAHOGA |
| FW1270785 | 12014 | CUYAHOGA |
| FW1270800 | 12445 | CUYAHOGA |
| FW2207125 | 12634 | CUYAHOGA |
| Subtotal Cuyahoga County | | |

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Summary of Hydrocodone Transactions from Walgreens Distributors to Walgreens Stores in Summi | | |
|---|---|---|
| BW4129880 | 3278 | SUMMIT |
| BW4129892 | 3279 | SUMMIT |
| BW4139540 | 3281 | SUMMIT |
| BW4208965 | 3276 | SUMMIT |
| BW4550287 | 3572 | SUMMIT |
| BW5523469 | 3741 | SUMMIT |
| BW5629615 | 4295 | SUMMIT |
| BW6026668 | 4776 | SUMMIT |
| BW6353572 | 4775 | SUMMIT |
| BW6819924 | 5904 | SUMMIT |
| BW8807402 | 7719 | SUMMIT |
| FW0581480 | 11143 | SUMMIT |
| FW1142962 | 11748 | SUMMIT |
| FW1641489 | 12543 | SUMMIT |
| Subtotal Summit County | | |
| Total Cuyahoga and Summit Counties | | |

**b)**     472 store-specific charts showing the historical volume of shipments of

hydrocodone and oxycodone from Walgreens' distributors from August 1, 2002

to April 9, 2014, measured in calculated base weight in grams, dosage units,

MME, and number of transactions.  See Figures 23 - 26.

50

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 23 - Hydrocodone to Store #3313 in Cuyahoga (Calculated Base Weight in Grams)**



Source: Walgreen's Transactional Data from 8/1/2002 - 4/9/2014, Produced 2/5/2019

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 24 - Hydrocodone to Store #3313 in Cuyahoga (Dosage Units)**



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 25 - Hydrocodone to Store #3313 in Cuyahoga (MME)**



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 26 - Hydrocodone to Store #3313 in Cuyahoga (No. of Transactions)**



c)      2,240 store-specific charts highlighting the first transaction[27] identified by

McCann under each of his five methodologies for hydrocodone and oxycodone,

measured in calculated base weight in grams, dosage units, MME, and number of

transactions. These charts highlight the **only** transactions that McCann actually

identified under each of his five methodologies.  On days where there was more

than one transaction, McCann's computer code totaled the daily measures when

comparing to his thresholds, therefore all transactions on that day represent the

first identified transactions.  See Figures 1-10 above.

---

[27] First transaction or all transactions on the date first identified by McCann as he does not
specify which transaction he selected in his code.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

        This set of charts is based on McCann's data, hence the incorrect number of total Walgreens pharmacies in Cuyahoga County and Summit County, Ohio (i.e., McCann's calculations are based on 56 stores whereas there were actually 59 stores over the 2002-2014 time period).

75.    Chart with Walgreens store-specific open and close dates, and first and last transaction dates. See Table 2.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Table 2 – Walgreens Pharmacies in Cuyahoga and Summit County with Open and Close Dates, and Minimum and Maximum Transaction Dates**

