# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:  ALL CASES | MDL No. 2804<br><br>Hon. Judge Dan A. Polster |

**MEMORANDUM OF CERTAIN DEFENDANTS IN OPPOSITION TO PLAINTIFFS' RENEWED AND AMENDED MOTION FOR CERTIFICATION OF RULE 23(b)(3) CITIES/COUNTIES NEGOTIATION CLASS**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

PLAINTIFFS' MOTION .......................................................................................................3

ARGUMENT ..........................................................................................................................4

I.      Defendants Have a Fundamental Interest in This Motion. ..................................5

II.     Plaintiffs' Proposal Violates Rule 23 and Constitutional Limits on the Court's Authority. ...............................................................................................................6

        A.      Rule 23 Does Not Authorize Certification of a "Negotiation" Class. ...................6

        B.      Rule 23 Does Not Authorize Certification of a Class That is Untethered to a Specific Lawsuit With Defined Parties. ...............................................................9

III.    Plaintiffs Have Failed to Demonstrate That the Substantive Requirements of Rule 23 Are Satisfied...........................................................................................................11

        A.      The Fact That the Class is Proposed for Purposes of Pursuing Settlement Negotiations Does Not Excuse Plaintiffs from Their Obligation to Demonstrate Full Compliance With Rule 23(a) and Rule 23(b)(3).....................13

        B.      Conflicts Within the Class and for Class Counsel Preclude a Finding of Adequacy of Representation. ...............................................................................15

                1.      The Conflict of Interest Arising from Counsel's Representation of Non-Class Plaintiffs, Including the States, Remains a Barrier to Certification. ...............................................................................16

                2.      Plaintiffs' Proposal Presents an Irreconcilable Conflict of Interest Between the Counties and Other Putative Class Members......................19

                3.      There Are Significant Additional Conflicts of Interest That Independently Preclude Certification of the Proposed Class....................21

                4.      The "Participatory" Features of Plaintiffs' Proposal Do Not Permit Conflicts of Interest to be Ignored. ............................................23

        C.      Plaintiffs Have Not Created a Record Upon Which the Court Could Make Findings of Commonality and Predominance........................................................26

                1.      Plaintiffs' Arguments About Commonality Misconstrue the Applicable Legal Standard.........................................................................26

2.      Any Evaluation of Predominance Must Take Into Account the Numerous Disparities in the Facts Pertinent to Class Members' Claims and the Applicable Law. ........................................................ 28

3.      The Statistics Plaintiffs Offer from a Superficial Examination of Complaints Would Not Withstand Scrutiny Even if They Were Relevant to the Predominance Inquiry ........................................................ 29

4.      Plaintiffs' Motion Fails to Address the Most Critical Question on Predominance, and Their Own Past Statements Answer That Question in the Negative. ........................................................................ 33

D.      Plaintiffs Have Made No Meaningful Effort to Demonstrate That the Proposed Class Representatives are Typical. .......................................... 38

E.      The Proposed Class Does Not Offer a Superior Method of Resolving Class Members' Claims. ............................................................................ 40

IV.     Plaintiffs' Proposed Order Has Critical Omissions and Would Not Provide for Valid Notice. ........................................................................................................ 45

CONCLUSION ........................................................................................................................ 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Am. Med. Sys., Inc.*,
  75 F.3d 1069 (6th Cir. 1996) ........................................................................... *passim*

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) ......................................................................................... *passim*

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018) ..................................................................................23

*Baatz v. Columbia Gas Transmission, LLC*,
  814 F.3d 785 (6th Cir. 2016) ................................................................................9

*Chudner v. Transunion Interactive, Inc.*,
  2010 WL 5662966 (D. Del. Dec. 15, 2010) ........................................................13

*Cincinnati v. Beretta U.S.A. Corp.*,
  768 N.E.2d 1136 (Ohio 2002) .............................................................................32

*City of Chicago v. Beretta U.S.A. Corp.*,
  821 N.E.2d 1099 (Ill. 2004) .................................................................................32

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2005) ..................................................................................8

*Culver v. City of Milwaukee*,
  277 F.3d 908 (7th Cir. 2002) ...............................................................................18

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) .................................................................................44

*In re Dry Max Pampers Litig.*,
  724 F.3d 713 (6th Cir. 2013) .........................................................................11, 15

*East Texas Motor Freight Sys. Inc. v. Rodriguez*,
  431 U.S. 395 (1977) ..............................................................................................10

*Wolfert ex rel. Estate of Wolfert v. Transam. Home First, Inc.*,
  439 F.3d 165 (2d Cir. 2006) .................................................................................42

*Gawry v. Countrywide Home Loans, Inc.*,
  640 F. Supp. 2d 942 (N.D. Ohio 2009) ..........................................................10, 33

iv

*Grewal v. Purdue Pharma L.P.*,
    2018 WL 4829660 (N.J. Super. Ct. Ch. Div. Oct. 2, 2018)....................................32

*In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*,
    489 F. Supp. 2d 932 (D. Minn. 2007)........................................................9

*Harding v. Jacoby & Meyers, LLP*,
    2017 WL 4922010 (D.N.J. Oct. 30, 2017)..................................................12

*Hayes v. Eagle-Picher Indus., Inc.*,
    513 F.2d 892 (10th Cir. 1975) ............................................................26

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2009)...............................................................12

*State ex rel. Jennings v. Purdue Pharma L.P.*,
    2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019).........................................32

*Kern v. Siemens Corp.*,
    393 F.3d 120 (2d Cir. 2004)...............................................................6

*Martin v. Behr Dayton Thermal Prod. LLC*,
    896 F.3d 405 (6th Cir. 2018) ............................................................41

*In re Nat'l Football League Players Concussion Injury Litig.*,
    821 F.3d 410 (3d Cir. 2016)..............................................................25

*In re Orthopedic Bone Screw Prod. Liab. Litig.*,
    1995 WL 273597 (E.D. Pa. Feb. 22, 1995) ...............................................27

*Parker v. Bell Helicopter Co.*,
    78 F.R.D. 507 (N.D. Tex. 1978) ...................................................11, 12, 36

*In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*,
    208 F.R.D. 625 (W.D. Wash. 2002) ....................................................27

*Pilgrim v. Universal Health Card, LLC*,
    660 F.3d 943 (6th Cir. 2011) ...................................................11, 32, 33

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*,
    654 F.3d 618 (6th Cir. 2011) ............................................................40

*In re Polyurethane Foam Antitrust Litig.*,
    2012 WL 12868246 (N.D. Ohio Jan. 23, 2012).........................................15

*In re Prempro*,
    230 F.R.D. 555 (E.D. Ark. 2005).........................................................27

*Reeb v. Ohio Dep't of Rehab. & Correction,*
    435 F.3d 639 (6th Cir. 2006) ............................................... 12

*In re Rezulin Prod. Liab. Litig.,*
    210 F.R.D. 61 (S.D.N.Y. 2002) ........................................... 27

*Richardson v. Wells Fargo Bank, N.A.,*
    839 F.3d 442 (5th Cir. 2016) ............................................... 42

*Rutherford v. City of Cleveland,*
    137 F.3d 905 (6th Cir. 1998) ............................................... 16

*In re Saturn L-Series Timing Chain Prod. Liab. Litig.,*
    2008 WL 4866604 (D. Neb. Nov. 7, 2008) .......................... 27

*Schlaud v. Snyder,*
    785 F.3d 1119 (6th Cir. 2015) ............................................. 16

*Smith v. Bayer Corp.,*
    564 U.S. 299 (2011) ............................................................. 5

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ......................................................... 9

*Sprague v. Gen. Motors Corp.,*
    133 F.3d 388 (6th Cir. 1998) (*en banc*) ..................... 28, 38, 40

*State v. Purdue Pharma L.P.,*
    2018 WL 4468439 (Alaska Super. Ct. July 12, 2018) ......... 32

*North Dakota ex rel. Stenehjem v. Purdue Pharma L.P.,*
    2019 WL 2245743 (N.D. Dist. Ct. May 10, 2019) .............. 32

*Streater v. Sarchione Chevrolet, Inc.,*
    2019 WL 2903955 (N.D. Ohio July 5, 2019) ...................... 50

*Tax Auth., Inc. v. Jackson Hewitt, Inc.,*
    898 A.2d 512 (N.J. 2006) ................................................... 26

*Tyson Foods, Inc. v. Bouaphakaeo,*
    136 S. Ct. 1036 (2016) ....................................................... 33

*Vassalle v. Midland Funding LLC,*
    708 F.3d 747 (6th Cir. 2013) ....................................... 16, 40, 42

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) .................................................. *passim*

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) ............................................................12, 36

*Whitlock v. FSL Mgmt., LLC*,
    843 F.3d 1084 (6th Cir. 2016) ..............................................................15

*Williams v. Duke Energy Corp.*,
    2014 WL 12652315 (S.D. Ohio Mar. 13, 2014) ............................33, 36

*Wotus v. GenCorp, Inc.*,
    2003 WL 27382938 (N.D. Ohio Dec. 2, 2003) ...................................32

*Yadlosky v. Grant Thorton, L.L.P.*,
    197 F.R.D. 292 (E.D. Mich. 2000) ...............................................11, 36

**Statutes**

28 U.S.C. § 1407.............................................................................9, 27

**Other Authorities**

Francis E. McGovern & William B. Rubenstein, *The Negotiation Class: A
    Cooperative Approach to Large Claim Class Actions* (June 13, 2019).......................19, 20, 42

## INTRODUCTION

Certain defendants ("defendants")[1] respectfully submit this memorandum in opposition to plaintiffs' Renewed and Amended Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class (Dkt. No. 1820).[2]

Although plaintiffs' revised motion addresses a few of the obvious defects in their prior proposal, at its core the proposal remains unchanged.  Most of the fundamental defects in that proposal remain (and in some instances have been exacerbated), while important new issues have emerged.

Rule 23 does not authorize the Court to certify a "negotiation" class, untethered to the Court's constitutionally granted jurisdiction to resolve particular lawsuits setting out concrete disputes or controversies between specific parties.  As defendants observed previously, plaintiffs' proposal is creative and could possibly be of interest to the United States Congress or the Federal Rules Advisory Committee.  But under both the clear language of Rule 23 and the unambiguous interpretations of that language by the Supreme Court, the proposed class is not eligible for certification.

Even if a negotiation class were hypothetically permissible under Rule 23, plaintiffs' amended motion would not provide a sufficient basis for certification of such a class.  The amended motion makes more effort than the original to address the requirements of Rule 23(a) and 23(b)(3), but that effort still falls well short of what the rule mandates.  For example, the amended motion seeks to paper over some of the fundamental conflicts of interest that would preclude the proposed class representatives and their counsel from being deemed adequate, but

---

[1] AmerisourceBergen Drug Corporation, Cardinal Health, Inc., CVS Rx Services, Inc. and CVS Indiana, L.L.C., Discount Drug Mart, Inc., McKesson Corporation, Prescription Supply Inc., Rite Aid of Maryland, Inc., d/b/a Mid-Atlantic Customer Support Center, Walgreen Co. and Walgreen Eastern Co, and Walmart Inc.

[2] In this brief, items filed on the main docket of the MDL are cited as "Dkt. No. __," without separate citation to the case number (1:17-md-02804).  Materials from other dockets in this MDL include the case number also.

those conflicts are still very much present.  Indeed, the conflict of interest between counties and states that plaintiffs have sought to address is mirrored by an equally severe conflict between the counties and other members of the putative class – the cities and towns within each county – that is embedded in the proposal itself.  And although plaintiffs offer new *arguments* on issues such as predominance, they still offer no *evidence* on those subjects, and the record that does exist is generally inconsistent with their arguments.  This Court accordingly still lacks any meaningful record on which to perform the "rigorous analysis" the Supreme Court requires.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011).

Of equal practical concern to defendants are elements of plaintiffs' proposal – such as a highly complicated supermajority voting requirement that would almost certainly never be met – which make it extremely unlikely that this approach could ever lead to a successful settlement.  And the novelty of this approach means that any settlement that was reached through this mechanism would be subject to years of appeals.  For these and other reasons, these defendants, although respectful of the settlement process, would be unlikely to participate in settlement discussions with this class as currently proposed.  The diversion of party and judicial resources away from more constructive efforts to resolve this litigation is counterproductive to the objective of reaching a reasonable resolution.

Defendants accordingly urge the Court to deny plaintiffs' motion.  In opposing the motion, defendants do not mean to suggest that no settlement class could ever be approved in this litigation based upon a showing that complies with the requirements of Rule 23.  But the pending motion does not come close to satisfying those requirements.

## PLAINTIFFS' MOTION

The proposed class includes all counties, cities, towns, and similar entities in the United States, regardless of where – or if – they have filed suit.[3]  It does *not* include states, state agencies, Indian Tribes, or other persons or entities who have suits pending in this MDL and whose participation – especially in the case of the states – would be essential to any resolution providing global peace for defendants.

