

**National Association of Attorneys General**

PRESIDENT
Jeff Landry
*Louisiana Attorney General*

PRESIDENT-ELECT
Tim Fox
*Montana Attorney General*

VICE PRESIDENT
Karl A. Racine
*District of Columbia Attorney General*

IMMEDIATE PAST PRESIDENT
Derek Schmidt
*Kansas Attorney General*

EXECUTIVE DIRECTOR
Chris Toth

1850 M Street, NW
Twelfth Floor
Washington, DC 20036
Phone: (202) 326-6000
http://www.naag.org/

July 23, 2019

Honorable Dan Aaron Polster
Carl B. Stokes United States Courthouse
801 West Superior Avenue, Courtroom 18B
Cleveland, Ohio 44113 1837
dan_polster@ohnd.uscourts.gov

cc:
Helen Norton, Judicial Assistant
Helen_Norton@ohnd.uscourts.gov
and
Katherine King, Deputy Clerk
Katherine_King@ohnd.uscourts.gov

*Via Electronic Mail*

RE: Plaintiffs' Renewed and Amended Notice of Motion for Certification of Rule 23(b)(3) Cities / Counties Negotiation Class, *In Re: National Prescription Opiate Litigation*, MDL No. 2804

Dear Judge Polster:

    The undersigned Attorneys General, having reviewed the July 9, 2019 Plaintiffs' Renewed and Amended Notice of Motion for Certification of Rule 23(b)(3) Cities / Counties Negotiation Class (the "amended proposal"), and many having previously directed two letters to the Court's attention on June 24, 2019 regarding the original certification motion, respectfully submit this letter to provide our views on the amended proposal.[1]
    We appreciate the Court's statement at the June 25, 2019 hearing that it was concerned about the issues raised in our June 24, 2019 letters and expected that any revised class certification motion would incorporate the input that we had offered. The undersigned Attorneys General respectfully submit that the amended proposal does not resolve the problems we identified regarding the original class certification motion; instead, Plaintiffs continue to propose an unprecedented process that, among other problems, would make "global peace" more, not less, difficult to achieve. Moreover, the proposal continues to intrude on state sovereignty by purporting to regulate the States' resolution of their state court enforcement actions. Accordingly, the undersigned Attorneys General urge the Court to deny the Motion.

---

[1] The Attorneys General submit this letter only as *amici curiae* to offer their input on the question before the Court as the chief legal officers of our respective States; this letter is written without prejudice to any State's ability to enforce its consumer protection laws or otherwise investigate claims related to the issues here in dispute in its state courts, as the Court has repeatedly acknowledged it does not have jurisdiction over the Attorneys General.

1

The Attorneys General are expending significant resources prosecuting state law enforcement actions in our respective state courts against the companies responsible for the opioid crisis. In bringing these actions, the Attorneys General are exercising our unique roles as the top law enforcement officers of our States, with broad statutory, constitutional, and common-law powers to bring suit and obtain meaningful relief on behalf of all of our citizens. A number of these suits rely on investigative powers, statutory enforcement mechanisms, and remedies available only to state enforcement authorities. While the Attorneys General recognize the tremendous impact the opioid crisis has had on many cities and counties within our States, the political subdivision Plaintiffs lack the broad powers and duties that are necessary to effectively protect the States' citizenry as a whole.[2]

Moreover, as previously noted, the Attorneys General have an overarching interest and express statutory role in protecting class members under the Class Action Fairness Act ("CAFA"), which prescribes a role for Attorneys General in the class action settlement approval process.[3] The Attorneys General again write to protect both of these interests.[4]

The Attorneys General have participated in discussions regarding possible resolutions with manufacturers and distributors who are also Defendants in this MDL and understand the difficulty in achieving any global resolution. We also appreciate the efforts that Plaintiffs' counsel took in drafting the amended motion and seeking to address at least some of the Attorneys General's previously stated concerns. However, while the Attorneys General share the parties' and the Court's desire to achieve a fair, appropriate, and comprehensive resolution, we would note that any vehicle chosen must be reasonably capable of achieving this important goal. The Negotiation Class is unlikely to provide such a solution, for at least the following reasons:

