# EXHIBIT 7

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | :HON. DAN A. POLSTER<br>:<br>:MDL NO. 2804<br>: |
| APPLIES TO ALL CASES | :NO.<br>:1:17-MD-2804 |

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

December 14, 2018

- - -

      Videotaped sworn deposition of COLLEEN McGINN, taken pursuant to notice, was held at GOLKOW LITIGATION SERVICES, One Liberty Place, 1650 Market Street, Philadelphia, Pennsylvania, beginning at 9:39 a.m., on the above date, before Margaret M. Reihl, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    (Document marked for
2    identification as McGinn Deposition
3    Exhibit No. 9.)
4  BY MR. CARTMELL:
5    Q.   I'm handing you two copies of
6  Exhibit 9, one for you and one for your counsel.
7  This is produced from Teva's files in this
8  litigation, and I will represent to you that
9  this was information that came from your file.
10        You'll see from the e-mail on the
11 first page of this document, there's an e-mail
12 from LeighAnn Tulleson dated June 15, 2012 to
13 you and many others, and the subject is "DEA
14 Suspicious Order Monitoring Program."
15        Do you see that?
16   A.   Yes.
17   Q.   It states, "we have scheduled a
18 meeting to discuss the DEA suspicious order
19 monitoring program and its impact to Teva and
20 our customers."
21        It states, "This launch meeting
22 is critical to the overall understanding of the
23 issues and will require each of the parties
24 listed on this memo to attend."

Page 111

1         You see that?
2    A.   Yes.
3    Q.   Okay.  So it looks like as of
4  June of 2012, which is not long after you
5  started at Teva, is that fair, within a year?
6    A.   Yes.
7    Q.   There was going to be a launch
8  meeting to discuss the suspicious order
9  monitoring program?
10   A.   That's what it looks like.
11   Q.   Okay.  Attached to this e-mail
12 that you received is a series of letters from
13 the U.S. Department of Justice Drug Enforcement
14 Administration; is that right?
15   A.   Yes.
16   Q.   And I want to talk to you
17 specifically about the one that is actually a
18 crummy copy, but it's dated February 7, 2007.
19        Do you see that?
20   A.   That's a bad copy for sure.
21   Q.   Well, we got this from the files,
22 and, unfortunately, we were looking for a better
23 copy, but we couldn't find one, so we'll have to
24 make our way through this, if you don't mind.

Page 112

1         But I want to go through this,
2  and this is a letter, I take it, that you had
3  seen prior to 2012; is that right?
4    A.   It's hard to see where -- I
5  assume that I had.
6    Q.   Well, am I right that there are a
7  series of letters that were sent to
8  manufacturers and distributors of
9  opioid-containing products from a man named
10 Joseph Rannizzisi?
11   A.   Yes.
12   Q.   Okay.  And I know that you are
13 familiar with Mr. Rannizzisi, correct?
14   A.   Yes.
15   Q.   You have had dealings with him,
16 pretty extensive dealings with him in the past;
17 is that fair?
18   A.   Not personally.  I may have
19 talked to him once or twice.
20   Q.   At any rate, these letters, the
21 series of letters that are attached, and I think
22 there's three, are commonly known as the
23 Rannizzisi letters, correct?
24   A.   I had not called them that.  I

Page 113

1  had not heard that.
2    Q.   What do you call them?
3    A.   Distributor letters.
4    Q.   Okay.  And I take it that you
5  were familiar with these letters even back at
6  Cephalon, before you started at Teva?
7    A.   Yes.
8    Q.   Okay.  And let's go through this
9  February 7, 2007 letter, you see the date, and
10 you can see that this is a letter from the Drug
11 Enforcement Administration out of Washington,
12 DC.
13        It states, Dear Sir or Madam,
14 this letter is being sent to every commercial
15 entity in the United States registered with the
16 Drug Enforcement Administration to distribute
17 controlled substances.  The purpose of this
18 letter is to reiterate the responsibilities of
19 controlled substance distributors in view of the
20 prescription drug abuse problem in our -- our
21 nation currently faces.
22        Do you see that?
23   A.   Yes.
24   Q.   Okay.  So would you agree with me

