EXHIBIT 8

Highly Confidential - Subject to Further Confidentiality Review

 1            THE UNITED STATES DISTRICT COURT

             FOR THE EASTERN DISTRICT OF OHIO

 2                   EASTERN DIVISION

 3                    -   -   -

 4    IN RE:  NATIONAL     :

      PRESCRIPTION OPIATE :    MDL NO. 2804

 5    LITIGATION          :

      ----------------------------------------

 6                        :    CASE NO.

      THIS DOCUMENT       :    1:17-MD-2804

 7    RELATES TO ALL CASES:    Hon. Dan A. Polster

 8                    -   -   -

 9           Wednesday, November 28, 2018

10                    -   -   -

11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12               CONFIDENTIALITY REVIEW

13                    -   -   -

14        Videotaped deposition of JOSEPH

15    TOMKIEWICZ, taken pursuant to notice, was held

16    at Golkow Litigation Services, One Liberty

17    Place, 1650 Market Street, Suite 5150,

18    Philadelphia, Pennsylvania 19103, beginning at

19    9:58 a.m., on the above date, before Lisa V.

20    Feissner, RDR, CRR, Notary Public.

21

22                    -   -   -

23           GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

24               deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

```
1    ask you, it's also affected your family; is
2    that fair to say?
3            A.   My family:
4                 MR. HAMMOUD:  Object to the form.
5                 THE WITNESS:  I don't know anyone
6            in my family who is a -- has an issue
7            with opioids.
8    BY MR. CARTMELL:
9            Q.   But you have good friends?
10           A.   Oh, yeah, my -- like I said, my
11   wife's best friend growing up.
12           Q.   Okay.  Would you agree with me that
13   the abuse and addiction of both prescription
14   and nonprescription opioids is a serious
15   problem?
16           A.   Well, of course.
17           Q.   And it affects the health, social,
18   and economic welfare of all individuals,
19   communities, and companies?
20                MR. HAMMOUD:  Object to the form.
21                THE WITNESS:  I would say that's a
22           fair assessment.
23   BY MR. CARTMELL:
24           Q.   And you mentioned that opioid
```

1    deaths continue to rise; is that right?

2         A.    That is correct.

3         Q.    And in part that's because opioids

4    continue to be diverted and abused, correct?

5              MR. HAMMOUD:  Object to the form.

6              THE WITNESS:  The rates that I've

7         seen involving prescription opioids have

8         appeared to be relatively flat over the

9         last several years.

10   BY MR. CARTMELL:

11        Q.    Staying at the same level, is that

12   what you mean?

13        A.    Correct, correct.

14        Q.    In other words, you're not saying

15   that it's going down --

16        A.    Correct.

17        Q.    -- you're just saying that it's

18   been flat?

19        A.    Correct.  And I'm not saying it's

20   not an issue either.

21        Q.    You're saying it's a serious issue,

22   aren't you?

23        A.    Oh, it's a very serious issue, yes.

24        Q.    Would you agree, and I think you

Highly Confidential - Subject to Further Confidentiality Review

1    said this, that the opioid epidemic is

2    worsening?

3                    MR. HAMMOUD:  Object to the form,

4           mischaracterizes prior testimony.

5                    THE WITNESS:  Yeah, it -- in terms

6           of what I see with heroin and illicit

7           fentanyl -- and that's fentanyl that's

8           not produced for medical purposes -- I

9           see pretty dramatic increases in those

10          products.

11   BY MR. CARTMELL:

12          Q.   And would you agree with me that

13   the opioid epidemic must be addressed in part

14   through the manufacturers --

15                   MR. HAMMOUD:  Objection.

16   BY MR. CARTMELL:

17          Q.   -- of the opioids?

18          A.   Well, I think my program has been

19   part of helping to solve the problem.

20          Q.   Right.  In other words, you would

21   agree with me that in order to solve this

22   problem, the manufacturers -- and I'm not

23   eliminating any others -- but are a part of

24   that solution and have responsibility to do

Highly Confidential - Subject to Further Confidentiality Review

1  their duty to try to limit the amount of

2  diverted opioids.  Would you agree with that?

3              MR. HAMMOUD:  Object to the form.

4              THE WITNESS:  Oh, from -- yeah, we

5        have a different responsibility to help

6        prevent diversion.

7  BY MR. CARTMELL:

8        Q.   Okay.  Let's talk about

9  specifically what the law says that duty and

10  responsibility is for manufacturers of opioids.

11  I talked about this a little bit, but let me

12  start from the beginning, if I can, because I

13  want to make this very clear to the jurors, and

14  understandable.

