# EXHIBIT 10

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4                       - - -
 5
      IN RE:  NATIONAL         :   HON. DAN A.
 6    PRESCRIPTION OPIATE      :   POLSTER
      LITIGATION               :
 7                             :
      APPLIES TO ALL CASES     :   NO.
 8                             :   1:17-MD-2804
                               :
 9
                - HIGHLY CONFIDENTIAL -
10
      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                       VOLUME II
12
                         - - -
13
                    April 18, 2019
14
                         - - -
15
16             Continued videotaped
      deposition of THOMAS PREVOZNIK, taken
17    pursuant to notice, was held at the law
      offices of Williams & Connolly, 725 12th
18    Street, Washington, D.C., beginning at
      8:16 a.m., on the above date, before
19    Michelle L. Gray, a Registered
      Professional Reporter, Certified
20    Shorthand Reporter, Certified Realtime
      Reporter, and Notary Public.
21
                         - - -
22
             GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

1             MR. FARRELL:  Did I make a
2      mistake?  Sorry I got that
3      backwards.
4             Number 4 is from March 13,
5      1971.  It's Volume 36, Number 50,
6      from the Federal Register.
7             Plaintiffs' Exhibit 5 is
8      from April 24, 1971, from the
9      Federal Register, Volume 36,
10     Number 80.
11            (Document marked for
12     identification as Exhibit
13     DEA-Prevoznik-P-5.)
14            MR. FARRELL:  And we
15     referenced Paragraph 6 at the top
16     of the first page.
17            (Document marked for
18     identification as Exhibit
19     DEA-Prevoznik-P-6.)
20            MR. FARRELL:  Plaintiffs' 6
21     is another slide that's been used
22     in the McKesson depositions of
23     Nate Hardle, 30(b)(6).  And it's
24     simply a demonstrative exhibit of

Highly Confidential - Subject to Further Confidentiality Review

1      21 C.F.R. 1301.74.
2           (Document marked for
3      identification as Exhibit
4      DEA-Prevoznik-P-7.)
5           MR. FARRELL:  Plaintiffs' 7
6      is a document produced by Cardinal
7      Health in discovery and MDL2804.
8           It begins with Bates stamp
9      CAH_MDL2804_01465723, and it
10     extends all the way through
11     CAH_MDL2804_01465734.
12          It's Plaintiffs' Exhibit 7.
13     And I'll represent that it was
14     also in the government reliance
15     materials that they produced
16     yesterday at deposition.
17          That brings us up-to-date
18     for all of the demonstrative
19     exhibits that were used so far on
20     the record.
21          MR. STEPHENS:  Thank you.
22          MR. FINKELSTEIN:  So should
23     we go off the record and bring the
24     witness back?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. FARRELL:  Yes.

2           MS. MAINIGI:  Yes.

3           THE VIDEOGRAPHER:  2:51.  We

4      are off the video record.

5           (Brief pause.)

6           THE VIDEOGRAPHER:  2:55.  We

7      are on the video record.

8           MR. FARRELL:  More

9      housecleaning.  Earlier today we

10     referenced -- more housecleaning.

11           Earlier we referenced a

12     position taken by Cardinal Health

13     in a pleading.  It's United States

14     District Court for the -- United

15     States District Court for the

16     District of Columbia, Cardinal

17     Health versus Eric Holder, Case

18     Number 1:12-cv-00185-RBW.

19           It is Document 16 in the

20     pleading index, filed on

21     February 13, 2012.  It's

22     previously been circulated, I'll

23     show it to you, even though it's

24     not being admitted through this

1          witness.
2                   For the record that's the
3          document that I referenced.
4                   (Document marked for
5          identification as Exhibit
6          DEA-Prevoznik-P-8.)
7                   MR. FARRELL:  Same thing
8          with earlier today, I referenced
9          what's being marked now -- that
10         was Plaintiff 8.  This is going to
11         be Plaintiff 9.
12                  (Document marked for
13         identification as Exhibit
14         DEA-Prevoznik-P-9.)
15                  MR. FARRELL:  And this is a
16         single page from a document with a
17         Bates stamp MCK MDL 00409239.  And
18         again, this is a document that was
19         produced by McKesson in discovery
20         that I referenced and asked
21         questions about it with this
22         witness.
23                  MR. FINKELSTEIN:  Are you
24         going to provide me with copies?

