# EXHIBIT 12

Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF OHIO
 2                 EASTERN DIVISION

 3

    IN RE: NATIONAL          )
 4  PRESCRIPTION             )  MDL No. 2804
    OPIATE LITIGATION        )
 5  _____  )  Case No.
                             )  1:17-MD-2804
 6                           )
    THIS DOCUMENT RELATES     )  Hon. Dan A.
 7  TO ALL CASES             )  Polster

 8

             TUESDAY, JULY 31, 2018
 9

     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10            CONFIDENTIALITY REVIEW
11                  - - -
12          Videotaped deposition of Nathan J.
13  Hartle, held at the offices of Covington &
14  Burlington, LLP, One City Center, 850 Tenth
15  Street Northwest, Washington, DC, commencing
16  at 9:04 a.m., on the above date, before
17  Carrie A. Campbell, Registered Diplomate
18  Reporter, Certified Realtime Reporter,
19  Illinois, California & Texas Certified
20  Shorthand Reporter, Missouri & Kansas
21  Certified Court Reporter.
22                  - - -
             GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S :
 2
 3      MCHUGH FULLER LAW GROUP
        BY:  MICHAEL J. FULLER, JR., ESQUIRE
 4           mike@mchughfuller.com
        97 Elias Whiddon Road
 5      Hattiesburg, Mississippi 39402
        (601) 261-2220
 6
        GREENE KETCHUM BAILEY WALKER FARRELL
 7      & TWEEL
        BY:  PAUL T. FARRELL, JR., ESQUIRE
 8           paul@greeneketchum.com
        419 Eleventh Street
 9      Huntington, West Virginia 25701
        (314) 525-9115
10
        LEVIN, PAPANTONIO, THOMAS, MITCHELL,
11      RAFFERTY & PROCTOR, P.A.
        BY:  TROY RAFFERTY, ESQUIRE
12           trafferty@levinlaw.com
             BRANDON BOGLE, ESQUIRE
13           bbogle@levinlaw.com
        316 South Baylen Street, Suite 600
14      Pensacola, Florida 32502
        (850) 435-7000
15
        SPANGENBERG SHIBLEY & LIBER LLP
16      BY:  PETER H. WEINBERGER, ESQUIRE
             pweinberger@spanglaw.com
17           (VIA TELECONFERENCE)
        1001 Lakeside Avenue East
18      Cleveland, Ohio 44114
        (216) 600-0114
19      Counsel for Plaintiffs
20
        COVINGTON & BURLING LLP
21      BY:  EMILY JOHNSON HENN, ESQUIRE
             ehenn@cov.com
22           MEGHAN MONAGHAN, ESQUIRE
             mmonaghan@cov.com
23      850 Tenth Street, NW
        Washington, DC 20001-4956
24      (202) 662-6000
        Counsel for McKesson Corporation
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      WILLIAMS & CONNOLLY LLP
        BY:  COLLEEN MCNAMARA, ESQUIRE
 2           cmcnamara@wc.com
             MIRANDA PETERSEN, ESQUIRE
 3           mpetersen@wc.com
        725 Twelfth Street, N.W.
 4      Washington, DC 20005
        (202) 434-5331
 5      Counsel for Cardinal Health, Inc.
 6
        REEDSMITH LLP
 7      BY:  THOMAS H. SUDDATH, JR., ESQUIRE
             tsuddath@reedsmith.com
 8      Three Logan Square
        1717 Arch Street, Suite 3100
 9      Philadelphia, Pennsylvania 19103
        (215) 851-8100
10      Counsel for AmerisourceBergen
11
        JONES DAY
12      BY:  CHRISTOPHER J. LOVRIEN, ESQUIRE
             cjlovrien@jonesday.com
13      555 South Flower Street, 50th Floor
        Los Angeles, California 90071-2452
14      (213) 489-3939
        Counsel for Walmart
15
16      PELINI, CAMPBELL & WILLIAMS LLC
        BY:  CRAIG G. PELINI, ESQUIRE
17           cgp@pelini-law.com
        8040 Cleveland Avenue NW, Suite 400
18      North Canton, Ohio 44720
        (330) 305-6400
19      Counsel for Prescription Supply,
        Inc.
20
21      JACKSONKELLY PLLC
        BY:  WILLIAM J. AUBEL, ESQUIRE
22           william.j.aubel@jacksonkelly.com
             (VIA TELECONFERENCE)
23      500 Lee Street East, Suite 1600
        Charleston, West Virginia 25301
24      (304) 340-1146
        Counsel for Miami-Luken
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       ZUCKERMAN SPAEDER LLP
         BY:  CONOR B. O'CROININ, ESQUIRE
 2            cocroinin@zuckerman.com
         100 East Pratt Street, Suite 2440
 3       Baltimore, Maryland 21202-1031
         (202) 778-1800
 4       Counsel for CVS Indiana, LLC, and
         CVS RX Services, Inc.
 5
 6       ARNOLD & PORTER
         BY:  DAVID D. FAUVRE, ESQUIRE
 7            David.Fauvre@arnoldporter.com
         601 Massachusetts Avenue, NW
 8       Washington, DC 20001-3743
         (202) 942-5000
 9       Counsel for Endo Pharmaceuticals
         Inc., and Endo Health Solutions Inc.
10
11       ROPES & GRAY
         BY:  WILLIAM T. DAVISON, ESQUIRE
12            william.davison@ropesgray.com
         800 Boylston Street
13       Boston, Massachusetts 02199-3600
         (617) 951-7000
14       Counsel for Mallinckrodt
15
         MARCUS & SHAPIRA LLP
16       BY:  SCOTT D. LIVINGSTON, ESQUIRE
              livingston@marcus-shapira.com
17       301 Grant Street, 35th Floor
         Pittsburgh, Pennsylvania 15219-6401
18       (412) 338-4690
         Counsel for HBC
19
20       MORGAN, LEWIS & BOCKIUS LLP
         BY:  MONICA C. PEDROZA, ESQUIRE
21            monica.pedroza@morganlewis.com
              (VIA TELECONFERENCE)
22       77 West Wacker Drive, Fifth Floor
         Chicago, Illinois 60601
23       (312) 324-1000
         Counsel for Teva Pharmaceuticals
24       USA, Inc., Cephalon, Inc., Watson
         Laboratories, Actavis LLC, Actavis
25       Pharma, Inc., f/k/a Watson Pharma
```

```
 1        MORGAN, LEWIS & BOCKIUS LLP
          BY:  JOHN P. LAVELLE, JR., ESQUIRE
 2             john.lavelle@morganlewis.com
               (VIA TELECONFERENCE)
 3        1701 Market Street
          Philadelphia, Pennsylvania 19103-2921
 4        (215) 963-5000
          Counsel for Rite Aid
 5
 6        LOCKE LORD LLP
          BY:  BRANDAN MONTMINY, ESQUIRE
 7             brandan.montminy@lockelord.com
               (VIA TELECONFERENCE)
 8        2200 Ross Avenue, Suite 2800
          Dallas, Texas 75201
 9        (214) 740-8445
          Counsel for Henry Schein, Inc., and
10        Henry Schein Medical Systems, Inc.
11
          KIRKLAND & ELLIS
12        BY:  KAITLYN L. COVERSTONE, ESQUIRE
               kaitlyn.coverstone@kirkland.com
13             (VIA TELECONFERENCE)
          300 North LaSalle
14        Chicago, IL 60654
          (312) 862-3671
15        Counsel for Allergan Finance, LLC
16
      VIDEOGRAPHER:
17        DANIEL HOLMSTOCK,
          Golkow Litigation Services
18
19    TRIAL TECHNICIAN:
          COREY SMITH,
20        Golkow Litigation Services
21                    - - -
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review



1              INDEX
2                                    PAGE
   APPEARANCES.....................................  2
4   EXAMINATIONS
5      BY MR. FARRELL............................  15
6
7                  EXHIBITS
8         No.        Description              Page

24
25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



25

Highly Confidential - Subject to Further Confidentiality Review



16          (Exhibits attached to the deposition.)

17
    CERTIFICATE.................................368
18  ACKNOWLEDGMENT OF DEPONENT...................370
    ERRATA......................................371
19  LAWYER'S NOTES..............................372
20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    VIDEOGRAPHER:  All right.  We

 2          are now on the record.

 3                    My name is Daniel Holmstock.  I

 4          am the videographer for Golkow

 5          Litigation Services.

 6                    Today's date is July 31, 2018.

 7          The time on the video screen is

 8          9:04 a.m.

 9                    This video deposition is being

10          recorded at the law firm of Covington

11          & Burling LLP at 850 Tenth Street,

12          Northwest, in Washington, DC, in the

13          matter of In Re: National Prescription

14          Opiate Litigation.  It is pending

15          before the United States District

16          Court for the Northern District of

17          Ohio, Eastern Division.

18                    The deponent today is Mr. Nate

19          Hartle.

20                    Will counsel please introduce

21          themselves and whom they represent.

22                    MR. FARRELL:  Paul Farrell on

23          behalf of the plaintiffs.

24                    MR. RAFFERTY:  Troy Rafferty on

25          behalf of the plaintiffs.
```

```
 1              MR. FULLER:  Mike Fuller on
 2       behalf of plaintiffs.
 3              MR. SUDDATH:  Tom Suddath on
 4       behalf of AmerisourceBergen.
 5              MR. BOGLE:  Brandon Bogle on
 6       behalf of the plaintiffs.
 7              MR. PELINI:  Craig Pelini,
 8       Prescription Supply.
 9              MR. FAUVRE:  David Fauvre on
10       behalf of the Endo and Par
11       Pharmaceutical defendants.
12              MR. LOVRIEN:  Chris Lovrien,
13       Jones Day, on behalf of Walmart.
14              MR. DAVISON:  Bill Davison,
15       Ropes & Gray, on behalf of
16       Mallinckrodt, LLC, and SpecGx, LLC.
17              MS. PETERSEN:  Miranda
18       Petersen, Williams & Connolly, on
19       behalf of Cardinal Health, Inc.
20              MS. MCNAMARA:  Colleen
21       McNamara, Williams & Connolly, on
22       behalf of Cardinal Health, Inc.
23              MR. LIVINGSTON:  Scott
24       Livingston on behalf of HBC.
25              MR. O'CROININ:  Conor
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          O'Croinin, CVS.
 2              MS. MONAGHAN:  Meghan Monaghan,
 3          Covington & Burling, on behalf of
 4          McKesson and the witness.
 5              MS. HENN:  Emily Henn,
 6          Covington & Burling, on behalf of
 7          McKesson and the witness.
 8              VIDEOGRAPHER:  Via telephone?
 9              MS. PEDROZA:  This is Monica
10          Pedroza on behalf of Teva
11          Pharmaceuticals USA, Inc., Cephalon
12          Inc., Watson Laboratories, Inc.,
13          Actavis, LLC, and Actavis Pharma, Inc.
14              MR. LAVELLE:  John Lavelle on
15          behalf of Rite Aid.
16              MR. MONTMINY:  Brendan Montminy
17          on behalf Henry Schein, Inc., and
18          Henry Schein Medical Systems, Inc.
19              MR. AUBEL:  Bill Aubel, Jackson
20          Kelly, on behalf of Miami-Luken, Inc.
21              MR. WEINBERGER:  Pete
22          Weinberger on behalf of the
23          plaintiffs.
24              VIDEOGRAPHER:  The court
25          reporter is Carrie Campbell, who will
```

```
 1          now administer the oath to the

 2          witness.

 3

 4               NATHAN J. HARTLE,

 5     of lawful age, having been first duly sworn

 6     to tell the truth, the whole truth and

 7     nothing but the truth, deposes and says on

 8     behalf of the Plaintiffs, as follows:

 9

10               DIRECT EXAMINATION

11     QUESTIONS BY MR. FARRELL:

12          Q.    Good morning.

13          A.    Good morning.

14          Q.    Please state your name.

15          A.    My name is Nathan -- I go by

16     Nate -- John Hartle.

17          Q.    And what is your occupation,

18     and who is your employer?

19          A.    I'm currently a vice president

20     of regulatory affairs and compliance for

21     McKesson Corporation.

22          Q.    How long have you been employed

23     by McKesson?

24          A.    Since May of 2014.

25          Q.    Have you ever had your
```

Highly Confidential - Subject to Further Confidentiality Review

1   deposition taken before?

2       A.      20 years ago when I -- when I

3   worked at a previous employer for a theft

4   case, investigative.

5       Q.      So if you'll bear with me,

6   we're going to do a little bit of paperwork

7   to start -- to start off.

8       A.      Okay.

9       Q.      The first thing is, is are you

10  aware that today you'll be testifying not as

11  Nate Hartle but as McKesson Corporation?

12      A.      I am.

13          (McKesson-Hartle Exhibit 1

14      marked for identification.)

15  QUESTIONS BY MR. FARRELL:

16      Q.      I'm going to have marked and

17  show you McKesson 30(b)(6) Document 1, and

18  this is the first notice of deposition that

19  was filed in this case.

20          Have you had a chance to review

21  this document before today?

22      A.      I do.  I have copies of this.

23      Q.      And you understand that today

24  I'll be asking you questions about the

25  subject matters that are in Exhibit 1, and

```
 1    McKesson has been kind enough to designate

 2    you as its spokesman to answer these

 3    questions?

 4                    MS. HENN:  Objection to form.

 5                    THE WITNESS:  I understand.

 6                    (McKesson-Hartle Exhibit 2

 7          marked for identification.)

 8    QUESTIONS BY MR. FARRELL:

 9          Q.    There's a second notice.  We'll

10    have that marked as Exhibit 2, and it's MCK

11    30(b)(6)_02.

12                    Have you had a chance to review

13    this document before today?

14          A.    I have.

15          Q.    Now, it's my understanding that

16    McKesson has designated you to testify on

17    certain subject matters within this document

18    but not all.

19                    Is that your understanding?

20          A.    Correct.

21          Q.    And those numbers are numbers

22    9, 14, 16, 17, 18, 19, 20, 21 and 22.

23                    Is that your understanding as

24    well?

25          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (McKesson-Hartle Exhibit 3

 2          marked for identification.)

 3   QUESTIONS BY MR. FARRELL:

 4          Q.    The next document, just to be

 5   fair, is I'm going to mark as Exhibit 3

 6   McKesson's objections and responses to each

 7   of these subject matters to create the whole

 8   record, if anybody wants to see it.  This

 9   will be McKesson 30(b)(6)_3.

10                    Have you had a chance to review

11   this document before today?

12          A.    I have.

13          Q.    It's much longer, isn't it?

14                    (McKesson-Hartle Exhibit 4

15          marked for identification.)

16   QUESTIONS BY MR. FARRELL:

17          Q.    And finally, I'm going to show

18   you McKesson 30(b)(6)_4, which we've also

19   labeled as Exhibit 4, which is simply the

20   redesignation of the date and location and

21   the subject matters of today's deposition.

22                    Have you had a chance to review

23   this document?

24          A.    I have.

25          Q.    So that everybody is on the
```

```
 1   same page, what you'll notice is that there
 2   are a number of different Bates stamps that
 3   we'll see throughout the day.  For purposes
 4   of this deposition, what we've done is we've
 5   created a unique and separate Bates stamp
 6   just for your deposition, which can be found
 7   in the top right-hand corner of, I hope, all
 8   of the exhibits today.  And some of them,
 9   start MCK 30(b)(6) and then underscore, and
10   then the first number you'll see is the
11   sequential number of exhibits, followed by a
12   dash and then individual page numbers.
13                As we go through later today, I
14   abandon the normal sequential numbering
15   system because we're going to bounce around
16   the timeline a little bit, and instead I use
17   basically a date indicator in the top
18   right-hand corner.
19        A.    Okay.
20        Q.    Now, that being said for
21   everybody on the telephone, a lot of these
22   documents have been produced in this
23   litigation, and what you'll find, to the best
24   of my ability, is I've always tried to find
25   the document that contains the MDL Bates
```

Highly Confidential - Subject to Further Confidentiality Review

1    stamp in the bottom right-hand corner.

2    Sometimes it's not been all that successful

3    because sometimes the document comes from a

4    prior production and has not yet matriculated

5    or made its way over to the MDL production.

6              But nonetheless, those are the

7    three different Bates stamp numbering systems

8    that we're going to come across today, and

9    when I talk on the record, I'll try to refer

10    just to the MDL number.

11              For the people on the telephone

12    and the record and then for you and I, it'll

13    be easiest for us to use the top right-hand

14    corner.

15        A.    Okay.

16        Q.    When did you first learn that

17    you would be designated as the corporate

18    witness for McKesson?

19        A.    I don't know the exact date,

20    but I believe within the last, say, 30 days

21    or so.

22        Q.    Do you know Gary Boggs?

23        A.    I do know Gary.

24        Q.    Are you aware that he has been

25    designated as a 30(b)(6) designee in another

```
 1    litigation pending in West Virginia?

 2         A.     I am aware.

 3         Q.     Have you read the deposition of

 4    McKesson from that litigation?

 5         A.     I have.

 6         Q.     Is there anything in that

 7    deposition that you think is wrong or

 8    factually inaccurate?

 9         A.     Not that I can recall.

10         Q.     Are you prepared, sitting here

11    today, to adopt or affirm the representations

12    McKesson made in the West Virginia Attorney

13    General litigation?

14              MS. HENN:  Objection to form.

15              THE WITNESS:  Can you ask that

16         again, please?

17    QUESTIONS BY MR. FARRELL:

18         Q.     So it's a little bit of a

19    Plato's Theory of the Forms right now, but

20    for all intents and purposes, McKesson is

21    sitting here in front of me today, and

22    McKesson was sitting before Mr. Lee Javins

23    from the West Virginia Attorney General

24    litigation pending in Boone County several

25    weeks ago.
```

Highly Confidential - Subject to Further Confidentiality Review

1           And so I'm trying to make the

2    connection that sitting here today McKesson

3    affirms or adopts all of its testimony from

4    the West Virginia litigation.

5           MS. HENN:  Objection to form.

6        This witness is here on -- designated

7        on behalf of McKesson for the topics

8        you've indicated.

9           But you can answer the

10       question.

11          THE WITNESS:  I'm not sure how

12       to answer that question.

13   QUESTIONS BY MR. FARRELL:

14       Q.    Okay.  So the answer is either

15   you adopt your testimony from the prior

16   litigation or you choose not to today.

17          MS. HENN:  Objection to form.

18   QUESTIONS BY MR. FARRELL:

19       Q.    It's okay either way.

20       A.    What's that?

21       Q.    It's okay either way.

22       A.    Yeah.

23       Q.    It's just a question of whether

24   or not I'm going to go back through some of

25   the other subject matters that Gary Boggs

Highly Confidential - Subject to Further Confidentiality Review

```
 1    testified to or whether or not I can rely on

 2    that sworn testimony --

 3         A.    Okay.

 4         Q.    -- to be applicable today.

 5              MS. HENN:  Objection to form,

 6         and same comment as I made before.

 7              MR. FARRELL:  So, Counsel,

 8         that's your second speaking objection,

 9         and so I would ask that you keep your

10         comments from the record.

11    QUESTIONS BY MR. FARRELL:

12         Q.    So it's okay if you do not want

13    to adopt that prior testimony.  We can go

14    through it today.  You may not have the

15    authority by McKesson to do so.

16         A.    Yeah.  Again, I'm not sure how

17    to answer that question specifically.

18         Q.    It's not a problem.

19         A.    Yeah.  Okay.

20         Q.    Can you tell me what documents

21    you reviewed to prepare for today's

22    testimony?

23              MS. HENN:  I'm going to object

24         to that question as calling for

25         attorney work product and instruct the
```

Highly Confidential - Subject to Further Confidentiality Review

1       witness not to respond if you're being

2       asked, as I understand you are, for a

3       list of documents counsel showed you.

4   QUESTIONS BY MR. FARRELL:

5       Q.    Okay.  Have all of the

6   documents that counsel shared with McKesson

7   been disclosed in the MDL?

8           MS. HENN:  Do you mean to ask

9       whether the documents Mr. Hartle has

10      used in preparing for the deposition,

11      have they been produced?

12          MR. FARRELL:  Yes.

13          MS. HENN:  I believe that to be

14      the case, yes.

15  QUESTIONS BY MR. FARRELL:

16      Q.    Okay.  So is it fair to say

17  that everything Mr. Hartle reviewed has

18  actually been produced in the litigation

19  today?

20          MS. HENN:  That is my

21      understanding.

22          MR. FARRELL:  The reason I ask

23      is because when I read Mr. Boggs'

24      testimony, there are references to a

25      dozen or so documents that he relied

Highly Confidential - Subject to Further Confidentiality Review

```
 1          upon and discussed that have not yet

 2          been disclosed in the MDL.

 3                  Are you aware of any documents

 4          that are pending that have not been

 5          produced?

 6                  MS. HENN:  I know that we're

 7          not complete with our productions, but

 8          I'm not -- I don't know what those

 9          documents -- what documents you're

10          referring to.

11                  MR. FARRELL:  So to the extent

12          that there are future documents that

13          are produced that are relevant to the

14          subject matters that are in the

15          30(b)(6) notices, we reserve our right

16          to petition the Court for good cause

17          to extend or continue this deposition.

18                  MS. HENN:  I note your

19          reservation of rights.  We may

20          disagree on the ability of plaintiffs

21          to continue this deposition, but let's

22          continue.

23     QUESTIONS BY MR. FARRELL:

24          Q.    Other than the documents

25     provided by counsel to you in preparation for
```

Highly Confidential - Subject to Further Confidentiality Review

1   this deposition, did you on your own review

2   any documents?

3        A.    Yes, I reviewed a handful of

4   documents that are standard with our program.

5        Q.    Okay.  Can you tell me which

6   ones they are?

7        A.    Can I ask a clarifying

8   question?  Can you repeat -- do the documents

9   that had already -- documents that haven't

10  been produced?  Anything in addition to

11  what --

12       Q.    That would be a swell place to

13  start.

14       A.    You know, as I think about

15  things that I've reviewed, it's standard

16  operating manuals and procedures, and I think

17  likely all that -- that stuff is part of what

18  was produced, so I don't --

19       Q.    That's actually not a very fair

20  way to place it because you probably haven't

21  studied the production list yet from

22  McKesson.

23       A.    No.  No.

24       Q.    So let's talk about it in a

25  different context.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      Okay.

 2        Q.      I'm assuming at some point in

 3   time your counsel provided you some documents

 4   that they culled through based upon the legal

 5   documents, and that, arguably, has been the

 6   subject of some debate between the lawyers on

 7   whether that list is producible or not.

 8              Aside from that, did you

 9   independently go and review anything on your

10   own, document-wise, to prepare for today?

11        A.      Document-wise?  You know, I

12   looked at files of mine, you know, just, you

13   know, what I -- what I have in my own, you

14   know, storage on things that I've done or

15   projects that I've been on and reviewed just

16   a variety of different pieces of information

17   that personally I have.

18        Q.      Where would those files be

19   located?

20        A.      On my computer, whether it be

21   e-mails or in documents on my standard

22   storage on my computer.

23        Q.      Would it be documents from

24   MCK.NET?

25        A.      I don't think there was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    anything stored on MCK.NET, our intra -- the

 2    company's intra site.

 3            Q.      I just wanted to say MCK.NET.

 4            A.      MCK.NET, yeah.

 5            Q.      Did you review documents that

 6    were on your personal computer -- that's a

 7    bad question.

 8                    Did you review documents that

 9    are located on your hard drive of your

10    computer?

11            A.      My work computer?

12            Q.      Yes.

13            A.      Yes.

14            Q.      Would those documents also have

15    been on the server?

16            A.      Could you clarify "server"?

17            Q.      Yeah.  So in general, when you

18    have a network of computers, sometimes

19    there's a central repository where

20    everybody's computer can pull up files from,

21    and then there's also on your own computer a

22    hard drive that nobody else can look at,

23    except you, from your computer station.

24            A.      I understand that, sir, but

25    I -- you know, in terms of the shared
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    repository that we use in regulatory affairs,

 2    yes, there's documents stored on there that

 3    I've reviewed.

 4         Q.    What about documents on your

 5    personal hard drive on your office computer?

 6         A.    Yes, I store documents on my

 7    personal office computer.

 8         Q.    And those documents you

 9    reviewed prior to today's deposition?

10              MS. HENN:  Objection to form.

11              THE WITNESS:  There are some

12         documents.

13    QUESTIONS BY MR. FARRELL:

14         Q.    Did you rely on any of those

15    documents or did any of those documents

16    refresh your recollection about the subject

17    matters of today's deposition?

18         A.    I used --

19              MS. HENN:  Objection to form.

20              Go ahead.

21              THE WITNESS:  I used them to

22         refresh.

23    QUESTIONS BY MR. FARRELL:

24         Q.    Okay.  How about e-mails?  Did

25    you go and review any old e-mails?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I may have looked at a few

 2    e-mails.

 3        Q.    Do any of them particularly

 4    stand out?

 5        A.    No.

 6        Q.    Who would the e-mails have come

 7    from that you were reviewing?

 8            MS. HENN:  Objection to form.

 9            THE WITNESS:  Could be a

10        variety of people.  I don't recall,

11        you know, specific e-mails that I

12        looked at.  Could be from my team or

13        part of a project or...

14    QUESTIONS BY MR. FARRELL:

15        Q.    And I'm sorry if I asked this

16    before.  How long have you been with

17    McKesson?

18        A.    Since 2014.  May of 2014.

19        Q.    You understand that some of the

20    subject matters today may predate 2014?

21        A.    I do understand that.

22        Q.    Other than documents provided

23    by your lawyer, where did you find documents

24    that predated 2014?

25            MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  They would be on

 2           our shared drive or our space where

 3           regulatory affairs -- it's called the

 4           R drive.  That's where we would share

 5           information.

 6   QUESTIONS BY MR. FARRELL:

 7        Q.     Okay.  Other than the R drive,

 8   where else would we find those documents?

 9                    MS. HENN:  Objection to form.

10                    THE WITNESS:  I'm not sure -- I

11           don't believe I accessed anything else

12           outside of the hard drive.  I know

13           there's other sites, a share point

14           site in the past, but I believe mine

15           were all from the R drive.

16   QUESTIONS BY MR. FARRELL:

17        Q.     Have you reviewed any documents

18   or seen any documents that predate 2006?

19        A.     I have.

20        Q.     And did you -- where did those

21   documents come from?

22                    I'll make it easier.  Did those

23   documents come from the lawyers?

24        A.     I have some in the -- the -- my

25   preparation over the past few days, but also
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I do have documents, as I joined McKesson,

 2    that I reviewed and had stored either on my

 3    personal computer, on my work computer, or

 4    the R drive that predate 2006.

 5         Q.    All right.  So we're going to

 6    jump into some topics.

 7         A.    Okay.

 8         Q.    Have you read the Masters

 9    Pharmaceutical case?

10         A.    Not for a while.  I read it

11    when it first came out, you know.

12         Q.    That was June of 2017.

13               So when I start asking

14    questions, I'm going to do my very best to

15    keep envisioning McKesson's logo sitting in

16    front of me instead of Nate Hartle.

17         A.    Okay.

18         Q.    So let me ask a different way.

19               Is McKesson aware of the

20    publishing of the Masters Pharmaceutical

21    case?

22               MS. HENN:  Objection to form.

23               THE WITNESS:  We are.

24    QUESTIONS BY MR. FARRELL:

25         Q.    You're aware that in Masters
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Pharmaceutical there was a discussion of the

 2    reporting requirement?

 3           A.     I am.

 4           Q.     And does McKesson acknowledge

 5    that is the law in the United States?

 6                  MS. HENN:  Objection to form.

 7                  THE WITNESS:  Could you ask

 8           that question again, please?  Do I --

 9    QUESTIONS BY MR. FARRELL:

10           Q.     Sure.

11                  I'm jumping out of order a

12    little bit, but I'm going to see if I can

13    actually grab the folder for you.

14                  We're not going to premark this

15    because that will absolutely mess up my

16    numbering system, but the top right-hand

17    corner it's Bates stamped 2017_06_30.

18                  And I apologize for the

19    flopping of the documents across the big

20    table.

21                  This is Masters Pharmaceutical.

22    Has McKesson read this document?

23                  MS. HENN:  Objection to form.

24                  THE WITNESS:  I believe that

25           several have read this document.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.     Have you read this document in

 3    preparation for today's deposition?

 4         A.     Did I have it in the past?

 5         Q.     No.

 6                In preparation for today's

 7    deposition, have you read this as McKesson's

 8    corporate designee?

 9         A.     I did not read this specific

10    right before the deposition.

11         Q.     So it's not -- it's not a

12    memory contest --

13         A.     Right.

14         Q.     -- and that's why I brought the

15    documents --

16         A.     Right.

17         Q.     -- so that -- so that we can

18    talk about some of the subject matters.

19                The first thing I'd like you to

20    do is turn to the Bates stamp page 7.  And

21    you'll notice that there are two columns, and

22    in the bottom right-hand corner the paragraph

23    heading number 2.

24                Do you see that?

25         A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And midway down through, you'll

 2    see that in the parentheses it says the

 3    "reporting requirement."

 4          A.     I see that.

 5          Q.     Do you see it?

 6          A.     I do.

 7          Q.     And then immediately after

 8    that, it describes what the reporting

 9    requirement is.  And I don't know if you do

10    better reading it aloud or reading it to

11    yourself.

12                 Would you like me to read it,

13    or would you like to read it?

14          A.     I can read it.

15          Q.     All right.  Starting with "the

16    reporting requirement is a relatively modest

17    one," will you finish the sentence?

18          A.     I read that sentence.

19          Q.     Okay.  Now, will you read it

20    aloud?

21          A.     "It requires only that a

22    distributor provide basic information about

23    certain orders to DEA so that DEA

24    investigators in the field can aggregate

25    reports from every point along the legally
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    regulated supply chain and use the

2    information to ferret out potentially illegal

3    activity."

4         Q.     Does McKesson acknowledge that

5    it has a duty under the reporting

6    requirement?

7              MS. HENN:  Objection to form.

8              THE WITNESS:  Acknowledge that

9         we -- we, as part of the designing and

10        operating the suspicious order system,

11        have to report suspicious orders.

12   QUESTIONS BY MR. FARRELL:

13        Q.     That wasn't my question.

14             My question is:  Does McKesson

15   acknowledge the reporting requirement, as you

16   just read aloud, is a duty owed by McKesson

17   under the federal regulations and United

18   States Code?

19             MS. HENN:  Objection to form.

20             THE WITNESS:  And it's our

21        responsibility to report suspicious

22        orders.

23   QUESTIONS BY MR. FARRELL:

24        Q.     So the answer to my question is

25   yes --
```

```
 1          A.      Yes.

 2          Q.      -- no, or I don't know.

 3                  MS. HENN:  Objection to form.

 4                  THE WITNESS:  It is our -- yes.

 5  QUESTIONS BY MR. FARRELL:

 6          Q.      Okay.  Now, I want you to go

 7  down, and if you actually flip the page,

 8  we'll cheat to the end, and it's the end of

 9  the first sentence in the top left-hand

10  corner.  In parentheses it says, "The

11  shipping requirement."

12                  Do you see that?

13          A.      Where am I looking again?

14  Sorry.

15          Q.      Very top left-hand corner

16  there's a --

17          A.      Okay.  Shipping requirement.  I

18  see that.

19          Q.      All right.  Now what we're

20  going to do is go to the beginning of that

21  sentence on the previous page, and it's the

22  last full sentence.  It starts with "once a

23  distributor has."

24                  Do you see that sentence?

25          A.      I see that.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      Now I'm going to give you a

2    chance to read it without -- and digest it

3    for a second.

4          A.      I've read that.

5          Q.      All right.  Now, can you read

6    it aloud for the record?

7          A.      "Once a distributor has

8    reported a suspicious order, it must make one

9    of two choices, decline to ship the order or

10   conduct some due diligence, and if it is able

11   to determine that the order is not likely to

12   be diverted into illegal channels, ship the

13   order."

14         Q.      Does McKesson acknowledge that

15   the shipping requirement is a duty it owes

16   under the United States Code and the Code of

17   Federal Regulations?

18              MS. HENN:  Objection to form.

19              THE WITNESS:  Yes.

20              (McKesson-Hartle Exhibit 5

21      marked for identification.)

22   QUESTIONS BY MR. FARRELL:

23         Q.      We'll come back to this later.

24              All right.  The next document

25   we're going to reference is MCK 30(b)(6)_5.

Highly Confidential - Subject to Further Confidentiality Review

1    And so to make this easy so I don't have to

2    say all those letters and numbers, as we move

3    forward I'm just going to refer to it exhibit

4    such-and-such.

5        A.    Okay.

6        Q.    And when I do, we're talking

7    about the exhibit for this deposition.

8            I'm going to represent to you

9    that there are four pages to this exhibit,

10    that you won't find this exhibit anywhere on

11    the Internet because I made them myself.  I'm

12    going to give you a second to flip through

13    them, and what I'm going to represent to you

14    is that these are four different provisions

15    from four different United States Code

16    provisions.  So I'll give you a second to

17    review.

18        A.    Okay.

19        Q.    So the first thing I want you

20    to take note of on Exhibit 5, page 1, is the

21    top left-hand corner, which is the great seal

22    of our United States Congress.

23            And if you look under the

24    United States Code, Title 21, for food and

25    drugs, under Chapter 13, Drug Abuse

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Prevention and Control, Subchapter 1, Control

 2    and Enforcement, Part A, Introductory

 3    Provisions, this is the beginning of the

 4    Controlled Substances Act.

 5              McKesson is aware of and

 6    acknowledges that its role in the chain of

 7    distribution of opioids is governed by the

 8    Controlled Substances Act, agreed?

 9              MS. HENN:  Objection to form.

10              THE WITNESS:  Yes.

11    QUESTIONS BY MR. FARRELL:

12         Q.    Now, I'm going to have you look

13    down all the way at all those letters and

14    numbers at the very bottom, Public Law

15    91-513, Title 2.  And the date there is

16    October 27, 1970.

17              McKesson is aware that the

18    Controlled Substances Act has been in force

19    and effect since 1970, correct?

20              MS. HENN:  Objection to form.

21              THE WITNESS:  Correct.

22    QUESTIONS BY MR. FARRELL:

23         Q.    So Section 801, which is on the

24    first page, is Congressional findings and

25    declarations regarding controlled substances.
```

1          Do you see that?

2     A.    I do.

3     Q.    And it says, "The Congress

4  agrees makes the following findings and

5  declarations."

