# EXHIBIT 34

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION

 3

      IN RE: NATIONAL        )
 4    PRESCRIPTION           )  MDL No. 2804
      OPIATE LITIGATION      )
 5    _____    )  Case No.
                             )  1:17-MD-2804
 6                           )
      THIS DOCUMENT RELATES  )  Hon. Dan A.
 7    TO ALL CASES           )  Polster
 8
                 TUESDAY, JANUARY 15, 2019
 9
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10                CONFIDENTIALITY REVIEW
11                      - - -
12             Videotaped deposition of Karen
13    Harper, held at the offices of STINSON
14    LEONARD STREET LLP, 7700 Forsyth Boulevard,
15    Suite 1000, St. Louis, Missouri, commencing
16    at 9:09 a.m., on the above date, before
17    Carrie A. Campbell, Registered Diplomate
18    Reporter and Certified Realtime Reporter.
19
20
21
22                      - - -
             GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
25
```

## Page 2

A P P E A R A N C E S :

KELLER ROHRBACK LLP
BY: DAVID KO
    dko@kellerrohrback.com
    DEREK LOESER
    dloeser@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
(206) 428-0562
Counsel for Plaintiffs

BRANSTETTER STRANCH & JENNINGS, PLLC
BY: TRICIA HERZFELD
    triciah@bsjfirm.com
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
Counsel for the Tennessee Action

ARMSTRONG TEASDALE
BY: JULIE FIX MEYER
    jfixmeyer@armstrongteasdale.com
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
(314) 621-5070
Counsel for Cardinal Health, Inc.

COVINGTON & BURLING LLP
BY: EMILY KVESELIS
    ekveselis@cov.com
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
Counsel for McKesson Corporation

## Page 3

JACKSON KELLY, PLLC
BY: SYLVIA WINSTON NICHOLS
    sylvia.winston@jacksonkelly.com
    (VIA TELECONFERENCE)
150 Clay Street, Suite 500
Morgantown, West Virginia 26501
(304) 284-4138
Counsel for AmerisourceBergen

JONES DAY
BY: NICHOLAS HODGES
    nhodges@jonesday.com
4655 Executive Drive, Suite 1500
San Diego, California 92121
(858) 314-1200
Counsel for Walmart

ROPES & GRAY, LLP
BY: WILLIAM DAVISON
    william.davison@ropesgray.com
    ANDREW O'CONNOR
    Andrew.O'Connor@ropesgray.com
800 Boylston Street
Boston, Massachusetts 02199-3600
(617) 951-7000
Counsel for Mallinckrodt

ARNOLD & PORTER KAYE SCHOLER, LLP
BY: DAVID HIBEY
    david.hibey@arnoldporter.com
    (VIA TELECONFERENCE)
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
Counsel for Endo Pharmaceuticals
Inc., and Endo Health Solutions Inc.

## Page 4

FOX ROTHSCHILD LLP
BY: JACOB PERSKIE
    jperskie@foxrothschild.com
    (VIA TELECONFERENCE)
1301 Atlantic Avenue, Suite 400
Atlantic City, New Jersey 08401
(609) 572-2355
Counsel for Validus Pharmaceuticals

VIDEOGRAPHER:
    JAMES ARNDT,
    Golkow Litigation Services

    – – –

## Page 5

INDEX

                                    PAGE
APPEARANCES................................... 2
EXAMINATIONS
    BY MR. KO.................................. 14
    BY MS. HERZFELD........................... 454
    BY MR. O'CONNOR........................... 610
    BY MS. HERZFELD........................... 615
    BY MR. KO................................. 615

EXHIBITS
No.       Description              Page
Mallinckrodt  Karen Harper LinkedIn        40
Harper 1      Profile printout

Mallinckrodt  E-mail(s),           109
Harper 2      MNK-T1_0000275504 -
              MNK-T1_0000275524

Mallinckrodt  E-mail(s),           130
Harper 3      MNK-T1_0000283074 -
              MNK-T1_0000283098

Mallinckrodt  E-mail(s),           151
Harper 4      MNK-T1_0001308810 -
              MNK-T1_0001308811

Mallinckrodt  E-mail(s),           158
Harper 5      MNK-T1_0000273902 -
              MNK-T1_0000273909

Mallinckrodt  DEA Compliance All Site      211
Harper 6      Conference Call,
              MNK-T1_0000287983 -
              MNK-T1_0000287985

Page 6

| 1 | Mallinckrodt | E-mail(s) | 220 |
| 2 | Harper 7 | MNK-T1_0000274572 | |
| 3 | Mallinckrodt | E-mail(s) | 230 |
| 4 | Harper 8 | MNK-T1_0000419810 -<br>MNK-T1_0000419815 | |
| 5 | Mallinckrodt | Deposition transcript of | 225 |
| 6 | Harper 9 | Karen Harper taken on<br>November 7, 2013 | |
| 7 | Mallinckrodt | E-mail(s) | 240 |
| 8 | Harper 10 | MNK-T1_0007146630 -<br>MNK-T1_0007146633 | |
| 9 | Mallinckrodt | E-mail(s) | 249 |
| | Harper 11 | MNK-T1_0000301994 | |
| 10 | Mallinckrodt | E-mail(s) | 262 |
| 11 | Harper 12 | MNK-T1_0000419907 -<br>MNK-T1_0000419908 | |
| 12 | Mallinckrodt | E-mail(s) | 267 |
| 13 | Harper 13 | MNK-T1_0000302096 -<br>MNK-T1_0000302100 | |
| 14 | Mallinckrodt | E-mail(s) | 289 |
| 15 | Harper 14 | MNK-T1_0000278806 -<br>MNK-T1_0000278810 | |
| 16 | Mallinckrodt | E-mail(s) | 300 |
| 17 | Harper 15 | MNK-T1_0000270090 | |
| 18 | Mallinckrodt | E-mail(s) | 326 |
| 19 | Harper 16 | MNK-T1_0000280260 | |
| | Mallinckrodt | E-mail(s) | 343 |
| 20 | Harper 17 | MNK-T1_0000368390 -<br>MNK-T1_0000368391 | |
| 21 | Mallinckrodt | E-mail(s) | 346 |
| 22 | Harper 18 | MNK-T1_0000279142 | |
| 23 | Mallinckrodt | E-mail(s) | 347 |
| | Harper 19 | MNK-T1_0000301020 | |
| 24 | Mallinckrodt | E-mail(s) | 349 |
| 25 | Harper 20 | MNK-T1_0000372333 -<br>MNK-T1_0000372334 | |

Page 7

| 1 | Mallinckrodt | E-mail(s) | 354 |
| 2 | Harper 21 | MNK-T1_0007728295 -<br>MNK-T1_0007728296 | |
| 3 | Mallinckrodt | E-mail(s) | 358 |
| 4 | Harper 22 | MNK-T1_0000500657 -<br>MNK-T1_0000500660 | |
| 5 | Mallinckrodt | E-mail(s) | 371 |
| 6 | Exhibit 23 | MNK-T1_0000421850 -<br>MNK-T1_0000421854 | |
| 7 | Mallinckrodt | November 1, 2010 letter to | 374 |
| 8 | Harper 24 | US Department of Justice<br>from Covidien, | |
| 9 | | MNK-T1_0000280607 -<br>MNK-T1_0000280609 | |
| 10 | Mallinckrodt | Harvard (MI) Summary, | 379 |
| | Harper 25 | MNK-T1_0000264292 | |
| 11 | Mallinckrodt | Controlled Substance | 393 |
| 12 | Harper 26 | Compliance/Suspicious Order<br>Monitoring Audit 12/07/10, | |
| 13 | | MNK-T1_0000307304 -<br>MNK-T1_0000307308 | |
| 14 | Mallinckrodt | September 21, 2011 letter to | 397 |
| 15 | Harper 27 | Wayne Corona from Karen<br>Harper, | |
| 16 | | MNK-T1_0000970734 -<br>MNK-T1_0000970735 | |
| 17 | Mallinckrodt | October 17, 2011 letter from | 400 |
| 18 | Harper 28 | Karen Harper to 43<br>wholesalers/distributors, | |
| 19 | | MNK-T1_0000289368 -<br>MNK-T1_0000289369 | |
| 20 | Mallinckrodt | E-mail(s) | 405 |
| 21 | Harper 29 | MNK-T1_0000291258 -<br>MNK-T1_0000291259 | |
| 22 | Mallinckrodt | Brooks Pharmacy Monthly | 417 |
| 23 | Harper 30 | Total 15mg & 30mg Oxy "Sales<br>Qty Govt UOM" 2010-2011 | |
| 24 | | | |
| 25 | | | |

Page 8

| 1 | Mallinckrodt | Island Drug Total 15mg & | 422 |
| 2 | Harper 31 | 30mg Oxy "Sales Qty Govt<br>UOM" 2010-2011 | |
| 3 | Mallinckrodt | November 2, 2010 memorandum | 431 |
| 4 | Harper 32 | from Karen Harper to Howard<br>Davis, | |
| 5 | | MNK-T1_0000269399 -<br>MNK-T1_0000269400 | |
| 6 | Mallinckrodt | E-mail(s), | 444 |
| 7 | Harper 33 | MNK-T1_0000485740 -<br>MNK-T1_0000485741 | |
| 8 | Mallinckrodt | E-mail(s) | 461 |
| 9 | Harper 34 | MNK-TNSTA05123927 | |
| 10 | Mallinckrodt | E-mail(s) | 471 |
| | Harper 35 | MNK-T1_0007185722 -<br>MNK-T1_0007185732 | |
| 11 | Mallinckrodt | Mallinckrodt Chargeback | 496 |
| 12 | Harper 36 | Restriction Reinstatement<br>Listing 11/13/2017, | |
| 13 | | MNK-TNSTA00609639 | |
| 14 | Mallinckrodt | E-mail(s), | 502 |
| 15 | Harper 37 | MNK-TNSTA05340154 -<br>MNK-TNSTA05340156 | |
| 16 | Mallinckrodt | E-mail(s), | 504 |
| 17 | Harper 38 | MNK-TNSTA05337163 | |
| 18 | Mallinckrodt | E-mail(s), | 511 |
| 19 | Harper 39 | MNK-T1_0007026593 -<br>MNK-T1_0007026594 | |
| 20 | Mallinckrodt | Suspicious Order Monitoring | 517 |
| 21 | Harper 40 | Chargeback Data 2009, 2010,<br>2011 Combined, Oxy 30 Totals<br>by State and Population | |
| 22 | | MNK-TNSTA05126722 | |
| 23 | Mallinckrodt | DIRJ and Pill Mill Physician | 531 |
| 24 | Harper 41 | Lists,<br>MNK-T1_0007704503 | |
| 25 | | | 533 |

Page 9

| 1 | Mallinckrodt | IMS High Oxy 30 Prescribers | |
| 2 | Harper 42 | Jan 2012,<br>MNK-T1_0005947296 | |
| 3 | Mallinckrodt | IMS Prescribers thru Jan | 535 |
| 4 | Harper 43 | 2013 - Condensed,<br>MNK-T1_0007704471 | |
| 5 | Mallinckrodt | Prescriber List | 535 |
| 6 | Harper 44 | MNK-T1_0005947297 | |
| 7 | Mallinckrodt | Oxy 15 and Oxy 30 Ship to | 537 |
| 8 | Harper 45 | and Sold via by month<br>Jan-Dec 2011 run 2-15-12<br>non-merged cells, | |
| 9 | | MNK-TNSTA02527616 | |
| 10 | Mallinckrodt | Oxy 15 and 30 Ship to and | 540 |
| 11 | Harper 46 | Sold via by month Jan-Dec<br>run 2-15-12 non-merged<br>cells, | |
| 12 | | MNK-TNSTA02527616 | |
| 13 | Mallinckrodt | HydroApap 10s Ship to and | 543 |
| 14 | Harper 47 | Sold via by DEA by month Jan<br>2012-Dec 2012 ALL APAP,<br>MNK-TNSTA02527625 | |
| 15 | Mallinckrodt | HydroApap 10s Ship to Sold | 548 |
| 16 | Harper 48 | via by mo Jan2015-Dec2015<br>APAP run 1-15-16,<br>MNK-T1_0007717730 | |
| 17 | | | |
| 18 | Mallinckrodt | Cardinal Top 40 Oxycodone | 551 |
| 19 | Harper 49 | 30mg Pharmacies As of March<br>2012,<br>MNK-T1_0004592727 | |
| 20 | Mallinckrodt | Pharmacy Information Sheet, | 558 |
| 21 | Harper 50 | MNK-T1_0004592754 -<br>MNK-T1_0004592758 | |
| 22 | Mallinckrodt | Pharmacy Information Sheet, | 562 |
| 23 | Harper 51 | MNK-TNSTA05350336 | |
| 24 | Mallinckrodt | Cardinal Health March 5-6, | 570 |
| 25 | Harper 52 | 2012 Summary Report,<br>MNK-TNSTA05353270 -<br>MNK-TNSTA05353272 | |

Page 10

```
 1   Mallinckrodt  Pharmacy Information Sheet,     572
     Harper 53    Cardinal Health,
 2                MNK_TNSTA00612651
 3   Mallinckrodt  Pharmacy Information Sheet,     574
     Harper 54    Cardinal Health,
 4                MNK_TNSTA00607869
 5   Mallinckrodt  Riggs Pharmacies all sales      578
     Harper 55    run T1-30-12,
 6                MNK_TNSTA00612647
 7   Mallinckrodt  Oxy 15 and 30 Shp to and        590
     Harper 56    Sold via by month Jan-Dec
 8                2011 run 2-15-12 non-merged
                  cells.
 9                MNK_TNSTA02527616
10   Mallinckrodt  HydroApap 10s Shp to Sold       593
     Harper 57    via by mo Jan2015-Dec2015
11                325 APAP run 1-15-16,
                  MNK-T1_0007717730
12
     Mallinckrodt  "DEA investigators seeking      602
13   Harper 58    answers in small Tennessee
                  town"
14
     Mallinckrodt  E-mail(s),                      603
15   Harper 59    MNK-T1_0006462195 -
                  MNK-T1_0006462197
16
     Mallinckrodt  E-mail(s),                      606
17   Harper 60    MNK-T1_0007185456 -
                  MNK-T1_0007185457
18
     Mallinckrodt  E-mail(s),                      608
19   Harper 61    MNK-T1_0007259043
20   Mallinckrodt  E-mail(s),                      615
     Harper 62    MNK-T1_0000387492
21
22      (Exhibits attached to the deposition.)
23
24
25
```

Page 11

```
 1        VIDEOGRAPHER:  We are now on       08:49:49
 2   the record.  My name is James Arndt.   09:08:57
 3   I'm a videographer for Golkow          09:09:00
 4   Litigation Services.                   09:09:01
 5        Today's date is January 15th of   09:09:01
 6   2019, and the time is 9:09 a.m.        09:09:05
 7        This video deposition is being    09:09:07
 8   held in St. Louis, Missouri, in the    09:09:09
 9   matter of the National Prescription    09:09:11
10   Opiate Litigation for the United       09:09:14
11   States District Court for the Northern 09:09:15
12   District of Ohio, Eastern Division.    09:09:16
13        The deponent is Karen Harper.     09:09:18
14        Will counsel please identify      09:09:20
15   themselves.                            09:09:22
16        MR. KO:  Good morning.  David     09:09:23
17   Ko, Keller Rohrback, on behalf of      09:09:25
18   plaintiffs.                            09:09:27
19        MR. LOESER:  Derek Loeser from    09:09:28
20   Keller Rohrback for the plaintiffs.    09:09:28
21        MS. HERZFELD:  Tricia Herzfeld,   09:09:30
22   Branstetter, Branch & Jennings, for    09:09:31
23   the Tennessee plaintiffs.             09:09:31
24        MS. FIX MEYER:  Julie Fix         09:09:34
25   Meyer, Armstrong Teasdale, for         09:09:34
```

Page 12

```
 1   Cardinal Health.                       09:09:38
 2        MS. KVESELIS:  Emily Kveselis,    09:09:38
 3   Covington & Burling, for McKesson.     09:09:40
 4        MR. HODGES:  Nick Hodges, Jones   09:09:41
 5   Day, for Walmart.                      09:09:42
 6        MR. DAVISON:  William Davison,    09:09:44
 7   Ropes & Gray, for Mallinckrodt, LLC,   09:09:44
 8   SpecGx, LLC, and the witness.          09:09:45
 9        MR. O'CONNOR:  Andrew O'Connor    09:09:45
10   from Ropes & Gray for Mallinckrodt,    09:09:49
11   LLC, SpecGx and Ms. Harper.            09:09:52
12        VIDEOGRAPHER:  Will counsel       09:09:53
13   present by phone please identify       09:09:53
14   themselves.                            09:09:56
15        MR. HIBEY:  David Hibey of        09:09:58
16   Arnold & Porter for the Endo and Par   09:10:01
17   defendants.                            09:10:03
18        MR. PERSKIE:  Jacob Perskie,      09:10:04
19   Fox Rothschild, for Validus.           09:10:09
20        MS. WINSTON:  Sylvian Winston     09:10:11
21   of Jackson Kelly for the               09:10:12
22   AmerisourceBergen Drug Corporation.    09:10:15
23        VIDEOGRAPHER:  The court          09:10:19
24   reporter is Carrie Campbell, and she   09:10:20
25   will now swear in the witness.         09:10:21
```

Page 13

```
 1        KAREN HARPER,
 2   of lawful age, having been first duly sworn
 3   to tell the truth, the whole truth and
 4   nothing but the truth, deposes and says on
 5   behalf of the Plaintiffs, as follows:
 6
 7        MR. KO:  Before we get started,    09:10:30
 8   I just wanted to note for the record    09:10:32
 9   that yesterday evening Mallinckrodt's   09:10:33
10   counsel had provided some documents,    09:10:35
11   another production of documents,        09:10:38
12   including some documents apparently     09:10:39
13   from Ms. Harper's custodial file.  It   09:10:40
14   appears to be a fairly substantial      09:10:44
15   production.                             09:10:46
16        We didn't get a chance to          09:10:47
17   review those, so I just wanted to note  09:10:48
18   for the record that we reserve the      09:10:49
19   right to reopen this deposition based   09:10:50
20   on that review.                         09:10:52
21        MR. O'CONNOR:  And we believe      09:10:52
22   the documents we produced don't         09:10:53
23   prejudice the plaintiffs in any way,    09:10:55
24   and I'm happy to discuss that further,  09:10:59
25   but do disagree with your               09:11:00
```

Page 14

1    characterization.                    09:11:01
2           DIRECT EXAMINATION             09:11:03
3    QUESTIONS BY MR. KO:                  09:11:04
4       Q.   Good morning.  We met earlier,  09:11:05
5    just a moment ago.                    09:11:06
6           Could you please state and     09:11:07
7    spell your name for the record?       09:11:09
8       A.   Yes.  Karen Harper, K-a-r-e-n,  09:11:09
9    H-a-r-p-e-r.                          09:11:12
10      Q.   Ms. Harper, where do you       09:11:14
11   currently reside?                     09:11:16
12      A.   St. Louis County, Missouri.    09:11:17
13      Q.   Okay.  And I know that you have  09:11:19
14   had your deposition taken at least once  09:11:21
15   before in connection with a matter involving  09:11:23
16   Island Drug Pharmacy.                 09:11:28
17          Have you had your deposition    09:11:29
18   taken at any other time other than that  09:11:30
19   instance?                             09:11:32
20      A.   Earlier in my life, before I    09:11:32
21   was an employee of Mallinckrodt.      09:11:35
22      Q.   Okay.  So how many times have   09:11:37
23   you been deposed?                     09:11:38
24      A.   Two -- twice.                  09:11:38
25      Q.   Okay.  So you understand       09:11:40

Page 15

1    probably some of the ground rules, but I just  09:11:42
2    want to remind you of a few that are   09:11:44
3    important to me today.                09:11:47
4           The court reporters have the   09:11:48
5    most important job here in transcribing  09:11:49
6    everything that we're saying, so it's  09:11:52
7    important that we don't talk over one  09:11:53
8    another.  So please wait until I finish my  09:11:54
9    question before you move on to your response,  09:11:56
10   and likewise, I'll wait until you finish your  09:11:58
11   question {sic} before I move on to my next  09:12:00
12   question.                             09:12:03
13          Does that sound good?          09:12:03
14      A.   Yes.                          09:12:04
15      Q.   And to the extent I ask a yes   09:12:05
16   or no question, I would ask that you actually  09:12:07
17   in fact answer yes or no, if that's your  09:12:11
18   response, rather than shaking your head or  09:12:11
19   nodding your head.                    09:12:15
20      A.   Understood.                   09:12:16
21      Q.   Okay.  And from time to time    09:12:16
22   counsel at this table may object to my  09:12:17
23   questioning, but unless you get a clear  09:12:19
24   instruction not to respond, I would ask that  09:12:21
25   you respond to my question.           09:12:23

Page 16

1           Okay?                         09:12:23
2       A.   Yes.                          09:12:24
3       Q.   I think we're here for a fairly  09:12:25
4    long time today, so to the extent you need  09:12:27
5    breaks throughout the day, please feel free  09:12:30
6    to ask and I'll do my best to accommodate.  09:12:33
7           Okay?                         09:12:35
8       A.   Thank you.                    09:12:36
9       Q.   Ms. Harper, is there anything   09:12:36
10   that you can think of today that will prevent  09:12:41
11   you from testifying truthfully and honestly?  09:12:43
12      A.   No.                           09:12:46
13      Q.   Great.                        09:12:46
14          Ms. Harper, what did you do to  09:12:47
15   prepare for this deposition today?    09:12:51
16      A.   I met with my attorneys.       09:12:52
17      Q.   Okay.  And who are they?       09:12:54
18      A.   Ropes & Gray.                 09:12:55
19      Q.   Okay.  And Mr. O'Connor and    09:12:58
20   Mr. Davison sitting here today, are those the  09:13:00
21   two individuals that you met with?    09:13:02
22      A.   Yes, among others.            09:13:03
23      Q.   Okay.  And how many attorneys   09:13:04
24   did you meet with?                    09:13:06
25      A.   At least one other.           09:13:06

Page 17

1       Q.   Okay.  And how many times did   09:13:08
2    you meet?                             09:13:09
3       A.   Five times.                   09:13:09
4       Q.   Okay.  So you met for five     09:13:10
5    different days or five different sessions?  09:13:13
6       A.   Five different sessions.       09:13:14
7       Q.   Okay.  And how many hours total  09:13:16
8    would you say that would be?          09:13:17
9       A.   The first two sessions were    09:13:18
10   eight -- two eight-hour days, so 16 and 16,  09:13:21
11   32.  Then we had an eight-hour day, 40, and  09:13:26
12   another two eight-hour days.  So 56 hours.  09:13:30
13      Q.   Sounds like a lot of          09:13:34
14   preparation.                         09:13:36
15          Other than your outside        09:13:37
16   counsel, or other than Ropes & Gray, were  09:13:42
17   there any other people present during your  09:13:44
18   meetings?                            09:13:49
19      A.   No.                           09:13:50
20      Q.   Okay.  And in those meetings,   09:13:50
21   did you review any documents?         09:13:53
22      A.   Yes.                          09:13:54
23      Q.   Okay.  And did -- were those    09:13:55
24   documents selected by counsel?        09:13:58
25      A.   Yes.                          09:14:01

Page 18

1    Q.   Okay.  And did you provide any   09:14:02
2  documents in any of these meetings?   09:14:04
3    A.   Not in those meetings.   09:14:06
4    Q.   Okay.  In preparation for this   09:14:09
5  deposition today, have you spoken with any   09:14:15
6  current or former employees of Mallinckrodt?   09:14:18
7    A.   Only to the extent that I   09:14:20
8  needed to be absent from work.   09:14:23
9    Q.   Okay.  Are you aware that other   09:14:26
10  former and current employees of Mallinckrodt   09:14:31
11  have been deposed?   09:14:32
12    A.   Yes.   09:14:33
13    Q.   Okay.  Have you spoken with any   09:14:34
14  of those deponents?   09:14:36
15    A.   No, sir.   09:14:37
16    Q.   Okay.  You know who Bill   09:14:38
17  Ratliff is, right?   09:14:41
18    A.   Yes.   09:14:42
19    Q.   Have you spoken with him about   09:14:42
20  this deposition at all?   09:14:44
21    A.   No.   09:14:44
22    Q.   Okay.  Do you know who John   09:14:45
23  Gillies is?   09:14:48
24    A.   Yes.   09:14:48
25    Q.   Have you spoken with him?   09:14:48

Page 19

1    A.   No.   09:14:50
2    Q.   Okay.  Ms. Harper, where did   09:14:53
3  you go to school?  I mean, college, excuse   09:14:55
4  me.   09:14:58
5    A.   I only have a couple of years   09:14:58
6  partial college credits, and so that was at   09:15:00
7  community college district, St. Louis,   09:15:03
8  Missouri.   09:15:06
9    Q.   Okay.  And what was the name of   09:15:06
10  that school?   09:15:07
11    A.   Meramec Community College.   09:15:07
12    Q.   Okay.  And did you actually   09:15:09
13  obtain a degree?   09:15:11
14    A.   I did not.   09:15:11
15    Q.   Okay.  And where did you -- by   09:15:12
16  the way, what year did you stop going to   09:15:18
17  school?   09:15:20
18    A.   So I graduated from high school   09:15:20
19  and took intermittent college classes but   09:15:22
20  never achieved a degree.  So I graduated from   09:15:26
21  high school in 1974.   09:15:28
22    Q.   Okay.  And after you stopped   09:15:30
23  going to community college, where did you   09:15:34
24  first work?   09:15:35
25    A.   Goldman and Gibson.  It was a   09:15:36

Page 20

1  specialty advertising company.   09:15:44
2    Q.   Okay.  And what did you do   09:15:45
3  there?   09:15:46
4    A.   Clerical.   09:15:46
5    Q.   Okay.  When did you first start   09:15:47
6  working at Mallinckrodt?   09:15:49
7    A.   In March of 1975.   09:15:50
8    Q.   Okay.  So there was a brief   09:15:53
9  period of about approximately one year   09:15:54
10  between when you ceased going to community   09:15:56
11  college and when you started working at   09:15:58
12  Mallinckrodt?   09:16:00
13    A.   Yes.   09:16:00
14    Q.   Okay.  And what was your first   09:16:00
15  job at Mallinckrodt?   09:16:02
16    A.   Clerk typist.   09:16:02
17    Q.   Okay.  And clerk typist for   09:16:05
18  what division or department?   09:16:08
19    A.   Purchasing group in the   09:16:09
20  corporate area.   09:16:12
21    Q.   Okay.  And how long did you do   09:16:12
22  that?   09:16:15
23    A.   Approximately one year.   09:16:15
24    Q.   Okay.  I may want to walk   09:16:18
25  through each position you had at   09:16:24

Page 21

1  Mallinckrodt, but why don't we try this way.   09:16:25
2         When did you first become   09:16:28
3  senior manager of controlled substance   09:16:30
4  compliance?   09:16:32
5    A.   I don't remember the year.   09:16:33
6    Q.   Okay.  Do you remember if it   09:16:35
7  was the late '70s or the early '80s?   09:16:36
8    A.   I'm sorry, I don't remember the   09:16:41
9  year.   09:16:42
10    Q.   Okay.  And when I say   09:16:42
11  "controlled substance compliance," it's my   09:16:43
12  understanding that the group was actually   09:16:44
13  called DEA compliance at the time.   09:16:46
14    A.   Correct.   09:16:48
15    Q.   Does that comport with your   09:16:49
16  understanding?   09:16:50
17    A.   Yes.  Yes.   09:16:50
18    Q.   And so you have no recollection   09:16:51
19  of when you became senior manager of DEA   09:16:54
20  compliance?   09:16:56
21    A.   I have recollection, but I   09:16:56
22  can't remember the year.  I'm sorry.   09:17:00
23    Q.   Okay.  And what is your   09:17:02
24  recollection?  Is it approximately -- I mean,   09:17:03
25  are we talking the 1990s that you became the   09:17:05

Page 22

```
 1   senior manager or is it the '80s?          09:17:08
 2       A.   It would have been in the -- in    09:17:10
 3   the -- after 2000.                          09:17:13
 4       Q.   After 2000?                         09:17:14
 5       A.   Yes.                                09:17:15
 6       Q.   Okay.  So from the period           09:17:16
 7   between when you became senior manager of    09:17:17
 8   controlled substance compliance, or DEA      09:17:21
 9   compliance, and when you were first started  09:17:23
10   at Mallinckrodt, there was approximately     09:17:26
11   25 years that had passed?                    09:17:28
12       A.   Yes.                                09:17:29
13       Q.   Okay.  And how was it that you      09:17:29
14   became senior manager of that group after    09:17:38
15   starting as a clerical typist?               09:17:42
16       A.   I moved into senior manager         09:17:45
17   after I went to the controlled substances    09:17:48
18   compliance group.  I was a coordinator in    09:17:52
19   that department, then became manager and then 09:17:55
20   became senior manager.                       09:17:58
21       Q.   Okay.  And when did you become      09:17:59
22   coordinator of the DEA compliance/CSC?       09:18:04
23       A.   I'm not certain of the year.        09:18:07
24   2001, approximate.                           09:18:11
25       Q.   Okay.  That's -- I believe          09:18:13
```

Page 23

```
 1   that's when you said you became senior       09:18:15
 2   manager.                                     09:18:17
 3            I was asking when you first         09:18:18
 4   became a coordinator, as you described       09:18:19
 5   earlier.  Approximately when was that?       09:18:21
 6       A.   No, sir, I'm sorry.  I think I      09:18:22
 7   said I became senior manager after year 2000, 09:18:24
 8   but I couldn't remember the year.  I         09:18:27
 9   apologize.                                   09:18:30
10       Q.   I got it.                           09:18:30
11            So around 2001 is when you          09:18:30
12   became a coordinator --                      09:18:32
13       A.   Yes.                                09:18:35
14       Q.   -- at the control --               09:18:35
15       A.   Yes.                                09:18:36
16       Q.   -- for the DEA compliance          09:18:37
17   group?                                       09:18:38
18       A.   Yes.  Yes.                          09:18:38
19       Q.   That's helpful.  Thank you.         09:18:39
20   And at the time you became                   09:18:40
21   involved in the DEA compliance group, were   09:18:45
22   you aware that Mallinckrodt was manufacturing 09:18:48
23   controlled substances?                       09:18:50
24       A.   Yes.                                09:18:50
25       Q.   Including prescription opioids?     09:18:51
```

Page 24

```
 1       A.   Yes.                                09:18:52
 2       Q.   Okay.  And by the way, have you     09:18:55
 3   ever worked for the DEA?                     09:18:59
 4       A.   No.                                 09:19:00
 5       Q.   Have you ever worked for the        09:19:01
 6   government?                                  09:19:02
 7       A.   No.                                 09:19:02
 8       Q.   Have you worked in any -- for       09:19:03
 9   any employer that -- whose responsibility it 09:19:07
10   was to perform diversion-type activities on  09:19:11
11   controlled substances?                       09:19:16
12       A.   No.                                 09:19:16
13       Q.   Okay.  Other than the one year      09:19:17
14   between finishing your -- or other than the  09:19:19
15   one year between when you stopped going to   09:19:23
16   community college and when you started       09:19:26
17   working at Mallinckrodt, fair to say that you 09:19:28
18   had no other employment?                     09:19:30
19            In other words, from 1975 to        09:19:33
20   present, you have always worked at           09:19:34
21   Mallinckrodt, correct?                       09:19:35
22       A.   That is correct.                    09:19:36
23       Q.   Okay.  At the time you joined       09:19:37
24   in 2001, the approximate 2001 time period,   09:19:43
25   when you joined the DEA compliance team,     09:19:46
```

Page 25

```
 1   approximately how large was that team?       09:19:49
 2       A.   Three or four people.               09:19:51
 3       Q.   Okay.  And who were those three     09:19:53
 4   or four people?                              09:19:54
 5       A.   My manager and two other            09:19:54
 6   compliance coordinators.                     09:20:00
 7       Q.   Okay.  Who was your manager at      09:20:01
 8   that time?                                   09:20:03
 9       A.   The gentleman's name is Jay         09:20:03
10   Foushee.                                     09:20:07
11       Q.   Okay.                               09:20:07
12       A.   Would you like for me to spell      09:20:07
13   that?                                        09:20:09
14       Q.   That's okay.  We can get it         09:20:09
15   later.                                       09:20:11
16       A.   All right.                          09:20:11
17       Q.   And so you reported to him?         09:20:12
18       A.   Yes.                                09:20:14
19       Q.   Okay.  And you said two other       09:20:15
20   compliance managers.  Who --                 09:20:16
21       A.   Compliance coordinators.            09:20:19
22       Q.   Coordinators, excuse me.            09:20:20
23       A.   Yes, sir.                           09:20:20
24       Q.   Thank you.                          09:20:21
25            Who were they?                      09:20:23
```

Page 26

1    A.    Mary Lewis and a gentleman        09:20:23
2    named Lee Nelson.                       09:20:25
3        Q.    And did the composition or the   09:20:27
4    size of this team change over time?    09:20:34
5        A.    Yes.                          09:20:37
6        Q.    Okay.  Did it expand, I assume?   09:20:39
7        A.    Yes.                          09:20:41
8        Q.    And when did you -- when do you   09:20:41
9    recall when it first expanded beyond the   09:20:46
10   four -- three or four people you've     09:20:48
11   mentioned?                             09:20:52
12       A.    After a few years went by --   09:20:52
13   and I'm sorry, I don't know the year -- the   09:20:55
14   company purchased another -- an additional   09:20:56
15   controlled substances facility in Hobart,   09:21:00
16   New York, and the department grew after that.   09:21:04
17       Q.    Okay.  Did it -- and how -- to   09:21:07
18   what extent did it grow?                09:21:10
19       A.    There are two persons who were   09:21:12
20   in the DEA compliance group at Hobart,   09:21:14
21   New York, as an isolated department, and we   09:21:17
22   became one group.  And there was another   09:21:21
23   person who was in the group at our Webster   09:21:24
24   Groves narcotics manufacturing facility, so   09:21:28
25   our group became united as one corporate   09:21:29

Page 27

1    department, if you will.               09:21:33
2        Q.    Okay.  So far to say it        09:21:34
3    doubled in size?  Your group --        09:21:37
4        A.    Yes.                          09:21:39
5        Q.    -- became seven or eight       09:21:39
6    people?                                09:21:41
7        A.    Yes.                          09:21:41
8        Q.    Okay.  At any time that you    09:21:42
9    were involved in the DEA compliance group,   09:21:44
10   was the group ever comprised of more than ten   09:21:47
11   individuals?                           09:21:51
12       A.    No.                           09:21:51
13       Q.    Okay.  It was always           09:21:52
14   approximately anywhere from three to eight   09:21:53
15   people?                                09:21:55
16       A.    Yes.                          09:21:55
17       Q.    Okay.  Ms. Harper, are you     09:21:55
18   familiar with the Controlled Substances Act?   09:21:59
19       A.    Yes.                          09:22:00
20       Q.    And are you familiar that      09:22:01
21   pursuant to Controlled Substances Act that   09:22:03
22   registrants have a fundamental duty to   09:22:05
23   maintain effective controls against    09:22:13
24   diversion?                             09:22:10
25       A.    Yes, I believe the language is   09:22:10

Page 28

1    to guard against diversion, but, yes.   09:22:13
2        Q.    Okay.  And are you familiar    09:22:16
3    that under the -- do you mind if I call the   09:22:20
4    Controlled Substances Act the CSA?     09:22:24
5        A.    I don't mind.                  09:22:25
6        Q.    Okay.  Are you familiar that   09:22:26
7    pursuant to the CSA that registrants have a   09:22:27
8    duty to monitor and implement a system to   09:22:30
9    identify suspicious orders?            09:22:32
10       MR. O'CONNOR:  Object to form.     09:22:33
11       THE WITNESS:  Yes, I'm aware.     09:22:35
12   QUESTIONS BY MR. KO:                   09:22:36
13       Q.    Okay.  And these obligations   09:22:37
14   have existed since the time that CSA was   09:22:39
15   enacted, correct?                      09:22:41
16       MR. O'CONNOR:  Object to form.     09:22:42
17       THE WITNESS:  I don't know the    09:22:44
18   date of the CSA versus the creation of   09:22:47
19   CFR 21.                                09:22:53
20   QUESTIONS BY MR. KO:                   09:22:55
21       Q.    Okay.  And by CFR 21, are you   09:22:55
22   referring to the -- what's commonly referred   09:22:57
23   to the regs that are interpreting the CSA?   09:22:59
24       A.    Yes.                          09:23:04
25       Q.    Okay.  Regardless of when they   09:23:04

Page 29

1    were enacted, you understood at the time that   09:23:06
2    you joined the DEA compliance group in 2001   09:23:07
3    that the CSA required registrants to design   09:23:10
4    and implement a system to identify suspicious   09:23:15
5    orders; is that correct?               09:23:19
6        A.    Yes.                          09:23:19
7        Q.    Okay.  What was your           09:23:21
8    compensation when you first became a   09:23:24
9    coordinator at -- in the DEA compliance group   09:23:27
10   in 2001?                               09:23:30
11       A.    I don't know.                  09:23:30
12       Q.    Okay.  Can you give us an      09:23:32
13   approximation?                         09:23:34
14       A.    I'm sorry, I really can't.     09:23:35
15       Q.    Was it less than $50,000?      09:23:36
16       A.    I honestly don't know.  I can't   09:23:37
17   remember, I'm sorry.                   09:23:40
18       Q.    Okay.  Was it less than        09:23:41
19   $25,000?                               09:23:43
20       A.    I'm sorry, I can't remember.   09:23:43
21       Q.    All right.  What was your      09:23:45
22   compensation when you became senior manager   09:23:47
23   of DEA compliance?                     09:23:49
24       A.    I can't remember my salary over   09:23:50
25   the years.                             09:23:52

Highly Confidential - Subject to Further Confidentiality Review

Page 30

```
 1    Q.    Okay.  Do you have an         09:23:54
 2    approximate recollection of how much you   09:23:55
 3    made?                               09:23:57
 4    A.    No, sir.                      09:23:57
 5    Q.    Okay.  Do you recall if it was   09:23:59
 6    $75,000 or more or above?           09:24:01
 7    A.    No, sir, I don't recall.      09:24:03
 8    Q.    Okay.  Do you know what your    09:24:04
 9    salary is currently?                09:24:09
10    A.    Yes.                          09:24:10
11    Q.    Okay.  And you're currently    09:24:13
12    director of controlled substance compliance,   09:24:15
13    correct?                            09:24:18
14    A.    Yes.                          09:24:19
15    Q.    And what is your salary        09:24:19
16    currently?                          09:24:21
17    A.    It's -- I'm going to give you   09:24:21
18    two numbers because I get that mixed up as   09:24:24
19    well, I'm sorry.  It's either ▓▓▓▓▓ or ▓   09:24:27
20    ▓▓▓▓▓ per year.                     09:24:31
21    Q.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓             09:24:32
22    A.    ▓▓▓▓.                         09:24:34
23    Q.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓              09:24:35
24    ▓▓▓▓▓▓▓▓                            09:24:39
25    A.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓          09:24:40
```

Page 31

```
 1    ▓▓▓▓▓▓▓▓                            09:24:42
 2    Q.    And when did you start         09:24:42
 3    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓?                 09:24:44
 4    A.    I don't recall the year.      09:24:44
 5    Q.    Okay.  And do you have any     09:24:45
 6    other -- do you have a retirement package at   09:24:49
 7    all?                                09:24:51
 8    A.    Yes.                          09:24:52
 9    Q.    Okay.  And what does that      09:24:53
10    consist of?                         09:24:54
11    A.    It's 401(k).                  09:24:55
12    Q.    Okay.  Other than the 401(k)   09:24:56
13    and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓, do you          09:24:58
14    have any other additional compensation in   09:25:01
15    addition to your salary?            09:25:04
16    A.    Yes.                          09:25:05
17    Q.    And what does that consist of?   09:25:07
18    A.    A bonus, an annual bonus.      09:25:08
19    Q.    Okay.  And approximately how   09:25:10
20    much is that?                       09:25:11
21    A.    It's -- it's a percent of the   09:25:11
22    salary based upon the performance of the   09:25:14
23    company.                            09:25:17
24    Q.    Okay.  And what's the          09:25:17
25    approximate percentage that you received last   09:25:18
```

Page 32

```
 1    year?                               09:25:20
 2    A.    It's ▓▓ percent.              09:25:20
 3    Q.    Okay.  And has that -- over the   09:25:23
 4    time that you've either been senior manager   09:25:27
 5    or director of controlled substance   09:25:28
 6    compliance, has it been that approximate   09:25:30
 7    percentage?                         09:25:32
 8    A.    Yes.                          09:25:32
 9    Q.    Okay.  Great.                 09:25:34
10          Ms. Harper, have you reviewed   09:25:35
11    any court documents or pleadings in this   09:25:39
12    case?                               09:25:42
13    A.    I'm not certain.              09:25:42
14    Q.    Okay.  Are you aware that      09:25:46
15    there's a case currently pending in Ohio,   09:25:49
16    generally titled the national opioid   09:25:54
17    litigation?                         09:25:56
18    A.    Yes.                          09:25:56
19    Q.    And you're aware that there are   09:25:57
20    approximately 1500 jurisdictions that have   09:25:58
21    filed suit against various manufacturers,   09:26:02
22    distributors and retail pharmacies of   09:26:07
23    prescription opioids?               09:26:08
24    A.    Yes.                          09:26:08
25    Q.    Okay.  And are you aware that   09:26:08
```

Page 33

```
 1    these jurisdictions have alleged that these   09:26:09
 2    entities are responsible for the opioid   09:26:12
 3    crisis?                             09:26:14
 4    A.    Yes.                          09:26:15
 5    Q.    Okay.  By the way, are you     09:26:16
 6    aware -- strike that.               09:26:20
 7          Are you generally aware that    09:26:20
 8    these jurisdictions are alleging that these   09:26:25
 9    entities should be responsible for the costs   09:26:28
10    that these entities have incurred as a result   09:26:30
11    of responding to the opioid crisis?   09:26:33
12    A.    Yes, in general.              09:26:35
13    Q.    Okay.  And are you aware of any   09:26:36
14    complaints that have actually been filed   09:26:39
15    against your company?               09:26:42
16    A.    No.                           09:26:43
17    Q.    Okay.  So you haven't read any   09:26:46
18    of the complaints that have been filed   09:26:47
19    against Mallinckrodt?               09:26:50
20    A.    I've read pieces of the MDL,   09:26:51
21    but nothing specific to Mallinckrodt.   09:26:55
22    Q.    Okay.  When you say "pieces of   09:26:56
23    the MDL," what do you mean?          09:26:59
24    A.    The multi-district litigation.   09:27:01
25    Q.    And particularly when you say   09:27:03
```

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  "pieces," I'm just trying to get an          09:27:04
2  understanding of what you've reviewed.       09:27:06
3      A.   So we receive a pharma news         09:27:07
4  brief every single day, and so there will be  09:27:10
5  excerpts from the various matters related to  09:27:13
6  the MDL, Judge Polster's rulings, et cetera.  09:27:16
7      Q.   I see.                              09:27:20
8          So in other words, you're           09:27:20
9  getting and receiving and reviewing these    09:27:22
10 news updates about the MDL?                   09:27:26
11     A.   Correct.                            09:27:28
12     Q.   Okay.  Great.                       09:27:29
13         Ms. Harper, do you agree that        09:27:30
14 there's an opioid epidemic in this country?   09:27:35
15         MR. O'CONNOR:  Object to form.       09:27:37
16         THE WITNESS:  Yes, I do.             09:27:38
17 QUESTIONS BY MR. KO:                          09:27:39
18     Q.   Okay.  And are you aware that       09:27:41
19 there's been an opioid epidemic in this       09:27:43
20 country for quite some time?                  09:27:45
21         MR. O'CONNOR:  Object to form.       09:27:47
22         THE WITNESS:  I don't know,          09:27:47
23     sir, what you mean by "quite some        09:27:50
24     time."                                   09:27:51
25         Can you -- I don't know.             09:27:52

Page 35

1  QUESTIONS BY MR. KO:                          09:27:53
2      Q.   When did you first start            09:27:54
3  believing that there was an opioid epidemic   09:27:57
4  in this country?                              09:28:02
5          MR. O'CONNOR:  Object to form.       09:28:03
6          THE WITNESS:  Approximately          09:28:04
7      mid-2000s.                               09:28:05
8  QUESTIONS BY MR. KO:                          09:28:06
9      Q.   Mid-2000s?                          09:28:07
10     A.   Yes, sir.                           09:28:08
11     Q.   Okay.  Are you familiar with        09:28:08
12 Mallinckrodt's market share of prescription   09:28:10
13 opioids?                                      09:28:13
14     A.   On some products, yes.              09:28:13
15     Q.   Okay.  With respect to the          09:28:18
16 generic product line of Mallinckrodt, are you 09:28:20
17 aware of Mallinckrodt's market share in the   09:28:24
18 generic line of business?                     09:28:27
19     A.   Not overall, no, sir.               09:28:29
20     Q.   Okay.  Are you aware that           09:28:31
21 Mallinckrodt has been either the number one   09:28:34
22 or number two in terms of market share        09:28:36
23 generic manufacturer of prescription opioids  09:28:40
24 for the last 20 or so years?                  09:28:42
25         MR. O'CONNOR:  Object to form.       09:28:43

Page 36

1          THE WITNESS:  That is not            09:28:44
2      the sta -- pardon me, the statistic I    09:28:46
3      have heard.                              09:28:48
4  QUESTIONS BY MR. KO:                          09:28:48
5      Q.   Okay.  What is the statistic        09:28:49
6  that you have heard?                          09:28:50
7      A.   That we're in the top five --       09:28:50
8      Q.   Okay.                               09:28:50
9      A.   -- of the share of generic         09:28:53
10 suppliers.                                    09:28:55
11     Q.   Okay.  And generic suppliers of     09:28:55
12 prescription opioids in particular, correct?  09:28:58
13     A.   Yes.                                09:28:59
14     Q.   Okay.  And currently, do you        09:29:00
15 understand that Mallinckrodt has the number   09:29:05
16 one market share of generic prescription      09:29:07
17 opioids?                                      09:29:10
18         MR. O'CONNOR:  Object to form.       09:29:10
19         THE WITNESS:  I don't -- I'm         09:29:11
20     sorry.  I don't know.  I don't know      09:29:12
21     our current market position.             09:29:13
22 QUESTIONS BY MR. KO:                          09:29:14
23     Q.   Okay.  During your time as          09:29:14
24 director or senior manager of controlled      09:29:18
25 substance compliance, have you ever inquired  09:29:21

Page 37

1  as to the market share of Mallinckrodt with   09:29:23
2  respect to prescription opioids?              09:29:26
3      A.   On certain specific drug            09:29:28
4  substances, yes.                              09:29:31
5      Q.   And which specific drug             09:29:32
6  substances?                                   09:29:34
7      A.   So I'll use the example             09:29:34
8  methylphenidate.  When we're applying for a   09:29:40
9  quota, if there is an intent or if we have a  09:29:43
10 belief that we will grow our market share, I  09:29:46
11 need to learn the existing market share that  09:29:48
12 Mallinckrodt holds.                           09:29:51
13     Q.   Okay.  And when over the last       09:29:52
14 20 or so years have you inquired into that?   09:29:57
15         Has that been inquiries that         09:30:03
16 you've made on a fairly regular basis?        09:30:04
17         MR. O'CONNOR:  Object to form.       09:30:07
18         THE WITNESS:  Yes, in                09:30:07
19     coordination with quota requests to      09:30:08
20     DEA, yes.                                09:30:09
21 QUESTIONS BY MR. KO:                          09:30:10
22     Q.   And those quota requests on an      09:30:10
23 annual basis, correct?                        09:30:13
24     A.   Quota is granted on an annual       09:30:13
25 basis, but the requests are an iterative      09:30:16

Page 38

1    process throughout a calendar year.          09:30:19
2        Q.    Okay.  And so you would say         09:30:20
3    that you have regularly -- I just want to     09:30:22
4    make sure I understand when you -- when you   09:30:25
5    have inquired into understanding             09:30:28
6    Mallinckrodt's market share, and you've said  09:30:30
7    on a fairly consistent basis, correct?       09:30:32
8        A.    Yes.                                09:30:34
9        Q.    Okay.  And consistent means         09:30:36
10   throughout the year, as you've described, in  09:30:40
11   connection with issues when dealing with      09:30:42
12   quota requests to the DEA?                    09:30:45
13       MR. O'CONNOR:  Object to form.            09:30:47
14       THE WITNESS:  Yes, throughout             09:30:47
15   the year, but on certain drug                 09:30:49
16   substances at different times, sir.           09:30:51
17   QUESTIONS BY MR. KO:                          09:30:52
18       Q.    Okay.  Going back to your           09:30:53
19   current position as director of controlled    09:30:57
20   substance compliance --                       09:31:01
21       A.    Sorry.                              09:31:02
22       Q.    That's okay.                        09:31:03
23            -- when did you become               09:31:05
24   director?                                     09:31:07
25       A.    Within the last six months.        09:31:08

Page 39

1        Q.    Okay.  So fairly recently?          09:31:11
2        A.    Yes, sir.                           09:31:12
3        Q.    And before that, you were           09:31:13
4    senior manager of controlled substance       09:31:15
5    compliance, correct?                          09:31:17
6        A.    Yes.                                09:31:18
7        Q.    Okay.  And so was this              09:31:18
8    considered a promotion?                       09:31:20
9        A.    Yes, sir.                           09:31:21
10       Q.    Okay.  And who did you replace,     09:31:22
11   if at all?  If anyone?                        09:31:25
12       A.    No one.                             09:31:27
13       Q.    So was this position created        09:31:28
14   for you?                                      09:31:30
15       A.    Yes.                                09:31:30
16       Q.    Okay.  And what were the            09:31:31
17   circumstances of creating this position?      09:31:34
18       A.    It was an evolution, if you         09:31:36
19   will, of my -- my existing job               09:31:39
20   responsibilities that merited a different     09:31:43
21   title.                                        09:31:46
22       Q.    Okay.  And now that you're          09:31:46
23   director, do you have people that report to   09:31:55
24   you?                                          09:31:56
25       A.    Yes.                                09:31:56

Page 40

1        Q.    And who reports to you?             09:31:57
2        A.    I have two direct reports.          09:31:58
3    They are managers of controlled substances   09:32:01
4    compliance.                                   09:32:04
5        Q.    And who are they?                   09:32:07
6        A.    There's a gentleman named --        09:32:07
7    his name is Dave Hunter.                      09:32:10
8        Q.    And who is the other person?        09:32:14
9    You said there were two?                      09:32:17
10       A.    Eileen Spaulding.                   09:32:17
11       Q.    Okay.  And you have worked with     09:32:19
12   Mr. Hunter and Ms. Spaulding before, correct?  09:32:21
13       A.    Correct.                            09:32:24
14       Q.    And you worked with them in         09:32:25
15   connection with the controlled substance      09:32:26
16   compliance team throughout the time you were  09:32:30
17   senior manager, correct?                      09:32:31
18       A.    Correct.                            09:32:32
19            (Mallinckrodt-Harper Exhibit 1       09:32:40
20       marked for identification.)               09:32:40
21   QUESTIONS BY MR. KO:                          09:32:40
22       Q.    I'd like to hand you an             09:32:41
23   exhibit.  Go ahead and mark this as Harper    09:32:42
24   Exhibit 1.                                    09:32:56
25            And there's no Bates on this,        09:33:09

Page 41

1    but this -- this appears to be a printout of  09:33:12
2    your LinkedIn profile; is that correct?       09:33:14
3        A.    Yes.                                09:33:16
4        Q.    And does that appear to be an       09:33:16
5    accurate reflection or copy of your LinkedIn  09:33:19
6    profile?                                      09:33:23
7        A.    Yes.                                09:33:23
8        Q.    And I don't want to spend too       09:33:23
9    much time on it, but I do want to ask you a   09:33:25
10   question about your involvement in the        09:33:27
11   National Association of Drug Diversion        09:33:33
12   Investigators.                                09:33:36
13            Do you see that reference?  I        09:33:37
14   believe that's on the next page.             09:33:38
15       A.    Yes, I see it.  Yes.                09:33:43
16       Q.    And it indicates that you've        09:33:44
17   been a member of the NADDI since 2013?        09:33:46
18       A.    Yes.                                09:33:50
19       Q.    What is the NADDI?                  09:33:51
20       A.    It's a group -- it's a             09:33:54
21   consortium of industry, law enforcement       09:34:00
22   leaders that assemble to discuss the issues   09:34:05
23   around diversion.                             09:34:10
24       Q.    Okay.  And diversion of            09:34:12
25   controlled substances?                        09:34:14

Page 42

```
 1    A.   Yes.                    09:34:15
 2    Q.   And did you have any    09:34:20
 3  involvement in the NADDI prior to 2013?  09:34:21
 4    A.   Yes.                    09:34:23
 5    Q.   Okay.  And what was that 09:34:28
 6  involvement?                    09:34:29
 7    A.   We received drug feed -- pardon  09:34:29
 8  me, information feed entitled "RX News."  09:34:32
 9    Q.   From the NADDI?         09:34:37
10    A.   Yes, sir.               09:34:40
11    Q.   Other than receiving news from  09:34:41
12  the NADDI, did you have any other type of  09:34:45
13  involvement with them?          09:34:47
14    A.   No.                     09:34:48
15    Q.   Okay.  Were you ever -- the  09:34:50
16  first time you became a member of the NADDI  09:34:55
17  was in 2013?                    09:34:57
18    A.   Yes.                    09:34:58
19    Q.   Okay.  Do you have any    09:35:00
20  involvement with any type of diversion  09:35:02
21  organization prior to 2013?     09:35:05
22    A.   Yes.                    09:35:06
23    Q.   And which one is that?    09:35:08
24    A.   The group name is Midwest  09:35:09
25  Controlled Substances Compliance Discussion  09:35:09
```

Page 43

```
 1  Group.                          09:35:18
 2    Q.   Okay.  And I believe I've seen  09:35:18
 3  plenty of references to that group in the  09:35:21
 4  documents, but is that -- correct me if I'm  09:35:23
 5  wrong, but is that a type of industry working  09:35:27
 6  group?                          09:35:28
 7    A.   That's correct.          09:35:29
 8    Q.   In other words, there were  09:35:29
 9  other manufacturers and distributors that  09:35:30
10  were part of that group?        09:35:33
11    A.   No distributors.         09:35:33
12    Q.   Okay.  So manufacturers of  09:35:35
13  prescription opioids were in that group; is  09:35:36
14  that correct?                   09:35:38
15    A.   Yes.                    09:35:38
16    Q.   Okay.  Other than that group,  09:35:39
17  any other organization that you were involved  09:35:46
18  in?                             09:35:47
19    A.   No.                     09:35:48
20    Q.   Okay.  Are you familiar with  09:35:48
21  the National Association of Controlled  09:35:51
22  Substances Authorities?         09:35:53
23    A.   Oh, yes.                09:35:53
24         I beg your pardon.       09:35:55
25    Q.   Okay.  So you had involvement  09:35:55
```

Page 44

```
 1  with them?                      09:35:56
 2    A.   I'd like to clarify my previous  09:35:57
 3  answer.                         09:36:00
 4    Q.   Sure.                   09:36:00
 5    A.   I have been a member of    09:36:00
 6  National Association of Controlled Substances  09:36:02
 7  Authorities.                    09:36:05
 8    Q.   Okay.  Since when?        09:36:05
 9    A.   I don't recall the date.   09:36:06
10  Approximately December 2013 forward.  09:36:11
11    Q.   Okay.  So about the same time  09:36:13
12  you joined the NADDI?           09:36:14
13    A.   Yes, sir.               09:36:15
14    Q.   Okay.  Did you have any     09:36:16
15  involvement with this National Association of  09:36:17
16  Controlled Substances Authorities prior to  09:36:24
17  2013?                           09:36:24
18    A.   Not that I recall.       09:36:25
19    Q.   Okay.  So fair to say other  09:36:28
20  than the Midwest Substance Compliance working  09:36:33
21  group, prior to 2013 you had no other  09:36:37
22  involvement with any other diversion-type  09:36:43
23  group?                          09:36:45
24    A.   Not that I recall.       09:36:46
25    Q.   Okay.  Did you ever consider  09:36:48
```

Page 45

```
 1  membership or joining any such groups?  09:36:55
 2    A.   No.                     09:36:57
 3    Q.   Okay.  Why not?          09:36:58
 4    A.   My job was full time and my  09:36:59
 5  husband was ill, so I did not participate in  09:37:08
 6  extracurricular activities, if you will.  09:37:12
 7    Q.   Okay.  And let's take a step  09:37:14
 8  back.                           09:37:21
 9         When you became -- I understand  09:37:21
10  you don't recall when you became senior  09:37:24
11  manager of controlled substance compliance,  09:37:26
12  but turning back to the first page of your  09:37:28
13  LinkedIn profile, it indicates that -- or at  09:37:30
14  least the profile indicates that you have  09:37:34
15  been senior manager for 43 years.  09:37:35
16         Is that incorrect?       09:37:37
17    A.   That's incorrect.        09:37:38
18    Q.   Okay.  It's more accurate to  09:37:39
19  say that you've been senior manager for some  09:37:41
20  period less than 17 years when considering  09:37:44
21  that you joined the controlled substance  09:37:46
22  compliance group in 2001?       09:37:48
23    A.   Yes.                    09:37:49
24    Q.   Okay.  And when you first    09:37:50
25  became senior manager of the controlled  09:37:55
```

Page 46

```
1  substance compliance group, what were your    09:37:57
2  general responsibilities?                      09:38:00
3       A.   The same as they were as            09:38:01
4  manager, except with one exception. I had --  09:38:06
5  when the company met with DEA, I was present  09:38:12
6  at those meetings where I had not been        09:38:16
7  necessarily in my previous position.          09:38:19
8       Q.   Okay. So in your previous           09:38:21
9  position, you had never communicated -- or    09:38:22
10 never met with the DEA, but when you became   09:38:26
11 senior manager, you became more involved and  09:38:29
12 met actually with the DEA?                     09:38:32
13       MR. O'CONNOR: Object to form.           09:38:33
14       THE WITNESS: So I'd like to             09:38:34
15   clarify, please.                            09:38:35
16 QUESTIONS BY MR. KO:                          09:38:36
17       Q.   Sure.                              09:38:36
18       A.   All through my career in           09:38:37
19 controlled substances compliance, I           09:38:40
20 communicated with DEA in the course of        09:38:41
21 inspections and on quota requests.            09:38:46
22       Q.   Okay. And so how did that          09:38:51
23 change when you became senior manager?        09:38:54
24       A.   So there were times when we met    09:38:56
25 with DEA in Washington, DC, and I then would  09:38:58
```

Page 47

```
1  participate in those meetings.                09:39:05
2       Q.   I see.                              09:39:07
3            And a moment ago when you said      09:39:08
4  that the only thing that really changed was   09:39:16
5  your interactions with the DEA relative to    09:39:19
6  when you were a manager, tell -- please       09:39:22
7  describe what your responsibilities were then 09:39:25
8  as a manager of the controlled substance      09:39:27
9  compliance group.                             09:39:31
10       A.   As a manager of the controlled     09:39:31
11 substances compliance group, I had primary    09:39:33
12 responsibilities associated with the          09:39:38
13 St. Louis plant function in the beginning.    09:39:40
14 And then as time went on, we acquired the     09:39:44
15 Hobart, New York, facility, and they came in  09:39:48
16 as part of our group.                         09:39:53
17       MR. KO: Sorry, do you mind if           09:40:15
18   we go off the record for just a             09:40:17
19   second?                                     09:40:18
20       VIDEOGRAPHER: We're going off           09:40:19
21   the record at 9:40 a.m.                     09:40:19
22   (Off the record at 9:40 a.m.)              09:40:25
23       VIDEOGRAPHER: We are back on            09:40:38
24   the record at 9:40 a.m.                     09:40:44
25
```

Page 48

```
1  QUESTIONS BY MR. KO:                          09:40:46
2       Q.   So when you say you had primary     09:40:46
3  responsibilities associated with St. Louis    09:40:49
4  and Hobart facilities, what exactly do you    09:40:51
5  mean?                                         09:40:54
6       A.   Prior to that, the controlled       09:40:54
7  substances compliance group at each facility  09:40:59
8  operated reporting to the management of their 09:41:02
9  separate sites. And so eventually the group   09:41:07
10 became one, and my position provided a        09:41:11
11 corporate oversight for all the facilities    09:41:14
12 that had controlled substances compliance     09:41:17
13 personnel.                                    09:41:19
14       Q.   Okay. And when you became          09:41:19
15 senior manager, those responsibilities        09:41:22
16 continued, correct?                           09:41:24
17       A.   Yes.                               09:41:25
18       Q.   Okay. And as you said, you         09:41:26
19 started interacting with the DEA on a more    09:41:28
20 regular basis.                                09:41:31
21            Do you recall when you first       09:41:32
22 started communicating with the DEA more       09:41:35
23 frequently?                                   09:41:37
24       MR. O'CONNOR: Object to form.           09:41:38
25       THE WITNESS: I don't know the          09:41:38
```

Page 49

```
1  year. Well, it was when I became             09:41:41
2  senior manager, but I don't know that        09:41:44
3  year, I'm sorry.                             09:41:45
4  QUESTIONS BY MR. KO:                         09:41:45
5       Q.   Okay. Real briefly turning         09:41:45
6  back to your membership in the NADDI, are you 09:41:50
7  aware that they conduct trainings on topics  09:41:54
8  such as diversion?                           09:41:58
9       A.   Yes.                               09:42:00
10       Q.   Okay. Did you ever attend any     09:42:00
11 of those trainings?                          09:42:01
12       A.   Yes.                              09:42:02
13       Q.   Did you ever attend those         09:42:03
14 trainings before 2013?                       09:42:04
15       A.   I don't think so, but I do not    09:42:06
16 know.                                        09:42:09
17       Q.   Okay. Prior to 2013, did you      09:42:09
18 ever attend any type of training related to  09:42:12
19 diversion?                                    09:42:16
20       A.   Yes.                              09:42:16
21       Q.   Okay. And what type of            09:42:17
22 trainings?                                    09:42:18
23       A.   So there were DEA conferences     09:42:19
24 for industry.                               09:42:22
25       Q.   Uh-huh. And --                    09:42:26
```

Page 50

1    A.    And --                09:42:26
2    Q.    Go ahead.  Sorry.         09:42:27
3    A.    I apologize.          09:42:27
4    Q.    That's okay.          09:42:28
5    A.    They're private industry    09:42:29
6 conferences, not -- so they were hosted by    09:42:33
7 other than DEA.              09:42:40
8    Q.    Sure.              09:42:41
9        Similar to the Midwest      09:42:42
10 substance compliance group you were referring 09:42:44
11 to, or something separate?        09:42:45
12    A.    Something separate.      09:42:46
13    Q.    Okay.  And these were put on   09:42:47
14 by, as you said, private entities?    09:42:50
15    A.    Yes.              09:42:52
16    Q.    Okay.  And in the -- from the  09:42:53
17 2001 to 2013 time period, how frequently did 09:42:58
18 you attend these trainings?       09:43:02
19    A.    Approximately one per year.   09:43:03
20    Q.    One per year.  Okay.     09:43:07
21        And the DEA conferences, do you  09:43:08
22 recall going to those on an annual basis or  09:43:10
23 was that less frequent than an annual basis? 09:43:12
24    A.    When they were offered, there  09:43:16
25 was a period of time they weren't offered on 09:43:19

Page 51

1 an annual basis.  But, yes, when they were  09:43:22
2 offered, I would attend, yes.      09:43:23
3    Q.    Okay.  And do you recall    09:43:25
4 attending a DEA conference in the fall    09:43:27
5 of 2008?                 09:43:32
6    A.    I'm so sorry, I'm not good on  09:43:32
7 my years.               09:43:37
8    Q.    Sure.             09:43:37
9    A.    I can't place the fall of 2008  09:43:37
10 and a conference at that time.      09:43:40
11    Q.    That's fine.  We can get to   09:43:40
12 some documents --          09:43:42
13    A.    Okay.             09:43:42
14    Q.    -- that will hopefully refresh  09:43:42
15 your recollection later.        09:43:46
16    A.    All right.          09:43:47
17    Q.    Do you maintain relationships  09:43:48
18 with any other individuals who have similar  09:43:49
19 jobs as you do for other entities?    09:43:52
20    A.    Yes.             09:43:52
21    Q.    Which individuals and for what  09:44:02
22 entities do they work for?       09:44:04
23    A.    So there's a director of    09:44:05
24 controlled substances compliance at Teva   09:44:12
25 Pharmaceuticals.          09:44:15

Page 52

1    Q.    Uh-huh.           09:44:15
2    A.    Director of controlled     09:44:16
3 substances compliance at Noramco, and    09:44:18
4 representatives -- and I don't know their   09:44:29
5 exact titles -- Actavis and Watson.  So those 09:44:30
6 are the ones that come to mind.     09:44:35
7    Q.    Okay.  And the director of   09:44:38
8 Teva, who is she or he?        09:44:42
9    A.    Her name is Colleen McGinn.   09:44:44
10    Q.    And how long have you known   09:44:47
11 her?                 09:44:49
12    A.    Since I joined the controlled  09:44:49
13 substances compliance group.      09:44:52
14    Q.    In 2001?         09:44:52
15    A.    Yes.             09:44:56
16    Q.    Okay.  And did you speak with  09:44:57
17 her about diversion-type activities?    09:44:58
18    MR. O'CONNOR:  Object to form.    09:45:02
19    THE WITNESS:  Yes.       09:45:03
20 QUESTIONS BY MR. KO:         09:45:03
21    Q.    And how frequent?      09:45:04
22    A.    Intermittently.  I don't know  09:45:05
23 the frequency.           09:45:09
24    Q.    Okay.  Are you aware of Federal 09:45:09
25 Register notices?          09:45:21

Page 53

1    A.    Yes.             09:45:22
2    Q.    Did you regularly review them  09:45:22
3 during your time in the DEA compliance group? 09:45:23
4    A.    Yes.             09:45:26
5    MR. O'CONNOR:  Object to form.    09:45:26
6    THE WITNESS:  Yes.       09:45:28
7 QUESTIONS BY MR. KO:         09:45:28
8    Q.    How frequent would you say you  09:45:28
9 reviewed those?          09:45:30
10    A.    I or someone in my group    09:45:31
11 monitored the Register every single day.   09:45:37
12    Q.    Okay.             09:45:40
13    A.    For DEA notices.       09:45:41
14    Q.    I see.           09:45:43
15        And when did you start doing   09:45:43
16 that?                09:45:45
17    A.    I don't recall the year.  It -- 09:45:46
18 I don't recall the year.        09:45:49
19    Q.    And would you say it was your  09:45:50
20 responsibility to review those notices?   09:45:54
21    A.    Initially, yes.       09:45:57
22    Q.    Okay.  And when did -- and I  09:45:58
23 assume you don't do that anymore if you said  09:46:04
24 "initially"?             09:46:07
25    A.    It depends on the nature of the 09:46:08

Page 54

1  notice that we're antici -- if we're          09:46:09
2  anticipating pivotal Federal Register Notice   09:46:10
3  about quota or our DEA registration, I         09:46:12
4  continue to monitor them, but other -- other   09:46:16
5  folks within my team monitor them on a daily   09:46:18
6  basis.                                         09:46:21
7      Q.   Okay.  And who would be those         09:46:22
8  individuals?                                   09:46:24
9      A.   The gentleman's name is Dave          09:46:25
10 Hunter.  He's the manager at the St. Louis     09:46:29
11 plant.                                         09:46:31
12     Q.   And he also, as you said              09:46:32
13 before, reports to you directly right now?     09:46:37
14     A.   Yes.                                  09:46:39
15     Q.   Are you aware of reviewing any        09:46:42
16 Federal Register Notices in the mid-2000s?     09:46:44
17     A.   I'm certain -- I'm not certain        09:46:47
18 because I'm mixed up on my years.              09:46:54
19     Q.   Sure.                                 09:46:56
20         But -- so I guess I'm trying to        09:46:56
21 get an understanding of when you started       09:46:58
22 reviewing these Federal Register Notices.      09:47:01
23     A.   Certainly that's helpful.             09:47:03
24         When I joined the controlled           09:47:05
25 substances compliance group.                   09:47:08

Page 55

1      Q.   Okay.  Again, we'll get to some       09:47:08
2  of those in a moment.                          09:47:14
3      A.   Okay.                                 09:47:15
4      Q.   Now, when you were in the DEA         09:47:16
5  compliance group, did you become aware of DEA  09:47:25
6  actions and investigations against major       09:47:29
7  distributors?                                  09:47:33
8      A.   Yes.                                  09:47:33
9      Q.   And those major distributors          09:47:34
10 are ABC, Cardinal and McKesson?                09:47:35
11     A.   Yes.                                  09:47:38
12     Q.   And did you review the details        09:47:38
13 of these investigations or DEA actions when    09:47:42
14 you became aware of them?                       09:47:48
15         MR. O'CONNOR:  Object to form.         09:47:48
16         THE WITNESS:  Not on a detailed        09:47:49
17     level all the time, but at a high          09:47:53
18     level, yes.                                09:47:55
19 QUESTIONS BY MR. KO:                           09:47:56
20     Q.   Okay.  Would it be fair to say        09:47:56
21 that these settlements and DEA actions of the  09:47:58
22 distributors caught your attention in          09:48:01
23 mid-2000 time period?                          09:48:04
24         MR. O'CONNOR:  Object to form.         09:48:04
25

Page 56

1  QUESTIONS BY MR. KO:                           09:48:05
2      Q.   The mid-2000s?                        09:48:06
3      A.   Yes.                                  09:48:07
4      Q.   Okay.  And would it also be           09:48:07
5  fair to say that up to that point, DEA         09:48:11
6  actions were against small or mid-sized        09:48:15
7  distributors related to their diversion-type  09:48:23
8  activities?                                    09:48:24
9      A.   I can't answer that question.         09:48:24
10 I don't know.                                  09:48:26
11     Q.   Now, at some point did you also       09:48:26
12 become aware of an action involving Purdue?    09:48:31
13         MR. O'CONNOR:  Object to form.         09:48:36
14         THE WITNESS:  Yes.                     09:48:37
15 QUESTIONS BY MR. KO:                           09:48:38
16     Q.   In particular, did you ever           09:48:40
17 become aware of the Purdue consent decree in   09:48:41
18 2007?                                          09:48:45
19     A.   Yes.                                  09:48:45
20     Q.   And are you aware that that           09:48:45
21 investigation revolved around Purdue's         09:48:50
22 manufacturing, promotion and advertising       09:48:54
23 activities of OxyContin?                       09:48:56
24     A.   Yes.                                  09:48:57
25     Q.   Okay.  And at the time you            09:48:59

Page 57

1  became aware of that consent decree, I assume  09:49:04
2  you're also aware that Mallinckrodt was        09:49:08
3  manufacturing a generic form of OxyContin?     09:49:10
4          MR. O'CONNOR:  Object to form.         09:49:12
5          THE WITNESS:  I don't know the         09:49:12
6      timing of when we entered the market       09:49:16
7      for OxyContin -- or, I'm sorry, the        09:49:18
8      generic oxycodone, so I don't know         09:49:22
9      exactly the timing relative to the         09:49:23
10     Purdue matter.                             09:49:25
11 QUESTIONS BY MR. KO:                           09:49:26
12     Q.   Okay.  So you are aware that          09:49:26
13 Mallinckrodt has manufactured oxycodone,       09:49:28
14 correct?                                       09:49:31
15     A.   Yes.                                  09:49:31
16     Q.   And oxycodone, generally              09:49:31
17 speaking, is a generic form of a prescription  09:49:34
18 opioid?                                        09:49:36
19     A.   Oxycodone is the name of the          09:49:38
20 molecule, so, yes, it's -- yes, oxycodone is   09:49:39
21 manufactured into the generic, yes.            09:49:43
22     Q.   Okay.  And you're also aware          09:49:46
23 that Mallinckrodt manufactured various dosage  09:49:48
24 strengths of oxycodone, correct?              09:49:53
25     A.   Yes.                                  09:49:54

Page 58

1    Q.   Including oxy 15 milligrams and    09:49:55
2  oxy 30 milligrams, correct?              09:49:58
3    A.   Yes, in the IR release form,      09:49:59
4  yes.                                     09:50:03
5    Q.   And by "IR" you mean immediate    09:50:03
6  release, correct?                        09:50:05
7    A.   Yes, sir.                         09:50:05
8    Q.   Now, one of your primary          09:50:06
9  responsibilities as senior manager of    09:50:28
10 controlled substance compliance was to design 09:50:31
11 and implement a system to identify suspicious 09:50:35
12 orders, correct?                         09:50:37
13       MR. O'CONNOR: Object to form.      09:50:37
14       THE WITNESS: We already had a      09:50:39
15    system in place.                      09:50:42
16 QUESTIONS BY MR. KO:                     09:50:43
17    Q.   Okay. So when you say "we        09:50:43
18 already had a system in place," first of all, 09:50:44
19 when -- what time period are you talking 09:50:48
20 about right now?                         09:50:49
21    A.   All the way back to my days      09:50:50
22 before controlled substances compliance, I 09:50:55
23 was aware that we had a system in place  09:50:58
24 designed to detect orders of unusual pattern, 09:51:02
25 size and frequency.                      09:51:05

Page 59

1    Q.   Okay. And what did that          09:51:07
2  system -- what was your understanding of what 09:51:09
3  that system consisted of?                09:51:11
4    A.   There was a algorithm in --      09:51:14
5  programmed by IT into our order entry system 09:51:20
6  that would flag orders for further review. 09:51:26
7    Q.   Okay. Other than that            09:51:29
8  algorithm, were there any other elements of 09:51:32
9  that system?                             09:51:35
10    A.   Yes, quite a few others.         09:51:36
11    Q.   Okay. And what did those         09:51:39
12 consist of?                              09:51:41
13    A.   So we had commercial            09:51:42
14 representative -- national account managers 09:51:46
15 that were our eyes and ears and boots on the 09:51:49
16 ground at the customer accounts. We trained 09:51:51
17 them to be vigilant for any potential sign -- 09:51:54
18 red flags that could be indicative of    09:51:59
19 diversion as they visited customers.     09:52:01
20       May I go on, please?              09:52:05
21    Q.   Yeah.                            09:52:06
22    A.   We have customer service         09:52:07
23 representatives who are veteran in the   09:52:08
24 business, and they were in general familiar 09:52:10
25 with customers' order patterns, and so they 09:52:13

Page 60

1  had responsibility, if they saw anything that 09:52:20
2  appeared to be unusual to them, to escalate 09:52:22
3  to their manager.                        09:52:24
4        We took precautions to make       09:52:26
5  certain that every single order we shipped 09:52:28
6  was to a valid DEA registration, every order 09:52:30
7  for Schedule II drugs was -- that we received 09:52:35
8  a 222 form that was filled out correctly, and 09:52:38
9  that the order -- the address on the 222 09:52:42
10 forms coincided exactly with the ship to 09:52:45
11 address in our company's order management 09:52:48
12 system.                                  09:52:51
13    Q.   Okay. And I want to get an       09:52:52
14 understanding of when these elements were in 09:52:53
15 place, because I've reviewed a lot of    09:52:57
16 documents in this case and I've been able to 09:53:00
17 determine -- or at least from my         09:53:02
18 interpretation I've been able to see some of 09:53:04
19 these things that you have discussed during 09:53:07
20 certain time periods. But I want to      09:53:08
21 understand what you said a moment ago when 09:53:10
22 you said that Mallinckrodt always had a  09:53:14
23 system.                                  09:53:15
24       Do you recall that testimony?     09:53:15
25    A.   Yes, I do.                       09:53:17

Page 61

1    Q.   Are these things that you're     09:53:18
2  describing, are you testifying that      09:53:20
3  Mallinckrodt always had all these elements in 09:53:21
4  connection with the suspicious order     09:53:26
5  monitoring program?                      09:53:29
6        MR. O'CONNOR: Object to form.     09:53:29
7        THE WITNESS: There's one that     09:53:30
8     I'm not certain of, but all the other 09:53:35
9     elements, yes, have been in place    09:53:37
10    since I became aware all the way back 09:53:40
11    to my days in manufacturing and within 09:53:42
12    the scope of DEA audits.             09:53:44
13 QUESTIONS BY MR. KO:                     09:53:46
14    Q.   Okay. So prior to, for          09:53:46
15 example, 2003 --                         09:53:54
16    A.   Yes.                             09:53:54
17    Q.   -- there was -- I just want to   09:53:55
18 make sure I understand.                  09:53:58
19    A.   Certainly.                       09:53:58
20    Q.   The suspicious order monitoring  09:53:59
21 program, as you understand it, consisted of 09:54:01
22 both an algorithm and other factors that you 09:54:04
23 had previously described; is that correct? 09:54:07
24    A.   Yes.                             09:54:07
25    Q.   Okay. Now, setting aside what    09:54:09

Page 62

1  you understood to be the -- by the way, do    09:54:13
2  you mind if I call suspicious order    09:54:17
3  monitoring "SOM" for short?    09:54:19
4      A.   I don't mind.    09:54:20
5      Q.   Okay.  Other than what you    09:54:21
6  believe to be the elements of Mallinckrodt's    09:54:25
7  SOM program, when you became involved as a    09:54:28
8  senior manager of the controlled substances    09:54:33
9  compliance group, is it accurate to say that    09:54:36
10 one of your primary responsibilities was to    09:54:39
11 design and implement a system to identify    09:54:41
12 suspicious orders?    09:54:44
13      MR. O'CONNOR:  Object to form.    09:54:44
14      THE WITNESS:  So, sir, we    09:54:45
15   already had a system in place to    09:54:47
16   identify suspicious orders.    09:54:49
17 QUESTIONS BY MR. KO:    09:54:51
18     Q.   Okay.  Well, it's my    09:54:51
19 understanding that you revised that system    09:54:55
20 over time when you were a senior manager.    09:54:58
21   Is that fair to say?    09:55:00
22     A.   Yes.    09:55:01
23     Q.   Okay.  So during the time that    09:55:02
24 you were senior manager, is it accurate to    09:55:05
25 say that you continued to help design and    09:55:06

Page 63

1  implement Mallinckrodt's suspicious order    09:55:10
2  monitoring system?    09:55:12
3      A.   Yes.    09:55:13
4      Q.   Okay.  Now, a fundamental    09:55:14
5  feature of any SOM program is to prevent    09:55:17
6  diversion of controlled substances, so just    09:55:20
7  prescription opioids manufactured by    09:55:23
8  Mallinckrodt; is that correct?    09:55:24
9      MR. O'CONNOR:  Object to form.    09:55:25
10      THE WITNESS:  Not to prevent,    09:55:26
11   but to guard against diversion.    09:55:30
12 QUESTIONS BY MR. KO:    09:55:32
13     Q.   Okay.  So you have a    09:55:32
14 distinction between prevent and guard    09:55:33
15 against?    09:55:36
16     A.   Yes.    09:55:36
17     Q.   Okay.  And what is that    09:55:36
18 distinction?    09:55:38
19     A.   So prevent is an absolute.  It    09:55:38
20 means we can assure that there's never any    09:55:41
21 diversion of our product.    09:55:44
22   Guard against means to the    09:55:46
23 extent we're able, detect orders that may    09:55:50
24 be -- that are cause for further review,    09:56:00
25 sorry.    09:56:02

Page 64

1      Q.   That's okay.    09:56:03
2   And when you say "may be," is    09:56:04
3  one way to say it that a fundamental feature    09:56:08
4  of a SOM program is to guard against the    09:56:12
5  potential diversion of controlled substances?    09:56:16
6      MR. O'CONNOR:  Object to form.    09:56:17
7      THE WITNESS:  Yes.    09:56:18
8  QUESTIONS BY MR. KO:    09:56:20
9      Q.   Okay.  And guarding against the    09:56:20
10 diversion of prescription opioids is an    09:56:23
11 important responsibility of a company that    09:56:25
12 manufactures prescription opioids; wouldn't    09:56:28
13 you say?    09:56:29
14     A.   Yes.    09:56:31
15     Q.   Okay.  And as we discussed    09:56:32
16 before, the CSA imposes that obligation on    09:56:33
17 registrants in the supply chain, including on    09:56:37
18 Mallinckrodt, correct?    09:56:39
19      MR. O'CONNOR:  Object to form.    09:56:40
20      THE WITNESS:  Yes.    09:56:40
21 QUESTIONS BY MR. KO:    09:56:41
22     Q.   And would you agree with me    09:56:43
23 that that would be one of the most    09:56:45
24 fundamental duties of the CSA?    09:56:46
25      MR. O'CONNOR:  Object to form.    09:56:48

Page 65

1      THE WITNESS:  The CSA covers    09:56:48
2   many aspects, my understanding, for --    09:56:53
3   to maintain the closed system of    09:56:57
4   distribution, and suspicious order    09:57:00
5   monitoring is one of those components.    09:57:02
6  QUESTIONS BY MR. KO:    09:57:03
7      Q.   Sure.    09:57:03
8   And I understand that there are    09:57:04
9  a lot of aspects to the CSA, but from your    09:57:06
10 perspective, would you agree with me that    09:57:09
11 guarding against diversion, as you put it, is    09:57:12
12 one of the fundamental duties of the CSA?    09:57:15
13      MR. O'CONNOR:  Objection.    09:57:17
14   Form.    09:57:18
15      THE WITNESS:  I can't say if    09:57:18
16   it -- yes.  Yes.  Yes.    09:57:22
17 QUESTIONS BY MR. KO:    09:57:23
18     Q.   Okay.  Now, as we discussed    09:57:24
19 before, in connection with these duties, you    09:57:29
20 helped revise Mallinckrodt's suspicious order    09:57:33
21 monitoring program, correct?    09:57:36
22     A.   Correct.    09:57:37
23     Q.   And these revisions occurred    09:57:38
24 generally in the 2000 -- the late, I guess I    09:57:42
25 would say -- I would describe it this way.    09:57:49

Page 66

1    These revisions occurred          09:57:50
2  sometime between the 2008 and 2012 time    09:57:52
3  period.  Would that be fair to say?        09:57:55
4        MR. O'CONNOR:  Object to form.    09:57:57
5        THE WITNESS:  Yes, but they're    09:57:58
6    ongoing to this day, yes.              09:57:59
7  QUESTIONS BY MR. KO:                      09:58:00
8    Q.   Would it be accurate to say      09:58:00
9  that there was increased scrutiny on      09:58:01
10 Mallinckrodt's SOM program in 2008?       09:58:03
11       MR. O'CONNOR:  Object to form.    09:58:07
12       THE WITNESS:  I can't say that.   09:58:07
13 QUESTIONS BY MR. KO:                      09:58:13
14   Q.   Okay.                             09:58:14
15   A.   No.                               09:58:14
16   Q.   Do you recall a time in which    09:58:14
17 you believed there was increased scrutiny on   09:58:18
18 Mallinckrodt's SOM program?               09:58:21
19       MR. O'CONNOR:  Object to form.    09:58:22
20       THE WITNESS:  We had ongoing      09:58:23
21    discussions with DEA, but, yes, yes,  09:58:26
22    there was a time.                     09:58:29
23 QUESTIONS BY MR. KO:                      09:58:29
24   Q.   And approximately what time      09:58:30
25 period was that?                          09:58:31

Page 67

1    A.   We met with DEA in August       09:58:32
2  of 2011, I do remember that date --       09:58:36
3    Q.   Okay.                             09:58:38
4    A.   -- and they had some additional  09:58:39
5  suggestions about potential enhancements of   09:58:41
6  our suspicious order monitoring program.  09:58:43
7    Q.   Do you recall any instances in   09:58:45
8  which you met with DEA prior to that in which   09:58:55
9  you discussed Mallinckrodt's SOM program?  09:58:59
10   A.   Yes.                              09:59:01
11   Q.   Okay.  When was that?            09:59:02
12   A.   I don't remember the year, but   09:59:03
13 there was a discussion with DEA St. Louis on   09:59:06
14 that topic.                               09:59:10
15   Q.   Okay.  By the way, when you      09:59:11
16 became senior manager of controlled substance   09:59:16
17 compliance group -- of the controlled     09:59:19
18 substance compliance group, you were the --   09:59:21
19 you had the primary responsibility of     09:59:24
20 revising and designing Mallinckrodt's SOM   09:59:26
21 program; is that fair to say?            09:59:29
22       MR. O'CONNOR:  Object to form.    09:59:31
23       THE WITNESS:  So it was all --    09:59:32
24    I was part of a team.  It was a team   09:59:32
25    effort, sir.                          09:59:34

Page 68

1  QUESTIONS BY MR. KO:                      09:59:34
2    Q.   Okay.  And when you say you      09:59:35
3  were "part of a team," who was on that team?   09:59:36
4    A.   Security.                         09:59:38
5    Q.   Okay.  And security, is that     09:59:42
6  Bill Ratliff?                             09:59:43
7    A.   It was Bill Ratliff, and he's    09:59:44
8  retired, and now it's John Gillies.       09:59:47
9    Q.   Okay.  Anybody other than Bill   09:59:49
10 Ratliff or John Gillies?                  09:59:51
11   A.   Yes, legal.                       09:59:53
12   Q.   Was that Mr. Lohman and          09:59:54
13 Ms. Duft?                                 09:59:56
14   A.   Yes.                              10:00:00
15   Q.   Okay.  Who else?                 10:00:01
16   A.   Members of the commercial        10:00:06
17 group.  Members of the IT group.          10:00:09
18   Q.   So other than security, legal,   10:00:10
19 commercial and IT, were there any other   10:00:16
20 groups or departments that were part of the   10:00:18
21 SOM team?                                 10:00:20
22   A.   Yes.  Members of the SOM team    10:00:21
23 came and went through different iterations of   10:00:23
24 the program, so I don't recall the        10:00:27
25 composition of the team at a specific time,   10:00:29

Page 69

1  but there was a patient and product       10:00:31
2  monitoring group that was a participant in   10:00:34
3  the team.  Credit department was a        10:00:39
4  participant in the team.  And those are the   10:00:42
5  ones I can recall.                        10:00:44
6    Q.   Okay.  Thank you.               10:00:46
7        When you referenced the          10:00:46
8  commercial group a moment ago, what did that   10:00:51
9  consist of?                               10:00:56
10       In other words, who were          10:00:57
11 members of that commercial group?         10:00:59
12   A.   Primarily John Adams.            10:01:00
13   Q.   Anyone else?                     10:01:05
14   A.   A gentleman named Steve Becker.  10:01:07
15   Q.   Okay.  And Steve Becker was a    10:01:09
16 national account manager, correct?        10:01:14
17   A.   Correct.                         10:01:15
18   Q.   Okay.  Were there any other      10:01:16
19 customer service representatives that were   10:01:18
20 part of that group?                       10:01:19
21   A.   Yes.                             10:01:20
22   Q.   Okay.  Who were they?           10:01:21
23   A.   The lady's name is Brenda        10:01:22
24 Rehkop; she's passed away.  Cathy Stewart.   10:01:29
25 Jim Rausch.                               10:01:35

Page 70

1    Q.   And Jim Rausch was part of    10:01:36
2    commercial?                        10:01:40
3    A.   Well, we distinguish --       10:01:40
4    customer service is not considered to be part  10:01:46
5    of commercial, although it would seem that it  10:01:47
6    would be, so customer service is a separate   10:01:49
7    group.                             10:01:51
8    Q.   Okay.  Than commercial you're  10:01:51
9    saying?                            10:01:53
10   A.   Yes.                          10:01:53
11   Q.   Now, you mentioned some names  10:01:54
12   of people that have been deposed previously  10:01:57
13   in this case in the past few weeks.  Many of  10:02:01
14   them have testified that you are the person   10:02:05
15   most knowledgeable about Mallinckrodt's SOM   10:02:07
16   program.                           10:02:10
17       Would you agree with that      10:02:10
18   assessment?                        10:02:11
19       MR. O'CONNOR:  Object to form.  10:02:11
20       THE WITNESS:  Well, I'm not a   10:02:12
21   vain person, but, yes, I know a lot  10:02:17
22   about the program, but it's all been  10:02:18
23   with the contributions of a -- team  10:02:20
24   effort as time has gone on.         10:02:22
25

Page 71

1    QUESTIONS BY MR. KO:               10:02:23
2    Q.   Sure.                         10:02:23
3        Do you believe there's anyone   10:02:25
4    in the SOM team or anyone else in the  10:02:27
5    company, for that matter, with more knowledge  10:02:30
6    about Mallinckrodt's suspicious order  10:02:31
7    monitoring program than you?        10:02:33
8        MR. O'CONNOR:  Object to form.  10:02:36
9        THE WITNESS:  I'll say that's   10:02:36
10   unlikely.                          10:02:37
11   QUESTIONS BY MR. KO:               10:02:38
12   Q.   Okay.  By the way, other than   10:02:38
13   the SOM program that you helped revise,  10:02:43
14   design and implement, were there any other  10:02:48
15   programs or systems in place at Mallinckrodt  10:02:53
16   related to diversion of controlled   10:02:57
17   substances?                        10:03:00
18   A.   Yes.                          10:03:00
19   Q.   Okay.  And what were those?    10:03:04
20   A.   So we -- we work with law      10:03:05
21   enforcement and give testimony when  10:03:12
22   requested.  We provide placebos for law  10:03:17
23   enforcement use on specific cases.  We have a  10:03:20
24   department that educates prescribers and  10:03:25
25   patients on the proper prescribing and  10:03:30

Page 72

1    dispensing and consumption of controlled  10:03:34
2    substances.                        10:03:39
3        So we have many programs within  10:03:40
4    Mallinckrodt, as a responsible manufacturer,  10:03:42
5    aimed at guarding against diversion.  10:03:45
6    Q.   Okay.  And taking that last    10:03:46
7    category that you described with respect to  10:03:48
8    educating, I guess the public on safe  10:03:50
9    prescribing and dispensing, when did  10:03:55
10   Mallinckrodt first engage in that type of  10:03:57
11   conduct?                           10:04:01
12   A.   I do not know the answer.      10:04:01
13   Q.   Do you generally recall if it  10:04:03
14   was after 2010?                    10:04:06
15   A.   I'm sorry, I don't know when   10:04:06
16   the group --                       10:04:08
17   Q.   Okay.                         10:04:10
18   A.   -- was created.               10:04:10
19   Q.   And then when you described the  10:04:11
20   law enforcement activities, it seemed like to  10:04:12
21   me, and correct me if I'm wrong, that  10:04:16
22   those -- you provided that type of support  10:04:21
23   when they requested it; is that fair to say?  10:04:23
24       MR. O'CONNOR:  Object to form.  10:04:27
25       THE WITNESS:  Yes.             10:04:28

Page 73

1    QUESTIONS BY MR. KO:               10:04:30
2    Q.   Okay.  So in other words, there  10:04:30
3    wasn't a program in place in which you were  10:04:32
4    regularly providing testimony, for example,  10:04:35
5    but you were -- you were providing testimony  10:04:37
6    to help law enforcement when they requested  10:04:39
7    it; is that fair?                  10:04:41
8    A.   So I don't know -- I may not be  10:04:42
9    aware of other people in other groups that  10:04:46
10   provided testimony, such as our research  10:04:48
11   scientists, so -- but those are the times  10:04:50
12   that I am aware.                   10:04:54
13   Q.   Okay.  Now, is it accurate to  10:04:55
14   say that one of the -- you mentioned this a  10:04:56
15   moment ago, but I just want to make sure I  10:05:00
16   understand correctly.              10:05:02
17       But is it accurate to say that  10:05:03
18   one purpose of a SOM program is to identify  10:05:05
19   orders of unusual size?            10:05:08
20   A.   Yes.                          10:05:10
21   Q.   Okay.  And would it also be --  10:05:11
22   well, why is that?                 10:05:13
23   A.   It's one of the indicators that  10:05:15
24   may be -- that may prompt -- well, should --  10:05:23
25   will prompt additional investigation of that  10:05:26

Page 74

1    order.                                    10:05:28
2        Q.    Okay.  And other than that        10:05:29
3    general concept that -- in particular, the   10:05:31
4    size of an order at its most fundamental    10:05:34
5    level is important because an excessive order  10:05:37
6    or an order of -- that's -- that's large    10:05:42
7    could potentially be unusual; is that       10:05:47
8    correct?                                  10:05:49
9        MR. O'CONNOR:  Object to form.       10:05:49
10       THE WITNESS:  Yes, but it's all      10:05:50
11   relative to what -- what is large.  I      10:05:55
12   can't define large.                       10:05:58
13   QUESTIONS BY MR. KO:                     10:05:59
14       Q.    Sure.                          10:05:59
15          But generally speaking,            10:06:00
16   shipping too many prescription opioids could  10:06:01
17   potentially be problematic, correct?       10:06:03
18       MR. O'CONNOR:  Objection to          10:06:05
19   form.                                    10:06:06
20       THE WITNESS:  I don't have all       10:06:06
21   the information, I'm sorry, to answer      10:06:08
22   that question completely.                 10:06:09
23   QUESTIONS BY MR. KO:                     10:06:10
24       Q.    Sure.                          10:06:11
25          Another purpose of a SOM          10:06:11

Page 75

1    program is to identify orders that deviate   10:06:14
2    from a normal pattern; would you agree with  10:06:18
3    me?                                      10:06:19
4        A.    Yes.                           10:06:19
5        Q.    Okay.  And it's important to     10:06:20
6    identify ordering patterns at a general    10:06:22
7    level; is that correct?                    10:06:25
8        A.    Yes.                           10:06:25
9        Q.    Okay.  And another purpose of a   10:06:27
10   SOM program is to identify orders of unusual  10:06:28
11   frequency; is that fair to say?            10:06:32
12       A.    Yes.  Yes.                     10:06:34
13       Q.    And it's important to identify    10:06:35
14   the timing of orders; that would be fair to   10:06:37
15   say?                                     10:06:39
16       MR. O'CONNOR:  Object to form.       10:06:39
17       THE WITNESS:  Yes.                   10:06:40
18   QUESTIONS BY MR. KO:                     10:06:41
19       Q.    Okay.  And would you agree with   10:06:41
20   me that one of -- or another central purpose   10:06:43
21   of identifying suspicious orders is to avoid   10:06:47
22   filling them for any other purpose than      10:06:50
23   legitimate, scientific or medical needs?    10:06:53
24       MR. O'CONNOR:  Object to form.       10:06:55
25       THE WITNESS:  Yes.                   10:06:56

Page 76

1    QUESTIONS BY MR. KO:                     10:07:01
2        Q.    Okay.  Would you agree with me    10:07:01
3    that an effective SOM program would be able   10:07:05
4    to identify whether a pharmacy or clinic is   10:07:08
5    ordering excessive quantities of controlled   10:07:12
6    substances?                              10:07:15
7        MR. O'CONNOR:  Object to form.       10:07:15
8        THE WITNESS:  No.                    10:07:16
9    QUESTIONS BY MR. KO:                     10:07:16
10       Q.    Okay.  You don't believe that    10:07:18
11   would be an effective SOM program, or you    10:07:18
12   wouldn't -- you don't agree with me?       10:07:21
13       A.    So would you please rephrase    10:07:23
14   the question?                            10:07:25
15       Q.    Sure.                          10:07:26
16          Would you agree with me that an    10:07:27
17   effective SOM program would be able to      10:07:28
18   identify whether a pharmacy or a clinic is    10:07:31
19   ordering excessive quantities of controlled   10:07:34
20   substances?                              10:07:36
21       MR. O'CONNOR:  Same objection.       10:07:36
22       THE WITNESS:  So the components     10:07:37
23   of the SOM program that point out a        10:07:43
24   reason for further investigation,          10:07:50
25   they're not singular.  So DEA tells us     10:07:52

Page 77

1    that these things are to be considered     10:07:58
2    during the course of our                  10:08:00
3    investigation, but no one factor is        10:08:02
4    conclusively -- indicates diversion.       10:08:05
5    QUESTIONS BY MR. KO:                     10:08:12
6        Q.    Sure, I understand that, and I    10:08:13
7    understand that there are several different   10:08:15
8    things that you may consider.             10:08:17
9          But would you agree with me        10:08:18
10   that one aspect of an effective SOM program   10:08:19
11   would be to identify pharmacies or clinics   10:08:24
12   that order excessive amounts of controlled   10:08:26
13   substances?                              10:08:29
14       MR. O'CONNOR:  Object to form.       10:08:29
15       THE WITNESS:  So we do not sell     10:08:29
16   to pharmacies or clinics.  We sell to      10:08:32
17   wholesalers and distributors.            10:08:36
18   QUESTIONS BY MR. KO:                     10:08:37
19       Q.    I understand that.             10:08:38
20          But as -- as an entity that       10:08:39
21   sells to wholesalers, distributors, you know  10:08:41
22   that eventually those products are going    10:08:44
23   somewhere else; is that fair to say?       10:08:47
24       A.    Yes.                           10:08:49
25       Q.    The distributors aren't         10:08:49

Page 78

1  necessarily providing them directly to the        10:08:50
2  consumers at that point, correct?                  10:08:54
3      A.   Yes.  Yes.                      10:08:55
4      Q.   So eventually these             10:08:55
5  distributors distribute these controlled          10:08:58
6  substances to, among other entities,              10:09:03
7  pharmacies and clinics; is that correct?          10:09:05
8      A.   Yes.                           10:09:07
9      Q.   Okay.  So would you agree with       10:09:08
10 me that one component of a -- an effective        10:09:10
11 suspicious order monitoring program is to         10:09:14
12 identify whether or not these downstream          10:09:16
13 pharmacies or clinics are ordering excessive      10:09:19
14 quantities of controlled substances?             10:09:21
15         MR. O'CONNOR:  Object to form.       10:09:22
16         THE WITNESS:  We -- throughout       10:09:23
17     time we've been asking -- we always       10:09:26
18     ask DEA for additional guidance          10:09:29
19     because the regulations state "know       10:09:30
20     your customer."                        10:09:32
21 QUESTIONS BY MR. KO:                    10:09:33
22     Q.   Right.                         10:09:34
23     A.   And we weren't aware of an         10:09:35
24 obligation, if you will, to monitor             10:09:41
25 customers' customers or if the tools existed     10:09:43

Page 79

1  to do so.                              10:09:48
2      Q.   And we'll get to that in a        10:09:49
3  moment, but I just have a very specific          10:09:53
4  question that I was hoping that you could        10:09:55
5  answer.                                10:09:56
6         Now, you agreed with me that        10:09:57
7  distributors sell downstream to pharmacies       10:10:01
8  and clinics, correct?                    10:10:03
9      A.   That's correct.                 10:10:04
10     Q.   And at some point -- and I         10:10:05
11 understand your testimony that you became        10:10:06
12 aware that you had to, in your words, know       10:10:08
13 your customer, correct?                   10:10:10
14     A.   Know your customer is part of      10:10:11
15 the regulations.                        10:10:13
16     Q.   And then also you talked about     10:10:14
17 knowing your customer's customer as well,        10:10:16
18 correct?                               10:10:19
19     A.   Yes.                          10:10:19
20     Q.   And putting aside when you         10:10:19
21 became aware of that, I'm simply asking you:     10:10:22
22 Would you agree with me that one component of    10:10:24
23 an effective SOM program would be to identify    10:10:27
24 whether or not a downstream pharmacy or          10:10:31

Page 80

1  clinic is ordering excessive quantities of       10:10:33
2  controlled substances?                    10:10:36
3         MR. O'CONNOR:  Object to form.       10:10:36
4         THE WITNESS:  So, yes, that         10:10:38
5     could be one component.                10:10:41
6  QUESTIONS BY MR. KO:                    10:10:42
7      Q.   Okay.  Now, would you also         10:10:42
8  agree with me that an effective SOM program     10:10:49
9  would be able to identify whether or not that   10:10:53
10 downstream pharmacy or clinic was ordering       10:10:56
11 from multiple distributors?               10:10:58
12         MR. O'CONNOR:  Object to form.       10:10:59
13         THE WITNESS:  It could be one       10:11:00
14     component, yes.                       10:11:03
15 QUESTIONS BY MR. KO:                    10:11:04
16     Q.   Okay.  And in fact, that was       10:11:04
17 something that was important to Mallinckrodt    10:11:06
18 to try and determine at some point in the, I    10:11:08
19 believe, the 2010 or 2011 time period,          10:11:15
20 correct?                               10:11:19
21         MR. O'CONNOR:  Object to form.       10:11:19
22         THE WITNESS:  When we received      10:11:19
23     guidance from DEA that that was an       10:11:20
24     appropriate thing to monitor, yes.      10:11:22
25

Page 81

1  QUESTIONS BY MR. KO:                    10:11:23
2      Q.   Okay.  So in other words, if a     10:11:23
3  downstream pharmacy or clinic was ordering      10:11:25
4  the same oxy 15 manufactured by Mallinckrodt   10:11:26
5  from five different distributors, it would be   10:11:30
6  important to know that, correct?          10:11:32
7      A.   It could be one indicator --       10:11:34
8      Q.   Right.                         10:11:37
9      A.   -- precipitating further          10:11:37
10 review.                                10:11:40
11     Q.   And you would agree with me        10:11:40
12 that an effective SOM program would be able     10:11:41
13 to determine or identify whether or not that    10:11:44
14 downstream pharmacy or clinic was ordering      10:11:47
15 from multiple distributors, correct?       10:11:49
16         MR. O'CONNOR:  Object to form.       10:11:51
17         THE WITNESS:  Yes.  That's one      10:11:52
18     component of many, yes.                10:11:54
19 QUESTIONS BY MR. KO:                    10:11:55
20     Q.   Now, some of these factors we      10:12:07
21 were just discussing, is it fair to say that    10:12:09
22 you acquired this knowledge of -- strike        10:12:14
23 that.                                  10:12:19
24         Was there ever a time when you      10:12:19
25 were senior manager of controlled substance    10:12:28

Page 82

1  compliance where you became aware that          10:12:30
2  relying on a simple algorithm or numerical       10:12:38
3  formulation alone was insufficient for           10:12:41
4  purposes of complying with your duties under     10:12:43
5  the CSA?                                          10:12:45
6           MR. O'CONNOR:  Object to form.          10:12:45
7           THE WITNESS:  Yes.                       10:12:46
8  QUESTIONS BY MR. KO:                              10:12:46
9     Q.   Okay.  And approximately when            10:12:46
10 was that?                                         10:12:48
11    A.   It was a guidance letter from            10:12:51
12 DEA.                                              10:12:54
13    Q.   Okay.                                     10:12:54
14    A.   And it was 2006 or 2007.                 10:12:54
15    Q.   Okay.  So you would agree with           10:12:59
16 me then that an ineffective SOM program would     10:13:00
17 be one that just simply relies on numerical       10:13:07
18 formulas to try and understand orders that        10:13:11
19 are suspicious; is that fair to say?              10:13:14
20          MR. O'CONNOR:  Object to form.          10:13:17
21          THE WITNESS:  That's the                10:13:17
22    guidance that -- yes, from DEA.               10:13:18
23 QUESTIONS BY MR. KO:                              10:13:19
24    Q.   Okay.  Well, regardless of the           10:13:19
25 guidance that you received, I'm just simply       10:13:21

Page 83

1  asking you today, as you sit here in your         10:13:23
2  position as someone that is most                  10:13:25
3  knowledgeable about Mallinckrodt's SOM            10:13:28
4  program:  Would you agree with me that an         10:13:31
5  ineffective SOM program would be one that         10:13:34
6  simply relies on numerical formulas to            10:13:38
7  identify suspicious orders?                        10:13:40
8           MR. O'CONNOR:  Object to form.          10:13:41
9           THE WITNESS:  Yes.                       10:13:42
10 QUESTIONS BY MR. KO:                              10:13:42
11    Q.   Okay.  Now, you talked a moment          10:13:49
12 ago about how there was always -- as far as       10:13:51
13 you know, there was always an SOM program at      10:13:54
14 Mallinckrodt as far as -- as long as you          10:13:57
15 could recall.                                     10:14:01
16    A.   Yes.                                      10:14:01
17    Q.   Now, from my position, looking           10:14:01
18 at the documents, the first reference I see       10:14:05
19 to an SOM program existing at Mallinckrodt is     10:14:07
20 from 2003.                                         10:14:11
21         Is it your testimony that an             10:14:13
22 SOM program existed prior to that?               10:14:15
23    A.   Yes.                                      10:14:16
24    Q.   Okay.  And the program prior to          10:14:17
25 2003 consisted of, in your testimony, of both    10:14:21

Page 84

1  the algorithm and some of the other factors      10:14:24
2  that you were describing before?                 10:14:26
3     A.   Yes.                                      10:14:28
4     Q.   And turning to that algorithm,           10:14:28
5  what was your understanding of what that          10:14:31
6  algorithm consisted of?                           10:14:34
7     A.   I don't know the specific                10:14:36
8  multiplier, but it measured each customer        10:14:39
9  against their previous order history.            10:14:43
10    Q.   Okay.  And when you say a                10:14:48
11 "multiplier," what do you mean?                  10:14:54
12    A.   There was a formula that                 10:14:55
13 indicated -- a cause for additional             10:14:59
14 investigation would be if that order pattern    10:15:02
15 exceeded a certain formula, such 1.5 as a       10:15:07
16 multiplier.                                       10:15:10
17    Q.   And a 1.5 multiplier relative           10:15:11
18 to what?                                          10:15:14
19    A.   That customer's previous order          10:15:15
20 pattern.                                          10:15:18
21    Q.   Okay.  And I have seen some             10:15:18
22 references in the documents to a previous        10:15:20
23 order pattern consisting of anywhere from 7     10:15:22
24 to 18 months.                                     10:15:26
25         Does that comport with your             10:15:27

Page 85

1  general understanding?                            10:15:30
2           MR. O'CONNOR:  Object to form.          10:15:31
3           THE WITNESS:  I don't know.  I          10:15:31
4     know about the 18 months; I don't know       10:15:33
5     about the seven.                             10:15:34
6  QUESTIONS BY MR. KO:                              10:15:37
7     Q.   Okay.  But generally speaking,          10:15:37
8  what you mean when you say "multiplier" and     10:15:41
9  when you referenced 1.5, are you saying that    10:15:42
10 the algorithm in place before 2003 was          10:15:44
11 utilization of some multiplier relative to      10:15:50
12 the previous ordering history of a              10:15:52
13 Mallinckrodt customer?  Is that accurate?       10:15:55
14    A.   Yes.  Yes.                               10:15:57
15    Q.   Okay.  And the customers at the         10:15:57
16 time, of course, are wholesale distributors,    10:15:59
17 right?                                            10:16:01
18    A.   I can't -- we only sold to              10:16:02
19 other manufacturers from the St. Louis plant    10:16:08
20 manufacturing until we acquired our Hobart,     10:16:12
21 New York, facility, and I always forget what    10:16:16
22 year that was.  I'm sorry.                       10:16:18
23    Q.   Okay.  So prior to -- was that          10:16:19
24 generally 2004, 2005; do you know?              10:16:21
25    A.   I can't remember the year, I'm          10:16:24

Page 86

1   sorry.                              10:16:25
2      Q.   Okay.  That's all right.    10:16:25
3   That's helpful.                     10:16:26
4      So before acquiring the Hobart   10:16:27
5   facility, Mallinckrodt was only distributing  10:16:30
6   to other manufacturers?             10:16:32
7      A.   Yes, and some researchers, yes.  10:16:33
8      Q.   Okay.                       10:16:37
9      A.   But not wholesalers,        10:16:37
10  distributors.                       10:16:39
11     Q.   And these other manufacturers  10:16:39
12  included entities like Purdue?      10:16:42
13     A.   I don't know if Purdue was a  10:16:44
14  customer, but they were dosage pharm  10:16:45
15  manufacturers who chose to buy our bulk  10:16:48
16  narcotics.                          10:16:51
17     Q.   Right.  Okay.               10:16:52
18     So then -- thank you for         10:16:53
19  bringing up the bulk narcotics.     10:16:55
20     This order -- excuse me.  This   10:16:57
21  SOM program that you're describing, was there  10:17:03
22  an SOM program that existed both with respect  10:17:05
23  to Mallinckrodt's bulk business and its  10:17:08
24  dosage business at the time you became  10:17:14
25  involved in the DEA compliance group?  10:17:17

Page 87

1      A.   It always existed for the bulk  10:17:19
2   business, and it existed when we bought the  10:17:24
3   Hobart facility.  But I'm sorry, I can't  10:17:26
4   remember what year that was relative to when  10:17:29
5   I was in the DEA compliance group, but I  10:17:31
6   believe it was during my time in the DEA  10:17:34
7   compliance group, yes.              10:17:37
8      Q.   Okay.  And then I just want to  10:17:38
9   make sure the record is clear because we're  10:17:39
10  talking about the bulk business.  But when  10:17:41
11  did you became {sic} aware of an algorithm or  10:17:43
12  a suspicious order monitoring program that  10:17:45
13  applied to the dosage side of Mallinckrodt's  10:17:49
14  business?                           10:17:55
15     MR. O'CONNOR:  Object to form.   10:17:55
16     THE WITNESS:  When we began      10:17:55
17     participating in the dosage generic  10:17:58
18     business.                        10:18:00
19  QUESTIONS BY MR. KO:                10:18:00
20     Q.   And that was after you acquired  10:18:01
21  the Hobart facility?                10:18:02
22     A.   Yes.                        10:18:04
23     Q.   Okay.  So prior to that time,  10:18:04
24  Mallinckrodt did not have -- because they  10:18:06
25  weren't participating.  But they did not have  10:18:09

Page 88

1   a SOM program for anything other than the  10:18:11
2   bulk side of the business; is that accurate?  10:18:14
3      MR. O'CONNOR:  Object to form.   10:18:16
4      THE WITNESS:  Yes.               10:18:17
5   QUESTIONS BY MR. KO:                10:18:19
6      Q.   Okay.                       10:18:19
7      MR. O'CONNOR:  Counsel, we've    10:18:30
8      been going a little more than an hour.  10:18:31
9      Should we take a break?          10:18:35
10     MR. KO:  Sure.                   10:18:36
11     VIDEOGRAPHER:  We are going off  10:18:36
12     the record at 10:18 a.m.         10:18:38
13     (Off the record at 10:18 a.m.)   10:18:39
14     VIDEOGRAPHER:  We are back on     10:35:34
15     the record at 10:35 a.m.         10:35:43
16  QUESTIONS BY MR. KO:                10:35:44
17     Q.   Welcome back from the break,  10:35:46
18  Ms. Harper.                         10:35:49
19     A.   Thank you.                  10:35:49
20     Q.   Now, at some point in time when  10:35:50
21  you were involved in the controlled substance  10:35:52
22  compliance group, did you become aware of  10:35:54
23  diversion issues in the state of Florida in  10:35:58
24  particular?                         10:36:01
25     MR. O'CONNOR:  Object to form.   10:36:02

Page 89

1      THE WITNESS:  Yes.               10:36:02
2   QUESTIONS BY MR. KO:                10:36:03
3      Q.   Okay.  And approximately when  10:36:03
4   was that?                           10:36:04
5      A.   I don't know the exact year.  10:36:04
6   I'm sorry.                          10:36:10
7      Q.   Okay.  And were you aware of  10:36:10
8   the problems that existed in Florida through,  10:36:13
9   among other things, communications with the  10:36:15
10  DEA?                                10:36:17
11     MR. O'CONNOR:  Object to form.   10:36:18
12     THE WITNESS:  Yes.               10:36:18
13  QUESTIONS BY MR. KO:                10:36:21
14     Q.   Okay.  And is it fair to say  10:36:21
15  that the DEA was focused on the distribution  10:36:24
16  of Mallinckrodt oxy -- oxycodone   10:36:28
17  15 milligrams and oxycodone 30 milligrams?  10:36:32
18     MR. O'CONNOR:  Object to form.   10:36:35
19     THE WITNESS:  Yes.               10:36:36
20  QUESTIONS BY MR. KO:                10:36:36
21     Q.   Okay.  And do you mind if I   10:36:37
22  call that, just for shorthand, oxy 15 and  10:36:40
23  oxy 30s?                            10:36:47
24     A.   I don't mind.               10:36:48
25     Q.   So you were aware at some point  10:36:49

Page 90

1  in time when you were involved with the          10:36:52
2  controlled substance compliance group that        10:36:53
3  Mallinckrodt was manufacturing a substantial     10:36:57
4  amount of oxy 15s and 30s that were ending up    10:36:59
5  in Florida; is that accurate?                     10:37:03
6          MR. O'CONNOR: Objection to               10:37:05
7      form.                                          10:37:06
8          THE WITNESS: So I don't know              10:37:06
9      our market share over time, and               10:37:07
10     substantial is -- I don't have enough         10:37:08
11     information relative to other                  10:37:10
12     suppliers to answer that question.            10:37:11
13     I'm sorry.                                     10:37:13
14  QUESTIONS BY MR. KO:                             10:37:13
15     Q.    Sure.                                    10:37:13
16          But you knew that -- you became         10:37:13
17  aware at some point that Mallinckrodt was        10:37:16
18  sending hundreds of millions of pills to the     10:37:19
19  state of Florida, and in particular oxy 15s      10:37:22
20  and oxy 30s; is that fair to say?                10:37:25
21     A.    So we sell to wholesalers and          10:37:28
22  distributors who subsequently sell to            10:37:31
23  downstream registrants. Some of those are in    10:37:34
24  Florida, yes, but I believe we only have one    10:37:36
25  distributor actually located within the state   10:37:38

Page 91

1  of Florida.                                        10:37:40
2      Q.    Yeah.                                     10:37:40
3          And setting aside who you               10:37:41
4  directly sold to, at some point in time you       10:37:44
5  became acutely aware of the amount of oxy 15s    10:37:47
6  and 30s that were ending up in Florida,          10:37:51
7  regardless of who you initially sold them to;    10:37:55
8  is that fair to say?                              10:37:58
9      A.    Yes.                                     10:37:58
10     Q.    Okay. And you also became             10:37:59
11  aware that Mallinckrodt-manufactured generic    10:38:03
12  opioids, including oxy 15s and 30s, were         10:38:07
13  being widely abused and diverted in Florida;    10:38:10
14  is that fair to say?                              10:38:16
15          MR. O'CONNOR: Objection to              10:38:16
16     form.                                          10:38:17
17          THE WITNESS: Yes.                        10:38:17
18  QUESTIONS BY MR. KO:                             10:38:17
19     Q.    Okay. And are you also               10:38:18
20  familiar with the term "the Oxy Express"?        10:38:20
21     A.    Yes.                                     10:38:24
22     Q.    In fact, you gave a                    10:38:24
23  presentation, I believe, at one point in time   10:38:25
24  about the Oxy Express; is that accurate?         10:38:26
25          MR. O'CONNOR: Object to form.           10:38:29

Page 92

1          THE WITNESS: Yes.                        10:38:30
2  QUESTIONS BY MR. KO:                             10:38:30
3      Q.    And the Oxy Express is also           10:38:30
4  shorthand for the migration of pills from        10:38:32
5  Florida up north through the I-75 corridor;      10:38:38
6  is that fair to say?                              10:38:42
7      A.    I'm not certain of the exact          10:38:42
8  road, but, yes, yes, in general.                 10:38:44
9      Q.    Okay. But generally speaking,         10:38:45
10  you agree with me that the Oxy Express refers   10:38:47
11  to the migration of pills outside of the        10:38:50
12  state of Florida?                                10:38:51
13     A.    Yes.                                     10:38:52
14     Q.    Okay. And these pill migrated        10:38:52
15  to other states, including, for example,         10:38:55
16  Ohio; is that correct?                           10:38:58
17          MR. O'CONNOR: Objection to              10:38:59
18     form.                                          10:38:59
19          THE WITNESS: Yes.                        10:38:59
20  QUESTIONS BY MR. KO:                             10:39:00
21     Q.    Okay. Have you ever heard the        10:39:01
22  term "blue highway"?                             10:39:04
23     A.    No.                                      10:39:06
24     Q.    Okay. You understood that            10:39:07
25  Mallinckrodt oxy 15s and 30s were blue,         10:39:09

Page 93

1  correct?                                          10:39:13
2      A.    Oh, yes. Yes.                          10:39:13
3      Q.    Okay. And you understood that        10:39:14
4  a distinct feature of these oxy 15s and 30s      10:39:15
5  and -- were -- was the fact that they were      10:39:20
6  blue, and they were one of the only              10:39:22
7  prescription opioids on the market that were    10:39:24
8  that color.                                       10:39:25
9          MR. O'CONNOR: Objection to              10:39:26
10     form.                                          10:39:27
11  QUESTIONS BY MR. KO:                             10:39:27
12     Q.    Do you understand that to be         10:39:28
13  the case?                                         10:39:29
14     A.    So I know that oxy 30s are           10:39:29
15  blue. I'm not certain if oxy 15s are blue or    10:39:32
16  not, sir, I'm sorry. They may be a different   10:39:35
17  color.                                            10:39:38
18     Q.    Okay. So with respect to at          10:39:38
19  least oxy 30 -- and again, we're talking        10:39:39
20  about the IR oxy 30s.                            10:39:41
21     A.    Yes.                                     10:39:43
22     Q.    Those pills were blue, and you       10:39:44
23  understood that those pills were migrating      10:39:47
24  north away from Florida; is that fair to say?   10:39:49
25          MR. O'CONNOR: Objection to              10:39:51

Page 94

1    form.                          10:39:51
2         THE WITNESS: Yes.              10:39:52
3    QUESTIONS BY MR. KO:              10:39:52
4         Q.    Okay. We'll get to this a      10:39:53
5    little bit later, but about a year and a half  10:40:02
6    ago you obviously became aware of a      10:40:06
7    settlement between Mallinckrodt and DOJ; is  10:40:07
8    that correct?                    10:40:11
9         A.    Yes.                 10:40:11
10        Q.    And the settlement was with     10:40:12
11   respect to Mallinc -- among other things,    10:40:13
12   Mallinckrodt's conduct with respect to      10:40:16
13   suspicious order monitoring of controlled    10:40:21
14   substances, correct?               10:40:23
15        A.    Yes.                 10:40:24
16        Q.    Okay. And the settlement       10:40:27
17   resulted in a $35 million payment by your    10:40:32
18   employer to the government, correct?       10:40:34
19        A.    Yes. And given that the       10:40:36
20        Q.    Okay. And given that the       10:40:38
21   settlement revolved largely around       10:40:40
22   Mallinckrodt's suspicious order monitoring   10:40:44
23   activities -- I mean, that was something that  10:40:48
24   was your responsibility during the relevant  10:40:52
25   time period covered under the settlement; is  10:40:55

Page 95

1    that correct?                    10:40:57
2         MR. O'CONNOR: Objection to        10:40:57
3    form.                          10:40:57
4         THE WITNESS: Yes.              10:40:58
5    QUESTIONS BY MR. KO:              10:41:00
6         Q.    Okay. And the relevant time     10:41:00
7    period of the settlement, I believe, or the   10:41:02
8    covered conduct as described in the        10:41:04
9    settlement -- actually, strike that.       10:41:07
10        Are you familiar with the terms     10:41:09
11   of the settlement?                 10:41:10
12        A.    Yes.                 10:41:10
13        Q.    You reviewed them?          10:41:11
14        A.    Yes.                 10:41:12
15        Q.    Did you play a role in         10:41:13
16   negotiating any of the terms?           10:41:15
17        A.    No.                  10:41:17
18        Q.    Okay. That was presumably done  10:41:18
19   by counsel?                      10:41:21
20        A.    Yes.                 10:41:21
21        Q.    Both in-house and outside      10:41:22
22   counsel?                        10:41:24
23        A.    Yes.                 10:41:24
24        Q.    Okay. Were you consulted at    10:41:25
25   all in connection with the settlement?      10:41:27

Page 96

1         A.    Yes.                 10:41:28
2         Q.    Okay. And I understand the     10:41:29
3    settlement includes a period described     10:41:33
4    "covered conduct."                 10:41:37
5         Do you recall that provision of    10:41:37
6    the settlement agreement?             10:41:39
7         A.    Yes.                 10:41:40
8         Q.    And the time period for that   10:41:40
9    covered conduct was from January 1, 2008, to  10:41:42
10   January 1, 2012.                  10:41:47
11        Is that consistent with your      10:41:48
12   understanding?                    10:41:49
13        A.    I don't remember the specific  10:41:50
14   times of the covered conduct, but --        10:41:52
15        Q.    Okay.                 10:41:52
16        A.    I don't. I'm sorry.         10:41:54
17        Q.    All right. That's fine. We     10:41:56
18   can get to that later.               10:41:56
19        A.    Okay.                10:41:57
20        Q.    But in general terms, there was  10:41:57
21   a period of time in which the government     10:41:59
22   alleged that Mallinckrodt had a deficient SOM  10:42:01
23   program; is that fair to say?           10:42:04
24        A.    I don't know that the term     10:42:06
25   "deficient" was used.               10:42:07

Page 97

1         Q.    Okay.                 10:42:08
2         A.    But, yes, it was mentioned in   10:42:09
3    the memorandum of agreement.           10:42:10
4         Q.    Yeah.                10:42:13
5         That Mallinckrodt's SOM -- the     10:42:14
6    settlement agreement indicated that       10:42:16
7    Mallinckrodt's SOM program did not comport   10:42:19
8    with the DEA guidelines set forth in a couple  10:42:22
9    letters sent by the DEA; is that correct?    10:42:27
10        MR. O'CONNOR: Objection to        10:42:29
11   form.                          10:42:29
12        THE WITNESS: I don't remember      10:42:29
13   the specifics of the language. I'm        10:42:30
14   sorry.                         10:42:33
15   QUESTIONS BY MR. KO:              10:42:33
16        Q.    Okay. That's fine.          10:42:33
17        Was this settlement ever          10:42:34
18   discussed in any performance review that you  10:42:37
19   had recently?                    10:42:40
20        A.    No.                  10:42:40
21        Q.    Okay. Was there ever any      10:42:42
22   discussion of you losing your job as a result  10:42:45
23   of the settlement?                 10:42:46
24        A.    I offered to quit.          10:42:47
25        Q.    You offered to quit.         10:42:48

Page 98

1    Why was that?    10:42:49
2    A.    So that -- so that perhaps if    10:42:50
3  the company chose to bring someone in my    10:42:55
4  place, that I would gladly leave.    10:42:58
5    Q.    Okay.  And you offered to quit    10:43:01
6  because it was your responsibility during the    10:43:03
7  time of the covered conduct and the time    10:43:06
8  period in the settlement to monitor and    10:43:08
9  revise and design Mallinckrodt's suspicious    10:43:10
10  order monitoring system, correct?    10:43:14
11    MR. O'CONNOR:  Object to form.    10:43:15
12    THE WITNESS:  Yes.  It happened    10:43:15
13  on my watch.    10:43:16
14  QUESTIONS BY MR. KO:    10:43:17
15    Q.    By the way, are you aware of    10:43:23
16  any -- of whether or not the company    10:43:23
17  maintained a personnel file for you?    10:43:27
18    A.    Yes.    10:43:28
19    Q.    Okay.    10:43:31
20    A.    Yes.    10:43:31
21    Q.    And I take it you had annual    10:43:32
22  reviews?    10:43:37
23    A.    Yes.    10:43:37
24    Q.    Okay.  And did you receive    10:43:38
25  copies of these annual reviews to the extent    10:43:39

Page 99

1  they were in writing?    10:43:41
2    A.    Yes, I suppose.  Yes.    10:43:42
3    Q.    Okay.  Do you recall collecting    10:43:48
4  them, keeping them, storing them?    10:43:54
5    A.    No.    10:43:56
6    Q.    Okay.  Do you have any    10:43:56
7  documentation that you keep from the company    10:44:02
8  regarding your personnel file in any fashion?    10:44:05
9    A.    I do not.    10:44:09
10    Q.    Okay.  Everything, you believe,    10:44:10
11  is held by the company with respect to your    10:44:12
12  employment history and your personnel file;    10:44:15
13  is that fair to say?    10:44:17
14    A.    Yes.    10:44:17
15    Q.    Okay.  Earlier this morning we    10:44:18
16  were talking about your understanding of    10:44:30
17  Mallinckrodt's SOM program when you joined    10:44:33
18  that -- the CSC group, correct?    10:44:37
19    A.    Uh-huh.    10:44:39
20    Q.    And by CSC, I'm referring to    10:44:39
21  the controlled substance compliance group.    10:44:41
22  Is that fair to say?    10:44:43
23    A.    Yes.    10:44:44
24    Q.    Or fair to use for purposes of    10:44:44
25  this deposition today?    10:44:45

Page 100

1    A.    Yes.    10:44:46
2    Q.    Okay.  And regarding    10:44:47
3  Mallinckrodt's SOM program, you mentioned the    10:44:49
4  role of national account managers.    10:44:53
5    Do you recall that?    10:44:56
6    A.    I do.    10:44:57
7    Q.    And also that customer service    10:44:58
8  representatives were involved?    10:45:00
9    A.    Yes, that's correct.    10:45:02
10    Q.    And I believe you testified    10:45:03
11  that they were necessary because they were    10:45:05
12  your eyes and ears on the ground -- or eyes    10:45:07
13  and ears to your customers and the customers'    10:45:09
14  customers and also the boots on the ground.    10:45:13
15    Is that an accurate --    10:45:15
16    MR. O'CONNOR:  Objection to    10:45:17
17  form.    10:45:17
18  QUESTIONS BY MR. KO:    10:45:18
19    Q.    -- statement?    10:45:18
20    A.    So they were the eyes and ears    10:45:19
21  to our customers, but I do not necessarily    10:45:21
22  know that they were the eyes and ears to our    10:45:23
23  customers' customers.    10:45:28
24    Q.    Got it.    10:45:29
25    So it's accurate to say that    10:45:29

Page 101

1  you had NAMs, the national account managers,    10:45:32
2  and the CSRs, the customer service    10:45:34
3  representatives, involved because they were    10:45:36
4  your eyes and ears to your customers,    10:45:37
5  correct?    10:45:40
6    MR. O'CONNOR:  Object to form.    10:45:40
7    THE WITNESS:  Yes.  Yes.  Yes.    10:45:40
8  QUESTIONS BY MR. KO:    10:45:41
9    Q.    Okay.  And you -- is it fair to    10:45:42
10  say that you then relied on these NAMs and    10:45:47
11  CSRs to identify and assist with the    10:45:49
12  detection of suspicious orders?    10:45:53
13    MR. O'CONNOR:  Object to form.    10:45:54
14    THE WITNESS:  To assist, yes.    10:45:56
15    To bring things to our attention for    10:46:01
16    further investigation, yes.    10:46:03
17  QUESTIONS BY MR. KO:    10:46:05
18    Q.    And you said earlier that you    10:46:05
19  had a team, and they were part of it, so they    10:46:06
20  were -- they were part of the team in    10:46:08
21  which -- they were part of the SOM team,    10:46:12
22  correct?    10:46:14
23    MR. O'CONNOR:  Object to form.    10:46:15
24    THE WITNESS:  They were part of    10:46:15
25    the SOM team at the time that we were    10:46:18

Page 102

1    enhancing the program but not as an          10:46:20
2    ongoing, current-day member of the          10:46:23
3    team.                                        10:46:25
4    QUESTIONS BY MR. KO:                         10:46:25
5        Q.   Got it.                             10:46:27
6            And when did that occur, that        10:46:27
7    they were...                                 10:46:30
8            Well, when you said they were        10:46:31
9    part of the SOM team at that time, what time 10:46:39
10   period are you talking about?                10:46:41
11       A.   So we went through several          10:46:42
12   projects of enhancing the suspicious order   10:46:50
13   monitoring program, and one of the components 10:46:53
14   was a customer checklist that each customer  10:46:55
15   was to fill out once per year.               10:46:58
16           So the NAMs and the customer         10:47:01
17   service reps were important contributors to  10:47:04
18   that effort because they knew more about the 10:47:06
19   customer side of the house, but as we sit    10:47:10
20   here today, they are not part of the         10:47:13
21   suspicious order monitoring team.            10:47:15
22       Q.   Got it. Thank you for the           10:47:16
23   clarification.                               10:47:17
24           So at some point in time when        10:47:17
25   you were part of the CSC team, the           10:47:24

Page 103

1    involvement of the NAMs and the customer     10:47:27
2    service reps in the day-to-day monitoring of 10:47:29
3    the customers was removed off their plate; is 10:47:34
4    that fair to say?                            10:47:38
5            MR. O'CONNOR: Object to form.        10:47:38
6            THE WITNESS: So I would have         10:47:41
7        never called the NAMs a day-to-day      10:47:41
8        monitoring. The customer service        10:47:44
9        reps, yes, as they reviewed orders      10:47:46
10       that came in, that has not changed.     10:47:48
11       So I'd like to clarify that point.      10:47:49
12           But when we speak of the            10:47:51
13       suspicious order monitoring team, the   10:47:53
14       commercial -- neither the commercial    10:47:56
15       group nor customer service is           10:47:57
16       currently on the team.                  10:47:59
17   QUESTIONS BY MR. KO:                         10:48:00
18       Q.   Okay. So when they were part       10:48:00
19   of the team, the NAMs and the CSRs assisted  10:48:02
20   in rooting out potential diversion of        10:48:06
21   Mallinckrodt controlled substances; is that  10:48:10
22   accurate?                                    10:48:12
23           MR. O'CONNOR: Objection.            10:48:12
24           THE WITNESS: So they assisted       10:48:13
25       in bringing things to our attention     10:48:15

Page 104

1    for additional investigation.               10:48:17
2    QUESTIONS BY MR. KO:                         10:48:17
3        Q.   Okay.                               10:48:19
4        A.   Not necessarily conclusion         10:48:19
5    diversion.                                   10:48:21
6        Q.   Okay. That's helpful.              10:48:22
7            And with regard to the SOM          10:48:24
8    program, the NAMs -- so then it's fair to say 10:48:26
9    that the NAMs' and the CSRs' job was to alert 10:48:28
10   you to -- alert you to potential diversion;  10:48:32
11   is that accurate?                            10:48:34
12       A.   Yes, I believe the structure       10:48:35
13   for customer service was they would escalate 10:48:36
14   to their manager first, who would then, if   10:48:39
15   appropriate, come to the controlled          10:48:41
16   substances compliance group with that        10:48:43
17   concern.                                     10:48:44
18       Q.   Okay. So if a -- if an             10:48:45
19   individual who was a national account manager 10:48:48
20   or customer service representative testified 10:48:50
21   that she or he was not involved in           10:48:54
22   identifying suspicious orders, that would not 10:48:57
23   be accurate, correct?                        10:48:59
24           MR. O'CONNOR: Objection to          10:49:00
25       form.                                    10:49:01

Page 105

1            THE WITNESS: It would not be        10:49:01
2        accurate.                               10:49:08
3    QUESTIONS BY MR. KO:                         10:49:15
4        Q.   Okay. Now, throughout the time     10:49:15
5    you were involved with the CSC and in        10:49:18
6    connection with your duties to revise the SOM 10:49:20
7    program, did you ever consult any third      10:49:25
8    parties or consultants to assist you in      10:49:28
9    implementing and maintaining an SOM program? 10:49:33
10       A.   Yes.                                10:49:36
11       Q.   Okay. And which third parties      10:49:37
12   or vendors would those be?                   10:49:38
13       A.   The company is Drug and            10:49:39
14   Chemical Advisory Group. I'm not certain if  10:49:47
15   they still exist, but that was the firm at   10:49:48
16   the time. And that group was made up of      10:49:55
17   former DEA executives.                       10:49:58
18       Q.   Okay. Including Frank              10:49:59
19   Sapienza?                                    10:50:02
20       A.   Sapienza, yes, sir.                10:50:02
21       Q.   Other than the drug and           10:50:04
22   chemical group, anyone else?                 10:50:05
23       A.   Yes.                                10:50:06
24       Q.   Who or which entities?            10:50:06
25       A.   A gentleman, Howard Davis. He     10:50:09

Page 106

1    was retired DEA diversion program manager.    10:50:13
2        Q.    Okay.  Other than the drug and    10:50:20
3    chemical group and Mr. Davis, did you retain    10:50:21
4    any other entities to assist in the    10:50:25
5    implementation of Mallinckrodt's SOM program?    10:50:28
6        A.    Is there a specific time frame    10:50:30
7    to which you refer?    10:50:34
8        Q.    During the time period in which    10:50:35
9    you were senior manager of the controlled    10:50:37
10   substance compliance group.    10:50:40
11       A.    Yes.    10:50:41
12       Q.    Okay.  And who would -- who    10:50:44
13   would that individual be or which entities    10:50:45
14   would that be?    10:50:47
15       A.    So I get -- I get confused    10:50:48
16   because we did not retain the consulting    10:50:50
17   group for this purpose.  They were retained    10:50:55
18   through outside counsel, so Mallinckrodt did    10:50:58
19   not retain them.    10:51:01
20       Q.    I see.    10:51:02
21           So outside counsel, do you mean    10:51:03
22   Ropes & Gray?    10:51:05
23       A.    Yes.    10:51:05
24       Q.    Okay.  And which third-party    10:51:06
25   consultant or vendor are you referring to?    10:51:11

Page 107

1        A.    They've changed names    10:51:12
2    throughout the years.  It was at one time    10:51:14
3    called Buzzeo Consulting.  Their named    10:51:16
4    changed to IQVIA, Quintiles IMS, and now    10:51:20
5    they're known only at IMS.    10:51:27
6        Q.    And my understanding of IMS    10:51:31
7    is -- and IQVIA is that it's a database that    10:51:32
8    tracks detailed patient-level information.    10:51:36
9    So I just want to make sure I understand what    10:51:39
10   you're referring to in terms of their    10:51:41
11   retention.    10:51:44
12           Is it your testimony that you    10:51:45
13   believe that they actually testified as    10:51:47
14   consultants for the company, or did you    10:51:51
15   simply acquire data from them?    10:51:53
16           MR. O'CONNOR:  Objection to    10:51:55
17   form.    10:51:56
18           THE WITNESS:  We did not    10:51:56
19   acquire data from them.  The company    10:51:59
20   may have in some respect, but the old    10:52:01
21   Buzzeo group became a part of the    10:52:04
22   IQVIA IMS organization, so they    10:52:06
23   were -- primarily we dealt with    10:52:13
24   another gentleman who was a former    10:52:15
25   official at DEA.    10:52:18

Page 108

1    QUESTIONS BY MR. KO:    10:52:19
2        Q.    Okay.  Other than the Buzzeo    10:52:19
3    group, the drug and chemical group and    10:52:25
4    Mr. Howard Davis, do you recall any other    10:52:27
5    entities or individuals that Mallinckrodt    10:52:29
6    retained for purposes of implementing its SOM    10:52:31
7    program at the time you were senior manager?    10:52:34
8        A.    Yes.    10:52:36
9        Q.    Okay.  Who else?    10:52:37
10       A.    So there's -- there is a lady    10:52:39
11   who was a former employee.  Her name is    10:52:41
12   Jennifer, but she goes by Jen, Buist,    10:52:45
13   B-u-i-s-t.    10:52:51
14       Q.    And if memory serves me    10:52:51
15   correct, Ms. -- or Jennifer was retained    10:52:55
16   sometime after 2012.    10:52:58
17           Is that consistent with your    10:53:02
18   understanding?    10:53:02
19       A.    Yes.    10:53:02
20       Q.    Okay.  In other words, she    10:53:06
21   wasn't retained -- or she wasn't part of the    10:53:08
22   SOM team in the 2008 to 2012 time period, was    10:53:10
23   she?    10:53:12
24       A.    No.    10:53:13
25           (Mallinckrodt-Harper Exhibit 2    10:53:13

Page 109

1    marked for identification.)    10:53:13
2    QUESTIONS BY MR. KO:    10:53:13
3        Q.    Okay.  Why don't we turn to a    10:53:13
4    new exhibit.  This will be marked as Harper    10:53:22
5    Exhibit 2.    10:53:26
6           And for the record, Harper    10:53:39
7    Exhibit 2 is MNK-T1_0000275504.    10:53:41
8           And, Ms. Harper, I just want to    10:53:54
9    direct you to some pages on this document.    10:53:56
10   And we can get to -- well, let's take a step    10:54:04
11   back.    10:54:08
12           This appears to be an e-mail    10:54:08
13   dated February 23, 2009, from you to Eileen    10:54:11
14   Spaulding and Mary Lewis; is that correct?    10:54:15
15       A.    Yes.    10:54:18
16       Q.    And it's attaching a    10:54:18
17   presentation you're making regarding the    10:54:20
18   controlled substance compliance group?    10:54:22
19       A.    Yes.    10:54:24
20       Q.    Okay.  And I have seen a lot of    10:54:24
21   these presentations, and I believe that you    10:54:28
22   have given some of these presentations, so    10:54:30
23   I'm assuming they look familiar to you, but    10:54:33
24   does this presentation that you see attached    10:54:35
25   to this e-mail -- do you recall this    10:54:36

Page 110

1  particular presentation?                    10:54:40
2       MR. O'CONNOR:  Objection to        10:54:41
3  form.                                        10:54:42
4       THE WITNESS:  Not this one         10:54:43
5  specifically, but as I read it, I'm          10:54:44
6  familiar -- I'm refamiliarizing              10:54:46
7  myself.                                      10:54:49
8  QUESTIONS BY MR. KO:                         10:54:49
9       Q.   Sure.  Do you recall giving   10:54:49
10 presentations to other people or groups at   10:54:52
11 Mallinckrodt regarding the controlled        10:54:55
12 substance compliance roles and               10:54:56
13 responsibilities during the 2008 to 2017 time 10:54:58
14 period?                                      10:55:03
15      A.   Yes.                          10:55:03
16      Q.   Okay.  And this was one of    10:55:03
17 those presentations?                         10:55:06
18      A.   Yes.                          10:55:06
19      Q.   Turning to page 2, which you're 10:55:07
20 on --                                        10:55:13
21      A.   Okay.                         10:55:13
22      Q.   -- of the deck, you see that  10:55:14
23 the controlled substance compliance group was 10:55:15
24 established in August 2008.                  10:55:16
25      Do you see that?                    10:55:18

Page 111

1       A.   I see that.                   10:55:18
2       Q.   Okay.  And that the name was  10:55:19
3  changed from DEA compliance to the CSC,      10:55:21
4  correct?                                     10:55:29
5       A.   Yes.  Yes.                     10:55:29
6       Q.   Okay.  And just to help you   10:55:29
7  along, the portion I was referencing just a  10:55:35
8  moment ago was right there.                  10:55:43
9       And so the CSC group of which      10:55:44
10 you were senior manager was established in    10:55:47
11 August 2008, according to this presentation,  10:55:49
12 correct?                                     10:55:51
13      A.   Yes, according to the         10:55:52
14 presentation.                                10:55:54
15      Q.   And is that consistent with   10:55:54
16 your recollection?                           10:55:57
17      A.   I'm so uncertain of the years 10:55:58
18 the different events happened.  I know this   10:56:01
19 happened.  I see that the presentation reads  10:56:03
20 that way, but if it conflicts with a date     10:56:05
21 that I previously provided, I apologize.      10:56:08
22      Q.   Sure.  No need to apologize.  10:56:12
23 This isn't necessarily a memory test.        10:56:15
24      A.   Okay.                         10:56:17
25      Q.   But I'm just curious -- well, I 10:56:18

Page 112

1  want you to confirm that at least as         10:56:19
2  reflected on this deck, the CSC group was    10:56:22
3  established in August of 2008, correct?      10:56:27
4       MR. O'CONNOR:  Objection to        10:56:29
5  form.                                        10:56:31
6       THE WITNESS:  Yes.                  10:56:32
7  QUESTIONS BY MR. KO:                         10:56:32
8       Q.   And you were senior manager of 10:56:32
9  that group at this time, correct?            10:56:33
10      A.   I was manager.                 10:56:34
11      Q.   You were manager.  Okay.      10:56:40
12      And when -- and so at some         10:56:42
13 point you became senior manager?             10:56:44
14      A.   Yes.                          10:56:45
15      Q.   Okay.  And as we discussed    10:56:46
16 earlier, you don't recall exactly when?      10:56:47
17      A.   No, I'm sorry.                 10:56:49
18      Q.   Okay.  Now, based on this     10:56:51
19 document, is it accurate to say that prior to 10:56:56
20 August 2008 there was no such group at       10:56:58
21 Mallinckrodt called the controlled substance 10:57:00
22 compliance group?  Is that correct?          10:57:02
23      A.   Correct.                       10:57:04
24      Q.   Okay.  I want to turn to      10:57:04
25 page 11 of this document, of the deck in     10:57:12

Page 113

1  particular.  And there is a reference made to 10:57:17
2  the controlled substance compliance team.    10:57:20
3       Do you see that?                    10:57:21
4       A.   Yes, I do.                     10:57:22
5       Q.   And it indicates here that you 10:57:24
6  are the manager, as we just discussed, of    10:57:26
7  controlled substance compliance, correct?    10:57:28
8       A.   Correct.                       10:57:31
9       Q.   And this comprises the entire 10:57:31
10 controlled substance compliance team?        10:57:34
11      A.   Yes.                          10:57:35
12      Q.   And it looks like you reported 10:57:37
13 to Ms. JoAnne Levy?                          10:57:41
14      A.   Levy, yes, sir.               10:57:43
15      Q.   Levy, thank you.              10:57:44
16      And what was her role?             10:57:45
17      A.   She was the vice president of 10:57:47
18 the logistics group.                         10:57:50
19      Q.   And did she have any day-to-day 10:57:51
20 involvement with the controlled substance    10:57:54
21 compliance team?                             10:57:55
22      A.   Yes.                          10:57:56
23      Q.   Okay.  And what did that      10:57:56
24 day-to-day involvement consist of?           10:57:57
25      A.   As our vice president, she was 10:57:59

Page 114

1  part of the team that enhanced the suspicious    10:58:03
2  order monitoring program.    10:58:09
3      Q.    Okay.    10:58:09
4      A.    We also deferred to her on    10:58:09
5  certain matters of, pardon me, on quota and    10:58:14
6  other duties related to the DEA compliance    10:58:19
7  group.    10:58:22
8      Q.    Okay.  Now, with respect to the    10:58:22
9  revisions and implementation of    10:58:30
10  Mallinckrodt's SOM program in particular, is    10:58:31
11  it fair to say that you were the team leader    10:58:36
12  of that particular group?    10:58:38
13      A.    No.    10:58:41
14      Q.    It's not.    10:58:41
15          You don't believe you were the    10:58:42
16  team leader of -- during -- well, let me take    10:58:43
17  that back.    10:58:47
18          So from the time period of    10:58:47
19  August 2008 to 2012, were you the team leader    10:58:50
20  of Mallinckrodt's SOM program?    10:58:57
21      A.    We did not have a designated    10:59:00
22  team leader.    10:59:02
23      Q.    Okay.    10:59:03
24      A.    And we would have deferred to    10:59:04
25  the most senior official on the team, but we    10:59:06

Page 115

1  did not have a designated leader.    10:59:10
2      Q.    And when you say "defer to the    10:59:12
3  most senior official," are you referring to    10:59:13
4  Ms. Levy?    10:59:15
5      A.    At that time, yes.    10:59:16
6      Q.    Okay.  There has been -- again,    10:59:18
7  this isn't a memory test.    10:59:21
8      A.    Okay.    10:59:23
9      Q.    So if your recollection is    10:59:23
10  different, I totally understand.    10:59:25
11          But I have seen reference to    10:59:27
12  documents that suggest that you were the team    10:59:28
13  leader of the SOM program.    10:59:30
14          Do you -- you dispute that?    10:59:32
15          MR. O'CONNOR:  Objection to    10:59:33
16      form.    10:59:34
17          THE WITNESS:  I don't dispute    10:59:34
18      that.    10:59:36
19  QUESTIONS BY MR. KO:    10:59:36
20      Q.    Okay.  You don't dispute that.    10:59:36
21      A.    I may have been referenced as    10:59:38
22  the team leader, but I didn't -- I was a key    10:59:40
23  contributor, but I didn't perceive myself as    10:59:43
24  the leader.    10:59:46
25      Q.    All right.  But as we discussed    10:59:46

Page 116

1  before, it's highly unlikely that anyone else    10:59:47
2  at Mallinckrodt knew more about    10:59:49
3  Mallinckrodt's SOM program other than you,    10:59:52
4  correct?    10:59:54
5      A.    Correct.    10:59:54
6      Q.    Okay.  And in addition to you    10:59:55
7  having involvement in the SOM program at    11:00:02
8  Mallinckrodt, Ms. Spaulding also played a key    11:00:03
9  role; would you agree with that?    11:00:06
10          MR. O'CONNOR:  Objection to    11:00:08
11      form.    11:00:10
12          THE WITNESS:  Yes.    11:00:10
13  QUESTIONS BY MR. KO:    11:00:10
14      Q.    And she's based out of the    11:00:10
15  Hobart office?    11:00:12
16      A.    Yes.    11:00:13
17      Q.    And by the way, you were based    11:00:13
18  here in St. Louis, correct?    11:00:16
19      A.    Yes.    11:00:17
20      Q.    And were you based not in the    11:00:17
21  Hazelwood office but a different office?    11:00:20
22      A.    I've had three different    11:00:23
23  offices in the St. Louis area.    11:00:25
24      Q.    Okay.  During the 2008 to 2012    11:00:26
25  time period, where were you located?    11:00:30

Page 117

1      A.    I believe I was at Hazelwood.    11:00:32
2      Q.    And where was Ms. Levy?    11:00:37
3      A.    At Hazelwood.    11:00:42
4      Q.    Okay.  I want to turn to    11:00:43
5  page 15 of this deck, and here it appears    11:00:45
6  that you are describing some recent    11:00:58
7  developments in the controlled substance    11:01:01
8  compliance group; is that accurate?    11:01:03
9      A.    Contributions, yes, sir.    11:01:06
10      Q.    Contributions.    11:01:07
11          And one contribution appears to    11:01:07
12  be the implementation of an SOM program?    11:01:09
13          MR. O'CONNOR:  Objection to    11:01:14
14      form.    11:01:14
15          THE WITNESS:  So it's not    11:01:14
16      qualified in place, but we had a program    11:01:18
17      in place, so that would have been an    11:01:20
18      enhancement activity of the SOM    11:01:23
19      program.    11:01:24
20  QUESTIONS BY MR. KO:    11:01:25
21      Q.    Okay.  And an enhancement    11:01:25
22  activity, in other words, an attempt to    11:01:27
23  revise it and improve the program; is that    11:01:32
24  accurate?    11:01:35
25      A.    Yes.  Yes.    11:01:35

Page 118

1    Q.   And when -- here it says, "CSOS   11:01:36
2  receipt guidance for customers."        11:01:39
3         What does CSOS refer to?          11:01:40
4    A.   So the DEA implemented an         11:01:42
5  electronic 222 format, and some of our   11:01:45
6  customers are narcotic treatment programs. 11:01:51
7  They had a lot of questions around how to  11:01:54
8  manage their recordkeeping, so we provided 11:01:57
9  guidance to those customers.             11:02:01
10   Q.   Okay.  And the 222 form is a      11:02:02
11 form required by the DEA that every       11:02:04
12 registrant fills out when ordering        11:02:05
13 prescription -- or controlled substances; is 11:02:07
14 that accurate?                           11:02:09
15   A.   Schedule II.                       11:02:09
16   Q.   Schedule II in particular?        11:02:10
17   A.   Yes.                               11:02:12
18   Q.   Thank you.                         11:02:12
19        And here, the next reference is    11:02:12
20 to what -- the next item down refers to    11:02:16
21 something we had just previously discussed  11:02:20
22 about Federal Register Notices.           11:02:22
23        Do you see that?                   11:02:24
24   A.   Yes.                               11:02:24
25   Q.   And so you are informing          11:02:25

Page 119

1  whoever's at this presentation that one   11:02:27
2  contribution of the CSC group is to watch  11:02:30
3  Federal Register Notices that come out that 11:02:39
4  are relevant for Mallinckrodt, correct?    11:02:41
5    A.   Correct.                           11:02:41
6    Q.   And the Federal Register          11:02:42
7  Notices, what was your understanding of    11:02:44
8  generally what those consisted of?        11:02:46
9         Actually, take that back.         11:02:48
10        Is it -- a Federal Register        11:02:49
11 Notice -- with respect to the Federal      11:02:54
12 Register Notices that you paid particularly 11:02:57
13 close attention to, those were notices that 11:02:58
14 interpreted certain DEA statutes; is that   11:03:02
15 fair to say?                             11:03:05
16        MR. O'CONNOR:  Objection to        11:03:05
17   form.                                   11:03:05
18        THE WITNESS:  I would not call     11:03:06
19   them interpretations.  They were       11:03:08
20   statements of quota, the US aggregate   11:03:11
21   quota, notices of proposed rulemaking,  11:03:16
22   who had applied to become a new         11:03:19
23   registrant, things like that.          11:03:20
24 QUESTIONS BY MR. KO:                      11:03:22
25   Q.   Okay.  And the statements, did    11:03:22

Page 120

1  they also include -- or did you also review 11:03:24
2  and read statements regarding Federal      11:03:30
3  Register Notices of suspicious order       11:03:41
4  monitoring activities?                   11:03:42
5        MR. O'CONNOR:  Objection to         11:03:42
6   form.                                    11:03:43
7  QUESTIONS BY MR. KO:                      11:03:43
8    Q.   It was a poor question.  Let me    11:03:44
9  ask it again.                            11:03:46
10        When reviewing the Federal         11:03:46
11 Register Notices, did you also see and review 11:03:48
12 notices that related to SOM activities of   11:03:50
13 other registrants?                       11:03:52
14   A.   Yes.                               11:03:54
15   Q.   And my presumption is that you     11:03:55
16 paid particularly close attention to some of 11:04:00
17 those notices?                           11:04:01
18        MR. O'CONNOR:  Objection.          11:04:02
19        THE WITNESS:  One in               11:04:03
20   particular, yes.                        11:04:03
21 QUESTIONS BY MR. KO:                      11:04:04
22   Q.   Would that be the Southwood --     11:04:04
23   A.   Yes.                               11:04:04
24   Q.   -- notice?                         11:04:06
25        Okay.  Do you recall when you      11:04:06

Page 121

1  reviewed that one?                       11:04:07
2    A.   When DEA called it out in one      11:04:09
3  of their guidance letters as being        11:04:12
4  instructive, that is what we went to       11:04:14
5  immediately and reviewed.                11:04:16
6    Q.   Okay.  And you recall this was     11:04:17
7  generally in the 2007 or early 2008 time   11:04:19
8  period?                                  11:04:23
9    A.   It was 2006, 2007, approximate,    11:04:24
10 but I don't remember the dates.           11:04:26
11   Q.   Okay.  With respect to            11:04:27
12 participate in RiskMAP program, an FDA      11:04:33
13 initiative, can you describe to the Court   11:04:38
14 what the RiskMAP program was?             11:04:41
15   A.   I don't remember the definition    11:04:45
16 of the acronym, but it pertained -- it was an 11:04:47
17 FDA program where certain drug substances   11:04:53
18 were monitored forward through the supply   11:04:56
19 chain.                                   11:04:59
20   Q.   Okay.  And when you say           11:05:00
21 "forward," do you mean after they left the  11:05:02
22 warehouses of the manufacturer facility?    11:05:09
23   A.   Yes.                               11:05:12
24   Q.   Okay.  So would it be fair to      11:05:13
25 say that another way of saying -- well,     11:05:16

Page 122

1  strike that.                                    11:05:24
2        Now, there's also a reference    11:05:24
3  made to working with the DEA on methadone.    11:05:29
4        Do you see that?                11:05:35
5  A.   Yes.                              11:05:36
6  Q.   And Mallinckrodt manufactures a   11:05:36
7  large amount of generic methadone as well,    11:05:38
8  correct?                               11:05:41
9        MR. O'CONNOR:  Objection to      11:05:41
10       form.                           11:05:42
11       THE WITNESS:  We manufacture     11:05:42
12       methadone, and I don't again have -- I  11:05:44
13       don't know if we're the largest, or    11:05:45
14       large, but, yes, we manufacture it.    11:05:46
15 QUESTIONS BY MR. KO:                   11:05:47
16 Q.   Okay.  And despite not knowing    11:05:48
17 whether or not you are the largest, or large,  11:05:52
18 you do understand that Mallinckrodt has for    11:05:55
19 quite some time manufactured generic    11:05:58
20 methadone, correct?                    11:05:59
21 A.   Yes.                             11:06:00
22 Q.   Okay.  And since at least the    11:06:01
23 mid-'90s, if not prior to that?        11:06:02
24 A.   I don't recall the year because    11:06:06
25 previously it was manufactured by an external  11:06:09

Page 123

1  party and shipped to Mallinckrodt for    11:06:11
2  distribution, so I don't know when we brought  11:06:13
3  the manufacturing in-house.           11:06:15
4  Q.   Sure.                            11:06:17
5  A.   Of the methadone, 40             11:06:17
6  milligrams, that is.                  11:06:19
7  Q.   And thank you for that           11:06:20
8  clarification.                        11:06:21
9        Mallinckrodt manufactured       11:06:21
10 various different strengths of methadone,    11:06:22
11 correct?                              11:06:25
12 A.   Yes.                             11:06:25
13 Q.   I believe in 5, 10 and           11:06:27
14 40-milligram dosages, among other quantities?  11:06:30
15 A.   Yes.                             11:06:33
16 Q.   Okay.  And at a certain point    11:06:33
17 in time, the DEA alerted you and the CSC    11:06:35
18 group of methadone abuse and diversion,    11:06:39
19 correct?                              11:06:41
20       MR. O'CONNOR:  Objection to      11:06:42
21       form.                           11:06:45
22       THE WITNESS:  They called it    11:06:45
23       the methadone mortality working group.  11:06:46
24       DEA asked us to come to Washington,    11:06:48
25       DC, along with other major      11:06:51

Page 124

1  manufacturers -- there were two or    11:06:53
2  three others -- and have a            11:06:54
3  collaborative discussion with them in    11:06:57
4  terms of how the 40-milligram         11:06:58
5  methadone specifically was being      11:07:02
6  distributed at pharmacies, and the    11:07:07
7  data that they were seeing related to    11:07:10
8  the mortality that they were          11:07:12
9  associating with those distributions.    11:07:13
10 QUESTIONS BY MR. KO:                   11:07:15
11 Q.   And when you say "mortality,"    11:07:15
12 you're saying that there were a large amount    11:07:18
13 of -- or there were people that were    11:07:19
14 overdosing on methadone at the time that you    11:07:21
15 met with DEA, correct?                 11:07:25
16       MR. O'CONNOR:  Objection to      11:07:27
17       form.                           11:07:27
18       THE WITNESS:  Yes, but may I    11:07:28
19       please add that that was because there    11:07:29
20       were physicians that were writing them    11:07:33
21       for purposes other than which they    11:07:34
22       were FDA-approved.              11:07:38
23 QUESTIONS BY MR. KO:                   11:07:39
24 Q.   Okay.  And that's based on your    11:07:40
25 understanding what the DEA was telling you,    11:07:42

Page 125

1  correct?  Or do you actually have personal    11:07:44
2  knowledge?                            11:07:46
3  A.   I do not have any personal       11:07:46
4  knowledge.                            11:07:47
5  Q.   So it was based on what the DEA    11:07:47
6  was telling you?                      11:07:49
7  A.   Yes.                             11:07:50
8  Q.   And do you recall when --        11:07:50
9  approximately when that meeting in    11:07:51
10 Washington, DC, was?                   11:07:53
11 A.   I don't recall the date.         11:07:54
12 A.   Was it before 2008?              11:07:57
13 A.   I'm sorry, I don't recall the    11:08:00
14 date.                                 11:08:01
15 Q.   Fair enough.                     11:08:02
16       And going back to the RiskMAP    11:08:02
17 and trying to understand, as you described,    11:08:09
18 the path of a drug that a manufacturer    11:08:12
19 produced, forward, as you said, do you recall    11:08:20
20 at a certain point in time creating a RiskMAP    11:08:25
21 for oxycodone 30?                      11:08:31
22 A.   I do not.                        11:08:32
23 Q.   Okay.  You don't recall any      11:08:34
24 involvement in a RiskMAP for oxy 30s or 15s?    11:08:36
25 A.   We may have been asked to         11:08:39

Page 126

1  report in to the -- it was called the patient  11:08:41
2  and product monitoring group.  It was  11:08:44
3  specific to fentanyl in the beginning, but I  11:08:50
4  don't -- I don't know to which other products  11:08:53
5  it may have expanded, but we did annual  11:08:55
6  reporting to that group.  11:08:57
7    Q.  Sure.  Okay.  11:08:58
8       You didn't have any specific  11:09:00
9  responsibility with respect to that RiskMAP  11:09:02
10 report that you may have done for the FDA,  11:09:05
11 correct?  11:09:08
12   A.  So we had responsibility for  11:09:08
13 reporting any thefts or losses of these  11:09:11
14 specific drugs, but it was an internal  11:09:13
15 reporting to the patient and product  11:09:16
16 monitoring group who assembled a whole large  11:09:17
17 report consisting of other information for  11:09:21
18 the FDA.  11:09:24
19   Q.  Okay.  I understand.  11:09:25
20       And did you have any -- a  11:09:26
21 specific involvement with that?  11:09:29
22   A.  Only to the extent if we --  11:09:30
23 they contacted us once a year and asked if we  11:09:32
24 had any recorded thefts or losses, DEA 106  11:09:35
25 forms, for those drug products.  11:09:41

Page 127

1    Q.  Okay.  If you turn to page 18  11:09:42
2  of this deck, and there's a reference made to  11:09:52
3  the cost of noncompliance.  11:10:02
4       Do you see that?  11:10:03
5    A.  I do see it.  11:10:04
6    Q.  And by the way, do you have any  11:10:05
7  reason to doubt that this was a presentation  11:10:07
8  you made, or do you think that someone else  11:10:08
9  made this presentation?  11:10:11
10   A.  I have no reason to doubt I --  11:10:12
11 I did make the presentation.  11:10:14
12   Q.  You did make this presentation?  11:10:15
13   A.  Yeah.  11:10:16
14   Q.  Okay.  So here you're  11:10:16
15 describing the cost of noncompliance, and in  11:10:18
16 particular the cost of noncompliance with the  11:10:22
17 CSA; is that fair to say?  11:10:24
18   A.  Yes.  11:10:25
19   Q.  Okay.  And you are talking  11:10:25
20 about, I think, other fines paid by other  11:10:27
21 pharmacies and other entities and registrants  11:10:32
22 of the CSA, correct?  11:10:36
23   A.  Well, this one is specific to a  11:10:37
24 fine paid by Rite Aid and its subsidiaries.  11:10:41
25   Q.  Right.  11:10:47

Page 128

1       Now, in addition to an actual  11:10:48
2  cost, a business and corporate cost, would  11:10:52
3  you agree with me that the cost of  11:10:54
4  noncompliance is actually overdose deaths?  11:10:55
5       MR. O'CONNOR:  Objection to  11:11:00
6    form.  11:11:01
7  QUESTIONS BY MR. KO:  11:11:02
8    Q.  In other words, there's a human  11:11:02
9  cost of noncompliance, is there not?  11:11:04
10      MR. O'CONNOR:  Objection to  11:11:06
11   form.  11:11:06
12      THE WITNESS:  There is a human  11:11:07
13   cost based upon the diversion of  11:11:10
14   prescription opioids, yes.  11:11:14
15 QUESTIONS BY MR. KO:  11:11:16
16   Q.  And that human cost is  11:11:16
17 manifested in either mortality or morbidity  11:11:17
18 in the form of more people addicted to  11:11:21
19 opioids.  Would you agree with me on that?  11:11:24
20      MR. O'CONNOR:  Objection to  11:11:25
21   form.  11:11:26
22      THE WITNESS:  Correct.  Yes.  11:11:26
23   Sorry.  11:11:27
24 QUESTIONS BY MR. KO:  11:11:27
25   Q.  So in addition to the costs of  11:11:28

Page 129

1  noncompliance here that you list, a real and  11:11:30
2  tangible cost of noncompliance is -- are the  11:11:35
3  amount of lives affected by the abuse and  11:11:38
4  diversion of prescription opioids, correct?  11:11:41
5       MR. O'CONNOR:  Objection to  11:11:42
6    form.  11:11:44
7       THE WITNESS:  I agree, yes.  11:11:44
8  QUESTIONS BY MR. KO:  11:11:45
9    Q.  Okay.  And as we discussed  11:11:45
10 before, many, if not all, of the complaints  11:11:49
11 that have been filed against various entities  11:11:55
12 involved in the supply chain of prescription  11:11:59
13 opioids allege that state and local  11:12:01
14 governments have had to incur the burden of  11:12:09
15 responding to the overdose rates and  11:12:12
16 morbidity rates that have been caused as a  11:12:16
17 result of the opioid crisis?  11:12:19
18      MR. O'CONNOR:  Objection to  11:12:23
19   form.  11:12:24
20      THE WITNESS:  Yes, that is the  11:12:24
21   information that has been reported,  11:12:25
22   yes.  11:12:26
23 QUESTIONS BY MR. KO:  11:12:26
24   Q.  Okay.  And that is -- in  11:12:26
25 addition to the information that has been  11:12:27

Page 130

1  reported, is that consistent with your          11:12:29
2  understanding?  Do you believe that to be the   11:12:31
3  case?                                           11:12:32
4          MR. O'CONNOR:  Objection to             11:12:32
5      form.                                       11:12:33
6          THE WITNESS:  I don't have              11:12:33
7      firsthand knowledge of the costs, but       11:12:36
8      I have no reason to doubt that              11:12:39
9      reporting.                                  11:12:40
10 QUESTIONS BY MR. KO:                            11:12:41
11     Q.   Okay.  By the way, do you              11:12:46
12 know -- do you personally know anyone           11:12:47
13 impacted by the opioid crisis?                  11:12:49
14     A.   I do not.                              11:12:52
15     Q.   You're lucky.                          11:12:54
16     A.   I know.  I know that.                  11:12:55
17         (Mallinckrodt-Harper Exhibit 3          11:13:05
18     marked for identification.)                 11:13:05
19 QUESTIONS BY MR. KO:                            11:12:57
20     Q.   I want to turn to the next             11:12:57
21 exhibit, which will be marked as Harper         11:13:03
22 Exhibit 3.                                      11:13:05
23         For the record, this is ending          11:13:11
24 in Bates stamp 283074.                          11:13:13
25         And it is an e-mail dated               11:13:24

Page 131

1  April 12, 2011, from you to Michael             11:13:26
2  Santowski.                                      11:13:31
3          Who is Michael Santowski?               11:13:32
4      A.   He was the gentleman to whom I         11:13:35
5  reported at the time.                           11:13:38
6      Q.   Okay.  And he was -- was he            11:13:38
7  part of the controlled substance compliance     11:13:42
8  team?                                           11:13:43
9      A.   We reported to him, so he had          11:13:44
10 oversight for several groups, including ours,   11:13:49
11 yes.                                            11:13:52
12     Q.   I see.                                 11:13:52
13         And now it appears that you've          11:13:53
14 become the senior manager of the controlled     11:13:54
15 substance compliance group.                     11:13:56
16         Do you see that?                        11:13:57
17     A.   Yes.                                   11:13:57
18     Q.   So at least as of April 12,            11:13:58
19 2011, you were the senior manager of the CSC?   11:14:00
20     A.   I agree.                               11:14:04
21     Q.   Okay.  And this is another             11:14:05
22 presentation you made regarding the SOM         11:14:08
23 program at Mallinckrodt.                        11:14:12
24         Do you see that?                        11:14:13
25     A.   So clearly I created the               11:14:14

Page 132

1  presentation, but the e-mail indicates it was   11:14:20
2  provided to Michael Santowski for training of   11:14:24
3  the executive committee.  So that was a level   11:14:28
4  I didn't -- that was senior executives within   11:14:31
5  the organization.                              11:14:32
6      Q.   I see.  That's very helpful.           11:14:33
7          So you didn't actual present            11:14:35
8  this deck to the executive committee?           11:14:37
9      A.   I have a number of slides that         11:14:38
10 I pull in and out of presentations as           11:14:42
11 appropriate for the audience.  So I'm certain   11:14:44
12 I presented variations of these slides to       11:14:47
13 different audiences, but I did not present      11:14:50
14 this deck to the executive committee.           11:14:52
15     Q.   Okay.  That's helpful.                 11:14:55
16         But you created the deck for            11:14:56
17 Mr. Santowski, if I understand correctly?       11:14:58
18     A.   Yes.                                   11:15:00
19     Q.   Okay.  I want to turn to page 4        11:15:01
20 of this deck.  And here we have some of the     11:15:07
21 regulations that interpret the CSA.             11:15:19
22         Do you see that?                        11:15:21
23     A.   I think that's verbatim, but,          11:15:22
24 yes, yes.  Not an interpretation, but the       11:15:29
25 statements in the Code of Federal              11:15:32

Page 133

1  Regulations.                                    11:15:35
2      Q.   Okay.  Great.  Thank you for           11:15:35
3  that clarification.                             11:15:36
4          So these are statements that            11:15:37
5  actually appear in the regulations as           11:15:39
6  codified by 21 CFR 1301.74, correct?           11:15:42
7          MR. O'CONNOR:  Objection to             11:15:47
8      form.                                       11:15:47
9          THE WITNESS:  Yes.                      11:15:47
10 QUESTIONS BY MR. KO:                            11:15:48
11     Q.   Okay.  And we have previously          11:15:48
12 discussed Mallinckrodt's responsibilities       11:15:51
13 with respect to suspicious orders, but I just   11:15:53
14 want to make sure.                              11:15:56
15         You would agree that all the            11:15:57
16 responsibilities and requirements set forth     11:16:00
17 here are responsibilities that Mallinckrodt     11:16:02
18 had, correct?                                   11:16:04
19         MR. O'CONNOR:  Objection to             11:16:06
20     form.                                       11:16:07
21         THE WITNESS:  Yes, correct.             11:16:07
22 QUESTIONS BY MR. KO:                            11:16:08
23     Q.   Okay.  And that includes a duty        11:16:08
24 to design and operate a suspicious order        11:16:11
25 identification system.                          11:16:15

Highly Confidential — Subject to Further Confidentiality Review

Page 134

1    Mallinckrodt had that duty,    11:16:17
2  correct?    11:16:18
3    A.    Yes.    11:16:18
4    Q.    And Mallinckrodt had a duty to    11:16:18
5  require -- or Mallinckrodt had a duty to    11:16:24
6  report suspicious orders to the DEA when    11:16:26
7  discovered via a monitoring process, correct?    11:16:28
8    A.    Yes.    11:16:31
9    Q.    And Mallinckrodt had a duty    11:16:31
10 to -- had a duty to ensure that this    11:16:34
11 responsibility to report suspicious orders    11:16:38
12 did not end merely with filing a suspicious    11:16:39
13 order report; is that correct?    11:16:43
14    MR. O'CONNOR: Objection to    11:16:44
15    form.    11:16:45
16    THE WITNESS: So the statement    11:16:45
17 is correct, but I -- I must -- I would    11:16:46
18 like to clarify.    11:16:49
19    All these are not straight from    11:16:50
20 CFR 21. Some of the statements, I    11:16:53
21 believe, particularly the italicized    11:16:55
22 one at the bottom, may have been    11:16:58
23 culled from a DEA -- one of the DEA    11:17:01
24 guidance letters.    11:17:04
25

Page 135

1  QUESTIONS BY MR. KO:    11:17:04
2    Q.    Okay. But regardless of where    11:17:05
3  it came from, at least at the time of this    11:17:08
4  presentation, you believe that Mallinckrodt    11:17:10
5  had a duty to ensure that their suspicious    11:17:12
6  order responsibilities did not end merely    11:17:17
7  with the filing of a suspicious order report;    11:17:18
8  is that correct?    11:17:21
9    MR. O'CONNOR: Objection to    11:17:21
10    form.    11:17:22
11    THE WITNESS: Correct.    11:17:22
12    Correct.    11:17:22
13 QUESTIONS BY MR. KO:    11:17:23
14    Q.    And Mallinckrodt also -- you    11:17:23
15 also understand that Mallinckrodt was not    11:17:26
16 going to get any specific guidance from the    11:17:30
17 DEA at this time on whether or not their    11:17:33
18 particular SOM program would be endorsed --    11:17:37
19    MR. O'CONNOR: Objection to    11:17:40
20    form.    11:17:41
21 QUESTIONS BY MR. KO:    11:17:41
22    Q.    -- is that accurate?    11:17:41
23    A.    That's accurate.    11:17:42
24    Q.    Okay. And when did you    11:17:43
25 understand DEA to tell you that first; do you    11:17:45

Page 136

1  have any recollection?    11:17:48
2    MR. O'CONNOR: Objection to    11:17:48
3    form.    11:17:49
4    THE WITNESS: I'm fairly    11:17:49
5    certain that that was in one of the    11:17:51
6    guidance letters from DEA circa 2006,    11:17:56
7    2007.    11:17:59
8  QUESTIONS BY MR. KO:    11:18:00
9    Q.    Okay. And then finally, this    11:18:00
10 last bullet indicates that -- or you would    11:18:04
11 agree with me that Mallinckrodt had a duty to    11:18:08
12 conduct an independent analysis of suspicious    11:18:10
13 orders prior to completing a sale to    11:18:13
14 determine whether or not the controlled    11:18:14
15 substances are likely to be diverted.    11:18:17
16    MR. O'CONNOR: Objection to    11:18:19
17    form.    11:18:19
18 QUESTIONS BY MR. KO:    11:18:19
19    Q.    Is that accurate?    11:18:19
20    A.    Yes.    11:18:20
21    Q.    Okay. Now, turning to the next    11:18:21
22 page, here you put in this presentation the    11:18:30
23 number of people -- the number of registrants    11:18:36
24 there are in the supply chain -- or the    11:18:39
25 number of registrants that are part of the    11:18:43

Page 137

1  CSA; is that correct?    11:18:44
2    A.    As of that time, yes.    11:18:45
3    Q.    Right, as of that time.    11:18:48
4    A.    Yes.    11:18:49
5    Q.    And there's a specific quote    11:18:49
6  that you include in this presentation that    11:18:51
7  says that "the DEA must rely on the states    11:18:53
8  and individual registrants to monitor."    11:18:56
9    Do you see that?    11:18:58
10    A.    I do see that.    11:18:58
11    Q.    And the "individual    11:18:59
12 registrants" obviously refers to entities    11:19:00
13 like Mallinckrodt?    11:19:03
14    A.    Correct.    11:19:04
15    Q.    And so at least as of this    11:19:05
16 time, the date of this deck, you understood    11:19:07
17 that the DEA was not going to give you    11:19:10
18 specific guidance but was going to rely on    11:19:11
19 registrants like Mallinckrodt to monitor    11:19:16
20 their controlled substances, correct?    11:19:18
21    MR. O'CONNOR: Objection to    11:19:19
22    form.    11:19:20
23    THE WITNESS: Correct.    11:19:20
24 QUESTIONS BY MR. KO:    11:19:21
25    Q.    Okay. Now, I want to turn to    11:19:21

Page 138

1    page 7 of this particular report, and there's    11:19:29
2    a reference made to Florida.  And I know we    11:19:36
3    had spoken a little bit about problems in    11:19:39
4    Florida a moment ago, but on page 7 -- give    11:19:43
5    you a moment to get there.    11:19:49
6        A.   I'm sorry, the front and back    11:19:50
7    is mixing me up.    11:19:52
8        Q.   Yeah.    11:19:53
9        A.   Okay.  Thank you.  I am at    11:19:53
10   page 7.    11:19:55
11       Q.   Sure.    11:19:56
12       Page 7 gives some color to what    11:19:56
13   we were previously discussing about the    11:19:59
14   problem in Florida, and here you describe    11:20:01
15   that most, if not almost all, 98 percent, of    11:20:04
16   all doctors dispensing oxycodone nationally    11:20:09
17   are in Florida.    11:20:12
18       Do you see that?    11:20:12
19       A.   I do.    11:20:13
20       Q.   So you were aware at the time    11:20:13
21   of this presentation that there was a --    11:20:16
22   almost all of the -- or the top doctors    11:20:20
23   dispensing oxycodone were in Florida,    11:20:23
24   correct?    11:20:25
25       MR. O'CONNOR:  Objection to    11:20:26

Page 139

1    form.    11:20:27
2        THE WITNESS:  Yes.  Accepting    11:20:27
3    as factual this data published by the    11:20:32
4    Florida governor's office, yes.    11:20:35
5    QUESTIONS BY MR. KO:    11:20:38
6        Q.   Right.  And you had    11:20:38
7    knowledge -- or you understood there to be a    11:20:39
8    big problem in Florida at this time --    11:20:41
9        MR. O'CONNOR:  Objection to    11:20:43
10   form.    11:20:43
11   QUESTIONS BY MR. KO:    11:20:43
12       Q.   -- with respect to prescription    11:20:43
13   opioids manufactured by Mallinckrodt,    11:20:45
14   correct?    11:20:46
15       MR. O'CONNOR:  Same objection.    11:20:46
16       THE WITNESS:  A problem, yes.    11:20:47
17   The -- sorry.  The adjective "big,"    11:20:50
18   again, is a relative term, but, yes, a    11:20:53
19   problem in Florida.    11:20:56
20   QUESTIONS BY MR. KO:    11:20:57
21       Q.   Okay.  And in fact, there was    11:20:57
22   substantially more oxycodone manufactured by    11:20:59
23   Mallinckrodt that was being dispensed in    11:21:03
24   Florida than all the other remaining states    11:21:05
25   combined according to this deck, correct?    11:21:07

Page 140

1        MR. O'CONNOR:  Objection to    11:21:09
2    form.    11:21:09
3        THE WITNESS:  So there are    11:21:09
4    other manufacturers of oxycodone --    11:21:13
5    QUESTIONS BY MR. KO:    11:21:14
6        Q.   I understand that.    11:21:14
7        A.   -- and this is not specific to    11:21:15
8    Mallinckrodt oxycodone.    11:21:16
9        Q.   Okay.  But Mallinckrodt    11:21:18
10   manufactured oxy 15s and 30s in large    11:21:19
11   amounts, correct?    11:21:22
12       A.   Mallinckrodt manufactured oxy    11:21:23
13   15s and 30s, and again, "large" is -- I don't    11:21:25
14   have enough reference information relative to    11:21:28
15   the other manufacturers' production to answer    11:21:31
16   the question.    11:21:35
17       Q.   Well, let's talk about that    11:21:36
18   then.  The next -- the previous page,    11:21:40
19   actually, page 6, there's a description of    11:21:42
20   oxycodone market share of Mallinckrodt    11:21:45
21   relative to the rest of your competitors.    11:21:47
22       Do you see that?    11:21:50
23       A.   I do see it.    11:21:51
24       Q.   So at least as of Q4 of 2010,    11:21:53
25   it appears that Mallinckrodt has a 52 percent    11:21:59

Page 141

1    share of oxycodone in the nation; is that    11:22:02
2    accurate?    11:22:08
3        MR. O'CONNOR:  Object to form.    11:22:08
4        THE WITNESS:  Yes.    11:22:09
5    QUESTIONS BY MR. KO:    11:22:11
6        Q.   Okay.  And then that rose    11:22:12
7    slightly in Q1 of 2011 -- fiscal year 2011 to    11:22:16
8    56 percent.    11:22:19
9        Do you see that?    11:22:20
10       A.   Yes, I do see that statistic,    11:22:23
11   yes.    11:22:26
12       Q.   All right.  And so there -- and    11:22:26
13   none of Mallinckrodt's competitors are    11:22:27
14   anywhere close to Mallinckrodt's market share    11:22:29
15   based on this table, correct?    11:22:32
16       A.   Correct.    11:22:33
17       Q.   And in fact, as we just    11:22:35
18   previously described and went over, the total    11:22:37
19   percentage of Mallinckrodt's competitors is    11:22:41
20   less than Mallinckrodt's own share of the    11:22:44
21   market of oxycodone, correct?    11:22:47
22       MR. O'CONNOR:  Objection to    11:22:50
23   form.    11:22:51
24       THE WITNESS:  Yes.  As I sit    11:22:51
25   here and perform quick math, yes.    11:22:53

Page 142

```
1    Yes.                        11:22:55
2    QUESTIONS BY MR. KO:         11:22:56
3        Q.   Okay.  Now, based, I believe --  11:22:56
4    if you turn to page 14 of this deck now,  11:23:05
5    going forward.               11:23:08
6        And there's reference made to a  11:23:20
7    conversation that Mallinckrodt had with the  11:23:22
8    DEA on July 20, 2010.        11:23:25
9        Do you see that?         11:23:28
10   A.   I do.                   11:23:29
11       Q.   And do you recall that  11:23:29
12   conversation?                11:23:32
13   A.   I do.                   11:23:32
14       Q.   And you participated in it?  11:23:33
15   A.   Yes.                    11:23:35
16       Q.   Okay.  And we'll get to that in  11:23:35
17   a moment --                  11:23:36
18   A.   All right.             11:23:37
19       Q.   -- but I just want to talk  11:23:37
20   about some of the things that you've put in  11:23:40
21   this presentation, including the fact that  11:23:42
22   Mallinckrodt is viewed as the kingpin within  11:23:44
23   the drug cartel.             11:23:47
24       Do you see that reference?  11:23:48
25   A.   I do.                   11:23:50
```

Page 143

```
1        Q.   And that was something that the  11:23:50
2    DEA had indicated to you?     11:23:52
3    A.   Yes.                    11:23:53
4        Q.   Okay.  And my presumption is  11:23:55
5    that they expressed that view because  11:23:57
6    Mallinckrodt had the majority of the market  11:23:59
7    share of oxycodone?          11:24:02
8        MR. O'CONNOR:  Objection to  11:24:03
9    form.                        11:24:03
10       THE WITNESS:  I know the view  11:24:03
11   was expressed, but I don't know what  11:24:05
12   the basis was because this is talking  11:24:07
13   about Harvard Drug distributor.  11:24:09
14   QUESTIONS BY MR. KO:         11:24:12
15       Q.   Okay.  So you -- regardless,  11:24:12
16   you recall during this DEA meeting in July  11:24:16
17   of 2010 that DEA had expressed the view that  11:24:20
18   Mallinckrodt was viewed as the kingpin within  11:24:22
19   the drug cartel?             11:24:24
20   A.   I do.                   11:24:25
21       Q.   Okay.  And we had discussed a  11:24:26
22   little time ago that -- about Mallinckrodt's  11:24:31
23   duties to know their customers' customers,  11:24:34
24   and here you indicate that at least as of the  11:24:36
25   date of this meeting, you understood that DEA  11:24:38
```

Page 144

```
1    expected Mallinckrodt to understand and know  11:24:43
2    their customer's customer; is that correct?  11:24:47
3        MR. O'CONNOR:  Objection to  11:24:51
4    form.                        11:24:51
5        THE WITNESS:  Yes, that's per  11:24:51
6    DEA St. Louis, yes.          11:24:53
7    QUESTIONS BY MR. KO:         11:24:54
8        Q.   Okay.  So as of July 20th -- no  11:24:54
9    later than July 20, 2010, you understood that  11:24:56
10   Mallinckrodt had an obligation as required by  11:25:00
11   the DEA to know their customer's customer,  11:25:02
12   correct?                     11:25:05
13       MR. O'CONNOR:  Objection to  11:25:05
14   form.                        11:25:06
15       THE WITNESS:  So it was told to  11:25:06
16   us by DEA St. Louis, but DEA Albany  11:25:07
17   contradicted the statement.  11:25:10
18   QUESTIONS BY MR. KO:         11:25:12
19       Q.   Okay.  And we'll get to that  11:25:12
20   maybe in a moment, but -- well, first of all,  11:25:13
21   is there any indication of a contradiction on  11:25:17
22   this deck?                   11:25:19
23   A.   Well, so the DEA expectation,  11:25:19
24   I'm using that term as all of DEA here when I  11:25:24
25   prepared the bullet point on the slide, but  11:25:28
```

Page 145

```
1    the comment came from DEA St. Louis.  11:25:31
2        Q.   Okay.  So when you say that you  11:25:33
3    are referring to DEA -- the DEA expectation,  11:25:34
4    then it is fair to say that based on your  11:25:39
5    conversation with the DEA on July 20th, you  11:25:41
6    understood that Mallinckrodt had an  11:25:43
7    obligation to know your customer's customer;  11:25:46
8    is that correct?             11:25:50
9        MR. O'CONNOR:  Objection to  11:25:50
10   form.                        11:25:50
11       THE WITNESS:  So again, I'm  11:25:50
12   sorry, it was DEA St. Louis, and it  11:25:51
13   was DEA St. Louis expectation because  11:25:54
14   that was a quote from the  11:25:58
15   conversation.                11:25:59
16   QUESTIONS BY MR. KO:         11:25:59
17       Q.   Okay.  So I just want to make  11:25:59
18   sure the record is clear.    11:26:01
19       Based on your conversations  11:26:02
20   with DEA St. Louis, it was your understanding  11:26:03
21   that the DEA St. Louis required Mallinckrodt,  11:26:06
22   and in fact expected Mallinckrodt, to know  11:26:10
23   their customer's customer as of July 20,  11:26:13
24   2010; is that correct?       11:26:15
25       MR. O'CONNOR:  Objection to  11:26:16
```

Page 146

```
1   form.                          11:26:16
2        THE WITNESS:  Yes.         11:26:16
3   QUESTIONS BY MR. KO:            11:26:17
4        Q.   Okay.  By the way, we talked    11:26:17
5   about Mr. Ratliff a moment ago.    11:26:31
6        When did you first start    11:26:34
7   working with Mr. Ratliff?        11:26:35
8        A.   I don't know the year.    11:26:37
9        Q.   Okay.  It was before the 2008    11:26:38
10  time period?                    11:26:41
11       A.   I don't know when he came to    11:26:41
12  us, I'm sorry.                   11:26:45
13       Q.   Sure.                 11:26:46
14       Do you know who Pete Kleissle    11:26:47
15  is?                            11:26:51
16       A.   Yes.                  11:26:51
17       Q.   He was at DEA, correct?    11:26:52
18       A.   Yes.                  11:26:53
19       Q.   Do you recall any conversations    11:26:53
20  with Pete Kleissle regarding your obligations    11:26:55
21  to know your customer's customer?    11:26:59
22       A.   So when I'm using the term    11:27:01
23  "DEA" here, this conversation was indeed with    11:27:06
24  Pete Kleissle.                   11:27:10
25       Q.   Okay.  So Pete Kleissle    11:27:11
```

Page 147

```
1   specifically told you and other people that    11:27:15
2   were at this meeting that you had an    11:27:18
3   obligation to know your customer's customer    11:27:20
4   or --                          11:27:23
5        A.   It was only me.        11:27:23
6        Q.   Only you.  Okay.       11:27:24
7        And who did you share that    11:27:27
8   information with?               11:27:28
9        A.   The person to whom I reported    11:27:28
10  at the time and Bill Ratliff, because I don't    11:27:35
11  believe our group reported to him, but we    11:27:38
12  work in close conjunction with the security    11:27:39
13  group in DEA compliance.         11:27:41
14       Q.   Okay.  And so the person you    11:27:42
15  reported to at the time was Ms. Levy or was    11:27:44
16  it Mr. Santowski?  You don't recall?    11:27:46
17       A.   It was another person, Tom    11:27:48
18  Berry.                         11:27:52
19       Q.   Tom Berry.  Okay.      11:27:52
20       So other than Mr. Berry and    11:27:52
21  Mr. Ratliff, did you talk about this    11:27:54
22  conversation you had with Mr. Kleissle with    11:27:56
23  anyone else?                    11:27:58
24       A.   I may have discussed it --    11:27:59
25  well, clearly I put it in a presentation, so    11:28:04
```

Page 148

```
1   I may have carried this information back to    11:28:05
2   the suspicious order monitoring team at the    11:28:08
3   time.                          11:28:10
4        Q.   Okay.  I want to turn back to    11:28:10
5   the table of contents of this deck, which    11:28:26
6   appears on page 2.  And again, I understand    11:28:32
7   that you didn't actually make this    11:28:41
8   presentation, but you prepared all the    11:28:44
9   materials in this presentation, correct?    11:28:47
10       A.   Yes.                  11:28:48
11       Q.   Including some of the things    11:28:50
12  that we went over and also this reference to    11:28:52
13  an OxyContin Express video?      11:28:55
14       A.   Yes.                  11:28:58
15       Q.   And do you recall ever    11:28:59
16  presenting -- I know you didn't make this    11:29:01
17  presentation, but did you recall presenting    11:29:04
18  about the OxyContin Express in other settings    11:29:07
19  at Mallinckrodt?                11:29:13
20       A.   Yes, I believe so.     11:29:13
21       Q.   Okay.  And that video, again,    11:29:13
22  consisted of your understanding of migration    11:29:15
23  of opioid pills moving north from Florida,    11:29:17
24  correct?                       11:29:20
25       A.   Correct.              11:29:21
```

Page 149

```
1        Q.   And unfortunately we don't have    11:29:22
2   the video to play, but I believe --    11:29:27
3        A.   Unfortunately, a lot of the    11:29:28
4   time I couldn't get the video to play.    11:29:31
5        Q.   Oh, okay.             11:29:32
6        Well, I believe there's some    11:29:33
7   stills, at least, in this presentation.    11:29:34
8   Turning to page 16.             11:29:36
9        A.   All right.            11:29:37
10       Q.   Do you recall that particular    11:29:47
11  image?                         11:29:48
12       A.   I do.                 11:29:48
13       Q.   This was an image that was    11:29:49
14  included in your video?          11:29:50
15       A.   I don't think so.  I think it    11:29:51
16  was separate.                   11:29:54
17       Q.   This is just an image?    11:29:55
18       A.   Yes.                  11:29:56
19       Q.   Okay.  This was an image of, I    11:29:57
20  think, a pill mill in Florida?    11:29:59
21       MR. O'CONNOR:  Objection to    11:30:01
22  form.                          11:30:01
23       THE WITNESS:  Yes.         11:30:01
24  QUESTIONS BY MR. KO:            11:30:02
25       Q.   And the pill mill was, I    11:30:02
```

Page 150

1  think -- I think this particular picture was   11:30:04
2  of Tru-Valu, I believe.   11:30:06
3       Does that name ring a bell?   11:30:08
4       MR. O'CONNOR: Objection to   11:30:12
5  form.   11:30:12
6       THE WITNESS: The name rings a   11:30:12
7  bell, but I don't have a way of   11:30:13
8  identifying the pharmacy here.   11:30:14
9  QUESTIONS BY MR. KO:   11:30:16
10      Q.   Okay. By the way, what's your   11:30:16
11  definition of a pill mill?   11:30:17
12      A.   The definition of a pill mill,   11:30:18
13  from my perspective, is a facility wherein   11:30:20
14  patients who may not legitimately have the   11:30:28
15  need for a prescription would go and have --   11:30:33
16  some doctors were overprescribing or selling   11:30:38
17  oxycodone specifically within the state of   11:30:43
18  Florida because it was a DEA-registered   11:30:45
19  activity at the time.   11:30:47
20      And then, therefore, as a   11:30:48
21  result of the wide -- or overprescription of   11:30:51
22  oxycodone, those particular prescription   11:30:53
23  opioids were being widely abused and   11:30:56
24  diverted; is that correct?   11:30:59
25      MR. O'CONNOR: Objection to   11:30:59

Page 151

1  form.   11:31:00
2       THE WITNESS: So, yes,   11:31:00
3  that's -- that's one of the   11:31:02
4  contributing factors, yes.   11:31:03
5  QUESTIONS BY MR. KO:   11:31:05
6       Q.   Okay. And you understood   11:31:05
7  during the 2008 through 2012 time period that   11:31:07
8  there were a large amount of pill mills in   11:31:10
9  Florida, correct?   11:31:13
10      A.   I don't know the number, and I   11:31:14
11  don't have a -- a basis for correlation in   11:31:16
12  terms of large -- I'm sorry, I can't answer   11:31:18
13  the question.   11:31:21
14      Q.   Relative to any other states   11:31:22
15  that you were looking at during your time as   11:31:25
16  senior manager of controlled substance   11:31:26
17  compliance, do you recall any other state in   11:31:28
18  which you've examined pill mill activities   11:31:32
19  other than Florida?   11:31:34
20      A.   No, the focus was Florida.   11:31:36
21      (Mallinckrodt-Harper Exhibit 4   11:31:54
22      marked for identification.)   11:31:54
23  QUESTIONS BY MR. KO:   11:31:40
24      Q.   Okay. Okay. We can set this   11:31:40
25  aside. Right now turn to what will be marked   11:31:49

Page 152

1  as Harper Exhibit 4. For the record, that'll   11:31:52
2  end in Bates stamp 496098.   11:31:58
3       Actually, we'll skip that one.   11:32:18
4  Let's go to -- I'll take that one. Still   11:32:23
5  Exhibit 4. Strike that.   11:32:32
6       Exhibit 4 is actually ending in   11:32:34
7  Bates stamp 1308810. That is Harper   11:32:36
8  Exhibit 4.   11:32:44
9       You keep that one. That's the   11:32:44
10  official copy with the --   11:32:46
11      A.   Okay. I apologize. Sorry.   11:32:48
12      Q.   No need to apologize.   11:32:49
13      For the record, this is a   11:32:50
14  March 3, 2008 e-mail from you to Bill   11:33:02
15  Ratliff.   11:33:05
16      Do you see that?   11:33:06
17      A.   I do.   11:33:06
18      Q.   Do you have any reason to doubt   11:33:06
19  that you sent this e-mail to Mr. Ratliff on   11:33:08
20  March 3, 2008?   11:33:11
21      A.   No reason to doubt it.   11:33:11
22      Q.   Okay. So I know you said a   11:33:13
23  moment ago you don't recall when you started   11:33:14
24  working with Mr. Ratliff, but at least as of   11:33:16
25  March of 2008, you seemed to be working with   11:33:18

Page 153

1  him in connection with DEA compliance,   11:33:20
2  correct?   11:33:24
3       A.   Correct.   11:33:24
4       Q.   And it appears that you're   11:33:24
5  preparing some DEA compliance monthly   11:33:25
6  highlights as of February 2008.   11:33:30
7       Do you see that?   11:33:32
8       A.   Yes.   11:33:32
9       Q.   And do you recall how   11:33:33
10  frequently you prepared these monthly   11:33:35
11  highlights?   11:33:37
12      A.   I believe it was monthly.   11:33:38
13      Q.   And do you recall when you   11:33:39
14  first started preparing these?   11:33:40
15      A.   I do not.   11:33:42
16      Q.   And here the distribution is to   11:33:44
17  Mr. Ratliff.   11:33:47
18      Do you recall ever sending   11:33:48
19  these DEA compliance monthly highlights to   11:33:50
20  anyone else?   11:33:55
21      A.   They would have been sent to   11:33:55
22  the person to whom I reported, so it was Bill   11:33:57
23  Ratliff at the time. So there would have   11:33:59
24  been other people as -- as my manager changed   11:34:00
25  over time.   11:34:03

Page 154

1     Q.   I see.                    11:34:04
2          So you sent -- during the time    11:34:04
3    period in which you created a DEA compliance  11:34:07
4    monthly highlight, you sent those to your   11:34:10
5    direct report each month, correct?        11:34:12
6     A.   The person to whom I reported,    11:34:14
7    yes.                           11:34:16
8     Q.   Okay.                     11:34:16
9     A.   And I can't rule out no one      11:34:16
10   else received this, but this is directed to   11:34:19
11   Bill Ratliff only on the correspondence.     11:34:22
12    Q.   And as a general matter, these    11:34:24
13   monthly highlights were sent only to your    11:34:26
14   direct report; is that fair to say?        11:34:29
15    A.   The person to whom I reported    11:34:31
16   directly, yes.                    11:34:33
17    Q.   Okay.  Thank you.           11:34:33
18         And I just want to go over one    11:34:34
19   quick thing on this particular e-mail.      11:34:38
20         Do you see three sections down   11:34:42
21   the portion of the e-mail that refers to    11:34:46
22   suspicious order monitoring?            11:34:48
23    A.   Yes, I see it.               11:34:49
24    Q.   You indicate to Mr. Ratliff     11:34:51
25   that "the need for a comprehensive review and  11:34:55

Page 155

1    upgrade of our suspicious order monitoring   11:34:58
2    program has received elevated priority."    11:34:59
3          Did I read that correctly?     11:35:02
4     A.   Yes.                      11:35:03
5     Q.   So is it fair to say that as of   11:35:05
6    March of 2008, your belief was that        11:35:08
7    Mallinckrodt's SOM program needed to be     11:35:12
8    reviewed and upgraded and that -- needed to  11:35:15
9    be reviewed and upgraded?              11:35:19
10         MR. O'CONNOR:  Objection to     11:35:20
11    form.                         11:35:20
12         THE WITNESS:  It states -- yes,  11:35:20
13    it states "upgraded."  I would have        11:35:22
14    changed that terminology if I could,       11:35:24
15    but it says "upgraded," yes.            11:35:26
16   QUESTIONS BY MR. KO:                 11:35:27
17    Q.   Okay.  And you also state that   11:35:28
18   "as of March 3, 2008, the need to review and  11:35:31
19   upgrade Mallinckrodt's SOM program is an     11:35:36
20   elevated priority"; is that correct?       11:35:40
21    A.   Yes.                      11:35:42
22    Q.   Okay.  You can set that aside.   11:35:42
23         Do you recall -- you can refer   11:35:54
24   back to that document if you like, but do you  11:35:55
25   recall why you felt at that particular time   11:35:58

Page 156

1    that Mallinckrodt's SOM program needed to    11:36:02
2    be -- needed to receive elevated priority?   11:36:04
3     A.   I do.                     11:36:08
4     Q.   Yeah.  And what were the       11:36:09
5    reasons for that?                  11:36:11
6     A.   So this master compounding     11:36:12
7    pharmacy sale, which we did not make, the   11:36:15
8    matter was brought to our attention by a DEA  11:36:20
9    investigator.  But after the decision was    11:36:23
10   made that that was a suspicious order we     11:36:26
11   would not ship, one of the narcotic -- the   11:36:28
12   NAMs -- but she was on the bulk side.  She   11:36:31
13   said to us, "Ah, I was in that place, and I   11:36:34
14   didn't look right."                 11:36:37
15         So that prompted a reeducation  11:36:38
16   of the commercial group, our eyes and ears in  11:36:41
17   the market again, to call to our attention   11:36:45
18   anything that looked abnormal with any of the  11:36:47
19   facilities to which we were selling.       11:36:50
20    Q.   Okay.  And during this time     11:36:52
21   period -- we had talked a moment ago about   11:36:54
22   certain DEA guidance letters that you had    11:36:56
23   received in 2006 through 2007 time period,   11:36:59
24   correct?                        11:37:01
25    A.   Yes.                      11:37:01

Page 157

1     Q.   And those letters were sent by   11:37:01
2    Joseph Rannazzisi, correct?             11:37:04
3     A.   I believe, yes.  Yes, he was    11:37:05
4    deputy assistant administrator.  Yes.      11:37:08
5     Q.   And is it okay for purposes of   11:37:13
6    this deposition to refer to those guidance   11:37:16
7    letters as the Rannazzisi letters?         11:37:17
8     A.   Yes.                      11:37:19
9     Q.   Okay.  So was one of the       11:37:19
10   reasons why you were putting more attention   11:37:20
11   to Mallinckrodt's SOM program a result of    11:37:25
12   receiving these -- of receiving the        11:37:28
13   Rannazzisi letters?                 11:37:30
14    A.   It caused us to pay -- to give   11:37:31
15   more attention to our suspicious order      11:37:36
16   monitoring, but specifically this event is as  11:37:38
17   I just previously spoke, where we had a     11:37:41
18   Mallinckrodt person out at this facility, and  11:37:44
19   in retrospect they said it didn't look right  11:37:47
20   and it wound up to be a suspicious order.    11:37:50
21         So we wanted to reeducate our   11:37:52
22   sales force about their reviewing customer   11:37:53
23   accounts when they were in there.         11:37:57
24    Q.   Sure.  And I understand the     11:37:59
25   specific example you're giving, and I       11:38:00

Page 158

1　appreciate that.  You have great recall about  11:38:02
2　that.                          11:38:06
3　　　　But in terms of revising and    11:38:06
4　enhancing your SOM program, would it be  11:38:09
5　accurate to say that in early 2008, one of  11:38:12
6　the reasons why you wanted to do so was a  11:38:16
7　result of receiving the Rannazzisi letters?  11:38:19
8　　A.　Yes.                  11:38:20
9　　Q.　Okay.  I want to hand you --  11:38:21
10　you can set that aside.              11:38:24
11　　　　(Mallinckrodt-Harper Exhibit 5  11:38:25
12　marked for identification.)          11:38:25
13　QUESTIONS BY MR. KO:              11:38:25
14　　Q.　I want to hand you what's been  11:38:26
15　marked as Harper Exhibit 5, and that ends in  11:38:27
16　Bates stamp 273902.  And this is an e-mail,  11:38:31
17　for the record, that you sent to several  11:38:45
18　people dated April 10, 2008.          11:38:47
19　　　　Do you have any reason to doubt  11:38:51
20　that you sent this e-mail on this day and  11:38:55
21　time?                          11:38:56
22　　A.　I have no reason to doubt it.  11:38:56
23　　Q.　Okay.  And here you talk about  11:38:58
24　reference to the Drug and Chemical Advisory  11:39:01
25　Group.  That's the group that we were  11:39:05

Page 159

1　discussing before that Frank Sapienza was  11:39:06
2　part of, correct?                  11:39:10
3　　A.　Correct.                11:39:12
4　　Q.　And so at least as of this  11:39:12
5　time you are consulting with them -- well, is  11:39:14
6　it fair to say that as of April 10, 2008, you  11:39:16
7　are consulting with the Drug and Chemical  11:39:18
8　Advisory Group in connection with your duties  11:39:20
9　to design and implement a suspicious order  11:39:21
10　monitoring program?              11:39:24
11　　A.　That's correct.            11:39:24
12　　Q.　Okay.  And on the additional  11:39:26
13　items for consideration section, you talk  11:39:29
14　about the Southwood Federal Register Notice.  11:39:33
15　　　　Do you see that?            11:39:37
16　　A.　I do.                  11:39:38
17　　Q.　And when you describe the  11:39:39
18　Southwood Federal Register Notice, you take  11:39:51
19　some important elements of that notice and  11:39:56
20　relay them to the people you are e-mailing  11:40:03
21　here.                          11:40:05
22　　　　Do you see that?            11:40:05
23　　A.　I do.                  11:40:06
24　　Q.　And so when you -- you are  11:40:06
25　saying that you should incorporate certain  11:40:09

Page 160

1　questions taken from Southwood into a  11:40:12
2　checklist, correct?              11:40:19
3　　A.　Correct.                11:40:19
4　　Q.　And this checklist is reference  11:40:21
5　to a customer checklist that Mallinckrodt  11:40:24
6　utilized in connection with this SOM program,  11:40:27
7　correct?                      11:40:30
8　　　　MR. O'CONNOR:  Objection to  11:40:30
9　　　　form.                  11:40:31
10　　　　THE WITNESS:  It was being  11:40:31
11　　　　implemented at the time, yes.  11:40:33
12　QUESTIONS BY MR. KO:              11:40:34
13　　Q.　Okay.  So, and when you say  11:40:34
14　"implemented at the time" -- thank you for  11:40:37
15　that -- as of April 10, 2008, there wasn't  11:40:38
16　necessarily a checklist that was final,  11:40:42
17　correct?                      11:40:44
18　　A.　There were several checklists.  11:40:45
19　Okay.                          11:40:49
20　　　　So may I explain, please?      11:40:49
21　　Q.　Sure.                  11:40:51
22　　A.　So there was a customer account  11:40:52
23　setup which had been in existence ad  11:40:53
24　infinitum, but this was a new customer  11:40:59
25　checklist that asked our customers to attest  11:41:01

Page 161

1　to their -- that they had a suspicious order  11:41:05
2　monitoring program.  And we got that guidance  11:41:10
3　straight from Drug and Chemical Advisory  11:41:12
4　Group, that that would be a tool to augment  11:41:16
5　our program.                  11:41:18
6　　Q.　Okay.  So a moment ago when you  11:41:18
7　said that there was always a customer account  11:41:21
8　setup, as far as you understood, in  11:41:23
9　connection with SOM procedure, prior to this  11:41:24
10　date was there ever a customer checklist that  11:41:28
11　was part of that customer account setup?  11:41:31
12　　A.　Right.  So, no, I'd like to  11:41:33
13　clarify because the previous checklist was  11:41:34
14　not in conjunction with SOM.  So this is the  11:41:37
15　first SOM checklist.              11:41:40
16　　Q.　Great.                  11:41:41
17　　　　So accurate to say that as of  11:41:42
18　April 2008, you are developing the first  11:41:45
19　customer checklist to be filled out in  11:41:47
20　connection with Mallinckrodt's SOM program?  11:41:50
21　Correct?                      11:41:53
22　　A.　That's correct.            11:41:53
23　　Q.　Okay.  And some of the  11:41:54
24　questions that you want included in the  11:41:56
25　checklist, at least your suggestion, if I  11:41:59

Page 162

1 understand correctly, is to try and determine 11:42:01
2 the overall percentage of controlled 11:42:03
3 substance filled by the pharmacy. 11:42:05
4      Do you see that? 11:42:06
5   A.  I do see that. 11:42:07
6   Q.  And so that was an important 11:42:08
7 feature of the checklist to you at this time. 11:42:10
8      MR. O'CONNOR: Objection to 11:42:11
9 form. 11:42:12
10 QUESTIONS BY MR. KO: 11:42:12
11   Q.  Correct? 11:42:13
12   A.  So it was -- they were 11:42:13
13 statements taken from Southwood, and I'm 11:42:17
14 asking the question: Should we incorporate 11:42:19
15 these questions? 11:42:21
16   Q.  Okay. And you're asking the 11:42:23
17 question, "should we incorporate," because 11:42:27
18 you have received a Federal Register Notice 11:42:28
19 that suggests that you should consider asking 11:42:30
20 those questions, correct? 11:42:32
21      MR. O'CONNOR: Objection to 11:42:33
22 form. 11:42:35
23      THE WITNESS: Yes. 11:42:35
24 QUESTIONS BY MR. KO: 11:42:35
25   Q.  Okay. And one question that 11:42:35

Page 163

1 you believe you should ask in light of 11:42:38
2 reviewing Southwood is to determine the 11:42:41
3 overall percentage of controlled substances 11:42:42
4 filled by a particular pharmacy, correct? 11:42:44
5      MR. O'CONNOR: Objection to 11:42:46
6 form. 11:42:47
7      THE WITNESS: So we don't ship 11:42:47
8      to pharmacies, so we adapted the 11:42:50
9      spirit of this question to ask the 11:42:53
10      question of our distributor customers. 11:42:56
11 QUESTIONS BY MR. KO: 11:42:59
12   Q.  Right. 11:42:59
13      But the idea is to understand, 11:43:00
14 notwithstanding the fact that you don't ship 11:43:02
15 directly to pharmacies, the idea is to 11:43:04
16 understand what overall percentage of a 11:43:08
17 controlled substance is being filled by a 11:43:12
18 downstream pharmacy, that is, a customer of 11:43:13
19 one of your distributors, correct? 11:43:17
20      MR. O'CONNOR: Objection to 11:43:18
21 form. 11:43:19
22      THE WITNESS: That's correct. 11:43:19
23 QUESTIONS BY MR. KO: 11:43:19
24   Q.  Okay. And another important 11:43:20
25 question that you glean from your review of 11:43:25

Page 164

1 Southwood is to input into the checklist 11:43:27
2 identification of the percentage of 11:43:32
3 prescriptions filled by the -- filled by the 11:43:35
4 pharmacy that originate from the Internet. 11:43:37
5      Do you see that? 11:43:39
6      MR. O'CONNOR: Objection to 11:43:39
7 form. 11:43:41
8      THE WITNESS: It was -- yes, it 11:43:41
9      was stated -- it was suggested in 11:43:42
10      Southwood's. 11:43:44
11 QUESTIONS BY MR. KO: 11:43:45
12   Q.  Okay. And that -- you felt 11:43:45
13 that that was an important element to you 11:43:47
14 included in the checklist at the time, 11:43:49
15 correct? 11:43:51
16   A.  So I pulled -- we pulled these 11:43:52
17 from Southwood's, but they were not 11:43:57
18 applicable to the questions we asked 11:43:59
19 distributors. Some of them became part of a 11:44:02
20 pharmacy information sheet, so I'm -- I'm 11:44:05
21 confusing the names of our forms, and I 11:44:08
22 apologize for that. 11:44:10
23      So this was taken from 11:44:11
24 Southwood's for evaluation by the team: 11:44:12
25 Could we, should we, incorporate these 11:44:14

Page 165

1 statements into our direct customer 11:44:17
2 checklist. 11:44:19
3   Q.  Right. And thank you for that. 11:44:19
4      So these are questions that you 11:44:21
5 believe should be incorporated into the new 11:44:23
6 customer checklist that you were working on 11:44:25
7 in April of 2008, correct? 11:44:27
8   A.  I did not know if we should -- 11:44:28
9 should use them. 11:44:33
10   Q.  But you believe that they were 11:44:33
11 good suggestions pursuant to your review of 11:44:36
12 Southwood, correct? 11:44:39
13      MR. O'CONNOR: Objection to 11:44:40
14 form. 11:44:41
15      THE WITNESS: So I pulled them 11:44:41
16      out of Southwood, but I was learning 11:44:42
17      more and more and more about the 11:44:43
18      business and our customers at the 11:44:45
19      time, and I did not know if these had 11:44:48
20      relevance to be added to this direct 11:44:50
21      customer checklist. 11:44:54
22 QUESTIONS BY MR. KO: 11:44:55
23   Q.  Fair enough. 11:44:55
24      Was the purpose of posing these 11:44:56
25 questions an attempt to understand more, as 11:45:00

Page 166

1    you said, about Mallinckrodt's business?    11:45:04
2    Correct?    11:45:06
3         MR. O'CONNOR:  Objection to    11:45:07
4    form.    11:45:08
5         THE WITNESS:  Yes.    11:45:08
6    QUESTIONS BY MR. KO:    11:45:09
7         Q.    And in particular, the    11:45:09
8    questions you posed here you were considering    11:45:11
9    to include in your checklist because they    11:45:15
10   provide details of the downstream customer    11:45:18
11   that purchases drugs from distributors that    11:45:21
12   you ship and sell to directly, correct?    11:45:25
13        MR. O'CONNOR:  Objection to    11:45:27
14   form.    11:45:28
15        THE WITNESS:  Correct.    11:45:28
16   QUESTIONS BY MR. KO:    11:45:32
17        Q.    So is it fair to say that you    11:45:33
18   are trying to understand details of where    11:45:35
19   Mallinckrodt drugs end up in terms of which    11:45:41
20   pharmacy or clinic they go to?    11:45:45
21        MR. O'CONNOR:  Objection to    11:45:46
22   form.    11:45:47
23        THE WITNESS:  We had two    11:45:47
24   checklists.    11:45:51
25        May I restate this?  Is that    11:45:51

Page 167

1    all right with you?    11:45:54
2    QUESTIONS BY MR. KO:    11:45:54
3         Q.    Yeah, sure.    11:45:55
4         A.    So this was within the scope of    11:45:55
5    the suspicious order checklist going to our    11:45:59
6    direct customers.  Okay?  So these questions    11:46:02
7    were not applicable to our business because    11:46:07
8    we sold to wholesaler and distributor.    11:46:08
9         But as time went on, we    11:46:10
10   developed a pharmacy information sheet which,    11:46:13
11   when we had conversations with the    11:46:16
12   distributors about their customers, we asked    11:46:18
13   these questions from Southwood's:  Are you    11:46:21
14   aware that your pharmacy customer has these    11:46:25
15   percentages, et cetera.    11:46:27
16        So there are two checklists,    11:46:28
17   and I think they're getting interchanged    11:46:29
18   here, and I apologize for the confusion.    11:46:31
19        Q.    That's okay.  I appreciate the    11:46:33
20   response.  I just have a simple yes or no    11:46:37
21   question.    11:46:40
22        A.    All right.    11:46:41
23        Q.    Is it accurate to say, yes or    11:46:41
24   no, that one of the reasons why you are    11:46:44
25   suggesting the consideration of these    11:46:46

Page 168

1    questions as you learned from Southwood was    11:46:50
2    to understand more about the downstream    11:46:52
3    customer of a distributor that you ship drugs    11:46:54
4    to?    11:46:57
5         MR. O'CONNOR:  Objection to    11:46:57
6    form.    11:46:58
7         THE WITNESS:  Yes.    11:46:58
8    QUESTIONS BY MR. KO:    11:47:01
9         Q.    Okay.  Thank you.    11:47:02
10        There's also a reference made,    11:47:04
11   next item down -- next paragraph, excuse me,    11:47:08
12   starting with "Kim France."  Do you see    11:47:13
13   there's a reference made to IntegriChain?    11:47:16
14        To help orient you, I've    11:47:21
15   highlighted it on the screen for you.    11:47:23
16        A.    Oh, thank you.    11:47:25
17        Q.    Yeah.    11:47:25
18        A.    Yes, I see it.    11:47:34
19        Q.    Okay.  And you participated in    11:47:35
20   the potential retention of IntegriChain, did    11:47:37
21   you not?    11:47:42
22        A.    Correct.    11:47:42
23        Q.    Okay.  And so did Kimberly    11:47:42
24   France, as I understand it?    11:47:49
25        A.    Yes.    11:47:50

Page 169

1         Q.    And who is Ms. France?    11:47:50
2         A.    She was -- she was with the    11:47:51
3    patient and product monitoring group that had    11:47:53
4    a different focus and goal than the DEA    11:47:56
5    compliance group.    11:48:00
6         Q.    Okay.  And both she and you    11:48:01
7    were involved in the potential retention of    11:48:06
8    IntegriChain during this 2008 time period,    11:48:08
9    correct?    11:48:12
10        A.    Yes, among others, yes.    11:48:12
11        Q.    Okay.  And this e-mail    11:48:14
12   specifically states from you that "one of the    11:48:16
13   goals of the Mallinckrodt IntegriChain    11:48:19
14   project being considered as part of RiskMAP    11:48:22
15   is to combine prescription data from Verispan    11:48:24
16   and IMS, added Mallinckrodt sales data and,    11:48:28
17   coupled with ARCOS data from DEA, to provide    11:48:32
18   a mechanism to detect diversion through the    11:48:34
19   supply chain."    11:48:37
20        Did I read that correctly?    11:48:38
21        A.    Yes, you did.    11:48:39
22        Q.    Okay.  And so was one of the    11:48:42
23   purposes of trying to retain IntegriChain to    11:48:44
24   understand where Mallinckrodt prescription    11:48:48
25   opioids were ending up once they had left    11:48:52

Page 170

1  Mallinckrodt facilities in Hobart and          11:48:54
2  St. Louis?                                      11:48:56
3       A.   We were looking at that as a          11:48:57
4  possibility, yes.                               11:49:01
5       Q.   Okay.  And so you were trying         11:49:01
6  to understand and trying to detect diversion    11:49:02
7  throughout the supply chain with the help of    11:49:05
8  IntegriChain; is that correct?                  11:49:09
9            MR. O'CONNOR:  Objection to           11:49:11
10      form.                                       11:49:12
11           THE WITNESS:  Yes, that is the        11:49:12
12      service they offered, yes.                  11:49:13
13 QUESTIONS BY MR. KO:                             11:49:20
14      Q.   Okay.  And can you generally          11:49:21
15 describe to the Court your involvement with      11:49:22
16 this project?                                    11:49:23
17      A.   IntegriChain came in to               11:49:24
18 Mallinckrodt and gave one or two                 11:49:28
19 presentations.  I'm not certain.  And then we    11:49:30
20 evaluated the merit of adding that to our        11:49:35
21 suspicious order monitoring, and we decided      11:49:39
22 not to add IntegriChain's services.              11:49:40
23      Q.   And why did you decide not to         11:49:43
24 retain them?                                     11:49:45
25      A.   So IntegriChain was a vendor,         11:49:45

Page 171

1  and their data collection did not add value     11:49:49
2  from our perspective to our suspicious order     11:49:54
3  monitoring program at the time.                  11:49:57
4       Q.   Uh-huh.  And why did you feel         11:49:58
5  like they did not add value?                     11:50:00
6       A.   Well, it was a multitude of          11:50:01
7  data from different sources, not necessarily     11:50:06
8  specific to Mallinckrodt data, and we            11:50:10
9  evaluated it, as I said.                         11:50:14
10           This also says "coupled with         11:50:16
11 ARCOS data from DEA."  DEA has steadfastly       11:50:18
12 throughout time refused to share ARCOS data      11:50:22
13 with anyone, and so that was another key         11:50:25
14 component of their program.                       11:50:28
15           So for those reasons we              11:50:31
16 declined the service.                            11:50:32
17      Q.   Do you recall how long you            11:50:34
18 evaluated whether or not you were going to       11:50:35
19 retain IntegriChain?                             11:50:36
20      A.   It was straightaway, shortly         11:50:38
21 after their one or two presentations.            11:50:42
22      Q.   Okay.  I have seen reference to      11:50:46
23 documents in which you have -- you have asked    11:50:51
24 approval from Bill Ratliff to be part of the     11:50:53
25 IntegriChain project.                            11:50:56

Page 172

1       Q.   Do you have any reason to            11:50:58
2  dispute that?                                    11:50:59
3            MR. O'CONNOR:  Objection to          11:51:00
4       form.                                       11:51:00
5            THE WITNESS:  I have no reason       11:51:00
6       to dispute it.                              11:51:01
7  QUESTIONS BY MR. KO:                             11:51:02
8       Q.   Okay.  So do you recall             11:51:02
9  actually asking for approval from Mr. Ratliff    11:51:04
10 to participate in the potential retention of     11:51:07
11 IntegriChain?                                    11:51:09
12      A.   I do.                                 11:51:10
13      Q.   Okay.  And that was obviously        11:51:11
14 prior to this date, but do you recall whether    11:51:13
15 or not that was in the 2007 time period?         11:51:15
16      A.   I don't recall the date, I'm        11:51:17
17 sorry.                                           11:51:21
18      Q.   Okay.  I want to go forward to       11:51:21
19 the second attachment, titled "IntegriChain      11:51:29
20 Pilot Program and Overview."  And I don't --     11:51:33
21 we don't need to go through this in detail,      11:51:36
22 but do you recall who actually drafted this     11:51:38
23 language?                                        11:51:45
24      A.   It was not me.                        11:51:46
25      Q.   Okay.  Was it someone at            11:51:49

Page 173

1  Mallinckrodt?                                    11:51:50
2       A.   I do not know, or if it was         11:51:50
3  IntegriChain.                                    11:51:53
4       Q.   Okay.  But as far as you know,      11:51:54
5  you didn't draft this particular language,       11:51:55
6  correct?                                         11:51:57
7       A.   I'm positive I did not.             11:51:57
8       Q.   Despite not knowing who             11:51:59
9  may have drafted it, as you said, you were       11:52:07
10 considering retention of IntegriChain because    11:52:09
11 they were going to hopefully help detect         11:52:13
12 diversion throughout the supply chain.  So       11:52:17
13 separate and apart from what I'm                 11:52:19
14 highlighting, sorry.                             11:52:22
15      A.   Oh, I'm sorry.                        11:52:22
16      Q.   Yeah, no, that's okay.  Let me      11:52:23
17 repeat.                                          11:52:26
18      A.   Okay.                                 11:52:26
19      Q.   You were considering the            11:52:26
20 retention of IntegriChain because they were      11:52:27
21 going to help detect diversion throughout the    11:52:30
22 supply chain, correct?                           11:52:31
23           MR. O'CONNOR:  Objection to          11:52:32
24      form.                                       11:52:33
25           THE WITNESS:  Yes, that was          11:52:33

Page 174

1    what they advertised.  Yes.          11:52:33
2    QUESTIONS BY MR. KO:                 11:52:36
3       Q.   That was the intent?         11:52:37
4       A.   Yes.              11:52:37
5       Q.   And one of the ways that they   11:52:38
6    would do that was through capturing -- at   11:52:39
7    least representing to you that they would   11:52:41
8    capture detailed data, correct?     11:52:43
9       A.   Correct.            11:52:45
10      Q.   And so -- and in particular, in   11:52:46
11   the second sentence of this background   11:52:48
12   material, it indicates that "detailed data   11:52:51
13   through surveillance and pharmacovigilance   11:52:56
14   an important resource for the company."   11:53:00
15           Do you see that?            11:53:02
16      A.   I do see that.            11:53:03
17      Q.   Would you agree with that   11:53:03
18   statement?                    11:53:04
19      A.   I would not.            11:53:04
20      Q.   You don't believe detailed data   11:53:05
21   is an important resource for the company?   11:53:08
22      A.   I don't understand how      11:53:09
23   pharmacovigilance, which in my understanding   11:53:10
24   is adverse event reporting, could be an   11:53:12
25   important resource for the company.   11:53:18

Page 175

1           Also, this statement -- may I   11:53:20
2    say something else, please?         11:53:22
3       Q.   Of course.            11:53:24
4       A.   So this document, it switches   11:53:24
5    back and forth, so it's confusing in terms of   11:53:26
6    they're talking about "the company,"   11:53:30
7    Mallinckrodt, but then "our company,"   11:53:33
8    indicating IntegriChain.            11:53:36
9           So it's difficult to -- to   11:53:38
10   define every sentence and under --   11:53:43
11      Q.   Sure.  Fair enough.        11:53:46
12      A.   Thank you.  Thank you.      11:53:47
13      Q.   Fair enough.  And we can put   11:53:47
14   the document aside because I don't mean to   11:53:49
15   put you through a memory test of the actual   11:53:51
16   document.                     11:53:53
17      A.   Okay.              11:53:53
18      Q.   I would just ask you separately   11:53:53
19   whether or not you believe detailed data is   11:53:55
20   an important resource for the company to   11:53:57
21   utilize in trying to detect diversion.   11:54:00
22      A.   Yes.  In general, yes.      11:54:03
23      Q.   Okay.  And a moment ago when   11:54:04
24   you were talking about what your   11:54:06
25   understanding of pharmacovigilance is, you   11:54:06

Page 176

1    described it as being a report of adverse   11:54:08
2    events, correct?              11:54:10
3       A.   Yes.              11:54:11
4       Q.   Why would -- why would not   11:54:12
5    considering an adverse event be a fruitful   11:54:17
6    thing to do in connection with trying to   11:54:20
7    detect suspicious orders?            11:54:22
8           MR. O'CONNOR:  Objection to   11:54:23
9    form.                   11:54:24
10          THE WITNESS:  Adverse events   11:54:25
11   were handled by patient and product   11:54:27
12   monitoring, and they were events such   11:54:30
13   as a doctor had a patient on the      11:54:34
14   operating table and had administered a   11:54:35
15   Mallinckrodt medication and there was   11:54:37
16   some unexpected symptom occurring.  So   11:54:38
17   it was like a hotline of            11:54:44
18   pharmacovigilance.            11:54:47
19   QUESTIONS BY MR. KO:               11:54:49
20      Q.   Okay.  And was that -- did --   11:54:49
21   during your time at Mallinckrodt, did you   11:54:51
22   ever receive -- or were you aware of any   11:54:54
23   adverse event reports related to diversion?   11:55:00
24          MR. O'CONNOR:  Objection to   11:55:02
25   form.                   11:55:03

Page 177

1           THE WITNESS:  Yes.         11:55:03
2    QUESTIONS BY MR. KO:               11:55:08
3       Q.   Okay.  And did you -- during   11:55:08
4    your time at Mallinckrodt, did you ever   11:55:13
5    receive or were you aware of any adverse   11:55:15
6    event reports related to the abuse of   11:55:18
7    prescription opioids manufactured by   11:55:20
8    Mallinckrodt?              11:55:23
9       A.   Yes.              11:55:24
10      Q.   Okay.  And notwithstanding the   11:55:27
11   fact that some of these adverse event reports   11:55:29
12   included instances of diversion and abuse,   11:55:31
13   you don't believe that it was necessary to   11:55:35
14   include these -- or consider these reports in   11:55:37
15   connection with Mallinckrodt's duties to   11:55:40
16   implement and design a suspicious order   11:55:42
17   monitoring program?            11:55:44
18          MR. O'CONNOR:  Objection to   11:55:44
19   form.                   11:55:46
20          THE WITNESS:  So this was one   11:55:47
21   of the tools that was offered to us,   11:55:49
22   among many, and eventually we realized   11:55:51
23   that we had the chargeback tool which   11:55:55
24   could give us the detailed data about   11:56:00
25   the Mallinckrodt product, whereas   11:56:03

Page 178

1    IntegriChain was talking about the          11:56:05
2    universe of products not specific to        11:56:07
3    Mallinckrodt.                               11:56:08
4    QUESTIONS BY MR. KO:                         11:56:08
5       Q.   Sure.  And I understand --          11:56:09
6    maybe it'll help to put the document aside.  11:56:10
7       A.   Okay.                               11:56:13
8       Q.   I really don't have any more        11:56:13
9    questions on it.  I was just asking with     11:56:14
10   respect to your statement about            11:56:16
11   pharmacovigilance and adverse --           11:56:18
12      A.   Uh-huh.                            11:56:18
13      Q.   -- event reports in particular.    11:56:19
14          You had suggested that it was        11:56:19
15   not necessary to review adverse event reports 11:56:24
16   in connection with Mallinckrodt's duties to   11:56:27
17   design and implement an SOM program.          11:56:33
18          Is that what you testified to?       11:56:35
19          MR. O'CONNOR:  Objection to          11:56:37
20   form.                                       11:56:37
21          THE WITNESS:  Yes.                   11:56:37
22   QUESTIONS BY MR. KO:                         11:56:38
23      Q.   Okay.  And my question is, why      11:56:38
24   would you not consider such adverse event     11:56:39
25   reports relating to the abuse and diversion   11:56:42

Page 179

1    of Mallinckrodt prescription opioids that     11:56:44
2    were contained in such adverse event reports  11:56:47
3    as you testified?                           11:56:49
4       A.   Okay.  Please, I'd like to take     11:56:50
5    a break and confer with my attorneys on this  11:56:54
6    answer.                                     11:56:56
7          MR. KO:  Okay.                        11:56:57
8          MR. O'CONNOR:  Answer the            11:56:57
9    pending question.                           11:57:00
10          THE WITNESS:  Because the           11:57:01
11   adverse events that came to my             11:57:03
12   attention were notices of document         11:57:04
13   retention notice of litigation against     11:57:09
14   the company for people who took           11:57:11
15   fentanyl -- various -- various            11:57:19
16   episodes that resulted in abuse or a       11:57:22
17   lawsuit against the company as a          11:57:27
18   result of perceived Mallinckrodt          11:57:30
19   responsibility.                           11:57:33
20   QUESTIONS BY MR. KO:                         11:57:34
21      Q.   Okay.  And with respect to that    11:57:35
22   example in particular about the fentanyl    11:57:37
23   episode, that was related to an overdose?   11:57:41
24          MR. O'CONNOR:  And just for         11:57:48
25   clarity, I'm instructing you not to       11:57:49

Page 180

1    answer to the extent answering his        11:57:52
2    question would reveal any               11:57:54
3    conversations you had with company       11:57:56
4    counsel.                                11:57:57
5          THE WITNESS:  Okay.  I can        11:57:58
6    answer because it did not relate to      11:58:01
7    conversation with company counsel.       11:58:04
8    QUESTIONS BY MR. KO:                      11:58:05
9       Q.   Okay.                           11:58:05
10      A.   The adverse event that was      11:58:05
11   reported was a result of someone -- the   11:58:08
12   allegation was stealing fentanyl patches from 11:58:12
13   a glove compartment of a car that was hot.  11:58:16
14   Fentanyl, the active ingredient is activated 11:58:19
15   by heat.  And so the person who suffered the 11:58:21
16   adverse event had stolen the fentanyl,    11:58:24
17   allegedly, taken it and, yes, overdosed.  And 11:58:27
18   I don't know if they expired or not.  I know 11:58:32
19   there was a medical emergency.           11:58:35
20      Q.   Isn't that an example of        11:58:37
21   diversion leading to an opioid overdose?   11:58:39
22      A.   Yes, it's diversion at the      11:58:41
23   patient level, yes.                      11:58:47
24      Q.   Okay.  And diversion at the     11:58:47
25   patient level is something that would be   11:58:49

Page 181

1    important for you to understand that is     11:58:52
2    occurring in connection with your duties as  11:58:53
3    someone responsible for designing and      11:58:57
4    implementing a system to detect suspicious  11:59:00
5    orders, is it not?                        11:59:03
6          MR. O'CONNOR:  Objection to        11:59:04
7    form.                                    11:59:05
8          THE WITNESS:  So it's            11:59:05
9    impossible, completely impossible.  We   11:59:12
10   can monitor potentially down to the      11:59:14
11   pharmacy level, but once the           11:59:15
12   prescription is dispensed, we cannot     11:59:17
13   prevent diversion when it gets into a    11:59:21
14   private person's hands.                  11:59:24
15   QUESTIONS BY MR. KO:                      11:59:25
16      Q.   I know that you may think that    11:59:26
17   you cannot prevent diversion, but my question 11:59:27
18   is simply whether or not it would be     11:59:30
19   important to know whether Mallinckrodt drugs 11:59:33
20   were being diverted in instances like you   11:59:36
21   just described.                          11:59:39
22      A.   Yes.                            11:59:41
23          MR. O'CONNOR:  Objection to       11:59:42
24   form.                                    11:59:43
25

Page 182

1  QUESTIONS BY MR. KO:                11:59:43
2      Q.   And in particular, it would be    11:59:43
3  important to know -- if there were thousands  11:59:45
4  of overdoses that resulted from diversion of  11:59:46
5  Mallinckrodt drugs, that would be important   11:59:50
6  to know in connection with your duties as    11:59:52
7  a -- someone responsible for implementing an  11:59:55
8  SOM program, correct?               11:59:58
9        MR. O'CONNOR:  Objection to    11:59:59
10     form.                         11:59:59
11       THE WITNESS:  So will you     11:59:59
12     please repeat the question?  I'm   12:00:03
13     sorry.                        12:00:04
14  QUESTIONS BY MR. KO:               12:00:04
15     Q.   Sure.                   12:00:04
16       If there were thousands of    12:00:04
17  overdoses that resulted from the diversion of  12:00:06
18  Mallinckrodt drugs, that would be important   12:00:08
19  to know in connection with your duties as    12:00:11
20  someone responsible for implementing an SOM  12:00:13
21  program, correct?                 12:00:15
22       MR. O'CONNOR:  Objection.     12:00:16
23       THE WITNESS:  Yes.  So the    12:00:17
24     question is hypothetical -- yes,  12:00:20
25     thousands, yes, that would have been a  12:00:21

Page 183

1  concern.                         12:00:23
2  QUESTIONS BY MR. KO:               12:00:23
3      Q.   And overdose deaths that result  12:00:28
4  from someone taking a pill from a patient is   12:00:32
5  a sign of diversion, is it not?         12:00:35
6        MR. O'CONNOR:  Objection.     12:00:38
7     Form.                         12:00:40
8        THE WITNESS:  It's a form of   12:00:40
9     diversion.  It's misuse of a      12:00:42
10     prescription drug, yes.           12:00:43
11       MR. O'CONNOR:  Counsel, we've   12:00:46
12     been going almost an hour and a half.  12:00:47
13     Should we take another break?     12:00:48
14       MR. KO:  Yeah, I was just going  12:00:50
15     to say it's time for a break.      12:00:52
16       VIDEOGRAPHER:  We are going off  12:00:54
17     the record at 12 p.m.             12:00:55
18     (Off the record at 12:00 p.m.)     12:00:58
19       VIDEOGRAPHER:  We are back on   12:13:39
20     the record at 12:13 p.m.          12:13:43
21  QUESTIONS BY MR. KO:               12:13:45
22     Q.   Welcome back from the break,   12:13:47
23  Ms. Harper.                       12:13:49
24     A.   Thank you.                12:13:50
25     Q.   Going back to the -- do you   12:13:50

Page 184

1  have Exhibit 6 in front of you?         12:13:58
2      A.   It's Exhibit 2.             12:14:00
3      Q.   Oh, Exhibit 2.  Okay.  You can  12:14:01
4  set that aside.                   12:14:02
5        I'm going to hand you a copy of  12:14:03
6  what's previously been marked as Exhibit 21   12:14:04
7  of the Stewart deposition.            12:14:06
8        MR. KO:  And for the record,   12:14:18
9     this is -- ends in Bates 274111, and  12:14:20
10     it is an e-mail from Cathy Stewart to  12:14:26
11     several people, and you are among the  12:14:29
12     recipients.                    12:14:32
13  QUESTIONS BY MR. KO:               12:14:32
14     Q.   Do you see that?            12:14:32
15     A.   I do.                    12:14:32
16     Q.   And it's dated May 14, 2008,   12:14:33
17  correct?                         12:14:35
18     A.   Yes.                     12:14:35
19     Q.   And by the way, who is -- or   12:14:36
20  you know Cathy Stewart, right?          12:14:37
21     A.   Yes.                     12:14:39
22     Q.   You worked with her in       12:14:40
23  connection with SOM procedure --        12:14:42
24     A.   Yes.                     12:14:44
25     Q.   -- and activities!           12:14:44

Page 185

1      A.   (Witness nods head.)         12:14:46
2      Q.   Okay.  And do you respect her   12:14:46
3  opinions?                         12:14:48
4      A.   Yes.                     12:14:48
5      Q.   Okay.  And did you work with   12:14:49
6  her closely throughout the 2008 and 2012 time  12:14:51
7  period?                          12:14:54
8      A.   I can't -- she wasn't in that  12:14:54
9  role for an extremely long time, so I don't   12:14:56
10  know when she left, I'm sorry.          12:14:58
11     Q.   Did you work with her closely   12:15:00
12  in connection with SOM-related activities at   12:15:01
13  Mallinckrodt in the 2007, 2008 time period?   12:15:04
14     A.   I don't know when she started.  12:15:07
15  Clearly it was in May of 2008, but I don't    12:15:12
16  know the start or the end date of when she    12:15:15
17  became part of the initiative.          12:15:18
18     Q.   And you attended a -- you      12:15:21
19  attended a conference with her --        12:15:27
20     A.   Yes.                     12:15:28
21     Q.   -- in 2008, correct?          12:15:29
22     A.   Yes.                     12:15:30
23     Q.   And this was, I believe, in    12:15:30
24  October of 2008, and it was the Buzzeo        12:15:32
25  conference?                       12:15:36

Page 186

```
 1    A.   Yes.                    12:15:36
 2    Q.   And I know that postdates the    12:15:36
 3  date of this letter, but do you recall anyone  12:15:38
 4  else attending that conference other than you  12:15:42
 5  and Cathy from Mallinckrodt?        12:15:45
 6    A.   I do not.               12:15:47
 7    Q.   Okay.  So as far as you recall,   12:15:48
 8  you were the only -- you and Cathy were the   12:15:55
 9  only two that attended the Buzzeo conference  12:15:57
10  in 2008?                       12:16:00
11    A.   Yes.                    12:16:01
12    Q.   And what was her position       12:16:01
13  during the 2008 time period?        12:16:03
14    A.   Manager of dosage customer      12:16:04
15  service.                       12:16:09
16    Q.   Okay.  So she was a customer    12:16:09
17  service rep -- or sorry, excuse me.  She was  12:16:11
18  involved in the customer service group,   12:16:14
19  correct?                       12:16:16
20    A.   Correct.  The reps reported to  12:16:16
21  her.                           12:16:17
22    Q.   Right.                  12:16:18
23         And so she, at least of this     12:16:18
24  time, was having some involvement in the   12:16:23
25  revising of Mallinckrodt's SOM program; is  12:16:25
```

Page 187

```
 1  that fair to say?                 12:16:29
 2    A.   Yes.                    12:16:29
 3    Q.   Okay.  And also it appears that  12:16:30
 4  at this time the customer service group is   12:16:33
 5  having some involvement in the implementation  12:16:35
 6  of the revised SOM program.         12:16:38
 7         Separate and apart from what    12:16:39
 8  the e-mail says, is it your recollection that  12:16:41
 9  the customer service group had some       12:16:44
10  involvement in the revising of Mallinckrodt's  12:16:45
11  SOM program in 2008?              12:16:47
12         MR. O'CONNOR:  Objection to    12:16:49
13  form.                          12:16:50
14         THE WITNESS:  Yes.          12:16:50
15  QUESTIONS BY MR. KO:             12:16:50
16    Q.   Okay.  Ms. Stewart says that --  12:16:51
17  in particular she is advising everyone   12:17:00
18  on this e-mail that she is working with you   12:17:03
19  and Mr. Harper to develop procedures to   12:17:06
20  ensure that Mallinckrodt maintains compliance  12:17:11
21  with DEA requirements to identify suspicious  12:17:15
22  orders; is that correct?            12:17:18
23    A.   So I'm Harper, and it talks     12:17:18
24  about working with me and Bill Ratliff.   12:17:21
25    Q.   Right.                  12:17:23
```

Page 188

```
 1    A.   Yes.                    12:17:23
 2    Q.   So Ms. Stewart is at this time,  12:17:24
 3  as of May 14, 2008, working with you and   12:17:27
 4  Mr. Ratliff to specifically ensure that   12:17:32
 5  Mallinckrodt maintains compliance with DEA   12:17:40
 6  requirements related to identification of   12:17:42
 7  suspicious orders, correct?         12:17:44
 8    A.   I don't see the word          12:17:45
 9  "specifically," but, yes, she is assisting  12:17:49
10  with enhancing the program.         12:17:52
11    Q.   Okay.  And then she also        12:17:55
12  mentioned -- mentions that "in light of the  12:17:57
13  recent developments with McKesson, a good   12:17:59
14  deal of focus is being placed on this    12:18:02
15  project."                      12:18:03
16         Do you see that?            12:18:04
17    A.   I do.                   12:18:04
18    Q.   And is she referring to a DEA   12:18:05
19  investigation that ultimately resulted in a  12:18:08
20  DEA action against McKesson in the early 2008  12:18:12
21  time period?                   12:18:16
22    A.   Yes.                    12:18:16
23    Q.   Okay.  And McKesson, as we      12:18:17
24  mentioned before, is a -- is one of the -- or  12:18:21
25  one of the major distributors that faced DEA  12:18:23
```

Page 189

```
 1  scrutiny regarding their distribution of   12:18:25
 2  prescription opioids, correct?      12:18:28
 3    A.   Yes.                    12:18:29
 4    Q.   Okay.  Now, she goes on to      12:18:32
 5  describe generally when an order is deemed   12:18:34
 6  peculiar by a customer service rep.     12:18:41
 7         Do you see that?            12:18:42
 8    A.   Uh-huh.  Yes.              12:18:42
 9    Q.   And she says that "an order is   12:18:44
10  deemed peculiar by a customer service rep   12:18:50
11  based on a set of guidelines currently being  12:18:52
12  developed."                    12:18:56
13         Do you see that reference?      12:18:56
14         First sentence of the second    12:19:05
15  paragraph.                     12:19:07
16    A.   Yes, yes, yes, I see it.  Yes,   12:19:07
17  thank you.                     12:19:08
18    Q.   So fair to say as of May 14,    12:19:08
19  2008, Mallinckrodt is developing certain   12:19:13
20  guidelines to determine whether or not an   12:19:15
21  order is peculiar?              12:19:17
22    A.   It's not correct.            12:19:20
23    Q.   Okay.  Is it -- is that -- is    12:19:21
24  your testimony that it's not correct because  12:19:24
25  you always had a system to determine whether  12:19:25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1  or not an order was peculiar?                    12:19:28
2      A.   That's correct.                         12:19:29
3      Q.   Okay.  So is it fair to say             12:19:30
4  that as of May 14, 2008, you are revising         12:19:31
5  set of guidelines to determine whether or not    12:19:37
6  it's peculiar?                                    12:19:39
7      A.   Yes.                                     12:19:40
8      Q.   Okay.  And what is the                   12:19:41
9  difference from your perspective between a        12:19:47
10 peculiar order and a suspicious order?            12:19:49
11     A.   We -- at different times with            12:19:51
12 the enhancements of our program, we called        12:19:58
13 orders "peculiar," we called orders               12:20:01
14 "unusual," and we called orders "suspicious."     12:20:03
15 So at this time, the peculiar order was           12:20:06
16 something that came to our attention and          12:20:10
17 warranted additional review but was not           12:20:14
18 necessarily deemed to be suspicious.              12:20:17
19     Q.   Okay.  So a peculiar order, if           12:20:19
20 I understand your testimony correctly, is not     12:20:21
21 necessarily synonymous with a suspicious          12:20:23
22 order; is that correct?                           12:20:26
23     A.   Correct.                                 12:20:26
24     Q.   Okay.  And if I understand both          12:20:28
25 this e-mail and some other documents I've         12:20:32

Page 191

1  reviewed, my understanding is that once an        12:20:35
2  order is identified as peculiar, certain          12:20:38
3  people make the determination of whether or       12:20:42
4  not the order is ultimately suspicious            12:20:44
5  sufficient to notify the DEA; is that             12:20:46
6  accurate?                                         12:20:48
7          MR. O'CONNOR:  Objection to               12:20:48
8      form.                                         12:20:49
9          THE WITNESS:  Yes.                        12:20:49
10 QUESTIONS BY MR. KO:                              12:20:50
11     Q.   Okay.  And so for purposes of            12:20:50
12 this e-mail from Ms. Stewart to you, among        12:20:54
13 others, she is discussing a revision of what      12:20:58
14 determines a peculiar order, correct?             12:21:03
15     A.   A peculiar order as recognized           12:21:05
16 by customer service.                              12:21:11
17     Q.   Okay.                                    12:21:12
18     A.   Yes.                                     12:21:12
19     Q.   And is it accurate to say that           12:21:13
20 a peculiar order -- whether or not an order       12:21:17
21 was deemed peculiar was based on an               12:21:22
22 algorithm, as we discussed earlier; is that       12:21:25
23 correct?                                          12:21:29
24     A.   That was one of the reasons,             12:21:29
25 but in the case of a customer service rep, it     12:21:31

Page 192

1  could have been anything that came to the        12:21:34
2  customer service rep's attention as them         12:21:35
3  being familiar with the account.                 12:21:39
4      Q.   Okay.  Because as you testified         12:21:41
5  previously, they were your eyes and ears to      12:21:43
6  the customer, correct?                           12:21:47
7      A.   That was the NAMs.  But, yes,           12:21:48
8  the customer service reps were veterans with     12:21:49
9  the accounts, and, yes, they knew the            12:21:51
10 customers.                                        12:21:56
11     Q.   So would you agree -- because I         12:21:56
12 realize that you are trying to make a            12:22:04
13 distinction between the NAMs and the CSRs.        12:22:08
14         But would it be fair to say             12:22:11
15 that the CSRs had deep knowledge about the       12:22:12
16 customers?                                        12:22:16
17         MR. O'CONNOR:  Objection to             12:22:16
18     form.                                        12:22:17
19 QUESTIONS BY MR. KO:                             12:22:17
20     Q.   Of Mallinckrodt?                        12:22:17
21     A.   I wouldn't use the term "deep          12:22:18
22 knowledge."  They had knowledge of the          12:22:22
23 customers from the customer service             12:22:24
24 perspective.                                      12:22:26
25     Q.   Okay.  And when you said              12:22:27

Page 193

1  earlier that the NAMs were your eyes and          12:22:29
2  ears, would you also say that the customer        12:22:34
3  service reps to some extent were the eyes and     12:22:36
4  ears for the Mallinckrodt business as well?       12:22:38
5      A.   If you use the term -- making           12:22:40
6  an inferential leap, because the customer         12:22:45
7  service reps didn't see the customers or --       12:22:48
8  they talked to the customers and took            12:22:50
9  customer orders.                                  12:22:52
10     Q.   Okay.  Let me make sure I               12:22:53
11 understand it.                                     12:22:55
12         They didn't see the customers,           12:22:55
13 but they talked to them?                           12:22:57
14     A.   Yes.                                     12:22:58
15     Q.   Okay.  So they didn't actually          12:22:58
16 visit them like the NAMs did, but they would     12:23:00
17 speak to them via telephone only?                 12:23:03
18         MR. O'CONNOR:  Objection to             12:23:05
19     form.                                        12:23:06
20         THE WITNESS:  Correct.                  12:23:06
21 QUESTIONS BY MR. KO:                             12:23:06
22     Q.   But the CSRs had, through these         12:23:06
23 conversations, presumably had knowledge about    12:23:10
24 the customers, correct?                           12:23:11
25     A.   Yes.                                     12:23:13

Page 194

1    Q.    Turning back to this          12:23:20
2    distinction between peculiar and suspicious,    12:23:21
3    do you ever recall an instance in which an    12:23:23
4    order was identified as suspicious but not    12:23:25
5    peculiar?                12:23:30
6        A.    I don't know that answer.        12:23:31
7        Q.    Okay.  Do you ever recall an        12:23:32
8    instance in which an order was identified as    12:23:36
9    unusual but not peculiar?            12:23:38
10        A.    I can't say.  I'm sorry.        12:23:39
11        Q.    Okay.  Is it accurate to        12:23:43
12    describe at least the -- well, strike that.    12:23:45
13        Prior to the revision of the        12:23:50
14    SOM program in 2008 that's reflected in these    12:23:55
15    e-mails that we're going over, is it accurate    12:24:00
16    to say that an order was first -- an        12:24:04
17    evaluation was made first about whether or    12:24:10
18    not an order was peculiar, separate and apart    12:24:11
19    from an analysis of whether or not an order    12:24:14
20    was suspicious?                12:24:15
21        MR. O'CONNOR:  Objection to        12:24:16
22    form.                    12:24:17
23        THE WITNESS:  It appeared, yes.    12:24:17
24    That was a term that we used, yes.        12:24:21
25

Page 195

1    QUESTIONS BY MR. KO:            12:24:23
2        Q.    So in addition to it being a        12:24:24
3    term that you used, is it accurate to say    12:24:26
4    that at Mallinckrodt, before making a        12:24:28
5    determination with respect to whether an    12:24:31
6    order was suspicious, the existing SOM        12:24:33
7    program at the time determined first whether    12:24:37
8    an order was peculiar?            12:24:39
9        A.    Yes, that was the term we used,    12:24:42
10    yes.                    12:24:46
11        Q.    And then once an order was        12:24:46
12    deemed to be peculiar, you subsequently made    12:24:48
13    a determination of whether or not that order    12:24:50
14    was suspicious, correct?            12:24:53
15        A.    Yes.                12:24:55
16        Q.    Okay.  And you had mentioned a    12:24:56
17    moment ago that there were other        12:25:11
18    circumstances besides the algorithm that    12:25:14
19    would potentially make an order peculiar.    12:25:17
20        Do you recall that?            12:25:20
21        A.    Yes.  I'm using the terms        12:25:21
22    "peculiar," "suspicious," "unusual,"        12:25:26
23    interchangeably, yes.            12:25:31
24        Q.    Okay.  Well, I would not like    12:25:32
25    to use those words interchangeably --        12:25:35

Page 196

1        A.    Okay.  All right.  Okay.  Thank    12:25:35
2    you.                    12:25:35
3        Q.    -- and I'm trying to understand    12:25:35
4    the distinctions between them.        12:25:39
5        A.    Okay.  Thank you.            12:25:40
6        Q.    So with respect to            12:25:42
7    identification of a peculiar order, you had    12:25:43
8    previously testified that if an order met a    12:25:44
9    certain threshold by an algorithm determined    12:25:53
10    by Mallinckrodt, it would be deemed peculiar.    12:25:55
11        MR. O'CONNOR:  Objection to        12:25:58
12    form.                    12:25:59
13    QUESTIONS BY MR. KO:            12:25:59
14        Q.    Correct?                12:25:59
15        A.    Correct.                12:25:59
16        Q.    And in addition to the        12:26:00
17    algorithm triggering a peculiar order, you    12:26:03
18    had also testified that there were other    12:26:06
19    circumstances that may indicate an order was    12:26:08
20    peculiar as identified by a customer service    12:26:11
21    rep, correct?                12:26:14
22        A.    Correct.                12:26:14
23        Q.    Okay.  And who other than the    12:26:15
24    CSRs had a responsibility or an obligation to    12:26:20
25    determine whether or not this order was    12:26:26

Page 197

1    peculiar?                12:26:28
2        MR. O'CONNOR:  Objection to        12:26:28
3    form.  THE WITNESS:  Peculiar, using    12:26:29
4    the strictest definition of the term.    12:26:37
5    The national account managers, if they    12:26:43
6    saw something when they were at the        12:26:43
7    accounts, the customer service review    12:26:43
8    and the peculiar order algorithm        12:26:50
9    detection, yes.            12:26:50
10    QUESTIONS BY MR. KO:            12:26:52
11        Q.    Okay.  So I'm setting aside the    12:26:52
12    algorithm detection.            12:26:54
13        A.    Okay.                12:26:55
14        Q.    So for purposes of identifying    12:26:56
15    an order as peculiar, do you recall any    12:26:59
16    instances in the 2007 through 2010 time    12:27:00
17    period in which orders were identified as    12:27:03
18    peculiar by either a CSR or an NAM, separate    12:27:05
19    and apart from whether or not an algorithm    12:27:10
20    triggered the order to be peculiar?        12:27:14
21        A.    Yes.                12:27:17
22        Q.    Okay.  And other than the CSRs    12:27:18
23    and the NAMs, did anyone else have        12:27:22
24    responsibility with respect to determining    12:27:25
25

Page 198

1    whether or not that order was peculiar?    12:27:26
2    Separate and apart from the algorithm.    12:27:32
3        A.    Separate from the algorithm?    12:27:33
4        So may I ask a question,    12:27:37
5    please?    12:27:38
6        Q.    Sure.    12:27:38
7        A.    So there was -- we spoke    12:27:39
8    earlier about a circumstance where a DEA    12:27:40
9    investigator contacted Mallinckrodt.  It was    12:27:44
10   a compounding pharmacy.  So I don't know if    12:27:48
11   that was within the same time frame.    12:27:50
12       But so my point is, peculiar    12:27:52
13   order information could come from an external    12:27:56
14   source, potentially.    12:27:59
15       Q.    Okay.  So other than an    12:28:00
16   external source or from some evaluation made    12:28:03
17   by a CSR or an NAM, apart from the algorithm    12:28:06
18   that triggered a peculiar order, were there    12:28:11
19   any other circumstances in which a peculiar    12:28:15
20   order was identified at Mallinckrodt?    12:28:19
21       A.    No.    12:28:20
22       Q.    Okay.  Is it your understanding    12:28:21
23   that Mallinckrodt could not ship a peculiar    12:28:30
24   order without first conducting some sort of    12:28:37
25   due diligence on that order?    12:28:38

Page 199

1        A.    It is not.    12:28:39
2            MR. O'CONNOR:  Objection to    12:28:39
3        form.    12:28:40
4    QUESTIONS BY MR. KO:    12:28:40
5        Q.    It is not your understanding.    12:28:41
6        So a peculiar order could ship    12:28:42
7    without conducting due diligence then,    12:28:43
8    correct?    12:28:45
9        A.    Correct.    12:28:45
10       Q.    Okay.  So isn't that an unusual    12:28:46
11   circumstance?    12:28:55
12           MR. O'CONNOR:  Objection to    12:28:55
13       form.    12:28:57
14   QUESTIONS BY MR. KO:    12:28:57
15       Q.    In other words, if you're not    12:28:57
16   performing any -- earlier we made a    12:29:01
17   distinction between peculiar and suspicious    12:29:03
18   orders, correct?    12:29:05
19       A.    Correct.    12:29:05
20       Q.    And the latter is something    12:29:05
21   that you ultimately have to report to the    12:29:07
22   DEA, correct?    12:29:08
23       A.    Correct.    12:29:09
24       Q.    And we had also discussed about    12:29:09
25   how evaluation of a peculiar order is    12:29:16

Page 200

1    necessary to determine whether or not that    12:29:18
2    is, in fact, suspicious, correct?    12:29:21
3        A.    Correct.    12:29:22
4        Q.    So it's your testimony sitting    12:29:23
5    here today that you did not always perform    12:29:27
6    due diligence on peculiar orders before    12:29:29
7    shipping them, correct?    12:29:31
8            MR. O'CONNOR:  Objection to    12:29:31
9        form.    12:29:32
10           THE WITNESS:  Correct.    12:29:32
11   QUESTIONS BY MR. KO:    12:29:33
12       Q.    Okay.  Shipping of a peculiar    12:30:03
13   order without doing due diligence would seem    12:30:04
14   contradictory to what Ms. Stewart is trying    12:30:06
15   to describe here, right?    12:30:10
16           MR. O'CONNOR:  Objection to    12:30:12
17       form.    12:30:13
18           THE WITNESS:  Yes.    12:30:13
19   QUESTIONS BY MR. KO:    12:30:16
20       Q.    Okay.  And to be clear, so the    12:30:17
21   record is clear, she is suggesting that if an    12:30:21
22   order is deemed peculiar, it should be placed    12:30:23
23   on hold and the DEA compliance group will be    12:30:26
24   advised.    12:30:30
25       Do you see that?    12:30:30

Page 201

1        A.    I do.    12:30:31
2        Q.    And in particular, Mr. Ratliff    12:30:32
3    and you are the DEA compliance group as    12:30:34
4    referenced by Ms. Stewart, correct?    12:30:38
5        A.    Correct.    12:30:39
6        Q.    And she also states that "DEA    12:30:40
7    compliance will then conduct a more in-depth    12:30:44
8    investigation and determine if the situation    12:30:47
9    warrants notification to the DEA."    12:30:49
10       Do you see that?    12:30:51
11       A.    I do see it.    12:30:52
12       Q.    And so your testimony, so the    12:30:53
13   record is clear, is that that more in-depth    12:30:55
14   investigation did not always occur, correct?    12:30:58
15           MR. O'CONNOR:  Objection to    12:30:59
16       form.    12:31:00
17           THE WITNESS:  There were times    12:31:00
18   that we shipped an order before the    12:31:01
19   review was complete, but we never    12:31:03
20   shipped a suspicious order.    12:31:06
21   QUESTIONS BY MR. KO:    12:31:07
22       Q.    Okay.  Well, separate and apart    12:31:08
23   from the terminology now --    12:31:09
24       A.    Okay.    12:31:10
25       Q.    -- the process as described by    12:31:11

Page 202

1  Ms. Stewart and your testimony here today,        12:31:14
2  after an order was deemed to be peculiar from     12:31:17
3  a variety of means that we discussed, it was      12:31:22
4  not always the case that the order was placed     12:31:26
5  on hold and an in-depth investigation ensued,     12:31:30
6  correct?                                          12:31:34
7         MR. O'CONNOR: Objection to                 12:31:34
8  form.                                             12:31:34
9         THE WITNESS: So the order was              12:31:34
10    always placed on hold, but sometimes           12:31:35
11    it was released from hold and shipped          12:31:37
12    prior to the completion of the review.         12:31:39
13  QUESTIONS BY MR. KO:                             12:31:41
14     Q.    Okay. Now, a moment ago you             12:31:41
15  said that you believe you never shipped a        12:32:03
16  suspicious order, correct?                       12:32:04
17     A.    Correct.                                12:32:05
18     Q.    But that is just simply based           12:32:05
19  on your understanding of whether or not that     12:32:09
20  formal label was made by someone at              12:32:11
21  Mallinckrodt, correct?                           12:32:15
22         MR. O'CONNOR: Objection to                12:32:17
23    form.                                          12:32:18
24  QUESTIONS BY MR. KO:                             12:32:18
25     Q.    Let me ask a different way.             12:32:18

Page 203

1         If you release an order without           12:32:20
2  conducting an investigation or performing due     12:32:23
3  diligence, that order could potentially be        12:32:26
4  suspicious, could it not?                         12:32:28
5         MR. O'CONNOR: Objection to                 12:32:30
6    form.                                           12:32:30
7         THE WITNESS: That's correct.               12:32:30
8  QUESTIONS BY MR. KO:                              12:32:31
9     Q.    Okay. And in particular, just           12:32:48
10  to make sure the record is clear, if you         12:32:50
11  release a peculiar order without conducting      12:32:53
12  an investigation or performing due diligence,    12:32:55
13  that peculiar order could potentially be         12:32:58
14  suspicious, could it not?                        12:33:00
15         MR. O'CONNOR: Objection to                12:33:01
16    form.                                          12:33:02
17         THE WITNESS: It could.                    12:33:02
18  QUESTIONS BY MR. KO:                             12:33:04
19     Q.    Okay. Okay. Now, if you turn           12:33:04
20  to the second page of this e-mail -- it's        12:33:32
21  unfortunately just a one-page document.          12:33:41
22     A.    Okay. Thank you.                        12:33:42
23     Q.    And at the top, Ms. Stewart is         12:33:43
24  indicating that "in addition to order            12:33:47
25  quantities by product, we hope to also           12:33:52

Page 204

1  develop criteria for orders that deviate from     12:33:55
2  normal ordering patterns and/or from unusual      12:33:57
3  order frequency. Not yet sure how to capture      12:34:01
4  this. Hope to identify an algorithm that          12:34:05
5  will support a parsing through the data to        12:34:08
6  identify patterns, frequency, et cetera."         12:34:10
7         Did I read that correctly?                12:34:13
8     A.    Yes, you did.                            12:34:14
9     Q.    So is it accurate to say that           12:34:15
10  as the date of this e-mail, Mallinckrodt had     12:34:17
11  not yet developed a criteria in its              12:34:18
12  suspicious order monitoring system to            12:34:23
13  identify orders that deviate from a normal       12:34:25
14  ordering pattern?                                12:34:27
15         MR. O'CONNOR: Objection to                12:34:28
16    form.                                          12:34:32
17         THE WITNESS: Not correct.                 12:34:35
18  QUESTIONS BY MR. KO:                             12:34:36
19     Q.    Okay. Is it correct to say             12:34:36
20  that at the date of this e-mail, Mallinckrodt    12:34:37
21  is working on revising the criteria for         12:34:39
22  identifying orders that deviate from a normal    12:34:42
23  ordering pattern?                                12:34:44
24     A.    Yes.                                    12:34:44
25     Q.    And also accurate to say that          12:34:44

Page 205

1  at this time Mallinckrodt is revising its         12:34:46
2  criteria for determining whether or not a         12:34:48
3  usual -- an order that deviates from usual        12:34:53
4  order frequency; is that correct?                 12:34:56
5         MR. O'CONNOR: Objection to                 12:34:57
6    form.                                           12:34:58
7         THE WITNESS: Correct.                      12:34:58
8  QUESTIONS BY MR. KO:                              12:34:58
9     Q.    And Ms. Stewart indicates that          12:34:59
10  she's not sure how to capture this as of the     12:35:00
11  date of this e-mail.                             12:35:06
12         Do you see that?                          12:35:07
13     A.    I see that.                             12:35:07
14     Q.    And so is it fair to say that          12:35:08
15  you -- would you agree with this statement,      12:35:09
16  that at the time you weren't sure how to         12:35:11
17  capture this criteria in revising your SOM       12:35:12
18  policy?                                          12:35:15
19     A.    We were working through the             12:35:16
20  algorithm to understand -- there were several   12:35:18
21  approaches to the analysis, and we had not      12:35:25
22  settled on a specific one at this time.          12:35:28
23     Q.    Okay. And the algorithm at the         12:35:30
24  time of the -- at the time of this e-mail,       12:35:35
25  what was your understanding what the             12:35:36

Page 206

```
1   algorithm was?                    12:35:37
2       A.   It was comparing a customer's   12:35:38
3   order history to itself and flagging any   12:35:41
4   order that exceeded a multiplier.       12:35:46
5       Q.   And at the time, do you recall   12:35:49
6   what the multiplier was?            12:35:50
7       A.   I do not.                 12:35:51
8       Q.   Do you recall if it was a ███   12:35:52
9   multiplier?                        12:35:54
10      A.   I do not.                 12:35:55
11      Q.   Okay.  In the next paragraph,   12:35:56
12  Ms. Stewart indicates that "the sales force   12:36:06
13  will play a key role in this process by   12:36:07
14  verifying the customer's physical site and   12:36:11
15  operations ring true with the type of   12:36:14
16  business they purport to run."       12:36:16
17           Do you see that?          12:36:17
18      A.   I do.                     12:36:17
19      Q.   Do you agree that the sales   12:36:18
20  force would play this key role in trying to   12:36:20
21  identify the customer's physical site and   12:36:22
22  operations?                        12:36:27
23      A.   That was a suggestion from Drug   12:36:27
24  and Chemical Advisory Group that we did not   12:36:30
25  implement.  We used the sales force, but they   12:36:34
```

Page 207

```
1   did not play the key role in determining   12:36:35
2   whether the customer was set up or not.   12:36:38
3       Q.   Okay.  And to be clear, is the   12:36:40
4   sales force discussed here and as you just   12:36:41
5   testified to, are you talking about NAMs and   12:36:46
6   CSRs or both?  Or NAMs or CSRs or both?   12:36:48
7       A.   NAMs.                     12:36:54
8       Q.   Okay.  So the sales force   12:36:55
9   described in this e-mail is just with respect   12:36:56
10  to the national account managers, correct?   12:36:58
11      A.   Yes.                      12:37:00
12      Q.   Okay.  And you can set that   12:37:00
13  aside.  Thank you.                  12:37:14
14           Now, is it fair to say that in   12:37:21
15  the early 2008 time period you were working   12:37:27
16  on revising and revamping Mallinckrodt's SOM   12:37:28
17  program?  Is that accurate?          12:37:32
18      A.   Yes.                      12:37:33
19           MR. O'CONNOR:  Objection to   12:37:33
20      form.                         12:37:34
21  QUESTIONS BY MR. KO:                 12:37:34
22      Q.   And you had hoped to roll out a   12:37:35
23  formal SOM program at some -- as quickly as   12:37:40
24  possible; is that fair to say?       12:37:45
25           MR. O'CONNOR:  Objection to   12:37:47
```

Page 208

```
1   form.                             12:37:48
2           THE WITNESS:  So again -- I'm   12:37:48
3       sorry -- we've always had a program,   12:37:49
4       so we were hoping to enhance it and   12:37:51
5       introduce everyone to the enhancements   12:37:53
6       at that time.                 12:37:55
7   QUESTIONS BY MR. KO:                 12:37:55
8       Q.   Okay.  And the enhanced   12:37:56
9   version, just so the record is clear, extra   12:37:58
10  attention to the enhanced version was given   12:38:02
11  in early 2008, correct?             12:38:04
12      A.   Yes.                      12:38:05
13      Q.   And it was your hope to roll   12:38:06
14  out an enhanced version as quickly as   12:38:08
15  possible; is that fair to say?       12:38:11
16      A.   Yes.                      12:38:12
17      Q.   And it's important to roll out   12:38:13
18  an enhanced SOM program because failure to do   12:38:15
19  so would result in further diversion and   12:38:18
20  abuse of -- potentially of Mallinckrodt   12:38:21
21  opioids, correct?                  12:38:24
22           MR. O'CONNOR:  Objection to   12:38:24
23      form.                         12:38:25
24           THE WITNESS:  So we always had   12:38:25
25      a backbone program in place, and we   12:38:26
```

Page 209

```
1       were enhancing the program.      12:38:29
2   QUESTIONS BY MR. KO:                 12:38:30
3       Q.   Did you feel that backbone SOM   12:38:32
4   program was sufficient in terms of complying   12:38:34
5   with your duties under the CSA?      12:38:36
6       A.   Yes.                      12:38:38
7       Q.   Okay.  Well, then why did you   12:38:39
8   feel the need to enhance it?         12:38:41
9       A.   Because as time went on, we got   12:38:42
10  further guidance from DEA.  Any piece of   12:38:44
11  information that we gleaned, we acted upon it   12:38:47
12  immediately.  And we led the industry in   12:38:51
13  every aspect of enhancing our suspicious   12:38:53
14  order monitoring program.           12:38:57
15      Q.   Okay.  When you say you acted   12:38:57
16  on everything "immediately," what does that   12:38:59
17  mean?                             12:39:03
18           Did you act on advice from the   12:39:05
19  DEA as soon as you heard it?  Is that what   12:39:07
20  your testimony is today?            12:39:12
21      A.   So immediately -- that was a   12:39:12
22  poor choice of words.  As soon as possible,   12:39:16
23  yes.                              12:39:18
24      Q.   Okay.  And what does "as soon   12:39:19
25  as possible" mean to you?            12:39:21
```

Page 210

1         MR. O'CONNOR: Objection to    12:39:21
2   form.                      12:39:22
3         THE WITNESS: Depending upon    12:39:22
4   varying amounts of time, depending how   12:39:24
5   long it would have taken to implement   12:39:27
6   the suggestion from DEA.         12:39:28
7 QUESTIONS BY MR. KO:           12:39:29
8    Q.   Okay. Was it your goal at the   12:39:30
9 time that you were trying to enhance your SOM  12:39:32
10 program in early 2008 to make revisions and   12:39:35
11 roll out a formal enhanced policy as quickly   12:39:38
12 as possible?               12:39:40
13    A.   Yes.            12:39:42
14    Q.   Okay. And when would you say   12:39:43
15 you actually rolled out a formal SOM policy   12:39:46
16 that satisfied you, as someone who was in   12:39:49
17 charge of overseeing the SOM program?     12:39:53
18         MR. O'CONNOR: Objection to    12:39:54
19   form.                      12:39:56
20         THE WITNESS: So the existing   12:39:56
21   policy always satisfied me, but we     12:39:58
22   continued to work on enhancing our     12:40:00
23   policies.                12:40:02
24 QUESTIONS BY MR. KO:           12:40:02
25    Q.   Okay. And with respect to    12:40:03

Page 211

1 enhancing it in particular as we discussed in  12:40:07
2 early 2008, when would you say that process   12:40:10
3 was actually complete?         12:40:13
4    A.   I can't answer that because   12:40:14
5 enhancements are always ongoing. They're    12:40:18
6 ongoing up to today. So there's no start and  12:40:21
7 stop time to the enhancements.       12:40:24
8      (Mallinckrodt-Harper Exhibit 6   12:40:27
9   marked for identification.)       12:40:27
10 QUESTIONS BY MR. KO:          12:40:27
11    Q.   Fair enough.         12:40:28
12        I'm going to hand you a copy of  12:40:28
13 what will be marked as Harper Exhibit 6.    12:40:30
14        And for the record, this is --   12:40:41
15 ends in Bates stamp 387983.        12:40:42
16        Ms. Harper, this appears to be   12:41:00
17 a June 17, 2008, DEA compliance all site    12:41:01
18 conference call with notes attached to it.    12:41:06
19        Is that accurate -- an accurate   12:41:09
20 description of the document?        12:41:13
21    A.   Yes.            12:41:14
22    Q.   And you were present at this   12:41:14
23 meeting? You're listed as an attendee?     12:41:15
24    A.   Yes.            12:41:17
25    Q.   And it appears that the purpose  12:41:17

Page 212

1 of this meeting in the first sentence     12:41:25
2 underneath agenda, it states that "The     12:41:27
3 purpose of the meeting" -- and these calls --  12:41:33
4 "was to share information between sites and   12:41:37
5 to help each other gain a broader knowledge   12:41:39
6 of the supply chain process."       12:41:41
7        Did I read that correctly?    12:41:43
8    A.   Yes.            12:41:44
9    Q.   And so there were frequent    12:41:44
10 calls at the time to try and better      12:41:45
11 understand and gain knowledge of the supply   12:41:47
12 chain process?            12:41:51
13    A.   Yes.            12:41:51
14    Q.   Okay. And I just actually want  12:41:51
15 to turn to your portion of the       12:41:55
16 presentation -- or the notes that capture    12:41:59
17 your presentation, which is at the bottom of   12:42:00
18 page 2.                  12:42:05
19        Do you see where it says,     12:42:07
20 "Karen gave a brief update on Covidien's    12:42:08
21 efforts"?                12:42:11
22    A.   I do see that.        12:42:12
23    Q.   And by the way, Covidien is --  12:42:12
24 was your -- was the actual -- was the former  12:42:15
25 employer -- was your former employer?     12:42:19

Page 213

1    A.   Right. Our company has changed  12:42:22
2 corporate structure and ownership, yes.     12:42:25
3    Q.   Thank you.         12:42:26
4    A.   Yes.            12:42:26
5    Q.   You put it more artfully than   12:42:27
6 me.                     12:42:28
7        Covidien, at the time of     12:42:28
8 2000 -- 2008, Mallinckrodt was essentially   12:42:33
9 Covidien. And so for purposes of this     12:42:35
10 deposition, when I refer to Covidien, it's    12:42:37
11 synonymous with Mallinckrodt; is that fair?    12:42:40
12    A.   That's fair.         12:42:43
13    Q.   Okay. And you give a general   12:42:44
14 overview of the SOM program, and you say that  12:42:50
15 your efforts are ongoing to, quote, "Improve   12:42:57
16 our current suspicious order monitoring     12:43:01
17 system in light of recent DEA actions with    12:43:05
18 other registrants regarding this law."     12:43:08
19        Did I read that correctly?    12:43:10
20    A.   Can you point that out to me,   12:43:10
21 please, the sentence?         12:43:13
22    Q.   Sure. I just highlighted it.   12:43:13
23 It's at the top -- it's the first sentence    12:43:17
24 underneath your portion of the presentation.   12:43:18
25    A.   So I see that that is what it   12:43:20

Page 214

1  reads, but I don't know that I published  12:43:24
2  these notes or if Ms. Woznick was  12:43:26
3  interpreting the discussion and documenting  12:43:32
4  it --  12:43:33
5      Q.   Fair enough.  12:43:35
6      A.   -- as she saw fit.  12:43:35
7      Q.   Fair enough.  12:43:37
8           Would you agree with me that  12:43:37
9  one of the reasons why you were seeking to  12:43:38
10  improve Mallinckrodt's SOM system was in  12:43:41
11  light of recent DEA actions at the time?  12:43:45
12      A.   Yes.  12:43:48
13      Q.   Okay.  And the persons  12:43:51
14  responsible on the bottom right-hand corner  12:43:56
15  are listed as you and Eileen Spaulding.  12:44:03
16           Do you see that?  12:44:06
17      A.   I do.  12:44:06
18      Q.   And so is it fair to say that  12:44:07
19  based on this document, you and Eileen are  12:44:07
20  the people responsible for implementing an  12:44:11
21  improved SOM program at Mallinckrodt at this  12:44:15
22  time?  12:44:17
23           MR. O'CONNOR:  Objection.  12:44:17
24  Form.  12:44:18
25           THE WITNESS:  So not in  12:44:19

Page 215

1      isolation.  We were members of the  12:44:20
2      team, and we were the representatives  12:44:21
3      of the DEA compliance group on the  12:44:22
4      team, but there were others on the  12:44:25
5      team.  12:44:26
6  QUESTIONS BY MR. KO:  12:44:26
7      Q.   Okay.  But you guys were -- is  12:44:26
8  it fair to say that you were the team leaders  12:44:30
9  of the SOM team, or do you disclaim that  12:44:31
10  responsibility?  12:44:34
11      A.   I --  12:44:34
12           MR. O'CONNOR:  Objection to  12:44:34
13  form.  12:44:35
14           THE WITNESS:  The leader of the  12:44:35
15      team was always the most senior  12:44:43
16      official, so in one case it was JoAnne  12:44:46
17      Levy.  So I was a key contributor to  12:44:47
18      the team, as was Eileen, but I don't  12:44:50
19      know that I was ever designated as the  12:44:52
20      team leader.  12:44:53
21  QUESTIONS BY MR. KO:  12:44:54
22      Q.   Okay.  So is it your testimony  12:44:54
23  that you believe, at least as of the time  12:44:56
24  that JoAnne Levy was your direct report, that  12:44:58
25  she was the team leader of the SOM policy and  12:45:02

Page 216

1  program?  12:45:04
2      A.   I believe so, yes.  12:45:04
3      Q.   Okay.  And then at other  12:45:07
4  times -- I believe the name you referenced  12:45:14
5  before was Todd?  12:45:15
6           I'm sorry, who --  12:45:17
7           MR. O'CONNOR:  Objection to  12:45:18
8  form.  12:45:18
9  QUESTIONS BY MR. KO:  12:45:18
10      Q.   Who did you report to after  12:45:19
11  JoAnne Levy?  12:45:21
12      A.   Tom Berry.  12:45:21
13      Q.   Tom Berry.  Thank you.  12:45:22
14      A.   Yeah.  12:45:24
15      Q.   So Mr. Berry, would you agree  12:45:24
16  that after -- once you began reporting to  12:45:26
17  Mr. Berry, would you say that Mr. Berry was  12:45:31
18  the team leader for the SOM team?  12:45:34
19      A.   No.  12:45:36
20      Q.   Okay.  At the time that you  12:45:36
21  reported to Mr. Berry, would you say that you  12:45:37
22  were the team leader of the SOM team?  12:45:39
23      A.   So I'm sorry to repeat, but  12:45:41
24  there was no designated leader except in the  12:45:47
25  case of JoAnne Levy, who was the senior  12:45:49

Page 217

1  official.  Tom Berry was not as actively  12:45:52
2  involved in the team because he was new to  12:45:55
3  the controlled substances business, and so I  12:45:58
4  would not state anyone's name specifically  12:46:01
5  during this time period as the leader.  12:46:03
6      Q.   Separate and apart of whether  12:46:04
7  or not there was an official designation, did  12:46:11
8  you consider yourself, along with Eileen  12:46:13
9  Spaulding, to the team leader of implementing  12:46:18
10  an improved SOM program during the 2008 time  12:46:20
11  period?  12:46:23
12      A.   Yes.  I would consider it  12:46:23
13  controlled substances compliance  12:46:25
14  responsibility, and I was the leader of that  12:46:26
15  group at that time, yes.  12:46:28
16      Q.   Okay.  You thank.  12:46:28
17           And this document indicates a  12:46:31
18  deadline.  Do you see that?  12:46:36
19      A.   I do see it.  12:46:37
20      Q.   And the deadline, according to  12:46:43
21  this document, is fourth quarter 2008 fiscal  12:46:46
22  year?  12:46:50
23      A.   Yes.  12:46:50
24      Q.   By the way, what was  12:46:50
25  Mallinckrodt's fiscal year?  12:46:52

Page 218

1    A.    At that time it ended in        12:46:53
2  October -- September.              12:46:57
3    Q.    September.  Okay.           12:46:58
4        So it was at least as of the    12:47:02
5  date of this call and the notes that were    12:47:05
6  drafted pursuant to this call that an    12:47:10
7  improved SOM program would be complete no    12:47:15
8  later than October of 2008?          12:47:18
9        MR. O'CONNOR:  Objection to    12:47:19
10   form.                    12:47:19
11       THE WITNESS:  No, sir.        12:47:19
12  QUESTIONS BY MR. KO:            12:47:20
13   Q.    Is that accurate or is that --  12:47:21
14   A.    No.                12:47:21
15   Q.    That's incorrect?          12:47:22
16   A.    That's incorrect.          12:47:23
17   Q.    Okay.  So what is this deadline  12:47:24
18  referring to?                12:47:25
19   A.    The update that would be      12:47:26
20  provided on the next team call.        12:47:27
21   Q.    Okay.  So it wasn't necessarily  12:47:29
22  your goal to complete the SOM revisions by  12:47:31
23  fourth quarter of 2008?          12:47:35
24   A.    No.                12:47:36
25   Q.    Okay.  Did you have a -- did    12:47:36

Page 219

1  you have a firm goal at any point in time    12:47:41
2  other than trying to effectuate an improved  12:47:43
3  SOM program as soon as possible?      12:47:46
4    A.    Okay.              12:47:47
5    Q.    Okay.  By the way, turning back  12:47:48
6  to the first page, there are a list of      12:47:54
7  attendees.                  12:48:00
8        Are all those people folks on    12:48:02
9  the DEA/controlled substance compliance team?  12:48:06
10   A.    No.                12:48:10
11   Q.    Okay.  Which individuals were  12:48:11
12  not on the DEA compliance team?      12:48:13
13   A.    Joe Ruffino.            12:48:15
14   Q.    Okay.              12:48:23
15   A.    And I can't be certain about    12:48:23
16  Patti Woznick.  So Patti and Joe were in    12:48:27
17  purchasing, and dotted line, Hobart      12:48:30
18  compliance reported to Patti for a while, and  12:48:34
19  then they came into part of this      12:48:37
20  synchronized, coordinated group.  So Patti    12:48:42
21  may or may not have been part of the team at  12:48:45
22  the time.                  12:48:48
23   Q.    Okay.  So other than Joe and    12:48:48
24  potentially Patti, everyone else was a member  12:48:50
25  of the DEA compliance team?        12:48:52

Page 220

1    A.    Yes.  Well, we reported to      12:48:53
2  JoAnne Levy, yes.              12:48:55
3        MR. KO:  Okay.  And with that,  12:48:59
4  I think we can break for lunch.        12:49:00
5        THE WITNESS:  Okay.          12:49:02
6        VIDEOGRAPHER:  We are going off  12:49:02
7  the record at 12:49 p.m.          12:49:03
8        (Off the record at 12:49 p.m.)    12:49:04
9        (Mallinckrodt-Harper Exhibit 7    13:37:59
10  marked for identification.)          13:36:59
11       VIDEOGRAPHER:  We are back on    13:36:59
12  the record at 1:37 p.m.          13:37:01
13  QUESTIONS BY MR. KO:            13:37:02
14   Q.    Welcome back from lunch,      13:37:03
15  Ms. Harper.                13:37:06
16   A.    Thank you.            13:37:07
17   Q.    I appreciate your patience to    13:37:07
18  stay.  We've got a few more hours to go.    13:37:09
19       I've handed you a copy of      13:37:12
20  what's been marked as Harper Exhibit 7.    13:37:14
21       And for the record, this      13:37:16
22  document ends in Bates 274572.        13:37:17
23       And this is a July 29, 2008,    13:37:21
24  e-mail from you to Mr. Ratliff; is that    13:37:25
25  correct?                  13:37:27

Page 221

1    A.    Yes.              13:37:27
2    Q.    And this appears to be another  13:37:27
3  monthly report as of July 2008 that you are  13:37:29
4  sending on that we discussed previously    13:37:32
5  today?                  13:37:35
6    A.    Correct.            13:37:35
7    Q.    In terms of we had discussed    13:37:36
8  the fact that you had sent monthly reports to  13:37:38
9  Mr. Ratliff.                13:37:42
10       And I just wanted to ask a few    13:37:43
11  questions on this document.        13:37:45
12       It appears here on the third    13:37:46
13  section down that you are working on a draft  13:37:48
14  of the SOM policy, and you indicate that    13:37:56
15  hopefully the final draft is close to      13:38:02
16  publication.                13:38:04
17       Do you see that?          13:38:05
18   A.    I do see it.            13:38:05
19   Q.    Is it accurate to say as of    13:38:06
20  July 29, 2008, you're working on a final    13:38:07
21  revised draft of the SOM policy?      13:38:10
22   A.    Yes, as it stood at the time,    13:38:14
23  yes.                  13:38:16
24   Q.    And then you're awaiting      13:38:16
25  feedback from Ms. Stewart?        13:38:18

Page 222

1    A.   Yes.                        13:38:19
2    Q.   And that you are hoping to    13:38:19
3  train and implement the revised SOM program   13:38:26
4  in August, later that summer, correct?   13:38:28
5    A.   Yes.                        13:38:30
6    Q.   Okay.  So at this point it's   13:38:31
7  still a work in progress, the revised SOM   13:38:32
8  program, correct?                  13:38:35
9         MR. O'CONNOR:  Objection to   13:38:36
10  form.                             13:38:36
11         THE WITNESS:  Yes.  Yes.    13:38:36
12  QUESTIONS BY MR. KO:              13:38:38
13    Q.   And at the bottom of this    13:38:38
14  e-mail, there's another reference to   13:38:44
15  IntegriChain.  I don't want to ask you any   13:38:45
16  questions about that.  We've talked about   13:38:49
17  that.                             13:38:50
18         But you also discuss in this   13:38:50
19  e-mail how, quote, "How review of   13:38:53
20  Mallinckrodt chargebacks could be used to   13:38:55
21  help our customers monitor their customers,"   13:38:57
22  end quote.                        13:39:01
23         Did I read that correctly?   13:39:01
24    A.   Yes.                       13:39:02
25    Q.   So fair -- well, as of the date   13:39:02

Page 223

1  of this e-mail, is it fair to say that you   13:39:06
2  were considering how to utilize chargeback   13:39:10
3  information to understand how to help   13:39:12
4  customers monitor their customers?   13:39:16
5    A.   Yes, that's correct.         13:39:18
6    Q.   Okay.  You can set that aside.   13:39:19
7         And was one reason to utilize   13:39:22
8  chargeback information -- or strike that.   13:39:39
9         What is your understanding of   13:39:41
10  chargeback -- chargeback data, separate and   13:39:43
11  apart from what's included in that?   13:39:47
12    A.   Like currently my --         13:39:48
13    Q.   Yeah.  What's your            13:39:50
14  understanding of what chargeback data   13:39:51
15  consists of.                       13:39:54
16    A.   Certainly.                  13:39:54
17         We sell to wholesalers and    13:39:55
18  distributors at a certain price, and there   13:39:56
19  are wholesaler/distributor customers, their   13:40:01
20  customers, who have negotiated discounts   13:40:04
21  through purchasing co-ops, et cetera.   13:40:07
22         And so they then purchase from   13:40:10
23  our distributors.  The downstream registrants   13:40:12
24  purchase from our distributor at a lesser   13:40:14
25  price than the distributor has paid   13:40:19

Page 224

1  Mallinckrodt to begin with.          13:40:20
2         So then in that circumstance,   13:40:21
3  the distributor applies back to Mallinckrodt   13:40:23
4  to be made whole -- to be made whole for that   13:40:25
5  differential.  So I'd like to point out that   13:40:28
6  all transactions are not subject to   13:40:32
7  chargebacks, and chargebacks are after the   13:40:34
8  fact, retrospective information.     13:40:36
9    Q.   And when you say "all          13:40:39
10  transactions are not subject to chargebacks,"   13:40:41
11  what you mean by that, if I understand you   13:40:44
12  correctly, is that, you know, chargeback only   13:40:47
13  occurs if a distributor or customer of   13:40:49
14  Mallinckrodt makes such a request to   13:40:50
15  Mallinckrodt, correct?               13:40:52
16    A.   Correct.                    13:40:53
17    Q.   Pursuant to the terms of the   13:40:53
18  agreement between the distributor and   13:40:56
19  Mallinckrodt, correct?               13:40:58
20    A.   That's correct.             13:40:58
21    Q.   Okay.  And separate and apart   13:40:59
22  from whether or not all information, as you   13:41:01
23  describe, is contained in the chargeback   13:41:05
24  information -- or chargeback data, for lack   13:41:07
25  of a better term, was there also a certain   13:41:09

Page 225

1  point in time where you expanded the   13:41:12
2  examination of, quote/unquote, downstream   13:41:17
3  data?                             13:41:22
4         MR. O'CONNOR:  Object to form.   13:41:22
5  QUESTIONS BY MR. KO:              13:41:23
6    Q.   Let me strike that.          13:41:24
7         In addition to chargeback data   13:41:24
8  as you described, were there any other   13:41:26
9  sources of information that you asked to be   13:41:28
10  pulled for purposes of understanding the   13:41:32
11  obligation to monitor customers' customers?   13:41:36
12    A.   I -- not as you state the     13:41:38
13  question, I'm not aware.             13:41:41
14         (Mallinckrodt-Harper Exhibit 9   13:41:44
15         marked for identification.)   13:41:44
16  QUESTIONS BY MR. KO:              13:41:44
17    Q.   Okay.  I'm going to hand you a   13:41:44
18  copy -- going back to your description of   13:41:46
19  chargebacks, I'm going to hand you a copy of   13:41:48
20  what will be marked as -- I hate to go out of   13:41:50
21  order because I already premarked something,   13:41:52
22  but this is going to be Harper Exhibit 9.   13:41:54
23         And for the record, this is a   13:41:57
24  copy of your deposition transcript that you   13:41:59
25  sat for in connection with the Island Drug   13:42:04

Page 226

1  matter that we were discussing earlier today.  13:42:09
2      Do you recall sitting for that  13:42:12
3  deposition?  13:42:12
4      A.  Yes.  13:42:13
5      Q.  And Island Drug was a pharmacy  13:42:13
6  that actually one of your distributors  13:42:15
7  shipped to, correct?  13:42:17
8      A.  May I have a minute to  13:42:18
9  refamiliarize myself with the document?  Is  13:42:27
10  that all right?  13:42:30
11      Q.  Actually, I just want to -- is  13:42:31
12  it for purposes of answering my question?  13:42:31
13      A.  Yes, sir.  13:42:32
14      Q.  You don't need to answer that.  13:42:33
15  I just actually want to turn your attention  13:42:34
16  to page 12.  I'm sorry, page 11.  13:42:36
17      And so in connection with this  13:42:54
18  deposition testimony, do you see the question  13:43:05
19  that's asked:  "And what is a chargeback  13:43:08
20  system, if you'll define that, please?"  13:43:12
21      Do you mind reading your  13:43:14
22  response to that question in the record?  13:43:15
23      A.  I don't mind.  13:43:17
24      Q.  Okay.  Thank you.  13:43:19
25      A.  "Mallinckrodt sells controlled  13:43:20

Page 227

1  substances to wholesalers at a standard  13:43:22
2  price.  Some pharmacies negotiate a  13:43:24
3  discounted price.  When the wholesaler honors  13:43:27
4  the discounted price to the pharmacy, they  13:43:30
5  then submit a chargeback request  13:43:32
6  retroactively to Mallinckrodt so that they  13:43:35
7  can be made financially whole for the  13:43:39
8  difference in price."  13:43:41
9      Is that enough or shall I go  13:43:44
10  on?  13:43:46
11      Q.  Can you please continue?  13:43:46
12      A.  Certainly.  13:43:47
13      "In doing so, the wholesaler  13:43:48
14  tells Mallinckrodt exactly which pharmacy to  13:43:51
15  which the drugs were sold, what the DEA  13:43:53
16  registration number is, the pharmacy address,  13:43:55
17  the quantity, and which drugs they have sold  13:43:58
18  to that pharmacy."  13:44:01
19      Q.  Okay.  And as you sit here  13:44:04
20  today, is that still an accurate description  13:44:06
21  of how you understand the chargeback system?  13:44:11
22      A.  The only thing I would amend,  13:44:13
23  if possible, is to qualify that and say -- so  13:44:16
24  provided there was a chargeback transaction,  13:44:22
25  this is still the case, yes.  13:44:24

Page 228

1      Q.  Okay.  So for purposes of this  13:44:25
2  deposition, is it true that provided there  13:44:29
3  was a chargeback request, Mallinckrodt would  13:44:31
4  know exactly which pharmacy the drugs were  13:44:35
5  sold to?  13:44:37
6      A.  Yes.  13:44:38
7      Q.  And provided that there was a  13:44:39
8  chargeback request, Mallinckrodt would know  13:44:41
9  what the DEA registration number of the  13:44:43
10  downstream entity is, correct?  13:44:46
11      A.  Yes.  13:44:47
12      Q.  And Mallinckrodt would also  13:44:48
13  know exactly which pharmacy address its pills  13:44:50
14  were being shipped to, correct?  13:44:54
15      A.  Correct.  13:44:55
16      Q.  And Mallinckrodt would also  13:44:56
17  understand the quantity of pills being  13:44:58
18  shipped to that particular -- particular  13:44:59
19  pharmacy or clinic, correct?  13:45:02
20      MR. O'CONNOR:  Objection to  13:45:03
21  form.  13:45:04
22      THE WITNESS:  That's correct.  13:45:04
23  QUESTIONS BY MR. KO:  13:45:04
24      Q.  And Mallinckrodt would know  13:45:05
25  exactly which drugs they have sold to that  13:45:06

Page 229

1  particular pharmacy, correct?  13:45:08
2      A.  Correct.  13:45:09
3      Q.  And I want to focus on your  13:45:11
4  qualification when you say you -- this would  13:45:15
5  only be the case if Mallinckrodt obtained a  13:45:19
6  chargeback request.  13:45:22
7      First of all, wasn't it the  13:45:22
8  case that a chargeback request -- it was  13:45:25
9  certainly uncommon if a chargeback request  13:45:28
10  did not occur, correct?  13:45:30
11      MR. O'CONNOR:  Objection to  13:45:32
12  form.  13:45:33
13      THE WITNESS:  Yes.  13:45:33
14  QUESTIONS BY MR. KO:  13:45:36
15      Q.  In most instances, Mallinckrodt  13:45:37
16  and you expected a chargeback request to be  13:45:40
17  made by a distributor, correct?  13:45:43
18      A.  Yes.  13:45:45
19      Q.  And move -- and putting aside  13:45:46
20  whether or not a chargeback was paid, does  13:45:52
21  the chargeback data track all downstream  13:45:56
22  customer sales?  13:45:58
23      MR. O'CONNOR:  Objection to  13:46:00
24  form.  13:46:01
25      THE WITNESS:  "Downstream  13:46:01

Page 230

1    customers" meaning the pharmacy?          13:46:04
2    QUESTIONS BY MR. KO:                       13:46:05
3       Q.   Yes.                               13:46:06
4       A.   Their sales?                       13:46:06
5       Q.   The sales made to the              13:46:07
6    pharmacies by the distributors.            13:46:10
7       A.   For Mallinckrodt product, yes.     13:46:12
8       Q.   Okay.  So just so the record is    13:46:15
9    clear, the chargeback data would include all  13:46:17
10   downstream customer sales made by a        13:46:21
11   distributor to a pharmacy or clinic, correct?  13:46:24
12      A.   Correct.                           13:46:27
13      Q.   Okay.  And so you can set this     13:46:28
14   one aside.                                 13:46:37
15           (Mallinckrodt-Harper Exhibit 8     13:46:53
16           marked for identification.)        13:46:53
17   QUESTIONS BY MR. KO:                       13:46:53
18      Q.   I'm now going to go back in        13:46:46
19   time -- or back in order and hand you a copy  13:46:47
20   of what's going to be marked -- or what has  13:46:49
21   been marked as Harper Exhibit 4 -- or 8,   13:46:50
22   excuse me.                                 13:46:52
23           And this is a -- for the           13:46:56
24   record, this document ends in Bates 419810,  13:47:00
25   and this is a December 14, 2007, e-mail from  13:47:06

Page 231

1    you to Ms. Levy.                           13:47:10
2           Is that correct?                    13:47:12
3       A.   Yes.                               13:47:12
4       Q.   And going down to the bottom of    13:47:15
5    this page, you indicate that you are       13:47:23
6    receiving -- you have received the attached  13:47:29
7    memo as part of a training at a recent     13:47:33
8    seminar.                                   13:47:35
9           Do you see that?                    13:47:35
10      A.   Yes.                               13:47:36
11      Q.   And the memo is what's             13:47:36
12   contained in this attachment, and it's one of  13:47:38
13   the DEA guidance letters that we referred to  13:47:40
14   earlier today; is that correct?            13:47:42
15      A.   Yes.                               13:47:43
16      Q.   And would it also be fair to       13:47:44
17   say that this is one of the Rannazzisi     13:47:46
18   letters that we referred to?  Correct?     13:47:48
19      A.   Yes.                               13:47:50
20      Q.   So as of December 5, 2007, or      13:47:53
21   no later than December 5, 2007, you were in  13:47:58
22   possession of one of the Rannazzisi letters  13:48:01
23   dated December -- September 27, 2006,      13:48:04
24   correct?                                   13:48:08
25      A.   Yes.                               13:48:08

Page 232

1       Q.   Okay.  And you indicate that it    13:48:10
2    gives specific guidance on suspicious order  13:48:16
3    monitoring.                                13:48:20
4           Do you see that?                    13:48:20
5       A.   Yes, I do see it.                  13:48:21
6       Q.   And so is it fair to say that      13:48:23
7    you in fact believe it to be the case that  13:48:26
8    this letter was instructive on your        13:48:27
9    obligations to design and implement a      13:48:31
10   suspicious order monitoring system?        13:48:34
11      A.   It was instructive in terms of     13:48:35
12   guidance.                                  13:48:38
13      Q.   Okay.                              13:48:39
14      A.   Yes.                               13:48:39
15      Q.   And you also ask -- or you         13:48:40
16   don't -- you don't ask anything, but Jim    13:48:45
17   Rausch responds to your e-mail.            13:48:47
18           Do you see that?                    13:48:48
19      A.   Yes, I do.                         13:48:49
20      Q.   And he indicates that "We,"        13:48:51
21   being Mallinckrodt, "send a suspicious order  13:48:55
22   report to the DEA monthly."                13:48:57
23           Correct?                           13:48:59
24      A.   Correct.                           13:48:59
25      Q.   Did you ever review any of         13:49:00

Page 233

1    those reports prior to the time of this    13:49:02
2    e-mail?                                    13:49:07
3       A.   I'm not certain.                   13:49:07
4       Q.   Okay.  Generally speaking, was     13:49:12
5    it Mr. Rausch's responsibility to send these  13:49:13
6    reports to the DEA monthly?                13:49:14
7       A.   Yes.                               13:49:15
8       Q.   Okay.  And do you have an          13:49:16
9    understanding of -- well, earlier we were   13:49:19
10   talking about the distinction between      13:49:22
11   peculiar and suspicious orders.            13:49:24
12           Do you recall that?                13:49:25
13      A.   Yes.                               13:49:25
14      Q.   Is it your understanding that      13:49:26
15   these monthly reports being sent by        13:49:27
16   Mr. Rausch were a compilation of the peculiar  13:49:31
17   orders that Mallinckrodt had identified?   13:49:34
18      A.   Yes.                               13:49:36
19      Q.   Okay.  So in other words, it       13:49:38
20   wasn't necessarily the case that they were --  13:49:40
21   that Mallinckrodt was sending any          13:49:42
22   notification of suspicious orders to DEA,  13:49:44
23   correct?                                   13:49:46
24      A.   Correct.                           13:49:46
25      Q.   It was just simply a monthly       13:49:47

Page 234

1  report that contained all the peculiar orders  13:49:49
2  that Mallinckrodt had identified, right?  13:49:51
3      A.  Correct.  13:49:53
4      Q.  Okay.  And do you recall -- I  13:49:54
5  know I've asked this question in another form  13:50:08
6  or in a different way, but do you recall  13:50:11
7  prior to December 5, 2007, whether or not  13:50:13
8  Mallinckrodt had ever identified a suspicious  13:50:16
9  order to the DEA?  13:50:18
10     A.  Yes, I do recall.  13:50:20
11     Q.  You do recall instances in  13:50:22
12 which Mallinckrodt identified a suspicious  13:50:24
13 order to the DEA?  13:50:26
14     A.  Yes.  13:50:26
15     Q.  Okay.  And when did that occur?  13:50:27
16     A.  So there was the case we talked  13:50:28
17 about with the compounding pharmacy.  13:50:31
18     Q.  Okay.  13:50:34
19     A.  And there were several others,  13:50:35
20 but I don't recall the particulars of those  13:50:38
21 reports.  13:50:40
22     Q.  Fair enough.  13:50:41
23         So you do recall some instances  13:50:41
24 in which suspicious orders were reported to  13:50:45
25 Mallinckrodt prior to December 14, 2007?  13:50:48

Page 235

1      A.  Reported to the DEA?  13:50:52
2      Q.  Yes.  13:50:53
3      A.  Yes, sir.  13:50:54
4      Q.  Okay.  And approximately -- I  13:50:54
5  know you've -- you don't know the exact  13:50:58
6  amount, but you've given some examples.  13:51:00
7         Do you know whether or not it  13:51:02
8  was -- there were 10 instances or 50  13:51:04
9  instances?  13:51:06
10         Do you know approximately how  13:51:07
11 many suspicious orders Mallinckrodt reported  13:51:08
12 to the DEA?  13:51:09
13     A.  I will approximate it to be ten  13:51:10
14 or less.  13:51:15
15     Q.  Okay.  So in the entire time  13:51:16
16 that you were a part of the DEA compliance  13:51:17
17 team, you recall ten orders being  13:51:21
18 identified -- approximately ten orders being  13:51:24
19 identified as suspicious to the DEA?  13:51:25
20         MR. O'CONNOR:  Objection to  13:51:27
21 form.  13:51:27
22         THE WITNESS:  Prior to this?  13:51:27
23 QUESTIONS BY MR. KO:  13:51:36
24     Q.  Right.  13:51:36
25     A.  Yes.  Re -- but -- Rausch was  13:51:37

Page 236

1  sending reports as well, but the confirmed  13:51:41
2  suspicious orders to DEA were ten or less.  13:51:45
3      Q.  Right.  13:51:46
4         And as we discussed, the  13:51:47
5  report -- the monthly reports were just the  13:51:49
6  peculiar orders that Mallinckrodt had  13:51:50
7  identified, correct?  13:51:52
8      A.  Correct.  13:51:52
9      Q.  And not necessarily any -- or  13:51:53
10 not any suspicious orders, correct?  13:51:55
11     A.  Correct.  13:51:57
12     Q.  Okay.  By the way, there's  13:51:58
13 reference made to someone by the name of Sean  13:52:07
14 Welch.  13:52:10
15         Do you see that?  13:52:10
16     A.  Yes.  13:52:11
17     Q.  Who is he?  13:52:12
18     A.  He was a co-manager of customer  13:52:13
19 service at that time.  I believe Jim Rausch  13:52:19
20 may have reported to him.  13:52:22
21     Q.  Okay.  Was he involved on the  13:52:25
22 SOM team as well?  13:52:27
23     A.  Only in terms of being kept  13:52:28
24 informed of our activity.  13:52:36
25     Q.  So he didn't have any  13:52:37

Page 237

1  day-to-day responsibility with respect to the  13:52:44
2  SOM program?  13:52:48
3      A.  He did not.  13:52:49
4      Q.  Okay.  And you also indicate,  13:52:49
5  going back to the bottom e-mail from you to  13:52:51
6  Jim and Sean, you say that you received the  13:52:53
7  attached memo as part of a training at a  13:52:56
8  recent seminar.  13:52:58
9         Do you recall which seminar  13:52:59
10 this was?  13:53:00
11     A.  Yes, it was the Buzzeo.  13:53:00
12     Q.  Okay.  So the 2007 Buzzeo  13:53:02
13 conference, correct?  13:53:05
14         We'll just -- assuming -- I  13:53:08
15 mean, the e-mail is dated --  13:53:10
16     A.  Yes, yes, yes.  13:53:11
17     Q.  -- December 5th.  13:53:11
18     A.  Because it says "recent," yes.  13:53:12
19     Q.  Right.  13:53:15
20     A.  Yes, sir.  13:53:15
21     Q.  And the Buzzeo conference was  13:53:15
22 an annual occurrence, generally speaking, in  13:53:16
23 the fall of each year, correct?  13:53:19
24     A.  Yes.  13:53:20
25     Q.  Okay.  So was it the case  13:53:21

Page 238

```
 1   that -- well, did you ever receive this      13:53:24
 2   correspondence from Mr. Rannazzisi prior to   13:53:27
 3   the 2007 Buzzeo conference?                    13:53:31
 4       A.   No.                       13:53:34
 5       Q.   Okay.  In going back to the ten   13:53:35
 6   instances in which you recall in which a      13:53:46
 7   suspicious order was identified, certainly    13:53:50
 8   it's more than one, but I just want to make   13:53:52
 9   sure I understand.                             13:53:56
10           Did you say approximately ten,        13:53:56
11   or do you think it was ten or less?           13:53:58
12       A.   Ten or less.                13:53:59
13       Q.   Ten or less.                13:54:00
14           And do you recall if it was          13:54:01
15   five, or where in the spectrum between one    13:54:03
16   and ten?                          13:54:06
17       A.   I'm sorry, I can't recall.  I       13:54:07
18   really can't recall.                           13:54:09
19       Q.   Would it be fair to say,            13:54:09
20   relative to all the peculiar orders that you   13:54:11
21   had reported to you on a monthly basis to the  13:54:13
22   DEA, that the identification of a suspicious   13:54:16
23   order was extremely rare given that number?   13:54:19
24           MR. O'CONNOR:  Objection to          13:54:22
25   form.                             13:54:22
```

Page 239

```
 1           THE WITNESS:  If we can say          13:54:22
 2       extremely rare was a low percentage,      13:54:24
 3       if you don't mind that term, yes.         13:54:26
 4       Yes.                          13:54:28
 5   QUESTIONS BY MR. KO:                 13:54:29
 6       Q.   Well, in these peculiar --          13:54:29
 7   these monthly peculiar order reports that Jim  13:54:30
 8   Rausch was sending to the DEA, did you have   13:54:33
 9   any understanding of how many orders were     13:54:35
10   included in that report?                       13:54:36
11       A.   I did not.                 13:54:38
12       Q.   Okay.  There were quite a few,      13:54:40
13   weren't there?                                 13:54:42
14           MR. O'CONNOR:  Objection to          13:54:43
15   form.                             13:54:44
16           THE WITNESS:  I don't know if        13:54:44
17       this was the report that included the     13:54:47
18       dosage form orders out of Hobart or if    13:54:51
19       this was a separate report that Jim       13:54:54
20       Rausch was sending for the bulk API       13:54:55
21       orders.                       13:55:00
22   QUESTIONS BY MR. KO:                 13:55:00
23       Q.   Fair enough.               13:55:00
24           Well, regardless of whether or       13:55:01
25   not we can clarify that distinction, you do   13:55:05
```

Page 240

```
 1   agree with me that the actual amount of        13:55:07
 2   suspicious orders that were reported to the    13:55:09
 3   DEA prior to 2007 was a very low percentage    13:55:10
 4   relative to all peculiar orders reported to    13:55:16
 5   the DEA, correct?                  13:55:18
 6           MR. O'CONNOR:  Objection to          13:55:19
 7   form.                             13:55:19
 8           THE WITNESS:  Yes, correct.          13:55:19
 9   QUESTIONS BY MR. KO:                 13:55:20
10       Q.   Okay.  We can set this one          13:55:21
11   aside.                            13:55:29
12           (Mallinckrodt-Harper Exhibit 10   13:55:29
13       marked for identification.)               13:55:30
14   QUESTIONS BY MR. KO:                 13:55:30
15       Q.   Want to now turn your attention      13:55:30
16   to what's going to be marked as exhibit --    13:55:31
17   Harper Exhibit 10.                             13:55:33
18           And for the record, this            13:55:39
19   document ends in Bates 7146630.                13:55:40
20           And this appears to be -- if         13:55:56
21   you look at the bottom e-mail on the first    13:55:57
22   page, there's a reference made to an e-mail   13:56:00
23   you send to several people on January 4,      13:56:04
24   2008?                             13:56:09
25           Do you see that?                      13:56:09
```

Page 241

```
 1       A.   Yes.                       13:56:10
 2       Q.   Any reason to dispute -- or any     13:56:11
 3   reason to dispute whether or not you sent     13:56:14
 4   this letter -- or e-mail?                      13:56:16
 5       A.   No.                       13:56:18
 6       Q.   Okay.  And on this particular       13:56:19
 7   e-mail, you are attaching another memo/DEA    13:56:24
 8   guidance letter; is that correct?             13:56:31
 9       A.   Yes.                       13:56:33
10       Q.   And this is separate and apart      13:56:34
11   from the prior Rannazzisi letter that we      13:56:39
12   discussed.  This appears to be another one,   13:56:41
13   dated December 27, 2007, correct?             13:56:43
14       A.   Correct.                   13:56:46
15       Q.   And you received this -- you        13:56:46
16   actually received this correspondence,        13:56:49
17   correct?                          13:56:51
18       A.   Correct.                   13:56:51
19       Q.   Directly from Mr. Rannazzisi?       13:56:51
20       A.   Yes.                       13:56:54
21       Q.   Okay.  And turning back to         13:56:55
22   the -- to your e-mail, you indicate that the   13:57:00
23   guidance letter or the memo as referred to in  13:57:08
24   this e-mail that you received on January 4,   13:57:12
25   2000-A -- 2008 targets manufacturers as well   13:57:15
```

Page 242

1  as distributors in terms of suspicious order    13:57:20
2  monitoring obligations.    13:57:23
3         Did I read that correctly?    13:57:23
4    A.   Yes.    13:57:24
5    Q.   So is it fair to say that as of    13:57:24
6  January 4, 2008, you understand that the DEA    13:57:28
7  expected compliance with the standards set    13:57:31
8  forth in this letter?  Correct?    13:57:35
9         MR. O'CONNOR:  Objection to    13:57:36
10       form.    13:57:36
11       THE WITNESS:  So these aren't    13:57:36
12    regulations.  It's a guidance.    13:57:39
13  QUESTIONS BY MR. KO:    13:57:40
14    Q.   Sure.    13:57:41
15    A.   So, yes, we understood that    13:57:41
16  this was additional guidance on SOM.    13:57:43
17    Q.   And my question was whether or    13:57:46
18  not you understood that as of January 4,    13:57:49
19  2008, you understood that the DEA expected    13:57:52
20  compliance with the standards set forth in    13:57:56
21  that letter.    13:57:58
22       MR. O'CONNOR:  Objection to    13:57:59
23       form.    13:57:59
24       THE WITNESS:  No.    13:57:59
25

Page 243

1  QUESTIONS BY MR. KO:    13:58:00
2    Q.   So you believed that the things    13:58:00
3  set forth in this letter you did not    13:58:02
4  necessarily have to comply with?    13:58:04
5    A.   No.    13:58:06
6    Q.   Okay.  You believe you did not    13:58:06
7  have to comply with -- with the instructions    13:58:09
8  as sent out by Mr. Rannazzisi on...    13:58:14
9    A.   So this is another guidance    13:58:18
10  meant for industry which we attempted to    13:58:20
11  incorporate into our program.  But this was    13:58:23
12  not -- it quotes the regulations, but this    13:58:27
13  was not promulgated in CFR 21.    13:58:30
14    Q.   I understand that and I -- I    13:58:34
15  very clearly under the distinction that    13:58:35
16  you're trying to make, and my question simply    13:58:37
17  was whether or not you believed you were    13:58:39
18  expected to comply with the instructions set    13:58:42
19  forth in that letter.    13:58:45
20       MR. O'CONNOR:  Same objection.    13:58:45
21       THE WITNESS:  Yes.    13:58:46
22  QUESTIONS BY MR. KO:    13:58:51
23    Q.   All right.  You certainly did    13:58:51
24  not want to follow -- or you certainly    13:58:52
25  believed that Mallinckrodt could not follow    13:58:54

Page 244

1  the instructions set forth in that letter,    13:58:56
2  correct?    13:58:58
3         MR. O'CONNOR:  Objection to    13:58:58
4       form.    13:58:59
5         THE WITNESS:  Could you please    13:58:59
6    repeat that question?  I'm sorry.    13:59:01
7  QUESTIONS BY MR. KO:    13:59:02
8    Q.   Sure.    13:59:03
9         You certainly believed that    13:59:03
10  Mallinckrodt could not follow the    13:59:07
11  instructions set forth in that letter,    13:59:10
12  correct?    13:59:12
13       MR. O'CONNOR:  Objection to    13:59:13
14       form.    13:59:13
15       THE WITNESS:  I did not believe    13:59:13
16    that.    13:59:14
17  QUESTIONS BY MR. KO:    13:59:14
18    Q.   Right.    13:59:15
19         You believed that Mallinckrodt    13:59:15
20  should follow the instructions set forth in    13:59:17
21  that letter, correct?    13:59:19
22    A.   Correct.    13:59:20
23    Q.   Thank you.    13:59:21
24    A.   Yes.    13:59:22
25    Q.   That was an inartful question    13:59:22

Page 245

1  by me.  I apologize.    13:59:24
2         Now, going back to the bottom    13:59:26
3  of that first page, you also reference    13:59:37
4  another -- well, you reference a Federal    13:59:41
5  Register Notice.    13:59:41
6         Do you see that?    13:59:44
7    A.   Yes.    13:59:44
8    Q.   72 FR 36487.    13:59:44
9         And I believe that's a    13:59:51
10  reference to the Southwood Federal Register    13:59:51
11  Notice that we discussed earlier today,    13:59:53
12  correct?    13:59:55
13    A.   Yes, it is.    13:59:55
14    Q.   Okay.  So again, as of January    13:59:57
15  4, 2008, you understood that the DEA was    13:59:59
16  instructing you to read, review and follow    14:00:05
17  the guidelines set forth in that Federal    14:00:11
18  Register Notice, correct?    14:00:13
19       MR. O'CONNOR:  Objection to    14:00:14
20       form.    14:00:14
21       THE WITNESS:  So this is a    14:00:14
22    guidance, and it referenced    14:00:16
23    Southwood's, and Southwood's was the    14:00:18
24    relationship from a distributor to the    14:00:22
25    pharmacy.  And we sell to    14:00:23

Page 246

1  distributors, not directly to          14:00:24
2  pharmacies.                            14:00:26
3  QUESTIONS BY MR. KO:                   14:00:26
4      Q.   And I understand the          14:00:26
5  distinction being made, but there were 14:00:28
6  certain statements made in Southwood,  14:00:30
7  correct, as we discussed earlier?      14:00:32
8      A.   Yes.                          14:00:33
9      Q.   And it was your understanding 14:00:33
10 that there were certain principles to follow 14:00:36
11 as a result of the statements set forth in 14:00:42
12 Southwood, or did you believe that you did 14:00:43
13 not have to follow those?              14:00:45
14         MR. O'CONNOR:  Objection to    14:00:46
15 form.                                  14:00:47
16         THE WITNESS:  Certain          14:00:47
17 principles, yes.                       14:00:48
18 QUESTIONS BY MR. KO:                   14:00:49
19     Q.   So in other words, there were 14:00:49
20 certain principles that you believe you had 14:00:50
21 to follow as a result of the Southwood 14:00:52
22 Federal Register Notice, correct?      14:00:54
23         MR. O'CONNOR:  Objection.      14:00:55
24 Form.                                  14:00:55
25         THE WITNESS:  Yes.  Correct.   14:00:55

Page 247

1  QUESTIONS BY MR. KO:                   14:00:57
2      Q.   So the letters that you had   14:01:06
3  received from Mr. Rannazzisi, as we described 14:01:07
4  were the Rannazzisi letters, just so the 14:01:11
5  record is clear, those are two letters that 14:01:13
6  you became aware of sometime in the 2007, 14:01:16
7  2008 time period?                      14:01:19
8      A.   Yes.                          14:01:20
9          MR. O'CONNOR:  Objection to    14:01:21
10 form.                                  14:01:22
11 QUESTIONS BY MR. KO:                   14:01:22
12     Q.   And it's your testimony that  14:01:22
13 you only received directly the e-mail -- or 14:01:23
14 the letter reflected in Exhibit 10 directly, 14:01:27
15 correct?                               14:01:30
16     A.   Correct.                      14:01:31
17     Q.   Okay.  And in connection with 14:01:33
18 revising and improving Mallinckrodt's SOM 14:01:37
19 program, is one of the reasons for improving 14:01:40
20 the SOM program a result of reading these 14:01:44
21 letters?                               14:01:49
22         MR. O'CONNOR:  Objection.      14:01:49
23         THE WITNESS:  Yes.             14:01:50
24 QUESTIONS BY MR. KO:                   14:01:53
25     Q.   Okay.  Thank you.  You can set 14:01:54

Page 248

1  that aside.                            14:01:56
2          Actually, sorry, there was one 14:01:57
3  more question, but maybe you don't need to 14:02:09
4  consult with that actual exhibit.      14:02:12
5          Do you know who Kyle Wright is? 14:02:13
6      A.   Yes.                          14:02:15
7      Q.   He was at DEA, correct?       14:02:17
8      A.   Yes.                          14:02:19
9      Q.   And do you recall meeting with 14:02:20
10 him at various DEA meetings or conferences? 14:02:25
11     A.   Yes.                          14:02:28
12     Q.   And did you meet with him prior 14:02:29
13 to or after the receipt of that e-mail, or do 14:02:33
14 you not recall?                        14:02:36
15     A.   I do not recall.              14:02:37
16     Q.   Do you recall meeting with him 14:02:38
17 in the 2011 time period?               14:02:39
18     A.   I'm sorry, I remember meeting  14:02:40
19 with him at a conference, but not the date. 14:02:42
20     Q.   Sure.                         14:02:44
21          And do you recall the substance 14:02:47
22 of the conversation you had with Mr. Wright? 14:02:51
23     A.   Yes.                          14:02:53
24     Q.   And what was the substance of  14:02:55
25 the conversation you had with him?     14:02:57

Page 249

1      A.   He had been speaking from the 14:02:58
2  podium about suspicious order monitoring, and 14:03:01
3  I asked to speak to him during a breakout 14:03:06
4  session to talk about the attributes of our 14:03:09
5  program.                               14:03:11
6      Q.   Okay.  And I believe we have  14:03:12
7  some documentation about that, so we'll cover 14:03:15
8  that later.                            14:03:17
9          But other than that particular 14:03:18
10 conversation you had with him, do you recall 14:03:21
11 any other meetings or conversations you had 14:03:23
12 with Mr. Wright?                       14:03:24
13     A.   I'm not certain if he was at a 14:03:26
14 subsequent meeting at DEA in 2011.  I can't 14:03:31
15 recall if he was in attendance.        14:03:35
16     Q.   Okay.  Fair enough.           14:03:36
17         (Mallinckrodt-Harper Exhibit 11 14:03:42
18 marked for identification.)            14:04:00
19 QUESTIONS BY MR. KO:                   14:04:00
20     Q.   I'm going to hand you a copy of 14:03:38
21 what has been marked as Harper Exhibit 11. 14:03:40
22     A.   Uh-huh.                       14:03:40
23     Q.   And for the record, this      14:04:00
24 exhibit ends in Bates 301994, and it appears 14:04:04
25 to be an e-mail chain between you and Jim 14:04:12

Page 250

```
 1   Rausch from April 21, 2008.              14:04:14
 2         Do you see that?             14:04:19
 3      A.   Yes.                  14:04:19
 4      Q.   And in this e-mail chain, I      14:04:20
 5   believe you're asking what the algorithm --   14:04:24
 6   you're asking Mr. Rausch what the algorithm   14:04:29
 7   is to determine orders of excessive quantity,  14:04:31
 8   frequency or outside of the normal pattern;    14:04:36
 9   is that correct?            14:04:38
10      A.   Yes.                  14:04:38
11      Q.   And in particular -- I said    14:04:39
12   "algorithm," but you specifically asked what  14:04:43
13   the current equation is, correct?        14:04:45
14      A.   Yes.                  14:04:47
15      Q.   And he responds that "the       14:04:48
16   metric is ██ the previous fiscal year and    14:04:52
17   year-to-date average for a SKU and customer."  14:04:56
18         MR. O'CONNOR: Objection to    14:05:00
19      form.                14:05:04
20   QUESTIONS BY MR. KO:              14:05:04
21      Q.   Well, let me just make sure the  14:05:05
22   record is clear.              14:05:06
23         His response to your question   14:05:06
24   is, quote, "Any order quantity that is ██    14:05:08
25   the previous fiscal year and YTD" -- in other  14:05:09
```

Page 251

```
 1   words, year-to-date -- "average for a SKU and  14:05:13
 2   customer."                  14:05:15
 3         Did I read that correctly?     14:05:16
 4      A.   Yes.                  14:05:16
 5      Q.   Okay.  And so does this refresh  14:05:17
 6   your recollection that in the April 2008 time  14:05:21
 7   period, the algorithm that you were using for  14:05:23
 8   the peculiar order threshold was ██ the      14:05:24
 9   previous fiscal year?            14:05:26
10      A.   Yes.                  14:05:27
11      Q.   Okay.  And at that time, it's   14:05:28
12   also fair to say based on this e-mail that    14:05:30
13   you didn't actually know until Jim responded  14:05:32
14   what the formula actually was?         14:05:35
15         MR. O'CONNOR: Objection to    14:05:36
16      form.                14:05:38
17         THE WITNESS: That's not       14:05:38
18      correct.              14:05:39
19   QUESTIONS BY MR. KO:              14:05:39
20      Q.   Well, why did you ask him then?  14:05:40
21      A.   Because I asked the current    14:05:42
22   equation.  It had moved from ██ to ██ to ██  14:05:44
23   It moved around.              14:05:47
24      Q.   Right.               14:05:48
25      A.   The multiplier.  So I asked him  14:05:48
```

Page 252

```
 1   what the current one is --          14:05:50
 2      Q.   Sure.                 14:05:52
 3      A.   -- at that time.           14:05:52
 4      Q.   I see what you're saying.     14:05:52
 5      A.   Okay.                 14:05:54
 6      Q.   And so my question was simply:   14:05:54
 7   At the time of this e-mail, you did not know  14:05:56
 8   the then current equation to determine a     14:05:59
 9   peculiar order, correct?            14:06:02
10      A.   That's correct.           14:06:03
11      Q.   And based on your e-mail, you   14:06:04
12   had thought that perhaps it was just a 1.2    14:06:07
13   metric?                  14:06:09
14         MR. O'CONNOR: Objection to    14:06:11
15      form.                14:06:12
16         THE WITNESS: Yes.          14:06:12
17   QUESTIONS BY MR. KO:              14:06:13
18      Q.   All right.  Okay.          14:06:14
19         And just, again, to be clear,   14:06:17
20   this -- this e-mail talks about an excessive  14:06:19
21   quantity calculation.  That's the title of    14:06:22
22   the e-mail, right?              14:06:25
23      A.   Yes.                  14:06:26
24      Q.   And Mallinckrodt's then system  14:06:27
25   to determine whether or not an order was of   14:06:36
```

Page 253

```
 1   an excessive quantity, frequency or outside   14:06:39
 2   of normal pattern was to use the ██ metric   14:06:42
 3   that we've been describing today; is that     14:06:45
 4   correct?                  14:06:47
 5      A.   Yes.                  14:06:47
 6      Q.   Okay.  You can set that aside.   14:06:49
 7         Now, the date of this e-mail is  14:07:02
 8   April 21, 2008, correct?            14:07:03
 9      A.   Yes, correct.            14:07:05
10      Q.   And that's approximately three  14:07:07
11   and a half months after you received       14:07:08
12   notification from the DEA, and in particular  14:07:10
13   the second Rannazzisi letter, correct?       14:07:14
14      A.   Yes.                  14:07:17
15      Q.   So is it fair to say that it    14:07:17
16   took you three and a half months to ask      14:07:18
17   Mr. Rausch what your then existing peculiar   14:07:21
18   order algorithm metric was?          14:07:24
19         MR. O'CONNOR: Objection to    14:07:26
20      form.                14:07:27
21         THE WITNESS: We were rewriting  14:07:27
22      the policies in the systems and      14:07:29
23      procedures, and, yes, I did not know  14:07:31
24      it by heart.  So there was a reference  14:07:32
25      made, and I wanted to detail it in the  14:07:34
```

Page 254

```
1    procedure.                      14:07:36
2    QUESTIONS BY MR. KO:            14:07:36
3        Q.  Okay.  Thank you for that.  14:07:36
4            And I was just asking whether  14:07:37
5    or not you agree with the fact that it took  14:07:41
6    you three and a half months after receiving  14:07:43
7    the second Rannazzisi letter directed at  14:07:45
8    manufacturers to ask Mr. Rausch what the then  14:07:50
9    existing peculiar order algorithm was.  14:07:59
10           MR. O'CONNOR:  Objection.  14:08:01
11   Form.                            14:08:03
12           THE WITNESS:  Yes.       14:08:03
13   QUESTIONS BY MR. KO:            14:08:03
14       Q.  Okay.  Thank you.  You can set  14:08:03
15   that one aside.                  14:08:16
16           And I think -- or excuse me, I  14:08:18
17   will hand you a copy of what's previously  14:08:19
18   been marked as Exhibit 1 to the Stewart  14:08:21
19   deposition.                      14:08:24
20           MR. KO:  And for the record,  14:08:26
21       this document ends in Bates 299558.  14:08:27
22   QUESTIONS BY MR. KO:            14:08:27
23       Q.  Sorry to jump around, but going  14:08:42
24   back to the previous line of questioning, do  14:08:43
25   you recall why it took you three and a half  14:08:48
```

Page 255

```
1    months to ask for the existing algorithm?  14:08:50
2            MR. O'CONNOR:  Objection to  14:08:52
3        form.                        14:08:54
4            THE WITNESS:  I was writing the  14:08:54
5        procedure, and I wanted to document.  14:08:56
6        I knew the algorithm existed; I just  14:08:57
7        did not know the multiplier.  14:08:59
8    QUESTIONS BY MR. KO:            14:09:00
9        Q.  Okay.  And when you say you  14:09:00
10   were "writing the procedure," what are you  14:09:03
11   talking about?                   14:09:05
12       A.  I'm documenting the process  14:09:05
13   flow for our suspicious order monitoring  14:09:09
14   program within Mallinckrodt.     14:09:11
15       Q.  Okay.  And that's reflected in  14:09:12
16   a policy, then we'll have a copy of it  14:09:13
17   that we can show you, but it's the actual  14:09:16
18   policy of identifying -- company policy of  14:09:18
19   identifying a suspicious order, correct?  14:09:23
20       A.  Yes.                     14:09:24
21           MR. O'CONNOR:  Objection to  14:09:26
22   form.                            14:09:26
23   QUESTIONS BY MR. KO:            14:09:26
24       Q.  All right.  Now, turning back  14:09:27
25   to this document, this appears to be an  14:09:27
```

Page 256

```
1    e-mail chain between you -- well, excuse me.  14:09:32
2            It's an e-mail chain involving  14:09:35
3    Mr. Ratliff and Mr. Rausch in which you are  14:09:40
4    also a recipient, dated April 1, 2008; is  14:09:42
5    that correct?                    14:09:46
6        A.  Yes.                     14:09:46
7        Q.  And earlier we had spoken about  14:09:48
8    Pete Kleissle of the DEA, and you recall  14:09:58
9    meeting him sometime in 2010, correct?  14:10:01
10       A.  Yes.                     14:10:04
11       Q.  And it appears here that  14:10:05
12   Mr. Kleissle has had some interactions with  14:10:06
13   Mr. Ratliff and Mr. Rausch as well, correct?  14:10:09
14       A.  I believe directly with  14:10:11
15   Mr. Ratliff, who was passing on the  14:10:15
16   information to Jim Rausch.        14:10:17
17       Q.  Okay.  And it was also your  14:10:18
18   understanding that Mr. Rat -- or excuse me,  14:10:20
19   Mr. Rausch was sending monthly reports to  14:10:23
20   Mr. Kleissle at DEA --           14:10:27
21       A.  Yes.                     14:10:29
22       Q.  -- prior to this time, correct?  14:10:30
23       A.  Yes.                     14:10:31
24       Q.  And those were the peculiar  14:10:31
25   order reports that we were discussing  14:10:32
```

Page 257

```
1    previously, correct?             14:10:33
2        A.  Yes.                     14:10:34
3        Q.  Now, in response to receiving  14:10:36
4    those monthly reports, Mr. Ratliff reports a  14:10:38
5    conversation that he had with Mr. Kleissle  14:10:45
6    about them; is that correct?     14:10:48
7        A.  Correct.                 14:10:49
8        Q.  In particular, Mr. Ratliff  14:10:52
9    says, "Pete Kleissle, DEA diversion group  14:10:56
10   supervisor, St. Louis, just called regarding  14:10:58
11   several letters he has received from you  14:11:02
12   detailing suspicious orders."    14:11:04
13           Did I read that correctly?  14:11:07
14       A.  Yes.                     14:11:07
15       Q.  He goes on to say, "He advised  14:11:09
16   that he needs more information in that if it  14:11:12
17   is suspicious, why are we filling the order.  14:11:14
18   I explained that we use a calculation based  14:11:17
19   upon an amount previously ordered.  He  14:11:19
20   stated, 'If you think it is suspicious, don't  14:11:23
21   fill it.'  I will go into more detail on  14:11:26
22   Friday."                         14:11:30
23           Did I read that correctly?  14:11:30
24       A.  Yes.                     14:11:31
25       Q.  Now, we had discussed earlier  14:11:32
```

Page 258

1 today about instances in which Mallinckrodt 14:11:38
2 was shipping a peculiar order before making 14:11:42
3 any kind of due diligence determination. 14:11:46
4 Do you recall that testimony? 14:11:49
5 A. Yes, there was a short period 14:11:50
6 of time, yes. There was a period of time. 14:11:52
7 Q. Okay. And this seems to 14:11:54
8 reflect that practice; is that fair to say? 14:11:57
9 MR. O'CONNOR: Objection to 14:12:02
10 form. 14:12:03
11 THE WITNESS: No, not -- no, it 14:12:03
12 does not. 14:12:08
13 QUESTIONS BY MR. KO: 14:12:08
14 Q. Okay. Well, Mr. Kleissle is 14:12:08
15 concerned about -- Mr. Kleissle is concerned, 14:12:10
16 is he not, about the fact that Mallinckrodt 14:12:14
17 is actually filling orders -- 14:12:17
18 MR. O'CONNOR: Objection. 14:12:19
19 QUESTIONS BY MR. KO: 14:12:19
20 Q. -- that appear on the peculiar 14:12:19
21 order report? 14:12:20
22 MR. O'CONNOR: Objection to 14:12:21
23 form. 14:12:21
24 THE WITNESS: My understanding 14:12:21
25 of this instruction is, if it's 14:12:23

Page 259

1 suspicious, do not report it and don't 14:12:25
2 ship it. But if you're going to ship 14:12:28
3 it, it's not suspicious. 14:12:30
4 QUESTIONS BY MR. KO: 14:12:32
5 Q. Okay. Well -- 14:12:33
6 A. Sorry. Sorry. 14:12:34
7 Q. No, it's okay. We'll try to 14:12:35
8 unpack that in a moment. 14:12:36
9 A. Okay. 14:12:37
10 Q. But he does say, "If you think 14:12:37
11 it is suspicious, don't fill it," correct? 14:12:40
12 A. Yes. 14:12:42
13 Q. Okay. And he also is advising 14:12:43
14 that he needs more information based on the 14:12:48
15 peculiar order reports that Mr. Rausch -- 14:12:55
16 Mr. Rausch is sending to him; is that fair to 14:12:57
17 say? 14:12:59
18 A. Yes. 14:12:59
19 Q. Okay. So as of the date of 14:13:01
20 this e-mail, is it fair to say that 14:13:03
21 Mallinckrodt knew from the DEA that they 14:13:05
22 needed more information on the monthly 14:13:09
23 reports that they were sending to DEA? 14:13:11
24 MR. O'CONNOR: Objection to 14:13:13
25 form. 14:13:14

Page 260

1 THE WITNESS: Yes. 14:13:14
2 QUESTIONS BY MR. KO: 14:13:14
3 Q. Okay. And in response to 14:13:15
4 Mr. Ratliff's e-mail, Mr. Rausch says, "Bill, 14:13:22
5 okay. I think we just sent the monthly one 14:13:28
6 out yesterday, so maybe that's the one he 14:13:30
7 just got. We won't send out any more." 14:13:32
8 Did I read that correctly? 14:13:35
9 A. Yes. 14:13:35
10 Q. So as of the date of this 14:13:37
11 e-mail, it appears that Mr. Rausch is no 14:13:40
12 longer going to send the peculiar order 14:13:45
13 reports on to DEA; is that accurate? 14:13:46
14 A. Yes. 14:13:49
15 Q. And did you agree with that 14:13:50
16 practice? 14:13:51
17 A. Yes. 14:13:52
18 Q. Okay. And you agreed with that 14:13:55
19 because you were going to revamp and improve 14:13:56
20 your SOM program, correct? 14:14:02
21 A. Yes. 14:14:03
22 Q. You can set that one aside. 14:14:04
23 Actually, I take that back. 14:14:37
24 Sorry to jump around again. 14:14:39
25 A. No worries. 14:14:40

Page 261

1 Q. But can you grab that document 14:14:41
2 again? 14:14:44
3 A. Is this number 1? 14:14:44
4 Q. Yes. 14:14:44
5 Stewart? 14:14:46
6 Q. Stewart Exhibit 1. 14:14:48
7 A. All right. Yes, I have it. 14:14:50
8 Q. And Mr. Ratliff indicates to 14:14:50
9 the recipients of this e-mail, including you, 14:14:57
10 that "I advised that we have a conference 14:15:00
11 call planned with Frank Sapienza on Friday to 14:15:04
12 strengthen our suspicious order 14:15:07
13 identification system." 14:15:10
14 Did I read that correctly? 14:15:12
15 A. Yes. 14:15:12
16 Q. So do you agree -- do you agree 14:15:12
17 with Bill's sentiment at that time that your 14:15:13
18 suspicious order monitoring system needed to 14:15:17
19 be strengthened? 14:15:20
20 MR. O'CONNOR: Objection to 14:15:21
21 form. 14:15:22
22 THE WITNESS: No. 14:15:22
23 QUESTIONS BY MR. KO: 14:15:22
24 Q. You did not believe it needed 14:15:22
25 to be strengthened? 14:15:24

Page 262

```
1     A.    Semantics.  I believe it needed  14:15:25
2   to be enhanced, but I would not have used the  14:15:27
3   word "strengthen."                 14:15:29
4     Q.    Okay.  So as of April 1, 2008,  14:15:31
5   you believed that Mallinckrodt's suspicious  14:15:34
6   order monitoring program needed to be  14:15:37
7   enhanced?                   14:15:38
8     A.    Yes.                14:15:38
9     Q.    Okay.  You can set that one  14:15:39
10  aside.                     14:15:42
11        I'm now going to hand you a  14:15:53
12  copy of what will be marked as Harper  14:15:55
13  Exhibit 12.                  14:15:57
14        MR. KO:  For the record, this  14:15:58
15  is -- ends in Bates stamp 419907.  14:15:58
16        (Mallinckrodt-Harper Exhibit 12  14:16:01
17  marked for identification.)      14:16:02
18  QUESTIONS BY MR. KO:             14:16:02
19    Q.    And this is an e-mail chain in  14:16:21
20  which you are involved in in the late April  14:16:24
21  to early May 2008 time period; is that  14:16:27
22  correct?                    14:16:35
23    A.    Yes.                14:16:35
24    Q.    And do you have any reason to  14:16:36
25  doubt that you sent and received the e-mails  14:16:39
```

Page 263

```
1   reflected in this exhibit?       14:16:43
2     A.    No.                 14:16:44
3     Q.    Okay.  And at the very bottom  14:16:45
4   of the first page of the exhibit -- the first  14:16:47
5   page.                     14:16:54
6     A.    Oh, I'm terribly sorry.  14:16:55
7     Q.    That's okay.            14:16:57
8          -- you indicate that on  14:16:58
9   April 23, 2008, you attended a meeting to  14:16:59
10  discuss -- or sorry, you attended a meeting  14:17:01
11  of the Midwest Controlled Substance  14:17:03
12  Discussion Group in Chicago.     14:17:05
13        Do you see that?        14:17:06
14    A.    Yes.                14:17:07
15    Q.    And that was one of the  14:17:07
16  industry groups involving manufacturers that  14:17:09
17  you had referenced earlier today?  14:17:11
18    A.    Yes.                14:17:12
19    Q.    And one of the agenda items was  14:17:13
20  suspicious order monitoring, correct?  14:17:18
21    A.    Yes.                14:17:19
22    Q.    And there is reference made to  14:17:19
23  DEA advice that one member of the industry  14:17:28
24  received.                   14:17:31
25        Do you see that?        14:17:31
```

Page 264

```
1     A.    Yes.                14:17:32
2     Q.    And the DEA advice that  14:17:33
3   member received was that the DEA expected  14:17:37
4   registrants to know their customer, correct?  14:17:41
5     A.    Correct.            14:17:44
6     Q.    And I want to focus on the  14:17:44
7   portion of your e-mail in which you say that  14:17:48
8   "The DEA advice includes comparing" -- quote,  14:17:54
9   "Compare that activity to a bank's obligation  14:17:59
10  to report $10,000 transactions to law  14:18:01
11  enforcement for detection and money  14:18:03
12  laundering while having the ability to detect  14:18:05
13  multiple transactions at $9,999."  14:18:08
14        Did I read that correctly?  14:18:14
15    A.    Yes.                14:18:14
16    Q.    Is it a fair interpretation of  14:18:16
17  what you're saying here that it's important  14:18:21
18  for registrants to not just know about orders  14:18:22
19  that are actually suspicious and violate DEA  14:18:27
20  regulations or statutes, but also to  14:18:33
21  determine whether or not there are other  14:18:37
22  orders that could potentially violate such  14:18:38
23  duties and statutes under the CSA?  14:18:42
24        MR. O'CONNOR:  Objection to  14:18:43
25  form.                      14:18:44
```

Page 265

```
1         THE WITNESS:  My interpretation  14:18:44
2   of the comment is that the suspicious  14:18:46
3   order monitoring system should detect  14:18:48
4   orders that are causing uplift -- or  14:18:51
5   the algorithm to flag for unusual  14:18:56
6   pattern, size or frequency, but also  14:18:58
7   those that come in by other --  14:19:00
8   analysis come in just under those  14:19:06
9   metrics.                   14:19:07
10  QUESTIONS BY MR. KO:             14:19:07
11    Q.    So ones that could potentially  14:19:08
12  be suspicious and ones that could potentially  14:19:09
13  trigger your algorithm, correct?  14:19:12
14        MR. O'CONNOR:  Objection.  14:19:12
15  Form.                      14:19:13
16        THE WITNESS:  Yes.  Cause for  14:19:13
17  further review, yes.           14:19:16
18  QUESTIONS BY MR. KO:             14:19:18
19    Q.    All right.  So in other words,  14:19:18
20  you would agree with me that an effective SOM  14:19:21
21  program would not simply just identify actual  14:19:25
22  orders that are suspicious but orders that  14:19:29
23  come -- using your words, that come close to  14:19:32
24  being suspicious as well, correct?  14:19:37
25        MR. O'CONNOR:  Objection to  14:19:38
```

Page 266

```
 1    form.                           14:19:39
 2         THE WITNESS:  That was the    14:19:39
 3    advice given by this member of       14:19:40
 4    industry, yes.               14:19:41
 5    QUESTIONS BY MR. KO:            14:19:42
 6         Q.   And then regardless of the    14:19:42
 7    advice given by the member of the industry,  14:19:43
 8    is it your opinion that an effective SOM    14:19:45
 9    program would both flag actual suspicious   14:19:47
10    orders and those that come close to being a  14:19:50
11    suspicious order?               14:19:52
12         MR. O'CONNOR:  Objection to     14:19:52
13    form.                       14:19:54
14         THE WITNESS:  Not necessarily,   14:19:54
15    no.                       14:19:55
16    QUESTIONS BY MR. KO:            14:19:55
17         Q.   Okay.  So you don't -- you    14:19:56
18    didn't -- you didn't agree with the DEA    14:19:58
19    advice that was being given?         14:19:59
20         A.   So this is a person at a     14:20:00
21    conference making a comparison, and it was,  14:20:04
22    again, another suggestion.  But we understood  14:20:07
23    that we were still refining our algorithm at  14:20:11
24    the time to detect orders of unusual pattern,  14:20:15
25    size and frequency, not necessarily those   14:20:20
```

Page 267

```
 1    that meet the suggestion.         14:20:23
 2         Q.   Understood.            14:20:25
 3              And you're right, that is the   14:20:26
 4    fundamental duty at the end of the day.  You  14:20:29
 5    were working -- it's correct that at this    14:20:32
 6    time you were working on an algorithm to    14:20:33
 7    detect orders of unusual pattern, size and  14:20:35
 8    frequency, correct?             14:20:42
 9         A.   Yes.                 14:20:43
10         Q.   Okay.  You can set that one    14:20:43
11    aside.                      14:20:53
12         (Mallinckrodt-Harper Exhibit 13   14:21:15
13    marked for identification.)         14:21:15
14    QUESTIONS BY MR. KO:            14:21:15
15         Q.   Now, you said previously that  14:21:24
16    you recall attending the Buzzeo conferences  14:21:25
17    in certain years when you were senior manager  14:21:27
18    of controlled substance compliance group,   14:21:29
19    correct?                    14:21:32
20         A.   Yes.                 14:21:32
21         Q.   And do you recall attending in  14:21:33
22    2007 and 2008?               14:21:35
23         A.   I don't -- I can't recall the   14:21:37
24    dates.                     14:21:39
25         Q.   I'll hand you a copy of what   14:21:40
```

Page 268

```
 1    has been marked as Harper Exhibit 13.     14:21:52
 2         For the record, this e-mail     14:21:58
 3    chain ends in Bates 302096.        14:22:00
 4         And this is an e-mail dated     14:22:11
 5    November 4, 2008, from Cathy Stewart to    14:22:13
 6    several people, including you, correct?    14:22:15
 7         A.   Correct.             14:22:17
 8         Q.   And they appear to attach notes  14:22:17
 9    that she took at a conference she attended,  14:22:20
10    and I believe that is the Buzzeo conference;  14:22:24
11    is that correct?               14:22:26
12         A.   Yes.                 14:22:26
13         Q.   Does this refresh your      14:22:27
14    recollection as to whether or not you     14:22:29
15    attended this particular conference as well?  14:22:30
16         A.   Yes.                 14:22:32
17         Q.   And did you in fact attend this  14:22:33
18    conference with Ms. Stewart?        14:22:35
19         A.   Yes.                 14:22:35
20         Q.   Okay.  And she indicates in her  14:22:36
21    e-mail to you that "A lot of energy is being  14:22:42
22    focused on suspicious order monitoring."    14:22:46
23         Do you see that?           14:22:50
24         A.   Oh, yes.  Yes, I do.       14:22:51
25         Q.   And do you recall that at     14:22:54
```

Page 269

```
 1    this -- during this Buzzeo conference in    14:22:56
 2    late -- or fall of 2008 that there was in    14:23:01
 3    fact a lot of attention being given to     14:23:03
 4    suspicious order monitoring?        14:23:08
 5         A.   Yes.                 14:23:08
 6         Q.   Okay.  And she also indicates   14:23:09
 7    in the second sentence of the second      14:23:17
 8    paragraph -- you know, I've been talking    14:23:21
 9    quite a bit, so I'll let you -- if you don't  14:23:25
10    mind, do you want to read that second     14:23:28
11    sentence?                   14:23:29
12         A.   The second sentence of the     14:23:29
13    second paragraph?              14:23:30
14         Q.   Yeah.                14:23:30
15         A.   "Other highlights, i.e., more   14:23:31
16    intensive focus on carriers, are provided as  14:23:34
17    a heads-up that this is on its way."      14:23:37
18         Q.   And can you read the sentence   14:23:41
19    before that?                 14:23:42
20         A.   "The attached is for        14:23:43
21    informational" -- oh, I'm sorry.       14:23:45
22         Q.   The sentence before that.      14:23:47
23         A.   "As the team leader, I will    14:23:48
24    depend on Karen Harper to determine which   14:23:53
25    areas of our SOM process may need to be    14:23:55
```

Page 270

1  looked at again."                    14:23:57
2      Q.   Okay.  So certainly from the   14:23:58
3  perspective of Ms. Stewart, she believed that  14:23:59
4  you were the team leader of the SOM process;   14:24:01
5  is that correct?                    14:24:04
6      A.   That's what this states, yes.   14:24:04
7      Q.   Okay.  And you, in fact,        14:24:06
8  believed that you were effectively the team   14:24:08
9  leader for the enhancement of the SOM process  14:24:10
10  during this time period, correct?        14:24:12
11         MR. O'CONNOR:  Objection.       14:24:13
12  Form.                             14:24:14
13         THE WITNESS:  Yes.            14:24:14
14  QUESTIONS BY MR. KO:                  14:24:15
15      Q.   And turning the next -- turning   14:24:19
16  to the next page, you see her actual notes.   14:24:20
17         Do you recall reading and        14:24:27
18  reviewing these notes?               14:24:29
19      A.   Yes.                       14:24:30
20      Q.   Okay.  She indicates that,      14:24:32
21  quote, "We must also formally document the   14:24:43
22  investigation of each peculiar, suspicious,   14:24:47
23  peculiar, order that gets identified,     14:24:51
24  including the hows and the whys of the logic   14:24:53
25  we used to deem the order appropriate to ship  14:24:55

Page 271

1  or not."                           14:24:58
2         Did I read that correctly?       14:24:59
3      A.   Yes.                       14:24:59
4      Q.   Okay.  And do you recall        14:25:00
5  whether or not you implemented that policy   14:25:01
6  change into the enhanced SOM program?      14:25:05
7         MR. O'CONNOR:  Objection to      14:25:08
8  form.                             14:25:09
9         THE WITNESS:  Yes.  Yes, we      14:25:09
10  did.  Pardon me.                    14:25:12
11  QUESTIONS BY MR. KO:                  14:25:13
12      Q.   So is it your testimony that   14:25:13
13  for the revised and enhanced SOM program that  14:25:15
14  you eventually rolled out at a future date   14:25:18
15  from the date of this e-mail, you formally   14:25:21
16  documented every single peculiar order,    14:25:23
17  including the hows and whys of the logic we   14:25:30
18  used to deemed the order appropriate to ship   14:25:35
19  or not?                           14:25:37
20      A.   Yes.                       14:25:37
21      Q.   Okay.  And do you know whether   14:25:37
22  or not those -- and I think earlier I had   14:25:38
23  said "peculiar, suspicious, peculiar," but I   14:25:40
24  mean to say "particular suspicious."       14:25:42
25      A.   That's how the sentence reads.  14:25:43

Page 272

1      Q.   Right.  So --                 14:25:43
2      A.   Yes.                       14:25:44
3      Q.   I apologize for that.          14:25:45
4      A.   Quite all right.              14:25:50
5      Q.   Do you know whether or not the   14:25:51
6  formal documentation was contained in any     14:25:52
7  sort of database?                    14:25:56
8      A.   It is, yes.                  14:25:57
9      Q.   Okay.  And what database would   14:25:58
10  that all be kept in?                 14:26:00
11      A.   It's the share drive at        14:26:02
12  Mallinckrodt.                     14:26:05
13      Q.   Okay.  And so your testimony is   14:26:06
14  that every single order that was identified   14:26:08
15  as suspicious was formally documented, or is   14:26:11
16  it your testimony that every single order   14:26:17
17  that was identified as peculiar was formally   14:26:19
18  documented, or both?                 14:26:21
19         MR. O'CONNOR:  Objection to      14:26:21
20  form.                             14:26:22
21         THE WITNESS:  Both, but not      14:26:22
22  necessarily at that time.  But as time   14:26:24
23  went on, yes, every order review was      14:26:26
24  documented and why.                 14:26:29
25

Page 273

1  QUESTIONS BY MR. KO:                  14:26:30
2      Q.   Okay.  And do you recall        14:26:30
3  approximately when that formal documentation   14:26:31
4  began?                            14:26:36
5      A.   In 2012.                    14:26:37
6      Q.   Okay.  So that would be four   14:26:41
7  years after the date of this particular   14:26:44
8  e-mail, correct?                    14:26:48
9      A.   Correct.                    14:26:48
10      Q.   Do you know why it took so      14:26:49
11  along to enact that policy?           14:26:51
12      A.   So we were working on enhancing   14:26:53
13  our program again.  I keep stating that.   14:26:56
14         These are suggestions by        14:27:00
15  breakout speakers and not necessarily -- she   14:27:03
16  talks about they're not all-inclusive,    14:27:06
17  they're for informational purposes.       14:27:09
18         So it was our intent to do so,   14:27:10
19  but we had not completely incorporated the   14:27:13
20  explanation into every order that was      14:27:17
21  reviewed at that time.                14:27:19
22      Q.   But you -- excuse me.  You did   14:27:21
23  ultimately adopt a system whereby you      14:27:25
24  formally documented every peculiar and    14:27:27
25  suspicious order in 2012, correct?        14:27:29

Page 274

1    A.   Yes.          14:27:31
2    Q.   And that's four years after you   14:27:32
3  first discussed the possibility of doing so,   14:27:33
4  correct?            14:27:35
5    A.   It's four years after the topic  14:27:36
6  was made -- mentioned at a conference, yes.   14:27:38
7    Q.   And reference was made by     14:27:40
8  Ms. Stewart that "we must also formally   14:27:44
9  document."           14:27:47
10       Did I read that correctly?   14:27:47
11       So just the record -- just so   14:27:56
12  the record is clear, Ms. Stewart indicates in  14:27:57
13  her notes that, quote, "We must also formally  14:28:00
14  document the investigation of each particular  14:28:04
15  suspicious, open parens, peculiar, close   14:28:09
16  parens, order that gets identified," end   14:28:11
17  quote.            14:28:15
18       Did I read that correctly?   14:28:15
19    A.   Yes, you did.      14:28:15
20    Q.   Okay.  So as of the fall    14:28:16
21  of 2008, she is suggesting, is she not, that  14:28:21
22  you must formally document each suspicious or  14:28:23
23  peculiar order?        14:28:25
24    A.   She is relaying those notes   14:28:25
25  from the conference, not necessarily as a   14:28:29

Page 275

1  mandate that we incorporate them.    14:28:32
2    Q.   Sure.         14:28:34
3    A.   So they're notes that she took  14:28:35
4  at a conference.       14:28:38
5    Q.   Right.  And I understand it's  14:28:39
6  not a mandate, but she is making a suggestion  14:28:39
7  that you should formally document each    14:28:41
8  suspicious and peculiar order, is she not?   14:28:43
9    A.   Not necessarily.  She's    14:28:44
10  relaying comments made at a conference by a  14:28:45
11  speaker.          14:28:47
12    Q.   Okay.  Is it fair to say    14:28:48
13  that -- this Buzzeo conference that you    14:28:49
14  attended each year, it was an important    14:28:53
15  conference, correct?      14:28:56
16    A.   Yes.         14:28:56
17    Q.   And it was a conference in    14:28:56
18  which you would gain important insight    14:28:58
19  regarding your duties under the CSA to    14:29:01
20  maintain effective controls against    14:29:03
21  diversion, among other things, correct?   14:29:05
22       MR. O'CONNOR:  Objection to   14:29:06
23    form.          14:29:06
24       THE WITNESS:  Yes.     14:29:06
25

Page 276

1  QUESTIONS BY MR. KO:      14:29:07
2    Q.   And as we described earlier,   14:29:07
3  there weren't necessarily other     14:29:10
4  extracurricular activities that you were   14:29:12
5  involved in with respect to your diversion   14:29:14
6  responsibilities at Mallinckrodt, correct?   14:29:16
7       MR. O'CONNOR:  Objection to   14:29:18
8    form.          14:29:18
9       THE WITNESS:  Correct.    14:29:18
10  QUESTIONS BY MR. KO:      14:29:19
11    Q.   And so this conference was an  14:29:19
12  important conference for you to attend in   14:29:21
13  which you could further understand your    14:29:23
14  responsibilities under the CSA, correct?   14:29:25
15       MR. O'CONNOR:  Objection to   14:29:27
16    form.          14:29:28
17       THE WITNESS:  Yes.     14:29:28
18  QUESTIONS BY MR. KO:      14:29:28
19    Q.   So is it fair to say that the  14:29:29
20  advice and suggestions that were borne out of  14:29:31
21  this conference were important suggestions to  14:29:34
22  follow?           14:29:38
23       MR. O'CONNOR:  Objection to   14:29:39
24    form.          14:29:40
25       THE WITNESS:  They were    14:29:40

Page 277

1  elements to be considered as part of    14:29:41
2    our suspicious order monitoring    14:29:42
3    program, not necessarily a mandate to   14:29:44
4    be followed.        14:29:46
5  QUESTIONS BY MR. KO:      14:29:48
6    Q.   Okay.  And an element to be   14:29:48
7  considered as of the fall of 2008 was formal  14:29:49
8  documentation of every single peculiar and   14:29:51
9  suspicious order, correct?     14:29:54
10    A.   Yes, based upon one of the   14:29:54
11  conference speakers, yes, sir.    14:29:56
12    Q.   And again, it took you four   14:29:57
13  years to actually implement a system in which  14:30:06
14  you would formally document each peculiar or  14:30:09
15  suspicious order, correct?     14:30:13
16    A.   Yes.         14:30:15
17    Q.   And during that four-year time  14:30:17
18  period, do you have any understanding of how  14:30:21
19  many pills were diverted in the country,   14:30:25
20  Mallinckrodt pills were diverted in the    14:30:27
21  country?          14:30:29
22       MR. O'CONNOR:  Objection to   14:30:29
23    form.          14:30:30
24       THE WITNESS:  I do not.    14:30:30
25

Page 278

1  QUESTIONS BY MR. KO:                14:30:30
2      Q.   Do you have an understanding of  14:30:32
3  whether or not that time period reflected the  14:30:33
4  peak of pills that were being distributed  14:30:39
5  into Florida?                     14:30:43
6          MR. O'CONNOR:  Objection to    14:30:43
7      form.                       14:30:44
8          THE WITNESS:  Yes.          14:30:44
9  QUESTIONS BY MR. KO:                14:30:44
10     Q.   You do have an understanding,   14:30:44
11 correct?                         14:30:45
12     A.   Yes.                     14:30:45
13     Q.   And during that time period    14:30:45
14 there were -- there was a large concern from  14:30:47
15 2008 through 2012 that many of Mallinckrodt  14:30:51
16 pills were going into Florida and being    14:30:54
17 abused and diverted, correct?         14:30:56
18         MR. O'CONNOR:  Objection to    14:30:57
19     form.                       14:30:58
20         THE WITNESS:  Yes.          14:30:58
21 QUESTIONS BY MR. KO:                14:31:00
22     Q.   Okay.  Do you believe that     14:31:04
23 earlier adoption of the formal documentation  14:31:05
24 to identify peculiar or suspicious orders  14:31:07
25 would have helped stop the flow of diversion  14:31:10

Page 279

1  and abuse that was occurring of Mallinckrodt  14:31:13
2  pills had you implemented this policy     14:31:16
3  earlier?                         14:31:18
4          MR. O'CONNOR:  Objection to    14:31:18
5      form.                       14:31:18
6          THE WITNESS:  No.          14:31:18
7  QUESTIONS BY MR. KO:                14:31:19
8      Q.   You don't believe that?       14:31:19
9      A.   I do not.                 14:31:20
10     Q.   Okay.  So you don't -- well,   14:31:21
11 then why did you adopt this formal procedure  14:31:23
12 in 2012?                         14:31:25
13     A.   It was -- as we continued the  14:31:25
14 enhancement of our program, it was --     14:31:30
15         THE WITNESS:  This may be a    14:31:36
16     privileged --                 14:31:37
17         MR. O'CONNOR:  Then I guess I  14:31:39
18     would instruct you not to answer with  14:31:40
19     respect to any sort of attorney-client  14:31:42
20     communications.               14:31:46
21         But you can answer to the      14:31:46
22     extent you can without getting into   14:31:47
23     those communications with counsel.   14:31:48
24         THE WITNESS:  Okay.          14:31:49
25

Page 280

1  QUESTIONS BY MR. KO:                14:31:52
2      Q.   So are you going to follow your  14:31:58
3  counsel's instruction?               14:31:59
4      A.   Yes, sir.                 14:31:59
5      Q.   Okay.  Now, I know you said    14:32:00
6  earlier that this wasn't necessarily a    14:32:09
7  mandate but a suggestion.            14:32:11
8          But is there any reason you can  14:32:13
9  think of for not following this advice that  14:32:14
10 you learned at the Buzzeo conference in 2008?  14:32:19
11     A.   No.                      14:32:21
12     Q.   Okay.  Now, one thing -- going  14:32:22
13 down to the fifth paragraph of this page,   14:32:27
14 Ms. Stewart writes in her notes that "The   14:32:36
15 general consensus is that sales reps are not  14:32:38
16 considered a good option for on-site      14:32:42
17 investigations and initial review prior to  14:32:44
18 accepting new customers due to their       14:32:47
19 perceived bias in getting the customer     14:32:48
20 approved for sales revenue purposes."      14:32:50
21         Did I read that correctly?      14:32:53
22     A.   Yes.                     14:32:55
23     Q.   And so understanding your      14:32:56
24 perspective that these aren't necessarily   14:33:02
25 mandates, but is it fair to say that one    14:33:04

Page 281

1  thing -- one piece of advice and/or a     14:33:06
2  suggestion that you learned following this  14:33:09
3  conference was that the general consensus is  14:33:11
4  that sales reps should not be involved in   14:33:15
5  reviewing new customers due to their       14:33:19
6  perceived bias in getting sales?         14:33:21
7          MR. O'CONNOR:  Objection to    14:33:23
8      form.                       14:33:24
9          THE WITNESS:  That's correct,   14:33:24
10     and we did not.               14:33:26
11 QUESTIONS BY MR. KO:                14:33:28
12     Q.   In other words -- well, I think  14:33:29
13 you were asking {sic} my next question.    14:33:32
14         So you never had sales reps     14:33:34
15 involved in initial reviews of -- initial   14:33:36
16 reviews of new customers?             14:33:42
17     A.   So we had -- we had the sales  14:33:43
18 force calling on customers.  We had an     14:33:46
19 independent new customer setup process --   14:33:48
20     Q.   Right.                   14:33:51
21     A.   -- which involved the customer  14:33:51
22 filling out the application.          14:33:52
23         At one time we considered that  14:33:54
24 the sales reps would fill out the          14:33:55
25 application, and we -- we did not utilize   14:33:58

Page 282

1    that --                          14:34:02
2        Q.    Okay.                  14:34:02
3        A.    -- as part of the program.    14:34:02
4             So the customer fills out the    14:34:03
5    application.  We run the credit, the Dun &    14:34:05
6    Bradstreet, et cetera.  And that's the way --    14:34:08
7    so it's not predicated upon the salesperson's    14:34:10
8    review of the customer.                14:34:14
9        Q.    And by the way, the sales reps    14:34:16
10   referred to here, again, are these both NAMs    14:34:18
11   and CSRs, or NAMs or CSRs, or which -- which    14:34:22
12   sales reps is Cathy referring to?        14:34:26
13            MR. O'CONNOR:  Objection to    14:34:27
14   form.                              14:34:28
15            THE WITNESS:  NAMs.        14:34:28
16   QUESTIONS BY MR. KO:                14:34:29
17       Q.    NAMs.  Okay.            14:34:29
18            And so your testimony is that    14:34:29
19   NAMs were not involved in any initial review    14:34:32
20   of new customers?                  14:34:36
21       A.    Not to my knowledge.      14:34:38
22       Q.    Okay.  So if -- if for purposes    14:34:41
23   of the new checklist -- new customer        14:34:46
24   checklist form NAMs had some input and    14:34:49
25   involvement, that would be contrary to your    14:34:51

Page 283

1    expectation --                      14:34:53
2             MR. O'CONNOR:  Objection.    14:34:54
3    Form.                              14:34:55
4    QUESTIONS BY MR. KO:                14:34:56
5        Q.    -- is that correct?        14:34:56
6        A.    I don't -- can you provide more    14:34:57
7    detail to give me more information to answer    14:35:01
8    the question, please?                14:35:03
9        Q.    Sure.                  14:35:04
10            Well, maybe I'll -- I'll try it    14:35:05
11   this way.  Did you believe in the fall    14:35:07
12   of 2008 that it was a good idea to consult    14:35:12
13   national account managers in connection with    14:35:14
14   approval of new customers for purposes of    14:35:17
15   filling out the new customer checklist?    14:35:22
16            MR. O'CONNOR:  Objection to    14:35:24
17   form.                              14:35:25
18            THE WITNESS:  No.          14:35:25
19   QUESTIONS BY MR. KO:                14:35:25
20       Q.    Okay.  And how about with    14:35:26
21   respect to determining whether or not any    14:35:28
22   orders of new customers were peculiar and/or    14:35:33
23   suspicious?  Did you believe that NAMs had    14:35:37
24   any involvement in that process following the    14:35:41
25   fall of 2008?                      14:35:45

Page 284

1        A.    Yes.                  14:35:47
2        Q.    They did have involvement?    14:35:48
3        A.    Yes.                  14:35:49
4        Q.    Okay.  And what involvement --    14:35:50
5    what did that involvement consist of?    14:35:52
6        A.    So if an order was flagged as    14:35:54
7    peculiar, suspicious, unusual, whatever the    14:35:57
8    naming convention was at the time, we would    14:36:00
9    at times consult with the NAMs to ask them if    14:36:05
10   they had more information on the account that    14:36:08
11   would help us in our review of that order    14:36:12
12   that had been flagged.                14:36:14
13       Q.    Okay.  And sometimes they would    14:36:15
14   clear these orders, correct?            14:36:18
15            MR. O'CONNOR:  Objection to    14:36:19
16   form.                              14:36:20
17            THE WITNESS:  Yes.  Yes.    14:36:20
18   QUESTIONS BY MR. KO:                14:36:23
19       Q.    In other words, sometimes they    14:36:24
20   would conclusively -- or sometimes they would    14:36:27
21   make the recommendation to you that that    14:36:28
22   particular order was not suspicious    14:36:31
23   sufficient to alert the DEA, correct?    14:36:34
24            MR. O'CONNOR:  Objection to    14:36:36
25   form.                              14:36:36

Page 285

1            THE WITNESS:  Yes, with    14:36:36
2    appropriate explanation, yes.          14:36:38
3    QUESTIONS BY MR. KO:                14:36:39
4        Q.    Right.                  14:36:40
5            And that explanation, what did    14:36:40
6    that usually consist of?  Was that in the    14:36:43
7    form of an e-mail?  A telephone call?    14:36:46
8            MR. O'CONNOR:  Objection.    14:36:49
9    QUESTIONS BY MR. KO:                14:36:49
10       Q.    How did that message -- how was    14:36:49
11   that message conveyed to you?            14:36:51
12       A.    It could have been either,    14:36:53
13   e-mail or telephone.                14:36:55
14       Q.    But we know at least from the    14:36:56
15   2008 to 2012 time period, there was no formal    14:37:01
16   documentation of that, correct?          14:37:04
17       A.    Not relative to every order    14:37:05
18   that was flagged by the algorithm, correct.    14:37:08
19       Q.    Okay.  And separate and apart    14:37:10
20   from what's included in Ms. Stewart's notes,    14:37:15
21   do you believe having salespeople involved in    14:37:19
22   the identification of suspicious orders is a    14:37:21
23   good thing?                        14:37:25
24            MR. O'CONNOR:  Objection to    14:37:26
25   form.                              14:37:27

Page 286

1    THE WITNESS: No. They --    14:37:27
2    facilitating in the review, yes, but    14:37:31
3    not in the identification, no. I do    14:37:33
4    not think they should be involved.    14:37:36
5    QUESTIONS BY MR. KO:    14:37:38
6    Q.    Okay. And so if they were --    14:37:39
7    so I understand this is a hypothetical, but    14:37:43
8    bear with me.    14:37:45
9    So would it be appropriate then    14:37:46
10   if a national account manager was the only    14:37:49
11   source for determining whether or not a    14:37:57
12   peculiar order was suspicious or not?    14:38:00
13   A.    Yes.    14:38:01
14   Q.    It would be appropriate?    14:38:01
15   A.    Yes.    14:38:02
16   Q.    So in that case, isn't the NAM    14:38:03
17   the only person providing input as to whether    14:38:07
18   or not an order is suspicious?    14:38:09
19   A.    Yes.    14:38:10
20   Q.    Okay. And so you're saying    14:38:15
21   that's okay?    14:38:16
22   A.    Yes.    14:38:17
23   Q.    Okay. So you don't have any    14:38:17
24   problems, as someone who is in charge of    14:38:20
25   running a suspicious order monitoring    14:38:22

Page 287

1    program, of having national account managers    14:38:24
2    who have an incentive for new sales and new    14:38:29
3    business to be involved in the decision of    14:38:34
4    whether or not to identify an order as    14:38:36
5    suspicious or not?    14:38:39
6    MR. O'CONNOR: Objection to    14:38:39
7    form.    14:38:40
8    THE WITNESS: I do not have any    14:38:40
9    problem with that.    14:38:44
10   QUESTIONS BY MR. KO:    14:38:45
11   Q.    Okay. National account    14:38:45
12   managers at Mallinckrodt were compensated on    14:38:47
13   a commission -- or excuse me.    14:38:48
14   Do you have an understanding of    14:38:50
15   how national account managers were    14:38:52
16   compensated?    14:38:53
17   A.    I do not.    14:38:53
18   Q.    Do you understand that national    14:38:54
19   account managers had a -- received a    14:38:58
20   commission based on the amount of sales    14:39:01
21   activity that they were able to retain?    14:39:04
22   A.    I don't know how their pay is    14:39:06
23   structured.    14:39:08
24   Q.    Okay. Setting aside whether or    14:39:09
25   not you knew how NAMs were paid, don't you    14:39:12

Page 288

1    believe that conflict of interest exists in    14:39:17
2    having an individual who has a financial    14:39:20
3    incentive to create new sales also determine    14:39:23
4    whether or not an order is suspicious?    14:39:25
5    MR. O'CONNOR: Objection to    14:39:27
6    form.    14:39:28
7    THE WITNESS: I believe that    14:39:28
8    the greater incentive is regulatory    14:39:30
9    compliance and DEA compliance, as was    14:39:33
10   carried throughout our organization,    14:39:36
11   would override any financial    14:39:38
12   incentive.    14:39:40
13   QUESTIONS BY MR. KO:    14:39:41
14   Q.    Do you believe that the    14:39:42
15   national account managers had -- believed    14:39:43
16   that they had a greater incentive to comply    14:39:45
17   with the regulatory statutes laid out under    14:39:48
18   the CSA?    14:39:51
19   A.    Yes.    14:39:53
20   Q.    Okay. And you believe -- well,    14:39:54
21   strike that.    14:39:57
22   Do you recall following the    14:39:57
23   date of this particular Buzzeo conference    14:40:13
24   ever discussing removing NAMs from the    14:40:16
25   suspicious order monitoring and peculiar    14:40:22

Page 289

1    order monitoring review structure?    14:40:22
2    A.    No.    14:40:25
3    Q.    Okay. Do you ever recall    14:40:27
4    removing any member of sales force -- that    14:40:30
5    includes NAMs and customer service reps --    14:40:33
6    from the peculiar order/suspicious order    14:40:37
7    review system?    14:40:41
8    A.    No.    14:40:43
9    Q.    Okay. You can set this    14:40:43
10   document aside.    14:40:53
11   (Mallinckrodt-Harper Exhibit 14    14:40:57
12   marked for identification.)    14:40:58
13   QUESTIONS BY MR. KO:    14:40:58
14   Q.    I'm going to hand you a copy of    14:40:58
15   what will be marked as Harper Exhibit 14.    14:40:59
16   Now, do you recall -- I know    14:41:35
17   you said you didn't recall the specifics of    14:41:54
18   how NAMs were compensated at Mallinckrodt,    14:41:57
19   but do you know whether or not they received    14:41:59
20   any bonuses based in part of the volume of    14:42:01
21   their sales of controlled substances    14:42:03
22   manufactured by Mallinckrodt?    14:42:05
23   A.    I do not know.    14:42:06
24   Q.    Did you ever inquire as to    14:42:07
25   whether or not they were being compensated on    14:42:10

Page 290

```
 1  that basis?                        14:42:11
 2      A.   Nope.                      14:42:12
 3      Q.   How come you never inquired  14:42:13
 4  about that?                        14:42:15
 5      A.   Because the controlled     14:42:15
 6  substances compliance group operated, to the  14:42:19
 7  extent it was possible, autonomously unless  14:42:21
 8  we needed guidance from the NAMs on specific  14:42:27
 9  orders.  So I never knew how they were  14:42:30
10  compensated, why.  I don't know how much  14:42:32
11  oxycodone was sold for.  I don't know any of  14:42:34
12  the financial pieces of that.      14:42:38
13      Q.   Sure.                      14:42:38
14      A.   Thank you.                 14:42:40
15      Q.   Okay.  And you say that you  14:42:41
16  needed -- at times you needed guidance from  14:42:45
17  them on specific -- you needed guidance from  14:42:47
18  NAMs on specific orders --         14:42:50
19      A.   Uh-huh.                    14:42:53
20      Q.   -- with respect to identifying  14:42:53
21  a peculiar or suspicious order, correct?  14:42:55
22      A.   Not identifying but reviewing.  14:42:57
23      Q.   Reviewing.                 14:43:00
24          With the ultimate goal of   14:43:01
25  trying to determine whether or not that order  14:43:02
```

Page 291

```
 1  was suspicious, correct?           14:43:04
 2      A.   Correct.                   14:43:05
 3      Q.   So NAMs played -- would you  14:43:06
 4  agree with me that NAMs played an integral  14:43:10
 5  role in determining whether or not an order  14:43:13
 6  could potentially be suspicious?   14:43:15
 7          MR. O'CONNOR:  Objection to  14:43:16
 8      form.                          14:43:18
 9          THE WITNESS:  Certain orders.  14:43:18
10          May I explain or --        14:43:21
11  QUESTIONS BY MR. KO:               14:43:23
12      Q.   Well, let me -- certain orders.  14:43:24
13  Do you mean certain orders that were  14:43:25
14  previously flagged as peculiar?    14:43:27
15      A.   Yes.                       14:43:28
16      Q.   Okay.  So once an order was  14:43:29
17  flagged as peculiar, is it accurate to say  14:43:30
18  that NAMs played an integral role in  14:43:34
19  determining whether or not that peculiar  14:43:39
20  order was ultimately deemed to be suspicious  14:43:41
21  sufficient to notify the DEA?      14:43:45
22          MR. O'CONNOR:  Objection to  14:43:46
23      form.                          14:43:46
24          THE WITNESS:  Not every order.  14:43:46
25
```

Page 292

```
 1  QUESTIONS BY MR. KO:               14:43:47
 2      Q.   Correct.                   14:43:47
 3          But for some?               14:43:47
 4      A.   For some, yes.             14:43:48
 5      Q.   Okay.  So is it the case that  14:43:50
 6  for some orders, national account managers  14:43:53
 7  played an integral role in determining  14:43:56
 8  whether or not a peculiar order was  14:43:59
 9  ultimately determined to be suspicious?  14:44:00
10          MR. O'CONNOR:  Objection to  14:44:02
11      form.                          14:44:03
12          THE WITNESS:  They assisted in  14:44:03
13      the review, and the ultimate decision  14:44:05
14      about whether the order was suspicious  14:44:06
15      or not rests -- always did rest with  14:44:08
16      the controlled substances compliance  14:44:11
17      group.                         14:44:12
18  QUESTIONS BY MR. KO:               14:44:12
19      Q.   Including you and Mr. Ratliff,  14:44:13
20  among other people, correct?       14:44:14
21      A.   Correct.                   14:44:15
22      Q.   Okay.  So if -- in the scenario  14:44:16
23  we were just discussing, if the national  14:44:21
24  account manager -- well, strike that.  14:44:25
25          When the national account   14:44:28
```

Page 293

```
 1  manager was assisting in the review of  14:44:38
 2  whether or not a peculiar order was deemed --  14:44:39
 3  was going to be deemed as suspicious or not,  14:44:43
 4  can you think of any instances in which the  14:44:46
 5  input of the national account manager was the  14:44:53
 6  only input you received in making a  14:44:55
 7  determination of whether or not the order was  14:44:57
 8  suspicious?                        14:44:59
 9      A.   Yes, outside of the controlled  14:45:00
10  substances compliance group, yes.  14:45:06
11      Q.   Were there instances in which  14:45:07
12  the determination that the -- that you and  14:45:14
13  Mr. Ratliff made as to whether an order was  14:45:17
14  suspicious or not relied solely on the input  14:45:19
15  of a national account manager?     14:45:23
16      A.   Yes.                       14:45:24
17  QUESTIONS BY MR. KO:               14:45:43
18      Q.   Okay.  I'm going to hand you a  14:45:38
19  copy of what's going to be marked as Harper  14:45:40
20  Exhibit 14.                        14:45:43
21          MR. KO:  And this is, for the  14:45:46
22      record, an e-mail from Dave Hunter to  14:45:51
23      several people, including you, on  14:45:55
24      November 19, 2009, and Bates ending in  14:45:58
25      278806.                        14:46:03
```

Highly Confidential - Subject to Further Confidentiality Review

Page 294

```
 1   QUESTIONS BY MR. KO:                 14:46:03
 2       Q.   Do you recall this -- or do you   14:46:13
 3   have any reason to dispute that you received   14:46:15
 4   this e-mail?                          14:46:16
 5       A.   I have no reason to dispute.   14:46:17
 6       Q.   Okay.  And here Mr. Hunter is   14:46:18
 7   attaching notes from the Buzzeo conference I   14:46:21
 8   believe he attends in 2009; is that correct?   14:46:27
 9       A.   Yes.  Seeing this, so, yes.   14:46:29
10       Q.   Okay.  And do you recall       14:46:33
11   attending this particular Buzzeo conference   14:46:34
12   as well?                              14:46:35
13       A.   I do not.                    14:46:35
14       Q.   Okay.  So you recall attending   14:46:36
15   the 2008 Buzzeo conference with Ms. Stewart,   14:46:39
16   but you don't recall attending this     14:46:41
17   conference with Mr. Hunter; is that fair?   14:46:43
18       A.   That's fair.                 14:46:46
19       Q.   Okay.  Do you recall Mr. Hunter   14:46:48
20   sending these notes to you about what   14:46:54
21   transpired at this particular Buzzeo   14:46:59
22   conference?                           14:47:01
23       A.   I do not specifically recall   14:47:02
24   it, but I can refamiliarize myself with the   14:47:05
25   content.                              14:47:08
```

Page 295

```
 1       Q.   Sure.                        14:47:08
 2            And there are notes.  I just   14:47:09
 3   want to turn to the first page of notes that   14:47:11
 4   he drafts.  These appear to be notes that he   14:47:17
 5   has created following his attendance at the   14:47:20
 6   2009 Buzzeo conference; is that correct?   14:47:24
 7       A.   Yes.                         14:47:25
 8       Q.   And looking down at the bottom   14:47:28
 9   of this page, he indicates where I'm   14:47:32
10   highlighting right now, "Sir, suspicious   14:47:34
11   order monitoring was certainly a hotbed of   14:47:37
12   discussion."                          14:47:39
13            Do you see that?             14:47:40
14       A.   So that's a question, yes,   14:47:40
15   that's a question as documented here.   14:47:44
16       Q.   Right.                       14:47:45
17            And it's a question by someone   14:47:46
18   in the audience, some registrant or someone   14:47:47
19   who attended the conference, correct?   14:47:50
20       A.   Yes.                         14:47:51
21       Q.   Okay.  And so it's fair to say   14:47:52
22   that as of the fall of 2009, their   14:47:57
23   continual -- there's continual attention and   14:48:01
24   scrutiny being given to Mallinckrodt's   14:48:02
25   suspicious order monitoring system?   14:48:05
```

Page 296

```
 1            MR. O'CONNOR:  Objection to   14:48:07
 2   form.                                 14:48:08
 3            THE WITNESS:  So all suspicious   14:48:08
 4   order monitoring systems, not          14:48:14
 5   necessarily unique to Mallinckrodt,   14:48:15
 6   yes.                                  14:48:16
 7   QUESTIONS BY MR. KO:                   14:48:16
 8       Q.   Right.  Right.               14:48:16
 9            So as a general matter in 2009,   14:48:17
10   would you agree with the statement that   14:48:19
11   suspicious order monitoring continued to be   14:48:22
12   given close scrutiny by the DEA?       14:48:25
13       A.   Yes.                         14:48:27
14       Q.   Okay.  And the question is   14:48:28
15   asked, "Are there any plans for DEA to   14:48:31
16   publicize information to implement?"   14:48:35
17            Do you see that?             14:48:37
18       A.   Yes.                         14:48:38
19       Q.   "SOM incorporate algorithms   14:48:39
20   where products are more likely to be   14:48:43
21   diverted."                            14:48:45
22            Did I read that correctly as   14:48:47
23   well?                                 14:48:48
24       A.   You did.                     14:48:48
25       Q.   Okay.  And there is a response   14:48:50
```

Page 297

```
 1   given by someone at DEA, it appears.   14:48:51
 2            Do you see that?             14:48:54
 3       A.   Yes.                         14:48:54
 4       Q.   And that's Jim Crawford.   14:48:55
 5            Did you know who he has?       14:48:57
 6       A.   Yes.                         14:48:59
 7       Q.   Okay.  Did you communicate with   14:49:00
 8   him at all during the 2008, 2012 time period?   14:49:01
 9       A.   No.                          14:49:04
10       Q.   Okay.  But you just knew -- you   14:49:05
11   just knew who he was, but you didn't   14:49:08
12   necessarily communicate with him?     14:49:10
13       A.   Correct.  He and Mark Caverly   14:49:11
14   spoke at the end of every Buzzeo conference.   14:49:15
15       Q.   Got it.                      14:49:16
16            And it's -- he says in response   14:49:17
17   to this question, quote, "Whatever we put out   14:49:20
18   will be outdated by the time we put it out.   14:49:24
19   You're looking at a number.  Tell me how much   14:49:27
20   that we can exceed.  DEA can't do that.  It's   14:49:30
21   part of your due diligence, knowing your   14:49:33
22   customer," end quote.                  14:49:37
23            Did I read that correctly?   14:49:38
24       A.   Yes.                         14:49:39
25       Q.   Okay.  So this appears to be   14:49:39
```

Page 298

1   some Q&As in which -- there is a question in   14:49:41
2   which registrants are asking whether or not   14:49:44
3   DEA will give guidance on an appropriate   14:49:48
4   suspicious order monitoring algorithm.   14:49:54
5          Is that a fair characterization   14:49:55
6   of the question that was asked?   14:49:56
7          MR. O'CONNOR: Objection to   14:49:58
8   form.   14:49:58
9          THE WITNESS: Yes.   14:49:58
10  QUESTIONS BY MR. KO:   14:49:59
11       Q.   And the response given was that   14:49:59
12  DEA was not going to provide such concrete   14:50:03
13  guidance; is that correct?   14:50:06
14       A.   I'd like to reread the answer,   14:50:06
15  please.   14:50:10
16       Q.   Sure.   14:50:10
17       A.   Yes, that's the gist of the   14:50:11
18  response, yes.   14:50:19
19       Q.   Okay.  So as of the fall   14:50:20
20  of 2009, is it accurate to say that   14:50:22
21  Mr. Hunter informed you that the DEA was not   14:50:27
22  going to give concrete guidance as to what   14:50:31
23  particular algorithm to implement?   14:50:33
24       A.   Yes.   14:50:35
25       Q.   Okay.  Now, the following   14:50:36

Page 299

1   question by someone in the audience was,   14:50:39
2   "Well, what then does the DEA expect?"   14:50:43
3          And a response was given by   14:50:45
4   Mr. Caverly.  It says, quote, "Previously DEA   14:50:47
5   sat down with National Drug Association with   14:50:51
6   an algorithm.  DEA standpoint: You know our   14:50:55
7   customers better than we do.  DEA stepped   14:50:59
8   away from providing guidelines.  It is not   14:51:01
9   going to happen," end quote.   14:51:04
10         Did I read that correctly?   14:51:06
11      A.   Yes.   14:51:06
12      Q.   So as of the date of this   14:51:07
13  e-mail in the fall of 2009, you understood   14:51:09
14  that the DEA was not going to provide   14:51:12
15  guidelines with respect to SOM algorithms,   14:51:15
16  correct?   14:51:18
17      A.   Yes.   14:51:18
18      Q.   You can set that aside.   14:51:25
19         MR. O'CONNOR: We've been going   14:51:29
20  about an hour 15.  Maybe we should   14:51:30
21  take a break.   14:51:32
22         MR. KO: Yeah, we can take a   14:51:32
23  break.  Sounds good.   14:51:34
24         VIDEOGRAPHER: We are going off   14:51:37
25  the record at 2:51 p.m.   14:51:39

Page 300

1          (Off the record at 2:51 p.m.)   14:51:40
2          VIDEOGRAPHER: We are back on   15:10:02
3   the record at 3:10 p.m.   15:10:03
4   QUESTIONS BY MR. KO:   15:10:05
5       Q.   Now, Mr. Harper {sic}, is it   15:10:08
6   fair to say from the 2008 through 2009 time   15:10:10
7   period you are continually working to revise   15:10:16
8   and improve the enhanced suspicious order   15:10:17
9   monitoring system at Mallinckrodt, correct?   15:10:20
10      A.   Correct.   15:10:22
11      Q.   Okay.  And you also continue to   15:10:22
12  work on peculiar order algorithms in the 2008   15:10:27
13  through 2009 time period, correct?   15:10:33
14      A.   Correct.   15:10:34
15      Q.   And with respect to the   15:10:34
16  checklists we were discussing previously,   15:10:36
17  you're continually working on revising and   15:10:38
18  implementing a -- both a new customer   15:10:41
19  checklist and a customer checklist throughout   15:10:45
20  the 2008 and 2009 time period, correct?   15:10:47
21      A.   Correct.   15:10:49
22         (Mallinckrodt-Harper Exhibit 15   15:11:00
23  marked for identification.)   15:11:00
24  QUESTIONS BY MR. KO:   15:11:00
25      Q.   Okay.  I'm going to hand you a   15:11:01

Page 301

1   copy of what's going to be marked as Harper   15:11:02
2   Exhibit 15.  And in conjunction with that,   15:11:06
3   I'm going to hand you also a document that's   15:11:13
4   previously been identified as Exhibit 35 of   15:11:14
5   the Stewart deposition.  They're both right   15:11:16
6   here.   15:11:22
7          For the record, Harper   15:11:23
8   Exhibit 15 ends in Bates stamp 270090.   15:11:24
9          And of course the second   15:11:31
10  document I referenced was Stewart Exhibit 35   15:11:33
11  that ends in 477900.   15:11:37
12         Now, turning your attention   15:11:43
13  first to the e-mail identified as Harper   15:11:44
14  Exhibit 15, this is an e-mail exchange you   15:11:48
15  had with Eileen Spalding dated October 31,   15:11:53
16  2010, correct?   15:11:59
17      A.   Correct.   15:11:59
18      Q.   And earlier when I had -- just   15:12:00
19  a moment ago when we were discussing   15:12:05
20  continual revisions and enhancements to   15:12:06
21  Mallinckrodt's SOM program in the 2008 and   15:12:11
22  2009 time period, it's also safe to say that   15:12:14
23  in 2010 you're also continually working on   15:12:18
24  improving the SOM program, correct?   15:12:21
25      A.   Correct.   15:12:22

Page 302

1    Q.   And in fact, that work          15:12:23
2  continues in 2011 as well?              15:12:25
3    A.   Yes.                             15:12:27
4    Q.   When would you say you actually  15:12:28
5  implemented a procedure or an SOM policy that  15:12:31
6  sufficiently addressed some of the concerns    15:12:37
7  you raised in the 2008 time period with  15:12:41
8  respect to Mallinckrodt's SOM program?   15:12:43
9        MR. O'CONNOR:  Objection.         15:12:46
10       Form.                             15:12:46
11       THE WITNESS:  I don't know the    15:12:46
12    first date of the publication.  Again,  15:12:47
13    just as the program is constantly    15:12:50
14    being enhanced, we're constantly     15:12:53
15    updating our procedure, so I don't   15:12:56
16    have the date of the publication.  I'm  15:12:57
17    sorry.                               15:12:58
18  QUESTIONS BY MR. KO:                   15:12:58
19    Q.   And is it -- do you have a      15:12:59
20  general understanding of the approximate time  15:13:01
21  period of the date of publication?    15:13:03
22       Do you recall whether or not it   15:13:04
23  was after 2011?                        15:13:05
24    A.   I don't recall.                 15:13:07
25    Q.   Okay.                          15:13:08

Page 303

1    A.   I just don't know.              15:13:08
2    Q.   You remember a meeting you had   15:13:09
3  with DEA in 2011, often referred to as the  15:13:12
4  earthquake meeting?  Correct?          15:13:14
5    A.   Yes.                             15:13:16
6    Q.   And it's referred to in that     15:13:17
7  manner because there was an earthquake that  15:13:18
8  day outside of DC, in Virginia in particular?  15:13:20
9    A.   Yes.                             15:13:23
10   Q.   As of the date of that meeting,  15:13:24
11  you had not yet adopted a formal procedure  15:13:28
12  for the enhanced SOM program, correct?  15:13:31
13       MR. O'CONNOR:  Objection to       15:13:34
14    form.                               15:13:35
15       THE WITNESS:  I don't know what   15:13:35
16    date we wrote the procedure, so I    15:13:36
17    can't make -- I cannot answer, I'm   15:13:38
18    sorry.                              15:13:40
19  QUESTIONS BY MR. KO:                   15:13:40
20    Q.   Fair enough.  Okay.            15:13:40
21       So turning back to this           15:13:42
22  particular exhibit, in the second paragraph  15:13:46
23  of the bottom e-mail starting with    15:14:01
24  "Basically," can you read that for the  15:14:04
25  record?                               15:14:06

Page 304

1    A.   "Basically, during the last two  15:14:06
2  years, all peculiar orders that were on the  15:14:09
3  daily report were investigated by CSR  15:14:13
4  manager, were deemed to be okay, and none  15:14:18
5  rose to the level of peculiar.  As you will  15:14:21
6  see, it was not feasible to forward the  15:14:26
7  peculiar order report to DEA due to the  15:14:28
8  lengthiness as we were tweaking the    15:14:34
9  algorithms."                           15:14:36
10   Q.   Okay.  And in the e-mail above,  15:14:37
11  you amend your statement about none rising to  15:14:40
12  the level of peculiar.  And what you actually  15:14:45
13  meant was that no peculiar orders rose to  15:14:47
14  level of suspicious; is that correct?  15:14:50
15   A.   That is correct.                 15:14:52
16   Q.   So as of October 31, 2010, is    15:14:53
17  it accurate to say that Mallinckrodt did not  15:14:59
18  identify a single suspicious order between  15:15:02
19  beginning of 2000 -- excuse me, between  15:15:07
20  August of 2008 to October 31, 2010?   15:15:11
21       MR. O'CONNOR:  Objection to       15:15:15
22    form.                               15:15:17
23       THE WITNESS:  None that rose to   15:15:17
24    the level of suspicious and reported  15:15:19
25    to DEA, that is correct.            15:15:22

Page 305

1  QUESTIONS BY MR. KO:                   15:15:23
2    Q.   Right.                          15:15:24
3       And so we had discussed earlier   15:15:24
4  about the significant amount of diversion and  15:15:30
5  abuse of Mallinckrodt pills that occurred in  15:15:34
6  Florida in the 2008 through 2012 time period.  15:15:36
7       Do you recall that?               15:15:38
8       MR. O'CONNOR:  Objection.          15:15:38
9       THE WITNESS:  Significant is       15:15:39
10    your word, but, yes, the diversion,  15:15:40
11    yes.                                15:15:42
12  QUESTIONS BY MR. KO:                   15:15:42
13    Q.   You recall that we discussed    15:15:44
14  diversion and abuse of Mallinckrodt pills  15:15:47
15  occurring in Florida throughout the 2008  15:15:49
16  through 2012 time period, correct?    15:15:51
17   A.   Yes.                             15:15:53
18   Q.   Okay.  And during at least a     15:15:54
19  two-year time period between 2008 and 2010,  15:15:58
20  Mallinckrodt's suspicious order monitoring  15:16:01
21  policy and system did not identify a single  15:16:04
22  suspicious order, correct?            15:16:07
23   A.   Correct.                         15:16:08
24   Q.   Okay.  And in the third          15:16:10
25  paragraph below in your e-mail you state,  15:16:13

Page 306

1  quote, "It is significant to note that    15:16:18
2  neither Sunrise or Harvard triggered the    15:16:21
3  algorithms that were in place for direct    15:16:23
4  customers because we were looking at overall    15:16:25
5  purchase trends for each distributor, not    15:16:26
6  reviewing where the distributors were sending    15:16:29
7  our product, and our program met CFR    15:16:31
8  requirements. In essence, the program was    15:16:37
9  expanded within the last month to our    15:16:41
10  customers' customers."    15:16:43
11      Did I read that correctly?    15:16:45
12  A.  Yes.    15:16:45
13  Q.  Now, Sunrise and Harvard    15:16:46
14  two distributors that were customers of    15:16:48
15  Mallinckrodt, correct?    15:16:49
16  A.  Correct.    15:16:50
17  Q.  And they both had their license    15:16:50
18  eventually suspended by the DEA at some time    15:16:52
19  in the 2010 time period?    15:16:54
20  A.  Correct.    15:16:56
21  Q.  And so they had their licenses    15:16:57
22  suspended because they were selling to    15:17:01
23  customers, and in particular, pharmacies and    15:17:03
24  pain clinics that were engaged in    15:17:11
25  diversion --    15:17:13

Page 307

1      MR. O'CONNOR:  Objection to    15:17:13
2  form.    15:17:13
3  QUESTIONS BY MR. KO:    15:17:13
4  Q.  -- correct?    15:17:14
5  A.  That is what was reported in    15:17:14
6  the media, yes.    15:17:17
7  Q.  Okay.  And was it -- and in    15:17:18
8  addition to what was reported in the media,    15:17:20
9  you eventually acquired some level of    15:17:22
10  knowledge of certain orders that Sunrise and    15:17:24
11  Harvard had shipped to pharmacies and clinics    15:17:28
12  in Florida, did you not?    15:17:31
13      MR. O'CONNOR:  Objection to    15:17:33
14  form.    15:17:33
15      THE WITNESS:  Yes.    15:17:33
16  QUESTIONS BY MR. KO:    15:17:33
17  Q.  Okay.  And so ultimately    15:17:34
18  Sunrise and Harvard had their license    15:17:36
19  suspended by the DEA due to suspicious orders    15:17:38
20  that they had shipped in at least the 2008    15:17:41
21  through 2000 {sic} time period; is that    15:17:46
22  correct?    15:17:48
23  A.  Yes.    15:17:48
24  Q.  Okay.  And here you're    15:17:49
25  indicating that your suspicious order    15:17:50

Page 308

1  monitoring system did not trigger the    15:17:53
2  algorithms that were in place for that time    15:17:56
3  period.  And I presume the algorithms you're    15:18:01
4  discussing are the peculiar order algorithms,    15:18:04
5  correct?    15:18:06
6  A.  Correct.    15:18:06
7  Q.  So in other words, because    15:18:07
8  their orders were not either ██ or    15:18:10
9  potentially ██ of the prior fiscal year, as    15:18:13
10  we previously discussed, there was never a    15:18:18
11  peculiar order flag that was raised with    15:18:23
12  respect to their orders --    15:18:25
13      MR. O'CONNOR:  Objection to    15:18:26
14  form.    15:18:27
15  QUESTIONS BY MR. KO:    15:18:27
16  Q.  -- fair?    15:18:27
17  A.  Fair.    15:18:27
18  Q.  Okay.  And you note that your    15:18:28
19  suspicious order monitoring system at the    15:18:32
20  time was unable to identify whether or not    15:18:33
21  certain of their orders were suspicious    15:18:37
22  because, of course, you just had a peculiar    15:18:39
23  order algorithm that was based on a metric of    15:18:43
24  orders relative to prior order history.    15:18:49
25      MR. O'CONNOR:  Objection to    15:18:52

Page 309

1  form.    15:18:53
2      THE WITNESS:  So enabling is    15:18:53
3  paraphrasing, but we were looking at    15:18:56
4  different purchasing trends and not at    15:19:01
5  the downstream registrant.    15:19:05
6  QUESTIONS BY MR. KO:    15:19:07
7  Q.  Right.    15:19:07
8      And I didn't say -- just so the    15:19:08
9  record is clear, I didn't say "enable"; I    15:19:09
10  said "unable."    15:19:12
11  A.  Unable, yes.    15:19:12
12  Q.  Right.    15:19:13
13      So Mallinckrodt's suspicious    15:19:14
14  order monitoring program at the time was    15:19:15
15  unable to identify any suspicious orders of    15:19:17
16  Sunrise or Harvard because you were merely    15:19:23
17  looking at a numerical metric of order    15:19:26
18  history -- of orders relative to order    15:19:31
19  history of Sunrise and Harvard, correct?    15:19:33
20      MR. O'CONNOR:  Objection.    15:19:35
21  Form.    15:19:36
22      THE WITNESS:  Correct.    15:19:37
23  QUESTIONS BY MR. KO:    15:19:37
24  Q.  Okay.  At the time that you    15:19:45
25  learned that Sunrise and Harvard had their    15:19:45

Page 310

1  licenses suspended by the DEA, did that      15:19:48
2  concern you?                                 15:19:50
3      A.  Yes.                                 15:19:50
4      Q.  Okay.  And it also -- and it         15:19:50
5  concerned you because you had been unable to  15:19:52
6  detect the fact that they actually had       15:19:56
7  shipped many suspicious orders, according to  15:19:58
8  the DEA, prior to 2010, correct?             15:20:00
9          MR. O'CONNOR:  Objection to          15:20:01
10 form.                                        15:20:02
11         THE WITNESS:  It concerned me        15:20:02
12 because they were direct customers of        15:20:05
13 Mallinckrodt.                                15:20:06
14 QUESTIONS BY MR. KO:                         15:20:07
15     Q.  Okay.  And they were direct          15:20:07
16 customers of Mallinckrodt that had           15:20:09
17 Mallinckrodt pills sold to pharmacies and    15:20:12
18 clinics -- strike that.                      15:20:16
19         When you say it concerned you        15:20:22
20 because they were direct customers of        15:20:27
21 Mallinckrodt, is it also accurate to say that  15:20:28
22 you were concerned because Mallinckrodt pills  15:20:30
23 may have been diverted or abused as a result  15:20:37
24 of shipments made by Sunrise and Harvard?    15:20:40
25         MR. O'CONNOR:  Objection to          15:20:42

Page 311

1  form.                                        15:20:43
2          THE WITNESS:  Yes.                   15:20:44
3  QUESTIONS BY MR. KO:                         15:20:46
4      Q.  Okay.  Now, I want to turn to        15:20:47
5  the -- you can keep the e-mail in front of   15:20:49
6  you if you'd like, but this document which is  15:20:53
7  Exhibit 35, that appears to be a chronology  15:20:58
8  of the suspicious order monitoring program   15:21:03
9  from August 2008 through 2010; is that       15:21:05
10 correct?                                     15:21:08
11     A.  That is correct.                     15:21:08
12     Q.  And it's specifically a              15:21:08
13 chronology of the SOM program regarding      15:21:12
14 Mallinckrodt's dosage products during that   15:21:14
15 time period, correct?                        15:21:17
16     A.  Correct.                             15:21:17
17     Q.  And in Exhibit 15, you              15:21:18
18 reference to Ms. Spaulding a chronology, a    15:21:22
19 lengthy chronology, to try and get her up to  15:21:25
20 speed on what has occurred with respect to   15:21:28
21 Mallinckrodt's SOM program.                  15:21:30
22         Do you see a reference to that?      15:21:32
23         It'll be at the --                   15:21:38
24     A.  Yes, yes, I do.                      15:21:39
25     Q.  Do you recall whether or not        15:21:41

Page 312

1  this chronology is the chronology that you   15:21:41
2  conveyed to Ms. Spaulding?                   15:21:44
3      A.  Yes, I believe it is.               15:21:47
4      Q.  Okay.  And does the                 15:21:48
5  chronology -- indicates that in the fall     15:22:04
6  of 2008 -- well, first of all, there's a     15:22:07
7  reference made at the top of the page to an  15:22:09
8  old version that was being sent to DEA       15:22:11
9  Albany.                                      15:22:15
10         Do you see that?                     15:22:16
11     A.  Yes, I do.                           15:22:16
12     Q.  And in your chronology you          15:22:16
13 indicate, quote, "This reporting system was  15:22:22
14 discontinued at the direction of suspicious  15:22:24
15 order monitoring team pending new order      15:22:27
16 algorithms that the SOM team was working to  15:22:30
17 establish."                                  15:22:32
18         Did I read that correctly?          15:22:33
19     A.  Yes.                                 15:22:33
20     Q.  So, again, in the fall of 2008,     15:22:35
21 you are continually working on revising the  15:22:37
22 SOM program, correct?                        15:22:40
23     A.  Correct.                             15:22:41
24     Q.  And you had abandoned a             15:22:42
25 reporting system that was in place to send   15:22:45

Page 313

1  reports to DEA Albany as of this date,       15:22:49
2  correct?                                     15:22:52
3      A.  Yes.                                 15:22:52
4      Q.  Okay.  Turning to the next          15:22:54
5  page, there's an indication on February 16,  15:23:11
6  2009, that "SOM draft procedure sent to legal  15:23:18
7  department for further review relative to new  15:23:22
8  tasks being created as part of the revised   15:23:29
9  program."                                    15:23:31
10         Do you see that?                     15:23:31
11     A.  Yes.                                 15:23:31
12     Q.  So legal played a part in the       15:23:31
13 review of the SOM draft procedures and the   15:23:33
14 ultimate implementation of the revised SOM   15:23:36
15 program; is that fair to say?                15:23:39
16     A.  Yes.                                 15:23:40
17     Q.  Okay.  And do you recall            15:23:40
18 working with Mr. Lohman and Ms. Duft in      15:23:41
19 connection with implementation of the revised  15:23:45
20 SOM program?                                 15:23:47
21     A.  Yes.                                 15:23:48
22     Q.  Is it fair to say that they         15:23:48
23 had -- in addition to working with them, is  15:23:54
24 it fair to say that they had -- or how would  15:23:56
25 you describe their involvement in the        15:24:01

Page 314

1    implementation of the revised SOM program?    15:24:02
2         MR. O'CONNOR: I'm just going    15:24:05
3    to remind the witness not to get into    15:24:06
4    any specific communications with    15:24:07
5    counsel.    15:24:08
6         THE WITNESS: They were    15:24:09
7    contributors and reviewers in terms of    15:24:13
8    the current system set of enhancements    15:24:15
9    that we were working on.    15:24:17
10   QUESTIONS BY MR. KO:    15:24:18
11        Q.   Sure.    15:24:18
12        And do you recall how    15:24:18
13   frequently you communicated with them during    15:24:22
14   this time period?    15:24:24
15        A.   I do not.    15:24:25
16        Q.   Okay.  Do you recall whether or   15:24:26
17   not it was monthly communications with them    15:24:27
18   or weekly communications?    15:24:30
19        A.   I do not.    15:24:32
20        Q.   Relative to other people that    15:24:33
21   you had worked with in connection with    15:24:35
22   revising the SOM policy, do you have any    15:24:36
23   understanding of whether or not their    15:24:40
24   involvement was higher or lower than, for    15:24:42
25   example, your interactions with Mr. Ratliff    15:24:47

Page 315

1    in the security department?    15:24:49
2         MR. O'CONNOR: Objection to    15:24:53
3    form.    15:24:53
4         THE WITNESS: I'm sorry, I    15:24:53
5    thought you were talking about legal.    15:24:54
6    QUESTIONS BY MR. KO:    15:24:55
7         Q.   I am.  And I'm just trying to    15:24:55
8    get an understanding --    15:24:57
9         A.   Okay.    15:24:57
10        Q.   Because since you can't    15:24:59
11   necessarily recall how involved they were,    15:25:01
12   I'm just trying to get an understanding of    15:25:03
13   perhaps seeing if you knew how much they were   15:25:05
14   involved relative to other groups that were    15:25:07
15   part of the SOM team.    15:25:08
16        So it's fair to say that they    15:25:09
17   were part of the SOM -- legal was part of the   15:25:10
18   SOM team, correct?    15:25:13
19        A.   Correct.    15:25:13
20        Q.   And you had some interaction    15:25:14
21   with them in implementing an SOM program,    15:25:16
22   correct?    15:25:19
23        A.   Correct.    15:25:19
24        Q.   And would you say that that    15:25:20
25   involvement or interaction was more or less    15:25:22

Page 316

1    than the interaction you had with other    15:25:26
2    groups?    15:25:29
3         A.   I don't know.  I can't say.    15:25:30
4         Q.   Okay.    15:25:33
5         A.   I can't answer.    15:25:33
6         Q.   Do you recall if you had any    15:25:33
7    kind of day-to-day communication with them?    15:25:35
8         A.   I don't recall, but I do not    15:25:37
9    think so.    15:25:43
10        Q.   Okay.  Now, on the next --    15:25:43
11   well, the next entry is redacted, but the    15:25:50
12   entry after that dated March 2, 2009,    15:25:52
13   indicates that "Mr. Rausch continues to work   15:25:54
14   with IS to define the criteria of what would   15:25:57
15   be peculiar -- what would be a peculiar order   15:25:59
16   and how to determine programmatic flags for    15:26:01
17   detection."    15:26:05
18        Did I read that correctly?    15:26:06
19        A.   Yes, you did.    15:26:06
20        Q.   Okay.  And perhaps it might    15:26:09
21   mean to say problematic, but in any way, we    15:26:10
22   don't need to guess.    15:26:14
23        It's fair to say that as of    15:26:17
24   March 2, 2009, Jim Rausch is continuing to    15:26:19
25   try and define the criteria of what    15:26:24

Page 317

1    constitutes a peculiar order.    15:26:26
2         MR. O'CONNOR: Objection.    15:26:27
3    QUESTIONS BY MR. KO:    15:26:27
4         Q.   Correct?    15:26:28
5         A.   That is correct.    15:26:28
6         Q.   And IS is information systems?    15:26:29
7         A.   Yes, that's correct.    15:26:31
8         Q.   And was there a point person    15:26:32
9    in -- at IS that you worked with or you knew   15:26:34
10   was part of the SOM team?    15:26:37
11        A.   I don't know.    15:26:39
12        Q.   Okay.  Now, further down on    15:26:41
13   June 29, 2009, you indicate that "revised    15:26:48
14   questionnaire -- customer questionnaires are   15:26:54
15   submitted to legal that have been updated    15:26:56
16   based upon CSF focus group meetings Jim    15:26:58
17   Rausch and Cathy Stewart conducted with    15:27:02
18   CSRs."    15:27:04
19        Did I read that correctly?    15:27:05
20        A.   Yes.    15:27:05
21        Q.   So again, you're continually    15:27:06
22   working on the customer checklists or    15:27:07
23   questionnaires that will be submitted to    15:27:10
24   Mallinckrodt customers in connection with the   15:27:13
25   SOM program; fair to say?    15:27:15

Page 318

| | |
|---|---|
| 1 | A.   Yes.                    15:27:17 |
| 2 | Q.   Okay.  And the -- by the way,    15:27:18 |
| 3 | in this chronology that you drafted, you    15:27:36 |
| 4 | represented to Eileen that this was an    15:27:40 |
| 5 | attempt by you to provide an extensive    15:27:44 |
| 6 | chronology on SOM activities during this    15:27:49 |
| 7 | two-year time period.            15:27:52 |
| 8 |     Why were you providing this to    15:27:52 |
| 9 | her?                    15:27:56 |
| 10 | A.   I was assigned at the St. Louis    15:27:56 |
| 11 | plant, working in the plant during a work    15:27:57 |
| 12 | stoppage which had gone on for an extended    15:28:00 |
| 13 | period of time, months, and so I wanted to    15:28:04 |
| 14 | update Eileen on the status of the current    15:28:07 |
| 15 | system of enhancements.          15:28:10 |
| 16 | Q.   Okay.  And do you recall    15:28:11 |
| 17 | whether or not you may have provided this to    15:28:13 |
| 18 | her in preparation for any meetings that she    15:28:15 |
| 19 | was having with DEA?            15:28:18 |
| 20 | A.   I don't recall.          15:28:19 |
| 21 | Q.   Okay.  And you did reference a    15:28:23 |
| 22 | work stoppage at Mallinckrodt.  I understand    15:28:26 |
| 23 | that there was a strike by some employees at    15:28:29 |
| 24 | Covidien at the time.            15:28:31 |
| 25 | A.   Is that referenced here?      15:28:31 |

Page 319

| | |
|---|---|
| 1 | Q.   I don't think it is.        15:28:33 |
| 2 | A.   Okay.                15:28:34 |
| 3 | Q.   Yeah, but --            15:28:34 |
| 4 | A.   All right.              15:28:34 |
| 5 | Q.   -- just -- just generally there    15:28:35 |
| 6 | was --                  15:28:35 |
| 7 | A.   Yes, you're correct.  Yes.    15:28:35 |
| 8 | Q.   There was a strike by Covidien    15:28:37 |
| 9 | employees in the 2010 time period.      15:28:39 |
| 10 |     How long did that last?      15:28:41 |
| 11 | A.   17 weeks, I believe.        15:28:42 |
| 12 | Q.   Okay.  A fairly long strike.    15:28:51 |
| 13 | A.   (Witness nods head.)        15:28:52 |
| 14 | Q.   And during that time period,    15:28:53 |
| 15 | was there any work done on attempting to    15:28:54 |
| 16 | improve or revise the SOM process?      15:28:56 |
| 17 | A.   Yes.                15:29:00 |
| 18 | Q.   And who was that work done by?    15:29:01 |
| 19 | A.   So the work was ongoing, with    15:29:03 |
| 20 | Jim Rausch working with IT on the algorithms,    15:29:06 |
| 21 | so other subcomponents of the team continued    15:29:10 |
| 22 | while I was away.              15:29:13 |
| 23 | Q.   Okay.  And with respect to this    15:29:15 |
| 24 | chronology, you have no reason to dispute the    15:29:17 |
| 25 | accuracy of any of these events that you    15:29:21 |

Page 320

| | |
|---|---|
| 1 | report to Ms. Spaulding, do you?      15:29:25 |
| 2 | A.   I do not.              15:29:26 |
| 3 | Q.   Okay.  And by the way, what was    15:29:29 |
| 4 | the approximate date of the strike?    15:29:30 |
| 5 | A.   It was in 2010, and I believe    15:29:31 |
| 6 | it would have started in March or April    15:29:38 |
| 7 | because our union contract's due in March,    15:29:39 |
| 8 | but I think they had an extension until    15:29:43 |
| 9 | April.  So I'm not -- around that time.    15:29:45 |
| 10 | Q.   Okay.  Great.            15:29:48 |
| 11 |     And it lasted until May or June    15:29:49 |
| 12 | of 2010?                  15:29:54 |
| 13 | A.   Or longer.  I can't --      15:29:54 |
| 14 | Q.   Sure.                15:29:57 |
| 15 | A.   I can't remember when it was    15:29:57 |
| 16 | over.                    15:29:58 |
| 17 | Q.   Sure.                15:29:58 |
| 18 |     Turn to page 4 of this report,    15:29:59 |
| 19 | this chronology.  There's a reference made    15:30:02 |
| 20 | that on April 30, 2010, the peculiar order    15:30:11 |
| 21 | calculations changed from a ▆▆ factor to a ▆▆    15:30:14 |
| 22 | factor.                  15:30:18 |
| 23 |     Do you see that reference?    15:30:20 |
| 24 | A.   I do.                15:30:21 |
| 25 | Q.   So if I understand correctly,    15:30:22 |

Page 321

| | |
|---|---|
| 1 | the peculiar order algorithm on April 30,    15:30:27 |
| 2 | 2010, increased from ▆▆ to ▆▆, correct?    15:30:30 |
| 3 | A.   That's correct.          15:30:36 |
| 4 | Q.   So in other words, as of April    15:30:36 |
| 5 | 30, 2010, the algorithm that Mallinckrodt    15:30:38 |
| 6 | utilized to determine whether or not an order    15:30:42 |
| 7 | was suspicious was by determining whether an    15:30:44 |
| 8 | order was ▆▆▆▆▆▆▆ greater than the prior    15:30:50 |
| 9 | year average; is that accurate?      15:30:54 |
| 10 | A.   Yes.                15:30:57 |
| 11 | Q.   Okay.  And this increase      15:30:58 |
| 12 | resulted for a variety of reasons, is my    15:31:04 |
| 13 | understanding, but is one of the reasons that    15:31:08 |
| 14 | you increased from ▆▆ to ▆▆ because the    15:31:11 |
| 15 | peculiar order report was too lengthy?    15:31:14 |
| 16 |     MR. O'CONNOR:  Objection to    15:31:18 |
| 17 |     form.                15:31:19 |
| 18 |     THE WITNESS:  Yes.          15:31:20 |
| 19 | QUESTIONS BY MR. KO:            15:31:20 |
| 20 | Q.   So it was creating an        15:31:21 |
| 21 | administrative burden because there were too    15:31:22 |
| 22 | many orders to review?            15:31:25 |
| 23 |     MR. O'CONNOR:  Objection to    15:31:26 |
| 24 |     form.                15:31:27 |
| 25 |     THE WITNESS:  Yes.          15:31:27 |

Page 322

| | |
|---|---|
| 1 | QUESTIONS BY MR. KO: 15:31:29 |
| 2 | Q. Okay. And so you and others 15:31:29 |
| 3 | believed that increasing the peculiar order 15:31:33 |
| 4 | algorithm to ▮ would reduce the amount of 15:31:37 |
| 5 | reports that were printed for the SOM team to 15:31:39 |
| 6 | review, correct? 15:31:43 |
| 7 | A. That's correct, and the hope 15:31:45 |
| 8 | was that the truly -- the orders that needed 15:31:47 |
| 9 | to be investigated further would then print 15:31:50 |
| 10 | based upon this new change in the algorithm. 15:31:54 |
| 11 | Q. Okay. And the increase from ▮ 15:31:59 |
| 12 | to ▮ occurs during this time period -- well, 15:32:07 |
| 13 | strike that. 15:32:10 |
| 14 | I believe as of the date of -- 15:32:27 |
| 15 | I know you don't recall when the actual 15:32:29 |
| 16 | revised SOM policy was formalized, but at 15:32:32 |
| 17 | least as of the date of this e-mail, 15:32:34 |
| 18 | October 31, 2010, the revised SOM program had 15:32:36 |
| 19 | yet to be formalized; is that correct? 15:32:38 |
| 20 | MR. O'CONNOR: Objection. 15:32:40 |
| 21 | Form. 15:32:41 |
| 22 | THE WITNESS: So that 15:32:41 |
| 23 | depends -- yes. In a final SOP, yes, 15:32:46 |
| 24 | but I believe that we were updating 15:32:50 |
| 25 | our work instructions or our 15:32:52 |

Page 323

| | |
|---|---|
| 1 | procedures all the way along the line. 15:32:53 |
| 2 | But, yes, finalized, signed, sealed, 15:32:56 |
| 3 | yes, it was not at that time. 15:32:59 |
| 4 | QUESTIONS BY MR. KO: 15:33:00 |
| 5 | Q. And when we talk about the 15:33:00 |
| 6 | final SOP or SOM procedure, this was a formal 15:33:01 |
| 7 | document which lays out the criteria for 15:33:04 |
| 8 | identifying a suspicious order, correct? 15:33:07 |
| 9 | A. Correct. 15:33:10 |
| 10 | Q. And so at the time -- as of 15:33:11 |
| 11 | October 31, 2010, a final SOM procedure that 15:33:13 |
| 12 | outlines the criteria for identifying a 15:33:19 |
| 13 | suspicious order had not yet been finalized, 15:33:22 |
| 14 | correct? 15:33:25 |
| 15 | A. So does this -- oh, that -- 15:33:25 |
| 16 | yes, that's correct based upon this e-mail, 15:33:30 |
| 17 | yes. 15:33:32 |
| 18 | Q. Okay. I'm going to hand you a 15:33:47 |
| 19 | copy of what will be marked as Harper 15:33:49 |
| 20 | Exhibit 16. 15:33:50 |
| 21 | A. May I put these aside? 15:33:51 |
| 22 | Q. Yes, you may. 15:33:52 |
| 23 | A. All right. 15:33:54 |
| 24 | Q. Actually, I lied. It won't be 15:33:54 |
| 25 | Exhibit 16. It's previously been marked as 15:34:02 |

Page 324

| | |
|---|---|
| 1 | Exhibit 33 to the Stewart deposition. 15:34:04 |
| 2 | MR. KO: And for the record, it 15:34:15 |
| 3 | ends in Bates 279975. 15:34:11 |
| 4 | QUESTIONS BY MR. KO: 15:34:11 |
| 5 | Q. And this appears to be an 15:34:22 |
| 6 | e-mail exchange between you and Ms. Stewart. 15:34:23 |
| 7 | Do you see that? 15:34:25 |
| 8 | A. Yes. 15:34:26 |
| 9 | Q. And I just have a couple 15:34:26 |
| 10 | questions on this. 15:34:28 |
| 11 | Ms. Stewart asks on Monday, 15:34:32 |
| 12 | August 9, 2010, quote, "How's progress on the 15:34:36 |
| 13 | revised suspicious order monitoring program 15:34:43 |
| 14 | going?" end quote. 15:34:44 |
| 15 | Did I read that correctly? 15:34:47 |
| 16 | A. Yes. 15:34:48 |
| 17 | Q. Okay. And your response -- you 15:34:48 |
| 18 | respond several things, but your response to 15:34:53 |
| 19 | this question is, quote, "We had a meeting 15:34:54 |
| 20 | last week that could only be classified as a 15:34:57 |
| 21 | train wreck, but the effort will continue and 15:35:00 |
| 22 | I will not be discouraged. I will not be 15:35:02 |
| 23 | discouraged. I will not be discouraged." 15:35:38 |
| 24 | Did I read that correctly? 15:35:07 |
| 25 | A. Yes. 15:35:07 |

Page 325

| | |
|---|---|
| 1 | Q. Okay. So fair to say that as 15:35:08 |
| 2 | of August 9, 2010, at least with respect to 15:35:11 |
| 3 | the meeting you had on the revised SOM 15:35:14 |
| 4 | program, you believed that the meeting was a 15:35:16 |
| 5 | train wreck, correct? 15:35:19 |
| 6 | A. That particular meeting, but I 15:35:21 |
| 7 | don't remember what the meeting was, and it's 15:35:23 |
| 8 | an inartful term on my part. But, yes, 15:35:24 |
| 9 | that's what the e-mail says. 15:35:29 |
| 10 | Q. And you have no reason to doubt 15:35:30 |
| 11 | that you sent this e-mail to Ms. Stewart? 15:35:32 |
| 12 | A. I don't. 15:35:34 |
| 13 | Q. Okay. Were you frustrated at 15:35:35 |
| 14 | the time in August of 2010 with how the 15:35:39 |
| 15 | revised suspicious order monitoring program 15:35:42 |
| 16 | was going? 15:35:44 |
| 17 | A. I would like -- I would like to 15:35:44 |
| 18 | read this whole e-mail, please, for context, 15:35:51 |
| 19 | because it appears to be talking about 15:35:53 |
| 20 | exports, import permits and letters of 15:35:56 |
| 21 | non-reexport. 15:35:59 |
| 22 | So we've switched the 15:36:00 |
| 23 | conversation to SOM, but I don't see that on 15:36:01 |
| 24 | this page. 15:36:04 |
| 25 | Q. Sure. Sure. 15:36:05 |

Page 326

1   So I guess -- I'll just ask you    15:36:05
2   a question to save time.    15:36:08
3       Ms. Stewart clearly asks you    15:36:10
4   whether -- how progress on the revised    15:36:12
5   suspicious order monitoring program is going,    15:36:16
6   correct?    15:36:17
7   A.   Yes.    15:36:17
8   Q.   And separate and apart --    15:36:17
9   separate and apart from what you responded to    15:36:18
10  her, however inartful that was, my question    15:36:22
11  to you is:  Do you recall in the 2010 time    15:36:25
12  period being frustrated at the progress of    15:36:29
13  the revised SOM policy at Mallinckrodt?    15:36:32
14  A.   Yes.    15:36:35
15  Q.   Okay.  And as of August 2010,    15:36:40
16  this is about two and a half years after you    15:36:55
17  first identify SOM as being an elevated    15:36:58
18  priority for you; is that fair to say?    15:37:01
19  A.   Yes.    15:37:03
20      (Mallinckrodt-Harper Exhibit 16    15:37:07
21  marked for identification.)    15:37:07
22  QUESTIONS BY MR. KO:    15:37:07
23  Q.   Okay.  I'm going to hand you a    15:37:07
24  copy of what's going to now be marked as --    15:37:08
25  you can set that aside.    15:37:11

Page 327

1   A.   All right.    15:37:12
2   Q.   This is a copy of Harper    15:37:13
3   Exhibit 16.  And for the record, it ends in    15:37:20
4   Bates 280260.    15:37:25
5       And this is an e-mail exchange    15:37:37
6   between, again, you and Ms. Spaulding dated    15:37:38
7   September 24, 2010?    15:37:44
8   A.   Correct, yes.    15:37:45
9   Q.   And Ms. Spaulding asks at the    15:37:46
10  bottom how a conference call on SOM went.    15:37:54
11      Do you see that?    15:37:59
12  A.   Uh-huh.  I do.    15:38:00
13  Q.   And you respond, and I'd ask    15:38:01
14  that you read the first full sentence at the    15:38:05
15  top of your e-mail.    15:38:11
16  A.   "Interesting, the group    15:38:12
17  decided" --    15:38:15
18  Q.   I'm sorry, just I guess --    15:38:15
19  A.   Oh, I beg your pardon.    15:38:17
20  Q.   Yeah, I guess "pretty well" is    15:38:19
21  the first sentence.  Just so just start    15:38:20
22  reading from "pretty well."    15:38:23
23  A.   Oh, I'm sorry.    15:38:25
24  Q.   That's okay.    15:38:25
25  A.   "Pretty well.  Interesting, the    15:38:26

Page 328

1   group decided that the actual day-to-day    15:38:28
2   monitoring responsibility should be switched    15:38:31
3   to a non-customer service function in that    15:38:32
4   those that have responsibility to manage the    15:38:38
5   orders have a conflict of interest in    15:38:40
6   deciding which orders should ultimately be    15:38:42
7   shipped, with the ultimate right -- with    15:38:46
8   ultimate right of refusal retained by the    15:38:50
9   controlled substances compliance group."    15:38:55
10  Q.   Okay.  Thank you for that.    15:38:56
11      So is it accurate to say that    15:38:57
12  one of the things that came out of this    15:39:00
13  conference call regarding Mallinckrodt's then    15:39:03
14  existing SOM procedure was that you were    15:39:05
15  attempting to shift the day-to-day monitoring    15:39:09
16  responsibility of particular orders to a    15:39:12
17  non-customer service function?    15:39:19
18  A.   That is correct.    15:39:20
19  Q.   Okay.  And earlier we had    15:39:21
20  discussed about -- earlier we had discussed    15:39:27
21  the fact that certain salespeople did not    15:39:29
22  have day-to-day monitoring responsibilities    15:39:32
23  with respect to SOM.    15:39:34
24      Does this change your testimony    15:39:36
25  at all or refresh your recollection at all    15:39:38

Page 329

1   that at one point in time NAMs and/or    15:39:40
2   customer service representatives did, indeed,    15:39:44
3   have day-to-day monitoring responsibilities    15:39:49
4   with respect to Mallinckrodt's suspicious    15:39:50
5   order monitoring program?    15:39:52
6       MR. O'CONNOR:  Objection to    15:39:53
7   form.    15:39:54
8       THE WITNESS:  So I'd like to    15:39:54
9   clarify, please.    15:39:54
10      When we talk about commercial    15:39:55
11  group, that's the NAMs.    15:39:56
12      Customer service is not called    15:39:58
13  commercial group, unless I    15:40:00
14  inadvertently referred to them as that    15:40:01
15  here.  They've never been part --    15:40:04
16  even -- it seems like they would be    15:40:07
17  commercial.  They are not commercial    15:40:09
18  group.    15:40:10
19      So this is talking about switch    15:40:12
20  from a non-customer service function.    15:40:13
21  QUESTIONS BY MR. KO:    15:40:15
22  Q.   Okay.  So are you referring    15:40:16
23  here to CSRs or NAMs?    15:40:17
24  A.   CSRs.    15:40:20
25  Q.   Okay.  So then prior to the    15:40:21

Highly Confidential - Subject To Further Confidentiality Review

Page 330

1   date of this e-mail, it would be accurate to   15:40:25
2   say that CSRs had actual day-to-day   15:40:27
3   monitoring responsibilities with respect to   15:40:30
4   Mallinckrodt's SOM program?   15:40:31
5       A.   So I'd like to clarify.  It was   15:40:33
6   Jim Rausch in particular who was the manager   15:40:34
7   of C -- customer service.   15:40:36
8       Q.   Okay.  So what you're saying   15:40:39
9   then through this e-mail is that you wanted   15:40:41
10  to remove Jim Rausch from the day-to-day   15:40:45
11  monitoring of Mallinckrodt's SOM program?   15:40:48
12      A.   The group decided that, yes.   15:40:50
13      Q.   Okay.  And did you in fact   15:40:52
14  implement this policy change?   15:40:53
15      A.   Yes.   15:40:55
16      Q.   Okay.  Now, I know that you're   15:40:55
17  not referring to NAMs here, but would you   15:41:11
18  agree with me that -- well, first of all, let   15:41:15
19  me back up.   15:41:19
20          Do you have any understanding   15:41:19
21  of how many national account managers there   15:41:20
22  were at Mallinckrodt?   15:41:23
23      A.   I do not.   15:41:24
24      Q.   Okay.  Does the number four   15:41:25
25  sound accurate to you?   15:41:29

Page 331

1       A.   It's possible.  I just don't --   15:41:30
2   I don't know.   15:41:32
3       Q.   Okay.  Would you -- if I   15:41:33
4   represented to you, and assuming that I could   15:41:38
5   prove at trial that there were approximately   15:41:40
6   eight national account managers at   15:41:42
7   Mallinckrodt during the 2005 through 2015   15:41:44
8   time period, does that -- is that consistent   15:41:48
9   with your understanding?   15:41:49
10          MR. O'CONNOR:  Object to form.   15:41:51
11          THE WITNESS:  I just don't know   15:41:52
12      who the NAMs were at any particular   15:41:55
13      time or assigned to which product   15:41:57
14      line.   15:41:59
15  QUESTIONS BY MR. KO:   15:42:00
16      Q.   Sure.   15:42:00
17          But you interacted with many of   15:42:00
18  the NAMs, correct?   15:42:03
19      A.   Correct.   15:42:04
20      Q.   And how many NAMs did you   15:42:05
21  interact with?   15:42:06
22      A.   Four to six, I'm guesstimating.   15:42:06
23      Q.   And among those were Victor   15:42:13
24  Borelli, Steve Becker and Jane Williams,   15:42:16
25  correct?   15:42:19

Page 332

1       A.   Yes, except Jane Williams was   15:42:19
2   vice president.  And she was in charge of the   15:42:22
3   NAMs but not a NAM herself.   15:42:24
4       Q.   Right.  Thank you for the   15:42:26
5   clarification.   15:42:27
6           So during the two -- would it   15:42:27
7   be accurate to say that during the 2005   15:42:30
8   through 2017 time period you interacted with   15:42:35
9   about four NAMs?   15:42:37
10      A.   So there was also -- Bonnie New   15:42:39
11  is another.  There was a gentleman who -- a   15:42:46
12  name Dave Irwin.  Again, people transitioned   15:42:51
13  roles over time, and, I'm sorry, I cannot say   15:42:53
14  that at one certain time frame which NAMs I   15:42:54
15  interacted with.   15:42:57
16      Q.   Sure.  And I'm just trying to   15:42:57
17  get a general understanding.   15:42:59
18      A.   Okay.   15:43:00
19      Q.   So approximately four to five   15:43:01
20  NAMs that you interacted with in connection   15:43:02
21  with your -- in connection with your   15:43:04
22  responsibilities in designing, implementing,   15:43:08
23  an SOM program, correct?   15:43:09
24      A.   I'll agree with approximately,   15:43:11
25  yes.   15:43:13

Page 333

1       Q.   Okay.  And despite not knowing   15:43:13
2   exactly how much NAMs made, was it your   15:43:24
3   understanding that NAMs were compensated   15:43:26
4   based on the amount of customers that they   15:43:27
5   had?   15:43:32
6       A.   No, I didn't -- I didn't know.   15:43:32
7       Q.   You had no understanding?   15:43:34
8       A.   Right.   15:43:35
9       Q.   Okay.  To the extent they were   15:43:36
10  compensated based on the volume of pills   15:43:40
11  purchased by their customers, would you agree   15:43:46
12  that that would be a conflict of interest --   15:43:48
13          MR. O'CONNOR:  Object to form.   15:43:51
14  QUESTIONS BY MR. KO:   15:43:51
15      Q.   -- to the extent they were   15:43:51
16  involved in the SOM monitoring process?   15:43:52
17          MR. O'CONNOR:  Same objection.   15:43:54
18          THE WITNESS:  So I'm sorry, are   15:43:54
19      we making the -- the inferential leap   15:43:55
20      that they were definitely -- because I   15:43:59
21      don't know about their compensation,   15:44:01
22      if it was dollars, pills, accounts,   15:44:01
23      regions.  I don't know that.   15:44:04
24  QUESTIONS BY MR. KO:   15:44:05
25      Q.   Sure.   15:44:06

Page 334

| | | |
|---|---|---|
| 1 | Assuming that NAMs were paid | 15:44:06 |
| 2 | based on volume of pills sold, at least in | 15:44:09 |
| 3 | part -- | 15:44:11 |
| 4 | A. Okay. | 15:44:11 |
| 5 | Q. -- were paid based on the | 15:44:13 |
| 6 | amount of pills that they were able to sell | 15:44:14 |
| 7 | to a particular customer, would you agree | 15:44:16 |
| 8 | that that would be a conflict of interest to | 15:44:18 |
| 9 | have them involved in evaluating whether or | 15:44:21 |
| 10 | not an order was suspicious? | 15:44:23 |
| 11 | MR. O'CONNOR: Object to form. | 15:44:24 |
| 12 | THE WITNESS: No. | 15:44:25 |
| 13 | QUESTIONS BY MR. KO: | 15:44:26 |
| 14 | Q. Okay. And going back to the | 15:44:26 |
| 15 | e-mail that's in front of you and -- you | 15:44:41 |
| 16 | indicate that at least from this meeting it | 15:44:45 |
| 17 | was agreed that customer service | 15:44:51 |
| 18 | representatives would no longer be involved | 15:44:56 |
| 19 | in the day-to-day monitoring because of | 15:44:58 |
| 20 | their -- because of a conflict of interest. | 15:45:00 |
| 21 | MR. O'CONNOR: Object to form. | 15:45:02 |
| 22 | QUESTIONS BY MR. KO: | 15:45:03 |
| 23 | Q. Do you see it? | 15:45:05 |
| 24 | A. Yes. Yes, I do see that. Yes. | 15:45:06 |
| 25 | Q. And what is the conflict of | 15:45:09 |

Page 335

| | | |
|---|---|---|
| 1 | interest that you're referring to there? | 15:45:10 |
| 2 | A. It's a -- you know, it's just a | 15:45:11 |
| 3 | conglomeration of even though customer | 15:45:12 |
| 4 | service is separate from the NAMs and | 15:45:16 |
| 5 | separate from commercial, customer service | 15:45:20 |
| 6 | does maintain a relationship with the | 15:45:22 |
| 7 | customers. And so that's the basis on which | 15:45:24 |
| 8 | this statement was made. | 15:45:26 |
| 9 | Q. Well, how -- how was it any | 15:45:28 |
| 10 | different -- how was the conflict of interest | 15:45:34 |
| 11 | that applies with respect to the customer | 15:45:36 |
| 12 | service group any different than a conflict | 15:45:38 |
| 13 | of interest that would apply with respect to | 15:45:40 |
| 14 | the national account managers? | 15:45:43 |
| 15 | A. So customer service group | 15:45:44 |
| 16 | maintained the relationship with the | 15:45:51 |
| 17 | customer, as did the NAMs. | 15:45:53 |
| 18 | Could you repeat that question, | 15:45:55 |
| 19 | please? I'm getting mixed up as I'm thinking | 15:45:56 |
| 20 | of my answer. I'm sorry. | 15:46:01 |
| 21 | Q. Sure. | 15:46:03 |
| 22 | How was the conflict of | 15:46:03 |
| 23 | interest that applies with the customer | 15:46:04 |
| 24 | service group that you're referring to in | 15:46:07 |
| 25 | this e-mail differ in any way from the | 15:46:10 |

Page 336

| | | |
|---|---|---|
| 1 | conflict of interest that would apply with | 15:46:13 |
| 2 | respect to a national account manager? | 15:46:15 |
| 3 | MR. O'CONNOR: Object to form. | 15:46:16 |
| 4 | THE WITNESS: So it doesn't, | 15:46:17 |
| 5 | because neither of them, neither the | 15:46:18 |
| 6 | NAMs or customer service, were -- | 15:46:20 |
| 7 | after this, they were not directly | 15:46:26 |
| 8 | responsible for the day-to-day | 15:46:28 |
| 9 | monitoring. They were consulted or | 15:46:29 |
| 10 | rose situations to our attention. | 15:46:31 |
| 11 | QUESTIONS BY MR. KO: | 15:46:33 |
| 12 | Q. I understand that that was | 15:46:34 |
| 13 | the -- what happened after this e-mail, that | 15:46:34 |
| 14 | that change was attempted to be made. But | 15:46:37 |
| 15 | prior to the date of this, you are | 15:46:40 |
| 16 | indicating, are you not, in this e-mail that | 15:46:46 |
| 17 | a conflict of interest exists with respect to | 15:46:47 |
| 18 | the customer service group? | 15:46:49 |
| 19 | A. It does state -- yes, it does | 15:46:51 |
| 20 | state that. | 15:46:59 |
| 21 | Q. And you said also that national | 15:46:59 |
| 22 | account managers have involvement in -- in | 15:47:01 |
| 23 | Mallinckrodt customers as well, right? | 15:47:04 |
| 24 | A. Correct. | 15:47:06 |
| 25 | Q. And that approximately four to | 15:47:07 |

Page 337

| | | |
|---|---|---|
| 1 | eight national account managers that | 15:47:11 |
| 2 | Mallinckrodt had, they were in charge of | 15:47:12 |
| 3 | wholesale distributors that Mallinckrodt | 15:47:15 |
| 4 | supplied drugs to, correct? | 15:47:18 |
| 5 | MR. O'CONNOR: Object to form. | 15:47:20 |
| 6 | THE WITNESS: Correct. | 15:47:20 |
| 7 | QUESTIONS BY MR. KO: | 15:47:21 |
| 8 | Q. And so the -- do you believe | 15:47:22 |
| 9 | that a conflict of interest exists with | 15:47:28 |
| 10 | respect to a national account manager's | 15:47:32 |
| 11 | involvement in the suspicious order | 15:47:34 |
| 12 | monitoring program given that their -- | 15:47:37 |
| 13 | assuming this was true -- given that their | 15:47:40 |
| 14 | primary form of compensation was the amount | 15:47:44 |
| 15 | of pills they were able to sell -- | 15:47:47 |
| 16 | MR. O'CONNOR: Object to form. | 15:47:49 |
| 17 | QUESTIONS BY MR. KO: | 15:47:49 |
| 18 | Q. -- to a particular Mallinckrodt | 15:47:50 |
| 19 | customer? | 15:47:52 |
| 20 | MR. O'CONNOR: Objection. | 15:47:52 |
| 21 | THE WITNESS: No, I do not. | 15:47:53 |
| 22 | QUESTIONS BY MR. KO: | 15:47:54 |
| 23 | Q. Okay. It's okay to say no. | 15:47:54 |
| 24 | A. Oh, I'm sorry. I'm sorry. | 15:48:06 |
| 25 | Q. No, don't be sorry. | 15:48:09 |

Page 338

```
 1        Here's --                    15:48:09
 2     A.   That was for emphasis.        15:48:09
 3     Q.   I want to hand you a copy of    15:48:10
 4  what's going to be -- what has previously    15:48:11
 5  been marked -- you can set that aside --    15:48:12
 6  what's previously been marked as Exhibit 44    15:48:17
 7  of the Stewart deposition.          15:48:19
 8        MR. KO:  And for the record,      15:48:20
 9     it's dated -- sorry, that's -- ends    15:48:22
10     in Bates 3028219.                15:48:25
11  QUESTIONS BY MR. KO:                 15:48:25
12     Q.   And before turning to the text    15:48:32
13  of this document, Mr. -- as we discussed    15:48:33
14  before, Mr. Borelli is a national account    15:48:37
15  manager, correct?                   15:48:40
16     A.   Yes.                      15:48:40
17     Q.   Okay.  And he was a national    15:48:41
18  account manager in charge of certain    15:48:44
19  distributors that Mallinckrodt shipped pills    15:48:45
20  to, correct?                      15:48:47
21     A.   Yes.                      15:48:48
22     Q.   And the context of this e-mail,    15:48:49
23  or the subject, is Sunrise Wholesale,    15:48:56
24  correct?                          15:48:57
25     A.   Yes.                      15:48:58
```

Page 339

```
 1     Q.   And as we discussed before,    15:48:58
 2  Sunrise had its license revoked by the DEA in    15:48:59
 3  2010 as a result of suspicious orders they    15:49:02
 4  were shipping to Florida, correct?    15:49:05
 5        MR. O'CONNOR:  Object to form.    15:49:07
 6        THE WITNESS:  Yes.           15:49:08
 7  QUESTIONS BY MR. KO:                 15:49:09
 8     Q.   Okay.  And Sunrise was a        15:49:09
 9  customer, again, of Mallinckrodt?    15:49:11
10     A.   Yes.                      15:49:13
11     Q.   And is it your understanding    15:49:14
12  that Mr. Borelli was in charge of the Sunrise    15:49:17
13  account?                          15:49:24
14     A.   Yes.                      15:49:24
15     Q.   Okay.  And Ms. Stewart        15:49:24
16  indicates some language to you about    15:49:27
17  Mr. Borelli and indicates that the e-mail    15:49:31
18  importance is high.                 15:49:34
19        She says quote, "FYI, the        15:49:35
20  customer service reps all state that Victor    15:49:38
21  will tell them anything they want to hear    15:49:41
22  just so he can get the sale," end quote.    15:49:42
23        Did I read that correctly?      15:49:46
24     A.   You did.                   15:49:46
25     Q.   Okay.  And Mr. Borelli had    15:49:47
```

Page 340

```
 1  involvement in the suspicious order    15:49:49
 2  monitoring program, did he not?      15:49:51
 3     A.   To the extent that we would    15:49:52
 4  occasionally ask the NAMs questions after the    15:49:58
 5  algorithm indicated an order was for further    15:50:01
 6  review, yes, that's correct.         15:50:03
 7     Q.   So were there instances in      15:50:03
 8  which Mr. Borelli cleared -- or concluded    15:50:04
 9  that a peculiar order was not suspicious and    15:50:11
10  relayed that information to you?      15:50:14
11        MR. O'CONNOR:  Object to form.    15:50:15
12        THE WITNESS:  Yes.           15:50:16
13  QUESTIONS BY MR. KO:                 15:50:17
14     Q.   Okay.  And the date of this    15:50:18
15  e-mail is May 20, 2008, correct?      15:50:18
16     A.   Yes.                      15:50:21
17     Q.   This is simultaneous to when    15:50:21
18  you are first starting to revamp your -- the    15:50:26
19  revised SOM program, correct?        15:50:31
20     A.   Yes.                      15:50:32
21     Q.   And you learned Mr. Borelli --    15:50:32
22  you learned from Ms. Stewart that all the    15:50:34
23  customer service reps all state that        15:50:36
24  Mr. Borelli will tell them anything they want    15:50:38
25  to hear just so he can get the sale, correct?    15:50:40
```

Page 341

```
 1     A.   Yes, I see that that's printed    15:50:44
 2  in the e-mail, yes, sir.             15:50:46
 3     Q.   Okay.  So given that          15:50:47
 4  Mr. Borelli has an incentive to obtain as    15:50:51
 5  many sales as possible, is it still your    15:50:54
 6  testimony that you believe it's not a    15:50:57
 7  conflict of interest for him to be involved    15:50:58
 8  in the evaluation of a peculiar order?    15:51:00
 9        MR. O'CONNOR:  Object to form.    15:51:02
10        THE WITNESS:  Yes.  Yes.        15:51:03
11  QUESTIONS BY MR. KO:                 15:51:03
12     Q.   By the way, how many times did    15:51:04
13  Mr. Borelli confirm that an order was    15:51:05
14  actually suspicious?                 15:51:08
15     A.   I don't know.               15:51:10
16     Q.   Well, you had previously -- we    15:51:16
17  had previously discussed an e-mail in which    15:51:18
18  you told Ms. Spaulding that no orders rose to    15:51:19
19  the level of suspicious in the 2008 to 2000    15:51:24
20  {sic} time period --                15:51:26
21     A.   Okay.                      15:51:27
22     Q.   -- correct?                 15:51:28
23     A.   Uh-huh.                    15:51:28
24     Q.   So I take it that Mr. Borelli    15:51:29
25  never, ever identified a peculiar order as    15:51:33
```

Page 342

1  being suspicious; is that accurate?          15:51:35
2           MR. O'CONNOR:  Object to form.     15:51:37
3           THE WITNESS:  Yes.                  15:51:38
4  QUESTIONS BY MR. KO:                        15:51:39
5      Q.    And the same would be true with   15:51:39
6  respect to Ms. New and Mr. Becker, correct?  15:51:41
7      A.    Yes.  Yes, I'm following you,      15:51:43
8  yes.                                         15:51:44
9      Q.    Yeah.                              15:51:44
10          So to the extent that              15:51:44
11  Mr. Becker or Ms. New evaluated whether or  15:51:46
12  not a peculiar order was suspicious, they    15:51:50
13  never, in fact, reported that such an order  15:51:52
14  was suspicious to you, correct?             15:51:57
15      A.    Correct.                          15:51:58
16      Q.    Okay.  Oh, and with respect       15:51:59
17  to -- so in addition to Ms. New, Mr. Becker  15:52:17
18  and Mr. Borelli, were there any other NAMs  15:52:22
19  during the 2008 to 2000 {sic} time period   15:52:25
20  that informed you that a peculiar order      15:52:30
21  should rise to the level of a suspicious     15:52:33
22  order?                                       15:52:35
23      A.    Tim Berry was a NAM for the       15:52:35
24  generics group at one point, and Dave Irwin,  15:52:38
25  but I just don't remember specifically       15:52:42

Page 343

1  conferring with them in terms of an order    15:52:43
2  that required further review.                15:52:46
3      Q.    Okay.  As you sit -- well,         15:52:48
4  again, based on your representation to       15:52:52
5  Ms. Spaulding that there were no suspicious  15:52:54
6  orders as of October 31, 2010, is it fair to  15:52:57
7  say that no national account manager ever    15:53:00
8  reported to you that a peculiar order should  15:53:03
9  rise to the level of being a suspicious       15:53:05
10  order?                                      15:53:08
11      A.    Yes.                              15:53:08
12          (Mallinckrodt-Harper Exhibit 17     15:53:08
13      marked for identification.)             15:53:08
14  QUESTIONS BY MR. KO:                        15:53:09
15      Q.    Okay.  I want to turn to a copy   15:53:09
16  of what will be marked as exhibit -- Harper  15:53:15
17  Exhibit 17.                                  15:53:19
18          And for the record, this           15:53:34
19  document is -- ends in Bates stamp 368390.   15:53:35
20          In an August 26, 2010 e-mail        15:53:50
21  from you to others, you state, "Ginger and   15:53:54
22  Kate," is the first page, "Although we       15:54:00
23  require direct customers to submit a         15:54:04
24  suspicious order monitoring customer         15:54:06
25  questionnaire with proof of their annual DEA  15:54:07

Page 344

1  license renewal, the question whether our    15:54:10
2  customers monitor their customers was removed  15:54:12
3  from the questionnaire by the Mallinckrodt   15:54:14
4  suspicious order monitoring team because      15:54:16
5  there is no actual regulatory obligation to   15:54:19
6  monitor customers' customers."               15:54:23
7          Did I read that correctly with      15:54:25
8  the exception of the insertion "is"?          15:54:26
9      A.    Yes.                              15:54:30
10      Q.    Okay.  And so at -- is it safe    15:54:30
11  to say that prior to -- at some point prior  15:54:33
12  to August 26, 2010, in your customer         15:54:35
13  checklist you had a question of whether or   15:54:40
14  not your customers monitor their customers?  15:54:43
15  Correct?                                     15:54:50
16      A.    Yes.                              15:54:50
17      Q.    But you removed that question     15:54:51
18  from the questionnaire, correct?             15:54:53
19      A.    Yes.                              15:54:53
20      Q.    Set that aside.                   15:54:54
21      A.    All right.                        15:54:54
22      Q.    Did you believe that removing     15:55:10
23  that question from your questionnaire was an  15:55:10
24  enhancement of your SOM program?             15:55:12
25      A.    I don't think it was not, so      15:55:15

Page 345

1  that's a double negative.  I don't think it   15:55:17
2  was to the detriment of the program.         15:55:21
3      Q.    Okay.  So you don't regret        15:55:23
4  removing that question from your             15:55:25
5  questionnaire?                                15:55:26
6      A.    No.                               15:55:27
7      Q.    Okay.  And that's                 15:55:28
8  notwithstanding the fact that you did receive  15:55:30
9  guidance from the DEA that they expected you  15:55:33
10  to monitor your customer's customer, correct?  15:55:35
11          MR. O'CONNOR:  Object to form.     15:55:37
12          THE WITNESS:  Correct.             15:55:39
13  QUESTIONS BY MR. KO:                        15:55:39
14      Q.    Okay.  So you received guidance   15:55:40
15  from the DEA that it was important for        15:55:42
16  Mallinckrodt to know your customer's          15:55:46
17  customer, yet you removed that question from  15:55:48
18  your questionnaire; is that accurate?         15:55:50
19          MR. O'CONNOR:  Object to form.     15:55:53
20          THE WITNESS:  Yes.                 15:55:53
21          May I add, please?                 15:55:54
22  QUESTIONS BY MR. KO:                        15:55:55
23      Q.    This is a yes or no question.     15:55:56
24  That's all I needed.                         15:55:57
25      A.    All right.                        15:55:58

Page 346

1     Q.    Counsel can -- has the          15:55:59
2  opportunity to do some redirect if he would    15:56:01
3  like.                               15:56:02
4     A.    Okay.  Thank you.           15:56:03
5        (Mallinckrodt-Harper Exhibit 18    15:56:07
6     marked for identification.)          15:56:08
7  QUESTIONS BY MR. KO:                  15:56:08
8     Q.    I'm going to hand you a copy of   15:56:08
9  what's I'm going to be marked as Harper     15:56:09
10 Exhibit 18.                          15:56:12
11       And for the record, this          15:56:21
12 document ends in Bates 279142.           15:56:22
13       This is an April 29, 2010         15:56:28
14 e-mail you send to Ms. Spaulding regarding    15:56:32
15 suspicious order monitoring.            15:56:36
16       You state, quote, "We have        15:56:38
17 working algorithms, and J. Rausch has been    15:56:43
18 reviewing peculiar orders for several weeks.   15:56:46
19 I have a meeting with Jim tomorrow because    15:56:48
20 the review is taking several hours a day, yet   15:56:50
21 still results in him making a judgment call    15:56:53
22 that he is not comfortable with.  Bottom line   15:56:55
23 is that tomorrow I plan on having something    15:56:59
24 for you to give DEA.  Trying desperately to    15:57:01
25 clear up all loose ends before the potential   15:57:04

Page 347

1  work stoppage."                      15:57:06
2        Did I read that correctly?        15:57:07
3     A.    Yes.                        15:57:08
4     Q.    Okay.  And is it accurate to    15:57:09
5  say that as of April 29, 2010, it's your    15:57:12
6  understanding that Mr. Rausch is still making   15:57:16
7  judgment calls on peculiar orders that he is   15:57:19
8  not comfortable with?                 15:57:21
9     A.    Yes.                        15:57:22
10    Q.    Okay.  You can set that aside.   15:57:23
11       Now, as we discussed, in          15:57:25
12 addition to algorithms, you had checklists    15:57:34
13 that you were working on at the same time    15:57:38
14 with respect to new and current customers,    15:57:39
15 correct?                            15:57:41
16    A.    Correct.                    15:57:41
17       (Mallinckrodt-Harper Exhibit 19    15:57:48
18    marked for identification.)          15:57:48
19 QUESTIONS BY MR. KO:                  15:57:48
20    Q.    I'm going to hand you a copy of   15:57:48
21 what's going to be marked as Harper       15:57:49
22 Exhibit 19, and it ends in Bates 301020.    15:57:51
23       And this is a July 22, 2009       15:57:58
24 e-mail from Ms. Stewart to many people,     15:58:00
25 including you, regarding the customer      15:58:02

Page 348

1  checklist.                          15:58:05
2        Is that accurate?               15:58:10
3     A.    Yes, it is, yes.              15:58:11
4     Q.    And she indicates that you left   15:58:12
5  a message regarding a customer checklist,     15:58:16
6  correct?                            15:58:19
7     A.    Yes.  I just had to figure out   15:58:19
8  who was leaving the message.  Yes.  Yes.     15:58:24
9     Q.    Sure.                       15:58:26
10       And Ms. Stewart seems to be       15:58:26
11 referencing some failures on the customer    15:58:28
12 checklist that seemed to be the result of    15:58:31
13 confusion as it relates to the form itself.    15:58:35
14       Do you see that reference?        15:58:39
15    A.    Yes.                        15:58:40
16    Q.    So at the time of this e-mail,   15:58:42
17 there was certainly some confusion with      15:58:44
18 respect to the questionnaire that you were    15:58:46
19 trying to roll out in 2009, correct?        15:58:47
20    A.    Yes.                        15:58:49
21    Q.    And Ms. Stewart indicates that   15:58:49
22 she's actually putting customers that have    15:58:51
23 been put on hold as a result of this customer   15:58:54
24 checklist, and she's actually recommending    15:58:57
25 that they be taken off.                15:59:01

Page 349

1        Is that consistent with how      15:59:03
2  this e-mail reads?                   15:59:05
3        MR. O'CONNOR:  Object to form.   15:59:06
4        THE WITNESS:  Yes.             15:59:06
5  QUESTIONS BY MR. KO:                  15:59:09
6     Q.    So in other words, while there   15:59:09
7  was confusion surrounding this particular    15:59:10
8  version of the customer checklist, for any    15:59:13
9  customers that were put on hold at that time,   15:59:18
10 she had recommended putting them off of hold   15:59:19
11 and releasing orders; is that correct?      15:59:22
12    A.    Yes.                        15:59:25
13       MR. O'CONNOR:  Object to form.   15:59:26
14 QUESTIONS BY MR. KO:                  15:59:27
15    Q.    You can set that one aside.     15:59:28
16       (Mallinckrodt-Harper Exhibit 20    15:59:37
17    marked for identification.)          15:59:37
18 QUESTIONS BY MR. KO:                  15:59:37
19    Q.    I'm going to hand you a copy of   15:59:38
20 what's going to be marked as Harper       15:59:39
21 Exhibit 20.                          15:59:40
22       For the record, this ends in      15:59:42
23 Bates stamp 372333.                   15:59:44
24       And this is an e-mail exchange    15:59:50
25 that you are having with Ms. Spaulding in    15:59:52

Page 350

```
 1  the -- on February 11, 2011; is that      15:59:56
 2  accurate?                                  15:59:59
 3      A.   Yes.                              16:00:00
 4      Q.   Okay.  And I want to focus on     16:00:05
 5  the second e-mail down in the chain that you  16:00:09
 6  draft to Ms. Spaulding regarding the customer  16:00:13
 7  checklist.                                 16:00:20
 8           Do you see where you have         16:00:21
 9  indicated that you have discovered a       16:00:23
10  disconnect in the system?                  16:00:25
11      A.   I do.                             16:00:26
12      Q.   And you're talking about the      16:00:27
13  system of the customer checklist, correct?  16:00:28
14      A.   Yes.                              16:00:30
15      Q.   And you indicate that, quote,     16:00:31
16  "We have significant gaps in that although  16:00:35
17  CDIG send out the annual update SOM customer  16:00:40
18  checklist, when the system indicates customer  16:00:44
19  account DEA registration is nearing renewal  16:00:48
20  time, they do nothing if the SOM customer  16:00:51
21  checklist is not ever returned by the      16:00:54
22  customer."                                 16:00:56
23           Did I read that correctly?        16:00:57
24      A.   Yes.                              16:00:57
25      Q.   Okay.  And CDIG basically --      16:00:59
```

Page 351

```
 1  CDIG stands for customer data integrity     16:01:03
 2  group, correct?                             16:01:06
 3      A.   Correct.                           16:01:07
 4      Q.   And they had some involvement      16:01:07
 5  in the SOM procedure, in particular the     16:01:08
 6  customer checklist, correct?                16:01:11
 7      A.   Yes.                               16:01:12
 8      Q.   But if I understand this e-mail    16:01:13
 9  correctly, is it accurate to say that as of  16:01:16
10  February of 2011 you were -- you discovered  16:01:19
11  that all SOM customer checklists were not   16:01:24
12  actually being returned by the customers,   16:01:28
13  correct?                                    16:01:30
14           MR. O'CONNOR:  Object to form.    16:01:30
15           THE WITNESS:  Yes.                 16:01:31
16  QUESTIONS BY MR. KO:                        16:01:31
17      Q.   You would agree that this is a     16:01:32
18  significant gap in the review system, would  16:01:33
19  you not?                                    16:01:36
20      A.   It's a gap -- yes.  In this        16:01:37
21  component of the review system, yes, it is a  16:01:41
22  gap.                                        16:01:43
23      Q.   Because you relied on the          16:01:43
24  customer checklist to obtain information from  16:01:44
25  the customer, correct?                      16:01:47
```

Page 352

```
 1      A.   Yes.                               16:01:47
 2      Q.   And in some instances, you         16:01:48
 3  never actually in fact received the         16:01:50
 4  checklist, correct?                         16:01:53
 5      A.   I believe this says during the     16:01:53
 6  renewal.                                    16:01:56
 7      Q.   Yeah.                              16:01:58
 8           During the renewal time period,   16:01:59
 9  CDIG does nothing if the SOM customer        16:02:01
10  checklist is ever returned; is that correct?  16:02:05
11      A.   So customers would have sent in   16:02:07
12  an initial checklist, but then this is the  16:02:13
13  annual update that they may not have turned  16:02:17
14  in, and CDIG may not have caught that fact,  16:02:19
15  yes.                                        16:02:20
16      Q.   All right.  So they may have       16:02:20
17  turned in a checklist at one point in time,  16:02:21
18  but the requirement and the expectation     16:02:24
19  certainly was that they would turn in at    16:02:26
20  least an annual checklist as well, correct?  16:02:27
21           MR. O'CONNOR:  Object to form.    16:02:30
22           THE WITNESS:  Yes.                 16:02:30
23  QUESTIONS BY MR. KO:                        16:02:31
24      Q.   And that wasn't always            16:02:31
25  happening as of 2011, correct?              16:02:32
```

Page 353

```
 1      A.   Correct.                           16:02:33
 2      Q.   And so would you say that --       16:02:34
 3  we'll move on.  You can set that aside.     16:02:42
 4  Thank you.                                  16:02:44
 5           Now, earlier we were discussing   16:02:53
 6  chargebacks.                                16:02:55
 7           Do you recall that?                16:02:55
 8      A.   Yes.                               16:02:56
 9      Q.   Do you remember when you first     16:02:57
10  started looking into utilization of         16:03:01
11  chargebacks -- or chargeback data to        16:03:04
12  understand the details of where your pills,  16:03:09
13  Mallinckrodt pills, were going?             16:03:12
14           MR. O'CONNOR:  Object to form.    16:03:13
15           THE WITNESS:  Yes.                 16:03:14
16  QUESTIONS BY MR. KO:                        16:03:15
17      Q.   And when was that?                 16:03:15
18      A.   I believe it was within the        16:03:16
19  scope of our involvement in the Sunrise     16:03:19
20  investigation.                              16:03:23
21      Q.   Okay.  And that was in the 2009   16:03:23
22  time period?                                16:03:26
23      A.   I don't remember the -- I'm        16:03:27
24  terrible with my years.  I'm sorry, I don't  16:03:29
25  remember.                                   16:03:33
```

Page 354

1      (Mallinckrodt-Harper Exhibit 21    16:03:33
2      marked for identification.)    16:03:34
3   QUESTIONS BY MR. KO:    16:03:34
4      Q.   Okay.  I'm going to hand you a    16:03:34
5   copy of what's going to be marked as Harper    16:03:35
6   Exhibit 21.    16:03:37
7      A.   Okay.    16:03:39
8      Q.   And this is an e-mail chain    16:03:39
9   involving you, among other people, in the    16:03:58
10  April 17, 2007 time period; is that accurate?    16:04:03
11     A.   Yes.    16:04:06
12     Q.   And I don't believe I    16:04:08
13  identified this document, but it ends in    16:04:09
14  Bates 7728295.    16:04:14
15     Starting with the second to the    16:04:17
16  last e-mail at the bottom of this chain from    16:04:31
17  Vince Kaiman to Jeff Burd in which you are    16:04:33
18  cc'd, as of 2:47 -- let's start there.    16:04:38
19     First of all, who's Vince    16:04:43
20  Kaiman?    16:04:45
21     A.   He was director or vice    16:04:45
22  president of commercial group at that time.    16:04:48
23     Q.   Okay.  And he is inquiring in    16:04:53
24  an e-mail exchange with Jeff Burd whether or    16:04:57
25  not Jeff can also find out of the    16:05:02

Page 355

1   40-milligram sales into the channel, how much    16:05:06
2   of it ends up in clinics.    16:05:08
3      Do you see that portion of the    16:05:13
4   e-mail I'm referencing?    16:05:14
5      A.   Yes.    16:05:15
6      Q.   So in other words, Vince is    16:05:18
7   asking -- and the 40-milligram sales is a    16:05:20
8   reference to the methadone 40 milligrams,    16:05:22
9   correct?    16:05:24
10     A.   Yes.    16:05:25
11     Q.   Manufactured by Mallinckrodt?    16:05:25
12     A.   Yes.    16:05:27
13     Q.   And he is trying to determine    16:05:28
14  where those Mallinckrodt pills ends up in    16:05:31
15  clinics.    16:05:37
16     Is that a fair characterization    16:05:37
17  of the question he's asking Jeff?    16:05:39
18     MR. O'CONNOR:  Object to form.    16:05:41
19     THE WITNESS:  It's how many end    16:05:41
20  up in clinics versus retail.    16:05:43
21  QUESTIONS BY MR. KO:    16:05:46
22     Q.   Okay.  And there's some    16:05:47
23  discussion back and forth about how one might    16:05:52
24  go about doing that, but Vince at some point    16:05:55
25  in the e-mail chain says, "Would chargebacks    16:05:58

Page 356

1   help?"    16:06:03
2      Do you see that?    16:06:07
3      A.   Yes.    16:06:07
4      Q.   Okay.  And Mr. Burd's response    16:06:07
5   is, "Okay, I'll start to look into it.  Yeah,    16:06:12
6   it would be through chargebacks."    16:06:16
7      Do you see that portion of the    16:06:18
8   e-mail?    16:06:20
9      A.   I do.    16:06:20
10     Q.   So is it fair to say that this    16:06:20
11  e-mail chain reflects an understanding by    16:06:22
12  Mallinckrodt employees that they could    16:06:27
13  utilize chargebacks to understand where    16:06:30
14  Mallinckrodt-manufactured pills were ending    16:06:32
15  up?    16:06:36
16     A.   Yes.    16:06:36
17     Q.   And the date of this e-mail is    16:06:36
18  April 17, 2007, correct?    16:06:38
19     A.   Correct.    16:06:39
20     Q.   And you were on this e-mail    16:06:40
21  chain?    16:06:43
22     A.   Correct.    16:06:43
23     Q.   Okay.  And I want to pay -- I    16:06:44
24  want to turn your attention to the top of    16:06:52
25  this e-mail in which Jeff Burd -- by the way,    16:06:54

Page 357

1   who is Jeff Burd?    16:06:58
2      A.   He was in commercial group, but    16:06:59
3   I believe he was on the branded side.  I    16:07:00
4   didn't have any interaction with him.    16:07:02
5      Q.   Sure.    16:07:03
6      And Mr. Burd, who appears was a    16:07:04
7   senior marketing manager, he is -- he    16:07:08
8   indicates that, "Well, we were able to get at    16:07:11
9   this data quicker than I expected, with    16:07:14
10  Kate's help."    16:07:17
11     Do you see that?    16:07:18
12     A.   I do.    16:07:19
13     Q.   So is it a fair    16:07:19
14  characterization of this e-mail that he was    16:07:21
15  able to obtain the chargeback data a lot    16:07:22
16  quicker than he had expected?    16:07:26
17     MR. O'CONNOR:  Object to form.    16:07:27
18     THE WITNESS:  Yes.    16:07:28
19  QUESTIONS BY MR. KO:    16:07:28
20     Q.   Okay.  And if you look at the    16:07:29
21  timestamp, it looks like it takes him --    16:07:30
22  certainly the same day, but he responds    16:07:33
23  within six hours of when he says he will look    16:07:35
24  into it, correct?    16:07:39
25     A.   Yes.    16:07:40

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1    Q.  So in a six-hour time period,   16:07:41
2  is it accurate to say that a Mallinckrodt   16:07:45
3  employee was able to utilize chargeback data   16:07:46
4  to understand where Mallinckrodt products   16:07:50
5  were ending up?   16:07:52
6        MR. O'CONNOR: Object to form.   16:07:53
7        THE WITNESS: Yes.   16:07:53
8  QUESTIONS BY MR. KO:
9    Q.  Okay. And by the way, do   16:07:56
10  you -- there's a reference here to Kate. It   16:08:00
11  says that he's able to -- he was able to   16:08:04
12  utilize Kate's help to get this data.   16:08:07
13        Do you see that?   16:08:09
14    A.  Yes, I do.   16:08:09
15    Q.  And that was Kate Neely?   16:08:10
16    A.  Yes. Kate Muhlenkamp at the   16:08:12
17  time, yes.   16:08:14
18    Q.  Right.   16:08:15
19    A.  Yes.   16:08:15
20    Q.  Thank you.   16:08:16
21        (Mallinckrodt-Harper Exhibit 22   16:08:18
22  marked for identification.)   16:08:18
23  QUESTIONS BY MR. KO:   16:08:18
24    Q.  I'm going to hand you now a   16:08:26
25  copy of what will be marked as Harper   16:08:28

Page 359

1  Exhibit 22.   16:08:31
2        And we can go through this   16:08:37
3  document and we can take a break.   16:08:38
4        MR. O'CONNOR: Okay.   16:08:38
5  QUESTIONS BY MR. KO:   16:08:38
6    Q.  If that doesn't -- or if you   16:08:42
7  don't mind.   16:08:44
8    A.  That's acceptable, thank you,   16:08:45
9  yes.   16:08:45
10    Q.  For the record, this e-mail   16:08:53
11  exchange ends in Bates 500657. And this is   16:08:54
12  an e-mail exchange from actually the 2009 to   16:08:59
13  2010 time period.   16:09:04
14        And the title of the e-mail is   16:09:08
15  "Chargeback Information Request."   16:09:09
16        Do you see that?   16:09:10
17    A.  Yes, but I see that it started   16:09:11
18  in 2010, not in 2009.   16:09:14
19    Q.  And it's a little confusing   16:09:17
20  because I think that's reference made to a   16:09:19
21  subsequent e-mail. But if you look at the   16:09:22
22  bottom of the second page, there is an e-mail   16:09:24
23  from you to Tiffany Rowley dated November 19,   16:09:27
24  2009.   16:09:33
25        Do you see that?   16:09:33

Page 360

1    A.  Oh, here. Yes.   16:09:33
2    Q.  Okay. Now, in that   16:09:41
3  November 19, 2009 e-mail, you ask, among   16:09:45
4  other things, to Tiffany, quote, "Is it   16:09:48
5  feasible to run chargeback summary reports   16:09:53
6  each time we receive information through the   16:09:55
7  industry about DEA actions against pharmacies   16:09:57
8  or physicians?"   16:09:59
9        Did I read that correctly?   16:10:00
10    A.  Yes.   16:10:00
11    Q.  So is it fair to say that at   16:10:02
12  least as of November 2000 -- fair to say that   16:10:04
13  as of November 19, 2009, you're inquiring   16:10:11
14  about how to utilize chargeback summary   16:10:15
15  reports to determine where Mallinckrodt pills   16:10:18
16  are ending up?   16:10:22
17        MR. O'CONNOR: Object to form.   16:10:23
18        THE WITNESS: Yes.   16:10:24
19  QUESTIONS BY MR. KO:   16:10:24
20    Q.  Okay. And was this -- does   16:10:25
21  this refresh your recollection at all that   16:10:28
22  this was about the time you were -- you   16:10:32
23  became interested in utilizing chargeback   16:10:34
24  information consistent with the DEA   16:10:36
25  investigation against Sunrise?   16:10:39

Page 361

1        MR. O'CONNOR: Object to form.   16:10:41
2        THE WITNESS: No.   16:10:42
3  QUESTIONS BY MR. KO:   16:10:44
4    Q.  Okay.   16:10:44
5    A.  Well, around the same time,   16:10:44
6  but -- this is not speaking of that, but,   16:10:46
7  yes, at the same time, yes, sir, sorry.   16:10:48
8    Q.  Yeah, I understand that this   16:10:50
9  doesn't make any reference --   16:10:51
10    A.  Okay. I apologize. Yes.   16:10:52
11    Q.  Yeah, that's okay.   16:10:54
12        Around this time was when   16:10:54
13  Sunrise -- you began looking into Sunrise as   16:10:56
14  well, correct?   16:10:59
15    A.  Yes.   16:11:00
16    Q.  And you also were trying to   16:11:01
17  pull chargeback data and chargeback   16:11:04
18  information in connection with understanding   16:11:07
19  where your pills ended up after distributing   16:11:09
20  to Sunrise, correct?   16:11:13
21        MR. O'CONNOR: Object to form.   16:11:14
22        THE WITNESS: Yes. The company   16:11:15
23  was. I -- yes, not me personally,   16:11:16
24  yes.   16:11:18
25

Page 362

| | | |
|---|---|---|
| 1 | QUESTIONS BY MR. KO: | 16:11:18 |
| 2 | Q. But it was in connection with | 16:11:20 |
| 3 | your obligations as the team leader of the | 16:11:21 |
| 4 | suspicious order monitoring program -- | 16:11:23 |
| 5 | A. Yes. | 16:11:24 |
| 6 | Q. -- right? | 16:11:24 |
| 7 | A. Yes. | 16:11:25 |
| 8 | Q. Okay. Now, after you asked | 16:11:25 |
| 9 | that question on November 19, 2009, | 16:11:29 |
| 10 | Tiffany -- by the way, who is Tiffany Rowley | 16:11:33 |
| 11 | Kilper? | 16:11:37 |
| 12 | A. She -- she was with the | 16:11:37 |
| 13 | contract group, contract administration, but | 16:11:41 |
| 14 | I'm not certain of what her role entailed. | 16:11:45 |
| 15 | Q. Okay. But she was someone who | 16:11:48 |
| 16 | you consulted with to pull chargeback | 16:11:50 |
| 17 | information, correct? | 16:11:52 |
| 18 | A. Yes. | 16:11:53 |
| 19 | Q. Okay. And she responds, "Sure, | 16:11:57 |
| 20 | Karen, I can always provide that data." | 16:12:02 |
| 21 | Do you see that? | 16:12:05 |
| 22 | A. Yes. | 16:12:05 |
| 23 | Q. And unfortunately, for this | 16:12:08 |
| 24 | e-mail exchange there's no date that's | 16:12:10 |
| 25 | indicated for that particular e-mail, but we | 16:12:17 |

Page 363

| | | |
|---|---|---|
| 1 | can move up to your Monday, February 22, 2010 | 16:12:19 |
| 2 | e-mail. | 16:12:22 |
| 3 | Do you see that? | 16:12:23 |
| 4 | A. I do. | 16:12:23 |
| 5 | Q. And you say, "Tiffany, we | 16:12:24 |
| 6 | exchanged e-mails several months ago about | 16:12:27 |
| 7 | running chargeback reports as a benefit to | 16:12:28 |
| 8 | the business based upon information we | 16:12:30 |
| 9 | receive regarding DEA actions against | 16:12:33 |
| 10 | registrants and industry news." | 16:12:35 |
| 11 | Did I read that correctly? | 16:12:39 |
| 12 | A. Yes. | 16:12:39 |
| 13 | Q. So for whatever reason, three | 16:12:41 |
| 14 | months pass between when you first ask | 16:12:45 |
| 15 | Ms. Kilper to identify and run certain | 16:12:49 |
| 16 | requests with respect to chargeback | 16:12:51 |
| 17 | information and when you follow up again with | 16:12:53 |
| 18 | her about this request; is that accurate? | 16:12:59 |
| 19 | A. Yes. | 16:13:01 |
| 20 | Q. Okay. And then she responds | 16:13:01 |
| 21 | that same day that -- with some questions, | 16:13:03 |
| 22 | but ultimately she -- well, let me read it | 16:13:10 |
| 23 | for you. | 16:13:13 |
| 24 | She says, "Karen, if you could | 16:13:14 |
| 25 | give me an estimate of how frequent the | 16:13:17 |

Page 364

| | | |
|---|---|---|
| 1 | requests might be or how many end user | 16:13:18 |
| 2 | inquiries per month, I can run this by my | 16:13:21 |
| 3 | manager to ensure she agrees this fits our | 16:13:24 |
| 4 | area. I just pull the data from Cognos. | 16:13:26 |
| 5 | It's nothing complicated at all. I'd be | 16:13:29 |
| 6 | happy to train someone in your group to do | 16:13:31 |
| 7 | this if that makes more sense." | 16:13:33 |
| 8 | Did I read that correctly? | 16:13:35 |
| 9 | A. Yes. | 16:13:35 |
| 10 | Q. So as of February 22, 2010, is | 16:13:35 |
| 11 | it accurate to say that Mallinckrodt | 16:13:43 |
| 12 | certainly has the ability to run chargeback | 16:13:44 |
| 13 | information and chargeback data to determine | 16:13:51 |
| 14 | where Mallinckrodt pills are going? | 16:13:53 |
| 15 | MR. O'CONNOR: Object to form. | 16:13:54 |
| 16 | THE WITNESS: Yes. | 16:13:55 |
| 17 | QUESTIONS BY MR. KO: | 16:13:55 |
| 18 | Q. Okay. And this request | 16:13:55 |
| 19 | actually originated on November 19, 2009, as | 16:13:56 |
| 20 | indicated by your original e-mail, correct? | 16:14:04 |
| 21 | A. Yes. | 16:14:06 |
| 22 | Q. And she's -- it's accurate to | 16:14:08 |
| 23 | say that at least based on | 16:14:11 |
| 24 | Ms. Rowley-Kilper's characterization, it's | 16:14:16 |
| 25 | nothing complicated at all to pull this data, | 16:14:17 |

Page 365

| | | |
|---|---|---|
| 1 | correct? | 16:14:20 |
| 2 | MR. O'CONNOR: Object to form. | 16:14:20 |
| 3 | THE WITNESS: Correct. | 16:14:21 |
| 4 | QUESTIONS BY MR. KO: | 16:14:22 |
| 5 | Q. And she would be happy to train | 16:14:22 |
| 6 | someone in your group to do it yourself? | 16:14:24 |
| 7 | A. Correct. | 16:14:25 |
| 8 | Q. Did you take her up on her | 16:14:26 |
| 9 | offer? | 16:14:27 |
| 10 | A. No. | 16:14:28 |
| 11 | Q. Okay. Ms. Kilper always ran | 16:14:28 |
| 12 | the chargeback reports, correct? | 16:14:31 |
| 13 | MR. O'CONNOR: Object to form. | 16:14:32 |
| 14 | THE WITNESS: Not always. | 16:14:34 |
| 15 | QUESTIONS BY MR. KO: | 16:14:34 |
| 16 | Q. Did you ever run a chargeback | 16:14:35 |
| 17 | report? | 16:14:36 |
| 18 | A. No. | 16:14:36 |
| 19 | Q. You had some other people do | 16:14:37 |
| 20 | it, correct? | 16:14:38 |
| 21 | A. Yes. | 16:14:38 |
| 22 | Q. And was there ever a time in | 16:14:38 |
| 23 | which it was indicated to you that it would | 16:14:41 |
| 24 | be difficult to pull this data? | 16:14:44 |
| 25 | A. No. | 16:14:47 |

Page 366

```
1      Q.   Okay.  In fact, it was quite      16:14:49
2  easy and they could -- whomever you directed  16:14:52
3  would always comply with your request for    16:14:55
4  this information, correct?                   16:14:57
5           MR. O'CONNOR:  Object to form.      16:14:58
6           THE WITNESS:  Yes.  Yes.            16:14:59
7  QUESTIONS BY MR. KO:                          16:14:59
8      Q.   Now, turning to the first page      16:15:00
9  of this e-mail, you indicate -- sorry, not   16:15:03
10  you, but Ms. Johnson, who appears to be a    16:15:09
11  compliance assistant, she asks you whether or 16:15:12
12  not anything has been figured out on the      16:15:16
13  chargeback requests yet.                      16:15:18
14           Do you see that?                    16:15:19
15      A.   Yes.                                16:15:19
16      Q.   And that's dated March 8, 2010?    16:15:24
17      A.   Yes.                                16:15:27
18      Q.   And it appears that there was      16:15:28
19  no response by you until Tiffany asks whether 16:15:31
20  or not someone was in her court on this,     16:15:37
21  because she never heard back in response to   16:15:40
22  your questions.                               16:15:42
23           Do you see that?                    16:15:43
24      A.   Yes.                                16:15:44
25      Q.   Okay.  And finally at the top      16:15:45
```

Page 367

```
1  of this e-mail, you indicate to Carrie that   16:15:48
2  "I have the next steps on this.  I'll discuss  16:15:51
3  with you later this week.  I am booked solid   16:15:53
4  with meetings today.  Thanks for following up  16:15:56
5  to get your project going."                   16:15:59
6           Did I read that correctly?          16:16:02
7      A.   Yes.                                16:16:02
8      Q.   Okay.  So is it fair to say         16:16:02
9  that there is a approximately four-month time  16:16:03
10  period in which -- between when you first     16:16:05
11  asked for this information and when action is 16:16:07
12  actually taken on obtaining this chargeback   16:16:12
13  information?                                  16:16:16
14      A.   Yes.                                16:16:17
15      Q.   Okay.  And of course it's clear     16:16:23
16  from this e-mail exchange that the ball was   16:16:25
17  in your court to respond to Carrie.           16:16:29
18           And unfortunately I don't have      16:16:31
19  any subsequent documentation of when, in      16:16:33
20  fact, you responded, but at least four months 16:16:35
21  go by between when you first ask and when you 16:16:37
22  again follow up with Tiffany and Carrie on    16:16:40
23  the chargeback data requests, correct?        16:16:43
24           MR. O'CONNOR:  Object to form.      16:16:45
25           THE WITNESS:  Yes.                  16:16:45
```

Page 368

```
1           MR. KO:  Why don't we take a        16:16:47
2  break.                                        16:16:52
3           MR. O'CONNOR:  Sure.                16:16:53
4           VIDEOGRAPHER:  We are going off     16:16:54
5  the record at 4:16 p.m.                       16:16:55
6           (Off the record at 4:16 p.m.)       16:16:56
7           VIDEOGRAPHER:  We are back on       16:35:05
8  the record at 4:35 p.m.                       16:35:06
9  QUESTIONS BY MR. KO:                          16:35:07
10      Q.   Welcome back, Ms. Harper.          16:35:08
11  Thank you for your patience today.  I        16:35:11
12  appreciate your -- the time that you have    16:35:13
13  spent, and we have, I think, a few more hours 16:35:14
14  to go.                                        16:35:19
15           So before we broke, we were        16:35:19
16  talking about utilization of chargeback data. 16:35:22
17           Do you recall that?                 16:35:26
18      A.   Yes.                                16:35:26
19      Q.   And --                              16:35:27
20           MR. O'CONNOR:  Can we go off        16:35:28
21  the record for just a second to put          16:35:30
22  the mic on?                                   16:35:31
23           THE WITNESS:  Oh, I'm sorry.        16:35:36
24  QUESTIONS BY MR. KO:                          16:35:38
25      Q.   So a moment ago we were talking     16:35:57
```

Page 369

```
1  about chargebacks, correct?                   16:35:58
2      A.   Yes.                                16:36:00
3      Q.   And was -- in the late 2009         16:36:00
4  time period you had asked about whether or     16:36:05
5  not someone could run certain chargeback data 16:36:09
6  for you so that you could understand the       16:36:11
7  details of a transaction in which             16:36:15
8  Mallinckrodt was sending its pills to a       16:36:18
9  particular distributor, correct?               16:36:22
10           MR. O'CONNOR:  Object to form.      16:36:23
11           THE WITNESS:  Yes.                  16:36:23
12  QUESTIONS BY MR. KO:                          16:36:23
13      Q.   And specifically, was it your      16:36:24
14  idea to take the information you learned --   16:36:28
15  well, strike that.                            16:36:29
16           One of the reasons for              16:36:34
17  identifying -- or utilizing chargeback        16:36:38
18  information was to take the information you   16:36:40
19  received regarding certain DEA actions        16:36:46
20  against registrants and industry news that    16:36:50
21  you had acquired, correct?                    16:36:52
22           MR. O'CONNOR:  Object to form.      16:36:53
23           THE WITNESS:  Yes.                  16:36:54
24  QUESTIONS BY MR. KO:                          16:36:54
25      Q.   So the idea was to take that       16:36:54
```

Page 370

1  information regarding specific pharmacies and    16:36:59
2  doctors and go into your data to determine    16:37:04
3  whether or not Mallinckrodt was selling to    16:37:07
4  these pharmacies or physicians, correct?    16:37:10
5       MR. O'CONNOR:  Object to form.    16:37:13
6       THE WITNESS:  Whether or not    16:37:13
7  they were our -- they were downstream    16:37:15
8  customers of the distributors of our    16:37:18
9  product, yes.    16:37:20
10  QUESTIONS BY MR. KO:    16:37:21
11     Q.   Right.    16:37:21
12       So the idea --    16:37:21
13     A.   Yes.    16:37:22
14     Q.   -- of -- one of the reasons for    16:37:22
15  why you utilize chargeback information is to    16:37:26
16  determine whether or not Mallinckrodt was    16:37:29
17  selling to pharmacies or physicians that were    16:37:36
18  customers of distributors that you sold to,    16:37:38
19  correct?    16:37:40
20       MR. O'CONNOR:  Object to form.    16:37:41
21       THE WITNESS:  Yes.    16:37:42
22  QUESTIONS BY MR. KO:    16:37:43
23     Q.   Okay.  And the idea of using    16:37:48
24  this chargeback information was also to make    16:37:49
25  sure your customers/wholesale distributors    16:37:52

Page 371

1  were not also selling Mallinckrodt drugs to    16:37:56
2  these pharmacies or physicians, correct?    16:38:00
3     A.   Yes.    16:38:02
4     Q.   Okay.  And again, you had this    16:38:03
5  idea, or at least you discussed the    16:38:07
6  possibility of obtaining this data, as of    16:38:11
7  November 2009, correct?    16:38:14
8     A.   Yes.    16:38:15
9     Q.   And also turning back to some    16:38:17
10  of the e-mails that we had discussed    16:38:20
11  previously in 2007, you were -- it's accurate    16:38:23
12  to say that Mallinckrodt employees knew as of    16:38:28
13  2007 how to utilize chargeback data to    16:38:31
14  understand where pills were going after they    16:38:34
15  were shipped to Mallinckrodt customers,    16:38:37
16  correct?    16:38:39
17       MR. O'CONNOR:  Object to form.    16:38:39
18       THE WITNESS:  Yes.    16:38:39
19       (Mallinckrodt-Harper Exhibit 23    16:38:51
20  marked for identification.)    16:38:51
21  QUESTIONS BY MR. KO:    16:38:51
22     Q.   Okay.  I'm going to hand you a    16:38:52
23  copy of what will be marked as Harper    16:38:53
24  Exhibit 23.    16:38:55
25       And for the record, this    16:39:02

Page 372

1  document ends in Bates 421850.    16:39:03
2       And this is an e-mail chain    16:39:21
3  from the July 21, 2000 time period regarding    16:39:23
4  Mallinckrodt suspicious order monitoring and    16:39:29
5  the Harvard Drug license suspension.    16:39:30
6       Do you see that?    16:39:32
7     A.   I'm reading the e-mail,    16:39:33
8  please --    16:39:41
9     Q.   Sure.    16:39:41
10     A.   -- so that I can understand the    16:39:41
11  whole context.    16:39:41
12     Q.   Absolutely.    16:39:41
13       And my questions will relate to    16:40:02
14  just the first page of this e-mail.    16:40:04
15     A.   All right.  I'm ready.  Thank    16:40:06
16  you.    16:40:07
17     Q.   Okay.  On July 21, 2010,    16:40:07
18  Mr. Ratliff asks you whether or not, quote,    16:40:14
19  "As an aside, are we capable of knowing our    16:40:19
20  customers' customers with any specificity?"    16:40:22
21  end quote.    16:40:27
22       Did I read that correctly?    16:40:28
23     A.   Yes.    16:40:28
24     Q.   And you respond that same day    16:40:29
25  that -- well, why don't you read the first    16:40:30

Page 373

1  sentence of that e-mail response.    16:40:35
2     A.   "Using chargeback data, it is    16:40:39
3  indeed possible to know our customer's    16:40:41
4  customer with great specificity."    16:40:46
5     Q.   Okay.  And do you have any    16:40:49
6  reason to doubt that you in fact sent that    16:40:50
7  e-mail to Mr. Ratliff on July 21, 2010?    16:40:51
8     A.   No.    16:40:54
9     Q.   And so it's accurate to state    16:40:55
10  that as of July 2010, you understood that you    16:40:58
11  could utilize chargeback data to understand    16:41:03
12  with great specificity knowledge of your    16:41:07
13  customer's customer; is that accurate?    16:41:11
14     A.   Knowledge of who our customer    16:41:14
15  was shipping to, yes.    16:41:20
16     Q.   Okay.  So just so the record is    16:41:21
17  clear, yes or no:  Is it accurate to state    16:41:25
18  that as of July 2010, you understood that you    16:41:26
19  could utilize chargeback data to understand    16:41:32
20  with great specificity where -- where your    16:41:34
21  pills were going after you shipped to the    16:41:38
22  distributor?    16:41:42
23       MR. O'CONNOR:  Object to form.    16:41:42
24       THE WITNESS:  Yes.    16:41:43
25

Page 374

```
1    QUESTIONS BY MR. KO:                16:41:43
2        Q.   You can set that aside.       16:41:46
3            (Mallinckrodt-Harper Exhibit 24   16:41:48
4    marked for identification.)            16:41:49
5    QUESTIONS BY MR. KO:                   16:41:49
6        Q.   This is a copy of what will be   16:41:59
7    marked as Harper Exhibit 24.           16:42:00
8            And this ends, for the record,   16:42:09
9    ends in Bates 280607.                  16:42:09
10           And this appears to be a       16:42:31
11   November 1, 2010 letter that you send to Paul   16:42:32
12   Kleissle, correct?                     16:42:38
13       A.   Yes.                          16:42:39
14       Q.   And you'll see later on there's   16:42:40
15   the signature block of you on the second   16:42:43
16   page.                                  16:42:46
17       A.   Yes.                          16:42:47
18       Q.   And is it accurate to say that   16:42:47
19   you're sending him this correspondence on   16:42:49
20   November 1, 2010, to describe to him what you   16:42:52
21   can utilize based on the chargeback   16:42:56
22   information that you are -- that you have   16:42:59
23   been reviewing in that 2010 time period?   16:43:00
24       A.   Yes.                          16:43:03
25       Q.   Okay.  That's all I have on   16:43:04
```

Page 375

```
1    that document.                         16:43:14
2            Now, in connection with running   16:43:15
3    chargeback reports, is it also accurate to   16:43:28
4    say that indirect match reports were reports   16:43:33
5    that you asked to be run to understand the   16:43:40
6    downstream details of a transaction?   16:43:44
7            MR. O'CONNOR:  Object to form.   16:43:46
8            THE WITNESS:  I don't          16:43:47
9        understand the term "indirect match   16:43:49
10       report."                           16:43:50
11   QUESTIONS BY MR. KO:                   16:43:52
12       Q.   Okay.  How about -- let's --   16:43:52
13   I'm sorry, let's go back to that document   16:43:55
14   then that we just set aside.           16:43:58
15       A.   All right.                    16:43:59
16       Q.   And in the first sentence of   16:44:00
17   this correspondence to Mr. Kleissle, you   16:44:09
18   ask -- or you indicate, "In an ongoing effort   16:44:12
19   to enhance our existing suspicious order   16:44:15
20   monitoring program and in accordance with 21   16:44:18
21   CFR 1301.74, Mallinckrodt has begun the   16:44:22
22   process of reviewing sales to indirect end   16:44:26
23   user customers, open parens, retail   16:44:30
24   pharmacies, close parens, but geographic   16:44:34
25   region.  This analysis is accomplished by a   16:44:36
```

Page 376

```
1    review of chargeback data."            16:44:39
2            Did I read that correctly?     16:44:41
3        A.   Yes.                          16:44:41
4        Q.   Okay.  And understanding that   16:44:41
5    you don't recall the use of the word   16:44:45
6    "indirect match report," you at least in this   16:44:47
7    correspondence refer to retail pharmacies as   16:44:53
8    indirect end user customers, correct?   16:44:55
9        A.   Yes.                          16:44:58
10       Q.   Okay.  Do you recall a time in   16:45:00
11   which -- and you state to Mr. Kleissle that   16:45:03
12   you can do this and accomplish this by   16:45:07
13   reviewing chargeback data, correct?    16:45:11
14       A.   Yes.                          16:45:12
15       Q.   Okay.  And so do you recall a   16:45:12
16   time in which you had asked for reports to be   16:45:15
17   run on indirect end user customers?    16:45:20
18       A.   Yes.                          16:45:24
19       Q.   Okay.  And these -- you can set   16:45:25
20   that aside.                            16:45:28
21           And in these reports -- you ran   16:45:28
22   certain reports or had asked certain reports   16:45:37
23   to be run in connection with certain   16:45:39
24   customers that you were shipping drugs to,   16:45:44
25   including Harvard, for example, correct?   16:45:47
```

Page 377

```
1            MR. O'CONNOR:  Object to form.   16:45:51
2            THE WITNESS:  Yes.             16:45:51
3    QUESTIONS BY MR. KO:                   16:45:53
4        Q.   By the way, when asking others   16:46:04
5    to run reports about indirect end users, did   16:46:06
6    you have a name for these reports, or did you   16:46:13
7    call them by a specific moniker?       16:46:15
8        A.   I believe chargeback reports.   16:46:19
9        Q.   Okay.                         16:46:21
10       A.   Yes.                          16:46:21
11       Q.   So that's helpful.            16:46:22
12           So you -- is it accurate to say   16:46:23
13   that identification of pills that end up --   16:46:28
14   end up at retail pharmacies was accomplished   16:46:35
15   through running chargeback reports?    16:46:38
16       A.   Yes.                          16:46:41
17       Q.   Okay.  And you performed       16:46:41
18   chargeback reports in connection with various   16:46:46
19   distributors that had their license suspended   16:46:50
20   by the DEA, including Harvard, for example,   16:46:52
21   correct?                               16:46:54
22           MR. O'CONNOR:  Object to form.   16:46:55
23           THE WITNESS:  Yes.             16:46:56
24   QUESTIONS BY MR. KO:                   16:46:56
25       Q.   Okay.  And also Masters and   16:46:57
```

Page 378

1  Sunrise and Cedardale?                    16:46:59
2          MR. O'CONNOR:  Same objection.    16:47:05
3          THE WITNESS:  Yes.                16:47:06
4  QUESTIONS BY MR. KO:                      16:47:06
5      Q.  Okay.  Did you also run           16:47:06
6  chargeback reports for customers of       16:47:08
7  KeySource?                                16:47:09
8      A.  Yes.                              16:47:11
9      Q.  Okay.  So is it fair to say       16:47:14
10 that you had chargeback reports run for   16:47:18
11 customers of KeySource, Cedardale, Masters,  16:47:24
12 Sunrise and Harvard?                      16:47:29
13     A.  Yes.                              16:47:30
14     Q.  And this was all in the 2009 to   16:47:30
15 2010 time period?                         16:47:32
16     A.  I'm terrible with my years,       16:47:33
17 but -- I don't know the year.             16:47:36
18     Q.  Okay.                             16:47:40
19     A.  The years.                        16:47:40
20     Q.  Generally speaking, was it --     16:47:40
21 do you recall these reports being run in the  16:47:42
22 2009 through 2011 time period?            16:47:45
23     A.  Yes.                              16:47:47
24     Q.  Okay.  Now, the chargeback        16:47:52
25 reports you could distinguish by Mallinckrodt  16:47:58

Page 379

1  drug, correct?                            16:48:02
2          MR. O'CONNOR:  Objection.         16:48:04
3          THE WITNESS:  Yes.                16:48:04
4  QUESTIONS BY MR. KO:                      16:48:05
5      Q.  In other words, you could         16:48:05
6  determine -- you could sort by all oxy 15s or  16:48:06
7  30s that Mallinckrodt was sending to a    16:48:13
8  particular customer, correct?             16:48:14
9      A.  Yes.                              16:48:16
10         (Mallinckrodt-Harper Exhibit 25   16:48:19
11     marked for identification.)           16:48:20
12 QUESTIONS BY MR. KO:                      16:48:20
13     Q.  Okay.  I'm going to hand you a    16:48:20
14 copy of what's going to be marked as      16:48:22
15 Exhibit 25.                               16:48:25
16         And I will represent to counsel   16:48:30
17 and for the record that this is a         16:48:32
18 demonstrative chart that we have prepared  16:48:33
19 based on chargeback data that you had pulled  16:48:36
20 for Harvard.                              16:48:39
21         And we can refer to it in a       16:48:48
22 moment, but again, to be clear, you had run  16:48:51
23 chargeback reports in connection with     16:48:55
24 customers of Harvard Drug, correct?       16:48:57
25     A.  Yes.                              16:48:59

Page 380

1      Q.  And do you recall who you had     16:48:59
2  perform that analysis?                    16:49:07
3      A.  No.                               16:49:08
4      Q.  Either Ms. Spaulding or           16:49:08
5  Ms. Rowley-Kilper?                        16:49:10
6      A.  It may have been Ms. Neely.       16:49:11
7      Q.  Ms. Neely, okay.                  16:49:13
8          Now, I'll represent for the      16:49:16
9  record that this is a summary of the      16:49:19
10 chargeback information that appears on that  16:49:20
11 report.  And if you look at the bottom row  16:49:28
12 total, there appears to be 12,487 total    16:49:33
13 orders recorded in which Harvard Drug sold  16:49:43
14 controlled substances.                    16:49:48
15         Do you see that?                  16:49:49
16     A.  Yes.                              16:49:49
17     Q.  So I'll represent to you for      16:49:50
18 the record that the chargeback data that you  16:49:52
19 had run for Harvard Drug reported that there  16:49:58
20 were 12,000 -- a total of 12,487          16:49:59
21 transactions.                             16:50:02
22         MR. O'CONNOR:  Counsel, I'm       16:50:03
23     going to object.                      16:50:03
24         Just to be clear, are you         16:50:04
25     saying that this is a document that   16:50:06

Page 381

1  you've prepared based on produced         16:50:08
2      data?                                 16:50:11
3          MR. KO:  Based on produced        16:50:11
4      data, the Bates number which appears  16:50:13
5      at the top of this.                   16:50:14
6          MR. O'CONNOR:  Okay.  So the      16:50:15
7      fact that the Bates number is at the  16:50:15
8      top here does not mean that this is a  16:50:17
9      copy of the document we produced?     16:50:18
10         MR. KO:  That's -- that's         16:50:20
11     right.                                16:50:22
12         MR. O'CONNOR:  Okay.  Thank       16:50:22
13     you.                                  16:50:24
14         MR. KO:  This itself is not a     16:50:24
15     copy of a document that you produced  16:50:27
16     but is instead based on the          16:50:29
17     information that is -- appears on this  16:50:30
18     Bates number.                         16:50:32
19         MR. O'CONNOR:  Thank you.         16:50:32
20 QUESTIONS BY MR. KO:                      16:50:33
21     Q.  Now, I'll represent to you that   16:50:36
22 this Bates number -- or this document     16:50:38
23 reflects that Harvard Drug was doing business  16:50:44
24 as First Veterinary Supply.               16:50:48
25         Do you recall ever being made     16:50:51

Page 382

1  aware of certain transactions or pills that          16:50:56
2  were being sent to a First Veterinary Supply?        16:50:58
3        A.   No.                                        16:51:00
4        Q.   Okay.  Would you agree with me            16:51:02
5  that sending pills to a -- prescription              16:51:03
6  opioids to a veterinarian clinic would be            16:51:07
7  suspicious or potentially suspicious?                16:51:14
8            MR. O'CONNOR:  Object to form.             16:51:15
9            THE WITNESS:  That depends on              16:51:16
10       the product and the quantities.                16:51:18
11 QUESTIONS BY MR. KO:                                 16:51:19
12       Q.   Okay.  Do you recall shipping             16:51:19
13 prescription opioids to vet clinics?                 16:51:23
14       A.   I cannot say if we did or did             16:51:25
15 not.                                                 16:51:26
16       Q.   Okay.  Harvard Drug -- do you             16:51:27
17 recall when Harvard Drug had its license             16:51:41
18 suspended by the DEA?                                16:51:44
19       A.   2010 or before, around that               16:51:45
20 time.                                                16:51:51
21       Q.   Okay.  And they had their                 16:51:52
22 license suspended because of diversion of            16:51:54
23 pills -- diversion of pills by certain               16:51:58
24 customers that they sold to, correct?                16:52:05
25           MR. O'CONNOR:  Object to form.             16:52:07

Page 383

1            THE WITNESS:  Yes.                         16:52:08
2  QUESTIONS BY MR. KO:                                 16:52:10
3        Q.   Okay.  And would you agree with           16:52:10
4  me that First Vet Supply is not a physician          16:52:25
5  or a pain clinic?                                    16:52:30
6        A.   I don't know their business              16:52:32
7  model.  I don't -- is their DEA registration         16:52:34
8  number the same as Harvard Drug Group?               16:52:38
9        Q.   I believe that to be the case,            16:52:42
10 actually.                                            16:52:44
11       A.   So, many of our distributors             16:52:44
12 had d/b/a second lines, and that's a -- my           16:52:54
13 understanding is a legal term implying the           16:52:57
14 organization of a corporation.  So I only            16:52:59
15 knew this customer as Harvard Drug.                  16:53:01
16       Q.   Okay.  Setting aside the name,           16:53:03
17 did you understand that a large percentage of        16:53:10
18 drugs sold by Harvard Drug were going to             16:53:15
19 Florida?  And in particular, I direct you to         16:53:18
20 the percentages that appear in the middle of         16:53:28
21 the screen that show Florida percentage.             16:53:24
22       A.   So total POs doesn't tell me             16:53:28
23 number of drugs.  They could have been               16:53:30
24 purchase orders for a hundred drugs or 10,000        16:53:33
25 dosage units, so I can't -- I don't have             16:53:35

Page 384

1  enough information to answer that question.          16:53:37
2        Q.   Okay.  But if you look at                 16:53:39
3  Florida percent POs -- do you see that?              16:53:40
4        A.   I do.                                     16:53:43
5        Q.   Okay.  And is that -- in the              16:53:44
6  chargeback data, you had been able to                16:53:47
7  determine what percentage of purchase orders         16:53:51
8  went to Florida, correct?                            16:53:55
9        A.   No.                                       16:53:56
10       Q.   You did not?                              16:54:01
11       A.   No.                                       16:54:02
12       Q.   Okay.  Wasn't it the case that           16:54:02
13 through the chargeback data you knew you             16:54:08
14 could understand, as we discussed earlier,           16:54:11
15 where the pills that you sold to the                 16:54:13
16 distributors were going?                             16:54:16
17       A.   Yes, but in this context, I              16:54:17
18 believe the purchase order to be the purchase        16:54:20
19 order from Harvard to Mallinckrodt as the           16:54:22
20 supplier, not forward through the supply             16:54:25
21 chain.                                               16:54:27
22       Q.   Okay.  So it's your                       16:54:27
23 understanding that this is just -- well,             16:54:28
24 Harvard Drug, do you know where they were            16:54:32
25 located?                                             16:54:35

Page 385

1        A.   I believe Wisconsin.                      16:54:35
2        Q.   Okay.  I think they were in               16:54:37
3  Michigan, but somewhere in the Midwest.              16:54:40
4        A.   All right.                                16:54:42
5        Q.   So you're saying that this is             16:54:42
6  the percentage of initial pills that go to           16:54:43
7  the distributor?                                     16:54:47
8        A.   Again, these are purchase                16:54:48
9  orders.  They could have been for 100 pills          16:54:51
10 or a million pills.  I don't have enough             16:54:55
11 information to answer the question.                  16:54:57
12       Q.   Okay.  Turn to the second page           16:54:58
13 of this document.  And so these -- these             16:55:06
14 columns, by the way, are taken straight from         16:55:14
15 the -- I'll represent to you that they're            16:55:16
16 taken straight from the chargeback reports           16:55:18
17 that are reflected by this Bates number.             16:55:22
18           And if you see on the far                 16:55:25
19 right-hand side above the oxy 15 and oxy 30          16:55:27
20 sections, do you see the reference to UOM?           16:55:30
21       A.   I do.                                     16:55:34
22       Q.   And what's your understanding            16:55:34
23 of UOM?                                              16:55:35
24       A.   Unit of measure.                          16:55:36
25       Q.   Okay.  And would that actually           16:55:38

Page 386

1    be synonymous with, for example, a pill?    16:55:40
2        A.    Yes.                                16:55:44
3        Q.    So that's the actual amount of      16:55:45
4    pills that are being shipped for that        16:55:47
5    particular order, correct?                   16:55:51
6        A.    It -- this is a monthly total,      16:55:53
7    so, yes, if we're -- yes, I'm sorry, I didn't 16:55:59
8    have the correlation to -- that a PO equals   16:56:04
9    one month in -- I'm just not familiar with    16:56:08
10   the spreadsheet, so, yes.                     16:56:10
11       Q.    Yeah, fair enough.                   16:56:12
12             And on the -- on this document       16:56:13
13   there's an indication also of Florida         16:56:18
14   percentage sales, quantity government UOM.    16:56:21
15             Do you see that?                     16:56:24
16       A.    Yes.                                 16:56:24
17       Q.    Do you recall that particular        16:56:25
18   data field in the chargeback information?     16:56:28
19       A.    Yes.                                 16:56:30
20       Q.    Okay.  And so does that reflect      16:56:31
21   the percentage of pills that went to          16:56:33
22   downstream customers of Mallinckrodt?         16:56:37
23             MR. O'CONNOR:  Object to form.       16:56:40
24   QUESTIONS BY MR. KO:                           16:56:45
25       Q.    In other words -- let me ask it      16:56:46

Page 387

1    a different way.                              16:56:47
2             Does this percentage reflect         16:56:47
3    the total percentage of pills relative to the 16:56:49
4    total order that ended up in Florida?         16:56:52
5             MR. O'CONNOR:  Object to form.       16:56:55
6             THE WITNESS:  Yes.                    16:56:55
7    QUESTIONS BY MR. KO:                           16:56:56
8        Q.    Okay.  So you'll see that the        16:56:56
9    summary indicates below that from the fourth  16:57:00
10   quarter 2008 through the second quarter of    16:57:04
11   2010, that at least with respect to oxy 15s,  16:57:06
12   90.5 percent of Mallinckrodt pills that were  16:57:13
13   sold to Harvard ended up in Florida.          16:57:17
14             Do you see that?                     16:57:20
15       A.    Yes.                                 16:57:21
16       Q.    Okay.  And likewise with            16:57:22
17   respect to oxy 30s during that same time      16:57:23
18   period, 88 percent ended up in Florida,       16:57:27
19   correct?                                       16:57:31
20       A.    Yes.                                 16:57:31
21       Q.    Okay.  Was it suspicious to you     16:57:31
22   at the time that such a disproportionate      16:57:37
23   percentage of pills were ending up in         16:57:41
24   Florida?                                       16:57:43
25             MR. O'CONNOR:  Object to form.       16:57:43

Page 388

1             THE WITNESS:  So this report         16:57:44
2    that you extracted from our production         16:57:48
3    information, it is -- it is data that          16:57:51
4    for certain came to me?                        16:57:54
5    QUESTIONS BY MR. KO:                           16:57:57
6        Q.    Uh-huh.                              16:57:59
7        A.    It is?                               16:58:00
8        Q.    No.  Yes, this is -- this is         16:58:01
9    data based on chargeback reports that were    16:58:03
10   requested at the direction of you, correct.   16:58:07
11       A.    I -- I don't know.                   16:58:11
12       Q.    Okay.  That wasn't my question.     16:58:15
13       A.    Okay.                                16:58:17
14       Q.    I'll represent to you that          16:58:17
15   these chargeback reports were run in          16:58:18
16   connection with your investigation of where   16:58:21
17   your pills were going.                         16:58:24
18             So my question to you simply         16:58:25
19   is:  Were you aware at the time -- or is it   16:58:28
20   suspicious -- separate and apart from the     16:58:32
21   process of running this report --            16:58:34
22       A.    Uh-huh.                              16:58:36
23       Q.    -- is it suspicious to you that     16:58:36
24   90 percent of all pills that you shipped to   16:58:40
25   Harvard Drug end up going to Florida?         16:58:44

Page 389

1             MR. O'CONNOR:  Object to form.       16:58:47
2             THE WITNESS:  Yes, it appears        16:58:48
3    to be a disproportionate percentage of        16:59:24
4    this product going into Florida.              16:59:28
5    QUESTIONS BY MR. KO:                           16:59:30
6        Q.    Okay.  Thank you for waiting.       16:59:30
7        A.    It's all right.                      16:59:31
8        Q.    And based on this review of         16:59:32
9    Harvard chargeback information, did you also  16:59:41
10   conclude that Harvard's suspicious order      16:59:45
11   monitoring system was inadequate?            16:59:47
12       A.    Can you tell me when -- I don't     16:59:52
13   know when Harvard was suspended.  So was this 16:59:54
14   after their suspension that I had the report  16:59:56
15   pulled?                                        16:59:59
16       Q.    Well, I would say separate and      16:59:59
17   apart from these numbers --                   17:00:01
18       A.    Okay.                                17:00:04
19       Q.    -- did you review chargeback        17:00:04
20   data to make the determination of whether or  17:00:07
21   not Harvard's suspicious order monitoring     17:00:10
22   system was effective?                         17:00:12
23             MR. O'CONNOR:  Object to form.       17:00:14
24             THE WITNESS:  I don't know.  I       17:00:14
25   don't know how to answer the question.        17:00:20

Page 390

QUESTIONS BY MR. KO:                              17:00:23

Q.   Okay.  Do you recall a period        17:00:23
of time, or do you recall ever reviewing the    17:00:24
suspicious order monitoring systems of your     17:00:26
distributors?                                    17:00:29

A.   Of our distributors?                 17:00:29

Q.   Yes.                                  17:00:32

A.   To their downstream customers?       17:00:33

Q.   Correct.                             17:00:35

A.   Yes.                                  17:00:35

Q.   In other words, Mallinckrodt        17:00:36
was the registrant in the CSA that had duties   17:00:38
to maintain effective controls against          17:00:42
diversion, but so too were distributors as      17:00:44
well, correct?                                   17:00:46

MR. O'CONNOR:  Object to form.      17:00:47

THE WITNESS:  Correct.              17:00:47
Correct.                                   17:00:47

QUESTIONS BY MR. KO:                              17:00:48

Q.   So distributors like both           17:00:48
Harvard or Sunrise, including the major          17:00:53
distributors like ABC, McKesson and Cardinal,   17:00:56
all had duties to maintain effective controls   17:00:59
against diversion, correct?                      17:01:02

MS. KVESELIS:  Object to form.      17:01:04

Page 391

THE WITNESS:  Correct.              17:01:05

QUESTIONS BY MR. KO:                              17:01:06

Q.   And all these registrants had       17:01:06
duties to implement and design an effective     17:01:08
suspicious order monitoring program, correct?   17:01:11

MR. O'CONNOR:  Object to form.      17:01:12

THE WITNESS:  That guards           17:01:13
against -- yes, guards against              17:01:16
diversion, yes.                             17:01:18

QUESTIONS BY MR. KO:                              17:01:20

Q.   And was there a period of time      17:01:20
in which Mallinckrodt decided to perform an     17:01:21
audit or a review of your distributors' SOM     17:01:25
programs?                                        17:01:32

A.   Yes.                                  17:01:32

Q.   And during that review and          17:01:32
based on that review, did you make              17:01:33
determinations as to whether or not you would   17:01:36
continue to ship to certain distributors?       17:01:38

A.   Yes.                                  17:01:40

Q.   And one of the reasons for          17:01:40
which you decided to stop shipping to certain   17:01:46
distributors was as a result of pulling         17:01:49
chargeback information in which you could        17:01:52
identify details of where your pills were       17:01:54

Page 392

going after you shipped them to the             17:01:57
distributor, correct?                            17:01:59

MR. O'CONNOR:  Object to form.      17:02:00

THE WITNESS:  That's one of the     17:02:00
reasons that pointed us to a certain        17:02:04
distributor, to go and visit them,          17:02:06
yes.                                        17:02:08

QUESTIONS BY MR. KO:                              17:02:08

Q.   Okay.  And some of this             17:02:09
chargeback data, by the way, some of the        17:02:10
chargeback information was provided to you by    17:02:13
certain distributors, correct?                   17:02:15

MR. O'CONNOR:  Object to form.      17:02:17

THE WITNESS:  No, this is our       17:02:17
information.                                17:02:20

QUESTIONS BY MR. KO:                              17:02:20

Q.   Okay.  In 2010 you performed --     17:02:21
at some point in 2010 you performed some        17:02:36
audits of your distributors, correct?            17:02:39

A.   Yes.                                  17:02:41

Q.   And you recall that these           17:02:43
audit -- in these audits you actually went to   17:02:46
the -- your customer and visited some of        17:02:51
their facilities?                                17:02:53

A.   Yes.                                  17:02:55

Page 393

Q.   And you went to -- I believe        17:02:55
you performed on-site audits of at least        17:02:58
Masters and KeySource; is that correct?          17:03:02

A.   Correct.                             17:03:04

Q.   Okay.  And these -- what was        17:03:04
the purpose of performing these on-site         17:03:06
audits?                                          17:03:10

A.   So we had reviewed -- the          17:03:11
purpose was to review their suspicious order    17:03:14
monitoring and understand which -- what due     17:03:19
diligence they perform when reviewing their     17:03:21
customers.                                       17:03:24

(Mallinckrodt-Harper Exhibit 26     17:03:26
marked for identification.)                 17:03:27

QUESTIONS BY MR. KO:                              17:03:27

Q.   Okay.  I'm going to hand you a      17:03:27
copy of what's going to be marked as Harper     17:03:28
Exhibit 26.                                      17:03:30

And for the record, this is --     17:03:33
ends in Bates 48430.                             17:03:34

I just have some general            17:03:47
questions about this, so feel free to consult   17:03:49
the document if you need to.  But I just want   17:03:51
to know whether or not this reflects the        17:03:54
written report of your on-site audit to         17:03:56

Page 394

1  Masters as of December 7, 2010?                17:04:00
2      A.   Yes.                                  17:04:02
3      Q.   And so as you described, one of       17:04:03
4  the purposes of performing this audit was to   17:04:04
5  review Masters' suspicious order monitoring    17:04:08
6  system; is that correct?                       17:04:11
7      A.   Yes.                                  17:04:11
8      Q.   Okay.  And do you recall              17:04:12
9  actually going out to Masters Pharmaceutical   17:04:17
10 located in Cincinnati, Ohio?                   17:04:19
11     A.   Yes.                                  17:04:20
12     Q.   And you went there with               17:04:20
13 Mr. Ratliff, correct?                          17:04:21
14     A.   Yes.                                  17:04:22
15     Q.   And at the time you -- there          17:04:23
16 was some certain with respect to Masters       17:04:27
17 Pharmaceutical activities, and so that         17:04:30
18 prompted the need for you and Mr. Ratliff to   17:04:32
19 go visit; is that accurate?                    17:04:35
20     A.   Yes.                                  17:04:40
21     Q.   Okay.  And by the way, Masters        17:04:40
22 Pharmaceutical also had its license suspended  17:04:42
23 by the DEA at some point, correct?             17:04:43
24     A.   Yes.                                  17:04:44
25     Q.   Okay.  I believe that was 2014,       17:04:44

Page 395

1  but it related -- is it consistent with your   17:04:49
2  understanding that it related to activities    17:04:51
3  regarding their distribution of prescription   17:04:53
4  opioids in the 2008 through 2014 time period?  17:04:56
5      MR. O'CONNOR:  Object to form.             17:04:59
6      THE WITNESS:  I don't know the             17:04:59
7      date of the covered conduct.               17:05:01
8  QUESTIONS BY MR. KO:                           17:05:04
9      Q.   Okay.  Was there ever a time          17:05:04
10 when you ceased or put a temporary hold on     17:05:10
11 shipping orders to Masters?                     17:05:13
12     A.   Yes.                                  17:05:14
13     Q.   And that occurred at some point       17:05:14
14 in the late 2010 time period, right?           17:05:16
15     A.   Yes.                                  17:05:18
16     Q.   And after this review, it was         17:05:18
17 determined that they were -- it was            17:05:24
18 sufficient to resume shipments to Masters; is  17:05:28
19 that fair to say?                              17:05:34
20     A.   No.                                   17:05:34
21     Q.   Or did you -- at the time you         17:05:34
22 ceased sending shipments to Masters in late    17:05:36
23 2010, did you ever resume shipments to         17:05:39
24 Masters?                                       17:05:41
25     A.   No.                                   17:05:42

Page 396

1      Q.   Okay.                                 17:05:43
2      A.   It's my understanding that they       17:05:44
3  have recently been reissued a DEA              17:05:47
4  registration, so I don't know the current      17:05:49
5  status, but from 2010 forward, no.             17:05:50
6      Q.   Fair enough.                          17:05:53
7      And in addition to the on-site             17:05:54
8  audit of Masters, you had done an on-site      17:06:00
9  audit of KeySource as well, correct?           17:06:03
10     A.   Yes.                                  17:06:06
11     Q.   Do you recall any other on-site       17:06:06
12 audits that you were -- you participated in?   17:06:09
13     A.   Sunrise, previously, and then         17:06:10
14 there were others subsequently.  But at this   17:06:12
15 time I did not go to Cedardale; several of my  17:06:15
16 colleagues did.                                17:06:19
17     Q.   Got it.                               17:06:20
18     So other than on-site audits              17:06:20
19 performed of Cedardale, KeySource, Sunrise     17:06:23
20 and Masters, are you aware of any other        17:06:28
21 on-site audits that the SOM team conducted?    17:06:30
22     A.   Ever?                                 17:06:33
23     Q.   From in the 2009 through 2012         17:06:35
24 time period.                                   17:06:38
25     A.   Yes.                                  17:06:39

Page 397

1      Q.   Okay.  Which additional on-site       17:06:40
2  audits did you perform?                        17:06:44
3      A.   We went to AmerisourceBergen,         17:06:45
4  McKesson, Cardinal, and I believe HD Smith,    17:06:49
5  although -- yes, HD Smith, yes.                17:06:56
6      Q.   And again, the purpose of these       17:06:59
7  on-site audits was to, among other things,     17:07:01
8  examine and understand their SOM program?      17:07:04
9      A.   Yes.                                  17:07:05
10     (Mallinckrodt-Harper Exhibit 27            17:07:19
11     marked for identification.)                17:07:19
12 QUESTIONS BY MR. KO:                           17:07:05
13     Q.   Okay.  Now, turning to -- you         17:07:05
14 can set that aside, and I'm going to hand you  17:07:15
15 a copy of what will be marked as Exhibit 27.   17:07:17
16     And for the record, this ends             17:07:23
17 in Bates 970734.                               17:07:25
18     And this appears to be a letter           17:07:38
19 you drafted to Masters on September 21, 2011,  17:07:40
20 correct?                                       17:07:46
21     A.   Yes.                                  17:07:46
22     Q.   Okay.  And now, you had               17:07:46
23 testified that you ceased shipments to         17:07:48
24 Masters at the end of 2010; is that correct?   17:07:52
25     A.   Approximate time.  I'm not            17:07:55

Page 398

1 certain.                              17:07:57
2     Q.    But despite -- well, you     17:07:57
3 stopped shipping to them, but you are still    17:08:02
4 undergoing a review of their SOM program; is    17:08:05
5 that correct?                         17:08:08
6     A.    At their request, yes.       17:08:08
7     Q.    At their request. Okay.      17:08:09
8         And on -- this culminates in a    17:08:11
9 letter on September 21, 2011, from you to    17:08:15
10 Mr. Corona, who I believe is the president of    17:08:20
11 Masters Pharmaceutical.               17:08:24
12        Is that consistent with your    17:08:24
13 understanding?                        17:08:25
14     A.    I don't know his title. He was    17:08:25
15 an executive, yes.                    17:08:28
16     Q.    Okay. And you indicate that,    17:08:28
17 among other things, "We are not comfortable    17:08:30
18 that your suspicious order monitoring program    17:08:33
19 is robust enough to identify suspicious    17:08:34
20 orders of controlled substances to ensure    17:08:37
21 that the products are being used for    17:08:39
22 legitimate medicinal purposes."       17:08:42
23        Did I read that correctly?     17:08:46
24     A.    Yes.                       17:08:46
25     Q.    And you continue that "As    17:08:46

Page 399

1 parted of our SOM and through evaluation of    17:08:48
2 customer buying patterns and chargeback data,    17:08:50
3 we have identified unusual purchasing    17:08:53
4 patterns by some of your customers for    17:08:54
5 oxycodone 15-milligram and 30-milligram    17:08:56
6 tablets."                             17:09:01
7        Did I read that correctly?     17:09:02
8     A.    Yes.                       17:09:02
9     Q.    So this is an example of how    17:09:03
10 you have utilized chargeback data that    17:09:05
11 Mallinckrodt can acquire to identify certain    17:09:09
12 customer buying patterns, among other things,    17:09:15
13 correct?                             17:09:17
14     A.    Correct.                   17:09:18
15     Q.    And also to identify unusual    17:09:18
16 purchasing patterns by some of Masters'    17:09:22
17 customers, correct?                   17:09:24
18        MR. O'CONNOR: Object to form.    17:09:25
19        THE WITNESS: Correct.          17:09:25
20 QUESTIONS BY MR. KO:                   17:09:26
21     Q.    Okay. And based on that    17:09:26
22 review, you indicate that you are not    17:09:29
23 prepared, Mallinckrodt is not prepared, to    17:09:33
24 resume sales of controlled substances,    17:09:35
25 correct?                             17:09:37

Page 400

1     A.    Yes.                       17:09:37
2     Q.    Okay. So you've done an    17:09:38
3 analysis of their SOM program, and you    17:09:39
4 conclude that Mallinckrodt is not comfortable    17:09:43
5 making any sales to them?             17:09:46
6     A.    Yes.                       17:09:47
7     Q.    You can set that aside.       17:09:47
8        (Mallinckrodt-Harper Exhibit 28    17:10:00
9     marked for identification.)        17:10:01
10 QUESTIONS BY MR. KO:                   17:10:01
11     Q.    And I'm going to hand you a    17:10:01
12 copy of what'll be marked as Harper    17:10:02
13 Exhibit 28.                          17:10:05
14        And for the record, this ends    17:10:07
15 in Bates 289368.                     17:10:08
16        Does this letter look familiar    17:10:15
17 to you, Ms. Harper?                   17:10:18
18     A.    Yes. Yes.                  17:10:19
19     Q.    And this is -- in your ongoing    17:10:19
20 review of chargeback data, you are able to    17:10:21
21 identify through this letter that you send to    17:10:24
22 your customers a series of pharmacies that    17:10:30
23 your customers ship to that you will not be    17:10:36
24 processing chargeback requests for; is that    17:10:39
25 accurate?                            17:10:42

Page 401

1     A.    Yes, and it was also after    17:10:42
2 meeting with the distributors to understand    17:10:46
3 their due diligence at the pharmacy level,    17:10:48
4 yes.                                 17:10:50
5     Q.    Okay. And just so I understand    17:10:50
6 this document and just so the record is    17:10:51
7 clear, I understand you sent this same letter    17:10:53
8 to all 43 wholesale distributors of    17:10:57
9 Mallinckrodt as of October 17, 2011, correct?    17:11:04
10     A.    Yes.                       17:11:06
11     Q.    And so these were all your    17:11:06
12 customers that you shipped Mallinckrodt    17:11:07
13 opioids to, correct, during this time period?    17:11:12
14     A.    Well, specifically oxycodone 15    17:11:14
15 and 30, yes.                         17:11:16
16     Q.    Okay. So 40 -- there were 43    17:11:17
17 wholesale distributors as of October 17,    17:11:20
18 2011, that you had previously done business    17:11:24
19 with that was -- that you had shipped oxy 15s    17:11:27
20 and oxy 30s to, correct?             17:11:29
21        MR. O'CONNOR: Object to form.    17:11:31
22        THE WITNESS: You know, I'd    17:11:32
23     like to clarify my previous -- so    17:11:35
24     these were all wholesalers and    17:11:37
25     distributors of records as purchasing    17:11:39

Page 402

1    opioids, but they may not have          17:11:42
2    purchased oxy 15 and 30. They may       17:11:43
3    have purchased other opioids.           17:11:46
4        So that's the correct answer.       17:11:48
5    QUESTIONS BY MR. KO:                     17:11:50
6        Q.   Okay. Thank you for the        17:11:50
7    clarification.                           17:11:51
8        A.   You're welcome.                17:11:52
9        Q.   So then is it fair to say that 17:11:53
10   these 43 wholesalers and distributors   17:11:54
11   constituted all the wholesaler distributors 17:11:59
12   that Mallinckrodt did business with in terms 17:12:02
13   of shipping prescription opioids to?    17:12:05
14       A.   To the best of my              17:12:07
15   understanding, yes.                     17:12:08
16       Q.   Okay. And as we just discussed 17:12:09
17   a moment ago, "effective immediately,   17:12:17
18   Mallinckrodt will no longer process     17:12:21
19   chargebacks from distributor sales of   17:12:22
20   Mallinckrodt products to the pharmacies 17:12:25
21   identified on attachment 1 hereto."     17:12:27
22       And those pharmacies are of         17:12:29
23   course the ones listed in the second page of 17:12:31
24   this document, correct?                 17:12:33
25       A.   Yes.                           17:12:33

Page 403

1        Q.   Okay. And so you're not        17:12:34
2    necessarily saying here that these pharmacies 17:12:37
3    need to be placed on any kind of do not ship 17:12:40
4    list. You're simply telling these      17:12:43
5    distributors that you're not going to process 17:12:44
6    any chargeback requests related to these 17:12:46
7    particular pharmacies, correct?         17:12:49
8        MR. O'CONNOR: Object to form.       17:12:50
9        THE WITNESS: Yes.                   17:12:50
10   QUESTIONS BY MR. KO:                     17:12:51
11       Q.   Okay. And by the way, going    17:12:51
12   back to the first paragraph of this     17:12:53
13   correspondence, you indicate to your    17:12:57
14   customers at the end of the first paragraph 17:13:01
15   that, quote, "As a DEA registrant,      17:13:04
16   Mallinckrodt, LLC, a Covidien company,  17:13:06
17   Mallinckrodt, has developed and maintains a 17:13:10
18   comprehensive program that includes review of 17:13:12
19   customer orders, IMS data and chargeback 17:13:14
20   information and, where appropriate,      17:13:17
21   subsequent audits of distributors' suspicious 17:13:20
22   order monitoring programs," end quote.  17:13:22
23       Did I read that correctly?          17:13:26
24       A.   Yes.                           17:13:27
25       Q.   So we discussed the concept of 17:13:27

Page 404

1    Mallinckrodt doing audits of your customers' 17:13:28
2    SOM programs. I want to understand to what 17:13:33
3    extent you actually utilize IMS data to make 17:13:36
4    certain determinations as well.          17:13:39
5        A.   Okay. We used IMS data to look 17:13:41
6    at the prescribers of oxycodone 15s and 30s. 17:13:47
7    When we spoke to the distributors about these 17:13:53
8    potentially -- about these pharmacies that 17:13:57
9    displayed red flags, we asked the       17:14:00
10   distributors if they had a list of the top 17:14:04
11   prescribers that were writing RXs at these 17:14:06
12   pharmacies, and then that was a method of 17:14:09
13   comparison that we had to this IMS data list 17:14:12
14   of the top prescribers in the country.   17:14:14
15       Q.   Okay. And when do you recall    17:14:16
16   first utilizing the IMS data in connection 17:14:22
17   with this review of prescriber-level    17:14:26
18   information?                             17:14:28
19       A.   I don't know when it started.   17:14:28
20       Q.   Okay. Are you currently         17:14:30
21   utilizing IMS data in connection with your 17:14:34
22   suspicious order monitoring system?     17:14:36
23       A.   No.                            17:14:37
24       Q.   Okay. Other than for purposes   17:14:38
25   of sending out this letter to make      17:14:39

Page 405

1    distributors aware that chargeback requests 17:14:46
2    will not be honored, do you recall ever 17:14:48
3    utilizing IMS data in connection with SOM 17:14:51
4    activities?                              17:14:55
5        A.   Not that I recall.             17:14:55
6        Q.   You can -- I'd actually ask    17:14:56
7    that you keep that document in front of you, 17:15:08
8    but just probably you can refer to the back 17:15:09
9    because I want to ask you some questions 17:15:11
10   about these pharmacies.                  17:15:12
11       A.   All right.                     17:15:13
12       (Mallinckrodt-Harper Exhibit 29     17:15:15
13   marked for identification.)             17:15:16
14   QUESTIONS BY MR. KO:                     17:15:16
15       Q.   So I'm going to hand you a copy 17:15:16
16   of what will be marked as Harper Exhibit 29. 17:15:17
17       A.   Oh, my gosh.                    17:15:30
18       Q.   And for the record, this       17:15:32
19   document ends in Bates 32384 and is an e-mail 17:15:35
20   from Wayne Corona at Masters to you, dated 17:15:40
21   October 10 -- 20, 2011.                 17:15:46
22       Do you recall this e-mail?          17:15:49
23       A.   Yes.                           17:15:50
24       Q.   Okay. This is Masters'         17:15:51
25   response to the letter that you had sent to 17:15:55

Page 406

1    them that we just previously discussed that    17:15:59
2    reflects Exhibit 28; is that correct?    17:16:03
3        A.    I don't see -- we had a    17:16:04
4    separate letter addressed -- is this in your    17:16:11
5    pile?  I'm so confused.    17:16:16
6            Okay.  We had a separate letter    17:16:18
7    addressed to Masters.    17:16:23
8        Q.    Okay.  And in that separate    17:16:23
9    letter, you were identifying -- I believe    17:16:24
10   I've seen that, but in that separate letter    17:16:29
11   you identify these same pharmacies; is that    17:16:31
12   correct?    17:16:32
13       A.    Yes.  Yes.    17:16:32
14       Q.    So at some point before this    17:16:34
15   e-mail, you had obviously indicated to    17:16:38
16   Masters that there were certain pharmacies    17:16:40
17   that you weren't going to honor chargebacks    17:16:48
18   to, correct?    17:16:52
19       A.    Yes.    17:16:52
20       Q.    And I assume that there was a    17:16:52
21   separate e-mail sent to Masters, because at    17:16:54
22   the time you weren't doing business with    17:16:57
23   them?    17:16:59
24       A.    I believe this is the time we    17:17:00
25   notified Masters that we were going to    17:17:04

Page 407

1    discontinue sales of Mallinckrodt product to    17:17:07
2    Masters.    17:17:09
3        Q.    Okay.    17:17:10
4        A.    So it would have been a letter.    17:17:10
5            But we sent several letters to    17:17:11
6    Masters, and so I -- the content of each one    17:17:13
7    I can't attest to.    17:17:19
8        Q.    Sure.  Fair enough.    17:17:19
9            In any event, Mr. Corona,    17:17:20
10   who -- it does appear in the end of this    17:17:24
11   e-mail that he is the president of Masters    17:17:27
12   Pharmaceutical.    17:17:29
13           Do you see that?  I've    17:17:29
14   highlighted it.    17:17:38
15       A.    Yes, I do.  Yes.  Yes.    17:17:38
16       Q.    So you had sent some    17:17:39
17   correspondence to Jennifer Seiple at Masters,    17:17:42
18   and you had identified these pharmacies that    17:17:46
19   appear in attachment 1, correct?    17:17:49
20       A.    Yes.    17:17:50
21       Q.    Okay.  And he responds that "As    17:17:51
22   you can see, the dates of termination predate    17:18:03
23   your notification."    17:18:06
24           Do you see that?    17:18:08
25       A.    I do.    17:18:08

Page 408

1        Q.    Okay.  So is it accurate to say    17:18:09
2    that what he's trying to tell you is that for    17:18:12
3    each one of these pharmacies that you have    17:18:15
4    identified as being problematic, he has    17:18:16
5    indicated that Masters has already placed    17:18:21
6    them on Masters' termination list; is that    17:18:24
7    accurate?    17:18:28
8        A.    Yes.    17:18:28
9        Q.    Okay.  And for several of these    17:18:29
10   pharmacies, Masters had placed these    17:18:32
11   pharmacies on the termination list    17:18:36
12   approximately one year prior to you notifying    17:18:39
13   Masters of these problematic pharmacies; is    17:18:42
14   that accurate?    17:18:47
15       A.    Yes.    17:18:47
16       Q.    Okay.  Now, he goes on to    17:18:48
17   say -- and I recall earlier when we discussed    17:18:57
18   how you had indicated to Masters that they    17:19:01
19   had an inadequate SOM program.    17:19:04
20       A.    Yes.    17:19:06
21       Q.    Okay.  And he responds, quote,    17:19:07
22   "In your last two letters to Masters, you    17:19:11
23   have judged our SOMs to be inadequately    17:19:16
24   robust, yet somehow we identified these    17:19:18
25   accounts well before you, exclamation point."    17:19:20

Page 409

1            Did I read that correctly?    17:19:23
2        A.    Yes.    17:19:23
3        Q.    So, again, is it accurate to    17:19:24
4    state that Masters had identified one -- at    17:19:27
5    least one year prior, in some instances, some    17:19:30
6    pharmacies that were deemed to be    17:19:33
7    problematic, sufficient to place them on    17:19:34
8    their termination list before you were able    17:19:36
9    to make that same determination?    17:19:39
10           MR. O'CONNOR:  Object to form.    17:19:40
11           THE WITNESS:  Yes.    17:19:41
12   QUESTIONS BY MR. KO:    17:19:41
13       Q.    Okay.  And earlier we had --    17:19:42
14   you had testified that one of the reasons why    17:19:46
15   you had audited Masters was to review their    17:19:48
16   SOM program, correct?    17:19:51
17       A.    Yes.    17:19:52
18       Q.    Okay.  And yet through your    17:19:53
19   review, you were unable to determine which    17:19:55
20   pharmacies they placed on their termination    17:20:00
21   list, correct?    17:20:02
22       A.    Correct.    17:20:03
23       Q.    Okay.  Isn't that reflective of    17:20:04
24   an inadequate audit on the part of    17:20:10
25   Mallinckrodt?    17:20:12

Page 410

1  MR. O'CONNOR: Object to form.  17:20:12
2  THE WITNESS: No.  17:20:13
3  QUESTIONS BY MR. KO:  17:20:13
4  Q.  Okay.  Do you feel that had you  17:20:14
5  asked Masters the simple question of which  17:20:16
6  pharmacies they had placed on their do not  17:20:21
7  ship list, you would have also understood  17:20:23
8  that these pharmacies were problematic?  17:20:26
9  A.  I do not know.  17:20:31
10  Q.  Okay.  Do you agree with me  17:20:32
11  that had you asked that question in your  17:20:34
12  audit, you would have learned that these  17:20:36
13  pharmacies were problematic?  17:20:38
14  A.  If they would have provided  17:20:40
15  this listing, yes.  17:20:42
16  Q.  Okay.  Regardless of whether or  17:20:43
17  not they provided the listing --  17:20:45
18  A.  Uh-huh.  17:20:47
19  Q.  -- the purpose of your audit in  17:20:47
20  late 2010 was to understand Masters' SOM  17:20:50
21  program, was it not?  17:20:56
22  A.  Yes.  17:20:57
23  Q.  And you were doing an  17:20:57
24  independent review?  17:20:58
25  A.  Yes, a Mallinckrodt review of  17:21:01

Page 411

1  their program, yes.  17:21:02
2  Q.  Right.  17:21:03
3  And in connection with that  17:21:04
4  review, did you ever ask them whether or not  17:21:05
5  they had placed certain pharmacies on their  17:21:08
6  do not ship list?  17:21:11
7  A.  I don't -- I don't know.  I  17:21:11
8  don't recall.  17:21:14
9  Q.  Okay.  Had you asked that  17:21:14
10  question, you would have certainly learned  17:21:15
11  this information, correct?  17:21:18
12  MR. O'CONNOR: Object to form.  17:21:18
13  THE WITNESS: Perhaps.  17:21:19
14  QUESTIONS BY MR. KO:  17:21:20
15  Q.  Okay.  Sitting here today, is  17:21:20
16  it reflective of an adequate audit if you  17:21:28
17  didn't ask Masters whether or not they had  17:21:31
18  any pharmacies on their termination list?  17:21:34
19  MR. O'CONNOR: Object to form.  17:21:37
20  THE WITNESS: No.  17:21:37
21  QUESTIONS BY MR. KO:  17:21:38
22  Q.  So to be clear, not asking them  17:21:41
23  whether or not they had pharmacies on their  17:21:45
24  termination list is indicative of an  17:21:47
25  inadequate audit, correct?  17:21:51

Page 412

1  MR. O'CONNOR: Object to form.  17:21:52
2  THE WITNESS: I'm sorry, there  17:21:53
3  were double negatives.  Will you  17:21:55
4  please restate?  I'm sorry.  17:21:57
5  QUESTIONS BY MR. KO:  17:21:58
6  Q.  Sorry, I have a bad habit of  17:21:58
7  that.  17:22:02
8  So not asking Masters whether  17:22:03
9  or not they had pharmacies on their  17:22:04
10  termination list is indicative of an  17:22:05
11  inadequate audit, correct?  17:22:09
12  MR. O'CONNOR: Object to form.  17:22:10
13  THE WITNESS: I do not agree.  17:22:11
14  QUESTIONS BY MR. KO:  17:22:12
15  Q.  You do not agree.  17:22:12
16  Had you simply asked Masters  17:22:13
17  whether or not certain pharmacies appeared on  17:22:19
18  their do not ship list, you would have  17:22:21
19  learned that certain pharmacies did in fact  17:22:23
20  appear on that list, correct?  17:22:25
21  MR. O'CONNOR: Objection.  17:22:27
22  Asked and answered.  17:22:28
23  THE WITNESS: I don't know if  17:22:28
24  they would have given us this list.  17:22:30
25

Page 413

1  QUESTIONS BY MR. KO:  17:22:33
2  Q.  Okay.  But you don't recall  17:22:34
3  ever asking that question?  17:22:35
4  A.  I do not.  17:22:36
5  Q.  Okay.  Certainly if you had  17:22:37
6  asked that question, you would have been able  17:22:39
7  to determine whether or not certain  17:22:41
8  pharmacies appeared on their do not ship  17:22:43
9  list, correct?  17:22:45
10  MR. O'CONNOR: Objection.  17:22:45
11  Asked and answered.  17:22:46
12  THE WITNESS: So, sir, I'll  17:22:46
13  answer again.  This whole Masters'  17:22:47
14  event became quite adversarial.  And I  17:22:51
15  don't mean to be irreverent, because  17:22:55
16  I'm under testimony, but this Wayne  17:22:57
17  Corona, I expected to find a dead  17:22:58
18  chicken on my porch.  17:23:00
19  He called me, he hounded me, he  17:23:02
20  was angry, angry about our decision,  17:23:04
21  so he was defending, I'm going to  17:23:06
22  say, to Mallinckrodt Masters' SOM  17:23:10
23  program with these series of  17:23:14
24  communications.  17:23:15
25

Page 414

1  QUESTIONS BY MR. KO:            17:23:15
2      Q.   Okay.  Is it fair to say that   17:23:16
3  Masters identified problematic pharmacies    17:23:17
4  before you had identified them in your    17:23:24
5  October 17, 2011 correspondence to them?   17:23:27
6      A.   Yes.                   17:23:30
7           MR. O'CONNOR:  Object to form.   17:23:30
8           THE WITNESS:  According to this   17:23:31
9  e-mail, yes.                17:23:32
10 QUESTIONS BY MR. KO:            17:23:33
11     Q.   Okay.  Do you -- had you had    17:23:33
12 the information -- let's take Gulf Coast, for   17:23:39
13 example.                    17:23:42
14          Do you see that -- by the way,    17:23:42
15 do you recall Gulf Coast medical pharmacy?   17:23:46
16     A.   The names all run together.  I    17:23:48
17 do not.  I'm sorry.             17:23:51
18     Q.   They were -- I believe that    17:23:51
19 they were the subject of a DEA indictment,   17:23:53
20 and they were a particularly problematic   17:23:55
21 customer.                   17:23:58
22          But regardless, in -- as of    17:23:59
23 October 28, 2010, Masters had placed Gulf    17:24:03
24 Coast on their termination list, correct?   17:24:07
25          MR. O'CONNOR:  Object to form.   17:24:09

Page 415

1           THE WITNESS:  Yes.        17:24:10
2  QUESTIONS BY MR. KO:            17:24:14
3      Q.   And sitting here today, would    17:24:14
4  you agree with me that if you had shipped   17:24:17
5  pills to distributors that sold eventually to   17:24:20
6  Gulf Coast after October 20, 2010, that would   17:24:25
7  have been a problem, correct?        17:24:31
8           MR. O'CONNOR:  Object to form.   17:24:32
9           THE WITNESS:  Not a problem we   17:24:33
10 were aware of.              17:24:37
11 QUESTIONS BY MR. KO:            17:24:37
12     Q.   Certainly I understand that you   17:24:39
13 may not have been aware of it, but is it --   17:24:41
14 is it reflective of an effective SOM program   17:24:46
15 if you ship orders to a pharmacy that you   17:24:50
16 know appear on your customer's termination   17:24:53
17 list?                       17:24:56
18          MR. O'CONNOR:  Object to form.   17:24:56
19          THE WITNESS:  If we know a    17:24:57
20 customer -- if we know a pharmacy       17:24:58
21 appears on our customer's termination    17:25:01
22 list, we also discontinue honoring of    17:25:03
23 chargebacks to that pharmacy.        17:25:07
24 QUESTIONS BY MR. KO:            17:25:07
25     Q.   Okay.  So that's helpful.     17:25:08

Page 416

1  So -- I thank you for that clarification.   17:25:10
2           So to be clear, if you obtain    17:25:11
3  knowledge from a customer that they have    17:25:13
4  placed a particularly pharmacy -- particular   17:25:16
5  pharmacy on their do not ship list, you also   17:25:18
6  would no longer honor chargeback requests   17:25:22
7  from that particular distributor as it    17:25:26
8  relates to pills shipped to that pharmacy,   17:25:29
9  correct?                   17:25:31
10     A.   Correct.               17:25:32
11     Q.   And it would have also been    17:25:33
12 problematic to do so, right, because that   17:25:36
13 particular pharmacy for a variety of reasons   17:25:38
14 would have certain red flags, correct?   17:25:43
15          MR. O'CONNOR:  Object to form.   17:25:45
16          THE Witness:  Yes.         17:25:45
17 QUESTIONS BY MR. KO:            17:25:47
18     Q.   And potentially that pharmacy    17:25:48
19 would be engaged in diversion of prescription   17:25:49
20 opioids, correct?              17:25:52
21          MR. O'CONNOR:  Object to form.   17:25:53
22          THE WITNESS:  Potentially.     17:25:53
23 QUESTIONS BY MR. KO:            17:25:54
24     Q.   Okay.  And so for each one of    17:25:55
25 these pharmacies that are listed here that   17:25:58

Page 417

1  predate your correspondence on October 17th,   17:26:02
2  you would agree with me that had you known   17:26:11
3  from Masters that they were placed on their   17:26:13
4  termination list, you would also have agreed   17:26:18
5  that these pharmacies were problematic?   17:26:20
6           MR. O'CONNOR:  Object to form.   17:26:22
7           THE WITNESS:  Yes.         17:26:23
8  QUESTIONS BY MR. KO:            17:26:23
9      Q.   Okay.  And shipping orders --    17:26:24
10 and I understand you don't believe you knew   17:26:27
11 at the time, but shipping orders to these   17:26:30
12 pharmacies after they were placed on a    17:26:33
13 termination list would not be indicative of   17:26:36
14 an effective SOM program, correct?       17:26:38
15          MR. O'CONNOR:  Object to form.   17:26:40
16          THE WITNESS:  Correct.       17:26:40
17          (Mallinckrodt-Harper Exhibit 30   17:27:02
18     marked for identification.)       17:27:03
19 QUESTIONS BY MR. KO:            17:27:03
20     Q.   Okay.  I'm going to hand you a    17:27:04
21 copy of what's being marked as Harper     17:27:04
22 Exhibit 30.                 17:27:07
23          And for the record, this is a    17:27:10
24 demonstrative based on chargeback information   17:27:12
25 produced to us.  And to be clear, it's not   17:27:15

Page 418

1  any copy provided by your counsel or by          17:27:19
2  Mallinckrodt but something that we have          17:27:24
3  prepared.                                        17:27:25
4      So Brooks Pharmacy was a                      17:27:44
5  pharmacy that appeared on your letter to all     17:27:47
6  distributors, correct?                           17:27:50
7      A.   Yes.                                     17:27:51
8      Q.   Including to Masters, correct?           17:27:51
9      A.   Yes.                                     17:27:53
10     Q.   And Masters had indicated to             17:27:53
11  you that they had already placed Brooks on       17:27:58
12  their termination list as of October 4, 2010,    17:27:59
13  correct?                                         17:28:02
14     A.   Yes.                                     17:28:02
15     Q.   Okay.  Based on this chart, it           17:28:03
16  appears that several hundred thousand pills      17:28:09
17  nevertheless shipped to Brooks Pharmacy from     17:28:11
18  the period between October 4, 2010, and          17:28:13
19  October 17, 2011, based on chargeback data       17:28:16
20  that has been provided to us.                    17:28:20
21     Do you see that?                              17:28:21
22     A.   So, yes, but may I ask what the          17:28:22
23  unit of measure is here, please?                 17:28:26
24     Q.   Those are total pills.                   17:28:28
25     A.   Dosage units.                            17:28:30

Page 419

1      Q.   Dosage units.                            17:28:31
2      A.   All right.  All right.  Thank            17:28:32
3  you.                                              17:28:32
4      Q.   So hundreds of thousands of              17:28:32
5  dosage units/pills are delivered to Brooks        17:28:35
6  Pharmacy through Cardinal between October 4,      17:28:39
7  2010, and October 17, 2011, correct?             17:28:42
8      MR. O'CONNOR:  Object to form.                17:28:45
9      MS. FIX MEYER:  Object to form.               17:28:46
10     THE WITNESS:  The graph                       17:28:47
11  indicates that Cardinal sold this                17:28:49
12  product to that downstream customer.             17:28:52
13     MS. FIX MEYER:  Object to the                 17:28:55
14  form.  Foundation.                               17:28:57
15  QUESTIONS BY MR. KO:                             17:28:58
16     Q.   You can answer the question.             17:28:59
17  She's just lodging her objection for the         17:29:00
18  record.                                          17:29:02
19     A.   Okay.  So if I'm to believe the          17:29:02
20  graph is gospel, yes.  It appears that           17:29:04
21  Cardinal told that number of dosage units to     17:29:06
22  Brooks Pharmacy.                                 17:29:10
23     Q.   And again, had you asked                 17:29:10
24  Masters which pharmacies appeared on their       17:29:11
25  termination list, you would have understood      17:29:19

Page 420

1  that Masters put Brooks Pharmacy on their do      17:29:20
2  not ship list as of October 4, 2010, correct?    17:29:25
3      MR. O'CONNOR:  Object to form.                17:29:27
4      MS. FIX MEYER:  Object to form.               17:29:28
5      THE WITNESS:  If they would                   17:29:29
6  have given it to us.  We had some                 17:29:30
7  customers that declined to provide               17:29:31
8  that information, unfortunately.                  17:29:32
9  QUESTIONS BY MR. KO:                             17:29:35
10     Q.   Now -- but we had spoken about           17:29:35
11  an audit before, but you performed an on-site    17:29:36
12  audit of Masters, correct?                       17:29:41
13     A.   Yes.                                     17:29:42
14     Q.   And that on-site audit was all           17:29:42
15  day, I believe?                                  17:29:44
16     A.   Yes.                                     17:29:44
17     Q.   Okay.  And again, sitting here           17:29:46
18  today, do you believe that shipments made to     17:29:52
19  a -- an end user after one of your customers     17:29:53
20  puts them on the termination list is             17:30:00
21  indicative of an effective suspicious order      17:30:02
22  monitoring program?                              17:30:04
23     MR. O'CONNOR:  Object to form.                17:30:05
24     MS. FIX MEYER:  Object to                     17:30:06
25  foundation.                                      17:30:07

Page 421

1      THE WITNESS:  If we are aware                 17:30:07
2  of it?                                            17:30:08
3  QUESTIONS BY MR. KO:                             17:30:09
4      Q.   Yes.                                     17:30:09
5      A.   So, yes, but not if we're not           17:30:10
6  aware of it.                                      17:30:12
7      Q.   Okay.  But you had the ability,          17:30:13
8  and as reflected by this chargeback data that     17:30:15
9  you had acquired, you had the ability to          17:30:19
10  understand where your -- the details of where    17:30:22
11  your pills were going after you shipped them     17:30:24
12  to the distributor, correct?                     17:30:26
13     MR. O'CONNOR:  Object to form.                17:30:27
14     THE WITNESS:  Yes.                            17:30:29
15  QUESTIONS BY MR. KO:                             17:30:29
16     Q.   Okay.  And by the way, as we             17:30:29
17  discussed before, you did an audit of            17:30:35
18  Cardinal's SOM program as well, correct?         17:30:38
19     A.   Yes.                                     17:30:40
20     Q.   And so would you agree that              17:30:40
21  Cardinal could have asked the same question      17:30:41
22  as well?                                         17:30:43
23     MR. O'CONNOR:  Object to form.                17:30:44
24     MS. FIX MEYER:  Objection to                  17:30:44
25  foundation.  Object to form.                     17:30:45

Page 422

1    THE WITNESS: I don't know the    17:30:46
2    specifics of Cardinal's interaction    17:30:47
3    with the pharmacies or with their    17:30:49
4    customers, so I don't know that -- I    17:30:51
5    cannot answer.    17:30:52
6    QUESTIONS BY MR. KO:    17:30:53
7    Q.    Sure. Fair enough.    17:30:53
8    Regardless, is it accurate to    17:30:54
9    state, assuming that these numbers are true,    17:30:59
10    that Mallinckrodt shipped hundreds of    17:31:00
11    thousands of pills to customers, including    17:31:05
12    Cardinal, that eventually shipped to Brooks    17:31:10
13    Pharmacy after they were placed on the    17:31:13
14    termination list by Masters?    17:31:16
15    MR. O'CONNOR: Object to form.    17:31:18
16    MS. FIX MEYER: Object to form.    17:31:19
17    Object to foundation.    17:31:22
18    THE WITNESS: Yes.    17:31:23
19    QUESTIONS BY MR. KO:    17:31:23
20    Q.    Okay. Set that aside.    17:31:24
21    (Mallinckrodt-Harper Exhibit 31    17:31:48
22    marked for identification.)    17:31:49
23    QUESTIONS BY MR. KO:    17:31:49
24    Q.    I'm going to hand you just    17:31:50
25    another quick copy of some data we were able    17:31:52

Page 423

1    to pull from the chargeback information    17:31:54
2    produced by your counsel, and that is -- I'm    17:31:55
3    sorry. I'm handing you a copy of what will    17:32:00
4    be marked as Harper Exhibit 31.    17:32:02
5    MR. O'CONNOR: So, again,    17:32:04
6    Counsel, this is a document you    17:32:06
7    created?    17:32:07
8    MR. KO: This is a    17:32:07
9    demonstrative exhibit created by us,    17:32:08
10    correct, based on the Excel files    17:32:10
11    produced to us.    17:32:13
12    THE WITNESS: Yes, I know. I'm    17:32:13
13    just verifying it against that list,    17:32:13
14    yes. Okay.    17:32:16
15    QUESTIONS BY MR. KO:    17:32:18
16    Q.    So here, I'll -- this is    17:32:18
17    similar to Exhibit 30. This is a chart that    17:32:19
18    shows pills that were shipped to Island Drug    17:32:23
19    by your customers from the January 2010 to    17:32:28
20    September 2011 time period.    17:32:33
21    And in particular, there is    17:32:35
22    again -- on the left-hand side the numbers    17:32:44
23    are reflective of dosage units --    17:32:45
24    A.    Thank you.    17:32:47
25    Q.    -- slash pills.    17:32:47

Page 424

1    And it appears that based on    17:32:50
2    the chargeback data that you had access to,    17:32:53
3    Mallinckrodt had shipped to distributors that    17:32:57
4    shipped to Island Drug in the June 3, 2010,    17:32:59
5    through October 17, 2011 time period,    17:33:03
6    correct?    17:33:05
7    A.    Yes.    17:33:06
8    Q.    Okay. And similar to Brooks    17:33:06
9    Pharmacy, would you agree with me that    17:33:10
10    shipping drugs to customers who shipped to    17:33:13
11    Island Drug after they appeared on a    17:33:19
12    termination list would be indicative of an    17:33:22
13    inadequate SOM program?    17:33:26
14    MR. O'CONNOR: Object to form.    17:33:28
15    THE WITNESS: No.    17:33:29
16    QUESTIONS BY MR. KO:    17:33:29
17    Q.    You would not.    17:33:30
18    A.    I would not.    17:33:31
19    Q.    Okay. You had -- as we    17:33:33
20    discussed before, you had access to this    17:33:38
21    chargeback data, correct?    17:33:40
22    A.    Yes.    17:33:41
23    Q.    Okay. And you also performed    17:33:42
24    an on-site audit of Masters, correct?    17:33:45
25    A.    Yes.    17:33:48

Page 425

1    Q.    And so assuming you had asked    17:33:48
2    them the question of whether or not Masters    17:33:50
3    had placed Island Drug on their do not ship    17:33:53
4    list, would you agree with me that it would    17:33:57
5    be indicative of an inadequate SOM program if    17:34:00
6    you continued to ship drugs to customers who    17:34:05
7    shipped to Island Drug?    17:34:08
8    MR. O'CONNOR: Object to form.    17:34:09
9    THE WITNESS: So the premise is    17:34:09
10    that we would have asked Masters for    17:34:13
11    their do not ship list, and there's no    17:34:15
12    assurance whether they would or would    17:34:20
13    not have provided it. But if we would    17:34:21
14    have known which customers Masters had    17:34:24
15    terminated, we would have put them on    17:34:26
16    our chargeback restriction list.    17:34:28
17    QUESTIONS BY MR. KO:    17:34:29
18    Q.    And you would have also -- you    17:34:30
19    would have also determined that you should    17:34:34
20    stop shipping orders to customers that sell    17:34:36
21    to that particular pharmacy as well, correct?    17:34:38
22    MR. O'CONNOR: Object to form.    17:34:40
23    THE WITNESS: Stop -- there's a    17:34:40
24    distinction there. Stop -- stop the    17:34:43
25    payment of chargebacks. We cannot    17:34:45

Page 426

1  totally stop the shipment of          17:34:48
2  Mallinckrodt product to a pharmacy.    17:34:49
3  QUESTIONS BY MR. KO:                    17:34:51
4     Q.   Okay.  You would recommend      17:34:51
5  to -- one of the reasons why you would not  17:34:57
6  honor the chargeback request is to notify the  17:34:58
7  distributor that you would not be paying them  17:35:01
8  the difference between the amount that they  17:35:03
9  agreed upon with you and the subsequent price  17:35:07
10  that they're receiving for the drug in the  17:35:10
11  downstream transaction, correct?       17:35:12
12     A.   Yes.                           17:35:13
13     Q.   Okay.  So it would -- in other  17:35:13
14  words, it would alert the distributor -- it  17:35:14
15  would alert the distributor to the     17:35:23
16  possibility that that particular pharmacy was  17:35:25
17  problematic, correct?                  17:35:26
18          MR. O'CONNOR:  Object to form.  17:35:27
19          THE WITNESS:  Yes.             17:35:27
20          MR. KO:  Okay.  You can set     17:35:29
21  this aside.                            17:35:36
22          Why don't we take a quick break  17:35:41
23  and...                                 17:35:43
24          VIDEOGRAPHER:  We are going off  17:35:45
25  the record at 5:35 p.m.                17:35:46

Page 427

1          (Off the record at 5:35 p.m.)    17:35:48
2          VIDEOGRAPHER:  We are back on    17:46:10
3  the record at 5:46 p.m.                 17:46:12
4  QUESTIONS BY MR. KO:                    17:46:14
5     Q.   Okay.  Thank you again,         17:46:14
6  Ms. Harper.  As the court reporter indicated,  17:46:17
7  we have about approximately 25 minutes, and I  17:46:18
8  appreciate your patience thus far today.  17:46:20
9          Going back to our discussion    17:46:22
10  about Harvard, putting aside the details of  17:46:26
11  how that chart was created or the information  17:46:32
12  that you had requested through chargeback  17:46:37
13  reports, sitting here today, you weren't  17:46:39
14  aware that Harvard Drug had sent, on 12,486  17:46:43
15  occasions, oxy 15 and 30 to pain clinics,  17:46:49
16  pharmacies and medical doctors; is that  17:46:53
17  accurate?                              17:46:55
18          MR. O'CONNOR:  Object to form.  17:46:55
19          THE WITNESS:  I'm not aware or  17:46:55
20  I wasn't aware?  I'm sorry.            17:46:58
21  QUESTIONS BY MR. KO:                    17:47:00
22     Q.   Let's take you weren't aware at  17:47:00
23  the time.                              17:47:03
24          MR. O'CONNOR:  Same objection.  17:47:03
25          THE WITNESS:  I wasn't aware at  17:47:04

Page 428

1  the time of their suspension.          17:47:06
2  QUESTIONS BY MR. KO:                    17:47:07
3     Q.   All right.  And you weren't     17:47:07
4  aware of the total amount of oxy 15 and  17:47:09
5  oxy 30 pills they sent to end users,   17:47:11
6  including pain clinics and pharmacies,  17:47:17
7  correct?                               17:47:20
8     A.   So I realize I'm under oath,    17:47:20
9  and I saw that data that I -- you said I  17:47:23
10  extracted, and I don't know the timing of  17:47:25
11  that in correlation to when their license was  17:47:27
12  suspend, if it was before or after.    17:47:30
13     Q.   And I'll represent to you it    17:47:31
14  was before their license was suspended.  17:47:32
15          And I am just simply asking --  17:47:34
16     A.   Okay.                          17:47:36
17     Q.   -- whether or not at any point  17:47:36
18  in time you became aware of how many orders  17:47:38
19  of oxy 15 or oxy 30s they had sent to pain  17:47:41
20  clinics, pharmacies or medical doctors?  17:47:45
21     A.   In Florida?                     17:47:47
22     Q.   At any time.                    17:47:50
23     A.   Anywhere?                       17:47:50
24     Q.   Anywhere.                       17:47:51
25     A.   Clearly, I must have because --  17:47:52

Page 429

1  but -- was that chargeback report unique to  17:47:55
2  Florida?                               17:47:58
3          I'm sorry.                      17:48:00
4     Q.   No, that's okay.               17:48:00
5     A.   I'm so sorry.  I'm getting      17:48:01
6  mixed up here.                         17:48:03
7     Q.   No, it's okay.                  17:48:03
8          Sitting here today, would you   17:48:05
9  agree with me that it would be suspicious for  17:48:20
10  Harvard Drug to sell oxy 15s and oxy 30s to  17:48:21
11  pain clinics, pharmacies and medical doctors  17:48:25
12  through a veterinary supply company?    17:48:28
13          MR. O'CONNOR:  Object to form.  17:48:32
14          THE WITNESS:  I don't know      17:48:33
15  their corporate structure, so that     17:48:34
16  would have been something, if it had   17:48:36
17  come to our attention, we would have   17:48:38
18  asked Harvard more questions about     17:48:41
19  their -- their business model.         17:48:43
20  QUESTIONS BY MR. KO:                    17:48:44
21     Q.   Sure.                          17:48:44
22          As a general matter, do you     17:48:45
23  recall any instances in which you sold  17:48:46
24  prescription opioids to vet companies?  17:48:48
25          MR. O'CONNOR:  Object to form.  17:48:51

Page 430

1     THE WITNESS: There may have          17:48:51
2  been one.                              17:48:55
3  QUESTIONS BY MR. KO:                   17:48:55
4     Q.   Okay.  And what -- which       17:48:55
5  instance was that, and when did that occur?  17:48:57
6     A.   It was -- I don't know the     17:48:59
7  date.  I remember a customer -- no, strike  17:49:01
8  that, please.                          17:49:06
9         I'm not aware of any sales to   17:49:06
10 veterinary companies.                  17:49:09
11    Q.   Are you aware of any legitimate  17:49:10
12 medical reason for Mallinckrodt to ship pills  17:49:13
13 to veterinary clinics?  And by "pills" I mean  17:49:19
14 particularly prescription opioids.     17:49:25
15    MR. O'CONNOR:  Object to form.      17:49:26
16    THE WITNESS:  So through some        17:49:27
17    event, I don't remember why, we    17:49:31
18    checked with a couple vets, and indeed  17:49:33
19    there are times when doctors prescribe  17:49:36
20    opioids for pain in animals.        17:49:38
21 QUESTIONS BY MR. KO:                   17:49:41
22    Q.   Would you agree with me that   17:49:42
23 that would be a rare occurrence?       17:49:42
24    MR. O'CONNOR:  Object to form.      17:49:44
25    THE WITNESS:  I don't know the      17:49:45

Page 431

1  frequency.                             17:49:45
2     (Mallinckrodt-Harper Exhibit 32     17:49:57
3     marked for identification.)         17:49:46
4  QUESTIONS BY MR. KO:                   17:49:46
5     Q.   Okay.  I'm going to hand you a  17:49:46
6  copy of what's going to be marked as   17:49:52
7  Exhibit 32.                            17:49:56
8         And for the record, this is --  17:49:59
9  ends in Bates 269399.                  17:50:02
10        Ms. Harper, do you recognize    17:50:17
11 this memo from Howard Davis to you dated  17:50:18
12 November 2, 2010?                      17:50:24
13    A.   I do.                          17:50:24
14    Q.   Okay.  And Howard Davis, as we  17:50:27
15 had discussed before, was a consultant you  17:50:29
16 had retained in connection with your SOM  17:50:31
17 program; is that correct?              17:50:35
18    A.   Yes.                           17:50:36
19    Q.   Okay.  And Howard Davis was    17:50:37
20 ex-DEA?                                17:50:40
21    A.   Yes.                           17:50:41
22    Q.   And I believe he was, in       17:50:41
23 particular, a DRM.                     17:50:43
24        Do I understand --             17:50:45
25    A.   DPM.                           17:50:46

Page 432

1     Q.   Sorry, a DPM?                  17:50:47
2     A.   Yes.                           17:50:47
3     Q.   Do I understand correctly?     17:50:50
4     A.   Yes.                           17:50:50
5     Q.   And what does DPM stand for?   17:50:51
6     A.   Diversion program manager.     17:50:53
7     Q.   Okay.  And he had spent some   17:50:53
8  amount of years at the DEA as a DPM, correct?  17:50:55
9  And I believe in Atlanta?              17:50:56
10    A.   He was in Atlanta when he      17:50:57
11 retired.  Prior to that, he was our group  17:51:01
12 supervisor in St. Louis, so I don't know the  17:51:03
13 date of his promotion.                 17:51:06
14    Q.   Okay.  So before -- are you    17:51:07
15 saying before he went to DEA, he was an  17:51:08
16 employee of Mallinckrodt?              17:51:12
17    A.   No, I'm sorry.  I beg your     17:51:13
18 pardon.                                17:51:15
19        For St. Louis DEA he was        17:51:16
20 diversion group supervisor, and then he was  17:51:18
21 promoted to diversion program manager and  17:51:20
22 went to Atlanta, but I'm not certain of  17:51:23
23 the -- the timing of his move to Atlanta.  17:51:25
24    Q.   I see.                         17:51:28
25        So this is in connection        17:51:30

Page 433

1  with -- this is when he was at DEA, correct?  17:51:31
2     A.   Yes, sir.                      17:51:33
3     Q.   Okay.  And at some point in the  17:51:34
4  2010 time period, Mallinckrodt retained  17:51:36
5  Mr. Davis, correct?                    17:51:39
6     A.   Yes.                           17:51:40
7     Q.   And they retained him          17:51:41
8  specifically to examine the then existing  17:51:43
9  suspicious order monitoring program?   17:51:47
10    A.   Yes.                           17:51:47
11    Q.   Okay.  And so I know he was    17:51:48
12 retained for a brief period of time, but do  17:51:53
13 you recall how long his engagement lasted?  17:51:58
14    A.   A couple of months, at most.   17:52:02
15    Q.   Okay.  Now, this memo, is it   17:52:07
16 accurate to describe it is his overview of  17:52:08
17 the suspicious order monitoring program based  17:52:17
18 on his review?  Is that fair to say?   17:52:19
19    A.   Yes, he was reviewing one      17:52:22
20 particular procedure.                  17:52:24
21    Q.   Okay.                          17:52:25
22    A.   Yes.                           17:52:25
23    Q.   And the procedure is consistent  17:52:25
24 with the formal documents we were referring  17:52:28
25 to earlier that you were in charge of  17:52:29

Page 434

1  drafting that outlined the policies and          17:52:32
2  procedures Mallinckrodt would follow to          17:52:37
3  identify potentially suspicious orders,          17:52:38
4  correct?                                          17:52:40
5       MR. O'CONNOR:  Object to form.               17:52:40
6       THE WITNESS:  Yes.                           17:52:41
7  QUESTIONS BY MR. KO:                              17:52:41
8    Q.   Okay.  And in his review of              17:52:41
9  this particular draft of the suspicious order    17:52:45
10 monitoring program -- actually, let's take a     17:52:50
11 step back.                                        17:52:57
12      During the time that you were               17:52:57
13 drafting and revising these policies, you had    17:53:01
14 previously testified that you were still         17:53:04
15 utilizing a suspicious order monitoring          17:53:08
16 program, correct?                                17:53:10
17   A.   Yes.                                       17:53:11
18   Q.   And with the suspicious order            17:53:12
19 monitoring program being utilized during a       17:53:16
20 particular time period between 2008 and 2012,    17:53:19
21 would it be reflective of a draft policy that    17:53:23
22 you are writing or would it be reflective of     17:53:27
23 some other policy?                               17:53:32
24      MR. O'CONNOR:  Object to form.               17:53:34
25      THE WITNESS:  We have a                      17:53:34

Page 435

1    document management system, and              17:53:37
2    then -- so after all the approvals,          17:53:43
3    it's housed there and it's considered        17:53:45
4    a formal policy.  However, DEA               17:53:47
5    compliance did not use that system.          17:53:50
6       So indeed this controlled                17:53:52
7    substance compliance 3.0 was in draft      17:53:55
8    form for a while, and I do not know if      17:53:57
9    it was finalized, but we were                17:54:00
10   operating by it.                            17:54:02
11 QUESTIONS BY MR. KO:                            17:54:02
12   Q.   Right.  Okay.  And that's             17:54:03
13 helpful.                                        17:54:05
14      So as you prepared drafts,               17:54:05
15 whatever operative draft that you were         17:54:07
16 working on at the time was also the policy     17:54:10
17 that you would follow with respect to          17:54:15
18 Mallinckrodt's suspicious order monitoring     17:54:16
19 obligations, correct?                          17:54:18
20   A.   Correct.                                17:54:19
21   Q.   Okay.  Now, he -- Mr. Davis          17:54:20
22 reports to you, as we had discussed before,    17:54:33
23 his evaluation of Mallinckrodt's suspicious    17:54:39
24 order monitoring program at the time.  And in  17:54:44
25 particular, I want to focus on the portion in  17:54:45

Page 436

1  which he says, quote, "Federal Register         17:54:56
2  Notices published as early as 2007, 72         17:54:59
3  Federal Register 36487, state specifically     17:55:02
4  that using formulas that rely on percentages   17:55:05
5  or averages over time has been determined, by  17:55:07
6  the DEA, to be insufficient."                   17:55:10
7       Did I read that correctly?               17:55:12
8    A.   Yes.                                     17:55:14
9    Q.   Okay.  And the Federal Register       17:55:18
10 that he's referring to that's been published   17:55:21
11 as early as 2007, I believe that's also        17:55:24
12 reference to the Southwood notice; is that      17:55:26
13 correct?                                        17:55:27
14   A.   I don't know for certain, but          17:55:27
15 if --                                           17:55:29
16   Q.   Okay.                                   17:55:30
17   A.   Yes, if you say so, yes.               17:55:31
18   Q.   Setting aside which particular        17:55:32
19 Federal Register that refers to, he reports    17:55:35
20 to you as of November 2, 2010, that it is in   17:55:37
21 fact his belief that a suspicious order        17:55:42
22 monitoring program that uses formulas to rely  17:55:48
23 on percentages or averages over time would be  17:55:49
24 insufficient, correct?                         17:55:52
25      MR. O'CONNOR:  Object to form.            17:55:53

Page 437

1       THE WITNESS:  Those are the             17:55:54
2    statements he made, yes.                    17:55:55
3  QUESTIONS BY MR. KO:                            17:56:15
4    Q.   Okay.  He goes on to state that       17:56:15
5  "an order must not be processed and filled if  17:56:17
6  it is either suspicious or excessive."          17:56:21
7       Do you see that?                         17:56:22
8    A.   Yes.                                    17:56:23
9    Q.   "The existing SOP excels to           17:56:23
10 meet this requirement through a specific       17:56:25
11 evaluation process; however, the numeric       17:56:28
12 formula is problematic.  For example, should   17:56:32
13 an occasion arise where an order is three      17:56:35
14 times over the historical average for that     17:56:35
15 customer in item, or in a situation where the  17:56:36
16 order meets but does not exceed the ██         17:56:38
17 criteria, it would theoretically be filled     17:56:42
18 through normal processing without further      17:56:44
19 question.  In doing so, in certain cases and   17:56:46
20 as noted in recent immediate suspensions of    17:56:50
21 other large-scale DEA registrants, which are   17:56:53
22 all a matter of public record, Mallinckrodt    17:56:56
23 would be unnecessarily exposing itself to      17:56:58
24 potential liability."                          17:57:00
25      Did I read that correctly?               17:57:02

Page 438

1    A.   Yes.                          17:57:02
2    Q.   Okay.  And the ███ criteria that   17:57:03
3  he's referring to here is the ███ metric that   17:57:05
4  we had discussed before, correct?      17:57:09
5    A.   Yes.                          17:57:10
6    Q.   Okay.  And is it accurate to      17:57:11
7  say that as of November 2, 2010, he is      17:57:14
8  expressing the view that reliance on a      17:57:17
9  numeric formula such as a ███ criteria could   17:57:20
10  potentially expose Mallinckrodt to a      17:57:24
11  liability?  Correct?                 17:57:27
12    A.   Yes.                         17:57:27
13    Q.   And in fact, in an example we      17:57:28
14  went over -- or an e-mail we went over      17:57:29
15  earlier today, we discussed the fact that      17:57:31
16  Mallinckrodt's ███ or ███ formula with respect   17:57:36
17  to Harvard or Sunrise did not necessarily      17:57:40
18  trigger a suspicious order, correct?      17:57:44
19        Because those orders did not --      17:57:48
20  were not triggered as a result of the      17:57:50
21  peculiar order system in place, correct?      17:57:53
22        MR. O'CONNOR:  Object to form.      17:57:54
23        THE WITNESS:  Correct.          17:57:54
24  QUESTIONS BY MR. KO:                 17:57:55
25    Q.   Okay.  And so it's safe to say      17:57:55

Page 439

1  that prior to the date of this memorandum      17:57:59
2  there were, in fact, instances in which you      17:58:03
3  later discovered that you may have been      17:58:05
4  shipping certain suspicious orders to      17:58:09
5  distributors because you were utilizing this      17:58:12
6  peculiar order algorithm?             17:58:16
7        MR. O'CONNOR:  Object to form.      17:58:18
8        THE WITNESS:  Can you restate      17:58:18
9    that question, please?              17:58:24
10  QUESTIONS BY MR. KO:                 17:58:25
11    Q.   Sure.  Let me try --          17:58:25
12    A.   Okay.                       17:58:27
13    Q.   -- again.                    17:58:27
14        Prior to November 2, 2010 --      17:58:29
15    A.   All right.                   17:58:33
16    Q.   -- it's safe to say that there      17:58:34
17  were instances in which you later discovered   17:58:37
18  that you have -- you were shipping suspicious   17:58:41
19  orders to distributors because you were      17:58:45
20  utilizing a ███ or ███ peculiar order      17:58:47
21  algorithm?                         17:58:51
22        MR. O'CONNOR:  Object to form.      17:58:52
23        THE WITNESS:  So the question      17:58:52
24    is, is that problematic?            17:58:55
25

Page 440

1  QUESTIONS BY MR. KO:                 17:58:58
2    Q.   I'm just simply asking whether      17:58:59
3  or not you determined that there were      17:59:00
4  instances, prior to 2000 -- November 2, 2010,   17:59:01
5  in which you discovered that you were      17:59:07
6  shipping suspicious orders based on a      17:59:09
7  peculiar order algorithm that was in place at   17:59:14
8  that time.                         17:59:17
9        MR. O'CONNOR:  Same objection.      17:59:18
10        THE WITNESS:  The algorithm      17:59:18
11    points to orders that need to be      17:59:20
12    investigated further and does not      17:59:23
13    necessarily conclude in and of itself      17:59:26
14    that the order is suspicious.        17:59:28
15  QUESTIONS BY MR. KO:                 17:59:30
16    Q.   Right.                      17:59:31
17        And I -- I see where the          17:59:31
18  confusion is, because I'm putting a label on   17:59:32
19  a particular order, so let me try it this      17:59:34
20  way.                              17:59:36
21    A.   All right.                   17:59:36
22    Q.   In the e-mail that you had      17:59:37
23  drafted to Eileen Spaulding that we went over   17:59:42
24  earlier today in which you said that no      17:59:45
25  orders -- no peculiar orders had risen to the   17:59:49

Page 441

1  level of suspicious, you also -- do you      17:59:53
2  recall also referencing Harvard and Sunrise?   17:59:56
3        MR. O'CONNOR:  Object to form.      17:59:58
4        THE WITNESS:  Yes.  Yes.          17:59:59
5  QUESTIONS BY MR. KO:                 17:59:59
6    Q.   And you specifically reference      18:00:00
7  Harvard and Sunrise because you are saying      18:00:02
8  that those were instances in which the      18:00:05
9  peculiar order algorithm did not flag orders   18:00:09
10  to them that were potentially suspicious.      18:00:13
11        Is that accurate to say?        18:00:18
12    A.   Correct.                     18:00:19
13    Q.   Okay.  And so applied to this      18:00:20
14  memorandum, I am asking you to confirm that   18:00:26
15  prior to November 2, 2010, there were in fact   18:00:29
16  instances in which you shipped potentially      18:00:36
17  suspicious orders because you were utilizing   18:00:38
18  a peculiar order algorithm that relied on the   18:00:41
19  numeric formula.                    18:00:45
20        MR. O'CONNOR:  Object to form.      18:00:47
21        THE WITNESS:  We shipped orders      18:00:48
22    that would have been further          18:00:53
23    investigated if the algorithm was      18:00:56
24    different, but I can't conclude that      18:00:58
25    we shipped suspicious orders because   18:01:00

Page 442

```
1      it's my belief that we have never        18:01:01
2    shipped a suspicious order.               18:01:05
3   QUESTIONS BY MR. KO:                       18:01:05
4      Q.   For what time period?              18:01:06
5      A.   Ever.                      18:01:07
6      Q.   Okay.  So your testimony here      18:01:11
7    today is that you believe Mallinckrodt has  18:01:13
8    never shipped a suspicious order?          18:01:15
9      A.   Yes.                       18:01:16
10      Q.   Okay.  And that's              18:01:18
11    notwithstanding the settlement that        18:01:19
12    Mallinckrodt had entered into with the DOJ  18:01:22
13    regarding its suspicious order monitoring  18:01:24
14    activities?                        18:01:25
15      A.   Correct.                   18:01:26
16      Q.   Okay.  And that's              18:01:31
17    notwithstanding the fact that the DOJ has  18:01:31
18    alleged, and Mallinckrodt has in fact      18:01:38
19    admitted in the DOJ agreement, that at     18:01:40
20    certain points in time in 2008 through 2012  18:01:43
21    Mallinckrodt did not have an adequate      18:01:46
22    suspicious order monitoring system?        18:01:49
23        MR. O'CONNOR:  Object to form.      18:01:49
24        THE WITNESS:  I -- I don't -- I     18:01:50
25      don't recall the MOA language.         18:01:56
```

Page 443

```
1   QUESTIONS BY MR. KO:                       18:01:57
2      Q.   I guess what I'm trying to ask     18:01:57
3    you is, I understand that -- well, let's take  18:01:59
4    a step back.                       18:02:03
5        I believe you testified earlier     18:02:04
6    today that at least prior to 2008 there were  18:02:05
7    at least ten instances, somewhere between one  18:02:09
8    and ten instances, in which suspicious orders  18:02:14
9    were reported to the DEA.                18:02:17
10        Was that correct?              18:02:18
11        MR. O'CONNOR:  Object to form.      18:02:19
12        THE WITNESS:  Yes.              18:02:19
13   QUESTIONS BY MR. KO:                       18:02:21
14      Q.   So at least there were          18:02:22
15    somewhere north of one but south of ten     18:02:23
16    suspicious orders reported to the DEA?     18:02:25
17      A.   Yes.                       18:02:26
18      Q.   So that's more than the "none"    18:02:27
19    you just indicated to me; is that not      18:02:30
20    accurate?                        18:02:32
21      A.   You asked if we had shipped a     18:02:32
22    suspicious order.                   18:02:34
23      Q.   I see.                     18:02:35
24      A.   But the orders that we had       18:02:36
25    reported between one and ten to DEA were not  18:02:38
```

Page 444

```
1    subsequently shipped.                  18:02:41
2      Q.   Got it.  Understood.           18:02:41
3        So from -- is it your testimony    18:02:43
4    today that from 2008 to present, Mallinckrodt  18:02:48
5    has not shipped a single suspicious order?  18:02:50
6      A.   Yes.  When we talk about         18:02:54
7    suspicious orders, direct orders to our     18:02:56
8    customers.                       18:03:00
9      Q.   Okay.  Let's take -- you can      18:03:00
10    set that aside.                     18:03:15
11        I hand you a copy of what will     18:03:19
12    be marked as Harper Exhibit 33.           18:03:20
13        MR. KO:  And for the record,       18:03:23
14      this is Bates -- ends in Bates 485740.  18:03:24
15        (Mallinckrodt-Harper Exhibit 33    18:03:28
16      marked for identification.)          18:03:29
17   QUESTIONS BY MR. KO:                       18:03:29
18      Q.   Do you recognize that e-mail,    18:03:41
19    Ms. Harper?                      18:03:44
20      A.   No, I don't, so I'm going to     18:03:45
21    read it, please --                  18:03:52
22      Q.   Sure.                      18:03:52
23      A.   -- because -- yeah.  Okay.      18:03:53
24      Q.   In terms of the September 9,     18:04:40
25    2010 e-mail that you drafted to James Parker,  18:04:47
```

Page 445

```
1    do you have any reason to doubt that you sent  18:04:51
2    that?                         18:04:53
3      A.   No.                        18:04:53
4      Q.   And who is James Parker?        18:04:53
5      A.   He was a -- I don't know his     18:04:55
6    title, unless it's on here.  He was in our   18:05:01
7    operational excellence program.           18:05:03
8      Q.   Okay.  Was he in senior         18:05:07
9    management?                      18:05:09
10      A.   No.                        18:05:10
11      Q.   Okay.  And there's a reference   18:05:13
12    to Tom Berry as well, and that was at one    18:05:14
13    point your direct report, as you indicated   18:05:20
14    previously, correct?                 18:05:21
15      A.   Yes, I reported to Tom.         18:05:22
16      Q.   Okay.  And you indicate in this  18:05:24
17    e-mail -- the title of the e-mail is "DEA   18:05:30
18    mandated a suspicious order monitoring      18:05:34
19    program"; is that correct?             18:05:35
20      A.   Yes.                       18:05:35
21      Q.   Okay.  And you indicate, among   18:05:36
22    other -- well, you say, "Jim, I am working on  18:05:41
23    obtaining the number relating to potential   18:05:45
24    lost business and have assembled some       18:05:50
25    documentation around actual fines imposed for  18:05:51
```

Page 446

1  regulatory noncompliance. I will work on the   18:05:54
2  chart and will have all of the above ready by   18:05:56
3  this weekend."                                  18:05:58
4       Did I read that correctly?                 18:05:59
5  A.   Yes.                                        18:05:59
6  Q.   And then there's a portion                 18:06:00
7  that's redacted, and then you go on to state,   18:06:02
8  "I don't ever want to be perceived as a         18:06:04
9  person who cried wolf by asking for a           18:06:07
10 presentation to the larger group and welcome    18:06:09
11 your feedback."                                 18:06:11
12 A.   Okay.                                       18:06:13
13 Q.   Did I read that correctly?                  18:06:14
14 A.   Yes.                                        18:06:14
15 Q.   Okay. And again, the subject               18:06:15
16 of this e-mail is the SOM program.               18:06:16
17      Is it accurate to say that you             18:06:19
18 are at this point asking Jim, or James, for a   18:06:24
19 presentation to a larger group about            18:06:29
20 Mallinckrodt's SOM program?                      18:06:31
21 A.   It appears that way. I                     18:06:32
22 don't -- I do not remember these comments at    18:06:34
23 all about the presentation --                    18:06:36
24 Q.   Sure.                                       18:06:37
25 A.   -- but I've refamiliarized                 18:06:37

Page 447

1  myself with the rest of the e-mail.             18:06:39
2  Q.   Okay. And I'll ask you a few               18:06:41
3  questions about the previous e-mails.            18:06:44
4  A.   Certainly.                                  18:06:48
5  Q.   But do you recall what you are             18:06:48
6  referring to by the "presentation to the        18:06:53
7  larger group"?                                   18:06:55
8  A.   I don't.                                    18:06:55
9  Q.   Okay.                                        18:06:57
10 A.   I don't.                                    18:06:57
11 Q.   And when you are suggesting --              18:06:58
12 at the beginning of this e-mail when you are     18:07:01
13 saying you are working on the number relating    18:07:03
14 to potential lost business, are you referring    18:07:05
15 to the potential lost business of                18:07:08
16 Mallinckrodt -- well, strike that.               18:07:11
17      What are you referring to when             18:07:16
18 you're referring to the potential lost          18:07:19
19 business?                                         18:07:21
20 A.   We approached Jim Parker                    18:07:21
21 because he was operational excellence. So       18:07:23
22 there is initiative in business Six Sigma.       18:07:26
23 It's a whole process of reviewing a program,    18:07:29
24 fishbone charts, a lot of data gathering         18:07:34
25 designed to improve a program.                   18:07:38

Page 448

1       So we approached Jim Parker to             18:07:41
2  ask him if he would lend his operational        18:07:44
3  expertise to the suspicious order monitoring    18:07:47
4  program. And in order to do that, these         18:07:48
5  folks had to be chartered. So part of the       18:07:52
6  charter statement was, what's the potential     18:07:54
7  financial impact if we do not do -- perform     18:07:59
8  this project.                                     18:08:02
9       So that's why I'm referring to            18:08:03
10 this potential lost business and actual fines    18:08:05
11 which may be composed -- imposed for            18:08:09
12 regulatory noncompliance.                        18:08:12
13 Q.   And regulatory noncompliance               18:08:13
14 with the CSA, correct?                           18:08:15
15 A.   Yes.                                        18:08:17
16 Q.   Okay. And potential lost                   18:08:17
17 business, are you referring to the potential    18:08:19
18 lost business from continuing to do business    18:08:21
19 with your distributors to distribute            18:08:24
20 prescription opioids?                            18:08:26
21      MR. O'CONNOR: Objection to                 18:08:27
22 form.                                            18:08:29
23      THE WITNESS: Yes.                          18:08:29
24 QUESTIONS BY MR. KO:                             18:08:33
25 Q.   Okay. And so in effect, you're            18:08:33

Page 449

1  doing -- you're asking -- or you are being      18:08:36
2  asked to do some sort of burden/benefit         18:08:39
3  analysis with respect to a more enhanced SOM    18:08:42
4  program relative to the value of the business   18:08:46
5  that Mallinckrodt has in distributing           18:08:51
6  prescription opioids to its distributors.        18:08:53
7       Is that accurate to say?                   18:08:55
8       MR. O'CONNOR: Objection to                 18:08:56
9  form.                                            18:08:57
10      THE WITNESS: In order to                   18:08:57
11 complete this charter document and get          18:08:58
12 the resources from the operational              18:08:59
13 excellence group.                                18:09:00
14 QUESTIONS BY MR. KO:                             18:09:01
15 Q.   Okay. That's all the questions            18:09:01
16 I have on that.                                   18:09:04
17      Unfortunately, I just only have           18:09:06
18 one copy of this, so you will be the lucky      18:09:10
19 one to get it. But this is a copy of the        18:09:12
20 settlement agreement, the memorandum of         18:09:18
21 understanding between Mallinckrodt and the      18:09:23
22 DOJ, and it's previously been marked as         18:09:24
23 Ratliff Exhibit 41.                              18:09:26
24      Does this document look                    18:09:28
25 familiar to you?                                 18:09:29

Page 450

```
1    A.   Yes.                  18:09:29
2    Q.   And I'd ask that you turn to    18:09:29
3  the --                       18:09:34
4        MR. KO:  Sorry, Andrew, but I    18:09:35
5  know that you are probably very      18:09:37
6  familiar with this, so --           18:09:39
7        MR. O'CONNOR:  I'll look over    18:09:40
8  her shoulder.                 18:09:42
9        THE WITNESS:  Do you want to    18:09:42
10  know the page number?               18:09:42
11  QUESTIONS BY MR. KO:             18:09:42
12    Q.   I just want to ask you to turn    18:09:43
13  to Section 4 --                18:09:44
14    A.   All right.           18:09:44
15    Q.   -- of the agreement entitled    18:09:45
16  "Admission of Responsibility."        18:09:47
17    A.   Is that acceptance of       18:09:49
18  responsibility?               18:09:51
19    Q.   Sorry, acceptance of        18:09:52
20  responsibility.  Thank you.          18:09:53
21    A.   All right.           18:09:55
22    Q.   Do you see that section?      18:09:55
23    A.   Yes.                18:09:57
24    Q.   And I know that earlier we had    18:09:57
25  been discussing some specific language, and   18:10:20
```

Page 451

```
1  certainly didn't expect you to remember    18:10:24
2  specifically what was included.  But in that   18:10:25
3  section, there is reference made that during   18:10:29
4  the covered time period certain aspects of    18:10:33
5  Mallinckrodt's systems to monitor and detect   18:10:36
6  suspicious orders did not meet the standards   18:10:39
7  outlined in the DEA letters provided to you   18:10:41
8  in 2006 and 2007.  Is that accurate?      18:10:43
9    A.   Yes.                18:10:47
10    Q.   Okay.  And do you -- sitting    18:10:52
11  here today, do you agree with that admission?   18:10:55
12    A.   We admitted no wrongdoing, but,    18:10:57
13  yes, I agree with the MOA -- the statement in   18:11:02
14  the MOA.                      18:11:06
15    Q.   Okay.  And the covered time    18:11:07
16  period, by the way, just so the record is    18:11:09
17  clear -- and you can take a look at the    18:11:10
18  document if you'd like.  But the covered time   18:11:12
19  period for the settlement agreement is from   18:11:15
20  January 1, 2008, through January 1, 2012,    18:11:16
21  correct?                      18:11:19
22    A.   So that's covered conduct, but    18:11:20
23  this paragraph relating to the admission of   18:11:33
24  guilt -- or acceptance of responsibility --    18:11:36
25  very poor choice of words on my part -- is    18:11:40
```

Page 452

```
1  talking about a covered time period,      18:11:42
2  January 1, 2012, until -- oh, prior to    18:11:44
3  January 1, 2012, yes.              18:11:55
4    Q.   Okay.  So the covered time    18:11:56
5  period -- and I believe there's --      18:12:00
6    A.   I'm sorry.          18:12:02
7    Q.   No, it's okay.  It's not your    18:12:03
8  fault.  I should have more -- more copies.    18:12:05
9        So there is a definition of the   18:12:10
10  covered time period in this agreement.    18:12:13
11    A.   All right.           18:12:15
12    Q.   And you can take a look at the    18:12:16
13  document, but I believe if my memory serves   18:12:19
14  me correct, that the covered time period    18:12:23
15  begins from January 1, 2008, through the date   18:12:25
16  of the signing of that agreement.        18:12:29
17    A.   So that's part of the       18:12:34
18  background.                   18:12:35
19    Q.   Right.              18:12:36
20    A.   Right.  It's part of the      18:12:39
21  background.                   18:12:40
22    Q.   And so I just want to make sure   18:12:41
23  the record is clear.               18:12:42
24        So for purposes of the       18:12:43
25  Section 4 that we were looking at -- we were   18:12:45
```

Page 453

```
1  just looking at the admission of       18:12:46
2  responsibility?               18:12:48
3    A.   Yes.                18:12:48
4    Q.   -- there is reference made to    18:12:48
5  the covered -- from the covered time period   18:12:50
6  to January 1, 2012, correct?          18:12:53
7    A.   Yes.                18:12:56
8    Q.   And so the covered time period   18:12:58
9  begins on January 1, 2008, correct?      18:12:59
10    A.   Yes.                18:13:02
11    Q.   Okay.  So --           18:13:04
12    A.   Sorry.              18:13:07
13    Q.   A lot of flipping back and      18:13:08
14  forth.                        18:13:11
15        But just so the record is      18:13:11
16  clear, the admission of responsibility is    18:13:13
17  that Mallinckrodt agrees that at certain    18:13:15
18  times from between January 1, 2008, through   18:13:18
19  January 1, 2012, certain aspects of       18:13:22
20  Mallinckrodt's system to monitor and detect   18:13:25
21  suspicious orders did not meet the standards   18:13:28
22  set forth in the DEA guidance letters,     18:13:30
23  correct?                      18:13:32
24        MR. O'CONNOR:  Object to form.   18:13:32
25        THE WITNESS:  Correct.       18:13:34
```

Page 454

1  QUESTIONS BY MR. KO:                   18:13:35
2      Q.   Okay.  And you would agree with   18:13:35
3  that statement, correct?                18:13:36
4          MR. O'CONNOR:  Object -- same     18:13:37
5  objection.                              18:13:40
6          THE WITNESS:  Yes.               18:13:40
7          MR. O'CONNOR:  Counsel, I think   18:13:41
8  we're at time.                          18:13:42
9          MR. KO:  Well, perfect, because   18:13:43
10 I think that was my last question.       18:13:45
11         VIDEOGRAPHER:  Go off the        18:13:50
12 record?                                 18:13:52
13         MR. KO:  Yes.                    18:13:52
14         VIDEOGRAPHER:  We're going off   18:13:53
15 the record at 6:13 p.m.                 18:13:53
16    (Off the record at 6:13 p.m.)        18:13:56
17         VIDEOGRAPHER:  We are back on    18:26:44
18 the record at 6:26 p.m.                 18:26:52
19         DIRECT EXAMINATION               18:26:54
20 QUESTIONS BY MS. HERZFELD:              18:26:54
21     Q.   Okay.  Ms. Harper, we're back   18:26:55
22 after a break.  My name is Tricia Herzfeld,  18:26:57
23 and I'm an attorney representing the     18:27:00
24 Tennessee plaintiffs.                   18:27:02
25         Do you know anything about the   18:27:02

Page 455

1  Tennessee litigation?                   18:27:05
2      A.   Not specifically, no.           18:27:06
3      Q.   Okay.                           18:27:07
4          MS. HERZFELD:  Before we get     18:27:08
5  started, I just want to lodge the        18:27:08
6  standard objections we've lodged in      18:27:10
7  all of our Mallinckrodt depositions      18:27:12
8  about the lack of timely document        18:27:14
9  production and the unnecessary           18:27:17
10 narrowing of the time limitation for     18:27:19
11 questioning the witness.                 18:27:22
12         MR. O'CONNOR:  And I'll lodge    18:27:23
13 our usual objection to the objection.    18:27:25
14         MS. HERZFELD:  Wonderful.        18:27:27
15 Okay.  Moving on.                        18:27:30
16 QUESTIONS BY MS. HERZFELD:              18:27:33
17     Q.   Okay.  Ms. Harper, have you     18:27:33
18 ever been to Tennessee?                  18:27:36
19     A.   Yes.                            18:27:37
20     Q.   Okay.  And have you been for    18:27:37
21 business?                               18:27:41
22     A.   Yes.                            18:27:41
23     Q.   Okay.  And how many times?      18:27:42
24     A.   Twice.                          18:27:42
25     Q.   Okay.  And when were those two  18:27:42

Page 456

1  times?                                  18:27:43
2      A.   I don't recall the dates.       18:27:43
3      Q.   Do you recall roughly what      18:27:44
4  years?                                  18:27:46
5      A.   So I was at FedEx, but I don't  18:27:48
6  know -- I truly don't know the date.     18:27:50
7      Q.   Okay.                           18:27:54
8      A.   And I was at a small            18:27:54
9  distributor, and I cannot remember the name  18:27:56
10 or the date.                            18:27:59
11     Q.   Okay.  And when you were at     18:28:00
12 FedEx, what was the purpose of that?     18:28:03
13     A.   To watch their nighttime in and 18:28:04
14 out shift operation.                     18:28:08
15     Q.   Okay.  And did you find         18:28:08
16 anything deficient in observing that?    18:28:11
17     A.   No.                             18:28:14
18     Q.   And the small distributor that  18:28:14
19 you observed, that was during your time at  18:28:16
20 Mallinckrodt?                           18:28:17
21     A.   Yes.                            18:28:18
22     Q.   Okay.  And do you recall who    18:28:18
23 else was at that meeting?                18:28:19
24     A.   Bill Ratliff.                   18:28:20
25     Q.   Okay.  And it was a             18:28:21

Page 457

1  distributor, not a pharmacy?             18:28:25
2      A.   Yes.                            18:28:26
3      Q.   Okay.  And do you recall        18:28:27
4  finding anything deficient with the      18:28:28
5  operations of that distributor?          18:28:30
6      A.   No.                             18:28:31
7      Q.   Okay.  And would there be       18:28:32
8  documentation someplace of that trip that you  18:28:35
9  took with Mr. Ratliff?                   18:28:36
10     A.   Yes, at least a meeting notice. 18:28:37
11 I'm not certain, yes.                    18:28:43
12     Q.   Okay.  And do you know perhaps  18:28:45
13 if it was after the year 2005?           18:28:47
14     A.   Yes.                            18:28:50
15     Q.   Okay.  Do you think maybe it    18:28:52
16 was more recently than 2010?             18:28:53
17     A.   Yes.                            18:28:55
18     Q.   Okay.  So sometime between 2010 18:28:59
19 and -- do you think it was in the last three  18:29:01
20 or four years?                           18:29:03
21     A.   No.                             18:29:04
22     Q.   Okay.  So maybe sometime        18:29:05
23 between 2010 and 2015?                   18:29:06
24     A.   Yes.                            18:29:09
25     Q.   Okay.  Great.  Okay.            18:29:11

Page 458

1     And those are the only two          18:29:14
2  times you've been to Tennessee for business;  18:29:16
3  is that correct?                        18:29:18
4     A.   Yes.                            18:29:18
5     Q.   Okay.  Have you been for        18:29:18
6  pleasure?                               18:29:19
7     A.   No.                             18:29:20
8     Q.   Okay.  Do you have any family   18:29:21
9  or relatives in Tennessee?              18:29:23
10    A.   No.                             18:29:25
11    Q.   Okay.                           18:29:25
12    A.   I stopped over in Tennessee --  18:29:25
13    Q.   Okay.                           18:29:27
14    A.   -- once, so, sorry.             18:29:28
15    Q.   That's okay.                    18:29:30
16       Were you driving somewhere?       18:29:30
17    A.   I was coming back from Gulf      18:29:31
18  Shores, and I stopped in Memphis to take a  18:29:33
19  rest, yes.                             18:29:36
20    Q.   Okay.  And when you say you      18:29:37
21  were coming from Gulf Shores, you meant from  18:29:38
22  Gulf Shores back here to St. Louis?    18:29:41
23    A.   Yes.                            18:29:42
24    Q.   Okay.  Did you get to see        18:29:42
25  anything when you were in Memphis?     18:29:44

Page 459

1     A.   No.                             18:29:45
2     Q.   Okay.  And do you have any       18:29:47
3  friends that live in Tennessee?         18:29:48
4     A.   No.                             18:29:49
5     Q.   Okay.  And you said earlier      18:29:51
6  that you were aware of the opioid epidemic in  18:29:53
7  this country.                           18:29:56
8       Do you recall that testimony?      18:29:56
9     A.   Yes.                            18:29:57
10    Q.   Okay.  And are you aware of any  18:29:58
11  particular regions of the country where the  18:30:00
12  opioid epidemic seems to have hit harder than  18:30:02
13  others?                                18:30:06
14       MR. O'CONNOR:  Objection.         18:30:07
15  Form.                                  18:30:08
16       THE WITNESS:  I read the press,   18:30:09
17  so Florida, Kentucky, Tennessee, yes,  18:30:11
18  I'm familiar with that -- that press.  18:30:18
19  QUESTIONS BY MS. HERZFELD:             18:30:20
20    Q.   Okay.  Okay.  And I think you    18:30:20
21  had already testified that you knew that  18:30:36
22  pills were going from Florida to other  18:30:38
23  states; is that correct, ma'am?        18:30:41
24    A.   Yes.                            18:30:41
25    Q.   Okay.  And was -- did you        18:30:42

Page 460

1  understand Tennessee to be one of those  18:30:45
2  states where pills were going from Florida to  18:30:46
3  Tennessee?                             18:30:49
4     A.   Yes.                            18:30:50
5     Q.   Okay.  And did you understand    18:30:50
6  that when those pills were going from Florida  18:30:54
7  to Tennessee, that they were ending up in the  18:30:56
8  illegal drug market in Tennessee?       18:30:58
9       MR. O'CONNOR:  Object to form.    18:31:01
10       THE WITNESS:  Yes.               18:31:01
11  QUESTIONS BY MS. HERZFELD:             18:31:03
12    Q.   Okay.  And you said before that  18:31:03
13  you'd heard of the Oxy Express.         18:31:06
14       Do you know if that could have    18:31:09
15  been highway I-75 that goes from Florida to  18:31:11
16  Ohio?                                  18:31:13
17    A.   I'm sorry, I don't remember the  18:31:14
18  highway number.                        18:31:16
19    Q.   Okay.  That's okay.             18:31:16
20       The highway that is the Oxy       18:31:17
21  Express, do you know if it goes through  18:31:21
22  Tennessee?                             18:31:23
23    A.   Yes, it does.                    18:31:24
24    Q.   Okay.  Okay.  And have you ever  18:31:26
25  had any communication with any law      18:31:35

Page 461

1  enforcement in Tennessee?              18:31:36
2     A.   Yes.                            18:31:37
3     Q.   Okay.  And can you tell me       18:31:38
4  roughly how many times?                18:31:40
5     A.   Me, once.                        18:31:41
6     Q.   Okay.  And what was the time?    18:31:46
7     A.   I'm not -- I don't want -- I     18:31:49
8  don't want to swear to the year or attest to  18:31:55
9  the year.  I believe it was 2008.       18:31:58
10    Q.   Okay.  And do you recall who it  18:32:00
11  is you were speaking with?              18:32:05
12    A.   No.                             18:32:06
13    Q.   Okay.  I'm going to show you     18:32:10
14  what we're going to have marked here as  18:32:11
15  Exhibit 34, which we're going to late file  18:32:14
16  with an e-mail.                        18:32:16
17       MS. HERZFELD:  No objection       18:32:18
18  from defendants, yes?                  18:32:18
19       MR. O'CONNOR:  Provided it's      18:32:19
20  the copy we see.                       18:32:20
21       MS. HERZFELD:  Yes, sir.          18:32:22
22       (Mallinckrodt-Harper Exhibit 34   18:32:23
23  marked for identification.)             18:32:23
24  QUESTIONS BY MS. HERZFELD:             18:32:23
25    Q.   Okay.  And I am going to turn    18:32:24

Page 462

1  this around so you can just read it        18:32:24
2  yourself --                                18:32:26
3       A.   Oh, great, because I just --     18:32:26
4       Q.   It's just --                     18:32:28
5       A.   I just had lens implants, so     18:32:28
6  thank you.                                 18:32:31
7       Q.   Oh, very good.                   18:32:31
8            And if you want to read down,    18:32:33
9  you can just use your finger, just, you know.  18:32:34
10      A.   Okay.                            18:32:38
11           All right.  I've reread, yes.    18:32:39
12      Q.   Okay.  Great.                     18:33:14
13           And you received this e-mail      18:33:15
14  from Bill Ratliff on Wednesday, July 8, 2009;  18:33:17
15  is that correct?                           18:33:21
16      A.   July 7, 2009.                     18:33:21
17      Q.   July 7th.  Okay.                  18:33:38
18      A.   Yes, ma'am.                       18:33:39
19      Q.   And does this e-mail describe a   18:33:43
20  communication that Mr. Ratliff had received  18:33:45
21  from an Officer Dwayne Collins in Morristown  18:33:47
22  talking about pills going from -- being found  18:33:50
23  in an illegal drug transaction in Tennessee  18:33:54
24  that were traced to Florida?               18:33:56
25      A.   Yes.                              18:33:58

Page 463

1       Q.   Okay.  And just for the record,  18:34:00
2  this is a three-page document that is labeled  18:34:03
3  MNK_TNSTA05123927.                          18:34:09
4            Okay.  Great.  Now we're done    18:34:15
5  with that complicated moment.               18:34:17
6            Okay.  And did you personally    18:34:26
7  speak to Officer Dwayne Collins; do you     18:34:27
8  recall?                                     18:34:32
9       A.   I believe the initial contact    18:34:32
10  to Mallinckrodt was to me.                  18:34:38
11      Q.   Okay.                             18:34:39
12      A.   And I immediately turn it over    18:34:39
13  to Bill Ratliff.                            18:34:40
14      Q.   Okay.  And once you turned it     18:34:41
15  over to Mr. Ratliff, did you have any further  18:34:43
16  involvement with that situation?            18:34:47
17      A.   Yes.                              18:34:48
18      Q.   Okay.  And what was your          18:34:48
19  involvement?                               18:34:49
20      A.   I helped Mr. Ratliff obtain the   18:34:49
21  reports he was requesting in terms of the   18:34:56
22  shipments of the particular drug product that  18:35:03
23  was the object of the investigation.        18:35:05
24      Q.   Okay.  And is there any other     18:35:07
25  involvement that you had with the situation  18:35:10

Page 464

1  in Morristown?                             18:35:13
2       A.   Only to the extent that the      18:35:14
3  situation in Morristown led us to review --  18:35:18
4  to go to Sunrise distributors.              18:35:24
5       Q.   Okay.  And then I think you've    18:35:26
6  already testified about your involvement with  18:35:27
7  Sunrise today.                             18:35:29
8       A.   Yes.                              18:35:30
9       Q.   Okay.  But other than that,       18:35:31
10  specifically with the Tennessee portion, you  18:35:32
11  didn't have any other involvement in that?   18:35:34
12      A.   There were some chargeback        18:35:37
13  reports --                                  18:35:39
14      Q.   Okay.                             18:35:39
15      A.   -- also, but those were           18:35:39
16  gathered to provide to Mr. Ratliff --       18:35:42
17      Q.   Okay.                             18:35:44
18      A.   -- again within the initial       18:35:45
19  course of his investigation.                18:35:47
20      Q.   Okay.                             18:35:48
21      A.   But, no, nothing else.            18:35:48
22      Q.   And do you know -- oh, go          18:35:52
23  ahead.                                     18:35:54
24      A.   I apologize.                       18:35:54
25      Q.   That's okay.                      18:35:55

Page 465

1       A.   I apologize.                       18:35:56
2            So we made the decision to go      18:35:56
3  to Sunrise and conduct an audit.  Mr. Ratliff  18:35:59
4  contacted Pete Kleissle, who was our         18:36:04
5  diversion group supervisor of DEA St. Louis.  18:36:06
6            Pete came to Mallinckrodt, and    18:36:10
7  we had an informal conversation about --     18:36:11
8  where Mr. Ratliff conveyed the circumstances  18:36:16
9  around the law enforcement investigation.    18:36:18
10  And Mr. Ratliff told Pete Kleissle that we   18:36:20
11  intended to go and conduct an audit of       18:36:23
12  Sunrise.  So I was present for that meeting.  18:36:26
13      Q.   Okay.  And so Tennessee was        18:36:29
14  brought up in the context of we received this  18:36:30
15  information from this individual in          18:36:33
16  Morristown?                                 18:36:34
17      A.   Yes.                              18:36:35
18      Q.   Okay.  And the chargeback         18:36:35
19  reports that you provided to Mr. Ratliff in   18:36:37
20  furtherance of his investigation in response  18:36:41
21  to this Morristown e-mail, do you recall     18:36:43
22  specifically what information was pulled in   18:36:46
23  those chargeback reports?                   18:36:47
24      A.   I don't know specifically what     18:36:48
25  the reports -- how they were tailored or     18:36:57

Page 466

1  customized.                           18:36:59
2      Q.    Okay.  Do you know where I    18:37:00
3  could locate those reports?           18:37:01
4      A.    I don't know.                18:37:03
5      Q.    Okay.  Would you have e-mailed  18:37:10
6  them to Mr. Ratliff?                  18:37:11
7      A.    They would have likely been  18:37:12
8  e-mailed from Eileen Spaulding.       18:37:14
9      Q.    Okay.                        18:37:19
10      A.    And potentially on the      18:37:19
11  chargebacks from Kate Muhlenkamp.     18:37:21
12      Q.    Okay.  And it would have been  18:37:25
13  to you and/or Mr. Ratliff?            18:37:29
14      A.    Yes.                         18:37:31
15      Q.    Okay.  And would it have been  18:37:32
16  around that time in 2009?             18:37:34
17      A.    Yes.                         18:37:36
18      Q.    Okay.  And the -- that's all  18:37:39
19  you remember about the chargeback data?  18:37:43
20          Is there anything else you    18:37:45
21  remember?                             18:37:46
22      A.    It was 2009 -- I'm sorry.    18:37:46
23      Q.    That's okay.                 18:37:48
24      A.    That's the drug task force   18:37:49
25  officer call to Mallinckrodt.        18:37:51

Page 467

1      Q.    Yes, ma'am.                  18:37:52
2      A.    I'm sorry.                   18:37:53
3          So can you repeat the last     18:37:53
4  question?                             18:37:56
5      Q.    Sure.                        18:37:56
6          So when the chargeback data was  18:37:57
7  pulled, do you believe that would have been  18:37:58
8  in 2009?                              18:38:01
9      A.    Yes.                         18:38:01
10      Q.    Okay.  Okay.  Okay.  And I    18:38:03
11  think you testified earlier that as part of  18:38:25
12  your job, you were included on certain  18:38:26
13  LISTSERVs where you received news articles?  18:38:29
14      A.    Yes.                         18:38:30
15      Q.    Okay.  And those were the    18:38:31
16  NADDI; is that right?                 18:38:34
17      A.    Yes.                         18:38:35
18      Q.    Okay.  Which is the National  18:38:35
19  Association of Drug Diversion Investigators?  18:38:39
20      A.    Yes.                         18:38:39
21      Q.    Okay.  And also RX News?     18:38:39
22      A.    Yes.                         18:38:42
23      Q.    Okay.  And then what is Mudri  18:38:43
24  and Associates?                       18:38:46
25      A.    So National Association of Drug  18:38:50

Page 468

1  Diversion Investigators, the title of their  18:38:55
2  newsletter is RX News.                18:38:56
3      Q.    Okay.                        18:38:57
4      A.    And a lot of them came       18:38:58
5  through -- it was called Mudri, or Mudri,  18:38:59
6  agency.                               18:39:02
7      Q.    Okay.                        18:39:03
8      A.    So it was all connected to   18:39:03
9  these NADDI reports.                  18:39:05
10      Q.    Okay.  So those are all      18:39:06
11  generally the same thing, even if they have  18:39:07
12  different names?                      18:39:09
13      A.    Yes.                         18:39:10
14      Q.    Okay.  Great.                18:39:11
15          And you received those reports  18:39:11
16  as part of your job; is that correct?  18:39:13
17      A.    Yes.                         18:39:15
18      Q.    Okay.  And then did          18:39:16
19  Mallinckrodt take that information and then  18:39:17
20  turn that into a controlled substances  18:39:20
21  compliance monthly newsletter?        18:39:23
22      A.    Yes.                         18:39:26
23      Q.    Okay.  And who was responsible  18:39:27
24  for doing that?                       18:39:28
25      A.    One of my colleagues.  Her name  18:39:29

Page 469

1  is Carrie Johnson, and she's at our Hobart,  18:39:32
2  New York, facility.                   18:39:36
3      Q.    Okay.  And basically in those  18:39:37
4  controlled substances compliance monthly  18:39:39
5  newsletters, it would summarize news articles  18:39:41
6  about controlled substances?          18:39:43
7      A.    Yes.  Well, the reports we had  18:39:44
8  obtained through RX News, yes.        18:39:47
9      Q.    Okay.  And does Mallinckrodt  18:39:49
10  still receive some kind of document that  18:39:53
11  aggregates news articles in that way?  18:39:56
12      A.    I don't know.  We have Google  18:39:58
13  Alerts set, but I don't know that we receive  18:40:03
14  RX News or if they still provide that  18:40:05
15  service.                              18:40:07
16      Q.    Google Alerts is definitely  18:40:08
17  pretty easy to do, right?             18:40:11
18      A.    Yes.                         18:40:12
19      Q.    Okay.  Do you know what words  18:40:12
20  are keyed in for Google Alerts?       18:40:13
21      A.    Yes.                         18:40:16
22      Q.    Could you tell me, please?   18:40:16
23      A.    "Oxycodone."  "Prescription  18:40:18
24  drug."  "Diversion."  "Pharmacy theft."  18:40:23
25  Those are some, but I don't know that's  18:40:28

Page 470

1  an all-inclusive list.                    18:40:30
2      Q.   Okay.  Thank you, ma'am.          18:40:32
3           Do you know if "pill mill" is     18:40:33
4  in there?                                  18:40:34
5      A.   I believe so.                     18:40:35
6      Q.   Okay.  And one of the things      18:40:37
7  that you're monitoring is news about pill  18:40:39
8  mills?                                     18:40:42
9      A.   Yes.                              18:40:42
10     Q.   Okay.  And specifically pill      18:40:44
11 mills that are dealing in oxycodone?       18:40:45
12     A.   Yes.                              18:40:48
13     Q.   Okay.  And are you aware of       18:40:51
14 that there are pill mills in the state of  18:40:54
15 Tennessee?                                 18:40:56
16     A.   I may have received articles to   18:40:56
17 that effect, but not -- no, I'm not -- it's 18:41:00
18 not in my sphere of awareness right now.   18:41:02
19     Q.   Okay.  I can show you some of     18:41:06
20 the articles if you'd like.                18:41:07
21     A.   No, I'll believe you.            18:41:08
22     Q.   Oh, well, I don't want to         18:41:10
23 testify to it.  I just need to know if you 18:41:11
24 were aware from your time at Mallinckrodt -- 18:41:15
25     A.   Oh, yes.                          18:41:16

Page 471

1      Q.   -- that there are pill mills in   18:41:17
2  Tennessee.                                 18:41:19
3      A.   Yes.  Yes.                        18:41:19
4      Q.   Okay.  Great, ma'am.  Thank       18:41:20
5  you.                                       18:41:22
6           And had you ever heard that       18:41:22
7  those pill mills, some of them had popped up 18:41:23
8  more after pill mills had closed in Florida? 18:41:26
9      A.   Yes.                              18:41:28
10          MR. O'CONNOR:  Object to form.    18:41:29
11 QUESTIONS BY MS. HERZFELD:                 18:41:30
12     Q.   So if pill mills closed in        18:41:30
13 Florida, you heard that more had popped up in 18:41:32
14 Tennessee?                                 18:41:34
15     A.   Yes, and surrounding states,      18:41:35
16 yes.                                       18:41:37
17     Q.   Okay.  Thank you, ma'am.          18:41:37
18          (Mallinckrodt-Harper Exhibit 35   18:42:59
19     marked for identification.)            18:43:00
20 QUESTIONS BY MS. HERZFELD:                 18:43:00
21     Q.   Okay.  We'll mark this next       18:43:00
22 exhibit as number 35.                      18:43:01
23          Okay.  I've handed you what       18:43:17
24 we've marked as Exhibit 35.                18:43:40
25          For the record, it's Bates        18:43:42

Page 472

1  number MNK-T1_0007185722.                  18:43:42
2          Okay.  What I've handed you        18:43:53
3  here is an e-mail that you received from    18:43:57
4  Eileen Spaulding dated August 11, 2016; is  18:43:59
5  that correct?                              18:44:03
6      A.   Yes, that's part of the chain.    18:44:03
7      Q.   Okay.  And then the subject is    18:44:05
8  re: Google Alert oxycodone; is that correct? 18:44:07
9      A.   Yes.                              18:44:09
10     Q.   Okay.  And so looking down        18:44:10
11 here, I'm mostly interested in -- who is    18:44:14
12 Heather McKenzie?                          18:44:17
13     A.   She was part of our group --      18:44:19
14 well, she's still part of the controlled    18:44:21
15 substances compliance group, but she for a  18:44:25
16 period of time worked more closely with     18:44:26
17 suspicious order monitoring.               18:44:29
18     Q.   Okay.  And was she working more   18:44:29
19 with suspicious order monitoring or         18:44:32
20 controlled substances compliance in August  18:44:34
21 of 2016?                                   18:44:37
22     A.   Suspicious order monitoring.      18:44:37
23     Q.   Okay.  And so it looks to me      18:44:39
24 like Heather McKenzie set up her Google Alert 18:44:41
25 to her work e-mail address and is excited   18:44:44

Page 473

1  that it showed up.                         18:44:47
2          Does that look correct?            18:44:48
3      A.   Yes.  Yes.                        18:44:49
4      Q.   Okay.  And she's e-mailing that   18:44:50
5  to you.                                    18:44:51
6          Was that a direction from you      18:44:54
7  to her to set up the Google Alert?         18:44:55
8      A.   Yes.                              18:44:57
9      Q.   Okay.  And why was that?          18:44:58
10     A.   She was taking over the           18:44:58
11 responsibility being passed on from Carrie  18:45:00
12 Johnson.                                   18:45:03
13     Q.   Okay.  Great.                     18:45:04
14          And then Eileen says, "It seems    18:45:04
15 like there's an awful lot of hits here.  Is  18:45:08
16 this what Jen used to receive?  Just make    18:45:11
17 sure we set up her Google Alerts correctly   18:45:13
18 for the right terms.  Eileen."             18:45:16
19          Do you see where it says that?    18:45:18
20     A.   Yes, and I'd like to clarify my   18:45:21
21 last answer.                               18:45:23
22     Q.   Sure.                             18:45:23
23     A.   So Carrie Johnson did the         18:45:24
24 Google Alerts, and then this prompted my    18:45:27
25 memory.  There was a woman named Jen Buist  18:45:31

Page 474

1  who did for them a while.          18:45:34
2      Q.   Okay.               18:45:34
3      A.   Jen left the company, and then   18:45:36
4  they went to this Heather McKenzie.    18:45:37
5      Q.   Okay. Great.          18:45:40
6          And do you know if Heather does  18:45:40
7  them now?                  18:45:41
8      A.   She does not.         18:45:42
9      Q.   Do you know who does?     18:45:42
10     A.   Yes.               18:45:44
11     Q.   Who is it?            18:45:44
12     A.   There's a controlled substances  18:45:45
13 compliance auditor analyst at our Hobart, New  18:45:48
14 York, facility who takes care of them.    18:45:52
15     Q.   And do you know his or her   18:45:53
16 name?                    18:45:55
17     A.   She's very new. Rochelle --   18:45:55
18 it's like MoQuay or Mokay. I'm not certain.  18:46:00
19 She's within the past couple of weeks joined  18:46:03
20 our group.                18:46:05
21     Q.   Oh, very new.         18:46:05
22     A.   Yes.               18:46:06
23     Q.   Okay. Great.          18:46:07
24          And in between Rochelle, has  18:46:07
25 Heather had the responsibility from that   18:46:10

Page 475

1  point?                   18:46:12
2      A.   Yes.               18:46:13
3      Q.   Okay. So then Eileen says, as  18:46:16
4  we just said, going back to this, it looks   18:46:20
5  like basically there's a lot of hits there.  18:46:22
6  Is that usual.              18:46:25
7          Did you respond to her?    18:46:26
8      A.   Yes.               18:46:27
9      Q.   Okay. And that's the next   18:46:28
10 e-mail chain here, Thursday, August 11th, at  18:46:29
11 8:56 a.m.; is that right?         18:46:34
12     A.   Yes.               18:46:36
13     Q.   Okay. And so in this e-mail   18:46:36
14 you say, "The amount of hits is correct;    18:46:38
15 however, important note: Not all articles   18:46:40
16 require any kind of chargeback lookup     18:46:42
17 whatsoever."               18:46:46
18          So let's back up a little bit  18:46:47
19 before we get there.           18:46:48
20          So you say, "The amount is   18:46:49
21 correct." Let's start with that.       18:46:51
22          There are, gosh, one, two --  18:46:54
23 nine and a half, roughly, pages of Google   18:47:05
24 hits here.                18:47:07
25          Is that -- that's what was   18:47:08

Page 476

1  usual?                   18:47:12
2      A.   So I'm looking to see, please,  18:47:12
3  if these are Google Alerts all from the same  18:47:14
4  day or if it's an accumulation of days. I   18:47:17
5  cannot tell that by this document.      18:47:21
6      Q.   Okay. And do you know if you  18:47:22
7  normally had your team running them, the   18:47:25
8  Google Alerts for oxycodone and the other key  18:47:27
9  words we had talked about, once a day or once  18:47:30
10 a week?                  18:47:33
11     A.   So it's a passive process. We  18:47:34
12 set up the Google Alerts, and then the Google  18:47:37
13 Alerts come to us automatically based upon   18:47:40
14 Google's search for these key terms.     18:47:43
15     Q.   Okay. So you don't set the   18:47:45
16 frequency; Google does?          18:47:47
17     A.   Correct.             18:47:48
18     Q.   Okay. Okay. And so looking at  18:47:49
19 this basically nine and a half pages of hits,  18:47:53
20 that didn't seem unusual to you according to  18:47:55
21 this e-mail?               18:47:56
22     A.   Correct.             18:47:57
23     Q.   Okay. And then when you said,  18:47:57
24 "Not all articles require any kind of     18:47:59
25 chargeback lookup whatsoever," typically did  18:48:02

Page 477

1  some article require chargeback lookup?    18:48:06
2      A.   Yes, if a pharmacy was named.  18:48:08
3      Q.   If a pharmacy was named. Okay.  18:48:09
4          What about if a physician was  18:48:11
5  named?                   18:48:12
6      A.   In -- at some point in our    18:48:13
7  program, yes, but not -- not at the current  18:48:21
8  time.                    18:48:25
9      Q.   Okay. And what was the period  18:48:26
10 of time that you would do a chargeback lookup  18:48:27
11 if a physician was named?          18:48:30
12     A.   I don't know -- I don't know   18:48:31
13 the span of time.             18:48:33
14     Q.   Okay. Do you know for how long  18:48:34
15 it was? Months? Years? Weeks?       18:48:36
16     A.   Months. I can't say years.   18:48:39
17 Months up to -- up to a year or so.      18:48:46
18     Q.   Okay. But you don't remember  18:48:49
19 the time period when that happened?     18:48:50
20     A.   No.               18:48:53
21     Q.   And do you know why that     18:48:53
22 practice was discontinued?         18:48:56
23     A.   The answer may require      18:48:58
24 privileged information.          18:49:07
25          MR. O'CONNOR: And of course   18:49:08

Page 478

1 I'll instruct the witness not to          18:49:10
2 answer to the extent it requires          18:49:11
3 revealing communications with a          18:49:13
4 lawyer.          18:49:14
5 QUESTIONS BY MS. HERZFELD:          18:49:15
6      Q.   Can you answer the question          18:49:16
7 without telling me what your lawyers told          18:49:17
8 you?          18:49:20
9      A.   I cannot.          18:49:20
10      Q.   Okay.  So I'll take it --          18:49:28
11      A.   I'm sorry.          18:49:29
12      Q.   That's okay.          18:49:29
13           So when I ask, at some point          18:49:29
14 did it change looking at chargeback          18:49:32
15 information when the mention of doctors were          18:49:34
16 in these Google hits or the Google news          18:49:37
17 alerts, you're asserting attorney-client          18:49:40
18 privilege to answer that question?          18:49:43
19      A.   Yes, I am.          18:49:44
20      Q.   Okay.  And your attorney has          18:49:45
21 advised you to assert attorney-client          18:49:46
22 privilege to this question, and you're taking          18:49:49
23 his advice?          18:49:53
24      A.   Correct.          18:49:53
25      Q.   Okay.  Okay.  So there's no          18:49:54

Page 479

1 other way you could answer that without          18:49:55
2 telling me what your attorney said?          18:49:56
3      A.   No.          18:49:58
4      Q.   Okay.  Do you know if the          18:50:00
5 decision to stop monitoring physicians for          18:50:04
6 chargeback data when you've gotten an alert          18:50:09
7 from Google, if that happened within the past          18:50:13
8 two years?          18:50:15
9      A.   It did not.          18:50:16
10      Q.   Okay.  Do you know if it          18:50:17
11 happened in the last five years?          18:50:18
12      A.   I'm aware that I'm under oath,          18:50:21
13 and I apologize, I'm just terrible with my          18:50:23
14 dates and years, as we've heard all day long.          18:50:25
15 So I can't -- you continue -- and I          18:50:28
16 appreciate you're trying to help me with a          18:50:32
17 frame of reference in time, but I can't          18:50:34
18 answer the question.          18:50:36
19      Q.   If you can't answer it, you          18:50:36
20 can't answer it.  I'm just trying to figure          18:50:40
21 out if it was very -- you know, at the          18:50:40
22 beginning, in like 2007, or if we're talking          18:50:42
23 in 2018.          18:50:45
24      A.   It's not 2010; it's not 2018.          18:50:48
25      Q.   Okay.          18:50:57

Page 480

1      A.   It's -- it was active in the          18:50:57
2 early part of 2012 --          18:51:02
3      Q.   Okay.          18:51:03
4      A.   -- but I just don't know          18:51:04
5 specifically when it started before that or          18:51:06
6 ended after that.          18:51:08
7      Q.   Okay.  Great.          18:51:10
8           Okay.  So going back to what we          18:51:13
9 have here.  So you said pharmacy would          18:51:15
10 require a chargeback look.  If there was a          18:51:18
11 pharmacy name in Google Alert, that would          18:51:21
12 require a chargeback look from your team; is          18:51:24
13 that right?          18:51:27
14      A.   Yes.          18:51:27
15      Q.   Okay.  And if physician named,          18:51:27
16 for a short period of time you did a search          18:51:29
17 for physician information, if they were          18:51:33
18 named?          18:51:36
19      A.   Yes.          18:51:36
20      Q.   Okay.  And what type of search          18:51:37
21 would you do for physicians?          18:51:39
22      A.   So we were -- that was when we          18:51:41
23 were looking at IMS data.          18:51:43
24      Q.   Okay.          18:51:45
25      A.   And an internal group provided          18:51:46

Page 481

1 us a list of physicians that were the highest          18:51:54
2 prescribers of oxycodone within the country.          18:51:56
3      Q.   Okay.  And you said an internal          18:51:58
4 group provided you that list of physicians.          18:52:01
5           What was the name of the          18:52:03
6 internal group?          18:52:05
7      A.   Oh, gosh, I can't remember.          18:52:07
8      Q.   Okay.  Do you remember who was          18:52:09
9 on it?          18:52:11
10      A.   Yes.          18:52:12
11      Q.   Okay.  Could you tell me the          18:52:13
12 name?          18:52:14
13      A.   Certainly.  There was a lady          18:52:14
14 named Tammy Fraley and a gentleman named          18:52:15
15 Jeremy Stammer.          18:52:20
16      Q.   Okay.  And they would provide          18:52:23
17 you a list of the top prescribing oxycodone          18:52:26
18 physicians within the country?          18:52:30
19      A.   Yes.          18:52:32
20      Q.   Okay.  And what would you do          18:52:33
21 with that list?          18:52:34
22      A.   If we learned the name of a          18:52:35
23 physician for that period of time we were          18:52:39
24 conducting that activity through Google Alert          18:52:41
25 or when we were talking to our wholesaler and          18:52:44

Page 482

```
1   distributor customers about their due         18:52:49
2   diligence with the downstream registrants,     18:52:53
3   the pharmacies, sometimes they had gathered    18:52:55
4   information on who the top prescribers were    18:52:59
5   at a pharmacy.                                 18:53:02
6       Q.    Okay.                                18:53:03
7       A.    So then we'd compare that name       18:53:03
8   to our list of top prescribers.                18:53:06
9       Q.    Okay.  And then if you found         18:53:08
10  that person on the list of top prescribers,    18:53:10
11  what, if anything, would you do?               18:53:13
12      A.    It was a -- pardon me.               18:53:14
13      Q.    It's okay.                           18:53:16
14      A.    It was a contributing factor to     18:53:16
15  whether we -- it was another factor in         18:53:20
16  evaluating whether we would restrict the       18:53:23
17  payment of chargebacks to that pharmacy.       18:53:27
18      Q.    Okay.  So I just want to make        18:53:30
19  sure that I'm understanding this correctly.    18:53:31
20           So for a relatively short            18:53:33
21  period of time, somewhere maybe around         18:53:35
22  2012 --                                        18:53:37
23      A.    Yes.                                 18:53:39
24      Q.    Okay.  When you'd receive a          18:53:40
25  Google Alert or other information from a       18:53:42
```

Page 483

```
1   distributor's pharmacy or from their           18:53:48
2   information about a physician, you also had a   18:53:49
3   list from an internal group that was the       18:53:52
4   highest prescribers of oxycodone, and you      18:53:55
5   would compare the two and use those as a       18:53:57
6   factor in making a determination of whether    18:54:01
7   you were giving chargebacks?                   18:54:02
8           MR. O'CONNOR:  Objection to           18:54:04
9   form.                                          18:54:05
10          THE WITNESS:  Paying                   18:54:05
11  chargebacks, yes.                              18:54:06
12  QUESTIONS BY MS. HERZFELD:                      18:54:07
13      Q.    Okay.  Paying chargebacks --        18:54:07
14      A.    Yes, ma'am.                          18:54:08
15      Q.    -- not giving chargebacks.          18:54:09
16      A.    Yes.                                 18:54:10
17      Q.    Okay.  I just wanted to make         18:54:10
18  sure I understood that.                        18:54:12
19           But then that practice was           18:54:13
20  discontinued after a relatively short period   18:54:14
21  of time?                                       18:54:17
22      A.    Again, I don't know the stop         18:54:17
23  and the start date or how long we used that    18:54:19
24  as a component of our program.  I don't know.  18:54:22
25      Q.    But it was -- it was stopped         18:54:24
```

Page 484

```
1   in, you said you thought, a matter of months,  18:54:26
2   maybe a year.  It wasn't something that went   18:54:29
3   on for years and years?                        18:54:30
4       A.    Yes, that's my approximation,        18:54:31
5   yes.                                           18:54:33
6       Q.    Okay.  Great.                        18:54:33
7            Okay?  And you'd also said in         18:54:33
8   earlier testimony that someone from your team  18:54:39
9   or you would review the Federal Register       18:54:41
10  every day; is that correct?                    18:54:46
11          MR. O'CONNOR:  Objection to           18:54:46
12  form.                                          18:54:47
13          THE WITNESS:  Yes.                     18:54:47
14  QUESTIONS BY MS. HERZFELD:                      18:54:47
15      Q.    Okay.  And in those Federal          18:54:49
16  Register updates, there are updates to the     18:54:53
17  Federal Codes of Regulations; is that right?   18:54:54
18      A.    Yes.                                 18:54:56
19      Q.    Okay.  And there are also, from     18:54:57
20  time to time, updates of, for example,         18:54:58
21  physicians who have been indicted; is that     18:55:00
22  correct?                                       18:55:02
23      A.    Yes.                                 18:55:02
24      Q.    Okay.  And so would you review       18:55:03
25  those Federal Register documents for           18:55:05
```

Page 485

```
1   physicians that had been indicted or arrested  18:55:10
2   for anything involving prescription opioids?   18:55:13
3       A.    Yes.                                 18:55:17
4       Q.    Okay.  And what would you do         18:55:18
5   with that information if you saw it?           18:55:20
6       A.    So that would have been during       18:55:21
7   the same amount of time.                       18:55:26
8       Q.    Okay.                                18:55:28
9       A.    If we're reviewing information        18:55:28
10  gathered by any source that named a            18:55:30
11  prescriber, we were -- we were comparing that  18:55:31
12  to the top prescriber listing of -- that had   18:55:34
13  been supplied to us.                           18:55:38
14      Q.    Okay.  But once that -- that         18:55:39
15  short-term practice ended, did you continue    18:55:41
16  to do that?                                    18:55:44
17      A.    No.                                  18:55:45
18      Q.    Okay.  Okay.  And when you           18:55:46
19  would receive these Google Alerts and it       18:56:01
20  would talk about pharmacies, would you look    18:56:02
21  at the area that the pharmacy was in?          18:56:06
22      A.    Yes.                                 18:56:09
23      Q.    Okay.  And what information          18:56:11
24  would you gather about the area that the       18:56:12
25  pharmacy was in?                               18:56:14
```

Page 486

1    A.   So I'd like to clarify.  It was   18:56:14
2    more so the pharmacy name --            18:56:22
3    Q.   Okay.                          18:56:23
4    A.   -- and that would prompt us to   18:56:23
5    look through our chargebacks.  And if there   18:56:25
6    was a nexus of the city and states -- in the   18:56:30
7    case of Joe's Pharmacy, if the Google Alert   18:56:32
8    said the same city and state as was          18:56:34
9    referenced in our chargeback information, we   18:56:37
10   knew that there was a correlation.          18:56:40
11   Q.   Okay.  But if it said, for       18:56:41
12   example, Joe's Pharmacy in Rocky Top,       18:56:45
13   Tennessee, did you go and do any research on   18:56:50
14   Rocky Top, Tennessee, other than to verify   18:56:52
15   that Joe's Pharmacy was in Rocky Top,       18:56:55
16   Tennessee?                               18:56:57
17   A.   At times, yes.                 18:56:58
18   Q.   Okay.  And what would prompt     18:56:58
19   you to do that?                          18:57:01
20   A.   Some of the media alerts        18:57:01
21   contained things like statements that in a   18:57:04
22   certain region there was an issue, and so     18:57:09
23   then that would prompt us to look at the     18:57:13
24   chargebacks by -- in a specific geographic   18:57:15
25   area.                               18:57:18

Page 487

1    Q.   Okay.  So let's finish up with   18:57:19
2    your e-mail here before we move on to the    18:57:24
3    next one.                               18:57:25
4    A.   Okay.                          18:57:25
5    Q.   So it says, "Google Alerts are   18:57:26
6    scanned quickly for any mention of a pharmacy   18:57:27
7    name or address.  If none are contained in   18:57:29
8    the article, an article is about perhaps new   18:57:33
9    legislation or drug takeback initiatives,    18:57:35
10   then no further action is taken."          18:57:39
11   Did I read that correctly?          18:57:41
12   A.   Yes.                           18:57:41
13   Q.   Okay.  And is that true, if it   18:57:42
14   was about legislation or drug takeback       18:57:43
15   initiatives, you just skipped over it?       18:57:45
16   A.   Yes.                           18:57:48
17   Q.   Okay.  Is there anything else   18:57:48
18   you looked for in those Google Alerts --     18:57:50
19   A.   No.                            18:57:52
20   Q.   -- than what we've talked       18:57:53
21   about?                               18:57:54
22   A.   No.                            18:57:55
23   Q.   Okay.                          18:57:55
24   A.   No.                            18:57:56
25   Q.   Okay.  And then Eileen writes   18:57:58

Page 488

1    back and says, "Okay, thank you.  I didn't do   18:58:04
2    much with them, as Carrie started the project   18:58:06
3    and then Jen took it over and just wanted to   18:58:08
4    double-check."                          18:58:11
5    That seems correct with your     18:58:11
6    memory?                               18:58:13
7    A.   Yes.                           18:58:13
8    Q.   Okay.  And so going back to the   18:58:14
9    section of the e-mail where you're talking   18:58:15
10   about the amount of hits is correct?        18:58:17
11   A.   Yes.                           18:58:21
12   Q.   Yes.  Okay.                     18:58:22
13   So when you respond to her       18:58:23
14   about we're looking at pharmacy name and     18:58:25
15   address, you don't mention physician or      18:58:26
16   location, those things we just talked about.   18:58:30
17   That's because that short-lived   18:58:32
18   initiative had already been terminated by    18:58:34
19   that point; is that right?              18:58:37
20   MR. O'CONNOR:  Objection to       18:58:37
21   form.                               18:58:38
22   THE WITNESS:  So the physician   18:58:38
23   piece was not part of the program       18:58:42
24   then.  It was an error of omission in   18:58:45
25   the e-mail.  We would indeed do          18:58:48

Page 489

1    further review if a geographic area    18:58:52
2    was mentioned without the benefit of a   18:58:54
3    pharmacy name.                      18:58:56
4    QUESTIONS BY MS. HERZFELD:          18:58:57
5    Q.   Okay.  So if a geographic area   18:58:57
6    was mentioned, you would --              18:58:59
7    A.   Yes.                           18:59:01
8    Q.   -- but a physician at that      18:59:03
9    point was not in the program?            18:59:07
10   A.   Correct.                       18:59:08
11   Q.   Okay.  I just wanted to make    18:59:09
12   sure I understood that.  Thank you.          18:59:11
13   A.   You're welcome.                18:59:11
14   Q.   You can put that aside.         18:59:11
15   Have you ever heard the term     18:59:12
16   "pillbillies"?                          18:59:29
17   A.   No.                            18:59:31
18   Q.   Have you ever heard the term   18:59:32
19   "blues," referencing Mallinckrodt oxycodone?   18:59:40
20   A.   Yes.                           18:59:43
21   Q.   Okay.  What do you understand   18:59:44
22   it to be a term for?                    18:59:45
23   A.   A street name for Mallinckrodt   18:59:46
24   oxycodone.                          18:59:51
25   Q.   Okay.  And do you know if       18:59:53

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1    that's 15 or 30s?                    18:59:55
2        A.   I testified earlier, I'm    18:59:57
3    certain that the 30s are blue, but I don't  18:59:58
4    know for certain the color of the 15s.  19:00:00
5        Q.   Okay.  Was there ever any    19:00:03
6    discussion amongst you and your colleagues  19:00:11
7    about pill mills popping up in Tennessee?  19:00:13
8        A.   Yes.                        19:00:16
9        Q.   Okay.  And who did you have  19:00:19
10   that discussion with?                 19:00:20
11       A.   It would have been the team.  19:00:21
12   We have a suspicious order monitoring team  19:00:23
13   meeting approximately once a month.   19:00:26
14       Q.   Okay.  And when did you discuss  19:00:29
15   Tennessee?                            19:00:31
16       A.   I don't have a date.        19:00:31
17       Q.   Okay.  Do you know how many  19:00:34
18   times you discussed Tennessee?        19:00:34
19       A.   I do not.                   19:00:35
20       Q.   Okay.  Do you know if you    19:00:37
21   discussed Tennessee recently?         19:00:38
22       A.   I don't recall discussing it  19:00:40
23   recently.                             19:00:43
24       Q.   Okay.  Do you know what the  19:00:44
25   substance was of the conversations about  19:00:45

Page 491

1    Tennessee?                            19:00:47
2        A.   So we looked at chargebacks in  19:00:48
3    a number of ways, Google Alerts       19:00:56
4    notwithstanding.                      19:00:59
5        Q.   Okay.                       19:01:00
6        A.   And so the chargeback reports  19:01:00
7    were sorted by state, so that would prompt a  19:01:05
8    review of the distributions by our customers  19:01:11
9    to end -- end downstream registrants within  19:01:16
10   certain states if the numbers met a certain  19:01:20
11   criteria.                             19:01:24
12       Q.   Okay.  Okay.  I'll get back to  19:01:25
13   that in just one second, the state sorting of  19:01:28
14   the chargeback data.                  19:01:31
15       A.   Okay.                       19:01:32
16       Q.   Other than sorting the        19:01:32
17   chargeback data by state, do you recall any  19:01:34
18   other substantive conversations about pill  19:01:36
19   mills in Tennessee?                   19:01:38
20       A.   It was mentioned at DEA      19:01:39
21   conferences.  I don't specifically know which  19:01:42
22   one.                                  19:01:44
23       Q.   Okay.                       19:01:44
24       A.   But we would have brought that  19:01:44
25   back to the suspicious order monitoring team,  19:01:46

Page 492

1    as we would have all the notes that were  19:01:50
2    pertinent, and discussed it relative to  19:01:52
3    suspicious order monitoring.          19:01:55
4        Q.   Okay.  Do you recall when that  19:01:56
5    DEA conference was?                   19:01:57
6        A.   I do not.                   19:01:59
7        Q.   Okay.  But you think there    19:01:59
8    would have been notes on it?          19:02:01
9        A.   I do not know.              19:02:02
10       Q.   Okay.  And do you recall what  19:02:05
11   they said about Tennessee at that DEA  19:02:08
12   conference?                           19:02:11
13       A.   Yes.                        19:02:11
14       Q.   What did they say?          19:02:12
15       A.   The DEA showed an interactive  19:02:13
16   map of the migration of the abuse or misuse  19:02:23
17   of oxycodone pills emanating from Florida  19:02:28
18   moving throughout different states.   19:02:32
19       Q.   Okay.  Do you recall anything  19:02:33
20   else they said about Tennessee?       19:02:41
21       A.   No.                         19:02:42
22       Q.   Okay.  And other than what    19:02:43
23   we've discussed, do you recall any other  19:02:45
24   conversations substantively about pill mills  19:02:47
25   in Tennessee?                         19:02:50

Page 493

1        A.   No.                         19:02:50
2        Q.   Okay.  Okay.  And I think I  19:02:51
3    might have asked you this question before, so  19:03:12
4    if I did, just tell me that I did, and I  19:03:16
5    apologize for asking it before.       19:03:20
6             Other than the discussion we  19:03:20
7    had talked about, the communication with the  19:03:23
8    officer from Morristown and you and   19:03:23
9    Mr. Ratliff, have you ever communicated with  19:03:25
10   any other law enforcement from Tennessee?  19:03:27
11       A.   Not to my knowledge.        19:03:28
12       Q.   Okay.  And do you know if     19:03:29
13   anyone on your team ever did?         19:03:31
14       A.   So I'd like to clarify the   19:03:33
15   previous answer.                      19:03:34
16       Q.   Sure.                       19:03:34
17       A.   So law enforcement officers  19:03:35
18   from various jurisdictions were members of  19:03:38
19   this National Association of Drug Diversion  19:03:41
20   Investigators.                        19:03:44
21       Q.   Okay.                       19:03:44
22       A.   And so they came to conferences  19:03:44
23   with us.                              19:03:47
24       Q.   Okay.                       19:03:47
25       A.   So I may have had a discussion  19:03:47

Page 494

1  with them as a member of law enforcement,    19:03:50
2  particularly if we were speaking at the    19:03:52
3  conference and talking about our placebo    19:03:59
4  program for law enforcement.    19:04:01
5      Q.   Okay.  But do you recall any    19:04:02
6  specific conversations with anyone from    19:04:04
7  Tennessee?    19:04:05
8      A.   No.    19:04:05
9      Q.   Okay.  And other than that    19:04:06
10  conversation with the law enforcement officer  19:04:08
11  from Morristown about a specific    19:04:09
12  investigation, you don't recall any    19:04:12
13  communications about any other specific    19:04:14
14  investigations within Tennessee that you were  19:04:16
15  involved in?    19:04:18
16      A.   No.    19:04:19
17      Q.   Okay.  Or anybody from your    19:04:19
18  team for that matter?    19:04:21
19      A.   So I cannot speak -- I did    19:04:22
20  not -- I wasn't always privy.    19:04:25
21      Q.   Okay.    19:04:26
22      A.   If our security director, Bill    19:04:27
23  Ratliff, our current vice president of    19:04:31
24  security, John Gillies, was involved in an    19:04:33
25  investigation, but not to my knowledge.    19:04:36

Page 495

1      Q.   Okay.  Okay.  And have you ever    19:04:37
2  reported any Tennessee pharmacies to    19:04:41
3  Tennessee law enforcement?    19:04:45
4      A.   Not to my knowledge.    19:04:47
5      Q.   Okay.  Or to federal law    19:04:51
6  enforcement with jurisdiction over Tennessee?  19:04:54
7      A.   Well, when we restrict the sale    19:04:57
8  of the processing of chargebacks to    19:05:01
9  pharmacies, that's reported to all    19:05:04
10  distributors and to DEA.    19:05:07
11      Q.   Okay.  But other than the DEA,    19:05:09
12  you didn't reach out to anybody at the    19:05:10
13  US Attorney's Office for the Eastern District  19:05:12
14  of Tennessee or anything like that?    19:05:14
15      A.   No.    19:05:16
16      Q.   Okay.  Okay.  And what about    19:05:16
17  any prescribers?  Did you ever report any    19:05:20
18  Tennessee prescribers to any Tennessee law    19:05:22
19  enforcement?    19:05:24
20      A.   Not to my knowledge.    19:05:25
21      Q.   Okay.  What about any Tennessee    19:05:26
22  prescribers to federal law enforcement?    19:05:29
23      A.   Not to my knowledge.    19:05:31
24      Q.   Okay.  Do you know if    19:05:32
25  Mallinckrodt, you were involved at    19:05:39

Page 496

1  Mallinckrodt, with any Tennessee pharmacies    19:05:40
2  being reported to the DEA?    19:05:43
3      A.   Again, if I researched the    19:05:44
4  chargeback-restricted pharmacies, perhaps,    19:05:50
5  but I would not have had any other    19:05:53
6  conversation than that.    19:05:55
7      Q.   Okay.  Do you know how many    19:05:55
8  Tennessee pharmacies have been put on    19:06:05
9  chargeback restriction?    19:06:06
10      A.   I do not.    19:06:07
11      Q.   Okay.    19:06:07
12      A.   I'm saying no, I do not, again.    19:06:16
13          (Mallinckrodt-Harper Exhibit 36    19:06:24
14      marked for identification.)    19:06:25
15  QUESTIONS BY MS. HERZFELD:    19:06:25
16      Q.   Okay.  I'm going to mark this    19:06:25
17  as Plaintiff's Exhibit 36.  It's Bates number  19:06:26
18  MNK_TNSTA00609639.    19:06:28
19          That front page is just a    19:06:34
20  placeholder.    19:06:45
21          If you look at the second one,    19:06:46
22  I will represent to you that we have searched  19:06:48
23  the chargeback restriction database and    19:06:51
24  sorted it by Tennessee.  The title of the    19:06:53
25  document was "Mallinckrodt chargeback    19:07:01

Page 497

1  restriction, underscore, reinstatement list."  19:07:03
2          Are you familiar with a list    19:07:04
3  that's called that?    19:07:05
4      A.   Yes.    19:07:06
5      Q.   Okay.  And are you responsible    19:07:06
6  for creating it?    19:07:07
7      A.   No.    19:07:09
8      Q.   Are you responsible for    19:07:10
9  maintaining it?    19:07:11
10      A.   No.    19:07:11
11      Q.   Do you have input into its    19:07:12
12  creation?    19:07:14
13      A.   I have input into the    19:07:15
14  chargeback restriction or recisions.    19:07:20
15      Q.   Okay.    19:07:22
16      A.   And then someone else on our    19:07:22
17  team creates -- maintains the list.    19:07:23
18      Q.   Okay.  And you have access to    19:07:25
19  the list?    19:07:26
20      A.   Yes.    19:07:26
21      Q.   Okay.  Okay.  So looking at    19:07:27
22  this list, does it look like that is what it   19:07:28
23  is, Mallinckrodt chargeback restriction and    19:07:29
24  reinstatement list?    19:07:34
25      A.   Yes.    19:07:35

Page 498

1     Q.    And it shows one, two, three,     19:07:35
2   four, five, six, seven, eight, it looks like,     19:07:42
3   eight pharmacies that are on that list.     19:07:50
4         Does that look correct to you?     19:07:52
5     A.    Yes.     19:07:53
6     Q.    Okay.  And of that chargeback     19:07:55
7   list, it looks like five were reinstated; is     19:08:11
8   that correct?     19:08:14
9     A.    Yes.     19:08:14
10    Q.    Okay.  And if there were     19:08:15
11  pharmacies that were put on chargeback     19:08:18
12  restriction in Tennessee, they would appear     19:08:19
13  on this list; is that right?     19:08:21
14    A.    I'm assuming that the sort is     19:08:22
15  correct, but given that, yes, they would be     19:08:25
16  on this list.     19:08:27
17    Q.    Okay.  And each one of these     19:08:28
18  pharmacies that were put on chargeback     19:08:31
19  restriction would have been reported to the     19:08:32
20  DEA?     19:08:34
21    A.    Yes.     19:08:34
22    Q.    Okay.  You can set that one     19:08:35
23  aside, please, ma'am.     19:08:38
24        Ma'am, was someone on your team     19:09:12
25  responsible for checking with the Tennessee     19:09:14

Page 499

1   boards of medical examiners or the Tennessee     19:09:16
2   Board of Pharmacy about specific pharmacies?     19:09:19
3     A.    John Gillies, our vice     19:09:23
4   president of security, may have done that,     19:09:30
5   but I don't know -- he's retired from the     19:09:33
6   FBI, so he had different resources than the     19:09:39
7   rest of the team.  And some of his     19:09:42
8   contributions to the team we didn't under --     19:09:45
9   know his methodology or have that pathway.     19:09:51
10    Q.    Okay.  But to your knowledge,     19:09:55
11  he didn't routinely -- nobody routinely     19:09:56
12  checked with the various state boards of     19:10:00
13  licensing for pharmacies to find out what's     19:10:03
14  going on with pharmacies in a particular     19:10:05
15  state?     19:10:08
16        MR. O'CONNOR:  Object to form.     19:10:09
17        THE WITNESS:  Correct.     19:10:09
18  QUESTIONS BY MS. HERZFELD:     19:10:10
19    Q.    And what about the doctor     19:10:10
20  licensing boards for each state?  Was there     19:10:12
21  routine audit of the doctor licensing boards     19:10:14
22  of each state within your team, to your     19:10:17
23  knowledge?     19:10:20
24    A.    Not to my knowledge.     19:10:20
25    Q.    Okay.  And based on those     19:10:21

Page 500

1   Google Alerts and other information, you were     19:10:52
2   aware that doctors were being arrested in     19:10:54
3   Tennessee for improperly prescribing     19:10:57
4   oxycodone; is that correct?     19:11:01
5     A.    Yes.     19:11:02
6     Q.    Okay.  And based on those     19:11:07
7   Google Alerts and other information, you also     19:11:10
8   knew that some pharmacies were filling     19:11:11
9   improper prescriptions in Tennessee for     19:11:14
10  oxycodone; is that correct?     19:11:16
11        MR. O'CONNOR:  Objection to     19:11:17
12  form.     19:11:18
13        THE WITNESS:  Yes.     19:11:18
14  QUESTIONS BY MS. HERZFELD:     19:11:19
15    Q.    Okay.  Okay.  And when you     19:11:19
16  talked earlier about chargeback data, I just     19:11:22
17  want to make sure I understand that a little     19:11:24
18  bit.     19:11:27
19        You can sort chargeback data in     19:11:27
20  all sorts of different ways, right?     19:11:29
21    A.    Yes.     19:11:30
22    Q.    Okay.  So you can sort it, I     19:11:30
23  think we talked about, by state; is that     19:11:32
24  correct?     19:11:35
25    A.    Yes.     19:11:35

Page 501

1     Q.    Okay.  And can you sort it by     19:11:36
2   time -- various time periods?     19:11:39
3     A.    Yes.     19:11:41
4     Q.    Okay.  And can you sort it by     19:11:42
5   ZIP code?     19:11:44
6     A.    Yes.     19:11:45
7     Q.    Okay.  And you can sort it by     19:11:46
8   per capita?     19:11:49
9         MR. O'CONNOR:  Objection to     19:11:51
10  form.     19:11:53
11        THE WITNESS:  We did that for a     19:11:53
12  period of time.     19:11:55
13  QUESTIONS BY MS. HERZFELD:     19:11:57
14    Q.    Okay.     19:11:57
15    A.    We know -- I don't believe that     19:11:58
16  we currently use the per capita information.     19:11:59
17    Q.    Okay.  Do you know when you     19:12:01
18  stopped using the per capita information?     19:12:03
19    A.    I'm so sorry, I do not.     19:12:05
20    Q.    Okay.  Do you know why you     19:12:08
21  stopped using the per capita information?     19:12:08
22    A.    I do not.     19:12:10
23    Q.    Okay.  And you can sort it by     19:12:15
24  pharmacies; is that correct?     19:12:16
25    A.    Yes.     19:12:17

Page 502

1      Q.   Okay.  And I think you said        19:12:17
2  before if you wanted to, and for a period of   19:12:19
3  time you did, monitor physicians via IMS       19:12:23
4  data?                          19:12:27
5      MR. O'CONNOR:  Objection.        19:12:27
6      THE WITNESS:  Yes.             19:12:28
7      (Mallinckrodt-Harper Exhibit 37    19:13:25
8  marked for identification.)             19:13:26
9  QUESTIONS BY MS. HERZFELD:               19:13:26
10     Q.   Okay.  Ms. Harper, I am going    19:13:27
11 to mark you -- hand you what we will mark as  19:13:31
12 plaintiff's next exhibit, which is number 37.  19:13:33
13     For the record, it's              19:13:37
14 MNK_TNSTA05340154.  It is a two-page        19:13:43
15 document.                       19:13:50
16     You want to start from the back    19:14:01
17 forward.  Oh, you've got it.  Good.  Very    19:14:02
18 good.                          19:14:04
19     A.   Yes, ma'am.                19:14:04
20     Q.   Great.  Thank you.          19:14:05
21     And take your time.  Read        19:14:07
22 through it.                      19:14:11
23     MR. O'CONNOR:  Counsel, can we    19:14:39
24 go off the record for a minute?          19:14:41
25     MS. HERZFELD:  Sure.           19:14:42

Page 503

1      VIDEOGRAPHER:  We are going off   19:14:43
2  the record at 7:14 p.m.              19:14:44
3      (Off the record at 7:14 p.m.)    19:14:46
4      VIDEOGRAPHER:  We are back on    19:15:26
5  the record at 7:15 p.m.              19:15:27
6      MR. O'CONNOR:  And, Counsel, as   19:15:29
7  we discussed, I'm going to object to       19:15:30
8  the use of this document.  It appears     19:15:33
9  to be protected by the attorney-client    19:15:34
10 privilege and was inadvertently          19:15:37
11 produced, and we'll be making a          19:15:37
12 clawback request to retrieve the         19:15:39
13 document.                       19:15:40
14     MS. HERZFELD:  Okay.  And we'll   19:15:41
15 discuss it at a later time.            19:15:43
16     I just have one question for      19:15:44
17 you, ma'am.                      19:15:46
18 QUESTIONS BY MS. HERZFELD:               19:15:46
19     Q.   Do you know if Tennessee was a  19:15:47
20 state that was specifically being monitored  19:15:47
21 as one of a number of states by Mallinckrodt  19:15:51
22 for high volume oxycodone sales?         19:15:54
23     A.   Yes.                     19:15:57
24     Q.   Okay.  Thank you very much.    19:15:57
25 You can move that aside.              19:15:59

Page 504

1      Do you know why Tennessee was     19:16:00
2  one of those states?                 19:16:01
3      A.   So our program monitors all   19:16:02
4  states, all 50 states.               19:16:08
5      Q.   Okay.  But at some point were  19:16:10
6  Kentucky, Tennessee, Ohio, Florida and Texas  19:16:12
7  singled out for specific review?         19:16:20
8      A.   I don't recall.             19:16:22
9      (Mallinckrodt-Harper Exhibit 38   19:16:22
10 marked for identification.)             19:16:59
11 QUESTIONS BY MS. HERZFELD:               19:16:59
12     Q.   Okay.  I'm going to hand you   19:16:22
13 what we will mark as Plaintiff's Exhibit 38.  19:16:57
14 It's MNK_TNSTA05337163.               19:17:00
15     Okay.  And is this an e-mail      19:17:07
16 that you sent on May 13, 2011?          19:17:36
17     A.   Yes.                     19:17:40
18     Q.   Okay.  And with it, it looks   19:17:43
19 like the attachments are oxy percentage of   19:17:45
20 sales by dist state master spreadsheet and   19:17:48
21 hydro percentage of sales by state master   19:17:52
22 spreadsheet.                     19:17:55
23     Do you see where I'm at?         19:17:55
24     A.   Yes.                     19:17:56
25     Q.   Okay.  And it says, "Georgia   19:17:57

Page 505

1  has been added to the statistics per Pat's   19:18:00
2  request."                       19:18:03
3      Did I read that correctly?        19:18:03
4      A.   Yes.                     19:18:04
5      Q.   Who's Pat?                 19:18:04
6      A.   She's one of our attorneys.    19:18:04
7      Q.   Okay.  And you know          19:18:07
8  Tennessee -- if you'll look with me to the   19:18:11
9  second page, you'll see a chart that talks   19:18:13
10 about the personnel of hydrocodone sales in   19:18:24
11 Tennessee from 10/2007 till 2/1/2011.       19:18:25
12     Do you see where I'm at?         19:18:31
13     A.   Yes.                     19:18:32
14     Q.   Okay.  Do you know why the     19:18:33
15 percentage of hydrocodone sales were being   19:18:34
16 monitored in Tennessee?               19:18:36
17     A.   So I'd like to note, please,   19:18:37
18 from where this graph came.  Was it part of   19:18:42
19 this packet?                     19:18:45
20     Q.   I believe so, yes, ma'am.  I   19:18:47
21 didn't create it.                  19:18:49
22     A.   Okay.  All right.           19:18:50
23     So will you please repeat the     19:18:52
24 question?  Sorry.                  19:18:54
25     Q.   Sure.  That's okay.         19:18:55

Page 506

1    Do you know why the percentage    19:18:56
2  of hydrocodone sales were being monitored in    19:18:57
3  Tennessee by Mallinckrodt?    19:18:59
4    A.    I do not know.    19:19:00
5    Q.    Okay.  But they were?    19:19:01
6    A.    Yes.    19:19:03
7    Q.    Okay.  And it was not    19:19:04
8  necessarily all 50 states that were pulled    19:19:07
9  out for these specific looks?    19:19:09
10   A.    I do not know that.    19:19:11
11   Q.    Okay.  Let's go through and    19:19:12
12 look.    19:19:13
13     So after this chart that you're    19:19:14
14 on, if you'll flip with me to the next page,    19:19:16
15 it says page 1 at the bottom?    19:19:18
16   A.    Yes.    19:19:20
17   Q.    Okay.  So looking at hydro    19:19:20
18 sales here, it looks like we're looking at    19:19:22
19 the state of?    19:19:25
20   A.    Florida.    19:19:26
21   Q.    Okay.  And two pages later, the    19:19:27
22 one that says page 3, it looks like we're    19:19:32
23 looking at the state of?    19:19:35
24   A.    Oh, I'm sorry.  Texas.    19:19:36
25   Q.    Okay.    19:19:36

Page 507

1    A.    Yes.    19:19:39
2    Q.    Okay.  And flip two more pages    19:19:40
3  with me to page 5.    19:19:42
4      Okay.  And that is the state    19:19:44
5  of?    19:19:45
6    A.    Ohio.    19:19:46
7    Q.    Okay.  Keep flipping.    19:19:46
8      Page 7.  That's the state of?    19:19:49
9    A.    Kentucky.    19:19:52
10   Q.    Okay.  And this is -- looks    19:19:54
11 like the percentage of hydro sales by    19:19:55
12 distributor; is that right?    19:19:57
13   A.    Yes.    19:19:58
14   Q.    Okay.  Keep flipping.    19:19:59
15     Page 9, and the state there is?    19:20:01
16   A.    Tennessee.    19:20:05
17   Q.    Tennessee.  There we go.    19:20:06
18     And that is the percentage of    19:20:08
19 sales by distributor on that chart; is that    19:20:09
20 correct?    19:20:15
21   A.    Yes, the chart states that.    19:20:15
22   Q.    Okay.  And the chart appears to    19:20:20
23 monitor this information from October 2007    19:20:21
24 through March of 2010 on this page going    19:20:24
25 through to the second page, all the way    19:20:27

Page 508

1  through March of 2011; is that right?    19:20:29
2    A.    Yes.    19:20:31
3    Q.    Okay.  And then on page 11, the    19:20:33
4  state is?    19:20:41
5    A.    Georgia.    19:20:42
6    Q.    Okay.  And those are the only    19:20:44
7  states that were included in this handout.    19:20:45
8      So do you know if there was    19:20:48
9  a -- do you know why those states were    19:20:50
10 particularly singled out to have these    19:20:52
11 reports run?    19:20:55
12   A.    I do not.    19:20:55
13   Q.    Okay.  Was there anything about    19:20:56
14 opioid sales to these states that was of    19:20:59
15 note?    19:21:01
16   A.    No.  And unfortunately I    19:21:02
17 don't -- I don't understand -- I don't recall    19:21:05
18 this report --    19:21:08
19   Q.    Okay.    19:21:08
20   A.    -- and I don't understand this    19:21:08
21 unit of measure, this percentage.    19:21:11
22   Q.    Okay.    19:21:13
23   A.    I just don't understand what    19:21:14
24 this page is telling --    19:21:15
25   Q.    Okay.    19:21:16

Page 509

1    A.    -- me.    19:21:17
2    Q.    But you don't doubt that you    19:21:17
3  sent the e-mail with the attachments?    19:21:18
4    A.    No, I don't doubt it.    19:21:21
5    Q.    Okay.  Okay.  So flipping    19:21:25
6  through to the next one, kind of leaving    19:21:26
7  where we -- stopping where we left off and    19:21:28
8  going back to where we were, if you'll just    19:21:31
9  keep going.    19:21:33
10   A.    What page?  Keep going?    19:21:33
11   Q.    Uh-huh.  I can help you out if    19:21:35
12 you want.    19:21:37
13   A.    Okay, certainly.    19:21:38
14   Q.    Yeah.  Yeah.  Make it a little    19:21:38
15 easier for you.  Keep you from paper cuts.    19:21:39
16 There we go.    19:21:45
17     Okay.  And then so -- then on    19:21:46
18 this chart, it looks like the second    19:21:47
19 attachment there is the percentage of    19:21:50
20 oxycodone sales for Tennessee.    19:21:52
21     Do you see that?    19:21:53
22   A.    Yes.    19:21:53
23   Q.    And that's broken down by    19:21:54
24 distributor from 10/1/2007 till 10/1/2011; is    19:21:56
25 that right?    19:22:02

Page 510

1    A.   Yes.                    19:22:02
2    Q.   Okay.  And I will posit to you,    19:22:02
3  and if we flip through, it's the same charts    19:22:06
4  breaking down the percentage of oxycodone for    19:22:09
5  various states by distributor for Florida,    19:22:13
6  Texas, Ohio, Kentucky, Tennessee and Georgia,    19:22:18
7  those same states.              19:22:33
8         Does that look to be correct?    19:22:35
9         MR. O'CONNOR:  You can answer    19:22:39
10  the question.                  19:22:39
11         THE WITNESS:  Yes.      19:22:40
12  QUESTIONS BY MS. HERZFELD:        19:22:40
13    Q.   Okay.  Yes?             19:22:41
14         MR. O'CONNOR:  Counsel, since    19:22:42
15  we just finished that page, I notice    19:22:43
16  there appears to be an unrelated    19:22:45
17  document attached to the back.     19:22:47
18         MS. HERZFELD:  I do see that.    19:22:48
19  I do.  That's interesting.         19:22:50
20         Okay.  Let's pull off this    19:22:51
21  unrelated document, because I think    19:22:55
22  that's supposed to be separate.     19:22:55
23         My apologies for having some    19:22:59
24  exhibit problems today.  You can tell    19:23:01
25  I'm having exhibit problems today.    19:23:04

Page 511

1         There we go.  Just make this    19:23:07
2  next one Exhibit 39.             19:23:08
3         (Mallinckrodt-Harper Exhibit 39    19:23:12
4  marked for identification.)         19:23:12
5         MS. HERZFELD:  And for those in    19:23:17
6  the cheap seats, it's            19:23:18
7  MNK-T1_0007026593.               19:23:22
8         Thank you for pointing that    19:23:27
9  out, Andrew.                    19:23:29
10         MR. O'CONNOR:  You're welcome.    19:23:31
11  QUESTIONS BY MS. HERZFELD:        19:23:32
12    Q.   Okay.  So looking at this next    19:23:36
13  document, this is an e-mail that you sent to    19:23:38
14  Anthony Rattini on 10/14/2013; is that    19:23:40
15  correct?                       19:23:45
16    A.   Yes.                    19:23:45
17    Q.   Okay.  And who is Anthony    19:23:47
18  Rattini?                       19:23:58
19    A.   He is, or was, a representative    19:23:58
20  we spoke to at Miami-Luken.         19:24:03
21    Q.   And Miami-Luken is what?    19:24:06
22    A.   It's a distributor.        19:24:09
23    Q.   Okay.  And do you know where    19:24:10
24  they're located?                19:24:12
25    A.   I do not.               19:24:12

Page 512

1    Q.   Do you know if they're located    19:24:13
2  in Miami?                      19:24:14
3    A.   I don't know.            19:24:15
4    Q.   Okay.  Flipping to the third    19:24:17
5  page that says MNK-T1_0007026595.  State    19:24:19
6  ranking for hydrocodone, total dosage units    19:24:26
7  sold to retail, January 1, 2010, through    19:24:30
8  December 31, 2011.              19:24:34
9         Do you see where I'm at?     19:24:35
10    A.   Yes.                    19:24:36
11    Q.   Could you tell me what number    19:24:37
12  Tennessee is, ma'am?             19:24:38
13    A.   Tennessee is the third ranking.    19:24:39
14    Q.   Okay.  Great.  Thank you very    19:24:46
15  much.                          19:24:47
16         And the next page, state    19:24:47
17  ranking for oxycodone.  This one ends with    19:24:49
18  6596.  Total dosage units sold to retail on    19:24:56
19  January 1, 2010, through December 31, 2011.    19:25:03
20         And do you see that what number    19:25:07
21  Tennessee is on this list, ma'am?    19:25:08
22    A.   It is -- I have a question    19:25:10
23  about the document, please.         19:25:11
24    Q.   Sure.                   19:25:12
25    A.   This says Drug Enforcement    19:25:12

Page 513

1  Administration.                 19:25:14
2    Q.   Yes, ma'am.              19:25:14
3    A.   So it's something DEA        19:25:14
4  published.                     19:25:16
5    Q.   Okay.                   19:25:16
6    A.   So that would include, am I    19:25:17
7  correct, all manufacturers of all products?    19:25:19
8    Q.   Ma'am, you're the one who    19:25:22
9  forwarded this, so I wouldn't know.    19:25:24
10    A.   Oh, we did?             19:25:25
11    Q.   Yeah, I'm going to back up.    19:25:27
12  Okay.  Let me ask this question first, and    19:25:29
13  then we'll back up so you clarify that.    19:25:30
14    A.   Okay.                   19:25:32
15    Q.   So what number is Tennessee on    19:25:32
16  this state ranking for oxycodone in 2011?    19:25:34
17    A.   Number 9.               19:25:38
18    Q.   Okay.  And in 2000 -- okay.    19:25:39
19  Great.  Thank you.              19:25:49
20    A.   Okay.                   19:25:49
21    Q.   Okay.  Now going back to what I    19:25:49
22  think what was your concern.  If you back to    19:25:50
23  the very first page, which was the e-mail.    19:25:53
24         If you read the e-mail, it's an    19:25:55
25  e-mail from you, right?          19:25:56

Page 514

```
 1    A.   Yes.                    19:25:57
 2    Q.   Okay.  It says, "Hi, Tony.  It    19:25:58
 3  was very good to speak with you today, and    19:26:02
 4  I'm looking forward to finally meeting you in    19:26:03
 5  person next week at the DEA conference.  The    19:26:05
 6  first PDF attached was pulled from the DEA    19:26:06
 7  web page USDOJ.gov, a recent presentation    19:26:10
 8  made to HDMA as indicated below.  The second    19:26:13
 9  PDF was extracted from DEA web page also,    19:26:17
10  registrant population information pharmacy    19:26:19
11  registrations."                 19:26:22
12       Did I read that correctly?    19:26:22
13    A.   Yes.                     19:26:23
14    Q.   Okay.  So it looks like you    19:26:23
15  attached both of these as attachments to the    19:26:25
16  e-mail you sent to Mr. Rattini; is that    19:26:28
17  correct?                        19:26:31
18    A.   Yes.                     19:26:31
19    Q.   Okay.  And what is HDMA?    19:26:32
20    A.   It's Healthcare Distribution    19:26:40
21  Management Association.          19:26:44
22    Q.   Okay.  Okay.  Moving on.  You    19:26:44
23  can get rid of that one.          19:26:55
24       Okay.  Was Mallinckrodt    19:26:57
25  concerned about the number of opioids that it    19:27:14
```

Page 515

```
 1  was shipping to Tennessee?        19:27:16
 2       MR. O'CONNOR:  Objection to    19:27:18
 3  form.                           19:27:19
 4       THE WITNESS:  It's a broad    19:27:20
 5  question, so can you -- I'm sorry, I    19:27:26
 6  can't answer.                   19:27:30
 7  QUESTIONS BY MS. HERZFELD:        19:27:30
 8    Q.   Sure.  Okay.  I'll try to --    19:27:31
 9  I'll try to narrow it a little bit.    19:27:34
10       It looks like Tennessee,    19:27:35
11  according to some of the charts we've seen,    19:27:37
12  has been at the higher level of numbers of    19:27:38
13  opioids being shipped to it; is that correct?    19:27:43
14       MR. O'CONNOR:  Objection to    19:27:45
15  form.                           19:27:46
16       THE WITNESS:  Yes.           19:27:46
17  QUESTIONS BY MS. HERZFELD:        19:27:47
18    Q.   Okay.  And was that concerning    19:27:48
19  to Mallinckrodt, that Tennessee was -- or    19:27:49
20  concerning to you?  Was that concerning --    19:27:52
21  strike that.                    19:27:54
22       Was it concerning to you in    19:27:54
23  your position at Mallinckrodt that Tennessee    19:27:58
24  was amongst the higher numbers for opioid    19:28:00
25  sales by Mallinckrodt?            19:28:05
```

Page 516

```
 1       MR. O'CONNOR:  Objection to    19:28:07
 2  form.                           19:28:08
 3       THE WITNESS:  So we reviewed    19:28:08
 4  all the data for all the states, so it    19:28:09
 5  was among those that were of concern.    19:28:13
 6  QUESTIONS BY MS. HERZFELD:        19:28:16
 7    Q.   Okay.  And why was that of    19:28:16
 8  concern?                        19:28:18
 9    A.   So which charts are we talking    19:28:18
10  about, these last ones from DEA?    19:28:21
11    Q.   Yes.                     19:28:23
12    A.   So I'd like to add that since    19:28:24
13  these were from DEA, all manufacturers -- and    19:28:29
14  there were certain areas of the country that    19:28:33
15  Mallinckrodt may have had zero of the market.    19:28:35
16  There are other hydrocodone manufacturers and    19:28:39
17  oxycodone manufacturers.  So, yes, we studied    19:28:42
18  these graphs as a tool within our program,    19:28:45
19  yes.                            19:28:48
20    Q.   Okay.  But if we go back to,    19:28:48
21  let's see, this one, I think.  Yeah,    19:28:51
22  Exhibit 35.                     19:28:59
23       You agreed with me before that    19:28:59
24  one of the states that Mallinckrodt was    19:29:01
25  monitoring was Tennessee; is that right?    19:29:02
```

Page 517

```
 1    A.   Yes.  Yes.               19:29:03
 2    Q.   Okay.  And so based on    19:29:03
 3  Mallinckrodt's own documentation here in    19:29:05
 4  Exhibit 35, you were monitoring Tennessee    19:29:08
 5  specifically for opioid sales; is that    19:29:12
 6  correct?                        19:29:15
 7    A.   Yes.                     19:29:15
 8    Q.   Okay.  Okay.  You can set that    19:29:19
 9  aside.                          19:29:22
10       (Mallinckrodt-Harper Exhibit 40    19:29:29
11       marked for identification.)    19:29:30
12  QUESTIONS BY MS. HERZFELD:        19:29:30
13    Q.   Okay.  I'm going to hand you    19:29:30
14  what we'll mark as Exhibit 40.  And this is    19:29:33
15  MNK_TNSTA05126722 through 6735.  It's front    19:29:39
16  and back document.               19:29:53
17       That type is very, very small,    19:29:55
18  so we'll read through it together if you    19:30:24
19  don't mind.                     19:30:28
20       So the one that says page 1,    19:30:29
21  let's start there.  Okay.          19:30:30
22       At the very top line under    19:30:33
23  where it says A, B and C, what is the title    19:30:34
24  there?  Do you see it, line 1?    19:30:37
25    A.   Yes.                     19:30:39
```

Page 518

```
1    Q.   What is it?                19:30:39
2    A.   30-milligram oxy, sum of sales,   19:30:40
3  dosage units by state.            19:30:45
4    Q.   Okay.  So looking at that, it   19:30:46
5  looks like Mallinckrodt was tracking the   19:30:49
6  oxy 30 sales by state in 2009, 2010 and 2011;   19:30:51
7  is that correct?                  19:30:58
8    A.   I see 2010 and I see 2000 --   19:30:58
9  2011.  I don't see 2009 on the chart.   19:31:14
10   Q.   Okay.  I'll show you right   19:31:16
11 here.                             19:31:17
12   A.   Okay.                     19:31:17
13   Q.   Right under B?             19:31:18
14   A.   Okay.  I see it now, thank you,   19:31:25
15 yes.                              19:31:26
16   Q.   2009, 2010, 2011.          19:31:26
17   A.   Yeah.                     19:31:26
18   Q.   Okay.  And what number is   19:31:29
19 Tennessee on this list?           19:31:30
20   A.   This list indicates --     19:31:31
21 Tennessee is seventh listed, but this is by   19:31:46
22 sales dollars, am I correct, not dosage   19:31:51
23 units?                            19:31:54
24   Q.   It says -- it says sum of sales   19:31:54
25 dosage units by state, so...       19:31:56
```

Page 519

```
1        Okay.  So it says Tennessee is   19:32:08
2  number 7; is that right?          19:32:11
3    A.   Yes, it does say that.     19:32:12
4    Q.   Okay.  And then if you go over   19:32:16
5  a couple blocks here, it has the various   19:32:17
6  numbers.  Then it says grand percent total,   19:32:22
7  3.64 percent.                     19:32:24
8        Do you see where that's at?   19:32:26
9    A.   I'm having a hard time tracking   19:32:28
10 you.                              19:32:31
11   Q.   I know, it's so small.     19:32:32
12   A.   On the chart.             19:32:33
13   Q.   Do you want to use a piece of   19:32:34
14 paper?                            19:32:35
15   A.   Can you give me a column header   19:32:35
16 name?                             19:32:37
17   Q.   Uh-huh, sure.  Okay.  So let's   19:32:39
18 look at -- we're at number 7, and G.  So 7 G.   19:32:40
19   A.   Okay.  Yes, I see it.      19:32:43
20   Q.   Okay.  And so it says grand   19:32:47
21 total percent is 3.64 percent; is that right?   19:32:48
22   A.   Yes.                      19:32:51
23   Q.   Okay.  And then it says 2010   19:32:51
24 increase.                         19:32:53
25        Can you read that next one for   19:32:53
```

Page 520

```
1  me, please?                       19:32:54
2    A.   Yes.  42 percent.          19:32:56
3    Q.   Okay.  And then 2011 increase?   19:32:57
4    A.   11 percent.               19:33:00
5    Q.   Okay.  And then going over   19:33:03
6  exactly -- stay on that exact line and go   19:33:05
7  over one, and then we're at 15-milligram oxy,   19:33:07
8  sum of sales dosage units by state.  And   19:33:11
9  we're still at number 7 here, Tennessee.   19:33:13
10       Do you see that?           19:33:16
11   A.   I'd like to use a piece of   19:33:17
12 paper --                          19:33:18
13   Q.   Yeah, sure.  It will certainly   19:33:18
14 make it easier.                   19:33:20
15   A.   I'm sorry.  I just had eye   19:33:21
16 surgery.  I'm sorry.              19:33:26
17   Q.   For sure.  And I'm not trying   19:33:28
18 to make this difficult on you.     19:33:30
19   A.   Okay.  I'm on line 7.      19:33:31
20   Q.   Okay.  And so it shows the 15   19:33:33
21 on line 7.  Then it says percentage of grand   19:33:35
22 total there under Q4, .49 percent; is that   19:33:37
23 right?                            19:33:41
24   A.   Yes.                      19:33:41
25   Q.   Okay.  And then it says units   19:33:42
```

Page 521

```
1  per capita, 1.87; is that correct?   19:33:44
2    A.   Yes.                      19:33:47
3    Q.   Units per capita rank,      19:33:48
4  number 5; is that correct?        19:33:52
5    A.   Yes.                      19:33:53
6    Q.   Population rank, 17.        19:33:54
7        And then it goes through the   19:33:58
8  census population through 2010, 2000, 1990.   19:34:02
9        Do you see that?           19:34:06
10   A.   Yes.                      19:34:07
11   Q.   I want to make sure I am      19:34:07
12 staying on the right line.        19:34:09
13       And then it says percentage of   19:34:10
14 US total, 2.03 percent.           19:34:12
15       Do you see that?           19:34:15
16   A.   Yes.                      19:34:15
17   Q.   Okay.  Then if you go -- follow   19:34:15
18 that line all the way to the very end.  It   19:34:20
19 ranks by density and population, and then it   19:34:22
20 says units adjusted for density, 8.85.   19:34:26
21       Do you see that?           19:34:30
22   A.   Yes.                      19:34:31
23   Q.   Okay.  And did you create this   19:34:33
24 chart?                            19:34:35
25   A.   I did not.  I don't understand   19:34:35
```

Page 522

1  it. I did not.                    19:34:38
2      Q.   Okay.                    19:34:39
3      A.   No.                      19:34:39
4      Q.   Does it appear to be on       19:34:39
5  monitoring chargeback data by state and      19:34:42
6  population?                        19:34:45
7      A.   I don't know. It's monitoring    19:34:45
8  by state and by population, but, again, is it  19:34:54
9  dosage units or dollars. I don't know the   19:34:58
10  units of measure for certain.            19:35:02
11     Q.   Okay. But other than that, not   19:35:04
12  knowing what the unit of measure is, you    19:35:06
13  recognize this as chargeback data by state  19:35:09
14  and population?                    19:35:11
15     A.   I don't recognize where the    19:35:13
16  data came from, I'm sorry.             19:35:17
17     Q.   Okay.                    19:35:18
18     A.   I just don't.               19:35:18
19     Q.   So have you seen this chart     19:35:19
20  before?                           19:35:21
21     A.   No.                      19:35:21
22     Q.   Have you -- did you have       19:35:22
23  reports run like this before?            19:35:24
24     A.   No.                      19:35:26
25     Q.   Do you know if anybody on your  19:35:26

Page 523

1  team did?                          19:35:27
2      A.   I do not know.              19:35:28
3      Q.   Okay. When you save things on  19:35:31
4  a computer in your team back in 2010, 2011,  19:35:34
5  would you have a share drive?           19:35:38
6      A.   Yes.                      19:35:40
7      Q.   Okay. Would it have certain    19:35:40
8  folders in it?                       19:35:43
9      A.   Yes.                      19:35:43
10     Q.   You put stuff in a folder?      19:35:44
11          Was there a folder for       19:35:45
12  suspicious order monitoring?            19:35:47
13     A.   Yes, and I do see the title.    19:35:47
14     Q.   Yes, ma'am.                 19:35:49
15     A.   I see that.                 19:35:50
16     Q.   Uh-huh.                    19:35:51
17     A.   And certainly I can read it,    19:35:52
18  but I -- I don't recall seeing or utilizing  19:35:54
19  this spreadsheet or requesting this       19:35:58
20  spreadsheet, although I do see that the file  19:36:00
21  name indicates that.                  19:36:02
22     Q.   Okay.                     19:36:03
23     A.   Yes.                      19:36:03
24     Q.   Do you have any reason to think 19:36:04
25  that it's not accurate?                19:36:05

Page 524

1      A.   Well, I do not.             19:36:06
2      Q.   Okay. Okay. You can set it    19:36:14
3  aside. Thank you.                    19:36:15
4          MR. O'CONNOR: Counsel, as     19:36:19
5  we're getting close to the end here,       19:36:19
6  maybe it's time to take a break. I        19:36:21
7  think we've been going at it for quite     19:36:25
8  a while.                          19:36:27
9          MS. HERZFELD: How long have I   19:36:28
10  been going?
11          VIDEOGRAPHER: A little over an
12  hour. Hour and ten minutes.
13          MS. HERZFELD: Oh, we can take
14  a break, yeah, but -- yeah, sure,
15  okay. Yeah, we can take a break.
16          VIDEOGRAPHER: We are going off  19:36:33
17  the record at 7:36 p.m.              19:36:34
18      (Off the record at 7:36 p.m.)       19:36:35
19          VIDEOGRAPHER: We are back on    19:45:27
20  the record at 7:45 p.m.              19:45:28
21  QUESTIONS BY MS. HERZFELD:             19:45:30
22     Q.   Okay. Great.               19:45:30
23          Ms. Harper, we're back on the  19:45:31
24  record after a quick break. I have a couple  19:45:34
25  more questions for you. Hopefully we'll get  19:45:37

Page 525

1  you out of here relatively quickly.        19:45:39
2          I'm done with that exhibit, so  19:45:41
3  you can set it aside.                 19:45:43
4          I have a question about the    19:45:45
5  branded side of Mallinckrodt.           19:45:51
6          Did you deal at all with them?  19:45:52
7      A.   On a fairly limited basis.     19:45:54
8      Q.   Okay. And what was your       19:45:56
9  involvement with the branded side?        19:45:58
10     A.   Only to the extent that they    19:46:00
11  sold branded products that were narcotics.  19:46:06
12     Q.   Okay. So like Exalgo or       19:46:10
13  Xartemis?                          19:46:13
14     A.   Yes.                      19:46:15
15     Q.   Okay. And so I'm going to ask   19:46:15
16  you some questions about that just to figure 19:46:18
17  out if there's -- what your role is.       19:46:19
18          Okay?                     19:46:20
19     A.   Okay.                     19:46:21
20     Q.   So the branded side had target  19:46:22
21  pharmacy lists; is that correct?         19:46:26
22     A.   I don't know.               19:46:27
23     Q.   Okay. Were you ever involved   19:46:28
24  in reviewing target pharmacy lists from the  19:46:30
25  branded sided?                      19:46:33

Page 526

1  A.  So I'm going to -- I'm going to  19:46:34
2  clarify my previous answer.  19:46:36
3  Q.  Sure.  19:46:37
4  A.  Because, yes, I believe they  19:46:39
5  had -- I don't know what they were called --  19:46:42
6  Q.  Okay.  19:46:42
7  A.  -- but they -- did you say  19:46:44
8  pharmacies?  19:46:45
9  Q.  Yes, ma'am.  19:46:45
10  A.  I'm not certain about that.  19:46:46
11  Q.  Okay.  What about physicians?  19:46:48
12  A.  Yes.  19:46:49
13  Q.  Okay.  19:46:50
14  A.  Yes.  Yes.  19:46:50
15  Q.  And do you -- what was your  19:46:51
16  involvement in reviewing those target  19:46:54
17  physician lists?  19:46:56
18  A.  When we had -- when we were  19:46:57
19  using the top prescriber list from the IMS  19:47:02
20  data, we would vet that against the speakers  19:47:06
21  list.  19:47:13
22  Q.  Okay.  And what's the speakers  19:47:13
23  list?  19:47:18
24  A.  Those were speakers that -- and  19:47:18
25  I don't know very much about the program, but  19:47:21

Page 527

1  that Mallinckrodt employed to speak on our --  19:47:23
2  I don't know -- I don't know the arrangement,  19:47:28
3  but they spoke on behalf of Mallinckrodt for  19:47:30
4  Mallinckrodt products.  But I don't want to  19:47:33
5  reach too far into the brands because --  19:47:34
6  okay.  19:47:37
7  Q.  Okay.  As long as I understand  19:47:37
8  your answer.  19:47:40
9  A.  Yeah.  19:47:41
10  Q.  Okay.  And so on -- do you know  19:47:41
11  on -- if -- when you looked at those top  19:47:44
12  prescriber lists, did you review those at all  19:47:47
13  from a suspicious order monitoring  19:47:51
14  perspective?  19:47:53
15  A.  Yes.  19:47:54
16  Q.  Okay.  And what did you do for  19:47:56
17  that?  19:47:58
18  A.  So that is when, in the  19:47:58
19  circumstance we spoke about before, if we  19:48:01
20  were reviewing a downstream registrant and  19:48:04
21  their due diligence with a particular  19:48:10
22  pharmacy, if the distributor's file contained  19:48:12
23  information about the top prescribers at  19:48:18
24  those pharmacies, we would vet that against  19:48:19
25  the list of the top prescribers per IMS.  19:48:22

Page 528

1  Q.  Okay.  And top prescribers for  19:48:27
2  Mallinckrodt products, those prescriptions  19:48:31
3  could have been legitimate; is that right?  19:48:32
4  A.  Yes.  19:48:34
5  Q.  Okay.  And those prescriptions  19:48:35
6  also could have been illegitimate?  19:48:37
7  A.  And I'd like to qualify that.  19:48:40
8  Q.  Yes, ma'am.  19:48:41
9  A.  So our top prescriber list --  19:48:42
10  Q.  Yes, ma'am.  19:48:44
11  A.  -- I don't know if that was  19:48:45
12  exclusive to Mallinckrodt product, but it was  19:48:46
13  for oxy 15 and oxy 30.  19:48:47
14  Q.  Okay.  So for the folks that  19:48:50
15  were the top prescribers of oxy 15 and  19:48:53
16  oxy 30, those could be legitimate doctors.  19:48:56
17  They could be at the top of the list; is that  19:48:58
18  right?  19:49:01
19  A.  Correct.  19:49:01
20  Q.  Or those could be people who  19:49:01
21  were operating pill mills.  They could also  19:49:03
22  be at the top of the list?  19:49:05
23  A.  Potentially, yes.  19:49:06
24  Q.  Okay.  And did Mallinckrodt  19:49:07
25  have a way of figuring that out?  19:49:11

Page 529

1  A.  When we used that list and the  19:49:12
2  review with our distributors of their  19:49:18
3  downstream registrants, again, if they  19:49:20
4  provided us the names of the top prescribers  19:49:22
5  at the pharmacy, and if that coincided with  19:49:26
6  the top prescriber list we had within the  19:49:29
7  country, we would have a detailed  19:49:32
8  conversation with the distributor about the  19:49:34
9  fact that that prescriber appeared on the  19:49:37
10  list.  19:49:40
11  Q.  So that they were a top  19:49:40
12  prescriber?  19:49:43
13  A.  Yes.  19:49:43
14  Q.  Okay.  Okay.  And so do you  19:49:44
15  know if anyone from Mallinckrodt sales team  19:49:47
16  was supposed to report signs of diversion to  19:49:52
17  you?  19:49:58
18  A.  We spoke before about the NAMs,  19:49:58
19  the narcotic -- national account managers.  19:50:00
20  Q.  Yes, ma'am.  19:50:02
21  A.  We asked them to be our  19:50:03
22  observers, and if they saw anything at any of  19:50:05
23  our customers that may appear to be a red  19:50:10
24  flag, that they would report to the company.  19:50:11
25  Q.  Okay.  And was that process the  19:50:13

Page 530

```
 1  same for the sales team on the branded side?    19:50:15
 2      A.   Not to my knowledge.         19:50:18
 3      Q.   Okay.  Do you know if there was    19:50:21
 4  any sort of suspicious order monitoring       19:50:23
 5  training for the sales team on the branded    19:50:25
 6  side?                                 19:50:27
 7      A.   I'm not certain.              19:50:27
 8      Q.   Okay.  Do you know if you had a    19:50:28
 9  counterpart, a suspicious order person, on    19:50:30
10  the branded side?                     19:50:35
11      A.   Did not.                      19:50:36
12      Q.   Okay.                         19:50:37
13           THE WITNESS:  I have a -- I'm   19:50:40
14  looking at the questioner's mouth a           19:50:42
15  lot, and this thing's in my way.  Can         19:50:46
16  we scoot it or something?  I'm sorry.         19:50:49
17  It's just helping me understand the           19:50:51
18  question.                             19:50:53
19           MS. HERZFELD:  That was very    19:50:54
20  thoughtful.  Thank you.               19:50:58
21           THE WITNESS:  Okay.           19:50:59
22  QUESTIONS BY MS. HERZFELD:                    19:50:59
23      Q.   Did Mallinckrodt have a program 19:51:16
24  or procedure in place to connect problem      19:51:18
25  prescribers and problem pharmacies?           19:51:20
```

Page 531

```
 1           MR. O'CONNOR:  Objection to     19:51:22
 2  form.                                 19:51:23
 3           THE WITNESS:  Only to the      19:51:23
 4  extent I previously described.  If we         19:51:28
 5  were talking to a distributor about          19:51:30
 6  their downstream sales, sales to a            19:51:33
 7  downstream registrant, and if their           19:51:34
 8  due diligence, the distributor's due          19:51:36
 9  diligence, files contained a list of          19:51:38
10  top prescribers, we would reference           19:51:39
11  that against our listing of top               19:51:40
12  prescribers within the country.               19:51:43
13           (Mallinckrodt-Harper Exhibit 41 19:52:32
14  marked for identification.)                   19:52:34
15  QUESTIONS BY MS. HERZFELD:                    19:52:34
16      Q.   Okay.  I'm going to mark this    19:52:34
17  next one as Exhibit 41.  And this is          19:52:35
18  MNK-T1_0007704503.  I'm sorry, it's stapled   19:52:39
19  on the bottom.                        19:52:47
20           Take a minute to take a look at 19:53:27
21  this list.  I'll represent to you that the    19:53:31
22  path it says is -- the file name is DIRJ and  19:53:33
23  pill mill physicians list, 2012, something.   19:53:36
24  It looks like the date it was last modified   19:53:49
25  was 1/16/2012.                        19:53:52
```

Page 532

```
 1           Have you seen this list before? 19:53:54
 2      A.   No.                           19:53:55
 3      Q.   Okay.  Do you know of any list  19:53:56
 4  that was kept of pill mill physicians?        19:53:59
 5      A.   No.                           19:54:04
 6      Q.   Okay.  Do you know what DIRJ     19:54:05
 7  stands for?                           19:54:08
 8      A.   No.                           19:54:08
 9      Q.   Okay.  Do you have any idea who  19:54:08
10  I might ask about this document?              19:54:28
11      A.   Perhaps someone on the branded  19:54:30
12  side.                                 19:54:32
13      Q.   Okay.  You suspect this has     19:54:33
14  something to do with branded, perhaps?        19:54:34
15      A.   I suspect that, yes.           19:54:36
16      Q.   Okay.  Very good then.         19:54:37
17      A.   Okay.                         19:54:39
18      Q.   Set it aside.                  19:54:39
19           Oh, you know what?  Actually if 19:54:48
20  you'll take it back for one second, it looks  19:54:49
21  like they stapled it all together again.  I   19:54:51
22  don't think we have to put it as a separate   19:54:53
23  exhibit.                              19:54:54
24      A.   So are we still on 41?  Is that 19:54:54
25  correct?                              19:54:56
```

Page 533

```
 1      Q.   We are.                        19:54:57
 2           If you'll look at the very last 19:54:58
 3  page for me, if you flip it over one, I'll    19:54:59
 4  represent to you that this list here is the   19:55:03
 5  same list but sorted by Tennessee.  It's got  19:55:04
 6  the same Bates number.                19:55:07
 7           Do any -- looking at that, do   19:55:09
 8  any of those names ring a bell to you for any 19:55:13
 9  suspected pill mill operations in Tennessee?  19:55:18
10      A.   No.                           19:55:20
11      Q.   Okay.  That was my last         19:55:22
12  question.  Thank you, ma'am.          19:55:22
13           (Mallinckrodt-Harper Exhibit 42 19:55:28
14  marked for identification.)                   19:55:30
15  QUESTIONS BY MS. HERZFELD:                    19:55:30
16      Q.   Okay.  Mark this next one as     19:55:30
17  Exhibit 42.  It is MNK-T1_00005947296.        19:55:41
18           Okay.  The file name is "IMS    19:56:02
19  high oxy 30 prescribers in January 2013."  I  19:56:06
20  will represent to you that we have modified   19:56:11
21  this list to sort it just by Tennessee.  We   19:56:12
22  haven't changed the contents of it at all.    19:56:17
23           Do you recognize this list,     19:56:20
24  ma'am?                                19:56:21
25      A.   No.                           19:56:21
```

**Page 534**

```
1      Q.   Is this the IMS data you were      19:56:24
2   talking about earlier, perhaps, looking for   19:56:26
3   physicians?                                19:56:29
4      MR. O'CONNOR: Objection to            19:56:33
5   form.                                      19:56:33
6      THE WITNESS: It states IMS            19:56:33
7   data, yes, so, yes.                        19:56:34
8   QUESTIONS BY MS. HERZFELD:               19:56:37
9      Q.   Okay.  Have you seen a chart      19:56:37
10  like this that you've consulted before?   19:56:39
11     A.   Perhaps.                          19:56:41
12     Q.   Okay.  Do you know if you did,    19:56:47
13  if it would have been on the branded side or  19:56:49
14  the generic side?                         19:56:51
15     MR. O'CONNOR: Objection to            19:56:52
16  form.                                      19:56:53
17     THE WITNESS: This would have         19:56:53
18  been the list of -- potentially the       19:56:56
19  list of high prescribers that we were     19:57:01
20  cross-referencing.  However, I don't      19:57:04
21  recall that the list was this large or    19:57:07
22  this long.                                 19:57:09
23  QUESTIONS BY MS. HERZFELD:               19:57:09
24     Q.   Okay.  So -- okay.  Very good.    19:57:10
25  Moving along.                              19:57:17
```

**Page 535**

```
1      (Mallinckrodt-Harper Exhibit 43      19:57:18
2   marked for identification.)               19:57:19
3   QUESTIONS BY MS. HERZFELD:               19:57:19
4      Q.   Next one is Exhibit 43,          19:57:22
5   MNK-T1_0007704471.  And the title on this is  19:57:29
6   "IMS prescribers through January 2013," and   19:57:47
7   we have modified it just to show Tennessee.   19:57:51
8      Have you seen a chart like this        19:57:55
9   before, ma'am?                            19:58:20
10     A.   A similar chart with the high     19:58:21
11  prescribers throughout the country is all I   19:58:27
12  recall seeing.                            19:58:31
13     Q.   Okay.  Okay.  And if              19:58:32
14  something's in the network share drive, does  19:58:39
15  that mean it's open to everybody within the   19:58:42
16  suspicious order monitoring team to view?  19:58:44
17     A.   Yes.                             19:58:46
18     Q.   Okay.  So you would have had      19:58:48
19  access to anything on the share drive?    19:58:49
20     A.   Yes.                             19:58:52
21     (Mallinckrodt-Harper Exhibit 44      19:58:57
22  marked for identification.)               19:58:57
23  QUESTIONS BY MS. HERZFELD:               19:58:57
24     Q.   Okay.  Exhibit 44,               19:58:57
25  MNK-T1_0005947297.  The file name on this is   19:59:07
```

**Page 536**

```
1   "Prescriber list."  The date last modified is   19:59:23
2   2/1/2016 on the network share.            19:59:27
3      Have you seen this list before?        19:59:31
4      A.   No.                              19:59:32
5      Q.   Do you have any idea what it      19:59:33
6   is?                                        19:59:34
7      A.   No.                              19:59:34
8      Q.   Okay.  Do you know if it has to   19:59:35
9   do with suspicious order monitoring?      19:59:39
10     A.   No.                              19:59:43
11     Q.   Okay.  I'm going to note here     19:59:43
12  on the page -- let's start with page 3, all  20:00:01
13  the way at the back.                      20:00:05
14     The very top it says, "Alan           20:00:07
15  Pecorella," and the comments are "arrested on  20:00:11
16  8/23/13 on charge of possession of a      20:00:13
17  Schedule II with intent to distribute.    20:00:16
18  State, Tennessee.  On target list, Q2013.   20:00:21
19  Specialty physician assistant."           20:00:25
20     Do you see where that's at?            20:00:27
21     A.   Yes.                             20:00:28
22     Q.   Okay.  And if you keep going      20:00:31
23  through a bunch of these, it has various   20:00:33
24  criminal descriptions here.               20:00:37
25     You didn't create this?                20:00:42
```

**Page 537**

```
1      A.   No.                              20:00:42
2      Q.   Did you have someone on your      20:00:43
3   team create it?                           20:00:44
4      A.   No.                              20:00:45
5      Q.   Okay.  You can set that aside.    20:00:47
6      (Mallinckrodt-Harper Exhibit 45      20:01:11
7   marked for identification.)               20:01:12
8   QUESTIONS BY MS. HERZFELD:               20:01:12
9      Q.   Okay.  Just a couple more.        20:01:13
10  Okay.  I'm going to hand you what we've    20:01:22
11  marked as Plaintiff's Exhibit 45,         20:01:24
12  MNK_TNSTA02527616.  And take a look at that   20:01:35
13  for me, please.                           20:01:38
14     I will submit to you that we           20:01:44
15  took the information provided to us and    20:01:45
16  sorted by state, so it's Tennessee only.   20:01:47
17     Okay.  And the title of this           20:02:02
18  document is "oxy 15," and then we'll do 30,   20:02:04
19  "sold via by month January through        20:02:08
20  December 2011."  Run -- the run, I am      20:02:11
21  guessing, is report run, 2/15/2012.       20:02:13
22     Do you see that?                       20:02:16
23     A.   Yes.                             20:02:17
24     Q.   Okay.  So going through this,     20:02:19
25  I'm not going to ask you 800 million       20:02:21
```

Page 538

1  questions, but we've sorted it by Tennessee.  20:02:25
2  So if you will go with me to the very last  20:02:29
3  page.  20:02:42
4  A.  Page 17?  20:02:42
5  Q.  Page 17, yes, ma'am.  20:02:43
6  A.  All right.  20:02:43
7  Q.  All the way down to the very  20:02:45
8  bottom line that's open, sorting it by state  20:02:46
9  and then totaling the totals for 12 months,  20:02:49
10  can you please read that number in the  20:02:52
11  corner?  20:02:54
12  A.  4,071,300.  20:02:54
13  Q.  Okay.  And do you know if those  20:03:00
14  are sales of pills or bottles?  20:03:05
15  A.  These appear to be chargeback  20:03:12
16  reports --  20:03:19
17  Q.  Yes, ma'am.  20:03:19
18  A.  -- and it would have been  20:03:19
19  dosage units.  20:03:20
20  Q.  Dosage units?  20:03:21
21  A.  Yes.  20:03:22
22  Q.  Okay.  And what is a dosage  20:03:23
23  units?  20:03:24
24  A.  A pill.  20:03:24
25  Q.  Okay.  20:03:24

Page 539

1  A.  Or a tablet or a capsule, yes.  20:03:26
2  Q.  Okay.  So when we take the  20:03:29
3  total number here, 4,071,300, that would be  20:03:30
4  pills of oxy 15 shipped to Tennessee, January  20:03:36
5  through December 2011; is that right?  20:03:41
6  A.  So the front of the chart says  20:03:43
7  "oxy 15s and 30s."  20:03:51
8  Q.  Yes, ma'am.  20:03:53
9  A.  And I just don't see -- it says  20:03:53
10  it's on separate tabs, and I don't see --  20:03:54
11  Q.  Yeah.  So this one is the sheet  20:03:54
12  for oxy 15, and I'm going to show you the  20:03:56
13  next one for oxy 30.  20:03:58
14  A.  All right.  20:03:59
15  Q.  Okay?  20:03:59
16  A.  Got it.  20:04:00
17  Q.  Okay.  So I'm going to go back  20:04:00
18  and ask my question, just to make sure I  20:04:02
19  round that out.  20:04:04
20  So the total here, 4,071,300,  20:04:04
21  that would be the number of pills of oxy 15  20:04:08
22  shipped to Tennessee, January through  20:04:12
23  December of 2011, according to this  20:04:16
24  chargeback data; is that correct?  20:04:17
25  A.  Yes.  20:04:18

Page 540

1  Q.  Okay.  Thank you.  Okay.  20:04:19
2  Moving along.  20:04:22
3  (Mallinckrodt-Harper Exhibit 46  20:04:23
4  marked for identification.)  20:04:23
5  QUESTIONS BY MS. HERZFELD:  20:04:23
6  Q.  Okay.  It's a different tab of  20:04:28
7  the same Bates number, MNK_TNSTA02527616.  20:04:29
8  Okay.  Same chart but for -- the tab for  20:04:43
9  oxy 30.  We've modified this just to  20:04:48
10  Tennessee.  20:04:50
11  And if you'll flip with me to  20:04:51
12  the very last page, if you could read the  20:04:55
13  total for me there, ma'am.  20:05:00
14  A.  12,482,100.  20:05:02
15  Q.  Okay.  So same question on --  20:05:16
16  for this chargeback sheet for -- I want to  20:05:20
17  make sure I understand it.  20:05:28
18  So that's 12,482,100 pills of  20:05:29
19  oxy 30 that were sent to Tennessee, January  20:05:34
20  through December 2011, according to the  20:05:38
21  chargeback data; is that correct, ma'am?  20:05:41
22  A.  Yes.  20:05:42
23  Q.  Okay.  Thank you very much.  20:05:43
24  You can set that aside.  20:05:45
25  Okay.  So if you add those two  20:05:52

Page 541

1  numbers -- I'll submit that the total, so you  20:05:54
2  don't have to do the math, is 16,553,400  20:05:56
3  Mallinckrodt oxy 15 and 30-milligram pills  20:06:00
4  that ended up in Tennessee in one year.  20:06:02
5  Does that sound correct?  20:06:08
6  MR. O'CONNOR:  Objection to  20:06:09
7  form.  20:06:09
8  THE WITNESS:  Yes, based upon  20:06:09
9  these reports you've shown me, yes.  20:06:10
10  QUESTIONS BY MS. HERZFELD:  20:06:12
11  Q.  Okay.  And oxy 15 and oxy 30  20:06:12
12  are not the only oxycodone products that  20:06:16
13  Mallinckrodt manufactures; is that right?  20:06:18
14  A.  Yes.  20:06:20
15  Q.  Okay.  What other products are  20:06:21
16  there?  20:06:22
17  A.  There's oxycodone  20:06:23
18  acetaminophen --  20:06:25
19  Q.  Okay.  20:06:26
20  A.  -- tablets in various  20:06:26
21  strengths, but I don't know the list of  20:06:30
22  strengths.  20:06:31
23  Q.  Okay.  And other than the  20:06:32
24  oxycodone acetaminophen and the two branded  20:06:35
25  we've discussed, Exalgo and Xartemis, do you  20:06:37

Page 542

```
 1   know any other opioid products that are      20:06:41
 2   manufactured by Mallinckrodt?                 20:06:42
 3      A.   I can't be certain.  Some of          20:06:44
 4   the drug substances we distribute in an oral  20:06:47
 5   formulation --                               20:06:51
 6      Q.   Okay.                                 20:06:52
 7      A.   -- but I don't know if               20:06:52
 8   oxycodone is one of them.                     20:06:52
 9      Q.   Okay.  But so far as you know,        20:06:54
10   for oxycodone we've talked about what we      20:06:57
11   have?                                         20:06:59
12      A.   Yes.                                  20:06:59
13      Q.   Okay.  So for the oxycodone          20:06:59
14   with acetaminophen, do you know if            20:07:01
15   spreadsheets like that, like we just looked   20:07:02
16   at, if those exist for the oxycodone with     20:07:04
17   acetaminophen?                                20:07:07
18      A.   So the chargeback data exists        20:07:08
19   for all products, but the ones we focus on    20:07:10
20   are the oxy 15s, the oxy 30s and the hydro    20:07:15
21   10s.                                          20:07:20
22      Q.   Okay.  So there wouldn't have        20:07:21
23   been a chargeback report necessarily          20:07:23
24   regularly run for oxycodone acetaminophen?    20:07:25
25      A.   Correct.                              20:07:27
```

Page 543

```
 1      Q.   Okay.  And you mentioned the          20:07:27
 2   hydrocodone -- I say hydrocodone; you say     20:07:32
 3   hydrocodone.                                  20:07:34
 4      A.   That's all right.                     20:07:35
 5      Q.   I apologize for that.                 20:07:35
 6           You mentioned the hydrocodone         20:07:37
 7   10-milligram, you ran chargeback datas for    20:07:39
 8   those two; is that correct?                   20:07:41
 9      A.   Yes.                                  20:07:45
10           (Mallinckrodt-Harper Exhibit 47      20:07:46
11      marked for identification.)                20:07:47
12   QUESTIONS BY MS. HERZFELD:                    20:07:47
13      Q.   Okay.  I marked this one as           20:07:53
14   Exhibit 47.  Okay.  And this is               20:07:54
15   MNK_TNSTA02527625.                            20:08:06
16           If you look at the file name          20:08:13
17   here, it says "Hydro APAP 10 shipped to and   20:08:15
18   sold via W DEA by month, January 2012 through 20:08:20
19   December 2012, all APAP."                      20:08:27
20           Do you know what any of that          20:08:28
21   means?                                        20:08:30
22      A.   Yes.                                  20:08:30
23      Q.   Could you explain it to me,           20:08:31
24   please?                                       20:08:32
25      A.   So hydrocodone APAP, we sell          20:08:32
```

Page 544

```
 1   that in various strengths.                    20:08:36
 2      Q.   Uh-huh.                               20:08:38
 3      A.   Some of the products in our           20:08:40
 4   line have 5 milligrams of hydrocodone, some   20:08:42
 5   have 7 and a half milligrams of hydrocodone,  20:08:46
 6   and in this case it's referencing             20:08:49
 7   10 milligrams of hydrocodone --               20:08:52
 8      Q.   Okay.                                 20:08:53
 9      A.   -- per pill mixed -- or with          20:08:53
10   acetaminophen contained in the pill as well.  20:08:58
11      Q.   Okay.  And when it says, "W          20:09:00
12   DEA," is that with DEA?                        20:09:03
13           Do you know what that means?          20:09:06
14      A.   Yes, that's correct.                  20:09:06
15      Q.   What does that mean?                  20:09:07
16      A.   With DEA registration.                20:09:07
17      Q.   Oh, with DEA registration.            20:09:08
18   Okay.                                         20:09:10
19           And is the reason that the            20:09:11
20   hydro APAP 10 S was monitored with reports    20:09:13
21   like this via chargeback data because it was  20:09:20
22   susceptible to diversion?                     20:09:23
23           MR. O'CONNOR:  Objection.             20:09:25
24      Form.                                      20:09:26
25           THE WITNESS:  We were told that       20:09:26
```

Page 545

```
 1   it was a drug of concern based upon           20:09:27
 2      DEA information, yes.                       20:09:29
 3   QUESTIONS BY MS. HERZFELD:                    20:09:30
 4      Q.   Okay.  Thank you.                     20:09:31
 5           Okay.  So looking at this             20:09:33
 6   report, I want to make sure that I understand 20:09:35
 7   this correctly.  And you've already answered  20:09:39
 8   a lot of my questions, so that's great.        20:09:41
 9           Okay.  If you'll go with the          20:09:43
10   total to this one on the very last page, that 20:09:45
11   total there reads -- is that -- could you     20:09:50
12   read it for me, please?                        20:09:53
13      A.   78,184,600.                           20:09:54
14      Q.   Okay.  And so that would be           20:10:00
15   10-milligram hydrocodone -- hydrocodone APAP  20:10:03
16   pills sold in Tennessee from January 2012 to  20:10:06
17   December 2012; is that correct?  That's what  20:10:11
18   this shows?                                   20:10:15
19      A.   The date at the top says '13.        20:10:16
20   Year 2013.                                    20:10:21
21      Q.   Well, I think that's the date,        20:10:21
22   not -- oh, where do you see?                  20:10:22
23      A.   Here.                                 20:10:24
24      Q.   Oh, it sure does.  Maybe it's        20:10:27
25   mislabeled.                                   20:10:29
```

Page 546

1      Okay. So 2013. Make sure I've     20:10:30
2  got the right chart.              20:10:33
3      Well, it sure does say 2013.     20:10:46
4  Okay. So I'm going to modify my question.   20:10:49
5      So that total there -- okay.    20:10:50
6  So that total there, 78,184,600, that is   20:10:59
7  hydro APAP pills sold in Tennessee during the  20:11:06
8  calendar year 2013. Is that correct,     20:11:10
9  according to this chart?            20:11:11
10     A.   Those with 10 milligrams of    20:11:12
11 hydrocodone, yes.                20:11:14
12     Q.   Okay. Thank you.           20:11:15
13     Do you know why that number is    20:11:21
14 so large?                    20:11:25
15     A.   I don't have enough information  20:11:26
16 to determine whether this is a large number.  20:11:33
17     Q.   Okay. Do you know how -- what   20:11:37
18 the average was of 10-milligram hydrocodone  20:11:40
19 pills being shipped to a state?        20:11:42
20     A.   No.                   20:11:44
21     Q.   Okay. Do you know anything     20:11:47
22 about a Veterans Administration hospital in   20:11:48
23 Tennessee getting shipments of hydrocodone?   20:11:52
24     MR. O'CONNOR: Objection to       20:11:54
25 form.                        20:11:55

Page 547

1      THE WITNESS: Not specifically,   20:11:55
2  no.                         20:11:56
3  QUESTIONS BY MS. HERZFELD:           20:11:56
4      Q.   Okay. Do you know if the VA    20:11:57
5  has a warehouse in Tennessee for medication?  20:12:05
6      A.   I do not know.            20:12:07
7      Q.   Okay. Have you dealt with the   20:12:08
8  VA, Veterans Administration, at all in     20:12:12
9  supplying their medication?          20:12:15
10     A.   I know we supply the VA, but    20:12:16
11 I've not had any conversations with the VA.  20:12:18
12     Q.   Okay. Was there a specific     20:12:21
13 person at Mallinckrodt whose job it would   20:12:23
14 have been to deal with the VA?         20:12:24
15     A.   Yes.                  20:12:26
16     Q.   Who would that have been?      20:12:27
17     A.   So she's no longer with the     20:12:28
18 company.                     20:12:30
19     Q.   Okay.                  20:12:31
20     A.   Her name is Trudy Nicholson.    20:12:32
21     Q.   Okay. And what was Trudy      20:12:34
22 Nicholson's position?              20:12:36
23     A.   National account manager.      20:12:37
24     Q.   Okay. And do you know what her  20:12:38
25 area was?                    20:12:40

Page 548

1      A.   VA and other government       20:12:41
2  entities.                    20:12:44
3      Q.   Okay. And do you know what     20:12:45
4  year she left?                 20:12:50
5      A.   Within the past two years.     20:12:51
6      Q.   Okay. Do you know if someone    20:12:53
7  has replaced her?                20:12:54
8      A.   Yes.                  20:12:55
9      Q.   Do you know who it is?        20:12:56
10     A.   I -- there are several new     20:12:57
11 national account managers. I barely know   20:13:00
12 their names, and I don't know their       20:13:05
13 territories.                   20:13:06
14     Q.   Okay. Do you know what 867     20:13:07
15 data is?                     20:13:11
16     A.   I've heard the term, yes.      20:13:11
17     Q.   Okay. Do you know what it is?   20:13:13
18     A.   It has to do with chargebacks,   20:13:14
19 but other than that, it's -- I don't know.  20:13:19
20     (Mallinckrodt-Harper Exhibit 48   20:14:15
21 marked for identification.)          20:14:16
22 QUESTIONS BY MS. HERZFELD:           20:14:16
23     Q.   Okay. I'll show you what we'll   20:14:10
24 mark as Plaintiff's Exhibit 48.        20:14:14
25 Mallinckrodt -- sorry, it's          20:14:20

Page 549

1  MNK-T1_0007717730.               20:14:23
2      Take a look at this. My          20:14:31
3  question here is actually pretty simple if   20:14:41
4  you'll just take a look at it.        20:14:44
5      A.   All right.              20:14:45
6      Q.   Does this also appear to be a   20:14:47
7  chart of hydro APAP 10s sold for the calendar  20:14:48
8  year 2015 to the state of Tennessee?      20:14:51
9      A.   Yes.                  20:14:53
10     Q.   Okay. That's my only question.   20:14:54
11     Okay. And you could place any     20:14:55
12 pharmacy on the chargeback data restrictions  20:15:27
13 list; is that right?              20:15:29
14     MR. O'CONNOR: Objection to       20:15:33
15 form.                        20:15:34
16     THE WITNESS: Provided it was a    20:15:34
17 pharmacy that purchased through a       20:15:37
18 distributor who applied for a         20:15:39
19 chargeback reimbursement, yes. Yes.      20:15:41
20 QUESTIONS BY MS. HERZFELD:           20:15:43
21     Q.   Okay. And you didn't -- you    20:15:44
22 weren't required to fill any orders that   20:15:45
23 seemed suspicious?                20:15:49
24     A.   Correct.               20:15:49
25     Q.   Okay. And were you involved at  20:15:50

Page 550

1  all in the review of the distributors top 40    20:15:56
2  pharmacies that began somewhere around    20:15:58
3  October of 2011?    20:16:00
4        MR. O'CONNOR: Objection to    20:16:02
5  form.    20:16:02
6        THE WITNESS: Yes.    20:16:02
7  QUESTIONS BY MS. HERZFELD:    20:16:03
8    Q.   Okay. And that was --    20:16:03
9  Mallinckrodt reviewed the top 20 pharmacies    20:16:05
10 in Florida and the top 20 pharmacies outside    20:16:07
11 of Florida; is that correct?    20:16:11
12   A.   Yes.    20:16:12
13   Q.   Okay. And some of those    20:16:13
14 pharmacies that were on the 20 list outside    20:16:16
15 of Florida were in Tennessee; is that right?    20:16:18
16   A.   I don't -- I don't have the    20:16:20
17 list in front of me, but I don't dispute    20:16:24
18 that.    20:16:26
19   Q.   Okay. And which distributors    20:16:27
20 did you review?    20:16:35
21        You were involved with the    20:16:36
22 Cardinal review?    20:16:37
23   A.   Yes.    20:16:37
24   Q.   Okay. And if I understand    20:16:40
25 things correctly, one of the things that was    20:16:43

Page 551

1  asked of the distributors was to have them    20:16:50
2  fill out a pharmacy information sheet; is    20:16:52
3  that correct?    20:16:55
4    A.   Yes. Yes.    20:16:55
5    Q.   Okay. And were you involved in    20:16:56
6  helping to develop those pharmacy information    20:16:58
7  sheets?    20:17:01
8    A.   Yes.    20:17:01
9    Q.   Okay. And who else was    20:17:03
10 involved in that?    20:17:05
11   A.   It was a team effort by    20:17:05
12 suspicious order monitoring team members at    20:17:10
13 that time.    20:17:12
14   Q.   Okay. Okay. I think we'll go    20:17:12
15 back in our questioning just a little bit    20:17:44
16 here.    20:17:48
17        (Mallinckrodt-Harper Exhibit 49    20:17:55
18   marked for identification.)    20:17:56
19 QUESTIONS BY MS. HERZFELD:    20:17:56
20   Q.   Mark this one as Plaintiff's    20:17:56
21 Exhibit 49. This one is labeled    20:18:00
22 MNK-T1_0004592727.    20:18:15
23        Is this your handwriting,    20:18:17
24 ma'am?    20:18:23
25   A.   Yes.    20:18:23

Page 552

1    Q.   Okay. And you recognize it as    20:18:26
2  your handwriting?    20:18:27
3    A.   Yes.    20:18:27
4    Q.   Okay. Great.    20:18:28
5        And it looks like yet again we    20:18:29
6  have added another document to the back of    20:18:34
7  this, if you'll bear with me for just one    20:18:36
8  second.    20:18:38
9    A.   Oh -- oh.    20:18:39
10   Q.   Yeah, it looks like it got    20:18:44
11 copied on the second back, so we're going to    20:18:45
12 ignore those pharmacy information sheets for    20:18:48
13 a minute, okay? My apologies.    20:18:50
14   A.   All right.    20:18:53
15   Q.   Okay. So let's just look at    20:18:53
16 this document as it is.    20:18:55
17   A.   Which page, please?    20:18:56
18   Q.   The first page.    20:18:57
19   A.   This first page? Okay. Yes.    20:18:57
20 Got it.    20:18:59
21   Q.   Yes, the one that ends 2727.    20:18:59
22   A.   Got it.    20:19:02
23   Q.   Is this the Cardinal top 40    20:19:02
24 oxy 30 pharmacies as of March 2012?    20:19:04
25        MS. FIX MEYER: Objection.    20:19:09

Page 553

1  Form. Foundation.    20:19:10
2        MS. HERZFELD: I'm going to    20:19:12
3  object to your objection because    20:19:12
4  you're not a party in our case.    20:19:13
5        MS. FIX MEYER: Okay.    20:19:15
6        THE WITNESS: Yes.    20:19:16
7  QUESTIONS BY MS. HERZFELD:    20:19:19
8    Q.   Okay? And do you see Tennessee    20:19:20
9  pharmacies on this list?    20:19:21
10   A.   Yes.    20:19:22
11   Q.   Okay. And which pharmacies do    20:19:23
12 you see that are located in Tennessee on this    20:19:26
13 list?    20:19:28
14   A.   I see Riggs Drug.    20:19:28
15   Q.   Yes, ma'am.    20:19:31
16   A.   And, oh, Riggs Drug again.    20:19:32
17   Q.   Yes, ma'am.    20:19:38
18   A.   And Kinser drugstore.    20:19:39
19   Q.   Okay. And do you know what    20:19:41
20 that shaded area, pharmacy 90-day review from    20:19:42
21 previous meeting, means?    20:19:46
22   A.   Yes.    20:19:47
23   Q.   What does it mean?    20:19:48
24   A.   It means we had previously    20:19:49
25 spoken to the distributor about these    20:19:54

Page 554

1  pharmacies, and they were doing additional    20:19:57
2  review or performing due diligence or -- to    20:20:02
3  some extent, and that we were going to    20:20:06
4  revisit these pharmacies on our next    20:20:08
5  quarterly review.    20:20:10
6        MS. FIX MEYER: Objection.    20:20:11
7  Form. Foundation.    20:20:12
8        MS. HERZFELD: Same objection.    20:20:13
9  QUESTIONS BY MS. HERZFELD:    20:20:14
10    Q.    Pharmacies to be reviewed in    20:20:14
11  quarter 3 CY '12 is that bottom group.    20:20:16
12    What does that mean?    20:20:21
13        MS. FIX MEYER: Objection.    20:20:24
14  Form. Foundation.    20:20:25
15        MS. HERZFELD: Same objection.    20:20:25
16    I'm just going to have a    20:20:26
17  standing objection to any objections    20:20:27
18  from Cardinal's counsel. Cardinal has    20:20:29
19  not cross-noticed us in this    20:20:31
20  deposition, nor is Cardinal part of    20:20:34
21  our case. So our objection is    20:20:36
22  Cardinal doesn't have standing to    20:20:39
23  object.    20:20:40
24  QUESTIONS BY MS. HERZFELD:    20:20:41
25    Q.    You can go ahead.    20:20:41

Page 555

1    A.    So it means what it says.    20:20:42
2  These were the pharmacies that we would    20:20:45
3  discuss with Cardinal at that particular next    20:20:48
4  meeting.    20:20:52
5    Q.    Okay. And what does your    20:20:53
6  handwriting here say?    20:20:56
7    A.    It says, "Riggs not related."    20:20:57
8    Q.    Okay. And what does that mean?    20:20:59
9    A.    I do not know.    20:21:01
10    Q.    Okay. And then what does your    20:21:04
11  handwriting down below say?    20:21:05
12    A.    "Cardinal owns SPS, Specialty    20:21:07
13  Pharmacy Services."    20:21:12
14    Q.    Okay. And what does that mean?    20:21:12
15    A.    I don't know.    20:21:14
16    Q.    Okay. Do you know what    20:21:14
17  Specialty Pharmacy Services is?    20:21:17
18    A.    No.    20:21:18
19    Q.    Okay. And flip with me to the    20:21:19
20  next page.    20:21:27
21    Is that your handwriting on    20:21:28
22  this document as well?    20:21:29
23    A.    Yes.    20:21:30
24    Q.    Okay. Then we'll keep flipping    20:21:36
25  to the next one, the one that looks like    20:21:38

Page 556

1  this. This is the one that ends 59731.    20:21:40
2        Do you see that list?    20:21:47
3    A.    592731?    20:21:48
4    Q.    Yes, ma'am.    20:21:55
5    A.    Yes.    20:21:55
6    Q.    Okay. And so this is Cardinal    20:21:56
7  oxycodone 30 multi-distributor pharmacies as    20:21:58
8  of March 2012.    20:22:02
9        Did I read that correctly?    20:22:04
10    A.    Yes.    20:22:06
11    Q.    Okay. And is that your    20:22:08
12  handwriting to the right?    20:22:09
13    A.    Yes.    20:22:10
14    Q.    And what does that say?    20:22:11
15    A.    It says, "Rock 3 CAH," which is    20:22:12
16  the abbreviation for Cardinal Health,    20:22:20
17  "terminated December 2, 2011."    20:22:23
18    Q.    Okay. And then underneath    20:22:25
19  that?    20:22:27
20    A.    "Bellco picked them up."    20:22:27
21    Q.    Okay. Do you know what any of    20:22:30
22  that means?    20:22:31
23    A.    No.    20:22:32
24    Q.    Okay. And then looking at this    20:22:33
25  list, it looks like there are one, two on    20:22:35

Page 557

1  this list that are in Tennessee.    20:22:40
2        Do you see that?    20:22:41
3    A.    Just a moment, please.    20:22:42
4    Q.    Yeah, sure.    20:22:44
5    A.    Yes.    20:22:45
6    Q.    Okay. And those are Riggs in    20:22:47
7  La Follette, Tennessee, and Riggs Drug in    20:22:50
8  Powell, Tennessee; is that right?    20:22:53
9    A.    Yes.    20:22:54
10    Q.    And so they've been identified    20:22:54
11  as getting oxycodone 30 from multi --    20:22:56
12  multiple distributors; is that right?    20:22:59
13    A.    Yes.    20:23:02
14    Q.    Okay. And so looking at the    20:23:02
15  Riggs Drug, the first one in La Follette,    20:23:04
16  according to this chart it says they were    20:23:07
17  receiving oxycodone 30 from Cardinal and    20:23:09
18  Masters.    20:23:11
19        MS. FIX MEYER: Objection.    20:23:13
20  Form.    20:23:13
21  QUESTIONS BY MS. HERZFELD:    20:23:13
22    Q.    Do you see that?    20:23:14
23        MS. HERZFELD: Standing    20:23:14
24  objection.    20:23:15
25        THE WITNESS: Yes.    20:23:16

Page 558

1  QUESTIONS BY MS. HERZFELD:          20:23:16
2      Q.   And then Riggs Drug in Powell,   20:23:17
3  Tennessee, it says they were receiving    20:23:21
4  oxycodone 30 from Cardinal, Masters and    20:23:23
5  HD Smith Wholesale.                20:23:26
6          MS. FIX MEYER:  Same objection.   20:23:28
7          MS. HERZFELD:  Same objection.    20:23:29
8  QUESTIONS BY MS. HERZFELD:          20:23:31
9      Q.   Am I reading that correctly?   20:23:31
10     A.   Yes.              20:23:32
11     Q.   Okay.  And was this report run   20:23:32
12  every year?             20:23:40
13     A.   I'm not certain of the    20:23:41
14  frequency.              20:23:42
15     Q.   Okay.  Okay.  Then the next    20:23:43
16  one, unfortunately, is really supposed to be   20:23:48
17  another exhibit.              20:23:49
18         MS. HERZFELD:  Should we just    20:23:52
19  mark it separate?  Let's just mark it    20:23:53
20  separate.                20:23:56
21         (Mallinckrodt-Harper Exhibit 50   20:23:56
22  marked for identification.)        20:23:56
23         MS. HERZFELD:  Keep that.    20:23:56
24  Okay, you can put that one to the    20:23:56
25  side.  Then what we'll do is make this   20:24:20

Page 559

1  the next exhibit.  Okay?         20:24:22
2          Okay.  So the next exhibit is   20:24:23
3  50.  Mark this one as Exhibit 50.   20:24:25
4          MR. O'CONNOR:  Just to be    20:24:32
5  clear, what's the Bates number on the   20:24:33
6  exhibit you're marking right now?   20:24:35
7          MS. HERZFELD:  I'm going to    20:24:36
8  tell you.  It's MNK-T1_0004592758 and   20:24:37
9  2756 and 2754 of this collective    20:24:49
10  exhibit.              20:24:53
11         MR. O'CONNOR:  Just observe    20:24:53
12  that it appears to skip Bates numbers,   20:24:55
13  which suggests there might be pages   20:24:59
14  missing from this document.      20:24:59
15         MS. HERZFELD:  It does, and I   20:25:00
16  don't know why that is, but we'll just   20:25:02
17  move along.             20:25:03
18         MR. O'CONNOR:  Well, I would   20:25:04
19  just object to the extent this isn't a   20:25:04
20  document that's --          20:25:06
21         MS. HERZFELD:  Yeah, objection   20:25:07
22  noted.                20:25:08
23         MR. O'CONNOR:  As it's    20:25:08
24  maintained.             20:25:11
25

Page 560

1  QUESTIONS BY MS. HERZFELD:          20:25:13
2      Q.   Can you take a look at it for   20:25:13
3  me, please?             20:25:14
4          My first question on these is   20:25:20
5  pretty simple.  Is this your handwriting?   20:25:21
6      A.   Yes.              20:25:23
7      Q.   Okay.  And when -- do you    20:25:23
8  recognize these to be pharmacy information   20:25:28
9  sheets?                20:25:30
10     A.   Yes.              20:25:30
11     Q.   And these are all pharmacy    20:25:30
12  information sheets for Riggs pharmacy?   20:25:32
13     A.   Yes.              20:25:34
14     Q.   Okay.  Riggs --         20:25:37
15     A.   Except the back --       20:25:37
16     Q.   Okay.             20:25:38
17     A.   -- is some other chart.    20:25:39
18     Q.   Yeah, ignore that.       20:25:40
19     A.   Okay.             20:25:41
20     Q.   Okay.  So that would be Riggs   20:25:42
21  pharmacy in La Follette, Riggs pharmacy in   20:25:44
22  Jacksboro and Riggs pharmacy in Powell,   20:25:48
23  Tennessee; is that right?         20:25:51
24     A.   Yes.              20:25:52
25     Q.   Okay.  And looking at this,   20:25:53

Page 561

1  you've got your handwritten notes.  It goes   20:25:55
2  through, it looks like, portions of the   20:25:57
3  pharmacy information sheet.       20:25:59
4          Where did you get this    20:26:00
5  information?             20:26:02
6      A.   In a conversation with a    20:26:06
7  wholesaler.  It's not identified here.   20:26:09
8      Q.   Okay.  And you would agree with   20:26:12
9  me in those three pages of your handwritten   20:26:14
10  notes about the various Riggs that not every   20:26:16
11  section of your pharmacy information sheet is   20:26:21
12  filled out; is that correct?      20:26:24
13     A.   Correct.            20:26:24
14     Q.   Okay.  And did Mallinckrodt, to   20:26:26
15  your knowledge, ever do any site visits at   20:26:29
16  any of these three Riggs pharmacies?   20:26:32
17     A.   Not to my knowledge.      20:26:34
18     Q.   Okay.  And do you have any    20:26:34
19  recollection of any conversations about the   20:26:35
20  Riggs pharmacies at all?         20:26:37
21     A.   This pharmacy information sheet   20:26:40
22  would have been the product of a discussion.   20:26:42
23     Q.   Okay.  Other than what's    20:26:45
24  written down in your handwritten notes on   20:26:47
25  these pharmacy information sheets, do you   20:26:50

Page 562

```
 1  recall anything about those Riggs pharmacies?  20:26:52
 2      A.  No.                          20:26:54
 3      Q.  Okay.                        20:26:55
 4         (Mallinckrodt-Harper Exhibit 51   20:27:22
 5      marked for identification.)       20:27:23
 6  QUESTIONS BY MS. HERZFELD:            20:27:23
 7      Q.  Okay.  I'm going to hand you   20:27:23
 8  what we'll mark as Exhibit 51,        20:27:26
 9  MNK_TNSTA05350336.                    20:27:36
10         Okay.  Do you recognize this   20:27:43
11  document?                             20:27:46
12      A.  Yes.                          20:27:46
13      Q.  What does it appear to        20:27:47
14  be?                                   20:27:49
15      A.  Pharmacy information sheet on  20:27:49
16  Riggs Drug again.                     20:27:54
17      Q.  Okay.  And this is the Riggs  20:27:54
18  Drug in La Follette, Tennessee; is that  20:27:56
19  right?                                20:27:59
20      A.  Yes.                          20:27:59
21      Q.  Okay.  And that's date        20:27:59
22  10/12/11?                             20:28:02
23      A.  Yes.                          20:28:02
24      Q.  Okay.  And if you'll look down  20:28:03
25  here at the notes, it says, "Other notes:  20:28:04
```

Page 563

```
 1  Explanation of 800 RX total per day.  PIC  20:28:06
 2  said increases due to physicians switching  20:28:11
 3  from hydrocodone APAP mix due to liver  20:28:13
 4  concerns."                            20:28:17
 5         Do you know where that         20:28:18
 6  information was obtained?             20:28:19
 7      A.  I do not know.                20:28:20
 8         Well, the information would    20:28:25
 9  have been provided by Cardinal Health.  20:28:28
10      Q.  Okay.  And did you do anything  20:28:30
11  to verify the information provided to you by  20:28:32
12  Cardinal Health?                      20:28:34
13      A.  No.                          20:28:35
14      Q.  Okay.  And did anyone in      20:28:37
15  Mallinckrodt, to your knowledge, do anything  20:28:39
16  to verify the information provided by  20:28:40
17  Cardinal Health?                      20:28:42
18      A.  No.                          20:28:42
19      Q.  Okay.  Okay.  So then the next  20:28:44
20  sentence says, "Near Riggs Medical Center and  20:28:46
21  St. Mary's Hospital."                 20:28:49
22         Do you see where it says that?  20:28:52
23      A.  Yes.                          20:28:54
24      Q.  Okay.  You obtained that      20:28:54
25  information from Cardinal Health?     20:28:55
```

Page 564

```
 1      A.  Yes.                          20:28:57
 2      Q.  Okay.  Riggs Medical Center.  20:28:58
 3  Do you know if a Riggs Medical Center exists?  20:29:03
 4      A.  I do not.                     20:29:05
 5      Q.  Okay.  Did you do anything to  20:29:06
 6  verify whether a Riggs Medical Center exists?  20:29:08
 7      A.  No.                          20:29:11
 8      Q.  Okay.  What about St. Mary's  20:29:12
 9  Hospital?  It says, "near Riggs Medical  20:29:15
10  Center and St. Mary's Hospital."      20:29:18
11         Do you know how near this      20:29:19
12  pharmacy was to St. Mary's Hospital?  20:29:21
13         MR. O'CONNOR:  Objection to    20:29:24
14      form.                            20:29:24
15         THE WITNESS:  No.             20:29:24
16  QUESTIONS BY MS. HERZFELD:            20:29:29
17      Q.  Okay.  Do you know where La   20:29:29
18  Follette, Tennessee, is?              20:29:32
19      A.  No.                          20:29:32
20      Q.  Do you know where St. Mary's  20:29:33
21  Hospital is?                          20:29:34
22      A.  No.                          20:29:34
23      Q.  If St. Mary's Hospital is     20:29:35
24  45 miles away in Knoxville from La Follette,  20:29:43
25  is that information you would have wanted to  20:29:47
```

Page 565

```
 1  have known?                           20:29:49
 2         MR. O'CONNOR:  Objection to    20:29:49
 3      form.                            20:29:49
 4         THE WITNESS:  It's a piece of   20:29:54
 5      information, but I don't know how many  20:29:55
 6      other medical centers, how many other  20:29:57
 7      pharmacies, were within that 45 miles.  20:29:59
 8      So it would have been an additional  20:30:03
 9      piece of information, but not      20:30:05
10      conclusive.                       20:30:07
11  QUESTIONS BY MS. HERZFELD:            20:30:07
12      Q.  Okay.  But that's information  20:30:08
13  you would have liked to have had in   20:30:09
14  evaluating this pharmacy?             20:30:11
15         MR. O'CONNOR:  Objection to    20:30:12
16      form.                            20:30:13
17         THE WITNESS:  We -- it wasn't   20:30:13
18      always provided to us, the proximity  20:30:17
19      of the pharmacy to a hospital, so we  20:30:19
20      took this information as Cardinal   20:30:22
21      represented it to us.             20:30:25
22  QUESTIONS BY MS. HERZFELD:            20:30:27
23      Q.  When you hear "near Riggs     20:30:28
24  Medical Center and St. Mary's Hospital,"  20:30:33
25  would you consider near to be 45 miles away?  20:30:35
```

Page 566

1     MR. O'CONNOR: Objection to     20:30:37
2     form.     20:30:38
3     THE WITNESS: I don't know La     20:30:38
4     Follette, Tennessee, to know if -- in     20:30:41
5     Missouri, some of the health care     20:30:44
6     centers are hundreds of miles away     20:30:45
7     from where a patient may live and the     20:30:48
8     pharmacy from which they may obtain     20:30:52
9     their prescriptions, so I don't have     20:30:54
10    enough information to answer.     20:30:57
11    QUESTIONS BY MS. HERZFELD:     20:30:58
12    Q.    Okay. But you didn't do     20:30:58
13    anything to check that out, did you?     20:30:59
14    A.    No.     20:31:00
15    Q.    Okay. And then it says,     20:31:02
16    "Another Riggs drugstore is located in     20:31:03
17    Powell, Tennessee, with oxy 30 milligram     20:31:06
18    year-to-date of approximately 170,000."     20:31:09
19    Do you see that?     20:31:13
20    A.    Yes.     20:31:13
21    Q.    Okay. Did that concern you at     20:31:16
22    all, that there was another Riggs pharmacy so     20:31:18
23    close with that number?     20:31:21
24    MR. O'CONNOR: Objection to     20:31:24
25    form.     20:31:25

Page 567

1     THE WITNESS: I don't see on     20:31:25
2     this pharmacy information sheet a     20:31:28
3     disposition in terms of whether we     20:31:30
4     restricted chargebacks to the sale     20:31:35
5     of -- of pharmaceuticals to any of     20:31:39
6     these Riggs Drug's facilities.     20:31:40
7     I can tell you it was a topic     20:31:43
8     of conversation with Cardinal, but I     20:31:45
9     don't know the disposition.     20:31:46
10    QUESTIONS BY MS. HERZFELD:     20:31:47
11    Q.    Okay. If you look down at the     20:31:48
12    bottom there, it says, "Result, take off list     20:31:49
13    and honor chargebacks. Requested site visit     20:31:51
14    with 90 days. Low CS percentage is     20:31:54
15    mitigating factor."     20:31:57
16    Do you see that?     20:31:58
17    A.    Yes.     20:31:59
18    Q.    Okay. And so that would be the     20:31:59
19    result from the Mallinckrodt side; is that     20:32:02
20    correct?     20:32:04
21    MR. O'CONNOR: Objection to     20:32:04
22    form.     20:32:05
23    THE WITNESS: Yes.     20:32:05
24    QUESTIONS BY MS. HERZFELD:     20:32:09
25    Q.    Okay. When it says "take off     20:32:09

Page 568

1     list," what does that mean?     20:32:13
2     A.    Well, I'd like to clarify the     20:32:15
3     previous information.     20:32:17
4     Q.    Yes, ma'am.     20:32:18
5     A.    I don't know who filled this     20:32:19
6     out.     20:32:19
7     Q.    Okay.     20:32:19
8     A.    I don't know if it was us or     20:32:20
9     Cardinal --     20:32:20
10    Q.    Okay.     20:32:20
11    A.    -- because Cardinal was a great     20:32:21
12    collaborative partner. And so as time went     20:32:23
13    on, as opposed to us writing these things in     20:32:26
14    hand, Cardinal would come prepared to     20:32:28
15    conversations or meetings or tell -- or     20:32:30
16    transmit these pharmacy information sheets to     20:32:32
17    us.     20:32:35
18    Q.    Okay.     20:32:35
19    A.    So I don't know who typed this     20:32:36
20    disposition.     20:32:42
21    Q.    Okay. Do you know if Riggs was     20:32:43
22    ever put on a chargeback list?     20:32:44
23    A.    I -- yes.     20:32:46
24    Q.    Why don't we look at the list.     20:32:49
25    A.    All right.     20:32:51

Page 569

1     Q.    I'll find it.     20:32:51
2     Would Cardinal have had the     20:32:53
3     ability to tell Mallinckrodt what to put on     20:32:55
4     or take off a chargeback list?     20:32:57
5     MS. FIX MEYER: Objection.     20:32:59
6     Form.     20:33:00
7     MR. O'CONNOR: Objection to     20:33:00
8     form.     20:33:01
9     MS. HERZFELD: Same objection.     20:33:01
10    QUESTIONS BY MS. HERZFELD:     20:33:06
11    Q.    Did Cardinal have that ability?     20:33:06
12    A.    They had -- no, not the     20:33:08
13    ability.     20:33:13
14    Q.    Okay. Would they make     20:33:13
15    recommendations?     20:33:15
16    A.    Yes.     20:33:15
17    Q.    Okay. And would you follow the     20:33:17
18    recommendations?     20:33:19
19    A.    Yes.     20:33:19
20    Q.    Would you do any independent     20:33:20
21    research to verify their recommendations?     20:33:25
22    A.    I don't -- it would have been     20:33:27
23    situational.     20:33:33
24    Q.    Okay. I'm going to show you     20:33:35
25    Exhibit 36, which is the chargeback list, and     20:33:38

Page 570

1  please let me know if you see Riggs on there,  20:33:42
2  please.                          20:33:44
3      A.   I do not.                20:33:44
4      Q.   Okay.  So if Riggs was ever    20:33:47
5  placed on a chargeback list on         20:33:49
6  Mallinckrodt -- by Mallinckrodt, it should  20:33:51
7  appear on the chargeback list; is that   20:33:52
8  correct?                          20:33:54
9          MR. O'CONNOR:  Objection to    20:33:54
10  form.                           20:33:55
11          THE WITNESS:  Yes.          20:33:55
12  QUESTIONS BY MS. HERZFELD:           20:33:58
13      Q.   Okay.  Okay.  You can set that   20:33:58
14  aside.                           20:34:07
15          (Mallinckrodt-Harper Exhibit 52  20:34:57
16      marked for identification.)         20:34:57
17  QUESTIONS BY MS. HERZFELD:           20:34:57
18      Q.   I'm going to show what we'll    20:34:58
19  mark as Exhibit 51?  2?              20:35:00
20          MR. O'CONNOR:  It's 52.        20:35:03
21          MS. HERZFELD:  52?  Thank you.   20:35:06
22  QUESTIONS BY MS. HERZFELD:           20:35:06
23      Q.   This is MNK_TNSTA05353270.     20:35:14
24  Take a look at that for me, please, ma'am.  20:35:26
25          Do you recognize this as the     20:35:45

Page 571

1  summary report for the Cardinal Health   20:35:46
2  suspicious order monitoring audit conducted  20:35:49
3  March 5th through 6th in 2012 in Ohio?   20:35:51
4      A.   Yes.                     20:35:53
5      Q.   Okay.  Did you create this      20:35:54
6  document?                        20:35:55
7      A.   I don't recall.            20:35:55
8      Q.   Okay.  Looking through it, it   20:35:58
9  says on March 5th, a total of 19 pharmacies  20:36:02
10  located in Florida were reviewed.       20:36:04
11          If you look at the second page,   20:36:06
12  page ending in 53271, a total of 20     20:36:16
13  pharmacies located in non-Florida states were  20:36:22
14  reviewed.  Of the 20, 11 pharmacies have had  20:36:26
15  controlled substance sales restricted by   20:36:28
16  Cardinal.                        20:36:28
17          Do you see where that is?       20:36:29
18      A.   Yes.                     20:36:30
19      Q.   Okay.  And do you see the list   20:36:30
20  that says non-Florida, non-restricted?    20:36:36
21      A.   Yes.                     20:36:41
22      Q.   And what is the one at the      20:36:41
23  bottom there?                     20:36:42
24      A.   Riggs Drug.               20:36:42
25      Q.   Okay.  And if you go up two,    20:36:43

Page 572

1  that's Max Pharmacy; is that right?      20:36:44
2      A.   Yes.                     20:36:47
3      Q.   Do you know where that's      20:36:47
4  located?                         20:36:48
5      A.   No.                      20:36:48
6      Q.   Okay.  And then Kinser drug     20:36:49
7  store.                           20:36:54
8          Do you see that?             20:36:54
9      A.   Yes.                     20:36:55
10      Q.   Okay.  And is Kinser drug store   20:36:55
11  listed in Tennessee?                20:36:57
12      A.   I know the name came up within   20:36:59
13  the course of this deposition.  I'm getting   20:37:00
14  so muddled, I don't know.  I'm sorry.    20:37:02
15      Q.   That's fine.  Okay.  And I      20:37:04
16  think those are my only questions on that   20:37:06
17  document.                        20:37:07
18      A.   Okay.                    20:37:08
19      Q.   Let's put it aside.         20:37:08
20          Okay.  We'll just go through    20:38:39
21  these next three pretty quickly.        20:38:42
22          (Mallinckrodt-Harper Exhibit 53   20:38:44
23      marked for identification.)         20:38:44
24  QUESTIONS BY MS. HERZFELD:           20:38:44
25      Q.   Number 53, MNK_TNSTA00612651.   20:38:44

Page 573

1          Do you recognize this document   20:39:05
2  as a pharmacy information sheet?         20:39:15
3      A.   Yes.                     20:39:17
4      Q.   Do you know if it was filled   20:39:17
5  out by Mallinckrodt or by Cardinal?      20:39:18
6      A.   I do not know.             20:39:21
7          MS. FIX MEYER:  Objection.      20:39:22
8          MS. HERZFELD:  Okay.  Same      20:39:23
9      standing objection.              20:39:25
10  QUESTIONS BY MS. HERZFELD:           20:39:25
11      Q.   Okay.  And it talks about the   20:39:26
12  volume of oxycodone sales to this location;  20:39:28
13  is that correct?                   20:39:30
14      A.   Yes.                     20:39:30
15      Q.   Okay.  And then at the bottom   20:39:33
16  it says, "Describe physical location and    20:39:34
17  description of pharmacy.  Standalone building  20:39:37
18  on main two-lane road.  Services rural    20:39:40
19  community.  In residential town in Campbell   20:39:44
20  County."                         20:39:46
21          Did I read that correctly?      20:39:46
22      A.   Yes.                     20:39:47
23      Q.   Okay.  And did Mallinckrodt do   20:39:47
24  anything to verify that information?      20:39:50
25      A.   No.                      20:39:51

Page 574

1    (Mallinckrodt-Harper Exhibit 54    20:39:53
2    marked for identification.)    20:39:53
3    QUESTIONS BY MS. HERZFELD:    20:39:53
4    Q.    Okay.  Okay.  I'm handing you    20:39:54
5    Exhibit 54, MNK_TNSTA00607869.    20:40:14
6    Do you recognize this as a    20:40:21
7    pharmacy information sheet dated 11/30/2012    20:40:23
8    for the Riggs Drug in La Follette, Tennessee?    20:40:29
9    A.    Yes.    20:40:33
10    Q.    Okay.  And do you know if    20:40:33
11    someone from Mallinckrodt filled this out or    20:40:35
12    somebody from Cardinal filled it out?    20:40:39
13    MR. O'CONNOR:  Objection to    20:40:41
14    form.    20:40:41
15    MS. FIX MEYER:  Objection.    20:40:43
16    THE WITNESS:  No.    20:40:43
17    QUESTIONS BY MS. HERZFELD:    20:40:43
18    Q.    Okay.  And could you please    20:40:43
19    read to me what it says and describe the    20:40:44
20    physical description and location of the    20:40:45
21    pharmacy?    20:40:46
22    A.    "La Follette, Tennessee, is a    20:40:48
23    small town of 7,926 located northwest of    20:40:50
24    Knoxville.  The pharmacy is located in a    20:40:55
25    spacious standalone building with a large    20:40:58

Page 575

1    parking area.  It shares a small amount of    20:41:01
2    space with a medical clinic, which is in the    20:41:03
3    process of moving to a larger building.  The    20:41:06
4    pharmacy is located on the primary business    20:41:10
5    street and the state highway through town."    20:41:13
6    Q.    Okay.  And down at the bottom,    20:41:16
7    the notes, could you read that for me,    20:41:18
8    please?    20:41:21
9    A.    Yes.    20:41:21
10    "All Riggs 15/30s capped.  Have    20:41:22
11    stopped prescribing for certain docs.  Per    20:41:28
12    Cardinal Health" -- that's the abbreviation    20:41:37
13    for Cardinal Health -- "they believe    20:41:38
14    Jacksboro store has made progress.  One store    20:41:42
15    fills 12,000 scripts per month, another fills    20:41:44
16    5,000."    20:41:48
17    Q.    Okay.  So the information    20:41:50
18    that's included in the physical location    20:41:51
19    about the size of La Follette, Tennessee, and    20:41:53
20    description of the building, that's    20:41:58
21    information that was known to Mallinckrodt;    20:41:59
22    is that correct?    20:42:02
23    MR. O'CONNOR:  Objection to    20:42:02
24    form.    20:42:03
25    THE WITNESS:  Yes.    20:42:03

Page 576

1    QUESTIONS BY MS. HERZFELD:    20:42:03
2    Q.    Okay.  And then when it says,    20:42:04
3    "notes, all Riggs have been capped," talking    20:42:06
4    about per Cardinal Health, they believe the    20:42:08
5    Jacksboro store has made progress, Cardinal    20:42:10
6    is being referred to as "they."    20:42:13
7    So do you believe that note was    20:42:14
8    made by somebody at Mallinckrodt?    20:42:16
9    MR. O'CONNOR:  Objection to    20:42:18
10    form.    20:42:19
11    THE WITNESS:  Yes.    20:42:19
12    QUESTIONS BY MS. HERZFELD:    20:42:19
13    Q.    Okay.  And so do you know    20:42:20
14    anything about Riggs 15 and 30s being capped?    20:42:23
15    A.    It says it here, but I don't    20:42:27
16    recall.    20:42:29
17    Q.    Okay.  And what does it mean to    20:42:29
18    cap someone at 15 and 30s?    20:42:30
19    A.    It means a limit was placed on    20:42:35
20    the amount of oxycodone 15s and 30s that a    20:42:38
21    particular pharmacy could receive from a    20:42:41
22    distributor.    20:42:45
23    Q.    Okay.  And why would -- why    20:42:45
24    would that happen?  Why would a cap be put    20:42:47
25    on?    20:42:49

Page 577

1    A.    So this is part of Cardinal's    20:42:49
2    program, and I can't answer the question.    20:42:53
3    Q.    Okay.  When it says, "They    20:42:55
4    believe the Jacksboro store has made    20:42:57
5    progress.  One store fills 12,000 scripts per    20:43:00
6    month, another fills 5,000," does that mean    20:43:03
7    that the numbers went down?    20:43:06
8    MR. O'CONNOR:  Objection to    20:43:07
9    form.    20:43:07
10    THE WITNESS:  I don't know.    20:43:07
11    QUESTIONS BY MS. HERZFELD:    20:43:08
12    Q.    Okay.  Do you know if you had a    20:43:08
13    concern about diversion from these Riggs    20:43:11
14    pharmacies in Campbell County?    20:43:15
15    MR. O'CONNOR:  Objection to    20:43:17
16    form.    20:43:18
17    THE WITNESS:  So by virtue of    20:43:18
18    the fact we had a pharmacy information    20:43:20
19    sheet, it means we discussed these    20:43:22
20    pharmacies with Cardinal and any other    20:43:25
21    distributor that was selling to them.    20:43:27
22    So it was a point of discussion for    20:43:29
23    further review.    20:43:34
24    QUESTIONS BY MS. HERZFELD:    20:43:34
25    Q.    Okay.  So there was discussion    20:43:35

Page 578

1  about whether there was potential diversion  20:43:37
2  at these Riggs pharmacies?  20:43:39
3      A.  Yes.  20:43:42
4      Q.  Okay.  And at no time did  20:43:43
5  Mallinckrodt do chargeback restrictions for  20:43:48
6  Riggs pharmacies, according to that chart we  20:43:51
7  saw; is that correct?  20:43:54
8      MR. O'CONNOR:  Objection to  20:43:54
9  form.  20:43:55
10     THE WITNESS:  So, yes, and I  20:43:55
11  misspoke when I said that we had.  20:43:57
12  According to that chart, Riggs  20:44:00
13  pharmacies were not restricted --  20:44:02
14  QUESTIONS BY MS. HERZFELD:  20:44:03
15     Q.  Okay.  20:44:03
16     A.  -- from chargeback processing.  20:44:04
17     Q.  Okay.  And so that means, to  20:44:05
18  your knowledge, Riggs pharmacies could  20:44:07
19  continue to receive oxycodone 15 and 30s?  20:44:09
20     A.  Yes.  20:44:13
21     Q.  Okay.  Thank you.  20:44:15
22     (Mallinckrodt-Harper Exhibit 55  20:44:18
23  marked for identification.)  20:44:18
24  QUESTIONS BY MS. HERZFELD:  20:44:18
25     Q.  Okay.  55, marking Plaintiff's  20:44:42

Page 579

1  Exhibit 55 here.  It's MNK_TNSTA00612647.  20:45:06
2  Take a look at this for me, please.  20:45:15
3      The file name for this document  20:45:44
4  is "Riggs pharmacies all sales run  20:45:45
5  11/30/2012"; is that correct?  20:45:49
6      A.  Yes.  20:45:50
7      Q.  Did you create this document?  20:45:51
8      A.  No.  20:45:52
9      Q.  Did you direct that it be  20:45:53
10  created?  20:45:56
11     A.  I'm not certain.  20:45:58
12     Q.  Okay.  Okay.  If you'll look  20:46:00
13  with me on page 3.  20:46:19
14     A.  I'm sorry.  Oh, yes.  20:46:24
15     Q.  Do you see that?  20:46:25
16     A.  Yes.  Yes.  20:46:26
17     Q.  Okay.  Does this appear to be a  20:46:27
18  report based on chargeback data to you,  20:46:28
19  ma'am?  20:46:30
20     A.  Yes.  20:46:30
21     Q.  Okay.  And it appears to be a  20:46:31
22  report about the Riggs Drug stores in -- the  20:46:32
23  Riggs Drug stores we were discussing; is that  20:46:39
24  correct?  Jacksboro, La Follette and Powell?  20:46:43
25     A.  So the cover says Riggs  20:46:48

Page 580

1  pharmacies, but I don't see that there's --  20:46:53
2  oh, yes, I do see an identifier on the  20:46:56
3  spreadsheet itself.  Yes, Riggs pharmacies.  20:46:59
4      Q.  Okay.  Great.  20:47:00
5      In looking here, it's kind of  20:47:01
6  hard to review it all.  One, two -- if you  20:47:09
7  look on page 3, down at the bottom, the  20:47:12
8  orange line, it says, "Oxycodone 30-milligram  20:47:35
9  tablets."  20:47:38
10     Do you see where I'm at?  20:47:39
11     A.  Yes.  20:47:40
12     Q.  Okay.  And it indicates that  20:47:41
13  Cardinal Health shipped 292,600 oxycodone  20:47:44
14  30-milligram tablets to Riggs Drug in La  20:47:52
15  Follette, Tennessee, in the calendar year  20:47:56
16  2012; is that correct?  20:48:00
17     A.  So the data began November  20:48:01
18  of 2011.  20:48:08
19     Q.  Oh, you are correct.  20:48:08
20     So from November 2011 to  20:48:10
21  November 2012?  20:48:14
22     A.  Yes.  20:48:15
23     Q.  Okay.  And then it says  20:48:17
24  HD Smith shipped 30 milligrams of oxycodone  20:48:18
25  to that same Riggs location, 1,200 tablets.  20:48:24

Page 581

1      Am I reading that correctly?  20:48:29
2      A.  Yes.  20:48:32
3      Q.  Okay.  Okay.  Staying on page 3  20:48:32
4  with me there, the last blue line, it says  20:49:02
5  oxycodone 15-milligram tablets here for the  20:49:07
6  same Riggs store in La Follette, Tennessee.  20:49:08
7      Do you see where I am now?  20:49:10
8      A.  Yes.  20:49:12
9      Q.  Okay.  And it says that  20:49:12
10  Cardinal Health shipped 84,000 tablets during  20:49:13
11  that same time period; is that correct?  20:49:15
12     A.  Yes.  20:49:17
13     Q.  Okay.  So if you add those two  20:49:20
14  together, I submit to you that would be  20:49:27
15  377,600 Mallinckrodt-made oxycodone  20:49:31
16  15-milligram and 30-milligram tablets going  20:49:37
17  to that one pharmacy in that period of  20:49:39
18  November 2011 to November 2012.  20:49:43
19     Does that sound correct?  20:49:46
20     MR. O'CONNOR:  Objection to  20:49:47
21  form.  20:49:48
22     THE WITNESS:  Yes.  20:49:48
23  QUESTIONS BY MS. HERZFELD:  20:49:48
24     Q.  Okay.  And that's just to one  20:49:49
25  pharmacy, not to what was sent to that  20:49:56

Page 582

1 county; is that right? 20:49:58
2 MR. O'CONNOR: Object to form. 20:49:59
3 THE WITNESS: Yes. 20:50:01
4 QUESTIONS BY MS. HERZFELD: 20:50:01
5 Q. Okay. Does that number seem 20:50:02
6 too high to you? 20:50:05
7 MR. O'CONNOR: Object to form. 20:50:06
8 THE WITNESS: A number is one 20:50:07
9 of the indicators we use. High? I 20:50:10
10 don't have enough information to 20:50:16
11 compare other states to this 20:50:19
12 particular statistics or other 20:50:23
13 pharmacies, so I can't answer. 20:50:25
14 QUESTIONS BY MS. HERZFELD: 20:50:26
15 Q. Okay. So you'd have to have 20:50:27
16 that information in order to be able to make 20:50:28
17 a determination as to whether the number was 20:50:30
18 too high relatively? 20:50:32
19 A. Well, "too high" is a relative 20:50:33
20 term, again, so it would be a number that 20:50:37
21 merited further review. 20:50:41
22 Q. Okay. 20:50:43
23 A. Potentially, yes. 20:50:43
24 Q. And so the types of things that 20:50:44
25 you would want to know in order to make that 20:50:45

Page 583

1 determination would be population? 20:50:47
2 A. That could be -- 20:50:51
3 MR. O'CONNOR: Form. 20:50:52
4 THE WITNESS: -- one piece of 20:50:53
5 information. 20:50:55
6 QUESTIONS BY MS. HERZFELD: 20:50:55
7 Q. Okay. And what about the 20:50:55
8 percent of an aging population of the area? 20:50:58
9 A. No. 20:51:02
10 Q. That's not something you'd want 20:51:04
11 to consider? 20:51:05
12 A. Oh, I -- it wasn't a part of 20:51:05
13 our program. 20:51:09
14 Q. Okay. What about nearness to 20:51:10
15 hospitals or other medical facilities; would 20:51:14
16 you want to know that information? 20:51:16
17 A. Not routinely. 20:51:18
18 Q. Okay. 20:51:22
19 A. No. 20:51:22
20 Q. Okay. So what types of other 20:51:23
21 information would you need besides just pure 20:51:25
22 number in order to be able to make a 20:51:27
23 determination if a pharmacy was -- was 20:51:30
24 processing suspicious orders? 20:51:33
25 MR. O'CONNOR: Objection to 20:51:34

Page 584

1 form. 20:51:35
2 THE WITNESS: So the factors 20:51:35
3 listed on the pharmacy information 20:51:38
4 sheet, oxycodone compared to other 20:51:40
5 opioids being dispensed, percent 20:51:46
6 oxycodone 15, 30, relative to other 20:51:50
7 oxy products, and the other factors, 20:51:52
8 including a physical and -- in a 20:51:56
9 physical location and a description of 20:52:02
10 the pharmacy. 20:52:04
11 QUESTIONS BY MS. HERZFELD: 20:52:04
12 Q. Okay. And what types of 20:52:04
13 physical locations would cause you concern? 20:52:05
14 MR. O'CONNOR: Objection to 20:52:09
15 form. 20:52:11
16 THE WITNESS: I don't -- I 20:52:11
17 don't know offhand. 20:52:15
18 QUESTIONS BY MS. HERZFELD: 20:52:15
19 Q. Okay. Okay. So the things on 20:52:16
20 the list is what you would consider, on the 20:52:21
21 pharmacy information sheet checklist? 20:52:22
22 A. Yes. 20:52:24
23 Q. Okay. Is there anything 20:52:25
24 outside of the information, the questions 20:52:26
25 you've got contained in the pharmacy 20:52:29

Page 585

1 information sheet checklist, that you would 20:52:30
2 consider when determining whether a pharmacy 20:52:32
3 may be engaging in diversion? 20:52:35
4 A. So a Google report would prompt 20:52:38
5 further review. Those are the factors that 20:52:44
6 come to mind. 20:52:46
7 Q. Okay. But a Google report, if 20:52:47
8 it comes up, right, it's generally going to 20:52:49
9 be when there's been a drug bust at a 20:52:52
10 pharmacy after the fact; is that right? 20:52:54
11 MR. O'CONNOR: Objection to 20:52:55
12 form. 20:52:56
13 THE WITNESS: Yes. Yes. 20:52:56
14 QUESTIONS BY MS. HERZFELD: 20:53:00
15 Q. Okay. Okay. If you'll take 20:53:01
16 the same sheet with me, we're going to just 20:53:07
17 spend another minute with it. And if you'll 20:53:10
18 flip with me to the one that's page 4. 20:53:15
19 If you'll go down to the part 20:53:22
20 that's highlighted in orange. I guess that's 20:53:24
21 orange. 20:53:27
22 A. Oh, I'm sorry. I'm on the 20:53:28
23 wrong page. 20:53:30
24 Q. That's okay. Page 4. 20:53:30
25 A. All right. 20:53:36

Page 586

1    Q.   At the top it should say Riggs    20:53:37
2  Drug in Jacksboro, Tennessee.    20:53:39
3         Do you see where I'm at?    20:53:42
4    A.   Yes.    20:53:43
5    Q.   Okay.  And then the orange all    20:53:44
6  the way down at the bottom.    20:53:46
7    A.   Yes.    20:53:47
8    Q.   Okay.  So it says oxycodone    20:53:47
9  30-milligram tablets, and then it would be    20:53:49
10  139,400 tablets were supplied to this    20:53:51
11  pharmacy, Riggs, in Jacksboro, Tennessee, by    20:53:56
12  Cardinal Health in the time period of    20:53:59
13  November 2011 through November of 2012.    20:54:01
14         Did I read that correctly?    20:54:04
15    A.   Yes.    20:54:05
16    Q.   Okay.  And if you go one line    20:54:06
17  up, it talks about oxycodone 15-milligram    20:54:09
18  tablets shipped to that Jacksboro Riggs.    20:54:12
19         That's 38,700; is that correct?    20:54:16
20    A.   Yes.    20:54:19
21    Q.   Okay.  And so if you total    20:54:20
22  that, that would be 178,100 Mallinckrodt    20:54:21
23  oxycodone pills going to that one pharmacy in    20:54:26
24  that time period; is that correct?    20:54:30
25    A.   Yes.    20:54:31

Page 587

1    Q.   Okay.  And the rest of these    20:54:33
2  numbers on there, those are the other    20:54:40
3  controlled substance Mallinckrodt products;    20:54:44
4  is that correct?    20:54:47
5    A.   Yes.    20:54:47
6    Q.   Okay.  And many of those are    20:54:48
7  opioids as well; is that right?    20:54:51
8    A.   Yes.    20:54:52
9    Q.   Is methylphenidate an opioid?    20:54:53
10    A.   Yes.    20:54:59
11    Q.   Okay.  So is everything on this    20:54:59
12  list an opioid?    20:55:01
13    A.   Yes.    20:55:02
14    Q.   Okay.  So if you total all of    20:55:02
15  the opioids then, the Mallinckrodt opioids,    20:55:03
16  sent to Riggs Drug in Jacksboro, Tennessee,    20:55:05
17  during this time period, that would be    20:55:07
18  279,570 Mallinckrodt opioids shipped to this    20:55:10
19  pharmacy during that period of time, I submit    20:55:14
20  to you.    20:55:17
21         Does that seem like a lot of    20:55:18
22  opioids to one pharmacy to you?    20:55:20
23    A.   So I'm sorry.  You're saying    20:55:23
24  that you did the math --    20:55:25
25    Q.   Yes, ma'am.    20:55:25

Page 588

1    A.   -- and added all these?    20:55:26
2    Q.   Yes, ma'am.    20:55:27
3    A.   Okay.  All right.    20:55:27
4    Q.   I'm not going to make you vouch    20:55:27
5  for my math.    20:55:29
6    A.   Okay.    20:55:30
7    Q.   But if I tell you that that    20:55:30
8  totals to 279,570 --    20:55:30
9    A.   Yes.    20:55:30
10    Q.   -- does that seem like a lot of    20:55:36
11  Mallinckrodt opioids to go to one pharmacy to    20:55:38
12  you?    20:55:39
13    A.   No, not necessarily.    20:55:39
14    Q.   You would want to look at the    20:55:40
15  factors that are on the pharmacy information    20:55:42
16  sheet; is that right?    20:55:44
17    A.   Yes.    20:55:44
18    Q.   And the Google Alerts; is that    20:55:44
19  right?    20:55:47
20    A.   Yes, and have a conversation    20:55:47
21  with the distributor, yes.    20:55:49
22    Q.   Okay.  Do you know anything    20:55:50
23  about Jacksboro, Tennessee?    20:55:51
24    A.   No.    20:55:53
25    Q.   Okay.  Do you know if Jacksboro    20:55:54

Page 589

1  and La Follette are in the same county?    20:56:01
2    A.   No.    20:56:02
3    Q.   What if I told you they are?    20:56:03
4  They're in Campbell County, Tennessee.    20:56:04
5         Have you ever heard of Campbell    20:56:06
6  County, Tennessee?    20:56:09
7    A.   No.    20:56:09
8    Q.   Okay.  Do you know anything    20:56:10
9  about Campbell County, Tennessee?    20:56:10
10    A.   No.    20:56:12
11    Q.   Has Campbell County, Tennessee,    20:56:12
12  ever been a topic of discussion during your    20:56:14
13  professional time at Mallinckrodt?    20:56:16
14    A.   Not that I recall.    20:56:17
15    Q.   Okay.    20:56:19
16         MR. O'CONNOR:  We're on the    20:56:38
17  12-hour mark.  Are you almost done?    20:56:39
18         MS. HERZFELD:  I am so almost    20:56:43
19  done.    20:56:44
20         MR. O'CONNOR:  Okay.    20:56:44
21         MS. HERZFELD:  I have, I    20:56:44
22  think -- I have two very quick charts    20:56:45
23  and then like three tiny things to ask    20:56:47
24  her about.  Like I'm probably ten    20:56:49
25  minutes.    20:56:51

Page 590

```
1    Do you want to take a break?    20:56:52
2        MR. O'CONNOR:  Not if it's    20:56:54
3    going to be ten minutes.    20:56:55
4        MS. HERZFELD:  I think it's    20:56:56
5    going to be ten minutes.    20:56:57
6        MR. O'CONNOR:  Okay.    20:56:57
7        MS. HERZFELD:  I think it's    20:56:57
8    going to be ten minutes.  I will try    20:56:58
9    very hard not to lie to you.  Okay.    20:56:59
10       MR. O'CONNOR:  It's always    20:57:02
11   appreciated.    20:57:04
12       (Mallinckrodt-Harper Exhibit 56    20:57:05
13   marked for identification.)    20:57:06
14   QUESTIONS BY MS. HERZFELD:    20:57:06
15   Q.    I will hand you what I'm    20:57:07
16   marking as Plaintiff's Exhibit 56.  This is    20:57:08
17   MNK_TNSTA25 -- I'm sorry, 02527616.    20:57:14
18       This is -- the title is "Oxy 15    20:57:23
19   and 30 shipped to and sold to via month,    20:57:28
20   January through December 2011."  And it looks    20:57:31
21   like the report was run 2/15/2012.    20:57:34
22       I will submit to you that we    20:57:37
23   have condensed this just to Campbell County.    20:57:40
24       Okay.  So if you take a look at    20:58:01
25   this list, I think you'll notice La Follette    20:58:03
```

Page 591

```
1    that we've been talking about and also    20:58:05
2    Jacksboro, which we've already discussed; is    20:58:06
3    that right?    20:58:09
4    A.    Yes.    20:58:09
5    Q.    Okay.  And this chart appears    20:58:10
6    to show you chargeback data to the various    20:58:11
7    pharmacies during the period of January 2011    20:58:13
8    through December 2011; is that correct?    20:58:19
9    A.    Yes.    20:58:23
10   Q.    Okay.  And we haven't talked at    20:58:26
11   all about a place called Jellico.    20:58:29
12       Have you ever heard of Jellico,    20:58:31
13   Tennessee?    20:58:32
14   A.    No.    20:58:33
15   Q.    Okay.  Okay.  On this list I    20:58:33
16   think you'll recognize we've got the three    20:58:39
17   Riggs Drugs right at the top, right?    20:58:41
18   A.    Yes.    20:58:42
19   Q.    Okay.  Riggs Drug in La    20:58:43
20   Follette and Riggs Drug in Jacksboro.    20:58:46
21   A.    Yes.    20:58:53
22   Q.    Okay.  Do you know how many    20:58:54
23   people live in Jellico, Tennessee?    20:59:07
24   A.    No.    20:59:10
25   Q.    Okay.  And this spreadsheet is    20:59:11
```

Page 592

```
1    for the oxy 15s.  Do you see that?    20:59:15
2        I'll show you the oxy 30s next.    20:59:19
3    A.    Yes.    20:59:22
4    Q.    Okay.  And if you look at this    20:59:22
5    spreadsheet, you've got Jellico one, two,    20:59:24
6    three, four times.    20:59:27
7        Let's look at the first one.    20:59:27
8    Jellico Drugs.    20:59:30
9        Do you see that?    20:59:31
10   A.    Yes.    20:59:31
11   Q.    And it looks like Jellico Drugs    20:59:31
12   was getting stuff from AmerisourceBergen --    20:59:33
13   getting oxycodone 15 from AmerisourceBergen    20:59:35
14   and Masters; is that correct?    20:59:39
15   A.    Yes.    20:59:40
16   Q.    Okay.  So during that time    20:59:46
17   period, it looks like Jellico Drugs received    20:59:48
18   14,400 oxycodone 15 tablets from Masters; is    20:59:51
19   that right?    20:59:57
20   A.    Yes.    20:59:57
21   Q.    And then 12,200 from    20:59:58
22   AmerisourceBergen?    21:00:00
23   A.    Yes.    21:00:01
24   Q.    Okay.  And if you go down to    21:00:02
25   the others, you have the Rite Aid,    21:00:04
```

Page 593

```
1    number 1935 in Jellico.  They received 2500    21:00:08
2    oxycodone 15; is that correct?    21:00:13
3    A.    Yes.    21:00:15
4    Q.    Okay.  And then the last one is    21:00:19
5    the family drug center in Jellico by Cardinal    21:00:20
6    Health, and it looks like they received 300    21:00:23
7    oxy 15s; is that right?    21:00:28
8    A.    Yes.    21:00:29
9    Q.    Okay.  So if you add all that    21:00:29
10   together, I'll submit to you that that's    21:00:31
11   about 29,400 oxycodone 15s for the town of    21:00:33
12   Jellico.    21:00:40
13       Does that sound right?    21:00:40
14   A.    I have not done the math, but    21:00:41
15   if you say it's true, we'll go with it.    21:00:45
16       (Mallinckrodt-Harper Exhibit 57    21:00:49
17   marked for identification.)    21:00:51
18   QUESTIONS BY MS. HERZFELD:    21:00:51
19   Q.    Okay.  I'm going to hand you    21:00:51
20   what's marked as Plaintiff's Exhibit 56?  6?    21:00:53
21   A.    This was 56.    21:00:55
22   Q.    Oh, 57.  I left my -- I'll just    21:00:56
23   do another one.  57.    21:01:03
24       Okay.  This is the tab -- hold    21:01:04
25   on.  It looks like I'm missing one, so you    21:01:13
```

Page 594

1    might have lucked out. Okay. It appears        21:01:27
2    that I'm missing the one for the oxy 30.        21:01:45
3    Okay.                                          21:01:51
4              Did you ever run the numbers          21:01:52
5    for the total number of Mallinckrodt            21:01:58
6    oxycodone products going to Campbell County,    21:02:00
7    Tennessee?                                      21:02:04
8        A.    I do not know.                        21:02:04
9        Q.    Okay. I'm going to...                 21:02:07
10             Okay. I'm going to mark you --        21:02:45
11   I'm going to hand you what we've marked as      21:02:46
12   Plaintiff's Exhibit 57.                         21:02:48
13             Okay. Could you read the file         21:02:50
14   name of this document for me, please, ma'am?   21:02:58
15       A.    "Hydro APAP 10s shipped to and        21:03:00
16   sold via by month, January 2015 through         21:03:04
17   December 2015, 325 milligrams APAP."            21:03:08
18       Q.    Okay. Great.                          21:03:15
19             Okay. I'm going to back up for       21:03:15
20   a second, if you'll set this aside, and we'll   21:03:21
21   talk about it in just a second. I skipped       21:03:23
22   some questions.                                 21:03:25
23             Going back to our discussion          21:03:26
24   about Campbell County, do you know what         21:03:27
25   Campbell County's population was in 2010?       21:03:33

Page 595

1        A.    No.                                   21:03:35
2        Q.    Do you know if Mallinckrodt has       21:03:35
3    ever looked specifically at the number of       21:03:37
4    pills it sends to the various counties in       21:03:40
5    Tennessee?                                      21:03:42
6              MR. O'CONNOR: Objection.              21:03:42
7    Form.                                           21:03:43
8    QUESTIONS BY MS. HERZFELD:                      21:03:43
9        Q.    Have you looked by county?            21:03:44
10       A.    I do not know.                        21:03:45
11       Q.    Okay. Did you run any                 21:03:45
12   chargeback reports by county on a routine       21:03:49
13   basis with Tennessee?                           21:03:50
14       A.    No.                                   21:03:51
15       Q.    Okay. What about towns?              21:03:51
16       A.    The reports can be sorted by          21:03:54
17   towns --                                        21:03:57
18       Q.    Okay.                                 21:03:57
19       A.    -- but not specific to               21:03:58
20   Tennessee towns.                                21:04:02
21       Q.    Okay. Okay. Had you -- were          21:04:03
22   you aware that in 2015 Campbell County          21:04:09
23   prescribed the third highest morphine           21:04:13
24   equivalent milligrams per capita annually in    21:04:17
25   the country?                                    21:04:19

Page 596

1        A.    No.                                   21:04:19
2        Q.    Is that a list that               21:04:19
3    Mallinckrodt would look at?                     21:04:21
4              MR. O'CONNOR: Objection to            21:04:22
5    form.                                           21:04:24
6              THE WITNESS: Not within the          21:04:24
7    scope of suspicious order monitoring.           21:04:25
8    QUESTIONS BY MS. HERZFELD:                      21:04:28
9        Q.    Okay. So if the CDC lists           21:04:28
10   counties with the highest prescribing of        21:04:31
11   opioids per capita, is that something you       21:04:34
12   would consult in your job in suspicious order   21:04:36
13   monitoring?                                     21:04:38
14       A.    No.                                   21:04:38
15       Q.    Okay. Think it would be             21:04:40
16   helpful?                                        21:04:44
17             MR. O'CONNOR: Objection to            21:04:44
18   form.                                           21:04:45
19             THE WITNESS: We use various          21:04:45
20   pieces of information at various                21:04:46
21   times, so I can't compare and contrast          21:04:49
22   one thing is more helpful than the              21:04:53
23   other.                                          21:04:56
24   QUESTIONS BY MS. HERZFELD:                      21:04:56
25       Q.    Okay. I think you looked            21:04:57

Page 597

1    before at the chargeback data list, the         21:05:03
2    chargeback restriction list, Exhibit 36.        21:05:05
3    It's Mallinckrodt's chargeback restriction      21:05:09
4    list. If you would take a look at that for      21:05:10
5    me for one more second.                          21:05:14
6              Are you aware of the number of        21:05:16
7    pharmacies that were on that list, how many     21:05:19
8    have been subject of law enforcement action?   21:05:21
9        A.    No.                                   21:05:23
10       Q.    Okay. Are you aware if any of       21:05:24
11   the reinstated pharmacies on that list have     21:05:26
12   been subject of law enforcement action?         21:05:31
13       A.    No.                                   21:05:32
14       Q.    Okay. And do you know if the        21:05:33
15   pharmacies on that list, that were placed on    21:05:35
16   that list, were placed on before or because     21:05:37
17   of -- I'm sorry, I'm going to back up. I'm      21:05:40
18   going to strike that question. We're going      21:05:43
19   to start over.                                  21:05:44
20             Do you know of the pharmacies         21:05:45
21   that were placed on that Mallinckrodt           21:05:48
22   chargeback restriction list, how many of       21:05:50
23   those restricted pharmacies were placed on      21:05:55
24   after law enforcement action?                   21:05:58
25       A.    No.                                   21:06:00

Page 598

1    Q.    Okay.  You can set it aside,    21:06:00
2  please.    21:06:02
3        Have you ever heard of Clay    21:06:03
4  County, Tennessee?    21:06:08
5    A.    No.    21:06:09
6    Q.    Do you know what the population    21:06:09
7  is of Clay County, Tennessee?    21:06:10
8    A.    No.    21:06:12
9    Q.    Okay.  Has there been any    21:06:12
10 discussion in your professional capacity at    21:06:15
11 Mallinckrodt having to do with Clay County,    21:06:16
12 Tennessee?    21:06:19
13   A.    Not that I recall.    21:06:19
14   Q.    Okay.  If you'll take a look at    21:06:21
15 Exhibit 57 for me, please, ma'am.    21:06:23
16       Okay.  You've already    21:06:25
17 identified this document.  I will submit to    21:06:27
18 you that we've modified it to show only the    21:06:29
19 town of Celina, Tennessee.    21:06:33
20       If you'll flip to the page, do    21:06:34
21 you recognize this as chargeback data, ma'am?    21:06:37
22   A.    Yes.    21:06:40
23   Q.    Okay.  Looking at this    21:06:40
24 chargeback data, does it indicate to you that    21:06:41
25 Rite Aid number 2494 in Celina, Tennessee,    21:06:43

Page 599

1  through McKesson, received 87,000    21:06:55
2  Mallinckrodt hydro APAP 10s?    21:06:59
3    A.    Yes.    21:07:05
4    Q.    Okay.  And then Anderson    21:07:06
5  Hometown Pharmacy received 500 hydro APAP 10s    21:07:10
6  through McKesson; is that right?    21:07:14
7    A.    Yes.    21:07:15
8    Q.    Okay.  And then Cumberland    21:07:15
9  River Hospital, also in Celina, Tennessee,    21:07:18
10 through Cardinal received 200 hydro APAP 10s;    21:07:21
11 is that right?    21:07:24
12   A.    Yes.    21:07:24
13   Q.    Okay.  And that shows, if you    21:07:25
14 total it -- and I think this math is a little    21:07:28
15 easier -- that's 87,700 hydro APAP 10s sent    21:07:30
16 to Celina, Tennessee, that were Mallinckrodt    21:07:38
17 between January 2015 and December of 2015; is    21:07:42
18 that correct?    21:07:45
19   A.    Yes.    21:07:45
20   Q.    Okay.  Did you know that the    21:07:47
21 town of Celina, Tennessee, is -- population    21:07:48
22 is 1,379 people?    21:07:51
23   A.    No.    21:07:54
24   Q.    Do you think that's an    21:07:55
25 appropriate number of hydro APAP 10s to be    21:07:56

Page 600

1  going to a town with 1,379 people?    21:08:01
2        MR. O'CONNOR:  Objection to    21:08:04
3    form.    21:08:05
4        THE WITNESS:  I don't have    21:08:05
5    enough information to answer.    21:08:06
6  QUESTIONS BY MS. HERZFELD:    21:08:09
7    Q.    Okay.  And the information that    21:08:09
8  you would want would be the information    21:08:11
9  that's contained on that pharmacy information    21:08:12
10 sheet that we talked about earlier?    21:08:14
11   A.    Part of the information, yes.    21:08:16
12   Q.    Okay.  And the other    21:08:20
13 information would be information that you get    21:08:21
14 from the Google Alerts; is that right?    21:08:23
15   A.    Potentially.    21:08:25
16   Q.    Okay.  And is there any other    21:08:27
17 information you can think of that you'd want    21:08:28
18 to know to make that decision?    21:08:30
19   A.    So let's circle back, please.    21:08:31
20   Q.    Sure.    21:08:33
21   A.    We're talking about Celina,    21:08:33
22 Tennessee.    21:08:35
23   Q.    Yes, ma'am.    21:08:35
24   A.    And what's -- what's the    21:08:36
25 question again, please?    21:08:37

Page 601

1    Q.    The question was if you thought    21:08:38
2  that was an appropriate number of hydro APAP    21:08:40
3  pills to be going to that town.    21:08:46
4    A.    Okay.  And I said I can't    21:08:48
5  answer.  I don't have enough information.    21:08:50
6    Q.    And so then I said you'd want    21:08:50
7  the information on the pharmacy information    21:08:51
8  sheet that we talked about before in order to    21:08:53
9  make that determination?    21:08:54
10   A.    Yes, as one of the factors,    21:08:55
11 yes.    21:08:59
12   Q.    And one of the other factors    21:08:59
13 would be the information that you gleaned    21:09:00
14 from Google Alerts?    21:09:01
15   A.    Yes.    21:09:02
16   Q.    Okay.  And is there any other    21:09:03
17 information that you would feel you need to    21:09:04
18 consult?    21:09:08
19   A.    Any other information provided    21:09:08
20 to us by the distributors.    21:09:14
21   Q.    Okay.    21:09:16
22   A.    But, no, nothing other than    21:09:16
23 that.    21:09:19
24   Q.    Okay.  You can set that aside,    21:09:20
25 please, ma'am.  Okay.  Done with charts.    21:09:21

Page 602

1    (Mallinckrodt-Harper Exhibit 58    21:09:26
2    marked for identification.)    21:09:27
3    QUESTIONS BY MS. HERZFELD:    21:09:27
4    Q.    Okay.  Number 58.  If you'll    21:09:35
5    take a look at this for me, please.    21:09:49
6        Could you please read the    21:09:59
7    title?    21:09:59
8    A.    "DEA investigators seeking    21:10:00
9    answers in small Tennessee town."    21:10:05
10    Q.    And what does it say after    21:10:08
11    that?    21:10:10
12    A.    There's a header.    21:10:10
13    Q.    Yes, ma'am.    21:10:13
14    A.    Drug Enforcement    21:10:14
15    Administration.    21:10:15
16    Q.    Okay.  So this is a press    21:10:15
17    release coming from the Drug Enforcement    21:10:16
18    Administration?    21:10:18
19    A.    Yes.    21:10:18
20    Q.    Okay.  And then under that it    21:10:19
21    says, "Rural Clay County pharmacies 2017    21:10:26
22    purchases from distributors totaled more than    21:10:28
23    1 million pills."    21:10:30
24        Do you see that?    21:10:31
25    A.    Yes.    21:10:31

Page 603

1    Q.    Okay.  And then the date line,    21:10:32
2    what is the city and state that it indicates?    21:10:35
3    A.    Celina, Tennessee.    21:10:37
4    Q.    Okay.  And then if you could    21:10:39
5    read the first sentence for me, please?    21:10:40
6    A.    "DEA investigators this week    21:10:41
7    conducted inspections at several pharmacy    21:10:45
8    locations in the Clay County, Tennessee,    21:10:47
9    town" -- pardon me -- "of Celina following an    21:10:52
10    inquiry into irregular patterns of pill    21:10:56
11    purchases from drug distribution companies."    21:10:58
12    Q.    Okay.  You can stop there.    21:11:03
13        Were you aware of this DEA    21:11:05
14    investigation?    21:11:07
15    A.    No.    21:11:07
16    Q.    Okay.  Thank you, ma'am.  You    21:11:07
17    can set that aside.    21:11:09
18        Okay.  In 2017, did you start    21:11:20
19    working on pulling Tennessee order reports?    21:11:25
20        MR. O'CONNOR:  Objection.    21:11:27
21    Form.    21:11:28
22        THE WITNESS:  I don't know.    21:11:28
23        (Mallinckrodt-Harper Exhibit 59    21:11:35
24    marked for identification.)    21:11:36
25

Page 604

1    QUESTIONS BY MS. HERZFELD:    21:11:36
2    Q.    Okay.  I'm going to hand you    21:11:36
3    what I'm going to mark as Exhibit 59,    21:11:48
4    MNK-TN_000642 -- no, 6462195.    21:11:52
5        These all got jammed together,    21:12:01
6    guys.  Sorry.    21:12:05
7        If you'll look with me all the    21:12:07
8    way down to...    21:12:09
9        You don't have to read the    21:12:26
10    whole thing, but if you look where Tom --    21:12:30
11    Thomas Duffel -- three-quarters of the way    21:12:34
12    down the page?    21:12:35
13    A.    Yes.    21:12:36
14    Q.    And he, it looks like, sends an    21:12:36
15    e-mail to you on September 11, 2017, and    21:12:37
16    Debbie Dingle {sic}.    21:12:40
17        Do you see that?    21:12:42
18    A.    Yes.    21:12:42
19    Q.    And the subject is regarding    21:12:43
20    need listing of all current and past narcotic    21:12:46
21    SKUs.    21:12:48
22        Do you see that?    21:12:49
23    A.    Yes.    21:12:49
24    Q.    Okay.  And so his e-mail to you    21:12:50
25    and Debbie is, "Karen/Debbie, just to make    21:12:53

Page 605

1    sure, I'm sending a list of the items that we    21:12:57
2    used to pull the most recent Tennessee orders    21:13:00
3    report.  I'm assuming that the list will    21:13:02
4    remain constant as we have requests like    21:13:04
5    these.  Please let me know if there are any    21:13:07
6    issues.  Thank you."    21:13:09
7        Did I read that correctly?    21:13:13
8    A.    Yes.    21:13:13
9    Q.    Okay.  Do you know what he's    21:13:14
10    talking about?    21:13:16
11    A.    Yes.    21:13:16
12    Q.    Okay.  What he's talking about?    21:13:16
13    A.    He's determining that he has    21:13:17
14    the list of all opioid products to pull this    21:13:20
15    report and other reports.    21:13:22
16    Q.    For Tennessee orders?    21:13:24
17    A.    In this case, yes.    21:13:25
18    Q.    Okay.  And do you know why he    21:13:28
19    was pulling Tennessee orders?    21:13:29
20    A.    No.    21:13:30
21    Q.    You don't?    21:13:31
22    A.    No.    21:13:32
23    Q.    Okay.  Was -- did anybody ever    21:13:32
24    talk to you about pulling Tennessee orders?    21:13:36
25    A.    Clearly they did, but this    21:13:37

Page 606

1  could have been a request by -- by counsel.    21:13:41
2      Q.   Okay.  Can you think of any    21:13:51
3  other reason there would have been a request    21:13:53
4  to pull Tennessee numbers?    21:13:55
5      A.   A subpoena, request from    21:13:57
6  counsel, those type of things.    21:14:03
7      Q.   Okay.    21:14:04
8      A.   Yes.    21:14:04
9      Q.   Okay.    21:14:08
10         (Mallinckrodt-Harper Exhibit 60    21:14:17
11  marked for identification.)    21:14:21
12         MR. O'CONNOR:  For the record,    21:14:21
13  I think we're closing in on    21:14:22
14  20 minutes.    21:14:24
15         MS. HERZFELD:  Oh, my gosh,    21:14:24
16  really?  I thought I was doing so    21:14:25
17  well.  I'm so sorry.  So close.    21:14:28
18  QUESTIONS BY MS. HERZFELD:    21:14:32
19      Q.   Okay.  I'm going to hand you    21:14:34
20  60, and I think there's only one after this    21:14:35
21  one.    21:14:37
22         Okay.  I'm going to hand you    21:14:38
23  what's been marked as Plaintiff's Exhibit 60,    21:14:40
24  and that is MNK-T1_0007185456.  Okay.  It is    21:14:45
25  a two-page document.    21:15:03

Page 607

1         Do you recognize this as an    21:15:04
2  e-mail chain between you and David Widder?    21:15:05
3      A.   Yes.    21:15:08
4      Q.   Dated over the course of June    21:15:10
5  2017?    21:15:14
6      A.   Yes.    21:15:14
7      Q.   Okay.  Who is David Widder?    21:15:16
8      A.   He -- he was another person to    21:15:18
9  whom my group reported.    21:15:22
10      Q.   Okay.  What was his position?    21:15:24
11      A.   His title has changed over    21:15:25
12  time, but he's in -- supply chain is the name    21:15:28
13  of his group.    21:15:31
14      Q.   Okay.  And so if you'll go down    21:15:33
15  with me, it looks like David Widder is saying    21:15:35
16  to you in the second e-mail down, Wednesday,    21:15:41
17  June 14, 2017, "No worries.  If we can    21:15:43
18  complete by the end of the week, we'll be in    21:15:46
19  a good spot.  The DEA meeting prep and    21:15:47
20  Tennessee matter are both more pressing."    21:15:51
21         Do you see that?    21:15:53
22      A.   Yes.    21:15:54
23      Q.   And he is responding to you --    21:15:55
24  it's an e-mail, it looks like, earlier that    21:15:58
25  day?    21:16:03

Page 608

1      A.   Yes.    21:16:07
2      Q.   Okay.  "David, that will take    21:16:08
3  an additional day or two to complete.  You'll    21:16:13
4  have it no later than Friday COB.  I'm    21:16:14
5  waiting on slide input from David Hunter.    21:16:15
6  Don has slammed me last night and today with    21:16:18
7  work for the Tennessee matter and DEA meeting    21:16:19
8  prep.  Sorry."    21:16:21
9         What is the Tennessee matter?    21:16:22
10      A.   So I don't know specifically    21:16:24
11  what the Tennessee matter is or was.    21:16:27
12      Q.   Okay.  What was the DEA meeting    21:16:31
13  prep?    21:16:33
14      A.   I don't know.  I don't recall.    21:16:34
15      Q.   Okay.  All right.  And have you    21:16:36
16  read the complaint in the Tennessee matter?    21:16:48
17      A.   No.    21:16:50
18      Q.   Okay.  But it was sent to you;    21:16:51
19  is that right?    21:16:54
20      A.   I'm not certain of that.    21:16:54
21         (Mallinckrodt-Harper Exhibit 61    21:16:57
22  marked for identification.)    21:16:58
23  QUESTIONS BY MS. HERZFELD:    21:16:58
24      Q.   I'm going to give you our very    21:17:04
25  last exhibit, which is 61.  I'm handing you    21:17:05

Page 609

1  what is marked as Plaintiff's Exhibit 61.    21:17:17
2         Okay.  This appears to be an    21:17:19
3  e-mail from Don Lohman and John Gillies and    21:17:28
4  you dated June 14, 2017; is that right?    21:17:33
5      A.   Yes.    21:17:35
6      Q.   Okay.  And it says, filed    21:17:39
7  complaint 6/13/2017, and this was e-mailed to    21:17:42
8  you 6/14/2017; is that right?    21:17:47
9      A.   Yes, I see that.    21:17:48
10      Q.   Okay.  And I just copied the    21:17:49
11  first page of our complaint because it's    21:17:51
12  really super long.    21:17:52
13      A.   Okay.    21:17:53
14      Q.   Did you ever read it?    21:17:54
15      A.   No.    21:17:55
16      Q.   Okay.  You received it, but you    21:17:56
17  didn't read it?    21:17:58
18      A.   It's clear that I received it.    21:17:58
19  I don't recall receiving it, and I don't    21:18:00
20  recall reading it.    21:18:02
21      Q.   Okay.  And so when we were    21:18:03
22  talking before about the Tennessee matter,    21:18:04
23  could it have been the filing of our    21:18:06
24  complaint that was the matter?    21:18:09
25         MR. O'CONNOR:  Objection to    21:18:10

Page 610

1   form.                          21:18:10
2          THE WITNESS: I can't answer   21:18:10
3   that question.                 21:18:11
4   QUESTIONS BY MS. HERZFELD:      21:18:11
5      Q.   You can't answer because you   21:18:12
6   don't know or because it's privileged?   21:18:13
7      A.   Oh, because I don't know.   21:18:14
8      Q.   Oh, okay. Very good.      21:18:16
9      Sorry.                      21:18:20
10         MS. HERZFELD: Okay. I don't   21:18:27
11  think I have any other questions.   21:18:28
12         MR. O'CONNOR: Excellent. Can   21:18:30
13  we go off the record?           21:18:32
14         VIDEOGRAPHER: We are going off   21:18:33
15  the record at 9:18 p.m.         21:18:34
16  (Off the record at 9:18 p.m.)   21:18:36
17         VIDEOGRAPHER: We are back on   21:19:09
18  the record at 9:19 p.m.         21:19:15
19         CROSS-EXAMINATION         21:19:19
20  QUESTIONS BY MR. O'CONNOR:       21:19:19
21     Q.   Ms. Harper, considering the   21:19:20
22  hour, I'll keep this very brief. Just a few   21:19:20
23  questions.                     21:19:23
24         Earlier today you testified   21:19:23
25  about the scope of information provided   21:19:25

Page 611

1   through chargeback requests.     21:19:27
2          Do you generally recall    21:19:28
3   testifying on that issue?       21:19:30
4      A.   Yes.                    21:19:31
5      Q.   I just want to ask a few   21:19:32
6   questions so the record is clear on this.   21:19:37
7          Does chargeback data allow   21:19:39
8   Mallinckrodt visibility into all the sales of   21:19:41
9   its products made by distributor customers?   21:19:43
10     A.   No.                     21:19:48
11     Q.   Do all distributor customers   21:19:48
12  submit chargeback information?   21:19:52
13     A.   Yes.                    21:19:53
14     Q.   Do all customers of       21:19:54
15  Mallinckrodt product submit chargeback   21:19:56
16  requests?                      21:19:59
17     A.   No.                     21:20:01
18     Q.   And of those Mallinckrodt   21:20:03
19  customers that do from time to time submit   21:20:05
20  chargeback requests, do they submit   21:20:08
21  chargeback requests for every order they   21:20:12
22  receive?                       21:20:16
23         MR. KO: Object to the form.   21:20:16
24         THE WITNESS: I don't know the   21:20:17
25  answer.                        21:20:19

Page 612

1   QUESTIONS BY MR. O'CONNOR:       21:20:19
2      Q.   Okay. For those companies that   21:20:20
3   submit chargeback requests, are all orders   21:20:22
4   that those companies receive reflected in   21:20:26
5   those requests?                21:20:28
6      A.   No.                     21:20:30
7      Q.   Okay. Mallinckrodt         21:20:32
8   manufactures methylphenidate, correct?   21:20:39
9      A.   Yes.                    21:20:44
10     Q.   Do you know what           21:20:45
11  methylphenidate is used to treat?   21:20:46
12     A.   Attention-deficit/hyperactivity   21:20:48
13  disorder.                      21:20:52
14     Q.   Okay. Is it used to treat   21:20:52
15  pain, as far as you know?       21:20:54
16     A.   I do not know.           21:20:56
17     Q.   Okay. Is methylphenidate an   21:20:56
18  opioid?                        21:21:00
19     A.   It's a, yes, a synthetic   21:21:01
20  opioid, yes.                   21:21:03
21     Q.   It's a synthetic opioid. Okay.   21:21:03
22         And do you have any scientific   21:21:10
23  background on which you're basing that   21:21:11
24  statement?                     21:21:16
25     A.   No scientific background, no.   21:21:16

Page 613

1      Q.   Just a few minutes ago you   21:21:17
2   discussed with Ms. Herzfeld a number of   21:21:21
3   charts, including those labeled -- or marked   21:21:26
4   Exhibits 40 through 57, roughly.   21:21:30
5          Do you remember the charts I'm   21:21:33
6   referring to?                  21:21:34
7      A.   Yes.                    21:21:35
8      Q.   Okay. And many of those charts   21:21:38
9   purported to reflect chargeback data; is that   21:21:44
10  your understanding?             21:21:47
11     A.   Yes.                    21:21:48
12     Q.   Do you have any independent   21:21:49
13  recollection of the chargeback numbers that   21:21:53
14  you saw in any of those charts?   21:21:58
15     A.   No.                     21:22:00
16     Q.   So from time to time when you   21:22:02
17  indicated to Ms. Herzfeld that you thought   21:22:07
18  certain numbers were correct, did you have   21:22:09
19  any basis for saying that other than seeing   21:22:11
20  those numbers on the page -- on the document   21:22:14
21  that she provided you?          21:22:17
22         MS. HERZFELD: Object to the   21:22:17
23  form.                          21:22:19
24         THE WITNESS: No.           21:22:19
25

Page 614

1    QUESTIONS BY MR. O'CONNOR:            21:22:20
2        Q.   With respect to any numbers     21:22:21
3    that you indicated to Ms. Herzfeld that were  21:22:24
4    correct, do you have any basis to believe   21:22:27
5    that they were correct aside from -- aside  21:22:29
6    from the numbers on the document?       21:22:31
7        MS. HERZFELD:  Object to the      21:22:33
8    form.              21:22:34
9        THE WITNESS:  No.          21:22:34
10       MR. O'CONNOR:  What's the       21:22:35
11   objection?            21:22:37
12       MS. HERZFELD:  It's convoluted.   21:22:38
13   QUESTIONS BY MR. O'CONNOR:            21:22:42
14       Q.   Okay.  Do you recall responding  21:22:42
15   to Ms. Herzfeld that certain numbers she    21:22:43
16   presented to you were -- appeared to be    21:22:47
17   correct?             21:22:48
18       A.   Yes.             21:22:49
19       Q.   With respect to those numbers,   21:22:49
20   do you have any independent basis to believe  21:22:52
21   they are correct?          21:22:54
22       A.   No.              21:22:55
23       MR. O'CONNOR:  Okay.  That's     21:22:58
24   all I have.            21:22:58
25       MS. HERZFELD:  I have one        21:22:58

Page 615

1    question on redirect.         21:22:59
2        REDIRECT EXAMINATION           21:22:59
3    QUESTIONS BY MS. HERZFELD:            21:22:59
4        Q.   Based on those numbers we went   21:23:02
5    over, do you have any reason to think that   21:23:03
6    they'd be incorrect?          21:23:05
7        A.   I don't know the answer, no.   21:23:07
8        MS. HERZFELD:  Okay.  Thank     21:23:11
9    you.               21:23:13
10       MR. KO:  I'm sorry, folks, but   21:23:13
11   I have one question, of course, in     21:23:14
12   light of your redirect, and I have to    21:23:18
13   use a document for it.        21:23:20
14       (Mallinckrodt-Harper Exhibit 62   21:23:26
15   marked for identification.)       21:23:27
16       REDIRECT EXAMINATION           21:23:27
17   QUESTIONS BY MR. KO:             21:23:28
18       Q.   So I'm going to hand you a copy  21:23:22
19   of what will be marked as -- I don't know   21:23:23
20   what exhibit we're on -- 63?  Oh, 62.  Okay,  21:23:25
21   62.                21:23:38
22       And that's the --         21:23:38
23   unfortunately, that's the only copy of the   21:23:39
24   exhibit I have.           21:23:41
25       MR. KO:  Tricia, do you mind --   21:23:45

Page 616

1        MS. HERZFELD:  I'll read the    21:23:49
2    number in.            21:23:50
3        MR. KO:  Thank you.         21:23:50
4        MS. HERZFELD:  It's         21:23:51
5    MNK-T1_0000387492.           21:23:54
6    QUESTIONS BY MR. KO:             21:23:58
7        Q.   Ms. Harper, just a moment ago   21:24:03
8    Mr. O'Connor was asking you about whether or  21:24:05
9    not -- well, was asking you about chargeback  21:24:10
10   information.            21:24:12
11       Do you recall that?        21:24:13
12       A.   Yes.             21:24:13
13       Q.   And the document you have in    21:24:13
14   front of you is an e-mail that you sent to   21:24:17
15   someone at DEA regarding access and your    21:24:19
16   utilization of chargeback info; is that    21:24:24
17   correct?             21:24:26
18       A.   Yes.             21:24:26
19       Q.   And at the very end of that    21:24:26
20   e-mail, there's a portion that's underlined.  21:24:29
21   Do you mind reading that into       21:24:31
22   the record?            21:24:33
23       A.   "That said, Mallinckrodt     21:24:33
24   assumes that most transactions would result  21:24:38
25   in a chargeback request."        21:24:40

Page 617

1        Q.   Okay.  And do you have any    21:24:42
2    reason to dispute that you wrote that     21:24:45
3    language to the DEA on November 1, 2010?    21:24:47
4        A.   No.              21:24:50
5        MR. KO:  Okay.  That's all I    21:24:51
6    have.               21:24:52
7        MR. O'CONNOR:  All right.  We    21:24:54
8    can go off the record.         21:24:55
9        VIDEOGRAPHER:  We are going off   21:24:56
10   the record at 9:24 p.m.         21:24:57
11   (Deposition concluded at 9:24 p.m.)      21:24:58
12       - - - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 618

## CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Karen Harper was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____
CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand
Notary Public
Dated: January 21, 2019

Page 620

## ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
Karen Harper            DATE

Subscribed and sworn to before me this
_____ day of _____, 20 _____.
My commission expires: _____

Notary Public

Page 619

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 621

- - - - - - -
ERRATA
- - - - - - -

PAGE  LINE  CHANGE/REASON
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____
_____ ____ _____

Highly Confidential - Subject to Further Confidentiality Review

Page 622

```
1        _ _ _ _ _ _ _
         LAWYER'S NOTES
2        _ _ _ _ _ _ _
3    PAGE   LINE
4    ____   ____   _____
5    ____   ____   _____
6    ____   ____   _____
7    ____   ____   _____
8    ____   ____   _____
9    ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23   ____   ____   _____
24   ____   ____   _____
25
```