EXHIBIT 46

Highly Confidential - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF OHIO

 3                     EASTERN DIVISION

 4

 5    ----------------------------) MDL No. 2804

 6    IN RE NATIONAL PRESCRIPTION  )

 7    OPIATE LITIGATION            )

 8                                 ) Case No. 17-md-2804

 9    This document relates to:    )

10    All Cases                    )

11    ----------------------------) Hon. Dan A. Polster

12

13                   HIGHLY CONFIDENTIAL

14       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16            The videotaped deposition of KATE NEELY,

17    called for examination, taken pursuant to the Federal

18    Rules of Civil Procedure of the United States District

19    Courts pertaining to the taking of depositions, taken

20    before JULIANA F. ZAJICEK, a Registered Professional

21    Reporter and a Certified Shorthand Reporter, at Lieff

22    Cabraser Heimann & Bernstein, 8th Floor, 250 Hudson

23    Street, New York, New York, on January 8, 2019, at

24    9:06 a.m.
```

## Page 2

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFFS:
3     KELLER ROHRBACK L.L.P.
       1201 Third Avenue, Suite 3200
4      Seattle, Washington 98101-3052
       206-623-1900
5      BY:  DEAN KAWAMOTO, ESQ.
       dkawamoto@kellerrohrback.com;
6      ERIKA KEECH, ESQ.
       ekeech@kellerrohrback.com
7
8  ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
   AMERISOURCEBERGEN DRUG CORPORATION:
9
      REED SMITH LLP
10    811 Main Street, Suite 1700
      Houston, Texas 77002
11    713-469-3842
      BY:  MARY BALASTER, ESQ. (Telephonically)
12    MBalaster@reedsmith.com
13
   ON BEHALF OF MALLINCKRODT LLC and SPECGX LLC:
14
      ROPES & GRAY LLP
15    Three Embarcadero Center
      San Francisco, California 94111-4006
16    415-315-6300
      BY:  ROCKY C. TSAI, ESQ.
17    rocky.tsai@ropesgray.com
18    -and-
19    ROPES & GRAY LLP
      Prudential Tower
20    800 Boylston Street
      Boston, Massachusetts 02199-3600
21    617-951-7910
      BY:  ELISSA REIDY, ESQ.
22    elissa.reidy@ropesgray.com
23
24

## Page 3

1  APPEARANCES:
2  ON BEHALF OF CARDINAL HEALTH, INC.:
3     WILLIAMS & CONNOLLY LLP
       725 Twelfth Street, N.W.
4      Washington, D.C. 20005
       202-434-5000
5      BY:  JOEL S. JOHNSON, ESQ.
       jjohnson@wc.com
6
7  ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
   PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
8  INC.:
9     BAKER HOSTETLER
      Key Tower
10    127 Public Square, Suite 2000
      Cleveland, OH 44114-1214
11    216-861-6486
      BY:  DOUGLAS SHIVELY, ESQ. (Telephonically)
12    dshively@bakerlaw.com
13
   ON BEHALF OF WALMART INC.:
14
      JONES DAY
15    North Point
      901 Lakeside Avenue
16    Cleveland, Ohio 44114-1190
      216-586-3939
17    BY:  ADAM HOLLINGSWORTH, ESQ.
      ahollingsworth@jonesday.com
18
19  ON BEHALF OF VALIDUS PHARMACEUTICALS:
20    FOX ROTHSCHILD LLP
      2000 Market Street, 20th Floor
21    Philadelphia, PA 19103-3222
      215-299-2872
22    BY:  MAURA L. BURKE, ESQ. (Telephonically)
      MBurke@foxrothschild.com
23
24

## Page 4

1  APPEARANCES: (Continued)
2  ON BEHALF OF PERNIX THERAPEUTICS HOLDINGS, INC. IN
   NON-MDL CASES PENDING IN ARKANSAS AND PENNSYLVANIA:
3
      CLARK MICHIE LLP
4     220 Alexander Street
      Princeton, NJ 08540
5     609-423-2143
      BY:  BRUCE CLARK, ESQ. (Telephonically)
6     bruce.clark@clarkmichie.com
7
   THE VIDEOGRAPHER:
8
      MR. HENRY MARTE,
9     Golkow Litigation Services.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 5

1           I N D E X
2
3  WITNESS:                    PAGE:
4  KATE NEELY
5     EXAM BY MR. KAWAMOTO.................  10
6
7           *****
8
9         E X H I B I T S
10 MALLINCKRODT- NEELY EXHIBIT      MARKED FOR ID
11 No. 1    Plaintiffs' Notice of Oral      13
           Videotaped Deposition of Kate
12         Neely (Muhlenkamp) and Requests
           for Production of Documents
13
   No. 2    E-mail chain, top one from      40
14         Muhlenkamp to Vorderstrasse,
           10/10/08, Subject: RE: Fentanyl
15         question, w/attachment;
           MNK-T1_0006330799 - 800
16
   No. 3    E-mail from France to Muhlenkamp,   59
17         9/2/08, Subject: Action Plan,
           w/attachment;
18         MNK-T1_0000448772 - 780
19 No. 4    E-mail chain, top one from Victor   72
           Borelli to Kate Muhlenkamp, among
20         others; MNK-T1_0000563714 - 715
21 No. 5    E-mail chain, top one from Kate     89
           Muhlenkamp to Dave Irwin, among
22         others, Subject: Customer Demand
           Management and Allocations;
23         MNK-T1_0004916278 - 279
24

## Page 6

1       E X H I B I T S (Continued)
2  MALLINCKRODT- NEELY EXHIBIT    MARKED FOR ID
3  No. 6  E-mail from Amy Loomis to Rebecca   109
        Coyner, among others, 12/21/2007,
4       Subject: Excess Demand Rule
        Orders, w/attachment;
5       MNK-T1_0006330418 - 419
6  No. 7  E-mail chain, top one from Kate   113
        Muhlenkamp to Lisa Lundergan,
7       among others, 7/12/10, Subject:
        FW: Keysource Vault Program;
8       MNK-T1_0000449492 - 493
9  No. 8  E-mail chain, top one from Jeremy   136
        Stamer to Kate Muhlenkamp,
10      7/13/10, Subject: RE: Oxycodone
        Florida Sales;
11      MNK-T1_0006320438 - 440
12  No. 9  E-mail from Kate Muhlenkamp to   149
        Karen Harper, among others,
13      8/4/10, Subject: Jeremy Stamer,
        Portfolio Management - SOM Team
14      Participant; MNK-T1_0000262710
15  No. 10  E-mail chain, top one from Kate   152
        Muhlenkamp to Karen Harper,
16      9/14/10, Subject: RE: Requesting
        Info: Dollars of Sales, Oxycodone
17      15 and 30 mg to Florida per year,
        w/attachment;
18      MNK-T1_0000289707 - 708
19  No. 11  E-mail chain, top one from Lohman   155
        to Harper, among others, 11/3/10,
20      Subject: FW: Oxy IR Sales by
        Strength and State of Florida,
21      w/attachments;
        MNK-T1_0000558193 - 195
22
23  No. 12  E-mail from Muhlenkamp to Stamer,   162
        11/8/10, Subject: Suspicious Order
24      Monitoring; MNK-T1_0000448850

## Page 7

1       E X H I B I T S (Continued)
2  MALLINCKRODT- NEELY EXHIBIT    MARKED FOR ID
3  No. 13  Document titled: "Talking Points   167
        for DEA Albany and Stae St. Louis,"
4      dated 11/1/10; MNK-T1_0000270081
5  No. 14  E-mail from Muhlenkamp to Borelli,   173
        Collier, 8/5/10, Subject:
6      Keysource Oxycodone Sales,
        w/attachments;
7      MNK-T1_0000559192 - 195
8  No. 15  E-mail chain, top one from   195
        Muhlenkamp to Rausch, Harper,
9      8/4/10, Subject: Cedardale
        Answers; MNK-T1_0000265441
10
11  No. 16  E-mail chain, top one from Cathy   210
        Stewart to Charity Aranda, among
12      others, 8/17/09, Subject: FW:
        Sunrise Chargeback Summary,
        w/attachment;
13      MNK-T1_0000290041 - 053
14  No. 17  Letter from DEA to Mallinckrodt;   219
        MNK-T1_0000421084 - 085
15
      No. 18  E-mail chain, top one from   226
16      Muhlenkamp to Montgomery,
        11/12/09, Subject: RE: North
17      Carolina Mutual - Durham, NC - No
        Shipments Week of 11/23/09;
18      MNK-T1_0000387257 - 258
19  No. 19  E-mail chain, top one from   232
        Muhlenkamp to Adams, 10/28/08,
20      Subject: RE: Old Bridge acct#
        3448; MNK-T1_0000449467 - 469
21
22  No. 20  E-mail chain, top one from   238
        Muhlenkamp to Rausch, 10/7/10,
        Subject: FW: FW: PO# 472054618;
23      MNK-T1_0000267735 - 737
24

## Page 8

1       E X H I B I T S (Continued)
2  MALLINCKRODT- NEELY EXHIBIT    MARKED FOR ID
3  No. 21  E-mail chain, top one from   246
        Muhlenkamp to Rausch, Harper,
4      9/17/10, Subject: Re: Cardinal
        Health - order 70177713;
5      MNK-T1_0000264901 - 902
6  No. 22  E-mail chain, to one from Rausch   262
        to Rehkop, 9/14/10, Subject: RE:
7      Cardinal order for OXY's on
        peculiar order report;
8      MNK-T1_0000265090 - 092
9  No. 23  E-mail chain, top one from Rehkop   265
        to Harper, 10/26/10, Subject: RE:
10      McKesson on Peculiar ord rep for
        Oxy; MNK-T1_0000280580 - 582
11
      No. 24  E-mail chain, top one from   271
12      Muhlenkamp to Heideman, among
        others, 4/10/09, Subject: RE:
13      Oxycodone 15 mg tabs;
        MNK-T1_0000560771 - 774
14
15  No. 25  E-mail chain, top one from   277
        Muhlenkamp to Harper, Levy and
16      Borelli, 6/25/10, Subject: RE:
        Oxycodone Sales in Florida -
17      Summary;
        MNK-T1_0000387434 - 436249
18  No. 26  E-mail chain, top one from   286
        Muhlenkamp to Borelli, 6/25/10,
19      Subject: RE: Oxycodone Sales in
        Florida - Summary;
20      MNK-T1_0000449324 - 326
21  No. 27  E-mail chain, top one from Rehkop   290
        to Rausch, Coffey and Muhlenkamp,
22      6/23/10, Subject: FW: Item #
        853001; MNK-T1_0000297940 - 941
23
      No. 28  Chart; MNK-T1_0000264293 Keysource   301
24      Summary

## Page 9

1       E X H I B I T S (Continued)
2  MALLINCKRODT- NEELY EXHIBIT    MARKED FOR ID
3  No. 29  E-mail chain, top one from Stewart   305
        to Ratliff, among others, 6/4/08,
4      Subject: RE: Oxycodone orders;
        MNK-T1_0000290546 - 552
5
6  No. 30  E-mail chain, top one from   310
        Muhlenkamp to Gunning, 6/3/08,
        Subject: FW: Oxy monthly usage;
7      MNK-T1_0000562701 - 704
8  No. 31  E-mail chain, top one from Borelli   331
        to Becker, 6/6/08, Subject: FW:
9      Dextro Discontinuation;
        MNK-T1_0000564327 - 329
10
11  No. 32  E-mail chain, top one from Borelli   341
        to Muhlenkamp, 9/16/08, Subject:
12      RE: Master's 30mg Order;
        MNK-T1_0000562745 - 746
13  No. 33  E-mail chain, top one from Cathy   344
        Stewart to Ratliff and Harper,
14      5/20/08, Subject: FW: Sunrise
        Wholesale; MNK-T1_0003028219 - 220
15
      No. 34  E-mail chain, top one from Borelli   346
16      to Hoffman and Cochrane, 9/29/10,
        Subject: FW: Chargeback Quantity
17      on Oxycodone 30mg;
        MNK-T1_0000384139 - 140
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    THE VIDEOGRAPHER:  Okay.  We are now on the
2  record.  My name is Henry Marte.  I am a videographer
3  for Golkow Litigation Services.  Today's date is
4  January 8th, 2019, and the time is 9:06 a.m.
5    This videotape deposition is being held at
6  250 Hudson Street, New York, New York in the matter of
7  National Prescription Opiate Litigation.
8    The deponent today is Kate Neely.
9    All appearances are noted on the -- on the
10 stenographic record.
11    Will the court reporter please administer
12 the oath to the witness.
13    (WHEREUPON, the witness was duly
14    sworn.)
15    KATE NEELY,
16 called as a witness herein, having been first duly
17 sworn, was examined and testified as follows:
18    EXAMINATION
19 BY MR. KAWAMOTO:
20   Q.   Good -- good morning, Ms. Neely.
21   A.   Good morning.
22   Q.   Thank you for being here today.
23    My name is Dean, Keller Rohrback, and I am
24 here for the Plaintiffs.

Page 11

1    Have you ever been deposed before?
2   A.   I have not.
3   Q.   So let's go over some ground rules to make
4  the process a little smoother.
5    I will ask you questions and I will do my
6  best to ask coherent and clear ones.  If you don't
7  understand them for whatever reason, please let me
8  know and I'll try to rephrase them.  It's very
9  important that we not talk over each other, so I'll
10 ask the question and then give you an opportunity to
11 answer.
12    If you need to take a break, please just
13 let me know and -- and we can take one.  And your
14 counsel may object for the record.  Unless he directs
15 you not to answer, you should respond to the question.
16    Does that make sense?
17   A.   Yes.
18   Q.   Thank you.
19    How did you per -- how did you prepare for
20 this deposition?
21   A.   I've met with my attorneys on two
22 different occasions prior to today.
23   Q.   Okay.  And do you recall roughly when the
24 first meeting was?

Page 12

1   A.   The first meeting was in November.
2   Q.   And do you recall roughly how long that --
3  that meeting lasted for?
4   A.   It was approximately one business day.
5   Q.   And I take it you met with Mr. Tsai and
6  Ms. Reidy?
7   A.   The first time I met with Ms. Reidy and
8  another gentleman named Mr. Davidson and then the
9  second time I met with Mr. Tsai and Ms. Reidy.
10   Q.   And other than your counsel, was anyone
11 else present?
12   A.   No.
13   Q.   And the second day, roughly when was that?
14   A.   Yesterday.
15   Q.   And roughly how long was that meeting?
16   A.   The same amount of time, one business day.
17   Q.   Okay.  And other than your counsel, was
18 anyone else present?
19   A.   No.
20   Q.   Have you talked about this deposition with
21 anyone else besides your counsel?
22   A.   No.
23   Q.   Have you spoken to any former Mallinckrodt
24 employees about -- or any of your former colleagues

Page 13

1  about this case?
2   A.   No.
3    MR. KAWAMOTO:  Thank you.
4    So I'd like to mark this as Exhibit 1.  It
5  is just a copy of the deposition notice.
6    (WHEREUPON, a certain document was
7    marked Mallinckrodt - Neely
8    Deposition Exhibit No. 1, for
9    identification, as of 01/07/2019.)
10    MR. TSAI:  And do you have extra copies for us?
11    MR. KAWAMOTO:  Yes.
12    MR. TSAI:  Okay.
13    MR. KAWAMOTO:  They are going to sort of
14 circulate, you know, clockwise.
15 BY THE WITNESS:
16   A.   And do I need to do anything with this
17 or...?
18 BY MR. KAWAMOTO:
19   Q.   No.  Just take a look, and actually, there
20 are -- there are other copies underneath that.  So if
21 you can pass copies down to your counsel and --
22   A.   Sure.
23   Q.   -- to everyone else.
24    MR. TSAI:  So you'll take the marked one.

Page 14

1  BY THE WITNESS:
2      A.  Got it.  Okay.
3  BY MR. KAWAMOTO:
4      Q.  So, Ms. Neely, this is what's called a
5  deposition notice.
6          Have you -- have you ever seen this
7  document before?
8      A.  I don't think so.
9      Q.  Okay.  Starting on Page 4 and 5, it has
10 some requests for documents, and I'd like to -- to
11 direct your attention to Request for Production No. 2.
12 Okay.  And it is going to be on Page 5.
13     A.  Okay.
14     Q.  Do you have any documents in your
15 possession that relate to Mallinckrodt's
16 manufacturing, marketing, sale, or distribution of its
17 opioid business?
18     A.  I do not.
19     Q.  And did you consult any doc -- or were you
20 shown any documents in the con- -- in the process of
21 preparing for your deposition?
22         Well, let me strike that.
23         Did you review any documents while
24 preparing for this deposition?

Page 15

1      A.  I did meet with my attorneys, yes.
2      Q.  And did they show you documents?  I'm not
3  asking you what the documents were.
4      A.  Sure.
5      Q.  I'm just asking if they showed them to
6  you.
7      A.  We did review information, yes.
8      Q.  Okay.
9      MR. KAWAMOTO:  And, Counsel, I take it that
10 those documents are all ones that have been produced?
11     MR. TSAI:  Yes.
12     MR. KAWAMOTO:  Okay.
13 BY MR. KAWAMOTO:
14     Q.  Okay.  Ms. Neely, while you were employed
15 at Mallinckrodt, did you have a cell phone?
16     A.  I did.
17     Q.  And was it provided by the company?
18     A.  It was.
19     Q.  And did you return it to them when you
20 left the company?
21     A.  I did.
22     Q.  And they paid for the service and handled
23 its operation?
24     A.  Correct.

Page 16

1      Q.  Did you receive performance reviews while
2  you were employed at Mallinckrodt?
3      A.  Yes.
4      Q.  Do you recall roughly how often tho- --
5  they were?
6      A.  Annual.
7      Q.  And did you receive a written report or
8  summary of -- of the review?
9      A.  Yes.
10     Q.  The HR department has apparently misplaced
11 or lost your file.
12     A.  Okay.
13     Q.  That's the -- why I'm -- I'm asking these
14 questions.
15     A.  They wanted to get rid of me that bad.
16     Q.  I imagine not, but...
17         Were the -- well, could you describe or
18 characterize the -- the nature of the reviews?
19     A.  I can give you a high level.  It's been,
20 you know --
21     Q.  Sure.
22     A.  -- eight, nine years ago.  You know, you
23 did an annual review.  It was based on a combination
24 of company and personal goals.

Page 17

1      Q.  And did you generally meet those goals?
2      A.  I generally came in satisfactorily, yes.
3      Q.  Do you recall any areas where the -- the
4  company indicated that you could need a -- that needs
5  improvement or any shortcomings?
6      A.  I don't recollect any.
7      Q.  And do you recall roughly what your salary
8  was?
9      A.  When I started with the company?
10     Q.  Well, when you started and then ultimately
11 when you finished?
12     A.  Sure.
13         When I started with the company, I think
14 my base salary was ▌▌▌▌  and when I left with the
15 company it was just over ▌▌▌▌ .
16     MR. TSAI:  And given that we are talking about
17 her personal financial information, I'd like to
18 designate this highly confidential.
19     MR. KAWAMOTO:  Sure.  That's fine.
20 BY MR. KAWAMOTO:
21     Q.  Did you receive any bonuses while you were
22 at Mallinckrodt?
23     A.  We did receive bonuses.
24     Q.  And approximately how -- what -- what was

Page 18

1  the size of the bonuses you received?
2      A.   I don't remember the dollar amounts, but I
3  will tell you the base bonus was approximately
4  15 percent of your base salary, give or take,
5  depending on the -- how you accomplished your goals.
6      Q.   And do you recall what the bonuses were
7  based on?
8      A.   It was a combination of sales budget,
9  margin, and then individual goals.  As far as how it
10  was weighted out, that part I don't remember.
11     Q.   Okay.  And in terms of individual goals,
12  could you provide some examples of what an individual
13  goal would be?
14     A.   Sure.
15         An individual goal could range from
16  taking, you know, an Excel training class to going to
17  a leadership class and learning how to speak better in
18  public, anything that might enhance you as an
19  employee.
20     Q.   Now, while you worked at Mallinckrodt, you
21  did have certain compliance responsibilities, is that
22  fair?
23     A.   As a product manager, I was trained in
24  compliance.  It wasn't -- I wasn't necessarily in the

Page 19

1  SOM's, you know, department or in compliance, but we
2  definitely did undergo compliance training, yes.
3      Q.   Understood.
4          And were any -- did any of your individual
5  goals relate to compliance?
6      A.   I don't recollect.
7      Q.   Do you recall if any portion of your bonus
8  was tied to a compliance-related goal or
9  compliance-related criteria?
10     A.   I can't remember.
11     Q.   And you indicated that the bonus was tied
12  to sales budget and margin.
13         What do you mean by that?
14     A.   So each fiscal year you would set a sales
15  budget, so top line sales dollars, and then you would
16  as -- also have a margin budget and you were -- as a
17  company you had these top level goals and then you, if
18  you did not make those numbers as a company, then that
19  would be a shortcoming in regards to your -- your
20  goals.
21     Q.   And I'm sorry.  When you said "as a
22  company," so was there sort of an -- an -- a sum or
23  a -- a number in terms of the sales budget that you or
24  your department was expected to reach?

Page 20

1      A.   We really, when we talk in terms of sales
2  dollars, it was tied -- from my recollection, it was
3  tied to the total company sales.
4      Q.   Okay.  And was -- was this -- for total
5  company sales, was this opioid products or was this
6  all of their products?
7      A.   It was all products that we, Mallinckrodt,
8  marketed within the generics group, which would cover
9  opioids and non-opioids.
10     Q.   Okay.  Thank you.
11         Can you briefly describe your prior work
12  experience before you joined Mallinckrodt?
13     A.   Sure.  I was working as a corporate buyer
14  for a department store chain.  The name of the company
15  was May Company, May department stores.  They got
16  purchased by Federated, which is Macy's, in 2006,
17  which is when I left the company.
18     Q.   So prior to 2006, did you have any
19  experience with the pharmaceutical industry?
20     A.   I did not.
21     Q.   And I take it you didn't have any
22  experience with controlled substances or -- or
23  narcotics?
24     A.   I did not.

Page 21

1      Q.   And when you first joined Mallinckrodt,
2  what was your title?
3      A.   Marketing analyst.
4      Q.   And generally speaking, what were your job
5  responsibilities as a marketing analyst?
6      A.   I was responsible for creating tools to
7  help with the marketing team, so whether it be in
8  Excel or Access, I generated reports, did reporting
9  analytics.
10     Q.   And in terms of marketing tools, could you
11  provide some examples of -- of what -- what the --
12  what type of tools we are talking about?
13     A.   Sure.
14         I think we need to be clear that marketing
15  within a generics firm is not like traditional
16  marketing.  It's much more analytics driven because
17  you are not truly marketing the product to an end
18  consumer.
19         So when you talk about marketing tools,
20  things I created, I created the profitability analysis
21  tool, which allowed them -- it was something -- I
22  basically created tools that -- that were functions
23  that people repeated on a day-to-day basis, I created
24  things to make it easier for them to do that.  So it

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 was more for internal operations.  I created a
2 forecasting tool, things to help expedite internal
3 processes and projects.
4     Q.   Okay.  So the -- I mean, well, I guess
5 these are almost like computer programs or --
6     A.   They were -- they were -- yeah, they
7 were -- I wouldn't go that sophisticated, but similar,
8 yes.
9     Q.   Okay.
10     A.   Yep.
11     Q.   Okay.  And generally speaking, how did
12 Mallinckrodt -- well, strike that.
13         Generally speaking, how did Mallinckrodt
14 market its generic products, its generic opioid
15 products?
16     A.   In terms of, again, marketing generic
17 opioids, you don't truly market them.  The market is
18 already created by the brand.  So as a generic, you
19 come in and you contract with wholesalers,
20 distributors and/or retail, large retail chains to
21 gain position on their formulary, and then at that
22 point you sell to them and then they sell into the end
23 pharmacy.
24     Q.   And when you say you contract with

Page 23

1 wholesalers or distributors, what -- what is -- what's
2 the sales pitch to the wholesaler or distributor, is
3 it -- well, I mean, I -- I -- strike that.
4         What was -- was there a sales pitch that
5 Mallinckrodt delivered to wholesalers or distributors
6 in terms of, you know, when they were trying to get
7 them to enter into a contract?
8     A.   And, again, I wasn't in sales.  I was in
9 marketing at the time, so I was really working in the
10 back office, but in general, within the generics
11 industry, you're not really pitching your product.
12 It's all based on price.  And so you are negotiating
13 with -- because you are inherently competing against
14 at least one if not, you know, up to eight different
15 competitors, and so it really becomes a price game and
16 a relationship, a relationship-based sale.  And so you
17 really are competing, I would say, on price.
18     Q.   Okay.  So I assume distributors are
19 looking at price and presumably the reliability of --
20 of delivery, is that fair?
21     A.   So I think -- yeah, and that's fair.  So
22 let me take a step back.
23         So you -- you -- the distributors would
24 take a look at price, then quality, and then

Page 24

1 reliability of supply, those three components.
2     Q.   And so in terms of price, would -- would
3 the chargeback payments or the chargeback program
4 figure into the price?
5     A.   So the chargeback isn't -- it's more of a
6 financial exchange.  It's just something that -- so
7 the price is set.  So you -- let's say you negotiate a
8 contract price of $4 with a wholesaler.  However, you
9 sell to them at, say, $50.  Your price is your price.
10 It's $4.  And wherever you set that at, the chargeback
11 is then dictated based on that and -- and the WAC, so
12 in that case it would be a $46 chargeback.
13     Q.   And just so I understand, the $46 would
14 be -- would be the money that -- that Mallinckrodt
15 paid to the distributors --
16     A.   No.
17     Q.   -- is that right or --
18     A.   No.
19         So you sell it to the distributor at the
20 WAC price, let's say for this instance $50.  When the
21 distributor then turns and they sell it to their end
22 customer, which is a pharmacy, then -- and let's say
23 our negotiated price with them is $4 with the
24 wholesaler, they would then charge us back, the

Page 25

1 wholesaler would, the $46.  So the chargeback occurs
2 between the wholesaler back to the manufacturer.
3     Q.   Okay.
4     A.   And it only occurs after they have sold
5 the product to the pharmacy that they have the deal in
6 place with.
7     Q.   Understood.
8         So while -- or just to make sure I
9 understand, so Mallinckrodt has a price with a
10 distributor for $50, it then also has a price with, I
11 guess, the -- the indirect customer, is that the right
12 term or --
13     A.   The price is with the wholesaler as well.
14     Q.   Okay.
15     A.   So WAC is just a universal, WAC is
16 wholesaler acquisition cost.  And it is just a
17 universal price, it is published.  It's public.  And
18 that's what wholesalers purchase the product at.
19         You then in turn have negotiated contracts
20 with that particular wholesaler for a contract price,
21 but you have different contracts loaded with them at
22 different contract prices.  So depending on who they
23 sell that product on to, off of which contract,
24 they'll charge you back against that WAC the

Page 26

1  difference between that WAC and whatever the
2  negotiated contract price is.
3      Q.    And so -- I mean, in terms of the numbers,
4  Mallinckrodt is selling its opioid products, let's say
5  oxy 15, to a wholesaler for $50 a bottle, whatever the
6  price is, then that wholesaler charges a pharmacy, I
7  guess, $10 a bottle.  The chargeback would be $40 paid
8  by Mallinckrodt to the wholesaler, is that correct?
9      A.    No.  The wholesaler pays the chargeback to
10  Mallinckrodt -- hold on.  Let me think about this.
11      So they issue the chargeback to
12  Mallinckrodt and then Mallinckrodt pays the chargeback
13  to them.
14      Q.    Okay.
15      A.    So they'll issue the financial chargeback
16  to the wholesaler -- or to -- to Mallinckrodt and then
17  Mallinckrodt turns around and issues the actual
18  payment to the wholesaler, yes.
19      Q.    So in essence it is to make the
20  wholesaler -- it is to make -- to make the wholesaler,
21  you know, I guess, whole if there is a difference
22  between the acquisition price, the WAC, and the price
23  they ultimately end up collecting from their
24  customers.

Page 27

1      Is that -- is that accurate?
2      A.    It -- it is not necessarily the price that
3  they collect from their customers.  So we'll have a
4  negotiated contract price with the wholesaler of,
5  again, let's said $4, right, and that's their contract
6  price negotiated with the manufacturer.  They can
7  choose to mark up that price to their customer
8  whatever they want and that's how they make money.
9      So we may have a contracted price with a
10  wholesaler of $4 and then they may sell it out to
11  their end pharmacy at a price of $6 and then make $2
12  on -- that's where they make their margin.
13      Q.    Okay.
14      A.    So the chargeback is only going to be the
15  difference between our contracted price and WAC, not
16  necessarily the price that they turn around and sell
17  the product to the pharmacy at.
18      Q.    Okay.  And so in your example then what
19  would happen is for every sale the whole -- the
20  wholesaler makes to one of their customers at $6, they
21  would be getting a profit of $2 off of that plus --
22  I'm sorry, I'm trying to track the -- the number in
23  the example -- $46 from Mallinckrodt, which represents
24  a difference between 50 and 4?

Page 28

1      A.    They would get a chargeback of $46, yes.
2      Q.    Okay.  Okay.  Thank you.  That's very
3  helpful.
4      And so we started at marketing analyst,
5  and I -- I take it you were promoted.
6      So what -- what was your next position?
7      A.    I was promoted to associate product
8  manager.
9      Q.    And did your responsibilities change much?
10      A.    They did.  I didn't have any
11  product-specific responsibilities as a marketing
12  analyst.  When I was promoted to associate product
13  manager, I did take on the management of a couple of
14  smaller product families.
15      Q.    And then at some point you became a full
16  product manager, is that correct?
17      A.    I -- I did.
18      Q.    Do you recall roughly when?
19      A.    I don't.
20      Q.    And as a full product manager, what were
21  your responsibilities?
22      A.    I was essentially doing the same job that
23  I had been doing as an associate product manager, but
24  I had taken on the responsibility of larger product

Page 29

1  families in terms of contribution to the total
2  portfolio.
3      Q.    And these products were all -- were all
4  generics, correct?  Is that -- is that correct?
5      A.    They were all generics, yes.
6      Q.    When you are an associate product manager,
7  did you have any responsibility for any generic opioid
8  products?
9      A.    I don't recollect what the products were
10  that I managed at that time.
11      Q.    What about as a -- as a product manager?
12      A.    As a product manager, I did have opioids
13  within my portfolio.
14      Q.    And who did you report to?
15      A.    When I initially started at Mallinckrodt,
16  I reported to a gentleman named Jeff Burd.  After he
17  left, I reported into a woman named Ginger Collier.
18      Q.    And did you have anyone reporting to you?
19      A.    By the time that I left the company, I had
20  two people reporting to me.
21      Q.    And who were they?
22      A.    Lisa, it used to be Lundergan, now it is
23  Cardetti, and Lou Ann Randall.
24      Q.    And what was your impression of Lou Ann

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 Randall?
2     MR. TSAI: Object to the form.
3       Go ahead.
4 BY THE WITNESS:
5     A.   Yeah, I -- I think that's a really vague,
6 vague question.
7 BY MR. KAWAMOTO:
8     Q.   Okay. Fair enough.
9       With respect to the performance of her job
10 responsibilities, what was -- what was your -- well,
11 strike that.
12      Do you think Lou Ann Randall was good at
13 her job?
14     A.   Again, I think that's a really subjective
15 question.
16     Q.   Well, did you -- did you have any concerns
17 with her job performance?
18     A.   So Lou Ann worked within -- she was in
19 charge of handling the con -- like the contracts, so
20 making sure that things were processed that we -- when
21 a salesperson in -- you know, brought in a contract,
22 that it got turned around -- or brought in a new
23 business opportunity, that the contract got turned
24 around in an expeditious matter. And so she was

Page 31

1 really in a more clerical row -- role.
2       I will say when I took on the management
3 of her that people beyond me were in a position of not
4 wanting to keep her on. It wasn't that she was
5 necessarily bad at her job, but she wasn't really
6 thinking outside of the box and pushing the envelope.
7 And so it was my -- my job and what I ended up doing
8 was taking her and -- and really trying to -- to train
9 her.
10      And so I would say when I first took her
11 as an employee, it -- she probably was a lower --
12 lower than average performer and I think by the time
13 that I left she was performing at average if not
14 above. So my opinion of her varied.
15     Q.   Okay. And in terms -- when you say that
16 people beyond you, were -- I take it are you talking
17 about -- were you talking about Ginger Collier or
18 others that --
19     A.   It --
20     Q.   -- Lou Ann interacted with?
21     A.   It would have been at the time Jeff Burd
22 who I reported into.
23     Q.   And what about Lisa Cardetti?
24     A.   Lisa?

Page 32

1     Q.   In -- yes, in terms of her job
2 performance, did you have any concerns about her?
3     A.   And, again, what do you -- clarify
4 concerns.
5     Q.   Well, you indicated, for example, for
6 Lou Ann when you initially took over management of
7 her, I think Jeff Burd had some concerns about her and
8 probably felt that it -- that it wasn't a good fit
9 with her.
10      Was that the same situation with Lisa or
11 was it different? In -- in terms of how was Lisa
12 perceived within the company with respect to her
13 professionally?
14     A.   Sure.
15     MR. TSAI: Object to the form.
16       Go ahead.
17 BY THE WITNESS:
18     A.   So I can't speak to how Lisa was perceived
19 within the company. I can speak to how I -- I
20 perceived her. She is very smart. She was promoted
21 several times within the -- the department, within the
22 company and the department. So I perceived Lisa to be
23 a high performer and -- and very intelligent.
24 BY MR. KAWAMOTO:

Page 33

1     Q.   And what were -- you described Lou Ann's
2 responsibilities which were largely, you know,
3 administerial with respect to the -- to the contracts.
4       What were Lisa's responsibilities?
5     A.   So Lisa joined the marketing group as a
6 marketing analyst and then was promoted to an
7 associate product manager. So if you revert back to
8 how I described what my job duties were, she
9 essentially followed the same path that I did whenever
10 I came into the company.
11     Q.   And do you recall what product she had
12 responsibility for?
13     A.   I don't.
14     Q.   Did you ever work with people in the
15 compliance department?
16     A.   I interacted with them, yes.
17     Q.   And do you recall who you interacted with?
18     A.   Primarily Karen Harper.
19     Q.   And what was your professional impression
20 of Karen with respect to, you know, her job
21 performance?
22     A.   Karen was extremely professional, very
23 dedicated, and very focused on -- she was just -- just
24 a really dedicated, wanted to make sure that we were

Page 34

1 adhering to compliance and was very dedicated to doing
2 the right thing.
3     Q.   And did you interact with anyone else in
4 compliance?
5     A.   She is the main name that I remember.
6     Q.   Okay. Did you ever work with Jim Rausch?
7     A.   Yes, I did.
8     Q.   And what -- what was his role?
9     A.   Jim was in, I believe, customer service.
10     Q.   So that would have been a different
11 department from -- from, I guess -- well, strike that.
12     So as a product manager, were you in the
13 marketing department or what department was that?
14     A.   As a product manager I was in the
15 marketing department.
16     Q.   Okay. And the customer service
17 department, I take it, would have been separate
18 from -- from marketing?
19     A.   The customer service department was
20 separate from marketing.
21     Q.   And what were your impressions of
22 Mr. Rausch?
23     A.   I didn't work directly with him, and we
24 did interact -- I guess I did. I thought he -- he

Page 35

1 worked hard and he tried hard to do a -- a good job as
2 well.
3     Q.   And did you interact with Cathy Stewart?
4     A.   I did.
5     Q.   And what was -- what was her role?
6     A.   She was also in customer service.
7     Q.   And what was your impression of her?
8     A.   Again, good impression, she was diligent
9 and she worked hard.
10     Q.   And generally speaking, in the context of
11 your interactions with Jim and Cathy, what were their
12 responsibilities?
13     A.   So Jim and Cathy were in customer service,
14 so they were the front face to customers outside of
15 the sales team when customers would call inquiring
16 about orders, shipments. They also processed POs, so
17 they processed the orders and they were in charge of
18 releasing the orders to the warehouse so that they
19 would then ship.
20     Q.   And when you say "in charge of releasing
21 the orders," what -- what does that mean?
22     A.   Just within the ERP system, so when they
23 would come in via EDI, they would be the ones to
24 release the orders in the system from my

Page 36

1 understanding.
2     Q.   And my apologies. What -- what does ERP
3 stand for?
4     A.   Enterprise -- oh, gosh. So think about
5 like SAP --
6     Q.   Uh-huh.
7     A.   -- any kind of, like, tool that you --
8     Q.   Yeah.
9     A.   -- and -- and so I can't -- Enterprise
10 something --
11     Q.   Okay.
12     A.   -- I can't remember. I don't know.
13     Q.   But it is -- it is essentially like a
14 computer program or a database?
15     A.   It is exactly, yeah.
16     Q.   Okay. And EDI?
17     A.   Electronic data interchange.
18     Q.   Okay. Did you -- did you interact with
19 the sales team?
20     A.   I did.
21     Q.   And would these have been the national
22 account managers?
23     A.   We -- the marketing team didn't interact
24 with the national account managers.

Page 37

1     Q.   And so do you recall which sales -- which
2 salespeople -- or ob- -- strike that.
3     Do you recall which national account
4 managers you interacted with?
5     A.   I do.
6     Q.   Who were they?
7     A.   So at the time it would have been Steve
8 Becker, Dave Irwin, Bonnie New, Victor Borelli, Tim
9 Berry, and those were the -- the names that I
10 remember, yes.
11     Q.   Okay. And generally speaking in the
12 context of your interactions with them, what -- what
13 were their responsibilities?
14     A.   They were in charge of managing -- again,
15 I wasn't on the sales team, but my perception was they
16 were in charge of managing the relationship with the
17 national accounts, with the customers that we sold our
18 product to.
19     Q.   And what was your impression of -- of --
20 of Steve Becker?
21     A.   In -- in terms of my impression of just
22 having worked with him or...?
23     Q.   Yes.
24     A.   So Steve was a nice guy. He had been in

Page 38

1 the industry for a long time. He, again, worked very
2 hard, cared about his customers.
3     Q.   And what about Dave Irwin?
4     A.   Dave Irwin, also a very nice guy, had been
5 in the industry for some time, good relationships with
6 his customers.
7     Q.   And Bonnie New?
8     A.   Bonnie had been with the company for a
9 long time, nice person.
10     Q.   Victor Borelli?
11     A.   Vic started with the company about the
12 same time that I did. He had good relationships with
13 his customers. Of the sales force I would say he
14 probably had the most aggressively personality.
15     Q.   Now, when you say "aggressive
16 personality," what do you mean by that?
17     A.   Just more pushy. I think East Coast
18 versus, like, Midwest.
19     Q.   Okay. And what about Tim Berry?
20     A.   Tim was just a really nice guy and worked
21 really well with his customers.
22     Q.   Did you ever have any concerns with any of
23 the national account managers?
24     A.   By concerns, what do you mean?

Page 39

1     Q.   Well, professional concerns in that they
2 were -- they were not doing their job properly or they
3 were overlooking things or they weren't -- they
4 weren't advancing Mallinckrodt's goals?
5     A.   I didn't --
6 MR. TSAI: Object to the form.
7 BY THE WITNESS:
8     A.   Yeah.
9 MR. TSAI: Go ahead.
10 BY THE WITNESS:
11     A.   I -- I didn't work -- and I didn't manage
12 the sales team. I only worked with them in a certain
13 capacity, so I don't feel like I can answer that
14 question.
15 BY MR. KAWAMOTO:
16     Q.   And going back to Jim Rausch and Cathy
17 Stewart, did you ever have any concerns with their job
18 performance?
19     A.   Again, they were in customer service, I
20 was in marketing, so I didn't manage them and so I
21 don't feel like I can answer that question.
22 MR. KAWAMOTO: So I'd like to mark this as
23 Exhibit 2. It is multiple copies of an e-mail and an
24 attachment.

Page 40

1     (WHEREUPON, a certain document was
2     marked Mallinckrodt - Neely
3     Deposition Exhibit No. 2, for
4     identification, as of 01/07/2019.)
5 BY MR. KAWAMOTO:
6     Q.   The e-mail is Bates numbered
7 MNK-T1 6330799. The attachment was produced in native
8 form, but it is MNK-T1 6330800.
9     A.   Thank you.
10     Q.   So, Ms. Neely, I've handed you an e-mail
11 and an attachment, and I primarily want to direct your
12 attention to the attachment.
13     A.   Okay.
14     Q.   Which is titled "Marketing Roles and
15 Responsibilities April 2008."
16     A.   Um-hum.
17     Q.   And so it identifies you as a product
18 manager along with Rebecca Coyner and Marc Montgomery.
19     A.   Um-hum.
20     Q.   And it says that as product managers:
21 "Responsible for product-related issues, strategies
22 and tactics."
23     A.   Um-hum.
24     Q.   Do you re -- those are fairly broad

Page 41

1 categories.
2     A.   Um-hum.
3     Q.   You know, what -- what -- what does that
4 mean?
5     A.   Do you -- so you would like clarification
6 on what a product manager actually did?
7     Q.   Yes. What -- what were the issues,
8 strategies and tactics that you were responsible for?
9     A.   Sure.
10     So as a product manager, and, again,
11 within the generic space, it needed to be really clear
12 that the product manager and marketing is very
13 different than traditional marketing because the
14 market already exists. You are just selling into it.
15     So as a product manager, you were
16 responsible for forecasting your products, you were
17 responsible for helping to set the budget on a fiscal
18 basis. The forecasting was at the -- maybe at the
19 unit level as well because you were in charge of
20 working with supply chain to make sure that you had
21 proper inventories on hand.
22     In terms of strategies, you were looking
23 at market share strategies and then determining what
24 customers you might want to work with in terms of

Page 42

1  making those market share goals.
2      Q.   And I take it in terms of market share,
3  the -- the general goal was to expand Mallinckrodt's
4  market share, is that fair?
5      A.   Not always.
6      Q.   What would be under the circumstances --
7  or strike that.
8          What would be the circumstances under
9  which you wouldn't want to expand your market share?
10     A.   Sure.
11         So to be clear, again, the market already
12 exists, and when you talk about market share within
13 the generics industry, you are talking about what
14 piece of the market you are going to garner and then,
15 you know, what piece of the market your competitor who
16 is selling the exact same product will also garner.
17         If you are in a two-player market and you
18 have 70 percent of the market and your competitor has
19 30 percent, you would be perceived to be over indexed,
20 and by over indexed, you -- within a two-player
21 market, fair share would be 50/50.
22         So you asked me when would be a time that
23 you wouldn't want to pursue market share, when that
24 would not be a good thing, and in the case of where

Page 43

1  you had 70 percent and your competitor had 30, it
2  would not be financially advantageous from a margin
3  perspective to pursue additional share.  You might
4  even be in a position of wanting to give up share.
5      Q.   Okay.  And could you explain that?  Why
6  from a margin perspective would it -- would it not be
7  advantageous to pursue additional shares --
8      A.   Well --
9      Q.   -- if you are at 70 percent?
10     A.   Sure.
11         So if we go back to the conversation we
12 had earlier with regards to margins and talking about
13 the selling of product and how generics compete
14 primarily on price, so if we were to go after -- if we
15 already had garnered more than our fair share within
16 the market and we had to go -- if we went after
17 additional share within that 30 percent that already
18 existed, we would have to do so at a lower price.  The
19 only way we would win the business would be at a lower
20 price than what our competition is selling it.
21         At that point you almost are engaging in
22 potential -- you know, you could be disrupting the
23 book of business that you already have and potentially
24 lowering the value of it.  So you would be gaining a

Page 44

1  small incremental gain in market share and potentially
2  decreasing the value of the book of business that you
3  already had.  So in that case you would not go after
4  additional share.
5      Q.   Thank you.  That's helpful.
6          For your products, were any of them over
7  indexed?
8      A.   That part I don't remember.
9      Q.   And I take it if they were not over
10 indexed, then, you would -- your goal would be to
11 expand your market share?
12     A.   That is not always true.
13     Q.   So if you had a -- if you did not have a
14 over indexed product, meaning expanding your market
15 share would not cut into your, I guess your marginal
16 profits, why wouldn't you want to expand it?
17     A.   There could be the potential that we don't
18 make enough money -- or we don't have strong enough
19 costs to compete against our competitors.  So we may
20 be sitting at a 10 percent share and our fair share
21 may be 20, but our cost of goods is higher and so we
22 are not in a position to compete on price with our
23 competitor.  So it is a very situation by situation,
24 you can't put blanketed statements across market share

Page 45

1  strategies.
2      Q.   Now, you also indicated that in terms of
3  market share strategies, you were also looking at
4  customers that you would like to work with.
5          With respect to the opioid products, what
6  did you look for in the customers you -- you were --
7  well, strike that.
8          How did you go about evaluating which
9  customers you wanted to work with?
10     A.   In terms of contracting with different
11 customers within the market?
12     Q.   Sure.
13     A.   So I think it was not necessarily opioid
14 specific because we did market a wide range of
15 products or sell, I should say, a wide range of
16 products in addition to opioids.  I would say in
17 general when looking at customers to work with within
18 the market, you had three large wholesalers, which
19 were Cardinal, McKesson and AmerisourceBergen, and
20 then you had large chains, which were Walgreens, CVS,
21 Walmart, and then you had smaller accounts.  And each
22 one of those customers that I just mentioned made up a
23 certain market share within the generics space.
24         And so when you were looking at targeting

Page 46

1  or determining what customers that you wanted to work
2  with, you would look at your relationships with the
3  buyers at those particular customers, you would look
4  at the market share that they represented, and look at
5  what you wanted to -- what your business strategy was,
6  and then you would have discussions, and a lot of it
7  would also be dependent on price and what they were
8  currently paying and if you could offer them value off
9  of that.
10     Q.   And in terms of your responsibility for
11  identifying and creating relationships with customers,
12  did you work with the national account managers on
13  that?
14     A.   The national account managers, from my
15  understanding, it was their responsibility to own that
16  relationship.  That was their -- that was their job
17  with the customer.
18     Q.   But in terms of identifying customers
19  to -- to create relationships with, were you doing
20  that, were the national account managers doing that,
21  or were -- were you doing that in collaboration?
22     A.   Could you repeat the question?
23     Q.   Sure.
24         In terms of identifying customers that you

Page 47

1  wanted to create relationships with, was -- was --
2  were you identifying the customers, were the national
3  account managers identifying the customers, or were
4  both of you doing that?
5     A.   I was in marketing, so in terms of the
6  customer relationships and I -- you know, in terms of
7  that side, that would have been in -- within the sales
8  group.
9     Q.   Okay.  So the sales -- the -- the national
10  account managers would identify, you know, this
11  distributor, let's say it's -- it's Harvard --
12     A.   Uh-huh.
13     Q.   -- and say, you know, they would go out
14  and try to create a relationship between Mallinckrodt
15  and Harvard, is that fair?
16     A.   The sales team was in charge of building
17  the relationship between Mallinckrodt and -- and the
18  buyers within the customer organization, yes.
19     Q.   And did you have a say over who those
20  customers were?  In other words, could you have -- I
21  mean, could you say to one of the national account
22  managers, I think you ought to try to create a
23  relationship with X, or in the alternative, I don't
24  know that we want to do business with Y?

Page 48

1     Q.   Was -- was that part of your
2  responsibility?
3     A.   In terms of the creation of the
4  relationship and determining which customers they
5  should create relationships with?
6     Q.   Yes.
7     A.   That was not -- I was in marketing.  That
8  was not -- that was -- would have been more the head
9  of sales driving that.
10     Q.   Okay.  Now, looking at the -- the various
11  products that you were responsible for, both --
12  actually, let me take a step back.
13         So these are the products you are
14  responsible for as Ap -- of April of 2008.  Do you
15  recall if this list changed over your tenure as a
16  product manager?
17     A.   I don't recall.
18     Q.   Most of the questioning I'm going to have
19  is going to focus on oxycodone APAP and oxycodone.
20         Do you -- do you -- well, were you
21  responsible for those products during your tenure as a
22  product manager?
23     A.   The top two products, oxycodone APAP and
24  oxycodone, I believe I managed throughout my tenure

Page 49

1  until I left the company.
2     Q.   And is it fair to say that some of these
3  products were more popular than others in -- in terms
4  of demand for them?
5     A.   I think "popular" is the wrong word to
6  use.  I would say some of these products were larger
7  within our portfolio than others.
8     Q.   And by "larger," what do you mean by that,
9  Mallinckrodt had a larger market share?
10     A.   Either the market itself was larger or
11  Mallinckrodt had a larger market share.
12     Q.   And I take it, though, that demand varied
13  between these products, is that correct?
14     A.   Demand varied based on the size of the
15  market, our market share, and obviously our -- our
16  customer base.
17     Q.   So with respect to the oxycodone APAP and
18  the oxycodone, can you describe the market for those
19  two products?
20     MR. TSAI:  Object to the form.
21  BY THE WITNESS:
22     A.   Yeah, could you be -- could you rephrase
23  that question?
24  BY MR. KAWAMOTO:

Page 50

1    Q.   Well, you had indicated that markets
2  vary -- demand was a function of the market size --
3    A.   Uh-huh.
4    Q.   -- and Mallinckrodt's market share.
5    A.   Uh-huh.
6    Q.   So in terms of the market size for
7  oxycodone, how would that compare to the other
8  products that are listed as -- as ones you are
9  responsible for?
10    A.   Sure.
11       I -- I couldn't tell you.  I don't
12  remember what the market size was for the other
13  products, nor do I for oxycodone, so it would be tough
14  to make a relative statement about that.
15    Q.   And what about Mallinckrodt's market
16  share?
17    A.   I, again, don't recollect what
18  Mallinckrodt -- do you mean Mallinckrodt's overall
19  market share or do you mean their market share within
20  specific products?
21    Q.   Within specific products.  So with respect
22  to the oxycodone product, what was -- do you recall
23  what Mallinckrodt's market share was?
24    A.   I don't.

Page 51

1    Q.   What about the oxycodone APAP?
2    A.   Again, I don't remember.
3    Q.   Do you recall encountering shortages of
4  those two products?
5    A.   We did.
6    Q.   Do you recall encountering shortages for
7  any of the other products that you were the manager
8  for?
9    A.   We had backorders at any given time I --
10  on quite a few products, yes.
11    Q.   Okay.  In terms of the relative size of
12  those backorders, how did the backorders for oxycodone
13  compare to the other products you were managing?
14    A.   I don't remember.
15    Q.   Did you ever have concerns regarding
16  diversion as it relates to the oxycodone products?
17    A.   We had compliance -- so, again, I was in
18  marketing, product manager, we had compliance training
19  with Karen Harper's group to help control.  So
20  diversion could happen at any point within the supply
21  chain.  It could happen at the manufacturing level
22  with the product in our warehouse, it could happen at
23  the distributor level, it could happen at the pharmacy
24  level, or it could happen at the doctor level to the

Page 52

1  patient.
2       So at our point in the supply chain we had
3  really good compliance training that helped mitigate
4  the diversion risk that we could have had within the
5  portion that we had control over.
6    Q.   And in terms of -- you indicated that
7  diversion could occur at multiple points in the supply
8  chain.  So focusing on diversion at the doctor level,
9  what -- what is the nature of that diversion?
10       MR. TSAI:  Object to the form.
11       Go ahead.
12  BY THE WITNESS:
13    A.   Yeah.  Again, that's -- that's completely
14  outside of my wheelhouse, so I couldn't speak to that.
15  BY MR. KAWAMOTO:
16    Q.   Well, you indicated that you received
17  compliance training on diversion at different levels,
18  correct?
19    A.   No.  I stated that diversion could happen
20  at various levels.  We received compliance over the
21  portion that we had the visibility to within our
22  purview.
23    Q.   Okay.  But in terms of -- well, I guess
24  I'm -- I'm -- I guess another way of asking the

Page 53

1  question is, what did -- what do you mean when you say
2  that diversion could occur at the doctor level?
3    A.   I think that in terms of the diversion
4  occurring at the doctor level?
5    Q.   Yes.
6    A.   I'm not -- I -- so in terms of the
7  prescription, like if the patient and the doctor -- if
8  the doctor wrote a prescription potentially for
9  something other than a legitimate use could be
10  qualified as diversion.
11    Q.   And in terms of diversion occurring at the
12  pharmacy level, what did you mean by that?
13    A.   I think it could be, you know, if someone
14  broke into a pharmacy, if the pharmacy was robbed and
15  they, you know, acquired the -- the opioid medication
16  illegally.
17    Q.   So if a pharmacy were to knowingly
18  dispense a product for other than medical use, would
19  that be an example of diversion in your opinion?
20    A.   I'm not sure.  I guess, to answer that
21  question, is how would they knowingly be able to
22  distribute product -- how would they knowingly know
23  that it wasn't for non-medical use?  I mean, they --
24  they don't have a purview into the conversation

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 between the patient and the doctor and so I think that
2 it would be challenging for them to -- to make that --
3 that judgment.
4 Q. Well, let's say you had a pharmacy that
5 had a relationship with a doctor and because of this
6 relationship they knew that the doctor was essentially
7 writing prescriptions for non-legitimate medical
8 reasons --
9 A. Uh.
10 Q. -- and nevertheless they were filling
11 those prescriptions.
12 A. Uh-huh.
13 Q. You know, in -- in your opinion, would
14 that be an example of diversion?
15 A. I think that's an extremely hypothet- --
16 MR. TSAI: Object to the form.
17 Go ahead.
18 BY THE WITNESS:
19 A. Yeah, I think that's an extreme
20 hypothetical situation. I don't feel comfortable
21 answering that.
22 BY MR. KAWAMOTO:
23 Q. And in terms of diversion at the
24 distributor level, what -- what did -- what did you

Page 55

1 mean by that?
2 A. Again, it could involve, you know, an
3 employee stealing or taking the product or it being
4 vandaled, robbed.
5 Q. And in terms of diversion at the
6 manufacturing level, which would be Mallinckrodt's
7 level, what -- what does that mean?
8 A. Sure.
9 So the -- the -- again, it could be
10 somebody stealing the product out of the warehouse, it
11 could be -- I think that would be another example of
12 diversion.
13 Q. And is that the only example you can think
14 of of diversion or are there other -- are there
15 other ones?
16 A. I think in terms of blatant diversion,
17 that's a great example.
18 Q. If Mallinckrodt was aware of diversion
19 occurring at other levels, did it have an obligation
20 to do anything about it?
21 MR. TSAI: Object to the form of the question.
22 Go ahead.
23 BY THE WITNESS:
24 A. In terms of Mallinckrodt, and I can't

Page 56

1 speak to the -- to compliance directly because that
2 wasn't the area I was in, I was within marketing, but
3 I will tell you that Mallinckrodt had training and had
4 a suspicious order monitoring program in place that
5 the employees were trained on and that Karen Harper
6 and her team executed to.
7 BY MR. KAWAMOTO:
8 Q. And what was your role in the suspicious
9 order monitoring program?
10 A. Again, I was in marketing, so I was
11 trained within compliance, but you would have to talk
12 to Karen Harper about the specifics of it.
13 Q. No. I -- I -- I understand. And I guess
14 I'm not asking for you to generally describe the
15 suspicious order monitoring program.
16 A. Uh-huh.
17 Q. My question is a little more specific in
18 the sense of you received training and I take it did
19 you have a role in the implementation of the
20 suspicious order monitoring program?
21 A. I did not implement the suspicious order
22 monitoring program.
23 Q. Okay. So you weren't involved at all in
24 the -- in the SOM program?

Page 57

1 A. I was involved in it. And so you are
2 asking what -- okay. So you asked me if I implemented
3 it, and I didn't implement it.
4 Q. Or took part in implementing it?
5 A. I don't think I necessarily took part in
6 implementing it. I was trained on it. My role within
7 marketing, I served as essentially -- I would -- I
8 don't know if it is a conduit. So customer service
9 would receive the orders and a lot of times data
10 requests would come to me in terms of drilling down
11 into the data to help understand or help provide data
12 then to -- to Karen Harper's group so we can analyze
13 orders or ordering behavior and then she would take
14 that information and her -- it was her job to work
15 with that.
16 Q. And so you indicated that the order would
17 come into customer service and then customer service
18 would -- would often have data requests.
19 What -- do you recall what -- what were
20 the nature of the data requests?
21 MR. TSAI: Object to the form.
22 Go ahead.
23 BY THE WITNESS:
24 A. Could you rephrase your question?

Page 58

BY MR. KAWAMOTO:

1  Q.  Sure.

2      You had indicated that customer service

3  would receive orders and a lot of time data requests

4  would come to you --

5  A.  Uh-huh.

6  Q.  -- in terms of drilling down into the

7  data.

8  A.  Uh-huh.

9  Q.  And so my question is, you know, what was

10 the nature of that data?

11 A.  The nature of the data?

12 Q.  Or what -- what type of data were they

13 asking you for?

14 A.  Okay.

15     In terms of the data that they were asking

16 for --

17 Q.  Uh-huh.

18 A.  -- when we received an order, they would

19 take a look at it and they would ask me to compare it

20 to the historic averages from that particular customer

21 to see if it was within the norm or to provide them

22 with a number to gauge if it was within the norm of

23 that customer order size.

Page 59

1  Q.  Okay.

2      And in terms of the historic averages and

3  the data you were providing, was that coming from the

4  chargeback system?

5  A.  It was coming from our sales system, yes.

6  Q.  So you were in the marketing department

7  and the sales department was separate.  That's -- do I

8  have that understanding correct?

9  A.  Yes.

10 Q.  So why would the marketing department be

11 providing this data as opposed to the sales -- I

12 mean -- well, strike that.

13     Why would the marketing department be

14 providing sales data as opposed to the sales

15 department?

16 A.  Within the generics group that we worked

17 in, the marketing department did, like I mentioned, a

18 lot of the analytics and the sales reporting.

19 Q.  Okay.

20 MR. KAWAMOTO:  So could we mark this as

21 Exhibit 3.  Thank you.

22     (WHEREUPON, a certain document was

23     marked Mallinckrodt - Neely

24     Deposition Exhibit No. 3, for

Page 60

1      identification, as of 01/07/2019.)

2  BY MR. KAWAMOTO:

3  Q.  So, I've handed you copies of an e-mail

4  and an attachment.

5  A.  Uh-huh.

6  Q.  The e-mail is Bates numbered

7  MNK-T1 448772.  The attachment starts with Bates

8  No. 448773.

9  A.  Uh-huh.

10 Q.  And this document was previously used in

11 another deposition, that's why it has a -- a Ratliff

12 exhibit label on it.

13     This is an e-mail and attachment that

14 Kimberly France sent to you.

15 A.  Uh-huh.

16 Q.  Do you recall receiving this e-mail?

17 A.  I don't.

18 Q.  Okay.  Do you have any doubt that you did

19 receive it?

20 A.  I -- I did receive it.  I don't remember.

21 Q.  Okay.  And who -- who is Kimberly France?

22 A.  I don't recollect what she did.

23 Q.  And do you know why she would be sending

24 you this -- this -- well, actually, strike that.

Page 61

1      So this document is entitled the

2  "Oxycodone Extended Release RiskMAP Action Plan."

3  A.  Um-hum.

4  Q.  Do you recall ever reviewing this

5  document?

6  A.  I don't -- I'm sure I did, but I don't

7  remember.

8  Q.  Okay.  What -- what is this document or

9  what -- why was this document created?

10 A.  So my recollection on this is that oxy ER

11 had a REMS program and that's something that's

12 required by the FDA and this looks like this was

13 the -- and at the time RiskMAP associated with that.

14 Q.  And what -- what is -- what's your

15 understanding of what a RiskMAP is?

16 A.  It's when -- I'm not in regulatory, so I

17 can give you my layman's perspective on it.

18 Q.  Sure.

19 A.  A RiskMAP is something required by the FDA

20 on certain products, and I'm not certain if it's

21 because they have Black Box warnings, but there's --

22 there could be the potential or the higher risk for

23 issues -- or not issues, but there is higher risk

24 within the patient market and so the company is

Page 62

1 required to take additional steps to mitigate that
2 risk when selling the product into the -- into the
3 market.
4    Q.   And one of the higher risks could be an
5 increased risk of abuse, is that correct?
6    A.   I think that's a fair statement, yeah.
7    Q.   Do you recall if RiskMAPs were created for
8 any of your other products other than oxycodone?
9    A.   If they were required by the FDA.
10       So a RiskMAP is -- you need to understand,
11 a RiskMAP is -- is -- or what used to be called a
12 RiskMAP, a REMS, is something that is required by the
13 FDA on certain products.  So if you are selling those
14 products and there is a RiskMAP or a REMS required,
15 then you by law are -- are -- you are required to --
16 to provide that, yes.
17    Q.   And clearly a RiskMAP was required for
18 oxycodone.
19    A.   For oxy ER.
20    Q.   For oxy ER.
21       Do you recall looking at the -- the
22 product list from, I believe it's Exhibit 2, whether
23 any of the other products on that list also were
24 subject to a RiskMAP requirement?

Page 63

1    A.   I don't remember.
2    Q.   And what was the purpose of the
3 oxycodone ER RiskMAP?  What was -- what was -- it
4 designed to -- to -- to do?
5    A.   You -- I -- I can't answer that question
6 specifically.  You would have to talk to somebody in
7 regulatory.
8    Q.   Do you know why you were -- you -- you
9 were receiving it?
10    A.   At the time I was one of the members of
11 the -- of the launch team because I worked in
12 marketing and handled this product.
13    Q.   And when you say one of the members for
14 the launch team, are -- do you mean one of the members
15 for the oxy ER launch team?
16    A.   That's correct.
17       So there would have been, you know,
18 different functional groups represented and I was the
19 product manager.  So I was representing the marketing
20 team.
21    Q.   And the oxy ER product is a generic
22 product, is it -- isn't -- am I right on that?
23    A.   That's correct.
24    Q.   Okay.  So when you are describing or you

Page 64

1 are referring to the launch of the oxy ER product --
2    A.   Uh-huh.
3    Q.   -- what -- what do you mean by that?
4    A.   So, when you talk about the launch of a
5 generic product, basically it's what we talked to
6 earlier in terms of identification of -- so, again,
7 the market has already been created, so you are
8 launching into an already created market and you are
9 trying to ascertain how much market share you are
10 going to garner, at what price point, and then it
11 would be my job to build the forecast and work with
12 supply chain and manufacturing to produce to that
13 forecast.
14       By launching, it is the first bottle that
15 we ship out the door to one of our customers would
16 qualify as a launch.
17    Q.   And you indicated that you were sup- --
18 you -- you were responsible for developing the
19 forecast.
20       What -- what do you -- what do you mean by
21 forecast?
22    A.   So you will have a sales forecast, sales
23 dollars forecast and a unit forecast.
24    Q.   And the sales dollars is, I assume, the --

Page 65

1 the volume -- the volume in terms of dollars -- well,
2 strike that.
3       These are -- this is generally the amount
4 you -- you're -- you want to sell or you believe you
5 can sell or both?
6    A.   So the market, again, has already been
7 created, so you have that information publicly
8 available to you in terms of what the market size is.
9 In terms of looking at, you know, depending on who you
10 contract with and what market share they represent,
11 you calculate that to determine how many units that
12 equates to and then that becomes your sales unit
13 forecast.
14    Q.   And do you recall what market share -- is
15 it -- is it fair to -- to describe this as a market
16 share goal?
17    A.   It could -- yeah, yes.
18    Q.   So do you recall what the market share
19 goal was for Mallinckrodt for oxycodone ER or oxy ER?
20    A.   I'm assuming it was quite a bit different
21 than -- we were a single-source generic.
22    Q.   And so when you say "single-source
23 generic," that means Mallinckrodt was the only source
24 of the generic, is that correct?

Page 66

1    A.   That's correct.

2    Q.   So your market share would have been, I
3   guess, a 100 -- a 100 percent?

4    A.   That's not correct.

5    Q.   What -- why isn't that correct?

6    A.   But I don't know how much of it is second,
7   actually.

8         We had Purdue as the brand manufacturer
9   for this product.  And Mallinckrodt had a agreement
10  with Purdue in terms of -- in terms of the ability to
11  sell -- sell the generic product, a legal
12  negotiation -- negotiated.

13   Q.   Okay.  And so that agreement set
14  Mallinckrodt's market share?

15   A.   It did not.

16   Q.   Well, so what -- what was Mallinckrodt's
17  market share, then, for oxy ER?

18   A.   I don't remember what the market share
19  was, but it was not 100 percent.

20   Q.   But it would have been some percentage
21  share of the oxy ER market, right, it would have been,
22  like, 50 percent or 60 percent or some percentage?

23   A.   I can't qualify what the percentage was.

24   Q.   Fair enough.

Page 67

1        But I -- I was just asking, I want to make
2   sure I have the metric right.

3    A.   It was some percentage of the oxy ER
4   market.

5    Q.   And who at Mallinckrodt would have been
6   responsible for coming up with what that percentage
7   goal should be?

8    A.   Again, how much of this can I -- I mean,
9   if -- if it was a -- if it was a legal agreement
10  between us and Purdue, how much of this information
11  can I actually share?

12   Q.   Well, this is -- I mean, this is subject
13  to a protective order and it's all confidential -- or
14  your counsel can designate it as highly confidential,
15  so I don't -- I don't believe there are any
16  confidentiality concerns.

17   MR. TSAI:  Yeah, I'd have to look at the
18  agreement first.  I'd say let's designate this section
19  as highly confidential and I think let's see if we can
20  talk about this at a high level.

21  BY THE WITNESS:

22   A.   So I can talk -- I can do that at a high
23  level.

24        So there's four strengths within the oxy

Page 68

1   ER market, four -- four different milligrams.  We had
2   a negotiation with Purdue that allowed us to sell X
3   number in aggregate bottles over the course of
4   15 months and that number was broken down by the four
5   different strengths.

6        So we were -- we were legally bound by
7   this agreement with Purdue to only sell a certain
8   number of bottles of the oxy ER product.

9        Now, what I don't remember is what those
10  bottles equated to in terms of market share.  It also
11  didn't necessarily mean that's how much market share
12  that we got because it's tough to say because we were
13  able to sell that product over the course of a
14  15-month timeframe.  So at any given point it could
15  have been something different and so that's why your
16  question is very challenging for me to answer.  It is
17  not a very black-and-white scenario.

18  BY MR. KAWAMOTO:

19   Q.   And just -- I mean, just in terms of what
20  the -- the market dynamics --

21   A.   Uh-huh.

22   Q.   -- were.

23   A.   Uh-huh.

24   Q.   So this agreement covers a 15-month

Page 69

1   timeframe.

2    A.   I believe, from what I remember.

3    Q.   Or you -- you believe it covers a 15-month
4   timeframe.

5        And if the market grows between Month 1
6   and Month 15, does that mean the number of bottles you
7   are allowed to sell increases or --

8    A.   We had a finite number of bottles that was
9   set at the beginning of the agreement and that was all
10  that we could sell regardless of what happened in
11  terms of the branded market.

12   Q.   And this agreement lasted for 15 months.

13        Do -- do you re -- do you recall if it was
14  renewed at the end of 15 months?

15   A.   Again, we had an agreement for that
16  timeframe to sell those bottles and that was it.  So
17  after the -- after the conclusion of the timeframe,
18  then we were no longer selling this product.

19   Q.   Okay.  So at the -- at the end of those
20  15 months, were you no longer selling generic oxy ER?

21   A.   We were not allowed to, right.

22   Q.   Do you know if -- if anyone else was
23  allowed to sell generic oxy ER?

24   A.   I don't know.

Page 70

1    Q.   And if -- if we wanted additional
2  information on this agreement, the number of bottles,
3  the market share, who -- who would -- who would we
4  talk to?  Would -- would you be the right person for
5  this?  Would there be someone else at Mallinckrodt?
6    A.   I would suggest you talk to -- to the
7  legal counsel at Mallinckrodt in terms of -- I don't
8  have the details of -- of what the agreement detailed.
9    Q.   Fair enough.
10       So in -- in -- assuming that it's --
11 assuming that it's legally permissible for us to
12 obtain this information --
13   A.   Uh-huh, uh-huh.
14   Q.   -- who would have the details, that's --
15 that's all I'm asking?
16   A.   I'm guessing someone within Mallinckrodt.
17 I -- I don't know.  I have not been with the company
18 for almost eight years now, so I -- I don't know who
19 would have that information.
20   Q.   Well, his -- I mean, historically
21 speaking, when this agreement was negotiated with
22 Purdue --
23   A.   Uh-huh.
24   Q.   -- do you recall who the lead business

Page 71

1  person was that was overseeing this?
2    A.   So the person negotiating this with Purdue
3  would have been an attorney.  So it wasn't a business
4  person negotiating this deal.
5    Q.   But the -- the person at Mallinckrodt that
6  would have identified what Mallinckrodt was willing to
7  settle for or willing to accept with respect to the
8  number of bottles and the market share, I mean,
9  that -- that would be a business person of some type.
10       Do you -- do you recall who that would be?
11   A.   I don't remember, no.
12   MR. KAWAMOTO:  Could we go off the record very
13 briefly.
14   THE VIDEOGRAPHER:  The time is 10:15 a.m.  Off
15 the record.
16       (WHEREUPON, discussion was had off the
17       record.)
18       (WHEREUPON, a recess was had
19       from 10:15 to 10:28 a.m.)
20   THE VIDEOGRAPHER:  All right.  We are back on
21 the record.  The time is 10:28 a.m.
22 BY MR. KAWAMOTO:
23   Q.   So I just have a few follow-up questions
24 on the oxy ER and Purdue agreement.

Page 72

1        This agreement only applied to oxy ER, is
2  that -- is that correct?
3    A.   Yes.
4    Q.   And do you recall roughly when the
5  15 months ran from, meaning when did it start and when
6  did it end?
7    A.   It -- I don't -- I was with Mallinckrodt
8  from 2007 to 2011.  I believe this happened in the
9  2008 into 2009 timeframe, but I don't remember
10 exactly.
11   Q.   Understood.
12       And this didn't apply to oxy IR, is that
13 correct?
14   A.   That's correct.
15   Q.   Thank you.
16   MR. KAWAMOTO:  So I'd like to mark this as
17 Exhibit, I think it's 4 or 5.  Great.
18       (WHEREUPON, a certain document was
19       marked Mallinckrodt - Neely
20       Deposition Exhibit No. 4, for
21       identification, as of 01/07/2019.)
22 BY MR. KAWAMOTO:
23   Q.   So the court reporter has handed you an
24 e-mail.  It's Bates numbered MNK-T1 563714.

Page 73

1        Could you review this e-mail for me and
2  let me know when you are done?
3    MR. KAWAMOTO:  Can we take a ten-second break, I
4  just want to grab a highlighter.
5    THE VIDEOGRAPHER:  The time is 10:30 a.m.  Off
6  the record.
7        (WHEREUPON, a short recess was had.)
8    THE VIDEOGRAPHER:  Okay.  The time is 10:30 a.m.
9  Back on the record.
10 BY MR. KAWAMOTO:
11   Q.   So, have you been able to review the
12 e-mail?
13   A.   Yes.
14   Q.   Okay.  Great.
15       And so I think the way this will work is
16 that this will display on your screen, and then I can,
17 you know, highlight sort of the -- the things that I
18 have questions on.
19       So directing your attention to the back
20 page --
21   A.   Uh-huh.
22   Q.   -- this is an e-mail from Victor Borelli
23 to yourself, and I believe Victor was one of the
24 national account managers.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    A.   Uh-huh.
2    Q.   And he says -- do you see -- okay.
3         Can you read the -- the sections that I've
4    highlighted?
5    A.   Sure.
6         "Both Sunrise wholesalers and Masters
7    Pharmaceuticals are both out" -- that should say "out
8    of oxy 15-milligram and oxy 30-milligram and have
9    orders in-house on backorder.  Sunrise has both PO 259
10   and 261 on backorder and are bone dry on all products
11   listed on both POs.  We have displaced all competitors
12   at this account and they are relying on our supply to
13   cover their demand.  If we don't ship it, they can't
14   sell anything."
15   Q.   Okay.  And so this indicates -- does this
16   indicate that Mallinckrodt is the sole supplier to
17   Sunrise on oxy 15 and oxy 30-milligram?
18   A.   Based on this statement:  "We have
19   displaced all competitors at this account and they are
20   relying on our supply to cover their demand,"
21   indicates to me that we are their only supplier.
22   Q.   Okay.
23        And the reference to PO 259 and 261,
24   that's a reference to oxy 15 and oxy 30?

Page 75

1    A.   I can't specifically say that because he
2    talks about the 15-milligram and 30-milligram in the
3    first paragraph, but he doesn't reference them
4    specifically in the second.  So I would assume, but I
5    can't completely confirm.
6    Q.   Okay.  But Sunrise -- Sunrise is -- I
7    mean, Sunrise is -- your understanding of the e-mail
8    is that what he is saying is that Sunrise is out of
9    oxy 15 and out of oxy 30 and Mallinckrodt is the sole
10   supplier of -- of those products to Sunrise.
11   A.   Uh-huh.
12   Q.   Is that -- is that fair?
13   A.   That is my interpretation of the e-mail.
14   Q.   Okay.  And then Masters, if you see on the
15   bottom, it says:
16        "Masters Pharma has a PO that is
17   backordered since late October for 7,992 bottles of
18   oxy 30."
19   A.   Uh-huh.
20   Q.   "They also have a 31,968-bottle order
21   PO 1644 that is on backorder as well."
22   A.   Uh-huh.
23   Q.   And so this would also be in reference to
24   oxy 15 and oxy 30, is that -- is that correct?

Page 76

1    A.   This one looks like it is just related to
2    oxy 30, but, yeah, I think 15 and 30.
3    Q.   Okay.  And do you recall these types of
4    shortages with respect to oxy 15 and oxy 30?
5    A.   We did have shortages, back orders, yes.
6    Q.   Okay.  And just so we are on the same
7    page, what is a back order?
8    A.   A back order is when a customer places an
9    order with you and you are -- you do not have the
10   supply and/or you choose not to fill the order.
11   Q.   And when you say "you choose not to fill
12   the order," what are reasons you might not fill the
13   order?
14   A.   Depending on our allocation strategy in
15   terms of what customers -- if we were low on
16   inventory, then we might determine to allocate the
17   product to one customer over another or we might
18   choose to partial allocate, and that would be a time
19   where you would not choose to fill an order.
20   Q.   Okay.  Now, turning the page over, can you
21   read that highlighted section into the record, please?
22   A.   Sure.
23        "We are essentially stocked out of
24   oxycodone 15-milligram and 30-milligram.  This is

Page 77

1    largely the result of our previous quota shortage and
2    playing catchup.  They are working hard to make the
3    product so it will release next week.  When it does, I
4    will take care of your customers to the best of my
5    ability."
6    Q.   Now, the sentence:  "This is largely the
7    result of our previous quota shortage and playing
8    catchup," what is a quota shortage?
9    A.   So to be -- to be clear, within -- within
10   the opioid market and specifically if we want to talk
11   about oxy, the DEA granted Mallinckrodt a certain
12   amount of API, active pharmaceutical ingredient quota
13   for the year.  So we were only able to manufacture as
14   much as the DEA allowed us to based on the raw
15   material quote -- quota or amount that they gave to
16   us.  And that's of the oxycodone raw material.
17        So we would apply for quota, the DEA would
18   grant it, and then you would have to reapply
19   throughout the year and wait for them to grant the
20   quota request to you until you had the approval for
21   API quota or procurement quota.
22        And, again, I'm not -- I wasn't in the --
23   I wasn't in the conversations.  This is, again, from
24   my perspective within marketing just seeing what they

Page 78

1  did in terms of working with the DEA. You would
2  reapply for quota, the DEA would grant it, and then at
3  that point, only then, would you be able to actually
4  manufacture product.
5      Q.   So I -- I guess is the issue that the
6  demand for oxy 15 and 30 outstripped Mallinckrodt's
7  quota at some point in time?
8      MR. TSAI:  Object to the form.
9      Go ahead.
10 BY THE WITNESS:
11     A.   Yeah, I -- I don't think that that's
12 necessarily -- No. 1, I can't answer that because I
13 don't have the numbers in front of me and, No. 2, I'm
14 not the one who was working with the DEA, so I'm not
15 an expert within that area.
16     What I will tell you from my recollection
17 is that you would apply for what your annual quota
18 was, needs were at the beginning of the year, the
19 beginning -- back in, let's say, end of -- end of the
20 year for the next calendar year and the DEA never
21 granted it in full. It was always you were -- you
22 were always in a case of having to reapply throughout
23 the year. So it's not necessarily a linkage to demand
24 outstripping what they had approved us for.

Page 79

1  BY MR. KAWAMOTO:
2      Q.   And so just so I understand it, you would
3  at -- the -- the quota is measured in terms of -- of
4  API, is that right?
5      A.   From my understanding.
6      Q.   Sure.
7      And so -- and -- and API, does that mean,
8  is that a rough -- a rough approximation of -- of a --
9  of a pill, is that sort of the -- the unit of
10 measurement or --
11     A.   No.
12     Q.   So what -- what is API measured in?
13     A.   API is active pharmaceutical ingredient.
14 So it's going to be the raw material that is used to
15 manufacture the finished dose. So typically API is
16 managed in kilos.
17     Q.   Okay. And so you would -- you would
18 request, let's say, 50 kilos for your annual quota,
19 hypothetically?
20     A.   I -- I'm -- I would not request, but
21 someone within our -- within another area would be
22 working with the DEA to make those requests.
23     Q.   Okay.
24     So Mallinckrodt requests, let's say,

Page 80

1  50 kilos from the DEA. DEA would -- what -- what
2  would -- when you say that DEA wouldn't re -- wouldn't
3  grant it in full, so they would grant you, let's say,
4  30 kilos and allow you to reapply for the other 20 or
5  how -- I'm trying to understand how that system works?
6      A.   Sure.
7      You would really need to talk to someone
8  who was -- who was in charge of that process because
9  I'm only speaking from memory and this was from eight,
10 nine years ago.
11     Q.   Well, but what's your -- I mean, what's
12 your recollection of sort of in terms of how -- in
13 terms of how it impacted your job, you're describing a
14 quota shortage --
15     A.   Uh-huh.
16     Q.   So what -- what is -- when you said it's a
17 quota shortage, what did that mean to you?
18     A.   So I think you need to understand the DEA
19 allocates quota to the entire market, so not just
20 Mallinckrodt, but to other -- other generic suppliers
21 within -- within the market. So they -- they've got a
22 set quota they will allocate to manufacturers across
23 the market.
24     Does that make sense?

Page 81

1      Q.   I believe so.
2      A.   Okay. So then you have -- so if they have
3  allocated quota, they'll do it -- you provided a
4  forecast to them and this is really the only role I
5  play, is you provide a forecast to them in terms of
6  what you think you are going to sell for that next
7  year.
8      Now, I'm looking at the dates here, 2008,
9  there was significant market disruptions. I believe
10 there was at least one, maybe two competitors that had
11 recalls within this market during this timeframe.
12 However, they had already been allocated quota by the
13 DEA at the beginning of the year.
14     So when they recalled product and they
15 were no longer able to sell it, we were in the
16 position where we had only asked for a certain amount
17 of quota to meet our forecast for that year, the
18 forecast changed because these two competitors, direct
19 competitors, I believe it was two, again, went out of
20 the market, and we were in the position of our
21 forecast going up because we were going to take on
22 that market share or were trying to.
23     So we had to reapply to the DEA for
24 additional quota because we only had enough quota to

Page 82

1  meet the initial -- our baseline demand that we had
2  established.
3      Q.   And so that the -- when you say a quota
4  shortage, that means -- are you referring to the fact
5  that Mallinckrodt didn't have the legal -- well,
6  strike that.
7          Are you referring to the fact that
8  Mallinckrodt under its quota couldn't manufacture more
9  product to meet the back order, is that what this
10  e-mail is saying?
11      A.   So, again, the DEA had, let's think about,
12  like, a pie, and they've got a certain amount of quota
13  they are going to allocate to meet the demands of
14  total, let's say, oxy market.
15      Q.   Uh-huh.
16      A.   And at the time let's say Mallinckrodt
17  when we applied for quota had 30 percent of the
18  market, and, again, this is hypothetical, and then our
19  other two competitors had 70 percent.
20      Q.   Uh-huh.
21      A.   We would have applied for enough quota to
22  meet 30 percent market share.  When those other two
23  competitors -- and, again, I'm just hypothetically
24  speaking -- had recalls and exited the market, that

Page 83

1  left this other portion of the market unfulfilled, the
2  developed market.  The DEA had already granted them
3  quota because they were only granting to a finite
4  amount to service the market.  So we had to go back
5  and reapply to the DEA to try to get additional quota
6  to try to grow our manufacturing capabilities to meet
7  the unmet needs that were left because of the recall
8  within the market.
9          So, yes, that would have been -- when we
10  said there was a quota shortage, that's what we would
11  have been referring to.
12      Q.   And so the issue here is that I guess
13  Sunrise wholesalers and Masters were coming to you
14  because -- or potentially because of this recall and
15  they were seeking to increase the product they were --
16  they were getting from you.
17          Is that fair?
18      A.   I think that that's a fair statement.
19  It's tough to say because I don't remember the exact
20  timing, but when it talks about displaced competitors,
21  I do believe that that was a result of market
22  shortages, but I don't know 100 percent.
23      Q.   Okay.  And so when you say:  "When it
24  does, I will take care of you" -- "I will take care of

Page 84

1  your customers to the best of my ability," what did
2  you mean by that?
3      A.   We, because we were in a backorder state
4  and we had other customers that had backorders as
5  well, we were in a position that when we did have
6  inventory we were going to have to allocate.  So we
7  were not going to have -- we were going to have more
8  open orders than we had inventory to ship.
9      Q.   And who -- who de -- so did -- were you in
10  charge of -- for -- with respect to the oxycodone
11  product, deciding how to allocate the -- the product
12  among the different orders?
13      A.   From a business perspective, I was the
14  one, because I was in marketing, I was the product
15  manager, from a business perspective, I made decisions
16  about who we would want to allocate product to based
17  on relationships, based on importance of their total
18  book of business, based on, you know, the length of
19  backorders.
20          So from a business perspective, I was
21  working with the sales team and with my management to
22  make those decisions.  But that was outside of the
23  scope, so that was one path that was outside of the
24  scope of anything to do with the suspicious order

Page 85

1  monitoring.  So mine would strictly have been from a
2  business relationship side.
3      Q.   Okay.  And so just so I understand, you
4  have -- you've got five different distributors and
5  they each have, let's say, 20 bottles on backorder, so
6  in -- in a sense they are owed 20 bottles by
7  Mallinckrodt under the -- whatever sales agreement
8  they have.  Mallinckrodt only has 50 bottles, it
9  doesn't have a hundred.  And you would determine sort
10  of where those 50 bottles, how those 50 bottles were
11  divided among the five different distributors, is that
12  fair?
13      A.   I would play a part in that, yes.
14      Q.   Okay.
15          Who would ultimately decide what the
16  allocation was given that you had, you know, the --
17  the number of backorders exceeded the volume of
18  product?
19      A.   It would -- so I would drive it based on
20  historic demand.  So we would look at what they had
21  historically ordered and then we would ascertain of
22  that what percentage we thought should go to certain
23  customers based on their relationship and their book
24  of business.  I would provide that information to

Page 86

1  customer service in conjunction with the sales team so
2  we would arrive at that number and then it would go
3  through, you know, obviously the -- there were the
4  other steps that were taken in terms of just looking
5  at the order as a whole and does it -- does it meet
6  the terms of our suspicious order monitoring in terms
7  of releasing it.
8       So there was a couple of different people
9  who ultimately touched it before it went out the door,
10 before the okay happened.
11     Q.  And in -- in terms of -- of the
12 allocation, though, you would -- so you would look at
13 the -- the importance of the relationship and the book
14 of business --
15     A.  Uh-huh.
16     Q.  -- and based on that you would say, Okay.
17 I've got 50 bottles to allocate.  I'm going to give 20
18 to A, 30 to B and C, D and E get nothing.
19     Did -- does that hypothetical make sense,
20 just in terms of -- of how the process might work?
21     A.  I think that's what I stated to you
22 already, yes.
23     Q.  Okay.
24     And then at that point your -- your

Page 87

1  decision to give 20 to A and 30 to B, that's subject
2  to the suspicious order monitoring program?
3      A.  They would be executing that in tandem
4  with the -- with the process that I had, that I was
5  looking at, yes.
6      Q.  Okay.  And presumably let's say the five
7  different distributors are -- well, the -- the
8  different national account managers have
9  responsibilities for the five different distributors.
10     A.  Uh-huh.
11     Q.  I imagine each national account manager
12 is -- is presumably going to want his customer to get
13 some portion of that quota, is that -- isn't that
14 fair?
15     A.  It was the sales team's job to manage the
16 relationship with the customer.  So they would be --
17 they would be advocating for their customers to
18 receive product if -- if it was the right thing to do,
19 and it was our job internally to see that the big
20 picture and then to -- to make the final -- you know,
21 to make the final decisions.
22     Q.  Okay.  And so when you say to Victor:
23 "When it does, I will take care of your customers to
24 the best my ability" --

Page 88

1      A.  Uh-huh.
2      Q.  -- what you are talking about, what that
3  sentence means is -- or strike that.
4      When you say:  "When it does, I will take
5  care of your customers to the best of my ability," you
6  are referring to the allocation process, meaning that
7  you are going to try to allocate product to his -- to
8  his two customers, which would be Masters and Sunrise?
9      A.  I said:  "I will take care of your
10 customers to the best of my ability."  So I don't ever
11 say that I will or won't allocate to them.  I am just
12 addressing the fact that he has put in the request.
13     Q.  Okay.  So these are his customers.  I
14 assume multiple customers have backorders.
15     A.  Uh-huh.
16     Q.  He is trying to advocate for his customers
17 to -- to get them their product.  And he is, I guess
18 to some degree, pitching you or asking you to allocate
19 to them.
20     Is that a -- a fair understanding of this
21 e-mail exchange?
22     A.  Yes, that's fair.
23     Q.  And you -- you recall this occurring in
24 2008 because of recall issues.

Page 89

1      Do you recall similar shortages in 2009?
2      A.  I don't remember.
3      Q.  Do you recall similar shortages for the
4  other products that you managed?
5      A.  We had backorders, but I don't remember
6  specifically timeframes or products.
7      MR. KAWAMOTO:  I believe this is Exhibit 5.
8          (WHEREUPON, a certain document was
9          marked Mallinckrodt - Neely
10         Deposition Exhibit No. 5, for
11         identification, as of 01/07/2019.)
12 BY MR. KAWAMOTO:
13     Q.  So this is an e-mail that's Bates numbered
14 MNK-T1 4916278, and it is an e-mail from you,
15 Ms. Neely, to various people, including what appears
16 to be many of the national account managers.
17     A.  Uh-huh.
18     Q.  Do you recall drafting this e-mail?
19     A.  I don't recall drafting it, no.
20     Q.  Okay.  But you don't have any -- any doubt
21 that you sent it?
22     A.  I definitely -- I did send it, yeah.
23     Q.  Okay.
24     And then looking on the screen, do you see

Page 90

1 the reference to: "You have done a tremendous job of
2 meeting historic demand"?
3     A.   Yes.
4     Q.   What -- what -- what did you mean by
5 "historic demand"?
6     A.   Well, if you continue to read the e-mail,
7 it says: "However, in light of the Ethex recall, we
8 have all been challenged with the influx of orders."
9          So the timing of this is February of 2009
10 and if you reference the last e-mail we talked about,
11 that was November of 2008, and that was when I had
12 spoken to the fact that there had been a recall within
13 the market.
14          So if you look at the first, you know, the
15 first paragraph of this e-mail, it says: "In light of
16 the Ethex recall." So when I talk about historic
17 demand, historic demand would have been our demand,
18 what our baseline demand, which is what I spoke to you
19 about in terms of applying for the quota initially
20 from the DEA. That would have been our baseline
21 demand prior to the Ethex recall.
22          And so what I'm highlighting here is that
23 we have been able to meet our historic demand, been
24 able to service our customers in the manner that we

Page 91

1 historically have been able to. However, we have not
2 been able to meet the orders that we have been
3 receiving because they had escalated as a result of
4 the Ethex recall.
5     Q.   So in terms of the chronology with respect
6 to the quotas, though, the quotas were -- were set on
7 a yearly basis?
8     A.   So, I -- I think what we -- we spoke about
9 earlier is that you apply for your quota at the
10 beginning, you get granted your quota at the beginning
11 of a calendar year, and then you come and if you have
12 to reapply for more quota, then you do so throughout
13 the year to the DEA.
14     Q.   So, this is -- but this is a 2009 e-mail.
15 The last e-mail we saw was November of 2008.
16     A.   Uh-huh.
17     Q.   So in early 2009 Mallinckrodt would have
18 been applying for its DEA quota, you know --
19     A.   We would have --
20     Q.   -- with knowledge of the recalls, wouldn't
21 it?
22     A.   We would have been granted -- so we would
23 have applied at the end of 2008 and been granted our
24 quota for 2009.

Page 92

1     Q.   But when you applied in -- in late 2008 --
2     A.   Uh-huh.
3     Q.   -- presumably your quota would have
4 reflected your assessment of the recall situation,
5 wouldn't it?
6     A.   I can't speak to that specifically because
7 I didn't do the application, but one would assume,
8 yes.
9     Q.   Okay.
10          So -- so when they say -- when you say:
11 "However, in light of the Ethex recall, we have all
12 been challenged with the influx of orders we have been
13 receiving and how to best manage them" --
14     A.   Uh-huh.
15     Q.   -- is this still a quota shortage issue or
16 is this a -- now a manufacturing issue?
17     A.   So, you would need to speak to someone in
18 manufacturing to truly understand lead times, but if
19 you're granted your quota, your manufacturing and your
20 procurement quota at the beginning, so let's say on
21 January 1st of 2009, regardless of if you applied for
22 that quota with the understanding of the Ethex recall
23 or not, you still have to convert that raw material
24 into finished goods. So you are looking at a lead

Page 93

1 time there in terms of manufacturing.
2          Now, what that lead time is, I don't know,
3 but if you are already in a back order situation by
4 the end of 2008 and then you get your quota at the
5 beginning of January of 2009, I mean, we are looking
6 at February of 2016 [sic], so a month and 15 days
7 later, you still have to assume that you are coming
8 into this at a deficit, and not only that but you are
9 having to manufacture with a lead time. So, of
10 course, we are still going to be in a situation that
11 we can't fill all of the orders that have been left.
12     Q.   And I'm sorry. You said February of 2016.
13     A.   I said February 6th --
14     Q.   Oh, okay.
15     A.   I'm sorry, February 16th of 2009. My
16 apologies.
17     Q.   Okay. Got it.
18          In other words, even if you have the
19 expanded quota from DEA, you're still -- you still
20 need to make the product, is that fair?
21     A.   Yes, 100 percent.
22     Q.   Okay. So can you please read that
23 paragraph that I've just highlighted?
24     A.   You want me to read the second paragraph?

Page 94

1    Q.   Yes, the second paragraph.
2    A.   Okay.
3         "After maximizing our manufacturing
4    output, we know that we are not in the position to
5    fulfill the total market demand as a result of Ethex
6    exiting.  Therefore, we are going to begin managing
7    our customer demand, or more appropriately, making
8    them aware of what and when we will be able to ship
9    based on our manufacturing output.  Allocations per
10   customer will be based on historical demand from the
11   months of September to November of 2008."
12   Q.   Okay.  Now, you say "Ethex exiting."
13   A.   Um-hum.
14   Q.   So the -- I take it their product was
15   recalled.
16        Do you recall -- do you -- do you recall
17   them ever reentering the market or were they just --
18   were they done?
19   A.   I -- to my recollection, Ethex did not
20   reenter the market.
21   Q.   Okay.  So to the degree that
22   Mallinckrodt's market share increased because of Ethex
23   exiting, this was a -- a permanent condition?
24        MR. TSAI:  Object to the form.

Page 95

1         Go ahead.
2    BY THE WITNESS:
3    A.   Yeah, I -- I don't -- market share within
4    the generics industry is never -- you can never say
5    it's permanent.
6    BY MR. KAWAMOTO:
7    Q.   But you didn't have to deal with Ethex as
8    a competitor again after they left?
9    A.   Ethex, if they didn't reenter the market,
10   would have no longer been a competitor on this
11   product.
12   Q.   And so it -- is it fair to say that the
13   demand in 2009 increased from the de -- strike that.
14        Is it fair to say that with respect to
15   Mallinckrodt's oxy 15 and oxy 30 products the demand
16   in 2009 was greater than the demand in 2008?
17   A.   I don't have the numbers in front of me,
18   so I -- I can't speak to that.
19   Q.   Though the -- well, but wouldn't the --
20   the fact that you are experiencing shortages and
21   manufacturing shortages suggest a -- an increase in
22   demand?
23   A.   One would assume that based on -- on this
24   e-mail, but I -- again, I -- I would assume that, but

Page 96

1    I don't have the numbers in front of me to state
2    unequivocally that it's -- that it did.
3    Q.   And do you have any recollection of the
4    demand for oxy 15 and oxy 30 increasing over the 2008
5    through 2011 time period while you were employed at
6    Mallinckrodt?
7    A.   Again, I don't have the numbers in front
8    of me, so I -- I can't tell you directly.
9    Q.   Well, but even without the numbers in
10   front of you, I mean, do you have a -- a general
11   recollection of what happened to demand for these
12   products?
13   A.   There was a lot of market dynamics and
14   shifts that -- I believe, that happened within the
15   oxy IR market.  And there was growth, but I don't know
16   how much and I can't remember exactly when it
17   occurred.
18   Q.   But you were employed at Mallinckrodt
19   between 2006 and 2011, is that -- do I have that --
20   A.   That's correct.
21   Q.   -- that date right?
22   A.   Um-hum.
23   Q.   Right.
24        And you were the product manager for oxy

Page 97

1    from 2008 through 2011, is that -- is that fair?
2    A.   I -- yes, yep.
3    Q.   Okay.
4         And so during that time period, you know,
5    is your recollection that oxy -- I understand that
6    the -- there were market dynamics, but is your
7    recollection that oxy demand generally increased?
8    A.   Again, I don't have the numbers and it's
9    been a long time ago, so I -- I don't -- I can't speak
10   to that specifically.
11   Q.   Are you familiar with the requirements of
12   the Controlled Substances Act?
13   A.   Yes.
14   Q.   Okay.  And what are those requirements?
15   A.   I was made familiar with them whenever I
16   worked for the company during the training time.  I
17   haven't worked with controlled substances since I left
18   the company in 2011, so I can't state them to you
19   directly.
20   Q.   Okay.
21        Was it your understanding that a
22   manufacturer had a duty to know its customers?
23   A.   I wasn't in the compliance group, but
24   based on the training that I received, that would have

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    been my understanding.
2        Q.   Have you ever heard the term "indirect
3    customer"?
4        A.   I have heard the term "indirect customer."
5        Q.   And what did that term mean to you?
6        A.   So, an indirect customer would be when we
7    sold to a wholesaler and then the wholesaler sold on
8    to a pharmacy and/or -- on to their customer, that --
9    that customer was an indirect customer to the
10   manufacturer.
11       Q.   And what about the term "downstream
12   customer," are you familiar with that term?
13       A.   That one I'm not as familiar with, no.
14       Q.   Okay.  What about "end user," are you
15   familiar with that -- that term?
16       A.   For us, for a manufacturer, an end
17   purchaser is going to be the pharmacy that -- that --
18   that ends up with the product.  So, for instance, if
19   we sold it to CVS, that would be an end purchaser.  If
20   we sold it to Cardinal who then sold it to CVS, CVS,
21   again, would be the end purchaser.  So from a
22   manufacturer perspective, that was our end purchaser.
23       Q.   So is -- is "end user" and "indirect
24   customer," are those interchangeable terms?

Page 99

1        A.   Direct and indirect customers are
2    interchangeable, those two together, with end, end
3    customer, yes.
4        Q.   Oh, I'm sorry.  I'm little confused.
5            So I understand the direct customer and I
6    understand the indirect customer.
7        A.   Uh-huh.
8        Q.   With respect to the end user, though, the
9    end user is interchangeable with the indirect customer
10   or is -- or the direct customer or both?
11       A.   So we would sell direct to pharmacy chains
12   and then you would have pharmacies that would purchase
13   indirectly through wholesalers.
14       Q.   Okay.
15       A.   So you have direct and you have indirect
16   purchases.  The combination of the two resulted in
17   sales to an end purchaser.
18       Q.   Understood.
19            Was it your understanding that a
20   manufacturer had a duty to know its indirect
21   customers?
22       MR. TSAI:  Object to the form.
23            Go ahead.
24   BY THE WITNESS:

Page 100

1        A.   Again, that would have fallen into
2    compliance and that's something I don't feel
3    comfortable answering.
4    BY MR. KAWAMOTO:
5        Q.   And when you say it's -- you don't feel
6    comfortable answering, is -- is that because you --
7    you don't know what the answer is?
8        A.   It's because I have not worked in
9    controlled substances for over eight years and I truly
10   don't remember.
11       Q.   Would you agree that there is an opioid
12   crisis or opioid epidemic in this country?
13       A.   I don't know.
14       Q.   Have you ever heard the term "opioid
15   crisis" or "opioid epidemic"?
16       A.   I have.
17       Q.   And in what context did you -- did you
18   hear -- did you become familiar with that term?
19       A.   Most recently I suppose in the news.
20       Q.   Okay.
21            While you were working at Mallinckrodt, do
22   you ever recall hearing that term, "opioid crisis" or
23   "opioid epidemic"?
24       A.   I don't remember.

Page 101

1        Q.   And as you sit here today, you don't have
2    any understanding of whether there is an opioid crisis
3    or opioid epidemic?
4        A.   I -- I don't -- I -- I -- I don't really
5    know.  I mean, you see things in the news.  I don't
6    really know, though.
7        Q.   Do you believe there is a problem with
8    opioid abuse in this country?
9        A.   I can't speak to that.  I don't know.
10       Q.   Do you know what a pill mill is?
11       A.   I have become familiar with what a pill
12   mill is, yes.
13       Q.   Okay.  And what is a pill mill?
14       A.   From my understanding, a pill mill is
15   where patients know, and, again, this is -- they --
16   they know they can go there and doctors are more
17   freely writing prescriptions for different
18   medications.
19       Q.   Is it your understanding that certain
20   regions have more pill mills than others?
21       A.   That part I -- I really don't know.
22       Q.   Do you believe Mallinckrodt has an
23   obligation to take reasonable steps to prevent its
24   product from reaching pill mills?

Page 102

1    A.   Again, I'm not -- I wasn't in compliance.
2 I was in marketing. This has been eight years ago.
3 From my perspective, Mallinckrodt had an obligation to
4 control diversion at the -- the part of the supply
5 chain that it was able -- that it had the impact on.
6 So in terms of the distribution of its product into
7 the -- into the customer base.
8    Q.   But Mallinckrodt had no obligation to try
9 to combat diversion at the distributor level, did it?
10    A.   I don't know the answer to that.
11    Q.   And is it your understanding that
12 Mallinckrodt didn't have an obligation to try to
13 combat diversion at the pharmacy level?
14    A.   Again, I don't know the answer to that.
15    Q.   So when you said Mallinckrodt has an
16 obligation to fight diversion, what -- what do you
17 mean by that? Is it -- is it only at the
18 manufacturing level, is it throughout the supply
19 chain, you know, what -- what is Mallinckrodt -- what
20 is your understanding of Mallinckrodt's anti-diversion
21 obligation?
22    A.   Sure.
23        I can't speak to the -- the diversion
24 policy that they have or the -- what they have in

Page 103

1 place. From my recollection, when we were there, we
2 had suspicious order monitoring and we had a strong
3 compliance group led by Karen Harper. Those are
4 questions, though, that really would need to be
5 answered by her. She -- that -- that was her
6 wheelhouse and that was her expertise.
7    Q.   And so with respect to pill mills, though,
8 was it your understanding that Mallinckrodt had an
9 obligation to prevent pill mills from acquiring its
10 products?
11    A.   I don't have a good answer for you on
12 that, no.
13    Q.   Okay.
14        Looking back on your tenure at
15 Mallinckrodt, are there steps you believe Mallinckrodt
16 should have taken or should have taken sooner to try
17 to prevent diversion from occurring?
18    A.   Can you re -- say that question again?
19    Q.   Sure.
20        Looking back on your tenure at
21 Mallinckrodt, are there steps you believe Mallinckrodt
22 should have taken or should have taken sooner to try
23 to prevent diversion from occurring?
24    A.   Well, I would say, again, that the

Page 104

1 compliance group was in charge of the suspicious order
2 monitoring and in charge of putting together the
3 programs to monitor our orders and -- and the product
4 being, you know, shipped out. So that really fell
5 into Karen Harper's group.
6        I would say from a marketing perspective
7 and from what visibility that I had, I saw that group
8 working diligently and extremely hard to put in place
9 or to execute, I should say, on -- on suspicious order
10 monitoring programs to ensure that our product was
11 being shipped, I don't know what the right word for
12 this would be, but being shipped in the most
13 conscientious way possible.
14    Q.   And so do you believe that those programs
15 were effective?
16    A.   I can't speak to that because I don't know
17 what you mean by effective.
18    Q.   Well, did they stop -- did they stop the
19 Mallinckrodt products from being acquired by the pill
20 mills?
21    A.   I --
22        MR. TSAI:  Object to the form.
23        Go ahead.
24 BY THE WITNESS:

Page 105

1    A.   Yeah, I don't think that you can --
2 that -- that's too many -- too many what ifs down that
3 stream. I -- I can't speak to that. I don't know.
4 BY MR. KAWAMOTO:
5    Q.   Well, were they effective at preventing
6 Mallinckrodt's products from being provided to
7 distributors that did not have adequate diversion
8 control programs?
9        MR. TSAI:  Object to the form.
10        Go ahead.
11 BY THE WITNESS:
12    A.   Yeah, I think that, again, you can't
13 answer that question because how do you -- how did we
14 or how do they qualify what a pill mill was. So I --
15 I don't think that -- there is no way to answer that
16 question. That's impossible to make that linkage.
17 BY MR. KAWAMOTO:
18    Q.   Are you aware that certain of
19 Mallinckrodt's customers had their licenses revoked by
20 DEA for diversion-related activities?
21    A.   I am aware of that.
22    Q.   Do you believe or do you understand that
23 Mallinckrodt had any obligation to try to prevent its
24 products from reaching these customers?

Page 106

1    A.   Again, that's a question you would have to
2  talk to Karen Harper about.  I was in marketing.  That
3  is really outside of my wheelhouse.
4    Q.   So your -- your role was just to provide
5  information to the compliance department?
6    A.   Much of my role was to provide the data to
7  the compliance group, yes.
8    Q.   And I believe you indicated that you were
9  a conduit for data, is that -- is that correct?
10    A.   That's what I stated earlier, yes.
11    Q.   So in terms of being a conduit, though,
12  you were getting the data from where and you were
13  providing it -- well, where were you getting the data
14  that you were providing to compliance?
15    A.   Sure.
16        So in terms of the data, a lot of times it
17  would be the chargeback, so sales information.
18    Q.   So, is it fair to say that you're
19  essentially providing information from the sales
20  database and the sales team to compliance for them to
21  make their decisions?
22    A.   I think that's a fair statement.
23    Q.   And so compliance in this -- in this
24  regard was dependent upon the data it received from

Page 107

1  the sales team?
2    MR. TSAI:  Object to the form.
3        Go ahead.
4  BY THE WITNESS:
5    A.   So there was -- I -- I don't think it was
6  necessarily from the -- the sales -- no, that's not an
7  accurate statement.
8  BY MR. KAWAMOTO:
9    Q.   Okay.  Well, so, in terms of being a data
10  conduit, you were providing information to compliance
11  from what source?
12    A.   From -- I think we already talked about
13  this -- from the chargeback data.
14    Q.   And did you ever talk to the sales team
15  about their customers or the nature of their
16  customers?
17    A.   I believe that I would have talked to the
18  sales team about their customers, yes.
19    Q.   Okay.  And would you have provided that
20  information to compliance?
21    A.   I would have relayed the -- the anecdotal
22  information from the sales team to compliance, yes.
23    Q.   And compliance presumably would have
24  relied on that anecdotal information that you were

Page 108

1  relying in terms of making its decision, is that
2  correct?
3    MR. TSAI:  Object to the form.
4        Go ahead.
5  BY THE WITNESS:
6    A.   I -- I think that that would be a portion
7  of what they relied on, but it was never
8  100 percent -- or you couldn't actually -- you can't
9  even say that.  It was a -- it was a factor, but it
10  wasn't necessarily always the driver in
11  decision-making.
12  BY MR. KAWAMOTO:
13    Q.   Okay.  So -- well, so what were some of
14  the other factors or drivers then that compliance
15  looked at?
16    A.   I can't speak to that.  I provided
17  compliance with the -- the sales information and
18  beyond that the other factors that Karen and her team
19  factored -- or incorporated into, would you have to
20  talk to her about that.
21    Q.   But if the information you were providing
22  to compliance was inaccurate for whatever reason, that
23  would be a problem, wouldn't it?
24    MR. TSAI:  Object to the form.

Page 109

1  BY THE WITNESS:
2    A.   I can't speak to that.  Karen would have
3  to talk about that and whether -- how that would hurt
4  her decision-making.
5    MR. KAWAMOTO:  Okay.  So this is Exhibit, I
6  believe, 6.
7        (WHEREUPON, a certain document was
8        marked Mallinckrodt - Neely
9        Deposition Exhibit No. 6, for
10        identification, as of 01/07/2019.)
11  BY MR. KAWAMOTO:
12    Q.   So, Ms. Neely, I'm handing you an e-mail
13  and attachment.  The e-mail is marked as
14  MNK-T1 6330418.
15    A.   Uh-huh.
16    Q.   And the attachment was produced in native
17  form, but it's 6330419.
18    A.   Okay.
19    Q.   So this e-mail is from Ann -- I'm sorry --
20  Amy Loomis to a number of people, including yourself.
21    A.   Uh-huh.
22    Q.   Do you recall receiving this e-mail?
23    A.   I don't.
24    Q.   Okay.  The e-mail, the text of the e-mail

Page 110

1 is: "Another long list of orders hitting excess demand
2 rules."
3     A.   Uh-huh.
4     Q.   And then the attachment, I believe, is a
5 list of the various orders that, you know, hit those
6 excess demand rules.
7     A.   Uh-huh.
8     Q.   Do you know why you are receiving this
9 e-mail?
10     A.   I don't remember, no.
11     Q.   Do you know what is meant by "excess
12 demand rules"?
13     A.   I don't know what the exact definition is
14 in this context.
15     Q.   Well, what's your understanding of the
16 general definition?
17     A.   My understanding of excess demand would be
18 an order that exceeds what their historic average
19 order had been, average order history had been.
20     Q.   Okay.  And so in terms of how this list
21 gets generated --
22     A.   Uh-huh.
23     Q.   -- I assume there -- the -- there are
24 orders coming in to Mallinckrodt --

Page 111

1     A.   Uh-huh.
2     Q.   -- and then those orders are screened
3 against some type of numeric formula.
4          Is that consistent with your
5 understanding?
6     A.   I don't -- this fell into -- I --  Amy
7 Loomis, she was in logistics planning.  I -- I don't
8 know how she set it up.  It appears to be that way
9 looking at the spreadsheet, but I don't know.
10     Q.   Okay.  And then what did you do -- what
11 did you do with this list after you received it?
12     A.   I -- I truly don't remember receiving this
13 e-mail or this attachment, so I can't tell you what I
14 did with this.
15     Q.   Okay.  Did you have any role in reviewing
16 these orders?
17     A.   Again, I couldn't tell you because I don't
18 remember getting this spreadsheet.
19     Q.   Well, do you recall receiving, you know,
20 spreadsheets similar to this during your time at
21 Mallinckrodt?
22     A.   I -- I -- I'm going to be honest with you,
23 I truly don't remember.
24     Q.   Okay.

Page 112

1     A.   Yeah.
2     Q.   Well, taking a step back, what was your
3 understanding of the suspicious order monitoring
4 program that Mallinckrodt was -- was implementing?
5          Well, strike that.
6          What was your understanding of the
7 suspicious order monitoring program that -- that
8 existed at Mallinckrodt while you were there from, you
9 know, 2006 to 2011?
10     A.   Yeah, and I know -- and I again apologize,
11 but I really -- at the time I could have -- I was well
12 versed in it and I could have spoke to it, I don't
13 remember.  It has been seven, eight years.  I really
14 don't remember the specifics of it.
15     Q.   Well, do you know if a numeric formula was
16 used to screen the orders?
17     A.   In looking at this spreadsheet, it appears
18 that that's the case, but I, again, don't remember.
19     Q.   Do you recall being involved in reviewing
20 or evaluating suspicious orders?
21     A.   It appears that I was because I was on
22 this e-mail and there was an attachment here, but I
23 don't.
24     Q.   Well, so, do you -- do you recall anything

Page 113

1 about the process for either identifying suspicious
2 orders or for reviewing them?
3     A.   Again, what I -- I don't remember the
4 exact process, no.  I know that there was some --
5 there -- there was a program in place and at the time
6 I was, again, well versed in it, but, again, it's
7 been -- this is an e-mail from over 11 years ago,
8 12 years ago.  I don't -- I don't remember.
9     Q.   Well, and I understand that your -- your
10 testimony is that you don't remember the exact
11 process.  I guess my question is:  Do -- do you
12 remember anything about that process?
13     A.   I -- it appears that there were thresh --
14 according to this spreadsheet that they had thresholds
15 in place to identify orders that looked larger than
16 usual, but I can't -- I don't remember how that was
17 done or what was done with this information.
18     Q.   Okay.
19          (WHEREUPON, a certain document was
20          marked Mallinckrodt - Neely
21          Deposition Exhibit No. 7, for
22          identification, as of 01/07/2019.)
23 BY MR. KAWAMOTO:
24     Q.   Okay.  So, Ms. Neely, this is an e-mail

Page 114

1 Bates numbered 449492 and it is an e-mail chain
2 between you and others.
3     A.   Uh-huh.
4     Q.   And I'd like to direct your attention to
5 the bottom e-mail that starts on 492 and carries over
6 to 493.
7     A.   Okay.
8     Q.   Okay.  And that e-mail, it's an e-mail
9 from you to Victor Borelli --
10     A.   Uh-huh.
11     Q.   -- and it cc's Michael Gunning and Ginger
12 Collier.
13     A.   Uh-huh.
14     Q.   I believe Ginger Collier was your
15 supervisor, is that correct?
16     A.   She was, yes.
17     Q.   And who was Michael Gunning?
18     A.   He was the head of sales and marketing.
19     Q.   Okay.  And the Keysource vault program,
20 what -- what is that?
21     A.   So, in order to store controlled
22 substances, specifically Schedule II drugs, you have
23 to have a special vault within your warehouse required
24 by the DEA to store -- store Controlled II -- or

Page 115

1 Schedule II, I should say, and that particular storage
2 facility was called a vault.
3     Q.   Okay.
4         And do you see at the top where you say:
5     "Per our conversation regarding Keysource
6 and the proposed vault program, we are not planning to
7 proceed for the following reasons:"
8     A.   Uh-huh.
9     Q.   And then the first bullet point is:
10     "Rolling 12 months versus ... rolling
11 12 months sales are 99 percent."
12     A.   Okay.
13     Q.   "Rolling 12 months versus prior rolling
14 12 months sales in Florida are at 1364 percent."
15     A.   Yes.
16     Q.   Do you see that?
17     A.   Um-hum.
18     Q.   What does -- what does that mean?
19     A.   So --
20     Q.   Or what -- what is the significance of
21 that data point?
22     A.   It is stating that their sales are up
23 almost 100 percent, but then it is saying that within
24 the State of Florida, they were up significantly

Page 116

1 higher than their average sales across all of their
2 territories.
3     Q.   Okay.  Well, I mean, and significantly
4 higher, it's -- it's 99 percent versus 1300 percent,
5 is that correct?
6     A.   That's what the e-mail states, yes.
7     Q.   Okay.
8         And then the second bullet point is "KMI,"
9 which I assume is -- is Keysource, right?
10     A.   Yes.
11     Q.   It says:
12     "Keysource sold 8.8 million in net sales
13 for the past 12 months of which 78 percent is
14 oxycodone IR.  For the past three months that
15 percentage has increased to 100 percent."
16     A.   Um-hum.
17     Q.   So, does that mean for the past three
18 months all of Keysource's sales have been oxycodone?
19     A.   According to this e-mail, yes.
20     Q.   Okay.  And then the next bullet point is:
21     "Of KMI's total oxycodone IR sales, for
22 the past 12 months, 94 percent of them have gone
23 through the State of Florida."
24         So this is -- you know, their -- the

Page 117

1 primary sales area for them is Florida?
2     A.   That's correct.
3     Q.   Okay.
4         And the next bullet point is:
5     "Oxycodone IR sales represent, to our
6 total Mallinckrodt portfolio, 23 percent of total net
7 sales.  Oxycodone IR sales are almost 100 percent to
8 KMI net sales."
9         Do you see that, what I'm underlining?
10     A.   I do.
11     Q.   And so that indicates that 100 percent of
12 what Keysource is purchasing from Mallinckrodt is
13 oxycodone, is that correct?
14     A.   That's correct, that's what it says in
15 bullet point 2 and bullet point 4.
16     Q.   Okay.
17         And so, essentially, the reasons that
18 Mallinckrodt is not willing to go through this --
19 to -- to do the proposed vault program for
20 Keysource --
21     A.   Uh-huh.
22     Q.   -- is that they have a -- a very large
23 increase in their Florida sales, they are selling --
24 for the past three months, they have sold nothing but

Page 118

1 oxycodone?

2    A.   Um-hum.

3    Q.   94 percent of their oxycodone sales are

4 going through Florida, and the only thing Keysource is

5 purchasing from Mallinckrodt is oxycodone?

6    A.   That's what this e-mail states.

7    Q.   Okay.  And these were all -- these were

8 all factors of concern for Mallinckrodt, weren't they?

9    A.   Let me look at the timing.

10       So this is 2010, July of 2010, by this

11 point in time, yes, that was concerning.

12    Q.   Okay.

13    A.   Or there were definitely, I shouldn't say

14 concerning, questions around their sales, yes.

15    Q.   Well, there were questions and there were

16 concerns, weren't they?

17    A.   There were definite questions, yes.

18    Q.   Okay.  And then it says:

19       "Given the DEA situation in Florida and

20 the fact that Keysource is so heavily indexed in the

21 State of Florida, we do not want to do anything that

22 might be perceived as driving oxycodone sales in that

23 state."

24    A.   Um-hum.

Page 119

1    Q.   What is the DEA situation that's being

2 referred to?

3    A.   So by this point in time, my recollect --

4 this would have been after certain distributors had

5 been shut down because of their sales into the State

6 of Florida.  So it was starting to get more scrutiny,

7 if I remember correctly.

8    Q.   And when you say certain distributors had

9 been shut down because of their sales into the State

10 of Florida, do you recall roughly when those

11 distributors were shut down?

12    A.   I don't remember the timing.  I know, and

13 I just -- I know it -- probably it occurred by this

14 point, because that's why we are talking to it, and

15 then I left in January of '11, so I -- it -- but I

16 don't remember when, no.

17    Q.   Okay.  But when you left, you understood

18 that sales into the State of Florida were a cause of

19 concern?

20    A.   I knew that we had questions around it,

21 yes.

22    Q.   Okay.  And then you state:

23       "We do not want to do anything that might

24 be perceived as driving oxycodone sales in that

Page 120

1 state."

2       Do you see that?

3    A.   I do.

4    Q.   It's there.

5       What do you mean by that?

6    A.   Like I mentioned, by this point we had

7 questions around sales going into the State of Florida

8 based on other distributors having their licenses

9 taken and information that was being communicated by

10 the DEA.  And so we were starting to realize that

11 there was a potential situation -- there was a

12 potential situation and we were trying to wrap our

13 arms around it at this point.  And the last thing that

14 we wanted to do was to further -- further the -- you

15 know, these sales there while we are still trying to

16 figure out what was happening.

17    Q.   Well, and how could you drive -- how could

18 you drive sales in -- or what actions can Mallinckrodt

19 have taken to drive sales?

20    A.   We -- and that's a good question.

21       We, Mallinckrodt, can't actually drive

22 sales.  So the market is established by -- by the

23 prescriber writing the -- the prescription.  So the

24 market is established by that and then Mallinckrodt

Page 121

1 fills demand from our wholesalers and our

2 distributors.

3       So in terms of driving sales, we can't

4 actually drive them, but what we were looking at here

5 is seeing that Keysource was selling a lot of oxy and

6 selling a lot of oxy into the State of Florida.  And

7 essentially were looking to build out their vault

8 space so they could accommodate more Schedule II

9 drugs.

10       And while we were trying to understand

11 what was happening within the State of Florida, the

12 last thing that we wanted to do was to give a customer

13 the ability to warehouse more Schedule II drugs

14 without completely understanding what was evolving in

15 the State of Florida where it seemed like a lot of

16 their sales were going.

17    Q.   Well, and there were things that you could

18 do to encourage the sale of -- of oxycodone, couldn't

19 you?  So, for example, you know, you could offer --

20 you could offer to sell oxycodone for less than your

21 competitors, that would result in presumably more

22 purchases from you, wouldn't it?

23    A.   That would result in more demand, which we

24 talked to earlier in terms of market share.  So the

Page 122

1  market would have already have existed, but it would
2  have resulted in more market share for Mallinckrodt
3  resulting in sales.
4      Q.   And if you were to supply distributors
5  that other manufacturers were not willing to supply,
6  that could also have the effect of -- of increasing
7  demand, couldn't it?
8      A.   I can't speak to that because I don't know
9  what other manufacturers' strategies are.
10     Q.   Well, but regardless, if -- if you have a
11 distributor and the only place --
12     A.   Or what other manufacturers' strategies
13 are.  Sorry.
14     Q.   Well, if you have a distributor and the
15 only place they can get Mallinckrodt products from
16 is -- I'm sorry.
17          If you have a distributor and the only
18 place it can get oxycodone from is Mallinckrodt and
19 you fulfill those orders, you know, you are
20 facilitating those sales, aren't you?
21     A.   Again, I can't speak to whether or not
22 they were able to obtain the product from another
23 manufacturer.  I only know what the -- what
24 Mallinckrodt was -- was selling out.  So whether or

Page 123

1  not we were making that -- a sale to someone who was
2  buying it from us because they couldn't get it from
3  a -- I did not -- we wouldn't have had a purview into
4  that.
5      Q.   Understood, but, for example, we -- we
6  looked at a -- a prior document relating to Keysource.
7  And Keysource -- well, Mallinckrodt was Keysource's
8  sole supplier --
9      A.   Uh-huh.
10     Q.   -- for oxycodone.
11          Do you remember that?
12     A.   Did we look at that today?
13     Q.   Yes.  I -- I believe it's -- I think it is
14 Exhibit -- I believe it is -- it is Bates No. 563714.
15 It is an e-mail from Victor Borelli to you.  It was
16 the one that -- that started with "Help."
17     THE WITNESS:  Do you have it?
18     MR. TSAI:  Yes.  Exhibit 4.
19 BY MR. KAWAMOTO:
20     Q.   And on -- it is on the back page of
21 Exhibit 4.
22     A.   Oh, so it wasn't Keysource.  That's why I
23 didn't remember.
24     Q.   Oh, I'm sorry.  It is Sunrise, my mistake.

Page 124

1      A.   It is Sunrise and Masters, yep.
2      Q.   But for Sunrise, you were the sole
3  supplier for Sunrise, is that correct?
4      A.   According to that e-mail, yes, but we are
5  talking about Keysource right now.
6      Q.   And so if you don't -- if you don't supply
7  Sunrise, they are not selling anything to anyone,
8  isn't that fair?
9      A.   Are we talking about Sunrise now?
10     Q.   Yes, we are talking about Sunrise now.
11     A.   Okay.  We are jumping back and forth a
12 bit.
13          It says:  "We have displaced all
14 competitors."  So whether or not we have displaced
15 them because they chose not to buy from another
16 manufacturer or that manufacturer chose not to supply
17 to them, it doesn't say that in this e-mail.
18     Q.   Well, but re -- regardless of the -- the
19 reasons that Sunrise, that Mallinckrodt has become the
20 sole supplier to Sunrise, if you continued -- I mean,
21 if -- if you refused to provide products to Sunrise,
22 then they have nothing to ship and sell, isn't that --
23 I mean, that's a logical statement, isn't it?
24     A.   I -- I don't know because I wasn't running

Page 125

1  Sunrise's business.
2      Q.   Well, but isn't that what Mr. Borelli is
3  saying to you, if -- if we don't ship it, they can't
4  sell anything, do you see that?
5      A.   Well, they couldn't sell any of our -- of
6  our product, no.
7      Q.   And, in fact, they couldn't sell anything
8  because you were the sole supplier to them?
9      A.   I don't know if they could have had
10 options to reach out to other people.  I don't know
11 the answer to that.
12     Q.   Well, but isn't Mr. Borelli telling you
13 that you displaced all of the other competitors, so
14 they don't have any other sources?
15     A.   We did displace the competitors, but it
16 doesn't mean that they couldn't reach back out to one
17 of them, and that's the part that I don't have
18 visibility into.
19     Q.   Okay.  But assuming that -- that by
20 displacing the competitors that meant that Sunrise
21 couldn't go and obtain its product from other sources
22 and you were their sole supplier, you know, if you --
23 I mean, if you cut them off, that meant that, you
24 know, the -- the -- the supply of -- of oxy

Page 126

1  products -- oxycodone products into the market would
2  decrease?
3      MR. TSAI: Object to the form of the question.
4      Go ahead.
5  BY THE WITNESS:
6      A.  Yeah.  I -- I -- I don't think that that's
7  a true statement.
8  BY MR. KAWAMOTO:
9      Q.  Okay.  Why is that?
10     A.  So rephrase.  Say that again.
11     Q.  You are the sole supplier to Sunrise.
12     A.  Um-hum.
13     Q.  You supply 100 percent of their oxycodone
14  product.
15     A.  Um-hum.
16     Q.  On the assumption that Sunrise can't go
17  and get that oxycodone product from anyone else.
18     A.  Um-hum.
19     Q.  If you don't supply that product, that
20  oxycodone product to Sunrise.
21     A.  Um-hum.
22     Q.  They can't sell it into the market?
23     MR. TSAI: Object to the form.
24     Go ahead.

Page 127

1  BY THE WITNESS:
2      A.  But, yeah, and I -- I would say that
3  that's based -- your -- your statement has so many
4  assumptions and what ifs to get you from Point A to
5  Point B that I think that's an impossible thing to --
6  to validate.
7  BY MR. KAWAMOTO:
8      Q.  Okay.  Well, could you -- could you read
9  this paragraph then?
10     A.  Sure.
11     "Sunrise has both PO 259 and 261 on
12  backorder and they are bone dry on all products listed
13  on both PO's.  We have displaced all competitors at
14  this account and they are relying on our supply to
15  cover their demand.  If we don't ship it, they can't
16  sell anything.  As soon as product is released, please
17  ship PO's out via overnight delivery."
18     Q.  And so if you cut Sunrise off, doesn't
19  that mean that they essentially exit the market and
20  there is no -- they are -- you are not going to have
21  oxy coming from Sunrise into the market?
22     A.  I -- I think we've --
23     MR. TSAI: Object to the form.
24  BY THE WITNESS:

Page 128

1      A.  Yeah.  And I think we've talked about this
2  already.  We don't know if they don't have other
3  options from other manufacturers to procure the
4  product.
5  BY MR. KAWAMOTO:
6      Q.  Okay.  Did you have any reason to believe
7  that -- that they had options from other
8  manufacturers?
9      A.  I don't know.  I wasn't involved in the
10  business.  I don't know what their options were or
11  weren't.
12     MR. TSAI: Is now a good time for another quick
13  break?
14     MR. KAWAMOTO: Sure, why don't we take five
15  minutes.
16     MR. TSAI: I'm just looking ahead.  Do you want
17  to go another session after the break and then break
18  for lunch after that?
19     MR. KAWAMOTO: Yeah.  What time is it?
20     MR. TSAI: It is 11:30 approximately.
21     MR. KAWAMOTO: Okay.  Sure.  Yeah.
22     THE VIDEOGRAPHER: All right.  Please remove
23  your microphones.
24     The time is 11:32 a.m.  Going off the

Page 129

1  record.
2      (WHEREUPON, a recess was had
3       from 11:32 to 11:44 a.m.)
4  THE VIDEOGRAPHER: Okay.  We are back on the
5  record.  The time is 11:44 a.m.
6  BY MR. KAWAMOTO:
7      Q.  Okay.  So prior to the break, we were
8  looking at this e-mail, Bates No. 449492, and in
9  particular your e-mail to Mr. Borelli.
10     A.  Um-hum.
11     Q.  And I was focused on the phrase: "We do
12  not want to do anything that might be perceived as
13  driving oxycodone sales in that state."
14     A.  Um-hum.
15     Q.  And so when you wrote that, what did you
16  mean by "perceived as driving oxycodone sales in that
17  state"?
18     A.  I think what we were talking about before
19  the break was we had seen that Keysource was selling a
20  lot of oxycodone into the State of Florida and we at
21  the time were realizing that there was developments
22  happening within Florida, you know, as a result of
23  communication via the DEA and as a result of other
24  distributors having their license taken away because

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1  of sales into that state. And so we did not want to
2  help Keysource to be able to expand -- they were
3  looking for additional -- and, again, what we spoke to
4  earlier -- looking to build vault space so they would
5  have additional space to warehouse additional C-IIs to
6  service what we were seeing with our pharmacies within
7  the state of Florida. And so we did not want to be in
8  a position of helping them with that program while we
9  were still trying to understand what was happening
10 within the State of Florida.
11    Q.   And so in -- in terms of driving oxycodone
12 sales in Florida, taking a step back --
13    A.   Um-hum.
14    Q.   -- you know, what were -- prior to 2000 --
15 prior to this e-mail in 2010 --
16    A.   Um-hum.
17    Q.   -- what were things that Mallinckrodt was
18 doing to driving oxycodone sales in Florida?
19    MR. TSAI:  Object to the form.
20 BY THE WITNESS:
21    A.   Yeah, I don't -- I don't think that we
22 were ever -- I think you are taking this sentence a
23 bit out of context. I don't think we were ever
24 driving sales into that state.

Page 131

1       The market, as we spoke earlier, existed
2  and we were selling into wholesalers and/or
3  distributors that were then servicing that market. So
4  I don't -- we -- think we were ever in a position of
5  driving sales specifically, you know, focused on to
6  the State of Florida.
7  BY MR. KAWAMOTO:
8     Q.   Well, but there were things that
9  Mallinckrodt could do to increase its market share,
10 correct?
11    A.   Mallinckrodt, as we spoke earlier in terms
12 of market share, had the ability to contract with
13 different retail and/or wholesale distributor
14 customers across the US, to gather -- or to garner
15 additional market share.
16       That being said, those particular, you
17 know, those -- those wholesalers and distributors were
18 typically nationwide, so by contracting with them, we
19 weren't specifically focusing on the State of Florida.
20 We were focusing on them as an account.
21    Q.   And so in terms of increasing
22 Mallinckrodt's market share, you know, for its oxy --
23 oxycodone sales, what were steps that Mallinckrodt was
24 taking to do that?

Page 132

1     A.   Well, you are assuming that we were taking
2  steps to increase our market share.
3     Q.   Yes.
4     A.   And so I -- I don't know if that's the
5  case, so I couldn't tell you what steps we were or
6  weren't taking.
7     Q.   Okay. Well, if Mallinckrodt offered
8  oxy -- its oxy -- strike that.
9        If Mallinckrodt offered its oxycodone
10 products for sale for less than its competitors?
11    A.   Um-hum.
12    Q.   Would that have had the impact of
13 increasing Mallinckrodt's market share?
14    A.   If we offered lower pricing to our
15 competitors -- to our customer?
16    Q.   Yes.
17    A.   To offset a competitor and we gained the
18 business, then we would gain market share.
19    Q.   Okay. And if -- if Mallinckrodt were
20 willing to pro -- to supply distributors that other
21 manufacturers weren't willing to do so, that would
22 also increase Mallinckrodt's market share, is that
23 correct?
24    MR. TSAI:  Object to the form.

Page 133

1       Go ahead.
2  BY THE WITNESS:
3     A.   Yeah, and I think -- and I think we talked
4  about that before the break that we don't have
5  visibility to what other manufacturers were or weren't
6  doing or who and weren't selling to, so I don't think
7  that that's a question I can answer.
8  BY MR. KAWAMOTO:
9     Q.   But in terms of the market share assigned
10 to Mallinckrodt and ways to increase that market
11 share, one way to increase Mallinckrodt's market share
12 would be to sell to distributors that other
13 manufacturers weren't willing to sell to, isn't that
14 correct?
15    A.   And, again, I think we've answered this
16 question two times before. We don't know what other
17 manufacturers were or weren't doing, so I cannot tell
18 you that we picked up business because that customer
19 was unable to purchase the product from another
20 manufacturer. I don't have that information.
21    Q.   But in -- well, I understand that but --
22    A.   I don't know --
23    Q.   -- as a --
24    A.   -- because you've --

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  Q.  -- as a --
2  A.  -- asked me that three times.
3  Q.  As a theoretical matter --
4  A.  Uh-huh.
5  Q.  -- if you are willing to supply
6  distributors in the market that other manufacturers
7  are not --
8  A.  Um-hum.
9  Q.  -- isn't that going to result in an
10  increased market share for you?
11  A.  Again --
12  MR. TSAI:  Object to the form.
13  BY THE WITNESS:
14  A.  Yeah, I -- I can't answer.  I think we are
15  talking about real information here and not
16  theoretical, so I don't think I can answer that
17  question.
18  BY MR. KAWAMOTO:
19  Q.  Okay.
20  So you have no opinion or you have no
21  knowledge about how Mallinckrodt could increase its
22  market share by supplying distributors that others
23  weren't willing to, you just -- you don't know?
24  A.  Again, I don't know if other manufacturers

Page 135

1  were unable or unwilling to supply to certain
2  customers.  What I can tell you is that Mallinckrodt
3  had the ability to gain market share through
4  contracting with different customers.  Why those --
5  Q.  And how that --
6  A.  -- why those contracts became available is
7  not known to us.
8  Q.  Well, so let's -- let's explore that.
9  When you say they have the ability to
10  maintain market share through contracting with
11  different customers, what do you mean by that?
12  A.  So what we talked about in the earlier
13  discussion in terms of that's how generic companies go
14  to market.  So you have certain customers that make up
15  certain market shares and you choose to partner or you
16  offer a price point that incentivize them to want to
17  buy your product and at that point you create a
18  contract and you have a -- you contract with them to
19  sell your product to them.
20  Q.  And so you are competing with other
21  generic manufacturers for these customers, are you
22  not?
23  A.  Depending on the market, yes, potentially.
24  Q.  And so what are things you can do to make

Page 136

1  sure that you get the customer and your competitors
2  don't, other -- other than price, are there other
3  things?
4  A.  Price is usually the key driver.
5  Q.  Okay.
6  MR. KAWAMOTO:  So I believe we are up to
7  Exhibit 8.  Okay.  Great.
8  (WHEREUPON, a certain document was
9  marked Mallinckrodt - Neely
10  Deposition Exhibit No. 8, for
11  identification, as of 01/07/2019.)
12  BY MR. KAWAMOTO:
13  Q.  Okay.  So, Ms. Neely, I've given you an
14  e-mail chain that's Bates numbered 6320438.
15  A.  Uh-huh.
16  Q.  And I want to start with the e-mail on the
17  very back, which is 6320439.
18  A.  Um-hum.
19  Q.  Okay.  So this is an e-mail that you sent
20  to Jeremy Stamer.
21  Who is Jeremy?
22  A.  Jeremy worked in our market share -- I --
23  I don't know if the name of the department is
24  portfolio market share analytics.

Page 137

1  Q.  And could you read that first sentence
2  that I highlighted?
3  A.  Sure.
4  "In our meeting the other day, you
5  mentioned that you could estimate what Florida
6  oxycodone sales should be based on population,
7  demographics, et cetera versus where they are actually
8  tracking at."
9  Q.  Okay.
10  And what did you mean when you say that
11  you could estimate what Florida oxycodone sales should
12  be based on population, demographics?
13  A.  Yeah, that's a great question.
14  So, this was 2010.  So at this point we
15  had had enough data points coming in for us to start
16  to see that Florida was representing on -- on
17  oxycodone a higher percentage to the total country
18  than Florida sales on non-oxy-related products and we
19  were trying to understand why.  And what I -- because
20  it -- it seemed -- it seemed high, but at the same
21  time, you know, Florida is where older people go to
22  retire.  It's -- you know, so you've got an older
23  population that is aging, that could be more pain, and
24  so we couldn't understand why the sales were -- were

Page 138

1 high there.
2 And so what I had done was I was reaching
3 out to Jeremy to try to understand what -- what -- if
4 the demand was warranted or if not what it really
5 should be. And -- and if it was population
6 demographics driving it or if not, you know -- it
7 was -- it was helping us to try to get to maybe what a
8 root cause could be here.
9 Q. And did you -- did you reach any
10 conclusions as to what the cause was?
11 A. I, at this point in 2010, July --
12 Q. Well--
13 A. -- I don't --
14 Q. I'm sorry. Go ahead.
15 A. -- yeah, I don't -- yeah, no, I don't
16 remember the outcome of this analysis.
17 Q. But the -- the analysis, your -- your
18 recollection is that the analysis was completed?
19 A. I don't remember.
20 Q. But at a minimum, you know, the question
21 was being asked, is that fair?
22 A. It was obv -- obviously being asked, you
23 know, as read in this e-mail, yes.
24 Q. But you don't recall whether any

Page 139

1 conclusion was reached?
2 A. Well, we did eventually late -- in that
3 fall timeframe stop shipping to different distributors
4 that were heavily indexed into the State of Florida.
5 So I don't know what the conclusion of this specific
6 analysis was, but I do know what our end result ended
7 up being.
8 Q. And what -- what was that end result? The
9 end result was you stopped shipping to distributors
10 that were heavily indexed into Florida. So would --
11 well, strike that.
12 When you say "heavily indexed into the
13 State of Florida," what do you mean by that?
14 A. Well, if you want to go back to the e-mail
15 that we talked about for Keysource where you
16 referenced the percent to totals, so where we say that
17 oxy IR sales represent to our total portfolio
18 23 percent and we talk about 100 percent to KMI, so
19 that would be where Keysource is over indexed. So
20 looking at what the percent of sales represent and
21 then looking at the average, and if it's higher,
22 saying it's over indexed, and the same thing could be
23 said for the State of Florida.
24 Q. And so this would indicate that

Page 140

1 Mallinckrodt concluded that the demand for Florida was
2 not justified by demographics, correct?
3 A. I -- I can't tell you that because I don't
4 remember what the results of this particular analysis.
5 Q. But Mallinckrodt's actions in the fall
6 would suggest that it believed that there was
7 unwarranted demand in Florida, to use your words?
8 A. I think we did finally arrive at that
9 conclusion, but I can't tell you if it was a result of
10 this analysis or not.
11 Q. But the conclusion was demand was
12 unwarranted?
13 A. I'm sorry.
14 Q. The conclusion was demand was unwarranted,
15 it may have come from any number of analyses?
16 A. Well, the conclusion --
17 MR. TSAI: Objection to form.
18 Go ahead.
19 BY THE WITNESS:
20 A. Yeah, the conclusion was is that we
21 stopped selling to particular distributors. I -- we
22 can't speak to the demand being unwarranted or
23 warranted because that's so far downstream, but we did
24 make the conclusion to stop selling to different

Page 141

1 distributors, yes.
2 BY MR. KAWAMOTO:
3 Q. Okay. And why did you do that?
4 A. I think we can go back to our concerns
5 around the situation that DEA was addressing within
6 the State of Florida. So it was really more, you
7 know, whether or not it was warranted or unwarranted
8 demand is really in -- within the DEA's purview, not
9 ours. But what we could -- what we could ascertain
10 was that there was something happening based on the
11 communications with the DEA and their assessment of
12 shutting down other distributors and from that we're
13 able to draw inferences that this may not be the place
14 that we want to be operating or these people, these
15 distributors may not be the people that we would want
16 to be selling our product into.
17 But I can't speak to whether or not a
18 prescription was warranted or unwarranted or if a
19 demand was real or not -- not real. I don't -- I
20 can't speak to that.
21 Q. And so when you say that you were able to
22 draw inferences that this may not be the place that we
23 want to be operating or these -- or these distributors
24 may not be the people that we would want to be selling

Page 142

1 our product into, you know, what specific inferences
2 are you talking about?
3     A.   Again, what I just noted.  So in terms of
4 the communication from the DEA with regards to the
5 State of Florida and then the fact that other
6 distributors that had been selling into the state,
7 that coupled together, drove us to feel that there
8 was -- there was something happening.  Now, whether --
9 what it was I think was what we were trying to
10 understand here because we weren't sure, but we
11 ultimately based on a number of different factors made
12 that -- that decision.
13     Q.   And do you recall when Mallinckrodt first
14 started to have questions about Florida?
15     A.   That part I don't remember.
16     Q.   Do you recall reading news articles about
17 Florida as -- as it relates to the abuse of -- of
18 opioid products?
19     A.   I'm -- I do remember reading, yes.
20     Q.   And do you have any recollection of -- of,
21 you know, roughly when those -- when those articles
22 appeared?
23     A.   That part I don't remember.
24     Q.   And then the e-mail goes on to say:

Page 143

1         "The budget for oxycodone for fiscal year
2 2011 is getting scrutinized fairly closely."
3     A.   Um-hum.
4     Q.   What did you mean by in terms of the
5 budget being scrutinized?
6     A.   That's a great question.
7         So oxy IR in particular, and if you,
8 again, look back to the Keysource e-mail, we are talk
9 about oxy IR sales represented a total of 23 percent
10 to our top line sales for Mallinckrodt.  So it was
11 roughly a quarter of our sales at that time.
12         And from a business perspective, I was
13 trying to set budgets for fiscal year '11 and trying
14 to understand what the financials were going to look
15 like.  And because this was such a big driver but yet
16 I felt like there -- and we as a company felt like
17 there were so many moving pieces within it, I was
18 trying to get a handle on what that number, that sales
19 forecast number for budget should be.
20     Q.   And this -- the following sentence says:
21         "Having information that could reflect
22 what our potential downside will be if the State of
23 Florida normalizes to the rest of the country would be
24 extremely helpful."

Page 144

1     A.   Um-hum.
2     Q.   So what did you mean in terms of Florida
3 normalizing?
4     A.   Great question.
5         So we talk about Florida being over
6 indexed as a percent of total as it relates to the oxy
7 market versus the percentage that Florida on average
8 represented for other products.  And with Florida
9 being more heavily indexed on oxy and with the
10 scrutiny that we were starting to see from the DEA and
11 starting to understand that there was an evolving
12 situation and we weren't quite certain what it
13 completely was just yet.
14         I was trying to understand from a dollar
15 perspective what that difference would represent in
16 relation to our existing oxycodone dollar sales.  This
17 was strictly from a business dollar sales projection
18 standpoint.
19     Q.   And in -- in terms of the question you are
20 trying to answer or I guess the -- the issue you are
21 trying to examine, was it a concern that the overall
22 percentage, you know, as you indicated, roughly a
23 quarter, that was going to go down when Florida
24 normalized, is that correct?

Page 145

1     A.   It -- it wasn't necessarily a concern.  I
2 think we need to be careful about that.  It was more
3 about setting realistic sales numbers for our fiscal
4 year.  And, you know, and if that number dropped
5 because the total market for oxycodone dropped, then I
6 needed to accurately relay that and -- and be able to
7 support it within our budget.
8         So I wouldn't say it was a concern.  It
9 was more about trying to get to the accuracy of what
10 was going to happen.
11     Q.   And there was at least in your mind a
12 reasonable possibility that the sales numbers were
13 going to drop because of activities in Florida, is
14 that fair?
15     A.   At this point in time as we were seeing
16 the activity with the DEA within the State of Florida
17 and understanding that there was an evolving
18 situation, I obviously felt that there was a potential
19 for reduction in sales as evidenced by this e-mail.
20     Q.   And in terms -- when -- when you reference
21 the activities in Florida or the evolving situation in
22 Florida, what was the outcome you were contemplating,
23 what was going to happen, what -- what exactly was
24 going to happen in Florida?

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    A.   We really didn't know.  I mean, we were in
2  the thick of it.  We really didn't know what was
3  happening.
4       So the DEA was communicating information,
5  and Karen Harper could definitely speak to that much
6  more strongly than I could, I was really -- I was in
7  marketing, I was on the business side, but we
8  definitely felt like something, you know, was -- was
9  evolving, happening there and we just weren't quite
10  certain what the overall impact.  And so from my
11  perspective as a business manager, trying to
12  understand from a dollar perspective the impact that
13  would have to our existing sales dollars within our
14  budget.
15    Q.   Do you recall when you first started
16  scrutinizing the degree to which a distributor was
17  over indexed in Florida?
18    A.   I -- I don't remember, no.
19    Q.   But you do recall at one point that was
20  something that Mallinckrodt started analyzing?
21    A.   Well, we obviously did as a result -- I
22  mean, this e-mail that I sent here about Keysource and
23  the percent to total sales for Florida, so yes.
24    Q.   Now, Jeremy's response to you is:

Page 147

1       "This will likely take a few days, and the
2  real challenge will be incorporating the volume that
3  is outside of our tracked channels."
4    A.   Um-hum.
5    Q.   Do you understand what he meant by "volume
6  that is outside of our tracked channels"?
7    A.   I do.
8       So whenever we are determining market
9  share and market size, we are utilizing third-party
10  data sources that we purchase, so namely one would be
11  IMS.  So my perception of his e-mail with it saying
12  that's outside of our tracked channels is there is
13  prescription level data that is not available via IMS
14  and so we would have to ascertain what that amount
15  would equate to.
16       And, again, you would -- Jeremy would have
17  to -- he was the expert in terms of market share
18  analysis, employing that data.  He would be able to
19  speak to that much better -- or someone in that group
20  would be able to speak to that much better than --
21  than I could.  What I gave you is a very layman's
22  version of it.
23    Q.   But is the general issue that IMS might
24  not capture all of the prescriptions, is that what --

Page 148

1    A.   There are people who -- there are -- there
2  is, from my understanding -- again, you would need to
3  speak to somebody who is more well versed -- is that
4  there are certain non-reporting customers within the
5  US that don't report their prescription data into IMS,
6  so IMS has to make estimations.  So, yes, it's --
7  that's my understanding.
8    Q.   Then the very top e-mail on the front
9  page, so this is on 438.
10    A.   Um-hum.
11    Q.   Do you see the sentence that reads:
12       "He has been comparing the share by
13  strength for the retail channel by food/chain versus
14  independent to measure part of the at-risk volume" --
15    A.   Um-hum.
16    Q.   -- "and comparing the NA" -- "NPA data to
17  the NSP data to measure the rest by company."
18    A.   Um-hum.
19    Q.   What does he mean by "at-risk volume"?
20    A.   I don't know what he means.  You'd have to
21  ask Jeremy.  I'm not sure.
22    MR. KAWAMOTO:  Okay.  So I believe this is
23  Exhibit 9.
24       (WHEREUPON, a certain document was

Page 149

1       marked Mallinckrodt - Neely
2       Deposition Exhibit No. 9, for
3       identification, as of 01/07/2019.)
4  BY MR. KAWAMOTO:
5    Q.   So this is an e-mail that you sent to
6  Karen Harper?
7    A.   Um-hum.
8    Q.   Cc'ing Jeremy?
9    A.   Um-hum.
10    Q.   And it is Bates No. 262710.
11    A.   Um-hum.
12    Q.   Can you read the highlighted sentence for
13  me, please?
14    A.   Sure.
15       "He has some good insight into the
16  external data that we will and won't be able to access
17  in order to aid us in our analysis of the diversion
18  situation in Florida."
19    Q.   And in terms of the diversion situation in
20  Florida, doesn't that indicate that at the time you
21  wrote this e-mail you believed that there was an
22  increased -- an increased occurrence of diversion in
23  Florida?
24    A.   I don't know if there was an increase of

Page 150

1 diversion within Florida. I can't speak to that.
2 That would definitely be something you would need to
3 talk to the DEA about. And you would also need to
4 talk to Karen more on this because she is the one that
5 had the direct communication with the DEA. But I
6 think when I talked earlier, I mentioned the evolving
7 situation, and this would be what we are referencing.
8    Q.   And the evolving situation relates to
9 diversion in Florida and an increased risk of
10 diversion in Florida, doesn't it?
11   A.   I can't speak to increased risk in
12 diversion in Florida, but we did have an understanding
13 that there was a situation evolving in Florida and we
14 were trying to understand what we could do to impact
15 that.
16   Q.   And in your words, that situation was a
17 diversion situation, was it not?
18   A.   Well, if you read the sentence that you
19 just had me read: "In order to aid us in our analysis
20 of the diversion situation in Florida," that was my
21 statement, yes.
22   Q.   And then do you see the last sentence?
23   A.   I said: "Specifically, if the time comes
24 when we actually meet with the DEA?"

Page 151

1    Q.   Okay. What was the DEA meeting that you
2 are referencing?
3    A.   I don't know because I say:
4        "Specifically, if the time comes when we
5 actually meet with the DEA?"
6        So I don't know what that was referring
7 to.
8    Q.   Do you know if a meeting with the DEA
9 occurred?
10   A.   I don't remember.
11   Q.   And so I take it you don't recall ever
12 attending any such meeting?
13   A.   I -- I don't recall ever attending a
14 meeting with the DEA, no.
15   Q.   But the end result of all of this analysis
16 is that Mallinckrodt stopped shipping its product to
17 distributors that were over indexed in Florida,
18 correct?
19   A.   That's correct. And I think that's a
20 really important thing to note, yes.
21   Q.   And when you say that's a -- a really
22 important thing to note, what -- why do you say that?
23   A.   Because we'd stopped shipping to people
24 that were shipping heavily into the State of Florida.

Page 152

1    Q.   And that's a good thing why?
2    A.   I don't know.
3    Q.   So it's important to note that simply
4 because it meant you stopped shipping but you don't
5 actually have any idea as to whether that was a -- a
6 positive thing or a negative thing?
7    A.   I -- I can't speak to what the -- the
8 repercussions of it were, no.
9    Q.   Okay.
10   MR. KAWAMOTO: So I believe we are up to
11 Exhibit 10.
12       (WHEREUPON, a certain document was
13        marked Mallinckrodt - Neely
14        Deposition Exhibit No. 10, for
15        identification, as of 01/07/2019.)
16 BY MR. KAWAMOTO:
17   Q.   So this is another exhibit. It's an
18 attach -- it's an e-mail and an attachment. The
19 e-mail is Bates numbered 289707 --
20   A.   Uh-huh.
21   Q.   -- and the attachment is 289708.
22   A.   Okay.
23   Q.   Okay. So here it is an e-mail between you
24 and Karen Harper.

Page 153

1    A.   Um-hum.
2    Q.   And you're responding to her request for
3 dollar of sales of oxy 15 and oxy 30 to Florida --
4    A.   Um-hum.
5    Q.   -- per year?
6    A.   Um-hum.
7    Q.   Do you know why Karen was requesting this
8 data from you?
9    A.   I don't know why she requested this data.
10 You'd have to ask Karen.
11   Q.   Do you have any understanding of -- of why
12 the focus on oxy 15 and oxy 30 as opposed to other
13 products that were being sent into Florida?
14   A.   As we spoke about earlier, so this is in
15 September of 2010, so this would have been after the
16 e-mail exchange we just referred to with Jeremy Stamer
17 talking about the Florida sales. So it would be my
18 understanding that we pulled this to understand how
19 the Florida sales had been trending within this
20 particular molecule.
21   Q.   And why focus on this particular molecule
22 as opposed to other -- to sales of other -- either
23 other opioid products or other oxy products to
24 Florida?

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    A.   Sure.
2    Q.   What -- what's special about oxy 15 and
3  oxy 30?
4    A.   So as we've spoken about earlier, we saw
5  that Florida was more heavily indexed on oxy 15 and
6  oxy 30-milligram.
7    Q.   Did Mallinckrodt ever have questions about
8  sales of oxy 15 or oxy 30 into other states in
9  addition to Florida?
10    A.   I don't recall questions around other
11  states.
12    Q.   Do you recall concerns about other states
13  being more heavily indexed towards oxycodone products
14  generally along the lines of similar questions for
15  Florida?
16    A.   I don't recall discussing other states.
17    MR. KAWAMOTO:  I'm happy to keep going or we can
18  break for lunch.  I'm not sure what time it is.
19    MR. TSAI:  Sure, it is about 12:15.  So how
20  about --
21    MR. KAWAMOTO:  Okay.
22    MR. TSAI:  -- we break and we can typically get
23  down about 40 minutes for lunch, 45 minutes.  Do you
24  want to come back at one?

Page 155

1    MR. KAWAMOTO:  Sure.  So one, okay, that's fine.
2    THE VIDEOGRAPHER:  All right.  Standby.  Remove
3  your microphones.
4    The time is 12:16 p.m.  Off the record.
5    (WHEREUPON, a recess was had
6    from 12:15 to 1:01 p.m.)
7    THE VIDEOGRAPHER:  We are back on the record.
8  The time is 1:01 p.m.
9  BY MR. KAWAMOTO:
10    Q.   Okay.  Good afternoon.  Okay.  So this is
11  marked as Exhibit, I think, 11.
12    (WHEREUPON, a certain document was
13    marked Mallinckrodt - Neely
14    Deposition Exhibit No. 11, for
15    identification, as of 01/07/2019.)
16  BY MR. KAWAMOTO:
17    Q.   So I've handed you an e-mail and
18  attachment.  The e-mail is marked MNK-T1 558193.  And
19  the attachment was produced in native and it is
20  MNK-T1 558195.
21    So my first question is:  What is the
22  analysis that's being performed or represented in this
23  attachment?
24    A.   Can you give me a second to read?

Page 156

1    Q.   Sure.
2    A.   Okay.
3    Q.   Of course.
4    A.   Yeah.
5    Okay.  I think I'm ready for you.
6    Q.   Great.  And so my first question is a
7  general one.  What's the analysis that's being
8  performed or represented in this attachment?
9    A.   Sure.
10    So in reading through detail oxy IR sales
11  for the three distributors referenced in the letter.
12  And let me see.  I don't know --
13    Q.   I don't -- I don't believe the letter was
14  attached to this e-mail.
15    A.   Yeah.
16    Q.   We just have the -- the spreadsheet.
17    A.   I was just looking at the spreadsheet to
18  even see if I could ascertain.  So I don't know what
19  the distributors are --
20    Q.   Uh-huh.
21    A.   -- or what that references, but
22  basically -- so it says an indirect customer sourcing
23  for more than two distributors.
24    And could you repeat your question again?

Page 157

1  I'm so sorry.
2    Q.   Sure.  I'm -- I'm just trying to
3  understand, what -- what is is -- what is the --
4    A.   Sure.
5    Q.   -- analysis that's being performed?
6    A.   Got it.
7    We were in a position where we had started
8  to -- so the chargeback data that we had had
9  historically was used for financial reasons.  It
10  was -- it served as the -- the delta that we talked
11  about between the WAC and the contract price and that
12  was the mechanism that that financial transaction was,
13  you know, executed on, and as we moved further into
14  analysis of the oxy sales, you know, and as evidenced
15  by the information we'd share prior to launch, we
16  started using -- digging in more to the chargeback
17  data to understand our -- the end -- the -- and by end
18  purchaser I'll say the pharmacy that's purchasing
19  through the distributor and --
20    Q.   And is that -- is that also known as the
21  indirect customer?
22    A.   It's not because your indirect customer is
23  actually -- it can be, yeah, yes, because your
24  indirect -- I don't know.  We wouldn't have ever

Page 158

1 called it -- it is your end purchaser. So it's the
2 customer that's purchasing or the pharmacy that's
3 purchasing through the wholesaler or through the
4 distributor.
5 Q. So your customer's customer?
6 A. Yes.
7 And so we were in a position, whereas we
8 had started to identify the heavier indexed sales
9 within the State of Florida, we started driving into
10 the actual pharmacies that were purchasing our product
11 and trying to get a gauge on -- the hard part was is
12 we could only see what a particular pharmacy was
13 buying from us, so we didn't have a viewpoint into
14 what their total purchases were, so it was tough for
15 us to ascertain if what they were buying from us was
16 relatively high or not because we didn't have the
17 total picture, but one way that we thought we could
18 start to see if there was a -- an issue with the
19 pharmacy is if you saw them pulling from -- pulling
20 our product but from multiple sources.
21 So from buying it from multiple spots
22 because -- and so it was just another way to try to
23 slice the data that we had visibility to. And that
24 was -- that was it, to see if we could identify any

Page 159

1 trends within -- within pharmacy purchasing.
2 Q. And why -- why focus on -- or what -- what
3 was the significance of a pharmacy getting your
4 product from multiple different sources?
5 A. So the -- and the thought was is that
6 distributor -- we were allocating to -- to people and
7 the -- and the thought was is they were allocating
8 to -- to pharmacies. So if a pharmacy had higher --
9 and this is our thought, again, but if they had
10 high -- if they had demand that a certain distributor
11 or wholesaler wouldn't service them, they are going to
12 another, they are going to multiple sources to clump
13 together to meet their demand.
14 And we just -- we didn't know if it was
15 going to be -- if it was the sign of a suspicious
16 behavior within a customer. It was just another way
17 of us trying to put together the data to identify
18 where there -- if -- if there was a trend within the
19 State of Florida in terms of the pharmacies that
20 were -- that were pulling our product.
21 Q. And pharmacies that were obtaining your
22 product from multiple different wholesalers would
23 be -- I mean, one -- one thing -- or you might want to
24 subject those to increased scrutiny, is that fair?

Page 160

1 A. Well, in -- in -- and I think we need
2 to -- to take a step back. So we -- we sold to the
3 wholesaler distributor and then they ultimately made
4 the decision to sell our product onto the pharmacy,
5 the pharmacy or -- the end -- the end purchaser. It
6 was -- they -- they were making that decision.
7 This was more for us to start to -- and I
8 don't -- again, I don't know what the three were, but
9 this was more for us to start to ascertain if there
10 was a trend within these particular people that we
11 were selling to in terms of -- and who they were then
12 selling to.
13 Q. And taking a step back, if you identified
14 pharmacies that you had questions about, one thing you
15 could do is ask the distributors that were providing
16 to those pharmacies about the pharmacy, is that
17 correct?
18 A. That would be a potential option.
19 Q. And do you recall if -- if Mallinckrodt
20 ever did that at one point?
21 A. In terms of providing lists of pharmacies
22 to wholesalers or distributors that we had concerns
23 about?
24 Q. Yes, or -- or asking a distributor about a

Page 161

1 specific pharmacy that you had concerns about.
2 A. Gotcha.
3 I -- I don't remember if we did or did not
4 do that.
5 Q. Do you think it would be a good thing to
6 do?
7 A. I don't know if it would or wouldn't be.
8 Ultimately how a distributor or a wholesaler sets up
9 their program and runs it is -- is their business
10 practice. So I'm not certain that it would or would
11 not be helpful.
12 Q. And in terms of how they -- how they set
13 up their program, you're -- you're referring in your
14 last answer to their sys -- their SOM program,
15 correct?
16 A. Sure.
17 Q. And how a distributor ran its SOM program
18 and the effectiveness of that program, though, that
19 was a concern for Mallinckrodt, wasn't it?
20 A. I don't remember.
21 Q. Do you believe it should have been a
22 concern for Mallinckrodt?
23 A. I think that that's a really subjective
24 question.

Page 162

1    MR. KAWAMOTO: This is going to be Exhibit 12.
2          (WHEREUPON, a certain document was
3          marked Mallinckrodt - Neely
4          Deposition Exhibit No. 12, for
5          identification, as of 01/07/2019.)
6  BY MR. KAWAMOTO:
7    Q.   So I've handed you another e-mail that's
8  Bates numbered MNK-T1 --
9    A.   Uh-huh.
10   Q.   -- 448850 --
11   A.   Uh-huh.
12   Q.   -- and it's a -- it is an e-mail from you
13 to Jeremy again.
14   A.   Uh-huh.
15   Q.   And I wanted to direct your attention to
16 the last sentence in the middle paragraph.
17   A.   Uh-huh.
18   Q.   Do you see that?
19   A.   I do.
20   Q.   And can you read that for me?
21   A.   Yes.
22        "We're getting pressure to nail down a
23 systematic way to monitor our end purchaser sales and
24 I'd like to get ahead of it."

Page 163

1    Q.   Okay. And in terms of pressure, who was
2  the pressure coming from?
3    A.   So, so I think it's important -- so this
4  was in the end of 2010. So we had a suspicious order
5  monitoring program in place that pertained to our --
6  our orders, our shipments to our -- to our customers.
7  By this point in time, the DEA had made statements to
8  Karen Harper, and -- and she could definitely talk to
9  you more about this, but in terms of knowing our
10 customer's customer and putting the onus on
11 manufacturers to understand the customer's customer.
12       And if you go back to the previous e-mail
13 where I had started to -- or we had started to drive
14 into the pharmacy level data and seeing where they had
15 made purchases from multiple wholesalers, that was --
16 we were trying to figure out how to possibly
17 understand how we monitored our customers' customers,
18 and at this -- at this point that's what this e-mail
19 is about.
20       The challenge, again, that I mentioned to
21 you is that we could only -- we only had visibility
22 into what our customers were purchasing from us. So
23 we had no way of knowing how much they were purchasing
24 from other -- other, you know, sources, whether -- you

Page 164

1  know, other manufacturers. And so it was challenging
2  for us to say that, you know, a -- a pharmacy was
3  purchasing too much just based on the limited data
4  that we had. And so this was -- this -- this first
5  exhibit, 5 -- or was it 558193 was one of the ways
6  that we were trying to get to the bottom of how to
7  tackle that question.
8        And then this, you can see, was five days
9  later, me reaching out to Jeremy who we've spoken
10 about before who was in market research to try to see
11 if there was a different way to come at the question.
12   Q.   But the, you know, one -- one way to do it
13 would be to use chargeback data. That was what was --
14 the last document was based on?
15   A.   Well, and we did use chargeback data. And
16 I think that that's what I'm -- I'm referencing to.
17 So we used chargeback data down to -- down to the
18 pharmacy level and that's what this information was in
19 this exhibit.
20       But we could only see what they were
21 buying of our product. And we had no way of
22 ascertaining if that was or wasn't a lot. For all we
23 knew that pharmacy could be close to a pain -- to like
24 a Hospice center. Or we -- we didn't have a -- a

Page 165

1  systematic way in terms of evaluating the data to
2  determine relatively speaking what was -- what was too
3  much for a particular pharmacy. We could look at the
4  chargeback data until we were blue in the face, but it
5  only told a portion, a small portion of -- of the
6  story.
7    Q.   And in terms of the chargeback data, do
8  you recall when you started looking at the chargeback
9  data for this purpose?
10   A.   For this purpose, I -- I don't -- I don't
11 know when it was -- it was -- sometime in 2010, it
12 appears but I don't know when, no.
13   Q.   And was it your idea to look at the
14 chargeback data for this purpose?
15   A.   I don't remember if it was my idea. I
16 worked so closely -- I -- I don't remember if it was
17 my idea or not.
18   Q.   And who -- who did you work closely with
19 on this project?
20   A.   I worked closely with -- well, I was
21 working closely with Karen because Karen Harper was
22 the -- was actually in charge of -- of the
23 communications with the DEA and also in charge of
24 compliance, so I was working closely with her.

Page 166

1    What I don't remember is what drove us
2  to -- because, I mean, to get to this level of -- of
3  the chargeback data, you really had to dig into --
4  into the reports, and I don't remember who or when we
5  had the idea to -- to do that.
6    Q.   And how long had you been collecting
7  chargeback data for?
8    A.   I -- we had -- I mean, we've always had
9  collected, we always had collected chargeback data. I
10  mean, that was something that we had always gotten
11  because that was a mechanism of our sales to the
12  wholesaler in terms of when we sold product to them.
13    So across the board, not just for oxy, but
14  for any product that we sold into a customer that
15  purchased at WAC, we collected chargeback data. How
16  we used the data and the level that we started
17  drilling into it is what changed.
18    So it was originally chargeback was just a
19  financial mechanism to -- to net the wholesaler down
20  to their contract price. As we moved into, you know,
21  as we moved into 2010, the end of -- and, again, I
22  don't know when exactly, I think that was when we
23  started to realize the information that we could
24  gather from the chargebacks to help us understand more

Page 167

1  of our business, but when that happened and who drove
2  it, I can't remember.
3    Q.   And the -- the information that you were
4  drilling down on --
5    A.   Uh-huh.
6    Q.   -- I mean, that was information that
7  Mallinckrodt had in its possession by virtue of the
8  chargeback system, right? It was -- it wasn't
9  something that they went out and gathered specifically
10  for this task, it's data that they were already
11  collecting just because of how the chargeback system
12  worked?
13    A.   It was -- I'm -- I wasn't in the
14  chargeback system group, so I never administered
15  chargebacks, so -- but from my understanding this was
16  information that was submitted via the chargeback.
17    Q.   Okay. For the -- and it was submitted by
18  the distributors because they needed their -- they
19  wanted their chargeback reimbursement?
20    A.   Well, they wanted to be netted down to
21  their contract price, yes.
22    (WHEREUPON, a certain document was
23    marked Mallinckrodt - Neely
24    Deposition Exhibit No. 13, for

Page 168

1    identification, as of 01/07/2019.)
2  BY MR. KAWAMOTO:
3    Q.   So, Ms. Neely, I'm handing you a document
4  that's Bates numbered MNK-T1 270081.
5    A.   Okay.
6    Q.   And it's title is "Talking Points for DEA
7  Albany and DEA St. Louis." And it is dated
8  November 1st, 2010.
9    Do you recall that one of our prior
10  exhibits referenced a possible meeting with DEA?
11    A.   Yes.
12    Q.   Do you know if -- if this -- if this was
13  the meeting that was being referenced?
14    A.   Do you -- can you give me an opportunity
15  to read through this, please?
16    Q.   Sure.
17    A.   Thank you.
18    Okay.
19    MR. TSAI: Dean, can I just note for the record
20  I noticed that the previous Exhibit 11 has a number of
21  instances where Mallinckrodt's in-house counsel Donald
22  Lohman as well as Pat Duft are on the e-mail. So I
23  just wanted to reserve -- preserve our rights. We are
24  going to look into whether that is subject to

Page 169

1  clawback.
2    MR. KAWAMOTO: Okay.
3    MR. TSAI: But I just wanted to note that for
4  the record.
5    MR. KAWAMOTO: Okay.
6  BY MR. KAWAMOTO:
7    Q.   And so, have -- Ms. Neely, have you had a
8  chance to review this document?
9    A.   I have.
10    Q.   And I believe a prior document referenced
11  a possible meeting with DEA roughly in this timeframe?
12    A.   Sure.
13    Q.   Do you recall that?
14    A.   The previous document that we reviewed,
15  yes, I do remember the e-mail, yes.
16    Q.   Okay. And so do you -- do you know if
17  this was that meeting?
18    A.   I -- you would assume so based on the
19  timing of that e-mail versus the date at the top of
20  this document. I don't know for 100 percent certain.
21    Q.   And does this refresh your recollection as
22  to whether you were present or involved in -- in this
23  meeting?
24    A.   I don't think that I was involved in this

Page 170

1 meeting.

2 Q. Okay. But it is -- it is discussing the
3 chargeback system which is something that you were
4 closely involved with along with Karen Harper, is that
5 correct?

6 A. In terms of the data, yes.

7 Q. And then it says:

8 "Direct customer data," it says "Cedardale
9 Distributors, Master Pharmacies and Keysource, Inc.
10 will not be receiving any oxycodone 30-milligrams."

11 Oh, I'm sorry. Let me put this up. It is
12 easier to follow.

13 A. Um-hum. I gotcha.

14 Q. "For the remainder of the calendar year."

15 A. Um-hum.

16 Q. Do you know why those three distributors
17 were identified in this doc -- or -- or why the -- why
18 the meeting focused on those three distributors?

19 A. I don't -- so those were the three
20 distributors that we chose not to sell the
21 30-milligram to anymore because of the -- the
22 disproportionate amount of sales going through the
23 State of Florida on that particular product. I
24 can't -- I did not create this document, so I can't

Page 171

1 tell you exactly why they were noted on here. My
2 assumption coming from my position would have been for
3 that reason.

4 Q. Okay. And so -- and the decision was made
5 that you did -- to completely cut off sales to these
6 three entities, is that -- is that correct?

7 A. According to this document, yes.

8 Q. Though it does say "remainder of the
9 calendar year."

10 Do you -- do you recall what happened, I
11 guess, in 2011?

12 A. I don't because I left the company in
13 January of 2011.

14 Q. Okay. Given these concerns, would you be
15 surprised if they resumed sales to these entities in
16 2011?

17 A. That would be pure speculation on my part.
18 I don't think that's going to help you.

19 Q. Well, given your knowledge of these issues
20 and your involvement in this process, would you have
21 recommended resuming sales to these entities in 2011?

22 MR. TSAI: Object to the form.

23 BY THE WITNESS:

24 A. There was obviously a decision, there was

Page 172

1 a reason that drove the decision in 2010 to stop
2 shipping them. So I do think that had I been with the
3 company in 2011 that this would have been something
4 that would have required further discussion about --
5 about resuming shipment to these three particular
6 customers.

7 BY MR. KAWAMOTO:

8 Q. Then for the indirect customer data, and I
9 take it what we are talking about here is -- or in
10 this context, this is the end purchasers, is that
11 accurate?

12 A. They reference the pharmacies, so, yes.

13 Q. Okay. It says: "Mallinckrodt has no
14 knowledge of these pharmacies or their business model.
15 Mallinckrodt is developing algorithms to be used in
16 evaluating dosage units purchased upon zip code and
17 other information."

18 A. Um-hum.

19 Q. And so these were algorithms that would be
20 used on pharmacies, correct?

21 A. That's correct.

22 Q. And were you involved in the development
23 of those algorithms?

24 A. So when you and I spoke about the previous

Page 173

1 two exhibits, so talking about running the chargeback
2 level data down to whether or not a pharmacy was
3 buying from more than one wholesaler, also looking at
4 the zip code information that -- in the e-mail to
5 Jeremy Stamer, so I was involved in the initial
6 discussions of how to develop that algorithm. This
7 was the -- and -- and this paragraph in particular is
8 what I was referencing to you in our previous -- our
9 previous conversation was about how to do this,
10 because we were -- it was challenging. We were trying
11 to figure out how to wrap our arms around it. It had
12 not been established by the time I left the company,
13 but they were definitely working on it and trying to
14 figure out how to do it.

15 (WHEREUPON, a certain document was
16 marked Mallinckrodt - Neely
17 Deposition Exhibit No. 14, for
18 identification, as of 01/07/2019.)

19 BY MR. KAWAMOTO:

20 Q. Okay. So, Ms. Neely, I've handed you an
21 e-mail marked MNK-T1 559192. And it also has two
22 attachments which I have also provided to you. One of
23 them is Bates numbered 559194.

24 A. Uh-huh.

Page 174

1    Q.   And I believe the -- the third one which
2  is an Excel spreadsheet is Bates numbered
3  MNK-T1 559195.
4    A.   Okay.
5    Q.   Okay.  So could you please review the
6  e-mail.
7    A.   Okay.
8    Q.   Okay.  And do you recall writing this
9  e-mail?  It is an e-mail from you to Mr. Borelli.
10   A.   I don't recall writing it, but I have no
11 doubt that I did.
12   Q.   Okay.  And why did you write this e-mail
13 to Mr. Borelli?
14   A.   So H.D. Smith was one of our wholesalers
15 and they, had according to this e-mail, shut down
16 several pharmacies or stopped selling to several
17 pharmacies and we had obtained that list and then I
18 was able to run sales based on that, and if you look
19 at the chart behind it, you can see the direct
20 correlation of the drop in H.D. Smith sales and the
21 increase to Keysource.  So it showed that Keysource
22 was picking up the business that H.D. Smith had walked
23 away from.
24   Q.   And was this of concern to you?

Page 175

1    A.   I don't know if concern is the right word,
2  but if you read my e-mail, it says we are not -- it
3  says:
4        "Attached is a list of the customers that
5  they either shut down or severely restricted.  We are
6  not suggesting that Keysource adhere to H.D. Smith
7  methods, but thought it might be helpful to have a
8  list of accounts that a similar account has deemed
9  suspicious."
10       It was more of a callout to Keysource in
11 terms of saying, Hey, H.D. Smith has deemed these not
12 acceptable -- or not customers they want to sell to
13 and, Keysource, you are starting to sell to them.  It
14 was more of a trying to help them because they
15 wouldn't have had visibility into H.D. Smith stopping
16 shipment to these particular customers.
17   Q.   And do you see at the bottom of the page,
18 you say:
19       "Steve asked H.D. Smith how they identify
20 these accounts and H.D. Smith noted the following" --
21   A.   Uh-huh.
22   Q.   -- and then you have five bullet points.
23   A.   Yes.
24   Q.   Can you -- can you read that first bullet

Page 176

1  point to me?
2    A.   Sure.
3        "C-II ratio to normal non-scheduled
4  product orders."
5    Q.   Okay.  And what is -- what did you mean by
6  that?
7    A.   I -- I didn't -- I -- that was not me that
8  wrote that, so that was verbatim it looks like from
9  H.D. Smith.
10   Q.   Okay.  Well, did you understand what that
11 meant?
12   A.   In terms of C-II ratio to normal
13 non-scheduled product orders?
14   Q.   Yes.
15   A.   They were saying as a percent to total in
16 terms of product orders for all products, seeing a
17 higher ratio of C-II products.
18   Q.   Okay.  And would you agree that that is --
19 that is information to consider in evaluating a
20 pharmacy?
21   A.   According to H.D. Smith, they felt like it
22 was information to consider.
23   Q.   And would you -- would you agree with
24 H.D. Smith in that regard?

Page 177

1    A.   I -- that was H.D. Smith's business
2  practice.  H.D. Smith also had the benefit of selling
3  the entire gamut of generic drugs, so outside of
4  Schedule IIs, Schedule III scheduled drugs, so they
5  had the benefit of having a really broad portfolio
6  that they were selling, so it was easier for them to
7  identify a high ratio or what seemed to be a high
8  ratio of Schedule II drugs to aggregate because they
9  had such a broad portfolio that they were selling.  So
10 in that sense it made sense that that would be the way
11 they would evaluate their orders to pharmacies.
12   Q.   Though if a distributor was only -- if a
13 pharmacy was only ordering, for example, oxy 30 from a
14 distributor --
15   A.   Um-hum.
16   Q.   -- wasn't that an issue to look at?
17   A.   So I --
18 MR. TSAI:  Object to the form.
19       Go ahead.
20 BY THE WITNESS:
21   A.   Yeah, and I -- yeah, no, that's fine, and
22 I think that the C-II ratio to non -- normal
23 non-scheduled orders, that's exactly what you just
24 said, right?

Page 178

BY MR. KAWAMOTO:

Q.    Yes, so that -- well, I guess I had a put
it in another way.
        If the C-II ratio to normal non-scheduled
orders was essentially, you know, 100 percent on the
CT-II side --

A.    Uh-huh.

Q.    -- that would be something to look at?

A.    I mean, I can't speak to that.  It is
challenging.  What if a pharmacy was right next to a
Hospice center and they -- they serviced only, you
know, the pain patients, I mean, it's -- it's tough to
say that that would be a red flag.  H.D. Smith
identified it as one.  I -- I -- I can't say or not
say if that -- if that would be.

Q.    Though you -- do you recall the -- the
Keysource e-mail?

A.    Are we talking about this e-mail in
particular?

Q.    No.  Let me -- let me try to --

A.    Oh, you are talking about my e-mail that
bulleted out the 94 percent to total sales --

Q.    Yes.

A.    -- and 100 percent for the past three

Page 179

months.

Q.    That e-mail.

A.    Yes.

Q.    I mean, one of the bases for cutting off
Keysource was that they were supplying a pharmacy
with -- they were -- they were -- while a pharmacy was
getting 100 percent oxy from --

A.    Uh-huh.

Q.    -- that was their only order, right?

A.    Um-hum.

Q.    So, isn't -- isn't that of concern?

A.    So are we talking about our business
practices or are we talking about H.D. Smith's
business practices?

Q.    Well, we are -- we are talking -- I don't
think we are talking about any particular business
practice.  I think we are talking as a general matter
and for purposes of -- of developing potential screens
to identify, you know, pharmacies that could be
problematic --

A.    Um-hum.

Q.    -- isn't it -- isn't one of the things
that it is reasonable to look at whether the pharmacy
is only purchasing, you know, oxycodone from a

Page 180

distributor?

A.    Well, we did look at that.  So I think the
answer -- you have the answer to that question, which
is, yes, we thought that was a reasonable item to
evaluate.

Q.    Okay.  And so, with respect to this first
bullet point, which is the C-II ratio to normal
non-scheduled product orders, you would agree that's
something to look at?

A.    Well, this is, again, H.D. Smith and the
way they do business, so I can't speak to how they do
business.  Within our book of business, that was
something that we evaluated.

Q.    Okay.  And so let's look at the second
bullet point.
        "If the pharmacy was closed door servicing
just physicians."
        What does that mean to you?

A.    That part I don't know.  I don't know.

Q.    Okay.  What about the third bullet point:
"Large pharmacies with excess orders."
        What is -- what is your interpretation
of -- or what did -- what did you mean when you copied
that into your e-mail?

Page 181

A.    I think it's really challenging for you to
have me interpret these words when they are not my
words, when I did just literally copy and paste them
into an e-mail.
        So if you could just ask me what does that
mean when you copied that in, it means I took somebody
else's words and I cut and paste them into an e-mail,
so it is really challenging for me to sit here and
tell you what the person meant by that.  It would be
my interpretation.

Q.    Okay.  So when I previously asked you if
you recalled writing this e-mail, you indicated that
you don't recall writing it, correct?
        Do you -- do you remember that?

A.    I said I did not recall writing this
e-mail.

Q.    Okay.  So then how do you know that you
just cut and pasted these?

A.    I said --

MR. TSAI:  Object to the form.

BY THE WITNESS:

A.    Yeah, and I said H.D. Smith noted the
following.  So it was me dropping in what H.D. Smith
said.

Page 182

BY MR. KAWAMOTO:

1 Q. And you dropped it in without any
2 understanding of -- of what it meant?
3 A. I was relaying what H.D. Smith had noted
4 within their -- within their order monitoring program.
5 Q. But you intended Mr. Borelli to pass this
6 information on to Keysource, did you not?
7 A. Keysource. I did.
8 Q. So doesn't that suggest that you believed
9 the information was reliable or at least should be
10 considered by them?
11 A. I don't think necessarily, no. I just
12 said this is what H.D. Smith used to identify these
13 accounts and they noted the following. I was
14 providing or relaying information.
15 Q. And so you had no opinion as to whether
16 any of these factors made any sense to look at?
17 A. I don't know because I've never worked for
18 a distributor before. I don't know how they do their
19 business model. So I don't know.
20 So the second bullet point, if the
21 pharmacy was closed door just servicing physicians, I
22 don't understand what that means. But if I worked for
23 a distributor and I operated in the sales environment,

Page 183

1 I might. So I made the assumption that H.D. Smith
2 understood that and by relaying it to Keysource they
3 would understand it too, but did I understand it, no.
4 Q. Well, but one of the things that you were
5 starting to do was look at pharmacies, you were
6 starting to look at the customers of your customer,
7 correct?
8 A. We were doing that, yes.
9 Q. Yes. Mallinckrodt was doing that and --
10 and you were heavily involved in that process?
11 A. I was involved in the collection of the
12 data, yeah.
13 Q. So as part of that process, weren't you
14 required to gain some famil -- some familiarity as to
15 what a distributor would look at with respect to a
16 pharmacy?
17 A. No.
18 Q. Well, then, how -- if DEA's -- if DEA's
19 suggestion to Mallinckrodt is you need to better
20 understand your customer's customer --
21 A. Um-hum.
22 Q. -- then doesn't that in part require you
23 to have some knowledge of what a distributor looks at
24 with respect to evaluating its customer? I mean, how

Page 184

1 else are you going to understand your customer's
2 customer?
3 MR. TSAI: Object to the form.
4 BY THE WITNESS:
5 A. Yeah, I don't think that that's how the --
6 how a distribution or a how a distributor evaluates
7 their customer. That's how they operate their
8 business.
9 In terms of knowing our customer's
10 customer, I did work with the data and I did provide
11 that to Karen and to that team, but from my
12 perspective in terms of these different qualifying
13 factors, this was not something that was in my
14 wheelhouse, no.
15 BY MR. KAWAMOTO:
16 Q. Well, was it at -- was it -- was there
17 another Mallinckrodt employee that this would have
18 been in their wheelhouse?
19 A. I can't speak to that. I don't know.
20 Q. So rereading your testimony, you say how
21 a -- how a distribution or how a distributor evaluates
22 their customer, that's how they operate their
23 business, and wasn't DEA essentially telling
24 Mallinckrodt that this was also now part of

Page 185

1 Mallinckrodt's concern --
2 MR. TSAI: Object to the form.
3 BY MR. KAWAMOTO:
4 Q. -- Mallinckrodt's business as well?
5 A. I can't speak to that. You would have to
6 talk to Karen Harper. She had the direct
7 conversations with the DEA.
8 Q. Well, but Karen Harper told you, did she
9 not, that the DEA expected Mallinckrodt to know its
10 customer's customer?
11 A. She did relay to me, yes.
12 Q. And so what did you understand that to
13 mean in terms of Mallinckrodt's obligations with
14 respect to its knowledge of pharmacies?
15 A. I think that that was where we were at the
16 beginning of whenever I left the company. So we were
17 in the process of trying to understand that and -- and
18 identify methodologies to understand our customer's
19 customer, and I think that, you know, in the documents
20 that you and I just reviewed within the previous
21 attachments, I think that that shows our first steps.
22 Now, in terms of this information, I -- I don't know
23 if or how this information was used in addition to the
24 data that I was pulling. I don't know that.

Page 186

1    Q.  Okay.  But the -- the first bullet point,
2  the C-II ratio to normal non-scheduled product orders,
3  that is information that would be helpful to
4  understanding your customer's customer, would you
5  agree with that?
6    A.  Yeah, because you -- absolutely, and I
7  think we reference that in the document when we talked
8  about Keysource.  So that was one item that we were
9  already starting to evaluate, but I think you were
10  talking more about the second bullet point, which I
11  don't have this much information on.
12    Q.  Okay.  Well, let's look at the third
13  bullet point then:  "Large pharmacies with excess
14  orders."
15    A.  Yep.
16    Q.  Is that something that would be useful in
17  terms of knowing your customer's customer?
18    A.  I don't know what large pharmacies with
19  excess orders means.
20    Q.  What about the fourth bullet point, which
21  is "no physician sales"?
22    A.  So, and I don't understand what that means
23  either, because if you look at that in conjunction
24  with bullet point number 2, they almost essentially

Page 187

1  contradict each other, so that part I don't
2  understand.
3      Again, this was from a distributor and it
4  was talking about the way they do business.  I
5  don't -- at this time did not understand and still
6  don't understand how distributors go to market.  So
7  for me this information did not necessarily make sense
8  in terms of the business that we were operating, but
9  my thought was is this would be good information to
10  relay to Keysource since we had seen the uptick in
11  demand from them.
12    Q.  And so looking at one of the attachments,
13  I think this is -- this is going to be -- and my
14  apologies, that's not Bates numbered, 559195.
15      So this is a list of pharmacies that
16  Key -- that, I'm sorry -- pharmacies that H.D. Smith
17  either cut off or severely restricted.
18      Is that -- are we on the same page?
19    A.  It doesn't have an exhibit number listed
20  on it, but I think we must be.
21      So I said:  "Attached is a list of
22  customers that they have either shut down or severely
23  restricted," so I would have to make the assumption
24  that this is the attachment.

Page 188

1    Q.  Yeah, I -- I'll represent to you that
2  that -- this is that list.
3    A.  Okay.
4    Q.  And this is a list that you wanted
5  forwarded to Keysource for their consideration?
6    A.  That's what I said in my e-mail.
7    Q.  Would you be concerned if Keysource
8  continued to do business with these pharmacies?
9    A.  I can't say if I would be concerned or not
10  concerned.  H.D. Smith had made the decision based on
11  their criteria to not sell to them.  Whether or not
12  H.D. Smith's business practices were overly
13  conservative or, you know, Keysource should have
14  adhered to them, I can't speak to that.
15    Q.  Well, and to be clear, these are -- these
16  are pharmacies that H.D. Smith had made the decision
17  not to sell to based on the grounds that they were
18  suspicious, correct?
19    A.  They were suspicious --
20    MR. TSAI:  Object to the form.
21      Go ahead.
22  BY THE WITNESS:
23    A.  Yeah, and they were suspicious according
24  to H.D. Smith.

Page 189

1  BY MR. KAWAMOTO:
2    Q.  Yes.  And so --
3    A.  Which doesn't necessarily mean they were
4  universally suspicious.  They were suspicious to
5  H.D. Smith.
6    Q.  Well, but why would -- why would a
7  pharmacy on this list be suspicious to H.D. Smith but
8  not suspicious to anyone else?
9    MR. TSAI:  Object to the form.
10  BY THE WITNESS:
11    A.  Yeah, I don't know because I didn't work
12  at H.D. Smith, so I don't know.
13  BY MR. KAWAMOTO:
14    Q.  So if it turned -- well, let's look at the
15  other attachment, which I believe is a graph.  It's
16  modeled -- or it's Bates numbered 559194.
17      Do you -- you see that?
18    A.  I do.
19    Q.  And so the squares are Keysource Medical
20  and the -- the dots are H.D. Smith wholesale?
21    A.  That's correct.
22    Q.  So what is -- what is this graph showing?
23    A.  So this graph is in -- and I think the
24  e-mail is evidence, you know, backing this up.  It

Page 190

1  says:
2       "Per our conversation please find attached
3  the graph showing the transition of oxy sales from
4  H.D. Smith to Keysource as of the last several
5  months."
6       And so it was -- it was showing the
7  transition from -- of these pharmacies from H.D. Smith
8  to Keysource and that was graphically depicting that.
9       Q.  Okay.  And so the fact that -- that
10 Keysource was doing business with a large number of
11 pharmacies that H.D. Smith concluded were suspicious
12 wasn't a concern for Mallinckrodt?
13      A.  Again, I didn't work for H.D. Smith and so
14 I can't speak to how or why, what their business
15 practices were.
16      Q.  So the answer, then, is no, Mallinckrodt
17 was not concerned that Keysource was doing business
18 with a large number of pharmacies that H.D. Smith
19 declined to do business with or severely restricted
20 that business with because they were suspicious?
21      MR. TSAI:  Object to the form.
22 BY THE WITNESS:
23      A.  Yep.  H.D. Smith made decisions not to
24 sell to these accounts and Keysource was selling to

Page 191

1  those accounts, and we felt like we should share with
2  Keysource that another one of its competitors had made
3  the decision not to service them.
4       Now, why H.D. Smith did that and whether
5  Keysource should have adhered to the same -- same
6  approaches, I can't speak to that.
7  BY MR. KAWAMOTO:
8       Q.  And so you had no concerns at all that
9  Mallinckrodt's products via Keysource were making
10 their way to a large number of pharmacies that
11 H.D. Smith concluded were suspicious, correct?
12      A.  I --
13      MR. TSAI:  Object to the form.
14 BY THE WITNESS:
15      A.  Yeah.  And I think you know, and just in
16 all due respect, I think we -- we did because we
17 eventually stopped selling to Keysource, so we
18 notified them and said, Hey, these are accounts that
19 appear to be -- you know, that H.D. Smith has deemed
20 suspicious.
21      We don't know what their business
22 practices are or why, communicated that, and you can
23 see this is in August, and then by the end of
24 October we had stopped selling to them.  So I don't

Page 192

1  really see where your line of questioning is trying
2  to -- to take me.
3  BY MR. KAWAMOTO:
4       Q.  Well, I guess my -- my line of questioning
5  is I'm just trying to understand whether Mallinckrodt
6  was concerned that Keysource was continuing to do
7  business with -- with customers that H.D. Smith cut
8  off --
9       A.  Well, the fact that --
10      Q.  -- that's all I'm asking.
11      A.  Yeah, and I think that's a great question.
12      The fact that we stopped selling to
13 Keysource within the next two months after this
14 e-mail, doesn't that essentially answer the question
15 that you are asking me?
16      Q.  I believe it does.
17      So going beyond Keysource, if there were
18 other distributor companies that were continuing to do
19 business with -- with pharmacies on this list --
20      A.  Um-hum.
21      Q.  -- that would be cause for concern?
22      MR. TSAI:  Object to the form.
23 BY THE WITNESS:
24      A.  Yeah.  I mean, all I can say is that

Page 193

1  within two months of this e-mail, so as of
2  November 1st, 2010, which is the date of the talking
3  points for DEA Albany and DEA St. Louis, that we had
4  stopped selling to Keysource, we had stopped selling
5  to Cedardale and we had stopped selling to Masters.
6       So I think that the fact that that was two
7  months post this shows that we addressed it and I
8  think answers your question about whether or not we
9  had concerns.
10 BY MR. KAWAMOTO:
11      Q.  Okay.  And so if another distributor,
12 though, had taken up essentially Keysource's business
13 by servicing these customers, that's something that
14 Mallinckrodt would have considered in evaluating its
15 relationship with that distributor, is that --
16      A.  Um, I can't --
17      Q.  -- or should have considered it?
18      A.  I can't speak to these pharmacies in
19 particular, but we did evaluate sales for Cedardale,
20 Masters and Keysource, and because of the
21 disproportionately high sales into the State of
22 Florida in relation to their total business, we did
23 make the decision to stop shipping them.
24      Q.  And the last bullet point is: "Pharmacy

Page 194

1 secondary supplier relations."
2     Do you -- do you have any understanding of
3 what that means?
4     A.   I have no idea what that means.
5     Q.   Sorry.  One more question on this.
6     So I understand that you -- you understand
7 what some of these bullets mean and -- and don't
8 understand what other mean -- what others mean.  In
9 terms of developing a list to consider when
10 ascertaining whether a pharmacy was suspicious, you
11 know, and this -- this would be consistent with the --
12 the request or the requirement that Mallinckrodt know
13 its customer's customer --
14     A.   Um-hum.
15     Q.   -- other than this C-II ratio, would you
16 have any other factors on that list?
17     MR. TSAI:  Object to the form.
18     Go ahead.
19 BY THE WITNESS:
20     A.   Yeah.  And you would have to -- you would
21 have to talk to Karen Harper.  She was ultimately in
22 charge of the compliance and the suspicious order
23 monitoring and in -- and creating the different
24 criteria for the customer's customer and I -- she

Page 195

1 would have to speak to that.
2     (WHEREUPON, a certain document was
3      marked Mallinckrodt - Neely
4      Deposition Exhibit No. 15, for
5      identification, as of 01/07/2019.)
6 BY MR. KAWAMOTO:
7     Q.   Okay.  So this is another e-mail Bates
8 numbered MNK-T1 265441.  This is now an e-mail from
9 you to Jim Rausch cc'ing Karen Harper.
10     A.   Um-hum.
11     Q.   If you can take a look at it and let me
12 know when you are done reviewing, that would be great.
13     A.   Okay.
14     Q.   Okay.  And I just -- I have a question for
15 you about this highlighted section.
16     A.   Okay.
17     Q.   Okay.  So could you please read that?
18     A.   Sure.
19     "Then, I looked at where their sales
20 increase was coming from (i.e., pharmacies, clinics,
21 doctors, et cetera), as I was concerned that they
22 might be picking up the portion of Sunrise's and
23 Harvard's business that we want to stay away from
24 (i.e. doctors, pain clinics)."

Page 196

1     Q.   Okay.  Why did you want to stay away from
2 doctors and pain clinics?
3     Well, let's -- let's take the first
4 category.
5     A.   Sure.
6     Q.   Why did you want to stay away from
7 doctors?
8     A.   Um, I --
9     MR. TSAI:  Object to the form.
10     Go ahead.
11 BY THE WITNESS:
12     A.   Yeah, no, that's -- so in terms of Sunrise
13 and Harvard, they had had their DEA licenses taken and
14 their sales were primarily going into doctors and pain
15 clinics.  Whenever we saw the increase in Cedardale
16 sales, we were trying to understand where it was
17 coming from and I wanted to ensure, because Sunrise
18 and Harvard were no longer able to sell, I wanted to
19 ensure that the business that they were servicing,
20 because it had been deemed, you know, not proper,
21 obviously, because the DEA took their license, I
22 wanted to ensure that that business wasn't shifting to
23 another customer of ours, in particular the doctors
24 and the pain clinics.

Page 197

1 BY MR. KAWAMOTO:
2     Q.   Okay.  And so -- and this concern wasn't
3 just -- well, stepping back a moment, the general
4 concern with a -- a heavy indexing towards doctors and
5 pain clinics --
6     A.   Um-hum.
7     Q.   -- wasn't limited to Cedardale, if a -- if
8 another distributor had a -- a -- was shipping most of
9 its product to doctors or pain clinics, that would
10 have been a cause of concern, right?
11     A.   Not necessarily.  We were -- we were
12 focused on the demand that had been left open by
13 Sunrise and Harvard which happened to be doctors and
14 pain clinics.
15     Q.   So just so I understand this, though, so
16 you were concerned that Cedardale was taking over
17 Sunrise's doctors and pain clinics?
18     A.   That's what I said, yes.
19     Q.   So what -- why -- why wouldn't -- or --
20 well, strike that.
21     What was it about doctors and pain clinics
22 that concerned you?
23     A.   I don't know if there was concern
24 specifically about doctors and pain clinics as a rule

Page 198

1  of thumb, but Sunrise and Harvard's business was
2  doctors and pain clinics and they were the ones who
3  had their DEA license pulled. So my concern here was
4  that we hadn't -- we are obviously not selling product
5  to them anymore because of the -- the DEA license
6  being pulled. However, we were continuing to sell to
7  Cedardale and we were trying to ascertain if
8  Cedardale's increase in sales was a result of the
9  vacuum that had been created by Sunrise and Harvard
10 going out of the market, and because they primarily
11 serviced doctors and pain clinics, I noted that in the
12 e-mail.
13     Q.   And so if it turned out Cedardale was
14 serviced doctors but it was servicing doctors that
15 were different than Sunrise and Harvard, that would --
16 that would not have been of concern to you?
17     MR. TSAI: Object to the form.
18     Go ahead.
19 BY THE WITNESS:
20     A.   Yeah, I don't -- again, Cedardale was one
21 of the ones that we did end up shutting down within,
22 let's say, two months of this, so I obviously didn't
23 find anything in this particular analysis, but -- and
24 I can't speak to what exactly happened in those two

Page 199

1  months, but we obviously found something that was
2  concerning with regards to Cedardale to the point that
3  we stopped shipping them.
4  BY MR. KAWAMOTO:
5      Q.   Well, you shopped -- you stopped shipping
6  to them for 2010, correct?
7      A.   According to the document that was
8  published in 2010, we had stopped shipping to them for
9  2010, and I think that you and I had already settled
10 on the fact that I don't know what happened in 2011
11 because I was not with the company anymore.
12     Q.   Uh-huh.
13         So in terms of the concern with doctors
14 and pain clinics, though, were those -- were those two
15 categories that you were concerned with?
16     A.   I think that you and I have already
17 discussed that, and so --
18     Q.   Sure. And I -- I'm still not clear on it,
19 though.
20     A.   Obviously, because you keep asking me.
21     Q.   Uh-huh.
22     A.   So in this particular e-mail, I said:
23         "As I was concerned that they might be
24 picking up the portion of Sunrise's and Harvard's

Page 200

1  business," and for those two particular accounts they
2  were servicing doctors and pain clinics. I don't know
3  if doctors and pain clinics were an issue as a broad
4  spectrum, but for Sunrise and Harvard business, the
5  doctors and pain clinics they were servicing obviously
6  created issues because they got their DEA license
7  pulled.
8          When I saw an increase with Cedardale's
9  sales, my concern was that was an increase as a result
10 of those doctors and pain clinics going to Cedardale.
11 I ran the chargeback data and I could see all of the
12 sales were going through independent retail which then
13 confirmed to me that they were not picking up Sunrise
14 and Harvard's business.
15     Q.   And so if you had a distributor that,
16 let's say, was shipping primarily to West Virginia --
17     A.   Um-hum.
18     Q.   -- and 100 percent of its -- its
19 clientele, its customers, were pain clinics, that
20 wouldn't necessarily be a -- a concern because they
21 weren't Harvard or Sunrise's pain clinics?
22     A.   Why it's --
23     MR. TSAI: Object to the form.
24 BY THE WITNESS:

Page 201

1      A.   Yeah.
2  BY MR. KAWAMOTO:
3      Q.   That's what I'm asking.
4      A.   Yeah, I think that that's a really, really
5  challenging question to answer. First of all, you
6  noted West Virginia specifically, and I don't know
7  anything about the West Virginia market. I -- I -- I
8  don't think I can answer that question.
9      Q.   Well, so let me phrase this another way.
10         The fact that a distributor does, let's
11 say, 90 percent of its business with pain clinics --
12     A.   Um-hum.
13     Q.   -- is not necessarily a cause of concern
14 for you?
15     A.   Whenever I was writing this e-mail, I
16 don't -- I don't -- I don't know. I don't -- I can't
17 say that it would or wouldn't be.
18     Q.   Well, so, in terms of whether the doctors
19 and pain clinics as a categorical matter were of
20 concern, I mean, that -- that's what I'm -- I'm trying
21 to get at.
22     A.   I understand what you are trying to get
23 at. And I'm telling you that in this particular
24 e-mail I was focused on the shift from Sunrise and

Page 202

1 Harvard to potentially Cedardale, and in this
2 particular e-mail I was addressing the fact that that
3 was not what was happening.
4 Q. And so is your testimony then that you
5 didn't have any categorical concerns about doctors or
6 pain clinics, you were only concerned about the
7 specific doctors and pain clinics that were serviced
8 by Sunrise and Harvard?
9 A. From this particular e-mail, that is the
10 case.
11 Q. Okay. So if you had another distributor
12 that had a large percentage of pain clinics in Florida
13 but they were pain clinics that were different than
14 Sunrise or Harvard's, that wouldn't have been of
15 concern to you?
16 MR. TSAI: Object to the form.
17 BY THE WITNESS:
18 A. Yeah.
19 BY MR. KAWAMOTO:
20 Q. I want to make sure I understand that
21 testimony.
22 A. No, I -- I don't -- I don't -- I can't
23 speak to if it would or wouldn't be.
24 Q. Well, what -- what information would you

Page 203

1 need to determine whether or not it's problematic for
2 a distributor to be shipping primarily to pain
3 clinics?
4 A. Yeah, I -- I don't know. I will tell you
5 that this was August of 2010 and this was when we were
6 just at the infancy of starting to dive into this
7 information and understand. I left in -- in 2011.
8 What I will say is I can't speak categorically like
9 you want me to to concerns about doctors and -- and
10 pain clinics. What I will say is we started to
11 identify that there was issues within this particular
12 product and we took steps to stop shipping it within
13 the next two months.
14 So whether or not that's driven by doctors
15 or pain clinics, I can't speak to that, but we
16 definitely identified problem -- what we perceived to
17 be problem distributors.
18 Q. And your basis for identifying the problem
19 distributors largely turns --
20 A. It hinged on Florida, but I can't
21 specifically say if it hinged on doctors or pain
22 clinics, which is your question to me.
23 Q. Well, and it hinged both on Florida and
24 the -- those customers in Florida, right?

Page 204

1 A. It hinged on Florida and the particular
2 wholesalers that were selling a disproportionate
3 amount of oxycodone into the State of Florida.
4 Q. Okay. And you don't recall concerns with
5 any other state other than Florida?
6 A. Florida is -- I mean, seriously, this has
7 been eight years ago. The thing that -- that sticks
8 with me is Florida. I can't remember discussing other
9 states.
10 Q. Now, just in terms of the mechanics of
11 what's happening in this e-mail, so Jim Rausch, who
12 we've discussed, has identified an order that has been
13 flagged as suspicious.
14 Is that accurate?
15 A. He is asking why there is an increase in
16 their usage.
17 Q. Yes. So this -- this order -- well,
18 how -- how did this order come to Jim's attention?
19 A. I -- I can't speak to that. I don't know.
20 It says:
21 "We just received another order from
22 Cedardale." It says: "Did you find anything on their
23 increased usage?"
24 So Jim is seeing an increase in their

Page 205

1 orders versus what they historically purchased, it
2 appears.
3 Q. Are you familiar with the term "peculiar
4 order"?
5 A. I am.
6 Q. Okay. What does that mean to you?
7 A. It was part of the suspicious order
8 monitoring process.
9 Q. Okay. And was part of Jim Rausch's role
10 to identify peculiar orders and then gather
11 information on those orders?
12 A. Jim was in customer service, so he was
13 processing the orders, yes.
14 Q. And so he is identifying -- or an order
15 has been identified for him as peculiar, and he is now
16 coming to you to ask for additional information on
17 that order, is that --
18 A. Well, I --
19 Q. -- is that accurate?
20 A. -- I don't see that we noted it as
21 peculiar in here. He sent over an Excel attachment
22 and he asked me if we found out anything on their
23 increased usage. So he is asking about their increase
24 in usage. I don't see peculiar being referenced in

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1  here.
2      Q.   Okay.  But this is an order that was being
3  subject to additional scrutiny, was it not?
4      A.   It was an order that he had questions on,
5  so he was following up on.
6      Q.   And who had the authority to determine
7  whether or not to either fill the order or -- or -- or
8  decline it?
9      A.   It was a combination of factors.  I would
10 be evaluating it from a business perspective to see
11 and to give him my feedback in terms of whether or not
12 from a business perspective it made sense.  But
13 essentially he would be adhering to the suspicious
14 order monitoring process, and I don't remember the
15 details of that.
16     Q.   Now, when you say you were evaluating it
17 from a business perspective, though, the -- top
18 e-mail that you drafted --
19     A.   Uh-huh.
20     Q.   -- and sent to Jim, I mean, that -- those
21 are compliance concerns, right, that's not a business
22 perspective?
23     A.   So maybe business perspective isn't
24 necessarily the right word, but from a data

Page 207

1  perspective I was able to pull the data and start to
2  help him tell the story about what was happening
3  within that particular customer.
4      Q.   And so when you indicated that you were
5  evaluating the order from a business perspective --
6      A.   I mean, I think we agreed it wasn't
7  necessarily business, that we were going to say from a
8  data perspective.
9      Q.   Yes.  And I'm -- I'm trying to understand
10 what it means to evaluate an order from a data
11 perspective.
12     A.   Well, I had the visibility into it, so I
13 was able to pull -- pull the data.  So it says here:
14         "I evaluated everything we have shipped
15 them from an historical perspective versus all
16 chargebacks we have received."
17         So I was able to run that data to look and
18 see, look at the numbers, look at the data.
19     Q.   But there was also some quantitative
20 aspect to this because in addition to looking at the
21 numbers, you were also looking at the identity of
22 the -- of the new business that Cedardale was
23 gathering, correct, because you concluded that
24 Cedardale wasn't taking over the doctors and plain --

Page 208

1  pain clinics from Sunrise and Harvard, correct?
2      A.   Yeah, that's correct.
3      Q.   So it wasn't just looking at numbers, it
4  was also making a decision about whether the --
5  whether you were comfortable with the pharmacies or
6  with the -- the end purchasers that were being
7  serviced by the distributor, correct?
8      A.   It was me making a statement to him that
9  the business that they were picking up was not coming
10 from Sunrise or Harvard's lost business as a result of
11 the DEA license being taken away.
12     Q.   And if it had come out the other way,
13 meaning you had determined that the business was
14 coming from the doctors and the pain clinics,
15 presumably you would have stopped the order, correct?
16     A.   It would have raised additional concerns
17 about those orders and about that customer.
18     Q.   Okay.  So who would have had the authority
19 to stop the order at that point?
20     A.   I don't remember who had the authority.
21 There was a process that was in place that we adhered
22 to, but I honestly can't remember who the ultimate --
23 what the ultimate authority was for this.
24     Q.   But your e-mail to Jim is that you don't

Page 209

1  have any concerns about this order, is that the
2  substance of it?
3      A.   From my perspective, I was letting him
4  know that the sales that we were seeing an increase on
5  for Cedardale were not the result of Sunrise and
6  Harvard being unable to ship to those customers, so
7  they were shifting to Cedardale.
8      Q.   Okay.  And presumably you didn't have any
9  other concerns about the increase -- the increase in
10 order size, right?
11     A.   Again, I stated in here that the order
12 increases had not come from the lost business at
13 Sunrise and Harvard and it was a result of independent
14 retail.
15     Q.   Yes.  So you -- you didn't have any
16 concerns with the increase?
17     A.   I noted that I didn't have concerns about
18 it coming from Sunrise and Harvard.
19     Q.   And so do you know if -- if anyone else --
20 if anyone else reviewed the increase in the order
21 size?
22     A.   I don't remember what the process was in
23 terms of who else would have been evaluating this
24 after I sent this e-mail.

Page 210

1  Q.  And do you know if you ever ascertained
2  who the customers were that Cedardale was now
3  servicing?
4  A.  I don't know that we did.  I can't speak
5  to that.
6  MR. TSAI:  We are past the top of the hour.  Can
7  we take a quick break?
8  MR. KAWAMOTO:  Sure.
9  THE VIDEOGRAPHER:  Okay.  Standby, please.
10  Remove your microphones.
11  Okay.  The time is 2:06 p.m., going off
12  the record.
13  (WHEREUPON, a recess was had
14  from 2:06 to 2:22 p.m.)
15  THE VIDEOGRAPHER:  Okay.  We are back on record.
16  The time is 2:22 p.m.
17  MR. KAWAMOTO:  Okay.  So I'd like to mark this.
18  (WHEREUPON, a certain document was
19  marked Mallinckrodt - Neely
20  Deposition Exhibit No. 16, for
21  identification, as of 01/07/2019.)
22  BY MR. KAWAMOTO:
23  Q.  So this is an e-mail chain that you are on
24  the bottom e-mail.

Page 211

1  A.  Uh-huh.
2  Q.  It's from Cathy Stewart to Karen Harper
3  and then the bottom e-mail that you are on, it's from
4  Cathy Stewart to Karen Harper, Bill Ratliff and you
5  are cc'd along with various other people.
6  A.  Okay.
7  Q.  The Bates number is MNK-T1 290041, so if
8  you could review the -- cover e-mail, please.
9  A.  Sure.
10  Okay.
11  Q.  Okay.  So this is a 2009 e-mail and its
12  title is "Sunrise Chargeback Summary."
13  Do you recall receiving this e-mail?
14  A.  I -- I don't, but I see my name on there,
15  so...
16  Q.  Okay.  And as -- as you will recall,
17  Sunrise was one of the distributors that the DEA shut
18  down, right?
19  A.  Okay.  Uh-huh, yes.
20  Q.  Okay.  So looking at the -- the top
21  e-mail, it says:  "Here is the other file...the doctor
22  in question is column CX."
23  A.  Okay.
24  Q.  Do you see that?

Page 212

1  And then if you look at the chargeback
2  data --
3  A.  Um-hum.
4  Q.  -- that doctor is identified, and the
5  Bates number for that one is going to be 290048 --
6  A.  I've got it.
7  Q.  -- is the page, for column CX.
8  A.  Uh-huh.
9  Q.  And, actually, taking a step back, do you
10  know why this spreadsheet summary or this chargeback
11  summary was prepared?
12  A.  I don't remember, no.
13  Q.  Okay.
14  If I were to tell you that it was prepared
15  in connection with an audit that was being performed
16  on Sunrise, would that -- would that jog your
17  recollection at all?
18  A.  I have the recollection of us doing an
19  audit on Sunrise, but I, again, don't know -- I don't
20  remember this particular document or information.
21  Q.  Now, looking to -- to column CX and the
22  doctor that's highlighted?
23  A.  Um-hum.
24  Q.  You'll see that it's Dr. Schultz.

Page 213

1  A.  Okay.
2  Q.  Are you familiar with Dr. Schultz?
3  A.  No.
4  Q.  Okay.  Would it surprise you to -- to know
5  that he is currently serving a -- a lengthy prison
6  sentence in a -- in a Florida prison?
7  A.  I -- I guess it would surprise me.  I
8  don't know him, so.
9  Q.  Okay.
10  A.  Okay.
11  Q.  So Dr. Schultz, though, has been flagged.
12  A.  Okay.
13  Q.  And his -- his purchase is .6 kilograms
14  or, I think, 612 -- I'm -- I'm not sure exactly what
15  the units are.
16  Do you -- do you know what the units are
17  for this?
18  A.  Well, it says in her e-mail:
19  "The subject physician purchased the
20  equivalent of .6" and it says "kg," which means
21  kilograms.
22  Q.  Uh-huh.
23  A.  So if you look at your column CX that you
24  are referring to, this says 612,000, so it is the .6

Page 214

1 kilograms referenced in the e-mail.
2    Q.   And what is the 612,000, is that tablets,
3 is that molecules, et cetera?
4    A.   It is the kilos in the e-mail, .6.
5    Q.   Oh, no, I -- I -- it -- it's .6, but
6 that's -- so that's 612 --
7    A.   So she --
8    Q.   -- grams?
9    A.   -- she divided it -- I'm assuming.  I'm
10 not really good at conversion of metrics, but that's
11 your -- that's your -- I guess it is 612,000, would
12 that be grams, and it converts to .6 kilos.  I'm not
13 good at this type of math.
14    Q.   Okay.  Fair enough.
15    A.   But this is the -- this is -- if you look
16 at your e-mail that you gave me to me, the .6 kilos in
17 the last line ties to what's in column CX row 3.
18    Q.   Okay.
19        Now, if you will look at column CW that is
20 right next to Schultz.
21    A.   Uh-huh.
22    Q.   Do you see that's -- that's Dr. Shook?
23    A.   I see that, yes.
24    Q.   Okay.  And his -- the amount he is

Page 215

1 ordering is essentially 12.6 kilograms or 12 -- 12
2 million, you know, whatever that --
3    A.   Grams.
4    Q.   -- unit is.
5    MR. TSAI:  I think it is milligrams.
6    THE WITNESS:  Is it milligrams?
7    MR. TSAI:  Just to clear the record.
8    THE WITNESS:  Thank you.
9 BY MR. KAWAMOTO:
10    Q.   Fair enough.
11        So he is ordering 12 million milligrams of
12 product, which, as you -- you can note from the e-mail
13 is the -- that is the -- largest out of all of
14 these customers.
15    A.   Um-hum.
16    Q.   Isn't that large number of concern?
17    A.   I don't know how many kilograms serviced
18 the entire oxy market.  So I don't know from a
19 relative measure if 12.6 kilograms is -- is a lot.
20    Q.   But in terms of their -- all -- all of
21 Sunrise's other customers, 12.6 kilograms is the most,
22 isn't that -- that's what the -- the cover e-mail
23 indicates, right?
24    A.   Yeah, the e-mail says the equivalent of

Page 216

1 12.6 kilograms and that's nearly 2 kilo grams more
2 than the next closest purchaser.
3    Q.   Okay.  And so, you know, they -- they
4 flagged Dr. Schultz for, you know, 612 milligrams.
5    A.   Uh-huh.
6    Q.   You know, Dr. Schultz is at 12,597,000 --
7    A.   Uh-huh.
8    Q.   -- milligrams?
9    A.   Um-hum.
10    Q.   You know, doesn't -- shouldn't that raise
11 a red flag?
12    A.   I -- and I don't know that it didn't.  So
13 if you -- if you look at the e-mail, it says:
14        "Here is the other file.  The doctor in
15 question is in column CX."
16        So it -- it indicates to me that this
17 e-mail is part of a larger conversation, so I don't --
18 it's -- I don't know.  Because otherwise we wouldn't
19 have just flagged Schultz in column CX for having
20 purchased .6 kilos, you are correct, because the guy
21 right next to him purchased 12.6.
22        So it -- it leads me to believe that there
23 was some other questions being asked about
24 Dr. Schultz, perhaps related to why he is incarcerated

Page 217

1 now, and we had pulled the data to try to give
2 information for that.  And, again, this is assumptions
3 because I only have this one e-mail here.
4    Q.   Okay.  But in -- in -- I mean, just
5 looking at this chargeback data --
6    A.   Uh-huh.
7    Q.   -- if you were going to perform an audit
8 of Sunrise, isn't one of the -- the questions that you
9 would ask in that audit, you know, what was going on
10 with Dr. Shook, just because of the -- the large
11 volume of his -- of his order?
12    A.   While I would agree with you 100 percent
13 that the volume that he purchased is large in
14 comparison to the other doctors on this list, that
15 ultimately would be Karen Harper determining what
16 kinds of questions would be executed during an audit
17 of Sunrise.
18    Q.   Well, but wouldn't -- would -- would you
19 agree that the sheer volume, you know, 12.6 kilograms,
20 that volume in and of itself is -- at minimum makes
21 this -- puts it in the -- the -- the suspicious or the
22 peculiar category that requires further inquiry?
23    A.   Not necessarily.  And I think what you and
24 I just talked about is I don't know what the total

Page 218

1  market size of oxy is in aggregate, so I don't know
2  what 12.6 is relative. I think what this does tell me
3  is he is purchasing the most product through Sunrise
4  and he obviously is -- is pulling the most product
5  through Sunrise, but as it relates to 12.6 kilograms
6  being a lot, I -- I don't have a reference point for
7  that.
8      Q.   Okay.  And so what -- what other data,
9  then, would you -- would you want to gather to
10 determine whether or not you -- you, you know,
11 Dr. Shook should be subject to additional inquiry?
12     A.   I -- I think that that would be a question
13 that you would need to ask Karen Harper.  She was the
14 one that was in charge of performing the audits for --
15 for our wholesalers and distributors.
16     Q.   Okay.
17     A.   So in terms of looking at this from a
18 marketing perspective, if I were to look at the
19 numbers, I would agree that Dr. Shook is purchasing
20 the most across all of these doctors and that would
21 warrant to me a second look, but I don't know what was
22 actually done, nor do I know how the audit would
23 actually be performed.
24     Q.   Oh, I'm sorry.  In going back to that

Page 219

1  prior exhibit, you don't -- you don't have any
2  knowledge as to whether or not Dr. Shook was part of
3  the audit that was performed on Sunrise, do you?
4      A.   I was not -- no, I do not know.
5          (WHEREUPON, a certain document was
6                marked Mallinckrodt - Neely
7                Deposition Exhibit No. 17, for
8                identification, as of 01/07/2019.)
9  BY THE WITNESS:
10     A.   Thank you.
11 BY MR. KAWAMOTO:
12     Q.   Okay.  So this is a letter from the Drug
13 Enforcement Administration to Mallinckrodt and its
14 Bates number is MNK-T1 421084.
15         So could you take a -- a minute to review
16 this letter?
17     A.   Sure.
18         Okay.
19     Q.   So this is a letter from the DEA to
20 Mallinckrodt.
21         Do you recall ever reviewing this?
22     A.   I don't remember.
23     Q.   So you don't have a recollection of
24 ever -- of ever receiving this letter?

Page 220

1      A.   This was from 2007 which was almost
2  12 years ago.  I don't remember if I did or didn't
3  review this letter.
4      Q.   Okay.  So can you read the bottom
5  paragraph that I've highlighted into the record?
6      A.   Sure.
7          "The regulation specifically states that
8  suspicious orders include orders of an unusual size,
9  orders deviating substantially from a normal pattern,
10 and orders of an unusual frequency.  These criteria
11 are disjunctive and are not all inclusive.  For
12 example, if an order deviates substantially from a
13 normal pattern, the size of the order does not matter
14 and the order should be reported as suspicious.
15 Likewise, a registrant need not wait for a 'normal
16 pattern' to develop over time before determining
17 whether a particular order is suspicious.  The size of
18 an order alone, whether or not it deviates from a
19 normal pattern, is enough to trigger the registrant's
20 responsibility to report the order as suspicious.  The
21 determination of whether an order is suspicious
22 depends not only on the ordering patterns of the
23 particular customer, but also on the patterns of the
24 registrant's customer base and the patterns throughout

Page 221

1  the relevant segment of the regulated industry."
2      Q.   So with respect to suspicious orders, I
3  mean, do you -- do you agree with -- with this
4  paragraph?
5      MR. TSAI:  Object to the form.
6          Go ahead.
7  BY THE WITNESS:
8      A.   Yeah, I -- I don't agree or disagree.
9  This was the DEA's interpretation of a suspicious
10 order.
11 BY MR. KAWAMOTO:
12     Q.   And was this consistent with your
13 understanding of what suspicious orders were when you
14 were a product -- or a product manager at
15 Mallinckrodt?
16     A.   This was the information provided by the
17 DEA and we had a compliance program in place that was
18 reflective of DEA criteria.
19     Q.   And so this -- this information was -- was
20 ultimately provided to you as well, correct?
21     A.   I have an understanding of what a
22 suspicious order is and this -- this mimics my
23 understanding.
24     Q.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    And going back to Dr. Shook, you know,
2  they note that the size -- the size of an order alone,
3  whether or not it deviates from a norm -- normal
4  pattern is enough to trigger the registrant's
5  responsibility to report the order as suspicious.
6    A.  Um-hum.
7    Q.  So Dr. Shook presumably would have fit
8  that criteria, wouldn't he?
9    MR. TSAI:  Object to the form.
10  BY THE WITNESS:
11    A.  I think that when we talked about
12  Dr. Shook before we agreed that 12.6 kilograms of oxy
13  we don't have a relative measure in terms of if that
14  is indeed a large order.  We also don't have any
15  documentation, I don't have any documentation that
16  tells me if we did or didn't go after Dr. Shook.  So I
17  don't think that I can answer the question that you've
18  asked properly.
19  BY MR. KAWAMOTO:
20    Q.  Well, and at a minimum, though, I mean,
21  you -- you weren't involved in any investigation of
22  Dr. Shook and you didn't -- you didn't have anything
23  to do with looking at Dr. Shook?
24    A.  Well, I -- I wasn't involved in the

Page 223

1  investigations period.  That was in Karen Harper's
2  group, so I don't have any knowledge of Dr. Shook
3  being investigated or not being investigated.
4    Q.  Well, so, then, why did you -- why were
5  you sent this summary worksheet?
6    I'm sorry.  I'm -- I'm gone -- I've gone
7  back to the previous exhibit.
8    A.  Yeah, I know, I understand what you are
9  looking at and I understand what you are asking.
10    There were a lot of people copied on this.
11  I was the product manager on this particular product
12  and, let's see here, Vic was the sales manager for
13  this account, Jim was a customer service manager for
14  this account, George Saffold was the head of customer
15  service, John Adams the head of sales.  There are a
16  lot of people copied on this, but you can see it was
17  directly sent to Karen Harper and Bill Ratliff who
18  were -- be handling the investigation.
19    Q.  Okay.  Then going back to this DEA letter.
20  So, can you read the top paragraph of the second page,
21  please?
22    A.  Sure.
23    "Registrants that rely on rigid formulas
24  to define whether an order is suspicious may be

Page 224

1  failing to detect suspicious orders.  For example, a
2  system that identifies orders as suspicious only if
3  the amount" -- "the total amount of a controlled
4  substance ordered during one month exceeds the amount
5  ordered the previous month by a certain percentage or
6  more is insufficient.  This system fails to identify
7  orders placed by a pharmacy if the pharmacy placed
8  unusually large orders from the beginning" -- "from
9  the" --
10    Q.  Um -- sorry.
11    A.  -- "from the beginning of its relationship
12  with the distributor.  Also, the system would not
13  identify orders as suspicious if the order were solely
14  for one highly abused controlled substance if the
15  orders never grew substantially.  Nevertheless,
16  ordering one highly abused controlled substance and
17  little or nothing else deviates from the normal
18  pattern of what pharmacies generally order."
19    Q.  Okay.
20    Was this your understanding of the inquiry
21  that Mallinckrodt was supposed to undertake with
22  respect to suspicious orders?
23    A.  It was.
24    Q.  Okay.  In other words, that it wasn't

Page 225

1  adequate to just rely on a numeric formula but that
2  additional inquiry should be performed as well, is
3  that fair?
4    A.  Yeah, and I think that's what you've seen
5  over the course of the documents that we've reviewed
6  in terms of looking at the data, asking questions, so
7  I -- I -- yeah, I think that that is 100 percent the
8  interpretation that we had of this.
9    Q.  Okay.  And that interpretation was in
10  place, you know, as of the date of this letter, which
11  was December 2007, is that correct?
12    MR. TSAI:  Object to the form.
13    Go ahead.
14  BY THE WITNESS:
15    A.  I -- I can't speak to what was or wasn't
16  in place in 2007.  I mean, we had a suspicious order
17  monitoring program that supported the DEA
18  requirements.
19  BY MR. KAWAMOTO:
20    Q.  Okay.  And that suspicious order
21  monitoring program should presumably comply with the
22  requirements in this letter, is that --
23    A.  You would really -- I am not in
24  compliance, I was in marketing, so I can't speak to

Page 226

1 the exact program itself. All I can say is based on
2 this letter, we have a suspicious order monitoring
3 program that reflected the requirements of the DEA.
4         (WHEREUPON, a certain document was
5         marked Mallinckrodt - Neely
6         Deposition Exhibit No. 18, for
7         identification, as of 01/07/2019.)
8 BY MR. KAWAMOTO:
9    Q.   Okay. So this is an e-mail, an e-mail
10 chain or an e-mail from you to Cheryl Nelson and Marc
11 Montgomery, cc'ing various other people.
12   A.   Uh-huh.
13   Q.   And the Bates number is MNK-T1 387257.
14   A.   Okay.
15   Q.   Okay. And so I'd like to start on the
16 back page, which is, I think, information relating to
17 the orders.
18   A.   Okay.
19   Q.   And if I wanted to -- there is a -- a
20 bunch of numbers or rows of numbers towards the bottom
21 of each of the -- the orders.
22   A.   Um-hum.
23   Q.   If I wanted to get an understanding of the
24 volume of the order, what number should I be looking

Page 227

1 at? Is it, for example, the one -- the row that's
2 starting at 577101, is the volume the 4,200?
3    A.   So I think you would need to look across
4 the headings at the top where it says "item code,"
5 "quantity shipped," "cancelled unit," "extended
6 price," "slip," "package" or "picking slip date."
7        So if you look at those headings, it would
8 say "item code," "quantities," and so naturally you
9 would look to the second column, which would be 708.
10   Q.   Okay.
11        Okay. And the same would be true for the
12 bottom. So the column that starts either 708 or 588
13 is -- that's the -- the volume of is it bottles or is
14 it pills? I take it it's bottles?
15   A.   That would be my assumption. It is really
16 challenging to tell just because of the way the e-mail
17 collapsed it.
18   Q.   Yeah.
19   A.   But, yeah, and it would be bottles.
20   Q.   Okay. So these orders are a couple
21 thousand bottles, just sort of glancing at the numbers
22 quickly. And so the e-mail from Cheryl Nelson to you
23 and Marc Montgomery, when she says:
24        "Mr. Hall will send a new order on Monday

Page 228

1 and increase on quantities by 50 percent."
2    A.   Um-hum.
3    Q.   The -- the new order -- the volume for the
4 new order then is it going to be an increase of
5 50 percent over several thousand bottles, correct?
6    A.   If that was what their normal order was
7 and they were going to increase by 50 percent, then
8 yes.
9    Q.   Okay. So at the top of the paragraph
10 there is -- do you see the -- the sentence saying:
11        "We have experienced considerable
12 diversion, tampering issues with regard to this
13 customer in" -- "in NC."
14   A.   Um-hum.
15   Q.   What were -- what were the diversion and
16 tampering issues?
17   A.   I -- I read that sentence, sir, and to be
18 honest with you, I don't know what the issues were
19 with this customer. I don't have a recollection.
20   Q.   Okay. Isn't it problematic to be
21 shipping, you know, thousands of bottles to a customer
22 that has experienced considerable diversion tampering
23 issues?
24   A.   I -- I can't speak to that. If they've

Page 229

1 experienced them in the past, I -- I don't -- I don't
2 know.
3    Q.   Well, so who -- who would make the -- who
4 was responsible for making the decision whether to
5 ship this to them?
6    A.   In terms of this e-mail itself, I -- I
7 don't know why the sentence, why it was led with that
8 particular sentence, but if you read the context of
9 the e-mail, the e-mail itself, so we had made
10 obviously the decision at some point to continue
11 shipping them, and if you read the context of the
12 e-mail, this was on November 12th, so they were
13 placing additional buys to cover for when they were
14 going to be closed or didn't have people in the office
15 for the week of Thanksgiving.
16        So the e-mail itself was just about an
17 order increasing quantities because they wouldn't be
18 ordering during that week of the 23rd.
19        In terms of the decision to continuing
20 to -- to ship to North Carolina, in that sentence, I
21 can't speak to that because I don't have a
22 recollection on it.
23   Q.   Well, but I under -- I understand the --
24 the timing issue that's being raised by the order.

Page 230

1    A.   Um-hum.
2    Q.   I guess my question is, you have a
3  customer that according to Cheryl --
4    A.   Um-hum.
5    Q.   -- you've experienced considerable
6  diversion/tampering issues and yet you are still
7  shipping to them thousands of bottles of -- of I
8  believe is it -- I believe it's -- is it oxy 30 or
9  what is --
10   A.   Well, I think that you need to be really
11 careful on that because there is a number of SKUs --
12   Q.   Uh-huh.
13   A.   -- that are listed on the back of that
14 e-mail.  So I'm counting here, you have one, two,
15 three, four, five, six, seven, eight, nine, ten SKUs I
16 think on the first order, different SKUs, not just
17 oxy 30, so I think we need to be really careful about
18 categorizing this order being an aggregate of
19 thousands of bottles for oxy 30.
20   Q.   Well, so, and do you know which SKUs would
21 have been the oxy 30s?
22        Well, or -- or -- stepping back, which
23 SKUs would have been the oxies?
24   A.   That part, no, I don't know.

Page 231

1        Based on the context of Marc's e-mail and
2  my e-mail, it looks like it was methylphenidate, which
3  is a non-opioid, oxycodone and morphine.
4    Q.   Okay.  So it is those three products that
5  would have been covered by these SKUs?
6    A.   I can't 100 percent say that, but I can
7  tell you that those three products are at least
8  included in those SKUs.
9    Q.   Okay.  So you are still going to be
10 shipping oxy and morphine to this customer,
11 notwithstanding the considerable diversion and
12 tampering issues.  And so, I guess my question is, you
13 know, who -- who made that decision?
14   A.   And I think my answer to you is I don't
15 know because I don't have a recollection of this
16 situation.
17   Q.   But you're signing off on the orders for
18 the methyl and the oxy, correct?
19   A.   At -- at some point someone had made the
20 decision to continue shipping them.  The context of
21 the e-mail is not about the diversion/tampering
22 issues.  The context of the e-mail is saying that
23 their orders are going to increase because they are
24 not going to order the following week, and that was

Page 232

1  the part that I was saying I'm okay with.
2    Q.   Okay.  Do you know what investigation was
3  done regarding the diversion and tampering issues?
4    A.   If I don't remember the situation, how
5  could I possibly tell you what was done?  I don't
6  know.
7    Q.   Okay.  So you have no idea -- you have no
8  idea what investigation, if any, was done with respect
9  to this client?
10   A.   I think I've stated to that same question
11 I have no recollection of this situation, so I cannot
12 speak to the investigation, no.
13   Q.   Okay.  And just to be clear, you don't
14 even know if an investigation was done because you
15 have no recollection one way or the other?
16   A.   How can I tell you yes or no if I don't
17 have a recollection?
18   Q.   Well, I just want to -- I would -- I just
19 want to make sure the record is clear on this.
20   A.   I think it is pretty explicit, yeah.
21        (WHEREUPON, a certain document was
22        marked Mallinckrodt - Neely
23        Deposition Exhibit No. 19, for
24        identification, as of 01/07/2019.)

Page 233

1  BY MR. KAWAMOTO:
2    Q.   Okay.  So this is an e-mail chain with the
3  Bates number MN -- MNK-T1 449467.
4    A.   Uh-huh.
5    Q.   And it is an e-mail exchange between you
6  and John Adams, among others.
7    A.   Okay.
8    Q.   Okay.  So this e-mail chain is -- well,
9  the chain -- the top e-mail is John Adams forwarding
10 this e-mail chain to you?
11   A.   Um-hum.
12   Q.   Who is John Adams?
13   A.   In 2008, I don't know if he had moved --
14 he had moved into head of sales.  He was in -- I think
15 he was head of sales by this point.
16   Q.   Okay.  And why is he forwarding this to
17 you?
18   A.   I don't know.  I -- I don't know why.
19 You'd have to ask John.
20   Q.   Okay.  Now, the e-mail at the bottom, it
21 says:
22        "Dear Karen, Please be informed that
23 Rochester Wholesale Drug has secured a new account Old
24 Bridge Drug who will be using Mallinckrodt's oxy

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 30 milligrams. The account's monthly use is
2 approximately 380 bottles monthly."
3     Do you see that?
4   A.  I do.
5   Q.  Okay. So because of that increase, would
6 that have triggered the peculiar order screen?
7   A.  It could have potentially, if the increase
8 was large enough in relation to what Rochester Drug
9 typically ordered, it would have increased their order
10 quantities, therefore, flagging, you know, a
11 difference to historic. So yes.
12   Q.  Okay. And because you were the -- because
13 you were, you know, the person in charge of the
14 data --
15   A.  Um-hum.
16   Q.  -- would that, then, have come to you as
17 a -- or -- or would -- would someone have requested
18 information from you, is that why -- is that why you
19 are getting this e-mail?
20   A.  So as a product manager, there is a couple
21 of reasons that I can suspect that I would have gotten
22 the e-mail. I also did forecasting for this
23 particular product. So if there was an increase in
24 usage, I would need to know that in terms of factoring

Page 235

1 in. I also was the one evaluating when they got an
2 order that was higher than what the historic average
3 had been, it would be sent to me, and I would need to
4 evaluate. And so if this order did get sent to me,
5 this would be the documentation showing the reason
6 why.
7   Q.  Okay. And actually, Karen's e-mail right
8 above the one I just read, it says:
9     "Heads up from the suspicious order
10 monitoring perspective."
11     Do you see that?
12   A.  Um-hum, I do.
13   Q.  Okay. Now, you indicated -- or I think
14 you just testified that this documentation would be
15 showing the reason why. Was -- was that -- was that
16 information important in the context of the suspicious
17 order monitoring that was being done?
18   A.  I can't speak to any work that Karen did
19 around the -- the actual customer. What I can say is
20 this was sent to me to let me know that if there was
21 an increase in demand from Rochester Drug, at least
22 I'm guessing, that this was my -- background as to
23 why there was an increase.
24   Q.  Okay. And do you know if -- if any

Page 236

1 investigation was done into the new account? The --
2 the new account is identified at the very -- at the
3 very bottom e-mail on --
4   A.  Sure.
5   Q.  I'm sorry. It is the very last e-mail on
6 449469.
7   A.  I -- I don't know. I don't know.
8   Q.  So we're talking about Old Bridge Drugs,
9 and they want to order 38,000 units a month of oxy 30.
10   A.  Um-hum.
11   Q.  In terms of the order, the fact that it's
12 an oxy 30 would trigger heightened concern, correct?
13   A.  This is in October of 2008, so oxy 30 was
14 part of our suspicious order monitoring program, so
15 that's part of the reason why this was generated.
16   Q.  Okay. Do you know if -- if any analysis
17 was done of the ratio that Old Bridge Drugs was
18 ordering with respect to oxy versus other products?
19   A.  I don't know the answer to that, no.
20   Q.  Okay. Should that analysis have occurred?
21   A.  I can't answer that question for you. I
22 don't know.
23   Q.  Do you know if any analysis was done at
24 all with respect to Old Bridge Drugs?

Page 237

1   A.  I don't have any recollection. Again,
2 this was 11 years ago.
3   Q.  And do you know if -- if the distributor,
4 I believe it's RDC, do you know if they did any
5 analysis of Old Bridge Drugs?
6   A.  Again, I'm going to respond to you that
7 I -- I don't know, and, again, this was 11 years ago.
8 I don't have a recollection.
9   Q.  Based on your experience with the SOM
10 program and your responsibilities at Mallinckrodt,
11 should some investigation have been conducted of Old
12 Bridge Drugs --
13     MR. TSAI:  Object to the form.
14 BY MR. KAWAMOTO:
15   Q.  -- in your opinion?
16   A.  That would have been a decision made by
17 Karen Harper, and whether or not an investigation was
18 done or not done, I don't know, so I can't answer that
19 question.
20 BY MR. KAWAMOTO:
21   Q.  If an investigation was done, would you
22 have been involved from a chargeback perspective?
23   A.  Not on this customer in particular, if
24 this is new volume.

Page 238

1    Q.   Okay.
2    A.   Because there would not have been
3 chargebacks associated with it yet.
4    Q.   And so this order doesn't seem problematic
5 to you given that it's oxy 30 and it's 38,000 units?
6    A.   Well, I think you need to -- to reference
7 the front page of your e-mail.  So it is 380 bottles.
8    Q.   Uh-huh.  So it is 380 bottles and it's of
9 oxy 30.  That doesn't -- that doesn't seem
10 problematic?
11    A.   I can't speak to whether it was prob -- I
12 can't tell you if it was problematic or not.  I don't
13 have what the total oxy 30-milligram total bottles
14 being sold was, so I couldn't tell you if 380 would
15 have raised a red flag or not.
16         (WHEREUPON, a certain document was
17          marked Mallinckrodt - Neely
18          Deposition Exhibit No. 20, for
19          identification, as of 01/07/2019.)
20 BY THE WITNESS:
21    A.   Okay.
22 BY MR. KAWAMOTO:
23    Q.   Okay.  And so this is an e-mail involving
24 H.D. Smith and directing your attention -- well,

Page 239

1 it's -- I'm sorry.  It is Mallinckrodt Bates number
2 MNK 267735.
3    A.   Um-hum.
4    Q.   And directing your attention to Bates
5 number 267736, do you see the -- the e-mail in the
6 middle of the page is from Steve Becker to you.
7       Do you see that?
8    A.   Uh-huh.
9    Q.   Okay.  Why is Steve e-mailing you?
10    A.   I had reached out to him about a
11 particular order, so if you go to Exhibit 8862, you
12 can see I forward him a PO number and then it looks
13 like he reached out to Dena Mando and Lynne Soja at
14 H.D. Smith:
15       "The order in question with the increase
16 was for your California DC."  And then Steve is
17 responding forwarding back to me what Lynne from
18 H.D. Smith had said to him.
19    Q.   So in terms of understanding the
20 context of this --
21    A.   Uh-huh.
22    Q.   The -- the order PO, 472054618 has been, I
23 guess, identified as -- as an order that requires
24 additional information.

Page 240

1       Is that fair?
2    A.   It looks like Steve and I must have had a
3 conversation on it and then I forwarded it to him,
4 yes.
5    Q.   Okay.  And then your e-mail at the top, do
6 you -- do you see what that -- that says?
7    A.   Um-hum.
8    Q.   Okay.  So --
9    A.   Would you like me to read that?
10    Q.   Yes, please.
11    A.   "In order to provide a proper response to
12 the D" -- "the DEA, we need to have some color around
13 why they think the orders are increasing?  Did they
14 pick up a new customer?  Are other manufacturers
15 having supply issues?  Let me know.  Thanks."
16    Q.   And so this is part -- this information is
17 being used in connection with the suspicious order
18 monitoring program, is it not?
19    A.   It is.
20    Q.   Okay.  And so his response to you is on
21 the middle of the first page.
22       Do you see that?
23    A.   I do.
24    Q.   Okay.  And so what is -- what is his

Page 241

1 response?
2    A.   It says:
3       "Orders at H.D. Smith are increasing due
4 to improved contract compliance and additional
5 accounts purchasing from their DC both as primary and
6 on a secondary basis.  Also note that other
7 distributors may be limiting distribution in
8 California.  Anda has cut back and Harvard is not
9 shipping."
10    Q.   Okay.
11       So you indicate that orders at
12 H.D. Smith -- or -- or he -- Steve indicates that
13 orders at H.D. Smith are increasing due to improved
14 contract compliance and additional accounts
15 purchasing.
16       Was any investigation done as to who the
17 additional accounts were?
18    A.   I don't know because you can see I sent
19 this to Jim Rausch and I said, "Is this okay?"  And I
20 don't know what Jim's response back was in terms of us
21 investigating.  I -- I don't know what happened after
22 this.
23    Q.   Okay.
24    A.   I think it's important to note on this,

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 too, that the conversation we had earlier with regards
2 to H.D. Smith where you have all of the questions
3 about the bullet points and how they determined what
4 customers to cut off, that was on August of 2010, and
5 this is October 7th of 2010, so it was two months
6 after that.
7 So I think from -- from my perspective,
8 and, again, I don't know if an investigation occurred,
9 but this was an account that we had seen go through
10 stringent measures in terms of cutting off multiple
11 accounts to not ship to. So in terms of customers to
12 be concerned with in terms of shipping and evaluation
13 of pharmacies and who they were shipping to, based on
14 those two documents tied together, I would say
15 H.D. Smith would be less of a concern.
16 Q. Okay. But that --
17 A. I -- but that doesn't answer your question
18 about whether or not an additional investigation
19 occurred. I don't know. It could or couldn't have.
20 It's tough to say because your e-mail that you
21 provided to me ends with "Jim, This okay?" So I don't
22 know how Jim responded to that.
23 It was my job as part of this program to
24 reach out to the sales team, to reach out to the

Page 243

1 account, to get information from them to provide back
2 in to give direction to Karen on what next steps she
3 might need to take. Your e-mail doesn't tell me what
4 those steps may or may not have been after this --
5 after this last response.
6 Q. And if an additional investigation was
7 conducted, it would have been memorialized in an
8 e-mail?
9 A. I'm sorry?
10 Q. If an additional investigation was
11 conducted, it would have been memorialized in an
12 e-mail, correct?
13 A. I -- I don't -- not necessarily. I
14 don't -- I don't know if it would or it wouldn't have
15 been. I did my -- my part. I reached out to the
16 account, I got the information, I provided it back to
17 Jim. What happened after this we can't speak to
18 because you don't have a -- a document for me to
19 reference and I don't know.
20 Q. And if an additional investigation
21 occurred, though, you would have -- would you have
22 been involved in it --
23 A. Not necess --
24 Q. -- as a conduit between the -- the

Page 244

1 national account manager?
2 A. Not necessarily. Not necessarily, no.
3 Q. Do you think it would have been prudent to
4 at least inquire as to who the additional accounts
5 were that were purchasing given the concerns that are
6 being raised particularly with respect to oxycodone by
7 the DEA?
8 A. That would have been a decision that would
9 have fallen into compliance.
10 Q. And so that decision would have been made
11 by who?
12 A. So the compliance team, which Karen Harper
13 was at the time leading.
14 Q. Now, the e-mail also notes that: "Other
15 distributors may be limiting distribution in
16 California" and that "Anda has cut back and Harvard is
17 not shipping."
18 Do you see that?
19 A. I do.
20 Q. Do you know why that was occurring?
21 A. I do not know. I don't have a
22 recollection on that.
23 Q. So that --
24 A. I can tell you as far as Harvard -- so the

Page 245

1 "Anda has cut back," I -- that I don't have a relic --
2 a recollection on.
3 "Harvard is not shipping," I think we've
4 spoken to that earlier in terms of Harvard getting
5 their DEA license taken away, so Harvard wasn't able
6 to ship to any part of the US.
7 Q. Okay. Though the sentence also notes
8 that: "Other distributors may be limiting
9 distribution in California."
10 You -- did -- did anyone know why other
11 distributors were limiting their distribution in
12 California?
13 A. I think we need to be clear on the wording
14 of that sentence. It says: "Also note that other
15 distributors may be limiting distribution in
16 California."
17 This is Steve Becker who is the
18 distribution of national accounts. That was his
19 opinion. So I don't know that we have any fact or
20 foundation for that sentence rather than it was just
21 Steve Becker's thoughts.
22 Q. Well, but this is going to be the basis
23 for evaluating a suspicious order, isn't it?
24 A. It is the basis for me understanding why

Page 246

1  H.D. Smith, the volume has gone up.
2      Q.   So do you know what steps, if any, Steve
3  Becker took to confirm the information he put in this
4  e-mail?
5      A.   I took this information and provided it to
6  Karen or to -- Jim and what he did with that after
7  the fact, I -- I don't know.
8      Q.   Would you have been comfortable approving
9  this order based solely on this information without
10 any follow-up?
11     A.   I -- I don't think that I was okay with it
12 because I put, "Jim, This okay?"  So I obviously was
13 saying, you know, Is this okay?  I obviously didn't
14 have a comfort level based on the e-mail.
15     Q.   So in your opinion some additional
16 investigation was warranted?
17     A.   I can't say that it was or wasn't.  That's
18 why I was asking Jim if this is okay, question mark.
19          (WHEREUPON, a certain document was
20              marked Mallinckrodt - Neely
21              Deposition Exhibit No. 21, for
22              identification, as of 01/07/2019.)
23 BY MR. KAWAMOTO:
24     Q.   So this is an e-mail chain between you and

Page 247

1  Jim Rausch and it is Bates numbered MNK-T1 264901.
2      A.   Okay.
3      Q.   Okay.  So the bottom e-mail is a little
4  confusing, but I -- my understanding based on the
5  context is that it's a combination of his e-mail to
6  you and your response to him, is that your
7  understanding as well?
8      A.   I understand why that was -- it was
9  confusing to me as well, but in reading the e-mails,
10 it does look like -- the part "I looked back to the
11 past two months" appears to be my -- my language for
12 the first two, and then "they have ten days on hand"
13 appears to be my response to him for the third line.
14     Q.   Okay.  So that's my understanding as well.
15          So, in terms of this e-mail, Jim is
16 identifying three different orders for you, and he has
17 got -- he has identified one as 85301, the -- I
18 believe the order amount is 12,084 --
19     A.   Uh-huh.
20     Q.   -- and the average is 4,620.
21          Is that your understanding?
22     A.   Right.  So he is saying the order was for
23 12,000 and the average order is -- or the average
24 demand is 4,600.

Page 248

1      Q.   Okay.  And then for the next order, the
2  order was for 25,440 and the average is 3,616?
3      A.   That's right.
4      Q.   Okay.  And then for the third one, the
5  order was for 85,176 and the average is 28,723?
6      A.   Okay.
7      Q.   Okay.
8          Now, this distributor, Cardinal, is
9  increasing its orders -- it's essentially tripling its
10 orders, is that -- is that fair?
11     A.   No, I don't think that's fair.
12     Q.   Well, if they are going from -- well, they
13 are -- they are tripling -- it is three times the
14 monthly average or close to three times the monthly --
15 that monthly average, correct?
16     A.   According to Karen's data, so she ran this
17 for the past year, so she ran the average for the past
18 year and then compared that to these orders.  So it
19 doesn't mean that these orders are necessarily large
20 compared to the business that we were doing with them
21 at the time, but for the average for the past
22 12 months, they were larger.
23     Q.   Yes.
24          And so if you look at the past, the

Page 249

1  12-month average, they are -- they are over triple or
2  they are close to triple that average, right, I mean,
3  comparing 12,084 to 4,620, or 25,000 to 3,600, or
4  85,000 to 28,000, you know, they are -- they are
5  several -- they are several times larger than the --
6  the 12-month average?
7      A.   Or, well, she said the average I ran was
8  over a year, so it could have been more than 12.  We
9  don't really know that.
10     Q.   And so your response -- what is your
11 response at the very top of the page?
12     A.   Would you like me to read it?
13     Q.   Yes, please.
14     A.   Okay.
15          "Their orders were severely depressed for
16 the first quarter of the calendar year as they were
17 bleeding down inventories.  If you incorporate those
18 orders into the average, the average is going to look
19 light.  The orders that you listed below do not appear
20 to be out of line."
21     Q.   And when you say they "do not appear to be
22 out of line," they do not appear to be out of line in
23 light of?
24     A.   Well, I said, "If you incorporate

Page 250

1 those...average, the average is going to look light."
2 I said: "The orders that you listed below do not
3 appear to be out of line." So that would have meant
4 out of line with the average order history.
5    Q.   Well, and I -- I guess -- I guess when you
6 say they are not out of line, what is your reference
7 point to the "out of line"? Meaning they are -- they
8 are clearly greater than the -- significantly greater
9 than the 12-month average, so what --
10    A.   They are greater than the 12-month
11 average.
12    Q.   -- what is your baseline?
13    A.   Yeah, so I think I address that in the
14 first sentence: "Their orders were severely depressed
15 for the first quarter of the calendar year," which it
16 would have been -- so we are in -- we are in month
17 nine of 2010, so the first quarter of the calendar
18 year "as they were bleeding down inventories. If you
19 incorporate those orders into the average, the average
20 is going to look light."
21    Q.   And so your solution or your analysis was
22 to just look back at the past two months?
23    A.   Well, I think I -- what I did was I --
24 after I ran it for the past two months and then I went

Page 251

1 back, if you say: "Their orders were severely
2 depressed for the first quarter of the calendar year
3 as they were bleeding down inventories," you can see
4 from that sentence that I went back and looked further
5 back at the sales.
6       I think this is also a really good
7 document to show the push and pull between customer
8 service, the questions that we got back and forth, of
9 me saying that to them and them saying, Hey, look,
10 maybe that's not good enough. Can you relook at it
11 again. So I think this is actually a good example of
12 the discussions that we would have prior to releasing
13 orders.
14    Q.   Well, and where -- where does it indicate
15 that you are going back, you are taking into account a
16 broader than one-year time period?
17    A.   So, I said: "Their orders were severely
18 depressed for the first quarter of the calendar year."
19 So that would have been way more than two months prior
20 to September 17th, 2010, which is evidence to me that
21 I went back and I looked at their total ordering
22 pattern, and I said: "The orders that you listed
23 below do not appear to be out of line."
24    Q.   Because you were discounting the first

Page 252

1 quarter of the calendar year, essentially?
2    A.   If you read this sentence, I wouldn't say
3 I was discounting it, but I was taking into account
4 that their orders were severely depressed during the
5 first quarter of the calendar year. And so if you
6 incorporated that into the average, the average is
7 going to look light, it was going to not be reflective
8 of the business that they were actually doing with us.
9    Q.   Or the business that they were doing with
10 you for the past two months, though, because isn't
11 that what your e-mail response is?
12    A.   I said if their order -- I don't know how
13 to be more frank with you. I'm sorry.
14       "If you incorporate those orders into the
15 average, the average is going to look light." So that
16 indicates that if you put them -- or you take them
17 back out of the average, then I feel comfortable with
18 the volumes being in line.
19       The other piece of this that you don't
20 know: "Their orders were severely depressed for the
21 first quarter of the calendar year, they were bleeding
22 down inventories," that can mean a number of things if
23 you look at that. It could mean that we just won
24 their business and they were transitioning and their

Page 253

1 orders were light with us as they bled down
2 inventories of the competition. I mean, it is
3 impossible to tell without having additional context.
4 And unfortunately, when I wrote this e-mail, I didn't
5 include the Excel sheet to support it. So unless I
6 have that, I can't give you any more specifics than
7 what I've just shared with you.
8    Q.   But the whole purpose of giving a yearlong
9 average is that it takes into account both the large
10 orders and the smaller orders, right, isn't that why
11 you are doing that?
12    A.   But -- but what if we had just
13 transitioned the business to us. I don't know that
14 from this e-mail. And if that was the case, then if
15 you take into account the time where they were
16 bleeding down inventories, as they bled down their
17 inventories, they wouldn't have been ordering as much
18 from us and, therefore, it doesn't affect -- it
19 doesn't mean that they don't have sales out to their
20 customers. It just means that they are not ordering
21 the product from us. And so it would be unfair to
22 incorporate those down months into the average and
23 penalize them on their orders in the month of
24 September.

Page 254

1    Q.   Well, I don't know if the purpose is to
2  penalize them or not penalize them.  I think the
3  purpose is to identify significant increases and then
4  scrutinize the basis for those increases, isn't that
5  fair?
6    A.   And I think that that's what this document
7  shows, yes.
8    Q.   Okay.  So you have a yearly average which
9  is --
10   A.   That -- that incorporates -- that
11 incorporates a quarter of them bleeding down
12 inventories, which we are not certain if that is our
13 products or someone else's, yeah.
14   Q.   And I'm sorry.  When you say that this
15 incorporates a quarter of them bleeding down
16 inventories and you are not certain if that is your
17 product or someone else's, what do you -- what do you
18 mean by that?
19   A.   So what this e-mail doesn't tell you, and
20 that's why it is dangerous to take it out of context,
21 what this e-mail doesn't tell you is it says that the
22 "orders were severely depressed for the first quarter
23 of the calendar year as they were bleeding down
24 inventories."

Page 255

1        Now, what I don't know is did we just win
2  the business from another manufacturer at that point
3  and they were bleeding down that current
4  manufacturer's inventories as they transitioned to us,
5  had we just won the business?  I -- I don't know that
6  from looking at this e-mail.  So it is tough for me to
7  answer -- answer that question.
8    Q.   Well, but why -- why would -- why would
9  that make -- I'm -- I'm sorry.  I'm not trying to be
10 difficult.  But why -- why would that make a
11 difference in terms of assessing whether -- whether
12 they are -- their -- their order is a significant
13 increase over, you know, their prior history looking
14 back over an extended time period?
15   A.   So if an account has inventory on hand --
16   Q.   Uh-huh.
17   A.   -- if they have excess inventory on hand,
18 they are still selling out to their customers, that
19 demand is still legitimate.  They could still be
20 selling out or let's say real, that demand is -- could
21 be 15,000 bottles a month, right.  But let's say they
22 are sitting on, I don't know, 50,000 units of
23 inventory at their DC, so they would need to work
24 through that inventory and sell through it to their

Page 256

1  customer before they would need to order more product
2  from us.
3        So their ordering pattern, even know their
4  true demand to their customers had not changed,
5  because of their inventory management strategies, how
6  much they were ordering from us could have changed.
7  And so if they were working through inventory, let's
8  say if they had an excess of inventory of our product,
9  they had an excess if they had transitioned from us --
10 from another manufacturer to us, then they would need
11 to work through that inventory.
12       So I was looking at the first quarter of
13 the calendar year and I was looking at their
14 inventories, because we did have visibility to our
15 inventory with them.  And you are able to see that
16 their ordering pattern was depressed during that
17 timeframe.  So their demand to their customers hadn't
18 necessarily changed, but their ordering pattern to us
19 wasn't reflective of that demand.
20       So that's why I excluded it from the
21 analysis whenever I was talking to him about using the
22 12-month average here.  I don't --
23   Q.   And so part of your analysis, though,
24 depends on why they were bleeding down inventories, is

Page 257

1  that fair?  Their orders were severely depressed for
2  the first quarter of the calendar year but part of
3  that turns on why they were severely depressed, is
4  that a fair statement?
5    A.   Their orders were -- I don't know.  I'm
6  sorry.  I'm -- their orders were severely depressed.
7  So in terms of inventory management, when you have an
8  excess of inventory, you are not going to be ordering
9  more of it.
10       So we had visibility into Cardinal's
11 inventories at least particularly for our product, and
12 we could have discussions with them about reasons why
13 they might not have been ordering, and I don't know
14 what that was because I don't have the context.  All I
15 have is this e-mail.
16       But what I'm trying to say to you is just
17 because they weren't ordering from us in the first
18 quarter of the calendar year doesn't mean that they
19 didn't continue to have the same demand to their
20 customers.  So I could not take their ordering pattern
21 from that first quarter and use that as an indication
22 for what their true ordering pattern was as an average
23 rule of thumb, and that's why it was problematic when
24 you used the past 12 months and didn't account for

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1  that depression in the first quarter.

2      Q.   So would one solution, though, to have

3  been to have gone back further than 12 months?  I

4  mean, Cardner [sic] is a -- Cardinal is a major --

5      A.   It --

6      Q.   -- distributor, it's a major client?

7      A.   Right.

8           And I would -- I would argue with you that

9  I -- I did.  So we went back two months initially and

10  then it looks like we did go back 12 months and that's

11  how I was able to identify that the first quarter was

12  an anomaly that needed to be removed.

13      Q.   But instead of doing two months as -- two

14  months versus 12 months, couldn't you have tried

15  doing, for example, 24 months?

16      A.   So I did do two months and then you see

17  Jim pushing back saying that's not very far back.  So

18  this to me is a document of evidence of the system

19  working.  I pulled two months.  He said, Hey, Kate,

20  that's probably not enough.  You should probably look

21  at it further back, and then I did.  So this was the

22  back and forth which is evidence of the system, to me,

23  working because there was dialogue there.

24      Q.   And when you say you looked further back,

Page 259

1  you are getting that from your e-mail from the fact

2  that you are saying that the first quarter of the

3  calendar year they were bleeding down inventories.

4           That -- that -- that's your basis for

5  saying you looked back?

6      A.   That's all that I have to go on because

7  that's the only e-mail documentation you've provided

8  me to.

9      Q.   Well, I'm -- I'm trying to -- I mean, so

10  is -- are -- are you saying one of the things that is

11  possible is you went and you recalculated the average

12  over 24 months, is that...?

13      A.   I can't answer that, because I don't know.

14      Q.   Okay.  So it's entirely possible, then,

15  that you didn't go back further than a year, you just

16  looked at their ordering history and concluded that

17  they were bleeding down inventories, right?

18      MR. TSAI:  Object to the form.

19      Go ahead.

20  BY THE WITNESS:

21      A.   Yeah.  Is -- is your issue the fact that I

22  used two months initially or is the issue that the

23  12-month average might have been less than these order

24  quantities back here?

Page 260

1  BY MR. KAWAMOTO:

2      Q.   Well, is --

3      A.   I guess I am confused about your

4  questions.

5      Q.   My -- my questions are -- are sort of

6  going to both, which is you go back two months and

7  that's not -- and Jim has concerns about that.

8      A.   Um-hum.

9      Q.   So your response to him is to say, Well,

10  the orders were severely depressed for the first, you

11  know, the first few months of this calendar year.

12      A.   Um-hum.

13      Q.   And so this average, you know, doesn't

14  reflect their current demand.

15           And I guess if -- if the concern is that

16  the 12-month average isn't the adequate baseline, why

17  not use a broader, longer average, for example,

18  24 months?

19      A.   Do you know how dynamic the generic

20  industry is and especially, like, with regards to

21  Cardinal?  So within 20 -- so much could have changed

22  in -- within 24 months.  I would -- you would never go

23  back that far because it could not be indicative of --

24  I mean, we could have picked up the business with

Page 261

1  Cardinal during that timeframe, Cardinal could have

2  picked up new accounts during that timeframe,

3  24 months, it would be -- would not be indicative of

4  current business today.

5           In looking at this, their demand to us was

6  light in the first quarter because they had excess

7  inventory that they were selling through.  If you

8  incorporated the first quarter into the average,

9  then -- then the numbers that they were ordering as of

10  September 17th, 2010, would look large.

11           My response back to him is if you take

12  that out, the orders that you listed below do not

13  appear to be out of line.  Unfortunately, I don't have

14  the document that shows the analysis of what I did.

15  So all I can tell you is based on this e-mail what

16  I'm -- what I can guess.

17      Q.   Okay.  So if there actually was a

18  significant increase in demand over the past three

19  months --

20      A.   Not necessarily.

21      Q.   -- but if there was, should that have been

22  investigated?

23      A.   It should have been investigated at that

24  point.

Page 262

1    Q.   Okay.
2    MR. TSAI:  We have been going about an hour, can
3  we take a quick break?
4    MR. KAWAMOTO:  Sure, why don't we take a break.
5    THE VIDEOGRAPHER:  Standby.  Remove your
6  microphones.
7        The time is 3:27 p.m.  Off the record.
8        (WHEREUPON, a recess was had
9           from 3:27 to 3:42 p.m.)
10    THE VIDEOGRAPHER:  Okay.  We are back on record.
11  The time is 3:42 p.m.
12    THE WITNESS:  Do you want to shut the door?
13    MR. JOHNSON:  Sure, I've got it.
14        (WHEREUPON, a certain document was
15           marked Mallinckrodt - Neely
16           Deposition Exhibit No. 22, for
17           identification, as of 01/07/2019.)
18  BY MR. KAWAMOTO:
19    Q.   So, Ms. Neely, this is an e-mail chain
20  which you are copied on, at least for some of them.
21    A.   Uh-huh.
22    Q.   The Bates number is MNK-T1 265090.
23    A.   Okay.
24        Okay.

Page 263

1    Q.   Okay.  So I want to direct your attention
2  to the middle e-mail on 265091.
3    A.   Um-hum.
4    Q.   It is from Brenda Rehkop to you.
5        And who is Brenda?
6    A.   Brenda was a customer service
7  representative.
8    Q.   Okay.  And her e-mail reads:
9        "Kate, Have you had a chance to look at
10  this?  The order already shipped, but we do have to do
11  our due diligence to validate all orders on the
12  report.  Please let me know."
13        So does -- does this indicate that the due
14  diligence or essentially the SOM due diligence is
15  being done after an order has shipped?
16    A.   It looks like on this one in particular
17  the order did ship.
18    Q.   And when you say "on this one in
19  particular," what -- what does that mean?
20    A.   It means that the order that we are
21  looking at on this e-mail, it is the only one we have
22  in front of us, but it looks like it did ship, yes.
23    Q.   Okay.  And do you have any eye -- any
24  sense of -- of how often this occurred?

Page 264

1    A.   I -- I couldn't possibly -- I couldn't
2  answer that question.  I don't know.  I don't --
3    Q.   Okay.  So what was the point of doing due
4  diligence if the order had already shipped?
5    A.   We wanted to -- I -- I can't tell you what
6  Brenda -- I can't -- I -- I don't know.
7    Q.   Okay.  And you don't -- you don't have any
8  recollection of how often you were asked to due
9  diligence -- to do due diligence on orders that had
10  already shipped?
11    A.   We had the suspicious order monitoring
12  program in place and from that, you know, we had a
13  process that we followed.  I don't know how -- I don't
14  know why in particular the timing of it.  It is also
15  interesting from September 3rd to September 14th, but
16  I couldn't answer if -- you know, no, I don't know if
17  this happened with other orders or not.
18    Q.   And you said the timing is interesting.
19  Why is that?
20    A.   Because it looks like I -- I missed the
21  ball in terms of responding, so I -- I was late in my
22  response to her.
23        (WHEREUPON, a certain document was
24           marked Mallinckrodt - Neely

Page 265

1        Deposition Exhibit No. 23, for
2           identification, as of 01/07/2019.)
3  BY MR. KAWAMOTO:
4    Q.   This is another e-mail chain.  It is Bates
5  numbered MNK-T1 280580.
6    A.   Okay.
7    Q.   And is this another -- well, could you
8  please review the e-mail and let me know when you are
9  done?
10    A.   Um-hum.
11        Okay.
12    Q.   Okay.  And so I'm just trying to
13  understand the process of -- of what's occurring here
14  with respect to this order.
15        It's -- so focusing on the top e-mail from
16  Brenda to -- to Karen, it says:
17        "I know we already talked about this, but
18  here is my response in writing, just in case you need
19  it.  Per Kate's e-mail I assumed these orders would be
20  held on backorder.  These appear to have been manually
21  allocated by Kate's instruction on Thursday, 10/21 and
22  shipped Monday 10/25.  (The peculiar order report runs
23  a day late, so these were allocated before they
24  appeared on the report)."

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    A.   Um-hum.
2    Q.   And so what -- what is the issue that
3  Brenda is trying to raise?
4    A.   So her e-mail says:
5        "These appear to have been manually
6  allocated by Kate's instruction on Thursday,
7  October 21st, and shipped Monday, October 25th," and
8  then she says:  "The peculiar order report runs a day
9  late.  So they were allocated before they appeared on
10 the report."
11       So if you look to the timing of my e-mail,
12 she e-mailed me on October 22nd and the allocations
13 have been communicated on October 21st.
14   Q.   Okay.  And your -- your e-mail response to
15 her, which is in the middle of the Page 20 -- 280581.
16   A.   Um-hum.
17   Q.   You say:
18       "These appear to be orders for their four
19 DCs and are above and beyond their average demand."
20   A.   Uh-huh.
21   Q.   "I foresee that we will be back ordering
22 these orders at least in the short term.  I will have
23 a better answer for you after we meet as a team next
24 Wednesday to determine what our customer allocations

Page 267

1  are going to be."
2    A.   Um-hum.
3    Q.   So these were orders that should have been
4  subject to the SOM program, is that correct?
5    A.   Well, they were part of the peculiar
6  ordering report, so yes.
7    Q.   But they were shipped before that -- that
8  due diligence was complete?
9    A.   So they say they were manually allocated.
10 What I don't know is if they were shipped in full or
11 if they were partially shipped.  I don't have that
12 information on this e-mail.
13   Q.   And so is -- is this potentially another
14 incidence of an order being shipped before the due
15 diligence was done?
16   A.   Not necessarily, no, because I don't have
17 what the quantities were that were shipped against
18 what they -- what they ordered.
19   Q.   And so are you -- are you -- are you
20 saying that one of the things that might have happened
21 is you might have only shipped up to the amount
22 consistent with their average?
23   A.   I think that that's speculation, so we
24 need to be really careful with that, but this e-mail

Page 268

1  doesn't tell me if or -- if that occurred or not, and
2  so that's -- that's the challenging piece again of
3  only having this e-mail and not having the actual
4  documentation to support it.
5    Q.   But if, in fact, they were shipped for the
6  full amount, then that would be an example -- like an
7  instance in which orders were shipped before the SOM
8  due diligence was complete?
9    A.   I -- I think we need to be really careful
10 with -- with answering "if" statements or "if"
11 questions.  That's a lot of speculation, again, in
12 that question.
13       So because I don't know what the
14 quantities there were that were shipped against it, so
15 part of it would have been the evaluation of their
16 average order quantities and then allocating against
17 their orders based on that.  So since I don't have
18 that in this e-mail, I don't know -- I can't answer
19 that question.
20   Q.   Do you recall any instances where an order
21 was shipped and it was subsequently determined to have
22 been suspicious?
23   A.   I don't have a recollection of that
24 happening.

Page 269

1    Q.   And you would agree that as a general
2  matter, though, it would be problematic to ship orders
3  before completing the due diligence -- the suspicious
4  order due diligence as a general statement?
5    A.   We --
6        MR. TSAI:  Object to the form.
7        Go ahead.
8  BY THE WITNESS:
9    A.   Yeah, we -- we had a suspicious order
10 monitoring program in place that we were to adhere to.
11 BY MR. KAWAMOTO:
12   Q.   And that suspicious order monitoring
13 program would presumably require the due diligence be
14 done before the order was shipped?
15   A.   I -- again, we've talked about the program
16 itself and it has been, what, seven, eight years ago,
17 I don't remember the details around it.
18   Q.   Well, can -- I mean, can you -- can you
19 think of any logical explanation for why it would be
20 okay to ship orders before completing the SOM due
21 diligence?
22   A.   I -- I think, again, this has been a long
23 time ago, that would be sheer speculation on my part
24 and I don't feel comfortable in answering that.

Page 270

1    Q.   So just so I'm clear, though, your
2   testimony is you -- you don't re -- you're not sure
3   whether there was a requirement that the due diligence
4   be done -- the suspicious order monitoring due
5   diligence be done prior to shipping the order, you
6   just -- you can't recall whether that was -- whether
7   that was a component of the program or not?
8    A.   Again, we had a program in place that --
9   that was, you know, we had a program in place, but as
10  far as the details of it, it has been so long since I
11  was involved in this, I don't have a recollection of
12  what the details were.
13   Q.   Okay.
14        But we just saw a document where it
15  appears that an order was shipped prior to due -- the
16  due diligence being completed?
17   A.   We did.
18   Q.   And you don't have any sense of how often
19  that occurred?
20   A.   We addressed the fact.  So you're asking
21  me if that was part of our program?
22   Q.   Well, I'm asking you if it was a -- rare
23  occurrence, a routine occurrence?
24   A.   You asked me if it was part of our program

Page 271

1   and I'm telling you I'm not certain because I don't
2   remember the details of our program.
3        Now, whether or not it was a rare
4   occurrence, a frequent occurrence, the occurrence
5   rate, I shared with you previously I don't have -- I
6   don't -- I don't have the information.  I can't
7   possibly answer that question.  I don't know if it was
8   a rare or if a -- I -- I don't know.
9        (WHEREUPON, a certain document was
10        marked Mallinckrodt - Neely
11        Deposition Exhibit No. 24, for
12        identification, as of 01/07/2019.)
13  BY THE WITNESS:
14   A.   Thank you.
15  BY MR. KAWAMOTO:
16   Q.   So this is another e-mail chain.  Its
17  Bates number is MNK-T1 560771.
18   A.   Okay.
19        Okay.
20   Q.   Okay.  So the bottom e-mail is an e-mail
21  from Heather Goodman to David Erwin.
22        Do you know who Heather Goodman is?
23   A.   I don't.
24   Q.   Okay.  And -- but you know who David Irwin

Page 272

1   is?
2    A.   I do.
3    Q.   Okay.  And who is he?
4    A.   David Irwin was a national account manager
5   for us at Mallinckrodt.
6    Q.   Okay.  And based on this e-mail, Heather
7   Goodman is asking for a delivery to a pharmacy for her
8   aunt of 1500 oxycodone 15-milligram pills, is that
9   accurate?
10   A.   That's what the e-mail says, yep.
11   Q.   And then this is Dave Irwin to you cc'ing
12  Victor Borelli and John Adams.
13        And do you see this -- do you see the
14  e-mail?  It's on the bottom of Page 560773.
15   A.   The one from Dave Irwin to me?
16   Q.   Yes.
17   A.   Yes.
18   Q.   Okay.  And so can you read that, please?
19   A.   "Kate:  Here is the info we talked about
20  earlier.  Is there something I can do to help out from
21  this point on?  Heather Goodman used to report to
22  Craig Cowman, who referred her to us.  You may want to
23  let Mike know what's going on...he will see Craig at
24  NACDS in two weeks.

Page 273

1        "Vic:  Thanks for helping set this up.  It
2   sounds like it is much appreciated."
3    Q.   And who is -- who is -- do you know who
4   Craig Cowman is?
5    A.   I do.
6    Q.   Who is he?
7    A.   So Craig Cowman is, I believe, a senior VP
8   the Cardinal.
9    Q.   Okay.  And when he references "you might
10  want to let Mike know what is going on," who is Mike?
11   A.   So Mike Gunning was the -- the person we
12  spoke about earlier who was the head of sales and
13  marketing.
14   Q.   Okay.  So Heather Goodman used to work for
15  Craig Cowman at Cardinal and she is asking if you can
16  arrange to have 1500 oxy 15-milligram pills shipped to
17  a pharmacy for her aunt, is that --
18   A.   That's correct.
19   Q.   -- that's accurate?
20   A.   Uh-huh.
21   Q.   Okay.  And so your response to Dave is:
22        "I have spoken with Victor and he thinks
23  he can make this happen.  Two cases per month to the
24  below pharmacy.  He is working on it and should have

Page 274

1    an answer shortly."
2         Do you see that?
3    A.   I do.
4    Q.   Now, do you recall this e-mail exchange?
5    A.   I don't.
6    Q.   Okay.
7    A.   It is unique, I can tell you that.
8    Q.   And then there is an e-mail from Dave to
9    you and Victor?
10   A.   Um-hum.
11   Q.   Cc'ing John Adams.
12        "I'm sure I'll be talking to Heather
13   Goodman later today so I can clarify this, but I did
14   the math in my head yesterday and this equates to 50
15   tablets per day.  Is that even possible?"
16   A.   I see that.
17   Q.   Okay.  So, I mean, 50 tablets per day is
18   an -- is an unusually -- or is an abnormally high
19   amount for a patient, isn't it?
20   A.   I -- I don't know.
21   Q.   Okay.
22   A.   I can't speak to what her situation was or
23   the -- the conversations that she and her doctor had.
24   I -- I don't know.

Page 275

1    Q.   Well, but do you know if anyone responded
2    to Dave as to whether it's -- it's possible for
3    someone to be consuming 50 tablets a day?
4    A.   I -- I don't know if anyone did respond.
5    If they did, it is not in this e-mail chain.
6    Q.   Okay.
7    A.   I don't think that, you know, it was up to
8    us to question the amount that -- that she was being
9    prescribed.  Again, that was -- that was the
10   conversation that she had with her doctor at that
11   point.
12   Q.   Well, when you say it is not up to you to
13   question the amount, though, I mean, you didn't know
14   Heather Goodman and you don't know Aunt Sandra and she
15   is -- she is ordering 1500 oxy 15 pills.
16        So, you know, is it -- given that she is
17   asking Mallinckrodt to supply this, you know, isn't --
18   shouldn't Mallinckrodt be taking steps to make sure
19   that this is a legitimate order?
20   A.   So if she has a prescription from her
21   doctor for this that she takes to the pharmacy to be
22   filled, what drove that prescription and the
23   conversation that she had, we don't know, and I don't
24   also know if 50 tablets per day is -- is a lot, if

Page 276

1    that qualifies as a lot.  So I -- I don't know that we
2    can answer that.
3    Q.   Okay.  But you don't think there is
4    anything improper for a generic salesperson to arrange
5    for the delivery of oxycodone to a -- a relative of a
6    colleague?
7    A.   So, it wasn't an arrangement of a delivery
8    to -- to a relative.  It was an arrangement of a
9    delivery to Dane Drugs, which is a drugstore that's
10   serviced by, it looks like -- let's see here -- at
11   this point Keysource Medical.  So I think we need to
12   clarify that the delivery was to the drugstore, not to
13   the aunt, that the aunt had a prescription that she
14   then had to take to the drugstore to have filled.
15   Q.   And this is occurring in April of 2010 and
16   it is going to Keysource?
17   A.   It is actually April of 2009, not 2010.
18   Q.   Okay.  It is April of 2009.  But, I
19   mean --
20   A.   Prior -- prior to us having -- prior to --
21   prior to 2010, which was when the escalation of
22   discussion around pharmacies and Keysource occurred.
23   Q.   And Keysource was cut off?
24   A.   In the fall of 2010, yes.  But this is

Page 277

1    April of 2009, which is well over a year prior to
2    those events transpiring.
3    Q.   And so you didn't have any concerns or any
4    issues with this order?
5    A.   We don't appear to, no.
6    Q.   Well, I -- in particular, you didn't
7    appear -- you didn't have any concerns either?
8    A.   It doesn't appear that there were concerns
9    around it, no.
10   Q.   Okay.
11   A.   I think, to clarify -- well, no.
12        (WHEREUPON, a certain document was
13         marked Mallinckrodt - Neely
14         Deposition Exhibit No. 25, for
15         identification, as of 01/07/2019.)
16   BY THE WITNESS:
17   A.   Okay.
18   BY MR. KAWAMOTO:
19   Q.   Okay.  So, directing your attention to the
20   very bottom e-mail in the chain, it's -- well, my
21   apologies.
22        This is an e-mail chain that is largely
23   between you and -- and -- of Victor Borelli and Karen
24   Harper, though there are others on it as well.

Page 278

1  A.  Uh-huh.

2  Q.  The Bates number is MNK-T1 387434.

3  A.  Uh-huh.

4  Q.  And then directing your attention to the

5  e-mail to the bottom, which is 387435.

6  A.  Okay.

7  Q.  Do you see the paragraph that reads:  "The

8  two wholesaler/distributor license suspensions"?

9  A.  Yes.

10  Q.  Okay.  So could you please read that

11  paragraph for me?

12  A.  Sure.

13  "The two wholesaler/distributor license

14  suspensions led us to do a more in-depth investigation

15  of Covidien's oxycodone sales in the State of Florida.

16  We specifically focused on doctors' offices and pain

17  clinics.  It appears that Harvard and Sunrise were the

18  dominant players in this market with over 50 percent

19  of their total sales coming from this market.

20  H.D. Smith, Keysource and McKesson One Stop are next

21  with only 3 percent of their total sales coming from

22  doctors' office and pain clinics."

23  Q.  Okay.

24  And so we had a prior discussion about a

Page 279

1  document relating to doctors' offices and pain

2  clinics.

3  A.  We did.

4  Q.  And part of that discussion involved sort

5  of if there were sort of categorical concerns?

6  A.  Um-hum.

7  Q.  So, you know, does this e-mail refresh

8  your recollection as to whether there were categorical

9  concerns with respect to doctors' offices and pain

10  clinics?

11  A.  In terms of the evaluation here, well, we

12  saw that Harvard and Sunrise were shut down.

13  Investigating them, it showed that their sales were

14  coming from doctors' offices and pain clinics.  And so

15  that spurred us to see if other wholesalers and

16  distributors were picking up those sales through

17  doctor office -- doctors' offices and pain clinics.

18  So it shows that we did that analysis.

19  Q.  And it was an analysis that was broader

20  than just the particular -- the specific doctors and

21  pain clinics that were being serviced by Sunrise and

22  Harvard, it was a concern with, as a category, doctors

23  and pain clinics in Florida, is that fair?

24  A.  I don't think we should categorize it as a

Page 280

1  concern because the e-mail said it led us to do a more

2  in-depth analysis.  We specifically focused on those

3  two, but it doesn't necessarily mean there was a

4  concern.  It is just that we saw that segmentation

5  appear within the Harvard and Sunrise and so we did an

6  analysis to see if there was a trend across other

7  source programs.

8  Q.  Well, and then your -- your top e-mail on

9  387434, which is you to Karen Harper cc'ing JoAnne and

10  Victor, and the -- the e-mail is actually addressed to

11  Victor.

12  A.  Uh-huh.

13  Q.  It says:

14  "Vic, The e-mail below refers to doctors'

15  offices and pain clinic, the segmentation utilized was

16  not an addiction treatment clinic."

17  So this indicates that you performed this

18  screen on Keysource for the non-addiction treatment

19  clinic category, is that fair?

20  A.  Well, it -- it definitely says that in the

21  e-mail that you just had me read, so H.D. Smith,

22  Keysource and McKesson are next with only 3 percent of

23  their total sales coming from those two segmentations.

24  Q.  Okay.  And what was the concern with

Page 281

1  respect to pain clinics?

2  A.  I don't know that there was a specific

3  concern.

4  Q.  Okay.  What -- why focus on pain clinics

5  then?

6  A.  Because we had two accounts that had a

7  portion of their sales coming from those two

8  segmentations and so it was curious and so we started

9  to do a deeper dive into other business.

10  Q.  But Harvard and Sunrise had other

11  categories of customers aside from doctors and pain

12  clinics, correct?

13  A.  Well, they would have had to have because

14  only 50 percent of their total sales were coming from

15  the other two.

16  Q.  And you didn't focus on any of those

17  categories, so what was -- what made doctors' offices

18  and pain clinics worthy of special attention?

19  A.  To be honest with you, I -- I don't know.

20  This was in June of 2010, and so this was just prior

21  to -- I mean, so as you remember, we shut down

22  accounts in October of 2010.  This was the beginning

23  of us trying to evaluate what was going on.  We

24  weren't sure what was happening.  And it was my job to

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1  try to slice and dice the data to try to see if we
2  could tell any stories with it.
3      Q.   And so it wasn't because pain clinics in
4  Florida were a heightened risk of -- of diversion?
5      A.   I don't remember.  I don't recollect that,
6  no.
7      Q.   And it wasn't because, you know, supplying
8  directly to doctors' offices led to an increased risk
9  of diversion?
10     A.   Well, I don't know that we have any proof
11 that supplying directly to doctor's office increased
12 or decreased diversion.  It definitely isn't noted
13 here.
14     Q.   And just, you know, stepping back, as a
15 general matter, you don't ever recall specific
16 concerns at Mallinckrodt regarding pain clinics or
17 doctors' offices?
18     A.   Again, this has been eight, nine years
19 ago.  I don't have a recollection.
20     Q.   And --
21     A.   I think what you are seeing here is the
22 beginning of us trying to identify and -- and dig into
23 the data to see what was happening.  This was June
24 of 2010.  And then you saw the end results of that

Page 283

1  three, four months later when we were finally starting
2  to -- to get more clarification and by us shutting
3  down these accounts, you know, these accounts.  So I
4  think this was the beginning of that analysis, but I
5  can't speak to pain clinics or doctors' offices
6  specifically.
7      Q.   And you don't have any -- you -- you don't
8  have any recollection of -- of why there was a focus
9  on non-addiction treatment clinics?
10     A.   That was a segmentation within our
11 chargeback data.  No, I don't know.
12     Q.   So you -- you don't recall there being a
13 concern with an increased risk of diversion with
14 respect to non-addiction treatment clinics?
15     A.   What it appears to me here is that Harvard
16 and Sunrise had their DEA licenses removed.  Whenever
17 I ran the sales I saw that 50 percent of their sales
18 were coming from two different segmentations and it
19 caused me to want to look at that, were there other
20 accounts, which I found was only 3 percent to their
21 total sales.  So it is just statement of fact here.
22         Now, I don't know why or if that was
23 concerning at that time, but it was just strictly an
24 analysis that we performed to see if the same

Page 284

1  segmentation breakdown existed with our other
2  wholesalers, which we didn't see.
3      Q.   Okay.
4      A.   And I think it's also fair to indicate
5  that, you know, for Keysource only 3 percent of their
6  sales were coming from non-addiction treatment
7  clinics, yet they were one of the accounts that we
8  chose to shut down.
9          So that clearly indicates that there were
10 other classes of trade that they were servicing
11 outside of pain clinics that were of concern to us,
12 which doesn't really support your question, your line
13 of questioning, which is saying that we had concerns,
14 overarching concerns about pain clinics only, because
15 here we shut down an account, you know, four months
16 later where 97 percent of their sales did not come
17 from pain clinics.
18         So that actually begs a question, you
19 know, of why we are focusing and asking so many
20 questions of me about whether pain clinics were of
21 concern whenever clearly there were other areas of
22 segmentations that were driving -- driving issues
23 within the Florida market.
24     Q.   In other words, you shut down Keysource

Page 285

1  even though only 3 percent or a relatively small
2  amount were pain clinics and doctors, that's your --
3      A.   It indicates --
4      Q.   -- your point?
5      A.   -- it indicates that there were larger
6  issues outside of pain clinics.  Whenever there was
7  only 3 percent of Keysource's sales going to clinics,
8  that means 97 percent of their sales were going to
9  other classes of trade within the State of Florida,
10 but yet we still deemed them unacceptable to ship to
11 starting in October of 2010, and we made that decision
12 outside of the pain clinic segment being an issue,
13 which indicates to me that although we were looking at
14 the pain clinics as a potential here, because it did
15 drive -- it looked like they drove sales for Sunrise
16 and for Harvard, for Keysource in particular, they
17 didn't, yet we still chose to shut them down, which
18 you are asking me, were we overly concerned with
19 clinics, and I think this is telling --
20     Q.   Well, to be -- to be clear --
21     A.   Let me finish.  Let me finish.
22         And I think this is saying here that
23 clinics within Keysource's business were relatively
24 small but yet we were still deeming them an issue or a

Page 286

1 problematic customer to ship to as of October of 2010.

2    Q.  Okay. So I'm going to move to strike the

3 portion of that answer that misstates my question, and

4 I'm just doing that for the record.

5      So it's -- it's fair to say, though, that

6 the problem was broader than just pain clinics and

7 doctors in Florida, is that -- is that a fair

8 statement?

9    A.  According to the data that we are looking

10 at here, we made the decision to shut down Keysource

11 in October, so roughly, let's say, three to four

12 months after this analysis began, and only 3 percent

13 of their sales were coming from pain clinics.

14      So it would indicate that we must have

15 found, which I don't know in the context of this

16 e-mail, that there were additional reasons outside of

17 pain clinics to not want to ship particular

18 distributors.

19    Q.  Do you recall whatever -- what any of

20 those reasons were?

21    A.  I don't.

22      (WHEREUPON, a certain document was

23      marked Mallinckrodt - Neely

24      Deposition Exhibit No. 26, for

Page 287

1      identification, as of 01/07/2019.)

2 BY THE WITNESS:

3    A.  Thank you.

4 BY MR. KAWAMOTO:

5    Q.  So this is an e-mail exchange between you

6 and Mr. Borelli.

7    A.  Um-hum.

8    Q.  The Bates number is 44 -- Mallinckrodt T1

9 449324.

10    A.  Uh-huh.

11    Q.  And this e-mail is related to the last

12 e-mail we looked at.

13    A.  Sure.

14    Q.  If you look at the top e-mail from you to

15 Victor, it says:

16      "Just sent you something on this, check it

17 out and see if you still think we need an

18 investigation."

19      And in terms of what you sent him, it was

20 presumably the information in the last document about

21 the non-addiction treatment clinics.

22    A.  Um-hum.

23    Q.  Right?

24      So, when you say: "Check it out and see

Page 288

1 if you think we still need an investigation," an

2 investigation of what?

3    A.  So it appears that I sent to him what

4 comprised the 3 percent of Keysource's sales. So that

5 would be the -- the accounts listed on Exhibit 128560.

6    Q.  And those would be the eight -- the eight

7 non-addiction -- non-addiction treatment clinics?

8    A.  That were being serviced by Keysource.

9    Q.  Okay. And so was it up to Mr. Borelli to

10 determine whether or not he wanted to investigate this

11 further?

12    A.  It was not, no.

13    Q.  Okay. So then why are you asking him

14 if -- if he thinks we still need an investigation?

15    A.  I honestly don't know.

16    Q.  Do you recall what his response was?

17    A.  I don't have any recollection, no.

18    Q.  Do you recall if a -- an additional

19 investigation occurred relating to this issue?

20    A.  I don't know.

21    Q.  You would a -- well, would you agree that

22 it is problematic to ask the salesperson whether their

23 account should be investigated?

24    MR. TSAI: Object to the form.

Page 289

1      Go ahead.

2 BY THE WITNESS:

3    A.  Yeah, and I -- I think we need to be clear

4 and what's not clear in my e-mail. It says: "Just

5 sent you something on this. Check it out and see if

6 you think we still need an investigation."

7      It is not clear to me who the "we" is. So

8 am I saying "we," as a collective with -- does

9 Keysource still need to do an investigation. Because

10 you can see I followed the proper channels in the

11 e-mail and Document 128560 where I sent it -- let's

12 see here -- to -- to -- to Karen Harper directly. So I

13 addressed Vic, but I sent it directly to Karen Harper

14 and copied Vic and JoAnne Levy. So ultimately Karen

15 is going to be the one in charge of determining if we

16 needed to look into it further on our end.

17      And I was sending this to Vic, and I'm not

18 clear on the "we," if it is "we" as in Keysource still

19 needs to do this or "we" as an internal group.

20      So Vic would never have been the one to

21 decide that. It would have been Karen Harper who

22 was -- the formal e-mail was sent to at 3:04:19 on

23 June 25th.

24 BY MR. KAWAMOTO:

Page 290

1    Q.   Do you know if Vic would have weighed in
2  on that decision?
3    A.   Vic could have opinions on it if he wanted
4  to, but ultimately it was going to be Karen Harper's
5  choice on how we proceeded.
6          (WHEREUPON, a certain document was
7          marked Mallinckrodt - Neely
8          Deposition Exhibit No. 27, for
9          identification, as of 01/07/2019.)
10 BY THE WITNESS:
11   A.   Okay.
12 BY MR. KAWAMOTO:
13   Q.   Okay.  So this is an e-mail exchange
14 between Brenda and you and others.
15       And this relates to a suspicious order,
16 does it not?
17   A.   It does.
18   Q.   And it's -- it then -- it once again
19 involves Keysource Medical.
20   A.   It does.
21   Q.   And so the -- the bottom e-mail of the
22 chain is -- there is an order for 12,720 bottles of
23 8B -- 853001 and 12,720 bottles of the same product
24 SKU on July 2nd.

Page 291

1        Do you see that?
2    A.   Um-hum, I do.
3    Q.   So they are asking, you know, for
4  essentially in two days to be shipped over
5  24,000 bottles?
6    A.   Um-hum.
7    Q.   Brenda is flagging this as a suspicious
8  order and then Victor Borelli responds.
9        "Brenda, Oxy's movements through the
10 wholesaler and distributor accounts historically moves
11 much faster in the beginning of the month due to
12 monthly quota allocations set by these customers to
13 their customers.  As the month moves along, the
14 volumes, orders and movements should taper off quite a
15 bit.  I am in a sales seminar for the next few days,
16 so if you could pull up Cognos on this SKU for KMI,
17 you will see an extremely large growth at KMI on all
18 items, especially this one.  I believe they sold
19 47,000 bottles last month and 36,000 bottles the month
20 before."
21       And when he says "especially this one" --
22   A.   Uh-huh.
23   Q.   -- he is referring to oxycodone, isn't he?
24   A.   It appears so, yes.

Page 292

1    Q.   Okay.  And so they sold approximately
2  40,000 oxycodone last month --
3    A.   Uh-huh.
4    Q.   -- and they sold another 36,000 bottles
5  the month before?
6    A.   Um-hum.
7    Q.   Okay.  So in your opinion does this
8  explanation satisfy the customer -- satisfy Brenda's
9  question as to why they are ordering so much oxy?
10   A.   I think this goes back to the conversation
11 we had of whether or not Victor influenced decisions,
12 and I say, Well, he could have an opinion but it
13 ultimately would come back to compliance.
14       So it's tough to say if Brenda thought it
15 satisfied or not or what the additional steps were
16 taken because all it says is:  "FYI see Victor's reply
17 below," and I don't know what happened after that
18 fact.
19   Q.   Okay.  In your opinion, should this
20 increased demand in this large order have been
21 investigated further?
22   A.   It may have been investigated further.
23   Q.   Well, I understand it -- it may have been,
24 and I guess I'm -- I'm asking, you know, in your

Page 293

1  opinion, it -- it should have been as well?
2    A.   That's -- that's tough for me to say.  I
3  don't have all of the factors in front of me in terms
4  of what the average demand had been for Keysource, how
5  this related to their average demand.  I -- I don't
6  have that information.
7        So similar to the conversation we had
8  about Cardinal when you were asking me about their
9  order patterns, short of having the numbers in front
10 of me, it is tough for me to tell you if this
11 warranted an investigation or if one occurred after
12 it.
13   Q.   Well, focusing on the whether it warranted
14 an investigation, so they are asking -- I mean,
15 they -- they sold 40,000 bottles last month and --
16   A.   Uh-huh.
17   Q.   -- 36 bottles the month prior?
18   A.   Um-hum.
19   Q.   You know, that's -- given the volume they
20 are selling?
21   A.   Um-hum.
22   Q.   Shouldn't someone have inquired as to who
23 they are selling to, because this is in June of 2010?
24   A.   Sure.  And I think that you see us

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1 starting -- so, starting to do that over the course of
2 the next three months up until October when we did
3 make the ultimate decision to shut them down.
4      So apparently -- I don't know when the
5 inquiries happened or when the investigation occurred,
6 but we did ultimately shut them down.
7      Q.   And with respect to this order, though,
8 you don't know if this order shipped with any
9 additional investigation or not?
10      A.   There is -- there is no -- I don't have
11 any visibility outside of the e-mail that you've
12 provided to me that says:  "FYI see Victor's reply
13 below."
14      If we had an e-mail response from Jim
15 saying this order has been released then I could -- I
16 could 100 percent tell you that, but I don't have any
17 additional information outside of what you have
18 provided to me here.
19      Q.   Okay.  So if I wanted to determine whether
20 in fact this order was shipped, where -- where --
21 where would I go to look?
22      A.   If you --
23      Q.   Yes.
24      A.   -- wanted to determine if this order was

Page 295

1 shipped?
2      Q.   If -- if I -- if I wanted to -- I mean, we
3 have data from Mallinckrodt, we have documents from
4 Mallinckrodt.
5      Is there a database that would have -- I
6 mean, just mechanically speaking, if I wanted to see
7 whether or not this order shipped, how would I do
8 that?
9      A.   I -- I have no idea what systems -- I have
10 no idea how you -- I have not been with the company
11 for eight years.  I don't know.
12      Q.   Okay.  Well, I mean, if you were at
13 Mallinckrodt today and you needed to find out whether
14 or not this order got shipped, I mean, how -- how
15 would you go about doing that?
16      A.   I -- I don't know what systems they are
17 utilizing today.  Mallinckrodt is a completely
18 different company than it was eight years ago, so I --
19 I don't know how I would do that today.
20      Q.   Okay.  Well, in 2010 -- or let's say in
21 January of 2011, if you wanted to determine whether
22 this order shipped, is there a database you could look
23 at?  Would it be --
24      A.   In June of 2010 you would have referenced

Page 296

1 JDE, I believe is what they had, and you could have
2 referenced to see if an order had released.
3      But what that won't tell you, and you can
4 look at is that, what it won't tell you is what
5 investigation occurred between then and if the order
6 did release.  There is no -- I -- we don't -- there is
7 nothing here for me to confirm that.
8      Q.   Well, but the investigation would have
9 been memorialized in the e-mail, is that correct?
10      A.   I -- I don't know.  You are the one who --
11 who did the e-mail discovery, so I -- I don't know.
12      Q.   Well, just as a matter of practice and
13 policy, because you are the Mallinckrodt employee, if
14 there was an investigation, wouldn't it have been
15 memorialized in a -- in an e-mail?
16      A.   I -- I -- I can't answer that.
17      Q.   There would be some record of it, wouldn't
18 there?
19      A.   I -- I don't -- I don't know.
20      Q.   So it's possible that an investigation was
21 conducted but no one documented it?
22      A.   I -- again, sir, I don't know.  All I have
23 is this e-mail that we are looking at here.
24      Q.   Well, I understand that, but based on your

Page 297

1 experience working for Mallinckrodt --
2      A.   Uh-huh.
3      Q.   -- if an investigation is conducted into
4 an order --
5      A.   Uh-huh.
6      Q.   -- there should be some record of it,
7 right?
8      A.   I -- I don't know.  I think that we need
9 to get back on focus here in terms of Keysource and
10 talking about this particular order.
11      What I don't know is was this order
12 excessive for them.  I -- I don't know if the order
13 was released.  What I can tell you is this was June,
14 the end of June 2010 and less than four months later
15 we had made the decision to cut them off.
16      So whether or not this particular order
17 was investigated, whether it was released, I -- I
18 don't know the answer to that.  But what I can tell
19 you is sometime in those next four months an
20 investigation of this account did take place to the
21 point that we decided not to ship to them anymore.
22      Q.   But it's possible that you shipped to them
23 based on this order and then cut them off later, is
24 that --

Page 298

1    A.   That's a --
2    Q.   -- possible?
3    A.   I -- that's a total possibility because I
4  don't know if the order shipped or not shipped.  I
5  don't know what investigation was done in between the
6  potential shipment.  That's -- that's a huge
7  hypothetical.  I don't know that.
8    Q.   Well, I'm --
9    A.   I think we are getting really hyper
10 focused on this and we need to look at the overarching
11 scenario, which is the fact that we as a company did
12 shut this account down, and this one in particular I
13 think we've established I don't know what happened
14 with this order, I don't know if this order released,
15 I don't know if an investigation was done, I don't
16 know if these quantities were deemed excessive based
17 on their order pattern history.  I don't have that
18 information.  So I'm not going to be able to answer
19 any more questions than what I've already established
20 for you with regards to this particular order.
21   Q.   Well, in your opinion, wouldn't it be
22 problematic to send Keysource 25,000 bottles of oxy
23 given that, you know, four months later you completely
24 shut them down?

Page 299

1    MR. TSAI:  Object to the form.
2  BY THE WITNESS:
3    A.   Yeah, I think that that's a -- that's a
4  really, really bad question.  We --
5  BY MR. KAWAMOTO:
6    Q.   Well, I understand that --
7    A.   Excuse me.
8    Q.   -- but I want -- I would like an answer.
9    A.   I am going to answer it, don't worry about
10 that.
11        You know, you said wouldn't it be
12 problematic to release an order and then four months
13 later make the decision to shut them down and what you
14 are not accounting for are any of the activities that
15 occurred in those next four months.
16        Hindsight is 20/20.  So you look at this
17 and you say, Okay, had we known, we didn't know we
18 were going to shut them down in October because of an
19 investigation we did, we would have shut them down in
20 June.  I mean, that's -- that's ridiculous.
21   Q.   But the factors that you based your
22 decision to shut them down on, mainly, the large
23 amount they were supplying to Florida and the product,
24 oxy 30, you know, there -- that was information that

Page 300

1  was available to Mallinckrodt at this time, wasn't it?
2    MR. TSAI:  Object to the form.
3  BY MR. KAWAMOTO:
4    Q.   You can answer.
5    A.   Yeah.  Oh, I understand that I can.  Thank
6  you --
7    Q.   Okay.
8    A.   -- for giving me permission.
9        You know, in terms of the -- the
10 information that was available, I think that we talked
11 about earlier how getting to the state level detail
12 and digging to that was not something that we had
13 utilized chargeback data for.
14        As we had dug into the State of Florida,
15 and you can see it over the timelines in the course of
16 this business, we had established that there were a
17 large amount of sales going through Keysource.  What
18 we didn't know was the end purchaser in Florida, if it
19 was warranted, if it wasn't, and so that was the
20 investigation that took place over the next several
21 months to understand who the end purchaser was and
22 ultimately led us to -- to discontinue them on this
23 particular product.
24   Q.   Okay.  But with respect to the data, that

Page 301

1  data was available in June of 2010, right?
2    A.   The data was available.
3    Q.   Okay.  And, in fact, the data was -- would
4  have been available in June of 2009 as well?
5    A.   We had chargeback data from -- from --
6  yes, we had chargeback data available.
7    Q.   Okay.  And you don't -- you don't recall
8  how far back that chargeback data goes?
9    A.   I don't.
10   Q.   Okay.
11       (WHEREUPON, a certain document was
12       marked Mallinckrodt - Neely
13       Deposition Exhibit No. 28, for
14       identification, as of 01/07/2019.)
15 BY MR. KAWAMOTO:
16   Q.   So, Ms. Neely, this is a chart that's
17 been -- that summarizes information we have extracted
18 from data provided by Mallinckrodt.
19   A.   Um-hum.
20   Q.   The -- the actual spreadsheet is very
21 voluminous and its Bates number is MNK-T1 264293.
22   A.   Um-hum.
23   Q.   But this is a summary of the -- the oxy 15
24 and oxy 30 pills --

Page 302

1    A.   Um-hum.
2    Q.   -- that Mallinckrodt shipped to Keysource
3 broken out by year.
4        Do you see that?
5    A.   I do.
6    Q.   Okay.  And so, you know, you've stated
7 repeatedly that Keysource was cut off in the fall
8 of 2010, is that correct?
9    A.   I -- I think what I stated to you, because
10 you asked the question, it showed that we cut them off
11 for calendar year 2010 and then I stated to you that I
12 left the company in January of 2011.  So I think we
13 need to be really clear on what I have stated to you.
14    Q.   Okay.
15    A.   I stated after I left the company I don't
16 know what they did or didn't do with Keysource as an
17 account.
18    Q.   But you repeatedly referenced the fact and
19 you repeatedly said that it is important to note that
20 Keysource was cut off in the fall of 2010.
21        Do you recall that testimony?
22    A.   Well, they were cut off in the fall
23 of 2010.
24    Q.   I'm sorry?

Page 303

1    A.   They were cut off in the fall of 2010.
2    Q.   Yes.  But if you look at the chart, in
3 2011 they were added back, weren't they?
4    A.   I can't speak to that because I wasn't
5 with the company at the time.
6    Q.   Okay.  Well, but this -- I mean, according
7 to the data that Mallinckrodt has produced, in 2011
8 they received 1,000,873 UOMs of oxy 15 or oxy 30.
9    A.   Uh-huh.
10    Q.   Do you see that?
11    A.   I do.
12    MR. TSAI:  Object to the form.
13 BY MR. KAWAMOTO:
14    Q.   In your opinion, isn't that problematic
15 given that based on the careful investigation you
16 conducted in calendar year 2010 you -- you cut them
17 off?
18    A.   I --
19    MR. TSAI:  Object to the form.
20        Go ahead.
21 BY THE WITNESS:
22    A.   Yeah, I can't speak to that.  This is my
23 first time seeing this document.  I don't know how you
24 guys compiled it.  I -- I can't speak to that.  I

Page 304

1 wasn't with the company in 2011.  I don't know what
2 transpired to lead to that decision.
3 BY MR. KAWAMOTO:
4    Q.   Well, but you were there in 2010 when the
5 decision was made to terminate them, weren't you?
6    A.   I was.
7    Q.   Okay.  And so based on your understanding
8 of that investigation, its conclusion and that
9 decision --
10    A.   Uh-huh.
11    Q.   -- can you imagine any reason why you
12 would want to start up with them again in 2011?
13    MR. TSAI:  Object to the form.
14        Go ahead.
15 BY THE WITNESS:
16    A.   Yeah, I -- I can't speak to that.  I have
17 no eye -- I mean, I -- yeah, I have no idea what
18 goes -- what is in this number, if it is all oxy 30,
19 is it oxy 30 and 15.  Like, I -- I don't have the
20 backup of this analysis, so that's really, yeah,
21 challenging to speak to.
22    MR. KAWAMOTO:  What exhibit is this?
23    THE COURT REPORTER:  29.
24    MR. KAWAMOTO:  Okay.  Thank you.

Page 305

1    THE WITNESS:  Do you see that?
2        (WHEREUPON, a certain document was
3        marked Mallinckrodt - Neely
4        Deposition Exhibit No. 29, for
5        identification, as of 01/07/2019.)
6 BY MR. KAWAMOTO:
7    Q.   So this is an e-mail chain between you and
8 others, it is Bates numbered MNK-T1 290546.
9    A.   Um-hum.
10    Q.   And I'd like to direct you to one of the
11 pages towards the back.  It is 290551.
12    A.   If you could just give me an opportunity
13 to read through the document, I'd appreciate it.
14    Q.   Okay.  So let me know when you are ready.
15    A.   I will.
16        Okay.
17    Q.   Okay.  So, the -- the starting or one of
18 the starting e-mails is 290551 and it's from -- it's,
19 I think, either forwarding you or a response to an
20 e-mail from Charity Aranda.
21        Do you know who Charity was?
22    A.   Charity was the supply chain analyst
23 with -- at least according to her signature line.
24    Q.   Okay.  And so this is an e-mail from Cathy

Page 306

1 to Karen Harper, she is cc'ing you, Charity and
2 Michael Pheney.
3    A.   Um-hum.
4    Q.   And do you -- it says:
5        "Karen, This is a significant increase in
6 volume, ten times, apparently there are other
7 suppliers unable to get product to them. We've
8 contacted the business manager Kate and their group is
9 meeting today to determine if we will service this
10 customer."
11    A.   Okay.
12    Q.   And so the -- the reference to the
13 business manager is you, because you are on -- on this
14 e-mail, is that right?
15    A.   That looks to be the case.
16    Q.   Okay.
17        And so this is -- I mean, this was a
18 flagged as a suspicious order, is that fair?
19    A.   Yes.
20    Q.   And then Karen's response to Cathy is, and
21 cc'ing all of you, is:
22        "Cathy, If Masters Pharmacy is an existing
23 established account in good standing and given the
24 valid business reason that the other supplier cannot

Page 307

1 fulfill orders, there is no opposition from the DEA
2 compliance suspicious order monitoring perspective to
3 servicing this customer."
4    A.   Um-hum.
5    Q.   Do you see that?
6    A.   So Masters was already an established
7 account that we were already shipping to, yes.
8    Q.   And when she references "a valid business
9 reason" --
10    A.   Uh-huh.
11    Q.   -- "that the other supplier cannot fulfill
12 orders" --
13    A.   Um-hum.
14    Q.   -- what is she -- what is she referring to
15 there, what is that?
16    A.   So I believe during this timeframe
17 Actavis, who was our main competitor within this
18 market, had a recall.
19    Q.   Okay.
20    A.   So that's why their orders -- why the
21 orders with this particular account were high in
22 relation to what they used to order from us because
23 they had been purchasing the product from our
24 competition.

Page 308

1    Q.   Okay. And then if you turn -- if you skip
2 and turn to the cover e-mail, it's 290546, do you --
3 do you see the e-mail from Bill Ratliff?
4    A.   I'm sorry. Which one, which page?
5    Q.   Sure. It is the e-mail at the very front.
6 It is 290546.
7        Okay. And in particular, I want to direct
8 your attention to the paragraph that starts: "Both
9 Kate and Vic have visited the customer."
10    A.   Um-hum.
11    Q.   Okay. So he writes:
12        "Both Kate and Vic have visited the
13 customer in the last 60 days and were able to
14 determine Masters was ordering a large amount from
15 another vendor, much larger than our current level of
16 supply. It was determined that Actavis cannot supply
17 customers with oxycodone at this time, the 15 and
18 30-milligram product, because of a recall.
19 Supposition would indicate that the other supplier is
20 Actavis based on their market share."
21    A.   Um-hum.
22    Q.   So, did Masters tell you that this was the
23 reason or is this your -- your inference based on --
24 on other data?

Page 309

1    A.   Well, if you go back to the e-mail on
2 exhibit, what is it, 290548 from me to Cathy Stewart
3 copying Charity and Michael, this is Cathy understood
4 they insist they have demand and this was a true shift
5 from Actavis as a result of Actavis supply issues.
6        So that indicates that the customer shared
7 with us that they had been with Actavis and that's why
8 they were looking for a new supplier.
9    Q.   Okay. And the e-mail indicates that both
10 you and Vic have visited the customer in the last
11 60 days.
12        Do you recall that visit?
13    A.   I would occasionally go on visits with the
14 sales directors to their accounts. I have a vague
15 recollection of going with him to Masters. It's
16 not -- I don't remember much about it.
17    Q.   Okay. And why would you accompany the
18 national account managers on their business with
19 clients?
20    A.   It is a great question.
21        I was in marketing and I was working on
22 the back end in terms of, you know, doing the
23 forecasting, allocations, and so it was a good
24 opportunity for me to get out and meet the customer

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1 and expand that side of me professionally.

2        Why we picked Masters in particular for me

3 to go to, I don't know, but I don't think it had

4 anything to do with -- it obviously was 60 days prior

5 to this happening, so it was just happenstance that I

6 had been at that account and then this occurred.

7     Q.    And so do you -- do you recall if they

8 communicated to you they were shifting from Actavis to

9 you at this meeting or was it subsequent

10 conversations?

11    A.    I -- I don't know if it occurred at the

12 meeting or if it was subsequent conversations.

13    Q.    But regardless, you know, Karen Harper and

14 DEA compliance is relying on the information that

15 you're providing to conclude -- or to indicate that

16 there is no opposition from them to fulfilling this

17 order, is that fair?

18    A.    Yeah, at that point we had no reason not

19 to -- not to service the customer.

20    Q.    Okay.

21        (WHEREUPON, a certain document was

22        marked Mallinckrodt - Neely

23        Deposition Exhibit No. 30, for

24        identification, as of 01/07/2019.)

Page 311

1 BY MR. KAWAMOTO:

2     Q.    So this is another e-mail chain, it's

3 between -- well, primarily you and Mr. Borelli, though

4 Michael Gunning is also included on it.

5     MR. KAWAMOTO:  I'm sorry.  How much time do I

6 have left?

7     THE VIDEOGRAPHER:  So we are at five hours and

8 54 minutes.

9     MR. KAWAMOTO:  Okay.

10    THE VIDEOGRAPHER:  An hour and six minutes.

11    MR. KAWAMOTO:  A little bit over an hour.  Thank

12 you.

13 BY THE WITNESS:

14    A.    Okay.

15 BY MR. KAWAMOTO:

16    Q.    Now, you'll look -- if you look at the

17 last document, you see that the timing of this

18 e-mail -- of these e-mails are on June 4th, is that --

19 or I'm sorry --

20    A.    They are on June 2nd.

21    Q.    Do you see --

22        No, I'm sorry, the pri -- the prior

23 document regarding Masters and its -- its oxy orders?

24    A.    Was June 4th, uh-huh.

Page 312

1     Q.    Yes, that e-mail exchange is going on

2 June 4th and through June 3rd.  And then this e-mail

3 is dated June -- or this e-mail chain is on June 3rd

4 through June 2nd?

5     A.    Um-hum.

6     Q.    So they appear to be discussing the -- the

7 same orders, is that fair --

8     A.    Okay.

9     Q.    -- given their -- given their dates?

10    A.    It is discussing the same account and oxy,

11 so yes.

12    Q.    Okay.  So do you see your e-mail on

13 page -- or Bates number 562702?

14    A.    I do.

15    Q.    It is an e-mail from you to Victor.

16        Could you please read that?

17    A.    "These usages account for 10 percent of

18 the 15 and 30-milligram and the cases of the

19 30-milligram are significantly higher than those of

20 Cardinal, who we have on source.  They look very high

21 and are concerning to me.  We need to talk as I don't

22 know that I feel comfortable shipping them at such

23 high levels.  Do we know where the product is going?

24 We need to discuss."

Page 313

1     Q.    Okay.  And you reference that these --

2 that these levels or -- or Masters orders are

3 significantly higher than Cardinal who you have on

4 source.

5        What does it mean to have someone on

6 source?

7     A.    So Cardinal or McKesson or

8 AmerisourceBergen, they each have source programs that

9 are a collection of independent pharmacies that they

10 sell product to.  And it's a buying -- it is

11 essentially a buying group, and so we would contract

12 with a source program via a wholesaler.

13    Q.    Okay.  And Masters didn't have that?

14    A.    Masters was a distributor.

15    Q.    Okay.  And so is it fair to say that you

16 had concerns regarding Masters' orders?

17    A.    I had concerns about the size of them.  In

18 terms of concerns about shipping product and it coming

19 back to us.

20        So at this point in time in 2008, this is

21 when Actavis was going out of the market because of

22 recalls and we were getting a huge influx of new

23 demand coming to us as a result and we were not --

24 because of the DEA quota that you and I talked about

Page 314

1  this morning, we were not in a position to service
2  the -- the additional demand.
3        And so for me, whenever we are getting --
4  when we are getting usages, at least back in 2008 for
5  this particular product, I had concerns about the
6  volumes, because if we had shipped Masters and it
7  wasn't -- I was questioning the numbers because if we
8  shipped to them, then we would potentially be
9  sabotaging shipments to our existing customer base.
10       And so I was trying to understand if we
11 shipped them product were they indeed going to be able
12 to sell it or was it going to get returned to us
13 because that would be -- because then if it gets
14 returned, it is essentially unsalable.
15 Q.   Well, but didn't you -- didn't you have a
16 concern with the nature of the demand for Masters'
17 products?
18 A.   I -- I think that my concern with the
19 demand for the -- for the oxy through Masters was that
20 I thought it looked high and I was concerned about our
21 inventories and being able to service our other
22 customers and not wanting to put them in a detrimental
23 situation.  I was questioning the volumes in terms of
24 shipping to them, because I was afraid the volume

Page 315

1  would literally ship to them and it wouldn't move.
2        And I -- so I was trying to understand
3  that they did, indeed, have a customer base that they
4  were selling this product to.
5  Q.   Well, but you also asked, do you -- do we
6  know where the product is going.  So that's --
7  A.   Well, the other concern that I had was --
8  Q.   Well, actually, let me finish the
9  question --
10 A.   Oh, I'm so sorry.
11 Q.   -- and I'll give you a chance to respond.
12 A.   I didn't mean to interrupt you.
13 Q.   You asked:  "Do we know where the product
14 is going?"
15 A.   Uh-huh.
16 Q.   Which means that -- isn't -- that is a
17 question about who the end purchasers are, isn't it?
18 A.   Yes.  So, at this time back, again, I'm
19 going to reiterate in 2008 when we got this request.
20 So -- so you asked the question, is Masters, do they
21 have a source program, and the answer was, no, they
22 are a distributor.
23       So what distributors do is -- so
24 Cardinal's source, they'll have -- they'll have

Page 316

1  pharmacies and then those particular pharmacies, if
2  they can't get the product from Cardinal, will
3  then rely on distributors to pull that -- to pull
4  product.
5        My fear was is that if we shipped the
6  product to Masters that they would somehow then be
7  sabotaging our business via our existing customer base
8  with Cardinal.  So when I asked:  "Do we know where
9  the product is going," I wanted to understand what
10 pharmacies or at what -- where they were -- where the
11 product was going to be sold because my concern is if
12 we allocate the product to Masters, they somehow
13 sabotage the sale with a source program, i.e.,
14 Cardinal, and Cardinal doesn't get the product from us
15 because we back ordered them here, then that puts us
16 in a bad situation with our existing customer
17 Cardinal.  So that was the question regarding:  "Do we
18 know where the product is going?"
19 Q.   So -- so I take it you recall this e-mail
20 chain then?
21 A.   I'm reading this e-mail chain and it's
22 jogged -- jogging my memory in terms of the Actavis
23 recall.  And if you look to Exhibit 562703, it's
24 showing the new customers from Victor.  So he is

Page 317

1  giving volumes for his customers that he is asking to
2  build in.
3        So these were all new customers that were
4  coming on board.  So those would have been questions
5  that would have been the reasoning behind my line of
6  questioning.
7  Q.   Okay.  And then do you see the e-mail
8  responding to -- well, actually, I'm sorry, going back
9  to that e-mail, you say:  "Do we know where the
10 product is going?  We need to discuss."
11 A.   Um-hum.
12 Q.   You recall to the discussions that you had
13 with Mr. Borelli?
14 A.   I -- I -- no, I don't.
15 Q.   Do you recall if you ever learned where
16 the product was going?
17 A.   I -- we must have gotten a comfort level
18 that it wasn't going to be detrimental to our existing
19 business.  I also don't know if we took on the full
20 volume at this point.  That's not clear in this
21 e-mail, and I don't remember.
22 Q.   And so the e-mail from Victor to you is --
23 well, it says:
24       "Kate, The only places that they, Masters,

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1 can ship the product to are authorized customers that
2 we approve from the chargebacks group. We only
3 authorize end using customers with registered and
4 up-to-date DEA licenses that dispense product to
5 consumers."
6     So his -- his statement that the only
7 places that the Masters can ship the product to are
8 authorized customers that we approve from the
9 chargeback group --
10     A.  Um-hum.
11     Q.  -- what does that mean?
12     A.  I don't know why Victor made that
13 statement and I can't speak to why he made that
14 statement and I also was not in the chargeback group,
15 so I don't -- I can't speak to the authorized
16 customers that we approved from the chargebacks group.
17 I don't understand that statement.
18     Q.  Okay.  And is -- is your understanding
19 that Mallinckrodt approved customers -- well, when he
20 says "authorized customers," he is referring to end
21 purchasers, correct?  Because he references the only
22 places that they can ship the product to.
23     A.  Uh-huh.
24     Q.  So that would be the -- the authorized

Page 319

1 customers are end purchasers?
2     A.  It appears to be what his statement says,
3 yeah.
4     Q.  Okay.  And so did -- did Mallinckrodt
5 approve end purchasers -- did Mallinckrodt's
6 chargeback group approve end purchasers?
7     A.  I think to just, to restate what I just
8 said, I -- I don't know.  So that -- that part I
9 wasn't in the chargebacks group.  I don't know what --
10 what, you know, the process was for approving end
11 purchasers in the -- if it was done in the chargeback.
12 I don't -- I don't know.
13     Q.  Well, I mean, regardless of whether it was
14 done in the chargeback group or elsewhere, do you have
15 any recollection of Mallinckrodt approving end
16 purchasers?
17     A.  I -- again, that wasn't something that was
18 within my group within marketing and I don't know what
19 the process was that was done or who -- I don't know.
20     Q.  Okay.  So he also says:
21     "We only authorize end using customers
22 with registered and up-to-date DEA licenses that
23 dispense product to consumers."
24     So what -- what did you take that

Page 320

1 statement to mean?
2     A.  Well, again, it's challenging for me to
3 answer that because I don't have a firm understanding
4 outside of my group who authorized end using customers
5 and how it was done in relation to DEA licenses, so
6 I -- I don't think that I can answer that.
7     Q.  And you don't have any recollection of
8 what you understood this to mean at the time because,
9 I mean, it -- he is -- he is -- he is sending this
10 e-mail to you --
11     A.  Um-hum.
12     Q.  -- presumably in response to your
13 question --
14     A.  Um-hum.
15     Q.  -- that you wanted to talk to him and also
16 do we know where the product is going?
17     A.  Sure.
18     Well, I don't know if that's in direct
19 response to that question or not, but in terms of what
20 he is responding on, I, again, can't answer that
21 because I wasn't in the group that was -- first of
22 all, I -- I wasn't part of the process of authorizing
23 customers, nor do I know how they utilized the DEA,
24 that part I -- I just don't know.  I was in marketing.

Page 321

1 That was completely outside of my purview.
2     Q.  Well, why were you having this
3 conversation with Mr. Borelli?
4     A.  Well, I think that we -- we talked to that
5 earlier, whenever I sent the e-mail to him asking him
6 about the volumes that Masters had given in terms of
7 the 15 and 30-milligrams.  So that would be why the
8 conversation -- his response came back.
9     How Vic chose to respond to my questions
10 is on Vic.  I mean, that's not -- I can't -- I can't
11 tell you what Vic was thinking when he put this e-mail
12 together, nor can I talk to the approval of authorized
13 customers being done by chargebacks group or whomever
14 within the organization.  I -- I can't -- I can't
15 cover -- cover that for you.
16     Q.  Okay.  But in terms of his statement that:
17 "We only authorize end using customers with registered
18 and up-to-date DEA licenses" --
19     A.  Um-hum.
20     Q.  -- I mean, presumably the review, for
21 example, of a suspicious order would involve more than
22 simply confirming that the end user had a registered
23 and up-to-date DEA license, right?
24     A.  But at this point are we talking about

| Page 322 | Page 324 |
|---|---|

**Page 322**

1  suspicious orders or are we just talking about the
2  volumes, as I mentioned, looking to understand who
3  they sell to because I didn't want to interfere with
4  our existing business?
5  Q.  Well, the -- the prior document, 290546
6  is -- is being -- I mean, that discussion is
7  occurring --
8  A.  Uh-huh.
9  Q.  -- in the context of suspicious orders,
10  and so it's the -- it's the same customer, it's their
11  orders.
12  A.  Well, we were receiving a large order from
13  a customer that we had never done business with
14  before, so we were trying to understand what that
15  volume, what it was and if it was going to be
16  detrimental to our existing business.  So that was
17  definitely part of the discussion.
18  Q.  Well, the -- but just -- just to, I guess,
19  correct something --
20  A.  Um-hum.
21  Q.  -- the e-mail says -- from Karen is:  "If
22  Masters is:" -- "If Masters Pharmacy is" --
23  A.  Can you take -- can you hold on.  Which --
24  Q.  Sure.

**Page 323**

1  A.  -- which document are you looking at right
2  now?
3  Q.  Okay.  Fair enough.
4  If you look at 290546.
5  A.  Um-hum.
6  Q.  The e-mail, and I'm referring now to Bates
7  number 290550, so that particular page.
8  A.  Okay.
9  Q.  This is an e-mail we looked at between
10  Cathy and Karen Harper.
11  A.  Uh-huh.
12  Q.  And Karen says:
13  "If Masters Pharmacy is an existing
14  established account in good standing" --
15  A.  Uh-huh.
16  Q.  -- "and given the valid business reasons."
17  So it -- it wasn't a new customer, I mean,
18  Masters was an established customer, wasn't it?
19  A.  No, no, it wasn't a new customer, but this
20  was new business for us.  So we hadn't currently been
21  primary, in the primary position with them for this
22  particular product.  So, no, not -- not a new account
23  but new business for us.
24  Q.  Okay.  So you had done business with this

**Page 324**

1  customer before, you were just receiving a -- a large
2  order from them?
3  A.  We were receiving -- so we had been
4  selling to them, yes, with other products and we had
5  received a large order from them for this particular
6  product which then did -- did catch our radar and
7  there were questions around -- around what their
8  ongoing usage was going to be, about their order
9  pattern would be, who their customer base was so we
10  can understand how it would impact our existing
11  customer base.  So there were definite questions
12  around it, 100 percent.
13  Q.  And these questions involved the
14  compliance department and the suspicious order
15  monitoring program as well, didn't they?
16  A.  Well, I think you can see that from this
17  e-mail chain.
18  Q.  The --
19  A.  Karen Harper is all over this.
20  Q.  The first -- yes, the first e-mail chain?
21  A.  Yeah, on 290546.
22  Q.  And so when Victor Borelli, turning now to
23  the second document --
24  A.  Uh-huh.

**Page 325**

1  Q.  -- 562701, when Victor Borelli says:
2  "We only authorize end using customers
3  with registered and up-to-date DEA licenses" --
4  A.  Uh-huh.
5  Q.  -- "that dispense product to consumers."
6  A.  Uh-huh.
7  Q.  The fact that the end purchaser has a
8  registered and up-to-date DEA license isn't the end of
9  the inquiry with respect to the SOM program, correct?
10  A.  Again, I -- in this particular paragraph,
11  I can't speak to this because I don't know what --
12  that fell completely outside of my purview.  So
13  talking about what Victor noted in the first paragraph
14  on Document 562701, I -- I think we've agreed that I
15  can't really provide any insight into this.
16  I can tell you that this business was part
17  of the suspicious order monitoring process.  The
18  evaluation of the -- the orders you can see in this
19  line.  And then you can also see me looking at it from
20  strictly, and this was my area, a business perspective
21  and trying to understand what this meant to us from a
22  business.
23  So you had a couple of parallel paths
24  happening with regards to this -- this influx or

Page 326

1  this -- this new demand that we were seeing from
2  Masters.
3      Q.   Okay.  And looking at Victor's response to
4  you, though --
5      A.   Um-hum.
6      Q.   -- that's what I'm -- I'm trying to
7  understand.  I'm trying to understand if his
8  response --
9      A.   Um-hum.
10     Q.   -- addresses either the suspicious order
11 monitoring concerns or your business concerns, and
12 that's --
13     A.   And I think what we've established is I
14 don't know what that response -- I first of all don't
15 know if that's indic -- I don't -- I don't know
16 because, like, that was not something that I
17 personally was responsible for.
18         And secondly, I don't know if this is --
19 because this e-mail chain happened before June 4th.
20 So I don't know if it was in relation -- I mean, if it
21 was in relation -- hmm, let me just look at the dates
22 here.  June 3rd.
23         So all of this exchange with Victor
24 happened on June 2nd and this entire exchange happened

Page 327

1  on June 3rd.  So I -- I -- to me, this would be -- it
2  couldn't have been a response to this because this
3  happened two -- what, a day, two days later.
4      Q.   Well, but the general review of Masters'
5  order --
6      A.   Um-hum.
7      Q.   -- was -- it involved both a business
8  component and an SOM component, didn't it?
9      A.   It did.
10     Q.   Isn't that what these two are showing?
11     A.   It did, yeah.
12     Q.   Okay.  And so --
13     A.   But what I don't know is does Victor's
14 paragraph there pertain to a response to my question
15 or if it pertains to -- to a suspicious order
16 monitoring question that he thought might come.  I --
17 I don't know that.  I didn't write this e-mail, Victor
18 did.
19     Q.   And so why would Victor be writing to just
20 you and John Adams about the S -- the SOM program?
21     A.   Well, again, we haven't established that
22 it is in regards to the SOM pro -- program, so -- so
23 until we know that, which the only way we would know
24 that is to understand what Vic meant, we can't

Page 328

1  establish that that's what he is referring to, so I
2  can't answer then why he wouldn't have copied Karen
3  Harper in.
4      Q.   Well, but I think we can establish that a
5  large order has come in and you've indicated a concern
6  about it, right, that's your e-mail on June 2nd at
7  5- --
8      A.   5:20.
9      Q.   -- -62702, correct?
10     A.   Um-hum.
11     Q.   And then Cathy Stewart has also indicated
12 a concern about it --
13     A.   Um-hum.
14     Q.   -- from a suspicious order monitoring
15 program standpoint and that's --
16     A.   Well, I think we need to be clear, from
17 the suspicious order monitoring program, so this
18 account had been buying this product from, but at a
19 smaller, much smaller level.  And so we've ascertained
20 that the suspicious order monitoring program caught
21 orders that were in excess of what the purchase from
22 an account historically had been.  This was much
23 larger than what they had historically purchased, so,
24 yes, it got kicked to suspicious order monitoring

Page 329

1  because of that.
2          The other e-mail chain that we are
3  referencing here from June 2nd and June 3rd is me in
4  communication with Victor about new volumes that he
5  has as a result with his account as a result of the
6  Actavis recall.  And my response back to him is
7  asking, saying the volumes looks high, and I want to
8  understand where they are going because I want to
9  understand how it impacts the balance of our business.
10     Q.   That's --
11     A.   And then how Victor responds, I can't --
12 I -- I don't know.
13     Q.   But in -- in both instances the concern is
14 with the size of the order, right?
15     A.   Well, of course, the size of the order was
16 significantly larger than what they had been buying
17 from us because they had been buying that product from
18 our competitor who had a recall.  So the order was
19 large and it caught us, it caught on the radar, of
20 course it did.
21     Q.   Okay.  And so it get -- it -- it popped up
22 on the radar of both you from a business standpoint
23 and the compliance department from an SOM standpoint?
24     A.   Um-hum.

Page 330

1   Q.   Correct?
2        And so Victor on June 2nd is e-mailing
3   you --
4   A.   -- and he is presumably responding to
5   Q.   -- and he is presumably responding to
6   someone, isn't he?
7   A.   It looks like he is responding to my
8   e-mail.
9   Q.   Yes.  And so one of the things that your
10  e-mail asks is:  "Do we know where the product is
11  going?"
12  A.   Um-hum.
13  Q.   And so he is -- I -- I believe, you know,
14  he is -- well, I guess my question is, is he answering
15  that question?
16  A.   Um-hum.  I -- I don't -- and, again, I
17  don't know because I am not inside Victor's head nor
18  was I when he wrote this e-mail.  I don't know.
19  Q.   And so, based on these two e-mail chains
20  and your recollection, you don't have any recollection
21  of whether you ever received a response as to where is
22  this product going?
23  A.   I don't -- I don't have a recollection,
24  no.

Page 331

1        MR. TSAI:  Dean, it is about 5:00, I think we
2   have about 30 some minutes left.  Can we take a quick
3   break?
4        MR. KAWAMOTO:  Sure.
5        THE VIDEOGRAPHER:  All right.  The time is
6   5:01 p.m.  We are going off the record.
7        (WHEREUPON, a recess was had
8         from 5:01 to 5:14 p.m.)
9        THE VIDEOGRAPHER:  Okay.  We are back on the
10  record.  The time is 5:14 p.m.
11       (WHEREUPON, a certain document was
12        marked Mallinckrodt - Neely
13        Deposition Exhibit No. 31, for
14        identification, as of 01/07/2019.)
15  BY MR. KAWAMOTO:
16  Q.   So this is an e-mail between you and
17  Victor Borelli.
18  A.   Uh.
19  Q.   And the e-mail that I'm interested in is
20  on 564327 and 564328.
21  A.   Okay.
22  Q.   And the starting Bates number is
23  MNK-T1 564327.
24       So could you review that e-mail for me,

Page 332

1   please?
2   A.   Sure.
3        Okay.
4   Q.   So this e-mail is from Victor to you, and
5   he says:  "Kate, I was thinking about our conference
6   call this morning with John Adams" --
7   A.   Um-hum.
8   Q.   -- "and I wanted to circle back with you
9   on both instances in which you say I did things that
10  compromised your trust in me."
11  A.   Uh-huh.
12  Q.   Do you see that?
13  A.   I do.
14  Q.   Do you recall receiving this e-mail from
15  Victor?
16  A.   I do.
17  Q.   Okay.  And what do you recall about this
18  e-mail?
19  A.   I don't recall the content of the e-mail,
20  but I do remember -- I remember having this
21  conversation, we had had a call with him and with John
22  Adams that -- that morning.  I didn't remember the --
23  I didn't remember the context, but I do remember
24  making this statement of losing trust with Vic and

Page 333

1   then him sending this e-mail to me later in the
2   evening at 9:30.  So I -- I remember this situation
3   occurring for sure.
4   Q.   Okay.  And do you recall why you -- why
5   you indicated that you lost trust in him?
6   A.   That's the part that I -- that I was more
7   vague on.  I'm reading it and he gives -- he gives the
8   reasons why, which give me recollection, but I
9   wouldn't have remembered this otherwise.
10  Q.   But do you -- you do recall a phone
11  conversation with him and John Adam -- Adams where you
12  indicated that you were --
13  A.   I was upset.
14  Q.   -- venting?
15  A.   Or I was -- I was upset about something,
16  yes.
17  Q.   Okay.  And it -- it caused you to -- to
18  lose trust in him, is that fair?
19  A.   It caused me to question a decision that
20  he had made, yes.
21  Q.   Okay.  Did you have any concerns that he
22  was providing information with his
23  distributor/customers that he shouldn't be?
24  A.   So if you read the paragraph, they kept

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1 asking it, so it looks like we, if you read the -- the
2 e-mail, it says: "The second instance was more
3 recent." It says: "The shipment was the Masters
4 recent large oxy 30-milligrams orders." And this was
5 on June 5th. And so that's, you know, a day after
6 the -- the exchange that we had on June 4th
7 internally. So we were holding these orders. We
8 weren't shipping them at the time because we were
9 trying to -- to determine, you know, determine if we
10 could take on the business, what we were going -- what
11 we were going to do, and we had asked -- according to
12 him, we had asked to keep that -- you know, we were
13 trying to have that conversation internally before we
14 communicated anything to the customer.
15        And it looks like from this e-mail he went
16 ahead and moved forward with telling Masters the
17 discussions that we were having.
18    Q.   And you had asked him not to do this,
19 correct?
20    A.   Well, I had said that we wanted to --
21 according to this, it looks like I had said we wanted
22 to keep the conversations internal. I don't remember
23 the conversation specifically, but based on his
24 response, that appears to be what I had said.

Page 335

1    Q.   Okay. And you don't have any reason to
2 believe that his characterization of the second
3 instance is inaccurate?
4    A.   Can you explain what you mean?
5    Q.   Well, you -- do you recall asking him to
6 keep your con -- your internal conversations
7 confidential?
8    A.   I -- I don't -- like I said, I don't
9 recall that, but reading his -- his response indicates
10 that that's what I had said.
11    Q.   Okay. And you don't have any reason to
12 believe he would be lying about that?
13    A.   No, because I remember -- I remember this
14 conversation, at least high level.
15    Q.   Okay. And so you had asked him to keep
16 information confidential and he apparently disregarded
17 that request, is that fair?
18    A.   He went ahead and shared with the
19 customer, yes.
20    Q.   Okay. Do you recall other instances where
21 he did that?
22    A.   This one in particular stuck with me.
23 I -- I don't have a recollection of other occasions.
24    Q.   But is it fair to say that as a general

Page 336

1 matter you had some concerns about his reliability
2 vis-à-vis the -- the information he was sharing with
3 his customers?
4    A.   I --
5    MR. TSAI:  Object to the form.
6 BY THE WITNESS:
7    A.   Yeah, I don't think that we can -- we can
8 say that based on this -- this one e-mail exchange.
9 I -- and I don't -- this -- like I said, this one
10 instance I do remember, but I don't have any
11 recollection of others.
12 BY MR. KAWAMOTO:
13    Q.   But you were certainly upset about this
14 instance, weren't you?
15    A.   I was upset, yes.
16    Q.   And, I mean, John Adams was Victor
17 Borelli's boss?
18    A.   That's correct.
19    Q.   So it was -- it was of sufficient concern
20 to you that you raised that with him?
21    A.   I think, you know, and I do remember this
22 conversation, this was 2008, so I would have been
23 29 years old at this point, and I think back on this,
24 actually, because this was something that stuck with

Page 337

1 me through my career, this conversation, and I think a
2 lot of -- it might have just been immaturity, to be
3 honest with you.
4    Q.   Well, you say that this -- this
5 conversation -- or -- well, I'm sorry.
6        You -- your testimony is because this was
7 something that stuck with me through my career, this
8 conversation, so this -- this conversation stuck with
9 you through your career, is that correct?
10    A.   I remember it, yes.
11    Q.   Okay.
12    A.   Unlike a lot of these things that we
13 reviewed today, where --
14    Q.   Uh-huh.
15    A.   -- it was -- there -- there was not a firm
16 recollection.
17    Q.   Sure. So what made this conversation
18 stick with you?
19    A.   I think because I realized -- do you
20 really want me -- I think because I realized the
21 relevance of calling someone out that -- that hard and
22 not having -- in front of their boss and not having a
23 direct conversation with them.
24    Q.   Okay.

Page 338

1    A.   So I think that that was a -- a miss on --
2  on my part in terms of how I handled it.  And that's
3  something that stuck with me.  And I'm sure you've had
4  those, too, where you've thought about things that you
5  could have done differently and handled differently
6  and it impacts how you manage those relationships
7  going forward.
8    Q.   So what -- what sticks out at you is your
9  reaction to this?
10   A.   Yeah.  100 percent.
11   Q.   Okay.
12   A.   Yeah.  That's why I didn't really remember
13 the content of it, but I remembered this -- this
14 happening.
15   Q.   Okay.  And, actually, looking -- looking
16 at the sentences that are at the bottom of 564327 and
17 the top of 564328.
18   A.   Uh-huh.
19   Q.   "When I was discussing the scenario with
20 Masters, I explained to them that their order size
21 immediately raised concerns throughout their entire
22 organization.  They understood the rational behind
23 this based on their purchasing history but their bone
24 of contention was that they weren't getting any

Page 339

1  direction or information about their orders.  They
2  kept asking and probing me with more questions about
3  why customer service didn't get back to them and why
4  nobody could get back to them with solid answers on
5  their order status."
6        So, in response to -- to Victor sharing
7  with them these internal discussions, did Masters
8  complain?
9    A.   Masters had placed their orders and we had
10 not shipped the orders and customer service was not
11 communicating to them status.  So it appears that
12 according to this that they complained to Victor about
13 not having an update on what was happening with their
14 orders.
15   Q.   Do you recall why you wanted this
16 conversation to be -- or these conversations to be
17 kept confidential?
18   A.   Because we hadn't made a decision yet on
19 what we were going to do, and so until we had that, we
20 didn't want to communicate yea or nay to Masters on
21 what was happening.
22   Q.   And Victor as the national account manager
23 wanted to ship, didn't he?
24   MR. TSAI:  Object to the form.

Page 340

1        Go ahead.
2  BY THE WITNESS:
3    A.   Yeah, I can't speak to what Victor wanted
4  to do.  It was Victor's job in sales, I was in
5  marketing, and so I can't speak to what he wanted to
6  do, but he did have an account asking where their
7  orders were and he -- they didn't have any answers and
8  he was getting a lot of pressure from -- from them to
9  have answers.
10 BY MR. KAWAMOTO:
11   Q.   And so would one reason for him to share
12 this information with Masters which prompted Masters
13 to -- to, you know, start complaining be to, you know,
14 put -- apply some pressure to -- to make a decision
15 and ship the order?
16   MR. TSAI:  Object to the form.
17 BY THE WITNESS:
18   A.   Yeah, I think that's -- there is a lot of
19 speculation there.  I can't -- I can't speak to -- to
20 what Victor, you know, what he did or didn't feel or
21 do on this.
22 BY MR. KAWAMOTO:
23   Q.   But the end result is that, you know,
24 putting aside the e-mails, the order did ship?

Page 341

1    A.   Did it?
2        I don't think we have any documentation
3  actually showing that the order shipped.
4        (WHEREUPON, a certain document was
5          marked Mallinckrodt - Neely
6          Deposition Exhibit No. 32, for
7          identification, as of 01/07/2019.)
8  BY THE WITNESS:
9    A.   So this e-mail chain is from June 6th of
10 2008 and this e-mail chain is as of September 15,
11 2008.
12 BY MR. KAWAMOTO:
13   Q.   Yes, and if I can just read into the
14 record, it is MNK-T1 562745 and it is a -- an e-mail
15 exchange between you and -- and Victor Borelli --
16   A.   Um-hum.
17   Q.   -- among other things, and you write to
18 him:  "You're way too energetic about this shipping
19 thing."
20   A.   Um-hum.
21   Q.   And part of his response is, you know:
22 "Ship, ship, ship."
23   A.   Yeah.
24   Q.   So previously you had indicated that

Page 342

1   Victor was aggressive.
2       Do you recall that?
3       A.   I did characterize him that way in our
4   initial conversations this morning.
5       Q.   And he was aggressive in trying to
6   serve -- service his distributor customers, is that
7   fair?
8       A.   He advocated for his customers.
9       Q.   Okay.
10      Q.   I guess what I'm asking you, though, is
11  you asked me specifically -- now it is me that's going
12  to get specific, but you asked me specifically on
13  whether this order shipped and then you produced this
14  document.
15      Q.   Yes, and, no, this document doesn't
16  address whether that order shipped.
17      A.   Okay.  That's what I thought you were --
18      Q.   Yeah, no.  I --
19      A.   Because that was the question that I had
20  for you in terms of --
21      Q.   Okay.
22      A.   -- you know.
23      Q.   So to -- to clarify that, this -- this
24  document doesn't indicate whether that order shipped.

Page 343

1       A.   Okay.
2       Q.   I have another document, to be -- but to
3   be honest, I haven't found it, so --
4       A.   That's okay.
5       Q.   -- moving on to --
6       A.   I mean, it's just -- it's --
7       Q.   -- this e-mail.
8       A.   Yeah, yeah.
9       Q.   You know, my -- my question is just
10  about -- about, you know, Victor Borelli and his
11  aggressiveness, which I believe you indicated.
12      A.   Sure.
13      Q.   Do you believe he was more aggressive than
14  other national account managers or were they kind
15  of -- did they have the same objective and -- and the
16  same -- the same, you know, approach?
17      A.   I think they all had very individual
18  approaches to how they -- they managed their accounts.
19      Q.   But they were all focused on the
20  relationship with the distributor and including, you
21  know, shipping the product to them?
22      A.   They were -- yes, so they were there to
23  manage the relationship with the customer and advocate
24  on their behalf, yeah, that was their job to manage

Page 344

1   that relationship.
2       Q.   And so to some degree was there some
3   tension between the national account managers and the
4   compliance department?
5       A.   I can't speak to that.  I wasn't part of
6   compliance, so I don't know if there was or wasn't
7   tension there.
8       Q.   Did you ever observe any tension in your
9   role as essentially the -- you know, a conduit or an
10  information provider to compliance?
11      A.   I honestly, I -- I don't -- don't
12  recollect, no.
13          (WHEREUPON, a certain document was
14          marked Mallinckrodt - Neely
15          Deposition Exhibit No. 33, for
16          identification, as of 01/07/2019.)
17  BY MR. KAWAMOTO:
18      Q.   So this is an e-mail from Cathy Stewart to
19  Bill Ratliff and Karen Harper.  You are not cc'd on
20  it, but I didn't want to ask about the very top
21  e-mail.
22      A.   Um-hum.
23      Q.   So the top e-mail is an e-mail from Cathy
24  Stewart to Bill and Karen, and she says:

Page 345

1          "FYI, the customer service reps all state
2   that Victor will tell them anything they want to hear
3   just so he can get the sale....."
4       Do you see that?
5       A.   I do.
6       Q.   Do you agree with that statement?
7       A.   I -- I don't know because I wasn't in
8   customer service.
9       Q.   Okay.
10      A.   And this is my first time seeing this
11  document, as I was not involved in this conversation.
12      Q.   Do you recall any concerns by anyone
13  regarding Victor and, you know, the accuracy or
14  reliability of the information he was providing in the
15  context of -- of --
16      A.   I really --
17      Q.   -- of products?
18      A.   -- I really don't have a recollection
19  around that.  And like I said, this is the first time
20  that I've seen the -- yeah, I don't have any
21  recollection, no.
22      Q.   Well, you -- you know Cathy Stewart,
23  though, right --
24      A.   Oh, I --

Page 346

1  Q.  -- you work with her?
2  A.  Um-hum.
3  Q.  Do you think that she was generally
4  reliable?
5  A.  I can only speak to my interactions with
6  her, but I think, you know, when we spoke, I think
7  she's -- she is a -- yeah, I think she is reliable.
8  Q.  And she cared about the company, didn't
9  she?
10  A.  Well, I think we all did.  I can't speak
11  to -- to Cathy specifically.
12        (WHEREUPON, a certain document was
13        marked Mallinckrodt - Neely
14        Deposition Exhibit No. 34, for
15        identification, as of 01/07/2019.)
16  BY MR. KAWAMOTO:
17  Q.  So this is an e-mail between you and
18  Victor Borelli and then Victor Borelli and Steven
19  Cochran.
20  A.  Uh-huh.
21  Q.  It is MNK-T1 384139.
22  A.  Uh-huh.
23  Q.  And do you know who Mr. Cochran is or was?
24  A.  I -- I do.

Page 347

1  Q.  Okay.  Who was he?
2  A.  He was the buyer at Keysource.
3  Q.  Okay.  And so you are providing Victor
4  Borelli was chargeback information on oxy 30, aren't
5  you?
6  A.  Yeah.  Can you just give me an opportunity
7  because it is hard to read and -- and respond.  Hold
8  on just a second.
9        Okay.
10  Q.  So this e-mail involves chargeback data or
11  chargeback information.
12        Chargeback data was considered
13  confidential at Mallinckrodt, wasn't it?
14  A.  I -- I don't know the answer to that.  I
15  don't know.
16  Q.  So do you -- you don't have any
17  recollection as to whether Mallinckrodt was willing to
18  share its chargeback data with other market
19  participants?
20  A.  We typically would not share competitive
21  chargeback data with customers.
22  Q.  And so when Victor Borelli is e-mailing --
23  is forwarding this information to -- to Cochran --
24  A.  Um-hum.

Page 348

1  Q.  -- and he says "PS:  Shhh..." --
2  A.  Um-hum.
3  Q.  -- I mean, it -- that's -- I mean,
4  that's -- that's because he -- he wasn't supposed to
5  be providing him with this information, was he?
6  A.  I can't -- ooh -- I'm not sure.  Let's see
7  here.
8        Okay.
9  Q.  So is this another example of Mr. Borelli
10  sharing information with a distributor client that he
11  shouldn't be?
12  MR. TSAI:  Object to the form.
13  BY THE WITNESS:
14  A.  I -- I can't -- I -- I don't know.  I'm
15  not sure.
16  BY MR. KAWAMOTO:
17  Q.  Well, this e-mail chain indicates that he
18  didn't ask you if he could share this, is that fair?
19  A.  It definitely -- you know, it does
20  indicate that, yes.  I don't know if we had a
21  conversation on this.  It -- I'm -- I don't -- I don't
22  recollect this.
23  Q.  Okay.  And I'm -- I'm sorry.  Just to sort
24  of clarify the question and answer.

Page 349

1  A.  Yeah.
2  Q.  The -- the e-mail chain does not indicate
3  that he was -- that he ever asked you if he could
4  share this?
5  A.  He did not, and he did not via e-mail
6  within this chain, correct.
7  Q.  Okay.  And you don't recall him asking you
8  in a phone conversation, do you?
9  A.  I don't have a recollection of this --
10  this entire e-mail chain, so I don't recollect if
11  there was or wasn't a phone call.
12  Q.  So thank you.  You can -- you can put that
13  document aside.
14  A.  Okay.
15  Q.  So in terms of -- I mean, I've -- I
16  recognize that we've been -- we've been going at this
17  for some time, and over the course of this deposition
18  we've reviewed numerous documents relating to the --
19  relating to suspicious orders.
20        Do you recall that?
21  A.  We have reviewed a lot of documents, yes.
22  Q.  Okay.  So in terms of your -- you were the
23  product manager for oxycodone from 2008 to
24  January 2011, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 350

```
 1    A.   Um-hum.
 2    Q.   So that's around a -- a three-year time
 3 period?
 4    A.   Okay.
 5    Q.   Do you recall how many suspicious
 6 orders -- suspicious order reviews that you were
 7 involved in?
 8    A.   No, I don't recall.
 9    Q.   Okay.  In terms of a rough estimate, could
10 it be -- would you say it's a hundred?
11    A.   I -- I seriously, I -- that is really
12 difficult for me to estimate.  I can't do that.
13    Q.   Well.  Okay, presumably it is more than,
14 like, 20 though, right?
15    A.   It would be more than 20.
16    Q.   Okay.  Fair to say more than 50?
17    A.   I -- I think at this point it would be
18 really difficult for me to give you a good estimate.
19 If I managed a product for two-and-a-half years, I
20 think it would be really challenging given the number
21 of orders that are processed even within, let's say, a
22 given week.  I think it would be really challenging
23 for me to -- I -- I -- I can't estimate that for you.
24    Q.   But it would be a large number?
```

Page 351

```
 1    A.   In terms of orders that we reviewed?
 2    Q.   Yes, in terms of orders that were being
 3 reviewed by this -- this program?
 4    A.   I -- I -- I can't estimate, so it's hard
 5 for me to say what, you know, what large even means,
 6 so...
 7    Q.   Well, okay.  So it's -- it's more than 20
 8 presumably.
 9         Is there a -- a number that you'd be
10 comfortable saying it was under?
11    A.   No.  Because I don't even have a
12 recollection of what the sheer scale of orders that we
13 processed on a daily basis.  So for me to give you a
14 ballpark or an estimate on how many we reviewed would
15 be -- it's -- no, I can't possibly provide you with
16 that information.
17    Q.   Okay.  So it could be 100, it could be
18 500, it could be 5,000, it could be 50,000, you don't
19 have any way of knowing?
20    A.   I don't have any way of quantifying that.
21    Q.   Okay.  Do you recall ever advising that an
22 order not ship?
23    A.   I don't recall.
24    Q.   Okay.
```

Page 352

```
 1    A.   I don't --
 2    Q.   So --
 3    A.   I don't -- this is all, again, eight, nine
 4 years ago, actually farther than that because you are
 5 going back to 2008.  I don't have a recollection of --
 6 of the order monitoring port -- I don't have a
 7 recollection of that activity that I can share with
 8 you on the record that I'm definitive about.  I -- I
 9 don't.
10    Q.   Though my -- my question here is in terms
11 of your recollection, do you recall during that
12 three-year time period that you were the product
13 manager for oxycodone --
14    A.   Um-hum.
15    Q.   -- ever advising that an order not ship?
16    A.   And, again, I'm telling you that that was
17 over ten years, from -- anywhere from nine to eleven
18 years ago, and I don't have a firm comfort level in
19 terms of -- I don't remember.
20    Q.   Okay.  But this was an important component
21 of your job, was it not?
22    A.   It was a portion of my job and oxy was one
23 of the products that I managed.  So it was a
24 component, it was important, but it was a smaller --
```

Page 353

```
 1 in terms of the scope of my job, this was not
 2 everything that I did.  And, again, it was, you know,
 3 eight to ten years ago.  I really don't remember.
 4    Q.   But the oxycodone product was an important
 5 product for Mallinckrodt, I think you indicated it was
 6 a quarter of their -- of their sales at one point?
 7    A.   We did talk to that, yes.
 8    Q.   Okay.  And so -- and there was -- there
 9 was clearly sensitivity by the DEA regarding the --
10 the abuse of this product, isn't that fair?
11    A.   Was there sensitivity from the DEA?
12    Q.   Yes.  There was clearly sensitivity by the
13 DEA regarding the abuse of this product, is that fair?
14    A.   Do you want me to confirm that statement?
15    Q.   I'm asking you if you agree with that
16 statement.
17    A.   There was definitely, as evidenced by the
18 documents that we went through, there was a lot of
19 focus on it by the DEA, yes.
20    Q.   Okay.  And so, you know, this was clearly
21 an important product for both you and Mallinckrodt?
22    A.   It was an important product, yes.
23    Q.   And making sure that this product didn't
24 end up -- or making sure that this product wasn't
```

Page 354

1 diverted was an important responsibility for you, was
2 it not?
3     A.   I'm going to restate that this was eight
4 to ten years ago that this happened.  You are asking
5 me whether or not we stopped any orders or what my
6 estimation is of the orders that we evaluated.  I
7 don't have a recollection.
8     MR. KAWAMOTO:  Okay.  How much time do I have
9 left?
10     THE VIDEOGRAPHER:  You are at six-forty so
11 20 minutes, 20 minutes left.
12     MR. KAWAMOTO:  Okay.  Great.  Why don't we take
13 a short break.
14     THE VIDEOGRAPHER:  Okay.  The time is 5:40 p.m.
15 Off the record.
16         (WHEREUPON, a recess was had
17             from 5:40 to 5:53 p.m.)
18     THE VIDEOGRAPHER:  Okay.  We are back on the
19 record.  The time is 5:53 p.m.
20 BY MR. KAWAMOTO:
21     Q.   Okay.  So, Ms. Neely, I went back and I
22 looked at the real-time, and I just want to make sure
23 that the record is clear on this.
24         You don't recall whether you did or did

Page 355

1 not ever say not to ship an order of oxycodone, is
2 that correct?
3     A.   I -- I don't know.
4     Q.   So it's possible that in your three years
5 as a product manager for oxycodone for Mallinckrodt,
6 YOU never said don't ship an order, that's possible?
7     A.   I would say that we had a robust SOMs,
8 suspicious order monitoring program in place that we
9 adhered to, that we had a strong compliance team, we
10 all worked diligently to -- to make sure that we were
11 doing the right thing as a whole.
12         I cannot speak to specifics with regards
13 to orders and the percentage of orders that were
14 reviewed, the percentage that were held.  I -- I can't
15 speak to that.
16     Q.   And so, I mean, it is -- it is possible
17 then that in your three years as a product manager for
18 oxycodone you never said, Don't ship an order, that's
19 possible?
20     A.   Since I don't have a recollection, that is
21 possible.
22     Q.   And if you did say not to stop -- or if
23 you did say not to ship an order, that would be
24 captured in an e-mail, wouldn't it?

Page 356

1     A.   Potentially.
2     Q.   Well, when you say potentially, what --
3 what -- what do you mean by that?
4     A.   It could be captured in the e-mail, it
5 could have been a discussion that we had, so the
6 communication could have taken place, I'm sure, a
7 number of different ways.
8     Q.   But there would be some written record of
9 you stating -- or of you objecting to the shipment of
10 an order, correct?
11     A.   Again, I'm just going to go back to the
12 fact that we did have a good suspicious order
13 monitoring program in place, that we were all working
14 diligently to make sure that what we were shipping out
15 the door was for, you know, for a good -- good
16 purpose.  I will also reiterate the product that we
17 were shipping was going to a wholesaler and to a
18 distributor, so we were monitoring those orders.  And
19 to the best of our ability, we were, you know,
20 adhering -- we were adhering to our program to -- to
21 flag suspicious orders.
22         What happened beyond that, you know, when
23 it got down to the -- to the customers' customer and
24 then, you know, down to then the doctor prescribing to

Page 357

1 the patient, that was so far down the supply chain
2 that that was definitely something that we wouldn't
3 have the -- especially down to the doctor and the
4 prescriber, we wouldn't have the visibility into.
5         I would say that when the DEA made the
6 statement about knowing your customers' customers and,
7 you know, as evidenced by the e-mails that you started
8 to see more so in 2010, we definitely were taking
9 measures to try to figure out how to do that.
10         So from an overarching perspective, I feel
11 very confident that we were doing the right thing.  In
12 terms of the orders and whether or not orders were
13 released, whether or not orders were held,
14 documentation of that activity, I can't speak to that.
15 I -- I don't have a firm recollection of -- of the
16 details.
17     Q.   So when you were a product manager, you
18 tracked the overall amount of oxycodone and oxy 15 and
19 30 that Mallinckrodt was providing to its
20 distribute -- to its customers, correct?
21     A.   We created sales forecasts and budgets
22 based on actuals, so yes.
23     Q.   Okay.  Did you ever become concerned with
24 the volume of oxycodone that Mallinckrodt was

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1  shipping?
2      A.  I wasn't necessarily concerned with the
3  volume that we were shipping.  We were doing
4  everything within our power to monitor orders and to
5  comply with the DEA's requests in terms of susp --
6  suspicious order monitoring.
7          So it wasn't so much concern with our
8  shipment of orders, because I feel like we were
9  adhering and doing the right thing.  I did have
10 questions about the -- the market and the size of the
11 overall market and trying to wrap my arms around what
12 was happening within the oxycodone market downstream,
13 which was really challenging because we didn't
14 really -- like I said, we didn't have the visibility
15 into that -- that portion.
16         I think what you saw from the e-mails in
17 2010 was us trying to understand what was happening
18 and trying to take measures even further than what we
19 had already done with our suspicious order monitoring
20 program which monitored the demand from our customer
21 base which was distributors and wholesalers, but I
22 think you saw us digging in even further, taking it a
23 step further beyond what you -- some might even
24 perceive to be on the, you know, the onus of the

Page 359

1  manufacturer to -- to really try to understand what
2  was happening in the oxycodone market.
3      Q.  And so when you say you had questions
4  about the market and the size of the overall market
5  for oxycodone, when did you have those questions?
6      A.  I would say that they -- we were
7  starting -- you know, so we -- we talked about IMS and
8  about the market data that's reported and so you could
9  see year-over-year molecule growth.  So you could see
10 what the total -- what was happening with the total
11 market.
12         And I -- I can't remember -- I can't
13 pinpoint the time when we started to look at it.  And
14 a lot of it started, to be honest with you, because we
15 were just trying to forecast, you know, we were trying
16 to, as a company, trying to get a handle on what our
17 forecast would be for this -- this product and we
18 would use molecule growth rate for all products, not
19 just oxy, to apply to that molecule to understand if
20 it was growing, if it was declining, and then use that
21 to, you know, calculate, you know, our market share
22 off of to -- to come up with our sales budget.
23         And, you know, at that point in time I
24 think the molecule growth rate was more like, Hey,

Page 360

1  what's happening here, I'm trying to project.  We were
2  trying to project, you know, what our sales would be
3  and the -- and the growth rate was faster than what we
4  had forecasted.  And I think that that led us to start
5  to -- to look at things and say, Well, why is that.
6  And -- and then, you know, and again seeing the
7  activity in 2010.
8          As to when that initial, like, thought
9  occurred, I -- I can't remember that, and I -- I would
10 tell you if I could, but it was definitely -- it was
11 something that evolved over the course of time with us
12 as a company in terms of understanding, you know, like
13 I said, we adhered to the suspicious order monitoring
14 program that we had put in place, we worked with the
15 DEA, we were doing everything that we were supposed to
16 be doing, but this was something that it took a while
17 to put all of the pieces together on in terms of what
18 was happening within the total market and then what
19 was happening with our -- our customer base.
20         And I would say it -- it took time to --
21 to finally see what the big -- the whole -- all of
22 these pieces together, what they meant.  And I think
23 you see that in 2010.  And I remember -- that's the
24 part that I remember is in 2010 seeing -- putting it

Page 361

1  all together, starting to see what was truly, you
2  know, happening and taking action.  And that's --
3  that's the part that has stuck with me since I left
4  the company.  I feel very strongly that we as a
5  company did what we could and adhered to what was
6  expected from the DEA at the time to -- to do the
7  right thing with this -- with this molecule, with --
8  with all of our -- all of our opioids.
9      Q.  And so when you say that you finally saw
10 the -- the -- the big or the whole pieces put
11 together, which was in 2010, what that whole picture
12 was was that Mallinckrodt's products were being
13 diverted downstream, was it not?
14     A.  I can't --
15         MR. TSAI:  Object to the form.
16 BY THE WITNESS:
17     A.  Yeah, and I can't speak to if
18 Mallinckrodt's products were being it diverted or --
19 or not downstream.  I -- I don't know that because I
20 don't know that there was ever a direct tie to -- I
21 don't know -- I don't know that.
22         But what I can say is from a big picture
23 perspective, the oxy market had grown and it caused us
24 to -- to dig into it more and whenever we did we

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1  started to identify the issues with the sales into
2  Florida, the DEA was, you know, working very closely
3  with Karen Harper, and we -- when we finally started
4  to put it together, we realized that we shouldn't be
5  selling to particular customers and we made that
6  decision not to.
7        I -- I -- I've just -- it's challenging
8  for me to sit here today, and I -- and I'm happy to go
9  through all of these e-mails with you and talk to
10 them, but it is challenging for me to see where we did
11 anything wrong. I mean, we -- we were trying to
12 adhere to the -- not trying. We were adhering to what
13 the DEA requested from us and we were putting together
14 programs, you know, and as you can see in the guidance
15 that you provided to me from the DEA, they didn't give
16 specific instructions on how to -- how to do this, you
17 know. There wasn't -- they -- they gave us high level
18 components on how to identify a suspicious order, but
19 they never gave us like -- they basically left it to
20 the manufacturers. There was no one system that all
21 manufacturers used to monitor, you know, suspicious
22 orders. So it was up to us as a company to -- to try
23 to determine how to build out the system. And I think
24 what you've seen is that we worked really hard to do

Page 363

1  that and to -- to adhere to it. So I -- I don't know.
2  I don't know what else to say.
3  BY MR. KAWAMOTO:
4        Q.   Well, based on the growth rate for
5  oxycodone, you clearly had questions about that growth
6  rate, correct?
7        A.   We --
8        Q.   That's -- that's what you --
9        A.   -- we --
10       Q.   -- testified to previously?
11       A.   We were trying to understand why the
12 market was growing that fast, yes.
13       Q.   And was one of the questions whether this
14 growth rate was reflective of diversion and medically
15 inappropriate uses?
16       A.   No, I don't think that that was really --
17 in terms of when we were first seeing the growth rate,
18 I don't think that that was so much on the -- on the
19 radar, at least for us in terms of that being -- that
20 being a driver of the molecular growth rate. I will
21 say that 2010 when we started to dig into the data
22 even more, into the data and we were being asked to
23 know our customer's customer, because you have to
24 understand, we were shipping into the distributor and

Page 364

1  the wholesaler and they were in turn shipping onto the
2  pharmacies. And so when we started digging into that,
3  that's when we started to put the pieces together, but
4  I -- yeah.
5        Q.   Well, you -- would you agree that sitting
6  here today there is an opioid crisis in this country?
7        A.   I think that you've asked me that question
8  already and it's on the record for my response.
9        Q.   And please refresh my memory then. What
10 is your response, would you agree?
11       A.   I said that I wasn't sure. I -- I don't
12 know if there is truly an opioid crisis. And I don't
13 know.
14       Q.   So you've put together all of the data,
15 you dig into the data in 2010, you assemble all of the
16 pieces of the puzzle, but as you are sitting here,
17 you're -- you -- you don't actually know whether there
18 is a problem with opioid abuse in the United States?
19       A.   I've been so far removed from the
20 situation. I mean, this was back, you know, in my
21 last -- my last month at Mallinckrodt was in January
22 of 2011 and I haven't worked in the opioid industry
23 since then.
24       What I can tell you as far as a company,

Page 365

1  which is what we are here to talk about today, is what
2  Mallinckrodt did do or didn't do back in the timeframe
3  that I was there, we did everything to the best of our
4  ability to -- to address -- to -- and to -- what's the
5  right word for me, what am I trying to say here -- to
6  -- to address what the DEA was sharing with us, which
7  at the time was sales into the State of Florida and
8  distributors who were selling to the State of Florida
9  in a disproportionate amount. And so we as a company
10 did do that and we took the steps that we needed to do
11 as a company to at least control the piece that we had
12 control over.
13       Q.   Well, but you weren't in the compliance
14 department, correct?
15       A.   I was not in the compliance department.
16       Q.   And you weren't in the sales department?
17       A.   I was in the marketing department.
18       Q.   You were in the marketing department, so
19 you dealt with data.
20       So you don't -- you don't know that the
21 DEA only talked to Mallinckrodt about the State of
22 Florida, right?
23       A.   I -- I don't know that. I think that so
24 much of your questioning was around the State of

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1 Florida today and that's why I specifically noted it
2 in my conversation just now with you, if we want to
3 call this a conversation.
4    Q.   Okay.  But you don't -- you -- you don't
5 know what the DEA was telling Mallinckrodt regarding
6 opioids generally or other jurisdictions where it had
7 concerns?
8    A.   I can only address what I knew from my
9 portion within marketing.  I saw all of our internal
10 teams working strongly together to try, you know,
11 to -- to make sure that I provided the right data, to
12 make sure that we were analyzing it, working closely
13 with Karen Harper who was, you know, the head of
14 compliance to ensure that we were meeting all -- you
15 know, being responsible as a company and ensuring that
16 we were being responsible with the product that we
17 were shipping out the door.
18    Q.   But when you say that Mallinckrodt did
19 everything it could, you are referring to your
20 department and from a marketing and data standpoint,
21 is that -- is that fair?
22    A.   I'm -- I'm speaking from a marketing
23 perspective, but I'm also speaking from what I was
24 able to observe during my time there.  We had a

Page 367

1 susp -- suspicious order monitoring program that we
2 adhered to.  Karen Harper was diligent and her team
3 was diligent in terms of adhering to that, making
4 improvements, figuring out how we could do better.  I
5 witnessed that.  And so -- so as an overarching
6 comment, I would say that the -- the company, yes, did
7 everything it could to ensure responsibility within
8 the marketplace.
9    Q.   But you have no idea how many Mallinckrodt
10 products were diverted by downstream customers?
11    A.   Do you?
12    MR. TSAI:  Object to the form.
13 BY MR. KAWAMOTO:
14    Q.   Well, my question is to you, do you
15 have --
16    A.   We have no way of knowing that.  There is
17 absolutely no way of knowing that.  That is so far
18 down the stream.  I mean, you've got -- you've got
19 doctors who are prescribing to patients and we don't
20 know -- we don't know of those patients who -- no,
21 there is no way to know.
22       But the part that we had control over --
23 so we didn't have control over the doctors writing the
24 prescriptions, we didn't have control, necessarily,

Page 368

1 over the distributors selling to -- to pharmacies that
2 you -- you qualify potentially as pill mills earlier,
3 but what we did have control over is who we sold the
4 product to.  And if we identified them as a customer
5 who was problematic, then we made that decision which
6 obviously happened in the fall of 2010 to not sell to
7 them.
8       So I think that we don't know what product
9 was or wasn't diverted in the market, but of the piece
10 that we had control over within the supply chain, we
11 did take the actions that we could to -- to be
12 responsible in terms of distribution of our product.
13    Q.   Are you aware that Mallinckrodt entered
14 into a settlement agreement with the DEA or a
15 Memorandum of -- of Understanding with the DEA?
16    A.   I am not familiar with that.  I have not
17 been with the company, again, for the past seven
18 years, so, no, I'm not familiar with that.
19    MR. KAWAMOTO:  How much time do I have?
20    THE VIDEOGRAPHER:  You are at four minutes.
21 So --
22    MR. KAWAMOTO:  Okay.
23    THE VIDEOGRAPHER:  -- six-fifty-six right now.
24    MR. KAWAMOTO:  Okay.  So I'm -- I'm done.

Page 369

1    MR. TSAI:  Okay.  We are done.
2    THE VIDEOGRAPHER:  Should we go off the record?
3    MR. TSAI:  Yes.
4    THE VIDEOGRAPHER:  Okay.  The time is 6 --
5 6:09 p.m.  Going off the record.
6       (Time Noted:  6:09 p.m.)
7       FURTHER DEPONENT SAITH NOT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

REPORTER'S CERTIFICATE

1
2
3    I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,
4    a Certified Shorthand Reporter, do hereby certify:
5    That previous to the commencement of the
6    examination of the witness herein, the witness was
7    duly sworn to testify the whole truth concerning the
8    matters herein;
9    That the foregoing deposition transcript
10    was reported stenographically by me, was thereafter
11    reduced to typewriting under my personal direction and
12    constitutes a true record of the testimony given and
13    the proceedings had;
14    That the said deposition was taken before
15    me at the time and place specified;
16    That I am not a relative or employee or
17    attorney or counsel, nor a relative or employee of
18    such attorney or counsel for any of the parties
19    hereto, nor interested directly or indirectly in the
20    outcome of this action.
21    IN WITNESS WHEREOF, I do hereunto set my
22    hand on this 11th day of January, 2019.
23
24    JULIANA F. ZAJICEK, Certified Reporter

1    DEPOSITION ERRATA SHEET
2
3
4    Case Caption:  In Re:  National Prescription
5    Opiate Litigation
6
7    DECLARATION UNDER PENALTY OF PERJURY
8
9    I declare under penalty of perjury that I
10    have read the entire transcript of my Deposition taken
11    in the captioned matter or the same has been read to
12    me, and the same is true and accurate, save and except
13    for changes and/or corrections, if any, as indicated
14    by me on the DEPOSITION ERRATA SHEET hereof, with the
15    understanding that I offer these changes as if still
16    under oath.
17
18    KATE NEELY
19
20    SUBSCRIBED AND SWORN TO
21    before me this    day
22    of    , A.D. 20__.
23
24    Notary Public

1    DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____DATE:_____
24    KATE NEELY

1    DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____DATE:_____
24    KATE NEELY