# EXHIBIT 62

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3
      IN RE: NATIONAL        )
 4    PRESCRIPTION           )  MDL No. 2804
      OPIATE LITIGATION      )
 5    _____  )  Case No.
                             )  1:17-MD-2804
 6                           )
      THIS DOCUMENT RELATES  )  Hon. Dan A.
 7    TO ALL CASES           )  Polster
 8
                TUESDAY, JANUARY 8, 2019
 9
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10               CONFIDENTIALITY REVIEW
11                      - - -
12            Videotaped deposition of Ginger
13    Collier, held at the offices of STINSON
14    LEONARD STREET LLP, 7700 Forsyth Boulevard,
15    Suite 1000, St. Louis, Missouri, commencing
16    at 9:10 a.m., on the above date, before
17    Carrie A. Campbell, Registered Diplomate
18    Reporterand Certified Realtime Reporter.
19
20
21
22                      - - -
23
             GOLKOW LITIGATION SERVICES
24       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

---

Page 2

```
 1        A P P E A R A N C E S :
 2
 3   KELLER ROHRBACK LLP
     BY:  GARY GOTTO
 4       ggotto@kellerrohrback.com
         GABE VERDUGO
 5       gverdugo@kellerrohrback.com
     1201 Third Avenue, Suite 3200
 6   Seattle, Washington 98101
     (206) 623-1900
 7   Counsel for Plaintiffs
 8
 9   BRANSTETTER STRANCH & JENNINGS, PLLC
     BY:  TRICIA HERZFELD
10       triciah@bsjfirm.com
     223 Rosa L. Parks Avenue, Suite 200
11   Nashville, Tennessee 37203
     (615) 254-8801
12   Counsel for the Tennessee Action
13
14   ARMSTRONG TEASDALE
     BY:  SARAH E. HARMON
15       sharmon@armstrongteasdale.com
     7700 Forsyth Boulevard, Suite 1800
16   St. Louis, Missouri 63105
     (314) 621-5070
17   Counsel for Cardinal Health, Inc.
18
19   COVINGTON & BURLING LLP
     BY:  FREDERICK BENSON
20       fbenson@cov.com
     850 Tenth Street, NW
21   Washington, DC 20001-4956
     (202) 662-6000
22   Counsel for McKesson Corporation
23
24
25
```

---

Page 3

```
 1   JACKSON KELLY
     BY:  SYLVIA WINSTON NICHOLS
 2       sylvia.winston@jacksonkelly.com
         (VIA TELECONFERENCE)
 3   150 Clay Street, Suite 500
     Morgantown, West Virginia 26501
 4   (304) 284-4138
     Counsel for AmerisourceBergen
 5
 6
 7   JONES DAY
     BY:  LAURA JANE DURFEE
 8       ldurfee@jonesday.com
     2727 North Harwood Street
 9   Dallas, Texas 75201
     (214) 220-3939
10   Counsel for Walmart
11
     ROPES & GRAY LLP
12   BY:  ANDREW O'CONNOR
         Andrew.OConnor@ropesgray.com
13       CASSANDRA A. LARUSSA
         Cassandra.LaRussa@ropesgray.com
14   800 Boylston Street
     Boston, Massachusetts 02199-3600
15   (617) 951-7000
     Counsel for Mallinckrodt
16
17
     FOX ROTHSCHILD LLP
18   BY:  EILEEN OAKES MUSKETT
         EMuskett@foxrothschild.com
19       (VIA TELECONFERENCE)
     1301 Atlantic Avenue, Suite 400
20   Atlantic City, New Jersey 08401
     (609) 572-2355
21   Counsel for Validus Pharmaceuticals
22
23
24
25
```

---

Page 4

```
 1   ARNOLD & PORTER
     BY:  DAVID HIBEY                    09:11:42
 2       david.hibey@arnoldporter.com
         (VIA TELECONFERENCE)
 3   601 Massachusetts Avenue, NW
     Washington, DC 20001-3743
 4   (202) 942-5000
     Counsel for Endo Pharmaceuticals
 5   Inc., and Endo Health Solutions Inc.
 6
 7   VIDEOGRAPHER:
         JAMES ARNDT,
 8       Golkow Litigation Services
 9             – – –
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 5

```
 1                    INDEX
 2                              PAGE
 3   APPEARANCES....................................   2
 4   EXAMINATIONS
 5     BY MR. GOTTO.............................  12
 6     BY MS. HERZFELD......................... 268
 7     BY MR. GOTTO............................. 334
 8
 9              EXHIBITS
10   No.      Description            Page
11   Mallinckrodt  Plaintiffs' Notice of Oral    16
     Collier 1     Videotaped Deposition of
12                 Ginger Collier and Requests
                   for Production of Documents
13
     Mallinckrodt  July 17, 2009 Covidien        43
14   Collier 2     employment letter to
                   Virginia Collier,
15                 MNK-T1_0007277843 -
                   MNK-T1_0007277847
16
     Mallinckrodt  Director of Marketing -       59
17   Collier 3     Specialty Generics,
                   MNK-T1_0007277883 -
18                 MNK-T1_0007277885
19   Mallinckrodt  Specialty Generics Marketing  106
     Collier 4     Roles & Responsibilities,
20                 MNK-T1_0004881300
21   Mallinckrodt  Covidien Pharmaceuticals:     129
     Collier 5     Specialty Generics Strategic
22                 Business Update December 2,
                   2009,
23                 MNK-T1_0004881300
24   Mallinckrodt  E-mail(s),                    136
     Collier 6     MNK-T1_0006305472
25
```

---

Page 6

Mallinckrodt   Covidien Pharmaceuticals   136
Collier 7        Specialty Generics Business
                 Review, January 6, 2010,
                 MNK-T1_0006305472

Mallinckrodt   Covidien Pharmaceuticals   145
Collier 8        Specialty Generics Business
                 Review, April 7, 2010,
                 MNK-T1_0002236317

Mallinckrodt   Specialty Generics Hobart   154
Collier 9        Business Review, February
                 21, 2011,
                 MNK-T1_0002337098

Mallinckrodt   October 11, 2011 letter from   159
Collier 10       Ginger Collier to Hal
                 Harrison,
                 MNK-T1_0002738887 -
                 MNK-T1_0002738888

Mallinckrodt   Covidien S&OP Management   164
Collier 11       Business Review - November
                 Cycle,
                 MNK-T1_0007289278 -
                 MNK-T1_0007289283

Mallinckrodt   Mallinckrodt Pharmaceuticals   167
Collier 12       Specialty Generics Overview,
                 Intern Initiation, Ginger
                 Collier, June 2014,
                 MNK-T1_0000661013 -
                 MNK-T1_0000661037

Mallinckrodt   Covidien Pharmaceuticals   173
Collier 13       Specialty Generics Strategic
                 Plan 2013-2017,
                 MNK-T1_0000607429 -
                 MNK-T1_0000607538

Mallinckrodt   Mallinckrodt Pharmaceuticals   187
Collier 14       Specialty Generics Strategic
                 Plan 2014-2019,
                 MNK-T1_0006663716 -
                 MNK-T1_0006663788

Mallinckrodt   E-mail(s)   190
Collier 15       MNK-T1_0000418885

Page 7

Mallinckrodt   "Summary" Worksheet,   190
Collier 16       MNK-T1_0000418886

Mallinckrodt   E-mail(s)   205
Collier 17       MNK-T1_0000483766 -
                 MNK-T1_0000483769

Mallinckrodt   Suspicious Order Monitoring   215
Collier 18       Team Charter, Updated
                 4/7/11,
                 MNK-T1_0000496062

Mallinckrodt   E-mail(s)   221
Collier 19       MNK-T1_0000262709

Mallinckrodt   Mallinckrodt Controlled   228
Collier 20       Substance Suspicious Order
                 Monitoring Program
                 Presentation for Marketing
                 Group, March 2, 2011,
                 MNK-T1_0000496098 -
                 MNK-T1_0000496124

Mallinckrodt   November 10, 2010 letter to   233
Collier 21       KeySource Medical,
                 MNK-T1_0000484113

Mallinckrodt   November 12, 2010 letter to   234
Collier 22       Cardinal Health and others,
                 MNK-T1_0000484156

Mallinckrodt   E-mail(s)   236
Collier 23       MNK-T1_000558202

Mallinckrodt   E-mail(s)   239
Collier 24       MNK-T1_0005905204 -
                 MNK-T1_0005905205

Mallinckrodt   E-mail(s)   242
Collier 25       MNK-T1_0004951225 -
                 MNK-T1_0004951228

Mallinckrodt   October 1, 2010 - September   244
Collier 26       30, 2011 chart of
                 conventions,
                 MNK-T1_0000384634 -
                 MNK-T1_0000384651

Page 8

Mallinckrodt   Chart of advertising   246
Collier 27       expenditures,
                 MNK-T1_0006714382

Mallinckrodt   E-mail(s),   248
Exhibit 28       MNK-T1_0005964786 -
                 MNK-T1_0005964790

Mallinckrodt   "The nuances and   252
Collier 29       complexities of opioid
                 rotation,"
                 MNK-T1_0001553927 -
                 MNK-T1_0001553928

Mallinckrodt   E-mail(s)   254
Collier 30       MNK-T1_0004673096

Mallinckrodt   Mallinckrodt Fentanyl   254
Collier 31       Transdermal System,
                 MNK-T1_0004673097

Mallinckrodt   E-mail(s),   257
Collier 32       MNK-T1_000925331 -
                 MNK-T1_000925332

Mallinckrodt   E-mail(s),   260
Collier 33       MNK-T1_0000660532 -
                 MNK-T1_0000660534

Mallinckrodt   2014 GCC Approved Grants   262
Collier 34       (Jan '14 - Present) (updated
                 9.5.14),
                 MNK-T1_0000661003

Mallinckrodt   E-mail(s),   264
Collier 35       MNK-T1_0000558153 -
                 MNK-T1_0000558154

Mallinckrodt   NACDS Meetings, April 20 -   267
Collier 36       23, 2013, Customer Meetings,
                 MNK-T1_0000609142 -
                 MNK-T1_0000609155

Mallinckrodt   E-mail(s),   274
Collier 37       MNK_TNSTA05202063 -
                 MNK_TNSTA05202064

Mallinckrodt   E-mail(s)   277
Collier 38       MNK_TNSTA0520176

Page 9

Mallinckrodt   SOM Steering Committee   295
Collier 39       Meeting Agenda 6/23/11,
                 MNK_TNSTA05296154

Mallinckrodt   E-mail(s)   297
Collier 40       MNK-T1_0007251678

Mallinckrodt   Customers Sourcing Oxy 15 &   297
Collier 41       30 from more than 2
                 distributors - Apr
                 2011.xlsx, 5/31/11,
                 MNK-T1_0007251679

Mallinckrodt   State Concentration Oxy 15 &   312
Collier 42       30 - Apr 2011.xlsx, 5/31/11,
                 MNK-T1_0007251680

Mallinckrodt   State Concentration   315
Collier 43       Hydro-Apap - Apr 2011.xlsx,
                 5/31/11,
                 MNK-T1_0007251681

Mallinckrodt   Top 150 Pharmacies, Oxy 30   323
Collier 44       mg only, 2009-2011 data
                 combined,
                 MNK_TNSTA05098003 -
                 MNK_TNSTA05098012

Mallinckrodt   E-mail(s),   326
Collier 45       MNK_TNSTA05299706 -
                 MNK_TNSTA05299707

Mallinckrodt   E-mail(s),   336
Collier 46       MNK-T1_0000368477 -
                 MNK-T1_0000368480

Mallinckrodt   Total $ & Units by Dist.,   338
Collier 47       MNK-T1_0000273249 -
                 MNK-T1_0000273258

Mallinckrodt   Oxy 15 & 30 versus Total   339
Collier 48       Gross Sales - October 2010
                 Data - Sorted by Units,
                 MNK-T1_0000557439

(Exhibits attached to the deposition.)

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    VIDEOGRAPHER: We are now on      08:47:29
2  the record. My name is James Arndt.    09:10:34
3  I'm a videographer for Golkow      09:10:37
4  Litigation Services.      09:10:39
5    Today's date is January 8,      09:10:39
6  2019, and the time is 9:10 a.m.    09:10:42
7    This video deposition is being    09:10:44
8  held in St. Louis, Missouri, in the    09:10:46
9  matter of the National Prescription    09:10:47
10  Opiate Litigation for the United    09:10:49
11  States District Court for the Northern    09:10:52
12  District of Ohio, Eastern Division.    09:10:54
13    The deponent is Ginger Collier.    09:10:56
14    Will counsel please identify    09:10:58
15  themselves.      09:10:59
16    MR. GOTTO: Gary Gotto, Keller    09:11:00
17  Rohrback, LLP, for the plaintiffs.    09:11:03
18    MR. VERDUGO: Gabe Verdugo,    09:11:07
19  Keller Rohrback, LLP, also for the    09:11:07
20  plaintiffs.      09:11:09
21    MR. BENSON: Fred Benson,    09:11:11
22  Covington Burling, LLP, for McKesson    09:11:12
23  Corporation.      09:11:15
24    MS. HARMON: Sarah Harmon with    09:11:17
25  Armstrong Teasdale for Cardinal    09:11:17

Page 11

1  Health.      09:11:19
2    MS. DURFEE: Laura Jane Durfee    09:11:20
3  with Jones Day for Walmart.    09:11:20
4    MS. LARUSSA: Cassandra    09:11:20
5  Larussa, Ropes & Gray, for    09:11:24
6  Mallinckrodt, LLC, SpecGx and Ginger    09:11:25
7  Collier.      09:11:28
8    MR. O'CONNOR: Andrew O'Connor    09:11:28
9  from Ropes & Gray for Mallinckrodt,    09:11:30
10  LLC, SpecGx and Ginger Collier.    09:11:34
11    VIDEOGRAPHER: Will counsel on    09:11:34
12  the phone please identify themselves?    09:11:35
13    MR. HIBEY: David Hibey of    09:11:42
14  Arnold & Porter on behalf of the Endo    09:11:43
15  defendants.      09:11:45
16    MS. WINSTON: Sylvia Winston    09:11:45
17  Nichols on behalf of AmerisourceBergen    09:11:49
18  Drug Corporation.      09:11:49
19    MS. MUSKETT: Eileen Muskett of    09:11:52
20  Fox Rothschild on behalf of Validus.    09:12:03
21    MS. WINSTON: Yes, this is    09:12:20
22  Sylvia Winston.      09:12:22
23    MS. HERZFELD: Tricia Herzfeld    09:12:25
24  on behalf of the Tennessee plaintiffs.    09:12:26
25    VIDEOGRAPHER: The court    09:12:31

Page 12

1  reporter is Carrie Campbell, and she    09:12:31
2  will now swear in the witness.    09:12:33
3
4    GINGER COLLIER,
5  of lawful age, having been first duly sworn
6  to tell the truth, the whole truth and
7  nothing but the truth, deposes and says on
8  behalf of the Plaintiffs, as follows:
9    09:12:39
10    DIRECT EXAMINATION    09:12:39
11  QUESTIONS BY MR. GOTTO:    09:12:40
12    Q.  Good morning, Ms. Collier.    09:12:42
13    A.  Good morning.    09:12:43
14    Q.  How are you?    09:12:43
15    A.  Very good, thank you.    09:12:44
16    Q.  Great.    09:12:45
17    As you just heard, my name is    09:12:45
18  Gary Gotto. I'm one of the lawyers    09:12:47
19  representing the plaintiffs in this    09:12:49
20  litigation.    09:12:50
21    Could you please state your    09:12:52
22  business address, please?    09:12:56
23    A.  My business address? I do not    09:12:57
24  have a business address. My home address?    09:13:00
25    Q.  Sure, home address is fine.    09:13:02

Page 13

1    A.  Okay. ████████████    09:13:07
2  ████████████████████████    09:13:07
3    Q.  Okay. And are you currently    09:13:11
4  employed?    09:13:11
5    A.  Yes, I am.    09:13:12
6    Q.  By whom?    09:13:12
7    A.  Hisun Pharmaceutical.    09:13:13
8    Q.  Okay. And what's your position    09:13:15
9  at Hisun?    09:13:18
10    A.  Vice president, national    09:13:19
11  accounts.    09:13:21
12    Q.  Okay. And when did you join    09:13:22
13  Hisun?    09:13:24
14    A.  In 2017.    09:13:25
15    Q.  Where is Hisun located?    09:13:28
16    A.  New Jersey.    09:13:29
17    Q.  Where in New Jersey?    09:13:30
18    A.  Bridgewater. Sorry, we just    09:13:31
19  moved from Princeton, so I'm still thinking    09:13:35
20  Princeton.    09:13:41
21    Q.  Okay. Great.    09:13:41
22    Have you ever given a    09:13:42
23  deposition before?    09:13:43
24    A.  No.    09:13:44
25    Q.  Okay. Have you ever testified    09:13:45

Page 14

1  under oath in any setting?                09:13:46
2      A.   Not that I can recall.           09:13:47
3      Q.   Okay.  And you understand        09:13:51
4  you're under oath today?                  09:13:52
5      A.   Yes.                  09:13:53
6      Q.   Okay.  And I'm sure your          09:13:54
7  counsel has given you a preview of how     09:13:55
8  depositions proceed generally, but I'll just  09:13:59
9  give you a few ground rules.               09:14:01
10         I will do my best not to talk      09:14:03
11 over you, and if you could reciprocate that,  09:14:06
12 that'll make for the court reporter to be  09:14:10
13 able to take down a good, clean transcript so  09:14:11
14 folks can understand what we're saying here  09:14:14
15 today if they ever choose to look at it down  09:14:16
16 the road.                    09:14:19
17         I will try to make my questions   09:14:19
18 as clear as I can.  If they're in any way   09:14:21
19 unclear to you, please let me know, and I'll  09:14:26
20 try to clarify them.              09:14:29
21         If you -- you know, if you        09:14:30
22 answer a question, I'll assume you understand  09:14:30
23 it and thought it was reasonably clear to   09:14:32
24 you.                       09:14:35
25         Is that fair?              09:14:35

Page 15

1      A.   Yes.                  09:14:35
2      Q.   If you need a break at any       09:14:36
3  point, just let me know, and we'll find a  09:14:39
4  convenient breaking spot.  We will take    09:14:42
5  regular breaks, approximately every hour or  09:14:44
6  so, in any event.                 09:14:46
7         The court reporter is here, of    09:14:47
8  course, making a transcript.  We also have  09:14:53
9  this on video.  There are various purposes in  09:14:56
10 the litigation that your testimony could be  09:14:59
11 used for in the future.  And if you have   09:15:00
12 any -- any questions regarding procedure at  09:15:07
13 all today, just feel free to let me know at  09:15:14
14 any point.                   09:15:16
15         Today is not a memory test.       09:15:18
16 Many of the events we're going to be talking  09:15:20
17 about happened several years ago, and I    09:15:23
18 understand that, you know, your memory may  09:15:25
19 not be as clear on certain things as on     09:15:29
20 others.  That's perfectly natural, to be   09:15:31
21 expected.                    09:15:35
22         In the course of the day you      09:15:35
23 may find that an answer that you gave      09:15:37
24 earlier, later on in the day you realize was  09:15:39
25 perhaps incomplete or could stand some     09:15:42

Page 16

1  embellishment.  If that's the case, please  09:15:46
2  let me know, and we'll be happy to         09:15:49
3  accommodate that as well.             09:15:50
4         Okay?                   09:15:52
5      A.   Okay.                 09:15:52
6      Q.   Are you taking any medications  09:15:53
7  that could impair your memory or ability to  09:15:54
8  testify accurately here today?            09:15:57
9      A.   No.                   09:15:58
10     Q.   Great.                 09:16:00
11         And you're represented by       09:16:00
12 counsel here today, correct?              09:16:03
13     A.   Yes, I am.               09:16:05
14     Q.   And are you paying your counsel  09:16:05
15 for today's representation?               09:16:08
16     A.   No, I am not.             09:16:09
17     Q.   Okay.  Do you know who is       09:16:10
18 paying them?                  09:16:12
19     A.   I assume Mallinckrodt.         09:16:12
20     Q.   Okay.  Let's go ahead and      09:16:14
21 mark...                     09:16:22
22         (Mallinckrodt-Collier Exhibit 1  09:16:22
23     marked for identification.)           09:16:29
24 QUESTIONS BY MR. GOTTO:                09:16:29
25     Q.   We've marked as Exhibit 1 the   09:16:41

Page 17

1  notice we served for today's deposition.   09:16:47
2         Have you seen this document      09:16:52
3  before?                     09:16:52
4      A.   Yes, I did.              09:16:52
5      Q.   Okay.  And when do you recall   09:16:53
6  seeing it for the first time?             09:16:54
7      A.   Yesterday.               09:16:54
8      Q.   Okay.  When did you first       09:16:55
9  become aware that there was a request to take  09:16:56
10 your deposition in this matter?            09:16:58
11     A.   About two months ago.         09:16:59
12     Q.   Did you undertake personally    09:17:05
13 any effort to locate documents that would be  09:17:08
14 responsive to the document request that's  09:17:15
15 included in the deposition notice?         09:17:17
16     A.   No, I don't recall having any   09:17:18
17 documents in my possession.  I retired when I  09:17:21
18 left Mallinckrodt.                09:17:23
19     Q.   Okay.  And when did you leave   09:17:24
20 Mallinckrodt?                  09:17:25
21     A.   February of 2015.           09:17:25
22     Q.   Okay.  And at that point did    09:17:27
23 you take with you any of your -- any files  09:17:30
24 that you had maintained while you were at   09:17:33
25 Mallinckrodt?                  09:17:35

Page 18

1    A.   No.                    09:17:35
2    Q.   Okay.  Any computer records,    09:17:36
3  laptop, anything of that nature?    09:17:38
4    A.   No.                    09:17:39
5    Q.   Okay.  Did you -- while you    09:17:40
6  were at Mallinckrodt, did you maintain    09:17:46
7  personally any files -- and when I say    09:17:48
8  "personally," I mean independent of your    09:17:51
9  place of work.                09:17:52
10        Did you maintain any files that    09:17:53
11  pertained to your work at Mallinckrodt?    09:17:55
12    A.   No, there were occasions when I    09:17:57
13  would do work from home on my computer, but I    09:18:01
14  would transfer it to my work computer and    09:18:03
15  send it to myself in e-mail or transfer it to    09:18:05
16  my work computer via USB hub.        09:18:07
17    Q.   Okay.  Great.            09:18:12
18        Did you ever use -- while you    09:18:12
19  were at Mallinckrodt, did you use any    09:18:13
20  personal e-mail accounts to communicate with    09:18:15
21  respect to professional activities?    09:18:19
22    A.   No.                    09:18:20
23    Q.   Did you use your phone to send    09:18:21
24  text messages that pertained to Mallinckrodt    09:18:28
25  business while you were at Mallinckrodt?    09:18:30

Page 19

1    A.   I had a Mallinckrodt phone at    09:18:32
2  the time, so I may have.            09:18:35
3    Q.   Okay.  When you say "a        09:18:37
4  Mallinckrodt phone," what do you mean by    09:18:38
5  that?                    09:18:38
6    A.   A company-issued phone that I    09:18:40
7  returned.  It was company property.    09:18:42
8    Q.   Okay.  Do you know who the    09:18:44
9  cellular carrier was on that -- for that    09:18:46
10  phone?                    09:18:49
11    A.   Possibly AT&T, I think is who    09:18:50
12  was doing it.                09:18:53
13    Q.   Okay.  It was an account that    09:18:53
14  Mallinckrodt handled, though, paid for, et    09:18:55
15  cetera?                    09:18:56
16    A.   Correct.                09:18:56
17    Q.   Okay.  So you don't have any    09:18:57
18  records from that account; is that right?    09:18:58
19    A.   No, I do not.            09:19:00
20    Q.   Okay.  Do you know who at    09:19:01
21  Mallinckrodt would have any records that    09:19:08
22  exist today with respect to your    09:19:12
23  Mallinckrodt-issued phone account?    09:19:14
24    A.   No.                    09:19:16
25        MR. GOTTO:  Counsel, we would    09:19:21

Page 20

1  ask if there are documents that    09:19:22
2  pertain to Ms. Collier's            09:19:23
3  Mallinckrodt-issued phone account,    09:19:26
4  text messages, et cetera, that those    09:19:28
5  be produced.                09:19:30
6        MR. O'CONNOR:  I understand the    09:19:30
7  request.                09:19:31
8        MR. GOTTO:  Thank you.    09:19:32
9  QUESTIONS BY MR. GOTTO:            09:19:32
10    Q.   Okay.  Ms. Collier, I'd like to    09:19:35
11  know what you did to prepare for today's    09:19:38
12  deposition.  I don't want you to divulge the    09:19:40
13  communications you had with any of your    09:19:43
14  counsel in giving me that description, but    09:19:47
15  perhaps you can tell me generally what you    09:19:50
16  did to prepare.                09:19:52
17    A.   I had two meetings with general    09:19:52
18  counsel, one in October and another one just    09:19:55
19  yesterday.                09:19:58
20    Q.   Okay.  And who was present at    09:19:59
21  those meetings?                09:20:01
22    A.   Bill was the first meeting.  I    09:20:02
23  don't remember his last name.  And Andrew    09:20:05
24  O'Connor and Cassandra were at the second    09:20:07
25  meeting yesterday.            09:20:11

Page 21

1    Q.   And Bill is an attorney?    09:20:11
2    A.   Yes.                    09:20:12
3    Q.   Okay.  A Ropes & Gray lawyer    09:20:13
4  or --                    09:20:16
5    A.   He's at Ropes & Gray, yes.    09:20:16
6    Q.   Okay.  Great.            09:20:19
7        Approximately how long did each    09:20:20
8  one of those meetings last?            09:20:21
9    A.   The first one was about six    09:20:22
10  hours, and yesterday was seven and a half.    09:20:24
11    Q.   Okay.  Independent of the    09:20:31
12  meetings with counsel, did you do anything    09:20:33
13  else to prepare for today's deposition?    09:20:35
14    A.   No, sir.                09:20:37
15    Q.   Didn't review any documents?    09:20:37
16    A.   I don't have any to review.    09:20:39
17    Q.   Okay.  Have you spoken with    09:20:41
18  anyone who has given testimony in this    09:20:42
19  litigation with respect to the litigation?    09:20:48
20    A.   No, I have not.            09:20:49
21    Q.   Okay.  Have you reviewed any    09:20:51
22  transcripts of any depositions or any other    09:20:52
23  proceedings --                09:20:55
24    A.   No.                    09:20:55
25    Q.   -- pertaining to -- okay --    09:20:56

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  pertaining to this litigation?            09:20:58
2      A.   (Witness shakes head.)           09:21:00
3      Q.   In your meetings with counsel,   09:21:01
4  did you review any documents?             09:21:07
5      A.   Yes, I did.                       09:21:09
6      Q.   Okay.  Did any of those          09:21:10
7  documents refresh your recollection in any  09:21:11
8  regard?                                    09:21:14
9      A.   On some issues, yes.             09:21:14
10     Q.   What issues can you recall your  09:21:16
11 recollection being refreshed on?          09:21:18
12     A.   Some memos that were sent in     09:21:21
13 e-mail.                                    09:21:26
14     Q.   In terms of subject matter of    09:21:26
15 the nature of the issues that you were     09:21:28
16 refreshed on, do you have a recollection of  09:21:29
17 what those were?                           09:21:31
18     MR. O'CONNOR:  Objection.  I'm        09:21:32
19   going to instruct the witness not to     09:21:33
20   answer to the extent this is getting     09:21:34
21   into attorney-client communications      09:21:36
22   and work product.                        09:21:38
23     MR. GOTTO:  Well, I think if          09:21:39
24   they refreshed her recollection, we're   09:21:41
25   entitled to know the subject matter on   09:21:45

Page 23

1    which they refreshed her recollection,   09:21:46
2    which is --                              09:21:48
3      MR. O'CONNOR:  You can answer          09:21:48
4    at a very high level.                    09:21:49
5      THE WITNESS:  Sure.  Specific          09:21:50
6    customer meetings or specific customer   09:21:52
7    communication.                           09:21:54
8  QUESTIONS BY MR. GOTTO:                     09:21:55
9      Q.   Okay.  Do you remember what      09:21:55
10 customers?                                  09:21:57
11     A.   Yes, I do.                         09:21:57
12     Q.   Which were they?                   09:21:59
13     A.   KeySource and Masters were        09:22:00
14 mentioned in them.                          09:22:05
15     Q.   Okay.  Well, we'll be looking     09:22:05
16 at some documents today on each of those --  09:22:07
17     A.   Okay.                              09:22:09
18     Q.   -- and we can get into that in    09:22:10
19 some more detail at that point.             09:22:12
20     So the two -- the two meetings          09:22:14
21 you had with counsel were personal meetings,  09:22:17
22 not telephonic; is that right?              09:22:19
23     A.   They were personal.               09:22:21
24     Q.   Okay.  And did you have any       09:22:22
25 other telephonic meetings or conferences with  09:22:23

Page 24

1  counsel in preparation for the deposition?   09:22:29
2      A.   Not in preparation for the        09:22:30
3  deposition, no.                             09:22:31
4      Q.   Okay.  Have you reviewed the --   09:22:33
5  any of the complaints on file in this       09:22:38
6  litigation?                                 09:22:41
7      A.   No, I knew that there was a       09:22:42
8  lawsuit.  I was aware there was a lawsuit,   09:22:45
9  but I haven't reviewed any of the materials.  09:22:46
10     Q.   Okay.  When did you first         09:22:49
11 become aware that this litigation was       09:22:50
12 pending?                                    09:22:52
13     A.   I can't remember.  And I can't    09:22:53
14 remember how I found out either.            09:22:57
15     Q.   Okay.  Do you have an             09:22:59
16 understanding of the nature of the claims   09:23:03
17 that are asserted in the litigation?        09:23:05
18     A.   Yes, I do.                         09:23:07
19     Q.   And what's that understanding?    09:23:08
20     A.   My understanding is that          09:23:09
21 federal facilities and counties and states  09:23:13
22 are suing to -- because they believe there is  09:23:16
23 lack of diligence or something on behalf of  09:23:24
24 the companies and that they want to sue on  09:23:28
25 behalf of the counties for cost, for opioid  09:23:32

Page 25

1  abuse.                                      09:23:37
2      Q.   Do you have any personal          09:23:38
3  opinion as to the merits of any of those    09:23:40
4  claims?                                     09:23:43
5      A.   Yes, I do.                         09:23:44
6      Q.   What are those opinions?          09:23:46
7      A.   I think they're probably         09:23:48
8  overreaching and misguided.                 09:23:53
9      Q.   Okay.  What do you base that      09:23:55
10 on?                                         09:23:57
11     A.   My knowledge of the industry.     09:23:57
12 And I don't have explicit knowledge about   09:24:00
13 abuse and how abuse occurs, but it's        09:24:02
14 basically on my knowledge of the industry and  09:24:05
15 some of the assertions that have been made.  09:24:07
16     Q.   Okay.  Are you being             09:24:10
17 compensated in any way for your testimony   09:24:19
18 here today?                                 09:24:21
19     A.   No, I'm not.                       09:24:22
20     Q.   Are you being reimbursed for      09:24:23
21 any of your expenses?                       09:24:25
22     A.   For my $12 parking today, I       09:24:26
23 assume, yes.                                09:24:28
24     Q.   Okay.  Travel expense or hotel    09:24:29
25 or anything?                                09:24:32

Page 26

```
1     A.   I live here, so there's no          09:24:34
2  expense involved.                            09:24:36
3     Q.   Okay.  Great.                        09:24:37
4          I'd like to ask you just a           09:24:38
5  little bit about your background.            09:24:43
6          Could you describe generally         09:24:44
7  your post-high school education?             09:24:45
8     A.   Yes.  I have a master's --           09:24:46
9  yeah, a master's in business administration, 09:24:48
10 a bachelor's in management, and those are my 09:24:53
11 two levels of education.                      09:24:58
12    Q.   Okay.  And from what                  09:25:00
13 institutions did you receive those degrees?   09:25:02
14    A.   University of Phoenix in              09:25:04
15 Fountain Valley, California.                  09:25:07
16    Q.   And approximately when did you        09:25:08
17 receive your degrees?                         09:25:09
18    A.   It's been a while.  23 years          09:25:11
19 ago I received my bachelor's, and 20 years    09:25:17
20 ago I received my master's.                   09:25:21
21    Q.   Okay.  Great.                         09:25:23
22         Beyond your bachelor's and            09:25:24
23 master's programs, have you received any      09:25:29
24 other -- or participated in any other formal  09:25:37
25 post-high school courses of study?            09:25:40
```

Page 27

```
1     A.   Well, I've attended other            09:25:42
2  sessions on management and, you know,         09:25:46
3  certification programs, but it's more         09:25:50
4  continuing education for management and        09:25:53
5  brushing up on skill sets, like that.         09:25:56
6     Q.   Okay.  So apart from the             09:25:59
7  bachelor's and master's programs, are those   09:26:02
8  the -- were there any other times when you    09:26:05
9  were -- considered yourself to be a full- or  09:26:08
10 part-time student --                          09:26:10
11    A.   No.                                   09:26:11
12    Q.   -- post-high school?                  09:26:11
13         Okay.  Do you hold any               09:26:13
14 professional licenses or certifications?      09:26:18
15    A.   No, I do not.                         09:26:19
16    Q.   Have you at any time?                 09:26:20
17    A.   No.                                   09:26:22
18    Q.   Okay.  And I'm sorry, you may         09:26:22
19 have already told me this, but what was your  09:26:28
20 undergraduate major?                          09:26:30
21    A.   Bachelor of arts in management.       09:26:31
22    Q.   Okay.  In either your                 09:26:35
23 undergraduate or master's degree programs,    09:26:37
24 did you take any courses that dealt with the  09:26:41
25 Controlled Substances Act?                    09:26:47
```

Page 28

```
1     A.   No.                                   09:26:48
2     Q.   Did you take any courses              09:26:49
3  related to pharmaceuticals more generally?    09:26:53
4     A.   No.                                   09:26:57
5     Q.   When you were pursuing your           09:26:57
6  bachelor's or master's degrees, did you have  09:27:02
7  an intent to pursue a career in the           09:27:06
8  pharmaceutical industry?                      09:27:10
9     A.   I was already in the                  09:27:10
10 pharmaceutical industry.  I just was pursuing 09:27:12
11 my degree to round out my education and to be 09:27:15
12 a better manager.                             09:27:18
13    Q.   Okay.  Well, then let's go            09:27:20
14 back.  Tell me when you first became involved 09:27:21
15 in any position in the pharmaceutical         09:27:23
16 industry.                                     09:27:25
17    A.   That was all the way back to          09:27:25
18 1975.  I worked in a drugstore.  From the     09:27:29
19 drugstore, I worked for a drug wholesaler,    09:27:34
20 and from the drug wholesaler, I went to work  09:27:36
21 for a pharmaceutical company.                 09:27:38
22         And so I stayed in the                09:27:39
23 pharmaceutical company, went back to work for 09:27:40
24 a drug wholesaler, then worked for another    09:27:42
25 pharmaceutical company.                       09:27:47
```

Page 29

```
1     Q.   Okay.  So fair to say that when      09:27:48
2  you were pursuing your bachelor's and         09:27:51
3  master's degrees, you were anticipating       09:27:52
4  future employment in the pharmaceutical       09:27:56
5  industry?                                     09:27:57
6     A.   I was anticipating staying in        09:27:59
7  the pharmaceutical industry.                  09:28:02
8     Q.   Okay.  So were you continued --       09:28:03
9  were you employed while you were pursuing     09:28:07
10 your degrees?                                 09:28:08
11    A.   Yes, I was.                           09:28:09
12    Q.   I see.  Okay.  Okay.  Thank          09:28:10
13 you.                                          09:28:11
14         So by whom were you employed at       09:28:11
15 that time?                                    09:28:15
16    A.   When I finished my degree, I          09:28:15
17 was employed with Schein Pharmaceutical.      09:28:16
18    Q.   And what position did you have?       09:28:20
19    A.   Product manager and national          09:28:22
20 account manager.                              09:28:24
21    Q.   Okay.  So product manager, what      09:28:25
22 does that mean in the pharmaceutical          09:28:28
23 industry?                                     09:28:30
24    A.   For a generic drug company,           09:28:30
25 it's a little bit different.  For generics,   09:28:32
```

Page 30

1  product management means forecasting, pricing  09:28:34
2  strategy, working with the national account  09:28:43
3  managers on customer strategy.  09:28:45
4      Q.   And when you said it's a little  09:28:46
5  different in generics, did you mean that you  09:28:51
6  were in a branded manufacturer at the time?  09:28:52
7      A.   No, I was always with the  09:28:57
8  generic side.  09:28:59
9      Q.   Okay.  Okay.  Including at  09:29:00
10  Mallinckrodt?  09:29:01
11      A.   Correct.  09:29:02
12      At Elan, I did one branded  09:29:03
13  product that was nonpromoted, and so there  09:29:06
14  was one brand product in my background.  09:29:09
15      Q.   Okay.  And so you indicated you  09:29:12
16  were both a product manager and a national  09:29:15
17  account manager.  09:29:16
18      What is a national account  09:29:17
19  manager responsible for, typically, in the  09:29:20
20  generic industry?  09:29:22
21      A.   A national account manager  09:29:22
22  works with key accounts, largest accounts,  09:29:24
23  national accounts, and negotiates contracts,  09:29:27
24  works on behalf of the customer to ensure  09:29:30
25  that they're getting all that they need taken  09:29:33

Page 31

1  care of, and it also -- they also would  09:29:34
2  negotiate pricing and determine who the  09:29:38
3  incumbent competitor is and try and displace  09:29:41
4  the incumbent competitor.  09:29:44
5      Q.   Okay.  So in your career in the  09:29:49
6  pharmaceutical industry, when did you -- when  09:29:54
7  were you first in a position that involved  09:29:58
8  responsibilities with respect to  09:30:04
9  pharmaceuticals that were scheduled under the  09:30:06
10  Controlled Substances Act?  09:30:09
11      A.   When I was working at Schein  09:30:10
12  Pharmaceutical, we sold some narcotics, and I  09:30:14
13  was product manager for them and sold them as  09:30:16
14  a national account manager.  09:30:17
15      Q.   Okay.  So when did you start at  09:30:19
16  Schein?  09:30:20
17      A.   I believe it was 1980, early  09:30:21
18  1980s.  09:30:29
19      Q.   Okay.  And did you have  09:30:30
20  occasion to become familiar with any aspect  09:30:32
21  of the regulatory requirements imposed under  09:30:36
22  the Controlled Substances Act while you were  09:30:40
23  at Schein?  09:30:42
24      A.   No.  09:30:43
25      Q.   Did Schein have a compliance  09:30:45

Page 32

1  department or other division that was  09:30:52
2  responsible for regulatory compliance?  09:30:54
3      A.   I don't know that.  It's not  09:30:56
4  anyone I interacted with or remember  09:30:59
5  interacting with.  09:31:02
6      Q.   Okay.  You were aware, though,  09:31:03
7  that the narcotics that Schein was  09:31:04
8  distributing were scheduled under the  09:31:06
9  Controlled Substances Act?  09:31:10
10      A.   That, I don't know.  09:31:10
11      Q.   Okay.  You know it now, but you  09:31:12
12  don't know if you were aware of it then?  09:31:15
13      A.   Correct.  09:31:17
14      Q.   Okay.  Did you stay at Schein  09:31:18
15  after you got your master's degree?  09:31:24
16      A.   Yes, I did.  09:31:26
17      Q.   And for how long?  09:31:26
18      A.   For a brief period.  And I got  09:31:27
19  promoted during that time and moved into the  09:31:30
20  home office.  That's when I became a product  09:31:33
21  manager, right after graduation, and I worked  09:31:36
22  there for a brief period.  09:31:38
23      Then they were acquired by  09:31:41
24  Watson, and then I stayed with Watson for a  09:31:43
25  brief period and left there.  09:31:46

Page 33

1      Q.   Okay.  And during the period  09:31:47
2  you were at Watson, did you continue to be a  09:31:48
3  product manager?  09:31:51
4      A.   Yes.  09:31:51
5      Q.   Okay.  And when you left  09:31:52
6  Watson, where did you go from there?  09:31:54
7      A.   I went to Baxter -- oh,  09:31:55
8  actually, excuse me, I went to Elan for a  09:32:01
9  very brief period, only six months or seven  09:32:04
10  months.  I went to Elan; they were a business  09:32:06
11  partner of Watson.  I went to work for them  09:32:09
12  in a specialty position, in product  09:32:11
13  management, basically, but it was more  09:32:13
14  working with their business partners.  So I  09:32:15
15  didn't manage the products, per se, but I  09:32:18
16  worked with them on that side of the  09:32:19
17  business.  09:32:22
18      Q.   And so what was the nature of  09:32:22
19  your responsibilities in this specialty  09:32:25
20  product manager position?  09:32:28
21      A.   It was any products that they  09:32:29
22  were not promoting for generics and -- that  09:32:32
23  became genericized, I would help them figure  09:32:37
24  out a strategy.  09:32:40
25      The other thing that I would do  09:32:42

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 is I worked with -- did the analytics on 09:32:43
2 business partners to make sure that Elan was 09:32:46
3 correctly getting the amount owed to them in 09:32:48
4 the alliance, because we had profit share 09:32:53
5 arrangements, and so I had to review. 09:32:55
6 Because as a -- in a generic sector, if 09:32:57
7 you've doing this a little while, you realize 09:32:59
8 it's very complicated in the pricing. So I 09:33:01
9 had to help them analyze the pricing and make 09:33:03
10 sure that they -- the rebates, discounts and 09:33:05
11 allowances were being calculated properly. 09:33:07
12    Q.    And after you left Elan, where 09:33:13
13 did you go? 09:33:15
14    A.    I went to Baxter. 09:33:16
15    Q.    Okay. And what was your 09:33:17
16 position at Baxter? 09:33:18
17    A.    Director of marketing. 09:33:19
18    Q.    How long were you at Baxter? 09:33:21
19    A.    I was at Baxter two years. 09:33:25
20    Q.    What was your reason for 09:33:26
21 leaving Elan and joining Baxter? 09:33:28
22    A.    Elan terminated my position. 09:33:30
23    Q.    And do you know the reason for 09:33:32
24 that? 09:33:33
25    A.    They were moving the 09:33:34

Page 35

1 facilities. They were selling off the entire 09:33:36
2 facility, and everybody was let go. 09:33:38
3    Q.    Okay. So you went to Baxter 09:33:40
4 and you were director of marketing? 09:33:43
5    A.    Correct. 09:33:46
6    Q.    So tell me generally what your 09:33:46
7 responsibilities were as director of 09:33:48
8 marketing at Baxter. 09:33:50
9    A.    Again, it was a generic 09:33:52
10 division of Baxter. It sold -- we sold 09:33:54
11 injectables, and so it was working with 09:33:56
12 customers on the contracts. The NAMs would 09:33:59
13 come up with contracts, and I would review 09:34:02
14 the contracts and adjust any terms and 09:34:04
15 conditions that I didn't think that we could 09:34:06
16 honor or that were too costly for the 09:34:09
17 company. 09:34:12
18       And my team was responsible for 09:34:12
19 forecasting any programs that we had to 09:34:14
20 ensure the compliance to the contracts, and 09:34:18
21 then forecasting and pricing. 09:34:22
22    Q.    Okay. And you used the acronym 09:34:26
23 NAMs. Is that national account manager? 09:34:29
24    A.    National account manager, I'm 09:34:32
25 sorry. 09:34:35

Page 36

1    Q.    Great. Thank you. 09:34:35
2       You indicated Baxter sold 09:34:38
3 injectables. What type of medication? 09:34:40
4    A.    Anesthesia products primarily, 09:34:43
5 and things used in the operating room or 09:34:47
6 surgical procedures. 09:34:50
7    Q.    Okay. 09:34:52
8    A.    Post and preop. 09:34:52
9    Q.    Okay. So these were not 09:34:53
10 Controlled Substances Act scheduled 09:34:55
11 materials, correct? 09:34:56
12    A.    We had some schedule drugs, but 09:34:57
13 I'm not sure which fell under the purview of 09:35:03
14 the Controlled Substances Act. 09:35:06
15    Q.    Okay. So while you were at 09:35:07
16 Baxter, did you have occasion to become 09:35:08
17 familiar with any of the regulatory 09:35:10
18 requirements imposed by the Controlled 09:35:13
19 Substances Act? 09:35:15
20    A.    No. 09:35:15
21    Q.    Okay. And you were at Baxter 09:35:16
22 for a couple of years; is that what you 09:35:19
23 indicated? 09:35:21
24    A.    Yes. 09:35:21
25    Q.    Okay. And where did you go 09:35:21

Page 37

1 from Baxter? 09:35:22
2    A.    I went to Baxter, then I moved 09:35:24
3 to Virginia, and I went to work for McKesson 09:35:29
4 medical/surgical. 09:35:33
5    Q.    And what was your reason for 09:35:34
6 leaving Baxter and going to McKesson? 09:35:35
7    A.    My husband retired, and I got 09:35:36
8 an opportunity at McKesson med/surg. 09:35:39
9    Q.    And what position did you have 09:35:43
10 at McKesson? 09:35:45
11    A.    Director of marketing. 09:35:45
12    Q.    Okay. Were your 09:35:46
13 responsibilities at McKesson similar to the 09:35:49
14 responsibilities you had at Baxter? 09:35:52
15    A.    No, McKesson's different. They 09:35:53
16 work with the vendors, so my job there was to 09:35:55
17 work with various vendors to negotiate 09:35:58
18 contracts, bring in new products, help the 09:36:02
19 team. Because it was different than the way 09:36:10
20 McKesson operated because they're a little 09:36:13
21 more independent, and then worked with them 09:36:15
22 on understanding how contracts work and 09:36:17
23 contract administration and chargebacks and 09:36:20
24 everything else. 09:36:22
25       So I worked -- I helped the 09:36:23

Page 38

1  team work on their programs to improve what          09:36:25
2  they were doing in Virginia.                          09:36:27
3      Q.   Okay.  You've used the term          09:36:29
4  "chargebacks" a couple of times.                      09:36:31
5          What do you mean by chargeback?     09:36:32
6      A.   Well, in the industry, in order     09:36:33
7  to sell to everybody at a certain price --    09:36:35
8  everybody has different prices based on       09:36:39
9  different terms that they have and what value  09:36:42
10 they can bring to the company, so you          09:36:44
11 negotiate with them on pricing.                09:36:45
12         So CVS and Rite Aid might have        09:36:47
13 two different prices.  Well, McKesson's not    09:36:50
14 going to know what that pricing -- they're     09:36:53
15 not going to sell -- we're not going to sell   09:36:55
16 to McKesson at that.  We have to have a        09:36:57
17 threshold.  So wholesale acquisition cost is   09:36:59
18 that threshold.  So everybody buys at one      09:37:01
19 price for which we can administer contracts.   09:37:04
20         After that, if we sell to CVS         09:37:07
21 for a certain price, then -- McKesson might    09:37:10
22 have paid $20, but the contract price that     09:37:12
23 they sell it to CVS for might be 7.50, so      09:37:14
24 they have to issue a chargeback.  They charge  09:37:18
25 us back for the difference between the list    09:37:21

Page 39

1  price of WAC, we call it, and the contract     09:37:22
2  price.                                          09:37:25
3      Q.   Okay.  And when you were using        09:37:25
4  the pronoun "us" in that setting, "charge us    09:37:27
5  back," "us" is the manufacturer?                09:37:32
6      A.   Yes, sir.                              09:37:33
7      Q.   Okay.  And McKesson was not a          09:37:34
8  manufacturer when you were there; is that       09:37:37
9  correct?                                        09:37:38
10     A.   Correct.                               09:37:38
11     Q.   Okay.  They were a distributor?        09:37:38
12     A.   However, McKesson had to issue         09:37:43
13 chargebacks, so we had to set up the system     09:37:55
14 so that when the vendors needed to get their    09:37:47
15 money back, we could do that.  So we were       09:37:49
16 working through getting that system set up.     09:37:51
17     Q.   Okay.  How long were you at            09:37:57
18 McKesson?                                        09:38:01
19     A.   I think I was there two years.         09:38:02
20     Q.   And during your time at                09:38:06
21 McKesson, did you have occasion to become       09:38:10
22 familiar with any of the regulatory             09:38:13
23 requirements under the Controlled Substances    09:38:15
24 Act?                                             09:38:16
25     A.   No, we weren't distributing any        09:38:16

Page 40

1  controlled substances there.                    09:38:19
2      Q.   Okay.                                   09:38:20
3      A.   That I remember.                        09:38:20
4      Q.   Okay.  So approximately, just           09:38:21
5  so we have some dates -- and I realize -- you    09:38:23
6  know, they don't have to be precise.            09:38:25
7  Approximately when you were at Baxter and        09:38:27
8  then at McKesson?                                09:38:29
9      A.   I was at McKesson from 1997 --          09:38:31
10 wait a minute -- 2007, excuse me, 2007 to        09:38:36
11 2000 -- let me back up.  I have to work          09:38:43
12 backwards.  I'm sorry.                           09:38:47
13         Do you happen to have my                 09:38:48
14 résumé?  Because that would help.                09:38:50
15     Q.   I have your -- your offer               09:38:52
16 letter from Mallinckrodt.                        09:38:54
17     A.   Yes.                                    09:38:57
18     Q.   And I believe it's in 2009, if          09:38:57
19 that helps.                                       09:38:59
20     A.   Right.  I started at                    09:38:59
21 Mallinckrodt in 2009, and I was with            09:39:01
22 GeneraMedix from 2004.  That's it.  So I was    09:39:03
23 with McKesson from 2002 to 2004, and with       09:39:06
24 Baxter about 2000 to 2002.                       09:39:15
25     Q.   Okay.  Great.                           09:39:19

Page 41

1          And so when you left McKesson,          09:39:20
2  you went where?                                  09:39:23
3      A.   To GeneraMedix.                         09:39:24
4      Q.   And what position did you hold          09:39:27
5  there?                                            09:39:31
6      A.   Vice president of marketing.            09:39:31
7      Q.   And just describe generally             09:39:33
8  what your responsibilities were at              09:39:41
9  GeneraMedix.                                     09:39:43
10     A.   GeneraMedix was a startup               09:39:44
11 company.  It was an injectable company          09:39:44
12 started by the president -- former president     09:39:46
13 of Baxter, and so I was helping him set          09:39:47
14 strategy for the company, what products would    09:39:51
15 we want to bring in, what customers would we     09:39:53
16 work with, and, again, reviewing contracts,      09:39:57
17 setting strategy, pricing, and then mostly       09:40:01
18 managing the portfolio.                          09:40:05
19     Q.   Okay.  And how long were you at         09:40:07
20 GeneraMedix?                                      09:40:12
21     A.   Five years.                             09:40:13
22     Q.   Okay.  Until you went to                09:40:14
23 Mallinckrodt?                                     09:40:17
24     A.   Correct.                                09:40:17
25     Q.   Okay.  What was your reason for         09:40:17

Page 42

1 leaving McKesson and joining GeneraMedix? 09:40:20
2     A.    Because the former president of 09:40:21
3 Baxter called me and asked me if I would be 09:40:23
4 interested with working with him, and it was 09:40:27
5 a startup company, so I had options available 09:40:28
6 to me, which was desirable. 09:40:31
7     Q.    Okay.  During your time at 09:40:32
8 GeneraMedix, did you have occasion to become 09:40:34
9 familiar with any of the regulatory 09:40:36
10 requirements under the Controlled Substances 09:40:37
11 Act? 09:40:38
12     A.    No, we didn't sell any 09:40:38
13 controlled substances. 09:40:40
14     Q.    Okay.  And in 2009, you left 09:40:42
15 GeneraMedix and joined Mallinckrodt, correct? 09:40:46
16     A.    Correct. 09:40:48
17     Q.    What was your reason for making 09:40:48
18 that move? 09:40:49
19     A.    GeneraMedix sold as a startup, 09:40:50
20 that's what we do, and so they sold the 09:40:53
21 company.  I'm from St. Louis, so I got the 09:40:55
22 opportunity to move home and work with 09:40:57
23 Mallinckrodt with my former boss. 09:40:59
24     Q.    Okay.  Great. 09:41:01
25          (Mallinckrodt-Collier Exhibit 2 09:41:35

Page 43

1          marked for identification.) 09:41:36
2 QUESTIONS BY MR. GOTTO: 09:41:36
3     Q.    Ms. Collier, we've marked as 09:41:37
4 Exhibit 2 what I believe is a copy of your 09:41:38
5 offer letter from Mallinckrodt.  It's a 09:41:45
6 multipage document that begins at 09:41:47
7 MNK-T1_0007277843. 09:41:51
8          If you could take a moment and 09:41:55
9 look through that document and tell me if you 09:41:56
10 recognize it. 09:42:01
11     A.    Yes, I recognize this. 09:42:01
12     Q.    Okay.  And this was your offer 09:42:06
13 letter when you joined Mallinckrodt? 09:42:07
14     A.    Yes. 09:42:08
15     Q.    Okay.  This indicates your 09:42:09
16 starting salary was an annual salary of 09:42:20
17 $ ▮▮▮▮▮ when you began. 09:42:23
18          Is that consistent with your 09:42:25
19 recollection? 09:42:26
20     A.    Yes. 09:42:26
21     Q.    Okay.  And you were also 09:42:27
22 eligible to participate in an annual 09:42:30
23 incentive plan, correct? 09:42:33
24     A.    Correct. 09:42:34
25     Q.    And as well as the company's 09:42:34

Page 44

1 long-term incentive plan, correct? 09:42:38
2     A.    Correct. 09:42:40
3     Q.    How long did you stay at 09:42:40
4 Mallinckrodt? 09:42:44
5     A.    Five years. 09:42:44
6     Q.    Okay.  And I say 09:42:46
7 "Mallinckrodt."  I see that the letterhead 09:42:49
8 actually says "Covidien."  In 2009, was there 09:42:50
9 a distinction in your mind between 09:42:53
10 Mallinckrodt and Covidien? 09:42:55
11     A.    No.  Covidien owned 09:42:56
12 Mallinckrodt, and we kept the Mallinckrodt 09:43:00
13 name on the product. 09:43:02
14     Q.    Okay.  During your period at 09:43:03
15 Mallinckrodt, did your compensation change? 09:43:10
16     A.    Yes, it did. 09:43:12
17     Q.    And can you describe for me 09:43:13
18 approximately how -- the manners in which it 09:43:15
19 changed? 09:43:18
20     A.    Well, I got an increase when I 09:43:18
21 became a senior director of marketing. 09:43:21
22 They -- Mallinckrodt reviewed all the 09:43:23
23 employees and corrected salaries for those 09:43:25
24 that were started at a lower base, and I got 09:43:29
25 moved to be called a senior director.  And my 09:43:32

Page 45

1 salary eventually, when I left, was 203,000 a 09:43:35
2 year. 09:43:39
3     Q.    Okay.  When did you become a 09:43:40
4 senior director? 09:43:42
5     A.    That had to be probably in 09:43:43
6 2010, 2011 time frame. 09:43:47
7     Q.    Were you a corporate officer? 09:43:49
8     A.    No, I was not. 09:43:53
9     Q.    Were you at any time a member 09:43:54
10 of any committees at Mallinckrodt for any 09:44:01
11 period of time? 09:44:13
12          MR. O'CONNOR:  Object to form. 09:44:13
13          THE WITNESS:  Probably -- they 09:44:15
14          had a lot of committees, so I guess I 09:44:16
15          would need to understand what 09:44:18
16          specifically you're looking for. 09:44:19
17 QUESTIONS BY MR. GOTTO: 09:44:20
18     Q.    Sure.  Sure. 09:44:20
19          Any formal committee that met 09:44:21
20 on a regular schedule with agendas, 09:44:28
21 maintained minutes, that sort of thing? 09:44:30
22     A.    Most of them were informal 09:44:33
23 committees, and I don't remember them having 09:44:35
24 a lot of committees with minutes.  We're kind 09:44:38
25 of not as well-coordinated as we should have 09:44:43

Page 46

1    been in that effect, but there were         09:44:46
2    committees.                                  09:44:48
3         I remember being on the                 09:44:49
4    committee, for example, we were doing        09:44:51
5    serialization. It's a new regulation that's  09:44:56
6    come up, and so they asked me to be part of  09:44:59
7    that from a customer representative          09:45:01
8    perspective.                                 09:45:03
9         So I didn't participate in all          09:45:03
10   the meetings, even when I was on committees, 09:45:05
11   because I was very busy, and so I asked only  09:45:08
12   to be included when it was absolutely        09:45:10
13   necessary to include me.                     09:45:11
14        Q.   Okay. Do you recall being on       09:45:13
15   any committees, formal or informal, that had 09:45:15
16   any responsibilities with respect to         09:45:19
17   compliance with any requirements under the   09:45:23
18   Controlled Substances Act?                   09:45:26
19        A.   I was on an SOM committee,         09:45:26
20   which was about the development of the       09:45:30
21   suspicious order monitoring, as a peripheral 09:45:33
22   partner on that.                             09:45:38
23        Q.   And what do you mean by that?      09:45:39
24        A.   It means that I offered advice     09:45:41
25   on customer reporting, customer information, 09:45:44

Page 47

1    but I was not part of the establishment of   09:45:48
2    rules, policies, things of that nature.      09:45:52
3         Q.   Okay. And do you recall            09:45:55
4    approximately when you were on that          09:45:57
5    committee?                                   09:45:58
6         A.   Probably 2012 or 2013.            09:45:59
7         Q.   Okay. For approximately what       09:46:05
8    period of time, if you recall?              09:46:08
9         A.   I don't recall.                    09:46:09
10        Q.   Okay. Did you attend meetings      09:46:11
11   of that committee?                           09:46:13
12        A.   Yes.                               09:46:14
13        Q.   Okay. And you indicated you        09:46:16
14   offered advice on customer reporting and     09:46:18
15   customer information.                        09:46:20
16        What sort of advice can you             09:46:21
17   recall offering?                             09:46:24
18        A.   Well, we would get IMS data,       09:46:26
19   which is industry reporting, so we could pull 09:46:29
20   industry reporting data in certain formats.  09:46:31
21        I understood how the chargeback         09:46:35
22   process worked. Not necessarily had          09:46:38
23   responsibility for the chargebacks, but I    09:46:40
24   understood how the process worked. So I      09:46:43
25   would offer guidance on that on why we would 09:46:45

Page 48

1    receive a chargeback or not receive a        09:46:47
2    chargeback in certain instances.             09:46:49
3         Q.   Okay. And did you have an          09:46:51
4    understanding as to the interplay between    09:46:54
5    chargebacks and the suspicious order         09:47:00
6    monitoring program?                          09:47:03
7         MR. O'CONNOR:  Object to form.          09:47:03
8         THE WITNESS:  Yes.                      09:47:05
9    QUESTIONS BY MR. GOTTO:                       09:47:06
10        Q.   And what was that?                 09:47:07
11        A.   What was -- I'm sorry, please      09:47:08
12   explain your question.                       09:47:12
13        Q.   Sure.                              09:47:13
14        You mentioned in terms of --            09:47:13
15   part of the information you provided to the  09:47:16
16   SOM committee that you were part of related  09:47:19
17   to the chargeback process, and so my question 09:47:21
18   was what your understanding was of the       09:47:24
19   interplay between the chargeback process and 09:47:26
20   the SOM process.                             09:47:28
21        MR. O'CONNOR:  Same objection.          09:47:30
22        THE WITNESS:  I honestly don't          09:47:30
23   know, because I would explain to them        09:47:32
24   how it worked and what we could              09:47:34
25   possibly -- information we could pull,       09:47:36

Page 49

1    and then it was up to the SOM team to        09:47:38
2    decide how to use that data and what         09:47:40
3    to look at.                                  09:47:42
4    QUESTIONS BY MR. GOTTO:                       09:47:43
5         Q.   Okay. And so did you provide       09:47:43
6    that information with respect to the         09:47:45
7    chargeback process pursuant to a request you 09:47:46
8    received from the committee?                 09:47:51
9         A.   No, actually some of that was      09:47:52
10   volunteered earlier on.                      09:47:54
11        Q.   Okay. And what was your            09:47:57
12   reasoning for volunteering that information  09:47:58
13   to the SOM committee?                        09:48:00
14        A.   Because during the Sunrise         09:48:01
15   Medical -- there were rumors that Sunrise    09:48:06
16   Medical had a problem with the DEA, and one  09:48:10
17   of my employees was able to -- I don't want  09:48:11
18   to say it's a backdoor, but she got into the 09:48:16
19   system, or hacked, I don't know how you say  09:48:20
20   it, but she figured out a way to get into the 09:48:21
21   contract admin system and pull reports and   09:48:26
22   look for specific -- very specific data      09:48:27
23   related to Sunrise.                          09:48:29
24        And so when we showed that to           09:48:30
25   the compliance team, they asked us, how can  09:48:35

Page 50

1 we do this on a regular basis, what 09:48:40
2 information you get, how do we pull 09:48:42
3 information. 09:48:44
4 And so we provided them 09:48:44
5 guidance because we certainly couldn't do it 09:48:46
6 ourselves on a regular basis. It was just 09:48:48
7 too much data. 09:48:51
8 Q. And so which employee was it 09:48:51
9 who got this Sunrise data? 09:48:53
10 A. Kate Neely. Kate Muhlenkamp at 09:48:55
11 the time. 09:49:02
12 Q. Okay. That's the same person, 09:49:02
13 Kate Neely? 09:49:03
14 A. Yes. 09:49:06
15 Q. Okay. Great. 09:49:07
16 So Ms. Neely -- you used the 09:49:09
17 word "hacked." I'm sure you didn't mean to 09:49:12
18 suggest she did anything improper? 09:49:15
19 A. Not illegal, but, yeah, just 09:49:16
20 outside company norms. 09:49:18
21 Q. Okay. So the information that 09:49:20
22 she obtained was information that 09:49:22
23 Mallinckrodt maintained internally, correct? 09:49:24
24 A. It was -- yes, it was in the 09:49:26
25 system. 09:49:27

Page 51

1 Q. And do you know how she -- 09:49:28
2 well, did you instruct her to attempt to 09:49:32
3 access that information? 09:49:37
4 MR. O'CONNOR: Object to form. 09:49:38
5 THE WITNESS: No. 09:49:39
6 QUESTIONS BY MR. GOTTO: 09:49:39
7 Q. Do you know -- go ahead. 09:49:40
8 A. No, I did not instruct her. 09:49:40
9 Q. Okay. Was it her idea? 09:49:43
10 A. Yes. 09:49:44
11 Q. Okay. Do you know how she -- 09:49:45
12 how she came to believe that that information 09:49:47
13 might be accessible in some fashion? 09:49:51
14 A. She may have told me -- 09:49:53
15 MR. O'CONNOR: Objection. 09:49:53
16 THE WITNESS: Oh, I'm sorry. 09:49:54
17 She may have told me, and I 09:49:55
18 would not remember -- 09:49:57
19 QUESTIONS BY MR. GOTTO: 09:49:58
20 Q. Okay. 09:49:58
21 A. -- what she did because it was 09:49:59
22 over my head. 09:50:00
23 Q. Okay. Did she -- before 09:50:01
24 seeking to access the information, did she 09:50:04
25 discuss that with you at all? 09:50:06

Page 52

1 A. Yes. 09:50:08
2 Q. Okay. And what can you recall 09:50:10
3 about her raising that with you? 09:50:13
4 A. She said, well, I can pull 09:50:14
5 their chargeback data, but we wouldn't know 09:50:17
6 what to look for because chargeback data is 09:50:20
7 voluminous. There's so much information, 09:50:25
8 unless you're looking specifically for 09:50:26
9 something at a specific point in time, you're 09:50:27
10 not going to be able to tease it out. 09:50:30
11 So she told me this, that she 09:50:33
12 could get that, but we didn't know what to 09:50:37
13 look for. So we decided to look for specific 09:50:39
14 words and query the system for that. 09:50:43
15 Q. Okay. What types of words did 09:50:45
16 you look for? 09:50:47
17 A. "Doctor" or "MD." 09:50:47
18 Q. Okay. And why did you choose 09:50:49
19 those words to look for? 09:50:55
20 A. Because from what we were 09:50:56
21 reading, it sounded as if Sunrise Medical was 09:50:58
22 in trouble for selling to doctors in Florida. 09:51:01
23 And if that's a problem, then we need to 09:51:08
24 understand that and why. 09:51:10
25 Q. Okay. And when you say 09:51:11

Page 53

1 "reading," do you mean in press accounts? 09:51:13
2 A. Yes. I don't remember exactly 09:51:15
3 where the information came from, but I do 09:51:17
4 remember seeing that they were in trouble for 09:51:19
5 that. 09:51:21
6 Q. Okay. Do you recall how the 09:51:22
7 Sunrise issues with the DEA first came to 09:51:32
8 your attention? 09:51:34
9 MR. O'CONNOR: Object to form. 09:51:35
10 THE WITNESS: I believe they 09:51:37
11 came from Victor Borelli, one of our 09:51:39
12 national account managers. 09:51:44
13 QUESTIONS BY MR. GOTTO: 09:51:45
14 Q. Okay. So the chargeback data 09:51:48
15 that Ms. Muhlenkamp was able to access, 09:51:50
16 what's the nature of the information that's 09:51:56
17 contained there? 09:51:58
18 A. From what I know, because it's 09:52:00
19 limited in the amount of information that I 09:52:04
20 get, but there's standard forms that are 09:52:07
21 transferred back and forth between the 09:52:09
22 wholesaler/distributor and the vendor. And 09:52:11
23 so from what I've seen, it contains the 09:52:14
24 customer name, the pharmacy or physician, in 09:52:16
25 the cases there's a physician dispensing, the 09:52:21

Page 54

1 address to which it was shipped, the state, 09:52:30
2 you know, obviously, in the address, and the 09:52:33
3 quantity that they purchased and the amount 09:52:34
4 of the debit memo that they're requesting. 09:52:35
5 So if there were ten units, then the 09:52:40
6 chargeback amount was $10 per unit, then it's 09:52:43
7 a hundred dollars. 09:52:45
8    Q. Okay. And again, the "they" in 09:52:46
9 this context would be the distributor that 09:52:48
10 was -- 09:52:49
11    A. And the wholesaler, yes. 09:52:49
12    Q. Okay. And so it would be data 09:52:51
13 that would show -- so Mallinckrodt -- let me 09:52:53
14 back up. Strike that. 09:52:55
15    So Mallinckrodt's customer in 09:52:56
16 this setting is a distributor or a 09:52:57
17 wholesaler, correct? 09:52:59
18    A. Correct. 09:53:00
19    Q. And then the chargeback data 09:53:00
20 would have information regarding whom the 09:53:03
21 ultimate customer of that wholesaler or 09:53:07
22 distributor was, correct? 09:53:10
23    MR. O'CONNOR: Objection. 09:53:11
24    MS. DURFEE: Objection. 09:53:13
25    THE WITNESS: I want to be 09:53:14

Page 55

1 clear: You don't always know who the 09:53:15
2 ultimate customer is, so it would 09:53:18
3 contain information about who 09:53:20
4 purchased that particular product on 09:53:23
5 that date. 09:53:25
6 QUESTIONS BY MR. GOTTO: 09:53:25
7    Q. Okay. So strike the word 09:53:26
8 "ultimate" from my question. 09:53:28
9    The chargeback information 09:53:30
10 would include information regarding the 09:53:31
11 identity of the -- of the customer of 09:53:34
12 Mallinckrodt's customer, correct? 09:53:37
13    MS. DURFEE: Objection. Form. 09:53:39
14    THE WITNESS: Yes. 09:53:41
15 QUESTIONS BY MR. GOTTO: 09:53:41
16    Q. Okay. And I think we'll look 09:53:42
17 at some documents in a bit regarding Sunrise. 09:53:49
18    Do you have a recollection of 09:53:53
19 the approximate time frame when 09:53:56
20 Ms. Muhlenkamp accessed this information? 09:53:59
21    A. I believe it was around 2010. 09:54:01
22 It was probably in the first half of 2010. 09:54:03
23    Q. Okay. And do you know if prior 09:54:06
24 to Ms. Muhlenkamp accessing that information, 09:54:09
25 do you know if anyone at Mallinckrodt had 09:54:14

Page 56

1 previously used chargeback data in connection 09:54:17
2 with any suspicious order monitoring program? 09:54:20
3    A. I was not -- 09:54:23
4    MR. O'CONNOR: Object to form. 09:54:23
5    THE WITNESS: I was not aware 09:54:24
6 of that. 09:54:25
7 QUESTIONS BY MR. GOTTO: 09:54:25
8    Q. Do you know if there came to be 09:54:29
9 a time when Mallinckrodt regularly used 09:54:33
10 chargeback data as part of its suspicious 09:54:36
11 order monitoring? 09:54:40
12    A. I was not aware of what 09:54:40
13 information was used by the SOM team. 09:54:42
14    Q. Okay. At any time? 09:54:44
15    A. Right. 09:54:45
16    Q. Okay. Including when you were 09:54:47
17 on the committee that you were describing 09:54:48
18 earlier? 09:54:49
19    A. Right. They did ask me for 09:54:50
20 information, but I didn't know if they -- 09:54:52
21 after that, I gave them guidance, but I don't 09:54:55
22 know if they used it and I don't -- they 09:54:57
23 would ask me sometimes for information, but I 09:54:59
24 don't know what they were using to make 09:55:02
25 decisions. 09:55:05

Page 57

1    Q. Okay. 09:55:06
2    A. If that makes sense. 09:55:06
3    Q. Okay. Back on to your offer 09:55:08
4 letter, Exhibit 2. You described how your 09:55:12
5 salary changed over time while you were at 09:55:17
6 Mallinckrodt. 09:55:19
7    Did the bonus structure change 09:55:20
8 over time at all as well? 09:55:25
9    A. My bonus percentage remained 09:55:27
10 the same, and it fluctuated. 09:55:29
11    Q. The dollar amount fluctuated? 09:55:32
12    A. Correct. 09:55:34
13    Q. Okay. And what were the -- 09:55:35
14    A. Well, can I correct? 09:55:37
15    Q. Please. 09:55:38
16    A. Okay. The dollar amount 09:55:39
17 fluctuated depending on the overall company 09:55:41
18 performance. And there was a percentage of 09:55:44
19 the company performance, but there were other 09:55:46
20 metrics for -- 09:55:48
21    Q. Okay. What were the metrics 09:55:50
22 that came into play in determining your 09:55:51
23 bonus? 09:55:54
24    A. Forecast accuracy; the team's 09:55:54
25 participation in different programs, if we 09:56:01

Page 58

1    developed good programs that worked well for    09:56:07
2    the customer; allocation process, if we    09:56:09
3    developed processes that worked well for the    09:56:11
4    customers and for Mallinckrodt.    09:56:13
5        Q.    Okay.    Were total sales an    09:56:16
6    element of the bonus determination?    09:56:22
7        A.    Yes.    09:56:24
8        Q.    Okay.    And during your six or    09:56:25
9    so years at Mallinckrodt, apart from the    09:56:33
10   annual incentive plan and the long-term    09:56:36
11   incentive plan, were there any other bonus    09:56:38
12   programs that you were eligible to    09:56:41
13   participate in?    09:56:42
14       A.    I received stock options and    09:56:43
15   stock grants, but they were not related to    09:56:46
16   the team's performance.    09:56:50
17       Q.    Okay.    And what was the basis    09:56:52
18   for the stock grants that you received, or    09:56:53
19   options?    09:56:57
20       A.    Honestly, I could never figure    09:56:57
21   that out.    09:57:00
22       Q.    Okay.    Okay.    You can set that    09:57:01
23   aside.    09:57:06
24       A.    Okay.    09:57:06
25           (Mallinckrodt-Collier Exhibit 3    09:57:14

Page 59

1        marked for identification.)    09:57:14
2    QUESTIONS BY MR. GOTTO:    09:57:14
3        Q.    Ms. Collier, we have marked as    09:57:37
4    Exhibit 3 three pages from your personnel    09:57:38
5    file beginning at MNK-T1_0007277883.    09:57:44
6            The first page appears to be a    09:57:51
7    job description with respect to the director    09:57:54
8    of marketing position for specialty generics.    09:57:57
9    Second page is blank, and the third page is    09:58:00
10   an organizational chart.    09:58:03
11           Would you take a moment and    09:58:05
12   look, and let me know if you recognize those    09:58:06
13   documents.    09:58:10
14       A.    I remember this.    09:58:10
15       Q.    Okay.    If we could just start    09:58:47
16   on the third page on the organizational    09:59:04
17   chart.    09:59:06
18           On this chart, the director of    09:59:09
19   marketing position is indicated as open.    I    09:59:15
20   take it this was before you joined the    09:59:18
21   company.    09:59:20
22           Can you otherwise review the    09:59:21
23   chart and tell me if this is consistent with    09:59:24
24   your recollection of the organization of the    09:59:26
25   generic sales and marketing department at the    09:59:28

Page 60

1    time you joined Mallinckrodt?    09:59:30
2        MR. O'CONNOR:    Object to form.    09:59:31
3        THE WITNESS:    Yes.    Yes, it is.    09:59:32
4    QUESTIONS BY MR. GOTTO:    09:59:34
5        Q.    Okay.    And so when you joined    09:59:34
6    as director of marketing, did the individuals    09:59:37
7    that are listed in the far right column,    09:59:41
8    beginning with Kate Muhlenkamp and the names    09:59:43
9    under hers, report to you?    09:59:46
10       A.    Yes, they did.    09:59:48
11       Q.    Okay.    And you reported to    09:59:49
12   Mr. Gunning; is that right?    09:59:52
13       A.    Yes, I did.    09:59:53
14       Q.    Okay.    When you started as    09:59:54
15   director of marketing at Mallinckrodt, did    09:59:59
16   anyone else report to you other than the    10:00:00
17   individuals who are identified in this org    10:00:03
18   chart?    10:00:06
19       A.    I cannot remember because the    10:00:06
20   team changed considerably over time, but I    10:00:10
21   can't remember at the time when I started if    10:00:14
22   it was the same team.    10:00:15
23       Q.    Okay.    Tell me what you can    10:00:17
24   recall about the team changing under -- team    10:00:19
25   in terms of people who reported to you,    10:00:22

Page 61

1    directly or indirectly, how that changed over    10:00:24
2    time, any particular personnel changes.    10:00:27
3            And again, I realize it's a    10:00:29
4    several-year period and there were probably    10:00:32
5    multiple changes, so I'm not expecting a    10:00:34
6    complete and comprehensive list, but whatever    10:00:36
7    comes to your mind in terms of changes in the    10:00:39
8    team over time, if you could describe those.    10:00:41
9        A.    Okay.    10:00:43
10       MR. O'CONNOR:    Object to form.    10:00:43
11       THE WITNESS:    Kate ended up    10:00:43
12   leaving the company, and she was the    10:00:47
13   product manager.    At one point she had    10:00:48
14   another employee, Lisa Lundergan,    10:00:50
15   reporting to her, who is now Lisa    10:00:54
16   Cardetti.    10:00:56
17           We added analytical people to    10:00:57
18   the team, and I terminated Penny and    10:01:04
19   Margie and moved their products to    10:01:12
20   other people.    10:01:16
21   QUESTIONS BY MR. GOTTO:    10:01:17
22       Q.    What was the reason for those    10:01:18
23   terminations?    10:01:20
24       A.    Ineffective.    10:01:20
25       Q.    And do you recall when    10:01:21

Page 62

1  Ms. Muhlenkamp left Mallinckrodt?          10:01:25
2      A.    It was probably 2012 or 2013.     10:01:27
3      Q.    Okay.  And did someone else       10:01:33
4  take her position after she left?           10:01:34
5      A.    Yes.  Lisa Cardetti.              10:01:37
6      Q.    Okay.  So -- and Ms. Cardetti     10:01:39
7  had previously reported to Ms. Muhlenkamp?  10:01:41
8      A.    Correct.                          10:01:44
9      Q.    Okay.  Do you recall what the     10:01:45
10 reasons were for Ms. Muhlenkamp -- or at    10:01:47
11 least what your understanding was as for the 10:01:50
12 reasons for her leaving?                     10:01:52
13         MR. O'CONNOR:  Object to form.      10:01:52
14         THE WITNESS:  The reason she        10:01:53
15     told us is that she wanted to move up   10:01:56
16     in an organization, and she left for a  10:01:59
17     better opportunity.                     10:02:02
18 QUESTIONS BY MR. GOTTO:                      10:02:03
19     Q.    Okay.  Did you perform any        10:02:03
20 periodic evaluation or review of the job     10:02:09
21 performance of the individuals that reported 10:02:12
22 to you?                                      10:02:14
23     A.    Yes, I did.                        10:02:18
24     Q.    And you indicated that you        10:02:19
25 terminated some individuals from being       10:02:21

Page 63

1  ineffective.                                10:02:22
2         Apart from them, do you recall       10:02:23
3  any other situations in which you felt that 10:02:24
4  the job performance of any of the individuals 10:02:30
5  that reported to you was unsatisfactory?    10:02:33
6      A.    I can't recall that because       10:02:37
7  this is an incomplete list.                 10:02:44
8         Oh, yes, actually, I do              10:02:46
9  remember one.  Thomas Brown.                10:02:47
10     Q.    Okay.  What can you recall        10:02:49
11 about that?                                  10:02:52
12     A.    Thomas Brown was hired as the     10:02:52
13 communications support to work for -- with us 10:02:54
14 on trade shows and the programs that I said 10:02:57
15 that we developed for customers, and just   10:03:00
16 take some of the pressure off the product   10:03:04
17 managers for any materials, any support that 10:03:06
18 he could provide, and he did not provide that 10:03:10
19 level of support.                           10:03:12
20     Q.    Okay.  Any other examples that    10:03:14
21 come to your mind of individuals who you felt 10:03:17
22 their job performance was unsatisfactory?   10:03:19
23     A.    No.                               10:03:22
24     Q.    Okay.  How about                  10:03:23
25 Ms. Muhlenkamp, did you -- what was your    10:03:24

Page 64

1  general opinion of her job performance?     10:03:26
2      A.    She was an excellent employee     10:03:28
3  and very, very bright.                      10:03:30
4      Q.    Okay.  And judging from this      10:03:32
5  org chart, she had been at Mallinckrodt     10:03:35
6  before you joined, correct?                 10:03:37
7      A.    Yes.                              10:03:38
8      Q.    Do you know how long she had      10:03:38
9  been there?                                 10:03:40
10     A.    No.                               10:03:40
11     Q.    Okay.  And I take it             10:03:40
12 Ms. Cardetti joined Mallinckrodt sometime   10:03:47
13 after you did, judging from her absence on  10:03:50
14 this org chart; is that right?              10:03:52
15     A.    No, she was working in another    10:03:54
16 department.                                 10:03:56
17     Q.    Okay.                             10:03:57
18     A.    And we brought her over for       10:03:57
19 analytics.                                  10:03:59
20     Q.    Okay.  And then she took          10:04:00
21 Ms. Muhlenkamp's position when Ms. Muhlenkamp 10:04:02
22 left.                                        10:04:05
23         And did she stay in that            10:04:05
24 position for the balance of your tenure at  10:04:07
25 Mallinckrodt?                                10:04:09

Page 65

1      A.    No, she went into a national      10:04:10
2  account manager role.                       10:04:12
3      Q.    Okay.  And who took that          10:04:13
4  position, her position, under you at that   10:04:16
5  point?                                       10:04:19
6      A.    We had hired another product     10:04:19
7  manager, Jennifer Block, to work for us at  10:04:22
8  the time.  And so Jennifer was also another 10:04:25
9  product manager that worked during that     10:04:28
10 period, so we just realigned the products.  10:04:29
11     Q.    Okay.  And approximately when     10:04:32
12 did Ms. Cardetti leave your team?            10:04:33
13     A.    Probably 2014 -- 2015.            10:04:38
14     Q.    Okay.                             10:04:43
15     A.    2014, 2015, sometime there.       10:04:43
16     Q.    Okay.  Did there come to be a     10:04:45
17 time when Mr. Vorderstrasse was on your team? 10:04:47
18     A.    Yes.                              10:04:51
19     Q.    When was that?                     10:04:51
20     A.    I don't recall when he came on    10:04:53
21 board.  I'm sorry, I barely remember my own 10:04:59
22 dates, let alone all the employees.          10:05:01
23     Q.    I understand.                     10:05:03
24         What position did he hold?           10:05:04
25     A.    Kevin was in charge of the       10:05:06

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    analytical team, and he helped -- because he    10:05:09
2    was a big data mining person, so he could do    10:05:13
3    that.  He also helped with business    10:05:17
4    development, which meant deciding what    10:05:20
5    products to go pursue if we wanted to    10:05:23
6    continue our pipeline growth.    10:05:25
7        Q.    Okay.  So --    10:05:25
8        A.    And he also launched a drug for    10:05:27
9    us, so...    10:05:29
10       Q.    Okay.  What drug was that?    10:05:30
11       A.    Methylphenidate.  It's a    10:05:31
12   Concerta.    10:05:34
13       Q.    Okay.  So looking back at the    10:05:35
14   org chart, this part of Exhibit 3,    10:05:38
15   Ms. Muhlenkamp is identified as a product    10:05:43
16   manager, as is Marock Montgomery?    10:05:45
17       A.    It's actually Marc.    10:05:51
18       Q.    Marc?    10:05:51
19       A.    That's a typo.    10:05:52
20       Q.    Okay.  How were -- how were    10:05:58
21   the -- how did their responsibilities differ?    10:06:00
22       A.    They each had different    10:06:03
23   products that they were responsible for.    10:06:05
24       Q.    Okay.  And what products do you    10:06:06
25   recall Ms. Muhlenkamp being responsible for?    10:06:10

Page 67

1        A.    Oxycodone, oxy APAP.  Marc had    10:06:11
2    hydrocodone at the time.  We had mixed salts,    10:06:17
3    and I know Marc was responsible for that, but    10:06:26
4    I don't remember exactly how the products    10:06:30
5    lined up after that.    10:06:31
6        Q.    Okay.  And then you indicated    10:06:33
7    Mr. Vorderstrasse had particular    10:06:39
8    responsibility for analytics.    10:06:42
9            Was there any similar division    10:06:43
10   of responsibilities before he joined the    10:06:45
11   team, where one of the product managers had a    10:06:48
12   particular responsibility for analytics?    10:06:51
13           MR. O'CONNOR:  Object to form.    10:06:53
14           THE WITNESS:  That is a very    10:06:54
15       broad question because they each --    10:06:56
16       everyone on the team has to do some    10:07:00
17       form of analytics, so I'm not sure    10:07:05
18       what you're asking for.    10:07:07
19   QUESTIONS BY MR. GOTTO:    10:07:08
20       Q.    Okay.  I was just trying to    10:07:08
21   understand if the nature of the -- let me ask    10:07:10
22   the question this way.    10:07:11
23           Throughout your time as    10:07:12
24   director of marketing at Mallinckrodt, was it    10:07:13
25   the case that you had one or more product    10:07:16

Page 68

1    managers -- well, multiple product managers    10:07:24
2    reporting to you throughout your time,    10:07:26
3    correct?    10:07:27
4        A.    Correct.    10:07:27
5        Q.    And did each of them have    10:07:28
6    responsibility for discrete products?    10:07:32
7        A.    Yes.    10:07:34
8        Q.    Okay.  And so did    10:07:36
9    Mr. Vorderstrasse, for example, have    10:07:39
10   responsibility for discrete products?    10:07:41
11       A.    Yes, he did.    10:07:42
12       Q.    Now, when you came to    10:07:44
13   Mallinckrodt -- well, let's look at page 1    10:07:52
14   of -- the first page, rather, of Exhibit 3,    10:07:56
15   which the top-half of the page has eight    10:07:59
16   numbered items which appear to be a    10:08:05
17   description of the role and responsibility of    10:08:08
18   the -- of the director of marketing for    10:08:10
19   specialty generics.  So I'd like to go    10:08:13
20   through those with you and understand if, in    10:08:15
21   fact, those were your roles and    10:08:20
22   responsibilities and what you did in these    10:08:22
23   regards.    10:08:24
24           Let me begin by asking what --    10:08:24
25   specialty generics, what did you understand    10:08:32

Page 69

1    that phrase to means?    10:08:34
2        A.    It means different things to    10:08:35
3    different people.  At Mallinckrodt they meant    10:08:36
4    that is was just a niche, that not everyone    10:08:39
5    can produce and sell in a certain area.    10:08:42
6        Q.    Okay.  Did Mallinckrodt    10:08:43
7    manufacture other generic drugs that it did    10:08:46
8    not categorize as specialty generics?    10:08:49
9        A.    No, because they use that as an    10:08:51
10   umbrella comment.    10:08:57
11       Q.    Okay.  So specialty generics,    10:08:57
12   in the Mallinckrodt setting, anyway, meant    10:08:58
13   all generics that Mallinckrodt was    10:09:00
14   manufacturing?    10:09:00
15       A.    Correct.    10:09:01
16       Q.    Okay.  So I take it when you    10:09:05
17   became director of marketing, you needed to    10:09:09
18   become familiar with Mallinckrodt's product    10:09:12
19   line in the generic area, correct?    10:09:14
20       A.    Correct.    10:09:16
21       Q.    And so what did you do to    10:09:16
22   become familiar with what Mallinckrodt    10:09:17
23   manufactured and sold, the generics that they    10:09:21
24   manufactured and sold?    10:09:24
25       A.    Met with the product managers    10:09:25

Page 70

1    to understand their products, looked at IMS    10:09:27
2    data to understand the sales, the    10:09:30
3    competitors. I sat with different team    10:09:34
4    members in different parts of the    10:09:36
5    organization, such as logistics, to    10:09:38
6    understand how products were being shipped,    10:09:41
7    and did a tour of our warehouse -- not    10:09:43
8    warehouse -- manufacturing site up in Hobart    10:09:47
9    at one point.    10:09:49
10       Q.   Okay. Before we get into the    10:09:50
11   individual items listed in paragraphs 1 to 8    10:09:59
12   here, when you joined Mallinckrodt, were    10:10:03
13   there aspects of the director of marketing    10:10:05
14   job that you were taking that you felt were    10:10:11
15   different from the responsibilities you had    10:10:17
16   had at prior employers?    10:10:20
17          MR. O'CONNOR: Object to form.    10:10:23
18          THE WITNESS: Not really. The    10:10:23
19       responsibilities are similar across    10:10:28
20       any company. They were the same type    10:10:30
21       of job.    10:10:35
22   QUESTIONS BY MR. GOTTO:    10:10:35
23       Q.   Okay. Now, Mallinckrodt    10:10:36
24   obviously was engaged in the manufacture and    10:10:40
25   sale of a variety of scheduled    10:10:43

Page 71

1    pharmaceuticals under the Controlled    10:10:47
2    Substances Act, correct?    10:10:48
3       A.   Correct.    10:10:49
4       Q.   And that was somewhat different    10:10:49
5    from your prior experience, correct?    10:10:51
6       A.   Yes.    10:10:53
7       Q.   And did you undertake any    10:10:54
8    effort to become familiar with any of the    10:10:57
9    regulatory requirements imposed by the    10:11:00
10   Controlled Substances Act when you joined    10:11:03
11   Mallinckrodt?    10:11:04
12          MR. O'CONNOR: Object to form.    10:11:04
13          THE WITNESS: My familiarity    10:11:06
14       ran to that I knew things had to be    10:11:08
15       ordered using a 222 form. Customers    10:11:11
16       couldn't just place an order and    10:11:13
17       expect to get it like any other drug    10:11:14
18       product. So there were some things    10:11:16
19       that I was already familiar with.    10:11:18
20       I'm not familiar with the    10:11:21
21       regulations of the Controlled    10:11:23
22       Substances Act, so I have no idea of    10:11:26
23       them. I'm not a specialist in that.    10:11:28
24   QUESTIONS BY MR. GOTTO:    10:11:29
25       Q.   Okay.    10:11:30

Page 72

1       A.   So I can't say if I understood    10:11:30
2    any of that or not.    10:11:32
3       Q.   Okay. So when you say you were    10:11:32
4    already familiar with, for example, the 222    10:11:34
5    form, that was from prior employment you were    10:11:36
6    familiar with that?    10:11:37
7       A.   Correct.    10:11:38
8       Q.   Okay. Although in your prior    10:11:39
9    employment I think you had indicated you had    10:11:43
10   little --    10:11:45
11       A.   At Schein, I did.    10:11:45
12       Q.   I'm sorry?    10:11:46
13       A.   At Schein Pharmaceutical.    10:11:48
14       Q.   Okay. So going back to your    10:11:48
15   time at Schein, you developed that    10:11:50
16   familiarity?    10:11:52
17       A.   Uh-huh.    10:11:52
18       Q.   Was there any training that you    10:11:53
19   received at Mallinckrodt with respect to    10:11:58
20   the -- any requirements under the Controlled    10:12:02
21   Substances Act?    10:12:04
22       A.   Not that I recall.    10:12:04
23       Q.   Okay. And you indicated a    10:12:07
24   little earlier that -- go ahead.    10:12:09
25       A.   Well, I'm sorry. Are you    10:12:10

Page 73

1    referring to when I was being hired?    10:12:12
2       Q.   Well, let's start with that,    10:12:15
3    and then you can tell me also in the future    10:12:17
4    whether you received any such training.    10:12:21
5       A.   Okay. When I was hired, I did    10:12:22
6    not receive any training specific to here's    10:12:24
7    the Controlled Substances Act, here's what it    10:12:29
8    is. I had familiarity with it as far as like    10:12:31
9    222 forms and that you can't just be shipping    10:12:35
10   product anywhere to anybody.    10:12:37
11          The -- I gained additional    10:12:40
12   knowledge while I worked at Mallinckrodt    10:12:44
13   through Karen Harper giving sessions to the    10:12:46
14   team about what it is and -- not what the Act    10:12:50
15   is in particular, but what we should be doing    10:12:53
16   from our end.    10:12:57
17       Q.   Okay. You had indicated a    10:12:59
18   little earlier today in terms of your general    10:13:04
19   education that you had occasion to    10:13:06
20   participate in various types of continuing    10:13:07
21   education programs over the years.    10:13:09
22          Did any of those programs    10:13:11
23   address in any way requirements under the    10:13:14
24   Controlled Substances Act?    10:13:17
25       A.   No.    10:13:19

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    Q.    Okay. But Ms. Harper conducted    10:13:20
2   programs from time to time, I take it, at    10:13:24
3   Mallinckrodt that addressed certain aspects    10:13:26
4   of the Controlled Substances Act?    10:13:28
5    A.    From how it impacted the    10:13:29
6   commercial aspect of the business and what we    10:13:32
7   needed to do, yes.    10:13:34
8         MR. GOTTO: Okay. All right.    10:13:37
9   Well, why don't we take a break.    10:13:37
10  We've been going for about an hour.    10:13:40
11        VIDEOGRAPHER: We are going off    10:13:41
12  the record at 10:13 a.m.    10:13:42
13  (Off the record at 10:13 a.m.)    10:13:44
14        VIDEOGRAPHER: We are back on    10:30:20
15  the record at 10:30 a.m.    10:30:22
16  QUESTIONS BY MR. GOTTO:    10:30:23
17    Q.    Welcome back, Ms. Collier.    10:30:27
18    A.    Thank you.    10:30:28
19    Q.    Before the break, we had marked    10:30:28
20  as Exhibit 3 a document that included the job    10:30:31
21  description director of marketing. I'd like    10:30:36
22  to go through some of those items in some    10:30:39
23  more detail.    10:30:41
24        Before I do, who had been your    10:30:42
25  predecessor at Mallinckrodt as director of    10:30:46

Page 75

1   marketing; do you know?    10:30:49
2    A.    Jeff Burd.    10:30:50
3    Q.    And did Mr. Burd leave    10:30:51
4   Mallinckrodt?    10:30:54
5    A.    Yes, he did.    10:30:54
6    Q.    And did you -- was there any    10:30:56
7   sort of transition from Mr. Burd to you in    10:31:01
8   terms of any meetings or transfer of    10:31:03
9   information from him to you?    10:31:07
10    A.    No, he was gone before I was    10:31:09
11  hired.    10:31:11
12    Q.    Okay. Did you have access to    10:31:11
13  any materials that he had prepared to assist    10:31:15
14  the incoming director of marketing in    10:31:18
15  transition?    10:31:21
16    A.    Most of his files were -- I    10:31:22
17  don't remember seeing any of his files. They    10:31:26
18  probably weren't going to be relevant to me    10:31:27
19  because it was old data.    10:31:29
20        But I mostly got my information    10:31:31
21  from working with the product managers in    10:31:33
22  what the process had been about product    10:31:35
23  forecasting and product management.    10:31:37
24    Q.    Okay. And you started at    10:31:40
25  Mallinckrodt in mid-2009; is that right?    10:31:41

Page 76

1    A.    July 29, 2009.    10:31:43
2    Q.    Okay. Okay. Well, let's look    10:31:47
3   at Exhibit 3 for a moment under the heading    10:31:48
4   of director of marketing, specialty generics.    10:31:50
5         Item Number 1 is "oversee the    10:31:53
6   management of generic products by developing    10:31:56
7   financially sound business plans."    10:31:58
8         Tell me what -- well, first of    10:32:01
9   all, during your time as director of    10:32:09
10  marketing, did you develop business plans for    10:32:10
11  the generic products?    10:32:12
12    A.    Yes, I did.    10:32:13
13    Q.    Were there separate plans for    10:32:14
14  different products, or how did that work?    10:32:15
15    A.    Each product had a separate    10:32:18
16  plan, separate market share, because each had    10:32:20
17  different competitors.    10:32:22
18    Q.    Okay. And so the components of    10:32:24
19  the business plan for a generic product would    10:32:26
20  consist of what?    10:32:30
21    A.    It would consist of reviewing    10:32:31
22  historical sales, what sales projections    10:32:33
23  there are, what new products we anticipated    10:32:35
24  to launch, any additional customer programs    10:32:38
25  we intended to implement, any problems we had    10:32:40

Page 77

1   within the past year regarding such thing as    10:32:43
2   quota allocation, inventory management    10:32:45
3   issues, manufacturing issues, and how do we    10:32:49
4   address those going forward.    10:32:52
5    Q.    Okay. When you say "quota    10:32:54
6   allocation," what do you mean by that?    10:32:57
7    A.    The DEA allots quota based on    10:32:58
8   some criteria, and we may not get everything    10:33:02
9   we need to supply our customers throughout    10:33:05
10  the year.    10:33:07
11    Q.    Okay. And do you -- were you    10:33:08
12  involved in the process of applying for or    10:33:12
13  requesting quota from the DEA from time to    10:33:17
14  time?    10:33:20
15    A.    The only aspect that I was    10:33:20
16  involved in is occasionally they would ask if    10:33:23
17  we picked up new business, and the customers    10:33:26
18  had to provide a letter saying that it was    10:33:28
19  new business that we secured from a    10:33:29
20  competitor, and therefore the DEA would    10:33:31
21  switch the quota from the competitor to us.    10:33:33
22        I'm not sure of the process or    10:33:35
23  how the request was made. I just was    10:33:37
24  supplied the information by the customer.    10:33:39
25    Q.    Okay. And who would request    10:33:42

Page 78

1  that information from you regarding the          10:33:43
2  customer?                                        10:33:45
3       A.   Karen Harper.                          10:33:45
4       Q.   And so in formulating the             10:33:47
5  business plans for the different products,       10:33:56
6  one of the -- one of the issues you had to       10:33:58
7  deal with was quota allocation, correct?         10:34:03
8       A.   Correct.                               10:34:05
9       Q.   And so the DEA quota, did you          10:34:06
10 have an understanding as to how that quota       10:34:09
11 was granted in terms of its applicability to     10:34:13
12 various of the products?                         10:34:21
13      MR. O'CONNOR:  Object to form.              10:34:23
14      THE WITNESS:  The only thing I              10:34:24
15 was aware of is that they would give             10:34:27
16 quota based on historical sales.  I              10:34:28
17 have no idea how that was derived or             10:34:30
18 who set that quota or how Mallinckrodt           10:34:33
19 played a role in that.                           10:34:36
20 QUESTIONS BY MR. GOTTO:                          10:34:37
21      Q.   Okay.  And so the quota, did           10:34:38
22 you understand it to be -- to be applicable      10:34:39
23 to each particular molecule of controlled        10:34:42
24 substance?                                       10:34:45
25      A.   Correct.                               10:34:45

Page 79

1       Q.   And did you understand -- did          10:34:46
2  you have an understanding as to whether there    10:34:49
3  was quota for a particular dosage of that        10:34:51
4  molecule?                                        10:34:54
5       MR. O'CONNOR:  Object to form.              10:34:55
6       THE WITNESS:  No.                           10:34:56
7  QUESTIONS BY MR. GOTTO:                          10:34:57
8       Q.   Okay.  You didn't have an              10:34:58
9  understanding one way or the other on that?      10:35:00
10      A.   I'm sorry, no, I do not believe        10:35:01
11 that it was per molecule.                        10:35:03
12      Q.   Okay.                                  10:35:05
13      A.   It was just to the molecule,           10:35:05
14 not to the dosage form or the strength.          10:35:08
15      Q.   Okay.  And so in terms of              10:35:11
16 formulating business plans for the different     10:35:13
17 products, did you have a different business      10:35:15
18 plan for different dosage and strength of the    10:35:18
19 same molecule?                                   10:35:22
20      A.   Not typically.  Typically you          10:35:23
21 would have it just for the molecule itself.      10:35:26
22      Q.   Okay.  So, for example, with           10:35:28
23 oxycodone, when you -- when you joined           10:35:35
24 Mallinckrodt, would you have a single            10:35:38
25 business plan for oxycodone?                     10:35:39

Page 80

1       A.   Yes.  The exception in                 10:35:41
2  oxycodone is that we had a 5 milligram and       10:35:44
3  not everyone had that.  Not all competitors      10:35:46
4  had it, so that would call out for something     10:35:49
5  different.                                       10:35:51
6       Q.   So you had a separate business         10:35:51
7  plan on the 5 milligram?                         10:35:53
8       A.   Right.  A separate projection          10:35:54
9  of market share percentage, because obviously    10:35:56
10 there were fewer competitors.                    10:35:58
11      Q.   Okay.  But in terms of the             10:36:00
12 quota from the DEA, your understanding was       10:36:02
13 there was a single quota that Mallinckrodt       10:36:05
14 had for oxycodone in whatever dosage and         10:36:07
15 strength it chose to manufacture and sell,       10:36:10
16 correct?                                         10:36:12
17      A.   Correct.                               10:36:13
18      MR. O'CONNOR:  Object to form.              10:36:13
19      THE WITNESS:  Correct.                      10:36:14
20 QUESTIONS BY MR. GOTTO:                          10:36:15
21      Q.   Okay.  So, for example,               10:36:22
22 oxycodone 15 milligram versus 30 milligram,      10:36:23
23 were there separate business plans for those     10:36:27
24 two dosages?                                     10:36:29
25      A.   I don't recall doing separate          10:36:30

Page 81

1  business plans for them.                         10:36:32
2       Q.   Okay.  When you -- when you            10:36:33
3  started at Mallinckrodt, did you review the      10:36:41
4  then existing business plans for the various     10:36:46
5  products that were within the specialty          10:36:49
6  generics umbrella?                               10:36:51
7       A.   When I started, they did not           10:36:52
8  have a formal business plan.  They continued     10:36:55
9  doing what they were doing as far as product     10:36:58
10 forecasting and pricing and customer             10:37:02
11 strategy.                                        10:37:04
12      Q.   Okay.  So Exhibit 3, when              10:37:05
13 there's a reference to developing financially    10:37:07
14 sound business plans, was that a new             10:37:10
15 initiative for the director of marketing when    10:37:14
16 you joined compared to what Mallinckrodt had     10:37:17
17 done historically?                               10:37:18
18      A.   I think that was the                   10:37:19
19 expectation; it's just that I brought a          10:37:20
20 formal level to it.                              10:37:22
21      Q.   Okay.  Item Number 2, "direct          10:37:23
22 and lead the creation and development of         10:37:30
23 marketing plans, promotional literature,         10:37:32
24 product messages/identity and product-related    10:37:35
25 activities."                                     10:37:39

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    Does that accurately describe    10:37:41
2 an aspect of your responsibilities while you    10:37:45
3 were director of marketing?    10:37:49
4    A.    It's a little vague, but, yes.    10:37:52
5    Q.    Okay.  Well, let's break it    10:37:55
6 down a little bit.    10:37:56
7    First of all, it makes    10:37:57
8 reference to marketing plans.  Tell me what    10:37:59
9 you understand it to mean -- what you    10:38:03
10 understand a marketing plan to mean in this    10:38:05
11 context.    10:38:07
12    A.    A marketing plan would be    10:38:08
13 developing the pricing strategy, what target    10:38:09
14 customers we wanted, what market share, who    10:38:12
15 were the competitors and who would we    10:38:15
16 displace in selling product if we wanted to    10:38:17
17 gain share.    10:38:20
18    Q.    Okay.  So in terms of gaining    10:38:21
19 market share, since it's -- you're in a    10:38:24
20 generic industry here, what techniques were    10:38:31
21 available to you as a marketing director to    10:38:34
22 develop strategies for gaining market share    10:38:39
23 with respect to a particular product?    10:38:41
24    MR. O'CONNOR:  Object to form.    10:38:44
25    THE WITNESS:  I'm not sure what    10:38:45

Page 83

1    you mean by "techniques."  It would be    10:38:46
2    evaluating the market, so I'm going to    10:38:49
3    answer just what I'm thinking you    10:38:51
4    might mean.    10:38:54
5 QUESTIONS BY MR. GOTTO:    10:38:55
6    Q.    Okay.    10:38:55
7    A.    It would be evaluating the    10:38:56
8 market, see who the competitors are, who    10:38:58
9 might be entering based on market    10:39:00
10 intelligence provided by the national account    10:39:02
11 managers or anything we read online from the    10:39:05
12 FDA site.  So evaluating who might be    10:39:08
13 potential threats and who make take our    10:39:12
14 business, and if we wanted to retain the    10:39:14
15 business or let it go.    10:39:15
16    Q.    Okay.  So in general, generic    10:39:16
17 pharmaceuticals, to expand market share -- I    10:39:25
18 mean, I'm not in the business, so I'm    10:39:29
19 obviously asking you as someone who has spent    10:39:31
20 many years at this -- it would seem to be one    10:39:32
21 of the things you can do is develop    10:39:36
22 strategies to compete on price, correct?    10:39:38
23    A.    Correct.    10:39:40
24    Q.    Okay.  Apart from competing on    10:39:41
25 price, what other strategies are available to    10:39:45

Page 84

1 you to implement to attempt to increase    10:39:48
2 market share on a given product?    10:39:51
3    A.    Well, one of the biggest things    10:39:53
4 you would do is differentiate yourself as a    10:39:55
5 company, provide better customer service, be    10:39:57
6 responsive to customer needs.  Communication    10:40:00
7 is the biggest, letting them know what's    10:40:02
8 going on if there's a product issue, new    10:40:05
9 entrants coming, you know, advising them of    10:40:08
10 what's going on.  So just providing good    10:40:11
11 customer service is the bottom line.    10:40:14
12    Q.    Okay.  So when you say    10:40:16
13 communicating, letting them know "if there's    10:40:26
14 a product issue," are there types of product    10:40:28
15 issues you can recall arising during your    10:40:31
16 time at Mallinckrodt that you communicated    10:40:34
17 with customers on?    10:40:36
18    MR. O'CONNOR:  Object to form.    10:40:38
19    THE WITNESS:  Sure.  There's    10:40:39
20    always problems with supply.  Either    10:40:40
21    there's a manufacturing issue, it's    10:40:42
22    delayed, a raw material issue.    10:40:44
23    Advising them on anything that you can    10:40:47
24    see might be a long term versus a    10:40:49
25    short term and when you can supply the    10:40:52

Page 85

1    product again.    10:40:54
2 QUESTIONS BY MR. GOTTO:    10:40:55
3    Q.    Okay.  So back to my question    10:40:55
4 on, you know, techniques to increase market    10:41:04
5 share, competing on price being one,    10:41:08
6 excellent customer service of the type you    10:41:11
7 described being another.    10:41:13
8    Are there other approaches    10:41:14
9 available to you as a director of marketing    10:41:18
10 to try to increase market share with respect    10:41:20
11 to a given product?    10:41:23
12    A.    Sure.  There's -- the customers    10:41:24
13 have incentive programs in place, and so    10:41:28
14 participating in their incentive programs    10:41:30
15 that help them achieve their corporate goals    10:41:33
16 is one.  So it still goes back to price,    10:41:35
17 because you're still going to price them    10:41:38
18 appropriately for the market.    10:41:40
19    And just -- again, just    10:41:44
20 differentiating yourself as the vendor, as    10:41:48
21 the manufacturer.  Providing consistency of    10:41:51
22 supply is really important to customers so    10:41:55
23 that they don't have to have the pharmacies    10:41:59
24 constantly switching product.  So that's    10:42:01
25 another thing that's important.    10:42:03

Page 86

1    Q.   Okay. When you joined         10:42:04
2  Mallinckrodt, what was your understanding as   10:42:07
3  to Mallinckrodt's market share with respect   10:42:12
4  to its various generic products?     10:42:17
5        MR. O'CONNOR:  Object to form.   10:42:19
6        THE WITNESS:  Mallinckrodt had   10:42:20
7    strong market share on some products.   10:42:24
8    We're trailing on other products.    10:42:27
9  QUESTIONS BY MR. GOTTO:              10:42:28
10   Q.   Okay. When you first joined,    10:42:29
11  were there any products that you can     10:42:30
12  recall -- as to which you can recall any   10:42:32
13  particular effort to increase market share?   10:42:37
14   A.   Well, frankly, when you launch    10:42:38
15  a product, you obviously want to get some   10:42:45
16  market share. I don't remember particular   10:42:47
17  strategies where we wanted to gain more   10:42:52
18  share, because in some instances the more   10:42:53
19  share we gained, the more the price came down   10:42:55
20  and we actually got diminished returns. So   10:42:57
21  there were instances when I remember that we   10:43:01
22  would say we would surrender share because   10:43:03
23  somebody else entered.              10:43:05
24        But as far as gaining share,    10:43:06
25  there might be cases that we did it for a   10:43:08

Page 87

1  particular customer because we wanted a full   10:43:10
2  line with that customer, but other than that,   10:43:12
3  that wasn't our target, other than launching   10:43:16
4  products.                           10:43:18
5    Q.   Okay. So putting aside product   10:43:19
6  launches for a moment, during your time at   10:43:22
7  Mallinckrodt, as a general matter, is it your   10:43:27
8  recollection that in terms of market share,   10:43:34
9  again, apart from launching new products, the   10:43:37
10  emphasis was on maintaining existing market   10:43:43
11  share?                              10:43:46
12        MR. O'CONNOR:  Object to form.   10:43:46
13        THE WITNESS:  Our emphasis was   10:43:47
14    more on sales margin and maintaining   10:43:49
15    margin, so we did more things in line   10:43:54
16    with pricing adjustments in order to   10:43:57
17    achieve our objectives, and we        10:44:00
18    actually shed products because they   10:44:03
19    were not profitable. So I remember   10:44:05
20    culling out products instead of      10:44:09
21    looking to gain share.            10:44:11
22        I don't remember specifically   10:44:13
23    anything along that line, but that's   10:44:14
24    typical that you would try and gain   10:44:15
25    share from competitors during bid   10:44:17

Page 88

1    cycles. But I don't remember a     10:44:20
2    specific instance where we said, oh,   10:44:21
3    we really want to go after this     10:44:23
4    product, and we're going to cut     10:44:25
5    everybody out of the market.        10:44:26
6  QUESTIONS BY MR. GOTTO:              10:44:27
7    Q.   Okay. What are examples of     10:44:27
8  products you can recall shedding because of   10:44:29
9  nonprofitability?                   10:44:32
10   A.   There was methylphenidate, one   10:44:33
11  of the methylphenidates, it wasn't making any   10:44:37
12  money. It was a difficult product to make,   10:44:40
13  and so we were losing money on it, and we   10:44:42
14  decided not to sell it anymore.      10:44:45
15   Q.   Okay. Any others?            10:44:47
16   A.   None that I can recall, but I   10:44:48
17  know we did terminate several products, but I   10:44:51
18  can't remember the names of them at this   10:44:54
19  point.                              10:44:56
20   Q.   Okay. What product launches   10:44:56
21  can you recall during your period at     10:44:58
22  Mallinckrodt?                       10:44:59
23   A.   We launched fentanyl lozenge,   10:45:00
24  fentanyl patch and methylphenidate ER, the   10:45:06
25  generic for Concerta.               10:45:09

Page 89

1    Q.   From -- in terms of your       10:45:11
2  position as director of marketing, what were   10:45:19
3  your responsibilities associated with a   10:45:21
4  product launch?                     10:45:23
5    A.   To establish the market base   10:45:25
6  that we were going to target, who -- what   10:45:30
7  customers did we want to pursue, what     10:45:33
8  incentives were involved, what would be the   10:45:37
9  margin be if we targeted those customers, and   10:45:38
10  who would we take the market share from.   10:45:41
11   Q.   And so how did you go about     10:45:44
12  performing the analysis pertinent to these   10:45:46
13  types of issues with respect to, for example,   10:45:49
14  a fentanyl lozenge launch?           10:45:52
15   A.   We would look at -- that one   10:45:57
16  was a little bit easier; there was limited   10:45:58
17  competition. It's a really difficult product   10:46:00
18  to make; very few companies have the     10:46:03
19  machinery. So we knew we would be taking it   10:46:06
20  from -- I believe it was Teva at the time.   10:46:08
21  So we were going to be taking a product away   10:46:10
22  from Teva, and so we knew we were strong in a   10:46:11
23  particular customer, so we'd better -- we   10:46:14
24  would be better suited to align with that   10:46:17
25  customer. We knew their incentive programs   10:46:20

Page 90

1  and what their contract said about what we'd 10:46:21
2  have to offer, so we would determine pricing 10:46:24
3  based on that. And we knew what share we 10:46:26
4  needed to hit and did that with a couple of 10:46:30
5  customers. 10:46:34
6      Q.   Okay. How about the fentanyl 10:46:35
7  patch? 10:46:38
8      A.   The fentanyl patch was a little 10:46:39
9  bit different in that Mylan had a good 10:46:42
10  product out there. They had -- the customers 10:46:46
11  liked it. It's -- because, again, it's -- 10:46:49
12  that one's a little bit differentiated than 10:46:51
13  taking the tablet because it's got a tear 10:46:54
14  factor. So Mylan's product was 10:46:56
15  well-received, so it was a little bit 10:46:59
16  difficult because pharmacists knew the 10:47:01
17  patients liked that. 10:47:04
18      So we struggled to find our 10:47:05
19  share and our footing on that at first, but 10:47:08
20  we had a good product also. So once patients 10:47:09
21  started using our product, they liked it and 10:47:12
22  they were -- they stayed on it. 10:47:14
23      Q.   Okay. So as director of 10:47:15
24  marketing, what steps can you recall taking 10:47:19
25  to deal with -- for example, in the fentanyl 10:47:24

Page 91

1  patch example, to deal with the fact Mylan 10:47:30
2  already had a well-received product and 10:47:33
3  Mallinckrodt would be a new entrant into that 10:47:36
4  market? 10:47:38
5      A.   We would pursue other customers 10:47:39
6  that were more about price and they weren't 10:47:42
7  as concerned about customer -- patient 10:47:45
8  feedback. So that's part of it. 10:47:47
9      So -- and then we also pursued 10:47:49
10  customers that we knew could work with the 10:47:52
11  pharmacies in messaging, I guess, to them. 10:47:55
12  They don't really -- like the wholesalers 10:47:57
13  don't message. They list the product in 10:48:00
14  their catalogs and they list it on their 10:48:02
15  website so they don't send a message behind 10:48:05
16  it. So it was kind of a challenge, frankly, 10:48:07
17  to get our share on that at first. 10:48:11
18      Q.   And when you say "message" in 10:48:13
19  that setting, what do you mean by that? 10:48:16
20      A.   You can't tell -- you can't say 10:48:16
21  that we have a better tear factor or we have 10:48:18
22  a better -- our product's better in any way. 10:48:21
23  They're equivalent. The FDA declared them 10:48:24
24  equivalent so they're the same, no matter 10:48:26
25  which product you're looking at. 10:48:29

Page 92

1      So the challenge we had with 10:48:31
2  messaging on fentanyl patch is that we 10:48:32
3  couldn't say anything about we had a good 10:48:34
4  tear factor, too, or that we had anything 10:48:36
5  that was better about our product, the size 10:48:39
6  of it. And that's the one thing. Once they 10:48:41
7  did see the size of ours, because it was a 10:48:43
8  little bit smaller, they liked that because a 10:48:46
9  patient didn't want it to be as obvious. And 10:48:48
10  easy to tear off, you know, after they're 10:48:53
11  done using it for three days. 10:48:55
12      So the only -- that was one 10:48:56
13  campaign that we did advertising, to show 10:48:59
14  that the size of our patch was relatively 10:49:02
15  small. And it had the strength on the patch 10:49:04
16  itself so the patients could tell. And it 10:49:07
17  was color-coded so it made it easier. So we 10:49:10
18  did some trade journal advertising in that 10:49:13
19  case so pharmacies could see why it was a 10:49:15
20  good product. 10:49:18
21      Q.   Okay. And when you say "we" 10:49:18
22  did that, that was Mallinckrodt advertising? 10:49:23
23      A.   Yes. Yes. 10:49:26
24      Q.   Were there similar or -- strike 10:49:26
25  "similar." 10:49:35

Page 93

1      Were there other messaging 10:49:36
2  initiatives with respect to other generic 10:49:40
3  products that you can recall during your 10:49:43
4  period as director of marketing? 10:49:47
5      A.   Sure. We made a product 10:49:49
6  announcement in trade journals, goes to 10:49:50
7  pharmacists, to announce that we had fentanyl 10:49:53
8  lozenge. And fentanyl patch was the same, 10:49:57
9  and methylphenidate ER was the same. 10:49:59
10      Q.   Okay. And how about with the 10:50:04
11  existing product line, were there any 10:50:04
12  messaging initiatives that you can recall? 10:50:07
13      A.   I know we did some advertising. 10:50:10
14  We changed some of our labeling, so we 10:50:13
15  announced that the labels had changed so the 10:50:15
16  customers could see that. 10:50:19
17      I don't remember any other 10:50:21
18  advertising that we did around our core 10:50:22
19  products. 10:50:25
20      Q.   Okay. All right. Back on 10:50:25
21  Item 2 on Exhibit 3, there's reference to, 10:50:30
22  you know, "direct and lead the creation and 10:50:35
23  development of marketing plans" and then 10:50:36
24  promotional literature. 10:50:39
25      Is promotional literature 10:50:40

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1    something that was part of your          10:50:42
2    responsibilities?                        10:50:44
3        A.   Yes.                            10:50:46
4        Q.   So tell me what sorts of        10:50:47
5    promotional literature you oversaw.      10:50:49
6        A.   The advertising for the product 10:50:50
7    launch products in the trade journals.  We   10:50:54
8    developed several programs to better connect  10:50:57
9    with the customers, so we had advertising --  10:50:59
10   or not advertising, but we send information   10:51:02
11   out to the customers.  If there was a product  10:51:06
12   change or a product announcement, we would    10:51:12
13   send information to the customers.       10:51:14
14       So my team oversaw that and         10:51:15
15   messaged the message about the product's now  10:51:18
16   available, here's the wholesaler order entry  10:51:20
17   numbers to the wholesalers.  You know, here's  10:51:24
18   all the information we have.  If -- we have    10:51:27
19   to fill out a form that tells them everything  10:51:29
20   from what the list price is to the packaging  10:51:31
21   weights, dimensions, so we'd -- it's not  10:51:33
22   really promotional material, but we had to    10:51:36
23   send all that material, too.             10:51:37
24       Q.   Okay.  In terms of material you  10:51:39
25   would think of as promotional material,  10:51:42

Page 95

1    approximately -- was that a regular process   10:51:47
2    or was that an occasional process when there  10:51:51
3    was, say, a new development with respect to a  10:51:54
4    product?                                 10:51:56
5        A.   It was an occasional process.   10:51:57
6    As products go, the only thing we really did  10:52:00
7    was announce when products were available,    10:52:03
8    again, if there was some change to a product.  10:52:05
9        Q.   The next item under heading 2   10:52:08
10   is product messages/identity.  I guess it's   10:52:14
11   creation and development of product      10:52:19
12   messages/identities.                     10:52:24
13       Is that something that you           10:52:25
14   viewed as part of your responsibility as  10:52:26
15   director of marketing?                   10:52:28
16       A.   Yes.                            10:52:29
17       Q.   And tell me what that consisted  10:52:29
18   of.                                      10:52:30
19       A.   That was what I was just        10:52:31
20   explaining about trying to get across a  10:52:34
21   message to the pharmacists that our product   10:52:35
22   was available, that -- you know, you couldn't  10:52:36
23   talk about we had a smaller size; you could   10:52:39
24   show, basically.  You had to -- we couldn't   10:52:41
25   compare it to a Mylan product or any other    10:52:44

Page 96

1    competitor.  You had to show that -- you  10:52:46
2    know, we showed the hand and showed how small  10:52:51
3    it was next to somebody's hand.          10:52:53
4        Our fentanyl lozenge, I know we      10:52:54
5    advertise.  I think that in the trade    10:52:58
6    journals we would simply show that we had the  10:53:01
7    four sizes, strengths, and just the color of  10:53:03
8    the packaging because that helped, because    10:53:09
9    the pharmacists could quickly identify which  10:53:10
10   strength they were pulling from the shelf if  10:53:12
11   they were taking care of a patient and   10:53:14
12   filling a prescription.                  10:53:16
13       And methylphenidate, just to         10:53:19
14   announce that it was available.          10:53:21
15       Q.   Okay.  Item Number 4 on         10:53:23
16   Exhibit 3 is "identify new product/growth     10:53:34
17   areas, including new dosage forms of existing  10:53:37
18   products, preparing the necessary analyses to  10:53:40
19   support same, which includes working with R&D  10:53:43
20   on potential product line extensions and  10:53:46
21   working with new product group and business   10:53:48
22   development to develop strategies and tactics  10:53:51
23   resulting in additions to Mallinckrodt's  10:53:53
24   product portfolio."                      10:53:57
25       Does Item 4 describe an aspect       10:53:59

Page 97

1    of what you understood to be your        10:54:06
2    responsibilities as director of marketing?    10:54:08
3        A.   Yes, it does.                   10:54:09
4        Q.   And tell me what you did to go  10:54:10
5    about identifying new product and growth  10:54:11
6    areas in the matter described in Item 4 here.  10:54:14
7        A.   The easiest path we had for new  10:54:17
8    products would be to do line extensions.  For  10:54:22
9    example, oxycodone had 5, 10, 15, 20 and  10:54:23
10   30 milligrams.  We did not have the 10 or the  10:54:28
11   30 milligram to launch those.            10:54:30
12       We looked at solutions.  If we       10:54:32
13   had the finished dosage form in an oral  10:54:33
14   solid, can we launch it in a solution form.   10:54:36
15       We looked at other products          10:54:39
16   like methylphenidate ER; should we continue   10:54:40
17   filing for a patent challenge.  And if so, I  10:54:44
18   would be involved in those discussions with   10:54:49
19   legal about what would be the implications if  10:54:51
20   we want a patent challenge versus not.  So    10:54:53
21   there was many things like that.         10:54:56
22       And then there were other            10:54:58
23   products that were in the pipeline portfolio  10:55:01
24   when I started, and we killed some of those,  10:55:05
25   too, and said they're not worth launching  10:55:06

Page 98

1 because the market would dwindle before we 10:55:09
2 even got to market, so there wasn't anything 10:55:12
3 of value there. 10:55:14
4 Q. Okay. And so were there any 10:55:16
5 new products you can recall during your time 10:55:17
6 at Mallinckrodt that were developed where 10:55:20
7 the -- where the impetus for that development 10:55:26
8 came from the marketing department? 10:55:28
9 A. None that they took on that I 10:55:30
10 can remember. 10:55:40
11 Q. Okay. And so in terms of the 10:55:40
12 new products, it was -- marketing 10:55:41
13 department's involvement was essentially 10:55:44
14 responding to ideas that came out of other -- 10:55:49
15 other parts of the company? 10:55:50
16 A. Right. 10:55:51
17 Q. Okay. Item Number 5. And I 10:55:53
18 won't read the whole paragraph, but at the -- 10:56:08
19 toward the end it talks about compliance with 10:56:11
20 associated product-related dimensions as far 10:56:16
21 as working with the regulatory and legal 10:56:19
22 departments. 10:56:23
23 Who did you work with -- who 10:56:23
24 did the folks in the marketing department 10:56:24
25 under you, as part of your team, work with in 10:56:27

Page 99

1 the regulatory and legal departments to 10:56:30
2 ensure compliance as it's described in this 10:56:32
3 paragraph? 10:56:35
4 A. Primarily -- oh. 10:56:36
5 MR. O'CONNOR: Object to form. 10:56:36
6 THE WITNESS: Primarily we 10:56:37
7 worked with Stu Kim on regulatory and 10:56:39
8 Don Lohman on compliance. 10:56:43
9 QUESTIONS BY MR. GOTTO: 10:56:45
10 Q. Okay. And when you say "on 10:56:45
11 regulatory" in this setting, what do you 10:56:48
12 mean? What sorts of things did you work on? 10:56:51
13 A. Again, I'll go back to the 10:56:53
14 methylphenidate ER. Stu Kim was working on a 10:56:55
15 strategy on some of the products, like how we 10:56:59
16 would respond to the FDA on some of our 10:57:03
17 filings. Methylphenidate ER, should we 10:57:05
18 continue filing a paragraph IV challenge. 10:57:09
19 Even though other people were ahead of us, 10:57:10
20 should we continue doing that. What value 10:57:12
21 would it bring to the company if we won. And 10:57:13
22 so -- because it's an expense, obviously, to 10:57:15
23 hire external lawyers to do that, so was it 10:57:18
24 worth it to hire them to do that. 10:57:20
25 And just if there were 10:57:22

Page 100

1 regulatory issues like the changes in 10:57:26
2 hydrocodone. It moved from a Schedule III to 10:57:28
3 a Schedule II. 10:57:30
4 Q. Okay. Item 8 is "work closely 10:57:31
5 with sales to ensure business plans are met." 10:57:43
6 Was that part of your 10:57:46
7 responsibility as director of marketing? 10:57:48
8 A. Yes. 10:57:49
9 Q. And so who did you work with in 10:57:50
10 the sales department to ensure business plans 10:57:53
11 are met? 10:57:55
12 A. Primarily I worked with John 10:57:57
13 Adams in the beginning, and then John left, 10:57:58
14 and then I worked with Jane Williams. 10:58:00
15 Q. Okay. Do you recall when 10:58:03
16 Mr. Adams left? 10:58:04
17 A. Not really. I think it was 10:58:05
18 around 2011 or 2012. 10:58:08
19 Q. Okay. And in terms of working 10:58:10
20 with those individuals, what was -- describe 10:58:12
21 for me the types of things you would interact 10:58:15
22 with them on. 10:58:18
23 A. Marketing would interact with 10:58:19
24 sales on a regular basis. Sales would be -- 10:58:23
25 would bring customer requests to us such as 10:58:28

Page 101

1 the customer wants this incentive, they want 10:58:33
2 this pricing, here's the contract. So I 10:58:35
3 constantly worked with them on the contract 10:58:39
4 terms, incentives that the customers were 10:58:43
5 receiving, any value that the customer got, 10:58:45
6 because we did the analytics in my team on 10:58:47
7 what the real net margin was for that 10:58:49
8 particular customer, those product mix or 10:58:52
9 whatever was in the mix with that. And then 10:58:54
10 we also worked with them on forecasting. 10:58:58
11 Q. Okay. In terms of contract 10:59:02
12 terms, pricing, et cetera, incentives and the 10:59:04
13 like, who made the ultimate decision on 10:59:08
14 whether to offer a particular term or 10:59:13
15 incentive to a customer? 10:59:15
16 A. If we were in conflict, if I 10:59:17
17 was in conflict with the vice president of 10:59:20
18 sales, it would roll up to our president of 10:59:21
19 generics. 10:59:25
20 Q. Okay. And that was? 10:59:25
21 A. Mike Gunning at one time and 10:59:26
22 then David Silver for an interim then 10:59:29
23 Walt Kaczmarek. 10:59:35
24 Q. Do you recall that occurring 10:59:38
25 from time to time? 10:59:39

Page 102

1    A.   Yes.                          10:59:40
2    Q.   Okay.  When can you recall that   10:59:41
3  occurring?                           10:59:42
4    A.   There were several instances   10:59:43
5  when we would not give an incentive, and then   10:59:46
6  sales would push back.  And either I would   10:59:52
7  refer to the contract and they would comply   10:59:58
8  with the contract, or if we came to a   11:00:01
9  disagreement about what we should do as far   11:00:05
10 as should we offer an incentive, then that   11:00:09
11 would roll up to our boss.  And I do remember   11:00:11
12 that happening with a particular customer one   11:00:13
13 time with Jane Williams.             11:00:16
14   Q.   And who was -- what was that   11:00:18
15 occasion?                            11:00:19
16   A.   It was -- we were looking at a   11:00:19
17 smaller customer that wanted a price in order   11:00:20
18 to secure their business away from a   11:00:24
19 competitor, and by offering that, we would   11:00:26
20 have to offer a really big customer that same   11:00:31
21 discount, which would devalue the entire   11:00:33
22 product line.                        11:00:35
23   Q.   I see.                       11:00:35
24        Do you recall what the product   11:00:36
25 line was?                            11:00:36

Page 103

1    A.   No.  I just remember the      11:00:37
2  moment.                              11:00:40
3    Q.   Okay.  Did you personally      11:00:41
4  interact with any of the national account   11:00:47
5  managers?                            11:00:49
6    A.   Yes, I did.                   11:00:49
7    Q.   And with whom can you recall   11:00:50
8  interacting?                         11:00:52
9    A.   I would generally interact with   11:00:53
10 all of them at some point.           11:00:54
11   Q.   Okay.  And what was the -- what   11:00:55
12 were the types of issues you would interact   11:00:57
13 with them on?                        11:00:59
14   A.   Again, it would go back to the   11:01:00
15 contract terms, the incentives, the customer   11:01:03
16 earned their incentive.  Because the contract   11:01:07
17 admin team would come to me and say, "This   11:01:10
18 customer wants this payment and it's not --   11:01:12
19 they didn't reach their goal."       11:01:16
20        And so I would say, "yes, they   11:01:17
21 deserve it" or "they don't," based on doing   11:01:20
22 market research on what they've done.  So   11:01:21
23 that would happen on occasion.  The NAMs   11:01:24
24 would come to me.                    11:01:27
25        Or the NAMs would come to me   11:01:27

Page 104

1  and tell me that a customer wasn't agreeing   11:01:28
2  to something in the terms, do we want to just   11:01:32
3  quit negotiating, or what do we want to do.   11:01:34
4    Q.   Okay.  It appears to me from   11:01:36
5  some of the documents I've seen that you and   11:01:41
6  Mr. Borelli had some difficulties in your   11:01:43
7  relationship from time to time; is that fair?   11:01:46
8        MR. O'CONNOR:  Object to form.   11:01:48
9        THE WITNESS:  I would agree   11:01:48
10   with that.                         11:01:49
11 QUESTIONS BY MR. GOTTO:              11:01:49
12   Q.   Okay.  Can you recall the      11:01:50
13 circumstances that gave rise to those   11:01:51
14 difficulties?                        11:01:53
15   A.   Yes.  Victor would campaign on   11:01:53
16 behalf of the customer oftentimes to gain   11:02:02
17 business or to give incentives, and I would   11:02:07
18 do analytics around it because I'm a numbers   11:02:11
19 person.  So I would say, no, we don't want to   11:02:13
20 do that.  And he and I had business   11:02:15
21 challenges.  We did not see the business the   11:02:17
22 same way.                            11:02:20
23   Q.   Okay.  Do you recall how those   11:02:21
24 issues were resolved from time to time?   11:02:24
25        MR. O'CONNOR:  Object to form.   11:02:29

Page 105

1        THE WITNESS:  Victor --       11:02:30
2    sometimes they escalated, and       11:02:33
3    sometimes Victor said, okay, he -- he   11:02:36
4    wouldn't pursue it anymore.  It just   11:02:40
5    depended on the situation and how   11:02:43
6    strongly he felt about it.         11:02:45
7  QUESTIONS BY MR. GOTTO:              11:02:46
8    Q.   Do you recall anyone at the    11:02:48
9  company ever communicating to you anything to   11:02:50
10 the effect that Mr. Borelli would say   11:02:54
11 anything to make a sale?             11:02:58
12       MR. O'CONNOR:  Object to form.   11:02:59
13       THE WITNESS:  I don't recall   11:03:01
14   that.                              11:03:03
15 QUESTIONS BY MR. GOTTO:              11:03:03
16   Q.   Okay.  Did you interact with   11:03:03
17 Ms. Stewart from time to time?       11:03:04
18       MR. O'CONNOR:  Object to form.   11:03:11
19       THE WITNESS:  I know the name,   11:03:11
20   but I don't remember who she is or   11:03:14
21   what she did.                      11:03:15
22 QUESTIONS BY MR. GOTTO:              11:03:15
23   Q.   Okay.  Then I guess you didn't   11:03:16
24 interact with her very much, if at all?   11:03:17
25   A.   Yeah, probably not.           11:03:20

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1  Q.  Okay.  How about Mr. Rausch?  11:03:21
2  A.  Jim?  11:03:23
3  Q.  Uh-huh.  11:03:23
4  A.  Rausch?  Yes.  11:03:24
5  Q.  Okay.  In what context did you  11:03:26
6  interact with him?  11:03:29
7  A.  Occasionally orders would be  11:03:29
8  held up and -- because we were allocating, or  11:03:31
9  a customer issue might come up, and they  11:03:34
10  would contact my department.  11:03:36
11  Q.  Okay.  11:03:38
12  A.  Or he's in customer service, so  11:03:41
13  the customer service team would contact my  11:03:44
14  department or me personally.  11:03:47
15  (Mallinckrodt-Collier Exhibit 4  11:04:12
16  marked for identification.)  11:04:12
17  QUESTIONS BY MR. GOTTO:  11:04:12
18  Q.  Okay.  Let's mark another  11:04:12
19  document here.  11:04:13
20  We've marked as Exhibit 4 a  11:04:14
21  document bearing Bates MNK-T1_0004887323, and  11:04:30
22  it's a two-page document.  One page is blank,  11:04:40
23  indicating that it was produced in native  11:04:44
24  format.  The second page is another  11:04:45
25  organizational chart relating to specialty  11:04:50

Page 107

1  generic marketing goals and responsibilities  11:04:59
2  as of 1/12/2010.  11:04:55
3  Take a moment to look at this  11:05:00
4  chart and tell me if that -- if this chart is  11:05:02
5  consistent with your recollection of those  11:05:05
6  roles and responsibilities at this time.  11:05:07
7  A.  Yes.  11:05:09
8  Q.  Okay.  And I think you've  11:05:10
9  already indicated Lisa Lundergan, that's --  11:05:17
10  she changed her name to Cardetti at some  11:05:19
11  point?  11:05:22
12  A.  Correct.  11:05:22
13  Q.  Okay.  And at this point she  11:05:22
14  was an associate.  11:05:25
15  Did she report to  11:05:25
16  Ms. Muhlenkamp at this point?  11:05:26
17  A.  Yes.  11:05:28
18  Q.  Okay.  And so for -- there are  11:05:29
19  various products listed under each of the  11:05:37
20  product managers, and to the best of your  11:05:40
21  recollection, is that allocation of products  11:05:45
22  among those product managers as of January  11:05:49
23  2010 accurate?  11:05:51
24  A.  Yes.  11:05:52
25  Q.  Okay.  When you joined  11:05:54

Page 108

1  Mallinckrodt -- so this -- this chart that  11:06:07
2  we're looking at from January 2010, this is  11:06:08
3  about six months after you joined the  11:06:11
4  company, correct?  11:06:13
5  A.  Right.  11:06:13
6  Q.  And so when you joined the  11:06:14
7  company, were you aware of the existence of a  11:06:16
8  suspicious order monitoring program at the  11:06:23
9  company at that time?  11:06:25
10  MR. O'CONNOR:  Object to form.  11:06:26
11  THE WITNESS:  I don't  11:06:27
12  understand what you mean was I aware  11:06:29
13  of a suspicious order monitoring  11:06:31
14  program.  11:06:32
15  Oh, in 2010, did I know that  11:06:34
16  they had one?  11:06:35
17  QUESTIONS BY MR. GOTTO:  11:06:36
18  Q.  Yes, when you joined in 2009,  11:06:36
19  into early 2010.  11:06:39
20  A.  Yes, I was aware that there was  11:06:41
21  a compliance team.  11:06:42
22  Q.  Okay.  And who was involved in  11:06:45
23  the compliance team?  11:06:47
24  A.  I remember Don Harper -- I  11:06:47
25  mean, Don Lohman, Karen Harper, and then --  11:06:53

Page 109

1  those were the only two I interacted with.  11:06:54
2  Q.  Okay.  So you knew there was a  11:06:57
3  compliance team.  11:06:59
4  Did you --  11:07:00
5  A.  Right.  11:07:01
6  Q.  Did you have any understanding  11:07:02
7  of how the suspicious order monitoring  11:07:03
8  process worked at Mallinckrodt at that time?  11:07:07
9  A.  No.  I just knew they would  11:07:09
10  call on occasion about high orders.  11:07:11
11  Q.  Okay.  Were you familiar with  11:07:15
12  the term "peculiar order" at that time?  11:07:17
13  A.  I don't remember them calling  11:07:20
14  it that.  11:07:22
15  Q.  Okay.  When you say they would  11:07:23
16  call from time to time with high orders, what  11:07:29
17  do you recall them calling and asking about?  11:07:33
18  A.  On occasion they would call my  11:07:35
19  department and say that a customer ordered  11:07:37
20  more than their usual amount; did we know  11:07:39
21  why.  Did we just win a contract award where  11:07:43
22  we took the business from a competitor.  Is  11:07:46
23  the customer buying an inventory for the end  11:07:49
24  of the year.  Sometimes they'd do that for  11:07:52
25  inventory purposes.  So they would ask those  11:07:55

Highly Confidential - Subject to Further Confidentiality Review

Page 110

```
1   kinds of questions.            11:07:58
2      Q.   Okay.  And would they ask that    11:07:59
3   directly of you or would they ask that of the  11:08:01
4   product managers?              11:08:04
5      A.   They would sometimes ask it of    11:08:06
6   the product managers, and then if the product  11:08:08
7   managers didn't know, they'd ask me, and I'd   11:08:10
8   work with the NAMs to find out what was going  11:08:12
9   on.                            11:08:15
10     Q.   Okay.  Can you remember        11:08:15
11  specific examples where you worked with one    11:08:15
12  or more of the national account managers       11:08:18
13  responding to an inquiry you had received in   11:08:20
14  this regard?                   11:08:22
15     A.   Not a specific example, no.    11:08:22
16     Q.   Okay.  But you recall that it  11:08:24
17  did happen?                    11:08:25
18     A.   Yes.                   11:08:26
19     Q.   And do you recall the         11:08:26
20  approximate frequency with which that would    11:08:28
21  happen?                        11:08:30
22     A.   I don't remember it being very  11:08:30
23  frequent.  It did happen.  I don't remember    11:08:34
24  the frequency.                 11:08:36
25     Q.   Okay.  Do you recall any of the 11:08:37
```

Page 111

```
1   feedback you received from the national        11:08:41
2   account managers when you were personally      11:08:43
3   involved in responding to an inquiry in this   11:08:48
4   regard?                        11:08:49
5      A.   No.  The national account       11:08:50
6   managers obviously wouldn't be happy if an     11:08:55
7   order was cut off, but I don't even remember   11:08:57
8   the outcomes because I was not involved in     11:09:00
9   the decision about whether -- I would just     11:09:03
10  report the information, and I was not          11:09:04
11  responsible for the outcome of shipping or     11:09:07
12  not shipping.                  11:09:09
13     Q.   Okay.  Do you recall from whom  11:09:10
14  the inquiry would come?            11:09:14
15     A.   Karen Harper's office.         11:09:15
16     Q.   Okay.  And am I understanding  11:09:17
17  you correctly that generally the inquiry       11:09:20
18  would be along the lines that we've received   11:09:23
19  a large order and we're trying to ascertain    11:09:26
20  the reasons for this increased size in order?  11:09:30
21        MR. O'CONNOR:  Object to form.  11:09:33
22        THE WITNESS:  It could be for   11:09:33
23     any number of reasons that they     11:09:37
24     flagged the order, but they would tell  11:09:38
25     us, "We've got an issue, and can you  11:09:41
```

Page 112

```
1   help us find out more information."  11:09:41
2   QUESTIONS BY MR. GOTTO:            11:09:43
3      Q.   Okay.  So apart from just the  11:09:43
4   size of the order, what other sorts of issues  11:09:45
5   can you recall them flagging an order about?   11:09:47
6      A.   Frequency.  The customer        11:09:50
7   ordered more than -- most of the customers     11:09:52
8   order once a week, and even some of the small  11:09:55
9   guys once a month, and they might have         11:09:59
10  ordered more often than usual and did we know  11:10:00
11  why.                           11:10:03
12     Q.   Okay.  And when you would      11:10:03
13  receive such an inquiry, would it come         11:10:06
14  through an e-mail typically?       11:10:09
15     A.   Yes.                   11:10:10
16     Q.   Okay.  So to the extent you    11:10:11
17  received -- you personally received any such   11:10:14
18  inquiries, they would be reflected in -- to    11:10:16
19  the best of your knowledge, they'd be          11:10:18
20  reflected in your e-mails, correct?  11:10:20
21        MR. O'CONNOR:  Object to form.  11:10:21
22        THE WITNESS:  Yes.  There may   11:10:21
23     have been phone calls, but I don't   11:10:25
24     recall, you know, if it was phone call  11:10:28
25     or e-mail only.                11:10:29
```

Page 113

```
1   QUESTIONS BY MR. GOTTO:            11:10:30
2      Q.   Okay.  And when you inquired -- 11:10:30
3   and so when you personally received an        11:10:31
4   inquiry, you indicated you would inquire of    11:10:33
5   the national account managers, correct?       11:10:36
6      A.   Yes.                   11:10:37
7      Q.   Did you take any other steps    11:10:37
8   other than inquiring of the national account   11:10:39
9   managers?                      11:10:41
10     A.   Yes.  We would look at the      11:10:41
11  customer historical volume on -- overall and   11:10:44
12  find out if they did indeed award us a new     11:10:50
13  product, if we got a new contract with them.   11:10:54
14  If they were in fair share for the market, if  11:10:56
15  they were oversized share for the market,      11:10:59
16  that would be a concern.           11:11:02
17     Q.   What does that mean, "fair      11:11:03
18  share" versus "oversized share"?   11:11:06
19     A.   For example, if you had a small 11:11:07
20  distributor that ordered 30 percent of the     11:11:10
21  total market value, that's a concern.  11:11:11
22     Q.   Okay.  And when you responded  11:11:13
23  back to Ms. Harper's department to respond to  11:11:23
24  the inquiry, would that be in an e-mail form   11:11:26
25  that you would have responded?     11:11:27
```

Page 114

1    MR. O'CONNOR: Object to form.    11:11:29
2    THE WITNESS: Possibly.    11:11:29
3  QUESTIONS BY MR. GOTTO:    11:11:30
4    Q.    In what other forms might you    11:11:30
5  have responded?    11:11:33
6    A.    Phone call.    11:11:34
7    Q.    Do you recall if there was any    11:11:34
8  requirement in place at Mallinckrodt at the    11:11:40
9  time that a response to any such inquiry from    11:11:42
10  Ms. Harper's department be in writing?    11:11:46
11    A.    I don't recall that.    11:11:49
12    Q.    Do you know if any order as to    11:11:51
13  which you personally received an inquiry from    11:12:00
14  Ms. Harper's department was ultimately    11:12:02
15  determined to be a suspicious order and    11:12:05
16  reported to the DEA?    11:12:07
17    A.    Honestly, I never got that    11:12:08
18  information, so I wouldn't know.    11:12:11
19    Q.    Okay.  Do you know if the    11:12:14
20  product managers who reported to you received    11:12:22
21  inquiries from Ms. Harper's department with    11:12:27
22  respect to potentially suspicious orders?    11:12:31
23    A.    I don't know that for a fact.    11:12:34
24    Q.    Okay.  Do you recall any    11:12:37
25  situation or occasion in which    11:12:45

Page 115

1  Ms. Muhlenkamp, for example, informed you    11:12:47
2  that she had received an inquiry from    11:12:51
3  Ms. Harper's department with respect to a    11:12:56
4  potentially suspicious order?    11:12:58
5    A.    I don't remember any of that.    11:12:59
6    Q.    Okay.  Did you perform periodic    11:13:02
7  evaluations of the performance of the product    11:13:12
8  managers who reported to you?    11:13:14
9    A.    Yes, I did.    11:13:14
10    Q.    And so did that evaluation    11:13:15
11  include in any regard their activities in    11:13:18
12  responding to inquiries they had received    11:13:24
13  with respect to potentially suspicious    11:13:26
14  orders?    11:13:29
15    A.    I don't recall ever having that    11:13:29
16  in anybody's review.  It would be more around    11:13:33
17  forecasting accuracy.    11:13:37
18    Q.    Okay.  With respect to    11:13:39
19  Ms. Muhlenkamp in particular, do you recall    11:13:42
20  being aware at any point of any -- well,    11:13:44
21  strike that.    11:13:48
22       You've already testified with    11:13:48
23  regard to activities Ms. Muhlenkamp took when    11:13:51
24  the Sunrise issues came up and accessing the    11:13:53
25  chargeback data.  Apart from that example, do    11:13:58

Page 116

1  you recall other circumstances in which you    11:14:04
2  were aware that Ms. Muhlenkamp was conducting    11:14:06
3  any review of a potentially suspicious order?    11:14:11
4    A.    No, I don't recall that.  You'd    11:14:15
5  have to ask Kate.    11:14:18
6    Q.    Okay.  How about    11:14:19
7  Mr. Montgomery?    11:14:23
8    A.    I doubt that he would be    11:14:24
9  involved.  He was not strong on analytics.    11:14:26
10    Q.    Okay.  And how about Ms. Myers?    11:14:29
11    A.    No.    11:14:34
12    Q.    Or Ms. Lundergan?    11:14:36
13    A.    I'm not sure about Lisa either.    11:14:39
14    Q.    Okay.  So in -- so when the    11:14:44
15  compliance department had a question    11:15:01
16  regarding a potentially suspicious order, was    11:15:02
17  there a procedure in place at Mallinckrodt    11:15:06
18  under which they would refer that question to    11:15:16
19  any particular person in the marketing    11:15:19
20  department?    11:15:22
21    MR. O'CONNOR: Object to form.    11:15:22
22    THE WITNESS: I'm not sure what    11:15:23
23    you're asking.  Could you rephrase the    11:15:24
24    question?    11:15:26
25

Page 117

1  QUESTIONS BY MR. GOTTO:    11:15:26
2    Q.    Sure.    11:15:26
3       If someone in the compliance    11:15:27
4  department had a question regarding whether    11:15:31
5  an order was a suspicious order and they    11:15:35
6  wanted to refer that to the marketing    11:15:38
7  department for further information, was there    11:15:40
8  a procedure in place at Mallinckrodt whereby    11:15:43
9  they would know what person at the -- in the    11:15:45
10  marketing department was the appropriate    11:15:48
11  person to refer that question to?    11:15:49
12    MR. O'CONNOR: Object to form.    11:15:51
13    THE WITNESS: I'm not sure a    11:15:51
14    procedure, per se.  Karen Harper might    11:15:57
15    be able to tell you that if she had a    11:16:00
16    process in which she followed, but I'm    11:16:02
17    not aware of a specific procedure that    11:16:03
18    was taught to my team.    11:16:05
19  QUESTIONS BY MR. GOTTO:    11:16:06
20    Q.    Okay.  So in terms of -- within    11:16:06
21  the marketing department, from your    11:16:08
22  standpoint, there wasn't any formal procedure    11:16:11
23  in place that stated that inquiries from the    11:16:17
24  compliance department with respect to    11:16:24
25  potentially suspicious orders that were made    11:16:26

Page 118

1    to the marketing department should be handled    11:16:28
2    by person A, person B, person C, anything    11:16:31
3    like that; is that fair?    11:16:33
4          MR. O'CONNOR:  Objection.    11:16:36
5          THE WITNESS:  I would say    11:16:37
6    that's fair.  They understood who    11:16:38
7    managed which products, so they might    11:16:41
8    go to that specific product manager.    11:16:42
9          But I'm still not clear on    11:16:44
10   where you're going with this because    11:16:50
11   it -- it wasn't a formal policy that    11:16:52
12   I'm aware of.  Karen might have had    11:16:54
13   something in place, but I don't    11:16:57
14   remember us ever being educated on    11:16:58
15   something about this is exactly how    11:17:00
16   you handle it.    11:17:01
17   QUESTIONS BY MR. GOTTO:    11:17:02
18      Q.   Okay.  And so when you say    11:17:02
19   "they" knew who handled which products, you    11:17:07
20   mean the compliance department knew which --    11:17:09
21   which product manager handled which product;    11:17:11
22   is that fair?    11:17:14
23      A.   Correct.    11:17:14
24      Q.   Okay.  And certain inquiries    11:17:15
25   you became involved in personally.    11:17:24

Page 119

1          Are you aware of any inquiries    11:17:28
2    that were referred to anyone in the market    11:17:30
3    department -- marketing department, you know,    11:17:32
4    inquiries regarding potentially suspicious    11:17:36
5    orders, other than the inquiries that you    11:17:39
6    personally became involved in?    11:17:41
7      A.   I'm not aware unless they    11:17:43
8    involved me.    11:17:45
9      Q.   Okay.    11:17:47
10     A.   They may have made other    11:17:47
11   inquiries and I would not be aware.    11:17:49
12     Q.   Okay.  Was it your expectation    11:17:53
13   that if a product manager received an inquiry    11:17:56
14   from the compliance department with respect    11:18:00
15   to a potentially suspicious order that the    11:18:02
16   product manager would inform you of that    11:18:05
17   inquiry?    11:18:07
18     A.   The product managers were    11:18:07
19   generally good about informing me of things    11:18:11
20   going on with their products, so I may have    11:18:14
21   known, but they may not have always advised    11:18:16
22   me.  If they didn't tell me, I don't know.    11:18:19
23     Q.   Sure.    11:18:21
24          But as the -- as their -- the    11:18:21
25   person to whom they reported, was it your    11:18:27

Page 120

1    expectation that they would inform you of    11:18:29
2    their receipt of an inquiry from the    11:18:31
3    compliance department with respect to a    11:18:33
4    potentially suspicious order?    11:18:36
5      A.   I didn't have that expectation.    11:18:36
6    They are responsible product managers, and I    11:18:42
7    expect them to answer the question.  They    11:18:44
8    were not making the final decision.  So they    11:18:45
9    would supply the information needed, and I    11:18:47
10   knew they knew how to supply the correct    11:18:48
11   information.  So it was not my expectation    11:18:50
12   they would provide it to me.    11:18:52
13     Q.   Okay.  And so there was no --    11:18:54
14   is it fair to say that there was no    11:18:56
15   requirement in place within the marketing    11:18:59
16   department that a product manager report to    11:19:01
17   you when they received a -- an inquiry from    11:19:05
18   the compliance department as to a potentially    11:19:09
19   suspicious order?    11:19:12
20     A.   That would be a good    11:19:12
21   assumption.    11:19:14
22     Q.   Okay.  Okay.  Focusing back on    11:19:14
23   exhibit -- what are we on, 4?  I realize    11:19:22
24   you've testified that the composition of your    11:19:29
25   team changed over time as folks left.    11:19:33

Page 121

1          In terms of the particular    11:19:36
2    products that are set forth on Exhibit 4,    11:19:39
3    when Ms. Muhlenkamp left, did Lisa    11:19:45
4    Lundergan/Cardetti -- Cardetti, is it?    11:19:54
5      A.   Yes.    11:19:57
6      Q.   Thank you.    11:19:57
7          Did she assume responsibility    11:19:57
8    for those products?    11:19:58
9      A.   Actually, they -- I split them    11:19:59
10   out between Lisa, Marc, and hired a new    11:20:01
11   product manager, Jennifer Block.    11:20:05
12     Q.   Okay.  All right.  And    11:20:06
13   Mr. Montgomery, was he a product manager    11:20:09
14   through your tenure at Mallinckrodt?    11:20:13
15     A.   No, he got promoted to senior    11:20:14
16   product manager while I was there.    11:20:16
17     Q.   Okay.  And so senior product    11:20:18
18   manager was -- did he still report to you --    11:20:20
19     A.   Yes, he did.    11:20:22
20     Q.   Okay.  Were there other senior    11:20:23
21   product managers?    11:20:28
22     A.   No, he was the only one at the    11:20:29
23   time.    11:20:31
24     Q.   Okay.  And who took his spot as    11:20:31
25   product manager when he was promoted?    11:20:33

Page 122

1    A.   Jake Longenecker.          11:20:36
2    Q.   Okay.  The particular products   11:20:38
3  that are listed under Mr. Montgomery's name   11:20:41
4  on Exhibit 4, did they -- were they taken by   11:20:45
5  Mr. Longenecker when he took Mr. Montgomery's   11:20:48
6  position?                  11:20:52
7    A.   No, those were taken over by   11:20:52
8  Jennifer Block.             11:20:57
9    Q.   Okay.                11:20:57
10   A.   And Lisa Lundergan left, so   11:20:58
11 Jake took over Lisa's products and some of   11:21:01
12 Kate's.  So it was mixed on who was managing   11:21:04
13 what.                      11:21:08
14   Q.   And I'm sorry, when you say   11:21:09
15 Lisa Lundergan left, I thought -- did I   11:21:14
16 misunderstand?  I thought she had taken --   11:21:17
17   A.   She had gotten a NAM position,   11:21:19
18 yeah --                    11:21:22
19   Q.   Okay.                11:21:23
20   A.   -- when she left my department.   11:21:23
21 Sorry.                     11:21:26
22   Q.   Okay.  Great.  Okay.  You can   11:21:26
23 set that document aside.         11:21:27
24        When you joined Mallinckrodt in   11:21:29
25 mid-2009, did you have any awareness at that   11:21:54

Page 123

1  time of circumstances that have come to be   11:22:05
2  known as the opioid epidemic in this country?   11:22:11
3        MR. O'CONNOR:  Object to form.   11:22:13
4        THE WITNESS:  I was not aware   11:22:13
5    of the opioid epidemic, as they call   11:22:17
6    it today, no.              11:22:19
7  QUESTIONS BY MR. GOTTO:           11:22:20
8    Q.   Okay.  When did you become   11:22:21
9  aware of that, do you think?      11:22:22
10   A.   Probably in 2010 when I started   11:22:23
11 hearing about Sunrise and then started --   11:22:28
12 then started doing a little bit of background   11:22:31
13 on what was going on.           11:22:33
14   Q.   Okay.  What kind of background   11:22:37
15 did you do?                11:22:39
16   A.   Just looked to see about   11:22:39
17 Florida, the state of Florida, and how many   11:22:41
18 pills were being dispensed in the state of   11:22:43
19 Florida.                   11:22:47
20   Q.   Okay.  And how did you go about   11:22:47
21 doing that?                11:22:48
22   A.   Pulling IMS data and looking at   11:22:48
23 the population of Florida versus the rest of   11:22:53
24 the country, and the percent of pills that   11:22:54
25 were being dispensed in Florida versus the   11:22:56

Page 124

1  rest of the country.           11:22:58
2    Q.   Okay.  And what did you        11:22:59
3  discover?                  11:23:01
4    A.   It was higher in Florida, but   11:23:01
5  there was no -- we had no cause and effect.   11:23:03
6  We had no causal understanding of why there   11:23:08
7  was greater dispensing down there.   11:23:13
8    Q.   Okay.  When you say "we," do   11:23:14
9  you mean Mallinckrodt?          11:23:17
10   A.   Yeah.                11:23:17
11   Q.   Okay.                11:23:17
12   A.   Yeah.                11:23:17
13   Q.   So this effort of looking into   11:23:18
14 Florida distribution in particular, was this   11:23:25
15 something that you were -- did anyone else at   11:23:27
16 Mallinckrodt ask you to undertake this   11:23:34
17 inquiry?                   11:23:35
18        MR. O'CONNOR:  Object to form.   11:23:35
19        THE WITNESS:  No.  It was Kate   11:23:36
20    Neely in part of the -- looking into   11:23:39
21    Sunrise Medical.  We said, "They're   11:23:43
22    selling into the state of Florida.   11:23:46
23    What else is going into Florida that   11:23:49
24    we don't know about," because they   11:23:51
25    said it was physician prescribing down   11:23:52

Page 125

1    there.  So we were trying to     11:23:54
2    understand that.            11:23:55
3  QUESTIONS BY MR. GOTTO:           11:23:55
4    Q.   Okay.  And when you said "they   11:23:55
5  said," these are press accounts you were --   11:23:57
6    A.   Yeah, I'm sorry.           11:23:59
7    Q.   Okay.  And so -- so were you   11:24:02
8  looking into distribution in Florida of   11:24:04
9  product that Mallinckrodt had originally   11:24:09
10 manufactured, or were you looking more   11:24:11
11 generally at the entire industry?   11:24:13
12        MR. O'CONNOR:  Object to form.   11:24:14
13        THE WITNESS:  That I remember,   11:24:15
14    I think we were looking at          11:24:17
15    Mallinckrodt specifically.        11:24:20
16 QUESTIONS BY MR. GOTTO:           11:24:22
17   Q.   Okay.  And what did you do with   11:24:22
18 that information after you -- after you   11:24:25
19 developed it?              11:24:28
20   A.   Turned it over to the         11:24:29
21 compliance team.             11:24:31
22   Q.   Okay.  And was it to          11:24:32
23 Ms. Harper, or do you remember who in   11:24:35
24 particular --              11:24:37
25   A.   I don't remember specifically.   11:24:37

Page 126

1    Q.   Okay.  Do you remember the        11:24:38
2  format in which you turned it over?       11:24:39
3    A.   In a spreadsheet.        11:24:41
4    Q.   Okay.  And did you receive back    11:24:44
5  from the compliance department any requests  11:24:49
6  for follow-up information or analysis?     11:24:51
7    A.   Not that I recollect.  I          11:24:54
8  believe another department started running  11:24:59
9  reports.                          11:25:01
10   Q.   Okay.  Do you know which other    11:25:02
11 department?                        11:25:04
12   A.   David Silver's department.        11:25:04
13       So we didn't pull any data.  No    11:25:07
14 one -- I don't recollect anybody asking me  11:25:09
15 for more data.                     11:25:11
16   Q.   Okay.  And in terms of when you   11:25:13
17 pulled this data, this was in the 2010 time  11:25:16
18 frame?                           11:25:19
19   A.   Correct.                 11:25:19
20   Q.   And it was triggered by the       11:25:20
21 Sunrise DEA issues you became aware of?    11:25:23
22   A.   Uh-huh.                  11:25:25
23   Q.   Do you know if as a result of     11:25:27
24 the compilation of that data there were any  11:25:35
25 changes in Mallinckrodt's approach to the  11:25:40

Page 127

1  sale of any of the opioid products?       11:25:47
2       MR. O'CONNOR:  Object to form.    11:25:49
3       THE WITNESS:  I don't.         11:25:49
4  QUESTIONS BY MR. GOTTO:               11:25:50
5    Q.   Did you have occasion -- well,   11:25:55
6  strike that.                       11:25:59
7       Part of your job responsibility   11:25:59
8  was preparing forecasts and reviewing sales  11:26:01
9  results, et cetera, right, on a regular    11:26:05
10 basis; is that fair?                 11:26:07
11   A.   Correct.                 11:26:07
12   Q.   So after you compiled the data   11:26:08
13 in 2010, as you prepared sales forecasts or  11:26:11
14 reviewed sales results going forward, did you 11:26:20
15 make any effort to evaluate whether the sales 11:26:22
16 patterns going forward were different in any  11:26:29
17 way from what had predated the period during 11:26:33
18 which you compiled this information about the 11:26:39
19 Florida sales?                     11:26:41
20       MR. O'CONNOR:  Object to form.    11:26:42
21       THE WITNESS:  Yes.           11:26:43
22 QUESTIONS BY MR. GOTTO:               11:26:45
23   Q.   And what did you find?         11:26:45
24   A.   We projected lower sales.       11:26:46
25   Q.   And is that what actually       11:26:50

Page 128

1  happened, or is that what you projected    11:26:53
2  and --                          11:26:56
3    A.   It's what actually happened.     11:26:56
4    Q.   Okay.  And do you know what     11:26:57
5  caused that to happen, for the sales to be  11:27:02
6  lower?                          11:27:05
7       MR. O'CONNOR:  Object to form.    11:27:06
8       THE WITNESS:  I'm not exactly    11:27:07
9    sure, but we projected that some     11:27:10
10   customers would not be able to ship   11:27:12
11   into the state of Florida and        11:27:14
12   estimated their sales.            11:27:16
13 QUESTIONS BY MR. GOTTO:               11:27:17
14   Q.   Okay.  And mechanically, how    11:27:17
15 did you go about estimating what the       11:27:23
16 consequences would be of certain customers  11:27:26
17 not being able to ship into Florida?       11:27:28
18   A.   We would look at what the       11:27:31
19 customer's historical sales were.  And there 11:27:33
20 were certain distribution centers that we  11:27:36
21 shipped to, so we could tell which -- the  11:27:38
22 wholesaler distributor centers they went to, 11:27:40
23 and so we would know that that distributor  11:27:43
24 was not going to be able to ship in that   11:27:44
25 area.  And if we had that business, we knew  11:27:47

Page 129

1  that we lost that business.  It may have been 11:27:48
2  picked up by a competitor in a region, but we 11:27:50
3  knew that it would not be our business     11:27:54
4  because we were aligned with a particular  11:27:56
5  customer.                        11:27:57
6       (Mallinckrodt-Collier Exhibit 5   11:28:44
7    marked for identification.)          11:28:44
8  QUESTIONS BY MR. GOTTO:               11:28:44
9    Q.   We've marked as Exhibit 5 a     11:28:45
10 document that was produced in native format  11:28:47
11 under MNK-T1_0004881300.              11:28:48
12       And the document is a strategic   11:28:53
13 business update for Covidien Pharmaceuticals 11:28:58
14 Specialty Generics dated December 2, 2009.  11:29:03
15       Could you take a moment and      11:29:06
16 look through that document and tell me if you 11:29:07
17 recognize it?                      11:29:10
18   A.   Okay.                   11:29:11
19   Q.   Do you recognize that document?  11:30:27
20   A.   I don't remember it, but I       11:30:29
21 recognize it.                      11:30:32
22   Q.   Okay.                   11:30:33
23   A.   You know, the business review.   11:30:33
24   Q.   Okay.  Did -- would you have    11:30:35
25 participated in the preparation of any of the 11:30:40

Page 130

1  materials that are contained in this          11:30:43
2  document?                                     11:30:44
3      A.  Yes.                                  11:30:44
4      Q.  Which ones?                           11:30:45
5      A.  My team might have actually           11:30:45
6  pulled information on the business, the       11:30:50
7  units, and all the financials and, on        11:30:53
8  slide 12, the pipeline --                     11:31:02
9      Q.  Okay.                                 11:31:05
10     A.  -- in REMS.                           11:31:06
11     Q.  What are REMS?                        11:31:07
12     A.  Risk evaluation and mitigation        11:31:09
13 strategy.  They're put in place for           11:31:13
14 particular products so that it requires an    11:31:16
15 additional patient insert and more            11:31:18
16 monitoring.                                   11:31:22
17     Q.  Okay.  So it's a regulatory           11:31:22
18 requirement?                                  11:31:23
19     A.  Yes.                                  11:31:24
20     Q.  Okay.  So turning to the slides       11:31:24
21 1 and 2, on slide 2, it refers to meeting     11:31:31
22 participants, yourself and three other        11:31:38
23 Covidien/Mallinckrodt folks, and then four    11:31:41
24 AmerisourceBergen folks, correct?            11:31:47
25     A.  Correct.                             11:31:49

Page 131

1      Q.  Was this a regular type of           11:31:49
2  meeting that was held between Mallinckrodt    11:31:55
3  and AmerisourceBergen?                        11:31:58
4          MR. O'CONNOR:  Object to form.        11:32:00
5          THE WITNESS:  I would not say         11:32:01
6      it was regular.  It was not regular.      11:32:02
7  QUESTIONS BY MR. GOTTO:                       11:32:05
8      Q.  Okay.  Do you recall if there         11:32:06
9  was any particular reason for this -- this    11:32:09
10 meeting and this strategic business update to 11:32:10
11 be prepared?                                  11:32:13
12     A.  No, I don't.  I don't.               11:32:13
13     Q.  Okay.  Do you recall                  11:32:15
14 participating in similar strategic meetings   11:32:18
15 with other customers of Mallinckrodt from     11:32:25
16 time to time?                                 11:32:28
17         MR. O'CONNOR:  Object to form.        11:32:28
18         THE WITNESS:  I don't recall          11:32:29
19     any specific meetings, no.                11:32:30
20 QUESTIONS BY MR. GOTTO:                       11:32:31
21     Q.  Okay.  Do you recall if -- I         11:32:32
22 realize this -- this is from December of '09, 11:32:41
23 which was your first year at Mallinckrodt.    11:32:44
24         Do you recall if there had been       11:32:46
25 prior meetings with AmerisourceBergen of this 11:32:48

Page 132

1  type prior to the time you joined            11:32:51
2  Mallinckrodt?                                 11:32:53
3      A.  I would have no knowledge of          11:32:53
4  that.                                         11:32:54
5      Q.  Okay.  On slide 7, it says "VIP       11:32:54
6  update" at the top.                           11:33:12
7          What does VIP mean in this            11:33:16
8  context?                                      11:33:17
9      A.  Volume incentive plan -- or           11:33:18
10 program.                                      11:33:20
11     Q.  And what is that?                     11:33:20
12     A.  That is an incentive plan put         11:33:20
13 in place for customers to reach certain       11:33:22
14 volume hurdles on dollars and so that they    11:33:24
15 can be paid a rebate in addition.  And they   11:33:29
16 pass that along to the pharmacies, oftentimes 11:33:33
17 either a portion or all of it, on to the      11:33:35
18 pharmacies for complying with their programs. 11:33:37
19     Q.  Okay.  Is this separate from          11:33:40
20 the chargeback program that you discussed     11:33:41
21 earlier?                                      11:33:44
22     A.  Yes, it is.                           11:33:44
23     Q.  Okay.  And so slide 7 is              11:33:45
24 showing us the volume-based rebate.  Is that  11:33:48
25 the VIP rebate?                               11:33:51

Page 133

1      A.  Correct.                             11:33:53
2      Q.  Okay.  And so                         11:33:53
3  AmerisourceBergen, from April of '09 through  11:33:57
4  October of '09, had total sales of a little   11:34:03
5  bit more than 29 million, correct?           11:34:06
6      A.  Correct.                             11:34:07
7      Q.  And then the numbers below the        11:34:08
8  table, what do those numbers indicate?        11:34:10
9      A.  Those numbers are the volume          11:34:14
10 that if they reached -- to the right is the   11:34:18
11 amount of the rebate that they would receive, 11:34:20
12 AmerisourceBergen --                          11:34:23
13     Q.  Okay.                                 11:34:24
14     A.  -- for reaching those dollar          11:34:24
15 amounts.                                      11:34:28
16     Q.  Okay.  So if Amerisource --           11:34:28
17 since AmerisourceBergen had 29 million and    11:34:31
18 change during this period, am I reading this  11:34:34
19 correctly they would have received 5 percent  11:34:36
20 of 17.6 million and then 7 percent of the     11:34:41
21 difference between 17.6 -- well, I guess 15   11:34:43
22 million more on top of that 17.76, to 32.6,   11:34:46
23 and then 8 percent -- well, they didn't get   11:34:52
24 to 32.6.                                      11:34:53
25         So they would have gotten             11:34:54

Page 134

1  5 percent of the first 17.6 and 7 percent of    11:34:55
2  the balance; is that correct?    11:34:58
3      A.    No, they would have gotten    11:34:58
4  7 percent of the entire sale.    11:35:00
5      Q.    I see.    11:35:01
6          So it ratchets it up for the    11:35:02
7  entire thing if you reach the -- next    11:35:03
8  tier?    11:35:06
9      A.    Correct.    11:35:07
10     Q.    Okay.  And was that volume --    11:35:08
11 were those volume thresholds, were those six    11:35:16
12 months?  One year?  How were they set out?    11:35:20
13     A.    One year.    11:35:23
14     Q.    Okay.  So here we have six --    11:35:24
15 one, two, three, four, five -- these are    11:35:32
16 seven months, actually, of results that we're    11:35:32
17 seen on this chart, correct, from April    11:35:36
18 through October?    11:35:37
19     A.    Correct.    11:35:38
20     Q.    So if AmerisourceBergen had    11:35:38
21 additional sales over the remaining five    11:35:43
22 months, their rebate would be determined    11:35:46
23 based on the table -- the figures below the    11:35:49
24 table, ultimately, correct?    11:35:52
25     A.    Correct.    11:35:53

Page 135

1      Q.    Okay.  On slide 9, there's    11:35:54
2  reference to scorecard service levels.    11:36:12
3          What does "scorecard" mean in    11:36:14
4  this setting?    11:36:16
5      A.    This would be on    11:36:16
6  AmerisourceBergen-driven grading of how    11:36:19
7  Mallinckrodt delivered product over time:  if    11:36:25
8  we delivered on time, didn't deliver at all,    11:36:28
9  how did we perform.    11:36:31
10     Q.    Okay.  So on the table, there's    11:36:33
11 COV, raw service level and PRO raw service    11:36:37
12 level.    11:36:42
13         What are those showing us?    11:36:42
14     A.    Covidien means what we shipped    11:36:44
15 to the customer, and the blue line represents    11:36:46
16 what ABC was allowed to ship to their    11:36:49
17 customer.  So even though we declined in    11:36:52
18 sales, they had enough inventory to cover it    11:36:54
19 during that period to ship to their customers    11:36:56
20 with a slight dip.    11:36:59
21     Q.    Okay.    11:37:00
22     A.    That's my understanding.  I    11:37:00
23 mean, AmerisourceBergen, it's their data, so    11:37:03
24 it might be better to ask them.    11:37:04
25     Q.    Okay.  All right.  We can set    11:37:06

Page 136

1  that document aside.    11:37:15
2          MR. GOTTO:  Actually, before we    11:37:47
3  get into this, maybe it would be a    11:37:48
4  good time to take a break.  So why    11:37:51
5  don't we go off the record.    11:37:52
6          VIDEOGRAPHER:  We're going off    11:37:54
7  the record at 11:19 a.m. {sic}.    11:37:55
8          (Off the record at 11:37 a.m.)    11:37:58
9          VIDEOGRAPHER:  We are back on    11:52:26
10 the record at 11:52 a.m.    11:52:36
11         (Mallinckrodt-Collier Exhibits    11:52:37
12 6 and 7 marked for identification.)    11:52:38
13 QUESTIONS BY MR. GOTTO:    11:52:38
14     Q.    Ms. Collier, we've marked as    11:52:45
15 Exhibits 6 and 7 an e-mail and attachment    11:52:47
16 from 2009.    11:52:57
17         Exhibit 6 is Bates    11:52:57
18 MNK-T1_0006305472, and Exhibit 7 is a    11:53:00
19 document that was produced in native format    11:53:05
20 under MNK-T1_0006305473.    11:53:07
21         Would you take a moment to look    11:53:13
22 at those materials and tell me if you    11:53:16
23 recognize them.    11:53:18
24         Do you recognize those    11:56:59
25 materials?    11:57:00

Page 137

1      A.    Yes, I do.    11:57:00
2      Q.    Okay.  And it appears that the    11:57:02
3  attachment is the beginnings of the business    11:57:04
4  review that you referred to in your 11/20/09    11:57:10
5  e-mail, correct?    11:57:13
6      A.    Correct.    11:57:14
7      Q.    Okay.  So did you compile the    11:57:14
8  information that's included in Exhibit 7?    11:57:17
9      A.    My team did, yes.    11:57:22
10     Q.    Okay.  If you would turn to    11:57:23
11 slide 5 in Exhibit 7, there's a term    11:57:29
12 "Covidien modified gross" with an asterisk.    11:57:36
13 It's -- slide 5 it would be.  I believe    11:57:40
14 you're looking at 6.    11:57:43
15     A.    Oh, I'm looking at 6.  Okay.    11:57:44
16     Q.    There you go.    11:57:46
17         There's a reference to Covidien    11:57:47
18 modified gross with an asterisk, and then the    11:57:50
19 asterisk explains how modified gross is    11:57:53
20 determined.    11:57:56
21         Is that a metric that had been    11:57:57
22 used at Mallinckrodt at the time that you    11:58:01
23 joined, modified gross?    11:58:05
24     A.    Yes.    11:58:06
25     Q.    Okay.  And do you know why that    11:58:08

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  metric was used?                           11:58:12
2      A.   Because if we used WAC sales,     11:58:13
3  that would greatly increase the value of the  11:58:15
4  products without having actual value.      11:58:18
5      Q.   Okay.                             11:58:21
6      A.   So it would -- it would inflate   11:58:21
7  the value of the product.                  11:58:24
8      Q.   Okay.  And when you say "WAC       11:58:25
9  sales," you mean if you were not calculating  11:58:26
10 in the chargebacks?                        11:58:28
11     A.   Correct.                          11:58:30
12     Q.   Okay.  And what's -- in the       11:58:30
13 footnote there's a reference to wholesaler 11:58:32
14 differentials.                             11:58:34
15         What is that?                      11:58:35
16     A.   Correct.  We sometimes would      11:58:36
17 give a rebate or a discount on a given     11:58:39
18 product, for example, if we wanted to not  11:58:42
19 deflate the total market.  And so we would 11:58:45
20 offer the customer one price, but we would 11:58:49
21 give them a discount -- oh, excuse me,     11:58:51
22 differentials is different.                11:58:56
23         Differentials is that, for         11:58:57
24 example, we would price a particular       11:58:59
25 customer, a chain store, higher and then give  11:59:02

Page 139

1  them a rebate or discount down to the actual  11:59:06
2  contract price because we didn't want the  11:59:08
3  wholesaler to be able to see their actual  11:59:11
4  contract price.                            11:59:12
5      Q.   Okay.  And then to get to         11:59:13
6  modified gross, you're also backing out the  11:59:16
7  oxycodone ER, fentanyl lozenge and fentanyl  11:59:20
8  patch.                                     11:59:25
9         What's the reason for taking        11:59:26
10 those out?                                 11:59:27
11     A.   Because we hadn't launched them   11:59:27
12 yet, so we were looking forward and saying 11:59:28
13 that we don't include those -- the oxy ER was  11:59:30
14 discontinued.  We had it for a period of time  11:59:33
15 before I arrived at the company.  Part of a  11:59:34
16 paragraph IV filing against the branded    11:59:39
17 product, so we had exclusivity for a period.  11:59:41
18     Q.   What do you mean when you say      11:59:44
19 "a paragraph IV filing"?                   11:59:46
20     A.   You've challenged the patent      11:59:47
21 that the brand has and say that you should be  11:59:49
22 able to launch before they -- before the   11:59:51
23 patent expires.  And so that's what        11:59:55
24 Mallinckrodt had done, and so they negotiated  11:59:57
25 with the brand company that we would have an  11:59:59

Page 140

1  exclusivity period before the patent expired.  12:00:03
2      Q.   Okay.  On slide 6, under the      12:00:08
3  pie chart there's a reference to four key  12:00:14
4  product families represent 82 percent of   12:00:16
5  total modified gross sales.                12:00:19
6         Do you see that?                    12:00:20
7      A.   Correct.                          12:00:21
8      Q.   And do you recall that being      12:00:21
9  the case back in fiscal '09?               12:00:24
10     A.   Yes.                              12:00:27
11     Q.   And do you recall if that         12:00:27
12 metric changed over time in terms of those 12:00:37
13 four product families and the percentage   12:00:40
14 total modified gross sales that they       12:00:43
15 represented?                               12:00:45
16     A.   Yes, it changed significantly.    12:00:45
17     Q.   And how did it change?            12:00:47
18     A.   We launched new products which    12:00:48
19 contributed to the modified gross, and that  12:00:52
20 changed -- because one of the products we   12:00:55
21 launched, methylphenidate ER, was a sizeable  12:00:58
22 product, so that made all these numbers look  12:01:02
23 smaller, and some of our smaller products  12:01:05
24 contributed, so we had a bigger contribution  12:01:07
25 from other products.                       12:01:09

Page 141

1      Q.   Okay.  All right.  If you would   12:01:10
2  turn back to slide 38, under the assumptions  12:01:23
3  under the table, one of the assumptions is 12:01:38
4  market growth rate 7 percent.              12:01:40
5         Do you recall what the basis        12:01:43
6  was for that assumption?                   12:01:45
7      A.   That would be historical          12:01:47
8  trends, what you see in historical trends, 12:01:49
9  that it was -- the market had been growing 12:01:51
10 over time.                                 12:01:53
11     Q.   The next bullet item says,        12:01:55
12 "COV" -- I assume that's Covidien or       12:02:00
13 Mallinckrodt -- "will increase compliance at  12:02:02
14 McKesson."                                 12:02:05
15         Do you see that?                    12:02:06
16     A.   Yes.                              12:02:06
17     Q.   What does that phrase mean,        12:02:06
18 "increase compliance" in this setting?     12:02:10
19     A.   Anytime that we get a contract    12:02:11
20 with a customer, we ask them for how many  12:02:13
21 units they'll sell.  And then we set our   12:02:15
22 pricing and incentives based on what they say  12:02:17
23 they're going to sell, and they may not come  12:02:19
24 in at that level.                          12:02:21
25         Then we offered them additional    12:02:22

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1 value for the value that they said they were    12:02:24
2 going to deliver, and that drives production    12:02:26
3 at the plant and everything, so we expect    12:02:28
4 them to buy as much as they said they were    12:02:30
5 going to.    12:02:33
6        And in this particular case,    12:02:33
7 McKesson was not buying what they said they    12:02:35
8 would.    12:02:38
9    Q.    So the word "compliance" in    12:02:38
10 this setting means compliance with what their    12:02:42
11 sales or purchasing forecast had been?    12:02:44
12    A.    No, it's what they said they    12:02:47
13 could -- what they were buying from another    12:02:49
14 company, and we would gain their business.    12:02:51
15 And they said, for example, that we can sell    12:02:53
16 a hundred thousand tablets, and they might    12:02:56
17 have been buying 90,000 instead of a hundred    12:02:58
18 thousand, or whatever the variance is.    12:03:01
19        And so we needed to ask them,    12:03:02
20 "why are you not buying at the level you said    12:03:04
21 you would," and try and drive and find out    12:03:06
22 why there was an issue, and get them to buy    12:03:09
23 at the level they said they would.    12:03:12
24    Q.    Okay.  I'm just trying to    12:03:13
25 understand the meaning of the word    12:03:15

Page 143

1 "compliance" in this setting.    12:03:16
2        Is compliance with what they    12:03:17
3 had forecast they would be buying?    12:03:21
4    A.    What they told us they had been    12:03:22
5 purchasing from the competitor.  So it could    12:03:24
6 be that either their demand had dropped off,    12:03:26
7 even though they switched from the other    12:03:28
8 competitor, so we needed to find out why.    12:03:29
9 And if it was a reason -- compliance is not    12:03:31
10 like a contractual term.  It's just a term,    12:03:34
11 this is what you committed to.  So this is    12:03:38
12 what you said you were going to buy; we want    12:03:41
13 you to buy that much.  And find out why they    12:03:43
14 were not, and if they could not meet the    12:03:46
15 original number that they provided.    12:03:48
16    Q.    Okay.  If you turn to the next    12:03:50
17 slide, slide 30 -- I'm sorry, 39, under the    12:03:56
18 assumptions, there's a -- market growth rate    12:04:02
19 is 15 percent here.    12:04:06
20        Would that also be based on    12:04:08
21 historical data?    12:04:09
22    A.    Correct.    12:04:11
23    Q.    Okay.  And would that be --    12:04:12
24 various of these products had a market growth    12:04:13
25 rate assumption on the different slides.    12:04:16

Page 144

1        Is that always the case, it's    12:04:18
2 based on historical data that you had?    12:04:20
3    A.    Yes, it is.    12:04:22
4    Q.    Okay.  Under slide 40, or on    12:04:23
5 slide 40, under Assumptions, the second    12:04:33
6 bullet item says, "COV will recover 2009 lost    12:04:35
7 market share that resulted from backorders."    12:04:39
8        Do you see that?    12:04:43
9    A.    Correct.    12:04:44
10    Q.    Do you know what that's    12:04:44
11 referring to?    12:04:45
12    A.    That means that we were not    12:04:46
13 able to supply our customers with what they    12:04:47
14 needed at the time, so we think that we'll    12:04:50
15 pick up that business in the coming year.    12:04:52
16    Q.    Slide 44, Actions to Improve    12:04:55
17 Performance, the bullet item says, "Secure    12:05:13
18 Walgreens business."    12:05:16
19        Do you recall if that occurred?    12:05:18
20    A.    I know we had a good    12:05:20
21 partnership with Walgreens.  I'm not exactly    12:05:25
22 sure what this is referring to.    12:05:27
23    Q.    Okay.    12:05:29
24    A.    If it's a particular product or    12:05:29
25 if it's in general.    12:05:31

Page 145

1    Q.    Okay.  Okay.  We can set those    12:05:33
2 documents aside.    12:05:35
3        (Mallinckrodt-Collier Exhibit 8    12:06:02
4 marked for identification.)    12:06:03
5 QUESTIONS BY MR. GOTTO:    12:06:03
6    Q.    We've marked as Exhibit 8 a    12:06:23
7 document produced in native format under    12:06:25
8 Bates MNK-T1_0002236317, and it's a    12:06:28
9 PowerPoint deck that's -- first slide    12:06:39
10 indicates Covidien Pharmaceuticals Specialty    12:06:43
11 Generics Business Review, April 7, 2010.    12:06:45
12        Could you take a look and tell    12:06:49
13 me if you recognize that document?    12:06:51
14    A.    Okay.    12:06:52
15    Q.    Do you recognize that document?    12:10:08
16    A.    Yes, I do.    12:10:09
17    Q.    And what is it?    12:10:10
18    A.    It is our business review    12:10:11
19 document explaining the generic and our    12:10:13
20 budget and forecast for the year.    12:10:17
21    Q.    And did you participate in the    12:10:18
22 preparation of this document?    12:10:20
23    A.    Yes, I did.    12:10:21
24    Q.    Okay.  And is this a document    12:10:22
25 that you would prepare on an annual basis?    12:10:25

Page 146

1    A.   Yes.  It changed over time,    12:10:27
2  but, yes, something similar.    12:10:29
3    Q.   If you turn to slide 4, it    12:10:32
4  indicates Fiscal Year 2010 Specialty Generics    12:10:44
5  Objectives.  First one is "rebuild customer    12:10:48
6  confidence."    12:10:51
7         Do you recall why the objective    12:10:53
8  was to rebuild customer confidence at this    12:10:57
9  time?    12:10:59
10   A.   Because we had supply issues.    12:10:59
11   Q.   And what were those supply    12:11:01
12 issues?    12:11:03
13   A.   We had -- they were various,    12:11:03
14 but some of it was having problems out of our    12:11:06
15 API site, active pharmaceutical ingredients,    12:11:09
16 which are the raw materials, their inability    12:11:12
17 to supply enough product to the manufacturing    12:11:14
18 site in Hobart.  Or Hobart had issues    12:11:18
19 supplying product.  They couldn't produce to    12:11:18
20 the commitment -- the forecast, so they    12:11:23
21 sometimes would not have inventory readily    12:11:27
22 available when we needed it.    12:11:29
23   Q.   Okay.  And so was that a    12:11:32
24 problem that existed at the time you joined    12:11:35
25 Mallinckrodt?    12:11:37

Page 147

1    A.   Yes, it was.    12:11:38
2    Q.   Okay.  Do you know if the    12:11:38
3  company had experienced similar supply    12:11:39
4  problems historically?    12:11:42
5    A.   I don't know for sure before    12:11:43
6  me, but it obviously happened before my time,    12:11:47
7  so I don't know when --    12:11:50
8    Q.   Sure.    12:11:51
9    A.   -- how -- the frequency.    12:11:52
10   Q.   Okay.  In terms of the problems    12:11:53
11 that were experienced in fiscal '09, do you    12:11:55
12 know if it was the result of an increase in    12:11:58
13 demand for the products?    12:12:00
14   A.   In 2009, I'm not sure what the    12:12:02
15 problem was.    12:12:05
16   Q.   Okay.  And you indicated part    12:12:07
17 of the problem was some difficulty in    12:12:10
18 obtaining sufficient raw materials.    12:12:15
19        Do you know if in 2009 the --    12:12:17
20 Mallinckrodt was seeking to obtain raw    12:12:21
21 materials at a greater level than it had    12:12:23
22 historically?    12:12:26
23        MR. O'CONNOR:  Objection.    12:12:26
24 Form.    12:12:27
25        THE WITNESS:  It wasn't about    12:12:27

Page 148

1  obtaining sufficient raw materials.    12:12:28
2  It's about our ability to manufacture    12:12:30
3  the raw material, that it's a    12:12:32
4  difficult process and sometimes they    12:12:34
5  had failures.  And so we couldn't get    12:12:36
6  enough product, API, up to Hobart in    12:12:38
7  order to manufacture the finished    12:12:42
8  dosage form.    12:12:45
9  QUESTIONS BY MR. GOTTO:    12:12:45
10   Q.   Okay.  So it's Mallinckrodt    12:12:45
11 manufacture of the raw materials for Hobart    12:12:46
12 that was the issue?    12:12:49
13   A.   Correct.    12:12:49
14   Q.   I see.  Okay.    12:12:50
15        And do you know if the -- if    12:12:50
16 the manufacturing level -- or if the target    12:12:53
17 manufacturing level in 2009 was a higher    12:12:56
18 level than the company had historically    12:12:58
19 engaged in?    12:13:01
20        MR. O'CONNOR:  Object to form.    12:13:01
21        THE WITNESS:  I don't know    12:13:02
22 that.    12:13:02
23 QUESTIONS BY MR. GOTTO:    12:13:02
24   Q.   On slide 4, second bullet item    12:13:05
25 is "control price erosion."    12:13:08

Page 149

1         Do you see that?    12:13:10
2    A.   Correct.    12:13:11
3    Q.   And what's that referring to?    12:13:11
4    A.   That means that we do not want    12:13:13
5  to have our products erode in the    12:13:16
6  marketplace, so we balance our market share    12:13:19
7  against the additional prices that we need to    12:13:21
8  price -- concessions we need to give or    12:13:24
9  incentives we need to give in order to gain    12:13:27
10 that additional business.    12:13:31
11   Q.   Okay.  Was price erosion a    12:13:32
12 problem at the time that you were    12:13:35
13 particularly focused on addressing?    12:13:38
14   A.   Yes.    12:13:39
15   Q.   And do you know what was    12:13:40
16 causing that problem in fiscal '09?    12:13:42
17   A.   In the generic industry in    12:13:46
18 general, that is just additional competitors,    12:13:48
19 fierce competition among competitors, people    12:13:51
20 taking business from each other, trying to    12:13:53
21 gain share.  Or companies taking business,    12:13:55
22 not people.    12:13:57
23   Q.   Okay.  Turn if you would to    12:13:58
24 slide 51, which is a pie chart showing the    12:14:01
25 specialty generic expenses.    12:14:11

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    One of the items in the pie    12:14:15
2  chart is seminars, meetings, conferences.    12:14:20
3    Do you see that?    12:14:22
4    A.  Yes.    12:14:23
5    Q.  What types of seminars,    12:14:23
6  meetings, conferences would Mallinckrodt    12:14:24
7  participate in that gave rise to this    12:14:29
8  expense?    12:14:33
9    A.  We would attend conferences or    12:14:33
10  trade shows with -- sometimes with the    12:14:35
11  executives, so the buyers from the    12:14:40
12  warehousing chains, the wholesalers or their    12:14:43
13  executives. And sometimes we would attend    12:14:47
14  like a -- there's a hospital pharmacy buyer    12:14:49
15  meeting, so we would attend a buyer meeting    12:14:52
16  to talk to the pharmacy buyers to find out    12:14:54
17  what they're doing as far as their trends and    12:14:56
18  going forward.    12:14:59
19    And some were educational, some    12:15:01
20  were -- like, for example, the Wholesale    12:15:06
21  Distributor Manufacturer Association, HDMA at    12:15:08
22  the time, we would attend that to find out    12:15:11
23  industry trends like on the REMS regulations    12:15:14
24  or what was going on with other regulations    12:15:17
25  with serialization. And that often would be    12:15:18

Page 151

1  somebody on my team to get an education    12:15:20
2  around some of this.    12:15:22
3    Q.  Okay. And so down below I see    12:15:23
4  COND, which I assume is conventions and    12:15:28
5  exhibits.    12:15:30
6    Is that a different type of    12:15:30
7  event from what you've just described?    12:15:32
8    A.  Correct. That would include    12:15:35
9  the conventions, you know, attending some of    12:15:37
10  the educational shows to learn, but also the    12:15:39
11  cost of the exhibits when we had to display.    12:15:44
12    Q.  Okay. Who made the    12:15:47
13  determination as to what seminars and    12:15:53
14  meetings Mallinckrodt would participate in    12:15:57
15  that give rise to the expenses that are shown    12:16:00
16  on this slide?    12:16:02
17    A.  That often was the sales leader    12:16:04
18  would decide which sales meeting -- which    12:16:07
19  customer meetings they would attend. And    12:16:10
20  then for educational purposes, I would decide    12:16:12
21  who on my team should go to learn a little    12:16:14
22  bit more about a category or an area.    12:16:17
23    Q.  And how about the conventions    12:16:20
24  and exhibits? Who would decide what -- which    12:16:21
25  of those to participate in?    12:16:23

Page 152

1    A.  Some of them are general    12:16:24
2  national conventions, so that was just    12:16:27
3  standard industry attendance. So it was    12:16:30
4  expected that we would attend those, but    12:16:32
5  ultimately that would be decided by the    12:16:35
6  president of the team.    12:16:36
7    Q.  Okay. Take a look at slide 54,    12:16:38
8  if you would, please. There's a reference to    12:16:48
9  unapproved products deletions -- unapproved    12:16:56
10  products deletion.    12:17:01
11    Do you know what that's    12:17:03
12  referring to?    12:17:04
13    A.  Yes. At one point products    12:17:04
14  that were before the -- I don't know the    12:17:06
15  regulation or the ruling, but before generics    12:17:11
16  had proved that they were safe and effective,    12:17:14
17  these products were already in the market so    12:17:18
18  they didn't have to go through that process.    12:17:20
19  And so they were grandfathered, and you could    12:17:21
20  sell grandfathered products.    12:17:24
21    And Mallinckrodt was selling    12:17:26
22  these products long ago, and so we were    12:17:28
23  excluded. So -- but we were going to have to    12:17:32
24  discontinue them because the government    12:17:34
25  wanted everyone -- the FDA wanted everyone to    12:17:35

Page 153

1  issue a new FDA -- I mean an ANDA to prove    12:17:37
2  that they were safe and effective.    12:17:42
3    Q.  Okay. And on the right-hand    12:17:44
4  column there's identity of the products that    12:17:47
5  fall under this category, correct?    12:17:50
6    A.  Correct.    12:17:50
7    Q.  Okay. Turn, if you would, to    12:17:51
8  slide 59.    12:18:01
9    A.  (Witness complies.)    12:18:03
10    Q.  Improve Customer Confidence.    12:18:03
11  The second bullet item is "narcotic story."    12:18:09
12    Do you see that?    12:18:12
13    A.  Yes.    12:18:12
14    Q.  What does that refer to?    12:18:13
15    A.  That was an active    12:18:14
16  pharmaceutical ingredient initiative. It    12:18:17
17  showed everything from how -- because our    12:18:20
18  customers didn't understand how the products    12:18:22
19  were actually made from raw opium, so it was    12:18:24
20  just giving them information on -- and I    12:18:28
21  don't know that we used it, so I'll start    12:18:31
22  that off. But it was intended to show them    12:18:33
23  how the product goes from raw opium into a    12:18:35
24  finished dosage tablet.    12:18:39
25    Q.  Okay. And was -- since that's    12:18:40

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1  under the heading "Improve Customer          12:18:46
2  Confidence," was there a belief that there    12:18:48
3  was some failure of customer confidence with  12:18:53
4  respect to Mallinckrodt's manufacturing       12:18:55
5  process, or what gave rise to that being      12:18:58
6  something that you'd address to deal with     12:19:01
7  customer confidence?                          12:19:03
8      A.  Supply.  It was a supply issue.       12:19:05
9  And to explain to them -- and it went all the 12:19:07
10 way back to India where we secured the opium, 12:19:10
11 and then we had our manufacturing in          12:19:13
12 St. Louis and in Hobart.  So just to explain  12:19:14
13 to them that we are thoroughly knowledged in  12:19:19
14 the process of converting it from raw         12:19:21
15 material to finished dosage form.             12:19:23
16     Q.  Okay.  You can set that               12:19:26
17 document aside.                               12:19:30
18     A.  Okay.                                 12:19:56
19         (Mallinckrodt-Collier Exhibit 9       12:19:56
20 marked for identification.)                   12:19:57
21 QUESTIONS BY MR. GOTTO:                        12:19:57
22     Q.  We've marked as document -- as        12:20:05
23 Exhibit 9 a document produced in native       12:20:09
24 format under Bates MNK-T1_0002237098.         12:20:11
25         Would you take a moment to take       12:20:19

Page 155

1  a look at that document, please?             12:20:20
2      A.  Okay.                                 12:20:20
3      Q.  Do you recognize that document?       12:22:03
4      A.  Yes, I do.                            12:22:04
5      Q.  And what is it?                       12:22:04
6      A.  It is a business review that         12:22:05
7  was presented to our manufacturing site in   12:22:11
8  Hobart.                                        12:22:12
9      Q.  Okay.  Was that a regular             12:22:13
10 process, to present a business review to     12:22:16
11 Hobart?                                        12:22:18
12     A.  No, it was not.                       12:22:18
13     Q.  Was there a reason this               12:22:19
14 particular presentation was made when it was? 12:22:21
15     A.  To help them understand why          12:22:23
16 consistent supply was important in what they  12:22:26
17 were doing and why we came up with our        12:22:28
18 forecast numbers.                             12:22:30
19     Q.  Okay.  And so who made this           12:22:31
20 presentation?                                 12:22:33
21     A.  My team.                              12:22:33
22     Q.  And you participated in that?         12:22:35
23     A.  Yes, I did.                           12:22:37
24     Q.  And participated in compiling        12:22:38
25 the information that's contained in this      12:22:40

Page 156

1  package?                                     12:22:42
2      A.  Yes, I did.                          12:22:42
3      Q.  Okay.  If you turn to slide 2,       12:22:44
4  you'll see it's an org chart, and this -- the 12:22:48
5  spot that previously had been occupied by    12:22:52
6  Ms. Muhlenkamp is identified as vacant.      12:22:55
7          So is that consistent with your     12:22:58
8  recollection, by February 2011 Ms. Muhlenkamp 12:23:00
9  had left?                                    12:23:04
10     A.  Yes.                                 12:23:04
11     Q.  And ultimately -- ultimately,       12:23:05
12 who took that spot?                          12:23:10
13     A.  Jennifer Bullerdick, and then I     12:23:11
14 hired Jake Longenecker from the API site.    12:23:14
15     Q.  Okay.  Great.                        12:23:26
16         On slide 3, Ranking of Generic      12:23:26
17 Companies, Covidien/Mallinckrodt is indicated 12:23:35
18 MAT September 2010 rank.                     12:23:38
19         What is MAT?                         12:23:41
20     A.  Moving annual total.                 12:23:42
21     Q.  Okay.  And scripts are              12:23:44
22 prescriptions; is that right?               12:23:47
23     A.  Correct.                            12:23:47
24     Q.  Okay.  And share of generics,      12:23:49
25 do you know how that's calculated?          12:23:51

Page 157

1      A.  It's the total number of           12:23:53
2  prescriptions.  For example, on Teva, it     12:23:57
3  would be their number of prescriptions by the 12:23:59
4  total number that were provided in the       12:24:01
5  Wolters Kluwer study.                        12:24:03
6      Q.  Okay.  So it's not a dollar         12:24:04
7  determination?                               12:24:06
8      A.  No.                                  12:24:06
9      Q.  It's a number of prescriptions     12:24:06
10 determination?                               12:24:08
11     A.  Correct.                            12:24:08
12     Q.  Okay.  And again -- so here the    12:24:08
13 company is identified Covidien/Mallinckrodt,  12:24:13
14 but there was no separate product line that  12:24:16
15 was Covidien versus Mallinckrodt, correct?   12:24:18
16     A.  Correct.                            12:24:19
17     Q.  Okay.                               12:24:20
18     A.  Not for the generics.              12:24:22
19     Q.  Yeah.                               12:24:24
20         Was that the case with branded     12:24:24
21 product, that there was --                   12:24:25
22     A.  I don't know.                       12:24:26
23     Q.  Okay.  If you turn to              12:24:28
24 slide 12 -- I'm sorry, 11.  11 says "FY '11  12:24:42
25 overall goal:  Preserve, maintain but grow,  12:24:50

Page 158

1  underscore, the generic core business."  12:24:50
2       So the reference here to the  12:24:53
3  generic core business, what would that be  12:24:56
4  referring to?  12:24:58
5       A.  Our portfolio products.  And so  12:24:58
6  we would work on initiatives to either gain  12:25:01
7  additional share or increase prices or  12:25:06
8  maintain the current business of customers.  12:25:12
9       Q.  Okay.  Okay.  And turn to  12:25:16
10  slide 12, please.  12:25:18
11       A.  Yes.  12:25:19
12       Q.  Slide 12, one of the fiscal  12:25:19
13  year '11 objectives is "reinforce  12:25:23
14  Covidien/Mallinckrodt as pain management  12:25:28
15  experts."  12:25:30
16       Do you see that?  12:25:30
17       A.  Yes.  12:25:30
18       Q.  And what steps were taken to  12:25:31
19  reinforce Covidien/Mallinckrodt as pain  12:25:33
20  management experts?  12:25:37
21       A.  I can only remember having  12:25:38
22  discussions with Karen about customers that  12:25:39
23  were trying to set up their own warehouse,  12:25:43
24  and she could help them do that.  12:25:46
25       I don't think anything came to  12:25:49

Page 159

1  fruition of this, but I don't remember for  12:25:50
2  sure.  I don't remember developing any  12:25:52
3  materials around this particular program.  12:25:54
4       Q.  Okay.  When you say "Karen," is  12:25:55
5  that Karen Harper?  12:25:57
6       A.  Karen Harper.  12:25:57
7       Q.  So in terms of pain management,  12:25:58
8  I mean, that would -- your recollection is  12:26:05
9  to -- that meant storing and warehousing  12:26:09
10  product?  12:26:13
11       A.  That's our portfolio of  12:26:13
12  products, is pain management, so schedule  12:26:14
13  drugs would be another name.  12:26:17
14       Q.  But the expertise that is being  12:26:20
15  reinforced here, what expertise is that, as  12:26:25
16  best you can recall?  12:26:29
17       A.  Well, it would be the expertise  12:26:30
18  that Karen offered in the compliance because  12:26:31
19  she could -- in the past they had helped  12:26:35
20  other people with DEA inspections, how do you  12:26:37
21  work with the DEA and things like that.  12:26:42
22       Q.  Okay.  All right.  You can set  12:26:43
23  that document aside.  12:26:50
24       (Mallinckrodt-Collier Exhibit  12:27:06
25       10 marked for identification.)  12:27:07

Page 160

1  QUESTIONS BY MR. GOTTO:  12:27:07
2       Q.  We've marked as Exhibit 10 a  12:27:28
3  single-page -- or two-page document, sorry,  12:27:31
4  beginning at Bates MNK-T1_0002738887.  It  12:27:37
5  appears to be a letter that you sent out  12:27:43
6  October 11, 2011.  12:27:47
7       Please take a look and tell me  12:27:48
8  if you recognize it.  12:27:50
9       A.  Okay.  12:27:51
10       Q.  Do you recognize that letter?  12:28:27
11       A.  Yes, I do.  12:28:30
12       Q.  And do you recall sending this  12:28:31
13  letter out in October of 2011?  12:28:34
14       A.  I don't recall the date, but,  12:28:36
15  yes, it's on the letter, so I assume that's  12:28:39
16  it.  12:28:42
17       Q.  Okay.  Did you send a series of  12:28:42
18  similar letters out to other customers?  12:28:44
19       A.  Yes.  12:28:45
20       Q.  Okay.  And this letter, the  12:28:46
21  first paragraph says, "Mallinckrodt, LLC,  12:28:47
22  continues to experience supply challenges  12:28:51
23  related to our oxycodone immediate release  12:28:54
24  tablets in 15-milligram and 30-milligram  12:28:57
25  strengths.  The supply issue is driven by  12:28:59

Page 161

1  unexpected quota shortfalls from the US Drug  12:29:03
2  Enforcement Administration, with no firm  12:29:06
3  answer at this point as to when that  12:29:07
4  situation will improve."  12:29:09
5       Do you recall that circumstance  12:29:11
6  back in 2011?  12:29:12
7       A.  Yes, I do.  12:29:13
8       Q.  So you had testified earlier  12:29:14
9  back in 2009 there were some supply issues  12:29:18
10  relating to some manufacturing constraints or  12:29:21
11  difficulties, correct?  12:29:26
12       In 2011, now there's supply  12:29:28
13  issues resulting from quota shortfalls.  Do  12:29:31
14  you know what cause or -- well, strike that.  12:29:36
15       There's a reference here to  12:29:39
16  unexpected quota shortfalls.  Did you ever  12:29:41
17  come to have an understanding as to the  12:29:45
18  reasons for those quota shortfalls?  12:29:49
19       MR. O'CONNOR:  Object to form.  12:29:51
20       THE WITNESS:  No, I don't  12:29:51
21  recall why, because I did not interact  12:29:54
22  with the DEA.  12:29:55
23  QUESTIONS BY MR. GOTTO:  12:29:56
24       Q.  Okay.  So when you use the  12:29:56
25  phrase "quota shortfalls" in this letter,  12:29:59

Page 162

1  what do you mean by that exactly?          12:30:03
2      A.   My understanding was at the        12:30:04
3  time Mallinckrodt expected to have additional  12:30:06
4  quota, or enough quota to meet their annual   12:30:09
5  needs.  And we did not receive that approval  12:30:13
6  from the DEA, and so we didn't have enough    12:30:18
7  inventory to allow that.            12:30:21
8        I honestly don't even know if     12:30:23
9  it was an API or finished dosage form quotas.  12:30:24
10     Q.   Okay.  And do you know if        12:30:28
11 the -- if the quota that Mallinckrodt         12:30:29
12 received for the year was less than prior      12:30:32
13 year quota, or do you have any understanding   12:30:37
14 of that at all?                12:30:39
15     A.   I don't remember.             12:30:40
16     Q.   In the third paragraph you say,    12:30:42
17 "You were one of our valued partners, and it   12:30:50
18 is our goal to meet as much of your demand as  12:30:52
19 possible.  The impact this supply reduction    12:30:55
20 could have on your business is well           12:30:58
21 understood.  We have developed a supply plan,  12:31:00
22 attached, to maximize the amount of oxycodone  12:31:03
23 we can ship to you in the coming months that   12:31:05
24 are helping you to meet the needs of your      12:31:08
25 customers and their patients," correct?       12:31:10

Page 163

1      A.   Correct.                12:31:12
2      Q.   How did you go about developing    12:31:12
3  the supply plan and allocating the available  12:31:14
4  quota among the existing customers?          12:31:21
5      A.   First, we evaluated who had       12:31:23
6  intercontractual obligation of failure to     12:31:27
7  supply, which is a penalty for not supplying,  12:31:29
8  so that could be very costly, so they were     12:31:31
9  prioritized.  Other customers that had more    12:31:33
10 of our portfolio in their line were           12:31:35
11 prioritized over others.  If it was a         12:31:39
12 customer that we knew we could supply their    12:31:43
13 full amount, we'd try and take care of them.   12:31:46
14       But it was based on primarily     12:31:48
15 the failure to supply and the impact it'd      12:31:49
16 have on our business.             12:31:52
17     Q.   Do you recall receiving         12:31:53
18 responses from various customers to this and   12:31:59
19 other similar letters that went out at this    12:32:01
20 time?                     12:32:03
21     A.   I recall many customers were      12:32:05
22 not happy about receiving this kind of        12:32:07
23 information.                12:32:09
24     Q.   Did you have any direct contact   12:32:09
25 with any of those customers?          12:32:11

Page 164

1      A.   I don't recall any specific      12:32:12
2  situations, but I'm sure I did.        12:32:14
3      Q.   Did you -- were there any       12:32:16
4  modifications made to the proposed          12:32:18
5  allocations as a result of any feedback       12:32:22
6  received from customers?           12:32:25
7      A.   No.                  12:32:26
8      Q.   Okay.  You can set that aside.    12:32:31
9      A.   Not that I'm aware of.          12:32:32
10     Q.   Okay.  And is that something      12:32:33
11 that would have been a decision you would      12:32:34
12 have been involved in?            12:32:37
13     A.   Yes.                 12:32:38
14     Q.   Okay.  You can set that aside.    12:32:39
15       (Mallinckrodt-Collier Exhibit    12:32:49
16 11 marked for identification.)         12:32:50
17 QUESTIONS BY MR. GOTTO:           12:32:50
18     Q.   We've marked as Exhibit 12       12:33:11
19 {sic} a multipage document beginning at Bates  12:33:14
20 MNK-T1_0007289278.  Appears to be minutes and  12:33:16
21 action item from a November 23, 2011 business  12:33:23
22 review meeting.                12:33:30
23       MR. O'CONNOR:  Just for         12:33:31
24 clarity, this is marked 11.          12:33:32
25       MR. GOTTO:  Is it 11?  Oh,       12:33:36

Page 165

1  that's because I was looking at 12        12:33:38
2  over here that we hadn't used yet.         12:33:39
3        Thank you.               12:33:41
4        MR. O'CONNOR:  No problem.       12:33:41
5  QUESTIONS BY MR. GOTTO:           12:33:42
6      Q.   If you could take a moment and    12:33:42
7  look at that document, Ms. Collier.  I just    12:33:43
8  have a question for you on the third page.     12:33:45
9      A.   Page 3.                12:35:51
10     Q.   Yes, page 3, please.          12:35:52
11       First of all, do you recognize   12:35:53
12 what this document is?            12:35:54
13     A.   Yes, I do.               12:35:55
14     Q.   And what is it?             12:35:57
15     A.   This is from our sales and       12:35:58
16 operations planning meeting that we would      12:36:01
17 have with the leaders of each business unit    12:36:03
18 and manufacturing.             12:36:06
19     Q.   Okay.  So turn to the third      12:36:08
20 page, please, and the table in the middle of   12:36:09
21 the page, the second line that begins with     12:36:14
22 "oxymorphone/oxycodone constraint."           12:36:19
23       Do you see that?            12:36:21
24     A.   Yes.                 12:36:22
25     Q.   It says, "Favor oxymorphone      12:36:22

Page 166

1  production at the expense of oxycodone for     12:36:25
2  generics."     12:36:27
3         Do you know why that decision     12:36:28
4  was made?     12:36:30
5     A.   The St. Louis plant -- I     12:36:31
6  believe this was an incidence where the     12:36:34
7  St. Louis plant was having a hard time     12:36:36
8  manufacturing enough materials on a     12:36:38
9  consistent basis due to the complexity, and I   12:36:41
10  think that they -- we were reducing the     12:36:43
11  amount of oxycodone we were producing because   12:36:46
12  we lost some sales, and so they had to make a   12:36:48
13  decision: Should they make more oxymorphone   12:36:50
14  and -- at the expense of oxycodone for our     12:36:53
15  business.     12:36:56
16     Q.   Okay.  And then the next     12:36:57
17  paragraph in that -- in that box on the table  12:37:00
18  says, "Need to know impact of further     12:37:03
19  oxycodone reduction for the generics business  12:37:05
20  in order to manage demand to the appropriate   12:37:07
21  levels."     12:37:09
22         Do you see that?     12:37:10
23     A.   Oh, I see, in that same --     12:37:11
24  okay.  "Need to know" the further -- yes.     12:37:16
25     Q.   And my question is:  The     12:37:18

Page 167

1  reference to manage demand to appropriate     12:37:20
2  levels, how would you -- what steps would --   12:37:22
3  as marketing director, what steps would you     12:37:25
4  take to try to manage demand to appropriate    12:37:28
5  levels?     12:37:30
6     A.   We could slow down shipping     12:37:30
7  some orders to customers.  We could ask     12:37:32
8  customers, do not load inventory.  We could    12:37:35
9  not have as much safety stock.  So there were  12:37:38
10  a lot of things we could do to reduce the     12:37:41
11  amount of inventory that was required for the  12:37:43
12  year.     12:37:45
13     Q.   Okay.  And that -- you'd view   12:37:46
14  those steps as managing demand?     12:37:48
15     A.   Yes.     12:37:51
16     Q.   Okay.  You can set that aside.   12:37:51
17         (Mallinckrodt-Collier Exhibit   12:38:05
18     12 marked for identification.)     12:38:06
19  QUESTIONS BY MR. GOTTO:     12:38:06
20     Q.   Ms. Collier, we have now marked  12:38:26
21  as Exhibit 12 a document, a multipage     12:38:27
22  document, beginning at Bates     12:38:30
23  MNK-T1_0000661013.  It appears to be an     12:38:33
24  intern initiation prepared in June of 2014.    12:38:39
25         If you could take a look at     12:38:44

Page 168

1  that and tell me if you recognize that     12:38:45
2  document.     12:38:46
3     A.   (Witness nods head.)     12:38:46
4     Q.   Do you recognize that document?   12:39:57
5     A.   Yes, I do.     12:39:58
6     Q.   And what is it?     12:39:58
7     A.   It is to work with interns to     12:39:59
8  explain to them who Mallinckrodt is, what our  12:40:04
9  product looks like, our product line looks     12:40:06
10  like, and educate them a little bit about the  12:40:08
11  industry.     12:40:10
12     Q.   Okay.  And did you prepare this   12:40:10
13  document?     12:40:12
14     A.   I was one of the people.  My     12:40:13
15  team did it.     12:40:14
16     Q.   Okay.  If you would turn to     12:40:15
17  slide 4, which is Mallinckrodt Generics     12:40:22
18  Business Overview, our key products in order   12:40:33
19  of sales value, and then it lists a series of  12:40:36
20  products.     12:40:40
21         Best of your recollection, is     12:40:41
22  this an accurate depiction of the key     12:40:43
23  products Mallinckrodt generics offered in     12:40:46
24  fiscal 2014?     12:40:49
25     A.   Yes.     12:40:50

Page 169

1     Q.   Okay.  And turn, if you would,   12:40:51
2  to slide 17.     12:40:56
3     A.   (Witness complies.)     12:41:07
4     Q.   Products driving net sales.  It  12:41:11
5  says, "FY '14 net sales LE."     12:41:14
6         What does the LE refer to in     12:41:17
7  this setting?     12:41:19
8     A.   Latest estimate.     12:41:19
9     Q.   Okay.  And FY '13 net sales,     12:41:20
10  those are actuals, I take it?     12:41:24
11     A.   Correct.  It's an overlay, so    12:41:25
12  it's hard to see.     12:41:27
13     Q.   Okay.  And to the best of your   12:41:29
14  knowledge, the data depicted on this pie     12:41:33
15  chart for fiscal '13 and '14 is accurate?     12:41:36
16     A.   Yes.     12:41:39
17     Q.   Okay.  And turn, if you would,   12:41:41
18  to slide 20.     12:41:51
19     A.   (Witness complies.)     12:41:53
20     Q.   And it's current market model,   12:41:57
21  revised market model.  And under current     12:42:02
22  market model it says, "Products are pushed     12:42:03
23  out to customers through pricing and     12:42:05
24  incentive programs."     12:42:06
25         And then under revised market     12:42:08

Page 170

1  model, "Customers add products through    12:42:10
2  pricing incentive programs and preferred    12:42:11
3  service."    12:42:13
4  Could you elaborate on the    12:42:14
5  distinction that's being drawn there and what    12:42:17
6  steps were taken at Mallinckrodt to move from    12:42:20
7  current model to revised model?    12:42:23
8  MR. O'CONNOR: Object to form.    12:42:25
9  THE WITNESS: Sure. Sure.    12:42:26
10  Previously we had the product,    12:42:29
11  we launched it. We went and talked to    12:42:32
12  customers and said, "Okay, you've got    12:42:33
13  Mylan product, you've got Teva    12:42:36
14  product, and we'd like you to switch    12:42:39
15  to our product."    12:42:40
16  And what we decided that we    12:42:40
17  needed to do was put the customer at    12:42:41
18  the center of our focus.    12:42:43
19  So our drug wholesalers,    12:42:44
20  warehousing chains and distributors,    12:42:46
21  mostly the drug wholesalers and the    12:42:47
22  warehousing chains, they had formed a    12:42:50
23  consortium, so we had to align better    12:42:51
24  with them and meet their needs rather    12:42:55
25  than us going to them and asking them    12:42:56

Page 171

1  to meet our needs.    12:42:58
2  So we came up with initiatives    12:43:00
3  to focus more on providing better    12:43:01
4  customer service than we had in the    12:43:05
5  past, better communication about    12:43:05
6  supply issues. And that's what this    12:43:07
7  was about, was how do we communicate    12:43:11
8  better than what we've been doing in    12:43:13
9  the past.    12:43:15
10  Because they had -- for    12:43:15
11  example, a huge customer might call in    12:43:18
12  and ask about where their order is.    12:43:20
13  They might get a voicemail because    12:43:24
14  they got bounced around on the phone    12:43:25
15  call for several people, so we gave    12:43:27
16  them dedicated people to work with.    12:43:29
17  We had -- we informed people in    12:43:31
18  contract admin, "If this particular    12:43:34
19  customer calls, make sure you answer    12:43:35
20  their call and address their issues.    12:43:37
21  They're a priority. Don't think that    12:43:40
22  everybody in your basket is as    12:43:41
23  important. There's 11 customers    12:43:43
24  driving all of our business, and you    12:43:46
25  need -- most of our business, and you    12:43:47

Page 172

1  need to address their issues first."    12:43:49
2  So that's what we were doing,    12:43:51
3  was changing the way the company    12:43:52
4  looked at the customers.    12:43:56
5  QUESTIONS BY MR. GOTTO:    12:43:57
6  Q. Okay. Turn to slide 22, if you    12:43:57
7  would. There's a reference to customer    12:44:05
8  connectivity initiative, which sounds like it    12:44:09
9  may be part of what you were just talking    12:44:11
10  about.    12:44:12
11  A. Exactly.    12:44:12
12  Q. If you could just describe to    12:44:13
13  me what's meant by a customer connectivity    12:44:14
14  initiative.    12:44:16
15  A. That's exactly what it was. It    12:44:16
16  was to get our internal groups to understand    12:44:18
17  who the important customers were. So we    12:44:21
18  taught them, like, these are the customers    12:44:23
19  driving the value for the business, and    12:44:24
20  that's who's really paying your paycheck.    12:44:27
21  And then we empowered them to    12:44:30
22  make their own decisions to resolve issues.    12:44:33
23  So if there was a chargeback issue and they    12:44:36
24  thought that the customer was entitled to    12:44:38
25  that chargeback but we deducted it for some    12:44:39

Page 173

1  reason, they were now saying that they could    12:44:43
2  resolve that issue themselves.    12:44:44
3  And we actually surveyed    12:44:46
4  customers on what was important to them, and    12:44:47
5  that's how we came up with what we needed to    12:44:51
6  do.    12:44:53
7  MR. GOTTO: Okay. You can put    12:44:53
8  that aside.    12:44:55
9  Why don't we take our lunch    12:44:55
10  break.    12:44:58
11  VIDEOGRAPHER: We are going off    12:44:59
12  the record at 12:44 p.m.    12:45:00
13  (Off the record at 12:44 p.m.)    12:45:01
14  VIDEOGRAPHER: We are back on    13:26:47
15  the record at 1:33 p.m.    13:33:43
16  (Mallinckrodt-Collier Exhibit    13:33:44
17  13 marked for identification.)    13:33:45
18  QUESTIONS BY MR. GOTTO:    13:33:45
19  Q. Welcome back, Ms. Collier.    13:33:46
20  A. Thank you.    13:33:48
21  Q. We've marked as Exhibit 13 a    13:33:48
22  multipage document beginning with Bates    13:33:51
23  MNK-T1_0000607429. Appears to be a specialty    13:33:52
24  generic strategic plan, 2013 to 2017. It's    13:34:03
25  quite a lengthy document. I just have a few    13:34:07

Page 174

1  questions for you on it.                    13:34:09
2         If you could just look at it     13:34:10
3  just briefly to confirm that -- or ascertain  13:34:11
4  if you're familiar with it.                13:34:15
5      A.  Yes, I'm familiar with it.        13:34:37
6      Q.  And what is it?                    13:34:38
7      A.  It is a STRAT plan, a strategic   13:34:39
8  plan, about how our sales will project in the  13:34:44
9  future.                                    13:34:48
10     Q.  Okay.  And did you participate    13:34:48
11 in the preparation of this?                13:34:50
12     A.  Yes, I did.                        13:34:52
13     Q.  Okay.  If you would turn to       13:34:53
14 slide 20.  And this is an industry trends   13:34:56
15 retail slide.                              13:35:07
16        And the bottom two bullet          13:35:08
17 items, one says, "Our focus here will       13:35:12
18 continue to diminish as C-IIs become less of  13:35:15
19 an opportunity."                           13:35:18
20        Do you know what's meant by        13:35:22
21 that?                                      13:35:24
22     A.  I'm not clear what this meant     13:35:24
23 in the context, no.                        13:35:26
24     Q.  Okay.  How about the next         13:35:27
25 bullet, "Need to implement SOM monitoring for  13:35:28

Page 175

1  HB/APAP for this class of customers in      13:35:31
2  addition to the wholesalers."              13:35:34
3         Do you know what's meant there?    13:35:36
4      A.  Hydrocodone APAP was going from   13:35:38
5  a Schedule III to a Schedule II, so that    13:35:39
6  means it was included in the suspicious order  13:35:43
7  monitoring program.                        13:35:45
8      Q.  Okay.  All right.  If you'd       13:35:46
9  turn to slide 28, please.  This is a slide  13:35:55
10 entitled "Customer Initiatives."           13:36:05
11        Toward the middle of the slide,    13:36:09
12 there's a reference to "compliance         13:36:11
13 initiatives based on growing more profitable  13:36:13
14 product families."                         13:36:16
15        What would be examples of          13:36:17
16 compliance initiatives?                    13:36:20
17     A.  That would be, again, ensuring    13:36:21
18 that the customers, when they gave us the   13:36:24
19 volume, that they were buying at that volume  13:36:26
20 level.  And then we would worry more about  13:36:28
21 the profitable products than the less       13:36:31
22 profitable ones, because before we were just  13:36:32
23 kind of focusing on everything.  We needed to  13:36:35
24 change our focus.                          13:36:37
25     Q.  So in terms of the initiative,    13:36:38

Page 176

1  though, what sorts of things would you do   13:36:41
2  to -- to -- as it says, "Growing more      13:36:44
3  profitable product families through a      13:36:46
4  compliance initiative"?                    13:36:48
5      A.  That means -- so, for example,    13:36:49
6  if one of the drug wholesalers was not     13:36:51
7  purchasing the volume that we thought they  13:36:55
8  would, we would, again, work with them, find  13:36:56
9  out why they weren't purchasing, were they  13:36:59
10 buying from somebody else, too, because they  13:37:01
11 could do that.  They didn't have a commitment  13:37:03
12 in their contract to buy any certain volumes.  13:37:06
13        And because we didn't have a       13:37:09
14 commitment from them that we would change   13:37:09
15 your pricing, the only thing we could do was  13:37:11
16 ask them specifically why were they were not  13:37:13
17 buying.                                    13:37:16
18        And if they were buying off of     13:37:16
19 another program because somebody was offering  13:37:17
20 at a lower price or if it was something     13:37:19
21 that -- pharmacist's preference, anything   13:37:22
22 like that, then we would try and uncover that  13:37:23
23 and find out what we needed to do differently  13:37:25
24 at our company in order to ensure that      13:37:27
25 they're buying our product.                13:37:29

Page 177

1      Q.  Okay.  Turn to slide 54,          13:37:31
2  please.  This is the SWOT analysis.        13:37:38
3         Under Strengths, the first --      13:37:55
4      A.  It must be the wrong page, I'm    13:37:57
5  sorry.                                     13:37:58
6      Q.  I'm sorry, it's slide 54.         13:37:58
7      A.  I was on 64.  Even with my        13:38:00
8  glasses I'm having a hard time reading those  13:38:02
9  numbers.                                   13:38:04
10     Q.  These are a little tiny.          13:38:04
11     A.  Yes, they are.  Thank you.        13:38:06
12     Q.  Okay.  So the SWOT analysis for   13:38:07
13 Mallinckrodt, under Strengths, the first   13:38:10
14 bullet item is, "Recognized as leader in   13:38:11
15 narcotics."                                13:38:15
16        Do you see that?                    13:38:16
17     A.  Yes.                              13:38:16
18     Q.  And what's the basis for that,    13:38:16
19 that Mallinckrodt is recognized as a leader  13:38:19
20 in narcotics?                              13:38:20
21     A.  Partly due to our market share.   13:38:21
22 It was a 150-year-old company that started  13:38:24
23 out making the raw materials in narcotics and  13:38:27
24 grew from -- growing our -- making narcotics  13:38:30
25 all the way through to having a finished     13:38:33

Page 178

1  dosage form, so they also sold tablets and        13:38:35
2  everything.        13:38:37
3       And anytime you're vertically        13:38:38
4  integrated like that in the industry, that's        13:38:40
5  really widely appreciated because there        13:38:42
6  should be some consistency of supply behind        13:38:44
7  that.        13:38:46
8       Q.   Okay.  Under Strengths, the        13:38:47
9  bottom bullet item says, "Lobbyists engaged        13:38:52
10 in legislation."        13:38:54
11      Do you recall at this time if        13:38:57
12 there were any particular legislative        13:38:58
13 initiatives that lobbyists were engaged in?        13:39:00
14      A.   I can't remember the specific        13:39:03
15 initiative.  I remember working with one of        13:39:09
16 our lobbyists at that time.  We were at a        13:39:12
17 meeting in Washington, DC, and I can't        13:39:16
18 remember specifically what that was around.        13:39:18
19 It might have had to do with REMS, because of        13:39:19
20 the cost of REMS.        13:39:22
21      Q.   Under Weaknesses there's        13:39:23
22 "prolonged supply issues," and that's        13:39:25
23 something we've touched on here today,        13:39:28
24 correct?        13:39:29
25      A.   Correct.        13:39:30

Page 179

1       Q.   And it appears that that        13:39:30
2  continued to be a problem up till the time        13:39:32
3  this document was prepared, correct?        13:39:36
4       A.   Correct.        13:39:37
5       Q.   Under Threats, first bullet        13:39:37
6  item is "pill mill legislation."        13:39:42
7       Why was pill mill legislation a        13:39:45
8  threat?        13:39:47
9       MR. O'CONNOR:  Objection.        13:39:47
10      THE WITNESS:  It wouldn't be        13:39:48
11  considered a threat.  It would mean --        13:39:51
12  a threat would be anything that would        13:39:53
13  adjust our business, so we had to        13:39:54
14  consider it.  So I wouldn't say it's a        13:39:58
15  threat, per se, that it's a reduction        13:40:00
16  in our business, so it's going to        13:40:02
17  impact the overall value of our        13:40:04
18  portfolio.        13:40:06
19 QUESTIONS BY MR. GOTTO:        13:40:06
20      Q.   Okay.  Do you know if there was        13:40:08
21 specific pending or proposed legislation        13:40:15
22 related to pill mills at this time that was        13:40:20
23 of particular interest?        13:40:22
24      A.   I really don't remember what        13:40:23
25 that was around.        13:40:28

Page 180

1       Q.   Okay.  Turn to slide 95,        13:40:30
2  please.  If it's easier, it's -- the Bates        13:40:46
3  number ends in 523 in the lower right-hand        13:40:47
4  corner.        13:40:52
5       A.   Perfect.  Thank you.        13:40:52
6       Q.   This slide is on promotional        13:40:53
7  positioning.        13:40:57
8       What's meant by that phrase,        13:40:57
9  "promotional positioning"?        13:41:01
10      A.   It means how are we different        13:41:02
11 than Mylan, Teva and other competitors at        13:41:04
12 that time.        13:41:07
13      Q.   Okay.  And the second main        13:41:07
14 bullet item says, "Primary focus is        13:41:12
15 Mallinckrodt is a leader in pain management."        13:41:14
16      Do you see that?        13:41:17
17      A.   Yes.        13:41:17
18      Q.   And under that, the bullet item        13:41:17
19 is "committed to education."        13:41:19
20      What's that referring to,        13:41:21
21 "committed to education"?        13:41:24
22      A.   At one time there -- and I'm --        13:41:25
23 and I'm sorry if I misstate this, but I        13:41:29
24 believe that there was a program intended to        13:41:31
25 educate about pain management, and there were        13:41:34

Page 181

1  alternative therapies such as medication and        13:41:38
2  things like that.        13:41:41
3       And I'm not sure -- we never        13:41:42
4  launched that program.  But I'm not sure what        13:41:45
5  it means in this context, what all we        13:41:48
6  intended to do.        13:41:50
7       Q.   Okay.  Two bullet items below        13:41:51
8  that, there's a bullet item "education about        13:41:57
9  the proper use of medication and therapeutic        13:41:58
10 category."        13:42:00
11      Do you see that?        13:42:01
12      A.   Yes.        13:42:01
13      Q.   Any more insight into education        13:42:02
14 in that context?        13:42:05
15      A.   Well, and it seems that we did        13:42:05
16 run a CE article, continuing education        13:42:08
17 article, about proper use, and I do know that        13:42:10
18 we looked at proper disposal of products,        13:42:13
19 especially with the launch of fentanyl patch,        13:42:16
20 so it was probably around that.        13:42:19
21      Q.   Okay.  And the next bullet        13:42:22
22 item, "Sponsor CE article in drug topics."        13:42:25
23      Do you know what that article        13:42:28
24 pertained to?        13:42:29
25      A.   I can't remember the specific        13:42:31

Page 182

1  topic.                                  13:42:32
2       Q.  Okay.  Next bullet item says,    13:42:33
3  "Our primary vehicles for getting out our   13:42:36
4  messages will be direct mail, Pharm/alert and  13:42:39
5  PDQ."                                  13:42:43
6       Direct mail in this setting,       13:42:44
7  what is that referring to?             13:42:46
8       A.  That would be send it out --    13:42:48
9  send information out -- there's two levels:   13:42:51
10  One is our buyers, our customers, which are  13:42:53
11  the warehousing chains, wholesalers and    13:42:55
12  distributors, or send something out to the   13:42:59
13  retail pharmacies, which is downstream a    13:43:01
14  little bit further.  And so we -- so      13:43:04
15  Pharm/alert goes to retail pharmacies.  They  13:43:07
16  can't sell them to hospital pharmacies, so   13:43:11
17  the pharmacists get information that way.    13:43:12
18       Q.  When you said "they can't sell   13:43:16
19  to hospital pharmacies," who is the "they"   13:43:39
20  you're referring to there?             13:43:41
21       Maybe I just didn't understand      13:43:45
22  your answer.  You were talking in terms of a  13:43:46
23  direct mail to pharmacies.             13:43:47
24       A.  It can go to hospital           13:43:50
25  pharmacies, hospital pharmacists.       13:43:53

Page 183

1       Q.  Okay.                         13:43:55
2       A.  So we did sell to pharmacies    13:43:55
3  through the wholesalers.               13:43:58
4       Q.  Okay.  And so direct mail could  13:43:59
5  go to retail pharmacies and hospital       13:44:02
6  pharmacies?                            13:44:03
7       A.  Correct.                       13:44:03
8       Q.  Okay.  And how often -- well,    13:44:04
9  who was in charge of any kind of direct mail  13:44:12
10  program that you engaged in from time to    13:44:19
11  time?                                  13:44:21
12       MR. O'CONNOR:  Object to form.     13:44:21
13       THE WITNESS:  In charge of and      13:44:21
14  actually --                            13:44:23
15  QUESTIONS BY MR. GOTTO:                 13:44:23
16       Q.  Who decided what was going to   13:44:24
17  get sent out to whom?                  13:44:25
18       A.  Well, that would be generated   13:44:27
19  out of my department, and usually instructed  13:44:28
20  by me and with approval of the president of   13:44:32
21  the division.                          13:44:35
22       Q.  Okay.  And so in terms of       13:44:35
23  direct mail to retail pharmacy or to hospital  13:44:38
24  pharmacy, what sort of information would you  13:44:40
25  provide to them in a direct mailing?    13:44:42

Page 184

1       A.  We would do a direct mail on    13:44:45
2  new products and tell them what product is    13:44:47
3  now available.  For example, I -- earlier I   13:44:49
4  spoke to that we had fentanyl patch, fentanyl  13:44:51
5  lozenge and methylphenidate, so we would give  13:44:51
6  them information if the product's available   13:44:56
7  so that they were aware.  Because they may    13:44:59
8  have been continuing to order -- even though  13:45:02
9  we might have gotten the award on a contract,  13:45:04
10  they may have continued to order from the    13:45:06
11  competitor, not knowing that we were now     13:45:08
12  available.                             13:45:10
13       Q.  Okay.  What is PDQ?            13:45:12
14       A.  PDQ is a pharm -- like          13:45:22
15  Pharm/alert or any other mail.  It's a     13:45:24
16  collection of pieces from different         13:45:26
17  manufacturers, and it comes in a big mailing  13:45:28
18  packet, you know, like some of the junk mail  13:45:30
19  you get, and so the pharmacists receive that.  13:45:32
20  And they get a whole packet of information    13:45:34
21  about new products and whatever other       13:45:36
22  information that other companies might want   13:45:40
23  to put out.                            13:45:43
24       Q.  Okay.  The next bullet item     13:45:43
25  says, "Other vehicles will be webinars, our  13:45:44

Page 185

1  website and e-mails."                   13:45:48
2       What types of webinars were        13:45:49
3  conducted?                             13:45:51
4       A.  I don't remember what webinars   13:45:52
5  we may or -- may have even done them, if we   13:45:56
6  did them at all.                       13:46:01
7       Q.  Who would have coordinated      13:46:02
8  webinar activity?                      13:46:03
9       A.  That would have been within     13:46:04
10  promotion -- within the promotional group,   13:46:07
11  which was in my team.                  13:46:10
12       Q.  Okay.  But you don't recall if   13:46:10
13  that actually was done?                13:46:12
14       A.  No, I don't recall that.        13:46:12
15       Q.  Turn to slide 97, please, two   13:46:14
16  after the one you're on.  It's a slide about  13:46:27
17  other promotional activities.          13:46:34
18       And there's a bullet, "advisory     13:46:36
19  boards, question mark, topics, value,       13:46:39
20  potential participants."               13:46:42
21       Do you recall if Mallinckrodt      13:46:43
22  became involved in any advisory boards?    13:46:48
23       A.  No, we did not.                13:46:51
24       Q.  Was there a decision made not   13:46:52
25  to do that, or is it just something that    13:46:54

Page 186

1   didn't come together?                    13:46:56
2       A.   It was a decision not to do it.  13:46:57
3       Q.   Do you know why?                 13:46:59
4       A.   My input was that there were    13:47:00
5   challenges in trying to decide who would be  13:47:04
6   on the board and what would even be the topic  13:47:06
7   that we wanted to discuss.  We couldn't  13:47:10
8   perceive it to be something that we were  13:47:11
9   having the customers do to give the customers  13:47:13
10  a day out of the office.                 13:47:16
11      It needed to be something that    13:47:17
12  was constructive for the company.  We    13:47:18
13  couldn't come up with what would be value for  13:47:20
14  the company.                             13:47:22
15      Q.   And if you turn to the next    13:47:23
16  slide, slide 98, it's Generic Business   13:47:35
17  Expenses, and the first line, which says,  13:47:45
18  "Product Manager Collier."  And there's some  13:47:47
19  prior year, fiscal '12 and fiscal '13    13:47:52
20  figures, which show a significant increase in  13:47:56
21  fiscal year '13 budget versus the prior  13:47:58
22  years.                                   13:48:00
23      Do you know what the reason for   13:48:00
24  that is?                                 13:48:02
25      A.   I think this was with the      13:48:03

Page 187

1   launch -- this may have been that we were  13:48:05
2   preparing for the launch of -- one, I had  13:48:10
3   more people on my staff to do more analytics,  13:48:12
4   and this may have had to do something with  13:48:15
5   the launch of methylphenidate, that we needed  13:48:18
6   to increase the staffing prior to launch, and  13:48:21
7   just better analytics around all of our sales  13:48:24
8   numbers.                                 13:48:27
9       Q.   Okay.  You can set that aside.  13:48:27
10      A.   Okay.                          13:48:38
11      (Mallinckrodt-Collier Exhibit   13:49:10
12  14 marked for identification.)          13:49:10
13  QUESTIONS BY MR. GOTTO:                  13:49:10
14      Q.   Ms. Collier, Exhibit 14 is a   13:49:18
15  multipage document beginning at Bates    13:49:21
16  MNK-T1_0000663716.  Appears to be a strategic  13:49:28
17  plan for the years 2014 through '19.  Again,  13:49:30
18  I just have a couple of questions for you on  13:49:35
19  the document.                            13:49:37
20      A.   Okay.                          13:49:37
21      Q.   But if you can look through it  13:49:37
22  briefly just to familiarize yourself and  13:49:39
23  confirm that you are familiar with it.   13:49:41
24      A.   Okay.                          13:49:43
25      Q.   Are you familiar with this     13:51:02

Page 188

1   document?                                13:51:03
2       A.   Yes, I am.                      13:51:03
3       Q.   And what is it?                 13:51:04
4       A.   It's a strategic plan developed  13:51:05
5   by the generics group, generics marketing  13:51:07
6   group, for periods 2014 to 2019.         13:51:10
7       Q.   Okay.  And did you participate  13:51:12
8   in the preparation of this document?     13:51:13
9       A.   Yes, I did.                     13:51:15
10      Q.   Okay.  If you would turn to    13:51:16
11  slide 8, please.  The Bates number ends in  13:51:18
12  723.                                     13:51:25
13      A.   (Witness complies.)            13:51:28
14      Q.   This is a trends slide, and the  13:51:29
15  bottom half, there's a bullet item talking  13:51:35
16  about "abuse-deterrent legislation."     13:51:37
17      Do you see that?                  13:51:40
18      A.   Yes.                           13:51:40
19      Q.   What was abuse-deterrent       13:51:41
20  legislation as used in this slide?       13:51:44
21      A.   There was consideration by     13:51:46
22  several states to have products that if there  13:51:47
23  was an abuse-deterrent product available,  13:51:49
24  that they would give preference to that drug  13:51:53
25  over other nonabuse-deterrent drugs.     13:51:57

Page 189

1       Q.   Okay.  And the very last bullet  13:51:59
2   item on this slide says, "Mallinckrodt and  13:52:00
3   GPHA are opposed to this."               13:52:03
4       Is that the abuse-deterrent      13:52:06
5   legislation that Mallinckrodt was opposed to?  13:52:09
6       MR. O'CONNOR:  Object to form.    13:52:09
7       THE WITNESS:  Yes, I would       13:52:11
8   assume based where it's placed in the    13:52:12
9   slide, yes.                              13:52:15
10  QUESTIONS BY MR. GOTTO:                  13:52:15
11      Q.   And do you know why           13:52:15
12  Mallinckrodt was opposed to abuse-deterrent  13:52:16
13  legislation?                             13:52:21
14      A.   No, but I -- I could speculate,  13:52:21
15  but I would think that it would be better  13:52:23
16  placed with the lobbyists that were working  13:52:25
17  on the program.                          13:52:28
18      Q.   Okay.  All right.  And if you  13:52:28
19  would turn to the Bates -- Bates number 768  13:52:31
20  at the end, toward the back of the document.  13:52:35
21  It's slide 53.  It's the SWOT analysis.  13:52:38
22      And this is similar to the SWOT  13:52:50
23  analysis we looked at in the prior exhibit.  13:52:52
24      Under Threats, though, I had a   13:52:54
25  question on the last item: "Continued    13:52:58

Page 190

1  attempts by government to restrict access in  13:53:00
2  an effort to reduce abuse or misuse which  13:53:02
3  affects pain patients."  13:53:06
4       Do you know what continued  13:53:07
5  attempts by the government are being referred  13:53:11
6  to in that bullet item?  13:53:14
7       A.  Yes.  It would have been  13:53:16
8  switching -- for here, for example,  13:53:20
9  hydrocodone APAP to a C-II to restrict access  13:53:22
10  so patients were getting fewer pills.  So we  13:53:26
11  would have to accommodate the new request by  13:53:28
12  the government, and what would that mean in  13:53:31
13  our total volume.  13:53:33
14       Q.  Okay.  And that was a threat to  13:53:35
15  Mallinckrodt for what reason?  13:53:36
16       A.  It just would be a reduction in  13:53:38
17  our overall volume of units and sales,  13:53:40
18  obviously.  13:53:44
19       Q.  Okay.  You can set that aside.  13:53:44
20       (Mallinckrodt-Collier Exhibits  13:54:19
21       15 and 16 marked for identification.)  13:54:20
22  QUESTIONS BY MR. GOTTO:  13:54:20
23       Q.  We've marked as Exhibit 15 a  13:54:53
24  single-page e-mail bearing Bates  13:54:57
25  MNK-T1_0000418885, and as Exhibit 16 what I  13:55:00

Page 191

1  believe is one of the attachments to that  13:55:08
2  e-mail, a multipage document that was  13:55:12
3  produced in native form under Bates  13:55:17
4  MNK-T1_0000418886.  13:55:15
5       Take a look at those documents,  13:55:25
6  if you would, and tell me if you recognize  13:55:29
7  them.  13:55:31
8       A.  Yes, I do recognize them.  13:55:32
9       Q.  And what are they?  13:55:38
10       A.  This is a sales report that was  13:55:39
11  pulled to indicate if some of our customers  13:55:44
12  were buying from more than one distributor,  13:55:48
13  because we did not typically look at that.  13:55:49
14  We just would get chargebacks from individual  13:55:52
15  wholesalers or distributors and never looked  13:55:55
16  across the channel to see if they were  13:55:57
17  possibly buying from other distributors.  13:55:59
18       Q.  And why was that of interest to  13:56:01
19  you, whether they were buying from other  13:56:03
20  distributors?  13:56:04
21       MR. O'CONNOR:  Object to form.  13:56:05
22       THE WITNESS:  It was my thought  13:56:06
23  that our distributors may not know  13:56:10
24  that -- distributors and wholesalers  13:56:14
25  each have a limit, too, in which  13:56:15

Page 192

1  they'll sell to the customer.  They  13:56:17
2  may not know that that particular  13:56:18
3  customer is buying from other  13:56:19
4  distributors or wholesalers.  13:56:21
5       So because of the issue in  13:56:22
6  Florida, we looked at Florida and  13:56:24
7  pulled those customers that we thought  13:56:27
8  were possibly buying from other  13:56:29
9  distributors.  13:56:33
10  QUESTIONS BY MR. GOTTO:  13:56:34
11       Q.  Okay.  So is this the work  13:56:34
12  product that you were referring to earlier  13:56:37
13  today when you talked about analysis that you  13:56:39
14  and Ms. Muhlenkamp did after the Sunrise  13:56:41
15  issues surfaced?  13:56:46
16       A.  Correct.  13:56:47
17       Q.  Okay.  So the attachment --  13:56:48
18  just to be sure I understand the -- what's  13:56:52
19  depicted here.  Customer name -- the customer  13:56:57
20  in the context of Exhibit 16 is  13:57:00
21  Mallinckrodt's customer's customer, correct?  13:57:03
22       MR. O'CONNOR:  Object to form.  13:57:07
23       THE WITNESS:  Well, I want to  13:57:08
24  be clear I'm not sure, because what  13:57:11
25  could happen is one of our customers  13:57:12

Page 193

1  could sell to another pharmacy, and  13:57:14
2  that pharmacy, in turn, sold to other  13:57:16
3  pharmacies.  So it's never really  13:57:19
4  clear unless we get chargeback data  13:57:21
5  back on where it went.  13:57:26
6  QUESTIONS BY MR. GOTTO:  13:57:27
7       Q.  Okay.  So is the customer  13:57:28
8  that's listed on Exhibit 16 the entity that  13:57:29
9  would be identified as a customer in the  13:57:32
10  chargeback report that Mallinckrodt  13:57:34
11  maintained?  13:57:37
12       A.  Correct.  13:57:37
13       Q.  Okay.  And that may be the  13:57:38
14  direct customer of Mallinckrodt's customer or  13:57:45
15  may be an indirect customer of Mallinckrodt's  13:57:48
16  customer; is that fair?  13:57:51
17       MR. O'CONNOR:  Object to form.  13:57:52
18       THE WITNESS:  Correct.  13:57:52
19  QUESTIONS BY MR. GOTTO:  13:57:53
20       Q.  And this report is for the  13:58:04
21  September 2010 time period; is that correct?  13:58:07
22       A.  Yes.  It appears to be.  13:58:09
23       Q.  Is this the first time that you  13:58:15
24  and Ms. Muhlenkamp gathered this information;  13:58:33
25  do you know?  13:58:36

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1  A.  Yes.                          13:58:37
2  Q.  Okay.                         13:58:38
3  A.  That I remember it is.        13:58:38
4  Q.  Okay.  Did you engage in this  13:58:40
5  data gathering process again in the future?  13:58:44
6        MR. O'CONNOR:  Object to form.  13:58:47
7        THE WITNESS:  Not that I     13:58:48
8  recall.                           13:58:51
9  QUESTIONS BY MR. GOTTO:           13:58:51
10 Q.  Okay.  So according to        13:58:52
11 Exhibit 15, your cover e-mail, you sent this  13:58:56
12 to Mr. Becker, Mr. Borelli and Ms. Williams,  13:58:58
13 correct?                          13:59:04
14 A.  Correct.                      13:59:04
15 Q.  And did you have further      13:59:05
16 discussions with them regarding the data or  13:59:06
17 any further evaluation of this data?  13:59:09
18       MR. O'CONNOR:  Object to form.  13:59:13
19       THE WITNESS:  Yes, we did.   13:59:13
20 QUESTIONS BY MR. GOTTO:           13:59:14
21 Q.  What can you recall?          13:59:14
22 A.  I recall having a discussion  13:59:15
23 with them that they needed to talk to their  13:59:18
24 distributors and wholesalers and advise them  13:59:20
25 that these might be problem customers and  13:59:23

Page 195

1  that we would no longer issue chargebacks --  13:59:26
2  or pay them chargebacks for these customers  13:59:28
3  if they continued selling to them.  13:59:30
4  Q.  Okay.  And so would that be the  13:59:32
5  case as to any of your customers' customers  13:59:36
6  if they were buying from multiple  13:59:38
7  distributors, you would not pay chargebacks  13:59:40
8  to your -- to Mallinckrodt's distributor?  13:59:42
9        MR. O'CONNOR:  Object to form.  13:59:44
10       THE WITNESS:  No, it was     13:59:45
11  specific to these customers that we  13:59:48
12  identified, and that was all.    13:59:50
13 QUESTIONS BY MR. GOTTO:           13:59:52
14 Q.  Okay.                         13:59:52
15 A.  I don't know if anybody else  13:59:52
16 took action later.                13:59:55
17 Q.  Okay.  But the rationale was  13:59:57
18 because they were buying from multiple  13:59:58
19 distributors, Mallinckrodt wouldn't pay  14:00:00
20 chargebacks to the distributor who was buying  14:00:03
21 from Mallinckrodt, correct?       14:00:05
22 A.  Correct.                      14:00:06
23       MR. O'CONNOR:  Object to form.  14:00:06
24 QUESTIONS BY MR. GOTTO:           14:00:06
25 Q.  Okay.  And the second entry on  14:00:13

Page 196

1  the list, the Tru-Valu Drugs customer, that  14:00:15
2  was buying from six distributors, correct?  14:00:19
3  A.  Yes.                          14:00:22
4  Q.  How did you ascertain how many  14:00:23
5  different distributors a customer was buying  14:00:26
6  from?                             14:00:30
7  A.  Kate Neely, Kate Muhlenkamp,  14:00:30
8  pulled this, and I'm not sure exactly, but  14:00:36
9  I'm sure in a query you can develop this and  14:00:38
10 then have what distributor or wholesaler  14:00:41
11 issued the chargeback.  So she would be able  14:00:46
12 to ascertain from that.           14:00:48
13 Q.  So the number of distributors  14:00:50
14 here -- so, for example, Tru-Valu Drugs  14:00:57
15 buying from six different distributors, are  14:01:01
16 those six different Mallinckrodt  14:01:03
17 distributors?                     14:01:06
18 A.  Correct.                      14:01:06
19 Q.  Okay.  So it's possible they  14:01:08
20 could have been buying from other parties as  14:01:11
21 well, correct?                    14:01:13
22 A.  Correct.                      14:01:13
23 Q.  Okay.  Is there -- what would  14:01:14
24 be a business reason why a party identified  14:01:31
25 as a customer on this list would buy from  14:01:35

Page 197

1  multiple Mallinckrodt distributors?  14:01:37
2  A.  I'm not sure why they would do  14:01:40
3  that.  I don't know if you need me to  14:01:45
4  speculate, but I'm not sure that I know why  14:01:50
5  each individual customer did that.  14:01:53
6  Q.  Okay.  When you gathered this  14:01:57
7  information, was it surprising to you to  14:02:01
8  learn how many distributors these customers  14:02:04
9  were buying from?                 14:02:08
10       MR. O'CONNOR:  Object to form.  14:02:09
11       THE WITNESS:  Yes.           14:02:10
12 QUESTIONS BY MR. GOTTO:           14:02:11
13 Q.  Would your expectation have    14:02:12
14 been that they would have been buying from  14:02:13
15 just one distributor?             14:02:16
16 A.  Yes.                          14:02:18
17 Q.  And in the month of September,  14:02:18
18 if I'm reading this correctly, it's  14:02:32
19 approximately a million and a half dollars of  14:02:35
20 gross sales to these various customers; is  14:02:38
21 that correct?                     14:02:40
22 A.  Yes.                          14:02:40
23 Q.  Do you have any estimate of the  14:02:41
24 percentage of sales of Mallinckrodt product  14:02:51
25 in September of 2010 that went to the state  14:02:56

Page 198

1  of Florida, what percentage of those sales  14:02:59
2  are reflected on Exhibit 16?  14:03:02
3  MR. O'CONNOR: Object to form.  14:03:05
4  THE WITNESS: I don't know.  14:03:06
5  QUESTIONS BY MR. GOTTO:  14:03:06
6  Q.  Was any effort made to  14:03:08
7  ascertain that?  14:03:10
8  A.  I'm sure that we knew  14:03:11
9  somewhere, but I didn't know for a fact based  14:03:13
10  on this.  14:03:14
11  Q.  Do you know if the chargeback  14:03:16
12  database that Mallinckrodt maintained would  14:03:27
13  have been a source for that information?  14:03:30
14  MR. O'CONNOR: Object to form.  14:03:31
15  THE WITNESS: Could you repeat  14:03:32
16  the question?  14:03:35
17  QUESTIONS BY MR. GOTTO:  14:03:35
18  Q.  Yeah.  14:03:36
19  My question about the  14:03:36
20  percentage of sales into Florida that these  14:03:37
21  Exhibit 16 sales reflect, do you know if the  14:03:42
22  chargeback data that Mallinckrodt maintained  14:03:44
23  could have been queried to ascertain the  14:03:48
24  answer to that question?  14:03:51
25  MR. O'CONNOR: Object to form.  14:03:51

Page 199

1  THE WITNESS: I would assume  14:03:52
2  so, because we did it here.  14:03:53
3  QUESTIONS BY MR. GOTTO:  14:03:55
4  Q.  And I think you indicated  14:04:00
5  earlier that when you spoke to Mr. Becker and  14:04:06
6  Borelli and Ms. Williams about this data,  14:04:14
7  part of the idea was to let the distributors  14:04:17
8  know what you had discovered.  14:04:20
9  Do you know if that's -- if  14:04:24
10  that information would otherwise have been  14:04:27
11  available to Mallinckrodt's distributor  14:04:30
12  customers?  14:04:33
13  MR. O'CONNOR: Object to form.  14:04:33
14  QUESTIONS BY MR. GOTTO:  14:04:34
15  Q.  In other words, would they have  14:04:34
16  had any independent way of ascertaining which  14:04:36
17  of their customers were buying from other  14:04:40
18  Mallinckrodt distributors?  14:04:41
19  MR. O'CONNOR: Same objection.  14:04:42
20  THE WITNESS: I wouldn't know  14:04:43
21  what their systems could do.  14:04:45
22  QUESTIONS BY MR. GOTTO:  14:04:47
23  Q.  Okay. And I think you've  14:04:47
24  already testified you performed this analysis  14:04:55
25  just this one time that's reflected here on  14:04:57

Page 200

1  Exhibit 16, correct?  14:04:59
2  A.  Correct.  14:05:00
3  MR. O'CONNOR: Object to form.  14:05:01
4  QUESTIONS BY MR. GOTTO:  14:05:01
5  Q.  Do you know if any similar  14:05:02
6  analysis was ever conducted with respect to  14:05:05
7  sales in states other than Florida?  14:05:08
8  A.  I believe there were other  14:05:11
9  states listed in here. Well, I know there  14:05:15
10  are, so I don't know if it was just run for  14:05:19
11  all states or if there was a limited  14:05:22
12  population that we were looking for.  14:05:25
13  Q.  Well, it appears that the  14:05:28
14  significant -- the substantial majority of  14:05:32
15  the states -- of the customers on here are  14:05:36
16  identified as Florida, although there were  14:05:38
17  multiple other states listed as well.  14:05:47
18  Do you know -- is it your  14:05:42
19  understanding that this list, Exhibit 16, is  14:05:45
20  a list of all of the parties identified as  14:05:49
21  customer in Mallinckrodt's chargeback data  14:05:52
22  for September 2010 who were indicated to have  14:05:55
23  bought from multiple distributors?  14:05:59
24  A.  To my knowledge, this was the  14:06:01
25  list.  14:06:03

Page 201

1  Q.  Okay.  14:06:03
2  A.  This is the entire list.  14:06:04
3  Q.  For all states?  14:06:05
4  A.  And I want to be clear, too.  14:06:07
5  It says September 2010. I don't know the  14:06:09
6  time frame on this.  14:06:12
7  Q.  Okay. Do you have an  14:06:12
8  understanding of what the reference to  14:06:16
9  September 2010 in the title of the document  14:06:19
10  means?  14:06:21
11  A.  That's when the query was  14:06:22
12  pulled for the September -- in 2010. She  14:06:24
13  does not have a specific date on here. We  14:06:28
14  normally would have documented that  14:06:32
15  somewhere.  14:06:33
16  Q.  Do you --  14:06:33
17  A.  But --  14:06:35
18  Q.  Go ahead.  14:06:36
19  A.  Okay. It was run on  14:06:36
20  11/19/2010, but she doesn't even say there if  14:06:38
21  it's just one month or -- I don't know the  14:06:41
22  time frame, sorry.  14:06:43
23  Q.  Okay. So you don't know if the  14:06:44
24  data -- if the sales that are reflected on  14:06:45
25  Exhibit 16 occurred in September 2010 or at  14:06:49

Page 202

```
1  some other point?                    14:06:52
2      A.   Right.                       14:06:53
3      Q.   Presumably it would have     14:06:54
4  included September 2010, but it might have  14:06:56
5  extended beyond that?                 14:06:59
6      A.   Correct.                     14:07:00
7      Q.   You just don't know?         14:07:00
8      A.   Correct.                     14:07:02
9      Q.   Okay.  And so if it's the case  14:07:03
10 that Exhibit 16 reflects all of the customers  14:07:11
11 buying from multiple Mallinckrodt     14:07:16
12 distributors for whatever time period is  14:07:18
13 applicable here, it would appear to be the  14:07:20
14 case that that phenomenon of customers buying  14:07:23
15 from multiple distributors was highly  14:07:28
16 concentrated, if not exclusive, to the state  14:07:32
17 of Florida.                           14:07:34
18          It was at least highly       14:07:35
19 concentrated in Florida, correct?     14:07:37
20          MR. O'CONNOR:  Object to form.  14:07:38
21          THE WITNESS:  This would     14:07:39
22      reflect only those customers or  14:07:40
23      pharmacies that were issued a    14:07:42
24      chargeback as part of a contract.  14:07:43
25          So I cannot speak to that,   14:07:45
```

Page 203

```
1      because I don't know who purchased the  14:07:47
2      product at this price from the  14:07:49
3      wholesaler or at some other -- on  14:07:50
4      other various contracts or various  14:07:54
5      pharmacy names.  So it could be  14:07:56
6      misleading if I tell you yes.  14:07:58
7  QUESTIONS BY MR. GOTTO:              14:08:00
8      Q.   Okay.  But certainly among the  14:08:00
9  universe of customers whose purchases gave  14:08:03
10 rise to a chargeback claim that a distributor  14:08:05
11 made to Mallinckrodt, it's the case that this  14:08:08
12 phenomenon of purchases from multiple  14:08:11
13 distributors was heavily concentrated in  14:08:13
14 Florida?                              14:08:15
15          MR. O'CONNOR:  Object to form.  14:08:15
16          THE WITNESS:  It appears so,  14:08:16
17      yes.                            14:08:20
18 QUESTIONS BY MR. GOTTO:              14:08:20
19     Q.   And on page 3, the David's  14:08:21
20 Pharmacy line is highlighted.         14:08:25
21          Do you have any idea why that  14:08:26
22 is?  Is it because it's the average?  14:08:28
23     A.   Correct.                     14:08:30
24     Q.   And that percent to average  14:08:31
25 column, what is that reflecting?      14:08:35
```

Page 204

```
1      A.   It's the percent of the total  14:08:38
2  units.  And so she had to divide where --  14:08:43
3  where was the units, who was the average, who  14:08:48
4  was the median, the most frequent number, and  14:08:51
5  so the total dispensed units.          14:08:54
6      Q.   Okay.  So it's a comparison.  14:08:57
7          So, for example, West Coast  14:08:58
8  Pharmacy on the first page, 499.7 percent is  14:09:00
9  a comparison of the 173,900 to the 34,800 for  14:09:05
10 David's Pharmacy?                     14:09:11
11     A.   Yes, that would be the --    14:09:13
12 they're 499 percent to the average purchaser.  14:09:17
13     Q.   Okay.  Thank you.            14:09:20
14          At the time of the preparation  14:09:43
15 of the analysis or the compilation that's  14:09:44
16 reflected on Exhibit 16, did you make any  14:09:50
17 attempt to evaluate the magnitude of sales  14:09:53
18 from Mallinckrodt to any of the particular  14:10:03
19 distributors who -- whose customers, direct  14:10:06
20 or indirect, are reflected on Exhibit 16?  14:10:11
21     A.   I do remember knowledge of --  14:10:14
22 that there were certain distributors or  14:10:19
23 wholesalers in the list.               14:10:21
24     Q.   And whom do you recall being in  14:10:23
25 that category?                        14:10:25
```

Page 205

```
1      A.   I remember Smith Drug was one  14:10:25
2  of them.                              14:10:28
3      Q.   Okay.  Do you remember if there  14:10:29
4  was any particular analysis of KeySource?  14:10:32
5          MR. O'CONNOR:  Object to form.  14:10:39
6          THE WITNESS:  I don't.        14:10:40
7  QUESTIONS BY MR. GOTTO:              14:10:41
8      Q.   Okay.  And how about Sunrise?  14:10:41
9          MR. O'CONNOR:  Object to form.  14:10:42
10         THE WITNESS:  I don't remember  14:10:44
11     that either.                     14:10:44
12         At that time I'm not sure if  14:10:45
13     they were still in our sales, because  14:10:46
14     I'm not sure when the DEA took  14:10:49
15     enforcement action on them.        14:10:52
16 QUESTIONS BY MR. GOTTO:              14:10:54
17     Q.   Okay.  You can set those aside.  14:10:54
18         (Mallinckrodt-Collier Exhibit  14:11:26
19     17 marked for identification.)     14:11:26
20 QUESTIONS BY MR. GOTTO:              14:11:26
21     Q.   We have marked as Exhibit 17 a  14:11:26
22 multipage e-mail thread beginning at  14:11:30
23 MNK-T1_0000483766, and it's an e-mail  14:11:33
24 exchange from June of 2010 concerning  14:11:41
25 oxycodone sales in Florida.            14:11:45
```

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    Take a moment to look at those    14:11:47
2 and -- those e-mails. Let me know after    14:11:50
3 you've reviewed them.    14:11:53
4    A.    Okay.    14:11:55
5    Q.    Do you recognize those e-mails?    14:12:56
6    A.    Yes, I do.    14:12:58
7    Q.    Okay. So turning to the    14:13:00
8 earliest in time in the thread, from    14:13:03
9 Ms. Muhlenkamp on June 18th, e-mail from her    14:13:08
10 to a number of people and copying you, she    14:13:13
11 talks about Harvard Drug's license being    14:13:21
12 suspended. She then goes on to mention that    14:13:26
13 Sunrise wholesaler's DEA license was    14:13:30
14 suspended.    14:13:34
15    And then she says, "The two    14:13:34
16 wholesaler distributor license suspensions    14:13:36
17 led us to do a more in-depth analysis of    14:13:38
18 Covidien's oxycodone sales in the state of    14:13:42
19 Florida. We specifically focused on doctors'    14:13:44
20 offices and pain clinics."    14:13:49
21    And is that the initiative that    14:13:51
22 we discussed this morning --    14:13:53
23    A.    Yes, it is.    14:13:54
24    Q.    -- where she queried the    14:13:54
25 chargeback database?    14:13:57

Page 207

1    A.    Yes.    14:13:58
2    Q.    Okay. She says, "It appears    14:13:59
3 that Harvard and Sunrise were the dominant    14:14:04
4 players in this market, with over 50 percent    14:14:06
5 of their total sales coming from this market.    14:14:08
6 HD Smith, KeySource and McKesson Onestop are    14:14:11
7 next, with only 3 percent to their total    14:14:15
8 sales coming from doctors' offices and pain    14:14:17
9 clinics."    14:14:19
10    She goes on to say, "Karen    14:14:20
11 Harper and team, parens, internal Covidien    14:14:22
12 investigators, paren, will be working closely    14:14:25
13 with the DEA regarding their investigation of    14:14:28
14 the distribution of oxycodone in Florida, and    14:14:32
15 we will keep you apprised of further    14:14:34
16 happenings, period."    14:14:37
17    You then -- you responded to    14:14:41
18 that e-mail by saying, "It was excellent.    14:14:44
19 You may want to send this to Karen Harper,    14:14:46
20 too."    14:14:48
21    Correct?    14:14:49
22    A.    Yes.    14:14:49
23    Q.    And so before Ms. Muhlenkamp    14:14:50
24 sent her e-mail, her June 18th e-mail, had    14:14:58
25 she discussed with you the results of the    14:15:00

Page 208

1 investigatory work she had done?    14:15:05
2    A.    Yes, she did.    14:15:07
3    MR. O'CONNOR: Object to form.    14:15:07
4 QUESTIONS BY MR. GOTTO:    14:15:08
5    Q.    Okay. And she sent her    14:15:10
6 e-mail -- I just would like to understand who    14:15:13
7 the folks are that she sent it to.    14:15:15
8    Who was Dave Irwin?    14:15:17
9    A.    Dave Irwin was a national    14:15:19
10 account manager.    14:15:21
11    Q.    Okay. As was Mr. Becker,    14:15:22
12 correct?    14:15:24
13    A.    Correct.    14:15:24
14    Q.    And how about Tim Berry?    14:15:25
15    A.    National account manager.    14:15:28
16    Q.    And Bonnie New?    14:15:29
17    A.    Correct, national account    14:15:30
18 manager.    14:15:33
19    Q.    As was Mr. Borelli and Dan    14:15:33
20 Sanders?    14:15:37
21    A.    Yes.    14:15:38
22    Q.    Also a national account    14:15:38
23 manager?    14:15:39
24    A.    Yes, for hospital accounts.    14:15:39
25    Q.    And Rich McKendrick?    14:15:40

Page 209

1    A.    Yes, he was for government    14:15:43
2 accounts.    14:15:45
3    Q.    And Alex McGregor?    14:15:45
4    A.    National account manager for    14:15:47
5 hospital accounts.    14:15:49
6    Q.    Okay. And on the cc line, who    14:15:50
7 was Robert Lesnak?    14:15:52
8    A.    Robert Lesnak led the hospital    14:15:53
9 institutional sales team and addiction    14:15:56
10 treatment team. He's a sales leader.    14:15:59
11    Q.    And so when you and    14:16:03
12 Ms. Muhlenkamp discussed the results of her    14:16:10
13 work before she sent the e-mail out, did you    14:16:13
14 instruct her who to forward the information    14:16:15
15 to?    14:16:19
16    A.    Yes. I would have been    14:16:19
17 included in the conversation. I don't think    14:16:22
18 I instructed her, but I think I was included    14:16:24
19 in the conversation to copy everyone.    14:16:27
20    Q.    Okay. And what was the reason    14:16:28
21 for providing this information to the    14:16:29
22 national account managers?    14:16:33
23    A.    To apprise them that there was    14:16:33
24 a problem with accounts and to be aware of    14:16:35
25 who might be targeted next and who they    14:16:38

Page 210

1   should be watching; if there was any issues    14:16:44
2   going on with the account, that they should    14:16:46
3   be aware of it.                               14:16:49
4       Q.   Okay.  And so the analysis that      14:16:49
5   Ms. Muhlenkamp did here regarding doctors'    14:16:52
6   offices and pain clinics, that's a separate   14:16:56
7   analysis from the multi-distributor analysis  14:16:58
8   we looked at a few minutes ago, correct?      14:17:01
9           MR. O'CONNOR:  Object to form.        14:17:02
10          THE WITNESS:  Yes.                     14:17:03
11  QUESTIONS BY MR. GOTTO:                        14:17:04
12      Q.   And you then suggested to            14:17:11
13  Ms. Muhlenkamp that she send her e-mail to     14:17:14
14  Karen Harper.                                  14:17:16
15          What was your reason for that?        14:17:16
16      A.   I think Karen Harper, as the         14:17:18
17  lead of the suspicious order monitoring or     14:17:21
18  the compliance team, that she needed to be     14:17:22
19  fully aware of what we uncovered in case she   14:17:25
20  gets questions herself, that she could be      14:17:29
21  fully informed.                               14:17:32
22      Q.   So at this time you had been at      14:17:33
23  Mallinckrodt about nine or ten -- about 10 or  14:17:34
24  11 months, correct?                            14:17:37
25      A.   Correct.                             14:17:38

Page 211

1       Q.   Had you -- as of the time of         14:17:39
2   Ms. Muhlenkamp's e-mail, had you dealt with    14:17:42
3   Ms. Harper at all?                             14:17:45
4       A.   Yes, I had.                          14:17:45
5       Q.   In what context?                     14:17:47
6       A.   Conversations and some              14:17:48
7   educational materials around suspicious order  14:17:53
8   monitoring because I was not as familiar with  14:17:56
9   it as I needed to be.                          14:17:58
10          And I went with her to -- she         14:18:00
11  was doing site visits to a couple of          14:18:06
12  facilities, and I went with her to            14:18:08
13  visits.                                       14:18:10
14      Q.   Okay.  Where can you remember        14:18:10
15  going for site visits?                         14:18:11
16      A.   Masters Drug and Masters            14:18:14
17  Wholesale and KeySource.                       14:18:17
18      Q.   Are those in Cincinnati?             14:18:18
19      A.   Masters?  Yes.                        14:18:20
20      Q.   Okay.  And about when did those      14:18:22
21  site visits occur, if you can recall?          14:18:26
22      A.   I can't.  It was fairly early       14:18:29
23  in my tenure --                                14:18:30
24      Q.   Okay.                                14:18:33
25      A.   -- with Mallinckrodt.               14:18:33

Page 212

1       Q.   And what was your reason for        14:18:34
2   making those site visits?                      14:18:35
3       A.   I had not dealt with some of        14:18:37
4   these distributors in the past, and I was not  14:18:38
5   familiar with them, so I was curious as to     14:18:41
6   what they were about and how they did          14:18:43
7   business.                                     14:18:44
8       Q.   Did you ever express to anyone       14:18:45
9   at Mallinckrodt at this time period, early in  14:18:53
10  your tenure, any sentiments that would         14:18:59
11  indicate a skepticism of the distributors in   14:19:02
12  any regard?                                    14:19:06
13          MR. O'CONNOR:  Object to form.         14:19:07
14          THE WITNESS:  I think my               14:19:08
15  skepticism on dealing with most of            14:19:10
16  these distributors is that they --            14:19:12
17  their value was driving down the price         14:19:14
18  in the market, and as a business --           14:19:15
19  sound business practice, that's not           14:19:18
20  good.  You're driving down the value          14:19:20
21  of your own business because you're           14:19:22
22  selling to them, they're underselling        14:19:24
23  the wholesalers that actually provide          14:19:26
24  a value in a marketplace, and so they         14:19:28
25  were undermining the marketplace.  And        14:19:31

Page 213

1   I was concerned about that.                   14:19:33
2           On my tour to Masters, I do          14:19:36
3   remember that was a little bit taken         14:19:38
4   aback about their sales practice.             14:19:41
5   That's not something I had normally          14:19:42
6   seen in the pharmaceutical industry.          14:19:44
7   And that they were selling on price          14:19:45
8   and shouting out deals, and that was          14:19:47
9   very shocking to me.                          14:19:49
10  QUESTIONS BY MR. GOTTO:                        14:19:51
11      Q.   Okay.  And when you say              14:19:51
12  "selling on price and shouting out deals,"     14:19:52
13  what -- in what sort of setting do you mean    14:19:55
14  that?                                         14:19:57
15      A.   They had someone at the front        14:19:58
16  would say, "Now we're selling acetaminophen   14:20:00
17  for two dollars a bottle from this company,"   14:20:05
18  and that is not how I normally saw it; that    14:20:08
19  they typically would call the customer and     14:20:10
20  ask them what they needed.                     14:20:13
21          This one was that they were          14:20:14
22  doing calls out and driving sales to          14:20:15
23  particular products based on pricing.          14:20:18
24      Q.   Huh.                                 14:20:20
25          And in your experience, that         14:20:21

Page 214

1    was not something you were familiar with in    14:20:24
2    the industry?                                   14:20:27
3        A.   I had not seen it done that            14:20:27
4    way, no.                                        14:20:29
5        Q.   On the second page of the              14:20:29
6    exhibit, there's an e-mail from                 14:20:44
7    Ms. Muhlenkamp to Karen Harper, copying you,    14:20:46
8    saying, "We communicated the bullet to our      14:20:50
9    sales team.  We tried to word it carefully as   14:20:54
10   to not overstep any actions you are taking."    14:20:56
11       Do you know what actions                    14:20:58
12   Ms. Harper may have been taking that            14:21:00
13   Ms. Muhlenkamp was being careful not to         14:21:04
14   overstep?                                       14:21:07
15       A.   Right.  Our role in marketing          14:21:08
16   was not to be a compliance team.  That was      14:21:10
17   not what we did.  So we were very sensitive     14:21:13
18   to that Karen had her job, she dealt with the   14:21:17
19   DEA, she had to deal with the customers on      14:21:21
20   these issues.  So that's why I was a little     14:21:23
21   uncomfortable about us sending out              14:21:25
22   communication that Karen was not aware of,      14:21:26
23   because she needed to be aware of everything    14:21:28
24   that was being said.                            14:21:29
25       So that's -- that's where it                14:21:30

Page 215

1    is.  We don't want -- we want to be careful     14:21:32
2    not to overstep our boundary as marketing       14:21:34
3    people.  That's not what we do.                 14:21:37
4        She drives compliance and tells            14:21:39
5    us what we need to do, and we follow her        14:21:40
6    direction.  We don't provide the direction.     14:21:44
7        Q.   Okay.  You can set that aside.         14:21:46
8            (Mallinckrodt-Collier Exhibit           14:22:12
9            18 marked for identification.)          14:22:12
10   QUESTIONS BY MR. GOTTO:                         14:22:12
11       Q.   Exhibit 18 is a single-page            14:22:19
12   document, MNK-T1_0000496062, suspicious order   14:22:21
13   monitoring team charter, updated April 7th of   14:22:28
14   2011.                                           14:22:33
15       Take a look at that, if you                 14:22:33
16   would, and let me know if you recognize that    14:22:35
17   document.                                       14:22:36
18       A.   I'm not familiar with it, but I       14:22:36
19   recognize it.                                   14:22:56
20       Q.   Okay.  You're shown as a member        14:22:57
21   of the SOM steering committee, correct?         14:23:03
22       A.   Correct.                               14:23:04
23       Q.   And were you a member of that          14:23:05
24   committee throughout your tenure at             14:23:07
25   Mallinckrodt?                                   14:23:09

Page 216

1        A.   Yes.                                   14:23:09
2        Q.   Okay.  And this indicates that         14:23:11
3    committee met once per quarter.  Is that        14:23:13
4    consistent with your recollection?             14:23:17
5        A.   I don't remember the frequency         14:23:18
6    of the meetings.                                14:23:19
7        Q.   Okay.  Do you remember the             14:23:21
8    topics that would be discussed at those         14:23:22
9    meetings?                                       14:23:26
10       A.   I do remember one meeting, a           14:23:27
11   meeting with the committee, in discussing       14:23:30
12   chargeback reports and what's contained in      14:23:34
13   them and how they might possibly be used to     14:23:37
14   monitor what we found.  You know, you could     14:23:39
15   find multiple distributors in the chargeback    14:23:41
16   report, and if you know what you're looking     14:23:44
17   for, you can possibly do that.                  14:23:47
18       Q.   Okay.  Do you recall                   14:23:49
19   approximately when that meeting occurred?       14:23:50
20       A.   No, I don't.  It would be after        14:23:52
21   we ran the report, obviously.                   14:23:54
22       Q.   Okay.  Do you recall                   14:23:56
23   approximately how long a steering committee     14:24:01
24   meeting would typically last?                   14:24:03
25       A.   No.                                    14:24:04

Page 217

1        Q.   Were there materials provided          14:24:05
2    before the meeting for use at the meeting?      14:24:07
3        A.   Not that I can recall.                 14:24:10
4        Q.   Do you recall if minutes were          14:24:12
5    maintained of the meetings of the committee?    14:24:16
6        A.   I don't remember.                      14:24:17
7        Q.   Apart from the discussion about        14:24:19
8    chargeback data, any other particular           14:24:25
9    recollection of anything discussed at any of    14:24:27
10   the steering committee meetings?                14:24:31
11       A.   I remember one meeting that was        14:24:32
12   vivid to me is that Karen Harper showed a       14:24:37
13   video of what they called the OxyContin         14:24:40
14   Express, and it was about a bunch of patients   14:24:45
15   outside a pharmacy or pain clinic, I can't      14:24:47
16   remember which it was, in Florida just          14:24:52
17   waiting to get drugs.  And they were showing    14:24:53
18   they were from all around the country.  So I    14:24:55
19   just remember that.                             14:24:57
20       Q.   Okay.  And do you recall               14:24:58
21   approximately when that occurred?               14:24:59
22       A.   It was sometime in 2011, 2010,         14:25:01
23   2011 time frame.                                14:25:07
24       Q.   Okay.  And was there a                 14:25:08
25   discussion you can recall occurring around      14:25:10

Page 218

1 that presentation?    14:25:12
2    A.  Yes, that there was a serious    14:25:14
3 problem in Florida around pain clinics and    14:25:19
4 the abuse, and that they were getting    14:25:22
5 dispensed product and taking it up I-95 and    14:25:25
6 reselling it.    14:25:30
7    Q.  Do you recall any subsequent    14:25:31
8 meetings where there was any update or    14:25:40
9 follow-up on that presentation to monitor how    14:25:45
10 the situation was developing over time?    14:25:47
11       MR. O'CONNOR:  Object to form.    14:25:51
12       THE WITNESS:  I can't remember    14:25:52
13    specifically what was discussed in    14:25:55
14    future -- in the future or at any of    14:25:57
15    the meetings.  To be honest, it's    14:26:00
16    like -- it would be just another    14:26:02
17    meeting to me to go to.    14:26:03
18 QUESTIONS BY MR. GOTTO:    14:26:05
19    Q.  Okay.  Do you recall any    14:26:07
20 discussions of any proposed enhancements to    14:26:16
21 the suspicious order monitoring program that    14:26:20
22 Mallinckrodt had in place?    14:26:22
23    A.  The only thing I remember is    14:26:24
24 that they were going to use different    14:26:26
25 algorithms than what had been used in the    14:26:29

Page 219

1 past.    14:26:34
2    Q.  Okay.  Do you remember anything    14:26:34
3 about the algorithms that had been used    14:26:35
4 previously?    14:26:36
5    A.  No, I didn't have anything to    14:26:36
6 do with developing that.    14:26:38
7    Q.  Okay.  Anything -- any    14:26:39
8 description of the reasons for changing from    14:26:40
9 the prior algorithms to the subsequent    14:26:44
10 algorithms?    14:26:46
11       MR. O'CONNOR:  Object to form.    14:26:46
12       THE WITNESS:  I just know it    14:26:47
13    was to enhance the information they    14:26:49
14    were receiving.    14:26:53
15 QUESTIONS BY MR. GOTTO:    14:26:53
16    Q.  And do you know who had    14:26:56
17 ultimate responsibility for implementing the    14:27:00
18 suspicious order monitoring program?    14:27:05
19       MR. O'CONNOR:  Object to form.    14:27:07
20       THE WITNESS:  Karen Harper was    14:27:08
21    my contact in compliance, so she's the    14:27:12
22    one that I knew, and I knew Don    14:27:14
23    Lohman.    14:27:17
24 QUESTIONS BY MR. GOTTO:    14:27:17
25    Q.  Okay.  Down toward the bottom    14:27:19

Page 220

1 of this page there are some subcommittees    14:27:20
2 listed.    14:27:23
3       Were you a member of the    14:27:24
4 director order monitoring subcommittee?    14:27:25
5    A.  I have no idea, because I don't    14:27:29
6 even know what that is.    14:27:35
7    Q.  Yeah.    14:27:36
8       How about the --    14:27:37
9    A.  Oh, that's probably direct    14:27:37
10 order monitoring.    14:27:40
11    Q.  I suspect so.    14:27:41
12    A.  Yeah.    14:27:42
13       And indirect customer review.    14:27:44
14 They might have included me in discussions or    14:27:45
15 might have included me to ask me for data out    14:27:48
16 of my team --    14:27:50
17    Q.  Uh-huh.    14:27:50
18    A.  -- but I wasn't directing any    14:27:51
19 meetings or anything like this.    14:27:52
20    Q.  Do you recall participating in    14:27:54
21 any meetings of any of these subcommittees?    14:27:56
22    A.  I'm sure I did, but I don't    14:28:00
23 remember the content.    14:28:02
24    Q.  Okay.  And do you remember    14:28:02
25 which of the subcommittees it would have been    14:28:05

Page 221

1 that you would have participated in?    14:28:07
2    A.  It would have been anything    14:28:08
3 involving the customer, like direct or the    14:28:12
4 monitoring, indirect customer review and the    14:28:14
5 customer checklist.    14:28:16
6    Q.  Okay.  You can set that aside.    14:28:17
7    A.  Okay.    14:28:18
8       (Mallinckrodt-Collier Exhibit    14:28:20
9       19 marked for identification.)    14:28:21
10 QUESTIONS BY MR. GOTTO:    14:28:21
11    Q.  We've marked as Exhibit 19 a    14:28:45
12 single-page e-mail thread, Bates    14:28:47
13 MNK-T1_0000262709.  It appears to be an    14:28:51
14 e-mail exchange between you and Karen Harper.    14:28:58
15       Take a look at it, if you    14:29:01
16 would, please, and let me know if you    14:29:02
17 recognize it.    14:29:04
18    A.  Okay.    14:29:05
19    Q.  Do you recognize these e-mails?    14:29:31
20    A.  Yes.    14:29:32
21    Q.  Okay.  So the initial e-mail    14:29:34
22 from Ms. Harper on August 7th, subject,    14:29:38
23 Friday suspicious order monitoring meeting,    14:29:42
24 says to you that she "shared your frustration    14:29:46
25 during Friday's meeting.  We realize the    14:29:49

Page 222

1  group could have been much more focused by     14:29:52
2  making sure only the right people were          14:29:54
3  brought to the table and having a published     14:29:57
4  agenda that we adhered to."                     14:29:58
5         Do you remember the meeting              14:29:59
6  that Ms. Harper is referring to here?           14:30:00
7     A.  I don't recall this specific             14:30:02
8  meeting.  I recall the tenor of the issue       14:30:03
9  here.                                           14:30:08
10    Q.  Okay.  What do you recall of             14:30:08
11 the issue?                                       14:30:10
12    A.  We had another group that was            14:30:11
13 involved that was developing a CARES             14:30:15
14 Alliance, a Covidien acting responsibly or       14:30:18
15 something like that, along the lines of pain     14:30:21
16 management enacting responsibility, and I        14:30:24
17 remember they kept jumping in with things        14:30:28
18 thinking it was about CARES Alliance.            14:30:32
19        What we wanted to do was                 14:30:33
20 evaluate what we were supposed to be doing to    14:30:35
21 be in compliance with the DEA and what          14:30:37
22 reports could we bring to the table so that     14:30:38
23 they knew -- so that Karen Harper's team        14:30:41
24 could know what information we had access to.    14:30:43
25    Q.  Okay.  So this is in August              14:30:47

Page 223

1  of 2010, which I think the analysis of the      14:30:53
2  Florida doctor and pain clinic orders was       14:30:58
3  shortly before this, correct?                    14:31:01
4     A.  Uh-huh.                                   14:31:02
5         MR. O'CONNOR:  Objection.                 14:31:02
6  Form.                                            14:31:03
7         THE WITNESS:  Yes.                         14:31:03
8  QUESTIONS BY MR. GOTTO:                           14:31:04
9     Q.  And so at this meeting, is it            14:31:05
10 your general recollection that there was --     14:31:10
11 that it was -- from your standpoint, the        14:31:12
12 intention was to discuss potential              14:31:15
13 information that could be brought to bear on    14:31:18
14 the suspicious order monitoring process?        14:31:21
15    A.  Yes.                                      14:31:23
16    Q.  Okay.  And sounds like the               14:31:25
17 discussion got somehow side-railed by folks     14:31:28
18 who were there wanting to talk about the        14:31:31
19 CARES initiative, correct?                       14:31:35
20    A.  Correct.                                  14:31:36
21    Q.  And explain to me again what             14:31:37
22 the CARES initiative was?                        14:31:38
23    A.  It was -- they were trying to            14:31:40
24 develop an initiative -- and this goes back     14:31:42
25 to the lobbying.  Now I remember -- now that    14:31:43

Page 224

1  I saw the CARES Alliance, it all comes back     14:31:46
2  to me.                                           14:31:49
3         The CARES Alliance was an                14:31:49
4  initiative to be a responsible opioid          14:31:53
5  supplier in a marketplace.  So we would talk    14:31:56
6  about things like proper disposal.  We         14:31:58
7  supported opioid groups, you know, that were    14:32:01
8  helping either with abuse deterrence or        14:32:07
9  things likes that.  So that's what the CARES   14:32:11
10 Alliance was.                                    14:32:15
11        And that is not what we were             14:32:15
12 trying to accomplish.  We were trying to        14:32:16
13 understand what the DEA suspicious order        14:32:17
14 monitoring requirements were and if there       14:32:19
15 were materials that some of the team members,   14:32:21
16 not only in my group, from other groups like    14:32:23
17 Jeremy's, that they could provide.              14:32:25
18    Q.  Okay.  Do you recall in any of          14:32:28
19 the suspicious order monitoring steering        14:32:37
20 committee meetings that you attended any        14:32:38
21 discussion of the extent to which              14:32:44
22 Mallinckrodt should be monitoring -- or         14:32:48
23 should be familiar with not only its           14:32:55
24 customer, but it's customers' customers?        14:32:57
25        MR. O'CONNOR:  Object to form.           14:33:00

Page 225

1         THE WITNESS:  I've heard that           14:33:00
2  phrase before.                                   14:33:02
3  QUESTIONS BY MR. GOTTO:                           14:33:03
4     Q.  Did you hear it in the context         14:33:04
5  of any of the SOM steering committee            14:33:05
6  meetings?                                        14:33:08
7     A.  I'm not sure what context I             14:33:09
8  heard it in.  I just remember hearing that      14:33:12
9  the DEA had the belief or the thought process   14:33:15
10 that we should know our customer's customer.    14:33:19
11    Q.  Okay.  Do you recall in the,            14:33:21
12 again, the SOM steering committee context,      14:33:23
13 any discussion of ways to obtain information    14:33:27
14 regarding Mallinckrodt's customers'            14:33:31
15 customers?                                       14:33:34
16    A.  That was discussed, yes.                14:33:34
17    Q.  Okay.  And what sort of                 14:33:35
18 information was discussed?                       14:33:36
19    A.  Chargeback data.  How could we          14:33:37
20 get chargeback data and find out what          14:33:39
21 customers are purchasing downstream from        14:33:41
22 different wholesalers and distributors.         14:33:44
23    Q.  Okay.  Anything apart from the          14:33:46
24 chargeback data?                                 14:33:48
25        MR. O'CONNOR:  Object to form.           14:33:50

Page 226

1	THE WITNESS: Not that I	14:33:50
2	recall. Not from my group. There	14:33:52
3	were other groups that possibly had	14:33:54
4	information, but not from my group.	14:33:55
5	QUESTIONS BY MR. GOTTO:	14:33:57
6	Q.	Okay. All right. Back on	14:33:57
7	Exhibit 19, your response to Ms. Harper, in	14:34:00
8	your first paragraph you say, "I truly hoped	14:34:05
9	Carol could have brought more positive	14:34:07
10	feedback and seen the big picture."	14:34:09
11	Do you know who Carol is that	14:34:12
12	you're referring to in that sentence?	14:34:13
13	A.	No, I don't.	14:34:14
14	Q.	Okay. The next sentence you	14:34:15
15	say, "I also think Sherice is making this too	14:34:17
16	encompassing."	14:34:21
17	Do you know who Sherice is?	14:34:22
18	A.	Sherice was someone in Art	14:34:23
19	Morelli's group that was part of the	14:34:26
20	initiative for the CARES Alliance.	14:34:27
21	Q.	Okay. And you went on to say,	14:34:29
22	"If we go with her scope, we will monitor	14:34:30
23	hundreds of thousands of transactions and get	14:34:33
24	nowhere."	14:34:35
25	Do you recall what her scope	14:34:36

Page 227

1	was that you're referring to there?	14:34:39
2	A.	I don't remember that, but she	14:34:40
3	was thinking really high level, I think	14:34:43
4	across the entire industry, and she just was	14:34:46
5	not focused in the meeting on what we were	14:34:52
6	trying to accomplish.	14:34:54
7	Q.	She was thinking across the	14:34:54
8	industry in terms of order monitoring?	14:35:00
9	A.	Yes.	14:35:01
10	Q.	Okay.	14:35:01
11	A.	And involving other suppliers.	14:35:05
12	Q.	Okay. The next paragraph you	14:35:08
13	say, "Jeremy is your best bet."	14:35:11
14	Who is Jeremy that you're	14:35:14
15	referring to there?	14:35:16
16	A.	Jeremy worked in an analytical	14:35:16
17	team that mostly focused on brand products,	14:35:22
18	but he was very good at getting huge sets of	14:35:25
19	data and distilling it down into very strong	14:35:28
20	content and material. So just taking a bunch	14:35:35
21	of data, eliminating the noise and making it	14:35:37
22	see what we need to see to it.	14:35:41
23	Because as I keep saying, it's	14:35:42
24	really difficult that Kate looked for	14:35:44
25	something very minor or very minute in all of	14:35:47

Page 228

1	the data sets that we get, and so she was	14:35:50
2	looking specifically for something. Jeremy	14:35:52
3	could do that much easier than our group.	14:35:54
4	Q.	Okay. Okay. You can set that	14:35:57
5	aside.	14:36:01
6	(Mallinckrodt-Collier Exhibit	14:36:03
7	20 marked for identification.)	14:36:03
8	QUESTIONS BY MR. GOTTO:	14:36:03
9	Q.	We have marked as Exhibit 20 a	14:36:27
10	multipage document beginning at Bates	14:36:30
11	MNK-T1_0000496098. It appears to be a 2011	14:36:32
12	presentation concerning the suspicious order	14:36:40
13	monitoring program.	14:36:43
14	If you could take a look at	14:36:44
15	that and tell me if you're familiar with that	14:36:45
16	document.	14:36:48
17	Do you recognize that document?	14:40:26
18	A.	Yes, I do.	14:40:27
19	Q.	And is it a presentation that	14:40:28
20	was made to the marketing group in 2011?	14:40:30
21	A.	Yes.	14:40:32
22	Q.	Do you recall the presentation?	14:40:32
23	A.	This is the one where I	14:40:33
24	recalled having the OxyContin Express video.	14:40:37
25	Q.	Okay. Great.	14:40:40

Page 229

1	So on the -- on slide 5,	14:40:41
2	there's a reference here to the suspicious	14:40:48
3	order monitoring subcommittee -- I'm sorry,	14:40:53
4	suspicious order monitoring steering	14:40:55
5	committee that convenes once per month.	14:40:56
6	I think in the prior document	14:41:00
7	we just looked at indicated it was a	14:41:01
8	quarterly meeting.	14:41:03
9	Do you recall that committee	14:41:04
10	meeting monthly?	14:41:07
11	MR. O'CONNOR: Object to form.	14:41:07
12	THE WITNESS: The steering	14:41:08
13	committee, it said it meets once a	14:41:08
14	month. Quarterly was the other	14:41:11
15	members. There was a core group and	14:41:13
16	then peripheral members.	14:41:15
17	QUESTIONS BY MR. GOTTO:	14:41:16
18	Q.	I see. Okay.	14:41:18
19	You were not a member of the	14:41:18
20	steering committee; is that correct?	14:41:19
21	A.	I was a peripheral member.	14:41:20
22	Q.	Okay. And on page -- I'm	14:41:21
23	sorry, slide number -- slide number 13,	14:41:29
24	there's a description of the pre-June of 2010	14:41:35
25	SOM program.	14:41:40

Page 230

1       Do you see that?      14:41:41
2    A.   Yes.           14:41:41
3    Q.   And do you recall becoming     14:41:42
4 familiar at this time with what the SOM    14:41:44
5 program consisted of prior to June of 2010?   14:41:48
6    A.   Yes.           14:41:51
7    Q.   Okay. And you see in the one,    14:41:52
8 two, three, four, five, sixth bullet      14:42:01
9 there's -- I'm sorry, the fifth bullet     14:42:06
10 "Customer accounts or orders that appear,    14:42:08
11 quote, peculiar, close quote, based on     14:42:09
12 customer checklist results, credit check, CSR   14:42:13
13 interaction or order entry system flags are    14:42:15
14 reviewed by customer service -- customer     14:42:18
15 service manager."            14:42:19
16       Do you see that?      14:42:20
17    A.   Yes.           14:42:21
18    Q.   Okay. And do you recall      14:42:22
19 learning at this time that that was part of    14:42:24
20 the SOM program?           14:42:26
21    A.   Yes.           14:42:27
22    Q.   Okay. Two pages after that, on    14:42:28
23 slide 15 there's a slide concerning the DEA    14:42:36
24 St. Louis conversation, July 20th of 2010.    14:42:42
25       Do you recall learning of this    14:42:50

Page 231

1 St. Louis conversation at this presentation?   14:42:53
2    A.   Yes.           14:42:54
3    Q.   And the third entry on that     14:42:55
4 slide, "Mallinckrodt is viewed as the kingpin   14:42:57
5 within the drug cartel."        14:43:00
6       Do you recall hearing that at     14:43:02
7 the time of this presentation?       14:43:04
8       MR. O'CONNOR: Object to form.    14:43:04
9       THE WITNESS: Yes.       14:43:05
10 QUESTIONS BY MR. GOTTO:         14:43:05
11    Q.   Did that surprise you?      14:43:07
12    A.   Yes, it did.         14:43:08
13    Q.   If you look on slide 17, is     14:43:10
14 that a still from the video that you were     14:43:19
15 recalling seeing, the one outside the pain    14:43:21
16 clinic?             14:43:25
17    A.   Yes.           14:43:25
18    Q.   Okay. And if you turn to      14:43:25
19 slide 20, SOM distributor audit next steps,    14:43:35
20 the first entry is "ongoing review of      14:43:45
21 chargeback data to select other distributors   14:43:48
22 to be audited."           14:43:50
23       Do you see that?      14:43:51
24    A.   Yes.           14:43:51
25    Q.   So this is March of 2011.     14:43:52

Page 232

1       You testified a little earlier    14:43:59
2 recalling a meeting where there was       14:44:00
3 discussion about use of chargeback data as    14:44:02
4 part of the SOM program.         14:44:04
5       Do you know if that was -- if     14:44:06
6 that discussion was in the context of      14:44:09
7 selection of distributors to be audited, or    14:44:13
8 was it for some other part of the SOM      14:44:15
9 program?            14:44:19
10       MR. O'CONNOR: Object to form.    14:44:19
11       THE WITNESS: I'm not clear on     14:44:20
12 when that was discussed. Obviously,      14:44:22
13 it was used with -- the information we      14:44:24
14 had was used, but I don't remember       14:44:27
15 exactly what -- if this was what they      14:44:29
16 were intending to use.         14:44:32
17       MR. GOTTO: Okay. Okay. You    14:44:33
18 can set that aside. Why don't we take     14:44:40
19 a short break.           14:44:43
20       VIDEOGRAPHER: We were going     14:44:44
21 off the record at 2:44 p.m.        14:44:45
22     (Off the record at 2:44 p.m.)     14:44:47
23       VIDEOGRAPHER: We were back on    14:57:20
24 the record at 2:57 p.m.         14:57:21
25      (Mallinckrodt-Collier Exhibit    14:57:27

Page 233

1    21 marked for identification.)      14:57:28
2 QUESTIONS BY MR. GOTTO:         14:57:28
3    Q.   We've marked as Exhibit 21 a     14:57:52
4 letter dated November 10, 2010, beginning at   14:57:56
5 Bates MNK-T1_0000484110, and it appears to be   14:57:58
6 a letter from Karen Harper to KeySource     14:58:07
7 Medical on which you were bcc'ed.       14:58:12
8       If you'd take a look at that     14:58:15
9 and tell me if you recognize that document.    14:58:17
10    A.   Okay.           14:58:19
11    Q.   Do you recall -- are you      14:59:37
12 familiar with this letter?        14:59:39
13    A.   Yes, I am.          14:59:40
14    Q.   Okay. And do you recall      14:59:41
15 receiving a copy of it back in November     14:59:42
16 of 2010?            14:59:45
17    A.   Yes.           14:59:45
18    Q.   Now, in this letter, Ms. Harper   14:59:45
19 transmits various information regarding     14:59:52
20 KeySource orders into the state of Florida.    14:59:56
21       Was the source of the       15:00:01
22 information for Ms. Harper's letter, at least   15:00:04
23 in part, the multi-distributor analysis we    15:00:06
24 looked at earlier today?        15:00:09
25       MR. O'CONNOR: Object to form.    15:00:10

Page 234

1    THE WITNESS: Yes. Yes.    15:00:11
2  QUESTIONS BY MR. GOTTO:    15:00:14
3    Q.  And in this letter, Ms. Harper    15:00:14
4  requested various information from KeySource.  15:00:18
5    Do you have any knowledge as to    15:00:20
6  what KeySource's response to this letter was?  15:00:23
7    A.  No, I do not.    15:00:26
8    Q.  Okay.  Did you or anyone on    15:00:28
9  your team, to your knowledge, conduct any    15:00:30
10  subsequent analysis or inquiry with respect    15:00:32
11  to ongoing orders from KeySource?    15:00:36
12    A.  I don't recall.    15:00:38
13    Q.  Do you know if the information    15:00:40
14  contained in this letter was ever provided to  15:00:42
15  the DEA?    15:00:45
16    A.  I don't know.  That would be    15:00:47
17  Karen Harper's responsibility.    15:00:49
18    Q.  Okay.  All right.  You can set    15:00:50
19  that aside.    15:00:51
20    (Mallinckrodt-Collier Exhibit    15:00:53
21  22 marked for identification.)    15:00:53
22  QUESTIONS BY MR. GOTTO:    15:00:53
23    Q.  We've marked as Exhibit 22 a    15:01:29
24  series of letters, Bates MNK-T1_0000484145    15:01:32
25  through 156, from November 12th of 2010.    15:01:43

Page 235

1  You're indicated as a bcc on the first    15:01:49
2  letter, and I don't know if you were bcc'ed    15:01:51
3  on the balance of the letters in that    15:01:56
4  package.    15:01:59
5    But if you could take a look at    15:02:00
6  those letters and tell me if you recognize    15:02:02
7  them.    15:02:04
8    A.  Yes.    15:02:05
9    Q.  Do you recall receiving copies    15:02:44
10  of these letters back in November of 2010?    15:02:45
11    A.  Yes, I do.    15:02:47
12    Q.  Okay.  And again, each of these    15:02:47
13  letters contains information regarding    15:02:50
14  Florida purchasers who were purchasing from    15:02:56
15  multiple distributors.    15:02:58
16    Do you understand that    15:02:59
17  information to be based on the    15:03:01
18  multi-distributor information we looked at a    15:03:04
19  little earlier today?    15:03:05
20    A.  Yes.    15:03:06
21    Q.  And that analysis of multiple    15:03:07
22  distributors that you and Ms. Muhlenkamp did,  15:03:10
23  what triggered performing that analysis?    15:03:12
24    A.  I'm not sure if in the pulling    15:03:15
25  of the data for the state of Florida that she  15:03:20

Page 236

1  might have identified that there were a few    15:03:23
2  repeat pharmacies in there, and so we said,    15:03:28
3  well, wait a minute, there's repeat    15:03:31
4  pharmacies from different distributors.    15:03:33
5  Let's pull and see if we can bring this into    15:03:35
6  a better picture --    15:03:38
7    Q.  I see.    15:03:40
8    A.  -- of what's going on.    15:03:41
9    Q.  Okay.  So it may have grown out  15:03:42
10  of the original inquiry in terms of MD and    15:03:43
11  pain clinic purchasers in Florida?    15:03:47
12    A.  Yes.    15:03:50
13    Q.  Okay.  And do you know if the    15:03:50
14  information contained in the letters included  15:03:52
15  in Exhibit 22 was ever provided to the DEA?    15:03:54
16    A.  I didn't report to the DEA.  I    15:03:57
17  have no idea.    15:03:59
18    Q.  Okay.  You can set that aside.    15:04:01
19    A.  Okay.    15:04:03
20    (Mallinckrodt-Collier Exhibit    15:04:04
21  23 marked for identification.)    15:04:04
22  QUESTIONS BY MR. GOTTO:    15:04:04
23    Q.  We've marked as Exhibit 23 a    15:04:48
24  single-page e-mail thread, Bates    15:04:50
25  MNK-T1_0000558202.  Take a moment and look at  15:04:53

Page 237

1  those e-mails, if you would, and tell me if    15:04:59
2  you recognize them.    15:05:02
3    A.  Yes.    15:05:27
4    Q.  And the earlier e-mail in the    15:05:28
5  thread is from a Debbie Digby.    15:05:31
6    Who is that?    15:05:34
7    A.  She was a senior financial    15:05:35
8  analyst.  I'm not sure who she reported to or  15:05:38
9  what her role was.  I did not interact with    15:05:40
10  her very often.    15:05:43
11    Q.  Okay.  And her e-mail went to    15:05:43
12  Ms. Harper, to Susan Moore.    15:05:45
13    Who was Susan Moore?    15:05:47
14    A.  I do not remember.    15:05:49
15    Q.  How about Pat Duft?    15:05:53
16    A.  Pat was in logistics.    15:05:56
17    Q.  Okay.  And how about Carol    15:05:57
18  Svejkosky?    15:06:00
19    A.  She was in customer service.    15:06:01
20    Q.  Okay.  And Ms. Digby indicates,  15:06:03
21  here are -- "attached are the March monthly    15:06:06
22  SOM reports."  And there are three reports:    15:06:09
23  a customer sourcing greater than two    15:06:11
24  distributors, a state concentration report,    15:06:15
25  and a summary report by distributor compared  15:06:17

Page 238

1  to all products distributing.          15:06:20
2       Do you recall that you would       15:06:22
3  receive this package of reports monthly?   15:06:25
4       A.  I don't recall receiving it    15:06:29
5  monthly, but apparently it was.          15:06:32
6       Q.  Okay.  Do you know what the    15:06:34
7  state concentration report, what information  15:06:37
8  was contained on that?                   15:06:39
9       A.  I do remember that was a report  15:06:40
10 that showed sales by state.  I can't recall  15:06:42
11 if -- there were two different reports, and I  15:06:47
12 can't recall if this would have been      15:06:50
13 Mallinckrodt sales by state.             15:06:51
14      Q.  Okay.  And the report by       15:06:54
15 distributor compared to all products      15:06:57
16 distributed, do you recall what information  15:07:00
17 was contained in that report?            15:07:02
18      A.  I remember specifically that we  15:07:04
19 were looking at seeing if they were only   15:07:08
20 purchasing oxycodone or were they purchasing  15:07:10
21 all products.  And if they were purchasing  15:07:12
22 just oxycodone, that was something we      15:07:17
23 evaluated and sent on to suspicious order   15:07:20
24 monitoring.                              15:07:24
25      Q.  Okay.  And so in terms of your  15:07:24

Page 239

1  personal involvement with the SOM process,  15:07:27
2  did you review these reports when you     15:07:30
3  received them?                           15:07:33
4       A.  I looked at them, but I didn't  15:07:34
5  make any direction on the SOM, so I probably  15:07:36
6  didn't really dig into them too much.     15:07:40
7       Q.  Okay.  Do you recall ever      15:07:43
8  taking any action based on any information  15:07:45
9  that was contained in any of those reports?  15:07:48
10      A.  No, that was outside the scope   15:07:51
11 of my responsibility.                    15:07:52
12      Q.  Okay.  Do you ever recall      15:07:53
13 calling to anyone else's attention at     15:07:56
14 Mallinckrodt any information that was     15:07:59
15 contained in any of those reports?        15:08:00
16      A.  I may have, but I don't recall  15:08:02
17 it.                                      15:08:05
18      Q.  Okay.  Okay.  You can set that  15:08:05
19 aside.                                   15:08:07
20      (Mallinckrodt-Collier Exhibit      15:08:08
21 24 marked for identification.)           15:08:09
22 QUESTIONS BY MR. GOTTO:                   15:08:09
23      Q.  Exhibit 24 is a two-page e-mail  15:08:41
24 thread starting at MNK-T1_0005905204.  Take a  15:08:44
25 look at those e-mails, if you would, and tell  15:08:53

Page 240

1  me if you recall them.                   15:08:55
2       A.  Okay.                          15:08:57
3       Q.  Do you recall these e-mails    15:09:29
4  from 2013?                               15:09:30
5       A.  I don't recall them, but I      15:09:31
6  recognize them.                          15:09:33
7       Q.  Okay.  On the bottom of the    15:09:34
8  first page, Mr. Longenecker's e-mail says, "I  15:09:37
9  just met with Karen and Jennifer.  Prior to  15:09:42
10 removing the current allocation model,     15:09:45
11 they're going to take some time to review the  15:09:47
12 algorithms for the SOM."                 15:09:49
13      Do you recall what the -- what      15:09:51
14 the interplay was between the SOM algorithms  15:09:55
15 and the allocation model?                15:09:58
16      MR. O'CONNOR:  Object to form.      15:10:00
17      THE WITNESS:  In the allocation     15:10:01
18 model, we would look at who had           15:10:03
19 failure to supply and how much            15:10:06
20 inventory we had available and when       15:10:08
21 the next production schedule would        15:10:09
22 happen and how much we could release      15:10:10
23 to specific customers.                   15:10:12
24      The algorithms that they were       15:10:13
25 doing for SOM was entirely different,     15:10:16

Page 241

1  and they would stop orders or release     15:10:18
2  orders through that process.  That was    15:10:21
3  separate from what we were doing.         15:10:25
4  QUESTIONS BY MR. GOTTO:                   15:10:26
5       Q.  Okay.  And so Mr. Longenecker   15:10:26
6  goes on to say, "This should take about two  15:10:27
7  weeks.  They would like us to delay sending a  15:10:29
8  letter until they have completed this."    15:10:32
9       Do you know why the letter on       15:10:34
10 the allocation model or the allocation --  15:10:37
11 yeah, the allocation model would be delayed  15:10:40
12 waiting for the SOM algorithms?           15:10:42
13      MR. O'CONNOR:  Objection to         15:10:45
14 form.                                    15:10:46
15      THE WITNESS:  It's likely --        15:10:46
16 it's likely that they would have          15:10:48
17 said -- that we would have gotten         15:10:51
18 information from Karen or Jen Buist in     15:10:52
19 compliance that they didn't want          15:10:56
20 certain customers to get product at       15:10:57
21 all.                                     15:10:59
22 QUESTIONS BY MR. GOTTO:                   15:10:59
23      Q.  Okay.  Okay.  You can set that  15:10:59
24 aside.                                   15:11:06
25      (Mallinckrodt-Collier Exhibit      15:11:07

Page 242

1     25 marked for identification.)     15:11:07
2  QUESTIONS BY MR. GOTTO:     15:11:07
3     Q.   Exhibit 25 is a multipage     15:11:32
4  e-mail thread beginning at MNK-T1_0004951225.  15:11:34
5  Take a look at those and tell me if you     15:11:43
6  recognize these e-mails.     15:11:48
7        The only one I have a question     15:11:49
8  for you on is the very last one, the e-mail     15:11:50
9  from you to Jane Williams on October 23rd.     15:11:53
10    A.   Okay.     15:11:57
11       MR. O'CONNOR:  Counsel, while     15:12:40
12  reading this document, it looks like     15:12:41
13  the top two e-mails might be subject     15:12:42
14  to a clawback.     15:12:45
15       Are you planning to ask about     15:12:46
16  either of those top two e-mails?     15:12:48
17       MR. GOTTO:  Do you mean the     15:12:48
18  October 23rd?     15:12:49
19       MR. O'CONNOR:  Yes.  From     15:12:50
20  Ginger to Jane at 1:50.     15:12:52
21       MR. GOTTO:  I was going to ask     15:12:56
22  about that one.     15:12:57
23       MR. O'CONNOR:  Okay.  Yeah, we     15:12:57
24  would assert privilege over the     15:13:00
25  references to the discussion she had     15:13:03

Page 243

1  with Don, who I believe is Don Lohman,     15:13:05
2  who is counsel at Mallinckrodt.  It     15:13:09
3  appears this was inadvertently     15:13:11
4  produced.     15:13:13
5       MR. GOTTO:  Okay.  Well, I'll     15:13:14
6  ask her one question and see if it --     15:13:15
7  if it is okay with you or if you have     15:13:17
8  a problem with it.     15:13:21
9       MR. O'CONNOR:  Okay.     15:13:24
10       MR. GOTTO:  After she's --     15:13:24
11  once --     15:13:26
12  QUESTIONS BY MR. GOTTO:     15:13:26
13    Q.   Have you been through the     15:13:26
14  document?     15:13:27
15    A.   I focused more up here.     15:13:28
16    Q.   Okay.     15:13:30
17    A.   So I'm familiar with what's --     15:13:30
18    Here's the one question.     15:13:32
19       MR. O'CONNOR:  And be sure to     15:13:32
20  let me chime in before you answer.     15:13:33
21  QUESTIONS BY MR. GOTTO:     15:13:35
22    Q.   Yeah.  Here's the one question     15:13:35
23  I had on that October 23 e-mail.  You make     15:13:38
24  reference to "the DEA views these programs as     15:13:41
25  driving the wrong type of behavior."     15:13:45

Page 244

1        And my question for you is:     15:13:47
2  What programs are you referring to, and what     15:13:50
3  type of behavior did you understand the DEA     15:13:52
4  viewing them as driving?     15:13:55
5       MR. O'CONNOR:  Okay.  And you     15:13:57
6  can answer the question.  Just do not     15:13:59
7  discuss anything you said to or from     15:14:01
8  Don.     15:14:03
9       THE WITNESS:  Then I cannot     15:14:03
10  discuss that.     15:14:07
11  QUESTIONS BY MR. GOTTO:     15:14:09
12    Q.   Okay.  All right.  You can put     15:14:10
13  that aside.     15:14:12
14       (Mallinckrodt-Collier Exhibit     15:14:14
15    26 marked for identification.)     15:14:42
16       MR. O'CONNOR:  Counsel, just     15:14:42
17  for the record, we'll be making a     15:14:43
18  clawback request and objecting on the     15:14:45
19  basis of attorney-client privilege on     15:14:47
20  the document.     15:14:48
21       MR. GOTTO:  Okay.  Very good.     15:14:48
22  QUESTIONS BY MR. GOTTO:     15:14:49
23    Q.   Exhibit 26 is a multipage     15:14:52
24  document beginning with MNK-T1_0000384634.     15:14:54
25  It's a printout of a spreadsheet.     15:15:03

Page 245

1        If you can take a look at that     15:15:04
2  document and tell me if you're familiar with     15:15:06
3  it.     15:15:08
4    A.   Yes, I am.     15:15:08
5    Q.   What is it?     15:15:18
6    A.   This is a list of various trade     15:15:18
7  shows, conventions and conferences for the     15:15:20
8  generic team.     15:15:23
9    Q.   Okay.  And is this a list the     15:15:24
10  marketing department maintained from time to     15:15:27
11  time?     15:15:29
12    A.   Marketing and sales, yes.     15:15:29
13    Q.   Okay.  And we talked a little     15:15:30
14  earlier today about conventions, and you     15:15:34
15  indicated that I think many of the     15:15:39
16  conventions are sort of industry-wide that     15:15:41
17  Mallinckrodt would attend or participate in     15:15:45
18  regularly.     15:15:48
19       Are those the types of     15:15:49
20  conventions that are listed on this exhibit?     15:15:51
21       MR. O'CONNOR:  Object to form.     15:15:53
22       THE WITNESS:  Yes.     15:15:53
23  QUESTIONS BY MR. GOTTO:     15:15:56
24    Q.   If you turn to the page that --     15:16:18
25  where the Bates number ends in 638 in the     15:16:21

Page 246

```
 1   lower right-hand corner.                15:16:23
 2         In column F on that page, there    15:16:37
 3   are references to things like briefcase, 10  15:16:40
 4   by 30, et cetera.                        15:16:42
 5         Can you tell me what that          15:16:44
 6   column is describing?                    15:16:45
 7     A.   Those are displays.               15:16:46
 8     Q.   The displays that would be used   15:16:48
 9   at the convention?                       15:16:51
10     A.   Yes.                              15:16:52
11     Q.   Okay.  You can set that aside.    15:16:52
12         (Mallinckrodt-Collier Exhibit      15:16:56
13         27 marked for identification.)     15:16:58
14   QUESTIONS BY MR. GOTTO:                  15:16:58
15     Q.   Exhibit 27 is a one-page          15:17:26
16   document produced in native format,      15:17:35
17   MNK-T1_00006714382, and appears to be certain  15:17:38
18   advertising expenditures.               15:17:48
19         Can you tell me what the           15:17:50
20   information on this document is?         15:17:52
21         MR. O'CONNOR:  Object to form.     15:17:56
22         THE WITNESS:  It relates to        15:17:56
23     materials that we would -- programs or  15:17:59
24     advertising that we spend on          15:18:02
25     particular products, our programs that  15:18:04
```

Page 247

```
 1   we had.                                  15:18:08
 2   QUESTIONS BY MR. GOTTO:                  15:18:08
 3     Q.   Okay.  And this is for the        15:18:08
 4   years 2011 through 2015?                 15:18:09
 5     A.   Yes.                              15:18:10
 6     Q.   Okay.  In terms of budgeting      15:18:12
 7   for advertising expenses of these types, was  15:18:18
 8   this something that fell within your     15:18:21
 9   responsibility?                          15:18:24
10     A.   Yes.                              15:18:25
11     Q.   Okay.  And how did you go about   15:18:26
12   making the determination of what sorts of  15:18:28
13   journals or other publications were      15:18:33
14   appropriate ones to be spending money on  15:18:35
15   advertising in?                         15:18:38
16     A.   It depended on which magazines    15:18:38
17   or trade -- they were all trade journals, so  15:18:41
18   they went to pharmacists.  And it depended on  15:18:45
19   specific to the product, if it was used in  15:18:47
20   more hospitals or if it was used in retail  15:18:48
21   pharmacies and what the messaging was trying  15:18:51
22   to be about.  You know, if the fentanyl patch  15:18:54
23   size was a good size, we would try and    15:18:57
24   demonstrate that, or if we were launching a  15:18:59
25   new product, we would try and capture that  15:19:01
```

Page 248

```
 1   audience.                                15:19:03
 2     Q.   Okay.  You can set that aside.    15:19:05
 3         (Mallinckrodt-Collier Exhibit      15:19:07
 4         28 marked for identification.)     15:19:08
 5   QUESTIONS BY MR. GOTTO:                  15:19:08
 6     Q.   Exhibit 28 is a multipage         15:19:51
 7   e-mail thread beginning with             15:19:54
 8   MNK-T1_0005964786.  Take a look at those  15:19:56
 9   e-mails, if you would, and tell me if you  15:20:03
10   recognize them.                          15:20:05
11     A.   Okay.                             15:20:06
12     Q.   Do you recognize those e-mails?   15:22:29
13     A.   Yes, I do.                        15:22:31
14     Q.   And if you turn to the second     15:22:31
15   page, your e-mail at the bottom of that page  15:22:36
16   dated September 29th, it appears that you  15:22:38
17   were making adjustments to VIP tiers to   15:22:47
18   remove oxy 30 milligrams; is that correct?  15:22:50
19     A.   Yes.                              15:22:53
20     Q.   And what was the reason for       15:22:53
21   that?                                    15:22:54
22     A.   Because the oxy 30 milligram we   15:22:54
23   didn't want to appear to be promoting    15:22:57
24   increasing value of volume on products, so we  15:23:00
25   didn't want to provide incentives for that.  15:23:04
```

Page 249

```
 1         And most of them, obviously,       15:23:08
 2   came -- some of them fell off with the    15:23:10
 3   Florida issues that were going on at the  15:23:12
 4   time.                                    15:23:15
 5     Q.   When you say "fell off," what     15:23:15
 6   do you mean?                             15:23:17
 7     A.   Many of their sales of some of    15:23:17
 8   our customers fell off, so the customers  15:23:19
 9   weren't selling into the state of Florida.  15:23:21
10   So it -- we just advised them that the best  15:23:24
11   thing to do was just remove it from their  15:23:27
12   agreement so that they wouldn't have volume  15:23:29
13   incentive program for it.                15:23:32
14     Q.   Okay.  In the second paragraph    15:23:34
15   of your e-mail you say, "Sounds as if we  15:23:43
16   didn't have pushback from Steve's         15:23:45
17   perspective."                            15:23:47
18         Who is Steve in that sentence?     15:23:47
19     A.   Steve Becker was the sales        15:23:49
20   representative.                          15:23:53
21     Q.   Okay.  On the first page          15:23:53
22   there's an October 6th e-mail from Jane   15:24:05
23   Williams to you talking about a January   15:24:08
24   target date for removal of oxy 15 and 30 from  15:24:12
25   all volume incentive programs.           15:24:16
```

Page 250

1　　　　And then in the second　　　15:24:18
2　paragraph she says, "It's also my　　　15:24:23
3　recommendation that we consider a change in　15:24:26
4　strategy for customers requesting trade show　15:24:29
5　buys on our products by providing a trade　15:24:31
6　show allowance equal to what we might　　15:24:33
7　normally offer in discounted product costs or　15:24:36
8　possibly an educational giveaway to be　　15:24:38
9　determined in order to keep this consistently　15:24:40
10　managed."　　　　　　15:24:43
11　　　　And then you respond, "This is　15:24:44
12　the direction we discussed. I would like to　15:24:46
13　stop paying the trade show rebates and fees　15:24:48
14　for our products when the contracts come　15:24:50
15　due."　　　　　　　15:24:52
16　　　　Are the trade show rebates　15:24:52
17　related to the -- to the oxy 15 and oxy 30　15:24:55
18　sales, or is that a separate issue?　　15:25:00
19　　　　MR. O'CONNOR: Objection to　15:25:01
20　form.　　　　　　15:25:02
21　　　　THE WITNESS: Are the trade　15:25:02
22　show rebates related to the oxy -- no.　15:25:04
23　The customers gets trade show rebates,　15:25:06
24　just a standard percentage of all　15:25:11
25　sales.　　　　　　15:25:12

Page 251

1　QUESTIONS BY MR. GOTTO:　　15:25:13
2　　Q.　Okay. And that would -- were　15:25:13
3　those rebates being suspended with respect to　15:25:15
4　oxy 15 and 30 sales?　　　15:25:22
5　　A.　I wanted them suspended for all　15:25:23
6　products.　　　　　　15:25:25
7　　Q.　Okay. Did that happen?　　15:25:25
8　　A.　I believe we did.　　　15:25:27
9　　Q.　Okay. And what was the reason　15:25:28
10　for that?　　　　　　15:25:32
11　　A.　I just didn't think that　　15:25:33
12　Mallinckrodt had value in offering an　　15:25:34
13　additional discount to some of these　　15:25:36
14　customers. They would just get additional　15:25:39
15　rebate for doing nothing, basically. So we　15:25:42
16　just didn't see that there was value in doing　15:25:47
17　that.　　　　　　　15:25:49
18　　Q.　Okay. And then in the top　　15:25:49
19　e-mail on the first page from Lisa Cardetti,　15:25:56
20　she says, "Originally we were going to　　15:25:56
21　exclude all oxycodone. Just wanted to verify　15:26:01
22　that we will only be excluding 15 and 30."　15:26:02
23　　　　Now, do you understand her　15:26:05
24　there to be talking about excluding from the　15:26:08
25　VIP program?　　　　　15:26:13

Page 252

1　　A.　Yes.　　　　　15:26:14
2　　Q.　Okay. And which was it? Was　15:26:14
3　it excluding all oxycodone or just 15 and 30;　15:26:17
4　do you know?　　　　　15:26:20
5　　　　MR. O'CONNOR: Object to form.　15:26:20
6　　　　THE WITNESS: I believe it　　15:26:21
7　became only the 15 and 30. We　　15:26:23
8　remained with the 5 milligram.　　15:26:25
9　QUESTIONS BY MR. GOTTO:　　15:26:29
10　　Q.　Okay. You can set that aside.　15:26:29
11　　　　(Mallinckrodt-Collier Exhibit　15:26:30
12　　29 for identification.)　　　15:26:59
13　QUESTIONS BY MR. GOTTO:　　15:26:59
14　　Q.　Exhibit 29 is a two-page　　15:26:59
15　document beginning at Bates　　15:27:01
16　MNK-T1_0001553297. It appears to be a mailer　15:27:08
17　concerning a CME presentation.　　15:27:14
18　　　　Do you recognize this document?　15:27:22
19　　A.　No, I do not.　　　　15:27:24
20　　Q.　Do you recall having any　　15:27:25
21　familiarity with any CME presentations　　15:27:37
22　concerning opioid rotation?　　　15:27:42
23　　A.　Not the specific CE. We did　15:27:45
24　discuss doing continuing education.　　15:27:51
25　　Q.　On this topic?　　　15:27:52

Page 253

1　　　　MR. O'CONNOR: Object to form.　15:27:53
2　　　　THE WITNESS: I don't remember.　15:27:54
3　QUESTIONS BY MR. GOTTO:　　15:27:55
4　　Q.　Okay. Do you know what opioid　15:27:55
5　rotation means in the context of this mailer?　15:27:57
6　　A.　No, I do not.　　　　15:28:00
7　　Q.　Okay. And down toward the　　15:28:02
8　bottom of the mailer it says, "This activity　15:28:04
9　is funded through an educational grant from　15:28:06
10　Mallinckrodt/Covidien."　　　15:28:11
11　　　　Do you see that?　　　15:28:12
12　　A.　Yes.　　　　　15:28:13
13　　Q.　And educational grants of that　15:28:13
14　type, is that something that was handled by　15:28:17
15　the marketing department?　　　15:28:20
16　　A.　Not in my group, because this　15:28:21
17　is targeting physicians. We don't target　15:28:25
18　physicians at all. We don't even talk to　15:28:27
19　them.　　　　　　　15:28:29
20　　Q.　Okay. So whatever educational　15:28:29
21　grant underlay this presentation would have　15:28:33
22　been something that someone else handled?　15:28:35
23　　A.　Correct.　　　　15:28:37
24　　Q.　Okay. All right. You can set　15:28:37
25　that aside.　　　　　15:28:41

Highly Confidential - Subject to Further Confidentiality Review

Page 254

```
1      (Mallinckrodt-Collier Exhibits   15:28:55
2      30 and 31 marked for identification.)   15:28:56
3   QUESTIONS BY MR. GOTTO:          15:28:56
4      Q.   We've marked as Exhibit 30 a   15:29:23
5   single-page document, MNK-T1_0004673096, and   15:29:54
6   as Exhibit 31, a single-page document bearing   15:30:01
7   the next succeeding Bates number.   15:30:06
8          Could you take a look at those   15:30:09
9   materials and tell me if you recognize them?   15:30:09
10     A.   I recognize this.          15:30:11
11     Q.   The attachment?          15:30:20
12     A.   I do.                  15:30:21
13     Q.   Okay.  So in Exhibit 30,   15:30:21
14  Mr. Vorderstrasse sends you an e-mail saying   15:30:26
15  that "working on ideas for McKesson, who was   15:30:28
16  looking for information to show that we were   15:30:33
17  accepted in the market and to give them ideas   15:30:37
18  of selling techniques that have proven   15:30:38
19  successful."                15:30:42
20         And then Exhibit 31 appears to   15:30:42
21  be the attachment to the e-mail; is that   15:30:44
22  right?                      15:30:49
23     A.   Uh-huh.                15:30:49
24     Q.   And so Exhibit 31 has some   15:30:50
25  information about Mallinckrodt historical   15:30:53
```

Page 255

```
1   market share and then "available sales   15:30:55
2   materials, parens, we will likely need PARC,   15:30:59
3   P-A-R-C, approval to send examples."   15:31:02
4          What is PARC in this setting?   15:31:06
5      A.   Promotional material review   15:31:07
6   meeting.  Promotional advertising review   15:31:10
7   committee.                  15:31:13
8      Q.   Okay.  And that was a   15:31:13
9   Mallinckrodt committee?          15:31:15
10     A.   Yes.                  15:31:15
11     Q.   Were you on the committee?   15:31:15
12     A.   No, I submitted materials to   15:31:16
13  them --                    15:31:18
14     Q.   Okay.                  15:31:19
15     A.   -- for approval.          15:31:19
16     Q.   Who was on the committee; do   15:31:19
17  you know?                  15:31:21
18     A.   I didn't think I'd ever forget   15:31:21
19  his name, but, no, I don't remember the name.   15:31:26
20     Q.   Do you remember what his --   15:31:29
21     A.   The key gentleman.          15:31:30
22     Q.   Do you remember what   15:31:34
23  his position was?              15:31:35
24     A.   He was the lead at PARC, and so   15:31:35
25  he reviewed all communications.   15:31:37
```

Page 256

```
1      Q.   Okay.  Do you remember what   15:31:40
2   division in Mallinckrodt he worked in?   15:31:42
3      A.   He wasn't brand or generic.  He   15:31:44
4   actually -- both of us had to report our   15:31:47
5   materials through him.  I remember his first   15:31:49
6   name is Dennis.  That's all I can remember.   15:31:53
7      Q.   Okay.  So there are available   15:31:55
8   sales material -- materials that are listed   15:31:57
9   on the attachment, a sell sheet and a   15:32:01
10  tri-fold sell sheet with "think Mallinckrodt"   15:32:07
11  focus.                      15:32:10
12         Do you know what those   15:32:10
13  materials are?                15:32:11
14     A.   The tri-fold sell sheet was   15:32:12
15  something that we were thinking of doing.   15:32:15
16  It's a folder.  So if you go into brochure,   15:32:17
17  it's folded three times, it opens up and   15:32:21
18  it gives you information.  So it was   15:32:23
19  something we were thinking of doing, and the   15:32:24
20  pharmacy said they couldn't use it because   15:32:26
21  they didn't put anything on their shelves   15:32:28
22  anymore, on their counters for patients to   15:32:30
23  pick up.                    15:32:32
24         The sell sheet would be just a   15:32:32
25  sell sheet explaining -- with a copy of the   15:32:34
```

Page 257

```
1   ad, the package insert, and all the   15:32:37
2   information about the risks of the product.   15:32:39
3   And then it just showed, like I said, the   15:32:46
4   size of our patch.              15:32:48
5          And then we were going to   15:32:49
6   enclose a sample patch that was inactive so   15:32:51
7   they could see the size of the patch, because   15:32:55
8   we felt that was our biggest advantage.   15:32:56
9      Q.   Okay.  Okay.  All right.  You   15:32:58
10  can set that aside.              15:33:01
11         (Mallinckrodt-Collier Exhibit   15:33:33
12  32 marked for identification.)   15:33:33
13  QUESTIONS BY MR. GOTTO:          15:33:33
14     Q.   Exhibit 32 is a two-page e-mail   15:33:41
15  thread beginning at Bates MNK-T1_0000925331.   15:33:43
16  Please take a look at those e-mails and tell   15:33:49
17  me if you recognize them.          15:33:51
18     A.   Okay.                  15:34:48
19     Q.   Do you recognize those e-mails?   15:34:48
20     A.   Yes, I do.                15:34:49
21     Q.   Okay.  On the first page, the   15:34:50
22  bottom half, e-mail from you to Leah LaRue   15:34:53
23  and others.                  15:34:58
24         First of all, who was Leah   15:34:58
25  LaRue?                      15:35:01
```

Page 258

1      A.   She was part of the CARES      15:35:01
2  Alliance team.                    15:35:05
3      Q.   And how about Dan Brague?     15:35:05
4      A.   He was in business.  I don't   15:35:07
5  remember what his role was.           15:35:11
6      Q.   Okay.  Chris Wagner?          15:35:12
7      A.   Not familiar with him.        15:35:13
8      Q.   Okay.  In your e-mail you say,  15:35:15
9  "For generics we need more educational and    15:35:22
10 communication materials for pharmacies,    15:35:24
11 including how to identify a patient that may   15:35:25
12 be at risk, how to handle a patient that     15:35:27
13 comes in too soon for a refill," and then you  15:35:31
14 have several other bullet items under that.   15:35:34
15         How did you develop that list    15:35:36
16 of information that you felt needed more    15:35:37
17 education and communication materials for?   15:35:40
18     A.   At trade shows we had asked    15:35:42
19 customers what they thought was lacking and   15:35:46
20 what kind of information would they need from  15:35:48
21 a company like Mallinckrodt.          15:35:50
22     Q.   Okay.  At the end of your     15:35:51
23 e-mail you say, "I am sure I will think of    15:35:58
24 more once I dig into the SOM program more."   15:36:00
25         So this is in -- you send the   15:36:03

Page 259

1  e-mail in February 2013.            15:36:08
2          Do you recall what digging into  15:36:12
3  the SOM program you were doing at this time?  15:36:15
4      A.   I don't recall.            15:36:18
5      Q.   Do you recall if you did come   15:36:19
6  up with additional proposed items for     15:36:23
7  education for pharmacies?            15:36:26
8      A.   I don't remember if we did.    15:36:28
9      Q.   Okay.  Do you recall if -- do   15:36:31
10 you recall participating in preparing any    15:36:36
11 educational and communication materials of    15:36:39
12 the type you describe in your e-mail?      15:36:41
13     A.   The only thing I remember that  15:36:43
14 we did was information on safe disposal.     15:36:44
15     Q.   Okay.  The last bullet item in  15:36:47
16 your e-mail you say, "There was a poster we   15:36:55
17 handed out showing the most widely abused    15:36:58
18 drugs.  It would be good to have that again."  15:37:01
19         Do you recall that poster?     15:37:04
20     A.   I do recall seeing that poster.  15:37:05
21     Q.   And in what context do you     15:37:07
22 remember seeing it?               15:37:09
23     A.   There was a closet full of all   15:37:09
24 promotional materials, and I happened to see  15:37:13
25 something in there.               15:37:15

Page 260

1      Q.   Okay.  And do you recall if you  15:37:16
2  were ever able to locate that poster again?   15:37:22
3      A.   They never developed it again.  15:37:25
4      Q.   Okay.  You can set that aside.  15:37:26
5          (Mallinckrodt-Collier Exhibit   15:37:27
6          33 marked for identification.)   15:38:01
7  QUESTIONS BY MR. GOTTO:             15:38:01
8      Q.   Exhibit 33 is a multipage     15:38:01
9  e-mail thread beginning MNK-T1_0000660532.   15:38:03
10 Take a look at those, and tell me if you     15:38:09
11 recognize those e-mails.            15:38:11
12         Do you recognize those e-mails?  15:39:16
13     A.   Yes.                   15:39:19
14     Q.   And your e-mail on the bottom   15:39:19
15 part of the first page lists a series of    15:39:21
16 grants that had been funded the prior year,   15:39:24
17 correct?                     15:39:27
18     A.   Correct.                15:39:27
19     Q.   And the funding of these     15:39:27
20 grants, is that -- who was responsible for    15:39:30
21 making the decision to fund grants of this    15:39:32
22 type?                       15:39:35
23     A.   That actually would have been   15:39:35
24 the president of our team.            15:39:37
25     Q.   And Mr. Gunning?           15:39:38

Page 261

1      A.   Yes.                  15:39:40
2      Q.   Okay.                  15:39:41
3      A.   At this time it might have been  15:39:43
4  David Silver because Mr. Gunning had passed   15:39:45
5  away.                      15:39:47
6      Q.   Oh, I see.  Okay.          15:39:47
7          Did you have input into -- or   15:39:49
8  did you make recommendations as to grant --   15:39:52
9  you personally make recommendations as to    15:39:55
10 which grants you thought were worthwhile?    15:39:57
11         MR. O'CONNOR:  Object to form.  15:40:00
12         THE WITNESS:  Sometimes I did,   15:40:00
13 yes.                       15:40:01
14 QUESTIONS BY MR. GOTTO:             15:40:01
15     Q.   And what criteria did you     15:40:02
16 employ in making that determination?      15:40:03
17     A.   Relationship to Mallinckrodt.  15:40:05
18 Their relationship to Mallinckrodt.       15:40:09
19     Q.   And what sorts of -- when you   15:40:11
20 say "relationship to Mallinckrodt," what do   15:40:16
21 you mean by that?                15:40:17
22     A.   For example, AATOD is a big    15:40:18
23 organization about opioid dependence, and    15:40:25
24 they do a lot of education on methadone, and  15:40:27
25 we actually sold methadone, too.  So it would  15:40:29

Page 262

1  be that relationship, that they were very  15:40:31
2  important in the industry for methadone  15:40:33
3  treatment, so you want to make sure that they  15:40:36
4  continued doing work that they were doing.  15:40:38
5     Q.  Okay.  Are there any other of  15:40:40
6  these organizations in particular that you  15:40:44
7  can recall recommending Mallinckrodt make the  15:40:45
8  grant?  15:40:48
9     A.  American Pharmacists  15:40:49
10  Association.  American Society Health System  15:41:01
11  Pharmacists Research and Education  15:41:03
12  Foundation.  And the two customer requests  15:41:05
13  for Kroger and Cardinal would have come from  15:41:10
14  the sales team.  15:41:13
15     Q.  And in terms of the two  15:41:14
16  pharmacists associations that you mentioned,  15:41:18
17  what was the reason for recommending those  15:41:20
18  grants?  15:41:22
19     A.  They provide educational  15:41:22
20  materials for pharmacies, and they help  15:41:24
21  provide programs and services to independent  15:41:30
22  pharmacies which we don't have reach to.  15:41:32
23     Q.  Okay.  You can set that aside.  15:41:35
24     (Mallinckrodt-Collier Exhibit  15:41:49
25    34 marked for identification.)  15:41:50

Page 263

1  QUESTIONS BY MR. GOTTO:  15:41:50
2     Q.  I'll apologize in advance for  15:41:53
3  the small type on this document.  15:41:54
4     A.  Oh, boy.  15:41:57
5     Q.  Exhibit 34 is a multipage --  15:41:58
6  well, actually it's a document that was  15:42:02
7  produced in native at MNK-T1_0000661003, and  15:42:03
8  it appears to be a list of grants.  15:42:11
9     And perhaps I can just ask you  15:42:14
10  a general question about the very first line  15:42:17
11  where it says, "GCC approved grants  15:42:20
12  January 14 to present."  15:42:25
13     Do you know what GCC means in  15:42:26
14  this setting?  15:42:28
15     A.  No, I don't.  15:42:29
16     Q.  Okay.  Do you know if the  15:42:31
17  grants and contributions that are contained  15:42:35
18  in this document were grants and  15:42:38
19  contributions that Mallinckrodt made, or is  15:42:40
20  it some other compilation of grants and  15:42:43
21  contributions?  15:42:45
22     A.  I don't know if these are  15:42:45
23  grants that -- specifically that Mallinckrodt  15:42:48
24  made.  It looks as if many of them would have  15:42:50
25  been funded either through CARES Alliance or  15:42:53

Page 264

1  another initiative, so they wouldn't have  15:42:55
2  been in my area.  15:42:57
3     Q.  Okay.  Okay.  So in terms of  15:42:58
4  grants that the marketing department made a  15:43:01
5  determination on, those would be reflected on  15:43:07
6  the -- the prior exhibit we just looked at?  15:43:08
7     MR. O'CONNOR:  Object to form.  15:43:10
8     THE WITNESS:  Correct.  15:43:11
9  QUESTIONS BY MR. GOTTO:  15:43:11
10     Q.  Okay.  All right.  You can set  15:43:12
11  that aside.  15:43:13
12     (Mallinckrodt-Collier Exhibit  15:43:14
13    35 marked for identification.)  15:43:15
14  QUESTIONS BY MR. GOTTO:  15:43:15
15     Q.  Exhibit 35 is a two-page e-mail  15:43:51
16  thread beginning at Bates MNK-T1_0000558153.  15:43:55
17  Please take a look at that and let me know if  15:44:01
18  you recognize those e-mails.  15:44:03
19     A.  Yes, I recognize it.  15:44:04
20     Q.  Okay.  The bottom e-mail on the  15:44:10
21  first page from Debbie Digby is another  15:44:14
22  e-mail transmitting monthly SOM reports  15:44:17
23  similar to a document we looked at a little  15:44:21
24  earlier this afternoon.  15:44:23
25     You recall?  15:44:27

Page 265

1     A.  Yes.  15:44:27
2     Q.  And then the top e-mail is an  15:44:27
3  e-mail from you to, well, a number of folks,  15:44:29
4  but in the body of the e-mail you say  15:44:33
5  "Karen."  15:44:35
6     I assume that means Karen  15:44:35
7  Harper?  15:44:37
8     A.  I would assume so.  15:44:37
9     Q.  Okay.  And you indicate that  15:44:44
10  you took highest volume pharmacies ran by  15:44:50
11  distributor, et cetera, and compiled the data  15:44:53
12  that's in the table on the e-mail, correct?  15:44:55
13     A.  Correct.  15:44:58
14     Q.  And what was your reason for  15:44:59
15  doing that?  15:45:00
16     A.  I guess so that -- to inform  15:45:01
17  Karen of what the wholesalers' sales are.  15:45:07
18     Q.  And why did you think that  15:45:12
19  would be something that she should be  15:45:21
20  informed of?  15:45:23
21     A.  I'm trying to understand what  15:45:24
22  I'm even saying here.  15:45:26
23     Okay.  Well, I guess in the  15:45:42
24  process we continued to monitor what some of  15:45:43
25  the wholesalers were doing in their sales.  15:45:47

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1     Q.   And monitoring it for what    15:45:50
2 purpose?            15:45:57
3     A.   To see if there's any high    15:45:57
4 concentration by some of these smaller    15:46:00
5 distributors.            15:46:03
6     Q.   And high concentration meaning   15:46:03
7 what in this setting?         15:46:09
8     A.   So, for example, if Masters    15:46:11
9 would have 15 percent share, that would be   15:46:12
10 concerning because we have large volume   15:46:15
11 customers on here. Or if KeySource was high.  15:46:17
12     Q.   And do you recall if you    15:46:22
13 performed this analysis on other occasions,   15:46:34
14 or was this a one-time thing that you did?   15:46:38
15      MR. O'CONNOR: Object to form.   15:46:41
16      THE WITNESS: I'm not sure if    15:46:42
17    it was done on a frequent basis. I --   15:46:44
18    I just said I just took this, so I   15:46:50
19    assume that possibly from the data   15:46:52
20    that provided by Debbie, I twisted   15:46:53
21    it a little bit further, you know, to   15:46:55
22    look at the numbers in a different   15:46:57
23    way.            15:46:58
24 QUESTIONS BY MR. GOTTO:       15:46:58
25     Q.   Do you know if you had any    15:46:58

Page 267

1 particular reason for performing that    15:46:59
2 analysis in March of 2011?       15:47:02
3     A.   I don't recall.      15:47:03
4     Q.   Okay. You can put that aside.   15:47:06
5      (Mallinckrodt-Collier Exhibit   15:47:11
6    36 marked for identification.)    15:47:12
7 QUESTIONS BY MR. GOTTO:       15:47:12
8     Q.   Exhibit 36 is a multipage    15:47:33
9 document beginning at MNK-T1_0000609142. It  15:47:36
10 appears to be NACDS meeting notes from April  15:47:42
11 of 2013.            15:47:48
12      Are you familiar with what the   15:47:49
13 NACDS meetings were?        15:47:53
14     A.   Yes.         15:47:55
15     Q.   And what were they?     15:47:55
16     A.   They were National Association   15:47:57
17 of Chain Drugstores, and it was meeting --   15:47:59
18 this particular meeting was with executives   15:48:03
19 from the big wholesalers and big chains   15:48:05
20 and -- with the executives from the    15:48:09
21 manufacturers.          15:48:11
22     Q.   Okay. And did you participate   15:48:11
23 in those meetings?         15:48:13
24     A.   I participated, yes.    15:48:13
25     Q.   Okay. Did you prepare these   15:48:15

Page 268

1 notes?            15:48:17
2     A.   No, I did not.      15:48:17
3     Q.   Do you know who did?    15:48:18
4     A.   This would have been someone in  15:48:19
5 sales, possibly Jane.        15:48:21
6     Q.   Okay. Did you have any input   15:48:23
7 into what she put into the notes?    15:48:26
8     A.   I don't recall putting anything  15:48:28
9 in, adding any comments.      15:48:30
10     Q.   Were these meetings held    15:48:32
11 regularly?          15:48:35
12     A.   Annually, yes.     15:48:35
13     Q.   And did you participate each   15:48:37
14 year?           15:48:39
15     A.   Yes, I did.      15:48:39
16      MR. GOTTO: Okay. All right.   15:48:46
17 Why don't we go off the record.    15:48:47
18      VIDEOGRAPHER: We're going off   15:48:49
19    the record at 3:48 p.m.     15:48:50
20      (Off the record at 3:48 p.m.)   15:48:52
21      VIDEOGRAPHER: We are back on   15:53:10
22    the record at 3:52 p.m.     15:53:11
23      CROSS-EXAMINATION     15:53:12
24 QUESTIONS BY MS. HERZFELD:      15:53:13
25     Q.   Good afternoon, Ms. Collier.   15:53:14

Page 269

1 My name is Tricia Herzfeld. I'm an attorney  15:53:15
2 representing the plaintiffs in the Tennessee  15:53:17
3 state court litigation.       15:53:19
4      How are you doing this    15:53:20
5 afternoon?          15:53:21
6     A.   Very good, thank you.    15:53:21
7     Q.   Good.        15:53:22
8      Are you familiar at all with   15:53:22
9 the Tennessee litigation?      15:53:23
10     A.   No, I'm not.      15:53:24
11     Q.   Okay.        15:53:25
12      MS. HERZFELD: Well, before we  15:53:26
13    get on the record, I'm just going to   15:53:27
14    make our standard objection, which   15:53:28
15    we've made in every deposition we've   15:53:30
16    had thus far, so I won't repeat all   15:53:32
17    the specifics.        15:53:35
18      MR. O'CONNOR: And we'll make   15:53:35
19    our standard objection to your    15:53:36
20    objection.        15:53:37
21      MS. HERZFELD: Excellent.   15:53:38
22    Wonderful. Moving on.     15:53:39
23 QUESTIONS BY MS. HERZFELD:      15:53:41
24     Q.   Ms. Collier, have you ever been  15:53:42
25 to the state of Tennessee?      15:53:42

Page 270

1   A.   Yes, I have.                    15:53:44
2   Q.   And for business or pleasure?   15:53:44
3   A.   Both.                           15:53:45
4   Q.   Okay.  When for business?       15:53:46
5   A.   When for business?              15:53:47
6   Q.   Yes, ma'am.                     15:53:50
7   A.   I believe I was there for a     15:53:50
8   conference in Nashville, and doing business   15:53:52
9   in Memphis with McKesson.           15:53:54
10  Q.   Okay.  And when was the         15:53:59
11  conference in Nashville?            15:54:00
12  A.   I have no idea.                 15:54:00
13  Q.   Okay.  Do you know who you were   15:54:01
14  working for when you attended the conference?   15:54:03
15  A.   Probably Baxter.               15:54:04
16  Q.   Okay.  And when you said "in    15:54:08
17  Memphis," was that for your time with   15:54:11
18  McKesson?                           15:54:12
19  A.   No.  It was calling on         15:54:13
20  McKesson.                           15:54:15
21  Q.   Oh, calling on McKesson.       15:54:16
22  A.   They have a warehouse there.   15:54:18
23  Q.   Okay.                          15:54:18
24  A.   They had a warehouse there.    15:54:20
25  Q.   And who were you employed by   15:54:21

Page 271

1   when you were calling on McKesson?   15:54:23
2   A.   Baxter.                        15:54:24
3   Q.   Okay.  In your capacity as an   15:54:25
4   employee of Mallinckrodt, did you ever visit   15:54:27
5   Tennessee?                          15:54:31
6   A.   Yes.                           15:54:31
7   Q.   Okay.  And when was that?      15:54:32
8   A.   I don't recall.                15:54:33
9   Q.   Okay.  And what were you doing   15:54:39
10  in Tennessee?                       15:54:40
11  A.   Visiting the McKesson          15:54:41
12  warehouse.                          15:54:43
13  Q.   Okay.  So you visited the      15:54:43
14  McKesson warehouse in Memphis during your job   15:54:45
15  at Baxter as well as your job at    15:54:49
16  Mallinckrodt; is that correct?     15:54:52
17  A.   Correct.                       15:54:52
18       MR. O'CONNOR:  Object to form.   15:54:52
19  QUESTIONS BY MS. HERZFELD:          15:54:53
20  Q.   Okay.  Any other times that you   15:54:53
21  visited Tennessee in your capacity as an   15:54:56
22  employee of Mallinckrodt?           15:54:58
23  A.   Not that I remember.           15:54:59
24  Q.   Okay.  And you've gone         15:55:01
25  personally for vacation or something?   15:55:05

Page 272

1   A.   Yes.                           15:55:07
2   Q.   Okay.  And which cities did you   15:55:07
3   visit?                              15:55:09
4   A.   Memphis.                       15:55:09
5   Q.   Oh, okay.                      15:55:11
6        Did you get to go to the Civil   15:55:13
7   Rights Museum?                      15:55:14
8   A.   No.                            15:55:16
9   Q.   Graceland?                     15:55:16
10  A.   Yes.                           15:55:18
11  Q.   Did you like it?               15:55:18
12  A.   No.                            15:55:19
13  Q.   Okay.  It's a little different   15:55:19
14  than people think.                  15:55:21
15       Okay.  And does that pretty    15:55:22
16  much close out your visits to Tennessee, just   15:55:24
17  Memphis and Nashville?              15:55:27
18  A.   Yes.                           15:55:28
19  Q.   Okay.  Have you ever been to   15:55:29
20  the Appalachian region of Tennessee?   15:55:31
21  A.   Possibly driven through it.    15:55:34
22  Q.   Okay.                          15:55:36
23  A.   I'm not really sure where it   15:55:37
24  is.                                 15:55:39
25  Q.   Okay.  You've heard of the     15:55:39

Page 273

1   Smoky Mountains?                    15:55:42
2   A.   Yes.                           15:55:42
3   Q.   Okay.  Do you know there's an   15:55:43
4   area of Tennessee that's like up northeast of   15:55:44
5   the Smoky Mountains?  It's almost in   15:55:47
6   Kentucky, West Virginia?            15:55:49
7   A.   Then I might have driven       15:55:51
8   through it.                         15:55:52
9   Q.   Okay.  Do you know where you   15:55:53
10  were going?                         15:55:55
11  A.   From New Jersey to St. Louis.   15:55:55
12  Q.   Okay.  I'm going to go         15:55:57
13  through just a couple of e-mails with you   15:56:11
14  quickly, hopefully.  I don't think they've   15:56:13
15  been previously added as exhibits, so if they   15:56:17
16  have, if somebody will stop me and hopefully   15:56:21
17  we won't repeat it.                 15:56:23
18       If we could mark this one as    15:56:24
19  Exhibit -- are we on 29?            15:56:26
20       COURT REPORTER:  36.           15:56:32
21       MS. HERZFELD:  36.             15:56:32
22       MR. O'CONNOR:  I think I have a   15:56:32
23  36 already.  So 37.                 15:56:32
24       MS. HERZFELD:  37.  Okay.       15:56:47
25       (Mallinckrodt-Collier Exhibit   15:56:47

Page 274

```
1     37 marked for identification.)       15:56:48
2  QUESTIONS BY MS. HERZFELD:              15:56:48
3     Q.   Okay. If you'd take a moment    15:56:51
4  and look at this e-mail, please.        15:56:52
5     A.   Okay.                           15:56:53
6        MR. HIBEY: If there's a Bates     15:56:53
7  number for the document, could you      15:56:53
8  please read it for us?                  15:57:13
9        MS. HERZFELD: Sure. But it's      15:57:13
10 been produced in the Tennessee state    15:57:14
11 litigation, so I don't have a Bates     15:57:17
12 number for the MDL.                     15:57:18
13       MR. HIBEY: Well, I guess I'd      15:57:20
14 take that Bates number as well, just    15:57:21
15 some kind of identifier.                15:57:22
16       MS. HERZFELD: Sure.               15:57:25
17       Who is it on the phone?           15:57:25
18       MR. HIBEY: This is David Hibey    15:57:28
19 from Arnold & Porter.                   15:57:29
20       MS. HERZFELD: Okay. And           15:57:31
21 you're representing whom?               15:57:31
22       MR. HIBEY: Endo and Par.          15:57:33
23       MS. HERZFELD: Okay. So the        15:57:35
24 Tennessee state litigation number is    15:57:36
25 MNK_TNSTA05202063. And I have no idea   15:57:37
```

Page 275

```
1  if this was produced in the MDL.        15:57:45
2  QUESTIONS BY MS. HERZFELD:              15:57:55
3     Q.   Ma'am, you've had an            15:57:56
4  opportunity to review it?               15:57:57
5     A.   Yes. I'm still reviewing the    15:57:57
6  top. I'm sorry.                         15:57:59
7     Q.   That's okay.                    15:58:00
8        Okay. Are you finished            15:58:01
9  reviewing it?                           15:58:23
10    A.   Yes, ma'am.                     15:58:24
11    Q.   Okay. Do you recognize this     15:58:24
12 document?                               15:58:25
13    A.   Yes, I do.                      15:58:25
14    Q.   Okay. Does it appear to be an   15:58:26
15 e-mail that was sent to you and Kate Neely  15:58:28
16 from Karen Harper?                      15:58:32
17    A.   The top one is. The bottom one  15:58:33
18 started with Kate Neely sending something to  15:58:36
19 Karen Harper and me -- and copying me.  15:58:39
20    Q.   Okay. And then it looks like a  15:58:41
21 response on the top?                    15:58:44
22    A.   Correct, from Karen.           15:58:45
23    Q.   Okay. Great.                   15:58:46
24       And so looking at this e-mail,    15:58:47
25 Kate Neely asks about the audits of     15:58:51
```

Page 276

```
1  distributors, stating, "Have we ever asked  15:58:53
2  them to provide written protocol for how they  15:58:56
3  vet the customers that they sell to?"   15:58:58
4        Do you see where I'm at?          15:59:00
5     A.   Yes, I do.                      15:59:02
6     Q.   And did I read that correctly?  15:59:02
7     A.   Yes, you did.                   15:59:04
8     Q.   Okay. And then, "Can we start   15:59:05
9  making it a requirement that they provide us  15:59:07
10 with written standard operating practices as  15:59:09
11 to how they confirm that an account is okay?"  15:59:12
12       Do you see that?                  15:59:16
13    A.   Yes.                            15:59:16
14    Q.   Okay. And then Karen Harper     15:59:16
15 responds, "The question whether our customers  15:59:18
16 monitor their customers was removed from the  15:59:22
17 questionnaire by the Mallinckrodt suspicious  15:59:24
18 order monitoring team because there is no  15:59:25
19 {sic} actual regulatory obligation to monitor  15:59:28
20 customers' customers."                  15:59:32
21       Do you see where I'm at?          15:59:35
22    A.   Yes.                            15:59:36
23    Q.   Okay. Was that your             15:59:37
24 understanding of the DEA requirements?  15:59:38
25    A.   I did not know the DEA          15:59:39
```

Page 277

```
1  requirements. That's why we were requesting.  15:59:40
2     Q.   Okay. And were you part of the  15:59:43
3  decision to take that off the questionnaire?  15:59:44
4     A.   No, I was not.                  15:59:46
5     Q.   Okay. And were you part of the  15:59:48
6  decision to not require distributors to  15:59:50
7  provide their written policies?         15:59:52
8     A.   No, I was not.                  15:59:53
9     Q.   Okay. That was my only          15:59:54
10 questions on that document. Thank you,  15:59:57
11 ma'am.                                  15:59:58
12    A.   Okay.                           15:59:58
13       (Mallinckrodt-Collier Exhibit     16:00:08
14 38 marked for identification.)          16:00:09
15       MS. HERZFELD: For those on the    16:00:09
16 phone, this is MNK_TNSTA05202176.       16:00:27
17 QUESTIONS BY MS. HERZFELD:              16:00:34
18    Q.   Okay. You've had an             16:01:09
19 opportunity to read it?                 16:01:10
20    A.   Yes, I have.                    16:01:11
21    Q.   Okay. And what does this        16:01:11
22 e-mail appear to be to you?             16:01:14
23    A.   This appears that we were       16:01:16
24 requested to provide an average on      16:01:17
25 OxyContin -- I mean, oxycodone units    16:01:24
```

Page 278

1  dispensed at the pharmacy level by state.  16:01:26
2      Q.   Okay.  And it's an e-mail from  16:01:28
3  you to Michael Gunning; is that correct?  16:01:30
4      A.   Correct.  16:01:31
5      Q.   Okay.  And it's dated  16:01:32
6  4/18/2011?  16:01:35
7      A.   Correct.  16:01:35
8      Q.   Okay.  And do you have any  16:01:36
9  reason to think you didn't receive this  16:01:37
10  e-mail?  16:01:38
11     A.   No, I have no reason.  16:01:38
12     Q.   Okay.  And so who is Michael  16:01:40
13  Gunning?  16:01:43
14     A.   He was the president -- or the  16:01:43
15  general manager of the generics division.  16:01:46
16     Q.   Okay.  And do you have any  16:01:48
17  specific memory of him requesting this  16:01:51
18  information from you?  16:01:53
19     A.   No.  16:01:53
20     Q.   Okay.  And do you know why he  16:01:55
21  requested it from you?  16:01:56
22     A.   I'm not sure that he did  16:01:58
23  request it.  16:02:00
24     Q.   Okay.  Might it have been  16:02:01
25  something that you just came up with to send?  16:02:03

Page 279

1      A.   It might have been a discussion  16:02:05
2  and I decided -- I could have acted  16:02:07
3  proactively, or it could have been at a  16:02:09
4  request.  16:02:12
5      Q.   And from the testimony that  16:02:12
6  we've received a little bit earlier, it looks  16:02:13
7  like sometimes you acted proactively and  16:02:15
8  crunched numbers in a way and would pass that  16:02:17
9  on to someone; is that correct?  16:02:19
10     A.   Correct.  16:02:20
11         MR. O'CONNOR:  Objection.  16:02:21
12 QUESTIONS BY MS. HERZFELD:  16:02:22
13     Q.   Okay.  So looking at this  16:02:23
14  e-mail, it says, "Based on the report we get  16:02:24
15  for suspicious order monitoring, below are  16:02:26
16  the averages -- are the average pharmacy  16:02:29
17  dispensing units for the 15-milligram and  16:02:32
18  30-milligram combined."  16:02:35
19         Do you see where it says that?  16:02:36
20     A.   Yes.  16:02:37
21     Q.   Okay.  And then kind of moving  16:02:38
22  forward, it says, "By any standard it appears  16:02:40
23  5,000 tablets is too low."  16:02:42
24         What did you mean by that?  16:02:44
25     A.   When I'm looking at this, the  16:02:45

Page 280

1  average is well above 5,000 units, so I  16:02:50
2  assume that they were probably trying to set  16:02:53
3  a standard.  And I was saying that 5,000 is  16:02:54
4  too low based on that standard.  16:02:57
5      Q.   Okay.  So I'm going to back up  16:02:58
6  a little bit and just make sure that I fully  16:03:00
7  understand it because I'm struggling just a  16:03:02
8  tiny bit.  16:03:05
9         Okay.  So when you're looking  16:03:05
10  at the -- it's dispensing units, is that  16:03:08
11  right, DISP?  16:03:10
12     A.   Right.  16:03:11
13     Q.   Okay.  And so does that stand  16:03:12
14  for tablets or bottles, or what is a  16:03:13
15  dispensing unit?  16:03:15
16     A.   In this --  16:03:16
17         MR. O'CONNOR:  Objection to the  16:03:16
18     form.  16:03:16
19         THE WITNESS:  In this context I  16:03:16
20     would think that it's tablets.  It  16:03:21
21     doesn't say, but I refer to tablets  16:03:22
22     later on.  In looking at these  16:03:23
23     numbers, it looks like it could refer  16:03:25
24     to the tablets.  16:03:27
25

Page 281

1 QUESTIONS BY MS. HERZFELD:  16:03:28
2      Q.   Okay.  And so when you're  16:03:28
3  looking here, this looks like it is for, what  16:03:30
4  is it, a month?  For a year?  Do you know  16:03:34
5  what the time period is?  16:03:35
6      A.   No, I do not.  16:03:36
7      Q.   Okay.  And so looking at this,  16:03:37
8  it looks like it's oxy 15 and oxy 30,  16:03:39
9  according to your e-mail here; is that right?  16:03:42
10     A.   Yes.  16:03:44
11     Q.   Okay.  And it's for pharmacies  16:03:45
12  purchasing from two or more distributors; is  16:03:47
13  that right?  16:03:49
14     A.   Yes.  16:03:49
15     Q.   Okay.  And it says, "I will ask  16:03:51
16  if they can expand the report to include all  16:03:54
17  oxy sales."  16:03:56
18         What other oxy sales would be  16:03:58
19  included that are not included here?  16:04:00
20     A.   Oxy 5 milligram.  16:04:02
21     Q.   Is that what you're  16:04:04
22  referring to that's excluded?  16:04:05
23     A.   Yes.  16:04:06
24     Q.   Okay.  "And so by any standard  16:04:07
25  it appears that 5,000 tablets is too low."  16:04:11

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1       So do you know what the goal    16:04:14
2  was of this chart?          16:04:15
3       MR. O'CONNOR: Objection to    16:04:18
4  form.            16:04:19
5       THE WITNESS: I don't recall.    16:04:19
6  QUESTIONS BY MS. HERZFELD:      16:04:20
7    Q.  Okay. And you said before -- I  16:04:20
8  think you said something about setting    16:04:21
9  standards.         16:04:23
10       What did you mean by that?    16:04:23
11    A.  Setting standards on -- it says  16:04:25
12  "by any standard." I don't know what    16:04:28
13  standard they were looking for, but it says    16:04:30
14  in here looking at -- if they're looking at    16:04:31
15  5,000 to make that a benchmark, that's below    16:04:34
16  most of these numbers.      16:04:37
17    Q.  Okay. And when you say    16:04:38
18  "benchmark," I guess I'm trying to figure out  16:04:39
19  a benchmark for what. A benchmark for sales?  16:04:42
20    A.  I don't recall.      16:04:45
21    Q.  Target sales?      16:04:46
22    A.  I have no idea. I don't know    16:04:48
23  if this is in relation to setting any -- the  16:04:49
24  suspicious order monitoring baseline to    16:04:52
25  trigger part of their algorithms. Because    16:04:54

Page 283

1  they were looking at changing how they were    16:04:56
2  doing their algorithms, so it could have been  16:04:58
3  part of that. It could have been part of    16:04:59
4  sales. It could have been anything.    16:05:01
5    Q.  Okay. And Michael Gunning,    16:05:02
6  what did you typically communicate with him    16:05:04
7  about? Was it suspicious order monitoring or  16:05:06
8  sales?          16:05:08
9    A.  Typically I would communicate    16:05:09
10  with him about forecast and employee issues.  16:05:11
11    Q.  Forecast and employee issues.    16:05:15
12  Okay.         16:05:15
13       So when you say "forecast,"    16:05:15
14  that would be sales; is that right?    16:05:17
15    A.  Yes.        16:05:18
16    Q.  Okay. So if you were sending    16:05:19
17  something to Michael Gunning in your    16:05:21
18  position, and typically you dealt with him  16:05:24
19  about sales, it's likely that this chart here  16:05:26
20  would have to do with sales; is that right?  16:05:29
21       MR. O'CONNOR: Objection.    16:05:31
22  Form.         16:05:32
23       THE WITNESS: That's a reach.    16:05:32
24  QUESTIONS BY MS. HERZFELD:      16:05:34
25    Q.  That's a reach. Okay.    16:05:34

Page 284

1       Do you have any specific    16:05:36
2  knowledge of communicating with him about    16:05:36
3  suspicious order monitoring target numbers?  16:05:38
4    A.  Well, this relates to a    16:05:39
5  suspicious order monitoring report that we    16:05:44
6  received.         16:05:46
7    Q.  Okay.      16:05:46
8    A.  And so it's referring to    16:05:46
9  dispensing units.      16:05:48
10    Q.  Okay.      16:05:49
11    A.  When I'm looking at sales, I'm  16:05:49
12  not looking at dispensing units. I'm usually  16:05:53
13  look at dollars --      16:05:55
14    Q.  Okay.      16:05:56
15    A.  -- and units sold to    16:05:56
16  wholesalers --      16:05:57
17    Q.  Okay.      16:05:58
18    A.  -- and distributors.    16:05:58
19    Q.  Okay. So based on that, you    16:06:00
20  think this is based on suspicious order    16:06:01
21  monitoring levels?      16:06:02
22       MR. O'CONNOR: Object to form.    16:06:05
23       THE WITNESS: I cannot say    16:06:07
24    definitively, yes, it is. That would    16:06:08
25    be drawing a conclusion, and I don't    16:06:11

Page 285

1    know, and I don't recollect.    16:06:12
2  QUESTIONS BY MS. HERZFELD:      16:06:13
3    Q.  Okay. But if you had to guess,  16:06:14
4  do you think that's what it is?    16:06:17
5       MR. O'CONNOR: Objection to    16:06:18
6  form.         16:06:19
7       THE WITNESS: I would think    16:06:20
8    that it might have something to do    16:06:21
9    with that.      16:06:22
10  QUESTIONS BY MS. HERZFELD:      16:06:23
11    Q.  Okay. Very good.    16:06:23
12       Looking at this, it says on    16:06:24
13  state average, right? California average,    16:06:30
14  Florida average, Georgia average; is that    16:06:32
15  right?         16:06:34
16    A.  Yes.      16:06:34
17    Q.  Okay. And do you know if those  16:06:35
18  are pharmacy-level oxy units per month?    16:06:36
19       MR. O'CONNOR: Objection to    16:06:39
20  form.         16:06:41
21       THE WITNESS: There's no way to  16:06:41
22    tell without some context.    16:06:42
23  QUESTIONS BY MS. HERZFELD:      16:06:43
24    Q.  Okay. And it says,    16:06:43
25  "Tennessee's average here is 14,100 tablets";  16:06:44

Page 286

1  is that correct?                                  16:06:51
2      A.   Yes.                                     16:06:51
3      Q.   Okay.  And could you tell from           16:06:51
4  that, from this chart, if Tennessee was           16:06:52
5  considered high or low?                           16:06:56
6           MR. O'CONNOR:  Objection to              16:06:57
7  form.                                             16:06:57
8           THE WITNESS:  I cannot tell              16:06:58
9  that because I wouldn't know what the             16:06:58
10  medical needs or the population was of           16:07:03
11  Tennessee --                                     16:07:05
12 QUESTIONS BY MS. HERZFELD:                        16:07:06
13     Q.   Okay.                                    16:07:06
14     A.   -- so I wouldn't know that.              16:07:07
15     Q.   And are those things that are            16:07:08
16 important for you to determine if someone's       16:07:09
17 oxy numbers are high or low, is                   16:07:11
18 population or -- what was the other thing you     16:07:16
19 said?                                             16:07:17
20     A.   Or medical needs.                        16:07:17
21     Q.   Medical needs?                           16:07:18
22          MR. O'CONNOR:  Objection.                16:07:18
23 Form.                                             16:07:19
24          THE WITNESS:  I wouldn't have            16:07:19
25 any way to know that, so I couldn't               16:07:20

Page 287

1  use that in any decision-making                   16:07:23
2  anyway.                                           16:07:24
3  QUESTIONS BY MS. HERZFELD:                        16:07:25
4      Q.   Okay.  But is that some -- is            16:07:25
5  that information you would like to know, the      16:07:27
6  population of a particular area?                  16:07:29
7           MR. O'CONNOR:  Objection to             16:07:30
8  form.                                             16:07:31
9           THE WITNESS:  It wouldn't help,         16:07:31
10 so, no, I wouldn't need to know that.            16:07:35
11 QUESTIONS BY MS. HERZFELD:                       16:07:37
12     Q.   Okay.  It wouldn't help what?           16:07:38
13     A.   I'm sorry.  It wouldn't help            16:07:39
14 why?                                             16:07:43
15     Q.   Yes, ma'am.                             16:07:44
16     A.   Oh.  It wouldn't help because I         16:07:44
17 have no idea why the prescriptions are being     16:07:46
18 dispensed or being written for, so I cannot      16:07:49
19 make a judgment on somebody's medical            16:07:51
20 condition that I do not know and that I have     16:07:54
21 not seen come into a pharmacy.  I'm not there    16:07:55
22 physically in a pharmacy, so I have no idea      16:07:58
23 what's going on in that region.                   16:07:59
24          And I also have no idea does it         16:08:01
25 border next to another state that they --        16:08:04

Page 288

1  there's a higher population in that               16:08:06
2  concentration, in that area, and so there's      16:08:10
3  more people coming to that pharmacy or that      16:08:12
4  area because it's a higher population and it     16:08:14
5  borders on other states.                          16:08:16
6      Q.   Okay.  And so you've just given         16:08:17
7  two different examples of information that       16:08:19
8  you don't know when assessing the number of     16:08:22
9  oxy that are going to a particular area.         16:08:25
10         Why did you choose those two?            16:08:28
11     A.   Those are the first two that            16:08:30
12 come to mind.                                     16:08:33
13     Q.   Okay.  And where did you --             16:08:33
14 where did you develop that knowledge of          16:08:35
15 things you should look for in oxy                 16:08:36
16 prescriptions going to a specific area?           16:08:39
17          MR. O'CONNOR:  Objection to             16:08:40
18 form.                                             16:08:41
19          THE WITNESS:  I didn't develop          16:08:41
20 that knowledge.  You asked me a                   16:08:42
21 question, and I responded to your                 16:08:44
22 question, so with what I would think              16:08:45
23 top of mind.                                      16:08:47
24 QUESTIONS BY MS. HERZFELD:                        16:08:48
25     Q.   Okay.  So you came up with that         16:08:48

Page 289

1  information on your own.  You didn't have         16:08:50
2  that in a discussion in like a suspicious        16:08:52
3  order monitoring team meeting or anyplace        16:08:55
4  else?                                             16:08:57
5           MR. O'CONNOR:  Objection.               16:08:57
6  Form.                                             16:08:58
7           THE WITNESS:  Not that I'm              16:08:58
8  aware of.                                         16:08:58
9  QUESTIONS BY MS. HERZFELD:                        16:08:58
10     Q.   Okay.  Do you recall ever being         16:08:59
11 in a suspicious order monitoring team meeting    16:09:00
12 where factors relating to the volume of oxy      16:09:03
13 prescriptions going to a particular area were    16:09:09
14 discussed?                                        16:09:10
15     A.   We had discussions about               16:09:11
16 Florida.                                          16:09:16
17     Q.   Okay.                                    16:09:17
18     A.   I do remember that discussion.          16:09:17
19     Q.   Okay.  And what types of things         16:09:19
20 were discussed in relation to Florida?           16:09:21
21     A.   That Florida had a problem with         16:09:24
22 pain clinics and that they hadn't implemented    16:09:26
23 any legislation to shut down the pain            16:09:30
24 clinics.                                          16:09:35
25     Q.   Okay.  Anything else that you          16:09:35

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1  recall?                               16:09:37
2     A.   That's all -- that's all I     16:09:37
3  remember.                             16:09:39
4     Q.   Okay.  Do you recall ever being  16:09:39
5  involved in a conversation with anyone during  16:09:42
6  your time at Mallinckrodt where anyone    16:09:43
7  mentioned that oxy from Florida were going to  16:09:45
8  Tennessee?                            16:09:47
9        MR. O'CONNOR:  Objection to     16:09:48
10  form.                                16:09:49
11       THE WITNESS:  I don't remember  16:09:50
12  specifically them saying any state.  I  16:09:51
13  do remember them saying they would      16:09:53
14  come up Highway 95.  And I have no      16:09:55
15  idea if that even goes through          16:09:57
16  Tennessee or not.                     16:09:59
17  QUESTIONS BY MS. HERZFELD:            16:10:00
18     Q.   Okay.  Could it have been     16:10:00
19  Highway 75?                          16:10:01
20       MR. O'CONNOR:  Objection.       16:10:02
21  Form.                                16:10:02
22       THE WITNESS:  I thought they    16:10:02
23  said 95, but I don't remember.        16:10:04
24  QUESTIONS BY MS. HERZFELD:            16:10:05
25     Q.   And did you ever hear about a   16:10:05

Page 291

1  particular problem with oxy in West Virginia  16:10:07
2  or Appalachia region?                 16:10:10
3        MR. O'CONNOR:  Objection to     16:10:13
4  form.                                16:10:14
5        THE WITNESS:  I remember seeing  16:10:14
6  something about there was a problem in  16:10:15
7  the coal mining town.                 16:10:17
8  QUESTIONS BY MS. HERZFELD:            16:10:18
9     Q.   Okay.  Do you remember where  16:10:19
10  you saw that?                         16:10:20
11     A.   On -- I believe it was a news  16:10:21
12  show.                                16:10:25
13     Q.   Okay.  And do you think that  16:10:25
14  was during your time of employment at    16:10:26
15  Mallinckrodt?                        16:10:28
16     A.   Yes.                         16:10:29
17     Q.   Okay.  And did you do anything  16:10:30
18  in response to learning that information?  16:10:32
19     A.   No.                          16:10:34
20     Q.   Okay.  Okay.  Marking the next  16:10:36
21  document here.  I'm not sure this one --  16:10:51
22     A.   I think -- but wait a minute.  16:10:54
23  I think I should clarify.  What did you mean,  16:10:55
24  did I do anything in response to that    16:10:57
25  information?  Because I could have done a lot  16:10:58

Page 292

1  of things.                            16:11:00
2        But did you mean did I do       16:11:00
3  anything at Mallinckrodt, go back to    16:11:02
4  Mallinckrodt and talk to them about the show  16:11:03
5  that I saw?                           16:11:04
6     Q.   Did you do anything in response  16:11:05
7  to that?  Did watching that show or learning  16:11:07
8  that information, did that make you take any  16:11:10
9  steps in your personal or professional life?  16:11:13
10       MR. O'CONNOR:  Object to form.  16:11:17
11       THE WITNESS:  In my personal or  16:11:20
12  professional life?                    16:11:22
13  QUESTIONS BY MS. HERZFELD:            16:11:22
14     Q.   Yes, ma'am.                   16:11:23
15     A.   I don't recall if it did.     16:11:23
16     Q.   Okay.  So you thought it was  16:11:24
17  important to clarify that point, so I just  16:11:25
18  want to --                           16:11:26
19     A.   Okay.                        16:11:26
20     Q.   I want to be clear, okay?     16:11:27
21        So let's kind of back up, and   16:11:28
22  I'll try to make sure I'm understanding you.  16:11:30
23     A.   Okay.                        16:11:30
24     Q.   So you said you'd seen a show  16:11:33
25  that had talked about -- somewhere on coal  16:11:34

Page 293

1  mining, problems with OxyContin or oxycodone  16:11:35
2  in a coal mining area, in a coal mining town.  16:11:38
3        Am I right on that?             16:11:41
4        MR. O'CONNOR:  Objection to the  16:11:42
5  form.                                16:11:44
6        THE WITNESS:  I don't remember  16:11:44
7  about it being any specific products.   16:11:44
8  I remember that there was a problem in  16:11:46
9  coal mining towns with drug abuse.     16:11:47
10  QUESTIONS BY MS. HERZFELD:            16:11:49
11     Q.   Okay.  Do you remember it being  16:11:50
12  opioid abuse?                        16:11:51
13     A.   I don't remember.             16:11:51
14     Q.   Okay.  And so based on that    16:11:53
15  show that you saw at the time that you were  16:11:55
16  employed at Mallinckrodt, did you take any  16:11:57
17  steps in your job at Mallinckrodt to focus on  16:11:59
18  coal mining areas?                    16:12:04
19     A.   No, I did not.                16:12:06
20     Q.   Okay.  Did you talk to anybody  16:12:07
21  at Mallinckrodt about that show you saw?  16:12:09
22     A.   No, I did not.                16:12:11
23     Q.   Did you send any e-mails?     16:12:11
24     A.   No, I did not.                16:12:13
25     Q.   Did you take any steps as part  16:12:14

Page 294

1  of your position in the suspicious order       16:12:15
2  monitoring team to monitor coal mining areas   16:12:18
3  for prescription abuse?                        16:12:21
4        MS. HERZFELD: Objection to               16:12:22
5  form.                                          16:12:23
6        THE WITNESS: My role in the              16:12:23
7  suspicious order monitoring team was           16:12:25
8  peripheral. I was not part of the              16:12:27
9  core team that established the policy           16:12:28
10 or understood the government acts.             16:12:30
11 QUESTIONS BY MS. HERZFELD:                     16:12:33
12     Q.   Okay. My question is: Did you         16:12:33
13 take any steps in your role as being even on   16:12:34
14 the periphery of the suspicious order          16:12:37
15 monitoring team to monitor coal mining areas   16:12:39
16 for prescription abuse?                        16:12:41
17     A.   No.                                   16:12:43
18     Q.   Okay. What about in your              16:12:44
19 personal life? Did you send anybody an         16:12:46
20 e-mail about, "Hey, I saw this show"?          16:12:48
21     A.   No.                                   16:12:51
22     Q.   Okay. Did you have any                16:12:51
23 discussions with anybody about the show?       16:12:52
24     A.   Not that I recall.                    16:12:54
25     Q.   Okay. Did you take any steps          16:12:55

Page 295

1  because you saw that show?                     16:12:57
2        A.   Not that I recall.                  16:12:58
3        Q.   Okay. So we're moving on to         16:13:01
4  the next document here. This one may already   16:13:03
5  be an exhibit. I'm not 100 percent positive,  16:13:06
6  so I apologize if I'm doubling up.             16:13:08
7        (Mallinckrodt-Collier Exhibit           16:13:10
8  39 marked for identification.)                 16:13:10
9        MS. HERZFELD: For those on the           16:13:20
10 phone, it's MNK_TNSTA05296154.                 16:13:20
11 QUESTIONS BY MS. HERZFELD:                     16:13:29
12     Q.   Do you recognize this document,       16:13:42
13 ma'am?                                         16:13:44
14     A.   No, I do not.                         16:13:44
15     Q.   Okay. What does it appear to          16:13:47
16 be?                                            16:13:53
17     A.   It appears that the people that       16:13:53
18 are core members of the SOM team, this was     16:13:57
19 the meeting and they were -- this was the      16:13:59
20 agenda for the meeting.                        16:14:01
21     Q.   Okay. And this would have been        16:14:02
22 for the core team, not for people on the       16:14:03
23 periphery?                                     16:14:06
24     A.   I would assume so.                    16:14:07
25     Q.   Okay. You didn't attend this         16:14:10

Page 296

1  meeting?                                       16:14:12
2        A.   Not that I recall.                  16:14:12
3        Q.   Okay. Very good. Moving on.         16:14:13
4        Okay. And I think before, we             16:14:18
5  talked about you were involved in the         16:14:23
6  indirect customer review subteam; is that     16:14:26
7  correct?                                       16:14:29
8        MR. O'CONNOR: Objection to               16:14:29
9  form.                                          16:14:30
10       THE WITNESS: Yes.                        16:14:30
11 QUESTIONS BY MS. HERZFELD:                     16:14:31
12     Q.   Okay. And what did the                16:14:31
13 indirect customer review subteam do?          16:14:33
14     A.   That was the team that -- which       16:14:36
15 we were providing additional information      16:14:40
16 about chargebacks, if they wanted to know how  16:14:41
17 were chargebacks run or generated.             16:14:44
18     Q.   Okay. And you were providing          16:14:46
19 that information to whom?                       16:14:50
20     A.   To the suspicious order               16:14:52
21 monitoring team.                               16:14:55
22     Q.   And that would be the core            16:14:56
23 folks on that team?                            16:14:58
24     A.   Correct.                              16:14:59
25     Q.   Okay. So you were kind of the         16:15:00

Page 297

1  number crunchers explaining things to the      16:15:01
2  team that was the core part of the suspicious 16:15:04
3  order monitoring team?                          16:15:06
4        MR. O'CONNOR: Objection to               16:15:06
5  form.                                          16:15:08
6        THE WITNESS: Correct.                    16:15:08
7  QUESTIONS BY MS. HERZFELD:                     16:15:09
8        Q.   Okay. And do you know who else      16:15:09
9  was a member of the indirect customer review  16:15:12
10 subteam?                                       16:15:14
11     A.   I don't recall.                       16:15:15
12     Q.   Okay.                                 16:15:29
13       (Mallinckrodt-Collier Exhibits          16:15:29
14 40 and 41 marked for identification.)         16:15:37
15 QUESTIONS BY MR. GOTTO:                        16:15:37
16     Q.   I'm going to hand you                 16:15:37
17 two different documents, but I will submit to  16:15:38
18 you that one is an e-mail and the other one   16:15:41
19 is an attachment to the e-mail. Okay? Just    16:15:42
20 so everybody knows what I'm doing here.        16:15:44
21       MS. HERZFELD: The e-mail is             16:15:55
22 MNK-T1_0007251678.                            16:15:56
23       And we're separately going to           16:16:14
24 mark the next one, which is                    16:16:16
25 MNK-T1_0007251679.                            16:16:26

Page 298

1  QUESTIONS BY MS. HERZFELD:          16:16:49
2      Q.   Okay.  If you'll take a look at   16:16:49
3  the e-mail for me, please, ma'am, Exhibit 40.  16:16:51
4          This appears to be an e-mail   16:16:58
5  from Debbie Digby to Karen Harper, you and   16:16:59
6  some other folks; is that correct?   16:17:03
7      A.   Correct.              16:17:05
8      Q.   Okay.  And the subject is   16:17:06
9  "forward April indirect suspicious order   16:17:09
10  monitoring reports."           16:17:11
11          Did I read that correctly?   16:17:12
12      A.   Yes.               16:17:13
13      Q.   Okay.  And then the date it was   16:17:14
14  sent was May 31, 2011; is that right?   16:17:16
15      A.   Correct.              16:17:18
16      Q.   Okay.  And on -- I think we   16:17:19
17  already talked about who Debbie Digby was.   16:17:22
18  Karen Harper has been discussed.   16:17:25
19          Who is Suzanne Pea?       16:17:27
20      A.   I believe Suzanne Pea was   16:17:30
21  involved in chargebacks.        16:17:37
22      Q.   Okay.  Was there a specific   16:17:38
23  department for chargebacks?      16:17:39
24      A.   There was a contract admin   16:17:40
25  team.                    16:17:42

Page 299

1      Q.   Okay.               16:17:42
2      A.   Contract administration.   16:17:42
3      Q.   And do you know who was part of   16:17:44
4  that team?                 16:17:47
5      A.   Carol actually was.  I thought   16:17:47
6  she was customer service, but she was part of   16:17:53
7  the contract administration team.   16:17:56
8      Q.   Okay.  Do you recall anybody   16:17:57
9  else who was a member of that team?   16:17:58
10      A.   No.                16:17:59
11      Q.   Okay.  And so here it looks   16:18:00
12  like "all attached are the April monthly SOM   16:18:02
13  reports."                  16:18:05
14          SOM there stands for suspicious   16:18:07
15  order monitoring; is that right?   16:18:13
16      A.   Yes.               16:18:13
17      Q.   And then it looks like there's   16:18:13
18  customer service -- or I'm sorry.  Number one   16:18:16
19  is customer sourcing of greater than two   16:18:18
20  distributors; two, state concentration   16:18:21
21  report; and three, summary report by   16:18:23
22  distributor compared to all products   16:18:25
23  distributed, one for oxy and one for hydro   16:18:27
24  APAP.                    16:18:29
25          Did I read that correctly?   16:18:30

Page 300

1      A.   Yes.               16:18:31
2      Q.   Okay.  And if you'll turn with   16:18:31
3  me then to the attachment, the one that ended   16:18:33
4  Bates number 1679 on the top.   16:18:37
5          Okay.  Now looking at the top   16:18:40
6  of this it says, "Customer sourcing oxy 15   16:18:49
7  and 30 from more than two distributors."   16:18:52
8          Did I read that correctly?   16:18:55
9      A.   Yes.               16:18:57
10      Q.   Right there.  Yeah, and right   16:18:58
11  here at the top, if you look right there.   16:18:59
12      A.   It says, "Customer sourcing oxy   16:19:01
13  15, 30 from all distributors."   16:19:05
14      Q.   Oh, you're right.  It does.   16:19:06
15  That is correct.             16:19:07
16          Did you create this document?   16:19:08
17      A.   No, I did not.         16:19:09
18      Q.   Okay.  And were you responsible   16:19:11
19  for maintaining it?           16:19:12
20      A.   No, I was not.         16:19:13
21      Q.   Okay.  Did you use the   16:19:14
22  information that was contained within this   16:19:16
23  document to assist you with your -- to assist   16:19:20
24  you with your job duties?        16:19:25
25      A.   No, I did not.         16:19:27

Page 301

1      Q.   Okay.  And why did you receive   16:19:28
2  this information?             16:19:29
3      A.   Just so I had general   16:19:30
4  knowledge.                 16:19:33
5      Q.   Okay.  And why was it important   16:19:34
6  for you to have general knowledge?   16:19:36
7          MR. O'CONNOR:  Objection to   16:19:38
8      form.                 16:19:39
9          THE WITNESS:  Most items that   16:19:39
10      affected the customers or the   16:19:41
11      products, I was part of the   16:19:45
12      information trail.        16:19:46
13  QUESTIONS BY MS. HERZFELD:          16:19:47
14      Q.   Okay.  And what do you mean,   16:19:47
15  "information trail"?           16:19:49
16      A.   If there was communication   16:19:49
17  about the customers or the products, so that   16:19:51
18  I wouldn't be blindsided, I would have that   16:19:55
19  information at some point.  They would share   16:19:57
20  that information with me.        16:19:58
21          I also was part of the   16:19:59
22  peripheral that helped them understand   16:20:01
23  chargebacks, and so it may have been that   16:20:04
24  they need me to have knowledge of this report   16:20:06
25  in case they had further questions on it.   16:20:08

Page 302

1    But I was at that point no          16:20:10
2  longer involved in doing any assistance on    16:20:12
3  this level. This was Debbie.         16:20:14
4    Q.  Okay. When you say "assistance   16:20:17
5  on this level," what do you mean?       16:20:19
6    A.  Running these types of reports.  16:20:20
7    Q.  Okay. Debbie was doing that?    16:20:22
8    A.  Yes.           16:20:23
9    Q.  Okay. And what was Debbie's    16:20:23
10 position?             16:20:25
11   A.  She was a senior analyst.       16:20:25
12   Q.  Okay. And so if you were        16:20:28
13 forwarded these reports, would you read them  16:20:30
14 and crunch the numbers?          16:20:32
15     MR. O'CONNOR: Objection to      16:20:34
16   form.            16:20:35
17     THE WITNESS: I have no idea      16:20:36
18   what I'd do with them, if I ever did   16:20:38
19   that.            16:20:41
20 QUESTIONS BY MS. HERZFELD:        16:20:41
21   Q.  Okay. Do you know if someone    16:20:42
22 was responsible for looking at these reports  16:20:42
23 to make a determination if an order appeared  16:20:44
24 suspicious?           16:20:47
25   A.  That would be suspicious order  16:20:47

Page 303

1  monitoring team.           16:20:52
2    Q.  Okay. And so nobody ever told   16:20:52
3  you the purpose as to why you received this   16:20:54
4  report?             16:20:56
5    A.  For information.          16:20:57
6    Q.  Okay. And the information that  16:20:59
7  I have says you're the custodian of this    16:21:01
8  report.             16:21:03
9      Do you know why it's in your    16:21:03
10 custodian file?           16:21:04
11   A.  I have no idea. I don't know   16:21:06
12 what they meant by that.         16:21:07
13   Q.  Okay. Do you know when        16:21:10
14 Mallinckrodt began monitoring customers that  16:21:12
15 sourced from more than one distributor?     16:21:17
16     MR. O'CONNOR: Objection to the   16:21:20
17   form.            16:21:21
18     THE WITNESS: That was stated    16:21:21
19   earlier, that it was after Sunrise   16:21:24
20   Medical.           16:21:26
21 QUESTIONS BY MS. HERZFELD:        16:21:26
22   Q.  Okay. But that didn't occur    16:21:26
23 before Sunrise Medical; is that correct?    16:21:28
24   A.  No.            16:21:29
25   Q.  Okay.           16:21:31

Page 304

1    A.  Not within my group, it was    16:21:32
2  not.              16:21:35
3    Q.  Okay. But you're familiar with  16:21:35
4  how to read chargeback data; is that correct,  16:21:36
5  ma'am?             16:21:41
6    A.  It is not my expertise, but I   16:21:41
7  am familiar with it, yes.         16:21:43
8    Q.  Okay. So if you'll switch with  16:21:44
9  me to the -- I'm sorry, there's no page    16:21:45
10 numbers here.           16:21:47
11   A.  You can give me the line number  16:21:49
12 on the left.            16:21:51
13   Q.  2352 is the very bottom. This  16:21:52
14 one, actually, believe it or not, says    16:22:00
15 page 1. Right here it says page 1. Yep,   16:22:02
16 right there.            16:22:04
17   A.  Here? Okay.          16:22:04
18   Q.  Yep.           16:22:05
19     Okay. Do you see where I'm at?  16:22:06
20   A.  Yes.            16:22:07
21   Q.  Okay. So I will represent to   16:22:08
22 you that we've sorted this database that    16:22:11
23 we've received, this spreadsheet by      16:22:13
24 Tennessee, so I would let you know that this  16:22:15
25 has been sorted by Tennessee.         16:22:17

Page 305

1      Okay?           16:22:18
2    A.  Okay.           16:22:19
3    Q.  So looking at this, I just want  16:22:19
4  to go through and look at some of the numbers  16:22:22
5  here for Tennessee to see if I can understand  16:22:24
6  it.              16:22:27
7      If you could go with me,       16:22:28
8  please -- okay. So the first one on this    16:22:42
9  spreadsheet appears to be Lowe's Drug in    16:22:44
10 Maryville, Tennessee; is that correct?     16:22:48
11   A.  Yes.            16:22:50
12   Q.  Okay. And it has a ZIP code    16:22:51
13 there, and it says that it sold the apparent  16:22:53
14 customer name Cardinal Health.        16:22:57
15     Would that be the distributor?  16:22:58
16   A.  Yes.            16:22:59
17   Q.  Okay. And then it says, "gross  16:22:59
18 sales, 19,934.4."           16:23:01
19     Do you know if that's meant to  16:23:06
20 be dollars or units?          16:23:08
21   A.  That's dollars.         16:23:09
22   Q.  That's dollars. Okay.        16:23:11
23     And then it says, "DISP      16:23:12
24 units" -- I'm guessing that's dispensing    16:23:15
25 units -- "62,000."           16:23:19

Page 306

1    Do you know what the dispensing    16:23:19
2  units are here?    16:23:21
3    A.    That would be tablets.    16:23:21
4    Q.    Tablets.  Okay.    16:23:24
5    And do you happen to know the    16:23:24
6  population of Maryville, Tennessee?    16:23:26
7    A.    I have no clue.    16:23:28
8    Q.    Okay.  And then looking at the    16:23:31
9  next one, Food City in Knoxville, Tennessee,    16:23:34
10  DBS Trading, that's Masters Pharmaceuticals,    16:23:38
11  and then gross sales there at 8,068 and then    16:23:41
12  dispensing units 40,000; is that correct?    16:23:44
13    A.    Correct.    16:23:47
14    Q.    Okay.  And so I guess I want to    16:23:48
15  make sure I really understand the chargeback    16:23:50
16  data.    16:23:52
17    Gross sales, is that how much    16:23:52
18  money Mallinckrodt gets after the chargeback?    16:23:56
19    A.    That is the sale -- yes, after    16:24:00
20  the chargeback, but not including any    16:24:04
21  rebates, fees, discounts or allowances.    16:24:07
22    Q.    Okay.  Okay.  So then if you'll    16:24:10
23  go with me the third one that is labeled 225,    16:24:13
24  Riggs Drugs in La Follette, Tennessee.    16:24:16
25  Cardinal Health, $10,855.84, and 38,000 DISP    16:24:19

Page 307

1  units, dispensing units.    16:24:27
2    Did I read that correctly?    16:24:29
3    A.    Yes.    16:24:30
4    Q.    Do you know what the    16:24:31
5  population is of La Follette, Tennessee?    16:24:33
6    A.    No.    16:24:36
7    Q.    Okay.  And do you know if    16:24:38
8  someone was responsible for looking at the    16:24:38
9  population of these various locations?    16:24:41
10    MR. O'CONNOR:  Objection to    16:24:43
11    form.    16:24:44
12    THE WITNESS:  I don't know    16:24:44
13    anybody that would do that, that would    16:24:45
14    have time to do that.    16:24:49
15  QUESTIONS BY MS. HERZFELD:    16:24:50
16    Q.    Okay.  Was that anything that    16:24:50
17  was ever discussed in a suspicious order    16:24:52
18  monitoring team meeting when you were    16:24:56
19  present?    16:24:59
20    A.    Not when I was --    16:24:59
21    MR. O'CONNOR:  Objection.    16:25:00
22    Form.    16:25:01
23    THE WITNESS:  Oh, I'm sorry.    16:25:01
24    Not when I was present.    16:25:01
25  QUESTIONS BY MS. HERZFELD:    16:25:01

Page 308

1    Q.    Okay.  Did you ever hear of    16:25:02
2  anybody talking about, "Hey, maybe we should    16:25:03
3  be looking at different population numbers    16:25:06
4  for where pills are going"?    16:25:07
5    MR. O'CONNOR:  Objection.    16:25:08
6    THE WITNESS:  Not that I'm    16:25:09
7    aware of.    16:25:10
8  QUESTIONS BY MS. HERZFELD:    16:25:10
9    Q.    Okay.  At any point in your    16:25:10
10  time at Mallinckrodt were you trained to    16:25:17
11  recognize various signs of diversion?    16:25:19
12    A.    The only thing that we were    16:25:22
13  made aware of is that -- if there were    16:25:24
14  unusually large orders or peculiar orders.    16:25:26
15    Q.    Okay.  And how can you tell if    16:25:28
16  something is an unusually large order,    16:25:30
17  according to your training?    16:25:32
18    A.    From what -- I wouldn't have    16:25:34
19  visibility to the orders, so I wouldn't know    16:25:37
20  if something was an unusually large order or    16:25:39
21  suspicious -- I say "peculiar" only because    16:25:43
22  we used the word "peculiar" today.  But it    16:25:46
23  would be if something was -- they were    16:25:49
24  ordering too frequently, too often, compared    16:25:50
25  to what they usually did.  They were ordering    16:25:52

Page 309

1  too much.  They were ordering not to the    16:25:54
2  levels that they said they used to purchase.    16:25:58
3    Q.    Okay.  And that wasn't within    16:26:00
4  the purview of your responsibility to look    16:26:02
5  for those things?    16:26:03
6    A.    Correct.    16:26:04
7    Q.    Okay.  Okay.  Did they -- were    16:26:05
8  you taught while you were at Mallinckrodt    16:26:13
9  any other potential signs of diversion other    16:26:15
10  than frequency, I think you said, and volume?    16:26:17
11    MR. O'CONNOR:  Objection to    16:26:20
12    form.    16:26:21
13    THE WITNESS:  It wasn't in my    16:26:22
14    job, so they didn't need to teach me    16:26:25
15    that.    16:26:28
16  QUESTIONS BY MS. HERZFELD:    16:26:29
17    Q.    Okay.  And I guess I would have    16:26:29
18  expected perhaps there would have been some    16:26:30
19  discussion of signs of diversion at the    16:26:32
20  suspicious order monitoring team meetings.    16:26:35
21    Did that not occur?    16:26:36
22    MR. O'CONNOR:  Objection to    16:26:37
23    form.    16:26:38
24    THE WITNESS:  I don't recall    16:26:38
25    everything that was discussed in the    16:26:40

Page 310

1 meetings. So I'm sure there was some 16:26:31
2 discussion; otherwise, I wouldn't have 16:26:43
3 recalled two items. 16:26:45
4 QUESTIONS BY MS. HERZFELD: 16:26:45
5 Q. Okay. Do you recall anybody 16:26:46
6 talking about potential signs of diversion 16:26:47
7 being a percentage of cash sales? 16:26:50
8 A. No, I don't recall that. 16:26:53
9 Q. Okay. What about on a 16:26:56
10 concentration of pharmacies in a particular 16:26:59
11 area that are all high prescribing oxy 16:27:00
12 pharmacies, did anybody ever discuss that? 16:27:05
13 MR. O'CONNOR: Objection. 16:27:07
14 Form. 16:27:08
15 THE WITNESS: We wouldn't have 16:27:08
16 that information, nor would we have 16:27:09
17 the information about cash sales. 16:27:10
18 QUESTIONS BY MS. HERZFELD: 16:27:12
19 Q. Okay. And when you say "we 16:27:12
20 wouldn't have that information," who do you 16:27:14
21 mean by "we"? 16:27:16
22 A. The marketing team. 16:27:17
23 Q. The marketing team. Okay. 16:27:18
24 But somebody else in 16:27:20
25 Mallinckrodt may have that information? 16:27:21

Page 311

1 A. I have no idea. 16:27:22
2 Q. Okay. 16:27:22
3 A. I don't know how they would get 16:27:23
4 it. 16:27:24
5 Q. Okay. Okay. Going back to our 16:27:24
6 chart here. Okay. So I think the last one 16:27:31
7 we talked about was the one in La Follette. 16:27:50
8 That's Riggs. 16:27:53
9 And then at 334 we have 16:27:53
10 Ripptoe, Inc., in Morristown, Tennessee. And 16:27:56
11 there it says, sold the apparent customer 16:27:59
12 number AmerisourceBergen Health 11,144.4, 16:28:02
13 dispensing units, 31,200. 16:28:08
14 Do you see where I'm at? 16:28:11
15 A. Yes. 16:28:12
16 Q. Okay. And so that would be 16:28:12
17 gross sales, $10,855.84, and the units are 16:28:14
18 38,000; is that correct? 16:28:20
19 A. Correct. 16:28:20
20 Q. Okay. And do you know what the 16:28:21
21 population of Morristown, Tennessee, is? 16:28:22
22 A. I have no idea. 16:28:25
23 Q. Okay. 16:28:26
24 A. I don't even know what the 16:28:26
25 population of St. Louis is, so... 16:28:27

Page 312

1 (Mallinckrodt-Collier Exhibit 16:29:28
2 42 marked for identification.) 16:29:29
3 QUESTIONS BY MS. HERZFELD: 16:29:29
4 Q. Okay. Okay. We'll mark the 16:29:29
5 next exhibit 42. This is Bates 16:29:30
6 MNK-T1_0007251680. Okay. If you'll take a 16:29:42
7 look at this document for me, please. 16:29:56
8 Okay. Do you recognize this 16:30:10
9 document? 16:30:11
10 A. No, I do not. 16:30:12
11 Q. Okay. Do you think you've ever 16:30:13
12 seen it before? 16:30:14
13 A. I may have. 16:30:15
14 Q. Okay. Do you know if you were 16:30:16
15 involved in creating it? 16:30:18
16 A. I doubt that I was involved 16:30:19
17 creating it. 16:30:23
18 Q. Okay. Do you think perhaps you 16:30:24
19 had input into the chart at all? 16:30:25
20 A. Possibly. Someone on my team 16:30:27
21 might have had it. 16:30:34
22 Q. Okay. And this chart is 16:30:34
23 labeled "State concentration, oxy 15 and 30, 16:30:36
24 April 2011"; is that correct? 16:30:39
25 A. Yes. 16:30:40

Page 313

1 Q. Okay. And so with this chart, 16:30:46
2 would this show that Mallinckrodt was 16:30:49
3 monitoring the percentage of each distributor 16:30:52
4 shipments going to the various states; is 16:30:55
5 that right? 16:30:57
6 MR. O'CONNOR: Objection to 16:30:57
7 form. 16:30:58
8 THE WITNESS: At this 16:30:58
9 particular -- on this particular 16:30:59
10 report, yes. 16:31:00
11 QUESTIONS BY MS. HERZFELD: 16:31:01
12 Q. Okay. And so included within 16:31:01
13 that question is, Mallinckrodt was monitoring 16:31:06
14 the percentage of each distributor's 16:31:08
15 shipments going to Tennessee, at least in 16:31:11
16 April of 2011, according to this chart; is 16:31:14
17 that correct? 16:31:16
18 MR. O'CONNOR: Objection to 16:31:16
19 form. 16:31:19
20 THE WITNESS: Correct. 16:31:20
21 QUESTIONS BY MS. HERZFELD: 16:31:21
22 Q. Okay. And how was this 16:31:21
23 document used by the indirect customer review 16:31:22
24 team, if at all? 16:31:23
25 A. I'm not sure. 16:31:25

Highly Confidential - Subject to Further Confidentiality Review

Page 314

```
1     Q.   Okay.  Do you know if          16:31:30
2   Mallinckrodt was seeking to reduce the    16:31:35
3   concentration of oxycodone in Florida?    16:31:37
4     A.   Yes.                 16:31:40
5     Q.   Okay.  Do you know if          16:31:42
6   Mallinckrodt was seeking to reduce the    16:31:45
7   concentration of oxycodone in Tennessee?   16:31:47
8     A.   I do not remember that being a    16:31:50
9   topic of discussion.              16:31:53
10    Q.   Okay.  Other than Florida, do    16:31:55
11  you recall any other states being a topic of  16:31:57
12  discussion for the target of the reduction of  16:31:59
13  oxycodone concentration by state?        16:32:03
14    A.   I don't recall that.         16:32:04
15    Q.   Okay.  Okay.  And in this      16:32:07
16  chart, do you know if population was       16:32:13
17  considered at all?               16:32:15
18        MR. O'CONNOR:  Objection to    16:32:17
19    form.                     16:32:19
20        THE WITNESS:  Most likely not,  16:32:20
21    because we wouldn't know the        16:32:21
22    population.                 16:32:23
23  QUESTIONS BY MS. HERZFELD:             16:32:23
24    Q.   You wouldn't know the        16:32:24
25  population of a state?              16:32:24
```

Page 315

```
1     A.   Yeah.  At any given time, no.   16:32:25
2        (Mallinckrodt-Collier Exhibit   16:32:36
3     43 marked for identification.)      16:32:36
4   QUESTIONS BY MS. HERZFELD:             16:32:36
5     Q.   Okay.  The next one is 43.     16:32:37
6        For those on the phone, it's    16:32:51
7   MNK-T1_0007251681.                16:32:55
8        The type is very small, so my    16:32:58
9   apologies for that.              16:33:22
10       Okay.  And so is this the --     16:33:42
11  what I've handed you, is this the -- the    16:33:43
12  similar type of chart, a state concentration  16:33:46
13  chart?                      16:33:50
14       MR. O'CONNOR:  Objection to     16:33:50
15    form.                     16:33:52
16       THE WITNESS:  Yes.          16:33:53
17  QUESTIONS BY MS. HERZFELD:             16:33:53
18    Q.   Okay.  And so looking at this   16:33:54
19  title here it says, "State concentration    16:33:55
20  hydro APAP, April 2010 data."          16:33:58
21       Did I read that correctly?      16:34:02
22    A.   Yes.                 16:34:03
23    Q.   Okay.  And hydro APAP is what?  16:34:03
24    A.   It's a Schedule II pain med --  16:34:06
25  a Schedule III pain medication at this time.  16:34:10
```

Page 316

```
1     Q.   Okay.  And so hydro APAP, is    16:34:11
2   that also hydrocodone?             16:34:14
3     A.   Yes.                 16:34:15
4     Q.   Okay.  And so looking at this   16:34:16
5   chart, is this a chart that you would have   16:34:18
6   had input in creating or maintaining?      16:34:22
7     A.   I would not have created this.   16:34:25
8   I might have had input, but I'm not sure I   16:34:28
9   did.                       16:34:31
10    Q.   Okay.                 16:34:31
11    A.   Because this was taken over by   16:34:32
12  suspicious order monitoring.          16:34:34
13    Q.   Okay.  But you were employed by  16:34:35
14  Mallinckrodt in April of 2010; is that     16:34:37
15  correct?                     16:34:38
16    A.   Yes, I was.             16:34:38
17    Q.   Okay.  And if you'll take a     16:34:39
18  look with me here, do you know if this chart  16:34:41
19  is created using chargeback data?        16:34:48
20    A.   I would assume so --        16:34:50
21    Q.   Okay.                 16:34:56
22    A.   -- yes.               16:34:56
23    Q.   And so looking at this chart    16:34:56
24  here, if you go down with me to the line for  16:34:59
25  Tennessee, which is 51?             16:35:03
```

Page 317

```
1     A.   Yes.                 16:35:08
2     Q.   Okay.  And then you see the    16:35:08
3   various percentages.  I know it's kind of   16:35:09
4   hard to line up.                16:35:12
5        What are the -- do you know     16:35:13
6   what the percentages are indicating?      16:35:14
7     A.   My -- I don't know.  I'd have   16:35:18
8   to look at this more carefully because I'm   16:35:23
9   not sure.                    16:35:26
10    Q.   Okay.  But the percentages are   16:35:27
11  indicating something regarding each one of   16:35:29
12  these distributors; is that correct?      16:35:33
13       MR. O'CONNOR:  Objection to     16:35:35
14    form.                     16:35:36
15       THE WITNESS:  Yes.          16:35:37
16  QUESTIONS BY MS. HERZFELD:             16:35:39
17    Q.   It's broken out by distributor;  16:35:40
18  is that right?                  16:35:42
19    A.   Yes.                 16:35:42
20    Q.   Okay.  And so you have it      16:35:42
21  broken down by state and you have it broken   16:35:44
22  down by distributor in dealing with hydro   16:35:46
23  APAP in April of 2010; is that correct?    16:35:51
24    A.   Correct.               16:35:52
25    Q.   And it says based on units; is   16:35:52
```

Page 318

1  that right?                    16:35:55
2     A.   Yes.                   16:35:55
3     Q.   Okay.  And so if you look with    16:35:55
4  me at Tennessee, I want you to go over to    16:35:57
5  McKesson.  If you look at Tennessee and    16:35:59
6  McKesson in this itty-bitty little line, it    16:36:04
7  says 10.7 percent.             16:36:08
8        Do you see where I'm at?       16:36:09
9     A.   I don't see a 10.7.  I see    16:36:11
10  McKesson.                     16:36:17
11     Q.   Okay.  You see McKesson.      16:36:17
12     A.   Oh, I see it now.  I'm sorry, I    16:36:18
13  was on the wrong line.         16:36:20
14     Q.   Do you see it?            16:36:21
15     A.   Yes.                   16:36:21
16     Q.   Okay.  Do you know what that    16:36:22
17  10.7 represents for McKesson?   16:36:23
18        MR. BENSON:  Object to form.    16:36:23
19        THE WITNESS:  No, I do not,    16:36:24
20     because I don't know what those    16:36:25
21     percentages represent.      16:36:28
22        MS. HERZFELD:  I'm sorry, who    16:36:28
23     objected?                  16:36:30
24        MR. BENSON:  (Hand gestures.)    16:36:30
25        MS. HERZFELD:  Who are you?    16:36:31

Page 319

1        MR. BENSON:  Fred Benson for    16:36:33
2     McKesson.                   16:36:33
3        MS. HERZFELD:  You're from    16:36:34
4     McKesson.  Okay.            16:36:35
5        But I don't think you        16:36:35
6     cross-noticed this deposition, so I'm    16:36:36
7     going to object to your objection.    16:36:38
8     Okay?  You're not a party in our case.    16:36:40
9        MR. BENSON:  Fair enough.      16:36:43
10  QUESTIONS BY MS. HERZFELD:        16:36:44
11     Q.   Okay.  So 10.7.  Do you know    16:36:44
12  what that is in relation to McKesson, what    16:36:45
13  that 10.7 represents?          16:36:47
14     A.   No, because I don't know what    16:36:51
15  the percentages represent.     16:36:53
16     Q.   Okay.  Could it be that that's    16:36:53
17  10.7 percent of McKesson's hydrocodone APAP    16:37:03
18  of April 2010 going to the state of    16:37:06
19  Tennessee?                     16:37:09
20        MR. O'CONNOR:  Objection to    16:37:09
21     form.                     16:37:10
22        THE WITNESS:  That would ask me    16:37:10
23     to guess, and I would make the    16:37:12
24     assumption you do not want me    16:37:14
25     guessing.                 16:37:16

Page 320

1  QUESTIONS BY MS. HERZFELD:        16:37:17
2     Q.   Okay.  But I would like to have    16:37:17
3  your guess because I think it's probably more    16:37:18
4  educated than mine in this matter.  I've    16:37:20
5  never seen these charts before.    16:37:22
6        So can you guess what you think    16:37:23
7  that these -- I'm just trying to understand    16:37:25
8  what it is.                    16:37:27
9        MR. O'CONNOR:  Objection to    16:37:28
10     form.                     16:37:29
11        THE WITNESS:  Okay.  Give me a    16:37:30
12     minute.  I'll calculate what these    16:37:33
13     percentages add up to --    16:37:34
14  QUESTIONS BY MS. HERZFELD:        16:37:36
15     Q.   Great.                 16:37:37
16     A.   -- and I might be able to come    16:37:38
17  up with something.             16:37:39
18     Q.   I might be able to shortcut it    16:37:40
19  for you a little bit.          16:37:41
20        If you look all the way at the    16:37:42
21  bottom, it has a grand total.  And it looks    16:37:45
22  like the bottom of every one is totaled up to    16:37:49
23  100 percent.                   16:37:52
24        Do you see?               16:37:52
25     A.   Yes.  Okay.             16:37:53

Page 321

1     Q.   So if you look at McKesson and    16:37:54
2  you look at Tennessee, and if you add all    16:37:57
3  those up, it gets to a hundred percent.    16:38:02
4        So I'm looking at this and    16:38:04
5  saying, is it that McKesson is 10.7 percent    16:38:07
6  of their sales of hydro APAP in April 2010    16:38:14
7  were in Tennessee based on this chart?    16:38:21
8        MR. O'CONNOR:  Object to form.    16:38:23
9        THE WITNESS:  That seems to be    16:38:24
10     the case.                 16:38:29
11  QUESTIONS BY MS. HERZFELD:        16:38:31
12     Q.   Okay.  Thank you.         16:38:31
13     A.   Uh-huh.                16:38:32
14     Q.   Do you know anything         16:38:33
15  specifically or -- I'm going to back up.    16:38:45
16  Strike that.                   16:38:47
17        Do you know anything about the    16:38:48
18  sales of Mallinckrodt products to the VA?    16:38:49
19        MR. O'CONNOR:  Objection to    16:38:51
20     form.                     16:38:51
21        THE WITNESS:  No, I don't    16:38:52
22     recall.                   16:38:55
23  QUESTIONS BY MS. HERZFELD:        16:38:55
24     Q.   Okay.  Were you ever involved    16:38:55
25  in the sales of Mallinckrodt products to the    16:38:57

Page 322

```
1   VA?                              16:38:59
2      A.   No, I didn't have anything to   16:38:59
3   do with sales.                   16:39:02
4      Q.   Okay.  And when I say "VA," I   16:39:03
5   mean Veterans Administration.        16:39:05
6         Do you understand that?       16:39:06
7      A.   Yes, I understood that.       16:39:07
8      Q.   Do you know who would have been  16:39:08
9   the person in charge of selling Mallinckrodt  16:39:10
10  products to the VA?              16:39:14
11     A.   Yes.  Rich McKendrick.       16:39:15
12     Q.   Okay.  And do you know if Rich  16:39:19
13  McKendrick is still employed by Mallinckrodt?  16:39:22
14     A.   No, he is not.             16:39:24
15     Q.   Okay.  Do you know where he --  16:39:25
16  if he is employed now?           16:39:27
17     A.   I don't know.             16:39:28
18     Q.   Okay.  Do you know if he       16:39:29
19  retired?                        16:39:37
20     A.   I don't know.             16:39:38
21     Q.   Okay.  Are you in touch with   16:39:39
22  Mr. McKendrick?                  16:39:43
23     A.   Probably if I was, I would know  16:39:44
24  what he was doing.               16:39:46
25     Q.   Okay.                     16:39:47
```

Page 323

```
1      A.   No.                       16:39:47
2      Q.   Okay.  Very good.  Okay.      16:39:47
3         If you give me just one second,  16:40:24
4   I think I'm almost finished.        16:40:27
5         Were you involved at all in    16:41:11
6   creating a list of the 150 top pharmacies for  16:41:12
7   Mallinckrodt?                    16:41:15
8         MR. O'CONNOR:  Objection to    16:41:17
9   form.                          16:41:18
10        THE WITNESS:  I don't know what  16:41:18
11  you're talking about, so I'd need to  16:41:19
12  see what you're discussing.         16:41:22
13        (Mallinckrodt-Collier Exhibit  16:41:23
14  44 marked for identification.)       16:41:23
15        MS. HERZFELD:  Okay.  I'm not   16:41:25
16  sure if we have made this one an     16:41:26
17  exhibit or not yet.  44.           16:41:32
18        For those on the phone, this is  16:41:44
19  MNK_TNSTA05098003.              16:41:47
20  QUESTIONS BY MS. HERZFELD:           16:41:47
21     Q.   So the title of this document  16:42:02
22  is "Top 150 pharmacies, oxy 30-milligram  16:42:04
23  only, 2009 to 2011 data combined."   16:42:07
24        Did I read that correctly?     16:42:10
25     A.   Yes.                      16:42:10
```

Page 324

```
1      Q.   Okay.  And did you create this  16:42:12
2   document?                       16:42:14
3      A.   I did not.                16:42:14
4      Q.   Okay.  Did you have any input   16:42:16
5   in this document?                16:42:18
6      A.   I did not.                16:42:18
7      Q.   Okay.  This document is in your  16:42:20
8   custodian file.                  16:42:22
9         Have you seen this document     16:42:22
10  before?                         16:42:23
11     A.   I do not remember seeing this.  16:42:24
12     Q.   Okay.  Well, you're listed as a  16:42:28
13  custodian for it, so do you know who would  16:42:29
14  have been the person who created this  16:42:32
15  document?                       16:42:33
16     A.   I'm not sure where this came   16:42:34
17  from, so, no.                   16:42:37
18     Q.   Okay.  Do you know if there was  16:42:38
19  routinely a list of top 150 pharmacies that  16:42:41
20  was kept?                       16:42:44
21     A.   No.                       16:42:44
22     Q.   Okay.                     16:42:46
23     A.   I don't know that either.      16:42:46
24     Q.   Okay.                     16:42:48
25     A.   If it was outside my area, I    16:42:48
```

Page 325

```
1   wouldn't know if somebody was doing this on a  16:42:51
2   regular basis.                   16:42:52
3         And what does it mean that it's  16:42:54
4   in my custodian?                 16:42:55
5         MS. HERZFELD:  There -- maybe I  16:42:58
6   should have your lawyer explain that  16:43:00
7   to you.                         16:43:01
8         MR. O'CONNOR:  It simply means   16:43:02
9   that it was identified as being in   16:43:04
10  your e-mail or electronic files.     16:43:06
11        THE WITNESS:  But not           16:43:10
12  necessarily generated by me?         16:43:11
13        MR. O'CONNOR:  Exactly right.    16:43:12
14  QUESTIONS BY MS. HERZFELD:           16:43:13
15     Q.   Okay.  But you've potentially   16:43:13
16  seen this e-mail before -- or this list  16:43:16
17  before?                         16:43:18
18     A.   Possibly.                 16:43:18
19        MR. O'CONNOR:  Objection.       16:43:19
20        THE WITNESS:  Possibly.         16:43:19
21  QUESTIONS BY MS. HERZFELD:           16:43:20
22     Q.   Okay.  Do you know what this   16:43:20
23  was used for in your capacity at     16:43:21
24  Mallinckrodt?                    16:43:23
25     A.   I do not remember the document,  16:43:24
```

Page 326

1  so I would not remember what it was used for.   16:43:26
2      Q.   Okay.  Are you disputing that   16:43:36
3  you've ever received this document?   16:43:37
4      A.   No.   16:43:38
5      Q.   Okay.   16:43:40
6      A.   I just don't recall it.   16:43:40
7      Q.   Okay.  Okay.  Exhibit 45.   16:43:43
8          (Mallinckrodt-Collier Exhibit   16:44:10
9      45 marked for identification.)   16:44:10
10 QUESTIONS BY MS. HERZFELD:   16:44:10
11     Q.   Okay.  If you'll look at the   16:45:00
12 first page, do you recognize this document?   16:45:01
13     A.   I recognize it as being an   16:45:03
14 e-mail from Lisa Cardetti to me, yes.   16:45:08
15     Q.   Okay.  And is it dated   16:45:11
16 August 30, 2011?   16:45:13
17     A.   Yes.   16:45:13
18     Q.   Okay.  And in the e-mail it   16:45:14
19 says, "Ginger, as requested, I've looked at   16:45:16
20 past six months compared to the prior six   16:45:19
21 months of oxy sales by state."   16:45:21
22          Did I read that correctly?   16:45:22
23     A.   Yes.   16:45:23
24     Q.   Do you recall asking Lisa to do   16:45:23
25 this project?   16:45:27

Page 327

1      A.   I don't recall asking her to do   16:45:28
2  it, no.   16:45:31
3      Q.   Okay.  But she's clearly   16:45:32
4  responding to something, right?   16:45:33
5      A.   Right.   16:45:34
6          MR. O'CONNOR:  Objection.   16:45:35
7  QUESTIONS BY MS. HERZFELD:   16:45:36
8      Q.   And so looking at that, it   16:45:36
9  looks like -- if you look at the charts that   16:45:38
10 are attached here, the next couple, there are   16:45:40
11 various charts that are broken down by state;   16:45:45
12 is that correct?   16:45:47
13     A.   Yes.   16:45:47
14     Q.   Okay.  And it has to do with   16:45:48
15 prior six months and the past six months and   16:45:51
16 the percentage of change for oxy sales; is   16:45:53
17 that right?   16:45:56
18     A.   Yes.   16:45:56
19     Q.   Okay.  And so at least as of   16:45:58
20 the date of this e-mail, during this time,   16:46:01
21 Mallinckrodt was looking at the percentage   16:46:06
22 change of oxy sales state by state; is that   16:46:08
23 right?   16:46:11
24          MR. O'CONNOR:  Objection.   16:46:11
25     Form.   16:46:11

Page 328

1          THE WITNESS:  Maybe not state   16:46:12
2      by state.  The data were pulled.  That   16:46:13
3      does not mean that that's what we were   16:46:15
4      reviewing.   16:46:17
5  QUESTIONS BY MS. HERZFELD:   16:46:18
6      Q.   Okay.  I don't think I   16:46:18
7  understand your answer.   16:46:20
8      I'll back up.   16:46:20
9      A.   Okay.  Can you ask the question   16:46:21
10 a different way then?   16:46:22
11     Q.   Sure.   16:46:24
12     Okay.  So looking at this, it's   16:46:24
13 oxy -- it says attachments are sales by   16:46:26
14 state, August 30, 2011; is that right?   16:46:32
15     A.   Yes.   16:46:34
16     Q.   Okay.  And then, "Ginger, as   16:46:35
17 requested, I've looked at the past six months   16:46:39
18 compared to the prior six months of oxy sales   16:46:40
19 by state."   16:46:43
20          Did I state that correctly?   16:46:46
21     A.   Yes.   16:46:47
22     Q.   Okay.  And so looking at these   16:46:48
23 charts, it was looking at oxy sales by state;   16:46:49
24 is that right?   16:46:52
25     A.   Yes.   16:46:52

Page 329

1      Q.   Okay.   16:46:54
2      A.   That's what's in the chart.   16:46:54
3      Q.   Okay.  And the charts seem to   16:46:55
4  measure prior six months, past six months,   16:46:59
5  and then column F says percentage change.   16:47:01
6      I'm on the page ahead of you.   16:47:04
7  This one right here.   16:47:06
8      A.   Yes.   16:47:08
9      Q.   And so my question is actually   16:47:12
10 pretty simple.  So as of the date this e-mail   16:47:14
11 was sent, August 30, 2011, Mallinckrodt   16:47:18
12 monitored oxy sales by state?   16:47:22
13          MR. O'CONNOR:  Objection to   16:47:25
14     form.   16:47:26
15          THE WITNESS:  We pulled data by   16:47:26
16     state.  I wouldn't say we necessarily   16:47:29
17     monitored it because Lisa -- if she   16:47:31
18     referred to this, she wasn't looking   16:47:33
19     at many states.  She was looking at   16:47:35
20     Ohio, California, New York and   16:47:37
21     Florida, which were flagged for SLM.   16:47:40
22 QUESTIONS BY MS. HERZFELD:   16:47:41
23     Q.   Okay.  So then I will back up.   16:47:42
24 I will rephrase my question.   16:47:43
25     A.   Okay.   16:47:44

Page 330

1    Q.   So as of August 2011 when these    16:47:44
2  charts were sent to you from Lisa,        16:47:47
3  Mallinckrodt had the capability of monitoring  16:47:53
4  oxy sales by state?                        16:47:55
5         MR. O'CONNOR:   Objection to       16:47:56
6  form.                                      16:47:57
7         MS. HERZFELD:   What's the         16:47:58
8  objection?                                 16:47:59
9         MR. O'CONNOR:   Vague.   What      16:48:00
10    monitoring means, the capability.        16:48:02
11  QUESTIONS BY MS. HERZFELD:                 16:48:07
12    Q.   Do you understand what             16:48:08
13  "capability" means, ma'am?                 16:48:09
14    A.   The ability.                       16:48:10
15    Q.   Okay.   And do you understand      16:48:10
16  what "monitoring" means?                   16:48:11
17    A.   Well, it could mean any number     16:48:12
18  of things.   In the context of suspicious 16:48:15
19  order monitoring?   Or were we monitoring 16:48:18
20  those sales?   Which we were not.          16:48:19
21    Q.   Okay.   But my question wasn't     16:48:22
22  "were you."   That was my question before. 16:48:24
23         You said you only knew you were    16:48:26
24  monitoring some, right?                    16:48:28
25         So my question now is:  Did you    16:48:29

Page 331

1  have -- did Mallinckrodt have the          16:48:31
2  capability -- which we've determined you   16:48:32
3  understand what capability means.          16:48:33
4         Did Mallinckrodt have the          16:48:35
5  capability of monitoring -- let's use a    16:48:36
6  different word -- tracking sales of oxy by 16:48:39
7  state?                                     16:48:43
8         MR. O'CONNOR:   Objection to       16:48:44
9  form.                                      16:48:44
10         MS. HERZFELD:   What is the        16:48:45
11    objection?                               16:48:45
12         MR. O'CONNOR:   Compound.          16:48:47
13  Vague.                                    16:48:49
14         MS. HERZFELD:   Okay.   We'll      16:48:50
15    back up and ask it again.                16:48:51
16  QUESTIONS BY MS. HERZFELD:                 16:48:53
17    Q.   I'm going to ask it in smaller     16:48:53
18  parts so we don't get a compound objection. 16:48:55
19  Okay?                                      16:48:57
20         Looking at this chart,             16:48:57
21  Mallinckrodt, here, according to this chart, 16:48:59
22  was monitoring sales -- I won't say        16:49:01
23  monitoring -- tracking sales by state; is  16:49:04
24  that correct?                              16:49:07
25         MR. O'CONNOR:   Objection to       16:49:07

Page 332

1  form.                                      16:49:08
2         MS. HERZFELD:   Okay.   I'm going   16:49:09
3  to back up one more time.                  16:49:10
4         MR. O'CONNOR:   Do you want to      16:49:11
5  just try that question again?   It was     16:49:12
6  because you stopped in the middle.         16:49:14
7         MS. HERZFELD:   You're objecting    16:49:16
8  because I stopped in the middle?           16:49:16
9         MR. O'CONNOR:   Because it          16:49:18
10  became unclear what the question was.      16:49:20
11         MS. HERZFELD:   Okay.   We'll be    16:49:22
12  really clear this time.                    16:49:23
13  QUESTIONS BY MS. HERZFELD:                 16:49:24
14    Q.   As of the date that this e-mail    16:49:25
15  was sent to you, August 30, 2011,          16:49:28
16  Mallinckrodt was capable of tracking oxy   16:49:34
17  sales by state; is that correct?          16:49:37
18    A.   Mallinckrodt was capable of        16:49:40
19  running a report by state, yes.            16:49:42
20    Q.   Okay.   Do you not understand      16:49:45
21  what I mean when I say "tracking"?         16:49:47
22    A.   Tracking, to me, would indicate    16:49:49
23  it could be any number of things of what you 16:49:51
24  were asking.                               16:49:53
25    Q.   Okay.   So you don't understand    16:49:54

Page 333

1  the term "monitoring" because it can mean a 16:49:56
2  lot of things, and tracking seems like it  16:49:58
3  means a lot of things.                     16:50:01
4         So I just want to know:             16:50:01
5  According to this chart, there's 50 states on 16:50:03
6  this chart, correct?                       16:50:04
7    A.   Correct.                            16:50:06
8    Q.   And also the Virgin Islands, it     16:50:07
9  appears, and Puerto Rico, right?           16:50:10
10    A.   Yes.                                16:50:12
11    Q.   So looking at this, the data is     16:50:12
12  broken down by state; is that correct?     16:50:14
13    A.   Correct.                            16:50:15
14    Q.   Okay.   And the percentage          16:50:16
15  change of oxy sales is broken down per state; 16:50:17
16  is that correct?                           16:50:21
17    A.   Yes.                                16:50:21
18    Q.   Okay.   And this information        16:50:22
19  could have been pulled every month if       16:50:24
20  Mallinckrodt wanted to pull it as of August 16:50:26
21  2011; is that correct?                     16:50:29
22    A.   Yes.                                16:50:29
23         MS. HERZFELD:   Okay.   Take a     16:50:33
24  break.                                    16:50:34
25         VIDEOGRAPHER:   We are going off   16:50:34

Page 334

1    the record at 4:50 p.m.          16:50:35
2       (Off the record at 4:50 p.m.)      16:50:37
3       VIDEOGRAPHER:  We are back on    16:58:30
4    the record at 4:58 p.m.          16:58:31
5       REDIRECT EXAMINATION          16:58:36
6    QUESTIONS BY MR. GOTTO:          16:58:37
7       Q.   Ms. Collier, just a few    16:58:38
8    follow-up questions.          16:58:38
9       If you could look back at      16:58:39
10   Exhibit 45, the document you were just    16:58:40
11   looking at with Ms. Herzfeld.      16:58:44
12      A.   Oh, yes.          16:58:47
13      Q.   The e-mail.          16:58:48
14      My question -- the final      16:58:49
15   sentence of the first paragraph says, "The    16:58:53
16   other states that are increasing are      16:58:54
17   highlighted, Ohio, California and New York,    16:58:55
18   which are the same states that SOM      16:58:56
19   highlighted."          16:58:59
20      Do you know what Ms. Cardetti    16:59:00
21   meant when she said those were the same      16:59:02
22   states that SOM highlighted?      16:59:04
23      A.   I'm not clear, but it's    16:59:05
24   possible that there was a discussion during    16:59:08
25   an SOM meeting about those particular states.  16:59:09

Page 335

1       Q.   Okay.  Was Ms. Cardetti part of   16:59:13
2    the SOM committee or any subcommittee?    16:59:18
3       A.   She was part of pulling data   16:59:19
4    for the meetings, for some of the meetings    16:59:24
5    early on.  She was the one that helped with    16:59:27
6    some of the analytics --      16:59:29
7       Q.   Okay.          16:59:34
8       A.   -- along with Kate Neely.    16:59:34
9       Q.   Okay.  And you've testified    16:59:36
10   about an indirect purchaser subcommittee of    16:59:37
11   the SOM committee.          16:59:39
12      Who else was on that      16:59:40
13   subcommittee; can you recall?      16:59:45
14      A.   I don't remember.      16:59:45
15      Q.   You don't remember anyone at    16:59:46
16   all?          16:59:47
17      A.   No, I don't remember who was in   16:59:47
18   that.  It would have been people like the    16:59:49
19   Carol that was mentioned because she was in a   16:59:52
20   chargeback contract admin team, and so she    16:59:55
21   would have known about chargebacks.      16:59:58
22      Q.   Okay.  Do you recall there    16:59:59
23   being a time when the SOM function was moved   17:00:00
24   to a group known as CDIG?      17:00:02
25      MR. O'CONNOR:  Objection to    17:00:05

Page 336

1    form.          17:00:07
2       THE WITNESS:  I don't remember    17:00:07
3    what CDIG stood for.  I thought that    17:00:09
4    was an acronym for sales reporting.    17:00:13
5    QUESTIONS BY MR. GOTTO:          17:00:15
6       Q.   Okay.  So you're not familiar    17:00:15
7    with CDIG as a function at Mallinckrodt?    17:00:16
8       A.   No, I don't remember.  And I    17:00:18
9    know that there was -- CDIG was used in some   17:00:20
10   of the memos, but I don't know what it stood    17:00:25
11   for.          17:00:27
12      Q.   Okay.  Okay.  I just have a    17:00:27
13   couple more questions for you on some    17:00:29
14   documents.          17:00:31
15      (Mallinckrodt-Collier Exhibit    17:00:40
16   46 marked for identification.)      17:00:40
17   QUESTIONS BY MR. GOTTO:          17:00:40
18      Q.   Exhibit 46 is a multipage    17:00:58
19   e-mail thread beginning at Bates      17:01:00
20   MNK-T1_0000368477, and it's a several-page    17:01:06
21   document.          17:01:10
22      My only question for you      17:01:10
23   concerns your e-mail to Ms. Lundergan on    17:01:11
24   February 9th, the very top e-mail on the    17:01:15
25   second page.          17:01:23

Page 337

1       A.   Okay.          17:01:59
2       Q.   In your e-mail -- well, first,    17:02:00
3    the e-mail thread concerns resuming shipments   17:02:04
4    to KeySource, correct?          17:02:07
5       A.   Correct.          17:02:08
6       Q.   And this is in February      17:02:09
7    of 2011.          17:02:12
8       On February 8th, Ms. Lundergan    17:02:12
9    asks you if you agree with the resumption,    17:02:20
10   and you say, "Yes, Karen Harper said we can    17:02:22
11   ship all of our approved distributors because   17:02:25
12   they performed the audits, and the      17:02:26
13   distributors complied with our requests.  We    17:02:28
14   are cutting off the suspicious pharmacies."    17:02:32
15      What did you mean by that when    17:02:34
16   you said, "we are cutting off the suspicious    17:02:38
17   pharmacies"?          17:02:39
18      A.   That probably refers to where    17:02:40
19   we had pharmacies that were ordering from    17:02:42
20   more than one distributor, and we were      17:02:45
21   uncomfortable with them buying from multiple    17:02:48
22   distributors, and so we wouldn't allow      17:02:50
23   chargebacks anymore.          17:02:52
24      So basically we didn't cut off    17:02:52
25   the pharmacies; we cut off the payment      17:02:54

Page 338

1  mechanism for the wholesaler/distributor to   17:02:56
2  get their money back.                          17:02:58
3      Q.   Okay.  And when you said "they        17:02:59
4  performed the audits and the distributors      17:03:04
5  complied with our requests," who is the        17:03:06
6  "they" you're referring to in that sentence?   17:03:09
7      A.   Karen Harper and the SOM team.        17:03:10
8      Q.   Okay.  Okay.  You can put that        17:03:13
9  aside.                                         17:03:16
10         (Mallinckrodt-Collier Exhibit          17:03:17
11     47 marked for identification.)             17:03:18
12  QUESTIONS BY MR. GOTTO:                        17:03:18
13     Q.   Exhibit 48 {sic} is a multipage       17:03:52
14  document beginning at Bates                    17:03:58
15  MNK-T1_0000273249, and it appears to be a      17:04:05
16  spreadsheet that compiles information          17:04:07
17  concerning oxy 15 and 30 gross sales in        17:04:10
18  January 2011 time frame.                       17:04:17
19         Do you recognize this document?        17:04:18
20     A.   I recognize the content, yes.         17:04:21
21     Q.   Okay.  Is it a document that          17:04:24
22  you had involvement in preparing?              17:04:27
23     A.   Not that I recollect.                 17:04:29
24     Q.   Okay.  Or anyone on your team?        17:04:31
25     A.   Someone on my team might have         17:04:33

Page 339

1  done this.                                     17:04:35
2      Q.   Okay.  Do you know the purpose        17:04:36
3  of compiling this data back in early 2011?     17:04:37
4      A.   Just to understand, this might        17:04:42
5  have been part of removing it from their VIP   17:04:45
6  programs and understand what each of the       17:04:48
7  wholesalers were purchasing.                   17:04:50
8      Q.   Okay.  And the column A on the        17:04:51
9  first page, sold via parent/customer name,     17:05:02
10  what does that phrase mean, "parent/customer  17:05:05
11  name," in this context?                        17:05:10
12     A.   That's our customer that we           17:05:11
13  sold to, so it pulls the -- someone pulled    17:05:14
14  the chargeback data by who it was shipped     17:05:16
15  through.                                       17:05:18
16     Q.   Okay.  Okay.  You can set that        17:05:19
17  aside.                                         17:05:23
18     A.   Okay.                                 17:05:32
19         (Mallinckrodt-Collier Exhibit          17:05:32
20     48 marked for identification.)             17:05:32
21  QUESTIONS BY MR. GOTTO:                        17:05:32
22     Q.   Okay.  So to correct, the prior       17:05:51
23  document was Exhibit 47.                       17:05:56
24         This is Exhibit 48, which was a        17:05:57
25  document produced native under Bates          17:06:01

Page 340

1  MNK-T1_0000557439.                             17:06:03
2         If you can take -- this appears         17:06:10
3  to be an October 2010 compilation of           17:06:11
4  information regarding oxy 15 and 30 sales?     17:06:14
5         Do you recognize this document?        17:06:19
6      A.   I recognize the content, yes.        17:06:22
7      Q.   Okay.  And again, similar to          17:06:24
8  the Exhibit 47 we just looked at, is this      17:06:26
9  data that you or someone on your team          17:06:30
10  participated in compiling?                     17:06:33
11     A.   It appears it would be.              17:06:34
12     Q.   Okay.  And again, any insight        17:06:36
13  into the reason for the compilation of this   17:06:41
14  data?                                          17:06:43
15     A.   I'm not sure why we were             17:06:44
16  running this data on a regular basis, but it  17:06:49
17  was to understand who was selling most of our 17:06:51
18  product.                                       17:06:54
19         MR. GOTTO:  Okay.  I have no           17:07:02
20     further questions.  Thank you for your     17:07:02
21     time.                                      17:07:04
22         THE WITNESS:  Okay.  Thank you.       17:07:04
23         MR. O'CONNOR:  I have no               17:07:06
24     questions.                                 17:07:07
25         MR. GOTTO:  All right.                17:07:07

Page 341

1         VIDEOGRAPHER:  We are going off        17:07:08
2  the record at 5:07 p.m.                        17:07:10
3  (Deposition concluded at 5:07 p.m.)            17:07:11
4         - - - - - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 342

### CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Ginger Collier was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____
CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
Notary Public
Dated: January 14, 2019

Page 343

### INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 344

### ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
Ginger Collier          DATE

Subscribed and sworn to before me this _____ day of _____, 20 _____.
My commission expires: _____

Notary Public

Page 345

– – – – – – –
### ERRATA
– – – – – – –

PAGE   LINE   CHANGE/REASON

_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____

Highly Confidential - Subject to Further Confidentiality Review

Page 346

```
 1        _ _ _ _ _ _ _
              LAWYER'S NOTES
 2        _ _ _ _ _ _ _
 3    PAGE  LINE
 4    ____  ____  _____
 5    ____  ____  _____
 6    ____  ____  _____
 7    ____  ____  _____
 8    ____  ____  _____
 9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
25
```