EXHIBIT 67

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4     _____

5     IN RE:                          Case No. 17-MD-2804

                                       MDL No. 2804

6     NATIONAL PRESCRIPTION            Hon. Dan A. Polster

      OPIATE LITIGATION

7

      APPLIES TO ALL CASES

8     _____

9

10

                     HIGHLY CONFIDENTIAL

11

        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

12

              Wednesday, December 19, 2018

13

14

15

16

17          Video Deposition of STEVEN A. BECKER,

18     held at the JW Marriott, 2141 Lindau Lane,

19     Minneapolis, Minnesota, commencing at 9:16 a.m.,

20     on the above date, before Myrina A. Kleinschmidt,

21     Registered Merit Reporter, Certified Realtime

22     Reporter, and Certified Realtime Captioner.

23

24          GOLKOW LITIGATION SERVICES

            877.370.3377 ph | 917.591.5672 fax

25               deps@golkow.com

| | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | Representing Plaintiffs: |
| 4 | |
| 5 | KELLER ROHRBACK L.L.P. |
| 6 | DEREK W. LOESER |
| 7 | ALISON S. GAFFNEY |
| 8 | Attorneys at Law |
| 9 | 1201 Third Avenue, Suite 3200 |
| 10 | Seattle, WA 98101-3052 |
| 11 | dloeser@kellerrohrback.com |
| 12 | agaffney@kellerrohrback.com |
| 13 | |
| 14 | |
| 15 | Representing Tennessee Plaintiffs: |
| 16 | |
| 17 | BRANSTETTER, STRANCH & JENNINGS, PLLC |
| 18 | BENJAMIN A. GASTEL |
| 19 | Attorney at Law |
| 20 | The Freedom Center |
| 21 | 223 Rosa L. Parks Avenue, Suite 200 |
| 22 | Nashville, TN 37203 |
| 23 | beng@bsjfirm.com |
| 24 | |
| 25 | (continued...) |

| | Page 4 |
|---|---|
| 1 | APPEARANCES, continued: |
| 2 | |
| 3 | Representing Cardinal Health: |
| 4 | |
| 5 | WILLIAMS & CONNOLLY LLP |
| 6 | MELINDA JOHNSON |
| 7 | Attorney at Law |
| 8 | 725 Twelfth Street, N.W. |
| 9 | Washington, DC 20005 |
| 10 | mkjohnson@wc.com |
| 11 | |
| 12 | |
| 13 | APPEARED VIA CONFERENCE CALL: |
| 14 | |
| 15 | Representing Validus Pharmaceuticals: |
| 16 | |
| 17 | FOX ROTHSCHILD LLP |
| 18 | JACOB S. PERSKIE |
| 19 | Attorney at Law |
| 20 | 1301 Atlantic Avenue |
| 21 | Midtown Building, Suite 400 |
| 22 | Atlantic City, NJ 08401-7212 |
| 23 | jperskie@foxrothschild.com |
| 24 | |
| 25 | continued...) |

| | Page 3 |
|---|---|
| 1 | APPEARANCES, continued: |
| 2 | |
| 3 | Representing Mallinckrodt LLC, SpecGX LLC, |
| 4 | and the Witness: |
| 5 | |
| 6 | ROPES & GRAY LLP |
| 7 | WILLIAM DAVISON |
| 8 | JOSH GOLDSTEIN |
| 9 | Attorneys at Law |
| 10 | Prudential Tower |
| 11 | 800 Boylston Street |
| 12 | Boston, MA 02199-3600 |
| 13 | william.davison@ropesgray.com |
| 14 | joshua.goldstein@ropesgray.com |
| 15 | |
| 16 | |
| 17 | Representing Walmart: |
| 18 | |
| 19 | JONES DAY |
| 20 | BRANDY H. RANJAN |
| 21 | Attorney at Law |
| 22 | 325 John H. McConnell Blvd., Suite 600 |
| 23 | Columbus, OH 43215-2673 |
| 24 | branjan@jonesday.com |
| 25 | continued...) |

| | Page 5 |
|---|---|
| 1 | APPEARANCES, continued: |
| 2 | |
| 3 | APPEARED VIA CONFERENCE CALL AND REMOTE |
| 4 | REALTIME/VIDEO STREAM: |
| 5 | |
| 6 | Representing AmerisourceBergen |
| 7 | Drug Corporation: |
| 8 | |
| 9 | JACKSON KELLY PLLC |
| 10 | JILL MCINTYRE |
| 11 | Attorney at Law |
| 12 | 500 Lee Street East, Suite 1600 |
| 13 | Charleston, WV 25301-3202 |
| 14 | jmcintyre@jacksonkelly.com |
| 15 | |
| 16 | |
| 17 | Representing Endo Pharmaceuticals: |
| 18 | |
| 19 | ARNOLD & PORTER KAYE SCHOLER LLP |
| 20 | SEAN P. HENNESSY |
| 21 | Attorney at Law |
| 22 | 601 Massachusetts Avenue, NW |
| 23 | Washington, DC 20001-3743 |
| 24 | sean.hennessy@arnoldporter.com |
| 25 | (continued...) |

Page 6

1  APPEARANCES, continued:
2
3  Representing McKesson:
4
5      COVINGTON & BURLING LLP
6      JAMES HOVARD
7      Attorney at Law
8      3000 El Camino Real
9      5 Palo Alto Square
10     Palo Alto, CA  94306-2112
11     jhovard@cov.com
12
13
14  The Videographer:
15
16      DANIEL BURTON
17
18
19
20
21
22
23
24
25            * * * * *

Page 7

1              INDEX
2
3  EXAMINATION:
4
5      By Mr. Loeser - Pages 22 and 419
6      By Mr. Gastel - Page 374
7      By Mr. Davison - Page 417
8
9  REQUESTS:
10
11     Pages 30, 31, 218
12
13  EXHIBITS:
14
15  MALLINCKRODT-BECKER EXHIBITS      PAGE
16
17  Exhibit 001.................................25
18     Plaintiffs' Amended Notice of
19     Oral Videotaped Deposition of
20     Steven Becker and Requests for
21     Production of Documents
22     (Amended as to location only)
23     (6 pages)
24
25            (continued...)

Page 8

1  EXHIBITS:
2
3  MALLINCKRODT-BECKER EXHIBITS      PAGE
4
5  Exhibit 002 .................................45
6     Written Notification of
7     Unsatisfactory Performance;
8     Employee Name: Steve Becker,
9     Job Title: National Account Director,
10    Manager Name: Jane Williams,
11    Department: Specialty Generics,
12    Date: August 7, 2014
13    MNK-T1_0007147596 through 598
14
15  Exhibit 003 .................................58
16    Document Produced in Native Format,
17    FY13 Pharmaceutical Combined Trade Show,
18    Conference and Event Schedule
19    MNK-T1_0002161144, (and 2 additional pages)
20
21  Exhibit 004 .................................68
22    Pre-show Worksheet
23    MNK-T1_0002867894 through 898
24
25            (continued...)

Page 9

1  EXHIBITS:
2
3  MALLINCKRODT-BECKER EXHIBITS      PAGE
4
5  Exhibit 005 .................................73
6     e-mail correspondence with
7     attached HD Smith Fentanyl Patches
8     & Lozenge Fall Suggested Order September
9     12.xls; HD Smith Oxycodone Fall Suggested
10    Orders September 2012.xlsx
11    MNK-T1_0004809715
12
13  Exhibit 006 .................................99
14    Newsroom, 12/3/06; Alarm over
15    Prescription Drug Trade Deaths
16    Skyrocket as Dealers and Addicts
17    Flock to S. Florida
18    (5 pages)
19
20  Exhibit 007 .................................108
21    e-mail correspondence
22    MNK-T1_0000264194 through 195
23
24
25            (continued...)

Page 10

1  EXHIBITS:
2
3  MALLINCKRODT-BECKER EXHIBITS         PAGE
4
5  Exhibit 008 ...............................112
6  "The 'Oxy Express':
7  Florida's Drug Abuse Epidemic"
8  (11 pages)
9
10  Exhibit 009 ...............................115
11  e-mail correspondence
12  MNK-T1_0004916278 through 279
13
14  Exhibit 010 ...............................121
15  e-mail correspondence with attached
16  Oxy Florida Sales 091410.xls
17  MNK-T1_0000289707, (and 1 additional page)
18
19  Exhibit 011 ...............................137
20  e-mail correspondence with attached
21  6-16-11Oxycotin PD Article.rtf
22  MNK-T1_0004888161 through 162
23
24
25                   (continued...)

Page 12

1  EXHIBITS:
2
3  MALLINCKRODT-BECKER EXHIBITS         PAGE
4
5  Exhibit 016 ...............................201
6  MNK-T1_0000264292
7  (3 pages)
8
9  Exhibit 017 ...............................210
10  e-mail correspondence
11  MNK-T1_0000559192, 195,
12  (and 1 additional page)
13
14  Exhibit 018 ...............................221
15  MNK-T1_0000264296
16  (2 pages)
17
18  Exhibit 019 ...............................226
19  Las Vegas Pharmacy to Pay Department
20  of Justice $1 Million and Surrender
21  its DEA Registration to Resolve
22  Allegations of Unlawful Prescription Drug
23  Distribution
24  (1 page)
25                   (continued...)

Page 11

1  EXHIBITS:
2
3  MALLINCKRODT-BECKER EXHIBITS         PAGE
4
5  Exhibit 012 ...............................142
6  Document Produced in Native Format,
7  Specialty Generics National Sales
8  Meeting, November 9, 2011
9  MNK-T1_0002450579,
10  (and 5 additional pages)
11
12  Exhibit 013 ...............................158
13  e-mail correspondence
14  MNK-T1_0000289849 through 852
15
16  Exhibit 014 ...............................163
17  e-mail correspondence with
18  attached Griffin
19  Pharmacy-Montclair_20110601.xlsx
20  MNK-T1_0004254158 through 160
21
22  Exhibit 015 ...............................188
23  MNK-T1_0000264292 Harvard (MI) Summary
24  (2 pages)
25                   (continued...)

Page 13

1  EXHIBITS:
2
3  MALLINCKRODT-BECKER EXHIBITS         PAGE
4
5  Exhibit 020 ...............................228
6  List of Clients
7  MNK-T1_0000448041 through 042
8
9  Exhibit 021 ...............................237
10  e-mail correspondence with attached 2011 AAP
11  Backgrounder.DOC; 2011 ANDA Backgrounder.DOC;
12  2011 CardinalBackgrounder.DOG; 2011 Castillo
13  Backgrounder.DOC; 2011 Cedardale
14  Backgrounder.DOC; 2011 Harvard
15  Backgrounder.DOC; 2011 HD Smith
16  Backgrounder.DOC; 2011 Kinray Backgrounder.DOC;
17  2011 Masters Backgrounder.DOC; 2011 OptiSource
18  Backgrounder.DOC; 2011PBA TrueCare
19  Backgrounder.DOC; 2011 Pharmacy Select
20  Backgrounder.DOC; 2011 Premier Backgrounder.DOC
21  MNK-T1_0000369226, 231, 232, 245, 246, 239,
22  240, 243, 244, 241, 242, 249, 250, 229, 230,
23  237, 238, 247, 248, 235, 236, 251, 233, 234,
24  227, and 228
25                   (continued...)

Page 14

1  EXHIBITS:
2
3  MALLINCKRODT-BECKER EXHIBITS          PAGE
4
5  Exhibit 022 ...............................261
6     e-mail correspondence
7     MNK-T1_0000266735 through 736
8
9  Exhibit 023 ...............................267
10    e-mail correspondence
11    MNK-T1_0002940658 through 660
12
13 Exhibit 024 ...............................275
14    e-mail correspondence
15    MNK-T1_0004595209 through 211
16
17 Exhibit 025 ...............................278
18    e-mail correspondence
19    MNK-T1_0000267546 through 547
20
21 Exhibit 026 ...............................283
22    e-mail correspondence
23    MNK-T1_0000267735 through 737
24
25              (continued...)

Page 15

1  EXHIBITS:
2
3  MALLINCKRODT-BECKER EXHIBITS          PAGE
4
5  Exhibit 027 ...............................288
6     e-mail correspondence with
7     attached Backorder Priority
8     customers.xlsx
9     MNK-T1_0000560836 through 837
10
11 Exhibit 028 ...............................292
12    Document Produced in Native Format,
13    Trade Records
14    MNK-T1_0000560953,
15    (and 2 additional pages)
16
17 Exhibit 029 ...............................295
18    e-mail correspondence
19    MNK-T1_0000506895
20
21 Exhibit 030 ...............................298
22    e-mail correspondence
23    MNK-T1_0004787571 through 576
24
25              (continued...)

Page 16

1  EXHIBITS:
2
3  MALLINCKRODT-BECKER EXHIBITS          PAGE
4
5  Exhibit 031 ...............................305
6     e-mail correspondence
7     MNK-T1_0004790079 through 081
8
9  Exhibit 032 ...............................310
10    e-mail correspondence
11    MNK-T1_0000379855
12
13 Exhibit 033 ...............................312
14    Press release, "Michigan Pharmaceutical
15    Supplier'S DEA License Suspended;
16    -Harvard Drug Group, LLC distributed
17    13 million doses of Oxy from 2008-2010"
18    (1 page)
19
20 Exhibit 034 ...............................314
21    e-mail correspondence with
22    attached Untitled Attachment
23    MNK-T1_0000561028 through 029
24
25              (continued...)

Page 17

1  EXHIBITS:
2
3  MALLINCKRODT-BECKER EXHIBITS          PAGE
4
5  Exhibit 035 ...............................322
6     "Pennsylvania Pharmaceutical
7     Wholesaler Value Drug, Inc. to
8     Pay $4,000,000 in Settlement"
9     (2 pages)
10
11 Exhibit 036 ...............................324
12    Federal Register; Vol. 80, No. 178;
13    Tuesday, September 15, 2015
14    (3 pages)
15
16 Exhibit 037 ...............................329
17    "Manhattan U.S. Attorney Announces
18    $10 Million Civil Penalty Recovery
19    Against New York Pharmaceutical
20    Distributor Kinray, LLC."
21    (3 pages)
22
23
24
25              (continued...)

| | Page 18 |
|---|---|

1  EXHIBITS:

2

3  MALLINCKRODT-BECKER EXHIBITS          PAGE

4

5  Exhibit 038 ................................334

6     e-mail correspondence with attached

7     image001.gif; image002.jpg

8     MNK-T1_0000561015 through 016

9

10  Exhibit 039 ................................348

11    e-mail correspondence with attached

12    Customer Audit Checklist Revision

13    04_01_11.doc; 02_11 Update Wholesaler

14    Checklist.docx; 04_11 Customer Checklist

15    Information Sheet.doc

16    MNK-T1_0000269760 through 762

17

18  Exhibit 040 ................................367

19    e-mail correspondence with attached DEA Memo to

20    Industry 09_27_2006.pdf; DEA Memo to Industry

21    12_27_2007.pdf; DEA Memo Reference

22    Southwood Pharm Revocation_Suspicious

23    Order Monitoring.pdf

24    MNK-T1_0005038685 through 690

25                (continued...)

| | Page 19 |
|---|---|

1  EXHIBITS:

2

3  MALLINCKRODT-BECKER EXHIBITS          PAGE

4

5  Exhibit 041 ................................381

6     Spreadsheet, TN and UT oxy15 and 30

7     through June 2012; Date Created: 9/4/2012

8     (20 pages)

9

10  Exhibit 042 ................................399

11    Oxy 15 and 30 Ship to and Sold

12    via by mo Jan2014-Dec2014 run 1-15-15

13    (14 pages)

14

15  Exhibit 043 ................................404

16    Document Produced in Native Format,

17    Non-Warehousing Chain, Bridge the Gap

18    Campaign, March 22, 2011

19    MNK-T1_0006449611, (and 11 additional pages)

20

21

22

23

24

25                (continued...)

| | Page 20 |
|---|---|

1  EXHIBITS:

2

3  MALLINCKRODT-BECKER EXHIBITS          PAGE

4

5  Exhibit 044 ................................409

6     e-mail correspondence with attached ANWC

7     Program.docx; Distributor ABC Alternate

8     NW Contract Program 3-17-2011.xls;

9     Distributor Cardinal Alternative NW

10    Contract Program 3-17-2011.xls;

11    Distributor McKesson Alternative NW

12    Contract Program 3-17-2011.xls

13    MNK-T1_0005890567 through 569

14

15

16

17

18

19

20

21

22

23

24

25                (continued...)

| | Page 21 |
|---|---|

1  EXHIBITS WHICH WERE MARKED PRIOR, BUT REFERENCED

2  DURING THIS DEPOSITION:

3

4  EXHIBIT       DESCRIPTION          PAGE

5

6  Borelli Exhibit 2 .........................  54

7     This document produced natively,

8     Retail Generic Incentive Plan Earnings

9     by Sales Rep, Calendar year 2006 through

10    calendar year 2011

11    MNK-T1_0000315995, (and 2 additional pages)

12

13  Borelli Exhibit 11 .........................166

14    MNK-T1_0000264292

15    (2 pages)

16

17  Borelli Exhibit 22 .........................127

18    e-mail correspondence with attached

19    Oxycodone IR Monthly Update.docx

20    MNK-T1_0000368646 through 649

21

22  Borelli Exhibit 24 .........................102

23    "Inside Broward County's pill mills"

24    (17 pages)

25                * * * * *

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    WHEREUPON, the following proceedings were
2  duly commenced:
3    THE VIDEOGRAPHER:  We are now on the
4  record.  My name is Dan Burton.  I'm the
5  videographer for Golkow Litigation Services.
6  Today's date is December 19th, 2018, and the time
7  is 9:16 a.m.
8    This video deposition is being held in
9  Minneapolis, Minnesota, in the matter of National
10  Opiate Litigation, MDL number 2804, in the United
11  States District Court for the Northern District of
12  Ohio, Eastern Division.  The deponent is Steven
13  Becker.
14    Counsel will be noted on the record.  The
15  court reporter is Myrina Kleinschmidt and will now
16  swear in the witness.
17    (Whereupon, the oath was administered by
18  the court reporter.)
19    THE WITNESS:  Yes, I do.
20        STEVEN A. BECKER,
21  a witness in the above-entitled proceedings,
22    after having been first duly sworn,
23    testified under oath as follows:
24        EXAMINATION
25  BY MR. LOESER:

Page 23

1    Q  Good morning, Mr. Becker.  My name is
2  Derek Loeser from the firm of Keller Rohrback for
3  the plaintiffs in this litigation.
4    A  Good morning.
5    MR. LOESER:  Do I need to make
6  appearances?
7    THE REPORTER:  They'll be noted on the
8  record.
9  BY MR. LOESER:
10    Q  Could you please state and spell your --
11  your last name, please?
12    A  Becker, B-e-c-k-e-r.
13    Q  And your full name?
14    A  Steven A. Becker.
15    Q  And what is your current job?
16    A  I'm retired.
17    Q  What was the last job you had before you
18  retired?
19    A  Mallinckrodt.
20    Q  And what year did you retire?
21    A  2014.
22    Q  Are you taking any medication or is there
23  any reason that would interfere with your ability
24  to answer questions fully and truthfully today?
25    A  I'm taking medications, but I haven't read

Page 24

1  the package inserts to know if there -- what any
2  side effects could be.  Except a bloody nose, I
3  know that one.
4    Q  So you have no reason to believe, from the
5  medications that you are taking, that it will
6  interfere with your ability to testify --
7    A  Correct.
8    Q  -- accurately and truthfully?
9    A  Right.
10    Q  Have you ever had your deposition taken
11  before?
12    A  No.
13    Q  Well, I'll go over a few of the ground
14  rules that should make this go a little more
15  smoothly.  I'm going to ask you questions --
16    A  Mm-hmm (affirmative).
17    Q  -- and you will answer them.
18    A  Mm-hmm (affirmative).
19    Q  You're under oath; do you understand that?
20    A  Yes, I do.
21    Q  Do you understand what that means?
22    A  Yes, I do.
23    Q  And that's that you need to testify
24  truthfully?
25    A  Yes.

Page 25

1    Q  So I'll ask questions, and it's important
2  that you let me finish asking the question before
3  you try to answer it.
4    A  Mm-hmm (affirmative).
5    Q  Likewise, I will attempt to let you finish
6  answering before I ask another question.  If you
7  don't understand a question, please tell me.  I'll
8  try to restate it.  And it's important, as well,
9  that you answer affirmatively, yes or no, and not
10  shake your head or --
11    A  Mm-hmm (affirmative).
12    Q  -- answer nonverbally; do you understand
13  that?
14    A  Yes, I do.
15    Q  Are you represented by counsel here today?
16    A  Yes.
17    Q  And --
18    A  Ropes & Gray.  Bill Davison.
19    Q  And any other counsel?
20    A  No.
21    Q  I'm going to show you what will be marked
22  Exhibit 1.
23    (Whereupon, Exhibit Mallinckrodt-Becker-
24  001 was marked for identification by the
25  reporter.)

Page 26

```
1  BY MR. LOESER:
2     Q I've handed you the deposition notice for
3  your deposition today. Have you seen this
4  document before?
5     A I don't believe so.
6     Q If you read the bottom of that first page
7  of that document, there's a paragraph that starts
8  "ADDITIONALLY, PLEASE TAKE NOTICE that pursuant to
9  the applicable Federal Rules of Civil Procedure,
10 Plaintiffs have requested that the individual
11 identified above produce the documents identified
12 in the Schedule A attached to this Notice that are
13 in their possession, custody, or control"; do you
14 see that?
15    A Mm-hmm (affirmative).
16    Q And the notice is -- does the notice have
17 your name in the first paragraph?
18    A The first paragraph, up above here
19 (indicating)?
20    Q Yeah.
21    A Steven A. Beck-- or Steven Becker, yes.
22    Q Great. If you could turn to the next
23 page --
24    A Mm-hmm (affirmative).
25    Q -- which indicates "SCHEDULE A," keep
```

Page 27

```
1  turning to page 4.
2     A Yes.
3     Q There are some requests for production,
4  and I'm going to skip to REQUEST FOR PRODUCTION
5  NO. 2, which states, "All documents, including
6  electronic data and e-mail, in your possession
7  related in any way to any defendant's manufacture,
8  marketing, sale, distribution, suspicious order
9  monitoring and lobbying efforts in connection with
10 its opioid business"; do you see that?
11    A No, I'm not seeing it. Can you point to
12 where --
13    Q Can you turn to page 5 of the document?
14    A Oh, page 5. Okay. Yes.
15    Q At the very top, it says, "REQUEST FOR
16 PRODUCTION NO. 2"?
17    A Yes. Okay.
18    Q So have you searched and determined
19 whether you have any of the documents in your
20 possession that are listed there?
21    A I have no documents.
22    Q So when you left Mallinckrodt, you didn't
23 keep any documents or information?
24    A No, they were all sent back to the
25 company.
```

Page 28

```
1     Q Nothing in your personal e-mail or any
2  other --
3     A Not that I'm aware of.
4     Q If you read the next request below that,
5  it says, "All documents that you have consulted or
6  reviewed or plan to consult in preparation for
7  your deposition and have relied upon or will rely
8  upon for your testimony for your deposition," and
9  this really is a question for counsel.
10    MR. LOESER: Have all the documents that
11 Mr. Becker relied on been produced in this
12 litigation?
13    MR. DAVISON: Yes, they have.
14    MR. LOESER: I would like to note, just
15 for the record, that yesterday we received, from
16 opposing counsel, notice that looks like about
17 another 300,000 documents were produced to us,
18 some of which were from Mr. Becker's custodial
19 file, and we have not, obviously, had the time to
20 go through 300,000 documents in one night, and
21 have looked at those that specifically came from
22 Mr. Becker's custodial file. We reserve the right
23 to recall Mr. Becker if, in fact, there's other
24 materials that were produced yesterday that are
25 relevant to his testimony.
```

Page 29

```
1     MR. DAVISON: And just to make the record
2  clear, I believe there were less than 40 documents
3  produced from Mr. Becker's custodial file, which
4  were provided courtesy copies last evening.
5     MR. LOESER: However, the other 300,000
6  documents may well have information and materials
7  relevant to the questions we'd like to ask
8  Mr. Becker.
9     MR. DAVISON: We would disagree,
10 obviously, but it's on the record, so...
11 BY MR. LOESER:
12    Q When you worked for Mallinckrodt, did they
13 provide you with a phone?
14    A Yes.
15    Q And did you return that phone to
16 Mallinckrodt --
17    A Yes.
18    Q -- when you left?
19    And did you use your phone to send e-mail
20 or text messages?
21    A Very little.
22    MR. LOESER: And Counsel, again, as we
23 asked for Mr. Borelli, to the extent there's any
24 record of text messages or anything used from the
25 phone to communicate Mallinckrodt-related matters,
```

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 we request that that be produced.
2     MR. DAVISON: We will endeavor to look
3 into that.
4 BY MR. LOESER:
5   Q Sir, what did you do to prepare for this
6 deposition?
7   A Just met with Mr. Davison.
8   Q And how many times did you meet with him?
9   A A week ago and then yesterday.
10   Q And a week ago, where did you meet with
11 him?
12   A A Marriott, across the road over here
13 (indicating).
14   Q And do you live nearby?
15   A I live in Eagan. I have -- I've spent
16 most of my time up in Brainerd, the lakes area.
17   Q And how long would you say the meeting, a
18 week ago, lasted?
19   A It was from 9:00 to 4:00, approximately.
20   Q And you didn't bring any documents or
21 materials with you to that meeting?
22   A No. All I had was a sheet of telephone
23 numbers of contacts that I used to call on, just
24 for my memory. I didn't know -- I've never gone
25 through this, so I had no idea what was going to

Page 31

1 be asked. I've been retired for basically, you
2 know, four years now, you know. It's -- I had
3 that just to refresh my memory, if any questions
4 came up, because --
5   Q And did you -- sorry.
6   A -- on who is who. That's what it was for.
7   Q And is this a document that you gave to
8 your counsel at that meeting?
9   A Yes, I did.
10     MR. LOESER: Counsel, if you could please
11 ensure that that's produced --
12     MR. DAVISON: I believe it has been, but I
13 will endeavor to ensure that.
14     MR. LOESER: Thank you.
15 BY MR. LOESER:
16   Q And there was a second meeting. When was
17 that?
18   A Yesterday.
19   Q And again, was that -- who was that with?
20   A With William and his partner.
21   Q And how long did that meeting last?
22   A Approximately from 9:00 to 4:00.
23   Q And did you bring any documents to that
24 meeting?
25   A No.

Page 32

1   Q And did you review documents and materials
2 that were brought by counsel to that meeting?
3   A Yes.
4   Q And can you generally describe what those
5 were?
6     MR. DAVISON: I'm just going to object.
7 You can describe generally what they were, but I
8 don't want you to get into any of the specifics of
9 the documents.
10   A Basically, e-mail documents that I had
11 sent or some that may have been sent to me.
12 BY MR. LOESER:
13   Q And other than e-mail, were there reports
14 or memoranda or anything else?
15   A I'm not sure what Miranda is, but
16 portions -- just basically, portions of my e-mail
17 is what I saw, things that I've sent to the person
18 I reported to and other various departments.
19   Q Okay. And were you shown anything, any
20 e-mail that you didn't send, and you didn't
21 receive, and you were seeing for the first time?
22   A I don't believe so.
23   Q Have you read any transcripts from any
24 other depositions in this case?
25   A No.

Page 33

1   Q And was there anyone else present at the
2 meetings with counsel, other than the two
3 individuals you identified?
4   A It was William, and was it Cassandra?
5     MR. DAVISON: (Moves head up and down.)
6   A One of the people from Ropes & Gray, and
7 then yesterday, these two gentlemen.
8 BY MR. LOESER:
9   Q And nobody from any firm other than Ropes
10 & Gray?
11   A No.
12   Q Have you talked about the -- in advance of
13 this deposition, have you spoken to anyone other
14 than your attorneys about your testimony today?
15   A I reached out to some people that I used
16 to work with, Vic Borelli, Jane Williams, Jake
17 Longenecker, Tim Berry, and Bonnie New, just to
18 ask if -- what was going on when I received the
19 deposition -- request that I was going to be in a
20 deposition.
21   Q And when did you reach out to those
22 individuals?
23   A I can't remember the exact date. It was
24 after I was contacted by Ropes & Gray.
25   Q And do you recall what you said to them?

Page 34

1    A  I just asked if they had been deposed as
2  well and what it was for, that -- that's it.
3  Short conversation.
4    Q  And did you have a conversation with each
5  of the individuals that you identified?
6    A  Yes.
7    Q  And can you generally describe what you
8  learned from each of them?
9    A  That Vic Borelli was going to be doing a
10  deposition, and Jane Williams was going to be
11  doing a deposition, and other people did not
12  indicate that they were doing depositions, and
13  that was the course of the conversation.
14    Q  And did you talk at all about what you
15  thought you would have to testify about?
16    A  No.
17    Q  And did they share any of that with you?
18    A  No.
19    Q  And was it just one conversation with each
20  of them?
21    A  Correct.
22    Q  Are you being reimbursed or compensated in
23  any way for time and expenses?
24    A  No.
25    Q  For this deposition?

Page 35

1    A  No.
2    Q  Nobody's offered to pay you anything for
3  your testimony?
4    A  No.
5    Q  Have you ever been charged with a crime?
6    A  No.
7    Q  Did you ever graduate from college,
8  Mr. Becker?
9    A  Yes.
10    Q  What year did you graduate?
11    A  I don't recall the year, but I graduated
12  from St. Cloud State University.
13    Q  And what was your -- do you recall what
14  your major was?
15    A  That, I can remember.  Mass
16  communications.
17    Q  And can you describe your job history
18  after you graduated from college?
19    A  After I graduated from college, I worked
20  at a municipal liquor store as assistant manager
21  for the City of Edina.  Then I worked -- from
22  there, I went and worked with Midwest Wine Company
23  as a wine salesman.  Then from there, I went to
24  John O. Butler dental company and then Dental
25  Solutions, Schein Pharmaceutical.

Page 36

1    THE REPORTER:  What was the last one?
2    A  Schein.  Henry -- Schein Pharmaceutical,
3  not Henry Schein.  And then Mallinckrodt.
4  BY MR. LOESER:
5    Q  And the year you started at Mallinckrodt
6  was?
7    A  I believe 2000.
8    Q  And to go back to the first liquor store
9  that you worked for, do you generally recall what
10  year that was?
11    A  No, I don't.
12    Q  And Midwest Wine, do you recall when that
13  was?
14    A  No, I don't.
15    Q  Do you recall how long you worked there?
16    A  Approximately four years, maybe.
17    Q  And then John O. Butler?
18    A  Mm-hmm (affirmative).
19    Q  Then what did you do for them?
20    A  I was a salesman and then a regional sales
21  manager.
22    Q  And what did you sell for them?
23    A  Chairside dental products and toothbrushes
24  and floss, home care products through retail.
25    Q  Any pharmaceuticals?

Page 37

1    A  No.
2    Q  And then was it Dental Solutions, the next
3  on your list?
4    A  That's correct.
5    Q  And do you generally recall when you
6  worked there?
7    A  No, I don't.
8    Q  And what did you do for them?
9    A  I was product development manager for a
10  sterile dental unit that provided sterilized water
11  during invasive -- dental treatments for cavities,
12  things of that nature, so all the water that would
13  be utilized to cool the high-speed drill or the
14  air/water syringe was all sterile water.
15    Q  And then, after Dental Solutions, you
16  worked for Schein --
17    A  Correct.
18    Q  -- Pharmaceuticals?
19    What did you do for them?
20    A  I started as a salesman and was a regional
21  sales manager.
22    Q  And what products did you sell?
23    A  Generic pharmaceuticals.
24    Q  Any controlled substances?
25    A  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  Q  Do you recall which ones?
2  A  Hydrocodone, methylphenidate.  Those are
3  the two I remember off the top of my head.
4  Q  Okay.  And then from Schein, you said you
5  started at Mallinckrodt, and you believe that was
6  around 2000?
7  A  Yes.
8  Q  And when you started at Mallinckrodt, what
9  was your position?
10  A  National account manager.
11  Q  And was that the position that you
12  retained from then until you stopped working
13  there?
14  A  Yes.
15  Q  And what year did you stop working there?
16  A  2014.
17  Q  And what products were you responsible for
18  selling, for Mallinckrodt?
19  A  Their product portfolio of products.  I
20  can't remember all of them.  Hydrocodone,
21  hydromorphone, methadone, methylphenidate,
22  morphine, fentanyl patch, amoxil, oxycodone
23  products.  Then there was affiliation with a
24  company named Zydus from India and sold their
25  products.  None of those were schedule products.

Page 39

1  It was products such as warfarin, things of that
2  nature.
3  Q  And over the time that you worked there,
4  were you selling mostly controlled substances?
5  A  Yes.
6  Q  The majority of the products that you
7  sold --
8  A  Mallinckrodt's products, the majority of
9  the products, was controlled substance.
10  Q  And when you started at Mallinckrodt, did
11  you receive any training in how controlled
12  substances operated or what they were?
13  MR. DAVISON:  Object to the form.
14  A  Just with product managers, reviewing the
15  products and learning the products.
16  BY MR. LOESER:
17  Q  Did you receive any training on the
18  requirements of the Controlled Substances Act?
19  A  Not at the -- not when I started, no.
20  Q  At some point did you provide training --
21  were you provided training --
22  A  Not that I recall.
23  Q  So how did you learn about the
24  requirements of the Controlled Substances Act when
25  you worked for Mallinckrodt, or did you?

Page 40

1  MR. DAVISON:  Objection to form.
2  A  I'm not truly aware of that act, and
3  anything that I may have read in industry news
4  periodicals, things of that nature, and anything
5  that Mallinckrodt may have handed out at various
6  meetings that we had, that's basically the
7  training that I had.
8  BY MR. LOESER:
9  Q  Do you recall how many national account
10  managers there were at a time at Mallinckrodt?
11  A  I have to use my fingers.  One, two -- I
12  believe it was like six or seven.
13  Q  And were you responsible for a particular
14  region?
15  A  No.
16  Q  How did that work --
17  A  I was --
18  Q  I'm sorry.  Let me finish asking the
19  question.
20  How did that work among the different
21  national account managers?
22  A  We were account-based responsibilities, so
23  it wasn't geographic.
24  Q  And who made the decision what accounts
25  you would have?

Page 41

1  A  The sales manager, Mike Gunning.
2  Q  And was he the sales manager the entire
3  time you worked there?
4  A  No.
5  Q  Tell me the sequence.  When was he the
6  manager and --
7  A  When I started, then he -- he passed away.
8  I'm not certain what year it was, but he did pass
9  away.  It was open, and then -- I think his title
10  was president of sales.  Then a Walt Kaczmarek
11  came in.
12  Q  And those were the two people that were
13  sales managers during your employment?
14  A  I believe they were president of sales.  I
15  reported to Jane Williams.
16  Q  And the entire time you were there, you
17  reported to Jane Williams?
18  A  No, I reported to other people before Jane
19  came in.
20  Q  Okay.  Who did you report to before Jane?
21  A  I can't think of her name now.  Melanie
22  Cameron, Mitchell Goldberg, Jane Williams.
23  Q  Is that all you recall?
24  A  That's correct.
25  Q  Was the person to whom you reported

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1  responsible for evaluating your yearly
2  performance?
3      A  Yes.
4      Q  And did you have annual performance
5  evaluations?
6      A  Yes.
7      Q  Were there written materials given to you
8  for your evaluation, a written performance report,
9  for example?
10     A  Yes.
11     Q  And did that happen every year?
12     A  Yes.
13     Q  Did you keep a copy of any of those?
14     A  At one time, when I was working, I had
15  copies of them.  I no longer have copies of them.
16     Q  And was it your understanding that
17  Mallinckrodt kept a copy of your annual
18  performance evaluation?
19     A  I'm not sure --
20        MR. DAVISON:  Objection to form.
21     A  -- what records they kept.  I would assume
22  they did.
23  BY MR. LOESER:
24     Q  And so each year you had a performance
25  evaluation, can you generally describe for me what

Page 43

1  happened at each evaluation?  How was it
2  conducted?
3      A  It was either conducted in person or over
4  the telephone.
5      Q  And with the person to whom you reported,
6  and nobody else, or were there other people there,
7  as well?
8      A  It was usually the person I reported to.
9      Q  And were you asked to sign any document
10  after a performance evaluation that confirmed
11  matters that were discussed during the evaluation?
12     A  I believe so.
13     Q  And again, you would, as -- your
14  recollection is that you would sign that and give
15  that to Mallinckrodt?
16     A  Gave it to the manager.
17     Q  Do you recall, what was the metrics that
18  were used to evaluate your performance?
19     A  Sales performance, just regular business
20  conduct, how I worked with others, team conduct,
21  team concept, things of that nature.
22     Q  During the time that you worked for
23  Mallinckrodt, did you receive any awards or
24  commendations for your performance?
25     A  Yes.

Page 44

1      Q  Can you describe those, please?
2      A  I won the president's club two times that
3  I recall.
4      Q  And what is the president's club?
5      A  It is the group of people in various
6  divisions, within Mallinckrodt, their top
7  performing people were recognized for their
8  achievements during the course of the year.
9      Q  And by "top performing," do you mean the
10  people who sold the most Mallinckrodt product?
11     A  Not necessarily the most Mallinckrodt
12  products.  I'm not certain with other divisions.
13  Ours was for our basic performance, sales versus
14  quota, working together with the team concept,
15  which I had mentioned earlier.
16     Q  Do you recall the years that you won the
17  president's club award?
18     A  No, I don't.
19     Q  In discovery in this case, Mallinckrodt
20  has produced what appears to be portions of your
21  personnel file, including a 2014 performance
22  report, and I gather shortly after this 2014
23  evaluation, you ceased working for Mallinckrodt?
24        MR. DAVISON:  Objection to form.
25     A  I retired.

Page 45

1  BY MR. LOESER:
2      Q  And at the time that you retired, what
3  was -- how were you being evaluated?
4        MR. DAVISON:  Objection to form.
5      A  I'm not certain, because they didn't --
6  they hadn't finished any evaluations, but they
7  were looking at some of the work, and it was, I
8  think, more of a downsizing technique, wanting to
9  move some people, so I decided to retire.
10  BY MR. LOESER:
11     Q  Did they ask you to retire or --
12     A  No, I retired all on my own.
13     Q  And do you recall that you received a
14  negative performance evaluation in 2014?
15     A  In 2014?  I retired in 2014.  I wasn't
16  there in 2014 when performance reviews were
17  conducted.
18        (Whereupon, Exhibit Mallinckrodt-Becker-
19  002 was marked for identification by the
20  reporter.)
21        THE REPORTER:  Number 2.
22  BY MR. LOESER:
23     Q  Showing you what's been marked Exhibit 2,
24  and we're not going to spend a lot of time on this
25  document, I'll just -- I've handed you what says,

Highly Confidential - Subject to Further Confidentiality Review

---

Page 46

1 on the top of the document, "WRITTEN NOTIFICATION
2 OF UNSATISFACTORY PERFORMANCE, EMPLOYEE NAME:
3 Steve Becker." Does that refresh your
4 recollection at all?
5      A Correct, but this is not a performance
6 review, as such, that I would normally get in the
7 course of my work, which was done at year-end.
8      Q Can you tell me what this is?
9      A This is basically from my manager and
10 looking to have improvements made in my work.
11      Q Okay. Do you recall this happening?
12      A Yes.
13      Q And do you recall whether you thought this
14 was accurate or fair or do you recall one way or
15 the other?
16      MR. DAVISON: Objection to form.
17      A I recall it. I didn't think it was -- it
18 was fair. I think they were looking to move
19 personnel by the use of performance. At the time,
20 I'm sure I was performing quite well, from my
21 sales numbers, things of that nature.
22 BY MR. LOESER:
23      Q If you could turn to the last page of that
24 review --
25      A (Complies.) Yes, sir.

---

Page 47

1      Q -- and in the second paragraph, which
2 starts, "DESCRIBE THE ACTION PLAN REQUIRED THAT
3 WILL LEAD TO SUCCESSFUL COMPLETION OF THIS
4 OBJECTIVE"; do you see that?
5      A Yes.
6      Q The very bottom, the second two bullets
7 there, one says, "Review one account weekly to
8 include Cardinal Source, Optisource, Smith Drug
9 and PBA." Do you recall what that was about?
10      A No.
11      Q And then the following bullet, "Target
12 products oxycodone, oxy/apap as well as full line
13 summary." Do you recall what that was about?
14      A No, I don't recall what it was about. It
15 was just basically things that they wanted me
16 to -- to work on.
17      Q So this was in 2014 --
18      A Mm-hmm (affirmative).
19      Q -- and does this suggest that Mallinckrodt
20 was wanting you to target oxycodone and oxy/apap
21 to increase sales of those items?
22      MR. DAVISON: Objection.
23 BY MR. LOESER:
24      Q Do you have any recollection of that?
25      A No.

---

Page 48

1      MR. DAVISON: Objection to form.
2      A You'd have to ask Jane Williams, who wrote
3 this.
4 BY MR. LOESER:
5      Q We can put that document aside.
6      A Do you want me to put it --
7      Q You can just put it there, yes.
8         When you left, were you paid a severance?
9      A No.
10      Q Did you have any kind of agreement with
11 Mallinckrodt, upon your departure?
12      A No.
13      Q Did you consider yourself a successful
14 national account manager?
15      A Yes.
16      Q And a good Mallinckrodt employee?
17      A Yes.
18      Q Did you comply with all of the rules that
19 Mallinckrodt told you about?
20      A I believe so.
21      Q And would you say that you did your job
22 the way Mallinckrodt expected you to do your job?
23      A Yes.
24      Q Were you well regarded by your peers at
25 Mallinckrodt?

---

Page 49

1      A I believe so.
2      Q Would you say that you're a
3 detail-oriented person?
4      A Yes.
5      Q And is the same true for your work at
6 Mallinckrodt?
7      A I believe so.
8      Q And how would you say your memory is for
9 things that are important to you?
10      MR. DAVISON: Objection to form.
11      A I've been retired for four years. I
12 don't -- I don't have a good recollection of
13 everything that happened at Mallinckrodt over the
14 past 15, 16 years that I worked there.
15 BY MR. LOESER:
16      Q And during your time at Mallinckrodt, did
17 you believe you had a good memory for the details
18 of your employment?
19      MR. DAVISON: Objection to form.
20      A Yeah.
21 BY MR. LOESER:
22      Q We've seen reference in documents to
23 national account managers getting to know their
24 clients. Can you tell me what that generally
25 means?

---

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    MR. DAVISON:  Objection to form.
2    A Could you repeat the question?
3 BY MR. LOESER:
4    Q Sure.  What does it mean to get to know
5 your clients?
6    MR. DAVISON:  Objection to form.
7    A I don't know who made that statement, but
8 being account-based rather than
9 geographically-based account responsibility, I
10 would believe that Mallinckrodt placed a
11 salesperson with people to build decent and good
12 relationships with various accounts that they were
13 responsible for.
14 BY MR. LOESER:
15    Q And as a national account manager, did you
16 believe it was important for you to get to know
17 the details of your clients' businesses?
18    A For the most part.
19    Q And how would you do that?
20    A Reading about the account, calling on the
21 account, investigating the account with various
22 question sets, things of that nature.
23    Q And who were your -- I'm referring to them
24 as clients, but did you refer to them as clients
25 or customers?

Page 51

1    A Customers, yes.
2    Q Who were your customers?  What types of
3 businesses were your customers?
4    A Wholesalers, chain drug stores, retail
5 buying groups, distributors.  I may have had some
6 GPO account responsibility at one time.  Over the
7 various years, you know, responsibilities changed.
8    Q And did you develop particularly close
9 relationships with any particular clients or
10 customers?
11    A I wouldn't say particularly close, where
12 I'm going out and doing things.  PBA True Care, I
13 had a good relationship with the person, with
14 their -- with their people.
15    Q And what made it a good relationship?
16    A We're basically friends.  That's with one
17 of the buyers there.
18    Q And any other customers that you felt like
19 you had a particularly good relationship?
20    A Not necessarily, no.
21    Q We've seen reference to customer
22 realignment among the national account managers.
23 Can you tell me what that means?
24    A Realignment, I believe, is shifting of
25 account -- accounts and who may be responsible for

Page 52

1 it.  So maybe one year I was responsible for a
2 specific account.  Due to the changes in the
3 business, I would relinquish that account to
4 somebody else.  I would be given a different
5 account.
6    Q And do you understand why accounts would
7 be realigned?
8    MR. DAVISON:  Objection to form.
9    A Not always, but for the most part, it was
10 to help grow -- help grow relationships with the
11 account.
12 BY MR. LOESER:
13    Q And was that ever a point of contention
14 for you?
15    A No.  Acquisitions had a lot to do with
16 changes of accounts, within the industry.
17    Q And was your pay at all based upon the
18 amount of sales that you had with any particular
19 account?
20    A Can you repeat that?
21    Q Did you receive a salary?
22    A Yes.
23    Q And did you also receive bonuses?
24    A Yes.
25    Q And were those sales-based?

Page 53

1    A Yes.
2    Q Were the bonuses sales-based?
3    A Yes.
4    Q And was the salary sales-based at all?
5    A Not that I recall, no.
6    Q And so if a client was realigned, and as a
7 result you no longer had that client, would you
8 lose the credit for sales to that client?
9    A Well, most likely, yes.
10    Q And so did that ever happen?
11    A Yes, many times.
12    Q And was that ever a point of contention
13 for you?
14    A No.
15    Q For bonuses, can you explain to me how the
16 bonus system worked at Mallinckrodt?
17    MR. DAVISON:  Objection to form.
18    A Based on sales units, for the most part,
19 objectives.
20 BY MR. LOESER:
21    Q And was it generally the case, if you sold
22 more product, your bonus was larger?
23    MR. DAVISON:  Objection to form.
24    A Repeat that.
25 BY MR. LOESER:

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    Q  Was it generally the case that if you sold
2  more product, your bonus was larger?
3    A  It could be.
4    Q  Were there any circumstances where that
5  wasn't the case?
6    A  Not that I recall.
7    Q  Do you recall what your -- do you recall
8  the years in which you received the highest
9  bonuses?
10    A  No.
11    Q  Do you recall whether there were any
12  particular products that you sold more of than
13  other products?
14    A  No.
15    Q  I'm showing you what's previously been
16  marked Borelli Exhibit 2.  If you could take a
17  look at that.
18    MR. LOESER:  For the record, this is a
19  document that, at the top, is titled on the -- if
20  you look at the second page, "Retail Generic
21  Incentive Plan Earnings by Sales Rep Calendar year
22  2006 through calendar year 2011."
23    And if you look at the 2006 information,
24  you'll go down, and you'll see that in 2006, you
25  received a bonus of

Page 55

1    A  Mm-hmm (affirmative).
2  BY MR. LOESER:
3    Q  Do you recall, in 2006, what products
4  were -- what products you sold, more than any
5  other products?
6    A  No, I don't.
7    Q  And then in 2007, if you look, you'll see
8  that your bonus was zero?
9    A  Mm-hmm (affirmative).
10    Q  Do you recall why your bonus was zero in
11  2007?
12    A  No.
13    Q  That didn't -- that doesn't stand out to
14  you?
15    A  (Moves head from side to side.)
16    Q  And then, in 2008, your bonus is
17  Do you recall why your bonus went from zero --
18    A  No, I don't.
19    Q  -- to               ?
20    A  No.
21    Q  You have no recollection of any particular
22  circumstances that caused you to have an increase
23  of          ?
24    A  No.
25    MR. DAVISON:  Objection to form.

Page 56

1  BY MR. LOESER:
2    Q  No?  Okay.
3    If you look 2009, your bonus $         .  Do
4  you have any recollection as to why your bonus
5  went from          to          ?
6    A  No.
7    Q  There's no particular product that you
8  were selling that was -- that -- for which sales
9  had increased substantially during that time
10  period?
11    A  I --
12    MR. DAVISON:  Objection to form.
13    A  -- don't recall what products may have
14  increased or decreased.
15  BY MR. LOESER:
16    Q  Okay.  So if you look at 2010, in 2010
17  your bonus went up          .  Do you -- do you
18  recall why your bonus increased to that amount?
19    A  No, I don't.
20    Q  Do you recall whether there was any
21  particular product that you were selling more of
22  in 2010?
23    A  No.
24    Q  Do you remember receiving          bonus?
25    A  I remember getting bonuses.  I didn't pay

Page 57

1  that much attention to my bonuses, just that I got
2  them and...
3    Q  What was your salary in 2010?
4    A  I don't recall.
5    Q  Do you have any recollection of a ballpark
6  of it?
7    MR. DAVISON:  Objection to form.
8    A  I really don't.  I just --
9  BY MR. LOESER:
10    Q  Was it more than $25,000?
11    A  Yes.
12    Q  Was it more than $50,000?
13    A  Yes.
14    Q  Was it more than $75,000?
15    A  It very well could have been in 2010.  I
16  don't know.
17    Q  Was it more than $100,000?
18    A  I don't know.
19    Q  Do you recall whether this bonus was more
20  than your base salary?
21    MR. DAVISON:  Objection to form.
22    A  I don't -- I don't recall.
23  BY MR. LOESER:
24    Q  So you have no recollection of your salary
25  in 2010, and you don't have any recollection of

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1 why you received a $_____ bonus in --
2     MR. DAVISON: Objection to form.
3     A I made my bonuses, that -- that was it.
4 BY MR. LOESER:
5     Q But no product stood out for you as being
6 one that you sold a lot of in -- particularly in
7 the years 2008, '9 and '10, causing you to receive
8 a much larger bonus?
9     A No.
10     MR. DAVISON: Objection to form.
11 BY MR. LOESER:
12     Q If you look at 2011, your bonus is
13 _____. Do you recall why it went down from
14 _____?
15     A No, I don't.
16     Q And again, you don't recall any product
17 in 2011 that you were selling more of than any
18 other product that could explain the bonus?
19     MR. DAVISON: Objection to form.
20     A No.
21     (Whereupon, Exhibit Mallinckrodt-Becker-
22 003 was marked for identification by the
23 reporter.)
24     THE REPORTER: Number 3.
25     A You want me to look at this?

Page 59

1 BY MR. LOESER:
2     Q Yes. I'm referring you to -- you've been
3 handed what's marked Exhibit 3.
4     MR. LOESER: And for the record, I'll just
5 read the Bates number, MNK-T1_0002161144.
6 BY MR. LOESER:
7     Q And before you -- before we go through
8 that document, can you -- can you explain to me
9 how marketing worked for specialty generics
10 products?
11     MR. DAVISON: Objection to form.
12 BY MR. LOESER:
13     Q Were you involved in any marketing of
14 specialty generics products?
15     A I was a sales representative, sales and
16 marketing sometimes go hand in hand, but I was not
17 in the marketing department.
18     Q So let's take a step back. How -- did you
19 do anything to go out and find new clients?
20     A To actively pursue clients?
21     Q Right. Or customers, as you call them?
22     A Just basically called on customers I knew,
23 maybe there was an opportunity when I first
24 started with Mallinckrodt that Mallinckrodt may
25 not be doing business with.

Page 60

1     Q And so explain how that worked.
2     A Mallinckrodt -- I mean, I was brought in
3 to call on regional wholesalers and distributors,
4 and Mallinckrodt may have or may not have been
5 doing business with the majority of the accounts
6 that were in the marketplace. It was my job to
7 work with those accounts and see if we could open
8 up and do business with them.
9     Q And so did you identify accounts that you
10 wanted to go after?
11     A Yes.
12     Q And how did you do that?
13     A Based on my knowledge within the industry,
14 looking at segments of business that Mallinckrodt
15 wasn't doing business with, and looking at new
16 opportunities.
17     Q And what would you say to a potential new
18 customer when you would contact them? How would
19 you encourage them to start doing business with
20 Mallinckrodt?
21     A I would set up an appointment, go in and
22 speak with them about our product line, find out
23 more about their product line, find out if they're
24 warehousing products. If they're warehousing
25 products, are they on contract with other people

Page 61

1 or other companies, you know, is there interest in
2 doing business with Mallinckrodt.
3     Q And did you bring any materials with you
4 that would -- that you would present to them that
5 described Mallinckrodt's products?
6     A Yes.
7     Q And what were those materials?
8     A Marketing materials.
9     Q And who prepared those materials?
10     A Marketing department.
11     Q And those marketing materials dealt
12 specifically with -- with generic products?
13     A With our product line.
14     Q Okay. And your product line of controlled
15 substances?
16     A Yes.
17     Q And can you -- were they all products that
18 were generics or did they include branded products
19 as well?
20     A Our group really didn't deal with any
21 branded products.
22     Q Okay. So all the marketing materials that
23 you would give to potential customers dealt with
24 generic Mallinckrodt products?
25     A Correct.

Page 62

1  Q And then, when you would talk to a
2  potential customer, would you have price
3  negotiations with them or what would you do to
4  encourage them to start purchasing from
5  Mallinckrodt?
6  A I would investigate the prices of what
7  they were paying for various products, which we
8  had similar products with, do my homework. And
9  then, if they wanted -- depending on what type of
10 business it was and what type of business they
11 wanted to do with Mallinckrodt, I would pursue the
12 business from that avenue.
13 Q And would you offer price concessions or
14 anything of the sort in order to entice them to
15 start purchasing from Mallinckrodt?
16 A Price concessions, no.
17 Q How did you determine the pricing to
18 offer?
19 A Depended on the size of the account,
20 who -- what type of account it was, how they
21 wanted -- how they were situated in the
22 marketplace.
23 Q Okay. And did you negotiate any discounts
24 or rebates or anything like that?
25 A You're speaking of initial accounts and

Page 63

1  trying to open up initial accounts, correct?
2  Q Yes.
3  A No. No discounts. Basically, we sell at
4  one price. We do contract work, and contract
5  pricing can be lower than the acquisition cost.
6  Everyone would be doing contracts.
7  Q Okay. And if it was already -- if you
8  were talking to a customer, an existing customer,
9  would you have negotiations with the customer
10 about pricing?
11 A With an existing customer, did you say?
12 Q Yes.
13 A At times, yes.
14 Q And how would that work?
15    MR. DAVISON: Objection to form.
16 A Pricing, basically, if our price was out
17 of line in the marketplace, we're me-too products,
18 we're a generic company. Other companies had our
19 same line of products, and if you wanted to be on
20 a formulary, you'd hopefully have to have a very
21 strong pricing program to be in the primary
22 position.
23 BY MR. LOESER:
24 Q So would you say among the different
25 generic manufacturers, when you would talk to a

Page 64

1  customer and try and get a new customer, was there
2  a competition based on price, between the
3  different manufacturers?
4     MR. DAVISON: Objection to form.
5  A It could be.
6  BY MR. LOESER:
7  Q And with existing customers, did that
8  continue to be the case?
9     MR. DAVISON: Objection to form.
10 A Yes.
11 BY MR. LOESER:
12 Q And were there factors other than the
13 price that potential or actual customers took into
14 account when choosing to purchase from
15 Mallinckrodt?
16 A Yes.
17    MR. DAVISON: Objection to form.
18 BY MR. LOESER:
19 Q And what were those?
20 A Service. Our product line being fully
21 in -- basically fully integrated product line.
22 Q And pause for a second. What do you mean
23 by "service"?
24 A How you service the account, how you take
25 care of it. If they have issues, you take care of

Page 65

1  the issues. Hopefully, you can out perform
2  somebody, your competition.
3  Q What do you mean by "issues"? What would
4  be some examples of issues that a client would
5  have that you could take care of?
6  A Out of stock, allocated products, things
7  of that nature.
8  Q Do you recall any issues other than out of
9  stock?
10    MR. DAVISON: Objection to form.
11 A There was other issues. I don't recall
12 them all.
13 BY MR. LOESER:
14 Q Was that a primary issue that service
15 would take care of, when a customer was out of
16 stock and Mallinckrodt would make sure that it
17 would provide that stock?
18 A We would work with the customer as best we
19 can and allocate a product and backorders, things
20 of that nature, which was common in the industry.
21 Q Did you have any interaction with pharmacy
22 benefit managers?
23 A No.
24 Q How about retail pharmacies, national
25 retail pharmacies, Walgreens, Rite Aid?

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  A  You may want to restate that question for
2  me.
3  Q  Yeah.  As part of your marketing and sales
4  efforts, did you reach out to any national retail
5  pharmacies?
6  A  Yeah.  We were in most of the retail
7  chains.
8  Q  And was there anything different about how
9  Mallinckrodt supplied the retail chains versus a
10  wholesale distributor?
11  A  No.
12  Q  And did you interact with the -- with the
13  three main wholesale distributors, Cardinal
14  Health, Amerisource?
15  A  I was responsible for AmerisourceBergen at
16  one point and Cardinal at one point.
17  Q  And was there anything different about
18  doing business with them versus regional wholesale
19  distributors?
20  A  The magnitude of the business and their
21  sheer size and volume of business that they would
22  do.
23  Q  Anything different about the contracting?
24  A  No.
25  Q  Price different?

Page 67

1  A  There may have been price differences, but
2  that's -- there may have been price differences,
3  that's all I can say.
4  Q  Based upon the size of the orders they
5  were placing?
6  A  No.
7  MR. DAVISON:  Objection to form.
8  A  Based on the size of the account.
9  BY MR. LOESER:
10  Q  Okay.  If we could look at the exhibit
11  that's in front of you.
12  MR. LOESER:  For the record, I'll read the
13  heading on the second page of the exhibit.  It
14  says, "FY13 PHARMACEUTICAL COMBINED TRADE SHOW,
15  CONFERENCE AND EVENT SCHEDULE."
16  A  Mm-hmm (affirmative).
17  BY MR. LOESER:
18  Q  Can you just -- and if you look down the
19  second column -- I'm sorry -- the first column on
20  the second page, you see your name listed there a
21  few times under "Attendees."  Can you just
22  generally describe for me what this document is?
23  MR. DAVISON:  Objection to form.
24  A  It's just a listing of the various
25  pharmaceutical trade shows and wholesale shows,

Page 68

1  retail shows that we were going to be attending,
2  during the course of the year.
3  BY MR. LOESER:
4  Q  And why would you attend these shows?
5  A  Support the account and support their --
6  their accounts.
7  Q  And was the goal to develop business by
8  going to these shows?
9  A  Not necessarily to develop business.
10  Basically to answer various questions on the
11  accounts that, for example, Cardinal may have.
12  It's a retail pharmacy convention.  The retailers
13  come up, and they may ask questions on various
14  products.
15  Q  And would marketing materials about
16  Mallinckrodt's products be distributed at these
17  shows?
18  A  Yes.
19  MR. LOESER:  Mark that as Exhibit 4,
20  please.
21  (Whereupon, Exhibit Mallinckrodt-Becker-
22  004 was marked for identification by the
23  reporter.)
24  BY MR. LOESER:
25  Q  You've been handed what's marked

Page 69

1  Exhibit 4, which is Bates number
2  MNK-T1_0002867894.  This document states on the
3  top, "Pre-show Worksheet," and then it says,
4  "Meeting, National Community Pharmacists
5  Association."  Can you look through this document
6  for a minute and then just tell me what it is?
7  A  (Reviewing.)  This is basically a Pre-show
8  Worksheet of who will be doing what, various
9  products and things that we sent to the meeting.
10  Q  Okay.  That's good enough.  And you know,
11  when I look back at the prior exhibit, there's an
12  item, the second convention listed says, "National
13  Community Pharmacists Association (NCPA) Annual
14  Convention and Trade Show," and then looking at
15  the exhibit that you just went through, this
16  appears to be the Pre-show Worksheet for the
17  National Community Pharmacists Association trade
18  show; is that accurate?
19  MR. DAVISON:  Objection to form.
20  A  What are we looking at, on this sheet?
21  BY MR. LOESER:
22  Q  On the second row, do you see where it
23  says, "National Community Pharmacists
24  Association"?
25  A  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  Q So that's one of the events that
2  Mallinckrodt would have people from Mallinckrodt
3  attend.  Then if you turn to the next exhibit,
4  this is actually the description of that event?
5  A Correct.
6  Q Maybe not that particular year, but -- and
7  looking down at the third item on the Pre-show
8  Worksheet, it says, "Meeting/Audience - More than
9  3000 leaders of independent pharmacy, independent
10  pharmacy GPOs (retail buying groups), and students
11  will attend."
12  Do you recall whether you attended this
13  particular trade show?
14  A I believe I did.
15  Q And if you read -- if you look at the
16  section captioned "MEETING OBJECTIVES" --
17  A Mm-hmm (affirmative).
18  Q -- and you can just look at those
19  objectives for a moment and tell me, are those the
20  objectives that you believe you had, when you
21  attended this meeting?
22  A (Reviewing.) Yes.
23  Q And looking further down the exhibit,
24  under Featured Products, number 2 is
25  "Hydrocodone"?

Page 71

1  A Mm-hmm (affirmative).
2  Q And it says, "Display message: 'Trust in
3  our strengths and soar with #1 dispensed generic
4  in the U.S. ...hydrocodone/APAP from
5  Mallinckrdt.'"  Is that the -- when it says,
6  "Display message," is that on a -- on some
7  marketing materials or what's being displayed and
8  where?
9  A I don't recall if that was a message that
10  was set up.  There was various handout sheets
11  on -- just had a handout sheet on hydrocodone.
12  Q So perhaps there -- sounds like there's a
13  display, and that's the --
14  A It could have been --
15  Q -- that's the marketing statement that's
16  on the display?
17  MR. DAVISON: Objection to form.
18  A I have no idea if that was in the display
19  or not.
20  BY MR. LOESER:
21  Q Do you know what "Display message" means?
22  A Display message is what -- the graphics
23  that you have in your booth, I believe.
24  Q So if you turn to the next page, number 3
25  is "Oxycodone"?

Page 72

1  A Yes, sir.
2  Q And the Display message is "One for all,
3  all from one...  responding to your oxycodone
4  needs."  Do you know who came up with that display
5  message?
6  A No.  You'd have to ask our marketing
7  people.
8  Q Do you have any sense what year this --
9  I'm sorry.  It says 2005.  Strike the question.
10  If you go to next page, there's a list
11  of -- there's a schedule with days, Sunday,
12  October 16, Monday, October 17, Tuesday, October
13  18, and you'll notice that on Sunday, October 16,
14  your name is listed as "Generic Rep 1," and
15  Monday, October 17, your name is listed "Generic
16  Rep 1."  And above that, it says, "Since we will
17  be featuring both generics and Zydus products, we
18  will need two representatives from both
19  organizations during each exhibit session."
20  Do you recall what you did at these
21  exhibit sessions?
22  A I was there to answer questions of various
23  people coming by the booth.
24  Q And by "people," you mean customers?
25  A Customers, retail pharmacists.

Page 73

1  Q Okay.  We can put that aside.
2  (Whereupon, Exhibit Mallinckrodt-Becker-
3  005 was marked for identification by the
4  reporter.)
5  BY MR. LOESER:
6  Q You've been handed what's now marked
7  Exhibit 5, which is Bates number
8  MNK-T1_0004809715, and take a minute to look that
9  over.  This is an e-mail from you to Dena Mando,
10  M-a-n-d-o, dated 9/7/2012.  The subject line is,
11  "Additional Dating Buy Opportunity."
12  A (Reviewing.)
13  Q And can you read out loud, please, the
14  sentence after "Dear Dena and Lynne"?
15  A "We were seeking an order on two" --
16  Q Above that?
17  A Above that.
18  Q Yeah.  "Mallinckrodt would like"...
19  A "Mallinckrodt would like to offer HD Smith
20  a buy in opportunity extending an additional 30
21  days dating on the Mallinckrodt oxycodone 15 & 30
22  products & Fentanyl patches."
23  Q And can you explain to me what a "buy in
24  opportunity" is?
25  A It's an opportunity where you buy the

Page 74

1 product, and there may be additional dating
2 available for the customer to take advantage of
3 the buy.
4   Q And what does "dating" mean?
5   A Dating is the period of time that we have
6 given to pay for the product.
7   Q And is what's described in this e-mail a
8 normal process for you, reaching out to a customer
9 to offer a buy in opportunity?
10   A It could be.
11   Q Is this the only time you did this?
12   A No. It may have been done other times.
13   Q So is the idea, here, to encourage a
14 wholesale distributor client to buy more product
15 from Mallinckrodt?
16   A Not necessarily, no.
17   Q How not necessarily?
18   A It could be -- we could have been coming
19 off back-order situations where we may have been
20 low on product. You'd have to actually go back to
21 the product manager on why this was done. That
22 may have come from the product manager, requesting
23 that we do a special specific buy or the account
24 may have reached out to us.
25   Q Okay. If we look at the second paragraph

Page 75

1 of your e-mail, you say, "We are seeking an order
2 on a 2 month allocated supply on the oxycodone
3 15mg & 30mg products & the attached Fentanyl
4 patches. I have attached the suggested order for
5 your review."
6   So again, it sounds like you're asking a
7 customer to place an order; is that accurate?
8   MR. DAVISON: Objection to form.
9   A It possibly could be. I don't recall this
10 document.
11 BY MR. LOESER:
12   Q Okay. So this is not an interaction that
13 was initiated by the customer, which is HD Smith?
14   MR. DAVISON: Objection to form.
15   A I'm not certain on that.
16 BY MR. LOESER:
17   Q You don't see any reference in this e-mail
18 to the customer asking for this opportunity,
19 right?
20   A No.
21   Q Okay. Instead, it's you offering this
22 opportunity to the customer?
23   A Appears that way, yes.
24   Q Mr. Becker, you understand that opioids
25 are narcotics, correct?

Page 76

1   A Yes.
2   Q And you're aware that the manufacturer
3 and -- manufacturer and distribution of narcotics
4 must comply with the Controlled Substances Act?
5   A Yes.
6   MR. DAVISON: Objection to form.
7 BY MR. LOESER:
8   Q Are you familiar with the term "closed
9 system" for opioid distribution?
10   A No.
11   Q Do you understand that all persons and
12 entities involved in the manufacture or
13 distribution of opioids must be a registrant under
14 the CSA?
15   MS. RANJAN: Object to form.
16   A I'm not aware.
17   (Reporter clarification.)
18 BY MR. LOESER:
19   Q You're not aware that -- are you aware of
20 whether Mallinckrodt is a registrant under the
21 Controlled Substances Act?
22   A You would have to ask the management team
23 on that. I would imagine we are compliant with --
24 Mallinckrodt complied with all rules and
25 regulations.

Page 77

1   Q Do you understand what diversion is?
2   MR. DAVISON: Objection to form.
3   A I do.
4 BY MR. LOESER:
5   Q Can you describe that for me?
6   A Diversion is being -- is product being
7 sold into the marketplace, and it falls into the
8 hands of unattended use, meaning it's not being
9 used possibly for the treatment of pain, on
10 opiates, as prescribed by a doctor.
11   Q And would you agree with me that a
12 manufacturer that sells controlled substances to
13 distributors who recklessly distribute opioids is
14 engaged in diversion?
15   MR. DAVISON: Objection to form.
16   A Could you repeat that --
17   MS. MCINTYRE: Objection to form.
18   A -- question?
19   MR. LOESER: Sure. Could you read it
20 back, please?
21   (Reporter clarification.)
22   (The record was read by the reporter as
23 follows:
24   Question: "And would you agree with me
25 that a manufacturer that sells controlled

Page 78

1 substances to distributors who recklessly
2 distribute opioids is engaged in diversion?")
3     MR. DAVISON:  Same objection.
4 BY MR. LOESER:
5     Q  You can answer.
6     A  I want you to repeat the question for me,
7 please.
8     Q  I'll repeat it.
9       (Reading from realtime screen as follows:)
10       "Would you agree with me that a
11 manufacturer that sells controlled substances to
12 distributors who recklessly distribute opioids is
13 engaged in diversion?
14     A  No.
15     MR. DAVISON:  Objection to form.
16 BY MR. LOESER:
17     Q  And why not?
18     MR. DAVISON:  Objection to form.
19     A  Because we're doing our due diligence in
20 selling our product to the various accounts, and
21 we're doing what we're supposed to be doing,
22 according to the DEA.  When accounts then sell
23 their product, it's their due diligence to know
24 where that product is going.
25 BY MR. LOESER:

Page 79

1     Q  And when you say, "due diligence," what do
2 you mean?
3     MS. RANJAN:  Object to form.
4     A  Our due diligence?
5 BY MR. LOESER:
6     Q  Right.
7     A  Doing what we're supposed to do in regards
8 to complying with the selling of any opiate
9 products.  When product monitoring came in place,
10 making sure all those systems and things were put
11 in place.
12     Q  And when you say, "when product monitoring
13 came into place," when was that?
14     MR. DAVISON:  Objection to form.
15     A  I don't know.
16 BY MR. LOESER:
17     Q  Is that something that was not in place
18 when you started working for Mallinckrodt?
19     MR. DAVISON:  Objection to form.
20     A  When I started working, back in 2000, I
21 don't believe they had a product monitoring system
22 that I knew of.  You'd have to ask the marketing
23 department on that.
24 BY MR. LOESER:
25     Q  And to the -- as best as you recall, when

Page 80

1 did a product monitoring system start at
2 Mallinckrodt?
3     A  I don't recall the date.
4     MR. DAVISON:  Objection to form.
5 BY MR. LOESER:
6     Q  Was it in the first two years you worked
7 there?
8     A  No.  I don't recall the exact date.
9     Q  Was it in the latter time period that you
10 worked there?
11     MR. DAVISON:  Objection to form.
12     A  Most likely.
13 BY MR. LOESER:
14     Q  Okay.  So maybe something around 2012?
15     MR. DAVISON:  Objection to form.
16     A  Possibly before.  I'm not certain,
17 exactly, what date.
18     MR. DAVISON:  Hey, Derek, we've been going
19 about an hour.  I understand if you want to finish
20 the line of questioning, but do you want to take a
21 break?
22     MR. LOESER:  Yeah.  I'll just finish.
23 BY MR. LOESER:
24     Q  Do you know what effective controls to
25 prevent diversion means?

Page 81

1     MR. DAVISON:  Objection to form.
2     A  No.  I don't know who made that statement.
3 BY MR. LOESER:
4     Q  I'm just asking you if you know what it
5 means, regardless of who made the statement.
6     MR. DAVISON:  Objection to form.
7     A  Effective controls, to prevent --
8 BY MR. LOESER:
9     Q  Diversion?
10     A  I have an idea what it means.
11     Q  Okay.  Tell me what your idea is.
12     MR. DAVISON:  Objection to form.
13     A  Is that the company would be doing
14 everything that they possibly can to help
15 eliminate diversion of your product.
16 BY MR. LOESER:
17     Q  And what do you mean by "everything" that
18 they can?
19     MR. DAVISON:  Objection to form.
20     A  Following all the rules and regulations
21 that are set forth by the DEA, or anybody else, in
22 regards to selling your product.
23 BY MR. LOESER:
24     Q  And are you familiar with any of those
25 rules and regulations?

Page 82

1    A  Not specifically, no.

2    Q  Can you describe them generally?

3       MR. DAVISON:  Objection to form.

4    A  Not truly, no, not that I recall.

5  BY MR. LOESER:

6    Q  Do you agree that diversion contributes to

7  drug abuse and addiction?

8       MR. DAVISON:  Objection to form.

9    A  I'm not an expert in that field.

10  BY MR. LOESER:

11    Q  Do you have any sense, one way or the

12  other?

13    A  On diversion?

14       MR. DAVISON:  Objection to form.

15  BY MR. LOESER:

16    Q  Right.

17    A  It can lead to the misuse of products.

18    Q  Including drug abuse and addiction?

19       MR. DAVISON:  Objection to form.

20    A  Yes.

21  BY MR. LOESER:

22    Q  And would you agree with me that drug

23  abuse and addiction increases the number of

24  overdose deaths?

25       MR. DAVISON:  Objection to form.

Page 83

1    A  I'm not an expert on it.

2  BY MR. LOESER:

3    Q  Do you have any sense one way or the

4  other?

5       MR. DAVISON:  Objection to form.

6    A  It's an opinion.  I would -- basically,

7  you'd have to -- can you repeat the question?

8  BY MR. LOESER:

9    Q  Do you agree that drug abuse and addiction

10  increases the number of overdose deaths?

11       MR. DAVISON:  Objection to form.

12    A  It can.

13  BY MR. LOESER:

14    Q  Do you know what a suspicious order

15  monitoring system is?

16    A  Yes.

17    Q  Can you describe that for me, please?

18    A  A system that was put in place to watch

19  and guard for suspicious orders being placed by

20  accounts.

21    Q  And was such a system in place when you

22  started working at Mallinckrodt?

23       MR. DAVISON:  Objection to form.

24    A  Not that I'm aware of.

25  BY MR. LOESER:

Page 84

1    Q  Do you have a general recollection of

2  whether a suspicious order monitoring system was

3  put in place at Mallinckrodt?

4    A  Yes, one was put in place.

5    Q  And do you recall when that was?

6    A  No, I don't.

7    Q  Was it towards the end of your career at

8  Mallinckrodt?

9       MR. DAVISON:  Objection to form.

10    A  I am not certain, the period of time

11  there.

12  BY MR. LOESER:

13    Q  Do you have any recollection at all?

14       MR. DAVISON:  Objection to form.

15    A  Not -- I'm not able to tell you what dates

16  Mallinckrodt put one in place.  You'd have to ask

17  Karen Harper on that.

18  BY MR. LOESER:

19    Q  Okay.  But your sense, from the sales

20  perspective, is that there was no SOM system when

21  you started, but at some point during the time

22  that you worked there, one was put in place?

23    A  Yes.

24       MR. DAVISON:  Objection to form.

25  BY MR. LOESER:

Page 85

1    Q  Were you involved, at all, in the system

2  that was eventually put in place?

3    A  Well, being a salesman, yes.  I helped --

4  I helped develop a questionnaire for the

5  wholesalers and distributors.

6    Q  So if we had documents that describe your

7  involvement in that questionnaire, would that

8  likely be the time frame of when you believed that

9  the suspicious order monitoring system was put in

10  place?

11    A  Yes.

12       MR. DAVISON:  Objection to form.

13  BY MR. LOESER:

14    Q  Do you agree with me that if an order by

15  one of your customers is identified as suspicious,

16  the order should not be shipped by Mallinckrodt?

17       MR. DAVISON:  Objection to form.

18    A  You'd have to ask our customer service and

19  product managers who handle that.

20  BY MR. LOESER:

21    Q  Do you have any understanding of that?

22       MR. DAVISON:  Objection to form.

23    A  Can you repeat the question?

24  BY MR. LOESER:

25    Q  Yes.  If an order is identified as

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 suspicious, the order should not be shipped by
2 Mallinckrodt, right?
3     MR. DAVISON: Objection to form.
4     A Our customer service people and product
5 monitoring people handled that.
6 BY MR. LOESER:
7     Q But do you have an understanding of
8 whether suspicious orders should be shipped?
9     MR. DAVISON: Objection to form.
10    A Again, the product managers and customer
11 service handle when and if orders would be
12 shipped.
13 BY MR. LOESER:
14    Q Right, but I'm trying to understand your
15 understanding of this. If an order is identified
16 as suspicious, and it is a suspicious order, is it
17 your understanding that that order should not be
18 shipped?
19    MR. DAVISON: Objection to form.
20    A It should be reviewed before it's shipped.
21 BY MR. LOESER:
22    Q And if the review determines that the
23 order is suspicious, then what happens?
24    MR. DAVISON: Objection to form.
25    A It shouldn't be shipped.

Page 87

1 BY MR. LOESER:
2     Q Does shipping a suspicious order violate
3 the Controlled Substances Act?
4     MR. DAVISON: Objection to form.
5     A I'm not certain. I don't know what the
6 act reads.
7 BY MR. LOESER:
8     Q That was not a -- something on which you
9 were given training when you were at Mallinckrodt?
10    MR. DAVISON: Objection to form.
11    A I didn't do anything with the ordering.
12 BY MR. LOESER:
13    Q Was it your understanding that
14 Mallinckrodt was required to report, to the DEA,
15 suspicious orders?
16    A Yes.
17    MR. DAVISON: Objection to form.
18 BY MR. LOESER:
19    Q And did Mallinckrodt also have a duty to
20 identify suspicious orders by the downstream
21 customers of your distributor clients?
22    MR. DAVISON: Objection to form.
23    A You'd have to define "downstream
24 customers."
25 BY MR. LOESER:

Page 88

1     Q Is that a term that you used, at all,
2 "downstream customers"?
3     A No.
4     Q Did you use the term "indirect customers"?
5     A Yes.
6     Q And what was that?
7     A Indirect customer is somebody that
8 purchases your product through a wholesaler or
9 distributor.
10    Q Okay. So if your wholesale distributor
11 customer -- your wholesale distributor customer is
12 referred to as your direct customers, right?
13    A That's correct.
14    Q And the pharmacies and dispensing
15 physicians and pain clinics, the entities that
16 purchased from your wholesale distributor
17 customers, those are referred to as the indirect
18 customers, correct?
19    A I believe so.
20    Q And you never used the term "downstream
21 customer" for those indirect customers?
22    A No.
23    Q Are you familiar with the term "customers
24 of your customers"?
25    A No.

Page 89

1     Q So when you're referring to the entities
2 that purchased from your wholesale customers, you
3 refer to them as your indirect customers?
4     A Correct.
5     Q And is it your understanding that you had
6 a duty to report, to the DEA, suspicious orders by
7 your indirect customers, from your wholesale
8 distributor customers?
9     MR. DAVISON: Objection to form.
10    A You'd have to ask Karen Harper that, but I
11 believe so.
12    MR. DAVISON: Ready for a break?
13    MR. LOESER: Yes.
14    THE VIDEOGRAPHER: We are going off the
15 record. The time is 10:27 a.m.
16    (A recess was taken from 10:27 a.m. to
17 10:45 a.m.)
18    THE VIDEOGRAPHER: We are back on the
19 record. The time is 10:46 a.m.
20 BY MR. LOESER:
21    Q Earlier, I was asking you about national
22 account managers, and that's how you referred to
23 yourself, as a national account manager?
24    A Correct.
25    Q And there were several other national

Page 90

1 account managers at the same time --
2    A  Correct.
3    Q  -- as you?  And did you all get together
4 occasionally?
5    A  It varies.  We're going to have sales
6 meetings or if we worked a trade show together.
7    Q  And how often did that occur?
8    A  It varied from year to year, but usually,
9 once a quarter.
10    Q  And would you also communicate by e-mail,
11 frequently?
12    A  Certainly.
13    Q  And in your conversations with the other
14 national account managers, did you talk about any
15 difficulties or issues you were having with
16 clients or customers?
17    A  Could have.
18    Q  And what are the other kinds of things
19 that you would talk about with your national
20 account manager colleagues?
21    A  Just basically business.  You know, what
22 account's doing what, what your account -- how
23 would you handle this, you know, comparison of
24 accounts.
25    Q  And did you have a good relationship with

Page 91

1 your co-national account managers?
2    A  I believe so.
3    Q  And did you have a better relationship
4 with some than others?
5    A  I'm sure I did.
6    Q  Do you recall, who among the group were
7 you closest to?
8    A  Bonnie New, Dave Irwin, probably.
9    Q  And do you recall why those two in
10 particular?
11    A  No.  Personalities probably just matched
12 up proper.
13    Q  And did you not get along with any of your
14 co --
15    A  No.
16    Q  -- account managers?
17    Okay.  Where we left off, I was asking
18 about suspicious -- suspicious orders, and are you
19 familiar with the characteristics of a suspicious
20 order?
21    MR. DAVISON:  Objection to form.
22    A  Well, define "characteristics," please.
23 BY MR. LOESER:
24    Q  Well, can you define the characteristics
25 of a suspicious order?

Page 92

1    MR. DAVISON:  Objection to form.
2    A  That wasn't my job.  You would have to ask
3 Karen Harper what the characteristics are.
4 BY MR. LOESER:
5    Q  Did you have any sense at all, that you
6 recall, of what the characteristics were of a
7 suspicious order?
8    MR. DAVISON:  Objection to form.
9    A  On a wholesale level, if the order was
10 over their normal averages, that would most likely
11 by a department, by a suspicious product
12 monitoring people be tagged as a suspicious order.
13 BY MR. LOESER:
14    Q  And that would be considered a red flag?
15    MR. DAVISON:  Objection to form.
16 BY MR. LOESER:
17    Q  Is that how that term was used?
18    MR. DAVISON:  Objection to form.
19    A  I don't know if we used that term, but
20 that's -- it would -- if the volumes were such and
21 the average -- or the order was over a certain
22 parameter, which I did not set, that was set by
23 the product monitoring people, it would be tagged
24 as a suspicious order.
25 BY MR. LOESER:

Page 93

1    Q  And can you think of other circumstances
2 that would get an order tagged as suspicious?
3    MR. DAVISON:  Objection to form.
4    A  New product that they hadn't ordered
5 before.
6 BY MR. LOESER:
7    Q  Anything else?
8    MR. DAVISON:  Objection.
9    A  That's just -- that's all I can think of
10 at this point.
11 BY MR. LOESER:
12    Q  And were you involved, at all, in helping
13 Mallinckrodt identify suspicious orders?
14    A  No, I didn't see the orders.  The orders
15 all came in in computerized orders, so I didn't
16 see the orders, so that was left up to our product
17 monitoring people.
18    Q  And you've mentioned Karen Harper a number
19 of times.  Is she -- does she fall under the
20 product monitoring people category?
21    A  I believe so.
22    Q  And do you recall what her position was?
23    A  I'm not certain what her title was.
24    Q  And did the product monitoring people
25 consult with you about orders that they thought

Page 94

1 might be suspicious?
2    A  I would get an e-mail if they had a
3 suspicious order.
4    Q  And then what would you do?
5    A  I'd have to follow up with the account to
6 find out why an order may be higher than the norm.
7 Clarify.
8    Q  And prior to 2011, did you -- did you ever
9 recommend that an order be cancelled because you
10 believed it was suspicious?
11    A  Not that I recall.
12    Q  And after 2011, do you recall that?
13    A  Not that I recall.
14    Q  Were there any incentives offered to you
15 to report suspicious orders?
16    A  No.
17    Q  When you were evaluated, was there any
18 consideration of whether you had identified
19 suspicious orders?
20    MR. DAVISON:  Objection to form.
21    A  I don't recall.
22 BY MR. LOESER:
23    Q  Would it have been appropriate for you, as
24 a national account manager from Mallinckrodt, to
25 ask a distributor client to ship opioids to a

Page 95

1 pharmacy as a favor for a family member of a
2 customer?
3    A  No.
4    MR. DAVISON:  Objection to form.
5    A  No.
6 BY MR. LOESER:
7    Q  Why not?
8    MR. DAVISON:  Objection to form.
9    A  Why would I do that?  It's -- no.
10 BY MR. LOESER:
11    Q  No, because it would be illegal?
12    MR. DAVISON:  Objection to form.
13    A  I would never do it.  It's not -- anything
14 to do with our products and family members was
15 prohibited.
16 BY MR. LOESER:
17    Q  Prohibited by Mallinckrodt?
18    A  Most likely, yes.
19    MR. DAVISON:  Objection to form.
20 BY MR. LOESER:
21    Q  And prohibited by the DEA as well?
22    A  I would imagine so.
23    MR. DAVISON:  Objection to form.
24 BY MR. LOESER:
25    Q  Mr. Becker, do you agree that there's an

Page 96

1 opioid crisis in this country?
2    A  I believe you asked me that before, and I
3 said yes.
4    Q  And in what year did you realize that
5 there was an opioid crisis in this country?
6    A  I don't recall what year I realized it.
7    Q  Was it after the time you started working
8 for Mallinckrodt?
9    MR. DAVISON:  Objection to form.
10    A  After I first started working there?  Yes.
11 BY MR. LOESER:
12    Q  Early in your time there?
13    A  I wouldn't say early.
14    Q  And how did you become aware that there
15 was an opioid crisis in this country?
16    A  Various news articles and things I would
17 read, periodicals, business periodicals.
18    Q  And did you ever investigate the extent to
19 which pills manufactured by Mallinckrodt
20 contributed to the problem?
21    MR. DAVISON:  Objection to form.
22    A  Could you repeat the question?
23 BY MR. LOESER:
24    Q  Did you ever investigate the extent to
25 which pills manufactured by Mallinckrodt

Page 97

1 contributed to the opioid crisis?
2    A  No.
3    MR. DAVISON:  Objection to form.
4 BY MR. LOESER:
5    Q  Did you evaluate whether particular types
6 of pills manufactured by Mallinckrodt were prone
7 to abuse or diversion?
8    MR. DAVISON:  Objection to form.
9    A  Repeat that, please.
10 BY MR. LOESER:
11    Q  Did you evaluate whether particular types
12 of pills manufactured by Mallinckrodt were prone
13 to abuse or diversion?
14    MR. DAVISON:  Objection to form.
15    A  I did not evaluate, no.
16 BY MR. LOESER:
17    Q  I think there was a cough while you
18 were --
19    MR. LOESER:  Did you get the answer?
20    (Reporter clarification.)
21 BY MR. LOESER:
22    Q  Are you aware that oxycodone 15 milligram
23 and 30 milligram were the most widely abused and
24 diverted Mallinckrodt products?
25    MR. DAVISON:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1  A  No.
2  BY MR. LOESER:
3  Q  Are you aware that your distributor
4  clients purchased millions of these pills from
5  Mallinckrodt?
6  MR. DAVISON:  Objection to form.
7  A  I'm not certain how many they purchased.
8  BY MR. LOESER:
9  Q  But you were aware, when you worked there,
10  of the number of pills that your customers
11  purchased --
12  MR. DAVISON:  Objection to form.
13  A  I had no idea on the number of pills.  I
14  didn't use a tablet count on purchases.
15  BY MR. LOESER:
16  Q  What did you use?
17  A  Bottles.
18  Q  How many --
19  A  Cases.  I never saw the orders.  All the
20  orders were done electronically.
21  Q  So if the metric you used was bottles, how
22  many pills are in a bottle?
23  A  It would vary on the type of bottle that
24  was used.
25  Q  And was there no standard measure when you

Page 99

1  referred to a bottle?
2  A  There was hundreds and 500s, then there's
3  unit of use, unit dose.
4  Q  But when you used -- when you looked at
5  the number of bottles of pills, there was no
6  particular number of pills that you knew were in
7  any bottle?
8  A  I didn't review that.
9  Q  And cases, how many bottles are in a case?
10  A  I couldn't recall.
11  Q  Is it a uniform measure or does it --
12  A  It is.  I don't recall what was in our
13  case packs.
14  Q  You mentioned that you learned of the
15  opioid crisis through news articles.  Are those
16  articles that you found on your own or articles
17  that were sent to you by colleagues or both?
18  MR. DAVISON:  Objection to form.
19  A  Both.
20  (Whereupon, Exhibit Mallinckrodt-Becker-
21  006 was marked for identification by the
22  reporter.)
23  THE REPORTER:  Number 6.
24  BY MR. LOESER:
25  Q  You've been handed what's marked

Page 100

1  Exhibit 6, which is a news report from the
2  Florida -- South Florida Sun-Sentinel, dated
3  December 3rd, 2006.  On December -- by December
4  3rd, 2006, you were working for Mallinckrodt,
5  correct?
6  A  Yes.
7  Q  And you were selling controlled substances
8  for Mallinckrodt?
9  A  Yes.
10  Q  This article headline is "ALARM OVER
11  PRESCRIPTION DRUG TRADE," "DEATHS SKYROCKET AS
12  DEALERS AND ADDICTS FLOCK TO SOUTH FLORIDA."  I'm
13  going to read a few sentences in this article and
14  ask you about your knowledge of these
15  circumstances.
16  The first sentence is "Out-of-state drug
17  dealers and addicts are traveling long distance to
18  visit Florida pain clinics, targeting the state
19  because of its lax oversight of prescription
20  drugs" -- "because of its lax oversight of
21  prescription drugs makes scoring pills easier."
22  Do you recall reading about people coming
23  from out of state to purchase pills in Florida?
24  MR. DAVISON:  Objection to form.
25  A  Yes, I read articles about it.

Page 101

1  BY MR. LOESER:
2  Q  And the next sentence of the article, next
3  paragraph, states, "The unwanted tourism alarms
4  state officials who have watched deaths from
5  prescription pain medications skyrocket in recent
6  years.  In 2005, such prescription drugs as
7  hydrocodone, methadone and oxycodone contributed
8  to more overdose deaths than all other narcotics
9  combined, according to Florida medical examiners."
10  Now, as of 2006, you were selling
11  hydrocodone, methadone, and oxycodone to your
12  distributor customers; is that correct?
13  MR. DAVISON:  Objection to form.
14  A  Correct.
15  BY MR. LOESER:
16  Q  And were you aware that those pills were
17  being sold en masse to pain clinics and doctors in
18  Florida?
19  MR. DAVISON:  Objection to form.
20  A  I don't know at the time.
21  BY MR. LOESER:
22  Q  But you read articles that described --
23  A  I had read articles.
24  Q  Okay.  And do you recall when you became
25  aware of the supply, the problem of hydrocodone,

Page 102

1 methadone, oxycodone, in Florida and people coming
2 from out of state?
3    A I don't recall the date.
4    Q Did you become aware of skyrocketing
5 overdose deaths in Florida at some point?
6    MR. DAVISON: Objection to form.
7    A Just in periodical readings, newscasts,
8 media.
9 BY MR. LOESER:
10    Q I'm passing to you what's previously been
11 marked as Borelli Exhibit 24. This is an article
12 from the Miami Herald, with the title "Inside
13 Broward County pill mills." The date of the
14 article is April 5th, 2009. You were working at
15 Mallinckrodt, selling controlled substances on
16 that date, correct?
17    A Yes.
18    Q And I'll read the first paragraph of the
19 article. "Broward County has become the
20 painkiller capital of the United States, the
21 notorious home to a cottage industry of storefront
22 pain clinics selling alarming numbers of narcotics
23 and feeding a brazen black market sprawling
24 through the South and New England."
25    And again, that description, that's

Page 103

1 something that you had become familiar with
2 because of the articles and information you had
3 seen?
4    MR. DAVISON: Objection to form.
5    A Yes.
6 BY MR. LOESER:
7    Q Yes. You were aware that Broward County
8 had become the painkiller capital of the United
9 States?
10    MR. DAVISON: Objection to form.
11    A Not specifically Broward County. I knew
12 that there was issues in Florida.
13 BY MR. LOESER:
14    Q And were you aware that, as of this time,
15 a number of your wholesale distributor customers
16 were selling a significant portion of the pills
17 they purchased from Mallinckrodt to indirect
18 customers in Florida?
19    MR. DAVISON: Objection to form.
20    A I didn't know who they were selling all
21 their products to.
22 BY MR. LOESER:
23    Q Had you examined, at all, whether your
24 wholesale distributor clients were selling
25 significant portions of the controlled substances

Page 104

1 they bought from you to locations in Florida?
2    MR. DAVISON: Objection to form.
3    A That would have been product monitoring.
4 BY MR. LOESER:
5    Q That's not something that you looked into?
6    MR. DAVISON: Same objection.
7    A Product monitoring was responsible for
8 that.
9 BY MR. LOESER:
10    Q Okay. But that's not something that you
11 looked into?
12    A No.
13    Q If you turn to the next page of this
14 article, there's a paragraph, second from the top,
15 that states, "And the travelers come -- by the
16 thousands, narcotics investigators say, from
17 Kentucky, Ohio, West Virginia, Massachusetts and
18 other states. Prospective pill buyers sometimes
19 camp outside clinics overnight, waiting for the
20 doors to open, said Hollywood police Capt. Allen
21 Siegel, director of a South Broward narcotics task
22 force."
23    Now, is this circumstance of people coming
24 from out of state to get pills at Florida pain
25 clinics something that you had heard about?

Page 105

1    MR. DAVISON: Objection to form.
2    A Yes.
3 BY MR. LOESER:
4    Q And if you turn to the next page, there's
5 a paragraph, "Experts blame these clinics for a
6 startling rise in prescription-drug overdose
7 deaths in Florida, including a 107 percent jump in
8 oxycodone deaths in two years."
9    And you were aware, from the articles that
10 you read, about spiking overdose deaths in
11 Florida?
12    MR. DAVISON: Objection to form.
13    A Yes.
14 BY MR. LOESER:
15    Q And were you also familiar with the fact
16 that many of those deaths were due to oxycodone
17 overdoses?
18    MR. DAVISON: Objection to form.
19    A Yes.
20 BY MR. LOESER:
21    Q And, of course, you knew that a number of
22 your wholesale distributor clients were purchasing
23 large volumes of oxycodone, manufactured by
24 Mallinckrodt, correct?
25    MR. DAVISON: Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1   A They were purchasing our oxycodone
2 product.
3 BY MR. LOESER:
4   Q Significant volumes of --
5   A I don't know if there -- what would be
6 considered significant.
7   Q What would you consider significant?
8   A I don't -- I don't know.
9   Q Thousands of bottles significant to you?
10    MR. DAVISON: Objection to form.
11    A I can't answer that. That would be
12 product monitoring's job. As I said earlier, I
13 never saw orders come in. Orders were done
14 electronically.
15 BY MR. LOESER:
16    Q Tens of thousands of bottles seem
17 significant to you?
18    MR. DAVISON: Objection to form.
19    A I can't answer the question. I have no
20 idea what the significant amount is for a
21 wholesaler.
22 BY MR. LOESER:
23    Q Go a few more pages into the article.
24 There's a paragraphs that states, "Police in
25 Kentucky, Tennessee, West Virginia, Ohio and other

Page 107

1 states routinely arrest drug suspects who have
2 oxycodone bought or prescribed in Florida, often
3 using bogus medical records to justify the
4 medication. 'Ninety-eight percent of it is coming
5 out of Florida,' said Capt. David Hall, a
6 narcotics detective in Scioto County, Ohio,
7 outside Cincinnati."
8    And again, you had heard of people coming
9 to Florida to purchase pills. Had you also heard
10 of those pills migrating out of the state of
11 Florida to other areas?
12    A Yes.
13    MR. DAVISON: Objection to form.
14 BY MR. LOESER:
15    Q Down below, it states, "More oxycodone is
16 distributed in Florida than any other state -- 40
17 percent more than in second-ranked California in
18 2006, according to DEA data."
19    Were you aware of that?
20    MR. DAVISON: Objection to form.
21    A I knew Florida was a heavy user of
22 oxycodone products. I'm not certain what date
23 they were.
24 BY MR. LOESER:
25    Q And did that cause you any concern, that

Page 108

1 Florida was such a heavy user of oxycodone
2 products?
3    MR. DAVISON: Objection to form.
4    A Did it cause me any concern? Just
5 concerns on who the product was getting to as an
6 end user.
7 BY MR. LOESER:
8    Q Concerns that it was being diverted?
9    A It could be.
10    Q That was a concern of yours?
11    MR. DAVISON: Objection to form.
12    A It could be.
13 BY MR. LOESER:
14    Q Was it?
15    MR. DAVISON: Objection to form.
16    A It was, but we had product monitoring
17 people in place to monitor those orders.
18    (Whereupon, Exhibit Mallinckrodt-Becker-
19 007 was marked for identification by the
20 reporter.)
21 BY MR. LOESER:
22    Q Sir, I'm handing you what's been marked
23 Exhibit 7, which bears Bates stamp
24 MNK-T1_0000264194. And while you're looking at
25 that document, for the record, this is an e-mail

Page 109

1 from Karen Harper, dated November 28th, 2009, sent
2 to a number of people, including yourself; is that
3 correct?
4    A Correct.
5    Q And the other folks to which this e-mail
6 was sent, John Adams, Robert Lesnak, Tim Berry,
7 Bonnie New, Dave Irwin, Victor Borelli, are those
8 all other national account managers for
9 Mallinckrodt?
10    A John Adams was a manager that I had
11 reported to. I forgot that I reported to him.
12 Robert Lesnak was in charge of methadone sales,
13 was a manager in that, and the rest look like they
14 were sales people.
15    Q And if you look at the subject line of
16 this e-mail, Ms. Harper is sending you a news
17 article from RxNews with the heading "Grand Jury
18 wants to crack down on pill Mills, Ft. Lauderdale,
19 Florida"; do you see that?
20    A Mm-hmm (affirmative).
21    Q And so if you go down into the body of the
22 article that's attached to Ms. Harper's e-mail,
23 the first line of that is, "Broward County has
24 become known as the 'pill mill capital' of the
25 United States"; is that correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    A  Where are you looking?

2    Q  Right below the title of the article, on

3  the first page.

4    A  Okay.  That's what it reads, yes.

5    Q  Okay.  And so this is an example of an

6  article about the problems in Florida that was

7  sent to you by Ms. Harper, describing the problems

8  in Florida and the fact that Florida had become a

9  pill mill capital, right?

10    MR. DAVISON:  Objection to form.

11    A  Correct.

12  BY MR. LOESER:

13    Q  And if you go to the second page of that

14  now, which attaches the article, third paragraph

15  from the top states, "According to the report, 'In

16  the past 2 years the number of pain clinics in

17  South Florida mushroomed from 4 to 176, dumping 9

18  million dose units of Oxycodone in our community

19  every six minutes."  And, sir, you are aware

20  that --

21    A  That was six months.  You said "minutes,"

22  I believe.

23    Q  Six months.  Yeah.

24    A  Okay.

25    Q  Fair correction.

Page 111

1    And then it continues, "Although the pain

2  clinics originated in Broward County, they have

3  spread north quickly throughout the rest of

4  Florida."

5    So again, this is information contained in

6  an article that was sent to you by Ms. Harper on

7  November 28, 2009; that's correct?

8    A  Correct.

9    Q  And at the time, you were selling

10  substantial amounts of oxycodone to your wholesale

11  distributor clients, correct?

12    MR. DAVISON:  Objection to form.

13    A  I don't know what substantial would be.

14  BY MR. LOESER:

15    Q  Were you selling --

16    A  As I stated earlier, I did not see the

17  orders come in for my accounts.  They were all

18  submitted electronically.

19    Q  Were you selling more oxycodone to your

20  clients in 2009 than in prior years?

21    A  I don't know.

22    Q  You never examined that?

23    MR. DAVISON:  Objection to form.

24    A  I would look at sales reports and look at

25  my top selling products, but I can't tell you, for

Page 112

1  that specific date, if we were.

2  BY MR. LOESER:

3    Q  You have no recollection one way or the

4  other?

5    A  No.

6    MR. DAVISON:  Objection to form.

7  BY MR. LOESER:

8    Q  This wasn't a time for you in which that

9  particular product was selling so much that it was

10  causing your bonus to go up significantly?

11    MR. DAVISON:  Objection to form.

12    A  I don't -- I don't -- I don't know if that

13  caused my bonus to go up or not.

14  BY MR. LOESER:

15    Q  That's not something you ever tried to

16  figure out?

17    A  No.

18    MR. DAVISON:  Objection to form.

19    A  Bonus to me was just part of my regular

20  program.

21    (Whereupon, Exhibit Mallinckrodt-Becker-

22  008 was marked for identification by the

23  reporter.)

24  BY MR. LOESER:

25    Q  You've been handed what's marked

Page 113

1  Exhibit 8, which is an NPR, National Public Radio,

2  article, dated March 2nd, 2011.  The heading is

3  "The 'Oxy Express': Florida's Drug Abuse

4  Epidemic."

5    A  Was this from the print media or was this

6  the electronic media?

7    Q  It was probably both.  According to the

8  exhibit, it was "Heard on Morning Edition" on

9  March 2nd, 2011.

10    A  Okay.

11    Q  Are you familiar with the term "The Oxy

12  Express"?

13    A  Yes.

14    Q  Can you tell me what that is?

15    A  Just Florida became known as an area where

16  all the pain clinics opened up, and it's where

17  people went to get diverted product.

18    Q  And The Oxy Express refers to the highway

19  running north out of Florida, I75; are you aware

20  of that?

21    MR. DAVISON:  Objection to form.

22    A  There's more than one highway running

23  north out of Florida that probably transported

24  drugs.

25  BY MR. LOESER:

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    Q  Have you -- are you familiar with I75
2  being referred to as The Oxy Express?
3    A  At times.
4    Q  And if you turn to the second page of that
5  exhibit, under the heading "Florida's Oxycodone
6  Prescriptions," this states, "Doctors in Florida
7  prescribe 10 times more oxycodone pills than every
8  other state in the country combined.  People come
9  from all over the Southeast to visit the state's
10  pain clinics."
11    You were aware of that, correct?
12    MR. DAVISON:  Objection to form.
13    A  Eventually, I was, in my readings.
14  BY MR. LOESER:
15    Q  You were aware of that at the time that
16  you were selling oxycodone to your wholesale
17  distributor customers?
18    A  I could have been.
19    MR. DAVISON:  Objection to form.
20    A  I'm not certain exactly, referring to all
21  the various states that have been thrown in front
22  of me.
23  BY MR. LOESER:
24    Q  But generally, this is something that you
25  were aware of?

Page 115

1    A  Yes.
2    Q  When you were still selling oxycodone to
3  your wholesale distributor customers?
4    A  Yes, yes.
5    (Whereupon, Exhibit Mallinckrodt-Becker-
6  009 was marked for identification by the
7  reporter.)
8  BY MR. LOESER:
9    Q  You've been handed what's marked
10  Exhibit 9, and while you're familiarizing yourself
11  with it, this is an e-mail from Kate Muhlenkamp,
12  dated February 16, 2009, sent to you, among
13  others.  Subject is "Customer Demand Management
14  and Allocations."  Bates number MNK-T1_0004916278.
15    Who is Kate Muhlenkamp?
16    A  She was a product manager.
17    Q  And if you look down at the e-mail -- have
18  you had a chance to read it?
19    A  Not the whole thing, no.
20    Q  Why don't you go ahead and do that?
21    A  (Reviewing.)
22    Q  So I'll read the first paragraph of the
23  e-mail, and then I'll ask you a question about
24  that.  It says, "All - As you are aware, we have
25  ramped up our supply capabilities surrounding

Page 116

1  Oxycodone IR over the past 8 months and have done
2  a tremendous job of meeting historic demand."
3    Does this refresh your recollection on the
4  demand for oxycodone back in 2009?
5    MR. DAVISON:  Objection to form.
6    A  I don't recall this particular e-mail, and
7  I do not recall Ethex having an issue with their
8  product.
9  BY MR. LOESER:
10    Q  And what was Ethex?
11    A  Ethex was a competitor company that
12  manufactured oxycodone.
13    Q  And Ms. Muhlenkamp goes on to note, "As a
14  point of reference, our backorder dollars have
15  reached 90 million today, 40 million of that, or
16  45%, is oxycodone IR."
17    Do you recall there being substantial
18  backorders of oxycodone IR in 2009?
19    A  I don't specifically recall it, but
20  according to this e-mail, we did have a backorder
21  situation.
22    Q  And what does that mean when Mallinckrodt
23  has backorders?
24    A  It means that we don't have enough
25  material or the manufacturing process is such that

Page 117

1  we can't manufacture enough product to meet
2  demand.
3    Q  It means that the entire amount of
4  oxycodone manufactured by Mallinckrodt had been
5  purchased by your clients or customers?
6    MR. DAVISON:  Objection to form.
7    A  Could you rephrase or restate the
8  question?
9  BY MR. LOESER:
10    Q  The backorder indicates that everything
11  Mallinckrodt had to sell, all of the oxycodone IR,
12  had been sold?
13    MR. DAVISON:  Objection to form.
14    A  I believe so.
15  BY MR. LOESER:
16    Q  And Mallinckrodt's response to that,
17  according to this e-mail, was to ramp up supply
18  capabilities?
19    A  You'd have to ask the manufacturing people
20  on that.
21    Q  But is that what Ms. Muhlenkamp is telling
22  you in this e-mail?
23    A  It appears so.
24    MR. DAVISON:  Objection to form.
25  BY MR. LOESER:

Page 118

1    Q  Do you recall Mallinckrodt being
2  backordered on oxycodone IR in 2009?
3    A  I don't recall this specifically, no.
4    Q  If you go to the next paragraph of her
5  e-mail, she writes, "After maximizing our
6  manufacturing output, we know that we are not in
7  the position to fulfill the total market demand as
8  a result of Ethex exiting.  Therefore, we are
9  going to begin managing our customers demand or,
10  more appropriately, making them aware of what and
11  when we will be able to ship based on our
12  manufacturing output."
13      Do you see that?
14    A  Mm-hmm (affirmative).
15    Q  So explain for me what's happening here.
16      MR. DAVISON:  Objection to form.
17    A  Well, based on a competitor leaving the
18  marketplace, it put strains on our product supply,
19  being that either we couldn't manufacture it fast
20  enough or we did not have enough raw material to
21  manufacture the product.
22  BY MR. LOESER:
23    Q  And do you recall in this time frame there
24  being a historic -- Mallinckrodt not being able to
25  meet historic demand?

Page 119

1      MR. DAVISON:  Objection to form.
2    A  I don't recall this and the date.  I do
3  recall, throughout my career, that Mallinckrodt
4  would have supply issues from time to time.
5  BY MR. LOESER:
6    Q  And do you recall there being a time when
7  Mallinckrodt started managing allocations to
8  customers for oxycodone IR?
9    A  Repeat the question, please.
10    Q  Do you recall, as described in this
11  e-mail, that there came a point in time, in 2009,
12  in which Mallinckrodt started allocating what it
13  had available of oxycodone IR among its different
14  customers?
15    A  Do I recall that?
16    Q  Yeah.
17    A  I recall that, over the course of --
18  course of time, products were subject to being
19  allocated.
20    Q  And that's because Mallinckrodt couldn't
21  manufacture enough to meet the demand?
22    A  Most likely.
23    Q  And do you recall that Mallinckrodt tried
24  to meet the demand by increasing the amount that
25  it was manufacturing?

Page 120

1      MR. DAVISON:  Objection to form.
2    A  You'd have to ask manufacturing that.  I'm
3  not certain.
4  BY MR. LOESER:
5    Q  Okay.  Is that what's described in this
6  e-mail?
7      MR. DAVISON:  Objection to form.
8    A  It appears so.
9  BY MR. LOESER:
10    Q  Do you recall whether not having oxycodone
11  IR available was something that was upsetting to
12  your customers?
13      MR. DAVISON:  Objection to form.
14    A  When the product was allocated or back
15  ordered, yes, it could be -- cause issues for a
16  customer and the end users that they served.
17  BY MR. LOESER:
18    Q  And back in 2009, when you received this
19  e-mail, did you try to figure out why your
20  customers were ordering so much Oxycodone IR?
21    A  No.
22      MR. DAVISON:  Objection to form.
23  BY MR. LOESER:
24    Q  That's not something that occurred to you
25  to do?

Page 121

1    A  No.
2      MR. DAVISON:  Objection to form.
3      (Whereupon, Exhibit Mallinckrodt-Becker-
4  010 was marked for identification by the
5  reporter.)
6  BY MR. LOESER:
7    Q  You've been handed what's marked
8  Exhibit 10.  MNK-T1_0000289707, and while you're
9  reading it, this is an e-mail from Kate Muhlenkamp
10  to Karen Harper, with the Subject, Requesting
11  Info: Dollars of Sales, Oxycodone 15 and 30 mg to
12  Florida per year," and with an attachment, "Oxy
13  Florida Sales" 9/14, 2010.
14      Do you have any understanding of why, on
15  September 14, 2010, Ms. Muhlenkamp sent to
16  Ms. Harper a report on Florida sales of oxycodone
17  15 and 30?
18      MR. DAVISON:  Objection to form.
19    A  No, I don't.
20  BY MR. LOESER:
21    Q  Were you involved, at all, at that time in
22  examining sales to Florida of oxycodone 15 and 30?
23    A  Not that I recall.
24    Q  If you turn to the next page of this
25  exhibit, there is a -- there's some tables that

Page 122

1 describe --
2   A  Mm-hmm (affirmative).
3   Q  -- sales of oxycodone 15 and 30, a total
4 in Florida; do you see that?
5   A  Where?
6   Q  The first table indicates "Total End
7 Purchaser," "Gross Sales"; do you see that?
8   A  Yes.
9   Q  And the table below that says, "Total End
10 Purchaser," and it says, "Fl"?
11   A  Oh.  There's a mark in front of the Fl
12 that I can't see that.  Okay.  Yes.
13   Q  So if you look down this, you'll see
14 that -- and then the third table has percentages.
15 So as of September 14, 2010, starting in 2008, 28
16 percent of all of the oxycodone 15 and 30 was sold
17 in -- to downstream customers in Florida as of
18 2008; do you see that?
19   A  Mm-hmm (affirmative).
20     MR. DAVISON:  Objection to form.
21 BY MR. LOESER:
22   Q  Were you aware of that?
23     MR. DAVISON:  Objection to form.
24   A  Not at the time.
25 BY MR. LOESER:

Page 123

1   Q  Okay.  And if you look at 2009, it shows
2 that as of 2009, 39 percent of all of the
3 oxycodone sales by Mallinckrodt were sold to
4 downstream customers in Florida; were you aware of
5 that?
6   A  No.
7     MR. DAVISON:  Objection to form.
8 BY MR. LOESER:
9   Q  And if you look at 2010, it shows that 47
10 percent of all of the oxycodone 15 and 30
11 purchased from Mallinckrodt by its wholesale
12 distributors was sold to downstream customers in
13 Florida; do you see that?
14   A  Yes.
15     MR. DAVISON:  Objection to form.
16 BY MR. LOESER:
17   Q  So the percentages went 28 percent in '08
18 to 47 percent in 2010.  And, sir, are you telling
19 me that among your wholesale distributor
20 customers, you were not aware of the portion of
21 all of the oxycodone they purchased from you that
22 was shipped to Florida?
23     MR. DAVISON:  Objection to form.
24   A  I didn't have that data from my
25 wholesalers or distributors on product from the

Page 124

1 end users.  You'd have to ask Karen Harper that
2 did our product monitoring, had that information.
3 BY MR. LOESER:
4   Q  And did you ever ask to get the
5 information?
6   A  For specific accounts, possibly.
7   Q  But you never did any type of examination
8 across the board for your wholesale distributor
9 customers of where they were sending the bulk of
10 the oxycodone they purchased from you?
11   A  I may have with one account.
12   Q  Okay.  Do you recall the details of that?
13   A  Smith Drug.
14   Q  And why did you do that?
15   A  I can't recall why it was done.
16   Q  Did you recall -- do you recall what you
17 learned?
18   A  If I recall properly, it was just that
19 their customer -- their end users were not located
20 in Florida.
21   Q  Okay.  So you learned that they were not
22 selling most of their drugs?
23   A  Smith Drug.
24   Q  And did you learn anything else that
25 caused you to be suspicious about Smith Drug?

Page 125

1     MR. DAVISON:  Objection to form.
2   A  No.
3 BY MR. LOESER:
4   Q  And you don't recall any other times
5 investigating any of your other wholesale
6 distributor customers to see who was purchasing
7 from them the products that you sold to them?
8     MR. DAVISON:  Objection to form.
9   A  If an account requested for me to look at
10 Steve's Drug on our particular product line, I had
11 the ability to run a chargeback report and see how
12 much product Steve's Drug was buying.
13 BY MR. LOESER:
14   Q  Would you agree with me that it's highly
15 suspicious that in 2008, 28 percent of all
16 oxycodone manufactured by Mallinckrodt was being
17 sold and shipped to Florida?
18     MR. DAVISON:  Objection to form.
19   A  Would I agree with you?
20 BY MR. LOESER:
21   Q  Yes.
22   A  If I was a number analysis person, looking
23 at these numbers, looking at the baseline on the
24 jumps, I would -- it would pique my interest, yes.
25   Q  Okay.  And then looking at 2009, would you

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 agree with me that it is highly suspicious that
2 out of all of the oxycodone manufactured by
3 Mallinckrodt, 39 percent of it was being shipped
4 to Florida?
5    MR. DAVISON: Objection to form.
6 BY MR. LOESER:
7    Q Would that pique your interest as well?
8    MR. DAVISON: Objection to form.
9    A Not necessarily. Based on the baseline
10 number and the jumps, that would pique my
11 interest.
12 BY MR. LOESER:
13    Q And the following year at 47 percent --
14    A That would pique my interest, based on
15 baseline of sales.
16    MR. DAVISON: Objection to form.
17 BY MR. LOESER:
18    Q And do you think it's possible that that
19 amount of oxycodone was being legitimately
20 consumed in Florida --
21    MR. DAVISON: Objection to form.
22 BY MR. LOESER:
23    Q -- for medically necessary purposes?
24    MR. DAVISON: Objection to form.
25    A You have to ask Karen Harper that, who

Page 127

1 does our product monitoring. I'm not in a
2 position to answer that.
3 BY MR. LOESER:
4    Q I'm handing you what's previously been
5 marked Borelli Exhibit 22, MNK-T1_0000368646. And
6 while you're reading that, this is an e-mail from
7 Lisa Lundergan to Karen Harper, dated April
8 18, 2011, and the Subject, "Oxycodone FL Update,"
9 with an attachment, "Oxycodone IR Monthly Update."
10    A (Reviewing.)
11    Q Who is Lisa Lundergan?
12    A She was product manager at the time.
13    Q And Ginger Collier, to whom this is cc'd?
14    A She was in charge of the marketing
15 department.
16    Q And in this e-mail, Ms. Lundergan writes,
17 "Karen, As requested, I have attached an update on
18 Oxycodone Florida activity. Please let me know if
19 there is anything else you would like added to
20 this. I will update this as often as you need it,
21 just let me know."
22      And do you remember what was going on in
23 April of 2011 that would cause Ms. Lundergan to
24 provide a report on --
25    A No.

Page 128

1    Q -- Florida IR activity?
2    MR. DAVISON: Objection to form.
3    A No, I have no idea. You'd have to ask
4 Lisa Lundergan or Karen Harper or Ginger Collier.
5 BY MR. LOESER:
6    Q If you turn to the next page, there's some
7 graphs.
8    A Yes.
9    Q And if you look at the one -- the second
10 one, the bar chart, it shows that in 2010, over 2
11 million bottles of oxycodone 5, 15 and 30
12 milligram tabs were sold to Florida; do you see
13 that?
14    A Mm-hmm (affirmative).
15    Q Does that seem like an alarming number of
16 bottles to be sold to Florida?
17    MR. DAVISON: Objection to form.
18    A I don't have any data to compare it by.
19 BY MR. LOESER:
20    Q In 2010, were you aware that that many
21 bottles were being sold --
22    A No.
23    Q -- by your group to Florida?
24    A No.
25    MR. DAVISON: Objection to form.

Page 129

1 BY MR. LOESER:
2    Q And were you aware of which of your
3 clients were sending significant volumes of
4 oxycodone to Florida at that time?
5    MR. DAVISON: Objection to form.
6    A No. I didn't have that data. You'd have
7 to ask Karen Harper.
8 BY MR. LOESER:
9    Q If you turn to the next page of that
10 exhibit, there's a table at the top. It says,
11 "Distributor Data," All Strengths - Oxycodone
12 HCl"; do you see that list?
13    A Yes.
14    Q And do you see that there's a list of
15 Mallinckrodt customers on there?
16    A I do.
17    Q Let's go down that list, and I want you to
18 tell me which of those customers were your
19 customers. Let's start at the top.
20 AmerisourceBergen, is that your customer?
21    A I don't recall at that time.
22    Q Did they become your customer at some
23 point?
24    A At one point, they were, but I don't
25 recall if it was at this date.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1   Q  Okay.  Do you see that in 2010
2  AmerisourceBergen sent 85,881 bottles of
3  oxycodone?
4   A  Mm-hmm (affirmative).
5      MR. DAVISON:  Objection to form.
6  BY MR. LOESER:
7   Q  And that would be the number of bottles
8  that they sent to Florida, correct?
9      MR. DAVISON:  Objection to form.
10   A  Mm-hmm (affirmative).
11  BY MR. LOESER:
12   Q  Okay.  The next one, Anda?
13   A  Mm-hmm (affirmative).
14   Q  Was that your customer?
15   A  It could have been at that time, yes.
16   Q  Do you see that they sent 22,000 bottles?
17   A  Mm-hmm (affirmative).
18   Q  Okay.  So you did not know as of this
19  time, because you had not looked to see, the
20  number of bottles of oxycodone that your wholesale
21  distributor customer sent to Florida?
22      MR. DAVISON:  Objection to form.
23   A  I did not have data, specifically, as to
24  Florida.  Karen Harper would have had that
25  information.

Page 131

1  BY MR. LOESER:
2   Q  Okay.  So if you had called Lisa Lundergan
3  and said, "Can you please send me information on
4  the number of bottles that my clients sent to
5  Florida," would she have been able to provide that
6  to you?
7      MR. DAVISON:  Objection to form.
8   A  She most likely would have had to contact
9  Karen Harper.
10  BY MR. LOESER:
11   Q  But the information was there?
12      MR. DAVISON:  Objection to form.
13   A  It could have been.  I don't know if there
14  was their account, specifically.
15  BY MR. LOESER:
16   Q  Okay.  Well, you know from this list that
17  there's tracking of the number of bottles of
18  wholesale distributor customers, number of bottles
19  of oxycodone they shipped to Florida, right?
20   A  Mm-hmm (affirmative).
21      MR. DAVISON:  Objection to form.
22  BY MR. LOESER:
23   Q  So presumably, since this list was created
24  and sent to Karen Harper, it also could have been
25  sent to you --

Page 132

1      MR. DAVISON:  Objection to form.
2  BY MR. LOESER:
3   Q  -- if you had asked for it?
4      MR. DAVISON:  Objection to form.
5   A  Repeat the question.
6  BY MR. LOESER:
7   Q  This data had been assembled by
8  Mallinckrodt, correct?
9      MR. DAVISON:  Objection to form.
10   A  Correct.
11  BY MR. LOESER:
12   Q  And if you had asked for it, you could
13  have been provided that data, too, correct?
14   A  I could have been, yes.
15      MR. DAVISON:  Objection.
16  BY MR. LOESER:
17   Q  So let's keep going down the list.  Tell
18  me when we get to another one of your clients.
19   A  Cedardale, at one time, was my client.
20   Q  Okay.  And you see that they sent 19,000
21  bottles of oxycodone to Florida --
22      MR. DAVISON:  Objection.
23  BY MR. LOESER:
24   Q  -- in 2010?
25      MR. DAVISON:  Same objection.

Page 133

1   A  Okay.
2  BY MR. LOESER:
3   Q  Keep going down.
4   A  Epic was my customer.
5   Q  Okay.  Who is below Epic?
6   A  Harvard was my -- I don't know if it was
7  at that time.
8   Q  Okay.  You see that they sent 79,039
9  bottles --
10   A  Yes.
11      MR. DAVISON:  Objection.
12  BY MR. LOESER:
13   Q  -- of oxycodone to Florida in 2010?
14      MR. DAVISON:  Objection.
15   A  HD Smith was my account.
16  BY MR. LOESER:
17   Q  Do you see how many bottles of oxycodone
18  they sent to Florida in 2010?
19   A  Mm-hmm (affirmative).
20      MR. DAVISON:  Objection.
21  BY MR. LOESER:
22   Q  Just how many was that?
23      MR. DAVISON:  Objection.
24   A  In 2010?
25  BY MR. LOESER:

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  Q  Yes.

2  A  396,697.

3  Q  Keep going down.

4  A  KeySource was my account.  I don't know if

5 it was my account at that time.  Same with

6 Master's.

7  Q  Okay.  How many bottles did KeySource send

8 into Florida in 2010?

9     MR. DAVISON:  Objection.

10  A  373,141.

11 BY MR. LOESER:

12  Q  Okay.  What's below that?  Master

13 Pharmaceutical, was that your client?

14  A  It could have been at that time.  I don't

15 recall.  That was an account that was transferred

16 to me.

17  Q  Okay.  Do you see the number of bottles of

18 oxycodone --

19  A  Yes, I do.

20  Q  -- that Masters Pharmaceutical sent to

21 Florida in 2010?  How many bottles was that?

22     MR. DAVISON:  Objection to form.

23  A  238,171.

24 BY MR. LOESER:

25  Q  Okay.  Keep going down.

Page 135

1  A  OptiSource.

2  Q  All right.  How many bottles did

3 OptiSource send to Florida?

4  A  152,923.

5     MR. DAVISON:  Objection.

6  Q  So in 2010, OptiSource sent 152,923

7 bottles of oxycodone into the state of Florida?

8     MR. DAVISON:  Objection to form.

9  A  Correct.

10 BY MR. LOESER:

11  Q  Any other clients of yours on this list?

12  A  No.  Premier Group may have been my

13 account at that time.

14  Q  Do you know, for each of the clients of

15 yours that you identified, what portion of their

16 total purchases of oxycodone from you were sent to

17 Florida?

18  A  No, I don't.

19  Q  Is that information that you could have

20 obtained, had you asked for it?

21     MR. DAVISON:  Objection to form.

22  A  Possibly, yes.

23 BY MR. LOESER:

24  Q  Just before we leave that exhibit, if you

25 go up to the Cardinal Preferred Source A, that was

Page 136

1 your customer, wasn't it?

2  A  Cardinal Preferred Source was a customer

3 of mine.  I'm not certain on this time frame.

4  Q  Do you see that in -- from 2010 to 2011,

5 Cardinal increased its shipments, to Florida, of

6 oxycodone 57 percent?

7     MR. DAVISON:  Objection to form.

8  A  Mm-hmm (affirmative).

9 BY MR. LOESER:

10  Q  Do you have any recollection of why that

11 occurred?

12  A  No, I don't.

13  Q  Does it seem strange to you that at a time

14 when most of the other distributors were

15 decreasing their shipments into Florida, Cardinal

16 was increasing its shipments?

17     MR. DAVISON:  Objection to form.

18  A  No.  That could be various reasons.  They

19 could have -- could have been a shift on our

20 product being on a source program or not being on

21 a source program.

22 BY MR. LOESER:

23  Q  And what does that mean?

24  A  Meaning, if you have -- works like a

25 medical formulary, if you're familiar with that.

Page 137

1 A wholesaler has a list of products, and since

2 there's more than one competitor, one manufacturer

3 of a product, Mallinckrodt may have a primary

4 position.  We may have been awarded a primary

5 position on that product, which would increase

6 your sales, rather than a secondary position.

7 Being preferred source -- preferred source, that's

8 what that means, that when a pharmacy goes to

9 order their product, they will be sent the primary

10 A source product.

11  Q  Okay.  And do you recall whether Cardinal

12 was picking up volume as other regional wholesale

13 distributors were slowing down their sales to

14 Florida in 2011?

15     MR. DAVISON:  Objection to form.

16  A  I don't recall.

17     (Whereupon, Exhibit Mallinckrodt-Becker-

18 011 was marked for identification by the

19 reporter.)

20     THE REPORTER:  Number 11.

21 BY MR. LOESER:

22  Q  You have in front of you what's been

23 marked Exhibit 11, Bates number MNK-T1_0004888161.

24 While you're looking at that, this is an e-mail

25 from Bonnie New, dated 6/16/2011, sent to you,

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 among others. The subject, "Oxytocin Article from
2 St. Louis Post Dispatch," with the attachment
3 "6-16-11Oxycotin PD Article.rtf"; do you see that?
4    A  Yes.
5    Q  And Bonnie New was one of the other
6 national account managers?
7    A  Correct.
8    Q  And her e-mail states, "Hello, Interesting
9 read.  I think it supports our suspicions in
10 regard to the increased usage of the Oxy 30mg"; do
11 you see that?
12    A  Yes.
13    Q  Let's turn and look at that article.
14    A  Mm-hmm (affirmative).
15    Q  Do you remember receiving this e-mail?
16    A  I don't specifically remember getting it.
17    Q  But you don't have any reason to think
18 that it wasn't sent to you?
19    A  It was sent.
20    Q  So if you look at that article on the next
21 page, the title is "New oxycontin form is said to
22 curb abuse"; do you see that?
23    A  Mm-hmm (affirmative).
24    Q  And this is from the "New York Times"?
25    A  Mm-hmm (affirmative).

Page 139

1    Q  And if you move down a few paragraphs, the
2 article states, "Purdue Pharma, the maker of
3 oxyContin, may have succeeded in reducing elicit
4 demand for its reformulated drug.  But in several
5 dozen interviews over the last few months, drug
6 abuse experts, law enforcement officials and
7 addicts said the reformulation had only driven up
8 interest for other narcotics.  Demand appears
9 especially high for pure oxycodone that can come
10 in 30-milligram pills."  And then down at the end
11 of the article, it states, "'It's just a matter of
12 switching,' said John Burke, commander of the drug
13 task force in Warren County, Ohio, and president
14 of the National Association of Drug Diversion
15 Investigators."
16       Do you see that?
17    A  Mm-hmm (affirmative).
18    Q  So do you remember having suspicions about
19 the increased usage of oxy 30 in June of 2011?
20       MR. DAVISON:  Objection to form.
21    A  I don't recall the specific date, but I
22 recall this article.
23 BY MR. LOESER:
24    Q  And did you respond to Ms. New about the
25 suspicions?

Page 140

1    A  I don't recall if I responded to her, but
2 we were, as a group, looking for why there was
3 such an increase in oxy sales.
4    Q  Okay.
5    A  This was one of the main reasons why there
6 was.
7    Q  And you were aware of that, at least as of
8 6/16/2011?
9       MR. DAVISON:  Objection to form.
10    A  Evidently.
11 BY MR. LOESER:
12    Q  And did you -- this refers to "our
13 suspicions," so I gather that's a suspicion that
14 she shared with you?
15       MR. DAVISON:  Objection to form.
16    A  Correct.
17 BY MR. LOESER:
18    Q  And you had the same suspicion?
19    A  After reading the article, yes.
20       MR. DAVISON:  Objection.
21 BY MR. LOESER:
22    Q  So as of June 16, 2011, you knew that the
23 increased demand was due to the fact that
24 OxyContin had been reformulated, and you knew that
25 your clients were purchasing significant volumes

Page 141

1 of oxy 30, right?
2       MR. DAVISON:  Objection to form.
3    A  I knew that oxy 30 was being purchased.
4 BY MR. LOESER:
5    Q  So did you raise any concerns with anyone
6 at Mallinckrodt about how maybe it would have been
7 a good idea to decrease the sale of oxy 30 at that
8 time?
9       MR. DAVISON:  Objection.
10    A  I may have.  I don't recall.
11 BY MR. LOESER:
12    Q  Why do you think you may have?
13    A  I just may have.  I don't recall -- with
14 the nature of the article and the monitoring and
15 things that were going on, I'm sure it was a
16 subject that was brought up many times.
17    Q  That would be a real concern, wouldn't it,
18 if oxycodone manufactured by Mallinckrodt was --
19 there was spiking demand because of the interest
20 of people who were addicted?
21       MR. DAVISON:  Objection to form.
22    A  It would be a concern.
23 BY MR. LOESER:
24    Q  So if you had raised that with anyone, how
25 would you have done that?

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    MR. DAVISON: Objection to form.
2    A  Communicated with -- over the telephone.
3 I don't know if I -- I don't recall any e-mails
4 that I may have sent.
5 BY MR. LOESER:
6    Q  And why over the telephone and not e-mail?
7    MR. DAVISON: Objection.
8    A  I don't know.  I don't know.
9 BY MR. LOESER:
10    Q  Do you have any specific recollection of
11 raising this suspicion with anyone at
12 Mallinckrodt?
13    A  No.
14    (Whereupon, Exhibit Mallinckrodt-Becker-
15 012 was marked for identification by the
16 reporter.)
17    THE REPORTER: Number 12.
18 BY MR. LOESER:
19    Q  You have in front of you what's been
20 marked Exhibit 12.  The document cover sheet
21 indicates the document was produced in Native
22 Format, and it attaches a PowerPoint presentation.
23 The presentation does not have Bates numbers
24 because of the Native Format.  The front cover
25 e-mail Bates number is MNK-T1_0002450579.

Page 143

1    And if you look at this presentation, the
2 title is "Specialty Generics National Sales
3 Meeting," "November 9, 2011."
4    And did you have a national sales meeting
5 every year?
6    A  Usually, yes.
7    Q  And this says "COVIDIEN" at the top.
8    A  Mm-hmm (affirmative).
9    Q  Is that the same as Mallinckrodt?
10    MR. DAVISON: Objection to form.
11    A  Covidien was the parent company of
12 Mallinckrodt.
13 BY MR. LOESER:
14    Q  Okay.  Do you recall the 2011 National
15 Sales Meeting?
16    A  Not the specifics of it.
17    Q  Let's turn the page --
18    A  Mm-hmm (affirmative).
19    Q  -- and the heading on that page says, What
20 You Accomplished In FY11."  Is that full year 11
21 or what is that for?
22    A  Fiscal year.
23    MR. DAVISON: Objection.
24 BY MR. LOESER:
25    Q  Fiscal year 11.  And the last item on

Page 144

1 there is "Performance regained senior management
2 confidence."  Do you know what that was about?
3    A  I have no idea what that actually means.
4 You'd have to ask the person that wrote it.
5    Q  And the bar at the bottom says, "On behalf
6 of Covidien & Pharmaceutical Sector Senior
7 Management, Thank You!"  So if look at those
8 bullet points, it sounds like 2011 was a
9 successful year for Mallinckrodt?
10    MR. DAVISON: Objection to form.
11    A  It could have been.  I don't recall.
12 BY MR. LOESER:
13    Q  If you turn to the page that has the
14 heading "Specialty Generic Product Families" --
15    A  Yes, sir.
16    Q  -- do you see that?
17    A  Yes.
18    Q  There's a list of controlled substances
19 here; do you see that?
20    A  Yes.
21    Q  And for each one, there's an indication of
22 the specialty generic product family; do you see
23 that?
24    A  Mm-hmm (affirmative).
25    Q  And it indicates the "Generic Equivalent

Page 145

1 of," and it lists what each of these is the
2 generic equivalent of; do you see that?
3    A  Yes.
4    Q  And then the next column says, "Covidien
5 Ranking August 11," so that's ranking among your
6 competitors where the -- where your sales stand;
7 is that right?
8    MR. DAVISON: Objection to form.
9    A  I would imagine that's the market share
10 data.
11 BY MR. LOESER:
12    Q  And in fact, the next column says,
13 "Covidien Market Share August 11"; do you see
14 that?
15    A  Mm-hmm (affirmative).
16    Q  And then it goes on.  It has "Covidien Net
17 Sales" and other indications; do you see that?
18    A  Yes.
19    Q  So if you look at Oxycodone IR --
20    A  Mm-hmm (affirmative).
21    Q  -- which is the generic equivalent of
22 Roxicodone, right?
23    A  Mm-hmm (affirmative).
24    Q  This is shows that Covidien's ranking is
25 number 1 out of 4; right?  Do you see that?

Page 146

1  MR. DAVISON: Objection to form.
2  BY MR. LOESER:
3  Q Do you see that?
4  A I believe so, yes.
5  Q Okay. And if you look at "Covidien Market
6  Share August 11," Covidien/Mallinckrodt had 51
7  percent of the market share of Oxycodone IR.
8  A Mm-hmm (affirmative).
9  Q Does that sound right to you?
10  MR. DAVISON: Objection to form.
11  A You would have to ask the person that made
12  this.
13  BY MR. LOESER:
14  Q Do you recall having conversations about
15  Mallinckrodt's market share for the different
16  generic products that it sold?
17  A It would be discussed at various sales
18  meetings, put together by product managers. You'd
19  have to ask them that information.
20  Q But what this suggests is that as of
21  August 11th, at any rate, 51 percent of all of the
22  oxycodone IR sold in the United States was sold by
23  Mallinckrodt?
24  A Correct.
25  MR. DAVISON: Objection to form.

Page 147

1  BY MR. LOESER:
2  Q And if you move down this list, for
3  oxycodone APAP, how did you say that?
4  A APAP.
5  Q APAP, which is the generic equivalent
6  Percocet, this shows that the Covidien market
7  share as of August 11 was 37 percent?
8  MR. DAVISON: Objection to form.
9  A Mm-hmm (affirmative).
10  BY MR. LOESER:
11  Q So 37 percent of all of the oxycodone APAP
12  sold, as of August 11th, was sold by Mallinckrodt?
13  MR. DAVISON: Objection to form.
14  A According to this, yes.
15  BY MR. LOESER:
16  Q And if you go down much farther to
17  "Hydromorphone," which is the generic equivalent
18  of Dilaudid, Covidien ranking, 1 out of 4?
19  A Mm-hmm (affirmative).
20  Q And Covidien, which again, Mallinckrodt's
21  market share there is 67 percent?
22  A Mm-hmm (affirmative).
23  MR. DAVISON: Objection to form.
24  BY MR. LOESER:
25  Q So 67 percent all of the hydromorphone

Page 148

1  sold in the United States, during the fiscal
2  year 2011, was sold by Mallinckrodt?
3  MR. DAVISON: Objection to form.
4  A Correct, according to this and what the
5  product managers put together.
6  BY MR. LOESER:
7  Q Okay. So if you go to the next page,
8  second bullet item says, "Sales forces - everyone
9  was in the money," most between 100 to 115
10  percent. What does that mean?
11  MR. DAVISON: Objection to form.
12  A I would imagine that must have something
13  to do with quota.
14  BY MR. LOESER:
15  Q So everyone -- the sales force, that
16  includes you, right?
17  A Correct.
18  Q So the sales force was, everyone's in the
19  money, everyone was selling well?
20  MR. DAVISON: Objection to form.
21  A Obviously. Correct.
22  BY MR. LOESER:
23  Q Okay. Let's go back up and look at the
24  chart we were looking at a minute ago, and if you
25  look at "Covidien Net Sales" --

Page 149

1  A Yep.
2  Q Okay. So fiscal year 2011, the top
3  selling product among all of Mallinckrodt's
4  products, in terms of net sales, was hydrocodone
5  APAP at 104.7 million; do you see that?
6  MR. DAVISON: Objection to form.
7  A Mm-hmm (affirmative).
8  BY MR. LOESER:
9  Q And that's an increase of volume, if you
10  go further down, from 2010 to 2011?
11  A Mm-hmm (affirmative).
12  Q And the second item, the second seller for
13  Mallinckrodt, fiscal year 2011, was oxycodone IR
14  at 75.1 million; do you see that?
15  A Mm-hmm (affirmative).
16  MR. DAVISON: Objection to form.
17  BY MR. LOESER:
18  Q And below that, oxycodone APAP at 56.6
19  million.
20  A Mm-hmm (affirmative).
21  MR. DAVISON: Objection.
22  BY MR. LOESER:
23  Q So those were the top selling -- this
24  lists the top-selling Mallinckrodt products in
25  fiscal year 2011?

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1      A  I believe so.
2         MR. DAVISON:  Objection to form.
3   BY MR. LOESER:
4      Q  So when there's articles that discuss
5   explosive sales of oxycodone, for example, in this
6   time period, you know from this that 51 percent of
7   all those sales are by Mallinckrodt?
8         MR. DAVISON:  Objection to form.
9      A  I didn't look at it that way, but based on
10  market share, it could be construed that way.
11  BY MR. LOESER:
12     Q  That would be an accurate statement,
13  right?
14        MR. DAVISON:  Objection to form.
15     A  I'm not certain it's an accurate
16  statement.  I didn't put this together.
17  BY MR. LOESER:
18     Q  Okay.  But assuming that the information
19  in this table is accurate, it would be accurate to
20  say that --
21     A  If you poured it through a funnel, that
22  would be an accurate statement.
23     Q  So if you're looking for the source of all
24  of the oxycodone in the United States, Oxycodone
25  IR, as of August 2011, you know that 51 percent of

Page 151

1   it was sold by Mallinckrodt?
2         MR. DAVISON:  Objection to form.
3      A  According to this, yes.
4   BY MR. LOESER:
5      Q  Okay.
6         MR. DAVISON:  We've been going another
7   hour.  Is now a good time for a break?
8         MR. LOESER:  Let me ask a few more
9   questions about this exhibit, and then yes.
10        MR. DAVISON:  I'm sorry.  I thought you
11  were finished with it.
12  BY MR. LOESER:
13     Q  Now, you're aware that in 2011 several of
14  Mallinckrodt's major wholesale distributor clients
15  had their licenses to sell controlled substances
16  suspended by the DEA?
17        MR. DAVISON:  Objection to form.
18     A  I recall that, but I don't recall specific
19  dates.
20  BY MR. LOESER:
21     Q  Okay.  But do you recall that it was
22  in 2011?
23     A  I don't recall the date, as I just stated.
24        MR. DAVISON:  Objection to form.
25  BY MR. LOESER:

Page 152

1      Q  So when you look at this November -- this
2   is towards the end of 2011, November 9, 2011,
3   sales meeting that talks about upbeat performance
4   and sales being in the money, there's no reference
5   anywhere to anyone being reprimanded for selling
6   controlled substances to wholesale distributors
7   whose licenses were suspended by the DEA; is that
8   right?
9         MR. DAVISON:  Objection to form.
10     A  I don't have a copy of what you're looking
11  at.
12  BY MR. LOESER:
13     Q  This is the exhibit we were just going
14  through.  Do you see any reference, anywhere in
15  that exhibit, to anyone being reprimanded for
16  selling controlled substances to wholesale
17  distributors whose licenses were suspended by the
18  DEA that year?
19        MR. DAVISON:  Objection to form.
20     A  I don't see that I have the same document
21  you have.  Is this the page that you're looking at
22  (indicating)?
23  BY MR. LOESER:
24     Q  I believe it's the same document.
25     A  Okay.

Page 153

1      Q  Just flip through the whole document --
2      A  Okay.  It's this back page.  Okay.
3      Q  Have you seen any reference in there?
4      A  Could you repeat the question?
5      Q  Is there any reference anywhere in this
6   PowerPoint presentation about Mallinckrodt's
7   successful full year 2011 about anyone being
8   reprimanded for selling controlled substances to
9   wholesale distributors whose licenses were
10  suspended by the DEA?
11        MR. DAVISON:  Objection to form.
12     A  No, not that I see.
13  BY MR. LOESER:
14     Q  And do you recall whether your senior
15  management -- and there's a thing here, it says,
16  "On behalf of Covidien & Pharmaceutical Sector
17  Senior Management, Thank You," on page 2.
18     A  Mm-hmm (affirmative).
19     Q  Do you recall anyone from senior
20  management raising, as an issue, the problem of
21  Mallinckrodt selling controlled substances to
22  wholesale distributors whose licenses were
23  suspended by the DEA --
24        MR. DAVISON:  Objection.
25  BY MR. LOESER:

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1  Q -- during this sales meeting?
2     MR. DAVISON: Objection.
3  A Not that I recall.
4     MR. LOESER: Now is a fine time to take a
5  break.
6     MR. DAVISON: Okay.
7     THE VIDEOGRAPHER: We are going off the
8  record. The time is 11:47 a.m.
9     (A recess was taken from 11:47 a.m. until
10 12:02 p.m.)
11    THE VIDEOGRAPHER: We are back on the
12 record. The time is 12:02 p.m.
13 BY MR. LOESER:
14   Q Mr. Becker, are you familiar with what a
15 chargeback is?
16   A Yes.
17   Q Can you please explain to me what a
18 chargeback is?
19   A Chargeback is a form of recording sales
20 transactions where a product is sold into the
21 wholesaler at one cost, sold to the end user at
22 another cost, and it's a difference between the
23 two that -- it's paid back, and to the wholesaler,
24 is the best I can explain.
25   Q And so when the end user -- and by that, I

Page 155

1  think you mean indirect customer?
2  A Correct.
3  Q Same thing. Who negotiates the price with
4  the end user where a chargeback is required?
5  A If it's an independent drugstore, is that
6  what you're referring to?
7  Q Right.
8  A Independent drugstore, that would be up to
9  the distributor or the wholesaler that would set
10 the prices.
11   Q And are there circumstances where
12 Mallinckrodt is negotiating directly with the
13 indirect customer?
14   A No.
15   Q And do chargebacks provide an incentive to
16 Mallinckrodt's distributor clients to sell
17 Mallinckrodt drugs?
18   A No.
19      MR. DAVISON: Objection to form.
20 BY MR. LOESER:
21   Q But they do prevent Mallinckrodt's
22 wholesale distributor customers from losing money
23 when it sells to a downstream customer at a price
24 that's lower than the price that the distributor
25 purchased from Mallinckrodt?

Page 156

1     MR. DAVISON: Objection to form.
2  A It's a transaction record.
3  BY MR. LOESER:
4  Q And I want to make sure I understand in
5  terms of the timing. Mallinckrodt sets a price
6  with its wholesale distributor, that's the first
7  transaction, and then the wholesale distributor
8  sets a price with the downstream customer. Is
9  that a transaction that happens after that?
10     MR. DAVISON: Objection to form.
11  A Could you repeat that?
12 BY MR. LOESER:
13  Q Yeah. I just want to try to understand
14 when a chargeback is required. So -- well, let me
15 just ask you that way. When does a wholesale
16 distributor get a chargeback payment from
17 Mallinckrodt?
18  A When they submit the chargeback data.
19  Q Okay. And a chargeback is required when
20 the downstream customer purchases the drug from
21 the wholesale distributor --
22  A Correct.
23  Q -- at a price that's lower than what the
24 wholesale distributor paid Mallinckrodt for the
25 product?

Page 157

1  A Correct.
2     MR. DAVISON: Objection to form.
3  BY MR. LOESER:
4  Q And the downstream customers that -- for
5  these chargeback transactions can be pharmacies;
6  is that correct?
7  A Correct.
8  Q And can they be pain clinics?
9  A Possibly, if they have a pharmacy license,
10 DEA license to sell product, a pain clinic can --
11 can be a pharmacy.
12  Q And then the data about the transaction,
13 the sale from the distributor to the downstream
14 customer, that data is reported to Mallinckrodt by
15 the wholesale distributor; is that correct?
16  A Correct.
17  Q And that data is, then, collected into
18 what's referred to as the chargeback system?
19  A I believe so.
20  Q And was Mallinckrodt able to exercise
21 control over its downstream customers were
22 through the chargeback system?
23     MR. DAVISON: Objection to form.
24 BY MR. LOESER:
25  Q Do you understand what I mean by that?

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1   A  No.  You may have to rephrase that
2  question.
3   Q  So if Mallinckrodt refused to pay a
4  wholesale distributor a chargeback for a sale to a
5  downstream customer, would that have the effect of
6  causing that wholesale distributor to stop doing
7  business with that downstream customer?
8     MR. DAVISON:  Objection to form.
9   A  It could.
10  BY MR. LOESER:
11   Q  Did you see that happening on occasion?
12   A  I did.
13   Q  And are you familiar with the reports that
14  could get generated from the chargeback system?
15   A  Somewhat.
16   Q  And did you, on occasion, request
17  chargeback reports?
18   A  Occasionally.
19   Q  And is another term for those an indirect
20  match report?
21   A  I'm not familiar with that.
22     (Whereupon, Exhibit Mallinckrodt-Becker-
23  013 was marked for identification by the
24  reporter.)
25     THE REPORTER:  Number 13.

Page 159

1  BY MR. LOESER:
2   Q  You've been handed what's marked
3  Exhibit 13, which is Bates MNK-T1_0000289849.  And
4  while you're reading that, this is an e-mail from
5  Jim Rausch to Karen Harper, dated July 13, 2010,
6  and it includes a string of e-mails, including one
7  from yourself to Karen Harper; do you see that?
8   A  Mm-hmm (affirmative).
9   Q  And if you flip to the last page -- the
10  second to the last page, there's an e-mail from
11  Kate Muhlenkamp to you, dated July 9, 2010.  Do
12  you see that, with the Subject, "Cedardale
13  Distribution - order"?
14   A  Yes.
15   Q  And this e-mail states, "Steve, Per Jim's
16  question below, could you please investigate the
17  increase in usage at Cedardale and let us know
18  what you find out?"
19   A  Mm-hmm (affirmative).
20   Q  Is this an example of an order being
21  flagged by the compliance department for you to
22  follow up on?
23   A  Yes, it was flagged by Kate Muhlenkamp.
24  That -- it's her product line.
25   Q  Okay.  And what's her responsibility for

Page 160

1  identifying suspicious orders?
2   A  I'm not certain --
3     MR. DAVISON:  Objection to form.
4   A  -- specifically, what her responsibilities
5  are.
6  BY MR. LOESER:
7   Q  Okay.  Why is she the one sending this
8  e-mail?
9     MR. DAVISON:  Objection to form.
10   A  Because she's the product manager for this
11  particular product.
12  BY MR. LOESER:
13   Q  Okay.  And Cedardale, that was one of your
14  wholesale distributor customers?
15   A  At the time, yes.
16   Q  Okay.  So she asks you to investigate, and
17  if you go to the next page, there's an e-mail from
18  you, dated July 12, 2010.  And you write, "This is
19  a fairly new account which started ordering CII
20  products in October of 2009."  CII is schedule 2
21  controlled substances?
22   A  Mm-hmm (affirmative).
23   Q  That would include, for example,
24  oxycodone?
25   A  Yes.

Page 161

1   Q  And this continuous, "Their account base
2  is continuing to grow as"--there's a typo, I
3  think--"as the are expanding their business."
4   A  Mm-hmm (affirmative).
5   Q  "I will speak to Kate directly on running
6  a charge back report to identify the end users";
7  do you see that?
8   A  Mm-hmm (affirmative).
9   Q  And then, if you go up above, the next
10  e-mail is from Karen Harper to Jim Rausch, cc'd to
11  you, states, "Jim, I agree that we should review
12  the chargeback data."  "Steve, Have you requested
13  the info from Kate?"
14     Do you see that?
15   A  Mm-hmm (affirmative).
16   Q  And then the string continues, there's an
17  e-mail July 12, 2010, from you to Karen Harper,
18  and you say, "Yes."  And then you go to the top,
19  and that's Karen Harper to Jim Rausch, and that
20  e-mail on July 13, 2010, starts, "Steve requested
21  the chargeback report from Kate."
22     Do you see that?
23   A  Mm-hmm (affirmative).
24   Q  So this is an example of you investigating
25  a potentially suspicious downstream order by

Page 162

1 asking for a chargeback report to be prepared; is
2 that correct?
3      MR. DAVISON: Objection to form.
4   A Not investigating a downstream order. I'm
5 investigate -- I was asked to investigate why this
6 account had -- order was as high as it is.
7 BY MR. LOESER:
8   Q So yes, the question came in, why is
9 Cedardale increasing the amount that they're
10 ordering, and you investigated that by asking for
11 a chargeback report?
12   A Correct.
13   Q And the chargeback report would show you
14 not just the Cedardale order from Mallinckrodt,
15 but the downstream customer to which Cedardale was
16 selling those bottles of pills, right?
17      MR. DAVISON: Objection to form.
18   A Rephrase the -- could you restate the
19 question, please?
20 BY MR. LOESER:
21   Q When you asked for the chargeback report,
22 what you would get is a record of the transaction
23 where Cedardale was making a sale to a downstream
24 customer and ordering pills from Mallinckrodt to
25 fulfill that sale, right?

Page 163

1   A Correct.
2      MR. DAVISON: Objection to form.
3      (Whereupon, Exhibit Mallinckrodt-Becker-
4 014 was marked for identification by the
5 reporter.)
6      THE REPORTER: Number 14.
7 BY MR. LOESER:
8   Q You've been handed what's marked
9 Exhibit 14, MNK-T1_0004254158. This is an e-mail
10 from Sandi Ivancho to you, dated June 1st, 2011,
11 and it attaches a string of e-mails; is that
12 accurate?
13   A Mm-hmm (affirmative).
14   Q And if you go to the last page of the
15 exhibit, there's an e-mail from Mike Cappock of
16 Quest Pharmaceuticals --
17   A Mm-hmm (affirmative).
18   Q -- to you, dated May 31st, 2001; do you
19 see that?
20   A Yes.
21   Q And in his e-mail, he writes, "Steve, We
22 would like to take you up on your offer to check
23 Mallinckrodt CT1 purchases for one of our
24 customers. The customer is Griffin
25 Pharmacy/Montclair"; do you see that?

Page 164

1   A Yes.
2   Q Do you recall offering this to Mike
3 Cappock?
4   A Not specifically, no.
5   Q And then do you see your response on the
6 chain, from you to Mike Cappock, May 31st, 2011?
7 "Will do and I hope to have an update by
8 Thursday"?
9   A Yes.
10   Q Okay. And then, if you flip to the first
11 page, there's an e-mail from you to Sandi Ivancho.
12 Who is Sandi Ivancho?
13   A She was sales analysis person at
14 Mallinckrodt.
15   Q Okay. And then you see your e-mail. You
16 write, "Dear Sandi, Please run charge back report
17 on the account below, to check Mallinckrodt" -- it
18 looks like "C-II purchases for a customer with
19 Quest Pharmaceutical."
20   A Mm-hmm (affirmative).
21   Q So here -- and Quest Pharmaceuticals is
22 one of your wholesale distributor clients?
23   A Yeah. They're part of a distributor
24 buying group named Premiere.
25   Q Okay. And so you apparently had offered

Page 165

1 Mr. Cappock, at Quest Pharmaceuticals, to check up
2 on what looks like a downstream sale, by him, to
3 one of his customers; is that right?
4   A Yes.
5   Q And in order to do that, you asked for a
6 chargeback report, right?
7   A Correct.
8   Q And then, in the top of the chain,
9 Ms. Ivancho sent you the chargeback report, right?
10   A Correct.
11   Q So again, this chargeback report here
12 contained information showing not just the
13 wholesale distributor transaction, the fact that
14 Quest Pharmaceuticals was buying schedule II
15 controlled substances from Mallinckrodt, but also
16 the transaction downstream where Quest
17 Pharmaceuticals was selling the product to one of
18 its customers, the indirect customer?
19   A That's what the data --
20      MR. DAVISON: Objection to form.
21   A The data showed -- requested was the
22 chargeback report for the pharmacy in question.
23 BY MR. LOESER:
24   Q So this isn't a report that was just --
25 you know, we've looked at other reports that other

Page 166

1 people generated. This is one where you, in
2 fact -- you knew how to ask to have a chargeback
3 report run in order to examine downstream customer
4 sales?
5     MR. DAVISON: Objection to form.
6     A Correct.
7 BY MR. LOESER:
8     Q And on occasion, you did ask?
9     A Yes.
10     Q I'm handing you what's been marked Borelli
11 Exhibit 11.
12     A Okay.
13     Q And this exhibit, at the top, has a Bates
14 stamp, which is MNK-T1_0000264292, and for the
15 record, this is a report that we ran from a Native
16 File produced by Mallinckrodt, which appears to be
17 chargeback data for Mallinckrodt wholesale
18 distributor customer Harvard Drug. Now, you
19 understand that from the chargeback system, you
20 could ask for particular reports to be run?
21     A By DEA number.
22     Q Right. And you could sort on any number
23 of different fields that's included within the
24 system, including the identity of the wholesale
25 distributor?

Page 167

1     MR. DAVISON: Objection to form.
2     A Right.
3 BY MR. LOESER:
4     Q So you could ask the folks responsible for
5 generating these reports, and who was that? Who
6 at Mallinckrodt actually ran the chargeback
7 reports?
8     A Sandi may have, but I put my requests,
9 usually, through a product manager or through
10 Karen Harper.
11     Q So Kate Muhlenkamp, product manager?
12     A Could have been, or I put the request in
13 through -- directly to Sandi.
14     Q And so you could ask, as we saw in the
15 last e-mail, please sort on this particular
16 downstream, this wholesale distributor on this
17 transaction to a particular customer, you could
18 sort that way and identify that information?
19     MR. DAVISON: Objection to form.
20     A By DEA number.
21 BY MR. LOESER:
22     Q Right. DEA number of the downstream
23 customer?
24     A Correct.
25     Q And you could also ask to have data

Page 168

1 presented to you for all of the transactions
2 involving Harvard Drug, for example?
3     MR. DAVISON: Objection to form.
4     A I guess I could -- could have, but I...
5 BY MR. LOESER:
6     Q Okay. I want to walk through this -- this
7 report, and just to be clear, this is a document
8 that we created from the Native File produced by
9 Mallinckrodt. And in what we created, we captured
10 all of the fields that were included in the
11 Mallinckrodt chargeback data, and I want to walk
12 through these fields with you and have you tell me
13 what they are, if you know.
14     A Okay.
15     Q So if you look at the first page of the
16 exhibit, there's a field that says, "Sold Via
17 Child" number, and there's a number.
18     A Mm-hmm (affirmative).
19     Q Is it your understanding that that number
20 is associated with the entity in the next column,
21 "Sold Via Child Customer Name"?
22     MR. DAVISON: Objection to form.
23 BY MR. LOESER:
24     Q Had you seen that terminology where --
25     A Child --

Page 169

1     Q -- a wholesale distributor is referred to
2 as the child?
3     MR. DAVISON: Objection.
4     A Harvard Drug, on this report, would be
5 considered a parent. The account purchasing the
6 product would be considered a child. That would
7 be the indirect customer.
8 BY MR. LOESER:
9     Q Okay. Well, it looks here, where it says,
10 "Sold Via Child Customer Name," the name listed is
11 "Harvard Drug," and then -- do you see that?
12     A Mm-hmm (affirmative).
13     Q And then, if you look farther down the
14 list, it says, "Ship To Customer Name," and it has
15 names there. So the customer name appears to be
16 the downstream customer. The first name, Harvard
17 Drug, appears to be the wholesale distributor; is
18 that right?
19     MR. DAVISON: Objection to form.
20     A That's right.
21 BY MR. LOESER:
22     Q Okay. So then you have "Sold Via Child
23 Address," and you see there's an address. That's
24 the address for the wholesale distributor --
25     A Correct.

Page 170

1  Q -- do you see that? And then address
2  continues, Lavonia, Michigan. That's where
3  Harvard Drug was located, right?
4  A I believe so, yes.
5  Q Then there's a postal code, and then
6  there's a customer number. Now, that's the number
7  associated with the downstream customer; is that
8  right?
9  MR. DAVISON: Objection to form.
10  BY MR. LOESER:
11  Q In this case, Barry Schultz?
12  MR. DAVISON: Same objection.
13  A "Ship To Customer," that, most likely, is
14  the Harvard Drug customer number for that account.
15  BY MR. LOESER:
16  Q For that account, okay, so for
17  Mr. Schultz's -- Dr. Schultz's account. And then
18  you have a "Ship To Customer Address." That's the
19  address of the downstream customer.
20  And if you continue to the next page, that
21  continues, and it shows an address, a suite, and a
22  city in Deerfield Beach, Florida. And again,
23  that's all the address for what, on here, is
24  referred to as the customer, but is the downstream
25  customer of Harvard Drug; is that correct?

Page 171

1  MR. DAVISON: Objection to form.
2  A It appears that way.
3  BY MR. LOESER:
4  Q Okay. And then it continuous down, you
5  see "Ship To Customer State," it says Florida.
6  "Ship To Customer Postal Code," and then the --
7  there's a DEA number, and that DEA number is
8  associated with the downstream customer; is that
9  right?
10  A That's correct.
11  MR. DAVISON: Objection to form.
12  BY MR. LOESER:
13  Q Okay. Then there's a "Product Number," a
14  "SKU," and does every Mallinckrodt product have a
15  unique SKU number?
16  A Yes.
17  Q Okay. So that's the number for oxycodone
18  HCL 15 milligram?
19  A Evidently, yes.
20  Q And then you have a "Product Description,"
21  and that's the description of the drug, right?
22  A Mm-hmm (affirmative).
23  Q And then there's an order number. I take
24  it that's the specific downstream order number
25  from Harvard to Dr. Schultz?

Page 172

1  MR. DAVISON: Objection to form.
2  A I haven't seen this report before, so I
3  would have to agree.
4  BY MR. LOESER:
5  Q And then there's an "Invoice Date"?
6  A Mm-hmm (affirmative).
7  Q "Gross Sales"?
8  A Mm-hmm (affirmative).
9  Q "Charge backs" and "Net Sales"; do you see
10  that?
11  A Mm-hmm (affirmative).
12  Q So all of that information about, first,
13  the wholesale distributor, name, address, state,
14  then about the downstream customer, DEA number,
15  name, address, state, drug type, order number,
16  invoice date, gross sales, chargeback, all of that
17  is collected in the chargeback system --
18  MR. DAVISON: Objection to form.
19  BY MR. LOESER:
20  Q -- for each transaction?
21  A It appears to be.
22  Q Okay. And that kind of information is
23  consistent with the information you saw in the
24  chargeback reports that you yourself requested,
25  right?

Page 173

1  MR. DAVISON: Objection to form.
2  A I believe so.
3  BY MR. LOESER:
4  Q And those reports also indicated the
5  quantity of the drug that was purchased. It
6  wasn't just the type, but it also indicated the
7  quantity the downstream customer was purchasing?
8  MR. DAVISON: Objection to form.
9  A That's correct.
10  BY MR. LOESER:
11  Q Okay. And so for this document, we sorted
12  on Dr. Schultz, but this is not -- as we saw from
13  your own request for a chargeback report, you
14  could sort on any downstream customer and come up
15  with data on the sale, by the wholesale
16  distributor, to that downstream customer; is that
17  right?
18  MR. DAVISON: Objection to form.
19  A Correct.
20  BY MR. LOESER:
21  Q And that's for dispensing physicians,
22  right, when they're a downstream customer?
23  MR. DAVISON: Objection to form.
24  A If they were sold to -- by a wholesaler to
25  a dispensing doctor.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 BY MR. LOESER:
2    Q  Okay.  And that would be true for pain
3 clinics as well?
4       MR. DAVISON:  Objection to form.
5    A  If they're ordering the product through
6 the distributor and they have a DEA license and a
7 pharmacy license, I would presume so.
8 BY MR. LOESER:
9    Q  And that's the same for pharmacies as
10 well, right?
11    A  Correct.
12       MR. DAVISON:  Objection to form.
13 BY MR. LOESER:
14    Q  So there's nothing terribly unique about
15 Dr. Schultz's example?  He's just one example of
16 the types of downstream customers that -- for
17 which Mallinckrodt collected data about downstream
18 sales?
19       MR. DAVISON:  Objection to form.
20    A  We did everything by chargeback, so this
21 is not an unusual request or report.
22 BY MR. LOESER:
23    Q  And there were no sales that would not be
24 recorded in the chargeback system by wholesale
25 distributors; is that right?

Page 175

1       MR. DAVISON:  Objection to form.
2    A  There could be.
3 BY MR. LOESER:
4    Q  When would there be sales not included
5 within the data collected in the chargeback
6 system?
7    A  If the charge -- if the wholesaler elects
8 not to put it into the chargeback system.
9    Q  And when would they do that?
10    A  Very seldom, usually by mistake or -- I
11 don't know.
12    Q  So it was very rare that any sale would
13 not be included in the chargeback system?
14       MR. DAVISON:  Objection to form.
15    A  I think that's a fair statement.
16 BY MR. LOESER:
17    Q  And when it did happen, it was generally a
18 mistake?
19       MR. DAVISON:  Objection to form.
20    A  Generally a mistake or an oversight.
21 BY MR. LOESER:
22    Q  And then would that, once found, be
23 corrected and information about that sale would
24 be --
25       MR. DAVISON:  Objection to form.

Page 176

1    A  I would correct it, if I was notified on
2 it.
3 BY MR. LOESER:
4    Q  And would you agree with me that based
5 upon the information in the chargeback system,
6 Mallinckrodt had detailed information about the
7 downstream customer sales?
8       MR. DAVISON:  Objection to form.
9    A  Our product monitoring people had that
10 information.
11 BY MR. LOESER:
12    Q  Okay.  And that was just as true for
13 pharmacies, as it was for dispensing physicians,
14 as it was for pain clinics?
15       MR. DAVISON:  Objection to form.
16    A  I'm not that familiar on dispensing
17 physicians, because we did not -- we didn't sell
18 to physicians on a direct basis.  So any purchases
19 that the physicians have that may show up on a
20 chargeback report, their sales were made through
21 the wholesale network and, hopefully, there would
22 be a chargeback attached to that.
23 BY MR. LOESER:
24    Q  Right.  Just as we saw with Dr. Schultz?
25    A  Correct, yes.

Page 177

1    Q  He's a dispensing physician, and the
2 transactions of his purchases from Harvard --
3    A  Yes.
4    Q  -- Group are contained in the chargeback
5 system?
6    A  Yes.
7    Q  And the same is true for pharmacies?
8    A  Yes.
9    Q  And so Mallinckrodt has detailed
10 information about downstream customer sales to
11 pharmacies --
12       MR. DAVISON:  Objection --
13 BY MR. LOESER:
14    Q  -- via the chargeback system?
15       MR. DAVISON:  Objection to form.
16 BY MR. LOESER:
17    Q  And it would not be accurate to say that
18 Mallinckrodt lacked information about sales to
19 downstream customers?
20       MR. DAVISON:  Objection.
21 BY MR. LOESER:
22    Q  Correct?
23       MR. DAVISON:  Objection to form.
24 BY MR. LOESER:
25    Q  By its wholesale distributors?

Highly Confidential - Subject to Further Confidentiality Review

---

Page 178

1    MR. DAVISON:  Objection to form.
2    A  Repeat the question, because I think --
3  BY MR. LOESER:
4    Q  It would not be accurate to say that
5  Mallinckrodt lacked detailed information --
6    A  They did not lack detailed information.
7    Q  -- about sales to downstream customers,
8  including pharmacies?
9    MR. DAVISON:  Objection.
10    A  To the best of my knowledge, I'm not in
11  charge of that.  You'd have to ask Karen Harper
12  that question.
13  BY MR. LOESER:
14    Q  But that's your understanding?  That would
15  not be an accurate statement?
16    MR. DAVISON:  Objection.
17    A  Mm-hmm (affirmative).
18  BY MR. LOESER:
19    Q  That's a yes?
20    A  Yes.
21    Q  So based upon this chargeback system, do
22  you agree that Mallinckrodt could determine
23  whether a distributor client ordered a limited
24  variety of controlled substances while ordering
25  few of any other types of drugs?

---

Page 179

1    Does that make sense?
2    MR. DAVISON:  Objection to form.
3  BY MR. LOESER:
4    Q  From the chargeback system, could
5  Mallinckrodt tell what portion of a wholesale
6  distributor's purchases were schedule II narcotics
7  versus noncontrolled substances?
8    MR. DAVISON:  Objection to form.
9    A  This is you, talking about an end user
10  here, not a wholesaler?
11  BY MR. LOESER:
12    Q  Yeah, generally speaking.  So if you
13  wanted a chargeback report, and you wanted to see
14  what portion of your customers' purchases were for
15  oxycodone, for example, that's something you could
16  determine through the chargeback system?
17    A  You'd have to ask Karen Harper that.
18    MR. DAVISON:  Objection to form.
19  BY MR. LOESER:
20    Q  But that's your understanding?
21    A  Yes.
22    Q  So you could tell the ratio of controlled
23  substances purchased versus noncontrolled
24  substances by any one of your wholesale
25  distributor clients?

---

Page 180

1    MR. DAVISON:  Objection to form.
2    A  I believe so.
3  BY MR. LOESER:
4    Q  And through the chargeback system, you
5  could also tell if a downstream customer was
6  purchasing from multiple different Mallinckrodt
7  wholesale distributor customers?
8    A  Yes.
9    Q  And, of course, you could tell whether a
10  downstream customer -- you could tell the volume
11  of purchases by any particular downstream
12  customer, from your wholesale distributor?
13    MR. DAVISON:  Objection to form.
14    A  Yes.
15  BY MR. LOESER:
16    Q  Do you know when Mallinckrodt started
17  collecting chargeback data?
18    A  No, I don't.
19    Q  Do you recall when Mallinckrodt first
20  started using chargeback data to evaluate
21  downstream customer sales?
22    A  I don't know, specifically, any time
23  lines.
24    Q  Do you know when you first started doing
25  that?

---

Page 181

1    A  A chargeback -- using chargeback data?
2    Q  Right.
3    A  Or knowing that it was collected.
4    Q  Yeah.
5    A  I didn't totally use the information
6  myself, but the companies -- it was part of the
7  overall system of how people would purchase and
8  sell products.  It was based on a chargeback
9  report.  It was basically an industry standard.
10    Q  So the whole time that you worked for
11  Mallinckrodt, this data was collected by
12  Mallinckrodt?
13    MR. DAVISON:  Objection to form.
14    A  You would have to ask the chargeback
15  people that.  I don't know when they started, you
16  know -- started on the collection.  I don't know.
17  I know it's a standard of the industry.
18  BY MR. LOESER:
19    Q  Do you generally recall when you first
20  heard the expression "chargeback data"?
21    A  Back when I was at Schein Pharmaceutical.
22    Q  So it's something you knew about through
23  the whole time period --
24    A  Yes.
25    Q  -- you worked for Mallinckrodt?  Okay.

---

Highly Confidential – Subject to Further Confidentiality Review

Page 182

1     Have you ever been interviewed by the DEA
2 in connection with Mallinckrodt --
3    A No.
4    Q You've got to let me finish the question.
5    A Oh. I thought you were done.
6    Q I guess I am.
7    A I'm sorry.
8    Q So let's go back to this -- this report
9 that we were looking at a minute ago, Borelli
10 Exhibit 11, and if you look at this sort, we
11 sorted on Harvard Drug and Dr. Barry Schultz. Do
12 you know who Dr. Barry Schultz is?
13    A No.
14    Q Did you see 60 Minutes a few months ago in
15 which he was interviewed from his jail cell?
16    MR. DAVISON: Objection to form.
17    A I saw 60 Minutes. I don't recall his
18 name.
19 BY MR. LOESER:
20    Q Okay. Dr. Schultz is currently serving a
21 157-year sentence for illegal prescribing and
22 manslaughter. Do you recall seeing that on a 60
23 Minutes episode?
24    MR. DAVISON: Objection to form.
25    A I recall the program. I don't recall the

Page 183

1 specifics.
2 BY MR. LOESER:
3    Q So if you look at this chargeback report
4 that we generated, what it shows is that on a
5 number of instances, Dr. Schultz purchased, if you
6 look at the next page, oxy 15 and oxy 30 from
7 Harvard Drug; do you see that?
8    A Mm-hmm (affirmative).
9    Q And like you said before, you could also
10 tell from the system any other distributor from
11 which Dr. Schultz purchased?
12    A Correct.
13    MR. DAVISON: Objection to form.
14 BY MR. LOESER:
15    Q Right. And are you aware of whether he
16 purchased from other distributors as well?
17    A Not according to this report. It appears
18 that maybe the request on this particular report
19 was only for Harvard Drug.
20    Q That's correct. So there are other --
21 there are other reports for other distributors,
22 and, in fact, he did purchase from other
23 distributors as well.
24    MR. DAVISON: Objection to form.
25 BY MR. LOESER:

Page 184

1    Q Now, if Dr. Schultz used a different DEA
2 registration number when he purchased from
3 different wholesale distributors, would that be a
4 red flag in your mind for a suspicious order?
5    MR. DAVISON: Objection to form.
6    A You'd have to ask our suspicious
7 monitoring people. I'm not aware of people using
8 more than one DEA number.
9 BY MR. LOESER:
10    Q And based upon what you know and
11 understand, would that seem to be suspicious for a
12 medical doctor to use different DEA registration
13 numbers when ordering from different wholesale
14 distributors?
15    MR. DAVISON: Objection to form.
16    A I wouldn't know. I wouldn't know that.
17 BY MR. LOESER:
18    Q Okay. And whether you know it's a red
19 flag or not, you do agree that DEA registration
20 numbers are recorded in the chargeback system for
21 downstream customers?
22    A Correct.
23    Q So Mallinckrodt could look and see if
24 Dr. Schultz, in fact, used different DEA
25 registration numbers when purchasing from

Page 185

1 different wholesale distributors?
2    MR. DAVISON: Objection to form.
3    A That would be up to the monitoring people.
4    MR. DAVISON: Objection to form.
5 BY MR. LOESER:
6    Q But they could look and see that, right?
7    A That would be their job.
8    Q That would be their job to identify red
9 flags like that, right?
10    A Under analysis, I would imagine so, yes.
11    Q Now, if you look at the third column on
12 the first page, you see, for this Harvard Drug
13 report for Dr. Schultz, that each one of these
14 transactions indicated Dr. Schultz purchased the
15 oxycodone 15 and 30 from Harvard Drug doing
16 business as First Veterinary Supply; do you see
17 that?
18    A Mm-hmm (affirmative).
19    MR. DAVISON: Objection to form.
20 BY MR. LOESER:
21    Q Now, you'd agree that it would be
22 suspicious for a medical doctor to purchase
23 oxycodone 15 and 30 from a company doing business
24 as First Veterinary Supply?
25    MR. DAVISON: Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1  A  Could you repeat that, please?

2  MR. LOESER:  Can we read that back,

3  please.

4  (The record was read by the reporter as

5  follows:

6  Question:  "Now, you'd agree that it would

7  be suspicious for a medical doctor to purchase

8  oxycodone 15 and 30 from a company doing business

9  as First Veterinary Supply?")

10  MR. DAVISON:  Objection.

11  A  I'm not -- not certain on that.  I'm not

12  familiar with First Veterinary Supply, so I don't

13  know if I can answer that question.

14  BY MR. LOESER:

15  Q  Can you think of any reason why a medical

16  doctor would legitimately buy controlled

17  substances from a veterinary supply company?

18  MR. DAVISON:  Objection to form.

19  A  No, I can't.

20  BY MR. LOESER:

21  Q  Would you agree with me that the fact that

22  this transaction was via First Veterinary Supply

23  is a red flag for diversion?

24  MR. DAVISON:  Objection to form.

25  A  I'm not an expert at it.  You'd have to

Page 187

1  ask Karen Harper that.

2  BY MR. LOESER:

3  Q  I know you're not expert, sir, but Harvard

4  Drug was your wholesale distributor customer,

5  right?

6  A  Part of the time.

7  Q  Okay.  And you sold controlled substances

8  for Mallinckrodt for a number of years, correct?

9  A  Correct.

10  Q  And would you knowingly allow a medical

11  doctor to purchase controlled substances from a

12  veterinary supply company?

13  A  I would not.

14  MR. DAVISON:  Objection to form.

15  BY MR. LOESER:

16  Q  And why would you not do that?

17  A  Because I don't -- I believe it's not

18  right.

19  Q  Because it appears to be diversion,

20  correct?

21  MR. DAVISON:  Objection to form.

22  A  Correct.

23  BY MR. LOESER:

24  Q  Now, this must be unusual, right, for a

25  medical doctor to purchase Mallinckrodt controlled

Page 188

1  substances from a veterinary supply company?

2  MR. DAVISON:  Objection to form.

3  A  Mm-hmm (affirmative).

4  BY MR. LOESER:

5  Q  Right?

6  A  Yes.

7  Q  You would think that that would be a rare

8  occurrence?

9  MR. DAVISON:  Objection to form.

10  A  I would think so.

11  (Whereupon, Exhibit Mallinckrodt-Becker-

12  015 was marked for identification by the

13  reporter.)

14  THE REPORTER:  Number 15.

15  BY MR. LOESER:

16  Q  While you're looking that over, this is

17  another report that we prepared from the Native

18  File produced by Mallinckrodt, which appears to be

19  chargeback data for sales to Harvard Drug.  The

20  Native File Bates number is MNK-T1_0000264292.

21  Now, as we discussed, Mr. Becker, it's

22  possible to sort the information included in the

23  chargeback system, based upon wholesale

24  distributor customers, right?

25  A  I would assume that's correct.

Page 189

1  Q  So the chargeback system would allow a

2  sort on all transactions involving oxycodone 15

3  and 30, right?  You could sort on that?

4  MR. DAVISON:  Objection to form.

5  A  I believe so.

6  BY MR. LOESER:

7  Q  And you could sort on Harvard Drug Group,

8  right?

9  MR. DAVISON:  Objection to form.

10  A  On the Harvard Drug Group?

11  BY MR. LOESER:

12  Q  Yes.

13  A  If we had the request and the data to make

14  the -- run the report.

15  Q  So that's what we did, and these are the

16  results of the sort, and if you look through, what

17  this shows is that the Harvard Drug Group had a

18  total of 12,487 transactions doing business as

19  First Veterinary Supply.

20  A  Mm-hmm (affirmative).

21  Q  So it wasn't an unusual occurrence at all;

22  does that surprise you?

23  MR. DAVISON:  Objection to form.

24  A  You'd have to ask Harvard Drug that.  They

25  had their product monitoring people in place as

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1  well, and they were the ones that should have
2  looked at that data.
3  BY MR. LOESER:
4    Q  Correct.  But does that surprise you, that
5  there are 12,487 individual transactions in which
6  Harvard Drug sold oxy 15 and 30 as First
7  Veterinary Supply?
8      MR. DAVISON:  Objection to form.
9    A  Again, you'd have to ask Harvard Drug.  I
10 don't look at their numbers and what they sell.
11 BY MR. LOESER:
12   Q  We're looking at this now.  Is this
13 surprising to you?
14     MR. DAVISON:  Objection to form.
15   A  For a veterinary clinic, yes.
16 BY MR. LOESER:
17   Q  It's very surprising that there are 12,487
18 transactions in which First Veterinary Supply sold
19 oxy 15 and 30, manufactured by Mallinckrodt,
20 correct?
21     MR. DAVISON:  Objection to form.
22   A  Correct.
23 BY MR. LOESER:
24   Q  And if you look further, if you sort on
25 where all of this oxy 15 and 30 went, at the

Page 191

1  bottom line, it shows that 92.4 percent of the
2  12,487 transactions in which First Veterinary
3  Supply sold oxy 15 and 30 to Mallinckrodt
4  downstream customers were shipped to Florida.
5      MR. DAVISON:  Objection.
6  BY MR. LOESER:
7    Q  What does that suggest to you?
8      MR. DAVISON:  Objection to form.
9    A  It suggests it was sold in Florida.
10 BY MR. LOESER:
11   Q  Right.  And if you look at the date when
12 these transactions occurred in the second column,
13 they occurred between September 30th, 2008, and
14 April 1st, 2010; is that right?
15   A  That's correct.
16   Q  And that's the same time period that we
17 discussed where you indicated that you knew that
18 Florida had become the pill mill capital of the
19 United States?
20     MR. DAVISON:  Objection to form.
21   A  Correct.
22 BY MR. LOESER:
23   Q  So during the time that Florida was the
24 pill mill capital of the United States, your
25 wholesale distributor customer, Harvard Drug,

Page 192

1  doing business as First Veterinary Supply, sold,
2  on 12,487 occasions, oxy 15 and 30, and shipped
3  92.4 percent of it to downstream customers in
4  Florida.
5    A  According to this, yes.
6      MR. DAVISON:  Objection to form.
7  BY MR. LOESER:
8    Q  And would you agree with me that that's
9  alarming?
10     MR. DAVISON:  Objection to form.
11   A  For First Veterinary, that would be
12 alarming -- the name of doing business as a
13 veterinary account, that's alarming.
14 BY MR. LOESER:
15   Q  And during the time that Harvard Drug
16 Group was your client, was your customer, you were
17 unaware that all of the transactions for oxy 15
18 and 30 were via First Veterinary Supply?
19   A  I wasn't aware of it.
20     MR. DAVISON:  Objection to form.
21 BY MR. LOESER:
22   Q  And yet, this is information that's in the
23 chargeback system, right?
24     MR. DAVISON:  Objection to form.
25   A  Yes.

Page 193

1  BY MR. LOESER:
2    Q  And we saw that from the report before
3  that we ran from the chargeback system, which
4  showed First Veterinary Supply as on the Child
5  Address line, right?
6    A  Yes.
7      MR. DAVISON:  Objection to form.
8  BY MR. LOESER:
9    Q  So if you had asked to see Harvard Drug
10 Group's sales during the time that they were your
11 customer, and you had asked for the chargeback
12 information, what you would have gotten back was
13 something that indicated that all of the
14 transactions, every occasion in which your
15 customer bought from you, oxy 15 and 30, on all of
16 those occasions, they sold those drugs via First
17 Veterinary Supply?
18     MR. DAVISON:  Objection to form.
19   A  Repeat the question.
20 BY MR. LOESER:
21   Q  So if you had asked to see Harvard Drug
22 Group's sales during the time that they were your
23 customer, what you would have gotten back was
24 something that indicated that all of the
25 transactions, every occasion in which your

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1 customer bought from you oxy 15 and 30, on all of
2 those occasions, they sold those drugs via First
3 Veterinary Supply?
4     MR. DAVISON:  Objection to form.
5     A I'm not certain of that, based on this
6 report.
7 BY MR. LOESER:
8     Q Okay.  But you could have become certain
9 of that by asking for chargeback data and looking
10 to see whether First Veterinary Supply --
11     A I could have.
12     MR. DAVISON:  Objection to form.
13     A I'm not certain if Harvard Drug was my
14 account when these sales were going on.  I'd have
15 to look at a document to see.
16 BY MR. LOESER:
17     Q Okay.
18     A I inherited the account from Vic Borelli.
19     Q And do you know, generally, when you
20 inherited that account?
21     A I can't recall.
22     Q Was it during 2008, '9 or '10?
23     A I can't recall.
24     Q And there would be information in
25 Mallinckrodt's files that would show exactly when

Page 195

1 you inherited that account, right?
2     A Yes, so you'd have to ask Mallinckrodt.
3 I'm sorry, but I can't recall.
4     Q So if we looked at that data and we saw
5 that Harvard Drug Group was, in fact, your
6 customer during that time, then any transaction in
7 which Harvard Drug purchased oxy 15 and 30 from
8 you, every one of those sales was via First
9 Veterinary Supply.  That's the information that
10 would be contained in the chargeback report?
11     MR. DAVISON:  Objection to form.
12     A I guess, yes.
13 BY MR. LOESER:
14     Q If you go back to this summary sheet we
15 have here, the sales by -- in which Harvard Drug
16 sold oxy 15 and 30 through First Veterinary Supply
17 are broken down by quarter; do you see that?
18     A Mm-hmm (affirmative).
19     Q So in 2009, the second quarter, if you go
20 in one, two, three, four columns, you'll see that
21 there were 426 purchase orders.  So in the second
22 quarter 2009, on 426 occasions, Harvard Drug sold
23 oxy 15 and 30 via First Veterinary Supply.
24     And then, if you see that column as well,
25 81.7 percent of those transactions were shipped to

Page 196

1 downstream customers in Florida?
2     A Mm-hmm (affirmative).
3     Q Now, if you wanted to see if any of those
4 customers were veterinarians, that's something
5 that you could see in the chargeback system,
6 right?
7     MR. DAVISON:  Objection to form.
8     A If it was requested, I believe so.
9 BY MR. LOESER:
10     Q And so if you wanted to see how many of
11 those shipments were to pain clinics, dispensing
12 physicians, and pharmacies, you could see that,
13 too, in the chargeback system?
14     MR. DAVISON:  Objection to form.
15     A If they are differentiated by DEA number,
16 which I'm not certain if they were.  You'd have to
17 ask the DEA that.
18 BY MR. LOESER:
19     Q So when you go from the second quarter
20 2009 to the third quarter 2009, you'll see that
21 the total purchase orders by Harvard Drug via
22 First Veterinary Supply went to 1,119.
23     A Mm-hmm (affirmative).
24     Q Can you explain that substantial increase
25 in the number of sales to Harvard Drug?

Page 197

1     MR. DAVISON:  Objection to form.
2     A No, I can't.
3 BY MR. LOESER:
4     Q Is an increase like that something that
5 would be flagged as a suspicious increase?
6     MR. DAVISON:  Objection to form.
7     A You'd have to ask Karen Harper that.
8 BY MR. LOESER:
9     Q Well, what do you think?
10     MR. DAVISON:  Objection.
11     A I don't know if I had this data accessible
12 to me.
13 BY MR. LOESER:
14     Q Well, you have it now.
15     A Mm-hmm (affirmative).
16     Q Can you think of a good reason why --
17     A As I said earlier --
18     MR. DAVISON:  Objection.
19     A -- the reason that I would look at this
20 order differently is because it's a veterinary
21 clinic.
22 BY MR. LOESER:
23     Q Right.  That would make it particularly
24 suspicious to you?
25     A Correct.

Page 198

1    Q  And then, if you look at the next quarter,
2  2009 fourth quarter, the number of times Harvard
3  Drug sold via First Veterinary Supply, and again,
4  this is selling oxycodone 15 and 30, manufactured
5  by Mallinckrodt, it goes up to 2,988, so it more
6  than triples.  Would that appear particularly
7  suspicious to you as well?
8      MR. DAVISON:  Objection to form.
9    A  On the number-wise, yes.
10  BY MR. LOESER:
11    Q  And then, if you look next quarter, first
12  quarter 2010, it goes up to 3,591 total purchase
13  orders, so again, it's skyrocketing, right?
14      MR. DAVISON:  Objection to form.
15    A  Mm-hmm (affirmative).
16  BY MR. LOESER:
17    Q  And the time frame that these sales to
18  Harvard Drug are skyrocketing is the exact same
19  time frame discussed in the articles we saw
20  earlier in which Florida had become the pill mill
21  capital of the world, right?
22      MR. DAVISON:  Objection to form.
23    A  Correct.
24      MR. DAVISON:  Break for lunch?  It's
25  12:45.

Page 199

1      MR. LOESER:  Okay.
2      THE VIDEOGRAPHER:  We are going off the
3  record.  Time is 12:44 p.m.
4      (A luncheon recess was taken from
5  12:44 p.m. until 1:28 p.m.)
6      THE VIDEOGRAPHER:  We are back on the
7  record.  Time is 1:28 p.m.
8  BY MR. LOESER:
9    Q  Good afternoon, Mr. Becker.
10    A  Hello.
11    Q  If I could refer you back to the article
12  that was marked Borelli Exhibit 24, it's the
13  article with the title "Inside Broward County's
14  pill mills."  Looks like that (indicating).
15      MR. DAVISON:  Two black boxes
16  (indicating).
17    A  (Reviewing.)
18  BY MR. LOESER:
19    Q  And, sir, this is the article that we went
20  through that talks about how Broward County has
21  become the painkiller capital of the United
22  States, and the date on this article is April 5th,
23  2009; is that correct?
24    A  Correct.
25      MR. DAVISON:  Objection to form.

Page 200

1  BY MR. LOESER:
2    Q  And in this article, in addition to what
3  we went through and read before, there are a
4  number of dispensing physicians and a -- what's
5  described as a pill mill.  And I'll just turn to
6  the pages --
7    A  Okay.
8    Q  One of the doctors is Dr. Amy Seinfeld,
9  and she was an osteopathic physician in North
10  Miami Beach, according to a police report prepared
11  in connection with one of her patients who
12  overdosed on oxycodone pills.
13      And as we saw, the article talks at some
14  length about the exploding number of pill mills in
15  Florida, the fact that people were traveling
16  en masse from out of state, purchasing pills and
17  driving them up I75, distributing to Appalachia
18  and Ohio.
19      Another doctor that is identified in here
20  is Dr. Enrique Gonzalez-Pujol.  In addition to
21  some other information, it indicates that he was
22  placed on probation after he pleaded guilty to the
23  criminal charge of filing false medical records
24  for clinics involved in a several million-dollar
25  insurance fraud ring and a variety of other issues

Page 201

1  involving him and his prescribing practices.
2      And then later in the article, there's a
3  discussion of a pain clinic that you may have
4  heard of called South Florida Pain.  Have you ever
5  heard of that pain clinic?
6      MR. DAVISON:  Objection.
7      MS. RANJAN:  Objection to form.
8  BY MR. LOESER:
9    Q  And what it says about South Florida Pain
10  is, "Among police in Appalachia, one Fort
11  Lauderdale clinic has earned a notorious
12  reputation for selling pills that end up on the
13  black market:  South Florida Pain."
14      And so the doctors that I mentioned and
15  the pain clinic, they were identified in this
16  April 5th, 2009, article in connection with the
17  discussion of illegal prescribing and diversion.
18      MR. DAVISON:  Objection to form.
19      MS. RANJAN:  Form.
20  BY MR. LOESER:
21    Q  And you've seen that article and looked
22  through it.  So I have another exhibit I'd like to
23  show you.
24      (Whereupon, Exhibit Mallinckrodt-Becker-
25  016 was marked for identification by the

Page 202

1 reporter.)
2 THE REPORTER: 16.
3 BY MR. LOESER:
4 Q Before I hand you that exhibit, are you
5 aware of whether -- well, first of all, did you,
6 after this article came out, make any effort to
7 figure out if any of your wholesale distributor
8 clients were selling oxycodone or other schedule
9 II substances to Dr. Seinfeld or Dr. Pujol or to
10 American Pain?
11 MR. DAVISON: Objection to form.
12 A I wasn't aware of the article.
13 BY MR. LOESER:
14 Q And are you aware of any investigation
15 that was done around the time of this article that
16 examined whether any of Mallinckrodt's wholesale
17 distributor clients were selling to any of these
18 individuals or --
19 MR. DAVISON: Objection to form.
20 A You'd have to ask Karen Harper that, in
21 our product monitoring. She would have been
22 responsible for that.
23 BY MR. LOESER:
24 Q That's not something that anyone ever
25 talked to you about?

Page 203

1 MR. DAVISON: Objection to form.
2 A Not on this particular article, no.
3 BY MR. LOESER:
4 Q You don't recall anyone taking this
5 article, which was in the Miami Herald, and asking
6 you if you could please check to see, via the
7 chargeback reports, whether any of your wholesale
8 distributor clients had, as downstream customers,
9 any of the entities identified in this article?
10 MR. DAVISON: Objection to form.
11 A No. This is the first time I've seen this
12 article.
13 BY MR. LOESER:
14 Q So why don't we look at Exhibit 16.
15 A Okay.
16 Q And this, for the record, is from a Native
17 File produced by Mallinckrodt. The Bates number
18 is MNK-T1_0000264292. And again, that's the Bates
19 number that is on the cover sheet from the Native
20 File. And like we did with some of the other
21 reports that I've given to you, we went ahead and
22 looked in Mallinckrodt's chargeback data for sales
23 to any of those three entities and individuals
24 that are discussed in that article.
25 And so if you take a look at that exhibit,

Page 204

1 starting at the first page, the first is a list of
2 43 times that your wholesale distributor client,
3 the Harvard Drug Group via First Veterinary
4 Supply, sold oxycodone to Dr. Gonzalez-Pujol; do
5 you see that?
6 MR. DAVISON: Objection to form.
7 A Mm-hmm (affirmative).
8 BY MR. LOESER:
9 Q And you see that the date of transactions
10 on here indicate -- you can look down the list,
11 you can see that every single one of those
12 transactions was on or after the date of this
13 article.
14 MR. DAVISON: Objection to form.
15 A Okay.
16 BY MR. LOESER:
17 Q Do you see that?
18 A I see that. It's highlighted.
19 Q So if -- and so at the time, you certainly
20 could have asked for a chargeback report to be run
21 in which you identified sales to
22 Dr. Gonzalez-Pujol; correct?
23 MR. DAVISON: Objection to form.
24 A Repeat the question, please.
25 BY MR. LOESER:

Page 205

1 Q At the time, as of April 5th, 2009, you
2 could have asked your product manager, or whoever
3 else, to run a chargeback report in which you
4 sought to identify sales to Dr. Gonzalez-Pujol,
5 right?
6 MR. DAVISON: Objection to form.
7 A Correct.
8 BY MR. LOESER:
9 Q And you certainly did not tell your
10 wholesale distributor client, Harvard, not to sell
11 to Dr. Gonzalez after the date of this article; is
12 that correct?
13 A Not that I'm aware of.
14 MR. DAVISON: Objection to form.
15 BY MR. LOESER:
16 Q And is it fair to assume, since there were
17 43 sales to him after the date of that article,
18 that nobody else at Mallinckrodt told Harvard not
19 to sell to Dr. Gonzalez-Pujol?
20 MR. DAVISON: Objection to form.
21 A I would assume so.
22 BY MR. LOESER:
23 Q Now, you would agree with me, would you
24 not, that it is -- it was not appropriate for
25 Mallinckrodt to continue allowing Dr. Pujol to

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1 purchase Mallinckrodt oxycodone after the date of
2 this article?
3     MR. DAVISON:  Objection to form.
4     A  I'm not aware of the article being read.
5 I'm not aware of anyone -- personnel from
6 Mallinckrodt reading that article, so I can't
7 answer for them.  You'd have to ask those other
8 specific people.
9 BY MR. LOESER:
10    Q  Can you think of any reason why it would
11 be appropriate to continue allowing sales of
12 oxycodone to a physician who's been publicly
13 identified as participating in diversion and
14 illegal drug trafficking?
15    MR. DAVISON:  Objection to form.
16    A  Can I?
17 BY MR. LOESER:
18    Q  Yes.  Can you?
19    A  I don't see a reason why, no.
20    Q  So that's a "no"?
21    A  Correct.
22    MR. DAVISON:  Objection.
23 BY MR. LOESER:
24    Q  So if you turn to the -- if you look at
25 the next group of transactions, you'll see in the

Page 207

1 highlighted column, in the chargeback report that
2 I've given you, there's Dr. Seinfeld, and there's
3 a list of transactions, again dated between -- it
4 looks like here they start on May 4th, 2009, and
5 they run through April 21st, 2010, and it appears
6 that there are 81 separate transactions.
7     And again, each one of these is via your
8 wholesale distributor customer, the Harvard Drug
9 Group, selling to dispensing physician, Amy
10 Seinfeld via First Veterinary Supply; do you see
11 that?
12    A  Yes.
13    MR. DAVISON:  Objection to form.
14 BY MR. LOESER:
15    Q  And so these are 81 transactions that
16 occurred after the date of this article in which
17 she -- in which she is specifically identified in
18 which she purchased oxycodone from -- manufactured
19 by Mallinckrodt?
20    MR. DAVISON:  Objection to form.
21    A  Correct.
22 BY MR. LOESER:
23    Q  And can you think of any reason why it
24 would be appropriate to continue allowing
25 downstream customer, Amy Seinfeld, to purchase

Page 208

1 Mallinckrodt oxy after the date of this article?
2     MR. DAVISON:  Objection to form.
3     A  As I had stated, I wasn't aware of the
4 article.  The product monitoring people that --
5 you would have to ask them that question.
6 BY MR. LOESER:
7     Q  But can you think of any reason why it
8 would be appropriate to continue allowing the sale
9 of oxycodone --
10    A  Personally, if I --
11    MR. DAVISON:  Objection.
12 BY MR. LOESER:
13    Q  Let me finish -- to a downstream customer
14 who has been specifically identified in an article
15 about diversion?
16    MR. DAVISON:  Objection to form.
17    A  If I was aware of the article and did my
18 investigation, then I wouldn't see a reason that
19 I'd continue the sales, no.  But I have no reason.
20 I wasn't aware of this.
21 BY MR. LOESER:
22    Q  You mentioned before that you did read
23 articles, and articles were sent to you.  Was it
24 your practice to look to see if any of your
25 wholesale distributor customers were identified in

Page 209

1 the articles?
2     A  I would notice if they were.
3     Q  Okay.  And would you, then, investigate to
4 see, learn anything more about their downstream
5 customers?
6     MR. DAVISON:  Objection to form.
7     A  I don't recall doing any investigations.
8 BY MR. LOESER:
9     Q  And so if you go to the third category of
10 transactions, identified on this report from
11 Mallinckrodt's chargeback system, again, you see
12 that, here, there are eight transactions
13 between -- there's eight transactions in which
14 Harvard Drug Group via First Veterinary Supply is
15 selling oxy to downstream customer South Florida
16 Pain; do you see that?
17    MR. DAVISON:  Objection to form.
18    A  Mm-hmm (affirmative).  Yes, I do.
19    Q  And prior to seeing this article that I
20 presented to you, had you ever heard of South
21 Florida Pain?
22    A  No.
23    Q  Can you think of any reason why it would
24 be appropriate for Mallinckrodt to allow its
25 downstream customer, Harvard Drug Group, to sell

Page 210

1 Mallinckrodt product to South Florida Pain in
2 light of its reputation for engaging in diversion
3 and illegal practices?
4    MR. DAVISON: Objection to form.
5   A I wasn't aware of the article or them
6 being mentioned in an article.
7 BY MR. LOESER:
8   Q Was it your understanding that your
9 product managers and others who were involved in
10 compliance read articles about controlled
11 substances that were being shipped around the
12 country?
13    MR. DAVISON: Objection.
14   A I can assume they may have read them, but
15 you'd have to ask them directly.
16    (Whereupon, Exhibit Mallinckrodt-Becker-
17 017 was marked for identification by the
18 reporter.)
19    THE REPORTER: Number 17.
20 BY MR. LOESER:
21   Q You've been handed what's marked
22 Exhibit 17, which has Bates number
23 MNK-T1_0000559192. This is an e-mail from Victor
24 Borelli to Ginger Collier, dated August 5th, 2010;
25 is that correct?

Page 211

1   A Correct.
2   Q And the Subject, it says, "Keysource
3 Oxycodone Sales"; do you see that?
4   A Yes.
5   Q And if you look down into the body of the
6 e-mail, the e-mail's from Kate Muhlenkamp, and she
7 writes, "Vic - Per our conversation please find
8 attached the graph showing the transition of
9 Oxycodone Sales from HD Smith to Keysource of the
10 last several months. I removed the bottle
11 numbers, etc., so you should be able to share the
12 graph with Keysource, as just denotes scale.
13 Additionally, we had Steve reach out to HD Smith
14 to find out what business they had walked away
15 from. Attached is a list of customers that they
16 have either shut down or severely restricted. We
17 are not suggesting that Keysource adhere to HD
18 Smith's methods, but thought it might be helpful
19 for them to have a list of accounts that a similar
20 business has deemed suspicious."
21    Did I read that correctly?
22   A I believe so.
23   Q And HD Smith was one of your wholesale
24 distributor clients; is that right?
25   A Yes.

Page 212

1   Q And do you recall being asked by
2 Ms. Muhlenkamp to reach out to HD Smith to find
3 out what business they had walked away from?
4   A I don't recall this specifically, no.
5   Q Do you have any recollection, at all,
6 about the matters that are discussed in this
7 e-mail?
8    MR. DAVISON: Objection to form.
9   A I believe this had to do with HD Smith
10 looking at their business model in Florida and
11 deciding to walk away from business that they were
12 not comfortable with.
13 BY MR. LOESER:
14   Q And what's your understanding of why they
15 weren't comfortable with the business they were
16 walking away from in Florida?
17    MR. DAVISON: Objection to form.
18   A You'd have to ask HD Smith that.
19 BY MR. LOESER:
20   Q Well, you asked HD Smith, so do you have
21 any recollection of what they said?
22    MR. DAVISON: Objection to form.
23   A I asked them what accounts they moved away
24 from.
25 BY MR. LOESER:

Page 213

1   Q Did you ask them why?
2   A I don't recall asking why, but I'm
3 assuming that it had to do with possible
4 pharmacies that were diverting.
5   Q And then the e-mail goes on to say --
6 state, "Steve asked HD Smith how they identified
7 these accounts and HD Smith noted the following."
8 Do you see that list of bullet points?
9   A Yes.
10   Q Can you read the first one?
11   A CII ratio to normal non scheduled
12 products.
13   Q Can you explain to me the significance of
14 that?
15   A I believe that -- I can't speak for
16 wholesalers, but I believe that they had ratios,
17 numbers that they looked at on -- a ratio of
18 scheduled products versus nonscheduled products in
19 their orders from, for example, Steve's Pharmacy,
20 and that was one of the criteria that they would
21 look at and investigate in their process of
22 suspicious order monitoring.
23   Q And so if the ratio was skewed in favor of
24 controlled substances, that would be an indication
25 of something that was potentially suspicious?

Page 214

1    MR. DAVISON: Objection to form.
2    A  Potentially.
3  BY MR. LOESER:
4    Q  Can you read the second bullet?
5    A  "If the pharmacy was closed door servicing
6  just physicians."
7    Q  And what does that mean?
8    A  That means that it's a closed door
9  pharmacy, servicing the physician marketplace.
10    Q  And why was that something that was
11  utilized by HD Smith to identify suspicious
12  customers?
13    A  You'd have to --
14    MR. DAVISON: Objection to form.
15    A  -- ask HD Smith that particular question.
16  BY MR. LOESER:
17    Q  Do you have any understanding of why?
18    MR. DAVISON: Objection to form.
19    A  I believe it would be a flag for them, on
20  suspicious orders, due to the nature of the
21  problem in Florida with dispensing physicians.
22  BY MR. LOESER:
23    Q  Okay.  Can you read the next bullet point?
24    A  "Large pharmacies with excess orders."
25    Q  And can you explain why that would be a

Page 215

1  reason to identify customers as suspicious?
2    MR. DAVISON: Objection to form.
3    A  Well, possibility of the size of the
4  pharmacy in correlation with the size of their
5  orders.
6  BY MR. LOESER:
7    Q  And what does that mean?
8    MR. DAVISON: Objection to form.
9    A  Just what I stated.
10  BY MR. LOESER:
11    Q  Okay.  How does that correlation indicate
12  the possibility of something being suspicious?
13    MR. DAVISON: Objection.
14    A  Large pharmacies place large orders.
15  BY MR. LOESER:
16    Q  Okay.  And this says, "excess orders."  Do
17  you have an understanding of what that means?
18    A  It could be an excess of what their
19  averages are.
20    Q  Okay.  And what about -- can you read the
21  next bullet?
22    A  "No physician sales."
23    Q  And what's the significance of that?
24    MR. DAVISON: Objection to form.
25    A  Well, I would imagine that HD Smith would

Page 216

1  be aware -- they would be aware of physician
2  sales, and they would question physician sales.
3  BY MR. LOESER:
4    Q  They were suspicious of dispensing
5  physician's --
6    A  I can't -- I can't speak for HD Smith.
7    Q  Okay.  Well, did you speak to them, so did
8  you get any further information that you recall?
9    A  I can't recall.
10    Q  And is this suggesting that they stopped
11  providing controlled substances to dispensing
12  physicians?
13    MR. DAVISON: Objection to form.
14    A  You'd have to ask HD Smith.  I don't know.
15  BY MR. LOESER:
16    Q  Can you read the next bullet point?
17    A  "Pharmacy secondary supplier relations."
18    Q  What does that mean to you?
19    A  Steve's Pharmacy was using HD Smith as
20  primary, who are the secondary suppliers that I
21  could possibly purchase my product from.
22    Q  Okay.  And so this was the list when you
23  called HD Smith.  These were the characteristics
24  that they identified for accounts that they walked
25  away from; is that right?

Page 217

1    MR. DAVISON: Objection to form.
2    A  Correct, best of my knowledge.
3  BY MR. LOESER:
4    Q  If you turn the page --
5    A  Mm-hmm (affirmative).
6    Q  Well, the first page, it indicates there's
7  an attachment, and then the next page is the
8  attachment, and it's a list of accounts that
9  HD Smith either shut down or severely restricted;
10  is that right?
11    MR. DAVISON: Objection to form.
12    A  The best of my knowledge, yes.
13  BY MR. LOESER:
14    Q  Okay.  That's what the e-mail says.  It
15  says, "Attached is a list of customers that they
16  have either shut down or severely restricted."
17    A  Right.
18    Q  Right?  So this list was given to
19  Mallinckrodt.  You got this list from HD Smith,
20  right?
21    A  Correct.
22    MR. DAVISON: Objection to form.
23  BY MR. LOESER:
24    Q  And did you help them in any way prepare
25  the list?

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1    A  No.

2    Q  And what did you do with the list when you

3  got it?

4    A  I evidently passed it on to Kate

5  Muhlenkamp.

6    Q  And since this is a list of downstream

7  customers of your wholesale distributor client, HD

8  Smith, transactions involving any of these

9  downstream customers would be reflected in the

10  chargeback system, right?

11    A  Correct.

12    MR. DAVISON:  Just so I'm clear on this,

13  sorry Counsel, it looks like the Bates numbers

14  aren't consecutive on this, so I just wanted to

15  make sure we had an understanding.  I also just

16  would note, it looks like maybe the copy of the

17  Bates number got cut off.

18    Can we just make sure this exhibit is

19  marked "highly confidential" until we can figure

20  out exactly what the confidentiality marker should

21  be for this document?

22    MR. LOESER:  Sure.  It looks to me like

23  there were two attachments to this e-mail.  The

24  first one indicates "KeySource Oxy Sales.pdf," and

25  I believe that the gap in Bates numbers are

Page 219

1  because that document is not attached, but we can

2  make sure of that.  And there's a second

3  attachment, which is Smith Oxy Accounts.xls, and I

4  think that is what is attached, but noted.

5    MR. DAVISON:  Okay.  So I just object to

6  that.

7  BY MR. LOESER:

8    Q  So you got this list from HD Smith, you

9  apparently turned this list over, and then

10  Mr. Borelli was supposed to use this list when

11  talking to his wholesale distributor client,

12  KeySource, that was taking over HD Smith's

13  customers; is that right?

14    MR. DAVISON:  Objection to form.

15    A  You'd have to ask Vic Borelli that.

16  BY MR. LOESER:

17    Q  Is that your recollection?  Is that what

18  the e-mail says?

19    MR. DAVISON:  Objection.

20    A  It's what the e-mail says, but you'd have

21  to ask Vic Borelli that specific question.

22  BY MR. LOESER:

23    Q  I'd have to ask Vic Borelli what he did

24  with the list, right?

25    A  Correct.

Page 220

1    Q  But in terms of what you did with the

2  list --

3    A  I did what was asked.  I got the list of

4  accounts from HD Smith and forwarded them to the

5  people that requested it.

6    Q  So this was a list of accounts that your

7  wholesale distributor client deemed suspicious?

8    MR. DAVISON:  Objection.  Objection to

9  form.

10    A  Correct.

11  BY MR. LOESER:

12    Q  So once you had this list, did you go into

13  the chargeback system and see if any of your other

14  wholesale distributor clients were continuing to

15  sell to any of these suspicious downstream

16  customers?

17    MR. DAVISON:  Objection.

18    A  I did not.  That would have been up to

19  Kate Muhlenkamp and anyone that she shared the

20  information with.

21  BY MR. LOESER:

22    Q  But that is certainly something that you

23  could have done, right?

24    MR. DAVISON:  Objection.

25    A  Could have.

Page 221

1  BY MR. LOESER:

2    Q  And you didn't do that?

3    A  No.  They were already cut off by HD

4  Smith, and I did not -- I didn't need the

5  information at that point, any further

6  information.

7    (Whereupon, Exhibit Mallinckrodt-Becker-

8  018 was marked for identification by the

9  reporter.)

10    THE REPORTER:  Number 18.

11  BY MR. LOESER:

12    Q  You've been handed what's marked

13  Exhibit 18, which is another chargeback report

14  that we've run from the data produced by

15  Mallinckrodt.  The Native File Bates number is

16  MNK-T1_0000264296.  Now, Masters Pharmaceuticals

17  was one of your wholesale distributor customers;

18  is that right?

19    A  At a certain time, yes.

20    Q  Okay.  At some point in time, that account

21  was turned over to you by Victor Borelli; is that

22  right?

23    A  Correct.

24    Q  And do you have a recollection of when

25  that occurred?

Highly Confidential – Subject to Further Confidentiality Review

Page 222

1    A No, I don't.
2    Q So if you look at the spreadsheet that
3 I've handed you, this is a sort on Masters
4 Pharmaceuticals, additionally sorting on
5 downstream customer, a Lam's Pharmacy; do you see
6 that?
7     MR. DAVISON: Objection to form.
8    A Mm-hmm (affirmative).
9 BY MR. LOESER:
10    Q And if you look over at the Invoice Date
11 column, you'll see that there are a series of
12 transactions that occurred after the date of the
13 e-mail that we looked at a moment ago, the transactions
14 that occurred after August 5th, 2010.
15    Do you see that?
16     MR. DAVISON: Objection to form.
17 BY MR. LOESER:
18    Q Here, let me highlight it for you.
19    A (Handing.)
20    Q (Highlighting.) (Handing.)
21    A (Reviewing.)
22    Q Do you see that?
23    A Yes.
24    Q So after the date you learned from HD
25 Smith that it had cut off Lam Pharmacy because it

Page 223

1 was suspicious, your other wholesale distributor
2 client, Masters Pharmaceutical, continued to sell
3 oxycodone 30-milligram tabs to Lam's Pharmacy; is
4 that what this shows?
5     MR. DAVISON: Objection to form.
6    A It appears that way.
7 BY MR. LOESER:
8    Q So if you had taken that list that HD
9 Smith gave you in which they identified suspicious
10 downstream customers and you had shared that with
11 all of your other wholesale distributor customers,
12 you could have stopped them from selling to this
13 pharmacy that HD Smith had identified as
14 suspicious; is that right?
15     MR. DAVISON: Objection to form.
16    A In theory, but that was up to our product
17 monitoring person to look at this data and
18 communicate it out, and I don't believe Masters
19 was my account at this period of time.
20 BY MR. LOESER:
21    Q Okay. And the timing of when they were
22 your account, we can sort that out from records
23 that --
24    A From Mallinckrodt records, I'm sure you
25 can.

Page 224

1    Q Okay. And so if we have documents that
2 indicate that in -- from August of 2010 forward,
3 through June of '11, that Masters was your client,
4 then you would agree with me that you could have
5 taken the information you learned from HD Smith
6 and shared it with --
7     MR. DAVISON: Objection.
8    A If the information was shared with me.
9 BY MR. LOESER:
10    Q But you know the information was shared
11 with you by HD Smith because you got it?
12    A With HD Smith, yes.
13     MR. DAVISON: Objection.
14 BY MR. LOESER:
15    Q Right. And HD Smith gave you the
16 information about Lam Pharmacy on August 5th,
17 2010, and you could have shared that with your
18 other wholesale distributors customers, who also
19 sold to Lam's Pharmacy, but you did not do so?
20     MR. DAVISON: Objection.
21    A That, you'd have deal with Karen Harper on
22 that, who was our -- in charge of our product
23 monitoring.
24 BY MR. LOESER:
25    Q But you didn't do that?

Page 225

1     MR. DAVISON: Objection.
2    A No, I didn't.
3 BY MR. LOESER:
4    Q Can you explain to me why HD Smith was
5 able to identify that Lam Pharmacy was suspicious,
6 but apparently Masters Pharmaceuticals could not?
7     MR. DAVISON: Objection to form.
8    A No, I can't. You'd have to ask Masters
9 and HD Smith those two questions.
10 BY MR. LOESER:
11    Q And based upon knowing your customer, is
12 there something about Masters that you recall that
13 would suggest that they were less careful about
14 identifying suspicious --
15     MR. DAVISON: Objection.
16    A They're not a wholesaler. That would be
17 the first identifying factor.
18 BY MR. LOESER:
19    Q And what difference does that make?
20    A A Distributor does not have salespeople
21 going directly into Steve's Pharmacy. It's
22 basically telemarketing based, calling the
23 account.
24    Q And that would make it harder for someone
25 like Masters to identify suspicious downstream

Page 226

1 customers?
2    MR. DAVISON:  Objection to form.
3    A  Yes.
4 BY MR. LOESER:
5    Q  And is it your understanding that Masters
6 had any less responsibility to identify downstream
7 customers than wholesale distributors?
8    MR. DAVISON:  Objection to form.
9    A  They had the same responsibility as
10 everybody else did in regards to following the DEA
11 protocol, product monitoring.
12    Do you have the magnifying glass, too?
13 BY MR. LOESER:
14    Q  Well, I try to help with highlighting.
15    (Whereupon, Exhibit Mallinckrodt-Becker-
16 019 was marked for identification by the
17 reporter.)
18    THE REPORTER:  Number 19.
19 BY MR. LOESER:
20    Q  You've been handed what's marked
21 Exhibit 19, which is a press release from the
22 United States Department of Justice for the
23 District of Nevada, and this states, "A Las Vegas
24 pharmacy has entered into a settlement agreement
25 with the U.S. Department of Justice to resolve

Page 227

1 civil allegations that it violated federal drug
2 laws."
3    Do you see that?
4    A  Yes.
5    Q  And do you see that this -- the pharmacy
6 that's discussed in this press release is Lam's
7 Pharmacy?
8    A  Yes.
9    Q  And in the second paragraph of the press
10 release, this states, "The agreement states that
11 the DEA conducted an investigation concerning the
12 receipt and distribution of and record-keeping for
13 certain controlled substances that were received
14 and distributed by Lam's Pharmacy during the
15 period May 1, 2006, through February 1, 2012, and
16 that based on that investigation, the DEA alleges
17 that the pharmacy violated civil provisions of the
18 Controlled Substances Act."
19    Do you see that?
20    A  Yes, I do.
21    Q  So HD Smith figured out that Lam's
22 Pharmacy was suspicious in August of 2010, and as
23 we saw from this last chargeback report, Masters
24 continued to sell to Lam after that date.  Is it
25 your understanding that Masters essentially

Page 228

1 continued to sell Mallinckrodt oxycodone to Lam's
2 Pharmacy, up until the point that the DEA shut
3 down Lam's Pharmacy?
4    MR. DAVISON:  Objection to form.
5    A  You'd have to ask Masters on that.  It
6 appears that way.
7    (Whereupon, Exhibit Mallinckrodt-Becker-
8 020 was marked for identification by the
9 reporter.)
10    THE REPORTER:  Number 20.
11 BY MR. LOESER:
12    Q  Mr. Becker, you've been handed what's
13 marked Exhibit 20, MNK-T1_0000448041, and this
14 appears to be a list of your clients in -- as of
15 2010; is that correct?
16    A  It appears so, yes.
17    Q  And if you look at column A, it states,
18 "Steve Becker, NAM - Minnesota."  That's you?
19    A  Yes.
20    Q  And that's national account manager?
21    A  Yes.
22    Q  And then there's a list of your clients?
23    A  Yes.
24    Q  And so we've had a number of -- number of
25 instances today in which you indicated you weren't

Page 229

1 sure when an entity was your client or was not.
2    A  Mm-hmm (affirmative).
3    Q  According to this list, can you just
4 read -- well, I'll read the clients, as of 2010,
5 that were your clients, and it was "Optisource
6 LLC"; is that correct?
7    A  That's correct.
8    Q  And "Anda"; is that correct?
9    A  Correct.
10    Q  And "Associate Pharmacies, Inc.", correct?
11    A  Correct.
12    Q  And "Cedardale"; is that correct?
13    A  Correct.
14    Q  "United Drugs"?
15    A  Correct.
16    Q  "Epic"?
17    A  Yes.
18    Q  "Harvard"?
19    A  Yes.
20    Q  And is that Harvard Drug Group?
21    A  Yes.
22    Q  "Henry Schein"?
23    A  Yes.
24    Q  "HD Smith"?
25    A  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    Q  "PBA True Care Pharmacy"?
2    A  Yes.
3    Q  "Kinray Wholesale"?
4    A  Yes.
5    Q  "Pharmacy Select Group"?
6    A  Yes:
7    Q  "Cesar Castillo, Inc."?
8    A  Yes.
9    Q  "Masters"?
10   A  Yes.
11   Q  "Premiere"?
12   A  Yes.
13   Q  Okay.  So those were your clients as of
14   2010?
15   A  It appears so, yes.
16   Q  And if you look at column O, which is on
17   the next page, there's a -- the heading of the
18   column says, "November Net Margin" and "Quota
19   Attainment."
20      Can you explain to me what quota
21   attainment is?
22      MR. DAVISON:  Objection to form.
23   A  Well, quota is the assigned number that we
24   have placed on the account for our sales goal.
25   BY MR. LOESER:

Page 231

1    Q  And how did the quota come about?
2    A  You'd have to ask Jane Williams and the
3    management team, how they -- what formulas they
4    used in making -- making their quotas.
5    Q  And was it the practice that if you beat
6    the sales goal for a client that the quota would
7    be increased for that client?
8      MR. DAVISON:  Objection to form.
9    A  Not specifically.  Maybe the following
10   year.  The numbers are reviewed every year.
11   BY MR. LOESER:
12   Q  And was the goal generally to grow sales
13   with each of your customers?
14      MR. DAVISON:  Objection to form.
15   A  Not necessarily, no.
16   BY MR. LOESER:
17   Q  Okay.  So if you look down this list of
18   quota attainment, a number of these indicate that
19   you exceeded a quota; is that right?
20   A  Correct.
21   Q  So for the first one, which is number 4,
22   which is OptiSource, you were at 119.3 percent of
23   your quota?
24   A  Correct.
25   Q  So this means that in the -- if I'm

Page 232

1    reading this right, for fiscal year 2009, you
2    exceeded the quotas; is that right?
3      MR. DAVISON:  Objection to form.
4    A  Correct.
5    BY MR. LOESER:
6    Q  And then, if you go down the list a bit,
7    you'll see for column 8, and that's United Drugs,
8    you exceeded the quota and you were at 123.4
9    percent; do you see that?
10   A  Mm-hmm (affirmative).
11   Q  And if you go down a little bit further,
12   number 10, that's Harvard Drug; do you see that?
13   A  Yes.
14   Q  And what was the amount that you exceeded
15   your quota for Harvard Drug in 2009?
16      MR. DAVISON:  Objection to form.
17   A  That I exceeded?
18   BY MR. LOESER:
19   Q  Well, it says, "Quota Attainment" and a
20   percent.  What's the number for Harvard Drug,
21   which is line 10?
22      MR. DAVISON:  Objection to form.
23   A  Well, it's 359 percent.
24   BY MR. LOESER:
25   Q  Okay.  So you more than tripled the quota,

Page 233

1    and you're looking at the first column H, which is
2    for November?
3    A  Correct.
4    Q  And if you go down to O, "Net Margin,"
5    "Quota Attainment," what does that mean?
6      MR. DAVISON:  Objection to form.
7    A  We had quotas, responsibility on net sales
8    and net margin, margin of the product.
9    BY MR. LOESER:
10   Q  Okay.  And so for the margin, you exceeded
11   that goal by -- well, the percentage was 559.9
12   percent; is that correct?
13      MR. DAVISON:  Objection to form.
14   A  Correct.
15   BY MR. LOESER:
16   Q  And if you go down a couple more entries,
17   you have line 12, which is HD Smith.
18   A  Mm-hmm (affirmative).
19   Q  And for them, you exceeded the sales
20   quota.  You're at 133 percent; is that right?
21   133.3?
22      MR. DAVISON:  Objection to form.
23   A  Okay.
24   BY MR. LOESER:
25   Q  And on net quota margin, you were at 132.9

Page 234

1  percent?
2    A  Mm-hmm (affirmative).
3    Q  And was a report like this, describing
4  your quota and quota attainment, something that
5  was prepared every year?
6      MR. DAVISON:  Objection to form.
7    A  The quotas were set by the -- like Jane
8  Williams --
9  BY MR. LOESER:
10   Q  Right.
11   A  -- who I reported to.  This is a report
12 that I would -- the salespeople would run and most
13 likely was sent in with the monthly report.
14   Q  And is it your -- did you see this report
15 when it was created?
16   A  I may have created this particular report.
17   Q  Okay.  And so you were responsible for
18 creating the reports for your clients?
19     MR. DAVISON:  Objection to form.
20   A  This was for my use.
21 BY MR. LOESER:
22   Q  Right.
23   A  Internal use only, to be shared with Jane
24 Williams, product managers.
25   Q  And did you create a report like this

Page 235

1  every year?
2    A  I did this on a monthly report, usually.
3    Q  So how many times a year did you create
4  this report?
5    A  Most likely 12.
6    Q  And so you would just update it over the
7  course of the year?
8    A  Yeah, it changed.  It was a moving number,
9  based on our fiscal year, which ended October 1st.
10   Q  And then the following year, would you do
11 the same?
12   A  Yes.
13   Q  So there should be one of these reports
14 for every year that you were employed by
15 Mallinckrodt?
16     MR. DAVISON:  Objection to form.
17   A  Could be, depending on when that was
18 incorporated into our monthly report.
19 BY MR. LOESER:
20   Q  And do you recall when that was?
21   A  No, I don't.
22   Q  Can you think of any reason why there is
23 not a report like this for 2006 or 2007?
24     MR. DAVISON:  Objection to form.
25   A  It may not have been required --

Page 236

1  BY MR. LOESER:
2    Q  How about --
3    A  -- as part of our monthly report.
4    Q  And do you have an understanding of why
5  you were able to exceed your quotas by substantial
6  amounts during this time frame?
7      MR. DAVISON:  Objection.
8    A  Be various reasons.  Could have been new
9  product introductions, new product additions that
10 the product -- that the account put in, changing
11 us from a secondary position to a primary position
12 on their formulary.  Backordered products from our
13 competitors, and there's a whole host of reasons.
14 BY MR. LOESER:
15   Q  And for the time period that we're looking
16 at here, 2009 and 2010, do you recall whether
17 sales of oxycodone enabled you to exceed these
18 quotas by such margins?
19     MR. DAVISON:  Objection to form.
20   A  Oxycodone was a portion of our product
21 portfolio, so I'm sure it did help, yes.
22 BY MR. LOESER:
23   Q  Okay.  Do you recall how much it helped?
24   A  No.
25     MR. DAVISON:  Objection.

Page 237

1      (Whereupon, Exhibit Mallinckrodt-Becker-
2  021 was marked for identification by the
3  reporter.)
4      THE REPORTER:  Number 21.
5  BY MR. LOESER:
6    Q  Mr. Becker, you've been handed what's
7  marked Exhibit 21, which is a series of reports,
8  with a cover e-mail prepared by you, sent to
9  Jennifer Bullerdick, Lisa Lundergan, Penny Myers,
10 and Natalie Kayich.
11     Who are the rec- -- and this is dated May
12 10, 2011.
13   A  Product managers.
14   Q  And did you report to all of those product
15 managers or --
16   A  I didn't report to any of them.
17   Q  Okay.  So what's their relationship to
18 you?
19   A  They're the product managers.  They manage
20 our product portfolio.
21   Q  Okay.  If you look at the body of your
22 e-mail, there are a number of attachments, and you
23 write, "Attached for your review are my account
24 backgrounders that I complete at the beginning of
25 each fiscal year."

Page 238

1  A Yes.
2  Q "I thought I would share these with you to
3  help you know our goals as I have set them for the
4  accounts. The information may be helpful for you
5  to see how they operate and what type of business
6  we do with them as a snap-shot."
7    Do you recall preparing these reports and
8  sending this e-mail?
9  A Yes.
10  Q And is this something that you did every
11  year?
12  A I personally, I don't know when I started
13  doing product backgrounder, but I normally did
14  them in the beginning of the year on my assigned
15  accounts so I would have a good idea of what my
16  goals and objectives were, opportunities, negative
17  things.
18    And I shared them with product managers,
19  as product managers did, at times, come along with
20  sales reps on sales calls.
21    So they have an understanding of the
22  account, and they'd have an understanding of the
23  account back at the office, if questions came up
24  on the account.
25  Q And were product managers responsible for

Page 239

1  specific products?
2  A Yes.
3  Q And so the list of names you have here,
4  were they each responsible for different products
5  identified in these reports?
6  A For the most part, yes.
7  Q So who was responsible for oxycodone?
8  A I'm not certain at that period of time --
9  got married, so -- I'm not certain who was
10  responsible for what, at that time.
11  Q And again, that would be something
12  reflected in documents maintained by Mallinckrodt?
13    MR. DAVISON: Objection to form.
14  A Yes, yes.
15 BY MR. LOESER:
16  Q And was anyone responsible for more than
17  one product?
18  A Yes.
19  Q And so someone, the same person, could be
20  responsible for oxycodone and oxy APAP?
21  A Correct, correct.
22  Q Were they grouped around similar products?
23  A They usually were. I just -- I just don't
24  recollect.
25  Q Okay. Well, let's look through, and for

Page 240

1  the record, this is a series of what Mr. Becker
2  has referred to as backgrounder reports for his
3  clients. The order in which the exhibit is
4  assembled is not the order in which these reports
5  were produced.
6    They were originally alphabetical, and
7  I've sorted them to be according to the rank
8  provided by Mr. Becker, which will explain the
9  Bates numbers, but if you turn to the first page,
10  it indicates, this is your report for Cardinal; is
11  that right?
12  A Correct.
13  Q And you indicate that for 2010, its
14  Account Rank was 1; do you see that?
15  A Yes.
16  Q So that means this was your biggest
17  customer in 2010?
18  A Correct.
19    MR. DAVISON: Objection.
20 BY MR. LOESER:
21  Q In terms of sales?
22  A Correct.
23  Q And below that, it says, "Kinray 2010" and
24  "Account Rank 5." What's the relationship between
25  Kinray and Cardinal?

Page 241

1  A Cardinal purchased Kinray as a -- and
2  Kinray continued to operate as Kinray Wholesale.
3  Q And Kinray was a wholesale distributor?
4  A Yes, located in New York.
5  Q Okay. And you see the information that
6  you've collected for each one of your clients,
7  starting with Cardinal, starts with current full
8  year sales; do you see that?
9  A Mm-hmm (affirmative).
10  Q And so that shows the sales --
11  A That's fiscal year sales.
12  Q Fiscal year that Cardinal -- while your
13  customer purchased from you?
14    MR. DAVISON: Objection to form.
15  A Correct.
16 BY MR. LOESER:
17  Q And that includes Kinray as well, right?
18  A Yes.
19  Q Do you see for the next group of -- next
20  people, full year 2011, "Top 5 Product Sales"; do
21  you see that?
22    MR. DAVISON: Objection.
23  A Yes.
24 BY MR. LOESER:
25  Q Can you read for me what the number one

Page 242

1 top product was on that list?
2   A  Oxycodone 30 milligram.
3   Q  And below that?
4   A  Fentanyl lozenge.
5   Q  All right.  And so this shows that -- and
6 do you know what these -- these numbers are
7 dollars of sales?  Is that what we're looking at?
8     MR. DAVISON:  Objection to form.
9   A  Correct.
10 BY MR. LOESER:
11   Q  If you look further down the list of top
12 sales, there's a number of other controlled
13 substances; is that right?
14   A  Yes.
15   Q  And then on the next column below that,
16 next table, full year 2011, "Top 5 Negative
17 Product Sales" --
18   A  Mm-hmm (affirmative).
19   Q  -- and this is a list of products where
20 sales had declined; is that right?
21   A  That's correct.
22   Q  And yet the total dollar amount of those
23 sales, if you just ranked based on dollars, you
24 would see that oxycodone, as indicated up above,
25 is the top seller, and if you move down the list,

Page 243

1 oxy/APAP is in second place at 751,172; do you see
2 that?
3     MR. DAVISON:  Objection to form.
4   A  Yes.
5 BY MR. LOESER:
6   Q  And then, if you move down below that, you
7 see, although sales declined, oxycodone HCL 15 was
8 at 437,000?
9     MR. DAVISON:  Objection.
10   A  Correct.
11 BY MR. LOESER:
12   Q  Right.  Looking further down on your
13 Executive Summary of Account, you indicate, "Sales
14 are running behind quota as we struggle to meet
15 historical shipment demands."  Can you explain
16 what that means to me?
17   A  I recall we may have been struggling with
18 backorders, moving product out to the account.
19   Q  So the demand for the controlled
20 substances you were selling to Cardinal was
21 outstripping the supply that Mallinckrodt --
22     MR. DAVISON:  Objection.
23   A  Not necessarily, no.  Maybe we had issues
24 with manufacturing product, causing backorders,
25 thus inhibiting the sales of the particular

Page 244

1 account.
2 BY MR. LOESER:
3   Q  Right.  You couldn't ship enough product
4 to meet the demand?
5     MR. DAVISON:  Objection.
6   A  Possibly, yes.
7 BY MR. LOESER:
8   Q  Turning to the next page, the first bullet
9 says, "Secure contract agreement on 852 & 867 data
10 exchange for Kinray."  Can you tell me what that
11 means?
12   A  I can't recall what the 852 and 867 data
13 exchanges are, off the top of my head.
14   Q  Okay.  And under "Challenges," the first
15 item is "Maintaining the sales pace of 2010."
16   A  Correct.
17   Q  Was that a goal of yours to try and
18 maintain that sales pace?
19   A  Yes.
20   Q  And that was Mallinckrodt's goal as well?
21     MR. DAVISON:  Objection to form.
22   A  You'd have to ask management people if it
23 was their goal.  It was my goal to maintain my
24 sales pace or, hopefully, increase them.
25 BY MR. LOESER:

Page 245

1   Q  If you turn to the next report --
2   A  Yes, sir.
3   Q  -- that's your backgrounder for
4 OptiSource?
5   A  Yes.
6   Q  That indicates that's "Account Rank 2"; is
7 that right?
8   A  Correct.
9   Q  And if you look at the table you prepared
10 for fiscal year 2010, "Top 5 Product Sales," can
11 you read for me, please, the number one product?
12   A  Oxycodone 30 milligram.
13   Q  Okay.  So in first place is oxycodone 30
14 milligram.  What's second?
15   A  "OXY/APAP 10/325."
16   Q  And what's third?
17   A  15 milligram.
18   Q  Of oxycodone?
19   A  Correct.
20   Q  Okay.  If you look down to "Primary
21 Objectives" --
22   A  Yes.
23   Q  -- it states, "Maintaining our presence as
24 primary on the 2011 bid is our biggest issue we
25 face due to our inability to supply products for

Page 246

1 the remainder of the year." Can you explain to me
2 what that's about?
3    A We're obviously -- I believe we were
4 having backorder situations at the time that were
5 impacting our sales and our ability to fill the
6 orders for the OptiSource members.
7    Q And do you recall whether those backorder
8 issues were, in particular, with regard to
9 oxycodone?
10    A No, I don't.
11    Q If you look further down, first bullet
12 point, "Overcome the DEA product quota issues to
13 maintain sales in 2011." Can you tell me what
14 that refers to?
15    A It's obvious, that would appear to me that
16 we had DEA quota issues to manufacture a product.
17    Q What does that mean?
18    A Do you understand how the DEA assigns
19 quota for manufacturing products?
20    Q Go ahead and explain it to me.
21    A You didn't answer me, though. Do you
22 understand it?
23    Q I would like you to explain it.
24       MR. DAVISON: Objection.
25    A Okay. The DEA sets a quota on raw

Page 247

1 material for manufacturing purposes. That starts
2 with the raw material with -- where quota is. So
3 the manufacturer of the raw ingredient, oxycodone,
4 manu -- the one that manufactures the oxycodone
5 for the pharmaceutical end gets a quota, and you
6 can only -- it only goes so far. Then on top of
7 it, the pulse of the manufacturer gets a quota on
8 the product. So we're only allowed quota to
9 manufacture so much product. That's basically
10 what that all means there.
11 BY MR. LOESER:
12    Q So you used up all your quota?
13       MR. DAVISON: Objection.
14    A According to my -- this, in this report,
15 we were having issues that particular year, yes.
16 BY MR. LOESER:
17    Q Okay. And so these reports that we're
18 going through were created on May 10, 2011;
19 correct?
20       MR. DAVISON: Object to the form.
21    A That's the date that's on here.
22 BY MR. LOESER:
23    Q So if you go down your bullet points, one
24 of the items is "Hydrocodone opportunities." Does
25 that mean that you were hoping to sell more

Page 248

1 hydrocodone?
2    A Looking at opportunities on open spots
3 within the product line of hydrocodone.
4    Q Okay. In 2011?
5    A Correct.
6    Q And then, if you turn the page to
7 "Challenges," again, one of your challenges is
8 "Maintaining the current sales," so your goal was
9 to maintain the current sales from 2010, for
10 OptiSource, for controlled substances in 2011?
11    A Yes.
12    Q If you turn to the next report, which is
13 for HD Smith --
14    A Mm-hmm (affirmative).
15    Q -- that's Account Rank number 3; do you
16 see that?
17    A Yes.
18    Q And can you please read to me the first
19 Top 5 Product -- the number one product for HD
20 Smith?
21    A "OXYCODONE 30, OXYCODONE 15, OXY/APAP
22 10/325, METHADONE," and "OXYCODONE 5MG."
23    Q Okay. So for yet another client, the
24 top-selling product that you're reporting on here
25 was oxycodone, in its varieties, sold by

Page 249

1 Mallinckrodt?
2       MR. DAVISON: Objection to form.
3    A Correct.
4 BY MR. LOESER:
5    Q And if you look down to your Executive
6 Summary, you state "2010 sales had steady growth
7 and are fueled by Oxycodone products"?
8    A Correct.
9    Q So earlier, when I was asking you about
10 whether you remember any particular product,
11 explaining your sales numbers in this time frame,
12 does this refresh your recollection that it was
13 the oxycodone products?
14       MR. DAVISON: Objection to form.
15    A Yes.
16 BY MR. LOESER:
17    Q And if you turn to the next page, under
18 "Challenges," you once again indicate "Maintaining
19 the current sales," so again, I take it that one
20 of your objectives for 2011 was to maintain the
21 volume of sales for these oxycodone and other
22 products that you had in 2010?
23       MR. DAVISON: Objection to form.
24    A Correct.
25 BY MR. LOESER:

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    Q  Okay.  If you turn to the next report,
2  this is for Masters --
3    A  Yes.
4    Q  -- which is Account Rank number 4 for you?
5    A  Yes.
6    Q  And if you look down at Top 5 Product
7  Sales, can you please read the first two items on
8  that list?
9    A  Oxy 30 and 15 milligram.
10   Q  Okay.  So that's oxycodone HCL 30
11  milligram is number 1; is that right?
12   A  30 milligram, yes.
13   Q  And number 2 is oxycodone HCL 15
14  milligram?
15   A  Correct.
16   Q  Okay.  If you look down below, under the
17  Executive Summary, you write, "Sales were down
18  significantly due to full stocking of Mallinckrodt
19  products at the wholesale level."  Can you tell me
20  what that means?
21   A  I don't recall what that means.
22   Q  Okay.  And then it says, "Last years sales
23  were inflated due to our back orders and our
24  persistence to ship products to Masters over
25  regional wholesale accounts."  Can you explain

Page 251

1  that?
2    A  I had inherited this account, so you'd
3  have to ask Vic Borelli that particular question,
4  but it may -- it appears Masters was on an
5  allocation list and may have received more product
6  than my other accounts.
7    Q  And you say you "inherited this account."
8  Does this summary that you prepared suggest that
9  you were responsible for this account for fiscal
10  year 2010?
11   A  I'd had it --
12     MR. DAVISON:  Objection.
13   A  I don't recall when I took the account
14  over.
15  BY MR. LOESER:
16   Q  If you turn to the next page, which
17  follows on the Challenges, list of bullets again,
18  one of your challenges is identified as
19  "Maintaining the current sales"; is that right?
20   A  (Reviewing.)  Yes.
21   Q  And so again, your objective for this
22  account for Masters, for which the top two
23  products are oxycodone, your goal for 2011 was to
24  maintain the current sales from 2010?
25     MR. DAVISON:  Objection to form.

Page 252

1    A  That's correct, but I think you see that
2  it is probably stated in most of these documents.
3  BY MR. LOESER:
4    Q  So let's go to the next summary,
5  backgrounders that you prepared for Kinray?
6    A  Yes.
7    Q  Account Rank number 5; do you see that?
8    A  Yes.
9    Q  Can you please read the first product,
10  number 1 sales for you, for this wholesale
11  distributor client?
12   A  Oxycodone 30 milligram.
13   Q  Okay.  What's number 2?
14   A  Hydromorphone.
15   Q  Look down under your Executive Summary.
16  You state, "Sales finished ahead of last year's
17  pace and were being fueled by CII products."
18   A  Yes.
19   Q  And that's controlled substances schedule
20  II products?
21   A  Yes.
22   Q  And that includes oxycodone?
23   A  Yes.
24   Q  And if you turn to the next page, you once
25  again indicate "Maintaining the current sales" is

Page 253

1  one of your objectives?
2    A  Correct.
3    Q  For your fifth ranked client, top
4  products, oxycodone and hydromorphone for 2011,
5  one of your objectives is maintaining the sales
6  rate of 2010?
7    A  Correct.
8      MR. DAVISON:  Objection to form.
9  BY MR. LOESER:
10   Q  Can you turn to the next customer of
11  yours, Account Rank number 6?
12   A  Mm-hmm (affirmative).
13   Q  This is "Pharmacy Select"; do you see
14  that?
15   A  Yes.
16   Q  And again, you have a table that you list
17  the top selling product for that client.  Can you
18  please read to me what that top-selling product
19  is?
20   A  Oxycodone 30 milligram.
21   Q  And then down below on your Executive
22  Summary, you write "Sales grew steadily for 2010
23  due to CII sales increases"; is that correct?
24   A  Correct.
25   Q  And that, again, would refer to oxycodone?

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1     MR. DAVISON:  Objection to form.
2     A  And our other schedule products.
3  BY MR. LOESER:
4     Q  Okay.  Let's turn to the next report for
5  Anda, Account Rank number 7 for you.
6     A  Mm-hmm (affirmative).
7     Q  Under top selling products for fiscal year
8  2010, can you please read to me the two
9  top-selling products?
10    A  Oxy 30 and Oxy 5 milligram.
11    Q  Okay.  So the oxycodone HCL 30 milligram
12  was the top-selling product, right?
13    A  The oxy 30 milligram was the top-selling
14  product.
15    Q  In second place, oxycodone HCL 5
16  milligram?
17    A  Correct.
18    Q  Under your Executive Summary, you state,
19  "2010 sales were up 128% with units up 145% over
20  2009 and showed slight growth due to the addition
21  of Oxycodone 5mg and 30mg in a secondary position
22  with their source program."
23    Can you explain what that means?
24    MR. DAVISON:  Objection to form.
25    A  Well, as I had stated earlier, in regards

Page 255

1  to if you compare it to a formulary, we weren't in
2  the primary position.  If Steve's Drug ordered
3  oxycodone, they would be shipped the primary
4  product, unless they so specified on their DEA
5  form, ordering schedule II products.
6  BY MR. LOESER:
7     Q  If you turn to the Challenges for your
8  client Anda, your 7th ranked client, top selling
9  oxy 30.  You indicate "Maintaining the sales pace
10  of 2010," so that was your objective for this
11  account as well?
12    MR. DAVISON:  Objection to form.
13    A  Objective for all my accounts.
14  BY MR. LOESER:
15    Q  Turn to your next customer, Harvard Drug?
16    A  Yep.
17    Q  Account Rank number 8.  Can you please
18  read to me, one at a time, the top selling
19  products that you sold to Harvard Drug during
20  fiscal year 2010?
21    MR. DAVISON:  Objection to form.
22    A  Oxy 30 milligram.
23  BY MR. LOESER:
24    Q  Okay.  And what was second place?
25    A  Oxy 15.

Page 256

1     Q  Okay.  If you go down under Executive
2  Summary of Account, you write, "Sales in 2010 are
3  up 79% over 2009 and are being fueled by CII
4  products mainly from the Oxycodone product
5  families," correct?
6     A  Correct.
7     Q  So once again, you have a customer for
8  which significant growth is occurring,
9  specifically involving oxycodone product families;
10  is that right?
11    MR. DAVISON:  Objection to form.
12    A  That's right, but I believe that you would
13  see in almost every one of these product
14  backgrounders that oxycodone is their top selling
15  product.
16  BY MR. LOESER:
17    Q  Okay.  When did that start being the case?
18    A  I'm not certain.
19    Q  Do you have any idea at all?
20    A  (Moves head from side to side.)
21    Q  Was it the case when you started working
22  for Mallinckrodt?
23    A  No.
24    Q  Okay.  Did it start in 2005?
25    MR. DAVISON:  Objection.

Page 257

1     A  As I've stated, I'm retired, been out of
2  the business for four years.  I have a hard time
3  recollecting specific dates and specific data that
4  you're requesting.
5  BY MR. LOESER:
6     Q  Okay.  If we turn to the next page,
7  bullets under "Challenges," once again, you
8  identify "Maintaining the current sales"?
9     A  Yes, sir.
10    Q  So for this client as well, the number 1
11  and 2 products are oxy 30 and 15.  Your goal is to
12  maintain the sales level of 2010 and 2011?
13    A  Mm-hmm (affirmative).
14    MR. DAVISON:  Objection to form.
15  BY MR. LOESER:
16    Q  So we're going to skip one, which I'm sure
17  you're relieved to hear, and go to Cedardale,
18  since we've mentioned Cedardale today, Account
19  Rank number 11.  Again, you list the top selling
20  products for fiscal year 2010.  Can you please
21  read those products, in order?
22    A  Oxy 30 and oxy 15, and then APAP/CODEINE,
23  and the number five product is OXY/APAP 10/325.
24    Q  So again, the number one sales product for
25  you, selling controlled substances to Cedardale

Page 258

1 for fiscal year 2010, was oxycodone 30, right?
2     MR. DAVISON: Objection to form.
3     A  Correct.
4 BY MR. LOESER:
5     Q  And the number two product that you sold
6 for fiscal year 2010, to Cedardale, was oxycodone
7 15 milligram, right?
8     A  Right.
9     MR. DAVISON: Objection.
10 BY MR. LOESER:
11     Q  And if you look down under "Challenges,"
12 the first item is "Mallinckrodt's marketing team
13 perception of the account." What does that mean?
14     MR. DAVISON: Objection to form.
15     A  This was a new distributor account, and
16 our perception of the account was still
17 questionable.
18 BY MR. LOESER:
19     Q  Questionable, like you were suspicious of
20 the account or what?
21     MR. DAVISON: Objection.
22     A  Basically, I would assume so, yes.
23 BY MR. LOESER:
24     Q  Okay. If you look at the next item, it
25 says, "CII sales imbalance." What does that mean?

Page 259

1     A  It means I noticed that there's a sales
2 imbalance on the products that they were carrying,
3 where the CII sales were leaning too far to the
4 positive side.
5     Q  And did you examine whether any of your
6 other clients had that same imbalance?
7     A  Well, when -- when I would run my various
8 reports, I would see my top five products.
9     Q  Okay. But we've seen on a lot of reports
10 that oxycodone was the top one and two products on
11 every report?
12     A  Correct.
13     Q  So did you examine the sales imbalance for
14 all those other clients?
15     MR. DAVISON: Objection to form.
16     A  No, depending on the size of the account
17 and their product mix.
18 BY MR. LOESER:
19     Q  The third bullet on "Challenges" says,
20 "State of Florida CII sales." What does that
21 refer to?
22     A  Meaning watch out for any of their sales
23 in the State of Florida.
24     Q  And why?
25     MR. DAVISON: Objection to form.

Page 260

1     A  Because evidently, at that time, they
2 could be suspicious due to the product monitoring
3 and the situation that was going on in Florida.
4 BY MR. LOESER:
5     Q  And did you examine all of your other
6 accounts for the same suspicious fact?
7     MR. DAVISON: Objection to form.
8     A  I didn't have reason to make that
9 statement with all the other accounts.
10 BY MR. LOESER:
11     Q  You didn't have reason with Harvard Drug
12 or Masters or HD Smith to examine whether they had
13 a disproportionate amount of sales in Florida?
14     MR. DAVISON: Objection to form.
15     A  Not at that time, no.
16 BY MR. LOESER:
17     Q  Turn to the Premiere Group report, Account
18 Rank 12. Again, you list the top sales for your
19 wholesale distributor client here, Premier Group,
20 and what -- can you please read the number one --
21     A  Oxycodone 30.
22     Q  Seems like kind of a pattern, doesn't it?
23     MR. DAVISON: Objection to form.
24     A  It's our top-selling product.
25     MR. DAVISON: We've been going about an

Page 261

1 hour. If now is a good time, I wasn't sure if you
2 were finished with this.
3     MR. LOESER: Yes.
4     THE VIDEOGRAPHER: Going off the record.
5 Time is 2:32 p.m.
6     (A recess was taken from 2:32 p.m. until
7 2:48 p.m.)
8     (Beginning without Mr. Gastel's presence.)
9     THE VIDEOGRAPHER: We are back on the
10 record. The time is 2:48 p.m.
11     (Whereupon, Exhibit Mallinckrodt-Becker-
12 022 was marked for identification by the
13 reporter.)
14     THE REPORTER: Number 22.
15 BY MR. LOESER:
16     Q  Mr. Becker, you've been handed what's
17 marked Exhibit 22 MNK-T1_0000266735. This is an
18 e-mail string that at the top is from Penny Myers
19 to Jim Rausch, dated May 5th, 2010. Subject line,
20 "RE: HD Smith"; is that correct?
21     A  Correct.
22     Q  And if you turn to the back to where the
23 e-mail string starts, do you see the e-mail from
24 Penny Myers to you dated May 5th, 2010; Subject,
25 "HD Smith"?

Page 262

1    A  Yes.
2    Q  Who is Penny Myers?
3    A  I don't know if she was product manager at
4  the time or analysis person.
5    Q  Okay.  And she sends you an e-mail and she
6  writes, "Steve, HD Smith placed an order for more
7  than 3 times their normal 10mg methadone.  It's
8  only 700+ bottles, but we have to give a reason
9  for the increase"; do you see that?
10   A  Yes.
11   Q  And do you see your response to her above
12  that e-mail?
13   A  Mm-hmm (affirmative).
14   Q  Dated May 5th, 2010, from you to Penny
15  Myers.  And you write, "Penny, the increase in
16  orders is due to increased compliance and new
17  pharmacies being added to their source program";
18  do you see that?
19   A  Correct.
20   Q  That was your response as to why they
21  increased, right?
22      (Enters the proceedings at this time:
23  Mr. Gastel.)
24   A  Right.
25  BY MR. LOESER:

Page 263

1    Q  And if you go to the first page, there's
2  an e-mail from Jim Rausch to Penny Myers.  And he
3  writes, "Penny, sorry for the ignorance but what
4  is increased compliance?"
5    A  Mm-hmm (affirmative).
6    Q  And then above that Penny Myers' response
7  to Jim Rausch on May 5th, 2010, at 1:38, and she
8  writes, "No problem.  When we offer a price, we
9  ask for the estimated quantity that they will
10  purchase.  If they don't purchase close to the
11  amount they estimated, we encourage them to do
12  that, or their price may not remain the same, or
13  their VIP provision may change."
14      Did I read that correctly?
15   A  Yes, did you.
16   Q  Okay.  So going back to the beginning,
17  there was an order flagged by Penny Myers.  And so
18  what she does is she asks you to go out and figure
19  out why the order amount is increased; is that
20  right?
21   A  Yes.
22   Q  And this order -- HD Smith was one of your
23  wholesale distributor customers?
24   A  Correct.
25   Q  Okay.  And so whatever it was that Penny

Page 264

1  Myers was doing, she needed to talk to you in
2  order to figure out whether this order was
3  suspicious or not; is that fair?
4      MR. DAVISON:  Objection to form.
5    A  That's a fair assumption.
6  BY MR. LOESER:
7    Q  Okay.  And "increased compliance," that
8  term is used.  Is the description of increased
9  compliance by Ms. Myers one that you had heard
10  before?
11   A  (Reviewing.)  What I had written back to
12  Penny, is that what you're referring to?
13   Q  No.  At the very top Penny Myers gives an
14  explanation of what -- of what --
15   A  Restating what I had stated to her?
16   Q  No.  She just indicates what increased
17  compliance means.  And I'm wondering if you had
18  heard that description of "compliance" before?
19   A  Well, she's referring to -- are you
20  stating the -- to Jim Rausch the second part,
21  "Penny, sorry for my ignorance but what is
22  increased compliance?"  Is that where you're
23  asking?
24   Q  Right.  I'm sorry.  You used the
25  expression "increased compliance."

Page 265

1    A  Yeah, that's what --
2    Q  So what does that mean?
3    A  Increased compliance means on a source
4  program, you have primary A products, B would be
5  secondary products.  You could have shifted from
6  the B slot and moved to the A slot, which means
7  more of your account -- more of the people will
8  automatically be shipped your primary A product
9  than you would be on the B product.
10      So in regards to this, if we moved into
11  that primary position or there was a change in the
12  source program, we would basically be seeing
13  increased compliance towards their source program.
14   Q  Okay.  I think I understand what you just
15  said; but based upon the description that
16  Ms. Myers gave here, increased compliance was
17  something that Mallinckrodt did to make sure that
18  a wholesale distributor customer was purchasing up
19  to the amount that they said they were going to
20  purchase?
21      MR. DAVISON:  Objection to form.
22   A  No, that's --
23  BY MR. LOESER:
24   Q  Let's look at her explanation again.
25  "When we offer a price, we ask for the estimated

Page 266

1 quantity that they will purchase. If they don't
2 purchase close to the amount they estimated, we
3 encourage them to do that, or their price may not
4 remain the same."
5 A Correct.
6 Q Okay. So that's consistent with what I
7 just said, correct?
8 MR. DAVISON: Objection to form.
9 A It is -- I think in looking at this when
10 you -- you're aware of how the contracts and
11 source programs work; are you not?
12 BY MR. LOESER:
13 Q Let's just move on and try and get this
14 answer.
15 A Well, I'm trying to answer the question.
16 Q Why don't you go ahead and explain what
17 you think I need to understand.
18 A I just -- a wholesaler working for their
19 source program to get the A slot, they give you a
20 quantity of products that they hope to sell on
21 that -- on their source program for the year. So
22 compliance within that program means keeping their
23 orders should fall into that number to meet the
24 average that they stated.
25 Q Right.

Page 267

1 A That's what -- that I think is what she's
2 referring to here.
3 Q Okay. And so when --
4 A Hopefully I explained it properly for you.
5 Q Yes, that's consistent with what she wrote
6 here. And so when the sales department is using
7 the word "increased compliance," as you've done in
8 your e-mail, what you're talking about is making
9 sure that customers are ordering basically up to
10 the amounts that they indicated they would order?
11 MR. DAVISON: Objection.
12 A Up to their commitment.
13 BY MR. LOESER:
14 Q And if they don't do that --
15 (Reporter clarification.)
16 A Up to their commitment.
17 BY MR. LOESER:
18 Q And if they don't do that, then they may
19 not get as favorable pricing going forward?
20 MR. DAVISON: Objection.
21 A That could happen.
22 (Whereupon, Exhibit Mallinckrodt-Becker-
23 023 was marked for identification by the
24 reporter.)
25 THE REPORTER: Number 23.

Page 268

1 BY MR. LOESER:
2 Q Mr. Becker, you've been handed what's been
3 marked Exhibit 23.
4 A Mm-hmm (affirmative).
5 Q This again is an e-mail string. This time
6 the cover page Bates number MNK-T1_0002940658.
7 The string starts with a message from Karen Harper
8 dated July 13th, 2010, to you. The subject is,
9 "RE: Oxycodone HCL"; is that correct?
10 A Correct.
11 Q If we go to the beginning of the string,
12 you receive an e-mail from Christine Maiolo, who
13 is at Anda; is that correct?
14 A Correct.
15 Q And Anda is one of your wholesale
16 distributor clients?
17 A Correct.
18 Q And Christine Maiolo says to you, "Steve,
19 I just got your message. You're still in a
20 secondary position, but usage has picked up since
21 we brought you in 3 months ago. New forecast-
22 15mg- 3,000 a month, 30mg- 11,000 a month." And
23 these -- the "15" and the "30" refers to oxycodone
24 HCL?
25 MR. DAVISON: Objection to form.

Page 269

1 A Correct.
2 BY MR. LOESER:
3 Q And the "3,000" refers to the number of
4 bottles?
5 MR. DAVISON: Objection to form.
6 A Correct.
7 BY MR. LOESER:
8 Q As does the "11,000"?
9 A I believe so, yes.
10 Q And when she says that you're still in the
11 secondary position, that means that they are also
12 buying from another manufacturer who is the
13 primary position?
14 MR. DAVISON: Objection.
15 A Correct.
16 BY MR. LOESER:
17 Q And you then above the e-mail from
18 Ms. Maiolo, e-mail Jim Rausch and Karen Harper,
19 July 13, 2010, at 8:38 a.m. The subject line is,
20 "Oxycodone HCL," importance is "High"; do you see
21 that?
22 A Mm-hmm (affirmative).
23 Q And you write, "Dear Team, Mallinckrodt is
24 in the secondary position on the Anda Source
25 program, with Qualitest being primary. Anda's

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 initial purchases were 3 months ago.
2 "Since bringing in the Oxycodone products
3 sales have increased significantly with Anda.
4 Mallinckrodt is the markets preferred product and
5 Anda continues to build their business with
6 non-warehousing chain tied to their CSOC program";
7 do you see that?
8 A Yes.
9 Q And then you indicate the number of
10 bottles of oxycodone that Anda wants to purchase?
11 A Yes.
12 Q Can you explain to me what you mean by
13 "Mallinckrodt is the markets preferred product"?
14 A We were the preferred product by
15 pharmacies purchasing our product based on our
16 color, our shape of our product.
17 Q What do you mean by "color"?
18 A Color of the tablet.
19 Q The blue tablet?
20 MR. DAVISON: Objection.
21 A Could be.
22 BY MR. LOESER:
23 Q Is that your recollection, that they were
24 blue?
25 A I don't recall what color they were.

Page 271

1 Q And people liked taking blue tablets?
2 MR. DAVISON: Objection.
3 A Not necessarily like blue tablets. A
4 generic company when they come out with a generic
5 product, one of their objectives in manufacturing
6 when they come -- bring that product to the market
7 front is to resemble as close as possible to the
8 innovator product, in color and shape, is one of
9 the primary goals of a manufacturer when bringing
10 a product forward.
11 I don't know if that's the case with our
12 oxycodone, but we were the preferred product of
13 oxycodone, I believe, in the marketplace.
14 BY MR. LOESER:
15 Q And the innovator of oxycodone was who?
16 MR. DAVISON: Objection.
17 A I'm not certain. Maybe Roxane or Purdue.
18 Q But nonetheless, this is e-mail exchange
19 between you and one of your clients about one of
20 their orders. You then take that and communicate
21 to your product managers that one of your
22 wholesale distributor clients is increasing the
23 amount that they are buying?
24 A Correct.
25 Q And if you turn to the next page,

Page 272

1 Ms. Harper writes to Jim Rausch with a cc to you
2 and Kate Muhlenkamp on July 13, 2010, at 9:18 a.m.
3 And she writes, "Jim, increased market share, as
4 described below for the ANDA business, is a
5 satisfactory explanation from the Suspicious Order
6 Monitoring perspective. Thanks, Steve, for
7 working through this with us."
8 A Mm-hmm (affirmative).
9 Q So is it your understanding that you were
10 involved in the suspicious order monitoring
11 program here by collecting more information about
12 the order from your client?
13 MR. DAVISON: Objection.
14 A You'd have to ask Karen that. I got the
15 requested information to answer their questions on
16 the specific question of orders, our products that
17 were in place, for them to release the order.
18 BY MR. LOESER:
19 Q Can you explain to me how your explanation
20 resolved any concerns about this being a
21 suspicious order?
22 MR. DAVISON: Objection.
23 A It clarified the numbers and why they were
24 seeing the increase in the numbers on the
25 oxycodone orders.

Page 273

1 BY MR. LOESER:
2 Q So other than this e-mail exchange between
3 you and Christine Maiolo in which she indicates
4 the amount that she's ordering, in your position
5 vis-a-vis other manufacturers, were there
6 any other information that you collected that
7 would help resolve whether this was a suspicious
8 order?
9 MR. DAVISON: Objection.
10 A Not to my recollection.
11 BY MR. LOESER:
12 Q Did you examine the ratio of controlled
13 substances to noncontrolled substances that Anda
14 was purchasing from Mallinckrodt?
15 MR. DAVISON: Objection.
16 A Not to my recollection.
17 BY MR. LOESER:
18 Q Did you examine the ratio of products that
19 Anda was selling and shipping to customers in
20 Florida versus other states?
21 A Not to my recollection.
22 MR. DAVISON: Objection.
23 BY MR. LOESER:
24 Q Did you examine the proportion of
25 downstream customers of Anda that were pain

Page 274

1 clinics or dispensing physicians?
2     MR. DAVISON:  Objection.
3     A No, best of my recollection.
4 BY MR. LOESER:
5     Q If you go to the top of this e-mail
6 exchange, where the string starts, Ms. Harper
7 writes to you 2:52 p.m. "Steve, Long story, but
8 this just in -- has DEA taken action against ANDA
9 in the Ft. Lauderdale area?  Our Security Director
10 was just speaking to a DEA Florida agent who
11 mentioned problems with them . . . in a discussion
12 about Mallinckrodt providing Oxy placebos (which
13 we were doing) and about Sunrise registration
14 surrender."
15     Do you recall that conversation with
16 Ms. Harper?
17     A No.
18     Q Do you recall the DEA taking action
19 against Anda?
20     A No, I don't.
21     Q Do you recall why Ms. Harper is asking you
22 about your understanding of any DEA action against
23 Anda?
24     MR. DAVISON:  Objection to form.
25     A She'd be asking me questions about Anda

Page 275

1 because it was my account.
2 BY MR. LOESER:
3     Q Do you know what she's referring to here,
4 the "Oxy placebos"?
5     A No, I don't.
6     MR. DAVISON:  Objection.
7     A You'd have to ask Karen Harper that.
8     (Whereupon, Exhibit Mallinckrodt-Becker-
9 024 was marked for identification by the
10 reporter.)
11     THE REPORTER:  24.
12 BY MR. LOESER:
13     Q Mr. Becker, you've been handed Exhibit 24,
14 Bates number MNK-T1_0004595209.  This is an e-mail
15 string that starts at the top with Jim Rausch,
16 dated September 8, 2010, to LouAnn Randall, "RE:
17 H.D. Smith- order 70176900"; do you see that?
18     A Mm-hmm (affirmative).
19     Q And you see that this e-mail string
20 includes e-mail to and from you as well?
21     A Yes.
22     Q So let's go to the back of the string.
23 And if you look at where it starts, Mr. Rausch
24 sends Penny Myers an e-mail on September 7, 2010.
25 And it states, "Penny, we received an order from

Page 276

1 the Kearny, N.J. location for 900 bottles of code
2 577101.  They average from order history is about
3 290 bottles per order.  Do you know why they would
4 have such a large increase?"  Did I read that
5 correctly?
6     A Yes, you did.
7     Q Do you see moving forward from there,
8 Ms. Myers says to -- I guess it's Ms. Randall,
9 September 7, 2010, "LouAnn, Does Steve Becker have
10 HD Smith?  Could you please send him this e-mail
11 and ask him to let Jim Rausch know why they are
12 placing such a large order?  I don't know if they
13 are afraid that we will run out of quota, but
14 that's not a problem, so I'd rather they didn't
15 start stockpiling.  I just wasn't sure if it was
16 Steve's or not."
17     Who is LouAnn Randall?
18     A She was one of the secretary assistants.
19     Q Okay.  And then moving ahead, the string
20 moves on to you at that point, from LouAnn Randall
21 to you, dated September 8, 2010, same subject;
22 "H.D. Smith- order."  "Steve, please see Penny's
23 comments below.  Do you know why HD Smith is
24 placing this large Methadone order?"  Do you see
25 that?

Page 277

1     A Yes.
2     Q And then up above you respond on
3 September 8, 2010, at 8:13 a.m.  And can you read
4 your response?
5     A "They decreased inventories in August due
6 to their fiscal year end."
7     Q Okay.  And then moving up from there,
8 LouAnn Randall sends your answer on to Penny Myers
9 and cc's you.  And says, "Per Steve, this HD Smith
10 order is a legitimate order.  Please contact Steve
11 Becker if you have further questions."  Do you see
12 that?
13     A Mm-hmm (affirmative).
14     Q So how does your explanation establish
15 that this is a legitimate order?
16     MR. DAVISON:  Objection to form.
17     A Wholesalers many times in their fiscal
18 year-end conduct inventory, take inventory, reduce
19 their inventories for their accounting purposes.
20 And that's basically what took place here.
21 BY MR. LOESER:
22     Q And other than finding out about what they
23 were doing with their inventory, did you do
24 anything else to investigate whether this order
25 was suspicious?

Page 278

1     MR. DAVISON:  Objection.
2     A  No.  You'd have to ask Karen Harper on
3  that.
4  BY MR. LOESER:
5     Q  And looking at what Ms. Randall says to
6  Mr. Rausch, she says, "Per Steve, this HD Smith
7  order is a legitimate order."  And so this
8  indicates that the decision as to whether this was
9  a legitimate order or not was based upon the
10  information that you provided; is that correct?
11     A  It appears so.
12     MR. DAVISON:  Objection to form.
13     (Whereupon, Exhibit Mallinckrodt-Becker-
14  025 was marked for identification by the
15  reporter.)
16     THE REPORTER:  Number 25.
17  BY MR. LOESER:
18     Q  Mr. Becker, you've been handed Exhibit 25,
19  which is another e-mail string, first page
20  MNK-T1_0000267546.  Top of the string is an e-mail
21  from Kate Muhlenkamp to Jim Rausch, cc'd to you,
22  Order 70178685, importance indicates "High"; is
23  that correct?
24     A  Correct.
25     Q  Okay.  If you go to where this chain

Page 279

1  starts, Mr. Rausch sends Ms. Muhlenkamp an e-mail
2  September 29, 2010.  He writes, "H.D. Smith
3  ordered 960 bottles of 853001" -- is that a SKU
4  number?
5     A  I believe so.
6     Q  -- "their average is 256 over 9 months.
7  Do you know why they have increased their orders?
8  Thanks, Jim"; do you see that?
9     A  Mm-hmm (affirmative).
10     Q  And up above that Mr. Rausch writes Kate
11  Muhlenkamp, "Kate, two open peculiar order
12  responses needed."  First of all, do you know what
13  a peculiar order is?
14     A  No.  You'd have to ask Jim Rausch that.
15     Q  Okay.  And then the e-mail goes on to
16  state, "You were going to check with Steve Becker
17  Quest Order for Oxycodone.  Secondly I need a
18  response on the e-mail below.  Thanks."
19     Do you see up above from there
20  Ms. Muhlenkamp in an e-mail dated October 5th,
21  2010, the next day writes to you, "Steve... can
22  you check on the below order and advise?
23  Additionally, Quest has been increasing their
24  orders on Oxycodone - do you have any background
25  on that?  Thanks for your help."

Page 280

1     So once again here is your product manager
2  and Mr. Rausch contacting you to obtain
3  information about an order that has been
4  identified, as in this case, peculiar; is that
5  right?
6     MR. DAVISON:  Objection to form.
7     A  Could you repeat that?  I'm sorry.
8     MR. LOESER:  Could you read that back,
9  please.
10     (The record was read by the reporter as
11  follows:
12     Question:  "So once again here is your
13  product manager and Mr. Rausch contacting you to
14  obtain information about an order that has been
15  identified, as in this case, peculiar; is that
16  right?"
17     MR. DAVISON:  Objection to form.
18     A  That's correct.
19  BY MR. LOESER:
20     Q  And then moving up the chain, you send an
21  e-mail on October 7 at 10:55 a.m. to Kate
22  Muhlenkamp, again the importance is "High."  And
23  you write, "Kate in regards to Quest they
24  indicated that their core accounts are requesting
25  Mallinckrodt products over Qualitest and that is

Page 281

1  what is causing the spike on our sales with them";
2  do you see that?
3     A  Yes, I don't.
4     Q  "Please let me know if you need any
5  additional information and I will follow up with
6  you on HD Smith and Kinray later today after I
7  speak directly with the buyers."
8     A  Mm-hmm (affirmative).
9     Q  Right.  So you obtained information from
10  your wholesale distributor client and provided
11  that information to Ms. Muhlenkamp; is that right?
12     A  I believe so.
13     Q  And that was the normal course where if an
14  order was identified as suspicious or peculiar,
15  the product manager would contact you, ask you to
16  obtain information from your customer and then the
17  decision as to whether that order was suspicious
18  or not was based upon the information you
19  obtained?
20     MR. DAVISON:  Objection.
21     A  It appears that way, yes.
22     MR. DAVISON:  Objection to form.
23     Did you get my objection?
24     (Reporter clarification.)
25  BY MR. LOESER:

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    Q And your explanation sum total which is
2  that their -- Quest indicated that their core
3  accounts are requesting Mallinckrodt products over
4  Qualitest and that is what's causing the spike,
5  how did that rule out that the order was
6  suspicious?
7        MR. DAVISON: Objection.
8    A You'd have to ask Karen Harper that.
9  BY MR. LOESER:
10   Q Okay. Did you look into the ratio of
11 controlled substances to noncontrolled substances
12 that Quest was ordering at that time?
13       MR. DAVISON: Objection to form.
14   A No, I didn't. Most of our products were
15 controlled substances.
16 BY MR. LOESER:
17   Q How about the ratio of oxycodone to other
18 products?
19   A No, I didn't look into that at the time.
20   Q And how about the ratio of products that
21 this wholesale distributor customer was sending to
22 Florida versus other places?
23       MR. DAVISON: Objection.
24   A No, I didn't look at that at the time.
25 BY MR. LOESER:

Page 283

1    Q How about the ratio of pain clinics and
2  dispensing physicians that this wholesale
3  distributor customer of yours was sending its
4  Mallinckrodt product as opposed to other types of
5  customers?
6        MR. DAVISON: Objection.
7    A I didn't have that information. You'd
8  have to ask Karen Harper on that.
9        (Whereupon, Exhibit Mallinckrodt-Becker-
10 026 was marked for identification by the
11 reporter.)
12       THE REPORTER: Number 26.
13 BY MR. LOESER:
14   Q Mr. Becker, you've been handed Exhibit 26,
15 which is another e-mail string from Kate
16 Muhlenkamp to Jim Rausch. And then with other
17 e-mails that involve you. First page has Bates
18 number MNK-T1_0000267735.
19       And you see at the top of the string, it's
20 dated October 7, 2010; is that correct?
21   A Yes.
22   Q If we go to the back of this string,
23 there's an e-mail from Lynne Soja from HD Smith to
24 you and Dena Mando, subject "PO# 47204618"; do you
25 see that?

Page 284

1    A Yes.
2    Q That's on October 7, 2010. And the e-mail
3  states, "Sales increased in August and September,
4  and are tracking at an increase for October. The
5  order in question with the increase was for your
6  California DC." What's DC?
7    A Distribution center.
8        MR. DAVISON: Objection.
9  BY MR. LOESER:
10   Q Okay. And that was an explanation
11 provided by Ms. Soja. And then above that you see
12 your e-mail to Kate Muhlenkamp at 12:20 p.m.?
13   A Mm-hmm (affirmative).
14   Q You write, "Please see the response from
15 Lynne Soja, buyer for the HD Smith below. Sales
16 are increasing at the DC and tracking to
17 continue."
18   A Mm-hmm (affirmative).
19   Q Correct?
20       So I gather Ms. Muhlenkamp asked a
21 question about this HD Smith order. You asked for
22 the information from Ms. Soja and then you
23 forwarded that information back to Ms. Muhlenkamp;
24 is that right?
25       MR. DAVISON: Objection.

Page 285

1    A It appears that way.
2  BY MR. LOESER:
3    Q Then moving up the string, Ms. Muhlenkamp
4  writes to you at 2:12 p.m. on October 7, "In order
5  to provide a proper response to the DEA, we need
6  to have some color around why they think the
7  orders are increasing? Did they pick up a new
8  customer? Are other manufacturers having supply
9  issues? Let me know." Do you see that?
10   A Yes.
11   Q So once again, there's an order that's
12 been flagged and you are being asked to collect
13 information from your wholesale distributor
14 customer in order to respond to questions about
15 whether the order is suspicious; is that right?
16   A Correct.
17   Q And then if you move up the chain, on
18 October 7, 2010, at 2:23 p.m. you write, "Orders
19 at HD Smith are increasing due to improved
20 contract compliance and additional accounts
21 purchasing from their DC both as primary and on a
22 secondary basis. Also note that the other
23 distributors may be limiting distribution in
24 California. Anda has cut back and Harvard is not
25 shipping."

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1  So explain to me why that information
2 resolves whether HD Smith's order is suspicious?
3      MR. DAVISON: Objection to form.
4   A Anda evidently was no longer shipping C-II
5 products so it put additional strains on the DC at
6 HD Smith and Anda had cut back, according to the
7 information I had received.
8 BY MR. LOESER:
9   Q And why was Anda no longer shipping C-II
10 product?
11      MR. DAVISON: Objection.
12   A You'd have to ask Anda that.
13 BY MR. LOESER:
14   Q And why was Harvard not shipping anymore?
15      MR. DAVISON: Objection.
16   A They may have been shut down from their
17 DEA license.
18 BY MR. LOESER:
19   Q And so that didn't provide you any concern
20 about whether HD Smith should continue shipping?
21      MR. DAVISON: Objection.
22   A No.
23 BY MR. LOESER:
24   Q And did you examine at that point for HD
25 Smith the ratio of oxycodone to other products it

Page 287

1 was purchasing from Mallinckrodt?
2   A No.
3      MR. DAVISON: Objection.
4 BY MR. LOESER:
5   Q And did you examine at that point the
6 ratio of HD Smith's downstream customers that were
7 in Florida versus other places?
8      MR. DAVISON: Objection.
9   A No.
10 BY MR. LOESER:
11   Q And this -- I see this reference to
12 improved contract compliance again. That merely
13 means that they are continuing to buy at the rate
14 that they indicated that they would buy as we
15 talked about earlier; is that right?
16      MR. DAVISON: Objection.
17   A Continuing to purchase products at a
18 normal rate with accounts being more compliant
19 within the source program set up by HD Smith.
20 BY MR. LOESER:
21   Q And then if you look to the beginning of
22 the chain, Ms. Muhlenkamp sends on to Mr. Rausch
23 your explanation and asks him if this is okay; is
24 that right?
25      MR. DAVISON: Objection.

Page 288

1   A Correct.
2 BY MR. LOESER:
3   Q So once again, it appears that the
4 information that you obtained from your wholesale
5 distributor customer was being used by product
6 manager, Mr. Rausch, to determine whether the
7 order was suspicious; is that right?
8      MR. DAVISON: Objection.
9   A You'd have to ask them if they looked at
10 any other criteria.
11 BY MR. LOESER:
12   Q Does it appear, however, that they're
13 relying on the information that you provided?
14      MR. DAVISON: Objection.
15   A They're using that information, correct.
16      (Whereupon, Exhibit Mallinckrodt-Becker-
17 027 was marked for identification by the
18 reporter.)
19      THE REPORTER: Number 27.
20 BY MR. LOESER:
21   Q Mr. Becker, you've been handed another
22 e-mail string. This time the beginning top of the
23 page is an e-mail from Charity Keeven to Victor
24 Borelli with a cc to Jane Williams, dated
25 3/14/2001 (sic), Bates number MNK-T1_0000560836;

Page 289

1 is that correct?
2   A Correct.
3   Q So if you look at the e-mail from
4 Ms. Keeven; who is that?
5   A I'm not certain. I don't recall her, if
6 she got married, had a different name or not.
7 Some -- I -- most -- I'm not certain.
8   Q All right. Well, the subject of this
9 e-mail is, "RE: Backorder Priority customers"; do
10 you see that?
11   A Could you repeat that, please.
12   Q The subject of the e-mail is, "RE:
13 Backorder Priority customers"; do you see that?
14   A Mm-hmm (affirmative).
15   Q And it indicates there's an attachment
16 which is a backorder priority customers
17 spreadsheet; do you see that?
18   A (Reviewing.) A spreadsheet?
19   Q Right. The e-mail indicates that there's
20 an attachment.
21   A Yes, but I don't have the attachment.
22   Q All right. So if you turn to the next
23 page, or actually go to the bottom of the page,
24 the e-mail from Charity Keeven on March 7, 2011 --
25   A Yes.

Highly Confidential – Subject to Further Confidentiality Review

Page 290

1    Q  -- goes to you and a number of other
2  people as well; is that right?
3    A  Yes.
4    Q  And the people that are included on here
5  are national account managers?
6    A  Yes, and product managers.
7    Q  And product managers.  And the subject is
8  "Backorder Priority customers," right?
9    A  Correct.
10   Q  And if you turn the page, there's an
11 e-mail from Ms. Keeven and she writes, "Hi
12 Everyone, Attached is a list of our customers and
13 the priority in which we have been shipping
14 backorders.  The first tab 'Class of Trade' lists
15 the customers and their class of trade in the
16 order of which we ship.  The second tab 'By
17 product family' is broken out by product
18 family" -- and I'll skip.  And then it says, "The
19 third tab 'Not shipping Oxy 30' lists the
20 customers were are currently not shipping
21 Oxy 30 mg and their average demand."
22   Do you see that?
23   MR. DAVISON:  Objection to form.
24   A  Yes.
25 BY MR. LOESER:

Page 291

1    Q  Okay.  Do you recall receiving this --
2    A  No, I don't.
3    Q  -- spreadsheet that indicates backorder
4  priority customers?
5    A  No, I don't recall this specifically.
6    Q  Do you recall there being a priority list
7  made of shipment to customers?
8    A  We would do that occasionally, if
9  backorders and allocated product came up.
10   Q  Turn to the attachment.
11   (Whereupon, Exhibit Mallinckrodt-Becker-
12 028 was marked for identification by the
13 reporter.)
14   THE REPORTER:  Number 28.
15 BY MR. LOESER:
16   Q  Handing you the attachment that is the
17 first tab identified on that e-mail.  And can you
18 look at that for a moment and explain how the
19 priority functions, what the order is?
20   MR. DAVISON:  Just hold off for a second.
21 I don't think we have copies of this yet.  You
22 don't have to -- let me just look at the exhibit
23 quickly.
24   MR. LOESER:  Why don't we add...
25   THE WITNESS:  Do you need this?

Page 292

1    MR. LOESER:  Why don't we off the record
2  for a moment.
3    MR. DAVISON:  We can go off the record.
4    THE VIDEOGRAPHER:  Going off the record.
5  The time is 3:21 p.m.
6    (A recess was taken from 3:21 p.m. until
7  3:22 p.m.)
8    (Whereupon, Exhibit Mallinckrodt-Becker-
9  028 was re-marked for identification by the
10 reporter.)
11   THE VIDEOGRAPHER:  We are back on the
12 record.  The time is 3:22 p.m.
13 BY MR. LOESER:
14   Q  Mr. Becker, you're looking at Exhibit 28,
15 which is the attachment to the e-mail we were
16 talking about with priority -- backorder priority
17 customers.  And if you look at that list, you'll
18 see there's a number of customers with the class
19 of trade that says "Retail" followed by a group
20 "Retail Buying Group" --
21   A  Mm-hmm (affirmative.)
22   Q  -- followed by "Mail Order" --
23   A  Mm-hmm (affirmative.)
24   Q  -- and on down the list.
25   A  Yes, sir.

Page 293

1    Q  Do you have any understanding of the
2  reason for this particular order of priority?
3    MR. DAVISON:  Objection to form.
4    A  You're referring to the column on the
5  right-hand side of the page, "Class of Trade
6  Priority"?
7  BY MR. LOESER:
8    Q  Yes, yes.
9    A  You'd have to ask product managers that
10 specific question on why and how they formulated
11 that priority list.
12   Q  And you don't have any understanding?
13   Where did your customers fall on this
14 list?
15   A  It would depend what type of accounts.
16 Looking through on the top ones, on the retail
17 side (reviewing), just looking, Publix may have
18 been mine at one time, SuperValu may have been
19 mine at one time.  I'm not --
20   Q  And do you have any understanding why
21 retail would be the top priority for backorders?
22   MR. DAVISON:  Objection.
23   A  No, I don't.  I think this is a little
24 confusing because if you look at -- if you look at
25 wholesalers and distributors, and I don't see our

Page 294

1 major wholesalers on this list, so...
2 BY MR. LOESER:
3    Q Who are your major wholesalers?
4    A Your major wholesalers would be the big
5 three, McKesson, ABC, and Cardinal. HD Smith
6 would fall in behind them, they're wholesalers.
7    Q AmerisourceBergen is listed under
8 distributor, Cardinal is listed under distributor.
9    A Is that over on the second page? Okay. I
10 see them, yes. I see them now.
11    Q So and do you have any understanding why
12 all of the distributors are in the bottom priority
13 for backorder fulfillment?
14    A No, I don't.
15    MR. DAVISON: Objection.
16    Sorry. I just want to be clear with this
17 document, are you representing, Counsel, that this
18 is the attachment to the bottom e-mail in Exhibit
19 27? It's just again the Bates numbers are
20 different, so I just want to make sure the record
21 is clear on...
22    MR. LOESER: Yeah, I believe that's the
23 case, but we can -- you know, we can look into it.
24 Again, it might be the native file issue.
25    MR. DAVISON: Understood.

Page 295

1 BY MR. LOESER:
2    Q And, Mr. Becker, if you turn the page,
3 you'll see the "Distributor" column continues and
4 McKesson is on the list.
5    A Mm-hmm (affirmative).
6    Q But I did misspeak, "GPO" and
7 "Repackagers" are below "Distributors." What are
8 GPOs?
9    A GPO's are like managed care account.
10    Q And what are repackagers?
11    A Repackagers would be somebody that would
12 purchase Mallinckrodt product, put it under their
13 label, for -- normally that product would be used
14 in a nursing home setting, so they would repackage
15 product as unit of use or unit dose.
16    Q Okay.
17    (Whereupon, Exhibit Mallinckrodt-Becker-
18 029 was marked for identification by the
19 reporter.)
20    THE REPORTER: Number 29.
21 BY MR. LOESER:
22    Q Mr. Becker, you've been handed Exhibit 29,
23 which is an e-mail from you to Chrissy Madden
24 dated April 11, 2001 (sic), subject line is, "RE:
25 Oxy 30."

Page 296

1    And if you look down at the bottom, it
2 starts with an e-mail from Ms. Madden, who is at
3 Masters, to you on April 7, 2011; subject, "Oxy
4 30." She writes, "We are out. Any chance of
5 getting some shipped asap? I know you are
6 allocating just don't want to sub with kvk"?
7    So --
8    MR. DAVISON: Can we just hold on for one
9 second so I can review the document. I don't
10 think you have a copy for us.
11    MR. LOESER: Oh, I'm sorry.
12    THE WITNESS: (Handing.)
13    MR. DAVISON: (Reviewing.)
14    MR. LOESER: Can we go off the record for
15 a minute.
16    THE VIDEOGRAPHER: Going off the record.
17 The time is 3:27 p.m.
18    (A recess was taken from 3:27 p.m. until
19 3:28 p.m.)
20    THE VIDEOGRAPHER: We are back on the
21 record. Time is 3:28 p.m.
22    A Number 029.
23 BY MR. LOESER:
24    Q Mr. Becker, you have in front of you
25 Exhibit 29, which again is an e-mail string that

Page 297

1 starts from Ms. Madden at Masters to you. She
2 indicates that Masters is out of oxy. And she
3 writes, "I know you're allocating just don't want
4 to sub with kvk." Can you explain what she means
5 by that?
6    MR. DAVISON: Objection to form.
7    A KVK was competitor and didn't want to
8 substitute our orders evidently.
9 BY MR. LOESER:
10    Q So she's saying to you that basically if
11 you don't get her the product that she needs,
12 she'll go to another manufacturer for the product?
13    MR. DAVISON: Objection to form.
14    A It's what it looks like, yes.
15 BY MR. LOESER:
16    Q Okay. And then you write a response to
17 her above that and you write, "Dear Chrissy, The
18 update I last sent you still holds and we do not
19 have any product available to ship.
20    "Please note that the Oxycodone 30mg will
21 continue to have rolling back orders through the
22 spring."
23    And again is that because Mallinckrodt had
24 sold out of all of the oxy 30 that it had at that
25 point?

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    MR. DAVISON:  Objection to form.
2    A There may have been a manufacturing issue
3 or there could have been quota issues with this
4 particular product.  I don't recall.
5 BY MR. LOESER:
6    Q Okay.  But whatever it was, Mallinckrodt
7 did not have the product to deliver to Masters,
8 right?
9    A Not to Masters evidently.
10    Q And you write, "We at Mallinckrodt
11 apologize for the inconvenience that we have
12 caused in our service level to Masters and I will
13 keep you updated on availability."
14    A Mm-hmm (affirmative).
15    Q So were you concerned at all at that point
16 in April of 2011 about the amount of oxy 30 that
17 Masters was ordering from Mallinckrodt?
18    A I don't recall.
19    MR. DAVISON:  Objection.
20    (Whereupon, Exhibit Mallinckrodt-Becker-
21 030 was marked for identification by the
22 reporter.)
23    THE REPORTER:  Number 30.
24 BY MR. LOESER:
25    Q Mr. Becker, you have in front of you

Page 299

1 Exhibit 30, which is an e-mail chain, top of which
2 is an e-mail from you to Charity Keeven, dated
3 May 4th, 2011; subject, "RE: OXYCODONE 30MG."
4    Let's flip to the back of that chain.  Do
5 you see Tom Donohue from Value Drug sends you an
6 e-mail on April 28th, 2011; subject, "OXYCODONE
7 30."  And he writes, "Steve, Need an update on
8 Oxycodone 30mg.  Would McKesson have this stock?
9 I haven't had for roughly 6 to 8 weeks"; do you
10 see that?
11    A Which page is it?
12    Q Very last page.
13    A Oh, yes.  I see that.
14    Q Okay.  And you see your response you send
15 on to Ms. Keeven, you've attached the e-mail from
16 your wholesale distributor --
17    A Mm-hmm (affirmative.)
18    Q -- client.  And you write, "Charity,
19 Value Drug is in need of Oxycodone 30mg.  Can we
20 send them some so they can service some of their
21 accounts that use McKesson"; do you see that?
22    A Mm-hmm (affirmative).
23    Q And then up above that at 12:05 on the
24 same day, she responds, "Hi Steve, Unfortunately
25 we are in such short supply right now that we have

Page 300

1 to stick with the original prioritization of
2 customers for Oxy 30.  Value Drug was on the list
3 of customers that we planned to not ship during
4 this time."
5    A Mm-hmm (affirmative).
6    Q Do you recall why Value Drug was on the
7 list to not ship as of that time?
8    A No, I don't.
9    Q And do you see moving up that chain on
10 April 29th at 9:04 you send an e-mail to
11 Ms. Keeven, cc to Jane Williams; the subject is
12 "OXYCODONE 30MG"?
13    "Any update, I request that you take some
14 product from the HD Smith allocations and send
15 them some product on Oxycodone 30"; do you see
16 that?
17    A Yes.
18    Q Do you recall why you asked for that to
19 happen?
20    A I don't recall specifically why I asked
21 that, but it was obviously a allocated product.
22 And with my accounts, I would look at accounts if
23 we could take product that was being allocated to
24 one account, ship it to another account.
25    Q Okay.

Page 301

1    A And that's obvious.  It appears that's
2 what I was doing.
3    Q So there was -- again Mallinckrodt did not
4 have enough product to keep all of its customers
5 happy?
6    MR. DAVISON:  Objection.  Objection to
7 form.
8 BY MR. LOESER:
9    Q Is that fair?
10    A It appears that way.
11    Q They needed more oxy 30 than Mallinckrodt
12 had on hand to provide?
13    MR. DAVISON:  Objection to form.
14    A It appears that way.
15 BY MR. LOESER:
16    Q If you move up chain, there's an e-mail
17 from Jane Williams to Charity Keeven and to you.
18 And again, this is all attached.  It's one long
19 string.  This is on April 29th at 9:28 a.m.  And
20 Ms. Williams writes, "Hi Steve, I put a
21 recommendation out to Charity and Lisa yesterday
22 copying Ginger.  It was more of an ongoing
23 philosophy.
24    "As it relates to this specific situation
25 with HD Smith.  You are aware of the extremely

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1 limited supply we have available. We have not
2 made a change to our allocation process or the
3 priority customers as of this moment in time."
4     And then skipping down below, it says,
5 "Charity and Lisa, with this message I am
6 requesting that we make a small amount of product
7 available to Value Drug and take the allocation
8 from Cardinal. By small I mean no more than 60
9 bottles"; do you see that?
10    A Yes, I do.
11    Q Okay. And then if you move forward,
12 there's an e-mail from Ms. Keeven to you and to
13 others, continuing in this string, May 4, 2011,
14 11:56 a.m. And she writes, "Hi Steve, I just saw
15 your e-mail regarding Value Drug and Oxy 30...
16 Have they received the 60 bottles I allocated to
17 them Friday? Is this in addition to that," right?
18    A I see that, yes.
19    Q Okay. And moving up you respond, "Yes
20 they got the 60. I know we are under" -- I think
21 you meant to say "severe"; but it says, "I know we
22 are under serve stains but OptiSource accounts are
23 pushing me hard to delivery. As you can see in
24 the e-mails, this one and Rochester Drug other
25 accounts serviced by the big 3 are getting

Page 303

1 products and the pharmacies are starting" --
2 "stating" but I think you meant "starting that
3 they will change wholesalers.
4     "We are now hurting the OptiSource
5 wholesalers as accounts are looking to move their
6 business."
7     So here again it appears that your
8 customers are growing quite upset that you don't
9 have enough oxy to satisfy all their demands; is
10 that right?
11    MR. DAVISON: Objection to form.
12    A Yes.
13 BY MR. LOESER:
14    Q And do you recall why, what's going on
15 with the big three and why they are able to
16 provide product when --
17    A They were allocated a higher amount of
18 product based on their use.
19    Q And then moving up, Ms. Keeven responds to
20 you on May 4th, 2011, at 12:16, "Steve, I am happy
21 to send whatever is needed to keep the business, I
22 just wanted to make sure it was in addition and
23 Friday's allocation was not overlooked. It
24 appears that Value Drug has 1908 bottles on order.
25 I can ship around 500 bottles in case quantity.

Page 304

1 Would that be all right?" Do you see that?
2    A Yes, I do.
3    Q And then moving to the next page you
4 respond, "Yes please ship."
5    A Mm-hmm (affirmative).
6    Q Right? And then moving up from there
7 there's confirmation from Ms. Keeven that "492
8 bottles out of the 900 order" -- "out of the 900
9 ordered has been allocated to their order and
10 scheduled to ship overnight." Okay.
11    A Mm-hmm (affirmative).
12    Q So in this exchange, if we go all the way
13 back to the beginning it starts with your customer
14 indicating to you that they need oxy 30; is that
15 right?
16    A Correct.
17    Q And you were told that they weren't
18 allowed to have any because none was going to be
19 allocated to them, right?
20    MR. DAVISON: Objection.
21    A Correct.
22 BY MR. LOESER:
23    Q After sending e-mail back and forth with
24 Ms. Keeven and others, the decision was made to
25 ship 60 bottles, even though they weren't

Page 305

1 allocated any in the first place; is that right?
2    MR. DAVISON: Objection to form.
3    A Correct.
4 BY MR. LOESER:
5    Q And then after further exchange, instead
6 of 60 bottles -- or in addition to 60 bottles,
7 another 492 bottles were shipped to the client; is
8 that right?
9    MR. DAVISON: Objection to form.
10    A That's correct.
11    (Whereupon, Exhibit Mallinckrodt-Becker-
12 031 was marked for identification by the
13 reporter.)
14    THE REPORTER: Number 31.
15 BY MR. LOESER:
16    Q You have Exhibit 31. This is an e-mail
17 from Jane Williams to you dated August 31st, 2012;
18 Subject, "RE Smith Drug Hydro/Apap SOM inquiry";
19 do you see that?
20    A Yes.
21    Q So if you go to the beginning of this
22 string, you'll see at the bottom of the first page
23 there's an e-mail from Eileen Spaulding to
24 Jennifer Bullerdick.
25    And it states, "Jennifer, 3 orders have

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1 gone on hold for SOM review for Smith Drug for
2 Hydro/Apap 7.5 and 10"--I'm skipping some of the
3 numbers--"for their different DC's. The orders
4 placed are significantly higher than their past
5 ordering history even taking account" -- "even
6 taking into account that they might be ordering
7 today for next week due to the Labor Day holiday.
8     "Can you provide any additional
9 information for use in the SOM review?"
10     Do you see that?
11 A Yes, I do.
12 Q And HD Smith was -- or Smith Drug was your
13 customer; is that right?
14 A Correct.
15 Q And so you were then e-mailed by
16 Ms. Bullerdick on August 31st, 2012, at 12:18.
17 I'm sorry. Below that at 10:55 a.m. She
18 writes, "Steve - the following orders were flagged
19 due to the increased quantity of the order
20 compared to their historical demand.
21     "Please have them cancel these orders and
22 resubmit."
23     Do you see that?
24 A Yes.
25 Q And can you read your response to

Page 307

1 Ms. Bullerdick in the e-mail above that?
2 A "Jennifer, I am not having the orders
3 cancelled. I will contact the buyer and find out
4 the reason for the increase."
5 Q Okay. So who is Jennifer Bullerdick?
6 A She's a product manager.
7 Q Okay. So the product manager told you to
8 cancel the order because it had been identified as
9 in the SOM inquiry; is that right?
10     MR. DAVISON: Objection to form.
11 A They were cancelling the order.
12 BY MR. LOESER:
13 Q Right. And your response was you told her
14 that you would not cancel the order; is that
15 right?
16     MR. DAVISON: Objection to form.
17 A I didn't want the order cancelled. I
18 wanted to investigate why there is an increase
19 with the people at Smith Drug.
20 BY MR. LOESER:
21 Q Okay. And do you recall whether you
22 investigated why there was an increase?
23 A I can't recall.
24 Q Do you recall what information, if any,
25 you obtained from Smith Drug?

Page 308

1     MR. DAVISON: Objection to form.
2 A This particular incident, I don't recall.
3 BY MR. LOESER:
4 Q Okay. So this is another example, though,
5 of an order that came up as being potentially
6 suspicious where the call went out to you to
7 collect the information necessary to determine
8 whether the order should ship or not; is that
9 right?
10     MR. DAVISON: Objection to form.
11 A Yes.
12     MR. LOESER: Can we go off the record?
13     THE VIDEOGRAPHER: We are going off the
14 record. The time is 3:40 p.m.
15     (A recess was taken from 3:40 p.m. until
16 3:54 p.m.)
17     THE VIDEOGRAPHER: We are going back on
18 the record. The time is 3:54 p.m.
19 BY MR. LOESER:
20 Q Okay?
21 A Yeah.
22 Q So during 2009 and 2010, as we saw, your
23 sales increased substantially, wouldn't you say?
24     MR. DAVISON: Objection to form.
25 A It appears that way.

Page 309

1 BY MR. LOESER:
2 Q And in particular, your sales of
3 oxycodone, for most of your customers, was the
4 leading product that you sold; is that right?
5     MR. DAVISON: Objection to form.
6 A It was our leading product, so I assume
7 so, yes, reflective of the reports that I made.
8     MR. LOESER: Why don't we go off the
9 record for a second.
10     THE VIDEOGRAPHER: We're going off the
11 record. Time is 3:55 p.m.
12     (A recess was taken from 3:55 p.m. until
13 3:58 p.m.)
14     THE VIDEOGRAPHER: We are back on the
15 record. The time is 3:58 p.m.
16 BY MR. LOESER:
17 Q Mr. Becker, in 2011, the amount of
18 oxycodone you were able to sell decreased; is that
19 right?
20     MR. DAVISON: Objection to form.
21 A I don't have that record in front of me.
22 BY MR. LOESER:
23 Q Do you recall that a number of clients of
24 yours had their licenses suspended by the DEA
25 in 2011?

Page 310

1   A The Mallinckrodt accounts?
2   Q Yes.
3   A There were some, yes.
4   Q Okay. And did that have an impact on your
5 sales?
6   A It may have.
7   Q You don't recall one way or the other?
8   A No.
9   (Whereupon, Exhibit Mallinckrodt-Becker-
10 032 was marked for identification by the
11 reporter.)
12   THE REPORTER: Number 32.
13 BY MR. LOESER:
14   Q You've been handed Exhibit 32, which is an
15 e-mail from Victor Borelli to you, dated June
16 15th, 2010, with the subject, "CBSNews.com: US
17 Yanks License Of Michigan-based Drug Wholesaler";
18 is that correct?
19   A That's correct.
20   Q And Mr. Borelli sent this, and he writes
21 to you, "FYI regard Harvard Drug."
22   A Mm-hmm (affirmative).
23   Q And what is attached to Mr. Borelli's
24 e-mail is a story from Associated Press, that
25 starts, "The government has suspended the license

Page 311

1 of a Michigan-based drug wholesaler after finding
2 that many customers in Florida were illegally
3 distributing painkillers"; do you see that?
4   A Mm-hmm (affirmative).
5   Q And was this the first you heard of the
6 suspension of Harvard's license?
7   A I'm not certain.
8   Q Do you recall whether you learned this
9 information from Mr. Borelli versus through your
10 own --
11   A I can't recall.
12   Q But whether your wholesale distributor
13 clients had their license suspended with the DEA
14 was an important matter for you, correct?
15   A Would you repeat that?
16   Q Whether a wholesale distributor customer
17 of yours had its license suspended by the DEA was
18 an important matter for you?
19   MR. DAVISON: Objection.
20   A It was an important matter. I don't
21 understand what "whether" has to do...
22 BY MR. LOESER:
23   Q Right, it was an important matter for you?
24   A Yes.
25   MR. DAVISON: Objection.

Page 312

1 BY MR. LOESER:
2   Q And you paid attention to news and press
3 releases and the like that indicated if a customer
4 of yours had its license suspended --
5   A I tried to, yes.
6   (Whereupon, Exhibit Mallinckrodt-Becker-
7 033 was marked for identification by the
8 reporter.)
9   THE REPORTER: Number 33.
10 BY MR. LOESER:
11   Q Mr. Becker, you've been handed Exhibit 33,
12 which is a press release from the U.S. Drug
13 Enforcement Administration. And the caption of
14 the press release is "Michigan Pharmaceutical
15 Supplier'S DEA License Suspended-Harvard Drug
16 Group, LLC distributed 13 million doses of Oxy
17 from 2008 through 2010"; do you see that?
18   A Mm-hmm (affirmative).
19   Q And as we've discussed Harvard Drug Group
20 was a wholesale distributor client of yours; is
21 that correct?
22   A Yes.
23   Q And as we've seen, it was a client of
24 yours during that time period as well, right?
25   A Yes.

Page 313

1   Q This press release indicates, "Harvard
2 Drug Group, LLC, based in Livonia Michigan, has
3 been the subject of DEA investigation that alleges
4 the company was selling large quantities of
5 controlled substances to pharmacies, primarily in
6 Florida. The investigation has revealed that
7 several of Harvard's largest purchasers of
8 oxycodone were engaged in schemes to dispense
9 controlled substances based on prescriptions that
10 were written for other than legitimate medical
11 purposes. The investigation revealed that Harvard
12 Drug Group, LLC, distributed over 13 million
13 dosage units of oxycodone products to customers in
14 the two year time frame between March 2008 and
15 March 2010."
16   Did I read that correctly?
17   A Yes, you did.
18   Q Now, the information about Harvard Drug
19 companies' purchases of oxycodone from
20 Mallinckrodt was tracked in Mallinckrodt's
21 chargeback system, right?
22   MR. DAVISON: Objection to form.
23   A I presume so, yes.
24 BY MR. LOESER:
25   Q And as we talked about earlier, that

Page 314

1 information included the number of dosage units of
2 oxycodone products that were purchased by Harvard
3 Drug Group; is that right?
4     MR. DAVISON:  Objection to form.
5     A  Units, I believe, yes.
6 BY MR. LOESER:
7     Q  Okay.  And in addition, the chargeback
8 system tracked what happened to those units,
9 meaning the downstream customers to which they
10 were sold, right?
11     A  I believe so, yes.
12     MR. DAVISON:  Objection.
13 BY MR. LOESER:
14     Q  And the chargeback system tracked that
15 information based on transaction dates, correct?
16     MR. DAVISON:  Objection to form.
17     A  I believe so.
18 BY MR. LOESER:
19     Q  Do you know if Harvard was buying
20 oxycodone from anyone other than Mallinckrodt
21 during the time that they were your client?
22     MR. DAVISON:  Objection.
23     A  No, I don't.
24     (Whereupon, Exhibit Mallinckrodt-Becker-
25 034 was marked for identification by the

Page 315

1 reporter.)
2     THE REPORTER:  Number 34.
3 BY MR. LOESER:
4     Q  Mr. Becker, you've been handed Exhibit 34,
5 which is an e-mail from Kate Muhlenkamp to, among
6 other persons, you.  And it's dated June 18th,
7 2010.  The subject is "Oxycodone Sales in Florida
8 - Summary"; do you see that?
9     A  Mm-hmm (affirmative).
10     Q  So this e-mail was sent three days after
11 the press release about Harvard Drug having its
12 license suspended, correct?
13     A  Apparently, yes.
14     Q  And if you read the first paragraph of
15 Ms. Muhlenkamp's e-mail, she writes, "As many of
16 you have probably heard, Harvard Drug's license to
17 handle controlled substances was suspended this
18 week.  The predominant reason for the suspension
19 was the sale of Oxycodone in the state of Florida.
20 Please see the attached article for additional
21 information and details"; do you see that?
22     Down further, she notes, "Additionally, it
23 came to our attention that Sunrise Wholesaler's
24 DEA license was suspended pending further
25 investigation.  Although the official reason for

Page 316

1 the suspension has not been named, we are under
2 the impression that it was also due to the sale of
3 Oxycodone in the state of Florida," right?
4     A  Correct.
5     Q  And below that, she writes, "The two
6 wholesaler/distributor license suspensions led us
7 to do a more in-depth analysis of Covidien's
8 Oxycodone sales in the state of Florida.  We
9 specifically focused on doctors' offices and pain
10 clinics.  It appears that Harvard and Sunrise were
11 the dominant players in this market with over 50
12 percent of their total sales coming from this
13 market"; do you see that?
14     A  Yes.
15     Q  Now, the information that Ms. Muhlenkamp
16 indicates Mallinckrodt will be doing a closer look
17 at is information contained in the chargeback
18 system; is that right?
19     MR. DAVISON:  Objection to form.
20     A  I would presume so.
21 BY MR. LOESER:
22     Q  And so collecting information by utilizing
23 the chargeback system, Mallinckrodt was able to
24 identify the transactions that were with doctors'
25 offices and pain clinics?

Page 317

1     MR. DAVISON:  Objection to form.
2 BY MR. LOESER:
3     Q  Right?
4     A  Could you please repeat that.
5     Q  The data in the chargeback system allowed
6 Mallinckrodt to identify transactions with
7 doctors' offices and pain clinics?
8     A  Yes.
9     MR. DAVISON:  Objection.
10 BY MR. LOESER:
11     Q  That same data allowed Mallinckrodt to
12 determine that Harvard and Sunrise were the
13 dominant players in the market with over 50
14 percent of their total sales coming from this
15 market, right?
16     MR. DAVISON:  Objection to form.
17     A  It appears that way, yes.
18 BY MR. LOESER:
19     Q  Okay.  And as we talked about before, at
20 any point in time prior to the license suspension
21 of Harvard, you too could have asked for
22 information from the chargeback system on doctors'
23 offices and pain clinics with which there were
24 transactions?
25     MR. DAVISON:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1    A  I could have.
2  BY MR. LOESER:
3    Q  Right.  And you could have also looked at
4  the percentage of those -- of Harvard's total
5  sales that were with doctors' offices and pain
6  clinics?
7      MR. DAVISON:  Objection.
8    A  If I requested a chargeback report for
9  their full account base.
10  BY MR. LOESER:
11    Q  And you could see in the system the
12  portion of the sales that were shipped to
13  locations in Florida?
14      MR. DAVISON:  Objection.
15    A  Correct.
16  BY MR. LOESER:
17    Q  Now, with regard to all of that data, the
18  DEA had the same information, correct?  Is that
19  your understanding?
20    A  Yes.
21      MR. DAVISON:  Objection.
22    A  They had more information.
23  BY MR. LOESER:
24    Q  Okay.  Was what the "more information"
25  that the DEA had?

Page 319

1    A  They had information on every
2  manufacturer.
3    Q  Okay.  So you're saying that if other
4  manufacturers supplied information to Harvard,
5  that the DEA knew in addition to Mallinckrodt's
6  sales, it would also know --
7    A  Well, the DEA knew --
8      MR. DAVISON:  Objection.
9    A  -- everything in regards to sale of
10  scheduled products.  They not only knew of
11  Mallinckrodt products, they knew of every
12  manufacturer of oxycodone and what their sales
13  were.
14  BY MR. LOESER:
15    Q  Right.  And so if you were dealing with a
16  Mallinckrodt customer that purchased all of their
17  oxycodone from Mallinckrodt, with regard to that
18  product and that distributor, Mallinckrodt had the
19  same information as the DEA, right?
20    A  If they --
21      MR. DAVISON:  Objection.
22    A  If they purchased all their product, but
23  that was highly unlikely.
24  BY MR. LOESER:
25    Q  Do you know whether other customers of

Page 320

1  Mallinckrodt, during any particular time periods,
2  purchased all of their product -- all of their
3  oxycodone product from Mallinckrodt?
4    A  No, I don't know.
5      MR. DAVISON:  Objection.
6  BY MR. LOESER:
7    Q  And if, in fact, that occurred and a
8  hundred percent of the wholesale distributors'
9  purchases of oxycodone came from Mallinckrodt,
10  then in that instance the DEA would have exactly
11  the same information as Mallinckrodt?
12      MR. DAVISON:  Objection.
13    A  They should have, under that example.
14  BY MR. LOESER:
15    Q  Now, you see in the press release that we
16  looked at before, and in this e-mail from
17  Ms. Muhlenkamp, that the DEA shut down Harvard
18  Drug Group and suspended its license based upon
19  the proportion of oxycodone that Harvard Drug
20  Group sold to Florida; is that right?
21      MR. DAVISON:  Objection.
22    A  That's correct.
23  BY MR. LOESER:
24    Q  And with regard to Harvard Drug Group's
25  purchase of Mallinckrodt oxycodone, you also had

Page 321

1  that information?
2      MR. DAVISON:  Objection.
3    A  Yeah, we had that information on
4  chargeback.
5  BY MR. LOESER:
6    Q  So at what point in time prior to seeing
7  the suspension of Harvard's license in June of
8  2010 did you become suspicious of Harvard's sales
9  of oxycodone?
10      MR. DAVISON:  Objection.
11    A  I didn't become suspicious of their orders
12  until I read this article.
13  BY MR. LOESER:
14    Q  Do you believe that the persons at
15  Mallinckrodt responsible for the suspicious order
16  monitoring program and compliance should have been
17  suspicious of Harvard Drug sales prior to the time
18  the DEA suspended Harvard's license?
19      MR. DAVISON:  Objection.
20    A  You'd have to ask them.  It was their job
21  to review all the orders.
22  BY MR. LOESER:
23    Q  And do you have an opinion?
24      MR. DAVISON:  Objection.
25    A  I just stated it; it'd be their job to do

Page 322

1 so.
2 BY MR. LOESER:
3   Q  So based on the time that you were
4 responsible for Harvard Drug Group and they were
5 your wholesale distributor client, you did not
6 have any suspicions --
7   A  No, I didn't.
8   Q  -- based upon the sales that you saw?
9   A  No.  Because I just saw their sales.  I
10 didn't do any chargeback reports.
11     (Whereupon, Exhibit Mallinckrodt-Becker-
12 035 was marked for identification by the
13 reporter.)
14     THE REPORTER:  Number 35.
15 BY MR. LOESER:
16   Q  Mr. Becker, you've been handed Exhibit 35,
17 which is a press release from the United States
18 Department of Justice, District of Maryland, dated
19 June 25th, 2014, indicating that, "Pennsylvania
20 Pharmaceutical Wholesaler Value Drug, Inc. To Pay
21 4 million In Settlement, Settles Claims that Value
22 Drug Failed to Report Suspicious Orders of
23 Oxycodone to Pharmacies in Maryland and
24 Pennsylvania."
25     Did I read that correctly?

Page 323

1   A  Yes, you did.
2   Q  And Value Drug was another one of your
3 customers; is that correct?
4   A  Yes, it was.
5   Q  And if you look at the second page of this
6 press release, in the middle of the second
7 paragraph, this states, "The settlement resolves
8 allegations that from January 1st, 2009 through
9 September 12th, 2012, Value Drug failed to report
10 suspicious orders of oxycodone to six pharmacy
11 customers"; do you see that?
12   A  Yes, I do.
13   Q  And that was the time period that Value
14 Drug was your customer; is that right?
15   A  That's correct.
16   Q  And during that time period, did you ever
17 ask for any chargeback information to show
18 transactions with Value Drug's downstream
19 customers?
20   A  I had no reason to.
21   Q  But at that time, you could have asked for
22 that information?
23     MR. DAVISON:  Objection.
24   A  I could have.  There was no red flags for
25 me to ask for such.

Page 324

1 BY MR. LOESER:
2   Q  Okay.  But you didn't evaluate the ratio
3 of oxycodone or other products to noncontrolled
4 substances?
5     MR. DAVISON:  Objection.
6   A  We are predominantly a Schedule II
7 manufacturer, so no, I did not.
8 BY MR. LOESER:
9   Q  And you didn't examine the ratio of where
10 products were shipped for this particular
11 wholesale distributor customer of yours?
12     MR. DAVISON:  Objection.
13   A  No, I did not have any reason to.
14 BY MR. LOESER:
15   Q  And you didn't examine any of the
16 circumstances of the particular pharmacies to
17 which this wholesale distributor shipped --
18   A  No.
19   Q  -- its customer --
20     MR. DAVISON:  Objection.
21     (Whereupon, Exhibit Mallinckrodt-Becker-
22 036 was marked for identification by the
23 reporter.)
24     THE REPORTER:  Number 36.
25 BY MR. LOESER:

Page 325

1   Q  Mr. Becker, you've been handed Exhibit 36,
2 which are some pages from the Federal Register
3 dated September 15th, 2005.  And it contains the
4 decision and order regarding Masters
5 Pharmaceuticals' DEA license.  And as we went over
6 before, Masters Pharmaceuticals was another one of
7 your wholesale distributor clients; is that right?
8   A  Yes.
9   Q  And if we look at the first paragraph of
10 this decision, it indicates, "On August 9, 2013,
11 the Deputy Assistant Administrator, Office of
12 Diversion Control, Drug Enforcement
13 Administration, issued an Order to Show Cause to
14 Masters Pharmaceuticals"; do you see that?
15   A  Yes.
16   Q  And down below, the order states, "The
17 Order then alleged that notwithstanding 'the MOA,
18 the specific guidance provided to [Respondent] by
19 DEA, and the public information readily available
20 regarding the oxycodone epidemic in Florida, and
21 in the United States, [Respondent] failed to main
22 effective controls against the diversion of
23 controlled substances."
24     And we've talked about the oxycodone
25 epidemic in Florida; is that right?

Page 326

1    MR. DAVISON:  Objection to form.
2    A  Yes.
3  BY MR. LOESER:
4    Q  And you were aware of that based upon
5  articles and other information that you read when
6  you were selling oxycodone?
7    A  Yes.
8    Q  This goes on to state, "The Order then
9  alleged that from April 1st, 2009 through December
10  31st, 2009, Respondent distributed more than 37
11  million dosage units of oxycodone nationally and
12  that nearly 25 million dosage units 'were
13  distributed to its Florida customers'"; do you see
14  that?
15    A  Yes.
16    Q  Now, at least with respect to Mallinckrodt
17  sales to Masters as we've discussed, Mallinckrodt
18  could have easily determined from the chargeback
19  data the proportion of sales to Masters that were
20  shipped to locations in Florida?
21    MR. DAVISON:  Objection to form.
22    A  You'd have to ask Karen Harper that, if
23  she is reviewing -- if she chose to review those
24  reports, that she would have discovered that.
25  BY MR. LOESER:

Page 327

1    Q  Right.  You understand that information
2  was contained in the chargeback system?
3    MR. DAVISON:  Objection.
4    A  Yes.
5  BY MR. LOESER:
6    Q  And if you look at the middle column of
7  the order, it states, "More specifically, the
8  Order alleged that."  And do you see that there's
9  a series of numbered paragraphs 1. through 7.?
10    A  Yes.
11    Q  And, for example, paragraph 6. states,
12  "From January 1st, 2009 through November 30th,
13  2010, [it]," and that means Masters, "distributed
14  approximately 1.7 million dosage units. . .to
15  Lam's Pharmacy; do you see that?
16    A  Yes, I do.
17    Q  And so all of these transactions that are
18  described in 1. through 6., that involve
19  downstream customers of Masters purchasing dosage
20  units from Masters, if any of those sales were of
21  Mallinckrodt product, that information would be
22  contained in the Mallinckrodt chargeback system,
23  right?
24    MR. DAVISON:  Objection to form.
25    A  Yes.

Page 328

1  BY MR. LOESER:
2    Q  And so with regard to Mallinckrodt product
3  sales, when the DEA is looking at information
4  about downstream customer sales, if it involves
5  Mallinckrodt product, the DEA is looking at the
6  same information that Mallinckrodt has in its own
7  chargeback system; is that right?
8    MR. DAVISON:  Objection to form.
9    A  Correct.
10  BY MR. LOESER:
11    Q  So when did you become suspicious of
12  Masters Pharmaceuticals' downstream customer
13  sales?
14    MR. DAVISON:  Objection.
15    A  I don't recall getting suspicious.
16  BY MR. LOESER:
17    Q  Okay.  And do you believe Mallinckrodt's
18  failure to stop selling oxycodone in particular to
19  Masters was the result of negligence or was it an
20  intentional failure?
21    MR. DAVISON:  Objection to form.
22    A  You'd have to ask Karen Harper that
23  question.
24  BY MR. LOESER:
25    Q  Okay.  Do you have an opinion on that?

Page 329

1    MR. DAVISON:  Objection.
2    A  I don't.
3    (Whereupon, Exhibit Mallinckrodt-Becker-
4  037 was marked for identification by the
5  reporter.)
6    THE REPORTER:  37.
7  BY MR. LOESER:
8    Q  Mr. Becker, you've been handed what's
9  marked Exhibit 37, which is a press release from
10  the United States Attorney's Office for the
11  Southern District of New York, dated December
12  23rd, 2016, with the heading "Manhattan U.S.
13  Attorney Announces $10 Million Civil Penalty
14  Recovery Against New York Pharmaceutical
15  Distributor Kinray, Llc."; do you see that?
16    A  Yes, I do.
17    Q  And it states, "This Recovery Is Part of a
18  $44 Million Nationwide Civil Penalty Settlement
19  with Kinray, LLC., and Its Parent Company,
20  Cardinal Health"; do you see that?
21    A  Yes, I do.
22    Q  And Kinray was another one of your
23  wholesale distributor customers; is that right?
24    A  Yes, it was.
25    Q  And after the time Cardinal Health

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1 purchased Kinray, Cardinal Health was one of your
2 wholesale distributor customers, right?
3     A  Correct.
4     Q  And if you look at the first paragraph of
5 this press release, it states in the middle, "In
6 the consent decree approved yesterday by U.S.
7 District Judge Ronnie Abrams, Kinray agreed to pay
8 $10 million to the United States, and admitted and
9 accepted responsibility for failing to inform the
10 DEA, as required by CSA regulations, of Kinray's
11 receipt of suspicious orders for certain
12 controlled substances during the time period
13 between January 1st, 2011 and May 14th, 2012"; do
14 you see that?
15     A  Yes, I do.
16     Q  And, again, that's -- time period overlaps
17 with the time period that Kinray and Cardinal
18 Health were wholesale distributor customers of
19 yours; is that right?
20     A  Yes, but this immediate release, I was
21 retired at that time.
22     Q  Right.  But the time period that they're
23 examining was the time period that these --
24     A  Yeah.
25     Q  -- entities were wholesale --

Page 331

1     A  Yes, I agree to that.
2     Q  -- distributor customers of yours.
3       So, Mr. Becker, when did you become
4 suspicious of Kinray and Cardinal Health's
5 downstream orders?
6       MR. DAVISON:  Objection --
7     A  I didn't -- I wasn't suspicious of them.
8 BY MR. LOESER:
9     Q  And when did you get suspicious of their
10 direct orders of oxycodone from Mallinckrodt?
11       MR. DAVISON:  Objection.
12     A  I wasn't suspicious of them.  I didn't see
13 their orders directly.  They were done by computer
14 electronically.
15 BY MR. LOESER:
16     Q  Well, as we saw from your background
17 reports, you carefully tracked the type of drug
18 that they purchased from you and the amount,
19 correct?
20     A  Correct.
21     Q  And you carefully tracked the dollars that
22 they paid you for those drugs?
23     A  Correct.
24     Q  And you saw the order in terms of which
25 drugs they purchased more of and which they

Page 332

1 purchased less of?
2       MR. DAVISON:  Objection.
3     A  Correct.
4 BY MR. LOESER:
5     Q  And you saw the ratio of oxycodone, for
6 example, to the other drugs that they purchased
7 from you?
8     A  I didn't look at ratios.
9       MR. DAVISON:  Objection.
10 BY MR. LOESER:
11     Q  But in the tables that you prepared, you
12 could easily determine the ratio, right?
13     A  If you wanted to, yes.
14       MR. DAVISON:  Objection.
15 BY MR. LOESER:
16     Q  Okay.  And you didn't do any of that?
17       MR. DAVISON:  Objection.
18     A  I didn't look at ratios, no.
19 BY MR. LOESER:
20     Q  Okay.  And in the chargeback system, at
21 any point in time you could have asked for
22 information on where the product you sold to these
23 entities was shipped --
24       MR. DAVISON:  Objection.
25 BY MR. LOESER:

Page 333

1     Q  -- isn't that right?
2     A  I could have, yes.
3     Q  And you never once did that?
4       MR. DAVISON:  Objection.
5     A  I had no reason to on this particular
6 account.
7 BY MR. LOESER:
8     Q  And you didn't do that for any account,
9 did you?
10       MR. DAVISON:  Objection.
11     A  Not to my recollection.
12 BY MR. LOESER:
13     Q  Did you ever talk to Mr. Borelli about his
14 customer, KeySource Medical?
15     A  When the account was turned over to me, I
16 most likely did.
17     Q  And did you discuss with him the nature of
18 KeySource's business and types of products that it
19 tended to buy?
20     A  I believe we probably reviewed that.
21     Q  And do you recall what you learned from
22 that?
23     A  No, I don't.
24     Q  Did you ever monitor any of the KeySource
25 sales or see any reports?

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1   A  Just the basic reports that we've looked
2  at and product backgrounders, doing business
3  reviews, things of that nature.
4   Q  So for KeySource as well, did you see
5  information indicating the proportion of his
6  purchases that were oxycodone versus other
7  products?
8     MR. DAVISON:  Objection.
9   A  You could look at it that way, yes.
10 BY MR. LOESER:
11  Q  Okay.  And did you see the -- did you ever
12 examine the extent to which KeySource sent its
13 product to Florida versus other locations?
14  A  No, I did not.
15  Q  Did you ever talk to Mr. Borelli about
16 that?
17  A  Not that I recall.
18  Q  Did you ever see the amount of oxycodone
19 that KeySource purchased from Mallinckrodt?
20     MR. DAVISON:  Objection.
21  A  I may have, yes, in my various reports.
22     (Whereupon, Exhibit Mallinckrodt-Becker-
23 038 was marked for identification by the
24 reporter.)
25     THE REPORTER:  Number 38.

Page 335

1  BY MR. LOESER:
2   Q  Showing you what's been marked Exhibit 38,
3  which is an e-mail from Chrissy Madden at Masters
4  to you, dated June 10, 2011.  And the subject is
5  "fyi," and she attaches an article that appears
6  that it was in Money Magazine -- or --
7   A  Mm-hmm (affirmative).
8   Q  -- no, I'm sorry, "wlwt.com money."  I'm
9  not sure what that is.
10     And that article title is "Local Drug
11 Supplier's Controlled Drug License Suspended"; do
12 you see that?
13  A  Yes, I do.
14  Q  And so on this date, on June 10, 2011,
15 Ms. Madden sent you an article indicating that
16 KeySource's medical -- KeySource Medical's license
17 was suspended by the DEA; is that right?
18  A  That's correct.
19  Q  And this indicates, "The agency said
20 KeySource Medical has been the subject of a DEA
21 investigation that alleges the company was selling
22 large quantities of controlled substances to
23 pharmacies, primarily in Florida"; is that right?
24  A  Correct.
25  Q  Down below, it says, "The investigation

Page 336

1  revealed that" -- it says "KeyStone," but I
2  believe it means "KeySource Medical distributed
3  approximately 48 million dosage units of oxycodone
4  products to customers in Florida between November
5  2008 and November 2010," correct?
6   A  Correct.
7   Q  And in the reports that you saw when you
8  were working at Mallinckrodt, you were fully aware
9  of the amount of oxycodone that KeySource
10 purchased from Mallinckrodt; is that right?
11  A  Yes.
12     MR. DAVISON:  Objection to form.
13 BY MR. LOESER:
14  Q  This goes on to state, "'Pharmaceutical
15 companies have a responsibility to ensure that the
16 drugs they sell don't end up in the hands of drug
17 traffickers or businesses that are conducting
18 their businesses illegally.'"  Do you agree with
19 that statement?
20  A  Yes.
21     MR. DAVISON:  Objection to form.
22 BY MR. LOESER:
23  Q  And it goes on to state, "'Prescription
24 drug abuse in Florida, southern Ohio and northern
25 Kentucky has risen to epidemic proportions.'"  Do

Page 337

1  you agree with that statement --
2     MR. DAVISON:  Objection.
3  BY MR. LOESER:
4   Q  -- as of this time?
5     MR. DAVISON:  Objection.
6   A  As of this time, yes.
7  BY MR. LOESER:
8   Q  And it states, "'And KeySource Medical
9  should have known based on the large, frequent
10 quantities, that their customers were diverting
11 oxycodone into arenas that were not legitimate.'"
12     Do you agree that KeySource should have
13 known that?
14     MR. DAVISON:  Objection.
15  A  If they had a product monitoring program
16 in place, they should have been aware of it.
17 BY MR. LOESER:
18  Q  And do you agree that if Mallinckrodt
19 tracked all of that information to all of
20 KeySource's sales, it also should have been aware
21 of that?
22     MR. DAVISON:  Objection.
23  A  You'd have to ask Karen Harper that
24 question.
25 BY MR. LOESER:

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    Q  You worked in this industry for a long
2    time.  What's your understanding of that?
3        MR. DAVISON:  Objection.
4    A  My understanding of what?
5    BY MR. LOESER:
6    Q  Well, let's look at it again.
7        "KeySource should have known based on the
8    large, frequent quantities, that their customers
9    were diverting oxycodone into arenas that were not
10   legitimate."  Mallinckrodt had the same
11   information.  Do you believe that that should have
12   been apparent to Mallinckrodt that KeySource was
13   engaged in diversion?
14       MR. DAVISON:  Objection to form.
15   A  That would be in our product monitoring
16   department's hands, and they should be looking at
17   the data.
18   BY MR. LOESER:
19   Q  And do you know if they did?
20   A  I do not know if they did on this
21   particular account.
22   Q  I want to run through some facts that we
23   covered today and make sure that I understand your
24   testimony.
25       Mallinckrodt had 51 percent of the

Page 339

1    oxycodone market share in the United States in
2    2010 and '11.  Does that sound right?
3        MR. DAVISON:  Objection to form.
4    A  I wouldn't know without looking at the
5    numbers.
6    BY MR. LOESER:
7    Q  Okay.  And the numbers that we looked at
8    showed that for fiscal year 2011, Mallinckrodt's
9    market share of oxycodone was 51 percent?
10       MR. DAVISON:  Objection.
11   A  It appeared that way on what you provided
12   me.
13   BY MR. LOESER:
14   Q  And as we've seen and discussed in
15   articles, oxycodone was one of the most abused and
16   diverted opioids in the United States; is that
17   right?
18       MS. RANJAN:  Objection.
19       MR. DAVISON:  Objection.
20   A  I believe so.
21   BY MR. LOESER:
22   Q  And Mallinckrodt sold hundreds of millions
23   of oxycodone IR 15 and 30 pills to its wholesale
24   distributor clients; is that right?
25       MR. DAVISON:  Objection.

Page 340

1    A  That's correct.
2        (Reporter clarification.)
3    BY MR. LOESER:
4    Q  Mallinckrodt sold hundreds of millions of
5    oxycodone IR 15 and 30 pills to its wholesale
6    distributor clients?
7        MR. DAVISON:  Objection.
8    BY MR. LOESER:
9    Q  Okay.  That's correct?
10   A  Correct.  According to the information
11   that you have.
12   Q  And several of Mallinckrodt's major
13   wholesale distributor clients sold most, and in
14   some cases, nearly all of the oxycodone they
15   bought from Mallinckrodt to pain clinics,
16   pharmacies and dispensing physicians in Florida,
17   right?
18       MR. DAVISON:  Objection.
19   A  I don't know that.
20   BY MR. LOESER:
21   Q  Is that what these --
22   A  You'd have to ask Karen Harper that
23   question.  She would have better knowledge on
24   that.
25   Q  And as to your own clients, that's

Page 341

1    information that you could have obtained from the
2    chargeback data if you had wanted to?
3        MR. DAVISON:  Objection.
4    A  If I elected to run a detailed chargeback
5    report.
6    BY MR. LOESER:
7    Q  Okay.  And there was a very
8    well-publicized raging pill mill problem in
9    Florida, and oxycodone IR was at the center of
10   this, right?
11       MR. DAVISON:  Objection.
12   A  Correct.
13   BY MR. LOESER:
14   Q  And you saw that in articles?
15   A  Yes.
16       MR. DAVISON:  Objection.
17   BY MR. LOESER:
18   Q  Back starting in 2006, right?
19       MR. DAVISON:  Objection.
20   A  It could have been.
21   BY MR. LOESER:
22   Q  Yeah.  And the pills -- many of those
23   pills were shipped by wholesale distributors to
24   Florida, and from there, they migrated north along
25   what we talked about was the "Oxy Express"; is

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1 that right?

2    MR. DAVISON:  Objection.

3    A According to the articles that I read and

4 that have been published.

5 BY MR. LOESER:

6    Q And as we saw in the e-mail from Ms. New

7 to you, you had suspicions about why the amount of

8 oxycodone being sold was increasing to the degree

9 it was as a result of the reformulation of

10 oxycodone; is that right?

11    A Correct.

12    MR. DAVISON:  Objection.

13 BY MR. LOESER:

14    Q And so you read that addicts were

15 switching from OxyContin to oxycodone because

16 OxyContin had become more difficult to abuse,

17 right?

18    MR. DAVISON:  Objection.

19    A Did you say I read that?

20    MR. DAVISON:  Objection.

21 BY MR. LOESER:

22    Q Yes.

23    A I don't believe I read that.

24    Q Okay.  That's a conversation you had with

25 Bonnie New based upon her --

Page 343

1    A With Bonnie New and --

2    MR. DAVISON:  Objection.

3    A -- possibly other people.  It was an

4 assumption that we made why oxycodone sales had

5 increased due to reformulation of the Purdue

6 Frederick product.

7    (Reporter clarification.)

8    A Purdue Frederick product.

9 BY MR. LOESER:

10    Q And every time a Mallinckrodt wholesale

11 distributor sold Mallinckrodt opioids to a

12 downstream customer, that sale and key details of

13 the sale were logged in the chargeback system?

14    A That's correct.

15    MR. DAVISON:  Objection.

16 BY MR. LOESER:

17    Q So Mallinckrodt had available to it

18 detailed information about the number of pills it

19 sold to distributors and the number of these same

20 pills that these distributors shipped to Florida

21 and everywhere else, right?

22    MR. DAVISON:  Objection to form.

23    A They should have, yes.

24 BY MR. LOESER:

25    Q And so it was no secret to Mallinckrodt

Page 344

1 that it was sending hundreds of millions of pills

2 to Florida; is that right?

3    MR. DAVISON:  Objection.

4    A You'd have to ask Karen Harper that

5 particular question.  She was product manager.

6 She was the monitoring person.

7 BY MR. LOESER:

8    Q Right.  But you knew that was happening,

9 right?

10    MR. DAVISON:  Objection.

11    A I did not specifically know they were all

12 going into Florida, and I didn't review specific

13 numbers.

14 BY MR. LOESER:

15    Q Okay.  That information was available,

16 however, in the chargeback system?

17    A Correct.

18    MR. DAVISON:  Objection.

19 BY MR. LOESER:

20    Q And millions of oxycodone pills that you

21 sold to your wholesale distributor clients were,

22 in fact, shipped to Florida, right?

23    MR. DAVISON:  Objection.

24    A They could have been.

25 BY MR. LOESER:

Page 345

1    Q And, Mr. Becker, is it fair to say that

2 the pills that you sold to your wholesale

3 distributor clients contributed to the abuse and

4 diversion problem in Florida?

5    MR. DAVISON:  Objection.

6    A I don't know that for a fact because I

7 don't know who the end users were.

8 BY MR. LOESER:

9    Q Do you have any reason to doubt that?

10    MR. DAVISON:  Objection.

11    A I don't have a reason to doubt it, but I

12 don't have information to state that all of our

13 product went to abusers.

14 BY MR. LOESER:

15    Q Okay.  And we went through some chargeback

16 data for Harvard Drug Group, for example --

17    A Mm-hmm (affirmative).

18    Q -- and you saw that in addition to selling

19 that product via a veterinary supply company, over

20 90 percent of that product was, in fact, shipped

21 to Florida?

22    MR. DAVISON:  Objection.

23    A From that particular account, yes.

24 BY MR. LOESER:

25    Q Right.  And so based on that, is it fair

Page 346

1 to assume that product that you sold, like other
2 oxycodone products shipped to Florida, were
3 diverted and abused as well?
4    A  I don't know.
5       MR. DAVISON:  Objection to form.
6    A  I don't believe it's fair to make that
7 statement.
8 BY MR. LOESER:
9    Q  Okay.  Do you have any reason to believe
10 that the product you sold that was shipped to
11 Florida did not get into the -- was not diverted,
12 whereas other people's product was diverted?
13       MR. DAVISON:  Objection.
14    A  Could you repeat that question?
15 BY MR. LOESER:
16    Q  Do you have any reason to believe that the
17 product you sold was not diverted, whereas product
18 that other manufacturers sold was diverted?
19    A  No.
20       MR. DAVISON:  Objection.
21 BY MR. LOESER:
22    Q  So it's fair to assume that if there was a
23 significant problem of the diversion of oxycodone
24 in Florida, that included in that would be product
25 that you sold that ended up in Florida as well?

Page 347

1    A  A Mallinckrodt product?
2       MR. DAVISON:  Objection.
3 BY MR. LOESER:
4    Q  Yes.
5    A  Correct.
6    Q  And you understand that a significant
7 number of people died overdosing on oxycodone?
8       MR. DAVISON:  Objection to form.
9    A  I don't know how many people passed
10 away -- or died from this epidemic.
11 BY MR. LOESER:
12    Q  But you know from the articles that we've
13 gone over and that you read at the time that you
14 were selling oxycodone that a significant number
15 of people were, in fact, dying because of
16 overdoses on oxycodone, right?
17       MR. DAVISON:  Objection to form.
18    A  I believe so.
19 BY MR. LOESER:
20    Q  Mr. Becker, can you please tell the jury
21 if you have any regrets regarding your involvement
22 in the sale and distribution of opioids during the
23 time that you worked for Mallinckrodt?
24    A  No.
25       MR. DAVISON:  Objection.

Page 348

1       MR. LOESER:  Can we go off the record for
2 a minute.
3       THE VIDEOGRAPHER:  We are going off the
4 record.  Time is 4:33 p.m.
5       (A recess was taken from 4:33 p.m. until
6 4:44 p.m.)
7       THE VIDEOGRAPHER:  We are back on the
8 record.  The time is 4:44 p.m.
9       (Whereupon, Exhibit Mallinckrodt-Becker-
10 039 was marked for identification by the
11 reporter.)
12       THE REPORTER:  Number 39.
13 BY MR. LOESER:
14    Q  Mr. Becker, you've been handed Exhibit 39,
15 which is an e-mail from Karen Harper to you, dated
16 April 1st, 2011, subject, "Updated Suspicious
17 Order Monitoring Customer Checklist for
18 Wholesaler."  Is that correct?
19    A  That's correct.
20    Q  And if you look at the bottom half of that
21 page, there's an e-mail from you to Ms. Harper,
22 with a cc to Jane Williams, dated March
23 14th, 2011, subject, "Questionnaire."
24    A  Mm-hmm (affirmative).
25    Q  And can you read what you wrote?

Page 349

1    A  "I've attached an update for you on the
2 questionnaire for the DEA license renewal.  Please
3 refer to the end of the document for additional
4 questions we may want to consider.  We can set up
5 a time to discuss at any time."
6    Q  And if you go to the top of that e-mail
7 string, in Karen Harper's e-mail to you, she
8 writes, "Steve, Thanks for the great suggested
9 questions.  I've reviewed with the SOM Leadership
10 Team and incorporated many of your suggestions
11 into the actual On-Site Customer Audit document."
12    A  Mm-hmm (affirmative).
13    Q  "Regarding the Wholesaler Checklist, do
14 the questions seem to be on point and relevant to
15 that class of trade?  Based on the information you
16 and Jane received at the recent trade show, I've
17 revised the Customer Checklist Information Sheet
18 that will be sent with every Customer Checklist
19 going forward after our update is complete.  Your
20 feedback will be appreciated."
21       Do you recall the circumstances of this
22 e-mail?
23    A  Yes.  I was asked to help put together a
24 questionnaire.
25    Q  And what was the purpose of the

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1  questionnaire?
2  A It was for our records on the account and
3  their DEA license, I believe.
4  Q And if you turn to the questionnaire
5  itself, the top of the second page of the exhibit,
6  there's a handwritten note, "Steve Becker
7  Revision." Is that your handwriting?
8  A No.
9  Q Okay. And if you look at this page,
10 there's a number of questions; is that right?
11 A Appears that those are all questions. Are
12 you looking at 1. through 10.?
13 Q Right.
14 A Yes.
15 Q And these are -- the idea was that these
16 are circumstances that would be evaluated when --
17 for each downstream customer transaction; is that
18 right?
19    MR. DAVISON: Objection to form.
20 BY MR. LOESER:
21 Q Let me ask it another way.
22    Looking at this document, before the 10
23 questions, there's the statement, "Does this
24 wholesaler monitor pharmacy customers engaged in
25 dispensing controlled substances for one or more

Page 351

1  of the following characteristics in the pattern of
2  ordering controlled substances?" Do you see that?
3  A Yes.
4  Q And so this was a question -- the idea was
5  that your wholesale distributor customers will be
6  presented with this questionnaire, and this
7  information about these characteristics, they
8  would be asked whether they were collecting this
9  information?
10    MR. DAVISON: Objection.
11 A That's correct.
12 BY MR. LOESER:
13 Q And the idea of these ten characteristics
14 is to identify suspicious orders, right?
15    MR. DAVISON: Objection.
16 A It appears that way, yes.
17 BY MR. LOESER:
18 Q Okay. And so, for example, the very first
19 item on this list is "Ordering excessive
20 quantities of a limited variety of controlled
21 drugs (e.g. Ordering only oxycodone,
22 hydrocodone)" -- can't really say that, but
23 alprazolam. How do you say that?
24 A Which one? Hydrocodone?
25    MS. GAFFNEY: Alprazolam.

Page 352

1  BY MR. LOESER:
2  Q Alprazolam, okay.
3  A Alprazolam, mm-hmm (affirmative).
4  Q (Continuing) "while ordering few, if any,
5  non-controlled drugs."
6  A Mm-hmm (affirmative).
7  Q So that would be -- according to this
8  questionnaire that you helped prepare, that would
9  be a characteristic of a suspicious order; is that
10 right?
11 A It could be.
12    MR. DAVISON: Objection.
13 BY MR. LOESER:
14 Q And you apparently were aware of that
15 because you helped prepare this questionnaire?
16    MR. DAVISON: Objection.
17 A Correct.
18 BY MR. LOESER:
19 Q Okay. And the next item on this list is
20 "Ordering a limited variety of controlled
21 substances in quantities disproportionate to the
22 quantity of non-controlled drugs ordered."
23    So that would be another circumstance that
24 would be indicative of a suspicious order; is that
25 right?

Page 353

1     MR. DAVISON: Objection.
2  A Correct.
3  BY MR. LOESER:
4  Q And again, that's something else that you
5  would be aware of because you helped prepare this
6  questionnaire?
7     MR. DAVISON: Objection to form.
8  A Correct.
9  BY MR. LOESER:
10 Q And the same is true for each of these ten
11 items, these are circumstances of a suspicious
12 order, of which you are generally aware, and
13 understood as to why they would potentially
14 identify a suspicious order?
15 A I believe so.
16    MR. DAVISON: Objection.
17 BY MR. LOESER:
18 Q Okay. Let's turn to the second page --
19 well, you note in your e-mail to Ms. Harper,
20 "Please refer to the end of the document for
21 additional questions we may want to consider."
22 And so then the third page of this exhibit is a
23 list of additional questions.
24    Are these questions that you prepared?
25 A I believe I did.

Page 354

1    Q  Okay.  So let's go down through that list,
2  and you can tell me why these items would be
3  indicative of a suspicious order.
4      The first one is, "Provide the date that
5  your company began controlled substance
6  distribution."
7      Why would that matter?
8      MR. DAVISON:  Objection.
9    A  Depending on -- not every account would
10  have a vault to store -- for the proper storage of
11  scheduled products, and six months down the road,
12  they put one in.  So knowing the date of when they
13  started selling controlled substances would be an
14  important factor.
15  BY MR. LOESER:
16    Q  Could it also be because in the opioid
17  epidemic, a lot of new companies came forward to
18  participate in the illegal distribution of --
19    A  Yeah, that's why --
20      MR. DAVISON:  Objection.
21    A  Yes, that's why the questions are...
22  BY MR. LOESER:
23    Q  Okay.  And then your second question is,
24  "Does your company distribute controlled
25  substances and other pharmaceuticals out of your

Page 355

1  state?"  Why is that potentially indicative of a
2  suspicious order?
3      MR. DAVISON:  Objection.
4    A  It's to know where the account distributes
5  their product.
6  BY MR. LOESER:
7    Q  Okay.  And would it matter if they
8  distributed all of their product to one state, for
9  example?
10      MR. DAVISON:  Objection.
11    A  They're licensed for one state, then
12  that's all they're licensed for.  Licensed for
13  three states, that's fine.
14  BY MR. LOESER:
15    Q  And were you thinking as well of the
16  problem that you knew existed of wholesale
17  distributors shipping most or all of their product
18  to Florida, for example --
19      MR. DAVISON:  Objection to form.
20  BY MR. LOESER:
21    Q  -- which was out of the state where a lot
22  of these distributors were located?
23    A  Could you repeat the question.
24      MR. DAVISON:  Objection.
25    A  I'm sorry.

Page 356

1  BY MR. LOESER:
2    Q  Was the reason why you came up with this
3  question your knowledge that for a number of
4  wholesale distributors, while they were not in the
5  state of Florida, they were shipping most of their
6  product to Florida?
7      MR. DAVISON:  Objection.
8    A  Yeah, I think it was information for us to
9  know if they were licensed to sell in Florida.
10  BY MR. LOESER:
11    Q  The next question you have is, "Does your
12  company distribute controlled substances and other
13  pharmaceuticals in the state of Florida?"
14      Now tell me, why was that, according to
15  your helpful assistance with this questionnaire,
16  potentially indicative of a suspicious order?
17      MR. DAVISON:  Objection.
18    A  Because the amount of orders evidently
19  that were going into Florida at the time that we
20  were aware of.
21  BY MR. LOESER:
22    Q  Okay.
23    A  And the problem that they had in Florida.
24    Q  And that was something you were aware of
25  on April 1st, 2011 -- or I'm sorry,

Page 357

1  March 14th, 2011, when you sent these
2  contributions to the questionnaire?
3    A  Evidently, yes.
4      MR. DAVISON:  Objection.
5  BY MR. LOESER:
6    Q  Okay.  The next question is, "Does your
7  company sell controlled substances or
8  pharmaceuticals to customers who distribute or
9  dispense products over the Internet?"
10      Now, tell me, why would that be indicative
11  of a suspicious order?
12      MR. DAVISON:  Objection.
13    A  Knowing if the pharmacy has other outside
14  business than walk-in business.
15  BY MR. LOESER:
16    Q  Was there something in particular about
17  selling controlled substances over the Internet
18  that you thought was a cause for concern?
19    A  Evidently.
20    Q  The next item is, "Has your company been
21  cited for any violations pertaining to controlled
22  substances?"
23      Why was that a factor potentially
24  indicative of suspicious orders?
25      MR. DAVISON:  Objection to form.

Highly Confidential – Subject to Further Confidentiality Review

Page 358

1 A So we're aware of it.
2 BY MR. LOESER:
3 Q So you're aware of whether the company
4 that you're considering as a wholesale distributor
5 had engaged in prior illegal conduct with regard
6 to controlled substances?
7 MR. DAVISON: Objection to form.
8 A Possibly, yes.
9 BY MR. LOESER:
10 Q Okay. And is that something that you had
11 seen among wholesale distributor customer
12 candidates?
13 MR. DAVISON: Objection.
14 A Not particularly, no.
15 BY MR. LOESER:
16 Q The next item is, "Does your company have
17 a specific person who manages compliance on
18 controlled substances and DEA regulations?"
19 Why would that be a factor to consider
20 when identifying whether a wholesale distributor
21 customer engages in suspicious orders?
22 MR. DAVISON: Objection to form.
23 A Well, they have to have a product
24 monitoring program in place, as required by the
25 DEA, I believe.

Page 359

1 BY MR. LOESER:
2 Q Okay. The next item is, "Does your
3 company have a distribution site security
4 manager?"
5 Why does that matter?
6 A I'm not really certain on that one.
7 Q Okay. Could it be that it would help
8 deter theft of controlled substances from the
9 distributor?
10 A I would imagine that's what it was --
11 MR. DAVISON: Objection.
12 A -- pertaining to, and their vault,
13 security with their vault.
14 BY MR. LOESER:
15 Q Okay. The next item is, "List the name of
16 the security company who you have contracted
17 with."
18 Explain that one.
19 MR. DAVISON: Objection.
20 A Again that would pertain to the security
21 of their vault and who they may work with.
22 BY MR. LOESER:
23 Q The next item on your list is, "Does your
24 company have a card access control system?"
25 Explain that.

Page 360

1 A I believe that has to do with getting into
2 the vault.
3 Q Okay. Again, the idea being you wanted to
4 make sure that the distributor was not set up in a
5 way where theft would be easy from their facility?
6 MR. DAVISON: Objection.
7 A Theft and access to their vault or cage.
8 BY MR. LOESER:
9 Q Okay. The next item says, "Does your
10 company have video surveillance of sensitive areas
11 where controlled drugs received, stored and
12 processed?"
13 That too to deter theft?
14 MR. DAVISON: Objection.
15 A Yes.
16 BY MR. LOESER:
17 Q So if a company didn't have that, that
18 would be something to take into account when
19 evaluating the suspicious order monitoring program
20 of that --
21 A Correct.
22 Q -- wholesale distributor?
23 MR. DAVISON: Objection.
24 BY MR. LOESER:
25 Q The next item is, "Provide an overview of

Page 361

1 your company process of opening new pharmacy
2 customers."
3 Why is that important?
4 A So we know how they conduct their business
5 of going to sell to the end user.
6 Q And by "end user," you mean the downstream
7 customers?
8 A Yes.
9 Q So you have a better idea of who the
10 downstream customers are of the wholesale
11 distributor that you --
12 A Yes.
13 Q -- consider bringing on?
14 MR. DAVISON: Objection to form.
15 BY MR. LOESER:
16 Q Then you have a number of items listed
17 here, and it starts with "Number of accounts
18 serviced."
19 Why does that matter?
20 A To know their size, to know -- basically
21 just get more information about their business.
22 Q Okay. And then there's a series of types
23 of downstream customers that you've listed, and
24 they include "Distributors, Retail Pharmacies,
25 Pain Management Clinics, Physicians, Hospitals,

Page 362

1  Mail Order, Long Term Care."
2      The type of downstream customer, why does
3  that matter for evaluating the suspicious order
4  monitoring program of a wholesale distributor?
5      MR. DAVISON: Objection.
6      A  Just basically based on the number of
7  accounts you service, breaking it down from there.
8  If it's retail pharmacies, that's fine.  If it's
9  pain management clinics and they're being
10 outnumbered, that would -- for our people to use
11 this form, that would be relevant information that
12 they have about approving an account to be opened
13 up to service to purchase Mallinckrodt products.
14 BY MR. LOESER:
15     Q  Okay.  So pain management clinics in
16 particular would stand out as a potential --
17     A  To me, yes.
18     Q  -- problem?
19     A  To me.
20     MR. DAVISON: Objection.
21 BY MR. LOESER:
22     Q  And that's because of the amount of
23 diversion that happened from pain management
24 clinics?
25     MR. DAVISON: Objection.

Page 363

1      A  Most likely, yes.
2  BY MR. LOESER:
3      Q  Okay.  And what about physicians?  Is that
4  dispensing physicians; is that what you had in
5  mind?
6      A  Yes.
7      Q  And would they also stand out as a
8  particular issue because of the --
9      A  With me, yes.
10     Q  Because of the diversion that occurred
11 with physicians?
12     A  Yes.
13     MR. DAVISON: Objection.
14 BY MR. LOESER:
15     Q  So for all these factors that you
16 identified, did you examine whether your wholesale
17 distributor clients -- did you collect this
18 information from all of your wholesale distributor
19 clients?
20     A  You'd have to ask Karen Harper that.
21     MR. DAVISON: Objection.
22     A  That information was done through her
23 department, I believe.
24 BY MR. LOESER:
25     Q  Okay.  But I'm asking you.  So during the

Page 364

1  time that you worked at Mallinckrodt, did you
2  attempt to collect any of this information from
3  your wholesale distributor clients?
4      MR. DAVISON: Objection.
5      A  It was sent out by Karen Harper's group
6  and response went back to Karen Harper's group on
7  the e-mail, I believe.  I don't believe any of the
8  documents came back through me.
9  BY MR. LOESER:
10     Q  Right.  And this is April 1st, 2011, and
11 this is a questionnaire you're preparing as of
12 that date, correct?
13     A  Correct.
14     Q  And so I'm asking you prior to that date,
15 during the years from 2000 to 2011 that you worked
16 at Mallinckrodt, is this information that you
17 collected from any of your wholesale distributor
18 clients?
19     A  I may have collected some --
20     MR. DAVISON: Objection.
21     A  -- but yes.
22 BY MR. LOESER:
23     Q  Okay.  And where would that be reflected,
24 if you collected that information?
25     MR. DAVISON: Objection.

Page 365

1      A  I'm not certain where I would have put it.
2  BY MR. LOESER:
3      Q  Were you required to submit any kind of
4  report or information to anyone in which you
5  indicated the collection of any of this
6  information?
7      A  No, not that I recall.
8      Q  And so if there is no such report, does
9  that indicate that you provided no report of this
10 information?
11     MR. DAVISON: Objection.
12     A  I can't answer that.  If I did or did not,
13 I don't recall.
14 BY MR. LOESER:
15     Q  I'm going back to the first page that has
16 questions number 1. through 10., and we went over
17 some of them, including "Ordering excessive
18 quantities of a limited variety of controlled
19 drugs," and so on.
20     Is this information that you collected
21 from your clients or evaluated during the time
22 2000 through 2011?
23     MR. DAVISON: Objection to form.
24     A  Did I collect this data?
25 BY MR. LOESER:

Page 366

1  Q  Right.
2  A  I may have.
3  Q  Okay.  And if you did, would there be some
4  record of you having done that?
5  A  Not that I know.  I'm not certain.
6  Q  Okay.  So when you say you may have, are
7  you saying that there's a very, very remote chance
8  that you did or that --
9  A  I could have asked --
10  MR. DAVISON:  Objection.
11  A  -- these various questions to some of my
12  accounts, and I don't know if I made record of it
13  or not.
14  BY MR. LOESER:
15  Q  But you don't have any specific
16  recollection of asking any of these questions, do
17  you?
18  MR. DAVISON:  Objection.
19  A  No recollection specifically, no.
20  BY MR. LOESER:
21  Q  Okay.  And as we talked about earlier with
22  regard to the oxycodone sales to your wholesale
23  distributor clients, you did not evaluate the
24  ratio of oxycodone --
25  A  I've answered that before.  No, I did not.

Page 367

1  Q  Yeah, okay.
2  MR. DAVISON:  Objection.
3  BY MR. LOESER:
4  Q  And that's the same for all of these
5  questions on here, during the time frame that
6  we've discussed today, with regard to oxycodone?
7  MR. DAVISON:  Objection.
8  A  I believe so, yes.
9  (Whereupon, Exhibit Mallinckrodt-Becker-
10  040 was marked for identification by the
11  reporter.)
12  THE REPORTER:  Number 40.
13  BY MR. LOESER:
14  Q  Mr. Becker, you have in front of you
15  Exhibit 40, which is an e-mail to you from Lisa
16  Cardetti, dated October 15th, 2012.
17  Who is Lisa Cardetti?
18  A  She was a product manager at Mallinckrodt.
19  Q  I'm sorry.  This is an e-mail from you to
20  Lisa Cardetti.
21  A  Mm-hmm (affirmative).
22  Q  And below that is an e-mail from Karen
23  Harper to you.
24  A  Mm-hmm (affirmative).
25  Q  And so it looks like you forwarded, to

Page 368

1  Lisa Cardetti, Karen Harper's e-mail to you; is
2  that right?
3  A  Could have been, yes.
4  Q  Okay.  So if you look at the e-mail from
5  Karen Harper to you on November 15th, 2011, she
6  writes, "Steve, I was grateful for the opportunity
7  to speak to the expanded Generic Sales Group last
8  week and I enjoyed catching up with you, Jane,
9  Bob, and all who attended.
10  "Attached please find several DEA memos to
11  industry regarding Suspicious Order Monitoring and
12  the Federal Register DEA Revocation Notice
13  referenced in the DEA letter dated 12/27/2007.
14  "Although these are several years old, DEA
15  frequently references them to this day in
16  conversations pertaining to industry obligations."
17  Do you recall the meeting with Ms. Harper
18  and --
19  A  No.
20  Q  Do you recall whether -- between
21  April 1st, 2011, and October 15th, 2012, whether
22  you continued to be involved with helping create a
23  checklist for suspicious order monitoring?
24  A  I don't recall specifically, no.
25  Q  And in looking at this e-mail, it looks

Page 369

1  like the e-mail that you forwarded to Ms. Cardetti
2  on October 15, 2012, was an e-mail that was sent
3  to you on November 15th, 2011, so the prior year.
4  Do you recall receiving this e-mail from
5  Ms. Harper?
6  A  No.
7  MR. DAVISON:  Objection.
8  BY MR. LOESER:
9  Q  And then below her e-mail, there's an
10  e-mail from you a little earlier in that same day.
11  On November 15th, 2011, you write, "Dear Karen, It
12  was great to see you last week in DC for our
13  National meeting.
14  "I am looking for any type of document
15  from the DEA on the requirement for product
16  monitoring the wholesale sale account should
17  follow.
18  "Do you have anything you can send?"
19  And that's what caused her to then send
20  the materials that she references in her e-mail.
21  Do you have any recollection --
22  MR. DAVISON:  Objection.
23  BY MR. LOESER:
24  Q  -- of asking for that information?
25  A  I remember asking for it.

Page 370

1   Q And why did you ask for it?

2   A So I could have it on hand to understand

3 what the DEA is looking for and have it to share

4 with accounts.

5   Q Okay. So this was 2011, and you had been

6 working at Mallinckrodt since 2000; is that right?

7   A I believe so.

8   Q And was this the first time -- so if you

9 look at the attachment, one of the things that you

10 were sent was a letter dated September 27th,

11 2006 --

12   A Mm-hmm (affirmative).

13   Q -- from the DEA. Was this the first time

14 you had seen this letter?

15   A Correct.

16   Q And was this the first time that you had

17 received information regarding what the DEA would

18 consider circumstances that might be indicative of

19 diversion?

20   A I believe so.

21      MR. DAVISON: Objection to form.

22 BY MR. LOESER:

23   Q So why don't you turn to the third page of

24 the DEA letter dated September 27, 2006.

25   A (Complies.)

Page 371

1   Q The heading is, "Circumstances That Might

2 Be Indicative of Diversion, DEA investigations

3 have revealed that certain pharmacies engaged in

4 dispensing controlled substances other than a

5 legitimate medical purpose often display one or

6 more of the following characteristics in their

7 pattern of ordering controlled substances."

8     Do you see those items there?

9   A Yes.

10   Q And some of those items are the same items

11 that were on the questionnaire that you were

12 working on; is that right?

13   A Yes.

14   Q And take a look at the first four items on

15 that list.

16   A Mm-hmm (affirmative).

17   Q The first one is, "Ordering excessive

18 quantities of a limited variety of controlled

19 substances."

20   A Mm-hmm (affirmative).

21   Q Second one, "Ordering a limited variety of

22 controlled substances in quantities

23 disproportionate to the quantity of non-controlled

24 medications."

25   A Yes.

Page 372

1   Q Third, "Ordering excessive quantities of a

2 limited variety of controlled substances in

3 combination with excessive quantities of lifestyle

4 drugs."

5     Fourth is, "Ordering the same controlled

6 substances from multiple distributors"; do you see

7 that?

8   A Yes, I do.

9   Q So we've spent a lot of time going through

10 your customers, particularly during the time frame

11 of 2008 to 2010. How many of those factors would

12 you say applied to your wholesale distributor

13 customers?

14     MR. DAVISON: Objection to form.

15   A How many of these apply to my accounts?

16 BY MR. LOESER:

17   Q Yeah.

18   A Well, I would imagine all of them.

19     MR. LOESER: Go off the record.

20     THE VIDEOGRAPHER: We are going off the

21 record. The time is 5:06 p.m.

22     (A recess was taken from 5:06 p.m. until

23 5:17 p.m.)

24     THE VIDEOGRAPHER: We are back on the

25 record. Time is 5:17 p.m.

Page 373

1     MR. GASTEL: Good evening, Mr. Becker. My

2 name is Ben Gastel, and I represent a group of

3 plaintiffs in Tennessee that have been

4 cross-noticed in today's deposition.

5     I'll first state for the record, as we

6 have done in numerous of these depositions, that

7 we object to the deposition going forward today on

8 behalf of our clients because of Mallinckrodt's

9 continuous failures to meet their obligations set

10 forth in the state-federal cooperation protocol,

11 and as laid out in our previous deposition records

12 and in our motions to quash.

13     MR. DAVISON: And I just note that

14 Mallinckrodt has complied with state-federal

15 protocol, but your objection is noted.

16     MR. GASTEL: And I also will incorporate

17 Mr. Loeser's objections about the recently

18 produced documents, and like Mr. Loeser, I will

19 also like to reserve the right to recall the

20 witness.

21     MR. DAVISON: And just to make the record

22 clear on the number of documents produced, I think

23 earlier today Mr. Loeser said it was 300,000

24 documents. I believe it was closer to 25,000

25 documents or somewhere around there. I do not

Page 374

1 believe it was 300,000 documents.
2            EXAMINATION
3 BY MR. GASTEL:
4    Q So now that that dance is out of the way,
5 Mr. Becker, I'll reiterate that my name is Ben
6 Gastel, and I represent, like I said, a different
7 group of plaintiffs than the group that Mr. Loeser
8 was representing when he was asking you questions
9 throughout the day. Fortunately for you, I don't
10 have nearly as many questions as Mr. Loeser.
11    And everyone I represent is from the state
12 of Tennessee, so I'll begin by asking you, have
13 you ever been to Tennessee as part of your work
14 for Mallinckrodt?
15    A Yes.
16    Q In what capacities did you go to the state
17 of Tennessee?
18    A I had an account that I called on there.
19    Q What account was that?
20    A TopRx I believe was in Tennessee.
21    Q And do you remember what part of Tennessee
22 TopRx was located?
23    A I don't. Bartlett, possibly. Is there
24 such a town?
25    Q There is.

Page 375

1    A I think that's where I think it is. My
2 memory doesn't serve me the best. It's been
3 awhile.
4    Q And how many times, approximately, do you
5 think that you traveled to Tennessee to visit
6 TopRx?
7    A I may have traveled -- to that account, I
8 may have traveled there two, three times.
9    Q Anything stick out from those visits?
10    MR. DAVISON: Objection to form.
11    A No.
12 BY MR. GASTEL:
13    Q And what was the nature of the visit?
14    A Sales call. And on top -- on that, I may
15 have attended -- some sales meetings for my
16 accounts may have taken place in Memphis or
17 Nashville.
18    Q And those would be separate than your
19 visits directly to TopRx?
20    A Correct.
21    Q And approximately how many times do you
22 think that you traveled to Tennessee for these
23 sales meetings?
24    A Again, I don't recall specifically. Maybe
25 two, three times.

Page 376

1    Q And do you recall approximately when those
2 visits were?
3    A No, I don't.
4    Q Anything stick out in your mind regarding
5 your visits for the sales meetings?
6    MR. DAVISON: Objection to form.
7    A No. I can't even remember what accounts
8 they were for.
9 BY MR. GASTEL:
10    Q And apart from those visits regarding
11 TopRx and the visits you've described for the
12 sales meetings, do you recall any other instances
13 where you would have traveled to the state of
14 Tennessee for your work for Mallinckrodt?
15    A No.
16    Q I probably should have began here, but
17 will you state your full current address.
18    A 581 Coventry Parkway, Eagan, Minnesota
19 55123.
20    Q And how long have you lived there, sir?
21    A I believe maybe 25 years, 26 years.
22    Q Any plans to move from there anytime soon?
23    MR. DAVISON: Objection.
24    A I'm not planning to move from there, but I
25 have another residence I spend quite a bit of time

Page 377

1 in.
2 BY MR. GASTEL:
3    Q And where is that other residence?
4    A Brainerd, Minnesota.
5    Q And what is the address of that residence?
6    A I don't have the ZIP Code. It would be
7 20857 Paradise Lane, Brainerd, Minnesota.
8    Q Going back again, the clients that I
9 represent are in the state of Tennessee. What is
10 your understanding of opioid prescription rates in
11 the state of Tennessee?
12    A I don't have any --
13    MR. DAVISON: Objection to form.
14    A -- information on that.
15 BY MR. GASTEL:
16    Q Do you believe that Tennessee has been
17 particularly hard hit by the opioid crisis?
18    MR. DAVISON: Objection.
19    A I don't know how they would rank on any
20 issues with opiates.
21 BY MR. GASTEL:
22    Q But you understand that the opioid crisis
23 affects certain parts of the country
24 differently --
25    A Correct.

Page 378

1 Q -- than it affects other parts of the
2 country?
3 A Correct.
4 MR. DAVISON: Objection.
5 A I believe Tennessee, Kentucky, Ohio, up
6 that corridor, there was an issue.
7 BY MR. GASTEL:
8 Q Have you ever reviewed any materials
9 published by the Tennessee Department of Health on
10 Tennessee's opioid crisis?
11 A No.
12 Q Are you aware that as of 2013, 2014, the
13 Tennessee Department of Health estimated that
14 there were approximately 221,000 adults in
15 Tennessee using prescription opioids for
16 nonmedical reasons?
17 A No.
18 MR. DAVISON: Objection to form.
19 BY MR. GASTEL:
20 Q You talked a lot earlier today about the
21 I-75 corridor from Florida to Ohio. Do you
22 remember that testimony?
23 MR. DAVISON: Objection.
24 A I didn't talk about it. I was asked
25 questions on the I-75 corridor.

Page 380

1 MR. DAVISON: Objection.
2 A No, it would not surprise me. I'm just
3 not familiar with it.
4 BY MR. GASTEL:
5 Q Mr. Loeser went through some documents
6 related to Masters Pharmaceutical and specifically
7 as it relates to the DEA's suspension of their
8 license in 2011. Do you recall those documents?
9 MR. DAVISON: Objection.
10 A I recall seeing the documents from him
11 today.
12 BY MR. GASTEL:
13 Q Do you recall that after Mallinckrodt
14 suspended sales to Masters, Mallinckrodt held a
15 meeting that some employees referred to as "the
16 earthquake meeting"?
17 MR. DAVISON: Objection to form.
18 A I've never heard any such thing.
19 BY MR. GASTEL:
20 Q You never heard anybody refer to a meeting
21 at Mallinckrodt as "the earthquake meeting"?
22 MR. DAVISON: Objection.
23 A No.
24 BY MR. GASTEL:
25 Q And you testified earlier that you knew

Page 379

1 BY MR. GASTEL:
2 Q Sure. And I think that you kind of refer
3 to that as the Oxy Express a couple of times.
4 A That's what it is --
5 MR. DAVISON: Objection to form.
6 A I guess that's what it is acknowledged as
7 being, but I also believe I stated there's other
8 highways that come out of Florida.
9 BY MR. GASTEL:
10 Q Sure. But are you aware that I-75 runs
11 right through Eastern Tennessee?
12 MR. DAVISON: Objection.
13 A I'm not sure exactly where it is.
14 BY MR. GASTEL:
15 Q Would it surprise you to learn that that
16 was true?
17 MR. DAVISON: Objection.
18 BY MR. GASTEL:
19 Q Would it surprise you to learn that that
20 was true?
21 MR. DAVISON: Objection.
22 A What was true?
23 BY MR. GASTEL:
24 Q That Interstate 75 runs right through
25 Eastern Tennessee?

Page 381

1 that Mallinckrodt collected chargeback data
2 regarding its sales, correct?
3 A Correct.
4 Q And you went through some chargeback data
5 with Mr. Loeser earlier today, correct?
6 MR. DAVISON: Can we just hold up for a
7 second. I think there might be an issue with the
8 phone. Can we just check if anyone on the phone
9 can hear us.
10 THE REPORTER: One moment. Should we go
11 off the record?
12 MR. DAVISON: Yeah, let's go off the
13 record.
14 THE VIDEOGRAPHER: Going off the record.
15 The time is 5:25 p.m.
16 (A recess was taken from 5:25 p.m. until
17 5:27 p.m.)
18 THE VIDEOGRAPHER: We are back on the
19 record. The time is 5:27 p.m.
20 MR. GASTEL: Do you have the exhibit
21 stickers?
22 THE REPORTER: Yes.
23 (Whereupon, Exhibit Mallinckrodt-Becker-
24 041 was marked for identification by the
25 reporter.)

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1      THE REPORTER: We are on 41.
2 BY MR. GASTEL:
3      Q  Mr. Becker, I've handed you a document,
4 and you'll see on the front page there's a cover
5 page.  This Microsoft Excel spreadsheet was
6 produced to us in a native format with Bates
7 Number MNK_TNSTA05347733, and it has a file name
8 of "TN and UT oxy15 and 30 through June 2012."
9      Do you see where it says that, sir?
10     A  Yes, I do.
11     MS. RANJAN:  Counsel, do you have copies
12 for either attorneys in attendance?
13     MR. GASTEL: Sure.  (Handing.)
14 BY MR. GASTEL:
15     Q  Flipping to the spreadsheet--and I'll
16 represent to you that this is the sheet that
17 carries the tab name of "Oxy 30 TN"--do you see
18 across the top there are column labels for this
19 spreadsheet, including the "Ship to Number," the
20 "Ship to Name," the "Ship to Address," the "Ship
21 to City," the "Ship to State" --
22     A  Yes.
23     Q  -- and the "Sold Via Parent Name"; do you
24 see that?
25     A  Yes, I do.

Page 383

1      Q  And this would be consistent with the type
2 of information that would be collected in
3 chargeback data that was maintained by
4 Mallinckrodt, correct?
5      MR. DAVISON:  Objection to form.
6      A  I'm not certain exactly what information
7 they put in their chargeback reports because I
8 only requested reports.  I did not work in that
9 department.
10 BY MR. GASTEL:
11     Q  But you know that chargeback data would
12 include information on who Mallinckrodt sold
13 product to, correct?
14     A  Yes.
15     Q  And that would typically be shown as a
16 parent in the name of the chargeback data,
17 correct?
18     MR. DAVISON:  Objection to form.
19     A  Correct.
20 BY MR. GASTEL:
21     Q  And then it would also show the address
22 and the name of the customer, the downstream
23 customer, who ultimately received that order,
24 correct?
25     A  Correct.

Page 384

1      MR. DAVISON:  Objection.
2 BY MR. GASTEL:
3      Q  Then do you see again on this document --
4 I now realize I have not put it up on the -- that
5 in the far right there are columns that have dates
6 listed, do you see that, and they run from
7 July 2011 through June 2012?
8      A  Yes, I do.
9      Q  Do you see that?
10     A  Yes, I do.
11     Q  Would that suggest to you that this is
12 chargeback data covering that period of time?
13     MR. DAVISON:  Objection to form.
14     A  I do not know.
15 BY MR. GASTEL:
16     Q  Well, when you would see July 2011 in a
17 spreadsheet, you would normally consider that to
18 be data reflect --
19     A  If this is a chargeback report.
20     MR. DAVISON:  Objection.
21 BY MR. GASTEL:
22     Q  Yeah, and I'll represent to you that it is
23 a chargeback report --
24     A  Okay.
25     Q  -- that was maintained by Mallinckrodt on

Page 385

1 its share drive, okay?
2      MR. DAVISON:  Objection.
3 BY MR. GASTEL:
4      Q  I didn't run this report.  This is a --
5      A  Right, I've never seen this report.
6      Q  -- document that Mallinckrodt produced to
7 us.
8      A  I've never seen this report.
9      Q  I understand.
10     And you recall earlier today that
11 Mr. Loeser walked you through the period of time
12 when Mallinckrodt suspended sales to Masters
13 Pharmaceutical; do you remember that?
14     MR. DAVISON:  Objection.
15     A  Yes.
16 BY MR. GASTEL:
17     Q  So I want to look at the column "Sold Via
18 Parent Name" on this spreadsheet.
19     A  Yes.
20     Q  Okay.  And will you go down and find the
21 first instance where Masters Pharmaceutical is
22 identified.  And to help direct your attention,
23 you'll see that it is in row 24; do you see that?
24     A  (Reviewing.)  Yes, I do.
25     Q  And the downstream customer reflected in

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1  this for Masters Pharmaceutical is Food City
2  located at 11503 Chapman Highway; do you see that?
3      MR. DAVISON: Objection.
4      A Is what? Food City, did you say?
5  BY MR. GASTEL:
6      Q Yes, on --
7      A Yes.
8      Q -- 11503 --
9      A Yes.
10     Q -- Chapman Highway; you see that, correct?
11     A Yes.
12     Q And then if you go over here to the data
13 reflected in the columns with the month and year
14 names --
15     A Mm-hmm (affirmative).
16     Q -- you'll see that there are sales
17 reported for July 2011; do you see that?
18     MR. DAVISON: Objection.
19     A Yes.
20 BY MR. GASTEL:
21     Q And there are sales reported for
22 August 2011; do you see that?
23     A Yes.
24     MR. DAVISON: Objection.
25 BY MR. GASTEL:

Page 387

1      Q And then there are sales reported in
2  September of 2011; do you see that?
3      A Yes.
4      MR. DAVISON: Objection.
5  BY MR. GASTEL:
6      Q And then there's no more sales for the
7  rest of the year; do you see that?
8      A Yes.
9      MR. DAVISON: Objection.
10 BY MR. GASTEL:
11     Q And that would be consistent with roughly
12 the time period when Mallinckrodt suspended sales
13 to Masters Pharmaceuticals, correct?
14     A Evidently, yes.
15     Q And then for the first month that there's
16 no reported Masters sale, do you see that there is
17 a sale of what I imagine is 22,200 pills to that
18 very same pharmacy that went through
19 AmerisourceBergen Health? Do you see that in line
20 22?
21     MR. DAVISON: Objection.
22     A I see that.
23 BY MR. GASTEL:
24     Q And then sales continued through the
25 period covered by this spreadsheet through June

Page 388

1  2012 via AmerisourceBergen; do you see that?
2      A Mm-hmm. Mm-hmm (affirmative).
3      MR. DAVISON: Objection.
4  BY MR. GASTEL:
5      Q And that was your client during this time
6  period, correct?
7      MS. MCINTYRE: Object to form.
8      A AmerisourceBergen?
9  BY MR. GASTEL:
10     Q AmerisourceBergen was your account during
11 this time period?
12     A It may have been. I don't recall.
13     Q But at some point you were the account
14 manager for the AmerisourceBergen account,
15 correct?
16     A At one point I was, yes.
17     Q And so after Mallinckrodt suspends sales
18 to Masters Pharmaceuticals for its failure to
19 maintain effective controls against diversion,
20 what did the sales team do to ensure that drugs
21 that were previously being sold to Masters were
22 just simply not being diverted to other wholesale
23 customers?
24     MR. DAVISON: Objection to form.
25     A Could you repeat the question, please.

Page 389

1  BY MR. GASTEL:
2      Q Sure. After Mallinckrodt suspends sales
3  to Masters Pharmaceuticals, what did the sales
4  team do to ensure that Masters' downstream
5  customers were not simply going to other
6  wholesalers to obtain prescription opioids?
7      MR. DAVISON: Objection to form.
8      A I don't recall that the sales team did
9  anything. That would be Karen Harper's job under
10 product monitoring.
11 BY MR. GASTEL:
12     Q And do you see that the Ship to City here
13 for this Food City location is in Seymour,
14 Tennessee; do you see that?
15     A Yes, I do.
16     Q And then do you see that with regard to
17 the sales via Masters that there is -- during the
18 period covered by this spreadsheet, which appears
19 to be one year, there were 76,600 oxy 30 pills
20 sold to this pharmacy in Seymour?
21     A What line number are you looking at again?
22     MR. DAVISON: Objection.
23 BY MR. GASTEL:
24     Q Again, on line number 24 --
25     A Yes, I see that.

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1  Q -- for sales to Food City via Masters
2  Pharmaceuticals, there's 76,600 pills; do you see
3  that?
4       MR. DAVISON:  Objection.
5       A  Mm-hmm (affirmative).  I see that.
6  BY MR. GASTEL:
7       Q  And then AmerisourceBergen, during that
8  same period, has 77,900 pills sold to this Food
9  City in Seymour, Tennessee --
10      MS. MCINTYRE:  I can't hear the question.
11  I'm sorry to interrupt.
12  BY MR. GASTEL:
13      Q  -- during the period reflected in this
14  spreadsheet; do you see that?
15      MR. DAVISON:  Objection.
16      A  You hesitated, so could you repeat the
17  question.
18  BY MR. GASTEL:
19      Q  Sure.  And then if you go farther up the
20  spreadsheet to the same Food City located in
21  Seymour, Tennessee, sales via AmerisourceBergen
22  during this period covered by this spreadsheet
23  constitutes 77,900 pills; do you see that?
24      A  Yes.
25      MR. DAVISON:  Objection to form.

Page 391

1       MS. MCINTYRE:  Object to form.
2  BY MR. GASTEL:
3       Q  And also do you see that this spreadsheet
4  is sorted by the "Total 12 months" column; do you
5  see that?
6       A  Yes.
7       Q  And it's sorted in descending order from
8  the highest to the lowest; do you see that?
9       A  Yes.
10      Q  And so this would appear that during this
11  time period, this was -- this account, Food City
12  in Seymour, Tennessee, was Masters' largest
13  Tennessee customer covered by this time period; do
14  you see that?
15      MR. DAVISON:  Objection to form.
16      A  According to this data.
17  BY MR. GASTEL:
18      Q  Sure.  And then again we see, if we go
19  back -- if we flip farther down the spreadsheet
20  down to rows 41 and 42; do you see that?
21      A  Mm-hmm (affirmative).
22      Q  We see the next instance of Masters being
23  listed in this spreadsheet; do you see that --
24      A  Mm-hmm (affirmative).  Yes, I do.
25      Q  -- in line 42?  And it reflects a sale in

Page 392

1  July of 2011 of 45,600 oxy 30 pills into this Food
2  City pharmacy in Knoxville, Tennessee; do you see
3  that?
4       A  Yes, I do.
5       MR. DAVISON:  Objection.
6  BY MR. GASTEL:
7       Q  And then no sales for the rest of the
8  year; do you see that?
9       A  Yes, I do.
10      MR. DAVISON:  Objection.
11  BY MR. GASTEL:
12      Q  But then sales continue through
13  AmerisourceBergen, as reflected on row 41; do you
14  see that?
15      MR. DAVISON:  Objection.
16      A  Yes, I do.
17  BY MR. GASTEL:
18      Q  And again the sales through
19  AmerisourceBergen are 46,300; do you see that?
20      A  Yes, I do.
21      MR. DAVISON:  Objection.
22  BY MR. GASTEL:
23      Q  So after Mallinckrodt shut off Masters in
24  the summer of 2011, are you aware of any attempt
25  by Mallinckrodt's sales department to undertake

Page 393

1  any investigation regarding Masters' customers in
2  Tennessee?
3       A  I don't know.
4       MR. DAVISON:  Objection to form.
5       A  That would have been Karen Harper's
6  responsibility.
7  BY MR. GASTEL:
8       Q  Do you know whether or not Karen Harper
9  did anything?
10      MR. DAVISON:  Objection.
11      A  I do not know.  You'd have to ask her
12  specifically.
13  BY MR. GASTEL:
14      Q  But she didn't talk to you about that at
15  that time?
16      MR. DAVISON:  Objection.
17      A  About Food City?
18  BY MR. GASTEL:
19      Q  Well, about any Masters customer in the
20  state of Tennessee?
21      A  Not that I recall.
22      Q  And after Mallinckrodt shut off -- sorry.
23  Strike that.
24      Do you know whether the suspicious order
25  monitoring team held any meetings with the sales

Page 394

1 force to discuss Masters Pharmaceuticals'
2 downstream customers moving to other Mallinckrodt
3 wholesalers?
4     A Not that I recall.
5         MR. DAVISON: Objection.
6 BY MR. GASTEL:
7     Q Do you know how many people live in
8 Seymour, Tennessee?
9     A I don't.
10        MR. DAVISON: Objection.
11 BY MR. GASTEL:
12    Q According to the United States Census
13 Bureau, there's approximately 11,000 people who
14 live there. Do you have any reason to dispute
15 that?
16        MR. DAVISON: Objection.
17    A No.
18 BY MR. GASTEL:
19    Q Would it raise a red flag to you that
20 Mallinckrodt, during the period reflected by this
21 chargeback data, was selling what appears to be
22 approximately 145,000 oxy 30 pills into Seymour,
23 Tennessee?
24        MR. DAVISON: Objection.
25        MS. MCINTYRE: Objection.

Page 395

1     A Repeat the question, please.
2 BY MR. GASTEL:
3     Q Would it raise a red flag to you that
4 Mallinckrodt, during the period reflected by this
5 chargeback data --
6     A If I had this information --
7        MR. DAVISON: Objection.
8     A -- it may have raised a flag to me.
9 BY MR. GASTEL:
10    Q And you've testified a little bit about
11 this today, but Mallinckrodt isn't the only oxy 30
12 manufacturer in the United States, correct?
13    A That's correct.
14    Q You had numerous other competitors, right?
15    A I'm not certain the definition of
16 "numerous." I'm not certain how many players may
17 have been out there.
18    Q Well, how many players do you recall being
19 in the oxy 30 market?
20    A Three to four.
21    Q So there were three to four others. And I
22 think that Mr. Loeser showed you data earlier
23 today that in or around 2011, your market share
24 for oxy was approximately 51 percent, correct?
25    A Correct.

Page 396

1         MR. DAVISON: Objection.
2 BY MR. GASTEL:
3     Q And so it's entirely possible that other
4 manufacturers and other wholesalers are also
5 pushing product into this pharmacy in Seymour,
6 Tennessee, correct?
7         MR. DAVISON: Objection.
8     A You'd have to ask those accounts.
9 BY MR. GASTEL:
10    Q Sure.
11    A I wouldn't be able to answer that.
12    Q But your chargeback data only reflects
13 sales made by Mallinckrodt, not the other
14 manufacturers, correct?
15    A That's correct.
16        MR. DAVISON: Objection.
17    A The DEA has the information on all
18 combined manufacturers.
19 BY MR. GASTEL:
20    Q Sure. But with regard to the information
21 about Mallinckrodt sales, Mallinckrodt has the
22 same information as the DEA through its chargeback
23 data, right?
24        MR. DAVISON: Objection.
25    A It should.

Page 397

1 BY MR. GASTEL:
2     Q And oxy 30, which is the only prescription
3 opioid reflected by this spreadsheet, is not the
4 only prescription opioid on the market, is it?
5         MR. DAVISON: Objection.
6     A Correct.
7 BY MR. GASTEL:
8     Q There are other prescription opioids like
9 oxy 15, correct?
10    A Correct.
11    Q Or hydrocodone, correct?
12    A Correct.
13    Q And oxy with Tylenol, which often trades
14 under the brand name of Percocet, right?
15        MR. DAVISON: Objection.
16    A Correct.
17 BY MR. GASTEL:
18    Q Will you flip to the last page of that
19 exhibit, please.
20    A (Complies.)
21    Q Do you see the very last line of this
22 spreadsheet?
23    A 963?
24    Q 964.
25    A 964?

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1   Q Yep.
2   A Yes.
3   Q Will you read the number that's right
4 there.
5       MR. DAVISON: Objection.
6   A I believe that's 8,635,800.
7 BY MR. GASTEL:
8   Q And according to this chargeback data
9 that's maintained by Mallinckrodt, that's the
10 number of oxy 30 pills sold by Mallinckrodt into
11 the state of Tennessee from July 2011 through June
12 2012.
13      MR. DAVISON: Objection to form.
14  A According to your report, yes.
15 BY MR. GASTEL:
16  Q And does that raise a red flag to you that
17 Mallinckrodt is selling 8.6 million pills of oxy
18 30 into Tennessee over a 12-month period?
19      MR. DAVISON: Objection to form.
20  A You'd have to ask Karen Harper that under
21 product monitoring.
22 BY MR. GASTEL:
23  Q Do you know how many people live in the
24 state of Tennessee?
25  A No, I don't.

Page 399

1       MR. DAVISON: Objection.
2 BY MR. GASTEL:
3   Q According to the United States Census
4 Bureau, approximately 6 and a half million people
5 live in the state of Tennessee. Do you have any
6 reason to dispute that figure?
7       MR. DAVISON: Objection.
8   A No.
9 BY MR. GASTEL:
10  Q So according to your own data, during this
11 time period, you were selling over 1.3 pills of
12 oxy 30 for every man, woman and child in the state
13 of Tennessee. Does that concern you?
14      MR. DAVISON: Objection to form.
15  A Does that concern me?
16 BY MR. GASTEL:
17  Q Yeah.
18  A If I had these numbers in front of me, I
19 would have had concerns, yeah.
20      THE WITNESS: Can this go on this pile
21 here as well, or do you want this separate?
22      THE REPORTER: You can put it on the same
23 pile.
24      (Whereupon, Exhibit Mallinckrodt-Becker-
25 042 was marked for identification by the

Page 400

1 reporter.)
2       THE REPORTER: This is Number 42.
3       MR. GASTEL: I might have come with less
4 copies of this one for some reason. I'm sorry
5 about that. Well, I'll share that one, and I'll
6 just, on the Elmo, use mine.
7 BY MR. GASTEL:
8   Q I just handed you a document, sir, that
9 was produced to us in this litigation under Bates
10 number MNK_TNSTA02127136. And the file name is
11 "Oxy 15 and 30 Ship to and Sold via by mo Jan2014
12 to December2014 run 1-15-15."
13      Does that suggest to you, sir, that this
14 is chargeback data for the calendar year 2014 that
15 was run on January 15th, 2015?
16  A It could be --
17      MR. DAVISON: Objection.
18  A -- a chargeback report. I'm not familiar
19 with what our full chargeback reports look like.
20 BY MR. GASTEL:
21  Q Sure. But chargeback reports often come
22 with information regarding the name of the ship --
23 the ship to name, the ship to address, the ship to
24 city, the ship to state, the sold via parent name,
25 correct?

Page 401

1       MR. DAVISON: Objection.
2   A Correct.
3 BY MR. GASTEL:
4   Q And then do you see that there's also here
5 a column for "Product"; do you see that?
6   A (Reviewing.)
7   Q It's column K, sir.
8   A Yes, I see that.
9   Q And then again we see columns reflecting
10 the months of January 2014 through December 2014.
11 Do you see those columns, sir?
12  A Yes, I do.
13  Q And then do you also see that this
14 spreadsheet is sorted by the column "Total 12
15 months"?
16  A Yes.
17  Q And they're sorted once again in
18 descending order beginning with the highest volume
19 and descending down. Do you see that?
20  A Yes, I do.
21      MR. DAVISON: Objection.
22 BY MR. GASTEL:
23  Q And do you see that the third largest
24 customer of Mallinckrodt for oxy 15 and oxy 30
25 during the time period reflected by this

Page 402

1  spreadsheet is that Food City in Seymour,
2  Tennessee?
3       MR. DAVISON:  Objection to form.
4   A  I do see that.
5  BY MR. GASTEL:
6   Q  And this is in 2014, correct?
7       MR. DAVISON:  Objection.
8   A  Correct --
9  BY MR. GASTEL:
10   Q  This is approximately --
11   A  -- according to your report.
12   Q  -- two and a half years after you've --
13  after Mallinckrodt suspended sales to Masters
14  Pharmaceuticals for its failure to maintain
15  effective controls against diversion, correct?
16   A  Mm-hmm (affirmative).
17       MR. DAVISON:  Objection.
18  BY MR. GASTEL:
19   Q  Is that a "yes," sir?
20   A  Yes.
21   Q  And then do you see that according to this
22  spreadsheet, there were--I'm trying to zoom in a
23  little--83,800 pills sold to that Food City; do
24  you see that?
25   A  Yes, I do.

Page 403

1       MR. DAVISON:  Objection to form.
2  BY MR. GASTEL:
3   Q  Once again in Seymour, Tennessee; do you
4  see that?
5   A  Yes, I do.
6       MR. DAVISON:  Objection.
7  BY MR. GASTEL:
8   Q  And this time the Mallinckrodt customer is
9  reflected to be McKesson Drug; do you see that?
10       MR. DAVISON:  Objection.
11   A  Yes, I do.
12  BY MR. GASTEL:
13   Q  And again, if the population of Seymour,
14  Tennessee, is approximately 11,000 people, and
15  you're selling 83,000 oxy 30 pills over a year,
16  that's almost eight pills for every man, woman and
17  child in Seymour, Tennessee.
18       MR. DAVISON:  Objection to form.
19  BY MR. GASTEL:
20   Q  Does that cause you concern?
21       MR. DAVISON:  Objection to form.
22   A  It would cause me concern.
23  BY MR. GASTEL:
24   Q  And once again -- I don't want to belabor
25  this point, but you're not the only manufacturer

Page 404

1  of oxy 30 during this time period of 2014, right,
2  there are other --
3   A  That's correct.
4   Q  And there are also other prescription
5  opioids on the market, like hydrocodone and oxy
6  15, correct?
7       MR. DAVISON:  Objection.
8   A  Correct.
9  BY MR. GASTEL:
10   Q  Do you know of any reason why Seymour,
11  Tennessee, would have a medical need for this much
12  prescription opioids?
13   A  I have no idea.
14       MR. DAVISON:  Objection to form.
15       (Whereupon, Exhibit Mallinckrodt-Becker-
16  043 was marked for identification by the
17  reporter.)
18       THE REPORTER:  Number 43.
19       MR. GASTEL:  I got my copies this time.
20  Oh, wait. Can I... (Handing.)
21  BY MR. GASTEL:
22   Q  Sir, you've just been handed a document
23  that was produced to us in this litigation with
24  the Bates stamp number of MNK-T1_0006449611.  And
25  it's a PowerPoint presentation, and that's why the

Page 405

1  rest of the document does not have Bates stamps on
2  it.
3       But do you see the first page?  It is
4  listed as the "Non-Warehousing" -- or this
5  document is identified as the "Non-Warehousing
6  Chain Bridge the Gap Campaign," and it's dated
7  March 22nd, 2011; do you see that?
8   A  Yes.
9   Q  Do you recall this presentation, sir?
10   A  No, I don't.
11   Q  Do you see here that it says, "Credit for
12  developing this program goes to Steve Becker and
13  Victor Borelli?
14   A  Mm-hmm (affirmative).
15   Q  Do you see that?
16   A  Yes, I do.
17   Q  And you don't recall developing this
18  program in March of 2011?
19       MR. DAVISON:  Objection to form.
20   A  No, I don't.
21  BY MR. GASTEL:
22   Q  Do you recall that in 2011 there was a
23  push to sort of directly interact with what's
24  called the nonwarehousing chain?
25       MR. DAVISON:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 406

1    A  Please repeat that.
2  BY MR. GASTEL:
3    Q  Do you recall that in 2011 there was a
4  push to directly interact with what's called a
5  nonwarehousing chain?
6    A  I don't recall that.
7      MR. DAVISON:  Objection.
8  BY MR. GASTEL:
9    Q  Do you know what a nonwarehousing chain
10  is?
11    A  Yes, I do.
12    Q  What is a nonwarehousing chain?
13    A  A Nonwarehousing chain does not warehouse
14  product.  They purchase it through their
15  wholesaler, and they could be on contract with the
16  manufacturer.
17    Q  And those could be pharmacies, correct?
18      MR. DAVISON:  Objection.
19    A  They could be pharmacies, yes.
20  BY MR. GASTEL:
21    Q  And do you see this document on the second
22  page, beginning with "Why Now?"
23    A  Mm-hmm (affirmative).
24    Q  And one of the bullet points listed here
25  is to "Expand our sales base and market share with

Page 407

1  the second tier chains which balances our risk
2  with large chain accounts."
3      Did I read that correctly?
4    A  You did.
5    Q  Does that suggest to you that the purpose
6  of this program was to expand Mallinckrodt's sales
7  base?
8      MR. DAVISON:  Objection.
9    A  Not necessarily.  I don't believe I wrote
10  this particular part of this.
11  BY MR. GASTEL:
12    Q  When you see the term "expand our sales
13  base," you don't interpret that to mean that the
14  goal of whatever program is being described here
15  is to expand Mallinckrodt's sales base?
16      MR. DAVISON:  Objection.
17    A  "Expand sales base" could mean that, yes.
18  BY MR. GASTEL:
19    Q  And do you see here on the next page it
20  says, "Target Audience/Target Products"?
21    A  Mm-hmm (affirmative).
22    Q  And it says, "Non-warehousing chains with
23  20 or more pharmacies."
24      Did I read that correctly?
25    A  Yes, you did.

Page 408

1    Q  And then flip through until you get to
2  this page, which is a chart (indicating).
3    A  (Complies.)  Mm-hmm (affirmative).
4    Q  First page of the chart; do you see that?
5    A  Yes, I do.
6    Q  And then about midway down, it lists Food
7  City; do you see that?
8    A  Yes, I do.
9    Q  And it says the store count is 73 and the
10  wholesaler is ABC.
11    A  Mm-hmm (affirmative).
12    Q  Does that suggest to you that Food City
13  was a target of this program which stated purpose
14  was to expand Mallinckrodt's sales base?
15      MR. DAVISON:  Objection to form.
16    A  Again, it could be.  I don't recall
17  writing this specifically.  It could have been
18  Vic.
19  BY MR. GASTEL:
20    Q  And I understand that you didn't write it,
21  but it would suggest that the goal here was to
22  expand sales to the chains listed here, which
23  would include Food City; do you see --
24      MR. DAVISON:  Objection to form.
25    A  Possibly expand sales, but to work with

Page 409

1  them and make -- put them on some type of a
2  nonwarehousing program.
3  BY MR. GASTEL:
4    Q  And so according to this document,
5  in 2011, it was the goal to expand sales into
6  nonwarehousing chains like Food City, correct?
7      MR. DAVISON:  Objection.
8    A  Yes.  Could be, yes.
9      (Whereupon, Exhibit Mallinckrodt-Becker-
10  044 was marked for identification by the
11  reporter.)
12      THE REPORTER:  Number 44.
13  BY MR. GASTEL:
14    Q  You've just been handed a document that's
15  been marked as Exhibit 44.  It was produced to us
16  in this litigation carrying the Bates stamp
17  MNK-T1_0005890567.
18    A  Yes.
19    Q  Do you see at the top this is an e-mail to
20  LouAnn Randall from Steven Becker, dated March
21  28th, 2011; do you see that?
22    A  Yes, I do.
23    Q  Do you recall sending this e-mail?
24    A  I don't recall sending it, no.
25    Q  Any reason to doubt that you did?

Highly Confidential - Subject to Further Confidentiality Review

Page 410

1 A No.
2 Q And it says, "Dear LouAnn, Attached is
3 pricing and program outline that I need placed
4 into profit models for the following accounts,
5 Anda, Harvard, KeySource and Masters"; do you see
6 that?
7 A Yes, I do.
8 Q And what does that mean, that you need
9 this placed into profit models?
10 MR. DAVISON: Objection.
11 A Profit models show a profitability of our
12 products if we set specific accounts up to a
13 nonwarehousing chain program.
14 BY MR. GASTEL:
15 Q And then you see that you also describe
16 this as the -- "This is for a special Alternative
17 Non-warehousing Chain Program for distributors
18 which Jane presented to Ginger."
19 Did I read that correctly?
20 A Yes.
21 Q And then there's a variety attachments to
22 this e-mail; do you see that?
23 A Yes.
24 Q And I want to just direct your attention
25 to the first one, which is the document that's

Page 411

1 described here as the "ANWC Program," okay? And
2 then if you flip to the second page of that
3 document, you'll see that there are accounts
4 listed there, and one of those accounts is the
5 Food City account; do you see that?
6 A Yes.
7 Q And so this is a follow-up to that
8 previous document that we were just reviewing
9 regarding the nonwarehousing chain bridge the gap
10 campaign?
11 A Mm-hmm (affirmative).
12 MR. DAVISON: Objection to form.
13 BY MR. GASTEL:
14 Q Correct?
15 A This document's a follow-up to that?
16 Q Well, it's dated March 28th, 2011, and the
17 previous document was dated six days earlier,
18 March 22nd, 2011.
19 A It could be.
20 Q So it would appear that this is once again
21 you putting into motion to get this program off
22 the ground with the intent of expanding sales to
23 nonwarehousing chains, including Food City, right?
24 MR. DAVISON: Objection to from.
25 A Correct.

Page 412

1 BY MR. GASTEL:
2 Q And you had that intent despite knowing
3 that Masters was one of the customers selling into
4 Food City, correct?
5 MR. DAVISON: Objection to form.
6 A Repeat that question.
7 BY MR. GASTEL:
8 Q You put this program together despite
9 knowing at this time that Masters was one of your
10 customers that was selling into Food City, right?
11 MR. DAVISON: Objection to form.
12 A I did not put this program together for
13 Masters in my regards.
14 BY MR. GASTEL:
15 Q Well, that wasn't my question, sir.
16 My question was you put this program
17 together despite knowing that Masters, in 2011,
18 was one of your customers to Food City, right?
19 MR. DAVISON: Objection to form.
20 A I didn't know that they serviced Food
21 City.
22 BY MR. GASTEL:
23 Q Well, the chargeback data that we looked
24 at earlier certainly would have told you that
25 Masters was a --

Page 413

1 A I didn't have that information.
2 Q But at that time, you still knew that
3 Masters was having problems with regard to
4 maintaining effective controls against
5 diversion --
6 A Evidently I did, yes.
7 MR. DAVISON: Objection.
8 BY MR. GASTEL:
9 Q And then if you didn't know that Masters
10 was one of the Mallinckrodt customers that was
11 selling into Food City, why would they be listed
12 here as one of the accounts that needed to be
13 placed into profit models?
14 MR. DAVISON: Objection.
15 A I'm not certain.
16 BY MR. GASTEL:
17 Q What's a chargeback restriction?
18 MR. DAVISON: Objection.
19 A Chargeback restriction most likely would
20 be an account that's cut off to accept chargebacks
21 of our product.
22 BY MR. GASTEL:
23 Q Were you aware of any instances where a
24 distributor continued to ship to a customer even
25 though a chargeback restriction was in place?

Page 414

1    MR. DAVISON: Objection to form.
2    A  Not that I was aware of.
3  BY MR. GASTEL:
4    Q  Who was principally responsible for
5  collecting and maintaining chargeback data during
6  your time at Mallinckrodt?
7    A  I'm not certain who ran that department.
8    Q  Do you recall any specific people that
9  were involved in collecting or maintaining
10  chargeback data?
11    A  I don't recall their names, no.
12    Q  Was it your understanding that Karen
13  Harper had that information?
14    MR. DAVISON: Objection.
15    A  She had access to it.  She was the product
16  monitoring person.
17  BY MR. GASTEL:
18    Q  Did you ever use IMS data in your role
19  with Mallinckrodt?
20    A  Our marketing department may have.
21    Q  Do you know how they used it?
22    MR. DAVISON: Objection.
23    A  The marketing department used it in
24  presentations to the sales force.
25    MR. GASTEL: And this will probably be

Page 415

1  music to your ears, Mr. Becker, but I am almost
2  done.  If we could go off the record for two
3  minutes and let me review my notes, and we'll be
4  finished up with you shortly.
5    THE WITNESS: Okay.
6    THE VIDEOGRAPHER: Going off the record.
7  The time is 6:02 p.m.
8    (A recess was taken from 6:02 p.m. until
9  6:06 p.m.)
10    THE VIDEOGRAPHER: We are back on the
11  record.  The time is 6:06 p.m.
12  BY MR. GASTEL:
13    Q  Mr. Becker, you spoke with Mr. Loeser
14  briefly about this before, but you were
15  compensated both with a salary and a bonus at the
16  end of the year, correct?
17    A  Correct.
18    Q  And your bonus was based on whether or not
19  you hit specific sales targets, correct?
20    A  Correct.
21    Q  Were you ever incentivized to locate and
22  report pill mill operations?
23    MR. DAVISON: Objection to form.
24    A  No.
25  BY MR. GASTEL:

Page 416

1    Q  Do you recall ever trying to develop a
2  program with your sales force to incentivize them
3  to locate and report pill mill operations?
4    MR. DAVISON: Objection to form.
5    A  No.
6  BY MR. GASTEL:
7    Q  Were you ever incentivized to locate and
8  report suspicious orders?
9    MR. DAVISON: Objection.
10    A  Were we incentivized?
11  BY MR. GASTEL:
12    Q  Yeah.  You have a bonus system in place --
13    A  No.
14    Q  -- to incentivize you to meet sales,
15  right?
16    A  Correct.
17    MR. DAVISON: Objection.
18  BY MR. GASTEL:
19    Q  So my question is, did you have an
20  incentive structure in place to encourage you to
21  locate and report suspicious orders?
22    A  No.
23    Q  Did you ever recall having a -- trying to
24  develop an incentive system to encourage the sales
25  force to locate and report suspicious orders?

Page 417

1    A  No.
2    MR. DAVISON: Objection.
3    MR. GASTEL: Mr. Becker, I have no further
4  questions for you to today.
5    THE WITNESS: Thank you.
6    MR. DAVISON: I just have something --
7  very brief follow-up.  Do you want to just go
8  ahead?  Is that okay with everyone?
9    MR. GASTEL: Do you want to take the seat?
10    MR. DAVISON: Yeah.  Could we go off the
11  record just real quick.
12    THE VIDEOGRAPHER: Going off the record.
13  The time is 8:08 p.m. -- or I'm sorry, 6:08 p.m.
14    (A recess was taken from 6:08:19 p.m.
15  until 6:08:52 p.m.)
16    THE VIDEOGRAPHER: We are back on the
17  record.  Time is 6:08 p.m.
18    EXAMINATION
19  BY MR. DAVISON:
20    Q  Mr. Becker, my name is William Davison.
21  I'm your lawyer here today, as well as
22  representing Mallinckrodt, LLC, and SpecGX LLC.
23    THE REPORTER: I'm sorry.  Slow down.
24  BY MR. DAVISON:
25    Q  It's SpecGX LLC.  And I just have a few

Page 418

1 questions for you.
2 　　Do you recall talking earlier about First
3 Veterinary Supply?
4 　A Yes.
5 　Q Had you ever heard of First Veterinary
6 Supply before today?
7 　A No.
8 　Q Do you know whether First Veterinary
9 Supply sells exclusively veterinary products?
10 　A No.
11 　Q Do you know whether First Veterinary
12 Supply sells exclusively to veterinarians?
13 　A No.
14 　Q And do you recall talking earlier today
15 about chargeback data?
16 　A Yes.
17 　Q Were you ever in the chargeback department
18 during your time at Mallinckrodt?
19 　A No.
20 　Q Did you ever have access to the actual
21 chargeback database when you worked at
22 Mallinckrodt?
23 　A No.
24 　Q Were others at Mallinckrodt more familiar
25 with the chargeback database and its capability

Page 419

1 than you?
2 　A Yes.
3 　Q During your time at Mallinckrodt, were you
4 aware of all the information maintained by the
5 Drug Enforcement Administration relating to the
6 sale and distribution of controlled substances?
7 　A No.
8 　　THE REPORTER: One moment.
9 　　Okay. Great.
10 BY MR. DAVISON:
11 　Q And finally, do you recall talking about
12 Food City earlier today?
13 　A Yes.
14 　Q Was Food City ever a direct customer of
15 Mallinckrodt during your time at the company?
16 　A Not that I know.
17 　　MR. DAVISON: That's all the questions I
18 have, Mr. Becker.
19 　　MR. LOESER: Just a couple of follow-up
20 questions, Mr. Becker.
21 　　　FURTHER EXAMINATION
22 BY MR. LOESER:
23 　Q It's true, is it not, that veterinary
24 sales, sales of opioids that were, in fact, to
25 veterinarians, were not recorded in the chargeback

Page 420

1 system?
2 　　Is that right?
3 　　MR. DAVISON: Objection to form.
4 　A You'd have to ask Karen Harper that. I
5 don't recall.
6 BY MR. LOESER:
7 　Q You did, in fact, have a veterinary supply
8 customer; did you not?
9 　A There may have been some, yes.
10 　Q Yeah, and that was not First Veterinary
11 Supply company, as far as you knew; is that right?
12 　A I believe so -- I'm not certain what
13 account I had. I believe Schein Pharmaceutical,
14 which was an account of mine, had a vet supply
15 distributor.
16 　Q And do you recall that for sales that were
17 to an actual vet supply distributor for the
18 purpose of supplying veterinarians, that those
19 sales were not accounted for in the chargeback
20 system?
21 　A That very well could be. I'm not certain
22 of that.
23 　Q And as Mr. Davison noted, you were not in
24 the chargeback department, correct?
25 　A Correct.

Page 421

1 　Q But you did have the ability to ask for
2 chargeback reports; is that correct?
3 　A Correct.
4 　Q And, in fact, we saw in a few e-mail
5 examples of you asking for chargeback reports?
6 　A Yes.
7 　Q And there was no limitation imposed by
8 Mallinckrodt on the number of times you could ask
9 for chargeback reports; is that --
10 　A Not that I'm aware of.
11 　Q And there was no limitation that
12 restricted your ability to ask for chargeback
13 reports with respect to any of your wholesale
14 distributor clients; is that right?
15 　　MR. DAVISON: Objection.
16 　A Correct.
17 BY MR. LOESER:
18 　Q That's correct?
19 　A Yes.
20 　　MR. LOESER: I have no further questions.
21 　　MR. DAVISON: Thank you. We can go off
22 the record.
23 　　THE VIDEOGRAPHER: We're going off the
24 record.
25 　　This is the conclusion of the deposition.

Highly Confidential - Subject to Further Confidentiality Review

Page 422

1 The time is 6:12 p.m.
2
3
4     (Time noted:  6:12 p.m., Wednesday,
5 December 19, 2018.)
6
7
8
9
10
11
12
13          * * * * *
14
15
16
17
18
19
20
21
22
23
24
25

Page 424

1 Deponent: Steven A. Becker
  Deposition Date:  December 19, 2018
2 Case:  National Prescription Opiate Litigation
3
4       ACKNOWLEDGMENT OF DEPONENT
5
6     I,_____,
7 do hereby certify that I have read the foregoing
8 pages, and that the same is a correct
9 transcription of the answers given by me to the
10 questions therein propounded, except for the
11 corrections or changes in form or substance, if
12 any, noted in the attached Errata Sheet.
13
14 _____
15 STEVEN A. BECKER          DATE
16
17
18     Subscribed and sworn to before me
19 this_____day of _____, 20____.
20
21 My commission expires: _____.
22
23
   _____
24 Notary Public
25

Page 423

1         E R R A T A
2 Deponent:  Steven A. Becker
  Deposition Date:  December 19, 2018
3 Case:  National Prescription Opiate Litigation
4 PAGE  LINE  CHANGE
5 ____  ____ _____
6   REASON: _____
7 ____  ____ _____
8   REASON: _____
9 ____  ____ _____
10   REASON: _____
11 ____  ____ _____
12   REASON: _____
13 ____  ____ _____
14   REASON: _____
15 ____  ____ _____
16   REASON: _____
17 ____  ____ _____
18   REASON: _____
19 ____  ____ _____
20   REASON: _____
21 ____  ____ _____
22   REASON: _____
23 ____  ____ _____
24   REASON: _____
25

Page 425

1 STATE OF MINNESOTA)
       :  ss  CERTIFICATE
2 COUNTY OF HENNEPIN)
3
      I, Myrina A. Kleinschmidt, Registered
4 Merit Reporter, a Notary Public in and for the
  County of Ramsey, State of Minnesota, hereby
5 certify that I reported the deposition as noted on
  the first page, and that the witness was by me
6 first duly sworn to tell the whole truth;
      That the testimony was transcribed under
7 my direction and is a true record of the testimony
  of the witness;
8      That I am not a relative or employee or
9 attorney or counsel of any of the parties or a
  relative or employee of such attorney or counsel;
10      That I am not financially interested in
11 the action and have no contract with the parties,
  attorneys, or persons with an interest in the
12 action that affects or has a substantial tendency
  to affect my impartiality;
13      That the right to read and sign the
14 deposition by the witness was reserved;
15      WITNESS MY HAND AND SEAL this 24th day of
16 December, 2018.
17
18
19
20
       _____
21     Myrina A. Kleinschmidt
      Registered Merit Reporter
22     Certified Realtime Reporter
23
24
25