EXHIBIT 92

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF OHIO

 3                    EASTERN DIVISION

 4   IN RE: NATIONAL          *

 5   PRESCRIPTION             *    MDL No. 2804

 6   OPIATE LITIGATION        *       Case No.

 7   _____     *    1:17-MD-2804

 8   THIS DOCUMENT RELATES     *     Hon. Dan A.

 9   TO ALL CASES             *      Polster

10

11              THURSDAY, JANUARY 10, 2019

12

13        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

14             CONFIDENTIALITY REVIEW

15                    - - -

16        Videotaped deposition of JACK CROWLEY,

17        held at the JW Marriott Atlanta,

18        3300 Lenox Road NE, Atlanta, Georgia,

19        commencing at 9:22 a.m., on the

20        above date, before Lois A. Robinson,

21        Registered Diplomate Reporter and Certified

22        Realtime Reporter.

23

24

25
```

## Page 2

```
 1              A P P E A R A N C E S
 2  COUNSEL FOR PLAINTIFFS:
 3       SIMMONS HANLY CONROY, LLC
         One Court Street
         Alton, Illinois  62002
 4       BY:  JAYNE CONROY, ESQUIRE
         Jconroy@simmonsfirm.com
 5       LAURA FITZPATRICK, ESQUIRE
         Lfitzpatrick@simmonsfirm.com
 6
 7  COUNSEL FOR WITNESS, JACK CROWLEY:
         PETRILLO, KLEIN & BOXER LLP
 8       655 Third Avenue, 22nd Floor
         New York, New York  10017
 9       BY:  DAN GOLDMAN, ESQUIRE
         Dgoldman@pkbllp.com
10
11  COUNSEL FOR PURDUE PHARMA:
         DECHERT LLP
12       35 West Wacker Drive, Suite 3400
         Chicago, Illinois  60601
13       BY:  NATHAN E. HOFFMAN, ESQUIRE
         Nathan.hoffman@dechert.com
14
15
16  COUNSEL FOR WALMART:
         JONES DAY
         555 South Flower Street, 50th Floor
17       Los Angeles, California  90071
         BY:  SARAH G. CONWAY, ESQUIRE
18       Sgconway@jonesday.com
19
20  COUNSEL FOR CARDINAL HEALTH, INC.:
         WILLIAMS & CONNOLLY, LLP
21       725 Twelfth Street, NW
         Washington, DC  20005
22       BY:  STEVEN M. PYSER, ESQUIRE
23       Spyser@wc.com
24
25       (Continued on next page)
```

## Page 3

```
 1       A P P E A R A N C E S - (continued)
 2  COUNSEL FOR McKESSON:
         COVINGTON & BURLING LLP
 3       One City Center
         850 Tenth Street, NW
 4       Washington, DC  20001-4956
         BY:  LAURA SIDARTH, ESQUIRE
 5       Lsidarth@cov.com
 6
    (PARTICIPATING BY TELECONFERENCE/STREAMING):
 7
 8  COUNSEL FOR AMERISOURCEBERGEN:
         REED SMITH, LLP
 9       Three Logan Square
         Suite 3100
10       1717 Arch Street
         Philadelphia, Pennsylvania  19103
11       BY:  MICHAEL J. SALIMBENE, ESQUIRE
         Msalimbene@reedsmith.com
12
13  COUNSEL FOR ENDO HEALTH SOLUTIONS, INC., ENDO PHARMACEUTICALS,
    INC., PAR PHARMACEUTICAL, INC., PAR PHARMACEUTICAL COMPANIES,
14  INC. (F/k/a PAR PHARMACEUTICAL HOLDINGS, INC.):
         ARNOLD & PORTER
15       70 West Madison Street, Suite 4200
         Chicago, Illinois  60602-4321
16       BY:  MICHAEL BULLERMAN, ESQUIRE
         Michael.bullerman@arnoldporter.com
17
18  COUNSEL FOR VALIDUS PHARMACEUTICALS:
         FOX ROTHSCHILD LLP
19       1301 Atlantic Avenue
         Midtown Building, Suite 400
20       Atlantic City, New Jersey  08401-7212
         BY:  ADAM BUSLER, ESQUIRE
21       Abusler@foxrothschild.com
22
23       (Continued on next page)
24
25
```

## Page 4

```
 1       A P P E A R A N C E S - (continued)
 2  COUNSEL FOR ABBOTT LABORATORIES:
         VENABLE LLP
 3       750 East Pratt Street
         Suite 900
 4       Baltimore, Maryland  21202
         BY:  JOHN A. McCAULEY, ESQUIRE
 5       Jamccauley@venable.com
 6  COUNSEL FOR PERNIX THERAPEUTICS:
         CLARK MICHIE LLP
 7       220 Alexander Street
         Princeton, New Jersey  08540
 8       (609) 423-2144
         BY:  CHRISTOPHER MICHIE, ESQUIRE
 9       Chris.michie@clarkmichie.com
10  COUNSEL FOR ROCHESTER DRUG COOPERATIVE, INC.:
         ALLEGAERT BERGER & VOGEL LLP
11       111 Broadway, 20th Floor
         New York, New York  10006
12       BY:  LAUREN J. PINCUS, ESQUIRE
         Lpincus@abv.com
13
    COUNSEL FOR MALLINCKRODT:
14       ROPES & GRAY, LLP
         1211 Avenue of the Americas
15       New York, NY 10036-8704
         BY:  JUSTIN MANN, LAW CLERK
16       Justin.mann@ropesgray.com
17
18  ALSO PRESENT ON PHONE/STREAMING:
         JONATHAN JAFFE
19       DAVID EGILMAN
         ALEXIS PICCIRILLO
20
21  VIDEOGRAPHER:       JOSH COLEMAN
22
23                 LOIS ANNE ROBINSON, RPR, RDR, CRR, CRC
24
25
```

## Page 5

```
 1              I N D E X
 2  EXAMINATION                    PAGE
 3  By Ms. Conroy                     9
 4  By Mr. Pyser                    342
 5  By Mr. Hoffman                  353
 6  By Ms. Conroy                   375
 7             * * * * *
 8  EXHIBITS                       PAGE
 9  Crowley Exhibit 1                19
10    Second Amended Notice of Deposition
11  Crowley Exhibit 2                39
12    LinkedIn page of Jack Crowley
13  Crowley Exhibit 3                20
14    Curriculum vitae
15  Crowley Exhibit 4                20
16    Excerpts from DEA/Rannazzisi 2006 and 2007 letters
17  Crowley Exhibit 5               192
18    Article from LA Times - "More than 1 million OxyContin pills
19    ended up in the hands of criminals and addicts.  What the
20    drugmaker knew."
21  Crowley Exhibit 6               242
22    Article from thefix.com - "Oxy Manufacturers Knowingly
23    Supplied LA Drug Ring with More than 1 Million Pills"
24  Crowley Exhibit 7               116
25    List of Pharmacies - PPLP004384833 to PPLP004384837
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1  I N D E X - (continued)
2  Crowley Exhibit 8                         129
3   10/28/10 Report to OMS TEAM - PPLPC041000014663 - 670
4  Crowley Exhibit 9                         116
5   Handwritten notes used on Elmo at deposition
6  Crowley Exhibit 10                        245
7   Jack Crowley email of 10/3/17 - PPLPC004000132946 - 954
8  Crowley Exhibit 11                        262
9   Emails - PPLPC019000216132 - 137
10 Crowley Exhibit 12                        297
11  Emails - PPLPC018000240260 - 267
12 Crowley Exhibit 13                        300
13  OMS Measures of Effectiveness email - PPLPC023000371445
14 Crowley Exhibit 14                        304
15  Emails - PPLPC018000137550 - 552
16 Crowley Exhibit 15                        304
17  Emails - PPLPC008000045952 - 954
18 Crowley Exhibit 16                        304
19  Emails - ALLERGAN_MDL_03953259 - 267
20 Crowley Exhibit 17                        304
21  CAH_MDL2804_00824045 - 050
22 Crowley Exhibit 18                        304
23  Emails - ALLERGAN_MDL_02128065 - 072
24 Crowley Exhibit 19                        304
25  Emails - ABDCMD00301700 - 703

Page 8

1  I N D E X - (continued)
2  Crowley Exhibit 31                        334
3   Bill Mahoney email to Crowley - PPLPC023000234301 - 303
4  Crowley Exhibit 32                        360
5  Crowley email to Boockholdt - PPLPD004687363 with Bates
6  PPLPC004687385 attached
7  Crowley Exhibit 33                        376
8   9/27/06 letter - ALLERGAN_MDL_02467796 - 799
9  Crowley Exhibit 34                        376
10  12/27/07 letter - no Bates number
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1  I N D E X - (continued)
2  Crowley Exhibit 20                        304
3   Crowley email to Donald Walker - MCKMDL00536290
4  Crowley Exhibit 21                        304
5   Email - CAH_MDL2804_01724159 - 160
6  Crowley Exhibit 22                        304
7   CAH_MDLPRIORPROD_DEA07_00842131
8  Crowley Exhibit 23                        304
9   DEA Industry Investigation and the Impact on Manufacturing -
10  11/9/01
11 Crowley Exhibit 24                        304
12  Crowley email to George Euson - PPLPC026000064596 - 599
13 Crowley Exhibit 25                        304
14  Emails - TEVA_MDL_A_01453620 - 21
15 Crowley Exhibit 26                        304
16  Crowley email to Donald Walker - MCKMDL00536290
17 Crowley Exhibit 27                        266
18  Email re SOP - PPLPC026000112463 - 969
19 Crowley Exhibit 28                        329
20  Crowley email to Adam Fein - PPLPC031000423731 - 735
21 Crowley Exhibit 29                        331
22  Crowley email to Gina Limer - PPLPC018000310388
23 Crowley Exhibit 30                        332
24  Crowley email to J. David Haddox - PPLPC022000271055
25

Page 9

1  VIDEOGRAPHER:
2       We are now on the record.  My name is
3  Josh Coleman.  I am the videographer for Golkow
4  Litigation Services.  Today's date is January
5  10th, 2019.  The time is approximately 9:22 a.m.
6       This video deposition is being held in
7  Atlanta, Georgia, in the matter of National
8  Prescription Opiate Litigation, MDL Number 2804,
9  the United States District Court for the Northern
10 District of Ohio, Eastern Division.
11      The deponent is Jack Crowley.
12      Will counsel -- counsel will be noted
13 on the stenographic record.
14      The court reporter is Lois Robinson,
15 who will now swear in the witness.
16           JACK CROWLEY,
17 the witness, after having first been
18 duly sworn to tell the truth, the whole truth,
19 and nothing but the truth, was examined and
20 testified as follows:
21      EXAMINATION
22 BY MS. CONROY:
23 Q      Good morning, Mr. Crowley.  We met
24 briefly.  My name is Jayne Conroy, and I'm gonna
25 be asking you questions today.

Page 10

1    There may be some other lawyers that
2  will ask questions of you as well. Is that okay?
3  A    That's fine. Thank you.
4  Q    Is there any reason that you can't give
5  truthful testimony today?
6  A    No reason.
7  Q    Great.
8    You have with you a lawyer,
9  Mr. Goldman?
10 A    Yes, I do.
11 Q    And is he representing you today?
12 A    He is.
13 Q    Okay. And are you paying for him?
14 A    Not personally.
15 Q    Okay. Who's paying for him?
16 A    The company, Purdue Pharma.
17 Q    Okay. And do you have any other
18 lawyers that are representing you here in the
19 room today?
20 A    No.
21 Q    When did you retain -- or do you know
22 when Purdue retained Mr. Goldman to represent
23 you?
24 MR. GOLDMAN:
25    Objection.

Page 11

1    The question is when.
2  A    Could you clarify?
3  MS. CONROY:
4  Q    I'm just looking -- did -- did you --
5    When did you first learn that
6  Mr. Goldman was going to be representing you
7  today? And just -- I don't want any --
8  A    In December. December sometime.
9  Q    Okay. When did you first learn that
10 you would be deposed in this case?
11 A    About that time. Wasn't -- the exact
12 date had not been set, but...
13 Q    And how did you learn?
14 A    Telephone -- telephone call, you know,
15 following email.
16 Q    Okay. Has your deposition -- have you
17 had your deposition taken before in the past?
18 Not about -- not in this case. In any case have
19 you had your deposition taken?
20 A    I have.
21 Q    Okay. How many times?
22 A    As a government official, probably
23 several. And I had a deposition taken as a -- my
24 position with Purdue Pharma 2004, I believe. I
25 don't -- I don't remember the details.

Page 12

1  Q    Okay. So from 2004 until today, you
2  have not had your deposition taken in any matter
3  at all?
4  A    My understanding of the term
5  "deposition," I would say no, I have not.
6  Q    What's your understanding of the
7  deposition?
8  A    It -- as opposed to investigative
9  testimony type of a witness.
10 Q    Have you given investigative testimony
11 since 2004?
12 A    Yes.
13 Q    Okay. And on how many occasions?
14 A    Twice.
15 Q    And what would the -- what was the
16 subject of those investigations?
17 MR. GOLDMAN:
18    Objection.
19    And to the extent that the question
20 calls for a conversation between you and counsel
21 about the subject investigation, I'm gonna
22 instruct you not to answer that question.
23 MS. CONROY:
24 Q    What -- Mr. Crowley, what I'm asking
25 you about is your understanding of why you were

Page 13

1  deposed or why you gave --
2    This was sworn testimony, correct,
3  these two instances? You were under oath?
4  A    I'm not trying to be evasive. I don't
5  remember --
6  Q    Okay.
7  A    -- if I was or not.
8  Q    They were -- they were discrete events,
9  those whatever -- these two times that you spoke
10 with respect to an investigative action?
11 MR. GOLDMAN:
12    Objection.
13    Go ahead.
14 A    Government agencies.
15 MS. CONROY:
16 Q    So someone from a government agency was
17 asking the questions?
18 A    Yes.
19 Q    Was it a lawyer? Do you know?
20 A    Yes.
21 Q    And what was the subject matter of each
22 of those occasions when a government agent was
23 asking you questions?
24 MR. GOLDMAN:
25    Objection.

Page 14

1  Go ahead.
2  A       Potential litigation against Purdue
3  Pharma.
4  MS. CONROY:
5  Q       Do you know if litigation ever occurred
6  against Purdue Pharma?
7  A       I don't.
8  Q       Were you represented by anyone when you
9  were questioned in those investigations?
10  A       Yes.
11  Q       And who represented you?
12  A       At one time, Mr. Goldman. And the
13  other time, one of his associates. I can't
14  remember her name at the moment.
15  Q       Did the -- was the subject matter
16  opioids?
17  A       Yes.
18  Q       And your -- you were -- you don't know
19  if those were depositions; is that correct?
20  A       Uh, one of them may have been, and the
21  other was categorized a different way.
22  Q       Okay. Do you recall how it was
23  categorized?
24  MR. GOLDMAN:
25  And to the extent that the question

Page 15

1  calls for and the answer calls for communications
2  that you had with counsel, I'm gonna direct you
3  not to answer the question. So if your knowledge
4  of how it's categorized only comes from
5  conversations that you and I had or you had with
6  other people in my firm, then you should not
7  answer the question.
8  Can you answer the question without
9  drawing upon conversation you had with me or
10  someone else in my firm?
11  THE WITNESS:
12  I cannot.
13  MR. GOLDMAN:
14  Okay.
15  MS. CONROY:
16  Q       Okay. When was the one that you
17  characterize as a deposition? It was sometime
18  after 2004; correct?
19  A       I believe it was in June of two -- June
20  2016, I think.
21  Q       Okay. Was there a court reporter
22  present or a tape recording of it? Do you know?
23  A       Recording, audio.
24  Q       And the other instance, was there a
25  court reporter or an -- or an audio recording of

Page 16

1  that?
2  A       No. To my recollection, no.
3  Q       And when do you think that occurred?
4  A       I think that was also around the -- I
5  think it was 2017.
6  Q       Okay.
7  A       Probably in June. I -- I really don't
8  remember the exact date. I'm sorry.
9  Q       Few of us do. I'm not gonna -- I'm
10  just trying to get a feel.
11  So the -- the one that you characterize
12  as a deposition was not too long ago, and it came
13  before the one that you don't characterize as a
14  deposition?
15  A       That's correct.
16  Q       Okay. And what government agency was
17  asking questions at the deposition, if you
18  recall?
19  A       State of New Hampshire, Attorney
20  General's Office.
21  Q       And the second one, who was asking the
22  questions? What agency or government entity?
23  A       U. S. Attorney's Office, District of
24  Connecticut.
25  Q       Have you ever seen the -- the actual

Page 17

1  printout of the deposition from the one in 2016?
2  A       No.
3  MR. GOLDMAN:
4  Objection.
5  Go ahead.
6  A       No, I have not.
7  MS. CONROY:
8  Q       Okay. And there was, as far as you
9  understand, there was -- there was no record of
10  what you had to say in the June 2017 or
11  thereabouts questions from the U. S. Attorney's
12  Office in Connecticut?
13  MR. GOLDMAN:
14  Objection.
15  Go ahead.
16  A       No record except for maybe some of
17  their personal notes.
18  MS. CONROY:
19  Q       Okay. Do you have any notes or
20  documents from either of those two instances?
21  A       No.
22  Q       You talked about a deposition in 2004
23  when -- concerning Purdue. Is that correct?
24  A       Yes.
25  Q       And what was -- what was the subject

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 matter of that deposition?
2 A      My recollection is it had more to do
3 with marketing of...
4 Q      Marketing of opioids?
5 A      Yes.
6 Q      And you were employed by Purdue at that
7 time?
8 A      Yes.
9 Q      And do you recall who took that
10 deposition or whether there was a lawsuit with
11 respect to that deposition or any other -- any
12 other details about it?
13 A      No, not really.
14 Q      Where did it take place?  Do you
15 remember that?
16 A      I think it took place right at Purdue
17 headquarters, at the home office, I think.
18 Q      In Stamford?
19 A      Yes.
20 Q      Where did the June 2016 deposition take
21 place?
22 MR. GOLDMAN:
23         Objection.
24         Go ahead.
25 A      Concord, New Hampshire.

Page 19

1 MS. CONROY:
2 Q      And where did the U. S. Attorney's
3 Office in Connecticut, where did they talk to
4 you?
5 A      That was by tele- -- teleconference, I
6 would call it.  They were in their office in
7 New Haven, Connecticut, and I was here at -- in
8 Atlanta at a hotel.
9 Q      And that was -- that was not a
10 face-to-face?  That was over a telephone?
11 A      Video conference.
12 Q      I see.
13 A      Video conference.
14 Q      Okay.
15 A      Yeah.
16 Q      And then you've had several depositions
17 while you were a DEA agent?  Is that correct?
18 MR. GOLDMAN:
19         That's a "yes" or "no."
20 A      Yes.
21 MS. CONROY:
22 Q      And where would you put that?  Ten to
23 twenty?  Five to ten?
24 A      Less than five.
25 Q      Have you ever testified at a trial?

Page 20

1 A      Yes.
2 Q      On how many occasions?
3 A      Civil or criminal or --
4 Q      Doesn't -- doesn't matter.
5 A      Probably twenty.
6 Q      Okay.  And how would you break down
7 between civil and criminal of the twenty?
8 A      I would say all but two would have been
9 on the criminal side.
10 Q      And what were the two civil cases?
11 A      I don't remember.  I might as we go
12 along, but I don't remember.
13 Q      Okay.
14 A      Yeah.
15 Q      Did they -- they involve something with
16 respect to your responsibilities as a DEA agent?
17 A      Yes.
18 Q      And were they in a courtroom?
19 A      Yes.
20 Q      And is that the -- is that true of the
21 times that you testified at criminal trials?
22 They were as a result of your responsibilities as
23 a DEA agent?
24 A      That's correct.
25 Q      Have you --

Page 21

1         Take a look at Exhibit 1, which is your
2 Notice of Deposition.
3         (CROWLEY EXHIBIT NUMBER 1
4           WAS MARKED FOR IDENTIFICATION.)
5 MS. CONROY:
6 Q      Have you seen this document before?
7 A      I believe this is the same document
8 that I saw a PDF copy.  Yeah.
9 Q      You're here, so at least you heard
10 about it somehow; right?
11 A      Yeah.
12 Q      All right.  You see the second
13 paragraph?  It says, "Pursuant to the Federal
14 Rules, the deponent should produce all documents
15 which deponent has consulted or reviewed or plans
16 to consult in preparation for his deposition and
17 has relied upon or will rely upon for testimony
18 in this matter."
19         Do you see that?
20 A      Yes.
21 Q      And number 2, "Copies of all curriculum
22 vitae used or prepared by the deponent in the
23 preceding five years."
24         And, then, 3 we'll talk about in a
25 minute.  That's a much larger set.

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 But I do have what we've marked as
2 Exhibits 3 and 4 that counsel for Purdue gave to
3 us today.
4 (CROWLEY EXHIBITS 3 AND 4 WERE
5 MARKED FOR IDENTIFICATION.)
6 MS. CONROY:
7 Q Exhibit 3 looks like some sort of
8 biographical information about you. Is that
9 correct?
10 A Yes.
11 Q Okay. And who prepared this?
12 A I did.
13 Q Okay. And when did you prepare it?
14 A Well, I have to go by the date, which
15 says July 2018.
16 Q Okay. Were you asked to prepare it or
17 is this something that you typically do; you kind
18 of keep your CV up to date?
19 A I am asked to do this on occasion when
20 I'm about to get a project. But...
21 Q And this is your most up-to-date bio?
22 A Yes. I think so.
23 Q Do you have a -- a CV that's longer
24 than this or that is set up any differently than
25 this?

Page 23

1 A I have prepared one in the past, yeah.
2 Q Okay. And how old is that one?
3 A Within the same time frame, within the
4 last three to six months.
5 Q Is there a reason why you didn't
6 provide that one?
7 A I -- no. No reason. Thought this
8 would be sufficient.
9 Q Okay. And, then, Exhibit 4 is
10 double-sided document. Does it look familiar to
11 you?
12 A Yes.
13 Q And what is it?
14 A Some excerpt notes that I had prepared
15 at some point concerning two DEA letters.
16 Q And when, approximately, would you have
17 prepared them, would you have prepared these
18 notes?
19 A Well, sometime before 2012. Well,
20 that's my --
21 Q You're guessing that because of Roman
22 Numeral VI?
23 A Yes.
24 Q Okay. And what was the purpose for
25 preparing this document?

Page 24

1 A Just to help me understand what the DEA
2 was asking for on those two letters.
3 Q And why were you doing that in 2012?
4 Why did you want to help -- why did you want that
5 understanding?
6 A Whatever I have done in the course of
7 my duties would be to be at the highest level of
8 compliance with DEA policies -- well, law,
9 regulations, policies, procedure. So just to
10 keep myself up to date.
11 Q Okay. These are excerpts from letters
12 in 2006 and 2007. So what, in 2012, when you
13 created this document, had you select excerpts
14 from these two letters to keep up with regulatory
15 and other --
16 A The two letters are the basic
17 documents. Sometimes you would learn an emerging
18 interpretation from a conversation with a DEA
19 agent, investigator, or at a conference or at
20 some other kind of a meeting.
21 Q And, so, you have the two excerpts from
22 the letters, Roman Numeral IV and Roman Numeral
23 V. Do you see that?
24 A Yes.
25 Q Is there a Roman Numeral I through III

Page 25

1 anywhere?
2 A I don't know. Probably is. I don't
3 know. Yeah.
4 Q Okay. Do you know where this -- where
5 this came from?
6 A My personal file.
7 Q And when you say your personal file,
8 personal file as in a file folder at home or an
9 electronic file or --
10 A Electronic file.
11 Q So from your computer?
12 A Yes.
13 Q And did -- did you print this out
14 yourself?
15 A No.
16 Q Okay. Who did that?
17 A Mr. Goldman, I think, or --
18 MR. GOLDMAN:
19 That's fine.
20 A Right.
21 MR. GOLDMAN:
22 Counsel.
23 MS. CONROY:
24 Q Counsel.
25 A Counsel.

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  Q       One of your counsel.
2          And do they have access to your
3  computer at home?
4  A       Not readily.
5  Q       How were they able to -- how were they
6  able to get this document to print it out?
7  A       I -- I mentioned it, and they asked me
8  for a copy.
9  Q       Okay.  So you -- so you sent it to your
10 counsel?
11 A       That's correct.
12 Q       Okay.  Did they inquire about any other
13 documents that were on your computer, whether
14 there was any earlier portion of this document?
15 A       No.
16 MR. GOLDMAN:
17         Direct you not to answer that question.
18         Counsel, that question clearly calls
19 for attorney-client communication.
20 MS. CONROY:
21         I actually don't agree.
22 Q       So you were asked to produce anything
23 what?  That had to do with opioids or the subject
24 of this deposition?
25 MR. GOLDMAN:

Page 27

1          Counsel, to the extent --
2          Sorry.
3          Jack, to the extent that you're -- any
4  response to the question comes from conversation
5  with counsel, you should not answer the question.
6  A       I will take that counsel.
7  MS. CONROY:
8  Q       Okay.
9  A       Yeah.
10 Q       Let me ask you this way.  After you
11 received the PDF of the deposition notice, did
12 you take a look at your home files, including
13 your electronic files on your computer, to
14 determine if you had any documents responsive to
15 the notice?
16 A       I did not.
17 Q       So when you provided Exhibit 4 to
18 counsel and then it was given to me, that was not
19 as a result of the deposition notice?
20 MR. GOLDMAN:
21         Objection.
22 A       I don't believe it was.
23 MS. CONROY:
24 Q       Do you know why I've been given this
25 document?

Page 28

1  MR. GOLDMAN:
2          Jack, if the answer to the question
3  calls for -- if your understanding of why she's
4  been given the document comes from a conversation
5  that you and I have had, then you should not
6  answer the question.
7  THE WITNESS:
8          Okay.  I will not answer on advice of
9  my counsel.
10 MS. CONROY:
11 Q       Okay.  Is it fair to say this is not
12 the only document kept electronically on your
13 computer with respect to opioids or anything to
14 do with Purdue or opioids?
15 MR. GOLDMAN:
16         Object to form.
17 A       I don't think that's fair.  No.
18 MS. CONROY:
19 Q       I don't understand your answer.  In --
20 you have -- in your -- this comes from your home
21 computer files; correct?
22 A       Correct.
23 Q       Exhibit 4.
24 A       (Nods affirmatively.)
25 Q       Is it fair to say that you have other

Page 29

1  opioid --
2          Would you consider this an
3  opioid-related document?
4  A       Not necessarily, no.
5  Q       Okay.  Well, how would you characterize
6  what this is?
7  A       It's a document, an extraregulatory
8  communication in the form of a letter --
9  actually, two letters -- written by a person at
10 Drug Enforcement Administration offering, shall I
11 say, guidance on the suspicious order monitoring
12 regulation.
13 Q       And that's Sections 4 and 5, right,
14 what you just -- what you just told me about?
15 A       That's correct, yes.
16 Q       Okay.  Let's take a look at Roman
17 Numeral VI, Emerging Interpretation, 2008 to 2012
18 and present.  Do you see that?
19 A       Yes.
20 Q       Did you type those words?
21 A       Yes.
22 Q       Okay.  And then there are bullet points
23 underneath it.  First one says, "It's not DEA's
24 intent to negatively impact those pharmacies
25 filling prescriptions for legitimate medical

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 purposes."
2     Do you see that?
3 A    I do.
4 Q    Okay. What kind of prescription --
5     Strike that.
6     Are these your words, your
7 interpretation?
8 A    No.
9 Q    Who's at -- who's -- where does this
10 bullet point come from?
11 A    If it did not come from either of those
12 letters, it would have come from a -- some other
13 communication from a DEA official.
14 Q    So this is a quote from a DEA
15 official's letter, that bullet point?
16 MR. GOLDMAN:
17     Objection.
18     Go ahead.
19 A    I don't think it's a quote because I
20 would have included that in quotation marks.
21 MS. CONROY:
22 Q    Is that your opinion?
23 MR. GOLDMAN:
24     Objection.
25     Go ahead.

Page 31

1 A    No. That was my understanding of what
2 was communicated.
3 MS. CONROY:
4 Q    To you by someone at the DEA?
5 A    Yes.
6 Q    And who was that?
7 A    I don't recall.
8 Q    When would it -- when would you have
9 received that understanding from someone at the
10 DEA?
11 A    I could only give you an estimate, and
12 that's sometime after 2008.
13 Q    Okay. And it's -- it's your memory
14 that there was someone at the DEA that told you
15 that the DEA has no intention to negatively
16 impact pharmacies filling prescriptions for
17 legitimate medical purposes?
18 A    Yes. It could have been communicated
19 to me or to a group that I was part of.
20 Q    And what kind of prescriptions
21 are -- what kind of prescriptions are the subject
22 of that intention?
23 A    Prescriptions for controlled
24 substances.
25 Q    And that would include OxyContin?

Page 32

1 A    It would include narcotics, any central
2 nervous system controlled substance. So
3 narcotics, depressants, tranquilizers,
4 amphetamines.
5 Q    Okay. Would it include OxyContin?
6 A    Yes. OxyContin is a Schedule II
7 controlled substance.
8 Q    Would it include Duragesic?
9 A    Yes.
10 Q    And was there some discussion of what a
11 legitimate medical purpose was when you had this
12 conversation with the DEA agent or heard this at
13 some group meeting?
14 A    I don't recall and I don't believe so.
15 Q    Do you have an understanding of what
16 that means?
17 A    It's a very difficult concept, but
18 I -- I think I do.
19 Q    Okay. Can you -- can you tell me what
20 your understanding is?
21 A    Well, for a prescription to be
22 legitimate, it must be issued in the usual course
23 of professional practice for a legitimate medical
24 reason. The legitimate medical reason is arrived
25 at after a conversation with the patient, a

Page 33

1 diagnosis is -- is reached, and part of
2 the -- part of the therapy would be that the
3 prescription may be appropriate.
4 Q    Has that been your understanding of the
5 definition legitimate medical purposes for
6 years? Is that fair to say?
7 MR. HOFFMAN:
8     Object to the form.
9 MR. GOLDMAN:
10     Yeah. Before you answer that
11 question --
12     Counsel, I think, to avoid any Touhy
13 problems, I think if you could define as far as
14 his understanding --
15 MS. CONROY:
16     That's fine.
17 Q    After -- well, after you were a DEA
18 agent.
19 A    Yes. Right.
20 Q    So that would be starting --
21     When did you begin -- when did you
22 leave the DEA?
23 A    2001.
24 Q    Okay.
25 A    Officially, September of 2001.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 Q      The next bullet point, "Prevent
2 Diversion - onus squarely on the registrant."
3         Do you see that?
4 A      Yes.
5 Q      And is this a quote from somewhere?  Is
6 this your opinion?  What is this?
7 A      It's not my opinion.  That would have
8 been a quote from a comment made by a DEA
9 official at one of their conferences or some
10 other meeting attended by representatives of
11 industry who heard it and then shared it.
12 Q      And when you drafted this document,
13 were you writing that from memory or did you have
14 other documents you were referring to?  How
15 did -- how'd you do it?
16 A      I really don't remember.  I would say
17 from memory.
18 Q      Do you have other documents on your
19 computer with respect to notes or materials from
20 conferences that you attended or conversations
21 you've had with DEA agents?
22 A      I don't believe so.
23 Q      But this is not the only document on
24 your computer; correct?
25 MR. GOLDMAN:

Page 35

1       Object to the form.
2 A      The only document on my computer?
3 MS. CONROY:
4 Q      Correct.  This is not the only document
5 on your computer; correct?
6 A      That's correct.
7 Q      And do you have other documents and
8 materials on your computer that relate in any way
9 to prescription drugs?
10 A      That's a broad question, so I would say
11 I have documents that relate to compliance issues
12 that I've kept over the years so I can be
13 current.
14 Q      And when you're being asked questions
15 today, some of those documents have informed your
16 experience and understanding of this area?
17 MR. HOFFMAN:
18       Object to form.
19 A      I didn't review any of them in
20 preparation for today.
21 MS. CONROY:
22 Q      Okay.  That's not what I asked you.
23 A      Okay.
24 Q      I asked you whether they contributed to
25 your experience and understanding in the area of

Page 36

1 prescription drugs.
2 MR. HOFFMAN:
3       Object to the form.
4 A      Would contribute to my understanding of
5 prescription controlled substances and compliance
6 thereof, yes.
7 MS. CONROY:
8 Q      And that would include -- that would
9 include the compliance issues surrounding
10 controlled substances?
11 A      Yes.
12 Q      The -- if you turn the page on Exhibit
13 4, there's seven more bullet points.  Do you see
14 this?
15 A      Excuse me.
16       I do.
17 Q      Okay.  The next one is "Can a
18 prospective customer be trusted."
19       Do you see that?
20 A      Yes.
21 Q      Is that a quotation from something?
22 A      It would have been in a -- a
23 communication from a DEA official at a
24 conference.
25 Q      And when you sat at your computer and

Page 37

1 typed up this page, were you just recalling what
2 you had heard at conferences or were you
3 referring to anything?
4 A      Well, I may have been referring to
5 emails or something like that.  I'm sure I was
6 referring to something.
7 Q      Would it have been something on your
8 computer, that you had access to on your
9 computer?
10 A      At the time I wrote it, yes.
11 Q      Have you ever provided this document to
12 anyone other than your counsel for this
13 deposition today?
14 A      Yes.
15 Q      And who was that?
16 A      I belong to and actually was one of the
17 creators of an industry group, an informal
18 working group -- we call it the New Jersey
19 Pharmaceutical Industry Group -- manufacturers
20 and distributors from the state of New Jersey and
21 contiguous states and informal meetings that we
22 had several times a year.  So my recollection
23 would have been anyone who attended a certain
24 meeting would have gotten that document.
25 Q      When you say "that document," you mean

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  Exhibit 4?
2  A    Yes.
3  Q    Okay.  And do you still attend such
4  meetings?
5  A    I do not.  No.
6  Q    Is the working group still in effect?
7  A    Yes.
8  Q    Why do you no longer attend?
9  A    I -- I'm a consultant now, or I'm not
10 viewed as an employee of a manufacturing company,
11 so I'm not allowed to.
12 Q    Okay.  So that working group, at least,
13 is restricted to just current employees of
14 manufacturers or distributors?
15 A    Yes.  Or whoever they invite to the
16 meeting.
17 Q    Okay.  And you -- you were instrumental
18 in the creation of that group?
19 A    Yes.
20 Q    And approximately when was that?
21 A    Probably 2008, after these letters came
22 out.
23 Q    Okay.  And when -- did you stop
24 attending when you left Purdue or sometime later?
25 A    When I left Purdue, yes.

Page 39

1  Q    And have you on any occasion been
2  invited back after you left Purdue --
3  A    No.
4  Q    -- to any meetings?
5  A    No.
6  Q    If I had the files of the -- the
7  New Jersey working group, would I potentially
8  find Exhibit 4 in those files?
9  MR. HOFFMAN:
10       Object to form.  Calls for speculation.
11 A    There were no official files.
12 MS. CONROY:
13 Q    So nobody -- there was no -- was there
14 a -- was there any official office for that
15 organization?
16 A    No.
17 Q    Do you keep in touch with any of the
18 members from that working group?
19 A    On occasion, yes.
20 Q    Who do you -- who do you keep in touch
21 with?
22 A    Definition of "in touch"?  Just,
23 you know, from time to time, once a year, or
24 something like that?
25 Q    Yeah, sure.

Page 40

1        Who were the -- who were the folks that
2  you kind of kept up, Christmas card, occasional
3  emails, whatever?
4  A    I might have trouble spelling his name.
5  Mike Magliaro.
6  Q    And what companies was or is he
7  involved with?
8  A    Well, he's changed jobs recently, so I
9  don't know.
10 Q    And when you were -- when you were in
11 the working group, who did he work for?
12 A    Halo, H-A-L-O.
13 Q    And what is Halo?
14 A    That's been acquired also, but it's a
15 manufacturing company.  It was Avid before that,
16 Halo, and now it's -- I don't know.  I can't
17 remember.
18 Q    Okay.  Anyone other than Mike?
19 A    Michelle Dempsey.
20 Q    And she's from Janssen?
21 A    Yes.  Noramco at the time.
22 Q    Have you had any conversations with
23 Michelle Dempsey recently?
24 A    No.
25 Q    Anybody else?

Page 41

1  A    No.  Not really, no, that I can think
2  of.
3  Q    Okay.  Now that we've been talking
4  about Exhibit 4 a little bit more, does it
5  refresh your memory at all whether or not there
6  was a Roman Numeral I, II, and III to this
7  document?
8  A    I'm sure there was.
9  Q    But you, at least for the purposes of
10 this deposition, you couldn't find it?
11 A    It wasn't part of that -- that
12 document.  I don't -- I no longer have it,
13 whatever it was.  Correct.
14 Q    Okay.  So whatever -- whatever's on
15 your computer today is, as best as you can tell,
16 is just this -- the two pages here?
17 A    That's right.
18      (CROWLEY EXHIBIT NUMBER 2
19       WAS MARKED FOR IDENTIFICATION.)
20 MS. CONROY:
21 Q    Let's take a look at Exhibit 2, which
22 is a LinkedIn.  It's a little hard to read on
23 this.  If you turn the page, it says that you
24 are, from January 2013 to present, you are the
25 president of Crowley Associates, LLC.  See that?

Highly Confidential - Subject To Further Confidentiality Review

Page 42

1  A     Oh.  Right at the top.
2  Q     At the very --
3  A     Yes.
4  Q     Okay.  And is that true through today?
5  A     Yes.
6  Q     And did you form that Crowley
7  Associates upon leaving Purdue Pharma?
8        You can see just down a couple of steps
9  you were Executive Director, Purdue Pharma, from
10 January 2003 to December 2012.  Do you see that?
11 A     Yes.
12 Q     Okay.  So did you form Crowley
13 Associates --
14       You left -- you left in December --
15 December of 2012.  You formed Crowley Associates
16 right away in January?
17 A     Well, actually formed it in 2001.  So I
18 re-formed it, I should say.
19 Q     Okay.
20 A     Yeah.
21 Q     Okay.  And, so, when you were -- if you
22 look just above the Purdue Pharma listing, when
23 you were Vice President, DEA Regulatory
24 Compliance at Gates Healthcare Associates, Inc.,
25 that ran concurrently with Crowley Associates?

Page 43

1  A     Correct.
2  Q     Okay.  And were you -- were you
3  employed as a consultant by Gates Healthcare?
4  A     A 1099 employee, friend, helping
5  him --
6  Q     Okay.
7  A     -- expand his business.
8  Q     Who was the "him"?
9  A     Ernest Gates.
10 Q     And what kind of business is Gates
11 Healthcare?
12 A     Primarily regulatory compliance for
13 retail pharmacies, compounding pharmacies.
14 Q     And what did you -- what did you help
15 him with?
16 A     Expanding his business in the area of
17 DEA compliance, perhaps offering services to
18 hospitals, any other entity that might need help.
19 Q     Did you prepare anything in writing for
20 Mr. Gates or for Gates Healthcare?
21 A     Work product, I think.  Yes.
22 Q     Right.
23       Did you write any reports or anything
24 like that for him?
25 A     Yes.

Page 44

1  Q     And did -- did anything with respect to
2  the Rannazzisi letters involve -- did that have
3  any relevance to Gates Healthcare?
4  A     No.
5  Q     Did Gates Healthcare -- was Gates
6  Healthcare involved in any controlled substances?
7  Do you know?
8  A     As far as handling controlled
9  substances --
10 Q     Correct.
11 A     -- no.  No.
12 Q     So you were not -- you were not
13 advising him with respect to anything with
14 controlled substances?  Is that fair?
15 A     That's fair, yes.
16 Q     Then -- do you have clients at Crowley
17 Associates currently?
18 A     I -- I take projects on referral, so
19 I've done work for several recently.  But I have
20 one client in Atlanta here, AttainMed, M-E-D,
21 AttainMed, small wholesale company.
22 Q     Do they deal in controlled substances?
23 A     Yes, among other things.
24 Q     And what are you doing for them?
25 A     I provide DEA advice.  I'm hands-on

Page 45

1  compliance work, physical inventory, reporting,
2  make sure they're the highest level of
3  compliance --
4  Q     Okay.
5  A     -- yeah.
6  Q     And what other clients have you had
7  since January of 2013?
8        Or let me ask it this way, because --
9        Has it been, you know, ten or so
10 clients or --
11 A     Yeah.
12 Q     -- 50-plus clients?
13 A     Ten.  Ten, probably.
14 Q     Ten?
15 A     Yeah.
16 Q     And who have the major clients been?
17 A     Noramco, Incorporated, Athens, Georgia.
18 Q     And what did you do for Noramco?
19 A     We performed an assessment.
20 Q     Assessment of what?
21 A     Scientific affairs and -- and the
22 compliance function and internal interviews and
23 best way to comply with Controlled Substances Act
24 when you're talking about small quantities, and
25 research, that type of thing, analysis.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 Q      Okay.
2 A      I was down in Puerto Rico for that
3 company, different name.  Janssen-Cilag,
4 C-I-L-A-G.
5        I've done assessments for Fresenius
6 Kabi, K-A-B-I, in Grand Island, New York, which
7 is Buffalo.  They also have a manufacturing site
8 in Wilson, North Carolina.  That's a German
9 company that has a U.S. presence now in the past
10 ten years.
11 Q      What's the name of that company?
12 A      Fresenius Kabi.
13 Q      With a PH or an F?  Fresenius?
14 A      Oh, Fresenius is F.  Fresenius, R --
15 F-R-E-S -- let's see -- E-N-I-U-S.  Fresenius
16 Kabi, K-A-B-I.
17 Q      And what do they manufacture or supply?
18 A      Schedule II injectable narcotics and
19 also a Schedule IV Midazolam, I believe.
20 Q      And what did you do for them?
21 A      Assessment, you know, identify gaps,
22 opportunities for improvement.
23 Q      Is Fresenius Kabi a manufacturer, a
24 supplier or --
25 A      Manufacturer.

Page 47

1 Q      And they have manufacturing facilities
2 in -- in Grand Island, New York, as well as
3 Wilson, North Carolina?
4 A      Yes.
5 Q      And the work for Janssen-Cilag, was
6 that -- was Janssen-Cilag in Puerto Rico a
7 manufacturer or supplier?
8 A      Manufacturer.  I conducted a -- an
9 unannounced audit of that location.
10 Q      Of that manufacturing location?
11 A      Yes.
12 Q      And that's -- that's basically what you
13 did as a DEA agent; correct?  You inspected and
14 audited manufacturing locations?
15 MR. GOLDMAN:
16        I'm gonna --
17 MS. CONROY:
18        Just generally.  I'm not --
19 MR. GOLDMAN:
20        Yeah.  So object --
21 MS. CONROY:
22 Q      I just want to ask just generally.
23 That was your background?
24 MR. GOLDMAN:
25        Be mindful of that.  No specifics.

Page 48

1 A      Yes.
2 MS. CONROY:
3 Q      What other -- what other companies have
4 you consulted for?
5 A      I've been involved in Eaton Apothecary,
6 that assessment.  That's in Massachusetts.
7 E-A-T-O-N Apothecary.  I think they had, like, 13
8 retail locations.
9 Q      Okay.  And what did you -- what was the
10 subject of your assessment there?
11 A      To make sure that they didn't have any
12 DEA type issues in any of their locations.
13 Q      Did -- were you looking at both
14 controlled substances and just their regular
15 pharmaceutical line?
16 A      Controlled substances.
17 Q      And they're a retail pharmacy?
18 A      That's what they're categorized as.
19 Some of their locations are what you'd call
20 closed-door, almost.
21 Q      Okay.
22 A      So...
23 Q      What -- do you recall what controlled
24 substance Janssen-Cilag manufactured in
25 Puerto Rico?

Page 49

1 A      I should.  Amphetamine.
2 Q      Can you recall any other substances?
3 A      That was the main, I think.  I don't
4 think they had any Schedule II narcotics there.
5 I really don't remember at the moment.  I'm
6 sorry.
7 Q      That's fine.
8 A      Yeah.
9 Q      Did you do any consulting work for
10 Purdue Pharma after you left as executive
11 director?
12 A      I was retained for one year in case
13 anyone had a question.  I did not perform any
14 work that would be in the category of an
15 assessment or a project.  Occasionally, I would
16 answer questions.
17 Q      And that was the year right -- that was
18 2013?
19 A      Yes.
20 Q      Have you -- are you being paid for your
21 time today by Purdue Pharma?
22 A      No.
23 Q      Are you being paid for your time by
24 anyone today?
25 A      No.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  Q     What does it mean -- if you go to the
2  first page of Exhibit 2 of your LinkedIn account,
3  it says, "Mr. Crowley has managed and conducted
4  domestic and international assessments and audits
5  of manufacturers, distributors, laboratories,
6  hospitals, clinics, retail pharmacies, and
7  medical and dental practices during his career,
8  including office-based opioid treatment (OBOT)."
9        Do you see that?
10 A     Yes.
11 Q     And you gave me, basically -- I know,
12 as a DEA investigator, just very generally, you
13 were in a lot of manufacturing facilities;
14 correct?
15 A     Could you just repeat the end of that
16 question?
17 Q     Sure.
18 A     Sorry.
19 Q     You're talking about -- a little bit
20 earlier you talked about a career of over 40
21 years, and it says here that you have managed and
22 conducted --
23 A     Correct.
24 Q     -- domestic and international
25 assessments and audits of manufacturers,

Page 51

1  distributors, laboratories, hospitals, clinics,
2  retail pharmacies, and medical and dental
3  practices during your career; correct?
4  A     Correct.  Yeah.
5  Q     And that career included your time at
6  the DEA; correct?
7  A     Yes.
8  Q     And, without getting into any details,
9  some of -- some of what you're talking about, the
10 assessments and audits of manufacturers and
11 distributors, that would have taken place while
12 you were a DEA agent?
13 A     Yes.
14 Q     Did you -- would it also include --
15 assessments and audits of laboratories,
16 hospitals, clinics, retail pharmacies, medical
17 and dental practices -- would all of those have
18 been done while you were a DEA agent?
19 A     Not all of them.
20 Q     Okay.  Which ones -- which ones were
21 just after your time as a DEA agent?
22 A     Well, just generally speaking --
23 MR. GOLDMAN:
24        Listen to the question.
25 THE WITNESS:

Page 52

1        Yeah.
2  MS. CONROY:
3  Q     I'm just -- while you were a DEA
4  agent --
5  A     Yeah.
6  Q     -- you certainly had assessment and
7  inspection and audit experience with respect to
8  manufacturers; right?
9  A     I wouldn't use the word "assessment."
10 Q     Okay.  I'm actually -- so I'm going by
11 what it --
12        Let me -- let me start again.
13 A     Right.
14 Q     It says, "Mr. Crowley" --
15 A     Right.
16 Q     -- "has managed and conducted domestic
17 and international assessments and audits of
18 manufacturers."
19        Do you see that?
20 A     Yes.
21 Q     Would you have performed that or those
22 functions while you were a DEA agent?
23 A     As I answered, I would not use the word
24 "assessments" --
25 Q     Okay.  What --

Page 53

1  A     -- while I was a DEA agent.
2  Q     You did audits?
3  A     Yes.
4  Q     Would that be the correct way of
5  terming it?
6  A     Yes.
7  Q     Okay.  And, then, after you left the
8  DEA, you would call it -- would you call it an
9  assessment?
10 A     Yes.
11 Q     Okay.  And is that -- did you do audits
12 of distributors while you were a DEA agent?
13 A     Yes.
14 Q     And of laboratories?
15 A     Yes.
16 Q     Of hospitals?
17 A     Investigations.
18 Q     Okay.  Clinics?
19 A     Same.  Investigations.
20 Q     Retail pharmacies?
21 A     The same.  That would be
22 investigations.
23 Q     Medical and dental practices?
24 A     Same.  Investigations.
25 Q     Investigations.  Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  Then when you became a consultant, you
2  don't call it an audit anymore. You call it an
3  assessment. Is that fair?
4  A    I did call the one in Puerto Rico an
5  audit, but it was an assessment.
6  Q    But it was like a mock audit? Is
7  that --
8  A    Yes.
9  Q    And have you, as a consultant, done
10 assessments of all of these: Manufacturers,
11 distributors, laboratories, hospitals, clinics,
12 retail pharmacies, medical and dental practices?
13 A    I'm sorry. As a consultant?
14 Q    Yes.
15 A    Yes.
16 Q    Okay. Now, it says "including
17 office-based opioid treatment," OBOT in
18 parentheses. What's that?
19 A    That would be a practice that would
20 treat patients for drug addiction.
21 Q    Okay. And when did you do that?
22 A    I did one here in Atlanta, Georgia,
23 about two years ago.
24 Q    And could you describe for me what it
25 is that you did?

Page 55

1  A    I did a site visit to determine their
2  qualifications to be a customer, to understand
3  the practice, interview the medical doctor, make
4  an assessment of the type of practice that they
5  were conducting, perhaps get a estimate of the
6  amount of patients they would treat, what they
7  would be ordering, how often.
8  Q    And was this -- were you hired to do
9  this?
10 A    Yes.
11 Q    And who hired you to do this?
12 A    AttainMed.
13 Q    And that's the small wholesaler?
14 A    Correct.
15 Q    And they're in the Atlanta area?
16 A    Yes.
17 Q    And were they looking to supply
18 controlled substances to this opioid treatment
19 center?
20 A    If appropriate, yes.
21 Q    What do you mean by "if appropriate"?
22 A    Based on the results of the
23 application.
24 Q    Was the -- what's -- what's the name of
25 the customer?

Page 56

1  A    It's called The Spine Practice,
2  but -- I'll tell you as soon as I think of it.
3  Q    That's fine.
4  A    Yeah. Yeah.
5  Q    They're -- they are not connected to
6  Attain; correct?
7  A    They're not. Only -- only as a
8  customer.
9  Q    Okay.
10 A    Yeah.
11 Q    And describe for me what Attain asked
12 you to do with respect to this -- The Spine
13 Practice.
14 A    We -- we just conduct due diligence --
15 or, in this case, I did -- to determine if the
16 practice was going to be, you know, limited, what
17 size would the practice be, would it be helpful
18 to the patients, you know.
19     What they asked me to do was to verify
20 the information that was contained on the
21 application. Of course, all part of that is the
22 license verification of the physician, of the
23 pharmacy that they had on site; interview the
24 president of the company, the medical director or
25 the director of pharmacy; what types of

Page 57

1  substances they would be using in the opioid
2  treatment, which is SUBOXONE; my impressions,
3  based on my experience. What did the office look
4  like? Is it a professional office space? All of
5  those types of things.
6  Q    And did you write up a report for
7  Attain?
8  A    I think I probably did an email report,
9  yeah.
10 Q    Do you know if Attain did decide to do
11 business and supply controlled substances
12 to -- we'll call it spine practice, but --
13 A    They did.
14 Q    And what kind of a -- what kind of
15 opioid treatment, other than the prescribing of
16 sub- --
17 A    SUBOXONE.
18 Q    -- SUBOXONE, what were they providing?
19 A    That was only part of their practice,
20 so the -- the medical director there is a
21 qualified physician to offer that type of
22 service. That's not her primary function. So,
23 in addition to the SUBOXONE, which is
24 buprenorphine, would be counseling and therapy,
25 physical therapy probably.

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1 Q      Are they also -- do they also prescribe
2 controlled substances for pain as opposed to
3 addiction treatment?
4 A      I don't think so.
5 Q      Do you know one way or the other?
6 A      I didn't --
7       Based on their ordering, which I look
8 at from time to time, I would say no.
9 Q      Okay.  And what's the name of the
10 doctor?  Do you recall?  It's a woman?
11 A      Yes.
12 Q      And she's -- is she the medical
13 director that you went to interview?
14 A      Yes.
15 Q      And you also interviewed the pharmacist
16 or whoever was in charge of the pharmacy?
17 A      I did.
18 Q      Did you create any type of suspicious
19 order monitoring system for Attain or assess
20 whatever they may have had in place?
21 A      We -- we do have suspicious --
22 suspicious order monitoring, yes.
23 Q      And did you have anything to do with
24 that -- the creation of suspicious order
25 monitoring or did you assist them with what they

Page 59

1 may have already had in place?
2 A      It was created before I became involved
3 with them.
4 Q      And was it any part of your
5 responsibilities to over- -- to take a look at
6 that program, the suspicious order monitoring
7 program?
8 A      Yes.
9 Q      And have you written up any sort of
10 report or email with respect to your assessment
11 of their suspicious order monitoring practice?
12 A      I don't believe so.
13 Q      Did you find it -- did you find that it
14 met your guidelines for suspicious order
15 monitoring practice?
16 A      I did.
17       Again, this is a small company, so it's
18 fairly obvious and easy to do that.
19 Q      Who do they -- who distributes -- I
20 mean, are they connected with a particular
21 wholesaler?
22 A      They are a wholesaler.
23 Q      And are they connected with -- do
24 they -- do they contract directly with
25 manufacturers?

Page 60

1 A      They do.
2 Q      And who do they -- and so they have
3 SUBOXONE?  They -- they purchase SUBOXONE?
4 A      They do.
5 Q      And who do they purchase it from?
6 A      I'm not sure if they got that from
7 Mallinckrodt or -- or someone else.
8 Q      Do they have fee for service
9 agreements -- do you know? -- with --
10 A      No.
11       Well, please continue with the
12 question.
13 Q      Okay.
14 A      Yeah.
15 Q      So let me -- they do not have fee for
16 service agreements with any manufacturers that
17 you're aware of?
18 A      None that I'm aware of.
19 Q      Do you know if they provide any data of
20 their supply of any of their drugs to retail
21 pharmacies to any manufacturer or other
22 wholesaler?
23 A      I don't think so.  Not to my knowledge.
24 Q      And when they purchase -- if it's from
25 Mallinckrodt or some other drug manufacturer, is

Page 61

1 it just a one-time purchase or do they have an
2 account set up with that purchase --
3       Are they -- let me ask it this way.  Do
4 you know if they are an authorized distributor
5 for any manufacturer?
6 A      I think they have a relationship with
7 Mallinckrodt now, yeah, which would meet that
8 definition.
9 Q      Okay.  But your -- but they do not have
10 a fee for service contract with Mallinckrodt?
11 A      I don't believe so.
12 Q      Okay.  And -- and why do you believe
13 they do not have that?
14 A      I think I would have been aware of it.
15 That's all.
16 Q      Okay.  You're familiar with the term
17 "fee for service"?
18 A      Yes.  Generally, yes.
19 Q      Okay.  How would you describe for me
20 your responsibilities during the 10 years you
21 were with Purdue?  If you could just give me an
22 overview of why you went there, what you -- what
23 your responsibilities were and how they changed
24 up until the time you left.  And I'm just looking
25 for kind of a -- I know you could go on all day.

Highly Confidential - Subject To Further Confidentiality Review

Page 62

1 But I'm just looking for a brief overview of what
2 your responsibilities were.
3 A        So this was a good opportunity for me
4 to create a Controlled Substance Act or DEA, if
5 you want to say it that way, compliance program
6 from the ground floor.
7          So, initially, the focus was on the
8 manufacturing plant and all of the issues
9 involved there.  So when I first joined Purdue, I
10 would say that I was able to create a realtime
11 one-voice sustainable compliance program which
12 was, shall I say, directed by -- by one person.
13 It happened to be me.
14         Where some companies and so forth have
15 compliance embedded in -- in operational people,
16 we made it a separate independent organization.
17 I was able to do that.
18         So it would be a reconciliation and
19 accountability-type things in manufacturing,
20 packaging, warehousing, distribution to the
21 authorized distributors, import/export, my advice
22 to nonclinical research and development.
23         I was involved in -- I became a
24 clearinghouse for -- throughout the company for
25 any compliance type of question that would be

Page 63

1 DEA-related.
2 Q        And just if I could stop you there --
3 A        Yeah.
4 Q        -- when you -- what you're talking
5 about right now is sort of the first type
6 position you held, which was to oversee
7 compliance at the manufacturing facilities for
8 Purdue?
9 A        Right.  That -- that continued the
10 whole time.
11 Q        Okay.  And those manufacturing
12 locations were located in North Carolina?  Is
13 that correct?
14 A        There's one in Wilson, North
15 Carolina --
16 Q        Okay.
17 A        -- totowa, New Jersey.  Bulk
18 manufacturing was in Coventry, Rhode Island.  At
19 the time I first joined, nonclinical research was
20 in Ardsley, New York.  Subsequently moved to
21 Cranbury, New Jersey.
22 Q        And prior to you getting to Purdue
23 and -- or starting at Purdue in 2003, there was
24 no compliance department for the -- for what
25 you're talking about for the manufacturing?

Page 64

1 A        No formal department --
2 MR. GOLDMAN:
3          Objection.
4          Go ahead.
5 A        Yeah.
6 MS. CONROY:
7 Q        So you created a formal compliance
8 department for what --
9          What would you have called it?  For the
10 manufacturing division of Purdue?  Or how would
11 you term it?
12 A        We called it the Controlled Substances
13 Act Compliance Organization or Department.
14 Q        But, at that time, 2003, it was with
15 respect to the manufacturing arm of Purdue;
16 correct?
17 A        Primarily.
18 Q        Okay.  So when did -- when did your --
19          Because I know, since I've read so much
20 about what you did at Purdue, it became a broader
21 responsibility for you; correct?
22 A        I think it evolved to a broader, yes.
23 Yeah.
24 Q        So it began to include more than just
25 manufacturing; correct?

Page 65

1 A        As I say, I became a clearinghouse
2 for -- for, you know, interpreting regulations,
3 whether it be clinical trials, international
4 clinical trials, import/export issues.  So there
5 were a lot of things as it evolved and people
6 became acquainted with me in my -- in our
7 department.  And, of course, as a result of these
8 letters, it expanded a little bit.
9 Q        Okay.  And what you have pointed to is
10 a result of the Rannazzisi letters in 2006 and
11 2007.  Would it be fair to say that your
12 clearinghouse expanded to the distribution of
13 controlled substances, not just the manufacture
14 of controlled substances?
15 MR. HOFFMAN:
16          Object to form.
17 A        My duties and -- my -- duties.  My
18 responsibilities in distribution had to do with
19 accountability from the manufacturing site to the
20 customer.  Security matters were jointly
21 conducted with a separate department in Purdue,
22 corporate security.  Each site had a director of
23 security.  Compliance is really records reports
24 and security.  We had a very strong security
25 presence as well.

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1 So, in terms of distribution, my
2 responsibility was always there from day one.
3 MS. CONROY:
4 Q What about with respect to wholesalers,
5 the -- the purchase of controlled substances by
6 wholesalers from Purdue? At some point did your
7 compliance clearinghouse begin to encompass that
8 area of Purdue?
9 MR. HOFFMAN:
10 Object to form.
11 A That resided in a different department.
12 MS. CONROY:
13 Q What department was that?
14 A Well, it would have been several.
15 Customer service and national accounts.
16 Q At some point after the Rannazzisi
17 letters, was there a committee formed, the order
18 monitoring committee? Did you -- do you recall
19 that happening?
20 A Yes.
21 Q That did not exist, am I correct, prior
22 to the Rannazzisi letters?
23 A It did not exist prior to that.
24 Q Okay. And, so, when you -- when you
25 began at Purdue, you were in -- you were dealing

Page 67

1 with compliance with respect to the manufacturing
2 operation; correct?
3 A Yes.
4 Q At some point after the Rannazzisi
5 letters, did your responsibilities expand to
6 include order mon- -- suspicious order
7 monitoring?
8 A I became part of a committee. So, in
9 that regard, my responsibilities expanded.
10 Q To the best of your knowledge, did that
11 committee exist prior to your joining that
12 committee?
13 A It did not.
14 Q What proximate time frame would you put
15 on the creation of that committee?
16 A Discussions took place throughout 2008.
17 I think the committee probably became established
18 in the fall of 2008. Became more formal in the
19 first quarter of 2009, something like that. That
20 would be my recollection.
21 Q Do you know if there was any sort of
22 suspicious order monitoring program in place
23 prior to, say, the fall of 2008 at Purdue?
24 A I do.
25 Q And what do you know about that?

Page 68

1 A There was a --
2 I'm sorry. Did you ask was there a
3 policy?
4 Q Was there a suspicious order monitoring
5 program?
6 A Program. Yes. There was a suspicious
7 order monitoring procedure.
8 Q And what was that?
9 A And that was -- resided with customer
10 service and I think probably national accounts
11 and maybe, generally speaking, the finance
12 organization.
13 Q And is that anything that you knew
14 about prior to getting involved with the
15 formation of the committee?
16 A Yes.
17 Q Okay. And how did you come in contact?
18 How did you know about it?
19 A Well, I -- I developed relationships
20 with people throughout the company. One -- one
21 of those would be the director of customer
22 service. I had a close relationship with the
23 executive director, chief financial officer -- he
24 had a very, very strong interest in all aspects
25 of the business and the national accounts -- and

Page 69

1 also the credit manager. So just from
2 interactions with those people, I knew about it.
3 Whether or not I asked or they told me, I don't
4 remember.
5 Q Okay. And what is it about the
6 Rannazzisi letters that, in your mind, changed
7 things?
8 MR. HOFFMAN:
9 Object to form.
10 MR. GOLDMAN:
11 Object to form.
12 Go ahead.
13 A Sorry. I keep stepping on this cord.
14 I apologize.
15 Well, the first thing I noticed was
16 that it was a letter that -- industry had not
17 received letters like that in the -- in the past,
18 to my knowledge. So it was what I would
19 categorize as an extraregulatory guidance letter
20 that DEA was asking for industry's help. So the
21 first thing I noticed was that it was an
22 expansion of the plain language of the
23 regulation.
24 MS. CONROY:
25 Q And did you have -- did you have

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1 conversations with customer service or national
2 accounts or the -- or your -- or the credit
3 manager about how this plain language explanation
4 could impact Purdue?
5 A    Yes.
6 Q    Okay.  And -- and what did you tell
7 them?
8 A    That, you know, we -- we had to take
9 note of this; that the DEA was asking for our
10 help.  We wanted to stay ahead of the curve in
11 understanding what it really was that they
12 wanted, and that it, sooner or later, might
13 impact the manufacture.
14         Wasn't sure, but I began conversations
15 with cross-functional people throughout the
16 company:  Supply chain, security, in addition to
17 customer service.
18         Certainly the credit -- director of
19 credit was heavily involved in the beginning
20 because of his interest in accounts, and then
21 expanded to national accounts, and a series of
22 meetings to try to, you know, understand this,
23 basically.
24 Q    And you said that it might impact
25 manufacturing.  Did you believe at the time that

Page 71

1 it did impact distributors or wholesalers?
2 A    I did.
3 Q    And tell me a little bit about that.
4 What was your understanding of the impact of the
5 Rannazzisi letters to --
6     Do you call them distributors or
7 wholesalers?
8 A    Well, actually, they're one and the
9 same in this context.  A distributor could be a
10 distributor -- I'm sorry -- of its own products.
11 Q    Okay.
12 A    A full-line wholesaler distributes
13 everyone's products.  All right?
14 Q    Okay.
15 A    So, but they're the same category of
16 registrant with DEA.
17 Q    Okay.
18 A    Nonpractitioner.
19 Q    And what was your understanding of the
20 impact of the Rannazzisi letters on distributors
21 and wholesalers?
22 A    A little bit more advice or directive,
23 even though it was not a -- a formal guidance
24 letter.  We didn't know how to describe it.  It
25 was a letter, and -- on what their

Page 72

1 responsibilities were in providing and filling
2 orders for their retail customers, meaning retail
3 pharmacies, primarily.
4 Q    And what made you think that it would
5 have any impact on manufacturers?
6 A    I wasn't sure.  I just said we wanted
7 to be ready if it did.
8 Q    And, at some point in time, did you
9 begin to believe it did impact manufacturers?
10 MR. GOLDMAN:
11     Objection.
12     Go ahead.
13 A    At some point in time I believed it to
14 be a good call for citizens, shall I say, and to
15 help DEA in this mission that we would do all we
16 could to help.  But whether or not we were
17 required, that -- that was another story.
18 MS. CONROY:
19 Q    Purdue was a DEA registrant --
20 A    Yes.
21 Q    -- with respect to controlled
22 substances?
23 A    Yes.
24 Q    And was it your opinion that the
25 letters encompassed DEA registrants?

Page 73

1 A    I'm trying to understand "encompassed
2 DEA registrants."
3 Q    Let me ask it a little bit differently.
4     Did you come to believe that there
5 was -- if you were a DEA registrant, it didn't
6 matter whether you were a manufacturer, a
7 wholesaler, or a distributor; you had a
8 responsibility as outlined in the Rannazzisi
9 letters?
10 MR. HOFFMAN:
11     Object to form.
12 MR. GOLDMAN:
13     Objection.
14 A    I -- I hate to ask -- request you to
15 ask that again, but I would say no.
16 MS. CONROY:
17 Q    Okay.  So you -- you saw a difference
18 between a manufacturer that was a DEA registrant
19 and a wholesaler or distributor who was a DEA
20 registrant with respect to controlled substances?
21 A    I did, clearly.
22 Q    Okay.  And do you still hold that
23 opinion, that they're different?
24 A    Yes.
25 Q    Okay.  And does that mean that they are

Highly Confidential - Subject to Further Confidentiality Review

---

Page 74

1 different with respect to their responsibilities
2 concerning suspicious orders?
3 MR. HOFFMAN:
4     Object to the form.
5 MS. CONROY:
6 Q     Do they -- do they have different
7 responsibilities?
8 MR. HOFFMAN:
9     Object to the form.
10 A     I'm sorry. I didn't --
11 MS. CONROY:
12 Q     You can -- you can answer.
13 MR. GOLDMAN:
14     You can answer, yeah.
15 A     Different responsibilities.
16 MS. CONROY:
17 Q     Okay. And explain to me the
18 differences.
19 A     Well, one of the terms used in
20 suspicious order monitoring is -- would be an
21 order or orders. You have to detect whether or
22 not an order is suspicious. That denotes an
23 order from your customer.
24     So a manufacturer has a customer base
25 of wholesale companies or distributing companies.

---

Page 75

1 Those are the customers of the manufacturer.
2     The distributors -- distributors -- I'm
3 sorry -- or wholesalers distribute controlled
4 substance products to retail pharmacies, some
5 cases to -- I mean, and hospitals, clinics, and
6 so forth, what we call a retail level.
7     So there's a difference in customer.
8 And that, to me, denotes a difference in
9 responsibility.
10 Q     Okay. And what sort of difference in
11 responsibility does it --
12     Explain to me what that difference is.
13 A     Well, suspicious order monitoring in
14 that regard, the manufacturer would be required
15 to have a system to detect, you know, irregular
16 or noteworthy orders from their customer.
17 Q     And that would be the distributor or
18 the wholesaler?
19 A     Right.
20     They do not have the responsibility of
21 the direct relationship of -- of the movement of
22 the product to the retail level.
23 Q     And would that responsibility be in the
24 hands of the distributor of the wholesaler whose
25 customers were the retail pharmacies?

---

Page 76

1 A     Yes, it would.
2 MR. GOLDMAN:
3     Counsel, we're going for an hour and a
4 half, so whenever would be good to take a break.
5 MS. CONROY:
6     Okay. Yeah. Just give me a couple of
7 minutes.
8 MR. GOLDMAN:
9     Yeah.
10 MS. CONROY:
11 Q     Is your -- is your understanding of
12 those two separate -- I'll call them separate
13 responsibilities or separate explanations of
14 responsibilities, is that generally held -- do
15 you know? -- in the industry?
16 MR. HOFFMAN:
17     Object to the form.
18 A     Yes.
19 MS. CONROY:
20 Q     Okay. And how -- how do you know that?
21 A     From my experience.
22 MS. CONROY:
23     Okay. Let's -- let's take a break, and
24 then --
25 VIDEOGRAPHER:

---

Page 77

1     We are now going off the video record.
2 The time is currently 10:49 a.m. This is the end
3 of media number 1.
4     (OFF THE RECORD.)
5 VIDEOGRAPHER:
6     We are now back on the video record
7 with the beginning of media number 2. The time
8 is currently 11:17 a.m.
9 MS. CONROY:
10 Q     Mr. Crowley, you gave me some positions
11 of individuals who became -- were or became
12 involved in suspicious order monitoring. One was
13 customer service department. Do you recall that?
14 A     Yes.
15 Q     Who was the person that you would --
16 who do you recall from customer service as being
17 involved?
18 A     The director, in the initial
19 discussions --
20 Q     Sure.
21 A     -- Laura Watson.
22 Q     Okay. And anyone else from customer
23 service that either joined discussions or became
24 involved later?
25 A     No.

---

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 Q      And national accounts, who's that?
2 A      Stephen Seid.
3 Q      Anyone -- what about Mr. Projansky or
4 anyone else in national accounts?  Do you know
5 Mr. Projansky?
6 A      I believe he worked for Stephen Seid.
7 Q      Okay.
8 A      Right.
9 Q      But you -- in your head, it's Stephen
10 Seid?
11 A      Yes.
12 Q      The credit manager, who's that?
13 A      Dan Colucci.
14 Q      Can you recall any other individuals at
15 Purdue involved with those three and yourself
16 with respect to suspicious order monitoring?
17 A      In the discussions in the time frame
18 leading up to the establishment of the committee?
19 Q      Correct.
20 A      Generally speaking, Chuck Forsaith.
21 Q      And where did he fit in?
22 A      He was the director of supply chain
23 security at that time.
24 Q      Anyone from the sales side, marketing
25 side, somebody like Russ Gasdia, anybody like

Page 79

1 that?
2 A      No.  National accounts was the only
3 area that I spoke with, that Stephen Seid.
4 Q      Okay.  What about Howard Udell or Robin
5 Abrams?
6 A      Well, I reported directly to Robin
7 Abrams.  At that time that we're speaking about,
8 I have no recollection of having anything -- any
9 conversations with Howard Udell.
10 Q      Okay.  Would you include Robin Abrams
11 with the discussions leading up to the creation
12 of a suspicious order monitoring program?
13 A      Yes.
14 MR. HOFFMAN:
15      Sorry.  Object to form.
16 MS. CONROY:
17 Q      So do I have everybody when I --
18      Let me list out the names.  Yourself,
19 Laura Watson, Stephen Seid, Dan Colucci, Chuck
20 Forsaith and Robin Abrams?
21 A      To the best of my recollection, yes.
22 Q      And let me make sure that I completely
23 understand what you were telling me just before
24 we took the break.
25      So you were talking to me about

Page 80

1 customers and -- and the way to interpret the
2 Rannazzisi letters with respect to whose
3 responsibilities it was to prevent suspicious
4 orders from being filled.  Do you -- do you
5 recall that testimony?
6 A      Yes, I do.  Yeah.
7 Q      Okay.  And who do you consider the
8 Purdue customers in that analysis?
9 A      Its authorized distributors.
10 Q      And has that been your opinion since
11 you began to interpret the Rannazzisi letters and
12 create the suspicious order -- be a part of the
13 creation of the suspicious order monitoring
14 program at Purdue?
15 A      Yes.
16 Q      And who are the wholesaler --
17      I'm calling it wholesaler.
18 A      Right.
19 Q      Would you -- that means distributors to
20 you, wholesalers?
21 A      Right.
22 Q      Okay.  And who are their customers?
23 A      Well, their customers are retail
24 pharmacies, hospital clinics, primarily.  Whether
25 or not they -- they are also able to distribute

Page 81

1 to secondary wholesalers, smaller companies.
2 Q      Okay.
3 A      And I don't know.  It's possible that
4 they would distribute to individual
5 practitioners.  But I'm not a hundred percent
6 positive on that.
7 Q      But an individual practitioner could be
8 a customer if there was that kind of an
9 arrangement?
10 A      Could be.
11 Q      Right.
12 A      You know.
13 Q      Would that be, like, a dispensing
14 physician or a physician that has a -- who has a
15 pharmacy in their --
16 A      Yes.
17 Q      -- clinic or office?
18 A      That's right.
19 Q      And, so, it's your testimony that when
20 DEA was asking for help, as you -- as you stated,
21 in the Rannazzisi letters, 2006, 2007, that you
22 understood that to mean that Purdue had to -- had
23 to know who their authorized distributors were in
24 order to fill their orders?
25 MR. GOLDMAN:

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1      Objection.
2 MR. HOFFMAN:
3      Object to form.
4 A      Well, we always knew who our authorized
5 distributors were. We had a relationship with
6 them. So, yes, that's the way I understood it.
7      The 2007 letter was a little bit of an
8 extension of that first letter.
9 MS. CONROY:
10 Q      Okay. And how -- did that impact in
11 any way your view of who Purdue was responsible
12 for with respect to suspicious orders?
13 A      I thought, and several of us thought
14 that we should, you know, go the extra step to
15 support our authorized distributors in their due
16 diligence efforts with their own customers.
17 Q      And that meant that, going the extra
18 step, is it fair to say that that would mean
19 providing them information that Purdue might have
20 with respect to an authorized distributor's
21 customers?
22 A      Eventually. First we'd have to get
23 that data, which we didn't have readily.
24 Q      And that data ultimately came from the
25 fee for service agreements?

Page 83

1 A      Yes. My understanding, yeah.
2 Q      And, once that data came in, it was at
3 least your position, and maybe some others', that
4 that information should be shared with Purdue's
5 authorized distributors?
6 MR. HOFFMAN:
7      Object to form.
8 MS. CONROY:
9 Q      Or let me put it this way. Was
10 already -- they already knew what it was.
11 A      Right.
12 Q      But it should be shared for the purpose
13 of assisting with suspicious order monitoring.
14 MR. HOFFMAN:
15      Object to form.
16 A      We -- we had to convert, shall I say,
17 or manipulate -- not manipulate, but we had to
18 take that data and -- and apply some instructions
19 to it. I'm not an IT person. But we wanted to
20 get certain information from that data that we
21 could then use to support our authorized
22 distributors in their efforts, yes.
23 MS. CONROY:
24 Q      And is it fair to say that the fee for
25 service agreements or contracts that were set up

Page 84

1 between Purdue and its authorized distributors
2 allowed for a significant amount of visibility
3 with respect to the customers of the authorized
4 distributors?
5 MR. HOFFMAN:
6      Object to the form.
7 MS. CONROY:
8 Q      By visibility, I mean, you knew what
9 they were -- knew what they were ordering and
10 what prescriptions they were filling.
11 MR. HOFFMAN:
12      Object to form.
13 A      That data was contained within the
14 system.
15 MS. CONROY:
16 Q      And, so, when I -- and I understand it
17 was a work in progress to be able to get it all
18 together and get a database working that you
19 could see that data and work with that data.
20 A      Correct.
21 Q      But it was -- it was your understanding
22 that, as of around 2008, 2009, Purdue had
23 significant visibility with respect to where its
24 pills were going all the way down to the
25 street-level pharmacies?

Page 85

1 MR. HOFFMAN:
2      Object to form.
3 A      We had visibility to the pharmacies,
4 yes.
5 MS. CONROY:
6 Q      And I believe -- and I'm gonna -- just
7 gonna ask if you agree or disagree with this. I
8 took Mr. Seid's deposition a few weeks ago, and
9 he put it in sort of the -- I think in the
10 90 -- somewhere in the 90 percent visibility, and
11 it might have even been as high as 97 and a half
12 percent visibility by Purdue down to the retail
13 pharmacies. Would you agree with that?
14 MR. HOFFMAN:
15      Object to form. Foundation.
16 A      Purdue's top three customers provided
17 that percentage that you just talked about.
18 MS. CONROY:
19 Q      And, so, the top -- the top three
20 customers, you're talking about the top three
21 authorized distributors?
22 A      Yes.
23 Q      And who were they?
24 A      McKesson, Cardinal, and
25 AmerisourceBergen.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 Q     And because you had visibility down to
2 the street-level retail pharmacies with respect
3 to all three of those authorized distributors,
4 that gave you visibility in the high 90 percent?
5 MR. HOFFMAN:
6        Object to form.  Foundation.
7 A     I've seen figures of 93, and I've also
8 seen 97.  I don't really know what the actual
9 figure is.
10 MS. CONROY:
11 Q    Okay.  But it's somewhere in the 90s?
12 A    Yes.
13 Q    And it was -- it was -- it was your
14 view that --
15       Or let me ask you.  Was it your view
16 that Purdue should take an extra step with its
17 suspicious order monitoring program to support
18 its authorized distributors with respect to the
19 filling or not filling of suspicious orders down
20 to the pharmacy level?
21 A    It was -- it was my view that we should
22 support our authorized distributors with that
23 activity on a, you know, case-by-case basis.
24 Yeah.
25 Q    And what was your understanding of what

Page 87

1 a distributor could do with that data or that
2 information?
3 MR. HOFFMAN:
4        Object to form.  Foundation.
5 A     Well, they could report certain orders
6 as suspicious to DEA.  They could also, if it was
7 appropriate, stop -- discontinue doing business
8 with a retail account.  Those two things,
9 primarily.
10 MS. CONROY:
11 Q    When you say discontinue doing business
12 with a retail account, could the wholesaler at
13 least stop a shipment to those retail accounts
14 while it conducted an investigation?
15 A    It could.
16 MR. HOFFMAN:
17       Object to form.
18 MS. CONROY:
19 Q    Would that be something to --
20 A    Yeah.
21 MR. GOLDMAN:
22       You have to wait a bit.
23 MS. CONROY:
24 Q    -- to --
25 MR. HOFFMAN:

Page 88

1        Object to form.
2 MS. CONROY:
3 Q     -- to add to that?  You would -- they
4 could -- they could report a -- they could report
5 a retail pharmacy or hospital or clinic or a
6 secondary wholesaler or an individual
7 practitioner, they could -- they could report
8 them to the DEA with the information that Purdue
9 could provide; correct?
10 MR. HOFFMAN:
11       Object to form.
12 A     They would report to DEA with -- using
13 their own information, supported by us, right.
14 MS. CONROY:
15 Q     Sure.  But what I'm -- what I'm asking
16 you about is, in your view of this and in your
17 view of the extra step that Purdue could take
18 with this -- this very robust database that you
19 were creating in 2008, 2009, that would provide
20 information to the wholesalers so that they could
21 report orders as suspicious to the DEA concerning
22 their own retail customers; correct?
23 MR. HOFFMAN:
24       Object to form.
25 A     The data information that we --

Page 89

1 actually, myself -- shared with wholesalers was
2 to support them in their own due diligence
3 efforts, to direct them, you know, at certain
4 accounts that they needed to evaluate a little
5 bit closer.  I don't -- I think that's the
6 easiest way for me to describe it.
7 MS. CONROY:
8 Q     Okay.  And, I mean, is it fair to say
9 that once you provided that information, it was
10 up to them to do whatever they were going to do;
11 correct?
12 MR. HOFFMAN:
13       Object to form.
14 A     Generally.  But, on a case by case, I'd
15 have to address it.  Right.
16 MS. CONROY:
17 Q     Well, let me -- let me put it this way.
18 You could not report an order as suspicious to
19 the DEA on behalf of one of the -- one of
20 Purdue's authorized distributors; correct?
21 A     We -- we would not have done that
22 without their agreement.
23 MR. PYSER:
24       Object to form on the last question.
25 MS. CONROY:

Page 90

1 Q      And -- and why is that?
2 MR. PYSER:
3         Object to form.
4 A      Without their knowledge, it would be a
5 direct reflection on their -- on their business
6 process. So this was a support activity so that
7 any reports to DEA would be -- would known -- be
8 known to both parties. If -- yeah. Simple as
9 that.
10 MS. CONROY:
11 Q      Because if you -- if you went sort of
12 behind their back and reported to the DEA about a
13 suspicious pharmacy that was purchasing
14 controlled substances from, say, McKesson, you
15 would want to let McKesson know that first
16 because McKesson was gonna lose business when the
17 DEA -- potential -- potentially could lose
18 business when the DEA heard about that pharmacy;
19 correct?
20 MR. PYSER:
21         Object to form.
22 MS. SIDARTH:
23         Object to the form.
24 A      There would be an ongoing discussion
25 with McKesson. Right.

Page 91

1 MS. CONROY:
2 Q      And it's not -- were there any
3 instances where you feel Purdue should report
4 without having a conversation or contact with the
5 distributor?
6 MR. HOFFMAN:
7         Object to form.
8 MS. CONROY:
9 Q      Or with their customers? With Purdue's
10 customer.
11 MR. HOFFMAN:
12         Sorry. Object to form.
13 A      Not that I recall.
14 MS. CONROY:
15 Q      Is there any instance that you can
16 recall where there was a report to the DEA with
17 respect to a suspicious order of a retail
18 pharmacy where you did not have the distributor's
19 agreement to make that report?
20 MR. HOFFMAN:
21         Object to form.
22 A      I believe there was one.
23 MS. CONROY:
24 Q      And what one was that?
25 A      It was a meeting that took place in May

Page 92

1 of 2009 with the DEA officials in Los Angeles.
2 And, in good faith, I think our new chief
3 security officer may have mentioned a pharmacy or
4 two -- I don't remember -- without coordinating
5 with the wholesaler first.
6 Q      And what happened as a result of that?
7 Was -- was the -- was the wholesaler upset with
8 Purdue?
9 A      I made a call as soon as I found out
10 about it and explained the situation. So I -- I
11 don't -- I don't think upset would be a -- a
12 accurate word.
13 Q      So is it fair to say you -- you heard
14 about it in time to sort of smooth the waters a
15 bit?
16 MR. GOLDMAN:
17         Objection.
18 MR. HOFFMAN:
19         Object to form.
20 A      I just called my contacts at
21 Amerisource and told them what happened. Right.
22 MS. CONROY:
23 Q      Who was the -- who was the corporate
24 security person at Purdue that --
25         Do you recall?

Page 93

1 A      Last name Geraci, G-E-R-A-C-I, Geraci,
2 Mark.
3 Q      And Mr. Geraci didn't -- is it fair to
4 say he didn't follow the --
5         At least I'll call it a procedure, but
6 maybe that's too strong a word for it. I don't
7 know. You can tell me.
8         -- that he needs to tell ABC before he
9 does some -- before he reports something or talks
10 about something directly to the DEA agents?
11 MR. HOFFMAN:
12         Object to the form.
13 A      Well, it -- it was a brand new policy.
14 He -- he was fairly brand new to the company, so
15 I think it was done in good intention to take
16 advantage of other activity that he was doing in
17 that geographical area, so to maximize his own
18 productivity.
19         So I -- I can't remember exactly how
20 you phrased it, but I don't think he violated the
21 policy, you know, and certainly not knowingly.
22 MS. CONROY:
23 Q      Okay. Now, you said it was a brand new
24 policy. What -- what year would you put on the
25 policy?

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 A      2009.
2 Q      Okay.  And how -- would you describe
3 the policy to me?  How -- or how would you --
4        Or let me -- strike that.
5        Is -- is the policy written anywhere?
6 A      Yes.
7 Q      Where is it written?
8 A      It -- it's a standard operating
9 procedure that resides in the Office of General
10 Counsel.
11 Q      And do you know which --
12        Is it 0007?  Does that sound familiar
13 to you?
14 A      I think so.  I know there's a seven
15 involved.
16 Q      Okay.  We'll look at some, and you can
17 tell me which one.
18 A      Excuse me.
19 Q      Now, in that standard operating
20 procedure at Purdue, is there a section of that
21 SOP that says do not report a retail pharmacy or
22 secondary wholesaler or any of these -- any of
23 the wholesalers' customers to the DEA without
24 first letting the authorized distributor know?
25 MR. HOFFMAN:

Page 95

1        Object to form.  Foundation.
2 A      There's language contained in that, is
3 my recollection, that addresses reporting to DEA
4 and that that will be done with the agreement of
5 the authorized distributor.
6        There may also be wording that, if
7 there is a disagreement, it'll be conducted in
8 writing before Purdue would make the report
9 itself.  That provision was in there just in
10 case.
11 MS. CONROY:
12 Q      Okay.  And, as far as you know, the
13 Las Vegas pharmacy -- was that -- was that Lams?
14 Does that sound familiar to you?
15 MR. HOFFMAN:
16        Object to form.
17 A      I'm familiar with the Lams Pharmacy in
18 Las Vegas, yes.
19 MS. CONROY:
20 Q      Do -- do you think that was the one
21 that Mr. Geraci reported?
22 A      Yes.  I think -- as I say, there might
23 have been another one.  I'm not sure.
24 Q      Okay.  Well --
25 A      Well, there was a variety of them.

Page 96

1 Q      Okay.
2 A      Yeah.
3 Q      But that was the only instance that
4 you know that the Purdue policy was violated and
5 a Purdue employee went directly to the DEA
6 without receiving agreement from an authorized
7 distributor?
8 MR. HOFFMAN:
9        Object to form.  Foundation.  Also
10 misstates his prior testimony.
11 A      It's the only instance I'm aware of.
12 MS. CONROY:
13 Q      Do you ever recall a situation where
14 the disagreement was put in writing, as the SOP
15 allowed?
16 MR. HOFFMAN:
17        Object to form.  Foundation.
18 A      No.
19 MS. CONROY:
20 Q      The agreement with the distributor, who
21 was responsible for speaking with the authorized
22 distributor and reaching agreement with respect
23 to whether or not to report one of the
24 distributor's customers to the DEA?
25 A      On the Purdue side?

Page 97

1 Q      Yes.
2 A      Me.  Myself.
3 Q      Okay.  Anyone else?
4 A      Anyone from that committee could have
5 done it.
6 Q      And you're talking about the order
7 monitoring committee?
8 A      Yes.
9 Q      Okay.  So anyone on that committee on
10 their own could seek agreement from a
11 distributor, or would it need to be a committee
12 function?
13 A      It would generally be a committee
14 function, right.
15 Q      And then -- and then someone from the
16 committee would then be designated to inform both
17 the distributor and then, if there was agreement,
18 they would -- the committee would decide who
19 should report to the DEA?
20 A      If there were gonna be a report to the
21 DEA, the SOP said that it would be done by me or
22 my department.
23 Q      Okay.  And, as far as you know, that's
24 the way it worked?
25 A      Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1 Q    And do you recall instances where there
2 was agreement with the distributor to report to
3 the DEA a -- a distributor's customer?  Did it
4 ever happen?
5 A    I'm sorry.  That there was a
6 disagreement?
7 Q    No.  Was -- do you have -- do you
8 recall any instances where there was agreement
9 with the distributor and you yourself reported
10 one of the distributor's customers to the DEA?
11 A    It would have happened the other way,
12 and they would have said, if they wanted to,
13 per -- per discussion with Purdue.  It was up to
14 them.  But there was an agreement, yes.
15 Q    Okay.  So you would -- the way it
16 worked was, then, you would have a discussion
17 with the distributor, you would say, "We
18 believe" -- "We, Purdue, have -- believe that
19 this customer of yours should be reported to the
20 DEA"?
21 A    Well, be- --
22 MR. GOLDMAN:
23     Objection.
24     Go ahead.
25 A    Before that, there has to be a due

Page 99

1 diligence assess- -- you know --
2 Q    Sure.
3 A    -- assessment.
4 Q    You would have done your -- you would
5 have done your homework, and you would have
6 come --
7 A    Well, they have to also.
8 Q    Okay.
9 A    So, then, after that, you mean?
10 Q    Right.  And, so, what you're telling me
11 is when everyone did their homework, both the
12 distributor as well as Purdue, and you reached
13 agreement that there was a necessity to report a
14 customer of the distributor to the DEA, the
15 entity who would make that report to the DEA,
16 you're telling me, was the distributor?
17 MR. HOFFMAN:
18     Object to form.  Foundation.
19 A    Yes.
20 MS. CONROY:
21 Q    It would -- it would not be Purdue.
22 A    That's correct.
23 Q    Do you recall any instances where
24 Purdue then agreed to make the report to the DEA
25 rather than the authorized distributor?

Page 100

1 A    No.
2 Q    So it would have been your
3 responsibility to tell the distributor to
4 report -- after agreement and everyone did their
5 homework, it would be your responsibility to say
6 to the distributor, "Okay, go and report this to
7 the DEA"?
8 A    We would reach an understanding, yes.
9 Q    And would you get confirmation that the
10 distributor did in fact report to the DEA?
11 A    Not in all cases.
12 Q    Was that something that you would
13 request of the distributor --
14 A    Yes.
15 Q    -- to be told?
16 A    Yes.
17 Q    And, in some instances, would you get a
18 copy of the report or anything like that?
19 A    I don't recall.  I don't think so.
20 Q    Was there any way that you could track
21 which retail customers of one of Purdue's
22 authorized distributors had been reported to the
23 DEA by the distributor?
24 A    No.
25 Q    Were you tracking at any place at

Page 101

1 Purdue, once you and the order monitoring
2 committee reached agreement with the distributor,
3 that the retail customer should be reported to
4 the DEA?
5 MR. HOFFMAN:
6     Object to form.
7 A    Perhaps in notes of the committee
8 meeting -- committee minutes or in the system
9 itself, the remarks section.
10 MS. CONROY:
11 Q    That -- the system, what do -- what do
12 you call that system?
13 A    I call it the OMS system.  That's what
14 I call it.
15 Q    And you had a hand in the creation or
16 the design of that system?  Is that fair?
17 A    I'm not a design person, so what -- I
18 had input into what the algorithm should be or
19 the instructions or parameters, whatever you want
20 to call it, what information do we want in the
21 beginning to create a system to see how we could
22 help and support.
23     So then the IT experts would take that
24 data that we got from the fee for service and
25 create our -- our own unique internal system.

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 Q        And you called that the OMS system?
2 A        Yes.
3 Q        Was that -- was it a database?
4 A        Yes.
5 Q        Could you -- could you get to your
6 office in the morning and call it up on your
7 computer and see it?
8 A        I could.
9 Q        Okay.  And did you?
10 A       Not every day, but, yes, I could.
11 Q       And, when you did that, what would
12 you -- what would you see?
13 A       Other committee members also had,
14 you know, sight lines to that.  I may have been
15 looking at something differently than they did.
16        I saw high-volume purchasers of our
17 product that came to my attention that I wanted
18 to discuss with the wholesalers.
19 Q       And somehow, in the inner workings of
20 the database, those high-volume purchases --
21 purchasers -- those high-volume purchasers would
22 be retail --
23 A       Retail pharmacies.
24 Q       Or hospitals, clinics, any of the
25 customers of the distributors?

Page 103

1 A        Yes.  Except a very -- one time, I
2 think, it's always retail cus- -- retail
3 pharmacies.
4 Q        Okay.
5 A        Yeah.
6 Q        And somehow the database would create
7 for you a list of those high-volume retail
8 pharmacies and maybe some others that were
9 triggering some algorithm.  Is that correct?
10 A       Yes.
11 Q       And if you went on your computer and
12 clicked the right buttons, you would see that
13 list?
14 A        It -- it -- I mean, it's probably not
15 as simple as that.  It's -- it's done by -- you
16 can do it by state, you could do it by ZIP code,
17 whatever.  But -- or you could do it in its
18 entirety.  So I could see top purchasers for
19 geographical area.
20 Q       And if -- if you were anywhere between
21 93 to 97 and a half percent visibility, you were
22 gonna -- you could see a ranking of all of the
23 retail pharmacies in the country and know what
24 their volumes were; is that correct?
25 MR. HOFFMAN:

Page 104

1        Object to form.
2 A        I -- I wouldn't say a ranking, but,
3 yes, that's correct.
4 MS. CONROY:
5 Q        Or you could -- by ranking --
6 A        Correct.
7 Q        -- you could -- well, you could see
8 what they were all ordering from Purdue.  And
9 whether or not you could rank it or put them in
10 alphabetical order or something, that was a
11 function of the database?
12 MR. HOFFMAN:
13        Object to form.
14 A        Yeah.
15 MS. CONROY:
16 Q        What else could you -- other than
17 high-volume purchasers, what else could you see
18 on the database?
19 A        That was it, primarily.  Yeah.
20 Q        Or that was what -- that was it for
21 what you looked at?
22 A        Right.
23 Q        Okay.  Others on the committee may have
24 had access to other areas?
25 A        That may not have been the only thing

Page 105

1 that we looked at.
2 Q        Okay.  Okay.
3 A        Yeah.
4 Q        And I know I'm going back in time,
5 trying to kind of --
6 A        That's okay.
7 Q        -- have to recreate what the system was
8 like.
9        Did the system have a password?
10 A        I truthfully don't recall.
11 Q       Could you -- could you access the
12 system on a laptop?  If you were on the road,
13 could you see the system?
14 A        I believe that that was possible,
15 because we could --
16        What do they call it?  VPN?
17 Q        Yeah.
18 A        You know, right.
19 Q        Could you, on the system itself, if --
20 if there were emails or reports that had been
21 created, were they linked in the system?  Could
22 you -- could you click on something and see an
23 email exchange or see reports that had been
24 written up about a particular pharmacy?
25 A        You could see notes that were written.

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1  I'm not -- I don't think we -- you couldn't see
2  any committee report on that system, but you
3  could see notes.
4  Q        Could you create a report using the
5  system?  Could you -- could you select certain
6  notes or certain parts of the system and have it
7  print out and give you the, you know, the top ten
8  volume pharmacies in South Carolina or something?
9  A        I'm -- I'm sure one could.  I didn't
10  particularly do that, but --
11  Q        Okay.
12  A        Yeah.
13  Q        Was that system in operation when you
14  left Purdue in 2013?
15  A        I believe so.  2012.  The end of 2012.
16  Q        The end of 2012.
17  A        Right.
18  Q        Do you know or do you have any idea if
19  it's still in effect today, or some version of
20  it?
21  A        I truthfully don't know.  I -- I don't
22  know.
23  Q        Okay.  How many, if you know --
24           Or let me ask it --
25           I would like to know who or how many

Page 107

1  people had access to the OMS system.  Was it
2  company-wide or was it a select --
3  A        No.  Just committee members.
4  Q        Just the -- just the OMS --
5  A        And maybe the designer of the system.
6  Q        Okay.  So the -- the order monitoring
7  committee all had access to this database.
8  A        Yes.
9  Q        And maybe IT to fix --
10  A        Yeah.
11  Q        -- things or whatever?
12  A        And maybe one or two support people
13  from the Office of General Counsel.  Maybe.
14  Q        Would that be Giselle Issa?
15  A        She was the -- designated as the
16  director of the order monitoring system at some
17  point while I was there, yeah.  That would be
18  her, yeah.
19  Q        Okay.  Cheryl Reuss, do you remember
20  that name in the --
21           Cheryl Reuss?  No?
22           I -- I may see a name further and ask
23  who else.
24  A        No.  I don't know that name.
25  Q        Did you have a secretary?

Page 108

1  A        Administrative assistant.
2  Q        Okay.
3  A        Yeah.
4  Q        And did he or she have access?
5  A        If I requested, perhaps.  I -- I didn't
6  exclude her for any reason that I may have
7  forgotten.  But that wouldn't have been her
8  primary function at all.
9  Q        Could you -- could you yourself input
10  text into the notes section of the database?
11  A        Yes.
12  Q        And did you?
13  A        Yes.
14  Q        And what was -- what kinds of notes
15  would you enter?
16  A        An example would be, "On January 10th,
17  2010" -- I just picked that date --
18  Q        Yeah.
19  A        -- "I spoke with a certain person at
20  AmerisourceBergen about this customer, and this
21  was the result."
22  Q        And is that how -- is -- is the
23  database the way that you would keep track of
24  your communication and contact with your
25  authorized distributors in discussing suspicious

Page 109

1  orders?
2  A        That was the intent.  That was the --
3  excuse me -- the goal.
4  Q        And that was so if you -- would it be
5  fair to say that if you left for a couple of
6  days, one, and you were waiting for a call back
7  from AmerisourceBergen, when that individual
8  called back, you could then go back and call in
9  and -- and look at the notes and say, "Oh, I
10  tried to reach him on such-and-such a day about
11  this particular pharmacy"?
12  A        That -- that capability was there.
13  Again, that was the goal.
14  Q        Okay.
15  A        Yeah.
16  Q        And did you feel that the database
17  accomplished the goal of keeping track of
18  suspicious orders and contact with authorized
19  distributors, or reporting contact with
20  authorized distributors?
21  A        I think it -- if there were any
22  shortfall, it would have been I failed to make
23  notes because I was busy doing something else.
24  Again, the intent was to put the note.  The
25  capability was there.  I think we captured most

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1  of it, yeah.
2  Q      And that's where, if -- if the database
3  exists today, that's where your contemporaneous
4  notes would reside?
5  A      Yes.
6  Q      Anywhere else you would keep notes
7  other than the database?
8  A      Emails.  Doing an email correspondence.
9      Perhaps, you know, committee notes of
10  some of the meetings.
11  Q      Were committee notes kept on the
12  database at all?  Do you know?  Do you know if
13  there was a tab --
14  A      I don't believe so.  We were working
15  towards that or were trying to get that kind of a
16  system, but I don't think it was ever
17  accomplished while I was there.
18  Q      Okay.
19  A      Yeah.
20  Q      The other committee members, as far as
21  you know, did they use the notes section to keep
22  notes, contemporaneous notes?
23  A      The people who kept the notes were
24  myself, primarily, Steve Seid, and Luis Bauza.
25  He was the director of security, investigations.

Page 111

1  I don't think anyone else really put notes in
2  there, although, you know, perhaps so.
3  Q      Okay.  Could anybody who had access to
4  the database read your notes or Mr. Seid's notes
5  or Mr. Bauza's notes?
6  A      Yes.  That -- that was the purpose.
7  Q      And when the notes went in, were they
8  current at that point?  They didn't need -- when
9  you typed them in, they were then available for
10  people to read?
11  A      They were available immediately, yep.
12  Yes.
13  Q      Was there any quality control, that you
14  were aware of, of that database?
15  MR. HOFFMAN:
16      Object to the form.
17  A      That was one of the functions of
18  Giselle Issa, so I -- I -- if there was,
19  she -- she would have been the one.  Yeah.  I
20  don't know.
21  MS. CONROY:
22  Q      Did the database, as far as you're
23  concerned, at least, by the end of 2012, could
24  you go all the way back to the beginning of the
25  database?

Page 112

1  A      My recollection is that was a problem
2  for me personally.  I -- so whether I was doing
3  it wrong, you know...
4      I'm sure the capability was there, but
5  it wasn't readily available for -- with a couple
6  of clicks, you know.  So...
7  Q      Okay.  So it wasn't something that
8  you -- it might have been there, but it's not
9  something you were -- did?
10  A      Yeah.  It was the current -- it would
11  have been the current 12 months.  Might have been
12  18, but certainly the current 12 months.  But I
13  don't think you could go back 60 months or
14  something like that.
15  Q      Or, at least, you didn't --
16  A      I didn't.
17  Q      -- know what the clicks were to do
18  that?
19  A      Right.
20  MS. CONROY:
21      I think we should probably stop for the
22  status conference and lunch.  Okay?
23  THE WITNESS:
24      Okay.
25  MS. CONROY:

Page 113

1      Okay?  Thank you.
2  VIDEOGRAPHER:
3      We are now going off the video record.
4  The time is currently 11:58 a.m.  This is the end
5  of media number 2.
6      (OFF THE RECORD.)
7  VIDEOGRAPHER:
8      We are now back on the video record.
9  The time is currently 12:47 p.m.  This is the
10  beginning of media number 3.
11  MS. CONROY:
12  Q      Mr. Crowley, welcome back from lunch.
13  A      Thank you.
14  Q      A couple of questions back about the
15  OMS database.  When you would sit down at your
16  desk and access the database do you remember did
17  you click on an icon or did you have to do
18  something else to get to the database?
19  A      I'm sure I had to click on something,
20  yes.
21  Q      Okay.  But it was -- it was accessible
22  the way email is accessible on your database --
23  on your desktop?  If you recall.
24  A      Right.  I think you asked me before if
25  it was password-protected, and I don't remember

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 that it -- that it was.
2 Q      Okay.
3 A      That's not to say that it wasn't,
4 but --
5 Q      No.  I understand.
6 A      Yeah.  And it would have been only
7 available to the people that we've talked about.
8 Q      And it was -- and it was available on
9 your desktop, and there was possibly a way to
10 dial in or otherwise remotely connect to it from
11 your laptop at least at some point during your
12 tenure at Purdue?
13 A      I believe -- I believe that's correct.
14 Q      And did you have an actual office at
15 Purdue?
16 A      Had several.
17 Q      Okay.  And did you have an office in
18 Stamford?
19 A      Yes.
20 Q      And where else did you have one?
21 A      Wilson, North Carolina.
22 Q      And did you have computers at --
23 desktop computers at both locations?
24 A      I had two computers.
25 Q      And could you actually look at your

Page 115

1 email and look at the OMS database on two
2 different monitors?
3 A      I could.  I don't recall ever doing
4 that.
5 Q      Okay.  What else would you use your
6 computer for when you were at Purdue?  Emails,
7 the OMS database.  What other -- what other --
8      Did you look, for example, at
9 the -- did you look at fee for service contracts
10 electronically or did you access orders that were
11 coming in, anything like that?
12 A      I did not.
13 Q      Did you use any -- did you have any
14 sort of database that you used with respect to
15 your functions as a compliance executive with
16 respect to the manufacturing operations?
17 A      I did set up a file, and I think that
18 then became included in another file of all the
19 activities, yes.
20 Q      And when you say "file," you mean like
21 a database with respect to manufacturing
22 functions?
23 A      Right.  And it might -- might have been
24 by location, by activity, whether it was -- you
25 know, what part of packaging, what part of

Page 116

1 manufacturing, what part of packaging, warehouse,
2 whatever.  Many different categories,
3 subcategories.
4 Q      And that was separate from the OMS
5 database?
6 A      Yes.
7 Q      And you were telling me earlier that IT
8 would have assisted with the O- -- OMS database
9 or the creation of the OMS database.  Is that
10 correct?
11 A      That's my understanding.  Yes.
12 Q      Is there a particular person that you
13 recall that you would have spoken to about what
14 you and others were looking for in that database?
15 A      That -- that was handled by Steve Seid.
16 I do know the individual but cannot remember his
17 name right now.  I -- I can't.  I'm sorry.
18 Q      Okay.  But you remember that Steve Seid
19 had discussions with whoever that IT individual
20 is about what the OMS committee wanted the
21 database to do?
22 A      Yes.
23 Q      And was it the same person that you
24 used to help you design or create the
25 manufacturing compliance database?

Page 117

1 A      No.
2 MR. GOLDMAN:
3      Objection.
4 MS. CONROY:
5 Q      Who was that?
6 MR. GOLDMAN:
7      Go ahead.
8 A      Created it myself.
9 MS. CONROY:
10 Q      Okay.  So you -- you were able to
11 do -- you were able to do that on your own.
12 A      Yes.  And then later, with probably
13 someone like Giselle Issa, who worked for me at
14 that time, we included that in a, you know, in a
15 different system, shall I say, so it was
16 available to other people if they needed it.
17 Q      And would that have -- would it be fair
18 to say that, when you sat either in Stamford or
19 in Wilson, you could get access to either the OMS
20 database or you could get access to this
21 manufacturing database?
22 A      Yes.
23 Q      Okay.
24 A      Yeah.
25 Q      Was there an SOP with respect to the

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 manufacturing database?
2 A    I don't believe so.
3 Q    Was there ever any guide or instruction
4 manual for the OMS database?
5 A    I'm only familiar with that SOP,
6 you know, in my recollection. So I'm not
7 familiar with anything else.
8 Q    Okay.
9 A    Yeah.
10 Q    Let me show you what I've marked as
11 Exhibit 7.
12    (CROWLEY EXHIBIT NUMBER 7
13    WAS MARKED FOR IDENTIFICATION.)
14 MS. CONROY:
15 Q    Yours -- the stamped copy is yours, and
16 then there are some copies to pass down.
17    Actually, I will mark this OMO note as
18 Exhibit 9 so that we don't lose it.
19    (CROWLEY EXHIBIT NUMBER 9
20    WAS MARKED FOR IDENTIFICATION.)
21 MR. HOFFMAN:
22    So are we skipping 5 and 6 for now?
23 MS. CONROY:
24    I have them here, but I'm out of order
25 right now. So I'm not skipping. We'll get

Page 119

1 there.
2 MR. GOLDMAN:
3    This is 7.
4 MS. CONROY:
5 Q    Exhibit 7 is PPLP004384833 through 37.
6 And I realize this is just -- I'm just gonna ask
7 you, does this look in any way familiar to you?
8 I see here on the first page a list of pharmacies
9 that, as you go further in, there's more
10 information about the pharmacies. And then we go
11 and there's some physicians that are listed on
12 the final page.
13    Do you know if this is -- or can you
14 tell if this is anything from the OMS database,
15 or are these screenshots from it or something
16 else?
17 A    I'm familiar with some of these names,
18 so looks familiar in that sense.
19    If I go by the date here that it's
20 modified, it was after I retired from Purdue. So
21 I don't know if this is an extension of the
22 system as I recall it, but --
23    The question is am I familiar with
24 this.
25 Q    Yeah.

Page 120

1 A    Not particularly, no.
2 Q    Okay. Have you ever seen a screen that
3 looked like the first page of Exhibit 7, that
4 just listed out pharmacies and individuals? Does
5 that look familiar, even if it's not these exact
6 pharmacies?
7 A    I've only seen a list like this that
8 would include pharmacy, not individual
9 pharmacies.
10 Q    I see.
11    And do you recognize whatever that icon
12 is on the left-hand side, this -- right -- where
13 it says B & B Pharmacy and there's a --
14 A    Yeah. I see it, what you mean, and I
15 don't. I don't recognize that.
16 Q    Okay. And, then, if you turn the page.
17 And I realize this, again, is after you had left
18 Purdue, but does that look familiar in any way to
19 something you might have seen on your computer
20 screen?
21 A    At my time, I don't remember seeing
22 emails and correspondence and OMS meeting minutes
23 and notes. So I -- I would say no, I'm not
24 familiar with this, but I've seen screenshots
25 that -- which included maybe some of this, but...

Page 121

1 Q    Okay. So when -- you -- you know what
2 emails and correspondence are.
3 A    I do.
4 Q    You just maybe didn't see it in
5 this -- in the way it appears here on this
6 document, Exhibit 7?
7 A    Did not.
8 Q    Did you keep or do you know if the OMS
9 committee kept emails and correspondence in one
10 place, for example, that concerned B & B Pharmacy
11 or any pharmacy?
12 MR. PYSER:
13    Object to form. Foundation.
14 A    I -- I believe that we were always
15 trying to perfect that system. One of Giselle
16 Issa's -- part of her title was director of
17 recordkeeping. So I think some of this was
18 developed after I left.
19 MS. CONROY:
20 Q    And --
21 A    But the intention was always to,
22 you know, capture as much data as you could, I
23 think.
24 Q    Okay.
25 A    And, so, they perfected it as they went

Highly Confidential – Subject to Further Confidentiality Review

Page 122

1 along, yeah.
2 Q    Looking at these, B & B Pharmacy,
3 Better Value Pharmacy, Central Care Pharmacy, is
4 it fair to say that these are customers of an
5 authorized distributor of Purdue?
6 A    Yes, those pharmacies would be, I -- I
7 believe.
8 Q    Okay.
9 A    It's fair to say that they -- they
10 could be, sure, absolutely.
11 Q    And when -- do you see where, on the
12 first page, it says, for example, Pharmacist
13 Perry Tam Nguyen?  Do you see that?
14 A    Nguyen?  Yeah.
15 Q    Nguyen?
16    Had you ever seen a pharmacist -- had
17 you ever seen anything with respect to an
18 individual pharmacist before in the OMS system?
19 A    No.
20 Q    Okay.
21 A    Well, except in notes maybe.
22 Q    Okay.
23 A    Yep.
24 Q    And if we turn the page to the section
25 about Perry Nguyen --

Page 123

1    See if there is one.
2 MR. GOLDMAN:
3    Top of the last page.
4 MS. CONROY:
5    Yeah.
6 Q    Do you see that?
7    Do you know what boardofpharmacy.mht
8 is?
9 A    I do not.
10 Q    Or are you familiar with what a
11 LexisNexis report --
12 A    Yes, I am.  But I -- I -- yes.
13 Q    I understand you don't know what this
14 is --
15 A    Right.
16 Q    -- in particular, but do those -- do
17 those file indicators mean anything to you,
18 generally?
19 A    Familiar with the term -- with
20 LexisNexis.
21 Q    And would you have occasion to look up
22 pharmacists on LexisNexis?
23 A    I would ask someone else to -- to help
24 me with -- with that.
25 Q    And that's --

Page 124

1 A    Case-by-case basis, yeah.
2 Q    So if you, during the time at Purdue,
3 when you would sit down at your desk and there'd
4 be a list of pharmacies to look -- as you told me
5 before, the high-volume pharmacies to look at,
6 would it be part of your practice to take a look
7 or ask someone to run a LexisNexis report on a
8 particular pharmacist?
9 A    A case-by-case basis.  It wouldn't --
10 wouldn't be routine.
11 Q    Okay.  So, depending on the case,
12 that's something you might have asked an
13 assistant to do?
14 A    Potentially, yes.
15 Q    And then if you look at Physician
16 Eleanor Santiago, do you see that --
17 A    Yes.
18 Q    -- a little further on down on the
19 page?
20    And then it says, "Santiago, 24-month
21 Rx history, May 2010."
22    Do you see that?
23 A    Yes.
24 Q    Did you have -- did you have access,
25 while you were on the OMS committee, to physician

Page 125

1 prescribing history if you asked for it?
2 A    Only if I asked for it.  I didn't have
3 it readily.
4 Q    Okay.  And who did you ask for it?
5 MR. GOLDMAN:
6    Objection.
7 MS. CONROY:
8 Q    Or who would -- who would you ask, or
9 what department would you ask?
10 A    Someone within general counsel.
11 Usually Joan Zooper, Attorney.
12 Q    And did the general counsel's office
13 have that data, or would that be something that
14 Joan Zooper or someone in the general counsel's
15 office would get from a different department?
16 A    I -- I don't think they had to rely on
17 anyone else, so I -- I would say their own
18 department.
19 Q    Okay.  So -- so Joan Zooper in the
20 general counsel's office could call up from
21 somewhere, some database, prescribing history of
22 someone, a physician or whoever that you might
23 ask for?
24 MR. HOFFMAN:
25    Object to form.  Foundation.

Page 126

1 A     I don't want to be mixed up.  So are we
2 talking about prescribing history or the
3 LexisNexis --
4 MS. CONROY:
5 Q     I'm talking about prescribing -- right
6 now I'm talking about --
7        Let me ask it this way.  As I
8 understand it, you didn't need to go to the
9 general counsel's office to get a LexisNexis
10 report.  That's something you could ask your
11 assistant to run for you.
12 A     Well, I had to ask someone who had
13 access to that, and that happened to be someone
14 in the general counsel's office, in my
15 experience.  So --
16 Q     Okay.  So who -- who would you ask in
17 the general counsel's office to run --
18 A     The -- the same person --
19 MR. GOLDMAN:
20        Let her finish her question.
21 A     I'm sorry.  I'm sorry.
22 MS. CONROY:
23 Q     That's okay.
24 A     Yeah.
25 Q     Giselle Issa would you ask?

Page 127

1 A     No, no, I -- I did not answer that.
2 I'm sorry.
3 Q     Oh.
4 A     For the LexisNexis, if I needed that
5 report, if -- if I were the one to initiate the
6 request, I would probably go to Joan Zooper.
7 Q     Okay.
8 A     Right.
9 Q     And, now, in asking you about a
10 prescription history with respect to a
11 physician --
12 A     Right.
13 Q     -- you would also ask Joan Zooper for
14 that?
15 A     Yes.
16 Q     And was it Joan Zooper until you left
17 Purdue at the end of 2012?
18 A     Yes.
19 Q     Anyone else in the general counsel's
20 office you would have asked for that type of
21 information?
22 A     Not to my recollection.  My answer
23 would be no.
24 Q     And how did you know to go to Joan
25 Zooper for that information?

Page 128

1 A     We're colleagues, and she was a support
2 person on the OMS committee.  She wasn't a formal
3 member but valuable asset --
4 Q     Okay.
5 A     -- colleague.
6 Q     And could, if you know, could
7 Stephen --
8        Stephen Seid was on the commission as
9 well, correct?  I mean was on the committee as
10 well; correct?
11 A     Yes.
12 Q     And would Stephen Seid be able to call
13 on Joan Zooper for that sort of support?
14 A     He could, in my opinion, yes.
15 Q     Who else was on the committee that you
16 recall?
17 A     The --
18 Q     The formal members.
19 A     Right.  The formal members were Robin
20 Abrams --
21        She was the chair.
22        -- Mark Geraci, who we had mentioned
23 before --
24        He's the chief security officer.  Both
25 of those individuals are vice presidents.

Page 129

1        -- Stephen Seid, Executive Director,
2 National Accounts, Luis Bauza, Director of
3 Investigations --
4        He was a direct report to Mark Geraci.
5        -- and myself, Executive Director of
6 CSA Compliance.  I believe those were the formal
7 members.
8 Q     And were those the members from the
9 time of inception of the committee until you left
10 Purdue at the end of 2012 --
11 A     Yes.
12 Q     -- as best you can recall?
13 A     Yes.
14 Q     Did -- did the members elect Robin
15 Abrams as the chair or --
16 A     No.
17 Q     How did that work?  How did she become
18 the chair?
19 A     She -- she assumed the responsibility.
20 That -- that's my answer.
21 Q     And was the OMS committee considered a
22 formal committee within the Purdue structure?
23 MR. HOFFMAN:
24        Object to the form.
25 A     I think it would have been on the next

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1  level down, but it may have -- may have been
2  eventually, yeah.
3  MS. CONROY:
4  Q       Did you get any additional payment or
5  salary for sitting on that committee?
6  A       No.
7  Q       Okay.  Do you know if anyone else on
8  the committee did?
9  A       I do know, and they did not.
10 Q       It was -- it was part of your daily
11 responsibilities?
12 A       Yes.
13 Q       And do you know who, if anyone, took
14 your place when you left Purdue?
15 A       I -- I don't.  I don't, no.
16 Q       Was Stephen Seid at Purdue when -- by
17 the end of December of 2012?  Was he still there?
18 A       Yes.  I think he retired after I did,
19 so...
20 Q       And Luis Bauza --
21 A       Bauza.
22 Q       -- Bauza, is he still at Purdue?  Do
23 you know?
24 A       I -- I believe so.  I haven't spoken to
25 the gentleman since -- since I retired.  I think

Page 131

1  he's still there.
2  Q       Have you spoken to Robin Abrams since
3  you retired?
4  A       No.
5  Q       How about -- maybe you told me this --
6  Mark Geraci?
7  A       Right.  I have not spoken to him.
8  Q       Okay.  What about Joan Zooper or
9  Giselle Issa?  Have you spoken to either of them?
10 A       Have not spoken to Giselle since I
11 retired.  I may have spoken to Joan once or twice
12 about issues that had nothing to do with
13 the -- our former duties, you know.
14 Q       Just -- just personal?
15 A       Personal, yeah.  Relocation type of
16 thing.
17 Q       We'll put that one away.
18        (CROWLEY EXHIBIT NUMBER 8
19        WAS MARKED FOR IDENTIFICATION.)
20 MS. CONROY:
21 Q       I want to show you what I've
22 marked -- again, this is just out of order -- as
23 Exhibit 8.
24        And I have the stickered copy and then
25 copies behind it for you.

Page 132

1        This is PPLPC041000014663 through 670.
2  MS. CONROY:
3  Q       I'm not going to -- this looks pretty
4  dense.  I'm not going to be asking you --
5        I just want to ask you some general
6  questions about the document.  But, obviously,
7  feel free to read it if you want to.
8        But I'm just gonna say does this --
9  does Exhibit 8, Report to OMS Team, October 28th,
10 2010, look familiar to you?  Does the -- does the
11 way it appears look familiar to you, not -- not
12 the data in it?
13 A       I think this looks familiar in format.
14 Q       Okay.
15 A       Yep.
16 Q       And who would -- who would create a
17 report to OMS team in -- in or around 2010?
18 A       So, at that time, I believe the
19 director of the order management system was
20 Elizabeth -- Betsy Adams, I believe, and --
21 attorney.  And she was top-notch in creating
22 these types of reports.
23 Q       And did the report -- I see that it's
24 got, you know, sort of a shaded area, Background
25 and Reason, OMS Investigation.  You see the Roman

Page 133

1  Numerals I and II on the front page.  Was this a
2  template?
3  A       It was something she developed, so
4  it -- it was not a template that was formally
5  approved by the committee.  It's just something
6  that -- it was her format.
7  Q       And if you take a look -- and this says
8  at the top, on the first page, V Pacifica PHCY,
9  Inc., Hunt Beach.  So that's V Pacifica Pharmacy,
10 Huntington Beach?
11 A       Yes.
12 Q       And would this be a pharmacy that you
13 were investigating, if there was a report
14 created?
15 A       I'm not sure "investigating" is the
16 word I'd use at this point, but it's certainly
17 one we were considering.
18 Q       Okay.  Where it says on the first page
19 "Ranked 30th in sales operations audit of 638
20 national accounts outlets for 12 months ending
21 July 31, 2010," do you see that?
22 A       I do.
23 Q       And then there's a -- there's
24 a -- looks like some sort of a chart.  Would
25 that -- would that chart have been pulled off of

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 some other document and inserted into this
2 report?
3 MR. HOFFMAN:
4       Object to form.  Foundation.
5 A      Frankly, she -- some people were better
6 at manipulating that data than I was.  So it was
7 pulled from -- from various sources, including
8 the OMS system, I guess.
9 MS. CONROY:
10 Q     Okay.  So -- because the O -- the OMS
11 system, or at least as far as you're concerned,
12 you weren't ranking sales operations; correct?
13 A     That's right.  I had nothing to do with
14 that.
15 Q     Right.  So this -- this -- that's taken
16 from some other data in the company; correct?
17 A     Yes.  Yes.  That --
18 Q     But that's -- that's within -- that's
19 data within Purdue, correct, as far as you know?
20 A     As far as I know, that -- that would be
21 true, yes.
22 Q     Okay.  Then the next bullet point says,
23 "Flagged by sales operations as an outlier for
24 OMS review."
25       Do you see that?

Page 135

1 A     Yes.
2 Q     And what does that mean?
3 A     I -- that means that the sales
4 representative who was responsible for that area
5 filed a report of concern through a -- through
6 the sales system of --
7       What was on that report, I don't know.
8 But that's why it was flagged.
9 Q     Okay.  And then the next bullet point
10 says, "ROC from field sales force indicating the
11 pharmacy was filling prescriptions written by
12 Region 0 prescribers."
13       Do you see that?
14 A     I do.
15 Q     And is that ROC "report of concern"?
16 A     Yes.
17 Q     And, so, the bullet point above it,
18 they -- they're both a result of a report of
19 concern, the identification or the flagging as an
20 outlier, as well as the actual report of concern
21 from the sales force?
22 A     That would be my interpretation of
23 that, my understanding of that, yes.
24 Q     Okay.  Then the next section, OMS
25 investigation activity, do you see that?

Page 136

1 A     Yes.
2 Q     And then it says, "OMS database, FFS
3 data."
4       That's fee for service data?
5 A     Yes.
6 Q     Then it says, "Summary fee for service
7 data for the 12 months ending September 30th,
8 2010, shows a slight increase in sales compared
9 to the 12-month data ending July 30th, above, but
10 a slight decrease in the percentage attributable
11 to the higher OxyContin dosage strengths."
12       Do you see that?
13 A     Yes.
14 Q     And then there's -- there's another
15 table that's pulled in, correct, the table just
16 underneath that sentence I just read?
17 A     It's a table of another customer?
18 MR. GOLDMAN:
19       No.  She's just saying that there's
20 another table.
21 A     Oh, there's another table, yes.
22 MS. CONROY:
23 Q     There's another table --
24 A     Yeah.  Right.
25 Q     -- that's pulled in; correct?

Page 137

1 A     Yes.
2 Q     Do you know where the text comes from
3 that's in that bullet?  Do you know who would
4 have prepared that?  Does that come from Stephen
5 Seid?  Does it come from Joan Zooper?  Does it
6 come from Betsy Adams?
7 A     I -- I think that came from Betsy
8 Adams.
9 Q     And then it says, "As detailed in the
10 following customer 867 data on the next page."
11       Do you see that?
12 A     Yes.
13 Q     Do you recall what 867 data is?
14 A     That's the one and the same as what we
15 have referred to as FFS data.  It's the data we
16 purchased from our wholesalers which captured
17 their sales to the retail pharmacies.
18 Q     Okay.  And that would be -- if you just
19 look one line down, the wholesaler was H.D. Smith
20 in this situation?
21 A     Yes, I see that.
22 Q     Okay.  And, so, Purdue -- one of
23 Purdue's authorized distributors was H.D. Smith
24 at this time; correct?
25 A     Yes, that's correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 Q     And H.D. Smith, pursuant to the fee for
2 service agreement with Purdue, was paid to
3 provide data with respect to its retail
4 pharmacy -- or supply to its retail pharmacy
5 customers back to Purdue; correct?
6 A     Yes, that's correct.
7 Q     And, as a result of that data that went
8 back to Purdue, someone on the order monitoring
9 team was able to determine that there might be a
10 problem with the Pacifica Pharmacy in Huntington
11 Beach. Is that fair?
12 MR. HOFFMAN:
13     Object to form.
14 A     There were indications that additional
15 due diligence should occur. Right.
16 MS. CONROY:
17 Q     And that 867 data is either daily or
18 weekly, correct, that it gets back to Purdue?
19 A     I -- I don't know that it was as often
20 as daily or even weekly, but certainly monthly.
21 I -- I'm not trying to be evasive. I don't know
22 that it was weekly, but it might have been.
23 Q     That's something Mr. Seid knows more
24 about; correct?
25 A     Yes. Right.

Page 139

1 Q     Okay. But, in any event, that data was
2 available to Purdue to review and analyze;
3 correct?
4 A     Yes. I -- I answer as a member of the
5 OMS committee. Steve Seid would be a better
6 person to answer some aspects of that. He had
7 sight on this every day.
8 Q     Okay. And earlier today you had said
9 to me that when you would go to your office, you
10 could have a list -- you know, not every day, but
11 some days you would have a list of high-volume
12 pharmacies that needed to be -- closer look
13 needed to be taken. Correct?
14 MR. HOFFMAN:
15     Object to form.
16 A     I could log on to the system, if I can
17 use the term "log on" --
18 MS. CONROY:
19 Q     Yeah.
20 A     -- and -- and query anything I wanted
21 to that day.
22 Q     Would there be any triggering mechanism
23 that would tell you, for example, you should take
24 a look at the Huntington Beach pharmacy, for
25 example, this week because we're seeing some

Page 140

1 unusual activity at the -- at that location?
2 A     No.
3 Q     Did that ever happen?
4 A     Not to my knowledge.
5 Q     How did you select the pharmacies to
6 look at as part of the OMS committee?
7 MR. HOFFMAN:
8     Object to form.
9 A     There were various methods. But
10 speaking of the OMS system itself, I would select
11 high-volume outlets in, perhaps, hot spot areas.
12 If I were interested in south Florida, Detroit,
13 San Francisco, New York, Knoxville, Tennessee, or
14 Los Angeles, I might do it that way. I could
15 also look at that -- the top 25 in the whole
16 country. So there are various ways I could do
17 it.
18 MS. CONROY:
19 Q     Okay. And that was up to you. You
20 could -- you could determine how you wanted to
21 slice and dice the data to take a look?
22 A     And each member could also input what
23 they thought was important. And that would
24 include the new director, who was Betsy Adams at
25 the time.

Page 141

1 Q     Would you ever receive a request from
2 Betsy Adams or Robin Abrams, as the chair, or
3 Stephen Seid at national accounts, Hey, I think
4 you'd better take a look at X pharmacy?
5 A     Most of the time it was the other way
6 around. But we didn't mention Mark Geraci.
7 He -- he might develop a hot spot strategy and he
8 would want Jack Crowley and Luis Bauza to go look
9 at each borough of New York City.
10 Q     I see. And then -- and then -- then
11 you would take the data and --
12 A     Right.
13 Q     -- and do whatever you needed to do to
14 be able to see all the pharmacies in a particular
15 borough in New York?
16 A     That's right.
17 Q     Okay. And what was the purpose -- what
18 was your purpose in doing that?
19 A     Primarily, as we've discussed, to
20 support our authorized distributors. Right.
21 Q     And when you would receive information,
22 how would you actually support an authorized
23 distributor? What would you do to support them?
24 A     Well, I -- I had routine, if I could
25 use that word, or pretty regular contact with the

Highly Confidential – Subject to Further Confidentiality Review

Page 142

1 monitoring committees of each company. And, so,
2 there'd be a phone call, there'd perhaps email
3 pretty soon in the process if I thought that they
4 needed to be made aware of, you know, what I was
5 looking at, what I was finding. Perhaps they
6 already knew. Perhaps they were way ahead of me.
7 But we would have a conversation. So...
8 Q      Did you believe it was Purdue's
9 responsibility to support their authorized
10 distributors with respect to problem pharmacies
11 or hot spot areas or issues that you were seeing
12 in the data?
13 MR. HOFFMAN:
14       Object to form. Time frame.
15 MS. CONROY:
16 Q      During the time of the -- during the
17 time of the order monitoring committee?
18 A      I -- I believe it's something we wanted
19 to do. I believe we were trying to be a
20 corporate -- good corporate citizen and -- excuse
21 me -- citizen, and I -- I don't necessarily and I
22 do not believe that it was our responsibility
23 under the regulatory scheme at that time. That's
24 all I'll say.
25 Q      Okay. Did you believe it was a part of

Page 143

1 the -- that it was a -- that it was Purdue's
2 responsibility to track whether or not there were
3 suspicious order amounts from its authorized
4 wholesalers or distributors?
5 A      That's something that we wanted to do
6 as -- as -- as this thing emerged. Maybe that's
7 not the --
8       As it became developed, based on those
9 letters, this is what we wanted to do. When you
10 asked me is it -- was it Purdue's responsibility,
11 I -- I would have to say what I said before, and
12 the answer's "no."
13 Q      Okay. My question was just -- just a
14 little bit different. Let's -- let's just go
15 back and look at Exhibit 9.
16       Purdue's -- would you agree that Purdue
17 had a responsibility under the Controlled
18 Substances Act with respect to whether or not
19 there was suspicious orders generally going to
20 authorized -- its authorized distributors?
21 A      Yes.
22 Q      And did you perform that function? Was
23 that part of the OMS committee to look to see
24 whether there were suspicious orders generally to
25 the authorized distributors?

Page 144

1 A      On a case-by-case basis, yes.
2 Q      Okay. And then what you're -- what you
3 were kind of parsing for me was when it came to
4 the authorized distributor's customers, the
5 wholesaler's customers as a -- as a -- as you
6 term it, a good corporate citizen --
7 A      Right.
8 Q      -- you were working to report those to
9 your authorized distributors if you thought there
10 was a suspicious customer, but you didn't feel
11 that that was Purdue's responsibility?
12 MR. HOFFMAN:
13       Object to form.
14 A      I believe it was something that, as we
15 developed a system, we wanted to do and could do
16 and -- and tried to do the best we could with it,
17 yeah. But whether or not there's a
18 responsibility from a regulatory requirement, did
19 not believe that.
20 MS. CONROY:
21 Q      Okay. Did you believe or do you
22 believe that the authorized distributors have a
23 responsibility under the Controlled Substances
24 Act to report suspicious orders to the DEA?
25 MR. HOFFMAN:

Page 145

1       Object to form.
2 A      That's always been my understanding,
3 that --
4 MR. GOLDMAN:
5       I think she was asking about your
6 current understanding.
7 A      I'm sorry. Could you repeat that? I'm
8 sorry. Yeah.
9 MS. CONROY:
10 Q      You can go ahead with your answer.
11 A      Yeah. Was it the responsibility of
12 wholesalers to report suspicious orders to DEA?
13 Q      Yes.
14 A      And my answer is when detected, yes.
15 Q      And part of what you were doing in the
16 OMS committee was to support Purdue's authorized
17 wholesalers or distributors in meeting their
18 requirements with respect to the Controlled
19 Substances Act?
20 MR. GOLDMAN:
21       Object to form.
22 MR. HOFFMAN:
23       Object to form.
24 A      Yes. We were -- we were supporting
25 them in conducting the due diligence that would

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1 lead to whether or not they made a decision, yes.
2 So I...
3 MS. CONROY:
4 Q    And you did that by keeping in close
5 contact with individuals at each of Purdue's
6 authorized distributors. Is that correct?
7 MS. SIDARTH:
8      Objection.
9 A    I made regular contact with people in
10 the big three companies, H.D. Smith. There was a
11 company called Kinray in New York at that time,
12 other smaller companies. So my answer is "yes,"
13 I had many and routine conversations with
14 wholesale companies, yes, authorized
15 distributors.
16 MS. CONROY:
17 Q    And those routine conversations, what
18 I'm talking about specifically in those routine
19 conversations was you were communicating with
20 them about problems you were seeing from the data
21 that was visible to Purdue about their retail
22 customers?
23 MR. HOFFMAN:
24      Object to form.
25 A    That's certainly most of -- you know,

Page 147

1 most of it, but it could have worked the other
2 way, too.
3 MS. CONROY:
4 Q    Right. They may have --
5 A    Right.
6 Q    -- called you and said --
7 A    Right.
8 Q    -- we think there's a problem with this
9 customer; what do you know about this customer?
10 A    Could you help me understand this
11 and -- yes. I mean...
12 Q    Give me a percentage. Which -- which
13 way did the information usually flow? From you
14 to the authorized distributors or from the
15 authorized distributors back?
16 MR. HOFFMAN:
17      Object to form.
18 A    I really don't know how accurate it
19 would be, but I'd say 75/25, something like that.
20 MS. CONROY:
21 Q    So you would initiate the conversation
22 75 percent of the time.
23 A    Yes.
24 Q    Okay. And -- and I'm not talking
25 about --

Page 148

1      After that, there might be a very free
2 flow of information. But you would initiate 75
3 percent of the time. 25 percent of the time, an
4 authorized distributor might come back -- might
5 go initiate a conversation with you about a
6 problem area.
7 A    That's correct.
8 Q    And, when that was happening, was it
9 your goal to record those conversations in the
10 notes of the OMS database?
11 A    As I mentioned earlier, that was the
12 goal, but I may not have been the best
13 recordkeeper.
14 Q    We all suffer from that, but...
15      But that was your -- the goal of the
16 database was, at least, to have that note section
17 so that those conversations could be recorded and
18 that you would have that as some record of what
19 was happening for later conversations?
20 A    That was the intent, yes.
21 Q    Did -- I think you told me earlier --
22      Approximately how many authorized
23 distributors were there while you were at Purdue
24 of controlled substances?
25 A    I think, when I was there, I think

Page 149

1 there were twenty.
2 Q    And did they all have their own, as far
3 as you know, suspicious order monitoring
4 procedures or system?
5 A    I believe that they did, but I -- I
6 wasn't necessarily familiar with the smallest of
7 them, you know, their system.
8 Q    Were you familiar with the big three,
9 AmerisourceBergen, McKesson, and Cardinal?
10 A    Yes.
11 Q    And how did you become familiar with
12 their systems? What did -- what did you do to
13 learn about their systems?
14 A    Well, let me clarify. I know that they
15 had systems.
16 Q    Okay.
17 A    Being the types of companies they are,
18 I just -- I know they're robust systems. I began
19 reaching out to those companies early on, early
20 2008. We also had formal meetings with those
21 companies beginning September 2008, I think. So
22 I've learned about those, you know,
23 through -- through that sort of activity,
24 conversations on the telephone and -- and
25 meetings.

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1 Q    Okay. Have you ever had access to any
2 of the big three's suspicious order monitoring
3 systems? Did anyone ever invite you in and show
4 it to you or anything like that?
5 A    No.
6 Q    Have you ever seen any of the standard
7 operating procedures for any of the big three
8 suspicious order monitoring systems?
9 MS. SIDARTH:
10     Objection.
11 A    I don't think so. In my -- I don't
12 believe so.
13 MS. CONROY:
14 Q    It's your experience that tells you
15 they had them, but you don't actually know for
16 certain whether they had formal procedures. Is
17 that correct?
18 MR. HOFFMAN:
19     Object to form.
20 A    I'd say that was a pretty educated
21 feeling that I had.
22 MS. CONROY:
23 Q    I didn't mean to suggest it wasn't.
24 A    From my experience.
25 Q    I just mean -- yeah. But --

Page 151

1 A    Well, yeah.
2 Q    -- that's -- that's where that's coming
3 from. You didn't -- you -- you haven't been to a
4 conference and seen someone's protocols or
5 anything like that. You just -- you, from
6 conversations, you believe they had a suspicious
7 order monitoring program?
8 A    And, again, from our meetings with
9 them, I'm sure it was discussed.
10 Q    Okay. Do you know if the type of data,
11 the fee for service data or the 867 data, if you
12 want to call it that, do you know if their
13 systems used that data? Do you know any -- you
14 know, do you know that type of granular
15 information?
16 A    It is their data. So, yes, they --
17 they would use it.
18 Q    Do you know if they had any access
19 to --
20     Or let me strike that.
21 Along with the FFS data that you used
22 at Purdue, did you use --
23     You mentioned reports of concern.
24 Would you consider that data or something else?
25 A    Something else.

Page 152

1 Q    Okay. So was -- was it a written
2 report or do you know whether that was contained
3 in some sort of a electronic form, ROCs, or
4 reports of concern?
5 A    I was not part of that system, but they
6 had a formal reporting system which was
7 electronic. Right.
8 Q    And how is it --
9     Is it Betsy Adams or Joan Zooper or
10 someone else that would tell you, if you were
11 looking at, for example, Pacifica Pharmacy in
12 Huntington Beach, would you yourself ask, Hey,
13 let me know if there are any ROCs out there for
14 this pharmacy, or would somebody automatically
15 supply that to you?
16 A    At the time, Betty Adams was -- that
17 was automatically supplied.
18 Q    Okay. So you would -- you would -- you
19 would -- you would know it existed because it
20 would be provided to you?
21 A    Yes.
22 Q    What about -- what about the physicians
23 who were -- the physicians who were prescribing
24 and those prescriptions were being filled out of
25 a pharmacy? Would you receive that kind of data?

Page 153

1 MR. GOLDMAN:
2     Objection.
3 A    Not unless I asked for it.
4 MS. CONROY:
5 Q    That data was available at Purdue;
6 correct? If you asked for it, they could tell
7 you whether or not -- they could tell you which
8 physicians' prescriptions were being filled at
9 which pharmacies?
10 MR. HOFFMAN:
11     Object to the form. Foundation.
12 A    I have to think about that.
13 MS. CONROY:
14 Q    Okay.
15 A    They could tell you -- they had
16 prescriber information. I don't believe that
17 system shows where the prescriptions are filled.
18 Q    Do you know if the data that came back
19 from the authorized distributors tracked whose
20 prescription it was that was filled, who the
21 physician was? Do you know one way or the other?
22 A    I don't know, but my -- again, through
23 my experience, they didn't have that information.
24 Q    And why -- and why do you think they
25 didn't?

Page 154

1 A    From an IDT perspective, I've never
2 known those data streams to be joined up.
3 Q    I understand the -- the not -- the
4 joining up. But do you know whether or not that
5 data was available? Do you know, for example, at
6 a pharmacy, whether there would be a record of
7 not only the dose and the number of pills but
8 also the name of the physician who prescribed the
9 pills?
10 MR. PYSER:
11      Object to form.
12 A    I'm sorry. Available to who?
13 MS. CONROY:
14 Q    To -- to the -- to the pharmacy and
15 then -- and --
16 A    Well, the pharmacy would have that
17 information, sure.
18 Q    Right.
19      And if the pharmacy had the
20 information, wouldn't the authorized wholesaler
21 or distributor have that information?
22 A    No.
23 MR. PYSER:
24      Object to form.
25 MR. HOFFMAN:

Page 155

1      Object to form. Foundation.
2 THE WITNESS:
3      Sorry.
4 MS. CONROY:
5 Q    Do you know one way or the other?
6 A    We're talking about FF- -- FFS and 867
7 data, so my answer is no, they don't have it.
8 Q    From Purdue; correct? You -- your
9 understanding is Purdue did not have that data.
10 A    I'm sorry. Maybe I misunderstood you,
11 so let me be clear.
12 Q    Okay. Let me ask again. Let me ask
13 again.
14 A    Yeah.
15 Q    If I -- if I wanted to know who the
16 physician was who prescribed a particular dose of
17 OxyContin, would I be able to determine that from
18 any data at Purdue, if you know?
19 MR. HOFFMAN:
20      Object to form.
21 A    There is prescribing data available
22 that will show 12 months or 18 months of what
23 a -- what a -- what an individual prescriber
24 prescribed, what an individual doctor prescribes,
25 all substances, you know. So that's available to

Page 156

1 manufacturers who want to purchase that
2 information. Normally it's for -- that -- that
3 resides in, you know, some part of the company
4 that's different than what we're talking about.
5 MS. CONROY:
6 Q    Right.
7 A    So --
8 Q    Do you know if that data contains the
9 name of the pharmacy where the prescription was
10 filled?
11 A    I believe it does not and it cannot.
12 That's my belief.
13 Q    And why do you think it cannot?
14 A    It's just -- I don't know how it would
15 be captured.
16 Q    It would depend on who's capturing it,
17 though; correct?
18 A    Right. That's true. But, again,
19 that's my -- my interpretation -- my
20 understanding.
21 Q    Okay. And that's your understanding
22 with respect to Purdue, that that information,
23 that data, of what pharmacy filled which
24 physician's prescriptions was not available to
25 Purdue.

Page 157

1 A    Right. So -- so let me think about
2 this for a second.
3      The company that provided that data
4 probably offers different buckets, shall I say,
5 of data that you could purchase. So I -- it was
6 not available in that format to Purdue.
7 Q    Okay. Do you know one way or the other
8 whether that information was available to an
9 authorized distributor of Purdue?
10 MR. PYSER:
11      Objection.
12 MS. CONROY:
13 Q    Do you know?
14 MR. PYSER:
15      Objection.
16 MR. HOFFMAN:
17      Form. Asked and answered.
18 A    I don't know.
19 MS. CONROY:
20 Q    Do you know the name of the vendor that
21 Purdue received or purchased that information
22 from, the prescribing information?
23 A    At that time, it was IMS Health
24 Services, I -- I think. Then it merged to -- or
25 became Quintiles. And now it's -- it's right on

Page 158

1 the bottom of -- I want to say --
2 Q    I think it's IQVIA.
3 A    Yeah.  That's the company.  It was IMS
4 when I was there.
5 Q    Okay.  And do you know one way or the
6 other whether or not, if Purdue had wanted to
7 purchase from IMS, or whatever it may have become
8 over the years, data with respect to which
9 pharmacy a physician filled -- a physician's
10 prescriptions were filled at, do you -- do you
11 even know if IMS or IQVIA collected that
12 information?
13     I -- I understand your testimony is
14 that Purdue didn't have it, but do you know if it
15 was available?
16 A    I don't know, and I -- I -- I don't
17 believe it was.
18 Q    And -- and why do you not believe it
19 was?
20 A    That's kind of like the Holy Grail to
21 those of us who are trying to develop our
22 programs.  If we could -- if we could merge the
23 852 and 867 and whatever -- 844 data with the
24 prescribing data and then, in a collaborative,
25 you know, relationship with the DEA, we'd have

Page 159

1 the Holy Grail, really.  So that's why I said
2 that.
3 Q    What about with a -- a company such as
4 CVS that's a distributor or wholesaler as well as
5 has the retail pharmacies?  Do you have an
6 understanding whether or not they would have data
7 about who the prescriber was?
8 MR. PYSER:
9     Object to form.
10 MR. HOFFMAN:
11     Object to form.
12 A    I'm -- I'm sorry.  My attention was not
13 as good as it should be for the first part of
14 your question.  I'm sorry.
15 MS. CONROY:
16 Q    Sure.
17     I understood that what you told me was,
18 with respect to a Cardinal or a McKesson, you
19 don't believe -- you don't know for sure, but you
20 don't believe that they have that Holy Grail of
21 information where the -- who the -- where a
22 physician's prescription is actually filled.
23 Correct?
24 MR. PYSER:
25     Object to form.

Page 160

1 MS. SIDARTH:
2     Objection.
3 A    That's my understanding.
4 MS. CONROY:
5 Q    So my -- my next question is if you
6 have a distributor who also owns the retail
7 pharmacies, like a CVS or a Walgreens, do you
8 have an understanding whether or not they have
9 that information, they have data with respect to
10 which physician prescribed the pills to a
11 particular patient who was filling it at those
12 pharmacies?
13 A    I don't think I'm the right person to
14 answer that, so I -- I'd say I don't know.
15 Q    That's not anything you've ever looked
16 into?
17 A    Right.
18 Q    Has CVS or Walgreens or Walmart ever
19 been an authorized distributor for Purdue?
20 A    I don't believe so.
21 Q    Have they ever purchased pills from
22 Purdue?  Do you know?
23 A    In -- in -- in what way?  Directly
24 or --
25 Q    In any way, do you know?

Page 161

1 MS. CONWAY:
2     Object to form.
3 A    I don't.  But I don't know all the
4 arrangements that national accounts had, so I
5 don't know.
6 MS. CONROY:
7 Q    Do you know if there were ever fee for
8 service agreements or something similar with CVS
9 or Walgreens or Walmart or Rite Aid?
10 MS. CONWAY:
11     Object to the form.
12 A    I don't know.  Not -- not in terms of
13 this I -- OMS committee.  I don't know.  I don't
14 think so.
15 MS. CONROY:
16 Q    Did you ever share reports of concern
17 physically with any of Purdue's authorized
18 distributors?
19 A    Report of concern?
20 Q    Right.  Did you ever --
21 A    Right.  Right.
22 Q    Did you ever actually let them have it
23 as opposed to talk to them about it?
24 A    I may have cut -- cut and pasted some
25 of it.  I would -- I don't think I ever gave any

Page 162

1 of the people I talked to a -- a report
2 from -- that came from some other part of the
3 company. So --
4        But would I share what's in the report?
5 Yes.
6 Q      Was there anything that you would not
7 share with a Purdue authorized distributor with
8 respect to suspicious orders? Is there anything
9 that you might have had or information you might
10 have had at Purdue that you felt you could not
11 tell the authorized distributor?
12 A      No.
13 MR. HOFFMAN:
14        Objection.
15 A      My recollection is we were a hundred
16 percent transparent. We would share everything.
17 MS. CONROY:
18 Q      And --
19 A      Unless it was -- something was omitted
20 by just personal mistake or something.
21 Q      Yeah. I didn't mean that.
22 A      Yeah.
23 Q      I just meant that your goal was to let
24 the authorized distributor know everything you
25 knew or everything that the order monitoring

Page 163

1 committee learned about a suspicious order.
2 MR. HOFFMAN:
3        Object to form.
4 A      If they wanted it, yes. You know, yes.
5 I -- I'd say, "We're discussing this. We have a
6 lot of information."
7        They may have said, "So do we."
8        But that would be the goal, to -- to
9 share it. Excuse me.
10 Q      Did you ever ask any of Purdue's
11 authorized distributors to let you know, to let
12 Purdue know or the order monitoring committee, if
13 there was a report to the DEA?
14 A      Yes. We -- we would ask that, or I
15 would ask that. Doesn't mean I asked for proof
16 of it. They could just tell me. Right.
17 Q      But that was something you would -- you
18 would hope that they would tell you?
19 A      Yes.
20 Q      And would you report --
21 A      If it involved our product, yeah.
22 Q      Sure. And would you record that in
23 the -- in the database?
24 A      Tried to. That was the goal. Yep.
25 Q      And would that have been your

Page 164

1 responsibility to record that if you learned that
2 there was a report to the DEA about a particular
3 pharmacy that Purdue supplied, the authorized
4 distributor?
5 A      Mostly.
6 Q      And how would --
7        Was there a particular place in the
8 database that would be made? Was there a box
9 that would be checked off, or was there -- or
10 would it -- would it just go into the notes
11 section?
12 A      They had certain categories. One of
13 them was "complete, close, referred," as I
14 recall.
15 Q      So would "referred" mean it went to the
16 DEA?
17 A      Yes.
18 Q      But at the time that Mr. Geraci spoke
19 to the DEA agents, would that have been
20 considered a referred, or was that just a
21 conversation that he had about the Las Vegas
22 pharmacies?
23 MR. HOFFMAN:
24        Object to form.
25 A      I'm glad you brought that up, because I

Page 165

1 may have given the wrong impression before.
2        We talk to DEA all the time, and not
3 only myself. But he, as the new chief security
4 officer, he was assuming a more active role.
5        So case-by-case basis, referral,
6 discussion, "Can we help each other?" I --
7        You know, and, then, the more I thought
8 of it when I was trying to have my lunch, the --
9 the SOP said we -- we may discuss with the
10 wholesaler. I think I made it more of an
11 absolute, and it -- and it wasn't an absolute.
12        So we talked to DEA all the time,
13 and -- and the wholesaler may know about it or
14 may not. Was that a referral? It probably -- it
15 became a referral because I think he followed up
16 with a letter after his meeting. And, so, yes,
17 that was a referral.
18 Q      And it was a referral because it was
19 something in writing that went to the DEA?
20 A      That's my interpretation, yes.
21 Q      Okay. And, so, in order for something
22 in the -- on the database -- in order for, we'll
23 call it, an investigation to be -- to be -- to
24 be -- to be marked as referred to the DEA, it has
25 to be something formal to the DEA, some -- a -- a

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1 writing or something else that is considered more
2 than just a conversation with the DEA?
3 MR. HOFFMAN:
4        Object. Object to form.
5 A        That's correct. But the referral might
6 actually reside from the wholesaler.
7 MS. CONROY:
8 Q        And if it -- if it resided from the
9 wholesaler -- or it did. You told me the only
10 time was the one time with Mr. Geraci.
11 A        Right.
12 Q        So there are no other referrals from
13 Purdue to the DEA; correct?
14 MR. HOFFMAN:
15        Object to form. Foundation.
16 MS. CONROY:
17 Q        At least while you were there.
18 A        I -- I -- I may have made a mistake on
19 that. Okay?
20        So there was a time where other
21 referrals were made to DEA in 2011 that I can
22 remember, and this was a result of analysis of
23 six months' worth of data after OxyContin was
24 reformulated to become abuse- and
25 tamper-resistant sort of thing.

Page 167

1        So it was noted in the OMS system that
2 certain retail outlets became very, very reduced
3 in -- in what they were buying. And people on
4 the committee took that as an indication that
5 those pharmacies were eligible for referral right
6 then, if not -- if --
7        If we weren't talking about them
8 before, which I believe we were anyway, that data
9 would indicate that they should be referred as
10 suspicious.
11        So I was not involved in the actual
12 meeting that took place at DEA, but that -- it
13 was one sometime in April where -- I don't know
14 the exact number -- 150 pharmacies were referred,
15 something like that.
16 Q        And those 150 pharmacies were
17 pharmacies whose OxyContin business greatly
18 decreased?
19 A        That's correct.
20 Q        And were those 150 pharmacies or
21 whatever the number is, did they have authorized
22 distributors?
23 A        Yes.
24 Q        And did you reach agreement with the
25 authorized distributor before you reported to the

Page 168

1 DEA?
2 A        I didn't personally, so I -- I don't
3 know.
4 Q        Who would have?
5 MR. HOFFMAN:
6        Object to form.
7 A        Robin Abrams.
8 MS. CONROY:
9 Q        Would it have been -- it was discussed
10 at the committee level, the OMS committee?
11 A        It -- it probably was. It may not have
12 been unanimous.
13 Q        Why do you say it may not have been
14 unanimous?
15 A        Well, I -- I should not have said that.
16 I apologize. But...
17 Q        Did you believe they should be
18 reported?
19 A        It -- it -- it's tough for me to
20 give -- give a simple answer to that.
21        I had no problem with the report going
22 forward. You know, we tried to do our best, do
23 the right thing. And, you know, was the timing
24 the best? It -- it was good for some aspects.
25 We have now six months of real data that we could

Page 169

1 show.
2 Q        Did you believe it could have been
3 reported earlier, when you were seeing the high
4 volume of OxyContin?
5 MR. HOFFMAN:
6        Object to form.
7 A        I believe we were doing our best to get
8 to that point. Right. And many of them may have
9 been by the wholesaler. I don't know.
10 MS. CONROY:
11 Q        You don't know. Many of those
12 pharmacies, during the period of time with the
13 high volume when you were communicating with the
14 authorized distributors, it's possible that
15 those -- some of those distributors reported to
16 the DEA, correct, reported those pharmacies to
17 the DEA?
18 A        It's possible.
19 MR. HOFFMAN:
20        Objection.
21 MS. SIDARTH:
22        Objection.
23 MS. CONROY:
24 Q        You don't --
25 THE WITNESS:

Page 170

1  Sorry.
2  MS. CONROY:
3  Q     You don't know one --
4  A     I don't know.
5  Q     -- way or the other?
6  A     No.
7  Q     But it is true that when the OxyContin
8  business vastly decreased, Purdue made a
9  decision, at least at the OMS committee level, to
10 report those pharmacies to the DEA; correct?
11 MR. HOFFMAN:
12      Object to the form.
13 A     A decision was made.  Whether or not it
14 was made from the point of view of suspicious
15 order monitoring primarily or "This is how good
16 our -- our reformulated product is working from
17 an abuse standpoint."
18      So, secondarily, the fact that these
19 particular pharmacies went from here to here may
20 have been an indication to some people that they
21 were suspicious and should be looked at.  Right.
22 MS. CONROY:
23 Q     And, if I understand what you're
24 telling me correctly, those pharmacies had been
25 suspicious for some time because of the high

Page 171

1  number of OxyContin before the reformulation.
2  MR. HOFFMAN:
3      Objection.
4  MR. GOLDMAN:
5      Objection.
6  MS. CONROY:
7  Q     As far as you know.
8  MR. HOFFMAN:
9      Object to form.  Foundation.
10 A     I -- I have a problem with the way you
11 describe it, only because I'm not an expert with
12 data.
13      A lot of those pharmacies may never
14 have ever appeared on anything that I looked at
15 because their volumes were so low.  But
16 percentage-wise, did it go from 90 percent to 20
17 percent?  Yes.  If that's what you're talking
18 about.
19      But I, myself, I'm interested in
20 volume, period, as a first indicator.  And -- and
21 the volume of those stores may not have been
22 anything that I was interested in speaking to a
23 wholesaler about.
24 MS. CONROY:
25 Q     Right.

Page 172

1  A     We only have so much time.
2  Q     It was the delta that triggered the
3  reporting, then, the delta between the high
4  prescribing and the low prescribing of the -- of
5  the reformulated OxyContin.
6  MR. HOFFMAN:
7      Object to the form as to prescribing.
8  MR. GOLDMAN:
9      Objection.
10 A     It was the percentage change.
11      It wasn't that they were a -- a -- a
12 suspiciously high-volume pharmacy, necessarily,
13 but once the reformulation happened, it went
14 down.
15 MS. CONROY:
16 Q     Right.  And, so, the -- the decision
17 was made to report those to the DEA.  And, in
18 part, that was to tout the benefit or potentially
19 tout the benefit of the reformulated --
20 A     Yes.
21 MS. CONROY:
22 Q     -- OxyContin?
23 MR. HOFFMAN:
24      Object to form.
25 A     That was my understanding.

Page 173

1  MS. CONROY:
2  Q     Did Robin Abrams make the decision to
3  report those pharmacies to the DEA?
4  A     Yes.
5  Q     And do you know if she made that
6  decision with input from the committee, or was it
7  a separate decision?
8  MR. HOFFMAN:
9      Object to form.  Asked and answered.
10 A     I -- I think it was discussed,
11 certainly with -- yeah, with each member of the
12 committee.  Right.
13 MS. CONROY:
14 Q     I take it you were not supportive of
15 reporting.  You didn't have a -- you didn't -- it
16 didn't bother you that they got reported, I take
17 it, but you weren't supportive of the reason for
18 it?
19 MR. HOFFMAN:
20      Objection.  Form.
21 A     I didn't know how it would be received
22 by DEA.  So I don't think it was accurate to say
23 I was not in favor.  I was just skeptical
24 that -- that it would be received in the -- in
25 the way it was intended.  That's all.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  MS. CONROY:
2  Q      And did you get any feedback from any
3  of Purdue's authorized distributors with respect
4  to that reporting?
5  A      Not that I recall.
6  Q      And that was a --
7         Did -- did Miss Abrams go to the DEA to
8  report those pharmacies?
9  A      Yes.
10 Q      And do you know which office she went
11 to?
12 A      She went to the Office of Diversion
13 Control, which was headed up by Joel Rannazzisi,
14 and spoke to some of the staff members there.
15 Q      In DC?
16 A      Yes. They're actually located in --
17 Q      Virginia?
18 A      Yes. Pentagon City, yeah.
19 Q      And did anyone accompany her?
20 A      I believe Giselle Issa.
21 Q      You didn't go?
22 A      I did not go.
23 Q      And Mr. Seid didn't go, as far as
24 you know?
25 A      As far as I know, did not.

Page 175

1  Q      And Luis Bauza didn't go?
2  A      Did not.
3  Q      And Mr. Geraci didn't go?
4  A      Did not.
5  Q      And this, if we continue on Exhibit 8,
6  there's national -- it says, "National accounts
7  input, October" -- it's on the second
8  page -- "October 27, 2010, report from Steve
9  Seid. Modern store. Near a medical group.
10 Still orders significant product but for weeks
11 all reformulated. Decent product mix. Doesn't
12 appear to be an issue."
13        Do you see that?
14 A      Yes.
15 Q      Do you know where that information is
16 coming from? I know it comes from a report from
17 Steve Seid, but do you know how he knows it's a
18 modern store and that it's near a medical group?
19 A      I -- I believe some of that would have
20 to come from the sales side of the house. He
21 would --
22 Q      Let me just --
23        Sales side of the house is the sales
24 reps, that area, not the -- not the --
25 A      Correct.

Page 176

1  Q      -- national accounts side of the house?
2  A      Right. National accounts would be the
3  relationship with the authorized distributors.
4  You're correct.
5         I -- I really don't know how it came to
6  that. I just know he -- he had the capability of
7  doing that. I didn't know how he specifically
8  got that information.
9  Q      Okay. And, then, where you see Luis
10 Bauza did a public records search, I assume he
11 did that on his computer or something like that?
12 A      My understanding, yes.
13 Q      Then the field sales force input,
14 that's the ROCs that are listed here.
15 Those -- those are from the sales side of the
16 house; correct?
17 A      Yes.
18 Q      "Savings card information," what --
19 what does that mean?
20 A      I'm probably not the right person to
21 answer that question. I -- I didn't pay that
22 much attention to it, personally. But I know
23 that the company ordered -- I mean offered
24 savings cards for people who financially needed
25 it, I think. Yeah.

Page 177

1  Q      Okay. Is that anything you ever looked
2  at?
3  A      No, not -- not personally, no.
4  Q      You see it says, in that first bullet
5  point, "Savings card utilization reports indicate
6  that the following Region 0 prescribers had
7  prescriptions filled by Prescription [sic] Side
8  Pharmacy in March, April, and May but not in
9  June, July, and August."
10        Do you see that?
11 A      Yes.
12 Q      And what's a Region 0 prescriber? Do
13 you know?
14 A      Region 0 is a -- was a category that
15 the company used to describe physicians that the
16 sales force was not allowed to speak to those
17 physicians.
18 Q      Okay.
19 A      The company did not want its product --
20 they didn't want those physicians visited by
21 anybody from Purdue.
22 Q      There was no prohibition of any of
23 those physicians on Region 0 to prescribe a
24 Purdue product; correct?
25 MR. HOFFMAN:

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1  Object to form.
2  A  My understanding was there's no
3  mechanism to -- to do that. So that's correct.
4  MS. CONROY:
5  Q  Okay. And then it says the savings
6  card utilization reports --
7  Those are reports that are available to
8  Purdue. Correct?
9  A  I think so.
10  Q  Okay. It says that those reports
11  indicate that the following prescribers -- and
12  all of those prescribers are listed here in this
13  bullet point -- had prescriptions filled by The
14  Pacific Side Pharmacy. Do you see that?
15  A  Yes.
16  Q  So that would -- that would indicate,
17  wouldn't it, that Purdue did have information
18  about where prescribers' prescriptions were
19  filled?
20  MR. HOFFMAN:
21  Object to form.
22  A  I wouldn't say that data was absolutely
23  available. It had to be sought out.
24  MS. CONROY:
25  Q  Okay. But a few moments ago you told

Page 179

1  me that Purdue did not have that data. And I'm
2  not -- I'm not discussing whether it was
3  difficult to get or how much there was of it or
4  anything like that.
5  A  No. I understand. And I'm not trying
6  to be -- hold anything back.
7  Q  Right. But would this indicate to you
8  that, at least in some -- under some
9  circumstances, it was possible for Purdue to see
10  where certain prescribers' prescriptions were
11  filled?
12  MR. HOFFMAN:
13  Object to form.
14  A  In -- in some circumstances, Purdue
15  could see where prescriptions written by some
16  doctors -- why -- why some prescriptions written
17  by some doctors were filled.
18  MS. CONROY:
19  Q  Then we have here wholesaler input, and
20  it says that you spoke with George Euson of
21  H.D. Smith concerning LA area scams. And
22  this -- this text, would Betsy Adams have written
23  this up? Would she have pulled this off of the
24  notes section of the database? Would you have
25  typed something up and given it to her or do you

Page 180

1  know?
2  A  She could have pulled that off of the
3  OMS system under the remarks section or an email
4  or both.
5  Q  Did she have -- did Betsy have access
6  to your email? Could she go in and, you know,
7  search for any conversations, email conversations
8  you had with H.D. Smith or a particular person,
9  or would you have to forward those to her?
10  A  I'd have to forward them.
11  Q  And here where you see on the third
12  paragraph, it says, "H.D. Smith had made an
13  adjustment to the account's threshold. Jack
14  traded information concerning Dr. Siew as well as
15  other prescribers in the area."
16  Do you see that?
17  A  I'm sorry. I heard you. I'm still
18  trying to find it.
19  Q  Oh. Sorry. The bottom -- see there
20  under your -- the wholesaler input section?
21  A  Yes.
22  Q  The third paragraph --
23  A  Oh, okay.
24  Q  -- of that very last sentence where it
25  says, "H.D. Smith had made an adjustment to the

Page 181

1  account's threshold. Jack traded information
2  concerning Dr. Siew as well as other prescribers
3  in the area."
4  Do you see that --
5  A  Yes.
6  Q  -- sentence?
7  And would it -- would it be fair to say
8  that it was a consequence of your conversations,
9  in part, with George Euson at H.D. Smith that
10  adjustments were made to the -- to the
11  pharmacies -- to the Pacifica Pharmacy's
12  threshold at H.D. Smith?
13  A  We had routine conversations. On this
14  case-by-case basis, I don't know. He was a very
15  aggressive person in this regard, so he -- in
16  this case, he may well have reduced that
17  threshold before we had that conversation.
18  Q  I see.
19  A  But -- but it -- it could be that it
20  was as a result, but he -- he was -- was quite
21  capable of acting independently.
22  Q  Okay. So he may have done it on his
23  own.
24  A  Yes.
25  Q  Or he may have been reinforced by

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1 something you told him or maybe you told him in
2 the first case?
3 A      That's correct.
4 Q      Where it says "further investigative --
5 investigatory activity," it says that -- you
6 know, the square footage of the store, et cetera,
7 do you know where that information comes from,
8 who would -- who would find that out?
9 A      I -- again, Betsy Adams was the
10 director for -- I don't know -- about a year, and
11 she was very good at pulling data from any number
12 of sources.  I think she would have put that in.
13 Where she got it, I don't know.
14 Q      Okay.  A document like Exhibit 8, a
15 report to the OMS team, if you were having a
16 committee meeting, is this -- would this be a
17 sort of report that you would discuss at the
18 meeting?
19 A      It -- it would be discussed.  The
20 general object was that the members would have
21 read this before the meeting, and then a
22 discussion as time was allotted, available.
23 Q      Okay.  And would there be -- would
24 someone put together a packet of everything that
25 you needed to review before the committee

Page 183

1 meeting?
2 A      That began to happen at around -- you
3 know, in this time, yep.
4 Q      And who was responsible for creating
5 the material to be viewed -- reviewed or the
6 agenda for the committee meeting?
7 A      The agenda was controlled by
8 Betsy Adams or Giselle Issa, with input from
9 everyone else.
10 Q      Okay.  And, then, would it follow,
11 then, that Betsy or Giselle would collect all the
12 materials that would be necessary to have
13 everybody up to speed on the topics on the
14 agenda?
15 A      Yes.
16 Q      Where -- this report to the OMS team,
17 did you have sort of a share point or some sort
18 of document system at Purdue where, if you wanted
19 to look at this OMS report, you could see it?
20 A      Well, that's what I alluded to earlier.
21 We were trying to develop a share point.  I don't
22 think we ever got there while -- while I was
23 there.
24 Q      Okay.
25 A      That was the intention.

Page 184

1 Q      So, while you were there, you would
2 have -- you would have had to ask somebody, say
3 "Do we have a report on Pacifica," or something
4 like that?
5 A      Yes.
6 Q      Could you search -- could you search
7 the database?  Could you put in "Pacifica" to see
8 if anyone else had submitted any notes or if it
9 showed up anywhere?
10 A      Not -- not from the OMS system, no.
11 Q      It was not searchable?
12 A      Not searchable for additional
13 information from other sources.  Right.
14 Q      How about for -- could you search to
15 see if you wanted to know about whether anyone
16 else had put anything in the notes section with
17 the word "Pacifica"?  Could you search
18 "Pacifica"?
19 A      I don't think so.  So my answer would
20 be no, that I don't think so.  But...
21 Q      And if you wanted a -- a report
22 concerning a pharmacy such as Exhibit 8, who is
23 it that you would have asked for it?
24 A      I'm sorry.  If I wanted the -- the
25 report?

Page 185

1 Q      If you wanted to actually get a copy of
2 the report, who would you -- and I'm talking
3 about not -- I know it would be supplied to you
4 by Betsy or someone --
5 A      Right.
6 Q      -- in advance of the meeting.  But if
7 you were going to be getting on the phone, for
8 example, with George Euson and you knew that this
9 report existed and you said, Oh, I'd really like
10 to see a copy of that report, could you call it
11 up on your computer or would you have asked your
12 assistant, Hey, get me a copy of the report?  How
13 would -- how would you do it?
14 A      I could not call it up on my system
15 while I was there.  It's possible I could have
16 asked someone else to get a report.
17 Q      Do you know who that would have been?
18 A      Betsy Adams or Giselle, Giselle Issa.
19 Q      You can put that exhibit away.
20 MR. HOFFMAN:
21      Good time for a break, Jayne?
22 MS. CONROY:
23      Sure.
24      Want a break?
25 THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1     I -- I should probably take every
2 opportunity.
3 MS. CONROY:
4     You should. That's a -- yeah. I'll be
5 your counsel on that. Yes.
6 VIDEOGRAPHER:
7     We are now going off the video record.
8 The time is currently 2:14 p.m. This is the end
9 of media number 3.
10     (OFF THE RECORD.)
11 VIDEOGRAPHER:
12     We are now back on the video record
13 with the beginning of media number 4. The time
14 is currently 2:39 p.m.
15 MS. CONROY:
16 Q     Mr. Crowley, can you expound for me how
17 knowledge of who the prescriber is and where his
18 or her patients are filling their prescriptions
19 would be the Holy Grail to the DEA?
20 A     I probably should have reworded that.
21 Could be the gateway to the Holy Grail.
22     But to -- to understand where
23 prescriptions come from, shall I say, someone has
24 to -- someone has to be on a location. There has
25 to be some kind of a knowledge of -- of the

Page 187

1 geographical location, who the prescribers are.
2 You have to ask the pharmacist, "Who's writing
3 these prescriptions?" You -- you can't -- you
4 can't see that in data. That's all I meant. I
5 mean, if you -- you know, it would have been
6 quite helpful.
7 Q     And helpful in what way?
8 A     Application of your resources to
9 conduct further due diligence. It would be more
10 efficient use of time if you knew which four or
11 five doctors were more interesting than the other
12 30 or 40 that were writing prescriptions that
13 were filled at that pharmacy.
14 Q     And -- well, I didn't mean to --
15 A     Well, you know, there's not much else
16 to say except efficiency.
17 Q     Would it also help to identify problem
18 pharmacies in a different way than just looking
19 at, for example, volume or whether it's a cash
20 sale or something else?
21 MR. HOFFMAN:
22     Object to form.
23 A     It -- it -- it might.
24 MS. CONROY:
25 Q     And, by way of example, if you were --

Page 188

1 Purdue has a list of Region 0
2 physicians that they will not allow their sales
3 force to call on, correct?
4 A     That's my understanding, yes.
5 Q     And what is your understanding of -- of
6 the reason why those physicians are on
7 Region 0 -- a Region 0 list?
8 A     Would have resulted from a process, a
9 report of concern -- and there was a separate
10 committee for -- for that -- determined that the
11 company no longer wanted to be associated in any
12 way with that prescriber, and the best way for
13 them to do that was to prohibit any salesperson
14 from visiting that -- that doctor. And, so, they
15 put it into something they called Region 0.
16 Q     And if it could be identified where
17 those Region 0 patients are filling
18 prescriptions, is it your understanding that that
19 would have been helpful to you in identifying
20 suspicious orders or pharmacies who were filling
21 suspicious orders?
22 MR. HOFFMAN:
23     Sorry. You said Region 0 patients.
24 You might have meant prescribers.
25 MS. CONROY:

Page 189

1 Q     I'm sorry. I did mean prescribers.
2     Do you want me to repeat that, maybe
3 repeat that?
4 A     Please. Please.
5 Q     So if it could be identified where
6 Region 0 prescribers' patients are filling their
7 prescriptions, is it your understanding that
8 would have been helpful to you in identifying
9 either suspicious orders or pharmacies that were
10 more likely to be filling suspicious orders?
11 MR. HOFFMAN:
12     Object to form.
13 A     In my role as a member of the order
14 monitoring system, that certainly could be
15 helpful as one source of information that would
16 be interesting to me, yes.
17 MS. CONROY:
18 Q     Would you agree that a Region 0's
19 physician's prescriptions are suspicious? It's
20 the reason they're on Region 0 list; right?
21 MR. GOLDMAN:
22     Objection.
23     Go ahead.
24 A     I -- my understanding would be that
25 there's something there, so it would rise to the

Highly Confidential - Subject to Further Confidentiality Review

---

Page 190

1  level of suspicious.  Right.
2  MS. CONROY:
3  Q      And if -- if you had had that
4  information, if you knew where the Region 0
5  prescribers -- physicians were -- where their
6  patients were filling their prescriptions, would
7  those pharmacies have been some of the pharmacies
8  on your list, like the high-volume pharmacies?
9  MR. HOFFMAN:
10        Object to form.
11  A      I'm sorry.  Would it have been helpful?
12  MS. CONROY:
13  Q      No.  Would you have -- would you have
14  looked into those pharmacies as well?
15        You told me earlier that you would look
16  at the high-volume pharmacies.
17  A      Right.
18  Q      That was sort of your process.
19        If you also knew which pharmacies --
20  A      I see.
21  Q      -- were filling Region 0 physicians'
22  prescriptions, would you have included those
23  pharmacies on your list of pharmacies to
24  investigate?
25  MR. HOFFMAN:

---

Page 191

1        Object to form.
2  A      Under Betsy Adams' leadership, that's
3  where they were moving.  They were moving in that
4  direction.  She wanted to include all the
5  information that -- that was available different
6  places in the company.
7  MS. CONROY:
8  Q      And when you say Betsy Adams'
9  leadership, when was -- when was that?
10  A      2009 and maybe --
11        What's the date on this?  Can I look at
12  that?
13  Q      Oh, yeah.  Sure.
14  A      -- through two thousand and -- through
15  2010.
16  Q      And was she -- did -- did she leave at
17  some point?
18  A      Yes.
19  Q      And did she leave in 2010?
20  A      I -- I'm sorry.  I don't really know
21  exactly when.
22  Q      Okay.  Do you -- do you know where she
23  is now?
24  A      No.
25  Q      Okay.  Was -- did she work with Robin

---

Page 192

1  Adams [sic] from 2009 to 2010, or was Robin out
2  of the picture while Betsy was there?
3  A      Abrams?
4  Q      Abrams.  I'm sorry.
5  A      She worked for Betsy -- I mean she
6  worked for Robin Abrams, yes.
7  Q      Betsy Adams worked for Robin Abrams.
8  A      That's correct.
9  Q      Okay.  And then Betsy left.  Did anyone
10  take Betsy's place?
11  A      Yes.  That was Giselle Issa.
12  Q      And did Giselle Issa have the same
13  desire as Betsy Adams, so far as you know, to
14  merge different data among the company?
15  A      May have had the same desire.  I don't
16  know that she succeeded to that level.  Yeah.
17  Q      Is Giselle Issa a lawyer?
18  A      She is not, no.  She's a Certified
19  Public Accountant.
20  Q      And what about Betsy Adams?  Is she
21  a --
22  A      Attorney.
23  Q      And she was located in Stamford?
24  A      Yes.
25  Q      And -- and Giselle Issa was

---

Page 193

1  headquartered in -- in Stamford as well?
2  A      Yes.
3  Q      Do you know where Robin Abrams is now?
4  A      Not specifically, no.
5  Q      Do you know generally where she is?
6  A      I was aware that she had moved to a new
7  position in a new company, but I -- I really
8  cannot remember what it was.
9  Q      Did she -- is she in a new company as
10  a -- as counsel?  Did she move -- is the
11  position?
12  A      Yes, I believe so.
13  Q      Do you know if she moved -- moved out
14  of Connecticut?
15  A      You mean her residence?
16  Q      Well, I -- I -- you may not know that,
17  but do you know if the new company is in
18  Connecticut or her office is in Connecticut?
19  A      I think it's in New York City.  I --
20  Q      You don't know the name of the company?
21  A      I don't recall.  I'm sorry.  No.
22  Q      Is she anyone that you have -- is she
23  anyone that you see at conferences or anything?
24  A      No.
25  Q      Have you kept up with Betsy Adams at

---

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1 all?
2 A     No.
3 Q     Let me give you what I've marked as
4 Exhibit 5.
5        (CROWLEY EXHIBIT NUMBER 5
6        WAS MARKED FOR IDENTIFICATION.)
7 MS. CONROY:
8 Q     The top one's yours and then copies.
9       Exhibit 5 is LA Times article dated
10 July 10th, 2016. It's several pages long, 16
11 pages -- 16 pages long.
12       You are familiar with this article,
13 correct, Mr. Crowley?
14 A     Correct.
15 Q     And, prior to this article publication,
16 you were interviewed; is that correct?
17 A     Yes.
18 Q     And were you interviewed -- were you
19 interviewed by the authors, Harriet Ryan, Lisa
20 Girion, and Scott Glover?
21 A     Scott Glover and Lisa Girion.
22 Not Harriet. Well, was not interviewed initially
23 by Harriet Ryan.
24 Q     Okay. And were the interviews face to
25 face or over the telephone?

Page 195

1 A     Face to face.
2 Q     And how many were there?
3 A     Two.
4 Q     And how long did they last?
5 A     Hour.
6 Q     An hour each?
7 A     Probably.
8 Q     Did they come to see you?
9 A     Yes.
10 Q     Okay. And where did they see you?
11 A     They saw me at a conference that I was
12 making a presentation in San Diego, and they,
13 because some things needed to be clarified, they
14 flew to South Carolina.
15 Q     For the second meeting.
16 A     Yes.
17 Q     Okay. And for what reason were you in
18 South Carolina?
19 A     That's where I lived at the time.
20 Yeah.
21 Q     Okay. And what prompted --
22       Was -- was the first -- the first
23 interview was in San Diego?
24 A     Yes.
25 Q     And what prompted that interview?

Page 196

1 A     They -- Lisa Girion and Scott Glover
2 showed up, unbeknownst to me -- and the
3 conference was at a well-attended group of
4 administrators of dental practices -- and created
5 kind of a commotion at the registration desk.
6       So once I found that out as I was
7 coming in, I said, "Well, come on, let's just go
8 off to the side here and -- and see what we
9 could -- what we could do."
10       I had no intention of speaking to them
11 until they showed up like that.
12 Q     Okay. Why were you at a conference
13 concerning the administration of dental
14 practices?
15 A     I was doing consulting work for the
16 company that was the primary wholesaler
17 for -- for their medication.
18 Q     And what kind of medications?
19 A     Oral surgery. So it would be conscious
20 sedation type drugs.
21 Q     Okay. And what was the name of -- of
22 that primary wholesaler?
23 A     Southern -- Southern Anesthesia
24 Company.
25 Q     And were you doing consulting work for

Page 197

1 them?
2 A     Certain projects, yes. Limited. I
3 mean, not -- it wasn't an ongoing thing. It was
4 a -- certain projects.
5 Q     I don't think -- that wasn't -- you
6 would add that to the list, what we were talking
7 about this morning?
8 A     Yes.
9 Q     Okay. And you were not presenting --
10 is that what you said? -- at -- at this
11 conference?
12 A     I was.
13 Q     Or you were presenting.
14 A     Yes.
15 Q     And what were you presenting on?
16 A     What -- what -- how the staff should
17 properly handle a DEA unannounced inspection.
18 Q     Staff of -- of what --
19 A     Dental -- dental office.
20 Q     Okay.
21 A     Right.
22 Q     Had you yourself -- this is just a
23 general question. Had you ever inspected a
24 dental office?
25 A     Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 Q    And did you -- did you present a
2 PowerPoint as well?
3 A    Yes.
4 Q    And what kind of a commotion did
5 the -- did Mr. Glover and Mrs. -- and Ms. Girion
6 create?
7 A    I can only go on secondhand reports.
8 They wanted to enter the conference and -- and
9 listen to my presentation.  They were not allowed
10 entrance, making demands and whatnot.
11 Q    So they were -- they were interested in
12 you --
13 A    It upset the people at the registration
14 desk.
15 Q    Okay.
16 A    Yeah.
17 Q    And they were interested in you,
18 not the -- not the dental practice.
19 A    I would say that's right.
20 Q    Okay.  And, so, you agreed to speak
21 with them?
22 A    Yes.
23 Q    Did you speak with them before you
24 presented?
25 A    They contacted me a couple of times by

Page 199

1 email, and I said was not interested.
2 Q    And that was -- that was after they
3 created the commotion?
4 A    Oh, no.  That would have been before.
5 Q    Before.  I see.
6 A    Right.
7 Q    And then they showed -- they were in
8 California, and they showed up because you were
9 there in San Diego.
10 A    Right.
11 Q    Do you know how they found out you were
12 gonna be there?
13 A    Not really.
14 Q    Okay.  So, then, what -- then what
15 happened?  How did you come to actually be
16 interviewed by them?
17 A    We -- we sat out -- this was at the
18 Marriott on Coronado Island, I think it was, in
19 San Diego.  So there might have been an area out
20 back of the conference area.  Sat there.
21 Q    And did they record you?  Do you know?
22 A    I don't think -- I don't know.  I don't
23 remember.
24 Q    Okay.  And what happened?  Did they ask
25 you questions?  Did they have set questions?  Did

Page 200

1 they hand you anything?  How did the interview
2 go?
3 A    They asked me about certain individual
4 practitioners, I think, in the Los Angeles area,
5 is my recollection, and must have gotten into my
6 duties or whatever.
7      But I -- I probably felt that I had
8 kind of a unique perspective that might help them
9 understand supply chain issues and so forth.
10 Q    And when -- the article was published
11 in July of 2016.  When do you think this first
12 interview took place?
13 A    2014.
14 Q    Okay.  What time of year?  Do you know?
15 A    April.
16 Q    And then there was a second interview
17 in South Carolina?
18 A    Yes.
19 Q    Okay.  And when was that?
20 A    I think it was still springtime.  I
21 think it was still probably a month later, May.
22 Q    So May of 2014?
23 A    I don't think it was a year later.  I
24 think it was a month later.  So...
25 Q    Okay.  And what were they looking, if

Page 201

1 you can recall, for clarification in the South
2 Carolina meeting?
3 A    I emphasized several times that I
4 wanted to be quoted 100 percent accurately.  I
5 didn't want to be cherry-picked or anything like
6 that.  So accuracy, I guess, is what.
7 Q    And -- and do you believe that they did
8 quote you accurately in the article when it was
9 published?
10 A    No.
11 Q    And did you have an understanding --
12 did you believe, at least in 2014, based on your
13 conversations with them, that your quotes were
14 accurate?
15 A    I didn't know what my quotes would be
16 at that point.  2014?
17 Q    Yeah.
18      So when they --
19      They didn't -- they didn't show you
20 anything?
21 A    Right.
22 Q    And then you didn't --
23      Did you have any telephone
24 conversations or emails with them, other than
25 when they were trying to get --

Highly Confidential - Subject to Further Confidentiality Review



Page 202

1  A       I think I probably had several.
2  Q       And were any of the -- were the emails
3  about scheduling or were some of them
4  substantive?
5  A       My recollection is substance --
6  substantive.  All right.
7  Q       And where are those emails now?
8  A       I have no idea.  I mean, I -- I don't
9  know if I kept them or not.  I don't think so.
10 Q       Do you know one way or the other?
11 A       I don't know one way or the other.
12 Q       Okay.  I would ask, at least as of
13 today, that you not destroy any emails that you
14 have at home.
15

Page 204

1  A       Oh, I didn't -- oh, oh, oh.  I
2  misunderstood you.  I'm sorry.
3  Q       Oh.
4  A       I never had an official email account
5  with Southern Anesthesia, if that's what you
6  mean.
7

15 Q       And how long has that been active?
16 A       Three years, probably.
17 Q       Any others?
18 A       Gates Healthcare.  That was a
19 consulting company.
20 Q       Any others?
21 A       No.  That's all.
22 Q       Okay.  And can you -- can you access --
23 still access any of -- of these emails, with the
24 exception of the Purdue email?  For example, can
25 you -- can you get on the AT&T.net and see your

Page 205

emails?
2  A       My own personal?
3  Q       Right.
4  A       Yes.  Yeah.
5  Q       And what about the Gmail?
6  A       I -- I have access to it, sure.
7  Q       Okay.  And the AttainMed.com, do you
8  have access to that email?
9  A       Yes.
10 Q       And what about the Gates Healthcare
11 email?
12 A       I -- I think I still may have access,
13 but I have not worked for that company for two
14 years, really.
15 Q       Okay.  Did you -- when did you first
16 see Exhibit 5 in its published form?
17 A       I think shortly before it was
18 published.
19 Q       Did they send you -- did they send you
20 the -- the to-be-published article by email?
21 A       Yeah.  I don't think it was in this
22 form, format, but I think they -- I think so.
23 Yeah.
24 Q       Okay.  And did -- did they ask for you
25 to -- did they ask for your comments on the draft

3  Q       What about a Comcast?  Do you have one
4  of those?
5  A       No.
6  Q       Any other email addresses other
7  than --
8          I know you have a pharma -- you had a
9  pharma.com; correct?
10 A       Right.  I don't have that.
11 Q       Okay.  And did that -- did you have
12 that -- did it cease in December of 2012 or did
13 you have that for the year after that?
14 A       I think I probably had it for the year
15 after.  Right.
16 Q       And for any of the clients that you did
17 consultancy work for, were you ever given
18 emails -- email addresses within those companies?
19 A       I'm sure I was, yeah.
20 Q       Okay.  So those -- were you able to
21 view, if you were --
22          For example, if you had a Southern
23 Anesthesia email account, were you able to see
24 that on your home email, on your home Outlook or
25 whatever?

Page 206

1 or comments on your quotes or anything like that?
2 A      Yeah.  I gave them.  Yeah.
3 Q      And did you give them by email?
4 A      Yes.
5 Q      And did they -- did they change
6 anything in the draft that you received shortly
7 before publication?
8 A      Excuse me.  I didn't mean to make a
9 noise.
10       I think there was some changes.  I
11 can't remember exactly which ones, you know.
12 Q      Did you have any conversations with
13 anyone at Purdue or anyone who had worked for
14 Purdue about this article, your interview, or the
15 draft?
16 A      I --
17       Any contact or communication?
18 Q      Right.
19       Did you -- did you have any -- did you
20 tell Purdue that you were speaking to reporters
21 for the L.A. Times or did you have any
22 conversation with anyone at Purdue?
23 A      I did at some point, yeah.  I did.
24 Q      Prior to the publication?
25 A      Yes.

Page 207

1 Q      Okay.  And what -- did you have any
2 conversations with Michele Ringler?
3 A      I did.  Well, email.  I did not speak
4 to her.
5 Q      And when I'm talking about this is this
6 is not with respect to work you were doing --
7 A      Right.
8 Q      -- at Purdue.  This is about the
9 article itself.
10 A      I think I sent her an email
11 and -- short and sweet, I think.  I think.  Yeah.
12 Q      Okay.  And did you provide any
13 documents to the L.A. Times or to the authors?
14 A      No.  I don't believe so.
15 Q      Did you provide any pictures?
16 A      No.
17 Q      Did you provide any substantive
18 information in writing to them?
19 A      I may have.
20 Q      Did you provide to either Mr. Goldman
21 or Purdue's counsel any of your emails to the
22 L.A. Times or from the L.A. Times?
23 A      No.
24 Q      Have you provided --
25 A      Could -- could -- could I clarify

Page 208

1 something?
2 Q      Sure.
3 A      You asked me about pictures --
4 Q      Right.
5 A      -- to the L.A. Times?
6 Q      Or to the authors of the article.
7 A      I -- I may have showed them a couple of
8 pictures to give them an idea --
9 Q      Pictures --
10 A      -- of what clearly a suspect patient
11 might look like.  Maybe.  I -- I can't really
12 recall.
13 Q      What's in your -- what's in your head?
14 What kind of a picture was it?  What was it a
15 picture of?
16 A      Young patients walking into a pharmacy
17 and then leaving.
18 Q      And where --
19       Did you take those pictures?
20 A      Yes.  Yeah.
21 Q      And had you -- had you -- did you take
22 them as a result of some prior investigation you
23 were -- you had done?
24 A      Uh, yeah.
25 Q      I mean, you didn't -- you didn't go out

Page 209

1 and take --
2       Did you go out and take these pictures
3 with the L.A. Times article --
4 A      No, no.
5 Q      -- in mind, or you had the pictures?
6 A      I had the pictures.
7 Q      And -- and you forwarded them on to the
8 authors, as best you can recall?
9 A      I -- I think I may have, yeah.
10 Q      And there were certain pharmacies and
11 physicians that were discussed in the article.
12 Did you give the authors any pictures of any of
13 those pharmacies?
14 A      With the -- with the three or four
15 pictures I gave of the individuals, Lams Pharmacy
16 may have been one.
17 Q      Was Purdue at any time from -- in 2014,
18 2015, or 2016 until the article was published,
19 were they aware that you were providing
20 information or pictures to the L.A. Times?
21 MR. HOFFMAN:
22       Object to form.
23 A      I -- I don't know.  I mean, I've had
24 conversations with people in the general
25 counsel's office, said that I tried to clarify

Page 210

1 many things. So, generally speaking, maybe.
2 Right. I don't know about anything specific.
3 MS. CONROY:
4 Q       Would these conversations have taken
5 place before the publication of the article or
6 after?
7 A       Before.
8 Q       So you -- don't tell me what the
9 conversations were or the substance of them, but
10 you believe you had conversations with the
11 general counsel's office at Purdue concerning
12 information you had provided to the authors of
13 what was going to be an article published in the
14 L.A. Times?
15 A       Yes.
16 Q       Did you have any -- those -- the emails
17 that you had with Michele Ringler, were those
18 in -- were those prior to the publication of the
19 article? Do you know?
20 A       Yes. Oh, I think -- the one -- the
21 only email after I left the company to Michele
22 Ringler may have been at the same time.
23 Q       Okay.
24 A       May have been the day of or the day
25 after. Yeah.

Page 211

1 Q       Day of or the day after what?
2 A       The publication.
3 Q       That the article came out?
4 A       Yes.
5 Q       I see. Did you know that Michele
6 Ringler was also going to be quoted in the
7 article?
8 A       No.
9 Q       Not until you read the article?
10 A       That's right.
11 Q       Okay. Do you know if -- do you know of
12 anyone here that was quoted or infor- --
13 information was provided? For example, had you
14 been given the statement from Purdue from
15 Phil Strassburger? Did you know about that
16 before the article was published?
17 A       Did not.
18 Q       Did you know Phil Strassburger?
19 A       Yes.
20 Q       And was he one of the individuals you
21 had conversations with before the article was
22 published?
23 A       No.
24 Q       Who was it that you spoke with in the
25 general counsel's office?

Page 212

1 A       Robin Abrams.
2 Q       Go to page --
3       Let me ask you this. Have you ever had
4 a conversation with Joseph Rannazzisi at any
5 time? Do you know him?
6 A       I know him. I believe he knows me, but
7 we're not acquainted to -- to the point where we
8 would have a direct conversation.
9 Q       Have you ever spoken at a conference
10 that he's also spoken at or attended? Do you
11 know?
12 A       I've attended a conference where he was
13 the speaker. I was one of the people that
14 invited him. Whether or not he attended anything
15 I spoke at, I can't remember.
16 Q       Did you ever -- did you ever have any
17 email -- email communication or any other kind of
18 communication with him about his letters?
19 A       Indirectly, no.
20 Q       Okay. If you look on the -- if you
21 look on page -- starting at the very bottom of
22 Exhibit 5, it says, "A former Purdue executive
23 who monitored pharmacies for criminal activity
24 acknowledged that even when the company had
25 evidence pharmacies were colluding with drug

Page 213

1 dealers, it did not stop supplying distributors
2 selling to those stores."
3       Do you see that?
4 A       Yes.
5 Q       Do you know who that executive is?
6 A       I have no idea what they're talking
7 about in that paragraph, that -- that sentence.
8 Q       Okay. As far as you know, they're not
9 talking about you?
10 A       Correct.
11 MR. HOFFMAN:
12       I'm sorry. What page is that on?
13 Maybe I missed it.
14 MS. CONROY:
15       It's the -- very bottom of the
16 first page to the top of the second page.
17 MR. HOFFMAN:
18       Okay. Yeah.
19 MS. CONROY:
20 Q       Then it goes on and it says, "Purdue
21 knew about many suspicious doctors and pharmacies
22 from prescribing records, pharmacy orders, field
23 reports from sales representatives and, in some
24 instances, its own surveillance operations
25 according to court and law enforcement records,

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1  which include internal Purdue documents, and
2  interviews with current and former employees."
3      Do you see that?
4  MR. HOFFMAN:
5      Object to the form.  Hearsay.
6  A    I see it.
7  MS. CONROY:
8  Q    Do you agree with that sentence?
9  A    That was part of our job on the OMS
10 committee.
11 Q    So you do agree?
12 A    Yes.
13 Q    And if you go to page --
14     Unfortunately, there aren't any pages
15 on this.  So let's see.  We're -- the very next
16 page where it says "what Purdue knew," do you see
17 that?
18 A    Yes.
19 Q    In the middle of the first paragraph,
20 it says, "The prescription drug epidemic is
21 fueling a heroin crisis, shattering communities
22 and taxing law enforcement officials who say they
23 would benefit from having information such as
24 that collected by Purdue."
25     Do you see that?

Page 215

1  A    Yes.
2  Q    Do you believe that the prescription
3  drug epidemic is fueling a heroin crisis?
4  MR. HOFFMAN:
5      Object to form.
6  A    I don't know.
7  MS. CONROY:
8  Q    Have you ever heard that before?
9  A    Yes.
10 Q    You have no opinion on it?
11 MR. HOFFMAN:
12     Object to form.
13 A    I have an opinion.  I mean, many times
14 those who abuse prescription drugs also abuse
15 heroin.
16 MS. CONROY:
17 Q    Have you ever heard that individuals
18 who become addicted to prescription drugs can
19 then move to heroin or other drugs?
20 MR. HOFFMAN:
21     Object to the form.
22 A    The question is "Have I heard it?"  I
23 have heard it.
24 MS. CONROY:
25 Q    Do you have any -- do you know whether

Page 216

1  that's ever happened before?
2  MR. HOFFMAN:
3      Object to the form.
4  A    I'm not the expert, I guess, that could
5  answer that question.
6  MS. CONROY:
7  Q    Well, I'm -- I'm not asking as an
8  expert.
9  A    Right.
10 Q    I'm asking are you familiar with anyone
11 who became addicted to a prescription drug and
12 then moved to illegal substances because of that
13 addiction?
14 MR. HOFFMAN:
15     Object to form.
16 A    Thank you for the clarification.  Thank
17 you.
18     I'm not aware of any.
19 MS. CONROY:
20 Q    Okay.  And you never heard of anything
21 like that during your time at Purdue?  You never
22 heard of any -- not an individual, but you never
23 heard of that happening, that someone could
24 become addicted to a prescription drug and then
25 move to illegal drugs?

Page 217

1  MR. HOFFMAN:
2      Object to the form.  Asked and
3  answered.
4  A    Not that I can recall.
5  MS. CONROY:
6  Q    Do you -- is it your understanding that
7  there -- that an individual can become addicted
8  to prescription opioids --
9  MR. HOFFMAN:
10     Object to form.
11 MS. CONROY:
12 Q    -- when -- when taken under a doctor's
13 care and as prescribed?
14 MR. HOFFMAN:
15     Object to form.
16 A    Terminology, I've never been really
17 good personally at terminology.  But a patient
18 could become medically dependent upon opioid
19 medication or other types of substances, yes.
20 Addicted is a -- I'm not qualified to use that
21 term, I don't think.
22 MS. CONROY:
23 Q    You -- you told me earlier that you
24 were a consultant with respect to an addiction
25 therapy --

Page 218

1 A      Right.
2 Q      -- clinic. Did that -- do you make a
3 separation between addiction and dependency when
4 you are evaluating an addiction -- an addiction
5 therapy clinic or addiction treatment clinic?
6 MR. HOFFMAN:
7      Object to form.
8 A      I would --
9      Let me think here for a second.
10      I would be evaluating --
11      No, that doesn't even play into it,
12 really.  There's -- there's no distinction.
13 MS. CONROY:
14 Q      Tell me what you mean by dependent.  Or
15 did you say medically dependent?  You did.
16 Medically dependent.
17 A      You know, some of that may be older
18 terminology.  But addicted, to me, almost -- I --
19 I -- I shy away from that because it could denote
20 abuse.  Medically dependent, in my mind, does not
21 denote abuse, if I could say it that way.
22 Q      Okay.  If someone is medically
23 dependent on an opioid medication, can they be
24 psychologically dependent as well?
25 MR. HOFFMAN:

Page 219

1      Object to form.  Still calling for a
2 medical opinion.
3 A      I -- I really don't know.  I don't
4 know.
5 MS. CONROY:
6 Q      Do you know if someone who's medically
7 dependent on an opioid medication can crave that
8 medication?
9 MR. HOFFMAN:
10      Same objection.
11 A      I would assume that would be part of
12 it.
13 MS. CONROY:
14 Q      And do you know if someone is medically
15 dependent on an opioid medication, can they
16 experience withdrawal if they stop taking the
17 medication?
18 MR. HOFFMAN:
19      Objection.  Same objection.
20 A      They could, in my opinion.
21 MS. CONROY:
22 Q      Have you ever -- have you ever been
23 trained with respect to the terms "medically
24 dependent," "addicted," "tolerance,"
25 "withdrawal"?  Just asking "yes" or "no."

Page 220

1 A      Trained or informed, I'd say yes.
2 Q      And were you trained or informed while
3 at the DEA?
4 MR. GOLDMAN:
5      Why don't we -- I -- I would -- I
6 would -- I'd think that -- I want to be mindful
7 of Mr. Crowley's Touhy obligations.  I think
8 that's a very specific question about training
9 that I would prefer him not answer unless
10 specifically instructed by the DEA.
11 MS. CONROY:
12 Q      Okay.  After -- after 2004, did you
13 ever receive --
14      Had you left the DEA by 2004?
15 A      Yes.
16 Q      After 2004, did you ever receive any
17 training of any type with respect to addiction,
18 withdrawal, tolerance, dependence, medical
19 dependence, anything?
20 A      Did not.
21 Q      Did you ever see a package insert for
22 OxyContin?  Ever read one?
23 A      I've perused one, I'm sure, yep.
24 Q      After 2004?
25 A      Yes.

Page 221

1 Q      Did you ever yourself provide any
2 training to sales reps or other individuals
3 employed by Purdue?
4 A      I never was involved in any training
5 with sales reps.  Some training probably with
6 other employees of Purdue but not in what you're
7 asking me about.
8 Q      Did you ever have any conversations at
9 the order monitoring committee about addiction,
10 abuse, tolerance, withdrawal, any -- any of those
11 types of issues with respect to controlled
12 substances?
13 A      Did not.  None that I can recall.
14 Q      What was the -- what was the point of
15 the picture of the young patient walking in and
16 out of the pharmacy?  What were you attempting to
17 show the authors of the LA Times article?
18 MR. GOLDMAN:
19      Objection.
20      Go ahead.
21 A      Probably the type of patient that would
22 trigger a -- a suspicion on the part of a
23 reasonably -- reasonable person conducting any
24 kind of a -- an inspection outside of the
25 pharmacy, that perhaps they may be entering for

Highly Confidential - Subject to Further Confidentiality Review

---

Page 222

1  some reason other than a legitimate medical
2  purpose.  However, it's not that easy, so I...
3  MS. CONROY:
4  Q       What would it be about -- what would it
5  be about the patient walking in?  What
6  would -- what would cause you to use that picture
7  to describe someone who was potentially seeking a
8  prescription for a nonlegitimate medical purpose?
9  A       The way they carried themselves, the
10 way they were dressed.
11 Q       And how would they be dressed?
12 A       Shorts that come down halfway, if
13 you know what I mean, hat on backwards, holding a
14 cell phone a funny way.
15 Q       And would you --
16 A       I didn't quite finish.  I'm sorry.
17 Q       Oh, I'm sorry.
18 A       Well, age, physical condition, that
19 sort of thing.
20 Q       And would you be identifying that
21 individual as someone who is either medically
22 dependent or addicted to a controlled substance
23 or someone who would be dealing or -- or
24 diverting a controlled substance?
25 MR. HOFFMAN:

---

Page 223

1        Object to form.
2  A       I would say the former, because the
3  latter is a very difficult concept, diversion.
4  So...
5  MS. CONROY:
6  Q       So you're describing someone who, at
7  least visually, to you, is -- and I'll use your
8  word -- medically dependent on a controlled
9  substance?
10 MR. HOFFMAN:
11       Object to form.
12 A       I think I may have used that term in a
13 different context.  They may have been
14 drug-seeking individuals who were addicted.
15 MS. CONROY:
16 Q       And you're making a distinction between
17 that individual that would be addicted and
18 someone else who might be medically dependent?
19 MR. HOFFMAN:
20       Object to form.
21 A       I am, yes.
22 MS. CONROY:
23 Q       If we turn the page, it says,
24 "Drugmakers like Purdue are required by law to
25 establish and maintain," quote, "effective

---

Page 224

1  controls against the diversion of drugs from
2  legitimate medical purposes."
3        Do you see that?
4  A       I'm sorry.  I may have the wrong page.
5  Q       Oh, I'm sorry.
6        Go to the -- we -- we were on the page
7  that talked about what Purdue knew.
8  A       Yes.
9  Q       Now turn the page.
10 A       Okay.
11 Q       And, at the very top, it says "After
12 the settlement."
13       Do you see that?
14 A       I see that, yeah.
15 Q       And then it says, "Drugmakers like
16 Purdue are required by law to establish and
17 maintain," quote, "effective controls against the
18 diversion of drugs from legitimate medical
19 purposes."
20       Do you see that?
21 A       I do.
22 Q       And do you agree with that?
23 A       No.  Not -- not the exact terminology.
24 Q       Okay.  How would -- tell me what's
25 wrong with it or the way that you would phrase

---

Page 225

1  it.
2  A       Establish and maintain effective
3  controls against the diversion of drugs from
4  legitimate medical channels, scientific channels.
5  Q       Instead of purposes, channels or
6  scientific channels?
7  A       That's correct.
8  Q       And did you make that suggestion to the
9  authors?
10 MR. HOFFMAN:
11       Object to form.
12 MS. CONROY:
13 Q       If you recall.
14 A       I don't recall that in particular, no.
15 Q       Okay.  And the next paragraph says,
16 "That anti-diversion effort at Purdue was run by
17 Associate General Counsel Robin Abrams, former
18 Assistant U.S. Attorney in New York, who had
19 prosecuted healthcare fraud in prescription drug
20 cases.  Jack Crowley, who held the title of
21 Executive Director of Controlled Substances Act
22 Compliance and had spent decades at the DEA, was
23 also on the team."
24       Do you see that?
25 A       I -- I do.

---

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1 Q     And is this, "the anti-diversion
2 effort" and "the team," is that referring to the
3 order monitoring committee?
4 A     I believe so.
5 Q     It says, the next line, "Purdue had
6 access to a stream of data showing how individual
7 doctors across the nation were prescribing
8 OxyContin.  The information came from IMS, a
9 company that buys prescription data from
10 pharmacies and resells it to drugmakers for
11 marketing purposes."
12      Do you see that?
13 A     I do.
14 Q     Do you agree with that paragraph?
15 MR. HOFFMAN:
16      Object to form.  Foundation.
17 A     I agree that Purdue had a -- access to
18 data showing prescribing practices.  I -- IMS, I
19 really don't know that much about their manner of
20 providing that information.
21 MS. CONROY:
22 Q     That's -- that's not a database that --
23 that you would go into at Purdue.  You would just
24 sometimes ask for information from that database;
25 correct?

Page 227

1 A     That's correct.
2 Q     Now I would like you to go to the page
3 at the top -- it's several in -- that says "I was
4 sitting on a gold mine."  It's at the very top of
5 the page.
6      It says here, "With a" --
7      Did you find it?
8 A     Yes.
9 Q     "With a few keystrokes on his computer
10 at Purdue, Jack Crowley could identify pharmacies
11 around the country that were moving a staggering
12 volume of 80s and almost nothing else."
13      Eighties is 80 milligram OxyContin?
14 A     That's correct.
15 Q     Do you have -- do you have issue with
16 anything in that sentence?
17 MR. GOLDMAN:
18      Object.
19 A     I'm -- I'm sure it was taken out of
20 context.  The word "staggering" would be
21 something that I would object to.  I was trying
22 to be 100 percent truthful with them on the fact
23 that we had certain abilities that, if we applied
24 the data correctly, would -- we'd see certain
25 things.

Page 228

1      So I -- I can agree with it generally,
2 but not necessarily every word.
3 MS. CONROY:
4 Q     Okay.  Then you're quoted, "'I could
5 punch it in at any time...Bang,' Crowley told the
6 Times.  'I was sitting on a gold mine.'"
7      Did you say that?
8 A     I probably did.  I -- I don't remember
9 exactly saying it that way.  But, again, that
10 would have been part of a broader idea that I was
11 trying to express.
12 Q     Okay.  Do you believe that you were
13 sitting on a gold mine?
14 MR. HOFFMAN:
15      Object to form.
16 A     Probably would have used different
17 terminology.  I was sitting on valuable data.
18 MS. CONROY:
19 Q     Okay.  And why was it valuable to you?
20 A     Well, I -- I had kind of a unique view
21 of things, having worked in this arena for DEA
22 for 28 and a half years and now in industry.  I
23 had a pretty good idea of what might be
24 noteworthy on its face, and it would give me then
25 the -- you know, would send me to the idea that I

Page 229

1 should look into this further.
2 Q     If you look, it says, a little further
3 down on that page, "In 2007 DEA pressured drug
4 manufacturers to do more to stem the prescription
5 drug crisis and warned that it would be looking
6 at every step in the supply chain."
7      Do you see that?
8 A     Yes.
9 Q     Is that a reference to one or both of
10 the Rannazzisi letters?
11 A     I assume it is.  Yeah.
12 Q     "'In response, Purdue decided to gather
13 detailed information about pharmacies,' Crowley
14 said."
15      Do you see that?
16 A     I do.
17 Q     And that's what you were talking about
18 with me this morning, that around that time
19 period after the two Rannazzisi letters, you were
20 beginning to form this order monitoring committee
21 and starting to look at data, with others, to try
22 to identify suspicious orders.
23 A     That's correct.
24 Q     And it says next, "The company
25 approached wholesalers and struck agreements."

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1  That's the fee for service agreements;
2  correct?
3  A    May I read the entire sentence?
4  Q    Absolutely.
5  A    Yes, I agree.
6  Q    Did you have anything to do with the
7  fee for service agreements or what types of data
8  you would be interested in that whoever was
9  negotiating the fee for service agreements should
10 try and secure from the authorized distributors?
11 A    No. That was national accounts. But
12 it's generally the -- what they call 867 data,
13 their sales to the retail outlets. That's what
14 it is.
15 Q    So you knew, as long as you said, "We
16 should be getting the 867 data from our
17 authorized distributors," that's --
18 A    Right.
19 Q    -- that's, to you, the data that you
20 would need?
21 A    Whether I said it first or Steve Seid
22 said it, yes.
23 Q    You both recognized that was where you
24 would be able to recognize suspicious orders.
25 A    Yes.

Page 231

1  MR. HOFFMAN:
2      Object to form.
3  THE WITNESS:
4      Sorry.
5  A    Could you -- could I back up on that a
6  second? I'm sorry.
7      We both recognized it would be valuable
8  data stream.
9  MS. CONROY:
10 Q    Okay.
11 A    And I think you said "for suspicious
12 orders"?
13 Q    Correct.
14 A    I mean, there'd have to be other steps
15 taken, I mean, you know, with that data.
16 Q    Sure.
17 A    Yeah.
18 Q    You needed -- you needed to create a
19 database; correct?
20 A    Yeah.
21 Q    So that you could collect that data and
22 then run an algorithm off of it.
23 A    Right.
24 Q    I'm not suggesting --
25 A    Right.

Page 232

1  Q    -- you could just get the agreement
2  signed and you'd know everything.
3  A    Right.
4  Q    But that was -- you needed the fee for
5  service agreement in order to get the data. Is
6  that correct? Or did you --
7  A    That's true.
8  Q    -- already have the data?
9  A    Well, he may have had some of it in his
10 role in national accounts. He had to evaluate
11 orders every day. So that's something, at that
12 time, I didn't pay attention to. Only as we
13 began to form this committee.
14     But in terms of the wholesalers making
15 orders to Purdue, he's involved in, I assume,
16 that kind of data readily for -- for a while,
17 yes.
18     Wait a minute. Wait a minute. Let me
19 back -- I might be getting...
20 MR. GOLDMAN:
21     You want the question repeated?
22 THE WITNESS:
23     Yeah. I think -- I'll repeat it
24 myself.
25 MS. CONROY:

Page 233

1  Q    Okay.
2  A    My understanding of the question was
3  did -- did he have access to that data before.
4  MS. CONROY:
5  Q    Correct.
6  A    And, so, I'm -- I -- I was getting a
7  little mixed up that he was the main driver of
8  the Purdue order monitoring system, so he made
9  decisions hourly, daily, weekly in this regard.
10     Whether or not he had data that looked
11 down all the way to the retail pharmacy, I'm not
12 really sure, until we began looking into this.
13 Q    What you do know is that Mr. Seid, when
14 he received an order from Cardinal or McKesson or
15 AmerisourceBergen, he could determine whether
16 that order was of unusual size or it was some
17 suspicion about that; correct? Before the fee
18 for service agreements.
19 A    Yeah, the -- the -- the --
20 MS. SIDARTH:
21     Object to form.
22 MR. HOFFMAN:
23     Object to form.
24 A    There may have been something
25 noteworthy about it. I'd use that word rather

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 than "suspicious."
2      But he would certainly make phone
3 calls, do it, whatever due diligence he had, to
4 assure himself that that order was fine.
5 MS. CONROY:
6 Q      And he would also be looking at credit
7 issues, whether whoever was ordering the product
8 could pay for it?
9 A      Could be part of it, yes.
10 Q      And are you familiar at all with the
11 score cards?  Is that term familiar to you, score
12 cards that Mr. Seid would use to look and
13 determine whether, for example, whether McKesson
14 had provided the data during a particular period
15 of time and how much they purchased and how much
16 of a rebate or a chargeback they may get?  Did
17 you have anything to do with that?
18 A      No.
19 Q      And then if you go a few pages in, past
20 the picture of the pharmacy and then at the top
21 of the page, it says, "Once Purdue identifies."
22      Do you see that?
23 MR. GOLDMAN:
24      Next page, I think.
25 A      Next page?

Page 235

1      Yes.
2 MS. CONROY:
3 Q      It says, "'Once Purdue identifies the
4 potential suspicious activity of a wholesaler's
5 customer, Purdue informs the wholesaler so they
6 can perform their due diligence,' Strassburger
7 said."
8      Is this a reference to your activities
9 and maybe others at Purdue contacting Purdue's
10 authorized distributors and that exchange of
11 information we talked about about hot spots or
12 high-volume pharmacies?
13 MR. HOFFMAN:
14      Object to the form.
15 A      I -- I have to apologize, because I
16 kind of zoned out --
17 MS. CONROY:
18 Q      Okay.
19 A      -- on your question while I was reading
20 this.  I think I know what it is, but I --
21 Q      Sure.  Let me repeat it.
22      What's meant here is that once Purdue
23 identifies the potential suspicious activity of a
24 wholesaler's customer, Purdue would --
25      Oh, no.  I'm sorry.

Page 236

1      Actually, is this a reference to your
2 activities and maybe others at Purdue contacting
3 Purdue's authorized distributors in that exchange
4 of information we talked about concerning hot
5 spots or high-volume pharmacies?
6 A      I -- I believe it is.
7 Q      So that's when you -- we -- we saw a
8 couple of examples.  You might call George Euson
9 at H.D. Smith or, I mean, or he might call you,
10 but there would be an exchange of information
11 with Purdue's wholesalers.
12 A      Yeah.
13 Q      It then says, "In the case of Lake
14 Medical, Purdue didn't notify some distributors
15 that it suspected St. Paul's was part of a drug
16 ring."
17      Do you see that?
18 MR. HOFFMAN:
19      Object to form and beyond the scope of
20 the track 1 cases.
21 A      I see it.
22 MS. CONROY:
23 Q      Do you know whether some distributors
24 were not notified who were supplying -- who were
25 authorized distributors supplying to Lake

Page 237

1 Medical?
2 MR. HOFFMAN:
3      Same objections.
4 A      I do not.
5 MS. CONROY:
6 Q      Did you take issue with this sentence
7 with the authors?
8 A      If I didn't, I should have.
9 Q      Okay.  And -- and why is that?
10 A      Well, the terms "drug ring," number
11 one.
12 Q      How could we tell today whether or not
13 Purdue notified any of its authorized
14 distributors who supplied Lake Medical?
15 MR. HOFFMAN:
16      Object to the form.  Beyond the scope
17 of the track 1 cases.
18 A      Notifying them of what?  That
19 St. Paul's was ordering suspicious amounts of
20 OxyContin?
21 MS. CONROY:
22 Q      Correct.  This is the same type of
23 information you were communicating to H.D. Smith.
24 A      I don't know, but -- if there are any
25 notes in the OMS system, but that would be one

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1 way.
2 Q      Because this might not be correct.  You
3 may in fact have had conversations with other
4 distributors who were supplying to Lake Medical;
5 correct?
6 MR. HOFFMAN:
7       Same objection.
8 A      I'm getting mixed up.  The sales would
9 have gone to St. Paul's.
10 MS. CONROY:
11 Q      Correct.  And, so, there was H.D. Smith
12 was -- was one of the distributors to St. Paul's;
13 correct?
14 A      That's right.
15 Q      And -- and it looks, according to this
16 sentence, that there were other distributors
17 distributing Purdue products to St. Paul's.
18 Correct?
19 MR. HOFFMAN:
20       Same objection -- same objections.
21 A      That helps me to understand.
22       I believe I -- I did have conversation
23 with other wholesalers.
24 MS. CONROY:
25 Q      Okay.  And those conversations may, in

Page 239

1 fact, be referenced in the notes of the OMS
2 database?
3 A      May be, yeah.
4 Q      Or in your emails.
5 A      Yes.
6 Q      Then, a little bit further down on that
7 page, it says, "It really takes G a long time to
8 catch up with these jokers."
9       Do you see that?
10 A      Yes.
11 Q      What did you mean by that?
12 MR. HOFFMAN:
13       Object to form.
14 A      Poor choice of terminology, but really
15 takes the government, meaning DEA or any
16 investigative agency, a long time to conduct and
17 complete an investigation which would lead to
18 indictments and arrests.
19       The word "jokers," I don't know.  Maybe
20 I was having a bad day.
21 Q      And by "catch up" there, you mean
22 indictment or arrest?
23 A      Yes.
24 Q      That's different from one of Purdue's
25 authorized distributors -- and I'll use the

Page 240

1 word -- catching up with a St. Paul's or some
2 other pharmacy to actually report them to the
3 DEA?
4 A      Correct.
5 MR. HOFFMAN:
6       Object to the form.
7 MS. CONROY:
8 Q      That's -- that's a different timing;
9 correct?
10 MR. HOFFMAN:
11       Object to form.
12 MS. CONROY:
13 Q      That's a different timing; correct?
14 A      I -- I was specifically talking about
15 my understanding of law enforcement
16 investigation.  So it's different in that regard,
17 sure.
18 Q      Because under your -- under the system
19 that you helped to create at Purdue, you created
20 a system with others that could be used to stop
21 the distribution of controlled substances to
22 specific pharmacies as long as you had
23 cooperation from an authorized distributor.
24 Correct?
25 MR. GOLDMAN:

Page 241

1       Objection.
2 A      That'd be -- be a big part of it.  But
3 it's very, very difficult for industry,
4 manufacturers and wholesalers, to stop shipping
5 with the risk of -- of depriving legitimate
6 patients of their medicine.  So there's --
7 there's more steps involved in that, except for
8 the cases that are unbelievably egregious, I
9 would imagine.
10       But, for instance --
11       Well, you know, there's more to it.
12 But the idea was as we made the system better,
13 we'd get a different, perhaps, reaction from the
14 DEA and the collaborative effort to make the
15 right kind of decisions so that legitimate
16 patients did not get harmed.  And, in my view,
17 shall I say, my idea would be that that -- that's
18 what would have taken place.  And you bring in
19 the state disciplinary boards and all that,
20 together with administrative action, which could
21 happen a lot faster than criminal investigations.
22       I'm sorry to, you know...
23 MS. CONROY:
24 Q      I understand that your concern -- your
25 concerns, at least with respect to the industry

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 side, not the government side, your concern was
2 that if you stopped shipping to a particular
3 suspicious pharmacy or if you persuaded an
4 authorized distributor to stop supplying to a
5 suspicious pharmacy, you would impact legitimate
6 patients?
7 MR. GOLDMAN:
8     Objection.
9     Go ahead.
10 A     Potentially, yes.
11 MS. CONROY:
12 Q     Do you know if that ever happened?
13 MR. HOFFMAN:
14     Object to form.
15 A     I don't know directly.
16 MS. CONROY:
17 Q     Did you ever hear indirectly of any
18 particular instance where legitimate patients
19 were impacted by the shutting -- by the reporting
20 to the DEA of a particular pharmacy by an
21 authorized distributor?
22 MR. HOFFMAN:
23     Object to the form.
24 A     I'm sure there were reports from news
25 organizations, other types of agencies. But

Page 243

1 certainly our own observations would be that
2 perhaps a certain amount of patients that are
3 entering this pharmacy are, quote, drug-seeking
4 individuals who are -- whose intent is to abuse
5 the substance, and another percentage might be --
6 would be, therefore, legitimate patients. How do
7 you -- how do you stop shipping completely
8 without -- without harming 50 percent or whatever
9 the percentage might be who are legitimate?
10     So that was always something that we
11 struggled with on a daily basis, and how are we
12 gonna do the right thing? So...
13 MS. CONROY:
14 Q     I understand you struggled with the
15 concept.
16 A     Right.
17 Q     What I'm asking is did you ever do it
18 and see what the consequences were?
19 MR. HOFFMAN:
20     Object to the form.
21 A     I never saw the consequences in my time
22 at Purdue.
23 MS. CONROY:
24 Q     And were the consequences weighed when
25 Robin Abrams reported those 150 or so pharmacies

Page 244

1 to the DEA? Do you know if legitimate patients
2 were deprived their controlled substances when
3 that happened?
4 A     I -- I don't, no. But I -- I don't.
5 Q     Did you supply any pictures that
6 ultimately ended up in the article?
7 A     I don't think so.
8 Q     And did you ever go on to --
9     It looked like there was an ability to
10 go on the L.A. Times website and see a little bit
11 more information or look at the full documents.
12 Did you ever go on the website and look at the --
13 A     No.
14 Q     -- at what they had?
15 A     I never did, no.
16 Q     There was a -- at least maybe some
17 other articles, but I see a second article that
18 I've marked as Exhibit 6. And your copy is the
19 top one.
20     (CROWLEY EXHIBIT NUMBER 6
21     WAS MARKED FOR IDENTIFICATION.)
22 MS. CONROY:
23 Q     Exhibit 6 is an article from
24 www.thefix.com on July 11th of 2016 by Paul
25 Gaita, G-A-I-T-A. Have you ever read -- does

Page 245

1 this article look familiar to you?
2 A     I don't think it looks familiar to me
3 at all. I don't recognize this.
4 Q     Okay. If you'd turn the page, it's
5 double-sided, so go to not the back side but the
6 next page. At the very top, it says "more than
7 1800."
8     Do you see that? Not that page. Go to
9 the next one.
10 A     Yes.
11 Q     Okay. In the second paragraph, it
12 says, "But as he," talking about you --
13     You can take a look -- take your time
14 to look at this paragraph.
15     "But as he and others noted, company
16 policy prohibited employees from taking such
17 actions without first consulting distributors,
18 and Purdue continued to fulfill orders to stores,
19 even in cases where company employees personally
20 witnessed suspicious behavior at these
21 locations."
22     Do you see that?
23 MR. HOFFMAN:
24     Object to form.
25 A     I'd like to read it again, if -- if

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1 that's okay.
2 MS. CONROY:
3 Q      Feel free to -- to read it.  And I'll
4 tell you in advance of you reading it, what I'm
5 going to ask you about, is this the policy we
6 were discussing about Purdue telling authorized
7 distributors if it was gonna report suspicious
8 activity to the DEA?
9 A      We were talking about it.  I don't know
10 if it's captured accurately here.  I never spoke
11 to this man.  I don't know who he is.
12 Q      Okay.
13 A      I think that's the policy we were
14 talking about.
15 Q      Okay.  You can put that away.
16 A      Okay.  I -- I don't like the word
17 "prohibited."
18 Q      Okay.  You can keep that --
19 A      Oh, okay.
20 Q      -- in that stack.
21 MR. HOFFMAN:
22      Jayne, would it be good time for a
23 break?
24 MS. CONROY:
25      Yeah, that's fine.

Page 247

1 VIDEOGRAPHER:
2      We are now going off the video record.
3 The time is currently 3:54 p.m.  This is the end
4 of media number 4.
5      (OFF THE RECORD.)
6 VIDEOGRAPHER:
7      We are now back on the video record.
8 The time is currently 4:11 p.m.  This is the
9 beginning of media number 5.
10      (CROWLEY EXHIBIT NUMBER 10
11      WAS MARKED FOR IDENTIFICATION.)
12 MS. CONROY:
13 Q      Mr. Crowley, let me pass you Exhibit
14 10.  Your copy is on the top.  The rest are the
15 copies for everyone else.
16      Exhibit 10 is an email from Mr. Crowley
17 dated October 3rd, 2007, to a number of people at
18 Purdue, PPLPC004000132946 through 954.
19      If you take a look at this, if you go
20 to the last page, you see the first email is from
21 you, on September 24th, to a John Lowne.
22      Do you see that?
23 A      Yes.  Lowne.
24 Q      Lowne?
25 A      Yeah.

Page 248

1 Q      And then you have a series of emails.
2 But the one I want to ask you about is the one
3 that's on page 951, if you look at the stamped
4 numbers down at the bottom right-hand corner.
5 A      Yes.
6 Q      And it's from you, Tuesday,
7 September 25th, to Stephen Seid, Laura Watson.
8 We know who they are.  Dan Colucci, we know who
9 he is.  Who's Pat McGrath?
10 A      She worked in the finance organization.
11 Q      Who's Kris Christensen?
12 A      He -- he was another colleague in -- in
13 finance.
14 Q      And John Lowne?
15 A      Lowne.  He was a --
16 Q      Lowne?
17 A      Yeah.
18      I can't remember the exact titles, but
19 John Lowne may have been director of budget --
20      No, I don't think that was it, but
21 more -- controller or something like that, yeah.
22 Q      And what was the executive audit
23 committee?  That's on the "RE" line.  It says,
24 "Executive Audit Committee Follow-Up."
25 A      That's something that the Chief

Page 249

1 Financial Officer had set up.
2 Q      And there was no order monitoring
3 committee at this time; correct?
4 A      September 25th, 2007.  That's correct.
5 Q      And on that page 951, you pose a
6 hypothetical question.  Do you see that?
7 A      Yes.
8 Q      It says -- it's right in the middle of
9 the page.
10 A      Yeah.
11 Q      "Number 1, was their order suspicious?"
12      And you're talking about a hypothetical
13 wholesaler.  Correct?
14 A      I don't know.  Could I --
15 Q      I'm only going by it says "Louisiana
16 Wholesale," so --
17 A      Oh.  Oh.  I didn't see that part.  I
18 didn't -- that's why I said.
19 Q      Right.  Just to --
20 A      "Our hypothetical question was not
21 really answered, but let's take the situation
22 with Louisiana..."
23      Okay.
24 Q      It says, "It was at least questionable
25 initially, based on our criteria."

Page 250

1  And then number 2, "What responsibility
2  do we, as the manufacturer, have, if any, to
3  evaluate the wholesaler's customers; in essence,
4  the customers of our customer, Louisiana
5  Wholesale?"
6  A      Right.
7  Q      Do you see that?
8  A      Yeah.
9  Q      And that's what we were talking about
10  earlier, whether Purdue had a responsibility with
11  respect to its customers, its authorized
12  distributors, and what responsibility Purdue's
13  authorized distributors had to their customers.
14  Correct?
15  A      Yes.
16  Q      And their -- and their customers was
17  that list we saw, pharmacies, hospitals,
18  dispensing physicians?
19  A      That's correct.
20  Q      And -- and you say, "I think that the
21  emerging standard is that we have to take all
22  information available in totality and make a wise
23  and defendable business decision on whether or
24  not to fill the order.  This would include
25  maintaining a record of our discussion and what

Page 251

1  was considered before rendering our," quote,
2  "'business decision' to fill the order and not
3  report it as suspicious."
4      Do you see that?
5  A      Yes.
6  Q      And this was what you were discussing
7  prior to having any sort of an order monitoring
8  database.  Correct?
9  MR. HOFFMAN:
10      Object to form.
11  A      It appears so, yes.
12  MS. CONROY:
13  Q      And would it be fair to say that you
14  were in the -- in the beginnings at Purdue of
15  determining what you would need in an order
16  monitoring database to begin to render a business
17  decision about whether or not to fill an order
18  and whether or not to report it as suspicious?
19  MR. HOFFMAN:
20      Object to form.
21  A      Yeah.  This was the beginning of our
22  discussions on what would help us to make the
23  right decisions.  Right.
24  MS. CONROY:
25  Q      Then if you look to the next email on

Page 252

1  one page earlier, 950, there's an email from
2  Stephen Seid, hour and a half later or so, and he
3  says, "Let's make sure we take a step back and
4  look at the entire picture.  Our goal is to
5  assure availability to appropriate patients while
6  we do our best due diligence to assure
7  appropriate channels of distribution."
8      Do you see that?
9  A      I do.
10  Q      And that's -- that's what we were
11  talking about just before the break; right?
12  Appropriate patients or patients with legitimate
13  prescriptions?
14  MR. GOLDMAN:
15      Objection.
16  A      Yeah.
17  MR. GOLDMAN:
18      Go ahead.
19  A      Yes.  My recollection, yes.
20  MS. CONROY:
21  Q      And Mr. Seid goes on to say, "First, we
22  have already taken action that I initiated to
23  utilize available FFS" -- fee for
24  service -- "data to help what might be suspect
25  channels of sale."

Page 253

1      And then he goes on to talk about, "Ten
2  regionals are under contract."
3      Does that mean ten regionals at this
4  time were under fee for service contract?  Do
5  you know?
6  A      I don't know.  I -- I don't.
7  Q      Okay.  Then it says, "The system sends
8  alerts if their business is out of line."
9      Do you see that?
10  A      Yes.
11  Q      Do you know if what Mr. Seid is talking
12  about is whether or not the authorized
13  distributor's business is out of line?
14  A      I believe that's what it is, yes.
15  MR. HOFFMAN:
16      Object to form.
17  MS. CONROY:
18  Q      Then if you go to the very first page,
19  which is your very long response, in the "RE"
20  line, "Changes to follow-up on suspicious order
21  reporting."
22      Do you see that?
23  A      I do.
24  Q      Have you seen this email recently?
25  A      No.  I don't think so.

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1 Q    Okay.  You -- you say, "As a follow-up
2 to our email and telephone conversations
3 regarding the latest DEA thinking" -- and you put
4 in parentheses, "The 13th DEA Pharmaceutical
5 Industry Conference in Houston."
6        Do you see that?
7 A    I do.
8 Q    Did you attend that conference?
9 A    I did.
10 Q    Okay.  And if you look down, you -- it
11 says, "Recap:  DEA requires the registrant to,
12 number 1, design a system to disclose; 2, report
13 to DEA; and, 3, prevent diversion."
14        Do you see that?
15 A    I do.
16 Q    And is that a recap of what you heard
17 at the industry conference in Houston?
18 A    That would have been a recap of my
19 knowledge and experience.  Whether or not I heard
20 that at the conference, I'm not sure.
21 Q    Okay.  And, in the next paragraph,
22 it -- it looks like you were aware of SOP --
23 standard operating procedure -- 7.7, which was
24 one from finance and accounting, but you -- you
25 felt that it should be a broader SOP.  Correct?

Page 255

1 In -- where you say it should be cross-functional
2 responsibility.
3 MR. HOFFMAN:
4        Objection.
5 A    Yeah.  I see it.
6        Please allow me to read that a little
7 bit closer.
8 MS. CONROY:
9 Q    Yep.
10 A    Yeah.  I -- I read that, and I
11 understand what my meaning is.  That was your
12 question?
13 Q    Right.  So my question was that there
14 was an SOP 7.7 system to disclose suspicious
15 orders of controlled substances that resided in
16 accounting and finance, but it was -- it was your
17 belief, at this time, at least, that there needed
18 to be something broader, more cross-functional,
19 that included other areas of Purdue.  Is that
20 fair?
21 A    That is fair.  Yes.
22 Q    And then if you look in the next
23 sentence, you say, "We agree that customer
24 service, credit services, national accounts,
25 legal, CSA compliance, each play a role in this

Page 256

1 system.  Others in the finance organization are
2 involved as well."
3        Do you see that?
4 A    I do.
5 Q    So is it -- is it fair that this
6 is -- you are beginning to discuss with others at
7 Purdue how you're going to create an SOP that is
8 going to identify suspicious orders outside
9 of -- or in a different way than the 7.7 SOP?
10 A    To involve other areas of the company
11 and to broaden the concepts in that SOP, yes.
12 Q    And you go on and you say, "The
13 requirement is to report suspicious orders, not
14 suspicious sales after the fact."
15        Do you see that?
16 A    I do.
17 Q    And do you -- do you still agree with
18 that?
19 A    Yeah.  Yes, I agree with that.
20 Q    And, in the middle, you say -- middle
21 of the paragraph, "The registrant" --
22        And that means the DEA registrant,
23 which would be Purdue or anyone else who has a
24 DEA controlled substances registration number;
25 correct?

Page 257

1 A    Yes.  In this case, the registrant
2 would be either the manufacturer or the
3 wholesaler.  Yep.
4 Q    And you're saying that "The registrant
5 must make the business decision whether or not to
6 ship the order.  The responsibility for making
7 the decision to ship rests with the supplier."
8        You're talking about the authorized
9 distributor; correct?  Or are you talking about
10 Purdue?  Who's the supplier?
11 A    The supplier in this instant would be
12 the authorized distributor.
13        If I can back up for a moment?
14 Q    Sure.
15 A    I have, "DEA does not relieve a
16 distributor," and, in parentheses, "or
17 manufacturer."  But it's primarily the
18 distribution to the retail customer that we're
19 talking about.
20 Q    Okay.  There's nothing to prevent a
21 manufacturer from reporting diversion to the DEA;
22 correct?
23 MR. HOFFMAN:
24        Object to the form.
25 A    And diversion is a -- is a big concept.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 258

1  So if --
2  MS. CONROY:
3  Q       Well, I'll strike that and I'll
4  ask -- I was only using that word because it's in
5  the sentence.
6          But the -- there's nothing that stops a
7  manufacturer from reporting suspicious orders to
8  the DEA?
9  A       Nothing to prevent a manufacturer from
10 reporting suspicious orders that it receives,
11 inference being from their customers.
12 Q       Correct.  To the DEA?
13 A       To the DEA.  There's nothing preventing
14 that, right.
15 Q       But when you say "The responsibility
16 for making the decision to ship" -- what we're
17 talking about here is shipping the order --
18 A       Right.
19 Q       -- "rests with the supplier."
20         And "the supplier," in your sentence,
21 is the authorized distributor.
22 A       Well, it could be either.  But
23 I -- I -- I believe that my intention was to say
24 that it was the distributor.  Right.
25 Q       Because there's nothing to prevent the

---

Page 259

1  manufacturer, but you believe that it's the
2  authorized distributor that has the actual
3  ability to stop the shipment.
4  MR. HOFFMAN:
5          Object to the form.
6  A       I know that Purdue stopped many
7  shipments.  What period of time, again, I think I
8  stated before, some for an hour, some for half a
9  day, some for two, three days.
10         So I'm -- I'm not necessarily excluding
11 manufacturers from that concept.  So the sentence
12 reads, "The responsibility for making the
13 decision to ship rests with the supplier."  I --
14 I agree.  And the supplier could be either the
15 manufacturer or the distributor.
16 MS. CONROY:
17 Q       Okay.
18 A       It was kind of a general statement.  I
19 try to be accurate in these memos, but --
20 Q       Okay.  And what you're saying is you
21 certainly knew of instances where Mr. Seid would
22 receive an alert about a particular order and it
23 might be a concern about whether the -- whether
24 the person or the wholesaler making the order
25 could pay for it, whether they had issues with

---

Page 260

1  credit, or it could be that it was of an unusual
2  size, or there could have been some other issue
3  with it that -- who knows?
4  A       That was my understanding, yes.
5  Q       And, so, Mr. Seid would have the
6  ability, when those alerts were triggered, for
7  whatever reason, to decide whether or not to
8  ship.  He could -- he could do some
9  investigation, he could hold the order for ten
10 minutes, he could hold the order for three weeks,
11 or he could just say, "No, we're not shipping."
12 A       That's right.
13 Q       And --
14         Okay.  But, if I understand your
15 testimony from earlier today, if the decision was
16 made not to ship because the order was
17 suspicious, that would -- you would have
18 contacted the authorized distributor before you
19 made that decision.
20 MR. GOLDMAN:
21         Objection.
22 MR. HOFFMAN:
23         Object to form.
24 A       Not to ship from Purdue to the
25 authorized distributor?  I -- I'm not --

---

Page 261

1  MS. CONROY:
2  Q       Right.
3  A       I'm just trying to understand.
4  Q       Right.
5          If -- if there was --
6          Well, do you know of any instance where
7  the -- where the order from the authorized
8  wholesaler or distributor was suspicious because
9  of size or because it was a certain percentage of
10 one -- one dose versus another?
11 A       I -- I -- I don't know.  But -- I don't
12 know.
13 Q       Okay.  That's not something you were
14 involved with?  That's a -- that's a --
15 A       That's what we were trying to,
16 you know, develop.  That's what we were moving
17 towards, getting some kind of visibility.  Yeah.
18 Q       You say, "Historically, it's been
19 difficult for a manufacturer" -- I'm on the next
20 page -- "for a manufacturer to gauge what might
21 be a suspicious order from a wholesaler."
22         You still agree with that; right?
23 A       Yes.
24 Q       "It seemed natural that we would extend
25 the discussion to the question of," quote,

---

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1 "'knowing our customer's customers.'"
2       Do you see that?
3 A    I do.
4 Q    And that's talking about with things
5 like -- and I know this is early days -- the fee
6 for service agreements and such getting more
7 visibility into the authorized distributor's
8 retail pharmacy customers.
9 A    Yes.
10 Q    And then you say, in the third -- the
11 second full paragraph, "I've been giving this a
12 lot of thought since last Wednesday, which is the
13 one -- which is one of the reasons I'm a little
14 late sending out this summary. I believe we can
15 make intelligent decisions in this area by
16 involving our authorized distributors in an
17 as-needed, collaborative effort."
18       Do you see that?
19 A    I do.
20 Q    And we've talked about that today, that
21 you still hold -- hold that opinion today;
22 correct?
23 A    I -- that's correct.
24 Q    And you did, as far as you know,
25 everything you could to communicate with

Page 263

1 authorized decisions to help them -- with
2 authorized distributors to help them make
3 intelligent decisions.
4 A    Yes. I agree.
5 Q    And you go on. You say, "The very best
6 way for us to protect ourselves and our
7 registrations regarding suspicious order
8 discovery and reporting is to pledge to remain in
9 close contact with each other whenever there may
10 be a questionable order."
11       Do you see that?
12 A    I do.
13 Q    And you're talking about keeping in
14 close contact with other departments at Purdue;
15 correct?
16 A    I'd like to take a minute and -- and
17 read that. I apologize.
18 Q    Yep.
19 A    Okay. Thank you for allowing me to do
20 that.
21       And -- and the question, again, was?
22 Q    When you --
23 A    I'm sorry.
24 Q    In this paragraph, you say, "The very
25 best way for us to protect ourselves and our

Page 264

1 registrations regarding suspicious order
2 discovery and reporting is to pledge to remain in
3 close contact with each other whenever there may
4 be a questionable order."
5       So my question is: What you're talking
6 about there is you need close contact within the
7 different departments at Purdue to identify
8 suspicious orders.
9 A    I believe so.
10 Q    Because you already -- you already
11 discussed earlier on you need to have close
12 collaboration with your authorized distributors,
13 but --
14 A    That's right.
15 Q    -- what I think -- what I'm asking if
16 you're saying here is it's not just an accounting
17 function; you need help from other departments to
18 try to identify those authorized distributors
19 that may have suspicious orders.
20 A    That's right.
21 Q    You can put this one away.
22       (CROWLEY EXHIBIT NUMBER 11
23       WAS MARKED FOR IDENTIFICATION.)
24 MS. CONROY:
25 Q    Exhibit 11 -- yours is the top copy --

Page 265

1 is PPLPC019000216132 through 37. And you can
2 kind of look through this, but this looks, to
3 me -- and, so, my question to you is this looks,
4 to me, like your first stab at an order
5 management system protocol.
6 A    It's a stab at it. I -- I don't know
7 if it's the first, but it -- I say it's a start,
8 so it probably is, yeah.
9 Q    Okay. It's dated May of 2008.
10 A    Yes.
11 Q    And who is, if you remember, Aileen
12 Barcia?
13 A    She was a paralegal in the Office of
14 General Counsel.
15 Q    Okay. And then if you look a little
16 bit down, there was an earlier email before you
17 actually sent the draft. Aileen says, "Jack, do
18 you want me to review the SOP prior to our 2:15
19 meeting? If not, we can always circulate after
20 Robin's review."
21       Do you see that?
22 A    I do.
23 Q    That's Robin Abrams she's referring to?
24 A    Yes.
25 Q    Then if you turn the page, this

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1  is -- there's no -- there's no signature or
2  anything, but this is -- this is a draft that
3  you're working on; correct?
4  A      Yes.  I think that's correct.  Yeah.
5  Q      Okay.  And who would you -- do you --
6      It says at the bottom here -- and we've
7  seen this in other SOPs -- that this would be
8  issued by legal and national accounts.
9      Do you see that in the bottom left?
10  A      I do.
11  Q      And then, next to it, it says
12  "approval," and there's a bunch of initials.  Do
13  you see that?
14  A      Yes.
15  Q      And would you have expected -- do you
16  think that's an artifact or do you think you
17  would have also approved something like this?  I
18  don't see your initials.
19  A      I -- I eventually did approve this.
20  But maybe in this iteration my initials were not
21  included.
22  Q      Okay.  We can -- we'll take a look at
23  what finally became the protocol.  You can put
24  that one away.
25      So by at least May, the end of May of

Page 267

1  2008, you were working on a protocol for
2  suspicious order monitoring that would be --
3  encompass more than just national accounts;
4  correct?
5  A      Yes, that's correct.
6  MR. HOFFMAN:
7      Object to form.
8  MS. CONROY:
9      Bear with me a second.  The 007 SOP is
10  actually attached to a document, and I'm looking
11  to see which one has the final SOP.
12      No, no, no.  It's 2012.  Here.
13      We don't have it until -- 007 is what I
14  need.  And we don't actually have a copy of it
15  until --
16      I think this is it here.
17      Do you have more stickers?
18  MS. FITZPATRICK:
19      Yeah.  It's gonna be out of order.  Is
20  that okay?
21  MS. CONROY:
22      Yeah.
23      What number is it?
24  MS. FITZPATRICK:
25      27.

Page 268

1      (CROWLEY EXHIBIT NUMBER 27
2      WAS MARKED FOR IDENTIFICATION.)
3  MS. CONROY:
4  Q      Exhibit 27 is an email from Jack
5  Crowley to James Doyle and Robin Abrams and
6  others dated Thursday, November 29th, 2012, and
7  it attaches the OMS SOP dated March 23rd, 2009.
8      The -- Mr. Crowley, the top email is
9  out of date, at least for our discussion, because
10  you are in the process of thinking about updating
11  the 2009 SOP, but you attach the signed SOP.  Do
12  you see that?  Take a look.  And I'm gonna ask
13  you if this appears to be the Order Management
14  System SOP 0007 and that -- with your signature
15  on the back page.
16  A      Certainly looks like it.
17  Q      Okay.  And that's your signature, on
18  the last page, of April 2nd, 2009?
19  A      That's -- that's right.  Yes.
20  Q      And it says -- you're under the
21  "written by Robin Abrams," and she signed it on
22  April 1st.  Do you see that?
23  A      I do.
24  Q      And then you signed it the next day.
25  And then there are approvals by Mr. Seid on April

Page 269

1  2nd and Mr. Geraci on March 31st.  Do you see
2  that?
3  A      I do.
4  Q      And then the approvals down the bottom,
5  that's who we see the signatures.  It's -- REA is
6  Robin Abrams; SS, Stephen Seid; JC is you; and MG
7  is Geraci?
8  A      That's correct.
9  Q      And who -- on the front page, you're
10  sending it to a James Doyle at Purdue.  Who is
11  that?
12  A      He was the vice president in charge of
13  business development.  I don't know if that was
14  his exact title, but he probably sat on the
15  executive committee, so I sent it to him.
16  Q      Okay.  And it says at the bottom of
17  your email, "Our members decide" --
18      By "members," you're talking about the
19  members of the order monitoring committee;
20  correct?
21  A      Yes.
22  Q      -- "decide which accounts need further
23  due diligence analysis, which accounts to discuss
24  with our authorized distributors, when to conduct
25  OMS site visits, and when to report a particular

Page 270

1 account to the Drug Enforcement Administration as
2 suspicious."
3        Do you see that?
4 A     I do.
5 Q     And then it goes on.  You say, "The OMS
6 committee has the authority to stop shipments to
7 both wholesale and retail accounts."
8        Do you see that?
9 A     I do.
10 Q     And that was -- that was true when you
11 wrote it; right?
12 A     It was true in the context that I
13 wanted Mr. Doyle to know that the committee was
14 capable of powerful action and would involve
15 shipments to both wholesale and, I mention here,
16 retail accounts.
17        I -- I didn't include a longer
18 description of how that would happen, so, as a
19 general matter, I -- that was my intent to show
20 this was a powerful committee, and -- and I
21 didn't -- I didn't express it by saying we'd go
22 through certain -- the amount of different steps
23 in order to stop, you know.  So it's -- it's
24 fairly accurate, but...
25 Q     The OMS committee did have the

Page 271

1 authority to stop shipments to wholesalers;
2 correct?
3 A     Yes.
4 Q     And they did --
5        What -- what is -- what's your
6 definition of a retail account?  What's that?
7 A     Retail pharmacy.
8 Q     Okay.  And the OMS committee -- did the
9 OMS committee have authority to stop a shipment
10 to a retail account?
11 A     We did not sell directly to retail
12 accounts.  Those were through the wholesalers.
13 The only way a manufacturer could stop would
14 be -- and this is an example -- to say we are not
15 gonna ship 20 percent of your normal order until
16 we can evaluate this particular retail outlet.
17 And -- and that would maybe strongly induce the
18 wholesaler to not ship to that account while
19 further analysis was being performed, further due
20 diligence.  But we -- we did not have the
21 authority to stop a shipment on its face.  Right.
22 Q     And you could -- and I know it's
23 a -- it's an -- it's an example, but you could
24 determine to hold back 20 percent of an order or
25 14 percent or 32 percent based -- because you

Page 272

1 would actually see in the fee for service
2 agreement, you could take -- you could come up
3 with an estimate of how much of the supply was
4 going to that -- to that retail account, or at
5 least had gone to that retail account.
6 A     On a case-by-case basis, in my
7 experience, those involved the smaller wholesale
8 authorized distributors that we had, the smaller
9 companies.  All right.
10 Q     And it doesn't appear that it's
11 mentioned in your email to Mr. Doyle, but the OMS
12 committee also had the authority to report
13 anything to the DEA; correct?
14 MR. HOFFMAN:
15        Object to the form.
16 A     Report anything to DEA is your
17 question?
18 MS. CONROY:
19 Q     Well, the OMS committee had the
20 authority to report suspicious orders to the DEA;
21 correct?
22 A     That was part of the function.
23 Q     Okay.
24 A     Right.  If it was indicated, yes.
25 Q     And the OMS committee had the authority

Page 273

1 to report suspicious sales to the DEA as well;
2 correct?
3 MR. HOFFMAN:
4        Object to the form.
5 A     The -- the -- the suspicion would be on
6 the order.  So I wouldn't say suspicious sales.
7 I'd say noteworthy orders.
8 MS. CONROY:
9 Q     When do you -- what -- when -- what's
10 the dis- -- what's the distinction between or the
11 timing between an order and a sale?  You know,
12 obviously, talking about Purdue and -- and -- and
13 its -- its order, when is it an order and when is
14 it a sale?
15 A     It's an order when it's received by
16 Purdue, and it becomes a sale when the -- when
17 the order is fulfilled.
18 Q     Fulfilled -- when the order is
19 fulfilled to the authorized wholesaler?
20 A     In that instance, yes.
21 Q     And that would -- so that would be
22 almost --
23        If an order came in and it was filled
24 the very next day, the order and the sale would
25 be a day apart; correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1  A       Yes.
2  Q       Okay.  And is there any reason that if
3  for some reason information came in after
4  a -- an -- a sale was made to an authorized
5  wholesaler, is there any reason that could not be
6  reported to the DEA?  That would be a sale
7  reported to them as opposed to an order.
8  A       Oh, there's no reason.  The -- the --
9  what was being asked of industry by DEA was make
10 that report before you make the sale.  Could it
11 happen?  Yes, it probably could happen.  But the
12 intention was to perform your due diligence, your
13 -- your independent assessment of the quality of
14 that order before you made the sale.
15 Q       But in all of what we looked at earlier
16 today when you were looking at pharmacies and you
17 were calling up high-volume pharmacies, those are
18 all retail pharmacies that had already --
19         You'd already sold the product;
20 correct?  It wasn't a -- it wasn't a pending
21 order.
22 MR. HOFFMAN:
23         Object to the form and foundation.
24 A       Just to be clear, Purdue did not sell
25 the product.  What we were looking at were orders

Page 275

1  from retail accounts to -- to the wholesaler.
2         Now, I don't want to split hairs.  The
3  sales were made in most cases, probably, by the
4  time I saw that data.
5  MS. CONROY:
6  Q       Yeah.
7  A       But I'm looking at the orders.
8  Q       True.
9  A       Yeah.
10 Q       You're looking at the order,
11 but -- that's all I'm getting at, that by the
12 time you're looking at --
13         You're looking at what the order was,
14 and you're assuming that order was filled and
15 sold and made its way to the pharmacy.
16 A       Reasonable assumption, yes.
17 Q       Right.
18         And so you're looking at --
19         Even though you're looking at an order,
20 you're assuming that the sale was actually made.
21 And, so, when you would be reporting to the -- to
22 the distributor and saying we have a -- we think
23 we have a problem with this pharmacy or this is a
24 hot spot or whatever, you would be attempting to
25 stop future orders and future sales to that

Page 276

1  pharmacy.
2  MR. HOFFMAN:
3         Object to the form.  Overly broad.
4  A       We were looking at, after the fact, if
5  I could say that, data.  And then the effort
6  would be to conduct due diligence to potentially
7  stop future sales.  Right.
8  MS. CONROY:
9  Q       It's just a function of the way the
10 business works; right?
11 A       Yes.
12 Q       How long has it been since you've taken
13 a look at this SOP 0007 from 2009?
14 A       I may have looked at it yesterday.  But
15 prior to that, long time.
16 Q       Is this anything you have used in your
17 consulting work to say, Hey, this is -- even if
18 you didn't give it attribution of Purdue, this is
19 a type of protocol that can be used?
20 A       I'm working with a company right now on
21 developing their program, and I may have given
22 them several examples -- examples, and the reason
23 is not one size fits all, especially when you're
24 bringing a new product to market.  So...
25 Q       By the time you had drafted, with

Page 277

1  others, this SOP, was the order monitoring
2  database up and running?  Dated -- this is March
3  23rd of 2009.
4  A       My recollection -- my recollection is
5  that, yes, it was.
6  Q       Okay.  If you go to page -- it's 465 at
7  the bottom, and it says, in the middle, "Order
8  Management System (OMS) Review."
9  A       Yes.
10 Q       It says, "As part of this SOP, Purdue
11 has instituted and developed an OMS program to
12 review data received from Purdue's authorized
13 distributors per fee for service (FFS) data,
14 contracts.
15         Do you see that?
16 A       I do.
17 Q       And then it goes on and says, "The
18 program uses certain specified parameters to
19 determine which accounts, wholesaler or retail,
20 shall be subject to further review in an effort
21 to ascertain whether any order or series of
22 orders meets the standard of being," quote,
23 "suspect and warrant a potential DEA referral."
24         Do you see that?
25 A       I do.

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1 Q       Is that a description, generally, of
2 the database, where it says the program uses
3 specified parameters to determine which accounts,
4 wholesaler or retail, shall be subject to further
5 review?
6 A       I -- I don't think it's necessarily
7 about the database itself.  I think I -- I
8 describe a program.
9 Q       Does the program include the database?
10 A       Yes, I would say so.
11 Q       And does the program include the
12 committee meetings?
13 A       I would say yes.
14 Q       And I don't see it here.  Maybe
15 it's -- maybe it's elsewhere in here.  But the
16 program also includes conversations and
17 communications with Purdue's authorized
18 distributors; correct?
19 A       Those would be the notes we've talked
20 about several times before.  So they -- they
21 could include conversations.  That -- that was
22 the goal, yeah.
23 Q       Right.
24       Because the program needed -- not only
25 did it need the data that Purdue had but, if I

Page 279

1 understand the program, you needed to communicate
2 with the authorized distributors as well.
3 A       Yes.
4 Q       Turn to page 466.  And that's, I think,
5 where --
6       So it says, at the very top, "Follow-up
7 review of accounts identified by OMS" --
8       That's the committee; right?
9 A       Yes.
10 Q       -- "is conducted by an
11 interdisciplinary group, including
12 representatives from the office of the general
13 counsel, CSA compliance, national accounts, and
14 corporate security.  Follow-up may include a
15 discussion with the authorized distributor."
16       Do you see that?
17 A       I do.
18 Q       And, so, that's -- that's -- so those
19 are the members of the committee, and the
20 committee may speak with authorized distributors.
21 Correct?
22 A       Yes.
23 Q       They don't have to.  It just says
24 "follow-up may include."
25 A       That's correct.

Page 280

1 Q       And then it says, "If a referral is to
2 be made to the Drug Enforcement Administration
3 (DEA), that will be handled by CSA compliance.
4       And that's you; right?
5 A       That's right.
6 Q       And then it goes on and it gives the
7 detail.  "Once an account is selected by the
8 system under the current criteria," and then it
9 says "notify distributors if it's a retail
10 account."
11       That means you notify the distributor
12 if one of the accounts that's triggering the
13 suspicious order is a retail pharmacy?
14 A       Yes.  I want to read that again, but
15 yes.
16 Q       Yeah.
17 A       Yes.
18 Q       Then it says, "All pharmacies will be
19 assigned to National Accounts" --
20       That's Steve Seid; right?
21 A       That's right.
22 Q       -- "for initial feedback based upon
23 familiarity with account, comparison with similar
24 accounts, or other information or context for a
25 particular order."

Page 281

1       Do you see that?
2 A       I do.
3 Q       So Mr. Seid's national accounts group
4 would look and to see how that retail account
5 compares to historical numbers or any other
6 information he might have?
7 A       I think that's accurate.
8 Q       And then after he -- "After national
9 accounts is complete, CSA compliance, acting on
10 behalf of the Office of General Counsel -- that's
11 you -- will review available information and
12 provide feedback and suggestions, which may
13 include a request for further information from
14 sales relative to other pharmacy or healthcare
15 practitioners in the vicinity of the subject
16 account."
17       Do you see that?
18 A       I do.
19 Q       So that would -- that would mean that
20 either you or someone in the general counsel's
21 office could go and talk and see if there were
22 any reports of concern or IMS data or Region 0
23 prescribers that were somehow related to the --
24 the retail account that was under suspicion.
25 Correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1  A      I think someone could seek out that
2  information.  But I think this particular
3  sentence may have been more related to a series
4  of questions which were posed to a sales
5  representative to -- just as it says, other
6  pharmacy or healthcare practitioners in the
7  vicinity.  So that would be asking for a
8  comparison.
9         What do you know about the account in
10 question and how does it compare to other
11 pharmacies in the area and do you know any of the
12 healthcare practitioners that are writing
13 prescriptions?
14 Q      And that would be IMS data; correct?
15 MR. HOFFMAN:
16        Object to the form.
17 MS. CONROY:
18 Q      That -- that's where the data would be,
19 IMS or -- or one -- one of its -- IQVIA or
20 whatever it would be called at the time.  But
21 that's where the healthcare practitioners in the
22 vicinity of the subject account, that's where you
23 would see that data; right?
24 MR. HOFFMAN:
25        Object to the form.

Page 283

1  A      Excuse me.
2         I wouldn't see that data personally,
3  so -- and I wasn't really that familiar with what
4  was available to sales reps.  And I'm not trying
5  to be evasive in any way.
6  Q      And I don't -- I don't -- when I'm
7  asking, it just says -- I'm going by the SOP, and
8  it just says, "When National Accounts' review is
9  complete, CSA compliance, acting on behalf of the
10 Office of General Counsel, will review available
11 information."
12        So you may not know exactly what
13 information is available, but someone in the
14 general counsel's office, just someone working
15 with you, there's no -- there's no restriction.
16 If there's information or data available at
17 Purdue, it's -- it's at your disposal, correct,
18 with respect to doing research into this retail
19 account that is potentially suspicious?
20 MR. HOFFMAN:
21        Object to the form.
22 A      Yes, I think that's true.
23 MS. CONROY:
24 Q      And then if -- if you go down, it says,
25 "After the sales force responds, that information

Page 284

1  gets added to the database."
2         You have no reason to doubt that
3  happens; right?
4  A      I have no reason to doubt, no.
5  Q      Then it says, "The file will be further
6  reviewed by corporate security for any additional
7  relevant information that may be available."  And
8  that's Mr. Geraci, and I think you gave me
9  another name at some point.
10 A      Luis Bauza.
11 Q      Then it says, "Following corporate
12 security review, it may be marked for CSA
13 compliance review, which will generally take
14 place in conjunction with the other reviewers as
15 a summary discussion."
16        Do you see that?
17 A      I do.
18 Q      And is that a committee meeting that
19 would take place to discuss all that -- the
20 compilation of results that were input into the
21 database?
22 A      May happen outside of the committee
23 meeting.  We try to make it as much in real time
24 as we could, so --
25 Q      Okay.  So you could just -- you could

Page 285

1  call a discussion at any point.
2  A      Right.
3  Q      And then it says, "The reviewing team,
4  under the guidance and direction of the general
5  counsel's office" --
6         And that's -- that's Robin Abrams,
7  Betsy Adams, Giselle Issa; correct?
8  A      Correct.
9  Q      -- "will then discuss and perform next
10 steps as appropriate and coordinate its
11 assessment with the authorized distributor."
12        Do you see that?
13 A      Excuse me.
14        I do.
15 Q      Okay.  And, so, the reviewing team,
16 under the direction of the general counsel's
17 office, decides what to do next.  Right?
18 A      I agree with that generally, as far as
19 coordinating the assessment with the authorized
20 distributor.
21 Q      Okay.
22 A      I mean, I -- I -- what I mean to say
23 is -- like I say, "perform next steps as
24 appropriate in addition to the coordination of
25 the assessment."  I'm not trying to split hairs.

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1 I'm --
2 Q      No.  That's fine.
3      And then, on the next page, it says,
4 "There are three final status values for all
5 pharmacies that were identified for follow-up
6 review."
7      Do you see that?
8 A      Yes.
9 Q      And those are the three:  Pending;
10 complete; and complete, referred.  Correct?
11 A      Yes.  That's what I see, yes.
12 Q      And we -- and we talked about, earlier
13 today, what those mean.  Correct?
14 A      Yes.  Well, I think we did, yeah.
15 Q      Okay.  Then it says "Filing suspicious
16 order reports with DEA."
17      It says, "Under 21 CFR Section
18 1301.74(b), orders designated as suspicious must
19 be reported to DEA when discovered.  Once the
20 determination that an order is suspicious has
21 been made, a phone call to report the order to
22 the local DEA office is recommended to meet this
23 requirement unless DEA provides other direction.
24 If requested, Purdue will provide additional
25 information."

Page 287

1      Do you see that?
2 A      I do.
3 Q      And, as you sit here today, at least as
4 of the time you left Purdue, the only occasions
5 where an order was designated as suspicious and
6 reported to the DEA was the incident with
7 Mr. Geraci when he did a written report to the
8 DEA on a single pharmacy or group of pharmacies
9 in Las Vegas and the instance where Robin Abrams
10 went to the DEA office in Virginia and reported
11 on a decrease in OxyContin sales to the DEA.
12 MR. HOFFMAN:
13      Object to form.
14 MS. CONROY:
15 Q      Is that -- is that your best memory?
16 MR. HOFFMAN:
17      Object to form.  I believe it misstates
18 the record.
19 A      I probably need to clarify more.  I --
20 I'd be thinking in terms of a -- an official
21 referral document type of a report.  In terms of
22 reporting to DEA, it's the definition of report.
23 We spoke -- I personally, and also others in the
24 organization, spoke to and reported activity to
25 DEA routinely.

Page 288

1      So did they meet the definition of a
2 formal report?  I don't think that they did.  But
3 they were reports.  They were communications to
4 DEA.
5 MS. CONROY:
6 Q      And if -- and if there was a
7 communication to DEA, the file -- the database
8 would be marked "referred"?
9 A      No.  No.  Not -- huh-uh.  I don't agree
10 with that.
11 Q      Okay.  So if I wanted to know if --
12      So what you're telling me is there's a
13 formal referral and then maybe a less formal
14 referral, but there certainly was communication
15 with the DEA about a particular account by
16 Purdue.
17 A      That's correct.
18 Q      And if that took place, that would be
19 in the notes of the database, but it wouldn't
20 necess- -- I couldn't -- if I just asked to see
21 which -- which pharmacies or retail accounts were
22 referred to the DPA -- DEA by this designation,
23 complete, comma, referred, that wouldn't -- that
24 wouldn't give me all the times that you
25 communicated to the DEA.

Page 289

1 A      It would not give you all the times.
2 Q      I'd have to look at the database.
3 A      I'm not sure that's included in the
4 database.
5 Q      What?
6 A      You know, routine conversations
7 with -- with DEA.  They're just too numerous
8 to -- you know, to capture sometimes.  As I
9 mentioned before, that may have been the goal,
10 but, you know...
11 Q      Would it be fair to say it would be a
12 start?
13 A      I'm sorry, though.  A start --
14 Q      If -- if -- if you wanted to know at
15 least some of the instances where someone on the
16 order monitoring committee contacted the DEA
17 about a suspicious retail account, they
18 were -- the goal was, at least, to put that into
19 the notes of the database; correct?
20 A      That's the goal, yeah.
21 Q      And it might be emails as well;
22 correct?
23 A      Might be.  Might be, yes.
24 Q      And -- and then there'd be phone
25 conversations, and there would be no way to track

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 those phone conversations. Is that correct?
2 A     I think that's accurate.
3 Q     So the only place left, to me, to check
4 that is the database and the emails at Purdue;
5 correct? Is there anywhere -- is there any other
6 written record of that?
7 A     Not that I know of.
8 Q     And the people that would be closest to
9 this are the members of the order monitoring
10 committee; correct?
11 A     That's correct.
12 Q     Those are the individuals that would be
13 tasked with having any conversation with DEA
14 officers, correct, about these --
15 A     Well --
16 Q     -- particular suspicious retail
17 accounts?
18 A     These being the ones that we've
19 earmarked within the system?
20 Q     Yes.
21 A     Right.
22 Q     I'm not talking about just any kind of
23 account. I'm talking about, once you've
24 earmarked these, you have a -- you have a
25 protocol that you're following and you have

Page 291

1 particular procedures that are followed by the
2 different members of the committee, by what
3 department they are, and you would -- and each
4 one has a particular procedure they're following.
5        But if they're contacting a DEA agent,
6 they're contacting a DEA agent about that
7 suspicious retail account as a function of their
8 position on the order monitoring committee.
9 Correct?
10 A     And/or their function as the chief
11 security officer or executive director of CSA
12 compliance, yeah. I -- I don't mean to get
13 in --
14 Q     I understand that. But if -- but if
15 you're identifying them as suspicious orders as
16 part of this SOP, then I would expect that to be
17 a rather -- a more formal procedure than if
18 someone in corporate security had a conversation
19 with a DEA agent about a nonsuspicious retail
20 account, just because there was something
21 happening.
22        Once -- once it rises to the level of
23 being a targeted or triggered suspicious retail
24 account, then any conversations with a DEA agent
25 about that account are part of this standard

Page 292

1 operating procedure, correct?
2 MR. HOFFMAN:
3        Object to form.
4 MS. CONROY:
5 Q     Or should be?
6 MR. HOFFMAN:
7        Object to the form.
8 A     We try to capture the formal system as
9 well -- as well as we could. But if I personally
10 was talking to a DEA agent because I had
11 relationships with people throughout the field in
12 DEA or they happened to call me, I -- I may, in
13 fact, say, "Oh, by the way," and then go on from
14 there. This is the type of relationship that you
15 have with -- with field personnel, shall I say.
16 That's -- might be conversations to an
17 investigator. Is it a report? Will it become a
18 report later?
19        I -- I'm not trying to -- I'm -- I'm
20 just trying to say to you there are many times
21 I've talked to DEA, and -- and I'm sure it's not
22 captured in that database.
23 MS. CONROY:
24 Q     Okay. And I'm trying to figure out
25 whether I need to ask you, for days on end, every

Page 293

1 possible memory you have about speaking to a DEA
2 agent that may, in fact, have been about a
3 suspicious retail account, or can I rely, in some
4 part, on produced suspicious order monitoring
5 system and their protocol that there was at least
6 an attempt to log conversations with DEA agents,
7 communications with distributors, and anything
8 else about the suspicious retail accounts that
9 were tar- -- that were -- that were triggered?
10 MR. HOFFMAN:
11        Object to the form.
12 A     May I use one of the exhibits that you
13 gave me?
14 MS. CONROY:
15 Q     Of course.
16 A     That is Exhibit -- whatever it is --
17 Number 8.
18 Q     Uh-huh.
19 A     Sitting here, I don't know for a fact
20 if -- if that pharmacy was reported to the DEA by
21 the wholesaler involved with -- with the,
22 you know, with the input from Purdue.
23        I -- I don't know that it was
24 formally -- you'd find it in the system as being
25 referred. What you'd find is that's in a report

Page 294

1 and -- and -- and, in a meeting with DEA, that
2 might have been one of 15 pharmacies that was
3 discussed with them, see.
4         "By the way," (indicating), okay?
5 So that -- that's all I mean.
6         "And if you need any help from us, we
7 have information that we can -- we can work
8 together on this."
9 Q      And that's what you'd say to the DEA.
10 A      Yes.
11 Q      And you would also say that to your
12 authorized distributors.
13 A      I would personally say that. I'd say,
14 "Look, I talked to them about this, that whole
15 area," you know.
16 Q      Do you have individuals at the DEA that
17 you talk to regularly, agents that you know their
18 names and you would talk to them?
19 A      There aren't too many left.
20 Q      Okay. Any that I would recognize --
21 any that you --
22         Would you also email them?
23 MR. HOFFMAN:
24         Sorry. Are you asking now or back at
25 this time?

Page 295

1 MS. CONROY:
2         When he was at Purdue.
3 Q      I'm assuming that's what you mean when
4 you say there are not that many left. You're
5 talking about they're still not at the DEA now.
6 A      Right.
7         I -- I would send emails to some, yes.
8 Q      And who -- who are the ones that you
9 can remember those --
10         What names do you recall?
11 A      Well, I distinctly remember Jane
12 Tomko -- she had a hyphenated name -- Griffin.
13 Griffith, Griffin. And she was in Las Vegas.
14 That -- that's one example.
15 Q      Anyone else you recall?
16 A      Well, people at headquarters. Agents
17 who may have asked me questions, I don't remember
18 their names.
19         There were pockets of investigators
20 that I would have talked to. Whether or not I
21 emailed, I mean, I don't know, but --
22 Q      Okay.
23 A      -- I -- I spoke to contacts
24 from -- from Boston to Los Angeles.
25 Q      No. I just was curious if there were

Page 296

1 any that, you know --
2         One obviously sticks in your head. I
3 just wondered if there were others.
4         Is -- is your wife a DEA agent?
5 A      Formerly.
6 Q      And what was --
7 A      Retired.
8 Q      And what was her --
9         Did -- did she have anything to do with
10 controlled substances, or what were her
11 responsibilities, generally?
12 A      Her title was Group Supervisor,
13 Columbia, South Carolina, resident office.
14 Q      And what does a group supervisor do?
15 MR. GOLDMAN:
16         Give a very, very broad description.
17 A      She would supervise inspections and
18 investigations involving compliance with the
19 Controlled Substances Act and the Code of Federal
20 Regulations or violations thereof.
21 MS. CONROY:
22 Q      And was there any restriction? Could
23 she be in charge or be a part of an investigation
24 of Purdue or any of its manufacturing facilities?
25 And I'm talking about while -- while -- while you

Page 297

1 were there.
2 A      Right. I understand.
3         Her geographical area of responsibility
4 was the state of South Carolina. We -- we didn't
5 have any facilities there. So, generally
6 speaking, no, she was not.
7 Q      And what about any retail accounts in
8 South Carolina or authorized distributors in
9 South Carolina? Was there any prohibition,
10 because she was your spouse, to having anything
11 to do with any investigations with anything to do
12 with Purdue within her geographic territory?
13 A      Prohibition by who?
14 Q      By the DEA.
15 A      None.
16 Q      Any on the part of Purdue?
17 A      No.
18 Q      So you could have a conversation, for
19 example, with her about a particular retail
20 pharmacy you were concerned about?
21 A      That never happened, so I -- I suppose
22 I could, but I didn't.
23 Q      That's what I'm saying. There's
24 no -- there's nothing that said that she couldn't
25 have anything to do with where her spouse was

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1 employed?
2 A    I could reach out to her like any other
3 DEA employee, in -- in my opinion.
4 Q    Okay.  Did you ever seek any advice
5 from her while you were at Purdue about how a DEA
6 agent would view something or another?
7 A    I don't remember anything specific.
8 Q    Do you remember anything generally?
9 A    I -- I'm sure we had general
10 discussions of frustrations, whatever.  But, you
11 know...
12 Q    Did you ever forward to her any issues
13 that were coming up at Purdue about particular
14 pharmacies or distributors or give her a tip
15 about any pharmacies or distributors?
16 A    She was quite good at getting her own
17 tips.  Yeah.
18    I'm not trying to be smart.
19    Don't believe so.
20 Q    If it had looked like something that
21 would have been useful with respect to
22 identifying or getting more information about a
23 suspicious activity at a retail level or an
24 authorized distributor, would there be any reason
25 you wouldn't contact her to get more information

Page 299

1 if you thought she had it?
2 A    I probably would have thought closely
3 whether or not there would be any kind of a
4 conflict.  But I wouldn't preclude myself from
5 doing that.
6 Q    Okay.  Do you have any other family
7 members that are DEA agents?
8 A    I do not.
9 Q    And she's retired now?
10 A    Retired, yes.
11 Q    Is she part of your consultancy
12 business?
13 A    No.  I wish she was.  No, she's not.
14 No.
15    (CROWLEY EXHIBIT NUMBER 12
16    WAS MARKED FOR IDENTIFICATION.)
17 MS. CONROY:
18 Q    I'll show you what's been marked as
19 Exhibit 12.  This is PPLPC018000240260, and this
20 is an email from you to Richard Widup at the --
21 at the top, but if you go in a bit, you have
22 a -- you attach an email to Douglas Robinson at
23 H.D. Smith.
24    Do you -- do you see that?
25 A    I do.

Page 300

1 Q    And who was -- do you know Douglas
2 Robinson?
3 A    I don't know him personally.  He -- he
4 took the place of George Euson for about one year
5 at H.D. Smith as the director of security.
6 Q    Okay.  And, in this email, you -- you
7 send Mr. Robinson excerpts from the Rannazzisi
8 letters and you -- you offer your -- you talk
9 about the emerging interpretation of the DEA
10 letters, you give him some examples, and I
11 believe somewhere you offered -- you say, at the
12 end, "Our primary focus is to help you protect
13 your registration and your business in general
14 and especially in distributing our products.
15 We're very appreciative of your work in assuring
16 that our medicine reaches our patients in an
17 appropriate manner and in a timely fashion.  I
18 look forward to our next discussion and will
19 provide more direct background if you would
20 like."
21    Do you see that?
22 A    I'm sorry.  I heard it, and -- and I
23 kind of zoned out on what page it was, so...
24 Q    Very end of the letter, you know, it
25 basically sounds like you're saying to

Page 301

1 Mr. Robinson that you appreciate his business and
2 you're there if he has any questions.
3 THE WITNESS:
4    Oh, I'm sorry.
5 MR. HOFFMAN:
6    She's looking at page 0265 at the
7 bottom.
8 A    Yeah, 0265.  Five.  Oh.  I think this
9 one's a -- oh, I'm sorry.  I went too far.
10    (Reading.)
11    Yes, I -- I see that.
12 MS. CONROY:
13 Q    Okay.
14 A    Yes.
15 Q    And I -- I -- I see from the -- the
16 cover email to this that Mr. Robinson didn't get
17 back to you after you sent that email to him.
18    Do you know if -- did you -- I know and
19 I've seen several emails between you and
20 Mr. Euson at H.D. Smith.  Did you develop a
21 relationship with Mr. Robinson?
22 A    Not really, because he was not in that
23 position that long.
24 Q    Did someone replace him?  Do you know?
25 Or this was in 2008.  Who replaced Mr. Robinson,

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1 if you recall?
2 A    Eventually, George Euson went back
3 there, but I think there was a person in
4 the -- in the middle, Tracy Hernandez -- and
5 sometimes I've seen her name hyphenated, Tracy
6 Hernandez-Norton, I think. Yeah.
7 Q    And then you -- you think Mr. Euson
8 went back to H.D. --
9 A    He did. I know he did. Yeah.
10 Q    Okay. And, so, then you continued
11 having communication with him, with Mr. Euson?
12 A    I certainly did if -- if he came back
13 before I left in 2012, which I think he did.
14 So...
15 Q    Okay.
16 A    Yeah.
17 Q    Can put that one away.
18 A    But I'm actually not sure when he came
19 back. I'm sorry.
20 Q    It will be -- there are -- there are
21 records of those kind of things.
22 A    Oh, okay.
23     (CROWLEY EXHIBIT NUMBER 13
24     WAS MARKED FOR IDENTIFICATION.)
25 MS. CONROY:

Page 303

1 Q    I'll show you Exhibit 13, which is
2 PPLPC023000371445, just a one-page document.
3 This is from you to Gina Limer. Do you recall
4 who she was?
5 A    Limer.
6 Q    Limer.
7 A    She -- she was my assistant.
8 Q    Okay.
9 A    Administrative assistant, I think,
10 is the term.
11 Q    Okay. And this is dated Wednesday,
12 April 5th -- I'm sorry. Yeah. Wednesday,
13 April -- May 4th of 2011. And it's called OMS
14 (order monitoring system) Measures of
15 Effectiveness (MOE).
16     Do you see that?
17 A    I do.
18 Q    What -- what was an MOE or what
19 did -- tell -- do you have a memory about what
20 that was? Because I want to ask you to describe
21 it for me.
22 A    I think the company had -- or was
23 developing and perfecting a -- a more robust
24 system of gauging, just as it says, effectiveness
25 of whatever. And each unit, if not each

Page 304

1 individual, would have certain measures of
2 effectiveness, and this is one -- one of them.
3 Q    And --
4 A    I'm sorry. Yeah. Go ahead.
5 Q    Did you ever -- did you ever see a
6 measure of effectiveness of the order monitoring
7 system?
8 MR. HOFFMAN:
9     Object to the form.
10 A    I -- I need to read this, so if -- if
11 you can bear with me.
12 MS. CONROY:
13 Q    Yep. Absolutely.
14 A    I -- I -- I see it.
15     I was generally aware of this.
16 Q    Do you know if there were measures of
17 effectiveness or if somebody had a scorecard
18 about this or whether somebody was -- was grading
19 the effectiveness of the order monitoring system?
20 A    I think that that may be the case, that
21 there was a scorecard by someone. Whether it was
22 Giselle Issa, I -- you know, I'm not the type of
23 individual who would let that, you know, dictate
24 to me what I try to accomplish, so...
25 Q    No, I wasn't -- I wasn't suggesting

Page 305

1 that.
2 A    Yeah.
3 Q    I just mean were you -- were you
4 familiar that as sort of some corporate exercise
5 that was potentially being done?
6 A    I think so.
7 Q    And --
8 A    Yes.
9 Q    And if it was being done, was it being
10 done through the general counsel's office, if --
11 if it involved Giselle Issa?
12 MR. HOFFMAN:
13     Object to the form. Foundation.
14 A    Well, she would have been part of it.
15 It may have been passed up to someone else in
16 some kind of a committee. Right.
17 MS. CONROY:
18 Q    Did you have a memory of what kind of
19 committee would do this kind of audit or measure
20 of effectiveness?
21 A    I -- I -- I don't.
22 Q    Okay. You can put that away.
23     I have a number of exhibits here.
24 Those are yours, 14 --
25     Through what?

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1 MS. FITZPATRICK:
2      26.
3 MS. CONROY:
4 Q      -- 26. And then that's your set.
5 MR. GOLDMAN:
6      Oh, thank you.
7 MS. FITZPATRICK:
8      Here are the other sets.
9 MS. CONROY:
10      Okay.
11      (CROWLEY EXHIBIT 14 THROUGH 26
12      WERE MARKED FOR IDENTIFICATION.)
13 MS. CONROY:
14 Q      I'm not gonna ask you about these
15 individually, but I want you to take a look at
16 Exhibits 14 through 26. And these appear to me
17 to be your emails and communications with
18 Purdue's authorized distributors talking about
19 issues that you may be seeing as part of the
20 order monitoring triggers. So --
21 MR. HOFFMAN:
22      And you're not asking him if it's all
23 of them. Just to identify if that's what they
24 are?
25 MS. CONROY:

Page 307

1      No. I'm gonna go -- I'm gonna go --
2 Q      I'm not expecting you to identify them.
3 It's that -- what I'm -- I was just giving you a
4 general explanation of what I've just given to
5 you.
6      Let's see. Which one is it? If you go
7 to -- take a look at Exhibit 17, for example.
8 MR. HOFFMAN:
9      What's the Bates number on that one?
10 MS. CONROY:
11      That is CAH_MDL2804_00824045 through
12 50.
13 Q      And that is an email from you
14 concerning the New Jersey work group meeting
15 notice to Charles Forsaith and Greg Halvacs.
16      Do you see that?
17 A      Yeah. At the bottom of page 045?
18 Q      That's right.
19      And if you'll look at the top, Greg
20 Halvacs is at Cardinal. You can tell by his
21 email address.
22 A      That's right.
23 Q      And if you look at your email, you say,
24 "Hello, Greg. Glad to meet you on email. I hope
25 to meet you in person soon."

Page 308

1      And in the first -- in the second or
2 maybe third paragraph you say, "On a side note,
3 I'd love to speak with you or your colleagues who
4 are involved with the suspicious order monitoring
5 program. We can collaborate with Cardinal on
6 issues about our products, and we have recently
7 developed our own order monitoring system that
8 reaches down to the retail customer."
9      Do you see that?
10 A      I do.
11 Q      And you go on. You say, "Since the
12 retail customer is really your customer" --
13      Meaning Cardinal; correct?
14 A      Correct.
15 Q      -- "I refer to this as knowing our
16 customer's customer. And since you are our
17 customer, I feel that it is very important for
18 Purdue to collaborate with and support you on any
19 accounts we might feel require further
20 assessment, et cetera. This isn't a situation
21 where we would be questioning you,
22 et cetera -- nay, nay -- this is a support
23 function for industry to do the right thing,
24 support itself and each other, protect itself
25 from overzealous regulators, and ensure that the

Page 309

1 patients receive their appropriate medication in
2 a timely fashion."
3      Do you see that?
4 A      I do.
5 Q      And do you -- you stand by what you
6 said there?
7 A      Beginning with "this isn't a situation
8 where we would be questioning you"?
9 Q      Well, it's all your --
10 A      Yeah.
11 Q      It's all what you said, so not
12 necessarily beginning but --
13 A      All right.
14 Q      -- you stand by this is what you were
15 offering to Cardinal --
16 A      Right.
17 Q      -- to collaborate with them and discuss
18 any assessments about any of their retail
19 accounts?
20 A      To -- to a person I didn't really know
21 who -- who's vice president of security.
22 Q      Did you get to know him?
23 A      Met him once or twice, yeah.
24 Q      Okay. And then you say, "I'd like to
25 discuss that with you to see if we can support

Page 310

1 each other in the," quote, "DEA-created mess."
2       Do you see that?
3 A     I do.
4 Q     And by that, are you talking about the
5 Rannazzisi letters?
6 A     I -- I would have been talking about
7 that, yes.
8 Q     And did you meet Mr. --
9 A     Halvacs?
10 Q    -- Halvacs at a -- a New Jersey
11 industry work group meeting?
12 A     I think I met him at a different
13 meeting.  I -- I don't think he ever was able to
14 come to a New Jersey industry meeting.
15 Q     Did you attend New Jersey industry work
16 group meetings?
17 A     Each one that I could, yes.
18 Q     Okay.
19 A     Usually twice a year.
20 Q     It -- it says here -- and if you look
21 on page 046, there's an email from Gina cc'ing
22 you about a New Jersey industry work group
23 meeting notice that says, "Hello, New Jersey DEA
24 controlled substances compliance colleagues."
25       And you say, "We have 20 attendees who

Page 311

1 have confirmed."  Or Gina says.  "It was the goal
2 of the planning committee to have 30 to 35
3 attendees for the first meeting of the New Jersey
4 industry work group on June 5th from 10:00 to
5 3:00."
6       Do you see that?
7 A     I do.
8 Q     When you attended, was that about how
9 many -- do you think you had somewhere between 20
10 and 35 attendees?
11 A     My recollection would be yes.  Yep.
12 Q     Then it says, "Please note, Ron Buzzeo
13 graciously offered to host the first meeting so
14 that we could get the group up and running."
15       Do you know Ron Buzzeo?
16 A     I do.
17 Q     And how do you know him?
18 A     He at one time was the deputy -- his
19 title would have been Deputy Director, Office of
20 Diversion Control.  He was the number two
21 official at DEA in the Office of Diversion
22 Control.
23 Q     "And the inaugural meeting will take
24 place at Cegedim," C-E-G-E-D-I-M, "Dendrite
25 headquarters."

Page 312

1       Are you familiar with that?
2 A     Yes, I am.
3 Q     Have you been there before?
4 A     That one time.
5 Q     And are you familiar with that
6 business, the Cegedim/Dendrite business?
7 A     I'm familiar with Buzzeo PDMA, as he
8 calls it, which is a part of Cegidem/Dendrite.
9 Q     Do you know if Purdue ever purchased
10 any data or other information from either
11 Cegidem/Dendrite or Buzzeo PDMA?
12 A     I don't.
13 Q     Do you know if Purdue ever purchased
14 any data or information from any company owned by
15 Ron Buzzeo?
16 A     I don't.
17 Q     Do you know the kind of data they had
18 for sale?
19 A     I -- I really don't.
20 Q     Okay.
21 A     No.
22 Q     Do you know what kind of services they
23 had for sale?
24 A     Well, certainly DEA compliance
25 services, all aspects.

Page 313

1 Q     Do you know if --
2 A     Right.  Go ahead.
3 Q     Do you know if those services were ever
4 utilized by any of Purdue's authorized
5 distributors?
6 A     I don't know.
7 Q     Take a look at Exhibit 18, which is an
8 email -- well, it's Allergan_MDL_02128065 through
9 072.  And if you look on the first page --
10       Did you find that exhibit?
11 A     I did.
12 Q     Great.
13       On the first page, there's an email
14 from you to Noemi Rebeco.  Do you see that?
15 A     I do.
16 Q     Do you recall her?
17 A     Not at this moment, no.
18 Q     Okay.  You say, "We did not use a
19 consulting group to design our own program but
20 utilized specialists from our IT group from the
21 sales business side with input from various
22 stakeholders."
23       Do you see that?
24 A     I do.
25 Q     And you're talking about the creation

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1  of the OMS database and -- and suspicious order
2  monitoring program; correct?
3  A       Yes.
4  Q       And you say, "We have met with our
5  customers, our wholesalers, and made agreements
6  with them to discuss certain accounts when
7  appropriate.  We also get their sales data for
8  our products through contract agreement which is
9  fed into our order monitoring system database."
10       That's the fee for service agreements;
11 correct?
12 A       Yes.
13 Q       "Our relationship with our own
14 customers, wholesalers in the area of mutual
15 support for order monitoring is key for us."
16       Do you see that?
17 A       I do.
18 Q       And then you're suggesting Ron Buzzeo
19 if she would prefer to use a consultant.  Do you
20 see that?
21 A       I do.
22 Q       Did you typically suggest Ron Buzzeo
23 to --
24       Well, let me ask you this first.  Was
25 Allergan an authorized distributor for Purdue?

Page 315

1  A       I don't think so.  I think Allergan was
2  a manufacturer.  I -- I'm sorry.  I think -- I'm
3  looking at Actavis.  Where's Allergan?
4  Q       Oh, I'm sorry.  That's on the -- it is
5  Actavis.  I think it's now called Allergan.  But
6  it was Actavis at the time that you were sent
7  this email.
8  A       I don't believe that they were.
9  I -- I'm not familiar with having a relationship
10 as manufacturer to distributor with them.
11 Q       Okay.  You can put that one away.
12 MR. GOLDMAN:
13       Do you want to take a break?
14 THE WITNESS:
15       We can keep going if you want.
16 MS. CONROY:
17 Q       Yeah.  Let me just finish up with
18 these.  I just have a few questions about these,
19 and we'll identify them, then take a break.
20 MR. HOFFMAN:
21       Okay.
22 MS. CONROY:
23 Q       Exhibit 19, ABC -- ABDCMDL00301700
24 through 0703.  And this is an email from you to
25 Edward Hazewski at AmerisourceBergen dated

Page 316

1  February 29th of 2012.  And do you recall
2  Ed Hazewski?
3  A       I do.
4  Q       It's H-A-Z-E-W-S-K-I?
5  A       He pronounces it "He-Zes-ski."
6  Q       Hazewski.
7        And what -- what position, or best you
8  can describe for me, did he hold at
9  AmerisourceBergen?
10 A       He was the director of order -- their
11 order monitoring service, system, or group.
12 Q       And did you have -- did you have
13 contact with him over your tenure at Purdue?
14 A       I did.
15 Q       And was -- AmerisourceBergen was an
16 authorized distributor for Purdue?
17 A       I'm sorry?
18 Q       Was an authorized distributor for
19 Purdue?
20 A       Yes, yes.
21 Q       AmerisourceBergen was an authorized
22 distributor?
23 A       Yes.
24 Q       And what -- if -- if you'll look at
25 these, there's a -- it looks like you have

Page 317

1  forwarded to Mr. Hazewski in February an article
2  from USA Today.  Do you see that?
3  A       I see it.
4  Q       And why were you telling Mr. Hazewski
5  that -- something about Ruth Carter?
6  A       Well, we like to keep up to date with
7  people in responsible positions at DEA
8  headquarters or in the field, diversion program
9  managers or whatnot that you might have to deal
10 with.
11 Q       So you were just -- this was just part
12 of your kind of back and forth with Mr. Hazewski
13 just to make sure that he knew about this?
14 A       That's right.
15 Q       And this would be an example of some of
16 the communications you may have with distributors
17 that may or may not make it on to the OMS
18 database?  This would just be something outside
19 of the suspicious order monitoring?
20 A       Is it -- for the sake of time, is this
21 all from --
22 Q       It's all the article, yeah.
23 A       All the article?
24 Q       It's all the article.
25 A       Yeah, that would be outside the system.

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1 Q     Okay.  You can put that one away.
2       Take a look at Exhibit 21
3 CAH_MDL2804_01724159 through 160.  This concerns
4 a Purdue-Cardinal meeting on November 28th of
5 2012.  And the email, you are -- you are on the
6 email, but it comes from Giselle Issa, and
7 there's an agenda attached.
8       Do you have a memory of this meeting
9 taking place at the end of November of 2012?
10 A     Yes.
11 Q     And what was -- what do you recall the
12 purpose of this meeting?
13 A     To meet the new team that was in place
14 at Cardinal for their order monitoring service
15 system.
16 Q     And why was there a new team?
17 A     Perhaps retirement, reassignment.  I
18 really don't know.
19 Q     Okay.  And the attendees for Purdue
20 Pharma were the, looks like, at least, most of
21 the members of the order monitoring committee;
22 correct?
23 A     Yes.
24 Q     And this is an instance where Cardinal
25 explained what their due diligence system was

Page 319

1 like?  Is that fair?
2 A     A discussion on each other's role,
3 whether we're not -- whether or not we get into
4 the nuts and bolts of their system, probably in a
5 broad sense, yes, I guess it's fair.
6 Q     And where it says -- it looks like the
7 order monitoring manufacturer/distributor
8 collaboration, there are a number of bullet
9 points.  The first one, Cardinal talks about
10 updated changes to the due diligence system.
11 Further down, Purdue, you have a general outline
12 of your order monitoring system.  Do you see
13 that?
14 A     I do.
15 Q     And then there's a bullet point,
16 collaboration of efforts and mutual support.
17 Would that be with respect to mutual support
18 communication with respect to suspicious orders
19 that Purdue was identifying that potentially
20 involved Cardinal's retail outlets, or retail
21 accounts?
22 A     Yes.  Or -- or -- or the other way.
23 Yes.
24 Q     And they're providing information up to
25 you?

Page 320

1 A     It's possible.  Yes.
2 Q     And, as part of that collaboration and
3 mutual support, is this where you would have
4 reiterated the Purdue policy that you would
5 inform Cardinal before you would report any of
6 their retail accounts or retail pharmacies to the
7 DEA?
8 MR. GOLDMAN:
9       Objection.
10 MR. HOFFMAN:
11       Object to the form.
12 A     I -- I personally would always at least
13 verbally communicate that that was the goal, that
14 there would be -- have to be agreement.  That --
15 whether or not that was said formally by Robin or
16 anyone else, I don't know.
17 MS. CONROY:
18 Q     Would it typically be your practice
19 yourself or would Robin say, "If you do report
20 one -- if you, Cardinal, report one of your
21 retail pharmacies to the DEA, we would like to
22 know about it"?
23 A     She may have done that, or Giselle.
24 Yeah.  May have.
25 Q     There would be -- it was nothing

Page 321

1 controversial about that; correct?  You -- there
2 was no reason why you, Purdue, would not feel
3 entitled to know if Cardinal had reported one of
4 its outlets or retail outlets to the DEA;
5 correct?
6 MR. HOFFMAN:
7       Object to form.
8 MR. PYSER:
9       Object.  I'm going to object on that
10 prior question as well.
11 A     My own personal view and my
12 recollection and memory, there's nothing
13 controversial about that.
14 MS. CONROY:
15 Q     Because if you were -- if you were
16 gonna communicate with -- with Cardinal or any
17 other authorized distributor before you were
18 going to report their customers to the DEA, you
19 were just looking for the same courtesy back;
20 that if they actually reported those customers,
21 that they let you know.
22 A     Generally speaking, yeah.
23 Q     And -- and what was the reason?  Why
24 would you want to know at Purdue if Cardinal or
25 one of your other authorized distributors

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1 reported one of their retail pharmacies to the
2 DEA?
3 A       In my opinion, several reasons.  One
4 would be to note that in -- in our file so you
5 could complete-refer it or close out or
6 something.
7           And the other one would be, from my
8 perspective, in continuing due diligence, to
9 sooner or later find out what other wholesaler
10 might have picked up that business.
11 Q      Right.  Because you would want to be
12 able to then say to the next wholesaler that you
13 would -- who would then be an authorized
14 wholesaler for Purdue products, "Hey, we just had
15 a problem with this pharmacy, with Cardinal or
16 whoever it was as the authorized distributor.
17 Keep your eyes open."
18 A       I think that's accurate.
19 Q      And did you have occasions when that
20 happened or you can recall generally that that
21 happened?
22 MR. HOFFMAN:
23           Object to form.
24 A       I -- I think it did happen.  I would
25 have to dig a little bit to think, but I would

Page 323

1 say it happened, yes.
2 MS. CONROY:
3 Q      And that would be also one of the
4 functions of the order monitoring database, that
5 if -- if you had some type of a reference in
6 there to Cardinal referring one of their -- one
7 of the pharmacies to the DEA, hopefully that
8 would pop up again if you were looking at another
9 wholesaler that was -- that was supplying to that
10 pharmacy?
11 MR. PYSER:
12           Object to form.
13 A       Hopefully.
14 MS. CONROY:
15 Q      Right.  But that's where it would show
16 up; right?
17 A       If the annotation was made.
18 Q      Right.
19 A       Yeah.
20 Q      Well, always assuming that.
21 A       If.
22 Q      We can put that one away.
23           Want to take a break, and I can
24 identify --
25           Did we hit every one of these?  I'm not

Page 324

1 sure.  I can make sure these are -- exhibits are
2 identified for the record without taking the time
3 to read in the Bates numbers.
4 MR. GOLDMAN:
5           Okay.  Thank you.
6 VIDEOGRAPHER:
7           We are now going off the video record.
8 The time is currently 5:54 p.m.  This is the end
9 of media number 5.
10           (OFF THE RECORD.)
11 VIDEOGRAPHER:
12           We are now back on the video record
13 with beginning of media number 6.  The time is
14 currently 6:07 p.m.
15 MS. CONROY:
16 Q       Mr. Crowley, did I understand your
17 testimony today that, although it's not something
18 you would actually have been able to go and get,
19 you had Region 0 physician lists available to you
20 on the order monitoring committee; correct?
21 A       I don't agree with that.  I'd have to
22 completely -- I would have to ask for it or be
23 provided with some of it.  I don't think I ever
24 had access to the whole list.
25 Q       Well, let me -- let me phrase it a

Page 325

1 little differently.
2 A       Okay.
3 Q       Did you have a reason to believe, if
4 you had asked for a -- a list of Region 0
5 physicians as of November of 2012, that you would
6 not receive it?
7 A       I -- I have no reason to believe that
8 would be the case.  I would have received it.
9 Q       And did you ever have occasion to use a
10 Region 0 list or reason to use the names of
11 physicians that appeared on that list with
12 respect to any of the investigations you were
13 conducting with particular pharmacies as part of
14 your suspicious order monitoring?
15 MR. HOFFMAN:
16           Object to form.
17 A       I may have.  That would not have been a
18 primary reason that I initiated a further study
19 or investigation of a particular physician.  They
20 may have also happened to be on Region 0, which I
21 would find out later, I mean, right.
22 MS. CONROY:
23 Q       Okay.  What about with respect to a
24 pharmacy?  Would you ever look or see if they
25 were -- if there was a Region 0 physician or more

Highly Confidential – Subject to Further Confidentiality Review

Page 326

1 than one Region 0 physician in the area of a
2 pharmacy that you were investigating?
3 A      A case-by-case basis, that may have
4 happened, yes.
5 Q      And -- and would it be fair to say, on
6 a case-by-case basis, that may be relevant to you
7 if there was a pharmacy across the street from a
8 Region 0 physician?
9 A      I -- I think it could be relevant, yes.
10 Q      But that would be something case by
11 case?
12 A      Yes.
13



11 Q      Did you ever implement a suspicious
12 order monitoring program with respect to supply
13 of Purdue product coming from Rhodes?
14 MR. GOLDMAN:
15      Objection.
16 MR. HOFFMAN:
17      Object to the form.
18 MR. GOLDMAN:
19      Go ahead.
20 A      Rhodes?
21 MS. CONROY:
22 Q      Rhodes, the company.  I -- there are a
23 number of different names:  Rhodes Technologies,
24 Rhodes -- several.  It's in -- located in
25 Rhode Island and --

Page 328

1 A      Coventry, Rhode Island.  Yes.
2 Q      -- and affiliated in some fashion with
3 Purdue Pharma.
4 A      That's correct.
5 Q      Right.
6      Did you ever -- did you ever institute
7 a suspicious order monitoring program with
8 respect to its supply of product?  I'm not
9 talking about its -- I'm not talking about the
10 manufacturing part of the company.
11 A      I did not.
12 Q      Okay.  Do you know if anyone else ever
13 has?
14 A      I do not.
15 Q      Do you know who the authorized
16 distributors are for Rhodes?
17 A      The -- are we speaking of Rhodes
18 Pharmaceuticals, I believe it is?
19 Q      That's one of the -- that's one of the
20 corporate names, yes.
21 A      One of them?  Okay.
22      Towards the time that I was leaving,
23 shall I say, or my last period of time, a year or
24 two -- may have been longer, but I don't think
25 so -- that company was trying to develop the

Page 329

1 ability to sell generic oxycodone and
2 maybe -- maybe something else, morphine.  I -- I
3 don't remember.
4      They did not have the ability to
5 distribute, so their authorized distributor was
6 going to be Purdue Pharmaceuticals in Wilson,
7 North Carolina, which would have been used sort
8 of the same way a third-party, you know,
9 distributor would be used.
10      So I -- I'm -- I'm generally aware of
11 that.  Don't know how long that would have taken
12 place.
13 Q      And you don't know one way or the other
14 whether or not, at Rhodes Pharmaceuticals, there
15 was a suspicious order monitoring program set up
16 to determine whether or not the retail accounts
17 where the product was going were triggering as
18 unusual or however the suspicious order
19 monitoring algorithm would have worked?
20 MR. HOFFMAN:
21      Object to form.
22 A      I -- I -- I don't have direct
23 knowledge, no.
24 MS. CONROY:
25 Q      Do you not know one way or the other

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1 whether there was a suspicious order monitoring
2 program in place?
3 A       I -- I remember discussions, but not to
4 the extent that I was involved in it.
5 Q       Okay.  And did you ever have
6 discussions at Wilson about a suspicious order
7 monitoring program being set up if, in fact,
8 Wilson was going to become a distributor of
9 Purdue products or Rhodes Pharmaceuticals'
10 products?
11 A       I really do not.
12 Q       Did Purdue have affiliations or own any
13 other distribution arms other than Wilson?  And
14 I -- I don't mean to characterize Wilson that
15 way, but...
16 A       At -- at the time of --
17 Q       When you were there.
18 A       While I was there.
19       The facility at Totowa, New Jersey,
20 P.F. Labs, was still technically registered at
21 that time, so potentially that could have been.
22       But, no, they did not have another
23 distribution facility, no.
24 Q       Do you know if Totowa in New Jersey had
25 a suspicious order monitoring program in place?

Page 331

1 A       I believe they had a suspicious order
2 monitoring program that was broad and general,
3 and by the time these guidelines started to come
4 out, that -- that facility was in the process of
5 being phased out, so...
6 Q       Okay.
7       (CROWLEY EXHIBIT NUMBER 28
8       WAS MARKED FOR IDENTIFICATION.)
9 MS. CONROY:
10 Q       Let me show you what I've marked as
11 Exhibit 28, which is PPLPC031000423- --
12 A       Oh, yeah.  I'm sorry.
13 Q       -- -731 through 734.  This is an email
14 from you to Adam Fein.  But what I'm actually
15 gonna ask you about is way toward the end, which
16 you are asking Dr. Fein at pembrokeconsulting.com
17 if he would publish your blog comment anonymously
18 rather than how it went in as Big Jack Krack,
19 with a K.
20       Did you -- did you have a blog?
21 A       No, I did not.  No.
22 Q       What was -- what was Dr. Fein's blog
23 about, generally?
24 A       He has a very comprehensive blog on
25 matters relating to pharmacy operations and

Page 332

1 distribution.
2 Q       Do you still read his blog?
3 A       It -- it appears in my email.  Don't
4 always read it.  I haven't got the time.
5 Q       And did you provide comments to the
6 blog anonymously during the time you were at
7 Purdue?  This -- this email is around March of
8 2008, when you asked to be -- you asked your
9 comments to be anonymous.  But did you, after
10 this date, submit comments to Dr. Fein's blog?
11 A       After this, no.
12 Q       And why is that?
13 A       I never had the --
14       Why did I ever not comment on any of
15 his --
16       I -- I didn't think -- feel the need, I
17 guess.
18 Q       Okay.
19 A       Yeah.
20 Q       Do you -- do you comment on blogs, any
21 other blogs?
22 A       The only other blogs that I comment on
23 have to do with the Boston College sports.
24 Q       My mother's an Eagle.
25 A       Oh, really.

Page 333

1 Q       And my brother's a double Eagle.  No,
2 he's a triple Eagle.  So that's a good blog.
3       (CROWLEY EXHIBIT NUMBER 29
4       WAS MARKED FOR IDENTIFICATION.)
5 MS. CONROY:
6 Q       Let me hand to you Exhibit 29, which is
7 PPLPC018000310389.  I'm sorry.  88 to 89.  I have
8 it backwards.
9       This appears to be, starting on August
10 6th of 2009, an email from Bill Mahoney at
11 McKesson to you saying, "I know neither one of us
12 is a doctor, but would you consider prescription
13 of 330 OxyContin, 80 milligrams, and 390
14 oxycodone, 30 milligrams, to a single patient on
15 a monthly basis to be for a medical purpose?"
16       Do you see that?
17 A       I first heard it.  I'm sorry.  I
18 was --
19 Q       Go to page 89.  That's --
20 A       Yeah.  I'm sorry.
21 A       Yep.  And Bill Mahoney --
22 A       Yes.
23 Q       -- at McKesson's --
24 A       Yes.
25 Q       -- asking you a question about --

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1 A    I see it.

2 Q    Okay. And then you get back to him and
3 you say, "Hello, Bill. I'm not comfortable with
4 those amounts. I'd be curious why the doctor is
5 writing those and why the pharmacist is filling."

6        And then you kind of go through a whole
7 calculation about what that would actually mean
8 practically.

9        And you say you would get -- "I'll get
10 you a better medical opinion as soon as I can,
11 but this does not appear to be a legitimate
12 medical purpose on its face."

13       Do you see that?

14 A    Spoken as a compliance person, yes. I
15 see it.

16 Q    Okay. Did you often get questions like
17 that, if you can recall, from distributors or
18 others about what you would consider a suspicious
19 prescription?

20 MS. SIDARTH:

21       Objection to the form.

22 A    No. Not this type of a question, no.

23 MS. CONROY:

24 Q    Okay.

25       (CROWLEY EXHIBIT NUMBER 30

Page 335

1        WAS MARKED FOR IDENTIFICATION.)

2 MS. CONROY:

3 Q    Now let me give you Exhibit 30, which
4 is PPLPC022000271055 through 56. And it looks
5 like you forward the question about 330
6 OxyContin, 80 milligrams, and 390 oxycodone, 30
7 milligrams, to a single patient to Dr. David
8 Haddox.

9        Do you see that?

10 A   I do.

11 Q   And Dr. Haddox tells you to give him a
12 call, puts his number there.

13       Do you see that?

14 A   I do.

15 Q   Do you know Dr. Haddox?

16 A   Yes.

17 Q   Is he someone that you would
18 communicate with regularly?

19 A   No.

20 Q   Why is it that you went to Dr. Haddox
21 with this question?

22 A   Well, he was a qualified medical
23 director of our -- in our company.

24 Q   And do you recall whether or not you
25 did have a telephone conversation with him?

Page 336

1 A    I don't.

2        (CROWLEY EXHIBIT NUMBER 31
3        WAS MARKED FOR IDENTIFICATION.)

4 MS. CONROY:

5 Q    Let me now show you what I've marked as
6 Exhibit 31, PPLPC023000234301 through 303. And
7 here you -- this is a continuation a couple of
8 days later to Mr. Bill Mahoney, and you tell him
9 when used appropriately --

10       You say, first of all, "Would you like
11 to discuss this with Purdue Medical Services?"

12       Do you see that?

13 A    I do.

14 Q    And then you say, "I have seen the
15 study that describes the maximum dose of
16 OxyContin tablets."

17       Do you see that?

18 A    I do.

19 Q    And where did you receive the study
20 describing the maximum dose of OxyContin tablets?

21 A    I don't recall. Would -- would have to
22 rely on this chain here.

23 Q    Would that be something you would have
24 had in your office or would it be likely
25 something that Dr. Haddox provided you with?

Page 337

1 A    It would not have been in my office,
2 no.

3 Q    Would it be reasonable to believe
4 that -- that it's something that you received
5 from Dr. Haddox?

6 MR. HOFFMAN:

7        Object to form.

8 A    It's reasonable to believe that I
9 received it from someone in Medical Services.
10 Possibly from him, but I can't be certain.

11 MS. CONROY:

12 Q    Okay. And then you go on to tell Bill
13 Mahoney, "When used appropriately, there is no
14 established or fixed upper limit on the dosage of
15 full, single-entity opioid agonists such as
16 oxycodone."

17       Do you see that?

18 A    Yes.

19 Q    Is that information you would have
20 received from someone or is that something that
21 you would have known and been able to type?

22 A    I would have received that from
23 someone.

24 Q    Do you typically use the term "opioid
25 agonist"?

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1 A    I don't, no.

2 Q    Do you know what that is?

3 A    Generally.

4 Q    Okay.  And did you know that there --

5 or did you understand that there was no

6 established or fixed upper limit on the dosage of

7 full, single-entity opioid agonists such as

8 oxycodone?

9 A    Not generally, no.

10 Q    Was that a surprise to you, that

11 there -- there was no limit on the dose?

12 MR. HOFFMAN:

13       Object to the form.

14 A    Not completely.  But I would look at

15 that as more of an academic research paper.

16 MS. CONROY:

17 Q    Did -- did you read the study, Maximum

18 Dose of OxyContin Tablets, or were you just

19 referencing it for Mr. Mahoney?

20 A    Oh, I was just referencing it

21 to -- to -- to show that, you know, it's not easy

22 to answer that question as a compliance person,

23 so...

24 Q    Okay.  If you look further down at the

25 fifth paragraph, it says, at the last sentence,

Page 339

1 "This patient would be receiving a daily dose,"

2 quote, "at the highest end for sure."

3       Do you see that?

4 A    I do.

5 Q    Would you have had an understanding at

6 that time of what a high-end dose would be?  For

7 example, did you know whether there were other

8 higher doses out there?

9 MR. HOFFMAN:

10       Objection.

11 A    It was the number of tablets times the

12 milligram.  So only what I read that what the

13 range is, 80 milligrams to 1360 milligram.

14 MS. CONROY:

15 Q    Did you have an understanding that that

16 range --

17       So when you're -- the median daily dose

18 of OxyContin was 120 milligrams, is that coming

19 from the study that describes the maximum dose of

20 OxyContin tablets?

21 A    That may have been a corresponding

22 document.  I -- I don't recall.  I'm sorry.

23 Q    Would this -- would the -- would the

24 substance of this email about the median daily

25 dose and the eight clinical trials and the

Page 340

1 percentages, would that have been something that

2 was provided to you and then you cut and pasted

3 it and put it into an email to McKesson?

4 A    I think that's right.

5 Q    Okay.  And then where you say at the

6 bottom of the page "The pharma should --

7 pharmacist should have ample documentation on

8 such a patient, in my opinion, and would have to

9 defend his professional reasons for filling those

10 prescriptions," do you see that?

11 A    I do.

12 Q    And on what is -- is that based that a

13 pharmacist should have ample doc- -- ample

14 documentation on such a patient?  What kind of

15 documentation are you talking about?

16 A    Documentation from the prescriber on a

17 treatment plan, goals, what the level of

18 medication would be, what the long- -- short-term

19 and long-term plan is to treat this patient, why

20 would a patient be on the high end of the -- of

21 the spectrum, so to speak.

22       In other words, how can you justify

23 this?  We need your professional opinion because

24 we're nonprofessionals looking at this.

25 Q    And is it your understanding that a

Page 341

1 pharmacist presented with a legitimate

2 prescription would not fill such a prescription

3 unless they had a treatment plan or some

4 understanding in addition to the size of the

5 prescription or the -- the -- the dose and the

6 volume of the prescription?

7 MR. HOFFMAN:

8       Object to form.

9 A    I would say that should be the --

10 should be the professional standard.  Whether or

11 not a pharmacist would fill a prescription

12 without such a thing, I -- I really don't know.

13 MS. CONROY:

14 Q    Well, what --

15       Have you ever seen that, a pharmacist

16 that has a treatment plan?  Is that something

17 you're familiar with?

18 A    Generally speaking, yes.

19 Q    Okay.  And -- and how are you familiar

20 with that?

21 A    I think I have, in my experience, seen

22 some, but I've also studied up on it.  I've

23 become aware of what -- what -- what the standard

24 should be for -- for managing pain patients and

25 so forth.

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1 Q    And when did you study up on that?
2 A    Sometime during my employment at
3 Purdue.
4 Q    So, during your employment at Purdue,
5 you studied up on what -- the parameters of
6 prescribing for a pain patient -- prescribing a
7 controlled substance?
8 A    My understanding of the parameters
9 might -- might be different than yours, so I'd
10 have to apologize.  But what should be included
11 in a treatment plan in order to prescribe levels
12 of -- of a -- of an opioid.
13 Q    Right.
14      What I'm talking about is when you said
15 "I've studied up on it, I've become aware of what
16 the standing should be for managing pain patients
17 and so forth."  So --
18 A    I -- I'm sorry.  Where is that?
19 Q    That's what you said a few minutes ago.
20 A    Oh, oh, oh, oh.
21 Q    And, so, I'm -- I'm -- that's what I'm
22 asking you about.  Where did you -- where did you
23 get that understanding while you were at Purdue?
24 What -- what were you -- what were you looking at
25 or studying to become aware of the standing for

Page 343

1 managing pain patients and so forth?
2 MR. HOFFMAN:
3      Objection to form.
4 A    I'm a Google type person, Internet
5 person, so I would con- -- consult sources from
6 American Medical Society, American Society of
7 Addiction Medicine, whatever like that; that that
8 would be my main thing.
9 MS. CONROY:
10 Q    Would you look at the American Pain
11 Society?
12 A    I may have, yes.
13 Q    The American Pain Foundation?
14 A    I don't know what that is, so I don't
15 know.
16 Q    Okay.  But you would -- your studying
17 would have included -- you would have -- you
18 would have Googled how to manage pain patients or
19 something like that?
20 A    Professional standards for -- for that,
21 yes.
22 Q    And do you recall any other instances
23 when you informed any of the authorized
24 distributors about what would or would not be an
25 appropriate prescription?

Page 344

1 MR. HOFFMAN:
2      Object to the form.
3 A    I do not, and I don't think I did.
4 MS. CONROY:
5      I think my time is up.
6 MR. GOLDMAN:
7      Okay.
8 VIDEOGRAPHER:
9      We are now going off the video record.
10 The time is currently 6:34 p.m.
11      (OFF THE RECORD.)
12 VIDEOGRAPHER:
13      We are now back on the video record.
14 The time is currently 6:48 p.m.
15           EXAMINATION
16 BY MR. PYSER:
17 Q    Good afternoon, or I guess evening,
18 Mr. Crowley.  My name is Stephen Pyser.  I
19 represent Cardinal Health.
20      Before today, have we ever spoken or
21 met?
22 A    No, to my knowledge.
23 Q    I don't remember either.
24      Earlier today, counsel for the
25 plaintiffs presented you Exhibit 4.  Do you have

Page 345

1 Exhibit 4 in front of you?
2 A    I do.
3 Q    Okay.  And it's -- it's been a while.
4 Can you remind us what Exhibit 4 is, where it
5 came from?
6 A    It's a document that lists excerpts
7 from two letters from DEA, Joseph Rannazzisi, and
8 with some emerging interpretation at the bottom
9 of that, and it came from my personal file.
10 Q    So these are some notes you kept on
11 your file -- in your files?
12 A    That's correct.
13 Q    Okay.  And, at the bottom in
14 particular, you had a piece about emerging
15 interpretation, 2008 through 2012, in
16 parentheses; right?
17 A    Yes.
18 Q    I'm gonna ask you a couple questions
19 about that.  But, generally speaking, in this
20 time period, 2007 and 2008, was DEA broadening
21 their guidance for registrants, meaning
22 distributors and manufacturers?
23 MS. CONROY:
24      Objection.
25 A    That -- that was my impression.  I

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1 mean, they're trying to -- I guess that's a good
2 word, "broaden."
3 MR. PYSER:
4 Q      Well, let's go back to what the
5 regulation is.  The original regulation is -- or
6 the regulation --
7 A      Right.
8 Q      -- for suspicious order monitoring
9 reporting, that's 21 CFR 1301.74(b).  Are you
10 familiar with that?
11 A      Yes, I am.
12 Q      And that -- the actual language of the
13 regulation hasn't changed since the 1970s; right?
14 A      It's never changed.
15 Q      But, over time, since it was
16 established in the 1970s, has DEA periodically
17 issued new guidance or interpretations of how
18 distributors and manufacturers should act?
19 MS. CONROY:
20      Objection.
21 A      This was the only guidance type letter
22 that I'm -- letters that I'm familiar with DEA
23 ever sending out to any entire industry of
24 manufacturers and distributors.
25      The --

Page 347

1      Excuse me.
2      So to say "periodically," I don't think
3 would be accurate.  These -- these are more
4 unique.
5 MR. PYSER:
6 Q      So these letters, the 2007 Rannazzisi
7 letter --
8 A      Right.
9 Q      -- that was a set of guidance for
10 industry.  Is that fair?
11 MS. CONROY:
12      Objection.
13 A      I think that was the intention, yes.
14 MR. PYSER:
15 Q      And earlier today you were
16 testifying -- I guess counsel was asking you some
17 questions -- you said -- and I'm quoting from the
18 rough transcript as to the Rannazzisi letters --
19 quote, "The first thing I noticed was that it was
20 an expansion of the plain language of the
21 regulation."
22      Do you remember discussing that?
23 A      I remember discussing it.  I don't
24 remember that I -- actual --
25 Q      But that -- that's a -- that's a

Page 348

1 fair -- is that a fair description of -- of how
2 you saw the Rannazzisi letters?
3 A      Yes.
4 Q      And, just to be clear, did you see the
5 Rannazzisi letters as an expansion of the plain
6 language of the regulation?
7 A      That's the way I -- I would describe
8 it.  That's my understanding, yes.
9 Q      At the bottom of the -- of the first
10 page of your notes, there's this section,
11 emerging interpretation, 2008 through 2012.
12 A      Could I back up for a second?
13      It's an expansion, but it's a goal.  I
14 mean, was it -- I don't have to say anything
15 else.
16      It -- it's -- I think I -- I believe I
17 said earlier DEA was asking for industry's help
18 and they're giving more information, more
19 guidance; but it is, in fact, an expansion,
20 right.
21 Q      Thank you for that --
22 A      Okay.
23 Q      -- clarification.
24      So in your notes, you -- you write
25 "Emerging interpretation, 2008 through 2012 and

Page 349

1 present."
2      Do you see that?
3 A      Yes.
4 Q      And I want to go to the -- the next
5 page and look at a couple of your comments in
6 particular or your notes on this.
7      The last three, you said in your notes,
8 quote, "Must conduct an independent analysis of
9 suspicious orders prior to completing sale."
10      Do you see that?
11 A      I do.
12 Q      Okay.  And this was part of this
13 expansion or emerging interpretation, as you
14 described it in your notes.  Is that right?
15 A      Yes.  It may have -- this actual
16 language may have come after that letter.  I -- I
17 really don't know without seeing the -- the
18 entire letter.
19 Q      But it's sometime in this time period,
20 this 2007-'8 time period.  Is that fair?
21 MS. CONROY:
22      Objection.
23 A      2007 -- well, later.  I think -- I
24 think I have 2008 to 2012.
25 MR. PYSER:

Page 350

1  Q      Okay.  So this -- this piece of it, you
2  understood that this was an emerging -- excuse
3  me -- an emerging interpretation as of roughly
4  2008.  Is that fair?
5  MS. CONROY:
6        Objection.
7  MR. PYSER:
8  Q      It's part of what you put in your
9  notes.  Is that right?
10 A      Right.  But that particular bullet may
11 have come after 2008.  But it's fair to say it
12 came in 2008 or later, no later than 2012.  Yeah.
13 Q      And, similarly, the -- the second
14 bullet, "Know your customers, don't rely on rigid
15 formulas," that's also part of this new emerging
16 interpretation that you put in your notes -- is
17 that right? -- in this time period?
18 A      That language may have been included in
19 one of these two letters, if not both, so it was
20 a reiteration of the advice, "Don't rely only on
21 a rigid formula."
22 Q      So you're -- and when you say
23 "reiteration," you're reiterating something that
24 DEA had recently said in one of these two
25 letters.  Is that -- is that fair?

Page 351

1  A      DEA or -- or other consulting groups or
2  anyone who may have made comments to -- some law
3  firms.
4  Q      But my -- my point, I think, is --
5  A      Right.
6  Q      -- just a little bit simpler than that.
7  A      Okay.
8  Q      It's that wherever exactly your -- your
9  note came from, that "Know your customers, don't
10 rely on rigid formulas," that was something that
11 was being discussed in the industry as an
12 emerge -- as you described it, an emerging
13 interpretation roughly in this time period.  Is
14 that right?
15 A      That's --
16 MS. CONROY:
17        Objection.
18 A      That's right.  That's my understanding,
19 yeah.
20 MR. PYSER:
21 Q      And same thing for the -- for the last
22 bullet point, "Do not fill suspicious orders
23 without first determining that order is not being
24 diverted into other than legitimate medical,
25 scientific, and industrial channels."  That's

Page 352

1  also a part of these emerging interpretations?
2  A      Yes, that is.
3  Q      Just to -- to set us in time and place,
4  this -- in 2008, you'd been doing compliance
5  consulting or work for Purdue for about seven
6  years after you left DEA by that point?
7  A      Yes.  About, yeah.
8  Q      So -- and you'd retired from DEA in
9  what year?
10 A      2001.
11 Q      After how many years?
12 A      Twenty-eight and a half.
13 Q      I want to just ask you about one other
14 document we saw earlier.  This is gonna be -- if
15 you go into the stack in front of you, it's gonna
16 actually be Number 17.  So I think it's -- it's
17 maybe the next one.
18        There you go.
19 A      Okay.
20 Q      And Exhibit 17 is an email between you
21 and someone at Cardinal Health.  Do you see that?
22 A      I do.
23 Q      Now, you were asked some questions
24 about this email in particular.  You were asked a
25 couple of questions about how Purdue and

Page 353

1  manufacturers were gonna work with distributors
2  to aid each other in anti-diversion efforts.  Do
3  you recall that line of questioning?
4  A      I'm sorry.  I was concentrating on
5  this.
6        I think I do.  But should you repeat it
7  maybe?
8  Q      Sure.
9  A      I'm sorry.
10 Q      Do you recall answering --
11       No.  Not a problem at all.
12       Do you recall answering some questions,
13 when you were looking at this email, about how
14 distributors and manufacturers such as Purdue
15 were going to work with each other in their
16 anti-diversion efforts?
17 A      Yes.
18 MS. CONROY:
19        Objection.
20 MR. PYSER:
21 Q      And did Purdue take steps, in this time
22 period around 2008, to work with distributors in
23 their joint anti-diversion efforts?
24 A      In this time period?
25 Q      Around 2008.

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1 A        I -- I would recollect -- recall that
2 the answer to that is yes.
3 Q        And there was one part of this email
4 that, while you were being examined by
5 plaintiff's counsel, you didn't speak to, and I
6 wanted to draw your attention to that.
7        This is an email from you to some folks
8 at Cardinal Health dated June 2nd, 2008.  It's
9 the bottom half of the email on the first page.
10        There you go.  Sorry.  The first page
11 with writing on it.
12 A        Okay.
13 Q        And if you go there to the second
14 paragraph that begins "Here's the latest
15 reminder."
16 A        Yes.
17 Q        Okay.  You mention that, "I have known
18 Steve Reardon for years, and I have a very high
19 regard for your company."
20        Do you see that language?
21 A        Yes.
22 Q        Who is Mr. Reardon?
23 A        He was a vice president in charge of
24 compliance, I think was his title, at Cardinal in
25 Dublin, Ohio.

Page 355

1 Q        And when you say you'd known him for
2 years, does that even date back prior to 2001
3 or --
4 A        Yes.
5 Q        So you've known him for years,
6 including the time when you were at DEA; right?
7 A        That's correct.
8 Q        And, just to be clear, when you say "I
9 have a very high regard for your company," what
10 company are you speaking about there?
11 A        Cardinal.
12 MR. PYSER:
13        Thank you very much, sir.
14        No further questions.
15 VIDEOGRAPHER:
16        We are now going off the record.  The
17 time is currently 7:00 p.m.
18        (OFF THE RECORD.)
19 VIDEOGRAPHER:
20        We are now back on the video record.
21 The time is currently 7:04 p.m.
22        EXAMINATION
23 BY MR. HOFFMAN:
24 Q        Good evening, Mr. Crowley.  My name is
25 Nathan Hoffman.  For the record, I represent

Page 356

1 Purdue, and now is my chance to ask you some
2 questions.  Okay?
3 A        Yes.
4 Q        Do you have in front of you Exhibit 27?
5 A        I do.
6 Q        Okay.  I want to start there.  And, for
7 the record, Exhibit 27 is a November 29, 2012,
8 email that attaches a March 23, 2009, SOP on the
9 order management system.  Is that correct?
10 A        Yes, that's correct.
11 Q        Okay.  And I know you -- you had quite
12 an extensive discussion with plaintiff's counsel
13 earlier.  I just want to go back and talk about a
14 few aspects of this with you, if we could.
15        Turning to the page Bates ending
16 2466 --
17 A        Yes.
18 Q        -- you may recall earlier today there
19 was quite a bit of discussion about whether it
20 was the policy of Purdue to reach agreement with
21 wholesalers and distributors before reporting to
22 or referring to DEA.
23        Do you recall that?
24 A        Yes.
25 Q        If we go through some aspects of this

Page 357

1 SOP, I've highlighted the sections that I'd like
2 to discuss with you.
3        At the top there, do you see where it
4 says "Follow-Up from the OMS committee may
5 include a discussion with the authorized
6 distributor"?  Do you see that?
7 A        I do.
8 Q        And it says, "If a referral is to be
9 made to the Drug Enforcement Administration
10 (DEA), that will be handled by CSA compliance."
11 Is that right?
12 A        I see that.  That's right.
13 Q        And that would be you and CSA
14 compliance.  Is that fair?
15 A        That's right.
16 Q        Okay.  And the language here is the
17 follow-up "may" include a discussion.  Is that
18 right?
19 A        That's correct.
20 Q        It then goes on to talk about notifying
21 the distributors if a retail account is in
22 question.
23        Do you see that?
24 A        Yes.
25 Q        Then, at the bottom, it also discusses

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1 near the end of this process, after the reviewing
2 team is looking at all of this information, it
3 says, "It will then discuss and perform next
4 steps, as appropriate, and coordinate its
5 assessment with the authorized distributor."
6        Do you see that?
7 A      I do.
8 Q      And is it fair to say that's always the
9 goal of the SOP is to have that type of
10 coordination with the wholesaler or distributor?
11 MS. CONROY:
12        Objection.
13 A      I believe -- I believe so.
14 MR. HOFFMAN:
15 Q      And, then, going over to the next page,
16 under "Filing Suspicious Order Reports," you had
17 some discussion with plaintiff's counsel about
18 this section as well, and I want to call your
19 attention to the second sentence.  It says, "Once
20 a determination that an order is suspicious has
21 been made, a phone call to report the order to
22 the local DEA office is recommended to meet this
23 requirement."
24        Do you see that?
25 A      I do.

Page 359

1 Q      And I believe you had some discussion
2 with plaintiff's counsel about formal referrals
3 versus less formal conversations, discussions,
4 and reports that you may have had with the DEA.
5        Do you recall that?
6 A      Yes, I do.
7 Q      And correct me if I'm wrong, but I
8 believe earlier today you described those
9 conversations -- I guess those ongoing
10 conversations with DEA agents as somewhat
11 routine.  Is that fair?
12 A      I think that's accurate.
13 MS. CONROY:
14        Objection.
15 MR. HOFFMAN:
16 Q      Okay.  As part of your routine duties
17 and discussions with DEA agents, did you always
18 reach agreement with the wholesalers and
19 distributors or notify them of each and every
20 discussion that you were having with DEA?
21 A      I would say no.  I tried to inform them
22 afterwards.
23 Q      Okay.
24 A      Right.
25 Q      Is there any way for you to quantify,

Page 360

1 sitting here today, even ballparking over your
2 years at Purdue, how many discussions you would
3 have had as part of your routine duties with DEA
4 agents as part of the suspicious order monitoring
5 program?
6 A      Probably several hundred, at least.
7 And that's conservative.
8 Q      Okay.  You mentioned, I believe, some
9 examples, at least a couple of examples, maybe
10 more, when you recalled Purdue referring retail
11 pharmacies to DEA without necessarily having a,
12 you know, a specific agreement or -- I don't know
13 how I can characterize it -- I guess a specific
14 agreement with wholesalers or distributors.  Do
15 you recall that?
16 A      I -- I think so.  I do.
17 Q      And I believe one of the examples you
18 mentioned was after the reformulation of
19 OxyContin, you noticed at Purdue, you and your
20 colleagues in the suspicious order monitoring
21 program noticed that certain pharmacies, their
22 orders of the reformulated OxyContin had fallen
23 off substantially, perhaps greater than 75
24 percent.
25        Do you recall that?

Page 361

1 A      I do.
2 Q      And, just so we're clear on the record,
3 when we say the reformulation of OxyContin, what
4 did that reformulation entail or what was the
5 purpose of it?
6 A      The purpose was to --
7 MS. CONROY:
8        Objection.
9 A      -- make the tablet much more, if not
10 impossible, to crush or snort, if I could say it
11 that way.
12 MR. HOFFMAN:
13 Q      Okay.  So what, if anything, would a
14 pharmacy's decrease in orders, substantial
15 decrease, perhaps over 50 percent, 75 percent,
16 whatever the quantification is, why would that be
17 significant in the context of the reformulation
18 of OxyContin as you've described it?
19 MS. CONROY:
20        Objection.
21 A      Would -- may or would indicate that
22 patients of those pharmacies were not interested
23 in the new product.
24 MR. HOFFMAN:
25 Q      Because of being more difficult to

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1 abuse? Is that fair to say?
2 MS. CONROY:
3       Objection.
4 A       I think that's fair to say.
5 MR. HOFFMAN:
6 Q       Okay.
7       (CROWLEY EXHIBIT NUMBER 32
8       WAS MARKED FOR IDENTIFICATION.)
9 MR. HOFFMAN:
10 Q       Let me hand you what I've marked as
11 Exhibit 32 to your deposition. I'll ask you to
12 take a look at Exhibit 32. And after you've had
13 a chance to review it, can you tell me whether or
14 not this is the referral to DEA that you
15 referenced earlier in your testimony in 2011
16 regarding slow pharmacies after the reformulation
17 of OxyContin?
18 A       I -- it is, yes. That's -- that's what
19 it is.
20 Q       Okay. So here is the email, Exhibit
21 32. It is dated Friday, October 7, 2011.
22       Do you see that?
23 A       I do.
24 Q       And it is from -- looks like it's from
25 you to somebody at usdoj.gov. Do you see that?

Page 363

1 A       I do.
2 Q       And can you tell us who that individual
3 is?
4 A       Barbara Boockholdt at the time was the
5 chief of the Regulatory Unit, Office of Diversion
6 Control, one of the -- staff members of --
7 primary staff chiefs of Joe Rannazzisi.
8 Q       And, over time, had you been having
9 ongoing conversations with Barbara, among others
10 at DEA?
11 A       Yes.
12 Q       So this is somebody that you had some
13 form of working relationship with?
14 A       Yes.
15 Q       If we look at the email, first
16 sentence, it says, "Thank you very much for your
17 time and supervisory investigators Levin and
18 Arnold spent with Robin and me on Tuesday."
19       Do you see that?
20 A       I do.
21 Q       So I believe your testimony earlier
22 today was that you didn't recollect being
23 involved in these meetings with DEA; correct?
24 A       I recall I said that, yes.
25 Q       Does this help refresh your

Page 364

1 recollection that you were involved in at least
2 one of those meetings?
3 A       It does. I think I was mixed up on my
4 previous answer, and I'd like to correct that. I
5 apologize. Yeah.
6 Q       It goes on to talk about how the list
7 was compiled and some of the criteria that were
8 used. And I believe earlier today there was just
9 a number thrown out there of 150 pharmacies that
10 met the criteria and were referred to DEA.
11       Do you recall that?
12 A       I do.
13 Q       This document actually indicates that
14 the total pharmacies that met the criteria is
15 285.
16       Do you see that?
17 A       I do.
18 Q       And, in fact, if we look at the
19 exhibit, Exhibit 32, you see that it includes a
20 list of each of those -- each of those 285
21 pharmacies, as well as the criteria being used to
22 evaluate those pharmacies?
23 A       I do.
24 Q       And, so, this was, in fact, the
25 referral that you mentioned earlier in your

Page 365

1 testimony in 2011, and it involved 285 total
2 retail pharmacies being referred to FDA.
3 A       DEA.
4 Q       DEA. I'm sorry. Maybe I'll -- let me
5 strike that and I'll back up and re-ask my
6 question. I do that sometimes.
7       So Exhibit 32, was this, in fact, a
8 referral that you mentioned earlier in your
9 testimony in 2011, and it involved 285 total
10 retail pharmacies being referred to DEA?
11 A       Yeah. The testimony I gave today about
12 2011, yes.
13 Q       Yeah.
14       Okay. Going now to Exhibit 8 --
15       Do you have Exhibit 8 in front of you?
16 A       I do.
17 Q       Oh, I'm sorry. Before we move off of
18 Exhibit 32, I had one more question I wanted to
19 ask you.
20       So there was -- there was a question
21 posed or maybe a couple questions posed earlier
22 today by plaintiff's counsel --
23       I wrote it down and hope I captured it
24 correctly.
25       -- about touting the benefits or one of

Highly Confidential - Subject to Further Confidentiality Review

---

Page 366

1 the reasons to submit this information to FDA was
2 to tout the benefits of reformulated OxyContin.
3        Do you -- do you recall that?
4 A      I do.
5 Q      Is there -- is there any mention in
6 this referral, in the email, or anywhere that you
7 see about touting the benefits of reformulated
8 OxyContin?
9 A      No.
10 Q     Okay.  I'm sorry.  Now going to Exhibit
11 8, you had a series of discussions today with
12 plaintiff's counsel regarding something referred
13 to as "Region 0 prescribers."  Do you recall
14 that?
15 A      I do.
16 Q      And one of the sources of information
17 for Region 0 prescribers that you were asked
18 about was a list kept by Purdue in the ordinary
19 course of business.
20        Do you recall that?
21 A      Yes.
22 Q      Now, in addition to that list, does
23 this particular report, which is dated October
24 28, 2010, does it also mention that, based upon
25 reports of concern, ROCs --

---

Page 367

1        Do you see that?
2 A      I do.
3 Q      -- ROCs from field sales force
4 indicating the pharmacy was filling prescriptions
5 written by Region 0 prescribers?
6        Do you see that?
7 A      Yes.
8 Q      So would it be fair to say that's
9 another source of information whereby Purdue
10 could determine whether or not Region 0
11 prescribers were filling prescriptions at a
12 particular location; in other words, by the sales
13 force telling Purdue that in a report of concern?
14 A      I'm sorry.  It -- that's available to
15 Purdue, that prescriptions written by Region 0
16 prescribers, yes.  That's --
17        I hate to ask you to repeat the
18 question, but I --
19 Q      I'm just asking if that would be one
20 source --
21 A      Yeah.
22 Q      -- whereby Purdue could receive that
23 information.  We talked about the list, but I'm
24 asking you now if a report of concern is another
25 way where the sales force at the ground -- you

---

Page 368

1 know, on the ground, understanding doctors,
2 under-- interviewing, you know, local doctors
3 and a pharmacist, for example, if they could come
4 to that understanding that Region 0 doctors or
5 Region 0 prescribers were filling prescriptions
6 at a particular pharmacy.
7 A      That would be one source, yes.
8 Q      And then this report also mentions
9 another source, at least, at this time, would be
10 looking at the savings card information, the data
11 that was being returned to FDA regarding savings
12 card utilization.
13        Do you see that?
14 A      Returned to DEA, yes.  I mean -- I'm
15 sorry.
16 MS. CONROY:
17        You said FDA.
18 THE WITNESS:
19        I'm sorry.
20 MR. HOFFMAN:
21 Q      Did I say FDA again?
22 MR. GOLDMAN:
23        You said FDA, and you said DEA.
24 THE WITNESS:
25        Yeah.  Yeah.  We're all --

---

Page 369

1 MS. CONROY:
2        Yes.  I'm not sure you meant either one
3 of them.
4 THE WITNESS:
5        We're all confused.  We're all
6 confused.
7 MR. HOFFMAN:
8        I'm sorry.  It's late in the day.
9 Thank you.  Thank you for telling me that.
10 THE WITNESS:
11        Sure.
12 MR. HOFFMAN:
13        I apologize.
14 Q      Let me go back, and I'll try to re-ask
15 the question.
16        Then on the next page of this report,
17 which is Bates 4665, it mentions another source
18 of information provided to Purdue whereby Purdue
19 could see at least at some level that Region 0
20 prescribers were utilizing sales -- excuse
21 me -- saving -- savings cards based on data that
22 was being returned to Purdue.  Is that right?
23 A      Yes.
24 Q      So we talked about at least three
25 sources.  Now we've talked about a list that was

---

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1 kept in the ordinary course, we talked about
2 reports of concern, and, at least in this
3 instance, we've also talked about the savings
4 card program whereby those data could be accessed
5 by Purdue. Is that fair?
6 A      That's fair.
7 Q      Now, going to Exhibit 5, which is the
8 L.A. Times article that plaintiff's counsel asked
9 you about, before we get into any specifics in
10 the article, I want to go back and ask you about
11 some of your testimony earlier in the day.
12        You mentioned at one point -- I believe
13 it was this morning -- that in May of 2009 you
14 recall that Mark Geraci and perhaps others had
15 meetings and discussions with DEA regarding
16 certain pharmacies in -- in that time period.
17        Is that right?
18 A      That's correct.
19 Q      And I believe plaintiff's counsel asked
20 you if Lams Pharmacy was one of those pharmacies.
21 A      I believe that was asked, yes.
22 Q      Okay. Can you tell us whether or not
23 the St. Paul Pharmacy and the Lake Medical Group
24 was also a part of that discussion with DEA in
25 May of 2009?

Page 371

1 A      I believe it was.
2 Q      Okay. And what is your belief based
3 on?
4 A      Conversations with Luis Bauza and Mark
5 Geraci himself.
6 Q      Okay. And do you recall which DEA
7 agent was involved in those discussions?
8 A      The two that I recall, one was Michael
9 Lewis, who was a diversion program manager in
10 Los Angeles, and the other -- I'm trying to think
11 of her name. She was assistant special agent in
12 charge, and I can't be a hundred percent certain,
13 but I think it was Lisa McElhaney, something, I
14 think.
15 Q      Okay. And did you have follow-up
16 conversations with the folks at DEA after May of
17 2009, when Mr. Geraci and Lou Bauza spoke with
18 them?
19 A      I did.
20 MS. CONROY:
21        Objection.
22 MR. HOFFMAN:
23 Q      Regarding, among other things,
24 Lake Medical and St. Paul's Pharmacy?
25 A      I did.

Page 372

1 Q      You mentioned earlier today to
2 plaintiff's counsel that you do not believe the
3 L.A. Times article necessarily quoted you
4 accurately in certain circumstances.
5        Do you recall that?
6 A      I do.
7 Q      Okay. I want to show you a couple of
8 statements in Exhibit 5, which, again, is the
9 L.A. Times article. If you go over -- and it
10 doesn't have a Bates number, but if you go over
11 to the page where, at the top, it has that map of
12 MacArthur Park.
13 A      I'm sorry. I haven't found it yet.
14 Q      Might be on the back of one of those
15 pages.
16 MR. GOLDMAN:
17        There it is.
18 A      Oh, there it is. Okay.
19 MR. HOFFMAN:
20 Q      I want to draw your attention to the
21 fourth paragraph. It says, "In an interview,
22 Crowley said that in the five years he spent
23 investigating suspicious pharmacies, Purdue never
24 shut off the flow of pills to any store."
25        Do you see that?

Page 373

1 A      I do.
2 Q      And there's no quote there that's
3 attributed to you, but it says "Crowley said,"
4 and then it goes on to characterize some
5 statements.
6        Do you see that?
7 A      I do.
8 Q      Okay. Do you -- do you believe that
9 that's -- that accurately conveys what you said?
10 A      No.
11 Q      And why not?
12 A      Because I don't believe I said that.
13 Q      Okay. And just help us understand. I
14 guess if we -- if you can leave that exhibit out
15 and now if you go to Exhibit 13, which you should
16 also have in front of you.
17 A      Yes.
18 Q      Exhibit 13, for the record, is a May 4,
19 2011, email, and it goes through certain criteria
20 of OMS measures of effectiveness.
21        Do you recall that?
22 A      I do.
23 Q      I draw your attention to number 3. It
24 says, "Reduction or Cut-Off Supply. Wholesaler
25 reduces supply or stops supplying the outlet

Highly Confidential – Subject To Further Confidentiality Review

Page 374

1 based on due diligence review in coordination
2 with Purdue."
3         Do you see that?
4 A      I do.
5 Q      In fact, did that happen over the years
6 that you were involved in suspicious order
7 monitoring with Purdue?
8 A      Yes.
9 Q      And would that be in collaboration, as
10 it says here, with the -- the wholesaler?  And
11 the wholesaler being the one that actually
12 reduces the supply or stops supplying the outlet.
13 A      That's true.  That's correct.
14 Q      Okay.  And is that one of the reasons
15 why this statement attributed to you may be
16 misleading, in your view?
17 MS. CONROY:
18         Objection.
19 A      Yes.
20 MR. HOFFMAN:
21 Q      Okay.  Now, if we go to one other
22 page -- I guess it's -- it might be the last page
23 of the article.  It's down near the bottom.  The
24 top of the page has -- it looks like some kind of
25 chain or medallion at the top of it.

Page 375

1 A      Okay.
2 Q      What I want to ask you about is a
3 statement --
4         Maybe I can get it a little closer
5 here.  And, again, it says, "In hindsight,"
6 Crowley said, "he questions whether Purdue should
7 have done more."
8         Do you see that?
9 MR. GOLDMAN:
10         Right here (indicating).
11 A      Yes.
12 MR. HOFFMAN:
13 Q      And, again, it says "Crowley said," but
14 there's no actual quotation that's attributed to
15 you.  Is that right?
16 A      That's right.
17 Q      Do you believe this is a fair
18 conveyance of a quote that you actually provided
19 to the L.A. Times?
20 A      No.
21 Q      In your review of the L.A. Times
22 article, do you believe that it accurately
23 depicted the efforts of Purdue's order monitoring
24 system?
25 A      No.

Page 376

1 Q      Based on your experience while on the
2 order monitoring committee, what is your view of
3 Purdue's efforts to detect suspicious orders?
4 MS. CONROY:
5         Objection.
6 A      I -- I think we were leading the
7 industry in terms of our efforts to monitor
8 suspicious orders and always continually --
9 continually trying to improve it.  So I -- I -- I
10 thought we did the best we could at that time.
11 Yeah.
12 MR. HOFFMAN:
13 Q      In all your years at Purdue working on
14 suspicious order monitoring, you mentioned
15 earlier having routine conversations with the
16 DEA?
17 A      We did.
18 Q      Okay.  So in all your years at Purdue
19 working on suspicious order monitoring, did
20 anyone at FDA express to you any critique --
21 MR. GOLDMAN:
22         DEA.
23 MR. HOFFMAN:
24 Q      Did I say it again?
25 A      It's okay.

Page 377

1 Q      Unbelievable.  I'm sorry about that.  I
2 talk about the FDA way too much.  Thank you for
3 that.
4         Let me back up and try this one more
5 time.
6         In all your years at Purdue working on
7 suspicious order monitoring, did anyone at DEA
8 express to you any critique or complaint about
9 Purdue's suspicious order monitoring system?
10 MS. CONROY:
11         Objection.
12 A      No.  No.
13 MR. HOFFMAN:
14         Thank you.  I believe those are all the
15 questions I have at this time.
16 VIDEOGRAPHER:
17         We are now going off the video record.
18 The time is currently 7:27 p.m.
19         (OFF THE RECORD.)
20 VIDEOGRAPHER:
21         We are now back on the video record.
22 The time is currently 7:29 p.m.
23         EXAMINATION
24 BY MS. CONROY:
25 Q      Mr. Crowley, I'm gonna hand you what

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1 I've marked as Exhibit 33 and 34.
2     (CROWLEY EXHIBITS 33 and 34
3     WERE MARKED FOR IDENTIFICATION.)
4 MS. CONROY:
5 Q     And there are some copies behind it.
6 It's the -- they are the two Rannazzisi letters.
7 Exhibit 33 is the September 27th, 2006, letter,
8 and it's Allergan_MDL_02467796 through 799, and
9 Exhibit 34 is the December 27th of 2007 letter,
10 and it's Card-- -- it's
11 CAH_MDL_PRIORPROD_DEA07_00866877 and 78.
12     You have -- you have read these letters
13 in the past; is that correct, Mr. Crowley?
14 A     If they're the same letters that were
15 addressed to Purdue, I have, yes.
16 Q     Okay. And I -- I will -- I will
17 represent to you that we've been talking about
18 the Rannazzisi letters.
19 A     Correct.
20 Q     These are -- these are the two -- the
21 2006 letter and then the 2007 letter. Okay?
22     And I just want to draw your attention
23 first, on Exhibit 33, to the front page, where it
24 says, "The statutory scheme and legal duties of
25 distributors and DEA registrants."

Page 379

1     Do you see that?
2 A     I do.
3 Q     And it says, "Although most
4 distributors are already well aware of the
5 following legal principles, they are reiterated
6 here as an additional background for this
7 discussion."
8     Do you see that?
9 A     I do.
10 Q     Is it fair to say that you don't know
11 whether or not the DEA believed there to be any
12 expansion of the Controlled Substances Act?
13 Correct?
14 MR. HOFFMAN:
15     Object to the form.
16 A     In terms of this letter, I would agree
17 with that, in terms of that letter.
18 MS. CONROY:
19 Q     Okay. Because you may --
20     Well, okay. Fine.
21     Let's take a look, then, at Exhibit 34,
22 which is the 2007 letter. And, in this letter,
23 is "The purpose" -- in the first paragraph, "The
24 purpose of this letter is to reiterate the
25 responsibilities of controlled substance

Page 380

1 manufacturers and distributors to inform DEA of
2 suspicious orders in accordance with 21 CFR
3 1301.74(b)."
4     Do you see that?
5 A     I do.
6 Q     And you don't know one way or the other
7 whether the DEA believed this letter to be an
8 expansion of the Controlled Substances Act. In
9 fact, they say it's a reiteration of the
10 requirements of the Controlled
11 Substances -- Substances Act; correct?
12 MR. HOFFMAN:
13     Object to the form.
14 A     Well, that's what the first part says.
15 And then it begins, "In addition..."
16 MR. GOLDMAN:
17     Yeah, but listen -- please listen to
18 her question.
19 THE WITNESS:
20     I'm sorry.
21 MR. GOLDMAN:
22     Because I think the question is do
23 you know one way or the other whether the DEA
24 believed this to be an expansion of the
25 Controlled Substances Act. Do you know whether

Page 381

1 or not the DEA believed that?
2 MR. HOFFMAN:
3     Object to form.
4 A     I don't know.
5 MS. CONROY:
6 Q     And do you know any more today about
7 whether or not -- about what the DEA knew or
8 didn't know in December of 2007?
9 MS. SIDARTH:
10     Objection.
11 MR. HOFFMAN:
12     Object to form.
13 A     I don't know.
14 MS. CONROY:
15 Q     You can put that away.
16     You were asked some questions about
17 Exhibit 17, a meeting between Cardinal -- or some
18 con- -- some emails between Cardinal and
19 yourself. Do you recall that?
20 A     Yes.
21 Q     And you were asked a question about
22 joint anti-diversion efforts between Purdue and
23 an authorized distributor such as Cardinal. Do
24 you recall that?
25 A     Asked that question by you?

Highly Confidential - Subject to Further Confidentiality Review

---

Page 382

1 Q    No.  It was Mr. Pyser, and he asked you
2 about joint anti-diversion efforts.
3 MR. PYSER:
4        Object to form.
5 A    I -- I -- I recall generally, yes.
6 MS. CONROY:
7 Q    Okay.  Let me ask it this -- because
8 it's kind of -- of course you don't remember
9 specifically every word.
10        Would you agree with me that DEA is not
11 interested in whether there are joint efforts to
12 prevent diversion?  The responsibility is
13 individual with respect to each registrant;
14 correct?
15 MR. PYSER:
16        Object to form.
17 MR. HOFFMAN:
18        Object to form.
19 A    Are we talking about a certain time
20 frame?
21 MS. CONROY:
22 Q    Well, let's talk about the time that
23 you were at Purdue.  You understood that Purdue
24 had its own responsibility as a DEA registrant
25 with respect to the Controlled Substances --

---

Page 383

1 Substances Act in any requirements?
2 A    That's correct.
3 Q    So it wasn't -- you didn't have a --
4 joint responsibility with your authorized
5 wholesalers.  You had your own responsibility.
6 Correct?
7 A    Correct.
8 Q    And every authorized distributor of
9 Purdue had its own responsibilities.
10 MR. PYSER:
11        Object to form.
12 A    To my knowledge, yes.
13 MS. CONROY:
14 Q    So an authorized distributor couldn't
15 say, "Hey, we didn't report that because we
16 thought Purdue was gonna do it."  You each had a
17 responsibility; correct?
18 MR. HOFFMAN:
19        Objection.  And argumentative.
20 A    I and others made every effort that
21 that would not happen.  It could have happened,
22 but...
23 MS. CONROY:
24 Q    Right.
25 A    Right.

---

Page 384

1 Q    And I understand that you worked -- it
2 was your goal to work jointly with the authorized
3 distributors to make sure that you were not -- to
4 make sure you could try to end diversion and
5 oversupply or whatever.  But the responsibility
6 under the Controlled Substances Act was
7 individual.  Correct?
8 MR. HOFFMAN:
9        Object to the preamble.  Move to
10 strike.
11 A    The requirement is suspicious orders.
12 So that indicates individual manufacturer,
13 individual distributor, yeah.
14 MS. CONROY:
15 Q    Okay.  Would you agree with me that a
16 referral to the DEA is not routine?  And I'm
17 using "referral" in the sense of referrals that
18 were identified as such in the order monitoring
19 system database.
20 A    Would I agree that reporting was not
21 routine?
22 Q    Referral.
23 A    Referrals.
24 Q    The category "Referral."
25 A    Right.

---

Page 385

1        In the system that says "Complete,
2 Referred"?
3 Q    Exactly.
4 A    Was not routine?
5 Q    Correct.
6 A    I would agree with that.
7 Q    What you were talking about with
8 Mr. Hoffman was conversations with the DEA may
9 have been routine for you.
10 A    Yes.
11 Q    Oh, here it is.  If you take a look at
12 Exhibit 32 that was just marked, and you see in
13 this list of --
14        There's -- there are two things
15 attached to this Exhibit 32 email to Barbara
16 Bockholdt.  One is a list of slow pharmacies
17 with new criteria, an Excel spreadsheet.
18 Correct?
19 A    I think it's an Excel spreadsheet,
20 yeah.
21 Q    Okay.  And, on that spreadsheet, I
22 noticed, as number 86, you have the V Pacifica
23 Pharmacy in Huntington Beach, the B & B Pharmacy,
24 Gamble Pharmacy.  On -- as number 21 you have
25 St. Paul's Pharmacy.

---

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1      Do you see that?

2 A     I -- I see some of them that you've

3 mentioned. I heard you. I see some of them,

4 yeah.

5 Q     Okay. Number 21 --

6 A     I see it.

7 Q     -- St. Paul's?

8 A     Yep.

9 Q     Number 80, B & B.

10 A     I see it.

11 Q     Number 86, V Pacifica. Do you see

12 that?

13 A     I see it.

14 Q     And we -- and we talked about an order

15 monitoring report that was done for V Pacifica;

16 correct?

17 A     We did.

18 Q     And that was Exhibit 8, which I think

19 you had out, or maybe it's back in the stack, if

20 you could pull that out.

21     St. Paul's -- I'm sorry -- V Pacifica

22 was a pharmacy that had been -- that had been

23 suspicious for quite some time. Correct?

24 MR. HOFFMAN:

25     Object to form.

Page 387

1 MS. CONROY:

2 Q     The report is dated October 28th of

3 2010, but this -- the workup done on this

4 pharmacy was certainly done over a period of

5 time; correct? You see, for example, the field

6 sales force input was back in April and June of

7 2010?

8 MR. HOFFMAN:

9     I'm sorry. Objection. There are now

10 three questions pending. Which question do you

11 want him to answer?

12 MS. CONROY:

13 Q     The investigation of Pacifica Pharmacy

14 didn't occur at the end of October of 2010;

15 correct?

16 A     That's correct.

17 Q     It went over several months, if not

18 years; correct?

19 MR. HOFFMAN:

20     Object to the form. Foundation.

21 A     Several months. I don't know if I'd

22 agree with "years."

23 MS. CONROY:

24 Q     Okay. And your testimony was it was

25 referred to the DEA on October 7th of 2011, in a

Page 388

1 face-to-face visit with the DEA; correct? That's

2 what -- that's what Exhibit 32 is, this list?

3 A     Thirty-two, yeah. Once I was reminded

4 of this, that's -- that's what I said, yes.

5 Q     And it's your -- and you testified that

6 285 pharmacies were referred to the DEA?

7 A     Yes, based on this correspondence here.

8 Q     Did you go and check and determine

9 whether or not they were referred, as the term is

10 used in the order monitoring system's database?

11 A     I did not.

12 Q     You don't know one way or the other

13 whether they are classified as referred as far as

14 Purdue's database is concerned; correct?

15 A     As we sit here today, that's correct.

16 I don't remember.

17 Q     And if you take a look at Exhibit 8,

18 the recommendation on page 3 of 8, you actually

19 see -- do you see that it's also number 665 at

20 the bottom?

21 A     Yes.

22 Q     Okay. Do you see where it says, "Since

23 the wholesaler took appropriate action in

24 consultation with Purdue to ensure greater due

25 diligence on the part of the pharmacy, order

Page 389

1 volume decreased by more than 50 percent in

2 February, has maintained at that level, and

3 neither Steve nor Luis or the wholesaler have any

4 concerns about this account, it's recommended

5 that this account be designated complete, closed,

6 with the stipulation that the order monitoring

7 system team will reopen its review upon receipt

8 of new information"?

9     Do you see that?

10 A     I do.

11 Q     Does that -- do you know one way or the

12 other whether it was designated "complete,

13 closed" on the system?

14 A     I don't, but I would agree that it

15 probably was.

16 Q     And the DEA was not alerted to this

17 Pacifica Pharmacy until its sales of OxyContin

18 decreased.

19 MR. HOFFMAN:

20     Object to form. Alerted by Purdue or

21 somebody else?

22 A     I'm sorry.

23 MS. CONROY:

24 Q     Okay. Let's take a look again at

25 Exhibit 32 --

Page 390

1  A      Right.
2  Q      -- where you go and visit with the
3  DEA --
4  A      Right.
5  Q      -- and you alert them to --
6  A      Right.
7  Q      -- in a list of two hundred and -- 285
8  pharmacies.
9  A      Right.  I have it.
10 Q      Pacifica Pharmacy was -- that name was
11 provided to the DEA on October --
12        Well, the email was sent October 7.
13 I'm not sure what time -- the meeting was a
14 couple of days earlier.  That -- that pharmacy
15 was listed because it sold less OxyContin;
16 correct?
17 A      That's correct.
18 Q      And I would like you to look at the
19 front of Exhibit 32.  One of the attachments is
20 the list of slow pharmacies with new criteria.
21 Do you see that?
22 MR. GOLDMAN:
23        Thirty-two.
24 THE WITNESS:
25        Oh, I'm sorry.

Page 391

1  MS. CONROY:
2  Q      Thirty-two.
3  A      I -- I -- I see the name of the listed
4  attachment, yeah.
5  Q      And that -- and then there's a second
6  attachment, PAINWeek ASI-MV OxyContin ORF Poster,
7  August 31st, 2011, FINAL.PPTX.
8         Do you see that?
9  A      I see it.
10 Q      Do you know what that is?
11 A      No.  At this time, I don't recall it.
12 Q      Does it refresh your memory if I tell
13 you that that was the study that was conducted
14 that showed the less abuse criteria -- less abuse
15 of the reformulated OxyContin?
16 MR. HOFFMAN:
17        Object to the form.
18 A      It -- it doesn't, unfortunately,
19 refresh my memory.
20 MS. CONROY:
21 Q      In --
22 A      So -- right.
23 Q      In response to one of Mr. Hoffman's
24 questions about a question I had asked you
25 earlier about whether the benefits of the

Page 392

1  reformulated OxyContin had been touted to the
2  DEA --
3         Do you recall that exchange?
4  A      I do.  Yeah.
5  Q      And wouldn't you agree with me, if a
6  study poster was being provided to the DEA about
7  the benefits of the reformulated OxyContin, that
8  was very far afield with the reporting of
9  suspicious pharmacies?
10 MR. HOFFMAN:
11        Object to form.
12 A      That was in addition to.
13 MS. CONROY:
14 Q      Correct.
15 A      Right.
16 Q      But it had nothing to do with
17 suspicious pharmacies; right?
18 MR. HOFFMAN:
19        Object to form.
20 A      Generally speaking, that's correct.
21 MS. CONROY:
22 Q      It's -- it's -- it's a piece about one
23 of Purdue's products; correct?
24 MR. HOFFMAN:
25        Object to the form.

Page 393

1  Q      The risks and benefits of one of its
2  products.
3  MR. HOFFMAN:
4         Object to the form.
5  MR. GOLDMAN:
6         Object to the form.  Lacks foundation.
7  A      I'm not trying to be difficult.  I do
8  not -- I don't remember what it was.
9  MS. CONROY:
10 Q      Okay.
11 A      Yeah.
12 Q      With respect to Exhibit 5, which is the
13 LA Times article, you had issue with -- on the --
14        You may not need to see this.
15 A      Okay.
16 Q      You're lucky -- you're fine looking at
17 it if you want.
18        The page with MacArthur Park where you
19 say -- where it's the -- what the article says,
20 "In an interview, Crowley said that in the five
21 years he spent investigating suspicious
22 pharmacies, Purdue never shut off the flow of
23 pills to any store."
24        Do you remember that?  And you said
25 that was not accurate.  You --

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1 A     I do remember saying that, yeah.
2 Q     Okay.  Is it accurate that Purdue did
3 not shut off the flow of pills to any of the
4 stores that were identified, any of the
5 pharmacies that were identified in this LA
6 article, LA Times articles?
7 A     I'd have to look at the names again.
8 I --
9 Q     Okay.
10 A     Sorry.  Yeah.
11 Q     And if I wanted to take a look and see
12 if Purdue had ever shut off any of the
13 pharmacies, reported them to the DEA and shut off
14 the supply of Purdue product to the pharmacies
15 listed in the LA Times article, I would need to
16 go to the database, the order monitoring system
17 database, and determine whether or not there were
18 referrals to the DEA?
19 MR. HOFFMAN:
20     Object to form.
21 A     That's one place, yes.
22 MS. CONROY:
23 Q     Okay.  Or look at the notes.
24 A     Right.
25 Q     Or ask you what you remember.

Page 395

1 A     That'd be another way of doing it, yep.
2 Q     Or ask other members of the order
3 monitoring committee if they recalled whether or
4 not any of the LA Times-mentioned pharmacies were
5 shut off from Purdue products?
6 A     That's correct.
7 Q     Anybody else I could talk to that would
8 know?
9 A     Again, we're using the terminology
10 "shut off."
11 Q     Or not -- not sold to?
12 A     Exclusively by Purdue?
13 Q     Well, that'd be one way, if Purdue had
14 done it.  But there's no reason to believe that
15 they did it, because you told me about every
16 instance when Purdue shut off supply; correct?
17 MR. GOLDMAN:
18     Objection.
19 MR. HOFFMAN:
20     Object to the form.  Foundation.
21 Misstatement.
22 A     I don't know if I told you about every
23 incident that --
24     I tried to.  So...
25 MS. CONROY:

Page 396

1 Q     Okay.
2 A     Yeah.
3 Q     Do you know if H.D. Smith referred any
4 of the pharmacies listed in the LA Times article
5 to the DEA?
6 A     Off the top of my head, I would say
7 St. Paul's Pharmacy simultaneously with -- they
8 shut them off as a customer, if I could use that
9 term.  They discontinued business with St. Paul's
10 Pharmacy.  I believe they reported that to DEA.
11 Q     And was that around the time of the
12 article?
13 MR. GOLDMAN:
14     Object to the form.
15 A     No.  That was -- that was in 2009.  I
16 think the article came out in -- what? -- 2016?
17 MS. CONROY:
18 Q     Okay.  So who -- who was supplying
19 St. Paul's Pharmacy after -- after H.D. Smith in
20 2009?
21 MR. HOFFMAN:
22     Object to form.  Foundation.
23 A     I -- I -- I don't remember.  I'm sorry.
24 MS. CONROY:
25 Q     It would have been one of Purdue's

Page 397

1 authorized distributors; correct?
2 A     Yes.
3 Q     Do you know --
4 A     I believe so, yes.
5 Q     And do you know if, whoever that may
6 have been, do you know if that authorized
7 distributor stopped the supply of Purdue products
8 to St. Paul's Pharmacy?
9 MR. HOFFMAN:
10     Object to form.  Foundation.
11 A     I -- I -- I don't.  But I will say
12 eventually St. Paul's shut itself off.  The owner
13 fled the country, I think.  So it -- it
14 discontinued pharmacy business on its own --
15 MS. CONROY:
16 Q     But --
17 A     -- is my recollection.
18 Q     But that was -- that was some number of
19 years after H.D. Smith stopped supplying in 2009;
20 correct?
21 A     I --
22 MR. HOFFMAN:
23     Object to form.  Foundation.
24 A     I -- I don't think so.  I think it was
25 around the same time.  I mean, you know, within

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1  several months.
2  MS. CONROY:
3  Q      What about Pacifica Pharmacy?
4  MR. HOFFMAN:
5      Objection.
6  MR. GOLDMAN:
7      Objection.
8  MS. CONROY:
9  Q      Do you know if that was -- do you know
10 if any supply was ever stopped to that pharmacy?
11 MR. HOFFMAN:
12     Object to form.  I think it's also
13 beyond the scope of the track 1 cases.
14 A      I don't.  I read something in the
15 exhibit.
16 MS. CONROY:
17 Q      The exhibit about the slow pharmacies?
18 A      No.  The one you just asked me about,
19 V Pacifica.  Isn't that --
20 Q      Oh, right.  The -- the order -- the
21 report about that?
22 A      I think so, yeah.
23 Q      Let me ask it this way.  As you sit --
24     There are a number of pharmacies that
25 were involved in the L.A. Times article; correct?

Page 399

1  Not just St. Paul's?
2  A      That's correct.
3  Q      Okay.  And do you know one way or the
4  other when or who of the authorized distributors
5  of Purdue products stopped supplying those
6  pharmacies, if ever?
7  MR. HOFFMAN:
8      Object to form.  Foundation.
9  A      At this point, I don't -- do not.
10 MS. CONROY:
11     That's all I have.  Thank you,
12 Mr. Crowley.
13 THE WITNESS:
14     Thank you.
15 VIDEOGRAPHER:
16     We are now going off the video record.
17     Are there any follow-ups?
18 MR. HOFFMAN:
19     No.  I don't have any.
20 VIDEOGRAPHER:
21     The time is currently 7:57 p.m.  This
22 is the end of media number 6 and the end of the
23 deposition.
24     (Deposition concluded at 7:57 p.m.)
25

Page 400

1      C E R T I F I C A T E
2
3      I do hereby certify that the above and
4  foregoing transcript of proceedings in the matter
5  aforementioned was taken down by me in machine
6  shorthand, and the questions and answers thereto
7  were reduced to writing under my personal
8  supervision, and that the foregoing represents a
9  true and correct transcript of the proceedings
10 given by said witness upon said hearing.
11     I further certify that I am neither of
12 counsel nor of kin to the parties to the action,
13 nor am I in anywise interested in the result of
14 said cause.
15
16
17
18
19     LOIS ANNE ROBINSON, RPR, RMR
       REGISTERED DIPLOMATE REPORTER
       CERTIFIED REALTIME REPORTER
20
21
22
23
24
25

Page 401

1      E R R A T A   P A G E
2
3      I, JACK CROWLEY, the witness herein, have
   read the transcript of my testimony, and the same
4  is true and correct, to the best of my knowledge,
   with the exceptions of the following changes noted
5  below, if any:
6  Page/Line  Word(s) to be changed/reason  Correct Word
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21
22     _____
       JACK CROWLEY
23
24
25

Page 402

1    DECLARATION OF WITNESS
2
3        I, the undersigned, declare under penalty
4    of perjury that I have read the foregoing
5    transcript, and I have made any corrections,
6    additions, or deletions that I was desirous of
7    making; that the foregoing is a true and correct
8    transcript of my testimony contained herein.
9        EXECUTED this _____ day of _____,
10   2019, at _____, _____.
     (City)          (State)
11
12
13
14
15

     _____
16   JACK CROWLEY
17
18
19
20
21
22
23
24
25