EXHIBIT 93

```
 1                UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF OHIO

 3                     EASTERN DIVISION

 4   ----------------------------) MDL No. 2804

 5   IN RE NATIONAL PRESCRIPTION  )

 6   OPIATE LITIGATION            )

 7                                ) Case No. 17-md-2804

 8   This document relates to:    )

 9   All Cases                    )

10   ----------------------------) Hon. Dan A. Polster

11                   HIGHLY CONFIDENTIAL

12        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

13

14            The videotaped 30(b)(6) deposition of

15   PURDUE PHARMA, L.P., PURDUE PHARMA, INC. And the

16   PURDUE FREDERICK COMPANY through STEPHEN SEID, called

17   for examination, taken pursuant to the Federal Rules

18   of Civil Procedure of the United States District

19   Courts pertaining to the taking of depositions, taken

20   before JULIANA F. ZAJICEK, a Registered Professional

21   Reporter and a Certified Shorthand Reporter, at the

22   offices of Dechert LLP, Suite 3400, 35 West Wacker

23   Drive, Chicago, Illinois, on December 12, 2018, at

24   9:58 a.m.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3         SIMMONS HANLY CONROY LLC
           112 Madison Avenue, 7th floor
 4         New York, NY 10016
           212-784-6400
 5         BY:  JAYNE CONROY, ESQ.
                jconroy@simmonsfirm.com;
 6              LAURA FITZPATRICK, ESQ.
                lfitzpatrick@simmonsfirm.com
 7              ELLYN HURD, ESQ. (Telephonically)
                ehurd@simmonsfirm.com
 8
 9    ON BEHALF OF THE STATE OF TENNESSEE PLAINTIFFS:
10         BRANSTETTER, STRANCH & JENNINGS, PLLC
           The Freedom Center
11         223 Rosa L. Parks Avenue, Suite 200
           Nashville, Tennessee 37203
12         615-254-8801
           BY:  MICHAEL G. STEWART, ESQ.
13              mstewart@bsjfirm.com
14
      ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
15    AMERISOURCEBERGEN DRUG CORPORATION:
16         JACKSON KELLY PLLC
           150 Clay Street, Suite 500
17         Morgantown, West Virginia 26501
           304-284-4138
18         BY:  SYLVIA WINSTON NICHOLS, ESQ.
                (Telephonically)
19              sylvia.winston@JacksonKelly.com
20
      ON BEHALF OF MALLINCKRODT LLC and SPECGX LLC:
21         ROPES & GRAY LLP
           Prudential Tower
22         800 Boylston Street
           Boston, Massachusetts 02199-3600
23         617-951-7910
           BY:  LUKE D. RILEY, ESQ. (Telephonically)
24              luke.riley@ropesgray.com
```

```
 1    APPEARANCES: (Continued)
 2
      ON BEHALF OF CARDINAL HEALTH, INC.:
 3
             WILLIAMS & CONNOLLY LLP
 4           725 Twelfth Street, N.W.
             Washington, D.C. 20005
 5           202-434-5000
             BY:  KATELYN ADAMS, ESQ. (Telephonically)
 6                kadams@wc.com
 7
      ON BEHALF OF McKESSON CORPORATION:
 8
             COVINGTON & BURLING, LLP
 9           One City Center
             850 Tenth Street, NW
10           Washington, D.C. 20001
             202-662-5531
11           BY:  AMBER CHARLES, ESQ. (Telephonically)
                  acharles@cov.com
12
13           TABET DIVITO & ROTHSTEIN LLC
             209 South LaSalle Street, 7th Floor
14           Chicago, Illinois 60604
             312-762-9461
15           BY:  DANIEL L. STANNER, ESQ.
                  dstanner@tdrlawfirm.com
16
17    ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
      PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
18    INC.:
19           ARNOLD & PORTER KAYE SCHOLER LLP
             70 West Madison Street, Suite 4200
20           Chicago, Illinois 60602-4231
             312-583-2435
21           BY:  MICHAEL S. BULLERMAN, ESQ.
                  michael.bullerman@arnoldporter.com
22
23
24
```

```
 1    APPEARANCES:  (Continued)

 2

      ON BEHALF OF WALMART INC.:

 3

          JONES DAY
 4        77 West Wacker Drive
          Chicago, Illinois 60601-1692
 5        312-269-4164
          BY:  MARK W. DeMONTE, ESQ.
 6            mdemonte@jonesday.com

 7

      ON BEHALF OF PURDUE PHARMA, L.P., PURDUE PHARMA, INC.
 8    and THE PURDUE FREDERICK COMPANY, INC.:
 9        DECHERT LLP
          35 West Wacker Drive, Suite 3400
10        Chicago, Illinois 60601
          312-646-5800
11        BY:  NATHAN HOFFMAN, ESQ.
              nathan.hoffman@dechert.com;
12            MELANIE MACKAY, ESQ.
              melanie.mackay@dechert.com

13

14    ON BEHALF OF PERNIX THERAPEUTICS HOLDINGS, INC. IN
      NON-MDL CASES PENDING IN ARKANSAS AND PENNSYLVANIA:
15
          CLARK MICHIE LLP
16        220 Alexander Street
          Princeton, NJ 08540
17        609-423-2143
          BY:  CHRISTOPHER J. MICHIE, ESQ.
18            (Telephonically)
              chris.michie@clarkmichie.com

19

20    ON BEHALF OF DEFENDANT ROCHESTER DRUG COOPERATIVE:
          ALLEGAERT BERGER & VOGEL, LLP
21        111 Broadway, 20th Floor
          New York, New York 10006
22        212-571-0550
          BY:  LOUIS CRACO, ESQ. (Telephonically)
23            lcraco@abv.com;
              LUCY ONYEFORO, ESQ. (Telephonically)
24            lonyeforo@abv.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES: (Continued)

 2

      ON BEHALF OF THE DEPONENT:

 3

              SALVATORE PRESCOTT & PORTER

 4            1010 Davis Street
              Evanston, Illinois 60201

 5            312-283-5711
              BY:   JULIE B. PORTER, ESQ.

 6                  porter@spplawyers.com

 7

 8

 9

10    THE VIDEOGRAPHER:

11            MR. BEN STANSON,
              Golkow Litigation Services.

12

13

14

15

16

17

18

19

20    REPORTED BY:    JULIANA F. ZAJICEK, RPR, CSR 84-2604.

21

22

23

24
```

```
 1                    I N D E X

 2

 3  WITNESS:                                PAGE:

 4   STEPHEN SEID

 5       EXAM BY MS. CONROY..................    9

 6       EXAM BY MR. HOFFMAN.................   80

 7       FURTHER EXAM BY MS. CONROY..........  110

 8       FURTHER EXAM BY MR. HOFFMAN.........  137

 9       FURTHER EXAM BY MS. CONROY..........  137

10

11                    *****

12

13               E X H I B I T S

14  PURDUE-SEID 30(b)(6) EXHIBIT          MARKED FOR ID

15   No. 001   Third Amended Notice of Deposition    14
                Pursuant to Rule 30(b)(6) and
16              Document Request Pursuant to Rule
                30(b)(2) and Rule 34 to Defendants
17              Purdue Pharma, L.P., Purdue Pharma
                Inc. and the Purdue Frederick
18              Company
19   No. 002   Purdue's Supplemental Responses    16
                and Objections to Plaintiff's
20              Amended Notice of Deposition
                Pursuant to Rule 30(b)(6) and
21              Document Request Pursuant to Rule
                30(b)(2) and Rule 34
22
     No. 003   Documents provided in response to    23
23              Topic #5:Policies and procedures
                for SOM
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S (Continued)

 2    PURDUE-SEID 30(b)(6) EXHIBIT          MARKED FOR ID

 3     No. 004   Documents provided in response to    23

                 Topic #13 & 14: HDMA

 4

       No. 005   Documents provided in response to    24

 5               Topic #50: Wholesalers

 6     No. 006   Marked up version of document        129

                 titled "Order Monitoring System

 7               (OMS)" by Jayne Conroy shown on

                 Elmo; PPLPC019001275418

 8

       No. 007   Notes by Jayne Conroy                139

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1        THE VIDEOGRAPHER:  We are now on the record.  My

 2   name is Ben Stanson.  I am a videographer for Golkow

 3   Litigation Services.  Today's date is December 12th,

 4   2018, and the time is 9:58 a.m.

 5             This video deposition is being held in

 6   Chicago, Illinois in the matter of National

 7   Prescription Opiate Litigation MDL No. 2804, pending

 8   in the US District Court, Northern District of Ohio,

 9   Eastern Division.

10             The deponent is Stephen Seid.  Counsel

11   will be noted on the stenographic record.

12             Our counsel -- our court reporter is

13   Juliana Zajicek.

14             Will you please swear in the witness.

15             (WHEREUPON, the witness was duly

16              sworn.)

17        MR. HOFFMAN:  Jayne, sorry, before we begin, I

18   just want to confirm for the record, excuse me, all

19   who are present here or attending by phone have agreed

20   to be bound by the applicable terms of the

21   confidentiality orders in place, both in the MDL or in

22   State Court litigation unless I hear otherwise.

23             Hearing nothing, all are bound.  Thank

24   you.
```

```
 1                    STEPHEN SEID,

 2   called as a witness herein, having been first duly

 3   sworn, was examined and testified as follows:

 4                    EXAMINATION

 5   BY MS. CONROY:

 6        Q.    Good morning, Mr. Seid.

 7        A.    Good morning.

 8        Q.    My name is Jayne Conroy and I'm going to

 9   be asking you some questions today on behalf of the

10   Plaintiffs in a case that's pending in Ohio.

11              Have you ever been deposed before?

12        A.    No, I haven't.

13        Q.    I'm sure your counsel gave you some of the

14   ground rules.

15        A.    Um-hum.

16        Q.    Probably the most important is that you

17   don't do "um-hum."

18        A.    Okay.

19        Q.    Even though the court reporter --

20        A.    Yes.

21        Q.    -- can probably deal with it --

22        A.    Yeah.

23        Q.    -- try to give a verbal answer.

24              And also, when I'm asking a question, wait
```

 1    until I finish.  That helps the court reporter, and if

 2    your counsel wants to object, it also gives her a

 3    chance to object, and I will likewise try not to speak

 4    when you are speaking.

 5         Okay?

 6    A.   Understood.

 7    Q.   Great.  Thank you.

 8         If you want to take a break at any time,

 9    just let everybody know.  We've got some unhooking and

10    things to do for a break and I would also ask that you

11    not ask for a break while there is a question pending.

12    A.   Understood.

13    Q.   But I think what we are going to do is we

14    are going to try and go for an hour or so, an hour and

15    a half, but if -- if that seems too long, just let

16    everybody know.  No problem at all, we can just -- we

17    can just stop the record.

18    A.   Sure.

19    Q.   Have you ever been involved in a court

20    case?

21    A.   How so?

22    Q.   Personally, car accident, insurance

23    matter, anything?

24    A.   No.

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.    Where do you live?

 2       A.    I live in Chicago.

 3       Q.    Okay.  Right in the city?

 4       A.    Right in the city.

 5       Q.    And have you always lived here?

 6       A.    No.  Originally from New Jersey and then

 7  Connecticut and -- and then Chicago for about four

 8  years.

 9       Q.    Okay.  And I was looking at -- through

10  many of your documents and you were -- you've -- you

11  were at Purdue Pharma in Connecticut for a very long

12  time, correct?

13       A.    Very long time.

14       Q.    You started in the sales department?

15       A.    Started in the sales department, yes.

16       Q.    As a sales representative?

17       A.    A sales representative in New Jersey.

18       Q.    And then around -- well, we can look later

19  and get the dates about right, 2001 you became the

20  executive -- the senior director of national accounts

21  and trade relations?

22       A.    Actually October of 2000.

23       Q.    Okay.  Great.

24             And how long did you keep that position?
```

```
 1        A.    Until I retired in May of 2014.

 2        Q.    I want to make sure I get it right.  It

 3   was senior director national accounts?

 4        A.    When I first came in, and I retired as

 5   executive director.

 6        Q.    What does national accounts mean?

 7        A.    National accounts referred to the trade

 8   accounts at Purdue, so it was anybody who warehoused

 9   or dispensed our products.

10        Q.    And what were your products generally?

11        A.    Our products were anything from

12   over-the-counter products to prescription products.  I

13   was responsible for all.

14        Q.    And did you have a staff starting in

15   October of 2000 as a senior director?

16        A.    Yes.

17        Q.    And you did when you retired, I assume?

18        A.    Yes.

19        Q.    Did that change, the size of the staff?

20        A.    It was pretty much the same throughout,

21   one or two people difference, but nothing significant.

22        Q.    Okay.  What was the -- what's the

23   approximate size?

24        A.    Seven to eight people.
```

1    Q.    And were they all located in Connecticut?

2    A.    Four were remoted -- located remotely and

3    then three were located remotely eventually.

4    Q.    Okay.  And the -- and the remainder were

5    in Connecticut with you?

6    A.    Yes.

7    Q.    You are here today for this portion of the

8    deposition to give testimony on behalf of three

9    corporate entities, correct?

10   A.    What corporate entities?

11   Q.    Purdue Pharma, L.P., Purdue Pharma, Inc.,

12   and Purdue Frederick Company.

13   A.    Yes.

14   Q.    That's -- that sounds right?

15   A.    That sounds right.

16   Q.    Okay.  Who did you work for while you were

17   at Purdue?

18   A.    I started at Purdue Frederick.  I actually

19   was one of the last Purdue Frederick employees, and it

20   was Purdue Pharma when I retired.

21   Q.    Purdue Pharma, L.P. or Inc.?

22   A.    L.P., I believe.

23   Q.    That -- that's who paid you?

24   A.    I believe so.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (WHEREUPON, a certain document was

 2                     marked Purdue-Seid 30(b)(6)

 3                     Deposition Exhibit No. 001, for

 4                     identification, as of 12/12/2018.)

 5   BY MS. CONROY:

 6        Q.    And I'm going to show you what we've

 7   marked as Exhibit 1.  That's your copy with the stamp

 8   on it.

 9        A.    Thank you.

10        MS. CONROY:  Let's see how many copies we've got

11   here.  I have two more.

12   BY MS. CONROY:

13        Q.    Have you seen this document before?

14        A.    Yeah, I believe -- yes, I believe so.

15        Q.    Okay.

16              Exhibit 1 is the Third Amended Notice of

17   Deposition pursuant to Rule 30(b)(6) and Document

18   Request to Purdue Pharma, L.P., Purdue Pharma Inc. and

19   Purdue Frederick Company.

20              And so you have seen this document before?

21        A.    I believe so.

22        Q.    Okay.  And do you understand that you are

23   here today to talk about in a -- sort of the center of

24   the page, the first page, Topics 5, 13, 14, 19 and 50?
```

```
 1        A.    13 is lobbying, Topic 13, or am I looking

 2   in the wrong place here?

 3        Q.    Let me take a look.

 4              It's on Page 9.

 5        A.    Oh, 9.  I'm sorry.

 6              Yes.  Okay.  Sorry about that.

 7        Q.    Okay.  That looks right to you?

 8        A.    Yes.

 9        Q.    Okay.  What did you do to prepare to

10   testify today about those five topics?

11        A.    I met with my attorney and reviewed some

12   documents.

13        Q.    Did you yourself have any documents?

14        A.    No.

15        Q.    Were they provided to you?

16        A.    They were provided to me.

17        Q.    Approximately how many times did you meet

18   with your attorney?

19        A.    Three.

20        Q.    And was that here in Chicago?

21        A.    Here in Chicago.

22        Q.    And about how long did those meetings

23   last?

24        A.    Combined, approximately ten hours.
```

1    Q.    And were you paid for that time?

2    A.    No.

3    Q.    Do you expect to be?

4    A.    No.

5    Q.    Why is that?

6    A.    I don't -- I don't work for the company

7    anymore.  I'm retired.

8    Q.    So you are not going to give them a bill

9    for your time?

10    A.    No, I'm not going to give them a bill for

11    my time.

12    Q.    Is there a reason why you are not giving a

13    bill for your time?

14    A.    I -- it was not my intention to give them

15    a bill for my time.

16    Q.    Okay.

17    A.    I didn't expect to.

18    Q.    Other than attorneys at the meeting, were

19    there any other individuals present?

