EXHIBIT _97

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION

 3

        IN RE: NATIONAL        )
 4      PRESCRIPTION           )  MDL No. 2804
        OPIATE LITIGATION      )
 5      _____)  Case No.
                               )  1:17-MD-2804
 6                             )
        THIS DOCUMENT RELATES  )  Hon. Dan A.
 7      TO ALL CASES           )  Polster

 8

                THURSDAY, APRIL 4, 2019
 9

         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10                CONFIDENTIALITY REVIEW
11                     - - -
12          Videotaped deposition of Mark
13      Geraci, held at the offices of DECHERT LLP,
14      1095 Sixth Avenue, New York, New York,
15      commencing at 9:10 a.m., on the above date,
16      before Carrie A. Campbell, Registered
17      Diplomate Reporter and Certified Realtime
18      Reporter.
19

20

21                     - - -
22

                GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
24

25
```

```
 1                A P P E A R A N C E S :
 2
 3      SIMMONS HANLY CONROY, LLC
        BY:  JAYNE CONROY
 4           jconroy@simmonsfirm.com
             LAURA FITZPATRICK
 5           lfitzpatrick@simmonsfirm.com
             (VIA REALTIME STREAM)
 6           ELLYN HURD
             ehurd@simmonsfirm.com
 7           SANFORD SMOKLER
             (VIA REALTIME STREAM)
 8      112 Madison Avenue, Seventh Floor
        New York, New York 10016
 9      (212) 784-6400
10
        LANIER LAW FIRM, P.C.
11      BY:  MILDRED CONROY
             mildred.conroy@lanierlawfirm.com
12      126 East 56th Street, Sixth Floor
        New York, New York 10022
13      (212) 421-2800
        Counsel for Plaintiffs
14
15
        DECHERT LLP
16      BY:  NATHAN HOFFMANN
             nathan.hoffman@dechert.com
17           DANA MARTIN
             dana.martin@dechert.com
18      35 West Wacker Drive, Suite 3400
        Chicago, Illinois  60601
19      (312) 646-5800
20      and
21      DECHERT LLP
        BY:  PAUL LAFATA
22           paul.lafata@dechert.com
        1095 Avenue of the Americas
23      New York, New York 10036
        (212) 698-3500
24      Counsel for Purdue Pharma
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          COVINGTON & BURLING LLP
            BY:   SHAILEE DIWANJI SHARMA
 2                ssharma@cov.com
            850 Tenth Street, NW
 3          Washington, DC 20001-4956
            (202) 662-6000
 4          Counsel for McKesson Corporation
 5
 6          JACKSON KELLY PLLC
            BY:   JON L. ANDERSON
 7                jlanderson@jacksonkelly.com
                  (VIA TELECONFERENCE)
 8          500 Lee Street East, Suite 1600
            Charleston, WV 25301-3202
 9          (304) 340-1288
            Counsel for AmerisourceBergen
10
11
            VENABLE LLP
12          BY:   JOHN A. McCAULEY
                  jamccauley@Venable.com
13                (VIA TELECONFERENCE)
            750 East Pratt Street, Suite 900
14          Baltimore, Maryland  21202
            (410) 244-7400
15          Counsel for Abbott Laboratories
16
17     VIDEOGRAPHER:
              HENRY MARTE,
18            Golkow Litigation Services
19
                        - - -
20
21
22
23
24
25
```

```
 1                       INDEX
 2                                             PAGE
 3   APPEARANCES...............................   2
 4   EXAMINATIONS
 5     BY MS. CONROY...........................   8
 6     BY MR. HOFFMAN.......................... 214
 7     BY MS. CONROY.......................... 219
 8
 9                    EXHIBITS
10     No.        Description                  Page
11   Purdue        E-mail(s),                   22
     Geraci 1      PPLPC022000763004 -
12                 PPLPC022000763005
13   Purdue        "When OMS Started & Updated,"  36
     Geraci 2      PPLP004449246
14
     Purdue        Finance & Accounting Standard  96
15   Geraci 3      Operating Procedures Manual,
                   PPLPC004000119321_001 -
16                 PPLPC004000119321_003
17   Purdue        Purdue Order Management System 102
     Geraci 4      SOP-0007,
18                 PPLP003430436 - PPLP003430441
19   Purdue        Order Monitoring System (OMS), 121
     Geraci 5      PPLPC019001275418
20
     Purdue        CC-SOP-000017,                146
21   Geraci 6      PPLP004368538 - PPLP004368543
22   Purdue        CC-SOP-000018,                146
     Geraci 7      PPLP004393084 - PPLP004393098
23
     Purdue        CC-SOP-000019,                146
24   Geraci 8      PPLPC023000971890 -
                   PPLPC023000971896
25
```

Highly Confidential - Subject to Further Confidentiality Review

| 1  | Purdue    | E-mail(s),                       | 161 |
|    | Geraci 9  | PPLPC00400317960 -               |     |
| 2  |           | PPLPC00400317961                 |     |
| 3  | Purdue    | Objection to Notice of           | 219 |
|    | Geraci 10 | Deposition                       |     |
| 4  |           |                                  |     |
|    | Purdue    | Notice of Deposition Pursuant    | 226 |
| 5  | Geraci 11 | to Rules 30(B)(6) and Document   |     |
|    |           | Request Pursuant to Rule         |     |
| 6  |           | 30(B)(2) and Rule 34 to Purdue   |     |
|    |           | Pharma, L.P., Purdue Pharma,     |     |
| 7  |           | Inc., and the Purdue Frederick   |     |
|    |           | Company                          |     |
| 8  |           |                                  |     |
| 9  |           |                                  |     |
| 10 |           |                                  |     |
| 11 |           |                                  |     |
| 12 |           |                                  |     |
| 13 |           |                                  |     |
| 14 |           |                                  |     |
| 15 |           |                                  |     |
| 16 |           |                                  |     |
| 17 |           |                                  |     |
| 18 |           |                                  |     |
| 19 |           |                                  |     |
| 20 |           |                                  |     |
| 21 |           |                                  |     |
| 22 |           |                                  |     |
| 23 |           |                                  |     |
| 24 |           |                                  |     |
| 25 |           |                                  |     |

```
 1                  VIDEOGRAPHER:  Okay.  We are

 2          now on the record.  My name is Henry

 3          Marte.  I'm a videographer with Golkow

 4          Litigation Services.

 5                  Today's date is April 4, 2019,

 6          and the time is 9:10 a.m.

 7                  This videotaped deposition is

 8          being held at 1095 Avenue of the

 9          Americas, New York, New York, in the

10          matter of National Prescription Opiate

11          Litigation.

12                  The deponent today is Mark

13          Geraci.

14                  All appearances please

15          introduce themselves for the record.

16                  MS. CONROY:  Jayne Conroy for

17          plaintiffs.

18                  MS. HURD:  Ellyn Hurd for

19          plaintiffs.

20                  MS. CONROY:  Mildred Conroy,

21          Lanier Law Firm, for the plaintiffs.

22                  MR. HOFFMAN:  Nathan Hoffman on

23          behalf of the Purdue defendants and

24          the witness.

