# EXHIBIT 100 – A

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF OHIO
 3                 EASTERN DIVISION
 4                  -  -  -
 5   IN RE:  NATIONAL     :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION           :
     ----------------------------------------
 7                        :  CASE NO.
     THIS DOCUMENT        :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                          :  Hon. Dan A.
 9                        :  Polster
10                  -  -  -
           Tuesday, November 27, 2018
11                  -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
            CONFIDENTIALITY REVIEW
13
                    -  -  -
14
               Videotaped deposition of
15   KEVIN KREUTZER, taken pursuant to notice,
     was held at the law offices of Reed Smith
16   LLP, Three Logan Square, 1717 Arch
     Street, Suite 3100, Philadelphia,
17   Pennsylvania 19103, beginning at 9:34
     a.m., on the above date, before Amanda
18   Dee Maslynsky-Miller, a Certified
     Realtime Reporter.
19
                    -  -  -
20
21
22
23        GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
24           deps@golkow.com
```

Page 2

1  APPEARANCES:
2
3      BARON & BUDD, P.C.
       BY:  WILLIAM POWERS, ESQUIRE
       600 New Hampshire Avenue, N.W.
4      Washington, D.C.
       (202) 333-4562
5      Wpowers@baronbudd.com
       - and -
6
       BY: STERLING CLUFF, ESQUIRE
7      15910 Ventura Boulevard
       Suite 1600
8      Encino, California 91436
       (818) 839-2333
9      scluff@baronbudd.com
       Representing the Plaintiffs
10
11
12
13     REED SMITH, LLP
       BY:  ROBERT A. NICHOLAS, ESQUIRE
14     BY:  JOSEPH J. MAHADY, ESQUIRE
       BY:  SAMANTHA L. ROCCHINO, ESQUIRE
15     Three Logan Square
       1717 Arch Street
16     Philadelphia, Pennsylvania 19103
       (215) 851-8100
17     Rnicholas@reedsmith.com
       Jmahady@reedsmith.com
18     Srocchino@reedsmith.com
       Representing the Defendant,
19     Amerisource Bergen Drug
       Corporation
20
21
22
23
24

Page 3

1  APPEARANCES:  (Continued)
2
3
4      WILLIAMS & CONNOLLY, LLP
       BY:  MIRANDA PETERSEN, ESQUIRE
       725 Twelfth Street, N.W.
5      Washington, DC  20005
       (202) 434-5000
6      mpetersen@wc.com
       Representing the Defendant,
7      Cardinal Health
8
9
10     COVINGTON & BURLING LLP
       BY:  KEVIN KELLY, ESQUIRE
11     850 Tenth Street, NW
       Suite 856N
12     Washington, DC 20001
       (202) 662-5000
13     kkelly@cov.com
       Representing the Defendant,
14     McKesson Corporation
15
16
17     JONES DAY
       BY:  SARAH G. CONWAY, ESQUIRE
18     555 South Flower Street
       Fiftieth Floor
19     Los Angeles, California 90071
       (213) 489-3939
20     sgconway@jonesday.com
       Representing the Defendant,
21     Walmart
22
23
24

Page 4

1  APPEARANCES: (Continued)
2  VIA TELEPHONE/LIVESTREAM:
3
4
       BARTLIT BECK LLP
5      By:  SHARON DESH, ESQUIRE
       Courthouse Place
6      54 West Hubbard Street, Suite 300
       Chicago, Illinois 60654
7      (312) 494-4400
       Sharon.desh@bartlit-beck.com
8      Representing the Defendant,
       Walgreens
9
10
11     PELINI CAMPBELL & WILLIAMS, LLC
       BY:  ERIC J. WILLIAMS, ESQUIRE
12     8040 Cleveland Avenue NW
       Suite 400
13     North Canton, Ohio 44720
       (330) 305-6400
14     ejwilliams@pelini-law.com
       Representing the Defendant,
15     Prescription Supply, Inc.
16
17
18     FOX ROTHSCHILD LLP
       BY:  JACOB S. PERSKIE, ESQUIRE
19     1301 Atlantic Avenue
       Midtown Building, Suite 400
20     Atlantic City New Jersey 08401
       (609) 348-4515
21     Jperskie@foxrothschild.com
       Representing the Defendant,
22     Validus Pharmaceuticals
23
24

Page 5

1  APPEARANCES: (Continued)
2  VIA TELEPHONE/LIVESTREAM:
3
4      MORGAN, LEWIS & BOCKIUS LLP
       BY:  JONATHAN E. MAIER, ESQUIRE
5      1111 Pennsylvania Ave. NW
       Washington, DC 20004
6      (202) 739-3000
       Jonathan.maier@morganlewis.com
7      Representing the Defendant,
       Teva Pharmaceuticals, Inc.,
8      Cephalon, Inc., Watson
       Laboratories, Actavis LLC, and
9      Actavis Pharma, Inc
10
11
       ALLEGAERT BERGER & VOGEL LLP
12     BY:  JOHN S. CRAIG, ESQUIRE
       111 Broadway, 20th Floor
13     New York, New York 10006
       (212) 616-7075
14     Representing the Defendant,
       Rochester Drug Cooperative
15
16
17     BARON & BUDD, P.C.
       BY:  JAY LICHTER, ESQUIRE
18     GRETCHEN KEARNEY, OFFICE MANAGER
       15910 Ventura Boulevard
19     Suite 1600
       Encino, California 91436
20     (818) 839-2333
       Jlichter@baronbudd.com
21     Representing the Plaintiffs
22
23
24

Page 6

1 APPEARANCES: (Continued)
2 VIA TELEPHONE/LIVESTREAM:
3
4 MARCUS & SHAPIRA, LLP
   BY: PAUL M. MANNIX, ESQUIRE
5 One Oxford Centre
   35th Floor
6 Pittsburgh, Pennsylvania 15219
   (412) 471-3490
7 Pmannix@marcus-shapira.com
   Representing the Defendant,
8 HBC Company
9
10 CLARK MICHIE LLP
    BY: CHRISTOPHER J. MICHIE, ESQUIRE
11 103 Carnegie Center, Suite 300
    Princeton, New Jersey 08540
12 (609) 423-2143
    Chris.michie@clarkmichie.com
13 Representing the Defendant,
    Pernix Therapeutics Holdings, Inc.
14
15
16 REED SMITH, LLP
    BY: ANNE E. ROLLINS, ESQUIRE
17 Three Logan Square
    1717 Arch Street
18 Philadelphia, Pennsylvania 19103
    (215) 851-8100
19 Arollins@reedsmith.com
    Representing the Defendant,
20 Amerisource Bergen Drug
    Corporation
21
22
    ALSO PRESENT:
23 Devyn Mulholland, Videographer
    Zach Posen, Trial Technician
24 Christopher Casalenuovo, AmerisourceBergen

Page 7

1      - - -
2    I N D E X
3      - - -
4
   Testimony of: KEVIN KREUTZER
5
6 By Mr. Cluff          11
7
8      - - -
9    E X H I B I T S
10     - - -
11
   NO.      DESCRIPTION       PAGE
12
   AmerisourceBergen-Kreutzer
13 Exhibit-1   ABDC_MDL_00304391-392   164
14 AmerisourceBergen-Kreutzer
   Exhibit-2   ABDC_MDL_00154441-443   176
15
   AmerisourceBergen-Kreutzer
16 Exhibit-3   Teva_MDL_A_(0)233-1299-320 223
17 AmerisourceBergen-Kreutzer
   Exhibit-4   Teva_MDL_A_(0)233-1346-348 250
18
   AmerisourceBergen-Kreutzer
19 Exhibit-5   Teva_MDL_A_(0)233-1426-428 274
20 AmerisourceBergen-Kreutzer
   Exhibit-6   ABDC_MDL_0045077       304
21
   AmerisourceBergen-Kreutzer
22 Exhibit-7   ABCD_MDL_0045075       306
23
24

Page 8

1
2      - - -
3    E X H I B I T S
4      - - -
5 NO.      DESCRIPTION       PAGE
6 AmerisourceBergen-Kreutzer
   Exhibit-8   ABDC_MDL_00045076    314
7
8 AmerisourceBergen-Kreutzer
   Exhibit-9   ABDC_MDL_00047572    361
9 AmerisourceBergen-Kreutzer
   Exhibit-10   ABDC_MDL_00151471-472  369
10
11 AmerisourceBergen-Kreutzer
   Exhibit-11   ABDC_MDL_00178337    374
12 AmerisourceBergen-Kreutzer
   Exhibit-12   ABDC_MDL_00168122 and
13      ABDC_MDL_00168127-134   388
14
15
16
17
18
19
20
21
22
23
24

Page 9

1      - - -
2 DEPOSITION SUPPORT INDEX
3      - - -
4
5 Direction to Witness Not to Answer
6 Page Line   Page Line   Page Line
7 None
8
9
10 Request for Production of Documents
11 Page Line   Page Line   Page Line
12 None
13
14
15 Stipulations
16 Page Line   Page Line   Page Line
17 10   1
18
19
20 Question Marked
21 Page Line   Page Line   Page Line
22 None
23
24

Page 10

1         - - -
2         (It is hereby stipulated and
3    agreed by and among counsel that
4    sealing, filing and certification
5    are waived; and that all
6    objections, except as to the form
7    of the question, will be reserved
8    until the time of trial.)
9         - - -
10        VIDEO TECHNICIAN:  We are
11   now on the record.  My name is
12   Devyn Mulholland, I'm a
13   videographer for Golkow Litigation
14   Services.  Today's date is
15   November 27, 2018.  The time is
16   9:34 a.m.
17        This video deposition is
18   being held in Philadelphia,
19   Pennsylvania, in the matter of
20   National Prescription Opiate
21   Litigation.  The deponent is Kevin
22   Kreutzer.
23        Counsel will be noted on the
24   stenographic record.  The court

Page 11

1    reporter is Amanda Miller and will
2    now swear in the witness.
3         - - -
4         KEVIN KREUTZER, after having
5    been duly sworn, was examined and
6    testified as follows:
7         - - -
8         EXAMINATION
9         - - -
10   BY MR. CLUFF:
11        Q.   Good morning, Mr. Kreutzer.
12   As I explained earlier, my name is
13   Sterling Cluff, I work at a law firm
14   called Baron and Budd, and we represent
15   the Track 1 plaintiffs in the national
16   opiate litigation.  And I'll be taking
17   your deposition today.
18        To start off, could you just
19   spell your first and last name for the
20   record, so we have a clear record of
21   that, please?
22        A.   Sure.  It's K-E-V-I-N.  Last
23   name is K-R-E-U-T-Z-E-R.
24        Q.   And have you ever had your

Page 12

1    deposition taken before?
2         A.   I have not.
3         Q.   I'm sure that your esteemed
4    lawyers have explained sort of the
5    deposition protocols for you, so I'm
6    going to skip some of the admonitions.
7         But just remind you that
8    you're under oath, so we need to get
9    truthful answers from you.
10        And also remind you not to
11   disclose any attorney-client privilege,
12   and that if you feel like you need to
13   discuss with your lawyers about a
14   privilege, we can make arrangements for
15   that.
16        In addition to that, we're
17   entitled to your best recollection.  If
18   you don't recall, you can tell me that.
19   And I'd also caution you not to guess at
20   an answer.  If you don't know, just let
21   me know.
22        Does that all make sense?
23        A.   Yes.
24        Q.   So how long have you worked

Page 13

1    for AmerisourceBergen?
2         A.   Since 2007, so going on 11
3    years.
4         Q.   Has your employment with
5    AmerisourceBergen been continuous since
6    2007?
7         A.   It has not.
8         Q.   When you began with
9    Amerisource -- well, when you joined the
10   company in 2007, was it AmerisourceBergen
11   or was it some previous entity that
12   merged into AmerisourceBergen?
13        A.   It was AmerisourceBergen.
14        Q.   And what was your title at
15   the time that you joined
16   AmerisourceBergen?
17        A.   I believe my title was
18   collections associate.
19        Q.   And do you recall what month
20   in 2007 you started with Amerisource?
21        A.   It was April.
22        Q.   And you believe your title
23   at that time was collections associate?
24        A.   Yes.

Page 14

1    Q.   Do you recall how long you
2  held that position?
3    A.   Approximately a year
4  and-a-half.
5    Q.   So that would have been
6  until approximately the middle of 2009?
7    A.   I believe so, yes.
8    Q.   And after you were a
9  collections associate, do you recall what
10 your next position with AmerisourceBergen
11 was?
12   A.   Yes.  It was diversion
13 control specialist.
14   Q.   And to the best of your
15 recollection, you would have assumed that
16 position in -- some time in 2009?
17   A.   Yes.
18   Q.   What position did you -- did
19 your position ever change at
20 AmerisourceBergen after you became a
21 diversion control specialist?
22   A.   I received a promotion last
23 year to diversion control investigator.
24   Q.   So that would have been

Page 15

1  2017?
2    A.   Yes.
3    Q.   So between 2009 and 2017,
4  leaving out the time when you were
5  employed elsewhere, you were a diversion
6  control specialist?
7    A.   Yes.
8    Q.   And what department did you
9  work in as a diversion control
10 specialist?
11   A.   It was corporate security
12 and regulatory affairs.
13   Q.   And did you report to anyone
14 in that department?
15   A.   Yes.
16   Q.   Who was that?
17   A.   Ed Hazewski.
18   Q.   Was it Mr. Hazewski for the
19 entire time you were a diversion control
20 specialist?
21   A.   No, it was not.
22   Q.   Who else did you report to?
23   A.   Eric Cherveny.
24   Q.   Do you recall when you began

Page 16

1  reporting to Mr. Cherveny?
2    A.   I believe it was 2015.
3    Q.   At the time you're
4  reporting -- at the time that that change
5  occurred, do you recall why you began
6  reporting to Mr. Cherveny instead of Mr.
7  Hazewski?
8    A.   I do not.
9    Q.   Was there any change in your
10 responsibilities after you began
11 reporting to Mr. Cherveny?
12   A.   No.
13   Q.   To fast-forward to the
14 change to a diversion control
15 investigator, did you report to anybody
16 in that role?
17   A.   I'm sorry, could you ask
18 that again?
19   Q.   Sure.  No problem.
20       When you were promoted to a
21 diversion control investigator, prior to
22 that time, were you still reporting to
23 Mr. Cherveny?
24   A.   Yes.

Page 17

1    Q.   And after you were promoted,
2  did you continue to report to Mr.
3  Cherveny?
4    A.   Yes.
5    Q.   Was there any change in your
6  job responsibilities when you became a
7  diversion control investigator?
8    A.   No.  They were pretty much
9  the same.
10   Q.   You said there was a brief
11 interruption in your employment with
12 AmerisourceBergen.
13       What happened there?
14   A.   I applied for a position for
15 Teva Pharmaceuticals.
16   Q.   When was that?
17   A.   I started January 7th, I
18 believe, of 2012.
19   Q.   That's a pretty specific
20 date.
21       Is there some reason why
22 that date stands out to you?
23   A.   I just remember the date.
24   Q.   What prompted the

Page 18

1  application to Teva Pharmaceuticals?
2      A.   It was a brand-new position
3  for the company.
4      Q.   And why did you want to
5  apply for that brand-new position?
6      A.   I thought my skill set
7  matched the job requirements.
8      Q.   What was the -- do you
9  recall what the title of the position you
10  applied for was?
11     A.   I believe it was diversion
12  operations manager.
13     Q.   And it was your
14  understanding -- or was it your
15  understanding, at the time, that Teva
16  Pharmaceuticals had never had a diversion
17  operations manager before?
18     A.   That was my understanding.
19     Q.   During the interview process
20  with Teva, did you form an understanding
21  as to why Teva Pharmaceuticals was
22  creating this new position?
23     A.   No.
24     Q.   Did you ask?

Page 19

1      A.   I'm sure I did, but I don't
2  remember the questions that I asked.
3      Q.   And so looking back today,
4  you don't recall if you learned why Teva
5  was creating this new position?
6      A.   I don't know the specifics.
7  I don't recall the specifics.
8      Q.   You said you started on
9  January 7th, 2012.
10         Do you recall when you would
11  have filled out the application, or when
12  you began the application process?
13     A.   I'm not exactly sure.  Maybe
14  September or October of 2012, or maybe
15  that was 2011.
16     Q.   Do you recall who you met
17  with at Teva Pharmaceuticals about this
18  new position?
19     A.   Yes.  Colleen McGinn.
20     Q.   And who is she?
21     A.   She was my director that I
22  would be reporting to.
23     Q.   Do you recall her -- the
24  title of her position?

Page 20

1      A.   No.  No, I don't.
2      Q.   If later we showed you some
3  documents between -- e-mail
4  correspondence between you and Ms.
5  McGinn, do you think it would refresh
6  your recollection about her title and her
7  position?
8      A.   Perhaps.
9      Q.   Do you recall, when you
10  worked at Teva Pharmaceuticals,
11  exchanging e-mail correspondence with Ms.
12  McGinn?
13     A.   Yes.
14     Q.   Did you report directly to
15  her at the time?
16     A.   I did.
17     Q.   So in January 2012, you
18  joined Teva Pharmaceuticals.
19         And, if I recall correctly,
20  you were applying for the division
21  operations manager -- or diversion
22  operations manager position, correct?
23     A.   Yes.
24     Q.   And did you succeed in

Page 21

1  securing that position?
2      A.   I did.
3      Q.   And when you began working
4  for Teva Pharmaceuticals, was your job
5  title the same one that you applied for?
6      A.   Yes.
7      Q.   How long were you employed
8  with Teva Pharmaceuticals?
9      A.   Three months.
10     Q.   Did you say three months?
11     A.   Yes.
12     Q.   What happened -- what
13  happened when you left Teva
14  Pharmaceuticals?  Did you go -- what
15  happened with your job -- those are all
16  bad questions.
17         What did you do after those
18  three months?
19     A.   What did I do after those
20  three months?
21     Q.   Yes.
22     A.   I went back to
23  AmerisourceBergen.
24     Q.   So is it your recollection,

Page 22

1  then, that you rejoined AmerisourceBergen
2  in the middle of 2012?
3      A.   Yes.  Towards the end of
4  April 2012 -- or, no, I'm sorry.  2013 --
5  yes, 2012.
6      Q.   2012.
7      A.   Yes.
8      Q.   Is it possible that you
9  worked at Teva for a year and three
10  months instead of just three months?
11      A.   No.
12      Q.   No.
13          Is there a reason why you
14  were considering that possibly you had
15  worked there until 2013?
16      A.   Just mixing up the dates.
17      Q.   Certainly.
18          So the jobs we've talked
19  about today, between AmerisourceBergen
20  and Teva Pharmaceuticals, is that
21  fully -- have we fully discussed all of
22  the positions you've had with
23  AmerisourceBergen and Teva
24  Pharmaceuticals?

Page 23

1      A.   Yes.
2      Q.   Prior to joining
3  AmerisourceBergen in 2007, were you
4  employed?
5      A.   Yes.
6      Q.   Where were you employed?
7      A.   Wyeth Pharmaceuticals.
8      Q.   What is Wyeth?
9      A.   Wyeth Pharmaceuticals was a
10  manufacturer of pharmaceutical products.
11  However, they've been sold off and now
12  part of Pfizer.
13      Q.   What was your responsibility
14  there, or what was your position?
15      A.   I worked for Wyeth
16  Pharmaceuticals for 14 years.  I had many
17  different positions there.
18      Q.   What's the -- what's the job
19  title -- the earliest job title you can
20  recall?
21      A.   Back in 1992, I was a
22  security officer.
23      Q.   How long did you hold that
24  position?

Page 24

1      A.   Approximately a year.
2      Q.   And then did your title
3  change at that point?
4      A.   I applied for another
5  position in the packaging department.
6      Q.   So you applied internally
7  with --
8      A.   Internally.
9      Q.   -- Wyeth?
10      A.   Yes.
11      Q.   One thing we should just
12  point out again, and we haven't had a
13  problem with it yet, but we shouldn't
14  talk over each other, to the best of our
15  ability.  So I'll do my best to let you
16  finish all of your answers.
17          The only reason is we have
18  to let the court reporter get everything
19  that we're saying, so.
20      A.   Sure.
21      Q.   I'm reminding myself, just
22  as much as I'm reminding you.  Thank you.
23          What was the job title that
24  you applied for in the packaging

Page 25

1  department at Wyeth?
2      A.   I don't know the exact
3  title.  It was packaging operator.  I'm
4  not exactly sure.  I don't remember --
5  recall.
6      Q.   And how long did you hold
7  that position?
8      A.   Approximately a year
9  and-a-half.
10      Q.   And then what happened?
11      A.   And then that department was
12  outsourced to Puerto Rico.
13      Q.   Did you go to Puerto Rico?
14      A.   I did not.
15      Q.   Sorry to hear that.
16          What did you do instead?
17      A.   I applied for another
18  position internally in the accounts
19  receivable department.
20      Q.   And do you recall what that
21  position was?
22      A.   Accounts receivable
23  representative.
24      Q.   And how long did you hold

Page 26

1 that position?
2     A.   This is only an
3 approximation.  I received a couple
4 promotions in that department.  Maybe two
5 years, three years tops.
6     Q.   So you were in the accounts
7 receivable department for approximately
8 two years, but you had some promotions?
9     A.   Yes.
10     Q.   Do you recall what those
11 promotions were?
12     A.   It was just a level up, from
13 a rep 1 to a rep 2.
14     Q.   Would your job
15 responsibilities essentially have stayed
16 the same between rep 1 and rep 2?
17     A.   Pretty much so, yes.
18     Q.   And what happened after --
19 after the accounts receivable department?
20     A.   Then I applied for a
21 position in the credit department, credit
22 and collections.
23     Q.   Is that the name of the
24 department or is that --

Page 27

1     A.   Yes.
2     Q.   -- the position?
3     A.   Of the department.
4     Q.   And what was your title
5 there?
6     A.   Initially, it was a credit
7 correspondent.
8     Q.   How long did you hold that
9 position?
10     A.   I'm not exactly sure.  Maybe
11 three years.
12     Q.   And what happened after
13 those three years?
14     A.   And then I received a
15 promotion to a credit analyst.
16     Q.   How long were you a credit
17 analyst?
18     A.   Until the day I left the
19 department.  Well, the department was
20 outsourced, in 2006.  Or 2007, I'm sorry.
21     Q.   And 2007 is when you joined
22 AmerisourceBergen?
23     A.   Yes.
24     Q.   And is the outsourcing of

Page 28

1 that credit and collections department,
2 is that the reason you applied to
3 AmerisourceBergen?
4     A.   Yes.  They closed the entire
5 department, and that was outsourced to
6 India.
7     Q.   Did you hold any other
8 positions when you were with Wyeth
9 Pharmaceuticals?
10     A.   No.
11     Q.   Do you know when Wyeth
12 Pharmaceuticals was merged into or
13 acquired by Pfizer?
14     A.   I'm not sure of the exact
15 year.
16     Q.   I want to start back at the
17 beginning with your job history at Wyeth
18 to kind of understand some of your roles
19 and responsibilities.
20         So I believe you said you
21 started in approximately 1992 there,
22 "there" being Wyeth, as a security
23 officer?
24     A.   Correct.

Page 29

1     Q.   What was your -- what were
2 your responsibilities as a security
3 officer?
4     A.   I conducted rounds of the
5 facility.  I also greeted everybody as
6 they walked into the building.  I
7 inspected packages as they left the
8 building and conducted some
9 investigations involving theft.
10     Q.   So aside from the
11 investigations involving theft, it sounds
12 like the majority of your responsibility
13 as a security officer was, essentially,
14 to be a security guard, right?
15     A.   Pretty much, yes.
16     Q.   You said -- you referred to
17 the facility.
18         What was the facility?
19     A.   The manufacturing site, the
20 building.  We had, actually, three
21 buildings.
22     Q.   Were you a security officer
23 responsible for all three?
24     A.   For all three.

Page 30

1  Q.  How did that work out?  Let
2  me be more specific.
3        So were you assigned to
4  patrol all three at one time, or some
5  days you were assigned to one facility
6  and other days another facility?
7  A.  I was pretty much assigned
8  to all three.
9  Q.  So when you were conducting
10  rounds, you would patrol all three
11  facilities?
12  A.  Yes.
13  Q.  Was there a central desk
14  where people would come in and out of to
15  get into the three facilities?
16  A.  Yes.
17  Q.  What kind of pharmaceutical
18  products do you recall that Wyeth
19  manufactured?
20  A.  Prevnar.  There was birth
21  control pills.  Penicillin.  Those are
22  the three that I recollect the most.
23  Q.  Do you recall if Wyeth
24  Pharmaceuticals manufactured any Schedule

Page 31

1  II or Schedule III controlled substances?
2  A.  I don't recall.
3  Q.  Are you familiar with what a
4  Schedule II controlled substance is?
5  A.  Yes.
6  Q.  And are you familiar with
7  what a Schedule III controlled substance
8  is?
9  A.  Yes, in basic -- yeah.
10  Q.  So did you understand, at
11  the time you worked at Wyeth
12  Pharmaceuticals, what Schedule II or III
13  controlled substances were?
14  A.  No.
15  Q.  So if Wyeth had been
16  manufacturing them, you wouldn't have
17  known about it?
18        MR. NICHOLAS:  Object to
19  form.
20        Go ahead.
21        THE WITNESS:  I may not
22  have.
23  BY MR. CLUFF:
24  Q.  So it's possible -- well,

Page 32

1  would you agree with me that it's
2  possible Wyeth manufactured controlled
3  substances, you just may not have been
4  aware of it?
5  A.  They may have and I'm just
6  not aware.
7  Q.  Do you recall if, as a
8  security officer, you received any
9  training about controlled substances?
10  A.  No, I did not.
11  Q.  Did you have any other
12  responsibilities aside from, you know,
13  conducting the rounds and conducting the
14  investigations at Wyeth as a security
15  officer?
16  A.  I don't recall any
17  additional responsibilities.
18  Q.  When you mentioned
19  conducting investigations, I believe you
20  referred to it as conducting
21  investigations about theft.
22        Is that accurate?
23  A.  Correct.
24  Q.  What was your understanding

Page 33

1  of that responsibility as a security
2  officer?
3  A.  It was involving theft of
4  personnel, associates that had items
5  stolen from their desks or offices.
6  Q.  Are you referring to
7  personal items?
8  A.  Personal items, yes.
9  Q.  So you were not
10  investigating thefts of any of the drugs
11  that Wyeth manufactured?
12  A.  No.
13  Q.  When you worked at Wyeth
14  Pharmaceuticals as a security
15  investigator, did you receive any
16  training about diversion?
17  A.  I did not.
18  Q.  I should have asked this
19  question first.
20        Are you familiar with the
21  concept of diversion?
22  A.  Yes.
23  Q.  But at the time you worked
24  at Wyeth, you did not receive any

Page 34

1 training about it?
2     A.   I did not.
3     Q.   Understood.
4          How about suspicious orders;
5 were you familiar with the term
6 "suspicious orders" when you worked at
7 Wyeth?
8     A.   No.
9     Q.   You didn't receive any
10 training about suspicious orders at
11 Wyeth?
12     A.   I did not.
13     Q.   You said after about a year
14 as a security officer you applied
15 internally for a job with the packaging
16 department?
17     A.   Yes.
18     Q.   And your best recollection
19 is that you assumed a position that you
20 referred to as a packing operator,
21 correct?
22     A.   Correct.
23     Q.   Would that have been within
24 the same facilities where you were a

Page 35

1 security officer?
2     A.   Yes.
3     Q.   And what were your
4 responsibilities as a packing officer --
5 or operator, excuse me?
6     A.   I was packaging, I think it
7 was mostly birth control pills.  And I
8 was also a machine operator there as
9 well, all in the same department.
10     Q.   And the department you're
11 referring to is the packaging department?
12     A.   Packaging, yes.
13     Q.   What's the procedure like
14 for packaging drugs at Wyeth, or was it
15 like, excuse me?
16          MR. NICHOLAS:  Object to
17     form.
18          THE WITNESS:  It was just
19     ensuring they were color-coded
20     pills in different rows, and we
21     had to ensure that the pills were
22     not cracked or missing, to that
23     extent.
24 BY MR. CLUFF:

Page 36

1     Q.   So as a packing operator,
2 you were ensuring that the pills were
3 placed into their individual packages
4 correctly?
5     Blister packs, yes.
6     Q.   Did you, as a packing
7 operator, ever have any responsibility
8 for taking individual packaging and
9 putting them into a larger shipment?
10     A.   Yes.
11     Q.   What was that process like?
12     A.   It was -- it was a belt,
13 belt-fed line, and we would collect the
14 blister packs and place them in the box.
15 And then once that box was full, wrap it
16 up and put it on a pallet.
17     Q.   So, essentially, an assembly
18 line of packages coming to you that
19 you're going to pack into a larger box?
20     A.   Yes.
21     Q.   Did you, as part of the
22 individual packaging and the larger
23 shipment packaging, get any training
24 about security related to the manufacture

Page 37

1 of drugs or controlled substances?
2     A.   No, I don't believe so.
3     Q.   You mentioned the birth
4 control pills.
5          Did you ever have
6 responsibility for packaging any other
7 kinds of products that Wyeth
8 manufactured?
9     A.   Penicillin.
10     Q.   Did you get any training
11 about security related to packaging
12 penicillin?
13     A.   No, I don't believe I did.
14     Q.   And what was your other job
15 responsibility as a packaging operator?
16     A.   I was also a machine
17 operator there as well.
18     Q.   And what was involved in
19 being a machine operator?
20     A.   Just ensuring that there
21 were pills in the hopper so they could be
22 fed into blister packs and sent down the
23 line.
