EXHIBIT 119

Highly Confidential - Subject to Further Confidentiality Review

```
  1         IN THE UNITED STATES DISTRICT COURT
  2          FOR THE NORTHERN DISTRICT OF OHIO
  3                   EASTERN DIVISION
  4                     -  -  -
  5
       IN RE:  NATIONAL        :   HON. DAN A.
  6    PRESCRIPTION OPIATE      :   POLSTER
       LITIGATION               :
  7                             :
       APPLIES TO ALL CASES     :   NO.
  8                             :   1:17-MD-2804
                                :
  9
            - HIGHLY CONFIDENTIAL -
 10
       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 11
                      -  -  -
 12
                  March 15, 2019
 13
                      -  -  -
 14
 15         Videotaped deposition of
       STEPHEN C. MACRIDES taken pursuant to
 16    notice, was held at the offices of
       McCarter & English, LLP, 1600 Market
 17    Street, Philadelphia, Pennsylvania,
       beginning at 9:05 a.m., on the above
 18    date, before Michelle L. Gray, a
       Registered Professional Reporter,
 19    Certified Shorthand Reporter, Certified
       Realtime Reporter, and Notary Public.
 20
                      -  -  -
 21
 22         GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
 23              deps@golkow.com
 24
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      There's growth.

2          Q.      Okay.  And let's see, how

3    did we do from 2000 to 2001, sir?

4                  Doing better?

5                  MS. VANNI:  Object to form.

6    BY MR. BUCHANAN:

7          Q.      Selling more?

8                  MS. VANNI:  Objection.

9                  THE WITNESS:  We're shipping

10         more product to patients who need

11         them.

12   BY MR. BUCHANAN:

13         Q.      Okay.  500 plus million,

14   half a billion pills; is that right?

15         A.      516 million.

16         Q.      Okay.

17                 MS. VANNI:  Also note my

18         objection that he is not a

19         30(b)(6) on sales history.

20   BY MR. BUCHANAN:

21         Q.      Okay.  I believe, in fact,

22   you are a designee on suspicious order

23   monitoring, correct?

24         A.      Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Okay.  Each of the shipments
2   that are memorialized in shipping records
3   followed an order, right?
4              MS. VANNI:  Object to form.
5              THE WITNESS:  You need an
6         order to ship a product.
7   BY MR. BUCHANAN:
8        Q.    Understood.  Since the
9   beginning of Endo's existence, Endo has
10  been charged with maintain -- maintaining
11  effective controls against diversion,
12  correct?
13             MS. VANNI:  Object to form.
14             THE WITNESS:  The
15        regulations state that we need to
16        have controls to prevent
17        diversion.
18  BY MR. BUCHANAN:
19       Q.    Not just any controls,
20  right?
21       A.    Can you clarify what you
22  mean by that?
23       Q.    You have to have effective
24  controls, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.  We have to have

2  controls in place to prevent diversion.

3      Q.    You have to have -- what's

4  the word you dropped?

5           MS. VANNI:  Object to form.

6  BY MR. BUCHANAN:

7      Q.    Effective controls, right?

8      A.    That those controls should

9  be effective.

10      Q.    That's right.

11      A.    I don't disagree with you.

12      Q.    Okay.  So from the

13  beginning, from 1999 till today, Endo has

14  been responsible for ensuring it has

15  effective controls to prevent diversion,

16  correct?

17      A.    By the regulations, that's

18  what we need to do.

19      Q.    As a reasonable company,

20  that's what you need to do --

21           MS. VANNI:  Object to form.

22  BY MR. BUCHANAN:

23      Q.    -- right?

24      A.    We have a responsibility to

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  There's an operating

2    company known as Endo, right?

3    A.    Right.

4    Q.    That line of business

5    includes the company's branded portfolio;

6    is that accurate?

7    A.    That would be accurate.

8    Q.    Okay.  There's an operating

9    company known as Par today?

10    A.    Correct.

11    Q.    Just owned by the Irish Endo

12    entity, correct?

13    A.    Correct.

14    Q.    Par today owns what used to

15    be Endo's generic business, as well as

16    what used to be called Qualitest's

17    business, correct?

18    MS. VANNI:  Object to form.

19    He's also not a corporate designee

20    on corporate structure, corporate

21    history.

22    BY MR. BUCHANAN:

23    Q.    And I'm really not trying to

24    do that, you know, for a legal purpose.

Highly Confidential - Subject to Further Confidentiality Review

1    I just want to make sure we're clear in

2    communicating today, because it could get

3    confusing.

4            A.    What I can tell you is Par

5    had a generics business.  Endo had a

6    generics business that it operated as

7    Qualitest.  Par and Qualitest were merged

8    into a single generics business that now

9    operates under the Par name.

10           Q.    Okay.  So the current -- the

11   current generics business is all under

12   the Par name.  Is it in the Par entity?

13                 MS. VANNI:  Object to form.

14                 THE WITNESS:  I'm not an

15           expert on our legal entity

16           structure.  Our generics business

17           operates under the Par name.

18   BY MR. BUCHANAN:

19           Q.    Okay.

20           A.    That's what I can tell you.

21           Q.    We have named Par and we

22   have named Endo.

23           A.    Right.

24           Q.    I want to know when I talk

Highly Confidential - Subject to Further Confidentiality Review

1                MS. VANNI:  Object to form.

2                THE WITNESS:  There -- there

3           are other regulations, controls,

4           that we follow that would more be

5           under the category of suspicious

6           order monitoring when it comes to

7           DEA compliance, to ensure that

8           orders are properly reviewed,

9           investigated before they are

10          distributed.

11     BY MR. BUCHANAN:

12          Q.    Okay.  And that's what I

13     wanted to understand.

14                So the concern that you have

15     and the care you have to take with

16     handling this product in the warehouse or

17     handling this product in manufacturing

18     with your own employees, people who you

19     trust and hire, has to be exercised in

20     investigating, in reviewing, every single

21     order you receive, because that concern

22     doesn't stop in the warehouse, right?

23                MS. VANNI:  Object to form.

24                THE WITNESS:  The control --

Highly Confidential - Subject to Further Confidentiality Review

1          the proper control of these

2          products extends throughout the

3          supply chain.

