EXHIBIT 120

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF OHIO
 3                 EASTERN DIVISION
 4                   -  -  -
 5   IN RE:  NATIONAL   :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ---------------------------------------
 7                      :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                         :  Hon. Dan A.
 9                       :  Polster
10                   -  -  -
             Tuesday, December 4, 2018
11                   -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
13
                     -  -  -
14
                  Videotaped deposition of
15   LISA WALKER, taken pursuant to notice,
     was held at Golkow Litigation Services,
16   One Liberty Place, 1650 Market Street,
     Suite 5150, Philadelphia, Pennsylvania
17   19103, beginning at 9:12 a.m., on the
     above date, before Amanda Dee
18   Maslynsky-Miller, a Certified Realtime
     Reporter.
19
                     -  -  -
20
21
22
23        GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24             deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

1      But did that change over the

2  years?

3          MR. LIMBACHER:  Object to

4      form.

5          THE WITNESS:  It didn't, no.

6      I had no control over that when I

7      worked at DuPont.

8  BY MR. BUCHANAN:

9      Q.    Oh, I see, okay.

10         So what was your role and

11  function at DuPont between '89/'90 and

12  '98?

13     A.    Like I said, I worked in the

14  mailroom.  And then I was a clerical -- I

15  was a clerk within the customer service

16  department.  And then I became a customer

17  service rep.

18     Q.    Okay.  And as customer

19  service rep, what did you do for DuPont?

20     A.    Order entry, putting in

21  orders.

22     Q.    Customers would send in

23  orders, you would receive them

24  physically, probably, by fax or mail?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    At that time, yes.

2        Q.    And then you would

3    physically key them into a computer

4    system and track the orders?

5        A.    Yes.

6        Q.    And was that really the

7    extent of your exposure to controlled

8    substance orders at that point in time?

9        A.    Yes, that's correct.

10        Q.    You weren't responsible for

11    filling the orders?

12        A.    No, I was not.

13        Q.    You weren't responsible for

14    selling to customers?

15        A.    No, I was not.

16        Q.    As a customer service rep,

17    you were the liaison between DuPont Merck

18    and the end customer, in terms of getting

19    their order physically input into the

20    system so it could be fulfilled?

21        A.    The end customer would be

22    the wholesaler.

23        Q.    Got it.

24            So DuPont Merck had

Highly Confidential - Subject to Further Confidentiality Review

```
 1    wholesale customers?

 2          A.    Yes.

 3          Q.    Distributors as customers?

 4          A.    I just -- I don't recall.

 5    It was 20 years ago.  Mostly wholesalers.

 6          Q.    Okay.  Let's step back in

 7    time prior to your time at DuPont Merck.

 8                Did you have any role and

 9    involvement in the pharmaceutical

10    industry prior to 1989 or '90?

11          A.    No.

12          Q.    And what was your prior

13    employment?

14          A.    Prior to DuPont?

15          Q.    Yes.

16          A.    I was in college.

17          Q.    All right.  Graduated when?

18          A.    I graduated college in 1995.

19          Q.    Okay.  Started college when?

20          A.    Right after high school,

21    '87.

22          Q.    Got you.

23                So you were working at

24    DuPont while you were finishing college?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.     That's correct.

2        Q.     Okay.  And where did you go

3   to school?

4        A.     Wilmington College.

5        Q.     And that's Wilmington,

6   Delaware?

7        A.     Yes.

8        Q.     And you graduated with a

9   degree in some specialty?

10       A.     Business management,

11  Bachelor's.

12       Q.     Got you.

13              Did you go on to any

14  postgraduate further education?

15       A.     No.

16       Q.     Any certificate programs

17  anywhere, ma'am?

18       A.     No.

19       Q.     Any focus on medicine or

20  healthcare as part of your education?

21       A.     No.

22       Q.     So your education, we can

23  fairly characterize as was in business?

24       A.     Correct, yes.

Highly Confidential - Subject to Further Confidentiality Review

1   Q.   So since college, since

2   starting college, you've really had two

3   employers, DuPont Merck and Endo?

4   A.   That is correct.

5   Q.   You're still in the area

6   here?  Home?

7   A.   Home is in Pennsylvania,

8   yes.

9   Q.   And work every day, you're

10  driving out to Malvern?

11  A.   Yes.

12  Q.   And that's the home base for

13  Endo today?

14  A.   Yes.

15  Q.   Okay.  And your paycheck

16  today, what's the logo on the top, or

17  what's the name of the company that sends

18  your paycheck to you?

19  A.   Endo Pharmaceuticals.

20  Q.   Got you.

21  And is Endo Pharmaceuticals

22  a subsidiary, as you understand it, to

23  Endo the parent?

24  MR. LIMBACHER:  Object to

1        form.

2    BY MR. BUCHANAN:

3        Q.    If you know.

4        A.    I don't know.  I can't

5    confirm.

6        Q.    Okay.  Endo Pharmaceuticals

7    has been in the business of selling

8    branded -- among other things, but in the

9    business of selling branded opioid

10   products for the time that you've been at

11   the company, fair?

12           MR. LIMBACHER:  Object to

13       form.

14           THE WITNESS:  Yes.

15   BY MR. BUCHANAN:

16       Q.    Endo Pharmaceuticals is a

17   manufacturer of opioids?

18           MR. LIMBACHER:  Object to

19       form.  Foundation.

20           THE WITNESS:  It depends on

21       what your definition of

22       "manufacturer" is.

23           Yes, we do own the products,

24       but we don't physically

Highly Confidential - Subject to Further Confidentiality Review

1          manufacture the products.

2    BY MR. BUCHANAN:

3          Q.    I understand.

4                You contract out to other

5    people to make them --

6          A.    Correct.

7          Q.    -- for you, but ultimately

8    on the label and everything it will say

9    you're the manufacturer, right?

10         A.    Yes.

11         Q.    And that's been true since

12   you've been there?

13               MR. LIMBACHER:  Object to

14         form.

15               THE WITNESS:  Yes.

16   BY MR. BUCHANAN:

17         Q.    Could you run through some

18   of the names of the products that are --

19   branded opioids that you've had a role

20   and involvement with while you've been at

21   Endo?

22         A.    Percocet, Opana, Zydone,

23   Belbuca.

24         Q.    That's a newer one?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    Percocet is a combination

3  narcotic together with aspirin -- or

4  acetaminophen, excuse me?

5           MR. LIMBACHER:  Object to

6      form.

7  BY MR. BUCHANAN:

8      Q.    Withdrawn.

9           Percocet is a combination of

10  acetaminophen and a narcotic?

11           MR. LIMBACHER:  If you know.

12           THE WITNESS:  I don't know

13      the -- I can't confirm the actual

14      ingredients of the product.

15  BY MR. BUCHANAN:

16      Q.    Do you know whether

17  Percocet, ma'am, has an active narcotic

18  in it?

19      A.    I know that Percocet is an

20  opioid, yes.  But the active ingredient,

21  I can't confirm that.

22      Q.    You don't know whether it's

23  oxycodone, hydrocodone, something else,

24  oxymorphone?

1           MR. LIMBACHER:  Object to

2      form.

3           THE WITNESS:  I can't

4      confirm that, no.

5  BY MR. BUCHANAN:

6      Q.    Is it fair to say, ma'am,

7  over the time that you've been at Endo,

8  Endo has manufactured and shipped

9  billions of Percocet pills?

10          MR. LIMBACHER:  Object to

11     form.

12          THE WITNESS:  I can't

13     confirm the dollar value that you

14     just said.

15 BY MR. BUCHANAN:

16     Q.    I wasn't talking dollar

17 value.

18          Just billions of pills?

19          MR. LIMBACHER:  Same

20     objection.

21          THE WITNESS:  I can't

22     confirm the number of pills.

23 BY MR. BUCHANAN:

24     Q.    Let's talk about the

positions, I guess, you had -- well, let me finish this thread first. Withdrawn.

Is it fair to say, ma'am, over the time that you've been at Endo, Endo has shipped hundreds of millions of Opana pills?

MR. LIMBACHER: Object to form.

THE WITNESS: Again, I can't confirm the actual number of pills.

BY MR. BUCHANAN:

Q. I'm not asking for the actual number.

Do you have a sense, though, that over the time that you were there, Endo has shipped hundreds of millions of Opana ER pills?

MR. LIMBACHER: Same objection.

THE WITNESS: Again, I'm sorry, I can't confirm that number.

BY MR. BUCHANAN:

```
1          Q.    Endo was making a lot of

2    opioids, fair?

3                MR. LIMBACHER:  Object to

4          form.

5                THE WITNESS:  We make

6          opioids, yes.

7    BY MR. BUCHANAN:

8          Q.    You made a lot?

9                MR. LIMBACHER:  Object to

10         form.

11               THE WITNESS:  I'm not -- I

12         can't confirm that.  I don't know

13         what your definition of "a lot"

14         is.  I'm not going to -- I can't

15         answer that.

16   BY MR. BUCHANAN:

17         Q.    What's your definition of "a

18   lot," ma'am?

19               MR. LIMBACHER:  Same

20         objection.  Object to form.

21   BY MR. BUCHANAN:

22         Q.    Would 100 million be a lot?

23         A.    I can't speak to the number

24   of pills.  And I'm not going to speak to
```

1   the number -- the dollar value.

2         I can't.  That's not --

3   that's not within my role.  I don't know.

4      Q.   Well, you saw orders cross

5   your desk, right?

6      A.   Yes.

7      Q.   And one of your jobs was to

8   evaluate orders if they were excessive,

9   right?

10      A.   Yes.

11      Q.   So what's a lot?

12         MR. LIMBACHER:  Object to

13      form.

14         THE WITNESS:  That's not a

15      fair question.  I don't know

16      what -- it depends what you're

17      talking about, a lot.  Each

18      customer is different.  Each

19      wholesaler is different.

20   BY MR. BUCHANAN:

21      Q.   What's excessive?

22         MR. LIMBACHER:  Object to

23      form.

24         THE WITNESS:  We had, you

1          know, programs in place to monitor

2          excessive orders.

3   BY MR. BUCHANAN:

4          Q.    I'm just asking you what

5   excessive was.

6                MR. LIMBACHER:  Object to

7          form.  You're asking for a

8          definition from a dictionary?

9                MR. BUCHANAN:  Counsel, you

10         get to object to form.

11               MR. LIMBACHER:  No.  I'm

12         asking you to rephrase your

13         question, please.

14               MR. BUCHANAN:  No, that's

15         not the way it works.

16               MR. LIMBACHER:  I don't

17         understand.

18               MR. BUCHANAN:  It's my right

19         to rephrase my question.  Your

20         role is to tell me whether you

21         have an objection to form, for my

22         benefit.

23               MR. LIMBACHER:  And I'm

24         objecting -- I'm objecting to your

Highly Confidential - Subject to Further Confidentiality Review

 1          question.

 2                  MR. BUCHANAN:  I'll ask you

 3          if I need clarification.

 4                  MR. LIMBACHER:  I'm

 5          objecting to your question.

 6                  I don't think we're here to

 7          ask her for definitions of

 8          individual words.

 9                  MR. BUCHANAN:  Move to

10          strike, counsel.

11                  MR. LIMBACHER:  You have to

12          put it into some kind of context.

13                  MR. BUCHANAN:  Just mark the

14          transcript, please.

15     BY MR. BUCHANAN:

16          Q.   Ma'am, I'd just like to

17     know, during your time at Endo, am I

18     correct that you had a role and

19     involvement for the monitoring of

20     suspicious orders?

21          A.   Yes.

22          Q.   Monitoring for suspicious

23     orders, among other things, includes

24     monitoring for excessive orders, right?

1      A.    Yes.

2      Q.    Excessive by quantity,

3  right?

4      A.    We had an excessive -- we

5  had an excessive program and SOM programs

6  in place, yes.

7      Q.    And that was among your role

8  and functions over the time at Endo,

9  fair?

10      A.    Correct.

11      Q.    Okay.  So I'd like to know,

12  what's an excessive order?

13          MR. LIMBACHER:  Object to

14          form.

15          THE WITNESS:  We have

16          programs in place that monitor our

17          excessive orders and SOM programs

18          in place.  And those orders come

19          in, and they're reviewed and

20          they're released as necessary.

21          I'm not providing a

22          definition of an excessive order.

23  BY MR. BUCHANAN:

24      Q.    Well, you looked at the

1    orders when they came across your desk?

2         A.    Yes.

3         Q.    Or came across your computer

4    screen?

5         A.    Me or somebody on my team,

6    yes.

7         Q.    And when you did that, one

8    of the things you were looking for was

9    whether they were excessive, right?

10        A.    We had a program in place

11   that would monitor our excessive orders.

12        Q.    Is that a yes answer to my

13   question, ma'am?

14        A.    We had --

15             MR. LIMBACHER:  Object to

16        form.

17   BY MR. BUCHANAN:

18        Q.    Is that a yes answer?

19             MR. LIMBACHER:  Object to

20        form.

21             THE WITNESS:  We had a

22        program in place that monitored

23        our excessive orders.

24   BY MR. BUCHANAN:

1      Q.    I'm asking whether you

2    examined the orders?

3      A.    Yes.

4      Q.    Thank you.

5      A.    Based on our program.

6      Q.    And so over the course,

7    ma'am, of looking at those orders, you

8    saw orders for thousands and thousands

9    and tens of thousands of purchases for

10   bottles of Percocet, true?

11            MR. LIMBACHER:  Object to

12        form.

13            THE WITNESS:  I don't recall

14        actual numbers of bottles that

15        customers may or may not have

16        ordered.

17   BY MR. BUCHANAN:

18      Q.    You don't recall even having

19   the sense, ma'am, that in the orders that

20   you reviewed, tens of thousands of

21   bottles of Percocet, 100 and 500 count,

22   were purchased containing narcotics that

23   you manufactured, "you" meaning Endo?

24            MR. LIMBACHER:  Object to

1           form.

2                    THE WITNESS:  I can tell you

3           that our customers placed orders,

4           they went through our excessive

5           program and our SOM program, and

6           they were reviewed and released

7           based on -- based on our program.

8                    That's what I can tell you.

9    BY MR. BUCHANAN:

10          Q.    As the person -- were you, I

11   mean, the person with that responsibility

12   within Endo with regard to branded

13   products?

14                   MR. LIMBACHER:  Object to

15          form.  Time period.

16                   THE WITNESS:  Repeat your

17          question.

18   BY MR. BUCHANAN:

19          Q.    Were you that person within

20   Endo who had responsibility for

21   ordering -- reviewing orders to determine

22   if they were suspicious?

23                   MR. LIMBACHER:  Object to

24          form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  What time

2     frame are you asking about?

3  BY MR. BUCHANAN:

4     Q.   That was a good tip from

5  your counsel, I guess.

6          MR. BUCHANAN:  Counsel, I'm

7     going to ask you, if you have a

8     form objection, please state a

9     form objection.  I'll decide

10    whether I need to re-ask it.

11         MR. LIMBACHER:  And I will

12    make my objections as I think is

13    appropriate.

14         MR. BUCHANAN:  That's

15    coaching.

16         MR. LIMBACHER:  And I don't

17    appreciate the speeches, okay.

18         MR. BUCHANAN:  Then you

19    should ask -- you should make

20    appropriate objections.

21         MR. LIMBACHER:  I think I'm

22    doing that.

23         MR. BUCHANAN:  This

24    deposition is supposed to proceed

Highly Confidential - Subject to Further Confidentiality Review

 1          as if it was in court, unless this

 2          witness is going to show up in

 3          court.

 4   BY MR. BUCHANAN:

 5          Q.    Ma'am, are you planning to

 6   come to court?

 7                MR. LIMBACHER:  Object to

 8          form.

 9                MR. BUCHANAN:  Withdrawn.

10   BY MR. BUCHANAN:

11          Q.    When this case goes to trial

12   in September of this year, September of

13   2019, if we request your presence at

14   court, are you willing to come to

15   Cleveland and make your presence there

16   live?

17                MR. LIMBACHER:  Object to

18          form.

19                THE WITNESS:  If that's the

20          recommendation of my counsel, then

21          I will do that.

22   BY MR. BUCHANAN:

23          Q.    Okay.  It would not be too

24   inconvenient for you to attend, correct?

1          MR. LIMBACHER:  Object to

2     form.

3          THE WITNESS:  If that's the

4     recommendation of my counsel.

5  BY MR. BUCHANAN:

6     Q.    Thank you.

7          You stated that it depends

8  on what time as to what your role and

9  function would have been with regard to

10 suspicious orders.

11         Did I understand your

12 request for clarification correctly?

13    A.    Yes.

14    Q.    So when you started with

15 Endo, what was your role and function in

16 1998?

17    A.    I was a contract analyst.

18    Q.    At what point in time did

19 you have a role and function that gave

20 you oversight of suspicious orders?

21         MR. LIMBACHER:  Object to

22    form.

23         THE WITNESS:  I became the

24    director of the group in 2015.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2         Q.    My question was, at what

3    point in time did you have a role and

4    function that gave you oversight of

5    suspicious orders?

6                   MR. LIMBACHER:  Object to

7         form.

8                   THE WITNESS:  I've always

9         been part of the customer service

10        and distribution group my entire

11        time at Endo.  The ultimate

12        responsibility became when I

13        became a director in 2015.

14   BY MR. BUCHANAN:

15        Q.    Okay.  When did you have any

16   oversight and responsibility for

17   monitoring for suspicious orders of your

18   customers?

19        A.    I don't recall.

20                   MR. LIMBACHER:  Object to

21        form.

22                   THE WITNESS:  Sorry.

23                   I don't recall.  I've been

24        with the company for 20 years.

1          Some time during that time frame.

2          I don't recall the exact time.

3    BY MR. BUCHANAN:

4          Q.    Can you identify somebody --

5    is there a time frame when you recall

6    that you did have that responsibility --

7               MR. LIMBACHER:   Same

8          objection.

9    BY MR. BUCHANAN:

10         Q.    -- prior to 2015?

11         A.    No, I don't recall the exact

12   date.

13         Q.    Well, if you weren't looking

14   at suspicious orders, ma'am, who was, or

15   orders to assess whether they were

16   suspicious, who was doing that?

17         A.    It could have been me.  It

18   could have been my boss at the time.  It

19   could have been somebody on the team.

20   There's a variety of people.

21         Q.    Okay.  What was the name of

22   your group?

23              Withdrawn.

24              What was the name of the

Highly Confidential - Subject to Further Confidentiality Review

1    group that had responsibility for

2    examining orders to see whether or not

3    they were suspicious?

4              MR. LIMBACHER:  Object to

5         form.

6              THE WITNESS:  Customer

7         service.

8    BY MR. BUCHANAN:

9         Q.    Customer service?

10        A.    It's the customer service

11   team, yes.

12        Q.    So the role and

13   responsibility -- withdrawn.

14             The group responsible for

15   evaluating orders to determine if they

16   were suspicious was in the customer

17   service function?

18        A.    Within Endo, yes.

19        Q.    Did Endo have a regulatory

20   group?

21        A.    So let me -- maybe I should

22   provide some clarification.

23             So Endo has a third-party

24   logistics company, UPS Supply Chain

1   Solutions, that does all of our

2   warehousing and distribution for us.

3   They also have an SOM program.

4           So there's a group of --

5   within customer service that manages

6   these orders.  And there's also the

7   regulatory group at UPS that does another

8   review of the orders.

9           So I wanted to make some

10  clarification there.

11      Q.    Within the labeling of the

12  products that you sold, the narcotics,

13  Endo is listed as the manufacturer?

14          MR. LIMBACHER:  Object to

15      form.

16          THE WITNESS:  Yes.

17  BY MR. BUCHANAN:

18      Q.    Okay.  Is UPS listed as the

19  manufacturer?

20      A.    No.

21      Q.    So getting back to my

22  question, the customer service function

23  is not within the regulatory group at

24  Endo, fair?

```
 1           A.    Yes, that's correct.

 2           Q.    The customer service

 3    function is not in the, quote, compliance

 4    group within Endo --

 5           A.    That's correct.

 6           Q.    -- fair?

 7                 The customer service

 8    function is not in a DEA compliance

 9    group, fair?

10           A.    At Endo, yes.

11                 But, if I can also add,

12    again --

13           Q.    That was my only question,

14    ma'am.

15                 MR. LIMBACHER:  You can

16           finish your answer.

17                 Go ahead.

18                 THE WITNESS:  Thank you.

19                 MR. BUCHANAN:  Does it go to

20           my question?

21                 MR. LIMBACHER:  You can

22           finish your answer.

23                 She's entitled to finish her

24           answer.  You interrupted her,
```

1   counsel.

2           MR. BUCHANAN:  I don't think

3   so.  I think, counsel, you'll have

4   an opportunity -- you'll have an

5   opportunity to direct examination.

6           MR. LIMBACHER:  I think it

7   was pretty clear you interrupted

8   her.

9           So why don't you go ahead

10  and finish your answer, if you

11  remember at this point.

12          MR. BUCHANAN:  I'll read the

13  question back to you, ma'am.

14          MR. LIMBACHER:  Why don't

15  you read the partial answer that

16  she gave and maybe that will

17  refresh her as to where she was

18  trying to go when you interrupted

19  her.

20  BY MR. BUCHANAN:

21      Q.   The customer service

22  function is not in a DEA compliance

23  group, fair?

24      A.   Yes.

1    Q.    Thank you.

2    A.    But what I wanted to add to

3  that, so as I stated, our products are

4  shipped under -- let me back up.

5          Endo has a 3PL, third-party

6  logistics company, which is UPS Supply

7  Chain Solutions.  Our products are

8  shipped under UPS's DEA license.  UPS

9  also has their own SOM program, which is

10  part of the regulatory group.

11          So the Endo products are

12  shipped and monitored -- sorry, the Endo

13  products are monitored through Endo's SOM

14  program and UPS's SOM program.  So I

15  wanted to make that clear to everybody

16  here.

17          MR. BUCHANAN:  I'll move to

18      strike as nonresponsive.

19  BY MR. BUCHANAN:

20    Q.    Do you remember my question?

21    A.    Yes, I remember your

22  question.

23    Q.    And what was it?

24    A.    If the customer service team

Highly Confidential - Subject to Further Confidentiality Review

1    was part of regulatory.

2              Q.    And is it?

3              MR. LIMBACHER:  Object to

4        form.  Asked and answered.

5              THE WITNESS:  No, it's not.

6    BY MR. BUCHANAN:

7              Q.    Thank you.

8              I was asking you earlier

9    when you evolved into an oversight

10   responsibility or had some responsibility

11   for suspicious order monitoring.

12             Can you describe for me,

13   ma'am, when you had some responsibility

14   for that --

15             MR. LIMBACHER:  Object to

16        form.

17   BY MR. BUCHANAN:

18             Q.    -- for the first time?

19             A.    Can you clarify that?

20             Q.    In what way?

21             A.    I don't understand your

22   question exactly.

23             Q.    Okay.  As I understand it,

24   ma'am, and your company has told us, that

1   you had responsibility for suspicious

2   order monitoring.

3           When did you first have that

4   responsibility?

5       A.    So Endo has always had an

6   excessive program in place since '99, and

7   it's evolved over time.

8       Q.    Okay.

9       A.    I've always been part of the

10  customer service and distribution group

11  my entire -- my entire time at Endo.  I

12  became the director in 2015.

13          So the ultimate

14  responsibility was 2015.  But I've been

15  part of the team the entire time I've

16  been at Endo.

17      Q.    Who had that responsibility

18  in 2010?

19          MR. LIMBACHER:  Object to

20      form.

21          THE WITNESS:  I was not the

22      director of the group back then,

23      but it was part of my

24      responsibility, along with other

1          team members.

2     BY MR. BUCHANAN:

3          Q.    Who was more senior to you

4     with that responsibility, then, in 2010?

5          A.    There was a director of the

6     team.

7          Q.    And who was that person?

8          A.    Her name was Jill Connell.

9          Q.    And would Ms. Connell review

10    the orders to determine whether they were

11    suspicious?

12         A.    No, no.  She would if I

13    needed her to.  But no, it was my

14    responsibility, or somebody on my team.

15         Q.    So as of 2010, I understand

16    Ms. Connell was senior to you, but you

17    had the responsibility for overseeing

18    whether the orders were suspicious or

19    not?

20              MR. LIMBACHER:  Object to

21         form.

22              THE WITNESS:  Yes.

23    BY MR. BUCHANAN:

24         Q.    Okay.  Let's dial the clock

Highly Confidential - Subject to Further Confidentiality Review

1   back to 2005.

2              Was there somebody more

3   senior to you, as of 2005, who had

4   responsibility to determine if the orders

5   were suspicious or not?

6        A.   Jill Connell was still --

7   was still the director at the time.

8        Q.   And was her role and

9   function in 2005 similar, in that

10  ultimately you could have asked her but

11  you handled it on a day-to-day basis?

12             MR. LIMBACHER:  Object to

13        form.

14             THE WITNESS:  Yes.

15  BY MR. BUCHANAN:

16        Q.   And that was the process and

17  structure that Endo had created to

18  oversee suspicious order monitoring of

19  its branded controlled substances, true?

20        A.   But --

21             MR. LIMBACHER:  Object to

22        form.

23  BY MR. BUCHANAN:

24        Q.   Is that a yes?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    It is.

 2                But I'd like to add.

 3          Q.    Thank you.

 4          A.    Again, I want to remind

 5    everybody that Endo, we've had a

 6    partnership with UPS Supply Chain

 7    Solutions since 2000, who also had their

 8    own SOM program.  So they were also part

 9    of the equation of monitoring orders for

10    Endo.

11          Q.    I understand.

12                Endo is the manufacturer,

13    correct?

14                MR. LIMBACHER:  Object to

15          form, asked and answered.

16                THE WITNESS:  Yes.  Endo is

17          the manufacturer.

18                But our products, again, are

19          shipped under the UPS DEA license,

20          so they are part of the equation.

21    BY MR. BUCHANAN:

22          Q.    And we'll talk about UPS.  I

23    understand they had a role and function

24    during various points in time.
```

Highly Confidential - Subject to Further Confidentiality Review

1    I want to focus on Endo's

2 and your role and function, fair?  Is

3 that okay?

4        A.    Yes.

5        Q.    Okay.  I just want to

6 understand.  You had that responsibility

7 on a day-to-day basis -- withdrawn.

8             Focusing on suspicious order

9 monitoring, you had that responsibility

10 through the customer service function

11 within Endo, fair?

12            MR. LIMBACHER:  Object to

13        form.

