EXHIBIT 129

Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
                         -  -  -
 3
      IN RE:  NATIONAL          : HON. DAN A. POLSTER
 4    PRESCRIPTION OPIATE        :
      LITIGATION                 :
 5                               :
      APPLIES TO ALL CASES       : NO.
 6                               : 1:17-MD-2804
 7                  - HIGHLY CONFIDENTIAL -
 8         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 9                         -  -  -
                     JANUARY 16, 2019
10                         -  -  -
11              Videotaped sworn deposition of
12         TRACEY L. NORTON, taken pursuant to
13         notice, was held at BEST WESTERN LEHIGH
14         VALLEY HOTEL & CONFERENCE CENTER, 300
15         Gateway Drive, Bethlehem, Pennsylvania,
16         beginning at 8:51 a.m., on the
17         abovedate, before Margaret M. Reihl, a
18         Registered Professional Reporter,
19         Certified Shorthand Reporter, Certified
20         Realtime Reporter, and Notary Public.
21
                         -  -  -
22
                GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              don't know for sure.

 2                    (Document marked for

 3              identification as Par-Norton Deposition

 4              Exhibit No. 2.)

 5  BY MR. BUCHANAN:

 6         Q.     Ma'am, I'm passing over what

 7  we're marking as Exhibit 2 to your deposition.

 8  I have a few more questions before we get into

 9  that, but you will have a chance to review that

10  at the appropriate time.

11                    So you were at Watson, just to

12  confirm, until 2009?

13         A.     Yes.

14         Q.     And do you remember roughly how

15  soon before you left Watson that this -- or when

16  relative to your departure from Watson this

17  meeting with Anda and the DEA occurred?

18         A.     I do not recall.

19         Q.     Okay.  Let's look now at

20  Exhibit 2 to your deposition.  This is a

21  document during your time at Endo.  It was

22  produced to us by, I think, H.D. Smith.

23                    MS. VANNI:  Counsel, I just want

24              to clarify she was not an Endo employee.
```

 1                    off, they were on board anytime that I

 2                    interacted with them.

 3    BY MR. BUCHANAN:

 4           Q.      Right.

 5                    So once you showed them diligence

 6    that you had done -- or investigation that had

 7    been done, a review of data that had been

 8    conducted, people were willing to accept the

 9    conclusion, fair?

10           A.      Yes.

11           Q.      Okay.  But you've got to do the

12    diligence, you've got to do the digging, you had

13    to make the case?

14                    MS. VANNI:  Object to form.

15                    THE WITNESS:  Yes.  We're not

16            going to, you know, stop shipping to a

17            customer without justification, sure.

18    BY MR. BUCHANAN:

19           Q.      So it's really hard to develop

20    that justification if you're not doing due

21    diligence on customers, correct?

22                    MS. VANNI:  Object to form.

23                    THE WITNESS:  No, because sales

24            was contacting me.  If they had a

1    DEA throughout my time at Qualitest.  I don't

2    know which -- what instance you are referring

3    to, but we did have occasions where we had

4    violation letters.

5         Q.    Okay.  And do you recall -- do

6    you recall getting a letter not from the DEA,

7    but from the U.S. Attorney directed to you,

8    telling you that there were egregious violations

9    and you had a week to sit down with them to talk

10   about your fine?

11             MS. VANNI:  Object to form.

12             THE WITNESS:  I don't recall

13        that.

14             THE VIDEOGRAPHER:  Counsel, could

15        we go off the record just momentarily?

16             MR. BUCHANAN:  Yeah.

17             THE VIDEOGRAPHER:  Going off the

18        record.  The time is now 9:53 a.m.

19             (Brief recess.)

20             THE VIDEOGRAPHER:  Back on the

21        record.  The time is 9:55 a.m.

22             (Document marked for

23        identification as Par- Norton Deposition

24        Exhibit No. 3)

1    BY MR. BUCHANAN:

2         Q.    I'm passing you, Ms. Norton, a

3    copy of Exhibit 3 to your deposition.  This is a

4    letter from the U.S. Attorney, U.S. Department

5    of Justice, Joyce Vance, United States Attorney,

6    I guess for the Northern District of Alabama,

7    it's dated September 30, 2014, 1060.2.  If you

8    could pull it up, please.

9              And do you see before -- I guess

10   you read the content of it, ma'am, do you see

11   you're on this exchange?

12        A.    Yes, I do.

13        Q.    Okay.  You are the point of

14   contact from the Department of Justice on this

15   particular correspondence from the U.S.

16   Attorney's Office?

17        A.    Yes.

18        Q.    It says "Ms. Hernandez, please

19   find attached the Notice of Intent to Seek Civil

20   Penalties."

21              Do you see that on the cover, the

22   cover e-mail?

23        A.    Yes.

24        Q.    And this is September 30, 2014,

Highly Confidential - Subject to Further Confidentiality Review

1  it's a couple weeks, it looks like, before you

2  are engaging with H.D. Smith in your job search.

3          Do you see that?

4      A.    The date, yes, September 30.

5      Q.    Is that correct?

6      A.    Mm-hmm.

7      Q.    Okay.  So you get this letter.

8  Please feel free to look at it.  It's a

9  follow-up letter to a teleconference you had had

10 a week earlier on September 22, 2014.

11          Do you see that?

12     A.    Yes.

13     Q.    Okay.  It says, "The audit

14 revealed alarming deviations of Schedule II and

15 Schedule III controlled substances in violation

16 of 21 CFR 1304.21, other statutes, you failed to

17 account for and properly maintain records of the

18 following."

19          And then it's got a list of seven

20 items there.  And, I'm sorry, are you still

21 reading?

22     A.    Yes.

23     Q.    Okay.

24     A.    (Witness reviews document.)

1        Q.    And can you highlight the items,

2  please.

3        So we see item one, Hydrocodone

4  10, 325 milligrams, that's Hydrocodone

5  10 milligrams, 325 milligrams of acetaminophen,

6  is that what that would be?

7        A.    Yes.

8        Q.    And so, you know, about roughly

9  1200 bottles unaccounted for, right?

10        A.    Mm-hmm.

11        MS. VANNI:  Objection to the

12      form.

13        THE WITNESS:  Doesn't necessarily

14      mean they were unaccounted for as much

15      as the recordkeeping of them.

16  BY MR. BUCHANAN:

17        Q.    Well, it says "GB," and GB is --

18        A.    Generics Bidco.

19        Q.    And Generics Bidco was one of the

20  operating entities of Qualitest, correct?

21        A.    Yes.

22        Q.    One of the registrants with the

23  DEA, correct?

24        A.    Yes.

1    Q.    And there was another registrant

2  with the DEA that also operated under Qualitest,

3  correct?

4    A.    Yes.

5    Q.    And what was the entity's name?

6    A.    Vintage -- Vintage

7  Pharmaceuticals.

8    Q.    Right.

9          So what we see here are some 1200

10 bottles of Hydrocodone with 10 milligrams, 1300

11 bottles of hydrocodone seven and a half

12 milligrams, more in different -- in different

13 allocations.  816 bottles of Oxycodone.

14         What's Oxycodone 30 milligrams,

15 ma'am?

16   A.    What is it?

17   Q.    Yeah.

18   A.    I don't --

19   Q.    Is it a generic of Oxycontin?

20   A.    Yes.

21   Q.    Okay.  And then on the next page,

22 it says "The DEA's inspection revealed an

23 overall careless and haphazard recordkeeping

24 practice at GB" -- that's the Qualitest entity,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    correct?

 2            A.      Mm-hmm.

 3            Q.      -- "as demonstrated by, among

 4    other things, deviations exceeding 9 million

 5    tablets."

 6                    Did I read that correctly?

 7            A.      Yes.

 8            Q.      It continues, the follow on

 9    paragraph, "GB's recordkeeping violations, in

10    particular, as evidenced by the several-million

11    tablet deviations are" -- and what did they say?

12            A.      I'm sorry, where are you looking?

13    Failure to maintain --

14            Q.      "GB's recordkeeping violations,

15    in particular" --

16            A.      Yes.

17            Q.      -- "as evidenced by the

18    several-million tablet deviation are," and what

19    do they say?

20            A.      -- "egregious and evidence a

21    complete disregard of GB's statutory and

22    regulatory obligations."

23            Q.      That's not good.

24                    MS. VANNI:  Object to form.
```

1          THE WITNESS:  The way the DEA

2     and/or the Attorney General words a

3     violation letter is meant to -- meant to

4     be exaggerated for impact.

