# EXHIBIT 174

Highly Confidential - Subject to Further Confidentiality Review

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

IN RE:  NATIONAL          :   HON. DAN A.
PRESCRIPTION OPIATE       :   POLSTER
LITIGATION                :
                          :
APPLIES TO ALL CASES      :   NO.
                          :   1:17-MD-2804
                          :

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

VOLUME I

- - -

January 22, 2019

- - -

          Videotaped deposition of
MICHELE R. DEMPSEY, taken pursuant to
notice, was held at the law offices of
Drinker Biddle & Reath, 105 College Road
East, Princeton, New Jersey, beginning at
9:12 a.m., on the above date, before
Michelle L. Gray, a Registered
Professional Reporter, Certified
Shorthand Reporter, Certified Realtime
Reporter, and Notary Public.

          - - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Okay.  And following that,

2  did you meet again?

3      A.     Yesterday.

4      Q.     Yesterday.  Okay.  Aside

5  from meeting with counsel, did you meet

6  with anyone else to prepare for this

7  deposition?

8      A.     No.

9      Q.     Did you review any of the

10 transcripts in this litigation in

11 preparation -- preparation for your

12 deposition?

13     A.     No.

14     Q.     Did you speak with anybody

15 who has been deposed that is a current or

16 former employee of Janssen or Johnson &

17 Johnson or JOM in preparation for this

18 deposition?

19     A.     No.

20     Q.     Did you speak with any

21 employee who has been deposed in this

22 litigation at all concerning their

23 depositions?

24     A.     No.

1      A.    I no longer had oversight of

2  DEA compliance and security with the

3  divestiture of Noramco in 2016.

4      Q.    Okay.  So did there come a

5  time between 2007, when you oversaw

6  Noramco's supply chain, and 2016, when

7  Noramco was divested, that you

8  simultaneously had another role within

9  Johnson & Johnson?

10      A.    Yes.

11      Q.    And can you describe that?

12      A.    In 2011, I was asked to lead

13  a project to introduce quota

14  understanding with -- outside of Noramco

15  into Janssen Supply Chain for -- so I was

16  involved in this project where I updated

17  existing SOPs outside of Noramco.  I

18  became aware and visited the other

19  locations that did the manufacturing of

20  the Janssen products.

21          And over -- from 2011 until

22  2012, 2012 March was when I was formally

23  given direct -- I had people at the sites

24  reporting into me.  So I had the

1    Janssen.

2         Q.    Okay.  Before we move on

3    from employment history, I just want to

4    make sure that I have this -- this down.

5              You addressed that in March

6    of 2012, you took on the additional role

7    of being director of controlled

8    substances compliance -- substance

9    compliance; is that right?

10        A.    Yes.

11        Q.    And that was for Johnson &

12   Johnson?

13        A.    That was for the Janssen

14   Supply Chain.

15        Q.    Okay.  And when we speak

16   about the Janssen Supply Chain, I know of

17   another company called JOM.  Do you know

18   who JOM is?

19        A.    Janssen Ortho-McNeil is the

20   legal entity name of the distribution

21   centers in which -- under J&J.

22        Q.    Okay.  So when I see or when

23   we see JOM as an emblem or insignia on

24   letterhead, that's referring to Janssen

1    Ortho-McNeil; is that right?

2           A.    Yes.

3           Q.    Okay.  And Janssen

4    Ortho-McNeil, or JOM, oversaw supply

5    chain distribution for Janssen's

6    pharmaceutical products; is that right?

7                MR. BARKER:  Objection.

8                THE WITNESS:  Yes.

9    BY MR. JANUSH:

10          Q.    JOM, for short, oversaw the

11   shipments of products from Janssen to

12   wholesaler customers, as an example; is

13   that correct?

14          A.    JOM received orders for

15   wholesalers and shipped orders that were

16   approved to the wholesalers that went

17   through.

18          Q.    Okay.  And your function as

19   director of controlled substance

20   compliance operated out of JOM or out of

21   Janssen or Johnson & Johnson?  Which is

22   it?

23          A.    My role was in Janssen

24   Supply Chain, which I was located in

1   Wilmington, Delaware under Noramco.

2         Q.     So you were simultaneously

3   working for Noramco addressing DEA

4   compliance issues, quota issues, security

5   issues for Noramco, right?

6         A.     Yes.

7         Q.     And at the same time you

8   were based out of Noramco's site in

9   Wilmington, Delaware.  And you were

10  overseeing Janssen's compliance with

11  controlled substances; is that right?

12        A.     Noramco was part of Janssen

13  Supply Chain.  They were the active

14  pharmaceutical ingredient supplier.  So I

15  expanded my support from just the active

16  pharmaceutical ingredient manufacture

17  through formulation to distribution.

18        Q.     But to be clear, Noramco was

19  a wholly separate company than Janssen,

20  right?

21        A.     It was a wholly owned

22  subsidiary of Johnson & Johnson.

23        Q.     Right.  And Noramco made the

24  raw ingredient that went into Janssen's

Highly Confidential - Subject to Further Confidentiality Review

1   overseeing suspicious order monitoring

2   for Janssen or Johnson & Johnson?

3        A.    It went back to Noramco.

4   Because Noramco was obligated to have a

5   suspicious order monitoring program.  And

6   then when, in 2012 I had the two

7   distribution centers reporting into me.

8   I had input on their order monitoring

9   system as well.

10        Q.    I'm separating out Noramco

11  in -- well, and Janssen.  Okay.

12             So let's start with Noramco.

13  Your -- your role in overseeing

14  suspicious order monitoring for Noramco

15  was what?

16             MR. BARKER:  Object to form.

17  BY MR. JANUSH:

18        Q.    Can you describe your role

19  overseeing suspicious order monitoring

20  for Noramco?

21        A.    As I mentioned before, my

22  role as the director of DEA compliance

23  and security is I ensured that the

24  manager and the specialist, that we had

Highly Confidential - Subject to Further Confidentiality Review

1    if you're a seller like Mallinckrodt, and

2    you are selling to a wholesaler, and that

3    wholesaler is selling to a drug store,

4    for example a CVS or a Walgreens, that's

5    an example, and if Mallinckrodt had data

6    as to where customers' customer was

7    stocking its product, it should have

8    known that.  Do you understand?  We're on

9    the same page on that, aren't we?

