EXHIBIT 186

Highly Confidential - Subject to Further Confidentiality Review

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION
                      -  -  -
3

IN RE:  NATIONAL          :   HON. DAN A.
4   PRESCRIPTION OPIATE       :   POLSTER
LITIGATION               :
5                             :
APPLIES TO ALL CASES      :   NO.
6                             :   1:17-MD-2804
                             :
7

          - HIGHLY CONFIDENTIAL -
8
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
9

10                    VOLUME II
11                      -  -  -
12                  March 8, 2019
13                      -  -  -
14

15              Continued videotaped
deposition of MICHELE R. DEMPSEY, taken
16   pursuant to notice, was held at the law
offices of Drinker Biddle & Reath, 105
17   College Road East, Princeton, New Jersey,
beginning at 10:15 a.m., on the above
18   date, before Michelle L. Gray, a
Registered Professional Reporter,
19   Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.
20
                      -  -  -
21

          GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
23
24

Highly Confidential - Subject to Further Confidentiality Review

1     A.     This was at that time, yes.

2     Q.     Then I'm going to flip

3 forward to that separator sheet that I

4 spoke to you about, with the big bold

5 numbers for the separate set of Bates

6 numbering.

7           And there we have the Drug

8 and Chemical Advisory Group LLC,

9 suspicious orders monitoring, SOM, for

10 Johnson & Johnson, dated December 13,

11 2017.  Presented by Terrance W.

12 Woodworth.

13          Do you see that?

14    A.     Yes.

15    Q.     Was this the presentation or

16 the slideshow of the presentation that

17 Mr. Woodworth presented to your

18 December 13th workshop on suspicious

19 order monitoring?

20    A.     Yes, it is.

21    Q.     It is.  Okay.  And it goes

22 through an overview of drug control

23 history; is that right?  Is that a yes?

24    A.     Yes, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And we'll flip

2  through it fairly quickly for time

3  purposes.

4            And at Page 7, it addresses

5  U.S. drug law and regulations, Controlled

6  Substance Act, CSA, of 1970.

7            Do you see that?

8    A.    Yes, I do.

9    Q.    That Page 9, it's addressing

10  Schedule II through V drugs, which are

11  deemed, according to Mr. Woodworth, to

12  have a -- to include at Schedule II,

13  excuse me, hydromorphone, morphine,

14  fentanyl, methylphenidate.

15            Do you see that?

16    A.    Yes, I do.

17    Q.    And at Page 11,

18  Mr. Woodworth was addressing the opioid

19  epidemic in the U.S.; is that right?

20    A.    Yes, he was.

21    Q.    At Page 12, he was

22  addressing how in 2015 there were 52,404

23  drug-related overdose deaths; is that

24  right?

1                    MR. BARKER:  Object to form.

2                    THE WITNESS:  Yeah.

3    BY MR. JANUSH:

4         Q.    And he addressed there were

5    143 deaths every 24 hours; is that also

6    right?

7                    MR. BARKER:  Object to form.

8                    THE WITNESS:  That is the

9         data that he presented.

10   BY MR. JANUSH:

11        Q.    Okay.  He presented data

12   that 33,091 deaths involved opioids

13   including heroin; is that also right?

14                   MR. BARKER:  Object to form.

15                   THE WITNESS:  That is what

16        is presented on the slide, yes.

17   BY MR. JANUSH:

18        Q.    And he went into a little

19   bit more detail about the -- on an

20   average day in the U.S., at Page 13, the

21   650,000 opioid prescriptions that are

22   dispensed; is that right?

23                   MR. BARKER:  Object to form.

24                   THE WITNESS:  The slide does

1          present the data on the opioid

2          prescriptions, yeah.

3     BY MR. JANUSH:

4          Q.    And he addressed, at Page

5     14, opioid diversion and abuse and the

6     high abuse potential of these drugs; is

7     that right?

8          A.    He did speak to high abuse

9     potential during the presentation.

10          Q.    And he addressed severe

11     dependence liabilities as well, didn't

12     he?

13          A.    He read the bullet during

14     his presentation, yes.  He did.  He

15     mentioned -- so these are the bullets

16     that he read during the training.

17          Q.    Okay.  At Page 17, he

18     addressed 21 C.F.R. 1301.74(b); is that

19     right?

20          A.    Yes.

21          Q.    And that says, "The

22     registrant shall design and operate a

23     system to disclose to the registrant

24     suspicious orders of controlled

Highly Confidential - Subject to Further Confidentiality Review

1   substances.  The registrant shall inform

2   the field division office of the

3   administration in his area of suspicious

4   orders when discovered by the

5   registrant."

6          Do you see that?

7      A.    Yes.

8      Q.    And do you recall this being

9   presented to Johnson & Johnson?

10     A.    Yes.

11         MR. BARKER:  Object to form.

12  BY MR. JANUSH:

13     Q.    And then he defined the

14  suspicious order monitoring regulation or

15  quoted the definition at Page 18, or

16  Slide 18.  Quote, "Suspicious orders

17  include orders of unusual size, orders

18  deviating substantially from a normal

19  pattern, and orders of unusual

20  frequency."

21         Do you see that?

22     A.    Yes, I do.

23     Q.    Did you have an

24  understanding that this was the

1  definition of suspicious orders?

2      A.    Yes, we did.

3      Q.    Okay.  What's the earliest

4  date that you had that understanding of

5  this definition?

6          MR. BARKER:  Object to form.

7          THE WITNESS:  Back to my

8      early -- when I took over the DEA

9      compliance with Noramco in 2007,

10     2008.

11 BY MR. JANUSH:

12     Q.    So in or around 2007 or

13 2008, you had an understanding that the

14 definition of suspicious orders include

15 orders of unusual size, orders deviating

16 substantially from a normal pattern, and

17 orders of unusual frequency; is that

18 right?

19     A.    Yes.

20     Q.    We're going to move on from

21 this exhibit for a moment.

22         (Document marked for

23     identification as Exhibit

24     Janssen-Dempsey-24.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. JANUSH:

2        Q.    I'm going to mark a new

3    exhibit as Exhibit Dempsey -- Exhibit 24.

4            MR. JANUSH:  And copies to

5        opposing counsel.

6    BY MR. JANUSH:

7        Q.    This exhibit is

8    Bates-stamped JAN-MS-05444730.

9            It is an e-mail from Valerie

10   Chikwendu to Michele Dempsey.  And you

11   don't actually get the date until reading

12   slightly below the first e-mail.  And it

13   looks like it's June 8th, 2018.  Do I

14   have that right?

15       A.    Yes.

16       Q.    And who is Valerie

17   Chikwendu?

18       A.    She is a project manager

19   from the project management organization

20   of JOM.

21       Q.    And what does it mean to be

22   a project manager?

23       A.    You take on a project to

24   make sure you have the funding, the team,

1    the resources, the capital expenses to

2    deliver a project.

3            Q.    Does she work within a

4    different -- a specific group?  For

5    example, does she work within compliance?

6            A.    No, she does not.

7            Q.    She does not.  So she

8    assists in getting a project funded, off

9    the ground, et cetera; is that right?

10           A.    She does all the tactical

11   activity to facilitate making sure a

12   project gets done when it's supposed to

13   get done.

14           Q.    Okay.  And she is providing

15   you with a draft e-mail, it looks like

16   to, a Sudha, S-U-D-H-A.  Who is Sudha?

17           A.    I believe she's a finance

18   leader.

19           Q.    Okay.  And in this draft

20   e-mail, she's addressing questions that

21   Sudha raised earlier in the e-mail string

22   regarding the compliance-related

23   investment to meet DEA requirements; is

24   that right?

1    A.    Can I read?

2    Q.    You may.

3    A.    Thank you.

4    Q.    It's the second page.  Turn

5  to the -- follow with me, the second page

6  of the e-mail is where I'm focusing where

7  Sudha wrote in the middle of the page to

8  John Dzurenko, Katrina Purifoy -- or

9  Purifoy, and is addressing, "Agree that

10  it is compliance related.  Would like to

11  understand how this investment will meet

12  the DEA requirement.  Are there other

13  programs that are doing this, i.e.,

14  within commercial?  What is the

15  cap/expense split?"

16        Do you see that?

17    A.    Yes, I do.

18    Q.    Okay.  And Valerie Chikwendu

19  is drafting a response for you and she

20  wrote on Page 1, "Michele, here's the

21  e-mail I plan to send."

22        Do you see that?

23    A.    Yes, I do.

24    Q.    All right.  And I'm moving

1   down to the draft e-mail.  She wrote,

2   "Hello, Sudha.  Here are the answers to

3   your questions below.  I have also cc'd

4   Michele Dempsey, director of controlled

5   substances compliance, for further

6   elaboration if needed.

7               "DEA guidelines:  The DEA

8   guidelines include an expectation for us

9   to flag:  Orders of unusual size, orders

10  deviating substantially from normal

11  pattern, orders of unusual frequency."

12              Do you see that?

13       A.    Yes, I do.

14       Q.    Okay.  Now, focusing on my

15  prior question, Ms. Dempsey, that I asked

16  just moments ago, I asked if you agreed

17  with that definition.  And if -- you said

18  you did, right?

19       A.    Yes.

20       Q.    I asked when is your

21  earlier -- earliest understanding of that

22  definition, and you said around 2007,

23  2008 when you joined Noramco; is that

24  right?

1        A.      Yes.

2        Q.      Okay.  Next sentence in this

3    draft e-mail is, "We currently have a

4    process to flag unusual based on List 1

5    chemicals, and it is not up to current

6    industry practice.  The other two

7    requirements are vulnerabilities that

8    must be addressed.  Our current

9    monitoring program flags orders of

10   unusual size (a running average of past

11   orders is taken and we flag any order

12   that is 300 percent more than average).

13   We do not currently account for ordering

14   frequency or cumulative effect of

15   multiple orders in one month against the

16   threshold, and we plan to incorporate

17   other ordering deviations based on

18   patterns which will be defined as part of

19   this project."

20             Did I read that correctly?

21        A.      You did.

22        Q.      Do you agree that at that

23   time, the we, Johnson & Johnson, or JOM,

24   did not account with its current

1    monitoring system, for ordering frequency

2    or cumulative effect of multiple orders

3    in one month against a threshold?

4         A.    No.

5         Q.    You don't agree or you do

6    agree?

7         A.    I do not agree.  The

8    algorithm, which is what is being spoken

9    to, because we're asking for capital

10   funding to reprogram, to come up with an

11   algorithm that factors in the three, the

12   current one was only looking at the

13   12-month rolling average of a quantity.

14             But our program, the

15   outside, the overall review and

16   investigation, that's where we have the

17   frequency and pattern reviewed, because

18   if a customer orders one SKU every

19   12 months, it's going to be flagged.  And

20   then we look at the ordering pattern,

21   their history, and that's how -- so this

22   was for a capital appropriation to get

23   funding for an IT system.

24        Q.    Let's go back to what this

1    says, because -- because you had an

2    opportunity to edit this document, right?

3    Let's go up to the top of the e-mail.

4         A.    Yes.

5         Q.    It says -- I'm going to

6    circle it.

7               "Made some tweaks below.

8    Thank you."

9               Do you see that?

10        A.    Yes.  Yes.

11        Q.    Your tweaks are embedded in

12   this document, correct, in this e-mail?

13   "Made some tweaks below"?

14        A.    Yes.

15              MR. BARKER:  Object to form.

16   BY MR. JANUSH:

17        Q.    Is that right?

18        A.    I did make some

19   modifications below.

20        Q.    Okay.  Okay.  And you didn't

21   edit the language, "We currently have a

22   process to flag unusual based on List 1

23   chemicals and is not up to current

24   industry practice."

Highly Confidential - Subject to Further Confidentiality Review

1          You didn't edit that

2     sentence, right?

3          A.    No, I -- I don't have her

4     previous one to see what she originally

5     wrote to see what I actually tweaked.

6          Q.    But you didn't change it?

7          A.    No.

8          Q.    That language is in here,

9     you didn't modify that beyond the

10    statement that's written here, correct?

11         A.    Right.  Our algorithm --

12         Q.    No, that's not what I'm

13    asking you.  I'm -- don't talk about your

14    algorithm.  I'm asking about whether you

15    modified that first sentence, beyond

16    what's written here?

17         A.    No, I didn't.

18              MR. BARKER:  Object to form.

19    BY MR. JANUSH:

20         Q.    No, you did not, right?

21         A.    No, I not modify it.

22         Q.    Second sentence, "The other

23    two requirements are vulnerabilities that

24    must be addressed."

Highly Confidential - Subject to Further Confidentiality Review

1    You didn't modify that

2    sentence beyond the language that's

3    written there, correct?

4         MR. BARKER:  Object to form.

5         THE WITNESS:  No, I didn't.

6    BY MR. JANUSH:

7         Q.    Third sentence, "Our current

8    monitoring program flags orders of

9    unusual size, a running average of past

10   orders is taken, and we flag any order

11   that is 300 percent more than average."

12        You didn't modify that

13   sentence beyond what's written there,

14   right?

15        A.    No, I didn't.

16        Q.    Next sentence, "We do not

17   currently account for ordering frequency

18   or cumulative effect of multiple orders

19   in one month against a threshold, and we

20   plan to incorporate other ordering

21   deviations based on patterns which will

22   be defined as part of the project."

23        You didn't edit this

24   sentence beyond what is written here; is

1    that right?

2              MR. BARKER:  Object to form.

3              THE WITNESS:  I don't have

4         the original to see what I

5         actually tweaked.  But this is the

6         end product which would include

7         what I tweaked.

8    BY MR. JANUSH:

9         Q.    Thank you.  Now, to go back

10   to what you were addressing earlier, I

11   think.  Your algorithm was designed to

12   flag any order that is 300 percent more

13   than the average rolling annual weekly

14   order; is that right?

15        A.    For every customer that

16   places an order for one particular SKU,

17   it looks at the 52-week history ordering

18   and compares -- takes an average, times

19   by the 300 percent, and compares the

20   current order against what they have

21   ordered -- this threshold.

22        Q.    And by this threshold, you

23   mean the 300 percent more than their

24   average; is that right?

1        A.    Yes.

2        Q.    I'm going to move on to

3   another document that I'm marking as

4   Dempsey Exhibit 25.

5              (Document marked for

6              identification as Exhibit

7              Janssen-Dempsey-25.)

8              MR. JANUSH:  Let me hand all

9              three to you.

10  BY MR. JANUSH:

11       Q.    This document is

12  Bates-stamped in the upper right corner

13  vertically, JAN-MS-02960650.  It's a

14  completed questionnaire from Miami-Luken

15  concerning the JOM SOM program

16  questionnaire.

17             Does that look right to you

18  on the first page, that this would have

19  been the JOM program -- SOM program

20  questionnaire?

21             MR. BARKER:  Object to form.

22             THE WITNESS:  It appears to

23        be the April 2014 questionnaire.

