# EXHIBIT 218

Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE NORTHERN DISTRICT OF OHIO

 3                         EASTERN DIVISION

 4

 5

 6    *****************************

 7    IN RE:

 8    NATIONAL PRESCRIPTION OPIATE     MDL NO. 2804
      LITIGATION
 9
      This document relates to:       Case No. 17-MD-2804
10
      All cases                        Hon. Dan A. Polster
11
      *****************************
12

13          HIGHLY CONFIDENTIAL - SUBJECT TO

14             FURTHER CONFIDENTIALITY REVIEW

15                VIDEOTAPED DEPOSITION OF:

16                      STEVE REARDON

17                   ALOFT BOSTON SEAPORT

18                    401-403 D Street

19                  Boston, Massachusetts

20             November 30, 2018     9:03 a.m.

21

22                  Darlene M. Coppola

23                Registered Merit Reporter

24                Certified Realtime Reporter
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I don't recall seeing it.

 2   BY MR. PAPANTONIO:

 3        Q.   Did your company sell each one of these

 4   things, oxycodone, alprazolam, benzodiazepine?

 5   Did you all sell that?

 6             MR. PYSER:  Object to form.

 7        A.   Yes.

 8   BY MR. PAPANTONIO:

 9        Q.   According to the medical examiner's

10   office, they have seen a 127 percent increase in

11   the number of deaths associated with

12   benzodiazepines in the State of Florida between

13   2005 and 2010.

14             You were there in 2005 as -- in charge of

15   quality regulation, right?

16        A.   Yes.

17        Q.   You were there in 2006 in that position,

18   correct?

19        A.   Correct.

20        Q.   You were there in 2007 in that position,

21   correct?

22        A.   Part of the year.

23        Q.   And then it goes on to say -- as a matter

24   of fact, you were a leader in those positions,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   weren't you, sir?

 2              I mean, part of your job was to be a

 3   leader in those positions, correct?

 4        A.   Correct.

 5        Q.   It says "Approximately February 2009

 6   through 2010, monthly oxy -- oxycodone sales to

 7   Florida practitioners steadily increased and well

 8   surpassed monthly oxycodone sales in the remaining

 9   states."

10              Now, did you know that Florida actually

11   had the highest sales in the country during that

12   period of time?

13                   MR. PYSER:  Object to form.

14        A.   I was not aware.

15   BY MR. PAPANTONIO:

16        Q.   But you were there in 2005, what was

17   your -- daily, in 2005, you would review orders

18   that would come in from the company, correct?

19                   MR. PYSER:  Object to form.

20        A.   Not personally.

21   BY MR. PAPANTONIO:

22        Q.   Not personally, but you had a department

23   that did that.  There was three of you all?

24        A.   Correct.
```

```
 1    organization not sure what their role is or should

 2    be."

 3           Did you write that?

 4       A.  No.

 5       Q.  And then the last one, "Would like to see

 6    stronger regulatory, i.e., FDA affairs could be a

 7    strategic advantage," right?

 8           Do you see that?

 9       A.  Yes.

10       Q.  Now, you agree, sir, that the idea of

11    following regulatory standards was undersourced.

12    You agree with that?

13               MR. PYSER:  Object to form.

14    BY MR. PAPANTONIO:

15       Q.  It was undersourced.  You see the next

16    one.  It says "People undersourced today"?

17       A.  Again, this piece of it speaks to the

18    manufacturing side of the business.

19       Q.  Yeah, which is a Cardinal business.  I

20    want to be sure.  It's a Cardinal business,

21    correct?