| Walgreens Store Location Information [1] | | | | | | Transaction Dates from Walgreens Transactional Data [2] | |
|---|---|---|---|---|---|---|---|
| Buyer DEA Number | Store Number | Address | County | Open Date | Close Date | Min Txn Date [3] | Max Txn Date |
| BW4096322 | 3313 | 5264 LEE RD MAPLE HEIGHTS OH | CUYAHOGA | 8/4/1994 | | 8/5/2002 | 4/4/2014 |
| BW4096358 | 3307 | 15609 LAKE SHORE BLV CLEVELAND OH | CUYAHOGA | 8/11/1994 | | 8/1/2002 | 4/4/2014 |
| BW4096360 | 3309 | 3121 CLARK AVE CLEVELAND OH | CUYAHOGA | 8/23/1994 | 1/28/2009 | 8/6/2002 | 1/23/2009 |
| BW4096360 | 12444 | 3415 CLARK AVENUE CLEVELAND OH | CUYAHOGA | 1/29/2009 | | 2/4/2009 | 4/4/2014 |
| BW4108797 | 3234 | 4281 W 130TH ST CLEVELAND OH | CUYAHOGA | 9/8/1994 | | 8/1/2002 | 4/4/2014 |
| BW4129842 | 3226 | 6410 BROADWAY AVE CLEVELAND OH | CUYAHOGA | 9/23/1994 | | 8/2/2002 | 4/4/2014 |
| BW4129854 | 3238 | 14525 EUCLID AV EAST CLEVELAND OH | CUYAHOGA | 10/6/1994 | | 8/5/2002 | 4/2/2014 |
| BW4129866 | 3326 | 4365 MAYFIELD RD SOUTH EUCLID OH | CUYAHOGA | 9/29/1994 | | 8/2/2002 | 4/3/2014 |
| BW4129878 | 3235 | 16400 CHAGRIN B SHAKER HEIGHTS OH | CUYAHOGA | 10/7/1994 | | 8/2/2002 | 4/3/2014 |
| BW4139564 | 3312 | 22401 LAKE SHORE BLVD EUCLID OH | CUYAHOGA | 9/15/1994 | | 8/1/2002 | 4/4/2014 |
| BW4147307 | 3310 | 16803 LORAIN AVE CLEVELAND OH | CUYAHOGA | 9/29/1994 | | 8/1/2002 | 4/4/2014 |
| BW4387759 | 3256 | 11401 UNION AVE CLEVELAND OH | CUYAHOGA | 5/19/1995 | | 8/5/2002 | 4/2/2014 |
| BW4673554 | 3314 | 5400 PEARL PARMA OH | CUYAHOGA | 12/6/1995 | | 8/1/2002 | 4/9/2014 |
| BW5624184 | 3308 | 4265 STATE RD CLEVELAND OH | CUYAHOGA | 11/21/1997 | | 8/7/2002 | 4/2/2014 |
| BW5688176 | 4159 | 6300 PEARL RD PARMA HEIGHTS OH | CUYAHOGA | 1/30/1998 | | 8/1/2002 | 4/4/2014 |
| BW5837945 | 4130 | 3020 MAYFIEL CLEVELAND HEIGHTS OH | CUYAHOGA | 6/5/1998 | | 8/2/2002 | 4/3/2014 |
| BW5961063 | 4202 | 127 E PLEASANT VAL SEVEN HILLS OH | CUYAHOGA | 8/15/1998 | | 8/1/2002 | 4/7/2014 |
| BW5985998 | 4685 | 2135 WARRENSVILLE SOUTH EUCLID OH | CUYAHOGA | 8/29/1998 | | 8/1/2002 | 4/4/2014 |
| BW6156396 | 4684 | 12777 ROCKSID GARFIELD HEIGHTS OH | CUYAHOGA | 1/13/1999 | | 8/1/2002 | 4/3/2014 |
| BW6577312 | 5030 | 6605 MAYFIELD MAYFIELD HEIGHTS OH | CUYAHOGA | 11/27/1999 | 7/30/2014 | 8/6/2002 | 4/4/2014 |
| BW6631560 | 5473 | 25524 CENTER RIDGE RD WESTLAKE OH | CUYAHOGA | 1/30/2000 | | 8/6/2002 | 4/4/2014 |
| BW6704185 | 5206 | 11701 DETROIT AVE LAKEWOOD OH | CUYAHOGA | 4/21/2000 | | 8/2/2002 | 4/4/2014 |
| BW7200633 | 5550 | 21010 CENTER RIDGE ROCKY RIVER OH | CUYAHOGA | 4/7/2001 | | 8/6/2002 | 4/2/2014 |
| BW7664130 | 6659 | 4071 LEE RD CLEVELAND OH | CUYAHOGA | 3/11/2002 | | 8/6/2002 | 4/4/2014 |
| BW8142159 | 6889 | 6270 SOM CENTER RD SOLON OH | CUYAHOGA | 1/31/2003 | | 1/30/2003 | 4/3/2014 |
| BW8393441 | 5031 | 7260 PEARL  MIDDLEBURG HEIGHTS OH | CUYAHOGA | 8/1/2003 | | 7/28/2003 | 4/4/2014 |
| BW8904206 | 7474 | 751 RICHMOND  RICHMOND HEIGHTS OH | CUYAHOGA | 8/6/2004 | | 8/2/2004 | 4/4/2014 |
| BW8963224 | 2226 | 5090 TURNEY R GARFIELD HEIGHTS OH | CUYAHOGA | 8/30/2004 | | 8/30/2004 | 4/3/2014 |