Only one class is proposed, with no subclasses.  Fifty-one class representatives are identified.  The overwhelming majority are large cities (such as Chicago and Los Angeles) or populous counties in which such cities are located.  Forty-eight of these entities are plaintiffs in forty-seven different lawsuits pending in this MDL.  Plaintiffs' motion neglects to mention that three of the proposed class representatives are not parties to *any* cases in this MDL.[4]

Plaintiffs do not identify any particular case in which certification is sought; their motion is captioned for "all cases" in this MDL.  Nor does the motion seek certification of the class with respect to class members' claims against any particular defendants.  Attached as Exhibit B to the motion is a list of 88 entities that were sued in six of the MDL cases.  As plaintiffs acknowledge, however, this list identifies only a subset of the defendants who have been sued by putative class

---

[3] To be more precise, the class definition identifies the class as consisting of counties, cities, and similar entities "as recognized by the United States Census Bureau" *and* "as listed on the Opioids Negotiation Class website."  Mem. at 15.  The list posted on the website is not provided with plaintiffs' motion.  The reliance on a list that plaintiffs have modified rather than the independent Census Bureau database apparently derives from the need to correct for certain errors in the Census Bureau list.  *See* Mem. at 2 n.3.  At least some issues continue to exist, however.  For example, the Census Bureau apparently does not always distinguish between cities and counties in a manner consistent with the structure contemplated by plaintiffs' proposal.  Defendants have not attempted to review this issue comprehensively but have observed, as an example, that some cities in Fairfax County, Virginia, are not listed on plaintiffs' website among the municipalities in that county but instead appear on the drop-down menu for Virginia counties.  For reasons discussed in more detail below, whether a putative class member is identified as a "county" or a "city" can make a huge difference in its treatment and potential for recovery under plaintiffs' proposal.

[4] These three are the City of Norwalk, Connecticut, the City of Roanoke, Virginia, and the County of Rockland, New York.  Two of the these three have cases pending in other federal courts; those cases may at some point be transferred to this MDL, but as of this writing that has not yet occurred.  Norwalk is a plaintiff in a case pending in state court.

members; their motion apparently contemplates that the "negotiation class" would be certified to negotiate with anyone who was interested in doing so.

Plaintiffs now propose that two lawyers from firms on the Plaintiffs' Executive Committee ("PEC") be appointed as "lead" class counsel.  The motion and accompanying declarations from these lawyers assert that they do not represent any states with claims in this litigation.  Four other lawyers, including corporation counsel for the cities of Chicago and New York, are also proposed as class counsel.  Significantly, however, nearly half of the proposed class representatives are represented by lawyers who also represent states.[5]  All members of the PEC, including lawyers who also represent states, are listed as signatories on the motion.

The Memorandum in Support of the motion ("Mem.") explicitly states that "[t]his is **not** a Rule 23(e) motion for settlement class certification" and "[t]his is **not** a Rule 23(b)(3) motion to certify a class for trial."  Mem. at 11.  Instead, plaintiffs characterize their proposal as one to "organize a class of similarly-situated cities and counties with a common interest in the best possible settlements," *id.* at 13, and to create a "voting trust to consider, in turn, prospective comprehensive settlement of claims against specific defendants in this litigation."  *Id.* at 91.  Absent from the motion is any explanation for why a "voting trust" or other entity to perform this function could not be organized *without* the certification of a Rule 23 "class."

## ARGUMENT

Defendants do not submit this Opposition lightly.  They are acutely aware of the benefits that could accrue if a legally supportable mechanism were available to permit global settlements in this litigation.  But the proposal presented in plaintiffs' motion, as currently framed, is not

---

[5] A list of the proposed class representatives, identifying the counsel representing them who defendants understand also represent states, is provided in Exhibit 2.  Defendants' knowledge of the counsel relationships of the states is limited, so this list may be incomplete.

legally supportable.  Given the immense complexity of this litigation and the limited resources available to deal with it, defendants urge that the Court deny the motion.

## I.     Defendants Have a Fundamental Interest in This Motion.

Defendants have a fundamental interest in ensuring that any certification of a class in this litigation, and subsequent proceedings involving that class, comply with the law, including Rule 23.  The proposed process is of practical value only if, at the end of the day, it generates a valid and enforceable settlement.  This in turn requires compliance with Rule 23 and other applicable legal requirements.  If such compliance cannot be assured, defendants will have no incentive to negotiate a settlement with the class, as they will have no assurance that the release and judgment granted in return for the settlement consideration they offer will be enforceable.  *See Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011) (confirming that "a properly conducted class action, with binding effect on nonparties, can come about in federal courts in just one way— through the procedure set out in Rule 23"); *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 622 (1997) (overturning global class settlement of asbestos claims based on failure to comply with Rule 23).

Even if, as plaintiffs assert, defendants would have the option of declining to negotiate with the class, defendants would be materially harmed by an improper certification that diverted the limited resources available to support and promote resolution of the litigation, whether through settlement or otherwise, along a path that could not be relied upon to achieve meaningful results.  Moreover, the confusion that would be engendered by the proposed notice and certification could jeopardize other, potentially more fruitful paths to resolution.

Defendants also have a legitimate interest in ensuring that the Court does not make findings – as Rule 23 requires before any certification can occur – that are inaccurate and that

could be construed as binding in other contexts.[6]  Defendants understand and appreciate plaintiffs' attempt to address this concern by including language in their proposed order to confirm the limited purpose of the certification and preclude use of the Court's findings for other purposes.  *See* Proposed Order (Dkt. No. 1820-2) ¶¶ 14-15.  But the fact remains that plaintiffs are asking the Court, in the interests of expediency, to make findings under Rule 23 for which plaintiffs have made no meaningful effort to establish a record – a fact that could be easily misunderstood by another court.  Even if such a ruling were proper – and it would not be – it would threaten harm to defendants that could go well beyond the context of this motion.

## II.    Plaintiffs' Proposal Violates Rule 23 and Constitutional Limits on the Court's Authority.

### A.    Rule 23 Does Not Authorize Certification of a "Negotiation" Class.

Plaintiffs' motion is explicit in stating that the class they are seeking would be certified *neither* for litigation purposes *nor* as a "settlement class" created for purposes of obtaining judgment on an existing agreed-upon settlement.  Mem. at 11.  Plaintiffs further acknowledge that such a class would be unprecedented.  Nonetheless, plaintiffs suggest that such a class is permissible because Rule 23 does not expressly *forbid it*.  *Id*. at 4, 6.  That is not how the Supreme Court interprets and applies Rule 23.

The Supreme Court has cautioned repeatedly that Rule 23 may *not* be stretched beyond its clear terms.  Observing that Rule 23 establishes a procedural mechanism – the class action – that is itself a departure from the norm, *Wal-Mart*, 564 U.S. at 348, the Court has instructed that "a mere negative inference does not in our view suffice to establish a disposition that has no basis in [Rule 23]'s text, and that does obvious violence to the Rule's structural features."  *Id.* at 363.  *See also Amchem*, 521 U.S. at 620 (district courts are bound by Rule 23 as written and may not adjust it through "judicial inventiveness"); *Kern v. Siemens Corp*., 393 F.3d 120, 128 (2d Cir.

---

[6] Defendants observe in this regard that the Court has just established a schedule for full merits class certification briefing in certain other cases.  *See* Dkt. No. 1829.  Defendants expect to vigorously oppose those motions.

2004) (court could not invoke its "equitable powers" to certify a class beyond the bounds of what is explicitly authorized under Rule 23, as "Rule 23 offers the *exclusive* route to forming a class action").

Plaintiffs' motion seeks to use Rule 23 to create an organization – something akin to the National League of Cities (*see* Mem. at 17) – that would facilitate agreements among class members and pursue negotiations on their behalf with defendants, as well as with the states that are not part of this MDL.  That is not authorized under Rule 23.  The Rule authorizes the certification of classes for purposes of pursuing standard *judicial* activity – the litigation of claims – with a carefully delineated provision allowing judgment to be entered on class settlements.  These activities stem from the courts' Article III powers, which are limited to the adjudication of concrete cases and controversies ending in entry of a judgment.  Neither Article III nor Rule 23 provides a generalized authorization for courts to create organizations to pursue other activities in the interests of their members – including the negotiation of contracts.

To be sure, Rule 23 does authorize certification of a class for purposes of *entering judgment* on a class settlement.  Rule 23(c)(2)(B) states:  "For any class certified under Rule 23(b)(3) – or upon ordering notice under Rule 23(e)(1) to *a class proposed to be certified for purposes of settlement under Rule 23(b)(3)* – the court must direct to class members the best notice that is practicable under the circumstances."  (Emphasis added.)  Similarly, Rule 23(e) states:  "The claims, issues, or defenses of a certified class – *or a class proposed to be certified for purposes of settlement* – may be settled, voluntarily dismissed, or compromised only with the court's approval."  (Emphasis added.)  However, certification "for purposes of settlement" is authorized only if there is a duly negotiated settlement.  *See* Fed. R. Civ. P. 23(e).  Indeed, Rule

23(e) requires a court to conduct a preliminary evaluation of the settlement terms *before* it may authorize issuance of class notice. *See* Fed. R. Civ. P. 23(e)(B)(i).[7]

Thus, a court approving a class settlement under Rule 23 is engaging in the judicial function of entering a judgment of approval on a class settlement, and a class is certified for the purpose of enabling that *judicial* function to be performed. Certifying a class solely for purposes of negotiations, with no concrete judicial function to be performed, is fundamentally different.[8]

Plaintiffs suggest (Mem. at 18) that their proposal may properly be analogized to Section 524(g) of the Bankruptcy Code, which allows a debtor facing asbestos claims to establish a trust, to which the bankruptcy court may order all asbestos claims to be directed if the terms of the debtor's reorganization are approved by a super-majority of claimants. 11 U.S.C. § 524(g); *see In re Combustion Eng'g, Inc.*, 391 F.3d 190, 201 n.4 (3d Cir. 2005). Plaintiffs argue that "[i]t would be bizarre to leave the powers to prepackage a voting resolution of a complicated dispute in the hands of an Article I tribunal, but not the Article III tribunal." Mem. at 18. Whether "bizarre" or not, that is what Congress chose to do. Similarly, plaintiffs' assertion that it would be "second nature" to take a similar approach if opioid cases were resolved in a bankruptcy court (*id.*) ignores the fact that Section 524(g) applies only to asbestos claims.[9]

---

[7] Plaintiffs' original motion asked the Court to give "preliminary" approval to the proposed negotiation class and authorize class notice before making its final certification decision. This process is authorized only for settlement classes certified under Rule 23(e). Apparently conceding this error, plaintiffs now ask the Court to follow the standard process of deciding class certification first and only then authorizing class notice to issue.

[8] Observing that at one time the certification of settlement classes was considered a "judicial innovation," plaintiffs suggest that precedent supports a further expansion to encompass negotiation classes. Mem. at 6 n.6. This is a false analogy. Regardless of whether there was reason to question the authority for settlement classes in prior versions of Rule 23 (settlement classes are explicitly authorized by the current version of the rule), they have always had the function of facilitating the entry of judgment by a court on a concrete case or controversy between specifically defined parties. And the Supreme Court has in recent years repeatedly warned that new innovations that go beyond the express scope of Rule 23 are prohibited. *Wal-Mart*, 564 U.S. at 363; *Amchem*, 521 U.S. at 620.

[9] Plaintiffs' original motion also suggested that "issue" certification under Rule 23(c)(4) might authorize the Court to certify a class for negotiation purposes. This argument does not withstand close scrutiny and has now been relegated to a short footnote in their amended motion. *See* Mem. at 91 n.46. Rule 23(c)(4) allows "an action [to] be brought or maintained as a class action with respect to particular issues." The proposal here does not involve bringing or maintaining an "action" – a civil action to be litigated. *Cf.* Fed. R. Civ. P. 2 ("There is one form of action – the civil action."). Nor is settlement a substantive "issue" contested by the parties. The Sixth Circuit has

In short, Rule 23 does not authorize certification of a "negotiation" class.

**B.      Rule 23 Does Not Authorize Certification of a Class That is Untethered to a Specific Lawsuit With Defined Parties.**

There is another fundamental defect in plaintiffs' class certification proposal:  It is not tied to any specific lawsuit with defined parties.  Rather, the motion is filed with a caption saying that it relates to "all cases" in this MDL.  It identifies as proposed class representatives entities that are plaintiffs in dozens of separate cases, but the motion is not brought in the specific cases in which those entities are plaintiffs.  Indeed, as far as defendants have been able to determine three of the proposed class representatives are not parties in *any* case in this MDL – they have *no* claims pending within the jurisdiction of this Court against *anyone.*  Nor is plaintiffs' motion directed at "negotiation" of claims against any specific group of defendants.[10]

Nothing in either Rule 23 or the MDL statute authorizes an MDL court to certify a free-floating "MDL class."  Any such authority would be contrary to Article III of the Constitution, which restricts the jurisdiction of the federal courts to concrete cases and controversies.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  An MDL is not itself a "civil action"; it is a procedural device for the management of civil actions; the latter, not the MDL itself, embody the cases and controversies on which the Court's jurisdiction is based and that, under Rule 23, may be certified to proceed, not merely as "actions," but as "class actions."[11]  Here the proposed

indicated that Rule 23(c)(4) certification is to be used only for trial purposes.  *See Baatz v. Columbia Gas Transmission, LLC*, 814 F.3d 785, 792 (6th Cir. 2016) (noting that Rule 23(c)(4) is used for "bifurcating the proceedings to allow class litigation as to liability while leaving damages for individual determinations").

[10] Exhibit B to plaintiffs' motion lists 88 defendants who have been sued in six of the MDL cases (including some brought by plaintiffs who are not proposed class representatives).  As plaintiffs readily acknowledge, numerous other defendants, not listed in Exhibit B, have been sued by the proposed class representatives and other putative class members.  Conversely, several of the defendants listed on Exhibit B have not been sued by any of the proposed class representatives.

[11] *See* 28 U.S.C. § 1407(a) ("When *civil actions* involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings"; "[e]ach *action* so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings….") (emphases added); *cf. In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*, 489 F. Supp. 2d 932, 936 (D. Minn. 2007) ("The transfer under § 1407, even after the filing of an amended

class is not linked to any "action" by any specific plaintiffs against any specific defendants asserting any specific claims.