- The amended proposal would interfere with the States' ability to vindicate the rights of their citizens. The proposal continues to purport to give class counsel and this Court a role in the negotiations between each State and its political subdivisions over any allocation of settlement funds obtained through the state court enforcement actions. Notwithstanding the amended proposal's insistence that it does not encroach on the States' sovereignty, that is exactly its effect.
- The amended proposal's legal defects would almost certainly lead to objections from class members and ultimately appeals, delaying and possibly derailing any settlement process, including getting funds for remediation to our States and local communities.
- The amended proposal's approach cannot be fair, reasonable, and adequate at the point of a future settlement, as will be required under Rule 23(e)(2).
- The amended proposal's proposed Negotiation Class does not meet the prerequisites for certification under Rules 23(a) and 23(b)(3).

---

[2] *See* Hunter v. City of Pittsburgh, 207 U.S. 161, 178 (1907) ("It is basic in our structure of government that cities are political subdivisions of their states . . . created as convenient agencies for exercising such of the governmental powers of the state as may be entrusted to them.").

[3] *See* 28 U.S.C. § 1715 (Pub. L. No. 115-281); *see also* S. REP. 109-14, 2005 U.S.C.C.A.N. 3, 6 (requirement "that notice of class action settlements be sent to appropriate state and federal officials," exists "so that they may voice concerns if they believe that the class action settlement is not in the best interest of their citizens.").

[4] Many of the undersigned Attorneys General have engaged in previous efforts to promote fairness in class action settlements, which have produced meaningful settlement improvements for class members.

2

- The amended proposal raises practical concerns.

### 1) **The Proposed Negotiation Class Settlement Process Would Intrude Upon State Settlement Allocation Discussions And Jeopardize The States' Ability To Settle State Enforcement Actions**

Plaintiffs recognize[5] that, in any enforcement action brought by an Attorney General, the defendants may very well propose a joint settlement to a State and its political subdivisions. The amended proposal contemplates that consideration of such an offer may require the State and its political subdivisions to decide how to negotiate its allocation, stating it would be "the preferred result of that discussion … for each State to reach agreement with the cities and counties within the State on the allocation and use of the money within the State." Plaintiffs propose that, in the event a State and its political subdivisions cannot reach agreement about how to allocate any such joint settlement offer, the State would be forced to negotiate with counsel who largely represent out-of-state non-parties over the allocation of settlement monies the Attorney General obtained through litigation of her or his own state court action.

The Motion and Memorandum provide conflicting indications about what would happen at that point. The Motion provides that any settlement allocation agreed to in a negotiation between a State and its political subdivisions (represented by proposed MDL class counsel) would then be submitted to the nationwide Negotiation Class of cities and counties for a vote and ultimately – if, as the proposal states, it is "treated as a settlement" – submitted to this Court for approval under Rule 23(e).[6] By contrast, the Memorandum provides that the negotiated in-State allocation would be submitted to members of the Negotiation Class "in that state for a vote"[7] – a dramatically different proposal. Either way, the amended proposal is not only unworkable but unconstitutionally impinges on state sovereignty in at least the following ways.

First, the proposed Negotiation Class interferes with the authority of the Attorneys General to settle their state court enforcement actions without the interference of out-of-state non-parties. To the extent Plaintiffs propose that there is any scenario in which the nationwide Negotiation Class is or may be entitled to vote on a State's allocation of settlement monies with its political subdivisions, they propose giving non-party, out-of-state cities and counties effective veto power over any State's resolution of its state court enforcement action. Such a result is both illegal and untenable.