29 (Pages 110 to 113)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  that that was the purpose of these letters was
2  to put or to reiterate to manufacturers of
3  opioid drugs and other controlled substances and
4  distributors of these drugs of their
5  responsibilities related to the law that applies
6  to manufacturing and selling controlled
7  substances?
8          MR. ANDRISANI: Objection, form.
9          THE WITNESS: Yes.
10 BY MR. CARTMELL:
11     Q.  And it looks like the DEA was
12 reiterating the law that applied to
13 manufacturers and distributors of opioids at
14 this time because there was an emerging
15 controlled substance prescription drug problem,
16 correct?
17         MR. ANDRISANI: Object to the
18     form.
19         THE WITNESS: I assume that's
20     why.
21 BY MR. CARTMELL:
22     Q.  And this was back in 2007, right?
23     A.  Yes.
24     Q.  It states, "Background, as each

Page 115

1  of you is undoubtedly aware, the abuse
2  (nonmedical use) of controlled prescription
3  drugs is a serious and growing health problem in
4  this country.  DEA has an obligation to combat
5  this problem, as one of the agency's core
6  functions is to prevent the diversion of
7  controlled substances into illicit channels."
8          Do you see that?
9      A.  Yes.
10     Q.  What does that mean, "illicit
11 channels"?
12         MR. ANDRISANI: Object to form.
13         THE WITNESS: I'm going to assume
14     that he means that it ends up anywhere
15     than where it was intended to go.
16 BY MR. CARTMELL:
17     Q.  Okay.  "Congress assigned DEA to
18 carry out this function through enforcement of
19 the Controlled Substances Act and DEA
20 regulations that implement the Act."
21         So does that mean that actually
22 the Drug Enforcement Administration is the
23 agency that Congress has given the power to
24 enforce the law related to the sale and

Page 116

1  manufacture of controlled substances?
2      A.  Yes.
3          MR. ANDRISANI: Objection, form.
4  BY MR. CARTMELL:
5      Q.  Including opioid-containing
6  products?
7          MR. ANDRISANI: Objection, form.
8          THE WITNESS: Yes.
9  BY MR. CARTMELL:
10     Q.  The Controlled Substances Act was
11 designed by Congress to combat diversion by
12 providing for a closed system of drug
13 distribution.
14         What does it mean to be a closed
15 system?
16     A.  The way it's been --
17         MR. ANDRISANI: Object to form.
18         THE WITNESS: -- described to us
19     is that controlled substances would only
20     be shipped to DEA registrants.
21 BY MR. CARTMELL:
22     Q.  And then it says further down,
23 "If the closed system is to function properly as
24 Congress envisioned, distributors must be

Page 117

1  vigilant in deciding whether a prospective
2  customer can be trusted to deliver controlled
3  substances only for lawful purposes.  This
4  responsibility is critical, as Congress has
5  expressly declared that the illegal distribution
6  of controlled substances has a substantial and
7  detrimental effect on the health and general
8  welfare of the American people."
9          Do you see that?
10     A.  Yes.
11     Q.  And do you agree with that?
12         MR. ANDRISANI: Objection to
13     form.
14         THE WITNESS: Yes.
15 BY MR. CARTMELL:
16     Q.  Now, it then talks about actually
17 the law that manufacturers and distributors are
18 bound by related to the sale and manufacture of
19 controlled substances, correct?
20         MR. ANDRISANI: Objection, form.
21         THE WITNESS: I'm sorry.
22     Could -- I missed it.  Sorry, I was
23     reading.
24 BY MR. CARTMELL:

Page 118

```
 1        Q.   Sorry I interrupted you.  Were
 2   you done?
 3        A.   I'm done.  I'm sorry.
 4        Q.   We'll talk about the rest of the
 5   letter in some detail, but I want to -- I was
 6   just pointing out that the rest of the letter
 7   actually talks about the regulations and the law
 8   that applies and that the DEA is enforcing,
 9   correct?
10        A.   Yes.
11        Q.   And one of the things, just so
12   it's clear for the jury, that is important to
13   know is that companies like Teva, for example,
14   because they sell and manufacture
15   opioid-containing products, they have to
16   register with the DEA to be able to do that; is
17   that right?
18        A.   Yes.
19        Q.   And is it true that they become
20   known as a registrant, for example, is that
21   referred to?
22        A.   Yes.
23        Q.   Okay.  And that registration, is
24   it true, provides, for example, Teva a license
```