15              Is it true that the sale of opioid

16  narcotic drugs is regulated by the law in

17  America?

18        A.   That's fair.

19              MR. HAMMOUD:  Object to the form.

20  BY MR. CARTMELL:

21        Q.   And for opioid narcotic drugs like

22  the ones that Teva sells and distributes, those

23  are called controlled substances; is that

24  right?

1          MR. HAMMOUD:  Object to the form.

2          THE WITNESS:  That is correct.

3   BY MR. CARTMELL:

4      Q.   Okay.  And what does it mean for a

5   drug or a pharmaceutical like the opioids

6   produced by Teva and sold by Teva, what does it

7   mean to be a controlled substance?

8      A.   From my understanding, it is that

9   it's a -- that the manufacture, sale,

10  distribution of the products are controlled

11  federally by the federal government and that --

12  and as part of what's called the closed

13  distribution system.

14     Q.   Okay.  And I think you mentioned

15  this, but Congress actually passed what's

16  called the Controlled Substances Act that

17  governs and regulates the sale of opioid

18  narcotics and controlled substances?

19         MR. HAMMOUD:  Object to the form.

20         THE WITNESS:  Correct.

21  BY MR. CARTMELL:

22     Q.   Okay.  And I think you mentioned

23  this, too, but the Controlled Substances Act

24  went into effect in 1970; is that right?

Highly Confidential - Subject to Further Confidentiality Review

1         A.    That's correct.

2         Q.    Okay.   I want to actually hand you

3   Exhibit 4 in this case and ask you a few

4   questions about this document.

5               (Exhibit Teva-Tomkiewicz-004 marked

6         for identification and attached to the

7         transcript.)

8   BY MR. CARTMELL:

9         Q.    This was a document that was

10  produced in this litigation by Teva from their

11  internal files, and I just have a few questions

12  about this letter for you.

13              This is a letter dated --

14              MR. HAMMOUD:   Can you give him a

15        second to read the document.

16  BY MR. CARTMELL:

17        Q.    Mr. Tomkiewicz, have you seen this

18  letter before?

19        A.    Yes, I have.

20        Q.    In other words, you're familiar

21  with this letter based on your experience in

22  the industry related to diversion control of

23  opioid narcotics?

24        A.    Yes, I've seen it and have a copy

Highly Confidential - Subject to Further Confidentiality Review

1    of it.

2            Q.    Okay.  Now, I think actually we

3    found this letter in your file.  But as you see

4    here, this is from the U.S. Department of

5    Justice Drug Enforcement Administration.

6            Do you see that?

7            A.    Yes.

8            Q.    And we talked -- you kept calling

9    it the administration; I kept calling it the

10   agency.  I apologize.

11           A.    Administration, yeah.

12           Q.    But this is the entity that is --

13           A.    I've been wrong before.

14           Q.    Don't worry.  I am all the time.

15   But this is the entity that is charged with the

16   duty to enforce the act, the Controlled

17   Substances Act, correct?

18           A.    My understanding, yes.

19           Q.    Okay.  And I want to go through a

20   few things here.  The date of this is actually

21   February 7th of 2007.

22           Do you see that?

23           A.    Yes.

24           Q.    So that's actually over ten years

```
 1    ago, correct?

 2         A.    Correct.

 3         Q.    And this is a letter from, if you

 4    look at the last page, somebody named Joseph

 5    Rannazzisi.

 6               Do you see that?

 7         A.    Yes.

 8         Q.    Okay.  And that's a name that

 9    you're familiar with, right?

10         A.    Yes.

11         Q.    And is it true that this letter and

12    maybe some of the additional letters from

13    Mr. Rannazzisi have become well-known to

14    manufacturers and distributors of opioid

15    narcotics?  Is that fair?

16               MR. HAMMOUD:  Object to the form.

17               THE WITNESS:  I would say that that

18         is fair, yeah.

19    BY MR. CARTMELL:

20         Q.    Okay.  Now, you weren't working at

21    Teva at this time, but let me go through this

22    and ask you some questions about it.  But first

23    it states, Dear sir or madam, this letter is

24    being sent to every commercial entity in the
```

Highly Confidential - Subject to Further Confidentiality Review

1    United States registered with the Drug

2    Enforcement Administration to distribute

3    controlled substances.

4              Now, let me ask you, is it true

5    that a pharmaceutical company like Teva or a

6    distributor like AmerisourceBergen, they have

7    to register with the DEA in order to be allowed

8    to sell or distribute opioid narcotics?

9              MR. HAMMOUD:  Object to the form.

10             THE WITNESS:  Or manufacture.

11   BY MR. CARTMELL:

12        Q.   Or manufacture?

13        A.   Correct.

14        Q.   Okay.  It states, The purpose of

15   this letter is to reiterate the responsibility

16   of controlled substance distributors in view of

17   the prescription drug abuse problem our nation

18   currently faces.