 1              MR. FARRELL:  Yes.
 2              Did you get a copy of the
 3       NWDA policy?
 4              MR. FINKELSTEIN:  Thanks.
 5              MR. FARRELL:  That's
 6       previously been made.
 7              MR. FINKELSTEIN:  Just wait
 8       for a question.
 9   BY MR. FARRELL:
10       Q.   Mr. Prevoznik, the next
11   document I'm going to reference is
12   actually in your notebook.
13       A.   Okay.
14       Q.   In the reliance materials
15   that you disclosed yesterday.
16            And it's the -- from the
17   1996 diversion investigators manual.
18   Section 5126.
19              MR. FARRELL:  Bring it up on
20       the screen.  And pass it down.
21              Here is some extra copies in
22       case people didn't bring their
23       notebooks back.
24   BY MR. FARRELL:

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    On behalf of the DEA, do you
 2    recognize this document?
 3          A.    Yes, I do.
 4          Q.    What is it?
 5          A.    It is part of our diversion
 6    investigators manual.
 7          Q.    What does that mean?
 8                What -- what is a diversion
 9    investigators manual?
10          A.    It's a manual that breaks
11    down our responsibilities, our job.
12    It -- it covers the whole gambit of what
13    registration is -- what a registrant is,
14    down to record reports, requirements.  It
15    goes through our scheduled
16    investigations, pre-registration
17    investigations, how to -- conducting
18    audits when we do the scheduled
19    investigation, what topics, what areas to
20    cover.
21                It covers controlled
22    substances -- controlled substances.  It
23    also covers the chemicals, List I
24    chemicals, the requirements of that, as
```

1   well as preregistration investigations of
2   chemicals, applicants.
3            It covers the -- the gambit
4   of exactly what our job is.
5       Q.   Are these -- in this page
6   that we're showing here, the bottom
7   right-hand corner is a Bates stamp.  Can
8   you read that Bates stamp?
9       A.   00025231.
10      Q.   Okay.  Is this a document
11  produced by the DEA in this litigation at
12  the request of counsel for the diversion
13  investigators manual from 1996?
14           MR. FINKELSTEIN:  Scope.
15           We'll stipulate that we
16      produced it.
17           MR. FARRELL:  Thank you.
18  BY MR. FARRELL:
19      Q.   So the title of Section 5126
20  says what?
21      A.   Requirement to report
22  suspicious orders.
23      Q.   Would you read the first
24  sentence of the first paragraph aloud?

1      A.   "Registrants are required to
2  inform DEA of suspicious orders in
3  accordance with 21 C.F.R. 1301.74(b).
4  DEA field offices are not to approve or
5  disapprove supplier shipments of
6  controlled substances.  The
7  responsibility for making the decision to
8  ship rests with the supplier.  No (sic)
9  exception to this occurs when a supplier
10 complies with a DEA field office's
11 request to initiate a controlled delivery
12 of controlled substances."
13      Q.   Is this consistent with the
14 guidance provided by the DEA to
15 registrants?
16           MS. MAINIGI:  Objection.
17           THE WITNESS:  Yes.
18           MR. FARRELL:  Now, if you'll
19      go down to -- keep going.
20 BY MR. FARRELL:
21      Q.   Beginning with
22 "registrants," could you begin reading,
23 please.
24      A.   "Registrants who routinely

Highly Confidential - Subject to Further Confidentiality Review

1  report suspicious orders, yet fill these
2  orders, with reason to believe they are
3  destined for the illicit market, are
4  expressing an attitude of
5  irresponsibility that is detriment to the
6  public health and safety as set forth in
7  21 U.S.C. 823 and 824."
8        Q.    Thank you.  Is this
9  consistent with the guidance provided by
10  the DEA to registrants?
11             MS. MAINIGI:  Objection to
12        form.
13             MR. FINKELSTEIN:  Objection.
14        Form.
15             THE WITNESS:  Yes.
16  BY MR. FARRELL:
17        Q.    So this is the official
18  policy of the DEA as of 1996, agreed?
19        A.    Yes.
20        Q.    Is this the position that
21  the DEA was instructing its diversion
22  investigators to take when looking into
23  cases involving the distribution of
24  controlled substances?