6          And to be fair, paragraph 1,

7  will you read it aloud?

8     A.    "Many of the drugs included

9  within this subchapter have a useful and

10  legitimate medical purpose and are necessary

11  to maintain the health and general welfare of

12  the American people."

13     Q.    Does McKesson acknowledge and

14  agree with that finding?

15          MS. HENN:  Objection to form.

16          THE WITNESS:  Yes.

17  QUESTIONS BY MR. FARRELL:

18     Q.    Now, will you read Section 2

19  aloud, please?

20     A.    "The illegal importation,

21  manufacture, distribution and possession and

22  improper use of controlled substances have

23  substantially and detrimentally effect --

24  have a substantial and detrimental effect on

25  the health and general welfare of the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    American people."

 2         Q.    Does McKesson acknowledge and

 3    agree with those findings?

 4              MS. HENN:  Objection to form.

 5              THE WITNESS:  Yes.

 6    QUESTIONS BY MR. FARRELL:

 7         Q.    So you'll notice in paragraph 2

 8    it includes distribution, correct?

 9         A.    Correct.

10         Q.    And McKesson is engaged in the

11    distribution business, agreed?

12         A.    We are.

13         Q.    And that if they do not follow

14    the law as provided by the US code and the

15    Code of Federal Regulations, it has a

16    substantial and detrimental effect on the

17    health and general welfare of the American

18    people, agreed?

19              MS. HENN:  Objection to form.

20              THE WITNESS:  Could you restate

21         that question for me, please?

22    QUESTIONS BY MR. FARRELL:

23         Q.    Yeah.

24              You agree with paragraph 2 --

25         A.    Right.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    -- as McKesson's

2   representative, correct?

3    A.    Correct.

4    Q.    And what it says is that the

5   illegal, and one of the words is

6   distribution, of controlled substances has a

7   substantial and detrimental effect on the

8   health and general welfare of the American

9   people.

10          I'm asking you if McKesson

11  agrees and acknowledges with this finding by

12  Congress in 1970.

13          MS. HENN:  Objection to form.

14          THE WITNESS:  Yes, that the

15       illegal distribution can -- could

16       potentially have an impact on the

17       American --

18  QUESTIONS BY MR. FARRELL:

19    Q.    Well, it doesn't say

20  "potential" in paragraph 2, does it?

21    A.    It doesn't.

22    Q.    It says that if you break the

23  law, it has a substantial and detrimental

24  effect on the health and general welfare of

25  the American people.

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      That's what it says, correct.

2          Q.      Does McKesson agree and

3   acknowledge that finding?

4                  MS. HENN:  Objection to form.

5                  THE WITNESS:  Yes.

6   QUESTIONS BY MR. FARRELL:

7          Q.      Now, if you flip to page 2,

8   this is section A 12 of the Controlled

9   Substances Act, and what it says is it places

10  drugs into one of several categories.

11                 Is McKesson aware of the

12  scheduling of controlled substances?

13         A.      We are.

14         Q.      Okay.  And what we're dealing

15  with in this litigation primarily today are

16  Schedule II drugs, correct?

17         A.      Correct.

18         Q.      Now, there was a period of time

19  when certain hydrocodone combination products

20  were Schedule III, but they've since been

21  reclassified as Schedule II, agreed?

22         A.      Agreed.

23         Q.      And McKesson picked up a book

24  of business when that happened on the HCPs,

25  agreed?
```

```
 1              MS. HENN:  Objection to form.

 2              THE WITNESS:  Can you rephrase

 3         the book of business and the question

 4         a little bit?

 5  QUESTIONS BY MR. FARRELL:

 6         Q.    Yeah, that was a little too

 7  country.

 8              Is McKesson aware that its

 9  sales of hydrocodone combination products

10  rose following the reclassification of those

11  opioids from Schedule III to Schedule II?

12         A.    Yes.

13         Q.    So nonetheless, when we're

14  talking about these products, I'm referencing

15  Schedule II for today.

16         A.    Understood.

17         Q.    So the Schedule II has a

18  definition, does it not, under the United

19  States Code?

20         A.    It does.

21         Q.    There's three aspects to it.

22              Do you see those three aspects?

23         A.    I do.

24         Q.    Could you read aspect A?

25         A.    "The drug or other substance
```

```
 1    has a high potential for abuse."

 2        Q.    McKesson is aware since 1970

 3    that it was engaging in business of

 4    distributing Schedule II controlled

 5    substances which have a high potential for

 6    abuse, agreed?

 7        A.    Agreed.

 8        Q.    And you agree that the opioids,

 9    whether they're Schedule II or formerly

10    Schedule III, are drugs that have a high

11    potential for abuse?

12        A.    Agree.

13        Q.    McKesson knows this?

14        A.    We do.

15        Q.    And McKesson has known this

16    from the very beginning of their decision to

17    distribute controlled substances?

18        A.    Agreed.

19        Q.    Would you read paragraph B,

20    please?

21        A.    "The drug or other substance

22    has a currently accepted medical use and

23    treatment in the United States or a currently

24    accept medical use with severe restrictions."

25        Q.    Does McKesson agree and
```

Highly Confidential - Subject to Further Confidentiality Review

1  acknowledge with this statement from

2  Congress?

3              MS. HENN:  Objection to form.

4              THE WITNESS:  Yes.

5  QUESTIONS BY MR. FARRELL:

6      Q.    Now, read paragraph C, please.

7      A.    "Abuse of a drug or other

8  substances may lead to severe psychological

9  or physical dependence."

10     Q.    Does McKesson agree and

11 acknowledge this finding?

12             MS. HENN:  Objection to form.

13             THE WITNESS:  Yes.

14 QUESTIONS BY MR. FARRELL:

15     Q.    So just to be clear, when we're

16 talking about controlled substances in this

17 litigation, we're talking about opiates and

18 opioids, agreed?

19     A.    Agreed.

20     Q.    And what these are, are these

21 are derivatives of opium in the form of a

22 pill, agreed?

23             MS. HENN:  Objection to form.

24             THE WITNESS:  It's multiple

25     formulations but, yes.

```
 1   QUESTIONS BY MR. FARRELL:

 2       Q.    What we start with is we start

 3   with the poppy plant, agreed?

 4             MS. HENN:  Objection to form.

 5             THE WITNESS:  Agreed.

 6   QUESTIONS BY MR. FARRELL:

 7       Q.    Well -- and it's okay if -- I'm

 8   just trying to figure out what McKesson

 9   knows.

10             McKesson distributes pills from

11   a manufacturer to pharmacies.  That's what

12   they do, yes?

13       A.    Correct.

14       Q.    The pills that you're

15   distributing, you're aware they originally

16   come from the poppy plant?

17             MS. HENN:  Objection to form.

18        Outside the scope.

19             THE WITNESS:  I'm not an expert

20        in the medical field and design, but I

21        understand that, yes.

22   QUESTIONS BY MR. FARRELL:

23       Q.    Does McKesson acknowledge or

24   appreciate that what they're selling are

25   opium pills?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                MS. HENN:  Objection to form.
2                THE WITNESS:  We understand
3       how -- what's in the pills, so, yes.
4   QUESTIONS BY MR. FARRELL:
5       Q.    Okay.  So the opium can be
6   manipulated by the manufacturers to be
7   opiate-like?  Opiate-like, right?  There's
8   opiates and opioid, or opiate-like, and
9   that's how you get hydrocodone and oxycodone
10  and all the different types of opium pills,
11  agreed?
12      A.    Correct.
13               MS. HENN:  Objection to form.
14  QUESTIONS BY MR. FARRELL:
15      Q.    So when I say "opium pills,"
16  what I'm talking about is the big
17  classification of all of these pills derived
18  from the poppy plant.
19               Is that fair?
20      A.    Understood.
21      Q.    All right.  And when we talk
22  about any of the individual pills, whether
23  it's hydrocodone or oxycodone, those all fall
24  within the opium pill umbrella, right?
25               MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes.
 2    QUESTIONS BY MR. FARRELL:
 3         Q.     So when McKesson is
 4    distributing opium pills, it knows and
 5    understands that these pills have a high
 6    potential for abuse?
 7         A.     We do.
 8         Q.     Now, they also -- you also --
 9    McKesson understands that these pills do have
10    an accepted medical use in treatment, but
11    they have severe restrictions, agreed?
12                    MS. HENN:  Objection to form.
13                    THE WITNESS:  We understand the
14         language, yes.
15    QUESTIONS BY MR. FARRELL:
16         Q.     You understand the language of
17    paragraph B?
18         A.     Right.
19         Q.     Opium pills have a place in
20    current medical practice?
21         A.     Yes.
22         Q.     But abusing opium pills may
23    lead to severe psychological and physical
24    dependence?
25         A.     Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      McKesson understands and

2    acknowledges this?

3        A.      Yes.

4        Q.      And that's why the unlawful

5    distribution of these opium pills, relating

6    back to page 1, has a substantial and

7    detrimental effect on the health and general

8    welfare of the American people.

9              Does McKesson acknowledge that?

10             MS. HENN:  Objection to form.

11             THE WITNESS:  Yes.

12   QUESTIONS BY MR. FARRELL:

13       Q.      Now we're going to flip to

14   page 3, which is Section 821, rules and

15   regulations.

16             Will you please read this

17   aloud?

18       A.      "The Attorney General is

19   authorized to promulgate rules and

20   regulations and to charge reasonable fees

21   relating to the registration and control of

22   the manufacture, distribution and dispensing

23   of controlled substances and to listed

24   chemicals."

25       Q.      All right.  Do you see the date

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of this?

 2         A.    I do.

 3         Q.    What is the date?

 4         A.    October 27, 1970.

 5         Q.    Does McKesson acknowledge that

 6    Congress gave the United States Attorney

 7    General the authority to promulgate rules

 8    regarding the distribution of opium pills?

 9               MS. HENN:  Objection to form.

10               THE WITNESS:  Yes.

11    QUESTIONS BY MR. FARRELL:

12         Q.    Now let's flip to the next

13    page.  This is the -- this is where we'll be

14    spending most of our time today.  This is

15    page 4, Section 823.

16               This is from the United States

17    Code, and it includes, as you'll see down in

18    paragraph 1, what Congress has said is

19    McKesson's duty.  I'd like you to first read

20    that to yourself.

21         A.    I've read it.

22         Q.    All right.  Does McKesson

23    acknowledge that it has a duty to maintain

24    effective control against diversion of opium

25    pills as mandated by Congress?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MS. HENN:  Objection to the

 2         form.

 3                  THE WITNESS:  We do.

 4                  (McKesson-Hartle Exhibit 6

 5         marked for identification.)

 6    QUESTIONS BY MR. FARRELL:

 7         Q.     Now this is a much bigger

 8    document, but I promise we won't go through

 9    every page.

10                  This is going to be marked as

11    Exhibit 6 in the bottom right-hand corner,

12    and in the top right-hand corner it's MCK

13    30(b)(6)_6.

14                  For our fans following on the

15    telephone, this is the Congressional history

16    that can be found at 91-1444.  It is Public

17    Law 91-513.

18                  Do you remember when we were

19    looking at the United States Code and it

20    referenced Public Law 91-513 from Exhibit 5?

21         A.     Yes.

22         Q.     This is that document, I'll

23    represent to you.

24         A.     Okay.

25         Q.     And what this is, is this is
```

Highly Confidential - Subject to Further Confidentiality Review

1    the Congressional history of all those codes

2    that we just walked through.  And I'm not

3    going to ask you to read the entire document

4    because I've highlighted certain sections for

5    you.

6              The first thing I'd like you to

7    do is I'd like for you to turn to Bates stamp

8    page 5.  And while you read the document to

9    yourself, I'm going to read it out loud to

10   save you some time.

11        A.    Okay.

12        Q.    Under Title 2, Control and

13   Enforcement, it states, "The bill provides

14   for control by the Justice Department of

15   problems related to drug abuse through

16   registration of manufacturers, wholesalers,

17   retailers and all others in the legitimate

18   distribution chain and makes transactions

19   outside the legitimate distribution chain

20   illegal."

21              Does McKesson acknowledge this

22   finding from Congress?

23              MS. HENN:  Objection to form.

24              THE WITNESS:  Yes.

25

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.     I'm going to have you to turn

 3   to Bates stamp page 8.  And again, these are

 4   my highlights.  Congress didn't highlight

 5   this in 1970; Paul Junior did.  So while you

 6   read it, I'm going to read it out loud.

 7              "The bill was designed to

 8   improve the administration and regulation of

 9   the manufacturing, distribution and

10   dispensing of controlled substances by

11   providing for a closed system of drug

12   distribution for legitimate handlers of such

13   drugs.  Such a closed system should

14   significantly reduce the widespread diversion

15   of these drugs out of the legitimate channels

16   into the illicit market, while at the same

17   time providing the legitimate drug industry

18   with a unified approach to narcotic and

19   dangerous drug control."

20              Does McKesson acknowledge the

21   truth of this finding by Congress?

22              MS. HENN:  Objection to form.

23              THE WITNESS:  Yes.

24   QUESTIONS BY MR. FARRELL:

25        Q.     So let's just talk about this
```

Highly Confidential - Subject to Further Confidentiality Review

1    for a minute.

2              McKesson understands that in

3    1970 Congress created a closed system,

4    agreed?

5         A.    Agree.

6         Q.    What a closed system means is

7    that laissez-faire economics don't apply,

8    agreed?

9              MS. HENN:  Objection to form.

10             THE WITNESS:  Have to refresh

11        my memory on laissez-faire economics.

12   QUESTIONS BY MR. FARRELL:

13        Q.    It's just a fancy French word

14   for "hands off."  The government is

15   intervening in the marketplace of the chain

16   of distribution for opium pills, agreed?

17        A.    For controlled substances.

18        Q.    Well, for all controlled

19   substances --

20        A.    Correct.

21        Q.    -- but today we're talking

22   about opium pills.

23        A.    Understood.

24        Q.    So the controlled substances

25   are in a chain of distribution that are

Highly Confidential - Subject to Further Confidentiality Review

1    closed off to the rest of the marketplace.

2    McKesson acknowledges that?

3                    MS. HENN:  Objection to form.

4                    THE WITNESS:  Correct.  It's a

5         closed system.

6    QUESTIONS BY MR. FARRELL:

7         Q.     And in order to participate in

8    the closed system, you have to be one of the

9    select few that gets a registration

10   certificate from the DEA, agreed?

11        A.     Agreed.

12        Q.     And the reason Congress did

13   this was to reduce diversion.  Does McKesson

14   acknowledge that?

15                   MS. HENN:  Objection to form.

16                   THE WITNESS:  Yes, I believe

17        that was the overall intent.

18   QUESTIONS BY MR. FARRELL:

19        Q.     So it's creating rules to

20   prevent diversion to the best of their

21   ability.  McKesson acknowledges that fact?

22                   MS. HENN:  Objection to form.

23                   THE WITNESS:  Yes.

24   QUESTIONS BY MR. FARRELL:

25        Q.     Because if McKesson doesn't

Highly Confidential - Subject to Further Confidentiality Review

```
 1    follow the law, then diversion is likely.

 2    You agree with that statement?

 3              MS. HENN:  Objection to form.

 4              THE WITNESS:  I don't know if

 5         I'd say -- always characterize it as

 6         likely all the time, but diversion can

 7         happen.

 8    QUESTIONS BY MR. FARRELL:

 9         Q.    Okay.  Well, in this specific

10    provision, the United States Congress passed

11    a law to close the system of distribution and

12    enact laws to reduce the widespread diversion

13    of these drugs.  You agree with that?  That's

14    the purpose of this law?

15              MS. HENN:  Objection to form.

16              THE WITNESS:  Yes.

17    QUESTIONS BY MR. FARRELL:

18         Q.    So the idea here is that -- to

19    close the system of distribution so that we

20    keep these dangerous opium pills inside the

21    legitimate market for medical care, agreed?

22         A.    Agreed.

23         Q.    And that's why we have these

24    laws enacted, so that we can do our best to

25    keep these drugs to the patients that need
```

Highly Confidential - Subject to Further Confidentiality Review

1    them, agreed?

2         A.    Agreed.

3         Q.    And if you don't follow those

4    laws, then what happens is we have diversion

5    into the illicit market?

6              MS. HENN:  Objection to form.

7              THE WITNESS:  That can happen

8         if you don't follow those laws.

9    QUESTIONS BY MR. FARRELL:

10        Q.    And that's the reason Congress

11   created the laws as stated in this finding?

12             MS. HENN:  Objection to form.

13             THE WITNESS:  Correct.

14   QUESTIONS BY MR. FARRELL:

15        Q.    Next I'm going to have you flip

16   to page 11.  And I just highlighted one

17   sentence in here.  And it says, "The price

18   for participation in this traffic," which is

19   illicit drug trafficking, "should be

20   prohibitive."

21             Do you see that sentence?

22        A.    I see that.

23        Q.    Does McKesson acknowledge that?

24             MS. HENN:  Objection to form.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    Does McKesson acknowledge that

 3    sentence to be true?

 4              MS. HENN:  Objection to form.

 5              THE WITNESS:  Yes.

 6    QUESTIONS BY MR. FARRELL:

 7         Q.    It just makes sense, right?  If

 8    you're going to punish somebody and the

 9    punishment isn't very severe, they're likely

10    to what?

11              MS. HENN:  Objection to form.

12              THE WITNESS:  To do it again.

13    QUESTIONS BY MR. FARRELL:

14         Q.    Why?

15         A.    There's no penalty or

16    accountability.

17         Q.    And so by making the penalty

18    prohibitive, what does it do?

19              MS. HENN:  Objection to form.

20              THE WITNESS:  Could you ask the

21         question in a -- again?  What --

22    QUESTIONS BY MR. FARRELL:

23         Q.    If you make the penalty

24    prohibitive, then what happens?

25              MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MONTMINY:  Objection to
 2         form.  Calls for speculation.  This is
 3         Brandon Montminy for Henry Schein.
 4              MS. HENN:  And just to note for
 5         everyone's knowledge, many of you know
 6         this, but in the deposition protocol,
 7         one defendant's objection counts for
 8         all defendants, so there's no need to
 9         do depositions {sic} if I'm done them.
10         But if on the phone you can't hear me,
11         I can try to speak up.
12              MR. FARRELL:  So that means
13         you're not allowed to object to this
14         question because Henry Schein objected
15         to it.
16              MS. HENN:  I already did, I'm
17         afraid to say.  There are two.
18    QUESTIONS BY MR. FARRELL:
19         Q.    So back to my original
20    question.
21         A.    Yeah, could you put it in
22    simpler terms in --
23         Q.    Yeah.  Let me put it --
24         A.    Just so I know.
25         Q.    -- in other terms.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.      Yeah.

 2         Q.      Let's say that a speeding

 3    ticket is a dollar.  What would happen across

 4    America if a speeding ticket was a dollar?

 5              MS. HENN:  Objection to form.

 6    QUESTIONS BY MR. FARRELL:

 7         Q.      What would happen?

 8         A.      It wouldn't hold the same

 9    weight or it wouldn't -- it may not deter

10    people from speeding.

11         Q.      What if the speeding ticket was

12    a million dollars?  What would that do?

13              MS. HENN:  Objection to form.

14              THE WITNESS:  I'm just

15         guessing, but likely people would not

16         speed.

17    QUESTIONS BY MR. FARRELL:

18         Q.      Because the penalty would be

19    prohibitive, agreed?

20         A.      Agreed.

21         Q.      Like not to be cute, but

22    McKesson was fined $13 million in 2008 and

23    then was fined again in 2017 $150 million.

24              Do you think that the second

25    fine was intended to be more prohibitive than
```

```
 1   the first fine?

 2                MS. HENN:  Objection to form.

 3                THE WITNESS:  I believe so.

 4   QUESTIONS BY MR. FARRELL:

 5        Q.    All right.  Now, let's go to

 6   Bates stamp page 26.

 7                And it says, "Titles 2 and 3 of

 8   the bill deal with law enforcement aspect of

 9   drug abuse and provide authority for the

10   Department of Justice to keep track of all

11   drugs subject to abuse, manufactured or

12   distributed in the United States, in order to

13   prevent diversion of these drugs from

14   legitimate channels of commerce."

15                Does McKesson acknowledge the

16   truth of that statement?

17                MS. HENN:  Objection to form.

18                THE WITNESS:  Yes.

19   QUESTIONS BY MR. FARRELL:

20        Q.    This is just another reflection

21   of the US Code that we were reading that

22   Congress is giving the authority to the

23   Department of Justice to enact safety rules

24   in order to prevent the diversion of

25   controlled substances, including opium pills,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   from legitimate channels into illegitimate

 2   channels.

 3               Does McKesson acknowledge that?

 4               MS. HENN:  Objection to form.

 5               THE WITNESS:  Yes.

 6   QUESTIONS BY MR. FARRELL:

 7        Q.    Flip to page 27, the very next

 8   page.

 9               It says, "The legislation

10   provides that all persons engaged in a

11   legitimate distribution chain involving drugs

12   included in one of the schedules under the

13   bill must be registered with the Attorney

14   General."

15               So again, this is bringing full

16   circle the authority of the Attorney General

17   and the Department of Justice to promulgate

18   rules for those that wish to engage in the

19   closed system of distribution for controlled

20   substances, and McKesson acknowledges that?

21               MS. HENN:  Objection to form.

22               THE WITNESS:  Yes.

23   QUESTIONS BY MR. FARRELL:

24        Q.    Now flip to page 34.  And I

25   would like for you to please read that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   provision that's highlighted aloud.

 2       A.    One second.

 3             "The illegal importation,

 4   manufacture, distribution and possession and

 5   improper use of controlled substances have a

 6   substantial detrimental effect on the

 7   public's health and general welfare."

 8       Q.    Does McKesson acknowledge the

 9   truth of that statement?

10       A.    Yes.

11       Q.    So if somebody in the chain of

12   distribution breaks the law, it has a

13   substantial detrimental effect on the public

14   health and general welfare, agreed?

15             MS. HENN:  Objection to form.

16             THE WITNESS:  It can.

17   QUESTIONS BY MR. FARRELL:

18       Q.    Now go to page 44.

19             Again, this is another

20   reiteration that Congress authorizes the

21   Attorney General to "promulgate rules and

22   regulations and to charge reasonable fees

23   relating to the registration and control of

24   the manufacture, distribution and dispensing

25   of substances covered by the Act."
```

Highly Confidential - Subject to Further Confidentiality Review

1           Does McKesson acknowledge the

2   authority of the Department of Justice and

3   the Attorney General to do so?

4           MS. HENN:  Objection to form.

5           THE WITNESS:  Yes.

6   QUESTIONS BY MR. FARRELL:

7       Q.    Now flip to page 45, the very

8   next one.  This is a little bit longer, so

9   I'm going to give you a chance to read it

10  real quick.

11      A.    Okay.  I've read it.

12      Q.    So I'm going to read it aloud,

13  and I'm going to stop and ask you some

14  questions.

15          It's -- Section B of

16  Section 303 states that the Attorney General,

17  when issuing registrations, is going to

18  consider several factors, agreed?

19      A.    Can you say that again?  I was

20  looking at --

21      Q.    Yeah, I was trying to summarize

22  the first four lines.

23      A.    Yeah.

24      Q.    Basically, what it really boils

25  down to is this is a reiteration of the

1    findings behind the statute that I showed you

2    regarding maintaining effective control.

3              So if you drop down to where it

4    says number 1 at the bottom of the page --

5    can you start reading there?

6         A.     Yeah.  Okay.

7         Q.     Will you read that aloud,

8    please, starting with "maintenance of

9    effective controls"?

10        A.      "Maintenance of effective

11   controls against diversion of particular

12   controlled substances into other than

13   legitimate medical, scientific and industrial

14   channels."

15        Q.     All right.  So again, what

16   we're talking about is the enactment of rules

17   to prevent diversion?

18        A.      Correct.

19        Q.     Last factor, factor 5, would

20   you read that?

21        A.      "Such other factors as may be

22   relevant to and consistent with the public

23   health and safety."

24        Q.      Does McKesson acknowledge that

25   Congress gave the Department of Justice the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    authority to promulgate rules which govern

 2    McKesson so that they maintain effective

 3    controls against diversion, and to adopt any

 4    other rule they want that may be relevant and

 5    consistent with public health and safety?

 6              MS. HENN:  Objection to form.

 7              THE WITNESS:  Agree.

 8    QUESTIONS BY MR. FARRELL:

 9        Q.    I just want to make sure that

10    we start off with the premise that the rules

11    we're about to go through aren't designed

12    to -- let me ask it in a better way.

13              The rules that we're about to

14    get into, McKesson acknowledges, are designed

15    with the primary purpose of preventing

16    diversion?

17              MS. HENN:  Objection to form.

18              THE WITNESS:  Correct.

19    QUESTIONS BY MR. FARRELL:

20        Q.    Because diversion impacts

21    public health and safety, and McKesson

22    acknowledges that?

23        A.    Yes.

24              MS. HENN:  Objection to form.

25              (McKesson-Hartle Exhibit 7
```

```
 1              marked for identification.)

 2   QUESTIONS BY MR. FARRELL:

 3        Q.     The next exhibit we'll have is

 4   marked as Exhibit 7, and correspondingly in

 5   the top right-hand corner it's MCK

 6   30(b)(6)_07-01, and it's just one page.

 7              Once we get through this

 8   section, we can take a break if you like.

 9              All right.  So what I'm going

10   to represent to you is that you will not find

11   this anywhere on the Internet either because

12   I made it.  In the top left-hand corner is

13   the Department of Justice seal, and in the

14   top right-hand corner is the Drug Enforcement

15   Administration seal, and in the middle is

16   where you can trace down the rules that

17   govern McKesson.

18              Does McKesson acknowledge that

19   Title 21 CFR 1301.74 governs its conduct with

20   the distribution of controlled substances,

21   including opium pills?

22              MS. HENN:  Objection to form.

23              THE WITNESS:  Yes.

24   QUESTIONS BY MR. FARRELL:

25        Q.     Part B is what we're going to
```

 1    spend the rest of the day on.

 2              Have you read part B before?

 3         A.    Yes.

 4         Q.    Does McKesson acknowledge that

 5    part B governs its conduct?

 6              MS. HENN:  Objection to form.

 7              THE WITNESS:  Yes.

 8    QUESTIONS BY MR. FARRELL:

 9         Q.    Does McKesson acknowledge that

10    for it to be lawfully carrying out its job of

11    dispensing controlled substances and opium

12    pills, it must follow paragraph B?

13              MS. HENN:  Objection to form.

14              THE WITNESS:  Yes.

15    QUESTIONS BY MR. FARRELL:

16         Q.    And if McKesson does not follow

17    paragraph B, its conduct is illegal?

18              MS. HENN:  Objection to form.

19              THE WITNESS:  Yes.

20    QUESTIONS BY MR. FARRELL:

21         Q.    To make it clear --

22         A.    Yeah.

23         Q.    -- if McKesson follows

24    paragraph B, its conduct is legal?

25         A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      And if McKesson does not follow

 2   paragraph B, its conduct is illegal?

 3              MS. HENN:  Objection to form.

 4              THE WITNESS:  Correct.

 5   QUESTIONS BY MR. FARRELL:

 6          Q.      And so bringing full circle, we

 7   understand that the purpose of this

 8   regulation, one of them, is the prevention of

 9   diversion, correct?

10              MS. HENN:  Objection to form.

11              THE WITNESS:  Correct.

12   QUESTIONS BY MR. FARRELL:

13          Q.      So if you engage in illegal

14   conduct and violate paragraph B, the result

15   of that is diversion?

16              MS. HENN:  Objection to form.

17   QUESTIONS BY MR. FARRELL:

18          Q.      It's the whole reason this law

19   was enacted?

20              MS. HENN:  Objection to form.

21   QUESTIONS BY MR. FARRELL:

22          Q.      Does McKesson acknowledge that?

23          A.      Could you ask the specific

24   question again?

25              MS. HENN:  Objection to form.
```

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.     Yeah, it got very complicated

 3   because it was a compound question with

 4   compound objections.

 5               Does McKesson acknowledge that

 6   paragraph B that we're looking at here is

 7   intended to prevent diversion?

 8               MS. HENN:  Objection to form.

 9               THE WITNESS:  Yes.

10   QUESTIONS BY MR. FARRELL:

11        Q.     And that if you follow -- if

12   McKesson abides by paragraph B, its conduct

13   is legal and diversion is prevented?

14               MS. HENN:  Objection to form.

15               THE WITNESS:  Agreed.

16   QUESTIONS BY MR. FARRELL:

17        Q.     And if McKesson does not abide

18   by paragraph B, its conduct is illegal and

19   the result could be diversion?

20               MS. HENN:  Objection to form.

21               THE WITNESS:  Agree.  The

22        result could be diversion.

23   QUESTIONS BY MR. FARRELL:

24        Q.     Well, if McKesson is

25   distributing orders of unusual size, could it
```

Highly Confidential - Subject to Further Confidentiality Review

 1    be anything other than diversion?

 2              MS. HENN:  Objection to form.

 3              THE WITNESS:  It could.

 4    QUESTIONS BY MR. FARRELL:

 5        Q.    All right.  Give me some

 6    examples.

 7              MS. HENN:  Objection to form.

 8              THE WITNESS:  Maybe the best --

 9         a customer adds, you know -- their

10         business model changes or they add --

11         for example, a pharmacy may add

12         contracts with multiple long-term care

13         facilities and require that they now

14         dispense more for legitimate reasons,

15         so they could order more in that

16         context.

17    QUESTIONS BY MR. FARRELL:

18        Q.    So what's the purpose of the

19    Department of Justice making McKesson follow

20    paragraph B?

21              MS. HENN:  Objection to form.

22              THE WITNESS:  Say that again?

23              What's the purpose of why we

24         follow that?  To try to prevent

25         diversion.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. HENN:  Mr. Farrell, we've
 2         been going over an hour.  Would this
 3         be a good time for a five-minute
 4         break?
 5                MR. FARRELL:  Let me close up
 6         this thing and then we'll get there.
 7                MS. HENN:  All right.
 8                MR. FARRELL:  Is that okay?
 9                MS. HENN:  If it's all right
10         with the witness.
11                THE WITNESS:  It's okay.
12    QUESTIONS BY MR. FARRELL:
13         Q.    Okay.  At the bottom of
14    Exhibit 7, do you see the numbers in the
15    brackets?
16         A.    I do.
17         Q.    36 FR 7778.  Do you know what
18    that means?
19         A.    I don't know off the top of my
20    head.
21         Q.    What about the letters and
22    numbers after that; do you know what that
23    means?
24         A.    The date?
25         Q.    Yes.
```

 1          A.     Of course I know the date.

 2          Q.     Yes.

 3                 Does McKesson acknowledge that

 4    21 CFR Section 1301.74 has been in force and

 5    effect since 1971?

 6                 MS. HENN:  Objection to form.

 7                 THE WITNESS:  Yes.

 8                 (McKesson-Hartle Exhibit 8

 9          marked for identification.)

10    QUESTIONS BY MR. FARRELL:

11          Q.     Just to make sure, I actually

12    pulled 36 Federal Register 778.  I'm going to

13    have it marked as Exhibit 8.

14                 And I'm not going to ask you to

15    read the whole thing because I was kind

16    enough to highlight for you Bates stamp

17    page 10.

18                 And this is from 1971, and this

19    is the document in our United States Archives

20    which adopts the language that we just read

21    in 21 CFR 1301.74.

22                 Does McKesson acknowledge this

23    is the law and it has been the law since

24    1971?

25                 MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes.
 2   QUESTIONS BY MR. FARRELL:
 3         Q.     The language that you just read
 4   in paragraph B, is it the same language
 5   that's in the CFR provision that I showed
 6   you?
 7         A.     It's similar.  Not word for
 8   word.
 9         Q.     Okay.  Is there any meaningful
10   difference?
11         A.     No.
12         Q.     You'll acknowledge that that is
13   the law today as reflected in the 2016
14   version that we're not going to have marked
15   but I'm going to show and ask for -- for --
16   you can just trust me on it if you'd like,
17   but you acknowledge that in 20 -- it's the
18   law today, the same?
19                    MR. SUDDATH:  Objection.
20   QUESTIONS BY MR. FARRELL:
21         Q.     Well, and just to be sure, what
22   I did was I went and ordered the CFR from
23   every year between 1971 and this year, and I
24   looked at every single one of them just to
25   make sure that the law is, and always has
```

 1   been, what it says in Masters Pharmaceutical,

 2   including in 1996 when OxyContin was

 3   launched.