20    A.    Just attorneys.

21          (WHEREUPON, a certain document was

22           marked Purdue-Seid 30(b)(6)

23           Deposition Exhibit No. 002, for

24           identification, as of 12/12/2018.)

```
 1   BY MS. CONROY:

 2        Q.    I was -- I'm also going to pass to you

 3   what I've marked as Exhibit 2.

 4              Exhibit 2 is Purdue's Supplemental

 5   Responses and Objections to Plaintiff's Amended Notice

 6   of Deposition.

 7              Have you seen this document before?

 8        A.    No, I haven't seen this document.

 9        Q.    When you met with your counsel to prepare

10   for this deposition, you were working off of

11   Exhibit 1, those topics?

12        A.    Primarily.

13        Q.    And you also, your counsel gave me this

14   morning a file folder of documents and -- with three

15   manila folders inside.

16              Are you -- you familiar -- you have one in

17   front of you.  What is --

18        MS. PORTER:  Object -- I'm sorry.

19              Please go ahead.

20   BY MS. CONROY:

21        Q.    Okay.  And I see you have one in front of

22   you.

23              Are these documents that you put together?

24        MS. PORTER:  Ob -- objection.  I just want to
```

1    point out that that's from Purdue's counsel, not from

2    Mr. Seid's personal counsel.

3    BY MS. CONROY:

4        Q.    I see.

5              You are represented here today by

6    Ms. Porter?

7        A.    Yes.

8        Q.    Are you also represented by Purdue's

9    counsel?

10       A.    No.  I'm represented by Ms. Porter.

11       Q.    And how is Ms. Porter being paid, if she

12   is being paid?

13       A.    She is being paid by Purdue.

14       Q.    And how did you -- how did you come to

15   hire Ms. Porter?

16       A.    She was recommended to me.  I spoke to

17   her.  I did some research, and I agreed that she would

18   represent me.

19       Q.    Okay.  Do you have a retainer agreement

20   with her?

21       A.    I don't have one personally.

22       Q.    Okay.  You don't have anything in writing

23   that she --

24       A.    But I -- yeah, I agreed to retain her as a

```
1    counsel, yes, I did.

2         Q.    In writing?

3         A.    Yes.

4         Q.    And where is that document?

5         A.    It was electronic.  I don't have a copy of

6    it.

7         Q.    In a -- some e-mail communication?

8         A.    Yes.

9               I don't need my glasses here.

10        Q.    And the three file folders that I was

11   given today, those were prepared by Purdue's counsel?

12        A.    I believe so, yes.

13        Q.    Have you seen them before?  Or let me ask

14   it this way:  Have you -- have you seen this -- have

15   you gone through this folder of documents?

16        A.    I've gone through some folders, but I

17   haven't gone through this folder of documents yet.

18        Q.    Okay.  So as you sit here, we -- we can --

19   we are going to look at these, but you're not

20   familiar -- if I were to say to you "What's in there?"

21   you don't know?

22        MR. HOFFMAN:  I'm sorry.  I'm going to object.

23             We just transferred from one folder to the

24   others and finalized them, but Mr. Seid has reviewed
```

 1    all of the documents that are in there at one point in

 2    time or another.

 3        MS. CONROY:  I wasn't -- I wasn't suggesting he

 4    hadn't reviewed them.  I'm just saying he hasn't seen

 5    them in this kind of a compilation, he didn't put this

 6    together.

 7    BY MS. CONROY:

 8        Q.    Is that correct, you didn't put this

 9    together?

10        A.    I did not put that together.

11        Q.    How would you describe for me what you did

12    as the senior and then executive director of national

13    accounts?  Just generally, what was your role at

14    Purdue?

15        A.    My role at Purdue was to be responsible

16    for the dis -- distribution of all of our products,

17    whether they were OTC or prescription, related

18    promotion to those -- of those products, in particular

19    the OTC brands which protected specific promotions.

20            My ultimate goal in distributing our

21    products was that they were at a given pharmacy when a

22    patient who needed any one of those products would

23    enter that pharmacy with a prescription or for a

24    non-prescription product and need them for a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    particular medical purpose.

 2         Q.    And when you say you were -- for the

 3    distribution of your products, what does that actually

 4    mean?  Were you -- were you making sure that they --

 5         A.    I was making sure that -- I'm sorry.  I

 6    interrupted you.

 7         Q.    No, go ahead.

 8         A.    I was making sure that the manufacturer --

 9    that the wholesalers had adequate supplies, that they

10    were being appropriately distributed to retail

11    pharmacies, in some cases hospital pharmacies, and

12    ensuring that adequate and appropriate inventories

13    were available in the marketplace.

14         Q.    And what did you mean by "related

15    promotion"?

16         A.    Related promotion, for example, would be,

17    with our OTC brands, we would be promoting specials as

18    far as the products go, setting up advertisements,

19    that type of thing.

20         Q.    And it -- it also included things like

21    e-mail blasts and others for some of the prescription

22    drugs as well, correct?

23         A.    What specific products are you talking

24    about?
```

```
 1        Q.    I'm talking about the opioid products.

 2        A.    The opioid products is that there would be

 3   initial distribution programs or promotions,

 4   particularly at launch, but it was not a -- opioids

 5   were not a product that we would normally promote in

 6   any specific way, like giving specials or that kind of

 7   thing.

 8        Q.    Okay.  I -- I wasn't asking whether you

 9   promoted them in any sort of special way, but they

10   were included in the promotion, correct?

11        A.    They were com -- included in the promotion

12   of products, yes.

13        Q.    And so -- and that was part of what you

14   did?

15        A.    That was part of what I did.

16        Q.    I think maybe if your counsel, just

17   because -- I'm going to put exhibit stickers -- you

18   know, sorting, I should have put -- I should have put

19   them on -- on Mr. Seid's.  Let's -- let's do it that

20   way.

21              If you'd just pass that over to me and

22   I'm -- or -- okay.  Actually, pass the whole Redweld

23   over and I'm just going to put -- pass that back to

24   you.
```

```
 1        A.    Okay.

 2              (WHEREUPON, a certain document was

 3               marked Purdue-Seid 30(b)(6)

 4               Deposition Exhibit No. 003, for

 5               identification, as of 12/12/2018.)

 6   BY MS. CONROY:

 7        Q.    Okay.  Mr. Seid, what I've marked as --

 8   in -- in the -- in the Redweld there are three manila

 9   folders, and I've marked as Exhibit 3 the one that

10   says:  "Topic #5:  Policies and Procedures For SOM."

11              What's SOM stand for?

12        A.    Suspicious order monitoring.

13              (WHEREUPON, a certain document was

14               marked Purdue-Seid 30(b)(6)

15               Deposition Exhibit No. 004, for

16               identification, as of 12/12/2018.)

17   BY MS. CONROY:

18        Q.    Okay.  And I've marked as Exhibit 4 the

19   folder labeled:  "Topics #13 and 14:  HDMA."

20        A.    Um-hum.

21        Q.    And what is HDMA?

22        A.    Health -- Health Distribution

23   Manufacturers Association.

24              (WHEREUPON, a certain document was
```

```
 1                       marked Purdue-Seid 30(b)(6)

 2                       Deposition Exhibit No. 005, for

 3                       identification, as of 12/12/2018.)

 4     BY MS. CONROY:

 5          Q.    And as Exhibit No. 5, the manila folder

 6     labeled:  "Topic #50 Wholesalers."

 7                Do you see that?

 8          A.    No. 5?

 9          Q.    Yeah.

10          A.    Yes.

11          Q.    Okay.  Mr. Seid, are you only testifying

12     here today up until the time that you retired?  Is

13     that your knowledge base today?

14          A.    My knowledge base would only be until I

15     retired, yes.

16          Q.    Have you informed yourself at all on

17     Topics 5, 13 and 14 or 50 with respect to what has

18     happened at Purdue after October of 2014?

19          A.    No, I haven't.

20          Q.    Okay.

21                Who would you -- who would, do you

22     believe, if anyone, would know the answers to those

23     issues after you left?

24          A.    After 2014, they've had various people
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   heading the department and I'm not aware of all of

 2   them.

 3        Q.    Who took your position?

 4        A.    A woman whose name escapes me, quite

 5   frankly.

 6        Q.    But did -- did she work --

 7        A.    She was not from the company before, so

 8   I'm --

 9        Q.    So she cay -- she came in new?

10        A.    She came in new.  She came from outside.

11        Q.    Did you ever work with her?

12        A.    Never.

13        Q.    If her name occurs to you over the day,

14   just blurt it out, okay?

15        A.    Okay.  I will do that.

16        Q.    Did anyone from -- that you worked with

17   from your department remain?

18        A.    Yes.

19        Q.    The woman that took over, did she -- was

20   she based in Connecticut?

21        A.    I -- she was working out of the home

22   office.  I understand that she is still retained where

23   she lived in Philadelphia, so I don't know if she

24   worked remotely or purely at the office.
```

1    Q.    Is there still a national accounts and

2    trade relations department so far as you know at

3    Purdue?

4    A.    I'm not sure exactly how it's -- it's set

5    up at this point, because they've had significant

6    reduction in staff recently.  And I know there were

7    some changes and that several of my former colleagues

8    were -- were laid off.

9    Q.    Take a look at Exhibit 3.

10    A.    Um-hum.  Yes.  I'm sorry.

11    Q.    I will identify what's in here.  We have a

12    front page which has invin- -- "Individuals Involved

13    in," Suspicious Order Monitoring, "SOM."

14          Do you see that?

15    A.    I see that.

16    Q.    Did you help put that list together?

17    A.    I did.

18    Q.    Okay.  And how did you do that, from

19    memory or --

20    A.    No.  I looked at an original list and made

21    some suggestions as to additions and deletions.

22    Q.    Okay.  And then the next document is Bates

23    PPLPC030000397963, and if you turn the page, it's an

24    Audit Committee Meeting --

Highly Confidential — Subject to Further Confidentiality Review

```
1      A.     Um-hum, yes.

2      Q.     -- from June 20th, 2007?

3      A.     Yes.

4      Q.     In the ordinary course would you have had

5   those -- something like this in your file while you

6   were at Purdue?

7      A.     If I prepared it, it would be in my file.

8      Q.     And this is one prepared by you, right,

9   Steve Seid there on the front page?

10      A.     That's what it says.

11      Q.     And can you tell me, audit committee

12   meeting, was that a -- a set meeting that took place

13   just once or was it a reoccurring meeting?

14      A.     I don't know.  I was asked to attend and

15   make a presentation, apparently, and I'm not sure if

16   it was a recurring meeting.

17      Q.     Are you a member -- were you a member of

18   the audit committee meeting?

19      A.     No, I wasn't.

20      Q.     Or I'm sorry, the audit committee?

21      A.     No.  I was a guest lecturer.

22      Q.     Okay.  The next document is

23   PPLPC018000246423 through -- it's just a two-page,

24   2/2.  On the top it says "Suspicious Order Monitoring
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    (SOM)."

2              Do you see that?

3    A.    Um-hum.

4    Q.    Did you prepare this document?

5    A.    No.  It looks like Jack Crowley prepared

6    this document.

7    Q.    And how can you tell that?

8    A.    Because on the back it says Jack Crowley.

9    Q.    And who is Jack Crowley?

10   A.    He was the executive dired- -- director of

11   CSA compliance.

12   Q.    And CSA is controlled substances?

13   A.    Yes.

14   Q.    And why is this included in this -- in the

15   package Exhibit 3 which responds to Topic No. 5?

16   A.    I don't know.

17   Q.    Was this document anything that you

18   referred to during your tenure at Purdue?

19   A.    I certainly knew the information that was

20   here, but I didn't refer to the -- to this.

21   Q.    Do you know if anyone did?

22   A.    No, I don't.

23   Q.    When you say you knew the information in

24   it, we can -- after we go through these, we can go
```

1   through some of the information that's in it, but have

2   you -- did you review this document prior to coming

3   here today?

4       A.    I did not review this document.  I don't

5   remember reviewing this document.

6       Q.    Okay.  The next document is

7   PPLPC031001491482 through 1487, and this is an SOP --

8   GC-SOP-0007.

9           Do you see that?

10      A.    Yes.

11      Q.    Could you tell me what this document is?

12      A.    This was the SOP of -- in reference to the

13  order management system.

14      Q.    And SOP means standard operating

15  procedure?

16      A.    Operating procedure, yes.

17      Q.    And was this a standard operating

18  procedure in effect at Purdue?

19      A.    It appears to be, yes.

20      Q.    Is this any -- did you ever operate

21  your -- within your responsibilities as the director,

22  senior, then executive, of national accounts and trade

23  relations pursuant to this SOP-0007?

24      A.    I'm not sure what you mean.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Did you ever -- did you use this document,

 2   this SOP in your --

 3        A.    I mean --

 4        Q.    -- daily business?

 5        A.    Well, not daily business, but it was

 6   related to order management system, yes.

 7        Q.    Okay.  And did you have -- did you assist

 8   in drafting it?

 9        A.    I reviewed it, but I did not draft it.

10        Q.    And that's where it says "Approval" down

11   at the bottom with the "SS"?

12        A.    Yes.

13        Q.    And --

14        A.    It was issued by -- drafted by legal.

15        Q.    And how -- and you can tell that where it

16   says "Issued:  Legal/national accounts," that means it

17   was drafted by the legal department?

18        A.    Well, I knew it was drafted by the legal

19   department because I reviewed it from them.

20        Q.    And what was the purpose of this SOP?

21        A.    To codify the procedure -- policies and

22   procedures as relates to order management sys --

23   system.

24        Q.    And what is the -- an order management
```

```
 1    system is up here, I've also seen it OMS.

 2              Does that make sense to you?

 3         A.    Um-hum.

 4         Q.    And --

 5    MS. PORTER:  Remember, don't answer "um-hum."

 6    THE WITNESS:  I'm sorry.

 7    BY MS. CONROY:

 8         Q.    -- what was the perfect -- purpose of the

 9    order management system?

10         A.    Honor -- order monitoring system.

11         Q.    Monitoring.  Okay.  So it says --

12         A.    It is order mannerment -- management on

13    top, but within the --

14         Q.    Oh, I see.

15         A.    -- the first paragraph.

16         Q.    I see.  Right here.

17              So you refer to it as the order

18    monitoring -- OMS as the order monitoring system?

19         A.    Well, we refer to it as the suspicious

20    order monitoring system.

21         Q.    Okay.  And what was the purpose of that

22    generally?

23         A.    The purpose of the SOP or of the system?

24         Q.    Of the system.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.      The system was based on what is a
2    directive in the CSA under Section USC 823 and 21 CFR
3    1301.b(74) [sic], but distributors in general, they
4    were responsible to create a system to order [sic]
5    suspicious opioid orders.
6        Q.      And would that encompass someone like
7    Purdue as well?
8        A.      Purdue is responsible for that, yes.
9        Q.      Okay.
10               Do you consider Purdue a distributor?
11       A.      The -- under the guidelines of the CSA,
12   DEA would consider Purdue a distributor.  I would not.
13       Q.      How do you refer to Purdue?
14       A.      As a manufacturer.
15       Q.      But it's your understanding that the CSA,
16   for want of a better word, lumps together
17   manufacturers and distributors?
18       A.      Um-hum.  Yes.
19       Q.      And this SOP is dated March 23rd -- or it
20   says:  "Effective Date:  March 23rd, 2009."
21               Do you see that?
22       A.      Yes.
23       Q.      Was there anything, do you know, in place,
24   any sort of an SOP prior to March 23rd of 2009 with
```

```
 1    respect to the order monitoring system?

 2         A.    I don't remember an SOP.

 3         Q.    When did the CSA take effect?

 4         A.    The CSA?

 5         Q.    Well, the CSA that you are referring to.

 6    You gave me the full name that refers to suspicious

 7    order monitoring?

 8         A.    I don't know exactly when the DEA put that

 9    into law.  The -- the CSA has been around since 1971

10    or '2.

11         Q.    Right.  Is it -- is it your understanding

12    that it was many years prior to March of 2009?

13         A.    It was years prior.  I don't know when.

14         Q.    Do you know if Purdue had any standard

15    operating procedure with respect to suspicious order

16    monitoring in place prior to this GC-SOP-0007?

17         A.    I don't know if there was an SOP in place,

18    but there was suspicious order monitoring being done

19    before that.

20         Q.    And were you the person that oversaw the

21    suspicious order monitoring prior to --

22         A.    No, I was not.

23         Q.    Who was that?

24         A.    Well, the way the committee was set up was
```

```
1    that the person who was the chair was in the general

2    counsel's office.

3         Q.    And while you -- who were the -- who were

4    the individuals who occupied that chair from the

5    general counsel's office during your tenure at Purdue?

6         A.    The chair was Robin Abrams.

7         Q.    For the entire time?

8         A.    Yep.  Yes.

9         Q.    Never -- never Mr. Udell?

10        A.    Never Mr. Udell that I am aware of.

11        Q.    Do you know if she is still the chair?

12        A.    No, she doesn't work for Purdue anymore.

13        Q.    Is that -- are these her initials down

14   here at the bottom, "REA"?

15        A.    Yes.

16        Q.    Do you know if there were any additional

17   standard operating procedures with respect to

18   suspicious order monitoring or order -- or an order

19   monitoring system after March of 2009?

20        A.    Yes, there was one in place.

21        Q.    Okay.  And what was that?

22        A.    It was basically what was established in

23   here.  It was the committee of various disciplines,

24   met on a regular basis, using state of the art data to
```

```
 1    review suspicious orders.

 2         Q.    And so those meetings began sometime after

 3    March of 2009?

 4         MR. HOFFMAN:  Object to form.

 5    BY MS. CONROY:

 6         Q.    That -- those committee meetings?

 7         A.    There were meetings prior to this, that --

 8    that date.

 9         Q.    Do you know when those meetings began?

10         A.    Not off the top of my head.

11         Q.    Do you know when the com -- approximately

12    when the committee was formed?

13         A.    It would be a guess.  2007.  It would be a

14    guess.

15         Q.    Why do you believe it was 2007?

16         A.    There were two letters sent from the DEA

17    in September of 2006 and one December of 2007 that was

18    reiterating to -- it was sent to all DEA registrants

19    who were distributors or considered distributors under

20    DEA's description, and they specifically talked about

21    having a suspicious order monitoring system in place.

22         Q.    And is -- and we'll look at some

23    documents.  I'm not really trying to tie you down to a

24    particular date, but your memory is you received
```

```
 1    something from the DEA and then a suspicious order

 2    monitoring committee was set up at Purdue?

 3         A.    A specific committee was set up, I

 4    believe, after that, yes.

 5         Q.    And were you a member of that committee?

 6         A.    I was a member of that committee.

 7         Q.    And what other disciplines were on that

 8    committee?

 9         A.    The other disciplines involved were --

10    with a representation would -- were from the legal

11    department and there was a person who was the director

12    of order monitoring systems that was also within the

13    legal department that was a member of the team.  The

14    vice president of corporate security, executive

15    director of CSA, myself, and director of

16    investigations, and then there were adjunct people who

17    would support us, generally with data and information.

18         Q.    Okay.  Did the position of executive

19    director of CSA exist before the committee was formed?

20         A.    Yes.

21         Q.    And the same for the corporate security

22    department?

23         A.    Yes.

24         Q.    Same for your department existed before
```

1    that, correct?