25                  MR. LAFATA:  Paul LaFata from
```

```
 1           Dechert for the Purdue defendants
 2           also.
 3                   MS. MARTIN:  Dana Martin from
 4           Dechert for the Purdue defendants
 5           also.
 6                   MS. SHARMA:  Shailee Diwanji
 7           Sharma, Covington & Burling, for
 8           McKesson.
 9                   VIDEOGRAPHER:  And those on the
10           phone, please?
11                   MR. ANDERSON:  Jon Anderson,
12           Jackson Kelly, on behalf of
13           AmerisourceBergen.
14                   MR. McCAULEY:  John McCauley
15           for Abbott.
16                   VIDEOGRAPHER:  Anyone else?
17                   Okay.  Will the court reporter
18           please administer the oath to the
19           witness.
20
21                   MARK GERACI,
22    of lawful age, having been first duly sworn
23    to tell the truth, the whole truth and
24    nothing but the truth, deposes and says on
25    behalf of the Plaintiffs, as follows:
```

```
 1                    DIRECT EXAMINATION
 2   QUESTIONS BY MS. CONROY:
 3         Q.     Good morning, Mr. Geraci.
 4         A.     Ms. Conroy.
 5         Q.     Have you ever had your
 6   deposition taken before?
 7         A.     No.
 8         Q.     Was that a no?
 9         A.     No.
10         Q.     Okay.  A couple of ground
11   rules.  We have a court reporter, which you
12   saw her magic machine a moment ago, and so
13   she's going to take down what I say; she's
14   going to take down what you say.  It's hard
15   if we talk at the same time, so try to wait
16   for the end of my question, and I'll try not
17   to start a question during your answer.
18                Okay?
19         A.     Fine.
20         Q.     If you want to take a break at
21   any point, just let me know.  I would prefer
22   you not take one between a question and
23   answer; we'll wait until the answer is
24   completed to take a break.  And we'll all try
25   to remind ourselves to remove our microphones
```

```
 1    before we break.

 2         A.    Okay.

 3         Q.    But you're allowed one break

 4    without removing it.

 5               Where do you live?

 6         A.    In New York state.

 7         Q.    And did you prepare at all for

 8    this deposition today?

 9         A.    Yes.

10         Q.    Okay.  Did you meet with your

11    lawyers?

12         A.    Yes.

13         Q.    Okay.  Who did you meet with?

14         A.    Nathan, Paul and Dana.

15         Q.    And for approximately how long?

16         A.    Five to six hours in total.

17         Q.    And did you review any

18    documents in preparation for this deposition?

19         A.    Yes.

20         Q.    And were those documents that

21    you had in your possession, or were they

22    provided to you?

23         A.    They were provided to me.

24         Q.    Okay.  Were any of the

25    documents that you reviewed in your
```

```
 1    possession?

 2         A.      No.

 3         Q.      And did you review those

 4    documents separately from the meetings that

 5    you had with Nathan, Paul and Dana?

 6                 MR. HOFFMAN:  Object to the

 7         form.

 8                 To the extent counsel provided

 9         it to him, I don't think there's any

10         distinction there, but go ahead.

11    QUESTIONS BY MS. CONROY:

12         Q.      Well, I'm asking about when you

13    reviewed them.

14                 Did you review them during the

15    time you were meeting with your lawyers, or

16    was it a separate period of time that you

17    reviewed the documents?

18         A.      Both.

19         Q.      Okay.  And approximately how

20    much time did you spend reviewing the

21    documents outside the presence of your

22    lawyers?

23         A.      Maybe an hour.

24         Q.      What's your current title at

25    Purdue?
```

```
 1            A.      I am vice president and chief

 2     security officer.

 3            Q.      VP and chief security officer.

 4                    What are your responsibilities

 5     in that role?

 6            A.      I am responsible for the

 7     protection of the company's people, its

 8     facilities, its information.

 9                    That's in the broadest sense.

10            Q.      And for how long have you held

11     that position?

12            A.      I've been with Purdue for ten

13     years.

14            Q.      And have you been a vice

15     president and chief security officer for the

16     ten years?

17            A.      Yes.

18            Q.      Have you had any promotions or

19     job title changes in the ten years?

20            A.      No.

21            Q.      How about responsibilities,

22     have they changed over the ten years?

23            A.      Yes.

24            Q.      In what way?

25            A.      Currently I'm chairman of the
```

```
1    executive audit committee.

2         Q.     And what does the executive

3    audit committee do, or what are your

4    responsibilities on that committee?

5         A.     We coordinate the activities of

6    our external auditors and our internal

7    auditors.

8         Q.     Any other responsibilities that

9    have changed over the ten years?

10        A.     Yes.

11               I don't recall when it

12   occurred, but the control substance act group

13   based out of our North Carolina facilities

14   was moved from the legal division into

15   corporate security.

16        Q.     The North Carolina facility,

17   what does that facility do?

18        A.     That's a manufacturing

19   facility.

20        Q.     Okay.  And what did the CSA

21   group do, roughly, generally, at that

22   manufacturing facility?

23        A.     Primary mandate is to be

24   DEA-ready, for inspection by the DEA.

25        Q.     And that group was moved?
```

```
 1          A.      Yes.

 2          Q.      Off site?

 3          A.      No.  Moved from where it

 4   reported in to.

 5          Q.      Oh, I see.  I see.

 6                  So they remain in North

 7   Carolina --

 8          A.      Yes.

 9          Q.      -- but they report to you?

10          A.      They did, yes, that's correct.

11          Q.      They did.  Okay.

12                  And is that no longer the case?

13          A.      That is not the case now.

14          Q.      Okay.  And for how long has

15   that not been the case?

16          A.      The change occurred last year.

17          Q.      Do they report to someone else?

18          A.      They report locally, into local

19   operations, with oversight by corporate

20   security.

21          Q.      Any other changes in

22   responsibilities?

23          A.      No.

24          Q.      Did you -- at some point you

25   became a member of the order monitoring
```

```
 1    committee at Purdue?

 2         A.    Yes.

 3         Q.    Okay.  And did that start when

 4    you began at Purdue?

 5         A.    Yes.

 6         Q.    And has that remained the case?

 7         A.    Yes.

 8         Q.    Where were you before Purdue?

 9         A.    I was with Bristol-Myers

10    Squibb, BMS, as you probably -- as I see you

11    writing down here.

12         Q.    And what was -- what were

13    your -- what was generally your title and

14    your responsibilities there?

15         A.    I was the senior director of

16    corporate security with worldwide

17    responsibility.  Same three broad bullets of

18    responsibility.

19         Q.    Okay.  And where were you

20    located?

21         A.    Here in New York City.

22         Q.    And where is your office at

23    Purdue, if you have an office?

24         A.    Stamford, Connecticut.

25         Q.    And is that where you go to
```

```
 1     work every day?

 2            A.      Yes.

 3            Q.      And has that been the case for

 4     the ten years?

 5            A.      Yes.

 6            Q.      For how long were you at BMS?

 7            A.      Over 27 years.

 8            Q.      So I take it your roles changed

 9     and expanded over those 27 years?

10            A.      Yes.

11            Q.      And could you describe for me

12     briefly why you left BMS and went to Purdue

13     ten years ago?

14            A.      It was an opportunity to

15     actually be the leader of the entire group,

16     corporate security.

17            Q.      And you described BMS as a -- I

18     think did you say international --

19            A.      No, I did not.

20            Q.      How did you describe it?

21            A.      I said my responsibilities were

22     global.

23            Q.      Global.  Oh, sorry.

24                    What is the range of your

25     responsibilities at Purdue geographically?
```

```
1        A.      United States.

2        Q.      Is there someone -- is there

3   anyone in Connecticut that is responsible for

4   outside of the United States in a corporate

5   security capacity?

6        A.      No.

7        Q.      And what facilities in the

8   United States do you oversee in your role as

9   VP and corporate security chief?

10       A.      We have our corporate

11  headquarters and our two manufacturing

12  locations in North Carolina.