24     Q.   What's a hopper?

Page 38

1    A.   It's a pill hopper.  It's
2  like a circular -- a cylinder-type object
3  and all the pills are in there and they
4  are fed into the blister packs and made.
5    Q.   So it's a large piece of
6  machinery --
7    A.   Yes.
8    Q.   -- that pills come into; is
9  that right?
10    A.   Yes.
11    Q.   And then the pills go
12  through the machine and into the blister
13  packs?
14    A.   Correct.  And sent down the
15  line, which is belt-fed.
16    Q.   And the line out of the bell
17  feed -- or belt feed goes to the people
18  packaging?
19    A.   Yes.  So there will be
20  approximately three people on each side
21  checking the blister packs.
22    Q.   And that was, like you said,
23  to make sure that they weren't cracked or
24  they had been packaged appropriately?

Page 39

1    A.   Correct.
2    Q.   Did you have any other job
3  responsibilities within the packing
4  department that we haven't discussed?
5    A.   I believe that's it.
6    Q.   And you worked in the
7  packing department for approximately a
8  year and-a-half, right?
9    A.   Approximately a year
10  and-a-half, two years.
11    Q.   Before the packing
12  department was outsourced to Puerto Rico,
13  had you considered leaving that
14  department for another department in
15  Wyeth?
16    A.   I may have, but I don't
17  recall.
18    Q.   So, then, the outsourcing to
19  Puerto Rico, was that the primary reason
20  why you left the packing department?
21    A.   I believe so, yes.
22    Q.   So after the packing
23  department was outsourced, you went to
24  the accounts receivable department, and

Page 40

1  your best recollection was that you took
2  on a role that you described as rep 1; is
3  that right?
4    A.   Correct.
5    Q.   And what was your job
6  responsibility in the accounts receivable
7  department?
8    A.   We would receive invoices
9  and -- I believe we would receive mail
10  from the customers with invoices and
11  checks where they were paying for their
12  products.
13    Q.   And so what were you doing
14  with the invoices and the checks that you
15  received?
16    A.   Entering them into the
17  system.
18    Q.   What system was that?
19    A.   It was a mainframe system.
20    Q.   Was this essentially like a
21  data entry job?
22    A.   It was data entry and
23  ensuring that the customers were paying
24  for their invoices.  I vaguely remember

Page 41

1  the details of this position, since it
2  was so long ago.
3    Q.   Did you have any
4  responsibility for pills within the
5  accounts receivable department?
6    A.   No.
7    Q.   Did you get any training
8  about security while you were in the
9  accounts receivable department?
10    A.   No.
11    Q.   Did you receive any training
12  about diversion when you were in the
13  accounts receivable department?
14    A.   No.
15    Q.   Did you receive any training
16  about suspicious orders when you were in
17  the accounts receivable department?
18    A.   No.
19    Q.   Just circling back to the
20  packing department again, did you receive
21  any training about security when you
22  worked in the packing department?
23    A.   No.
24    Q.   How about diversion?

Page 42

1    A.   No.
2    Q.   Suspicious orders?
3    A.   No.
4    Q.   And so back to the accounts
5  receivable, you received a couple of
6  promotions, you said, while you were in
7  accounts receivable; is that right?
8    A.   Yes.
9    Q.   And I think you referred to
10  those as moving from rep 1 to rep 2; is
11  that right?
12    A.   Yes.
13    Q.   And were your job
14  responsibilities essentially the same the
15  entire time you were in that department?
16    A.   I believe they increased
17  where -- from what I remember, is that I
18  was entering -- it was a cash
19  application, where I was entering the
20  payments of the invoices that the
21  customers made to their accounts.
22    Q.   And that's a job
23  responsibility you assumed when you
24  became a rep 2?

Page 43

1    A.   Yes.
2    Q.   And, again, there the
3  responsibility was mainly ensuring the
4  customers were paying their bills?
5    A.   Correct.
6    Q.   Did you have any
7  responsibility with looking at order
8  forms when you were in the accounts
9  receivable department?
10    A.   I don't recall.
11    Q.   Is it possible that you did
12  have responsibility for that and just
13  don't recall it?
14    A.   I just don't recall.
15    Q.   Do you remember the
16  approximate years, not the number of
17  years, but, like, the calendar years that
18  you were in the accounts receivable
19  department?
20    A.   I would only be guessing.
21    Q.   Was it in -- by your best
22  estimate, would it have been in the late
23  '90s or early 2000s?
24    A.   I was thinking maybe mid to

Page 44

1  late '90s.
2    Q.   And then after the accounts
3  receivable department, you told me that
4  you moved to the credit and collections
5  department; is that accurate?
6    A.   Yes.
7    Q.   Do you recall what prompted
8  that application?
9    A.   It was -- I was just looking
10  to further my career in the company by
11  applying for the position.
12    Q.   How did you feel like that
13  would have furthered your career at that
14  point?
15    A.   It would give me the
16  opportunity to work more on computers.
17    Q.   So at that time, was Wyeth's
18  business operation primarily by paper?
19    A.   It was a mix.
20    Q.   What was your job title in
21  the credit and collections department?
22    A.   Credit correspondent,
23  initially.
24    Q.   And what was your

Page 45

1  responsibility as a credit correspondent?
2    A.   I would have area
3  responsibility, a region within the
4  country, to follow up on customers'
5  invoices where they were past due.
6    Q.   So does the word "credit"
7  and "credit correspondent" refer to the
8  fact that you had credited these
9  customers and not been paid yet?
10    A.   Yes.  They received the
11  products and we have not yet received
12  payment.
13    Q.   And how long were you a
14  credit correspondent?
15    A.   I just don't remember how
16  long.  Two to three years, maybe.
17    Q.   And then at that point, you
18  were promoted to a credit analyst,
19  correct?
20    A.   Yes.  I went back to school
21  and I received my Associate's Degree, and
22  I received that promotion.  And I was
23  continuing on in my education.
24    Q.   So prior to this time when

Page 46

1 you received your Associate's Degree, you
2 had not completed a degree after high
3 school?
4     A.    I attended college, but I
5 did not fully complete college at that
6 point.
7     Q.    Do you remember when you
8 received your Associate's Degree?
9     A.    I believe it was 2003.
10     Q.    And what was your degree in?
11     A.    It was just general studies.
12     Q.    And where did you get it
13 from?
14     A.    University of Phoenix.
15     Q.    Prior to getting the degree
16 from the University of Phoenix, did you
17 attend college classes, you said?
18     A.    I did.
19     Q.    Do you recall where that
20 was?
21     A.    Yes.  Community College of
22 Beaver County.
23     Q.    Forgive my lack of knowledge
24 about the local area, is Beaver County in

Page 47

1 Pennsylvania?
2     A.    It's Western PA, outside of
3 Pittsburgh.
4     Q.    And what was the name of the
5 community college?
6     A.    Community College of Beaver
7 County.
8     Q.    Were you a full-time student
9 there or part-time student?
10     A.    I believe I was part time.
11     Q.    Do you recall how long you
12 were enrolled?
13     A.    I believe it was three
14 years, two and-a-half to three years.
15     Q.    Do you recall the general
16 time period you were enrolled?
17     A.    It was from '84 to '86.
18     Q.    And do you recall what you
19 studied?
20     A.    Air traffic control.
21     Q.    Was there any particular
22 reason why you didn't complete that
23 course of study?
24     A.    I decided it was not for me.

Page 48

1     Q.    And what did you do -- were
2 you working at the time?
3     A.    I was working, yes.
4     Q.    So what prompted you to go
5 back to school to get the Associate's
6 Degree when you were in the credit and
7 collections department?
8     A.    I just realized that in
9 order for me to have a better life, I
10 needed to go back to school and have more
11 career opportunities.
12     Q.    Were the classes you took at
13 the University of Phoenix, were they
14 tailored to helping improve your ability
15 to conduct your -- or to fulfill your job
16 responsibilities as a credit analyst?
17     A.    It certainly helped.
18     Q.    What were your job
19 responsibilities as a credit analyst?
20     A.    They were similar to the
21 duties of a credit correspondent, but I
22 had larger accounts to manage.
23     Q.    When you discussed the
24 responsibilities as a credit

Page 49

1 correspondent, I think you mentioned that
2 you had a region you were responsible
3 for?
4     A.    Yes.
5     Q.    When you were a credit
6 analyst, were you also responsible for a
7 region?
8     A.    Yes.
9     Q.    But the accounts were
10 larger?
11     A.    The accounts were larger
12 accounts, meaning wholesaler accounts.
13     Q.    What's a wholesaler account?
14     A.    A wholesaler account would
15 be, for instance, AmerisourceBergen,
16 McKesson, Cardinal, one of those.
17     Q.    When you worked at Wyeth, do
18 you recall which wholesaler accounts you
19 were responsible for?
20     A.    I also -- I do remember
21 being in charge of the DOD account, as
22 well as -- I was either in charge of the
23 McKesson account or I helped out on the
24 McKesson account, I don't recall which.

Page 50

```
1    Q.   Any other wholesalers you
2  can recall?
3    A.   No.
4    Q.   So you didn't work with
5  AmerisourceBergen?
6    A.   I did not.
7    Q.   You didn't work with
8  Cardinal Health?
9    A.   I don't believe so.
10   Q.   How about HD Smith?
11   A.   No.
12   Q.   Bellco?
13   A.   No.
14   Q.   And just so the record is
15 clear, is it you do not recall working
16 for those wholesalers -- with those
17 wholesalers or you're telling me you did
18 not?
19   A.   I don't believe I have
20 worked with those wholesalers.
21   Q.   Understood.  Thank you.
22        And even though you assumed
23 larger accounts, was the responsibility
24 still to work with those accounts to make
```

Page 51

```
1  sure they paid their invoices?
2    A.   Paid their invoices.  And if
3  there were any deductions that they took,
4  I had to help resolve those situations in
5  working with the account.
6    Q.   You mentioned they took
7  deductions --
8    A.   Meaning the accounts.
9    Q.   So the accounts would have
10 been the wholesalers or the DOD or any of
11 the smaller accounts that you worked
12 with?
13   A.   That's correct.
14   Q.   What form of deductions
15 would they have been taking on their
16 invoices?
17   A.   It could have been any form;
18 it could have been a 2 percent discount
19 that we offered if they paid their
20 invoice ahead of time or any other
21 reason.
22   Q.   Do you know if Wyeth ever
23 offered discounts to wholesalers if the
24 volume of their purchasing from Wyeth was
```

Page 52

```
1  higher?
2    A.   I don't recall that.
3    Q.   Do you recall if Wyeth ever
4  offered discounts to wholesalers for
5  receiving chargeback data?
6    A.   I don't recall that either.
7    Q.   Do you understand that term,
8  "chargeback data"?
9    A.   No, I really don't, because
10 I wasn't part of that, that area.
11   Q.   Just for clarity, are you
12 telling me that at the time you worked at
13 Wyeth you would not have understood what
14 chargeback data is?
15   A.   That is correct.  Because I
16 believe that was a separate department
17 that I wasn't involved in.
18   Q.   And then currently do you
19 have an understanding of what chargeback
20 data is?
21   A.   I really do not.  I don't
22 understand the full definition.
23   Q.   Do you recall who you --
24 what individuals you would have worked
```

Page 53

```
1  with at McKesson when you were a credit
2  analyst?
3    A.   No.
4    Q.   Do you recall what
5  department you would have been working
6  with at McKesson?
7    A.   I don't recall the specific
8  department.
9    Q.   So eventually this credit
10 department at Wyeth was outsourced to
11 India, correct?
12   A.   Correct.
13   Q.   And your recollection was
14 that was approximately 2006 or 2007?
15   A.   That was 2007.
16   Q.   When did you apply -- or do
17 you recall when you applied for the
18 position at AmerisourceBergen?
19   A.   I don't recall exactly when
20 I applied, but I know the day that I had
21 the interview for AmerisourceBergen.
22   Q.   You recall the date when you
23 had the interview?
24   A.   It was literally three days
```

Page 54

1 after I was let go from Wyeth
2 Pharmaceuticals.
3    Q.   What day was that?
4    A.   That was -- I believe that
5 was March 30th of 2007.
6    Q.   And is that the day you were
7 let go or the date of the interview?
8    A.   That was the date I was let
9 go, the whole department was let go.
10    Q.   And so you would have
11 interviewed approximately three days
12 later?
13    A.   Yes.
14    Q.   And do you recall who you
15 met with when you interviewed?
16    A.   Yes.  His name was Harry
17 Chamberlain.
18    Q.   Do you recall his job
19 position?
20    A.   I don't know -- I don't
21 remember his exact title, but he was the
22 director of, maybe, collections.
23    Q.   Would he have been the
24 person to whom you reported in the

Page 55

1 collections department when you worked at
2 Amerisource?
3    A.   Initially, yes.
4    Q.   Did you report to somebody
5 else when you were a collections
6 associate at Amerisource?
7    A.   I did.
8    Q.   Who was that?
9    A.   Her name was Ann Marie
10 Duran.
11    Q.   Do you recall her job
12 position?
13    A.   Similar to Harry's.
14    Q.   Essentially, a director of
15 that collections department?
16    A.   Yes.
17    Q.   When we went through your
18 employment history at AmerisourceBergen,
19 I think you said your best recollection
20 was that your title in that collections
21 department was a collections associate?
22    A.   In credit collections, it
23 was initially credit correspondent and
24 then a credit analyst.

Page 56

1    Q.   At AmerisourceBergen?
2    A.   Oh, I'm sorry.  I was going
3 back to Wyeth.
4       At AmerisourceBergen, I
5 believe it was collections associate,
6 yes.
7    Q.   And was that in the
8 collections department --
9    A.   Yes.
10    Q.   -- or did it have a
11 different name?
12    A.   I don't recall it had a
13 different name.
14    Q.   And how long were you a
15 collections associate in the collections
16 department?
17    A.   Approximately a year
18 and-a-half.
19    Q.   And what were your job
20 responsibilities?
21    A.   I was in charge of the
22 similar duties that I had at Wyeth
23 Pharmaceuticals, ensuring customers were
24 paying their invoices on time.

Page 57

1    Q.   Anything else?
2    A.   Running statements for
3 customers, monthly statements.
4    Q.   What does that mean?
5    A.   I believe it was the 1st of
6 the month, we would run statements of, I
7 believe, it was customers' purchases.
8    Q.   What was the purpose of
9 running statements of purchases for
10 customers?
11    A.   Those customers would
12 request statements from us on a monthly
13 basis.
14    Q.   Do you recall why they would
15 request those statements?
16    A.   I do not.
17    Q.   In your work as a
18 collections associate, did you ever, as
19 part of your responsibilities, have to
20 review order forms from
21 AmerisourceBergen's customers?
22    A.   I do not recall.
23       But going back to Wyeth
24 Pharmaceuticals, I did review customer

Page 58

1 orders for customers.
2      Q.   In what role at Wyeth were
3 you reviewing invoices from -- or
4 purchase orders from customers?
5      A.   It was based on their credit
6 standing with us.
7      Q.   What position did you hold
8 at Wyeth when you were reviewing the
9 order forms from customers?
10      A.   It was the credit analyst
11 role.
12      Q.   And you said "it was based
13 on their credit standing with us."
14      What does that mean?
15      A.   I don't fully recollect the
16 details of that, but it was based on
17 their payment history with Wyeth
18 Pharmaceuticals.
19      Q.   So the purpose for you
20 looking at an order form from a customer
21 would be to analyze their payment history
22 and credit standing with Wyeth?
23      A.   Correct.
24      Q.   So not to look at what they

Page 59

1 were ordering; is that right?
2      A.   I do remember looking at
3 what they were ordering.  But, again, it
4 was based on their credit history.
5      Q.   And do you recall looking at
6 any customer order forms when you worked
7 as a collections associate at
8 AmerisourceBergen?
9      A.   I do not remember.
10      Q.   When you were a collections
11 associate at AmerisourceBergen, did you
12 have an understanding of what diversion
13 was?
14      A.   At that time, no.
15      Q.   And at that time, when you
16 were a collections associate at
17 AmerisourceBergen, did you have an
18 understanding of what a suspicious order
19 is, or was?
20      A.   No.
21      Q.   When you were a collections
22 associate at AmerisourceBergen, did you
23 ever receive any training about security
24 around controlled substances?

Page 60

1      A.   For which role?  For which
2 position?
3      Q.   When you were a collection
4 associate at AmerisourceBergen.
5      A.   No.
6      Q.   Did you receive any training
7 about diversion?
8      A.   No.
9      Q.   Did you receive any training
10 about suspicious orders?
11      A.   No.
12      Q.   Did you have any
13 responsibility for monitoring for
14 diversion when you were a collections
15 associate?
16      A.   No.
17      Q.   Did you have any
18 responsibility for identifying suspicious
19 orders when you were a collections
20 associate?
21      A.   No.
22      Q.   Just to make sure I
23 understand, no training and no
24 responsibility, correct?

Page 61

1      A.   For that role, yes, correct.
2      Q.   So after working at
3 AmerisourceBergen as a collections
4 associate for approximately a year
5 and-a-half to two years, you moved into
6 the position of a diversion control
7 specialist?
8      A.   Correct.
9      Q.   Do you recall what prompted
10 that change in your employment?
11      A.   Just like other roles that I
12 have had over my career, just looking to
13 further my knowledge in a different job
14 position.
15      Q.   Did you apply for that
16 position?
17      A.   I did.
18      Q.   What was the application
19 process like?
20      A.   It was filling out an
21 application form online.
22      Q.   When you say "online," do
23 you mean on the Internet?
24      A.   Inner-company web.

Page 62

1  Q.  So like an AmerisourceBergen
2  intranet?
3  A.  Yes.
4  Q.  Do you recall what the
5  application was like?
6  A.  I do not.
7  Q.  Do you recall any
8  qualifications that AmerisourceBergen
9  wanted applicants to have for that
10 position?
11 A.  I don't recall.
12 Q.  Do you recall if there were
13 any educational requirements?
14 A.  I do not.
15 Q.  Do you recall if there were
16 any experience requirements?
17 A.  I do not recall.
18 Q.  Was there an interview
19 process for the diversion control
20 specialist position?
21 A.  There was.
22 Q.  What was the interview
23 process like?
24 A.  It was meeting with Ed

Page 63

1  Hazewski.
2  Q.  Anybody else?
3  A.  And I also met with Chris
4  Zimmerman.
5  Q.  Did you meet with Ed and
6  Chris together or separately?
7  A.  Separately.
8  Q.  Were those meetings on the
9  same day or subsequent days?
10 A.  Same day.
11 Q.  Were there any other
12 interviews besides with Ed and Chris?
13 A.  I don't believe so, no.
14 Q.  Do you recall, at the time,
15 what Ed Hazewski's position was?
16 A.  I believe it was diversion
17 control manager.
18 Q.  Do you have -- did you have
19 an understanding, at the time, of why you
20 were meeting with Ed for that position?
21 A.  To apply for the position.
22 Q.  Was he going to be your
23 direct supervisor in that position?
24 A.  He would be.

Page 64

1  Q.  Do you understand why you
2  were meeting with Chris Zimmerman?
3  A.  Yes.
4  Q.  Why was that?
5  A.  My understanding is that Ed
6  wanted a second opinion, so he asked
7  Chris Zimmerman to also interview me.
8  Q.  Do you know if
9  AmerisourceBergen posted this diversion
10 control specialist job outside of
11 AmerisourceBergen?
12 A.  I do not know.
13 Q.  Did you -- did you, at any
14 time after you interviewed for that
15 position, learn whether AmerisourceBergen
16 was hiring people from outside of the
17 company?
18 A.  I do not recall.
19 Q.  During the interviews with
20 Ed -- or the interview with Ed, did they
21 ask you about your educational
22 background?
23 A.  He may have, but I don't
24 remember.

Page 65

1  Q.  Do you recall if it was a
2  concern that you did not have more than
3  an Associate's Degree?
4  A.  I do have more than an
5  Associate's Degree.
6  Q.  Sorry.  Please forgive me.
7  Can you -- let's back up
8  right there, and you can tell me, what
9  further education have you received after
10 the Associate's Degree?
11 A.  I completed my Bachelor's
12 Degree in 2006.
13 Q.  So you completed your
14 Bachelor's Degree before applying for the
15 diversion control job?
16 A.  Yes.
17 Q.  And what is your Bachelor's
18 Degree in?
19 A.  Management.
20 Q.  Any particular kind of
21 management?
22 A.  No.  It was management.
23 Q.  And where did you complete
24 your Bachelor's Degree?

Page 66

1   A.   University of Phoenix.  And
2 I also took one class towards my
3 Master's.
4   Q.   What was that class?
5   A.   That, I don't remember.
6   Q.   Do you recall what
7 institution you took it through?
8   A.   University of Phoenix.
9   Q.   What were you intending to
10 get a Master's in?
11   A.   Business.
12   Q.   Would that have been like a
13 Master's in business administration or
14 business management?
15   A.   Something like that, yes.
16   Q.   Is there any particular
17 reason why you didn't complete your
18 Master's?
19   A.   No particular reason.
20   Q.   Going back to the interview
21 with Mr. Hazewski, did he ever ask you
22 questions about your experience with
23 controlled substances?
24   A.   I don't recall that

Page 67

1 question.
2   Q.   Did he ask you any questions
3 about your experience with diversion or
4 monitoring for diversion?
5   A.   I don't recall.
6   Q.   Do you recall if Mr.
7 Hazewski asked you any questions about
8 your experience with suspicious orders or
9 monitoring for suspicious orders?
10   A.   No.  But we did discuss the
11 nature of the position.
12   Q.   What was that discussion
13 like?
14   A.   It was just he was telling
15 me about the role of the position that
16 I'm applying for.
17   Q.   What did he tell you about
18 the role?
19   A.   That I would be reviewing
20 orders of interest.
21   Q.   Did he use the word "order
22 of interest" or did he use the word
23 "suspicious orders"?
24   A.   I don't recall.

Page 68

1   Q.   Do you recall if he may have
2 used the word "excessive purchase
3 orders"?
4   A.   That, I don't remember.
5   Q.   The word "order of
6 interest," do you recall him using that
7 word, or is that a word you're using
8 today --
9   A.   That's --
10   Q.   -- to describe --
11   A.   Sorry.
12   Q.   Is that a word you're using
13 today to describe the subject you
14 discussed back then?
15   A.   Yes.
16   Q.   But it's not the words that
17 he would have used back then?
18     MR. NICHOLAS:  Object to
19 form.
20     Go ahead.
21     THE WITNESS:  Possibly.
22 BY MR. CLUFF:
23   Q.   Was there anything else that
24 he told you about the role of diversion

Page 69

1 control specialist?
2   A.   I do recall talking about
3 spreadsheets.
4   Q.   What about spreadsheets?
5   A.   Just my knowledge of working
6 with Excel.
7   Q.   Did you have a working
8 knowledge of Excel?
9   A.   I had a basic understanding.
10   Q.   What did he tell you about
11 working with spreadsheets in this new
12 role as a diversion control specialist?
13   A.   I don't recall the details.
14   Q.   But he told you you would
15 essentially need to work with Excel
16 spreadsheets?
17   A.   Right.
18   Q.   We discussed your work at
19 Wyeth in pretty substantial detail, and I
20 think we agreed that you did not have any
21 experience or training at Wyeth about
22 diversion or suspicious order monitoring;
23 is that right?
24   A.   Correct.

Page 70

1    Q.   Did that topic come up
2  during your interview with Mr. Hazewski?
3    A.   My recollection is that I
4  did inform him that I did review orders
5  when I was a credit analyst at Wyeth.
6    Q.   When you were at Wyeth and
7  you reviewed orders, it was to make sure
8  that Wyeth was getting paid, correct?
9    A.   When I was reviewing orders,
10 those -- the decision-making was based on
11 their credit risk with the company.
12   Q.   So what was the purpose of
13 the review of the orders at Wyeth?
14   A.   My understanding is that it
15 was to review those orders; if the
16 credit -- if the customer had a bad
17 credit history with Wyeth
18 Pharmaceuticals, that those orders would
19 not be released.  That's my recollection.
20   Q.   So when you reviewed orders
21 at Wyeth, you were not reviewing them to
22 determine whether or not they were
23 suspicious?
24   A.   I believe so.

Page 71

1    Q.   But that is the role you
2  were going to take on at
3  AmerisourceBergen as a diversion control
4  specialist, correct?
5    A.   Correct.
6    Q.   Did Mr. Hazewski express any
7  concern that you did not have any
8  experience reviewing orders to determine
9  whether or not they were suspicious?
10   A.   I don't recall.
11   Q.   Do you recall if Mr.
12 Hazewski was looking for somebody with
13 experience in reviewing orders for -- to
14 determine whether or not they were
15 suspicious?
16   A.   He didn't inform me, no.
17   Q.   Do you know why
18 AmerisourceBergen was hiring additional
19 diversion control specialists at that
20 time in 2007?
21   A.   I don't know the specific
22 reasons.
23   Q.   I said 2007, that was
24 incorrect.

Page 72

1    I think you applied for that
2  position in 2009, correct?
3    A.   Correct.
4    Q.   I'll just re-ask the
5  question so it's clear.
6    Did you have an
7  understanding of why AmerisourceBergen
8  was hiring more division -- diversion
9  control specialists in 2009?
10   A.   I don't recall.
11   Q.   When you met with Mr.
12 Zimmerman, do you recall what kind of
13 questions he asked you?
14   A.   No.
15   Q.   Did you talk about your
16 education?
17   A.   I don't recall the substance
18 that we --
19   Q.   Do you recall --
20   A.   -- the subjects we talked
21 about.
22   Q.   Do you recall if you talked
23 with Mr. Zimmerman about your experience
24 monitoring for suspicious orders?

Page 73

1    A.   I don't recall.
2    Q.   Do you recall if he had any
3  concern that you did not have any prior
4  experience monitoring for suspicious
5  orders?
6    A.   No, I do not.
7    Q.   What happened after you met
8  with Mr. Hazewski and Mr. Zimmerman?
9    A.   I believe within
10 approximately a week I was informed by
11 human resources that I was being offered
12 the position.
13   Q.   So it was a one-day
14 interview process, and then you were
15 hired a week later?
16   A.   Yes.
17   Q.   Do you recall how long after
18 you were informed by HR that you assumed
19 your new responsibilities as a diversion
20 control specialist?
21   A.   I believe it was two weeks.
22   Q.   Did you receive any training
23 before you started your new job?
24   A.   I trained when I started my

Page 74

1  new job.
2      Q.   What happened in the two
3  weeks between when HR let you know you
4  were getting the job and you started the
5  job?
6      A.   I had to put in my two
7  weeks' notice with my position.
8      Q.   And then you essentially
9  just wrapped up that position and started
10 the new one?
11     A.   Yes.
12     Q.   And you said you trained on
13 the job, correct?
14     A.   Yes.
15     Q.   What was that training like?
16     A.   The training was going over
17 customer orders with Ed.
18     Q.   Did you ever, like, receive
19 any written materials or policies and
20 procedures or PowerPoints?
21     A.   I'm sure there were, but I
22 just don't -- just don't recall at the
23 moment.
24     Q.   What you do recall is sort

Page 75

1  of hands-on training directly with Ed
2  Hazewski?
3      A.   That is correct.
4      Q.   And you said you recall
5  looking at customer orders.
6          How would you have done
7  that?
8      A.   I would look at those orders
9  individually through the system that we
10 were using.
11     Q.   So that we can kind of
12 understand what the training process was
13 like, I'd like to back up and understand
14 what the order process was like from your
15 viewpoint.
16         So AmerisourceBergen has
17 customers, correct?
18     A.   Yes.
19     Q.   And there's some way that
20 they place orders with AmerisourceBergen?
21     A.   Yes.
22     Q.   What was your understanding,
23 in 2009, as a diversion control
24 specialist, of how customers placed

Page 76

1  orders with AmerisourceBergen?
2      A.   My understanding at the time
3  is that the customers would place orders
4  through -- I believe it was CSOS and 222
5  forms.
6      Q.   What is CSOS?
7      A.   CSOS is controlled substance
8  ordering system.
9      Q.   And what's a 222 form?
10     A.   A 222 form is a DEA form
11 that has the customer's name, DEA
12 license, as well as the items that
13 they're ordering.
14     Q.   Is the CSOS system just an
15 electronic form of the 222 form?
16     A.   It is.
17     Q.   So it has all the same
18 information that a 222 form would have?
19     A.   My understanding is that
20 yes, that is correct.
21     Q.   And is it your recollection
22 that in 2009 the CSOS system was already
23 operational?
24     A.   I don't recall.

Page 77

1      Q.   But at some time it did
2  become --
3      A.   Yes.
4      Q.   When you were training on
5  the job with Ed Hazewski, do you recall
6  if you looked at 222 forms?
7      A.   We did not.  The 222 forms
8  go through the distribution centers.
9      Q.   So a customer would fill out
10 a 222 form and send it to the
11 distribution center?
12     A.   Yes.
13     Q.   And then how would -- how
14 would the order come to you and Ed
15 Hazewski for review?
16     A.   I don't recall the actual
17 steps.
18     Q.   So, then, what were you
19 reviewing when you were working with Ed
20 Hazewski to start your training for this
21 new job?
22     A.   It was all the customer
23 orders that were currently in the system
24 to be reviewed.

Page 78

1    Q.   Do you recall if you were
2  looking at them in an Excel spreadsheet,
3  or some other form?
4    A.   No, I don't recall.
5    Q.   What were you looking for,
6  or what was Ed Hazewski showing you to
7  look for when you were training?
8    A.   My recollection is that we
9  were looking at the product that they
10  were ordering, as well as the quantity
11  that they were ordering.
12    Q.   And what were you trying to
13  determine when you were looking at the
14  product and the quantity?