4    BY MR. BUCHANAN:

5          Q.    Right.  So when the company

6    receives an order for one of its

7    controlled products, it has an obligation

8    to maintain effective controls against

9    diversion with regard to the orders it

10   receives, right?

11              MS. VANNI:  Object to form.

12              THE WITNESS:  We have a

13         responsibility under the

14         regulations to make sure that we

15         are reviewing orders, that we are

16         understanding any orders of

17         interest, we are investigating

18         those.  And if it comes to it, and

19         if we determine that the order is

20         suspicious, then not to ship that

21         order.

22   BY MR. BUCHANAN:

23         Q.    Okay.  So we were looking at

24   the Endo orders just a moment ago, just

1    to give us some context.  I believe it's

2    Exhibit 4.

3                    Let's look at 1999.  You

4    know, shipped -- shipped hundreds of

5    millions of opioid products in 1999.

6    Every one of those was by an order.

7                    And how many suspicious

8    orders did the company report to the DEA

9    in 1999 for Endo products, sir?

10                   MS. VANNI:  Object to form.

11        The colloquy.

12                   THE WITNESS:  I don't

13        believe we reported any suspicious

14        orders as an outcome of our

15        investigations.

16   BY MR. BUCHANAN:

17        Q.    Okay.  So in 1999 the

18   company reported no suspicious orders to

19   the DEA for Endo's orders?

20        A.    I don't believe we reported

21   any suspicious orders to the DEA in 1999

22   as a result of our investigations.

23        Q.    Okay.  How about in 2000,

24   we've got, you know, hundreds of millions

Highly Confidential - Subject to Further Confidentiality Review

1    of pills again, 400 million plus.  I

2    guess that's also syrups, so dosage units

3    of syrups.

4              400-plus million pills and

5    dosage units all pursuant to orders.  And

6    how many suspicious orders did -- did

7    Endo report to the DEA for 2000?

8              MS. VANNI:  Object to form.

9              THE WITNESS:  I don't

10        believe we reported any suspicious

11        orders in 2000 as an outcome of

12        our investigations into anything

13        that was of interest.

14   BY MR. BUCHANAN:

15        Q.    Okay.  How about 2001, it

16   looks like -- well, sales are growing.

17   We talked about that a moment ago.

18   500-plus million pills and dosage units

19   for Endo in 2001.

20              How many suspicious orders

21   got reported to the DEA that year?

22              MS. VANNI:  Object to the

23        colloquy.  You can answer.

24              THE WITNESS:  I don't

1      believe we reported any suspicious

2      orders to DEA after the outcome of

3      our invest -- as an outcome of our

4      investigations into anything that

5      was of interest.

6  BY MR. BUCHANAN:

7      Q.    Oh.   Okay.  So thousands and

8  thousands and thousands of orders, right?

9      A.    We had orders.  I can't tell

10 you specifically how many orders we had.

11 But we had orders that represented these

12 quantities.

13     Q.    Okay.  That -- that on an

14 annual basis would give every American an

15 opioid, right?

16          MS. VANNI:  Object to form.

17          THE WITNESS:  We got

18     order -- we received orders for

19     opioids from our customers who in

20     turn sold them to patients who

21     needed them.

22 BY MR. BUCHANAN:

23     Q.    And not one suspicious order

24 was reported to the DEA in 2001?

1        A.    We did not report any

2    suspicious orders to DEA after

3    investigating internally any orders that

4    we deemed as of interest.

5        Q.    Okay.  How about 2002?

6    Sales still on the move.  Growing along,

7    I guess we can pull out our -- our death

8    map that we looked at a moment ago.  We'd

9    see the deep blue going to lighter blue,

10   going to tan and yellow, and more people

11   dying.

12            How many suspicious orders

13   did you report to the DEA in 2002?

14            MS. VANNI:  Objection.

15            THE WITNESS:  I don't

16        believe we reported any orders,

17        suspicious orders to DEA as an

18        outcome of our internal

19        investigations into any orders of

20        interest.

21   BY MR. BUCHANAN:

22        Q.    Okay.  2003, sales still on

23   the move, right?  We are back on

24   Exhibit 4.

Highly Confidential - Subject to Further Confidentiality Review

1       800 million pills, opioids,

2    dosage units in 2003.  All pursuant to

3    orders the company received, right?

4            MS. VANNI:  Object to form.

5            THE WITNESS:  Yes.  We would

6        receive orders to represent those

7        quantities shipped.

8    BY MR. BUCHANAN:

9        Q.    Okay.  And how many of those

10   did the company identify as suspicious?

11       A.    I don't believe we reported

12   any suspicious orders to the DEA as an

13   outcome of our internal investigations

14   into any orders of interest.

15       Q.    Okay.  So you didn't report

16   any over this period of time as we just

17   looked at a five-year window.

18            How many did you not ship?

19       A.    I don't believe we

20   ultimately -- we ultimately shipped all

21   of these orders as an outcome of our

22   internal investigations into any orders

23   of interest.

24       Q.    Okay.  So you've got a drug

Highly Confidential - Subject to Further Confidentiality Review

1    issues through our suspicious order

2    monitoring system.  That's my answer.

3           Q.    Not a single one was ever

4    reported to DEA?

5           A.    If an order had been

6    determined to be suspicious, it would

7    have been reported to DEA.

8           Q.    As a numbers matter, sir,

9    just stay with my question.

10              Did the company ever report

11    any order that Endo received for any of

12    its opioid products over the period of

13    time, 1999 to present to the DEA as a

14    suspicious order?

15              MS. VANNI:  Object to form.

16              THE WITNESS:  If an order

17       was deemed suspicious --

18    BY MR. BUCHANAN:

19           Q.    Did the company ever do it?

20           A.    If the order was -- if an

21    order was deemed suspicious, it would

22    have been reported to the DEA.

23           Q.    It doesn't answer my

24    question.  I just want the fact.  Not an

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2         Q.    I'm passing you, sir, what

3    we're marking as Exhibit 8 to your

4    deposition.