14            THE WITNESS:  Yes.

15 BY MR. BUCHANAN:

16        Q.    For orders of Endo-branded

17 products, correct?

18        A.    What time frame are you

19 speaking of?

20        Q.    I'm speaking of from 1998

21 until present.

22        A.    Yes.

23        Q.    Okay.  So at all times that

24 you've been at Endo?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, I've been part of the

2  same group for the entire time I've been

3  at Endo.

4    Q.    And one component of your

5  responsibilities within that group has

6  been to monitor for suspicious orders,

7  fair?

8                MR. LIMBACHER:  Object to

9        form.  Asked and answered.

10                THE WITNESS:  Yes.

11  BY MR. BUCHANAN:

12    Q.    Can you tell me at what

13  point in time you identified your first

14  suspicious order?

15                MR. LIMBACHER:  Object to

16        form.

17                THE WITNESS:  I don't

18        recall.

19  BY MR. BUCHANAN:

20    Q.    I guess, can you tell me at

21  what point in time you reported your

22  first suspicious order to the DEA?

23                MR. LIMBACHER:  Object to

24        form.

1                    THE WITNESS:  I don't -- we

2          haven't.  I never -- I don't

3          recall.

4    BY MR. BUCHANAN:

5          Q.     Has Endo ever reported a

6    suspicious order for one of its branded

7    products to the DEA?

8                    MR. LIMBACHER:  Object to

9          form.

10                   THE WITNESS:  No, we have

11         not.

12                   If I could remind you again,

13         our products are shipped under

14         UPS's license.  So the person

15         reporting a suspicious order would

16         be UPS and not Endo.

17   BY MR. BUCHANAN:

18         Q.     Okay.  Let's stay with my

19   question first.

20                   Has Endo ever reported a

21   suspicious order for one of its branded

22   products to the DEA?

23         A.     Not --

24                   MR. LIMBACHER:  Object to

Highly Confidential - Subject to Further Confidentiality Review

1              form.

2                        THE WITNESS:  Not that I

3              recall.

4     BY MR. BUCHANAN:

5              Q.    And you've been in that role

6     and function, the "role and function"

7     being monitoring for suspicious orders,

8     since 1998?

9                        MR. LIMBACHER:  Object to

10             form.

11                       THE WITNESS:  Yes.

12    BY MR. BUCHANAN:

13             Q.    You've seen thousands and

14    thousands and thousands of orders for

15    opioid products since 1998, true?

16             A.    We've had orders since 1998,

17    yes.

18             Q.    A lot of them?

19             A.    It depends on what your

20    definition of "a lot" is.

21             Q.    Okay.  My definition would

22    be orders for billions and billions of

23    opioid pills.

24                       MR. LIMBACHER:  Object to

1      form.  Asked and answered.

2           THE WITNESS:  I can't speak

3      to billions of pills.

4           But I can remind you again

5      that we've had an excessive

6      program in place since -- since

7      2000, since Endo -- you know,

8      since Endo started.  And orders

9      have been monitored since the

10     beginning.

11  BY MR. BUCHANAN:

12     Q.   So orders have been

13  monitored and, to the best of your

14  knowledge, Endo has never reported a

15  single order as a suspicious order to the

16  DEA; is that correct?

17          MR. LIMBACHER:  Object to

18     form.

19          THE WITNESS:  As I recall,

20     yes.

21  BY MR. BUCHANAN:

22     Q.   You highlighted that UPS

23  also was involved in your supply chain,

24  fair?

```
 1          A.    Yes.

 2                MR. LIMBACHER:  Object to

 3          form.  Misstates her testimony.

 4                MR. BUCHANAN:  And, again,

 5          it's object to form.  Don't

 6          characterize whether I've

 7          misstated any testimony.

 8                MR. LIMBACHER:  I'm entitled

 9          to make my objections --

10                MR. BUCHANAN:  You are not.

11                MR. LIMBACHER:  -- counsel.

12                MR. BUCHANAN:  You are not.

13                MR. LIMBACHER:  I'm not

14          limited to simply saying the three

15          words "object to form."

16                MR. BUCHANAN:  I would

17          invite you, in any courtroom, to

18          do that and see if you don't get a

19          reprimand from the court.

20                MR. LIMBACHER:  I've been in

21          many courtrooms, counsel --

22                MR. BUCHANAN:  This is

23          supposed to proceed --

24                MR. LIMBACHER:  -- and I've
```

1          made objections many, many times

2          in front of a lot judges.  So

3          don't lecture me, please.

4                    MR. BUCHANAN:  This is

5          supposed to proceed as if it's in

6          court.  I'll mark the transcript.

7    BY MR. BUCHANAN:

8          Q.    With regard to UPS's role in

9    overseeing -- withdrawn.

10                   With regard to UPS's role in

11   fulfilling Endo's orders -- would that be

12   a fair characterization of one of their

13   roles, fulfilling Endo's orders?

14                   MR. LIMBACHER:  Object to

15         form.

16                   THE WITNESS:  They are a

17         part of the logistics company,

18         yes.  They do warehousing and

19         distribution for Endo.

20   BY MR. BUCHANAN:

21         Q.    I just want to make sure I'm

22   characterizing it in a way that's

23   reasonable from your perspective.

24                   So with regard to their role

1    in fulfilling orders, you identified that

2    they have a suspicious order monitoring

3    program as well, right?

4         A.    Yes, they do.

5         Q.    And of the orders that --

6    withdrawn.

7              Do I understand the workflow

8    correctly, that Endo is the manufacturer,

9    has relationships with customers of many

10   forms, true?

11             MR. LIMBACHER:  Object to

12        form.

13             THE WITNESS:  Our customers

14        for the opioid products are our

15        wholesalers.

16   BY MR. BUCHANAN:

17        Q.    You have wholesale

18   customers, true?

19        A.    Yes.

20        Q.    Companies like McKesson and

21   Cardinal and AmerisourceBergen, correct?

22        A.    That's correct.

23        Q.    You have other distribution

24   partners that you sell to as well, right?

```
 1              MR. LIMBACHER:  Object to

 2         form.

 3              THE WITNESS:  We have the

 4         big three that you mentioned, plus

 5         we have some regional wholesalers.

 6    BY MR. BUCHANAN:

 7         Q.    Do you sell direct to any

 8    retail pharmacies?

 9         A.    No, we do not.

10         Q.    Not today?  Not ever?

11         A.    Today, no.  We sold to

12    retail distribution centers many years

13    ago.

14         Q.    And just give me a window

15    for when that was happening.

16              MR. LIMBACHER:  Object to

17         form.

18              THE WITNESS:  Prior to 2005,

19         2006, if I recall correctly.

20    BY MR. BUCHANAN:

21         Q.    Okay.  So the orders come in

22    to Endo, as I understand the workflow.

23              Endo has a sales team that

24    interacts with the wholesale distributor
```

1    customers, true?

2         A.    There is a sales team, yes.

3         Q.    Those sales folks do

4    whatever -- you're not in a sales

5    function, per se?

6         A.    No, I'm not.

7         Q.    You are in the business

8    side, though, of fulfilling orders, fair?

9         A.    Yes.

10         Q.    So those orders come in,

11    they either get keyed in or

12    electronically submitted to Endo?

13              MR. LIMBACHER:  Object to

14         form.

15    BY MR. BUCHANAN:

16         Q.    True?

17         A.    Yes.

18         Q.    There is some review that is

19    conducted of those orders at Endo --

20              MR. LIMBACHER:  Object to

21         form.

22    BY MR. BUCHANAN:

23         Q.    -- correct?

24         A.    Yes.  They go through

1   multiple checks and balances within our

2   system.

3         Q.    And then they are

4   transmitted, ultimately, to your

5   third-party logistics company.

6              That would be UPS?

7         A.    Yes.  We send to them -- we

8   send the orders to them electronically

9   for fulfillment.

10        Q.    So you are the first check

11  on an order, "you" being Endo?

12             MR. LIMBACHER:  Object to

13        form.

14             THE WITNESS:  Endo is, yes.

15  BY MR. BUCHANAN:

16        Q.    And you and your team are

17  the people within Endo that are

18  monitoring for suspicious orders --

19        A.    We have a --

20        Q.    -- within Endo?

21        A.    We have a program within our

22  SAP system, yes.

23        Q.    And am I correct, then, in

24  understanding your testimony, ma'am, that

1    since the time you've been at Endo,

2    between 1998 and present, no order has

3    been flagged as suspicious by you?

4               MR. LIMBACHER:  Object to

5          form.

6    BY MR. BUCHANAN:

7          Q.    By your group?

8               MR. LIMBACHER:  Misstates

9          her testimony.

10              MR. BUCHANAN:  I'll move to

11         strike again, counsel.

12              And mark the transcript,

13         please.

14   BY MR. BUCHANAN:

15         Q.    You can answer.

16         A.    Am I supposed to answer?

17         Q.    He'll do that throughout the

18   day, and it's supposed to be for my

19   benefit and not yours.  And I can reframe

20   my question if I need to.

21              So you can answer.

22         A.    So when orders -- if I --

23   could you make sure I understand your

24   question?  Could you please repeat it?

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Am I correct in

2   understanding your testimony, ma'am, that

3   since the time you've been at Endo,

4   between 1998 and present, no order has

5   been flagged as suspicious by your group?

6               MR. LIMBACHER:  Object to

7          form.

8               THE WITNESS:  So all orders

9          are -- that Endo receives go

10         through our SOM program, and there

11         is checks and balances within that

12         program.

13              MR. BUCHANAN:  I'm going to

14         move to strike as nonresponsive.

15   BY MR. BUCHANAN:

16      Q.    Can you answer my question,

17   ma'am?

18              Have you ever --

19      A.    Not that I recall, no.

20      Q.    Okay.  So over the course of

21   the 20 years that you've been in that

22   role, you have never flagged an order as

23   suspicious within your group at Endo,

24   true?

1           MR. LIMBACHER:  Object to

2      form.  Misstates her testimony.

3           THE WITNESS:  Not that I

4      recall.

5  BY MR. BUCHANAN:

6      Q.    Let's talk about UPS.

7           So after the order clears

8  the Endo internal systems, through the

9  magic of electronics, somehow that order

10 is transmitted to UPS and captured by

11 their order processing system.

12          Would that be fair?

13     A.    The orders are sent to UPS

14 for fulfillment, yes.

15     Q.    And you said UPS has their

16 own checks where they monitor for

17 suspicious orders?

18     A.    Yes, they do.

19     Q.    And to the best of your

20 knowledge, ma'am, has UPS ever identified

21 any order that you have cleared as a

22 suspicious order?

23          MR. LIMBACHER:  Object to

24     form.

1          THE WITNESS:  Not that I

2     recall, no.

3  BY MR. BUCHANAN:

4     Q.    And has UPS ever reported a

5  suspicious order for any Endo product

6  over the 20 years that you've been

7  working with them or their predecessor?

8          MR. LIMBACHER:  Object to

9     form.

10          THE WITNESS:  Not that I

11     recall.

12  BY MR. BUCHANAN:

13     Q.    So sitting here today, to

14  the best of your knowledge, as a person

15  who's had the role and responsibility

16  within Endo for looking at suspicious

17  orders, you're not aware of any orders

18  the company has received in 20 years that

19  have been reported to the DEA as

20  suspicious orders; would that be fair?

21          MR. LIMBACHER:  Object to

22     form.

23          THE WITNESS:  Like I stated,

24     we have an excessive program, SOM

Highly Confidential - Subject to Further Confidentiality Review

1          program, in place, orders go

2          through that program.  And they

3          are reviewed and released as

4          necessary.

5                And, no, nothing has been --

6          that I recall, nothing has been

7          reported to the DEA.

8    BY MR. BUCHANAN:

9          Q.    So the answer to my question

10   would be, over the 20 years you're not

11   aware of any order that's been

12   identified, by either Endo or UPS for an

13   Endo product, that's been identified as a

14   suspicious order, fair?

15               MR. LIMBACHER:  Object to

16         form.

17               THE WITNESS:  Not that I

18         recall.

19   BY MR. BUCHANAN:

20         Q.    Okay.  To clarify

21   organizationally, when we talk about

22   Endo, at a point in time, Endo acquired

23   another company known as Qualitest.

24               Do you recall that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Qualitest had its suite of

3  products; Endo Pharmaceuticals had its

4  suite of products, true?

5    A.    That's correct.

6    Q.    Qualitest was largely

7  focused on generics, while Endo was

8  focused on the branded, fair?

9         MR. LIMBACHER:  Object to

10        form.

11        THE WITNESS:  Yes.

12  BY MR. BUCHANAN:

13    Q.    Is that your understanding?

14    A.    Yes, correct.

15    Q.    There was a group over in

16  Qualitest that had a role and function,

17  at a point in time, with regard to

18  suspicious order monitoring of their

19  products, right?

20    A.    Yes, they did.  I can't

21  speak to it, but they did.

22    Q.    Okay.  With regard to Endo

23  Pharmaceutical's products, that role and

24  function resided -- currently resides

1    with you as the last stop and previously

2    was one of your functions, right?

3              MR. LIMBACHER:  Object to

4         form.

5              THE WITNESS:  Was one of

6         my --

7    BY MR. BUCHANAN:

8         Q.    Was one of your

9    responsibilities?

10        A.    Yes, correct.

11        Q.    You testified on a few

12   occasions, ma'am, that during your time

13   over the last 20 years at Endo there was

14   an excessive order program that was in

15   place.

16              Do you recall that?

17        A.    Yes, there was.

18        Q.    I understand your testimony

19   that you never identified an order over

20   the 20 years within Endo as being

21   suspicious.

22              Do you recall that

23   testimony?

24              MR. LIMBACHER:  Object to

1        form.  Asked and answered.

2                THE WITNESS:  Yes.

3   BY MR. BUCHANAN:

4        Q.    Did you ever identify an

5   order as excessive?

6                MR. LIMBACHER:  Object to

7           form.

8                THE WITNESS:  So as I

9           stated, you know, we have an

10          excessive program within Endo,

11          orders go through that program.

12          And if they kick out for any

13          reason, they are reviewed and

14          released as necessary.

15  BY MR. BUCHANAN:

16       Q.    Okay.  And when I said

17  "excessive," that is one of the things

18  that is reviewed in that program?

19       A.    Yes.

20       Q.    Over the course of your

21  years with Endo, ma'am, has the excessive

22  order program identified excessive

23  orders?

24                MR. LIMBACHER:  Object to

Highly Confidential - Subject to Further Confidentiality Review

1      form.

2              THE WITNESS:  Yes.  They

3          have been flagged as excessive.

4          But they are reviewed, like I

5          stated, and there's reasons that

6          you can release orders that are

7          flagged as excessive.

8    BY MR. BUCHANAN:

9          Q.   Okay.  And would it be fair,

10   ma'am, that over the years, you have

11   indeed identified orders as excessive in

12   quantity, true?

13             MR. LIMBACHER:  Object to

14         form.

15             THE WITNESS:  Yes, orders

16         that kicked out as excessive.

17   BY MR. BUCHANAN:

18         Q.   Would it be fair, ma'am,

19   that over the years at Endo, you

20   identified orders of unusual frequency?

21             MR. LIMBACHER:  Object to

22         form.

23             THE WITNESS:  What's your

24         definition of "unusual frequency"?

BY MR. BUCHANAN:

     Q.    Do you have one?

     A.    I'm asking you what your definition is.

     Q.    I'll work with yours.

     Do you have a definition of "unusual"?

     MR. LIMBACHER:  Object to form.

     THE WITNESS:  It depends.  I don't know what you're asking.  So you need to clarify for me.

BY MR. BUCHANAN:

     Q.    Okay.  Did you understand that one of your roles and functions, in looking for suspicious orders, was to look for orders of unusual frequency?

     A.    Unusual frequency, it depends.  I mean, there's a lot of reasons orders may kick out as excessive. It could be a holiday buying period.  It could be a supply issue.  It could be a back order.  It could be customers are consolidating.

1    There's many reasons that

2    are valid that orders would kick out as

3    excessive.

4        Q.    My question was simple.  And

5    it was really, just, did you understand

6    that one of your roles and functions, in

7    looking at suspicious orders, was to look

8    for orders of unusual frequency?

9            Did you understand that was

10   one of your roles and functions, ma'am?

11           MR. LIMBACHER:  Object to

12       form.

13           THE WITNESS:  What I can

14       tell you is we had an excessive

15       program.  And orders went through

16       that excessive program and orders

17       potentially kicked out as

18       excessive.  And then they are

19       reviewed.

20           That's how I'm going to

21       answer that question.

22   BY MR. BUCHANAN:

23       Q.    Okay.  Was one of your roles

24   and functions in looking at orders that

1    came through your excessive program to

2    look for orders of unusual frequency?

3                    MR. LIMBACHER:  Object to

4         form.

5                    THE WITNESS:  I'm not -- I

6         think I answered your question.

7    BY MR. BUCHANAN:

8         Q.    Is that one of the things

9    you looked at, ma'am?

10                   MR. LIMBACHER:  Object to

11        form.

12                   THE WITNESS:  We had an

13        excessive program in place.  The

14        orders went through that excessive

15        program.  And they kicked out if

16        anything was beyond what the

17        program was in place.

18   BY MR. BUCHANAN:

19        Q.    Okay.

20        A.    And to review it.  And I

21   gave you specific answers as to -- or

22   specific reasons as to why orders may

23   have kicked out.

24        Q.    Okay.  Is one of the reasons

1    unusual frequency?

2             MR. LIMBACHER:  Object to

3        form.  Vague.

4             THE WITNESS:  It's -- you

5        have to -- we can go round and

6        round about this.  But I don't

7        understand what you're asking, or

8        it's very vague what you're

9        asking.

10   BY MR. BUCHANAN:

11        Q.   Do you understand, ma'am,

12   that as a manufacturer of narcotics, Endo

13   had an obligation to maintain effective

14   controls to prevent diversion?

15             Did you have an

16   understanding of that at any point in

17   time?

18             MR. LIMBACHER:  Object to

19        form.

20             THE WITNESS:  Yes.  And as I

21        explained, we had the appropriate

22        checks and balances in place

23        within our system.

24             Can we take a break soon,

```
 1              please?  Can we take a break soon?

 2                   MR. LIMBACHER:  Sure.

 3              Counsel, is that all right?  Is

 4              this an appropriate place to take

 5              a break?

 6                   MR. BUCHANAN:  I said the

 7              witness can take one when she

 8              wanted to, so I'll respect that.

 9                   MR. LIMBACHER:  Thank you.

10                   VIDEO TECHNICIAN:  Off the

11              record.  The time is 9:54.

12                        -   -   -

13                   (Whereupon, a brief recess

14              was taken.)

15                        -   -   -

16                   VIDEO TECHNICIAN:  We're

17              going back on the record.

18              Beginning of Media File Number 2.

19              The time is 10:10.

20     BY MR. BUCHANAN:

21              Q.    Ma'am, did there come a time

22     in 2017 when you were approached by those

23     within Endo for information to respond to

24     a congressional inquiry concerning Endo's
```

1    practices with regard to suspicious order

2    monitoring?

3            A.    Are you speaking of the

4    McCaskill?

5            Q.    Yes.

6            A.    Yes.

7            Q.    You're familiar with that

8    inquiry?

9            A.    Yes, I am.

10           Q.    And you provided information

11   in connection with it, true?

12           A.    Yes.

13           Q.    You've seen the response

14   that was sent to the Senate in connection

15   with that inquiry?

16           A.    Yes.

17                 MR. BUCHANAN:  Can we get

18           669, please?

19                 MR. SIEGEL:  Endo Walker

20           Number 1.

21                        -   -   -

22                 (Whereupon, EndoWalker

23           Exhibit-1,

24           PAR_OPIOID_MDL_0001596408-442, was

1    marked for identification.)

2                - - -

3    BY MR. BUCHANAN:

4         Q.    You can do this either way,

5    whatever is most convenient for you,

6    ma'am.  We have it on the screen, and

7    there should have been two passed, one

8    that has the actual exhibit sticker on

9    it.

10              MR. BUCHANAN:  And one for

11         you, counsel.

12   BY MR. BUCHANAN:

13        Q.    I'm passing you what we

14   marked as Exhibit-1 to your deposition,

15   ma'am.  It's an attachment to the

16   transmittal to the Senate in connection

17   with this inquiry.

18              Did you -- just take a few

19   moments to turn the pages.  I'll zoom in

20   fairly specifically on Endo's response.

21   And "Endo" meaning Endo Pharmaceutical.

22        A.    Uh-huh.

23        Q.    I just want to make sure

24   this is something that you've seen and

1    are familiar with.

2         A.    Yes, I've seen it.

3         Q.    You've seen it in the

4    ordinary course, or just seen it getting

5    ready for today?

6              MR. LIMBACHER:  Object to

7         form.

8              THE WITNESS:  I've seen it

9         when we were putting it together.

10   BY MR. BUCHANAN:

11        Q.    Okay.  You worked

12   internally, I assume also with outside

13   counsel at that time, in connection with

14   responding to the inquiry?

15        A.    Yes.

16             MR. LIMBACHER:  Object to

17        form.

18   BY MR. BUCHANAN:

19        Q.    Okay.  And this is the

20   attachment that accompanied the letter,

21   and there were other attachments, but one

22   of the attachments that accompanied the

23   letter.

24             Do you recognize it?

1    A.    I do.

2    Q.    Let's go to -- would it be

3  fair, ma'am, that there was an inquiry

4  from Ranking Member McCaskill in the

5  summer of 2017 asking for particular

6  information from Endo in various areas,

7  true?

8    A.    Yes, that's correct.

9    Q.    Point one that's on the

10 first page, it says, Please describe any

11 suspicious order monitoring program Endo

12 and its subsidiaries have implemented,

13 including efforts to monitor, investigate

14 or report suspicious transactions between

15 its distributors and pharmacies and

16 efforts to analyze information related to

17 chargeback requests.

18         Did I read that correctly?

19    A.    Yes.

20    Q.    When you turn to the second

21 page -- and the first page is talking

22 about Par's SOM program.

23         Par is the successor by name

24 to Qualitest?

1    A.    That's correct.

2    Q.    So we can understand, this

3  first piece they're referring to that

4  portion of the business that was either

5  Par or Qualitest in prior years, fair?

6          MR. LIMBACHER:  Object to

7       form.

8          THE WITNESS:  Yes, that's

9       correct.

10  BY MR. BUCHANAN:

11    Q.    When we go forward in time,

12  we see -- I shouldn't say "forward in

13  time" -- to the second page of the

14  document, it talks about Endo's SOM

15  program?

16    A.    Yes.

17    Q.    How do you pronounce that as

18  somebody in the field?  Do you pronounce

19  it SOM or S-O-M?  What's your parlance?

20    A.    I mostly say SOM.

21    Q.    Got you.

22          And did this, at the time,

23  ma'am, fairly summarize the then-current

24  practices of Endo with regard to

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order monitoring?

2              MR. LIMBACHER:  Object to

3         form.

4              THE WITNESS:  Yes, this is

5         our current SOM program.

6    BY MR. BUCHANAN:

7         Q.    And this was the program --

8    this is the program today?

9         A.    Yes, as of --

10             MR. LIMBACHER:  Object to

11        form.

12             THE WITNESS:  Yes, as of

13        today.  Yes.

14   BY MR. BUCHANAN:

15        Q.    And the program in 2017?

16        A.    Correct.

17        Q.    Endo changed its SOM program

18   at some point in time, 2014, 2015, true?

19        A.    In 2014 we made enhancements

20   to it, yes.

21        Q.    So this would describe the

22   as-enhanced program?

23        A.    That would be correct.

24        Q.    Am I correct, ma'am, that

Highly Confidential - Subject to Further Confidentiality Review

1   what this describes is essentially what

2   you were describing to us earlier today,

3   and that would be an order management

4   monitoring within the company's SAP

5   system?

6           MR. LIMBACHER:  Object to

7       form.

8           THE WITNESS:  Yes.  Our SOM

9       program is within our SAP system.

10  BY MR. BUCHANAN:

11      Q.    So what the company does is

12  it gets orders, they get either input or

13  electronically transmitted into the

14  company's SAP system today, correct?

15      A.    Yes.

16      Q.    Then there's an algorithm in

17  that particular system that evaluates

18  orders across different metrics; would

19  that be fair?

20      A.    Yes.

21      Q.    Which you told -- this

22  inquiry, responded to the Senate inquiry

23  was, it evaluates individual orders based

24  on quantity, size and frequency, QSF; is

1    that right?

2            A.    Yes.

3            Q.    And then if the system

4    identifies a flag, then you have to clear

5    it, right?

6                    MR. LIMBACHER:  Object to

7            form.

8                    THE WITNESS:  If orders are

9            flagged, they are kicked out on

10           the report and they are reviewed

11           and then cleared.

12   BY MR. BUCHANAN:

13           Q.    And what the company did in

14   response to this inquiry is actually

15   produced, I believe, the orders that had

16   been flagged by its system over a

17   multi-year period of time and sent that

18   to the ranking member, fair?

19           A.    The orders that were

20   provided for this document were only for

21   certain states.  I believe it was only

22   for the state of Missouri.

23           Q.    Let's look at that.

24                   It would be Exhibit B, is

1    that correct, where that was attached?

2         A.    Yes.

3         Q.    And looking at Exhibit B,

4    and I may refer, at times, to dot

5    numbers, you'll see them in the top right

6    corner, .14, for example.

7              So we're on .14 of Exhibit-1

8    to your deposition.  Confusingly, this

9    page is named Exhibit B.  But let's look

10   at that, for example.

11             Are these -- are these

12   orders that were identified by the

13   algorithm as orders requiring further

14   investigation?

15        A.    Yes.

16        Q.    Okay.  And so what we see

17   here when we look at it is the ship date,

18   the customer, customer name, customer

19   address, results of the investigation.

20             Do you see that?

21        A.    Uh-huh.

22        Q.    And then we see the ultimate

23   outcome on the right, right?

24             MR. BUCHANAN:  Is it

Highly Confidential - Subject to Further Confidentiality Review

1    possible to blow that up so we can

2    see the headings a little better?

3    BY MR. BUCHANAN:

4        Q.    Is that more discernible to

5    you, ma'am?

6        A.    I can see it.  It's fine.

7        Q.    Investigative results, that

8    would be the fourth column.

9              And then the fifth column

10   says what?

11       A.    The action that was

12   required.

13       Q.    Okay.  And so what we see

14   are, I don't know, pages on pages of

15   orders that fit the description of the

16   inquiry.