5  BY MR. BUCHANAN:

6     Q.     "Egregious and evidence of a

7  complete disregard of your statutory and

8  regulatory obligation," that's not good, right?

9          MS. VANNI:  Object to form.

10          THE WITNESS:  It's not -- it's

11     not really descriptive of the situation.

12  BY MR. BUCHANAN:

13     Q.     It's certainly not the way a

14  company who is a registrant in a closed system

15  of controlled substance distribution should be

16  contacting itself, right?

17          MS. VANNI:  Object to form.

18          THE WITNESS:  These letters are

19     also meant to point out violations --

20  BY MR. BUCHANAN:

21     Q.     Can you answer my question?

22     A.     I'm sorry, what was the question?

23     Q.     Yes.  It's not the way in which a

24  manufacturer and registrant of a controlled

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. VANNI:  Thank you.
 2                    MR. BUCHANAN:  I need one back,
 3           actually.  Keep that in the folder.
 4   BY MR. BUCHANAN:
 5           Q.    We're marking as Exhibit 4 a
 6   summary of Qualitest shipments.
 7                    MS. VANNI:  Counsel, I'm assuming
 8           this is produced in native, but could
 9           you read the Bates number into this.
10                    MR. BUCHANAN:  Yeah, the Bates
11           number is -- so this -- we've asked you
12           for your shipping information, and
13           you've pointed us to this particular
14           document.  I guess I could ask the
15           witness to sum it, but that would be a
16           poor use of our day together, but the
17           Bates numbers at the top Par Opioid
18           MDL0001596805, Par Opioid
19           MDL00015968013-68019.  I believe these
20           are spreadsheets that you have produced
21           to us.
22                    MS. VANNI:  And it's one page or
23           two?
24                    MR. BUCHANAN:  Mine is two pages.
```

1    suspicious order monitoring system."

2                    Do you see that, ma'am?

3          A.      Yes.

4          Q.      Okay.  And it talks about

5    Qualitest and its locations and then there's a

6    sentence attributed to you.

7                    Ms. Hernandez was aware of the

8    chargeback system utilized by manufacturers,

9    including Qualitest, but stating that the firm

10   has not reviewed it.

11                   Do you see that?

12         A.      Yes.

13         Q.      Do you recall discussing that

14   with the DEA?

15         A.      Yes, I do.

16         Q.      Okay.  And that accurately sets

17   forth at least that portion of the discussion,

18   right?

19         A.      Yes.

20         Q.      Okay.  "Ms. Hernandez stated the

21   firm's suspicious order monitoring system is a

22   work in progress."

23                   Do you see that?

24         A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review

1  pharmacies purchasing large quantities of

2  oxycodone and hydrocodone products from

3  Qualitest's customers.  The graph showed the

4  pharmacies in Florida purchased very large

5  quantities of Qualitest's oxycodone products.

6  Also, the graphs show that pharmacies in Texas

7  and California purchased large quantities of

8  Qualitest's hydrocodone products.

9  Ms. Hernandez, Ms. Hudson and Ms. Patel were

10  completely unaware of where Qualitest products

11  were ending up.

12          As of that point in time, ma'am,

13  were you completely unaware of where Qualitest's

14  products were ending up?

15          A.    No.  What this refers to is that

16  we were unaware of the secondary customers.  So

17  we ship to the customers and we were aware who

18  we were shipping to and, you know, the

19  information for them, but we did not have

20  visibility of the customers that they then

21  shipped to.

22          Q.    Right, as of that point in time,

23  ma'am, you were not looking at really the

24  customers of customers in terms of what they

1    were receiving, right?

2          A.     Correct.  We didn't have data

3    available to us.

4          Q.     Well, there is chargeback data

5    that the company ultimately looked at, fair?

6                 MS. VANNI:  Object to form.

7                 THE WITNESS:  Yes, that gave

8          us --

9    BY MR. BUCHANAN:

10         Q.     In fact, the DEA told you you

11   need to be looking at that, right?

12                MS. VANNI:  Object to form.

13                THE WITNESS:  The DEA told us

14         that we should look at it because that's

15         what they were hearing from other

16         manufacturers, that they were looking

17         into that and trying to see if they

18         could get data from it.

19   BY MR. BUCHANAN:

20         Q.     And, in fact, you contracted to

21   after this meeting and started to implement a

22   process where you reviewed and considered

23   chargeback data, correct?

24         A.     Yes, we did try.

1    Q.    Okay.  You, in fact, did

2    implement the consideration of chargeback data

3    as part of your SOMS process, correct?

4    A.    Not while I was at Qualitest.  It

5    was something -- I don't know if anything was --

6    happened afterwards, but while I was there, we

7    were not able to get any good data out of it.

8    Q.    Okay.  Let's pause and see if I

9    can refresh your memory on that during our

10   examination today.

11   A.    Sure.

12   Q.    It then continues that "SC Levin

13   stated that Qualitest must review the chargeback

14   information which they have access to,

15   immediately address deficiencies in their

16   suspicious order monitoring system, have

17   compliance people visit their customers to

18   review their suspicious order monitoring system

19   and review the top customers of their customers

20   and pay visits to pharmacies that purchase their

21   products.  SC Levin advised Ms. Hernandez that

22   Qualitest must know their customers and maintain

23   a due diligence file on them.  SC Levin stated

24   Qualitest's current system as explained to him

1     A.     Yes.

2     Q.     So you were the head of DEA

3   compliance.  You hired Mr. Brantley into your

4   group, correct?

5     A.     Yes, I hired Larry first,

6   Mr. Shaffer and then later hired Eric.

7     Q.     When did you bring in Mr. -- is

8   it Shaffer or Shaffer?

9     A.     Shaffer.

10     Q.     It's the two Fs that are throwing

11   me there.

12     A.     I'm not sure exactly when.

13     Q.     I assume his e-mail address is

14   spelled right.  All right.  So when did you hire

15   him, by the way?

16     A.     I'm not sure on exact -- the

17   exact date, but he was, I believe, my first

18   hire.

19     Q.     After the meeting with the DEA?

20     A.     No.  After getting to Qualitest.

21     Q.     Okay.  And he was, if I

22   understand right, he was more in this quota

23   management function, right?

24     A.     He was at the company, however,

Highly Confidential - Subject to Further Confidentiality Review

1    he actually had a -- he had handled suspicious

2    order monitoring previously.

3              Q.    Got you.

4              All right.  So let's look at

5    this.  This is an e-mail from Mr. Shaffer to

6    Mr. Brantley early October 2013, subject SOMS

7    info, right?

8              A.    Yes.

9              Q.    SOMS violations as a spreadsheet,

10   SOMS doc from 2013 and a SOMS presentation,

11   right?

12             A.    Yes.

13             Q.    Okay.  Do you remember during

14   your time at the company one of the things you

15   were tracking was who was getting in trouble?

16                   MS. VANNI:  Object to form.

17                   THE WITNESS:  Yes.

18   BY MR. BUCHANAN:

19             Q.    And you had an Excel spreadsheet

20   that you put together and kind of tracked what

21   was happening with different registrants who was

22   getting gigged and written up with big fines and

23   stuff like that, right?

24                   MS. VANNI:  Object to form.

1                    THE WITNESS:  Yes.

2  BY MR. BUCHANAN:

3          Q.     Gigged is a confusing term.

4                 Getting, what, registrations

5  pulled, fined, civil actions, suspension orders,

6  all that kind of stuff?

7          A.     Yes, we were tracking it.

8          Q.     Okay.  And so one of the things a

9  reasonable company does, and I guess this was a

10  responsible thing to do?

11                    MS. VANNI:  Object to form.

12                    THE WITNESS:  I think so.  I

13          think it helped to -- it helped to teach

14          others in the company what ramifications

15          there were if something were to go

16          wrong.

17  BY MR. BUCHANAN:

18          Q.     And that's something that you

19  have in a compliance department as a bit of an

20  issue from time to time, right?

21                    MS. VANNI:  Object to form.

22                    THE WITNESS:  No company is

23          perfect.

24  BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Certainly not, certainly not, and

 2   nor are people.

 3                 But one of the issues you have in

 4   a compliance department is sometimes some

 5   tension between compliance with what a

 6   responsible company would do or reasonable

 7   company would do or the regulations require and

 8   what the business people want, right?

 9                 MS. VANNI:  Objection.

10                 THE WITNESS:  I wouldn't

11            necessarily say that there's tension

12            from the aspect of, you know, everybody

13            knows that you have to comply with the

14            DEA regulations.  It's a matter of

15            education, it really is.

16   BY MR. BUCHANAN:

17          Q.     And so one of the things you did

18   was compile a list of all the bad things that

19   could happen to us as a business with 70%

20   controlled substances if we don't comply, right?

21                 MS. VANNI:  Object to form.

22                 THE WITNESS:  Yes.

23   BY MR. BUCHANAN:

24          Q.     Because this, you know, this is a
```