10                   MR. BARKER:  Object to form.

11                   THE WITNESS:  I believe the

12              way DEA commented is you know the

13              customer and the downstream data,

14              where it goes.  I don't believe

15              they say know your customers'

16              customer.  But that was the intent

17              that, if you had this data

18              downstream that indicated where

19              your products go, you should have

20              been looking at it.

21    BY MR. JANUSH:

22              Q.    And 2017 wasn't the first

23    time that you had been introduced to the

24    concept of knowing who your customers'

1          THE WITNESS:  I -- I do

2      understand now 867.  We -- there

3      are people in the planning and

4      trade that does provide this data

5      to us occasionally.  So yes, I am

6      aware of 867.

7   BY MR. JANUSH:

8      Q.    And what is -- why is 867

9   data provided from trade to compliance

10  occasionally?

11     A.    For order monitoring.  If we

12  have an order that is questionable, we --

13  our process involves planning, trade and

14  customer service reaching out to the

15  customer, obtaining information to

16  justify the questionable order demand

17  change.  And so 867 data can be provided

18  to -- as part of the investigation.

19     Q.    And the last bullet is

20  addressing 844 and 849.  "Chargeback data

21  which identifies how much a vendor

22  qualifies for rebates."

23          Do you see that?

24     A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And do you have an

2  understanding of what chargeback data or

3  844, 849 data is?

4    A.    I never heard of the word

5  844, 849.  But in -- after the

6  Mallinckrodt incident, I did learn about

7  chargeback data.

8    Q.    And did you only learn about

9  chargeback data after the Mallinckrodt

10  incident?

11        Are you referring to the

12  2017 DEA citation with Mallinckrodt?

13    A.    Yes.

14    Q.    Okay.  And so after some

15  point in time in 2017 when the DEA

16  cracked down on Mallinckrodt for not

17  using its chargeback data to figure out

18  how much drugs their end purchasers

19  were -- were obtaining, that's the first

20  time you learned about chargeback data?

21    A.    That's the first time I

22  asked if we had the chargeback data, and

23  then I received the data.  And we tried

24  to analyze it.  But it was missing, it

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2      Q.     Okay.  Earlier we talked

3  about IntegriChain third-party data.  Do

4  you remember that?

5      A.     Yes.

6      Q.     Okay.  Would your answers be

7  the same, that you didn't know about a

8  company -- a third-party company called

9  ValueCentric 852 data or 867 data before

10  2017?

11              MR. BARKER:  Object to form.

12              THE WITNESS:  I did learn

13          about ValueTrak, ValueCentric

14          data.  That they were the ones

15          supplying the blinded 852, 867

16          data.

17  BY MR. JANUSH:

18      Q.     Okay.  And is that the sole

19  capacity -- how did you learn about

20  ValueTrak or ValueCentric data?

21      A.     I believe -- I don't recall

22  the exact date, but during our monthly

23  compliance reviews, it was presented as a

24  data source that could be used,

Highly Confidential - Subject to Further Confidentiality Review

1    potentially, to help investigate

2    questionable orders.

3          Q.    Okay.  It was not a data

4    source that was built into your

5    suspicious order monitoring protocols to

6    stop a suspicious order in realtime,

7    right?

8          A.    We have another order

9    monitoring program that reviews the

10    orders.  Value -- it's a separate --

11    ValueTrak is a separate IT.

12          Q.    So the answer to my question

13    is yes, right?

14                MR. BARKER:  Object to form.

15    BY MR. JANUSH:

16          Q.    My question was --

17          A.    ValueTrak --

18          Q.    It was not --

19          A.    Sorry.

20          Q.    My question was it was not a

21    data source that was built into your

22    suspicious order monitoring protocols to

23    stop an order in realtime, right?

24                MR. BARKER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  Yes, it was

2       not our order monitoring program.

3   BY MR. JANUSH:

4       Q.    Okay.  And it wasn't a

5   component of your order monitoring

6   program, correct?

7           MR. BARKER:  Object to form.

8           THE WITNESS:  It was part of

9       our investigation process, that

10      our -- during the investigation,

11      did use that data.

12  BY MR. JANUSH:

13      Q.    Okay.

14          (Document marked for

15      identification as Exhibit

16      Dempsey-4.)

17  BY MR. JANUSH:

18      Q.    Let me show you what's been

19  marked as Exhibit 4.  And this is a

20  parent cover e-mail, JAN-MS-00454956 with

21  an attachment.  This runs sequentially

22  through 957 and 958.  The attachment is

23  the third page, "High level overview of

24  JOM suspicious or excessive order

Highly Confidential - Subject to Further Confidentiality Review

1    monitoring SOM."

2              Do you see that, third page?

3         A.    I'm -- I'm reading that now.

4         Q.    So I'm going to -- I'm

5    actually going to first turn your

6    attention -- I just wanted to run through

7    the header that you saw that the third

8    page existed so I gave you a complete

9    document.

10             Do you see that?

11        A.    Yes.

12        Q.    Okay.  Turning to the first

13   page.  This is from Luis Valcárcel to Ron

14   Kuntz and Paul Lowman.

15             Who is Luis or Luis

16   Valcárcel in the organization of

17   Ortho-McNeil?

18             MR. BARKER:  Object to form.

19             THE WITNESS:  Luis was in

20        trade.

21   BY MR. JANUSH:

22        Q.    And do you remember what his

23   title was?

24        A.    No, I'm sorry.

1    Q.    And Ron Kuntz, who was he?

2    A.    He was in marketing for

3    Nucynta.

4    Q.    He was the director of the

5    pain franchise, right?

6            MR. BARKER:  Object to form.

7            THE WITNESS:  I don't recall

8        his actual title.

9    BY MR. JANUSH:

10    Q.    And how about Paul Lowman?

11    A.    I never -- I do not know who

12    he is.

13    Q.    Okay.  And this is

14    addressing the -- in -- underneath Luis's

15    e-mail, in the second paragraph,

16    "ValueTrak EDI 852 data has McKesson and

17    Cardinal constantly (sic) over 99 percent

18    in stock levels at a macro level.  There

19    are some deviations from the 99 plus

20    stocking levels at a few selected

21    distribution centers."

22            Do you see that?

23            MR. BARKER:  Object to form.

24        The witness had asked you before

1       A.      Yes.

2       Q.      So at the last paragraph of

3  this second page ending in Bates number

4  957, the definition of suspicious and

5  excessive order is provided, is it not?