24

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. JANUSH:

2        Q.    Okay.  And I've only

3    encompassed this large 70-page document

4    for your review because it included a

5    letter from the DEA way at the end of

6    this, at Bates number ending in 712.  So

7    I'm going to ask you to turn to -- look

8    in the upper right corner and turn to

9    712.

10           You are with me on 712.  The

11   header is -- the letterhead is from the

12   United States Department of Justice Drug

13   Enforcement Administration.

14           Do you see that?

15       A.    Mm-hmm.

16       Q.    The date is December 27,

17   2007.

18           Do you see that?

19       A.    Mm-hmm.

20       Q.    And it's signed by, if you

21   turn to Page 2, Joseph T. Rannazzisi,

22   deputy assistant administrator, office of

23   diversion control.

24           Do you see that?

1     A.     Yes, I do.

2     Q.     Okay.  So I'm producing you

3  with the letter that was produced from

4  Miami-Luken as part of their

5  questionnaire response on your suspicious

6  order monitoring questionnaire because

7  I'm representing to you today that we

8  couldn't locate the Johnson & Johnson,

9  JOM, Noramco, or Ortho-McNeil letter that

10  might have been sent by the -- that would

11  have been sent, excuse me, by the United

12  States Department of Justice.

13          I'm going to read you the

14  first sentence.  It says, "Dear

15  Registrant, this letter is being sent to

16  every entity in the United States

17  registered with the Drug Enforcement

18  Administration, DEA, to manufacture or

19  distribute controlled substances.  The

20  purpose of this letter is to reiterate

21  the responsibilities of controlled

22  substance manufacturers and distributors

23  to inform DEA of suspicious orders in

24  accordance with 21 C.F.R. 1301.74(b)."

1                    Do you see that?

2                    MR. BARKER:  Object to form.

3          Object to the preamble.

4                    THE WITNESS:  Yes, I do see

5          it.

6   BY MR. JANUSH:

7          Q.    And in December of 2007,

8   Janssen was a manufacturer of controlled

9   substances, correct?

10         A.    Yes.

11         Q.    And go on to read the next

12  paragraph.  "In addition to and not in

13  lieu of the general requirement under 21

14  U.S.C. 823, that manufacturers and

15  distributors maintain effective controls

16  against diversion, DEA regulations

17  require all manufacturers and

18  distributors to report suspicious orders

19  of controlled substances."

20                   Did I read that right?

21                   MR. BARKER:  Object to form.

22                   THE WITNESS:  Yes, you did.

23  BY MR. JANUSH:

24         Q.    Okay.  Title 21 C.F.R.

1    1301.74(b) specifically requires that a

2    registrant design and operate a system to

3    disclose to the registrant suspicious

4    orders of controlled substances."

5                    Did I read that correctly?

6                    MR. BARKER:  Object to form.

7                    THE WITNESS:  Yes.

8    BY MR. JANUSH:

9         Q.    Okay.  I'm going to have

10   you, for the purposes of time, jump down

11   to the very last paragraph on the page

12   with me.  Okay.

13                   It begins with, "The

14   regulation."  Are you there?

15        A.    Yes.

16        Q.    Okay.  I'm going to read it

17   out loud.

18                   "The regulation specifically

19   states that suspicious orders include

20   orders of an unusual size, orders

21   deviating substantially from a normal

22   pattern, and orders of an unusual

23   frequency."

24                   Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2            MR. BARKER:  Object to form.

3   BY MR. JANUSH:

4      Q.    And that's the same language

5   that Terrance Woodworth presented to you

6   on December 13, 2017, in his suspicious

7   order monitoring workshop, right?

8      A.    Very similar wording.

9      Q.    Okay.  And it's the same

10  language that, in the e-mail below, in

11  the e-mail that we just marked into

12  evidence at Exhibit 24 that I

13  highlighted -- we'll pull that up on the

14  screen for you.  It's the same language

15  that is listed in this June 8, 2018,

16  e-mail that you had the opportunity to

17  edit concerning, "The DEA guidelines

18  include an expectation for us to flag

19  orders of unusual size, orders deviating

20  substantially from normal pattern, orders

21  of unusual frequency."

22            Is that right?

23      A.    Yes.

24      Q.    Same language?

1    A.    Yes.

2    Q.    So the requirements that

3 Joseph Rannazzisi, as the deputy

4 assistant administrator, office of

5 diversion control, was listing in 2007

6 are the same requirements that you and

7 your company were acknowledging in

8 June 2018 that you had only met one of

9 the three requirements with your

10 algorithm, correct?

11    A.    Our algorithm was only

12 addressing the quantity.  But our program

13 outside the algorithm covered the other

14 aspects.  But we wanted --

15         MR. JANUSH:  Move to strike.

16    Nonresponsive.

17 BY MR. JANUSH:

18    Q.    I didn't ask about your

19 program.  For the moment, I asked only

20 about your algorithm.  So --

21    A.    But the regulation doesn't

22 say the algorithm has to have all three.

23 It just says that you have to have a

24 system.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Right.  I asked about your

2  algorithm, did I not?

3    A.    Yes.

4    Q.    Okay.  And there's a reason

5  for me asking that.  I'm going to connect

6  the dots in a moment.  Okay?

7    A.    Okay.

8    Q.    So my question was, you were

9  acknowledging in that e-mail, Exhibit 24,

10  that your algorithm only addressed one of

11  the three requirements stated by the DEA

12  concerning unusual size, deviating

13  substantially from a normal pattern, and

14  orders of an unusual frequency; is that

15  right?

16            MR. BARKER:  Object to form.

17  BY MR. JANUSH:

18    Q.    I'm only speaking of the

19  algorithm.

20    A.    That is what I -- what is

21  written.

22    Q.    Okay.  And in realtime, in

23  practice, when an order is placed for a

24  Schedule II drug, it is your algorithm

Highly Confidential - Subject to Further Confidentiality Review

1    that will flag whether the order is

2    suspicious or atypical and needing review

3    in that moment; isn't that right?

4            MR. BARKER:  Object to form.

5            THE WITNESS:  When an order

6        is placed and the quantity doesn't

7        match what the weekly average of a

8        52 weeks times three, it gets

9        flagged.

10   BY MR. JANUSH:

11       Q.    Right.  So going back to the

12   question I asked you.  In realtime, in

13   practice, when an order is placed for a

14   Schedule II drug, it is your algorithm

15   that will flag whether the order is

16   suspicious or atypical and needing review

17   in that moment, true or false?

18       A.    True.

19       Q.    Okay.  So the fact that you

20   have a program that has the capability to

21   analyze orders beyond the algorithm only

22   comes into play when that -- on that date

23   the order is placed when an order is

24   flagged; isn't that right?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BARKER:  Object to form.

2          THE WITNESS:  When the order

3      is flagged as atypical, it gets

4      investigated.  And then that

5      includes running all of the

6      historical -- looking through the

7      ordering pattern, as well as the

8      frequency part of that.

9  BY MR. JANUSH:

10         Q.    But you can't do an

11  investigation until the order is flagged,

12  right, in realtime?

13         A.    Agreed.

14         Q.    Okay.  When we concluded the

15  deposition -- when we concluded your

16  first day of this deposition, we ended

17  discussing the audit and that

18  December 13, 2017, workshop by the drug

19  and chemical advisory group, as we

20  discussed earlier, right?

21         A.    Yes.

22         (Document marked for

23      identification as Exhibit

24      Janssen-Dempsey-26.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. JANUSH:

2         Q.    Here's Exhibit 26.

3              MR. JANUSH:  There are

4         copies for counsel.

5    BY MR. JANUSH:

6         Q.    This has been produced by

7    your counsel following the January 21 --

8    22, excuse me, 2019, Day 1 of your

9    deposition.

10             And this document appears to

11   be the draft presented to Johnson &

12   Johnson by Terrance Woodworth dated

13   January 8, 2018; is that right?

14        A.    Yes.

15        Q.    And the purpose of this is

16   found within the title.  It's an

17   evaluation of the suspicious orders

18   monitoring system for Johnson & Johnson;

19   is that right?

20        A.    Yes.

21        Q.    Okay.  And Terrance met with

22   you and key customer service personnel at

23   the Piscataway facility concerning their

24   roles in the operation of the JOM

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order monitoring program in

2    order to conduct his examination of your

3    system, his audit of your system; is that

4    right?

5          A.    He met with several groups

6    to discuss the current process, yes.

7          Q.    Okay.  And for the record,

8    if I didn't already say this, this

9    document starts at JAN-MS-05444748.

10               I'm going to have you jump

11   to Page 3.  We're just going to focus on

12   some key aspects of this document.  At

13   Paragraph 3 at the bottom of the page,

14   Terrance wrote, "Start resolving the

15   issue of possibly not applying the SOM

16   order quantity assessment algorithm (SOM

17   algorithm) to all customer orders for

18   Schedule III and IV controlled substances

19   which are received via electronic data

20   interchange (EDI) throughout the day and

21   night.

22               "The SOM algorithm is run

23   against all existing controlled

24   substances orders each day at 3:45 p.m.

Highly Confidential - Subject to Further Confidentiality Review

1    Any orders that are received by J&J

2    customer service via EDI after that time

3    may be shipped to a customer the

4    following day without being subjected to

5    the SOM algorithm unless the EDI orders

6    are checked the next morning to ensure

7    the SOM algorithm has been applied."

8              Do you see that?

9        A.    Yes.

10       Q.    And we addressed that, you

11   may recall, at Day 1 of your deposition,

12   this issue of -- the fact that your

13   monitoring system physically cuts off at

14   a certain point in the afternoon and

15   would require manual review the next

16   morning to ensure that controlled

17   substance orders do not go out unchecked.

18             Do you remember that?

19             MR. BARKER:  Object to form.

20             THE WITNESS:  Yes.

21   BY MR. JANUSH:

22       Q.    Okay.  This issue, was it

23   new to you following the audit or did you

24   know about this limitation, this time

Highly Confidential - Subject to Further Confidentiality Review

1   limitation concerning when the system

2   would shut down in the late afternoon?

3                MR. BARKER:  Object to form.

4                THE WITNESS:  We knew that

5            the program ran every day in the

6            afternoon.  And that's why it was

7            important -- when orders are

8            received, they get manually

9            entered and placed in business

10           manager hold until this program is

11           run.

12               And then the morning, the

13           timestamp for every order is

14           compared to make sure that the

15           order is placed before the report

16           is run.

17   BY MR. JANUSH:

18       Q.    And then I'm going to jump

19   down to Paragraph 7.  It says, "Consider

20   modifying" -- same page, same page,

21   sorry.

22               "Consider modifying

23   Janssen's corporate policy to include the

24   organization's responsibility for

1   safeguarding controlled substances and

2   preventing their diversion, maintenance

3   of effective controls to prevent

4   diversion, Title 21 United States Code

5   Section 823, and include a summary of the

6   SOM program."

7           Do you see that?

8       A.    Mm-hmm.

9       Q.    Who -- what was being

10  referred to here concerning modifying --

11  consider modifying Janssen's corporate

12  policy to include the organization's

13  responsibility for safeguarding

14  controlled substances and preventing

15  their diversion?

16      A.    A lot of the manufacturing

17  sites had a diversion control policy.

18  And they wanted to make sure that that

19  diversion control policy incorporated the

20  suspicious order monitoring requirements.

21      Q.    Okay.  And at Page 8,

22  Paragraph 8, he noted, "Stop using the

23  term 'suspicious' or 'unusual' in all

24  standard operating procedures and work

Highly Confidential - Subject to Further Confidentiality Review

1  instructions related to the corporation's

2  SOM program and start using another term

3  which is more appropriate" -- "a more

4  appropriate characterization of the order

5  evaluation possess, such as 'questionable

6  orders' or 'atypical orders' or 'orders

7  of concern.'"

8          Do you see that?

9     A.    Yes, I do.

10    Q.    And after receiving his

11 guidance, you all actually did stop using

12 the term "suspicious" and modified, your

13 standard operating procedures, to

14 language such as "atypical orders," or

15 "questionable orders"; isn't that right?

16    A.    We started to use

17 questionable orders.

18    Q.    Okay.  And here too in the

19 original audit, the original draft of the

20 audit, Terrance Woodworth -- I'm going to

21 circle the center.  I've already

22 highlighted it -- is addressing the

23 registrant's obligation to design and

24 operate a system to disclose to the

1    registrant suspicious orders of

2    controlled substances.

3              And Terrance quoted, "The

4    registrant shall inform the field

5    division office of the administration in

6    his area of suspicious orders when

7    discovered by the registrant.  Suspicious

8    orders include orders of unusual size,

9    orders deviating substantially from a

10   normal pattern, and orders of unusual

11   frequency."

12             Do you see that?

13       A.    Yes, I do.

14       Q.    And that's what we've been

15   discussing, those three factors; is that

16   right?

17       A.    Yes.

18       Q.    Okay.  And then if you move

19   to Page 8, your auditor addressed, in the

20   middle of the page, second paragraph --

21   I'm going to show you on your screen

22   where I am with the big vertical line

23   that I'm highlighting, okay, vertical

24   lines.

Highly Confidential - Subject to Further Confidentiality Review

1          "The JOM program also takes

2     advantage of the capabilities of the SAP

3     software, which enables generation of

4     several key reports that are helpful in

5     identifying questionable aspects of an

6     order or customer activity over selected

7     time periods."

8               Do you see that?

9          A.    Yes, I do.

10         Q.    And then it goes on to say,

11     in the second sentence, "For example,

12     among many other possible reports, the

13     system can facilitate a report of all

14     controlled substance orders where the DEA

15     registration is missing, invalid or

16     expired; all controlled substances orders

17     where there is an incomplete or

18     inaccurately completed DEA Form 222; and

19     all monitored orders for controlled

20     substances where the quantity ordered has

21     exceeded the current threshold

22     algorithm."

23               Do you see that?

24         A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And so that means that the

2    program looks at monitored orders where

3    the quantity order exceeded the then

4    current 300 percent of an average annual

5    weekly order; is that right?

6              MR. BARKER:  Object to form.

7              THE WITNESS:  The algorithm

8         has the current threshold for

9         quantity ordered.

10   BY MR. JANUSH:

11   Q.    So is that right what I

12   asked?

13   A.    Yes.

14   Q.    And then he appears to be

15   addressing, in the last paragraph, that,

16   "Currently it appears the JOM

17   distribution center in Kentucky is unable

18   to independently render a final SOM

19   determination on a given atypical order.

20   Several different company elements, such

21   as customer service, channel operations,

22   established products, supply chain

23   analysis, and quality assurance, possess

24   information and perform key functions

1    which could pertain to every controlled

2    substance order."

3              Do you see that?

4         A.    Yes.

5         Q.    Okay.  So was he getting at

6    the point that the Kentucky distribution

7    center could not independently render a

8    final suspicious order monitoring

9    determination because several other

10   company functions like customer service

11   and channel operations had to play a role

12   in the determination of a suspicious

13   order?