22       A.  Correct.

23       Q.  All right.  "People have -- people we have

24    are good, don't have enough bench strength."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you shredded?
 2             MR. PYSER:  Object to form.
 3    Argumentative.
 4       A.    No, I wouldn't -- no.
 5    BY MR. FULLER:
 6       Q.    You wouldn't have shredded that one?
 7       A.    No.
 8       Q.    Just other documents?
 9             MR. PYSER:  Object to form.
10    BY MR. FULLER:
11       Q.    Right?
12             MR. PYSER:  Object to form.
13       A.    Other documents that required shredding.
14             MR. FULLER:  Sure.  So these
15    ingredient limit reports -- let me see 3756.
16    That's a big one.
17          This is going to be Plaintiffs' Exhibit
18    31.
19
20          (Exhibit No. 31 marked for
21    identification.)
22
23    BY MR. FULLER:
24       Q.    Have you seen this type of document
```

Highly Confidential - Subject to Further Confidentiality Review

1  before?  It appears to be an ingredient limit

2  report, correct?

3      A.   Not in this format, but yes.

4      Q.   It is an ingredient limit report?

5      A.   Yes.

6      Q.   And this is something Cardinal kept in the

7  normal course of business; is that right?

8      A.   Yes.

9      Q.   And I'll represent to you that Cardinal's

10 produced this to the plaintiffs in this case,

11 amongst other ingredient limit reports, some of

12 them going back to 2005.  We should have, at least

13 according to your testimony, ingredient limit

14 reports going back prior to that; is that right?

15              MR. PYSER:  Object to form.  You can

16 testify about what you should have.

17     A.   It was implemented '94, '95.

18 BY MR. FULLER:

19     Q.   So you believe ingredient limit reports

20 started being created by Cardinal in 1994 or '95.

21 Correct?

22     A.   Correct.

23     Q.   And it's your understanding that these

24 documents were provided to the DEA; isn't that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    true?

 2        A.   Correct, on a monthly basis.

 3        Q.   And it's also your testimony that this

 4    document, this 535-page document, if I can get my

 5    copy.

 6

 7             (Brief pause in proceedings.)

 8

 9             MR. FULLER:  You stay right there.

10             MR. PYSER:  Move to strike.

11

12        (Brief pause in proceedings.)

13

14    BY MR. FULLER:

15        Q.   These, again, were kept in the normal

16    course of business at Cardinal and provided to the

17    DEA; is that correct?

18        A.   Correct.

19        Q.   And this is 535 pages of suspicious

20    orders; isn't that true?

21        A.   I haven't counted the pages, but...

22        Q.   If you go to the last page, I think it

23    will tell you what it was.

24             MR. PYSER:  I'm going to object to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the claims and the length of this.  The way it's

 2    presented has added significantly to the page

 3    number.

 4                 MR. FULLER:  This is the way it was

 5    produced.

 6         A.   Not the format that it typically comes

 7    in.

 8    BY MR. FULLER:

 9         Q.   Fair enough.  You may see it in a

10    different format?

11         A.   Yes.

12         Q.   But this document is inclusive of, at

13    least out of the Wheeling distribution center,

14    right you see that at the top?

15         A.   Yes.

16         Q.   Out of the Wheeling distribution center

17    for July of 2007, if this report was run

18    accurately and produced to us in the format that

19    Cardinal kept it in, this would be how many ever

20    pages are here, I'm saying there's 535, whatever

21    the page count is, this is all suspicious orders,

22    right?

23         A.   Based on the criteria that the DEA agreed

24    to.
```

```
 1      Q.   Based on whatever.  These are all
 2   suspicious orders under your CFR reporting
 3   requirement, correct?
 4      A.   Correct.
 5      Q.   And Cardinal shipped all these orders out
 6   into our communities across the country, didn't
 7   they?
 8           MR. PYSER:  Object to form.
 9      A.   It may have been some that were caught at
10   the distribution center and investigated.
11   BY MR. FULLER:
12      Q.   Well, this report isn't generated until
13   the end of the month, right?
14      A.   But it's a two-step process.
15      Q.   I understand, but just listen to my
16   question.
17           This report isn't generated until the end
18   of month, correct?
19      A.   Correct.
20      Q.   And any shipments that have gone, have
21   long gone out because it's usually 24-hour
22   turnaround, correct?
23      A.   Correct.
24      Q.   So if you look, there's, actually, I
```