| BW9066982 | 1234 | 6 E BAGLEY RD BEREA OH | CUYAHOGA | 1/14/2005 | | 1/18/2005 | 4/4/2014 |
| BW9497327 | 2132 | 6900 ROCKSIDE RD INDEPENDENCE OH | CUYAHOGA | 10/28/2005 | | 10/25/2005 | 4/4/2014 |
| BW9507786 | 10032 | 8966 BRECKSVILLE R BRECKSVILLE OH | CUYAHOGA | 10/31/2005 | | 11/10/2005 | 3/28/2014 |
| BW9507798 | 10030 | 4507 CLARK AVE CLEVELAND OH | CUYAHOGA | 10/29/2005 | 1/27/2009 | 11/1/2005 | 1/20/2009 |
| BW9507837 | 10029 | 27251 WOLF RD BAY VILLAGE OH | CUYAHOGA | 11/7/2005 | | 11/8/2005 | 4/4/2014 |
| BW9509588 | 10033 | 647 BROADWAY AVE BEDFORD OH | CUYAHOGA | 10/29/2005 | 1/31/2007 | 11/3/2005 | 1/31/2007 |
| BW9509588 | 10220 | 520 BROADWAY AVE BEDFORD OH | CUYAHOGA | 2/1/2007 | | 2/5/2007 | 4/4/2014 |
| BW9525176 | 10028 | 20145 VAN AKEN  SHAKER HEIGHTS OH | CUYAHOGA | 11/7/2005 | 7/26/2006 | 11/22/2005 | 7/21/2006 |
| BW9525188 | 10026 | 19001 EUCLID AVE EUCLID OH | CUYAHOGA | 11/4/2005 | 12/31/2009 | 11/17/2005 | 12/31/2009 |
| BW9525188 | 10710 | 20485 EUCLID AVE EUCLID OH | CUYAHOGA | 1/1/2010 | | 1/5/2010 | 4/4/2014 |
| BW9866863 | 9073 | 20200 VAN AKEN  SHAKER HEIGHTS OH | CUYAHOGA | 7/27/2006 | | 7/31/2006 | 4/3/2014 |
| FW0022614 | 10328 | 7888 YORK RD PARMA OH | CUYAHOGA | 10/27/2006 | | 10/20/2006 | 4/2/2014 |
| FW0329931 | 9407 | 14815 MADISON AVE LAKEWOOD OH | CUYAHOGA | 7/6/2007 | | 6/28/2007 | 4/4/2014 |
| FW1058557 | 11558 | 5644 MAYFIELD RD LYNDHURST OH | CUYAHOGA | 9/19/2008 | | 9/15/2008 | 4/2/2014 |
| FW1270785 | 12014 | 19980 W 130TH ST STRONGSVILLE OH | CUYAHOGA | 3/11/2009 | | 3/5/2009 | 4/3/2014 |
| FW1270800 | 12445 | 24590 LORAIN RD NORTH OLMSTED OH | CUYAHOGA | 3/19/2009 | | 3/13/2009 | 4/2/2014 |
| FW2207125 | 12634 | 1415 ROCKSIDE RD PARMA OH | CUYAHOGA | 9/16/2010 | | 9/9/2010 | 4/4/2014 |
| BW4129880 | 3278 | 834 W MARKET ST AKRON OH | SUMMIT | 9/8/1994 | | 8/1/2002 | 4/2/2014 |
| BW4129892 | 3279 | 1303 COPLEY RD AKRON OH | SUMMIT | 9/16/1994 | | 8/1/2002 | 4/2/2014 |
| BW4139540 | 3281 | 1130 S ARLINGTON ST AKRON OH | SUMMIT | 9/22/1994 | | 8/2/2002 | 4/2/2014 |
| BW4208965 | 3276 | 1925 W MARKET ST AKRON OH | SUMMIT | 10/27/1994 | | 8/2/2002 | 4/3/2014 |
| BW4550287 | 3572 | 2645 STATE RD CUYAHOGA FALLS OH | SUMMIT | 8/17/1995 | | 8/2/2002 | 4/2/2014 |
| BW5523469 | 3741 | 302 CANTON RD AKRON OH | SUMMIT | 9/12/1997 | | 8/1/2002 | 4/2/2014 |
| BW5629615 | 4295 | 2086 GRAHAM RD STOW OH | SUMMIT | 11/29/1997 | | 8/5/2002 | 4/2/2014 |
| BW6026668 | 4776 | 900 WOOSTER RD N BARBERTON OH | SUMMIT | 9/26/1998 | | 8/1/2002 | 4/3/2014 |
| BW6353572 | 4775 | 9043 DARROW RD TWINSBURG OH | SUMMIT | 7/10/1999 | | 8/1/2002 | 4/2/2014 |
| BW6819924 | 5904 | 830 BRITTAIN RD AKRON OH | SUMMIT | 7/21/2000 | | 8/5/2002 | 4/3/2014 |
| BW8807402 | 7719 | 663 E AURORA RD MACEDONIA OH | SUMMIT | 6/11/2004 | | 6/9/2004 | 4/4/2014 |
| FW0581480 | 11143 | 3009 W MARKET ST FAIRLAWN OH | SUMMIT | 11/15/2007 | | 11/12/2007 | 4/3/2014 |
| FW1142962 | 11748 | 361 E WATERLOO RD AKRON OH | SUMMIT | 11/13/2008 | | 11/11/2008 | 4/2/2014 |
| FW1641489 | 12543 | 755 HOWE AVE CUYAHOGA FALLS OH | SUMMIT | 9/25/2009 | | 9/22/2009 | 4/2/2014 |