Nor does Rule 23 authorize a court to certify a single class for multiple cases at once, including cases in which no class representative is even a party. To the contrary, one of the fundamental qualifications for any class is that it be represented by someone who is both a plaintiff in the case and a class member. *Cf. East Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403-04 (1977) (proposed class could not be certified because plaintiffs were not class members); *Gawry v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 942, 950 (N.D. Ohio 2009) (Polster, J.) (same), *aff'd*, 395 F. App'x 152 (6th Cir. 2010). Although the motion seeks certification of a class in "all cases" in this MDL, plaintiffs have not proposed class representatives from "all cases." Nor could they do so, as many cases in this MDL were brought by claimants (*e.g.*, Indian Tribes) who would not even be class members.

It should go without saying that a class may not be certified to be represented by a party who is not a plaintiff in *any* case pending before the Court. Yet plaintiffs have proposed three class representatives who are not parties to any case before this Court. Plaintiffs have, unsurprisingly, cited no authority for the proposition that a *non-party* can be appointed as a class representative in a federal action.

Plaintiffs could theoretically have addressed these issues by filing this motion in a specific case in the MDL, amending the complaint in that case to include all of the proposed class representatives as plaintiffs.[12] But they elected not to do so – presumably because those plaintiffs want to be able to continue to litigate their original suits. They cannot have it both

---

complaint, is only a change in courtrooms. Consolidation of a master complaint is merely a procedural device designed to promote judicial economy, and, as such, it does not affect the rights of the parties in separate suits.").

[12] This is the standard practice when a global settlement is proposed to address claims pending in multiple different suits. *See, e.g.*, *Amchem*, 521 U.S. at 601-02 (describing process followed in global asbestos settlement); *see also Manual for Complex Litigation (Fourth)* § 22.36 (2004) (noting common practice in MDL litigation of filing a "consolidated amended class action complaint").

ways.  A class may only be certified in a specific civil action that presents a concrete case or controversy in which the proposed class representatives are asserting claims against the defendants.

Finally, it is clear that plaintiffs have not thought through a further *practical* reason why their untethered class would be valueless:  The purpose of this class, they say, would be to negotiate settlements that would then be submitted to the Court for approval under Rule 23(e).  But the end-point of judicial approval of any class settlement is the entry of judgment in the case in which the class has been certified; it is that judgment that finalizes the settlement and makes it enforceable.  Here there is no such case and, therefore, there could be no such judgment.

### III.  Plaintiffs Have Failed to Demonstrate That the Substantive Requirements of Rule 23 Are Satisfied.

The Supreme Court has made clear that, to certify a class for any purpose, each requirement of Rule 23(a) and of the pertinent subpart of Rule 23(b) – in this instance, Rule 23(b)(3) – must be satisfied.  *See Amchem*, 521 U.S. at 622; *see also In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013).  Plaintiffs do not dispute this.

Class certification is only appropriate where the district court is satisfied, after conducting a "rigorous analysis," that the moving party has "affirmatively demonstrate[d] his compliance with the Rule" by "prov[ing] that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Wal-Mart*, 564 U.S. at 350-51; *accord Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011).

Where, as here, the claims involve multiple defendants, the rigorous analysis required under Rule 23 must be performed as to *each* defendant.  *Yadlosky v. Grant Thorton, L.L.P.*, 197 F.R.D. 292, 302 (E.D. Mich. 2000); *Parker v. Bell Helicopter Co.*, 78 F.R.D. 507, 510 (N.D. Tex. 1978).  A finding that all elements of the class certification test are satisfied as to the claims of the putative class against one defendant does *not* justify certification as to all defendants.

Indeed, it is not uncommon for a court to deny certification on claims against some defendants even when the pertinent Rule 23 test is satisfied as to the claims against others. *See, e.g.*, *Parker*, 78 F.R.D. at 510.

Importantly, Rule 23 "does not set forth a mere pleading standard." *Wal-Mart*, 564 U.S. at 350. The "rigorous analysis" that the Supreme Court mandates requires examination of specific *facts* and *evidence* necessary to show that each and every required element of Rule 23 is satisfied. *See In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 851 (6th Cir. 2013) (rigorous analysis will ordinarily require class certification to be "predicated on evidence"); *Reeb v. Ohio Dep't of Rehab. & Correction*, 435 F.3d 639, 644 (6th Cir. 2006) (finding record insufficient for the district court to have conducted the required analysis); *Harding v. Jacoby & Meyers, LL*P, 2017 WL 4922010, at *4 (D.N.J. Oct. 30, 2017) ("Plaintiffs must show that the putative class meets the requirements through *evidentiary proof.*"). Following these dictates, a class certification motion submitted in a complex case is typically supported by detailed declarations, including expert analysis and other evidence. *See, e.g.*, *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312-14 (3d Cir. 2009) (summarizing evidence). Nothing like that has been presented here. Class certification is also typically preceded by a period of discovery, including discovery from the proposed class representatives. Except for the two Track 1 plaintiffs, there has been no discovery from any of the proposed class representatives here. In sharp contrast to the norm, the entirety of the record about each of the proposed class representatives is a single paragraph of description in plaintiffs' brief, with no verifying evidence.[13]

---

[13] Plaintiffs' failure to disclose that three of the proposed class representatives do not even have cases in this MDL – clearly a material fact – illustrates the danger of granting their motion without an appropriate record that has been tested in discovery. Here, discovery on class representatives would have provided an appropriate basis to examine the variations in (among other things) their claims, the impact of opioids on their respective jurisdictions, and the relief they seek. It would also have provided an opportunity to probe the significant conflict-of-interest issues addressed in Section III.B below. As discussed there, even the limited record that exists demonstrates that such conflicts preclude any finding that the proposed class representatives and their counsel can adequately represent the

Although the 99-page memorandum in support of the amended motion offers more *discussion* of the Rule 23 requirements than did its 68-page predecessor, plaintiffs have still presented virtually no *evidence* that the required elements of Rule 23 are satisfied.  *See Chudner v. Transunion Interactive, Inc.*, 2010 WL 5662966, at *1 n.1 (D. Del. Dec. 15, 2010) (denying certification where "Plaintiff … has provided zero evidence" to show satisfaction of Rule 23).  The only declarations supplied with the motion are from the lawyers who are proposed as class counsel, and they address only those lawyers' qualifications for that role.  In short, although the new brief is longer and offers more *argument* about the Rule 23 factors, the treatment of those issues is ultimately still perfunctory.  Numerosity is self-evident here, but satisfaction of the remaining elements of Rule 23 is not evident at all.  And plaintiffs' newly extended discussion of those issues creates more new questions than it answers.

> ### A.   The Fact That the Class is Proposed for Purposes of Pursuing Settlement Negotiations Does Not Excuse Plaintiffs from Their Obligation to Demonstrate Full Compliance With Rule 23(a) and Rule 23(b)(3).

Plaintiffs disavow in their motion any intention of short-circuiting the test for class certification established under Rule 23(a) and 23(b)(3).  Mem. at 6, 72.  Yet as discussed in the following sections, the specific arguments they present on several factors try to do exactly that.  It is therefore useful to begin with that question.

The Supreme Court has confirmed that Rule 23 must be satisfied fully regardless of the purpose for which certification is sought.  In *Amchem*, the Supreme Court rejected the suggestion that the requirements of Rule 23 are relaxed when certification is sought solely for purposes of approving a class settlement.  521 U.S. at 619-20.  *Amchem* involved a class certified for purposes of approving the settlement of asbestos claims; the class included both persons who had

---

class.  But should the Court have any doubt on that subject (or other factual issues it must resolve in evaluating this motion), it should permit the record to be appropriately developed through discovery and/or an evidentiary hearing.

filed suit claiming injury from asbestos exposure and persons who had been exposed to asbestos but had not filed suit.  The Supreme Court held that while the presence of a settlement was "relevant" to class certification – particularly insofar as a settlement may require *enhanced* scrutiny on the issue of adequacy of representation – it did not override the requirements of Rule 23.  *Id.* at 619-22.

The Supreme Court emphasized that, with one modest exception, the requirements of Rule 23 must always be analyzed with reference to whether the proposed class could be certified for purposes of *litigating* the class's claims, even if certification is requested only for purposes of approving a settlement.  *Id.* at 619-20.  In a discussion that is highly relevant here, the Court stated that the predominance inquiry could not focus on the "benefits asbestos-exposed persons might gain from the establishment of a grand-scale compensation scheme."  *Id.* at 622.  Such benefits were simply "not pertinent" to predominance, as that "inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement."  *Id.* at 623.  In other words, the predominance inquiry must focus on the issues involved in the *underlying claims*, not on the common benefits realized by class members from the resolution of those claims in a settlement.

Notably, *Amchem* confirmed that mass tort claims, even if "arising from a common cause or disaster[,] … are 'ordinarily not appropriate' for class treatment."  *Id.* at 625 (quoting Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment).  Such cases are "likely to present 'significant questions, not only of damages but of liability and defenses of liability, affecting individuals in different ways.'"  *Id.* (alteration and citation omitted).

Applying Rule 23 to the class in *Amchem*, the Supreme Court held that the requirements of Rule 23(b)(3) – as well as the adequacy of representation requirement of Rule 23(a) – were not satisfied.  The court held, for example, that predominance is lacking where the circumstances

14

of exposure and resulting harms vary significantly across the class.  *Id.* at 624.  Observing that "[d]ifferences in state law … compound these disparities," the Supreme Court refused to endorse certification of a settlement class "as sprawling as this one."  *Id.*[14]

The Sixth Circuit reads *Amchem* as "stand[ing] for the principle that the 'dominant concerns of Rule 23(a) and (b) persist when settlement, rather than trial, is proposed.'"  *Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1090 (6th Cir. 2016) (quoting *Amchem*, 521 U.S. at 619-21).  Indeed, as plaintiffs' motion acknowledges (Mem. at 67), adequacy of representation is ordinarily "scrutinized more closely, not less, in cases involving a settlement class."  *In re Dry Max*, 724 F.3d at 721; *see also In re Polyurethane Foam Antitrust Litig.*, 2012 WL 12868246, at *2 (N.D. Ohio Jan. 23, 2012) ("in the settlement context, courts must pay undiluted, even heightened, attention to class certification requirements").  There is no authority – and plaintiffs certainly cite none – suggesting that a more relaxed standard would apply where certification is sought for *neither* trial *nor* approval of a settlement.

## B. Conflicts Within the Class and for Class Counsel Preclude a Finding of Adequacy of Representation.

Rule 23(a) permits certification only if the Court is able to find that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This is the one element of the certification test on which plaintiffs implicitly acknowledge that their original proposal was deficient, and they have amended it in an effort to address some of the problems defendants identified in their original submission.  But it remains abundantly clear that this element of Rule 23(a) is not satisfied here.

A number of factors are considered in evaluating adequacy of representation, but the most important is usually the existence of a conflict of interest among class members and/or their

---

[14] The Supreme Court did hold that a district court "[c]onfronted with a request for settlement-only class certification … need not inquire whether the case, if tried, would present intractable management problems," a factor in the evaluation of superiority.  *Id.* at 620.  But no relaxation is permitted for other factors.

counsel.  *See Amchem*, 521 U.S. at 627 (adequacy prong of Rule 23(a) not satisfied when interests of class members were not aligned); *see also Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998) (adequacy inquiry serves to uncover conflicts of interest between the plaintiffs and the class they seek to represent); *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757 (6th Cir. 2013) (reversing adequacy determination due to conflict among class members); *Schlaud v. Snyder*, 785 F.3d 1119, 1126 (6th Cir. 2015) (adequacy not satisfied due to conflict between class members).

Here, there are not only multiple conflicts of interest within this class, but also conflicts of interest between class members and *other* clients of the lawyers proposed as class counsel. The discussion below begins by addressing conflict issues plaintiffs have at least attempted to remedy in their amended motion – conflicts of interest arising from counsel's representation of other plaintiffs in this litigation, including the states, whose interests are adverse to those of the class.  It then discusses several other conflict issues that the amended motion does *not* attempt to address, including an acute conflict of interest between the county and city/township class members that is inherent in plaintiffs' proposed allocation scheme.

> 1.     **The Conflict of Interest Arising from Counsel's Representation of Non-Class Plaintiffs, Including the States, Remains a Barrier to Certification.**

Plaintiffs' original motion proposed that the members of the PEC should be appointed as class counsel.  In response, defendants pointed out the disqualifying conflict of interest arising from the fact that several PEC members also represent other non-class members in opioid litigation.  This was particularly acute with respect to PEC members who represent states, given plaintiffs' concession that any global settlement designed to bring "peace" to any defendant will not be possible unless the states are included, and that this will require additional negotiation

between class counsel and the states.  There is a clear conflict of interest if counsel represent parties on both sides of that table.[15]

Although plaintiffs have made a superficial revision to their proposal in an apparent effort to address this issue, the underlying problem still remains.  Plaintiffs now propose appointment of two "Co-Lead Class Counsel," Jayne Conroy and Christopher Seeger, whose firms are members of the PEC, and four additional lawyers to associate with them as "Class Counsel."  Two of the latter are corporation counsel for New York and Chicago, whose capacity to serve in this role is open to question for other reasons.[16]  Ms. Conroy and Mr. Seeger have provided declarations confirming that their law firms (unlike others on the PEC) do not represent any states in the opioid litigation.[17]

Taking at face value the representation that Ms. Conroy's and Mr. Seeger's firms do not represent states in opioid litigation, the conflict problem is hardly put to rest.  Almost half of the proposed class representatives are still represented in this litigation by PEC members who *do* also represent states.  (*See* Exhibit 2.)  For example, lead counsel for Summit County (as well as at least two other proposed class representatives) has been, and remains, Motley Rice, which also represents multiple states.  Baron & Budd represents eight of the proposed class representatives and at least four states.  The State of Maryland is represented by the Robbins Geller and Lieff

---

[15]  The conflict of interest presented by this situation was confirmed when, shortly before the hearing on plaintiffs' original motion, more than two dozen states joined in letters to the Court strenuously opposing the motion.  *See* Dkt. Nos. 1726, 1727.  That motion had been signed by PEC members who represent some of the states that opposed it.