As this Court has recognized, "nobody should construe the AG's participation in MDL settlement discussions as a limitation on litigation in the sovereign States."[8] Purporting to require Attorneys General to gain supermajority approval for an in-state allocation in settling their own state court enforcement actions would violate exactly that principle. The amended proposal inverts the relationship between each State and its own political subdivisions, even if, as the Memorandum indicates, the in-state political subdivisions would be the only class members who would have to "pass" the proposed allocation.[9]

---

[5] Memorandum at 53.
[6] Mot. at 10 ("Any agreed-to allocation would be treated as a settlement and submitted to the Negotiation Class for its consideration").
[7] Memorandum at 53.
[8] Dkt. 146.
[9] Even if, as the Memorandum states, only members of the Negotiation Class in the particular State would be allowed to vote on the negotiated allocation between that State and its subdivisions of a recovery obtained in a state court action, the proposal still gives counsel representing out-of-state non-parties an

3

Second, to the extent the amended proposal treats any negotiated intra-state allocation as a settlement requiring federal court approval under Rule 23(e),[10] the proposal improperly seeks to subject State enforcement actions to federal jurisdiction and strip state courts of the authority to settle cases properly before them. This violates the principles of federalism.[11] This Court has properly acknowledged that it "has no jurisdiction over (i) the Attorneys General or their representatives, (ii) the State cases they have filed, or (iii) any civil investigations they may be conducting."[12]

The practical effect of Plaintiffs' amended proposal would be to allow political subdivisions within and outside of a State to hamstring the settlement of State enforcement actions that were properly filed and remain pending in state courts. Even if the Court decides to approve a Negotiation Class to settle the MDL despite our concerns, there is no reason for that class or this Court to approve or otherwise oversee State settlements or allocations, and the amended proposal does not offer one. If State cases brought by Attorneys General and federal cases brought by cities, counties, and other political subdivisions proceed on parallel, separate tracks, in different courts, as they have until now, there is little to no risk of double recovery in any event.

To safeguard this constitutionally-protected interest, the undersigned Attorneys General respectfully submit that the Court should decline to invade state sovereignty through the exercise of jurisdiction over the settlement of state enforcement actions brought in state court. States and their political subdivisions must be allowed to settle and resolve any allocation issues between themselves, without this Court's oversight and the unnecessary and improper federal court oversight and the Negotiation Class process proposed here.

### 2) **The Proposed Negotiation Class Settlement Process Will Likely Generate Uncertainty and Delay and/or Derail Any Potential Settlement**

As noted previously, given Plaintiffs' admittedly unprecedented approach, this settlement process is likely to generate numerous objections and appeals, causing additional delay to any potential resolution of this nationwide health crisis, including receiving funds for remediation. Contrary to the amended proposal's assertion that this process will help to buy "global peace," the approval of an unprecedented "negotiation class" at this stage will invite meritorious legal challenges to any eventual settlement, adding uncertainty and making it more difficult for the parties to achieve a global resolution. The amended proposal fails to provide even a cursory response to the Attorneys General's previously stated concerns regarding the likely delay and

---

unwarranted gatekeeping role as negotiators with the State while also subjecting States to the MDL process they have chosen to avoid.

[10] *See* Memorandum at 8.

[11] The U.S. Supreme Court has held that "[f]ederalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities," Horne v. Flores, 557 U.S. 433, 448 (2009), a principle that is particularly implicated by the amended proposal purporting to require a State to seek class and federal court approval for the allocation of resources obtained through its own state court action as between statewide and intra-state local initiatives to address the opioid crisis. Indeed, our established "constitutional structure" protects "the 'dignity' to which States are entitled" by preventing them from being involuntarily "dragged" into any court, especially a federal one. West Virginia ex rel. McGraw v. CVS Pharmacy, Inc., 646 F.3d 169, 178 (4th Cir. 2011) (*quoting* Alden v. Maine, 527 U.S. 706, 713–18 (1999)).

[12] Dkt. 146.

4

uncertainty that would arise here if a Negotiation Class is certified, much less what would occur if the proposed negotiation class settlement process was ultimately deemed to be unlawful.