Page 119

```
 1   that allows them through their multiple
 2   facilities to go ahead and distribute those
 3   opioids?
 4        A.   Yes.
 5        Q.   Okay.  And so, for example, if
 6   Teva had its license suspended or pulled from
 7   the DEA to sell or manufacture opioid-containing
 8   products, then they would no longer be able to
 9   sell those; is that fair?
10        A.   Yeah, they would not be able
11   to -- not just sell but they would not be able
12   to transfer drug anywhere.
13        Q.   If you go to the second page in
14   the third paragraph it states, the statutory
15   factors DEA must consider in deciding whether to
16   revokes a distributor's registration are
17   contained in 21 U.S.C. 823(e).
18             Do you see that?
19        A.   Yes.
20        Q.   So when you talk about statutes
21   and all that, that's legal mumbo-jumbo, that's
22   the actual -- that's the law, right?
23             MR. ANDRISANI:  Objection, form.
24             THE WITNESS:  U.S. Code.
```

Page 120

```
 1   BY MR. CARTMELL:
 2        Q.   Go ahead.
 3        A.   It's U.S. code.
 4        Q.   Okay.  "Listed first among these
 5   factors is the duty of distributors to maintain
 6   effective controls against diversion of
 7   controlled substances into other than legitimate
 8   medical, scientific and industrial channels."
 9             Do you see that?
10        A.   Yes.
11        Q.   And so that just means that every
12   manufacturer or distributor of opioid-containing
13   products and other controlled substances, they
14   have to make sure that they actually have
15   effective controls against diversion of those
16   drugs in place, correct?
17             MR. ANDRISANI:  Objection, form.
18             THE WITNESS:  Yes.
19   BY MR. CARTMELL:
20        Q.   For example, if Teva had
21   ineffective controls that weren't working, then
22   that would not be compliant with the law,
23   correct?
24             MR. ANDRISANI:  Objection, form.
```

Page 121

```
 1             THE WITNESS:  Yes.
 2   BY MR. CARTMELL:
 3        Q.   It states, In addition,
 4   distributors must comply with appropriate state
 5   and local law.  Congress also gave DEA authority
 6   under this provision to revoke a registration
 7   based on the distributor's past experience in
 8   the distribution of controlled substances and
 9   based on such other factors as may be relevant.
10             Do you see that?
11             "Relevant to and consistent with
12   the public health and safety."
13             Do you see that?
14        A.   Yes.
15        Q.   Okay.  Now, I want to focus on
16   this next section, because this next section is
17   talking specifically about something called
18   suspicious orders of controlled substances.
19             Do you see that?
20        A.   Yes.
21        Q.   Tell us what suspicious orders of
22   controlled substances means?
23        A.   Would you like me to read what
24   the regulation states.
```

Page 122

1  Q.  I'll withdraw the question, and
2  I'll read it, okay.
3       Let's go through this section,
4  and I'm going to follow up and ask you some
5  questions.
6       "The DEA regulations require all
7  distributors to report suspicious orders of
8  controlled substances.  Specifically, the
9  regulations state the registrant shall design
10 and operate a system to disclose to the
11 registrant suspicious orders of controlled
12 substances.  The registrant shall inform the
13 Field Division Office of the Administration in
14 his area of suspicious orders when discovered by
15 the registrant.  Suspicious orders include
16 orders of unusual size, order deviating
17 substantially from a normal pattern and orders
18 of unusual frequency."
19      Do you see that?
20 A.  Yes.
21 Q.  Okay.  So let me see if I can
22 interpret that for the jury.
23      Does that mean that, for example,
24 Teva at all times when they are licensed and