19             Do you see that?

20        A.   Yes.

21        Q.   And we've already talked about

22   that, but clearly back in 2007, at that point

23   already our nation was faced with an opioid

24   addiction and abuse problem, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MR. HAMMOUD:  Object to the form,
 2       lacks foundation.
 3            THE WITNESS:  Well, I'd say that's
 4       a fair assessment.
 5  BY MR. CARTMELL:
 6       Q.   Okay.  And then it states, As each
 7  of you is undoubtedly aware, the abuse or
 8  nonmedical use of controlled prescription drugs
 9  is a serious and growing health problem in this
10  country.
11            And we've talked about that, and
12  you agree with that, correct?
13       A.   Oh, yes.
14       Q.   The next paragraph states, The
15  CSA -- and that would be the Controlled
16  Substances Act, right?
17       A.   My understanding, yes.
18       Q.   -- was designed by Congress to
19  combat diversion by providing for a closed
20  system of drug distribution in which all
21  legitimate handlers of controlled substances
22  must obtain a DEA registration, and as a
23  condition of maintaining such registration,
24  must take reasonable steps to ensure that their
```

Highly Confidential - Subject to Further Confidentiality Review

1    registration is not being utilized as a source

2    of diversion.

3              Do you see that?

4         A.    Yes.

5         Q.    Distributors are, of course, one of

6    the key components of the distribution chain.

7    If the closed system is to function properly as

8    Congress envisioned, distributors must be

9    vigilant in deciding whether a prospective

10   customer can be trusted to deliver controlled

11   substances only for lawful purposes.  This

12   responsibility is critical as Congress has

13   expressly declared that the illegal

14   distribution of controlled substances has a

15   substantial and detrimental effect on the

16   health and welfare of the American people.

17             Do you see that?

18        A.    Yes.

19        Q.    And what this is talking about is

20   that distributors of these drugs and

21   manufacturers of these drugs that are selling

22   these opioid narcotic drugs have a

23   responsibility to try to do everything they can

24   to prevent the diversion of the drugs they are

Highly Confidential - Subject to Further Confidentiality Review

1    manufacturing, selling, and distributing,

2    correct?

3                MR. HAMMOUD:  Object to the form.

4                THE WITNESS:  Well, I think, you

5           know, doing everything we can, I think

6           that's a fair assessment.

7    BY MR. CARTMELL:

8        Q.   Okay.  And then if you go to the

9    next page, I want to talk to you about the

10   second paragraph.  Here's where it talks

11   specifically about manufacturers like Teva.

12               In the second sentence it says,

13   Moreover, all registrants -- manufacturers,

14   distributors, pharmacies, and practitioners --

15   share responsibility for maintaining

16   appropriate safeguards against diversion.

17   Nonetheless, given the extent of prescription

18   drug abuse in the United States, along with the

19   dangerous and potentially lethal consequences

20   of such abuse, even just one distributor that

21   uses its DEA registration to facilitate

22   diversion can cause enormous harm.

23               Do you agree with that?

24       A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.

2            Accordingly, the DEA will use its

3      authority to revoke or suspend registrations in

4      appropriate cases.

5            Do you see that?

6      A.    Yes.

7      Q.    And that's a fact, right, that DEA,

8      as the enforcer of the law, the Controlled

9      Substances Act, if they find that a

10     manufacturer of opioids or a seller or

11     distributor of opioids is allowing diversion or

12     ignoring diversion, or not taking on their duty

13     to try to prevent diversion and abuse of these

14     drugs, the DEA can take away the registration

15     from that company.  Is that fair?

16     A.    They have --

17           MR. HAMMOUD:  Object to the form.

18           THE WITNESS:  I believe they have

19     that ability, yes.

20     BY MR. CARTMELL:

21     Q.    And taking away a company's reg --

22     DEA registration is a really big deal.  Would

23     you agree with that?

24     A.    Oh, I would agree with that, yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.   Because if the registration for the

2     company, a company like Teva, is taken away by

3     the DEA, then that company no longer has the

4     ability to sell or distribute these opioid

5     narcotic drugs.  Is that fair?

6          A.   Or manufacture.