```
 1                MS. MAINIGI:  Objection to
 2      form.
 3                MR. FINKELSTEIN:  Vague as
 4      to time.
 5   BY MR. FARRELL:
 6      Q.    In 1996.
 7      A.    Yes.
 8      Q.    Are you aware of any
 9   deviation or change from that position by
10   the DEA since 1996?
11                MS. MAINIGI:  Objection.
12                THE WITNESS:  No.
13   BY MR. FARRELL:
14      Q.    So the next sentence is just
15   a recitation of the suspicious order
16   definition.  What I'd like you to do is
17   go down to where it starts, "The supplier
18   can determine," and begin reading aloud.
19      A.    "The supplier can determine
20   whether the order is excessive by
21   checking their own sales and establishing
22   the average amount of controlled
23   substances shipped to registrants of the
24   same apparent size in a particular
```

1   geographic area."
2       Q.   Read the next sentence,
3   please.
4       A.   "If the customer exceeds
5   this threshold, the request should be
6   viewed as suspicious."
7       Q.   Is this consistent with the
8   guidance that the DEA provided to
9   registrants since at least 1996?
10           MS. MAINIGI:  Objection to
11      form.
12           THE WITNESS:  Yes.
13  BY MR. FARRELL:
14      Q.   Is this the position that
15  the DEA -- strike that.
16           The reading of this seems to
17  indicate that if you exceed an average
18  amount, if a customer exceeds an average
19  amount -- let me start over.
20           This directive that DEA had
21  internally seems to indicate that it
22  considered that an order in excess of a
23  customer's average amount should be
24  deemed suspicious.  Is that a fair

Highly Confidential - Subject to Further Confidentiality Review

1  depiction?

2    A.    Could you please --

3          MS. MAINIGI:  Objection to

4    form.

5          THE WITNESS:  Could you

6    please repeat that.

7  BY MR. FARRELL:

8    Q.    Yeah.  When I read this, it

9  seems to indicate that a wholesale

10  distributor should watch the average

11  purchase by a customer over time, and if

12  that average is exceeded, it should be

13  deemed suspicious.  Is that a fair

14  reading of this provision?

15          MR. FINKELSTEIN:  Object to

16    the characterization.

17          MS. MAINIGI:  Object to

18    form.  Calls for a legal

19    conclusion.

20          THE WITNESS:  Well, I think

21    it also includes that it has to

22    look at the other registrants in

23    that area.  It's not just the

24    registrant that's ordering, but

```
 1            it's also comparing against the
 2            other registrants in that area.
 3    BY MR. FARRELL:
 4        Q.   So if you take an average of
 5    the registrants in the area and you
 6    calculate that, if a customer exceeds
 7    that average, is that a red flag for a
 8    wholesale distributor that the order may
 9    be suspicious?
10              MS. MAINIGI:  Objection.
11         Calls for speculation.  Objection
12         to form.
13              THE WITNESS:  Yes.
14    BY MR. FARRELL:
15        Q.   And is that consistent with
16    the directives the DEA has given to
17    registrants since at least 1996?
18              MS. MAINIGI:  Objection to
19         form.
20              THE WITNESS:  Yes.
21    BY MR. FARRELL:
22        Q.   The next sentence, would you
23    read, please.
24        A.   I forgot where I stopped.
```

```
 1            Q.    "This activity."
 2            A.    "This activity, over
 3    extended periods of time, would lead a
 4    reasonable person to believe that
 5    controlled substances possibly are being
 6    diverted.
 7            Q.    Now, so what I'm asking you
 8    is, when you read this, is it fair to
 9    assume that this is consistent with the
10    DEA's guidance to industry since at least
11    1996?
12                  MR. FINKELSTEIN:  Objection.
13         Vague.
14                  MS. MAINIGI:  Objection to
15         form.
16                  THE WITNESS:  Yes.
17    BY MR. FARRELL:
18            Q.    Would you read the next
19    sentence, please.
20            A.    "An investigation will be
21    conducted for possible violation of the
22    CSA and regulations upon determining that
23    the reporting registrant, as a general
24    practice, does not voluntarily halt
```

1  shipments of controlled substances to

2  registrants involved in suspected

3  diversion or to registrants against whom

4  previous action has been taken."

5      Q.   Is this consistent with the

6  guidance provided by the DEA to

7  registrants since at least 1996?

8      A.   Yes.

9           MS. MAINIGI:  Objection to

10         form.

11 BY MR. FARRELL:

12     Q.   This last sentence that you

13 read contains a statement that "a

14 registrant shall not ship a suspicious

15 order."  Is that a fair reading?

16          MR. FINKELSTEIN:  Objection.

17          MR. EPPICH:  Objection to

18     form.

19          MR. FINKELSTEIN:  Object to

20     the form.

21 BY MR. FARRELL:

22     Q.   Strike that.  I'll ask it

23 again.

24          Based upon this 1996