 4              So does McKesson acknowledge

 5   that the CFR provision in McKesson {sic} is

 6   and always has been the law governing

 7   McKesson's conduct since 1971?

 8              MS. HENN:  Objection to form.

 9              THE WITNESS:  Yes.

10   QUESTIONS BY MR. FARRELL:

11       Q.    I'm sorry.  I misspoke.

12              So does McKesson acknowledge

13   that the CFR provision we cited in the

14   Masters Pharmaceutical case is and always has

15   been the law governing McKesson's conduct

16   since 1971?

17              MS. HENN:  Objection to form.

18              THE WITNESS:  Can I read what

19       was in the Masters case again?

20              (McKesson-Hartle Exhibit 9

21       marked for identification.)

22   QUESTIONS BY MR. FARRELL:

23       Q.    Absolutely.

24              And at this point if you hand

25   it back to me, this'll be a good point for us

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to mark it as Exhibit 9.

 2         A.     So your question again?

 3         Q.     Yeah.

 4                Does McKesson acknowledge that

 5    the CFR provision cited in Masters

 6    Pharmaceutical case, which is 21 CFR

 7    1301.74 B, is and always has been the law

 8    governing McKesson's conduct since 1971?

 9                MS. HENN:  Objection to form.

10                THE WITNESS:  Yes.

11                MR. FARRELL:  And

12           unfortunately, I'm not going to be

13           able to get all of my pretty-colored

14           books on the videotape.

15                Let the record reflect that the

16           office of the Federal Register has a

17           kaleidoscope of colors that it uses

18           for the front cover of all of its CFR

19           booklets.

20                And with that, we'll take our

21           first break.

22                VIDEOGRAPHER:  The time is

23           10:23 a.m.  We're going off the

24           record.

25         (Off the record at 10:23 a.m.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                VIDEOGRAPHER:  The time is

 2        10:40 a.m., and we're back on the

 3        record.

 4   QUESTIONS BY MR. FARRELL:

 5        Q.    I forgot to warn you before the

 6   break, but during the break, did you have any

 7   meaningful conversations with your counsel

 8   about your testimony?

 9                MS. HENN:  Objection to form.

10                THE WITNESS:  No.

11   QUESTIONS BY MR. FARRELL:

12        Q.    Did you talk about your

13   testimony at all?

14                MS. HENN:  Objection to form.

15                THE WITNESS:  Not really my

16        testimony, just --

17                MS. HENN:  And I'm just going

18        to instruct the witness not to divulge

19        what we talked about.  I don't think

20        that's an appropriate question.  I

21        think you got the answer you were

22        looking for.

23                MR. FARRELL:  I think I almost

24        got the answer I'm looking for.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    Did you talk to your lawyer

 3    about the substance of your testimony during

 4    the break?

 5              MS. HENN:  And I'll instruct

 6         the witness not to divulge particulars

 7         of what we talked about.

 8              But you may answer that

 9         question yes or no.

10              THE WITNESS:  Yes.

11    QUESTIONS BY MR. FARRELL:

12         Q.    Okay.  What did you talk about?

13              MS. HENN:  I'm going to

14         instruct the witness not to answer

15         that question as calling for

16         privileged information.

17              MR. FARRELL:  Right.  But the

18         deposition protocol and the rules

19         governing this litigation state that

20         counsel is not allowed to discuss with

21         the witness the substance of any

22         testimony during a break.

23              And so his answer in the

24         affirmative indicates that that

25         occurred, and so I should be allowed
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          to inquire about that.

 2               MS. HENN:  All right.  Well,

 3          let's take a break, and we will

 4          discuss outside and have a privileged

 5          conversation, and we'll see if there's

 6          any answer that he can provide without

 7          divulging privileged information that

 8          I don't believe you're entitled to.

 9               MR. FARRELL:  Okay.  So you're

10          going to have a second conversation

11          during a break about the substance of

12          his testimony?

13               MS. HENN:  No, Counsel, that's

14          not what's going to happen.  But I'd

15          like to take a break so that I can

16          talk to my witness about answering the

17          question inquiring into discussions

18          with counsel.

19               MR. FARRELL:  Okay.

20               MS. HENN:  Thank you.

21               VIDEOGRAPHER:  The time is

22          10:42 a.m.  We're going off the

23          record.

24           (Off the record at 10:42 a.m.)

25               VIDEOGRAPHER:  The time is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        10:46 a.m.  We're back on the record.

 2              MR. FARRELL:  So what did you

 3        find out?

 4              MS. HENN:  Counsel, just to

 5        protect the privilege, I'm just going

 6        to instruct the witness that when he

 7        answered yes to your question and

 8        indicated affirmatively that we'd

 9        talked about the substance of his

10        testimony, I'm going to ask him to

11        answer your question and tell you what

12        he deemed to be the substance of his

13        testimony, but I'm also going to ask

14        him not to repeat what I -- my

15        response.

16              So let's do that, and we can

17        discuss if you're still concerned.

18              Okay?

19              MR. FARRELL:  Not really.  Let

20        me make --

21              MS. HENN:  Go ahead and ask

22        your question.

23              MR. FARRELL:  Let me make it

24        even easier.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.     Did anything your lawyer say to

 3    you cause you to change or withdraw anything

 4    you said this morning?

 5         A.     Absolutely not.

 6         Q.     Did anything your lawyer told

 7    you during the break impact or affect your

 8    testimony the rest of the day?

 9         A.     No.

10         Q.     That's fair enough.

11         A.     Okay.

12         Q.     Aside from the statutory duty

13    and the duty that's in the regulation, does

14    McKesson acknowledge that it has a general

15    duty to protect the public against diversion

16    of controlled substances and opium pills?

17              MS. HENN:  Objection to form.

18              THE WITNESS:  Could you restate

19         that, please?

20    QUESTIONS BY MR. FARRELL:

21         Q.     Does McKesson acknowledge that

22    it has a general duty to protect the public

23    against diversion of controlled substances

24    and opium pills into the illicit market?

25              MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes, a general

 2          duty as part of our responsibility,

 3          regulatory responsibilities and

 4          general responsibilities.

 5     QUESTIONS BY MR. FARRELL:

 6          Q.    So let's be careful.  I want

 7     to -- the wording sometimes makes a

 8     difference.

 9          A.    Okay.

10          Q.    Aside from the statute from the

11     United States Code and the regulations

12     promulgated by the Department of Justice,

13     does McKesson acknowledge that it owes a duty

14     to the general public to prevent diversion of

15     controlled substances and opium pills into

16     the illicit market?

17                    MS. HENN:  Objection to form.

18                    THE WITNESS:  We do feel

19          strongly about playing a role in

20          preventing diversion.

21     QUESTIONS BY MR. FARRELL:

22          Q.    So the answer needs to be

23     "yes," "no," or "I don't know."

24          A.    Yes.

25                    MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.    So your answer is, yes, aside

 3   from the statutory and regulatory provisions,

 4   McKesson acknowledges that it owes a duty to

 5   the general public to prevent diversion of

 6   controlled substances and opium pills into

 7   the illicit market?

 8             MS. HENN:  Objection to form.

 9             THE WITNESS:  Yes.

10             (McKesson-Hartle Exhibit 10

11        marked for identification.)

12   QUESTIONS BY MR. FARRELL:

13        Q.    I'm going to mark what is going

14   to be Deposition Exhibit 10.  The top

15   right-hand corner is going to be 1910_01_11.

16   And I'll show it to you, to counsel, two

17   extra copies for my new best friends.  And

18   I'm going to give you a little introduction

19   to this document before you start flipping

20   through it.

21             The front is the HathiTrust.

22   Are you familiar with the HathiTrust?

23        A.    I am not.

24        Q.    I wasn't either until this

25   litigation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  The HathiTrust is an

 2   organization, nonprofit organization, that

 3   collects public documents and puts them

 4   online.

 5         A.      Okay.

 6         Q.      This one is from December 1910

 7   and January 1911.  That's a long time ago,

 8   isn't it?

 9         A.      That would be a long time ago.

10         Q.      100 years ago.

11                 This predates 1970s US Code and

12   the 1971 Code of Federal Regulations, agreed?

13         A.      Clearly, yes.

14         Q.      This is a hearing on -- take a

15   guess.

16         A.      Opioids.

17         Q.      In particular, opium.  And it

18   was about the importation of opium into

19   America back in the early turn of the

20   century.

21                 McKesson was around back then,

22   wasn't they?

23         A.      McKesson was -- has been

24   around.

25         Q.      They were around back during
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    this time frame, agreed?

 2         A.     Agreed.

 3         Q.     So why do you think I'm

 4    bringing this up?

 5                MS. HENN:  Objection to form.

 6                THE WITNESS:  I don't want to

 7         speculate why I think you're bringing

 8         it up.

 9    QUESTIONS BY MR. FARRELL:

10         Q.     Guess who testified during this

11    hearing.

12                MS. HENN:  Objection to form.

13                THE WITNESS:  Don't know.

14    QUESTIONS BY MR. FARRELL:

15         Q.     Take a wild guess.

16                MS. HENN:  Same objection.

17                THE WITNESS:  I don't have

18         honestly a guess.

19    QUESTIONS BY MR. FARRELL:

20         Q.     Mr. McKesson.

21                So what I'm going to have you

22    flip to, is I'm going to have you flip to

23    page 72.

24                Now, without going through the

25    entire boring history of commerce clause, the
```

Highly Confidential - Subject to Further Confidentiality Review

1  United States Constitution, I'm just going to

2  give you a broad statement.

3           What this is, is this is

4  America's first attempt to regulate opium

5  trafficking in America.  And back then there

6  was a big debate on whether or not this was

7  something the federal government can do or

8  it's something that should be left to the

9  states.

10           So what the federal government

11  decided to do was pass the Harrison Narcotic

12  Act.  What that did was it basically taxed

13  opium as a way for the federal government to

14  control, and this is a debate about the

15  taxation on the importation of opium.

16      A.     Okay.

17      Q.     Page 72 is the beginning of the

18  testimony of Mr. McKesson from McKesson &

19  Robbins, which is the predecessor and when

20  McKesson Corporation was in the private hands

21  of the McKesson family.

22           You acknowledge that?

23      A.     Correct.

24      Q.     I'm going to have you flip to

25  page 75.  And if you look near the top, one

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of congressmen asks Mr. McKesson about

 2    whether or not he supports this bill.  And

 3    I'm going to give you an opportunity to read

 4    to yourself the provision before I ask you to

 5    read it aloud.

 6         A.    Which specific part do you want

 7    me to start and end at?

 8         Q.    The first time it says

 9    "Mr. McKesson."

10         A.    Okay.

11         Q.    He's asked about whether or not

12    he's in favor of the bill.

13               Do you see that?

14         A.    I do.

15         Q.    And his answer is, "Yes, very

16    much in favor of the bill."

17               Do you see that provision?

18         A.    I do.

19         Q.    Now, would you please begin

20    reading the next sentence?

21         A.    Out loud?

22         Q.    Please.

23         A.    "Our firm was founded in 1832,

24    and we have been ever since against the sale

25    of habit-forming drugs and all that kind of
```

Highly Confidential - Subject to Further Confidentiality Review

1    thing.  Orders which have come to us from

2    suspicious people we have put in the hands of

3    the proper authorities for tracing and

4    prosecution, if necessary."

5         Q.    So you agree with me that even

6    before the enactment of the Controlled

7    Substances Act and the Code of Federal

8    Regulations, which we discussed earlier this

9    morning, is that McKesson, Mr. McKesson

10   hisself, was acknowledging that if they have

11   suspicious people, they're going to turn it

12   over to law enforcement for prosecution,

13   agreed?

14             MS. HENN:  Objection to form.

15             THE WITNESS:  Agreed based on

16        what I'm reading in this document.

17   QUESTIONS BY MR. FARRELL:

18        Q.    And this duty predates the US

19   Code and predates the Code of Federal

20   Regulations, agreed?

21             MS. HENN:  Objection to form.

22             THE WITNESS:  Agreed.

23   QUESTIONS BY MR. FARRELL:

24        Q.    So would you agree, would

25   McKesson agree, that it owes a common law

Highly Confidential - Subject to Further Confidentiality Review

```
1    duty to the American public to prevent

2    diversion if it's engaged in the distribution

3    of controlled substances, including opium

4    pills, to prevent their diversion into the

5    illicit market?

6              MS. HENN:  Objection to form.

7              THE WITNESS:  Can you ask it in

8        a shorter version there?

9    QUESTIONS BY MR. FARRELL:

10       Q.     Probably not.

11              Does McKesson acknowledge it

12   owes a common law duty to the American public

13   to prevent the diversion of controlled

14   substances, including opium pills, into the

15   illicit market?

16              MS. HENN:  Objection to form.

17              THE WITNESS:  Yes.

18   QUESTIONS BY MR. FARRELL:

19       Q.     Now, the first part of the

20   sentence, it kind of grabbed my attention.

21   It says, "McKesson has ever since been

22   against the sale of habit-forming drugs."

23   And this was in 1910.

24              Do you see that?

25       A.     I see that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     When did McKesson begin the

 2    business of selling opium pills?

 3                 MS. HENN:  Objection to form.

 4                 THE WITNESS:  I do not know.

 5    QUESTIONS BY MR. FARRELL:

 6          Q.     At some point in time

 7    McKesson's philosophy changed, and it went

 8    from not selling habit-forming drugs to now

 9    selling habit-forming drugs, agreed?

10                 MS. HENN:  Objection to form.

11                 THE WITNESS:  Agreed.

12    QUESTIONS BY MR. FARRELL:

13          Q.     Has McKesson considered, given

14    the presence of the opioid epidemic in

15    America, perhaps returning to the stance of

16    1910 of its founder, Mr. McKesson?

17                 MS. HENN:  Objection to form.

18                 THE WITNESS:  Again, I'm not

19          aware of that.  Can't answer that

20          question.

21    QUESTIONS BY MR. FARRELL:

22          Q.     Well, you could choose not to

23    sell opium pills anymore in America, could

24    you not?

25          A.     You could choose to.
```

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.     But McKesson chooses to

 2   continue to sell opium pills in America,

 3   despite the fact that we have an opiate pill

 4   epidemic?

 5               MS. HENN:  Objection to form.

 6               THE WITNESS:  We do.

 7               (McKesson-Hartle Exhibit 11

 8        marked for identification.)

 9   QUESTIONS BY MR. FARRELL:

10          Q.     The next exhibit we're going to

11   have marked as Exhibit 11.  In the top

12   right-hand corner, this is 1996, 04, 01.

13               We've acknowledged that in

14   1971, Department of Justice adopted CFR

15   provision 1301.74, agreed?

16          A.     Agree.

17          Q.     And then we went through and

18   it's the law today, agreed?

19          A.     Agreed.

20          Q.     It's the law that was

21   referenced in the Masters Pharmaceutical

22   case, agreed?

23          A.     Agreed.

24          Q.     And it hadn't changed through

25   all those colorful books I showed you,

1    agreed?

2              MS. HENN:  Objection to form.

3              THE WITNESS:  Agreed.

4    QUESTIONS BY MR. FARRELL:

5         Q.    This is a specific year.

6              Can you tell me what year it

7    is?

8         A.    1996.

9         Q.    Why do you think I picked this

10   year?

11             MS. HENN:  Objection to form.

12             THE WITNESS:  I'm not -- I'm

13        not sure.

14   QUESTIONS BY MR. FARRELL:

15        Q.    What happened in 1996 that

16   changed the face of opioid sales in America?

17             MS. HENN:  Objection to form.

18             THE WITNESS:  I'm not

19        100 percent sure.  I'd be speculating.

20   QUESTIONS BY MR. FARRELL:

21        Q.    Well, McKesson's in the

22   business of selling opium pills, correct?

23             MS. HENN:  Objection to form.

24             THE WITNESS:  As part of

25        controlled substances, yes.

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.    And in 1996, business began

 3   hopping, agreed?

 4             MS. HENN:  Objection to form.

 5             THE WITNESS:  I'm not sure.  I

 6        don't -- I don't -- I can't answer

 7        that.  I don't know what the business

 8        was before or --

 9   QUESTIONS BY MR. FARRELL:

10        Q.    That's fair enough.

11        A.    Yeah.

12        Q.    In 1996, I'll represent to you,

13   OxyContin was launched.  So all I'm trying to

14   establish on page 2 of the exhibit is that

15   under 1301.74 B, the same law was in place

16   when OxyContin was launched.

17             MS. HENN:  Objection to form.

18   QUESTIONS BY MR. FARRELL:

19        Q.    Agreed?

20        A.    Understood.

21        Q.    Not understood --

22        A.    Agreed.

23        Q.    Yeah.

24        A.    Sorry.

25        Q.    This might take a little bit
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   longer because, as you can see, this next

 2   exhibit is a little bit thicker.

 3              (McKesson-Hartle Exhibit 12

 4       marked for identification.)

 5   QUESTIONS BY MR. FARRELL:

 6       Q.    We're going to have it marked

 7   as Exhibit 12.

 8              MR. FARRELL:  So for the

 9       record, the top right-hand corner is

10       2000_07.  The bottom right-hand

11       corner, for all the fans listening on

12       the telephone, is an actual Bates

13       stamp number.  And while this was

14       previously produced to some Attorney

15       Generals, it was also produced in the

16       MDL, so I have an MDL number.  And

17       it's MCKMDL00337660.

18   QUESTIONS BY MR. FARRELL:

19       Q.    Now, does McKesson recognize

20   this document?

21       A.    I do.

22       Q.    And has McKesson reviewed this

23   document in preparation for today's

24   testimony?

25              MS. HENN:  Objection to form.
```

```
 1                    THE WITNESS:  I have.

 2   QUESTIONS BY MR. FARRELL:

 3        Q.     What is this document?

 4        A.     This is the operational manual

 5   for how controlled substances are handled

 6   within McKesson.

 7        Q.     And what was the date of

 8   enactment?

 9        A.     I believe July of 2000.

10        Q.     Okay.  Prior to July of 2000,

11   what was the policy at McKesson regarding the

12   distribution of controlled substances?

13                    MS. HENN:  Objection to form.

14        Outside the scope.

15                    THE WITNESS:  I can't speak to

16        that.

17   QUESTIONS BY MR. FARRELL:

18        Q.     To your understanding and

19   belief sitting here today as the

20   representative of McKesson, is this document

21   the earliest version of the controlled

22   substance monitoring program adopted by the

23   company?

24                    MS. HENN:  Same objections.

25                    THE WITNESS:  I can't say for
```

```
 1        certain this is the only one I know

 2        of.

 3   QUESTIONS BY MR. FARRELL:

 4        Q.    I'm not asking you to --

 5        A.    Yeah.

 6        Q.    -- foreclose the existence of

 7   anything else.

 8        A.    Right.

 9        Q.    Sitting here today as the

10   McKesson designee for the 30(b)(6)

11   deposition, what we're showing you here as

12   Exhibit 12 is the earliest version you're

13   aware of for McKesson's controlled substance

14   monitoring program?

15            MS. HENN:  Objection to form.

16        Outside the scope.

17            THE WITNESS:  Correct, that I'm

18        aware of.

19   QUESTIONS BY MR. FARRELL:

20        Q.    So when I asked you in the

21   30(b)(6) deposition notice to testify

22   regarding all past and present suspicious

23   order policies and procedures, this, to the

24   best of your knowledge, is the first time

25   McKesson has adopted a policy and procedure
```

```
 1    in compliance with the United States Code

 2    that we discussed this morning and the Code

 3    of Federal Regulations we discussed this

 4    morning.

 5              MS. HENN:  Objection.

 6    QUESTIONS BY MR. FARRELL:

 7         Q.    Agreed?

 8              MS. HENN:  Objection to form.

 9         Outside the scope.

10              THE WITNESS:  I can't -- I

11         can't speak to things that may have

12         happened prior to this date that maybe

13         weren't put in this format and written

14         down on paper, but on paper, this is

15         the one that I recognize.

16    QUESTIONS BY MR. FARRELL:

17         Q.    I need to be a little more

18    clear about it.

19              Are you aware of any other

20    piece of paper in the annals of McKesson

21    Corporation that talk about the duty to

22    comply with the United States Code and the

23    Code of Federal Regulations regarding the

24    distribution of controlled substances?

25              MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Outside the scope.

 2              MR. FARRELL:  Counsel, it seems

 3        to be directly within point A of the

 4        30(b)(6) notice.

 5              MS. HENN:  We can disagree

 6        about that.

 7              MR. FARRELL:  Well, I'll read

 8        it out loud.

 9              "Your past, present, suspicious

10        orders monitoring system, SOMS

11        program, policies and procedures."

12              MS. HENN:  And I'll just object

13        again to the question as outside the

14        scope.

15              And to respond to you,

16        Mr. Farrell, the -- Special Master

17        Cohen has made rulings about the

18        proper time frame for discovery, and

19        so our position is that asking about

20        the annals of McKesson Corporation is

21        outside the scope.

22              But he can answer your question

23        if you want to state it again.

24              MR. FARRELL:  That's a fair

25        point.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    So sitting here today as

 3    McKesson Corporation, you're unaware of any

 4    piece of paper that predates Exhibit 12, but

 5    there may be; is that fair?

 6              MS. HENN:  Objection to form.

 7         Outside the scope.

 8              THE WITNESS:  That's fair.  I'm

 9         unaware, but I -- there may be.

10    QUESTIONS BY MR. FARRELL:

11         Q.    So you don't have any basis in

12    fact, as the McKesson designee today, to

13    discuss what the policies and procedures were

14    for McKesson related to the distribution of

15    controlled substances and opium pills between

16    '96 when OxyContin was launched and the

17    adoption of Section 55, Exhibit 12, in July

18    of 2000; is that a fair statement?

19              MS. HENN:  Objection to form.

20         Outside the scope.

21              THE WITNESS:  That's a fair

22         statement.

23    QUESTIONS BY MR. FARRELL:

24         Q.    So what we're looking at is

25    Exhibit 12.
```

1          Can you tell me the name of

2    this document?

3          A.     It's the drug operation manual.

4    It's been -- but it's known as Section 55,

5    often within McKesson, which is also in the

6    title.

7          Q.     And as of July 2000, is there

8    any other document related to the

9    distribution of controlled substances in the

10   prevention of diversion other than

11   Section 55?

12          MS. HENN:  Objection to form.

13      Outside the scope.

14          THE WITNESS:  I'm not following

15      your question 100 percent.

16   QUESTIONS BY MR. FARRELL:

17          Q.     Okay.  Are you a sports fan?

18          A.     I am.

19          Q.     What's your favorite sport?

20          A.     Wrestling.

21          Q.     Very good.

22          How many rules are in the

23   wrestling rule book?

24          A.     I couldn't even guess.  I don't

25   know.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      But the wrestling rule book is

2   intended to be comprehensive, agreed?

3      A.      I would agree.

4      Q.      If you're a referee, how many

5   different books do you have to read to know

6   the rules of wrestling on the mat?

7      A.      Should be one.

8      Q.      Is that the same for this

9   document, Exhibit 12?  Is this intended to be

10  the rule book for the distribution of

11  controlled substances for McKesson

12  Corporation?

13              MS. HENN:  Objection to form.

14              THE WITNESS:  For which time

15      frame?

16  QUESTIONS BY MR. FARRELL:

17      Q.      July 2000 until -- and I'll

18  give you a hint -- the 2007 Lifestyles

19  program.

20              MS. HENN:  Objection to form.

21      Outside the scope.

22              THE WITNESS:  I'm not aware of

23      another one.

24  QUESTIONS BY MR. FARRELL:

25      Q.      All right.  On page 1, the very

 1    first paragraph under general, I'd like you

 2    to take a minute and read that.  And I've

 3    never liked just having you -- or just spring

 4    that on you.  I want you to kind of digest

 5    it.

 6         A.     Just the first paragraph?

 7         Q.     Just the first paragraph.

 8         A.     I read it.

 9         Q.     All right.  Now, I'm going to

10    have you read aloud just the first sentence,

11    and I'm going to compliment you that all of

12    your testimony this morning is spot-on with

13    that very first sentence.  I couldn't trip

14    you up at all.  So I'd like you to read the

15    first sentence aloud, please.

16         A.     "The aim of the Controlled

17    Substance Act is to prevent diversion of

18    abusable substances into illicit traffic

19    while ensuring their availability for

20    legitimate medical purposes."

21         Q.     So again, we're back to this

22    theme that the Controlled Substances Act was

23    intended to prevent diversion, agreed?

24              MS. HENN:  Objection to form.

25              THE WITNESS:  Agreed.

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.    And in July of 2000, McKesson

 3   adopted a policy to accomplish that

 4   objective; is that fair?

 5             MS. HENN:  Objection to form.

 6             THE WITNESS:  They formalized a

 7        policy within -- within this document.

 8   QUESTIONS BY MR. FARRELL:

 9        Q.    That's the purpose of this

10   document?

11        A.    Right.

12        Q.    Who wrote this document?

13        A.    I'm not 100 percent sure

14   exactly who wrote it within the McKesson

15   team, but a combination of people.

16        Q.    Whose document is this?

17             MS. HENN:  Objection to form.

18             THE WITNESS:  McKesson's.

19   QUESTIONS BY MR. FARRELL:

20        Q.    Is this a document that is kept

21   in the regular course of business for

22   McKesson?

23             MS. HENN:  Objection to form.

24             THE WITNESS:  It is.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    Is this a true and authentic

 3    copy of Section 55 of McKesson's policy?

 4              MS. HENN:  Objection to form.

 5              THE WITNESS:  I know it's

 6         undergoing some revisions.

 7    QUESTIONS BY MR. FARRELL:

 8         Q.    Well, not as of July 2000.

 9         A.    Oh, can you say it again?

10         Q.    Yeah.  This document, sitting

11    here today --

12         A.    Right.

13         Q.    -- is this a document that as

14    of July of the year 2000 was a document

15    created by McKesson in the course of

16    conducting its regular business activities?

17              MS. HENN:  Objection to form.

18              THE WITNESS:  Yes.

19    QUESTIONS BY MR. FARRELL:

20         Q.    So if I hold this document up

21    in a courtroom I can say this is McKesson's

22    drug operations manual related to the

23    distribution of controlled substances that

24    was adopted in July of 2000?

25         A.    Yes.
```

1     Q.     Now, the second sentence,

2   starting with "The Drug Enforcement

3   Administration," can you read that sentence

4   aloud?

5     A.     Sure.

6            "The Drug Enforcement

7   Administration strictly interprets the law

8   and regulations and has imposed significant

9   fines for technical errors in completing

10  forms and keeping records."

11    Q.     So the DEA, even as of July

12  2000, took the Controlled Substances Act very

13  seriously, and McKesson acknowledges that,

14  agreed?

15           MS. HENN:  Objection to form.

16           THE WITNESS:  Correct, or

17      agreed.

18  QUESTIONS BY MR. FARRELL:

19    Q.     Now, would you read the last

20  sentence?

21    A.     "It's extremely important that

22  McKesson employees comply fully with the

23  regulations and the following guidelines."

24    Q.     How important is it?

25           MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 THE WITNESS:  To recite, it

 2      says "extremely important."

 3  QUESTIONS BY MR. FARRELL:

 4      Q.      And why?

 5      A.      To prevent the diversion of

 6  controlled substances.

 7      Q.      I'm going to have you now flip

 8  to page 27.  I'll give you a minute to kind

 9  of --

10      A.      The whole --

11      Q.      Yeah, you can just glance it.

12  We're going to walk through it a little bit.

13              We can start with the heading,

14  paragraph A.  What's paragraph A, the very

15  top of the page?  What's it say?

16              Oh, wait a minute, I'm sorry.

17      A.      Am I on the right page here?

18      Q.      I was on the wrong page.

19              Page 27, paragraph G.  Will you

20  read the first paragraph?

21      A.      The heading or the entire --

22  the first --

23      Q.      You can read the heading if

24  you'd like.

25      A.      "DEA continuing education"?
```

```
 1    That piece?

 2        Q.    Yes.  And then there's another

 3    word underneath that.

 4        A.    "Documentation."

 5        Q.    What does documentation mean?

 6        A.    Is you document something on

 7    paper.

 8        Q.    Okay.  And will you read the

 9    sentence, please?

10        A.    "All compliance training

11    sessions, formal and informal, held in your

12    distribution center must be logged and

13    documented on the DEA continuing education

14    report."

15        Q.    What does that mean?

16            MS. HENN:  Objection to form.

17        Outside the scope.

18            THE WITNESS:  It means you

19        should document the training that's

20        conducted related to compliance.

21    QUESTIONS BY MR. FARRELL:

22        Q.    Okay.  Is there a DEA

23    continuing education report that you're aware

24    of?

25        A.    Not that I'm aware of.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.      You haven't seen any such

 2    thing?

 3        A.      I don't believe I have, no.

 4        Q.      But if we ask for it, it's

 5    something McKesson could theoretically go and

 6    look for?

 7              MS. HENN:  Objection to form.

 8        Outside the scope.

 9              THE WITNESS:  Theoretically.

10    QUESTIONS BY MR. FARRELL:

11        Q.      All right.  Because the policy

12    seems to indicate you guys have this

13    documentation of compliance training

14    sessions.  And I'll admit to you I haven't

15    seen any, so I was wondering if you'd seen

16    any.

17        A.      I have not.

18        Q.      Now, if you flip to the next

19    page, page 28, at the top it's paragraph A.

20    And will you read the title of paragraph A?

21        A.      "Detecting suspicious orders."

22        Q.      And what's it say over there on

23    the right, that number?

24        A.      1301.74.

25        Q.      What do you think that is?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      That's from the CFR.

 2          Q.      All right.  And then under

 3   paragraph 1, you see where it says, "DEA

 4   regulation defines suspicious orders as

 5   follows"?

 6          A.      I do.

 7          Q.      Will you read what's in the

 8   quotation marks?

 9          A.      "Suspicious orders include

10   orders of unusual size, orders deviating

11   substantially from a normal pattern and

12   orders of unusual frequency."

13          Q.      Now, if you go down to the

14   paragraph that starts "recent cases," do you

15   see that?

16                  Will you read the first

17   sentence?

18          A.      "Recent cases indicate that DEA

19   will seek large penalties from distributors

20   who fail to comply with this regulation."

21          Q.      What do you interpret that to

22   mean?

23                  MS. HENN:  Objection.  Outside

24       the scope.

25                  THE WITNESS:  Exactly what it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          says.

 2     QUESTIONS BY MR. FARRELL:

 3          Q.     You got to follow the law?

 4                 MS. HENN:  Objection to form.

 5                 THE WITNESS:  Right.

 6     QUESTIONS BY MR. FARRELL:

 7          Q.     And if McKesson doesn't follow

 8     the law, that makes its conduct unlawful?

 9                 MS. HENN:  Objection to form.

10                 THE WITNESS:  Yes.

11     QUESTIONS BY MR. FARRELL:

12          Q.     And McKesson has acknowledged

13     that as early as July of 2000?

14                 MS. HENN:  Objection to form.

15          Outside the scope.

16                 THE WITNESS:  In this document,

17          yes.

18     QUESTIONS BY MR. FARRELL:

19          Q.     The next sentence says, "It is

20     left to the distributor to define what

21     constitutes an unusual or suspicious order."

22                 Do you see that sentence?

23          A.     I do.

24          Q.     And to comply with this,

25     McKesson has adopted this policy; is that
```

```
1    fair?

2              MS. HENN:  Objection to form.

3         Outside the scope.

4              THE WITNESS:  Yes.

5    QUESTIONS BY MR. FARRELL:

6
```



Highly Confidential - Subject to Further Confidentiality Review

1    to ask questions about the reports in the

2    ████████████████████

███        ████████████  ████████████████

███        ████████████  ████████████████

███      ████████████████

6    QUESTIONS BY MR. FARRELL:

7         Q.    Okay.  Flip to the next page,

8    page 29.  Little A talks about controlled

9    substances sales reports.

10              Do you see that?

11        A.    I do.

12        Q.    That's a document that should

13   exist as of July of 2000, agreed?

14              MS. HENN:  Objection to form.

15        Outside the scope.

16              THE WITNESS:  Agreed.

17   QUESTIONS BY MR. FARRELL:

18        Q.    Little B says, "Controlled

19   substance customer purchase report."

20              That's a document that should

21   exist as of July of 2000, agreed?

22              MS. HENN:  Objection to form.

23        Outside the scope.

24              THE WITNESS:  Agreed.

25

```
 1    QUESTIONS BY MR. FARRELL:

 2        Q.    Little C says, "Daily

 3    controlled substance suspicious order warning

 4    report."

 5              That's a document that should

 6    exist as of July 2000, agreed?

 7              MS. HENN:  Objection to form.

 8        Outside the scope.

 9              THE WITNESS:  Agreed.

10    QUESTIONS BY MR. FARRELL:

11        Q.    Next page, little D, "Monthly

12    controlled substance suspicious purchases

13    report."

14              That's a document that should

15    exist as of July 2000, agreed?