2         A.    Yes.

3         Q.    And the director of investigation?

4         A.    Yes.

5         Q.    What about the director of order

6    management that was from the legal department?

7         A.    No.

8         Q.    Did that position exist prior?

9         A.    That was -- no, that position did not

10   exist prior.

11        Q.    So that was a new position?

12        A.    That was a new position.

13        Q.    Did Ms. Abrams occupy that position or was

14   it someone else in her department?

15        A.    There are two people, I think, that are

16   listed there.  Initially Elizabeth Adams was the OMS

17   coordinator and then subsequent to that it was Giselle

18   Issa.

19        Q.    And when you -- was the committee in place

20   the -- your entire -- until you retired?

21        A.    Yes.

22        Q.    And was Issa, Giselle, the legal

23   department representative and the director of order

24   monitoring from the legal department when you retired?

```
 1        A.     Yes, she was.

 2        Q.     Do you know if SOP-double -- 0007 has been

 3   updated or supplemented since March of 2009?

 4        A.     I don't know.

 5        Q.     If you wanted to know that, how would you

 6   check it, and I realize you are not there anymore, but

 7   if -- if -- before you retired if you wanted to know

 8   if there were any updates to this standard operating

 9   protocol?

10        A.     I would have had to review it.

11        Q.     You'd have to review the protocol itself?

12        A.     I would have to review the update.

13        Q.     How would you know if there was an update?

14        A.     It would be sent to me by the legal

15   department.

16        Q.     And did you have a particular place where

17   they were -- where it was kept in your files or was

18   there a particular place at the company where all of

19   the standard operating procedures were kept as well as

20   their supplements?

21        A.     I had a fantastic admin who if there was a

22   place for it, she was able to put it there.

23        Q.     So you -- you would ask her and she would

24   give it to you?
```

```
1        A.    And I would get it.

2        Q.    Yeah, I -- I like those people.  They are

3   great.

4              Who was that?

5        A.    Cheryl Reuss.

6        Q.    And is she still at the company?

7        A.    No, she is not.

8        Q.    When did she leave?

9        A.    Recently she was part of the last layoff.

10       Q.    And so if you wanted to know if a

11  particular SOP existed or whether any had been

12  updated, you would go to Ms. Reuss --

13       A.    Yes.

14       Q.    -- and she would somehow be able to figure

15  out what the answer was?

16       A.    Or she would provide it for me to review.

17       Q.    Okay.  Do you know if Ms. Reuss was

18  contacted in preparing for your 30(b)(6) deposition

19  today?

20       A.    I don't.

21       Q.    You didn't talk -- contact her?

22       A.    I did not.

23       Q.    Are you in contact with her?

24       A.    I send her a Christmas card.
```

```
 1         Q.     The next document is PPLPC033000005829

 2   through 831.  This is dated January 24th of 2010 and

 3   it says "SOM Executive Summary."

 4                Do you have that one there?

 5         A.     Yes, I do.

 6         Q.     Do you know who wrote this document?

 7         A.     I don't.  Is this a draft or a final

 8   or...?

 9         Q.     This is what I received from your -- from

10   Purdue's counsel.

11                So is it familiar at all to you?

12         A.     I don't remember this document.

13         Q.     Have you read it in the last three to four

14   months, do you know?

15         A.     I've gone through it, yes.

16         Q.     Okay.  But it wasn't -- it is not familiar

17   to you what -- how it was prepared or who prepared it?

18         A.     No.

19         Q.     Was it anything that you ever referred to

20   during your tenure at Purdue?

21         A.     No.

22         Q.     And is it fair to say you didn't write it?

23         A.     I don't believe so, no.

24         Q.     The next document is PPLPD004687363 which
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    is an e-mail from Jack Crowley dated October 7th,

 2    2011, to a Barbara Boockholdt.

 3              Do you see that?

 4    A.    Um-hum.  Yes, I do.

 5    Q.    And why is this included in the package?

 6    A.    I don't know.

 7    Q.    Have you ever seen this before?

 8    A.    I don't remember reviewing this.

 9    Q.    The next document is Bates

10    PPLD004687385 --

11    A.    Um-hum.

12    Q.    -- and it contains a --

13    A.    -- yes.

14    Q.    -- spreadsheet list.

15              What is this document, if you know?

16    A.    This document is a sample of what a list

17    would appear in the database as it relates to

18    pharmacies that we were receiving information about.

19    Q.    So is this -- is this a report that was

20    generated from your database that contained pharmacy

21    information?

22    A.    This was more a summary than a report.

23    Reports would be based on the information that was in

24    here.
```

```
 1        Q.    Would this be -- is this a snapshot in

 2   time of the database with respect to pharmacies?

 3        MR. HOFFMAN:  Just so the record is clear,

 4   Jayne, it is actually an attachment to the prior

 5   e-mail, so that will explain what it is.

 6        MS. CONROY:  Oh, okay.

 7   BY MS. CONROY:

 8        Q.    Let's go back and take a look at that

 9   then.

10              In the middle of the document that was

11   from Jack Crowley, it says:

12              "Attached please find the list that we

13   have labeled 'slow pharmacies' with the new criteria,

14   retail pharmacies that have sales that are greater

15   than 350,000 and declined in units greater than or

16   equal to 50 percent."

17              Do you see that?

18        A.    Yes, I do.

19        Q.    A total number that met this criteria is

20   285.

21              Do you see that?

22        A.    Yes, I do.

23        Q.    So then let's look at -- that's what the

24   criteria is.  Is that what was put into the database,
```

1    that criteria "greater than 350,000 oxy one year sales

2    before reformulation."

3             Do you see that up at the top under

4    Criteria No. 1?

5       A.    Yes, I see that.  Since I did not prepare

6    this correspondence and did not provide it to Barbara

7    Boockholdt, the US DOJ, I am not aware of what

8    specific criteria and why they were providing it for

9    her.

10      Q.    Okay.  So you -- you did not prepare

11   yourself with respect to what this was at least in

12   preparation for me to ask you questions about it

13   today?

14      A.    Right.

15      MR. HOFFMAN:  Object to the form.

16   BY MS. CONROY:

17      Q.    I didn't hear your answer.  I'm sorry.

18      A.    The answer is, yes, I didn't -- I mean, I

19   looked at it, but it's not my document.

20      Q.    Okay.  And you didn't seek to ask anyone

21   else, anyone that might have been on this e-mail

22   attachment or Giselle Issa what this was all about, is

23   that fair?

24      MR. HOFFMAN:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.   No, I did not.

 3   BY MS. CONROY:

 4        Q.   Were you someone that would have been able

 5   to go into this particular database and pull out this

 6   information while you were at Purdue?

 7        A.   I could have done it, but, again, I relied

 8   on somebody who was much more efficient with dealing

 9   with databases to provide me summaries.

10        Q.   Okay.

11        A.   And he did a great job at doing that.

12        Q.   Who was that?

13        A.   Steve Projansky.

14        Q.   The next document is a Purdue document,

15   PPLPC019001275418.

16             It says up at the top:  "Order Monitoring

17   System (OMS).  Purdue developed the Order Monitoring

18   System to comply with Drug Enforcement Administration

19   (DEA) regulations to review and potentially report

20   orders that are deemed suspicious once identified."

21             Do you see that?

22        A.   Yes, I do.

23        Q.   Did you prepare this document?

24        A.   No, I did not.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Do you know who did?

 2        A.    No, I don't.

 3        Q.    At the bottom it says:  "To find out more,

 4   please visit:  www.purduepharma.com/getthefacts."

 5              Do you see that?

 6        A.    Yes, I do.

 7        Q.    Did you -- have you been on that website?

 8        A.    I have been on that website, but I have

 9   not seen -- I have only seen this document in hard

10   copy.

11        Q.    Do you know when this document was

12   created?

13        A.    I don't.

14        Q.    Do you know if there is a way to find that

15   out?

16        A.    I don't.

17        Q.    Who is able to post items on the

18   purduepharma.com/getthefacts?

19        A.    I don't know.

20        Q.    Have you ever put anything on that?

21        A.    I have never put anything on that.

22        Q.    Have you ever referred to that in your --

23   for any -- any of your job responsibilities during

24   your tenner at -- tenure at Purdue?
```

```
 1        A.    Not that I can attest to, and I think this

 2  is a relatively recent addition to their website.

 3        Q.    How can you tell -- how -- how do you tell

 4  that?

 5        A.    Because I don't remember it from when I

 6  worked there.

 7        Q.    I see.

 8              Does the -- if you look at the process, do

 9  you agree with the structure?

10        A.    Yes, I do.

11        Q.    And where it says:  "Purdue's OMS team

12  analyzes to deter" -- "Fa" -- "Factors that Purdue's

13  OMS Team Analyzes to Determine Pharmacy Review."

14              Do you see that?

15        A.    Um-hum.

16        Q.    Would you have been one of those team

17  members up through 2014?

18        A.    Yes, I would.

19        Q.    And would that be the same committee that

20  you mentioned to me?

21        A.    Yes, it would.

22        Q.    And it -- that was the OMS committee?

23        A.    SM -- SOMS we would call it.

24        Q.    SOM?
```

Highly Confidential - Subject To Further Confidentiality Review

```
 1       A.     We would call it.

 2       Q.     The SOM?

 3       A.     At least that's what I called it, SOMS.

 4       Q.     Okay.  We'll go by what you called it,

 5   okay.

 6              And so the factors would come -- if you

 7   look over on the left with -- from "data supplied by

 8   wholesalers on sales of Purdue products."

 9              Do you see that?

10       A.     Yes.

11       Q.     And where it says:  "To identify outliers

12   or indicia of potential concern," was that something

13   that the committee identified?

14       A.     They identified it using data, yes.

15       Q.     And who -- who selected the criteria that

16   would be applied to the data?

17       A.     The committee discussed the -- the

18   criteria and we relied on Sayee Na -- Natarajan was in

19   our IP department who was a -- a wizard with data and

20   creating algorithms and paradigms to -- to look at and

21   could do so very quickly and could actually very

22   rapidly adjust them as we needed, as circumstances in

23   the marketplace may change.

24       Q.     Okay.  So when it says:  "To identify
```

```
 1   outliers or indicia of potential concern," the

 2   committee would instruct Say- -- Sayeed, is that his

 3   name?

 4        A.    Sayee.

 5        Q.    Sayee.

 6              Sayee to either create an algorithm or

 7   some sort of a paradigm to capture that information?

 8        A.    Um-hum, um-hum, yes.

 9        Q.    And where was that data housed?

10        A.    It was housed in a computer system that

11   was proprietary -- in a data system that was

12   proprietary to Purdue.

13        Q.    And was that data system overseen by your

14   department or another?

15        A.    It is a difficult quest -- question to

16   answer be -- as to what oversight would be.  It was

17   more the committee was responsible for inputting what

18   the data was.  If there was an individual then who

19   would be responsible, it would be safe to assume that

20   it would be the chair of the committee.

21        Q.    And that would be?

22        A.    Robin Abrams.

23        Q.    Robin Abrams.

24              Did you have access to all of the data
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that was in the --

 2         A.    I had access to all of the pharmacy data.

 3         Q.    Then the second --

 4         MS. PORTER:  Let her finish her question.

 5         MS. CONROY:  I couldn't hear.

 6         MS. PORTER:  I was just saying to just make sure

 7    to let you finish your question before answering.

 8         MS. CONROY:  Thank you.

 9         MS. PORTER:  It is hard to get used to, but...

10    BY MS. CONROY:

11         Q.    It is a little stilted.

12               The next -- the next factor is:

13    "Discussions with wholesalers."

14               Do you see that?

15         A.    Um-hum.

16         Q.    "Based on concerning purchase trends and

17    other indications"?

18         A.    Um-hum.  Yes.

19         Q.    Who -- who would have had those

20    discussions with wholesalers?

21         A.    Various people within the -- particularly

22    the OMS team, SOMS team.  Myself, Jack Crowley,

23    corporate security.  I was often the liaison to get

24    them to the appropriate people, but it was generally
```

1    law enforcement types talking to law enforcement types

2    when it came to that.

3        Q.    And --

4        A.    Not commercial to commercial.

5        Q.    Okay.  And were there -- were there notes

6    kept or anything or was there -- was it -- was it

7    possible to put notes into the database or whatever

8    about those conversations?

9        A.    There were notes, and when the committee

10   got together for review, any appropriate or important

11   conversations would be noted.

12       Q.    In the minutes of the meeting?

13       A.    In the minutes of the meeting.

14       Q.    Was there any live way of tracking phone

15   calls or the ability, for ex -- for example, for

16   someone working at Purdue to, you know, put into the

17   database, Called, you know, Detective Smith?

18       A.    There were -- there were places for notes,

19   yes.

20       Q.    Okay.  Were those utilized?

21       A.    Yes.

22       Q.    And was that something that you or any of

23   the other committee members would review?

24       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.    And so did you -- you had access to that
2   at your desktop?
3       A.    I would have access to that at my desktop
4   generally after it was prepared by somebody else.
5       Q.    And if you had a question about a
6   particular order or a pharmacy, would it be your
7   general practice to go into the database and see what
8   notes had been left by others?
9       A.    If there were notes on a particular
10  pharmacy, yes.
11      Q.    Did -- all right.
12            Is that database -- was that database
13  still in existence when you left in 2014?
14      A.    Yes, it was.
15      Q.    Do you have any reason to believe it
16  doesn't still exist?
17      A.    I don't know.
18      Q.    Next factor is:  "Reports of concern and
19  Abuse and Diversion Detection (ADD) program reports
20  indicative of suspicious activity."
21            Did you utilize ADD reports on the SOM
22  committee?
23      A.    Yes, we did.
24      Q.    And what -- how did those get to you?
```

 1       A.     They were through, once again, the legal

 2    department.

 3       Q.     So the legal department would receive the

 4    ADD reports?

 5       A.     Yes.

 6       Q.     That's not something you would have?

 7       A.     No.  And if anybody attempted to give me

 8    them, I would refer them to legal.

 9       Q.     And did you ever receive copies of those

10    ADD reports from legal as part of your duties on the

11    SOM committee?

12       A.     If it was pertinent to a pharmacy we were

13    investigating, then I would see -- they would put in

14    the notes what was on the ADD report.

15       Q.     And when you say put in the notes, are you

16    talking about the meeting minutes or in the notes in

17    the database?

18       A.     Usually both.

19       Q.     So if there was an ADD report about a

20    particular pharmacy or wholesaler, you would actually

21    see a reference to the ADD report in the database?

22       A.     I can't attest to that.  I don't know if

23    it was triaged before it went in or not because it was

24    not through my department.