13       Q.      What about Rhodes in Rhode

14  Island?

15       A.      No direct responsibility for

16  Rhodes.

17       Q.      Do you have any indirect

18  responsibilities for Rhodes?

19       A.      On occasion, providing

20  consultation and advice.

21       Q.      Is there someone in a role

22  comparable to yours at Rhodes?

23       A.      There is a security manager at

24  Rhodes.

25       Q.      Prior to BMS -- long time
```

```
 1    ago --

 2          A.      Yes.  Yes, it was.

 3          Q.      -- where were you?

 4          A.      I was a special investigator

 5    with the New York State Attorney General's

 6    Office.

 7          Q.      And what was your concentration

 8    there or what did you investigate?

 9          A.      Criminal investigations of

10    health care fraud at hospitals, nursing homes

11    and eventually Medicaid, all Medicaid fraud,

12    throughout the state.

13          Q.      And how long were you there?

14          A.      I was there four years.

15          Q.      What sort of fraud did you

16    investigate?  You can give me some examples.

17          A.      Health care fraud.  It was

18    basically white collar crime.

19          Q.      Okay.  Did you investigate

20    doctors?

21          A.      Yes.

22          Q.      Did you investigate

23    pharmaceutical companies?

24          A.      No.

25          Q.      What about distributors or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    anyone in the supply chain of a

 2    pharmaceutical --

 3         A.      No.

 4         Q.      -- company?

 5         A.      No.

 6              MR. HOFFMAN:  Just wait until

 7         she finishes her question.

 8    QUESTIONS BY MS. CONROY:

 9         Q.      And prior to the New York State

10    Attorney General's Office, where were you?

11         A.      I was at university.

12         Q.      Okay.  And which university?

13         A.      I graduated in -- at Florida

14    Atlantic University.

15         Q.      And what year was that that you

16    graduated?

17         A.      1977.

18         Q.      And what was your degree?

19         A.      Criminal justice.

20         Q.      Do you have any degrees

21    after -- was that a BA or a BS?

22         A.      BA.

23         Q.      Any degrees after the BA?

24         A.      Yes.

25         Q.      And what are they?
```

```
 1          A.      I have a bachelor's degree in

 2    accounting.

 3          Q.      And where did you receive that

 4    degree?

 5          A.      New York -- SUNY Empire State

 6    College.

 7          Q.      And when?

 8          A.      1981.

 9          Q.      Any other degrees?

10          A.      I have an MBA.

11          Q.      And year?  What year did you

12    receive that?

13          A.      1984.

14          Q.      And whereabouts?

15          A.      New York Institute of

16    Technology.

17          Q.      And any other degrees?

18          A.      No.

19          Q.      Do you have any certifications

20    of any sort?

21          A.      Yes.

22          Q.      What are they?

23          A.      I have a CPP, which is

24    designated by ASIS International, which is

25    the largest security association in the
```

```
 1    world.

 2         Q.     And what is that -- what does

 3    that certification suggest to the world?

 4         A.     That you're a professional,

 5    certified protection professional.

 6         Q.     And what is involved in

 7    receiving that certification?

 8         A.     Examination.

 9         Q.     And when did you first take

10    that examination?

11         A.     Oh, gee.

12         Q.     Or if you want to give me like

13    where you were or --

14         A.     I'm thinking it was 1996, '97.

15         Q.     And is that something that you

16    just take once, or do you have to renew it

17    over time?

18         A.     You have to take continuing

19    education.

20         Q.     And have you done that?  Have

21    you kept up with it?

22         A.     Yes.

23         Q.     Any other certifications?

24         A.     I am a certified fraud

25    examiner.
```

1      Q.      And when did you receive that

2   certification?

3      A.      I don't recall.

4      Q.      Would it have been prior to

5   your New York State employment?

6      A.      No.

7      Q.      And are you current as a

8   certified fraud examiner?

9      A.      Yes, I am.

10      Q.      And any other certifications?

11      A.      No.

12      Q.      Do you teach at all?

13      A.      Not currently.

14      Q.      Have you taught in the past?

15      A.      Yes.

16      Q.      What have you taught?

17      A.      What was it?  Corporate

18   security.  Corporate security.

19      Q.      Okay.  And where did you do

20   that?

21      A.      Suffolk County Community

22   College in New York.

23      Q.      Out on Long Island?

24      A.      That is correct.

25      Q.      And for how long did you do

1    that?

2         A.    I believe two semesters.

3         Q.    And how long ago was that,

4    approximately?

5         A.    Over ten years ago.

6         Q.    So while you were at BMS?

7         A.    That is correct.

8         Q.    Any other teaching engagements?

9         A.    No.

10        Q.    And do you ever participate as

11   an instructor in CLE?

12        A.    No.

13        Q.    Have you ever published any

14   articles or books or book chapters with

15   respect to any of your employment

16   responsibilities?

17        A.    No.

18        Q.    Any in the works?

19        A.    No.

Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential — Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential — Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential — Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential — Subject to Further Confidentiality Review



Highly Confidential — Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential — Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential — Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential — Subject to Further Confidentiality Review



Highly Confidential — Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential – Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential — Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1        Are you familiar at all with

2   the procedures in the national accounts

3   department with respect to the receipt of

4   orders from distributors or wholesalers with

5   respect to triggering a suspicious order

6   because of size, frequency or pattern?

7            MR. HOFFMAN:  Objection.

8   QUESTIONS BY MS. CONROY:

9       Q.    That's before the order is

10  filled.

11           MR. HOFFMAN:  Sorry.

12  QUESTIONS BY MS. CONROY:

13      Q.    Are you familiar with that

14  trigger?

15           MR. HOFFMAN:  Sorry.  Object to

16       form.

17           THE WITNESS:  No.

18  QUESTIONS BY MS. CONROY:

19      Q.    Did you understand what I was

20  talking about?

21      A.    Yes.

22      Q.    And then I take it you have

23  never had any conversations with Stephen Seid

24  or Mr. Berjanski {phonetic} about suspicious

25  order triggers when the order actually comes

1    into Purdue before the order is filled?

2        A.    I don't recall having specific

3    discussions with Mr. Seid or Mr. Berjanski

4    about that.

5        Q.    Okay.  Do you recall any

6    conversations with anyone about that?

7        A.    I don't recall any specific

8    conversations.

9        Q.    Do you recall ever generally

10   discussing the concept of there being a

11   trigger with respect to the size, frequency

12   or pattern of an order that is received by

13   Purdue?

14       A.    I recall discussion at

15   committee meetings where this would be

16   discussed.

17       Q.    And what do you recall about

18   that?

19       A.    That this group, national

20   account group, would -- that there was a

21   review that would be conducted of orders at

22   their level looking for large or unusual

23   orders during any given time.

24       Q.    And was there any discussion

25   about what was done with those orders,

1    whether they were filled or not?

2         A.    I don't recall any specific

3    discussions about that.

4         Q.    Was there any discussion about

5    the connection between filling the order to

6    the distributor and pharmacies of suspicion

7    that that distributor was supplying?

8              MR. HOFFMAN:  Object to form.

9              THE WITNESS:  I don't recall

10        any specific discussions.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 4              MR. HOFFMAN:  Jayne, for your

 5         planning purposes, I think we're

 6         having lunch set up at like 12:15.  So

 7         it's in another 20-something minutes.

 8         If that's okay with you guys.

 9              MS. CONROY:  That's great.

10         Thank you.

11              How are you doing?  Do you

12         want --

13              THE WITNESS:  I'm fine.

14              MS. CONROY:  Okay.  We'll

15         keep -- we'll just keep going?

16              MR. HOFFMAN:  Sure.

17              MS. CONROY:  You tell me when

18         lunch is here.  Or tell me when it's

19         12:20.
```

Highly Confidential - Subject to Further Confidentiality Review

         7              MS. CONROY:  I'll try and do it

         8         in order.  That would actually make

         9         more sense.