15    A.   To see if they were ordering
16  within their current purchase history.
17    Q.   When you were training with
18  Ed, did he ever explain the concept of
19  diversion to you?
20    A.   Yes.
21    Q.   What did he explain?
22    A.   It was where the -- any
23  pharmaceutical products being diverted to
24  another individual for illicit purposes.

Page 79

1    Q.   You used the word "diverted"
2  to help define diversion, and I'm okay
3  with that.
4       But I'm just trying to
5  understand, like, what does diversion
6  mean?  Does that mean it's going out of
7  the regular supply chain?
8    A.   Supply chain, yes.
9    Q.   Did Ed tell you why the word
10  "diversion" mattered in your diversion
11  specialist role?
12    A.   He may have, but I just
13  don't recall.
14    Q.   What was your understanding
15  of why diversion was important in your --
16  in your role?
17    A.   My understanding, at the
18  time, was that pharmacies who were
19  ordering -- licensed pharmacies that are
20  ordering products are receiving those
21  products and not sending them to any
22  other individual for illicit purposes;
23  that they are only supposed to go to the
24  patient who has the prescription.

Page 80

1    Q.   Was it your role to help
2  AmerisourceBergen prevent diversion?
3       MR. NICHOLAS:  Object to
4    form.
5       THE WITNESS:  Can you ask
6    that question again?
7  BY MR. CLUFF:
8    Q.   Sure.  I'll ask it two
9  different ways.
10       When you became a diversion
11  control specialist, did you understand
12  that your job was to help
13  AmerisourceBergen prevent diversion?
14    A.   No.
15    Q.   AmerisourceBergen doesn't
16  want to prevent diversion?
17       MR. NICHOLAS:  Object to the
18    form.
19       THE WITNESS:  I didn't say
20    that.
21  BY MR. CLUFF:
22    Q.   I'm asking.
23    A.   We have a system in place
24  that detects orders of interest, and

Page 81

1  those orders of interest are reviewed
2  based on the current systems that we have
3  in place.
4    Q.   When you started as a
5  diversion control specialist, did anybody
6  discuss the Controlled Substances Act
7  with you?
8    A.   I don't recall.
9    Q.   Would anybody have discussed
10  the regulations that AmerisourceBergen
11  obtains -- scratch that.
12       Did anybody discuss
13  regulations that AmerisourceBergen has to
14  comply with in relation to wholesale
15  distribution?
16    A.   Yes.
17    Q.   What did they tell you about
18  those regulations?
19    A.   It was a DEA 21 CFR FDA
20  regulation.
21    Q.   And that was explained to
22  you when you started training for a
23  diversion control specialist job?
24    A.   Yes.

Page 82

1  Q.  What did they explain to you
2  about 21 CFR regulations?
3  A.  Well, they showed me the
4  regulation.
5  Q.  Which ones?
6  A.  It was the 21 CFR.  I don't
7  recall the exact number.
8  Q.  What did they tell you about
9  those regulations?
10  A.  It was regarding that
11  suppliers have to have an order
12  monitoring system in place that detects
13  orders of unusual quantities, frequencies
14  and pattern.
15  Q.  Did they explain to you what
16  a suspicious order was when you started
17  as a diversion control specialist?
18  A.  I don't recall.
19  Q.  In your time working for
20  AmerisourceBergen, has anybody explained
21  to you what a suspicious order is?
22  A.  Yes.
23  Q.  What is it?
24  A.  A suspicious order is

Page 83

1  initially an order of interest, but after
2  investigation, it is then determined
3  whether that order is suspicious or not.
4  If it is suspicious, that
5  order is rejected and reported to the
6  DEA.
7  Q.  Is that your understanding
8  of a suspicious order today?  Let me make
9  my question a little more clear.
10  Do you know whether this DEA
11  21 CFR regulation defines a suspicious
12  order?
13  A.  Yes.
14  Q.  Do you know what the
15  regulations define a suspicious order to
16  be?
17  MR. NICHOLAS:  Object to
18  form.
19  THE WITNESS:  I did state
20  that earlier.
21  BY MR. CLUFF:
22  Q.  What is the definition of a
23  suspicious order in the CFR?
24  MR. NICHOLAS:  Same

Page 84

1  objection.
2  Go ahead.
3  THE WITNESS:  That is a
4  wholesaler needs to have a system
5  in place that monitors orders of
6  unusual size, frequency and
7  pattern.
8  BY MR. CLUFF:
9  Q.  So would you agree with me,
10  then, that the CFR defines a suspicious
11  order as one of unusual size, frequency
12  and pattern?
13  MR. NICHOLAS:  Object to the
14  form.
15  THE WITNESS:  To an extent,
16  yes, from what I recollect.
17  BY MR. CLUFF:
18  Q.  How does AmerisourceBergen
19  define an order of interest?
20  MR. NICHOLAS:  Object to the
21  form.  He's not --
22  BY MR. CLUFF:
23  Q.  Based on your --
24  MR. NICHOLAS:  He's not

Page 85

1  here --
2  MR. CLUFF:  I'm sorry, Bob,
3  I didn't mean to talk over your
4  objection.
5  MR. NICHOLAS:  I was going
6  to say, object to the form.  This
7  is not a 30(b)(6) deposition.
8  Go ahead.
9  BY MR. CLUFF:
10  Q.  You've worked with
11  AmerisourceBergen for a number of years,
12  correct?
13  A.  Yes.
14  Q.  And you were responsible --
15  well, your position was a diversion
16  control specialist?
17  A.  Yes.



**Page 86**

21     Q.   So, essentially, orders of
22 interest, in your experience at
23 AmerisourceBergen, match the definition
24 of suspicious order in the Code of

**Page 87**

1 Regulations?
2     MR. NICHOLAS:  Object to the
3 form.
4     THE WITNESS:  It's a system
5 we have in place for orders of
6 interest that we investigate
7 individually to determine if that
8 order is suspicious or not.
9 BY MR. CLUFF:

**Page 88**

21 BY MR. CLUFF:
22     Q.   And we discussed earlier
23 that the Code of Federal Regulations
24 defines suspicious orders as orders of

**Page 89**

1 unusual size, frequency and pattern,
2 correct?
3     MR. NICHOLAS:  Object to the
4 form.
5     THE WITNESS:  Yes.
6 BY MR. CLUFF:



Page 90

17 BY MR. CLUFF:
18     Q.   And that's the same way that
19 the Code of Federal Regulations defines a
20 suspicious order, right?
21         MR. NICHOLAS:  Object to the
22     form.
23         THE WITNESS:  It's not
24     necessarily a suspicious order,

Page 91

1     it's an order of interest.
2 BY MR. CLUFF:
3     Q.   Does the word "order of
4 interest" appear anywhere in the Code of
5 Federal Regulations that you're aware of?
6         MR. NICHOLAS:  Well, object
7     to form.  He's not a lawyer.  He
8     hasn't read the entire --
9         THE WITNESS:  No.
10         MR. NICHOLAS:  -- statute.
11         But go ahead.
12 BY MR. CLUFF:

Page 92

7     Q.   Do you recall ever being
8 trained about what an order of interest
9 is?
10     A.   Yes.
11     Q.   Do you recall when that was?
12     A.   I do not recall the year.
13     Q.   If you were to estimate,
14 would you say it was before or after you
15 worked at Teva?
16     A.   I don't recall.
17     Q.   When you were training with
18 Ed Hazewski after you started this
19 position, was he training you about
20 suspicious orders?
21     A.   He was training me on order
22 review.

Page 93

6     Q.   So essentially the same
7 definition of a suspicious order that we
8 talked about in the Code of Federal
9 Regulations?
10         MR. NICHOLAS:  Object to the
11     form.
12         Go ahead.
13         THE WITNESS:  Just orders of
14     unusual size, quantity and
15     frequency, yes.
16 BY MR. CLUFF:

Page 94



17    A.    Yes.
18    Q.    Why were you reviewing
19 orders to determine whether they were
20 suspicious?
21    A.    That was part of the
22 training that Ed indicated to me.
23    Q.    Is there any other reason?
24    A.    And also it's part of the

Page 95

1 DEA regulation.
2    Q.    Did Mr. Hazewski explain,
3 during your training, that wholesalers
4 like AmerisourceBergen have a regulatory
5 requirement that they maintain a system
6 to prevent diversion?
7        MR. NICHOLAS:  Object to the
8    form.
9        THE WITNESS:  Could you ask
10    that question again, please?
11 BY MR. CLUFF:
12    Q.    Sure.
13        While you were training for
14 this new position as a diversion control
15 specialist, did Mr. Hazewski explain to
16 you that wholesalers like
17 AmerisourceBergen have a regulatory
18 requirement to maintain a system to
19 prevent diversion?
20        MR. NICHOLAS:  Object to the
21    form.
22        THE WITNESS:  No.
23 BY MR. CLUFF:
24    Q.    Has Mr. Hazewski ever

Page 96

1 explained to you that AmerisourceBergen
2 has a regulatory obligation to maintain a
3 system to prevent diversion?
4        MR. NICHOLAS:  Same
5    objection.
6        THE WITNESS:  He indicated
7    to me that we need to have a
8    system in place that monitors
9    orders of unusual size, pattern
10    and frequency.
11 BY MR. CLUFF:
12    Q.    Did he ever tell you why?
13    A.    I'm sure he has, but I don't
14 recall the discussion.
15        MR. NICHOLAS:  Sterling, I
16    don't want to break your flow
17    here, but it's been an hour
18    and-a-half.
19        MR. CLUFF:  I was looking at
20    that.  I just have a couple more,
21    and then we'll break.
22 BY MR. CLUFF:
23    Q.    In your work as a diversion
24 control specialist over the years, did

Page 97

1 you ever form an understanding of why
2 AmerisourceBergen is required to maintain
3 a system to monitor orders of unusual
4 size, pattern and frequency?
5    A.    Yes.
6    Q.    And what is that?
7    A.    Because it's part of the DEA
8 requirement that we have a system in
9 place.
10    Q.    A system in place to do
11 what?
12    A.    To monitor customer orders.
13    Q.    Have you ever formed an
14 understanding that AmerisourceBergen has
15 a regulatory requirement to maintain a
16 system to prevent diversion?
17        MR. NICHOLAS:  Object to the
18    form.
19        THE WITNESS:  I'm not aware
20    of that.
21        MR. CLUFF:  Let's go ahead
22    and take a break.
23        VIDEO TECHNICIAN:  We're off
24    the record at 10:56 a.m.

Page 98

1           - - -
2        (Whereupon, a brief recess
3     was taken.)
4           - - -
5        VIDEO TECHNICIAN:  We're
6     back on the record at 11:11 a.m.
7  BY MR. CLUFF:
8     Q.   All right.  Mr. Kreutzer,
9  we're back on the record, so we'll
10 continue your deposition.
11        You understand that you're
12 still under oath?
13    A.   Yes.
14    Q.   When we broke we were, I
15 believe, talking about training for the
16 position you took on as a diversion
17 control specialist at AmerisourceBergen.
18        Do you recall that?
19    A.   Yes.
20    Q.   Do you recall how long you
21 and Mr. Hazewski trained together for
22 before you started operating without
23 supervision?
24    A.   I do not, no.

Page 99

1     Q.   If you were to estimate,
2  would you say it was less than a month?
3     A.   I do not know.
4     Q.   Was it less than two weeks?
5     A.   I don't recall.
6     Q.   Just so we're clear, you
7  have absolutely no recollection of how
8  long you were trained for?
9     A.   Not specific time frame, no.
10    Q.   Did you train with anybody
11 else aside from Mr. Hazewski?
12    A.   I did.  I trained with Scott
13 Kirsh.
14    Q.   Who is Scott Kirsh?
15    A.   Scott Kirsh was -- I believe
16 he also reported to Ed Hazewski at one
17 time, prior to me coming on board.
18    Q.   Do you recall what his job
19 title was?
20    A.   I believe his -- I believe
21 he was working for Bruce Gundi.  But he
22 was filling in with Ed to also help me
23 train for the position.  So he had a dual
24 role at one point.

Page 100

1     Q.   What was the dual role?
2     A.   So he would help me review
3  orders throughout the day and also he had
4  his other job to do, reporting to Bruce
5  Gundi.  That's my recollection.
6     Q.   What work was he doing when
7  he reported to Bruce Gundi, did you know?
8     A.   It was investigations not
9  related to order monitoring.
10    Q.   We were talking about some
11 of the substantive training that you
12 received, and you mentioned reading the
13 Code of Federal Regulations.
14        I believe you referred to it
15 as DEA 21 CFR; is that right?
16    A.   Yes.
17    Q.   As part of your training,
18 did you ever read 21 USC Section 823?
19    A.   I don't recall.
20    Q.   In your work as a diversion
21 control specialist with
22 AmerisourceBergen, have you ever read 21
23 USC 823?
24    A.   I don't recall the specific

Page 101

1  regulation number.
2     Q.   How about when you worked
3  for Teva Pharmaceuticals, did you ever
4  read 21 USC 823?
5     A.   I don't -- I don't remember
6  the specific regulation number.
7     Q.   Have you ever reviewed the
8  regulation or statute that governs
9  registration to manufacture or distribute
10 controlled substances?
11    A.   I don't recall.
12    Q.   Do you know if there is a
13 regulation or statute that governs
14 registrations to manufacture or
15 distribute controlled substances?
16    A.   I don't recall.
17    Q.   Do you not recall today
18 whether or not there is a regulation, or
19 is it that you never knew when you worked
20 at Teva or ABC -- excuse me,
21 AmerisourceBergen, if there was a statute
22 or regulation that governs registrations?
23        MR. NICHOLAS:  Object to the
24    form.

|   | Page 102 |
|---|----------|
| 1 | THE WITNESS: I'm sure there |
| 2 | is, I just don't recall at the |
| 3 | moment. |
| 4 | BY MR. CLUFF: |
| 5 | Q. Is that something you would |
| 6 | have been familiar with at some earlier |
| 7 | point in time? |
| 8 | MR. NICHOLAS: Same |
| 9 | objection. |
| 10 | THE WITNESS: I just don't |
| 11 | recall. |
| 12 | BY MR. CLUFF: |
| 13 | Q. Are you aware that |
| 14 | AmerisourceBergen is required to maintain |
| 15 | a registration to distribute controlled |
| 16 | substances? |
| 17 | A. Yes. |
| 18 | Q. Do you know who issues that |
| 19 | registration? |
| 20 | A. The DEA. |
| 21 | Q. Are you aware that |
| 22 | manufacturers, like Teva, are required to |
| 23 | maintain a registration to manufacture |
| 24 | controlled substances? |

|   | Page 103 |
|---|----------|
| 1 | A. I'm not sure. |
| 2 | Q. When you worked at Teva, did |
| 3 | anybody discuss maintaining registration |
| 4 | to manufacture controlled substances? |
| 5 | A. I don't believe so. |
| 6 | Q. You never received any |
| 7 | training on Teva's registration to |
| 8 | manufacture controlled substances? |
| 9 | A. I don't recall. |
| 10 | Q. Going back to |
| 11 | AmerisourceBergen's registration to |
| 12 | distribute controlled substances, are you |
| 13 | aware of any of the requirements to |
| 14 | maintain -- to obtain a registration to |
| 15 | distribute controlled substances? |
| 16 | MR. NICHOLAS: Object to the |
| 17 | form. |
| 18 | THE WITNESS: I don't |
| 19 | recall. |
| 20 | BY MR. CLUFF: |
| 21 | Q. Your job position at |
| 22 | AmerisourceBergen, for the majority of |
| 23 | your time there, was diversion control |
| 24 | specialist, correct? |

|   | Page 104 |
|---|----------|
| 1 | A. Correct. |
| 2 | Q. Are you aware, through your |
| 3 | work as a diversion control specialist, |
| 4 | whether maintaining effective controls |
| 5 | against diversion is a requirement in |
| 6 | obtaining a registration to distribute |
| 7 | controlled substances? |
| 8 | MR. NICHOLAS: Object to the |
| 9 | form. |
| 10 | THE WITNESS: I don't |
| 11 | recollect. |
| 12 | BY MR. CLUFF: |
| 13 | Q. Have you ever received any |
| 14 | training about the maintenance of |
| 15 | effective controls against diversion, |
| 16 | while you've been employed by |
| 17 | AmerisourceBergen? |
| 18 | A. I don't recall. |
| 19 | Q. When you worked at Teva |
| 20 | under Colleen McGinn, did you ever |
| 21 | receive any training about the |
| 22 | maintenance of effective controls against |
| 23 | diversion? |
| 24 | A. I don't recall. |

|   | Page 105 |
|---|----------|
| 1 | Q. Do you recall if |
| 2 | AmerisourceBergen conducted training |
| 3 | about the maintenance of effective |
| 4 | controls against diversion? |
| 5 | A. I don't recall. |
| 6 | Q. Is it possible, then, that |
| 7 | AmerisourceBergen did not provide |
| 8 | training about the maintenance of |
| 9 | effective controls against diversion? |
| 10 | MR. NICHOLAS: Object to the |
| 11 | form. |
| 12 | THE WITNESS: I just don't |
| 13 | recall. |
| 14 | BY MR. CLUFF: |
| 15 | Q. How about at Teva, do you |
| 16 | recall if Teva ever offered training |
| 17 | about the maintenance of effective |
| 18 | controls against diversion? |
| 19 | A. I don't recall. |
| 20 | MR. MAIER: Object to form. |
| 21 | BY MR. CLUFF: |
| 22 | Q. Do you know if |
| 23 | AmerisourceBergen maintains effective |
| 24 | controls against diversion? |

Page 106

1      MR. NICHOLAS:  Object to the
2  form.
3      Go ahead.
4      THE WITNESS:  I'm assuming
5  yes, we do.
6  BY MR. CLUFF:
7      Q.   What is your assumption
8  based on?
9      A.   That we have a system in
10  place that identifies orders of interest.
11      Q.   Earlier I asked you if you
12  had ever received any training about the
13  maintenance of effective controls against
14  diversion, and you said you don't recall
15  receiving any training; is that right?
16      MR. NICHOLAS:  Object to the
17  form.
18      THE WITNESS:  Can you
19  rephrase the question?
20  BY MR. CLUFF:
21      Q.   I'll re-ask the question,
22  but I'm not going to rephrase it.
23      We discussed earlier
24  training about the maintenance of

Page 107

1  effective controls against diversion
2  while you worked at AmerisourceBergen.
3      And you said that you do not
4  recall receiving any training; is that
5  correct?
6      MR. NICHOLAS:  Object to the
7  form.  And I'll object to the
8  refusal to rephrase the question
9  at the witness's request.
10      Go ahead.
11      THE WITNESS:  We have a
12  system in place that identifies
13  orders of interest for unusual
14  size, frequency and pattern.
15  BY MR. CLUFF:
16      Q.   I appreciate that answer.
17  That's not -- that's not the question I
18  was asking, so let me try and get back to
19  the question I was asking.
20      Do you recall that we
21  previously discussed whether or not you,
22  at AmerisourceBergen, received training
23  about the maintenance of effective
24  controls against diversion?

Page 108

1      MR. NICHOLAS:  Object to the
2  form.
3  BY MR. CLUFF:
4      Q.   Do you recall that?
5      MR. NICHOLAS:  Object to the
6  form.
7      THE WITNESS:  I don't
8  recall.
9  BY MR. CLUFF:
10      Q.   You don't recall receiving
11  training, or you don't recall the
12  question?
13      MR. NICHOLAS:  I think the
14  question is confusing.  I will
15  object to the form, to the series
16  of questions that's confusing.
17      THE WITNESS:  I don't
18  recall.
19  BY MR. CLUFF:
20      Q.   Do you recall receiving
21  training at AmerisourceBergen regarding
22  the maintenance of effective controls
23  against diversion?
24      MR. NICHOLAS:  Same

Page 109

1  objection.
2      THE WITNESS:  Yes.
3  BY MR. CLUFF:
4      Q.   You do recall receiving
5  training?  What training --
6      A.   I recall receiving training
7  that identifies orders of interest.
8      Q.   When do you recall receiving
9  training about orders of interest?
10      A.   Throughout my career at
11  AmerisourceBergen.
12      Q.   When did the words "orders
13  of interest" start getting used at
14  AmerisourceBergen?
15      A.   I don't recall that.
16      Q.   Is it your recollection that
17  in 2009, when you became a diversion
18  control specialist, Mr. Hazewski trained
19  you about identifying orders of interest?
20      A.   I don't remember.
21      Q.   Do you recall Mr. Hazewski
22  using the words "orders of interest" in
23  2009 when he trained you?
24      A.   No, I do not.

Page 110

1    Q.   Do you recall him using the
2  words "suspicious orders"?
3    A.   No, I do not.
4    Q.   Do you recall him using the
5  words "excessive orders"?
6    A.   No.
7    Q.   What did he tell you you
8  were looking for in the orders you
9  reviewed when he was training you?
10   MR. NICHOLAS:  Object to the
11   form.
12   THE WITNESS:  Orders of
13   unusual size, quantity and
14   frequency.
15 BY MR. CLUFF:
16   Q.   And we discussed earlier
17 that that is the definition of a
18 suspicious order in the Code of Federal
19 Regulations, right?
20   MR. NICHOLAS:  Object to the
21   form.
22   Go ahead.
23   THE WITNESS:  I didn't say
24   that.  I said we have a system in

Page 111

1    place that identifies orders of
2    unusual -- of unusual size,
3    quantity and frequency.
4  BY MR. CLUFF:
5    Q.   Do you recall what the
6  definition of a suspicious order is in
7  the Code of Federal Regulations?
8    A.   Yes.
9    Q.   What is it?
10   A.   It's what I just stated.
11   Q.   Orders of unusual size,
12 quantity and frequency?
13   A.   Yes.  Pattern.
14   Q.   And that's what Mr. Hazewski
15 was training you to look for?
16   A.   He was training me to
17 identify orders of interest that need to
18 be reviewed individually to determine if
19 the order is suspicious or not.
20   Q.   So I just asked you if he
21 ever used the words "orders of interest"
22 when he was training you, and you told me
23 that you do not recall.
24   A.   That term, I do not recall.

Page 112

1    Q.   So your recollection today
2  is that you were being trained to
3  identify orders of interest?
4    MR. NICHOLAS:  Object to the
5    form.  I believe the questions are
6    confusing.
7    THE WITNESS:  That is my
8    term that I'm using.  I don't
9    recall Ed's term that he used in
10   2009.
11 BY MR. CLUFF:
12   Q.   When you were training with
13 Ed and with Scott, did either of them
14 discuss with you the obligation or
15 regulatory requirement that a wholesale
16 distributor has to maintain effective
17 controls against diversion of controlled
18 substances?
19   A.   I don't recall that
20 discussion.
21   Q.   Your title was diversion
22 control specialist, correct?
23   A.   Yes.
24   Q.   Don't you think it would

Page 113

1  have been important, as a diversion
2  control specialist, to be trained on
3  diversion control?
4    MR. NICHOLAS:  Object to the
5    form.  Just argumentative.
6    THE WITNESS:  I most likely
7    was trained, I just don't recall.
8  BY MR. CLUFF:
9    Q.   What would that training
10 have looked like, if it had occurred?
11   MR. NICHOLAS:  Object to the
12   form.
13   THE WITNESS:  It was
14   hands-on training.
15 BY MR. CLUFF:
16   Q.   And that was -- sorry, go
17 ahead.  I didn't mean to interrupt you.
18   A.   As well as, I believe, we
19 also had PowerPoint trainings or
20 presentations that were conducted.  And
21 we also conducted weekly meetings.
22   Q.   Do you recall who would have
23 given the PowerPoint presentations?
24   A.   I do not.

Page 114

1    Q.   What were the weekly
2  meetings you guys had?
3    A.   Weekly meetings consisted of
4  anything new that is happening in our
5  department, any pharmacy visits that were
6  being conducted, as well as any orders
7  that the investigators wanted to discuss,
8  or any other information the
9  investigators wanted to discuss on a
10  variety of subjects.
11    Q.   Who attended the weekly
12  meetings?
13    A.   Well, at the time when I
14  initially started, it was myself, I
15  believe it was Scott Kirsh, Ed.  And then
16  soon afterward Joe Tomkiewicz was hired,
17  as well as Dave Britemyer.
18    Q.   Kirsh, you mentioned, was --
19  he had a dual role helping you monitor
20  the -- review the customer orders?
21    A.   Initially, yes.
22    Q.   And working investigations
23  with Bruce Gundi?
24    A.   Yes, that's my recollection.

Page 115

1    Q.   These names, Tomkiewicz and
2  Britemyer, do you recall their positions?
3    A.   Yes.  Joe was a diversion
4  control -- I believe his title was
5  investigator.
6    Q.   And that's Joe Tomkiewicz?
7    A.   Yes.
8    Q.   And how about Dave
9  Britemyer?
10    A.   Dave Britemyer was an intern
11  for AmerisourceBergen.  So he was working
12  during the summer months, and then he was
13  hired full time.
14    Q.   So we talked about the
15  training on reviewing customer orders.
16      When you went into
17  autonomous mode without training, what
18  were your responsibilities as a diversion
19  control specialist?
20    A.   To review orders or overall?
21    Q.   Overall.
22    A.   Overall.  I conducted due
23  diligence reviews for new customer
24  accounts that want to do business with

Page 116

1  AmerisourceBergen, as well as reviewing
2  orders of interest and any other duties
3  as assigned.
4    Q.   You said "orders of
5  interest."
6      Was that a part of the scope
7  of your job responsibility in 2009?
8    A.   To review customer orders,
9  yes.
10    Q.   But you're using orders of
11  interest today to refer to the work you
12  did back then?
13    A.   That's correct.
14    Q.   And they were not referred
15  to as orders of interest in 2009,
16  correct?
17      MR. NICHOLAS:  Object to the
18      form.
19      THE WITNESS:  I do not know
20      what they were called back then.
21  BY MR. CLUFF:
22    Q.   The reason I'm asking is
23  because we get to different time periods
24  during your work history, and I'm just

Page 117

1  trying to make sure that I understand the
2  correct words to use for the work you
3  were doing at the time.
4      So if there was a word that
5  you used in 2009, I'd like us to use that
6  when we talk about the 2009 time period.
7  And my understanding is that you don't
8  recall?
9    A.   I don't recall the term that
10  I used.  Maybe other investigators used a
11  different term, I don't know.
12    Q.   So I don't want to put words
13  in your mouth, but I want you to
14  understand that I'm going to refer to
15  those as customer orders in 2009, then.
16    A.   Okay.
17    Q.   Because you did not --
18  you've told me you do not recall using
19  the words "orders of interest" in 2009.
20      Does that make sense?
21    A.   Yes, I understand.
22    Q.   So in 2009, I think you
23  described to me three job
24  responsibilities.

Page 118

1      One was doing customer -- or
2  conducting due diligence on new customer
3  accounts; is that right?
4      A.   As well as overall
5  customers, yes.
6      Q.   Is there a difference
7  between the due diligence on new
8  customers and what you just referred to
9  as overall customers?
10     A.   It's just reviewing customer
11 accounts throughout the month.
12     Q.   Is new customer due
13 diligence sometimes referred to as NCDD?
14     A.   Correct.
15     Q.   I've also heard the term
16 existing customer due diligence.
17          Is that ECDD?
18     A.   That's CDD.
19     Q.   CDD, without the E, okay.
20     A.   Correct.
21     Q.   And were you responsible for
22 both new and existing customer due
23 diligence?
24     A.   Yes.

Page 119

1      Q.   Are you familiar with the
2  term 590, Form 590?
3      A.   I am.
4      Q.   What is a Form 590?
5      A.   Form 590 is a pharmacy
6  questionnaire.
7      Q.   Is that a new customer due
8  diligence form?
9      A.   It's a part of it, yes.
10 Meaning that -- yes, it is a new customer
11 that would complete that form.
12     Q.   What's a Form 595?  Do you
13 know what that is?
14     A.   Form 595 is a new customer
15 due diligence, it's a checklist.
16     Q.   So it's a part of the due
17 diligence process?
18     A.   Process, yes.
19     Q.   But it's different than the
20 590?
21     A.   Correct.
22     Q.   In addition to new customer
23 and existing customer due diligence, you
24 mentioned reviewing customer orders,

Page 120

1  correct?
2      A.   Yes.
3      Q.   And then I think the third
4  category is sort of like special projects
5  by assignment?
6      A.   Yes.
7      Q.   Did you have a geographic
8  area that you were responsible for
9  reviewing customer orders in or from?
10     A.   I was covering, I believe it
11 was -- back then, it could have been the
12 East and South.  It's a little different
13 now.  But at the time, I think it was
14 East and South I was covering.
15     Q.   Did your geographic area of
16 responsibility for customer orders change
17 over time?
18     A.   It has.
19     Q.   And how did it change?
20     A.   It changed where I was now
21 covering just the North and East regions.
22     Q.   Are those two separate
23 regions, North and East, or --
24     A.   Yes, yes.

Page 121

1      Q.   -- or is it Northeast?
2      A.   Yes, they are two separate
3  regions.
4      Q.   Before you became a
5  diversion control specialist in 2009, do
6  you know who was responsible for
7  reviewing customer orders out of the
8  South region?
9      A.   I do not.
10     Q.   Do you know who the
11 diversion control specialists were that
12 were employed prior to your joining in
13 2009?
14     A.   That would have been Ed
15 Hazewski and Scott Kirsh, I believe.  And
16 there may have been others that I don't
17 remember their names, but they weren't
18 there when I started.
19     Q.   So there may have been some
20 others that worked as diversion control
21 specialists before you started in 2009?
22     A.   Yes, yes.
23     Q.   And you just can't remember
24 their names?

Page 122

1    A.   I don't remember their
2  names, but I know there were others.