5              MS. VANNI:  Thank you.

6    BY MR. BUCHANAN:

7         Q.    Sir, you'll recall before

8    the break we were talking about your

9    awareness or not of Endo's products being

10   diverted.  Do you recall that?

11        A.    I recall that.

12        Q.    Okay.  Showing you what is

13   an e-mail from Mr. Barto to Ms. Connell

14   from 2003, subject revised DEA meeting

15   minutes.  Do you see that?

16        A.    I see it.

17        Q.    Okay.  Who's Mr. Barto?

18        A.    I believe he was a former

19   employee of Endo.

20        Q.    You recognize him as being

21   in regulatory affairs for Endo?

22        A.    It says here that he worked

23   in regulatory affairs.

24        Q.    Okay.  Ms. Connell, you

1   recognize her as being on the supply

2   chain side?

3          A.    I do.

4          Q.    Okay.  In connection with

5   your preparation, sir, were you aware

6   that the company sat down with the DEA in

7   2003 to discuss abuse and diversion

8   measures with regard to Endo's products?

9              MS. VANNI:  Object to form.

10             THE WITNESS:  In 2003?

11  BY MR. BUCHANAN:

12         Q.    Mm-hmm.

13         A.    I was aware that Endo had

14  discussions with DEA during the time

15  period that we are talking about.

16         Q.    Okay.  I'll pass you, sir,

17  Exhibit 9 to your deposition.

18             (Document marked for

19             identification as Exhibit

20             Endo-Macrides-9.)

21  BY MR. BUCHANAN:

22         Q.    Is that a yes answer, that

23  you're aware that the company had

24  discussed abuse and diversion of Endo's

1    oxycodone/APAP.  All three of those are

2    essentially the same pharmaceutical

3    combination, they just get marketed in

4    different ways, right?

5                  MS. VANNI:  Objection.

6          Beyond the scope.

7                  THE WITNESS:  Some are

8          branded and some are generic.

9    BY MR. BUCHANAN:

10         Q.    Fair.  I mean, I wasn't

11   trying to be tricky with that.  I just

12   wanted to -- the company, for whatever

13   its business reasons over time, has used

14   different trade names or branded names

15   for the same pharmaceutical combination,

16   true?

17                  MS. VANNI:  Object to form.

18                  THE WITNESS:  The branded

19         name is Percocet.  And then there

20         are generics that go by different

21         names.

22   BY MR. BUCHANAN:

23         Q.    Okay.  All right, good.  So

24   Percocet in abuse and diversion was a big

Highly Confidential - Subject to Further Confidentiality Review

1    deal into the early 2000s; isn't that

2    right?

3              MS. VANNI:  Objection.

4              THE WITNESS:  I don't have

5         specific knowledge on Percocet

6         abuse because --

7    BY MR. BUCHANAN:

8         Q.    Sorry.

9         A.    Well, as I stated earlier,

10   if our products aren't properly

11   controlled, if they get out of the closed

12   system, then they have -- they can be

13   abused and diverted.

14        Q.    Okay.

15              MR. BUCHANAN:  Can we pull

16        up the chart for the first --

17        let's just say through 2003,

18        please.

19              There you go.

20   BY MR. BUCHANAN:

21        Q.    All right.  So we can see

22   that in fact Percocet, Endocet, and

23   oxycodone/APAP -- let's get the Percocet

24   up there.  Those are big movers for the

Highly Confidential - Subject to Further Confidentiality Review

1    company in the early -- late '90s, early

2    2000s, right?

3                MS. VANNI:  Object to form.

4                THE WITNESS:  Can you

5         clarify what you mean by "big

6         mover"?

7    BY MR. BUCHANAN:

8         Q.    I guess, for simplicity,

9    two-thirds of your sales?

10        A.    We were shipping Percocet

11   and Endocet based on orders from our

12   customers based on patient demand.

13        Q.    I understand that, sir.  But

14   looking at the chart so we have some

15   rough sense of what the business

16   represented, about two-thirds of sales,

17   at least in terms of pills, was Percocet

18   or Percocet-like formulations, correct,

19   sir?

20                MS. VANNI:  Object to form.

21                THE WITNESS:  Yes, based

22        on -- if we're looking at 1999, a

23        majority of the tablets shipped

24        were Percocet or Endocet.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. BUCHANAN:

2          Q.    Right.  And roughly, what is

3  that, 260 million pills, Percocets,

4  versus a total of 360 or so?

5          A.    Right.

6          Q.    Okay.  And excuse my

7  rounding.  I'm just trying to make it

8  faster and simpler for both of us.

9                All right.  We go forward in

10  2000.  And you're, you know, again, at

11  roughly 340 million of 450 million pills

12  are the Percocet and Endocet drugs,

13  right?

14                MS. VANNI:  Object to form.

15                THE WITNESS:  That's what it

16          says.

17  BY MR. BUCHANAN:

18          Q.    Percocet was Endo's brand?

19          A.    Percocet was a branded

20  product or is a branded product.

21          Q.    But the brand Percocet, was

22  that Endo's brand name?

23          A.    It was.

24          Q.    They owned it?

1          MS. VANNI:  Object to form.

2          THE WITNESS:  Correct.

3     BY MR. BUCHANAN:

4          Q.     So when the jury or consumer

5     hears Percocet, they should think of

6     Endo?

7          MS. VANNI:  Object to form.

8     BY MR. BUCHANAN:

9          Q.     Right?

10         A.     Percocet is the brand.

11         Q.     That's the name you marketed

12     it under, right?

13         A.     That's the name that Endo

14     marketed the product under, Percocet.

15         Q.     And if we looked at Percocet

16     pills shipped by Endo, we'd see a little

17     R with a circle around it, right?

18              It was your registered trade

19     name for it, correct?

20         A.     It was.

21         Q.     You had the exclusive right

22     to use that name, right?

23         MS. VANNI:  Object to form.

24         Beyond the scope.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  From a

2      regulatory perspective, yes.

3   BY MR. BUCHANAN:

4          Q.    Right.  So when the jury

5   hears Percocet it can think Endo, right?