17             Was that just the state of

18   Missouri that you reported out?

19       A.    Correct.

20       Q.    So pages on pages of orders

21   for customers for the state of Missouri

22   that were flagged by the system as

23   excessive by one of those QSF factors,

24   right?

1            MR. LIMBACHER:  Object to

2       form.

3            THE WITNESS:  Yes.

4   BY MR. BUCHANAN:

5       Q.    And those QSF factors would

6   be, you know, excessive by quantity,

7   excessive by size or excessive by

8   frequency or unusual in that regard,

9   right?

10           MR. LIMBACHER:  Object to

11      form.

12           THE WITNESS:  By quantity,

13      size or frequency, yes.

14  BY MR. BUCHANAN:

15      Q.    And so these all -- all

16  these orders tripped the wire, so to

17  speak, and got kicked out and required

18  some review; is that right?

19      A.    Yes.

20      Q.    And these are orders that

21  would have been internally investigated

22  by you or your team, fair?

23      A.    Yes, correct.

24      Q.    Okay.  And so I guess the

1    Q.    How about after that?

2    A.    It was cleared after review.

3    Q.    Would it be fair to say, I

4  guess, if we went through this

5  exercise -- we're now at

6  AmerisourceBergen; is that right?

7    A.    Yes.

8    Q.    And the flag is pended due

9  to order history is the investigative

10  reason.

11        Do you see that?

12    A.    Yes.

13    Q.    And you see cleared after

14  review, cleared after review, cleared

15  after review, cleared after review for

16  all these lines on this page on .14; is

17  that fair?

18    A.    That's correct.

19    Q.    And that would have been

20  cleared after review by you or your team?

21    A.    Yes.

22    Q.    And it wasn't a secret that

23  you and your team were doing this within

24  Endo, right?

1              MR. LIMBACHER:  Object to

2      form.

3              THE WITNESS:  No.

4    BY MR. BUCHANAN:

5         Q.    I mean, you provided

6    reports, on a weekly or monthly basis, of

7    the orders that were investigated and

8    their status, right?

9              MR. LIMBACHER:  Object to

10     form.

11             THE WITNESS:  Repeat your

12     question.

13   BY MR. BUCHANAN:

14        Q.    You provided reports on the

15   orders that were pended and then cleared,

16   correct?

17        A.    No.  Reports were not

18   provided.

19        Q.    And then we see on the next

20   page, if we go to .15, let's just start

21   at the top again.  I guess we're still in

22   AmerisourceBergen.

23             And, again, this would just

24   be orders into Missouri, right?

1      A.    Yes.

2      Q.    And what was the result, now

3  we're up to, I guess, 2014 for

4  AmerisourceBergen, or 6/27 of 2014.  It's

5  page .15 on the top right corner.

6            What was the outcome of that

7  particular order that was pended due to

8  order history?

9      A.    Cleared after review.

10     Q.    How about the next one?

11     A.    The same.

12     Q.    The next one?

13     A.    The same.

14     Q.    How about for the rest of

15 this page?

16     A.    Cleared after review.

17     Q.    A few dozen orders here for

18 AmerisourceBergen.

19            And then moving into Express

20 Scripts, orders were pended or held

21 initially or kicked out of the system for

22 various reasons, and then in each

23 instance, after a physical review by a

24 person, you or somebody on your team,

1    they were cleared?

2            MR. LIMBACHER:  Object to

3        form.

4            THE WITNESS:  Correct.

5    BY MR. BUCHANAN:

6        Q.    And when we say "cleared

7    after review," that means that, then,

8    they are okay from your perspective with

9    regard to UPS, right?

10           MR. LIMBACHER:  Object to

11       form.

12           THE WITNESS:  Cleared after

13       review means they were cleared

14       from Endo's SAP system, but then

15       they were sent to UPS.  And then

16       they also went through UPS's SOM

17       program before they were

18       ultimately shipped out.

19   BY MR. BUCHANAN:

20       Q.    And then you would, under

21   your protocol, receive calls, from time

22   to time, from UPS about orders that were

23   kicked out of their system, correct?

24           A.    UPS will only reach out to

Highly Confidential - Subject to Further Confidentiality Review

1    me if they needed additional information

2    about an order.

3         Q.    So if they reached out to

4    you in connection with an order that was

5    pended by their system, they might call

6    you in the first instance, correct?

7              MR. LIMBACHER:  Object to

8         form.

9              THE WITNESS:  Repeat that.

10   BY MR. BUCHANAN:

11        Q.    Yes.

12             So UPS, you said, had their

13   own system to review?

14        A.    That's correct.

15        Q.    They had their own

16   algorithm, correct?

17        A.    Yes.

18        Q.    And sometimes there's things

19   that they couldn't address internally

20   within their system, correct?

21             MR. LIMBACHER:  Object to

22        form.

23             THE WITNESS:  If they needed

24        to, they would have reached out

1    for additional information.

2  BY MR. BUCHANAN:

3    Q.    And you recall that over the

4  years they did?

5    A.    A few times, yes.

6    Q.    And in each instance when

7  they called you, you cleared it after

8  review, correct?

9         MR. LIMBACHER:  Object to

10        form.

11        THE WITNESS:  I would

12        provide information that UPS

13        needed, depending on what they

14        would need.

15  BY MR. BUCHANAN:

16    Q.    In no instance did you guide

17  UPS not to ship an order, correct?

18        MR. LIMBACHER:  Object to

19        form.

20        THE WITNESS:  UPS makes that

21        ultimate decision whether or not

22        to ship an order.

23        I would just provide

24        information to what UPS needed.  I

Highly Confidential - Subject to Further Confidentiality Review

1          would not tell them to ship or not

2          ship.

3     BY MR. BUCHANAN:

4          Q.    UPS did not reach out to

5     your customers directly, correct?

6          A.    No, they do not.  They reach

7     out to the client.

8          Q.    Right.  So in terms of any

9     assessment with regard to whether an

10    order was suspicious or not, they did not

11    relate or communicate directly with

12    Endo's customers, fair?

13         A.    Correct, right.  They

14    reached out to the client.

15         Q.    Any communication in that

16    regard, with regard to the ultimate

17    purchaser, I should say the ultimate

18    purchaser, in this instance, we're

19    looking on this page, the first line is

20    AmerisourceBergen Corporation, that would

21    have been Endo's customer for that

22    particular order, fair?

23              MR. LIMBACHER:  Object to

24         form.

Highly Confidential - Subject to Further Confidentiality Review

1                    THE WITNESS:  Yes, yes.

2    BY MR. BUCHANAN:

3         Q.    So this was pended due to

4    order history.  And then we see, for many

5    of these on this page -- actually, all of

6    them on this page, they were cleared

7    after review, correct?

8         A.    Yes.

9         Q.    If it went to UPS, then it

10   tripped a wire there, they would, if they

11   needed more information and even

12   information from a customer, they would

13   reach out to Endo in the first instance,

14   not AmerisourceBergen, correct?

15                   MR. LIMBACHER:  Object to

16        form.

17                   THE WITNESS:  If they needed

18        information, yes.

19   BY MR. BUCHANAN:

20        Q.    Okay.  And at no point, to

21   your knowledge, did UPS ever reach out to

22   a customer of Endo's like

23   AmerisourceBergen for information to

24   clear an order or not, fair?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Not that I recall, no.  They

2    reach out to the client.

3        Q.      And you were the primary

4    point of contact with UPS?

5        A.      Yes.

6                MR. LIMBACHER:  Object to

7        form.

8    BY MR. BUCHANAN:

9        Q.      So we're on .16.  We've been

10   looking at orders into Missouri for Endo

11   products, Endo opioid products over the

12   years.

13               I guess we're still in

14   AmerisourceBergen now, moving into

15   Express Scripts at the bottom.

16               Can you tell us what the

17   result of your inquiry was, again, on the

18   first one here?  What is that, August of

19   2014?

20               MR. LIMBACHER:  Object to

21       form.

22               THE WITNESS:  Cleared after

23       review.

24   BY MR. BUCHANAN:

1    Q.    And again on this page,

2  cleared after review, cleared after

3  review, cleared after review, cleared

4  after review, cleared after review,

5  cleared after review, cleared after

6  review, order on order on order, fair?

7    A.    Correct.

8    Q.    That was the determination

9  with Endo with regard to each of these

10  orders, correct?

11    A.    Yes.

12    Q.    And you understand that when

13  it was cleared after review, from your

14  perspective, from Endo's perspective, it

15  was okay if UPS fulfilled the order,

16  fair?

17         MR. LIMBACHER:  Object to

18       form.

19         THE WITNESS:  No.  When the

20       orders are cleared from Endo, we

21       know that once they hit UPS's

22       system, they go through UPS's SOM

23       program.  And, yes.

24  BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    From Endo's perspective, the

2    order -- at that point in time, Endo did

3    not flag an order as suspicious at that

4    point in time, fair?

5    A.    Depends on what your

6    definition of "suspicious" is.

7    Suspicious as in it was flagged from our

8    SOM program?

9    Q.    Well, is that suspicious?

10    A.    It --

11    MR. LIMBACHER:  Object to

12    form.

13    THE WITNESS:  No, not really

14    suspicious, it just -- more

15    information needed to be done with

16    that particular order.

17    BY MR. BUCHANAN:

18    Q.    Okay.  And with regard to

19    each of the orders we see on 669.16, the

20    top right corner of Exhibit-1 to your

21    deposition, we see all those orders were

22    cleared, correct?

23    A.    Uh-huh.

24    Q.    After review, right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Let's go to .17.

3          Similar format.  Orders on

4    orders for various of Endo's customers,

5    correct?

6    A.    Yes.

7    Q.    There's various reasons why

8    they were kicked out of the SAP system,

9    correct?

10   A.    Correct.

11   Q.    And on the right, the

12   results of the investigation are noted,

13   fair?

14   A.    Yes.

15   Q.    And with regard to the

16   first, what was the result?

17   A.    Cleared after review.

18   Q.    And the second?

19   A.    The same.

20   Q.    The third?

21   A.    The same.

22   Q.    The next?

23   A.    The same.

24   Q.    For each one on this page,

1   again, ma'am?

2          A.    That's correct.

3          Q.    Cleared after review?

4          A.    Uh-huh.

5          Q.    Okay.  And so what had to

6   happen is, the system flagged these

7   orders as orders that tripped the

8   algorithm for being excessive as to

9   quantity or frequency -- what was the

10  other QSF?

11         A.    Quantity, size and

12  frequency.

13         Q.    There you go.

14               They got kicked out of the

15  system or flagged within the system as

16  orders to be further investigated, right?

17               MR. LIMBACHER:  Object to

18         form.

19               THE WITNESS:  Yes.

20  BY MR. BUCHANAN:

21         Q.    When the system -- within

22  the system's perspective, these were

23  orders that needed to be physically

24  reviewed to determine if they were

1    suspicious or not, fair?

2              MR. LIMBACHER:  Object to

3         form.

4              THE WITNESS:  They needed to

5         be reviewed, yes.

6    BY MR. BUCHANAN:

7         Q.    And at least with regard to

8    each of the orders that had been flagged

9    for further review on this page, the

10   determination of the human beings within

11   Endo that reviewed those orders is that

12   they were cleared for review, cleared,

13   correct, following review?

14        A.    They were -- correct.

15        Q.    Let's go to the next page,

16   .18.

17              Again, we're still just

18   looking at orders in Missouri, right?

19        A.    Yes.

20        Q.    And looking at

21   AmerisourceBergen, among other ordering

22   entities, customers of Endo, correct?

23        A.    Correct.

24        Q.    We see the rationale, at

Highly Confidential - Subject to Further Confidentiality Review

1    least on the first line, pended due to

2    order history.  We see underneath that,

3    other investigative results, pended due

4    to order history, pended due to order

5    history, correct?

6          A.    Yes.

7          Q.    And off to the right, we see

8    the response of your investigations, you

9    and your team's investigations, right?

10         A.    That's correct.

11         Q.    And in each case, cleared

12   after review, cleared after review,

13   cleared after review, cleared after

14   review, cleared after review?

15         A.    They were.  Yes, they were.

16               But as a reminder, once we

17   cleared them, they still go through UPS's

18   SOM program before they were a shipment

19   out to customers.

20         Q.    And you've told us already

21   that Endo, in circumstances where an

22   order would be flagged by UPS, if UPS

23   required additional information, they

24   would reach out to you, right?

1    A.    Correct.  Yes, they would.

2    Q.    Can you recall a single

3  order that you were contacted on by UPS

4  that you directed them not to ship?

5          MR. LIMBACHER:  Object to

6      form.

7          THE WITNESS:  Not that I

8      recall.

9  BY MR. BUCHANAN:

10    Q.    Can you recall a single

11  order that got kicked out by UPS's system

12  that you identified as suspicious if they

13  asked for additional information from

14  you?

15          MR. LIMBACHER:  Object to

16      form.

17          THE WITNESS:  They've asked

18      for additional information on

19      occasion, yes.

20  BY MR. BUCHANAN:

21    Q.    Can you identify any order

22  that they asked you about that you

23  subsequently confirmed, yes, it's

24  suspicious?

Highly Confidential - Subject to Further Confidentiality Review

 1                    MR. LIMBACHER:  Object to

 2          form.

 3                    THE WITNESS:  Not that I

 4          recall.

 5    BY MR. BUCHANAN:

 6          Q.    Can you identify any order

 7    that wasn't shipped by virtue of any of

 8    the flags that were tripped in the system

 9    following your reviews?

10                    MR. LIMBACHER:  Object to

11          form.

12                    THE WITNESS:  By Endo and

13          UPS's review?

14    BY MR. BUCHANAN:

15          Q.    Yes.

16          A.    Not that I recall.

17          Q.    Just looked at .17.  Let's

18    go to .18.

19                    Again, we're looking at

20    additional purchase orders from various

21    Endo customers through the years.

22                    Still limited to Missouri,

23    correct?

24                    MR. LIMBACHER:  Object to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  Yes.

3     BY MR. BUCHANAN:

4          Q.    Is it your understanding

5     this entire Attachment B relates to

6     Missouri, ma'am?

7          A.    Yes, that's correct.

8          Q.    Okay.  We're on .18.

9                And we see orders from

10    AmerisourceBergen, among others, that

11    were pended due to order history,

12    correct?

13         A.    Correct.

14         Q.    And off to the right, we see

15    the results, cleared after review,

16    cleared after review, et cetera, et

17    cetera, right?

18         A.    Yes, they were.

19         Q.    None on this were held,

20    correct?

21         A.    No, they were not.

22         Q.    None were cancelled and no

23    one was reported?

24         A.    That's correct.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.

2            .20, same story?

3      A.    After the review, yes, they

4  were cleared.

5      Q.    .21, same story?

6            MR. LIMBACHER:  Object to

7      form.

8            THE WITNESS:  Yes.

9  BY MR. BUCHANAN:

10     Q.    I guess there was an

11  objection, so let me be more specific.

12           .21 reflects orders that

13  Endo received from Endo's customers,

14  correct?

15     A.    Yes, these are Endo's

16  customers' orders.

17     Q.    These are customer orders

18  into Missouri only, correct?

19     A.    Yes, into Missouri only.

20     Q.    There's a listing for a

21  reason for an investigation, correct?

22           Do you see that?

23     A.    Yes.

24     Q.    And then there's the outcome

1    of that.  And it says, Cleared after

2    review, correct?

3         A.    That's correct.

4         Q.    In each instance on this

5    page, was every order cleared after

6    review?

7         A.    They were cleared after

8    review.  And, again, they went through

9    UPS's SOM program before they were

10   shipped.

11        Q.    Yes.  And I'm focused on

12   Endo's review in the first instance,

13   okay?

14             These were all cleared by

15   Endo's review, correct?

16        A.    I understand that.  But I

17   just wanted to point out that they also

18   go through UPS's SOM program.

19        Q.    And sitting here today,

20   ma'am, there are no orders that you're

21   aware of that weren't also cleared after

22   review by UPS, correct?

23             MR. LIMBACHER:  Object to

24             form.  Asked and answered.

Highly Confidential - Subject to Further Confidentiality Review

1            THE WITNESS:  They went

2       through UPS's SOM program.

3  BY MR. BUCHANAN:

4       Q.    Right.  And to the best of

5  your knowledge, even those that tripped

6  whatever algorithm they had, based on

7  either their own determination or their

8  interactions with you, they were all

9  cleared for review -- cleared to ship?

10      A.    They were, yes.

11            MR. LIMBACHER:  Object to

12      form.  Asked and answered.

13  BY MR. BUCHANAN:

14      Q.    Okay.  Let's go to .22.

15            Again, ma'am, now we're into

16  2015.  This looks like a sheet of just

17  AmerisourceBergen orders.

18            These were Endo's customers,

19  right?

20      A.    Uh-huh.

21      Q.    Orders through Endo,

22  correct?

23      A.    Yes.

24      Q.    Kicked out of the system

Highly Confidential - Subject to Further Confidentiality Review

1  because they tripped one of the

2  algorithms the company created to monitor

3  for suspicious orders, correct?

4          MR. LIMBACHER:  Object to

5      form.

6          THE WITNESS:  They were

7      kicked out for further review,

8      yes.

9  BY MR. BUCHANAN:

10      Q.    And when a human got

11 involved and looked at the orders, each

12 one of these orders was cleared, correct?

13      A.    That's correct.

14      Q.    Okay.  Let's go to page .23.

15          Just satisfy yourself,

16 ma'am, that we're still looking at Endo's

17 customers here.

18      A.    They are.

19      Q.    These are Endo orders?

20      A.    They are.

21      Q.    There is a computer

22 algorithm that was represented, in the

23 front of this Exhibit-1, to Congress that

24 identified orders of unusual QS&F.

1          Do you recall that?

2     A.    They went through --

3          MR. LIMBACHER:  Object to

4     form.

5          THE WITNESS:  Sorry.

6          They went through our

7     excessive program and they kicked

8     out for further review, yes.

9  BY MR. BUCHANAN:

10    Q.    And the further review was,

11 what, for QS&F?

12         MR. LIMBACHER:  Object to

13    form.

14         THE WITNESS:  For the

15    quantity, size and frequency, yes.

16 BY MR. BUCHANAN:

17    Q.    So the company created an

18 algorithm in its order system, it

19 identified orders, and then,

20 notwithstanding that, those orders were

21 cleared and forwarded to UPS for

22 processing, correct?

23         MR. LIMBACHER:  Object to

24    form.

```
 1                    THE WITNESS:  They were.

 2                    Another point of

 3             clarification, you keep talking

 4             about quantity, size and

 5             frequency.  And another piece of

 6             this was also reviewing the class

 7             of trade as well.

 8                    So these orders also looked

 9             on other wholesalers' ordering

10             patterns as well.

11      BY MR. BUCHANAN:

12             Q.    And the system, each of

13      these orders, by -- and these are big

14      customers, right?

15                    MR. LIMBACHER:  Object to

16             form.

17                    THE WITNESS:  We had three

18             big wholesalers which you know,

19             Endo as -- yes, correct.

20      BY MR. BUCHANAN:

21             Q.    So they are buying lots of

22      product, correct?

23                    MR. LIMBACHER:  Object to

24             form.
```

```
1                    THE WITNESS:  They are

2         buying product.

3    BY MR. BUCHANAN:

4         Q.    Okay.  You don't have a

5    sense of whether it was a lot or not?

6                    MR. LIMBACHER:  Object to

7         form.

8                    THE WITNESS:  I can't tell

9         by this information, no.

10   BY MR. BUCHANAN:

11        Q.    And then after these orders

12   get kicked out by the algorithm, a human

13   being looks at them and cleared them

14   all --

15                   MR. LIMBACHER:  Object to

16        form.

17   BY MR. BUCHANAN:

18        Q.    -- right?

19        A.    Yes.

20        Q.    We see that on the

21   right-hand column on the screen, or on

22   the document itself?

23        A.    Yes.

24        Q.    Okay.  Let's go to .23.
```

1           MR. LIMBACHER:  Object to

2       form.

3           THE WITNESS:  No, it would

4       depend on what they needed.

5   BY MR. BUCHANAN:

6       Q.    Understood.

7           Their order could kick out

8   of their system for a different reason

9   than it would for yours, right?

10      A.    Potentially, yes.

11      Q.    All right.  Let's go to .24.

12          We're still in orders that

13  were from Missouri customers of Endo,

14  right?

15      A.    Yes.

16      Q.    Buying narcotics, right?

17          MR. LIMBACHER:  Object to

18      form.

19  BY MR. BUCHANAN:

20      Q.    You can answer.

21      A.    Yes.

22      Q.    Orders getting kicked for

23  tripping a wire for one of the quantity,

24  size and frequency characteristics,

1    right?

2                    MR. LIMBACHER:  Object to

3            form.

4                    THE WITNESS:  Correct.

5    BY MR. BUCHANAN:

6            Q.    And notwithstanding that

7    they are getting flagged, these orders

8    are not being reported to the DEA,

9    correct?

10                   MR. LIMBACHER:  Object to

11           form.

12                   THE WITNESS:  These orders

13           kick out through our SOM program

14           for further review, correct.

15   BY MR. BUCHANAN:

16           Q.    The answer to my question,

17   just as a factual matter, ma'am, none of

18   these orders that we've looked at to this

19   point, and we're now up to .24, were

20   reported to DEA, correct?

21                   MR. LIMBACHER:  Object to

22           form.

23                   THE WITNESS:  No, not that I

24           recall.

1    BY MR. BUCHANAN:

2         Q.    And after your review of the

3    orders on .24, they were cleared, right?

4         A.    Cleared to go to UPS through

5    their SOM program before shipping.

6         Q.    And which you note here is

7    cleared after review; that's what you

8    stated here, correct?

9              MR. LIMBACHER:  Object to

10         form.

11             THE WITNESS:  They are

12         cleared from Endo's SAP system,

13         and then they still go to UPS

14         through their SOM program before

15         shipping.

16   BY MR. BUCHANAN:

17        Q.    Let's stay with what's

18   written on this document back to the

19   Senate inquiry on .24.

20             What was the outcome listed

21   on the first line?

22        A.    Cleared for review.

23        Q.    Cleared after review, is

24   that what it says?

1     A.    Sorry.  Cleared after

2   review.

3     Q.    And the next one says what?

4     A.    The same thing.

5     Q.    And the whole column says

6   that, right?

7     A.    Correct.

8     Q.    Let's go to .25.

9           You've got a lot of orders

10  into Missouri, don't you?

11          MR. LIMBACHER:  Object to

12          form.

13          THE WITNESS:  There's orders

14          into Missouri, yes.

15  BY MR. BUCHANAN:

16     Q.    In fact, these pages that

17  we've been looking at are all orders to

18  big entities, AmerisourceBergen, Express

19  Scripts.  I think we saw --

20     A.    Well, if you look about

21  Express Scripts, that was for a patient

22  assistance program, which is different

23  than a regular order.  So that's

24  different.

1    Q.    We can agree

2  AmerisourceBergen is a big company?

3    A.    Yes.

4        MS. ROLLINS:  Object to the

5    form.

6        MR. LIMBACHER:  Object to

7    form.

8  BY MR. BUCHANAN:

9    Q.    Big customers of yours?

10    A.    They are.

11    Q.    So we're on here again and

12  we've got all these orders that are

13  tripping the wire by your internal

14  algorithm, true?

15        MR. LIMBACHER:  Object to

16    form.

17        THE WITNESS:  These went

18    through our excessive program,

19    yes, and needed -- for further

20    review.

21  BY MR. BUCHANAN:

22    Q.    And when a human being got

23  involved on .24, each of these orders was

24  cleared after review, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. LIMBACHER:  Object to

2     form.

3          THE WITNESS:  Correct.

4  BY MR. BUCHANAN:

5     Q.    Okay.  Let's go to .25.

6          Still looking at Endo's

7  customers?

8     A.    Yes.

9     Q.    Still looking at Missouri

10  orders?

11     A.    Yes.

12     Q.    Still seeing the reason

13  reported, in the fourth column, why it

14  triggered an investigation?

15     A.    Correct.

16     Q.    And still seeing the outcome

17  on the right as cleared after review?

18     A.    Correct.

19     Q.    In each instance for each

20  order, correct?

21     A.    Yes.

22          Another point of

23  clarification, this is -- each one of

24  these lines is not each order.  There's,

Highly Confidential - Subject to Further Confidentiality Review

1  you know, multiple lines on one order.

2  So I don't want you all to think this is,

3  you know, just all individual orders.

4        Q.    So what you're saying, if I

5  understand your testimony, ma'am, is that

6  there's, in fact, multiple line items

7  that fill this order?

8        A.    Correct, right.

9              MR. LIMBACHER:  Object to

10       form.

11  BY MR. BUCHANAN:

12       Q.    So let's now go to .26, for

13  example.  And thank you for that

14  clarification.

15       A.    Right.

16       Q.    We're looking at an order

17  from AmerisourceBergen, a ship date of

18  April 3, 2015, right?

19       A.    Yes.

20       Q.    Okay.  The order -- that's

21  the date the product was shipped,

22  correct?

23       A.    Based on what this is

24  saying, correct.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    That particular order

2  shipment might involve multiple line

3  items and different bottle counts for

4  different products, correct?

5              MR. LIMBACHER:  Object to

6         form.

7              THE WITNESS:  Uh-huh.

8  BY MR. BUCHANAN:

9      Q.    All right.  And where would

10  you go to figure out what was in that

11  order?

12              MR. LIMBACHER:  Object to

13         form.

14              THE WITNESS:  Our SAP

15         system.

16  BY MR. BUCHANAN:

17      Q.    How long have you been using

18  that to track your orders?

19      A.    Twenty years.

20      Q.    And so how would you figure

21  out what composed each of these orders?

22      A.    There's reports that kick

23  out from SAP.

24      Q.    And what's that report

1    called?

2         A.    Orders on hold report, I

3    believe.

4         Q.    Okay.  And so the status of

5    all these orders would be orders on hold,

6    prior to them being cleared?

7              MR. LIMBACHER:  Object to

8         form.

9              THE WITNESS:  Correct.

10   BY MR. BUCHANAN:

11        Q.    So any order that has been

12   flagged, at any point in time by Endo's

13   algorithm, would have been an order on

14   hold, right?

15             MR. LIMBACHER:  Object to

16        form.

17             THE WITNESS:  Yes.

18   BY MR. BUCHANAN:

19        Q.    And then the order status

20   can be changed, right?