1    -- this could be a devastating consequence if we

2    don't comply, right?

3                    MS. VANNI:  Object to form.

4                    THE WITNESS:  Yes.

5    BY MR. BUCHANAN:

6         Q.    Fair, yeah.

7               So one of the things that's

8    helpful in certainly getting management's

9    attention is you should know distribution

10   facilities have been closed, right?

11        A.    Mm-hmm.

12        Q.    That's a yes answer?

13        A.    Yes.  Sorry.

14        Q.    You should know that tens of

15   millions of dollars in fines have been imposed

16   against certain distributors, right?

17                    MS. VANNI:  Object to form.

18                    THE WITNESS:  Yes.

19   BY MR. BUCHANAN:

20        Q.    You should know that we have a

21   distributor license, right?

22        A.    Yes.

23        Q.    And if we're not doing our job,

24   this could be devastating, right?

1              MS. VANNI:  Object to form.

2              THE WITNESS:  Well, it could

3         impact the business, yes.

4    BY MR. BUCHANAN:

5         Q.    Certainly.

6              And so you bring these items to

7    the attention of people above you to say, look,

8    this could affect our pocketbook, right?

9              MS. VANNI:  Objection.

10             THE WITNESS:  Actually, no.  The

11        reason that we use these was because I

12        knew that the electronic system that I

13        wanted to implement was very expensive,

14        and I needed to have adequate

15        justification to support that system

16        because -- because we did have something

17        in place, so I knew that the feedback I

18        would get is that we were complying with

19        the regulation.  So I wanted to show

20        them some of the things that the other

21        companies were doing that DEA

22        categorized as not enough.

23   BY MR. BUCHANAN:

24        Q.    Right.  I mean, basically, you're

1   saying I needed to make sure I could get some

2   budget to make this happen, so I had to show the

3   other side of not doing it?

4              MS. VANNI:  Object to form.

5              THE WITNESS:  I was expecting

6         more resistance, yes.

7   BY MR. BUCHANAN:

8         Q.    Okay.  And so you put together

9   this schedule, and let's look at the -- let's be

10  clear, I guess, because I may not have time to

11  come back to this today.

12             Some of what we see here in the

13  SOMS violations are, for example, we see a

14  reference to Walgreens.

15             MR. BUCHANAN:  Could we go to

16        606.4.  Can you blow up this one right

17        here, if you can see my finger.  Thank

18        you, yeah.  My eyes are failing me,

19        guys.  Sorry about that.

20             MR. SCHACK:  Counsel, do you have

21        any other copies of this exhibit that

22        you can share?

23             MR. BUCHANAN:  There's an extra

24        floater if somebody can pass the floater

Highly Confidential - Subject to Further Confidentiality Review

1      down.

2              MR. SCHACK:  Thank you.

3  BY MR. BUCHANAN:

4      Q.    Okay.  All right.  So this is

5  suspension order that you tracked, a suspension

6  of a DEA license relating to a Walgreens

7  distribution center in Jupiter, Florida.

8              Do you remember that?

9      A.    Yes.

10     Q.    Do you remember -- you were aware

11 of that when it happened in 2012, right, as

12 somebody who reads the Federal Register, as

13 somebody who attends DEA conferences?

14     A.    Yes.

15     Q.    Okay.  And then off to the right

16 we see really what you guys were doing, right,

17 and this is your drug that was being shipped in

18 to Florida, right?

19             MS. VANNI:  Object to the form.

20             THE WITNESS:  I can't read it.

21 BY MR. BUCHANAN:

22     Q.    Yeah, it's a challenge with, I

23 don't know, spreadsheets.  There's a

24 heading that's --

```
1                    MR. BUCHANAN:  Bradley, I'm

2            sorry, I think it's confusing for people

3            if you do it the way you've done it,

4            because at the top it says "Violation."

5   BY MR. BUCHANAN:

6            Q.    Let's just read across the top

7   together, ma'am.  You see Violation For --

8   there's Date, Violation For: Company, Violation,

9   Penalty, a web link, What they did, and What we

10  are doing.

11                   Do you see that?

12           A.    Yes.

13           Q.    Okay.  So then there's that

14  reference for the Walgreens facility that we

15  were just looking at, and you see there's a

16  narrative description of what happened with that

17  one?

18           A.    Yes.

19                   MR. BUCHANAN:  And then I need

20           you to blow up, if you could, Bradley,

21           the units all the way to the right.

22           Keep going.  Can you make the box a

23           little bigger so we don't clip off the

24           top.  Thanks.
```

1    BY MR. BUCHANAN:

2         Q.    Okay.  All right.  It doesn't get

3    any bigger, but at least it's a little more in

4    focus for you.

5              So what we see here is Walgreens

6    has a situation with their distribution center

7    severe enough that their license is suspended

8    for that particular distribution facility.

9              Do you recall that?

10        A.    Yes.

11        Q.    Okay.  And then what you did is

12   you looked at, hey, what are we doing with them,

13   right?