6                   MR. BARKER:  Object to form.

7                   THE WITNESS:  That is a

8           definition that the writer of the

9           e-mail had provided, is their

10          interpretation of what a

11          suspicious and excessive order is.

12  BY MR. JANUSH:

13      Q.      Why don't you read that into

14  the record.

15      A.      It states, "A potentially

16  suspicious or excessive controlled

17  substance order can be defined as an

18  order that exceeds the minimum order

19  quantity requirements and is above three

20  times (300 percent) the calculated

21  12-month per weekly order average.  This

22  definition also applies to products that

23  are scheduled in one or more states but

24  not by DEA."

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you disagree that in June

2    of 2012 this was your company's

3    definition of a suspicious -- potentially

4    suspicious order?

5    A.    That is the order monitoring

6    program's parameters that it was looking

7    for, so yes that was.

8    Q.    So you don't disagree with

9    this statement, correct?

10   A.    I do not disagree with the

11   statement that that is what the order

12   monitoring program was looking for.

13   Q.    Okay.  And by that we're

14   talking about three times or 300 percent

15   of the calculated 12-month per weekly

16   order average, right?

17   A.    Yes.

18   Q.    Now, turning to the last

19   page.  That same definition carries over

20   onto the high level overview of JOM

21   suspicious or excessive order monitoring;

22   is that right?

23        MR. BARKER:  Object to form.

24   BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I'm highlighting it on the

2  screen for you --

3    A.    Right.  That is what our

4  order monitoring report or program does.

5    Q.    Okay.  Now moving to the JOM

6  suspicious order report.  The first

7  bullet says, "BW report is generally

8  completed by 4:00 p.m."

9         What is the acronym BW stand

10  for?

11    A.    So it's an SAP terminology,

12  which is an IT system called Business

13  Warehouse.  We developed a report that

14  takes the last 12-month weekly order

15  average and factors in the three times

16  percent.  So when you're -- when you

17  review the definition above, that's

18  exactly what this BW report does, is all

19  the orders go through it, and history is

20  compared and is -- that one single order

21  is compared to this threshold.

22    Q.    When that one single order

23  is compared to threshold, how is that

24  order compared -- how is it broken down

Highly Confidential - Subject to Further Confidentiality Review

1    in terms of at a SKU or SKU level of a

2    product?

3          A.    It is per customer, per DEA

4    license SKU.

5          Q.    So just so we're on the same

6    page, and I'm going to break that down

7    into layman's terms, or try to since I'm

8    not in your business, when that BW report

9    is run or generally completed at

10   4:00 p.m., and it's comparing a

11   particular customer's order against their

12   rolling 12-month per weekly order

13   average, it's comparing for particular

14   SKUs for particular drug types and drug

15   strengths against the same drug type and

16   drug strength in the new order; is that

17   right?

18         A.    Yeah, it takes the SKU,

19   which is that dosage formulation, and it

20   compares to the past 12-month rolling

21   average.

22         Q.    Okay.  So we are on the same

23   page then.  What it doesn't do,

24   therefore, and correct me if I'm wrong,

Highly Confidential - Subject to Further Confidentiality Review

1    is address if hypothetically a wholesaler

2    like a Cardinal, AmerisourceBergen, or

3    McKesson, had previously purchased

4    Duragesic at 50-milligram strength, but

5    in an ensuing order, present day, so to

6    speak, purchased at a 75-milligram

7    strength, your system wouldn't compare

8    the 75-milligram order being made in the

9    present tense to the 50-milligram orders

10   that had previously been made because

11   they are different SKUs or S-K-U-s; is

12   that right.

13              MS. BOODY:  Object to form.

14              THE WITNESS:  Yes.

15   BY MR. JANUSH:

16        Q.    I didn't hear you.  I'm

17   sorry.  Is that right?

18        A.    Yes.

19        Q.    And moving beyond a

20   different SKU issue, for example, a

21   strength issue with Duragesic, that might

22   be produced in multiple different

23   strengths, your order monitoring system

24   or suspicious order monitoring system

1   also wouldn't have captured the aggregate

2   of opioid products sold to a wholesaler

3   customer and compared the aggregate order

4   history against the present day order;

5   isn't that also true?

6               MR. BARKER:  Object to form.

7   BY MR. JANUSH:

8        Q.    For example, to make this

9   more clear, we'll just speak in terms of

10  Nucynta and Duragesic.  Okay?

11       A.    Okay.

12       Q.    So if hypothetically

13  Cardinal purchased Duragesic

14  50-milligram, 2 cases of 24 patches last

15  month with one case of Nucynta ER -- and

16  this is obviously a hypothetical, because

17  Nucynta, I appreciate, was sold in 2016

18  or thereabouts.  Your system in a

19  hypothetical universe of 2012 wouldn't

20  have compared a new order by Cardinal,

21  where Duragesic was being purchased at

22  75 milligrams and Nucynta IR was being

23  purchased instead of Nucynta ER.

24  Those -- the past order and the current

1    order, having completely different SKUs,

2    would not have been compared against each

3    other under your suspicious order

4    monitoring system; isn't that right?

5                    MR. BARKER:  Object to form.

6                    MS. BOODY:  Object to form.

7                    THE WITNESS:  Every order

8            that we received with a customer

9            based on the SKU is reviewed for

10           historical ordering of that SKU.

11           We do also take in context total

12           products that are shipped to

13           Cardinal and McKesson, and we

14           compare total products to

15           controlled substances.  We're

16           monitoring how much of controlled

17           substances they're ordering

18           compared to other of our J&J

19           products.

20                  So quarterly basis we're

21           reviewing that information.  So --

22           so we have more visibility to what

23           volume of controlled substances

24           are they ordering compared to

Highly Confidential - Subject to Further Confidentiality Review

1  shipments, JOM is not Noramco, correct?

2        A.    Yes.   They are not Noramco.

3        Q.    JOM is Johnson Ortho-McNeil,

4  correct?

5        A.    Yes.

6        Q.    And JOM, the bullet above

7  it, is the Pharma customer service and

8  distribution center for North America

9  with around 14 billion worth of sales

10  shipped every year.

11           This is referring to Johnson

12  & Johnson's pharmaceutical sales that are

13  shipped through JOM; is that right?