14        A.    I think what he was talking

15   about is, physically in Kentucky, we only

16   have the material handlers, and that all

17   of the customer service, compliance, and

18   the planners are located in New Jersey.

19        Q.    I think we're on the same

20   page.  That was --

21        A.    Right.

22        Q.    That was what I was getting

23   at with my question.

24        A.    But the order -- the order

1   is not released to pick, pack, and

2   deliver until all the elements are

3   reviewed.  And that releasing happens

4   in -- by customer service, not local.

5        Q.    Then on Page 9, he addresses

6   recommendations.  I'm not going to go

7   through every one for the purpose of

8   time.

9             I am going to start with the

10  bottom of Page 9 at Paragraph 3.  He does

11  address that you have to start resolving

12  the issue of possibly not applying the

13  SOM order quantity assessment algorithm

14  to all customer orders for Schedule III

15  and IV controlled substances which are

16  received via electronic data interchange

17  throughout the day and night, right?

18       A.    Yes.

19       Q.    But there's actually no

20  difference between a Schedule II order

21  and a Schedule III and IV order with

22  respect to how that algorithm ran and

23  when that algorithm cut off during the

24  day; isn't that right?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BARKER:  Object to form.

2          THE WITNESS:  Well, Schedule

3     IIs don't come in through EDI.

4  BY MR. JANUSH:

5          Q.    Oh, right.

6          A.    Schedule II have 222s that

7     have to be entered in.

8          Q.    That's right.  And once

9     entered in, how do they -- how do they

10    run?

11         A.    Well, when you receive the

12    order, it goes into SAP and placed on

13    business manager hold until the

14    algorithm --

15         Q.    Right.  So the same

16    algorithm, though, applies with these

17    Schedule II as well, is what I'm getting

18    at, right?

19         A.    Yes.

20         Q.    And the same cutoff of that

21    algorithm, in terms of when it runs, it

22    runs for II, III, and IV, and it stops at

23    3:45 in the afternoon; is that right?

24         MR. BARKER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  It runs --

2     yes, it runs every afternoon.

3  BY MR. JANUSH:

4          Q.    And stops after that 3:45

5  run, correct?

6          MR. BARKER:  Object to form.

7          THE WITNESS:  It takes every

8     order that's been placed up until

9     the time it runs and it runs all

10     those orders through the

11     algorithm.

12  BY MR. JANUSH:

13          Q.    Right.  And that includes

14  Schedule II, correct?

15          A.    Yes.

16          Q.    Now let's go to Paragraph 4,

17  okay?

18          "Start modifying the

19  existing suspicious order monitoring

20  algorithm and/or adding algorithms to

21  include additional evaluation criteria

22  for each specific DEA basic class of

23  controlled substance handled by J&J;

24  example fentanyl, methylphenidate, and

Highly Confidential - Subject to Further Confidentiality Review

1    tramadol."

2            Do you see that?

3        A.    Yes.

4        Q.    "Consider a base unit

5    measurement" -- "unit of measurement such

6    as grams of active ingredient for the SOM

7    algorithms.

8            "Consider separating J&J

9    customers into two or more groups and

10   perform different analyses of orders for

11   these different groups; e.g., largest

12   three wholesalers in one group, smaller

13   wholesalers in another group.

14            "Consider evaluating

15   customer orders for specific DEA basic

16   classes of substances against similar

17   size and geographically placed customers,

18   and perform national, regional, state,

19   and perhaps three digit zip code

20   comparisons among like-size customers."

21            Did I read that correctly?

22       A.    Yes, you did.

23       Q.    Before getting Terrance

24   Woodworth's audit suggestion within this

1    report concerning this Paragraph 4, had

2    you and your team previously considered

3    modifying your suspicious order

4    monitoring algorithm in the manners that

5    he suggested here?

6         A.    We were in discussion about

7    these items.  After -- through

8    benchmarking, in recent benchmarking, we

9    realized these are potential enhancements

10   that DEA may expect us to do.

11        Q.    And let's go to Paragraph

12   4A.

13            Quote, "Stop using the

14   current single-criterion algorithm which

15   selects and holds orders from customers

16   when the quantity of an order is greater

17   than three times, 300 percent, the

18   customer's average weekly order based on

19   a rolling 12-month ordering history from

20   that customer."

21            Do you see that?

22        A.    Yes, I do.

23        Q.    And this is -- this report

24   was dated January --

1        A.     January.

2        Q.     -- of -- January 6th -- 8th,

3   excuse me, of 2018, right?

4        A.     Yes.

5        Q.     And a little more than a

6   year and about two weeks -- actually a

7   year and exactly two weeks later, on

8   January 22, 2019, I first deposed you.

9   And you indicated that you had not

10  stopped using the single-criterion

11  algorithm as of that date and were still

12  using the 300 percent of the customer's

13  average weekly order in J&J's suspicious

14  order monitoring algorithm; is that

15  right?

16              MR. BARKER:  Object to form.

17              THE WITNESS:  We are

18         currently using the algorithm

19         while the project, which you

20         already provided information on,

21         is underway.

22  BY MR. JANUSH:

23         Q.     And Terrance goes on to

24  critique the current single-criterion

Highly Confidential - Subject to Further Confidentiality Review

1   algorithm, which, by the way -- we

2   established in the last deposition, and

3   just to refresh everything for Day 2,

4   this 300 percent of the customer's

5   average weekly order based on a rolling

6   12-month order history is the algorithm

7   that existed since the inception of

8   Johnson & Johnson's suspicious order

9   monitoring program through the present

10   date, right?

11                  MR. BARKER:  Object to form.

12                  THE WITNESS:  This is the

13          algorithm that was implemented

14          late 2006.

15   BY MR. JANUSH:

16          Q.    Through the present date,

17   correct?

18          A.    Yes.

19          Q.    Okay.  And Terrance

20   Woodworth states, "This algorithm only

21   measures quantity and does not consider

22   frequency or a pattern of ordering by the

23   same customer," right?

24          A.    Yes.

1    Q.    And you agree with that,

2  right?

3              MR. BARKER:  Object to form.

4              THE WITNESS:  It focuses on

5         the ordering of one single

6         customer, yes.

7  BY MR. JANUSH:

8    Q.    And that's not my question.

9  I said this algorithm only measures

10  quantity and does not consider frequency

11  or a pattern of ordering by the same

12  customer.

13              Do you agree with that?

14    A.    That is what the algorithm

15  does, the quantity.

16    Q.    And so you agree with that,

17  right?  Yes?

18    A.    Yes.

19    Q.    And the algorithm compares a

20  customer's order quantity against only

21  that customer's average annual purchases,

22  right?

23    A.    Yes.

24    Q.    The algorithm would not

Highly Confidential - Subject to Further Confidentiality Review

1   detect multiple customer orders during a

2   given week, right?

3           MR. BARKER:  Object to form.

4           THE WITNESS:  Yes.

5   BY MR. JANUSH:

6       Q.   The algorithm would not

7   detect orders which consist of gradual

8   quantity increases of controlled

9   substance over time, right?

10          MR. BARKER:  Object to form.

11          THE WITNESS:  That is what

12      he wrote.

13  BY MR. JANUSH:

14      Q.   Is that right though?

15      A.   I've never seen it happen,

16  but it -- I guess it could.

17      Q.   Is it right that --

18      A.   He wrote that, yes.  He

19  wrote that, yes.

20      Q.   I'm not asking if he wrote

21  it.  I'm asking if you agree with it,

22  that the algorithm would not detect

23  orders which consist of gradual quantity

24  increases of a controlled substance over

Highly Confidential - Subject to Further Confidentiality Review

1    time.

2          A.     In theory it could happen.

3          Q.     What could happen?

4          A.     That if they ordered tiny

5    increases over time, by averaging it out,

6    it might -- it might not show.

7          Q.     Meaning the algorithm might

8    not pick it up?

9          A.     Yes.

10         Q.     Okay.  The algorithm would

11   not detect a new customer's orders for

12   controlled substances which initially

13   commence with larger than normal

14   quantities and remain at a constant

15   level.

16               Do you agree with that?

17               MR. BARKER:  Object to form.

18               THE WITNESS:  The algorithm

19          only detects what the orders are.

20          However, our outside processes by

21          onboarding new customers, we look

22          at their quantity.  So, if -- so

23          what number gets entered into the

24          algorithm, I question that one,

Highly Confidential - Subject to Further Confidentiality Review

1        that, you know, would we really

2        start a customer at a high level.

3   BY MR. JANUSH:

4        Q.    Well, you would go through

5   your -- your questionnaire process,

6   right?

7        A.    Yes.

8        Q.    And you would get on the

9   phone with the customer and ask what

10  their needs are, right?

11       A.    And then we would also

12  evaluate whether that makes sense.

13       Q.    Right.  And if it seemed to

14  make sense to customer service to clear

15  the order, and the order started at a

16  high number, that would be the starting

17  point for that new customer, right?

18       A.    But customer service doesn't

19  do the approval.  It would go to the DEA

20  compliance group that would look at it

21  and question it and ask for justification

22  for that high level.

23       Q.    Okay.  So you -- you

24  corrected me in terms of the department

Highly Confidential - Subject to Further Confidentiality Review

1    that would analyze it.  But I'm still

2    addressing the fundamental concept.  And

3    the fundamental concept that I'm

4    addressing is that DEA compliance would

5    question and speak with the customer and

6    see if they are content with the

7    explanation that the high order is

8    justified; is that correct?

9          A.    Yes.  And with the

10   documentation on hand, yes, that could

11   happen.

12         Q.    And so once a customer

13   starts at a high, larger than normal,

14   quantity, if they remain at that constant

15   level, the algorithm wouldn't detect --

16   it wouldn't detect anything, right?

17               MR. BARKER:  Object to form.

18               THE WITNESS:  If they

19          consistent -- if they ordered

20          consistently that amount over

21          time.  But if they had one big

22          order and they don't order for

23          12 months, the algorithm will flag

24          it.  And we'll have to investigate

1       it again.  Why did you not order

2       it, so --

3               MR. JANUSH:  Move to strike

4       as nonresponsive.

5   BY MR. JANUSH:

6       Q.    The algorithm does not

7   distinguish between controlled

8   substances, geographic areas, or similar

9   size customers; example, similar size

10  wholesaler.

11              Do you agree with that?

12      A.    Our algorithm doesn't,

13  right.

14      Q.    Doesn't or does?

15      A.    Does not.

16      Q.    I'm going to have you turn

17  to Page 14, if you will.

18              At the top, I'm looking at

19  the bullets that fall within Terrance

20  Woodworth's Paragraph 12.

21              And to be fair, we'll go to

22  13 -- Page 13.  He's addressing

23  continue -- issues to continue/enhance

24  J&J's program.  And multiple bullets

1    follow.

2              And so on 14, I'm looking at

3    the second bullet.  "When an SOM-related

4    action against a DEA registrant is noted,

5    determine whether there is a learning

6    from that case.  Determining whether it

7    involves one of J&J's customers, and if

8    so, whether the JOM suspicious order

9    monitoring algorithm identified any

10   previous atypical orders for that

11   customer and modify the algorithm

12   accordingly."

13              Do you see that?

14       A.    Yes, I do.

15       Q.    Okay.  And the last bullet

16   addresses, "Take past order examples and

17   evaluate their circumstances, order

18   patterns, and activity against revised

19   algorithm or algorithms to determine

20   discrepancies or adjustments needed."

21              Do you see that last bullet?

22       A.    Yes.

23       Q.    You didn't like that much,

24   did you?

Highly Confidential - Subject to Further Confidentiality Review

1        MR. BARKER:  Object to form.

2        THE WITNESS:  I don't

3    understand that.  He was saying

4    that once we include his

5    enhancements, to keep looking

6    at -- he was asking us, once we

7    identify -- we fix the

8    algorithm -- not fix -- we make

9    these enhancements for quantity,

10   frequency, and pattern, he said we

11   should run past examples through

12   it.

13        And at this time we didn't

14   understand why, because the

15   algorithm, the thresholds we

16   already are setting up is based on

17   historical ordering pattern.  And

18   those orders have already been

19   investigated.

20        And, you know, by sending

21   them through the new thresholds,

22   it would have confirmed we

23   shouldn't have investigated them,

24   because they were -- our current

1    algorithm was overflagging.

2         Do you know what I mean?

3    Because we were going based on

4    SKU, with these enhancements where

5    we're going on active ingredient,

6    if we were to throw all those

7    orders through the new system,

8    they would have shown that we

9    shouldn't have investigated them.

10   And --

11   BY MR. JANUSH:

12        Q.   So you're saying -- saying

13   throwing orders into a more robust

14   algorithm would have shown you that you

15   shouldn't have investigated prior orders?

16   That's your position?

17        A.   No.

18        Q.   Okay.  So let's get this

19   straight so that I can explain my

20   question.

21        A.   All right.

22        Q.   As of this date that he,

23   Terrance, is making his recommendations,

24   you have a one-dimensional algorithm that

Highly Confidential - Subject to Further Confidentiality Review

1  only looks at quantity ordered over the

2  past year, correct?

3          MR. BARKER:  Object to form.

4          THE WITNESS:  SKU ordered

5      over the year.

6  BY MR. JANUSH:

7      Q.    Right.  Only looks at the

8  SKU of a given order, meaning the same

9  NDC code, the same drug at the same

10 milligram compared to that same drug at

11 the same milligram purchased over the

12 year, right?

13     A.    So, yeah.  So --

14     Q.    And he's saying take past

15 order examples and evaluate them against

16 when you come up with whatever your new

17 future state algorithm is, isn't he?

18     A.    He is saying once we

19 incorporate the enhancements and we go to

20 active ingredient, so all of

21 methylphenidate a customer orders, run

22 these past orders through it.

23     Q.    And you expect less hits to

24 result under a newer program?

1      A.     Yes.

2      Q.     And why is that?

3      A.     Because we are currently

4   over flagging a lot because if a

5   customer -- we're basing it -- I can use

6   ADHD medicines.  You know, 18-milligram

7   is not commonly prescribed.  So a

8   customer may only order it once a year,

9   like in September before school starts.

10  And they only order that one 18-milligram

11  once a year.

12            But 12 months prior average

13  is zero.  So we're going to flag it even

14  though it makes sense, if you run the

15  investigation, you run what they've

16  ordered the past year, or we actually go

17  back two years, they see this wholesaler

18  always gets this 18-milligram before

19  school starts.

20     Q.     You're only looking at the

21  outlier where a rare order or a lesser

22  ordered product is being placed.  What

23  about the scenario where a Cardinal, for

24  example, is ordering a thousand cases of

1    Nucynta every few days or 600 cases of

2    Nucynta every few days in various

3    milligrams, and your old order would have

4    only been looking -- your old algorithm

5    would have only been looking at it as SKU

6    to SKU, and your new algorithm might be

7    looking at it in the cumulative as to the

8    total amount of product that is being

9    shipped, right?