[1] Walgreens Pharmacy Information provided by John Merritello, Manager at RxInventory Control at Walgreens.

[2] Source of Transaction Dates: Walgreens Transactional Data from 8/1/2002 - 4/9/2014 Produced 2/5/2019 (WAGMDL00773926).

[3] Minimum Transaction Dates may preceede the store open date by no more than 8 days. Pharmacies stock their shelves before opening.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

76.    Chart of Walgreens/Non-Walgreens distribution of hydrocodone and oxycodone levels over time.  See Table 3 and Table 4.

**Table 3 – Percentage of Sales of Hydrocodone to Walgreens Pharmacies in Cuyahoga and Summit County, by Year**

**Percentage of Total Sales of Hydrocodone, by Distributor Category to Walgreens Pharmacies in Cuyahoga County and Summit County, Ohio**

| Year | Cuyahoga County | | | Summit County | | |
|---|---|---|---|---|---|---|
| | Walgreens | Other | Total | Walgreens | Other | Total |
| 2006 | 97.6% | 2.4% | **100.0%** | 98.7% | 1.3% | **100.0%** |
| 2007 | 97.6% | 2.4% | **100.0%** | 98.1% | 1.9% | **100.0%** |
| 2008 | 98.6% | 1.4% | **100.0%** | 99.2% | 0.8% | **100.0%** |
| 2009 | 98.0% | 2.0% | **100.0%** | 98.5% | 1.5% | **100.0%** |
| 2010 | 98.6% | 1.4% | **100.0%** | 98.9% | 1.1% | **100.0%** |
| 2011 | 99.0% | 1.0% | **100.0%** | 99.1% | 0.9% | **100.0%** |
| 2012 | 98.8% | 1.2% | **100.0%** | 98.6% | 1.4% | **100.0%** |

Source: DEA-Produced ARCOS Dataset from 1/1/2006 - 12/31/2014

Walgreens refers to distributions from Walgreens.

Other refers to distributions from Non-Walgreens entities (e.g., Cardinal Health, ANDA, etc.).

Percentages based on Dosage Units.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Table 4 – Percentage of Sales of Oxycodone to Walgreens Pharmacies in Cuyahoga and Summit County, by Year**

**Percentage of Total Sales of Oxycodone, by Distributor Category to Walgreens Pharmacies in Cuyahoga County and Summit County, Ohio**

| Year | Cuyahoga County | | | Summit County | | |
|------|-----------|-------|----------|-----------|-------|----------|
| | Walgreens | Other | Total | Walgreens | Other | Total |
| 2006 | 95.8% | 4.2% | **100.0%** | 94.2% | 5.8% | **100.0%** |
| 2007 | 95.7% | 4.3% | **100.0%** | 94.6% | 5.4% | **100.0%** |
| 2008 | 96.1% | 3.9% | **100.0%** | 95.9% | 4.1% | **100.0%** |
| 2009 | 97.3% | 2.7% | **100.0%** | 96.5% | 3.5% | **100.0%** |
| 2010 | 97.6% | 2.4% | **100.0%** | 97.3% | 2.7% | **100.0%** |
| 2011 | 98.5% | 1.5% | **100.0%** | 98.1% | 1.9% | **100.0%** |
| 2012 | 98.6% | 1.4% | **100.0%** | 98.4% | 1.6% | **100.0%** |

Source: DEA-Produced ARCOS Dataset from 1/1/2006 - 12/31/2014

Walgreens refers to distributions from Walgreens.

Other refers to distributions from Non-Walgreens entities (e.g., Cardinal Health, ANDA, etc.).

Percentages based on Dosage Units.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed on this 10th day of May 2019, in Chicago, IL.

Robert L. Brunner