[16]  The New York City Corporation Counsel does not appear to represent *any* of the proposed class representatives. Nor does he represent anyone in this MDL – as indicated in his declaration, the City of New York is suing in state court.  *See* Carter Dec. ¶ 8.  The City of Chicago is an MDL litigant and a proposed class representative, but no showing has been made that its corporate counsel can represent the class.  Class counsel are required to serve as counsel, not just to their own clients, but to the class as a whole.  Unlike lawyers in private practice, corporation counsel who are employees of their cities are typically not authorized to represent anyone else.  This issue is not addressed in plaintiffs' motion or the supporting declarations of either of these lawyers.

[17]  Plaintiffs' brief asserts that these firms do not represent *any* plaintiffs in opioid litigation who are not class members.  Mem. at 69.  However, although Mr. Seeger's declaration makes such a representation, Ms. Conroy's does not and apparently could not.  Her firm represents other plaintiffs, including Feather River Tribal Health, Inc., and Riverside-San Bernardino County Indian Health, Inc., which are tribal government entities and excluded from the proposed class.  *See* Case Nos. 1:19-op-45334; 1:19-op-45025.

Cabraser firms, which between them appear on the complaints at least eleven of the proposed class representatives.

Plaintiffs thus appear to be suggesting that a class representative may be represented by one lawyer for purposes of its responsibilities as class representative and by *different* counsel – who (plaintiffs now implicitly concede) are affirmatively *disqualified* from acting as class counsel – for all other purposes. Plaintiffs have offered no authority supporting this remarkable proposition, and defendants are aware of none. To the contrary, it flies in the face of the very definition of the role of an adequate class representative, which is to serve with undivided loyalty to the class. A class representative who is represented by counsel whose own loyalties are divided is by definition unable to fill the class representative role. *See Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) (holding that adequacy evaluation must consider both the class representative and its counsel, as "it is counsel for the class representative … who direct and manage" its actions in the litigation).

The fact that plaintiffs' new class counsel proposal is no more than a fig leaf is confirmed by the fact that their motion suggests no change be made in the Court's prior order appointing a Settlement Committee for plaintiffs. *See* Mem. at 52 (citing Dkt. No. 118). The lawyers appointed in that role include many of the same lawyers who, by reason of their representation of states and other non-class plaintiffs, have been withdrawn as proposed class counsel. To be sure, the activities of this Settlement Committee extend beyond whatever settlement discussions, if any, may occur between the proposed class and any defendant. But there can be no serious question that those lawyers expect to play a significant role in any such class settlement discussions, no matter which lawyers are formally appointed to which roles.

In short, the conflict of interest between the proposed class and the non-class clients of the lawyers who represent proposed class representatives remains as a bar to class certification.

2. **Plaintiffs' Proposal Presents an Irreconcilable Conflict of Interest Between the Counties and Other Putative Class Members.**

Plaintiffs' revised proposal does not attempt to address another fundamental conflict of interest for class representatives and their counsel that arises from the structure of the proposal itself. The much-vaunted foundation of plaintiffs' proposal is that it fixes in advance the share of each class member in any settlement. The amended motion makes clear, however, that the allocation it proposes to establish would be no more than partial. The proposal would fix the allocation of future settlements only *among counties*. The amounts that are to be then allocated to the *towns, cities, and villages* within each county are left to future negotiation and, if necessary, resolution by the Court. *See* Mem. at 50-51, 60-61. Plaintiffs' motion describes two possible approaches that could be used to make this allocation (one of which was apparently applied to yield the predictive figures for cities and towns in their online tool). But neither of these methodologies would be mandatory, and the Court (acting in the first instance through a Special Master) could entertain a different approach. *Id.* at 60.

Because it offers no fixed metric for allocation of settlement proceeds beyond a partial allocation to counties, plaintiffs' proposal departs fundamentally from the negotiation class concept embodied in the draft article analyzing "the permissibility of the negotiation class approach" cited in their brief. Mem. at 7 n.7 (citing Francis E. McGovern & William B. Rubenstein, *The Negotiation Class: A Cooperative Approach to Large Claim Class Actions* (June 13, 2019) ("McGovern & Rubenstein")). As described in that article, "Stage 1" critically requires that "[p]rior to any motion for class certification, the putative class members jointly generate a metric that will govern the distribution of a lump sum settlement among themselves."

McGovern & Rubenstein at 20. That has not been accomplished here; no fixed "metric" has been established for the majority of the class.[18]

Regardless of whether the allocation of any recovery between the counties, on the one hand, and the cities and towns, on the other, is resolved through negotiation or through litigation before a Special Master, there is a clear conflict of interest, and once again class counsel – who would have an equal duty to *all* class members – would be representing parties on both sides and thus unable to represent them with undivided loyalties. This conflict could easily manifest itself before any settlement is concluded, as one can readily anticipate some municipalities demanding allocation concessions from their counties (or vice versa) as a *quid pro quo* for their votes in support of any final deal. Thus, counsel who are supposed to be negotiating a settlement with a defendant would at the same time be contending with class members they are supposed to be representing but who have to negotiate among themselves.

The fundamental conflict of interest that is inherent in this proposal will begin to arise from the outset, as class members are required to decide whether or not to opt out of the class. One of the unaddressed anomalies of the proposal is that if a county chooses to opt out of the class, the cities and towns within that county will not be able to share in any settlement, as there will be no allocation to that county from which their distributions would otherwise come. This could lead to a host of undesirable outcomes, including unfavorable advance sharing agreements extracted by counties from their constituent municipalities in return for their agreement not to opt out. Alternatively, some municipal class members could unwittingly find themselves bound by a settlement and release with no right to a distribution. Counsel who, as class counsel, would

---

[18] The McGovern & Rubenstein draft article goes on to warn that "[a]t the class certification stage, the movants will need to convince the court that the class is adequately represented," and that if lawyers involved in negotiation of any allocation "metric" are put forward as class counsel (and/or their clients as class representatives), "a court will likely review the preceding allocation negotiation in assessing their present (and future) adequacy." *Id.* at 22. Plaintiffs have presented no evidence that would permit such a review here; their motion offers only vague general references to consultations among the PEC and its retained experts and "meetings" with unidentified class members. Mem. at 49.

represent both a county and the cities and towns within that county would be hopelessly

conflicted in advising on these issues.

Given this critical feature of plaintiffs' proposal and the conflicts it inherently creates, the

Court could not responsibly find that the adequacy prong of Rule 23(a) is satisfied.

### 3. There Are Significant Additional Conflicts of Interest That Independently Preclude Certification of the Proposed Class.

Even leaving aside the issues discussed above, conflicts of interest abound within the

proposed class.  For example, class members who are overwhelmingly focused on the pursuit of

monetary recovery for past economic injuries will have interests adverse to those that have not

incurred such costs and instead seek a forward-looking preventative remedy.  Plaintiffs' motion

offers no discussion of non-monetary recovery, but many jurisdictions may wish to focus

primarily on non-monetary measures to prevent potential future harm, and they may be

uninterested in trade-offs that favor a recovery of short-term monetary relief that benefits others

significantly but may offer them little or nothing.[19]

Based on plaintiffs' description of the proposed class representatives (for which, as with

everything else, they have offered nothing more than unsupported representations in a brief), it

appears that most, if not all, will be primarily focused on monetary relief for past damages.  But

there are thousands of cities, towns, and counties across the country that have not brought

lawsuits at all, notwithstanding extensive efforts by plaintiffs' counsel to encourage them to do

so.  And a review of the "Allocation Map" tool on plaintiffs' website (referred to in their motion

---

[19] This dispute was recently illustrated for the Court when a group of public health organizations filed an amicus brief urging the Court to ensure that any settlement funds be used for forward-looking programs focused on addiction treatment and prevention.  See Dkt. No. 1607-1.  The City of St. Louis, which would be a member of the proposed negotiation class, sharply responded that local governments should be free to use funds realized from a settlement "to compensate the plaintiffs for the past fiscal impact of defendants' conduct, which caused diversion of public resources to address the results of that conduct."  Dkt. No. 1623 at 3.  As examples, the City pointed out that "a dollar spent in the past on treatment services due to defendants' conduct was a dollar not spent on other pressing need such as infrastructure, pollution control, suppression of violent crime, and the like."  Id.  In other words, class members like St. Louis are focused on obtaining settlement funds to be used for general purposes, while other class members will be more focused on preventative remedies.

as an "Allocation Lookup Tool") confirms that there is likely good reason for this.  As discussed further in Section VI below, although this tool is the cornerstone of plaintiffs' notice proposal, their motion is strikingly incomplete in its explanation of how the tool operates.  Be that as it may, if one takes at face value the results offered by the tool, one cannot avoid the conclusion that the variation in this class is immense.

It requires just a few minutes of exploration with plaintiffs' website tool to confirm that, at least according to the way the tool is programmed to predict allocations for purposes of guiding opt-out decisions, many class members should expect to receive nothing, or almost nothing, in the way of monetary recovery from even a substantial settlement.  For example, for a hypothetical billion dollar settlement, the tool predicts that hundreds of municipal class members in Ohio alone would be allocated less than the $500 threshold below which no distribution would be made.  *See* Ex. 1, Dec. of Jessica Samuels ¶ 6; Mem. at 60-61 n.27.  Many show a default allocation of just a few dollars or even $1.  Samuels Dec. ¶ 6.[20]  Ohio is not unusual in this respect; one sees similar results from the tool for putative class members in other states.  *Id.*

This is not to suggest, of course, that the towns facing such allocations would receive no value from a global settlement.  The point is simply that their priorities will not be the same as that of a large city or county that expects to receive a substantial monetary settlement.  A town that, according to the allocation tool, has incurred past opioid-related expenditures so negligible that it can expect to receive little or no monetary distribution from a settlement will be far more interested in non-monetary relief that offers it a genuine benefit.

Plaintiffs' motion seeks to dismiss any concerns about intra-class conflicts by asserting that a fixed formula for the allocation of any *monetary* recovery among class members would be

---

[20] Naturally, if a settlement netted more than $1 billion, the projected allocations to these entities would increase. But for a town that is projected to receive only $1 from a billion dollar settlement, the recovery expected from a settlement 100 times as large would still be only $100.

fully baked into the class certification.  As discussed above, this is not true.  But even if it were, that would not eliminate the problem of intra-class conflict, as plaintiffs' proposed formula would not address any of the *non-monetary* relief that many plaintiffs are seeking and to which different class members may assign different levels of priority.  Different class members would also have different interests in the prioritization of settlement discussions with different defendants.  A class member with no claim against a particular defendant will not wish resources to be devoted to settlement discussions with that defendant; another class member whose claims focus heavily on that defendant will wish it to be an early target.[21]

### 4.     The "Participatory" Features of Plaintiffs' Proposal Do Not Permit Conflicts of Interest to be Ignored.

The Court cannot properly accept plaintiffs' invitation to rely on the proposed voting mechanism as a basis for ignoring the numerous stark conflicts of interest within the proposed class.  *See* Mem. at 70 (arguing that "there is no risk of class representatives failing to represent the interests of passive, absent class members" because the proposed voting mechanism would make this "the ultimate 'participatory class action'").  The requirements of Rule 23(a) – including adequacy of representation – are *mandatory*.  The Court is not authorized to waive any element of Rule 23 by inserting a different protective measure in its place.  Authority to do that rests solely with the Supreme Court, in amending the rule, or the United States Congress.  As the Supreme Court has cautioned:

---

[21] Even the larger defendants do not do business uniformly nationwide.  Distribution to many locations, for example, is attributable overwhelmingly to only a few distributors, with one or more of the "national" distributors often being entirely absent.  Similarly, the geographic distribution of the national chain pharmacies is not uniform.  Plaintiffs do not appear to have included in their proposal, including their allocation methodology, any mechanism for taking into account the fact that many class members could have no conceivable claim against some settling defendants.  For example, if there were a settlement with a small distributor operating only in the Northeast, a county in Alaska would have no conceivable claim against that defendant; yet that county would still be allocated a share of the settlement paid by that distributor, based on the volume of opioids distributed in the county by *different* distributors.  The court cannot certify a class that contemplates payments to class members who would have lacked standing to sue the settling defendant.  *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 52 (1st Cir. 2018) (certification cannot occur without "a mechanism for distinguishing the injured from the uninjured class members") (citation omitted).

> [C]ourts must be mindful that the Rule as now composed sets the requirements they are bound to enforce. Federal Rules take effect after an extensive deliberative process involving many reviewers: a Rules Advisory Committee, public commenters, the Judicial Conference, this Court, the Congress. *See* 28 U.S.C. §§ 2073, 2074. The text of a rule thus proposed and reviewed limits judicial inventiveness. Courts are not free to amend a rule outside the process Congress ordered, a process properly tuned to the instruction that rules of procedure "shall not abridge … any substantive right." § 2072(b).