Additionally, although the amended proposal repeatedly cites the "benefit" of the proposed Negotiation Class as not requiring the same scrutiny as a class action settlement under Rule 23(e), in reality, the Negotiation Class is an additional hurdle and a hindrance to future Rule 23(e) approval, which would still be required once any settlement is reached with a particular defendant. Any eventual settlement would be subject to additional appellate proceedings at that stage due to the unprecedented nature of the process itself. Moreover, the unprecedented nature of the process leaves open the very real possibility that any class release that may be part of an eventual settlement would be subject to a potentially meritorious due process challenge through litigation years in the future by a purportedly bound class member.[13] It seems unlikely that there will be peace with all county and municipal governments – let alone global peace – with these significant legal uncertainties about finality that will remain unresolved for years.

### 3) The Proposed Negotiation Class Settlement Process Does Not Satisfy The Due Process And Fairness Requirements Of Rule 23(e)

Plaintiffs have stated that the Negotiation Class will be certified neither for settlement nor for trial, and the Attorneys General respectfully submit that such a procedure may not even be considered by the Court under Rule 23 despite Plaintiffs' assertions to the contrary. The nature of the proposed Negotiation Class settlement process demands additional protections like those afforded to putative settlement class members during the preliminary approval process. Proposed class members are being asked to opt out or to be bound by any settlement approved by a supermajority of the voting class members following an order certifying the Negotiation Class, like they would be asked similar to the preliminary approval stage of a traditional class action settlement. Therefore, the standards of Rule 23(e)(1)(b) should apply. Indeed, the fact that proposed class members will, by design, have very little idea what the terms of any settlement will be makes it all the more important to apply the due process requirements reflected in Rule 23(e)(1)(b).

"Courts have long recognized that 'settlement class actions present unique due process concerns for absent class members.'"[14] As the Court is aware, Rule 23(e) was amended just last year to provide for greater due process protections. As previously noted, the Attorneys General have significant concerns as to whether political entities differing in size, representation, and knowledge of the ongoing proceedings will be prejudiced due to the potential inability to evaluate this unprecedented Negotiation Class process and obtain the proper authority under their particular decision-making process within the proposed 60 day opt-out period.

Although the amended proposal mentions two methods of direct notice, such notice for a governmental entity is not as "direct" as it would be for an individual. The amended proposal also fails to provide details regarding how Epiq will determine where to send direct notice. It

---

[13] *Cf.* Elliott v. GM LLC *(In re* Motors Liquidation Co.*)*, 829 F.3d 135, 158-66 (2d Cir. 2016) (overturning "free and clear" sale provision in GM's 2009 bankruptcy plan as applied to litigation brought after the plan's confirmation by plaintiffs who did not receive adequate notice of the plan).
[14] *In re* Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 946 (9th Cir. 2011); *see also* Taylor v. Sturgell, 553 U.S. 880, 901 (2008) (Rule 23 protections are "grounded in due process").

5

may take days or even weeks for the notice to reach the correct decision-maker, especially depending on the address or email that Epiq selects for notice.

In addition, an opt-out request must be notarized after it has been signed by an official or employee of that city or county itself, which may be burdensome on rural class members and on those who have outside counsel representing them. For instance, in New England the practice of a "town meeting" is common. Under this form of government, residents of the towns gather only once a year and act as a legislative body, voting on operating budgets, laws, and other matters. Maine annual town meetings, for instance, are traditionally held in March.

Furthermore, the provided notice itself appears to be both inaccurate and inadequate. The proposed notice does not provide the easy to read "options" chart that standard settlement notices provide, explaining what will happen if class members "do nothing," "opt out," etc. There is significant ambiguity in the description of the Special Needs Fund, even though its terms will likely be of great interest to class members, especially those that may not receive funds directly from any proposed settlement, as discussed below.

Moreover, the notice describes a process regarding allocations of funds from a hypothetical State settlement that the States themselves have not approved and do not support. The proposed notice describes the Negotiation Class as promoting global resolution and global peace, and making settlement offers more likely, a characterization that the undersigned vehemently disagree with.