Page 123

1  selling, for example, opioid-containing
2  products, they have to have what's called a
3  suspicious ordering monitoring program in place?
4       MR. ANDRISANI:  Objection, form.
5       THE WITNESS:  If they are selling
6       commercial product, yes.
7  BY MR. CARTMELL:
8  Q.  Okay.  And so the DEA requires
9  and the law requires, according to the
10 regulations, that if Teva, for example, is going
11 to sell these opioids, that they have to put a
12 program in place that is going to effectively
13 identify suspicious orders of opioids, correct?
14      MR. ANDRISANI:  Objection to
15      form.
16      THE WITNESS:  Yes.
17 BY MR. CARTMELL:
18 Q.  In other words, if Teva has
19 customers, and I take it that they do, who
20 contact Teva and they say, "we want to buy or
21 purchase some of your opioid-containing
22 products," that's happens, doesn't it?
23 A.  Yes.
24 Q.  And the customer says, for

Page 124

1  example, we want 4,000 pills, is it -- does it
2  happen that way?  Do they ask by the pill?
3  A.  They don't call me to place an
4  order, so I don't know exactly how they do it,
5  but I assume it's by carton or bottle or NDC.  I
6  don't know.
7  Q.  Okay.  But you're actually
8  responsible as the DEA director at Teva for the
9  suspicious order monitoring program, aren't you?
10 A.  I don't physically go and review
11 orders.  I am responsible -- ultimately
12 responsible for it, but I don't actually process
13 the orders or investigate them.
14 Q.  Okay.  So a customer might
15 contact Teva and say we want cartons -- X number
16 of cartons of opioids or bottles of opioids,
17 something like that, fair?
18 A.  Yes.
19      MR. ANDRISANI:  Objection, form.
20 BY MR. CARTMELL:
21 Q.  And this is saying that Teva, as
22 a company, has to monitor those orders from its
23 customers and make sure they're not suspicious,
24 right?

Page 125

1       MR. ANDRISANI:  Objection, form.
2       THE WITNESS:  Yes.
3  BY MR. CARTMELL:
4  Q.  And if Teva finds that these
5  orders from its customers who are buying these
6  opioids are suspicious, then this says that
7  those orders have to be actually reported to the
8  DEA, correct?
9       MR. ANDRISANI:  Objection, form.
10      THE WITNESS:  Correct.
11 BY MR. CARTMELL:
12 Q.  And if there are suspicious
13 orders from customers to Teva, actually, Teva is
14 not supposed to go and ship those bottles or
15 crates of opioids to the customer, right?
16      MR. ANDRISANI:  Objection, form.
17      THE WITNESS:  Yes.
18 BY MR. CARTMELL:
19 Q.  And this process called
20 suspicious order monitoring is part of the law
21 that says Teva has to have effective safeguards
22 in place to prevent diversion of these opioids
23 or controlled substances, right?
24      MR. ANDRISANI:  Objection, form.

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  THE WITNESS:  Yes.
2  BY MR. CARTMELL:
3   Q.   Okay.  Now, Teva also has, as a
4  part of this law and these regulations from the
5  DEA, also has the responsibility to make sure
6  that they investigate if they find suspicious
7  orders from their customers for opioids; is that
8  right?
9    MR. ANDRISANI:  Objection, form.
10    THE WITNESS:  We investigate
11    orders of interest and report suspicious
12    orders.  We have that obligation.
13  BY MR. CARTMELL:
14   Q.   That's the duty of Teva to do
15  that, correct?
16   A.   Yes.
17    MR. ANDRISANI:  Objection to
18    form.
19  BY MR. CARTMELL:
20   Q.   And if you go down it states, "It
21  bears emphasis that the foregoing reporting
22  requirement is in addition to, and not in lieu
23  of, the general requirement under 21 U.S.C.
24  823(e) that a distributor maintain effective

Page 127

1  controls against diversion."
2    Do you see that?
3   A.   Yes.
4   Q.   "Thus, in addition to reporting
5  all suspicious orders, a distributor has a
6  statutory responsibility to exercise due
7  diligence to avoid filling suspicious orders
8  that might be diverted into other than
9  legitimate medical, scientific and industrial
10  channels."
11    Do you see that?
12   A.   Yes.
13   Q.   Okay.  Let's talk about that due
14  diligence.  If I'm reading this correctly, and
15  correct me if I'm wrong, the DEA is saying that
16  Teva, for example, when selling and
17  manufacturing opioids, when they get suspicious
18  orders, they can't just fill those orders, they
19  actually have to investigate and do due
20  diligence to determine or make sure that those
21  opioid pills are not going to be diverted to
22  illegal and illicit places, correct?
23    MR. ANDRISANI:  Objection, form.
24    THE WITNESS:  If it's deemed