7          Q.   Or manufacture them, right?

8          A.   Correct.

9          Q.   The next paragraph, if you look at

10    the second sentence, states, Listed first among

11    these factors is the duty of distributors to

12    maintain effective controls against diversion

13    of controlled substances into other than

14    legitimate medical, scientific, and industrial

15    channels.

16              Do you see that?

17          A.   Yes.

18          Q.   And does that mean there is a duty

19    by distributors and manufacturers of these

20    opioids, and sellers of these opioid narcotic

21    drugs, that they have to have controls in place

22    in their organization to help prevent the

23    diversion and abuse of these drugs?  Is that

24    what that means?

Highly Confidential - Subject to Further Confidentiality Review

 1          MR. HAMMOUD:  Object to the form.

 2          MR. NICHOLAS:  Object to form.

 3          THE WITNESS:  And I would say

 4     that's a fair assessment.

 5  BY MR. CARTMELL:

 6     Q.   Okay.  If you go down to the next

 7  paragraph, it states, The DEA regulations

 8  require all distributors to report suspicious

 9  orders of controlled substances.

10          Do you see that?

11     A.   Yes.

12     Q.   Now, you talked about you were

13  actually hired by Teva to be the manager of the

14  suspicious order monitoring; is that right?

15     A.   Of the suspicious order monitoring

16  program, yes.

17     Q.   And when we talk about suspicious

18  orders related to opioids, what are we talking

19  about?

20     A.   We're talking about orders that may

21  be of an unusual size, pattern, or frequency.

22     Q.   Okay.  And I think it says this

23  here.  Let's talk about it.

24          The registration -- or excuse me.

1   The registrant shall design and operate a

2   system to disclose to the registrant suspicious

3   orders of controlled substances.

4           Would you agree with me that it's

5   the duty of Teva and all manufacturers and

6   sellers and distributors of these opioids to

7   design a system so that they can, to the best

8   of their ability, have suspicious orders

9   identified?

10          MR. HAMMOUD:  Object to the form.

11          THE WITNESS:  I would say that's a

12      fair assessment, yes.

13  BY MR. CARTMELL:

14      Q.   It then states that the registrant

15  shall inform the field division office of the

16  administration in his area of suspicious orders

17  when discovered by the registrant.

18          Do you see that?

19      A.   Yes.

20      Q.   And "the registrant" is talking

21  about -- in your case Teva would be the

22  registrant because they have a DEA

23  registration, right?

24      A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.   So Teva, according to the law

2   that's been in place since the 1970s, has had,

3   one, the duty to design a system that's

4   effective in helping them to identify the

5   diversion of opioids, correct?

6              MR. HAMMOUD:  Object to the form.

7              THE WITNESS:  Controlled

8         substances, yes.

9   BY MR. CARTMELL:

10       Q.   Including opioids, right?

11       A.   Correct.

12       Q.   And also they've got to operate a

13   system that's effective in disclosing

14   suspicious orders that come to them for these

15   opioids, correct?

16       A.   Correct.

17       Q.   Okay.  And that's been going on --

18   that's been the duty of companies like Teva and

19   distributors of opioids, that duty has existed

20   since the 1970s, correct?

21             MR. HAMMOUD:  Object to the form.

22             THE WITNESS:  I'm not certain when

23        the reg came into effect, but I'll take

24        your word as an attorney.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. CARTMELL:

2         Q.   Well, you know that that -- and I

3    don't mean to put words in your mouth, but I

4    take it from your experience, you know that

5    this duty that we've been talking about, to

6    have a suspicious order monitoring system, one

7    that is effective, that duty has been in effect

8    since before the 1990s.  Fair enough?

9         A.   Oh, that's fair.

10        Q.   If you go a couple paragraphs down,

11   it says, Thus, in addition to reporting all

12   suspicious orders, a distributor has a

13   statutory responsibility to exercise due

14   diligence to avoid filling suspicious orders

15   that might be diverted into

16   other-than-legitimate medical, scientific, and

17   industrial channels.

18             Do you see that?

19        A.   Yes.

20        Q.   And that's the law, right?

21             MR. HAMMOUD:  Object to the form,

22        calls for a legal conclusion.

23             THE WITNESS:  And that's my

24        understanding.
```