16              MS. HENN:  Objection to form.

17        Outside the scope.

18              THE WITNESS:  Agreed.

19    QUESTIONS BY MR. FARRELL:

20        Q.    And little E, "Monthly ARCOS

21    customer recap variance."  Again, another

22    document that should exist as of July 2000 as

23    part of the McKesson suspicious order

24    detecting policy.

25              MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Outside the scope.

2    QUESTIONS BY MR. FARRELL:

3          Q.      Agreed?

4          A.      Can you rephrase that in terms

5    of...

6          Q.      Yeah.  We're talking about

7    under paragraph A, which is "Detecting

8    Suspicious Orders."

9          A.      Agreed.

10         Q.      ████████████████████████

██   ████████████████████████████████████████

██   ████████████████████████████████████████████

██   ███████████████████████████████████████████████

██   █████████████████████████████████████████

██               ██████████████████████

16         A.      I see that.

17         Q.      Have you seen any of those

18   reports?

19               MS. HENN:  Objection.  Outside

20         the scope.

21               THE WITNESS:  I have.

22   QUESTIONS BY MR. FARRELL:

23         Q.      Did you review them in

24   anticipation of today's deposition?

25         A.      I did.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.      And how far back did you review

 2   them?

 3        A.      I'm not certain of the dates on

 4   the examples that I had.

 5        Q.      How old?

 6        A.      In the early 2000s, I believe.

 7   I'd have to look.

 8        Q.      Did those reports help inform

 9   you of the policies and procedures for

10   McKesson in preparation for today's

11   deposition?

12               MS. HENN:  Objection to form.

13               THE WITNESS:  They did.

14   QUESTIONS BY MR. FARRELL:

15        Q.      And did they help refresh your

16   recollection in preparation for today's

17   testimony?

18               MS. HENN:  Objection to form.

19               THE WITNESS:  They did.

20   QUESTIONS BY MR. FARRELL:

21        Q.      Are those documents important

22   to McKesson for purposes of complying with

23   its duties under the Controlled Substances

24   Act beginning in July of 2000?

25               MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Outside the scope.

2           THE WITNESS:  Can you say it

3      again one more time?

4  QUESTIONS BY MR. FARRELL:

5      Q.    Are those documents important

6  to McKesson for purposes of complying with

7  its duties under the Controlled Substances

8  Act beginning in July of 2000?

9           MS. HENN:  Objection to form.

10      Outside the scope.

11           THE WITNESS:  They are

12      important.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 8              MS. HENN:  Objection to form.

 9        Outside the scope.

10  QUESTIONS BY MR. FARRELL:

11        Q.     Would you like me to restate

12  it?

13        A.     Yeah, please.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





```
 3              MS. HENN:  Objection to form.

 4         Outside the scope.

 5    QUESTIONS BY MR. FARRELL:

 6         Q.    It's what the policy says?

 7              MS. HENN:  Same objections.

 8              THE WITNESS:  Can you say that

 9         again or point me to the policy

10         section you're referring to?

11    QUESTIONS BY MR. FARRELL:

12         Q.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20      Q.      So you acknowledge, sitting

21   here today as McKesson, that simply

22   submitting reports to the DEA does not comply

23   with the US Code or the Code of Federal

24   Regulations?

25              MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

1        Outside the scope.

2              THE WITNESS:  Agree.

3    QUESTIONS BY MR. FARRELL:

4        Q.     You have a duty to review and

5    note orders of unusual size?

6        A.     It's part of our -- this

7    document program, yes.



25

Highly Confidential - Subject to Further Confidentiality Review



```
 6              MS. HENN:  Objection to form.

 7        Outside the scope.

 8              THE WITNESS:  One more time,

 9        please.

10    QUESTIONS BY MR. FARRELL:
```

Highly Confidential - Subject to Further Confidentiality Review



21    QUESTIONS BY MR. FARRELL:

22          Q.      This goes back to what we were

23    talking about earlier, is that aside from

24    your regulatory responsibilities, you also

25    perform a function that serves the public

Highly Confidential - Subject to Further Confidentiality Review

1    interest at large?

2         A.    Correct.



Highly Confidential - Subject to Further Confidentiality Review

7    QUESTIONS BY MR. FARRELL:

8         Q.    Sitting here today, though, you

9    have not seen any such document?

10        A.    I've not reviewed a completed

11   one.  I've seen one.

12        Q.    Do they still exist?

13              MS. HENN:  Objection to form.

14   Outside the scope.

15              THE WITNESS:  I'm not sure.

16              (McKesson-Hartle Exhibit 13

17        marked for identification.)

18   QUESTIONS BY MR. FARRELL:

19        Q.    I'm going to have marked as the

20   next sequential exhibit Exhibit 13.  The

21   document in the right-hand corner is

22   2001_0828.

23              Again, this is from the

24   HathiTrust.

25        A.    I see that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      It's a Congressional record

 2     from 2001.

 3                  Can you read the title of the

 4     Congressional investigation?

 5          A.      "OxyContin:  Its use and abuse:

 6     Hearing before the Subcommittee and Oversight

 7     and Investigations of the Committee on Energy

 8     and Commerce, House of Representatives, 107th

 9     Congress, First Session, August 28th of

10     2001."

11          Q.      Does McKesson acknowledge that

12     the use and abuse of OxyContin was on the

13     national radar at least as early as

14     August 28, 2001, with a Congressional

15     hearing?

16                  MS. HENN:  Objection to form.

17                  THE WITNESS:  Yes.

18     QUESTIONS BY MR. FARRELL:

19          Q.      I'm going to have you flip to

20     page 8.  This is the introductory statement

21     from the chairman, James Greenwood, on the

22     Subcommittee on Oversight and Investigations.

23     He's from Pennsylvania.

24                  Two-thirds of the way down, the

25     sentence says, "These actions, though
```

Highly Confidential - Subject to Further Confidentiality Review

1    commendable, also appear long overdue."

2              Do you see that sentence?

3         A.    I do see that.

4         Q.    Will you begin reading,

5    starting with "according"?

6         A.    "According to DEA, the number

7    of oxycodone-related deaths has increased

8    400 percent since 1996, the same time period

9    in which the annual number of prescriptions

10   for OxyContin has risen from approximately

11   300,000 to almost 6 million."

12        Q.    And how did these

13   prescriptions -- how did these pills get from

14   Purdue Pharma, who makes OxyContin, to the

15   pharmacies?

16              MS. HENN:  Objection to form.

17              THE WITNESS:  After being

18        prescribed by a doctor --

19   QUESTIONS BY MR. FARRELL:

20        Q.    Yes.

21        A.    -- and sent to pharmacies --

22        Q.    Yes.

23        A.    -- or other by distributors.

24        Q.    Right.

25              So between 1996 and the year

1    2001, the number of prescriptions went from

2    300,000 to almost 6 million.  So the

3    OxyContin business was a-booming, wasn't it?

4                MS. HENN:  Objection to form.

5         Outside the scope.

6                THE WITNESS:  It increased

7         significantly.

8    QUESTIONS BY MR. FARRELL:

9         Q.    And McKesson was amongst the

10   distributors that were delivering the pills

11   from Purdue Pharma to the pharmacies?

12               MS. HENN:  Objection to form.

13               THE WITNESS:  We were.

14   QUESTIONS BY MR. FARRELL:

15        Q.    Do you believe that the

16   increase from 300,000 prescriptions to 6

17   million is an increase of unusual size?

18               MS. HENN:  Objection to form.

19        Outside the scope.

20               THE WITNESS:  Could you ask

21        that again?

22   QUESTIONS BY MR. FARRELL:

23        Q.    You go from 300,000

24   prescriptions to 6 million in five years.  Do

25   you think that that is an unusual increase?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HENN:  Objection to form.

 2         Outside the scope.

 3                    THE WITNESS:  It appears to be

 4         a significant increase.  I don't -- I

 5         don't have the context of before --

 6         everything before, but it's a large

 7         increase.

 8    QUESTIONS BY MR. FARRELL:

 9         Q.    Well, assuming in 1996 there

10    were 300,000 prescriptions and five years

11    later there were 6 million, would you --

12    would you characterize that increase as

13    unusual?

14                    MS. HENN:  Objection to form.

15         Outside the scope.

16                    THE WITNESS:  I don't know if I

17         would characterize it as -- it's

18         significant.

19    QUESTIONS BY MR. FARRELL:

20         Q.    Significant enough to get

21    McKesson's attention?

22                    MS. HENN:  Objection to form.

23                    THE WITNESS:  Significant

24         enough.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.     Yes?

 3         A.     Yes.

 4         Q.     Now, two paragraphs down it

 5    says, "In its testimony today" --

 6                Do you see that paragraph?

 7         A.     I do.

 8         Q.     -- "Purdue Pharma will argue

 9    that the death figures heralded by newspapers

10    nationwide are inaccurate and are the prime

11    mover of the negative hype surrounding

12    OxyContin."

13                Do you see that sentence?

14         A.     I do see that sentence.

15         Q.     So does McKesson acknowledge

16    that death figures are being heralded by

17    newspapers nationwide as of 2001?

18                MS. HENN:  Objection to form.

19         Outside the scope.

20                THE WITNESS:  Could you ask

21         that again in a different way, maybe?

22    QUESTIONS BY MR. FARRELL:

23         Q.     Yeah.

24                This is saying that there's

25    newspaper headlines across the country of
```

```
 1    people dying taking opium pills that McKesson

 2    is distributing.

 3              Does McKesson acknowledge that?

 4              MS. HENN:  Objection to form.

 5         Outside the scope.

 6              THE WITNESS:  Not that --

 7         there's certainly headlines of

 8         opioid-related deaths.

 9    QUESTIONS BY MR. FARRELL:

10         Q.    In 2001?

11         A.    I don't know of any

12    specifically.  I'm assuming there were in

13    that time frame.

14         Q.    And it's a little unfair to ask

15    you because you weren't there in 2001, but as

16    McKesson's corporate designee I'm simply

17    looking for an acknowledgement that the chain

18    of distribution McKesson was involved in is

19    being heralded in newspapers as causing

20    deaths across the country.

21              MS. HENN:  Objection to form.

22         Outside the scope.

23    QUESTIONS BY MR. FARRELL:

24         Q.    Does McKesson acknowledge that

25    fact?
```

```
 1              MS. HENN:  Same objections.

 2              THE WITNESS:  I haven't seen

 3         any of those headlines, so I can't

 4         speak to whether us as a distributor

 5         was called out in those.

 6    QUESTIONS BY MR. FARRELL:

 7         Q.    I'm not asking you if you were

 8    called out as a distributor.  What I'm asking

 9    you is if McKesson acknowledged that the

10    pills that it was selling was causing deaths

11    nationwide and resulted in newspaper

12    headlines across the country.

13              MS. HENN:  Objection to form.

14         Outside the scope.

15              THE WITNESS:  Yes, pills that

16         we distribute were in headlines.

17    QUESTIONS BY MR. FARRELL:

18         Q.    And Purdue Pharma says that

19    "those headlines are inaccurate and the prime

20    mover of the negative hype surrounding

21    OxyContin."

22              Does McKesson Corporation,

23    sitting here today, concur with Purdue

24    Pharma?

25              MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Outside the scope.

 2                   THE WITNESS:  Reading the rest

 3              of this if you don't -- I'm reading

 4              down a little bit more, so...

 5                   Can you ask your question

 6              again?

 7    QUESTIONS BY MR. FARRELL:

 8         Q.     Yeah.

 9                Does McKesson Corporation,

10    sitting here today and testifying, concur

11    with Purdue Pharma that the nationwide

12    newspapers about overdose deaths are

13    inaccurate?

14                   MS. HENN:  Objection to form.

15         Outside the scope.

16                   THE WITNESS:  I can't speak to

17         that.  I'd just be speculating.

18    QUESTIONS BY MR. FARRELL:

19         Q.     You don't share Purdue Pharma's

20    disavow of the problems caused by its

21    OxyContin pills?

22                   MS. HENN:  Objection to form.

23         Outside the scope.

24                   THE WITNESS:  I'm not saying

25         that.  I'm saying I can't answer the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          question that you asked earlier.

2                  (McKesson-Hartle Exhibit 14

3          marked for identification.)

4    QUESTIONS BY MR. FARRELL:

5          Q.    Next exhibit we'll have marked

6    sequentially as Exhibit 4.  It's from the

7    Internet.  It's document 2002_09_26.

8                  MS. HENN:  Mr. Farrell, did you

9          mean Exhibit 4 or 14?

10                 MR. FARRELL:  14.

11                 MS. HENN:  Okay.

12                 MR. FARRELL:  You caught me.

13   QUESTIONS BY MR. FARRELL:

14         Q.    And I'm not going to bore you

15   with the details of this, but are you aware

16   of the Office of Inspector General?

17         A.    I am.

18         Q.    This is a report generated by

19   the OIG in 2002, and what it was talking

20   about was it was talking about the opioid

21   epidemic, and it was talking about the DEA's

22   ability to regulate the industry.

23                 Have you reviewed this document

24   before today?

25         A.    I have not.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Give me a second here.

2             On Bates stamp page 12, it's

3      talking about diversion investigators.  And

4      it says there were 55 at headquarters and 455

5      in the domestic field offices and 13

6      overseas.

7             Do you see that?

8      A.     I do see that.

9      Q.     So that means there's just over

10     500 DEA diversion investigators in the

11     country in 2001.

12            MS. HENN:  Objection to form.

13         Outside the scope.

14     QUESTIONS BY MR. FARRELL:

15     Q.     Responsible for regulating the

16     entire industry of the distribution of

17     controlled substances.

18            Do you know how many

19     transactions McKesson engaged in in the

20     distribution of controlled substances in

21     2001?

22            MS. HENN:  Objection to form.

23         Outside the scope.

24            THE WITNESS:  I do not have the

25         number off the top of my head.

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.    The OIG report basically says

 3   that as of 2001 there needed to be

 4   reassessment because the DEA was understaffed

 5   and underfunded and didn't have sufficient

 6   tools to be able to regulate the industry.

 7             Does McKesson acknowledge and

 8   agree with that assessment?

 9             MS. HENN:  Objection to form.

10        Outside the scope.

11             THE WITNESS:  Could you ask

12        that again?

13             MR. FARRELL:  Yeah, obviously

14        I'm leading up to some other

15        documents.

16   QUESTIONS BY MR. FARRELL:

17        Q.    But does McKesson acknowledge

18   that in 2001 there were 500 DEA diversion

19   investigators trying to monitor all of the

20   transactions in the country?

21             MS. HENN:  Objection to form.

22        Outside the scope.

23             THE WITNESS:  I see that in the

24        documents.  I can't speak to, you

25        know, the DEA's total -- their
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          response in total, so I can confirm
 2          that's in -- what's in this document.
 3     QUESTIONS BY MR. FARRELL:
 4          Q.     All right.  So let's talk about
 5     it from a theoretical standpoint.
 6               Let's say there were 500
 7     highway patrol officers charged with
 8     regulating the speed on the highways in the
 9     United States of America in the year 2001.
10               Do you believe that that would
11     be a significant challenge, a somewhat of a
12     challenge or not very challengeable at all?
13               MS. HENN:  Objection to form.
14          Outside the scope.
15               THE WITNESS:  Again, just
16          speculating, it would be a challenge.
17     QUESTIONS BY MR. FARRELL:
18          Q.     How many people would speed in
19     America if there were only 500 highway
20     patrolmen in the country?
21               MS. HENN:  Same objections.
22               THE WITNESS:  I can't even
23          guess or speculate.
24     QUESTIONS BY MR. FARRELL:
25          Q.     Do you think that would be a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    lot of people or not a lot of people?

 2                MS. HENN:  Same objections.

 3                THE WITNESS:  Again, that

 4         depends on how many law-abiding

 5         citizens you have.  I don't know if I

 6         can speculate.

 7    QUESTIONS BY MR. FARRELL:

 8         Q.    That is so true.

 9                What do you think the American

10    citizen would do if they knew there were only

11    500 highway patrolmen?

12                MS. HENN:  Objection to form.

13         Outside the scope.

14                THE WITNESS:  Again, I don't

15         know.  Some people might speed.  Some

16         people might not change their behavior

17         at all.

18    QUESTIONS BY MR. FARRELL:

19         Q.    That's right.

20                What if the penalty, if you did

21    get caught, was only $10?

22                MS. HENN:  Objection to scope.

23    QUESTIONS BY MR. FARRELL:

24         Q.    How would that impact your view

25    of the regulation of the American highways?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MS. HENN:  Objection to form.
 2          Outside the scope.
 3                  THE WITNESS:  Again, you can
 4          speculate.  Some might see that as
 5          a -- yeah, it depends.  It really
 6          depends.
 7    QUESTIONS BY MR. FARRELL:
 8          Q.    What if the biggest weapon the
 9    highway patrolmen had, which is the
10    revocation of the driver's license, was
11    changed and so now you don't even lose your
12    license?  How would that impact the system?
13                  MS. HENN:  Same objections.
14                  THE WITNESS:  Impact the
15          system?
16    QUESTIONS BY MR. FARRELL:
17          Q.    Yeah, impact the number of
18    speeders.
19                  MS. HENN:  Objection to form.
20          Outside the scope.
21                  THE WITNESS:  You can speculate
22          that it may go down.
23    QUESTIONS BY MR. FARRELL:
24          Q.    The number of speeders would go
25    down if you can't lose your license anymore?
```

```
 1              MS. HENN:  Same objections.

 2              THE WITNESS:  Oh, if you

 3       can't -- sorry, excuse me.  It may go

 4       up.

 5  QUESTIONS BY MR. FARRELL:

 6       Q.    So if there's -- if there's a

 7  limited number of regulators and a fine is

 8  not substantial and you don't lose your

 9  license, are we going to have more speeders

10  or less speeders?

11              MS. HENN:  Objection to form.

12       Outside the scope.

13              THE WITNESS:  Can you rephrase

14       that a little bit?

15  QUESTIONS BY MR. FARRELL:

16       Q.    Yeah.

17       A.    You rolled a few things in

18  there.

19       Q.    You know what I'm trying to get

20  to, right?  If there's not enough law

21  enforcement and the penalty isn't

22  prohibitive, what happens to conduct?

23              MS. HENN:  Objection to form.

24       Outside the scope.

25              THE WITNESS:  Again, it's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          speculative, but it could -- you know,

 2          behavior could change.

 3   QUESTIONS BY MR. FARRELL:

 4          Q.    What if you made billion of

 5   dollars by speeding, and there was not enough

 6   regulation by law enforcement and the penalty

 7   was not very big?  What would that do as an

 8   incentive?

 9               MS. HENN:  Same objections.

10               THE WITNESS:  Again, it depends

11          on the situation, the scenario.

12   QUESTIONS BY MR. FARRELL:

13          Q.    It really depends on whether or

14   not the individual is a law-abiding citizen

15   or a criminal, agreed?

16               MS. HENN:  Same objections.

17          Object to form.  Outside the scope.

18               THE WITNESS:  It's part of it.

19               (McKesson-Hartle Exhibit 15

20          marked for identification.)

21               MR. FARRELL:  Last exhibit and

22          then we'll take a break, if that's

23          okay.

24               MS. HENN:  That works.

25   QUESTIONS BY MR. FARRELL:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     I'm going to have marked

 2   Exhibit 15, and the exhibit in the top

 3   right-hand corner is 2004_ 06_17.  And for

 4   those of you playing at home, this is an

 5   excerpt from another Congressional record.

 6               This Congressional record was

 7   900 pages long, and so I did not copy the

 8   whole thing; I just pulled out the part that

 9   interested me.

10               This is part of the US Senate

11   Permanent Subcommittee on Investigations, and

12   it was a hearing in June of 2004.  And the

13   title of the hearing was "Buyers Beware:  The

14   Dangers of Purchasing Pharmaceuticals Over

15   the Internet."

16               Now, McKesson has some

17   experience with this, agreed?

18               MS. HENN:  Objection to form.

19               THE WITNESS:  Can you define --

20          experience.  What type of experience?

21   QUESTIONS BY MR. FARRELL:

22          Q.     Well, McKesson was selling to

23   Internet pharmacies in this time frame,

24   agreed?

25               MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    THE WITNESS:  I believe so.

2    QUESTIONS BY MR. FARRELL:

3         Q.    Well, McKesson should know so

4    because you paid a $13 million fine to the

5    DEA for doing that very thing in 2008.

6                    MS. HENN:  Objection to form.

7                    THE WITNESS:  Understood.

8    QUESTIONS BY MR. FARRELL:

9         Q.    Okay.  So this is a report, and

10   it was -- if you flip to page 2, it was

11   generated by a company called the

12   Pharmaceutical Research Manufacturers of

13   America.  I guess they call it PhRMA.

14                    Is that how you say it?

15        A.    I don't know.

16        Q.    Well, McKesson is a member of

17   this organization, and so colloquially within

18   your ranks do you call it PhRMA?  PhRMA?

19   PhRMA?  What do you say?

20                    MS. HENN:  Counsel, I'm sorry,

21            just a quick clarification.  I'm not

22            seeing a reference -- I see reference

23            to Giuliani and his organization, but

24            I don't see PhRMA.

25                    Can you just point out where
```

1          you're seeing that?

2                    MR. FARRELL:  Yeah, it's up on

3          the screen there, and it's in the very

4          middle.

5                    MS. HENN:  Thank you.  I

6          appreciate that.

7     QUESTIONS BY MR. FARRELL:

8          Q.    So does McKesson -- first, does

9     McKesson acknowledge that it is an associate

10    member of the Pharmaceutical Research and

11    Manufacturers of America?

12                   MS. HENN:  Objection to form.

13         Outside the scope.

14                   THE WITNESS:  I can't speak to

15         that.  I don't know.

16    QUESTIONS BY MR. FARRELL:

17         Q.    I'll represent to you -- I'll

18    represent to you that you are.

19         A.    Okay.

20         Q.    And do you know who this Rudy

21    Giuliani fellow is?

22         A.    I do know who Mr. Giuliani is.

23         Q.    He's a lawyer, too, isn't he?

24         A.    He is.

25         Q.    And he was hired to do this

Highly Confidential - Subject to Further Confidentiality Review

1    investigation by the pharmaceutical industry.

2              Do you see that?

3              MS. HENN:  Objection to form.

4         Outside the scope.

5              THE WITNESS:  I don't know if I

6         see where specifically it states that.

7    QUESTIONS BY MR. FARRELL:

8         Q.    It says, "Giuliani Partners has

9    been" --

10        A.    Oh, in the middle.  Okay.

11   Sorry.

12        Q.    They have been retained by

13   PhRMA to do an evaluation.

14        A.    Understood.  I see that.

15        Q.    Now what I'm going to have you

16   do is I'm going to have you flip over to

17   page 4, and it's interesting what Rudy

18   Giuliani found.

19              Do you see where it says "the

20   distribution chain"?

21              It says, "On its face, it

22   appears that the distribution chain for

23   prescription medicines in the United States

24   is fairly straightforward."

25        A.    I was on the wrong number 4.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    I see where it says that.

 2         Q.        And it says, "Manufacturers

 3    sell their products to wholesalers."

 4                    That'd be you, McKesson,

 5    correct?

 6         A.        Correct.

 7         Q.        "Who, in turn, sell the

 8    products to retail pharmacies and stores,

 9    who, in turn, dispense medicines to patients

10    with prescriptions."

11                    Do you see that?

12         A.        Yes.

13         Q.        And that's a straightforward

14    system is what Rudy Giuliani is saying.

15                    Will you read the next

16    sentence, please?

17         A.        "It is not until the system is

18    studied in greater detail that one begins to

19    appreciate both the complexities and the

20    vulnerability of the distribution chain and

21    potential for exploitation or abuse."

22         Q.        So big pharma is acknowledging

23    in 2004, through hiring their own expert in

24    presenting to Congress, that this chain of

25    distribution that McKesson is engaged in is
```

Highly Confidential - Subject to Further Confidentiality Review

1    complex and vulnerable for exploitation or

2    abuse, agreed?

3              MS. HENN:  Objection to form.

4         Outside the scope.

5              THE WITNESS:  It's what they

6         listed in here and documented, yes.

7    QUESTIONS BY MR. FARRELL:

8         Q.    And the very first factor for

9    contributing factors, will you read aloud

10   what it says?

11        A.    "Wholesalers or distributors

12   are primarily regulated by the states, with

13   no uniform standards across state borders.

14   States have a comparatively small number of

15   investigators to monitor the licensed

16   wholesalers; thus, given the sheer number of

17   wholesalers, oversight is minimal."

18        Q.    In the very next paragraph it

19   says, "There are thousands of secondary

20   pharmaceutical wholesalers in addition to

21   McKesson, AmerisourceBergen and Cardinal

22   Health, the big three."

23              Do you see that sentence?

24        A.    I see that.

25        Q.    So this is a recognition by big

1    pharma's own consultant that the chain of

2    distribution, at least in 2004 with respect

3    to rogue Internet pharmacies in particular,

4    was subject to exploitation or abuse.

5                MS. HENN:  Objection to form.

6        Outside the scope.

7    QUESTIONS BY MR. FARRELL:

8        Q.    Agreed that's what it says?

9                MS. HENN:  Same objections.

10               THE WITNESS:  Agree that's what

11       it says.

12   QUESTIONS BY MR. FARRELL:

13       Q.    And in fact, McKesson paid a

14   fine for some of these exploitations and

15   abuse in 2008.

16               MS. HENN:  Objection to form.

17   QUESTIONS BY MR. FARRELL:

18       Q.    Agreed?

19       A.    There was a fine as part of the

20   settlement.

21       Q.    Related to this specific topic?

22               MS. HENN:  Objection to form.

23               THE WITNESS:  It was included

24       in the settlement.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.     So yes?

 3        A.     Yes.

 4        Q.     So in 2004, we've got big

 5   pharma acknowledging the chain of custody for

 6   wholesalers is subject to exploitation or

 7   abuse because of a lack of oversight?

 8               MS. HENN:  Objection to form.

 9        Outside the scope.

10               THE WITNESS:  Would you say

11        that again?  Ask --

12   QUESTIONS BY MR. FARRELL:

13        Q.     In 2004, big pharma hired Rudy

14   Giuliani's firm to do an evaluation of the

15   chain of distribution of prescription

16   medicines, and what he found was that the

17   chain of distribution was subject to

18   exploitation or abuse because of lack of

19   oversight?

20        A.     That's what's stated in the

21   document, correct.

22        Q.     And that during this time

23   frame, McKesson paid a fine for that very

24   thing?

25               MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  In the 2008

2       settlement, yes.

3    QUESTIONS BY MR. FARRELL:

4       Q.     And that fine was related to

5    McKesson selling an unusual size of

6    prescription opiate pills to rogue Internet

7    pharmacies?

8              MS. HENN:  Objection to form.

9              THE WITNESS:  Can you ask that

10       again, one more time?  Sorry.

11    QUESTIONS BY MR. FARRELL:

12       Q.     Yeah.

13              In this time frame, McKesson

14    ended up paying a fine to the DEA for selling

15    too many opium pills to rogue Internet

16    pharmacies in violation of federal law?

17              MS. HENN:  Objection to form.

18              THE WITNESS:  To be accurate,

19       I'd have to look at the document again

20       in terms of specific language, but it

21       was part of the settlement.

22    QUESTIONS BY MR. FARRELL:

23       Q.     We'll get to that after lunch.

24       A.     Okay.

25       Q.     But you acknowledge that what

Highly Confidential - Subject to Further Confidentiality Review

 1    Rudy Giuliani said in 2004 came home to roost

 2    with McKesson when it paid a fine in 2008?

 3              MS. HENN:  Objection to form.

 4         Outside the scope.

 5              THE WITNESS:  I don't know if I

 6         would characterize it as coming home

 7         to roost, but they're connected or

 8         they're related.

 9              MR. FARRELL:  Take a break.

10              VIDEOGRAPHER:  The time is

11         12:04 p.m.  We're going off the

12         record.

13          (Off the record at 12:04 p.m.)

14              VIDEOGRAPHER:  The time is

15         1:05 p.m.  We're back on the record.

16              (McKesson-Hartle Exhibit 16

17         marked for identification.)

18    QUESTIONS BY MR. FARRELL:

19         Q.    I'm going to reference

20    Exhibit 16 which we've just had marked.  The

21    top right-hand corner is 2006_09_27,

22    Bates-stamped MCKMDL00478906.

23              Do you recognize this document?

24         A.    I do.

25         Q.    What is it?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    It's a letter from DEA to

 2   registrants from Joe Rannazzisi.

 3          Q.    Is this -- you might need help

 4   with counsel a little bit on this.

 5                I don't see where this letter

 6   is addressed to McKesson as the recipient;

 7   however, this document was produced by

 8   McKesson.  And I'm assuming this is the 2006

 9   Rannazzisi letter that was sent to McKesson.

10                Is that your understanding?

11          A.    Yes.

12          Q.    So there's no question

13   September 27, 2006, McKesson received this

14   communication.

15                Do you know whether or not

16   there was one document sent to McKesson or

17   there was a letter sent to each of your

18   distribution facilities?