1    Q.    So you -- let me -- so you -- you don't

2  know whether there would be a reference to an ADD

3  report in the database in the -- what -- what do

4  you -- what do you -- let me -- let's start there.

5          What do you call that database where

6  the -- where the SOM committee would refer?

7    A.    I called it the Suspicious Order

8  Monitoring System pharmacy data.

9    Q.    Pharmacy data?

10   A.    Yeah.

11   Q.    And would the wholesaler data be there as

12  well?

13   A.    Yes.  That was primarily what was there.

14   Q.    Okay.  Tell me the -- tell me the -- well,

15  if you were asking Ms. Reuss, what would you -- what

16  would you tell her your -- you wanted to look at, what

17  was that database called?

18   A.    Well, this database was called the

19  Suspicious Order Monitoring System Database, Sales

20  Database.

21   Q.    Suspicious Order Monitoring Sales

22  Database?

23   A.    Um-hum.

24   Q.    Okay.

Highly Confidential -- Subject to Further Confidentiality Review

```
 1      A.    I don't know if there was any other

 2 acronym or specific name.

 3      Q.    But -- but if you asked for that, people

 4 would know what you were talking about?

 5      A.    They would know what I was talking about.

 6      Q.    And do you know if that existed prior to

 7 March of 2009?

 8      A.    I believe it did.

 9      Q.    Do you believe it began to exist around

10 the time that you've told me that the DEA sent the

11 letters, which may have been around 2007?

12      A.    Yes.  The data -- the data was there prior

13 to that.

14      Q.    Was the data in something called the

15 suspicious order monitoring sales database or was the

16 data collected and then put into that?

17      A.    The data was collected -- it was 'ceive --

18 received electronically on a daily basis from the

19 wholesalers, washed, if you will, through a -- a third

20 party that could aggregate the data and then send it

21 to us.

22      Q.    Was that third party ValueCentric or

23 ValueTrak?

24      A.    Yes, ValueCentric.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.    And did you have access to the Suspicious

2   Order Monitoring Sales Database on your desktop?

3       A.    Yes.

4       Q.    And was that true from we'll say 2007,

5   from the time it was -- that database was created

6   until you left?

7       A.    Um-hum.

8       Q.    Okay.

9       A.    Yes.

10      Q.    And did the other committee members have

11  access on their desktop?

12      A.    I don't -- I'm not sure all did.  I assume

13  they did, but I don't know for sure.

14      Q.    Okay.  And who else at -- at Purdue had

15  access to that database?

16      A.    Giselle Issa, I'm assuming Robin Abrams,

17  Steve Projansky, who worked with me, IT.

18      Q.    Were there any sections of the suspicious

19  order monitoring sales database that were protected

20  from view from some individuals and not others or did

21  you have to have particular rights to look at certain

22  data?

23      A.    It was available to those people it would

24  be pertinent to, but there was still a transparency,
```

```
 1   nothing was hidden from anybody.

 2        Q.    So any -- anyone who had access --

 3        A.    Access had access to all of it.

 4        Q.    And then the fourth box is:  "Publicly

 5   available legal or regulatory actions,

 6   informations" -- "information collected based on

 7   public searches of terms to identify actions taken

 8   against pharmacists or pharmacies."

 9             Do you see that?

10        A.    Yes.

11        Q.    What does that mean?

12        A.    That means that particularly the folks

13   within the corporate security and specific -- those

14   who were involved in investigations would aggressively

15   go after information in the public domain that may be

16   relevant to actions that a pharmacist or a pharmacy

17   was taking that may have been -- may have pointed to

18   inappropriate activities as it relates to prescription

19   drugs.

20        Q.    And would this type of information be put

21   in the database as well?

22        A.    It would be put in the ultimate -- yeah,

23   the ultimate data -- the aggregation of all of the

24   data.  The numbers were part of it, the information
```

1    was another part of it, and then it would all be

2    brought together.

3         Q.    And if I was at my desktop and I was

4    looking on the Suspicious Order Monitoring Sales

5    Database and if there had been a -- some public domain

6    information that had been identified by corporate

7    security or investigations, could I -- could I click

8    on that and see it or would there be a summary of what

9    that was or --

10        A.    You would see a summary of it before we

11   met.

12        Q.    And -- and that summary would be prepared

13   by the individuals who -- who tracked that down?

14        A.    It -- it would be generally prepared by

15   Giselle Issa.

16        Q.    And so corporate security or

17   investigations would give that information to Giselle

18   Issa and she would create the summary?

19        A.    Yes.

20        Q.    And somebody, maybe her or maybe somebody

21   else would actually input it into the database?

22        A.    Yes.

23        Q.    Do you know what the timeframe for that,

24   how long that would take?

```
 1        A.    I don't know.

 2        Q.    So is it a -- the discussions with

 3   wholesalers and when that went into the database,

 4   would that go to Giselle first as well?

 5        A.    It would probably be fed to her, yes.

 6        Q.    What about the data supplied that

 7   identified outliers or indicia of potential concern,

 8   would that go to Giselle Issa first?

 9        A.    Well, others could see it, but she would

10   probably get it to -- to aggregate it.

11        Q.    So would it be -- if we -- if we look at

12   this chart, would it be -- would it be fair to say

13   that all of this information first goes to Giselle and

14   then it goes to the OMS team review?

15        A.    It would be safe to say that it was

16   aggregated by Giselle before the team reviewed it.

17        Q.    Okay.  And with --

18        A.    But, again, there was -- there was --

19   among those of us on the team, there was transparency.

20        Q.    I think I understand what that means,

21   but -- but, for example, you might know something

22   about some data that might be some public domain

23   information that would be collected by corporate

24   security?
```

```
 1        A.    Um-hum.

 2        Q.    That would all be collected, aggregated by

 3   Giselle Issa --

 4        A.    Um-hum.

 5        Q.    -- then it would be transparent to you, is

 6   that correct?

 7        A.    Correct, right.

 8        Q.    And what would she prepare before -- for

 9   the OMS team to review?  So she -- she puts all of

10   this together and then what would she prepare for you?

11        A.    She would prepare a -- a series of reports

12   on individual pharmacies that the team needed to

13   review with all pertinent data and she would provide

14   follow-up reports on accounts where we sought

15   additional data and which had not been resolved prior,

16   at prior meetings.

17        Q.    What's the -- is Giselle her first name or

18   her last name?

19        A.    First name.

20        Q.    Okay.  And what's her -- what's her

21   background?

22        A.    I don't know.  She was always in the legal

23   department, but I don't know what her background was.

24        Q.    Is she a lawyer?
```

```
1         A.    I don't believe so, but I don't know.

2         Q.    Okay.  But she is legal department?

3         A.    Yes.

4         Q.    Do you know if she is -- I think I asked

5    you.

6               Is she still there, do you know?

7         A.    I don't know.

8         Q.    And then after the OMS team review, were

9    those -- how often were those team reviews held?

10        A.    Every three to four weeks.

11        Q.    And then it would go to either "Complete,

12   Referred" or "DEA Referral".

13              Do you see that?

14        A.    Yes.

15        Q.    So if the OMS team determined there was

16   sufficient information regarding the potential

17   suspicious order, what, it -- it would be shipped or

18   what would happen?

19        A.    I don't -- I don't understand the

20   question.

21        Q.    I'm just reading what it says here.  So in

22   this box it says:  "Complete, Referred."

23              Do you see that?

24        A.    Yes.  "Complete, referred" is in reference
```

1    to whether it has been referred to the DEA or not.

2        Q.    And what does that -- was it or was it

3    not?

4        A.    Complete would mean the report was

5    complete.  And if the team determined that there was

6    sufficient information as it relates to potential

7    suspicious orders, the account would be referred to

8    the DEA and generally the local DEA office of where

9    the pharmacy was.

10        Q.    And -- and what happens if the

11    determination of the team is that there was -- it --

12    it was not a potential suspicious order?

13        A.    If it was deemed complete and no action

14    was --

15        Q.    So when it says "complete" here, that

16    means no action with respect to the DEA, correct?

17        A.    I'm --

18        MR. HOFFMAN:  Object to form.

19    BY THE WITNESS:

20        A.    I'm really not -- again, I didn't prepare

21    this document.  I believe this document from after --

22    was created from the time after I was there.  So I

23    don't know exactly what the person meant in that box

24    who created that.  If it was me, I might have worded

```
1    it differently, but...

2         Q.    Well, you were there.  How would you have

3    worded it after it went through the OMS team review?

4              What would -- how -- how would you fill

5    that box out?

6         A.    I would fill it out, probably give a

7    better definition of what complete -- complete means.

8         Q.    And what would -- what would you say?

9         A.    Complete reviewed non-referral.

10        Q.    Non-referred, not -- non-referred to the

11   DEA?

12        A.    Right.

13        Q.    So complete would mean the investigation

14   was complete and no action, no DEA?

15        A.    No action was taken.

16        Q.    Okay.  Complete.

17             So your version of this box would be

18   complete, no action necessary, is that fair?

19        MR. HOFFMAN:  I'd just object.

20   BY THE WITNESS:

21        A.    I would -- I don't know if I would say not

22   necessary.  I would say it was complete and not -- not

23   referred.

24   BY MS. CONROY:
```

1    Q.    And by saying "not referred," you mean not

2    referred to the DEA?

3    A.    Right.  And that -- it may be a pharmacy

4    that -- we would not stop reviewing all of the

5    pharmacies after we deemed them complete.  So

6    something could happen again, so...

7    Q.    Sure.  It would all start again the next

8    day, right?

9    A.    Yeah.

10   Q.    I mean, it would -- yeah, I -- I didn't

11   mean to infer that no action forever.  I just mean it

12   would be --

13   A.    Right, that's -- that's --

14   Q.    So this -- this particular investigation

15   of either an outlier or indicia of initial concern, a

16   purchase trend, something that shows up on ADD report

17   or something public, the OMS team would have reviewed

18   whatever Ms. Issa aggregated from that and then they

19   would make a decision whether there was going to --

20   whether the investigation was complete, no referral to

21   the DEA, or we need to refer this to the DEA?

22   A.    And also missing from the box is there

23   could be additional review taken, so.  Complete just

24   means that it was thoroughly reviewed.

```
 1          Q.     Okay.

 2                 Oh, so there -- there could be potentially

 3    another box that would be still investigating?

 4          A.     Could be.

 5          Q.     And at some point that investigation would

 6    end and it would be either complete or --

 7          A.     Referred.

 8          Q.     -- or the DEA referral?

 9                 How did the DEA referral take place?

10          A.     Generally it was, again, an individual

11    within corporate security or CAA -- CSA compliance or

12    I would imagine on some occasions Robin herself would

13    contact DEA office.

14          Q.     Was there a -- did -- was that ever

15    anything that you did?

16          A.     No.

17          Q.     And do you know if there was a form for

18    that or anything in particular the way that was done?

19          A.     I don't know.

20          Q.     Was there any kind of a reference on the

21    Suspicious Order Monitoring Sales Database that would

22    indicate that a particular pharmacy or wholesaler had

23    been reported to the DEA?

24          A.     Yes, there would be.  It would be noted as
```

1    referred.

2          Q.    And that's what it would say, referred?

3          A.    Yeah.

4          Q.    And do you know who was responsible for

5    entering that onto the database?

6          A.    My assumption is Giselle Issa, but I don't

7    know for sure.

8          Q.    The next, what's been marked as Exhibit 4,

9    which is Topics 13 and 14, which is the HDMA --

10         A.    Um-hum, yes.

11         Q.    -- and what does HDMA stand for again?

12         A.    Health Distribution Management

13   Association.

14         Q.    Health Distribution Management

15   Association?

16         A.    Um-hum, yes.

17         Q.    What is that?

18         A.    The association that represents the

19   distribution arm of the pharmaceutical industry.

20         Q.    The distribution arm of the pharmaceutical

21   industry.

22               When did you first hear about HDMA?

23         A.    Well, I knew of -- of HDMA from the time I

24   was in the field as a manager and representative.

```
 1      Q.    Is -- is Purdue Pharma a member of Health

 2   Distribution Management Association?

 3      A.    They were.  I don't know if they are

 4   today.

 5      Q.    And how does one become a member, do you

 6   know?

 7      A.    You ask to join and you pay the dues.

 8      Q.    And were you a member yourself

 9   individually?

10      A.    No.  You are a member as an organization.

11      Q.    So you don't have to -- you don't have to

12   be an individual member?

13      A.    I -- I could be, but I don't want to be.

14      Q.    But -- but you didn't need to be, you were

15   already --

16      A.    I didn't need to be.

17      Q.    -- a member?

18      A.    Yes.

19      Q.    Did you have -- were there any sorts of --

20   did you have a membership card or a membership number,

21   anything like that?

22      A.    I'm -- I assume there was a membership

23   number.  I didn't -- I wasn't a card carrying member,

24   though.
```

Highly Confidential -- Subject to Further Confidentiality Review

```
1        Q.     Okay.  And you didn't need -- you didn't,

2   yourself, need to pay the dues, somebody in the --

3        A.     No, no.

4        Q.     -- in the corporation paid them?

5        A.     Yeah.

6        Q.     Do you know if there is any kind of a

7   selection process to become a member of HDMA?

8        A.     You'd have to ask the folks at HDMA.

9   Mostly it was manufacturers and wholesalers.  So I

10  guess there was a criteria of what they saw as a

11  manufacturer or a wholesaler.

12       Q.     Okay.  And how often were there HDMA

13  meetings?

14       A.     There were -- HDMA did things like

15  seminars and meetings on a fairly regular basis.

16  There were two major meetings that they had a year

17  that I attended.  One was a management con --

18  conference and one was a business-to-business

19  conference.

20       Q.     What was the difference between the

21  management and the business to business?

22       A.     The distribution management conference was

23  more a technical meeting, a topic meeting.  The

24  business-to-business meeting was -- was pharmaceutical
```

```
 1    speed dating where you met for, like, 20, 15,

 2    20 minutes with various people from wholesalers for

 3    two or three days.

 4         Q.    Okay.

 5               And when did -- where -- where would the

 6    meetings take place generally?

 7         A.    All over the country.

 8         Q.    And they would be twice a year, is that --

 9         A.    Twice a year.  Generally, I don't know if

10    they've changed, generally March for the distribution

11    management and September/October for the business to

12    business.

13         Q.    And you provided these names to your

14    counsel?

15         A.    Yes.

16         Q.    We know who Robin Abrams is.

17               Who is Chuck Forsaith?

18         A.    Chuck Forsaith is responsible -- he works

19    under the umbrella of corporate security and is

20    responsible for supply chain security.

21         Q.    Russ Gasdia was the national head of sales

22    and marketing?

23         A.    Yes.

24         Q.    Are you in contact with Mr. Gasdia at all?
```

```
 1         A.     Yeah, on occasion.

 2         Q.     Did you speak with him about his

 3    deposition?

 4         A.     No, I did not.

 5         Q.     Who is Aaron Granham?

 6         A.     Our former vice president of corporate

 7    security.

 8         Q.     Is he still with the company, do you know?

 9         A.     No, he is not.

10         Q.     James Lang?

11         A.     He was Russ Gasdia before Russ Gasdia was

12    there.

13         Q.     Okay.  And he is retired?

14         A.     Retired.

15         Q.     Do you remember approximately when he

16    retired?

17         A.     I think 2004.

18         Q.     Alan Must?

19         A.     I think he has a different title now, but

20    at that time he was the VP of state government

21    affairs.

22         Q.     He is still with the company as far as you

23    know?

24         A.     I believe he is, yes.
```

1        Q.      Okay.  Burt Rosen?

2        A.      Burt Rosen was federal government affairs,

3    also VP.

4        Q.      Do you know if he is still there?

5        A.      I don't believe so, but I'm not sure.

6        Q.      Yourself.

7                And who is Laura Watson?

8        A.      Director of customer service.

9                And just thinking about it, actually,

10   Steve Projansky who worked with me also would have

11   attended that meeting.

12       Q.      Okay.  What about Giselle Issa?

13       A.      She might have gone when Robin did a

14   presentation, but I can't tell you for sure if she did

15   or not.

16       Q.      What was the -- did -- did HDMA provide

17   value to you in your job?

18       A.      Value as to what?

19       Q.      To -- with respect to any -- any of your

20   job responsibilities at Purdue, was it -- was it a

21   useful thing for you to be involved with HDMA?