        10              THE WITNESS:  While you're

        11         doing that, may I just step out for a

        12         second?  Thank you.

        13              MS. CONROY:  We'll go off the

        14         record.

        15              VIDEOGRAPHER:  The time is

        16         11:54 a.m.  Off the record.

        17          (Off the record at 11:54 a.m.)

        18              VIDEOGRAPHER:  Okay.  We are

        19         back on the record.  The time is

        20         11:59 a.m.

        21              (Purdue-Geraci Exhibits 6, 7

        22         and 8 marked for identification.)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 9              Do you know if the order

10    monitoring committee has been suspended, or

11    do you know if it ceases to exist?

12              MR. HOFFMAN:  Object to the

13         form.

14              THE WITNESS:  The order

15         monitoring committee continues.

16    QUESTIONS BY MS. CONROY:

17         Q.    Have you had any meetings?

18         A.    I don't know if they've had any

19    meetings.

20         Q.    Okay.  Do you believe you're

21    still on the order monitoring committee?

22         A.    I don't -- there isn't a

23    committee as such as it was before, so to

24    answer your question, I -- I really haven't

25    given thought as to if I'm on the committee
```

1    or not.

2         Q.    Okay.  Let me ask it this way:

3    Do you know if there -- do you know if

4    there's still an order monitoring committee

5    but it's a different committee and under a

6    different oversight department, or is it the

7    same order monitoring committee, you just

8    don't know if it's active?

9         A.    I just testified that it still

10   exists.  It is active.  It is within the

11   corporate ethics and compliance group.

12        Q.    Did you say it is within the

13   corporate --

14        A.    It is within.

15        Q.    The corporate ethics and

16   compliance?

17        A.    Yes.

18        Q.    But you have not, to the best

19   of your knowledge, attended any meetings?

20        A.    I have not attended any

21   meetings to the best of my knowledge.

22        Q.    Okay.  Do you receive any

23   packages or agendas or anything like that

24   with respect to the order monitoring

25   committee now that it's part of corporate

1    ethics and compliance?

2         A.    I have not, to the best of my

3    recollection.

4         Q.    What about Mr. Bauza, do you

5    know if he has attended any meetings or if he

6    receives any materials?

7         A.    I don't know.

8         Q.    How do you know it's still

9    active?

10        A.    In my discussions with Maggie

11   Feltz, and in discussions I've had with Eric

12   Brantley over time.

13        Q.    Do you know who the other

14   committee members are once there was the

15   switch to corporate ethics?

16        A.    The committee members were

17   those individuals listed on the -- I think

18   they call this their SOP, right?

19        Q.    Right.

20        A.    Yes.  Corporate compliance

21   CC-SOP.  It would be those individuals.

22        Q.    Danielle --

23        A.    Eric Brantley, Danielle Bacco,

24   Margaret Feltz, Alexis Stroud.

25        Q.    Do you know if anyone from

Highly Confidential - Subject to Further Confidentiality Review

 1    national accounts is still on the order

 2    monitoring committee?

 3         A.      I don't know.

 4         Q.      Do you know if anyone from

 5    marketing or sales, the marketing and sales

 6    side of the business, is on the order

 7    monitoring committee?

 8         A.      I don't know.

 9         Q.      Do you know if anyone from the

10    legal department is on the order monitoring

11    committee?

12         A.      I don't know.

13         Q.      Do you know if it's only those

14    four individuals, or do you know one way or

15    the other if there are additional members on

16    the committee?

17         A.      I don't know if there are

18    additional members.

19         Q.      Do you know if you are -- let

20    me ask it this way:  Would you have been

21    familiar with or had in your possession, for

22    example, the SOP with respect to ADD, abuse,

23    diversion and detection?  Would that be

24    something that you would have -- you would

25    have had in your role as a member of the

 1    order monitoring committee?

 2         A.    That I would have had what?

 3    I'm sorry, Ms. Conroy.

 4         Q.    The SOP, for example, the ADD

 5    reports.

 6         A.    I don't recall ever having the

 7    SOP for the ADD or anything related to ADD.

 8         Q.    Did you ever even know that

 9    there was an SOP for the ADD reporting?

10         A.    Did I ever know?  No, I don't

11    know.

12         Q.    Okay.  Did you ever know one

13    way or the other whether there was an SOP for

14    reports of concern?

15         A.    I don't know or ever recall

16    being aware of an SOP for reports of concern.

17         Q.    So that's not something you

18    would have had in your possession, such an

19    SOP, or if you had it, you didn't know what

20    it was?

21         A.    Well, I'll answer that I don't

22    know that I ever had those in my possession,

23    those SOPs.

24         Q.    What about a Fee-For-Service

25    SOP, is that familiar to you at all?  Would

1    you have ever seen one of those?

2         A.    I don't recall ever seeing a

3    Fee-For-Service SOP.

4         Q.    Do you know if you even knew if

5    one existed?

6         A.    I did not know that one

7    existed.

8         Q.    Okay.  Generally at Purdue --

9    or let me ask it this way:  In your role as

10   corporate security, do you work -- do you and

11   the individuals who report to you operate

12   under SOPs or refer to SOPs for their sort of

13   daily functions?

14             MR. HOFFMAN:  Object to the

15        form.

16             THE WITNESS:  Corporate

17        security has certain SOPs that are

18        very specific, but not to your daily

19        function.  Not that I know of to daily

20        function.  Pretty much in the roles

21        and responsibilities.  Physical

22        security, for example.

23   QUESTIONS BY MS. CONROY:

24        Q.    And are you involved in the

25   drafting or review of those SOPs that relate

1    to corporate security?

2         A.    I would have been when those

3    things -- during my tenure if those things

4    were up for review or for drafting, I would

5    have reviewed those and approved those.

6         Q.    And is there a department at

7    Purdue that keeps track of SOPs that makes

8    sure that they are kept up to date and they

9    keep a record of that sort of thing?

10              MR. HOFFMAN:  Object to the

11         form.  Beyond the scope.

12              THE WITNESS:  Yeah, I don't

13         know if there's a department that has

14         it.  I assume that they reside

15         someplace.

16   QUESTIONS BY MS. CONROY:

17        Q.    When you have a new employee

18   come in to corporate security, are they given

19   the SOPs for that -- for the corporate

20   security department?

21              MR. HOFFMAN:  Object to the

22         form.

23              THE WITNESS:  No.

24              MR. HOFFMAN:  Beyond the scope.

25              THE WITNESS:  Yeah, I haven't

1          had a new employee in a long time.  I

2          don't recall.

3     QUESTIONS BY MS. CONROY:

4          Q.     Okay.  Would you, for example,

5     have copies or know where to puts your hands

6     on the SOPs that relate to corporate

7     security?

8          A.     I would know who to ask to get

9     those.

10         Q.     Is it part of Purdue as a

11    corporation's culture to have SOPs that sort

12    of guide or explain in general the

13    responsibilities and duties of the different

14    departments?

15              MR. HOFFMAN:  Object to the

16         form.  Beyond the scope.

17              THE WITNESS:  To the best of my

18         knowledge, we -- there are a number of

19         SOPs that various departments, if not

20         all departments, have, to the extent

21         of which I don't know.

22    QUESTIONS BY MS. CONROY:

23         Q.     Compared to an SOP, for

24    example, do you have a guidebook or anything

25    like that for corporate security or would it

Highly Confidential - Subject to Further Confidentiality Review

1    be the SOPs?

2         A.    We do not have a guidebook, per

3    se.

4         Q.    Do you have something like a

5    guidebook?

6         A.    As I recall, there may be some

7    references to, quote, security in our

8    employee handbooks, but it's broad and

9    general, just for the employee base.

10        Q.    Okay.  With respect to the

11   order monitoring committee, we looked at the

12   SOP that specifically concerned the order

13   monitoring committee, correct?

14        A.    Yes, we did.

15        Q.    Are you familiar with any other

16   guidelines, handbooks, anything else that you

17   would have referred to as a member of the

18   order monitoring committee to define your

19   responsibilities or outline your

20   responsibilities or lay out protocols,

21   anything like that, or would it be the SOP?

22        A.    I'm unaware of any other SOP or

23   guidelines that would have guided our -- how

24   we comported ourselves with regard to the

25   order monitoring.