3    Q.   And so prior to you becoming
4  a diversion control specialist, Ed and
5  Scott Kirsh would have been the two
6  persons primarily responsible for
7  reviewing customer orders?
8    A.   As well as the other
9  individuals.
10    Q.   The people you can't
11  remember?
12    A.   I just -- that I can't
13  remember.
14    Q.   Yeah, I'm just trying to
15  understand the world of individuals.
16  Okay.
17        When you were conducting new
18  customer and existing customer due
19  diligence, did you consider that to be an
20  investigation?
21    A.   It was part of our due
22  diligence process.





Page 126

16 Q. As a diversion control
17 specialist, did you ever discuss upward
18 trends, to use your phrase, with any
19 other wholesale distributors?
20 A. Discuss that information
21 with other wholesalers?
22 Q. Yes.
23 A. No, we have not. Not that
24 I'm -- not that I'm aware of.

Page 127

1 Q. Do you know if any other
2 employees at AmerisourceBergen ever
3 discussed trends in distribution with any
4 other wholesale distributors?
5 A. Not that I'm aware of.
6 Q. Do you know if -- or have
7 you personally spoken to employees from
8 any manufacturers about trends in
9 controlled substance distribution?
10 A. No, I have not.
11 Q. You said you reported to Ed
12 Hazewski, correct?
13 A. Yes.
14 Q. Do you know if Ed Hazewski
15 ever had meetings with or discussions
16 with employees from any manufacturers
17 about trends in wholesale distribution?
18 A. I'm not aware of any
19 discussion.
20 Q. If Mr. Hazewski had learned
21 about a specific trend in wholesale
22 distribution from another distributor or
23 from a manufacturer, is that information
24 that he would have communicated to you?

Page 128

1 MR. NICHOLAS: Object to the
2 form.
3 THE WITNESS: He may have, I
4 don't know.
5 BY MR. CLUFF:

Page 129

21 Q. In 2009, when you became a
22 diversion control specialist, were you
23 aware of AmerisourceBergen's suspicious
24 order monitoring policies and procedures?

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Page 138
Page 140
Page 139
Page 141

Highly Confidential - Subject to Further Confidentiality Review





Page 150

■ ■■■■■■■■
■ ■■■■■■■■■■■■■
■ ■ ■■■■■■

4      Q.   Okay.  So going back to the
5  distribution center, after an order is
6  sent from the distribution center to the
7  CSRA group, would you have been the
8  person, as a diversion control
9  specialist, to review that order?
10      A.   I would be one of them, yes.
11      Q.   And what -- and that would
12  be when you were reviewing an order to
13  determine whether it was of unusual
14  frequency, size and pattern; is that
15  right?
16      A.   It would be an order of
17  interest.  That --
18      Q.   I'm talking -- let me
19  correct myself.
20          Prior to 2015, when an order
21  came to your desk, that is when you would
22  begin the process of reviewing that order
23  to determine if it was of unusual size,
24  frequency or pattern?

Page 151

1      A.   Yes.
2      Q.   Did you do anything else
3  with orders during that review process?
4      A.   Prior to --
5      Q.   2015.
6      A.   If there were -- if I had
7  any questions regarding a customer's
8  order, I would reach out to our
9  pharmacist who is on staff.
10      Q.   Who was the pharmacist prior
11  to 2015?
12      A.   It would be Sharon Hartman.
13      Q.   Do you know when she joined
14  the company?
15      A.   I do not know the specific
16  year, but I believe she was on staff in
17  2015.
18      Q.   If I suggested that she
19  joined the company in 2014, would that
20  sound accurate to you?
21          MR. NICHOLAS:  Objection.
22      Lack of foundation.
23          Go ahead.
24          THE WITNESS:  Possibly.

Page 152

1  BY MR. CLUFF:
2      Q.   Do you know if there was a
3  pharmacist on staff at AmerisourceBergen
4  prior to Ms. Hartman joining the company?
5      A.   I believe Joe Tomkiewicz
6  also had some pharmacy background.
7      Q.   What was his pharmacy
8  background, if you recall?
9      A.   I don't recall.
10      Q.   So prior to Ms. Hartman
11  joining the company in 2014, if you had a
12  question that warranted a pharmacist's
13  input, who would you ask about that?
14      A.   Prior to that, I don't
15  believe we had any other pharmacists on
16  staff, other than Joe.  I would contact
17  Ed Hazewski.
18      Q.   And he's who you would ask
19  questions about customer orders where you
20  needed additional input?
21      A.   Yes.  And, also, we had the
22  sales force also contact the customer at
23  that time.
24      Q.   So if you had a question

Page 153

1  about an order that was presented to you
2  for review, you would ask the sales force
3  sometimes for --
4      A.   Sometimes the sales force.
5      Q.   And then they would contact
6  the customer?
7          MR. NICHOLAS:  Let him
8      finish.
9          THE WITNESS:  No, no.  I'm
10      sorry you --
11  BY MR. CLUFF:
12      Q.   I didn't mean to talk over
13  you.  If you have more of an answer,
14  please give it.
15      A.   In addition to the sales
16  force reaching out to the customer, we
17  also had the distribution center manager
18  reach out to the customer as well.
19      Q.   So just to kind of
20  understand.  If there was a question that
21  you had about an order that you couldn't
22  resolve yourself, prior to 2014, a little
23  confusing now, because that's prior to
24  Ms. Hartman joining, right?

Page 154

1    A.    Yes.
2    Q.    You would talk to Mr.
3  Hazewski?
4    A.    Yes.
5    Q.    You could reach out to the
6  sales force, who would talk to the
7  customer?
8    A.    Yes.
9    Q.    Or you could reach out to
10  the distribution center manager, who
11  maybe also would talk to the customer?
12    A.    Correct.
13    Q.    Did you ever talk to
14  customers yourself?
15    A.    Prior to that time, I don't
16  believe I have.
17    Q.    Have you ever talked to
18  customers after that time?
19    A.    Yes.
20    Q.    When you had questions, what
21  kind of responses would you get back from
22  customers?
23        MR. NICHOLAS:  Object to the
24    form.

Page 155

1        Go ahead.
2        THE WITNESS:  If I called
3    them myself?
4  BY MR. CLUFF:
5    Q.    You know, that's a good
6  point.
7        Let's talk about the before
8  2014 time period.  What kinds of
9  questions would you have for, like, the
10  sales force and the distribution center
11  manager to get information from customers
12  about?
13    A.    I would ask them the reason
14  why this pharmacy is placing a larger
15  order than they typically place.
16    Q.    And what kinds of responses
17  would you get?
18    A.    I would get a response where
19  it could be any number of reasons.  A
20  pharmacy had a robbery, they're trying to
21  replenish their inventory.  There's a
22  pharmacy that closed down the street.
23  There's product that's going to be in
24  short demand.

Page 156

1        It could be any number of
2  reasons.
3    Q.    If a pharmacy was robbed,
4  would you continue shipping to that
5  pharmacy?
6        MR. NICHOLAS:  Object to the
7    form.
8        THE WITNESS:  If our
9    pharmacy was robbed, yes, after we
10    got a DEA Form 106 and a police
11    report.
12  BY MR. CLUFF:
13    Q.    Were there ever any factors
14  that you would uncover during reviewing
15  an order that warranted additional due
16  diligence, prior to 2015?
17        MR. NICHOLAS:  Object to the
18    form.
19        THE WITNESS:  I'm sure there
20    has been, but I just don't
21    recollect right now.
22  BY MR. CLUFF:
23    Q.    Based on your working
24  experience, what are some factors that

Page 157

1  you would identify as requiring
2  additional due diligence?
3    A.    Currently?
4    Q.    Yes.
5    A.    I would see if we have any
6  information on the customer in our Matter
7  Management System, if we have a Form 590
8  on file for the customer, and any other
9  information that we have.
10    Q.    The information management
11  system you mentioned, is that Lawtrac?
12    A.    Lawtrac is gone.  We have
13  Matter Management System now and NetDocs.
14    Q.    Is Matter Management System
15  abbreviated MMS?
16    A.    Yes.
17    Q.    And then what was the last
18  one you mentioned?
19    A.    NetDocs.
20    Q.    What is NetDocs?
21    A.    NetDocs took the replacement
22  of Lawtrac.  So any information that was
23  previously in Lawtrac should now be in
24  NetDocs.

Page 158

1  Q.   When you were reviewing an
2  order, I think you said that some of the
3  information you would look at would be,
4  you know, a Form 590, you would look at
5  the Lawtrac information, correct?
6  A.   Yes.
7  Q.   And how did those sources of
8  information inform your review of a
9  customer order that had passed the
10 distribution center?
11 A.   Well, each order is reviewed
12 individually.  So it's really the
13 totality of the circumstances, whatever
14 information we have on file to make a
15 sound decision whether to release or
16 reject and report that order.
17 Q.   Are you familiar with the
18 Form 590 project?
19 A.   I am.
20 Q.   What was the Form 590
21 project?
22 A.   The Form 590 project is a
23 listing of all the pharmacies, or all the
24 accounts that ABC services, for which we

Page 159

1  did not or could not find a Form 590 for.
2  Q.   Do you recall if the Form
3  590 project also included missing Lawtrac
4  information?
5  A.   I do not.
6  Q.   If an order was presented to
7  you for review and the Form 590 was
8  missing, would you have been able to do
9  an accurate review of that customer's
10 order?
11 A.   Yes.
12 Q.   How so?
13 A.   Based on the systems that we
14 have in place, we can make a decision, as
15 well as personnel we have on staff to
16 make a decision whether to release or
17 report that order, or just reject that
18 order.
19 Q.   Was the Form 590 a required
20 document at AmerisourceBergen?
21 MR. NICHOLAS:  Object to the
22 form.
23 THE WITNESS:  For new
24 customer onboardings, yes.

Page 160

1  BY MR. CLUFF:
2  Q.   So if a 590 was missing from
3  a customer's file, that would reflect a
4  gap in AmerisourceBergen's policies,
5  correct?
6  MR. NICHOLAS:  Object to the
7  form.
8  THE WITNESS:  No, not a gap.
9  Just a form could have been lost.
10 BY MR. CLUFF:
11 Q.   What about if you received
12 an order from a customer to review and
13 the Lawtrac information was missing or
14 incomplete, could you do an effective
15 review of that customer's order without
16 the Lawtrac information?
17 A.   Yes.
18 Q.   How so?
19 A.   Based on the systems that we
20 have in place.
21 Q.   So you testified that you
22 believe you could do an effective review
23 of an order without a 590, with a missing
24 or incomplete Lawtrac information, and

Page 161

1  both times you said you could do this
2  based on the systems you have in place.
3  Wasn't the 590 and the
4  Lawtrac part of the system that
5  AmerisourceBergen had in place to review
6  orders?
7  MR. NICHOLAS:  Object to the
8  form.
9  THE WITNESS:  To review
10 orders?  Can you ask that question
11 again, or rephrase it?
12 BY MR. CLUFF:
13 Q.   Yes.
14 So the 590 and the Lawtrac
15 information, were they part of
16 AmerisourceBergen's suspicious order
17 monitoring system?
18 A.   It was just a piece of it.
19 Q.   Is that the same system that
20 you would have relied on to review orders
21 once they were presented to you from the
22 distribution center?
23 A.   It's just a piece of the
24 process that we would look for, yes.

Page 162

1    Q.   But the piece -- but the
2  process you were using was missing
3  pieces, correct?
4         MR. NICHOLAS:  Object to the
5     form.
6         THE WITNESS:  Not
7     necessarily missing pieces.
8     Again, we have systems in place
9     that review all orders
10    individually.  So we can make a
11    sound decision with the systems
12    that we have in place.
13 BY MR. CLUFF:
14    Q.   But the systems that you
15 have in place were missing things like
16 Form 590s and Lawtrac information, right?
17        MR. NICHOLAS:  Object to the
18    form.
19        THE WITNESS:  If we had any
20    missing 590s, we would request
21    them to get completed.
22 BY MR. CLUFF:
23    Q.   Are you familiar with the
24 progress that AmerisourceBergen has made

Page 163

1  in updating the Form 590s that were
2  missing?
3     A.   Yes.
4     Q.   How complete is it?
5     A.   I'm not sure of the
6  percentage that it's completed.  But it's
7  a work in progress.
8     Q.   So it's not completed,
9  right?
10    A.   It's not fully completed,
11 no.
12    Q.   Do you know when
13 AmerisourceBergen first identified that
14 there was a problem with missing Form 590
15 information?
16        MR. NICHOLAS:  Object to the
17    form.
18        THE WITNESS:  I don't know
19    the specific time frame, no.
20 BY MR. CLUFF:
21    Q.   Was it before or after 2015,
22 do you think?
23        MR. NICHOLAS:  Same
24    objection.

Page 164

1         THE WITNESS:  I don't know.
2  BY MR. CLUFF:
3     Q.   I'm going to hand you a copy
4  of an exhibit, we're going to mark it as
5  1 to your deposition.
6         - - -
7         (Whereupon,
8         AmerisourceBergen-Kreutzer
9         Exhibit-1, ABDC_MDL_00304391-392,
10        was marked for identification.)
11        - - -
12 BY MR. CLUFF:
13    Q.   This is a document produced
14 by AmerisourceBergen.  It's Bates stamped
15 ABDC_MDL_00304391 to 392.
16        I'll hand you the top copy,
17 which is the exhibit copy, and you can
18 hand the rest down to your counsel.
19        So just so you're aware, I
20 want to start with the bottom e-mail that
21 starts on 304391 on the bottom of the
22 first page.
23        You can review the whole
24 document, I'm just letting you know

Page 165

1  that's where I want to start.
2         Do you know who Richard --
3  I'm sorry, go ahead.
4     A.   Could you hold on for one
5  second.
6     Q.   Sure.  I thought you were
7  done.  My fault.
8     A.   I'm not finished.
9     Q.   Turning to the second page,
10 which ends in 392, the numbers on the
11 bottom.
12        You see at the very top of
13 the page it says, Below is the text from
14 the initial e-mail regarding the project.
15        And the next paragraph down
16 says, We have been asked by the CSRA
17 diversion control team to assist them
18 with the collection of updated
19 documentation for a substantial number of
20 customers.
21        Did I get that right?
22    A.   Yes.
23    Q.   And was it your
24 understanding, at this time, that the 590

Page 166

1  project was to be filling out new Form
2  590s for an identified list of customers?
3       A.  Yes.  Yes, that was my
4  understanding.
5       Q.  Looking down at the heading
6  that says, Next steps.  It says, Due to
7  the high number of customers that will
8  need validation, we have broken the list
9  into two groups, CPA customers and
10  non-CPA.
11           What does the abbreviation
12  CPA stand for?
13       A.  I don't remember right now.
14       Q.  Looking in the body of that
15  paragraph underneath, where it says,
16  Beginning January 11th, do you see it
17  says, The 590 forms -- it's in bold in
18  the middle -- should be completed in
19  their entirety and all responses must be
20  legible.  After each account is
21  completed, please submit the
22  documentation to customer maintenance.
23           What is customer
24  maintenance?

Page 167

1       A.  Customer maintenance is a
2  group that does all the gathering of data
3  for a new prospective account, including
4  Form 590s and photos.
5       Q.  Is that a sales function?
6       A.  No, it's not a sales
7  function.
8       Q.  What department does that
9  group operate under?
10       A.  It's just a -- it's a
11  separate department from my department,
12  as well as sales.
13       Q.  And they were responsible
14  for gathering customer information?
15       A.  Yeah, for new -- for
16  onboarding new customers.
17       Q.  Did they have any
18  responsibility for existing customers?
19       A.  No.  They would -- they would --
20  in this example, they would forward any
21  completed 590s for new and existing
22  customers to the CSRA team to review.
23       Q.  Okay.  And so after people
24  were filling out these new 590s as part

Page 168

1  of the 590 project, CSRA was reviewing
2  them?
3       A.  Yes.
4       Q.  In the next sentence down,
5  it says, CM will then add the
6  documentation to their system and forward
7  to the CSRA OMP group.
8           What is the CSRA OMP group?
9       A.  That's the corporate
10  security regulatory affairs order
11  monitoring program group.
12       Q.  Who is in that group?
13       A.  Myself.
14       Q.  Are you the only member?
15       A.  No.  Let me clarify.
16           It's myself, Carol Sherman
17  Hines, Emily Coldren, Sara Cressman,
18  Nikki Seckinger, Teresa Javier.
19           And that's primarily the
20  ones that would review 590s.
21       Q.  And are all the members of
22  the CSRA OMP group, are you diversion
23  control specialists and investigators?
24       A.  Yes.

Page 169

1       Q.  Flip back to the first page
2  for me.  This e-mail at the bottom was
3  sent by a person named Richard Dominico.
4           Do you see that?
5       A.  I do.
6       Q.  Do you know who Richard
7  Dominico is?
8       A.  Other than his signature,
9  he's a district director.
10       Q.  Do you know would -- what is
11  community and specialty pharmacy in the
12  signature block?  Do you know what that
13  connotes?
14       A.  That's his title, where he
15  oversees the customers within that
16  segment.
17       Q.  So is he a customer services
18  or sales kind of a person?
19       A.  He's a sales director.
20       Q.  So would he have been
21  sending this e-mail, then, to sales
22  associates?
23       A.  His reports, yes.
24       Q.  Looking back at the second

Page 170

1 page, there is a bold heading that says,
2 Note.
3        Do you see that?
4    A.   Yeah, I do.
5    Q.   The first bullet point says,
6 This documentation project should be done
7 within the normal scope of your routing.
8 The priority is still the financial
9 performance of your assignment.
10       Did I read that correctly?
11   A.   Yes.
12   Q.   So despite the fact that
13 AmerisourceBergen was missing 590s for
14 what Mr. Dominico referred to as a
15 substantial number of customers, he is
16 telling sales associates that financial
17 performance is more important?
18       MR. NICHOLAS:  Object to the
19   form.
20       THE WITNESS:  I can't
21   comment.  I'm not a part of that
22   e-mail.
23 BY MR. CLUFF:
24   Q.   But you would agree that

Page 171

1 that's the words he's using, right, the
2 priority is still the financial
3 performance of your assignment?
4        MR. NICHOLAS:  Object to the
5   form.
6        THE WITNESS:  I can't agree,
7   other than what's typed here.
8 BY MR. CLUFF:
9    Q.   Who is -- turning back to
10 the first page, Marsha Widrick, if I'm
11 saying that correctly?  It's the second
12 e-mail on the page.
13   A.   Marsha Widrick, she's one of
14 the sales associates that reports to
15 Richard Dominico.
16   Q.   Do you know why she was
17 forwarding you this e-mail?
18   A.   I do not.  It appears there
19 was some accounts that were listed, and
20 she was just indicating to me that she'll
21 be sending out more requests over the
22 next couple of weeks.  And she wanted to
23 know, is there a better address to send
24 them to.

Page 172

1    Q.   Do you recognize this
2 address that she references, the CSRA
3 validation project?
4    A.   Yes.
5    Q.   What was that?
6    A.   CSRA validation project is a
7 term that we use for the assignment.
8 It's not an e-mail address, which she
9 thought it was.
10   Q.   So your group used the term
11 CSRA validation project synonymously with
12 590 form project or validation --
13   A.   That's the title of the
14 spreadsheet, yes.
15   Q.   Going back to Richard
16 Dominico's e-mail, he says, To date as a
17 company, only 10 percent of the overall
18 customer list has been completed.
19       Does that refresh your
20 recollection about how complete the
21 project was, at least as it existed in
22 July 2017?
23   A.   No.
24   Q.   It does not?

Page 173

1        Do you have any reason to
2 dispute that the 590 project was more
3 complete than 10 percent as of July 2017?
4        MR. NICHOLAS:  Object to the
5   form.
6        THE WITNESS:  I don't recall
7   this specific -- this specific
8   e-mail from Richard.
9 BY MR. CLUFF:
10   Q.   But you would agree with me
11 that AmerisourceBergen was essentially
12 conducting due diligence on customer
13 orders while missing Form 590s, correct?
14       MR. NICHOLAS:  Object to the
15   form.
16       THE WITNESS:  We conduct due
17   diligence on all our customers at
18   all times.
19 BY MR. CLUFF:
20   Q.   But according to the Form
21 590 project, some of that due diligence
22 was missing?
23       MR. NICHOLAS:  Object to the
24   form.

Page 174

1    THE WITNESS:  Some of those
2    590s were missing.
3  BY MR. CLUFF:
4    Q.   Whose responsibility would
5  it have been to ensure that due diligence
6  was being completed fully during the
7  customer onboarding process?
8    MR. NICHOLAS:  Object to the
9    form.
10    THE WITNESS:  Part of the
11    process is customers submit a Form
12    590 and photos.
13  BY MR. CLUFF:
14    Q.   Do customers submit that
15  directly to AmerisourceBergen, or do they
16  submit it to some representative in the
17  company?
18    A.   The potential customer works
19  with the sales representative, and, in
20  turn, then sends it into the customer
21  maintenance group for their review.
22    Q.   And then what does the
23  customer maintenance group do with it?
24    A.   Then once they determine

Page 175

1  that it is complete, then they will send
2  it up to the CSRA OMP group for review.
3    Q.   What does the CSRA OMP group
4  do with it?
5    A.   We review all the
6  information on the 590 to ensure all the
7  information is complete.  And we conduct
8  due diligence on the licenses, as well as
9  the doctors.
10    Q.   Is that process that you
11  just described, has that been the same
12  since 2009 all the way until the present
13  day?
14    A.   The form has changed over
15  the years, it has evolved.  So I don't
16  recollect what information was on the
17  initial 590.
18    Q.   I appreciate that
19  differentiation.
20    So the form has changed, but
21  has the process of submitting, reviewing
22  and approving a form, has that changed?
23    A.   No.
24    Q.   I want to hand you another

Page 176

1  set of documents that you can pass down
2  to your counsel for me.  We'll mark this
3  as Kreutzer Exhibit-2.
4    - - -
5    (Whereupon,
6    AmerisourceBergen-Kreutzer
7    Exhibit-2, ABDC_MDL_00154441-443,
8    was marked for identification.)
9    - - -
10  BY MR. CLUFF:
11    Q.   It's an e-mail with an
12  attachment, it is ABDC_MDL_00154441.  The
13  attachment begins at 442 and continues
14  through 443.
15    MR. CLUFF:  You keep the one
16    with the numbers on it and pass
17    the rest down.
18  BY MR. CLUFF:
19    Q.   So I just want to give you a
20  couple of notes about this, Mr. Kreutzer.
21    MR. NICHOLAS:  You take that
22    one.
23  BY MR. CLUFF:
24    Q.   If you look at the top of

Page 177

1  this e-mail, just for reference, you'll
2  notice that it's from Eric Cherveny to
3  you, Kevin Kreutzer.  The subject is,
4  Openin -- which I assume is supposed to
5  be opening -- Lawtrac matters.
6    And if you look at the
7  attachments line, it says OMP Lawtrac
8  review-due diligence notes.  If you flip
9  the page, you'll see there's a subject,
10  OMP Lawtrac review/due diligence notes.
11    These documents were
12  produced as a parent e-mail and
13  attachment, so they go together.  You can
14  review them.  Thanks.
15    A.   Okay.
16    Q.   Do you recall receiving this
17  e-mail from Eric Cherveny?
18    A.   I do not.
19    Q.   But you would agree that it
20  is addressed to you, correct?
21    A.   Yes.
22    Q.   I want to start in the
23  middle of the e-mail.  You'll see those
24  headings, Date, Description, Update,

Page 178

1 Source, Name.
2         MR. CLUFF:  Can you blow
3     that whole section up, Zach?
4 BY MR. CLUFF:
5     Q.   You can look up here, too,
6 if it's easier for you, Mr. Kreutzer,
7 whichever you prefer.
8         But I'm curious, this
9 description here, this, I'll call it a
10 box, for a lack of a better word, is that
11 an example of an entry that would have
12 been in a customer's Lawtrac file?
13     A.   It could have been.
14     Q.   Where would this kind of a
15 description be entered if it wasn't in
16 Lawtrac?
17     A.   Well, it's referring to the
18 content.  But at that time, it would have
19 been entered in Lawtrac.
20     Q.   And this kind of
21 information, where would it be recorded
22 now?
23     A.   In MMS, Matter Management
24 System.

Page 179

1     Q.   I want to point your
2 attention to the very last sentence in
3 that block.  It says, Related documents
4 are attached.
5         From reading the text in
6 that box, do you have any understanding
7 of what related documents would have been
8 attached?
9     A.   According to the
10 description, it would be the Form 590 and
11 photos.
12     Q.   So if you were to hand me a
13 copy of a Lawtrac file, it would have,
14 I'm guessing, a series of entries like
15 this on a sheet, correct?
16     A.   At a minimum, yes.
17     Q.   And then it would also have
18 documents included with it?
19     A.   Yes.
20     Q.   And I understand that this
21 information would have existed
22 electronically on Lawtrac, which is
23 different than, like, handing me a file.
24         But was there a way to

Page 180

1 export a Lawtrac file from the Lawtrac
2 database?
3     A.   It wasn't always electronic
4 in Lawtrac.  It was also in paper form
5 when I first started.
6     Q.   So in 2009, the Lawtrac
7 information existed on paper?
8     A.   It existed on paper.  And
9 all the documents, all the due diligence,
10 was included in a manilla folder entitled
11 as such.
12     Q.   Do you know where that would
13 have been housed or kept?
14     A.   It would have been kept in
15 the file cabinets in our office.
16     Q.   Which office?
17     A.   In the sales corporate
18 security/regulatory affairs office.
19     Q.   Do you know where that was
20 located?  Is it in Philadelphia, or --
21     A.   It's in Chesterbrook,
22 Pennsylvania, headquarters.
23     Q.   Do you know if those records
24 were kept, or were they destroyed ever?

Page 181

1     A.   They were moved around
2 after -- I'm not sure of the time frame,
3 a couple of years, they were moved off
4 site to Iron Mountain.
5     Q.   What's Iron Mountain?
6     A.   Iron Mountain is a storage
7 facility.
8     Q.   Do you have any
9 understanding of whether or not those
10 records are still kept at Iron Mountain?
11     A.   I do not.  I don't believe
12 they are.
13     Q.   Do you -- you said you don't
14 believe they are.
15         Is that because you have any
16 understanding about them being moved
17 somewhere else, or you just don't know if
18 they're there?
19     A.   I don't know if they're
20 there.
21     Q.   At some point were the paper
22 documents migrated to an electronic
23 format?
24     A.   Yes.

Page 182

1 Q. Do you recall when that
2 happened?
3 A. I don't recall the exact
4 year.
5 Q. Do you think it was before
6 or after 2009?
7 A. It was after 2009.
8 Q. It was before 2015, though,
9 presumably?
10 A. Yes. Approximately 2010,
11 '11.
12 Q. What was the procedure for
13 taking the paper files and converting
14 them to an electronic format?
15 A. I'm not following you there.
16 Q. Sure. Let me rephrase that.
17 Do you know if all of the
18 paper files were converted to electronic
19 format to be recorded in an electronic
20 version of Lawtrac?
21 A. Yes, I believe they were.
22 Q. The paper files that
23 eventually were stored at Eagle Mountain,
24 do you know how far back those records

Page 183

1 went?
2 A. I don't know. They went
3 back a number of years.
4 Q. So you started in diversion
5 control in 2009.
6 Do you think they went back
7 five or ten years, if you have an
8 understanding?
9 A. I don't know.
10 Q. You could not comment, okay.
11 That's fine.
12 MR. NICHOLAS: Sterling, I'm
13 not going to stop you in
14 midstream, but it's 12:30. So
15 it's been an hour and a-half. If
16 it's going to be a long time --
17 MR. CLUFF: Let's just
18 finish with this document and
19 we'll move on.
20 BY MR. CLUFF:
21 Q. I just want to go back to
22 the substance of Eric's e-mail to you, so
23 starting with the first line, where it
24 says, Kevin, per policy. He says, It's

Page 184

1 against CSRA policy to close your own due
2 diligence.
3 What does it mean to close
4 due diligence?
5 A. I believe this is right when
6 Eric started. And so we were using the
7 Lawtrac system. And at that time, I
8 believe we were closing our own matters.
9 Q. What did it mean to close a
10 matter, though?
11 A. Meaning that all the due
12 diligence has been conducted and
13 everything is in the file. Just because
14 it's closed doesn't mean it can't be
15 reviewed.
16 Q. What kind of due diligence
17 would you have been conducting in this
18 kind of an instance? Is it, like, new
19 customer due diligence? Existing
20 customer order monitoring due diligence?
21 Can you tell?
22 MR. NICHOLAS: Object to the
23 form.
24 THE WITNESS: According to

Page 185

1 the description here, as requested
2 Form 590 and photos from -- I'm
3 not sure what this acronym stands
4 for, but he's in sales, for an
5 existing ABC retail pharmacy
6 located in Brandon, Missouri, or
7 Mississippi.
8 BY MR. CLUFF:
9 Q. So that would have been
10 existing customer due diligence?
11 A. Yes.
12 Q. And at least at that time,
13 Mr. Cherveny believed that it was against
14 policy to close your own due diligence,
15 right?
16 MR. NICHOLAS: Object to the
17 form.
18 Go ahead.
19 THE WITNESS: Yes.
20 BY MR. CLUFF:
21 Q. Continuing, he says, I need
22 to be able to review each due diligence
23 matter before closing. Also, per my
24 memo, the 595 was not properly completed

Page 186

1 in this matter.
2         Can you tell from the
3 substance of his e-mail to you what was
4 improperly completed on the 595?
5     A.    I do not know, other than
6 what he indicates here.