6          MS. VANNI:  Objection.

7   BY MR. BUCHANAN:

8          Q.    It has your name?

9          MS. VANNI:  Objection.

10          THE WITNESS:  Percocet was

11      our branded product.  I will say

12      though, that as a strip that you

13      put on a cut, it's called a

14      Band-Aid, there is a branded

15      Band-Aid.  And there are a lot of

16      other kinds of band-aids.

17          There is a branded Percocet

18      product and there are a lot of

19      generic Percocet products.  Some

20      distributed by Endo, some

21      distributed not by Endo.

22          So there are a number of

23      products, generic products, that

24      get referred to as Percocet, that

Highly Confidential - Subject to Further Confidentiality Review

1          may or may not be the branded

2          Percocet.

3    BY MR. BUCHANAN:

4          Q.    Fair point, sir.

5                And we see, in fact, you

6    sold a generic version of your own

7    branded product, right?

8          A.    We did.

9          Q.    Right.  Well, we can't

10   dispute that -- or you don't dispute, do

11   you, sir, that you sold a lot of

12   Percocet?

13               MS. VANNI:  Object to form.

14   BY MR. BUCHANAN:

15         Q.    And its generic equivalence?

16               MS. VANNI:  Object to form.

17               THE WITNESS:  We sold

18         Percocet.  I'm not disputing that.

19   BY MR. BUCHANAN:

20         Q.    Okay.  And as we see through

21   the years, certainly the early years

22   here, sir, Percocet is a big part of your

23   sales portfolio, right?

24               MS. VANNI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  We sold the

2          quantities of Percocet that are

3          listed on this sheet.

4   BY MR. BUCHANAN:

5          Q.     Okay.  So by 2003, wow, you

6   have taken, with your Percocet and

7   Endocet brand, you've gone from, what,

8   about 260 million pills of Percocet and

9   Endocet in 1999, to, what is that, about

10  640 million pills, of Percocet and

11  Endocet for one year in 2003?

12         A.     About that.

13         Q.     Just about doubled, five

14  years.

15         A.     Right.  Reflecting the

16  demand for the product, for the patients

17  that need it.

18         Q.     A lot of growth, agreed?

19         MS. VANNI:  Object to form.

20  BY MR. BUCHANAN:

21         Q.     Doubled sales in five years

22  of Percocets?

23         A.     There's growth from 1999 to

24  2003 reflecting the increased demand for

Highly Confidential - Subject to Further Confidentiality Review

1       specific input to challenge us and

2       to give us suggestions on how we

3       can improve.

4  BY MR. BUCHANAN:

5       Q.    Sure.

6       A.    In that context that's why

7  we -- that's how we would have --

8       Q.    And you invited them into

9  your shop, right?

10           MS. VANNI:  Object to form.

11  BY MR. BUCHANAN:

12       Q.    Per the 1056.3?

13       A.    I'm just looking this over.

14  Yes, it looked like there was a visit to

15  the facility.

16       Q.    Visit to the facility, short

17  review of documents, to provide findings

18  and recommendations back to the company,

19  correct?  We're going to 1056.10.

20       A.    1056.10?

21       Q.    Yes.  Is that correct?  You

22  called them in.  They looked at stuff.

23  They gave you a report and analysis back?

24  Fair, sir?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    It looked like they did an

2  audit and gave us some -- some findings.

3      Q.    Okay.  Let's go to Finding

4  Number 8.

5      A.    Are you on --

6      Q.    1056.10.

7      A.    Okay.

8      Q.    I'm sorry.

9            Finding Number 8, SOM,

10  below.  I guess there's two Finding

11  Number 8 -- Findings Number 8.

12            Finding Number 8, SOM.

13  Could you read that sentence for us, sir?

14      A.    "There is no suspicious

15  order monitoring program in place."

16      Q.    Okay.  Let's pause there.

17  As of 2010, the company is selling

18  controlled substances that it must keep

19  in a vault and in a cage in its warehouse

20  and production facilities, correct?

21            MS. VANNI:  Object to form.

22            THE WITNESS:  Par was

23        selling opioids that had certain

24        regulations on how they needed to

1    be stored and controlled.

2  BY MR. BUCHANAN:

3        Q.    And there is a requirement?

4              MR. BUCHANAN:  Can we blow

5        that out?

6  BY MR. BUCHANAN:

7        Q.    Under 21 C.F.R. 1301.74(b).

8  Do you see that?  That the company must

9  maintain and operate a system to disclose

10  to the registrant suspicious orders of

11  controlled substances, right?

12              Do you see that?

13        A.    Yeah.  And if I could just

14  have a minute to read it.  Yes, this is

15  what the regulation says.

16        Q.    Okay.  And that regulation's

17  not a new one, right?

18        A.    No.

19        Q.    I mean, that regulation has

20  been around for as long as Endo has been

21  around, right?

22              MS. VANNI:  Objection.

23              THE WITNESS:  The

24        regulations has been in place for

1    whatever period of time they've

2    been in place.

3  BY MR. BUCHANAN:

4        Q.    Right.  And the Controlled

5  Substance Act actually has a provision

6  that manufacturers and distributors are

7  supposed to maintain effective controls

8  against diversion, right?  Are you aware

9  of that?

10        A.    I'm aware of that, yes.

11        Q.    Okay.  So as of 2010, sir,

12  there is no suspicious order monitoring

13  program in place.  That's what you're

14  told by the consultants you hired to look

15  at this issue, correct?

16        A.    That's what the report says.

17        Q.    Okay.

18        A.    So as I said earlier, we

19  hired --

20        Q.    That's my question sir.

21              Recommendation underneath,

22  "Although it was stated that sales are

23  mainly to large wholesalers" -- let's

24  pause.

Highly Confidential - Subject to Further Confidentiality Review

1    As a registrant, you have an

2  obligation to maintain a suspicious order

3  monitoring program, period, correct, sir?

4         MS. VANNI:  Object to form.

5         THE WITNESS:  We have an

6       obligation to do what it says here

7       in the regulations, to design and

8       operate a system to disclose to

9       the registrant suspicious orders

10      of controlled substances.