21             MR. LIMBACHER:  Object to

22        form.

23             THE WITNESS:  After review.

24   It can be released for shipping,

Highly Confidential - Subject to Further Confidentiality Review

1          yes.

2     BY MR. BUCHANAN:

3          Q.    So within your system, an

4     order that trips the wire, so to speak,

5     is an order on hold?

6               MR. LIMBACHER:   Object to

7          form.

8               THE WITNESS:   Correct.

9     BY MR. BUCHANAN:

10         Q.    And then I think you said

11    after it clears review it's then released

12    for shipping?

13         A.    It's released to UPS for the

14    order to go through UPS's SOM program

15    before it's released for shipping.

16    █        ████████████████

█  ██████████████████████

█  ██████████████████████

█  ██    ████████████

█  ██    ████████████████

█  ████████████████████

█  ██████████████████████████

█  ██████████

█  ██    █████████████

Highly Confidential - Subject to Further Confidentiality Review





21     Q.     And then we go to .33.

22            More of the same, Missouri

23     customers of Endo, correct?

24     A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Tripped the wires and held,

2    correct?

3              MR. LIMBACHER:  Object to

4         form.

5              THE WITNESS:  Correct.

6    BY MR. BUCHANAN:

7    Q.    When the human beings got

8    their hands on the order, they were

9    cleared after review, correct?

10             MR. LIMBACHER:  Object to

11        form.

12             THE WITNESS:  After they

13        were reviewed, yes.

14   BY MR. BUCHANAN:

15   Q.    Okay.  So, too, on .34.

16             More Endo customers from

17   Missouri?

18   A.    Yes.

19   Q.    Tripped the wire in Endo's

20   suspicious order monitoring system,

21   correct?

22             MR. LIMBACHER:  Object to

23        form.

24             THE WITNESS:  Correct.  And

1          then they were reviewed and sent

2          to UPS for shipping.

3     BY MR. BUCHANAN:

4          Q.    Okay.  And then the

5     conclusion of your team was cleared after

6     review in each instance of these,

7     correct?

8          A.    Yes.

9                But as a reminder, once they

10    get to UPS, they go through UPS's SOM

11    program --

12              MR. BUCHANAN:  Move to

13         strike.

14              THE WITNESS:  -- before they

15         are released for shipping.

16              MR. BUCHANAN:  Move to

17         strike the nonresponsive portion.

18    BY MR. BUCHANAN:

19         Q.    We're on to .35.  And this

20    looks like the last of the orders just in

21    Missouri.

22              Again, Endo customers from

23    Missouri, correct?

24         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And these tripped the wire

2    in Endo's suspicious order system,

3    correct?

4              MR. LIMBACHER:  Object to

5         form.

6              THE WITNESS:  They were

7         reviewed.

8    BY MR. BUCHANAN:

9    Q.   And then they were reviewed

10   by a human being, and the hold was lifted

11   and they were -- a delivery note was sent

12   to UPS, fair?

13             MR. LIMBACHER:  Object to

14        form.

15             THE WITNESS:  It was sent to

16        UPS, yes.

17   BY MR. BUCHANAN:

18   Q.   And what's noted on the far

19   right is cleared after review, correct?

20   A.   Correct.

21   Q.   Okay.  I just want to

22   understand.

23             After looking at Exhibit-1,

24   I think what's happening today, or at

Highly Confidential - Subject to Further Confidentiality Review

1  least in 2017, is it correct, ma'am, that

2  what was described in the response, in

3  Exhibit-1 to the Ranking Member

4  McCaskill, that that accurately reflects

5  what you're doing today?

6           MR. LIMBACHER:  Object to

7      form.  Did you want her to review

8      the first several pages of the

9      exhibit?

10          MR. BUCHANAN:  I thought we

11      did.

12  BY MR. BUCHANAN:

13      Q.   You have before you an

14  Exhibit-1, ma'am.

15          I think you told us part was

16  for the generic business, Qualitest and

17  Par, correct?

18          MR. LIMBACHER:  I think you

19      told us that, but --

20          THE WITNESS:  Yes, the

21      beginning is for Par, our generics

22      division.

23  BY MR. BUCHANAN:

24      Q.   And the second part is for

1    the branded division, correct?

2         A.    Yes.

3         Q.    And the part that's

4    summarized in Exhibit-1 for the branded

5    division, Endo, that's what the company

6    is doing to this day, correct?

7              MR. LIMBACHER:  Object to

8         form.

9              THE WITNESS:  Yes.  Endo has

10        an SOM program in place.

11   BY MR. BUCHANAN:

12        Q.    And as reflected in

13   Exhibit-1, that is what Endo's SOM

14   program is today?

15             MR. LIMBACHER:  Object to

16        form.

17             THE WITNESS:  We have an SOM

18        program in place.  Orders are

19        reviewed, if they are pended or

20        held or kicked out, whatever word

21        you want to use.

22   BY MR. BUCHANAN:

23        Q.    Is the branded arm of Endo

24   reviewing IMS data concerning its

Highly Confidential - Subject to Further Confidentiality Review

```
1    products with regard to suspicious order

2    evaluation?

3              MR. LIMBACHER:  Object to

4        form.  Foundation.

5              THE WITNESS:  I can't speak

6        to IMS data.  That's not part of

7        my responsibility.

8    BY MR. BUCHANAN:

9        Q.    Do you understand what IMS

10   data is?

11       A.    I know what IMS data is,

12   yes.  But that's not part of my

13   responsibility.

14       Q.    What is IMS data?

15       A.    It's prescription data for

16   the products.

17       Q.    And you can see down to the

18   prescriber level.  You can also see at

19   the pharmacy level.

20             Are you aware of that?

21             MR. LIMBACHER:  Object to

22       form.

23             THE WITNESS:  I know what

24       IMS data is, yes.
```

1    BY MR. BUCHANAN:

2         Q.    How about Wolters Kluwer; do

3    you use Wolters Kluwer data for anything?

4              MR. LIMBACHER:  Object to

5         form.

6              THE WITNESS:  I can't speak

7         to that.  I don't know.

8    BY MR. BUCHANAN:

9         Q.    Do you conduct due diligence

10   visits as part of your SOM program today?

11             MR. LIMBACHER:  Object to

12        form.

13   BY MR. BUCHANAN:

14        Q.    For branded?

15        A.    So our generic division,

16   which has the same customers as our

17   branded division, performed site visits

18   for our customers and the branded

19   division utilized that data.

20        Q.    When did you start doing

21   that for branded, ma'am?

22        A.    Our generic division has

23   always done site visits.

24        Q.    When did they start doing

1    that?

2         A.    I don't recall the actual

3    date.

4         Q.    Do you have confidence they

5    were doing that back in 2010?

6              MR. LIMBACHER:  Object to

7         form.  Foundation.

8              THE WITNESS:  I can't -- I

9         don't recall.  I can't speak to

10        that.

11   BY MR. BUCHANAN:

12        Q.    If I understand your

13   testimony, the branded arm of Endo, or

14   Endo Pharmaceuticals, is relying on due

15   diligence visits of Par?

16             MR. LIMBACHER:  Object to

17        form.  Misstates her testimony.

18   BY MR. BUCHANAN:

19        Q.    Is that right?

20        A.    The Par generics division

21   did customer site visits, that's correct.

22   And Endo has the same limited customer

23   base and Par had the same customers.

24             Actually, Par had more

Highly Confidential - Subject to Further Confidentiality Review

1  customers than Endo.

2      Q.   And that's a good thing to

3  do?

4          MR. LIMBACHER:  Object to

5      form.

6  BY MR. BUCHANAN:

7      Q.   Site visits?

8      A.   I can't really speak to

9  that.

10      Q.   Well, you said --

11      A.   Par did it.  Par -- yes, I

12  mean, it's important to do site visits.

13      Q.   And it sounded like, from

14  your answer, that Endo was relying on

15  site visits that Qualitest or Par are

16  conducting as part of their process --

17          MR. LIMBACHER:  Object to

18      form.

19  BY MR. BUCHANAN:

20      Q.   -- is that right?

21      A.   I know that Par/Qualitest

22  did site visits of the customers, yes.

23      Q.   But correct me if I'm

24  misunderstanding your testimony, ma'am.

Highly Confidential - Subject to Further Confidentiality Review

1            I thought you answered to me

2    that, when I asked do you conduct site

3    visits on branded, that you were relying

4    on site visits that Qualitest or Par

5    conducted?

6            A.    Our generic --

7                  MR. LIMBACHER:  Object to

8            form.

9                  THE WITNESS:  Our generic

10           division, yes, that's correct.

11   BY MR. BUCHANAN:

12           Q.    So am I understanding your

13   testimony that you consider that part of

14   your efforts to combat diversion?

15                 MR. LIMBACHER:  Object to

16           form.

17                 THE WITNESS:  I don't know

18           how to answer that.

19                 Could you say your question

20           again?

21   BY MR. BUCHANAN:

22           Q.    So am I understanding your

23   testimony correctly that you consider

24   those due diligence visits of Par and

1    Qualitest to be part of Endo's efforts to

2    prevent -- to combat diversion of its

3    branded products?

4                MR. LIMBACHER:  Object to

5           form.

6                THE WITNESS:  One thing that

7           is slightly different between

8           branded and generics is branded

9           has the same customer base.  We

10          don't add new customers, as the

11          generic division may or may not

12          do.

13               So we have the same customer

14          base as our generic group.  So we

15          partnered with our generic group,

16          and we used their site visits of

17          the branded customers, because

18          it's the same customer base.

19               The generics may have more.

20          We have a limited customer base,

21          and that's the same customer base

22          that our generics also have.

23   BY MR. BUCHANAN:

24          Q.    Okay.  So have you ever been

Highly Confidential - Subject to Further Confidentiality Review

1    on a due diligence visit for one of

2    Endo's customers?

3          A.    No.

4          Q.    Have you ever been on a due

5    diligence visit for one of Endo's

6    customer's customers?

7                MR. LIMBACHER:  Object to

8          form.

9                THE WITNESS:  No.  Our

10         customer is the wholesaler.

11   BY MR. BUCHANAN:

12         Q.    Do you recognize a

13   responsibility by Endo to know its

14   customers?

15               MR. LIMBACHER:  Object to

16         form.

17               THE WITNESS:  Yes.

18   BY MR. BUCHANAN:

19         Q.    To ensure that its customers

20   are not engaging in -- withdrawn.

21               And to ensure that its

22   customers have good suspicious order

23   monitoring systems?

24         A.    I know that our customers,

1    the wholesalers, have an SOM program in

2    place.

3            Q.    You're aware that they've

4    gotten -- they've had some problems, some

5    of your customers, true?

6            A.    I can't --

7                  MR. LIMBACHER:  Object to

8        form.

9                  THE WITNESS:  I can't speak

10       to that.

11   BY MR. BUCHANAN:

12           Q.    You're aware that some of

13   Endo's customers had their registrations

14   pulled?

15                 MR. LIMBACHER:  Object to

16       form.

17                 THE WITNESS:  I can't speak

18       to that.

19   BY MR. BUCHANAN:

20           Q.    You don't have an awareness

21   of that?

22           A.    I have an awareness, yes.

23   But I don't have any details that I can

24   provide.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Well, did you attempt to

2    ensure that the customers you were

3    selling Endo's products to had good

4    suspicious order monitoring practices?

5                    MR. LIMBACHER:  Object to

6          form.

7                    THE WITNESS:  I know that

8          the wholesalers have SOM programs

9          in place.

10   BY MR. BUCHANAN:

11         Q.    And so please tell us about

12   how you conducted your due diligence on

13   that.

14                   MR. LIMBACHER:  Object to

15         form.

16                   THE WITNESS:  We just know,

17         just -- you know, our customers

18         have told us that they have SOM

19         programs in place.

20   BY MR. BUCHANAN:

21         Q.    Okay.

22         A.    I don't have the details of

23   those programs.  I just know that they

24   have one in place.

1    Q.    Okay.  Well, as part of

2  evaluating your customer's due diligence

3  programs, did you collect them?

4    A.    No.  But our customer is the

5  wholesaler.  Who they ship to is on them,

6  not on Endo.

7    Q.    And the answer to my

8  question, just so I'm clear, is no?

9         You didn't collect them; is

10  that correct?

11         MR. LIMBACHER:  Object to

12    form.

13         THE WITNESS:  Did I collect

14    what?

15  BY MR. BUCHANAN:

16    Q.    Did you collect the SOM

17  programs and evaluate the SOM programs of

18  Endo's customers?

19         MR. LIMBACHER:  Object to

20    form.

21         THE WITNESS:  No, I did not.

22  BY MR. BUCHANAN:

23    Q.    Okay.

24    A.    Our Qualitest group may

1    have, as part of their site visits.

2           Q.    Do you have an awareness,

3    sitting here today, as to what your

4    customers' SOM program looks like that

5    you were selling Endo-branded

6    pharmaceuticals to?

7                   MR. LIMBACHER:  Object to

8           form.

9                   THE WITNESS:  No, all I know

10          is they have an SOM program in

11          place.

12   BY MR. BUCHANAN:

13          Q.    Okay.  And have you seen the

14   SOM program for any of Endo's customers?

15                  MR. LIMBACHER:  Object to

16          form.  Asked and answered.

17                  THE WITNESS:  No, I have

18          not.

19   BY MR. BUCHANAN:

20          Q.    And have you personally

21   asked for it from any of Endo's

22   customers?

23          A.    I know that our wholesalers

24   have an SOM program in place.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    I don't think you're

2   following my question.  Let me see if I

3   can read it back.

4            Have you personally asked

5   for any of Endo's customers' SOM

6   programs, ma'am?

7      A.    I can tell you that I know

8   our wholesalers have an SOM program in

9   place.  I do not know any details behind

10  that SOM program, but I know they have

11  one in place.

12     Q.    My question is, have you

13  ever asked for any of your

14  wholesalers' --

15     A.    Not that I --

16     Q.    -- programs?

17     A.    Not that I recall.

18           MR. LIMBACHER:  We've been

19       going about an hour, Dave, is this

20       a good time to stop?

21           MR. BUCHANAN:  If you need

22       it, it's fine.

23           MR. LIMBACHER:  Thank you.

24           VIDEO TECHNICIAN:  Going off

1      record.  The time is 11:14.

2                    -   -   -

3            (Whereupon, a brief recess

4      was taken.)

5                    -   -   -

6            VIDEO TECHNICIAN:  We're

7      going back on the record.  This is

8      the beginning of Media File Number

9      3.  The time is 11:33.

10   BY MR. BUCHANAN:

11         Q.    Ms. Walker, we're back on

12   the record.

13            You're still under oath.

14   You understand that, correct?

15         A.    Yes, I do.

16         Q.    I want to take us back to

17   your Exhibit-1.  You have the report.  It

18   says, Attachment.

19            With regard to Ranking

20   Member McCaskill's July 26, 2017 letter,

21   Endo provides the following response.

22            We were talking about Item

23   1, Please describe any suspicious order

24   monitoring program Endo and its

1    subsidiaries have implemented, including

2    efforts to monitor, investigate or report

3    suspicious transactions between its

4    distributors and pharmacies and efforts

5    to analyze information related to

6    chargeback requests.

7                Do you see that?

8          A.    Yes, I do.

9          Q.    Okay.  There's a summary of

10   Par's SOM program on the front page,

11   correct?

12         A.    Yes.

13         Q.    And on the second page, we

14   begin the characterization of Endo's SOM

15   program.

16               Do you see that?

17         A.    I do see that.

18         Q.    Okay.  In regards to the

19   request from Ranking Member McCaskill

20   about chargeback information, I don't see

21   any response with regard to what Endo

22   does in that regard.

23               Do you?

24               MR. LIMBACHER:  Object to

1    form.

2         THE WITNESS:  No.

3    Chargeback data is not listed

4    under the Endo SOM program.

5    BY MR. BUCHANAN:

6         Q.    So describe how Endo branded

7    uses chargeback data in connection with

8    its suspicious order monitoring program.

9         A.    Endo does not use the

10   chargeback data with our SOM program.

11        Q.    It doesn't use it today?

12        A.    No, we do not.

13        Q.    Didn't use it, obviously, in

14   2017 during the time of this, correct?

15        A.    That's correct.  In the --

16        Q.    And didn't --

17             MR. LIMBACHER:  Sorry, were

18        you finished in your answer?

19   BY MR. BUCHANAN:

20        Q.    Did you use it in 2017?

21        A.    No, we did not.

22             But I just wanted to point

23   out, the reason for that is the branded

24   opioid products are not on retail

Highly Confidential - Subject to Further Confidentiality Review

1   contracts, which is different from the

2   generics division.  So that's the reason

3   why chargeback data was not utilized.

4        Q.    Does the company not have

5   any chargeback agreements with any of its

6   distributors for branded products?

7        A.    I can't speak to chargeback

8   contracts, because that's not my area.  I

9   just know that the branded opioids are

10  not on retail-type contracts like

11  generics are.  That's the only thing that

12  I can -- that I can speak of.

13       Q.    Well, is it your testimony,

14  ma'am, that the company does not have

15  chargeback data for branded products?

16            MR. LIMBACHER:  Object to

17       form.

18            THE WITNESS:  I can't

19       confirm that.  There may be some,

20       but I know they're not on retail

21       contracts.  There may be -- I

22       don't want to speculate, because

23       it's not my area of

24       responsibility.  But there may be

Highly Confidential - Subject to Further Confidentiality Review

1          some government contracts where

2          there are branded opioid products.

3    BY MR. BUCHANAN:

4          Q.    Do you know, in connection

5    with your agreements with UPS over the

6    years, there's been provisions with

7    regard to chargeback data with regard to

8    Endo?

9              MR. LIMBACHER:  Object to

10         form.

11             THE WITNESS:  UPS --

12   BY MR. BUCHANAN:

13         Q.    And who is going to handle

14   that responsibility?

15         A.    UPS does not handle any of

16   our chargeback data.  Because, again,

17   retail contracts are not for branded

18   opioid products.  There are no retail

19   contracts for that.

20         Q.    What is a chargeback, ma'am?

21         A.    You want me to explain what

22   a chargeback is?

23         Q.    Sure.

24         A.    A chargeback is, for

 1    example, if we charge the wholesaler $10

 2    and then there's a retail contract for $5

 3    and the wholesaler charges it for $5 to

 4    XYZ retailer, the wholesaler charges us

 5    back the difference between $10 and $5.

 6            Q.    And you're saying your

 7    relationships with the wholesalers did

 8    not permit them to do that with regard to

 9    branded products?

10            A.    No, that's not --

11                  MR. LIMBACHER:  Object to

12            form.  Misstates her testimony.

13                  THE WITNESS:  No, that's not

14            what I'm saying.

15                  What I'm saying is, number

16            one, chargebacks and contracts is

17            not my responsibility.  But from

18            what I know, branded opioid

19            products are not on any retail

20            contract.  So there would be no

21            reason for the chargeback -- for

22            the wholesalers to send us

23            chargeback data if they're not on

24            contract.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2         Q.    Decided not to answer the

3    request?

4              MR. LIMBACHER:  Object to

5         form.

6              THE WITNESS:  I can't speak

7         to that.  I don't know.  It's not

8         listed.

9    BY MR. BUCHANAN:

10        Q.    You reviewed this response

11   before it went in, fair?

12        A.    Yes.

13             MR. LIMBACHER:  Object to

14        form.

15   BY MR. BUCHANAN:

16        Q.    I'm assuming others within

17   the organization reviewed it as well,

18   correct?

19        A.    Yes.

20        Q.    Do you have an awareness of

21   that?

22        A.    Yes.  Yes, an awareness.

23        Q.    Folks in senior management

24   reviewed it, to your knowledge?

1           MR. LIMBACHER:  Object to

2      form.

3  BY MR. BUCHANAN:

4      Q.    Do you know?

5      A.    I don't know.

6      Q.    Okay.  We can agree that the

7  company, in responding to this inquiry,

8  didn't state that it doesn't use

9  chargeback information because it would

10  be of no value with regard to branded

11  products, correct?

12           MR. LIMBACHER:  Object to

13      form.  The document speaks for

14      itself.

15  BY MR. BUCHANAN:

16      Q.    We can agree it doesn't say

17  that?

18      A.    After reading it, it does

19  not mention any chargeback data.

20      Q.    We can agree it doesn't say

21  that the company doesn't have chargeback

22  data with regard to branded products,

23  correct?

24           MR. LIMBACHER:  Object to

1       form.

2               THE WITNESS:  I don't think

3       it says that, it's just

4       chargebacks is just not listed.

5   BY MR. BUCHANAN:

6       Q.    It says nothing?

7       A.    Right.  It doesn't say one

8   way or the other.  It's just not listed.

9       Q.    It ignores the request?

10              MR. LIMBACHER:  Object to

11      form.

12              THE WITNESS:  I -- it's not

13      listed.  That's all I can tell

14      you.

15  BY MR. BUCHANAN:

16      Q.    Well, the company did

17  provide something with regard to what

18  Qualitest was doing, right?

19      A.    Yes.

20      Q.    As part of your role and

21  function, or, I guess, as an employee of

22  Endo, do you complete periodic reviews of

23  your own performance, ma'am?

24      A.    Yes.  We do it every year.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You've had some role and

2 involvement with regard to chargebacks

3 over the years; isn't that true?

4    A.    Years ago, yes.

5    Q.    So the company does have

6 chargeback data on its branded products,

7 correct?

8         MR. LIMBACHER:  Object to

9    form.

10        THE WITNESS:  Yes.

11 BY MR. BUCHANAN:

12   Q.    And chargeback data provides

13 information at the retail level, correct?

14   A.    From what I know of

15 chargeback data for branded opioid

16 products, there are no -- they are not on

17 retail contracts, so you would not have

18 any chargeback data for retail.

19   Q.    Okay.  Have you looked at

20 the chargeback data for branded opioid

21 products, ma'am?

22        MR. LIMBACHER:  Object to

23    form.

24        THE WITNESS:  Not recently,

1           no, because it's not my area of

2           responsibility.

3    BY MR. BUCHANAN:

4           Q.    Have you examined chargeback

5    data for Endo's branded work to see

6    whether it has information at your

7    customers' customer level?

8                MR. LIMBACHER:  Object to

9           form.

10               THE WITNESS:  No, I have

11          not.

12   BY MR. BUCHANAN:

13          Q.    At any point in time, when

14   you've had a role or responsibility for

15   suspicious orders within suspicious order

16   monitoring within Endo, you haven't

17   considered chargeback data, true?

18               MR. LIMBACHER:  Object to

19          form.

20               THE WITNESS:  I had the

21          information that I needed to do my

22          job.

23   BY MR. BUCHANAN:

24          Q.    Not my question, ma'am.

Highly Confidential - Subject to Further Confidentiality Review

1          Just as a factual matter, in

2    doing your job, at any point in time did

3    you consider chargeback data as part of

4    the suspicious order monitoring function?

5          A.    No.

6          Q.    As part of your doing your

7    job, did you ever consider IMS data as

8    part of doing suspicious order

9    monitoring?

10               MR. LIMBACHER:  Object to

11         form.

12               THE WITNESS:  IMS is not

13         part of my job responsibility.

14    BY MR. BUCHANAN:

15         Q.    And you never considered it,

16    then, certainly, as part of suspicious

17    order monitoring, fair?

18               MR. LIMBACHER:  Object to

19         form.

20               THE WITNESS:  Not

21         particularly in my role.  But

22         there may have been other people

23         within Endo that has done

24         something with that data.  But not

1      me.

2   BY MR. BUCHANAN:

3        Q.    Within --

4        A.    And I can't speak to other

5   roles within the company.

6        Q.    Within the suspicious order

7   monitoring role or function of Endo

8   branded products, to the best of your

9   knowledge, IMS data has never been a

10  component of that analysis, correct?

11            MR. LIMBACHER:  Object to

12       form.  Foundation.

13            THE WITNESS:  I had enough

14       data to do my job.  The IMS data

15       is part of another area of

16       responsibility within Endo.  They

17       may have.  I can't speak to it,

18       but they may have done something

19       with that.

20  BY MR. BUCHANAN:

21       Q.    The answer to my question,

22  then, would be, no, you didn't analyze

23  IMS data as part of your role and

24  function in suspicious order monitoring,

1  fair?

2          MR. LIMBACHER:  Object to

3      form.

4          THE WITNESS: I had --

5          MR. LIMBACHER:  Misstates

6      her testimony.

7          THE WITNESS:  I had the data

8      that I needed to do my job.

9  BY MR. BUCHANAN:

10     Q.    Was that data IMS data,

11  ma'am?

12     A.    There's other -- IMS data is

13  not part of my responsibility.

14     Q.    Ma'am, just tell me, did you

15  consider IMS data in connection with your

16  role and function of monitoring

17  suspicious orders for Endo; yes or no?

18         MR. LIMBACHER:  Object to

19     form.  Asked and answered.

20         THE WITNESS:  I had the data

21     that I needed to do my job.  IMS

22     data is within another area within

23     Endo.  There's other people that

24     reviewed that data.  I did not.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. BUCHANAN:

2       Q.    Did the other people within

3  Endo review IMS data for suspicious order

4  monitoring?

5       A.    I can't speak to that other

6  area of responsibility.  It's not my

7  area.

8       Q.    To the best of your

9  knowledge, sitting in this chair today,

10  Endo did not consider IMS data as part of

11  its suspicious order monitoring function,

12  correct?

13            MR. LIMBACHER:  Object to

14       form and foundation.

15  BY MR. BUCHANAN:

16       Q.    To the best of your

17  knowledge.  That's all we can get today,

18  ma'am.

19       A.    And I'm going to tell you

20  again, I had enough data -- I had the

21  data to do my job.  The IMS data was in

22  another area of responsibility within

23  Endo.  What they did or did not do with

24  that data, I cannot speak to.

1    Q.    At any point in time, did

2    Endo ask one of its customers, one of its

3    distributor or wholesaler customers, to

4    reduce its order size to account for

5    pharmacy customers or other customers of

6    concern?

7              MR. LIMBACHER:  Object to

8         form.

9              THE WITNESS:  Not that I

10        recall.

11   BY MR. BUCHANAN:

12   Q.    Are you familiar with the

13   phrase "know your customer's customer"?

14   A.    Yes.

15   Q.    What does that mean, or what

16   does that mean to you, ma'am?

17   A.    Knowing who our customers

18   ship to.

19   Q.    Knowing whether they have a

20   proper purpose, right?

21             MR. LIMBACHER:  Object to

22        form.