14             MS. VANNI:  Object to form.

15   BY MR. BUCHANAN:

16        Q.    Do you see that?

17        A.    Mm-hmm.

18        Q.    And it shows here that over the

19   same period of time, or I guess really from

20   2009, 2010, 2011, your company, Qualitest

21   shipped how many pills, 83 million pills, right?

22             You see that?

23        A.    Yes.

24        Q.    Shipped 83 million pills to that

1   particular distribution facility that had its

2   license suspended in 2012, correct?

3          A.     Yes, looks that way.

4          Q.     Of 2009 there were 11 million

5   dosage units, right, Walgreens Jupiter, and you

6   know I think I misspoke.  Let me restate this,

7   okay.

8                 What's at the top, I believe, are

9   the dosage units shipped into Florida.

10                Do you see that?

11         A.     Yes.

12         Q.     83 million dosage units shipped

13  into Florida, right?  Am I reading it correctly?

14         A.     I can't see.

15         Q.     I wish I could do more to help

16  you on that.

17         A.     Yes, it states that 83,000 --

18  83 million doses were sent to Florida in the

19  same time frame.

20         Q.     And then in 2009 you shipped

21  11.6 million dosage units to the Jupiter

22  facility of Walgreens, right?

23         A.     Yes.

24         Q.     In 2010 you shipped 7 million to

Highly Confidential - Subject to Further Confidentiality Review

1   that one?

2         A.    Yes.

3         Q.    And then apparently in 2011 they

4   went to another facility, right?

5         A.    Yes.

6         Q.    Okay.  So over those two years

7   that we have data for, it doesn't go back prior

8   to 2009, there's some, you know, 18 million,

9   19 million, 18 and a half million, I guess to be

10  precise, dosage units of controlled substances

11  going to the facility that the DEA suspended its

12  license in 2012, correct?

13        A.    Yes.

14              MS. VANNI:  Object to form.

15  BY MR. BUCHANAN:

16        Q.    Okay.  And the allegation of the

17  DEA was that that facility and the reason for

18  the suspension of a license was that they failed

19  to maintain effective controls against diversion

20  of controlled substances, right?

21        A.    Yes.

22        Q.    And so prior to -- prior to 2013,

23  ma'am, I take it are you aware of any site

24  visits to Walgreens Jupiter?

1        A.      Again, I don't know what the

2    sales team did, so I don't know if they went to

3    -- went there or not.

4        Q.      We know the DEA's conclusion, at

5    least as reflected here, was that they failed to

6    be -- they were not maintaining effective

7    controls against diversion, right?

8        A.      Yes.

9        Q.      Okay.  And had you asked for

10   copies of their suspicious order monitoring

11   protocols prior to 2013?

12       A.      Again, I don't know.

13       Q.      Okay.  I mean, there's a list of

14   violations that are noted over several years in

15   this spreadsheet, correct?

16       A.      Yes.

17       Q.      For various entities, some are

18   retail pharmacies, some are distributors,

19   correct?

20       A.      Yes, mm-hmm.

21       Q.      And these are all obviously

22   events that have happened prior to the time of

23   this PowerPoint, right?

24       A.      Yes, they are.

1    Q.    And we could agree, couldn't we,

2    ma'am, that you're not aware of any request to

3    any of the entities on this sheet for request

4    for their suspicious order monitoring program or

5    practices prior to the times of these

6    violations, correct?

7                 MS. VANNI:  Objection.

8                 THE WITNESS:  I'm not sure.  I

9        don't know.

10   BY MR. BUCHANAN:

11   Q.    You don't have any information,

12   sitting here today, that you did so?

13                MS. VANNI:  Objection.

14                THE WITNESS:  Right, or did not.

15   BY MR. BUCHANAN:

16   Q.    You have no information either

17   way?

18   A.    Correct.

19   Q.    Fair enough.  Okay.

20                So let's go back to this

21   document.  And so tab one was -- I'm sorry, at

22   606.4 we were just looking at violations, what

23   the allegations were, the consequences were and

24   then really where you were shipping product.

```
 1                    Do you see that there is

 2   information for other entities had their

 3   registrations pulled or suspended or there were

 4   allegations against with regard to effective

 5   controls against diversion on this sheet?

 6                    MS. VANNI:  Object to the

 7         colloquy.

 8                    THE WITNESS:  Yes, that's what --

 9         I mean, there are -- that's what this is

10         a list of violations, yes.

11   BY MR. BUCHANAN:

12         Q.    There's too many for us to read

13   and it's almost too challenging to put on the

14   screen but --

15         A.    Yes.

16         Q.    -- just for the jury's benefit,

17   there are other manufacturers, other

18   distributors, other pharmacies referenced,

19   correct?

20                    MS. VANNI:  Object to form.

21                    THE WITNESS:  Yes.

22   BY MR. BUCHANAN:

23         Q.    Okay.  And there are other areas

24   where it is listed that you are, in fact,
```

1    shipping into that particular customer or

2    community.  Do you see the column "What are we

3    doing" on page 606.5 and 606.4?

4            A.      I do, yes.

5            Q.      And there are other customers

6    that you were, in fact, fulfilling orders for

7    that had their licenses suspended or other

8    consequences?

9            A.      Yes.

10                   MS. VANNI:  Object to form.

11                   THE WITNESS:  Keep in mind as

12           well that when -- when there is a -- a

13           letter of admonition or issued by DEA

14           for not conducting due diligence, for

15           example, that doesn't mean they're not

16           conducting due diligence on every

17           customer that they have.  That means the

18           DEA found an example of that.  If the

19           license is getting suspended, they've

20           probably found quite a few of them.

21           However, that license was also

22           reinstated, I believe, at a later date

23           by DEA.  So at some point DEA felt that

24           they did have controls and gave them

1      back their license, basically.

2   BY MR. BUCHANAN:

3      Q.      Right.  I mean, but the concern,

4   obviously, and you've talked about it in your

5   own writings, we've seen it from the DEA

6   presentation, we have it in your oral testimony

7   today is a closed system, right?

8      A.      Yes.

9              MS. VANNI:  Object to form.

10  BY MR. BUCHANAN:

11     Q.      So if we don't have a closed

12  system at a particular point in time, and I

13  think we looked at that spreadsheet where, I

14  mean, there were billions of pills being made

15  every year of controlled substances by

16  Qualitest, you'd agree?

17             MS. VANNI:  Object to form.

18             THE WITNESS:  Again, I can't

19     speak to those -- those numbers.

20  BY MR. BUCHANAN:

21     Q.      I'll represent to you that the

22  data that's been produced to us reflects that

23  there were billions of pills of controlled

24  substances for hydrocodone and oxycodone that

Highly Confidential - Subject to Further Confidentiality Review

1    were being shipped every year, okay, accepting

2    that representation, if a manufacturer -- if

3    anyone in this chain has their head in the sand

4    or isn't doing their job, then we don't have a

5    closed system?

6                    MS. VANNI:  Object to form.

7                    THE WITNESS:  Yes, however, a

8            violation from DEA --

9    BY MR. BUCHANAN:

10           Q.     That's my question.

11           A.     -- a letter of admonition does

12   not mean that somebody had their head in the

13   sand.  Again, people make mistakes.  Mistakes do

14   occur.

15           Q.     Okay, okay.  And so when mistakes

16   occur, okay, when there's negligence and --

17   withdrawn.

18                   Let's go back to 606.14.

19                   This document, again, just to

20   reorient the jury, because we've been hoping

21   around, at 606.1, this is the e-mail from

22   Mr. Shaffer to Mr. Brantley, people obviously in

23   your DEA compliance group, fair?