14           MR. BARKER:  Object to form.

15           THE WITNESS:  I don't know

16        if that was the intent of that

17        bullet or where this data came

18        from.  But it speaks to, I do know

19        that our two distribution centers

20        under JOM do handle the

21        pharmaceutical products of

22        Janssen.

23  BY MR. JANUSH:

24        Q.    Okay.  I'm just trying to

1  delineate very clearly between when we're

2  speaking about JOM and when we're

3  speaking about Noramco.  Do you

4  understand that goal?

5        A.    Yes.

6        Q.    Okay.  And in this document,

7  you are -- not you, JOM is addressing

8  what JOM business is, right?

9        A.    Yes.  And as I mentioned

10  before, they lumped in Schedule II, the

11  psychotropic ADHD meds as well, instead

12  of just narcotics.

13        Q.    Okay.

14             (Document marked for

15             identification as Exhibit

16             Dempsey-6.)

17  BY MR. JANUSH:

18        Q.    I'm going to move to what

19  I've marked as Dempsey Exhibit 6.  This

20  is an e-mail string with an attachment.

21  This concerns communications between you

22  and Ron Kuntz that was then forwarded on

23  by Ron to Patricia Yap.  And I'm going to

24  read -- start by reading -- having you

1    read your e-mail in the middle of the

2    first page where you wrote to Ron, "I

3    just called my friend."

4                    Why don't you start there?

5         A.    "I just called my friend

6    that retired in December from Purdue,

7    ex-DEA, that managed the relationship

8    with DEA during the OxyContin years, and

9    setup their suspicious order monitoring

10   program.  He was the one who went to

11   visit pharmacies with wholesalers.  I

12   attached benchmarking notes taken when

13   JOM chatted with the Purdue on the

14   suspicious order monitoring program last

15   year."

16        Q.    Now, let's just stop and

17   pause right there.

18                "I attached benchmarking

19   notes taken when JOM chatted with Purdue

20   on the SOM program last year."

21                Do you see that?

22        A.    Yes.

23        Q.    And that's not saying, "I

24   attached benchmarking notes when Noramco

1    chatted with Purdue on the SOM program

2    last year"; is that right?

3         A.    Right.  It was JOM.

4         Q.    Okay.  And again, as you

5    just testified moments ago, JOM is

6    different from Noramco, right?

7         A.    Yes.

8         Q.    Okay.  And reading below his

9    business card that's embedded in your

10   e-mail -- why don't you read below?

11        A.    "He met with sales force

12   with Purdue.  He also was the one that

13   called DEA when sales force found

14   suspicious doctors.  Law department gave

15   suspicious order monitoring training to

16   sales."

17              Continue?

18              "I am not sure of the

19   project scope.  Didn't give him any

20   details but said you may call him.

21   Please do.  You will enjoy it.  He was

22   widely respected in the New Jersey pharma

23   industry group."

24        Q.    Now, before I go any

Highly Confidential - Subject to Further Confidentiality Review

1    page, he's addressing some background

2    information that, "Purdue enhanced its

3    order monitoring program beginning in

4    early 2008."

5              Do you see that?

6         A.    Yes, I do.

7         Q.    And then he addressed formal

8    monitoring meetings that were held with

9    various wholesalers; is that right?

10        A.    The authorized distributors,

11   yes.

12        Q.    Okay.  And we'll skip

13   forward to the attachment, which is

14   Bates-stamped JAN-MS-03115790.

15             These are the nine pages of

16   notes that you addressed with Michael

17   Levitt that you attached to the e-mail,

18   aren't they?

19             MR. BARKER:  Object to form.

20        You've got a gap in your Bates

21        numbers in this document.

22             MR. JANUSH:  Yes, I do.

23        It's due to the whole production

24        fight that we fought over.  You

1    may recall how these were

2    produced -- originally withheld as

3    nonresponsive, and then produced.

4    There was a reason for pushing

5    back this deposition.

6           So unfortunately --

7           MR. BARKER:  This is one of

8    them?

9           MR. JANUSH:  This is one of

10   those documents that Seth Baglin

11   said could not reproduce it in the

12   correct Bates range.  I would have

13   liked it to have been done right

14   as well.

15   BY MR. JANUSH:

16        Q.   Going back to my question.

17   These are your nine pages of notes from

18   my --

19        A.   This looks like my

20   handwriting and my notes, yes.

21        Q.   Okay.  And from a -- from a

22   3/20/12 pre-meeting, at the top.  Those

23   are your notes from the pre-meeting; is

24   that right?  Right?

1    And then moving to the

2    bottom, 3/21/12, that's the more complete

3    in-person meeting; is that right?

4        A.    Yes.

5        Q.    And this concerns what is

6    stated in the earlier e-mail when you

7    wrote to Ron Kuntz about your notes from

8    when JOM benchmarked with Purdue, right?

9        A.    These are the notes that I

10    took when we benchmarked with Purdue on

11    their suspicious order monitoring

12    program, and it was attached to the

13    e-mail that I sent to Ron Kuntz.

14        MR. JANUSH:  Not answering

15        my question specifically.  So I'm

16        going to move to strike as

17        nonresponsive.  I'm focusing on

18        JOM.

19    BY MR. JANUSH:

20        Q.    My question was, this

21    concerns what is stated in the earlier

22    e-mail when you wrote to Ron Kuntz that

23    you were attaching notes from when JOM

24    benchmarked with Purdue, right?  Just

1     asking for a yes or no here.

2          A.    Yes, these are the notes in

3     reference, yes.

4          Q.    Not from when Noramco

5     benchmarked with Purdue.  From when JOM

6     benchmarked with Purdue, right?

7          A.    Yes, JOM.

8          Q.    Okay.  We're going to go

9     through some of these notes.  All right?

10         A.    Mm-hmm.

11         Q.    And really, what my goal

12    here is to just figure out what -- what

13    information was conveyed by Mr. Crowley

14    and Purdue and perhaps other attendees to

15    JOM and you and your colleagues during

16    this meeting.

17               So first, in the pre-meeting

18    on March 20th, 2012, Mr. Crowley or

19    someone, appears to have stated, "Purdue

20    has a contract with wholesalers to buy

21    sales data."

22               Do you see that?

23         A.    Yes, I do.

24         Q.    Did you inquire as to what

Highly Confidential - Subject to Further Confidentiality Review

1  that actually means in practice, who the

2  contract is with with wholesalers to buy

3  sales data?