10              MR. BARKER:  Object to form.

11              THE WITNESS:  So when we get

12         the new enhancements, the products

13         that we would use are Duragesic

14         and Concerta and Ultram that we

15         have now.  That's the historical

16         orders.

17              And those products are

18         pretty consistent in the ordering

19         pattern.  So by running them

20         through, we're not going to get

21         any more new hits, because for the

22         past orders for the past few

23         years, because we divested

24         Nucynta --

1  BY MR. JANUSH:

2       Q.    Sure.

3       A.    So it would be a very -- to

4  have customer service -- instead of

5  focusing on our current products and

6  using this new threshold to get -- we

7  are -- it would just -- it wouldn't be

8  time well spent because we already know

9  that those past orders, the customer's

10  ordered the same time, the same

11  quantities, we know the ordering history,

12  anything that's atypical that arrived

13  would have been flagged in our existing

14  program.  So that is why we didn't see

15  the value at that time.

16       Q.    Got it.  Okay.  I'm going to

17  show you an example live in a moment.

18       A.    Okay.

19       Q.    And we're going to go back

20  in time to see how Terrance's

21  recommendation would have impacted you

22  years ago before you divested Nucynta,

23  fair?

24       A.    Sure.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Before doing that I want to
 2    go Paragraph 13.
 3                    MR. BARKER:  Before you ask
 4              that question, Evan, are you
 5              representing that the highlighting
 6              is in the original document.
 7                    MR. JANUSH:  No, I am
 8              absolutely not.  I highlighted all
 9              of this.  I apologize.  I can give
10              you clean copies here.  But
11              everything here is something I
12              highlighted.
13                    MR. BARKER:  Including
14              the --
15                    MR. JANUSH:  Including the
16              yellow highlighting that's
17              computer highlighted by me to
18              focus your attention on it.  I
19              didn't want to play hide the ball.
20              I wanted you to see exactly what I
21              was going to turn to when I
22              touched this page.  I made that
23              highlight.
24
```

1    BY MR. JANUSH:

2         Q.    So that highlight in

3    brighter gold at the bottom of Paragraph

4    13 states, "It appears that the JOM

5    suspicious order monitoring program" --

6    or "suspicious order monitoring has not

7    reported an order for controlled

8    substances as suspicious during its time

9    in operation."

10        Do you see that?

11        A.    Yes, I do.

12        Q.    Do you agree with that?

13        A.    We have not reported a

14   suspicious order, yes.

15        Q.    And when you say we have not

16   reported a suspicious order, you are

17   referring to the fact that we, JOM, or

18   Johnson & Johnson, has not reported a

19   suspicious order to the DEA; is that

20   correct?

21        A.    Right, we have -- might have

22   reported investigated orders to DEA.  But

23   none were deemed suspicious.

24        Q.    Did you report investigated

1  orders to DEA?

2       A.    We -- I recall, and I think

3  we spoke previously in 2007, when there

4  was a Cardinal distribution license

5  issue, and we saw an increased demand in

6  California.  And we reached out to San

7  Francisco DEA, explained our algorithm,

8  explained that we saw an increased demand

9  in this DC because three other DCs lost

10 their license.  We didn't -- we

11 investigated it.  It made sense, and we

12 didn't deem it suspicious.

13      Q.    And beyond that reporting,

14 did you ever report an order to the DEA?

15      A.    We had informal discussions

16 with DEA asking if they wanted every

17 order we investigated.  But no, none that

18 was suspicious.

19      Q.    You didn't like this

20 language that I highlighted in gold in

21 your audit report, did you?  And I'm

22 circling it in red.  You didn't like it,

23 right?

24           MR. BARKER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I don't know

2     what -- I -- it's -- we haven't

3     done any suspicious -- we haven't

4     reported suspicious --

5  BY MR. JANUSH:

6     Q.    You didn't like having the

7  language in the -- in the report and you

8  wanted it wiped out and deleted, didn't

9  you?

10         MR. BARKER:  Object to form.

11         THE WITNESS:  I don't

12     recall.

13  BY MR. JANUSH:

14     Q.    I'll work to refresh your

15  recollection.

16         (Document marked for

17     identification as Exhibit

18     Janssen-Dempsey-27.)

19  BY MR. JANUSH:

20     Q.    I'll mark Exhibit 27 a

21  document beginning with Bates

22  JAN-MS-05444648.

23         I'm going to have you turn

24  to the last page of the e-mail.

Highly Confidential - Subject to Further Confidentiality Review

1    And this is a family

2    document, and it's attaching a new draft

3    of the same date, Drug and Chemical

4    Advisory Group, evaluation of the

5    suspicious order monitoring system audit

6    that is JAN-MS-05444650.

7    But for the moment, I'm

8    going to look at 649, the second page of

9    the e-mail.

10    I'm going to draw your

11    attention to your e-mail to Terry.

12    And you wrote, "Hello,

13    Terry.  During the review last week,

14    Brian pointed out one statement that I

15    think needs to be clarified.  The below

16    statement in red can be misleading.

17    Perhaps you could consider rewording?

18    Something like, 'Due to the current

19    algorithm and order investigation

20    process, there has not been any deemed

21    suspicious that would require

22    reporting.'"

23    Do you see that?

24    A.    Yes, I do.

1    Q.    And the sentence that you're

2  referring to is the last sentence that is

3  also being boxed by me.  "It appears that

4  the JOM suspicious order monitoring has

5  not reported an order for controlled

6  substances as suspicious during its time

7  in operation."

8            Isn't that right?

9    A.    Yes.

10   Q.    Okay.  So Terry -- Terrance

11 Woodworth wrote back to you, "Hi, Michele

12 and Brian.  I hope you are both doing

13 well.  I am happy to just delete this

14 sentence altogether."

15           Do you see that?

16   A.    Mm-hmm.

17   Q.    And he says, "It really

18 doesn't fit well with the recommendation

19 being made.  What do you think?  And if

20 this is okay, do you want me to send you

21 a new draft with the sentence omitted?

22 Thank you, Michele and Brian!!"

23           Do you see that?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Does this refresh your

2 recollection of what happened?

3    A.    Yes, it does.

4    Q.    And then on the first page,

5 Brian Strehlke writes back, "Hi, Terry.

6 That sounds fine to me.  From our time

7 spent together in December, I took away

8 that:  One, our system has been working

9 well; two, there is an identified

10 weakness with Schedule III orders that

11 come in late in the day requiring manual

12 processing to verify their non-suspicious

13 nature; three, you made recommendations

14 necessary to enhance our process to meet

15 changing regulatory expectations; four,

16 there have been no orders identified as

17 suspicious and there have been none

18 reported.

19         "Are you in agreement with

20 the above?"

21         Did I read that right?

22    A.    Yes.

23    Q.    Okay.  Now, let's -- going

24 with Number 2, "There is an identified

Highly Confidential - Subject to Further Confidentiality Review

1   weakness with Schedule III orders that

2   come in late in the day requiring manual

3   processing to verify their non-suspicious

4   nature."

5           We have already established

6   that that same issue can exist with

7   Schedule II orders that come in late in

8   the day as well, right?

9           MR. BARKER:  Object to form.

10  BY MR. JANUSH:

11      Q.    Meaning a Schedule II order

12  that comes in late in the day, regardless

13  of whether it comes in on EDI or though a

14  manual 222 documentation, still can be

15  captured -- still may not be captured by

16  the running of the suspicious order

17  monitoring algorithm late in the day,

18  right?

19          MR. BARKER:  Object to form.

20          THE WITNESS:  If the human

21      error -- customer service puts the

22      order on after the time.

23  BY MR. JANUSH:

24      Q.    Okay.  And Terrance responds

1  to Brian, doesn't he, at the top of this

2  e-mail string?

3          A.    Yes, he does.

4          Q.    And he says, "Hi, Brian.

5  Okay.  Sentence has been deleted!"

6                Do you see that?

7          A.    Mm-hmm.

8          Q.    "Yes, I am in agreement with

9  all of your takeaway comments, and I

10  would add that we felt the current

11  algorithm was one-dimensional and thus

12  had some draw backs that could be

13  addressed by enhancing the algorithm."

14                Do you see that?

15          A.    Yes, I do.

16          Q.    Okay.  Did you agree with

17  his conclusion?

18          A.    That -- it just factored --

19  yes, that it was only on quantity.

20          Q.    Okay.  And going -- going to

21  the bottom again to Brian's e-mail.  At

22  Number 3, Brian sought to confirm, "You

23  made recommendations necessary to enhance

24  our process to meet changing regulatory

Highly Confidential - Subject to Further Confidentiality Review

1  expectations."

2           Do you see that?

3      A.    Yes, I do.

4      Q.    But, there were no changing

5  regulatory expectations as it concerned

6  the three factors of an algorithm that

7  we've been addressing in Joseph

8  Rannazzisi's letter of December 2007,

9  right?

10          MR. BARKER:  Object to form.

11          THE WITNESS:  The three

12      factors, the C.F.R., had not

13      changed; however, there were

14      changes through interaction with

15      DEA and going to conferences where

16      there were additional

17      expectations.

18  BY MR. JANUSH:

19      Q.    But the three factors hadn't

20  changed, right?

21      A.    No, the factors had not

22  changed.

23      Q.    Okay.  And if you turn to

24  page ending in 663 in the audit that's

1    attached, and you go to Paragraph 13, the

2    statement that you and Brian Strehlke

3    asked to be removed would have appeared

4    here.

5          A.    I would like to correct, we

6    didn't ask it to be removed.  Terry said

7    that he would be happy to delete it.  And

8    even Brian said there were no orders

9    identified as suspicious and thus had

10   none reported.  It was Terry that said

11   sentence has been deleted.

12         Q.    Except he said, "What do you

13   think?"  Which means -- if you go back to

14   the e-mail, he put the ball in your

15   court.  "What do you think?"

16               Do you see that?

17               MR. BARKER:  Object to form.

18   BY MR. JANUSH:

19         Q.    I'm highlighting it.  I'm

20   boxing it in.

21         A.    Yes.  But --

22         Q.    And the answer was, "That

23   sounds fine to me."

24               Do you see that?

1          A.     That is what Brian said,

2     yes.

3          Q.     So Brian had the opportunity

4     to say, "No, don't delete it.  We

5     disagree," correct?

6          A.     Yes.

7          Q.     And he didn't do it, right?

8          A.     Yes.

9          Q.     And, again, going back to

10    the deletion, it would have appeared

11    where I'm drawing this red underline at

12    the end of Paragraph 13, correct?

13         A.     Yes.

14         Q.     That's not all that was

15    deleted, is it?

16              MR. BARKER:  Object to form.

17              THE WITNESS:  No.

18    BY MR. JANUSH:

19         Q.     Do you remember other stuff

20    that was deleted, other language?

21         A.     As we were working through

22    the report in identifying how to actually

23    perform the enhancements, we did identify

24    some that we didn't -- we had some

```
1    issues -- not issues, but we didn't

2    understand why it was there.

3            Q.     Okay.

4                   (Document marked for

5            identification as Exhibit

6            Janssen-Dempsey-28.)

7    BY MR. JANUSH:

8            Q.     I'm going to hand you what's

9    been marked as Exhibit 28.

10                  MR. JANUSH:   Counsel.

11                  MR. BARKER:   Thank you.

12   BY MR. JANUSH:

13           Q.     And this is Bates-numbered

14   JAN-MS-05444781.

15                  And I'm going down to your

16   e-mail, middle of the -- I'm going to

17   draw a line to make it easier for you, if

18   you want to look at the screen too.  Your

19   e-mail, second half of the first page.

20   You're writing to Terry.  "Some other

21   tweaks I thought I would mention for your

22   consideration."

23                  Do you see that?

24           A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then go down to the

2  bottom.  Last sentence.  "Also, in

3  thinking this one over:  Take past order

4  examples and evaluate their

5  circumstances, order patterns, and" --

6  flip the page -- "activity against

7  revised algorithms to determine

8  discrepancies or adjustment needed."

9          Quote, or I should say end

10  quote.

11          And your statement that I've

12  highlighted is:  "I don't think we want

13  to question release decisions after the

14  fact.  We should remove this item.  The

15  intent will be covered when we implement

16  867 chargeback/data analytics and

17  reviewing actions taken against DEA

18  registrants."

19          Do you see that?

20    A.    Yes, I do.

21    Q.    Now, I'm going to introduce

22  you -- introduce to you, Exhibit 29,

23  which is another copy of the same draft

24  audit from Terrance Woodworth and the

Highly Confidential - Subject to Further Confidentiality Review

1   Drug and Chemical Advisory Group.  The

2   Bates numbering is JAN-MS-05444783.

3              (Document marked for

4         identification as Exhibit

5         Janssen-Dempsey-29.)

6   BY MR. JANUSH:

7         Q.    And I am going to draw your

8   attention to Paragraph 12.  And right

9   where I'm drawing the line on the screen

10  for your benefit is where the last bullet

11  was deleted; isn't that right?

12        A.    Yes.

13        Q.    Did you hire Terrance

14  Woodworth to be your independent

15  suspicious order monitoring auditor or to

16  be your lackey?

17              MR. BARKER:  Object to form.

18              THE WITNESS:  We hired him

19        to do an audit of our program.

20  BY MR. JANUSH:

21        Q.    Did you hire him to be an

22  independent auditor or to be your lackey?

23              MR. BARKER:  Object to form.

24              THE WITNESS:  We hired him

1        to be an auditor of our program

2        and provide us enhancements of

3        what he is currently seeing out in

4        industry.

5    BY MR. JANUSH:

6        Q.    Did you expect him to work

7    independently and give his independent

8    feedback to you?

9        A.    We expected him to give his

10   feedback.  And that's what this audit was

11   for.

12       Q.    Why did you play a role in

13   editing his audit?

14       A.    Because as this was being

15   developed, there were changes happening.

16            As -- you didn't mention,

17   but the whole funding item that he

18   suggested, which might have been fine in

19   the past, but given what Senator

20   McCaskill's -- the whole group was

21   identifying, that all these

22   pharmaceutical companies providing

23   funding, we didn't think that was

24   appropriate in this document.

Highly Confidential - Subject to Further Confidentiality Review

1           So we took his -- his

2    recommendations; however, we also looked

3    at the current environment to see.

4                MR. JANUSH:  Move to strike

5           all aspects of that answer

6           concerning funding.

7    BY MR. JANUSH:

8           Q.    I didn't ask about funding,

9    did I?

10          A.    No, but it was an item that

11   we also asked to be changed.  Just try to

12   explain, you know, that he gave his

13   recommendations; however, there were

14   different nuances happening out in the

15   environment that would require different

16   wording.