*Amchem*, 521 U.S. at 620. "Federal courts," the Court explained, "lack authority to substitute for Rule 23's certification criteria a standard never adopted." *Id.* at 622.[22]

Plaintiffs' proposed voting mechanism confirms the existence of conflicts of interest within the class. For a truly cohesive class, it ought to be possible to limit the voting mechanism to a single vote of the entire class. But plaintiffs themselves see a need for more, requiring a super-majority voting procedure that requires the votes of class members to achieve the required 75 percent threshold for *six different categories* of class members, with votes weighted in different ways for different categories. *See* Mem. at 53-54. If the interests of each of those groups were the same as all the others, there would be no need for such a complex voting scheme. Plaintiffs' assertion that their elaborate voting proposal is designed to provide "more protection" than an ordinary class receives (*id.* at 72) is a tacit acknowledgement that more protection is needed because class members' interests are not fully aligned.

Plaintiffs' suggestion of 51 different class representatives further confirms the variation and tensions within the class. If the interests of class members were truly cohesive to the extent contemplated by Rule 23, only a small number of class representatives would be needed. Many large class actions proceed with a single representative. Plaintiffs are clearly concerned that many putative class members will view themselves as effectively unrepresented by class

---

[22] Even if the Court could waive the adequacy requirement in favor of a "participatory" substitute, the voting mechanism proposed here would do nothing to protect a class member whose vote against a settlement was overridden by the majority.

representatives that do not resemble them.  But offering 51 representatives only highlights the problem; it does not solve it.

Plaintiffs' emphatic opposition to the use of subclasses (Mem. at 70-71) further reinforces the problem.  Subclasses that divide a class into subgroups whose interests are appropriately aligned are a well-accepted mechanism for addressing conflict barriers that would otherwise preclude certification.  *See, e.g.*, *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 432 (3d Cir. 2016).  It is no wonder that plaintiffs do not wish to propose subclasses here.  As they acknowledge, there would be no practical way to design a workable subclass structure that addressed all the fissures in this proposed class.  *See* Mem. at 70 (warning that "drawing rational lines becomes increasingly difficult").  And if separate settlements had to be negotiated with numerous separate subclasses, the whole purpose of plaintiffs' proposal would be defeated.  In any event, when subclasses are created to avoid intra-class conflicts, each subclass must be represented by independent counsel who owe no duty of loyalty to members of the other subclasses.  *See Amchem*, 521 U.S. at 627 ("members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups").  Plaintiffs do not, and cannot, assert that their proposed class counsel could possibly satisfy this requirement.

Finally, plaintiffs' reliance on their proposed voting mechanism itself creates yet another conflict of interest problem that their proposal has failed to address – *i.e.*, the strict attorney conflict of interest rules of many states that affirmatively *bar* counsel from participating in any settlement that uses such a voting mechanism to bypass the right of each client to veto any settlement it does not like.  Although the use of such a "majority rule" mechanism for collective settlements of mass tort claims has, as plaintiffs describe (Mem. at 9), received support from the American Law Institute, it has been found inconsistent with the rules of professional conduct in

some states.  *See, e.g.*, *Tax Auth., Inc. v. Jackson Hewitt, Inc.*, 898 A.2d 512, 521 (N.J. 2006) ("Most scholars and commentators agree that a majority-rules provision is forbidden under RPC 1.8(g)."); *see also Hayes v. Eagle-Picher Indus., Inc.*, 513 F.2d 892, 894-95 (10th Cir. 1975). Plaintiffs' motion makes no effort to address this additional potentially disabling bar to class counsel's representation of class members in states that prohibit majority rule settlements.

### C.     Plaintiffs Have Not Created a Record Upon Which the Court Could Make Findings of Commonality and Predominance.

Plaintiffs' amended motion offers more argument than did their original motion for why the commonality requirement of Rule 23(a) and the predominance requirement of Rule 23(b)(3) are satisfied.  But they offer no evidence to support these arguments; indeed, the sources of most of the factual assertions they offer are murky at best.  In the end, plaintiffs have again failed to offer any meaningful showing that common issues exist for the claims of all class members, much less that such issues predominate.

### 1.     Plaintiffs' Arguments About Commonality Misconstrue the Applicable Legal Standard.

Commonality is usually one of the easiest of the Rule 23(a) factors to satisfy, as – unlike the predominance requirement of Rule 23(b)(3) – it requires only the identification of one or more disputed issues that can be resolved through common proof, without considering the extent to which non-common issues are also present.  But it is far from clear that even commonality can be established for plaintiffs' proposed class.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), is instructive.  In that case, certification was sought for a nationwide class of female employees who alleged gender discrimination in promotions.  The plaintiffs claimed that there was a culture of discrimination at the company and that the problem was pervasive nationwide. It was undisputed, however, that promotion decisions were made strictly at the local level; in this context, the Supreme Court found, liability could not be established as a common issue based on aggregate nationwide evidence.  *Id.* at 353-54, 356-60.

Similarly here, the existence of liability, at least as to any distributor or chain pharmacy defendant, requires reference to evidence specific to the circumstances and events within each plaintiff's own jurisdiction.  Plaintiffs' assertion that commonality is self-evident because the proposed class members all make similar kinds of claims against the defendants (Mem. at 65) is exactly the kind of argument that *Wal-Mart* rejects.  Indeed, as discussed further below, the complaints of the proposed class representatives, as well as those of other putative class members, have been candid in acknowledging that their claims against these defendants *cannot* be proven on a "nationwide" basis and require specific reference to local data and events.

Contrary to plaintiffs' suggestion, the fact that the Judicial Panel on Multidistrict Litigation established this MDL does not by itself conclusively decide the issue of either commonality or predominance for purposes of Rule 23.  To satisfy the commonality requirement of Rule 23, a "common contention" must be material to the outcome of the suit.  *Wal-Mart*, 564 U.S. at 350.  There is no such requirement under 28 U.S.C. § 1407, and MDLs are often created based on common facts that are not even in dispute.  Class certification thus cannot be bootstrapped from the existence of an MDL.  *See In re Saturn L-Series Timing Chain Prod. Liab. Litig.*, 2008 WL 4866604, at *25 n.21 (D. Neb. Nov. 7, 2008) (declining to consider JPML finding of common issues on class certification).  Indeed, MDL proceedings are often created by the JPML in circumstances in which class certification is not appropriate.[23]  It is in part for this reason that bellwether trials have become a common tool of MDL courts.

---

[23] *See, e.g.*, *In re Prempro*, 230 F.R.D. 555, 574 (E.D. Ark. 2005) (denying class certification in multidistrict litigation involving pharmaceutical marketing campaign because "individual issues of fact *and* law overwhelmed any common issues"); *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 208 F.R.D. 625, 632-33 (W.D. Wash. 2002) (denying class certification in multidistrict litigation where "the number of individual questions posed by the proposed classes clearly overwhelm any common questions"); *In re Rezulin Prod. Liab. Litig.*, 210 F.R.D. 61, 70-71 (S.D.N.Y. 2002) (same); *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 1995 WL 273597, at *10 (E.D. Pa. Feb. 22, 1995) (denying class certification in multidistrict litigation, noting: "While recognizing the problems that accompany a case-by-case approach in a mass tort situation, the court concludes that there are simply too many individual issues with respect to causation, liability and damages to justify certification under Rule 23(b)(3)").

2.    **Any Evaluation of Predominance Must Take Into Account the Numerous Disparities in the Facts Pertinent to Class Members' Claims and the Applicable Law.**

Even if commonality under Rule 23(a) were shown, more would be required to demonstrate the *predominance* of common issues, as required by Rule 23(b)(3).  *See Amchem*, 521 U.S. at 609 (noting the "stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions").  Predominance is not satisfied where "individual stakes are high and disparities among class members are great."  *Id.* at 625; *see also Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998) (*en banc*) (certification inappropriate where "each plaintiff's claim depended upon facts and circumstances peculiar to that plaintiff"); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1081 (6th Cir. 1996) (predominance not satisfied where proof will "vary from plaintiff to plaintiff").

The burden plaintiffs face here in establishing predominance is formidable.  There is a substantial variation in the circumstances and claims of the putative class members, and those claims present a host of issues that are *not* common to the class.  To offer just some examples:

- The nature and scope of harms associated with opioid misuse and addiction vary across jurisdictions based on numerous factors, including (but not limited to) demographics, economic conditions, current and historical state regulation of prescribing and dispensing practices, local customs regarding prescribing practices, the mix of illegal drugs available in a particular area, and the relative availability of different kinds of drugs.

- Political subdivisions have different types of authority, responsibility, and funding schemes, which would make it difficult to generalize about the injuries municipalities allegedly suffered, as well as the abatement remedies they may require.

- Different plaintiffs have asserted different claims against different arrays of defendants, based on variations in pertinent facts and the applicable law.  These claims in turn require extensive individualized proof.

The individualized facts that will drive resolution of both claims and defenses are clear from the summary judgment motions that are currently before the Court in Track 1 on issues such as statute of limitations and causation.[24]  Regardless of how the claims and defenses

---

[24] *See, e.g.*, Dkt. Nos. 1885-1, 1894-1, 1896-1, 1920-1.

addressed in those motions are resolved – whether it be by the Court on summary judgment or a jury at trial – individualized evidence specific to the Track 1 counties will be critical.

Plaintiffs' motion offers the Court no basis upon which it can perform the "rigorous" analysis of these and other considerations necessary to the predominance determination.  Instead, they offer only a superficial tabulation of some of the causes of action alleged in the complaints, coupled with conclusory and generalized assertions about similarities in allegations made against certain *types* of defendants.  None of this establishes predominance – certainly not on a defendant-by-defendant basis, as Rule 23 requires.

> **3.** **The Statistics Plaintiffs Offer from a Superficial Examination of Complaints Would Not Withstand Scrutiny Even if They Were Relevant to the Predominance Inquiry.**

Plaintiffs' discussion of predominance relies primarily on certain limited statistics drawn, they assert, from a comparison of *complaints* filed by various plaintiffs.  Even if class certification findings could rest on pleadings alone – and the Supreme Court has made clear that they may not, *see Wal-Mart*, 564 U.S. at 350 – the incomplete and skewed "analysis" of the pleadings that plaintiffs offer would demonstrate nothing.

Plaintiffs offer statistics that purport to show what percentage of the proposed class representatives have (a) asserted certain causes of action and (b) sued certain defendants.  Mem. at 81-82.  This information is not particularly meaningful to the predominance test – one could present a similar chart for an assortment of 51 lawsuits against the Ford Motor Company confirming that all 51 plaintiffs had sued Ford and all 51 had asserted personal injury claims, but that would not tell the reader anything meaningful about whether those claims could be predominantly resolved through common evidence or were otherwise suitable for class treatment.  Plaintiffs' statistics are even less useful given their omission of information about the *other* claims asserted by these plaintiffs and the *other* defendants they have sued.  Once that information is taken into account, the picture plaintiffs attempt to draw changes substantially.

A full listing of the causes of action asserted by each of the class representatives is set forth in Exhibit 2.  Approximately two-thirds have asserted claims under their states' consumer protection, unfair competition, or false advertising statutes, each of which has its own individual requirements.  Most in this particular group do assert RICO claims, but five do not.  Numerous other claims appear in some, but far from all, of the complaints, including (among others) claims for Medicaid or other insurance fraud and claims under state criminal liability statutes.

A more complete picture of which *defendants* the proposed class representatives have sued also shows significant variation.  Two thirds have sued one or more distributors in addition to those identified in plaintiffs' motion; the identities of those defendants vary.  Several have also sued pharmacies and others not mentioned in plaintiffs' motion.  Two have sued Pharmacy Benefit Managers.

Plaintiffs also claim – in their brief, not in any sworn declaration – to have randomly selected for review an assortment of other MDL complaints of putative class members.  Mem. at 77-78.  But the information provided from those complaints is even more truncated.  A complete listing of the claims and defendants in those cases is provided in Exhibit 3 and again shows considerable variation in the claims asserted (including numerous state-specific statutory claims) and the defendants named.  One of these plaintiffs has sued the West Virginia Board of Pharmacy; some have also sued regional distributors and/or various individuals, including manufacturer sales representatives, while others have not.

Plaintiffs' analysis of complaints does not take into account the substantial portion of the class with cases pending in state courts.  For this purpose, one can look at the complaints included in the Texas state-court MDL.[25]  Forty-three of the cases in that proceeding were

---

[25] A list of Texas MDL cases, identifying the causes of action and defendants in each, is provided in Exhibit 4.  New cases are being transferred into the Texas MDL on a regular basis, so this exhibit offers only a snapshot and should be considered only for illustrative purposes.

brought by counties.  More than half of those cases (26) assert claims *only* against manufacturers and do not name any distributors as defendants.  None assert claims against pharmacies; three assert claims against regional distributors and two sue doctors.[26]

Thus, even if one confines the analysis to the causes of action asserted in the complaints and the defendants who are sued, it is clear that the variation in the proposed class is considerable.  Contrary to plaintiffs' suggestion, it is *not* true that virtually all class members that have filed suit have named the major distributors as defendants and that most have sued the major retail pharmacies.[27]  Fewer than half of the plaintiffs in the Texas MDL have named *any* distributors as defendants, and none have named pharmacies.  It is also untrue that the RICO claims are a constant in these cases – *none* of the plaintiffs whose cases are pending in the Texas state MDL have asserted RICO claims.  Indeed, very few, if any, of the putative class members with cases pending in state courts anywhere have asserted RICO claims.[28]

Nor can predominance be found based on the assertion that the majority of putative class members with pending lawsuits have asserted claims for public nuisance.  Nuisance claims can be asserted only under state law, and the applicable state laws on that subject vary substantially, as the Court is already aware from the detailed briefs on that subject it requested and received

---

[26] The causes of action in the Texas MDL cases also vary:  All assert claims for nuisance, negligence, and common law fraud (all under Texas law), but 17 also assert claims under the Texas Controlled Substances Act, 16 assert civil conspiracy claims, and smaller numbers of plaintiffs assert various other claims, such as violation of the Texas Deceptive Trade Practices Act.  None of the complaints asserts a RICO claim.  *See* Ex. 4.