The notice and FAQ description of the allocation of settlement proceeds is insufficient to inform class members, particularly municipalities, of their potential allocation. They refer to an online Allocation Map that uses an example with a $1 billion settlement to illustrate county and city allocations; however, that settlement amount is far from certain and may provide an overinflated view at first glance to class members who do not further calculate their percentage.

Without the class member's percentages provided, or a calculator to facilitate, any detailed analysis becomes more difficult for potential class members and less like the Tool described by Plaintiffs in their original motion. Additionally, the Memorandum describes only in a footnote, as does the Allocation Map, that if a municipality's share would be less than $500, that amount will instead be distributed to the county by default in the absence of another arrangement. If the city has less than $500 and it is within a county without a county government, that amount would revert to the Special Needs Fund.

In Pennsylvania, for instance, this would result in 52.2% of class members being allocated less than $500, and thus, potentially receiving nothing through a proposed Negotiation Class settlement. This allocation procedure should be described more prominently to provide adequate notice, given the sizeable portion of the class that it will likely affect, if it is permitted at all.

Additionally, as discussed in the June 24, 2019 letters, class members receiving notice would have insufficient information to allow them to make an informed choice regarding opting out of the Negotiation Class. They do not know the defendants with which they may be settling, the amount of a settlement fund, how much they will be paying the Class Counsel through the Common Benefit Fees, or even how much of the settlement they will be permitted to keep due to the further allocation between counties and cities. Moreover, for those who become bound by the Negotiation Class by failing, or choosing not, to opt out, it appears the Negotiation Class process does not contemplate a further opportunity to opt out despite the availability of such an opportunity under Rule 23(e)(4).

6

Because many of these proposed class members are headed by elected officials, it is even more concerning that they might become subject to the collective will of other jurisdictions – ultimately being required to bow to the will of the supermajority of voting political subdivisions nationally, including parts of the country that have been impacted by the opioid crisis very differently.

Plaintiffs also argue that the Negotiation Class would allow class members a more "active voice" and role in the settlement process than a settlement where the terms have already been decided. However, proposed class members are only provided with a singular up-down vote regarding the overall settlement fund, and no further opportunity to opt out. Unless they are a representative class member, the proposed class members actually have a far less active voice than in an ordinary settlement, where they would be permitted to make objections or provide comments to a settlement, while retaining opt out rights at the point any particular settlement is proposed.

Plaintiffs characterize this structure as permitted through the *Principles of the Law of Aggregate Litigation* ("ALI Principles") but the amended proposal omits the significant differences between the two scenarios. The plaintiffs in the ALI Principles model "opt in" and affirmatively agree to participate; in contrast, the Negotiation Class involves a negative option, forcing class members to be bound.

Finally, the Negotiation Class procedure does not meet the requirements for preliminary approval under Rule 23(e)(1)(B), which requires that the court likely will be able to approve a proposed settlement under Rule 23(e)(2). The Court would at least have to determine that the amended proposal met the requirements for certification of a class for settlement, the more lenient standard. Due to the lack of fairness and due process outlined above, as well as the numerous violations of the provisions of Rule 23, the undersigned respectfully submit that the Court will be unable to approve any ultimate settlement to which the Negotiation Class would be bound, thus demonstrating the fatally flawed nature of the amended proposal's approach.

### 4) The Negotiation Class As Currently Proposed Cannot Meet The Requirements Of Rules 23(a) And 23(b)(3)

Rule 23(a) and Rule 23(b)(3) identify prerequisites to be met for certification, prerequisites that the amended proposal recognizes must be met before the Negotiation Class can be certified. These prerequisites are particularly difficult to meet in the proposed Negotiation Class because no subclasses are currently designated. Such a nationwide class of varying political subdivisions likely could not meet the requirements of adequacy of representation, typicality, commonality, and superiority.

Conflicts of interest between class members and their counsel are a particular concern regarding adequacy of representation in the Negotiation Class structure. Intra-class conflicts exist that can only be remedied through sub-classes. Class Counsel have already laid the groundwork through their Memorandum for other plaintiffs' counsel to receive common benefit awards, prior to any settlement even coming to fruition, creating further opportunities for intra-class conflicts.