Page 128

1  suspicious, we have an obligation not to
2  ship.
3  BY MR. CARTMELL:
4   Q.   You have an obligation not to
5  ship, but when this talks about due diligence,
6  you also have an obligation to investigate,
7  right?
8    MR. ANDRISANI:  Objection, form.
9    THE WITNESS:  We investigate any
10    order that's pended in the system, and
11    then if we do our due diligence on that
12    and we determine that it's a suspicious
13    order, then we have to report it.
14  BY MR. CARTMELL:
15   Q.   So would you agree with me that
16  it's the responsibility of manufacturers and
17  distributors of opioids, including Teva, and
18  when you were at Cephalon as well, that if they
19  have potentially suspicious order, their duty
20  and responsibility is to investigate that order?
21   A.   Yes.
22   Q.   Okay.  And if the company fails
23  to investigate those potentially suspicious
24  orders, then they have breached their duty and

Page 129

1  responsibility, correct?
2    MR. ANDRISANI:  Objection, form.
3    THE WITNESS:  Yes.
4  BY MR. CARTMELL:
5   Q.   And if Teva, for instance, has a
6  suspicious order monitoring system or fails to
7  have one that is effective and is actually
8  identifying suspicious orders and they're not
9  investigating those properly, then they will
10  have breached their duty and responsibility,
11  correct?
12    MR. ANDRISANI:  Objection, form.
13    THE WITNESS:  We have an
14    obligation to make sure that we have an
15    effective system in place.
16  BY MR. CARTMELL:
17   Q.   I understand that.  My question
18  is a little bit different.
19    If, in fact, Teva, for instance,
20  has a suspicious order monitoring system that is
21  not effective and it isn't adequately
22  identifying suspicious orders, and it's not --
23  and those orders are not adequately being
24  investigated by the company, then Teva would

Page 130

1  have breached its duties and responsibilities,
2  according to the DEA regulations, correct?
3           MR. ANDRISANI: Objection, form.
4           THE WITNESS: I just want to say
5      that the suspicious order monitoring has
6      been a moving target, and what was
7      effective in one year -- considered
8      effective in one year may not have been
9      considered effective in another year.
10     So, you know, we try to monitor DEA
11     action to see where they're headed with
12     it, because they're basically
13     promulgating rules without writing
14     regulations, updating regulations, so we
15     try to monitor that. What I'm saying is
16     it depends on the time that you were
17     looking at the system in determining
18     whether it was effective or not. But at
19     the time, it should have been effective
20     with the information that we knew at the
21     time.
22  BY MR. CARTMELL:
23     Q.  I appreciate that. I'm going to
24  object and move to strike, and I'm going to ask

Page 131

1  you again and see if I can get an answer to that
2  question.
3     A.  Okay.
4     Q.  And we'll talk about that in more
5  detail, but, Ms. McGinn, if, in fact, Teva had a
6  suspicious order monitoring program that was
7  ineffective and not adequately identifying
8  suspicious orders and those orders that were
9  pended, when they did identify suspicious
10 orders, were not being adequately investigated,
11 then Teva, according to the regulations of the
12 DEA, would have breached its duty and
13 responsibility, fair?
14          MR. ANDRISANI: Objection, form.
15          THE WITNESS: Yes.
16 BY MR. CARTMELL:
17     Q.  Go ahead.
18     A.  Yes.
19     Q.  I want to go back to Exhibit 7,
20 if you would, and I just want to ask you a
21 question, and I think this gives us a good way
22 to demonstrate for the jury what I'm asking
23 about.
24          Now, this graph shows rising