1    BY MR. CARTMELL:

2        Q.    I should say that's your

3    understanding of the law as a suspicious order

4    monitoring manager at Teva.  Is that fair?

5        A.    That is a fair assessment, yes.

6        Q.    In other words, your understanding

7    as the manager at Teva since 2014 has been that

8    if your company determines that there are

9    suspicious orders for opioid narcotic drugs

10   that has come to your company, you have the

11   duty to report that to the DEA, correct?

12              MR. HAMMOUD:  Object to the form.

13              THE WITNESS:  That is correct.

14   BY MR. CARTMELL:

15       Q.    And is it true that you also have

16   the duty -- when your company determines that

17   one of your customers has a suspicious order,

18   you have the duty to, in fact, stop that order

19   from being shipped so that it won't likely be

20   diverted out in the community?

21              MR. HAMMOUD:  Object to the form,

22         calls for a legal conclusion.

23              THE WITNESS:  Yeah, I haven't heard

24         that there's a regulatory requirement to

Highly Confidential - Subject to Further Confidentiality Review

1     stop it, but I will say that I don't

2     ship anything that we have determined to

3     be suspicious.

4   BY MR. CARTMELL:

5         Q.   In other words, would you agree

6   with me that the most prudent practice and the

7   most responsible practice would be that if a

8   company like Teva and its manager like you

9   determines that orders are suspicious for these

10  opioids that are narcotics and that you know

11  can be diverted and abused so readily, the best

12  practice and the most responsible practice

13  would be not to ship those orders?  Do you

14  agree with that?

15        MR. HAMMOUD:  Object to the form.

16        THE WITNESS:  I would agree to

17    that.

18  BY MR. CARTMELL:

19        Q.   Okay.  It then states, In a similar

20  vein, given the requirement under Section

21  823(e) that a distributor maintain effective

22  controls against diversion, a distributor may

23  not simply rely on the fact that the person

24  placing the suspicious order is a DEA

Highly Confidential - Subject to Further Confidentiality Review

1    registrant and turn a blind eye to the

2    suspicious circumstances.

3         Do you see that?

4    A.    Yes.

5    Q.    In other words, that means that a

6    company like Teva, if you have an order for

7    opioids that you think may be suspicious and

8    could likely be diverted or abused out in the

9    communities, you can't turn a blind eye and

10   just say, well, I'll go ahead and ship it

11   because the person who made the order is

12   registered with the DEA.  You can't do that,

13   right?

14        MR. HAMMOUD:  Object to the form.

15        THE WITNESS:  And I would say that

16        yes, that is correct.

17   BY MR. CARTMELL:

18   Q.    And just on the -- I don't want to

19   go through them, but if you turn the page,

20   Mr. Tomkiewicz, you'll see that there are

21   actually some hints by the DEA here that were

22   given to distributors and manufacturers of

23   these opioids as far as some things that might

24   be a clue that an order might be suspicious or

1    may be ultimately diverted.

2          Do you see that?

3    A.    Yes.

4    Q.    You can see that they give

5    circumstances that might be indicative of

6    diversion, right?

7    A.    Correct.

8    Q.    And you're very familiar with those

9    circumstances, I take it?

10    A.    Yes, I'm familiar with them.

11    Q.    And you take those circumstances or

12    these hints that are given by the DEA into

13    consideration as the manager that is monitoring

14    suspicious orders.  Is that fair to say?

15    A.    These specifically, when I'm

16    reviewing -- when we're reviewing things that

17    might be suspicious, I wouldn't say we refer

18    back to this document, but they're often

19    included in, you know, how we review.

20    Q.    Okay.  In other words, you're

21    saying, I don't get the document out, but these

22    are some of the things we look for when we're

23    looking for a suspicious order of opioid

24    narcotic drugs, right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   Or any controlled substance, yes.

2    Q.   Okay.  Now, if you go back to the

3  first page, this letter, which is often

4  referred to as the Rannazzisi letter, was --

5  well, let me ask you if you agree with me.

6         This letter that was sent from the

7  Drug Enforcement Administration to all of the

8  manufacturers and sellers and distributors of

9  opioids, including the high-risk opioids that

10  are narcotics and easily diverted, this was

11  sort of a reminder to these manufacturers,

12  sellers, and distributors of the

13  responsibilities and duties they had to help

14  prevent diversions of opioids.  Would you agree

15  with that?

16         MR. HAMMOUD:  Object to the form.

17         THE WITNESS:  And I would not agree

18      with the assessment in your question

19      that certain high-risk, at least as I

20      define them, are easily diverted.  I --

21  BY MR. CARTMELL:

22    Q.   Okay, well, let me restate --

23    A.   -- I would --

24    Q.   Fair enough.

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Yeah, I would reject that.

2          Q.    Fair enough.  Let me restate the

3    question.

4                Would you agree with me that this

5    letter that's often referred to as the

6    Rannazzisi letter was the Drug Enforcement

7    Agency sending a letter to manufacturers,

8    distributors, sellers of opioid narcotic drugs

9    as sort of a reminder and reiterating the

10   duties and responsibilities that they had to

11   try to prevent the diversion of opioid narcotic

12   drugs?  Fair enough?

13               MR. HAMMOUD:  Object to the form.

14               THE WITNESS:  And I would say

15         that's a fair assessment.

16   BY MR. CARTMELL:

17         Q.    Okay.  Do you know, as you sit here

18   today, when it was that Teva first started

19   selling or distributing opioids?

20         A.    No, I don't.

21         Q.    Do you have any clue?

22               MR. HAMMOUD:  Objection, asked and

23         answered.

24               THE WITNESS:  I have no idea.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. CARTMELL:

 2         Q.   Okay.  It should be noted, though,

 3    I think, that when you arrived at Teva in 2014,

 4    at that point I take it you know that they were

 5    selling lots of different Class II opioid

 6    products.  Is that fair?

 7              MR. HAMMOUD:  Object to the form,

 8         lacks foundation.