19          A.    That, I do not know.

20                MR. FARRELL:  Okay.  Can I ask,

21          Counsel, do you know?

22                MS. HENN:  I'm sorry, I don't.

23   QUESTIONS BY MR. FARRELL:

24          Q.    Anyway, if in fact there is

25   another document that has a specific one,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you'll agree with me that all of these 2006
 2    letters that were sent out, they were sent
 3    out to all the registrants across the
 4    country?
 5              MS. HENN:  Objection to form.
 6              THE WITNESS:  Yeah, that's what
 7        I believe to be the case, yeah.
 8    QUESTIONS BY MR. FARRELL:
 9        Q.    In fact, the first sentence
10    says --
11        A.    Right.
12        Q.    -- this letter is being sent to
13    every commercial entity in the United
14    States --
15        A.    Right.
16        Q.    -- registered --
17        A.    Whether it went to all of our
18    individual DCs, I can't confirm, but --
19        Q.    But sitting here today as the
20    McKesson corporate designee, you acknowledge
21    receipt of the September 27, 2006 letter from
22    Joe Rannazzisi?
23        A.    Yes.
24    ███        ████████████████████████████
██  ████████████████████████████████████████
```

Highly Confidential - Subject to Further Confidentiality Review



21    QUESTIONS BY MR. FARRELL:

22          Q.      Okay.

23          A.      I don't believe so.

24          Q.      I've got some things that we'll

25    go through.  What I'm really curious about,

Highly Confidential - Subject to Further Confidentiality Review



13          Q.      Okay.  This letter was

14    received.

15                  Do you know whether or not it

16    was circulated amongst McKesson or it was

17    discussed or reviewed or analyzed?

18                  MS. HENN:  Objection to form.

19                  THE WITNESS:  I'm not

20          100 percent sure I know who all

21          received it, so I can't answer that --

22          I can't answer that specifically.

23    QUESTIONS BY MR. FARRELL:

24          Q.      Did McKesson change its conduct

25    at all based upon this correspondence?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      From what I understand in

2    talking with a former McKesson employee

3    before this deposition, this was mostly a

4    confirmation or a reiteration of the

5    regulations, which McKesson knew, and

6    highlighting things that were -- you know,

7    that the team was doing.  And it was sort of

8    a validation of some of the things that they

9    had been doing, so the red flags and things

10   like that.  So not significant changes that

11   I'm aware of.

12         Q.      Have you had an opportunity to

13   review the 2006 Rannazzisi letter in

14   preparation for today's deposition?

15         A.      Yes.

16         Q.      On behalf of McKesson

17   Corporation, are you willing to affirm,

18   acknowledge and validate all of the

19   statements Mr. Rannazzisi places in his

20   September 27, 2006 correspondence?

21              MS. HENN:  Objection to form.

22        Outside the scope.

23              THE WITNESS:  Could you be more

24        specific?  Validate every single

25        statement and...
```

```
1    QUESTIONS BY MR. FARRELL:

2         Q.    Yeah.

3               Paragraph C of the 30(b)(6)

4    notice asks for "testimony regarding

5    McKesson's past and present interpretation,

6    compliance, agreement and/or disagreement

7    with this letter from the DEA outlining the

8    duties imposed on a distributor under federal

9    law."

10              So let's start with this:  Is

11   there anything in this letter that you

12   disagree with?

13              MS. HENN:  Objection to form.

14              THE WITNESS:  I don't believe

15        there's anything I would disagree

16        with.

17   QUESTIONS BY MR. FARRELL:

18        Q.    Is this an accurate statement

19   of the law?

20              MS. HENN:  Objection to form.

21              THE WITNESS:  I believe it is.

22   QUESTIONS BY MR. FARRELL:

23        Q.    So as of September 27, 2006,

24   the DEA is advising McKesson -- not advising,

25   but referencing the fact that there was a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   prescription drug abuse problem in the United

 2   States of America.  That's in the very first

 3   paragraph.

 4             Does McKesson acknowledge that?

 5      A.    Yes.

 6      Q.    The next sentence says, "As

 7   each of you is undoubtedly aware, the abuse,

 8   nonmedical use, of controlled prescription

 9   drugs is a serious and growing health problem

10   in the country."

11             Does McKesson agree and

12   acknowledge that fact as of 2006?

13             MS. HENN:  Objection to form.

14             THE WITNESS:  Yes.

15   QUESTIONS BY MR. FARRELL:

16      Q.    The next full paragraph says,

17   "The Controlled Substances Act was designed

18   by Congress to combat diversion by providing

19   for a closed system of drug distribution in

20   which all legitimate handlers of controlled

21   substances must obtain a DEA registration; as

22   a condition of maintaining such registration,

23   must take reasonable steps to ensure that

24   their registration is not being utilized as a

25   source of diversion."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Does McKesson acknowledge and
 2    agree with that statement?
 3              MS. HENN:  Objection to form.
 4              THE WITNESS:  I agree with
 5         that.
 6    QUESTIONS BY MR. FARRELL:
 7         Q.   I'd like you to read the next
 8    sentence aloud, please.
 9         A.   Where it starts "distributors
10    are"?
11         Q.   Yes.
12         A.   "Distributors are, of course,
13    one of the key components of the distribution
14    chain."
15         Q.   Keep going, please.
16         A.   You want me to read the whole
17    paragraph?  Okay.
18              "If the closed system is to
19    function properly as Congress envisioned,
20    distributors must be vigilant in deciding
21    whether a prospective customer can be trusted
22    to deliver controlled substances only for
23    lawful purposes.  The responsibility is
24    critical, as Congress has expressly declared
25    that the illegal distribution of controlled
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    substances has a substantial and detrimental

2    effect on the health and general welfare of

3    the American people."

4        Q.    So again, this is the DEA

5    reiterating what we've discussed before:

6    that failing to abide by the Code of Federal

7    Regulations has a substantial and detrimental

8    effect on the health and general welfare of

9    the American people.

10              Does McKesson agree and

11   acknowledge with that fact?

12              MS. HENN:  Objection to form.

13              THE WITNESS:  Yes.

14   QUESTIONS BY MR. FARRELL:

15       Q.    Go to the next page, page 2,

16   the second full paragraph.  It says,

17   "Nonetheless, given the extent of

18   prescription drug abuse in the United States,

19   along with the potential -- along with

20   dangerous and potentially lethal consequences

21   of such abuse" -- will you please finish that

22   sentence?

23       A.    "Even just one distributor that

24   uses its DEA registration to facilitate

25   diversion can cause enormous harm."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Does McKesson acknowledge and

 2    accept that fact?

 3                 MS. HENN:  Objection to form.

 4                 THE WITNESS:  I agree with

 5       that.

 6    QUESTIONS BY MR. FARRELL:

 7          Q.     If you go down to the third to

 8    last paragraph, it says, "In addition to

 9    reporting all suspicious orders, a

10    distributor has a statutory responsibility to

11    exercise due diligence to avoid filling

12    suspicious orders that might be diverted into

13    other than legitimate medical, scientific and

14    industrial channels."

15                 Does McKesson acknowledge and

16    accept that to be true?

17                 MS. HENN:  Objection to form.

18                 THE WITNESS:  Yes.

19    QUESTIONS BY MR. FARRELL:

20          Q.     And then the last sentence of

21    the next paragraph says at the end, "The

22    distributor should exercise due care in

23    confirming the legitimacy of all orders prior

24    to filing."

25                 Do you see that sentence?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Not "filing."  "Prior to

 2    filling."

 3         A.     I see that sentence.

 4         Q.     All right.  Since I butchered

 5    that sentence, will you please read the last

 6    sentence that's highlighted on the screen?

 7         A.     "The distributor should

 8    exercise due care in confirming the

 9    legitimacy of all orders prior to filling."

10         Q.     Now, this is in September

11    of 2006, agreed?

12         A.     Agreed.

13         Q.     And this is a clear statement

14    from the DEA; would you agree with that?

15         A.     I would agree with that.

16         Q.     McKesson's official position is

17    that when it received communications from the

18    DEA, the DEA was clear as of 2006?

19              MS. HENN:  Objection to form.

20         Also beyond the scope.

21              THE WITNESS:  The only question

22         I would have about possibility is due

23         care, what the definition of what due

24         care means.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    Okay.  Fair.  Fair enough.

 3               If you flip to the next page,

 4    there's a laundry list of due care.

 5               Do you agree on page 3 going

 6    through this, the DEA was clear with McKesson

 7    about the circumstances that might be

 8    indicative of diversion?

 9               MS. HENN:  Objection to form.

10               THE WITNESS:  I wouldn't

11         classify these -- I wouldn't call them

12         due care.  These are to be red flags,

13         indicators.

14    QUESTIONS BY MR. FARRELL:

15         Q.    So in 2006, the DEA is telling

16    McKesson, you have to exercise due care prior

17    to filling an order which you deem to be

18    suspicious, agreed?

19               MS. HENN:  Objection to form.

20               THE WITNESS:  Could you ask

21         that again?  Restate that?

22    QUESTIONS BY MR. FARRELL:

23         Q.    In 2006, the DEA is telling

24    McKesson, you have to exercise due care prior

25    to filling an order which you deem to be
```

```
 1    suspicious, agreed?

 2        A.      That's what's in the document,

 3    yes.

 4        Q.      Okay.  Do you disagree with

 5    that?

 6        A.      That they shared that, they --

 7    I don't disagree with that.

 8        Q.      Yet your Section 55 policy, you

 9    testified this morning, you were shipping

10    suspicious orders?

11                MS. HENN:  Objection to form.

12                THE WITNESS:  There was a

13        process by which those reports were

14        reviewed, which I would consider to be

15        part of due care in a review.

16    QUESTIONS BY MR. FARRELL:

17        Q.      Is there a due care file for

18    each of those?

19                MS. HENN:  Objection to form.

20                THE WITNESS:  Not that I'm

21        aware of.

22    QUESTIONS BY MR. FARRELL:

23        Q.      So there's no documentation of

24    the due care of each suspicious order that

25    was shipped by McKesson in accordance with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the July 2000 policies and procedures?

 2               MS. HENN:  Objection to form.

 3               THE WITNESS:  Could you restate

 4         that, please?

 5    QUESTIONS BY MR. FARRELL:

 6         Q.    Is there any documentation of

 7    the due care performed by McKesson from

 8    July 2000 onward pursuant to Section 55 with

 9    regard to suspicious orders that were

10    shipped?

11               MS. HENN:  Objection to form.

12         Outside the scope.

13               THE WITNESS:  I can't speak to

14         the specific documentation and how it

15         was documented those reviews that were

16         conducted of those specific reports

17         that were generated.  Could have been

18         documentation on a form.

19    QUESTIONS BY MR. FARRELL:

20         Q.    Have you seen such

21    documentation?

22               MS. HENN:  Objection to form.

23               THE WITNESS:  I haven't

24         personally seen examples of that.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:
 2         Q.    Have you seen any piece of
 3    paper that indicates that the suspicious
 4    orders that were shipped were subject to a
 5    due diligence review beforehand, from
 6    July 2000 to 2007?
 7              MS. HENN:  Objection to form.
 8         Outside the scope.
 9    QUESTIONS BY MR. FARRELL:
10         Q.    It doesn't mean they don't
11    exist.
12         A.    Right.
13         Q.    I'm just asking if you've seen
14    them.
15              MS. HENN:  Same objections.
16              THE WITNESS:  I don't believe
17         I've seen -- I haven't seen examples.
18    QUESTIONS BY MR. FARRELL:
19         Q.    So you're taking it on faith
20    that due diligence was, in fact, performed?
21              MS. HENN:  Objection to form.
22         Outside the scope.
23              THE WITNESS:  From what I
24         understand and some of the
25         conversations I've had, that due
```

Highly Confidential - Subject to Further Confidentiality Review

1      diligence processes did happen and

2      exist, yes.

3  QUESTIONS BY MR. FARRELL:

4      Q.    Well, you'll agree with me that

5  Section 55 seems to indicate that there's no

6  subjective involvement regarding the

7  reporting of suspicious orders; it was a

8  statistical fact.

9           MS. HENN:  Objection to form.

10      Outside the scope.

11           THE WITNESS:  Can you ask that

12      one again?

13  QUESTIONS BY MR. FARRELL:

14      Q.    Yeah, I'm not trying to play

15  word games.

16      A.    I know.

17      ██      ████████████████████████

██  █████████████████████████

██  ███████████████████████████

██  ██████████████████████████

██  ██████████████████████████

██  ████████████████████████████████

██  █████████████████████    ██████████

24           MS. HENN:  Objection to form.

25      Outside the scope.

```
 1                    THE WITNESS:  Agreed.

 2   QUESTIONS BY MR. FARRELL:

 3        Q.    So every single order that was

 4   deemed suspicious by your monitoring program

 5   should have been reported to the DEA from

 6   July 2000, at least through Rannazzisi's 2006

 7   letter?

 8                    MS. HENN:  Objection to form.

 9        Outside the scope.

10                    THE WITNESS:  I believe that's

11        the case, to have faxed that or sent

12        it to the local diversion office.

13   QUESTIONS BY MR. FARRELL:

14        Q.    If McKesson did not report

15   those orders, it was in violation of federal

16   law, agreed?

17                    MS. HENN:  Objection to form.

18        Outside the scope.

19                    THE WITNESS:  Can you ask that

20        one again or restate?

21   QUESTIONS BY MR. FARRELL:

22        Q.    Yeah.  It's a hypothetical.

23        A.    Right.

24        Q.    If McKesson did not report

25   suspicious orders detected following the
```

```
 1    July 2000 Section 55 policy -- let me start

 2    over.  Let me see if I can make this as

 3    simple as possible.

 4              Beginning in July of the year

 5    2000 --

 6       A.    Okay.

 7       Q.    -- if McKesson did not report a

 8    suspicious order it detected pursuant to the

 9    Section 55 policy, McKesson was in violation

10    of federal law; agreed or disagree?

11              MS. HENN:  Objection to form.

12         Outside the scope.

13              THE WITNESS:  I agree that it

14         would -- it's -- I don't know.  Maybe

15         ask it again.  I apologize for pausing

16         here.

17    QUESTIONS BY MR. FARRELL:

18       Q.    It's an important question.

19       A.    Yeah.

20       Q.    McKesson has a statutory and

21    regulatory responsibility under federal

22    law --

23       A.    Right.

24       Q.    -- to report suspicious orders

25    to the DEA?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Correct.

 2              Q.      McKesson, in July of 2000,

 3      adopted a policy that we've been referring to

 4      as Section 55 --

 5              A.      Correct.

 6              Q.      -- to do that very thing?

 7              A.      Correct.

 8              Q.      That policy states that it's

 9      not a subjective determination of whether to

10      report; it's a statistical fact of whether

11      you should report?

12                      MS. HENN:  Objection to form.

13                      THE WITNESS:  The report is a

14              statistical -- a statistically

15              generated one, yes.

16      QUESTIONS BY MR. FARRELL:

17              Q.      And whether to report it to the

18      DEA is not a subjective determination; it's

19      mandatory if you detect a suspicious order?

20                      MS. HENN:  Objection to form.

21              Outside the scope.

22                      THE WITNESS:  I believe that to

23              be the case.

24      QUESTIONS BY MR. FARRELL:

25              Q.      So if you didn't do that, it's
```

```
 1    a violation of federal law?

 2              MS. HENN:  Objection to form.

 3         Outside the scope.

 4              THE WITNESS:  I believe so.

 5    QUESTIONS BY MR. FARRELL:

 6         Q.    Big if, right?

 7         A.    If, right.

 8         Q.    If that happened, if McKesson

 9    detected a suspicious order following the

10    Section 55 enactment and did not report it to

11    the DEA, that's a violation of federal law?

12         A.    If.

13              MS. HENN:  Objection to form.

14              (McKesson-Hartle Exhibit 17

15         marked for identification.)

16    QUESTIONS BY MR. FARRELL:

17         Q.    I'm going to mark what's going

18    to be Exhibit 17.  The document ID is

19    2007_04_25.  I apologize, there is no MDL

20    Bates stamp that I could locate; however,

21    there is a prior production Bates stamp of

22    MCK-HOI-002 dash a whole bunch of zeros and

23    then 1.

24              I'll give you a few minutes to

25    look through this.
```

```
 1                    Sir, have you seen this
 2  document before today?
 3       A.    I don't believe I've seen this
 4  specific one.
 5       Q.    I'll give you a minute to
 6  review.
 7       A.    Okay.  I've read that.  Thank
 8  you for taking the time.
 9       Q.    No problem.
10                    So to start off with on this
11  exhibit, you acknowledge that there was a
12  meeting with the DEA on April 5, 2007.  It's
13  from the very first paragraph.
14       A.    Yes.
15       Q.    So at this point in time, the
16  DEA had issued an order to show cause against
17  McKesson, agreed?
18       A.    Correct.
19       Q.    I've yet to see any
20  documentation of anything that predates
21  April 25, 2007, related to this
22  investigation.
23                    Have you seen such documents?
24                    MS. HENN:  Objection to form.
25                    THE WITNESS:  I don't believe
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        so, no.

 2   QUESTIONS BY MR. FARRELL:

 3        Q.     To the extent that such

 4   documents do exist, we again reserve our

 5   right to come back and discuss them further,

 6   subject to the objection of counsel.

 7             But for what we have here, this

 8   appears that at least in April of 2007, the

 9   DEA had already issued a rule to show cause

10   complaining that one of your distribution

11   centers was not following federal law,

12   agreed?

13             MS. HENN:  Objection to form.

14             THE WITNESS:  That's what they

15        alleged.

16   QUESTIONS BY MR. FARRELL:

17        Q.     When you go to page 2 under

18   Proposed Action Plan, does this indicate to

19   you that McKesson is acknowledging that they

20   need to do better to comply with federal law?

21             MS. HENN:  Objection to form.

22             THE WITNESS:  I think this is

23        acknowledge -- excuse me --

24        acknowledgement of just improvements

25        in the program, taking information in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          to evolve the program based on

 2          collaboration with DEA and information

 3          they're receiving.

 4     QUESTIONS BY MR. FARRELL:

 5          Q.     You're in management, are you

 6     not?

 7          A.     I am.

 8          Q.     And have you ever written a

 9     proposed action plan for an employee?

10          A.     I have.

11          Q.     And is it just to document

12     something new, or are you trying to correct

13     something?

14               MS. HENN:  Objection to form.

15               THE WITNESS:  There can be many

16          different types of action plans.  I've

17          done both.

18     QUESTIONS BY MR. FARRELL:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12  QUESTIONS BY MR. FARRELL:

13      Q.    As a McKesson corporate

14  designee, are you willing to admit here today

15  that as of April 25, 2007, McKesson was not

16  fulfilling its obligations under federal law

17  regarding the monitoring of the distribution

18  of controlled substances?

19          MS. HENN:  Objection to form.

20          THE WITNESS:  Can you ask that

21      again, please?

22  QUESTIONS BY MR. FARRELL:

23      Q.    As a McKesson corporate

24  designee, are you willing to admit here today

25  that as of April 25, 2007, McKesson was not

Highly Confidential - Subject to Further Confidentiality Review

```
 1    fulfilling its obligations under federal law

 2    regarding the distribution of controlled

 3    substances?

 4                MS. HENN:  Objection to form.

 5                THE WITNESS:  I believe in

 6         partnership with DEA and always in

 7         good faith, McKesson was believed to

 8         be compliant with the regulations.

 9    QUESTIONS BY MR. FARRELL:

10         Q.    I understand that McKesson as a

11    corporate entity -- McKesson, it's not a

12    person, right?  McKesson Corporation is a

13    fictional piece of paper that creates a

14    business model, agreed?

15                MS. HENN:  Objection to form.

16    QUESTIONS BY MR. FARRELL:

17         Q.    Is there a Mr. McKesson still

18    running the company?

19         A.    No, there's not.

20         Q.    All right.  So McKesson is a

21    corporation?

22         A.    Agreed.  I understand that.

23         Q.    And in April of 2007, it was

24    meeting with the federal government, the DEA,

25    and changing the way it was doing business,
```

```
 1    agreed?

 2                MS. HENN:  Objection to form.

 3                THE WITNESS:  Changing,

 4         enhancing, adding.

 5    QUESTIONS BY MR. FARRELL:

 6         Q.    Okay.  And in part, it was

 7    because McKesson was not fulfilling its

 8    obligations under federal law?

 9                MS. HENN:  Objection to form.

10    QUESTIONS BY MR. FARRELL:

11         Q.    Can that even be disputed?

12                MS. HENN:  Same objection.

13    QUESTIONS BY MR. FARRELL:

14         Q.    You paid a $13 million fine as

15    a result of this investigation.

16                Can you not acknowledge today,

17    in 2007 there were shortcomings in your

18    controlled substance monitoring program?

19                MS. HENN:  Objection to form.

20                THE WITNESS:  We denied those

21         allegations in that settlement, and we

22         obviously -- as any program does,

23         wants to improve and expand and take

24         new information in.

25
```

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    So you paid $13 million as a

 3    tax write-off?

 4              MS. HENN:  Objection to form.

 5              THE WITNESS:  As a settlement

 6         between both parties.

 7    QUESTIONS BY MR. FARRELL:

 8         Q.    To settle what?  Allegations of

 9    what?

10              MS. HENN:  Objection to form.

11              THE WITNESS:  Issues related to

12         the regulations.

13    QUESTIONS BY MR. FARRELL:

14         Q.    The allegations were that

15    McKesson was not fulfilling its obligations

16    under federal law, agreed?

17         A.    That was the allegations.

18         Q.    And McKesson wrote an action

19    plan and paid a fine to the DEA to get a

20    release for its conduct?

21              MS. HENN:  Objection to form.

22              THE WITNESS:  I think that's

23         accurate.  We did.

24    QUESTIONS BY MR. FARRELL:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12      Q.      In fact, nobody in the country

13   was doing thresholds prior to this?

14          MS. HENN:  Objection to form.

15      Outside the scope.

16          THE WITNESS:  I'm not aware if

17      others were.

Highly Confidential - Subject to Further Confidentiality Review

4    QUESTIONS BY MR. FARRELL:

5         Q.    So going back to the 2006

6    Rannazzisi letter, this is an acknowledgement

7    under the shipping requirement that you must

8    halt suspicious orders until due diligence is

9    performed?

10             MS. HENN:  Objection to form.

11             THE WITNESS:  Can you ask that

12        again or restate that, please?

13    QUESTIONS BY MR. FARRELL:

14        Q.    Mr. Rannazzisi, in his 2006

15    letter from the DEA to McKesson, informed

16    McKesson of its duty to halt suspicious

17    orders, agreed?

18        A.    Was that the specific language

19    or was that the due --

20        Q.    We can go back and take a look

21    at it.

22        A.    Yeah.  Exercise due care.

23        Q.    I mean, I don't care what

24    standard we're using right now; you can say

25    due diligence or due care.  But the idea

Highly Confidential - Subject to Further Confidentiality Review

```
 1    being is in 2006, the DEA is telling McKesson

 2    if you get a suspicious order, you have to

 3    halt and you cannot ship it until you look

 4    into it.

 5              MS. HENN:  Objection to form.

 6              THE WITNESS:  Can we look at

 7        that specific language?

 8    QUESTIONS BY MR. FARRELL:

 9        Q.    Sure.

10        A.    Can you point it out to me?

11        Q.    I hope so.  2006_09_27, page 2,

12    beginning with the paragraph, "Thus,"

13    two-thirds of the way down, "in addition to

14    reporting all suspicious orders" -- right?

15    What does that say?  "In addition to

16    reporting all suspicious orders."

17              "All" means what?

18        A.    All.

19        Q.    So if you get a suspicious

20    order, what is McKesson supposed to do?

21        A.    To report it.

22        Q.    And if you don't, is that

23    lawful or unlawful?

24              MS. HENN:  Objection to form.

25              THE WITNESS:  That doesn't meet
```

1              the expectation or the guideline that

2              they lay out in this communication.

3     QUESTIONS BY MR. FARRELL:

4              Q.    Which makes -- and that

5     guideline is premised upon what?

6                   MS. HENN:  Objection to form.

7                   THE WITNESS:  The CFR.

8     QUESTIONS BY MR. FARRELL:

9              Q.    And so that makes it lawful or

10    unlawful?

11                  MS. HENN:  Objection to form.

12                  THE WITNESS:  Unlawful.

13    QUESTIONS BY MR. FARRELL:

14             Q.    The next part:  "A distributor

15    has a statutory responsibility to exercise

16    due diligence to avoid filling suspicious

17    orders."

18                  Agreed?

19             A.    I agree with that language.  It

20    doesn't say -- that's not halt.

21             Q.    Well, it's a halt until you do

22    due diligence --

23             A.    Yeah.

24             Q.    -- right?

25             A.    It's not a block.  Yeah, it's

Highly Confidential - Subject to Further Confidentiality Review

1    a...

2         Q.      Maybe this is just a

3    terminology issue.

4         A.      Might be.

5         Q.      Block -- all I'm saying is, is

6    that McKesson's not allowed to ship a

7    suspicious order without looking into it

8    first, agreed?

9                 MS. HENN:  Objection to form.

10                THE WITNESS:  That's how I read

11        that language.

12   QUESTIONS BY MR. FARRELL:

13        Q.      That is the law?

14        A.      Yeah.

15        Q.      Yes?

16                MS. HENN:  Objection to form.

17                THE WITNESS:  The law is to

18        design a system to identify suspicious

19        orders.

20   QUESTIONS BY MR. FARRELL:

21        Q.      That's one part of the law.

22        A.      Right.

23        Q.      What does the CFR say?

24                MS. HENN:  Objection to form.

25                THE WITNESS:  To identify

Highly Confidential - Subject to Further Confidentiality Review

1          orders of unusual size, pattern and

2          frequency.

3     QUESTIONS BY MR. FARRELL:

4          Q.     And so if you ship a suspicious

5     order without doing due diligence, is that

6     lawful or unlawful?

7               MS. HENN:  Objection to form.

8               THE WITNESS:  Again, I'm -- the

9          CFR says you must design and operate a

10         system, right, and to identify

11         suspicious orders.  I don't believe it

12         says to halt them.

13    QUESTIONS BY MR. FARRELL:

14         Q.     It does?

15         A.     In that specific language.

16         Q.     It does or does not?

17         A.     Does not.

18         Q.     Is your interpretation of

19    federal law that you're allowed to ship a

20    suspicious order without conducting due

21    diligence?

22              MS. HENN:  Objection to form.

23    QUESTIONS BY MR. FARRELL:

24         Q.     Maybe this explains why

25    McKesson paid a $150 million fine.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HENN:  Objection to form.
 2    QUESTIONS BY MR. FARRELL:
 3         Q.    Let's get back to it.
 4               Masters Pharmaceutical has a
 5    reporting requirement and a shipping
 6    requirement.  We reviewed it this morning,
 7    agreed?
 8         A.    Parts of it, correct.  Agreed.
 9         Q.    It's premised upon a code
10    provision.  The United States Congress passed
11    a US Code provision in 1970, agreed?
12         A.    Agreed.
13         Q.    And it passed -- the Department
14    of Justice enacted regulations which are
15    binding as federal law related to this very
16    topic, agreed?
17         A.    Agreed.
18         Q.    And if you don't follow those
19    rules, McKesson can be fined by the federal
20    government?
21         A.    Agreed.
22         Q.    McKesson's been fined twice
23    that I know of, once for 13 million in 2008
24    and once for 150 million in 2017, for
25    violating these very laws.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HENN:  Objection to form.

 2                    THE WITNESS:  That's what was

 3        alleged.

 4   QUESTIONS BY MR. FARRELL:

 5        Q.    So my question to you is:  Is

 6   that the shipping requirement that you have

 7   to halt a suspicious order under federal law

 8   until you do due diligence is and always has

 9   been the law in the United States of America?

10                    MS. HENN:  Objection to form.

11        Outside the scope.

12                    THE WITNESS:  Can you ask that

13        again, please?

14   QUESTIONS BY MR. FARRELL:

15        Q.    The shipping requirement and

16   the reporting requirement as outlined in the

17   Masters Pharmaceutical case is and always has

18   been the law in the United States of America?

19                    MS. HENN:  Objection to form.

20        Outside the scope.

21                    THE WITNESS:  I believe that's

22        the law.  I mean...

23   QUESTIONS BY MR. FARRELL:

24        Q.    Well, you're McKesson --

25                    MS. HENN:  Did you finish your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        answer?

 2               THE WITNESS:  I did.  I didn't

 3        really have a -- yeah.

 4               MS. HENN:  Okay.  Just making

 5        sure.

 6   QUESTIONS BY MR. FARRELL:

 7        Q.    So your answer is yes?

 8               MS. HENN:  Objection to form.

 9               THE WITNESS:  Yes.

10   QUESTIONS BY MR. FARRELL:

11        Q.    I don't want to -- I don't want

12   you to hesitate.

13        A.    I'm not a legal expert.

14        Q.    I'm not asking you to be a

15   legal expert.

16        A.    Right.

17        Q.    I'm asking McKesson

18   Corporation -- I know this -- to be fair, I

19   understand you are in a role with McKesson

20   being asked to step in the shoes of a

21   corporation and answer on its behalf.

22        A.    Right.

23        Q.    So I'm not trying to be rude,

24   and I know I'm pressing you.

25        A.    Right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     But what I'm trying to do is,

 2    for the record, create McKesson's position.

 3    And I've asked for McKesson to designate

 4    someone to announce its position, and

 5    fortunately it's you.

 6                 So let me repeat the question.

 7    The shipping requirement and the reporting

 8    requirement as outlined and defined in the

 9    Masters Pharmaceutical case is and always has

10    been the law in the United States of America;

11    agree or disagree?

12                 MS. HENN:  Object to the form

13          of the question.  It's outside the

14          scope.

15                 THE WITNESS:  I agree that

16          that's the law.

17    QUESTIONS BY MR. FARRELL:

18          Q.     And if you don't follow the

19    law, that makes it unlawful?

20                 MS. HENN:  Objection to form.

21                 THE WITNESS:  If you don't

22          follow a law, that would be unlawful.

23    QUESTIONS BY MR. FARRELL:

24          Q.     And if you don't follow the

25    shipping requirement, that's unlawful?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MS. HENN:  Objection to form.

2                    THE WITNESS:  And if you don't

3          follow the law, I would agree.

4    QUESTIONS BY MR. FARRELL:

5          Q.    And if you don't follow the

6    reporting requirement, that's the law?

7                    MS. HENN:  Objection to form.

8                    THE WITNESS:  Again, if you

9          don't follow the law, if you don't

10         follow the guidelines, it would be

11         unlawful.

12   QUESTIONS BY MR. FARRELL:

13         Q.    So when you look at paragraph 7

14   of Exhibit 17, the 2007 correspondence from

15   McKesson to the DEA, you are announcing that

16   you're going to adopt new measures,

17   additional measures, revised, amended,

18   changed, more measures, to comply with

19   federal law?

20                   MS. HENN:  Objection to form.

21   QUESTIONS BY MR. FARRELL:

22         Q.    Agree or disagreed?

23                   MS. HENN:  Objection to form.

24                   THE WITNESS:  We're

25         communicating that we were enhancing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        the program.

 2   QUESTIONS BY MR. FARRELL:

 3        Q.     In response to allegations that

 4   you were not fulfilling your obligations

 5   under the shipping requirement and reporting

 6   requirement?

 7              MS. HENN:  Objection to form.

 8              THE WITNESS:  In part due to

 9        allegations.

10   QUESTIONS BY MR. FARRELL:

11        Q.     Now, this letter is addressed

12   to Linden Barber.

13              Do you know who Linden Barber

14   is?

15        A.     I've heard of Linden Barber.

16        Q.     How have you heard of him?

17        A.     Just in my past experience even

18   prior to McKesson, knowing he was in DEA.

19        Q.     Do you know where he is now?

20        A.     He's at Cardinal.

21        Q.     Cardinal Health?

22              How come you-all didn't hire

23   him?

24        A.     I can't speak to that.  I don't

25   know.  I'm confident in the people we have on
```

1   the team.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

12      Q.      Perfect.

13              Have you seen the customer

14  files for Cuyahoga County and Summit County?

15      A.      I have not.

16      Q.      Me either.

17              Do they exist?

18      A.      I can't speak to that.  I don't

19  know.

20      Q.      Okay.  One of the 30(b)(6)

21  topics that I asked was to talk about these

22  due diligence files.

23              You're telling me you haven't

24  seen any of the due diligence files for any

25  pharmacy in Summit County and Cuyahoga

Highly Confidential - Subject to Further Confidentiality Review

```
 1    County?

 2                MS. HENN:  Objection to form.

 3         Outside the scope.

 4    QUESTIONS BY MR. FARRELL:

 5         Q.    It's okay if you haven't, and I

 6    don't want you guessing.

 7         A.    No, I understand.

 8               I've seen files.  I don't know

 9    about files during this time frame with a

10    Level 1, 2 or 3 review.  I can't recall.

11         Q.    Let me ask you this:  How --

12    how many pharmacies in May of 2007, in

13    Cuyahoga and Summit County, do you reckon

14    ordered more than 8,000 pills of hydrocodone

15    or oxycodone?

16                MS. HENN:  Objection to form.

17         Outside the scope.

18                THE WITNESS:  I don't know.

19         I'd be guessing.

20    QUESTIONS BY MR. FARRELL:

21         Q.    Let's say there's ten.  Should

22    there be ten customer files that document why

23    McKesson was exceeding 8,000 pills a month?

24                MS. HENN:  Objection to form.

25                THE WITNESS:  There should be
```

Highly Confidential - Subject to Further Confidentiality Review

1      documentation.

2  QUESTIONS BY MR. FARRELL:

3      Q.      And if there was no due

4  diligence performed but those pills were

5  still shipped, is that lawful or unlawful?

6          MS. HENN:  Objection to form.

7  QUESTIONS BY MR. FARRELL:

8      Q.      Do you want me to repeat the

9  question?

10      A.      Sure.

11      Q.      If, if, if, three ifs, no due

12  diligence was performed, yet McKesson still

13  shipped more than 8,000 oxycodone pills to a

14  pharmacy in Cuyahoga or Summit County in May

15  of 2007, is that lawful or unlawful according

16  to the federal regulations?

17          MS. HENN:  Objection to form.

18  QUESTIONS BY MR. FARRELL:

19      Q.      Why are you struggling with

20  this?

21      A.      I'm just thinking.  I mean,

22  it's -- if it's -- it wouldn't be lawful.