22       A.      I believe it was.

23       Q.      And -- and why would you say that?

24       A.      Because they were the association that was

```
 1   responsible that all of the wholesalers that we dealt

 2   with were members of.  That there were various topics

 3   that crossed manufacturers and wholesalers that were a

 4   value to gain a better understanding of, provide input

 5   into.  So from that standpoint they were valuable.

 6        Q.    Was it a -- a resource for you?

 7        A.    In some ways it was a resource.  There was

 8   data available through them.

 9        Q.    Was it a way to get together with other

10   manufacturers and distributors to discuss issues like

11   suspicious order monitoring?

12        A.    It was a way to get together with

13   manufacturers and wholesalers.  Topics varied.

14        Q.    Do you recall that suspicious order

15   monitoring was one of the topics that was discussed?

16        A.    Well, there were presentations at several

17   meetings on suspicious order monitoring.

18        Q.    Who would -- who would be -- who would be

19   giving the presentations?

20        A.    Various people.

21        Q.    Would they also be members that were

22   giving the presentations?

23        A.    Some were, some were outside, some were

24   outside experts.
```

1    Q.    I think you mentioned that Ms. Abrams gave

2    a presentation at one point?

3    A.    At least one, yes.

4    Q.    And what would she give a presentation on?

5    A.    Suspic- -- suspicious order monitoring.

6    Q.    Okay.  Did you help her with that?

7    A.    I'd probably like to say I did, but she

8    was pretty competent in her own right, so --

9    Q.    I didn't mean --

10    A.    -- probably not much.

11    Q.    Yeah, I didn't mean to suggest that she

12    wasn't, but, I mean, would you have -- would you have

13    kind of looked it over, or maybe supplied some slides

14    for her or whatever?

15    A.    I -- I don't even -- I don't even remember

16    looking it over, to tell you the truth.

17    Q.    Okay.

18    A.    It was good.

19    Q.    Would she have given it at the

20    business-to-business or the management meeting?

21    A.    Oh, no.  At the distribution management

22    conference.

23    Q.    Do you think she did it more than once?

24    A.    She may have done it more than once.  I do

1    remember one in particular.

2        Q.    Did you ever present?

3        A.    I introduced speakers a couple of times,

4    but I never presented.

5        Q.    Were there any tiers with respect to

6    membership that you know of HDMA where, you know,

7    there were, you know, lifetime members or founding

8    members or sponsoring members, anything like that?

9        A.    I know there are people who did

10   sponsorships, but I don't remember any tiers.

11       Q.    Also included in this folder is -- it

12   doesn't have a Bates on it.  It looks like a -- some

13   sort of a document called Supply Chain Security

14   Guidelines.

15       A.    Um-hum.

16       Q.    Do you see that?

17       A.    Yes.

18       Q.    Did you provide this to your counsel?

19       A.    Did my counsel provide this to me?

20       Q.    No.  Did you provide it to your counsel?

21       A.    Oh, no.  No, I didn't provide this to my

22   counsel.

23       Q.    Have -- had -- had you seen this document

24   prior to reviewing for your deposition?

Highly Confidential – Subject to Further Confidentiality Review

```
 1      A.    Yes.

 2      Q.    And what did you -- why -- what was the

 3  purpose of looking at this document before preparing

 4  for the deposition?

 5      A.    It was partner in our -- to our

 6  relationship with HDMA.

 7      Q.    And why is that?

 8      A.    Because Purdue was considered to be

 9  implementing state of the art supply chain security,

10  and Chuck Forsaith, who was mentioned previously, is

11  a -- an acknowledged expert in this area and was

12  involved I'm guessing with a -- significantly with

13  this report.  I was not.

14      Q.    You were -- you are calling this a report?

15      A.    I think this -- well --

16      Q.    That's okay.  I just -- whatever.

17            I see, if we turn the page, it says:

18  "Supply chain security guidelines:  A risk assessment

19  methodology for protecting in-transit shipments within

20  the US pharmaceutical supply chain."

21            Do you see that?

22      A.    Yes.

23      Q.    And this was copyrighted in 2011 by HDMA.

24            Was this -- was this something that was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   prepared or contributed to by Mr. Forsaith?

 2        A.    I believe it was.

 3        Q.    How do you -- how do you know that?

 4        A.    Because when the wholesale industry looked

 5   to somebody who was expert in that area, Chuck was

 6   usually the first person they went to.

 7        Q.    And is this a document that you would

 8   refer to while you were at Purdue?

 9        A.    No, it would not be.

10        Q.    And why is that?

11        A.    Because it was important for me that the

12   products got from Point A to Point B safely, but I was

13   glad that there were people other than myself who were

14   responsible to make sure that got done.  So they would

15   refer to this.

16        Q.    And let's -- let me just go back to that

17   chart that we saw.

18              Where would something like this Supply

19   Chain Security Guidelines -- well, let me ask you

20   this.

21              Does the Supply Chain Security Guidelines

22   have something to do with suspicious order monitoring?

23        A.    No.

24        Q.    Okay.  And it's -- it's separate from
```

```
 1    suspicious order monitoring?

 2        A.    It is separate from suspicious order

 3    monitoring.  It's the safe storage receipt, stafe --

 4    safe storage transportation receipt and then storage,

 5    again, of controlled substances -- of I should say

 6    pharmaceuticals in general.

 7        Q.    And that was Mr. Forsaith's area?

 8        A.    That's his bailiwick, yes.

 9        Q.    Okay.  And what was his -- I think I wrote

10    it down.

11              He was corporate security?

12        A.    Um-hum.

13        MR. HOFFMAN:  Jayne, just so you know, you

14    are -- you are at an hour 20.

15        MS. CONROY:  Okay.

16    BY MS. CONROY:

17        Q.    The other documents in the HDMA, if you

18    look through them, did you -- we can identify them or

19    they'll be identified off the record.

20              Are these documents that you collected?

21        A.    I did not collect them or provide them,

22    no.

23        Q.    The final document is a PowerPoint slide

24    deck with Robin Abrams.
```

1          Do you think that's at least one of her

2    presentations?

3          A.    Yes.

4          Q.    I see that it was dated March 8th of 2012.

5          Do you recall, just looking at it, whether

6    you had anything to do with helping to prepare it?

7          A.    No.  I attended, though.

8          Q.    Okay.  Let's look at Exhibit 5.  And this

9    is the Topic No. 50, which is wholesalers.

10         A.    Um-hum.  Yes.

11         Q.    Did you put these documents together?

12         A.    Some of them, not all of them.  I -- I

13   didn't put them together and provide them.

14         Q.    Okay.  Did you review all of these dep --

15   these documents in preparation for your deposition?

16         A.    I reviewed some of them, not -- not all of

17   them.  I think most of them.

18         Q.    Most of them what?

19         A.    I did review them.

20         Q.    Okay.  If you go to a little bit -- a few

21   documents in, the report to the OMS team,

22   September 29th, 2010, about SafeScript Pharmacy.  It

23   looks like --

24         A.    One more, SafeScript, yes.

1      Q.    Would this be something -- where it says:

2    "Report to OMS Team," would that be to the OMS

3    committee or the SOM committee we were talking about

4    earlier?

5      A.    Yes, it would be.

6      Q.    Is this the sort of document that Giselle

7    Issa would have put together from aggregate

8    information and provided it to the committee for

9    review?

10     A.    Yes.  This is the kind of detailed

11   document she would put together.

12     Q.    Is the -- I don't see any other standard

13   operating procedures or protocols with respect to

14   suspicious order monitoring in your collection.

15          So is the one that we looked at a bit ago

16   that was in Exhibit 3, is that the only one that you

17   are familiar with?

18     A.    That's the only one that I am familiar

19   with.

20     Q.    Is that the only one that you used?

21     A.    That's the only one that I am familiar

22   with.

23     Q.    Have you ever heard of Protocol 7.7?

24     A.    7.7?

1        Q.    Is that familiar to you?  It is not in

2   these documents, but is that -- is that --

3        A.    Protocol 7.7?

4        Q.    Yes.

5        A.    I don't know.  I have no idea.

6        Q.    Okay.

7        MS. CONROY:  At this point, from Plaintiff's

8   point of view, we are going to suspend the 30(b)(6).

9   We do have a -- a pending motion or a meet and confer,

10  I think we've spoken about this, with Special Master

11  Cohen about seeking additional time for Purdue's

12  30(b)(6), but thank you and we will take a break,

13  figure out -- I think our LiveNote works, but...

14       MR. HOFFMAN:  Yeah, and I -- I will have just a

15  few follow-up questions on a couple of documents that

16  you referred to.

17       MS. CONROY:  Okay.

18       MR. HOFFMAN:  It shouldn't be long, but...

19       MS. CONROY:  That's fine.

20       THE VIDEOGRAPHER:  We are off the record at

21  11:23 a.m.

22                   (WHEREUPON, a recess was had

23                    from 11:23 to 11:38 a.m.)

24       THE VIDEOGRAPHER:  We are back on the record at

```
 1    11:38 a.m.

 2                        EXAMINATION

 3    BY MR. HOFFMAN:

 4         Q.    Good morning.  Again, Mr. Seid, how are

 5    you?

 6         A.    Good morning.  I'm fine.  Thank you.

 7         Q.    Again, for the record, my name is Nathan

 8    Hoffman.  I represent Purdue, and now it is my chance

 9    to ask you some questions, okay?

10         A.    Yes.

11         Q.    I want to go back and primarily discuss

12    the order monitoring system, or as it has been

13    referred to, the suspicious order monitoring system,

14    and I'd like to start with the SOP that you had some

15    discussion with Plaintiff's counsel about.  It's in

16    Group Exhibit 3.  And, again, for the record, it is

17    PPLPC031001491482.

18              So this is the SOP dated March 23, 2009,

19    on the order monitoring system that you had some

20    discussion with Ms. Conroy about, is that right?

21         A.    Correct.

22         Q.    I just want to go into a little more

23    detail into the process, and if you would, please,

24    turn to the second page.  I'd like to discuss with you
```

1    in some detail some of the inputs that went into the

2    order monitoring system for review.

3              In the paragraph there, the first

4    paragraph that I have highlighted, it says:

5              "As part of this SOP, Purdue has

6    instituted and developed an OMS program to review data

7    received from Purdue's authorized distributors per

8    fee-for-service (FFS data) contracts."

9              Do you see that?

10   A.    Yes.

11   Q.    I don't think we've defined yet what FFS

12   data is or those contracts.

13             Can you help us understand what that

14   means?

15   A.    We had contracts with all of our

16   wholesalers, some in the industry called them

17   distribution service agreements.

18             "FFS" stands for fee-for-service.  These

19   are negotiated contracts, and as part of the contracts

20   we receive data from them.  The data encompasses a

21   broad base of information, including what is in their

22   distribution system.  It gives us insight to orders

23   out, which means out of the wholesaler into the

24   retailer, and from which specific DC or distribution

1    center that product is going.  And we can see -- it

2    gives us insight, therefore, to product on hand at a

3    retailer and what their sales volume of a particular

4    retailer would be for our items by product by SKU, by

5    stock keeping unit.

6         Q.   Okay.  So if I understand correctly, the

7    data that would be received by Purdue from its

8    wholesale distributors would include the data at the

9    wholesale level, No. 1, as well as data at the retail

10   level, No. 2, and then also regionally as to where it

11   was distributed within different regions of the

12   country.

13              Would that be an aspect of it?

14        A.   It would be more spe- -- it would be down

15   to -- regionally, yes, but it would be down to street

16   level.  It would be store.

17        Q.   Okay.  The exact address --

18        A.   Right.

19        Q.   -- where -- where the --

20        A.   Yeah, yes.

21        Q.   -- the products ended up?

22        A.   Yes.

23        Q.   At a -- at a retail level for example?

24        A.   Right.

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.     And you would have that data, you said, by

2    SKU, meaning for each individual product and the lot

3    that was shipped, and would it go down all of the way

4    to the individual bottles that were shipped?

5       A.     We would know the number of bottles.

6       Q.     Okay.

7       A.     We wouldn't know lots.

8       Q.     Okay.

9       A.     That's -- that's a different system.

10      Q.     Got it.

11             But all of these data would be coming into

12   Purdue on, would it be a monthly basis?

13      A.     Depending on the contractual arrangement

14   with the wholesaler and minimum would be weekly, but

15   for most it was daily and in my negotiations I pushed

16   for daily.

17      Q.     Okay.

18      A.     I wanted optics on it.

19      Q.     So every single day Purdue would receive

20   these data from the wholesalers that would go down to,

21   as you referred, the street level to the exact address

22   and the pharmacy where the product ended up?

23      A.     Um-hum, yes.

24      Q.     And all of those data would go into, as I
```

```
 1    understand it, the order management or the order

 2    monitoring system?

 3         A.    The database for the order monitoring

 4    system, yes.

 5         Q.    Okay.  Let's go on.

 6               It says:  "The program uses certain

 7    specified parameters to determine which accounts,

 8    wholesaler or retail, shall be subject to further

 9    review in an effort to ascertain whether any order or

10    series of orders meet the standards of being 'suspect'

11    and warrant a potential DEA referral."

12               Do you see that?

13         A.    Yes.

14         Q.    And is that -- is that a -- just a general

15    description of the -- the overall purpose of the OMS

16    system?

17         A.    That's a general description of the

18    overall purpose.

19         Q.    Okay.  It goes on to say:

20               "An account will be reviewed as part of

21    the OMS program if the FFS data entered falls," it

22    says "falls outside established parameters based upon

23    certain norms, or other indicia are present that

24    suggest further review is appropriate."
```

 1          Let me stop there.  When -- when the SOP

 2    says "falls outside of established parameters" and it

 3    mentions "certain norms," you may have discussed this

 4    briefly earlier, but how were those established

 5    parameters, certain norms, how did Purdue come to put

 6    those into place?  In other words, what were the,

 7    generally speaking, the parameters and the certain

 8    norms that the data was judged against, how did Purdue

 9    come up with those?

10        A.    A condensed version of how that was done

11    would be if you looked at a particular product and

12    that particular bot -- product had four strengths and

13    we knew what percentage of our business was in any

14    given strength and what our prescription level was in

15    any given strength, so what we would look at and

16    create algorithms as related to that would be things

17    like volume, does it exceed or does it not meet --

18    meet a certain level for volume.

19          Second, we would look at the particular

20    combination of strengths.  In the case of the opioids,

21    we would be -- what might be an area of concern is if

22    a large part of the ordering was in a higher strength

23    as compared to a lower strength based on norms.  And

24    we'd add in other aspects, like are they buying our

Highly Confidential - Subject to Further Confidentiality Review

```
 1   other products, which would indicate, for example,

 2   that they were a full line, in quotes, pharmacy.

 3        Q.    Okay.  And, in fact, the SOP mentions some

 4   of the factors at least considered at this point in

 5   time in March of 2009.

 6              Do you see those down here?

 7        A.    Yes.

 8        Q.    Okay.  We'll get there in a -- in a -- in

 9   a minute.

10              It goes on to say:  "The criteria are

11   based on looking at the population of retail customer

12   data received via FFS and identifying," it says

13   "outliers based on statistical analysis (i.e. based on

14   average and standard deviation of comparable customer

15   populations)."

16              And was that what you were just

17   describing --

18        A.    Yes.

19        Q.    -- in terms of some of the factors --

20        A.    Absolutely.

21        Q.    -- that were looked at?

22              And that all went into, I think you said

23   it was an algorithm, a computer algorithm?

24        A.    We would create, yes, a comp -- an
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    algorithm utilizing the data.

 2         Q.    Okay.  And --

 3         A.    I had a database of the data.  That was

 4    for me.

 5         Q.    Okay.  Okay.

 6         A.    And we fed that data into the system.

 7         Q.    I see.

 8               And then listed here are some of the

 9    factors, includes:  "Number of wholesalers from which

10    retail account purchases, number of times retail

11    account orders the same product the same day,

12    percentage of order including Purdue products other

13    than OxyContin, total dollar value of OxyContin, and

14    then percentage of 80-milligram strength being

15    purchased."

16               Do you know whether some of these criteria

17    may have evolved over time as you continued to review

18    and analyze the data?

19         MS. CONROY:  Objection.

20    BY THE WITNESS:

21         A.    I think it evolved over time and it was

22    refined over time.