```
 1              MS. CONROY:  Okay.  I think we

 2        can break for lunch.  We just saved a

 3        lot of time.

 4              THE WITNESS:  Great.  Good.

 5              VIDEOGRAPHER:  Off the record,

 6        right?  The time is 12:16 p.m.  Off

 7        the record.

 8         (Off the record at 12:16 p.m.)

 9              VIDEOGRAPHER:  Okay.  We are

10        back on the record.  The time is

11        1:16 p.m.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





20          Are you familiar with the

21   entities ValuTrack or ValueCentric?

22          A.    I've heard the names.

23          Q.    If I suggested to you they had

24   something to do with the collection of

25   Fee-For-Service data, would that refresh your

Highly Confidential - Subject to Further Confidentiality Review

1    memory at all?

2         A.     It sounds reasonable.

3         Q.     What about the either software,

4    a database or an entity known as Vinyl?  Is

5    that familiar to you at all?

6         A.     Yes.

7         Q.     And what is that?

8         A.     As I recall, it's a software

9    that was used to capture information so --

10   for easier retrieval, whether it be reports

11   of concern -- and I'm not sure if

12   Fee-For-Service data was in there, but that's

13   what I recall.  It was a better way of

14   tracking information and being able to

15   retrieve that information.

16        Q.     Okay.  Is it still in effect?

17   Do you know?

18        A.     I don't know.

19        Q.     Can you put a time frame on it?

20               Would it have been at the time

21   that legal was responsible at the order

22   monitoring committee, or compliance?

23        A.     I don't recall.  I don't

24   recall.

25        Q.     Are you familiar at all with

1    scorecards that are kept by national accounts

2    with respect to particular -- with respect to

3    all of the authorized distributors?

4            A.      No.

5            Q.      You're not familiar with that

6    term "scorecards"?

7            A.      For distributors, no.

8            Q.      Okay.  Are you familiar with it

9    for pharmacies?

10           A.      No.

11           Q.      Have you heard of the entity

12   Edge Dynamics?

13           A.      No, I have not.

Highly Confidential - Subject to Further Confidentiality Review

16       Q.    Did you ever see any board

17  packages or have any discussions at the -- or

18  not board -- committee packages or have any

19  discussions at the order monitoring committee

20  about any CVS stores?

21       A.    I don't recall any discussions

22  about any particular chains, including CVS.

23       Q.    Do you know why there wouldn't

24  have been any discussion about chains?

25       A.    No.

```
 1                 MR. HOFFMAN:  Object to the

 2         form.

 3                 THE WITNESS:  No, I don't.

 4     QUESTIONS BY MS. CONROY:

 5         Q.    Do you know whether the

 6     individual data with respect to the actual

 7     chain pharmacy at a particular street address

 8     was available in the Fee-For-Service data?

 9         A.    I assume that it was.

10         Q.    Did it ever -- did it ever come

11     up as an issue that the chain pharmacies did

12     not appear in conversations at the order

13     monitoring committee?

14                 MR. HOFFMAN:  Object to the

15         form.

16                 THE WITNESS:  I don't recall.

17     QUESTIONS BY MS. CONROY:

18         Q.    But you do recall that -- you

19     don't recall there ever being a discussion

20     about one of the chain pharmacies at an order

21     monitoring committee meeting?

22         A.    I don't recall.

23         Q.    You don't --

24         A.    I don't recall a discussion

25     about a chain pharmacy at an OMS meeting.
```

1      Q.     Okay.  Thank you.

2             Do you believe that Purdue had

3      as much data as their authorized distributors

4      with respect to the outlets or the

5      pharmacies?

6             MR. HOFFMAN:  Object to the

7         form.

8             THE WITNESS:  I can't judge

9         that because I don't know what the

10        distributors actually had.

11     QUESTIONS BY MS. CONROY:

12        Q.     Was there anything that you

13     believed Purdue was missing with respect to

14     pharmacy data that it was receiving from the

15     distributors?

16            MR. HOFFMAN:  Object to the

17        form.  Calls for speculation.

18            THE WITNESS:  It never -- I

19        never thought of any particular

20        information that was not forthcoming

21        to us based on what we were requiring

22        from the distributors.

23     QUESTIONS BY MS. CONROY:

24        Q.     So you yourself never

25     identified any gaps or areas where you would

1    like more information?

2         A.     More information from whom?

3         Q.     From the -- from your customer,

4    the distributor.

5         A.     I don't recall that ever coming

6    up or me thinking there was a gap.

7         Q.     Right.

8         A.     I don't recall that happening.

9         Q.     Okay.  Would you agree that at

10   least as long as you were involved in the

11   order monitoring committee that Purdue has no

12   quantifiable trigger that identifies an order

13   as suspicious and would require a referral to

14   DEA?

15             MR. HOFFMAN:  Object to form.

16        Beyond the scope.

17             THE WITNESS:  Would you

18        rephrase the question, please?

19   QUESTIONS BY MS. CONROY:

20        Q.     Well, I'll tell you what, I'll

21   try or -- I'll reask it.

22             Do you know if Purdue has a

23   quantifiable trigger that would automatically

24   require Purdue to refer to the DEA a

25   suspicious customer?

```
 1              MR. HOFFMAN:  Object to form.
 2         Time frame and beyond the scope.
 3              THE WITNESS:  I do not know if
 4         we have an -- a quantifiable automatic
 5         trigger, and there's none to the best
 6         of my knowledge.
 7    QUESTIONS BY MS. CONROY:
 8         Q.     And so far as you know, the
 9    order monitoring committee must be involved
10    in order to reach a determination to refer a
11    suspicious pharmacy or outlet to the DEA?
12              MR. HOFFMAN:  Object to form.
13              THE WITNESS:  Order monitoring
14         committee or system would be -- has to
15         be involved --
16    QUESTIONS BY MS. CONROY:
17         Q.     Right.
18         A.     -- for pharmacy referrals to
19    the DEA.
20         Q.     Or at least that's how you
21    understand it works.  There would be a
22    determination by the members of the order
23    monitoring committee to refer to DEA?
24         A.     That is correct.
25         Q.     Are you aware of any time
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    restrictions based on ongoing investigations

2    of suspicious pharmacies or customers at

3    Purdue?

4                MR. HOFFMAN:  Object to the

5          form.

6                THE WITNESS:  I'm not aware of

7          any time restrictions.

8    QUESTIONS BY MS. CONROY:

9         Q.    So for as long as the order

10   monitoring committee decides to investigate a

11   pharmacy, there's no cutoff of that; they can

12   continue to investigate as long as they see

13   fit?

14        A.    I'm unaware of any time

15   restriction.

16        Q.    Is it true that if a

17   distributor's customer was deemed to be

18   suspicious, at least by triggering the

19   algorithm, that a distributor could just --

20   in a conversation with a member of the order

21   monitoring committee could justify that or

22   explain why such an order took place or

23   whatever to dispel the suspicion?

24                MR. HOFFMAN:  Object to form.

25                THE WITNESS:  It's my
```

1     understanding that there -- in that

2     conversation, if it was had and when

3     it was had, that they could provide,

4     the distributor could provide,

5     justification or an explanation that

6     may explain the anomaly in the orders.