7     Q.    Okay.  His closing sentence
8 of this e-mail is, Also, ensure a 595 is
9 included in all DD.
10        Does that stand for due
11 diligence?
12    A.    It does.
13    Q.    So he wants it included in
14 all due diligence matters?
15    A.    Yes.
16    Q.    So if a 595 was missing,
17 that would have indicated a gap in the
18 due diligence process, right?
19        MR. NICHOLAS:  Object to the
20    form.
21        THE WITNESS:  Not a gap.
22    It's just it's missing.
23 BY MR. CLUFF:
24    Q.    So missing information.

Page 187

1         MR. NICHOLAS:  Object to the
2     form.
3 BY MR. CLUFF:
4     Q.    I want you to turn the page
5 to the memo that Mr. Cherveny referenced
6 in his e-mail and that he attached.
7         He says that upon review of
8 due diligence matters, he observed some
9 areas that he wanted to comment on.
10        Do you recall having any
11 conversations with Mr. Cherveny about his
12 comments about due diligence in 2015?
13    A.    I do not.
14    Q.    Was new customer and
15 existing customer due diligence something
16 that you discussed with Mr. Cherveny as a
17 general part of your job
18 responsibilities?
19    A.    I don't personally recall
20 responding to him.
21    Q.    Look at the first bold
22 heading.  It says, Lawtrac matters.
23        The next heading down is,
24 Number 1, Naming matters.  He points out,

Page 188

1 in the first sentence, that, All new
2 customer due diligence and existing
3 customer due diligence and threshold
4 review matters should be named
5 consistently in Lawtrac.
6         And then the last sentences
7 say, Please pay special attention to the
8 misspelling point.  This causes havoc
9 when trying to pull up a customer file.
10        Did you ever experience
11 having problems finding customer
12 information in Lawtrac because of
13 misspellings or incomplete files?
14    A.    No, I don't recall that.
15    Q.    If a customer's due
16 diligence was incorrectly named, though,
17 and you went to go search for it, would
18 you have been able to find it as part of
19 your due diligence process?
20    A.    Most likely, yes.  Because I
21 could research it by DEA license.
22    Q.    What did you think Mr.
23 Cherveny was referring to when he
24 referenced misnaming of files causing

Page 189

1 havoc in customer files?
2         MR. NICHOLAS:  Object to the
3     form.  Lack of foundation.
4         THE WITNESS:  It appears
5     he's just ensuring that we're all
6     on the same page and naming the
7     matters the same across the board.
8 BY MR. CLUFF:



Page 190

Page 192

18 BY MR. CLUFF:
19     Q.   Does this refresh your
20 recollection at all about when the Form
21 590 problem was first identified?
22     A.   No, it does --
23         MR. NICHOLAS:  Object to the
24 form.

Page 191

Page 193

1         THE WITNESS:  No, it does
2     not.
3 BY MR. CLUFF:
4     Q.   But the accuracy and
5 completeness of information on the Form
6 590 was at least something that you were
7 discussing in the CSRA department as
8 early as February of 2015, correct?
9         MR. NICHOLAS:  Object to the
10     form.
11         THE WITNESS:  It could have
12     been.
13 BY MR. CLUFF:
14     Q.   I want you to look at the
15 second-to-last paragraph on the third
16 page, which ends in 443.
17         The paragraph that starts, I
18 don't want to send the wrong message.
19         He says, in the
20 second-to-last sentence, It's very
21 important that we be consistent and
22 detail oriented with all of our due
23 diligence records.
24         MR. NICHOLAS:  You don't



Page 194

1    want to read the first two
2    sentences to him?
3         MR. CLUFF:  Sure, Bob.
4    BY MR. CLUFF:
5         Q.   For the most part, the
6    matters I reviewed here were very clear
7    and complete.
8         Then he continues, It's very
9    important that we be consistent and
10   detail oriented with all of our due
11   diligence records.  Taking these steps
12   will help to preserve the integrity and
13   contribute to the overall success of our
14   OMP program.
15        Did I read that accurately?
16    A.   Yes.

Page 195

Page 196

Page 197

5         MR. CLUFF:  Let's go off the
6    record, and we'll break for lunch.
7         VIDEO TECHNICIAN:  Off the
8    record at 12:41 p.m.
9              - - -
10        (Whereupon, a luncheon
11   recess was taken.)
12             - - -
13        VIDEO TECHNICIAN:  We're
14   back on the record at 1:35 p.m.
15        MR. CLUFF:  Is counsel for
16   Teva on the phone?
17        MR. MAIER:  Yes.
18        MR. CLUFF:  I wanted to give
19   you a heads up that I'm going to
20   ask Mr. Kreutzer about some
21   Teva-produced documents, all of
22   which he is either an author or
23   recipient of.
24        I'm going to lay some

Highly Confidential - Subject to Further Confidentiality Review



| Page 198 |
|---|
| 1 foundation to establish that he |
| 2 worked through the scope of these |
| 3 e-mails and documents, but I |
| 4 wanted to give you the list now so |
| 5 you can look at them. I don't |
| 6 anticipate that you'll have an |
| 7 objection, because he's an author. |
| 8 But do you want to write these |
| 9 down really quick? |
| 10 MR. MAIER: Yes, that would |
| 11 be great. Thank you. |
| 12 MR. CLUFF: So all of these |
| 13 have the same Teva_MDL-A prefix, |
| 14 I'll just give you the number of |
| 15 the lead document. |
| 16 The first one is 0233-1299. |
| 17 MR. MAIER: Okay. |
| 18 MR. CLUFF: The second one |
| 19 is 06441441. |
| 20 MR. MAIER: I'm sorry, can |
| 21 you repeat that one? |
| 22 MR. CLUFF: Yeah. It's |
| 23 06441441. |
| 24 MR. MAIER: Okay. |

Page 199

1 MR. CLUFF: The next one is
2 0233-1346.
3 MR. MAIER: Okay.
4 MR. CLUFF: After that, it's
5 0233-1426.
6 And we included the
7 attachments to all of those, if
8 they had one. I think they all
9 did. And if they had multiple
10 attachments, we did our best to
11 make sure they were all included.
12 MR. MAIER: Okay.
13 MR. CLUFF: So take a look.
14 Just wanted you to be aware so
15 there weren't any surprises or,
16 you know, problems with them.
17 But as I said, I'm going to
18 lay a foundation and he's the
19 author on all of those.
20 MR. MAIER: Okay.
21 BY MR. CLUFF:
22 Q. So, Mr. Kreutzer, we're back
23 on the record again. As before, you're
24 still under oath.

Page 200

1 So earlier we talked about

22 A. No, I do not.
23 Q. And I understand that there
24 is a privilege being asserted on some of

Page 201

1 the work that FTI did in 2015 for
2 AmerisourceBergen. I just want to remind
3 you of that. So don't testify to
4 anything that you learned from your
5 lawyers about those parameters.
6 And your lawyer is free to
7 interpose an objection, but I just wanted
8 to all be clear that I have some
9 questions about your understanding, but I
10 don't want attorney communications.

Highly Confidential - Subject to Further Confidentiality Review



Page 202

Page 204

Page 203

Page 205

Highly Confidential - Subject to Further Confidentiality Review





as opposed to a
24   threshold review?

Highly Confidential - Subject to Further Confidentiality Review



Page 218

█ ▇▇▇▇▇▇▇▇
2    Q.   Okay.  All right.  We
3  previously discussed that you briefly
4  worked at Teva, correct?
5    A.   Yes.
6    Q.   And that you worked under
7  Colleen McGinn; is that right?
8    A.   Yes.
9    Q.   In fact, I think you
10 testified that she actually interviewed
11 you for the job?
12   A.   Correct.
13   Q.   Did you -- do you recall
14 interviewing with anybody else during the
15 time you worked at Teva, or before you
16 got the job at Teva?
17   A.   I do believe I met with two
18 other individuals.
19   Q.   Who were they?
20   A.   Mike Edwards, I believe.
21 And there was an individual in customer
22 service, the manager there that I
23 interviewed with, which I cannot remember
24 her name.

Page 219

1    Q.   Who was Mike Edwards?
2    A.   He was just another person
3  that reported to Colleen.  I don't
4  remember his title.
5    Q.   I may have asked this
6  already, and if I did, I apologize.
7         But do you recall what
8  Colleen McGinn's title was?
9    A.   I don't know exactly.
10 Diversion operations director.  I know
11 she had a director title.
12   Q.   Do you recall if she was the
13 head of DEA compliance?
14   A.   Yes.
15   Q.   So she would have been the
16 director of DEA compliance?
17   A.   Correct.
18   Q.   Do you recall working with
19 Colleen McGinn developing Teva's
20 suspicious order monitoring program?
21   A.   I do.
22        MR. MAIER:  Object to form.
23 BY MR. CLUFF:
24   Q.   What do you recall about the

Page 220

1  work you did with Colleen McGinn on
2  developing the suspicious order
3  monitoring program for Teva?
4    A.   She had wanted me to work
5  with the IT group internally, as well as
6  an individual outside the company, for
7  which they had a system already in place.
8  I believe they were the developers of a
9  new -- of this system.  And she had
10 wanted me to work with him.
11   Q.   Do you recall his name?
12   A.   I believe it was Bob
13 Williamson.
14   Q.   Do you recall what company
15 he worked for?
16   A.   Buzzeo, I believe.
17   Q.   And is that the company that
18 you recall that had a system that they
19 could roll out with Teva?
20   A.   Yes.
21   Q.   Do you recall having
22 meetings with Bob Williamson?
23   A.   Yes.  At least once.
24   Q.   As part of the work you did

Page 221

1  for Colleen McGinn, did you have
2  meetings, or at least prepare for
3  meetings, with Mallinckrodt?
4         MR. MAIER:  Object to form.
5         THE WITNESS:  I believe we
6  did meet Mallinckrodt in person.
7  BY MR. CLUFF:
8    Q.   Do you recall scheduling
9  meetings with the big four distributors?
10   A.   Yes.
11        MR. MAIER:  Object to form.
12 BY MR. CLUFF:
13   Q.   Do you have a recollection,
14 at the time you worked at Teva, who the
15 big four distributors were?
16   A.   I know it was ABC, McKesson,
17 Cardinal.  And I'm not sure if the fourth
18 was Morris -- it might have been Morris
19 Dickson or HD Smith, one of the two.
20   Q.   As part of your work for
21 Colleen McGinn, do you recall ever
22 putting together SOM, or suspicious order
23 monitoring, training programs or
24 presentations?

Page 222

1    A.   I had -- I had presented
2  three presentations, yes.
3    Q.   And what were those
4  presentations about?
5    A.   It was the -- I believe Bob
6  Williamson helped me develop the
7  presentation.  It was about the current
8  issues with the opioid crisis and some
9  other stats.
10   Q.   And who did you give those
11  presentations to?
12   A.   One was to Colleen's group.
13  Another was the customer service group.
14  And then one I gave to the customer
15  service manager individually.
16   Q.   And Colleen's group was the
17  DEA compliance group?
18   A.   Yes.
19   Q.   At Teva, based on your work
20  there, do you recall that customer
21  service was responsible for a portion of
22  Teva's suspicious order monitoring
23  program?
24       MR. MAIER:  Object to the

Page 223

1    form.
2        THE WITNESS:  A small part,
3    yes.
4  BY MR. CLUFF:
5    Q.   Is that why you would have
6  been presenting to that group about
7  suspicious order monitoring?
8    A.   Perhaps.
9    Q.   Okay.
10       MR. MAIER:  Object to form.
11  BY MR. CLUFF:
12   Q.   I'll hand you a copy of what
13  we'll mark as Number 3.
14           - - -
15       (Whereupon,
16   AmerisourceBergen-Kreutzer
17   Exhibit-3,
18   Teva_MDL_A_(0)233-1299-320, was
19   marked for identification.)
20           - - -
21       MR. CLUFF:  For counsel on
22   the phone, this is the first Teva
23   document that I mentioned.  It's
24   Teva_MDL_A_(0)233-1299.  There's

Page 224

1    an attachment to this e-mail that
2    is titled, Teva relaunch.zip.
3        I've included those
4    documents with the e-mail, to the
5    best of my ability.  Some of them
6    have a designation, file produced
7    natively.  The total document runs
8    through 02331320.
9  BY MR. CLUFF:
10   Q.   Mr. Kreutzer, this is a
11  longer document.  I'm not going to ask
12  you questions about every page.
13       So rather than us waste your
14  time with you going through every page of
15  it, which you're free to do if you
16  desire, what I was going to propose is
17  that I point to you the places in the
18  document where I'd like to discuss with
19  you.  And then when we get there, if you
20  feel like you need to review that page or
21  that piece of this document, you can let
22  me know, and we can give you a minute or
23  two off the record to do that.
24       Does that sound like a

Page 225

1  workable proposal?
2    A.   That's fair.
3    Q.   Thank you.
4        Let's start on the first
5  page, which is the e-mail from Robert
6  Williamson.  If you look up at the top
7  there, it's from Robert Williamson to
8  you, Colleen McGinn and LeRoy Simoes.
9  I'm probably not saying that right.
10       Why don't you go ahead and
11  review this cover e-mail?
12   A.   Okay.  Good.
13   Q.   So I want to look at the
14  first full paragraph there under the good
15  morning salutation.
16       So the person writing the
17  e-mail is Robert Williamson.  I believe
18  you referred to him as Bob.  Is it okay
19  if I refer to him as Bob?
20   A.   Sure.
21   Q.   Not to be confused with your
22  esteemed lawyer here.
23       He says, I've attached some
24  documents that we previously worked on.

Page 226

1    Do you recall if the "we" he
2 was discussing was Buzzeo and Teva, or if
3 he meant just employees at Teva?
4    A.   I'm not sure.
5    Q.   He continues and says that,
6 These documents may be useful for this
7 morning's call.  If not, they surely will
8 be when he comes to meet with you --
9 "you" being Kevin.
10    Do you see that?
11    A.   Yes.
12    Q.   So without requiring you to
13 review all these documents, do you recall
14 having calls with employees from Buzzeo
15 about suspicious order monitoring?
16    A.   I do recall speaking with
17 Bob.  But I don't remember much about
18 those calls.
19    Q.   Do you recall having a
20 meeting with him some time in late
21 January or early February of 2013?
22    A.   We did meet.
23    Q.   What was the substance of
24 that meeting?

Page 227

1    A.   I don't remember
2 specifically.  I really don't remember
3 the content.
4    Q.   Okay.  I mean, as a general
5 matter, do you recall why you and Colleen
6 were meeting with Buzzeo during this time
7 period?
8    MR. MAIER:  Object to form.
9    THE WITNESS:  Yes.  My
10    understanding is that we were
11    trying to develop an SOM program,
12    or a system, or a more enhanced
13    system than they currently had.
14 BY MR. CLUFF:
15    Q.   Was it your understanding
16 that Teva did not have a well-developed
17 SOM system in 2013?
18    MR. MAIER:  Object to form.
19    THE WITNESS:  No, I don't
20    believe that.  I know they had a
21    system in place, but I believe we
22    were trying to enhance that
23    system.
24 BY MR. CLUFF:

Page 228

1    Q.   Why were you trying to
2 enhance it?
3    A.   Just like with any system,
4 you're always trying to enhance the
5 system as it goes on.
6    Q.   In 2013 -- actually, I
7 believe we discussed earlier the time
8 period during which you worked at Teva,
9 and I think you said that you joined that
10 company in 2012 and you worked there for
11 three months.
12    Looking at the date in this
13 e-mail, which is January 2013, does that
14 refresh your recollection about how long
15 you would have worked at Teva?
16    A.   It does.
17    Q.   So is it possible that you
18 worked until the middle of 2013 instead
19 of middle of 2012?
20    A.   I started January 7th, as I
21 indicated previously, but I may have said
22 2012.  So it was 2013 until April 1st,
23 2013.
24    Q.   So your recollection is that

Page 229

1 you started in January 2013 instead of
2 2012?
3    A.   That is correct.
4    Q.   Understood.
5    And so you would have worked
6 until approximately April of 2013?
7    A.   April 1st.
8    Q.   Okay.  Understood.
9    In the months that you
10 worked at Teva, do you think you
11 developed a pretty good working
12 understanding of Teva's suspicious order
13 monitoring system?
14    MR. MAIER:  Object to form.
15    THE WITNESS:  I felt like I
16    had a good understanding of their
17    system in place.
18 BY MR. CLUFF:
19    Q.   Did you feel like it was a
20 robust system?
21    MR. MAIER:  Object to form.
22    THE WITNESS:  I felt like it
23    was a good system that they had.
24 BY MR. CLUFF:

Page 230

1  Q.  Did you feel like it was
2  complying with all of the rules and
3  regulations for manufacturing controlled
4  substances?
5       MR. MAIER:  Object to form.
6       THE WITNESS:  I believe so.
7  BY MR. CLUFF:
8  Q.  I want you to turn back with
9  me ten pages back.  There is -- one of
10  the attachments is a document, it
11  should -- my copy is in color, I'm not
12  sure if yours is.
13       But at the top it says,
14  Cegedim relationship management
15  compliance solutions powered by Buzzeo
16  PDMA.  I believe that's a two-page
17  attachment.
18       Do you want to look at that
19  and familiarize yourself with it?  I have
20  a few questions for you.
21       MR. MAHADY:  13087?
22       MR. CLUFF:  I think that's
23  right.  The copy I printed for
24  myself doesn't have the Bates

Page 231

1  number.
2       We have it down here, 1308.
3       THE WITNESS:  Just 1308 and
4  1309 to look at?
5       MR. CLUFF:  Yes.
6       THE WITNESS:  Okay.
7  BY MR. CLUFF:
8  Q.  So the title of this
9  document, you can see at the top, is,
10  Teva Accounts, quote, Red Flags, closed
11  quote.
12       Do you have any recollection
13  of what this document was that Buzzeo
14  attached to its cover e-mail for you?
15  A.  I do not recollect this
16  document.
17  Q.  Do you have any reason to
18  dispute that this is a true and accurate
19  copy of a document that was provided to
20  Teva, or to you while you were employed
21  at Teva?
22  A.  I have no reason to doubt
23  that.
24  Q.  Are you familiar with the

Page 232

1  concept -- or what -- the term that is in
2  quotes there, red flags?
3       MR. MAIER:  Object to form.
4       THE WITNESS:  Yes.
5  BY MR. CLUFF:
6  Q.  What are red flags?
7  A.  Red flags may be situations
8  where -- a situation where you would need
9  to take a closer look at.
10  Q.  And why would you be taking
11  a closer look at them?
12  A.  I can only address what's in
13  this document.  And these are the red
14  flags that are addressed in this
15  document.



Page 233

Page 234

1 Q. Do you see here that Buzzeo
2 identified a large percentage of
3 controlled substances versus NCS as a red
4 flag?
5 A. Yes.
6 Q. You disagree with that
7 statement?
8 A. No, I don't disagree.
9 Q. What about going down one
10 more on the list, DEA compliance issues.
11 Do you see that Buzzeo
12 identified DEA compliance issues as a red
13 flag that Teva should be looking at?
14 A. Right.
15 Q. Are you aware that
16 AmerisourceBergen had its registration
17 suspended in 2007?
18 A. Yes.
19 Q. Would you qualify that as a
20 DEA compliance issue?
21 MR. NICHOLAS: Object to the
22 form. Lack of foundation.
23 THE WITNESS: Not
24 necessarily.

Page 235

1 BY MR. CLUFF:
2 Q. So in your opinion as a
3 diversion control specialist, having
4 worked at AmerisourceBergen, losing a DEA
5 registration -- let me clarify -- having
6 a DEA registration suspended is not a DEA
7 compliance issue?
8 MR. NICHOLAS: Object to the
9 form. Lack of foundation.
10 THE WITNESS: It could be,
11 based on the results of why the
12 registration was suspended.
13 BY MR. CLUFF:
14 Q. In your work in diversion
15 control since approximately 2009, are you
16 aware that Cardinal Health and McKesson
17 also, at various points, had their
18 registrations suspended?
19 MR. KELLY: Objection.
20 Form.
21 THE WITNESS: I believe so.
22 BY MR. CLUFF:
23 Q. Would you qualify those as
24 DEA compliance issues?

Page 236

1 MR. NICHOLAS: Object to the
2 form.
3 THE WITNESS: Could be.
4 BY MR. CLUFF:
5 Q. Was Teva currently
6 monitoring for DEA compliance issues
7 before they received this red flags list
8 from Buzzeo?
9 MR. MAIER: Objection. Form
10 and foundation.
11 THE WITNESS: That, I don't
12 know.
13 BY MR. CLUFF:
14 Q. Let's move down the list
15 three more. It says, Lack of suspicious
16 order monitoring system.
17 Are you aware of any Teva
18 customers that lacked a suspicious order
19 monitoring system?
20 A. I am not.
21 Q. At the time that you
22 received this information from Buzzeo,
23 are you aware if Teva was monitoring for
24 suspicious order monitoring systems by

Page 237

1 its customers?
2 A. I believe they were.
3 Q. How about the next one down,
4 Threshold-based suspicious order
5 monitoring system.
6 Do you see that that's a red
7 flag that Buzzeo identified for Teva?
8 A. Yes.

16 Q. Would you agree that based
17 on this list, that should have been a red
18 flag to Teva?
19 A. No, I do not agree.
20 MR. MAIER: Objection.
21 Form.
22 BY MR. CLUFF:
23 Q. But do you agree that Buzzeo
24 identified it as a red flag for Teva?

Page 238

1       MR. NICHOLAS: Object to the
2   form. Lack of foundation.
3       THE WITNESS: I don't agree
4   with that.
5   BY MR. CLUFF:
6       Q.   Buzzeo was hired by Teva,
7   though, to help improve Teva's suspicious
8   order monitoring system, correct?
9       MR. NICHOLAS: Objection.
10  Form. Foundation.
11      MR. MAIER: Object to form.
12      THE WITNESS: Yes.
13  BY MR. CLUFF:
14      Q.   But you disagree with their
15  recommendations regarding red flag
16  monitoring?
17      MR. NICHOLAS: Objection to
18  the form. Lack of foundation.
19      THE WITNESS: I don't know
20  what discussions took place, other
21  than the document in front of me.
22  There may have been additional
23  discussions and/or documents that
24  may not be here.

Page 239

1   BY MR. CLUFF:
2       Q.   That was actually my next
3   question.
4       Do you know whether Teva
5   adopted this list of red flags for their
6   suspicious order monitoring system?
7       A.   I do not.
8       Q.   So you're unaware whether
9   Teva decided to monitor its customers for
10  threshold-based systems?
11      A.   I do not know.
12      Q.   Do you see the next one down
13  on the list is, Customer due diligence
14  deficiencies?
15      A.   Yes.
16      Q.   We previously talked about
17  the problems with the Form 590 validation
18  project.
19      Would you agree that Teva
20  is -- excuse me, Buzzeo is identifying to
21  Teva due diligence deficiencies like the
22  590 project as a red flag?
23      MR. NICHOLAS: Object to the
24  form.

Page 240

1       MR. MAIER: Objection.
2   Foundation.
3       MR. NICHOLAS: Object to
4   form and foundation.
5       THE WITNESS: I don't agree
6   with that.
7   BY MR. CLUFF:
8       Q.   Do you not agree that it is
9   a red flag, is what you're saying?
10      A.   I don't agree that it's a
11  red flag.
12      Q.   But do you see that Buzzeo
13  recommends it as a red flag?
14      A.   I do see that.
15      Q.   Do you know whether Teva
16  adopted that portion of the list as part
17  of its suspicious order monitoring
18  system?
19      A.   I do not know. And I don't
20  recall this document.
21      Q.   Do you see the next major
22  heading down at the bottom of that first
23  page says, Downstream?
24      A.   Yes.

Page 241

1       Q.   What does that refer to?
2       MR. MAIER: Objection. Form
3   and foundation.
4       THE WITNESS: I'd have to
5   read over this.
6       I'm not sure exactly what
7   that refers to.
8   BY MR. CLUFF:
9       Q.   Does it possibly -- based on
10  your understanding of Teva's business
11  model, does it possibly refer to
12  suspicious order monitoring of downstream
13  customers like pharmacies?
14      MR. MAIER: Object to form
15  and foundation.
16      THE WITNESS: I don't know.
17  There's not enough information
18  here for me to make a decision.
19  BY MR. CLUFF:
20      Q.   We talked about three issues
21  on this list, DEA compliance issues,
22  threshold-based suspicious order
23  monitoring system, and customer due
24  diligence deficiencies. I think that's

Page 242

¹ Number 2, 6 and 7 on the list.
²    A.  Yes.
³    Q.  And you said you disagreed
⁴ that those are red flags.
⁵    Why do you feel that those
⁶ are not red flags?
⁷    MR. NICHOLAS:  Object to the
⁸   form.
⁹    MR. MAIER:  Objection.
¹⁰    THE WITNESS:  I don't agree,
¹¹   because, first, I don't recall
¹²   this document; and, second, there
¹³   may have been changes made to this
¹⁴   document that I'm unaware of.
¹⁵ BY MR. CLUFF:
¹⁶    Q.  I guess my question is a
¹⁷ little bit different.  I'm not asking you
¹⁸ whether Teva actually adopted these
¹⁹ recommendations.
²⁰    What I was asking is, you
²¹ know, for example, do you think that a
²² DEA compliance issue with one of Teva's
²³ customers should have been a red flag to
²⁴ Teva?

Page 243

¹    MR. MAIER:  Objection.
²   Form.
³    THE WITNESS:  It could be,
⁴   based on the circumstances.
⁵ BY MR. CLUFF:
⁶    Q.  How about a threshold-based
⁷ suspicious order monitoring system, do
⁸ you feel that that should have been a red
⁹ flag to Teva about its customers?
¹⁰    MR. MAIER:  Objection.
¹¹   Form.
¹²    MR. NICHOLAS:  Same
¹³   objection.  And lack of
¹⁴   foundation.
¹⁵    THE WITNESS:  I don't think
¹⁶   so.
¹⁷ BY MR. CLUFF:
¹⁸    Q.  Why not?
¹⁹    A.  I don't think so because
²⁰ just because an account has a
²¹ threshold -- or a supplier has a
²² threshold-based system doesn't mean that
²³ the customers are aware of those
²⁴ thresholds.

Page 244

¹    Q.  How about customer due
² diligence deficiencies, do you agree that
³ that should be a red flag for Teva about
⁴ its customers?
⁵    MR. MAIER:  Objection.  Form
⁶   and foundation.
⁷    MR. NICHOLAS:  Same.
⁸    THE WITNESS:  It could be,
⁹   based on the circumstances.
¹⁰ BY MR. CLUFF:
¹¹    Q.  I want to point out one
¹² more.  It says, Distribution to brokers
¹³ and/or buying groups.
¹⁴    Do you understand what a
¹⁵ pharmacy buying group is?
¹⁶    A.  We do have pharmacy buying
¹⁷ groups, but I'm not really familiar with
¹⁸ the complete definition.
¹⁹    Q.  But AmerisourceBergen does
²⁰ distribute to buying groups?
²¹    A.  Correct.
²²    Q.  What about distribution to
²³ repackagers and relabelers, do you know
²⁴ what repackagers and relabelers are?

Page 245

¹    A.  I don't recall any customers
² offhand.
³    Q.  Do you know if
⁴ AmerisourceBergen distributes to
⁵ repackagers or relabelers?
⁶    A.  I can't think of one
⁷ customer at the moment.
⁸    Q.  Does AmerisourceBergen, the
⁹ parent company, have any other business
¹⁰ segments that might qualify as
¹¹ repackagers or relabelers, based on your
¹² understanding of those terms?
¹³    MR. NICHOLAS:  Object to the
¹⁴   form.  Lack of foundation.
¹⁵    THE WITNESS:  I just don't
¹⁶   know.  I don't know those
¹⁷   customers.
¹⁸ BY MR. CLUFF:
¹⁹    Q.  The last term on this list
²⁰ is suspicious activity, on the first
²¹ page, just above downstream.
²²    Do you see that?
²³    A.  Yes.
²⁴    Q.  Do you know what suspicious

Page 246

1  activity Buzzeo might have been referring
2  to with that --
3          MR. MAIER:  Objection.  Lack
4     of foundation.
5  BY MR. CLUFF:
6     Q.   -- with that bullet?
7     A.   I do not.
8     Q.   If you turn two pages back
9  in the document, the Bates number is
10 ending in 1310.  The top heading is,
11 Compliance solutions powered by Buzzeo
12 PDMA.  It looks like that document is
13 four pages long, and ends at 1313.
14          I can tell you, I have just
15 a couple of questions for you and they
16 are about the comment boxes that appear
17 in the right-hand margin, which are on
18 the second and third page.
19          So you can review that
20 document, but that's the -- that's where
21 I'm going to focus.
22    A.   Okay.
23    Q.   Do you have any
24 understanding of what this document is?

Page 247

1     A.   Just other than the title.
2     Q.   What does the title indicate
3  to you?
4     A.   SOM SOP template.  So I'm
5  assuming it's suspicious order monitoring
6  standard operating procedures.
7     Q.   And would these be a
8  template that Buzzeo was providing to
9  Teva as part of its suspicious order
10 monitoring policies?
11         MR. MAIER:  Objection.
12    Foundation.
13         THE WITNESS:  I don't -- I
14    don't remember this document.
15 BY MR. CLUFF:
16    Q.   Turning to the second page,
17 which is 1311, there's a Paragraph Number
18 4 that says, Responsibility.
19         And under that, in bold
20 italics, it says, DEA compliance,
21 question mark.  DEA compliance and
22 customer service, question mark.