11 BY MR. BUCHANAN:

12      Q.    Right.

13      A.    That's what we have an

14 obligation to do.

15      Q.    Right.  It doesn't -- the

16 explanation given to your consultant that

17 well, we just sell to wholesalers, that

18 doesn't mean that you don't have to have

19 a suspicious order monitoring program,

20 right?

21         MS. VANNI:  Object to form.

22         THE WITNESS:  We have to --

23 BY MR. BUCHANAN:

24      Q.    You know better than that?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Sitting here today, sir, you

2    don't recall a single Par policy,

3    procedure, or standard operating document

4    prior to the date of this memo for

5    suspicious order monitoring, correct,

6    sir?

7              MS. VANNI:  Object to form.

8              THE WITNESS:  I do recall a

9         suspicious order monitoring SOP.

10             I do not recall the time

11        frame at which that was

12        implemented.

13   BY MR. BUCHANAN:

14        Q.    Okay.  Well, we'll look at

15   that.  Okay.

16             Because the company, a few

17   years later, implements an SOP, right?

18             MS. VANNI:  Object to form.

19   BY MR. BUCHANAN:

20        Q.    After it's been selling

21   opioids for years --

22             MS. VANNI:  Objection.

23   BY MR. BUCHANAN:

24        Q.    -- right?

Highly Confidential - Subject to Further Confidentiality Review

1              MS. VANNI:  Objection.

2              THE WITNESS:  As I said, our

3          programs were evolving in response

4          to increasing our diligence around

5          monitoring orders and ensuring

6          that we were doing everything we

7          could within the regulations to

8          prevent our abuse and diversion.

9              This step of bringing in a

10         consultant, which we do quite

11         frequently, to challenge us, to

12         help us raise the bar, to give us

13         their view on things.

14             MR. BUCHANAN:  Move to

15         strike.

16     BY MR. BUCHANAN:

17         Q.    My question was, the company

18     has been selling opioids for years prior

19     to the time it implements its first SOP.

20             Do you know that, sir?

21             MS. VANNI:  Objection.

22         Asked and answered.

23             THE WITNESS:  I have data

24         here that says the company was

Highly Confidential - Subject to Further Confidentiality Review

1    things, and delivered a report which said

2    there is no suspicious order monitoring

3    program in place as of this date in 2010,

4    correct, sir?

5              MS. VANNI:  Object to form.

6              THE WITNESS:  As the

7         consultants define suspicious

8         order monitoring program, their

9         input was we needed to enhance

10        whatever we were doing in terms of

11        looking at orders and formalize

12        the program.  That's how I would

13        interpret their response here.

14   BY MR. BUCHANAN:

15        Q.    Okay.  And so the answer to

16   my question, sir, though about whether

17   you are aware of a standard operating

18   procedure for SOMs or a policy as of 2010

19   is still the same, you're not aware of

20   one, correct?

21              MS. VANNI:  Objection.

22        Misstates his testimony.

23              THE WITNESS:  I reviewed a

24        lot of documents.  I know I

1       reviewed documents, Par documents,

2       that were related to suspicious

3       order monitoring.

4           I don't remember -- I don't

5       recall the date.  I looked at a

6       lot of documents to prepare for

7       this.  I didn't commit them all to

8       memory.

9   BY MR. BUCHANAN:

10      Q.    Okay.  Let me show you the

11  first one we found, sir.  Okay.

12          MR. BUCHANAN:  Can I have

13      1839.

14          (Document marked for

15      identification as Exhibit

16      Endo-Macrides-12.)

17  BY MR. BUCHANAN:

18      Q.    I'm passing you, sir, what

19  we're marking as Exhibit 12.  This is an

20  e-mail from Ms. Feniger to Ms. Lipari and

21  some others on the team.  Suspicious

22  order monitoring.

23          SOM, do you see that?

24      A.    I see that.

1    Q.    Attachments SO002.  Do you

2  see that?

3    A.    I see that.

4    Q.    Okay.  The quality is

5  something we're both suffering with, sir.

6  I wish I could have given you a better

7  copy.

8             And so what we have here is

9  the SOM.  And it's SOP number SO002.0.

10  Do you see that?

11    A.    I see that.

12    Q.    And it says supersedes.

13  What does it say after that?

14             MR. BUCHANAN:  Can you go to

15       .2 please.

16             THE WITNESS:  I'm sorry.

17  BY MR. BUCHANAN:

18    Q.    I'm sorry.  It's the top of

19  the page, sir.  I know my question was

20  confusing.

21             We see the SOP number on the

22  right.  You recognize that companies like

23  yours number their SOPs?

24    A.    Right.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    And they often put a version
2   number, a dot after to indicate an
3   incremental change to an SOP?
4       A.    Right.
5       Q.    Okay.  What's the title of
6   this particular SOP, sir?
7       A.    Suspicious order monitoring.
8       Q.    Okay.  And the SOP number
9   for it is SO002.0, correct?
10      A.    Correct.
11      Q.    Supersedes?
12      A.    It says not applicable.
13      Q.    What is the date, the
14  effective date of this SOP, sir?
15      A.    April 17th of 2012.
16      Q.    Okay.  And we've got
17  signatures and approvals written by,
18  checked by, approved by.
19          Do you see all that?
20      A.    I do.
21      Q.    Okay.  This was actually
22  written by the head of sales?
23      A.    Written by Patricia Lipari,
24  director of sales.

1          Q.     Okay.

2          A.     Sales operations.

3          Q.     Okay.  Sales ops.  And it

4     was checked by a technical writer in

5     documentation, right?

6          A.     Checked by, yeah, Angela

7     Feniger.

8          Q.     I can't read the approved by

9     name.  Do you know that name?

10          A.     Dino Taraban.

11          Q.     Okay.  And so, sir, this

12     is -- the .0 or the first version of

13     Par's SOM, suspicious order monitoring

14     SOP, correct, sir?

15          A.     Appears to be the first

16     specific SOP entitled suspicious order

17     monitoring.

18          Q.     Okay.  And --

19          A.     But I wouldn't interpret

20     that as suggesting that orders were not

21     being looked at in some capacity prior to

22     that.