23             THE WITNESS:  Potentially,

24        yes.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2         Q.    At any point in time, did

3    Endo guide its distributor or wholesaler

4    customers to reduce the size of its

5    orders to account for certain of their

6    customers engaged in suspicious

7    activities?

8                   MR. LIMBACHER:  Object to

9         form.

10                  THE WITNESS:  Not that I

11        recall.

12   BY MR. BUCHANAN:

13        Q.    Do you have an awareness,

14   ma'am, that Qualitest did that at some

15   point in time?

16        A.    No.  That's the generics

17   division, no.

18        Q.    You didn't have visibility

19   to what the generic team was doing with

20   regard to their suspicious order

21   monitoring protocol?

22                  MR. LIMBACHER:  Object to

23        form.

24                  THE WITNESS:  No.

Highly Confidential - Subject to Further Confidentiality Review

1    visits of your customers?

2              And Endo replied?

3         A.    No.

4         Q.    And that was a true

5    statement?

6         A.    Correct.  Right.  Endo did

7    not.

8         Q.    And we can agree you

9    provided no explanation as to some other

10   source that was doing the customer review

11   for you, correct?

12             MR. LIMBACHER:  Object to

13        form.  The document speaks for

14        itself.

15             THE WITNESS:  No.

16   BY MR. BUCHANAN:

17        Q.    You filled this out, right?

18        A.    Right.  No, I did not

19   explain about Qualitest.

20        Q.    Okay.  And was UPS shipping

21   for Qualitest in 2013, ma'am?

22        A.    No, they were not.

23        Q.    In 2014?

24        A.    No.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    In 2015?

2              A.    No.

3              Q.    2016?

4              A.    No.

5              Q.    You can set that aside,

6    ma'am.

7                    MR. BUCHANAN:  Next in

8              order, Scott, 753.

9                    MR. LIMBACHER:  Dave,

10             whenever it's a good time to break

11             for lunch.  It's 12:30.

12                   MR. BUCHANAN:  This will

13             take five minutes.  Fair?

14                   MR. LIMBACHER:  That's fine.

15                   MR. SIEGEL:  This is marked

16             as Walker-5.

17                          -  -  -

18                   (Whereupon, EndoWalker

19             Exhibit-5,

20             ENDO_OPIOID_MDL_05968962-963 was

21             marked for identification.)

22                          -  -  -

23   BY MR. BUCHANAN:

24             Q.    Ms. Walker, we're passing
```

1    you what we're marking as Exhibit-5 to

2    your deposition.  It's Bates stamped

3    Endo_Opioid_MDL, last three digits 962.

4              It's an e-mail exchange

5    between you and your colleague, Kim

6    Lindell at UPS.  I said "your

7    colleague" --

8         A.    She works at UPS.

9         Q.    -- your counterpart at UPS?

10        A.    She works in the regulatory

11   group at UPS.

12        Q.    Okay.  We're looking here in

13   the summer of -- excuse me, April of

14   2014, starting at the bottom, please.

15   External, getting to know your customers.

16             Do you see that?

17        A.    Yes.

18        Q.    Actually, I should probably

19   start at the bottom of the first page, so

20   we orient ourselves.

21             You sent an e-mail off to

22   Ms. Lindell in April of 2014, right?

23        A.    Yes, that's what this is

24   stating.

1    Q.    Subject, Getting to know

2  your customers?

3    A.    Yes.

4    Q.    I guess it says, Getting to

5  you your customers, but you were saying

6  getting to know your customers,

7  essentially?

8    A.    Correct.

9    Q.    Hi, Kim, there have been

10  many discussions around getting to know

11  your customers at Endo and Qualitest.

12  With that being said, I was under the

13  impression that UPS was not required by

14  the DEA to perform these audits.

15          And what did you write after

16  that?

17    A.    And it was the

18  responsibility of the manufacturers.

19    Q.    And it was the

20  responsibility of the manufacturers.

21          That's what you wrote?

22    A.    That's what I wrote.

23    Q.    And that was your

24  understanding as of that point in time,

1    correct, ma'am?

2         A.    Correct.

3         Q.    Because after all, it was

4    the manufacturers who had the sales force

5    and the customers, right?

6              MR. LIMBACHER:  Object to

7         form.

8              THE WITNESS:  Yes.

9    BY MR. BUCHANAN:

10        Q.    Endo had the sales force,

11   Endo had the relationships with the

12   distributors and the wholesalers, Endo

13   had the relationship to the people who

14   were placing the orders, correct?

15             MR. LIMBACHER:  Object to

16        form.

17             THE WITNESS:  We had the

18        relationship with the wholesalers.

19   BY MR. BUCHANAN:

20        Q.    Okay.  So after you wrote,

21   it was the responsibility of the

22   manufacturers, you responded -- or

23   questioned, Can you confirm my assumption

24   is correct?

1          Did I read that correctly?

2     A.     You did.

3     Q.     Endo was looking at an

4  outside vendor to perform these audits

5  and someone mentioned to me that they

6  thought UPS had to perform these audits

7  as well, which I do not believe is true.

8          Did I read that correctly?

9     A.     You did.

10    Q.     So as of this point in time,

11  in 2014, you were clear, at least, that

12  UPS was not going to your customers to

13  know them, correct?

14    A.     In 2014, correct.

15    Q.     Okay.  And you got a

16  response from UPS, correct?

17    A.     Yes.

18    Q.     From -- this is the person

19  in regulatory affairs at UPS, correct?

20    A.     Yes.  Kim is in the

21  regulatory group.

22    Q.     Did you reach out -- did you

23  reach out to compliance and regulatory

24  affairs at Endo on this issue?

1        A.    I don't recall.

2        Q.    Okay.  The reply you got

3   from Ms. Lindell was, Hi, Lisa, UPS does

4   have a Know Your Customer program in

5   place.  However, as a 3PL provider --

6   let's pause.  What is a 3PL provider?

7        A.    Third-party logistics.

8        Q.    As a third-party logistics

9   provider, we do not maintain the

10  relationship with our clients' (Endo)

11  customers.

12           And that was true, right?

13  They don't have a relationship with your

14  customers?

15       A.    No, they don't.

16       Q.    You may recall the survey

17  that we asked you to complete, she asks

18  with a question mark on the end.

19           Do you see that?

20       A.    Yes.

21       Q.    Do you recall that we looked

22  at those surveys, the Know Your Customer

23  checklist surveys a moment ago?

24       A.    Yes.

1    Q.    And do you recall you

2  answering that Endo does not, in fact, go

3  and conduct customer due diligence,

4  correct?

5    A.    That is correct.

6    Q.    The survey contains

7  questions about your SOM program, process

8  for vetting new customers, customer

9  types, et cetera.  This allows us to do

10  our due diligence to the extent that we

11  can.  Having said that, we believe that

12  the DEA requires both the manufacturer

13  and the distributor have a program in

14  place.

15         Did I read that correctly?

16    A.    You did.

17    Q.    And that was your

18  understanding as well, as you noted on

19  the prior page, correct?

20    A.    Uh-huh.

21         MR. LIMBACHER:  Objection to

22    form.

23  BY MR. BUCHANAN:

24    Q.    That's a yes answer, ma'am?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And then you replied to that

3  e-mail saying, So your Getting to Know

4  Your Customer program is around your

5  clients?

6         You're saying that to UPS,

7  correct?

8    A.    I am.

9    Q.    And "your clients," when

10 directing that to UPS, would be companies

11 like Endo, right?

12   A.    It would, yes.

13   Q.    And so your understanding,

14 ma'am, was that UPS's obligation was to

15 get to know companies like you, right?

16         MR. LIMBACHER:  Object to

17    form.

18         THE WITNESS:  In 2014, yes.

19 BY MR. BUCHANAN:

20   Q.    And that it was the

21 manufacturer's obligation to get to know

22 their customers and their customers'

23 customers, correct?

24         MR. LIMBACHER:  Object to

1          form.  Misstates the evidence.

2                THE WITNESS:  Based on what

3          I know, yes.

4     BY MR. BUCHANAN:

5          Q.    Okay.

6                MR. BUCHANAN:  I think it's

7          a good place to break.

8                MR. LIMBACHER:  Do you want

9          to read the response from UPS or

10         do you want me to do that?

11               MR. BUCHANAN:  We can.  I

12         think I just did.

13               MR. LIMBACHER:  No, I don't

14         think so.

15    BY MR. BUCHANAN:

16         Q.    Friday, April 11, 2014.  So,

17    Kim, Getting to Know Your Customer

18    program is around your clients.  Thanks.

19               You responded -- withdrawn.

20    Let me start this over.

21               Where were we?

22               MR. BUCHANAN:  Middle of the

23         page, please.

24               MR. LIMBACHER:  Lisa sent a

Highly Confidential - Subject to Further Confidentiality Review

1    question and then --

2            MR. BUCHANAN:  I have it.

3    Yes.

4    BY MR. BUCHANAN:

5        Q.    Hi, Kim, so your Getting to

6    Know Your Customer program is around your

7    clients.  Thanks.  Lisa.

8            Did I read that correctly,

9    ma'am?

10       A.    Yes, you did.

11       Q.    And the reply you got from

12   Ms. Lindell to you was, Yes, and, to some

13   degree, your customers, based on the

14   information that you provide us.  The

15   original plan was to survey your

16   customers, but in the end we went down a

17   different path.

18           Did I read that correctly?

19       A.    You did.

20       Q.    And a response to the Know

21   Your Customer checklist that you sent

22   back to Ms. Lindell in 2013, did you

23   provide them with due diligence

24   information on your customers?

1    Q.   Did you have that

2  understanding, ma'am, that as a member of

3  the closed system for controlled

4  substance distribution that your company

5  had an obligation to maintain effective

6  controls against diversion; yes or no?

7          MR. LIMBACHER:  Object to

8          the form and foundation.

9  BY MR. BUCHANAN:

10   Q.   Did you understand that?

11         MR. LIMBACHER:  Asked and

12         answered.

13         THE WITNESS:  I know that

14         Endo had a lot of different

15         programs in place to maintain --

16         sorry, wrong word -- to stop

17         diversion.

18         I cannot speak to all those

19         programs within Endo.  I can only

20         speak to my job.

21  BY MR. BUCHANAN:

22   Q.   Okay.  Within Endo branded,

23  ma'am, please share with us the other

24  effective controls the company maintained

1    to prevent diversion that you know about.

2                    MR. LIMBACHER:  Object to

3              the form and foundation.  You want

4              her to now testify about the

5              things she just told you she

6              couldn't testify about?  Is that

7              the question?

8                    MR. BUCHANAN:  She said she

9              knows Endo has a lot of different

10             programs in place, so I'd like to

11             know what they are.

12                   MR. LIMBACHER:  And I can't

13             speak to all of those programs

14             within Endo, is her testimony.

15                   So I want just to be clear

16             on the record that you're asking

17             her now to testify about things

18             that she's just said that she

19             cannot speak to.  Is that what

20             we're doing now, counsel?

21                   MR. BUCHANAN:  You can

22             answer.

23                   MR. LIMBACHER:  Is that how

24             we're using our time?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. BUCHANAN:  We can
 2         definitely use our time that way,
 3         because she says she has knowledge
 4         of it.
 5    BY MR. BUCHANAN:
 6         Q.    So please share with us,
 7    ma'am, those effective controls against
 8    diversion that you're aware of that Endo
 9    had?
10              MR. LIMBACHER:  Objection to
11         the form.  Foundation.  Asked and
12         answered.
13              THE WITNESS:  Am I
14         answering?  I'm sorry.
15    BY MR. BUCHANAN:
16         Q.    You can answer.
17              MR. LIMBACHER:  Do you need
18         him to repeat the question?
19              THE WITNESS:  Sure.  Repeat
20         the question.
21    BY MR. BUCHANAN:
22         Q.    Please share with us, Ms.
23    Walker, the effective controls against
24    diversion that you're aware of that Endo
```

1    had.

2                  MR. LIMBACHER:  Object to

3            the form and foundation.  Asked

4            and answered.

5                  THE WITNESS:  I know that

6            Endo had other -- had programs in

7            place.  I can't speak to them.

8            They're not part -- they're not my

9            responsibility.

10   BY MR. BUCHANAN:

11           Q.    Are you aware of any?

12                  MR. LIMBACHER:  Object to

13           form.  And foundation.

14                  THE WITNESS:  There are

15           programs in place that Endo did.

16           I cannot speak to them.  I can't

17           speak for the company.  I can only

18           speak for myself and my job.

19   BY MR. BUCHANAN:

20           Q.    Your job, as I understand

21   it, ma'am, was head of suspicious order

22   monitoring, correct?

23                  MR. LIMBACHER:  Object to

24           form.

1          THE WITNESS:  Suspicious

2      order monitoring was part of my

3      job responsibility.

4  BY MR. BUCHANAN:

5      Q.    If we were to look for

6  Endo's SOPs on suspicious order

7  monitoring, we could see described at

8  least what Endo did in regard to standard

9  operating procedures with regard to

10 suspicious order monitoring, would that

11 be true?

12          MR. LIMBACHER:  Object to

13     form.

14          THE WITNESS:  I think we

15     already looked at the document

16     about our SOM program.

17 BY MR. BUCHANAN:

18     Q.    Does Endo even have SOPs for

19 suspicious order monitoring, ma'am?

20          MR. LIMBACHER:  Object to

21     form.

22          THE WITNESS:  We have that

23     document in place.  And many of

24     our SOPs are within UPS.

1    BY MR. BUCHANAN:

2         Q.    Does Endo have SOPs for

3    suspicious order monitoring?

4         A.    We have --

5              MR. LIMBACHER:  Object to

6         form.

7              THE WITNESS:  We have the

8         document that we looked at, that

9         we have already reviewed.  That's

10        the only document that I know of.

11   BY MR. BUCHANAN:

12        Q.    Okay.  Endo has standard

13   operating procedures as a general matter,

14   correct?

15             MR. LIMBACHER:  Object to

16        form.

17             THE WITNESS:  I'm sure some

18        areas do.  I can't speak to those.

19   BY MR. BUCHANAN:

20        Q.    Have you seen lists of Endo

21   standard operating procedures?

22        A.    No, I don't recall.

23        Q.    Would it surprise you,

24   ma'am, that Endo doesn't have standard

1    operating procedures for suspicious order

2    monitoring?

3                    MR. LIMBACHER:  Object to

4           the form.  Argumentative.

5                    THE WITNESS:  I have the

6           document that we've already

7           reviewed.  And we have UPS's

8           document.  And we have work

9           instructions within UPS.

10   BY MR. BUCHANAN:

11       Q.    The document that we

12   reviewed, could you identify it for the

13   record, just so we understand what you're

14   referring to as Endo's standard operating

15   procedures?

16                   MR. LIMBACHER:  Object to

17          form.

18                   THE WITNESS:  The document

19          that's attached to Number 3.  It's

20          this one.

21   BY MR. BUCHANAN:

22       Q.    What exhibit?

23                   MR. LIMBACHER:  Exhibit-3.

24                   THE WITNESS:  Exhibit-3.

1  BY MR. BUCHANAN:

2      Q.   Thank you.  Let's go to the

3  next page, please.

4           I'm sorry, let's go back to

5  the first page, so we describe it for the

6  record.

7           This is an e-mail exchange

8  that you're having in 2015, I guess it

9  was an e-mail from Mr. Collins to

10  yourself on SOM program, to yourself.  I

11  think it says, Hi, Laura, but do you

12  understand that to be referring to you in

13  that e-mail, ma'am?

14      A.   Yes.

15      Q.   Hi, Laura.  Please provide

16  an update on Endo's SOM program, written

17  is fine.  Then he asks, Is this a joint

18  Endo/Qualitest program or does each

19  company have its own?

20           Do you see that e-mail?

21      A.   Yes.

22      Q.   And here is your response,

23  with your summary of the SOM program,

24  approved by legal and Brian Lortie,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2          A.    Yes.

3          Q.    Who is Brian Lortie?

4          A.    At the time, he was -- I

5    don't know his title, but he was over the

6    branded division.

7          Q.    Okay.  And if we go to the

8    second page, this is the SOM's process

9    flow?

10         A.    Yes.

11         Q.    And the document that

12   describes your current process with a

13   limited SOM program and the current SAP

14   system, correct, ma'am?

15              MR. LIMBACHER:  Object to

16         form.  Asked and answered.  We

17         covered this document at great

18         length, counsel.

19              THE WITNESS:  We've already

20         covered this.

21   BY MR. BUCHANAN:

22         Q.    And this is the document

23   you're stating is the standard operating

24   procedure, or something that is

Highly Confidential - Subject to Further Confidentiality Review

1    functioning as one?

2            MR. LIMBACHER:  Object to

3        form.

4            THE WITNESS:  This is the

5        document that I have, yes.

6    BY MR. BUCHANAN:

7        Q.    It certainly doesn't state

8    standard operating procedure, does it?

9            MR. LIMBACHER:  Object to

10       form.  The document speaks for

11       itself.

12   BY MR. BUCHANAN:

13       Q.    Does it?

14       A.    No, it does not.

15       Q.    Standard operating

16   procedures within your company have a

17   standard form, correct?

18           MR. LIMBACHER:  Object to

19       form.  Foundation.

20           THE WITNESS:  I can't

21       confirm that.

22   BY MR. BUCHANAN:

23       Q.    You've never seen the

24   company's standard operating procedures,

1    ma'am?

2                MR. LIMBACHER:  Object to

3         form.

4                THE WITNESS:  I've seen

5         some, I'm sure.

6    BY MR. BUCHANAN:

7         Q.    Okay.

8                MR. BUCHANAN:  Let's pass it

9         over.

10               MR. SIEGEL:  Walker-8.

11                    -  -  -

12               (Whereupon, EndoWalker

13        Exhibit-8,

14        ENDO_OPIOID_MDL_05950068, With

15        Attachment was marked for

16        identification.)

17                    -  -  -

18   BY MR. BUCHANAN:

19        Q.    I'm passing you, ma'am,

20   what's been marked as Exhibit-8 to your

21   deposition.

22               It's from this 2012 window

23   we were just looking at with regard to

24   the questionnaire.  The latest-in-time

Highly Confidential - Subject to Further Confidentiality Review

 1    e-mail is from you to a Mr. Koumou -- or

 2    Ms. Koumou, Janice Koumou.

 3              Do you see that?

 4              MR. LIMBACHER:  She doesn't

 5        have it yet.

 6              Now she's got it.

 7    BY MR. BUCHANAN:

 8        Q.    Do you see the

 9    latest-in-time e-mail at the top from

10    yourself to Ms. Connell?

11              She was your boss at the

12    time?

13        A.    Jill was, yes.

14        Q.    And Janice Koumou, who is

15    she?

16        A.    I don't recall who she is.

17        Q.    And as you scroll into this,

18    you can see a list of company's various

19    SOPs, 674.7, the top right corner.

20              Do you see those?

21        A.    What number again?

22        Q.    674.7, top right corner.

23        A.    Yes.

24        Q.    And then it lists various

Highly Confidential - Subject to Further Confidentiality Review

1    SOPs on the left, the titles of the SOPs,

2    and the various departments that are

3    responsible for the SOPs.

4              Do you see those?

5         A.   I do.

6         Q.   Do you recognize those

7    departments as departments within Endo?

8         A.   I recognize those documents.

9         Q.   Information management

10   clinical, nonclinical, pharmaceutical

11   development, quality assurance, et

12   cetera.

13             Do you see those?

14        A.   I do.

15        Q.   And the various titles off

16   to the left, SOP tends to be embedded in

17   the name of the various documents,

18   correct?

19        A.   I see it, yes.

20        Q.   Just take a moment and

21   review and see, in this listing of SOPs

22   with the company in 2012, whether there

23   are any SOPs for suspicious order

24   monitoring, excessive order management,

Highly Confidential - Subject to Further Confidentiality Review

1    Know Your Customer, Know Your Customer's

2    Customer, things like that.

3                    MR. LIMBACHER:  Object to

4           form.

5                    THE WITNESS:  There's none

6           listed.

7                    MR. LIMBACHER:  Well, he's

8           not --

9    BY MR. BUCHANAN:

10          Q.   To your knowledge, ma'am,

11   are there --

12                   MR. LIMBACHER:  -- limiting

13          himself to just that one page, I

14          assume.

15                   THE WITNESS:  I was just

16          looking at this one page.

17                   MR. BUCHANAN:  Feel free to

18          turn the pages.

19                   MR. LIMBACHER:  And, I'm

20          sorry, is the representation that

21          this is a complete listing of the

22          Endo SOPs?

23   BY MR. BUCHANAN:

24          Q.   You can answer, ma'am.

1          MR. LIMBACHER:  I was asking

2      for a representation.

3          MR. BUCHANAN:  I cannot

4      represent what's in your internal

5      systems.  I only have what you

6      produced to me.

7          MR. LIMBACHER:  We don't

8      know if this is a complete listing

9      of the SOPs.

10          MR. BUCHANAN:  If you

11      produced them all to me, then I

12      suppose that would be the

13      representation.  But I don't know

14      what you chose to produce or not.

15  BY MR. BUCHANAN:

16      Q.    Have you had a chance to

17  look at it, ma'am?

18      A.    I have.

19      Q.    Did you see any SOPs for

20  suspicious order monitoring?

21          MR. LIMBACHER:  Object to

22      form.

23          THE WITNESS:  None were

24      listed, no.

1    BY MR. BUCHANAN:

2         Q.    Did you see any for Know

3    Your Customer?

4              MR. LIMBACHER:  Object to

5         form.

6              THE WITNESS:  No.

7    BY MR. BUCHANAN:

8         Q.    Did you see any for customer

9    due diligence visits?

10             MR. LIMBACHER:  Object to

11        form.

12             THE WITNESS:  No.

13   BY MR. BUCHANAN:

14        Q.    Did you see any for the

15   assessment or utilization of chargeback

16   information --

17             MR. LIMBACHER:  Object to

18        form.

19   BY MR. BUCHANAN:

20        Q.    -- and evaluating suspicious

21   orders?

22        A.    No.

23        Q.    If we go to the first page

24   of this document, 674.1, I just wanted to

Highly Confidential - Subject to Further Confidentiality Review

1    call out, in your exchange with Ms.

2    Koumou, it appears that it's you

3    forwarding this list of documents,

4    correct?  There are two files that you

5    forwarded?

6         A.    I don't recall this document

7    at all.  Just from what you're showing to

8    me.

9         Q.    I'm reading the e-mail that

10   was produced to us.

11             Do you see two documents

12   attached, one, customer service 2012

13   curriculum is one item, ma'am?

14             MR. LIMBACHER:  Which e-mail

15        are you referring to, counsel?

16             MR. BUCHANAN:  It's 674.1.

17             MR. LIMBACHER:  But which

18        e-mail on that page?

19             MR. BUCHANAN:  It's the

20        latest in time.

21   BY MR. BUCHANAN:

22        Q.    Do you see it on the screen,

23   ma'am?  It's highlighted for you.

24        A.    I see it, yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  So one of the

2  documents you forwarded was this customer

3  service 2012 curriculum, correct?

4      A.    I see that attached, yes.

5      Q.    And then the other thing you

6  forwarded was master effective procedural

7  documents as of February 8, 2012,

8  correct?

9      A.    Say that again.  What do

10  you --

11      Q.    The other document that you

12  forwarded was master effective procedural

13  documents as of February 8, 2012,

14  correct?

15      A.    February 8th?

16      Q.    2/8/2012?

17      A.    I don't see 2/8/2012

18  anywhere.

19          MR. LIMBACHER:  He's

20        referring to here.

21          THE WITNESS:  Oh, that.

22  BY MR. BUCHANAN:

23      Q.    Do you see that?

24      A.    I see it, yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And do you recognize, ma'am,

2    these SOPs and procedural documents that

3    are listed here to be SOPs of the

4    company?

5        A.    This is back from 2012.  I

6    don't recall if these were effective or

7    not in 2012.

8        Q.    Well, certainly, at least

9    the name of the file that you sent in

10   this exchange with Ms. Koumou was, master

11   effective procedural documents as of

12   February 8th, 2012, correct?

13               MR. LIMBACHER:  Object to

14        form.

15               THE WITNESS:  That's what it

16        says.

17   BY MR. BUCHANAN:

18        Q.    And in that list of

19   documents, as of February 8, 2012, you

20   didn't see any SOPs related to suspicious

21   order monitoring, correct?

22               MR. LIMBACHER:  Object to

23        form.  Asked and answered.

24               THE WITNESS:  No.

```
 1            Suspicious order monitoring is not

 2            listed here.

 3                 But I need to remind you all

 4            again that back in 2012, UPS had

 5            their own SOM program in place,

 6            along with UPS -- along with Endo.

 7   BY MR. BUCHANAN:

 8            Q.   And their own host of

 9   problems, right?

10                 MR. LIMBACHER:  Object to

11            form.  Argumentative.

12                 THE WITNESS:  What are you

13            asking?

14   BY MR. BUCHANAN:

15            Q.   I said -- you were

16   highlighting UPS.

17                 You know they got written up

18   by the DEA, right?

19                 MR. LIMBACHER:  Object to

20            form.  Argumentative.

21                 THE WITNESS:  I don't know

22            what you're referring to.

23   BY MR. BUCHANAN:

24            Q.   Well, we talked about Know
```

Highly Confidential - Subject to Further Confidentiality Review

1    Your Customer.

2              How about know your vendor?

3    Did UPS get in trouble with DEA, ma'am?

4              MR. LIMBACHER:  Object to

5         form.  Foundation.

6              THE WITNESS:  I don't know

7         exactly what you are -- what

8         you're referring to.

9    BY MR. BUCHANAN:

10        Q.    What are you thinking of

11   when I say that?

12             MR. LIMBACHER:  Object to

13        form.

14             THE WITNESS:  I believe

15        you're referring to the UPS small

16        package side of the business,

17        which is completely different and

18        separate from the UPS Supply Chain

19        Solutions side of the business.

20             I believe that's what you

21        are referring to.

22   BY MR. BUCHANAN:

23        Q.    Did they enter into an

24   agreement with the DEA?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. LIMBACHER:  Object to

2     form.

3          THE WITNESS:  I don't know

4     any details about that agreement,

5     if they did or if they didn't.

6  BY MR. BUCHANAN:

7     Q.    Were you aware of what was

8  going on with UPS?  Were they keeping you

9  aware of the investigation with the DEA?

10          MR. LIMBACHER:  Object to

11     form.

12          THE WITNESS:  I don't

13     recall.