24           A.     Yes.

1          Q.     Okay.  At 606.14 there's a

2     summary of the current SOMS process.

3                 Do you see that?

4          A.     Yes, I do.

5          Q.     Okay.  And this would be the SOMS

6     process for Qualitest as of -- prior to the

7     revamping, right?

8          A.     Prior to the upgrades, yes.

9                 MS. VANNI:  Object to form.

10    BY MR. BUCHANAN:

11         Q.     Okay.  So the current SOMS

12    process is that -- was really directed at the

13    retail pharmacies, right?

14                MS. VANNI:  Object to form.

15                THE WITNESS:  Yes.

16    BY MR. BUCHANAN:

17         Q.     Okay.  So prior to revamping,

18    SOMS procedures and monitoring of the orders was

19    not tied into the wholesale and distributor

20    customers, correct?

21                MS. VANNI:  Object to form.

22                THE WITNESS:  No, I would

23          disagree with that from the aspect of

24          there was visibility -- in some cases

Highly Confidential - Subject to Further Confidentiality Review

1              visibility to the inventories at the

2              wholesale level, so I think that

3              there -- they were being monitored, just

4              not part of this process.

5     BY MR. BUCHANAN:

6          Q.    Okay.  Well, without trying to

7     kind of look backwards and figure out how maybe

8     that could have been done, what was reflected on

9     this particular document, 606.14, as Qualitest's

10    current SOMS practices are these four bullet

11    points, correct?

12         A.    Yes.

13         Q.    Does the -- does this document

14    describe anything being done with wholesalers?

15              MS. VANNI:  Object to form.

16              THE WITNESS:  This document does

17         not.

18    BY MR. BUCHANAN:

19         Q.    Okay.  Retail pharmacies, so one

20    of the items is retail pharmacies under the

21    current SOMS process are based on a product

22    threshold amount, correct?

23         A.    Correct.

24         Q.    "Retail pharmacy threshold

1    amounts can be changed by the sales department,"

2    right?

3         A.    Yes.

4         Q.    And the threshold amounts are set

5    by the sales department, right?

6         A.    Yes.

7         Q.    And then the system holds the

8    order until reviewed, right?

9         A.    Yes.

10        Q.    Okay.  And so this is the SOMS

11   process as memorialized by Qualitest as of this

12   point in time, correct?

13        A.    Correct.

14        Q.    Okay.  The next page sets forth

15   the issues with that process, right?

16        A.    The improvements that we'd like

17   to make.

18        Q.    Well, what's written here is and

19   before somebody was asked to testify about it --

20        A.    Wording.

21        Q.    Yes, issues with the current

22   process, right?

23                   MS. VANNI:  Object to the

24             colloquy.

Highly Confidential - Subject to Further Confidentiality Review

```
1    were, in fact, issues with the then current

2    process prior to the revamping of the system in

3    2013, right?

4          A.    They were gaps that we internally

5    wanted to improve upon.

6          Q.    Right, I mean, look, especially

7    if you're selling 33 billion pills of

8    hydrocodone, it's a pretty big gap not to be

9    looking at wholesalers and distributors for

10   SOMS, right?

11             MS. VANNI:  Objection.

12             THE WITNESS:  Really the

13         wholesalers and distributors are not --

14         they weren't the problem.  The retail

15         pharmacies were the problem.

16   BY MR. BUCHANAN:

17         Q.    Right, but --

18         A.    So we were glad that we were

19   looking at retail pharmacies versus wholesalers.

20         Q.    Well, you knew from the DEA back

21   all the way for years -- when you were at

22   Watson, you were looking at wholesalers?

23         A.    They look at wholesalers on the

24   sale side separate from SOMS.  If they weren't
```

Highly Confidential - Subject to Further Confidentiality Review

1    is above the regulation.

2            Q.      Okay.   Something a responsible

3    company should do, right?

4                    MS. VANNI:  Object to form.

5                    THE WITNESS:  Possibly, yes.

6    BY MR. BUCHANAN:

7            Q.      I mean, you list it as a

8    requirement, right?

9            A.      Right, another example of

10   something that's not a requirement but that's

11   listed, yes.

12           Q.      Okay.   I guess if you're going to

13   make a promise to maintain effective controls of

14   diversion, you should do whatever you can do to

15   make sure these things don't leave the channel

16   of trade, right?

17                   MS. VANNI:  Object to form.

18                   THE WITNESS:  Yes.

19   BY MR. BUCHANAN:

20           Q.      And stay in the closed system,

21   yes?

22                   MS. VANNI:  Object to form.

23                   THE WITNESS:  Yes.

24   BY MR. BUCHANAN:

1  start looking at chargeback data, right?

2           MS. VANNI:  Object to form.

3           THE WITNESS:  It's not a

4      regulation.

5  BY MR. BUCHANAN:

6      Q.    Well, didn't they tell you you

7  need to do that?

8           MS. VANNI:  Object to form.

9           THE WITNESS:  They said you

10     should look at it.  There's a difference

11     between should and must.

12 BY MR. BUCHANAN:

13     Q.    Okay.  And you'd agree, ma'am, as

14 a company that has been given a permission slip

15 by the U.S. government to stamp apparently

16 billions of pills every year, that you've got to

17 act consistent with the terms of that permission

18 slip, right?

19          MS. VANNI:  Object to form.

20          THE WITNESS:  Yes, with the

21     regulations.

22 BY MR. BUCHANAN:

23     Q.    And the law, the statute, right?

24     A.    Yes.

1    Q.    Which says you must maintain

2  effective controls against diversion, right?

3    A.    Yes.

4    Q.    Okay.  And so one of the tools of

5  information -- one of the classes of information

6  available to manufacturers for many of its

7  customers is chargeback data, right?

8    A.    That's what DEA believes, yes.

9    Q.    Another category of information

10  that's available to manufacturers is IMS data,

11  right?

12    A.    Yes.

13    Q.    And using IMS data, you can see

14  in percentage terms quantities that end user

15  pharmacies might be acquiring, whether they're

16  consistent with national averages, whether

17  they're above national averages or whether

18  they're below, right?

19          MS. VANNI:  Object to form.

20          THE WITNESS:  Yes.

21  BY MR. BUCHANAN:

22    Q.    And that can raise red flags as

23  to whether a pharmacy, for example, is above

24  what you know the national average to be for

1    suspicious orders based on unusual size, order

2    pattern, deviation and unusual frequency,"

3    correct?

4         A.    That's what it says, yes.

5         Q.    And then the DEA SOMS feedback

6    you got on the next page, 581.6, was that "You

7    need to differentiate between the sales team

8    role and the DEA compliance role", right?

9         A.    Yes, that's what it says.

10        Q.    "You need to visit your

11   customers," right, and then this is an

12   exclamation point, right?

13             MS. VANNI:  Object to form.

14             THE WITNESS:  That's what it

15        says, yes.

16   BY MR. BUCHANAN:

17        Q.    You got to put boots on the

18   ground from compliance with customers, right?

19             MS. VANNI:  Object to form.

20             THE WITNESS:  Yes, that's what

21        DEA would like to see.

22   BY MR. BUCHANAN:

23        Q.    I'm assuming you put an

24   exclamation point in there for emphasis, right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Okay.  We have a problem, I guess

3  "we" there is the DEA -- are you using we to

4  refer to the DEA?