4        A.    No.

5        Q.    Do you know if Purdue had a

6  contract with Cardinal,

7  AmerisourceBergen, and McKesson to buy

8  sales data?

9        A.    No.

10        Q.    Never inquired?

11        A.    No.

12        Q.    And next statement is,

13  "Design a system so that they get

14  realtime information about wholesaler

15  sales."

16              Do you see that?

17        A.    Yes.

18        Q.    Did you -- was this just

19  informational as setup for the next day,

20  or did you get into a discussion

21  regarding how Purdue designed a system so

22  that they could get realtime information

23  about wholesaler sales?

24        A.    This was just a high level

Highly Confidential - Subject to Further Confidentiality Review

1    discussion point of elements that we were

2    going to discuss at the benchmark

3    meeting.

4           Q.    Got it.  So let's just then

5    move forward to the benchmark meeting if

6    these elements are covered therein.

7                 We'll go to the bottom of

8    the page, 3/21/2012.  Stephen Seid

9    executive director, national accounts,

10   Purdue, was present; is that right?

11          A.    Yes.

12          Q.    Jack Crowley, Controlled

13   Substances Act compliance, Purdue.  And

14   Rebecca Lyons listed as a VP of JOM.

15   What was Rebecca Lyons' role?

16          A.    She had accountability for

17   the two distribution centers.  I forget

18   exactly what her title was.  But the

19   operations reported in to her.

20          Q.    Okay.  Mike Levitt, he is

21   who we discussed earlier that was a DEA

22   compliance manager?

23          A.    Yes.

24          Q.    How about Bruce Keale?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Finance on the leadership

2    team at JOM.

3          Q.      Why would finance have been

4    involved in this benchmarking meeting?

5          A.      I wanted all the leaders to

6    understand the requirements of suspicious

7    order monitoring.

8          Q.      Okay.  How about Greg

9    Wolski?

10         A.      He was at the time, 2012,

11   customer service.

12         Q.      All right.  And so, would it

13   have been -- let's move to the next page

14   ending in Bates number 03115791.  And it

15   says, "Purdue enhanced in 2008, designed

16   program to characterize data exposure to

17   retail data, 'know your customers'

18   customer."

19               Do you see that?

20         A.      Yes, I do.

21         Q.      So here you were in 2012, in

22   March, specifically March 21, 2012,

23   benchmarking with Purdue, right?

24         A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And you were learning that

2   Purdue, in 2008, designed their

3   suspicious order monitoring program to

4   characterize data exposure to retail data

5   to know your customers' customer.  Is

6   that also right?

7                MR. BARKER:  Object to form.

8                THE WITNESS:  That is --

9         that is what Purdue relayed to us.

10  BY MR. JANUSH:

11       Q.    Janssen didn't follow

12  Purdue's benchmark, did they?

13               MR. BARKER:  Object to form.

14  BY MR. JANUSH:

15       Q.    You can answer.

16       A.    We -- we -- our system

17  provided the data that DEA had requested

18  from us.  And we had no -- with our

19  multiple engagements with DEA in -- in

20  2013, we talked about this, you know, and

21  we were not -- the DEA did not expect

22  that information from us at that time,

23  for our Duragesic and Nucynta.

24               Q.    That was a great answer to a

Highly Confidential - Subject to Further Confidentiality Review

1   question I never asked so I'm going to

2   move to strike as nonresponsive.

3              Do you remember my actual

4   question?

5              MR. BARKER:  Object to form.

6              THE WITNESS:  Yes.  You

7        asked if JOM implemented a know

8        your customers' customer --

9   BY MR. JANUSH:

10       Q.    No, that's not what I asked.

11  I said Janssen didn't follow Purdue's

12  benchmark, did they?

13             MR. BARKER:  Object to form.

14             THE WITNESS:  We --

15       actually, this entire benchmark we

16       did incorporate some of the

17       recommendations --

18  BY MR. JANUSH:

19       Q.    We'll get there.

20       A.    -- but the specific know

21  your customers' customer, we did not

22  include it as an enhancement to our

23  system at that time.

24       Q.    Okay.  Did you include know

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Isn't it also a hot spot

2    area an area that got a high prescribing

3    rate of opioids?

4    A.    I don't know.  At this time

5    it was those areas where there were

6    abuse, hot spots.

7    Q.    And --

8    A.    That was my -- my

9    interpretation from 2012.

10    Q.    And -- and isn't hot spot

11    areas where there is a high amount of

12    abuse and diversion correlated to hot

13    spot areas where there's a high amount of

14    prescribing?

15    A.    I don't know that data to --

16    to make an answer on that.

17    Q.    And it says, "Look at all

18    products."

19        Do you see that?

20    A.    Yes.

21    Q.    "Have an agenda."  Do you

22    see that?

23    A.    Yes.

24    Q.    At this time in March of

1    2012, you were being guided that Purdue

2    looks at all products when -- when it

3    revises its suspicious order monitoring

4    standard operating procedures, right?

5                    MR. BARKER:  Object to form.

6                    THE WITNESS:  That is what

7         they reviewed to us.

8    BY MR. JANUSH:

9         Q.    And earlier you and I were

10   discussing the concept of Janssen or JOM

11   only looking and running its suspicious

12   order monitoring calculation against the

13   same SKU so that an order would come up

14   as suspicious when the same SKU was

15   compared against a prior order involving

16   that specific product and strength, i.e.,

17   SKU.  Remember that discussion?

18        A.    I do remember that

19   discussion.

20        Q.    Okay.  Purdue was doing it

21   differently, weren't they?

22                    MR. BARKER:  Object to form.

23                    THE WITNESS:  I don't recall

24        if what he was talking about was

1        all of Purdue's products, meaning

2        controlled and noncontrolled, or

3        if they meant at the drug class.

4            It was a high level

5        discussion.  We didn't get into

6        the detail of what they actually

7        looked at in regards to all the

8        products.

9    BY MR. JANUSH:

10       Q.    Okay.  And it says, "Between

11   meetings meet with wholesalers, orders

12   looked at daily basis"; is that right?

13       A.    That's what it says.

14       Q.    "Channel strategy, 866 data,

15   orders monitored reach out.  Order arrow,

16   use day-to-day ValueCentric data to send

17   message when doesn't meet guidelines."

18            What does that mean, "to use

19   day-to-day ValueCentric data to send

20   message when it doesn't meet guidelines"?