17          Q.    You all weren't handcuffed

18   to abide by every recommendation in his

19   audit, right?  You could have disagreed

20   with his audit concerning anything

21   related to funding and left it in, true?

22          A.    This was -- this was his

23   recommendations that we consider --

24          Q.    No, that's not what I'm

1    asking.  You could have kept the language

2    as it was and ignored certain quoted

3    language, true or false?

4         A.    True.

5         Q.    And instead you actively

6    affirmatively chose to involve yourself

7    in an independent auditor's draft and

8    edit his draft, true or false?

9              MR. BARKER:  Object to form.

10             THE WITNESS:  True, we made

11        changes.

12             MR. JANUSH:  Okay.  We are

13        going to toggle now to the

14        computer HDMI hookup.  And we are

15        going to mark this exhibit as

16        Exhibit 35 (sic).

17             (Document marked for

18        identification as Exhibit

19        Janssen-Dempsey-30.)

20   BY MR. JANUSH:

21        Q.    It is an Excel file too

22   large to produce at this deposition, so

23   we'll pull it up on this 49-inch screen.

24   It's JAN-MS-03739863.

Highly Confidential - Subject to Further Confidentiality Review

1      And I have filtered this

2   Excel file to just address a portion of

3   it related to your customer, Cardinal

4   Health, and to go back in time to look at

5   Nucynta sales.  And at the bottom, you'll

6   see the tab, "SAP direct sales."

7      Do you see that?

8   A.   Yes.

9   Q.   And I'm going to draw your

10  attention to -- close to the top of the

11  screen, about four or five lines down,

12  I've highlighted it or grayed it in.  It

13  is Line 6016.  Or maybe that's not Line

14  6016.  But it ends in column O,

15  $322,608.96.

16      And Column N addresses

17  Nucynta tablets, 100 milligrams, 100s, 24

18  count, and 864 as the quantity number.

19      Do you see that?

20      MR. BARKER:  I'm going to

21      object to form and to the line of

22      questioning because I cannot see

23      what -- I'm looking up at that

24      screen, and I can't see what

Highly Confidential - Subject to Further Confidentiality Review

1     you're.

2          MR. JANUSH:  Okay.  You have

3     a right to walk up to the screen.

4          MR. BARKER:  And I'm happy

5     to do that.  I'm going to pass

6     behind the witness.

7          MR. JANUSH:  If you'd like.

8     If you'd like.  Since I have the

9     screen in front on have me, let me

10    give you this and make life easier

11    for you.  Okay.

12          MR. BARKER:  That's helpful.

13          MR. JANUSH:  There you have

14    a monitor.  Let the record reflect

15    that I've handed my monitor to

16    Mr. Barker, opposing counsel.  And

17    it is approximately 24 inches from

18    him.  And it appears to be a

19    20-inch wide-screen monitor.

20          MR. BARKER:  Okay.  I'm also

21    objecting because I don't -- I

22    don't know how this document has

23    been filtered, and I also don't

24    know what --

Highly Confidential - Subject to Further Confidentiality Review

1      A.    No, I don't.  Like I said

2  this is the project team that's managing

3  this.  I'm a high level watching it.

4      Q.    And who manages the

5  product --

6      A.    Valerie.

7      Q.    -- project team?

8            Valerie Chikwendu?

9      A.    Mm-hmm.

10     Q.    And --

11     A.    I do know there's been a few

12 since then.  This was the initial

13 kickoff, and more followed as we got to

14 the threshold.

15     Q.    So when did you start

16 working with The Analysis Group?  Was it

17 in May after receiving this, in May of

18 2018, after receiving this proposal?

19     A.    I believe we had them -- we

20 had a workshop where they came in, and I

21 can't remember what day it was.

22     Q.    Do you have notes from that

23 workshop?

24     A.    It wasn't my -- I just

Highly Confidential - Subject to Further Confidentiality Review

 1   attended it.  I didn't lead the workshop.

 2   But I think it was July.

 3            But yeah, so this is when we

 4   were initially engaging them and getting

 5   the funding to pay for them to come to

 6   the workshop.

 7        Q.    Incidentally, does Terrance

 8   Woodworth and his company also assist in

 9   creating revised algorithms?

10        A.    I don't know.

11        Q.    Did you ever investigate

12   that with Terrance Woodworth?

13        A.    No.

14        Q.    No.  Why not?

15        A.    I just -- we --

16        Q.    In other words, what made

17   you walk away from working with Terrance

18   Woodworth and move towards working with

19   The Analysis Group?

20            MR. BARKER:  Object to form.

21            THE WITNESS:  Oh, at a -- at

22        an HDA conference, The Analysis

23        Group was there.  And they

24        introduced themselves.  And I saw

Highly Confidential - Subject to Further Confidentiality Review

1    what they provide, the services.

2    And we thought they were more

3    relevant to the actual -- doing

4    the statistical analysis.

5  BY MR. JANUSH:

6        Q.    Thought what was more

7  relevant?

8        A.    What they do, the services

9  that they provide, is more in line with

10  what we needed for the thresholds.  I was

11  not aware that Terry could provide those

12  services.  So we didn't even think to ask

13  Terry.

14        Q.    When you say the services

15  that they provide, can you elaborate on

16  that?

17        A.    The Analysis Group aids

18  companies with looking at their data to

19  set up thresholds for suspicious order

20  monitoring.

21        Q.    Okay.  But lots of companies

22  do that.  How did they do it differently

23  than other companies?  You were

24  explaining that there was something

Highly Confidential - Subject to Further Confidentiality Review

1    different about The Analysis Group.

2         A.    Well, you were asking me to

3    compare to Terry.

4         Q.    Right.

5         A.    And I wasn't -- I had not

6    heard of anything that Terry -- the

7    services that Terry provides.

8         Q.    You said, "And we thought

9    they were more relevant to the actual --

10   doing the statistical analysis."  And I

11   said, "What was more relevant?"

12             I'm trying to dig a little

13   deeper and find out what was it that was

14   more relevant that The Analysis Group

15   could provide you with.

16             MR. BARKER:  Object to form.

17             THE WITNESS:  Well, your

18        question is, why didn't we use

19        Terry.

20   BY MR. JANUSH:

21        Q.    That's not my question now.

22        A.    I'm sorry.  Okay.  Well,

23   when we engaged with The Analysis Group,

24   what services they communicated to us

Highly Confidential - Subject to Further Confidentiality Review

1    appeared to support the enhancements that

2    we wanted to make with our program

3    because --

4        Q.    And what services were

5    those?

6        A.    -- they --

7            MR. BARKER:  Let's slow this

8        down.  Let her finish her answer

9        before we start with the next

10       question, please.  Thank you.

11           THE WITNESS:  So when we

12       engaged with them, they told us

13       that they come into companies that

14       distribute controlled substances.

15       They can assist them in

16       configuring their own systems with

17       threshold algorithms, or they

18       could provide -- or they can

19       provide guidance on other systems

20       that could do these calculations.

21       So they do the statistics based on

22       historical data and help the

23       companies configure their IT

24       systems to do the own threshold

Highly Confidential - Subject to Further Confidentiality Review

1    analysis.

2         And that's what we basically

3    needed.  We needed somebody to

4    help us take our historical data

5    and determine what statistics does

6    DEA expect to see on that data and

7    set up thresholds for our

8    products.

9  BY MR. JANUSH:

10        Q.    What are the statistics that

11  you believe DEA expects to see to set up

12  thresholds on your products?

13        A.    They expect us to be

14  monitoring quantity, frequency, and

15  patterns.  And The Analysis Group has had

16  experience with other companies

17  identifying what kind of thresholds are

18  needed to address those factors.

19        Q.    And again, the expectation

20  from the DEA concerning the requirement

21  that a registrant monitor quantity,

22  frequency, and patterns is not new,

23  right?

24        A.    No.  But we were currently

1    doing it from an algorithm and then the

2    manual for the pattern and frequency.

3    And we wanted one system that would do it

4    all automatically.

5         Q.    You're not testifying today

6    that you were in realtime every day when

7    an order was being placed doing an

8    investigation of every order for pattern

9    and frequency unless an order was first

10   flagged by your algorithm, right?

11             MR. BARKER:  Object to form.

12             THE WITNESS:  There are --

13        obviously the orders that are

14        flagged do get the investigation.

15             But we know the typical

16        ordering pattern of the customers,

17        if they order either once a week

18        or -- the big three, or twice a

19        week.  So the customer service

20        knows the typical ordering

21        patterns, that if they saw

22        somebody order twice, that they

23        would question it.

24             So that's what I'm saying,

Highly Confidential - Subject to Further Confidentiality Review

1       the human element was trying to

2       follow the frequency and pattern.

3       And we just wanted to make the

4       algorithm do all of it at once,

5       versus relying on a manual.

6   BY MR. JANUSH:

7       Q.    Except for Cardinal, where I

8   showed you on that spreadsheet, was

9   ordering three days apart from the prior

10  order for the same drug, that's not

11  something that would be flagged by your

12  algorithm, correct?  And it's something

13  that you knew happened because you knew

14  Cardinal's ordering schedule, right?

15          MS. BOODY:  Object to form.

16          THE WITNESS:  We knew that

17      they ordered Mondays and

18      Wednesdays for example.  The

19      quantity, we knew that that

20      location was the main hub that

21      Cardinal supplied all of their DCs

22      and pharmacies.  So -- and that

23      quantity was obviously less than

24      the threshold unless it was

Highly Confidential - Subject to Further Confidentiality Review

1    flagged as atypical.  So...

2  BY MR. JANUSH:

3    Q.    I'm going to move on to what

4  I've marked as Exhibit 33.

5        (Document marked for

6        identification as Exhibit

7        Janssen-Dempsey-33.)

8  BY MR. JANUSH:

9    Q.    This looks like the

10  preliminary algorithm for --

11        MR. JANUSH:  I have two

12        copies to share.

13        MR. BARKER:  How many pages

14        should this be?

15        MR. JANUSH:  It begins on

16        JAN-MS-05444640.  And that is Page

17        1.

18        And it ends on Page 7,

19        JAN-MS-05444646.

20        MR. BARKER:  One of the

21        copies you handed me goes that

22        far.  The other one only has six

23        pages, going through 45.  But I do

24        appear to have --

1         MR. JANUSH:  Here you go.

2     There's a corrected one.

3         MR. BARKER:  Thanks.  You

4     want that back.  There you go.

5         MR. JANUSH:  And that

6     explains my problem.  If you can

7     give that to Cardinal's counsel.

8         MR. BARKER:  Well, that

9     should be a complete copy.

10         MS. WINCKEL:  I can look on

11     here.

12 BY MR. JANUSH:

13     Q.    And this is dated

14 preliminary draft February 1st, 2019.

15         Do you see that?

16     A.    Yes.

17     Q.    Have you seen this before?

18 This is titled "Preliminary Algorithm

19 Logic For Suspicious Order Monitoring"?

20     A.    I have not seen this before.

21     Q.    Okay.  So I'm going to

22 represent that this was not produced with

23 any family, it was just produced

24 generally.  But since you have not seen

 1    it before, I'll just ask you to take a

 2    look at it and ask if you can explain it.

 3    And if the answer -- your answer will

 4    dictate what we do next.

 5              MR. BARKER:  Object to form.

 6              You're asking her to explain

 7         a document that she's never seen

 8         before.

 9              THE WITNESS:  Yes, this is

10         trying to explain how SAP is going

11         to work in --

12    BY MR. JANUSH:

13         Q.    Are you involved in the new

14    algorithm logic for suspicious order

15    monitoring?

16         A.    I am not involved in the

17    tactical execution, no.

18         Q.    Okay.  Who are the folks

19    that are involved in the tactical

20    execution going forward?

21         A.    Stephanie Dixon.  She -- the

22    control substance compliance manager.

23    IT.

24         Q.    Who from IT?

Highly Confidential - Subject to Further Confidentiality Review

1    marketing group for our new product.

2         Q.     What new product?

3         A.     Esketamine.

4         Q.     Okay.  And here you were

5    addressing in the middle of the page, on

6    February 14, 2018, a recap of what took

7    place during the December workshop with

8    Terrance Woodworth, your outside auditor

9    for suspicious order monitoring; is that

10    right?

11         A.     Yes.

12         Q.     And it states at the bottom,

13    "The commercial excellence team

14    introduced Brian and I to Sue.

15    IntegriChain is beginning to see a future

16    need in providing companies with trend

17    analysis beyond the wholesaler to

18    pharmaceutical companies and provided the

19    following scope of work.  Suspicious

20    order monitoring data analytics is new to

21    us and other companies as well.  I

22    recently saw my counterparts at

23    Mallinckrodt in D.C. and I asked them

24    what they are doing and was told they are

1    paying Quintiles/IMS, now IQVia, to do

2    the analysis for them."

3              Did I read that right?

4         A.    Yes, you did.

5         Q.    And then you asked if the

6    attachments could be reviewed and be

7    ready -- if they could be ready to

8    provide feedback at a teleconference that

9    you'll set up next week; is that correct?

10        A.    Yes.

11        Q.    And the attachments, Number

12   2, one is the IntegriChain substance

13   order analytics and reporting overview,

14   dated February 14, 2018.  And the other

15   is an IntegriChain statement of work

16   presented to Janssen Pharmaceuticals,

17   Inc., for controlled substance order

18   compliance, also dated February 14, 2018;

19   is that right?

20              MR. BARKER:  Objection.

21              THE WITNESS:  Yes.

22              MR. BARKER:  You misread the

23         statement of that document.

24              THE WITNESS:  Statement of

1          work presented at Janssen

2          Pharmaceuticals for controlled

3          substance order analytics.

4     BY MR. JANUSH:

5          Q.    Sorry.  Actually, statement

6     of work presented to Janssen

7     Pharmaceuticals, Inc., for controlled

8     substance order analytics, right?

9          A.    Yes.

10          MR. BARKER:  Object to form.

11     BY MR. JANUSH:

12          Q.    And the statement of work is

13     Bates Number JAN-MS-03060712.

14          And the IntegriChain slide

15     deck is JAN-MS-03060704.

16          Had you met with

17     IntegriChain before February 14, 2018,

18     prior to being provided with this

19     statement of work?

20          A.    I can't recall the first

21     time that I met them.

22          Q.    Okay.  What's your

23     understanding of what IntegriChain is --

24     let's take a step back.

Highly Confidential - Subject to Further Confidentiality Review

1      Janssen wound up retaining

2  IntegriChain, correct?

3      A.    JOM retained them last -- we

4  got the -- this SOW approved last

5  December.  Janssen has been using

6  IntegriChain.  The trade marketing folks

7  have been using them.

8      Q.    Right.  Janssen, for

9  purposes of sales and marketing, has been

10  using IntegriChain data dating back to at

11  least 2011; is that right?

12      A.    I don't know the actual

13  date.  But I do know that they've been

14  using this data.

15      Q.    And we -- we addressed that

16  at the last deposition with a document

17  showing ValueTrak and IntegriChain data

18  in 2011 and 2012; is that right?