[27] *No* distributor defendant is universally present in all cases brought by class members.  Many are brought only against manufacturer defendants.  Even in cases that name distributors, there are multiple instances in which not all of the major distributors are named.  For example, there are multiple cases in Arizona in which ABDC and Cardinal are named as defendants but McKesson is not.

[28] This is unsurprising, as RICO and other federal claims have been carefully avoided by plaintiffs who wish to avoid removal to federal court.  Plaintiffs' effort to brush this point aside in a footnote that refers to a single plaintiff (Mem. at 82 n.43) is disingenuous.

earlier this year.[29]  Resolution of a nuisance claim under the law of any given state – for either side – will *not* necessarily serve to resolve the nuisance claims of plaintiffs from other states.

It is well established that predominance is difficult to establish for a nationwide class whose claims are based primarily on state rather than federal law.  *Amchem*, 521 U.S. at 624; *see also Pilgrim*, 660 F.3d at 946 (differences in the consumer protection laws of different states would "cast a long shadow over any common issues of fact plaintiffs might establish"); *Wotus v. GenCorp, Inc.*, 2003 WL 27382938, at *8 (N.D. Ohio Dec. 2, 2003) (Polster, J.) ("[I]n a multi-state class action, variations in state law may swamp any common issues and defeat predominance.").  The critical variations in state law that exist here are not limited to the law of nuisance.  For example, some states broadly apply the "municipal cost recovery rule," which limits the types of damages a municipality may recover, while other states do not.  *Compare City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1145 (Ill. 2004) (adopting principle that municipalities could not recover "the costs of routine police and other emergency services"), *with Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1149 (Ohio 2002) (declining to apply rule in specific circumstances).  The common law of negligence also varies by jurisdiction in meaningful ways.  *See Am. Med. Sys.*, 75 F.3d at 1085 (reversing class certification of a nationwide class because "[t]he district judge also failed to consider how the law of negligence

---

[29] For example, many but not all jurisdictions recognize only public nuisance claims tied to land or the environment, bar product-based public nuisance claims, or require that defendant have control of the instrumentality of the nuisance at the time it causes injury.  *See* Defs.' Br. on Viability of Public Nuisance Claims Nationwide ("Defs.' Br."), Dkt. No. 1404, at 5-10, 14-15, 22-24.  In addition, as plaintiffs have acknowledged, some jurisdictions follow the Restatement (Second) of Torts § 821B in determining the definition of public nuisance, while others do not.  Ptfs.' Br. Concerning Survey of State Nuisance Law ("Ptfs.' Br."), Dkt. No. 1406, at 3-10.  Available defenses to public nuisance claims also vary from state to state, *see* Defs.' Br. 16 n.7, 25-26 (discussing the economic loss rule, doctrine of statewide concern, and statutes of limitations), and Plaintiffs have recognized that "most affirmative defenses" to public nuisance claims "will turn on questions of fact that may vary from case to case."  Ptfs.' Br. 2.  These and other differences in state law are reflected in the varied trial court decisions on public nuisance claims in opioid-related litigations.  *Compare, e.g.*, *North Dakota ex rel. Stenehjem v. Purdue Pharma L.P.*, 2019 WL 2245743, at *13 (N.D. Dist. Ct. May 10, 2019) (dismissing public nuisance claim), *State ex rel. Jennings v. Purdue Pharma L.P.*, 2019 WL 446382, at *12-13 (Del. Super. Ct. Feb. 4, 2019) (same), *and Grewal v. Purdue Pharma L.P.*, 2018 WL 4829660, at *17 (N.J. Super. Ct. Ch. Div. Oct. 2, 2018) (same), *with, e.g.*, *State v. Purdue Pharma L.P.*, 2018 WL 4468439 (Alaska Super. Ct. July 12, 2018) (denying motion to dismiss).

differs from jurisdiction to jurisdiction").  Many plaintiffs have also asserted statutory claims, such as claims under state consumer protection laws, that involve different standards, remedies, and defenses.  *See Pilgrim*, 660 F.3d at 946.[30]

Even if there were a single cause of action that was common to all class members and invoked essentially identical legal standards, there would be no value in certifying a "negotiation" class to address only that claim.  No defendant would enter into a settlement that addressed only one cause of action, with class members remaining free to litigate their remaining claims on an individual basis.

> **4.  Plaintiffs' Motion Fails to Address the Most Critical Question on Predominance, and Their Own Past Statements Answer That Question in the Negative.**

In the end, a bare comparison of what causes of action have been brought in the various complaints asks the wrong question.  The proper analysis under Rule 23 is not about identifying the causes of action asserted, but about the *proof* that will be required to establish class members' claims.  This is repeatedly stressed in the cases plaintiffs themselves cite.  As the Supreme Court has explained, the predominance question asks whether "members of a proposed class will need to present evidence that varies from member to member" or whether "the same evidence will suffice for each member."  *Tyson Foods, Inc. v. Bouaphakaeo*, 136 S. Ct. 1036, 1045 (2016).  *See also Am. Med. Sys.*, 75 F.3d at 1081 (finding predominance unsatisfied where "proof … will [] vary from plaintiff to plaintiff"); *Williams v. Duke Energy Corp.*, 2014 WL 12652315, at *14 (S.D. Ohio Mar. 13, 2014) ("a claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position").

---

[30] Courts sometimes address predominance concerns arising from variations in the applicable law through the use of subclasses.  *See, e.g.*, *Gawry*, 640 F. Supp. 2d at 949.  Plaintiffs propose no subclasses and in fact devote several pages of their brief to an argument about why they are impractical here.  *See* Mem. at 70-73.

Examination of the complaints and plaintiffs' own past statements helps to answer the question of what *proof* will be required to establish plaintiffs' claims, and that answer demonstrates the absence of predominance here.  One example should suffice:  the role of ARCOS data in this litigation.[31]

As this Court has explained, the ARCOS database includes "detailed transactional" data showing "the precise number of opioid pills delivered to each City and County in America." Dkt. No. 397 at 2.  Plaintiffs have consistently argued that jurisdiction-specific ARCOS data is crucial to their cases.  In some of the earliest suits filed, plaintiff counties alleged that they needed access to DEA's ARCOS database in order to "identify with specificity the transactions which will form the evidentiary basis for the claims asserted herein."  *See, e.g.*, Complaint, No. 2:17-cv-663 (S.D. Ohio) ¶ 10; Complaint, No. 2:17-cv-664 (S.D. Ohio) ¶ 10.  The counties also averred that, through discovery, they would identify the "origin" and "volume" of prescription opioids "sold into [their] community."  *Id.* ¶ 11.

Before this Court, plaintiffs argued that fuller disclosure of ARCOS data was necessary in order to "identify the specific manufacturers and distributors that sold and/or distributed the prescription opioids into specific communities," and also to "identify the amount of prescription opioids distributed into a particular state, county, or city."  Dkt. No. 137 at 1.  Plaintiffs urged that the data was "necessary" in order to determine "the extent of any current or potential defendant's activities in a given geographic area."  *Id.*  Only with access to the ARCOS data, plaintiffs have insisted, can they "pinpoint the communities which received the most pills per capita, over time" and then compare those figures "to CDC statistics related to opioid addiction,

---

[31] The discussion below is not intended to provide a comprehensive analysis of the individualized proof that would be needed to evaluate the claims and defenses in each case.  But the examples provided should be more than ample to illustrate the point, especially given plaintiffs' failure to offer *any* evidence in support of their predominance argument.

abuse, morbidity and mortality."  Ex. 6 (Letter from P. Farrell to J. Bennett, Feb. 13, 2018) at
2.[32]

This Court agreed that jurisdiction-specific ARCOS data could be important to individual
plaintiffs' claims.  *See* Dkt. No. 233 at 8.  The Court has suggested that reviewing ARCOS data
is "the only way" to "ensure" that each plaintiff "name[s] the correct defendants."  Dkt. No. 800
at 11.  Similarly, the Court has found ARCOS data to be "necessary for litigation" of these cases,
because showing "which distributors sent which drugs to which pharmacies and doctors" is
"critical" to "all of plaintiffs' claims."  Dkt. No. 233 at 7-8.  Because transaction-level data by
jurisdiction will be "relevant" for each plaintiff to "prove culpability," ARCOS data is evidence
"going to the merits of Plaintiffs' claims and their burden of proof."  *Id.* at 15 n.8.

Jurisdiction-specific ARCOS data is not, of course, alone sufficient to prove plaintiffs'
claims, but plaintiffs have consistently claimed that it is a critical element.  ARCOS data has
been used extensively in plaintiffs' complaints;[33] it also features prominently in plaintiffs' expert
reports addressing liability issues in Track 1.[34]

Thus, plaintiffs are themselves on record confirming that even threshold liability issues
will require individualized proof that addresses the actual conduct of each defendant in the
relevant geographical area.  The evidence needed to determine whether a distributor improperly

---

[32] In negotiating disclosure terms with DOJ, plaintiffs argued that they required nationwide access to the ARCOS database in order to "reflect[]" the "diverse interests" of the many different plaintiffs in the MDL.  Ex. 5 (Letter from P. Farrell to J. Bennett, Feb. 5, 2018) at 2.  By reviewing data for "each jurisdiction," Plaintiffs' counsel explained that each town or county could determine which distributors "sold which pills" and "in which amounts."  Ex. 6 at 2.

[33] *See, e.g.*, Second Amended Complaint (Dkt. No. 32), No. 1:18-op-45332 (Broward County, FL); Third Amended Complaint, Dkt. No. 1466 (Summit County, OH); Amended Complaint, (Dkt. No. 146) No. 1:17-op-45063 (Kanawha County, WV).  Indeed, the procedure set by this Court for short-form amendment of complaints expressly contemplates that plaintiffs will "review the relevant ARCOS data for their county" and then "amend their complaints" accordingly.  Dkt. No. 1282 at 3.  Overall, a substantial majority of the complaints of the proposed class representatives rely upon ARCOS data.

[34] These expert reports are addressed in *Daubert* motions that were recently filed on the public record.  *See, e.g.*, Dkt. Nos. 1900-1, 1906-2.

filled an order of opioids in Jefferson County, Alabama will have no bearing on whether that same distributor engaged in any wrongful conduct in Grand Forks, North Dakota.[35]  Similarly, proof that a pharmacy in Phoenix, Arizona, failed to comply with its legal obligations in shipping or dispensing opioids will not help Cumberland County, Maine prove its claims.[36]

The cases plaintiffs cite on predominance are readily distinguishable and offer little in support of their position.  For example, *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 858 (6th Cir. 2013), was a products liability case in which the plaintiffs argued that certain models of Whirlpool washing machines were defectively designed, and the court found that the same *proof* would allow the class (consisting of consumers who purchased those defective machines) to "prevail or fail in unison." *Id.*  In *Williams v. Duke Energy Corp.*, 2014 WL 12652315, at *14 (S.D. Ohio Mar. 13, 2014), the proposed class consisted of customers who had been denied a rebate that they claimed was mandatory for all of the defendants' customers; liability in that case turned on the "core" issue of whether this contention was correct.  *Id.*  There is no similar "core" issue of either law or fact that will definitively determine the liability of *any* defendant in this case, much less all of them.

---

[35] Plaintiffs assert in vague terms (citing no evidence) that "Defendants' suspicious order monitoring policies were uniform nationwide." Mem. at 84.  In fact, as the extensive Track 1 discovery record shows, both the policies and their implementation varied by defendant, over time, and by location.  And the claims of each plaintiff concerning alleged violations of defendants' legal obligations necessarily focus on shipments that affected consumption in that plaintiff's own community.

[36] Plaintiffs assert that class members' claims against manufacturers can be established with common proof concerning "nationwide" marketing campaigns. Mem. at 82-83.  Even if this were true, it would have no bearing on whether predominance existed here *as to claims against the distributors and pharmacies*.  *See Yadlosky*, 197 F.R.D. at 302 (requirements under Rule 23 must be satisfied with respect to each defendant); *Parker*, 78 F.R.D. at 510 (same).  Moreover, plaintiffs' argument is inconsistent with the discovery demands made by the Track 1 plaintiffs, which included intensive investigation of "detailing" and other marketing activities by manufacturers within Summit and Cuyahoga Counties.  This burdensome discovery should have been unnecessary if plaintiffs could prove their claims against the manufacturers based solely on evidence of nationwide conduct.  Plaintiffs' assertion that Track 1 discovery has been "seamlessly adopted by plaintiffs across the country," including through cross-noticing of depositions, Mem. at 83, ignores the fact that most plaintiffs in state court cases refused to accept cross-noticing of Track 1 depositions.

Given the foregoing, it is not necessary even to reach plaintiffs' assertion that the need for individualized proof of causation of injury can be ignored here.  *See* Mem. at 73, 80.  But this assertion is also incorrect, both as a legal matter and as a factual matter.

The Sixth Circuit has confirmed that predominance will generally *not* exist where causation of each class member's injury requires individualized proof.  *See Am. Med. Sys.*, 75 F.3d at 1081 (holding that individualized causation issues defeated predominance where proof would "vary from plaintiff to plaintiff because complications with an AMS device may be due to a variety of factors, including surgical error, improper use of the device, anatomical incompatibility, infection, [and] device malfunction").  This is consistent with the Supreme Court's observation in *Amchem* that predominance can rarely be demonstrated in a mass tort case, where issues of causation are inherently individualized.  *Amchem*, 521 U.S. at 625.