In addition, the claims or defenses of the proposed representative class members are not "typical." Despite the "diverse array" Plaintiffs purport to have chosen as representatives, many types of representatives have been omitted from the list of forty-nine, such as representatives from twenty States, and representatives from smaller counties and cities.

The proposed representative class members also cannot fairly represent the class if they have assisted in developing the plan for distribution. It is likewise unclear whether they will

7

receive "awards" as representatives after other class members are bound. Additionally, urban or city-dwelling class members' citizens may be counted more than rural class members' citizens in the supermajority voting mechanism since they could be, for example, counted both in a municipality and a county, again evidencing against typicality. This information has now been omitted from the amended proposal but is still relevant.

With the current Negotiation Class definition, commonality and predominance cannot be satisfied. Class members have different litigation postures, political structures, and thus damages, claims, and even potential defendants. The amended proposal relies upon the Class Representatives chosen by Plaintiffs' counsel and a random sample of only the litigating class members to prove commonality and predominance when this approach overlooks the vast majority of class members who have not sued and likely will have divergent interests from litigating class members.

Furthermore, because political subdivisions differ in the ways they operate and are funded, their harms would necessarily differ, not to mention the differences in the scope of the harms. Although this issue alone may not, by itself, necessarily defeat commonality or predominance, it should not be disregarded, especially since damages are already decided under the Negotiation Class model.[15] This is precisely one of the flaws inherent in the Negotiation Class model itself – that the allocation system should not be determined based on the class definition proposed.

In fact, the proposed allocation presents more commonality problems, because cities are treated differently than counties, with counties receiving certain funds by default, including potentially all of a city's funds should that city's allocation be less than $500, as discussed above. Differences in the claims asserted include state law public nuisance claims, the variety of effects of the opioid crisis in those areas, and the varying conduct of Defendants in subdivisions.

The amended proposal claims that these varying issues do not "predominate" and that the most important issue is the marketing itself, which it says is common to all Defendants and thus a common question overriding all other individual questions. However, the sheer number and the overall importance of the questions that differ for class members demonstrate that common issues do not in fact predominate, despite the self-serving examples taken from litigating class members. Furthermore, while many proposed class members are pursuing damages remedies, other litigating members are bringing public enforcement actions seeking only non-damages remedies.[16]

Superiority is also unlikely to be met, as there are existing, alternative methods to resolution that are superior to the amended proposal's Negotiation Class structure. For example, class counsel could, even without a certified Negotiation Class in place, negotiate a settlement on behalf of all cities and counties that includes a blow-up provision allowing a defendant to back-out of a deal if a minimum number or percentage of proposed class members opt out of the

---

[15] *See* Memorandum at 86.

[16] *See* Mazza v. Am. Honda Motor Co., Inc., 666 F.3d 581 (9th Cir. 2012) (Vacating class certification ruling because differences between California law and other jurisdictions were material and that class members' claims were governed by consumer protection laws of their own jurisdictions); Jamie S. v. Milwaukee Pub. Sch., 668 F.3d 481, 497 (7th Cir. 2012) ("superficial common questions—like whether each class member … 'suffered a violation of the same provision of law'—are not enough. ... Rather, '[c]ommonality requires the plaintiffs to demonstrate that the class members "have suffered the same injury."'").

settlement. The likelihood of meritorious objections and lengthy and possibly successful appellate proceedings regarding this untested and unprecedented Negotiation Class process also undermines any claim of superiority here.