Page 132

1  deaths with rising prescriptions, and it's true
2  that the law we just talked about and that the
3  DEA in its letter of 2007 was reiterating is
4  that at all times, for example, from 2000 until
5  2012 that law requiring Teva, for example, to
6  have effective -- effective systems in place to
7  prevent diversion, that was in effect, correct?
8           MR. ANDRISANI: Objection, form.
9           THE WITNESS: Yes.
10 BY MR. CARTMELL:
11     Q.  In other words, the law that
12 we're talking about was in effect in 2000 and
13 2001, all the way up to 2008, 2009, all the way
14 to 2012, and it's still in effect today?
15     A.  Yes.
16          MR. ANDRISANI: Objection, form.
17 BY MR. CARTMELL:
18     Q.  And so at all times, even back in
19 2004, 2003, any times from 2000 on, Teva had
20 that duty to have in effect a suspicious order
21 monitoring program, correct?
22          MR. ANDRISANI: Objection, form.
23          THE WITNESS: Yes.
24 BY MR. CARTMELL:

Page 133

1     Q.  And Teva had the duty during that
2  period of time all the way back to 2004 or
3  whenever it was they started selling controlled
4  substances, they needed to have effective
5  systems, including a suspicious order monitoring
6  program, in place that would prevent diversion
7  of opioids, correct?
8           MR. ANDRISANI: Objection, form.
9           THE WITNESS: Yes.
10 BY MR. CARTMELL:
11     Q.  Okay. In other words, Teva
12 couldn't start that program in 2010 or 2012, and
13 if they did that, they would have breached their
14 duties and responsibilities to do that prior to
15 that time, fair?
16          MR. ANDRISANI: Objection, form.
17          THE WITNESS: Yes.
18 BY MR. CARTMELL:
19     Q.  And would you agree with me,
20 Ms. McGinn, that if Teva did not monitor
21 effectively for suspicious orders or in a
22 responsible way and that actually contributed to
23 the epidemic, then Teva would be responsible for
24 that?

Page 134

1  MR. ANDRISANI: Objection, form.
2  THE WITNESS: If Teva was
3     responsible for that, it certainly was
4     never intentional.
5  BY MR. CARTMELL:
6     Q.  I understand that. My question
7  is a little different, though, and I'm not
8  trying to put words in your mouth either, but
9  would you agree with me that if Teva, in the
10 past, has not had effective systems in place to
11 prevent diversion, including a suspicious order
12 monitoring program for suspicious orders of
13 opioids, if that system has not been effectively
14 in place and has not been diverting opioids,
15 that could contribute to the epidemic, correct?
16    MR. ANDRISANI: Objection, form.
17    THE WITNESS: In some way, yeah.
18    I mean, we were just one part of the
19    supply chain. There were many other
20    steps in the process before it got to a
21    patient for a death.
22 BY MR. CARTMELL:
23    Q.  And I'm not trying to say that
24 Teva would be solely responsible for that, but

Page 135

1  if Teva didn't follow the DEA regulations and
2  have effective systems in place to prevent
3  diversion, they could be a contributor or would
4  be a contributor to the epidemic, correct?
5     MR. ANDRISANI: Objection, form.
6     THE WITNESS: In some way, yes.
7  BY MR. CARTMELL:
8     Q.  Okay. And the same is true with
9  other manufacturers of opioids and distributors
10 of opioids; they too could be contributors if
11 they didn't do a good job and have appropriate
12 systems in place to prevent diversion of
13 opioids, correct?
14    MR. ANDRISANI: Objection, form.
15    THE WITNESS: Yes.
16 BY MR. CARTMELL:
17    Q.  Okay. And if, in fact, that's
18 the case, then, for example, would you believe,
19 in your opinion, that Teva would be partly
20 responsible for the epidemic?
21    MR. ANDRISANI: Objection, form.
22    THE WITNESS: In some part, yes.
23    MR. CARTMELL: Let's take a
24    break.

Page 136

1     THE VIDEOGRAPHER: Going off the
2     record at 11:52 a.m.
3     (Luncheon recess.)
4     THE VIDEOGRAPHER: We are back on
5     the record at 12:38.
6  BY MR. CARTMELL:
7     Q.  Ms. McGinn, we're back on the
8  record after a lunch break. Are you ready to
9  proceed?
10    A.  I am, thank you.
11    Q.  Did you have a nice lunch?
12    A.  I've had better, but I've had
13 worse too so we're okay.
14    Q.  Okay, good.
15        Well, before we broke for lunch,
16 we were talking about, you'll recall, Exhibit 9,
17 which is the Rannizzisi letter that was sent
18 from the Drug Enforcement Administration to,
19 among others, manufacturers and distributors of
20 opioids.
21        You recall our conversation in
22 that regard?
23    A.  Yes.
24    Q.  Okay. And I don't think I made