 9              THE WITNESS:  And -- sorry, but I

10         don't like the term "lots."  I like

11         using numbers.

12    BY MR. CARTMELL:

13         Q.   Well, I counted, from the documents

14    I received, that today, Teva is selling, I

15    believe, 18 or 19 Class II opioid narcotic

16    drugs.  Is that consistent with your

17    understanding?

18         A.   That could be consistent, yes.

19         Q.   And I said "lots."  But when you

20    arrived in 2014, is it fair to say that Teva

21    was selling a number of different opioid --

22    Class II opioid narcotic drugs?  Fair to say?

23              MR. HAMMOUD:  Object to the form.

24              THE WITNESS:  I would say that's
```

1    fair to say.

2    BY MR. CARTMELL:

3         Q.   And fair to say that Teva sells and

4    distributes millions of prescriptions for

5    opioid narcotic drugs?  Fair?

6              MR. HAMMOUD:  Object to the form.

7              THE WITNESS:  We don't dispense

8         prescriptions.

9    BY MR. CARTMELL:

10        Q.   Bad question.  Thank you for

11   correcting that.

12             Is it fair to say that Teva sells

13   and distributes millions and millions of opioid

14   narcotic drug pills per year?

15             MR. HAMMOUD:  Object to the form.

16             THE WITNESS:  I haven't looked at

17        the specific number of dosage units, but

18        I'm sure it's in the millions.  But

19        beyond that, I couldn't say millions and

20        millions.  And to say -- we've sold a

21        good number of them.

22   BY MR. CARTMELL:

23        Q.   And I think I've seen data that

24   suggests that today, or since 2016, Teva has

1    been, as far as the sales of opioid drugs,

2    about at the 9 to 10 percent of the sales are

3    of Teva opioid products.  Is that consistent

4    with your understanding?

5                MR. HAMMOUD:  Object to the form,

6          lacks foundation.

7                THE WITNESS:  I don't know that

8          offhand.

9    BY MR. CARTMELL:

10         Q.   But you agree that Teva is one of

11   the larger sellers and distributors of opioid

12   narcotic drugs in America, correct?

13         A.   I would say that's a fair

14   assessment, yes.

15         Q.   And those are all things that, when

16   you came to Teva, some of the things that you

17   looked into, I take it, and learned as you

18   started in your job as the new suspicious order

19   manager; is that right?

20         A.   Right.  Well, looking at the -- you

21   know, which specific products we were selling,

22   which, of course, was a different mix when I

23   started from what is currently being sold.

24         Q.   We talked about the law, the

Highly Confidential - Subject to Further Confidentiality Review

1  Controlled Substances Act, and the DEA

2  enforcement of a law related to the sales of

3  opioids in America.  And is it true that the

4  DEA has actually left the responsibility to the

5  manufacturers and sellers and distributors of

6  opioids to design, internally, systems to help

7  prevent opioid diversion?

8         MR. HAMMOUD:  Objection to the

9     form.

10        THE WITNESS:  Could you ask that

11     again?  I got lost in the question.

12  BY MR. CARTMELL:

13     Q.   Sure.  Is it true that the DEA has

14  left the responsibility or relies on the

15  manufacturers and distributors and sellers of

16  opioid narcotic drugs in America to develop the

17  systems to help divert -- their internal

18  systems to help divert opioids -- help to

19  prevent the diversion of opioids?

20     A.   So are --

21        MR. HAMMOUD:  Same objection.

22        THE WITNESS:  Yeah, are you saying

23     that the DEA has sort of left the

24     manufacturers on their own to develop

Highly Confidential - Subject to Further Confidentiality Review

1        their own system to detect potential

2        diversion?

3    BY MR. CARTMELL:

4        Q.   Let me restate the question to make

5    it more clear.

6             As we saw from the Controlled

7    Substances Act, it requires manufacturers like

8    Teva to develop internal systems that will

9    help, for one thing, identify suspicious orders

10   of opioids, right?

11       A.   Correct.

12       Q.   It also said in the Controlled

13   Substances Act that manufacturers like Teva who

14   sell opioids have to design systems internally

15   to help prevent the diversion of opioids,

16   correct?

17            MR. HAMMOUD:  Object to the form.

18            THE WITNESS:  Of any controlled

19       substance.

20   BY MR. CARTMELL:

21       Q.   Including opioids, right?

22       A.   Yes.

23       Q.   And is it true that the DEA

24   actually relies on Teva and the individual

Highly Confidential - Subject to Further Confidentiality Review

1    manufacturers and sellers and distributors of

2    opioids to, in fact, develop those systems and

3    make sure they have effective systems in place

4    and monitoring programs in place so that they

5    can help divert the -- or help prevent the

6    diversion of opioids?

7              MR. HAMMOUD:  Same objection.

8              THE WITNESS:  And I wouldn't say --

9         I couldn't say that the DEA relies on

10        manufacturers and distributors for that.