23      Q.      That makes it...

24      A.      If there weren't documentation.

25  Or due diligence, excuse me.

```
 1          Q.     Then it would be lawful or

 2   unlawful?

 3               MS. HENN:  Objection to form.

 4               THE WITNESS:  It would be

 5        unlawful.

 6   QUESTIONS BY MR. FARRELL:

 7          Q.     So it's summarizing altogether.

 8   If in May of 2007 McKesson is shipping to a

 9   pharmacy in Cuyahoga or Summit County,

10   Cleveland, Ohio, or Akron, Ohio, more than

11   8,000 pills of hydrocodone or more than 8,000

12   pills of oxycodone, without conducting a due

13   diligence review, then McKesson is engaging

14   in unlawful conduct according to federal law,

15   agreed?

16               MS. HENN:  Objection to form.

17               THE WITNESS:  Can you ask it

18        again?  I apologize.  Let's pause

19        here.  I'm not a lawyer.

20   QUESTIONS BY MR. FARRELL:

21          Q.     I know you're not.  And again,

22   I'm going to reiterate --

23          A.     There's discretion in how this

24   due diligence is done and documented, so I'm

25   trying to understand.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    That's right.  So -- you're

 2   right.  So let me see if I can say it again.

 3               If in May of 2007 McKesson

 4   Corporation is shipping to a pharmacy in

 5   Cuyahoga or Summit County, Cleveland, Ohio,

 6   or Akron, Ohio, more than 8,000 pills of

 7   oxycodone or more than 8,000 pills of

 8   hydrocodone without conducting due diligence,

 9   then McKesson Corporation is engaging in

10   unlawful conduct according to federal law?

11               MS. HENN:  Object to form.

12               THE WITNESS:  I don't know how

13        to answer that exactly.  It depends.

14   QUESTIONS BY MR. FARRELL:

15          Q.    Depends on what?

16               If you ship more than 8,000

17   pills without conducting due diligence,

18   McKesson is engaging in unlawful conduct

19   according to federal law?

20               MS. HENN:  Objection to form.

21               Go ahead.

22               THE WITNESS:  It can be

23        interpreted that way.  I mean, it --

24   QUESTIONS BY MR. FARRELL:

25          Q.    Well, the DEA certainly
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    interprets it that way, agreed?

 2         A.     They have.

 3         Q.     And McKesson has paid fines

 4    based on that DEA interpretation, agreed?

 5                MS. HENN:  Objection to form.

 6                THE WITNESS:  We've paid fines.

 7         Again, we're --

 8    QUESTIONS BY MR. FARRELL:

 9         Q.     Based on the allegations by the

10    DEA that you shipped suspicious orders

11    without conducting due diligence?

12                MS. HENN:  Objection to form.

13                Go ahead.

14                THE WITNESS:  Based on those

15         allegations.

16    QUESTIONS BY MR. FARRELL:

17         Q.     Yes.

18         A.     Right.

19         Q.     The answer is yes?

20         A.     Yes.

21         Q.     See, a yes just gets me moving

22    faster.  Oh, this one's gonna be fun.

23                MR. FARRELL:  Why don't we take

24         a quick break.

25                MS. HENN:  Okay.
```

```
 1                 VIDEOGRAPHER:  The time is

 2         2:08 p.m., and we're going off the

 3         record.

 4          (Off the record at 2:08 p.m.)

 5                 VIDEOGRAPHER:  The time is

 6         2:20 p.m., and we're back on the

 7         record.

 8                 (McKesson-Hartle Exhibit 18

 9         marked for identification.)

10  QUESTIONS BY MR. FARRELL:

11         Q.    The next exhibit we're going to

12  have marked is Exhibit 18.

13                 For reference, the top

14  right-hand corner is 2007_04_XX.  The reason

15  it's XX is the metadata has not yet told me

16  what day of the month it is.

17                 Do you know what day of the

18  month this conference was back in 2007?

19         A.    I can't think off the top of my

20  head, no.  Yeah.

21         Q.    The Bates stamp, we have a MDL

22  Bates stamp of MCKMDL00403340.

23                 Do you recognize this document?

24         A.    I do.

25         Q.    What is it?
```

```
 1        A.    This is a presentation given by

 2   Don Walker about -- at a company meeting

 3   about the Lifestyle Drug Program.

 4        Q.    And Don Walker at the time

 5   was -- would be working for McKesson?

 6        A.    Yes.

 7        Q.    So this is a McKesson document?

 8        A.    Excuse me, yes.

 9        Q.    It's produced in the MDL by the

10   McKesson lawyers?

11        A.    Yes.

12        Q.    From the McKesson files?

13        A.    Yes.

14        Q.    And is a true and accurate copy

15   of the presentation given at the national

16   operations conference in 2007?

17             MS. HENN:  Objection to form.

18             THE WITNESS:  Yes, I believe

19        so.  I wasn't there, but I believe so,

20        yeah.

21   QUESTIONS BY MR. FARRELL:

22        Q.    So this national operations

23   conference 2007, this is a conference that is

24   just for McKesson employees.  Is that your

25   understanding?
```

```
 1          A.      Yeah, they typically are.

 2          Q.      It's from -- Mr. Boggs

 3    testified about it previously.  So this was

 4    in 2007.  Management basically gets together,

 5    and Don Walker is the senior vice president

 6    of distribution operations, is giving a

 7    presentation on a number of topics in the

 8    form of a PowerPoint slide?

 9          A.      Correct.

10                  MS. HENN:  Objection to form.

11    QUESTIONS BY MR. FARRELL:

12          Q.      Yes?

13          A.      Correct.

14          Q.      So the title of this is

15    "Lifestyle Drugs and Internet Pharmacies."

16                  "Lifestyle drugs" is an

17    interesting choice of words.

18                  Do you know where it came from?

19          A.      It's my understanding that's

20    the language that was -- the DEA used as well

21    and had referenced.

22          Q.      Some of the files that I've

23    seen has the DEA asking McKesson where you

24    came up with the oxycodone, hydrocodone and

25    opium pills as lifestyle drugs.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HENN:  Objection to form.
 2              THE WITNESS:  All I can tell
 3         you is I -- what I've heard is that
 4         it's the term that came from DEA.
 5   QUESTIONS BY MR. FARRELL:
 6         Q.     On page 2, it identifies
 7   several different topics:  public health
 8   issue, DEA focus, McKesson involvement,
 9   current status, and Lifestyle Drug Monitoring
10   Program.  So these will be our jeopardy
11   questions today.
12              Public health issues.  Can you
13   read what the very -- on page 3, can you read
14   what the first item is?
15         A.     "Abuse of prescription drugs
16   has risen 66 percent since 2000."
17         Q.     So this is McKesson telling
18   McKesson employees that we're in the business
19   of selling opium pills, and abuse has risen
20   66 percent since 2000.
21              Does that not give you,
22   Mr. McKesson Corporation, pause to think
23   about whether or not your role in the chain
24   of distribution is contributing to the abuse?
25              MS. HENN:  Objection to form.
```

```
 1                    THE WITNESS:  Can you ask that

 2          again, please?

 3   QUESTIONS BY MR. FARRELL:

 4          Q.     This is McKesson telling

 5   McKesson employees that abuse of prescription

 6   drugs has risen 66 percent since the year

 7   2000.

 8                    Does that not give you,

 9   Mr. McKesson Corporation, pause to think

10   about whether or not your role in the chain

11   of distribution is contributing to such

12   abuse?

13                    MS. HENN:  Objection to form.

14                    THE WITNESS:  I think it's --

15          it should give everybody pause that

16          that was the trend that was going on,

17          and it's a piece of information shared

18          with leaders to inform them.  So --

19   QUESTIONS BY MR. FARRELL:

20          Q.     But not everybody is selling

21   opium pills; McKesson is.

22                    MS. HENN:  Counsel, can we just

23          make sure we let the witness finish

24          his answers?

25                    MR. FARRELL:  Sure.  I was
```

```
 1              trying to make a snarky remark.

 2                   MS. HENN:  Thank you.

 3    QUESTIONS BY MR. FARRELL:

 4         Q.     Not everyone is engaged in the

 5    chain of distribution of opium pills, though?

 6                   MS. HENN:  Objection to form.

 7                   THE WITNESS:  Agree.

 8    QUESTIONS BY MR. FARRELL:

 9         Q.     So I'm asking you, McKesson

10    Corporation, whether or not you have any

11    regrets about selling so many opium pills.

12                   MS. HENN:  Objection to form.

13         Outside the scope.

14                   THE WITNESS:  Back to your

15         question about this, I would -- sure

16         that gives you pause, I mean, to

17         understand that there's an epidemic

18         out there.  And clearly there's many

19         players involved in the flow of

20         distribution.

21    QUESTIONS BY MR. FARRELL:

22         Q.     As of 2007, McKesson is

23    recognizing that opioid painkillers kill more

24    than cocaine and heroin combined, agreed?

25                   MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Agree.
 2    QUESTIONS BY MR. FARRELL:
 3         Q.    And these are McKesson's words.
 4               Where is McKesson getting this
 5    data from?
 6               MS. HENN:  Objection to form.
 7         Outside the scope.
 8               THE WITNESS:  I don't know
 9         specifically where they -- their
10         source of data for that particular
11         line, but information from different
12         sources.  Could be DEA, could be CDC,
13         it could be wherever.
14    QUESTIONS BY MR. FARRELL:
15         Q.    It says here, "Rogue Internet
16    pharmacies distributing oxycodone,
17    hydrocodone, phentermine and alprazolam," yet
18    McKesson was selling to rogue Internet
19    pharmacies, true?
20               MS. HENN:  Objection to form.
21         Outside the scope.
22               THE WITNESS:  Can you ask that
23         again, please?
24    QUESTIONS BY MR. FARRELL:
25         Q.    McKesson is noting that rogue
```

```
 1   Internet pharmacies are selling oxycodone and

 2   hydrocodone, yet what's missing from this

 3   slide is the fact that McKesson was supplying

 4   the pills to the rogue Internet pharmacies.

 5           MS. HENN:  Objection to form.

 6           THE WITNESS:  And what's your

 7       specific question again?

 8   QUESTIONS BY MR. FARRELL:

 9       Q.     What gives?

10           MS. HENN:  Objection to form.

11           THE WITNESS:  I don't know what

12       type of response a "what gives"

13       question is.

14   QUESTIONS BY MR. FARRELL:

15       Q.     Yeah.  You're noting that

16   people are dying, and part of the reason is

17   that rogue Internet pharmacies are out there.

18   Yet McKesson, during this time frame, is

19   selling to some of those very same Internet

20   pharmacies, and that's what the DEA fined you

21   for.

22           So is this ignorance of who

23   you're selling to?  Is this repackaging,

24   reframing the issue?  Or is it just flat out

25   a misrepresentation?
```

```
 1              MS. HENN:  Objection to form.

 2         Outside the scope.

 3              THE WITNESS:  This is raising

 4         awareness in -- about the issues that

 5         are the public health issues,

 6         communicating with leaders and sharing

 7         the -- where McKesson is enhancing the

 8         program.

 9    QUESTIONS BY MR. FARRELL:

10         Q.    But you understand that the

11    rogue Internet pharmacies were getting their

12    pills from, among other people, McKesson,

13    agreed?

14         A.    I understand.

15              MS. HENN:  Objection to form.

16    QUESTIONS BY MR. FARRELL:

17         Q.    Agreed?

18         A.    I understand.  Agreed.

19         Q.    I'm asking if you understand.

20    I want you to confirm that the rogue Internet

21    pharmacies were in fact getting some of their

22    pills from McKesson.

23              MS. HENN:  Objection to form.

24              THE WITNESS:  I don't have

25         specific details on that, but --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. FARRELL:

2         Q.    You understand that to be true?

3         A.    -- I understand that to be

4    true.

5         Q.    So McKesson Corporation admits

6    it was selling oxycodone and hydrocodone to

7    rogue Internet pharmacies in and around 2007?

8              MS. HENN:  Objection to form.

9         Outside the scope.

10             THE WITNESS:  Again, I don't

11        know the specific examples and --

12   QUESTIONS BY MR. FARRELL:

13        Q.    I'm not asking for specific

14   examples.

15        A.    Right.

16        Q.    I'm asking you to confirm that

17   in 2007, McKesson Corporation was selling

18   oxycodone and hydrocodone to rogue Internet

19   pharmacies.

20             MS. HENN:  Objection to form.

21             And, Counsel, I'll just ask you

22        to let him finish his answers so that

23        he can get his answers out.

24             MR. FARRELL:  Yes, ma'am.

25             THE WITNESS:  Again, I don't
```

```
 1          have the specific examples.  I believe

 2          that to be true, but I don't know the

 3          specific details.

 4   QUESTIONS BY MR. FARRELL:

 5          Q.     The next page, page 4,

 6   "Internet pharmacies."  It says,

 7   "Investigative work hours have doubled."

 8               Do you know what it doubled

 9   from or to?

10          A.     I do not.

11          Q.     "Cutting supply critical to

12   success."

13               What does that mean?

14          A.     I don't know.  I don't know

15   what the speaking points or -- it's one

16   bullet.  I'm not sure how it was represented

17   or communicated.

18          Q.     Do you know what price

19   diversion is?

20          A.     Not specifically.

21          Q.     Was McKesson at this time

22   considering that some of the Internet

23   pharmacies were competing with McKesson for

24   business?

25               MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  I do not know.

 2        Pricing is not my area.

 3   QUESTIONS BY MR. FARRELL:

 4        Q.    Okay.  It says, "Wholesalers.

 5   DEA expects that you know your customers."

 6                What does that mean?  It's in

 7   quotations.

 8        A.    Right.

 9                MS. HENN:  Objection to form.

10                MR. FARRELL:  Well, it is in

11        quotations, isn't it?

12                MS. HENN:  I was objecting to

13        asking what DEA means when they said

14        "know your customers."  That was what

15        was my objection.

16   QUESTIONS BY MR. FARRELL:

17        Q.    So McKesson is writing a slide

18   following a meeting with the DEA, reporting

19   to the DEA employees what the DEA's focus

20   was, and what McKesson is reporting is that

21   the DEA expects you to know your customers.

22                Is that fair?

23        A.    That's fair.

24        Q.    And when we do, quote, "know

25   our customers," end quote, that's a tag line
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for distributors with regard to knowing the

 2    customers you're selling opium pills to?

 3                 MS. HENN:  Objection to form.

 4                 THE WITNESS:  That is a DEA tag

 5         line.

 6    QUESTIONS BY MR. FARRELL:

 7         Q.    And then the next sentence, can

 8    you read it out loud, please?

 9         A.    The next bullet?

10         Q.    Yes.

11         A.    "Wholesalers accountable for

12    controlling quantities shipped."

13         Q.    Is that true or not true?

14                 MS. HENN:  Objection to form.

15                 THE WITNESS:  Can you add a

16         little more context to your question?

17         I know it's a true/false question,

18         but --

19    QUESTIONS BY MR. FARRELL:

20         Q.    Yes.

21                 The DEA expects the wholesalers

22    to be accountable for controlling quantities

23    that they ship.

24                 Is that fair or unfair?

25                 MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review



```
 1                Go ahead.

 2                THE WITNESS:  That's what

 3        the -- that's what the DEA expects, I

 4        guess, yeah.

 5   QUESTIONS BY MR. FARRELL:

 6        Q.     Does McKesson acknowledge that

 7   it is accountable for controlling the

 8   quantities of opium pills shipped to American

 9   pharmacies?

10        A.     We're accountable as a

11   distributor.

12        Q.
```

Highly Confidential - Subject to Further Confidentiality Review



1

23          MS. HENN:  Objection to form.

24    Outside the scope.

25          THE WITNESS:  What I would

Highly Confidential - Subject to Further Confidentiality Review

```
1        share is I believe that average is a

2        very rudimentary average, all

3        pharmacies divided by pills, and so it

4        doesn't account for different pharmacy

5        size.  So it's the number that is the

6        result of that basic calculation.

7   QUESTIONS BY MR. FARRELL:
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12  QUESTIONS BY MR. FARRELL:

13      Q.    As of April of 2007, which we

14  believe to be the date of this conference,

15  have you seen any documentation anywhere in

16  the records of McKesson Corporation that

17  indicate that any message from the DEA to

18  date had been unclear?

19          MS. HENN:  Objection to form.

20      Outside the scope.

21          THE WITNESS:  Have I seen

22      formal documentation where somebody

23      said DEA was unclear?

24  QUESTIONS BY MR. FARRELL:

25      Q.    That was my question, yes.



    1         A.      I have not seen any of that

    2    documentation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13            (McKesson-Hartle Exhibit 19

14       marked for identification.)

15   QUESTIONS BY MR. FARRELL:

16       Q.    We'll mark as 19, top

17   right-hand corner is 2007_5_15, Bates-stamped

18   MCKMDL00337303.

19            Is this, in fact, the Lifestyle

20   Drug Monitoring Program at McKesson?

21       A.    Yes.

22       Q.    Do you recognize this document

23   as a true and authentic version of the

24   Lifestyle Drug Monitoring Program?

25       A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      And is it a document kept in

 2    the regular course of business and produced

 3    by your lawyers in this litigation?

 4                  MS. HENN:  Objection to form.

 5                  THE WITNESS:  Yeah.

 6    QUESTIONS BY MR. FARRELL:
```

18                  (McKesson-Hartle Exhibit 20

19          marked for identification.)

20    QUESTIONS BY MR. FARRELL:

21          Q.      Exhibit 20, top right-hand

22    corner, 2007_06_12, Bates-stamped

23    MCKMDL00355527.

24                  I'll represent to you again,

25    this was produced by your counsel in this

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11          Q.      Right.

12                  (McKesson-Hartle Exhibit 21

13          marked for identification.)

14     QUESTIONS BY MR. FARRELL:

15          Q.      Next document is 21.   Top

16     right-hand corner, 2007_11_26.   This is a

17     February 2008 PowerPoint presentation

18     entitled "Controlled Substance Monitoring

19     Program, CSMP, Implementation Strategy -

20     Regulatory Review Document."

21                  Have you seen this document

22     before?

23          A.      I don't believe I've seen this

24     document.

25          Q.      All right.

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      No.

2          Q.      It's my understanding that the

3   CSMP was going to replace the Lifestyles

4   program?

5          A.      Correct.

6          Q.      And this document is talking

7   about in March of 2008 you're going to be

8   implementing pilot programs and then rolling

9   it across the country?

10              MS. HENN:  Objection to form.
```

```
16          A.      Can I finish reading this?

17          Q.      Sure.

18          A.      Pretty quickly.  Thank you.

19              Okay.  Thank you.

20          Q.      Yeah.

21              So you agree with what I said?

22          A.      You'll need to restate whatever

23   you said.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22          (McKesson-Hartle Exhibit 23

23      marked for identification.)

24   QUESTIONS BY MR. FARRELL:

25      Q.    Next document, Exhibit 23,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    2007_12_27, Bates stamp MCKMDL00478910.  This

 2    is the December 27, 2007 Rannazzisi letter.

 3              Do you recognize this document?

 4        A.    I do.

 5        Q.    McKesson Corporation

 6    acknowledges receipt of this communication

 7    from the DEA dated December 27, 2007,

 8    correct?

 9              MS. HENN:  Objection to form.

10              THE WITNESS:  Yes, we received

11        it.

12    QUESTIONS BY MR. FARRELL:

13        Q.    This is a true and authentic

14    version of the McKesson letter?

15        A.    I believe so.

16        Q.    And you kept it in the routine

17    business of collecting records,

18    record-keeping at McKesson?

19        A.    I can't speak to where this was

20    stored and -- I don't know, but --

21        Q.    But it came from McKesson; it's

22    got your Bates stamp on it?

23        A.    I may be a little confused on

24    your question.

25        Q.    I just want you to validate --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     It came us.

 2        Q.     You're just acknowledging you

 3   received this letter?

 4        A.     Correct.

 5        Q.     All right.  We can walk through

 6   this entire letter, but I'm going to first

 7   start broadly.

 8               Does McKesson acknowledge that

 9   the facts and guidelines set forth in the

10   2007 Rannazzisi letter are true and an

11   accurate representation of the obligations

12   McKesson has under federal law?

13               MS. HENN:  Objection to form.

14               THE WITNESS:  Can you ask that

15        question again?

16   QUESTIONS BY MR. FARRELL:

17        Q.     Yeah.

18               This is the second time the DEA

19   is writing a dear registrant letter to

20   everybody in the country.

21        A.     Understood.

22        Q.     Basically what it's saying is,

23   you people still aren't getting it; here's

24   what your obligations are under federal law.

25               And it includes the duty to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    halt suspicious orders, perform due diligence

 2    and report when necessary to the DEA, agreed?

 3              MS. HENN:  Objection to form.

 4    QUESTIONS BY MR. FARRELL:

 5         Q.    Could it be any clearer?

 6              MS. HENN:  Objection to form.

 7              THE WITNESS:  It's the same

 8         information they've shared before,

 9         with some additions.

10    QUESTIONS BY MR. FARRELL:

11         Q.    And it's clear, you have a duty

12    to halt suspicious orders, perform due

13    diligence and report when necessary.

14              This is an affirmation a decade

15    preceding the shipping requirement and the

16    reporting requirement in the Masters

17    Pharmaceutical case, agreed?

18              MS. HENN:  Objection to form.

19              THE WITNESS:  You rolled a

20         couple things in there together.  Can

21         you ask me -- what's the specific

22         question?

23    QUESTIONS BY MR. FARRELL:

24         Q.    This is a 2007 letter, which

25    predates the Masters Pharmaceutical case by a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   decade.  And I'm asking you whether or not

 2   you agree that this letter sets forth the

 3   shipping requirements and the reporting

 4   requirements as outlined in Masters

 5   Pharmaceutical.

 6              MS. HENN:  Objection to form.

 7              THE WITNESS:  I'm going to read

 8        this again just so --

 9   QUESTIONS BY MR. FARRELL:

10        Q.    Sure.

11              The second to the last

12   paragraph is probably the most helpful.

13        A.    What's that?

14        Q.    The second to last paragraph

15   may be the most helpful.

16        A.    On the very last -- okay.

17   Before I get there --

18        Q.    It states, "Lastly, registrants

19   that routinely report suspicious orders, yet

20   fill these orders without first determining

21   that order is not being diverted, may be

22   failing to maintain effective controls

23   against diversion."

24              It's what you and I have been

25   talking about for the last two hours,
```

1    correct?

2         A.      Correct.

3         Q.      This is an accurate statement

4    of federal law from the DEA to McKesson,

5    agreed?

6              MS. HENN:  Objection to form.

7              THE WITNESS:  Agreed.

8    QUESTIONS BY MR. FARRELL:

9         Q.      This is the same thing the DC

10   Circuit Court of Appeals said in 2017,

11   agreed?

12             MS. HENN:  Objection to form.

13             THE WITNESS:  Agreed.

14   QUESTIONS BY MR. FARRELL:

15        Q.      I don't need to put this in

16   there.  But backing up to the last exhibit we

17   had from February of 2008, can you pull that

18   up?

19             MS. HENN:  You talking about

20        Exhibit 21?

21             MR. FARRELL:  Yes.

22   QUESTIONS BY MR. FARRELL:

23        Q.      I'm going to represent to you

24   that the way that we pull these documents up

25   on the electronic system is you can pull it

```
 1    up in a -- basically a photocopy version like

 2    you're seeing here, but there's also a native

 3    format, which is actually the PowerPoint.

 4         A.     Okay.

 5         Q.     And so what I'm showing you on

 6    the screen is the same exact document, and

 7    the only reason I produced it in native

 8    format is that at the very bottom of each of

 9    the pages, except for the first one, there's

10    a date.

11              MR. FARRELL:  So if you flip to

12         the next page on the screen up there,

13         Corey.

14              MS. HENN:  Do you want to just

15         hand the copy over --

16              MR. FARRELL:  Yeah.

17              MS. HENN:  -- if that's easier?

18              MR. FARRELL:  I just want you

19         to affirm the date on it.

20              MS. HENN:  And do you have like

21         an identifier?  I know for these kinds

22         of native documents --

23              MR. FARRELL:  Not that I can

24         figure out.  I'm not that good.

25              MS. HENN:  All right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  So what do you
 2        need me to do?  What are you asking?
 3   QUESTIONS BY MR. FARRELL:
 4        Q.     What the date is.
 5        A.     On the front page?
 6        Q.     On the color version, on page 2
 7   maybe.
 8        A.     Oh, on the bottom?  11/26 of
 9   '07.  November 26, 2007.
10                  (McKesson-Hartle Exhibit 24
11        marked for identification.)
12   QUESTIONS BY MR. FARRELL:
13        Q.     Okay.  The next exhibit is
14   going to be Exhibit 24.  It's 2008_03_10.
15   It's another PowerPoint presentation at the
16   Denver sales meeting, March 10, 2008.
17                  Have you seen this document
18   before?
19        A.     I do not believe I've seen this
20   one.
21        Q.     It has a bunch of redacted
22   stuff in here.
23                  MR. FARRELL:  Counsel, do you
24        know if that was recorded in the
25        privilege log?
```

```
 1            MS. HENN:  I don't know off the
 2       top of my head, but we can certainly
 3       check.
 4            MR. FARRELL:  I think that's
 5       the main reason.  It basically is
 6       talking about your CSMP, the
 7       three-level review, and the rollout
 8       with a bunch of stuff redacted.  I
 9       just wanted to put it in the record so
10       we can fool with it later.
11            MS. HENN:  Is this a good --
12       the witness would like a break.
13            MR. FARRELL:  Sure.
14            MS. HENN:  Could we just maybe
15       pause for just five minutes?
16            MR. FARRELL:  Yep.
17            VIDEOGRAPHER:  The time is
18       3:08 p.m.  We're going off the record.
19        (Off the record at 3:08 p.m.)
20            VIDEOGRAPHER:  The time is
21       3:16 p.m.  We're back on the record.
22            (McKesson-Hartle Exhibit 25
23       marked for identification.)
24   QUESTIONS BY MR. FARRELL:
25       Q.    We'll mark Exhibit 25.  It's a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   2008_05_02, Bates stamp MCKMDL00355561.

 2              Do you recognize this document?

 3       A.    I do.

 4       Q.    What is it?

 5       A.    It's the settlement agreement

 6   from 2008.

 7       Q.    Between?

 8       A.    Between McKesson and the DEA,

 9   DOJ.

10       Q.    Settling what?

11       A.    Settling allegations of things

12   related to our responsibilities as a

13   distributor.

14       Q.    Right.

15              So you'll forgive me for

16   spending so much time for the last several

17   hours building up to the duties and

18   responsibilities under the federal

19   regulations, leading up to May 2, 2008, where

20   you signed a memorandum -- administrative

21   memorandum of agreement paying a $13 million

22   fine for allegedly violating all of those

23   rules we've been discussing.

24              MS. HENN:  Objection to form.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.    And I'll acknowledge on page 2

 3   the middle whereas clause that McKesson

 4   denied doing anything wrong.

 5             Sitting here today, McKesson

 6   continue to assert that it did nothing wrong

 7   despite the fact that it paid a fine in 2008?

 8             MS. HENN:  Objection to form.

 9             THE WITNESS:  We do.  I believe

10        we were in good faith working with DEA

11        and denied the allegations.

12   QUESTIONS BY MR. FARRELL:

13        Q.    So you deny you did anything

14   wrong.  You deny you broke the law?

15             MS. HENN:  Objection to form.

16             THE WITNESS:  I stand behind

17        what's in this document.

18   QUESTIONS BY MR. FARRELL:

19        Q.    Now, you weren't at McKesson,

20   but you're sitting here as McKesson, so

21   you're taking the position that's in the

22   document:  We didn't do anything wrong.

23             But you acknowledge that at

24   least in 2008 the DEA -- it's beyond doubt

25   now what the DEA could possibly mean when
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    they want you to fulfill your obligations

 2    under federal law, agreed?

 3               MS. HENN:  Objection to form.

 4               THE WITNESS:  It is beyond

 5        doubt -- can you say that again?

 6        Rephrase it?

 7    QUESTIONS BY MR. FARRELL:

 8        Q.     I can rephrase it, yes.

 9        A.     Yeah.

10        Q.     I'm trying to establish whether

11    or not McKesson Corporation believes as of

12    May 2, 2008, the DEA could be any clearer

13    about its expectations of McKesson

14    Corporation under the federal regulations

15    related to the distribution of opium pills.

16               MS. HENN:  Objection to form.

17        Outside the scope.

18    QUESTIONS BY MR. FARRELL:

19        Q.     I can walk through all of the

20    various communications leading up to this,

21    but you'll agree with me there was a 2006

22    letter, a 2007 letter, there were

23    presentations, there were meetings, there was

24    a rule to show cause, there's a settlement

25    agreement, you got fined $13 million.
```

```
 1                    Nobody, no reasonable person,

 2      could say that the DEA failed to tell

 3      McKesson what the rules of the road were.

 4                    MS. HENN:  Objection to form.

 5           Outside the scope.

 6                    THE WITNESS:  I agree that they

 7           mentioned that in many -- in many ways

 8           and many times.  There's still -- you

 9           know, there are areas of the

10           regulation that are still unclear, and

11           DEA does not provide clear guidance on

12           what is an order of unusual size,

13           frequency and pattern.  They put that

14           back on the distributors to design our

15           own.

16                    So they're not -- they're clear

17           on that guidance, but not on how to do

18           it all the time.

19      QUESTIONS BY MR. FARRELL:

20           Q.    All right.  So it's clear in

21      2008 what they're telling the DEA -- telling

22      McKesson is that whatever you're doing, we

23      think it's not enough?

24                    MS. HENN:  Objection to form.

25                    THE WITNESS:  It's clear that
```

```
 1          that's what they were alleging.

 2     QUESTIONS BY MR. FARRELL:

 3          Q.    And one of the things that's

 4     clear is that you have a duty to halt

 5     suspicious orders and perform due diligence.

 6               Is there any reasonable person

 7     in the United States of America as of 2008

 8     could possibly argue that it's unclear

 9     whether or not you should halt a suspicious

10     order before shipping?

11               MS. HENN:  Objection to form.

12               THE WITNESS:  I can't speak for

13          all reasonable people in the US.

14     QUESTIONS BY MR. FARRELL:

15          Q.    Well, what if somebody came up

16     and said, "We don't know whether or not we

17     have a duty to halt before shipping a

18     suspicious order," what you say to them as of

19     May 2, 2008, on the heels of paying

20     $13 million to the DEA?

21               MS. HENN:  Objection to form.

22          Outside the scope.

23               THE WITNESS:  Can you ask that

24          again?

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    Yes.

 3               Would you be a moron if you

 4    took the position out of May 2, 2008, that

 5    the DEA was unclear as to whether or not you

 6    could ship a suspicious order?

 7               MS. HENN:  Objection to form.

 8          Outside the scope.

 9               THE WITNESS:  I wouldn't call

10          anybody a moron, but it's clear what

11          they expect.

12    QUESTIONS BY MR. FARRELL:

13         Q.    And they expect what?

14         A.    To design and operate a system

15    to disclose suspicious orders.

16         Q.    And?

17               MS. HENN:  Objection to form.

18               THE WITNESS:  And report.

19    QUESTIONS BY MR. FARRELL:

20         Q.    And?

21               MS. HENN:  Same objection.

22    QUESTIONS BY MR. FARRELL:

23         Q.    Is it clear whether or not you

24    can ship a suspicious order without

25    conducting due diligence?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HENN:  Objection to form.

 2          Outside the scope.

 3                    THE WITNESS:  I think it

 4          depends.  It's -- there are other

 5          types of suspicious order systems.

 6   QUESTIONS BY MR. FARRELL:

 7          Q.    I understand.  I'm just trying

 8   to take it from a very basic standpoint.

 9                    Could the DEA have made it any

10   clearer that McKesson has a duty to monitor

11   and detect suspicious orders?

12                    MS. HENN:  Objection to form.

13          Outside the scope.

14                    THE WITNESS:  To monitor and

15          detect suspicious orders.

16   QUESTIONS BY MR. FARRELL:

17          Q.    That's what it says.

18          A.    Very clear.

19          Q.    Could they have been any

20   clearer that if you get a suspicious order,

21   you can't just ship it?

22                    MS. HENN:  Objection to form.

23          Outside the scope.

24                    THE WITNESS:  That's clear.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. FARRELL:

2        Q.    Clear or very clear?

3              MS. HENN:  Objection to form.

4              THE WITNESS:  It's very clear.

5    QUESTIONS BY MR. FARRELL:

6        Q.    Can you report the suspicious

7    order to the DEA and still ship it?

8              MS. HENN:  Objection to form.

9        Outside the scope.

10             THE WITNESS:  Can you ask that

11       one again or restate it?

12   QUESTIONS BY MR. FARRELL:

13       Q.    Can you report the suspicious

14   order to the DEA and still ship it?

15             MS. HENN:  Same objections.

16             THE WITNESS:  Without due

17       diligence or some sort of review?

18   QUESTIONS BY MR. FARRELL:

19       Q.    If you're reporting a

20   suspicious order to the DEA, what are you

21   doing?

22             MS. HENN:  Objection to form.

23             THE WITNESS:  Okay.  Can we

24       start with the original question?  I'm

25       getting a little -- I want to make
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          sure I'm going to answer your question

 2          right --

 3   QUESTIONS BY MR. FARRELL:

 4          Q.      Yeah, I'm going to show you --

 5          A.      -- the right question.

 6          Q.      I'm going to show you here in a

 7   few minutes some of your brethren who still

 8   haven't gotten the message by May 2008, and

 9   I'm trying to see if you'll call them morons.

10               So what I'm asking you is from

11   McKesson's corporation, is it clear by May 2,

12   2008, you -- the shipping requirement and the

13   reporting requirement?

14               MS. HENN:  Objection to form.

15          Outside the scope.

16               THE WITNESS:  That's how we

17          designed our program, and that's what

18          we believed it to be.

19   QUESTIONS BY MR. FARRELL:

20          Q.      Based on federal law?

21               MS. HENN:  Objection to form.

22               THE WITNESS:  Based on the

23          regulations and the guidance and the

24          information we collected.

25               (McKesson-Hartle Exhibit 26
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          marked for identification.)

 2   QUESTIONS BY MR. FARRELL:

 3          Q.     I'll mark Exhibit 26.  Top

 4   right is 2008_07_031.  It's Bates stamp

 5   MCK-HOI-002-0000042.

 6                 Have you seen this document

 7   before?

 8          A.     Yes, I have.

 9          Q.     And what is it?

10          A.     This is a PowerPoint.

11          Q.     Made by who?

12          A.     By McKesson.

13          Q.     For purposes of?

14          A.     Discussion with DEA.

15          Q.     Regarding?

16          A.     Our controlled substance

17   monitoring program.

18          Q.     And it's dated when?

19          A.     It's dated July 31, 2008.

20          Q.     So this is before or after your

21   settlement agreement with the DEA?

22          A.     Shortly after.

23          Q.     So that must have been kind of

24   awkward, right, your coming in after paying

25   the fine?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                        What are you doing here?  Are

2        you giving the DEA an update of all of the

3        parts of your action plan you're

4        implementing?

5                        MS. HENN:  Objection to form.

6                        THE WITNESS:  I can't say if it

7             was awkward or not, but standard -- or

8             a communication and updating them on

9             what we were doing.

10       QUESTIONS BY MR. FARRELL:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12          Q.     The more pills that get

13    diverted, what happens?

14                 MS. HENN:  Objection to form.

15                 THE WITNESS:  You can assume

16          that there's more abuse.

17    QUESTIONS BY MR. FARRELL:

18          Q.     Do you believe there's a direct

19    correlation between the more pills that get

20    sold and the more pills that get diverted?

21                 MS. HENN:  Objection to form.

22                 THE WITNESS:  Can you rephrase

23          that question?

24    QUESTIONS BY MR. FARRELL:

25          Q.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Is there a relationship between
 2      the number of pills that get sold and the
 3      number of pills that get diverted?
 4                    MS. HENN:  Objection to form.
 5                    THE WITNESS:  It's hard to say,
 6           but you could assume that the -- you
 7           know --
 8      QUESTIONS BY MR. FARRELL:
 9           Q.    I don't want you to assume.
10           A.    Yeah.
11           Q.    I want you to use common sense.
12           A.    Yeah.  Using common sense and
13      basic logic, you could assume the more pills
14      that are out there, the more potential for
15      diversion there could be.
16           Q.    So if I were to tell you that a
17      company sold 100 pills and 10 of them got
18      diverted, and then I come back to you and say
19      a year later, a thousand pills got sold, what
20      does common sense and logic tell you as
21      McKesson Corporation how many pills get
22      diverted?
23                    MS. HENN:  Objection to form.
24                    THE WITNESS:  I don't think
25           it's that easy of a connection to say
```

1        that happened.  There could be many

2        different reasons why a thousand

3        pills -- there may be an increase of a

4        thousand pills with zero diversion.