23    BY MR. HOFFMAN:

24         Q.    Okay.  But -- but is it fair to say based
```

Highly Confidential - Subject to Further Confidentiality Review

1   upon these factors, the algorithm would essentially,

2   for lack of a better term, throw up a red flag and say

3   a particular order or series of orders may be suspect?

4        A.    Yes.

5        MS. CONROY:  Objection.

6   BY MR. HOFFMAN:

7        Q.    Okay.  And how would you receive that,

8   again, red flag or indication that there may be a -- a

9   suspicious order?

10       A.    Well, for this system it would be, again,

11  based on this criteria.  And against an average or a

12  norm that we would -- it would -- it would jump out at

13  us.

14       Q.    So --

15       A.    You didn't have to search for it.  It

16  would be there.

17       Q.    So on the -- what -- what I'm -- I guess

18  what I'm asking is, as a practical matter when you

19  were on your laptop or your computer, would it just --

20  would there be an alert or some kind of indication to

21  you?

22       A.    There were -- well, there were two --

23  there were two systems that were parallel.  This SOP

24  refers primarily to what was going into a pharmacy,

1  but you also had an alert system for -- for what was

2  being sold to a wholesaler, and those would hit,

3  first, customer service -- well, it would come up on

4  my screen, but it would -- customer service would be

5  alerted, I would be alerted and Steve Projansky who

6  was my associate director would be alerted.  And if

7  those orders to wholesalers didn't meet certain

8  criterias, there were alerts sent.

9        Q.    Okay.  So you had the wholesaler orders

10  and then you also had alerts that were sent at the

11  retail level as well for certain pharmacies?

12        A.    No.  The -- there would not be alerts.

13  We'd have to -- we used the OMS system to identify the

14  a -- the alerts, if you will --

15        Q.    Okay.

16        A.    -- for the pharmacies.

17        Q.    Okay.  And so what you've just described

18  is, when we -- if we go back to this order monitoring

19  system overview schematic, what you've just described,

20  is that -- is that in this box over here on the -- on

21  the left?

22        A.    That would be, yes, the data supplied by

23  wholesalers on sales of Purdue products.

24        Q.    Okay.  And then if -- if an order or

1    series of orders were -- if they were flagged, the SOP

2    then goes on to discuss how the review of the accounts

3    would be conducted.

4            Do you see that?

5    A.    Yes.

6    Q.    Okay.  It talks about an interdisciplinary

7    group, including representatives of the Office of

8    General Counsel, CSA compliance, national accounts and

9    corporate security --

10    A.    Um-hum.

11    Q.    -- would meet --

12    A.    Yes.

13    Q.    -- and then they would have a discussion,

14    including maybe a follow-up discussion with the

15    authorized distributor, and then, if warranted, there

16    would be a referral that would be made to the DEA that

17    would be handled by CSA compliance.

18            Do you see that?

19    A.    Yes.

20    Q.    And I don't know if we've defined what CSA

21    compliance is yet.

22            What is -- what is that department?

23    A.    Controlled substance.

24    Q.    Okay.  And you would have been in national

```
 1    accounts, obviously?

 2         A.    Yes, I was national accounts.

 3         Q.    So this SOP goes on to describe various

 4    groups that would be involved in the internal review

 5    process, is that right?

 6         A.    Correct.

 7         Q.    So we have national accounts, CSA

 8    compliance, and then it talks about:

 9               "The pertinent field representative and

10    his or her supervisor will be notified when a retail

11    account requires further scrutiny from a local

12    representative with respect" -- excuse me -- "with a

13    request to provide certain information."

14               Now, I understand that that wouldn't

15    necessarily be your area, but was that part of the

16    information that was collected, it would -- it would

17    be interviews of sales representatives and district

18    managers, perhaps, to provide additional information

19    regarding the pharmacy accounts?

20         A.    Yes, they would.

21         Q.    It talks about after -- after sales force

22    responds, then there is a review by corporate

23    security.

24               Do you see that?
```

1      A.    Yes.

2      Q.    And then following corporate security

3  review, it says it -- it may be marked for CSA

4  compliance review?

5      A.    Yes.

6      Q.    And then:  "The reviewing team under the

7  guidance and direction of general counsel would then

8  discuss and perform," it says, "next steps as

9  appropriate and coordinate its assessment with the

10 authorized distributor."

11           Do you see that?

12     A.    Yes.

13     Q.    And is that generally consistent with your

14 recollection of how the OMS team review process

15 worked?

16     A.    Yes.

17     Q.    And so that would be -- so after we have

18 all of these various inputs, now we are talking about

19 this review right here, is that right?

20     A.    Yes.

21     Q.    Okay.  The SOP then goes on to talk about

22 actually three final status values that could be

23 assigned.

24           Do you see that?

```
 1      A.    Yes.

 2      Q.    So one is -- is:  "Pending, action:  This

 3   indicates that the team has completed its initial due

 4   diligence and feels that further inquiries must be

 5   made in order to properly assess the account and/or

 6   coordination with the authorized distributor must be

 7   scheduled."

 8            See -- did you see that?

 9      A.    Yes.

10      Q.    So this means that the -- the inquiry is

11   essentially just still ongoing, is that fair?

12      A.    Yes.

13      Q.    The next status is:  "Complete, closed:

14   This indicates that the team took an action or it was

15   concluded by the team that the account was not a

16   concern based on available information - no further

17   review at this time."

18            Do you see that?

19      A.    Yes.

20      Q.    So would that indicate an example that

21   Ms. Conroy discussed with you earlier where the review

22   was complete but it -- that order or that outlet is

23   not referred to the DEA?

24      A.    Correct.
```

1    Q.    Okay.  And then our final category is:

2    "Complete, referred:  This indicates that it was

3    determined that there was sufficient information that

4    indicated a potential suspicious order, thus requiring

5    referral to the local DEA field division office.  If a

6    referral is made, Purdue will notify its authorized

7    distributor of such action."

8              Do you see that?

9    A.    Yes.

10    Q.    So that's kind of our final category.  And

11    just so we are clear on our schematic here again,

12    it -- there are three categories, but it -- it is

13    actually talking about just that -- that last

14    category, is that fair?

15    A.    Yes.  Yes.

16    Q.    Okay.  And then it talks about the -- the

17    DEA referral actually being made over here, is that

18    right?

19    A.    Correct.

20    Q.    Okay.  And, again, is this all generally

21    consistent with your recollection of how the process

22    worked --

23    A.    Yes, it is.

24    Q.    -- dur- -- during your time at Purdue?

```
 1        A.     Yes, it is.

 2        Q.     I want to go now to the PowerPoint which

 3   was in Group Exhibit 4.  And I guess before we discuss

 4   this exhibit in some level of detail, I recall that

 5   you mentioned a couple of times on the record that

 6   it's your belief that Purdue's suspicious order

 7   monitoring system was state of the art, you referred

 8   to it as state of the art a couple of times.

 9               Do you recall that?

10        A.     Yes.

11        Q.     Why did you refer to it as state of the

12   art?

13        A.     Well, for a -- a couple of reasons, is

14   that I believe from what I ascertained from the

15   industry is that it appears that we started sooner

16   than most and took a more vigorous approach than most

17   to putting a robust suspicious order monitoring system

18   in place.

19               I know for -- well, I shouldn't say for a

20   fact.  I'm confident that we were the first

21   distributor to aggressively reach out to the

22   wholesaler and say, This is a concern and we need to

23   work together, which, quite frankly, met some

24   resistance at the wholesalers, like, basically, mind
```

```
 1    your own -- your business and we'll mind ours, but we

 2    didn't want to take that approach.

 3              The other aspect was that we were the

 4    first that I am aware of that developed the kind of

 5    algorithms that we developed in our system, so much so

 6    that our vendor, for just raw data, basically took

 7    their understanding of our modeling, created a module

 8    that they marketed to other people, really, based on

 9    the way that we did it, because that's how robust and

10    how unique it was.

11         Q.    Okay.

12         A.    So we were -- we were very confident

13    that -- and I think that's one of the reasons that

14    Robin was invited to give this -- this talk, because

15    we had -- we were so -- we seemed to be further down

16    the road, if you will, than most manufacturers as

17    related to suspicious order monitoring.

18         Q.    You mentioned some initial conversations

19    with wholesalers.

20              Is it fair to say over time that you did

21    work collaboratively with the wholesalers in terms of

22    suspicious order monitoring?

23         A.    Yes, we did.

24         MS. CONROY:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. HOFFMAN:

 2        Q.    Now, if we go to the PowerPoint that's in

 3    Group Exhibit 4.  For the record, it's

 4    PPLPC004000317962.

 5              And is this the PowerPoint presentation by

 6    Robin Abrams that you discussed briefly earlier today

 7    with Plaintiff's counsel?

 8        A.    Yes.

 9        Q.    And this was presented at an HDMA

10    conference in March of 2012, is that right?

11        A.    Yes, the distribution management

12    conference.

13        Q.    You mentioned earlier today your

14    recollection that the OMS program as described in the

15    SOP may have started back in or around 2007, is that

16    right?

17        A.    Yes.

18        Q.    And does the PowerPoint recount the DEA

19    correspondence that you referred to earlier?

20        A.    I'm sorry.  One more time, the --

21        Q.    On Slide 3, I'm sorry, Slide 3, it says:

22    "History of the Purdue OMS program"?

23        A.    Yes.

24        Q.    Do you see there at the top where it says:
```

1    "Followed DEA correspondence"?

2        A.    Yes, I'm sorry.

3        Q.    Is that the correspondence you referred to

4    earlier in --

5        A.    Yes, it is the correspondence I referred

6    to earlier.

7        Q.    And you believe it was around 2007?

8        A.    September of 2006 and December of 2007.

9        Q.    Okay.  And it mentions that the expanded

10   program was launched in 2008.

11             Do you see that?

12       A.    Correct.

13       Q.    And then the SOP that we just looked at

14   was finalized in March of 2009, is that right?

15       A.    Correct.  Yes.

16       Q.    Now, we've already talked about some of

17   the OMS information sources, including the FFS data.

18       A.    Um-hum, yes.

19       Q.    And then it also mentions:  "IMS

20   outlet/prescriber data and sales ops outlier

21   analyses."

22       A.    Yes.

23       Q.    I'm not sure, maybe it is just me, I don't

24   know if we've defined all of that yet.

1           Do you have some understanding as to what

2    that's referring to?

3        A.    Separate from the data that we received in

4    national accounts, there was outright data -- outlet

5    data available through IMS that our sales ops

6    department used.

7           Also, again, you asked about why I felt we

8    were state of the art.  I'm not confident that other

9    manufacturers, at least early on, tried to link

10   prescribers to the data, which we did early on.  So

11   what it refers to here is that if there was a pharmacy

12   that we had questions about, we tried to look at using

13   this segment, the prescribers that were sending

14   prescriptions to that pharmacy.

15       Q.    Okay.  And, in fact, I think on the next

16   page there is some definitions of that.  It mentions

17   pres -- well, maybe -- maybe -- maybe it's separate.

18   Let's -- let's just go through it one --

19       A.    No, it's on the next page.

20       Q.    Let's go through it one step at a time.

21   Maybe it is separate.  Let me just finish off with --

22       A.    Okay.

23       Q.    -- some of these other areas.

24           It mentions:  "Sales force reports of

```
 1   concern" --

 2        A.    Um-hum.  Yes.

 3        Q.    -- which I think may have been mentioned

 4   earlier.

 5             "Prescriber program information."  If we

 6   look on the next page, it says:  "Prescriber Program:

 7   Focus in on prescriber and Rx history/patterns," and

 8   then it also talks about OMS, which is what we just

 9   referred to, as -- with the dispenser or the

10   pharmacist and order histories or patterns.

11             Do you see that?

12        A.    Yes.

13        Q.    So -- so how was the prescriber program,

14   if you know, different from the OMS system?

15        A.    I was not responsible for the prescriber

16   program.

17        Q.    Okay.

18        A.    So the only thing I can attest to as it

19   relates to this, Nathan, is the fact that it was a way

20   where you could find appropriate as opposed to

21   inappropriate prescribers that may have been

22   utilizing -- sending their patients to a particular

23   pharmacy.

24             A simple example is that if there was a
```

1    pharmacy that was dispensing a significant amount of

2    OxyContin across the street from Memorial Sloan

3    Kettering and the prescribers sending patients to that

4    pharmacy where we could track the scripts were

5    primarily oncologists or pain management specialists,

6    often associated with the hospital, we felt very

7    confident that although their volume was high and may

8    have been higher in the stronger, higher doses,

9    strengths, that those were probably for legitimate

10   patients, probably, you know, we didn't -- because of

11   HIPAA, I mean, we didn't know what the diagnosis was,

12   but probably for -- for cancer patients.

13            Conversely, if there was a -- a pharmacy

14   where -- in the database where the prescriber may have

15   been concerned, if they were feeding a pharmacy, that

16   would be data that we could relate to that pharmacy.

17        Q.    Okay.  And so when it talks about the

18   prescriber program, which I -- I know you weren't

19   directly responsible for, but do you know whether that

20   includes the -- the ADD program that's mentioned in

21   the schematic over here?

22        A.    I believe it did, yes.

23        Q.    Okay.  That would be a -- that would be

24   coming up on the sales side, but that would be an

1    additional input as we discussed earlier into the OMS

2    team review?

3        A.    Yes.

4        Q.    But it also mentions government agencies,

5    law enforcement, I believe we -- you spoke with

6    Ms. Conroy about that earlier in terms of folks who

7    would search available databases and be on the lookout

8    for reports from -- from government sources, is that

9    right?

10       A.    Yes.

11       Q.    And then finally, I don't think we -- we

12   talked about it before, but also, would Purdue also

13   monitor media reports for --

14       A.    Yes.

15       Q.    -- doctors and pharmacies and that type of

16   thing?

17       A.    Yes.

18       Q.    And all of that information, again, would

19   go into the team that you are a member of here, the

20   OMS team review process, is that right?

21       A.    Yes.

22       Q.    Now, you -- you mentioned a few times what

23   other manufacturers may or may not have been doing.

24            Is it fair to say, however, that you

```
 1    don't -- you personally don't have any -- any personal

 2    or specific knowledge regarding what other

 3    manufacturers would -- were doing at this time?

 4         A.    I didn't have any personal knowledge.

 5         Q.    Okay.  Now, if you turn, please, to

 6    Slide 12, you referred to earlier meeting with

 7    distributors.

 8               Do you recall that?

 9         A.    Yes.

10         Q.    And does this generally describe the fact

11    that between September 2008 and March 2012 Purdue met

12    in person with ten separate wholesalers?

13               Do you see that?

14         A.    Yes.

15         Q.    It mentions the reason for that is to

16    discuss OMS programs and procedures and opportunities

17    for better collaboration.

18               Do you see that?

19         A.    Yes.

20         Q.    And do you believe that that did, in fact,

21    occur over time?

22         A.    Yes, it did.

23         Q.    It also says:  "Throughout that time,

24    Purdue engaged in regular ongoing contact via
```

1    conference calls and joint site visits to discuss

2    particular accounts of concern and appropriate

3    follow-up."

4              Did you -- do you see that?

5        A.   Yes.

6        Q.   And were you, in fact, involved in -- in

7    some or all of those site visits?

8        A.   I did not do site visits.

9        Q.   You did not?

10       A.   No.

11       Q.   Did you accompany the -- anyone who went

12   on a site visit or did -- did you just coordinate it

13   with the wholesaler, for example?

14       A.   I may, if needed, provide entree to the

15   appropriate person, but it was generally a corporate

16   security or a CSA compliance with a similar person at

17   the wholesaler.

18       Q.   Okay.  So you mentioned Jack Crowley

19   earlier?

20       A.   Right.

21       Q.   And Chuck Forsaith, is that right?

22       A.   Chuck wouldn't do these.  It would be a --

23   it would be Jack, it would be Luis Bauza, another

24   gentleman who worked in corporate security, Richard

1    Widup would sometimes do site visits.  And when we say

2    "site visits," we are talking go to a pharmacy.

3        Q.    Okay.  What about for wholesalers, did you

4    ever --

5        A.    I -- I was on those visits.

6        Q.    You were on those visits?

7        A.    Yes.

8        Q.    So you were -- you were on visits to

9    wholesalers, but not at the retail level?

10       A.    Not at the retail level.

11       Q.    Slide 15 also mentions various meetings

12   with DEA.

13             Do you see that?

14       A.    Yes.

15       Q.    Starting in April of 2009 with an overview

16   of the OMS program, is that right?

17       A.    Correct.

18       Q.    Throughout your time at Purdue, based upon

19   any of these meetings with DEA, were you ever told

20   that DEA wanted to change a system, modify the system

21   or had any concerns with the way Purdue was conducting

22   its OMS review?

23       A.    We never --

24       MS. CONROY:  Objection.

```
 1   BY THE WITNESS:

 2       A.    -- we never received any directive from

 3   the DEA on our system other than the written

 4   directives that went to everybody.

 5   BY MR. HOFFMAN:

 6       Q.    Did you ever receive any citations from

 7   DEA regarding your system?

 8       A.    Not -- not that I'm aware of.

 9       Q.    Then on the next slide entitled "Summary

10   of OMS Program Activity," it mentions:  "Outlets

11   reviewed and/or referred ('08 through '11)."  It says:

12   "Total 365."

13             Do you see that?

14       A.    Yes.

15       Q.    And it is broken down by state, including,

16   it says, 13 outlets in Ohio.

17             Do you see that?

18       A.    Yes.

19       Q.    And then it also breaks it down by OMS

20   committee action.