7          That information then would be

8     presented to the OMS team for

9     consideration.

10    QUESTIONS BY MS. CONROY:

11         Q.    Do you know if that information

12    needed to be in writing or could it be

13    relayed to one of the -- to the order

14    monitoring committee members and then

15    expressed at the committee meeting, or did it

16    need -- did that justification or explanation

17    need to be in writing from the distributor or

18    from the pharmacy?

19         A.    Yeah, I don't believe it needed

20    to be in writing.

21         Q.    Okay.  I don't know if you know

22    the answer to this, but let me ask it anyway.

23         With respect to any electronic

24    records with respect to the OMS work or lists

25    of suspicious pharmacies or whatever, do you

1   know if someone went in and searched that

2   database if those -- if logs of searches were

3   retained?

4        A.    I have no knowledge of that.

5        Q.    Okay.  And likewise, do you

6   know whether or not it was possible to

7   overwrite electronic notes in the OMS

8   database?  Do you know one way or the other?

9        A.    I don't know.

10       Q.    Do you know one way or the

11  other whether there is any centralized

12  repository for queries that were made into or

13  of the order monitoring database?

14            MR. HOFFMAN:  I'll just object

15       to form.  I think all of these are

16       beyond the scope.

17            But go ahead, if you know.

18            THE WITNESS:  I don't know.

19  QUESTIONS BY MS. CONROY:

20       Q.    Do you believe there's an

21  opioid crisis in this country?

22            MR. HOFFMAN:  Objection.

23       Beyond the scope.

24            THE WITNESS:  Yes, there is

25       an -- I do believe there's an opioid

Highly Confidential - Subject to Further Confidentiality Review

1    crisis.

2    QUESTIONS BY MS. CONROY:

3        Q.    Do you believe that the order

4    monitoring committee and the role it played

5    was successful?

6              MR. HOFFMAN:  Object to form.

7              THE WITNESS:  I believe that

8         the order monitoring committee, that

9         the good work and the evolution of

10        that committee to do its job better

11        and better and more efficiently, was

12        successful to a certain extent.  It --

13        there were referrals to the DEA, and

14        we considered that a very positive

15        step and a good thing to do.

16              So there's a certain -- certain

17        measure of success there as far as I'm

18        concerned.

19   QUESTIONS BY MS. CONROY:

20       Q.    Okay.  And is that how you

21   measure the success of the order monitoring

22   committee, the referrals to DEA?

23             MR. HOFFMAN:  Object to form.

24        Beyond the scope.

25             THE WITNESS:  I could see that

```
 1            as being a measure of success.
 2     QUESTIONS BY MS. CONROY:
 3            Q.     Any other measures that you can
 4     see?
 5                   MR. HOFFMAN:  Same objection.
 6                   THE WITNESS:  I would say over
 7            time that the measure of success is
 8            how we -- how the committee became
 9            more sophisticated, developed and was
10            continuously improving itself.
11     QUESTIONS BY MS. CONROY:
12            Q.     Would you agree that the one
13     reason for the opioid crisis is oversupply of
14     opioids in the United States?
15                   MR. HOFFMAN:  Object to form.
16            Beyond the scope.
17                   THE WITNESS:  I believe that
18            the opioid crisis -- very complicated,
19            many, many factors there, so -- and I
20            never -- I haven't studied it to say
21            what are those specific factors and if
22            that would be -- went into play.
23     QUESTIONS BY MS. CONROY:
24            Q.     So you don't know if oversupply
25     would be one factor?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      I can't comment on that.

 2            Q.      Was the order monitoring

 3    committee set up in part to determine whether

 4    or not there was oversupply to a particular

 5    customer?

 6                    MR. HOFFMAN:  Object to the

 7            form.

 8                    THE WITNESS:  I was not with

 9            the company when they set up the order

10            monitoring system.

11    QUESTIONS BY MS. CONROY:

12            Q.      Did you ever understand

13    oversupply to a particular customer to be

14    potentially a suspicious -- an indication of

15    suspicion?

16                    MR. HOFFMAN:  Object to form.

17                    THE WITNESS:  I do recall in

18            one instance, and I forget the name of

19            the distributor, but it was tied to a

20            pharmacy in Las Vegas, and I do recall

21            that there was discussion about not

22            about oversupply but overpurchasing by

23            this particular wholesaler, and it

24            appeared that a lot of the product was

25            going to one particular pharmacy.
```

1    QUESTIONS BY MS. CONROY:

2         Q.    So overpurchasing by a

3    distributor that was then ultimately supplied

4    to an individual pharmacy, would you call

5    that oversupply?

6         A.    I would call it a suspicious

7    order.

8         Q.    Suspicious because of its size?

9         A.    Because of its size.

10        Q.    Did the order monitoring

11   committee ever stop any shipments of opioids?

12        A.    I believe that there were

13   certain instances where not the order

14   monitoring team -- committee, but individuals

15   or an individual that is a member of the

16   team, based on a lot of this information,

17   would at times produce orders to certain

18   wholesalers.

19        Q.    Did you ever, as an order

20   monitoring committee member, reduce an order

21   to a wholesaler?

22        A.    No, I did not, because I did

23   not have the authority to do so.

24        Q.    Who did have the authority to

25   do that?

1        A.      I -- as I recall, it was done

2    by Stephen Seid.

3        Q.      Okay.  And do you believe

4    Stephen Seid, as a member of the order

5    monitoring committee, reduced certain orders

6    to wholesalers?

7        A.      I recall him doing it -- I

8    recall there were instances where, in fact,

9    he had done that.

10       Q.      Okay.  And do you recall why he

11   did that?

12       A.      Because the orders appeared to

13   be suspicious.

14       Q.      Suspicious because of size?

15              MR. HOFFMAN:  Object to the

16         form.

17              THE WITNESS:  Because either of

18         size or because it became -- based on

19         the algorithm, it looked unusual.

20   QUESTIONS BY MS. CONROY:

21       Q.      And he had the authority to do

22   that on his own.  That was not something that

23   the order monitoring committee would vote on?

24       A.      I believe that he -- I don't

25   believe it was the vote of the order

Highly Confidential - Subject to Further Confidentiality Review

1    monitoring committee, but Steve Seid, whether

2    he did on it on his own or had to receive

3    approval from his management, is something

4    I'm unaware of.

5        Q.    But that was outside of -- as

6    far as you know, the order monitoring

7    committee never stopped any shipments of

8    opioids?

9            MR. HOFFMAN:  Object to the

10           form.

11           THE WITNESS:  The order

12           monitoring committee was a monitoring

13           committee, not responsible, or

14           directly responsible, for the movement

15           of product.

16           MS. CONROY:  I think that's all

17       I have.  Thank you.

18           THE WITNESS:  Thank you.

19           MR. LAFATA:  Let's go off the

20       record.

21           VIDEOGRAPHER:  Okay.  The time

22       is 2:12 p.m.  Off the record.

23        (Off the record at 2:12 p.m.)