23         And I'll note that there is
24 a comment box that pops out from service,

Page 248

1  with a dotted line.  It says, Comment,
2  bracket, RB1, closed bracket.
3          Do you know what RB would
4  have stood for?
5     A.   I do not.
6     Q.   And the comment says, What
7  about limiting responsibility to DEA
8  compliance?
9          Do you know what that refers
10 to?
11    A.   No.  I don't recall this
12 document.
13    Q.   Let's flip to the next page,
14 which ends in 1312.
15          Looking at Paragraph 8,
16 Clearing an order from suspicion.
17 Subparagraph 8.2 says, All orders will be
18 initially investigated by customer
19 service representatives.
20          And there's another comment
21 box, again, RB2.
22          Does that refresh your
23 recollection about who RB2 might be?
24    A.   No.  I don't know who RB is.

Page 249

1     Q.   And then there are three
2  questions there.  Should this only be in
3  this department?  What about DEA
4  compliance?  Should they have primary
5  role?
6          Do you have any
7  understanding about what those questions
8  are about?
9     A.   No.
10    Q.   Do you have any recollection
11 of a discussion at Teva about whether
12 customer service versus DEA compliance
13 should have responsibility for suspicious
14 order policies and procedures?
15         MR. MAIER:  Objection.
16    Form.
17         THE WITNESS:  I don't recall
18    a discussion being made.
19 BY MR. CLUFF:
20    Q.   Do you recall who had
21 primary responsibility for things like
22 suspicious order monitoring and clearing
23 suspicious orders?
24    A.   I know I reviewed them when

Page 250

1  I was in that role.
2      Q.   And what were you reviewing
3  them for at the time?
4      A.   According to the documents,
5  for pended orders, I was reviewing for a
6  pattern and if a drug was pended before.
7      Q.   What does it mean to be
8  pended?
9      A.   I'm assuming that means when
10  the order goes into review status.
11          - - -
12      (Whereupon,
13  AmerisourceBergen-Kreutzer
14  Exhibit-4,
15  Teva_MDL_A_(0)233-1346-348, was
16  marked for identification.)
17          - - -
18      MR. CLUFF:  I put a sticker
19  on my copy so -- I'll give you the
20  next document, which we marked as
21  4.
22      For those on the phone, this
23  is Teva_MDL_A_(0)233-1346.  It has
24  an attachment which begins at 1347

Page 251

1  and continues to 1348.
2  BY MR. CLUFF:
3      Q.   This is a short document,
4  Mr. Kreutzer, so go ahead and familiarize
5  yourself with it.
6      A.   Okay.
7      Q.   Starting at the top, this is
8  an e-mail you wrote to Colleen McGinn,
9  February 4, 2013.  Subject:  Questions
10  for Mallinckrodt, with the attachment
11  Mallinckrodt February 7.
12      And you write, Thanks, I was
13  working on it -- I was actually working
14  on it so they were in a more organized
15  manner.
16      Do you recall receiving and
17  sending this e-mail to Colleen?
18      A.   I do not.
19      Q.   Do you have any reason to
20  dispute that this is a true and accurate
21  copy of an e-mail that you received from
22  Colleen and then replied to?
23      A.   No.
24      Q.   Looking at the attachment

Page 252

1  that starts on (0)2331347, have you ever
2  seen that document before?
3      A.   I don't recall this
4  document.
5      Q.   Do you recall preparing it
6  at all?
7      A.   I don't recall preparing it
8  either.
9      Q.   But do you generally recall
10  preparing for a meeting with Mallinckrodt
11  in February of 2013?
12      A.   I do, but I don't remember
13  the content, what information we were
14  preparing for our visit.
15      Q.   Do you have any reason to
16  dispute that this is a true and correct
17  copy of an e-mail that you -- I mean, a
18  document that you and Colleen McGinn
19  worked on together in February of 2014?
20      A.   No, I don't.
21      Q.   The subject matter of this
22  e-mail is, Questions for Mallinckrodt.
23      Do you see that at the top?
24      A.   Yes.

Page 253

1      Q.   And then turning to the
2  title of the attachment, it says,
3  Mallinckrodt, February 7, 2013 visit-SOM
4  program.
5      A.   Yes.
6      Q.   Would this, then, reflect
7  questions Teva was going to ask
8  Mallinckrodt in a meeting about its SOM
9  program?
10      A.   Yes, I believe so.
11      Q.   Do you recall whether, in
12  2013, Teva was coordinating the
13  enhancements to its suspicious order
14  monitoring program with Mallinckrodt?
15      A.   I don't recall that.
16      Q.   Based on this e-mail and the
17  questions here that are attached to that
18  e-mail, do you have any understanding
19  that Teva was coordinating its suspicious
20  order monitoring program with
21  Mallinckrodt?
22      A.   No, I don't.
23      MR. MAIER:  Form.
24  Foundation.

Page 254

BY MR. CLUFF:

Q. What about an understanding of enhancing its program in coordination with Mallinckrodt?

A. I don't recall that.

Q. Do you recognize the name Jack Crowley?

A. I don't remember his name. Where do you see his name?

Q. It's a name I have in my head that I was curious if you understand.

Do you know if Colleen McGinn talked to anybody at any other manufacturers about Buzzeo or suspicious order monitoring?

A. No, I don't.

MR. MAIER: Objection. Foundation.

BY MR. CLUFF:

Q. In the work that you did with Colleen on enhancing Teva's suspicious order monitoring program, did you communicate with anybody from any

Page 255

other manufacturers?

A. AmerisourceBergen.

Q. That's a distributor though, right?

A. I'm sorry. I misunderstood the question.

You said manufacturers?

Q. Yes.

A. I did conduct an audit of Cardinal's program.

Q. That's also a distributor, right?

A. Yes. I'm sorry.

Q. So did you personally meet with anybody from a manufacturer like Purdue or Actavis or Endo --

A. I have not, no.

Q. You did mention, though, that you met -- you conducted an audit of Cardinal Health.

What was that?

A. They were providing me a PowerPoint presentation of their order monitoring program.

Page 256

Q. Do you recall what time frame that was?

A. I do not, but it was within my 90 days between January and end of March.

Q. And you mentioned AmerisourceBergen, what about -- can you tell me what happened with AmerisourceBergen?

A. Conducted an audit. It was a questionnaire that we presented to Ed Hazewski. I was with Bob Mallinckrodt -- not Bob Mallinckrodt, Bob Williamson on my visit with Ed.

Q. And that's Bob Williamson from Buzzeo?

A. That is correct.

Q. So together you conducted an audit, using a questionnaire, of Amerisource's programs?

A. Correct.

Q. Did you -- going back to this attachment, the Mallinckrodt February -- Mallinckrodt February 7, 2013

Page 257

visit, did you go -- do you know if this meeting happened between Teva and Mallinckrodt on February 7th?

A. It did.

Q. Did you attend the meeting?

A. I did.

Q. So you're aware of these questions that were asked to Mallinckrodt by Teva?

A. I'm sure we did use these questions as part of our visit, but I don't remember their responses.

Q. Do you recall if these questions were asked to Mallinckrodt because Teva was looking for advice on how to structure its own SOM program?

MR. MAIER: Objection. Form.

THE WITNESS: No, I don't know that.

BY MR. CLUFF:

Q. Do you have any reason to dispute that Teva was asking for guidance on establishing an SOM program?

Page 258

1    A.   Teva was looking to enhance
2  their order monitoring program.
3    Q.   And was this meeting part of
4  the effort to enhance the program?
5    A.   I don't know.
6    Q.   Okay.  Do you have any
7  recollection of why this meeting happened
8  with Mallinckrodt?
9    A.   I do not remember.
10    Q.   Looking under the category
11  general there, it's underlined at the
12  top.
13        The first question is, Can
14  you describe the SOM program you have in
15  place?
16        Would you agree here that
17  Teva was asking Mallinckrodt to describe
18  its SOM program?
19    A.   Yes.
20    Q.   The next question down is,
21  How did you roll out your program to
22  customers?
23        Is that correct?
24    A.   Yes.

Page 259

1    Q.   Moving down a few it says,
2  Have you had any pushback?
3        Do you recall if
4  Mallinckrodt described any pushback about
5  its SOM program?
6    A.   I do not remember.
7    Q.   The next one down is, How do
8  you handle noncompliance issues?
9        Do you recall if
10  Mallinckrodt discussed any noncompliance
11  issues?
12    A.   No, I do not.
13    Q.   And then what about the last
14  bullet point there, it says, What kind of
15  training did you perform?  Customer
16  service?  SOM employees?
17        Do you recall discussing
18  that?
19    A.   No, I don't.
20    Q.   Under customer due
21  diligence, do you see that?  It's the
22  second underlined heading.
23    A.   Yes.
24    Q.   And you recall that this was

Page 260

1  occurring in February 2013?  I think the
2  question is, Do you have a risk analysis
3  of customers that are less of a threat
4  than others?
5        And there's a bullet point
6  there, For example, AmerisourceBergen,
7  Cardinal and McKesson, less than a threat
8  than a small distributor and retail
9  pharmacy chain.
10        Is that right?  Did I read
11  it accurately?
12    A.   That is correct, yes.
13    Q.   In February of 2013, were
14  you aware that AmerisourceBergen,
15  Cardinal and McKesson had all, at various
16  times, had their registrations to
17  distribute controlled substances
18  suspended?
19        MR. KELLY:  Object to the
20  form.
21        MR. NICHOLAS:  Object to the
22  form.  And foundation.
23        THE WITNESS:  I don't recall
24  the suppliers having their

Page 261

1  licenses suspended.
2  BY MR. CLUFF:
3    Q.   You don't recall that these
4  suppliers had their licenses suspended?
5        MR. NICHOLAS:  Object to the
6  form.
7        THE WITNESS:  I do not
8  recall.
9  BY MR. CLUFF:
10    Q.   If you knew at the time, in
11  2013, that Amerisource, Cardinal and
12  McKesson had all had their licenses
13  suspended, would you have classified them
14  as a lower threat than smaller
15  distributors?
16        MR. NICHOLAS:  Object to the
17  form.
18        Go ahead.
19        THE WITNESS:  I don't
20  recall.
21  BY MR. CLUFF:
22    Q.   There's a note here about
23  retail pharmacy chains.
24        What companies come to mind

Page 262

1 as examples of retail pharmacy chains?
2           MR. NICHOLAS:  Object to the
3     form.
4           THE WITNESS:  I don't
5     remember the pharmacy chains that
6     Teva serviced.
7 BY MR. CLUFF:
8     Q.   I'm asking just your general
9 recollection, who would be -- like,
10 qualify as a pharmacy chain?
11     A.   Rite Aid.  Walgreens.
12     Q.   CVS?
13     A.   CVS, perhaps.
14     Q.   How about Walmart?
15     A.   Walmart.
16     Q.   Were you aware that any of
17 the retail pharmacy chains, prior to
18 2013, had paid fines to the DEA for not
19 fulfilling their regulatory obligations
20 under the Controlled Substances Act?
21           MR. MAIER:  Object to form.
22           MR. NICHOLAS:  Foundation
23     and form.
24           THE WITNESS:  I don't recall

Page 263

1     the certain pharmacies and chains,
2     no.
3 BY MR. CLUFF:
4     Q.   If you had been aware, in
5 2013, that retail pharmacy chains had
6 paid fines for failing to fulfill their
7 duties under the CSA, would you have
8 classified them as lower risk than other
9 distributors?
10           MR. NICHOLAS:  Object to the
11     form.
12           THE WITNESS:  I don't know.
13     I would have to discuss that with
14     the management team.
15 BY MR. CLUFF:
16     Q.   Moving down the document,
17 there's an outline -- an underlined
18 heading that says, Order review.
19 It says, Teva's SOM program
20 is based on two standard deviations above
21 the average.
22           Is that an accurate
23 statement?
24           MR. NICHOLAS:  Objection.

Page 264

1     Form and foundation.
2           THE WITNESS:  According to
3     what's on the form that's in front
4     of me.
5 BY MR. CLUFF:
6     Q.   Skipping down two bullet
7 points, it says, How do you determine how
8 high a threshold should be?  Do you make
9 a threshold adjustment if warranted?  How
10 is that done?
11           Would you agree here that
12 Teva is asking Mallinckrodt here for
13 advice on setting thresholds and
14 adjusting them?
15           MR. MAIER:  Object to form.
16           THE WITNESS:  I don't recall
17     the discussions that were
18     discussed with Mallinckrodt.
19 BY MR. CLUFF:
20     Q.   But at least this document
21 reflects that it was a topic that Teva
22 wanted to discuss with Mallinckrodt,
23 right?
24     A.   It was a question that was

Page 265

1 posed on the form.
2     Q.   If you move to the next
3 page, which ends in 1348, I'm interested
4 in the top two bullet points there.
5           The first one, How do you
6 determine if a customer exceeded their
7 threshold?  Do you release orders that
8 are over the thresholds?
9           Would you agree that Teva
10 wanted to seek Mallinckrodt's advice on
11 customers exceeding thresholds?
12     A.   I don't recall that
13 discussion.
14     Q.   But that's what the document
15 indicates, correct?
16     A.   That's what the document
17 indicates.  And I don't recall if we
18 discussed that, or what the results of
19 the question was.
20     Q.   The next one down says, What
21 actions do you take if customers are
22 exceeding your threshold?
23           Do you recall what actions
24 Teva took if customers exceeded

Page 266

1  thresholds?
2      A.   I do not.
3      Q.   Do you recall if Teva
4  discussed this with Mallinckrodt?
5      A.   I do not.
6          MR. MAIER:  Objection.  Form
7  and foundation.
8  BY MR. CLUFF:
9      Q.   Let's go down to DEA
10 interaction.  The first line says, Have
11 you reported any orders deemed, quote,
12 suspicious to DEA?
13         Do you recall if Teva was
14 identifying suspicious orders to the DEA
15 in 2013?
16     A.   Yes.
17     Q.   They were?
18     A.   Yes.
19     Q.   Okay.
20     A.   I reported it myself.
21     Q.   Do you recall if Teva asked
22 Mallinckrodt whether they were reporting
23 suspicious orders to the DEA?
24         MR. MAIER:  Objection.

Page 267

1      Form.
2          THE WITNESS:  I'm sorry,
3      could you ask that question again,
4      please?
5  BY MR. CLUFF:
6      Q.   Sure.
7          Do you recall if
8  Mallinckrodt -- if Teva asked
9  Mallinckrodt whether they reported
10 suspicious orders to the DEA?
11     A.   I don't recall that.
12     Q.   All right.  Let's look at
13 the next underline, it's chargeback data.
14         Do you recall we previously
15 today discussed chargeback data in
16 general?
17         MR. NICHOLAS:  Object to the
18     form.
19         THE WITNESS:  In general,
20     yes.
21 BY MR. CLUFF:
22     Q.   It's not a quiz, I was just
23 trying to refresh that we had talked
24 about it.

Page 268

1      A.   Understood.
2      Q.   Does this little paragraph
3  here add any understanding or refresh
4  your recollection at all about what
5  chargeback data is or how it's used?
6      A.   I don't remember that.
7          MR. NICHOLAS:  Sterling, if
8  we're on to the next -- another
9  document, I'd like to take a
10 break.
11         MR. CLUFF:  Is there a
12 reason you would like to take a
13 break?
14         MR. NICHOLAS:  I need a
15 break.
16         MR. CLUFF:  Yeah, let's take
17 a break.
18         VIDEO TECHNICIAN:  Off the
19 record at 2:41 p.m.
20         - - -
21         (Whereupon, a brief recess
22 was taken.)
23         - - -
24         VIDEO TECHNICIAN:  We're

Page 269

1      back on the record at 2:56 p.m.
2  BY MR. CLUFF:
3      Q.   Mr. Kreutzer, you testified
4  that you only worked for Teva for
5  approximately 90 days?
6      A.   Yes.
7      Q.   How come you decided to
8  leave Teva after only 90 days?
9      A.   I was let go.
10     Q.   Can you share the reason why
11 you were let go?
12     A.   Sure.  I was let go because
13 Colleen felt that I wasn't doing the job
14 up to par, I guess.
15     Q.   Did she express what part of
16 the job you were not doing up to par?
17     A.   She felt like I needed more
18 assistance than I should have had.  She
19 was not -- she wasn't directly on site at
20 all times, she was off site at another
21 location.  So I was by myself on the job,
22 for the most part.
23     Q.   Was there a specific part of
24 your job parameters or job description

1 where she felt that -- where she
2 identified that your performance was
3 lacking?
4     A.   One issue was that I took it
5 upon myself to contact a customer
6 directly regarding an order that was
7 pended.  But I was previously told that
8 if I had any questions of any customers
9 that I had to go through customer
10 service, and then customer service would
11 then contact the customer with my
12 questions and then relay the answers back
13 to customer service, and then back to me.
14     Q.   And so the problem was that
15 if you contacted the customer directly?
16     A.   Yes.
17     Q.   Was that the straw that
18 broke the camel's back, so to speak?
19         MR. MAIER:  Object to form.
20         THE WITNESS:  I think it was
21     a good part of it.
22 BY MR. CLUFF:
23     Q.   Was there any other -- any
24 other specific information that was

1 conveyed to you about what Colleen
2 perceived that you had not done
3 adequately enough?
4     A.   Well, I don't recall the
5 real specifics.  But I had felt that the
6 job duties that were listed for the
7 assignment were above what I -- above my
8 current experience level at the time, and
9 I indicated that to her on my departure.
10     Q.   So it was -- I'm trying to
11 understand.
12         Was it your belief at the
13 time that they were requiring more of you
14 than they had advertised during the
15 interview process?
16     A.   That was my feelings.
17     Q.   Did you feel like you got
18 adequate training to fulfill your job
19 responsibilities when you worked at Teva?
20         MR. MAIER:  Object to form.
21         THE WITNESS:  I mean, I felt
22     like I did have training, but
23     there wasn't a current department
24     that I worked in.  I was literally

1 by myself.
2         It was a new role for the
3     company, so I had to figure
4     everything out for myself, as far
5     as contact people, and anything
6     else for that matter.
7 BY MR. CLUFF:
8     Q.   Did you feel like you
9 were -- that you did not have enough
10 resources to do the job that Teva was
11 asking you to do?
12     A.   I was supposed to have a
13 person to -- that was going to report to
14 me when I first received the position.
15 And then that position was taken away,
16 prior to my starting with the company.
17         But other than that, my role
18 was to mainly work with IT, as well as
19 customer service for any customer
20 inquiries that I had.
21     Q.   And was your role at Teva
22 essentially the same role that you had
23 had at AmerisourceBergen, that being sort
24 of customer order monitoring and

1 diversion control?
2     A.   It was.  But it was also a
3 role to enhance their current SOM program
4 and to develop policies and procedures.
5     Q.   How did you feel about the
6 quality of the employees you worked with
7 at Teva?  Did you feel like they were
8 qualified to do their jobs?
9         MR. MAIER:  Objection.
10         THE WITNESS:  I do.
11 BY MR. CLUFF:
12     Q.   You mentioned that you felt
13 like Teva expected more from you than
14 they advertised in the interview.
15         Do you feel like Teva
16 expected more out of its other employees
17 than they really were qualified to give?
18     A.   That, I don't know.
19         MR. MAIER:  Form.
20     Foundation.
21         MR. CLUFF:  I want to show
22     you a document.  This is produced
23     by Teva.  It's
24     Teva_MDL_A_(0)233-1426.  That's

Page 274

1  the e-mail with an attachment.
2  The attachment begins
3  Teva_MDL_A_(0)233-1428.  It's a
4  natively produced Bates number --
5  excuse me, it's a natively
6  produced PowerPoint, so it all has
7  the same Bates number.
8     And we'll mark it as Number
9  5.
10     - - -
11     (Whereupon,
12  AmerisourceBergen-Kreutzer
13  Exhibit-5,
14  Teva_MDL_A_(0)233-1426-428, was
15  marked for identification.)
16     - - -
17     MR. CLUFF:  I'm going to
18  have some questions for you about
19  specific slides.  But why don't
20  you go ahead and review just the
21  cover e-mail to start?
22     MR. MAHADY:  Sterling, if
23  you know, did the attachment have
24  confidentiality designations?

Page 275

1     MR. CLUFF:  I'm unaware.
2  But if we want to treat it, for
3  purposes of the deposition, as
4  confidential, since the cover
5  e-mail is confidential, I'm okay
6  with that.  But I'll defer to
7  Teva's lawyer on this one.
8     Do you know if this
9  PowerPoint would have had a
10  confidentiality designation?
11     MR. MAIER:  I believe it
12  would have.  I'm not sure what
13  form you're dealing with --
14     MR. CLUFF:  Sure.
15     MR. MAIER:  -- you know,
16  what format, so I would request
17  that we would treat it that way.
18     MR. CLUFF:  We'll lodge that
19  on the record that this document
20  will be treated as confidential.
21  BY MR. CLUFF:
22     Q.   Did you have a chance to
23  review the e-mail, Mr. Kreutzer?
24     A.   Not quite yet.

Page 276

1     Q.   Did you say something?
2     A.   Not quite yet.
3     MR. CLUFF:  My colleague,
4  Will Powers, here who is next to
5  me at the depo, looked in the
6  Relativity database and this
7  document, the attachment is
8  designated as confidential.  So we
9  can all agree on that.
10     THE WITNESS:  Okay.
11  BY MR. CLUFF:
12     Q.   Let's start with your e-mail
13  to Colleen McGinn on March 15th.  It's at
14  the bottom of the second page, or middle
15  of the second page.
16     It looks like you asked
17  Colleen to take a look at this
18  PowerPoint, and you describe it as a
19  PowerPoint that Bob came up with.
20     Would that have been Bob
21  Williamson?
22     A.   Yes.
23     Q.   And it says, in the next
24  sentence, When we met the other day -- is

Page 277

1  that you and Colleen would have met?
2     A.   Where do you see that
3  e-mail?
4     Q.   The same e-mail.  The next
5  sentence says, When we met the other day,
6  you wanted to have a couple slides from
7  Bob that had information regarding fines,
8  et cetera.
9     I was curious if the "we"
10  referred to you and Colleen?
11     MR. MAHADY:  The second
12  page.
13     MR. CLUFF:  Thanks, Joe.
14     THE WITNESS:  I think what I
15  was referring to is -- it was
16  possibly Bob, but I'm not sure.
17  BY MR. CLUFF:
18     Q.   In either event, you said,
19  Those slides are now in the presentation,
20  Slides 10, 11 and 12.
21     So those would have been
22  slides that Colleen asked you to include?
23     A.   Yes.
24     Q.   So moving to the very bottom

Page 278

1  of the first page, the e-mail from
2  Colleen to you, it continues on to the
3  second page.
4        Would you agree with me it
5  looks like she has some comments about
6  the slides?  Does that seem accurate?
7     A.  Yes.
8     Q.  At the end of that e-mail,
9  it says, You may want to add something in
10 here about evaluating chargeback data in
11 the future.
12       Correct?
13    A.  Yes.
14    Q.  And then let's skip up two
15 e-mails, and you essentially told her,
16 you know, Slide 23 has the facets and
17 Slide 37 mentioned the bullet points
18 about chargeback data.
19       And she says she wants you
20 to put in some more information about
21 chargeback data, right?
22    A.  Yes.
23    Q.  So that would be Slide 28,
24 according to your first e-mail?

Page 279

1     A.  Correct.
2     Q.  All right.  When you were
3  reviewing the document that I handed you
4  as Exhibit-5, did you flip through the
5  PowerPoint?
6     A.  I didn't flip through it
7  yet.
8     Q.  Does it look familiar to
9  you?
10    A.  Vaguely.
11    Q.  And it appeared, based on
12 your first e-mail, this was something
13 that Bob may have drafted initially but
14 then you had some interaction with
15 working on it, correct?
16    A.  Correct.
17    Q.  Okay.  Can you turn to Slide
18 8?  It will have an 8 in the bottom
19 right-hand corner.
20       MR. CLUFF:  So the lawyers
21    on the phone are aware, when I
22    created this exhibit from the
23    production, as I said, this
24    attachment was produced in its

Page 280

1  native format.  So we printed it
2  as a PDF so that the slide appears
3  in the top half of the page and
4  any speakers notes would have
5  appeared on the bottom half of the
6  page.
7        And we also formatted the
8  footer so that it would reflect
9  the Bates number and a page
10 number, just so that it's -- for
11 ease of reference for the witness
12 to look through.  We didn't make
13 any other -- we didn't make any
14 changes to the substance of the
15 document.
16 BY MR. CLUFF:
17    Q.  Did you look at Page 8?
18    A.  I did, yes.
19    Q.  Do you see there, DEA
20 statement is the heading?
21    A.  Yes.
22    Q.  So there it says, DEA has
23 and will continue to pursue criminal,
24 administrative and civil actions against

Page 281

1  registrants who fail to comply with all
2  aspects of the CSA and its implementing
3  requirements -- or regulations as
4  required.  More recent actions include,
5  but are not limited to, actions against
6  wholesale distributors, such as Harvard
7  Drugs, KeySource, CVS, Cardinal,
8  McKesson, Southwood and Sunrise.
9        Are you aware of any
10 enforcement actions against any of those
11 distributors?
12    A.  Nothing in particular.
13    Q.  We previously talked about
14 the red flags that Buzzeo provided to
15 Teva.  And I believe one of them said
16 something about the major distributors
17 like Cardinal, McKesson and Amerisource
18 not being a risk.
19       Would you agree that, based
20 on this DEA statement regarding the
21 enforcement actions against Cardinal and
22 McKesson, that they were maybe a higher
23 risk than some other distributors?
24       MR. KELLY:  Objection to

Page 282

1     form.
2        MR. MAIER: Object to form
3   and foundation.
4        MR. NICHOLAS: Join.
5        THE WITNESS: No, I can't
6   agree.
7 BY MR. CLUFF:
8     Q. Why would you disagree with
9 that statement?
10     A. Why? Because I don't know
11 who input this document and where it came
12 from and what other discussions were
13 discussed on this PowerPoint and if any
14 changes were made.
15     Q. As a general matter, having
16 worked in suspicious order monitoring and
17 diversion control since 2009, do you have
18 an opinion about whether a company who
19 had their -- or who was subject to a DEA
20 enforcement action would be high risk
21 versus low risk?
22        MR. NICHOLAS: Object to the
23   form. Lack of foundation.
24        THE WITNESS: No.

Page 283

1        MR. MAIER: Same objection.
2        THE WITNESS: No, I don't
3   have an opinion.
4 BY MR. CLUFF:
5     Q. Looking at that first line
6 of the DEA statement slide, it says, DEA
7 has and will --
8        MR. CLUFF: Can you
9   underline this, Zach, so he can
10   see where I'm pointing to?
11 BY MR. CLUFF:
12     Q. DEA has and will continue to
13 pursue criminal, administrative and civil
14 actions against registrants.
15     Are you aware of what --
16 that a violation of a CSA can result in
17 criminal action against a registrant?
18        MR. MAIER: Objection to
19   foundation.
20        MR. NICHOLAS: Same
21   objection. Form and foundation.
22        THE WITNESS: I'm only aware
23   of what's highlighted in front of
24   me.

Page 284

1 BY MR. CLUFF:
2     Q. Based on what's in front of
3 you, would you agree that violation of
4 the CSA could subject the registrant to
5 criminal action?
6        MR. NICHOLAS: Object to the
7   form. And foundation.
8        MR. MAIER: Same objection.
9        THE WITNESS: It depends on
10   the circumstances.
11 BY MR. CLUFF:
12     Q. But it's definitely a
13 possibility, right?
14        MR. NICHOLAS: Object to the
15   form.
16        MR. MAIER: Same objection.
17        THE WITNESS: I wouldn't say
18   it's definitely a possibility, but
19   it's a possibility.
20 BY MR. CLUFF:
21     Q. Looking back at the second
22 page of this document, which is your
23 e-mail to Colleen, you informed her that
24 you added Slides 10, 11 and 12, right?

Page 285

1     Do you see that there in the
2 first paragraph of your e-mail at the
3 bottom?
4     The next page.
5     A. Yes.
6     Q. In the PowerPoint, let's go
7 to those slides, 10, 11 and 12.
8     I want to focus on Number
9 11, if you're there. Go ahead and read
10 that for me.
11     A. Okay.
12     Q. So a little sidebar, your
13 lawyers and I had -- we noted that
14 Colleen appears to have deleted and maybe
15 changed some slides. So the original 10,
16 11 and 12 might not be the same 10, 11
17 and 12 that you're looking at here.
18     So I'll ask you, looking at
19 Number 11, is this a slide that you
20 recall having drafted?
21     A. I don't recall this slide.
22     Q. Looking at the top, it says,
23 Distributor and manufacturer initiative
24 program.

Page 286

1    Do you see that?
2    A.   Yes.
3    Q.   Are you familiar with the
4 concept of a distributor initiative or a
5 manufacturer initiative program?
6    A.   I am not.
7    Q.   Looking at the first point
8 it says, Established in 2005 to remind
9 DEA registrants of regulatory obligation
10 to maintain effective controls against
11 diversion.
12    Do you see that?
13    A.   Yes.
14    Q.   Earlier we talked about
15 whether you might have received training
16 at AmerisourceBergen, as a diversion
17 control specialist, about effective
18 controls against diversion.
19    Having read this paragraph
20 here, do you have any recollection about
21 receiving training on effective controls
22 against diversion?
23    A.   At Teva?
24    Q.   AmerisourceBergen.

Page 287

1    A.   At AmerisourceBergen.
2    I don't recall the specific
3 training that I received, but I did
4 receive training.