23          Q.     Yeah, that wouldn't be

24     helpful, right?  That'd be a real

1    problem?

2              MS. VANNI:  Object to form.

3    BY MR. BUCHANAN:

4         Q.    I mean, you had a consultant

5    come -- withdrawn.

6              You had a consultant come in

7    in 2010, in April, right?  The Buzzeo

8    group came in in April 2010?

9         A.    April.

10        Q.    We looked at that.

11        A.    Right.

12        Q.    They said, "There is no

13   suspicious order monitoring program," is

14   what they said, right?

15        A.    That was their observation.

16        Q.    Right.

17        A.    Those were their words.

18        Q.    They showed you the C.F.R.

19   They made a recommendation, right?  They

20   said, "You need an SOP," right?

21             MS. VANNI:  Object to form.

22        The document speaks for itself.

23             MR. BUCHANAN:  I'm happy to

24        let it speak for all of us.

Highly Confidential - Subject to Further Confidentiality Review

 1                 THE WITNESS:  They said --

 2                 MR. BUCHANAN:  I told you

 3          I'd allow that to happen.

 4                 THE WITNESS:  My

 5          interpretation of what they said

 6          is they said we need to improve

 7          our program around order

 8          monitoring.

 9   BY MR. BUCHANAN:

10          Q.    What they said, "There is no

11   suspicious order monitoring program in

12   place."  You can agree that's what they

13   wrote and told the company in early 2010,

14   correct?

15          A.    That's what they said in

16   2010, based on the way they would define

17   suspicious order monitoring.

18          Q.    Right.  And -- well, they

19   said you had no suspicious order

20   monitoring program in place.  Yes or no?

21          A.    That's what it says here.

22          Q.    Thank you.  They quoted you

23   the regulation.  Yes or no?

24          A.    They quoted the regulation.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    They said, "Although it was

2    stated" -- okay, do you understand that

3    to be referring to your people talking to

4    the Buzzeo folks, right?

5          MS. VANNI:  Object to form.

6    BY MR. BUCHANAN:

7    Q.    "Although it was stated that

8    sales are mainly to large wholesalers" --

9    is that your understanding, sir?

10   A.    Right.

11   Q.    The Buzzeo folks got that

12   information from your team at Par, right?

13   A.    Presumably yes, they were

14   speaking to people at Par.

15   Q.    Right.  "Although it was

16   stated that sales are mainly to large

17   wholesalers, a program must be instituted

18   based on customer sales, volumes,

19   seasonal fluctuations, et cetera, with a

20   firm statistical analysis as the basis

21   for such a program."

22         Did I read that correctly,

23   sir?

24   A.    You read -- that's what it

Highly Confidential - Subject to Further Confidentiality Review

1    says.

2         Q.    Okay.  "It is further

3    recommended that the basis for

4    conducting" -- what?  Due diligence.

5              Do you see that?

6         A.    I see that.

7         Q.    -- "of new and existing

8    customers and identifying and

9    investigating and clearing of reporting

10   suspicious orders be documented in an

11   SOP."

12             Did I read that correctly,

13   sir?

14        A.    You did.

15        Q.    Okay.  And so we have now,

16   the rest of 2010 passes without an SOP,

17   right?

18        A.    This appears to be the first

19   SOP that is specifically titled

20   "Suspicious Order Monitoring."

21        Q.    All of 2011 passes without

22   an SOP, right?

23        A.    As I said, this is the first

24   SOP that appears to be entitled

Highly Confidential - Subject to Further Confidentiality Review

1    "Suspicious Order Monitoring."  That

2    doesn't mean that Par wasn't complying

3    with the registration around identifying

4    potentially suspicious orders --

5         Q.    And then in --

6         A.     -- in the 2010-2011 time

7    frame.

8         Q.    Then sometime around April

9    of 2012, you got around to getting an

10   SOP, huh?

11              MS. VANNI:  Object to form.

12   BY MR. BUCHANAN:

13        Q.    Do I have that right?

14              MS. VANNI:  Object to form.

15              THE WITNESS:  In April

16   of 2012, we published an SOP.

17   BY MR. BUCHANAN:

18        Q.    Okay.  And you published

19   that SOP, and, you know, we can agree

20   some 200 million units of pills and doses

21   and patches -- I guess it's not pills.

22   It's oral transmucosal fentanyl citrate

23   and syrups, are going out the door with

24   hydrocodone and fentanyl in 2010 and

Highly Confidential - Subject to Further Confidentiality Review

1  2011, correct?

2           MS. VANNI:  Object to form.

3           MR. BUCHANAN:  Withdrawn.

4      Very confusing question.

5           MS. VANNI:  Very.

6  BY MR. BUCHANAN:

7      Q.    You told us earlier in

8  April 2012 you published that SOP.  Yet

9  in 2010 and 2011 some 200 million dosage

10 units of fentanyl citrate and hydrocodone

11 went out the door, correct?

12     A.    We sold those products in

13 2010 and 2011.

14     Q.    Okay.

15     A.    You're assuming that the

16 lack of -- the lack of an SOP meant that

17 those orders were not being looked at or

18 not being reviewed.

19     Q.    You have not been able to

20 highlight any written procedure, any

21 documentation for the company that

22 preceded the April 2012 SOP, correct,

23 sir?

24           MS. VANNI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I don't have a

2    document.

3  BY MR. BUCHANAN:

4      Q.   So could you describe for

5  us, sir, where in Exhibit 12 the company

6  describes how it's going to determine

7  what gets reported to the DEA?

8      A.   If you can give me a minute

9  to review this.

10      Q.   Sure.  Let's just -- let's

11  just go to 1839.2 real quick.

12      A.   1839.2.

13      Q.   We can agree under purpose,

14  policy, and responsibility, there's

15  nothing in here about reporting stuff to

16  the DEA, correct?

17      A.   It says, "Define process of

18  suspicious order monitoring as determined

19  by sales operations that we are in line

20  with DEA requirements."

21        So if -- if the order needs

22  to be reported to DEA, that would be in

23  line with DEA requirements.