14          MR. LIMBACHER:  And

15     foundation.

16          MR. BUCHANAN:  Now is

17     probably as good a time as any.

18     Let's talk about those agreements.

19  BY MR. BUCHANAN:

20     Q.    As I understand it, Endo was

21  utilizing UPS -- well, what is LHSI?

22     A.    Livingston Healthcare.

23     Q.    Did that get acquired by

24  UPS?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, they did.

2    Q.    Endo was using UPS, or that

3 predecessor company, to do order

4 fulfillments since '98, correct?

5    A.    We entered into an agreement

6 with them in January of -- sorry, in

7 April of 1999 is when they started.

8    Q.    Okay.

9         MR. BUCHANAN:  Can I have

10        597, 598 and 600 in sequence,

11        please?

12        MR. SIEGEL:  597 is

13        Exhibit-9.  598 is Exhibit-10.

14        And 600 is Exhibit-11.

15             -   -   -

16        (Whereupon, EndoWalker

17        Exhibit-9, UPSSCS0002916-935, was

18        marked for identification.)

19             -   -   -

20        (Whereupon, EndoWalker

21        Exhibit-10, UPSSCS0002991-3029,

22        was marked for identification.)

23             -   -   -

24        (Whereupon, EndoWalker

```
 1              Exhibit-11,

 2              ENDO_OPIOID_MDL_02060862-891, was

 3              marked for identification.)

 4                      -   -   -

 5              MR. BUCHANAN:  Can we start

 6       with 597 on the screen, please?

 7       That's Exhibit-9.

 8  BY MR. BUCHANAN:

 9              Q.   Ma'am, I'm passing you over

10  what's been marked as Exhibit-9 to your

11  deposition.  It's an agreement between

12  Endo Pharmaceuticals and Livingston

13  Healthcare Services, Inc.

14              MR. LIMBACHER:  She doesn't

15       have it yet, counsel.

16              This is 9, but not 10 and

17       11.

18              MR. BUCHANAN:  9 is what

19       we're referring to.

20              MR. LIMBACHER:  You want me

21       to show her 9 now --

22              MR. BUCHANAN:  Sure.

23              MR. LIMBACHER:  -- because I

24       got 9, 10 and 11.
```

1    BY MR. BUCHANAN:

2         Q.    Do you have before you

3    what's been marked as Exhibit-9, an

4    agreement between Endo Pharmaceuticals

5    and Livingston Healthcare, ma'am?

6         A.    I have it.

7         Q.    Dated April 1, '99?

8         A.    Uh-huh.

9         Q.    Have you seen this agreement

10   before?

11        A.    I have, yes.

12        Q.    And was this the operating

13   agreement at the outset of the formation

14   of Endo with regard to the relationship

15   with Livingston Healthcare Services?

16             MR. LIMBACHER:  Object to

17        form.

18             THE WITNESS:  I believe so.

19        It was at the time.

20   BY MR. BUCHANAN:

21        Q.    Do you recognize this as the

22   earliest operative agreement between Endo

23   Pharmaceuticals and Livingston Healthcare

24   Services, which was later acquired by

Highly Confidential - Subject to Further Confidentiality Review

1                    MR. BUCHANAN:  Can you go a
2          few more minutes, just so I can
3          finish this?
4                    MR. LIMBACHER:  Are you okay
5          for a few more minutes?
6                    THE WITNESS:  Yes.
7     BY MR. BUCHANAN:
8          Q.    And then it says, The CMA
9     will release the excessive order based on
10    one of the following excessive release
11    codes.
12                   Right?
13         A.    Yes, that was in our old
14    system.
15         Q.    And these were the
16    documents -- this was the documentation
17    you would log into the system, 8050,
18    release due to growth factor, right?
19         A.    Yes.
20         Q.    Customer tells you they're
21    selling more, release it --
22                   MR. LIMBACHER:  Object to
23          form.
24    BY MR. BUCHANAN:

1    Q.    -- right?

2    A.    We had our program in place,

3    and we reviewed them and we released

4    them, yes.

5    Q.    And then let's go to

6    4.3.7.9.  Endo's associate director of

7    customer service and distribution

8    reserves the right to reduce the quantity

9    ordered and/or advise the deletion of an

10   order.

11            Do you see that?

12   A.    Yes, I see it.

13   Q.    Is that you?

14   A.    Yes, it was at the time.

15   Q.    So you could structure an

16   order if it was excessive?

17   A.    I could what?

18   Q.    You could reduce the size of

19   an order so it stayed below an excessive

20   threshold and then still ship?

21            MR. LIMBACHER:  Object to

22       form.

23            THE WITNESS:  No, I don't

24       believe that's what that says.

```
 1    BY MR. BUCHANAN:

 2         Q.    Does it say you had the

 3    right to reduce the quantity ordered

 4    and/or advise the deletion of an order?

 5         A.    If we deemed it suspicious

 6    and we didn't want to ship it, yes.  But

 7    I don't recall us ever doing that.

 8         Q.    Okay.  You don't recall ever

 9    reducing the size of an order to allow it

10    to ship?

11         A.    No, I do not.

12              MR. LIMBACHER:  Object to

13         form.

14    BY MR. BUCHANAN:

15         Q.    Do you have an understanding

16    as to whether that would be appropriate

17    or not, ma'am?

18              MR. LIMBACHER:  Object to

19         form.

20              THE WITNESS:  We had an

21         excessive program in place that

22         monitored our orders, and we would

23         review and release.

24    BY MR. BUCHANAN:
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Was it your understanding,

2  ma'am, that it was permissible for you to

3  reduce the size of the order so that it

4  would no longer be excessive in the

5  shipment and then clear it?

6    A.    I don't recall that.

7            MR. LIMBACHER:  Object to

8        form.

9  BY MR. BUCHANAN:

10    Q.    My question is, is it your

11  understanding that that would be

12  appropriate to do that?

13    A.    I don't recall.

14    Q.    In fact, did you later

15  learn, ma'am, that if you had done such a

16  thing that that would, in fact, be

17  something that you would have to report

18  to the DEA?

19            MR. LIMBACHER:  Object to

20        form.

21            THE WITNESS:  I don't

22        recall.  We had excessive programs

23        in place and so did UPS, and our

24        orders were monitored and they

Highly Confidential - Subject to Further Confidentiality Review

1           were shipped as appropriate,

2           between both the companies and

3           both our systems and both our

4           programs.

5   BY MR. BUCHANAN:

6           Q.    And if you had cut an order

7   and hadn't reported it to the DEA, that

8   would not be appropriate, would it,

9   ma'am?

10          MR. LIMBACHER:  Object to

11          form.  Foundation.

12          THE WITNESS:  I don't

13          recall.

14  BY MR. BUCHANAN:

15          Q.    If you had an order that was

16  excessive, in order to make it not

17  excessive as to quantity, as to size, as

18  to frequency, you had to reduce its size

19  or reduce the quantity, that would be

20  something you would have to report to the

21  DEA, right?

22          MR. LIMBACHER:  Object to

23          form.  Asked and answered.

24          THE WITNESS:  We had an

Highly Confidential - Subject to Further Confidentiality Review

1           excessive program in place and UPS

2           had an SOM program in place, and

3           orders were filtered through both

4           programs and reviewed and shipped

5           as necessary.

6                And I don't recall an order

7           being deemed as suspicious and

8           reported to the DEA.

9     BY MR. BUCHANAN:

10          Q.    Do you recall ever cutting

11    an order in size, ma'am --

12          A.    No, I do not.

13          Q.    -- so it was no longer

14    excessive in size?

15          A.    No, I do not.

16                MR. LIMBACHER:  Object to

17          form.  Asked and answered.

18                THE WITNESS:  I do not

19          recall.

20    BY MR. BUCHANAN:

21          Q.    Do you recall ever

22    authorizing people on your staff to cut

23    the size of an order so that it was no

24    longer excessive?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    No.

 2                MR. LIMBACHER:  Object to

 3          form.  Asked and answered.

 4    BY MR. BUCHANAN:

 5          Q.    Would that be appropriate to

 6    do, ma'am?

 7                MR. LIMBACHER:  Object to

 8          form.  Asked and answered.

 9                THE WITNESS:  We had an

10          excessive program in place, at

11          both Endo and at UPS.

12    BY MR. BUCHANAN:

13          Q.    How is that responsive to my

14    question?

15          A.    I'm telling you what we had

16    in place.

17          Q.    I'm not asking you that.

18          A.    Well, that's what I'm

19    telling you.

20          Q.    I'm asking you -- the way

21    this works is we have questions and

22    answers.  I think you understand that by

23    this point in time.

24                My question to you, ma'am,
```

Highly Confidential - Subject to Further Confidentiality Review

1    is, to your understanding, would it be

2    appropriate for a company to cut -- for

3    you, in your role in suspicious order

4    monitoring, to cut an order in size that

5    had been flagged as excessive and then

6    ship it once it's no longer excessive and

7    not report that to the DEA?

8            MR. LIMBACHER:  Object to

9        form.

10           THE WITNESS:  I don't

11       recall.

12           MR. BUCHANAN:  We can take a

13       break.

14           VIDEO TECHNICIAN:  We are

15       going off record.  The time is

16       2:36.

17               -  -  -

18           (Whereupon, a brief recess

19       was taken.)

20               -  -  -

21           VIDEO TECHNICIAN:  We're

22       back on the record.  Beginning of

23       Media File Number 6.  The time is

24       2:54.

1           MR. BUCHANAN:  Can I have

2       659, please, Scott, next in order?

3           MR. SIEGEL:  659 is being

4       marked as Walker-14.

5               -  -  -

6           (Whereupon, EndoWalker

7       Exhibit-14,

8       ENDO_OPIOID_MDL_05948106-137, was

9       marked for identification.)

10              -  -  -

11  BY MR. BUCHANAN:

12      Q.    I'm passing you, ma'am,

13  what's been marked as Exhibit-14 to your

14  deposition.

15          It's an e-mail exchange.

16  I'm going to direct you to one of the

17  constituent e-mails.  It looks like this

18  was kind of assembled as a compilation of

19  some form.

20          I'm going to direct your

21  attention to .27, top right corner.  It's

22  an e-mail from yourself --

23      A.    Sorry, you said 27?

24      Q.    .27, yes, top right corner.

1              It's an e-mail from yourself

2    to Kayla Keinhofer, Robert Stuart and

3    Doug Azzalina and a couple of ccs on

4    there.

5              Do you see that?

6       A.    Yes.

7       Q.    And it's referring to an

8    interaction that you had with McKesson in

9    2009 relating to the shipment or

10   nonshipment of orders.

11             Do you recall that?

12      A.    I'm sorry, I was reading the

13   document.

14             Can you please repeat that.

15      Q.    Sure.  It's recalling to

16   certain McKesson service level penalties?

17      A.    Okay, yes.

18      Q.    In your agreement with

19   McKesson, were you required to ship a

20   minimum percentage of their order,

21   regardless?

22             MR. LIMBACHER:  Object to

23        form.

24             THE WITNESS:  This is back

1          from 2010.  I don't recall.  I

2          would have to look at the actual

3          document.

4     BY MR. BUCHANAN:

5          Q.    Let's read the e-mail,

6     Monday, May 10, 2010.

7               As we discussed last week

8     during our meeting, attached is the list

9     of POs that McKesson ordered during the

10    last two weeks in December.  This

11    spreadsheet lists the PO number, order

12    quantity, ship quantity and dates.  I

13    know within the agreement there is

14    language around us shipping at least 20

15    percent of their order quantities.  I'm

16    not sure of the exact language.

17              Did I read that correctly,

18    ma'am?

19         A.    Yes.

20         Q.    Are you familiar with

21    service level agreements you had with

22    various of your distributors over time?

23         A.    I know the generic side of

24    the business had service level

1    bit the obligation, under the Controlled

2    Substances Act, to maintain effective

3    controls against diversion.

4              Do you recall our discussion

5    on that?

6              MR. LIMBACHER:  Object to

7         form.

8              THE WITNESS:  Yes.

9    BY MR. BUCHANAN:

10        Q.    Do you recall your

11   acknowledgment that that was your

12   understanding, that if somebody is

13   selling controlled substances, you, in

14   fact, had that obligation?

15             MR. LIMBACHER:  Object to

16        form.

17             THE WITNESS:  Right.  And I

18        think I explained what my

19        obligation was.  And there was

20        other parts of the company and

21        their obligations that I can't

22        speak to.

23   BY MR. BUCHANAN:

24        Q.    So here we are in 2011.

Highly Confidential - Subject to Further Confidentiality Review

1    And, again, a statement about your

2    product, Opana, and misuse and diversion,

3    saying it was the next OxyContin

4    epidemic.

5                Do you see that?

6         A.    I see it in the e-mail,

7    sure.

8         Q.    Was that brought to your

9    attention by anybody within Endo?

10        A.    No.  This e-mail was not

11   brought to my attention.

12        Q.    So those within Endo,

13   whoever was told that, didn't share that

14   with you?

15              MR. LIMBACHER:  Object to

16        form.

17              THE WITNESS:  Not that I

18        recall, no.

19   BY MR. BUCHANAN:

20        Q.    And we can see this

21   reference further below from a Mr. --

22   excuse me, Dr. Silverman, MD, that, I am

23   at the ASIFF national meeting in DC,

24   lecture on prescription drug abuse by

1    director of abuse section, DEA.  He says

2    Opana is the next OxyContin epidemic.  He

3    says watch out for this drug.

4            Did I read that correctly?

5        A.    That's what it says in the

6    e-mail.

7        Q.    And that drug would have

8    been one of those drugs that you were

9    clearing orders for year after year after

10   year, at least in the Exhibit-1 that we

11   looked at, correct?

12           MR. LIMBACHER:  Object to

13       form.

14           THE WITNESS:  So if I can

15       remind you, I'm shipping to

16       wholesalers.  I'm not shipping to

17       retail pharmacies.  I'm shipping

18       to wholesalers.  And these orders

19       have gone through multiple SOM

20       programs at Endo and at UPS.

21   BY MR. BUCHANAN:

22       Q.    Okay.  In terms of the Know

23   Your Customer's Customer program, ma'am,

24   can you please describe the Know Your

```
 1    Customer's Customer program that Endo had

 2    in 2011?

 3                  MR. LIMBACHER:  Object to

 4          form and foundation.

 5                  THE WITNESS:  I can't recall

 6          what we did back in 2011.

 7    BY MR. BUCHANAN:

 8          Q.    Didn't have a Know Your

 9    Customer's Customer program in 2011, did

10    you, ma'am?

11                  MR. LIMBACHER:  Object to

12          form and foundation.

13                  THE WITNESS:  I can't recall

14          that.

15    BY MR. BUCHANAN:

16          Q.    And your customer's

17    customer, in the case of wholesale

18    customers, would be the very pharmacies

19    that you were just referring to, correct?

20                  MR. LIMBACHER:  Object to

21          form and foundation.

22                  THE WITNESS:  If that's who

23          the customers are.  I can't -- I

24          can't -- I don't know who their
```

Highly Confidential - Subject to Further Confidentiality Review

1      customers are.

2  BY MR. BUCHANAN:

3      Q.    Let's talk about Opana ER.

4            Opana ER is reformulated and

5  comes to market in 2011, right?  That was

6  your recollection at least earlier today.

7  Good enough for our conversation?

8      A.    Sure.  Some time in 2012.

9      Q.    It's on the market for

10 several years.

11           And you know there's some

12 safety issues that arise with that drug,

13 right?

14           MR. LIMBACHER:  Object to

15      form.

16           THE WITNESS:  There's

17      benefits to Opana.  And there are

18      safety issues with any opioid

19      medication.

20 BY MR. BUCHANAN:

21      Q.    Okay.  And doctors are still

22 prescribing the reformulated Opana ER

23 today?

24           MR. LIMBACHER:  Object to

Highly Confidential - Subject to Further Confidentiality Review

```
 1              form and foundation.

 2                   THE WITNESS:  I can't speak

 3              to what doctors are doing.

 4    BY MR. BUCHANAN:

 5         Q.    Well, we know you withdrew

 6    it from the market, right?

 7                   MR. LIMBACHER:  Object to

 8              form.  Misstates the evidence.

 9                   THE WITNESS:  I can't --

10              that's not part of my

11              responsibility.  That's somebody

12              else at Endo that worked with the

13              FDA on it.

14    BY MR. BUCHANAN:

15         Q.    Do you have that -- it's not

16    a matter of whose responsibility it is,

17    for the moment.

18                   Do you have an awareness,

19    ma'am, that in 2017, the FDA said the

20    risks outweigh the benefits and asked you

21    to withdraw the drug?

22                   MR. LIMBACHER:  Object to

23              form.

24                   THE WITNESS:  I know that
```

1    Endo withdrew the product from the

2    market, yes.

3  BY MR. BUCHANAN:

4    Q.    So Endo was told by the FDA

5  that the risks outweighed the benefit for

6  the product, right?

7         MR. LIMBACHER:  Object to

8    form and foundation.

9         THE WITNESS:  I don't know

10   that.  I don't know what decisions

11   were made at Endo and who they

12   talked to, as to why it was

13   withdrew from the market.

14        I just know that it was

15   withdrawn from the market.

16        MR. BUCHANAN:  Can I have

17   734, please?

18 BY MR. BUCHANAN:

19   Q.    Did you keep abreast of

20 these kind of reports on the street about

21 Opana being prone to abuse and misuse and

22 diversion?  Were you following news

23 reports, I mean, from the Philadelphia

24 office of the DEA?

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MR. LIMBACHER:  Object to
2         form.
3                    THE WITNESS:  I knew that
4         there was an opioid epidemic.  But
5         there's other people within Endo
6         that would -- I would assume that
7         would follow that.  It's not my
8         area of responsibility.
9    BY MR. BUCHANAN:
10        Q.    Your area of responsibility
11   included suspicious order monitoring,
12   fair?
13        A.    For shipments to our
14   wholesalers.
15        Q.    Right.  And it's fair, if
16   you didn't clear those orders, they
17   wouldn't leave, right?
18        A.    Yes.
19        Q.    Okay.  So in order for those
20   drugs to get to the street, they had to
21   leave the manufacturers, right?
22                   MR. LIMBACHER:  Object to
23        form.
24                   THE WITNESS:  I had
```

Highly Confidential - Subject to Further Confidentiality Review

1      shipments to the wholesalers.

2      After that is not my

3      responsibility.

4  BY MR. BUCHANAN:

5      Q.    So your position, ma'am, is

6  Endo had no responsibility to the

7  customers -- to evaluate the customers of

8  Endo's customers?

9      A.    Endo had other --

10      MR. LIMBACHER:  Object to

11  form.  Misstates her testimony.

12      Nice try, counsel.

13  BY MR. BUCHANAN:

14      Q.    Please answer the question.

15      A.    There's other departments

16  within Endo that reviewed or potentially

17  had, you know, reviewed suspicious order

18  monitoring or the abuse out there.  That

19  was not me.

20      Q.    What other department within

21  Endo was clearing suspicious orders,

22  ma'am?

23      MR. LIMBACHER:  Object to

24      form.  Misstates her testimony.