5    A.    We to refer to our company.

6    Q.    Well, it says, we have a problem

7  with companies using their sales team to conduct

8  these site visits.

9    A.    Oh, I'm sorry, it is DEA.

10    Q.    In that instance, you were using

11  the term we to refer to the DEA?

12    A.    Yes.

13    Q.    Right, and you understood the DEA

14  had a problem with companies using sales teams

15  to conduct the site visits, right?

16         MS. VANNI:  Object to form.

17         THE WITNESS:  They had a concern,

18    yes.

19  BY MR. BUCHANAN:

20    Q.    Then it says you need to use the

21  chargeback data to understand what your

22  customers' customers are doing.

23         Did I read that correctly?

24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1             THE WITNESS:  Yes.

2    BY MR. BUCHANAN:

3             Q.    And document your findings; is

4    that right?

5             A.    Yes, which would not be

6    permitted.

7             Q.    And you -- I'm sorry?

8             A.    Which would not be permitted.

9    You can't visit your customers' customers.

10   They're not your customer.

11            Q.    You can go to any pharmacy you

12   want and walk into, right?

13            A.    Not to do a SOM visit, not to ask

14   questions about their business and their

15   program.  That's your customer's job to ask

16   questions about their customer.  So you can't

17   skip a line -- a link in the supply chain and go

18   to that next level --

19            Q.    Well, we can agree you didn't

20   tell the DEA that in March 2013, did you, ma'am?

21                 MS. VANNI:  Object to form.

22                 THE WITNESS:  We didn't get into

23         that level of detail in the

24         conversation.

1        Q.     Okay.  So, certainly, if you're

2   going to have an effective program, you've got

3   to have people as part of this process, right?

4                MS. VANNI:  Object to form.

5                THE WITNESS:  We had people as

6           part of the process.  They were just in

7           sales and the perception was not good,

8           so we moved them into compliance.

9   BY MR. BUCHANAN:

10       Q.     Right.

11               And you're going to have to put

12  boots on the ground too and do due diligence

13  visits and do all kinds of stuff, right?

14               MS. VANNI:  Object to form.

15               THE WITNESS:  So that sales

16          doesn't have to do it, yes.

17  BY MR. BUCHANAN:

18       Q.     Well, one of things we know you

19  did is you brought in Mr. Brantley, right?

20       A.     Yes, I did.

21       Q.     I mean, you needed -- I mean,

22  what was his title?

23       A.     He was a manager of the SOM

24  program.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Was there a manager of the SOM

2  program in title, prior to that point in time?

3    A.    Not that title, no.

4    Q.    Right.

5          There was no manager of the SOM

6  program in Qualitest prior to September of

7  2014 -- 2013, excuse me?

8    A.    Yes, that's correct.  Doesn't

9  mean it wasn't being done.

10    Q.    All right.  So -- and someone

11  else is going to decide that, ma'am, so let's --

12  can we agree there was nobody at Qualitest who

13  had that title prior to September of 2013?

14    A.    Not that title, correct.

15    Q.    Okay.  And what you noted here is

16  you're going to hire individuals to support the

17  program, right?

18    A.    Yes.

19    Q.    One of the things you did was you

20  hired somebody as director of SOMS,

21  Mr. Brantley?

22    A.    Manager of SOMS, yes.

23    Q.    There you go.

24          "All individuals on board and

1    actively working on other aspects of the

2    program," right?

3           A.     Yes.

4           Q.     One of things you needed was

5    personnel training, right?

6           A.     Yes.

7           Q.     You had to implement SOPs, right?

8           A.     Yes.

9           Q.     You had to develop

10   questionnaires, distribute questionnaires, get

11   responses from questionnaires for their customer

12   SOMS data, right?

13          A.     Yes.

14          Q.     Okay.  You had to create customer

15   boundaries, that was one of the things you were

16   going to do, right?

17                 MS. VANNI:  Object to form.

18                 THE WITNESS:  That was using the

19          IMS data.

20   BY MR. BUCHANAN:

21          Q.     Okay.  So to create as part of

22   this individual customer boundary so that you'd

23   have flags as to unusual order sizes when they

24   went beyond boundaries for various classes of

1    Q.    Okay.  And so a demo was given to

2    the finance folks.  You said an agreement was

3    reached with them, right?

4    A.    Yes.

5    Q.    IT resources were implemented to

6    capture the feed, right?

7              MS. VANNI:  Object to form.

8              THE WITNESS:  Yes.

9    BY MR. BUCHANAN:

10   Q.    And then you're going to plan to

11   further develop this with leadership, I guess

12   that's Mike and Trey?

13   A.    That's the sales team.

14   Q.    Got you.

15         That was Phase III, right, and

16   that's chargeback data?

17   A.    Yes.

18   Q.    That was another new addition to

19   the program, right?

20             MS. VANNI:  Object to form.

21             THE WITNESS:  That was one new

22        addition to the program, one improvement

23        to the existing program, yes.

24   BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      All right.  And we've talked

2   about what the old program was, and this talked

3   about what it covered, and now we're talking

4   about your various phases for revamping it,

5   right?

6      A.      Yes, the enhancements to the

7   existing program.

8      Q.      Okay.  Next, Phase IV, boots on

9   the ground, right?

10     A.      Yes.

11     Q.      Okay.  "Customer Due Diligence

12  Visits," right, know your customer?

13     A.      Yes, correct.

14     Q.      Okay.  Because there were some

15  direct customers that were in the DEA binder,

16  you know, some big distributors, right?

17     A.      Yes.

18     Q.      There were six, I think, charts

19  that reflected McKesson.  There were five that

20  reflected CVS.  There were two that reflected HD

21  Smith, right?

22     A.      Our intent was to target the

23  customers that were identified in there first,

24  yes.

```
 1              Q.      Right.  And these have been
 2      called out in the DEA binder as, hey, these are
 3      people that you're buying they're well above the
 4      norms, right?
 5                      MS. VANNI:  Object to form.
 6                      THE WITNESS:  They had large
 7              quantities that needed to be researched
 8              or DEA thought they were large
 9              quantities, yes.
10      BY MR. BUCHANAN:
11              Q.      Right.  So you were going to put
12      boots on the ground first to customers that had
13      been flagged, right?
14                      MS. VANNI:  Object to form.
15      BY MR. BUCHANAN:
16              Q.      In that DEA presentation, right?
17              A.      Yes.
18              Q.      But you also sent out a dear
19      valued customer to every customer, correct?
20              A.      Correct.
21              Q.      That was the October 18 letter
22      that we looked at earlier today, correct?
23              A.      The October, yes, 2013.
24              Q.      I meant October 18, 2013 letter,
```

1    wording for that particular vendor, that's their

2    standard wording, yes.

3        Q.    But do you agree, I mean, if

4    you're going to have a system for detecting

5    suspicious orders, that it should be tested,

6    validated and defensible?

7        A.    Any computer system should be

8    validated.  It's an FDA requirement, yes.

9        Q.    Well, I'm not talking about FDA

10   requirements, ma'am.

11            I just want to know do you agree

12   with regard to suspicious order monitoring, the

13   system should be tested, validated and

14   defensible?

15       A.    Yes.

16       Q.    Okay, good.  Statistically

17   defensible, you agree?

18       A.    Yes.

19       Q.    Okay.  And they advised further

20   that you should not provide customers for the

21   reason their orders are held or pended as this

22   may result in customers working to avoid the one

23   item that caused the order to be declined.