21       A.    What that means is because

22   we had visibility to what the

23   wholesalers' inventory at their DC is

24   with this ValueCentric data, if a

1    questionable order comes in that doesn't

2    meet the typical ordering pattern or

3    volumes, we use this data to -- before we

4    reach out to the customer because their

5    order does not meet what they currently

6    have in inventory that -- that they --

7    the questionable order amount doesn't

8    appear to be needed.  That's what that

9    means.  And --

10        Q.    It says, "Use day-to-day

11   ValueCentric data to send message when

12   doesn't meet guidelines."

13        Was -- was there a way to

14   send message within ValueCentric?

15        A.    No.  This was -- customer

16   service.

17        Q.    He just meant to send -- he

18   just meant to send the message that

19   something is amiss?

20        A.    Yes.

21        Q.    What does it mean when you

22   wrote, "Different" -- when you took the

23   notes, "Different algorithm for SC-867

24   data"?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't recall.

2    Q.    What is SC?

3    A.    I don't remember.

4    Q.    "Trend prescriber data."

5  You know what this means, don't you?

6    A.    Yes, I do.

7    Q.    What does it mean?

8    A.    I am -- what he was saying

9  at a high level, that Purdue does use

10 prescriber data and analyze where it's

11 coming from.

12    Q.    In other words, they were

13 looking at prescriber data as a potential

14 red flag, right?

15              MR. BARKER:  Object to form.

16              THE WITNESS:  It appears

17       that they were for their products.

18 BY MR. JANUSH:

19    Q.    And Janssen and JOM were not

20 doing that, correct?

21              MR. BARKER:  Object to form.

22              THE WITNESS:  No, for our

23       Duragesic and Nucynta and other

24       scheduled products, we did not do

Highly Confidential - Subject to Further Confidentiality Review

1          trend analysis on the prescriber

2          data as I previously said.  We

3          stopped at the wholesaler.

4     BY MR. JANUSH:

5          Q.    Did you know that your sales

6     group was doing trend analysis on its

7     higher prescribers of Nucynta and

8     Duragesic?

9          A.    I did not know.

10         Q.    Did you know that Janssen

11    was ranking its high Duragesic

12    prescribers and calling them Duragesic

13    loyalists in spreadsheets that were

14    shared with the sales force?

15         A.    No, I did not know that.

16         Q.    Did you know that Janssen,

17    while you were head of controlled -- you

18    still are, but while you were director of

19    controlled substance compliance, was in

20    2013 and perhaps earlier ranking doctors

21    based on whether they were platinum,

22    gold, silver, or bronze, based on how

23    many long-acting and short-acting Janssen

24    opioid products they were writing?

1            MR. BARKER:  Object to form.

2            THE WITNESS:  No.

3     BY MR. JANUSH:

4        Q.    Is that information that you

5     would have wanted to know after meeting

6     with Jack Crowley and given -- been given

7     benchmarking guidance about looking at

8     prescriber data trends?

9        A.    No.  I was responsible for

10    ensuring our order monitoring process was

11    giving what DEA requested.  And through

12    numerous engagements, every two to

13    three years we reviewed our program with

14    DEA.  And they expected the wholesalers

15    to get that information.  You know, we

16    asked for recommendations, and they never

17    told us that they needed that information

18    from us.

19       Q.    Is it at all possible, have

20    you contemplated the fact that the DEA

21    might not have known what Janssen's

22    internal capabilities were in 2012 and

23    after?

24            MR. BARKER:  Object to form.

1    was done and how doctors were being

2    tracked for high prescribing status, were

3    you?

4                MR. BARKER:  Object to form.

5                THE WITNESS:  I am a

6          controlled substance compliance

7          leader.

8    BY MR. JANUSH:

9          Q.    Right.

10         A.    And I am -- I only get -- I

11   only see the processes that are required

12   from DEA.

13         Q.    Let's go back to the first

14   page of the e-mail.  This e-mail

15   concerning your notes about benchmarking

16   with Purdue and Jack Crowley, ex-DEA, and

17   addressing Purdue's SOM system that was

18   revised in '08 made it to Ron Kuntz,

19   product director of the pain franchise,

20   right?

21         A.    I did forward it to him.

22         Q.    And Ron forwarded notes with

23   an FYI to Patricia Yap or Trish Yap,

24   right?

1             MR. BARKER:  Object to form.

2             THE WITNESS:  Well, I am not

3       on this e-mail --

4   BY MR. JANUSH:

5       Q.    But you see --

6       A.    -- so I never received --

7       Q.    You can see that now, right?

8       A.    I can see that it was

9   forwarded.

10      Q.    Sorry.

11            MR. BARKER:  You need to let

12      her answer too.

13            MR. JANUSH:  My apologies.

14  BY MR. JANUSH:

15      Q.    And you know who Patricia

16  Yap is, right?

17      A.    No, I do not.

18      Q.    Did you know that Patricia

19  Yap was one of the most senior executives

20  in sales and marketing in the pain

21  franchise?

22            MR. BARKER:  Object to form.

23            THE WITNESS:  I just said I

24      didn't know who she was.

1   BY MR. JANUSH:

2         Q.    We'll go to the bottom of

3   this page ending in 793 addressing zip

4   codes, "Prescribers of concern.  Do

5   targeting zip code pharmacies.  If had

6   CVS and Walgreens, would be benefit."

7               That's referring to if we

8   had CVS and Walgreens' data unblinded,

9   that would be a benefit; is that right?

10        A.    At the time, the word

11  "unblinding" wasn't --

12        Q.    No, I know, but I'm saying

13  the intent of what this is capturing.

14        A.    The intent, yes.

15        Q.    Right?  I have this correct.

16              So it is, though,

17  addressing, "Zip codes, prescribers of

18  concerns.  Do targeting zip code

19  pharmacies."

20              Do you see that?

21        A.    Yep.

22        Q.    And so Purdue was reviewing

23  prescribers of concern and targeting zip

24  code pharmacies, right?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      That is what it says.

2        Q.      Janssen and JOM were not,

3  correct?

4        A.      Our program --

5        Q.      You can give me the

6  monologue.  But I'm asking if they were

7  not, yes or no.

8        A.      We were not.

9        Q.      Okay.  Flipping to the next

10 page.  "852 data, ordering pattern,

11 deviants in order data SKU.  867 data

12 suspicious, occasion limit wholesalers."

13        Did I read this correctly

14 what I'm boxing in?