19      A.    You did show me that trade

20  analytics slide deck.

21      Q.    And when was the first time

22  that compliance started working with

23  IntegriChain?

24      A.    It was when commercial

1    excellence introduced Brian Strehlke and

2    I to IntegriChain.  And I don't remember

3    when.  I guess it was in February.

4         Q.    Of 2018?

5         A.    Yeah.

6         Q.    What is your understanding

7    of what IntegriChain brings to the table

8    in terms of assisting with Janssen's

9    to-be-updated or revised suspicious order

10   monitoring program?

11              MR. BARKER:  Object to form.

12              THE WITNESS:  What

13         IntegriChain can assist us with is

14         identifying at the pharmacy level,

15         if there's any trends with our

16         products.

17              Right now, our 867 data is

18         blinded, and IntegriChain can get

19         the unblinded data and do the

20         analysis off our data to let us

21         know at the pharmacy level, how

22         does our product compare to, I

23         guess, national averages is what

24         they explained to us.  And they

Highly Confidential - Subject to Further Confidentiality Review

1          could do regional analysis and let

2          us know if there is any trends

3          with our product that we need to

4          investigate.

5     BY MR. JANUSH:

6          Q.    For example, on Page 2 of

7     the slide deck, "Identify pharmacies with

8     high volume purchasing trends leveraging

9     product and market deciles."  Is that

10    right?

11         A.    That is what -- yes.

12         Q.    Okay.  And that they can

13    also assist, based on, going to the last

14    bullet, "Based on historical purchasing

15    trends, set volume thresholds at the

16    pharmacy and distributor level.  Total

17    volume can be rolled up to distributor as

18    an input into the order monitoring

19    system."

20              Do you see that?

21         A.    Yes.

22         Q.    Are you doing that now going

23    forward?  Are you implementing this?

24         A.    This is the Track 2 of our

Highly Confidential - Subject to Further Confidentiality Review

1    project where we will be looking

2    downstream to determine whether, based on

3    what the wholesalers ship out, if we need

4    to adjust the thresholds.  So, yes, our

5    new enhancements will be doing this.

6            Q.    And to be clear, this is the

7    kind of third-party data vendor that

8    assists in unblinding sales that you make

9    to your distributor, such that they are

10   able to report back to you when a

11   Cardinal, as an example, may sell to a

12   CVS, they may be able to report back to

13   you which CVS store your products are

14   ending up at; is that right?

15               MR. BARKER:  Object to form.

16               THE WITNESS:  IntegriChain

17        can give us visibility to the CVS

18        level.

19   BY MR. JANUSH:

20           Q.    Okay.  This is the know your

21   customers' customer data, so to speak,

22   right?

23               MR. BARKER:  Object to form.

24   BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Remember we talked about

2  that concept of know your customers'

3  customer, in the context of the

4  Mallinckrodt DEA investigation?

5              MR. BARKER:  Object to form.

6              THE WITNESS:  We were told

7        to -- yes.  Well, you need to know

8        where your products are going

9        downstream.

10  BY MR. JANUSH:

11    Q.    Right.  And that refers to

12  knowing your customers' customer, right?

13    A.    Yes.

14    Q.    And knowing your customers'

15  customer was not a new concept for you,

16  was it?  You learned about this concept

17  when you benchmarked with Jack Crowley at

18  Purdue on March 21, 2012, didn't you?

19              MR. BARKER:  Object to form.

20              THE WITNESS:  We understood

21        that Purdue was doing that.

22  BY MR. JANUSH:

23    Q.    And by doing that, what do

24  you mean?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    That they were doing the

2    downstream pharmacy analysis because of

3    the oxycodone situation.

4      Q.    So Purdue was knowing their

5    customers' customer; is that right --

6    what you're testifying to?

7              MR. BARKER:  Object to form.

8              THE WITNESS:  That is what

9         they communicated to us.

10             (Document marked for

11         identification as Exhibit

12         Janssen-Dempsey-36.)

13    BY MR. JANUSH:

14      Q.    I'm going to hand you what's

15    been marked as 36.  It actually is a

16    document that references the know your

17    customers' customer.  Its Bates number is

18    JAN-MS-02984629, and this is when in July

19    of 2013, Jack Crowley, formerly of

20    Purdue, then on his own as Crowley

21    Associates, was pitching to Janssen an

22    abuse and diversion detection program,

23    isn't it?

24             MS. POWER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1       THE COURT REPORTER:  Can you
2   identify who you are?
3       MS. POWER:  This is Caroline
4   Power for the Purdue defendants.
5       MR. JANUSH:  Representing
6   which defendant?
7       MS. POWER:  The Purdue
8   defendants.
9       MR. JANUSH:  Thank you.
10  BY MR. JANUSH:
11      Q.   Let's go to the first line
12  of the middle of the e-mail.  "Hello,
13  Ron.  Here are a preliminary rough notes
14  on the subject of our recent
15  conversation.  DEA impact on pharmacy
16  stocking C-II medications - developing a
17  system for your abuse and diversion
18  detection program - prescribers of
19  concern."
20      Did I read that right?
21      MR. BARKER:  Object to form.
22      THE WITNESS:  Yes.
23  BY MR. JANUSH:
24      Q.   And it says, "We discussed

1  training for the sales force how to

2  recognize what is suspicious or a cause

3  for concern, that this is a delicate

4  balance and generally what steps need to

5  be taken to bring information into the

6  home office, so to speak, how to handle

7  that information, and how to move

8  forward."

9         Did I read that correctly?

10        MR. BARKER:  Object to form.

11        THE WITNESS:  Yes.

12  BY MR. JANUSH:

13     Q.    And at the bottom, it's

14  addressing five different suggestions,

15  after which Jack writes, "'Know your

16  customers' customers,' Janssen's

17  suspicious or noteworthy order monitoring

18  system and collaboration/mutual support

19  with authorized distributors."

20        Did I read that correctly?

21     A.    Yes.

22     Q.    From July 26, 2013, when

23  Jack Crowley pitched this abuse and

24  diversion detection program that follows

Highly Confidential - Subject to Further Confidentiality Review

1    at JAN-MS-02984631 with his presentation

2    to the present date, you didn't implement

3    a know your customers' customer program

4    to address prescribers of concern at the

5    sales force level, did you?

6          A.    It wasn't an expectation.

7    We weren't told by DEA to do this.  But I

8    am not aware if Ron implemented that.  I

9    did not.  I can't speak on behalf of Ron

10   what he did with this.  But I do know

11   that I did not.

12         Q.    And just to wrap up this

13   document, the attachment from Jack

14   Crowley, Bates Number JAN-MS-02984631,

15   concerned his pitch on how to address

16   prescribers of concern with a stated

17   goal, in the middle of the first page --

18   I'm going to direct your attention to the

19   first page of his title page.  "Goal -

20   make sure that the company is marketing

21   to the proper prescribers."

22               Do you see that?

23         A.    Yes, I do.

24         Q.    "Secondary goal, to provide

1    guidance and require the sales

2    representatives to recognize, detect, and

3    report suspicious" -- "suspected abuse

4    and suspected diversion by healthcare

5    practitioners of Janssen products."

6                    Do you see that?

7                    MR. BARKER:  Object to form.

8                    THE WITNESS:  Yes, I do.

9    BY MR. JANUSH:

10        Q.    Do you remember internally

11   pitching this within Janssen as something

12   that you had an interest in having Jack

13   present on?

14                    MR. BARKER:  Object to form.

15                    THE WITNESS:  I recall that

16            Ron asked me if I knew anybody

17            that could talk to him about

18            training of the sales force.  And

19            I introduced him to Jack Crowley.

20   BY MR. JANUSH:

21        Q.    You were friends with Jack

22   though, right?

23        A.    I have known Jack for many

24   years, yes.

1      Q.    So if Jack got retained

2    after you introduced him, you would have

3    known that, wouldn't you?

4      A.    Yes, I would have.

5      Q.    And to this day, you

6    don't -- you have no knowledge that he

7    was retained, right?

8      A.    He was not retained.

9          (Document marked for

10         identification as Exhibit

11         Janssen-Dempsey-37.)

12   BY MR. JANUSH:

13     Q.    I'm going to move on to

14   Exhibit 37, JAN-MS-03124101.

15         MR. JANUSH:  Whoops.  I

16         marked the wrong one.

17         MR. BARKER:  Feel free to

18         mark the one with all your notes

19         on it if you want.  That's all

20         right.

21   BY MR. JANUSH:

22     Q.    I'm going to just address

23   this.  This is the July 24, 2013, Version

24   2, work instruction, document entitled

1    "JOM Customer Service Suspicious Or

2    Excessive Orders."  Document Number DS/WI

3    3824, Version 2.0.

4              Do you see that?

5         A.    Yes.

6         Q.    This is the Version 2 of the

7    suspicious order monitoring program work

8    instruction that you played a role in

9    putting together after you came on board

10   as director of controlled substance

11   compliance in 2012; is that right?

12             MR. BARKER:  Object to form.

13             THE WITNESS:  Yes.

14   BY MR. JANUSH:

15        Q.    And just for the record,

16   this -- the purpose of this is stated at

17   1.1, "To define a process that complies

18   with DEA or state requirements to provide

19   information on any prescription order,

20   controlled or noncontrolled substances,

21   that could be considered potentially

22   suspicious or excessive," right?

23        A.    Yes.

24        Q.    And the algorithm that

Highly Confidential - Subject to Further Confidentiality Review

1    existed in Version 1.0 that we addressed

2    at the last deposition is the same here

3    isn't it, at 3.2.  It's 300 percent of

4    the calculated 12-month per weekly order

5    average; is that right?

6                    MR. BARKER:  Object to form.

7                    THE WITNESS:  Yes.  12-month

8          per weekly order average.

9                    (Document marked for

10          identification as Exhibit

11          Janssen-Dempsey-38.)

12    BY MR. JANUSH:

13          Q.    I'm going to mark for you

14    Exhibit 38.

15                    And this is a different

16    document.  It's JOM customer support

17    services Schedule II through V order

18    processing and investigating suspicious

19    or excessive orders.  This is DS SOP

20    1235, Version 7.0, found at

21    JAN-MS-03115424.  And the effective date

22    of this is December 19, 2016.

23                    And here too, the purpose of

24    this document is to provide instructions

1    for processing Schedule II through V

2    controlled substance orders and for

3    investigating suspicious or excessive

4    orders for controlled substances; is that

5    right?

6         A.    Yes.

7         Q.    And again, the algorithm is

8    stated differently.  But it's stated in

9    the definition section at 3.1.

10   "Suspicious orders or excessive

11   controlled substances orders:  Any

12   customers for Schedule II through V

13   orders exceeding three times the normal

14   12-month rolling demand."

15             Did I read that right?

16        A.    Yes.

17        Q.    And that's not 12 times the

18   normal 12-month weekly rolling demand

19   stated here.  It's just 12 times the

20   normal 12-month -- three times the normal

21   12-month rolling demand; is that right?

22             MR. BARKER:  Object to form.

23             THE WITNESS:  That is what

24        it reads.

1    BY MR. JANUSH:

2         Q.    Did you have a role in

3    drafting this document?

4         A.    I reviewed it.  But

5    customer -- this is a customer service

6    SOP.  They wrote it.

7         Q.    Did you have the ability to

8    edit the document if you thought it was

9    in error?

10        A.    Yes.

11        Q.    Did you ever edit that

12   document?

13        A.    I don't recall.

14             (Document marked for

15             identification as Exhibit

16             Janssen-Dempsey-39.)

17   BY MR. JANUSH:

18        Q.    I'm marking 39.  And I'm

19   handing copies to counsel.

20   JAN-MS-03115570.  This appears to be an

21   e-mail from you to Belinda Corum dated

22   November 15, 2017, concerning

23   suspicious -- titled -- the subject is

24   2017 -- November 15, 2017, "Suspicious

1    order monitoring minutes."

2            And it attaches DS/WI 3824,

3    the atypical order justification release

4    form work instruction, which can be found

5    at JAN-MS-03115575.

6            Do you see that work

7    instruction?

8        A.    Getting to it.  Yes.

9        Q.    And have you seen this

10   document before?

11       A.    I have seen this document

12   before.

13       Q.    Did you ever edit this

14   document?

15       A.    Yes.

16       Q.    You did.  Okay.

17           And here we have definition,

18   DEA unusual order quantity report at 3.1.

19   "A report that captures potentially

20   unusual quantities of controlled

21   substance orders, Schedule II through V,

22   that is equal to or greater than three

23   times (300 percent) the calculated

24   12-month order average."

Highly Confidential - Subject to Further Confidentiality Review

1  potential enhancements that can be made

2  to that system as recommended by

3  Mr. Woodworth and DCAG, correct?

4       A.    This is when we were

5  initially discussing the opportunity.

6  This is before the report.

7       Q.    One of the workshop

8  attendees was Mr. Woodworth, correct?

9       A.    Yes.  Yes, yes.

10      Q.    Okay.  So on that topic, can

11  you read what your comment was?

12      A.    "Anytime we need to have a

13  review done each morning by personnel

14  leads to potential of error, the

15  correct" -- "the current remediation is

16  not the perfect" -- "not the preferred

17  long-term" -- "long-time solution."

18      Q.    Okay.  What is it about the

19  current process that could lead to error?

20      A.    It is manually intensive,

21  requiring a person to do activity.

22      Q.    Would it be better if you

23  could get a computer to do that activity?

24      A.    Yes.

1    Q.    Just like in 2005, you

2    upgraded to a computer system that did

3    the stuff that you were doing manually

4    before, correct?

5    A.    Correct.

6    Q.    Okay.  Does someone have to

7    manually hold back the order until the

8    suspicious order monitoring protocol is

9    executed?

10    A.    Any controlled substance

11    order that is put into SAP goes in this

12    business manager hold, and someone

13    physically have has to go into SAP and

14    release it after all the processing is

15    done.

16    Q.    So all the orders are

17    automatically held, and they have to be

18    manually released, correct?

19    A.    Yes, yes, yes.

20    Q.    Now, let's look at third

21    item on this page.  It reads, "Current BW

22    report algorithm measures orders by NDC

23    number, SKU, not drug class, total

24    fentanyl, for example, or consolidated

Highly Confidential - Subject to Further Confidentiality Review

1    customer, just ship-to address, and total

2    brand base of controlled substance to the

3    consolidated or individual registrant."

4              Okay.  Now, this is the

5    potential issue and enhancement that

6    Mr. Janush spent a lot of time talking to

7    you about in this deposition, correct?

8         A.    Yes.

9         Q.    Okay.  And previously you

10   tried to explain to him what the issue

11   was.

12             Let's look at your comment

13   over on the right-hand side.

14             MR. JANUSH:  Object to the

15        narrative.

16             MR. BARKER:  Okay.  We'll

17        strike the narrative.