Plaintiffs do not seriously attempt to dispute that proof of class members' claims would require extensive individualized proof of causation and injury.  Instead, they argue (a) that predominance concerns are essentially just trial manageability concerns and can be disregarded because this class would be certified to pursue settlements, and (b) that individualized damages issues are unimportant because "the allocation system among Class members is already in place."  Mem. at 86.

The first of these arguments was squarely rejected in *Amchem*.  The Supreme Court held that, even for a class certified to implement a concrete settlement, the predominance inquiry must still focus on "the legal or factual questions that qualify each member's case as a genuine controversy, questions that preexist any settlement."  521 U.S. at 623.  The fact that individualized issues have been resolved in a settlement is irrelevant to this analysis.  *Id.*[37]

---

[37] The Court did hold that trial manageability issues could be discounted in the context of a settlement class in evaluating the separate Rule 23(b)(3) factor of *superiority*.  *Amchem*, 521 U.S. at 620.  But it rejected the suggestion that the *predominance* inquiry may be diluted because a settlement moots the need to resolve individualized issues.

Plaintiffs' suggestion that their proposed allocation system avoids problems with predominance is also wrong as a *factual* matter.  Their current proposal purports to offer a definitive allocation formula only for the allocation of any settlement *among counties*.  The ensuing allocation that must be made *between* counties and the cities, towns, and villages within them is left open-ended.  Plaintiffs express the optimistic hope that this allocation can be resolved by negotiation but acknowledge the need for a dispute resolution mechanism (a Special Master supervised by the Court) to perform the allocation where negotiation fails.  And that dispute resolution must itself presumably take into account the very same individualized evidence of causation, injury, and damages that class members would have to present if they litigated their claims against defendants.

Because plaintiffs' motion does not meaningfully address any of these issues, they have failed to carry their burden of establishing a record that would permit the Court to make a finding that the predominance requirement of Rule 23(b)(3) is satisfied.

> **D.  Plaintiffs Have Made No Meaningful Effort to Demonstrate That the Proposed Class Representatives are Typical.**

Rule 23(a)(3) requires a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." To satisfy typicality, plaintiffs have the burden of demonstrating, under *Amchem*, that resolution of the claims of the class representatives would offer a consistent and reliable resolution of the claims of all, or at least most, other class members.  *See Sprague*, 133 F.3d at 399 ("The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class.").  To make such a showing here, plaintiffs must account for significant variations in the proposed class, including, but not limited to, the following:

- Variations in the type, size, and organization of the plaintiff entities (*e.g.*, towns, cities, counties) and in the services they provide (and are authorized to provide) to their populations;

- Differences in the nature and scope of opioid-related harms that various jurisdictions are alleged to have suffered and the relief sought;

- Differences in the causes of action asserted in the complaints (most of which are asserted under state law) – and differences in the content of the governing state law as to the causes of action asserted, as well as potentially relevant defenses;

- Differences in the identities of the defendants sued in each case;

- Differences in the extent to which each defendant could have meaningfully contributed to each entity's alleged harms;

- Differences in the nature and quality of evidence available to prove the claims;[38]

- Differences in prescribing habits of local doctors and other factors affecting local usage of various opioid products; and

- Differences in the infiltration of each jurisdiction by illicit drug distribution enterprises and the associated impact on opioid use and abuse by the local population.

Plaintiffs' motion addresses none of these considerations.  Instead, they rely on the same incomplete analysis of the complaints of class representatives discussed above (at pp. 29-31) as showing that *some* of the claims asserted and *some* of the defendants who are named appear in a majority of complaints.  As shown above, a more complete analysis shows that the complaints even of the proposed class representatives vary considerably on these points; those of other putative class members vary even more.

There is another obvious question bearing on typicality that plaintiffs make no attempt to answer:  Why, if this is a cohesive class for which certification is appropriate, are as many as 51 different class representatives needed?  This is a huge number, particularly for a single class with no subclasses.  The answer appears to be that plaintiffs have attempted to offer a sufficient array of class representatives so that any given class member is likely to bear some similarity to someone in that group in size and/or geography.  But even if those were the only kinds of

---

[38] To offer one example, most populous jurisdictions have qualified medical examiners who perform post mortem examinations with detailed toxicological testing in cases of suspected overdose.  Many small jurisdictions, in contrast, do not even employ doctors as medical examiners and perform little or no toxicological testing; such jurisdictions have little ability to establish the prevalence of opioid overdoses in their populations.

variation in the class that mattered – and, as discussed above, they are not – the fact that more than 50 class representatives are needed to provide even arguable coverage for the class severely undermines the proposition that *anyone* is truly "typical."

Until and unless plaintiffs demonstrate that typicality genuinely exists – that "as goes the claim[s] of [these 51 plaintiffs], so go the claims of the class," *Sprague*, 133 F.3d at 399 – they will have failed to carry their burden of demonstrating typicality.  *See Am. Med. Sys.*, 75 F.3d at 1082 (reversing class certification where district court failed to give proper weight to variation in claims that precluded finding of typicality).

> **E.      The Proposed Class Does Not Offer a Superior Method of Resolving Class Members' Claims.**

Plaintiffs' amended motion makes no effort to argue that the superiority prong of Rule 23(b)(3) could be satisfied in anything beyond the settlement context.  And indeed, if this were a motion to certify a class to *litigate* these claims, it is clear that the superiority requirement would not be met.  A finding of superiority typically rests on a determination that the amounts at stake for individual class members are so small that separate suits would be impracticable.  *See Amchem*, 521 U.S. at 616-17; *Vassalle*, 708 F.3d at 758 (finding superiority lacking in part because "the likelihood that many members of the class will choose to bring individual lawsuits is not remote"); *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 631 (6th Cir. 2011) ("[W]hen individual class members have large stakes in the outcome and the ability to pursue a remedy alone, their individual interests weigh against a Rule 23(b)(3) class action.").  Here, the putative class members are sophisticated entities that have already shown a willingness to litigate these cases individually – and many have made clear their preference to do so in their respective home jurisdictions.  The many millions (and sometimes

billions) of dollars they seek in damages have been more than sufficient to attract able counsel to represent them in such individual suits.[39]

Assuming, *arguendo*, that one may focus exclusively on the "superiority" associated with certifying a class for purposes of pursuing settlement negotiations, it is far from clear that plaintiffs' proposal is superior to other alternatives.  Plaintiffs' arguments focus on whether *any* global settlement through this MDL would be superior to piecemeal settlements.  But that is not the question that the Court must answer.  The question is whether the creation of *this class* under *this proposed structure and set of rules* would be superior.  This question can be answered in the affirmative only if certification of this class would actually help to facilitate the settlement of a substantial proportion of the pending litigation.  *Cf. Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 415-16 (6th Cir. 2018) (in evaluating superiority, a court should "determine if a class action is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action").

This goal cannot be achieved unless the class is certified on terms that would give defendants substantial incentives to engage with the class and pursue settlement discussions.  Such incentives can exist *only* if (among other things) defendants would feel assured that (a) the release and judgment associated with any settlement would be fully enforceable, and (b) a reasonable settlement entered into in good faith can be assured of making it through the "voting" and approval process, including potential appeals.  Plaintiffs' proposal, as currently formulated, cannot deliver on either of these points.

To begin with, plaintiffs' proposed voting mechanism is so complicated and onerous that a defendant could not rely upon it to generate approval of even the best of settlements.  Under plaintiffs' proposal, a settlement negotiated in good faith and agreed upon by the class

---

[39] Indeed, it is no secret that law firms have been barnstorming across the country to sign up municipal and other government plaintiffs to bring additional suits, which continue to be filed.

representatives and their counsel would not be binding on anyone other than the defendant – or even subject to final approval by the Court – until and unless it was approved by six different super-majorities.  Mem. at 53-54.  It is difficult to imagine how *any* settlement could *ever* be approved under such conditions, especially given the unique political pressures to which these class members – themselves political entities – are subject.  And such a process would allow a relatively small group of class members to block an agreement by voting in the negative in order to place pressure on the settling defendants to increase the settlement amount.  In this context, any defendant entering into settlement discussions would know that a settlement signed in good faith with the class representatives and their counsel could very easily prove to be no agreement at all but merely an opening bid.  *See* McGovern & Rubenstein at 21 ("If a supermajority is not acquired, the parties do not move for final judicial approval, but return to the bargaining table.").

Equally problematic is the prospect that any settlement entered with this class would not be enforceable.  An enforceable release and judgment require compliance with Rule 23, both to ensure that any approved settlement survives on appeal and to avoid any effort by dissatisfied class members to attack it collaterally in separate suits.  As discussed above, any certification here would be subject to challenge on multiple grounds under Rule 23.[40]

The deficiencies in plaintiffs' proposed order and notice plan – discussed further in Section VI below – are also concerning, as adequacy of the class notice is the *sine qua non* of an enforceable class judgment.  *See Vassalle*, 708 F.3d at 759 (notice must "fairly apprise the prospective members of the class of the terms of the proposed settlement so that class members may come to their own conclusions about whether the settlement serves their interests").

---

[40] Objectors who appealed the approval of a class settlement in this litigation would have standing to appeal the certification of the class and not merely the settlement amount.  *See Amchem*, 521 U.S. 591 (deciding whether a settlement class satisfied Rule 23 on an appeal brought by objectors).  A failure to satisfy Rule 23 and/or due process could also provide a basis for *collateral* attack on the release and judgment in separate litigation brought by dissatisfied class members.  Many courts will permit such collateral attacks by class members who claim a violation of due process.  *See, e.g., Richardson v. Wells Fargo Bank, N.A.*, 839 F.3d 442, 454 (5th Cir. 2016); *Wolfert ex rel. Estate of Wolfert v. Transam. Home First, Inc.*, 439 F.3d 165, 171 (2d Cir. 2006).

Plaintiffs' motion suggests their proposed notice will be adequate because at the time of the original opt-out decision class members, although not aware of the total dollar amounts of hypothetical future settlements, will at least know the *formula* that will establish the share of any settlement to which each would be entitled.  Mem. at 8-9, 72-73.  But that is not true for the majority of class members – there is a fixed allocation formula only for the counties.  Moreover, as plaintiffs' motion concedes, any truly global settlement will require further allocations of the settlement proceeds, including with the states (*id.* at 15) – allocations for which no formulas have been established.  Thus, *no* class member would know at the time of the original opt-out period the full formula that would determine its share of any settlement.[41]

Given the severe deficiencies plaintiffs' proposed notice plan, any defendant that considered engaging in settlement discussions with this class would be deterred by the real prospect that an appellate court would find the notice fatally flawed and the settlement invalid. At a minimum, there would be concern that this Court might conclude that class members needed to be given, not merely the right to vote on the settlement, but a second opt-out opportunity.  If and when a settlement is finally reached and presented to the Court for approval, the Court will need to evaluate whether a second opt-out opportunity should be afforded at that time.  *See* Fed. R. Civ. P. 23(e)(4) (authorizing a court to provide second opt-out opportunity in connection with a class settlement where a class was previously certified under Rule 23(b)(3)); *see also* Fed. R. Civ. P. 23(e) advisory committee's note to 2003 amendment (explaining that a second opportunity to opt out may be appropriate if "[a] decision to remain in the class is likely to be more carefully considered and is better informed when settlement terms are known").

Plaintiffs dismiss this point in a single sentence, asserting that courts "rarely" allow a second round of opt-outs.  Mem. at 72.  That is true, and the Advisory Committee notes to Rule

---

[41] As discussed above, this defect violates one of the fundamental requirements of the negotiation class model proposed by Professors McGovern and Rubenstein.

23(e) confirm that the decision whether to require a second opt-out period at settlement "is confided to the court's discretion."  Fed. R. Civ. P. 23(e) advisory committee's note to 2003 amendment.  But as the determination must be based on circumstances as they exist at the time a specific settlement is approved – a determination that will be reviewable for abuse of discretion, *see, e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 271 (2d Cir. 2006) –  the Court cannot properly pre-commit now that it will not require a second opt-out period later.  And absent a robust notice at the outset, pressure to re-open the opt-out right could be formidable.

Ordinarily, of course, a class notice issued outside the settlement context contains little, if any, information about a prospective settlement.  But such notices are issued to assist class members in determining whether they wish to participate with the class in actively litigating the case.  Here, where the sole purpose of the class would be to pursue negotiations that would result in a settlement to which class members would be bound, information sufficient to permit a meaningful evaluation on the question of settlement would be of particular importance.

Importantly, the "voting" mechanism of plaintiffs' proposal does not fix this problem.  Under this proposal, opting out is the only way an individual class member can be assured that it will not be compelled to participate in a settlement it does not like.  A class member can choose to vote against a settlement, but it will still be bound if the required majorities vote in favor.  The adequacy of the notice provided before the right to opt out expired would thus be critical to ensuring that any settlement reached with the class could withstand challenge.

Given the inability of this class proposal to provide a mechanism that settling parties could rely upon, plaintiffs have failed to establish that the proposal presents a "superior" method of resolving this litigation.  This is particularly true given the fact that *none* of the complex machinery attendant on a class settlement – including the requirement for judicial review and approval of the terms of the settlement itself – would be required for any settlement concluded

on a non-class basis.  To be sure, plaintiffs' proposal seeks to make up for this by promising an opportunity for defendants to buy peace through a comprehensive settlement that sweeps hundreds or even thousands of cases into a single settlement.  But the promise is an illusory one, at least for the proposal in its current form.  This is particularly true given the fact that nothing in the proposal would provide a basis for settlement with the states, whose participation plaintiffs acknowledge to be critical to any effort at global peace.  Mem. at 3.  The "superior" use of the resources of the parties, the special masters, and the Court would be to seek resolution of the litigation through other means.