### 5) **Additional Practical Concerns**

The Attorneys General appreciate the revisions that were made to the Memorandum to attempt to address some of the practical concerns raised in our prior letters. Nevertheless, many of our practical concerns remain, likely because they are inherent to the proposed Negotiation Class structure itself.[17]

The allocation system under the amended proposal is at odds with the stated goal of "coordinated" solutions to the opioid crisis. Doling out small buckets of funds without regard to how the funds should be spent is the opposite of a "coordinated" response, which would balance statewide efforts – such as public education campaigns – with any local efforts. Indeed, this problem has been made worse in the amended proposal, as thousands of often tiny townships have now been added to the proposed class definition. It also purports to override State decision-making about how best to apply resources to the epidemic and may well interfere with existing State programs and priorities. Additionally, a notice for a Negotiation Class competing with a potential future motion for settlement under another mechanism would likely create mass confusion amongst the proposed class members, who may ultimately believe that the separately filed settlement is subject to a vote or that they have already "opted in" when they have not.

Finally, the Attorneys General respectfully submit that the amended proposal's provisions concerning attorneys' fees, including the awarding of common benefit fees, are contrary to the goal of providing maximum resources to abate the opioid crisis. The Attorneys General question whether there need to be two different manners in which private counsel for the local governments can seek to obtain attorneys' fees: the 10% "Private Attorneys' Fee Fund," and a separate application for Class Counsel / Common Benefit Fees to be approved by the Court pursuant to Rule 23(h). Most troubling, it appears there is no requirement that the fees awarded from the Private Attorneys' Fee Fund be tied to work that advanced the litigation for the benefit of Plaintiffs generally, which is the applicable standard for awarding Common Benefit Fees. Although Plaintiffs' counsel should have the opportunity to seek fair compensation for their work in this complex MDL proceeding, it is also a reality that Defendants will likely provide a finite amount of money to resolve all the cases, and any grant of excess compensation to Plaintiffs' counsel would unnecessarily lessen the funds available to abate the crisis.

In light of the foregoing practical, procedural, and sovereignty concerns, the Attorneys General respectfully request the Court deny the Motion. However, in recognition of the shared interest in pursuing "global peace," the Attorneys General are willing to participate in further discussions with Plaintiffs' counsel or to provide additional input to this Court upon its request.

Respectfully submitted,

---

[17] Under the amended proposal it is still not clear exactly how closely the operation of the settlement class, if approved, would follow the procedures and mechanisms explained in the filing. The submitted proposed order still makes explicit reference only to the class action notice and frequently asked questions, but not to the memorandum in support of the amended proposal, which provides the most granular detail about many aspects of the proposed settlement class's operation.

Xavier Becerra
California Attorney General

Ashley Moody
Florida Attorney General

Herbert H. Slatery III
Tennessee Attorney General

Ken Paxton
Texas Attorney General

Steve Marshall
Alabama Attorney General

Kevin G. Clarkson
Alaska Attorney General

Mark Brnovich
Arizona Attorney General

Phil Weiser
Colorado Attorney General

William Tong
Connecticut Attorney General

Kathleen Jennings
Delaware Attorney General

Karl A. Racine
District of Columbia Attorney General

Chris Carr
Georgia Attorney General

Leevin T. Camacho
Guam Attorney General

Clare E. Connors
Hawaii Attorney General

Lawrence Wasden
Idaho Attorney General

Kwame Raoul
Illinois Attorney General

10

Tom Miller
Iowa Attorney General

Derek Schmidt
Kansas Attorney General

Jeff Landry
Louisiana Attorney General

Aaron Frey
Maine Attorney General

Brian Frosh
Maryland Attorney General

Maura Healey
Massachusetts Attorney General

Dana Nessel
Michigan Attorney General

Keith Ellison
Minnesota Attorney General

Eric Schmitt
Missouri Attorney General

Doug Peterson
Nebraska Attorney General

Gurbir S. Grewal
New Jersey Attorney General

Letitia A. James
New York Attorney General

Josh Stein
North Carolina Attorney General

Wayne Stenehjem
North Dakota Attorney General

Dave Yost
Ohio Attorney General

Josh Shapiro
Pennsylvania Attorney General

11

Peter Neronha
Rhode Island Attorney General

Jason Ravnsborg
South Dakota Attorney General

T.J. Donovan
Vermont Attorney General

Mark Herring
Virginia Attorney General

Patrick Morrissey
West Virginia Attorney General

Josh Kaul
Wisconsin Attorney General