Page 137

1  this point, but I want to, and I don't mean to
2  put words in your mouth, but is it true that
3  these laws that require opioid manufacturers and
4  distributors to have safeguards that are
5  effective in place to prevent diversion of those
6  drugs, those laws are for safety purposes,
7  correct?
8     MR. ANDRISANI: Objection, form.
9     THE WITNESS: I'm sure that's one
10    aspect.
11 BY MR. CARTMELL:
12    Q.  In other words, safety of
13 individuals so that the drugs aren't diverted to
14 people who could abuse them or not even abuse
15 them and have overdoses and hospitalizations and
16 deaths, things like that, fair?
17    MR. ANDRISANI: Objection to
18    form.
19    THE WITNESS: It's there for
20    legitimate medical need.
21 BY MR. CARTMELL:
22    Q.  Okay. All right. Now, in
23 preparation for your deposition today, did you
24 read the deposition of Mr. Tomkiewicz?

Page 174

1  didn't know whether or not that meant compliant
2  with DEA regulations?
3              MR. ANDRISANI:  Objection, asked
4      and answered.
5              THE WITNESS:  What I'm saying is
6      I'm not sure what the person who wrote
7      this intended that to say.
8  BY MR. CARTMELL:
9      Q.   Okay.  At any rate, whoever wrote
10 this intended to say that the suspicious order
11 monitoring program and the Know your Customer
12 program were putting the company at risk related
13 to DEA sanctions, and that needed to be the
14 company's highest priority to make improvements
15 and close the gaps, correct?
16             MR. ANDRISANI:  Objection, form.
17     It misstates what's on the paper.
18 BY MR. CARTMELL:
19     Q.   Go ahead.
20     A.   It says that it was a risk and we
21 should give it high priority.
22     Q.   Okay.  Below it says, "DEA will
23 use its authority to revoke and suspend
24 registrations in appropriate cases."

Page 175

1          You see that?
2      A.   Yes.
3      Q.   Does that help you to understand
4  where it says under number 2 Know your Customer
5  program if they were talking about not being
6  compliant with the DEA?
7      A.   I would assume that that's what
8  they were referencing.
9      Q.   Okay.  Know your Customer
10 program, tell the jury what that is?
11     A.   It's looking into your customers,
12 knowing the background, the officers.  It's due
13 diligence on your customer.
14     Q.   And we saw the phrase due
15 diligence in the law from Mr. Rannizzisi in his
16 letter, correct?
17     A.   I think so.
18     Q.   And so the law requires for
19 manufacturers and sellers of opioids like Teva
20 that if they have potentially suspicious orders,
21 they have to do due diligence and actually do
22 investigation of those, correct?
23     A.   Yes.
24     Q.   And part of that investigation,

Page 176

1  the DEA has said, is to get to know your
2  customers, correct?
3              MR. ANDRISANI:  Objection, form.
4              THE WITNESS:  Yes.
5  BY MR. CARTMELL:
6      Q.   And do investigation on your
7  customers to see if possibly they're involved in
8  suspicious activity related to controlled
9  substances, correct?
10             MR. ANDRISANI:  Objection, form.
11             THE WITNESS:  Yes.
12 BY MR. CARTMELL:
13     Q.   And what this document says is
14 that at this time, Teva was not compliant in
15 that regard, correct?
16             MR. ANDRISANI:  Objection.
17             THE WITNESS:  That's what it says
18     here.
19 BY MR. CARTMELL:
20     Q.   I want to ask you -- strike that.
21          And then if you go through the
22 next several pages, there is information put
23 together that summarizes, for example, the law
24 that we already went through from the DEA

Page 177

1  letter, correct?
2      A.   Yes.
3      Q.   And it -- you had gathered
4  information on what the best practices were for
5  a suspicious order monitoring program, correct?
6              MR. ANDRISANI:  Objection as to
7      form with respect to her preparing this.
8              THE WITNESS:  This document does
9      contain information about other
10     companies.
11 BY MR. CARTMELL:
12     Q.   I'll restate it to hopefully take
13 care of the objection.
14          And then the attachment pages
15 also include information that you or somebody
16 gathered about what the best practices are
17 related to having a suspicious order monitoring
18 program, correct?
19     A.   It looks like information that
20 was available.  I don't -- I have to look
21 through it to see if it's best practices
22 necessarily.  Oh, there is best practices.
23     Q.   You see that?
24     A.   Yes.

45 (Pages 174 to 177)

Page 386

```
 1   acquisition.  He came with Actavis.
 2        Q.   Okay.  But, originally, before
 3   joining Actavis, he was with Purdue?
 4        A.   I believe so.
 5        Q.   Okay.  And you write here
 6   regarding 60 Minutes -- do you recall watching a
 7   60 Minutes segment on opioids?
 8        A.   I do.
 9        Q.   Okay.  And can you briefly
10   describe for me what the segment was that you
11   saw on 60 Minutes?
12        A.   It was -- if I remember
13   correctly, it was a interview with Joe
14   Rannizzisi talking about suspicious orders or
15   the opioid epidemic in general.
16        Q.   And we heard about Mr. Rannizzisi
17   earlier.  He had written those letters back in
18   2006 and '07, correct?
19        A.   Yes.
20        Q.   And you had those letters back
21   around that time frame, right?
22        A.   Yes.
23        Q.   And you write here to
24   Mr. Zerillo, "Did you see this last night?  My
```

Page 387

```
 1   first thought was that Joe Rannizzisi has lost
 2   his mind and the second was that it was a very
 3   one-sided story."
 4             Is that correct?
 5        A.   That is correct.
 6        Q.   And why was it one-sided?
 7        A.   It only presented information
 8   from -- about pharmaceutical industry and not
 9   the part that doctors played in the whole opioid
10   epidemic.
11        Q.   And what was the part about the
12   -- you said the pharmaceutical industry.  What
13   was the part about the pharmaceutical industry
14   that he was discussing on 60 Minutes?
15        A.   My recollection is that he blamed
16   the entire opioid epidemic on pharmaceutical
17   companies.
18        Q.   And what did he say they did
19   wrong?
20             MR. ANDRISANI:  Objection.
21   BY MR. CRAWFORD:
22        Q.   If you recall.
23        A.   I don't remember exactly what he
24   said.
```

Page 388

```
 1        Q.   And you say he has lost his mind.
 2   What does that mean he has lost his mind?
 3        A.   I don't remember why I said that.
 4   I just thought it was a very one-sided view and
 5   that he basically blamed everything on the
 6   pharmaceutical industry.
 7        Q.   Okay.  And then Mr. Zerillo
 8   responds back, "LOL," is that lots of laughing,
 9   is that what that stands for?
10        A.   You'd have to ask him, but I
11   assume so.
12        Q.   And it says, "Joe just made a lot
13   of friends?"
14             Right?
15        A.   Yes.
16        Q.   And you respond to him, "Right?
17   I guess he's not interested in working for
18   industry."
19             Correct?
20        A.   Yes.
21        Q.   What do you mean he's not
22   interested in working for industry?
23        A.   That he would not be able to work
24   for a pharmaceutical company.
```

Page 389

```
 1        Q.   But he works for the DEA.  Why
 2   would he work --
 3        A.   He wasn't --
 4        Q.   -- for a pharmaceutical company?
 5        A.   He wasn't working for DEA at the
 6   time of this interview.
 7        Q.   Is it your experience that a lot
 8   of people who leave the DEA go work in the
 9   industry?
10             MR. ANDRISANI:  Objection.
11             THE WITNESS:  Some do.
12             MR. CRAWFORD:  Next we'll go to
13        Exhibit 25.
14             (Document marked for
15        identification as McGinn Deposition
16        Exhibit No. 25.)
17             MS. ROLLINS:  Counsel, I think
18        your exhibit numbers -- i think there
19        might have been two 23s and two 24s?
20             MR. CRAWFORD:  I think we're
21        sequential, okay.  Yeah, they're great.
22        Thank you, though.
23             MS. HUDNALL:  21 and 22 were out
24        of order.
```