11        Because when it comes to suspicious

12        order monitoring, they really haven't

13        given any feedback.

14   BY MR. CARTMELL:

15        Q.   Okay.  But you know from the

16   Controlled Substances Act that you have to have

17   systems in place --

18        A.   Correct.

19        Q.   -- right?  And the DEA does not

20   develop those systems for you, correct?

21        A.   The DEA has not developed our

22   system, no.

23        Q.   Okay.  And so you are left as a

24   manufacturer, meaning Teva, of these opioids to

1   develop those systems yourself, correct?

2        A.    Correct.

3        Q.    And the DEA does rely on each of

4   the companies like Teva to develop those

5   systems to help prevent opioid diversion,

6   correct?

7                  MR. HAMMOUD:  Object to the form.

8                  THE WITNESS:  Well, and again, I

9             can't say that the DEA relies on because

10            I don't know what the DEA is doing on

11            their end.  So in terms of, you know,

12            saying that the DEA relies on, you know,

13            manufacturers or distributors or even

14            down to pharmacies or practitioners, I

15            can't say that.

16   BY MR. CARTMELL:

17        Q.    Okay.  One of the things, though,

18   that companies like Teva, as we discussed, are

19   interested in is maximizing the sales of their

20   prescription drugs like opioids, including

21   opioids, correct?

22                  MR. HAMMOUD:  Object to the form,

23            lacks foundation.

24                  THE WITNESS:  Maximizing?  I think

Highly Confidential - Subject to Further Confidentiality Review

1          that's a horrible word for it.  No

2          offense, but...

3     BY MR. CARTMELL:

4          Q.    How would you describe it?

5          A.    Companies want to increase

6     profitability.  That's the reason why people

7     are in business.

8          Q.    Mr. Tomkiewicz, the DEA, as we saw,

9     has told Teva and companies like Teva who sell

10    and distribute opioids to set up systems that

11    will identify suspicious orders of opioids,

12    correct?

13         A.    Correct.

14         Q.    And they've asked those companies

15    to take it upon themselves to provide the

16    resources and actual processes to put in

17    effective types of monitoring programs to find

18    suspicious orders, correct?

19              MR. HAMMOUD:  Object to the form.

20              THE WITNESS:  I would say that's a

21         fair assessment.

22    BY MR. CARTMELL:

23         Q.    And these same companies that the

24    DEA has asked to set up these systems so that

Highly Confidential - Subject to Further Confidentiality Review

1    they can find these suspicious orders are

2    companies like Teva who, as you said, are

3    interested in maximizing their profits,

4    correct?

5         A.   I never said that.

6              MR. HAMMOUD:  Objection,

7         mischaracterizes his testimony.

8              THE WITNESS:  In fact, I

9         categorically denied the word

10        "maximize."

11   BY MR. CARTMELL:

12        Q.   How did you describe it?  I'll use

13   your words.

14        A.   I said that any company wants to

15   increase profits.  That's why you're in

16   business.

17        Q.   So these companies that the DEA has

18   asked to set up these systems to help prevent

19   the diversion of opioids are the same companies

20   that want to increase their profits, correct?

21        A.   I think that's a goal of business.

22        Q.   And part of increasing profits, as

23   we've discussed, is potentially, or can be,

24   increasing their sales, correct?

1     A.    Correct.

2          Q.    So they're asking companies that

3    want to increase their sales and increase their

4    profits to set up systems that could, if they

5    find suspicious orders, decrease their sales,

6    correct?

7               MR. HAMMOUD:  Object to the form.

8               THE WITNESS:  Well, and that's --

9          that is correct.  I would say that's a

10         fair assessment.

11   BY MR. CARTMELL:

12         Q.    So these same companies that

13   they're saying that we want you to identify

14   these orders that are suspicious, and we want

15   you to make sure that they are stopped so

16   they're not diverted, are the same companies

17   that want to increase sales and increase

18   profits over time, correct?

19         A.    Well, it's going to be difficult to

20   increase sales if you don't have a DEA

21   registration.

22         Q.    I understand that, but my point is

23   simply that there is an inherent conflict in

24   that system, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.   Well, that's what I'm saying.
 2   There isn't an inherent conflict.
 3           Q.   You don't believe that's a conflict
 4   or sort of, so to speak, the fox guarding the
 5   hen house?
 6           A.   No.
 7                MR. HAMMOUD:  Object to the form.
 8                MR. CARTMELL:  How long have we
 9           been going?
10                MR. HAMMOUD:  About an hour and
11           three minutes.
12                MR. CARTMELL:  Do you want to take
13           a quick break?
14                THE WITNESS:  A break sounds good.
15                MR. CARTMELL:  Like ten minutes?
16                VIDEO OPERATOR:  Going off the
17           record, 2 p.m.
18                (Recess from 2:03 p.m. until
19           2:15 p.m.)
20                VIDEO OPERATOR:  Back on record at
21           2:15 p.m.
22   BY MR. CARTMELL:
23           Q.   Mr. Tomkiewicz, we're back on the
24   record.  Are you ready to proceed?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Yes, I am.

2          Q.    I want to ask you a few more

3    questions about Exhibit 3.  I think it's in

4    front of you.  And this was the PowerPoint

5    presentation from March of 2014, which was just

6    a few months after you arrived at the company

7    to start working, correct?

8          A.    Correct.

9          Q.    And if we look at page 3, as we

10   discussed, there was a proposed DEA compliance

11   organization, and as we discussed, there was a

12   small restructuring or a few people moving

13   around, according to this proposed

14   organization; is that correct?

15         A.    Correct.

16         Q.    And did that small restructuring

17   occur at that time; do you know?

18         A.    I believe it did.

19         Q.    Okay.  And if you look at where you

20   are, Joe Tomkiewicz, it states under you, you

21   had one individual reporting to you, Matt

22   Benkert; is that right?

23         A.    That's correct.

24         Q.    And his position was -- it

 1    indicates he's an investigator; is that right?

 2         A.    Correct.

 3         Q.    So does that mean that he would be

 4    somebody who would actually be involved in

 5    investigating the suspicious orders?

 6         A.    Potential suspicious orders.

 7         Q.    Okay.

 8         A.    Investigating orders to determine

 9    if they're suspicious.

10         Q.    I got you.  Okay.  And we'll talk

11    about that process more, but I think what

12    you're talking about is orders would be

13    sometimes flagged or pulled aside or pended

14    after going through the computer system or the

15    algorithm, and then there would be an

16    investigation of that to see if it was

17    suspicious or not, correct?

18         A.    Correct.

19         Q.    Okay.  Now, how many actually of

20    the 16 employees in this organization or this

21    department were actually involved in the

22    investigation of suspicious orders or pended

23    orders?

24         A.    Oh, of pended orders?  It was

1    primarily -- primarily Matt and myself.

2         Q.   Okay.  So of the 16 individuals

3    indicated in the organization as of March of

4    2014, it sounds like what you were saying is

5    you and your direct -- well, the person who was

6    directly under you, Matt, were the two that

7    would actually take on the job of investigating

8    whether or not orders from customers for

9    opioids were suspicious or not.  Is that fair?

10        A.   That is fair.

11        Q.   Okay.  And if you go to the next

12   page of this PowerPoint, it talks about

13   predictions, and then it states, Controlled

14   substances - Teva, 13 sites with DEA

15   registrations.

16             Do you see that?

17        A.   Yes.

18        Q.   What does that mean?

19        A.   13 locations, each with an

20   individual DEA registration.

21        Q.   Okay.  And so you had 13 different

22   sites that were distributing opioids or

23   narcotics and were DEA registered; is that

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.   No.

2              MR. HAMMOUD:  Object to the form.

3              THE WITNESS:  No, that's not

4         correct.

5    BY MR. CARTMELL:

6         Q.   Okay.  Well, 13 -- strike that.

7              It also states that you have a

8    total of 44 DEA registrations.

9              Do you see that?

10        A.   Yes.

11        Q.   Okay.  And so you had 16 people

12   that were in charge of what, with respect to

13   the DEA registrations?  Was it to make sure

14   they were in compliance?

15             MR. HAMMOUD:  Object to the form.

16             THE WITNESS:  Well, it depends upon

17        the person and their specific

18        responsibilities and their location.

19   BY MR. CARTMELL:

20        Q.   Okay.  As far as your DEA

21   compliance group, is it true that those 16

22   employees were located in lots of different

23   locations?

24        A.   In different locations, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Was Colleen McGinn in the

2  same location as you?

3    A.    No.

4    Q.    Okay.  And where was she located?

5    A.    I believe she's in the Frazer

6  location.

7    Q.    Okay.  But there wasn't one

8  centralized location for all of the DEA control

9  employees; they were spread out among the

10  different offices, correct?

11          MR. HAMMOUD:  Object to the form.

12          THE WITNESS:  Correct.

13  BY MR. CARTMELL:

14    Q.    Is that correct?

15    A.    That's -- is correct.

16    Q.    It says, CS -- that stands for

17  controlled substances, correct?

18    A.    Yes.

19    Q.    -- represent X percent of Teva

20  sales.  What does that mean?

21    A.    I don't know specific.  I can make

22  a conjecture.

23    Q.    Okay.

24    A.    That this is a draft.