5   QUESTIONS BY MR. FARRELL:

6        Q.    That's true.

7              Do you expect as McKesson

8   Corporation to find in general a direct

9   correlation to volume of pills sold and

10  volume of pills diverted?

11             MS. HENN:  Objection to form.

12        Outside the scope.

13             THE WITNESS:  Depends.  I don't

14        know if there's a statistic on how

15        many pills are diverted.  Again,

16        there's reasons why you may have very

17        large volumes of pills for legitimate

18        reasons and there may be zero

19        diversion.

20  QUESTIONS BY MR. FARRELL:

21        Q.    That's true.  Let me ask it a

22  different way.

23             Do you believe it's foreseeable

24  that the more pills you sell, the more pills

25  get diverted?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MS. HENN:  Objection to form.
 2                  THE WITNESS:  I would say that
 3          there -- that, you know, the volume
 4          of -- the more pills you have, there
 5          could be, could be more to diversion.
 6          It doesn't mean that there is.  Or I
 7          would foresee that just an increase in
 8          volume is going to increase diversion.
 9          There could be.
10    QUESTIONS BY MR. FARRELL:
11          Q.      The more pills that are
12    diverted -- let me ask you a different way.
13          A.      Okay.
14          Q.      Does McKesson believe that the
15    more pills that get diverted, the more pills
16    get abused?
17                  MS. HENN:  Objection to form.
18          Outside the scope.
19                  THE WITNESS:  Sorry, could you
20          rephrase that one again?  Let me --
21    QUESTIONS BY MR. FARRELL:
22          Q.      As McKesson Corporation, do you
23    acknowledge that the more pills that get
24    diverted, the more pills get abused?
25                  MS. HENN:  Same objections.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 THE WITNESS:  Again, I'd say
 2         what I said previously:  It could --
 3         that could be a possibility.  It
 4         depends, but...
 5    QUESTIONS BY MR. FARRELL:
 6         Q.     Are people diverting pills to
 7    engage in lawful conduct?
 8                 MS. HENN:  Objection to form.
 9                 THE WITNESS:  I don't know why
10         everybody is diverting pills every
11         single time, but generally, no.
12    QUESTIONS BY MR. FARRELL:
13         Q.     Right.
14                 So in general, the more pills
15    that gets diverted, the more abuse and
16    addiction we find with prescription opium
17    pills?
18         A.     There's that possibility.
19                 (McKesson-Hartle Exhibit 27
20         marked for identification.)
21    QUESTIONS BY MR. FARRELL:
22         Q.     I'm going to have marked what
23    is Deposition Exhibit 27.  The top right-hand
24    corner is 2012_5_9.
25                 This is an amicus brief.
```

1          Do you know what an amicus

2     brief is?

3          A.     I do not.  I do not have legal

4     background.

5          Q.     Okay.  McKesson Corporation is

6     a member of the Healthcare Distributors and

7     Manufacturers Association, now known as the

8     Healthcare Distributors Association, agreed?

9          A.     Healthcare Distributors

10    Management Association?

11         Q.     Management, I'm sorry, yes.

12         A.     Yes.

13         Q.     Okay.  And on May 9, 2012,

14    Cardinal Health had gotten itself into a

15    little trouble with the DEA, hadn't it?

16              MS. HENN:  Objection to form.

17              THE WITNESS:  I'm aware of that

18         time frame and...

19    QUESTIONS BY MR. FARRELL:

20         Q.     They got in trouble with the

21    DEA, very similar to how McKesson got in

22    trouble with the DEA in 2008, agreed?

23              MS. HENN:  Objection to form.

24              THE WITNESS:  I haven't

25         reviewed this document or all the

```
 1        details, but in spirit, in general.

 2   QUESTIONS BY MR. FARRELL:

 3        Q.     So in -- on May 9th of 2012,

 4   HDMA, the Healthcare Distribution Management

 5   Association, wrote a brief to a federal court

 6   here in Washington, DC, in support of

 7   Cardinal Health and against the DEA.

 8               Was McKesson Corporation aware

 9   of this amicus brief?

10               MS. HENN:  Objection to form.

11          Outside the scope.

12               MR. FARRELL:  It's actually

13          not.  It's actually referenced

14          directly in the notice.

15               MS. HENN:  I'm not sure that's

16          the case, but we can disagree about

17          that.

18               THE WITNESS:  I don't know for

19          100 percent certain, but I assume so.

20   QUESTIONS BY MR. FARRELL:

21        Q.     Well, I don't want you to

22   guess.  This is relatively important.

23               Have you seen any

24   acknowledgement within McKesson Corporation

25   validating or affirming or reviewing or
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    participating in this amicus brief?

2         A.     I have not.

3         Q.     Are you aware of McKesson being

4    involved at all in the amicus briefs?

5                MS. HENN:  Objection to form.

6                THE WITNESS:  I'm not.

7                (McKesson-Hartle Exhibit 28

8         marked for identification.)

9    QUESTIONS BY MR. FARRELL:

10        Q.     I'm going to have marked

11   Exhibit 28, 2012_05_05.

12               Are you aware of the Wayback

13   Machine?

14        A.     Excuse me?

15        Q.     Are you aware of the Wayback

16   Machine?

17        A.     I am not.

18        Q.     The Wayback Machine is an

19   Internet service that's free, and what it

20   does is it's able to go and bring up old

21   websites based on dates and time.

22               And it just so happens that the

23   Wayback Machine captured the HDMA website in

24   May of 2012.  This comes from the HDMA

25   website, and this is a list of the board of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   directors.
 2            Now, what's an executive
 3   committee on a board of directors?
 4            MS. HENN:  Objection to form.
 5        Outside the scope.
 6            THE WITNESS:  That's the senior
 7        leaders driving this group.
 8   QUESTIONS BY MR. FARRELL:
 9        Q.    And, Mr. McKesson Corporation,
10   you were on the executive committee of HDMA
11   of 2012, were you not?
12            MS. HENN:  Objection to form.
13        Outside the scope.
14            THE WITNESS:  One of our senior
15        leaders is.
16   QUESTIONS BY MR. FARRELL:
17        Q.    You're in the senior leadership
18   of HDMA, and you signed off on an amicus
19   brief submitted to a federal court in
20   Washington, DC, in support of one of your
21   colleagues and members, Cardinal Health.
22            MS. HENN:  Objection to form.
23        Outside the scope.
24   QUESTIONS BY MR. FARRELL:
25        Q.    So I'm going to ask you a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    couple of questions about it.

 2         A.     Okay.

 3         Q.     If you flip to page 3...

 4         A.     Of the brief?

 5         Q.     Of the brief.

 6                The very bottom of the page --

 7                MS. HENN:  Are you talking

 8         about the Bates numbers or the --

 9                MR. FARRELL:  Yeah, the Bates

10         number.

11                MS. HENN:  Thank you.

12    QUESTIONS BY MR. FARRELL:

13         Q.     It says, "HDMA's members have

14    not only statutory and regulatory

15    responsibilities to detect and prevent

16    diversion of controlled prescription drugs,

17    but undertake such efforts as responsible

18    members of society."

19                Do you see that?

20         A.     I do.

21         Q.     Do you recognize this as an

22    acknowledgement that all of the distributors

23    in the country have a common law duty to the

24    people of the United States of America to

25    prevent diversion of controlled substances
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    because you're selling controlled substances?

 2                    MR. SUDDATH:  Objection.

 3                    MS. HENN:  Objection to form.

 4         Outside the scope.

 5                    THE WITNESS:  Okay.  Could you

 6         ask me that again?

 7    QUESTIONS BY MR. FARRELL:

 8         Q.     Do you recognize this as an

 9    acknowledgement that all of the distributors

10    in the country have a common law duty to the

11    American citizens to prevent controlled

12    substances from being diverted into the

13    illicit market?

14                    MR. SUDDATH:  Objection.

15                    MS. HENN:  Objection to form.

16         Outside the scope.

17    QUESTIONS BY MR. FARRELL:

18         Q.     I mean, isn't this what we

19    talked about earlier?

20         A.     I do.

21         Q.     You do, don't you?  Yes?

22         A.     Yes.

23         Q.     Because it's not just

24    statutory, regulatory.  You're engaged in

25    selling opium pills.  You owe a duty to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    American people to do your very best to

2    prevent diversion.

3              MS. HENN:  Objection to form.

4         Outside the scope.

5    QUESTIONS BY MR. FARRELL:

6         Q.    Agreed?

7         A.    Agreed.

8         Q.    And this is your trade

9    organization making the same representation

10   to a federal court in Washington, DC?

11             MS. HENN:  Same objections.

12        Objection to form.  Outside the scope.

13             THE WITNESS:  Yes.

14   QUESTIONS BY MR. FARRELL:

15        Q.    Next sentence:  "The public

16   health dangers associated with the diversion

17   and abuse of controlled prescription drugs

18   have been well-recognized over the years by

19   Congress, DEA, HDMA and its members, and

20   public health authorities."

21             Is that all true?

22             MS. HENN:  Objection to form.

23        Outside the scope.

24             THE WITNESS:  Yes.

25
```

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.      The next sentence.  This is the

 3    part that I'd like to talk to you about, the

 4    highlighted part.  "The agency," meaning DEA,

 5    "has failed to provide meaningful guidance to

 6    assist the regulated industry in complying

 7    with the DEA's interpretation of its

 8    implementing regulations.  HDMA respectfully

 9    submits that despite the agency's oft-recited

10    refrain that the regulations are clear, the

11    regulated industry does not know the rules of

12    the road because DEA has not adequately

13    explained them."

14              McKesson has said the opposite

15    publicly and to its own people, agreed?

16              MS. HENN:  Object to form.

17    QUESTIONS BY MR. FARRELL:

18         Q.      Remember the slide that said

19    clear?  Remember your testimony about the

20    letters and the settlement agreement?  You

21    said a few minutes ago it was clear.

22         A.      I do remember all of that.  I

23    also --

24              MS. HENN:  Object to form.

25              Go ahead.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Oh, excuse me.

 2                    I also remember saying that

 3         certain parts of those regulations

 4         related to what a suspicious order is

 5         is not clear.

 6   QUESTIONS BY MR. FARRELL:

 7         Q.    Page 7.  "The societal costs of

 8   prescription drug abuse are" -- what's it

 9   say?

10         A.    I flipped to the wrong page.

11   Excuse me.

12               "Huge."

13         Q.    And if a distributor engages in

14   unlawful conduct, should the distributor be

15   held accountable for such societal costs?

16               MS. HENN:  Objection to form.

17         Outside the scope.

18               THE WITNESS:  Can you repeat

19         that, please?

20   QUESTIONS BY MR. FARRELL:

21         Q.    If a wholesale distributor

22   engages in unlawful conduct, should it be

23   held accountable for the societal costs of

24   prescription drug abuse?

25               MR. SUDDATH:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HENN:  Same objections.
 2              THE WITNESS:  I believe
 3         distributors have a responsibility in
 4         preventing diversion.
 5   QUESTIONS BY MR. FARRELL:
 6         Q.    So should they be held
 7   accountable for the societal costs that are
 8   documented in this pleading and referenced as
 9   huge?
10         A.    I think it depends.
11              MS. HENN:  Objection to form.
12   QUESTIONS BY MR. FARRELL:
13         Q.    Depends on what?
14              MS. HENN:  Same objection.
15              Go ahead.
16              THE WITNESS:  It depends on the
17         facts and circumstances and, you know,
18         the information about the specific
19         situation.
20   QUESTIONS BY MR. FARRELL:
21         Q.    If a distributor repeatedly
22   fails to report suspicious orders, do you
23   believe it should be held accountable for the
24   societal costs of prescription drug abuse?
25              MR. SUDDATH:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HENN:  Objection to form.

 2                    THE WITNESS:  And I believe it

 3         depends.

 4    QUESTIONS BY MR. FARRELL:

 5         Q.    On?

 6         A.    The facts and circumstances.

 7         Q.    How about the facts and

 8    circumstances which led to McKesson paying

 9    $150 million fine?

10                    MS. HENN:  Objection to form.

11                    THE WITNESS:  Again, I think it

12         depends.

13    QUESTIONS BY MR. FARRELL:

14         Q.    Do you think McKesson is partly

15    responsible for the societal costs of

16    prescription drug abuse in America?

17                    MS. HENN:  Objection to form.

18                    THE WITNESS:  Could you ask

19         that one again, please?

20    QUESTIONS BY MR. FARRELL:

21         Q.    Do you think McKesson is partly

22    responsible for the societal costs of

23    prescription drug abuse in America?

24                    MS. HENN:  Objection to form.

25                    THE WITNESS:  Again, there's a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        lot of people involved in -- it's a

 2        very complicated and multi-faceted

 3        issue, so...

 4   QUESTIONS BY MR. FARRELL:

 5        Q.    We'll get to the other people

 6   in a second.

 7             MS. HENN:  Are you done with

 8        your answer?

 9             THE WITNESS:  I am done.

10             MS. HENN:  Okay.

11   QUESTIONS BY MR. FARRELL:

12        Q.    We'll get to the others in a

13   second.  I want to talk about McKesson first.

14             This is your opportunity to

15   accept partial responsibility for the

16   societal costs of prescription drug abuse in

17   America; yes or no?

18             MS. HENN:  Objection to form.

19        Also outside the scope.

20             THE WITNESS:  So again, it

21        depends on -- it depends.

22   QUESTIONS BY MR. FARRELL:

23        Q.    You're McKesson Corporation.

24        A.    Right.

25        Q.    You're sitting here today.  You
```

```
 1    have the opportunity to look in the camera

 2    and tell the jury whether or not you accept

 3    partial responsibility for the societal costs

 4    of prescription drug abuse in America.

 5              MS. HENN:  Objection to form.

 6         Outside the scope.

 7    QUESTIONS BY MR. FARRELL:

 8         Q.    I'd ask you to answer yes or

 9    no.

10              MS. HENN:  Same objections.

11              THE WITNESS:  I'm not sure how

12         to answer that -- that question

13         specifically.

14    QUESTIONS BY MR. FARRELL:

15         Q.    Well, you can say yes or --

16         A.    I understand that.

17         Q.    -- you can say no.

18         A.    I understand that.

19              MS. HENN:  Objection to form.

20    QUESTIONS BY MR. FARRELL:

21         Q.    If I asked you the same

22    question in your personal capacity, would

23    that help you answer the question better?

24              MS. HENN:  Same objection.

25         Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Again, it

 2         depends -- I would say it doesn't

 3         change my answer.  It depends on the

 4         role that they played.

 5    QUESTIONS BY MR. FARRELL:

 6         Q.    Well, back to McKesson

 7    Corporation, which is you sitting in the

 8    chair today.  Knowing what you know as the

 9    30(b)(6) representative, the corporate

10    designee, knowing about your past conduct,

11    knowing about the past interactions with the

12    DEA, I'm going to ask you again:  Does

13    McKesson Corporation accept partial

14    responsibility for the societal costs of

15    prescription drug abuse in America?

16                MS. HENN:  Objection to form.

17                THE WITNESS:  Again, you know,

18         I -- we're part of the closed system,

19         so we're responsible for preventing

20         diversion.

21    QUESTIONS BY MR. FARRELL:

22         Q.    So the answer is?

23                MS. HENN:  Objection to form.

24                THE WITNESS:  Again, I think

25         we're responsible for something.  I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          don't know what -- how you define all

 2          societal costs and -- I still believe

 3          it depends on different circumstances.

 4    QUESTIONS BY MR. FARRELL:

 5          Q.     Sir, we're not going to parse

 6    out percentages.

 7          A.     Yeah.

 8          Q.     Let's just talk globally for

 9    McKesson Corporation.  So I don't want to put

10    words in your mouth because it's got to come

11    out of your mouth.  So the answer is yes or

12    no.

13               MS. HENN:  Objection to form.

14               THE WITNESS:  I would say yes,

15          partially.

16    QUESTIONS BY MR. FARRELL:

17          Q.     How about Purdue Pharma?  Does

18    McKesson Corporation take the position that

19    Purdue Pharma is partially responsible for

20    the societal costs of prescription drug abuse

21    in America?

22               MS. HENN:  Objection to form.

23          Outside the scope.

24               THE WITNESS:  I'm not going to

25          answer for other companies.  I'm --
```

```
 1          it's like I answered my question:

 2          Those involved in this space,

 3          depending on the facts and

 4          circumstances, may be.  So, yes.

 5   QUESTIONS BY MR. FARRELL:

 6       Q.    Flip to page 8, the last

 7   paragraph.  Your trade organization is saying

 8   that the "DEA's goal, the prevention of

 9   diversion of controlled prescription drugs,

10   is, of course, a public good."

11              Does McKesson validate,

12   acknowledge and affirm that statement?

13              MS. HENN:  Objection to form.

14              THE WITNESS:  Absolutely.  The

15       prevention of the diversion of

16       controlled substances is good for the

17       public.

18              (McKesson-Hartle Exhibit 29

19       marked for identification.)

20   QUESTIONS BY MR. FARRELL:

21       Q.    Next exhibit I'm going to have

22   marked is Exhibit 29.  It's Exhibit

23   2013_09_13.  It's Bates stamp

24   MCK-AGMS-006000880.

25              Have you seen this document?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      I have not.

 2          Q.      Do you know who Gary Boggs is?

 3          A.      I do know Gary.

 4          Q.      I'll represent to you that on

 5   the metadata that was provided by the --

 6   McKesson, indicates that this presentation is

 7   dated in late 2012 -- wait, late 2013, I

 8   think, probably before Gary Boggs came on to

 9   McKesson.  We'll ask him when we depose him.

10                  But anyway, this is a McKesson

11   spreadsheet from Gary Boggs.  Gary Boggs is

12   former DEA.

13          A.      PowerPoint, not spreadsheet.

14          Q.      Yeah, I'm sorry.

15          A.      Okay.

16          Q.      He's former DEA, correct?

17          A.      Correct.

18          Q.      He was the number 2 man on Joe

19   Rannazzisi, yes?

20          A.      Yes.

21          Q.      And as we'll see later, he was

22   actually in the room for one of the

23   presentations when DEA was negotiating with

24   McKesson on the 2008 settlement.

25                  Is that your memory as a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    corporate entity?

 2              MS. HENN:  Objection to form.

 3              THE WITNESS:  I wasn't aware

 4         that he was specifically in the room,

 5         but...

 6    QUESTIONS BY MR. FARRELL:

 7         Q.    The title of this PowerPoint

 8    slide is what?

 9         A.    Oh, "State of prescription drug

10    abuse."

11         Q.    And on the second page, talks

12    about the impact of effective compliance.

13    And it uses lots of America-related stuff,

14    eagles and flags and such.

15              Do you see that?

16         A.    I do see that.

17         Q.    "Protecting America from

18    Prescription Drug Diversion."

19              The next page is a history of

20    understanding the problem, and on page 4 it

21    talks about a collision course.

22              And presumably this is two

23    planes colliding in the air, and that's

24    OxyContin and Percocet.

25              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HENN:  Objection to form.

 2                    THE WITNESS:  I see that.

 3   QUESTIONS BY MR. FARRELL:

 4        Q.    "In the late 1990s, doctors

 5   aggressively prescribing painkillers - a

 6   radical change in health care behavior."

 7                    And that radical change in

 8   health care behavior did what to the number

 9   of prescriptions?

10                    MS. HENN:  Objection to form.

11                    THE WITNESS:  Increased them.

12   QUESTIONS BY MR. FARRELL:

13        Q.    Which resulted in an increase

14   or decrease in the number of pills McKesson

15   sold?

16        A.    I don't know exact numbers, but

17   it increased.

18        Q.    And then the last part,

19   "Manufacturers fueled the use of prescription

20   painkillers."

21                    This is coming from your new

22   head of regulatory affairs at McKesson,

23   agreed?

24                    MS. HENN:  Objection to form.

25                    THE WITNESS:  Can you say that
```

```
 1        again?

 2   QUESTIONS BY MR. FARRELL:

 3        Q.     Yeah.

 4        A.     He's not -- he wasn't the head

 5   of regulatory affairs.

 6        Q.     Then, but he is now?

 7        A.     He's one of the leaders on the

 8   regulatory affairs team.

 9        Q.     Okay.  And this is his

10   statement that "Manufacturers fueled the use

11   of prescription painkillers."

12              Is that McKesson's position?

13              MS. HENN:  Objection to form.

14              THE WITNESS:  I don't know if

15        that's his own specific words or he

16        got that from a previous deck from

17        DEA.  I'm not sure.

18   QUESTIONS BY MR. FARRELL:

19        Q.     We'll have to ask him.

20              But I'm asking McKesson whether

21   or not it shares this view.

22              MS. HENN:  Objection to form.

23        Outside the scope.

24              THE WITNESS:  Manufacturers are

25        part of the closed system, like -- and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           played a role.

 2    QUESTIONS BY MR. FARRELL:

 3           Q.    Does McKesson believe the

 4    manufacturers fueled the use of prescription

 5    painkillers?

 6                 MS. HENN:  Objection to form.

 7           Outside the scope.

 8                 THE WITNESS:  I think they

 9           played a role.  I think there's many

10           reasons -- many things that fueled the

11           epidemic.

12    QUESTIONS BY MR. FARRELL:

13           Q.    So would you rather just punt

14    on the question?

15                 MS. HENN:  Objection to form.

16                 THE WITNESS:  That's what I'm

17           going to share.  That's my answer.

18    QUESTIONS BY MR. FARRELL:

19           Q.    So yes or no, does McKesson

20    Corporation believe manufacturers fueled the

21    use of prescription painkillers?

22                 MS. HENN:  Objection to form.

23           Outside the scope.

24                 THE WITNESS:  Like I said,

25           my -- they're part of the system.
```

Highly Confidential - Subject to Further Confidentiality Review

1          They played a role.

2     QUESTIONS BY MR. FARRELL:

3          Q.     So the answer is?

4          A.     They played a role.  I wouldn't

5     say -- I wouldn't characterize it as fueled.

6     I don't know that I would use that language.

7          Q.     Fair enough.

8                 The next page, 5 and 6,

9     document Purdue Pharma's $635 million fine,

10    Cephalon's $425 million fine.

11                Going to page 7, it's comparing

12    the US rates of opioid overdose deaths, sales

13    and treatment admissions.

14                Do you see that?

15         A.     I see that.

16         Q.     What is the correlation between

17    opioid sales and opioid deaths?  Are they

18    related or unrelated?

19                MS. HENN:  Objection to form.

20                THE WITNESS:  They're both

21        increasing at a similar rate.

22    QUESTIONS BY MR. FARRELL:

23         Q.     So that means they're related

24    or unrelated?

25                MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   THE WITNESS:  They appear to be

 2          related.

 3    QUESTIONS BY MR. FARRELL:

 4          Q.    Does McKesson believe that

 5    opioid sales are related to opioid deaths?

 6                   MS. HENN:  Objection to form.

 7          Outside the scope.

 8                   THE WITNESS:  Can you ask that

 9          one more time, please?

10    QUESTIONS BY MR. FARRELL:

11          Q.    Does McKesson believe that

12    opioid sales are related to opioid deaths?

13                   MS. HENN:  Objection to form.

14          Outside the scope.

15                   THE WITNESS:  The volume of

16          opioids in the market and diversion is

17          related to opioid deaths, certainly.

18    QUESTIONS BY MR. FARRELL:

19          Q.    Page 8, the Controlled

20    Substances Act, the very last provision says,

21    "Creates checks and balances between

22    registrants to protect the public health and

23    safety."

24                   Again, this is again a

25    reaffirmation from Gary Boggs, who is now one
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of your senior regulatory affairs management,

 2    acknowledging that the registrants and the

 3    DEA have a duty to protect the public health

 4    and safety, agreed?

 5         A.     Agreed.

 6         Q.     Page 13.  It says, "What can

 7    happen when these checks and balances

 8    collapse?"

 9              What do you believe this is a

10    picture of?

11              MS. HENN:  Objection to form.

12              THE WITNESS:  It's a building

13         falling down.

14    QUESTIONS BY MR. FARRELL:

15         Q.     A disaster?

16         A.     It's a building that's falling

17    down.  Why it fell down could be a disaster.

18         Q.     What do you infer from

19    Mr. Boggs' implication?

20         A.     That things can go wrong,

21    something can happen.

22         Q.     Page 16, pictures of pain

23    clinics and people waiting in line to

24    purchase pills sold by McKesson to

25    pharmacies.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HENN:  Objection to form.

 2                    MR. FARRELL:  You're right.

 3         That's not necessarily a picture of

 4         McKesson.

 5    QUESTIONS BY MR. FARRELL:
```

12    QUESTIONS BY MR. FARRELL:

13         Q.     Page 17, historical comparison.

14    He's comparing the opioid crisis to the BP

15    oil spill where 11 people were killed and BP

16    paid 40 billion, plus 16 billion to the Clean

17    Water Act.

18                 Have more or less than 11

19    people been killed by the opioid crisis?

20         A.     Clearly more.

21         Q.     Have more people died today

22    than 11 people?

23                 MS. HENN:  Objection to form.

24                 THE WITNESS:  Based on the

25         statistics, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.     Page 24.  Does McKesson

 3    acknowledge and agree there is a national

 4    epidemic of prescription pill addiction,

 5    abuse, morbidity and mortality?

 6               MS. HENN:  Objection to form.

 7               THE WITNESS:  Absolutely.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

4    QUESTIONS BY MR. FARRELL:

5       Q.    They all originate within the

6  closed network, do they not?

7         MS. HENN:  Objection to form.

8         THE WITNESS:  What do you mean

9    by "all originate"?

10  QUESTIONS BY MR. FARRELL:

11     Q.    Well, Bob, in his trailer in

12  southern West Virginia, isn't making

13  OxyContin pills.

14     A.    No, I'm saying there's other --

15  I understand your point.  They come

16  ultimately from the manufacturer,

17  distributor, pharmacy.

18        (McKesson-Hartle Exhibit 30

19    marked for identification.)

20  QUESTIONS BY MR. FARRELL:

21     Q.    Exhibit 30, 2013_10_23, Bates

22  stamp MCKMDL00409046.  This is October 23,

23  2013.

24        McKesson is in trouble again

25  with the DEA, agreed?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MS. HENN:  Objection to form.

 2                 THE WITNESS:  There's

 3        allegations.

 4  QUESTIONS BY MR. FARRELL:

 5        Q.    Same ones as before, agreed?

 6                 MS. HENN:  Objection to form.

 7                 THE WITNESS:  Related to the

 8        regulations.

 9  QUESTIONS BY MR. FARRELL:

10        Q.    Same as the 2008?

11                 MS. HENN:  Objection to form.

12                 THE WITNESS:  Around suspicious

13        orders.

14                 (McKesson-Hartle Exhibit 31

15        marked for identification.)

16  QUESTIONS BY MR. FARRELL:

17        Q.    Exhibit 31, dated November 6,

18  2013.  It's 2013_11_6, MCKMDL00409048.

19                 It's again from the United

20  States Attorney in the Northern District of

21  West Virginia.  It's talking about further

22  explanations.

23                 You would agree with me this is

24  the same conduct that McKesson got in trouble

25  for in 2008?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HENN:  Objection to form.

 2              THE WITNESS:  Yeah, it has to

 3         do with suspicious orders, which is

 4         similar.

 5   QUESTIONS BY MR. FARRELL:

 6         Q.    And it's Covington & Burlington

 7   at a place called 1201 Pennsylvania Avenue,

 8   Northwest.

 9              Do you know where that is?

10   Isn't that here?

11              MS. HENN:  Old office.

12              MR. FARRELL:  The old office.

13         All right.

14              THE WITNESS:  In town.

15   QUESTIONS BY MR. FARRELL:

16         Q.    But again, this is the same

17   thing.

18              Do you know Bill Ihlenfeld?

19         A.    I do not.

20         Q.    Yeah, he was the US Attorney

21   for the Northern District of West Virginia

22   and a classmate of mine.  He's calling on

23   McKesson, and he's essentially telling

24   McKesson, "Hey, you're not doing your job

25   again."
```

```
 1                    MS. HENN:  Objection to form.

 2    QUESTIONS BY MR. FARRELL:

 3         Q.     "And you're dumping pills into

 4    my state."

 5                    MS. HENN:  Same objection.

 6                    (McKesson-Hartle Exhibit 32

 7         marked for identification.)

 8    QUESTIONS BY MR. FARRELL:

 9         Q.     Exhibit 32, 2014_1_XX,

10    MCKMDL00409050.  In fact, they put a whole

11    presentation together.

12                    Have you seen this

13    presentation?

14         A.     I have seen this one.

15         Q.     I'm not going to go through

16    this because we'll go through with it a lot

17    more tomorrow.

18                    In essence, what I'm trying to

19    accomplish here is that you understand that

20    the United States District Attorney for the

21    Northern District of Ohio, and then it turns

22    out other ones, including Colorado, are

23    basically telling McKesson:  You have a

24    systemic failure to monitor, detect and

25    report suspicious orders.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Is that what they're alleging?

 2                    MS. HENN:  Objection to form.

 3                    THE WITNESS:  Yes, that's what

 4          they're alleging.

 5                    (McKesson-Hartle Exhibit 33

 6          marked for identification.)

 7   QUESTIONS BY MR. FARRELL:

 8          Q.     Exhibit 33, this is your

 9   response, 2014_03_12, Bates-stamped

10   MCKMDL00409116.

11                    This is you responding, saying,

12   "Nuh-uh, no, we didn't."

13                    Does that about wrap it up?

14                    MS. HENN:  Objection to form.

15   QUESTIONS BY MR. FARRELL:

16          Q.     You've seen this document

17   before?

18          A.     I have not, so I'm going to go

19   through it.
```

Highly Confidential - Subject to Further Confidentiality Review



13          MS. HENN:  Objection to form.

14          (McKesson-Hartle Exhibit 34

15     marked for identification.)

16  QUESTIONS BY MR. FARRELL:

17     Q.     In fact, Exhibit 34 is the

18  response to the presentation, March 20, 2014.

19  It's 2014_03_20, MCKMDL00409174, from my good

20  friend Bill Ihlenfeld's office, which

21  basically says "bull."

22          MS. HENN:  Counsel, just to

23     clarify, I think Exhibit 33 you

24     might -- you have two documents in

25     here.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FARRELL:  Maybe.  It may

 2       have included it.

 3              MS. HENN:  Ah, is that why?

 4              MR. FARRELL:  Maybe.

 5              MS. HENN:  Okay.  That's fine.

 6       Just wanted to make sure you knew.

 7  QUESTIONS BY MR. FARRELL:
```

████      ████      ████████████████████

████  ██████████████████████████████

```
10       A.    Can I read this one?  I have

11  not read this one before.

12       Q.    Okay.  I'm not going to drill

13  you on that letter.  It's got --

14       A.    No, I'm about done.  I just

15  wanted to read the summary here, too.

16              Okay.  Thank you.

17       Q.    Now, skipping through all of

18  the other correspondence because we'll get

19  into that more tomorrow, more recently, as a

20  result of all of this, even though McKesson

21  is denying liability, you understand that

22  McKesson did enter into another settlement

23  agreement?

24       A.    I understand that.

25              (McKesson-Hartle Exhibits 35,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          36 and 37 marked for identification.)

 2    QUESTIONS BY MR. FARRELL:

 3          Q.    2017_01_05A, 35, Exhibit 35,

 4    MCKMDL00355322, the settlement agreement and

 5    release.

 6                Exhibit 37, 2017_01_5B,

 7    MCKMDL00355477.

 8                MS. HENN:  Did you skip 36?

 9    QUESTIONS BY MR. FARRELL:

10          Q.    I didn't.

11                36 will be 2017_01_05B, the

12    compliance addendum.

13                MS. HENN:  37.

14                MR. FARRELL:  Oh, okay, I'm

15          sorry.  But it's okay because we'll

16          just put 36 as the administrative

17          memorandum, which is 2017_01_5C,

18          MCKMDL0355513.

19                MS. HENN:  And, Counsel, we've

20          been going about an hour, so if we

21          could have a break at a good stopping

22          point.  It doesn't have to be this

23          second, but if there's one very soon,

24          that would be great.

25                MR. FARRELL:  Yeah, very soon.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. HENN:  Great.
 2   QUESTIONS BY MR. FARRELL:
 3        Q.     Just to acknowledge, McKesson's
 4   still is denying liability, and this time the
 5   cost has become more prohibitive with the
 6   fine, 150 million.
 7                MS. HENN:  Objection to form.
 8   QUESTIONS BY MR. FARRELL:
 9        Q.     Agreed?
10        A.     Agreed.  We settled with the
11   settlement agreement, agreed.
12        Q.     McKesson's distribution
13   facilities were systematically failing to
14   report suspicious orders and resulted in a
15   $150 million fine assessed by the DEA and
16   paid by McKesson Corporation; true or not
17   true?
18                MS. HENN:  Objection to form.
19                THE WITNESS:  We did pay that
20        fine, $150 million.
21   QUESTIONS BY MR. FARRELL:
22        Q.     Because you were systematically
23   not reporting suspicious orders?
24                MS. HENN:  Same objection.
25                THE WITNESS:  That was at the
```

```
 1            core of it.

 2   QUESTIONS BY MR. FARRELL:

 3            Q.    So let's just be fair.  There

 4   were certain distribution facilities that

 5   utterly failed to fulfill their obligations

 6   under federal law to monitor, detect, halt

 7   and report suspicious orders, which resulted

 8   in McKesson paying the largest fine in the

 9   history of the DEA; true or not true?

10            MS. HENN:  Objection to form.

11            THE WITNESS:  Could you

12        simplify that question a little bit?

13   QUESTIONS BY MR. FARRELL:

14        Q.    Yeah.

15            McKesson wasn't following the

16   law and got fined $150 million?

17            MS. HENN:  Objection to form.

18            THE WITNESS:  We acknowledged

19        that certain orders did not get

20        flagged in our system.

21   QUESTIONS BY MR. FARRELL:

22        Q.    Thousands.

23            MS. HENN:  Objection to form.

24   QUESTIONS BY MR. FARRELL:

25        Q.    Thousands of orders?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      Orders.

 2            Q.      Like some facilities reported

 3    none.

 4                    MS. HENN:  Objection to form.

 5    QUESTIONS BY MR. FARRELL:

 6            Q.      Yes?

 7            A.      Systematically none.

 8            Q.      Systematically none.

 9                    And it wasn't just an isolated

10    distribution facility.  It was several

11    different facilities across the spectrum at

12    McKesson had utterly failed to comply with

13    federal regulations to prevent diversion of

14    controlled substances?

15                    MS. HENN:  Objection to form.

16                    THE WITNESS:  We believed we

17            were in good faith working with DEA as

18            part of the 2008 agreement to report

19            customers and report orders in a

20            different way that was mutually agreed

21            upon.  So --

22    QUESTIONS BY MR. FARRELL:

23            Q.      Yeah, I'm not asking --

24            A.      -- I would say --

25                    MR. FARRELL:  You're right.
```

```
 1          You're right.

 2              THE WITNESS:  I know you say

 3          zero, but I -- you know, there are

 4          situations and scenarios where we

 5          reported based on what we agreed to

 6          with the DEA, based on that settlement

 7          agreement.

 8              So I understand systematically

 9          they weren't being reported, but they

10          were being reported in other ways.

11  QUESTIONS BY MR. FARRELL:

12      Q.    Sitting here today does

13  McKesson Corporation acknowledge that it

14  utterly failed in its obligations to prevent

15  diversion of opium pills into the American

16  illicit market?

17              MS. HENN:  Objection to form.

18              THE WITNESS:  No, I don't

19          believe we utterly failed.  We, again,

20          in good faith over the years have

21          worked with DEA, taken guidance,

22          developed programs, enhanced programs,

23          evolved them over the course of time.

24              So I wouldn't characterize it

25          as utterly failing.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.    Well, when you report zero

 3   suspicious orders over years at the same time

 4   selling tens of millions of opium pills into

 5   a community, you're not meeting your

 6   obligations under federal law, agreed?

 7             MS. HENN:  Objection to form.

 8             THE WITNESS:  Again, there's

 9        certain times in which we acknowledged

10        that we did not report orders.  That

11        does not mean that we did not conduct

12        diligence, that we did not evolve our

13        program to help prevent.

14   QUESTIONS BY MR. FARRELL:

15        Q.    And I understand the desire to

16   want to say in good faith you did your best.

17   What I'm asking for is a very simple

18   acknowledgement that McKesson was not

19   following the law and got fined for it on two

20   occasions.

21             MS. HENN:  Objection to form.

22             THE WITNESS:  Those were the

23        allegations.

24   QUESTIONS BY MR. FARRELL:

25        Q.    Do you accept those allegations
```

```
 1    as partially true?

 2              MS. HENN:  Objection to form.

 3              THE WITNESS:  Again, we --

 4         partially, in the second agreement, we

 5         did acknowledge that, you know, we

 6         didn't identify all the suspicious

 7         orders that we could have.

 8    QUESTIONS BY MR. FARRELL:

 9         Q.    In fact, in some distribution

10    facilities you didn't identify any?

11              MS. HENN:  Objection to form.

12    QUESTIONS BY MR. FARRELL:

13         Q.    This isn't like we missed a

14    needle in a haystack.  This is we missed the

15    hay.

16              MS. HENN:  Objection to form.

17              THE WITNESS:  So the thing I

18         would just share is that, again, all

19         of those orders were blocked and not

20         shipped.  And we may not have

21         systematically, as I mentioned

22         earlier, reported, but --

23              MR. FARRELL:  Hold on.

24              MS. HENN:  Wait, he's not done

25         with his answer.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I'm just

 2         reiterating the point I made earlier

 3         about the 2008 agreement, mutually

 4         discussing with DEA the fact that we

 5         were focusing on customers and would

 6         report suspicious orders in a mutually

 7         format -- a mutually-agreed-upon

 8         format.

 9              So you say zero, but it may not

10         always be zero.

11    QUESTIONS BY MR. FARRELL:

12         Q.    Just to be fair with you, we're

13    going to take a break.

14         A.    All right.

15         Q.    I have the transactional data

16    in Cuyahoga and Summit County from McKesson

17    sales of opium pills.  I also have the

18    suspicious order reports.

19              So let's be clear:  McKesson

20    didn't get in trouble for blocking orders and

21    not reporting them.  McKesson paid a record

22    fine for shipping suspicious orders and not

23    reporting them.

24              MS. HENN:  Objection to form.

25              THE WITNESS:  Say that again.
```

1          I want to be very clear what I heard.

2    QUESTIONS BY MR. FARRELL:

3          Q.    Me, too.

4          A.    Yeah.

5          Q.    You're telling me that

6    McKesson's conduct that it admitted to,

7    McKesson's position is that it blocked

8    suspicious orders and then just simply didn't

9    report them in the right way.  That's your

10   position?

11         A.    We systematically -- based on

12   the design of our system, orders were

13   blocked.

14         Q.    You believe that McKesson was

15   blocking all the suspicious orders and paid

16   $150 million because of the manner in which

17   it reported?

18         A.    Earlier I said we did

19   acknowledge that some orders, not all, we

20   didn't block.

21         Q.    Okay.  So let's get back --

22         A.    We didn't -- let me rephrase

23   that.  We acknowledge that our system may not

24   have detected orders that could be deemed as

25   suspicious.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And that the orders that your
 2   system did detect as suspicious, you still
 3   shipped anyway without reporting them?
 4                 MS. HENN:  Objection to form.
 5                 THE WITNESS:  No.
 6   QUESTIONS BY MR. FARRELL:
 7          Q.     You believe that's not true?
 8          A.     Based on my understanding of
 9   our systems and how things work in -- when
10   they hit a threshold and they're blocked,
11   those do not get shipped.
12          Q.     All right.  So fair --
13          A.     That's how we define those
14   suspicious orders.
15          Q.     Fair enough.
16                 Let me ask you this:  If your
17   system detects a suspicious order and you
18   ship it anyway and you don't report it, is
19   that unlawful?
20                 MS. HENN:  Objection to form.
21                 THE WITNESS:  Please say that
22        again.
23   QUESTIONS BY MR. FARRELL:
24          Q.     If your system detects a
25   suspicious order and you ship it anyway
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   without reporting it, is that unlawful?

 2              MS. HENN:  Objection to form.

 3              THE WITNESS:  I think it

 4        depends.

 5   QUESTIONS BY MR. FARRELL:

 6        Q.    On?

 7        A.    There could be a technical

 8   glitch --

 9        Q.    Okay.

10        A.    -- or some computer error.  I

11   mean --

12        Q.    I'm talking about hundreds and

13   hundreds and hundreds of orders that are

14   red-flagged by McKesson and shipped anyway

15   without reporting a suspicious order.

16              The US Attorney for the

17   Northern District of West Virginia doesn't

18   say this was a technical glitch.  He says it

19   was a systematic failure by your company to

20   abide by West Virginia law -- or federal law.

21              You paid a record fine, and

22   you're disavowing the underlying conduct

23   today?

24              MS. HENN:  Objection to form.

25              THE WITNESS:  I'm just trying
```

```
 1          to communicate that our system that

 2          was designed to detect suspicious

 3          orders using the concept of thresholds

 4          blocked all of the -- blocked those

 5          suspicious orders.

 6                  We recognize that and

 7          acknowledge that it may not have

 8          picked up on all of the suspicious

 9          orders and...

10                  MR. FARRELL:  One more and

11          we'll take a quick break.

12                  MS. HENN:  If it's okay, I'd

13          like to take it now.  It's been now an

14          hour and 15 minutes.  It's pretty

15          tiring to be a witness.  So if we

16          could just take a five-minute break,

17          that would be great.

18                  MR. FARRELL:  Okay.

19                  MS. HENN:  Thank you.

20                  VIDEOGRAPHER:  The time is 4:29

21          p.m.  We're going off the record.

22           (Off the record at 4:29 p.m.)

23                  VIDEOGRAPHER:  The time is

24          4:45 p.m.  We're back on the record.

25                  MR. FARRELL:  Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So we have about an hour left;
 2        we've been going about -- almost six
 3        hours.  So by agreement we've kept the
 4        deposition days to seven hours long,
 5        and I'll honor that.
 6              MS. HENN:  More than by
 7        agreement.  It's also ordered by the
 8        judge.
 9              MR. FARRELL:  No question.
10              MS. HENN:  Just a slight
11        clarification.
12              MR. FARRELL:  No question.
13        Seven hours of answering questions is
14        enough for anybody.
15              MS. HENN:  It is.
16              MR. FARRELL:  That being said,
17        I know there's a burden on travel and
18        arrangements; we have a tight
19        schedule.  So what I'm going to do is
20        I'm going to finish up some topics,
21        and I'm going to state for the record
22        that I have not been able to get
23        through all of the designated topics
24        today.
25              That being said, there are some
```

```
 1        additional topics that you were not

 2        designated for.  There's essentially

 3        two notices.

 4             So what we're -- what I'm going

 5        to do is recommend that I finish up

 6        the topics that I want to get to, and

 7        then tomorrow is your fact deposition.

 8        And what we'll do is work out with

 9        counsel if there are any of these

10        questions that can be answered in

11        writing to avoid you having to come

12        back and testify on things that can be

13        answered.

14             And then in addition, there are

15        records and there are -- there is

16        transactional data historically and

17        suspicious order report historically

18        that have not been disclosed yet

19        because of our tight schedules that

20        I'll -- I will be going to ask --

21        eventually to ask for some additional

22        time from you to finish the stuff we

23        didn't get to finish and to ask

24        questions about documents that have

25        not been disclosed yet.
```

```
 1              Obviously, it's going to be

 2         subject to the objection of your

 3         lawyers, and I just wanted to place

 4         that on the record.

 5   QUESTIONS BY MR. FARRELL:

 6         Q.    Jumping in real quick, I'm not

 7   going to spend a whole lot of time on this; I

 8   have a very specific question.

 9              Before we get into the

10   document, there's a reference in here about

11   heroin, and I just wanted to see if I could

12   cut to the chase with you.

13         A.    Okay.

14         Q.    As the McKesson corporate

15   representative, do you acknowledge that abuse

16   of prescription opium pills is a gateway to

17   the initiation of heroin?

18              MS. HENN:  Objection to form.

19         Outside the scope.

20              THE WITNESS:  Based on

21         everything that I've read and in the

22         media and statistics and discussion, I

23         would agree -- agree to that.

24   QUESTIONS BY MR. FARRELL:

25         Q.    If you abuse prescription
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    opiates, the CDC says that you're 40 times

2    more likely to initiate heroin use.

3              Does McKesson acknowledge

4    that -- that prescription opiate pill abuse

5    is a driving factor in the heroin epidemic

6    we're also experiencing?

7              MS. HENN:  Objection to form.

8        Outside the scope.

9              THE WITNESS:  Yeah, it's a

10       factor.

11   QUESTIONS BY MR. FARRELL:

12       Q.    That was easy.

13       A.    Yeah.

14       Q.    All right.  Back to this amicus

15   business.

16             (McKesson-Hartle Exhibit 38

17       marked for identification.)

18   QUESTIONS BY MR. FARRELL:

19       Q.    I'm going to mark as

20   Exhibit 38, it's 2016_04_04.  This is another

21   amicus brief.  This one is Masters

22   Pharmaceutical.

23             Does McKesson acknowledge that

24   in 2016 when this amicus brief was submitted

25   that it was still on the executive committee
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of HDMA?

 2              MS. HENN:  Objection to form.

 3         Outside the scope.

 4              THE WITNESS:  I can't speak to

 5         that.  If I saw a list of who was on

 6         the executive committee...

 7              (McKesson-Hartle Exhibit 39

 8         marked for identification.)

 9    QUESTIONS BY MR. FARRELL:

10         Q.    Fair enough.  Exhibit 39,

11    2016_04_05, the Wayback Machine.

12              So looking at the Exhibit 39,

13    can you acknowledge that McKesson was on the

14    executive board of HDMA --

15         A.    Yes.

16         Q.    -- at the time that this amicus

17    brief was submitted?

18         A.    Yes.

19         Q.    Have you had a chance to review

20    the amicus brief?

21         A.    I had a chance to look at some

22    of the highlighted sections.

23         Q.    So let's go to 2016_04_04,

24    page 5.

25         A.    Page 5.
```

```
 1            Q.      Down the right-hand side, you

 2   can see two-thirds of the way down it starts,

 3   "DEA."  The one below that.  Yeah.

 4                   "DEA has required distributors

 5   not only to report suspicious orders but to

 6   investigate orders by interrogating

 7   pharmacies and physicians and take action to

 8   halt suspicious orders before they are

 9   filled.  Those added obligations would

10   significantly expand a report-only duty of

11   distributors under the long-standing

12   regulatory scheme and impose impractical

13   obligations on distributors."

14                   Is that McKesson's position?

15                   MS. HENN:  Objection to form.

16         Outside the scope.

17                   THE WITNESS:  Obviously we're

18         part of the organization.  In parts,

19         you know, I agree with the added --

20         what it would -- you know, the added

21         responsibility or time that it would

22         take to -- you know, to investigate

23         each order.

24                   I don't know if I'm answering

25         your question, but...
```

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.     You're stumbling toward it.

 3         A.     Yeah.

 4         Q.     Let's go to page 6, a little

 5    more direct.  The second highlighted

 6    provision:  "As the final order in this case

 7    underscores, however, DEA now appears to have

 8    changed its position to require that

 9    distributors not only report suspicious

10    orders but investigate and halt suspicious

11    orders."

12              This is a 2016 document by your

13    trade organization, of which McKesson sits on

14    the executive board, and its telling the DC

15    Circuit Court of Appeals that it does not

16    have a duty to investigate and halt

17    suspicious orders.

18              Does McKesson validate this

19    position?

20              MS. HENN:  Objection to form.

21              THE WITNESS:  Can you rephrase

22         that for me?

23    QUESTIONS BY MR. FARRELL:

24         Q.     Yeah.

25              In 2016, your trade
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    organization is telling the second highest

2    court in the land, the DC Circuit Court of

3    Appeals, that the DEA is now requiring them

4    to investigate and halt suspicious orders.

5              Haven't we agreed that's been

6    the duty since 1971?

7              MS. HENN:  Objection to form.

8         Outside the scope.

9    QUESTIONS BY MR. FARRELL:

10        Q.    Tough position to defend, isn't

11   it?

12             MS. HENN:  Same objections.

13             THE WITNESS:  You know, again,

14        I -- I recognize that other

15        distributors have different systems

16        and have worked with DEA over the

17        years on different methodologies,

18        whether it's a threshold to block it

19        or it's a hold and investigate and

20        then block it.  And so, you know, I

21        recognize that.

22   QUESTIONS BY MR. FARRELL:

23        Q.    You recognize this position is

24   problematic given your experience, McKesson

25   Corporation, with the DEA?
```

```
 1              MS. HENN:  Objection to form.

 2              THE WITNESS:  I recognize that

 3         I'm sure there's lots of disagreements

 4         about this.

 5  QUESTIONS BY MR. FARRELL:

 6         Q.    Yeah.

 7              But we're still trying to

 8  figure out from internal communications

 9  whether or not McKesson signed off on this

10  brief.

11              Are you aware of whether or not

12  they signed off on this?

13              MS. HENN:  Objection to form.

14              THE WITNESS:  I don't -- I am

15         not aware of the process that goes

16         into signing off on these briefs and

17         what that specific looks like.  I know

18         how trade organizations work and how

19         they get to a point of consensus.

20  QUESTIONS BY MR. FARRELL:

21         Q.    Let me ask you in a different

22  way.

23              We talked about the original

24  enactment of the Controlled Substances Act

25  where the penalty for engaging in unlawful
```

1    conduct should be prohibitive.

2            Do you remember talking about

3    that this morning?

4        A.    I do.

5        Q.    And so in 2008, McKesson

6    Corporation paid $13 million, and in 2017,

7    McKesson paid $150 million.

8            What would happen in today's

9    world if McKesson went to the DEA and said,

10   "We don't have a duty to investigate and halt

11   suspicious orders"?  What do you reckon would

12   happen then?

13           MS. HENN:  Objection to form.

14       Outside the scope.

15           THE WITNESS:  I'm not sure

16       exactly what would happen, but they

17       wouldn't be thrilled.

18   QUESTIONS BY MR. FARRELL:

19       Q.    So what do you think the fine

20   will be next time?

21       A.    I can't speculate what it would

22   be.  It depends on the facts and

23   circumstances and...

24       Q.    So just simply stated, sitting

25   here today, McKesson Corporation, do you

```
 1   accept or reject the position your trade

 2   organization is taking regarding the

 3   interpretation of the shipping requirement

 4   and reporting requirement?

 5           MS. HENN:  Objection to form.

 6      Outside the scope.

 7           THE WITNESS:  I apologize.  Can

 8      you ask -- ask me again or rephrase?

 9      Do we accept --

10   QUESTIONS BY MR. FARRELL:

11      Q.    Yeah.

12           The sentence you see up there

13   on the screen --

14      A.    Yeah.

15      Q.    -- submitted by your trade

16   organization to which McKesson sits as an

17   executive board member, this is a position in

18   a legal document submitted to the second

19   highest court in the United States of

20   America.

21           Sitting here today, does

22   McKesson Corporation accept or reject this

23   position?

24           MS. HENN:  Objection to form.

25      Outside the scope.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  I'd say we accept

 2        this -- accept this --

 3   QUESTIONS BY MR. FARRELL:

 4        Q.     You accept --

 5        A.     -- as part of that

 6   organization.

 7        Q.     What is that?

 8        A.     As being part of that

 9   organization.

10        Q.     So your position today is

11   McKesson does not have a duty to investigate

12   and halt suspicious orders?

13                  MS. HENN:  Objection to form.

14   QUESTIONS BY MR. FARRELL:

15        Q.     You're in a tough spot here.

16        A.     I can tell you what our program

17   does, right?  We halt -- we block suspicious

18   orders.

19        Q.     All right.  So let's go

20   further.  Page 8.  "The 2006 letter from Joe

21   Rannazzisi fails to explain how the statutory

22   command of the US Code 823 Section E, a

23   command that the Attorney General consider

24   when adjudicating an application for

25   registration of the applicant's maintenance
```

```
 1    of effective controls against diversion" --

 2                MS. HENN:  I'm sorry, you're on

 3         page 8.  I believe the witness is on

 4         page 9.

 5                THE WITNESS:  Oh, excuse me.

 6         Sorry.  I was figuring that out when I

 7         looked up there.

 8    QUESTIONS BY MR. FARRELL:

 9         Q.    I'm sorry.

10         A.    No, that's me.

11         Q.    Basically, the position in this

12    brief is they're trying to figure out how in

13    the world that 2006 letter became a command

14    to distributors to engage in due diligence

15    and avoid filling suspicious orders.

16                MS. HENN:  Objection to form.

17    QUESTIONS BY MR. FARRELL:

18         Q.    How can you defend this

19    position, knowing that Masters Pharmaceutical

20    opinion that was released rejected in its

21    entirety this position?

22                So what I'm really trying to

23    figure out is whether McKesson has been so

24    intransigent that it continues to pay fines

25    to the DEA fighting its interpretation of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   federal regulations until such time as the DC

 2   Circuit Court of Appeals told them so.

 3               MS. HENN:  Objection to form.

 4               MR. FARRELL:  Terrible

 5      question?

 6   QUESTIONS BY MR. FARRELL:

 7      Q.    You get the gist of what I'm

 8   asking you?

 9      A.    Can you ask it in a different

10   way?

11      Q.    Yeah.

12               This appears to say that

13   McKesson does not have a duty to engage in

14   due diligence, nor does it need to avoid

15   filling suspicious orders.

16               Is that your position sitting

17   here today?

18               MS. HENN:  Objection to form.

19   QUESTIONS BY MR. FARRELL:

20      Q.    "You can't make me," is that

21   the position McKesson is taking?

22               MS. HENN:  Objection to form.

23   QUESTIONS BY MR. FARRELL:

24      Q.    I promise I'll quit if you just

25   simply say that this position here is
```

Highly Confidential - Subject to Further Confidentiality Review

1      nonsense.

2                       MS. HENN:  Objection to form.

3                       THE WITNESS:  I can say -- I

4          can't say that it's nonsense.  I'm not

5          sure how to answer this one

6          specifically.

7      QUESTIONS BY MR. FARRELL:

8          Q.      Go to page Bates stamp 9.

9      "Nothing in the federal regulations requires

10     distributors to investigate the legitimacy of

11     orders or to halt shipments of any orders

12     deemed to be suspicious."

13                      Does McKesson disavow this

14     statement or agree with it?

15                      MS. HENN:  Objection to form.

16                      THE WITNESS:  You know, I do

17         think the language of the regulations,

18         you know, "design and operate a system

19         to disclose suspicious orders," gets

20         interpreted in many different ways,

21         and that -- and that's how different

22         organizations, distributors, develop

23         their program.

24     QUESTIONS BY MR. FARRELL:

25         Q.      Respectfully, that's how you

Highly Confidential - Subject to Further Confidentiality Review

```
 1   get fined $150 million.

 2              MS. HENN:  Objection to form.

 3   QUESTIONS BY MR. FARRELL:

 4        Q.    The next sentence:  "There is

 5   no prohibition on shipment of suspicious

 6   orders."

 7              That's wrong, isn't it?

 8              MS. HENN:  Objection to form.

 9   QUESTIONS BY MR. FARRELL:

10        Q.    Make it easier.  Let's go to

11   page 12.

12              "DEA's regulations had sensibly

13   imposed a duty on distributors simply to

14   report suspicious orders, but left it to DEA

15   and its agents to investigate and halt

16   suspicious orders."

17              Nonsense or not nonsense?

18              MS. HENN:  Objection to form.

19   QUESTIONS BY MR. FARRELL:

20        Q.    Or no comment?  I'm giving you

21   an out.

22        A.    I would say no comment.  I'm

23   not sure how to answer that specifically.

24        Q.    Well, the answer should be

25   someone needs to call HDMA and figure out why
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    they're taking nonsense positions, but I'll

 2    leave that to somebody else.

 3              All right.  Homestretch.  Some

 4    toys.  As many at this table probably know,

 5    I'm the ARCOS nerd.

 6              You're familiar with ARCOS?

 7       A.    I'm familiar with what it is,

 8    yep.

 9       Q.    I'm the guy that's been banging

10    away trying to get access to ARCOS for the

11    better part of a year and a half, and I got

12    some.

13              Now, what this is is the

14    transactions by every distributor in the

15    country between 2006 and 2014, and it's

16    related to Cuyahoga and Summit County.  Now,

17    we also have the rest of the country, so I'm

18    able to determine national averages, state

19    averages and county averages for every

20    distributor, including McKesson.  But we're

21    not going to get into all of that today

22    because what I really need is I need the

23    transactional data dating back to 1996.  I'm

24    missing a decade.  I have '06 to 2014.

25              Last week, July 25th, your
```

```
 1    counsel provided a spreadsheet that gave us

 2    2006 to 2018.  All right?  So we've had it

 3    for a week.  I played with it a little bit.

 4              But I don't have the decade

 5    from the launch of OxyContin to 2006 yet, but

 6    I'm working on it.  So one day we may come

 7    back and have to talk about this

 8    transactional data in a different context.

 9              But that being said, one of the

10    interesting things that I did was I grabbed

11    the data provided by your counsel, and I

12    pulled it up and took a look at it.

13              MR. FARRELL:  Corey, can you

14       pull that up?

15    QUESTIONS BY MR. FARRELL:

16       Q.    Now, the first thing I want you

17    to note is this is highly confidential.

18    Nobody in here is allowed to talk about it

19    outside this room.

20              And it's MCKMDL00478913.

21              MR. FARRELL:  Is that right?

22              MS. HENN:  I see

23       MCKMDL00478913.  That may be the same.

24    QUESTIONS BY MR. FARRELL:

25       Q.    Okay.  Can either you or your
```

Highly Confidential - Subject to Further Confidentiality Review

1    counsel confirm that this is the complete

2    transactional data for McKesson in Cuyahoga

3    and Summit counties between 2006 and 2018?

4              MS. HENN:  Object to form.

5              Go ahead.

6              THE WITNESS:  I wasn't involved

7         in pulling it, so I can't -- without

8         seeing, I can't confirm that it's

9         everything.

10             MR. FARRELL:  Yeah, it's really

11        a question for your counsel, but I'm

12        not allowed to put her under oath, so

13        I'm hoping she'll volunteer.

14             MS. HENN:  That's my

15        understanding, but I'm not the person

16        who is most knowledgeable about this,

17        so you should ask one of my

18        colleagues.

19   QUESTIONS BY MR. FARRELL:

20

Highly Confidential - Subject to Further Confidentiality Review

1              Spreadsheet has up top the

2     Bates stamp number.

3              MR. FARRELL:  And, Corey, if

4         you'll click on the letter A, it'll

5         tell us how many transactions there

6         are.

7     QUESTIONS BY MR. FARRELL:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 7              MS. HENN:  Objection to form.

 8    QUESTIONS BY MR. FARRELL:

 9         Q.    Because remember, there was a

10    period of time where there were 300,000

11    prescriptions of OxyContin, and then -- in

12    '96, and then by 2001 there were 6 million,

13    right?

14              So when we get the data for the

15    first ten years, we're going to see a

16    progression of the number of pills being

17    delivered.  Okay?

18              So one of the things that I'm

19    going to have you do is we're able to do some

20    analysis with the ARCOS data.

21              MR. FARRELL:  So, Corey, if

22       you'll bring up Summit County PDF.

23              MS. HENN:  Do you have a

24       document that we can look at?  No?

25              MR. FARRELL:  Not yet, no.

Highly Confidential - Subject to Further Confidentiality Review



1    QUESTIONS BY MR. FARRELL:

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. HENN:  Counsel, just -- I

 2          just want to interpose really quickly.

 3          We would like this in the record with

 4          an exhibit number, at least maybe the

 5          version you have.  I think that's

 6          going to be necessary to understand

 7          the deposition transcript and required

 8          by the protocol.

 9                MR. FARRELL:  That's fair

10          enough.

11                MS. HENN:  But I don't want to

12          interrupt you.  Please continue.

13     QUESTIONS BY MR. FARRELL:

14          Q.    So now what I'm going to do is

15     I'm going to -- we're going --  --
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



25      Q.      Okay.  Fair enough.

1    A.    Okay.

2    Q.    Maybe somebody can testify that

3 they recall about it.

4    A.    Yeah.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15          MR. FARRELL:  Counsel?

16          MS. HENN:  Again, I'm not the

17     best person to ask that question of.

18          You can ask the witness if you'd like.

19     QUESTIONS BY MR. FARRELL:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



4    Q.    So you understand the position

5  about reporting suspicious customers McKesson

6  made to the United States District Attorney

7  in northern West Virginia and resulted in

8  you-all getting fined 150 million.  So what

9  I'm trying to figure out is whether or not

10  the same systemic errors were going on for --

11  which resulted in these pills going to

12  Cuyahoga and Summit County.

13          Do you see where I'm going with

14  it?

15          MS. HENN:  And, Counsel, I

16      would just point out that he said he

17      had a couple parts to his answer, and

18      we need to listen to his whole answer

19      to know what it is.

20          Go right ahead.

Highly Confidential - Subject to Further Confidentiality Review



14    QUESTIONS BY MR. FARRELL:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6    QUESTIONS BY MR. FARRELL:

7         Q.    Do you agree that one of the

8    foreseeable harms of engaging in unlawful

9    conduct in the distribution of prescription

10   opioids is diversion?

11              MS. HENN:  Objection.  Form.

12              THE WITNESS:  Could you ask

13        that again?

14   QUESTIONS BY MR. FARRELL:

15        Q.    One of the harms --

16        A.    You said foreseeable first, but

17   harms --

18        Q.    I'll go back and do it.

19              Do you agree that one of the

20   foreseeable harms of engaging in unlawful

21   conduct in the distribution of prescription

22   opioids is diversion?

23              MS. HENN:  Objection to form.

24              THE WITNESS:  I think it can

25        be.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    Do you agree that filling

 3    suspicious orders is a direct and proximate

 4    cause of prescription opioid abuse,

 5    addiction, morbidity and mortality?

 6              MS. HENN:  Objection to form.

 7              THE WITNESS:  Filling specific

 8         orders?

 9              MS. HENN:  Suspicious orders is

10         the word he used.

11              THE WITNESS:  Suspicious

12         orders.

13              There's a lot of reasons for --

14         that orders may get flagged as

15         suspicious, so I think it depends.

16    QUESTIONS BY MR. FARRELL:

17         Q.    That's fair.

18         A.    They'll get flagged as an order

19    of unusual size, frequency or pattern and not

20    mean that it's suspicious or

21    diversion-related.

22         Q.    Do you believe the prescription

23    opiate epidemic is an immediate hazard to

24    public health and safety?

25              MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  How do you -- how

 2       are you defining "immediate hazard"?

 3  QUESTIONS BY MR. FARRELL:

 4       Q.     A hazard.

 5       A.     A hazard?

 6              Sure.

 7              MR. FARRELL:  Okay.  We will

 8       adjourn with the reservation of rights

 9       for one day, continuing the subject

10       matters that most interest the

11       plaintiffs in the MDL in the 30(b)(6)

12       notices.

13              MS. HENN:  And, I mean, we will

14       object to continuing past the limit

15       set by the Court.  We feel that there

16       was a lot of time today that was spent

17       asking legal questions that could have

18       been spent on topics.

19              MR. FARRELL:  There was also a

20       lot of time spent reading documents

21       that were listed in my 30(b)(6).

22              MS. HENN:  Documents that you

23       put in front of the witness and wanted

24       him to read.

25              But more importantly, I wanted
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          to ask the court reporter to please

 2          designate this transcript

 3          provisionally highly confidential,

 4          which is required under the deposition

 5          protocol, and I also wanted to reserve

 6          the right to read and sign.

 7               I have no questions, and so I

 8          think we are finished.

 9               VIDEOGRAPHER:  Okay.  The time

10          is 5:47 p.m., July 31, 2018.  Going

11          off the record completing today's

12          videotaped session.

13               (McKesson-Hartle Exhibit 40

14          marked for identification.)

15      (Deposition concluded at 5:47 p.m.)

16               - - - - - - -

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE

 2

 3           I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 4   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 5   of the examination, Nathan J. Hartle was duly
     sworn by me to testify to the truth, the
 6   whole truth and nothing but the truth.

 7           I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.

10

             I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.

14

15

            _____

17          CARRIE A. CAMPBELL,
            NCRA Registered Diplomate Reporter
18          Certified Realtime Reporter
            California Certified Shorthand
19          Reporter #13921
            Missouri Certified Court Reporter #859
20          Illinois Certified Shorthand Reporter
            #084-004229
21          Texas Certified Shorthand Reporter #9328
            Kansas Certified Court Reporter #1715
22          Notary Public
23          Dated:  August 3, 2018

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    INSTRUCTIONS TO WITNESS

2

3               Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the

6    appropriate space on the errata sheet for any

7    corrections that are made.

8               After doing so, please sign the

9    errata sheet and date it.  You are signing

10   same subject to the changes you have noted on

11   the errata sheet, which will be attached to

12   your deposition.

13              It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24

25
```

```
 1            ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4         I,_____, do

    hereby certify that I have read the foregoing

 5  pages and that the same is a correct

    transcription of the answers given by me to

 6  the questions therein propounded, except for

    the corrections or changes in form or

 7  substance, if any, noted in the attached

    Errata Sheet.

 8

 9

10

11

12  _____

    Nathan J. Hartle              DATE

13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - - -

                            ERRATA

 2                    - - - - - - -

 3      PAGE     LINE    CHANGE

 4      _____    _____   _____

 5      _____    _____   _____

 6      _____    _____   _____

 7      _____    _____   _____

 8      _____    _____   _____

 9      _____    _____   _____

10      _____    _____   _____

11      _____    _____   _____

12      _____    _____   _____

13      _____    _____   _____

14      _____    _____   _____

15      _____    _____   _____

16      _____    _____   _____

17      _____    _____   _____

18      _____    _____   _____

19      _____    _____   _____

20      _____    _____   _____

21      _____    _____   _____

22      _____    _____   _____

23      _____    _____   _____

24      _____    _____   _____

25
```

```
 1                    - - - - - - -

                   LAWYER'S NOTES

 2                    - - - - - - -

 3     PAGE    LINE

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25
```