21             It says 290 were referred, is that right?

22       A.    Correct.

23       Q.    75 closed, and that would be with -- with

24   no action taken?
```

```
 1        A.    Yes.

 2        Q.    And then eight were continue to monitor,

 3   is that right?

 4        A.    Correct.

 5        Q.    So out of 365, at least during this time

 6   period of the outlets who were reviewed, 290 of them

 7   were referred to DEA?

 8        A.    Yes.

 9        Q.    Can you help us understand in terms of

10   order of magnitude or a percentage what -- what number

11   of outlets would that be, approximately?

12        A.    Well, this focused in on retail pharmacy.

13        Q.    Okay.

14        A.    And retail pharmacy is def -- defined as a

15   pharmacy open to the public, so it could be a chain

16   store, it could be in a food -- it could be in a

17   market, it could be in a wholesale ware -- warehouse,

18   something that's just open to the public.

19              There are about, depending on the year,

20   maybe more than when I was at Purdue, but probably

21   somewhere around 55, 57,000, so if you look at it --

22   and we did not have 100 percent of the -- the store

23   data because of agreements that wholesalers had with

24   their customers.  Some of the customers block their
```

1    data.  So we had about 80 percent of that number.  So

2    you are talking this is, I'm -- math was never my

3    strong suit, but, 6, 8 percent of that group were

4    referred.  That's a pretty significant number of

5    pharmacies, I -- I feel, that's my personal belief.

6        Q.    And on behalf of Purdue, looking back on

7    this system and the process and everything we've

8    discussed today, how would you describe the overall

9    effort by Purdue in the area of suspicious order

10   monitoring?

11       MS. CONROY:  Objection.

12   BY THE WITNESS:

13       A.    I spent a lot of time myself being

14   involved in this and I think -- I -- I think we took a

15   leadership role in this when we were there, we

16   certainly took it seriously, we took the action

17   seriously, we took the referral seriously.

18            And you'll note in the earlier slide it

19   says "informed the wholesaler."  I can't as a

20   representative of the company tell a wholesaler how to

21   run their business, but if we said Pharmacy X was

22   going to be referred and they said, Well, we're not

23   sure it is a bad account, it is one of our top

24   accounts, we referred it.  That relationship from a

```
 1    business standpoint did not stop us from referring

 2    that pharmacy.

 3         Q.    Is it --

 4         A.    So that's why I think we were very

 5    aggressive.

 6         Q.    Is it fair to say that you're proud of the

 7    efforts Purdue has made in this area?

 8         MS. CONROY:  Objection.

 9    BY THE WITNESS:

10         A.    I -- again, from a personal standpoint,

11    yeah, I am proud of it.

12         MR. HOFFMAN:  Okay.  Those are all of the

13    questions that I have.

14         MS. CONROY:  I've got 32 minutes.

15         MR. HOFFMAN:  Yeah, yeah, I believe that's

16    correct.

17         MS. CONROY:  I don't -- I think we can just --

18    everybody okay?  Are you okay, Mr. Seid?

19         THE WITNESS:  I'm okay.

20         MS. CONROY:  Okay.  Then we'll just --

21         MR. HOFFMAN:  Does she need a microphone?

22         MS. CONROY:  No, no, I'm going to move with you.

23    I'm going to switch with you.

24                    (WHEREUPON, there was a short
```

1                    interruption.)

2            (WHEREUPON, discussion was had off the

3            stenographic record.)

4      MR. HOFFMAN:  Can you do me a favor, can you

5  just hand me that little...?

6      MS. CONROY:  Is that yours?

7      MR. HOFFMAN:  Yeah.

8            Thanks.

9      THE WITNESS:  What did attorneys do before

10  sticky notes?

11      MS. CONROY:  Depositions were much shorter.

12                  FURTHER EXAMINATION

13  BY MS. CONROY:

14      Q.    Mr. Seid, you had what you described as a

15  robust suspicious order monitoring program, correct?

16      A.    Correct.

17      Q.    Of the -- if you take a look at

18  Ms. Abrams' presentation, I think you referenced that

19  there were 290 pharmacies that were reported to the

20  DEA?

21      A.    According to this, yes.

22      Q.    And that's out of approximately 57,000

23  pharmacies?

24      A.    Well, there is about 55, 57,000 in the

```
 1   universe.  I don't know the exact number of what was

 2   in our universe at that time because I -- as I

 3   indicated when Mr. Hoffman asked me, due to

 4   relationships that the wholesaler had with the

 5   retailer, some of them blocked their data, which we

 6   vigorously tried to get unblocked, but we only

 7   probably had somewhere around 40, 42,000.

 8        Q.    You had -- you could see the data for

 9   42,000 pharmacies?

10        A.    I'm guessing, but I'm -- I knew it was

11   less -- it was a significant number less than the

12   total aggregate population of pharmacies.

13        Q.    So you believed the -- the aggregate

14   population to be about 57,000 pharmacies?

15        A.    Yeah, I think that's a safe number.

16        Q.    Okay.  And you had visibility?

17        A.    With our data to 42, 45,000, somewhere in

18   there.  We tried to impute the information for

19   pharmacies we didn't have.

20        Q.    So that might have been another thousand

21   or so you could --

22        A.    We tried to fill that bucket as much as we

23   could.  It could have been -- if a particular area we

24   wanted to impute, you know, all of the Walgreens, it
```

Highly Confidential - Subject to Further Confidentiality Review

1   could have been two -- 1800 in a state, so it could be

2   more than that.

3        Q.   And of the 42,000 to 45,000 pharmacies

4   that you could actually in real-time, daily, in many

5   instances, see the data over four years almost, you

6   referred 290 of those pharmacies to the DEA?

7        A.   I don't know what period she is talking

8   here.

9        Q.   2- -- she is talking about 2008 to 2011.

10       A.   Yes, I guess that would be the case.

11       Q.   So three -- three years.

12            And 290 of those pharmacies were referred

13   to the DEA?

14       A.   Correct.

15       Q.   Out of --

16       A.   According to this, yes.

17       Q.   Out of up to 45,000 that you could

18   actually see the data?

19       A.   Yeah, it would be somewhere around there.

20            Now, the other thing that we did from a

21   partnering standpoint, and we were able to get some

22   visibility, is some of the chains that blocked the

23   data, we reached out to them individually, of that

24   original amount, which would be on the 2008 end, due

1    to our relationship that we developed with Walgreens,

2    we were able to add another 8,000 to that database, so

3    that would bring it closer to 50.

4         Q.    So it's -- so it's 290 pharmacies referred

5    to the DEA out of about 50,000?

6         A.    I'm guessing, yes.

7         Q.    This took some time to review, correct, by

8    the time you got the reports in, you looked at the

9    data, it went through the suspicious order monitoring

10   committee and then a decision was made, correct?

11        A.    It would be -- it would take some time.

12   What do you mean by "some time," months, years, weeks?

13        Q.    Not minutes.

14        A.    Not minutes.

15        Q.    It would take some, maybe few weeks, or

16   would you -- you wouldn't make a decision -- you told

17   me that the suspicious order monitoring committee

18   would meet about every three or four weeks?

19        A.    Yes.

20        Q.    So if there was a decision to refer a

21   pharmacy to the DEA, we are looking at at least three

22   weeks, correct, between meetings because that's when

23   the decisions were made?

24        A.    Yeah, it could have been that -- that

1    long.

2        Q.    So the -- the pills were shipped, right?

3        MR. HOFFMAN:  Object to form.

4    BY THE WITNESS:

5        A.    The pills were ship -- well, they had to

6    be shipped because there would be nowhere -- way for

7    us to see the data if they hadn't been shipped.

8            This is what went into the pharmacy.

9    BY MS. CONROY:

10       Q.    Correct.  And --

11       A.    We don't -- we don't see the data until it

12   is shipped from the wholesaler to the pharmacy.

13       Q.    And you see that daily?

14       A.    Right.  But we could not -- you can't stop

15   an order after it's shipped.

16       Q.    Could you stop the next order?

17       A.    You could.  There were times where we

18   would contact the wholesaler and say, There is

19   something -- we have seen something that we are

20   uncomfortable with here.

21       Q.    So if it --

22       A.    Immediately --

23       Q.    I didn't mean to stop you there.

24       A.    And we -- we could do that between

1    meetings.

2        Q.    Did you ever do that?

3        A.    Yes.

4        Q.    So for every one of these 290 pharmacies

5    that you reported to the DEA, you continued to ship

6    product through the wholesaler to those pharmacies,

7    correct?

8        A.    We continued to ship product to the

9    wholesaler.

10       Q.    And as far as you know, the wholesaler

11   continued to ship to the pharmacy?

12       MR. HOFFMAN:  Object to form, foundation.

13   BY THE WITNESS:

14       A.    If it showed up in the data, the

15   wholesaler had shipped it to that pharmacy.

16   BY MS. CONROY:

17       Q.    Well, you could see that, right?

18       A.    Yes.

19       Q.    You -- you would know that.  So if you --

20   you had a list of the 290 pharmacies that were

21   identified to the -- to the DEA, you would be able to

22   go into your data and look and know exactly how many

23   pills were manufactured by Purdue and ultimately made

24   their way to the wholesaler and then to that pharmacy

1    every day, right?

2        MR. HOFFMAN:  Object to form.

3    BY THE WITNESS:

4        A.    Certainly at least once a week depending

5    on how often we got the data.

6    BY MS. CONROY:

7        Q.    Did you ever give your suspicious otter --

8    order monitoring system to the DEA, did you ever

9    submit it to them?

10       A.    I did not submit it to them.  I believe in

11   this deck of Robin's, it points to the fact that our

12   system was discussed with the D -- DEA.

13       Q.    You weren't part of that?

14       A.    I was not part of that discussion.

15       Q.    You talked a little bit with Mr. Hoffman

16   about legitimate patients.

17            Do you remember that?

18       A.    Yes.

19       Q.    And that was because when you were looking

20   at data -- when Purdue was looking at IMS data that

21   would refer to a physician's prescriptions with

22   respect to not an identified patient but to patients?

23       A.    Correct.

24       Q.    Why would you be concerned about whether

1   someone was a legitimate patient or not?

2       A.   Well, if you have a suspicious order

3   monitoring system and you are trying to see if there

4   is inappropriate use of product and sometimes patients

5   or people masquerading as patients try to dupe doctors

6   and pharmacies, you certainly want to winnow those out

7   of the folks that are legitimate, because people in

8   unrelenting pain need access to pain management

9   products.  And one of the things that is important is

10  that if they are legitimate and appropriate that there

11  is access to the -- that product for them -- for them.

12      Q.   What is a -- at -- what is your criteria

13  for a legitimate patient?

14      MR. HOFFMAN:  Object to form.

15  BY THE WITNESS:

16      A.   A patient who is unrelent -- in an

17  unrelenting pain, is diagnosed by a licensed

18  physician.

19  BY MS. CONROY:

20      Q.   Do you have a definition for moderate

21  pain?

22      MR. HOFFMAN:  Object to form.

23  BY THE WITNESS:

24      A.   I don't have a definition for moderate

1    pain.

2    BY MS. CONROY:

3        Q.    What -- is -- is unrelenting pain a -- a

4    Purdue term or is that a term that you use personally?

5        A.    It is a tomb -- term that I've heard in

6    the industry, certainly a -- a way of describing

7    somebody who is in chronic pain, whether it's moderate

8    or severe, it's unrelenting.

9        Q.    And so long as someone has unrelenting

10   pain, then as far as you are concerned they fit the

11   criteria of a legitimate patient?

12       A.    If --

13       MR. HOFFMAN:  Object to the form.

14   BY THE WITNESS:

15       A.    If the patient has a condition that is

16   being treated that requires a pain medication, they

17   are a legitimate patient, or they could be -- they --

18   they are a legitimate patient.  It would be impossible

19   for me to identify every patient that was going into a

20   pharmacy.

21   BY MS. CONROY:

22       Q.    Oh, I -- I understand that, but -- but you

23   are making that evaluation with respect to the IMS

24   data you are looking at, correct?

```
 1        MR. HOFFMAN:  Object to form.

 2   BY THE WITNESS:

 3        A.    We are looking at the IMS data and trying

 4   to impute whatever data we can get from it.  As I

 5   said, using my Memorial Sloan Kettering analogy, I

 6   felt I personally would feel pretty safe that if the

 7   pharmacy across the street from the clinic was using a

 8   significant amount of an opioid they were probably

 9   getting patients from Memorial Sloan Kettering.

10   BY MS. CONROY:

11        Q.    And I --

12        A.    I couldn't guarantee that, but they were

13   probably getting patients from Memorial Sloan

14   Kettering.

15        Q.    And you could look at the physicians

16   through the IMS data, you could see which physicians

17   were prescribing and their patients were filling at

18   that particular pharmacy, correct?

19        A.    It was my understanding we could ascertain

20   prescriptions and -- and where the -- what pharmacies

21   they were going to.

22        Q.    And you're bringing up Sloan Kettering

23   because that's a -- a cancer institute, correct?

24        A.    Right.  But I could bring up MD Anderson.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I can -- you know, there's -- there are thousands of

 2    places that are all treating people in severe pain.

 3         Q.    Would you consider a patient with a

 4    headache that would not go away as unrelenting pain?

 5         MR. HOFFMAN:  Object to form.

 6    BY THE WITNESS:

 7         A.    If a person had unrelenting pain it could

 8    be a headache.  I don't know if they would be an

 9    appropriate person for an opioid, but they would have

10    unrelenting pain.

11                   (WHEREUPON, there was a short

12                    interruption.)

13    BY MS. CONROY:

14         Q.    If I understand your testimony in response

15    to Mr. Hoffman's questions, would it be fair to say

16    that you -- that Purdue had total transparency with

17    respect to its wholesalers?

18         MR. HOFFMAN:  Object to form.

19    BY THE WITNESS:

20         A.    I wouldn't say -- I couldn't strictly

21    ascertain that we had total transparency.

22    BY MS. CONROY:

23         Q.    And why is that?

24         A.    Well, it is based on the data that was fed
```

1   into the system.  So based on the data that was

2   provided to Purdue, that was the data I was able to

3   see.  We were able to see.  I can't guarantee from

4   where I sat that the wholesaler was giving us

5   100 percent.  We tried to get as close as possible,

6   but I couldn't guarantee that.

7        Q.    Okay.  Could you --

8        A.    And also, as you remember, I testified

9   earlier that they had some arrangements with their

10  downstream clients where they were prohibited from

11  providing the data in those agreements.

12       Q.    But you had total trans -- well, you had

13  transparency to the -- to the extent you, you know,

14  you --

15       A.    I could tell how much I shipped to them.

16       Q.    Correct.  So that's to the wholesaler.

17             You could see daily how much you sent to

18  the wholesaler and you could also see daily how much

19  went out the door from the wholesaler, correct?

20       A.    Correct.

21       Q.    And then --

22       A.    I could not necessarily see where

23  100 percent of it went out the door.

24       Q.    Correct.  Because some of those retail

```
1    pharmacies were blocked to you, correct?

2         A.    Right, correct.

3         Q.    And that's when you gave me the difference

4    between the --

5         A.    Right.

6         Q.    -- 57,000 total pharmacies, you didn't

7    have total visibility of those -- of what was going to

8    those 57,000 --

9         A.    Right.

10        Q.    -- pharmacies, but you did maybe up to

11   45,000 pharmacies?

12        A.    Right, and many of those that were blocked

13   were chain pharmacies and that's why, again, Purdue,

14   myself, aggressively went to the end user and said,

15   It's important that we see your data, and we were able

16   to increase that base number from the wholesaler.

17        Q.    And that's when you told me that that

18   gained you insight into potentially 8,000 more

19   pharmacies?

20        A.    Right.  So we had about 95, 92 percent,

21   something like that.

22        Q.    92 to 95 percent visibility?

23        A.    Um-hum.

24        Q.    And did you have -- how much --
```

```
1       A.    And that was my time there.  I can only

2    talk about when I was there.

3       Q.    I understand.

4       A.    Okay.

5       Q.    You -- you don't know whether it's more or

6    less after October of 2014, correct?

7       A.    I'm -- after May 30th of 2014.

8       Q.    May, okay.

9             You talked about Purdue being the leader

10   with respect to its data collection with respect to

11   suspicious order monitoring.

12            Do you recall that?

13      A.    Yes.

14      Q.    But you also testified that you don't have

15   any knowledge about what the other manufacturers or

16   distributors were doing, correct?

17      A.    Um-hum.

18      Q.    Did you have some ability to make a

19   comparison?

20      A.     My comparisons also came -- most often

21   came from the fact that when I talked to our trade

22   partners, our wholesalers and the chains, we were told

23   we were miles ahead of anybody else as to how we

24   managed it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.    And by saying "miles ahead of anyone

2   else," you had -- Purdue had more visibility into the

3   customer and the customer's customer?

4      A.    I don't --

5      MR. HOFFMAN:  Object to form.

6   BY THE WITNESS:

7      A.    -- I don't think it was only visibility.

8   I think it was the fact of how -- the comprehensive

9   approach we took.

10  BY MS. CONROY:

11     Q.    And what do you mean by "the comprehensive

12  approach"?

13     A.    Well, go back to that SOP and schematic

14  and Robin's presentation is that we went to -- we took

15  in as many data resources as we could.

16     Q.    But you don't know, it's possible that

17  this was done after you left Purdue, correct?

18     A.    That was done after I left Purdue.

19     Q.    Okay.  And it is your testimony that this

20  process, that Purdue's process that is described here

21  in the schematic was more robust than any other

22  manufacturer?

23     A.    That's my belief, yes.

24     MR. HOFFMAN:  Object to the form.
```

```
1   BY MS. CONROY:

2       Q.    And your belief with respect to other

3   opioid manufacturers?

4       MR. HOFFMAN:  Object to the form.

5   BY THE WITNESS:

6       A.    That's my belief, yes.

7   BY MS. CONROY:

8       Q.    And that's based on what the distributors,

9   Purdue's distributors told you?

10      A.    Purdue's distributors --

11      MR. HOFFMAN:  Object to form.

12  BY THE WITNESS:

13      A.    -- that, yeah, basically what we heard

14  from third parties.  We didn't -- I didn't sit down

15  with folks from other companies and say tell me about

16  your OM -- OMS procedures.

17  BY MS. CONROY:

18      Q.    Correct.  You heard about them through

19  your distributor customers?

20      A.    Right.

21      MR. HOFFMAN:  Object to form.

22  BY MS. CONROY:

23      Q.    Or wholesaler customers?

24      A.    Right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        MR. HOFFMAN:  Object to form.

2        MS. PORTER:  Make sure you --

3   BY MS. CONROY:

4        Q.    And that was a --

5        THE WITNESS:  Pardon me?

6        MS. PORTER:  Just make sure you give him an

7   opportunity for objections.

8        MS. CONROY:  But you just asked him to wait

9   until -- I just want to make sure I'm hearing.

10       MS. PORTER:  Folks are talking over each other,

11  so I was asking him just to pause --

12       MS. CONROY:  Okay.

13       MS. PORTER:  -- before he answers.

14  BY MS. CONROY:

15       Q.    The -- though -- you gained that knowledge

16  from conversations with wholesalers, correct?

17       MR. HOFFMAN:  Object to the form.

18  BY THE WITNESS:

19       A.    Within the trade, yes.

20  BY MS. CONROY:

21       Q.    Right.  I mean, what my -- my point of my

22  question is you face-to-face conversations?

23       A.    Yes, face-to-face conversations.

24       Q.    What about at HDMA, did you have some of
```

1    those conversations there?

2        A.    I would talk to our wholesaler partners at

3    HDMA meetings, yes.

4        Q.    So that would be one place where you would

5    have conversations about comparing Purdue's suspicious

6    order monitoring system to what those wholesalers

7    were -- were experiencing with other manufacturers?

8        MR. HOFFMAN:  Object to form.

9    BY THE WITNESS:

10        A.    I don't know if they would say and

11    specifically you are a lot better than Account --

12    Company X, but they would say you guys are doing a

13    tremendous job with this and I wish other people were

14    doing it as well as you are.

15            And when we --

16    BY MS. CONROY:

17        Q.    Go ahead.

18        A.    No, it's just that was the response I

19    would get.

20        Q.    Did they ever have any suggestions to you

21    as to how you would improve it?

22        MR. HOFFMAN:  Object to form.

23    BY THE WITNESS:

24        A.    I don't remember if anybody did make any

```
 1   suggestions.

 2   BY MS. CONROY:

 3       Q.    Was there a particular strength of

 4   OxyContin that was more of a red flag to you than

 5   another?

 6       MR. HOFFMAN:  Object to form.

 7   BY THE WITNESS:

 8       A.    Part of the algorithm included the

 9   utilization of 40 and 80-milligram.

10   BY MS. CONROY:

11       Q.    And so if there was more 80 than 40, was

12   that a -- a flag to you or how did it work?

13       A.    Generally it was 40 and 80 as compared to

14   the aggregate.

15       Q.    I see.

16             So you were concerned about whether there

17   was a substantial number of 40 compared to other doses

18   or 80 compared to other doses?

19       A.    Generally it was 40s and 80s compared to

20   the other doses.

21       Q.    Okay.

22             The fee-for-service, and I know we are

23   going to take your fact portion of the deposition in a

24   bit, but the fee-for-service contracts, you were
```

```
 1    involved in those?

 2         A.    Yes.

 3         Q.    In the negotiation of those

 4    fee-for-service contracts?

 5         A.    Yes, I was.

 6         Q.    And did Purdue pay for the data that was

 7    provided from the wholesalers?

 8         A.    That was part of the fee-for-service

 9    agreement, was that we got the data.

10         Q.    In exchange for something you were giving

11    them?

12         A.    Money.

13         Q.    And did you -- did you have any of those

14    arrangements with individual retail pharmacies?

15         A.    No.

16         Q.    I do want to mark, since I marked it up,

17    the exhibit that I used this morning, just so that we

18    have it for the record, okay.

19               (WHEREUPON, a certain document was

20                marked Purdue-Seid 30(b)(6)

21                Deposition Exhibit No. 006, for

22                identification, as of 12/12/2018.)

23         MR. HOFFMAN:  Your handwriting is a little

24    better than mine.
```

```
 1        MS. CONROY:  I'm not sure about that, but...

 2   BY MS. CONROY:

 3        Q.    Do you have an -- I know that DEA referral

 4   was 200 -- was it 290, is that what the number was?

 5        A.    For that period of time, yes.

 6        Q.    Through 2011?

 7        A.    Right.

 8        Q.    Was 290 out of 50,000 or so pharmacies

 9   when you add in the Walgreens visibility?

10        A.    Um-hum.

11        Q.    How many -- do you have any idea how many

12   pharmacies were investigated?

13        A.    Well, anything that was -- what do you

14   mean?  I'm not sure I understand the question.

15        Q.    Well, is that what this number is, the

16   365, "outlets reviewed and/or referred total 365"?

17        A.    Reviewed and investigated would be two

18   different things, so what specifically do you mean?

19        Q.    So was the 365 reviewed?

20        A.    Reviewed.

21        Q.    Okay.  And of those -- and this is the

22   breakdown by state, so there were -- there were 13 in

23   Ohio that were reviewed by the suspicious order

24   monitoring committee.  So there were -- there were 13
```

```
1    Ohio pharmacies that made it all of the way through to

2    the OMS team review, correct?

3         A.    Correct.

4         Q.    And we don't know, based on this summary

5    prepared by Ms. Abrams, if any of those were referred

6    to the DEA, correct?

7         A.    We don't -- I don't know.

8         Q.    And if I wanted to know that, how would I

9    find out?

10        A.    I don't know.

11        Q.    Do you know how many -- well, I guess it

12   is -- it is 365 that made it to a point where you made

13   a decision whether to report, do nothing or keep

14   looking at it, that's what that number 365 means,

15   right?

16        A.    That's what that says, yes.

17        Q.    Do you know if there is a breakdown of

18   these numbers after 2011, at least until you left in

19   May of 2014?

20        A.    I can only say I assume there is, but I

21   don't know for sure.

22        Q.    Is that anything that you looked at as the

23   executive director of national accounts and trade

24   relations?
```

```
1          A.     The only time I would look at them would

2   be during the OMS meetings and process, but the data

3   afterwards wouldn't have -- I would not look at the

4   breakdown points.

5          Q.     Do you know if you had anything to do with

6   the creation of the total number reviewed and then the

7   total that were completed?

8          A.     I sat on the committee.

9          Q.     But do you know if you had anything to do

10  with adding those up?

11         A.     Adding those up, no.  That would be all --

12  that was through Robin Abrams' department.

13         Q.     Okay.  So that would either be Robin

14  Abrams or Giselle Issa?

15         A.     Giselle Issa.

16         Q.     That would have figured out these numbers?

17         A.     That's correct.

18         Q.     Would there be any reason to believe that

19  these numbers, something like this slide, could not be

20  created right up until the present?

21         MR. HOFFMAN:  Object to form, foundation.

22  BY THE WITNESS:

23         A.     I don't know.

24  BY MS. CONROY:
```

1    Q.    As of the time you left in May of 2014, if

2  you had the time to do it, would you have been able to

3  create this summary of OMS pro -- program activity?

4    A.    I imagine so.  I don't know if it was or

5  it wasn't.

6    Q.    No, but it was -- as far as you know, it

7  was possible to do it?

8    A.    I would assume it was possible to do it,

9  yes.

10    Q.    There was nothing that had changed about

11  the way the data was collected that would make that --

12    A.    No.

13    Q.    -- not a possibility?

14    A.    No, no.

15    Q.    Would that -- would this compilation be

16  done strictly from the database or would you need

17  something other than the suspicious order monitoring

18  database to know what these numbers are?

19    A.    I don't know if I can answer that.  This

20  was based on -- this number was based on all of the

21  criteria we've gone over before through the OMS

22  committee.  So I don't --

23    Q.    But --

24    A.    -- I don't know what additional would be

1  added to it.

2     Q.   Okay.  But what I guess my question is,

3  would I have to go through all of the board minutes of

4  all of the OMS committee meetings to try to come up

5  with --

6     A.   That number?

7     Q.   -- 365 and how many were referred or would

8  I see that on the suspicious order monitoring

9  database?

10         Would that be collected on the database?

11    A.   I don't -- I can't tell you for sure there

12 was a spot on the database or there wasn't.  I don't

13 know.

14    Q.   Okay.  So it's not clear whether or not

15 the pharmacies that were reviewed would be able to be

16 identified by looking at the database?

17    A.   The aggregate number, is that what you are

18 asking?

19    Q.   No, just a -- how about an individual one?

20    A.   Well, that was the -- that was the purpose

21 of the -- of the system was to identify individual

22 stores so you could identify an individual store and

23 that individual store would go into the process and be

24 part of that number that's on that slide.

1      Q.    I understand that.  But if two years later

2    I was concerned about a particular pharmacy in a

3    particular place --

4      A.    Yeah, you could go to the database and see

5    it, sure.

6      Q.    And would I see in the database that it

7    had already gone through OMS review, that -- would

8    there be some column or some indication in the

9    database?

10      A.    I'm -- I am not sure.  I don't know.

11      Q.    Who would know the answer to that?

12      A.    Probably Giselle Issa.

13      Q.    And do you know if I went into the

14    database a couple of years after a particular pharmacy

15    was reported to the DEA, do you know if there would be

16    some notation in the database that that had occurred?

17      A.    That it had been reported?

18      Q.    Yes.

19      A.    Yes.

20      Q.    And what would that look like?  Was there

21    a column or --

22      A.    It would be -- it would be in the notes.

23    It would be in the final summary of action taken and

24    it would be noted as referred.

1    Q.    But you are not certain what might appear

2  in the Notes section with respect to either a pending

3  investigation or some prior investigation that did not

4  result in a report to the DEA?

5    A.    I believe the way the -- the notes were

6  prepared is that information was add -- added as

7  opposed to removed.  So if there was a pending store,

8  it would move from pending to referred or pending to

9  complete.

10    Q.    And that --

11    A.    So that would be in the notes.

12    Q.    Okay.  And that would be something

13  that Ms. Issa or Ms. Ro -- Ms. Abrams would know

14  about?

15    A.    Yes, I would think.

16    Q.    Who -- who actually did the quality

17  control for that database at Purdue?

18    A.    Giselle Issa was the OMS director.

19    Q.    Was the what?

20    A.    The OMS director as it was listed.

21    MS. CONROY:  Okay.  I have nothing more today.

22  Thank you.

23    MR. HOFFMAN:  I just have -- I think I have one

24  question.

Highly Confidential -- Subject to Further Confidentiality Review

```
 1                    FURTHER EXAMINATION

 2  BY MR. HOFFMAN:

 3       Q.    The -- the 290 number for outlets that

 4  were referred, just to be clear, that's referring

 5  specifically at the retail level, outlets, like,

 6  retail pharmacies?

 7       A.    Yes.

 8       Q.    And so would that or would that not

 9  include individual physicians and individual

10  pharmacists that were also referred to DEA or law

11  enforcement?

12       A.    No, that would not include that.  That was

13  the pharmacy referral.

14       MR. HOFFMAN:  Thank you.

15                    FURTHER EXAMINATION

16  BY MS. CONROY:

17       Q.    Just as a follow-up to that, were you --

18  were you involved in physician referring to the DEA as

19  well?

20       A.    No, I was not.

21       Q.    Okay.  And that wasn't part of the

22  suspicious order monitoring database, correct?

23       A.    Not for retail accounts.  There were other

24  systems, but not that I was involved with or privy to.
```

1     Q.     Correct.  So the database that you're

2  talking about, the suspicious order monitoring

3  database dealt with retail outlets, not physicians,

4  correct?

5     A.     Purely the trade, yes.

6     Q.     Thanks.

7            (Reporter clarification.)

8     A.     Purely the trade.

9     Q.     Okay.  So the suspicious order monitoring

10 database dealt with wholesalers as well as --

11    A.     Retailers.

12    Q.     -- retail pharmacies?

13    A.     Right.

14    Q.     What about doctors' offices that

15 dispensed, would that be part of it?

16    A.     They didn't dispense our product, none.

17    Q.     Okay.

18    A.     Not if I knew about it.

19    Q.     Okay.  And what about a hospital pharmacy,

20 would that be considered the same?

21    A.     Yeah, that's a pharmacy, sure.

22    MS. PORTER:  Is this a good place to stop?

23    MS. CONROY:  I'm going to mark, just so that we

24 have it, as Exhibit 7 my notes.

```
 1                    (WHEREUPON, a certain document was

 2                    marked Purdue-Seid 30(b)(6)

 3                    Deposition Exhibit No. 007, for

 4                    identification, as of 12/12/2018.)

 5          MR. HOFFMAN:  And on that, Jayne, I -- I think

 6     he disagreed with total transparency, so I -- I don't

 7     want the exhibit to be misleading.

 8          MS. CONROY:  No problem at all.  Let me get rid

 9     of that.

10     BY MS. CONROY:

11          Q.   How would you -- would you say you had --

12     Purdue had transparency to the wholesalers instead of

13     total?

14               Do you remember that discussion we had

15     about --

16          A.   Yeah, trans -- I would say transparency as

17     opposed to total.

18          Q.   Transparency.

19          MS. CONROY:  Okay.  Thank you.

20          THE VIDEOGRAPHER:  Off the record.  We are off

21     the record at 12:44 p.m.

22                    (Time Noted:  12:44 p.m.)

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 4    a Certified Shorthand Reporter, do hereby certify:

 5              That previous to the commencement of the

 6    examination of the witness herein, the witness was

 7    duly sworn to testify the whole truth concerning the

 8    matters herein;

 9              That the foregoing deposition transcript

10    was reported stenographically by me, was thereafter

11    reduced to typewriting under my personal direction and

12    constitutes a true record of the testimony given and

13    the proceedings had;

14              That the said deposition was taken before

15    me at the time and place specified;

16              That I am not a relative or employee or

17    attorney or counsel, nor a relative or employee of

18    such attorney or counsel for any of the parties

19    hereto, nor interested directly or indirectly in the

20    outcome of this action.

21              IN WITNESS WHEREOF, I do hereunto set my

22    hand on this 16th day of December, 2018.

23

24              JULIANA F. ZAJICEK, Certified Reporter
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION ERRATA SHEET

 2

 3    Assignment No.  200039

 4    Case Caption:  In Re: National Prescription

 5                     Opiate Litigation

 6

 7          DECLARATION UNDER PENALTY OF PERJURY

 8

 9          I declare under penalty of perjury that I

10    have read the entire transcript of my Deposition taken

11    in the captioned matter or the same has been read to

12    me, and the same is true and accurate, save and except

13    for changes and/or corrections, if any, as indicated

14    by me on the DEPOSITION ERRATA SHEET hereof, with the

15    understanding that I offer these changes as if still

16    under oath.

17

18                                STEPHEN SEID

19

20    SUBSCRIBED AND SWORN TO

21    before me this      day

22    of                , A.D. 20__.

23

24          Notary Public
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                       STEPHEN SEID
```

```
 1              DEPOSITION ERRATA SHEET

 2    Page No._____ Line No._____ Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____ Line No._____ Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____ Line No._____ Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____ Line No._____ Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____ Line No._____ Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____ Line No._____ Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____ Line No._____ Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____ DATE:_____

24                    STEPHEN SEID
```