24           VIDEOGRAPHER:  The time is

25       2:31.  Back on the record.

```
 1                    CROSS-EXAMINATION

 2    QUESTIONS BY MR. HOFFMAN:

 3         Q.      Mr. Geraci, good afternoon.

 4                 Again, for the record, my name

 5    is Nathan Hoffman.  I represent Purdue, and

 6    now it's my chance to ask you a few

 7    questions.

 8                 Okay?

 9         A.      Okay.

10         Q.      I promise to be brief.  Thank

11    you for your patience.

12                 I'd like to go to Exhibit 9, if

13    you have that in front of you.  Just ask you

14    a couple of clarifying questions.

15                 And specifically, I'd like for

16    you to turn to Slide Number 5, please.

17         A.      (Witness complies.)

18         Q.      Slide Number 5 is entitled,

19    "OMS Information Sources."  And you will see

20    that the fourth bullet point in the slide

21    describes a prescriber -- it says,

22    "Prescriber program information."

23                 Do you see that?

24         A.      Yes, I do.

25         Q.      And you were asked some
```

1    questions about that earlier, and I just want

2    to clarify for the record.

3                  What was the prescriber program

4    at Purdue?

5                  MS. CONROY:  Objection.

6                  THE WITNESS:  In looking at

7          this, I'm assuming that this is

8          referring to the ADD program.  I don't

9          recall ever hearing it described as a

10         prescriber program -- prescriber

11         program information.

12   QUESTIONS BY MR. HOFFMAN:

13         Q.    But as far as any distinction

14   between, for example, order monitoring, the

15   order monitoring system and a prescriber

16   program, is the only prescriber program that

17   you're aware of at Purdue, would that be the

18   ADD program?

19                MS. CONROY:  Objection.

20                THE WITNESS:  That would be

21         correct.

22   QUESTIONS BY MR. HOFFMAN:

23         Q.    Okay.  And you had some

24   discussion about that earlier.

25                Is it true that the ADD program

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was abuse, diversion and detection program?

 2          A.     Yes.

 3          Q.     And which department or

 4    departments were involved in the ADD program,

 5    if you know?

 6          A.     Legal department.

 7          Q.     So would that be a separate

 8    group analyzing that information as compared

 9    to the OMS committee?

10          A.     That is correct.

11          Q.     Okay.  And then on the second

12    page -- excuse me, not the second page, the

13    next page, which is Slide 6, there is a title

14    at the top of the slide.  It says,

15    "Prescriber versus Dispenser."

16                 Do you see that?

17          A.     Yes, I do.

18          Q.     And does this slide, in fact,

19    make a distinction between the prescriber

20    program on the one hand and the OMS program

21    on the other?

22                 MS. CONROY:  Objection.

23                 THE WITNESS:  Yes, it does.

24    QUESTIONS BY MR. HOFFMAN:

25          Q.     And were you involved at all
```

1    directly in the ADD program versus your role

2    in sitting on the OMS committee?

3         A.    I was not directly involved in

4    the ADD program.

5         Q.    You were asked some questions

6    by Ms. Conroy, I believe, to the effect of

7    whether or not the OMS committee had the

8    authority to stop or halt or change the

9    orders that were being sent out to the

10   wholesalers and distributors.

11              Do you recall that?

12        A.    Yes, I do.

13        Q.    Do you recall whether, in fact,

14   the OMS committee at times provided guidance

15   or input to committee members on the halting,

16   changing or the volume of orders that were

17   actually shipped to wholesalers and

18   distributors?

19              MS. CONROY:  Objection.

20              THE WITNESS:  I don't -- I

21         don't recall specifically, but it's

22         reasonable that the committee would

23         have provided guidance or

24         recommendations to certain committee

25         members concerning the distribution of

1    product to the distributors.

2    QUESTIONS BY MR. HOFFMAN:

3        Q.    And would that be generally in

4    the custom and practice of the committee to

5    provide that type of guidance to its members?

6            MS. CONROY:  Objection.

7            THE WITNESS:  When appropriate.

8    QUESTIONS BY MR. HOFFMAN:

9        Q.    And I believe you mentioned

10   Mr. Seid earlier.

11           Is that who typically would be

12   involved in those discussions?

13       A.    He would be in those

14   discussions and would in these -- in this

15   instance would have been the recipient of

16   that guidance and/or recommendation from the

17   committee.

18           MR. HOFFMAN:  Okay.  Thank you.

19       I believe those are all the questions

20       we have at this time.

21           MS. CONROY:  I have a couple of

22       follow-ups.

23           MR. HOFFMAN:  Let me mark that

24       real quick for the record, just before

25       you come back over here.  I forgot to

Highly Confidential - Subject to Further Confidentiality Review

```
 1          do this.
 2               Just for the record, I'd like
 3          to mark as Exhibit 10 -- it's just our
 4          objection to the notice of deposition
 5          regarding the scope of the notice we
 6          received from plaintiff's counsel.  I
 7          simply want to mark it for the record.
 8          I'm not going to ask any questions
 9          about it.
10               (Purdue-Geraci Exhibit 10
11          marked for identification.)
12               REDIRECT EXAMINATION
13     QUESTIONS BY MS. CONROY:
14          Q.    Mr. Geraci -- I'll wait until
15     he get done.  Sorry.
16               With respect to the ADD
17     program, you said that the legal department
18     would be the separate group that would
19     analyze that information developed from the
20     ADD program as opposed to the order
21     monitoring committee?
22          A.    Yes.
23          Q.    But isn't it true that the
24     order monitoring committee did have access to
25     whatever analysis was done by the legal
```

1    committee of the ADD information?

2         A.    I believe I testified to that

3    already and said yes.

4         Q.    Okay.  So even though the

5    analysis was done by the legal department,

6    the order monitoring committee would be able

7    to utilize that abuse, diversion -- abuse,

8    detection and diversion information in its

9    analysis of suspicious pharmacies?

10        A.    Yes, it could.

11        Q.    Your answers with respect to

12   the questions about whether or not it would

13   be -- whether or not you would have

14   conversations among committee members with

15   respect to the halting of product, do you

16   recall that?

17             The question was:  Do you

18   recall whether, in fact, the OMS committee at

19   times provided guidance or input to committee

20   members on the halting, changing or the

21   volume of orders that were actually shipped

22   to wholesalers and distributors?

23             And you said you didn't recall

24   specifically, but it was reasonable that the

25   committee would have provided guidance or

```
 1    recommendations to certain committee members

 2    concerning the distribution of product.

 3              Do you recall that?

 4    A.    Yes.

 5    Q.    Do you have a memory of

 6    providing guidance, or are you testifying

 7    that it would have been reasonable for you to

 8    do that but you don't know if it ever

 9    happened?

10              MR. HOFFMAN:  Object to the

11         form.

12              THE WITNESS:  I believe I also

13         testified that I did recall an

14         instance, one particular wholesaler,

15         that had come to the attention of the

16         committee and had been -- and that

17         there was guidance provided, I believe

18         it was guidance provided, or sales

19         operations, Steve Seid, cut back

20         orders to that particular wholesaler.

21         I believe I did testify to that, in

22         fact.

23    QUESTIONS BY MS. CONROY:

24    Q.    Okay.  So that was a particular

25    incidence when Stephen Seid came to the
```

1    committee and talked to you about a

2    particular order from a distributor, a

3    particular size order?

4        A.    What I stated was I don't

5    recall how it came about, whether Steve Seid

6    brought it to the committee's attention, or

7    if this particular wholesaler and, of course,

8    by extension, the pharmacy or pharmacies

9    connected to it, had been under scrutiny by

10   the OMS committee.  I don't recall that.

11             But I do recall that there was

12   an instance where orders to a particular

13   wholesaler were, in fact, cut back.

14       Q.    Do you have any particular --

15   do you have any memory at all of discussing

16   with committee members specific size orders

17   that should be suspicious or a particular

18   frequency of orders that should be suspicious

19   or a particular pattern that should be

20   suspicious?

21             MR. HOFFMAN:  Object to the

22       form.

23             THE WITNESS:  I don't recall

24       having that specific discussion.

25

1    QUESTIONS BY MS. CONROY:

2         Q.    Okay.  What you do recall is

3    when an actual order was described to you, as

4    a committee member, that you commented on

5    that particular order.  And it was your

6    recommendation, or at least the committee's

7    recommendation, to Mr. Seid that that -- that

8    order should not be shipped?

9         A.    What I -- what I believe I

10   stated just before was I don't recall the

11   sequence of how it came to the committee's

12   attention, what came first, but I do recall

13   an instance where orders were cut back to a

14   particular wholesaler.

15        Q.    So if you don't recall the

16   sequence, then you might remember that the

17   committee decided a certain amount in an

18   order should not be shipped, and then it's

19   possible then that Mr. Seid said, "Oh, I have

20   one of those"?

21        A.    No, I don't recall it that way,

22   and I don't recall that it was a particular

23   size.

24             It was -- the one I'm referring

25   to that I recall was -- and again, I don't

Highly Confidential - Subject to Further Confidentiality Review

1  recall the sequence as to how it came about

2  or came to the committee's attention, if it

3  was sales, operation or national account,

4  Mr. Seid seeing the pattern here, or if it

5  was activity, investigative activity, that

6  had been on -- under review by the OMS team.

7  I just don't recall what came first.

8          And then I do recall that there

9  was discussion and that there was a reduction

10 in our sale of our product to this particular

11 wholesaler.

12      Q.    Do you recall the wholesaler?

13      A.    If I recall correctly, I

14 believe it was called Value Drug.  I believe.

15      Q.    And that was a wholesaler?

16      A.    Yes.

17      Q.    Is that a wholesaler that was

18 part of the L.A. investigation?

19      A.    L.A. investigation by whom?

20      Q.    By the L.A. Times or -- there

21 was a very large investigation.  Jack Crowley

22 was quoted in the newspaper.

23          Do you remember that?

24      A.    I remember the L.A. Times

25 articles.  I don't recall specifically if

Highly Confidential - Subject to Further Confidentiality Review

1    Valley Drug or whatever their name actually

2    is or was mentioned in those articles.  I

3    just don't recall it.

4         Q.    Okay.  But you believe the

5    wholesaler was Valley Drug?

6         A.    I believe so.

7         Q.    And is it your best memory that

8    the order to Valley Drug was reduced?

9         A.    To the best of my recollection,

10   a order, or it could be orders, were in fact

11   reduced.

12        Q.    And what you don't recall is

13   whether Valley Drug was already a subject of

14   review by the order monitoring committee when

15   this issue came up or whether someone brought

16   it to the attention of the order monitoring

17   committee?

18        A.    That is correct.

19        Q.    That's what you mean by

20   sequence; you don't know whether the

21   conversation started?

22        A.    As I've stated repeatedly, yes,

23   that is correct, I don't know what came

24   first.

25        Q.    Do you recall if there was a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    discussion among the committee members as to

 2    what would constitute size, frequency or

 3    pattern that would require Mr. Seid to reduce

 4    the supply to Valley Drug?

 5              MR. HOFFMAN:  Object to the

 6         form.

 7              THE WITNESS:  I don't -- I

 8         don't recall those details.

 9    QUESTIONS BY MS. CONROY:

10         Q.    And that's the only instance

11    you recall?

12         A.    That's the only instance that I

13    recall.

14              MS. CONROY:  For completeness,

15         let me mark the notice as well since

16         you put the objection in.

17              We have a copy of the notice,

18         right?

19              Do we?

20              MS. HURD:  Oh, I don't know.

21         Yeah, it's here.  Sorry.

22              MS. CONROY:  That will be

23         Exhibit 11.

24              (Purdue-Geraci Exhibit 11

25         marked for identification.)
```

```
 1              MS. CONROY:  And I don't have

 2         any further questions.  I just want to

 3         mark the exhibits.

 4              THE WITNESS:  Okay.  Thank you.

 5              MS. CONROY:  Thank you.

 6              VIDEOGRAPHER:  Should we go off

 7         the record?

 8              MR. HOFFMAN:  That's fine.

 9         Yeah, we can mark it off the record.

10              VIDEOGRAPHER:  Okay.  This

11         marks the end of today's deposition.

12         The time is 2:46 p.m.

13         (Deposition concluded at 2:46 p.m.)

14                 - - - - - - -

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      CERTIFICATE
 2
 3            I, CARRIE A. CAMPBELL, Registered
      Diplomate Reporter, Certified Realtime
 4    Reporter and Certified Shorthand Reporter, do
      hereby certify that prior to the commencement
 5    of the examination, Mark Geraci was duly
      sworn by me to testify to the truth, the
 6    whole truth and nothing but the truth.
 7            I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
              I DO FURTHER CERTIFY that I am
11    neither a relative nor employee nor attorney
      nor counsel of any of the parties to this
12    action, and that I am neither a relative nor
      employee of such attorney or counsel, and
13    that I am not financially interested in the
      action.
14
15
16
              _____
17    CARRIE A. CAMPBELL,
      NCRA Registered Diplomate Reporter
18    Certified Realtime Reporter
      Notary Public
19    Dated:  April 9, 2019
20
21
22
23
24
25
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4     carefully and make any necessary corrections.

 5     You should state the reason in the

 6     appropriate space on the errata sheet for any

 7     corrections that are made.

 8              After doing so, please sign the

 9     errata sheet and date it.  You are signing

10     same subject to the changes you have noted on

11     the errata sheet, which will be attached to

12     your deposition.

13              It is imperative that you return

14     the original errata sheet to the deposing

15     attorney within thirty (30) days of receipt

16     of the deposition transcript by you.  If you

17     fail to do so, the deposition transcript may

18     be deemed to be accurate and may be used in

19     court.

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4              I,_____, do

        hereby certify that I have read the foregoing

 5      pages and that the same is a correct

        transcription of the answers given by me to

 6      the questions therein propounded, except for

        the corrections or changes in form or

 7      substance, if any, noted in the attached

        Errata Sheet.

 8

 9

10

11

12      _____

        Mark Geraci                   DATE

13

14

15      Subscribed and sworn to before me this

16      _____ day of _____, 20 _____.

17      My commission expires: _____

18

19      Notary Public

20

21

22

23

24

25
```

```
 1                 - - - - - - -

                       ERRATA

 2                 - - - - - - -

 3      PAGE     LINE    CHANGE/REASON

 4      _____    _____   _____

 5      _____    _____   _____

 6      _____    _____   _____

 7      _____    _____   _____

 8      _____    _____   _____

 9      _____    _____   _____

10      _____    _____   _____

11      _____    _____   _____

12      _____    _____   _____

13      _____    _____   _____

14      _____    _____   _____

15      _____    _____   _____

16      _____    _____   _____

17      _____    _____   _____

18      _____    _____   _____

19      _____    _____   _____

20      _____    _____   _____

21      _____    _____   _____

22      _____    _____   _____

23      _____    _____   _____

24      _____    _____   _____

25
```

```
 1              - - - - - - -

                LAWYER'S NOTES

 2              - - - - - - -

 3     PAGE    LINE

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25
```