5    Q.   Looking down at the next
6 bold bullet point, it states that, The
7 stated goal of the program is to cut off
8 the source of supply to these (rogue pain
9 clinics, physicians and pharmacies)
10 through effective due diligence and
11 suspicious order recording.
12    Do you have any
13 understanding of that being the goal of
14 the distributor and manufacturer
15 initiatives?
16    A.   I did not.
17    Q.   Did you understand, as a
18 diversion control specialist at
19 AmerisourceBergen, that part of your
20 responsibility was to maintain effective
21 controls against diversion?
22    MR. NICHOLAS:  Object to the
23 form.
24    THE WITNESS:  No, I am not.

Page 288

1 BY MR. CLUFF:
2    Q.   Did you have an
3 understanding, as a diversion control
4 specialist at AmerisourceBergen, that
5 part of the way to maintain effective
6 controls against diversion was through
7 effective due diligence?
8    A.   I'm aware of effective due
9 diligence, yes.
10    Q.   Was it a part of -- strike
11 that.
12    How about suspicious order
13 reporting, was that a part of
14 AmerisourceBergen's efforts to maintain
15 effective controls against diversion?
16    MR. NICHOLAS:  Object to the
17 form.
18    Go ahead.
19    THE WITNESS:  Can you ask
20 that question -- rephrase that
21 question?
22 BY MR. CLUFF:
23    Q.   Was suspicious order
24 reporting a part of AmerisourceBergen's

Page 289

1 efforts to maintain effective controls
2 against diversion?
3    MR. NICHOLAS:  Objection.
4 Because I think you just reread
5 it.  You didn't rephrase it.
6    MR. CLUFF:  I took a few
7 words out.
8 BY MR. CLUFF:
9    Q.   Did my question make sense
10 to you?
11    A.   Not really.
12    Q.   As a diversion control
13 specialist, did you understand that
14 AmerisourceBergen had a duty to identify
15 and report suspicious orders?
16    A.   I do understand that.
17    Q.   Did you understand that that
18 duty arose from the regulatory obligation
19 to maintain effective controls against
20 diversion?
21    MR. NICHOLAS:  Object to the
22 form.
23    Go ahead.
24    THE WITNESS:  According to

Page 290

1    the CFR.
2    BY MR. CLUFF:
3        Q.   Can you move forward to
4    Slide Number 15, please?  I have some
5    just general questions before we get into
6    the slide.
7            Before you became the
8    diversion control specialist at
9    AmerisourceBergen -- well, in your work
10   as a diversion control specialist at
11   AmerisourceBergen, did you become
12   familiar with AmerisourceBergen's
13   suspicious order monitoring and reporting
14   policy before 2009?
15       A.   Before I was hired in the
16   department?
17       Q.   Yes.  Did you have an
18   understanding of what it was before you
19   were hired?
20       A.   No, I did not.
21       Q.   Do you know if
22   AmerisourceBergen has always reported
23   suspicious orders to the DEA?
24       A.   As far as I know, we have.

Page 291

1        Q.   Are you aware that prior to
2    2007 -- or aware if, prior to 2007,
3    AmerisourceBergen reported excessive
4    purchases after it identified them as
5    such?
6        A.   I'm not aware of that.
7        Q.   I want to point your
8    attention to the very last bullet point
9    there.
10           It says, Registrants who
11   routinely report suspicious orders yet
12   fill those orders are failing to maintain
13   effective controls against diversion.
14           Do you see that?
15       A.   I do.
16       Q.   Do you have any
17   understanding of what that means?
18       A.   No.  Because I feel like
19   that's a vague statement.
20       Q.   Do you know if, at this
21   time, Teva was shipping orders that it
22   reported as suspicious?
23           MR. MAIER:  Objection.  Form
24   and foundation.

Page 292

1            THE WITNESS:  No, I do not.
2    BY MR. CLUFF:
3        Q.   Do you have any
4    understanding about whether
5    AmerisourceBergen shipped orders that it
6    deemed were suspicious prior to 2015?
7        A.   Could you ask that again,
8    please?
9        Q.   Sure.  So I think -- I used
10   2015, because we talked about there was a
11   change from thresholds to parameters in
12   2015.
13       A.   Correct.
14       Q.   In your work as a diversion
15   control specialist prior to 2015, are you
16   aware of AmerisourceBergen shipping
17   orders that were deemed suspicious?
18       A.   No, I am not.
19       Q.   If that happened, would you
20   agree that it was a failure to maintain
21   effective controls against diversion?
22           MR. NICHOLAS:  Object to the
23   form.
24           THE WITNESS:  No, I do not

Page 293

1    agree.
2    BY MR. CLUFF:
3        Q.   So your opinion is, based on
4    your work as a diversion control
5    specialist, that if AmerisourceBergen
6    shipped an order that it deemed was
7    suspicious, that would not be a failure
8    to maintain effective controls against
9    diversion?
10           MR. NICHOLAS:  Object to the
11   form.
12           THE WITNESS:  We would not
13   ship a suspicious order.  We would
14   reject it and report it.
15   BY MR. CLUFF:
16       Q.   What happens if it's shipped
17   after it's identified as suspicious?
18           MR. NICHOLAS:  Object to the
19   form.
20           THE WITNESS:  I don't think
21   we can ship a suspicious order.
22   Our system won't allow it.
23   BY MR. CLUFF:
24       Q.   Take a look with me at Slide

Page 294

20. You can go ahead and read that if
you'd like to.
    A.   Okay.
    Q.   So you see there it says,
System challenges and responses?
    A.   Yes.
    Q.   And the major heading at the
top is, Common SOM pitfalls?
    A.   Yes.
    Q.   Do you see there in bold
where it says, quote, Threshold, quote,
based systems are not sufficient?
    A.   Yes.
    Q.   This document, based on its
attachment to this e-mail, was drafted in
2013, correct?
    A.   It was included in the
document, yes.  It came from 2007, it
appears.
    Q.   The PowerPoint comes from
2007?
    A.   The slide.  Well, the DEA
memorandum.
    Q.   Right, yeah.  Okay.  Thank

Page 295

you.  I was going to get to that.
        You see at the bottom there,
where it says this comment about a
threshold sytem not being sufficient
comes from a December 27, 2007 DEA
memorandum?
    A.   Yes.



BY MR. CLUFF:
    Q.   So you disagree with the
DEA's memorandum?

Page 296

    MR. NICHOLAS:  Objection.
Objection to the form.
    THE WITNESS:  I agree with
the system we currently had in
place at the time.
BY MR. CLUFF:
    Q.   So you would agree with the
system you had in place at the time
instead of the December 2007 DEA
memorandum?
    MR. NICHOLAS:  Object to the
form.  You're asking him about a
document that he doesn't remember
that is quoting something that he
hasn't said he's even seen.
    I'll object to the form.
    THE WITNESS:  I don't -- as
Bob stated, I don't remember this
document or this slide.
    MR. CLUFF:  Hold on.
    THE WITNESS:  Sorry.
    MR. CLUFF:  Bob, that's a
clear example of you coaching this
witness and influencing his

Page 297

testimony.  I'm not going to make
a big deal about it, because we've
had a pretty collegial deposition
today.
    But I'd like to request that
that not happen again, please.
    MR. NICHOLAS:  Well, now --
    MR. CLUFF:  I'm going to let
you finish.  But all I want to say
is, we've had this out before,
there's no reason for any of us to
get upset about it.  But
objection, form; objection,
foundation.  You know the proper
basis for an objection.  You
influenced his testimony, and he
just used your objection to answer
my question.  And that's not
proper.
    MR. NICHOLAS:  Well, all
I'll say in response is that I
disagree with your
characterization of my objection
and his response.

Page 298

1    If I think your
2 questions are unfair, I'm going to
3 say I think it's unfair.
4    Now you can proceed.
5 BY MR. CLUFF:
6    Q.   Mr. Kreutzer, your attorney
7 is entitled to object.  But I'm also
8 entitled to an answer to my question.
9 His objection is not a proper basis for
10 you to give me an answer based on his
11 objection.
12    So let's look at this
13 document again.  Quote, Threshold, closed
14 quote, based systems are not sufficient.
15    Is that right?
16    A.   That's what it states.
17    Q.   Looking down at the bottom
18 section of this document, you identified
19 that this comes from a December 2007 DEA
20 memorandum, correct?
21    MR. NICHOLAS:  Object to the
22 form.
23    THE WITNESS:  Yes.
24    MR. NICHOLAS:  And

Page 299

1    foundation.
2 BY MR. CLUFF:
3    Q.   Now, do you see the bullet
4 point that immediately precedes that,
5 that says, Do not meet the regulations?
6    A.   That's what it states right
7 there.

15    Q.   I just have one more slide
16 here to talk to you about.  Let me find
17 it.
18    I previously asked you if
19 Teva reported suspicious orders to the
20 DEA.
21    Do you remember that?
22    A.   Yes.
23    Q.   Look at Slide 38 for me.
24    And I just would point out

Page 300

1 to you, the top portion of the slide
2 says, Improving our processes and target
3 dates; is that right?
4    A.   Yes.
5    Q.   Based on looking at this
6 document, do you believe that this would
7 have been Teva identifying processes that
8 needed to be improved?
9    A.   It appears to be.
10    Q.   Looking at the first bullet
11 point on that list of things that Teva
12 identified needed to be improved, would
13 you agree with me that it says, Began
14 reporting suspicious orders to the DEA?
15    A.   Yes.
16    Q.   So prior to February 2013,
17 Teva did not report suspicious orders to
18 the DEA?
19    A.   That, I don't know.
20    MR. MAIER:  Objection.
21 Form.
22 BY MR. CLUFF:
23    Q.   Do you have any reason to
24 disagree with this slide?

Page 301

1    A.   I can only -- I can only
2 read what's in front of me.  I don't know
3 if any orders were reported prior to --
4 from February 2013.
5    Q.   Based on the time when you
6 worked at Teva, which I believe you said
7 was January to April 1st, 2013, were you
8 aware that Teva reported suspicious
9 orders prior to February 2013?
10    A.   I am not.
11    MR. MAIER:  Object to form
12 and foundation.
13 BY MR. CLUFF:
14    Q.   Midway down the list there,
15 there's another bullet point that says,
16 Developing SOPs (targeted 03/13).
17    Was it your understanding,
18 based on your work at Teva, that Teva did
19 not have in operation standard operating
20 procedures prior to March of 2013?
21    MR. MAIER:  Objection.
22 Form.
23    THE WITNESS:  No, I believe
24 they did have some standard

Page 302

1    operating procedures.  But I don't
2    remember which ones they were.
3    BY MR. CLUFF:
4        Q.    Okay.  Do you have any
5    understanding of why they would have been
6    developing SOPs, then, in 2013?
7            MR. MAIER:  Objection.
8    Foundation.
9            THE WITNESS:  It may have
10   been further enhancing those SOPs,
11   but I'm not sure.
12   BY MR. CLUFF:
13       Q.    Okay.  All right.  That's
14   all I have for this document.
15           In your work at
16   AmerisourceBergen, I think you testified
17   that you worked with spreadsheets a lot;
18   is that right?
19           MR. NICHOLAS:  Object to the
20   form.
21           THE WITNESS:  We do work
22   with spreadsheets, yes.
23   BY MR. CLUFF:
24       Q.    And that your work with

Page 303

1    spreadsheets was partly to review
2    customer orders when they came up from
3    the distribution centers, correct?
4        A.    Which time frame are we
5    referring to?
6        Q.    Between 2009 and 2015.
7        A.    Yes.
8        Q.    Did you ever have occasion
9    to review spreadsheets that reflected
10   orders that were reported to the DEA?
11       A.    I don't recall that.
12       Q.    Did you have occasion to
13   review spreadsheets that reflected CSRA
14   comments for shipments between 2007 and
15   2012?
16       A.    I don't recall that.
17       Q.    Did you have occasion to
18   review a history report of all shipments,
19   a spreadsheet that catalogued that
20   information?
21       A.    I don't recall.
22       Q.    Do you think if I showed you
23   a copy of some of those spreadsheets they
24   would refresh your recollection?

Page 304

1        A.    Perhaps.
2        Q.    Give me one second, and I'll
3    grab these from my little box back here.
4            The first one I want to hand
5    to you is a document produced by
6    AmerisourceBergen, Bates stamped
7    ABDC_MDL_0045077.
8            I will apologize in advance
9    that these spreadsheets are very hard to
10   get onto one page.  I've tried my best to
11   do that for you.
12           - - -
13           (Whereupon,
14   AmerisourceBergen-Kreutzer
15   Exhibit-6, ABDC_MDL_0045077, was
16   marked for identification.)
17           - - -
18       MR. CLUFF:  We should
19   probably all use the blow-up on
20   the screen to the best of our
21   ability.
22           MR. MAHADY:  Sterling, these
23   spreadsheets, can we agree to
24   treat them confidential?

Page 305

1            MR. CLUFF:  Yes, all three.
2    So I'm going to be using 45077,
3    45075 and 45076, and all three
4    will be treated as confidential.
5    BY MR. CLUFF:
6        Q.    These are excerpts of
7    voluminous records.  They have been
8    selected to identify a single pharmacy,
9    which is Acme Pharmacy Number 30, which
10   is located in Stow, which is within --
11   off the top of my head, I can't remember
12   if it's Cuyahoga or Summit County, but
13   it's definitely a CT 1 jurisdiction.
14           Looking up on the top left
15   corner --
16           MR. CLUFF:  Can you blow
17   this up, Zach, top left corner?
18   BY MR. CLUFF:
19       Q.    -- it says, Reported to DEA,
20   report for all Ohio customers from
21   1/1/2007 to 12/31/2012.
22           Is that a spreadsheet that
23   you would have any familiarity with?
24       A.    I don't remember this

Page 306

1  spreadsheet.
2      Q.   Set that aside for just a
3  second, then.  That's okay.
4          I'd like to also hand you
5  another document.  It's a native file we
6  converted to PDF.  It is Bates marked
7  ABDC_MDL_0045075.  I ask that this also
8  be treated as confidential.
9          - - -
10         (Whereupon,
11         AmerisourceBergen-Kreutzer
12         Exhibit-7, ABCD_MDL_0045075, was
13         marked for identification.)
14         - - -
15         MR. CLUFF:  Zach, please
16     blow up the top left corner there
17     so we can all read the heading.
18  BY MR. CLUFF:
19     Q.   You can see, Mr. Kreutzer,
20  that this document is -- at least the
21  heading there at the top left is, CSRA
22  comments report for all Ohio customers
23  from 1/1/2007 to 12/31/2012.
24         Do you see that?

Page 307

1      A.   Yes.
2      Q.   Is this a report that you
3  have any familiarity with?
4      A.   I do not.
5      Q.   But you worked in the CSRA
6  department, correct?
7      A.   I did.
8      Q.   Okay.  And so you would have
9  reviewed orders, as part of your work in
10 the CSRA department, to determine if they
11 could be approved or had to be cancelled,
12 correct?
13     A.   Correct.
14         MR. CLUFF:  Zach, can you
15     remove that blow-up, please?  And
16     then over to the right, there is a
17     column that says, User ID.  And
18     next to it there's another column
19     that says, Action taken.
20         Can you blow those up,
21     please?
22  BY MR. CLUFF:
23     Q.   Looking on the screen in
24  front of you, Mr. Kreutzer, do you see

Page 308

1  where it says, User ID, in the top left
2  corner?
3      A.   Yes.
4      Q.   And underneath that is your
5  first initial and last name, K. Kreutzer?
6      A.   Yes.
7      Q.   So based on your work as a
8  diversion control specialist in the CSRA
9  department, and looking at this document,
10 does it reflect decisions that would have
11 been made by employees of
12 AmerisourceBergen, including yourself,
13 regarding customer orders?
14         MR. NICHOLAS:  Objection.
15     Form and foundation.
16         THE WITNESS:  Can you ask
17     that question again?
18  BY MR. CLUFF:
19     Q.   Sure.
20         I'm trying to understand
21  what this document is.  And I see that
22  it's got your first initial and your last
23  name on it.  And that it has a column
24  entitled, Action taken.

Page 309

1          And I'm trying to
2  understand, you know, based on the
3  heading, CSRA comments report, and some
4  of the information that's contained in
5  the document, what's reflected in here.
6          And the question is, does
7  this contain a record of customer orders
8  that would have been reviewed by
9  AmerisourceBergen employees, specifically
10 in the CSRA department, to determine
11 whether or not they could be, you know,
12 released or cancelled?
13     A.   I believe so, yes.
14     Q.   Have you ever seen a report
15  like this before?
16     A.   I don't recall this
17  document.

Page 310

Page 312

1    here on the screen, which you can
2    also see in front of you, because
3    I forgot to bring my magnifying
4    glass for you today.
5  BY MR. CLUFF:

Page 311

2       Q.   Earlier you testified that
3  if an order was reported to the DEA as
4  suspicious, it was not shipped, correct?
5       A.   Yes.
6       Q.   So looking back at, I
7  believe it's Number 6, which is 45077.
8            MR. CLUFF:  And then blow up
9  that top left corner, again, Zach.
10           MR. NICHOLAS:  Can you just
11  hold up while we catch up to you
12  here?
13           MR. CLUFF:  Sure.  I'm
14  sorry.
15           MR. NICHOLAS:  Which
16  document are we in?
17           MR. CLUFF:  It's Exhibit
18  Number 6.  It's one of the big
19  spreadsheets.  And down in the
20  bottom left corner -- bottom right
21  corner, it should have an Exhibit
22  6 tab on it.
23           And then I asked Zach to
24  blow up and highlight the heading

Page 313





Page 314

<sup>4</sup> Q. All right. Let's -- I want
<sup>5</sup> to hand you one more.
<sup>6</sup> MR. CLUFF: Zach, this will
<sup>7</sup> be Number 43.
<sup>8</sup> It's another Excel native
<sup>9</sup> spreadsheet that was produced by
<sup>10</sup> AmerisourceBergen that we'll treat
<sup>11</sup> as confidential. It is
<sup>12</sup> ABDC_MDL_00045076, and we'll mark
<sup>13</sup> it as Exhibit-8.
<sup>14</sup> - - -
<sup>15</sup> (Whereupon,
<sup>16</sup> AmerisourceBergen-Kreutzer
<sup>17</sup> Exhibit-8, ABDC_MDL_00045076, was
<sup>18</sup> marked for identification.)
<sup>19</sup> - - -
<sup>20</sup> MR. CLUFF: Zach, can you
<sup>21</sup> blow up the top left corner of
<sup>22</sup> that document?
<sup>23</sup> BY MR. CLUFF:
<sup>24</sup> Q. It says, History report

Page 315

<sup>1</sup> requested for all Ohio customers from
<sup>2</sup> 1/1/2007 to 12/31/2012.
<sup>3</sup> Do you see that, Mr.
<sup>4</sup> Kreutzer?
<sup>5</sup> A. Yes, I do.
<sup>6</sup> Q. Do you have any
<sup>7</sup> understanding about whether this document
<sup>8</sup> would reflect all shipments by
<sup>9</sup> AmerisourceBergen to customers in Ohio
<sup>10</sup> between 2007 and 2012?
<sup>11</sup> MR. NICHOLAS: Object to the
<sup>12</sup> form. And lack of foundation.
<sup>13</sup> THE WITNESS: I don't know.
<sup>14</sup> BY MR. CLUFF:
<sup>15</sup> Q. You were responsible for
<sup>16</sup> reviewing customer orders while you were
<sup>17</sup> a diversion control specialist, correct?
<sup>18</sup> A. Correct.
<sup>19</sup> Q. Just looking at this
<sup>20</sup> document, we'll start on the left, it
<sup>21</sup> says, Division, DEA, at the top heading.
<sup>22</sup> Would that be
<sup>23</sup> AmerisourceBergen's DEA number? Or do
<sup>24</sup> you know whose that would be?

Page 316

<sup>1</sup> A. I believe that is
<sup>2</sup> AmerisourceBergen's Columbus distribution
<sup>3</sup> center's DEA, but I'm not 100 percent
<sup>4</sup> certain.
<sup>16</sup> Q. Then the next column over is
<sup>17</sup> a shipping address, Line 1, that appears
<sup>18</sup> to be just a street address for the
<sup>19</sup> pharmacy, right?
<sup>20</sup> A. Yes.
<sup>21</sup> Q. Next column is -- I was
<sup>22</sup> reading it without abbreviating it.
<sup>23</sup> Do you want me to read the
<sup>24</sup> abbreviation so it's clear? Or if I --

Page 317

<sup>1</sup> A. No.
<sup>2</sup> MR. NICHOLAS: In this case,
<sup>3</sup> it's okay.
<sup>4</sup> BY MR. CLUFF:
<sup>5</sup> Q. So the next column over,
<sup>6</sup> based on what I'm reading, looks like
<sup>7</sup> shipping address, city name?
<sup>8</sup> A. Yes.
<sup>9</sup> Q. Which would be the city this
<sup>10</sup> pharmacy is located in.
<sup>11</sup> And then the next column is
<sup>12</sup> ship address, state code.
<sup>13</sup> Here it looks like it's
<sup>14</sup> Ohio, correct?
<sup>15</sup> A. Right.
<sup>16</sup> Q. Next column over is shipping
<sup>17</sup> address, zip 5, probably code again.
<sup>18</sup> The zip code the pharmacy is
<sup>19</sup> listed in?
<sup>20</sup> A. Yes.
<sup>21</sup> Q. Customer PO number.
<sup>22</sup> Would that stand for
<sup>23</sup> purchase order number?
<sup>24</sup> A. Yes.

Page 318

1   Q.   We looked at the DEA -- the
2   reported to DEA spreadsheet, which is
3   Exhibit-6, and we talked about that that
4   column -- that spreadsheet had a column
5   called purchase order number as well,
6   correct?
7   A.   Yes.
8   Q.   Moving to the right, again,
9   we see customer DEA is the next column,
10  and that would be this pharmacy
11  customer's DEA number, right?
12  A.   Correct.
13  Q.   The next column over is,
14  Customer chain ID.
15      Do you have any idea about
16  what a customer chain ID number is?
17  A.   Since that is a -- appears
18  to be a retail pharmacy chain, Acme, I
19  believe that's the chain ID number
20  associated with this particular customer.
21  Q.   Okay.  So chain pharmacies
22  had an additional ID aside from their
23  AmerisourceBergen customer ID?
24  A.   I don't recall.

Page 319

1   Q.   Understood.
2       The next column over, it's
3   kind of wrapped over, but it says,
4   Customer DEA TY.
5       Do you know what that stands
6   for?  Could it refer to type?
7   A.   I believe so, yes.
8   Q.   So what would the R1
9   designation refer to?
10  A.   I'm not sure.  I don't
11  recall.
12  Q.   Does it have any relation to
13  retail chains?
14  A.   I am not sure.
15  Q.   The next column over is,
16  Customer size.  And on the first four
17  lines, there is an M and after that, the
18  designation changes to L.
19      Do you know what is
20  identified in that column?
21  A.   What the letters stand for?
22  Q.   Yes.
23  A.   That would be medium and
24  large.

Page 320



20  Q.   Moving to the right one
21  more, it says, Order date.
22      That would have been just
23  the order -- or the date for this order
24  that we're looking at, right?

Page 321

1   A.   Yes.
2   Q.   And the quantity ordered,
3   how does AmerisourceBergen measure
4   quantities?  So I see there at the top it
5   says 49 is the quantity ordered.
6       Does that mean 49 pills were
7   ordered?
8   A.   That just seems like an odd
9   number to -- for an order quantity.
10  Usually, they would be in even numbers.
11  Q.   But what I'm trying to
12  figure out is, were they ordering 49
13  batches of 100 pills?
14  A.   It could be 49 bottles of
15  whatever they're ordering.
16  Q.   How many bottles -- how many
17  pills would be in a bottle?
18  A.   It varies.  It could be 100
19  dosage units.  It could be 500.  It could
20  be 1,000.
21  Q.   I want to go over two -- two
22  columns that say item family and item
23  description.
24      Would these columns tell us

Page 322

1 what family of drug and the description
2 of what was being ordered?
3     A.   Yes.
4     Q.   So morphine solid would be a
5 solid form of a morphine pill?
6     A.   Yes.
7     Q.   And then what would a
8 morphine sulfate be, or morphine SULF?
9     A.   That's just the brand name
10 or generic name.
11     Q.   Okay.  Scrolling over, there
12 is an item schedule column.
13         Under that, it says, C-II?
14     A.   Yes.
15     Q.   So is that the class of drug
16 that would have been ordered?
17     A.   Yes.
18     Q.   And the next column over is
19 DC, with a number 10 under it.
20         Can you tell me what that
21 number is?
22     A.   That's the Columbus DC
23 number.
24     Q.   Okay.  The next column over

Page 323

1 is user ID.  If you go five down, it
2 says, AREDFOX.
3         Would that be somebody
4 else's first initial and last name
5 combined, or do you know what that --
6 what those letters designated?
7     A.   I don't know what that
8 designates.  I don't know who that is.
9     Q.   If you keep moving down that
10 column, there's a field that reads,
11 DRC1213.
12         Do you know what that
13 designates?
14     A.   I do not.
15     Q.   Did AmerisourceBergen
16 employees such as yourself have IDs that
17 they sometimes used in addition to their
18 names or initials?
19     A.   We had user IDs, numbers.
20     Q.   So this DRC1213, could that
21 be somebody's user ID?
22         MR. NICHOLAS:  Object to the
23     form.
24         THE WITNESS:  I'm not sure.

Page 324

1 BY MR. CLUFF:
2     Q.   If you go to the next
3 column, it says, Release code.
4         And then midway down on the
5 screen, there is an abbreviation, IN.
6         Do you know what that stands
7 for?
8     A.   I do not.
9     Q.   Could it potentially stand
10 for investigation?
11         MR. NICHOLAS:  Object to the
12     form.
13         THE WITNESS:  It may, but
14     I'm not sure.
15 BY MR. CLUFF:
16     Q.   Scrolling down, do you see
17 that there is an abbreviation, AC?
18     A.   Yes.
19     Q.   Do you know what that stands
20 for?
21     A.   I do not.
22     Q.   Could it perhaps stand for
23 approved by a CSRA?
24         MR. NICHOLAS:  Same

Page 325

1     objection.
2         THE WITNESS:  That's what
3     the comments state.
4 BY MR. CLUFF:
5     Q.   So is it reasonable to
6 assume that means approved by CSRA?
7         MR. NICHOLAS:  Object to the
8     form.
9         THE WITNESS:  For this
10     particular item, yes.
11 BY MR. CLUFF:
12     Q.   I want you to look for me
13 again at Exhibit Number 6, which is the
14 first spreadsheet I handed you that is
15 45077.
16         Do you see that?  In the
17 middle --
18         MR. CLUFF:  Zach, could you
19     blow up the middle of the document
20     for me where we can see the
21     customer purchase order number
22     through to the item description?
23 BY MR. CLUFF:
24     Q.   Starting in the middle of

Page 326

1 that page, Mr. Kreutzer, do you see where
2 it says --
3        MR. CLUFF:  Can you pull
4    that to -- I need to see the
5    purchase order number, Zach.  It's
6    to your left.
7 BY MR. CLUFF:
8    Q.   So the purchase order number
9 says, CES112610.
10       Do you see that?
11   A.   Yes.
12   Q.   And there are four lines
13 there?
14   A.   Yes.
15   Q.   Okay.  Keep that in front of
16 you, just kind of hold it, put your
17 finger on that.  And then go back to
18 Exhibit Number 8, and go to Page 7.
19       And at the bottom third of
20 the page, you'll see midway down, in the
21 customer purchase order number column,
22 that CES112610 begins.
23       MR. CLUFF:  That's the wrong
24    one, Zach.

Page 327

1 BY MR. CLUFF:
2    Q.   Can you see on your page,
3 Mr. Kreutzer --
4    A.   I cannot.  I can't read
5 this.
6    Q.   That probably makes a lot of
7 us.
8    A.   I mean, I can read it on the
9 monitor in front of me.
10       MR. CLUFF:  Keep going down,
11    Zach.  To the very bottom of your
12    screen right now, Zach.  Right
13    there.
14       And then drag it to your
15    left, Zach.
16 BY MR. CLUFF:
17   Q.   So do you see the order
18 number there, Mr. Hazewski?
19       MR. NICHOLAS:  You mean Mr.
20    Kreutzer?
21 BY MR. CLUFF:
22   Q.   I'm sorry.  Yes.  Mr.
23 Kreutzer.
24       Is that the same number we

Page 328

1 were looking at in the DEA report,
2 CES112610?
3    A.   Yes.
4    Q.   If you scroll to the right,
5 to the column that has the release codes
6 in it, if you -- if you look down at the
7 bottom of that order, there is a code
8 that says, AC.
9        Would that mean that this
10 report -- this order was approved for
11 shipment by the CSRA?
12   A.   I don't see any information.
13       MR. NICHOLAS:  I don't see
14    it either, I'm sorry.
15       MR. CLUFF:  Do this for me,
16    Zach, do you see the first
17    CES112610?
18 BY MR. CLUFF:
19   Q.   Can you see it now on there,
20 Mr. Kreutzer?
21   A.   I'm sorry, what are we
22 looking at?
23   Q.   Can you see the highlighted
24 portion --

Page 329

1    A.   Yes, yes.
2    Q.   So if you -- all the way to
3 the left of your screen, you'll see a
4 list of order numbers.  And Zach has
5 highlighted one that says 112610 up
6 there.
7    A.   Yes.
8    Q.   There's also one that
9 precedes that, that's not highlighted
10 yet.
11       But if you travel down that
12 number, you see that the order number
13 remains the same all the way until he
14 gets to the bottom row that's
15 highlighted, correct?
16   A.   Correct.
17   Q.   And if you drag the
18 highlighted portion all the way over to
19 the end where we have those codes, you'll
20 see that they start out as IN codes and
21 then end as AC codes.
22       MR. MAHADY:  Hold on a
23    second.  I think you need to
24    take -- do you want the witness

Page 330

1  to leave so we can talk about
2  this?  I don't want to --
3      MR. CLUFF:  Step out for a
4  second, Mr. Kreutzer.  Give us --
5      MR. NICHOLAS:  Go out and
6  we'll talk about this so we don't
7  influence your testimony.
8      THE WITNESS:  You want me to
9  leave?
10     MR. CLUFF:  Just for a
11 minute.
12     VIDEO TECHNICIAN:  Off the
13 record at 3:51 p.m.
14         - - -
15     (Whereupon, a brief recess
16 was taken.)
17         - - -
18     VIDEO TECHNICIAN:  We're
19 back on the record at 4:11 p.m.
20     MR. CLUFF:  Mr. Kreutzer,
21 we're back on the record.
22     But before we start back
23 with you, your lawyers and I
24 discussed some of these

Page 331

1  spreadsheets that we were asking
2  you questions about, and we've
3  come to an understanding about
4  them.  So I'm going to do what's
5  called make a record of our
6  discussion.
7      I understand that you have
8  not been privy to any discussions
9  about these spreadsheets, so I'm
10 not going to ask you any questions
11 about discussions you had in the
12 hallway.
13     So during the break, counsel
14 for AmerisourceBergen and I met
15 and conferred about what has
16 previously been identified during
17 this deposition as Exhibits 6, 7
18 and 8.  Specifically, I was
19 informed, and this is something
20 that was disclosed during document
21 production, so it was not a
22 surprise, although it was
23 re-uncovered again today during
24 the deposition, that the document

Page 332

1  marked as Exhibit-6, which is
2  Bates number ABDC_MDL_00045077,
3  along with the documents
4  identified as Exhibits-7 and 8,
5  are not traditionally kept in this
6  format during AmerisourceBergen's
7  regular course of business.
8      And that during the creation
9  of Exhibit-6, there was, I
10 believe, what we have mutually
11 referred to as a data collection
12 error, or a data collection
13 malfunction that resulted in
14 inaccuracies in ABDC_MDL_00045077,
15 specifically that this document
16 may reflect orders being reported
17 to the DEA that were not actually
18 reported to the DEA.
19     We understand, as
20 plaintiffs, that these documents,
21 Exhibits-6, 7 and 8, were
22 reproduced after the data
23 malfunction was discovered and
24 that subsequently produced

Page 333

1  versions of these documents
2  contain more correct data.
3      So for the purposes of this
4  deposition, I will no longer be
5  relying on Exhibit-6 for further
6  questioning.  We discussed that I
7  do have some limited questions
8  regarding Exhibits-7 and 8, but
9  that the data malfunctions in
10 Exhibit-6 do not pervade
11 Exhibits-7 and 8.
12     And with that, I think I'll
13 turn it over to counsel for
14 AmerisourceBergen to correct me if
15 I'm wrong.
16     MR. MAHADY:  That is fine.
17 The only thing I'll add is that
18 the subsequently produced version
19 of Exhibit-6 was limited in scope
20 to Summit and Cuyahoga and not
21 Ohio.
22     MR. CLUFF:  Understood.
23     MR. MAHADY:  But counsel's
24 representations accurately reflect

Page 334

1 our understanding of the issue.
2 And we'll meet and confer with
3 counsel following the deposition.
4 BY MR. CLUFF:
5 Q. So with that understanding,
6 Mr. Kreutzer, we'll pick back up with you
7 and remind you that you're under oath
8 again.
9 I'll turn back to Exhibit-7
10 which is ABDC_MDL_450705.
11 Do you have that in front of
12 you?
13 A. I do.
14 Q. I'd like you to look at this
15 document, because we previously looked at
16 the user ID column, and we noted that
17 your -- the first initial of your first
18 name and your last name are in that
19 column.
20 MR. CLUFF: I'm going to ask
21 Zach to blow up and highlight, so
22 we can all see the headings,
23 starting with customer purchase
24 order number all the way to action

Page 335

1 taken.
2 So we're continuing to
3 action taken. Unfortunately,
4 these spreadsheets are rather
5 unwieldy.
6 BY MR. CLUFF:
7 Q. So you can see on the very
8 left, highlighted, we've got purchase
9 order number. And then on the right,
10 we've got action taken.
11 If you see under user ID,
12 it's got your name, K. Kreutzer.
13 I guess I should ask you.
14 Does that reflect that you were the
15 person who would have been taking action
16 on these?
17 MR. NICHOLAS: Are you able
18 to blow these up any more or not?
19 MR. CLUFF: Yeah. Zach, can
20 you try and just blow up the user
21 ID and action taken column so we
22 can see it?
23 BY MR. CLUFF:
24 Q. Do you see that, Mr.

Page 336

1 Kreutzer?
2 A. I do, yes.
3 Q. Okay. So in your role as a
4 diversion control specialist, you would
5 have reviewed customer orders that hit
6 OMP, correct?
7 A. Correct.



Page 337

10 Q. Okay. And if you look at
11 the column that says, Action taken.
12 Under there, we see two -- on the screen
13 in front of you, we see two different
14 entries. One is, Approved for
15 processing.
16 What would you have been
17 referring to if you entered approved for
18 processing as the action taken on an
19 order that hit OMP for review?
20 A. I'm not exactly sure,
21 because I don't remember using -- I don't
22 know if the action taken notes is
23 automatic or we have to enter those notes
24 manually.

Highly Confidential - Subject to Further Confidentiality Review

| | |
|---|---|
| Page 338 | Page 340 |

**Page 338**

1       This is going back eight
2 years. I don't know other than what
3 information is on the screen here.
4     Q.   Were you looking at the
5 heading column, action name, where it
6 says, Auto and manual/auto?
7     A.   Yes.
8     Q.   Do you have any
9 understanding of what an auto action name
10 would be?
11     A.   I do not.
12     Q.   And do you have any
13 understanding of what a manual/auto
14 action would be?
15     A.   I do not.
16     Q.   Okay. Going back to the
17 action taken column, do you see where it
18 says, Closed, notify compliant customer?
19     A.   Right.
20     Q.   When you compare that to
21 approved for processing, do you know what
22 either of those terms means, approved for
23 processing or closed, notify compliant
24 customer?

**Page 339**

1     A.   I do not.
2     Q.   Based on your work as a
3 diversion control specialist, could
4 either of those terms mean that this
5 order was approved for shipment?
6     MR. NICHOLAS: Object to the
7 form.
8     But go ahead.
9     THE WITNESS: I can't
10 acknowledge that.
11 BY MR. CLUFF:
12     Q.   Okay. But did you have any
13 understanding about what kind of terms
14 you used, pre-2015, to denote an order
15 that was approved for shipment?
16     A.   These notes listed here, I
17 don't remember using these notes.
18     Q.   Okay. Sure. Can you look
19 at Exhibit Number 8? That's the heavier
20 of the two spreadsheets, or the thicker
21 of the two. It's the one with 45076 at
22 the top.
23     I'm going to have them
24 highlight a portion of this for you, so

**Page 340**

1 you and I can talk about it.
2     The heading on this
3 spreadsheet is, History of all Ohio
4 reports.
5     And during the break, I'll
6 just make one further clarification, it
7 was represented that this document is a
8 complete list of all orders for Ohio that
9 went into OMP review. So I'll make that
10 representation to you, just to kind of
11 clear it up.
12     MR. MAHADY: We'll just add
13     that it's been filtered by
14     plaintiffs.
15 ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18 ▮ ▮▮▮▮▮▮▮▮▮▮▮▮
19     Zach, can you highlight all
20 the way over to where it has the
21 notes in the column after IN?
22 BY MR. CLUFF:
23     Q.   So, Mr. Kreutzer, I had our
24 tech here blow up a portion of this

**Page 341**

1 spreadsheet so we can look at it.
2     I will represent to you that
3 at the very left of your screen is the
4 customer purchase order number. You can
5 see that reflected there.
6     And then to the very far
7 right is a heading called, Column 1. And
8 immediately to the left of that, the
9 heading is, Release code.
10     I want to focus on the
11 headings with -- the two columns to the
12 very far right, the release codes and
13 then the comment.
14     So in the middle of your
15 screen on the right, there's a release
16 code that says, AC. We previously talked
17 about this one. And in the comment, it
18 says, Approved by CSRA per Ed
19 Hazewski/Kevin Kreutzer.
20     Reviewing the release code
21 with the comment together, do you have an
22 understanding of what the code AC stands
23 for?
24     A.   I do not.

Page 342

1  Q.  Looking at comment 1, it
2  says, Approved by CSRA per Ed
3  Hazewski/Kevin Kreutzer.
4       Do you know if that means
5  this order could have been released for
6  shipment?
7       A.  According to the comment
8  section, it says the order was approved.
9       Q.  Does that mean it was
10 approved for shipment to the customer?
11      A.  I assume so, yes.
12      Q.  If you come down into the
13 highlighted -- the big block highlighted
14 portion, to the very far left of your
15 screen, the purchase order number is
16 CES042110.
17      Do you see that?
18      A.  Yes.
19      Q.  And over to the far right in
20 the comments section, there is a note
21 that is repeated in pairs a number of
22 times.  And it says, Retail oxycodone,
23 63.8 percent -- I believe it's a
24 percentage -- over.

Page 343

1       The quality of the copy is a
2  little bad, I apologize.  It's clearer in
3  the printout, if you look at that.
4       Do you see where that is?
5       A.  I do.
6       Q.  Do you have any
7  understanding, reading this document,
8  what that comment signifies?
9       A.  According to the release
10 code, it says IN.  So I don't know if
11 that order was approved or rejected.
12      Q.  I'm going to get to that
13 question in a second.
14      I'm trying to understand
15 what retail oxycodone 63.89 percent over
16 means.
17      A.  It could mean -- it's a
18 retail pharmacy, oxycodone drug family,
19 and the 63.89 percent over.
20      Q.  So that would have been --
21 I'm sorry, I didn't mean to interrupt
22 you.
23      A.  I'm assuming that's -- I'm
24 not really sure what that means.  It

Page 344

1  could be over threshold, but I'm not
2  certain.
3       Q.  Okay.  Do you have anything
4  else that it would be besides over
5  threshold?
6       A.  Not that I can think of.
7       Q.  I want to scroll down to the
8  next page and stay with this order
9  number, which is CES042210.  Zach is
10 going to --
11      MR. CLUFF:  Blow it up for
12      us real big, Zach.
13 BY MR. CLUFF:
14      Q.  So do you see in the top
15 left corner there of the highlighted
16 block there is the customer order number,
17 which is CES042210?
18      A.  Yes.
19      Q.  That's the same order number
20 we were looking at the previous screen?
21      A.  Yes.
22      Q.  And if you go over to the
23 far right, there's the release code and
24 the comment 1.  The release code is for

Page 345

1  the top -- I can't count how many lines
2  that is, but the release code is AC, and
3  the comment is, Approved per Edward -- or
4  Ed Hazewski.
5       Is that --
6       A.  Yes.
7       Q.  Would that mean that this
8  order was approved for processing and
9  shipment to the customer?
10      A.  It appears so.
11      Q.  What kind of due diligence
12 or investigation would have been
13 conducted before an order like this was
14 approved by Ed Hazewski?
15      A.  I don't know.  I don't know
16 who actually approved this order.
17      Q.  Do you have any reason to
18 believe this was not approved by Ed
19 Hazewski?
20      A.  Other than the notes say
21 otherwise.
22      Q.  If you look at the order
23 date, it looks like it goes year, month
24 and day, which would be 2010/04/22.



Page 346

```
1        At that point, you had been
2   working as a diversion control specialist
3   for over a year, correct?
4        A.   I thought I came in to the
5   company in September of 2009, so
6   approximately, maybe six --
7        Q.   Six months?
8        A.   -- six months or so.
9        Q.   During the six months prior
10  to this order that we're looking at, had
11  you had experience investigating orders
12  that went into OMP for review?
13       A.   Yes.
```

Page 348

```
9        MR. NICHOLAS:  Object to the
10  form.
11       THE WITNESS:  Yes.
12  BY MR. CLUFF:
13       Q.   Was there a policy or
14  procedure document that described to you
15  what a detailed investigation included?
16       A.   I don't recall that
17  document.
```

Page 347

Page 349

Page 350

Q.   So, then, this note in the comments, Approved per Ed Hazewski, is that an example of documentation of a detailed investigation?

A.   I don't know.

Q.   This is one of the areas -- I'm sorry, I didn't mean to interrupt you.

A.   I don't know.  There may be other documentation elsewhere that I'm not aware of.

Q.   But this is one area where you said detailed documentation would exist?

A.   It could, yes.

Q.   And you said also it might be in Lawtrac?

A.   Yes.

Q.   So if a customer's order hit -- or went into OMP for review and there was a detailed investigation carried out about that order, that would be in Lawtrac, right?

Page 351

A.   It could be, yes.

Q.   Would there be documentation associated with that review?

A.   Like I said, it all depends on the review, yes.

Q.   Were there ever any e-mails generated that documented the findings of these detailed investigations about OMP review?

MR. NICHOLAS:  Object to the form.

THE WITNESS:  I don't know.

BY MR. CLUFF:

Q.   Do you recall receiving e-mails from an e-mail address ABC-notification@AmerisourceBergen regarding orders in OMP review?

A.   No, I don't recall.

Q.   You previously testified there were a couple of places where documentation about investigations like this could be stored.

But was there a standard place where it would have been stored?

Page 352

MR. NICHOLAS:  Object to the form.

THE WITNESS:  At that time, I believe it would be either Lawtrac or the system itself.

BY MR. CLUFF:

Q.   "The system itself" would be?

A.   This system that we see in front of us.

Q.   The system that generated the spreadsheet?

A.   Yeah, this -- yeah, exactly.

Q.   And it would have been recorded in this comments field?

A.   Yes.

MR. NICHOLAS:  Object to the form.

Go ahead.

BY MR. CLUFF:

Q.   And just so I understand, the system that you're referring to, you didn't enter into an Excel spreadsheet and manually make these notes, right?

Page 353

A.   Not into a spreadsheet, no.

Q.   You would have been working with sort of a computer program that had fields for you to work in?

A.   I'm not sure I follow you.

Q.   Like, when you order something online, there are fields for you to enter information into, like your name and your address and your credit card number?

A.   Yes.

Q.   So did you work with a computer program that had fields similar to that for you to put information into when you were investigating an order?

A.   In that system that we used in 2010, I believe there was a note section where we could have put notes in.

MR. CLUFF:  Let's take a break.  I think I have maybe one more topic that I want to cover, but then we'll probably wrap up.  I know people have flights they want to catch, down at the end of

Page 354

1 the table.
2 VIDEO TECHNICIAN: Off the
3 record at 4:31 p.m.
4 - - -
5 (Whereupon, a brief recess
6 was taken.)
7 - - -
8 VIDEO TECHNICIAN: We are
9 back on the record at 4:41 p.m.
10 BY MR. CLUFF:
11 Q. Mr. Kreutzer, we're back on
12 the record and you're still under oath.
13 I'll do my best to get you out of here
14 quickly, if your lawyers don't have
15 further questions on you. So lean on
16 them, and get us all home.

Page 355

8 Q. Was there ever a push or an
9 incentive to increase the rates at which
10 DC associates were releasing
11 low-to-medium drug families?
12 A. We had a spreadsheet of all
13 the participation rates of all the
14 distribution centers, as far as
15 adjudicating low- and medium-risk drug
16 families.
17 Q. Forgive my lay
18 understanding.
19 What is a participation
20 rate?
21 A. Participation rate would be
22 the adjudication rate, let me clarify.
23 Q. And is that adjudication
24 rate calculated by taking the total

Page 356

1 number of orders that come in for DC
2 review and comparing it to the number
3 that were escalated for CSRA interview?
4 A. Yes, for low- and
5 medium-risk drug families.
6 Q. Do you -- you're familiar
7 with the concept of a Schedule II drug
8 and a Schedule III drug?
9 A. Yes.
10 Q. Schedule I drug?
11 A. Yes.
12 Q. What is your understanding
13 of the different schedules?
14 A. Schedule I has no legitimate
15 medical use; Schedule II is products that
16 are prone to high risk for diversion; and
17 Schedule III is just a lower risk of
18 those drugs that are a potential for
19 diversion.
20 Q. Who classifies drugs as
21 Schedule I, II or III?
22 A. The DEA.
23 Q. AmerisourceBergen does not
24 ship Schedule I drugs, correct?

Page 357

1 A. I don't believe so, no.
2 Q. But AmerisourceBergen does
3 ship Schedule II and Schedule III drugs,
4 correct?
5 A. Yes.
6 Q. We've previously talked, and
7 you've mentioned low-, medium- and
8 high-risk drug families.
9 A. Yes.
10 Q. Were there ever any other
11 categories besides low, medium and high?
12 A. I don't believe so.
13 Q. Do you know if Schedule II
14 drugs were classified as medium risk by
15 AmerisourceBergen?
16 A. There may have been. But
17 over the years, we have moved drug
18 families from low to medium, medium to
19 high and high to medium. So it's -- we
20 do an annual refresh every year.
21 Q. Just so I understand the
22 parallels here, though, you described a
23 Schedule II drug as a high risk for
24 diversion, correct?

Page 358

1  A.  Yes.
2      Q.   What was -- what was the
3  high-risk category?  How did
4  AmerisourceBergen define high risk?
5      MR. NICHOLAS:  Object to the
6  form.
7      Go ahead.
8      THE WITNESS:  I believe just
9  as the explanation that I
10  provided, drug families that are
11  prone to diversion.
12  BY MR. CLUFF:
13      Q.   And so Schedule IIs had a
14  high risk for diversion.
15      But if I understand it
16  correctly, you testified that at some
17  points in time AmerisourceBergen
18  categorized Schedule IIs as medium risk;
19  is that right?
20      A.   I don't believe that.  What
21  my explanation is, is that we've always
22  had drug families that are in a high-risk
23  category.  And we -- as well as medium
24  and low.

Page 359

1      But over time and in review
2  with management and our pharmacist on
3  staff, we determined that some risks may
4  be -- needed to be switched from medium
5  to high, for instance.
6      Q.   I understand that.  Thank
7  you.
8      So I guess my question is
9  maybe a little bit more specific.
10      If Schedule II drugs have
11  been determined by the DEA to have a high
12  risk of diversion, has AmerisourceBergen
13  always categorized Schedule II drugs as a
14  high-risk drug family, or have they ever
15  been categorized as medium risk?
16      MR. NICHOLAS:  Object to the
17  form.
18      THE WITNESS:  I don't recall
19  them ever being medium risk.
20  BY MR. CLUFF:



Page 360

24      Q.   I'll hand you another

Page 361

1  document.  We're going to mark this as
2  Exhibit 9.  This is ABDC_MDL_00047572.
3          - - -
4      (Whereupon,
5      AmerisourceBergen-Kreutzer
6      Exhibit-9, ABDC_MDL_00047572, was
7      marked for identification.)
8          - - -
9  BY MR. CLUFF:
10      Q.   There were some Excel
11  spreadsheets attached to that document.
12  I elected not to include them and save
13  the paper.  I just have a couple quick
14  questions on this, Mr. Kreutzer.
15      MR. NICHOLAS:  Just give him
16  a moment.
17  BY MR. CLUFF:
18      Q.   Sure.  I'll just let you
19  know my questions are going to be about
20  the first paragraph.  So if you want to
21  focus your analysis there, that would
22  help.
23      MR. NICHOLAS:  Read the
24  whole document anyway.

Page 362

1     MR. CLUFF:  Do you want to
2  go home or not, Bob?  We'll be
3  here all night reading documents.
4     MR. NICHOLAS:  I think
5  reading seven more lines is not
6  going to make the difference
7  between going home tonight or not.
8     MR. CLUFF:  Bob, I respect
9  you, but I'll respectfully
10  disagree.
11     THE WITNESS:  Okay.
12  BY MR. CLUFF:
13     Q.   So looking at this first
14  paragraph -- well, actually, let's do
15  this.
16        So from the -- in the top of
17  the e-mail, you see there's a "from"
18  line.  It's from unknown.  Do you have
19  any idea who this kind of e-mail would
20  come from?
21     A.   I've never seen that before.
22     Q.   Well, first time for
23  everything for all of us, I guess.
24        In the "to" category, you

Page 363

1  see there are a number of individuals,
2  one of whom is yourself, right?
3     A.   Yes.
4     Q.   And then you see the subject
5  is, Discussion-report review, weekly OMP
6  field report performance.
7     A.   Yes.
8     Q.   Was your department having
9  weekly meetings regarding the OMP
10  performance of distribution centers?
11     A.   We were.
12     Q.   And were you also discussing
13  performance of, like, CSRA individuals,
14  as far as OMP review goes?
15     A.   I believe this particular
16  e-mail is pertaining to the DC
17  associates.
18     Q.   Understood.



Page 364

Page 365



Page 366

Page 367

Page 368

19      Q.   Let's hand you the next
20   document.  This is going to be marked as
21   Number 10.
22           -  -  -
23      (Whereupon,
24   AmerisourceBergen-Kreutzer

Page 369

1   Exhibit-10, ABDC_MDL_00151471-472,
2   was marked for identification.)
3           -  -  -
4      MR. CLUFF:  It is
5   ABDC_MDL_00151471.  It's a
6   two-page document ending in
7   151472.
8      THE WITNESS:  Okay.
9  BY MR. CLUFF:
10      Q.   At the top, this is an
11   e-mail from Eric Cherveny to Greg
12   Hamilton, with a cc to you.
13      Do you know who Greg
14   Hamilton was?
15      A.   Greg Hamilton is the CSRA
16   distribution center manager for Columbus.





Highly Confidential - Subject to Further Confidentiality Review



Page 378

Page 379

Page 380

Page 381





Page 386

Q. What's a listed chemical?

A. A listed chemical is pseudoephedrine products.

Q. How do you abbreviate that term?

A. Listed chemical? LC.

Q. Did AmerisourceBergen have different policies and procedures for suspicious orders for listed chemicals than they did for, for example, like opioids or controlled substances?

A. I don't recall.

Page 387

MR. CLUFF: Why don't we mutually take a break. You guys can go see if you have any further questions. I'll confer with Will. And we'll come back in five minutes.

VIDEO TECHNICIAN: Off the record at 5:11 p.m.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: We're back on the record at 5:19 p.m.

BY MR. CLUFF:

Q. Mr. Kreutzer, we're back on the record for the last few questions that I have for you, and then I'll turn it over to your counsel to talk.

I want to hand you -- excuse me. I'm going to hand you a copy of a document that was produced by AmerisourceBergen. It's ABDC_MDL_00168122, which is an e-mail

Page 388

that contains a number of attachments. I've included one attachment with the document that begins at ABDC_MDL_00168127 and goes to 168134. I'll hand you this one.

- - -

(Whereupon, AmerisourceBergen-Kreutzer Exhibit-12, ABDC_MDL_00168122 and ABDC_MDL_00168127-134, was marked for identification.)

- - -

BY MR. CLUFF:

Q. I'm not going to ask you any detailed questions about this document at all. I'd like you to just look at it.

You do not appear to have received this document. But we have discussed today, at length, Lawtrac

Do you see that?

Page 389

A. Give me a second.

MR. NICHOLAS: I don't see that. Where --

MR. CLUFF: The cover page, the e-mail, the attachments.

MR. NICHOLAS: Where it says attachments, okay. Sorry.

MR. CLUFF: I misspoke.

BY MR. CLUFF:

Q. I was just trying to indicate that this e-mail contained Lawtrac matter texts as attachments.

And then if you'll flip to the next page, which has ABDC_MDL_00168127, if you look at the top of the page in the middle of the document, there is some text that says,

Highly Confidential - Subject to Further Confidentiality Review

| Page 390 | Page 392 |

Page 390

1 Q. And then look down at the
2 bottom of the page, where it says, Text
3 records.
4 Do you see that?
5 A. Yes.
6 Q. We previously talked, in one
7 of these exhibits, about what you and I
8 kind of referred to as a text box, and
9 you said that might have been
10 documentation that would have been
11 included in Lawtrac.
12 Would that -- that
13 information that we talked about earlier,
14 would that have been under the text
15 records section of these Lawtrac reports?
16 A. Yes.
17 Q. So if I were looking at a
18 Lawtrac report, text records is where I
19 would find the records of investigations
20 or information about ABC's relationship
21 with a customer?
22 A. Correct.
23 Q. Okay. Can you tell me, in
24 looking at this document, where I would

Page 392

1 A. Yes, that is correct.
2 Q. So those text boxes, would
3 those have been what I'll refer to as a
4 hyperlink that I could have clicked and
5 it would have taken me to other
6 information?
7 MR. MAHADY: The text box is
8 on the right side of the document?
9 MR. CLUFF: Yes.
10 THE WITNESS: I'm not sure.
11 BY MR. CLUFF:
12 Q. Okay. Did you use Lawtrac
13 matters like this in your work?
14 A. I did.
15 Q. Okay. And I'm not trying to
16 catch you in anything. I'm trying to
17 just understand how you would have used
18 this system.

Page 391

1 be able to locate or identify the
2 documents that were associated with this
3 Lawtrac file?
4 MR. NICHOLAS: Object to the
5 form.
6 THE WITNESS: It's been
7 quite a while since I used this
8 system. I believe in the
9 documents and files column on
10 168129.
11 BY MR. CLUFF:
12 Q. Let me redirect you to
13 168127.
14 In the upper right-hand
15 corner, there's an underlined piece of
16 text that says, Main matter screen. And
17 there are text boxes underneath that.
18 Do you see that?
19 A. Yes.
20 Q. And one of them says,
21 Documents and files.
22 A. Yes.
23 Q. Is that the same as the one
24 you were looking at on 129?

Page 393

22 BY MR. CLUFF:
23 Q. That may be true. I will
24 just represent to you that this is how

Page 394

1 the document was produced to me.
2      And I'm just trying to
3 figure out where you would click in this
4 document that is a reflection of a
5 computer program to get to the documents?
6      A.   There would be documents
7 posted here that you would be able to
8 click on.
9      Q.   When you're saying "here,"
10 can you tell me what page you're looking
11 at?
12      A.   I would -- I believe it
13 would be under the linked matters.
14      Q.   What page is that?
15      A.   Page 2 of 3.
16      Q.   I'm sorry?
17      A.   168128.
18      Q.   Okay.  So in the middle of
19 the page?
20      A.   It would be in,
21 approximately, that field.
22      Q.   And is there anywhere else
23 in this Lawtrac file where you would have
24 been able to access records from?

Page 395

1      A.   No.  It would likely be in
2 this file.
3      Q.   Okay.  Go to
4 ABDC_MDL_00168129.  In the middle of the
5 page, there is a date, 06/09/14.  It
6 says, Status.  Then, Update, 06/09/14,
7 source name, in-house staff, Kevin
8 Kreutzer.
9      Do you see that?
10      A.   I do.

[redacted]

20      Q.   Would there have been
21 documentation attached to this?
22      A.   Yes, there would be.
23      Q.   So that's the last sentence
24 of that paragraph, it says, Form 590 and

Page 396

1 photos are attached?
2      A.   Correct.
3      MR. CLUFF:  That's all I
4 have.
5      That's all I've got, just in
6 case you guys didn't hear me.
7      MR. NICHOLAS:  I have no
8 questions.
9      VIDEO TECHNICIAN:  This
10 concludes today's deposition.  The
11 time is 5:28 p.m.  We are off the
12 record.
13      - - -
14      (Whereupon, the deposition
15 concluded at 5:28 p.m.)
16      - - -
17
18
19
20
21
22
23
24

Page 397

1      CERTIFICATE
2
3
4      I HEREBY CERTIFY that the
5 witness was duly sworn by me and that the
6 deposition is a true record of the
7 testimony given by the witness.
8
9
10
      Amanda Maslynsky-Miller
11      Certified Realtime Reporter
      Dated:  November 28, 2018
12
13
14
15
16
17      (The foregoing certification
18 of this transcript does not apply to any
19 reproduction of the same by any means,
20 unless under the direct control and/or
21 supervision of the certifying reporter.)
22
23
24

Page 398

## INSTRUCTIONS TO WITNESS

1
2
3         Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8         After doing so, please sign
9  the errata sheet and date it.
10        You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14        It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

Page 400

## ACKNOWLEDGMENT OF DEPONENT

1
2
3         I,_____, do
   hereby certify that I have read the
   foregoing pages,  1 - 396, and that the
4  same is a correct transcription of the
   answers given by me to the questions
5  therein propounded, except for the
   corrections or changes in form or
6  substance, if any, noted in the attached
   Errata Sheet.
7
8  _____
   KEVIN KREUTZER              DATE
9
10
   Subscribed and sworn
11 to before me this
   _____ day of _____, 20____.
12
   My commission expires:_____
13
14 _____
   Notary Public
15
16
17
18
19
20
21
22
23
24

Page 399

1         - - - - - -
           E R R A T A
2         - - - - - -
3  PAGE  LINE  CHANGE/REASON
4  _____ _____ _____
5  _____ _____ _____
6  _____ _____ _____
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____

Page 401

1       LAWYER'S NOTES
2  PAGE  LINE
3  _____ _____ _____
4  _____ _____ _____
5  _____ _____ _____
6  _____ _____ _____
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____