24      Q.   Okay.  So what orders, then,

Highly Confidential - Subject to Further Confidentiality Review

1    are suspicious orders under your SOP for

2    suspicious order monitoring, sir?

3         A.    Orders that would be deemed

4    of interest.

5         Q.    Where are those?  You're

6    looking -- it sounds like you are not on

7    1839.2.  You are now on 18 point --

8         A.    I'm just reviewing the

9    document.

10        Q.    -- 1839.3.  We can agree

11   1839.2 doesn't identify what a suspicious

12   order is, correct?

13             MS. VANNI:  Object to form.

14   BY MR. BUCHANAN:

15        Q.    Characteristics, quality.

16   We could agree?

17        A.    It says, "Define a process

18   for suspicious order monitoring that's in

19   line with DEA requirements."  That's what

20   it says.

21        Q.    Okay.  Let's go to 1839.3.

22             So what were you telling

23   your sales operations folks was a

24   suspicious order on 1839.3?

1          A.    So what this is telling me

2    is that they're looking at orders that

3    are considered to be excessive.  "If

4    quantities are higher than the average

5    transmission, it is questioned."

6          Q.    Where are you, sir?

7          A.    I'm on -- under procedure.

8          Q.    Okay.  What paragraph?

9          A.    The second one.  "Weekly

10   replenishment purchase orders are

11   analyzed by account service executives

12   versus customer provided usages.  If

13   quantities are higher than the average

14   transmission it is questioned.

15          "The buyer is contacted to

16   review a written request, is asked as to

17   the reason for the increase.  It is

18   reviewed to ensure it is correct and

19   warranted."

20          Q.    Mm-hmm.  And then what gets

21   reported to the DEA?

22          A.    If there is not a reasonable

23   explanation for the order, and it was

24   deemed suspicious, then under the

Highly Confidential - Subject to Further Confidentiality Review

1    regulations it would need to be reported

2    to DEA.

3         Q.    Okay.  And where is that?

4    I'm just trying to find that?

5              Can we agree, sir, nothing

6    in here spells out what and how it gets

7    reported to the DEA?

8         A.    It doesn't seem to describe

9    that exact process.  It seems to talk

10   more about monthly reports are generated

11   and sent to quality compliance for

12   submission to DEA on a quarterly basis.

13        Q.    Okay.  We can agree, sir, in

14   2010, I think your testimony was no

15   orders were identified as suspicious or

16   reported to DEA, correct?

17        A.    We did not submit any

18   suspicious orders based on our review of

19   the orders.

20        Q.    And not in 2011 or in 2012,

21   correct, sir?

22        A.    Not to my knowledge.

23        Q.    Okay.

24        A.    After review and

Highly Confidential - Subject to Further Confidentiality Review

1    investigation.

2         Q.    Well, in fact, there was no

3    SOP in force until April of 2012,

4    correct?

5              MS. VANNI:  Object to form.

6              THE WITNESS:  Yes.  No SOP

7         specifically entitled "Suspicious

8         Order Monitoring."

9    BY MR. BUCHANAN:

10        Q.    Okay.  And, in fact, please

11   tell the jury who had a responsibility

12   for evaluating orders once you had an

13   SOP.

14             Let's go to 1839.2.  Do you

15   see the heading that says Responsibility?

16             Who had responsibility?

17        A.    "Sales" -- "sales

18   operations/account services to monitor

19   applicable Par trade customer purchase

20   orders."

21        Q.    Okay.  So the sales group?

22        A.    These aren't -- these aren't

23   salespeople.  These are -- these are

24   people that -- these are more clerical

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BUCHANAN:

 2          Q.    This was put in force in

 3    October of 2012, correct?

 4          A.    That's what it says.

 5          Q.    Okay.  And then if we go to

 6    dot -- and again it was -- go back again,

 7    I'm sorry.

 8                Again, it was written by the

 9    same director of sales operations, right?

10          A.    Right.

11          Q.    And signed off by the --

12    excuse me, checked by the account

13    services executive, right?

14          A.    Right.

15          Q.    That's a different name than

16    last name.

17                And then we've got that same

18    Dino person, head of QA?

19          A.    Yeah, he was -- he was head

20    of compliance for the -- for Par.

21          Q.    Okay.

22          A.    All of compliance.

23          Q.    Okay.

24          A.    Quality and DEA compliance.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And well, let's look

2    at how this SOP evolved.

3                MR. BUCHANAN:  Can we go to

4         .3.

5    BY MR. BUCHANAN:

6         Q.    It says, "Reporting

7    suspicious criminal activities."

8                Do you see that?

9         A.    I see that.

10        Q.    Okay.  "If criminal activity

11   is suspected, report the following" --

12   "report the following to the state

13   agencies that are" -- "that license the

14   facility, e.g., board of pharmacy and

15   Food and Drug Administration, as well as

16   Drug Enforcement Administration for

17   controlled substances within three days

18   of suspecting criminal activity."

19                Do you see that, sir?

20        A.    I see that.

21        Q.    Okay.  We can agree, sir,

22   that your obligation and your promise as

23   a registrant, is to report orders of

24   unusual frequency, orders of unusual

Highly Confidential - Subject to Further Confidentiality Review



12          MR. BUCHANAN:  Let's take a

13    break.

14          THE VIDEOGRAPHER:  Off the

15    record at 3:13 p.m.

16          (Short break.)

17          THE VIDEOGRAPHER:  We are

18    back on the record at 3:32 p.m.

19    BY MR. BUCHANAN:

20          Q.    Okay.  Sir, I'm passing you

21    over a stack of exhibits.  We'll go

22    through them in sequence.  There's -- why

23    don't we start with what's been marked as

24    Exhibit Number 23.

1          (Document marked for

2          identification as Exhibit

3          Endo-Macrides-23.)

4               MR. BUCHANAN:  Charles,

5          could you pass a copy for defense

6          counsel.

7     BY MR. BUCHANAN:

8          Q.    For the record, it's

9     internally labeled as E-1051.  If we can

10    pull up that on the screen.  E-1051, sir,

11    is an e-mail to John Schultz, Mike

12    Reiney, Charles Propst, others.

13              Do you recognize any of

14    those names?

15         A.    I recognize most of the

16    names.

17    █████   █████   ███████████████

██    ███████████████████████████████████

██    ███████████████████████████████

██    ████████████████████████████

██    ██████████████

██              ███████████████

██    █████   ████████   ████████████████

██    █████████████████████

¹ what -- excuse me, in 2008, that this is

² what was required, right?

³          A.     All companies were reviewing

⁴ the guidance by DEA to move in the

⁵ direction of statistical models --

⁶          Q.     You still have to answer my

⁷ question.

⁸          A.     -- to adapt their programs.

⁹          MS. VANNI:  Objection to

¹⁰          form.

¹¹ BY MR. BUCHANAN:

¹²          Q.     You still have to answer my

¹³ question.  So my --

¹⁴          A.     Can you ask it again,

¹⁵ please.

¹⁶          Q.     Yeah.  My question to you,

¹⁷ sir, after you said, "In 2013, we engaged

¹⁸ with Cegedim to do that," I said, "So the

¹⁹ very consultant who told you in 2008 that

²⁰ this is what was required was the

²¹ consultant you used in 2013 to implement

²² the statistically validated algorithm for

²³ Qualitest, correct?"

²⁴          A.     We worked with them in 2013

Highly Confidential - Subject to Further Confidentiality Review

1  to enhance the program and build us a,

2  you know, more advanced algorithm.

3         Q.    Right.  In fact you did that

4  after you sat down with the DEA in March

5  of 2013, correct?

6         A.    I think I testified earlier

7  that we had identified areas to improve

8  our program throughout that period but as

9  early as 2011 when we had engaged Tracey

10 Hernandez to lead our DEA compliance.

11        Q.    When did management first

12 approve and fund a statistically

13 validated algorithm to detect potentially

14 suspicious orders, sir?

15             MS. VANNI:  Objection.

16 BY MR. BUCHANAN:

17        Q.    Before or after the

18 March 2013 meeting with the DEA?

19        A.    In 2013 we engaged with

20 Cegedim to develop the algorithm.

21        Q.    After you met with the DEA,

22 correct?

23        A.    Subsequent to March of 2013.

24        Q.    Which means after, right?

Highly Confidential - Subject to Further Confidentiality Review



1

▪

▪

▪

▪

▪

▪

▪ ?

9        MS. VANNI:  Object to form.

10        THE WITNESS:  There's no

11   knowledge here that -- or

12   information that they were

13   reported to the DEA.

14 BY MR. BUCHANAN:

15   Q.   Because in fact, you were

16 the person selling to them?  You were

17 selling directly to people that were

18 problematic customers, right?

19        MS. VANNI:  Object to form.

20        THE WITNESS:  We were

21   selling to these customers.

22 BY MR. BUCHANAN:

23   Q.   Please look at Exhibit 41,

24 sir.

```
 1              (Document marked for
 2          identification as Exhibit
 3          Macrides-41.)
 4              THE WITNESS:  41?
 5   BY MR. BUCHANAN:
 6          Q.    Yeah.  Exhibit 41, sir, is
 7   excerpted from the company's
 8   interrogatories that were prepared by the
 9   company and counsel and produced to us in
10   the last two weeks.
11              It says suspicious orders
12   and --
13              MS. VANNI:  This is a
14          demonstrative based on the --
15              MR. BUCHANAN:  It -- it's a
16          demonstrative.  But it is, in
17          fact, the entire chart as -- as
18          reflected in the interrogatory.
19   BY MR. BUCHANAN:
20          Q.    These are, in fact, either
21   suspicious orders or customers reported
22   to DEA by Par Pharmaceuticals, as
23   disclosed in discovery responses to us,
24   sir.
```

Highly Confidential - Subject to Further Confidentiality Review

1          We could agree, sir, looking

2    at this list, that you don't see any

3    reports to the DEA of any suspicious

4    orders or any suspicious customers prior

5    to the meeting with the DEA in March of

6    2013, correct, sir?

7               MS. VANNI:  Objection.

8               THE WITNESS:  All these

9         dates are after March of 2013.

10              MS. VANNI:  I want to make

11        one more objection to the extent

12        that I don't -- I don't know

13        whether that interrogatory even

14        called for that information.

15              MR. BUCHANAN:  It does.  But

16        your objection is noted.

17              MS. VANNI:  I also object to

18        completeness.

19   BY MR. BUCHANAN:

20         ███              ███████████████

█    █████████████████████████████████████

█    ████████████████████████████████████

█    ██████████████████████████████████

█    ██████████████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review

1    ultimate end customer.

2    BY MR. BUCHANAN:

3        Q.    UPS didn't have a

4    relationship with your customers,

5    correct?

6        A.    UPS is our distribution

7    partner.

8        Q.    My question to you, sir, is,

9    UPS -- you were UPS's customer, correct?

10            MS. VANNI:  Object to form.

11            THE WITNESS:  UPS --

12        correct.  UPS is a third-party

13        distributor.

14    BY MR. BUCHANAN:

15        Q.    Right.  UPS did not have

16    visibility to your customers and did not

17    conduct due diligence of your customers,

18    correct, sir?

19            MS. VANNI:  Object to form.

20            THE WITNESS:  No UPS -- UPS

21        is the registrant for

22        distribution, for the distribution

23        license would be required to have

24        a suspicious order monitoring

1        program in place.

2    BY MR. BUCHANAN:

3        Q.    My --

4        A.    It would be the

5    responsibility of the client, in this

6    case Endo, to manage the customer

7    relationship.

8        Q.    For you to manage your

9    customer, your Morris and Dickson, your

10   FW Kerr, your Top Rx, your BZ Pharmacies.

11   Those were your customers?

12       A.    That's how -- yes, that's

13   how these relationships work.

14       Q.    Right.  And it was your job

15   to manage your -- and do -- manage and do

16   the due diligence on your customers,

17   correct?

18            MS. VANNI:  Object to form.

19            THE WITNESS:  The model here

20        is to outsource distribution.  The

21        customer relationship, the

22        customer diligence is with Endo in

23        ██████████████

██                          ██████████████████████████