```
 1              THE WITNESS:  Do I answer
 2        that?
 3              I do.
 4   BY MR. BUCHANAN:
 5        Q.    You do.
 6        A.    But there's other areas
 7   within Endo --
 8        Q.    Okay.  And in terms of
 9   clearing -- identifying suspicious orders
10   and releasing held orders, that was the
11   responsibility within your group,
12   correct?
13        A.    To shipments to wholesalers.
14   How can --
15        Q.    Do you have my question?
16        A.    Pardon?
17        Q.    Do you have my question,
18   ma'am?
19        A.    Yes, I have your question.
20   And I answered your question.
21        Q.    Let's stay with it, then.
22              In terms of identifying,
23   clearing, releasing suspicious orders,
24   that was a responsibility of your group,
```

1    correct?

2              MR. LIMBACHER:  Object to

3         form.

4              THE WITNESS:  As I explained

5         throughout the entire day today --

6    BY MR. BUCHANAN:

7         Q.    Is that a yes?

8         A.    As I have explained --

9              MR. LIMBACHER:  Let her

10        finish her answer.

11             THE WITNESS:  -- throughout

12        the entire day --

13             MR. LIMBACHER:  She hasn't

14        interrupted you.

15             THE WITNESS:  -- throughout

16        the entire day today, Endo had

17        their own SOM program.  UPS Supply

18        Chain Solutions, our 3PL partner,

19        had their own SOM program.

20        Both -- orders were -- flow

21        through both programs before they

22        were shipped.

23    BY MR. BUCHANAN:

24        Q.    Okay.

1    different product -- or a different NDC

2    number, correct?

3            A.    Yes.

4            Q.    Scrolling to the right, what

5    does PLNT stand for?

6            A.    Plant.  That's the

7    distribution center, 0020 means Memphis.

8            Q.    And that would be the UPS

9    facility where all orders were shipped

10   from?

11           A.    For the opioids, yes.

12           Q.    We have a net value.

13                 Would the financial kind of

14   values be something you dealt with in

15   your day-to-day business, ma'am, the net

16   value of a given order?  Is that just --

17   is that something that's coming out of

18   the accounting function?

19                 MR. LIMBACHER:  Object to

20         form.

21                 THE WITNESS:  That's coming

22         out of -- that's coming off the

23         order.

24   BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  Do you have

2   visibility to that in your day-to-day

3   job?  You can see what the net value and

4   the gross value is of orders?

5      A.    It's listed --

6           MR. LIMBACHER:  Object to

7      form.

8           THE WITNESS:  It's listed on

9      the order, yes.

10  BY MR. BUCHANAN:

11     Q.    Order quantity, ma'am, is

12  that quantity of the 60 count, or is that

13  in dosage units?

14     A.    That's the selling unit.  So

15  it's a 60-count bottle.

16     Q.    And then we see confirmed

17  quantity on the right.

18           Do you see that?

19     A.    Uh-huh.

20     Q.    And that would be the

21  quantity you actually shipped, right?

22     A.    Yes.

23     Q.    What we have -- I'm sorry,

24  we see on the left, order quantity.

Highly Confidential - Subject to Further Confidentiality Review

1    Immediately to the right of that, we see

2    cumulative confirmed quantity.

3              Is that how you understand

4    that abbreviation?

5         A.    That's just an SAP term.

6    It's the confirmed quantity.  Order

7    quantity is what the customer ordered,

8    and the confirmed quantity is what was

9    committed on the order to ship.

10        Q.    Well, then we see to the

11   right, Ship to party.

12             Do you see that?

13        A.    Yes.

14        Q.    Is that a quantity or is

15   that an address of where the stuff is

16   going?

17        A.    It's the ship-to party for

18   the address of who is receiving the

19   product.  It's an internal SAP number.

20             MR. BUCHANAN:  So if we

21        scroll to the left, please.  I'm

22        sorry, can you go to the left?  A

23        little further.  I just want to

24        identify.

1    BY MR. BUCHANAN:

2         Q.    So we see it's sold to Smith

3    Drug Company, and on the right would be

4    the actual shipping address of Smith Drug

5    Company?  I'm sorry, the top line.

6         A.    That's correct.  You have a

7    sold to for the sold to location of the

8    wholesaler.  And then the ship to is who

9    is supposed to be getting the product for

10   that customer, for that wholesaler.

11        Q.    Smith Drug Company is a

12   wholesaler?

13        A.    They are, yes.

14             MR. BUCHANAN:  Let's go to

15        the right.

16   BY MR. BUCHANAN:

17        Q.    And we have the address

18   where it was shipped.

19             MR. BUCHANAN:  Keep

20        scrolling.  And I think that

21        encompasses all of our fields.

22             Great.

23   BY MR. BUCHANAN:

24        Q.    Does this system, which I

1    understand to be an SOM audit trail,

2    identify the reason the order was held or

3    appended?

4              MR. LIMBACHER:  Object to

5         form.

6              THE WITNESS:  There is

7         details behind this as to why it

8         was held by order size or

9         frequency, yes, or class of trade,

10        benchmark.

11   BY MR. BUCHANAN:

12        Q.   So you can see the

13   particular reason it tripped the wire?

14        A.   Yes.  It gives you the data

15   as to why it was flagged.

16        Q.   In your SAP system?

17        A.   Yes.

18        Q.   Okay.  All right.  Ma'am,

19   you can set that aside.

20             I guess, just so the record

21   is clear, you can identify the order from

22   or the ship to state using that same

23   chart, correct, of the customer?

24        A.   Yes.  It gives you who the

1    customer is and which DC it's shipping

2    to.

3        Q.    Great.  Thank you.

4            MR. BUCHANAN:  Scott, what

5        was the exhibit number we marked

6        734 as before the break?

7            MR. SIEGEL:  23.

8            MR. BUCHANAN:  I'm passing

9        you Exhibit-23, ma'am.

10   BY MR. BUCHANAN:

11       Q.    Do you recall before the

12   break we were talking about Opana ER.

13            And in 2017, do you recall

14   the FDA requesting the company to remove

15   Opana ER from the market, correct?

16       A.    Yes.

17       Q.    First paragraph states,

18   Today the U.S. Food and Drug

19   Administration requested that Endo

20   Pharmaceuticals remove its opioid pain

21   medication, reformulated Opana ER, from

22   the market.  After careful consideration,

23   the agency is seeking removal based on

24   its concern that the benefits of the drug

1    may no longer outweigh the risks.

2              Do you see that, ma'am?

3         A.    Yes.

4         Q.    Is that your recollection of

5    what happened in the summer of 2017?

6         A.    I know the FDA made a

7    request for us to remove Opana.

8         Q.    Okay.

9              MR. BUCHANAN:  Could we

10         have, please, 646?

11   BY MR. BUCHANAN:

12        Q.    So they request in June that

13   the company remove Opana ER reformulated

14   from the markets, correct?

15        A.    Uh-huh.

16        Q.    Did you continue selling it

17   after that?

18             MR. LIMBACHER:  Object to

19         form.  Foundation.

20             THE WITNESS:  The company

21         worked with the FDA and a decision

22         was made, we sold it through

23         August 31st of '17.

24   BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    So you kept selling it after

2  the request from the FDA to withdraw it

3  from the market?

4      A.    I know that --

5           MR. LIMBACHER:  Object to

6      form and foundation.

7           THE WITNESS:  I know that

8      Endo worked with the FDA on a

9      cease distribution date, and it

10     was August 31st, 2017.  I don't

11     know the decisions behind that

12     date, but I know that our ship

13     date was August 31st.

14  BY MR. BUCHANAN:

15     Q.    Do you remember trying to

16  blow it out?

17           MR. LIMBACHER:  Object to

18     form.

19  BY MR. BUCHANAN:

20     Q.    Going out of business

21  pricing?

22           MR. LIMBACHER:  Object to

23     form.

24           THE WITNESS:  No.

1    BY MR. BUCHANAN:

2         Q.    So in June of 2017, the FDA

3    requests Endo to withdraw Opana ER from

4    the market, correct?

5         A.    Yes.

6         Q.    The company doesn't

7    immediately withdraw it from the market,

8    right?

9              MR. LIMBACHER:  Object to

10             form.

11             THE WITNESS:  I know that

12             the company worked with the FDA on

13             the -- an agreed-upon cease

14             shipping date was determined, and

15             that was August 31st.

16   BY MR. BUCHANAN:

17        Q.    Okay.

18        A.    There are benefits to Opana,

19   so we had to ensure that patients that

20   are using it correctly continue therapy

21   until they moved to a different therapy.

22        Q.    Do you recall the statements

23   of the FDA that the benefits no longer

24   outweighed the risks of Opana?

1          MR. LIMBACHER:  Object to

2     form.

3          THE WITNESS:  All I can tell

4     you is that Endo worked with the

5     FDA, and the agreed-upon cease

6     shipping date was August 31st,

7     2017.

8  BY MR. BUCHANAN:

9     Q.    Do you recall when the

10 company went and talked to the FDA, I

11 guess it was a teleconference, in July of

12 2017, that the FDA once again said that

13 the benefits no longer outweighed the

14 risks of Opana ER?  Do you recall that,

15 ma'am?

16          MR. LIMBACHER:  Object to

17     form and foundation.

18          THE WITNESS:  I don't know

19     the outcome of that

20     teleconference.  I don't know

21     anything that went into that.

22 BY MR. BUCHANAN:

23     Q.    But as a factual matter, the

24 company continued to ship the product --

Highly Confidential - Subject to Further Confidentiality Review

 1              MR. LIMBACHER:  Object to

 2        form.

 3  BY MR. BUCHANAN:

 4        Q.    -- until the end of August;

 5   is that correct?

 6              MR. LIMBACHER:  Object to

 7        form.  Asked and answered.

 8              THE WITNESS:  All I can tell

 9        you is I know that the -- Endo and

10        FDA agreed that August 31st, 2017

11        was going to be our last shipping

12        date.  I don't know the details

13        behind that date.  I don't know

14        what went into it.  I can just

15        tell you that was my last shipping

16        date.

17              MR. BUCHANAN:  Did we pass

18        it over, Scott?

19              MR. SIEGEL:  This is being

20        marked as Exhibit-25.

21                   -  -  -

22              (Whereupon, EndoWalker

23        Exhibit-25,

24        ENDO_OPIOID_MDL_02062332-333, was

Highly Confidential - Subject to Further Confidentiality Review

1          marked for identification.)

2                    -  -  -

3     BY MR. BUCHANAN:

4          Q.    So this is an interaction

5     you're having, ma'am, after, I guess,

6     being alerted -- well, this is later in

7     time, right?

8                  This is June 12, 2017.  This

9     would be after you got word of the FDA

10    requesting the withdrawal of Opana ER

11    from the market.

12                  Do you recall that?

13         A.    Uh-huh.

14         Q.    Do you recall that?

15         A.    I'm sorry, the question?  I

16    was reading the e-mail so I can get up to

17    speed.

18                  Say that again, please.

19         Q.    Do you recall that after,

20    what was it, early June 2017, the FDA

21    requested the withdraw of Opana ER from

22    the market?

23         A.    Yes.

24         Q.    And you recall -- I guess

1  you were dealing and interacting with

2  various wholesalers, right?

3          MR. LIMBACHER:  Object to

4      form.

5          THE WITNESS:  Yes.

6  BY MR. BUCHANAN:

7      Q.    We're looking here at --

8          MR. BUCHANAN:  What did we

9      say this was, 26?

10          MR. SIEGEL:  25.

11  BY MR. BUCHANAN:

12      Q.    25, you're having some

13  interaction with Cardinal and McKesson

14  and with ABC, right?

15      A.    Yes.

16      Q.    Cardinal was looking into

17  what they were going to do, whether they

18  were going to continue to purchase this

19  drug that had been requested to be

20  withdrawn from the market, right?

21          MR. LIMBACHER:  Object to

22      form.

23          THE WITNESS:  Our

24      wholesalers were waiting for

1          direction from Endo as to what we

2          were going to do after the FDA

3          made that announcement.

4    BY MR. BUCHANAN:

5          Q.    And on June 12, I guess, you

6    talked to ABC.  Is that

7    AmerisourceBergen, ma'am?

8          A.    Yes, it is.

9          Q.    And you write, We talked to

10   ABC and it's business as usual until they

11   hear direction from Endo.

12               Is that right?

13         A.    Correct.

14         Q.    Business as usual, they're

15   going to continue to buy?

16               MR. LIMBACHER:  Object to

17         form.

18               THE WITNESS:  Right.  Until

19         Endo made a decision of what we

20         were going to do.

21   BY MR. BUCHANAN:

22         Q.    And you talked to McKesson,

23   and McKesson was also saying shipping and

24   business as usual with regard to this

Highly Confidential - Subject to Further Confidentiality Review

1   drug that the FDA had said the benefits

2   no longer outweigh the risks; is that

3   right?

4            MR. LIMBACHER:  Object to

5        form.

6            THE WITNESS:  That's what

7        the FDA said, yes.  But Endo

8        continued to ship.

9   BY MR. BUCHANAN:

10       Q.    Yeah.  They did.

11            And they shipped until the

12  end of August 2017, right?

13            MR. LIMBACHER:  Object to

14       form.  Asked and answered multiple

15       times.

16            THE WITNESS:  I know that

17       date was agreed upon between Endo

18       and the FDA.

19  BY MR. BUCHANAN:

20       Q.    You shipped $50 million

21  worth of Opana ER after the FDA told you

22  that the benefits no longer outweigh the

23  risks, right?

24       A.    I can't --

1          MR. LIMBACHER:  Object to

2     form.  Foundation.

3          THE WITNESS:  I can't

4     confirm the dollar value.  I don't

5     know.

6  BY MR. BUCHANAN:

7     Q.    Do you remember discounting

8  Opana ER to blow it out?

9          MR. LIMBACHER:  Object to

10    form.  Foundation.

11 BY MR. BUCHANAN:

12    Q.    In August of 2017, having

13 special programs with your wholesalers

14 for this drug for which the benefits no

15 longer outweighed the risk?

16         MR. LIMBACHER:  Object to

17    form.  Foundation.

18         THE WITNESS:  I know that we

19    had to stop shipping on August

20    31st, 2017.

21         And there are benefits to

22    Opana.

23 BY MR. BUCHANAN:

24    Q.    Not that are outweighed --

1    not that outweigh the risks, that's what

2    you were told, right?

3              MR. LIMBACHER:  Object to

4         form.

5              THE WITNESS:  That's what

6         the FDA stated.

7    BY MR. BUCHANAN:

8         Q.    Right.

9              MR. BUCHANAN:  Can I please

10        have 645?

11             MR. SIEGEL:  645 is being

12        marked as Exhibit-26.

13                  -   -   -

14             (Whereupon, EndoWalker

15        Exhibit-26,

16        ENDO_OPIOID_MDL_01681499-501, was

17        marked for identification.)

18                  -   -   -

19    BY MR. BUCHANAN:

20        Q.    I'm passing you what has

21    been marked as Exhibit-26 to your

22    deposition, ma'am.

23             We're at the end of August

24    2017.  You send an e-mail out to several

Highly Confidential - Subject to Further Confidentiality Review

1  colleagues at UPS talking about the Opana

2  transition, right?

3       A.    Uh-huh.

4       Q.    Do you recall this e-mail,

5  ma'am?

6            MR. LIMBACHER:  Take your

7       time and read the document.

8  BY MR. BUCHANAN:

9       Q.    Do you recall this e-mail,

10  ma'am?

11       A.    I do.

12       Q.    So August 22nd, 2017 would

13  be the earliest in time.  It's the bottom

14  of the first page.

15            You note there's going to be

16  a lot of information that you're going to

17  outline below, and you then set forth

18  various categories of information, fair?

19       A.    Yes.

20       Q.    Okay.  Orders, Some

21  wholesalers are participating in a

22  transition program in which they can

23  purchase certain inventory to ensure

24  patients have enough during this period.

1          Did I read that correctly?

2     A.     Yes, you did.

3     Q.     Yeah.  You have alerted the

4  UPS SOM team about this program as the

5  orders will be larger than normal, right?

6     A.     Uh-huh.

7     Q.     Is that right?

8     A.     Yes.

9     Q.     There is a promotion set up

10  in SAP that will need to be applied to

11  the orders.

12          Do you recall that?

13     A.     That's what you're stating,

14  yes.

15     Q.     Well, that's what you wrote,

16  right?

17     A.     Yes.

18     Q.     Okay.  And what you were

19  doing is you were giving these

20  distributors 20 percent off, right?

21          MR. LIMBACHER:  Object to

22     form.

23          THE WITNESS:  I believe it

24     was something like that, yes.

1    BY MR. BUCHANAN:

2        Q.    20 percent off on a drug

3    that the benefits no longer outweigh the

4    risks, that you're pushing out the door

5    in the last two weeks of August 2017

6    before the cutoff, do I understand that

7    correctly?

8                MR. LIMBACHER:  Object to

9            form.

10               THE WITNESS:  But there are

11           patients that use this product and

12           need this product, and we wanted

13           to ensure there was enough out

14           there for these patients during

15           the transition period so they can

16           work with their healthcare

17           provider to go on to some type of

18           other therapy.

19   BY MR. BUCHANAN:

20       Q.    Getting back to my question,

21   ma'am, do I have correctly what, in fact,

22   you were doing at the end of August of

23   2017?

24               MR. LIMBACHER:  Object to

Highly Confidential - Subject to Further Confidentiality Review

1          form.  I think she answered your

2          question.

3                  THE WITNESS:  I answered

4          your question.  That's what we

5          were doing.  We were shipping

6          these orders to ensure that

7          patients that needed this product

8          had enough during the transition

9          period so they could work with

10          their healthcare provider to go on

11          a different therapy.

12   BY MR. BUCHANAN:

13          Q.    20 percent off?

14          A.    I -- that was --

15                  MR. LIMBACHER:  Object to

16          form.

17                  THE WITNESS:  I had nothing

18          to do with that.

19   BY MR. BUCHANAN:

20          Q.    Is that a true statement, 20

21   percent off?

22          A.    I think there was 20 percent

23   off.  But that has nothing to do with me.

24   I don't make those decisions --

```
 1           Q.    20 percent off --

 2                 MR. LIMBACHER:  Object to

 3           form.

 4   BY MR. BUCHANAN:

 5           Q.    -- blowing the inventory out

 6   to your wholesale customers, right?

 7                 MR. LIMBACHER:  Object to

 8           form.

 9                 THE WITNESS:  We were not

10           blowing inventory out to our

11           customers.  We wanted to ensure

12           there was enough on the market so

13           patients had enough during this

14           transition period.

15   BY MR. BUCHANAN:

16           Q.    In fact, ma'am, you told the

17   FDA, in the summer of 2017, you were

18   going to stop producing Opana then,

19   right?

20                 MR. LIMBACHER:  Object to

21           form.

22   BY MR. BUCHANAN:

23           Q.    Stop making it --

24                 MR. LIMBACHER:  Are you
```

1    suggesting --

2    BY MR. BUCHANAN:

3        Q.    -- in July of 2017?

4            MR. LIMBACHER:  -- that Mrs.

5    Walker --

6    BY MR. BUCHANAN:

7        Q.    Are you aware of that?

8            MR. LIMBACHER:  -- made that

9    representation?

10   BY MR. BUCHANAN:

11       Q.    Are you aware of that?

12           MR. LIMBACHER:  Aware of

13   what?  What is the question?

14           MR. BUCHANAN:  If you would

15   stop stepping on my question, you

16   can read it.

17           MR. LIMBACHER:  I object to

18   the form of your question,

19   because --

20   BY MR. BUCHANAN:

21       Q.    Go ahead, you can answer.

22           MR. LIMBACHER:  -- it's

23   vague and unclear who you're

24   talking about.

```
 1                    THE WITNESS:  Clarify your

 2         question, please.

 3    BY MR. BUCHANAN:

 4         Q.    Are you aware the company

 5    represented to the FDA it was going to

 6    stop making it in July of 2017?

 7                    MR. LIMBACHER:  Object to

 8         form and foundation.

 9    BY MR. BUCHANAN:

10         Q.    Stop making it then.

11         A.    We did stop making it.  We

12    did not make any more product.

13         Q.    So what you were doing,

14    then, at the end of the August of 2017

15    was blowing out your excess inventory for

16    20 percent off?

17                    MR. LIMBACHER:  Object to

18         form and foundation.

19                    THE WITNESS:  No.  We were

20         not.

21                    MR. LIMBACHER:  Asked and

22         answered.

23    BY MR. BUCHANAN:

24         Q.    Is it not true that you
```

1    offered a 20 percent discount on this

2    drug that the FDA had asked you to

3    withdraw from the market in June of 2017?

4    Is that true that you were doing that,

5    ma'am?

6                    MR. LIMBACHER:  Object to

7            form.  Foundation.  Asked and

8            answered multiple times.

9                    THE WITNESS:  I do not make

10           the decisions around any type of

11           promotion with our customers.

12                   All I -- may I finish,

13           please?

14                   All I can tell you is we --

15                   MR. LIMBACHER:  You can

16           finish.

17                   THE WITNESS:  All I can tell

18           you is we wanted to ensure that

19           there was enough inventory at the

20           pharmacies for patients as a

21           transition through this period as

22           they worked with a healthcare

23           provider to go on a different

24           therapy.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BUCHANAN:
 2         Q.    Special offering for your
 3    wholesalers, 20 percent discount on
 4    Opana, before you voluntarily withdraw it
 5    from the market on September 1, 2017;
 6    that's what the company did, right?
 7              MR. LIMBACHER:  Object to
 8         form.  Foundation.  I don't know
 9         what document you're reading from,
10         counsel.
11    BY MR. BUCHANAN:
12         Q.    Is that true?
13              MR. LIMBACHER:  Object to
14         form.  Foundation.
15              THE WITNESS:  I know that
16         there --
17              MR. LIMBACHER:  Asked and
18         answered.
19              THE WITNESS:  I don't make
20         the decisions around the offering
21         that was made.  That was not my
22         decision.
23    BY MR. BUCHANAN:
24         Q.    I just want to make sure the
```

1   record is not fuzzy.

2           As a factual matter, are you

3   aware that two weeks before you were

4   scheduled to withdraw Opana ER from the

5   market, you offered your wholesalers a 20

6   percent discount on Opana ER?  Are you

7   aware of that?

8       A.    Yes, I am.

9           MR. LIMBACHER:  Object to

10      form.  Foundation.

11          MR. BUCHANAN:  Can I have,

12      please, 756?

13          MR. SIEGEL:  Being marked as

14      Exhibit-27.

15              -   -   -

16          (Whereupon, EndoWalker

17      Exhibit-27,

18      ENDO_OPIOID_MDL_02290107-110, was

19      marked for identification.)

20              -   -   -

21  BY MR. BUCHANAN:

22      Q.    I'm passing you, ma'am,

23  what's been marked as Exhibit-27 to your

24  deposition.

1           It's an e-mail exchange
2    beginning August 17th, 2017, right?
3           A.    Yes.
4           Q.    It's going from a Mary Jo
5    Magrone to Sal Grausso.
6                 He was your boss at that
7    point in time?
8           A.    He was.
9           Q.    Still is?
10          A.    Yes.
11          Q.    E-mail going to him and
12   others.  It says, Dear branded pricing
13   committee.
14                Do you see that?
15          A.    I do.
16          Q.    Attached for your review is
17   an Opana ER wholesaler promotion to be
18   offered immediately upon BPC approval.
19   The offering includes a 20 percent
20   reduction from WAC -- what's that, ma'am?
21          A.    WAC, wholesaler price, list
22   price.
23          Q.    Wholesaler price?
24          A.    List price.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     -- to be extended to the

2   wholesaler segment as an off invoice

3   discount.

4              What's that mean?

5      A.     They get 20 percent off the

6   list price.

7      Q.     And it looks like Ms.

8   Magrone is looking for a prompt response

9   so that this can be approved by the

10  pricing committee and get out to the

11  wholesalers, right?

12             MR. LIMBACHER:  Object to

13       form.

14             THE WITNESS:  Yes.  She sent

15       this to the pricing committee.

16  BY MR. BUCHANAN:

17     Q.     Is your boss on the pricing

18  committee?

19     A.     Sal Grausso is listed, yes.

20     Q.     And we see on the next page,

21  Background market overview.  On 9/1/17,

22  Endo will voluntarily withdraw Opana ER

23  from the market at the request of FDA.

24             Correct?

1          A.     Correct.

2          Q.     You have that understanding,

3     ma'am, that the FDA had said the benefits

4     no longer outweigh the risks?  Are you

5     aware of that?

6               MR. LIMBACHER:  Object to

7          form.  Asked and answered.

8               THE WITNESS:  That's what

9          the FDA said.

10    BY MR. BUCHANAN:

11         Q.     Issued a release in June of

12    2017 to that effect, correct?

13              MR. LIMBACHER:  Object to

14         form.  Asked and answered.

15              THE WITNESS:  The FDA did,

16         yes.

17    BY MR. BUCHANAN:

18         Q.     Had an advisory committee,

19    what, back in March of 2017, correct?

20              MR. LIMBACHER:  Object to

21         form.  Foundation.

22              THE WITNESS:  I can't speak

23         to that advisory committee.  I

24         don't know what that is.

1    BY MR. BUCHANAN:

2          Q.    So here we are two weeks

3    before the drug gets pulled, and the

4    background market overview reports to

5    your customer segment that you're going

6    to withdraw Opana ER at the request of

7    the FDA on September 1, 2017, right?

8          A.    That's what it states, yes.

9          Q.    Okay.  And then your

10   specific request, In support of the

11   above, this proposal requests approval

12   for the following wholesaler offering.

13              And, again, this is a

14   request for pricing approval to the brand

15   committee, correct?

16              MR. LIMBACHER:  Object to

17         form.

18              THE WITNESS:  It is.

19   BY MR. BUCHANAN:

20         Q.    Discount, 20 percent

21   discount from WAC given as an off invoice

22   discount, correct?

23         A.    Uh-huh.

24         Q.    Applied to all wholesalers,

Highly Confidential - Subject to Further Confidentiality Review

1  right?

2         A.    If they participated.

3         Q.    Okay.  And you're offering a

4  one-time buy, right?

5         A.    It's a one-time order.  It's

6  a transition order.

7         Q.    And did you get any

8  excessive orders at the end of August

9  2017 for Opana ER?

10                MR. LIMBACHER:  Object to

11         form.

12                THE WITNESS:  I don't

13         recall.  I'm sure we did.  It's

14         probably in this listed.

15                But, again --

16  BY MR. BUCHANAN:

17         Q.    You would agree, ma'am, that

18  you didn't cease any orders, right?

19                MR. LIMBACHER:  Object to

20         form.

21                THE WITNESS:  We did not,

22         because this was a transition to

23         ensure our patients were properly

24         transitioned by their physician to

Highly Confidential - Subject to Further Confidentiality Review

```
 1              another therapy, because they

 2              could no longer take Opana.

 3   BY MR. BUCHANAN:

 4         Q.    Was that $100 million worth

 5   of Opana that you sold, "you" being Endo,

 6   after the FDA advisory committee in March

 7   of 2017?

 8         A.    I don't--

 9              MR. LIMBACHER:  Object to

10         form and foundation.

11              THE WITNESS:  I have no

12         idea.  I can't confirm.  I don't

13         know what the sales were.

14   BY MR. BUCHANAN:

15         Q.    It sounds like you had

16   visibility, within your ordering system,

17   to the net revenue on a particular sale,

18   as well as the gross revenue, right?

19              MR. LIMBACHER:  Object to

20         form.

21              THE WITNESS:  It's on the

22         order.  But sales, that's not my

23         responsibility to know that.

24              MR. BUCHANAN:  651.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -   -   -

 2               (Whereupon, EndoWalker

 3          Exhibit-28,

 4          ENDO_DATA-OPIOID_MDL00000019, With

 5          Attachment, was marked for

 6          identification.)

 7                     -   -   -

 8  BY MR. BUCHANAN:

 9          Q.    I'm passing you next in

10  order, ma'am.

11               MR. SIEGEL:  It's being

12          marked as Exhibit-28.

13  BY MR. BUCHANAN:

14          Q.    Exhibit-28.

15               MR. LIMBACHER:  Can we pull

16          this up on the screen?  This is

17          produced natively, so let's go to

18          the first page of the spreadsheet.

19          Actually, let's go to the second

20          page of the spreadsheet.

21  BY MR. BUCHANAN:

22          Q.    Have you ever seen these

23  reports before?

24          A.    No.  I'm assuming this is
```

Highly Confidential - Subject to Further Confidentiality Review

1    out of SAP.

2           Q.    END contribution, MGN by

3    MPH.

4                 Do you see that?

5           A.    I do.

6           Q.    Excluding Interco.

7                 Do you see that?

8           A.    I do.

9           Q.    The product hierarchy lists

10   the product number and the product name.

11                Do you see that?

12          A.    Uh-huh.

13          Q.    You see what sheet we're on,

14   Opana ER.

15                Is that the sheet you're on?

16          A.    It just says, Opana.

17          Q.    If you go to the second

18   page.

19                You manufactured multiple

20   controlled substances, correct?

21                MR. LIMBACHER:  Object to

22          form.

23                THE WITNESS:  We do.

24   BY MR. BUCHANAN:

1    Q.    Okay.  If we go to that page

2    that says Opana ER, you see revenue?  Do

3    you see the top line, revenue?

4         A.    Yes.

5         Q.    And then there's Period 1,

6    2, 3, all the way up to 12, and then a

7    year to date at the end.

8              Do you see that, ma'am?

9         A.    I do.

10        Q.    Do you recognize period 1 as

11   the first month of the year and period 2

12   the second month?

13        A.    Yes.

14        Q.    You're familiar with reports

15   that look like this, right?

16        A.    This is a financial report,

17   I don't -- this is not something I see or

18   generate.

19        Q.    Okay.  That FDA advisory

20   committee to consider Opana ER that was

21   in March; is that right?

22        A.    I don't know.

23        Q.    We see revenue of Opana ER

24   from March was about $26 million, right?

```
 1                    MR. LIMBACHER:  Object to
 2          form.  Foundation.
 3                    THE WITNESS:  It says $26
 4          million.
 5   BY MR. BUCHANAN:
 6          Q.    From April was $17.9
 7   million, right?
 8                    MR. LIMBACHER:  Same
 9          objection.
10                    THE WITNESS:  That's what it
11          states.
12   BY MR. BUCHANAN:
13          Q.    For May is $22.8 million,
14   right?
15                    MR. LIMBACHER:  Form and
16          foundation.
17                    THE WITNESS:  That's what it
18          states.
19   BY MR. BUCHANAN:
20          Q.    From June is $21.8 million,
21   right?
22                    MR. LIMBACHER:  Form and
23          foundation.
24                    THE WITNESS:  Uh-huh.
```

1   BY MR. BUCHANAN:

2        Q.   From July is $12.2 million,

3   right?

4        A.   Yes.

5             MR. LIMBACHER:  Objection.

6        Form and foundation.

7   BY MR. BUCHANAN:

8        Q.   Period 8, it looks like you

9   sold more in August than you did in July,

10  right?

11            MR. LIMBACHER:  Objection.

12       Form and foundation.

13            THE WITNESS:  That's what

14       this report states.

15  BY MR. BUCHANAN:

16       Q.   As you're going out of

17  business with Opana ER?

18       A.   I can't speak to this

19  report.  I don't know what's generated

20  behind this report.  This is a financial

21  report.  I'm not in finance.  I can't

22  speak to it.

23       Q.   Okay.  It's over $100

24  million in sales between March and the

1    time you withdrew it from the market.

2              Did you know that, ma'am?

3         A.    No.

4              MR. LIMBACHER:  Objection.

5         Form and foundation.

6              THE WITNESS:  I did not.

7              Again, this is a financial

8         report, I'm not in finance.

9    BY MR. BUCHANAN:

10        Q.    Did you know it was more

11   than $50 million in sales -- or $50

12   million in sales between June and August

13   before you took it off the market?

14             MR. LIMBACHER:  Objection.

15        Form and foundation.

16   BY MR. BUCHANAN:

17        Q.    When the FDA requested in

18   June that it be withdrawn?

19        A.    I can't speak to the finance

20   of the company.  I'm not in finance.

21        Q.    I just wanted to -- while

22   we're on this sheet, you see there's a

23   line item on this sheet for chargebacks?

24        A.    I do.

1    Q.    Do you see each period is

2  reporting chargebacks?

3    A.    Yes.

4    Q.    And the sheet that we're

5  looking at is for Opana ER, correct?

6    A.    Yes.

7    Q.    All right.  Do you see for

8  August, Period 8 -- actually, if you look

9  about halfway down on the left, there is

10 a line item for sales promotions.

11          Do you see that?

12   A.    I do.

13   Q.    What sales promotion amount

14 was credited for January?

15   A.    Nothing.

16   Q.    What about was credited for

17 February?

18          MR. LIMBACHER:  Objection.

19          Form and foundation.  Objection to

20          all these questions with regard to

21          a document that she's told you

22          repeatedly she knows nothing

23          about --

24 BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What amount --

2          MR. LIMBACHER:  -- and has

3    never seen before.

4          MR. BUCHANAN:  Move to

5    strike.

6          MR. LIMBACHER:  You're going

7    to have an opportunity to ask

8    these questions of people who

9    might actually know something

10   about it.

11   BY MR. BUCHANAN:

12   Q.    What amount for sales

13   promotions, ma'am, was credited for

14   Period 3, March of 2017?

15         MR. LIMBACHER:  Same

16   objection.  Form and foundation.

17         THE WITNESS:  Zero.

18   BY MR. BUCHANAN:

19   Q.    What amount was credited for

20   April?

21         MR. LIMBACHER:  Same

22   objection.  Form and foundation.

23         THE WITNESS:  Zero.

24   BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    What amount was credited for

2  May?

3            MR. LIMBACHER:  Same

4      objection.  Form and foundation.

5            THE WITNESS:  Zero.

6  BY MR. BUCHANAN:

7      Q.    How about June?

8            MR. LIMBACHER:  Same

9      objection.  Form and foundation.

10            THE WITNESS:  Zero.

11  BY MR. BUCHANAN:

12      Q.    July?

13            MR. LIMBACHER:  Same

14      objection.  Form and foundation.

15            THE WITNESS:  Zero.

16  BY MR. BUCHANAN:

17      Q.    And when you were blowing it

18  out in August, what amount was credited

19  for sales promotions?

20            MR. LIMBACHER:  Same

21      objection.  Form and foundation.

22      And argumentative.

23            THE WITNESS:  Blowing it out

24      is not my word.  We had to

1          transition orders to our

2          wholesalers to ensure our patients

3          had enough inventory to get them

4          through the transition period as

5          they worked with their healthcare

6          provider on a new therapy.

7   BY MR. BUCHANAN:

8          Q.    What promotional amount did

9   you book on this sheet -- or the company

10  book on this sheet for promotional

11  activity of Opana in the days leading up

12  to its withdrawal from the market?

13              MR. LIMBACHER:  Objection.

14         Form and foundation.

15              THE WITNESS:  I'm not --

16  BY MR. BUCHANAN:

17         Q.    Just read the number, ma'am.

18         A.    It's 20 percent.  But that's

19  not my decision.  That's not my decision.

20              MR. BUCHANAN:  Let's take a

21         short break.

22              VIDEO TECHNICIAN:  We're

23         going off the record.  The time is

24         4:45.

1          Did I read that correctly?

2     A.     Uh-huh.

3     Q.     Okay.  And let's skip up to

4    the very top of the page, where you

5    appear to be responding to the team,

6    including Linda and Peter, on --

7     A.     Yes.

8     Q.     -- November 29th.

9          You say, I know that

10   Cardinal has really increased their SOM

11   program, so I'm wondering if they are

12   cutting them off because they are

13   ordering too much.

14    A.     Right.

15    Q.     Did I read that correctly?

16    A.     You did.

17    Q.     Now, on what were you basing

18   that observation?

19    A.     Again, it's just --

20          MR. LIMBACHER:  Object to

21       form.

22          THE WITNESS:  -- like I

23       stated, that's just my opinion.  I

24       guess, if I recall, just

Highly Confidential - Subject to Further Confidentiality Review

1          conversations maybe with Cardinal

2          back at that time.  I don't really

3          remember.

4     BY MR. LENISKI:

5          Q.    Well, you make the

6     statement, it's affirmative, Cardinal has

7     really increased their SOM program,

8     right?

9          A.    I state that, yes.  That's

10    what it says.

11         Q.    Do you know -- you remember

12    having discussions with Cardinal on that

13    point?

14         A.    I don't remember having

15    discussions with Cardinal directly.  It's

16    back in 2012.  I don't remember.

17         Q.    Do you recall whether -- or

18    why Cardinal had increased their SOM

19    program at this time of November 2012?

20              MR. TULLY:  Object to the

21         form.

22              THE WITNESS:  Probably

23         because of the opioid crisis,

24         everybody was redoing their SOM

Highly Confidential - Subject to Further Confidentiality Review

1          programs or making enhancements

2          and making changes.

3     BY MR. LENISKI:

4          Q.    Were you aware of other

5     wholesalers who were increasing their SOM

6     program at the same time, late 2012?

7          A.    No.   All I know is our

8     wholesalers have an SOM program.   I don't

9     know the details behind the programs.

10         Q.    Why did Peter believe you

11    might have information about this issue

12    that's affecting Florida and pharmacies

13    not being able to get Opana ER?

14              MR. LIMBACHER:   Object to

15         form.

16    BY MR. LENISKI:

17         Q.    Do you have any idea?

18         A.    Because UPS is our 3PL,

19    third-party logistics company, and we

20    partner with them on anything to do with

21    Endo's business.   So it's not unusual for

22    him to reach out.

23         Q.    Did you represent to Peter

24    that you had understanding about your

1    wholesalers' SOM programs in addition to

2    Endo's SOM program?

3          A.    I don't recall.  I mean,

4    just based on what my e-mail says, yes.

5          Q.    Was that something you

6    tracked, was what your wholesalers were

7    doing with their SOM programs?

8          A.    No.  We just know that our

9    wholesalers have SOM programs.  I don't

10    know the details behind the SOM programs

11    at our wholesalers.

12          Q.    And then you go on to say,

13    in the same e-mail, All we can state is

14    that we have plenty of inventory and it's

15    not on backorder and our wholesalers have

16    it in stock.

17                Correct?

18          A.    That's correct.  At this

19    time, obviously, we were off our supply

20    issue and our wholesalers have inventory.

21    If the patients can't get it, that's not

22    my -- all we can tell them is that it's

23    not on backorder.

24          Q.    Other than individuals in

1    this e-mail, did you discuss your

2    statement here that Cardinal may have

3    stopped shipping to Florida pharmacies

4    due to concerns about over-ordering with

5    anyone else at Endo?

6         A.    Not that I recall.

7         Q.    Never elevated that

8    observation to anyone else, to your

9    knowledge?

10        A.    Not that I recall.

11        Q.    Do you believe you're

12   obligated to do that?

13             MR. LIMBACHER:  Object to

14        form.

15             THE WITNESS:  No.

16             MR. LENISKI:  Ms. Walker,

17        pending any questions from

18        counsel, I think I'm finished.

19        Thank you very much.

20             MR. LIMBACHER:  Thank you.

21             VIDEO TECHNICIAN:  Going off

22        record.  The time is 5:42.

23                  -  -  -

24             (Whereupon, a brief recess

Highly Confidential - Subject to Further Confidentiality Review

1          was taken.)

2                    -  -  -

3          VIDEO TECHNICIAN:  We're

4          going back on the record.  The

5          beginning of Media File Number 10.

6          The time is 5:46.

7                    -  -  -

8          EXAMINATION

9                    -  -  -

10  BY MR. LIMBACHER:

11          Q.   Good evening, Mrs. Walker.

12  I know it's been a very long day, and I'm

13  sure you're very tired and are looking

14  forward to getting home.  But this is my

15  opportunity to ask you a few questions

16  and to kind of present you to the jury so

17  they have an opportunity to get to know

18  you just a little bit.

19          Can you tell us, and I know

20  some of these things we've covered

21  earlier, can you tell us, are you

22  currently employed at Endo?

23          A.   Yes, I am.

24          Q.   And when did you begin

```
 1    working for Endo?

 2           A.     November 2nd, 1998.

 3           Q.     And can you tell us your

 4    current job title?

 5           A.     I'm the director of

 6    distribution and customer service for

 7    Endo.

 8           Q.     And before we get into your

 9    job responsibilities and your history,

10    can you tell us, did you go to college?

11           A.     I did.

12           Q.     And where did you go?

13           A.     Wilmington College.

14           Q.     And when did you graduate?

15           A.     May of 1995.

16           Q.     What degree did you receive?

17           A.     Bachelor's in business

18    management.

19           Q.     And kind of walk us through,

20    very briefly, your work history after you

21    received your degree from Wilmington

22    College.

23                  Where did you first work?

24           A.     I actually started working
```

1    at DuPont in October of '89.  So I got my

2    degree at night going to Wilmington

3    College.

4         Q.    And when you first started

5    working at DuPont, what did you do?

6         A.    I delivered mail.  I pushed

7    a mail cart and delivered mail.

8         Q.    And about how long were you

9    doing that at DuPont?

10        A.    Probably about two years,

11   two and-a-half, give or take.

12        Q.    And then at some point in

13   time, did you start to work in the

14   customer service department at DuPont?

15        A.    Yes.  Then I moved over to

16   the customer service department.  It was

17   DuPont Merck at the time.

18        Q.    And when did you join Endo?

19   I think you said 1998; is that right?

20        A.    Yes.  November of '98.

21        Q.    And in what department were

22   you first employed at Endo?

23        A.    I was -- I've always been in

24   the customer service and distribution

1    department at Endo.

2         Q.    And have you received any

3    promotions over the 20 years that you've

4    been working for Endo?

5         A.    Yes, a few.

6         Q.    And tell us, what are the

7    different roles and job titles that

8    you've held at Endo?

9         A.    I came in as a contract

10   analyst.  Then I was promoted to

11   supervisor of distribution, manager of --

12   I forget the exact title.  Manager within

13   customer service, then associate director

14   and then director.

15        Q.    And when did you become

16   associate director of customer service at

17   Endo, if you remember?

18        A.    2003, 2004, something like

19   that.

20        Q.    And when did you become the

21   director of customer service?

22        A.    2015.

23        Q.    And what have been your

24   basic job responsibilities over time, as

Highly Confidential - Subject to Further Confidentiality Review

1   both associate director and director of

2   customer service in distribution?

3           A.    One of the main functions is

4   to manage the UPS relationship.  And then

5   anything around customer service and

6   distribution for the branded products.

7           Q.    And before we get into

8   details, has Endo's distribution team had

9   a monitoring program in place to track

10  suspicious orders of branded opioids?

11          A.    Yes, we did.

12          Q.    And since you've been at the

13  company, has Endo's distribution team

14  always had safeguards in place to prevent

15  diversion of Endo's opioids?

16              MR. BUCHANAN:  Objection to

17          form.

18              THE WITNESS:  Yes, we have.

19  BY MR. LIMBACHER:

20          Q.    Now, let's walk through how

21  an order for branded opioids comes in to

22  the company.

23              First, who are Endo's

24  customers for their branded opioids?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    As it relates to opioids,

2  the customers are our wholesalers.

3    Q.    And are there any

4  particularly large wholesaler customers

5  that Endo sells its branded opioids to?

6    A.    We have three large

7  wholesale customers; AmerisourceBergen,

8  Cardinal and McKesson.

9    Q.    And are the majority of the

10  sales of branded opioids, as you

11  understand it for Endo, sold to those

12  three large national wholesalers?

13    A.    Yes.  I believe they make up

14  about 90 percent of the business.

15    Q.    Do pharmacies ever place an

16  order with Endo for branded opioids?

17    A.    No.

18    Q.    What about a doctor's

19  office, do they ever order opioids

20  directly from Endo?

21    A.    No.

22    Q.    And what about a pain

23  clinic, do they ever order branded

24  opioids directly from Endo?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      No.

2        Q.      What about manufacturing of

3   the branded opioids at Endo sales, has

4   Endo itself manufactured those branded

5   opioids?

6        A.      We've always had contract

7   manufacturers for Endo.

8        Q.      And once the branded opioids

9   are manufactured by the contract

10  manufacturers, where are they stored?

11       A.      Once they're made, they are

12  shipped to UPS Supply Chain Solutions in

13  Memphis, Tennessee.  And that's where the

14  distribution is done, and that's where

15  they are stored.

16       Q.      And how long has that been

17  the case?

18       A.      We've been in Memphis since

19  April of 2000.

20       Q.      And is the warehouse that's

21  in Tennessee, is that guarded?

22       A.      Yes.

23       Q.      And how are the branded

24  opioids then distributed from Endo to the

Highly Confidential - Subject to Further Confidentiality Review

 1          A.    Our orders went through our

 2   SOM program and again at UPS.  And no.

 3          Q.    Stay with my question,

 4   ma'am.

 5                In 2010, were vice

 6   presidents and senior vice presidents

 7   those that were authorized to release

 8   orders and excessive orders?

 9          A.    No.

10          Q.    To the best of your

11   knowledge, ma'am, did a vice president or

12   senior vice president ever release an

13   excessive order?

14                MR. LIMBACHER:  Object to

15          form.

16                THE WITNESS:  Not to my

17          knowledge.

18   BY MR. BUCHANAN:

19          Q.    So if these were the

20   representations of the company to law

21   enforcement and the DEA in 2006, would it

22   be fair to say it wasn't done that way?

23                MR. LIMBACHER:  Object to

24          form.

1             THE WITNESS:  I don't know

2        what this document is.  I've never

3        seen this document until today.

4        So I don't know.

5   BY MR. BUCHANAN:

6        Q.    Looking at David Kerr, he

7   was, in fact, the vice president -- a

8   vice president with Endo Pharmaceutical,

9   Inc., correct?

10        A.    That's what it states on his

11   e-mail.

12        Q.    I am meeting with Philly DEA

13   tomorrow with Nick.  I am digging around

14   for that one-page graphic that is the

15   risk MAP showing the control flow

16   provided by Jill Connell.

17             Jill was your boss?

18        A.    She was.

19        Q.    And, Do you have access to

20   that copy and can you send today?

21             There's a reply from Heather

22   Mullen.

23             Who is Heather?

24        A.    I don't know.

1    Q.    Okay.  Yes, here it is.

2    Distribution chart, along with all the

3    docs that I put together that you might

4    use, in addition to a blue folder for law

5    enforcement meetings.

6              Do you see that?

7    A.    Yes.

8    Q.    Let me know if you need

9    anything else and let me know how it

10   goes.

11             Do you see that, ma'am?

12   A.    I do.

13   Q.    You were asked some

14   questions about Exhibit-15, which you

15   discussed in examination with me earlier

16   today.

17             Do you recall discussing

18   this e-mail thread, Exhibit-15, that

19   counsel just asked you some follow-up

20   questions on?

21   A.    Exhibit-15?

22   Q.    Yes.

23   A.    Yes.

24   Q.    Okay.  I think you said that

1   there was a reason why these orders had

2   to be cut in size or downsized.

3           Do you recall that?

4      A.    Correct.  We had a supply

5   issue at this time on Opana.

6      Q.    We spent some time going

7   through a SAP report, a SOM audit trail

8   report.

9           Do you recall doing that

10  with me?

11     A.    I do.

12     Q.    Does that system, in fact,

13  track whether orders were cut in size?

14     A.    I would have to look at it

15  to confirm that.  But I would assume --

16     Q.    The order that you

17  received --

18     A.    -- yes.

19     Q.    Does it keep track of

20  whether the company, notwithstanding the

21  initial order that was provided by the

22  customer, cut the order in size?

23     A.    Yes, it keeps the history of

24  the order.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So there's, in fact, an

audit trail tracking the circumstances

when the company cut order size?

4    A.    Within the order there is,

yes.

6    Q.    And are the reasons for that

cut documented in the order system?

8    A.    They should --

9         MR. LIMBACHER:  Object to

10        form.

11        THE WITNESS:  They should

12        be.

13  BY MR. BUCHANAN:

14   Q.    To your knowledge, they are?

15   A.    They should be, yes.

16   Q.    Okay.  You were shown a

document, 35, Exhibit-35, UPS audit.

18        Do you recall that?

19   A.    Yes.

20   Q.    That wasn't the first time

that you all audited UPS, correct?

22   A.    No.  UPS has been audited

many times over the years.

24   Q.    Okay.

1          MR. BUCHANAN:  Could I have

2      578, please?

3              -  -  -

4          (Whereupon, EndoWalker

5      Exhibit-36,

6      PAR_OPIOID_MDL_0000404285, was

7      marked for identification.)

8              -  -  -

9          MR. SIEGEL:  578 being

10      marked as Exhibit-36.

11          MR. BUCHANAN:  Pass it over

12      to counsel, please, and one for

13      the witness.

14  BY MR. BUCHANAN:

15      Q.    I'm showing you what's been

16  marked as Exhibit-36 to the deposition.

17  A summary of teleconference with UPS

18  regarding SOMS, February 13, 2013.

19          Do you see that, ma'am?

20      A.    I do.

21      Q.    And you're listed as an

22  attendee at this meeting, right?

23      A.    Uh-huh.

24      Q.    Do you have it before you

Highly Confidential - Subject to Further Confidentiality Review

1   now?  I'm sorry, I can't see over the

2   screen.

3          A.    I do, I have it.

4          Q.    Thank you.

5                I'd like to direct your

6   attention -- you see this list of

7   questions reflected here?

8          A.    I see them, yes.

9          Q.    And then you see answers

10  following the questions in a different

11  color?

12         A.    Yes.

13         Q.    Let's scroll down here.

14  Start with 8.

15               Have you ever reported a

16  suspicious order to any regulatory agency

17  for an Endo/Qualitest product?

18               Do you see that question to

19  UPS?

20         A.    I do.

21         Q.    And what was the answer,

22  ma'am?

23         A.    No.

24         Q.    Do you ever visit customers

1    in person who are deemed suspicious?

2              Do you see that question?

3         A.    I do.

4         Q.    It says, Not currently.

5              Right?

6         A.    That's what it says.

7         Q.    It says, Clients may have

8    their sales reps visit customers.

9              Do you see that?

10        A.    Yes, I see it.

11        Q.    Vis-à-vis the relationship

12   with UPS, you were the client, right?

13             MR. LIMBACHER:  Object to

14        form.

15             THE WITNESS:  Yes.  Endo was

16        the client at this time.

17   BY MR. BUCHANAN:

18        Q.    Do I understand your

19   testimony correctly, ma'am, that to the

20   best of your knowledge, as of 2013, Endo

21   was not visiting any of its customers

22   that it deemed suspicious, correct?

23             MR. LIMBACHER:  Object to

24        form.  Foundation.  Misstates her

1          testimony.

2               THE WITNESS:  I believe

3          Qualitest was doing customer site

4          visits.

5    BY MR. BUCHANAN:

6          Q.    As of February 13, 2013,

7    ma'am?

8          A.    I don't know the exact date

9    that Qualitest started doing customer

10   visits, but I know they did customer

11   visits.

12         Q.    At a point in time they did,

13   correct?

14         A.    Correct.  I don't know the

15   date when that started.

16         Q.    You know they revamped their

17   SOM system, too, after the DEA came and

18   knocked on their door in 2013, right?

19              MR. LIMBACHER:  Object to

20         form.

21              THE WITNESS:  I can't speak

22         to Qualitest's SOM program.

23   BY MR. BUCHANAN:

24         Q.    Then let's focus on Endo's

1    SOM program.

2                    At this point in time, in

3    February of 2013, are you aware of any

4    Endo employees going and visiting

5    customers that it deemed suspicious?

6                    MR. LIMBACHER:  Object to

7         form.  Asked and answered.

8                    THE WITNESS:  Not that I

9         recall.

10   BY MR. BUCHANAN:

11        Q.    Any customers of Endo

12   customers that it seemed suspicious?

13                    MR. LIMBACHER:  Object to

14        form.  Asked and answered.

15                    THE WITNESS:  Not that I

16        recall.

17   BY MR. BUCHANAN:

18        Q.    Okay.  There's also a

19   question about how do you know your

20   customer's customer.

21                    Do you see that?

22        A.    Question 10 I'm assuming

23   you're referring to?

24        Q.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1     A.    Uh-huh.

2     Q.    It was a question that was

3  being put by Endo to UPS, right?

4     A.    Yes.

5     Q.    Okay.  And as of this point

6  in time, they didn't have that

7  functionality where they were visiting

8  customers' customers or knowing

9  customers' customers, right?

10          MR. LIMBACHER:  Object to

11      form.

12          THE WITNESS:  That's what it

13      states.

14  BY MR. BUCHANAN:

15     Q.    And you didn't either,

16  right?

17     A.    Endo did not provide -- do

18  not do site visits.  But I believe

19  Qualitest started to.  Again, I don't

20  know the exact date.

21     Q.    Let's just talk about Endo.

22          You do have knowledge about

23  Endo, correct?

24     A.    I do.

1    Q.    And to the best of your

2  knowledge, Endo never conducted site

3  visits of its customers or its customers'

4  customers, correct?

5         MR. LIMBACHER:  Object to

6    form.  Asked and answered.

7         THE WITNESS:  Endo did not,

8    but our generics division,

9    Qualitest, did.

10 BY MR. BUCHANAN:

11   Q.    Do you know when that

12 started, ma'am?

13   A.    I do not know the exact date

14 at this time.

15   Q.    And you certainly couldn't

16 sit there and say they were doing it

17 prior to this teleconference, right?

18         MR. LIMBACHER:  Object to

19    form.

20         THE WITNESS:  No, I can't

21    confirm that.

22 BY MR. BUCHANAN:

23   Q.    Okay.  Who would be the

24 person to ask on that?

1    A.    When Qualitest did their

2  site visits?

3    Q.    Uh-huh.

4    A.    Somebody from Qualitest.

5    Q.    Tracey Hernandez?

6    A.    That would be a person to

7  start with.

8    Q.    How about, Do you utilize

9  chargeback data?

10         That was a question from you

11  to UPS, right?

12    A.    That's correct.

13    Q.    Why were you asking UPS

14  whether they utilized chargeback data,

15  ma'am?

16    A.    Probably just trying to get

17  an understanding of their SOM program.

18    Q.    Did you, in fact, have an

19  understanding, at that point in time,

20  that the DEA wanted manufacturers to use

21  chargeback data?

22    A.    I can't recall.

23         MR. LIMBACHER:  Object to

24    form.

1    BY MR. BUCHANAN:

2          Q.    Okay.  And they said, what?

3    They weren't doing that at that point in

4    time, right?

5                MR. LIMBACHER:  Object to

6          form.

7                THE WITNESS:  That's what it

8          states.

9    BY MR. BUCHANAN:

10         Q.    Okay.  Number 12, What type

11   of trending do you do, if any?

12               Do you see that question

13   from Endo to UPS?

14         A.    Uh-huh.

15         Q.    And why were you asking

16   about trending at that point in time?

17         A.    Probably just trying to get

18   an understanding of their SOM program.

19         Q.    Did you know that the DEA

20   was interested in manufacturers doing

21   trending analyses as of this point in

22   time?

23         A.    Not that I recall.

24               MR. LIMBACHER:  Object to

Highly Confidential - Subject to Further Confidentiality Review

```
 1              form.
 2                   THE WITNESS:  Not that I
 3              recall.
 4    BY MR. BUCHANAN:
 5         Q.   As of this point in time, we
 6    can agree that Endo wasn't doing
 7    trending, correct?
 8                   MR. LIMBACHER:  Object to
 9              form.  Misstates the evidence.
10                   THE WITNESS:  Not that I
11              recall.
12    BY MR. BUCHANAN:
13         Q.   Okay.  Do you modify your
14    program based on current diversion
15    trends?
16                   Do you see that item?
17         A.   I do.
18         Q.   And why were you asking UPS,
19    at this point in time, that question?
20         A.   Probably just trying to get
21    information about the SOM program.
22         Q.   In fact, you learned from
23    the DEA that they were interested in
24    manufacturers being sensitive to current
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    diversion trends and modifying their

 2    effective controls; isn't that right,

 3  ma'am?

 4         A.    I can't speak to that, no.

 5         Q.    Okay.

 6               MR. BUCHANAN:  Can I please

 7         have 736?

 8               How am I doing on time?

 9               VIDEO TECHNICIAN:  You have

10         23 minutes.

11               MR. BUCHANAN:  Thank you.

12               Do you have it already over

13         there or you're waiting for it

14         from us?

15               MR. LIMBACHER:  What are we

16         talking about?

17               MR. BUCHANAN:  If we haven't

18         passed you a new exhibit, you

19         don't have it yet.

20               MR. LIMBACHER:  You have not

21         just yet.

22               MR. BUCHANAN:  Okay.

23               Can we agree, with all

24         counsel, to just do it on the
```

Highly Confidential - Subject to Further Confidentiality Review

1      screen and move this along?  We

2      can certainly supplement it for

3      the record and identify it by

4      Bates number.

5           MR. LIMBACHER:  Let's give

6      him just a minute or two more to

7      see.

8           MR. BUCHANAN:  If not, we'll

9      just make a copy outside.  It's

10      fine.

11           MR. LIMBACHER:  Do you have

12      a lot of questions?

13           MR. BUCHANAN:  I don't.

14           THE WITNESS:  I'm okay with

15      it on the screen, if you're okay

16      with it.

17           MR. LIMBACHER:  Let's just

18      see if he can find it.

19           MR. BUCHANAN:  Thank you.

20      Sorry to put you on the spot like

21      that, Scott.

22           MR. SIEGEL:  736, being

23      marked as Exhibit-37.

24                 -   -   -

1              (Whereupon, EndoWalker

2         Exhibit-37, No Bates, 7/16/13

3         E-mail from Laurel McDermott to

4         Sanjay Patel; Subject: SOMS

5         Customer Letter & Sales Rep

6         Talking Points, was marked for

7         identification.)

8              -  -  -

9    BY MR. BUCHANAN:

10        Q.    I'm passing over what we

11   marked as Exhibit-736 -- I'm sorry, 37.

12   Thank you.  It's been a day, my

13   apologies.

14             MR. LIMBACHER:  It's been a

15        long day.

16   BY MR. BUCHANAN:

17        Q.    It's an e-mail from Ms.

18   McDermott to yourself and two other

19   individuals.

20             Do you see this?

21        A.    Yes.

22        Q.    Sanjay Patel, Lisa Walker

23   and Kevin O'Brien as recipients?

24        A.    I see that.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Who is Laurel McDermott?

2        A.    She was an admin at the

3    time.

4        Q.    Sanjay Patel?

5        A.    I don't remember his title.

6        Q.    Which function?

7        A.    I believe supply chain,

8    maybe.  I can't confirm.

9        Q.    Kevin O'Brien?

10       A.    He was my boss at the time.

11       Q.    So to three people in supply

12   chain?

13       A.    I was not part of supply

14   chain.

15       Q.    At this point in time?

16       A.    No, I was not.

17       Q.    What function would you

18   characterize your --

19       A.    I mean, I was in customer

20   service and distribution, but we were not

21   part of supply chain.

22       Q.    Understood, okay.

23             So yourself and your boss,

24   Mr. O'Brien.  The subject is, SOMS

1  customer letter and sales rep talking

2  points.

3          Do you see that?

4      A.   I do.

5      Q.   It says, Hi, Brian, you may

6  recall from various discussions that on

7  March 6, 2013, DEA notified Endo at a

8  meeting that took place in Washington the

9  need to bolster the suspicious order

10 monitoring program.

11          Do you see that?

12     A.   Yes.

13     Q.   They presented over 200

14 slides of data showing Endo/Qualitest

15 product sales specifically for those

16 distributors and pharmacies for which

17 they considered outliers and potential

18 diversion.

19          Did I read that correctly?

20     A.   Uh-huh.

21     Q.   DEA has asked Endo to

22 improve -- do you see that, ma'am?

23     A.   I do.

24     Q.   -- initial order evaluation