24            Do you see that?

1       A.      That's correct.

2       Q.      Do you agree that --

3       A.      That's common sense.

4       Q.      Yeah, I mean, because if you

5   share with customers what the thresholds are

6   that you've set, they can structure their orders

7   in a way so that they stay below the thresholds

8   all the time but get to the same place in a

9   different way?

10      A.      Right, which is why we didn't

11  share those.

12      Q.      Right.  So sharing thresholds,

13  bad practice, right?

14      A.      Yes.

15      Q.      Okay.  Working with orders to --

16  working with customers to structure their orders

17  so they stay within thresholds is not a good

18  practice?

19      A.      No, it's not.

20              MS. VANNI:  Object to form.

21  BY MR. BUCHANAN:

22      Q.      I mean, the manufacturer or the

23  distributor should not be working with its

24  primary customer to structure its order in a way

1    to stay within whatever the red flag thresholds

2    are, right?

3              MS. VANNI:  Object to form.

4              THE WITNESS:  No, that defeats

5         the purpose of the program.

6    BY MR. BUCHANAN:

7         Q.    Right.

8              That's a very bad practice,

9    right?

10        A.    Yes.

11        Q.    And if you're doing that kind of

12   practice and you're certainly not maintaining

13   effective controls against diversion, right?

14             MS. VANNI:  Object to form.

15             THE WITNESS:  That's correct.

16        However, customers can, over time, if

17        they're a regular customer, kind of

18        figure out what your threshold is.  You

19        don't communicate it to them, but if

20        they're smart and they keep track of it,

21        they can technically figure it out.

22   BY MR. BUCHANAN:

23        Q.    But as a manufacturer, you need

24   to be vigilant to make sure your customers are

```
 1                    MS. VANNI:  Object to the form.

 2   BY MR. BUCHANAN:

 3        Q.      And you forwarded along the

 4   Cegedim report and conclusions and

 5   recommendations, right?

 6        A.      Yes, looks like I did.

 7        Q.      And so the PowerPoint begins on

 8   -- I'm sorry, 1052.7.

 9                    MR. BUCHANAN:  If you can go

10           there, please, Bradley, for everyone's

11           benefit.

12   BY MR. BUCHANAN:

13        Q.      And you've got your agenda on the

14   next page and an overview of the Cegedim report,

15   right?

16        A.      Yes.

17        Q.      And then you've got the first

18   bullet on page 1052.10.

19        A.      Yes.

20        Q.      Called out for your boss, right?

21        A.      Yes.

22        Q.      Okay.  No qualifiers, right?

23                    MS. VANNI:  Objection.

24                    THE WITNESS:  Just repeating what
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.       Including geographical

2    distributions.  These are your recommendations

3    before the DEA ever sat down with you, right?

4          A.       Right, the geographical, mm-hmm,

5    yes.

6          Q.       As somebody in the industry with

7    experience in SOMS and also anti-diversion

8    efforts, right?

9          A.       And sitting at DEA conferences,

10   yes.

11         Q.       Okay.  And Phase III, you're

12   going to start doing on-site customer

13   evaluations, right?

14         A.       Yes.

15         Q.       That was before you met with the

16   DEA, right?

17         A.       Those were things we were --

18         Q.       On-site customer evaluations?

19         A.       Things we were moving towards,

20   yes.

21         Q.       1052.15, right?

22         A.       Yes.

23         Q.       And things that were not

24   happening before?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Right.

 2                  MS. VANNI:  Form.

 3                  THE WITNESS:  Things that were

 4          not happening by the compliance team or

 5          things that I wanted to improve.

 6   BY MR. BUCHANAN:

 7          Q.      Right.

 8                  Well, certainly, here it doesn't

 9   note that our sales force is doing on-site

10   customer evaluations for compliance, right?

11          A.      Didn't need to be.  It was an

12   internal document, and that was well known.

13          Q.      And next you proposed as Phase

14   III accessing chargeback data, correct, ma'am?

15          A.      Yes.

16          Q.      Before the DEA ever even told

17   you, right?

18          A.      Correct.  It was brought up at

19   other conferences.

20          Q.      Right.  So you didn't need this

21   meeting with the DEA in March to know that,

22   right?

23          A.      Well, I know that other

24   manufacturers --
```

1              MS. VANNI:  Object to form.

2              THE WITNESS:  -- were using

3        chargeback data, and it was something

4        that I was looking into.

5   BY MR. BUCHANAN:

6        Q.    Right.  So one of the things you

7   were going to do is you're going to start

8   accessing chargeback data and also third party

9   data sources, right?

10       A.    IMS, yes.

11       Q.    IMS, right.

12             This provides visibility of

13  product flow down the customer stream and allows

14  for enhanced compliance for the "Know Your

15  Customer" requirement of the DEA, correct?

16       A.    I thought it would, yes.

17       Q.    Right.

18             And so as of 2013, before you

19  ever met with the DEA, you were aware of the

20  know your customer obligation, correct?

21             MS. VANNI:  Object to form.

22             THE WITNESS:  Yes.

23  BY MR. BUCHANAN:

24       Q.    You were aware of the

Highly Confidential - Subject to Further Confidentiality Review

1        A.      This is not talking about the

2   current state of the business.  It's talking

3   about the requirements for DEA.

4        Q.      Let's go to 1071.8.

5                There's an analysis of current

6   weaknesses, right?

7        A.      Yes.

8        Q.      Okay.  Weaknesses and there's

9   strengths and opportunities and threats and all

10  kinds of things.  I'm not going to have time to

11  go through all of this with you.

12               One of the weaknesses at this

13  point in time was you had a lack of resources,

14  right?

15       A.      Yes.

16       Q.      Limited talent pool and limited

17  investments in the group, right?

18               MS. VANNI:  Object to form.

19               THE WITNESS:  I'm not sure what

20          the investments means, to be honest, but

21          the talent pool, yes.

22  BY MR. BUCHANAN:

23       Q.      Another weakness you had was a

24  "lack of training & compliance first culture,"

1    right?

2         A.    Yes.

3         Q.    Compliance first culture meaning

4    we got to do this, it's really important that we

5    do it, right?

6              MS. VANNI:  Object to form.

7              THE WITNESS:  I'm again not sure

8         what first culture means.  Some of those

9         words, I have a feeling Sanjay

10        participated in this.

11   BY MR. BUCHANAN:

12        Q.    Okay.  And what's the next

13   weakness?

14        A.    "Inadequate SOMS."

15             We wanted it to be stronger.

16        Q.    Let's be clear, the words you

17   wrote were "inadequate SOMS," correct, ma'am?

18        A.    Correct.  Current program is not

19   adequate for my standards.

20        Q.    Okay.  And what we're looking at

21   here is could you remind us, ma'am, is this

22   before or after you sat down with the DEA?

23        A.    This is before.

24        Q.    Okay.  So even before you sat

Highly Confidential - Subject to Further Confidentiality Review

1    down with the DEA and spent the three hours in

2    DC with them, I mean, you knew you had

3    inadequate SOMS, right?

4                    MS. VANNI:  Object to form.

5                    THE WITNESS:  I knew I had

6            improvements that I wanted to make.

7    BY MR. BUCHANAN:

8            Q.    I understand that's how it's

9    characterized here in the record, ma'am, but

10   what you wrote to your boss is we have

11   inadequate SOMS correct?

12                   MS. VANNI:  Objection.

13                   THE WITNESS:  That's what the

14           document says versus what is --

15   BY MR. BUCHANAN:

16           Q.    And that's what you put into it?

17           A.    Yeah.

18           Q.    Okay.  And what you forwarded up

19   the food chain in Qualitest at that point in

20   time, correct?

21                   MS. VANNI:  Objection.

22                   THE WITNESS:  Correct, because

23           improvements we wanted to make.

24   BY MR. BUCHANAN:

```
 1                    MS. VANNI:  Object to form.

 2                    THE WITNESS:  And I had very high

 3          goals and standards.

 4  BY MR. BUCHANAN:

 5          Q.    And we can agree not only your

 6  standards that was inadequate by but inadequate

 7  by the consultants who you met with, correct?

 8                    MS. VANNI:  Object to form.

 9                    THE WITNESS:  Because they wanted

10          the business, yes.

11  BY MR. BUCHANAN:

12          Q.    Okay.  We can agree before the

13  DEA told you that your SOMS system was

14  inadequate, you had concluded it was inadequate,

15  correct?

16                    MS. VANNI:  Object to form.

17                    THE WITNESS:  DEA did not say the

18          SOMS system was inadequate.  If they

19          found it to be inadequate, we would have

20          gotten violations.  We did not get

21          violations for our SOM system.

22                    MR. BUCHANAN:  Move to strike.

23  BY MR. BUCHANAN:

24          Q.    Okay.  We have the DEA statements
```

```
 1                    (Brief recess.)

 2                    THE VIDEOGRAPHER:  We're now back

 3           on the record.  The time is 3:39 p.m.

 4                    (Document marked for

 5           identification as Par-Norton Deposition

 6           Exhibit No. 17.)

 7   BY MR. BUCHANAN:

 8        Q.     Ma'am, I'm passing you over what

 9   we're marking as Exhibit 17 to your deposition.

10                    Are you miked up, ma'am?

11        A.     Yes.

12        Q.     You are.  Okay.  Better than I.

13                    It's a document from early 2013,

14   right?

15        A.     Yes.

16        Q.     An e-mail from yourself to Sanjay

17   Patel?

18        A.     Yes, correct.

19        Q.     Copied to your boss, Jill

20   Connell?

21        A.     Yes.

22        Q.     Was Sanjay also your boss?

23        A.     He was when Jill left the

24   company, Sanjay was my boss.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Okay.  This is today's meeting,

2   and then it's got a list of action items.

3             Do you see that?

4      A.     Yes, I do.

5      Q.     Okay.  Let's roll forward to the

6   body of this, and it's January 4, 2013, just to

7   orient ourselves in time.  This would have been

8   prior to the meeting with DEA when you got that

9   thick binder that we spoke about, right?

10     A.     Yes.

11     Q.     This would have been prior to the

12  interactions you had with the Buzzeo group in

13  mid-January 2013, right?

14     A.     Yes.

15     Q.     Okay.  Let's go forward to -- if

16  we could, page 574.24, right.

17            So prior to this meeting and this

18  audit you had with Buzzeo, you were categorizing

19  potential failure modes and effects, visibility

20  rating, severity rating, et cetera, right?

21     A.     Yes.

22     Q.     Okay.  And so with regard to your

23  suspicious order monitoring system, you note

24  that it was built in pieces and only applies to

1    the retail side of the business, correct, ma'am?

2         A.    SOMS does, yes.

3         Q.    Okay.  The "suspicious order

4    monitoring program was built in pieces and only

5    applies to the retail side of the business."

6              Did I read that correctly?

7         A.    You did.

8         Q.    DEA requires it to apply to all

9    customers.

10             Do you see that?

11        A.    Correct, which is what we had --

12        Q.    Your words, right?

13        A.    Yes.

14        Q.    Okay.  "In addition, the current

15   system has had two issues in the past year that

16   resulted in controlled product being released

17   that should not have been."

18             Do you see that?

19        A.    Yes, I do.

20        Q.    That's not good, right?

21             MS. VANNI:  Object to form.

22             THE WITNESS:  That's what it

23        says, yes.

24   BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.     Not good, right?

 2                  MS. VANNI:  Objection.

 3                  THE WITNESS:  Not good.

 4   BY MR. BUCHANAN:

 5           Q.     Okay.  "The system needs to be

 6   revamped," right?

 7           A.     Yes.

 8           Q.     Remember we talked earlier about

 9   the system needing to be revamped?

10           A.     Yes, improvements needed to be

11   made.

12           Q.     And what you wrote was revamped,

13   right?

14                  MS. VANNI:  Object to form.

15                  THE WITNESS:  Yes.

16   BY MR. BUCHANAN:

17           Q.     First, all customers have to be

18   added, right?

19           A.     Yes.

20           Q.     "IMS data and chargeback data

21   incorporated," correct?

22           A.     That's what it says, yes.

23           Q.     "And eventually a contracted

24   customer assessment firm hired or an on-site
```

```
 1    SOMS specific individual to perform these

 2    assessments."

 3                 Did I read that correctly?

 4         A.     Yes, you did.

 5         Q.     You knew all of that on your own

 6    without having to go up to DC and meet with the

 7    DEA, right?

 8                 MS. VANNI:  Object to form.

 9                 THE WITNESS:  Yes, we were trying

10          to make a lot of improvements before DEA

11          even got involved.

12    BY MR. BUCHANAN:

13         Q.     Okay.  How to revamp it, right?

14         A.     How to make improvements.

15         Q.     Okay.  And previously you

16    characterized the old system as inadequate,

17    correct?

18                 MS. VANNI:  Object to form.

19                 THE WITNESS:  Yes.

20    BY MR. BUCHANAN:

21         Q.     Okay.  Then we look at visibility

22    rating and severity rating, right?

23         A.     Yes.

24         Q.     You've been in corporate land for
```

Highly Confidential - Subject to Further Confidentiality Review

1    a while, right?

2                    MS. VANNI:  Object to form.

3                    THE WITNESS:  Yes.

4    BY MR. BUCHANAN:

5            Q.     This is one way you do a risk

6    assessment, right?

7            A.     Yes.

8            Q.     Look at the visibility of the

9    problem, look at the severity of the problem and

10   then give it a risk score, right?

11           A.     Correct.

12           Q.     And the risk score you gave this

13   for visibility was a 5, right?

14           A.     Yes.

15           Q.     And severity was a 5, right?

16           A.     Yes.

17           Q.     And the total risk rating was 25,

18   right?

19           A.     Yes.

20           Q.     Highest of anything -- highest of

21   any risk, right?

22                   MS. VANNI:  Objection.

23                   THE WITNESS:  Twenty-five was the

24           highest in the document, mm-hmm.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Thank you.

2          It's a couple years before you

3    had that sit down with the DEA where you got

4    called into DC, right?

5    A.    Yes.

6          MS. VANNI:  Object to form.

7    BY MR. BUCHANAN:

8    Q.    Okay.  So you had that knowledge

9    certainly in 2011, right, ma'am?

10         MS. VANNI:  Object to form.

11         THE WITNESS:  Yes.

12   BY MR. BUCHANAN:

13   Q.    Okay.  He stated -- he states,

14   "Yet, in his opinion, nothing has changed on the

15   manufacturer's side in regards to the way we do

16   reconciliations."

17         Do you see that?

18   A.    Yes, I do.

19   Q.    "He stated that we have the

20   public's trust in our hands and we need to be

21   sure we are staying ahead of the curve by

22   monitoring current diversion trends and

23   tightening our processes."

24         Do you see that?



Highly Confidential - Subject to Further Confidentiality Review