15        A.      Yes.

16        Q.      So at this time in 2012,

17 Purdue is addressing that when they

18 redesigned their 2008 SOM system, this is

19 information that was included in the

20 standard operating procedures; is that

21 right?

22        A.      I don't know if it was

23 included in their SOPs, but they said

24 this is what they consider in their

Highly Confidential - Subject to Further Confidentiality Review

1    process.

2          Q.    Got it.

3          A.    I didn't review SOPs.

4          Q.    Understood.  Then below

5    there's a note, "Sensitive to

6    wholesalers' relationship.  Purdue rarely

7    called and said concerned about account,

8    seen it before, will cut orders to

9    wholesalers."

10              Can you elaborate on that

11   part of the discussion?

12         A.    Looking at it all these

13   years, I don't recall what the discussion

14   was about.

15         Q.    Okay.  Was Janssen and JOM

16   concerned about their wholesalers'

17   relationships as well --

18              MR. BARKER:  Object to form.

19   BY MR. JANUSH:

20         Q.    -- when it came to notifying

21   wholesalers about suspicious orders?

22              MR. BARKER:  Object to form.

23              THE WITNESS:  Our process,

24         we already engaged the wholesalers

Highly Confidential - Subject to Further Confidentiality Review

1    whenever a questionable order was

2    discovered.  So we had no concern.

3    We reached out, and if necessary

4    engaged trade to reach up to the

5    wholesaler leaders to make sure

6    that we had the justification and

7    documentation, or if there's -- if

8    an order was deemed suspicious.

9  BY MR. JANUSH:

10       Q.    Moving to the next page

11  ending in 795.  It states, "Uses SAP

12  algorithm whiz, tweaks algorithm

13  instantly."  This refers to the fact that

14  the Purdue system, the computer algorithm

15  that runs the suspicious order monitoring

16  math could be tweaked instantly; is that

17  right?

18            MR. BARKER:  Object to form.

19            THE WITNESS:  We didn't get

20       into the details of their actual

21       algorithm.  So I don't -- I wrote

22       what they said, that -- apparently

23       they said tweaks instantly.

24  BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And you did get into

2    the system enough to see it, looking at

3    it on their screen, right?  That's what

4    follows next; is that right?

5    A.    No.  I just took notes.

6    They said looking on the screen.  They

7    didn't show us the screen.

8    Q.    Got it.

9    A.    So he said, "Looking at the

10   screen, you'd see" -- I apologize.  I

11   didn't give that detail there.

12   Q.    Okay.  Go ahead.

13   A.    They did not show -- it was

14   a phone call.  There was nothing -- by

15   then there was no WebEx or sharing.

16   Q.    Understood.  So why don't

17   you read what he stated looking at their

18   screen, what they could see?

19   A.    "Can see largest purchaser,

20   total sales."  I don't know what W stands

21   for.  Apologies.  I don't remember.  "How

22   many orders per day and strength info."

23   Q.    Keep going.

24   A.    "Compare three months, six,

1    nine, 12.  Room for committee to make

2    comment categories, pending, complete,

3    refer with wholesaler to DEA."

4         Q.    And now I'm just going to

5    skip forward to the page ending in 796.

6    And going to address, at the bottom, it

7    looks like information that was being

8    conveyed about what to look for.

9              But why don't you describe

10   what this is referring to.  It says,

11   "Number of prescriptions per month,

12   number for your product in month for

13   certain strength, number paid by cash.

14   DEA can figure out by NDC and number who

15   made it.  If 95 percent in cash is an

16   indicator."

17             What's that referring to?

18        A.    I don't recall.  I mean,

19   just looking at this, it looks like one

20   of the red flags about the cash.

21        Q.    Okay.  And then -- and then,

22   "Rebate reports, systems.  See what's

23   distributed, paid by cash."  How were

24   rebates reports and systems being used by

1    substances.

2           MS. BOODY:  Could I just see

3        a copy of Exhibits 12 and 13?  I

4        don't think you have the Bates

5        number on the record.

6           Thank you.

7           MR. JANUSH:  For the record,

8        the Bates number of Exhibit 13 is

9        JAN-MS-02964406.

10          And Exhibit 12 is

11       JAN-MS-02963380.

12          (Document marked for

13       identification as Exhibit

14       Dempsey-14.)

15   BY MR. JANUSH:

16       Q.    I'm going to hand you what's

17   been marked as Dempsey Exhibit 14.

18          And earlier I -- I addressed

19   how you drafted your questionnaire.  And

20   this just confirms for the record that

21   you wrote to Brian Strehlke, Michael

22   Levitt, Guy Bacco and Art Dysart, "I took

23   the Buzzeo questionnaire and blended our

24   questions.  Could you all review and let

Highly Confidential - Subject to Further Confidentiality Review

1   me know your thoughts by this Wednesday?

2   I have a meeting with trade to review.

3   Would like to get this to ABC, Cardinal

4   and McKesson before our May visits.

5   Thanks."

6           Did I read that accurately?

7       A.      Yes, you did.

8       Q.      Okay.  Why was it important

9   to you to get this to ABC,

10  AmerisourceBergen, Cardinal, and McKesson

11  before your May visits?

12      A.      We had intended to have --

13  to set up meetings.  I was going to work

14  with trade in order to meet with the

15  wholesalers to review our new

16  questionnaire.

17      Q.      Did that meeting happen?

18      A.      The meeting with trade did

19  happen.

20      Q.      Did the meeting with

21  McKesson happen?

22      A.      No.

23      Q.      Why not?

24      A.      They were not available to

1    meet.

2         Q.    Do you know why?

3         A.    No.

4         Q.    Did the meeting with

5    Cardinal happen?

6         A.    No.

7         Q.    Do you know why?

8         A.    No.   The meeting with ABC

9    did occur.

10             (Document marked for

11             identification as Exhibit

12             Dempsey-15.)

13   BY MR. JANUSH:

14        Q.    I'm going to hand you what's

15   been marked as Exhibit 15.   And this is

16   Bates Number JAN-MS-02966153.

17             And I'm going to draw your

18   attention to the third page.   There's an

19   attachment or a forward from the DEA to

20   Michele Dempsey, subject, McKesson agrees

21   to pay record $150 million settlement for

22   failure to report suspicious orders of

23   pharmaceutical drugs.

24             Do you see that?

1        A.     Yes, I do.

2        Q.     And you, on the next day, on

3    January 18th, a day after receiving this,

4    forwarded this on to Frank Mashett and

5    asked if Frank can confirm whether the

6    Ohio distribution center listed below is

7    the location we ship schedules and what

8    precautions we should take in order to

9    ensure we don't ship to a location that

10   no longer is allowed to have CS, right?

11       A.     Yes.

12       Q.     For the record, can you

13   speak up?

14       A.     Yes.

15       Q.     Okay.  And who is Frank

16   Mashett?

17       A.     He was in the trade.

18       Q.     So does that mean that he's

19   involved in sales?

20       A.     No.  He managed the

21   relationship with the wholesalers.

22       Q.     Okay.  Did he manage the

23   relationship with McKesson at this time,

24   in 2017?

1          A.     No.  As he was to remind me

2     that Phil West was the director for

3     McKesson.

4          Q.     Sorry, I see that right

5     above.

6               So Frank responded by

7     letting you know Phil West is the trade

8     account director for McKesson and SeWha

9     Park is the JOM planner.  The two of them

10     would be best to address my questions you

11     have related to this issue involving

12     McKesson.

13               And you respond, "Can you

14     please advise?  Thanks."  Right?

15               And you're writing to Phil

16     West and SeWha Park?

17          A.     Yes.

18          Q.     Okay.  And the answer that

19     you got from Phil West was, "Hi, Michele.

20     This has been an on" -- "this has been

21     ongoing litigation and McKesson has

22     contingency plans in place to leverage

23     their distribution center network over 30

24     sites to continue continuity of product.

Highly Confidential - Subject to Further Confidentiality Review

1          training.

2     BY MR. JANUSH:

3          Q.     Okay.

4          A.     She owned the training

5     program.

6          Q.     And listed as a major

7     violation, wilful nonconformance with

8     federal regulations.  No internal DEA

9     compliance processes in place to...

10               And we have things like

11    "detect and prevent diversion"; is that

12    right?

13         A.     Yes.

14         Q.     And, "submit DEA reports."

15    That's listed as well, right?

16         A.     Mm-hmm.

17         Q.     And, "identify and report

18    suspicious orders" is also listed, right?

19         A.     Yes.

20         Q.     And "train employees" is

21    also listed as a major violation; is that

22    right?

23         A.     Yes.

24         Q.     What's that regarding, train

Highly Confidential - Subject to Further Confidentiality Review

1    employees?

2          A.    Make sure that those that

3    are handling controlled substances know

4    how the regulations apply to their

5    activities.

6          Q.    Okay.  And control

7    distribution of controlled substance is

8    listed as a major -- an area for major

9    violation; is that right?

10          A.    Well, it's listed as if you

11    do not demonstrate anything and having no

12    process in place to control the

13    distribution, you will potentially get

14    a -- a violation with the DEA.

15          Q.    Now on to the next page you

16    address serious violations, right?

17          A.    The next level down, yes.

18          Q.    And at serious violations

19    you address "failure to implement

20    corrective actions that cause deviations

21    from federal regulations or internal DEA

22    compliance processes."

23                Did I read that correctly?

24          A.    Yes, you did.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            And I was trying to relay that the
 2            environment is a lot different
 3            than when we launched Concerta,
 4            which is the other non-narcotic as
 5            well as Duragesic, which you
 6            reminded me was over 20 years old.
 7            (Document marked for
 8            identification as Exhibit
 9            Dempsey-19.)
10    BY MR. JANUSH:
11        Q.    I'm going to hand you what's
12    been marked as Exhibit 19.
13            This is minutes of a
14    suspicious order monitoring workshop.
15            MR. BARKER:  Did you hand me
16            two copies?
17            MR. JANUSH:  Sorry, I
18            apologize.  I did.  Maybe you can
19            pass one down.
20            MR. BARKER:  Sure.  Just
21            wanted to make sure --
22            MR. JANUSH:  Total mistake.
23    BY MR. JANUSH:
24        Q.    And it looks at the top of
```

1    the workshop agenda you are listed as a

2    speaker from the 11 to 12 o'clock hour.

3    And you are listed to address current JOM

4    program and Teva or Teva benchmark.

5            Do you see that?

6        A.    Yes, I do.

7        Q.    In 2017 did you benchmark

8    with Teva?

9        A.    In 2017, yes, we did.

10        Q.    And what did you benchmark

11    on?

12        A.    We reviewed how they handle

13    the authorized generic of our ADHD

14    medicine.  So we -- they walked through

15    their suspicious order monitoring program

16    in regards to the handling of our

17    methylplenidate product.

18        Q.    Okay.  And I'm going to turn

19    your attention to the second page here.

20    And you're addressing opportunities with

21    current order monitoring program

22    discussed at December 13, 2017 workshop.

23            And by -- by the way, were

24    you the author of this document?  This

1        that you needed to have the

2        pharmaceutical data in the

3        statement you were saying, as part

4        of the suspicious order

5        monitoring, you needed to have the

6        pharmacy data.

7            And I'm explaining that we

8        have met with DEA, we've reviewed

9        our program, we have asked for

10       recommendations.  And the last

11       time they had our SOPs was

12       December of 2017 that we provided

13       them our program.  And that not

14       any of those times did they come

15       back and say well, you need to get

16       pharmaceutical data for our

17       Duragesic product.

18   BY MR. JANUSH:

19       Q.    But you wanted to get

20   pharmaceutical data for your Schedule II

21   products in 2018 in order to enhance your

22   suspicious order monitoring program,

23   didn't you?

24       A.    We were looking into that to

Highly Confidential - Subject to Further Confidentiality Review

1    enhance it, because we thought that that

2    was what was the next phase of what was

3    needed.

4         Q.    And one of the other things

5    that you were looking to do, was it not,

6    was to address the fact that your then

7    current suspicious order monitoring

8    program, as we've discussed a lot today,

9    only compared against a specific drug at

10   a specific strength when running the

11   mathematical formula to determine if an

12   order is suspicious.  And you viewed that

13   to be an issue that should be fixed going

14   forward, right?

15             MR. BARKER:  Object to form.

16             THE WITNESS:  Our current

17        program was looking at Duragesic

18        SKUs, history of ordering patterns

19        with our customers.

20             DEA regulations say you have

21        to have a system in place that

22        monitors orders, and it doesn't

23        say you need to have pharmacy data

24        downstream.  We were monitoring