18   BY MR. BARKER:

19        Q.    I want to -- on this topic,

20   I want to direct your attention to the

21   comment SB-4.  Who is making this

22   comment?

23        A.    Brian Strehlke.

24        Q.    And Brian Strehlke works

Highly Confidential - Subject to Further Confidentiality Review

1  with you, correct?

2          A.    Yes, yes.

3          Q.    And what does Mr. Strehlke

4  say?

5          A.    "Considering drug class and

6  customer locations should go a long way

7  towards eliminating false positives in

8  the report."

9          Q.    Okay.  And what's he talking

10  about there?

11          A.    He's talking about when we

12  had -- as I explained earlier today, if a

13  customer only orders one SKU once a year,

14  when it's time for them to reorder, they

15  automatically come up as a flagged order

16  and per our process, we have to

17  investigate, document the investigation,

18  and then -- prior to releasing it.

19          Q.    And right below

20  Mr. Strehlke's comment is another comment

21  from you.  That's DM, right?

22          A.    Yes.

23          Q.    And what's your comment?

24          A.    "Agree, can't tell you how

1  many investigations are done because a

2  customer hasn't ordered a particular

3  strength in the last 12 months."

4       Q.    Okay.  And is this what you

5  were trying to explain to Mr. Janush

6  before, that the improvement of moving

7  from a SKU-based system to a brand-based

8  system would reduce the number of

9  potentially questionable orders that you

10 had to investigate?

11           MR. JANUSH:  Objection.

12           THE WITNESS:  It would

13      eliminate the false positives so

14      that the orders that we do see

15      would be the ones that are truly

16      suspicious and not based on the

17      ordering pattern of the customer.

18 BY MR. BARKER:

19      Q.    Well, you mean truly

20 potentially suspicious, correct?

21      A.    Right.

22      Q.    Because until you complete

23 your investigation, you don't know

24 whether they are suspicious?

1        A.      Agreed.

2        Q.      Were any of the improvements

3  that were being discussed at this meeting

4  or in Mr. Woodworth's report from the

5  group DCAG about improving the system so

6  that you would catch orders that were

7  potentially suspicious that were possibly

8  being missed?

9        A.      No.

10        Q.      Okay.  Were there additional

11  updates to Janssen's suspicious order

12  monitoring program in 2017 and 2018?

13        A.      Well, after receiving the

14  recommendations from DCAG we did

15  implement some changes to address some of

16  the recommendations enhancing our

17  program.  So there were SOP changes, an

18  introduction of a customer form to fill

19  out when we do have questionable orders.

20        Q.      Okay.  And let's talk about

21  Mr. Woodworth, right?

22        A.      Yes.

23        Q.      Were you the one that hired

24  Mr. Woodworth and his group, the Drug and

1    Chemical Advisory Group?

2         A.    I was involved with the

3    selection of him, to bring him in, yes.

4         Q.    Was -- and if I refer to

5    that as DCAG for short, would you

6    recognize that as the Drug and Chemical

7    Advisory Group?

8         A.    Drug and Chemical

9    Advisory -- yes.

10        Q.    Were you familiar with the

11   drug and chemical advisory group?

12        A.    Yes.

13        Q.    I'm going to hand you a

14   document that we marked as Exhibit 55

15   which are the bios of the DCAG principals

16   that were pulled off of their website.

17             (Document marked for

18             identification as Exhibit

19             Janssen-Dempsey-55.)

20   BY MR. BARKER:

21        Q.    You testified before that

22   you knew about DCAG before you hired

23   them?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And how -- how do you know

2    the principals of DCAG?

3    A.    When I was working for

4    Noramco, I know that Terry Woodworth and

5    Frank Sapienza had provided guidance to

6    the Noramco company.  So that's how I

7    knew them.

8    Q.    Okay.  And their bios are

9    briefly stated on the second page of

10    Exhibit 55, correct?

11    A.    Well, Frank Sapienza starts

12    on the bottom of the first page.

13    Q.    It does.  You're absolutely

14    right, even though his picture is on the

15    next page.  It starts -- starts here.

16    And did you review their

17    qualifications before you hired them?

18    A.    For suspicious order

19    monitoring, no.

20    Q.    But did you have an

21    understanding as to whether either of

22    them had a background with the DEA

23    before --

24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    -- you hired them?

2    A.    Yes.  I knew from my

3  experience at Noramco that they were

4  retired headquarter DEA employees with

5  experience and knowledge of the

6  regulations.

7    Q.    Okay.  And, in fact,

8  Mr. Sapienza was a former chief of the

9  drug and chemical evaluation section of

10  the DEA office of diversion control,

11  correct?

12    A.    Yes.

13    Q.    And Mr. -- Mr. Woodworth was

14  deputy director in the DEA office of

15  diversion control, correct?

16    A.    Yes.

17    Q.    You thought that these

18  gentlemen would be knowledgeable about

19  diversion issues and suspicious order

20  monitoring, correct?

21         MR. JANUSH:  Objection.

22         THE WITNESS:  Yes.

23  BY MR. BARKER:

24    Q.    Let's talk about the report

1    that was generated by the DCAG group.

2              MR. JANUSH:  Which one?

3              MR. BARKER:  That's not --

4         there were multiple -- was that an

5         objection, sir?

6              MR. JANUSH:  I'm asking

7         which one so that I know which

8         ones to pull up.

9              MR. BARKER:  You'll know

10        when I give you an exhibit number.

11             MR. JANUSH:  All right.

12   BY MR. BARKER:

13        Q.    If you pull out from your

14   stack of exhibits over there from earlier

15   today, pull out Exhibit 26.  Do you have

16   Exhibit 26 in front of you?

17        A.    I do.

18        Q.    We previously went over

19   that.  This was the initial draft of the

20   report provided by Mr. Woodworth --

21   Woodworth, excuse me, correct?

22        A.    Correct.

23        Q.    And I want you to turn to

24   Page 2, and direct your attention to the

1  full paragraph at the bottom.

2      A.   Yes.

3      Q.   And what was DCAG's ultimate

4  conclusion about Janssen's suspicious

5  order monitoring system, in the initial

6  draft of its report?

7      A.   The DCAG evaluation found

8  that the suspicious orders monitoring

9  program for the JOM site in

10  Shepherdsville, Kentucky complies with

11  the DEA requirements set forth in the

12  federal regulations, Title 21 Code of

13  Federal Regulations, C.F.R. section

14  1301.74(b).

15      Q.   And those were sections of

16  the C.F.R. that Mr. Janush showed you

17  repeatedly talking about orders of

18  unusual size, unusual frequency or an

19  unusual pattern, correct?

20      A.   That is the section that

21  says you need to have a -- design and

22  operate a system to disclose orders --

23      Q.   Or to identify suspicious

24  order monitoring.

1    BY MR. JANUSH:

2         Q.    Opioid products aren't --

3    we're not talking about a standard

4    prescription that's a non-opioid drug,

5    are we?

6              MR. BARKER:  Object to form.

7              THE WITNESS:  Can you repeat

8         what you're trying to say?

9         Because we are monitoring

10        Duragesic, and we are also

11        monitoring Concerta, which isn't

12        an opiate.  We're also monitoring

13        the Nucynta.  And I'm trying to

14        understand what you're saying,

15        because the suspicious order

16        monitoring program is a system.

17        It's not just an algorithm.

18              So whether the algorithm is

19        flagging all three or your overall

20        program is encompassing all

21        three --

22   BY MR. JANUSH:

23        Q.    But you don't get to the

24   overall program unless the algorithm

1    flags the order to begin with.  I'm

2    talking about in real time, as you

3    testified earlier today with me, you

4    don't get to a suspicious order review

5    unless the algorithm flags a particular

6    order initially?

7         A.    For the particular order,

8    but we do look at the entire order

9    shipped to that customer.

10        Q.    But you do that as like a

11   monthly meeting, right?

12        A.    But it's still looking at

13   what where we've distributed to the

14   customer --

15        Q.    But it's too --

16        A.    -- on a whole.

17        Q.    When you've done the monthly

18   meeting, you've already shipped the

19   product, right?

20        A.    Yes, but if there was an

21   order that was not typical, there had

22   been an investigation.

23        Q.    But again, not typical is

24   viewed against -- not typical is viewed

1    against your initial algorithm, is what

2    flags what's not typical, right?

3            MR. BARKER:  Object to form.

4    BY MR. JANUSH:

5            Q.    Day one, realtime, shipping

6    an order, it's your algorithm that flags

7    the order, right?

8            MR. BARKER:  Object to form.

9            THE WITNESS:  Not

10           necessarily, because if we know

11           that there's a change downstream,

12           the customer has gotten a new

13           contract, we know in advance that

14           there's going to be an uptick in

15           demand.  And before the order is

16           placed -- for example, when we

17           reviewed with Kentucky DEA,

18           because of the opioid tax, we were

19           asked to ship directly to New

20           York.

21               So we knew that we had no

22           history going to New York.  So no,

23           the order system did not flag,

24           because we knew in advance that we

1      were shipping to New York State

2      with no history.  And we had to do

3      an investigation to figure out how

4      much typically goes to New York

5      prior to the order.

6           So you are just focused on

7      the algorithm.  But I'm saying our

8      overall suspicious order

9      monitoring program, there's other

10     components to it.

11  BY MR. JANUSH:

12     Q.    Those other components,

13  though, don't typically come into play in

14  the regular course of business when you

15  have rolling customers who are known to

16  you.  We're not talking about the rare

17  issue of the opioid tax, and having a

18  base level of knowledge of zero, and

19  having to investigate on the front end.

20  With a customer that is known to you and

21  has been purchasing from you, your

22  algorithm is the trigger to start an

23  investigation, true or false?

24          MR. BARKER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1             THE WITNESS:  For our

2        established products, we place the

3        order.  We know when the customer

4        orders because they -- the big

5        three have their days when they

6        place the orders.  We know what

7        they historically order.  And if

8        there is an increase, the

9        algorithm does tell us if there is

10       an atypical ordering pattern.

11  BY MR. JANUSH:

12       Q.    My question was, with a

13  customer that is known to you and has

14  been purchasing from you, your algorithm

15  is the trigger to start an investigation,

16  true or false?

17             MR. BARKER:  Object to form.

18             THE WITNESS:  And I'm saying

19       in the typical business, yes, an

20       order goes through the algorithm,

21       and it's reviewed.  And if it

22       comes up as flagged, we

23       investigate.  But there are orders

24       that we know in advance that are

Highly Confidential - Subject to Further Confidentiality Review

1    called "Recommendations"?

2           A.    It doesn't say conclusion.

3    That's recommendation.

4           Q.    It's a heck of a lot

5    stronger than executive summary?

6                THE WITNESS:  It doesn't say

7           conclusion.

8                MR. BARKER:  Object to form.

9                THE WITNESS:  It says

10          recommendations.

11   BY MR. JANUSH:

12          Q.    I honestly can't believe

13   you're fighting with me over that word.

14          A.    It is --

15                MR. BARKER:  I can't believe

16          that you're arguing with the

17          witness over something that

18          doesn't say conclusions.  It says

19          recommendations.

20                MR. JANUSH:  Right.

21          Recommendations.

22                MR. BARKER:  Future actions,

23          not past.

24                MR. JANUSH:  Excuse me.

1      Excuse me.

2           MR. BARKER:  Well, you're

3      arguing with the witness.  So I'm

4      arguing with you.

5           MR. JANUSH:  So move to

6      strike counsel's interruptions.

7  BY MR. JANUSH:

8      Q.    I'm talking to you.  You're

9  my witness.  I'm going to ask you some

10 questions about recommendations.

11          You hired an auditor to make

12 recommendations to improve your system,

13 right?

14     A.    We hired an auditor to give

15 us recommendations to enhance our current

16 program so that we could be proactive.

17     Q.    That's a long way of saying

18 right, isn't it?

19     A.    These aren't improvements.

20 These are recommendations.  He said we're

21 compliant.  These are recommendations to

22 make it better, enhancements.

23          MR. JANUSH:  Move to strike.

24     Nonresponsive.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BARKER:  Object to the

2      objection.  It's --

3          MR. JANUSH:  Enough.

4          MR. BARKER:  -- commentary.

5  BY MR. JANUSH:

6      Q.    Let's go to Page 10.  At

7  Recommendation 4, he told you to start

8  modifying the existing suspicious order

9  monitoring algorithm and/or adding

10  algorithms to include additional

11  evaluation criteria for each specific DEA

12  basic class of controlled substance

13  handled by J&J; example, fentanyl,

14  methylphenidate, tramadol.  Right?

15          MR. BARKER:  Object to form.

16          THE WITNESS:  Right.

17  BY MR. JANUSH:

18      Q.    He told you to consider a

19  base unit of measurement, such as grams

20  of active ingredient, for the SOM

21  algorithms, right?

22      A.    Yes.

23      Q.    Are you following that

24  instruction going forward, by the way?

1          A.    As a matter of fact, today

2    we are receiving thresholds from The

3    Analysis Group on a new product that will

4    be grams for our esketamine product.

5          Q.    And a gram-based unit of

6    measurement for a suspicious order

7    monitoring program is more rigorous than

8    the program you've had in place for the

9    last many years, isn't it?

10              MR. BARKER:  Object to form.

11              THE WITNESS:  I can't answer

12         that question because, in talking

13         to Analysis Group, we are going to

14         be most likely -- we won't be

15         getting the orders that we

16         received that the -- the false

17         positives.  So I cannot say

18         whether going to this is going to

19         give us fewer or more orders,

20         because we are launching a new

21         product, so we're going to be

22         receiving a higher number of

23         orders.  So I can't give you an

24         answer right now if this is going

1          to be less or more.

2   BY MR. JANUSH:

3          Q.    I didn't say less or more.

4   I said more rigorous.  And I'm talking

5   about spotting actual suspicious orders.

6          A.    That is the intent of going

7   to this, the intent.

8          Q.    Right.  We're not talking

9   about -- I'm not here to talk about false

10  positives.  This case, this opioid

11  epidemic, isn't about false positives.

12  It's about real orders that made it out

13  there that shouldn't have made it out

14  there.

15          Do you understand that?

16          MR. BARKER:  Object to form.

17          THE WITNESS:  I understand

18  you.

19  BY MR. JANUSH:

20          Q.    Okay.  Now, I understand

21  that you want to talk about false

22  positives.  I want to talk about what

23  Terrance was seeking to do in this audit

24  and in this recommendations.  Okay?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Okay.

2    Q.    Next, he said, "Consider

3  separating J&J customers into two or more

4  groups and perform different analyses of

5  orders for these different groups;

6  largest three wholesalers in one group,

7  smaller wholesalers in another group."

8         Do you see that?

9    A.    Yes.

10   Q.    Are you following something

11 like that going forward in your new

12 program?

13   A.    Yes, we are.

14   Q.    When he said, "Consider

15 evaluating customer orders for specific

16 DEA basic classes of substances against

17 similar size and geographically placed

18 customers and perform national, regional,

19 state, and perhaps three digit zip code

20 comparisons among like-size customers."

21        Did I read that right?

22   A.    Yes, you did read it.

23   Q.    Are you implementing any of

24 that in your new protocols?

1      A.    You saw the IntegriChain

2  statement of work, so yes, we are going

3  to be going to that level.

4      Q.    Okay.  And now, at 4-A,

5  Terrance advised, "Stop using this

6  current single-criterion algorithm which

7  selects and holds orders from customers

8  when the quantity of an order is greater

9  than three times, 300 percent, the

10  customer's average weekly order based on

11  a rolling 12-month ordering history from

12  that customer."

13          Did I read that right?

14      A.    Yes.

15      Q.    And he said, "This algorithm

16  only measures quantity and does not

17  consider frequency or a pattern of

18  ordering by the same customer."

19          Did I read that right?

20      A.    Yes, you did.

21      Q.    That statement isn't about

22  limiting Janssen's or JOM's false

23  positives.  That statement is about

24  improving your program so that you

Highly Confidential - Subject to Further Confidentiality Review

1    measure the other two C.F.R.-required

2    elements, isn't it?

3            MR. BARKER:  Object to form.

4            THE WITNESS:  In our

5        algorithm, he is suggesting that

6        we capture all three.

7    BY MR. JANUSH:

8        Q.    My question was, that

9    statement isn't about limiting Janssen's

10   or JOM's false positives.  That statement

11   is about improving your program so you

12   measure the other two C.F.R.-required

13   elements, isn't it?

14           MR. BARKER:  Object to form.

15           THE WITNESS:  He is

16       suggesting that we make

17       enhancements to the algorithm to

18       capture more formally the

19       frequency and pattern requirements

20       that we are doing outside --

21   BY MR. JANUSH:

22       Q.    Because --

23       A.    -- of the algorithm.

24       Q.    Because there's a risk that

Highly Confidential - Subject to Further Confidentiality Review

1    if you don't have those elements in your

2    algorithm, those elements are possibly

3    being missed, right?

4                    MR. BARKER:  Object to form.

5                    THE WITNESS:  Not with our

6             current products, because we have

7             established customers that haven't

8             changed that much, and we know

9             what they're ordering.  This

10            report was not just for

11            established products, but for this

12            product that just got approval

13            this year.  And we will have more

14            customers, different distribution,

15            and more orders.

16                 So he's saying, make sure

17            that we need to make these

18            changes.

19    BY MR. JANUSH:

20            Q.    You bring up a really good

21    point.  Thank you so much.

22                 The point that you're

23    bringing up is, you had a one-dimensional

24    algorithm during the hottest years that

1   were you selling Duragesic and Nucynta;

2   isn't that right?

3                    MR. BARKER:  Object to form.

4                    THE WITNESS:  What were the

5          hottest years?

6   BY MR. JANUSH:

7          Q.    Well, Nucynta came on the

8   market in 2009.  Nucynta was divested, I

9   believe, in 2015 or '16.

10         A.    When you mean the hottest

11  years --

12         Q.    So meaning, when Terrance is

13  doing this review, it's already long

14  after Nucynta is gone, right?

15                   MR. BARKER:  Object to form.

16                   THE WITNESS:  Nucynta was

17         gone.

18  BY MR. JANUSH:

19         Q.    And you had a

20  one-dimensional algorithm during the

21  entire time Nucynta was being sold,

22  right?

23                   MR. BARKER:  Object to form.

24                   THE WITNESS:  We had an

Highly Confidential - Subject to Further Confidentiality Review

1        algorithm that looked at the

2        quantity that the customer -- the

3        historical ordering pattern.

4    BY MR. JANUSH:

5        Q.    And that is a

6    one-dimensional algorithm, right?

7                MR. BARKER:  Object to form.

8                THE WITNESS:  The algorithm

9        had one factor.

10   BY MR. JANUSH:

11       Q.    As you sit here today, and

12   after reading Terrance's report from the

13   Drug and Chemical Advisory Group, you're

14   not the least bit concerned that during

15   the years that you were selling the

16   opioid product, Nucynta, and during the

17   heavier years, before it became generic,

18   that you were selling and marketing

19   Duragesic, that you only had a

20   one-dimensional, one-factor algorithm?

21               MR. BARKER:  Object to form.

22               THE WITNESS:  If there was a

23       problem with our products, we

24       would have been called down as

1            part of the distributor

2            initiative.

3       BY MR. JANUSH:

4            Q.    That's not what I asked you.

5            A.    No.  You're asking if we

6       were concerned.  And that would mean, I

7       would be concerned if there was diversion

8       and abuse of our products.  And if there

9       was, that was one of the criteria for the

10      distributor initiative.  You were called

11      in, reviewed your SOM and your ARCOS

12      data.

13           Q.    And two of the other

14      requirements of the C.F.R. at the very

15      same time as the distributor initiative

16      was ongoing concerned the fact that you

17      were to be measuring frequency as well as

18      ordering patterns, not just quantity;

19      isn't that right?

20           A.    The C.F.R. says you need to

21      have a system in place.  It does not say

22      your algorithm is the system.

23           Q.    But if your algorithm isn't

24      measuring all three factors, you cannot

1    trigger for all three factors to be

2    reviewed.  It would require a manual

3    review of every single order for you to

4    have a good system in the absence of

5    those two factors; isn't that right?

6                    MR. BARKER:  Object to form.

7                    THE WITNESS:  For Schedule

8            II orders, they are manually

9            entered.  We get them on the same

10           days every week.  The customer

11           service personnel know what the

12           customers typically order.

13                   And when it goes in, the

14           algorithm would flag anything

15           suspicious, if the customer

16           service -- they're seeing every

17           Monday, Wednesday, from this

18           customer.  This one only receives

19           once every 12 months.

20   BY MR. JANUSH:

21           Q.    You're not saying customer

22   service is eyeballing every order and

23   manually checking every order, are you?

24           A.    No.  What I'm saying

1   overall, there is a program in place

2   where orders are looked at, and every

3   month we reviewed the orders that were

4   reviewed, put on, and we track how much

5   is going to all the customers based on

6   total controlled versus noncontrolled.

7          Q.    But you weren't following

8   the C.F.R. --

9          A.    The C.F.R. does not say your

10  algorithm needs to have all this.

11         Q.    But your algorithm is what

12  triggers the review, right?

13         A.    I'm saying we do other

14  reviews of all the other --

15         Q.    You can't review an order

16  that wasn't tripped, correct?  You can't

17  review it in realtime is what I'm saying?

18  If it's not tripped, it ships, right?

19              MR. BARKER:  Object to form.

20              THE WITNESS:  If it is not

21         typical of the ordering pattern

22         for the previous 12-month, 52-week

23         average, we --

24

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. JANUSH:

2         Q.    Ship it?

3              MR. BARKER:  Object to form.

4              THE WITNESS:  No.  We

5         investigate.

6    BY MR. JANUSH:

7         Q.    If it's -- if -- I'm saying

8    if you have an order and you're only

9    investigating an order on an algorithm

10   that measures quantity, you inherently

11   cannot trip that order via the algorithm

12   for frequency or for --

13        A.    You can do pattern.

14        Q.    -- pattern?

15        A.    You can do pattern, because

16   if they don't order on a monthly basis

17   it's going to get flagged.  That's a

18   pattern.

19        Q.    When you say if they don't

20   order on a monthly basis.  That's more

21   like when a SKU is not ordered over a

22   period of time, it trips?

23        A.    So if a customer regularly

24   orders every month 100 each of a product,

Highly Confidential - Subject to Further Confidentiality Review

1   that is their order.  Their average is

2   going to be factored on that.  So if they

3   deviate and all of the sudden orders 150,

4   it's going to flag it, that the quantity

5   is high, and then when we run the report,

6   we'll say, well, hey, why -- you've

7   always been getting 100 each.  Why are

8   you asking 150 this month?

9          Q.    Right.  But that's a

10  quantity measurement.  That's --

11         A.    But that's also the pattern,

12  because the pattern takes in the

13  12 months, what they typically order, to

14  come up with the average.

15         Q.    Right.  The 12 months in

16  average, 150 is not going to be an

17  outlier on an average on -- if an order

18  is 100 for 12 months, you're going to

19  average that in, that's not going to be

20  a -- that's going to be a blip on the

21  radar, is what your example is.

22         A.    I used the wrong number.

23  But if it -- if it was a significant

24  increase, it would have been.

1    Q.    And then Terrance goes on to

2  say, going back to his recommendations,

3  "The algorithm would not detect multiple

4  customer orders during a given week.  It

5  would not detect orders which consist of

6  gradual quantity increases of a

7  controlled substance over time."

8            Do you agree with his

9  position that the algorithm that you had

10  wouldn't have detected multiple customer

11  orders during a given week?

12    A.    If we received multiple on

13  days that we weren't expecting.

14    Q.    I'm not -- I'm not --

15    A.    Because --

16    Q.    -- allowing you to add --

17  add language on days that you were not

18  expecting.  I'm talking about what he's

19  addressing.

20            He's addressing, "The

21  algorithm would not detect multiple

22  customer orders during a given week."

23            MR. BARKER:  Object to form.

24

1    BY MR. JANUSH:

2         Q.   Do you agree that the

3    algorithm would not have addressed

4    multiple customer orders during a given

5    week?

6              MR. BARKER:  Object to form.

7              THE WITNESS:  That is what

8         he wrote, and if they ordered it

9         continuously every single day, it

10        compares to the previous weeks.

11   BY MR. JANUSH:

12        Q.   Or even multiple orders in a

13   week like I showed earlier with Cardinal,

14   right?

15             MS. BOODY:  Object to form.

16   BY MR. JANUSH:

17        Q.   It compares it to the

18   previous weeks, right?

19             MR. BARKER:  Object to form.

20             THE WITNESS:  That is

21        comparing to the previous weeks

22        average, the 52 weeks.

23   BY MR. JANUSH:

24        Q.   So if Cardinal ordered every

Highly Confidential - Subject to Further Confidentiality Review

1  three days a specific order, what

2  Terrance is saying is, your algorithm is

3  not detecting multiple customer orders

4  during a given week.

5       A.    That is what he's saying.

6       Q.    Do you disagree with it or

7  agree with it?

8       A.    I don't know.  Because I

9  would have to see somebody actually go --

10  we never had the case where somebody's

11  going in every single day to see what the

12  algorithm would do.

13       Q.    And then he wrote, "It would

14  not detect orders which consist of

15  gradual quantity increases of a

16  controlled substance over time."

17            Do you see that?

18       A.    Yes.

19       Q.    Do you agree or disagree

20  with that statement?

21       A.    I agree.

22       Q.    And he wrote, "It would not

23  detect a new customer's orders for

24  controlled substances which initially

1    commence with larger than normal

2    quantities and remain at a constant

3    level."

4              Do you agree or disagree

5    with that recommendation?

6         A.    If it was entered in

7    initially at a high level, yes.

8         Q.    And he wrote that, "Your

9    algorithm does not distinguish between

10   controlled substances."

11             Do you agree that?

12        A.    What do you think -- we

13   treat all of our control -- the

14   algorithm, we use it for -- no matter

15   what schedule, if it's an ADHD med or if

16   it's an opioid.

17        Q.    I think that's his point,

18   that he's recommending that that be

19   modified.  Isn't that his point?

20             MR. BARKER:  Object to form.

21             THE WITNESS:  I don't know

22        what he intended.

23   BY MR. JANUSH:

24        Q.    Well, go up to Paragraph 4.

1  Isn't the purpose of Paragraph 4, above,

2  "Start modifying the existing SOM

3  algorithm and/or adding algorithms to

4  include additional evaluation criteria

5  for each specific DEA basic class of

6  controlled substance handled by J&J."

7          Isn't that going to this

8  concept of distinguishing between

9  controlled substances?

10     A.    I misread this in thinking

11  that the algorithm doesn't do anything

12  different, no matter what the product is,

13  whether it's an opiate or a psychotropic.

14  And what he was saying is you should lump

15  in all the SKU -- all the total quantity

16  of the drug class and -- rather than the

17  SKU.

18     Q.    Right.  That's a critique on

19  his part, isn't it?  I mean, I'm going to

20  find out.  I'm going to be deposing him

21  one day.  So I just want your opinion

22  whether he's critiquing Janssen or not on

23  this.

24          MR. BARKER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I don't know

2      what he means by that.

3  BY MR. JANUSH:

4      Q.    Even when you look up at

5  Paragraph 4, you --

6      A.    Well, I understand what he's

7  saying up here, that we should move from

8  the SKU to do an overall -- the drug

9  class of that product.

10          But down here, the algorithm

11  doesn't -- I don't know if he's saying,

12  you should do something different from

13  opiates versus ADHD.  You shouldn't.

14  It's all a controlled substance.

15      Q.    So let's talk about -- let's

16  talk about what he's saying in Paragraph

17  4.

18          Earlier, I was just

19  following along the lines of what JOM has

20  done.  I was only looking at, on that

21  sales spreadsheet, the 100-milligram,

22  bottles of 100 pills, packed in 24

23  bottles per case.

24          Do you remember that?

1     A.    Yes.

2     Q.    I wasn't also adding in the

3  same day or same week orders for the

4  Nucynta 50 milligrams or the Nucynta

5  75 milligrams or the Nucynta

6  125 milligrams on top of Cardinal's

7  Nucynta 100-milligram orders.

8           You agree I was not doing

9  that, right?

10          MR. BARKER:  Object to form.

11          MS. BOODY:  Object to form.

12          THE WITNESS:  You were just

13     highlighting the 100-milligram.

14  BY MR. JANUSH:

15     Q.    Right.  So there is a reason

16  I'm circling back to that, because what

17  Terrance was suggesting, was to move away

18  from the SKU to SKU, the same SKU

19  analysis, and lump in the total grams of

20  product and take into account all of the

21  Nucynta that would have been ordered by,

22  as an example, Cardinal, in a given week

23  or month, right?

24     A.    Right.

1    Q.    And there is a huge

2  difference between that suspicious order

3  monitoring analysis, and just going SKU

4  to SKU, isn't there?

5              MR. BARKER:  Object to form.

6              THE WITNESS:  It depends,

7         because when you come down to it,

8         and you just calculate how much

9         active ingredient is in a

10        50-milligram -- so there's

11        50 milligrams times 100 pills,

12        times whatever you mention, you're

13        going to come up with a different

14        historical ordering pattern.

15             And so you are not going to

16        have more flagged orders than we

17        currently have.

18  BY MR. JANUSH:

19    Q.    Well, you're going to

20  have -- you're not going to have the

21  false positives on the company that

22  ordered a lot of the 100s of Nucynta but

23  may have only ordered a few of the 50s,

24  and then increases their orders of 50,