Notably, plaintiffs' motion, while extolling the benefits of creating an organization that would permit the cities and counties to negotiate collectively, fails to explain why a judicially certified class is needed at all for that purpose, much less why it is a "superior" mechanism. Plaintiffs point out, for example, that litigation efforts for entities like these plaintiffs have previously been coordinated by the National League of Cities (Mem. at 17) but do not explain why something similar could not be done here without the need to invoke Rule 23.  This case is already sufficiently complicated that the extensive procedural baggage attendant on any class action should not be added unless it is shown to be truly superior, not just to the status quo, but to available alternatives.

## IV.    Plaintiffs' Proposed Order Has Critical Omissions and Would Not Provide for Valid Notice.

Even apart from all the fundamental defects in plaintiffs' proposal that are discussed above, the proposed order, draft notice, and other materials they have submitted to the Court to implement their proposal are replete with critical defects.  Any complex and unprecedented proposal such as this would require great care in its implementation.  Yet the materials plaintiffs have supplied with their motion, including their proposed order, draft notice, FAQs, and website

content, bear all the hallmarks of a rushed and inadequate effort.  These are not things that can be fixed later, after class notice has already issued.

Plaintiffs have submitted a bare-bones proposed order that incorporates virtually none of the structural details of their proposal for operation of this class and none of the allocation formulas that are key to their proposal.  Instead, they propose that the order simply "approve" a separate short-form notice and a FAQ document that addresses some of those subjects in summary terms.  But those documents fall far short of what would be required to provide genuine notice to the class.  The FAQ document is itself short on detail and in turn refers the reader to a "memorandum" and other materials that are supposedly on plaintiffs' website – but do not appear to exist there either.  FAQ (Dkt. No. 1820-2) #8, #12; Samuels Dec. ¶ 3.  Indeed, the version of the FAQs on the website states only that details about the allocation formulas and methodology "will be posted to this website, once available."  Samuels Dec. ¶ 4.[42]  Plaintiffs have not submitted those materials for review and approval by the Court, so they are not in the record.[43]  Nor does the proposed order require those documents to have any specific content.  Thus, many critical aspects of plaintiffs' proposal would not be mandated by their proposed order and would have no basis in the record.

---

[42] The version of the FAQs submitted to the Court with plaintiffs' motion differs in this respect from the version that is on the website as of this writing.  Samuels Dec. ¶ 4.  The version submitted to the Court states that "Detailed descriptions of the sources and methodologies for each of the three factors *are provided* in the Memorandum posted at Opioidsnegotiationclass.com."  FAQ (Dkt. No. 1820-2) #8 (emphasis added).  Either way, the information is *not* currently on the website.  Samuels Dec. ¶¶ 3-4. The only "memorandum" currently on the website is a copy of plaintiffs' brief in support of this motion.  But that document itself offers only limited information about the specific formulas, data sources, and other elements of the allocation mechanism, and much of that information is buried in footnotes.

[43] Even if the promised "memorandum" and other materials providing more detail on the allocation methodology were currently on the website (and they do not appear to be), mere citation to the website would not be sufficient to place them in the record for purposes of this Court's approval.  Given the ease with which any website can be revised, mere citation to a website does not refer to fixed content in the same manner as a citation to a document whose content has been finally established.  The fact that the FAQ document on the website differs from the version plaintiffs submitted to the Court serves to illustrate this problem.

The most critical element of the proposed class notice, as described in plaintiffs' brief, is an "Allocation Look-Up Tool" to be provided on their website.  Their brief describes in general terms the formulas and information that this tool is *supposed* to use to generate reliable estimates of each putative class member's "share" of any settlement.  But the tool itself (which, confusingly, the website instead refers to as an "Allocation Map") is a complete black box, with no details showing how the figures for each county are actually generated.  *See* Samuels Dec. ¶¶ 3-4.  Thus, even if a putative class member is able to trace its way from the notice to the FAQs to the website and finds a memorandum describing how the allocation is supposed to work, the actual *implementation* of the formulas in the online tool is completely opaque.  A class member will have no way of determining whether the formula has been applied accurately as to it using the right data inputs.  Nor have plaintiffs presented with their motion any expert or other evidence to guarantee the accuracy and reliability of the formulas, programming, and data that the website uses to generate those figures.

Moreover, the figures the tool provides for putative class members other than counties (*i.e.*, the cities and towns) are completely hypothetical, as there is to be no binding formula at all for how their shares, if any, are to be calculated.  Indeed, the notice this tool provides to cities and towns could be challenged as being not only inadequate but affirmatively *misleading* in suggesting that participating in the class will guarantee them the shares presented.  In approving issuance of notice to a proposed class, the Court has a non-delegable duty to ensure that the notice is clear and easily understood.  Fed. R. Civ. P. 23(c)(2)(B).

The basis upon which the hypothetical allocation figures for cities and towns are calculated is particularly opaque.  Plaintiffs apparently used a "default" formula to generate these figures, but their brief and supporting materials offer only scant information about what formula is actually used by the website or what data are used to implement it.  *See* Mem. at 60-61 & n.27;

FAQ #12.  Adding to the confusion, the examples provided in the brief for Cuyahoga County and Cleveland (Mem. at 61) do not match the figures provided for those entities by the "Allocation Map" tool on the website.  *See* Samuels Dec. ¶¶ 7-8.  Plaintiffs assert in their brief that, assuming a $1 billion settlement and applying the default formula, Cuyahoga County would ultimately receive $3,096,000 and Cleveland would receive $835,200.  Mem. at 61.  But the online tool indicates that, out of a $1 billion settlement, Cuyahoga County would receive $2,296,168 and Cleveland $617,826.  Samuels Dec. ¶ 7.

In addition to serious problems with the proposed notice materials, there are other critical omissions in plaintiffs' proposed order.  Significantly, there is no finding in the order that plaintiffs' allocation formula is reasonable.  Plaintiffs appear to have forgotten that if and when the time comes for the Court to approve any final class settlement, it will need to determine that the settlement, taken as a whole, is fair and reasonable.  This review will by necessity have to include the manner in which settlement proceeds are to be allocated among class members.[44] But plaintiffs' entire proposal is dependent on the idea that the allocation formula will be fixed *now*.  Even leaving aside the serious question as to whether Rule 23(e) would permit the Court to make this portion of its fairness determination in advance, it has to make that determination at some point in time.  And if judicial evaluation of that issue is left open, then the allocation will *not* be fixed in the manner plaintiffs propose.  Plaintiffs have included no fairness findings about their allocation formulas in their proposed order; nor have they presented the kind of detailed evidentiary showing that would be needed to permit such findings to be made.[45]

---

[44] The Court would also need to evaluate any allocation between putative class members and the States to determine whether the share of the settlement that the States succeed in winning through negotiations with the counties is fair to all class members.

[45] Similarly absent is any finding – or record basis for a finding – on the reasonableness of the proposed pre-set allocation of a full 25 percent of any settlement to the combination of an Attorneys' Fees Fund and a Special Needs Fund (which would apparently also be available to pay attorney fees).  *See* Mem. at 49-50, 92-97.

Also absent is any provision in the proposed order for the *processes* through which any settlement would actually be implemented, including the various funds that plaintiffs propose be created, as well as the critical allocations between cities and counties.  Plaintiffs address these points in summary fashion in their *brief*, but the proposed order is silent on these points.  There is, for example, no discussion in the proposed order of the appointment of a special master to oversee allocations between cities and counties; nor is there any reference to the "default" rules that are suggested in the brief.

The proposed order is also unclear on the impact that certification would have on settlements reached independently of the class structure.  For example, while plaintiffs state in their brief that their proposal "would not limit the ability of cities and counties to ... settle on their own, nor limit the Defendants to settle with individual Class members or through other procedures," (Mem. at 12) – and similarly provide in the proposed order that it "is without prejudice to the ability of any Class member to proceed with the … settlement … of an individual claim" (Proposed Order ¶ 15) – plaintiffs nowhere confirm that settlements involving *multiple* class members reached outside of the proposed process would be permitted.  Defendants assume that such settlements are not intended to be precluded by plaintiffs' proposal – it at least contemplates, for example, "a joint settlement offer to one or more States and the cities and counties within that State" (Mem. at 53; FAQ #22) – but no assurance of this is provided in the proposed order.  Adding to this ambiguity, plaintiffs' brief suggests that the class may be inserted into the allocation of *non-class* settlement funds between states and their subdivisions by subjecting such allocations to a class vote.[46]  But plaintiffs nowhere address the impact of a

---

[46] Plaintiffs propose that if a defendant makes a joint settlement offer to one or more states and the cities and counties within that state, "it could lead to discussion regarding allocation between the State" and that state's subdivisions.  Mem. at 53.  Class counsel would represent the cities and counties in an allocation negotiation with the State.  Once a negotiated allocation was reached, it "would be treated as a settlement and submitted to the Negotiation Class members in that state for a vote."  *Id.*  Confusingly, FAQ #22 states that the allocation would be "submitted to the *Negotiation Class*," rather than "the Negotiation Class members in that state." (Emphasis added.)

failed vote upon an independent proposed settlement with a state.  Absent clarity on these points, certification of the negotiation class could prove to be an obstacle to settlement through other means, possibly impeding the progress of more productive discussions.

Finally, the proposed order does not make an explicit determination on who will be in this class.  The proposed class definition simply cross-references a list that is to be supplied on plaintiffs' website.[47]  But the means of generating that list is merely described in a footnote in plaintiffs' brief; the list itself has not been provided to the Court. Nor does the order embody an explicit directive on how the list is to be generated based on objective factors. The class definition could accordingly be subject to challenge on grounds of ascertainability.[48]

## CONCLUSION

For the reasons stated above, the Court should deny plaintiffs' renewed and amended motion.

---

[47] The class definition provided in plaintiffs' brief (Mem. at 15) does not match the definitions provided in the Proposed Order and FAQs.  The wording differences are subtle but potentially important, especially given the explanation in the brief (Mem. at 2 n.3) that the Census Bureau list will not be simply copied over to the website without change but will be adjusted in multiple ways, none of which are clearly explained.

[48] *See Streater v. Sarchione Chevrolet, Inc.*, 2019 WL 2903955, at *3 (N.D. Ohio July 5, 2019) (noting that "[t]he touchstone of ascertainability is whether the class is objectively defined").  Plaintiffs' original class definition adopted a fixed list generated by the Census Bureau.  *See* Dkt. No. 1690-1 at 10-11.  For an objective class definition of this kind, nothing more would have been required.  But errors in the Census Bureau database were apparently identified, preventing reliance on a fully objective class definition and requiring a revised list to be generated by plaintiffs using criteria not spelled out in the new class definition.

Dated:      July 23, 2019                                 Respectfully Submitted,


 /s/ Geoffrey E. Hobart
Geoffrey E. Hobart
Mark H. Lynch
Sonya D. Winner
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
swinner@cov.com

*Counsel for McKesson Corporation*


 /s/ Enu Mainigi
Enu Mainigi
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street NW
Washington, DC  20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com

*Counsel for Cardinal Health, Inc.*


 /s/ Robert A. Nicholas
Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Drug Corporation*


 /s/ John J. Haggerty
John J. Haggerty (0073572)
James C. Clark
Stephan A. Cornell
**FOX ROTHSCHILD LLP**
2700 Kelly Road, Suite 300
Warrington, PA 18976
Tel: (215) 345-7500
Fax: (215) 345-7507
jhaggerty@foxrothschild.com
jclark@foxrothschild.com
scornell@foxrothschild.com

*Counsel for Prescription Supply Inc.*

 /s/ Kaspar Stoffelmayr
Kaspar Stoffelmayr
**BARTLIT BECK LLP**
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com

*Counsel for Walgreen Co. and Walgreen
Eastern Co.*


 /s/ Kelly A. Moore
Kelly A. Moore
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Tel: (212) 309-6612
Fax: (212) 309-6001
kelly.moore@morganlewis.com

Elisa P. McEnroe
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103
Tel: (215) 963-5917
Fax: (215) 963-5001
elisa.mcenroe@morganlewis.com

*Counsel for Rite Aid of Maryland, Inc., d/b/a
Mid-Atlantic Customer Support Center*


 /s/ Tara A. Fumerton
Tina M. Tabacchi
Tara A. Fumerton
**JONES DAY**
77 West Wacker
Chicago, IL 60601
Tel: (312) 269-4335
Fax: (312) 782-8585
tfumerton@jonesday.com

*Counsel for Walmart Inc.*


 /s/ Timothy D. Johnson
Timothy D. Johnson (0006686)
**CAVITCH, FAMILO & DURKIN CO. LPA**
Twentieth Floor
1300 East Ninth Street
Cleveland, Ohio 44114
Tel: (216) 621-7860
Fax: (216) 621-3415
tjohnson@cavitch.com

*Counsel for Discount Drug Mart, Inc.*


 /s/ Eric R. Delinsky
Eric R. Delinsky
Alexandra W. Miller
**ZUCKERMAN SPAEDER LLP**
1800 M Street, NW
Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
edelinsky@zuckerman.com
smiller@zuckerman.com

*Counsel for CVS Rx Services, Inc. and CVS
Indiana, L.L.C.*

## **CERTIFICATE OF SERVICE**

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the

Court's ECF system to all counsel of record.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart