EXHIBIT 238

Highly Confidential - Subject to Further Confidentiality Review

```
1                    UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION
3    IN RE: NATIONAL          )   MDL No. 2804
     PRESCRIPTION OPIATE      )
4    LITIGATION               )   Case No. 1:17-MD-2804
                              )
5                             )   Hon. Dan A. Polster
     THIS DOCUMENT RELATES TO )
6    ALL CASES                )
                              )
7
8
9                          __ __ __
10               Thursday, January 10, 2019
                           __ __ __
11
          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12                  CONFIDENTIALITY REVIEW
                           __ __ __
13
14
15
16       Videotaped Deposition of GARY HILLIARD,
     held at Winstead PC, 2728 N. Harwood St.,
17   Dallas, Texas, commencing at 9:06 a.m. on the
     above date, before Susan Perry Miller,
18   Registered Diplomate Reporter, Certified
     Realtime Reporter, Certified Realtime
19   Captioner, and Notary Public.
20
21
                           __ __ __
22
               GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | fax 917.591.5672
                    deps@golkow.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2
 3         LEVIN PAPANTONIO THOMAS MITCHELL
           RAFFERTY PROCTOR, P.A.
 4         BY:  BRANDON L. BOGLE, ESQUIRE
                bbogle@levinlaw.com
 5         316 South Baylen Street
           Pensacola, Florida 32502
 6         (850) 435-7000
           Counsel for Plaintiffs
 7
 8
           COVINGTON & BURLING LLP
 9         BY:  CHRISTOPHER K. EPPICH, ESQUIRE
                ceppich@cov.com
10         1999 Avenue of the Stars
           Los Angeles, California 90067-4643
11         (424) 332-4764
           Counsel for McKesson Corporation and
12         the Witness
13
14         COVINGTON & BURLING LLP
           BY:  KEVIN M. KELLY, ESQUIRE
15              kkelly@cov.com
           One City Center
16         850 Tenth Street, N.W.
           Washington, D.C. 20001
17         (202) 662-6000
           Counsel for McKesson Corporation and
18         the Witness
19
20         WILLIAMS & CONNOLLY LLP
           BY:  JULI ANN LUND, ESQUIRE
21              jlund@wc.com
           725 Twelfth Street, N.W.
22         Washington, D.C. 20005
           (202) 434-5000
23         Counsel for Cardinal Health, Inc.
24
25
```

```
 1       A P P E A R A N C E S, Continued:
 2
 3       JONES DAY
         BY:  RICHARD M. BRODSKY
 4            rbrodsky@jonesday.com
         150 W. Jefferson Street, Suite 2100
 5       Detroit, Michigan 48226-4438
         (313) 733-3939
 6       Counsel for Walmart
 7
 8       REED SMITH LLP
         BY:  STAN PERRY, ESQUIRE
 9            sperry@reedsmith.com
         811 Main Street, Suite 1700
10       Houston, Texas 77002
         (713) 469-3800
11       Counsel for AmerisourceBergen Drug
         Corporation
12
13
         ARNOLD & PORTER KAYE SCHOLER LLP
14       BY:  JOHN D. LOMBARDO, ESQUIRE
              john.lombardo@arnoldporter.com
15            (via teleconference)
         777 South Figueroa Street, 44th Floor
16       Los Angeles, California 90017-5844
         (213) 243-4000
17       Counsel for Endo Health Solutions
         Inc., Endo Pharmaceuticals Inc., Par
18       Pharmaceutical, Inc. and Par
         Pharmaceutical Companies, Inc.
19
20
         COLLINSON DAEHNKE INLOW & GRECO
21       BY:  LAURA S. LUCERO, ESQUIRE
              laura.lucero@cdiglaw.com
22            (via teleconference)
         2110 East Flamingo Road, Suite 305
23       Las Vegas, Nevada 89119
         (702) 979-2132
24       Counsel for C&R Pharmacy
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A P P E A R A N C E S, Continued:
 2
 3        MARCUS & SHAPIRA LLP
          BY:  ELLY HELLER-TOIG, ESQUIRE
 4             ehtoig@marcus-shapira.com
          One Oxford Center, 35th Floor
 5        301 Grant Street
          Pittsburgh, Pennsylvania 15219
 6        (412) 471-3490
          Counsel for HBC
 7
 8
          ALLEGAERT BERGER & VOGEL LLC
 9        BY:  JOHN S. CRAIG, ESQUIRE
               jcraig@abv.com
10             (via teleconference)
          111 Broadway, 20th Floor
11        New York, New York 10006
          (212) 571-0550
12        Counsel for Rochester Drug
          Cooperative, Inc.
13
14
          BAILEY & WYANT PLLC
15        BY:  HARRISON M. CYRUS, ESQUIRE
               hcyrus@baileywyant.com
16             (via teleconference)
          500 Virginia Street East, Suite 600
17        Charleston, West Virginia 25301
          (304) 345-4222
18        Counsel for West Virginia Board of
          Pharmacy
19
20
          FOX ROTHSCHILD LLP
21        BY:  EILEEN O. MUSKETT, ESQUIRE
               emuskett@foxrothschild.com
22             (via teleconference)
          1301 Atlantic Avenue
23        Atlantic City, New Jersey 08401-7212
          (609) 572-2355
24        Counsel for Validus Pharmaceuticals
25
```

```
 1        A P P E A R A N C E S, Continued:

 2

 3

          TRIAL TECHNICIAN:

 4

               RICHARD RIENSTRA,

 5             Complete Litigation Support

 6

 7        VIDEOGRAPHER:

 8             BRIAN BOBBITT,

               Golkow Litigation Services

 9

10

          ALSO PRESENT:

11

               RICHARD WOODS, Paralegal, Levin

12             Papantonio

13                      --oOo--

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2                                          Page

 3      APPEARANCES                            2

 4

 5      EXAMINATION OF GARY HILLIARD:

 6      BY MR. BOGLE............................. 14

 7      BY MR. EPPICH............................ 318

 8      BY MR. BOGLE............................. 340

 9

10

11      CERTIFICATE                           352

12      ACKNOWLEDGMENT OF DEPONENT            353

13      ERRATA                                354

14      LAWYER'S NOTES                        355

15

16

17

18

19

20

21

22

23

24                   --oOo--

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Index of Media

 2      File 1                                    12

 3      File 2                                    72

 4      File 3                                   162

 5      File 4                                   208

 6      File 5                                   281

 7

 8

 9

10

11

12                      --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T    I N D E X
 2                      Description                    Page
 3    McKesson-        E-mail from Walker,              35
      Hilliard        5/2/2012, with
 4    Exhibit 1       Attachment(s)
                      P1.1651
 5                    MCKMDL00498169 - 498183
 6    McKesson-        U.S. House of                    40
      Hilliard        Representatives
 7    Exhibit 2       Committee on Energy and
                      Commerce Memo dated May
 8                    4, 2018
                      P1.264
 9                    (9 pages, no Bates)
10    McKesson-        U.S. Department of               53
      Hilliard        Justice Drug Enforcement
11    Exhibit 3       Administration Letter
                      dated September 27,
12                    2006, from Joseph T.
                      Rannazzisi
13                    P1.1464
                      MCKMDL00478906 - 478909
14
      McKesson-        DEA Memorandum dated Oct         79
15    Hilliard        20, 2005, Subject:
      Exhibit 4       Internet Presentation
16                    with McKesson Corp. on
                      September 1, 2005
17                    P1.1946
                      MCKMDL00496859 - 496875
18
      McKesson-        DEA Memorandum dated Jan        107
19    Hilliard        23, 2006, Subject:
      Exhibit 5       Meeting Between Office
20                    of Diversion Control
                      (OD) and McKesson Corp.
21                    on January 3, 2006
                      P1.1789
22                    MCKMDL00496876 - 496878
23    McKesson-        DEA List of Pleadings in        124
      Hilliard        Order to Show Cause Re
24    Exhibit 6       McKesson Corporation
                      P1.1943
25                    MCKMDL00496306 - 496525
```

| | | |
|---|---|---|
| McKesson-Hilliard Exhibit 7 | Chart and Table, "McKesson hydrocodone sales for October 1, 2005 through January 31, 2006" P1.1947 MCKMDL00497154 - 497155 | 145 |
| McKesson-Hilliard Exhibit 8 | "Pharmacy Rankings for Hydrocodone, October 1, 2005 to January 31, 2006" P1.1951 MCKMDL00496536 - 496549 | 152 |
| McKesson-Hilliard Exhibit 9 | Drug Operations Manual Section 55-Controlled Substances P1.1555 MCKMDL00346554 - 346690 | 164 |
| McKesson-Hilliard Exhibit 10 | McKesson DU45 Report, Date 04/03/07 P1.2100 MCKMDL00660789 - 661435 | 169 |
| McKesson-Hilliard Exhibit 11 | Summary of the DEA-HDMA Meeting on Suspicious Orders, Meeting Date: Sept. 7, 2007 P1.1823 MCKMDL00574906 - 574907 | 187 |
| McKesson-Hilliard Exhibit 12 | E-mail Chain ending with E-mail from Gustin, 2/4/2011 P1.1667 MCKMDL00510747 - 510752 | 195 |
| McKesson-Hilliard Exhibit 13 | Settlement and Release Agreement and Administrative Memorandum of Agreement between DEA and McKesson, May 2, 2008 P1.889 MCKMDL00337001 - 337024 | 210 |

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | | | |
| 2 | McKesson-Hilliard Exhibit 14 | Presentation, "Lifestyle Drugs & Internet Pharmacies" | 215 |
| 3 | | P1.1830 MCKMDL00403340 - 403348 | |
| 4 | | | |
| 5 | McKesson-Hilliard Exhibit 15 | Lifestyle Drug Program, McKesson U.S. Pharma - DEA Licensure Audit | 225 |
| 6 | | P1.1887 MCKMDL00591949 - 591953 | |
| 7 | | | |
| 8 | McKesson-Hilliard Exhibit 16 | Lifestyle Drug Program, McKesson U.S. Pharma - DEA Licensure Audit, Landover, Maryland DC | 235 |
| 9 | | P1.1913 | |
| 10 | | MCKMDL00591841 - 591844 | |
| 11 | McKesson-Hilliard | McKesson Operations Manual for Pharma | 239 |
| 12 | Exhibit 17 | Distribution, Lifestyle Drug Monitoring Program | |
| 13 | | P1.1333 MCKMDL00330211 - 330216 | |
| 14 | | | |
| 15 | McKesson-Hilliard Exhibit 18 | Lifestyle Drug Program, McKesson U.S. Pharma - DEA Licensure Audit, | 242 |
| 16 | | So Cal DC P1.1918 | |
| 17 | | MCKMDL00591858 - 591861 | |
| 18 | McKesson-Hilliard | McKesson Internal Audit, Audit Report, DEA | 244 |
| 19 | Exhibit 19 | Licensure Compliance and LDMP Audit, U.S. | |
| 20 | | Pharmaceuticals P1.1917 | |
| 21 | | MCKMDL00591251 - 591262 | |
| 22 | McKesson-Hilliard | E-mail Chain ending with E-mail from Hilliard, | 248 |
| 23 | Exhibit 20 | 12 Sep 2007, RE: Mapes and ABC presentation | |
| 24 | | notes P1.2002 | |
| 25 | | MCKMDL00622532 - 622534 | |

Highly Confidential - Subject to Further Confidentiality Review

```
 1
      McKesson-          E-mail Chain ending with     259
 2    Hilliard           E-mail from Hilliard,
      Exhibit 21         10/18/2009
 3                       P1.1856
                         MCKMDL00573535 - 573539
 4
      McKesson-          E-mail Chain ending with     272
 5    Hilliard           E-mail from Walker,
      Exhibit 22         4/17/2008
 6                       P1.1962
                         MCKMDL00543610 - 543615
 7
      McKesson-          E-mail Chain ending with     278
 8    Hilliard           E-mail from Pacheco,
      Exhibit 23         11/3/2006
 9                       P1.1804
                         MCKMDL00543971 - 543973
10
      McKesson-          E-mail Chain ending with     288
11    Hilliard           E-mail from Hilliard, 27
      Exhibit 24         Aug 2008, RE: CSMP
12                       Suspicious Transaction
                         Reporting to the DEA
13                       P1.1937
                         MCKMDL00623568 - 623589
14
      McKesson-          DEA Letter to Geoffrey       300
15    Hilliard           Hobart dated November 4,
      Exhibit 25         2014
16                       P1.1443
                         MCKMDL00409453 - 409458
17
      McKesson-          United States Department     309
18    Hilliard           of Justice Letter to
      Exhibit 26         Geoffrey E. Hobart dated
19                       November 6, 2013
                         P1.1432
20                       MCKMDL00409048 - 409049
21
22                       --oOo--
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Thursday, January 10, 2019, 9:06 a.m.)

 2                   THE VIDEOGRAPHER:  All right,

 3              stand by.  We are now on the record.

 4              My name is Brian Bobbitt.  I'm a

 5              videographer for Golkow Litigation

 6              Services.  Today's date is

 7              January 10th, 2019, and the time is

 8              9:06 a.m.

 9                   This video deposition is being

10              held in Dallas, Texas, in the National

11              Prescription Opiate Litigation, MDL

12              No. 2804.  The deponent is Gary

13              Hilliard.

14                   Would counsel like to identify

15              themselves for the record.

16                   MR. BOGLE:  Brandon Bogle

17              representing the plaintiffs.  He's my

18              paralegal.

19                   MS. HELLER-TOIG:  Elly

20              Heller-Toig from Marcus & Shapira for

21              HBC Service Company.

22                   MR. PERRY:  Stan Perry for

23              AmerisourceBergen.

24                   MR. BRODSKY:  Richard Brodsky

25              from Jones Day on behalf of Walmart.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. LUND:  Juli Ann Lund from

 2         Williams & Connolly on behalf of

 3         Cardinal Health.

 4              MR. KELLY:  Kevin Kelly of

 5         Covington & Burling on behalf of

 6         McKesson.

 7              MR. EPPICH:  Chris Eppich of

 8         Covington & Burling on behalf of

 9         McKesson and the witness.

10              THE REPORTER:  Thank you.

11         Would those on the phone announce,

12         please?

13              MR. LOMBARDO:  Good morning.

14         John Lombardo with Arnold & Porter for

15         the Endo and Par defendants.

16              MS. LUCERO:  Good morning.

17         Laura Lucero from Collinson Daehnke on

18         behalf of C&R Pharmacy.

19              MS. MUSKETT:  Good morning.

20         Eileen Muskett from Fox Rothschild on

21         behalf of Validus.

22              THE REPORTER:  Anyone else?

23              (No response.)

24              (Witness sworn by the

25         reporter.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                P R O C E E D I N G S

 2                    GARY HILLIARD,

 3     having taken an oath to tell the truth, the

 4     whole truth, and nothing but the truth,

 5     testified as follows:

 6                      EXAMINATION

 7     QUESTIONS BY MR. BOGLE:

 8          Q.     Good morning.

 9          A.     Good morning.

10          Q.     Can I get your full name,

11     please?

12          A.     Gary Lawrence Hilliard.

13          Q.     And, Mr. Hilliard, my name is

14     Brandon Bogle.  I'm going to be asking you

15     some questions today.  Before we get into the

16     substance, though, have you ever had your

17     deposition taken before?

18          A.     I have not.

19          Q.     Okay.  Just a few ground rules

20     to hopefully make things go as smoothly as

21     possible for us.  I'm going to ask questions

22     and I'd ask that you wait till I finish my

23     question before you provide an answer, number

24     one, to make sure you understand my question;

25     number two, to allow the court reporter to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    more easily transcribe things.

 2              Does that make sense?

 3       A.    Yes, it does.

 4       Q.    Okay.  And if at any point in

 5    time you want to take a break, just let me or

 6    your counsel know.  I'm happy to do that.

 7    It's not an endurance contest.

 8              The other thing is if I ask a

 9    question that you don't hear or don't

10    understand, please ask me to repeat it or

11    rephrase it and I will do so.  Otherwise, I

12    assume if you're answering my question that

13    you understood it.  Is that fair?

14       A.    Yes.

15       Q.    Okay.  Where are you currently

16    employed, sir?

17       A.    Tech Data Corporation.

18       Q.    Where is that located?

19       A.    The corporate office is in

20    Clearwater, Florida.

21       Q.    Okay.  Are you out of

22    Clearwater or somewhere else?

23       A.    I'm out of a Fort Worth

24    facility.

25       Q.    Give me just a general sketch
```

Highly Confidential - Subject to Further Confidentiality Review

1    of what you do at Tech Data.  What is your

2    job?

3         A.     I'm a dangerous goods safety

4    advisor, so my role is to manage hazardous

5    materials for our company in the United

6    States, Canada and Mexico.

7         Q.     Okay.  Does Tech Data in any

8    way, shape or form sell, distribute or deal

9    in opioids?

10        A.     No.  It's all electronics.

11        Q.     All electronics, okay.

12               When did you start working for

13   Tech Data?

14        A.     In September 2016.

15        Q.     Okay.  And prior to working at

16   Tech Data, were you employed at McKesson?

17        A.     I was.

18        Q.     Okay.  Can you give me the span

19   of time that you worked for McKesson?

20        A.     From 1997 till 2016.

21        Q.     Okay.  And why did you leave

22   McKesson?

23        A.     I was part of a workforce

24   reduction.

25        Q.     Okay.  Were you given the

Highly Confidential - Subject to Further Confidentiality Review

1    opportunity to transfer to another department

2    or just outright told that they were

3    eliminating your position and there was no

4    other position for you?

5         A.    Outright elimination.

6         Q.    Okay.  Now, the time from 1997

7    to 2016 while you were at McKesson, during

8    that entire span, were you a director of

9    regulatory affairs?

10        A.    I started as a manager of

11   regulatory affairs.

12        Q.    Okay.  So tell me what time

13   period you were the manager.

14        A.    It was approximately a year, so

15   approximately '97-98.

16        Q.    Okay.

17        A.    I don't remember the exact time

18   frame.

19        Q.    That approximation is good

20   enough.  So approximately 1998 you take over

21   as director of regulatory affairs.  Do you

22   hold that position until 2016 when you leave?

23        A.    That's correct.

24        Q.    Okay.  Do you know what month

25   in 2016 you left?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      July, I believe.

 2        Q.      Okay.  So give me a sense,

 3   while you were at McKesson working at

 4   director of regulatory affairs, what your

 5   general job responsibilities were.

 6        A.      My role changed over the years,

 7   but as I started, I had responsibility for

 8   DEA compliance for our pharma distribution

 9   centers within the U.S.  I was over 30

10   facilities, I don't recall exactly, but...

11   so that entailed things such as the

12   management of the SOP, the audit, ARCOS, loss

13   and theft, any issue resolution; I would

14   assist with fiscal DEA audits, also with

15   corrective actions if there were any

16   corrective actions with that; the suspicious

17   order program that was in place at the time.

18        Q.      Okay.

19        A.      And then additionally I also

20   had responsibility for HAZMAT, hazardous

21   materials.  I also had responsibility for EPA

22   environmental issues, waste disposal.  I also

23   had responsibility for DEA registrations,

24   state licensure.  I was also active with the

25   industry association with NWDA on working
```

```
 1    committees for both federal and state.

 2         Q.    Is that the -- I'm sorry, go

 3    ahead.  Keep going.

 4         A.    And did some work on the OSHA

 5    side as well for safety.

 6         Q.    Okay.

 7         A.    Also, I had responsibility for

 8    FDA actions for -- as it related to our

 9    operations.

10         Q.    Okay.  I've got a few follow-up

11    questions for you.  Are you done?  I want to

12    make sure you're done.

13         A.    That's fine.

14         Q.    Good.  Okay.  A few follow-up

15    questions for you on a couple of these points

16    you gave me.  You said you were responsible

17    for the SOP.  What SOP are you referring to?

18         A.    Section 55 is what we referred

19    it to when we started.  It was already in

20    place when I arrived at McKesson, and follow

21    up on that until a migration took place,

22    changes took place in the 2006 time frame.

23         Q.    Okay.  Because you guys went

24    from Section 55 to approximately 2007, you go

25    to the LDMP, the Lifestyle Drug Management
```

```
 1    Program?  True?

 2         A.     True.

 3         Q.     Okay.  And then in

 4    approximately 2008, you go to the Controlled

 5    Substances Monitoring Program, otherwise

 6    known as the CSMP.  True?

 7         A.     True.

 8         Q.     Okay.  So did you have

 9    responsibility for -- let's do one by one.

10    So the Section 55 component, you had

11    responsibility for Section 55 in what

12    respect?

13         A.     Updates and adherence for our

14    operations to the policy.

15         Q.     For what period of time did you

16    have that responsibility?

17         A.     From '97 till 2006.

18         Q.     Okay.  Let's talk about the

19    LDMP.  Did you have any responsibility

20    related to the LDMP?

21         A.     I helped create that LDMP

22    process.

23         Q.     Okay.  So after it was created,

24    what was your responsibility in relationship

25    to that program?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      I worked with our team to

2  ensure compliance with that program and to

3  develop it.

4      Q.      Okay.  What about the CSMP?

5  What involvement did you have with the CSMP?

6      A.      I also helped write that SOP as

7  well.

8      Q.      What sort of experience did you

9  have with drafting SOPs prior to drafting the

10  LDMP, for example?

11      A.      I had drafted SOPs in the past

12  with my previous employers as well, so no

13  formal training, if you will, for SOPs.  But

14  just -- when something needed to be revised

15  or something wasn't in place and needed to be

16  created, then I would work on the SOPs for

17  that.

18      Q.      Okay.  Prior to drafting the

19  LDMP, had you had any experience drafting any

20  SOPs that related to suspicious order

21  monitoring for controlled substances?

22      A.      Just the experience from what

23  we gained from the original Section 55, and

24  then the changes that were necessary as we

25  developed that program.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.      Okay.  And where did you work

 2    before you came to McKesson?

 3           A.      FoxMeyer Drug Company.

 4           Q.      What did you do for them just

 5    generally?

 6           A.      Same thing, manager of

 7    regulatory affairs.

 8           Q.      How long were you with them?

 9           A.      Approximately two years.

10           Q.      Immediately before McKesson?

11           A.      Immediately before.  McKesson

12    acquired FoxMeyer so it was part of the

13    acquisition.

14           Q.      Gotcha.

15                   Did you have any sort of

16    regulatory job prior to working at FoxMeyer?

17           A.      I did.  I worked regulatory for

18    a reverse distributor of pharmaceuticals.

19           Q.      Can you say that again?  I'm

20    sorry.

21           A.      A reverse distributor.

22           Q.      Reverse distributor.

23           A.      RDS was the name, Reverse

24    Distribution Services.

25           Q.      How long did you work for them?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Two years.

 2          Q.      Immediately preceding FoxMeyer?

 3          A.      Correct.

 4          Q.      Any other regulatory position

 5   that you held prior to joining McKesson?

 6          A.      I worked in environmental, and

 7   so I gained an environmental background

 8   through waste management, Chemical Waste

 9   Management to be more specific, so we were

10   trained in EPA requirements and Department of

11   Transportation, FAA requirements as well.

12          Q.      What company are you referring

13   to there?

14          A.      Chemical Waste Management.

15          Q.      Chemical Waste Management.

16                  Okay.  Any others prior to

17   McKesson that are regulatory-related?

18          A.      No.

19          Q.      All right.  So a couple of

20   other follow-ups.  You mentioned, while at

21   McKesson, having responsibility related to

22   audit processes.  In what respect were you

23   responsible for audit processes at McKesson?

24          A.      I would update the audit as

25   necessary and then I'd go out to our
```

Highly Confidential - Subject to Further Confidentiality Review

1   facilities and conduct audits.

2       Q.    Okay.  You're talking about a

3   specific SOP that you would update for

4   audits, or what are you referring to by

5   "update the audit"?

6       A.    There was an audit that was

7   already written and it correlated to

8   Section 55, and I audited against that.

9       Q.    Okay.  How long did you have

10  responsibility for audits?

11      A.    From '97 till approximately

12  2014.

13      Q.    Okay.  Just from prior

14  depositions, I understand that Tracy Jonas

15  also had some responsibility for audits.  How

16  did your responsibility for audits compare to

17  his?

18      A.    So when the audit was changed

19  to -- we referred to it as a STARs audit, and

20  so we co-wrote good portions of those audits,

21  and then he ultimately took over facilitation

22  of the audit program.

23      Q.    Okay.  And that would have been

24  in 2014, you're saying?

25      A.    I'm not sure when -- the STARs

1    audit took place probably before 2014, but

2    I'm not exactly sure of the date.

3        Q.    Okay.  All right.  You

4    mentioned responsibilities related to

5    suspicious order -- I think "purchasing" was

6    the term you used.  Maybe you used a

7    different term, but something related to

8    suspicious order monitoring or purchasing.

9        A.    Monitoring.

10       Q.    What was your responsibility

11   there?

12       A.    To -- adherence to our SOP.

13       Q.    Okay.  Going back to

14   Section 55, the LDMP and the CSMP?

15       A.    Correct.

16       Q.    During what time period did you

17   have those responsibilities?

18       A.    1997 until -- again, I'm not

19   sure when the STARs ended.  It was handed off

20   to Dave Gustin.  I don't know, 2013 -- 2014,

21   maybe.

22       Q.    An approximation is fine.

23       A.    I'm not sure.

24       Q.    I'm not going to hold you to an

25   exact date.  I just want to get a sense of

```
 1    what the scope is here.

 2              You also said you handled DEA

 3    registrations and state licensure?

 4         A.    Correct.

 5         Q.    For what time period did you

 6    have those responsibilities?

 7         A.    '97 till 2016.

 8         Q.    Okay.  You mentioned being

 9    actively involved in the -- I think it was

10    NWMA?  Is that right?

11         A.    HDMA.

12         Q.    Right.  I think you mentioned

13    the predecessor term.

14         A.    NWDA, National Wholesale Drug

15    Association.

16         Q.    Which then became the HDMA,

17    right?

18         A.    And now is NDA, I believe, yes.

19         Q.    I think maybe HDA.

20         A.    HDA.

21         Q.    I think so.  It doesn't matter.

22         A.    Okay.

23         Q.    Okay.  What sort of committees

24    were you on at NWDA?

25         A.    I was on the federal committees
```

1    in reference to DEA, also state committee,

2    pharmaceutical waste management committee,

3    transportation committee.

4         Q.    Okay.  Let's talk about the

5    federal DEA committee.  What did you do --

6    what was your involvement with that

7    committee?  What did you do?

8         A.    We would meet typically

9    annually and with our counterparts from other

10   wholesalers and sometimes manufacturers, and

11   we would discuss issues that were happening,

12   proposed regulations that were coming up.

13   That's primarily it.

14        Q.    Okay.  And so this NWDA was a

15   trade association for pharmaceutical

16   distributors primarily, correct?

17        A.    That's correct.

18        Q.    Okay.  And so as part of that

19   association, as a member of that association,

20   you would have interactions with other

21   employees of other pharmaceutical

22   distributors.  Is that fair?

23        A.    That's correct.

24             MR. EPPICH:  Object to the

25        form.

```
 1                    Give me a minute to object, if
 2       you don't mind.
 3   QUESTIONS BY MR. BOGLE:
 4       Q.     How frequently would you attend
 5   meetings for NWDA, approximately?
 6       A.     Approximately twice a year.
 7       Q.     Okay.  Would those meetings
 8   generally be attended by employees of other
 9   pharmaceutical distributors as well?
10       A.     That's correct.
11       Q.     Okay.  You also mentioned
12   having responsibility for ARCOS.  Can you
13   tell me what you did related to ARCOS?
14       A.     I would train our employees at
15   our facilities when they needed training.  I
16   would assist in problems that they may have
17   understanding what types of code assignments
18   would be associated with a type of
19   transaction.  If they had error reports that
20   they needed assistance with, and any
21   communications from ARCOS corporate, then I
22   would typically work with them on that.
23       Q.     Okay.  And when it came to the
24   ARCOS training you're referring to, are you
25   talking about training people at the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distribution centers?

 2         A.    That's correct.

 3         Q.    All right.  So from 1997 to

 4    2007, would you have had responsibility for

 5    regulatory compliance for all of McKesson's

 6    distribution centers?

 7         A.    For the pharmaceutical

 8    division.

 9         Q.    Okay.  Well, let me rephrase it

10    because I think that's a fair clarification.

11              So from 1997 to 2007, would you

12    have had responsibility for compliance with

13    the Controlled Substances Act as it pertained

14    to all of McKesson's distribution centers?

15         A.    That would be correct.

16         Q.    Okay.  And, now, in 2008, as I

17    understand it, there were some additional

18    people added to McKesson's regulatory team.

19    Is that true?

20         A.    That's correct.

21         Q.    Okay.  And so when that change

22    occurred and additional people were added, as

23    I understand it, you would then have not been

24    responsible for all of those distribution

25    centers when it pertains to Controlled
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Substance Act compliance.  True?
 2                 MR. EPPICH:  Object to the
 3         form.
 4         A.    There were regional directors
 5    and I did not have a region.  So the regional
 6    directors specifically worked with the new
 7    programs that were being developed, whereas I
 8    worked on other operational aspects.
 9    QUESTIONS BY MR. BOGLE:
10         Q.    Okay.  From the information
11    that I've looked at from the time period of
12    1997 to 2007, when it came to Controlled
13    Substances Act compliance at McKesson, you
14    guys had a three-person team which consisted
15    of Donald Walker, yourself, and Bruce
16    Russell.  Is that true?
17         A.    When I started, there was -- I
18    reported to Dan White, who was a VP of
19    regulatory, and I reported to -- I'm sorry,
20    not reported.  I also had a colleague that
21    was a director of regulatory affairs, Rolly
22    Blythe.
23         Q.    Okay.  When did Mr. White leave
24    the company, roughly?
25         A.    He transitioned to a different
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     role, and I do not recall the date.

2          Q.    The other name was Rolly White,

3     I believe you gave me?

4          A.    Blythe.

5          Q.    Oh, Blythe, I'm sorry.  When

6     did that individual cease working in

7     regulatory affairs, roughly?

8          A.    He retired, and again, I don't

9     recall the exact time frame, but it was

10    probably a few years, three, four years, in.

11         Q.    To your tenure?

12         A.    Correct.

13         Q.    What did Rolly Blythe, what did

14    that person generally do during that time

15    period that they were there?

16         A.    The same role, so he was my

17    predecessor, and he managed the DEA

18    compliance.

19         Q.    Okay.  And Mr. White, what was

20    his role?

21         A.    He oversaw the regulatory

22    department, which included DEA compliance.

23         Q.    So would he have been --

24    Mr. White been in that role during the same

25    time that Donald Walker was working in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    regulatory affairs?

 2         A.     No.

 3         Q.     No.  So did Mr. Walker sort of

 4    take his role over?

 5         A.     Mr. Walker took over SVP of

 6    operations, and then I started reporting up

 7    through him.

 8         Q.     Okay.

 9         A.     Again, I don't remember the

10    exact time frame.

11         Q.     That's fine.

12                Do you agree that there is an

13    ongoing opioid epidemic in this country?

14         A.     I don't know about opioid

15    epi- -- sorry, epidemic, in those term- -- in

16    that terminology.

17         Q.     Okay.  Do you believe there's

18    any sort of problem in this country as it

19    relates to opioids?

20                MR. EPPICH:  Object to the

21         form.

22                MR. PERRY:  Object to form.

23         A.     I don't know.

24    QUESTIONS BY MR. BOGLE:

25         Q.     You don't know, okay.
```

```
 1                    Did you ever receive any

 2      training, formal or informal, about a

 3      potential epidemic in this country while at

 4      McKesson?

 5                    MR. EPPICH:  Object to the

 6           form.

 7      QUESTIONS BY MR. BOGLE:

 8           Q.    Related to opioids?

 9                    MR. EPPICH:  Object to the

10           form.

11           A.    I don't know.

12      QUESTIONS BY MR. BOGLE:

13           Q.    Did you ever have any

14      discussions with any of your colleagues at

15      McKesson about a potential opioid epidemic in

16      this country?

17           A.      Not that I recall in that

18      frame -- of that terminology.

19           Q.      Okay.  Any other sort of

20      terminology that you would utilize that you

21      did have such a discussion?

22                    MR. EPPICH:  Object to the

23           form.
```

Highly Confidential - Subject to Further Confidentiality Review



22          MR. EPPICH:  Object to the

23     form.

24   QUESTIONS BY MR. BOGLE:

25          Q.    Okay.  Are you familiar with

Highly Confidential - Subject to Further Confidentiality Review

1    the term "diversion"?

2           A.      I am.

3           Q.      What do you understand that

4    term to mean?

5                   MR. EPPICH:  Object to the

6           form.  Calls for a legal conclusion.

7           A.      Controlled substance

8    pharmaceuticals being utilized outside the

9    course of legal requirements under the CSA.

10   QUESTIONS BY MR. BOGLE:

17   QUESTIONS BY MR. BOGLE:

18          Q.      All right.  I'm going to hand

19   you what I'm marking as Exhibit 1.1651, which

20   is also Exhibit 1 to your deposition, and

21   that's MCKMDL00498169.

22                  (McKesson-Hilliard Exhibit 1

23          was marked for identification.)

24   QUESTIONS BY MR. BOGLE:

25          Q.      There you go, sir.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Okay, Mr. Hilliard.  What I've
 2    handed you as Exhibit 1 you see is an e-mail
 3    on the first page and then sort of a
 4    PowerPoint slide deck behind it.
 5                    Do you see that?
 6         A.    I see that.
 7         Q.    Okay.  And starting with the
 8    e-mail on the first page, you see that's an
 9    e-mail from Donald Walker dated May 2, 2012,
10    to several individuals, including yourself,
11    right?
12         A.    I see that.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20          I'm going to hand you what I'm

21   marking as Exhibit 2 to your deposition,

22   which is Exhibit 1.264.  This is a public

23   document so no Bates numbers.

24          (McKesson-Hilliard Exhibit 2

25      was marked for identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. BOGLE:

 2         Q.     Okay.  You see here this is a

 3    document from the U.S. House of

 4    Representatives Committee on Energy and

 5    Commerce from May 4, 2018.

 6                Do you see that?

 7         A.     I see that.

 8         Q.     Okay.  And it's -- the

 9    regarding line says:  Hearing entitled

10    "Combatting the Opioid Epidemic:  Examining

11    Concerns About Distribution and Diversion."

12                Do you see that there?

13         A.     I do see that.

14         Q.     Okay.  Have you followed the

15    outcomes of any of these congressional

16    hearings on the opioid epidemic?

17         A.     I have not.

18         Q.     You said you were aware of

19    them, right?

20         A.     I am aware of them but I have

21    not followed them.  I've been out of

22    pharmaceuticals for a while now.

23         Q.     If you look at the second page

24    of this document, underneath the chart it

25    says:  The U.S. continues to experience an
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    opioid epidemic, which has worsened over the

 2    last two decades.  Opioid-involved overdose

 3    deaths are the leading cause of injury death

 4    in the U.S. and take the lives of 115

 5    Americans per day.

 6              Is that a statistic you've seen

 7    before?

 8              MR. EPPICH:  Objection,

 9         foundation.

10         A.    It is not.

11    QUESTIONS BY MR. BOGLE:

12         Q.    "According to a recent report

13    issued by the Centers for Disease Control and

14    Prevention (CDC), prescription or illicit

15    opioids were involved in nearly two-thirds of

16    all drug overdose deaths in the U.S. during

17    2016 - a 27.7 percent increase from 2015.  In

18    total, more than 351,000 people have died

19    since 1999 due to an opioid-involved

20    overdose."

21              And then it says:  The crisis

22    has become so severe that the average life

23    expectancy declined in 2016 from the previous

24    year, largely because of opioid overdoses.

25              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. EPPICH:  Objection,

 2         foundation.

 3         A.     I see it on the page.

 4    QUESTIONS BY MR. BOGLE:

 5         Q.     Okay.  And the information I

 6    read to you, those last three sentences

 7    there, any of that information you were aware

 8    of prior to today?

 9         A.     I was not.

10         Q.     And so from our discussion at

11    the beginning of the deposition, you worked

12    at McKesson for, what, just shy of 20 years,

13    right?

14         A.     Correct.

15         Q.     Okay.  And so during that time

16    period, did you have the belief that

17    protecting the health and safety of the

18    public should be the most important

19    consideration for a pharmaceutical

20    distributor like McKesson?

21                    MR. EPPICH:  Object to the

22         form.

23         A.     I don't know.

24    QUESTIONS BY MR. BOGLE:

25         Q.     Okay.  Did you ever consider
```

```
 1    what sort of considerations should be most

 2    important for your job as you performed it?

 3                 MR. EPPICH:  Object to the

 4         form.

 5         A.    We complied with the CSA

 6    requirements.

 7    QUESTIONS BY MR. BOGLE:

 8         Q.    Okay.  Did you ever consider

 9    why those requirements existed?

10                 MR. EPPICH:  Object to the

11         form.

12    QUESTIONS BY MR. BOGLE:

13         Q.    What their purpose was?

14                 MR. EPPICH:  Object to the

15         form.

16         A.    Protection of the supply chain

17    under controlled substances.

18    QUESTIONS BY MR. BOGLE:

19         Q.    When you mean -- when you say

20    "protection of the supply chain," what do you

21    mean by that?

22         A.    Controlled substances stay in

23    legitimate markets.

24         Q.    And why would it be important

25    for controlled substances to stay in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    legitimate markets --

 2                 MR. EPPICH:  Object to the

 3         form.

 4    QUESTIONS BY MR. BOGLE:

 5         Q.    -- from your understanding?

 6                 MR. EPPICH:  Object to the

 7         form.  Foundation.

 8         A.    It's a requirement of the CSA.

 9    QUESTIONS BY MR. BOGLE:

10         Q.    Okay.  Anything beyond that?

11                 MR. EPPICH:  Same objections.

12         A.    I don't know.

13    QUESTIONS BY MR. BOGLE:

14         Q.    Okay.  While you were with

15    McKesson, the company was a distributor of

16    controlled substances, right?

17         A.    That's correct.

18         Q.    Okay.  And those controlled

19    substances included opioid products, right?

20         A.    That's correct.

21         Q.    Okay.  And opioid products are

22    generally in the class of drugs known as

23    narcotics, right?

24                 MR. EPPICH:  Object to the

25         form; foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Some of them can be.

 2     QUESTIONS BY MR. BOGLE:

 3          Q.     Okay.  Are you aware of any

 4     opioids that are nonnarcotic?

 5                 MR. EPPICH:  Same objections.

 6          A.     Not that I recall.

 7     QUESTIONS BY MR. BOGLE:

 8          Q.     We talked about this a little

 9     bit at the beginning of the deposition, but

10     in your role as manager and then director of

11     regulatory affairs, you would have had

12     responsibility for having understanding of

13     the Controlled Substances Act, right?

14          A.     Correct.

15          Q.     And the Controlled Substances

16     Act itself, you understand, is designed to

17     prevent the diversion of controlled

18     substances like opioids, right?

19                 MR. EPPICH:  Object to the

20          form.  Calls for a legal conclusion.

21          A.     I don't know.

22     QUESTIONS BY MR. BOGLE:

23          Q.     Okay.  Do you have any sense as

24     to what the purpose of the Controlled

25     Substances Act was while you worked at
```

```
 1    McKesson?

 2         A.    To prevent diversion.

 3         Q.    Okay.  And under the Controlled

 4    Substances Act while you were with McKesson,

 5    one of McKesson's responsibilities was to

 6    have effective controls against diversion,

 7    right?

 8         A.    That's correct.

 9               MR. EPPICH:  Object to the

10         form.  Calls for a legal conclusion.

11    QUESTIONS BY MR. BOGLE:

12         Q.    Another responsibility under

13    the Controlled Substances Act while you were

14    with McKesson would be to monitor for

15    suspicious controlled substances orders,

16    right?

17               MR. EPPICH:  Object to the

18         form.  Calls for a legal conclusion.

19         A.    We followed the processes and

20    procedures that we had in place that were to

21    comply with the CSA requirements.

22    QUESTIONS BY MR. BOGLE:

23         Q.    Okay.  But did you have an

24    understanding while you were at McKesson that

25    the company had a responsibility to monitor
```

Highly Confidential - Subject to Further Confidentiality Review

1    for suspicious orders --

2              MR. EPPICH:  Same objections.

3    QUESTIONS BY MR. BOGLE:

4         Q.    -- for controlled substances?

5         A.    We did monitor for controlled

6    substance orders.

7         Q.    Okay.  Did you know where that

8    responsibility came from?

9         A.    CSA requirements.

10        Q.    Okay.  And while you were at

11   McKesson, did you also understand that there

12   was a responsibility to report suspicious

13   orders when they were detected to the DEA?

14             MR. EPPICH:  Object to the

15        form.  Calls for a legal conclusion.

16        A.    The process was to report

17   controlled substances orders according to the

18   SOP.

19   QUESTIONS BY MR. BOGLE:

20        Q.    Okay.  And the SOP required

21   that if suspicious orders were detected, they

22   were to be reported to the DEA, correct?

23             MR. EPPICH:  Object to the

24        form.

25        A.    They were reported to the DEA.

Highly Confidential - Subject to Further Confidentiality Review

```
1      QUESTIONS BY MR. BOGLE:

2          Q.     Okay.  When you say "they,"

3      we're talking about suspicious orders, right,

4      for controlled substances?

5          A.     That's correct.

6          Q.     Okay.  And did you also

7      understand while you were at McKesson that

8      the company was to block any orders that it

9      deemed suspicious?

10             MR. EPPICH:  Object to the

11         form.

12         A.     That was not a requirement of

13     the CSA.

14     QUESTIONS BY MR. BOGLE:

15         Q.     Okay.  At any point in time

16     while you were at the company?

17             MR. EPPICH:  Object to the

18         form.  Calls for a legal conclusion.

19         A.     We made changes, developed

20     changes to our processes, and -- with the

21     CSMP program, and so with the CSMP program

22     that program did block.

23     QUESTIONS BY MR. BOGLE:

24         Q.     Okay.  Do you have an

25     understanding as to why the CSMP blocked
```

```
 1    suspicious orders?

 2                 MR. EPPICH:  Object to the

 3         form.

 4    QUESTIONS BY MR. BOGLE:

 5         Q.     Why that was a component of it?

 6                 MR. EPPICH:  Object to the

 7         form.

 8         A.     A guidance document provided by

 9    Rannazzisi.

10    QUESTIONS BY MR. BOGLE:

11         Q.     And do you recall when you

12    first saw that guidance document?

13                 MR. EPPICH:  Object to the

14         form.

15         A.     Approximately 2006.

16    QUESTIONS BY MR. BOGLE:

17         Q.     Okay.  And so prior to

18    receiving that document in approximately

19    2006, it was your personal belief that there

20    was no responsibility for McKesson to block

21    suspicious orders.  Is that true?

22                 MR. EPPICH:  Object to the

23         form.  Calls for a legal conclusion.

24         A.     It was not a requirement of the

25    CSA.
```

```
 1    QUESTIONS BY MR. BOGLE:

 2         Q.    Okay.  And so if I'm

 3    understanding your testimony correctly, prior

 4    to the implementation of the CSMP in 2008, it

 5    was not McKesson's policy to block suspicious

 6    orders.  Is that true?

 7              MR. EPPICH:  Object to the

 8         form.

 9         A.    Blocking of the orders was not

10    a requirement under the CSA.

11    QUESTIONS BY MR. BOGLE:

12         Q.    Yeah.  I'm just asking whether

13    it was a company policy to block suspicious

14    orders prior to 2008.  I'm not asking about

15    the CSA right now.

16              MR. EPPICH:  Object to the

17         form.

18         A.    We complied with requirements

19    under the CSA.

20    QUESTIONS BY MR. BOGLE:

21         Q.    Yeah.  I'm just asking whether

22    prior to 2008 when the CSMP was implemented,

23    was it McKesson's policy to not block

24    suspicious orders when they were detected?

25              MR. EPPICH:  Object to the
```

1          form.

2          A.      We complied with the CSA

3   requirements.

4   QUESTIONS BY MR. BOGLE:

5          Q.      Okay.  I guess I don't

6   understand how that applies to my question.

7   I'm just asking if you guys blocked

8   suspicious orders prior to 2008.

9                  MR. EPPICH:  Object to the

10         form.

11         A.      Blocking was not a requirement.

12  QUESTIONS BY MR. BOGLE:

13         Q.      So the answer is no, that that

14  wasn't done --

15                 MR. EPPICH:  Object to the

16         form.

17  QUESTIONS BY MR. BOGLE:

18         Q.      -- prior to 2008?

19         A.      We complied with the CSA

20  requirements.

21         Q.      Okay.  I got that that's your

22  answer, but I'm trying to just get a specific

23  answer to a specific question, which is to

24  nail down in time when McKesson, to your

25  understanding, started blocking suspicious

```
1    orders for controlled substances.  Can you

2    tell me when that started occurring?

3         A.    The CSMP, which was about 2008.

4         Q.    Okay.  I'm going to hand you

5    what I'm marking as Exhibit 3, which is

6    1.1464, and that's MCKMDL00478906.

7              (McKesson-Hilliard Exhibit 3

8         was marked for identification.)

9    QUESTIONS BY MR. BOGLE:

10        Q.    And you see this is a letter

11   from the U.S. Department of Justice Drug

12   Enforcement Administration dated

13   September 27, 2006.

14              Do you see that?

15        A.    I see that.

16        Q.    Is this the guidance document

17   from Mr. Rannazzisi that you were referring

18   to a minute ago?

19        A.    Yes, it is.

20        Q.    Okay.  So you've seen this

21   document before.  True?

22        A.    Yes.

23        Q.    Okay.  I want to look at a

24   couple of components of this letter.  It

25   says, in the first line:  This letter is
```

Highly Confidential - Subject to Further Confidentiality Review

1    being sent to every commercial entity in the

2    United States registered with the Drug

3    Enforcement Administration (DEA) to

4    distribute controlled substances.  The

5    purpose of this letter is to reiterate the

6    responsibilities of controlled substance

7    distributors in view of the prescription drug

8    abuse problem our nation currently faces.

9             Do you see that?

10       A.    I see that.

11       Q.    The term "reiterate" is used

12   there in that sentence.  What do you

13   understand the term "reiterate" to mean?

14             MR. EPPICH:  Object to the

15        form.  Foundation.

16       A.    This is written by

17   Mr. Rannazzisi.  I don't know what he's

18   referring to, reiterate.

19   QUESTIONS BY MR. BOGLE:

20       Q.    I'm just asking if you

21   understand what the term "reiterate" means.

22             MR. EPPICH:  Asked and

23        answered.

24       A.    I don't know.

25                  --oOo--

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. BOGLE:

2         Q.    You don't know what the term

3    "reiterate" means in general use?

4              MR. EPPICH:  Object to the

5         form.  Foundation.

6         A.    I don't know.

7    QUESTIONS BY MR. BOGLE:

8         Q.    Okay.  Going down to the third

9    paragraph in this letter, I'm looking at the

10   sentence that starts with "Distributors are,

11   of course."

12             Do you see that in the middle

13   of the paragraph?

14        A.    Third paragraph?  Yes, I see

15   that now.

16        Q.    All right.  It says:

17   Distributors are, of course, one of the key

18   components of the distribution chain.  If the

19   closed system is to function properly as

20   Congress envisioned, distributors must be

21   vigilant in deciding whether a prospective

22   customer can be trusted to deliver controlled

23   substances only for lawful purposes.

24             Do you see that?

25        A.    Yes, I see that.
```

```
 1           Q.      Okay.  Do you agree with that

 2      sentence?

 3                   MR. EPPICH:  Object to the

 4           form.  Foundation.

 5           A.      I don't know.

 6      QUESTIONS BY MR. BOGLE:

 7           Q.      You don't have an opinion one

 8      way or the other whether that's an accurate

 9      statement?

10           A.      No, I don't.

11           Q.      Okay.  Do you have any opinion

12      as to whether McKesson should have at all

13      times been vigilant in deciding which

14      customers got controlled substances from

15      them?

16                   MR. EPPICH:  Object to the

17           form.

18           A.      I don't know.

19      QUESTIONS BY MR. BOGLE:

20           Q.      Okay.  And it says -- it goes

21      on:  This responsibility is critical, as

22      Congress has expressly declared that the

23      illegal distribution of controlled substances

24      has a substantial and detrimental effect on

25      the health and general welfare of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     American people.

 2              Do you see that?

 3     A.      Yes, I see that.

 4     Q.      Okay.  Do you agree that

 5     illegal distribution of controlled substances

 6     has a substantial and detrimental effect on

 7     the health and general welfare of the

 8     American people?

 9              MR. EPPICH:  Object to the

10       form.  Foundation.

11     A.      I don't know.

12     QUESTIONS BY MR. BOGLE:

13     Q.      Okay.  Is that something you

14     ever considered while you were at McKesson,

15     that concept?

16              MR. EPPICH:  Object to the

17       form.

18     A.      I don't recall.

19     QUESTIONS BY MR. BOGLE:

20     Q.      Okay.  Going to the second page

21     here of the letter, the third paragraph that

22     starts with "The statutory factors."

23              Do you see that?

24     A.      Yes, I see that.

25     Q.      It says there:  The statutory
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    factors DEA must consider in deciding whether

 2    to revoke a distributor's registration are

 3    set forth in 21 U.S.C. 823(e).  Listed first

 4    among these factors is the duty of

 5    distributors to maintain effective controls

 6    against diversion of controlled substances

 7    into other than legitimate medical,

 8    scientific, and industrial channels.

 9             Do you see that?

10        A.    Yes, I see that.

11        Q.    And you're familiar with that

12    portion of the regulations, right?

13             MR. EPPICH:  Object to the

14        form.

15        A.    I don't recall.

16    QUESTIONS BY MR. BOGLE:

17        Q.    Okay.  If you go to the next

18    paragraph, it starts with:  The DEA

19    regulations require all distributors to

20    report suspicious orders of controlled

21    substances.

22             Do you see that?

23        A.    Yes, I see that.

24        Q.    Okay.  And you understand that

25    at all times that you were with McKesson that
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    the DEA regulations did require distributors

2    to report suspicious orders of controlled

3    substances?

4              MR. EPPICH:  Object to the

5         form.  Calls for a legal conclusion.

6         A.    It was under the CSA.

7    QUESTIONS BY MR. BOGLE:

8         Q.    Right.  So you knew that's

9    something that McKesson was supposed to do

10   under the CSA, right?

11             MR. EPPICH:  Same objections.

12        A.    Yes, I recall.

13   QUESTIONS BY MR. BOGLE:

14        Q.    Okay.  The next paragraph that

15   starts with "It bears emphasis," do you see

16   that?

17        A.    Yes, I see that.

18        Q.    It says:  It bears emphasis

19   that the foregoing reporting requirement is

20   in addition to, and not in lieu of, the

21   general requirement under 21 U.S.C. 823(e)

22   that a distributor maintain effective

23   controls against diversion.

24             Do you see that sentence?

25        A.    Yes, I see that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Were you aware while you were

 2    at McKesson that these were two different

 3    concepts and that there was a reporting

 4    requirement and a separate requirement to

 5    maintain effective controls against

 6    diversion?

 7                 MR. EPPICH:  Object to the

 8          form.  Calls for a legal conclusion.

 9          A.     I don't recall.

10    QUESTIONS BY MR. BOGLE:

11          Q.     Okay.  While you were working

12    at McKesson, did you operate as if there were

13    two separate requirements, a reporting

14    requirement and also a requirement to have

15    effective controls against diversion?

16                 MR. EPPICH:  Object to the

17          form.

18          A.     I don't recall.

19    QUESTIONS BY MR. BOGLE:

20          Q.     Okay.  It goes on and says:

21    Thus, in addition to reporting all suspicious

22    orders, a distributor has a statutory

23    responsibility to exercise due diligence to

24    avoid filling suspicious orders that might be

25    diverted into other than legitimate medical,
```

```
 1      scientific, and industrial channels.

 2              Do you see that?

 3      A.      I see that.

 4      Q.      Okay.  And that's referring to

 5   the requirement to block suspicious orders

 6   when they're detected, right?

 7              MR. EPPICH:  Object to the

 8         form.  Foundation.

 9      A.      I'm not sure.

10   QUESTIONS BY MR. BOGLE:

11      Q.      Okay.  What do you think that

12   refers to, then?

13      A.      I don't know.

14      Q.      Okay.  So do you have any

15   understanding of what that -- what he's

16   getting at there in that sentence?

17      A.      I don't know.

18      Q.      Okay.  Do you recall ever

19   asking any of your colleagues to help you

20   understand what Mr. Rannazzisi was saying in

21   that sentence that I just read?

22      A.      Not that I recall.

23      Q.      Okay.  Do you ever recall

24   reaching out to anyone at the DEA asking them

25   to explain to you what was meant by the
```

```
 1    sentence I just read?

 2         A.     Not that I recall.

 3         Q.     Okay.  That would have fallen

 4    within your purview, though.  If the DEA's

 5    view is that this is part of McKesson's

 6    responsibilities under the Controlled

 7    Substances Act in 2006 time frame, that would

 8    have been within your purview of your

 9    responsibilities, right?

10              MR. EPPICH:  Object to the

11         form.  Assumes facts not in evidence.

12         A.     I don't recall.

13    QUESTIONS BY MR. BOGLE:

14         Q.     Okay.  I think we talked about

15    earlier in the deposition that compliance

16    with the Controlled Substances Act would have

17    been part of your responsibilities in this

18    time frame, right?

19         A.     That's correct.

20         Q.     Okay.  So if the DEA --

21    Mr. Rannazzisi from the DEA is indicating

22    here that there's a requirement here, a

23    regulatory requirement, to avoid filling

24    suspicious orders of controlled substances,

25    would that not have fallen within your
```

Highly Confidential - Subject to Further Confidentiality Review



1    purview to make sure that McKesson complied

2    with that portion of the regulations?

3                MR. EPPICH:  Object to --

4          object to the form.

Highly Confidential - Subject to Further Confidentiality Review

10     QUESTIONS BY MR. BOGLE:

11          Q.     Okay.  The next paragraph down

12     says:  In a similar vein, given the

13     requirement under Section 823(e) that a

14     distributor maintain effective controls

15     against diversion, a distributor may not

16     simply rely on the fact that the person

17     placing the suspicious order is a DEA

18     registrant and turn a blind eye to the

19     suspicious circumstances.  Again, to maintain

20     effective controls against diversion as

21     Section 823(e) requires, the distributor

22     should exercise due care in confirming the

23     legitimacy of all orders prior to filling.

24               Do you see that?

25          A.     Yes, I see that.

1      Q.     The last sentence I just read

2   there, what do you understand that to mean?

3              MR. EPPICH:  Objection to the

4        form; foundation.

5      A.     I'm not sure what it means.

6   QUESTIONS BY MR. BOGLE:

7      Q.     Okay.  So while you were

8   working at McKesson after you read this

9   letter, you were unclear on what was meant by

10   that last sentence there about confirming the

11   legitimacy of all orders prior to filling?

12             MR. EPPICH:  Object to the

13        form.  Misstates prior testimony.

14      A.     I don't recall what I thought

15   at that time.

16   QUESTIONS BY MR. BOGLE:

17      Q.     Okay.  But as you read it here

18   today, you're not sure what is meant by that.

19   Is that true?

20             MR. EPPICH:  Same objections.

21      A.     I don't recall.

22   QUESTIONS BY MR. BOGLE:

23      Q.     No.  I'm asking what you think

24   today.

25      A.     I don't know.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  You don't have an

2    opinion about what that means?

3    A.    No.

4    Q.    Okay.  But we can agree that

5    you did perform regulatory compliance,

6    including for the Controlled Substances Act

7    for McKesson, all the way up until about two

8    years ago, right?

9    A.    That's correct.

10    Q.    Okay.  And we can also agree

11    this is a letter that you would have read in

12    your course of employment at McKesson, right?

13    A.    That's correct.

14    Q.    Did you follow up with anyone

15    at DEA about any of -- anything in this

16    letter that you were unclear on?

17    A.    Not that I recall.

18    Q.    Did you follow up with any of

19    your colleagues at McKesson about anything in

20    this letter that you felt you were unclear

21    on?

22    A.    I don't recall.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11    QUESTIONS BY MR. BOGLE:

12         Q.    Okay.  Do you recall there

13    being any meetings with yourself and other

14    people at the regulatory department at

15    McKesson to sort of walk through this letter

16    we're looking at here in Exhibit 3?

17              MR. EPPICH:  Object to the

18         form.

19         A.    I really don't recall.

20    QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19      Q.      Okay.

20              MR. EPPICH:  Is this a good

21      time to take a break?

22              MR. BOGLE:  Sure.

23              THE VIDEOGRAPHER:  Off the

24      record at 10:01.

25              (Recess taken, 10:01 a.m. to

Highly Confidential - Subject to Further Confidentiality Review

```
 1          10:16 a.m.)

 2               THE VIDEOGRAPHER:  All right,

 3          stand by.  The time is 10:16, back on

 4          the record.  Beginning of File 2.

 5     QUESTIONS BY MR. BOGLE:

 6          Q.    Mr. Hilliard, I want to go back

 7     just a step here and talk a little bit about

 8     sort of the hierarchy of the regulatory

 9     department while you were at McKesson.  So

10     let's focus on while you were director of

11     regulatory affairs, which I think you told me

12     was roughly 1998 to 2016.

13               So during that time frame, as

14     director of regulatory affairs, who would

15     have been your superiors in the regulatory

16     department?

17          A.    Dan White, and when I started

18     in '97 to -- again, I don't remember the

19     exact time frame, a couple of years; and then

20     Ron Bone.

21          Q.    What was his title?

22          A.    SVP, operations.

23          Q.    And that's senior vice

24     president?

25          A.    Yes, correct.
```

```
 1          Q.      All right.  Of operations?

 2          A.      Correct.

 3          Q.      Okay.

 4          A.      Regulatory rolled up under

 5   that.

 6          Q.      Okay.

 7          A.      Don Walker after that.  And

 8   then at some point there, Bruce Russell came

 9   in between us and I reported directly to

10   Bruce instead of Don.

11          Q.      Okay.

12          A.      And then it was back to Don

13   directly, and then finally to Krista Peck.

14          Q.      What was her job title?

15          A.      SVP of regulatory department.

16   QUESTIONS BY MR. BOGLE:

17          Q.      Okay.

18          A.      That's not the exact -- correct

19   title, but SVP of regulatory.

20          Q.      And again, when you say "SVP,"

21   it means senior vice president.

22          A.      Senior vice president.

23          Q.      I just want to make sure the

24   record is clear.  I think I know what you

25   mean but I want to make sure it's clear.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Okay.  Let me ask it to you

 2     this way just so I understand.  So at all

 3     times from 1998 to 2016, would there have

 4     only been one position in the regulatory

 5     department higher than yours on the corporate

 6     ladder?

 7          A.    No, because at the time point

 8     for which I reported to Bruce Russell, he

 9     would have been a VP, and then Bruce would

10     have reported to Don, so there would have

11     been one additional level there.

12          Q.    Okay.  So in what time period

13     would that have been where there was two

14     levels above yours?

15          A.    I would say 2000, early --

16     first part of the 2000s.  I'm not sure how

17     far that goes into.

18          Q.    Okay.

19          A.    I don't remember when Bruce

20     retired.

21          Q.    Okay.

22          A.    I want to say 2014, he retired,

23     approximately.

24          Q.    Okay.  So from this time period

25     from 1998 to 2016, there were points in time
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   where there's one person, one position higher
 2   than yours in the regulatory department, and
 3   some points in time where there's two
 4   positions higher than yours in the regulatory
 5   department.  Am I understanding that right?
 6        A.     That's correct.
 7        Q.     Okay.  So as director of
 8   regulatory affairs, then, from '98 to 2016,
 9   were there positions below yours in the
10   regulatory department, people that reported
11   to you?
12        A.     I had one direct report.
13        Q.     Okay.  And during what time
14   period?
15        A.     Approximately 2013 to 2016.
16        Q.     Okay.  Who was that?
17        A.     Cynthia.  My mind is going
18   blank on her last name.  All she managed was
19   licensure for our facilities.
20        Q.     Okay.  All right.  Shifting
21   gears a little bit, then -- actually, strike
22   that.
23               Again, when we started the
24   deposition, you listed off quite a few
25   different areas of responsibility that you
```

```
 1    had over time in the regulatory department.

 2    Did you consider each of the areas that you

 3    had responsibility for to be important areas,

 4    important things to you?

 5              MR. EPPICH:  Object to the

 6         form.

 7         A.    My job was important to me.

 8    QUESTIONS BY MR. BOGLE:

 9         Q.    Okay.  And did you feel that

10    you had an important job for McKesson

11    generally, that you held an important role at

12    the company?

13              MR. EPPICH:  Object to the

14         form.

15         A.    In my opinion, I felt worthy

16    and important to the company.

17    QUESTIONS BY MR. BOGLE:

18         Q.    Okay.  I guess my question is a

19    little different.  Did you feel like your

20    position itself was an important position to

21    the company, that it performed important

22    functions to the company?

23              MR. EPPICH:  Object to the

24         form.

25         A.    In my opinion, I felt it was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    important.

 2    QUESTIONS BY MR. BOGLE:
```

QUESTIONS BY MR. BOGLE:

```
22    QUESTIONS BY MR. BOGLE:

23         Q.    Okay.  And do you recall the

24    Lakeland distribution center at all, that it

25    existed?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Yes, I do.



Highly Confidential - Subject to Further Confidentiality Review



17        Q.      Okay.  I'm going to hand you

18    what I'm marking as Exhibit 4, which is

19    1.1946, and that's MCKMDL00496859.

20              There you go, sir.

21              (McKesson-Hilliard Exhibit 4

22        was marked for identification.)

23    QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Okay.  And you knew in 2005
 2     that that was part of McKesson's obligations
 3     were to report suspicious orders of
 4     controlled substances when they were -- to
 5     the DEA when they were discovered, right?
 6               MR. EPPICH:  Object to the
 7          form.  Calls for a legal conclusion.




12               MR. BOGLE:  Okay.  Move to
13          strike as nonresponsive.
14     QUESTIONS BY MR. BOGLE:
15          Q.      My question simply was:  You
16     understood at this point in 2005, by
17     September 2005, that there was an obligation
18     for McKesson to report suspicious orders to
19     the DEA when they were discovered.  True?
20               MR. EPPICH:  Object to the
21          form.  Foundation.
22          A.      McKesson did report suspicious
23     orders to the DEA.
24     QUESTIONS BY MR. BOGLE:
25          Q.      Okay.
```

```
 1              MR. BOGLE:  Move to strike as

 2         nonresponsive.

 3    QUESTIONS BY MR. BOGLE:

 4         Q.     My question was simply:  You

 5    did have an understanding as of 2005 that

 6    there was an obligation for McKesson to

 7    report suspicious orders to the DEA when they

 8    were discovered.  True?

 9              MR. EPPICH:  Object to the

10         form; calls for a legal conclusion,

11         asked and answered.

12         A.     We submitted the reports to the

13    DEA for the controlled substance suspicious

14    order reports.

15    QUESTIONS BY MR. BOGLE:

16         Q.     Okay.  And why would you do

17    that, then?

18         A.     That was the agreed reporting

19    mechanism for the suspicious order that was

20    created from the Suspicious Order Task Force

21    that DEA had agreed was the methodology.

22         Q.     What time period are you

23    referring to?

24         A.     Approximately '95.

25         Q.     Okay.  So before you were with
```

1    the company.

2            A.      That's correct.

3            Q.      Okay.  So you were not a member

4    of any such task force, right?

5            A.      That's correct.

6            Q.      Okay.  And so anything that you

7    would know about the task force came to you

8    from somebody other than yourself, right?

9    You don't have any firsthand knowledge of

10   that.

11                  MR. EPPICH:  Object to the

12          form.

13   QUESTIONS BY MR. BOGLE:

14           Q.      True?

15           A.      I was not there.

16           Q.      Right.  So you don't have any

17   firsthand knowledge of it, true?

18                  MR. EPPICH:  Object to the

19          form.

20           A.      I was not at the meeting.

21   QUESTIONS BY MR. BOGLE:

22           Q.      Okay.  So therefore you could

23   not have any firsthand knowledge, right?

24                  MR. EPPICH:  Object to the

25          form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      I was not -- I did not attend

 2     the meeting of the task force.

 3     QUESTIONS BY MR. BOGLE:

 4          Q.      Okay.  Do you know of anyone

 5     from McKesson that did?

 6          A.      I don't recall.

 7          Q.      Okay.  Did you keep any written

 8     documentation from the DEA that would have

 9     come from this task force you're referencing

10     that says, you know, the DEA -- this is our

11     stamp of approval that this is the mechanism

12     that we approved to report suspicious orders?

13              MR. EPPICH:  Objection --

14     QUESTIONS BY MR. BOGLE:

15          Q.      Did you keep a file like that?

16              MR. EPPICH:  Object to the

17          form.

18          A.      I don't recall if there was a

19     form associated with the outcome of that

20     meeting.

21     QUESTIONS BY MR. BOGLE:

22          Q.      Okay.  I'm just asking if you

23     had any sort of documentation that you kept

24     for yourself to make sure that you felt

25     comfortable that that was the proper
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reporting mechanism.

 2               MR. EPPICH:  Object to the

 3         form.  Vague.

 4         A.      Through my career, whenever I

 5    had information from the DEA, then I would

 6    maintain copies of it.

 7    QUESTIONS BY MR. BOGLE:

 8         Q.      Okay.  So if you had any

 9    correspondence from the DEA that said that

10    this was a reporting mechanism they signed

11    off on, you would have kept that, right?

12               MR. EPPICH:  Object to the

13         form.

14         A.      I wasn't at the meeting, so I

15    don't have -- I didn't have any documentation

16    on that, I don't recall having documentation

17    on that.

18               But as I said, throughout the

19    course of my career, if I did receive some

20    type of letter, like an extension to DEA

21    registrations, then we would maintain that

22    letter.

23    QUESTIONS BY MR. BOGLE:

24         Q.      So let's go to page .10 then.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

7    QUESTIONS BY MR. BOGLE:

8         Q.    You would agree with me that

9    the primary responsibility for investigating

10   suspicious orders or suspicious customers or

11   suspicious activity for a customer falls on

12   McKesson, right?  For any product it's

13   selling.

14              MR. EPPICH:  Object to the

15        form; foundation.  Calls for a legal

16        conclusion.

17        A.    Okay.  Restate the question.

18   QUESTIONS BY MR. BOGLE:

19        Q.    Sure.

20              You would agree the primary

21   responsibility for investigating suspicious

22   orders or suspicious activity of a customer

23   of McKesson's falls primarily on McKesson,

24   right?

25              MR. EPPICH:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

```
1              form.  Foundation.  Calls for a legal

2              conclusion.

3         A.      I'm not sure.

4    QUESTIONS BY MR. BOGLE:

5         Q.      Okay.  Is that not the way that

6    you performed your job, with that sort of

7    belief in mind?

8              MR. EPPICH:  Object to the

9              form.  Foundation.  Calls for a legal

10             conclusion.

11        A.      I don't know.

12   QUESTIONS BY MR. BOGLE:

13        Q.      You don't know?  Okay.

14             So when you came in to work

15   every day as director of regulatory affairs,

16   would you or would you not have the mindset

17   that the primary responsibility to make sure

18   that we're not putting out suspicious orders

19   of controlled substances falls on us as

20   McKesson?

21             MR. EPPICH:  Object to the

22             form.
```

Highly Confidential - Subject to Further Confidentiality Review

3     QUESTIONS BY MR. BOGLE:

4          Q.     Yeah, I guess I'm asking the

5     question a little differently than that,

6     though.  What I'm asking is:  When you came

7     to work every day from 1997 to 2016 and were

8     director of regulatory affairs at McKesson,

9     with what you've said is an important job,

10    did you take that job to mean that the

11    primary responsibility for making sure that

12    suspicious orders didn't go out to customers

13    fell on McKesson as opposed to somebody else?

14              MR. EPPICH:  Object to the form

15         to the extent it calls for a legal

16         conclusion.

17         A.     I don't recall what I thought

18    when I walked into the office each day.

19    QUESTIONS BY MR. BOGLE:

20         Q.     Okay.  Do you ever recall a day

21    at work where you sat down and said, "I've

22    got to make sure, as director of regulatory

23    affairs, that suspicious orders do not go to

24    customers from McKesson when it comes to

25    controlled substances"?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. EPPICH:  Object to the

 2         form.

 3         A.     I don't recall what I thought

 4   when I sat down each day.

 5   QUESTIONS BY MR. BOGLE:

 6         Q.     Okay.  Any day, that thought

 7   cross your mind that you can think of?

 8                    MR. EPPICH:  Object to the

 9         form; asked and answered.

10         A.     Not from 10 years ago.

11   QUESTIONS BY MR. BOGLE:

12         Q.     What about from two years ago?

13         A.     I wasn't involved in the DRA

14   CSMP process at that point in time.

15         Q.     What about five years ago?

16                    MR. EPPICH:  Same objections.

17         Asked and answered.

18         A.     I don't recall.

19   QUESTIONS BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10    QUESTIONS BY MR. BOGLE:

11          Q.    Okay.  I'm going to hand you

12    what I'm marking as Exhibit 5, which is

13    1.1789, and that's MCKMDL00496876.

14                (McKesson-Hilliard Exhibit 5

15          was marked for identification.)

16    QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
18        Q.    Who is Mr. Gilbert?

19        A.    Outside counsel.

20        Q.    So he's you guys' lawyer,

21   right?

22        A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





```
 6        Q.      So having a DEA registration

 7    surrendered or having an Order to Show Cause

 8    brought against a distribution center, those

 9    are serious enforcement actions, right?

10                MR. EPPICH:  Object to the

11         form.

12         A.      They are serious.

13    QUESTIONS BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16          MR. BOGLE:  Let me get my

17     copies here, sorry.  Slight delay.

18     I'm emptying boxes.

19          MR. EPPICH:  I'm going to stand

20     up for this one.

21     QUESTIONS BY MR. BOGLE:

22          Q.    All right.  I'm handing you

23     what I'm marking as Exhibit 6, which is

24     1.1943, MCKMDL00496306.

25               (McKesson-Hilliard Exhibit 6

Highly Confidential - Subject to Further Confidentiality Review



1          was marked for identification.)

2     QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20          MR. EPPICH:  Hold on.  Hold on.

21     Let me pause here.  I'd just caution

22     the witness that if this question is

23     seeking anything that's any

24     discussions or conferences with

25     counsel, that those would be

Highly Confidential - Subject to Further Confidentiality Review



1        privileged discussions and I'd

2        instruct the witness not to answer.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19    QUESTIONS BY MR. BOGLE:

20        Q.    Okay.  Let's look at

21    Exhibit 1.1947, which is Exhibit 7 to your

22    deposition, and that's MCKMDL00497154.

23            (McKesson-Hilliard Exhibit 7

24        was marked for identification.)

25                --oOo--

Highly Confidential - Subject to Further Confidentiality Review

```
1     QUESTIONS BY MR. BOGLE:
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13    1.1951, Bates number is MCKMDL00496536.

14              THE REPORTER:  10?

15              MR. BOGLE:  Did I skip one?

16        I'm sorry, let me get that number

17        back.  I may have skipped -- missing

18        some stickers here.  Oh, I buried it.

19        Okay.  Sorry.

20              (McKesson-Hilliard Exhibit 8

21        was marked for identification.)

22    QUESTIONS BY MR. BOGLE:

23        Q.    So it's actually Exhibit 8 is

24    Exhibit 1.1951, so correcting the number.

25    Same document, just correcting the exhibit

Highly Confidential - Subject to Further Confidentiality Review

1    number.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





2             MR. EPPICH:  Objection.  I

3       think that we are now on the edge of

4       seeking attorney-client

5       communications.

6             MR. BOGLE:  I'm just asking him

7       whether the communication occurred,

8       not the substance of it.

9       QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



```
 9              MR. EPPICH:  I'm going to
10         instruct the witness not to answer
11         that question.  You're treading on
12         that line again.  You may ask him if
13         he had a communication with his
14         counsel about the document.
15              MR. BOGLE:  I think that's what
16         I just asked.
17              MR. EPPICH:  No, you stepped
18         over the line.
19    QUESTIONS BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 9          MR. EPPICH:  Brandon, let's go

10     ahead and take a break.

11          MR. BOGLE:  Okay.

12          THE VIDEOGRAPHER:  Off the

13     record at 11:34.

14          (Recess taken, 11:34 a.m. to

15     11:45 a.m.)

16          THE VIDEOGRAPHER:  All right,

17     stand by.  The time is 11:45, back on

18     the record.  Beginning of File 3.

19     QUESTIONS BY MR. BOGLE:

20     Q.    All right, Mr. Hilliard, I want

21     to shift gears to a different topic here with

22     you.  We talked a little bit earlier just

23     briefly about the DU45 report.

24          Do you recall that discussion

25     generally?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes.

 2          Q.      Okay.  And also talked a little

 3    bit about Section 55 generally.

 4                  Do you recall that discussion?

 5          A.      Yes.

 6          Q.      Okay.  So Section 55 was the

 7    standard operating procedure that was in

 8    place when you joined McKesson that was meant

 9    to be the Suspicious Order Monitoring Program

10    for the company.  True?

11                  MR. EPPICH:  Object to the

12          form.

13          A.      There was a section within

14    Section 55 that contained that type of

15    information.

16    QUESTIONS BY MR. BOGLE:

17          Q.      Okay.  So it was included

18    within Section 55.  True?

19          A.      Correct.

20          Q.      Okay.  I think you told me, I

21    just want to make sure I understand.  When

22    you joined the company in 1997, Section 55,

23    and specifically the components with the

24    suspicious order monitoring provisions, were

25    already in place.  True?
```

```
 1          A.      Correct.

 2          Q.      Okay.  And the DU45 was one of

 3     the reports listed in Section 55 that would

 4     be produced and submitted to the DEA,

 5     correct?

 6          A.      That's correct.

 7          Q.      Okay.  I'll take a look at a

 8     few components of Section 55 here.  So I'm

 9     going to hand you what I'm marking as

10     Exhibit 9, which is 1.1555.  The Bates number

11     is MCKMDL00346554.

12               (McKesson-Hilliard Exhibit 9

13          was marked for identification.)

14     QUESTIONS BY MR. BOGLE:

15          Q.      When I read all those Bates

16     numbers, you can ignore me.  I'm supposed to

17     do that, unfortunately.  I won't be asking

18     you Bates number quizzes, I can promise you

19     that.

20          A.      Thank you.

21          Q.      Okay.  What I've handed you

22     here is the Drug Operations Manual,

23     Section 55, dated July 2000, correct?

24          A.      That is correct.

25          Q.      Okay.  And again, I think you
```

Highly Confidential - Subject to Further Confidentiality Review

1   said this, but you're familiar with this

2   manual, correct?

3           A.      Yes, I am.

4           Q.      All right.  Let's go to -- ah

5   jeez, wrong page number.  Page .29.  Sorry.

6           A.      I'm sorry, repeat that?

7           Q.      .29?

8           A.      .29.

9           Q.      Yes, sir.

10                  Okay.  On this page, you see

11  there's a section (c) titled Daily Controlled

12  Substance Suspicious Order Warning Report,

13  and then it's listed a bunch of other stuff,

14  but including DU45L500.

15                  Do you see that?

16          A.      Yes, I see that.

17          Q.      Okay.  So this section here

18  talks about the daily version of the DU45

19  report.  True?

20          A.      Yes.

21          Q.      Okay.  And if you go down to

22  the next paragraph, it says:  The same

23  factors that are used for the Customer Recap

24  Variance -- and then it gives a description

25  of the report -- are also used for the Daily

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Controlled Substance Suspicious Order Warning

 2    Report.

 3             Then it says:  3X monthly

 4    average for Schedule II and Schedule III

 5    reportables and 8X/monthly averages for

 6    IIIN-V.

 7             Do you see that?

 8        A.    Yes, I see that.

 9        Q.    Okay.  So I want to break that

10    down and make sure it's clear on what that

11    means.  So both for the DU45 reports run

12    daily and monthly, an order would appear on

13    the report for any controlled substance

14    that's in Schedule II or Schedule III if the

15    order was three times the average for

16    customers of McKesson for that product.

17    True?

18             MR. EPPICH:  Object to the

19        form.

20        A.    It was three times the monthly

21    average for 12-month sales and it was for

22    Schedule II and III narcotics.

23    QUESTIONS BY MR. BOGLE:

24        Q.    Okay.  So included within that

25    would be opioids, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.      Correct.

 2         Q.      Okay.  So you said a 12-month

 3   history, so let's talk about how that worked.

 4   Was it a 12-month same customer history that

 5   this number would be derived from?

 6         A.      Yes, that's correct.

 7         Q.      Okay.  So, for example, you

 8   would look at the 12 months for X pharmacy,

 9   the prior 12 months, and you would do what

10   with that data to determine how the three

11   times average would be generated?

12              MR. EPPICH:  Object to the

13         form; foundation.

14   QUESTIONS BY MR. BOGLE:

15         Q.      Walk me through that process.

16         A.      The system is taking 12 months'

17   worth of sales history based on that item and

18   then adds a factor of three times, I'm sorry,

19   three times the average, and if the orders

20   exceed that threshold then it shows up on the

21   report.

22         Q.      Okay.  And so an average is

23   generated from the prior 12 months.  Does

24   that roll over every month so it's looking at

25   a new 12-month period?
```

```
 1              MR. EPPICH:  Object to the

 2       form.

 3       A.     As I recall, it's a rolling

 4  12-month period.

 5  QUESTIONS BY MR. BOGLE:

 6       Q.     Right.  So we'll walk through

 7  this just to make sure it's clear.  So let's

 8  say, for example, we're in February 2007.

 9  The prior 12 months' data that would be

10  looked at for February 2007 would be the 12

11  months prior to that month.  True?

12       A.     Correct.

13       Q.     Okay.  So, for example, when

14  you go to March 2007, that would then include

15  the February 2007 data and the first month

16  from the prior 12 months would drop off the

17  analysis.  True?

18       A.     I believe that to be correct.

19       Q.     Okay.  So if a customer's

20  orders for a given month did not exceed three

21  times their prior 12-month average, they

22  would not appear on the DU45 report.  True?

23       A.     That's correct.

24       Q.     Okay.  Were there any other

25  calculations that went into the DU45 report
```

```
 1    other than the prior 12 months' average and

 2    looking at three times that average, if it

 3    hits that, it gets kicked to the report?  Any

 4    other variables?

 5              MR. EPPICH:  Object to the

 6         form.

 7         A.    Not to my knowledge.

 8    QUESTIONS BY MR. BOGLE:

 9         Q.    Okay.  All right.  I want to

10    look at a DU45 report that was produced to

11    us.  You may want to keep this exhibit kind

12    of just near you, but I want to look at a

13    sample DU45 with you.

14              All right.  I'm going to hand

15    you what I'm marking as Exhibit 10, which is

16    1.2100.  Bates number is MCKMDL00660789.

17              (McKesson-Hilliard Exhibit 10

18         was marked for identification.)

19    QUESTIONS BY MR. BOGLE:

20         Q.    Here's your version.  I

21    shouldn't say "version," they're all the

22    same, but your copy.  It's beefy.

23              Okay.  And what I've handed

24    you, Mr. Hilliard, I'll represent to you was

25    produced to us as part of this litigation as
```

```
 1     being a DU45 report from -- I believe it's

 2     the Oklahoma City distribution center.  I

 3     think you can determine that on the second

 4     page of the document, that that's the

 5     distribution center this pertains to.  Let me

 6     know if you disagree with that.

 7          A.     Yes.  This does appear to come

 8     from the Oklahoma City distribution center.

 9          Q.     Okay.  And going back to the

10     first page, this is noted to be a monthly

11     report that I'm showing you here, right?

12          A.     That is correct.

13          Q.     Okay.  And it's dated

14     April 3rd, 2007.  That's the date on the

15     first page, right?

16          A.     That's what's stated on the

17     first page.

18          Q.     Okay.  So you obviously have an

19     understanding and knowledge of DU45 reports.

20     Is what I'm showing you here consistent with

21     what a DU45 report would look like, a monthly

22     report?

23          A.     Yes.

24          Q.     Okay.  Now, these would -- so

25     this would be submitted to the DEA on a
```

```
 1    monthly basis, correct?  This version.

 2         A.    That's correct.

 3               MR. EPPICH:  Object to the

 4         form.

 5    QUESTIONS BY MR. BOGLE:

 6         Q.    And just looking, for example,

 7    at a few of these pages, I'm looking at the

 8    second page, which is Bates ending 0790,

 9    there's three fentanyl orders listed here for

10    this customer, right?

11               MR. EPPICH:  Objection,

12         foundation.

13         A.    Fentanyl is listed here, yes.

14    QUESTIONS BY MR. BOGLE:

15         Q.    Okay.  Fentanyl being an opioid

16    product, right?

17               MR. EPPICH:  Objection,

18         foundation.

19         A.    Yes, it is.

20    QUESTIONS BY MR. BOGLE:

21         Q.    Okay.  And go to the next page,

22    for example, there's an order listed for this

23    customer for oxycodone, an oxycodone

24    combination product, right?

25         A.    That's what's stated, yes.
```

```
 1          Q.     Okay.  Again, another opioid,

 2   right?

 3          A.     Yes, that's correct.

 4          Q.     Okay.  If you flip over to the

 5   next page, Bates page ending 0792, there are

 6   what I count to be 11 separate orders here

 7   for this customer, again, all for various

 8   opioid products, right?

 9                 MR. EPPICH:  Objection,

10          foundation.

11          A.     That is what's listed here.

12   QUESTIONS BY MR. BOGLE:

13          Q.     Okay.  And I'm not going

14   through every page here, but just one more

15   just to show you.

16                 Page 0793, for this customer,

17   there are -- looks like nine different orders

18   for either hydrocodone or oxycodone listed

19   here, right?

20          A.     That is what's listed.

21          Q.     Okay.  And so what's listed in

22   this report, for example, at this time

23   period, April 2007, would have been orders

24   that were placed by a customer, filled by

25   McKesson, and then appeared on this report
```

1    thereafter and sent to the DEA, right?

2             MR. EPPICH:  Object to the

3        form.  Calls for speculation.

4        A.    That would have been the

5    process.

6    QUESTIONS BY MR. BOGLE:

7        Q.    Right.  Because these are all

8    sales.  This product was provided to the

9    customers, right?  Everything listed in this

10   report.

11            MR. EPPICH:  Object to the

12       form, the characterization.

13       A.    That is my recollection.

14   QUESTIONS BY MR. BOGLE:

15       Q.    Right.  So the DU45 report is

16   listing sales, not just the order prior to

17   the sale, right?

18            MR. EPPICH:  Object to the

19       form, characterization.

20       A.    My recollection is it contains

21   the sales.

22   QUESTIONS BY MR. BOGLE:

23       Q.    Right.  And, for example, if

24   you see on 0793 in the left-hand column,

25   there's actually invoice numbers and invoice

1    dates for each of these, right?

2         A.    Yes, there is.

3         Q.    And you invoice at the time of

4    sale, right?

5              MR. EPPICH:  Objection;

6         foundation, calls for speculation.

7         A.    I don't recall if it was the

8    time of sale or date of shipment.

9    QUESTIONS BY MR. BOGLE:

10        Q.    Or of shipment, okay.

11        A.    Shipment date.

12        Q.    All right.  So, for example,

13   what we've got here as Exhibit 10 is, I

14   believe, about 600-plus pages of what

15   McKesson deemed for this month to be

16   suspicious Schedule II or Schedule III

17   controlled substance orders, right?

18             MR. EPPICH:  Objection to the

19        form.

20        A.    These are what showed up on our

21   suspicious order report as -- and then

22   reported to the DEA.

23   QUESTIONS BY MR. BOGLE:

24        Q.    Right.  But what the whole

25   purpose of this was, you're providing 600 --

1    in this instance, 600-plus pages to the DEA

2    for this month of suspicious controlled

3    substance sales that McKesson had made from

4    the prior month, right?

5                MR. EPPICH:  Objection to the

6          form and the characterization.

7          A.    They were submitted for DEA to

8    review.  The report is titled "suspicious"

9    but it's orders that need to be reviewed and

10   they were supplied to DEA for review.

11   QUESTIONS BY MR. BOGLE:

12         Q.    Okay.  So let me make sure I

13   understand that.  So when these reports would

14   have been submitted to the DEA, it was not

15   the intent of the regulatory department for

16   the conclusion to be drawn that McKesson

17   believed these were suspicious orders.  Is

18   that true?

19                MR. EPPICH:  Object to the

20         form; calls for speculation.

21         A.    This was part of the Suspicious

22   Order Task Force.  This was the format for

23   which industry came to the conclusion to

24   provide this information to the DEA and DEA

25   was good with it.  There was DEA inspections

1    that had occurred in our facilities and there

2    was never an issue with that.  So this is the

3    format for which the original documentation

4    was supplied to DEA.

5              MR. BOGLE:  I move to strike as

6         nonresponsive.

7    QUESTIONS BY MR. BOGLE:

8         Q.    My question was simply that

9    during the time that you were with McKesson

10   in the regulatory department, was it your

11   understanding that the intent was when a DU45

12   report like the one we're looking at here was

13   supplied to the DEA, was that -- was that

14   intended to or not intended to be what

15   McKesson deemed to be suspicious orders from

16   the prior month?

17             MR. EPPICH:  Object to the

18        form.  It calls for speculation; asked

19        and answered.

20        A.    Yeah.  Again, it was -- this is

21   what needed to be reviewed.  This was not

22   specifically a suspicious order.

23   QUESTIONS BY MR. BOGLE:

24        Q.    Okay.  So the view during this

25   time period when DU45s were used were that

1   this is not specifically a suspicious order

2   report.  Am I understanding you right?

3                MR. EPPICH:  Object to the

4       form.  Misstates prior testimony.

5   QUESTIONS BY MR. BOGLE:

6       Q.    If I'm misstating it, let me

7   know.  I'm trying to understand.

8       A.    The title was Suspicious Order

9   Report or Suspicious Purchase Report, but

10  this -- with the vast quantity of orders that

11  are conducted on a daily and nightly basis,

12  this provides a threshold for which to

13  review.

14                And so reviews would be

15  conducted nightly on the reports and they'd

16  be flagged and then submitted to the DEA, and

17  then the report in its entirety would be

18  provided to the DEA on a monthly basis.  So

19  they would have all this information.

20      Q.    Right.  I'm asking about from

21  McKesson's perspective, though, not DEA's

22  perspective.  So from McKesson's perspective

23  as you understood it in the regulatory

24  department -- strike that, let me make it

25  even easier.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Your perspective while you were
 2    in the regulatory department when the DU45s
 3    were used, did you understand these reports
 4    to be suspicious order reports from the prior
 5    month?
 6              MR. EPPICH:  Objection to the
 7         form.  Calls for a legal conclusion.
 8         Asked and answered.
 9         A.    Again, this was a -- an
10    identifier for review.  This didn't mean that
11    every order on here was suspicious.
12    QUESTIONS BY MR. BOGLE:
13         Q.    Okay.  So I think we talked
14    about this earlier, but you do understand
15    that during this time period, 2007, for
16    example, that the Controlled Substances Act
17    did require distributors to report suspicious
18    orders, right?
19         A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12    QUESTIONS BY MR. BOGLE:

13        Q.    Okay.

14            (McKesson-Hilliard Exhibit 11

15        was marked for identification.)

16    QUESTIONS BY MR. BOGLE:

17        Q.    I'm going to hand you what I'm

18    marking as Exhibit 1.1823, which is

19    Exhibit 11 to your deposition, and that's

25        Q.    And you would have been a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    member of HDMA at this point in time, right?

 2         A.     I was a member during this

 3    time.

 4         Q.     Okay.  What does HDMA stand

 5    for?

 6         A.     Healthcare Distribution

 7    Management Association.

 8         Q.     And again, that was y'all's

 9    trade association, right?

10         A.     That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

3          Q.      Okay.  I'll hand you what I'm

4     marking as Exhibit 12, which is 1.1667, and

5     that's MCKMDL00510747.

6                  (McKesson-Hilliard Exhibit 12

7          was marked for identification.)

8     QUESTIONS BY MR. BOGLE:

9          Q.      All right.  And we're going to

10    walk through from back to front here, but

11    just starting at the front, you see that top

12    e-mail there is one that you're copied on,

13    right?

14         A.      Yes, I am copied on it.

15         Q.      And you understand sort of how

16    e-mails work; once you appear on this e-mail,

17    the ones prior to it, you would also have

18    been able to view, right?

19         A.      Okay.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



2    QUESTIONS BY MR. BOGLE:

3         Q.    Yeah.  I'm just asking whether

4    you agree or disagree that simply reporting

5    larger-than-usual orders does not meet the

6    spirit and letter of the suspicious order

7    reporting regulation.  Agree or disagree?

8              MR. EPPICH:  Object to the

9         form; asked and answered.

Highly Confidential - Subject to Further Confidentiality Review



11    QUESTIONS BY MR. BOGLE:

12         Q.    Okay.  Well, do you want to

13    look at the -- I'm happy to give you whatever

14    time you need to look at the full e-mail

15    chain.  I'm not trying to take anything out

16    of context for you here.  Feel free.  Let's

17    do that.

18              Let's take -- take a minute.

19    It's, I think, seven pages or eight pages --

20    six pages.  Let me know when you're done

21    reading the six pages, but that's my question

22    that I'm going to ask you again.  Let me know

23    when you're ready.

24              (Document review by witness.)

25         A.    Restate your question.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      QUESTIONS BY MR. BOGLE:
```



```
20                MR. BOGLE:  Move to strike as

21           nonresponsive.

22      QUESTIONS BY MR. BOGLE:

23           Q.     Let me reask my question

24      because I think it's very straightforward.

25                My question is, simply:  Do you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    agree or disagree that, standing alone,

 2    providing a report that simply lists

 3    larger-than-usual orders does not comply with

 4    the suspicious order reporting requirements

 5    of the Controlled Substances Act?

 6              MR. EPPICH:  Object to the

 7         form.

 8    QUESTIONS BY MR. BOGLE:

 9         Q.    I'm not asking about additional

10    stuff.  I'm asking whether you think that

11    alone is good enough to meet that regulation.

12    Yes or no?

13              MR. EPPICH:  Object to form;

14         asked and answered, calls for a legal

15         conclusion.

16    QUESTIONS BY MR. BOGLE:

17         Q.    We'll talk about the rest of it

18    later, I promise you.

19              MR. EPPICH:  He's answered this

20         question three times now.

21              MR. BOGLE:  He hasn't come

22         close.  I mean, I'd love it if he had.

23              MR. EPPICH:  You're looking for

24         a yes-or-no answer.  He's given you

25         the answer.  It may not be the answer
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          you want --

 2                MR. BOGLE:  He hasn't said yes

 3          or no.

 4                MR. EPPICH:  -- but he has

 5          answered the question.

 6     QUESTIONS BY MR. BOGLE:

 7          Q.    Listen, here's what we can do.

 8     You can say yes or no and then provide

 9     whatever response thereafter you want.

10                MR. EPPICH:  I said you're

11          looking for a yes-or-no answer but

12          he's not providing that to you.

13          That's why you're upset, Brandon.

14                MR. BOGLE:  Right, because I

15          just want him to answer my question.

16          That does upset me, you're right.

17          You're right.  That's frustrating.

18                MR. EPPICH:  I'll allow him to

19          answer your question again.

20     QUESTIONS BY MR. BOGLE:

21          Q.    Can you just answer -- I mean,

22     I think it's a very straightforward question.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 2              MR. BOGLE:  Okay.  I'm going to
 3         something else, so if you want to take
 4         it now or I can plug along if you
 5         want.
 6              MR. EPPICH:  That's fine, let's
 7         take a lunch.
 8              THE VIDEOGRAPHER:  Off the
 9         record at 12:31.
10              (Recess taken, 12:31 p.m. to
11         1:17 p.m.)
12              THE VIDEOGRAPHER:  Stand by.
13         The time is 1:17 p.m.  Back on the
14         record, beginning of File 4.
15    QUESTIONS BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



16    QUESTIONS BY MR. BOGLE:

17         Q.    Okay.  And you're aware that

18    occurred, right?  That a settlement occurred

19    in 2008?

20         A.    Yes, I am.

21         Q.    Okay.  And you're aware that

22    settlement pertained to allegations from the

23    DEA that McKesson violated the Controlled

24    Substances Act in distributing opioids from

25    several of its distribution centers, right?

```
 1        A.      Correct.

 2        Q.      Okay.  Have you seen the

 3   settlement agreement itself?

 4        A.      I have seen it at one time.

 5        Q.      Okay.  All right.  I'm going to

 6   hand you what I'm marking as Exhibit 13,

 7   which is also 1.889, and that's

 8   MCKMDL00337001.

 9              (McKesson-Hilliard Exhibit 13

10        was marked for identification.)

11   QUESTIONS BY MR. BOGLE:

12        Q.      Here you go, sir.

13              Okay.  What I've just handed

14   you, Mr. Hilliard, as Exhibit 13 is titled at

15   the top Settlement and Release Agreement and

16   Administrative Memorandum Agreement dated in

17   the first paragraph May 2nd, 2008.

18              Do you see that?

19        A.      Yes, I see that.

20        Q.      Okay.  And do you recognize

21   this to be the settlement agreement we just

22   referenced from 2008?

23        A.      Yes.

24        Q.      Okay.  And if we'd go

25   specifically to -- let's see, my page numbers
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    are different here.  There's an Appendix B

 2    about halfway through the document that

 3    starts the actual settlement agreement.  Do

 4    you see where I'm at there?  Sorry, my page

 5    numbers don't match yours on this so I can't

 6    give you a specific number.  I'm sorry, I

 7    would if I could.  For reason -- but that's

 8    what the page looks like right there.

 9              MR. EPPICH:  I think it's on

10         Bates 337012.

11    QUESTIONS BY MR. BOGLE:

12         Q.    It says Appendix B at the top

13    left, Settlement Agreement at the top middle.

14              See where I'm at?

15         A.    Found it.

16         Q.    All right.  So this starts the

17    actual settlement agreement itself.  So I

18    want to go to the next page that talks about

19    the covered conduct in the agreement, which

20    is number 8 in the middle of the page.

21              Do you see where I'm at?

22         A.    Yes, I do.

23         Q.    Okay.  And A there says:

24    Within the District of Maryland:  From

25    January 2005 through October 2006,
```

```
 1    McKesson-Landover sold approximately

 2    3 million dosage units of hydrocodone to

 3    NewCare Pharmacy in Baltimore, and failed to

 4    report these sales as suspicious orders to

 5    DEA when discovered, as required by and in

 6    violation of -- and then it lists the C.F.R.

 7    and the U.S.C.

 8                 And then it says:  Further,

 9    from August 2006 to February 2007,

10    McKesson-Landover sold large quantities of

11    phentermine-based products to Smeeta Pharmacy

12    in Highland, Maryland, and failed to report

13    these sales as suspicious orders to DEA when

14    discovered, as required by and in violation

15    of -- and again it lists the statutes.

16                 Do you see where I'm reading

17    there?

18         A.     I see that.
```

```
23         Q.     Okay.  Then if you see in

24    section B, and I wasn't going to read this

25    whole section but you can look at it here for
```

Highly Confidential - Subject to Further Confidentiality Review

1    yourself, this talks about the conduct that

2    we actually covered for the seven

3    pharmacies -- seven Florida pharmacies that

4    were handled by the Lakeland distribution

5    center, right?

6         A.    Yes.  It's listed here.

7         Q.    And that's the same conduct we

8    talked about before, right?  That's what they

9    discuss here.

10        A.    Yes.

11        Q.    Okay.  And then in letter C:

12   Within the Southern District of Texas, it

13   says:  From February to September 2007,

14   McKesson-Conroe sold approximately 2.6

15   million dosage units of hydrocodone to

16   Mercury Drive Pharmacy and Maswoswe's

17   Alternative Pharmacy and failed to report

18   these sales as suspicious orders to DEA when

19   discovered, as required by and in violation

20   of -- and again it lists the statutes.

21             You see that there?

22        A.    I see that.

23        Q.    And on the next page, it

24   continues with letters D, E and F.  Letters D

25   involve allegations of large quantities of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    hydrocodone sent to three Colorado pharmacies

 2    out of the McKesson-Aurora distribution

 3    center from September 2005 to November 2007,

 4    right?

 5         A.    I see that.

 6         Q.    E involves McKesson-Salt Lake

 7    and distribution of 824,000 units of

 8    hydrocodone, oxycodone, fentanyl and

 9    methadone to the Blackfeet Clinic in

10    Browning, Montana from January 2005 to

11    October 2007.

12              Do you see that?

13         A.    I see that.

14         Q.    Okay.  And then finally, there

15    is, from McKesson-West Sacramento,

16    allegations of theft or significant loss of

17    controlled substances on 28 separate

18    occasions that were not reported timely to

19    the DEA.

20              Do you see that?

21         A.    I see that.

22         Q.    Okay.  And you know that for

23    this covered conduct, there was a fine paid

24    of $13.25 million by McKesson, right?

25         A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review



11    QUESTIONS BY MR. BOGLE:

12         Q.      Okay.  We'll take a look at a

13    few things related to the LDMP -- you're okay

14    with me calling it LDMP?

15         A.      Please.

16         Q.      Okay.  I think we're talking

17    about the same thing there.

18              All right.  So I'm going to

19    hand you what I'm marking as Exhibit 1.1830,

20    which is Exhibit 14 to your deposition, and

21    that is, for those keeping track of these

22    things, MCKMDL00403340.

23              (McKesson-Hilliard Exhibit 14

24         was marked for identification.)

25                   --oOo--

Highly Confidential - Subject to Further Confidentiality Review

```
1      QUESTIONS BY MR. BOGLE:

2           Q.      There's yours, sir, and there's

3      yours.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22          Q.     Okay.  You were actually

23     involved in auditing the Lifestyle Drug

24     Monitoring Program in 2007, right?

25          A.     I don't recall specifically

Highly Confidential - Subject to Further Confidentiality Review

1    what was in the audit at that time, but it's

2    possible.

3            Q.      Okay.  And you recall that

4    during that 2007 audit process, there were

5    some significant shortcomings found with the

6    program, right?

7                    MR. EPPICH:  Objection, form.

8            A.      I don't recall.

9                    MR. EPPICH:  Assumes facts not

10           in evidence.

11   QUESTIONS BY MR. BOGLE:

12           Q.      Okay.  I'm going to hand you

13   what I'm marking as Exhibit 15, which is

14   1.1887, MCKMDL00591949.

15                   (McKesson-Hilliard Exhibit 15

16           was marked for identification.)

17   QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20    you Exhibit 1.1913, also marked as

21    Exhibit 16.

22              (McKesson-Hilliard Exhibit 16

23         was marked for identification.)

24    QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



12        MR. LOMBARDO:  Excuse me, does

13     this exhibit have a Bates number?

14        MR. BOGLE:  MCKMDL00591841.

15  QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 9    QUESTIONS BY MR. BOGLE:

10         Q.    Okay.  Well, let's take a look

11    at the SOP itself on this issue, then, so we

12    can sew that up.  It's 1.1333, Exhibit 17 to

13    your deposition, which is MCKMDL00330211.

14              (McKesson-Hilliard Exhibit 17

15         was marked for identification.)

16    QUESTIONS BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21    QUESTIONS BY MR. BOGLE:

22         Q.    Okay.  And I'm going to hand

23    you next, then, what I'm marking as

24    Exhibit 18, which is 1.1918, and that's

25    MCKMDL00591858.

Highly Confidential - Subject to Further Confidentiality Review



1                    (McKesson-Hilliard Exhibit 18

2          was marked for identification.)

3     QUESTIONS BY MR. BOGLE:

4          Q.      There you go, sir.

Highly Confidential - Subject to Further Confidentiality Review





13    QUESTIONS BY MR. BOGLE:

14         Q.    All right.  I just want to show

15    you one more of these audits, which is

16    Exhibit 1.1917, marked as Exhibit 19 to your

17    deposition, and that's MCKMDL00591251.

18              (McKesson-Hilliard Exhibit 19

19         was marked for identification.)

20    QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20    QUESTIONS BY MR. BOGLE:

21         Q.    All right.  Let's take a look

22    at Exhibit 1.2002, which is Exhibit 20 to

23    your deposition.

24              (McKesson-Hilliard Exhibit 20

25         was marked for identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
1     QUESTIONS BY MR. BOGLE:

2          Q.    All right.  And here we've got

3     a series of e-mails and we're going to walk

4     through a couple of portions here with you.

5     This is MCKMDL00622532.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12    QUESTIONS BY MR. BOGLE:

13         Q.    Okay.  Let's take a look at

14    what I'm marking as Exhibit 21, which is

15    1.1856, and that's MCKMDL00573535.

16              (McKesson-Hilliard Exhibit 21

17         was marked for identification.)

18    QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6        Q.      Okay.  But you're aware that

7    significant additions to McKesson's

8    regulatory team did not occur, in fact, until

9    the 2013-2014 time frame, right?

10              MR. EPPICH:  Object to the

11         form.

12         A.      There were -- we doubled in

13    size when the regional DRAs came aboard, so

14    that was a major change from that aspect.

15    There were certainly much larger numbers that

16    came onboard as the department developed.

17    QUESTIONS BY MR. BOGLE:

18         Q.      Right.  But we just looked at

19    this discussion from 2009.  So it wasn't --

20    after 2009, it wasn't until late 2013, early

21    2014, that significant additions were made as

22    far as staffing in the regulatory department

23    of McKesson, right?

24              MR. EPPICH:  Objection to form;

25         asked and answered.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      I'm not sure exactly on the

 2    dates.  We doubled in size in the 2009 time

 3    frame, and at this point and juncture of 2013

 4    and such, I'm no longer working actively in

 5    the CSMP program.  But there were

 6    additional -- significant additional head

 7    count that was produced to the department.  I

 8    just don't know exact dates when that

 9    occurred.

10    QUESTIONS BY MR. BOGLE:

11          Q.      When you say you doubled in

12    size in around 2009, that's doubling from

13    three people to six people, right?

14          A.      Four more were added, so it's

15    from three to seven.

16          Q.      Three to seven people, okay.

17          A.      Yeah.

18          Q.      And that's to cover, again,

19    what is approximately 30 distribution

20    centers, right?

21          A.      Correct.

22          Q.      Okay.  And you're aware of --

23    well, strike that.
```

Highly Confidential - Subject to Further Confidentiality Review

 3              MR. EPPICH:  Object to the

 4        form.  Calls for speculation.

 5        A.     I didn't have any control on

 6   the head count in the department.  That would

 7   be our -- Don Walker's position to decide

 8   what type of head counts we needed to cover

 9   the area.  Again, I wasn't assigned to a

10   region for those processes.

11   QUESTIONS BY MR. BOGLE:

12        Q.     Okay.  So additional staffing

13   wouldn't have been your call.  Is that what

14   you're saying?

15        A.     That's correct.

16        Q.     We touched on this a little

17   bit, but I want to talk more specifically

18   about it.  In 2008, following the settlement

19   we saw with the DEA, the CSMP was

20   implemented, right?

21        A.     Correct.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6    QUESTIONS BY MR. BOGLE:

7         Q.    Okay.  But we looked at the

8    2008 settlement agreement where there were --

9    there was a $13.25 million fine paid for

10   conduct related to various distribution

11   centers for distribution of opioids.

12              In your view, after that, was

13   there not some reason to change the course of

14   conduct at McKesson as it pertained to

15   controlled substance distribution?

16              MR. EPPICH:  Objection to the

17        form; calls for speculation.

18        Foundation.

19        A.    McKesson, we worked to develop

20   new and enhanced programs that demonstrates

21   activity that occurred after that agreement.

22   QUESTIONS BY MR. BOGLE:

23        Q.    Okay.  But with the conduct

24   that we looked at in that settlement

25   agreement, do you agree or not agree that

1    changes needed to be made in the controlled

2    substance monitoring practices at McKesson?

3                    MR. EPPICH:  Object to form.

4         A.      There were changes made.

5    That's how we came to develop the LDMP and

6    then developed the more robust CSMP program.

7    QUESTIONS BY MR. BOGLE:

8         Q.      And if those changes are going

9    to be meaningful, then it shouldn't be

10   business as usual for customers, should it?

11   It should be more difficult for customers to

12   get controlled substances, right?

13                   MR. EPPICH:  Object to the

14        form.  Vague.

15        A.      You can work collaboratively

16   with your customers and not make it painful

17   for them, so, you know, it's -- business

18   doesn't have to be painful.  Changing

19   processes, enhancing programs, working

20   collaborative with customers, is what was

21   needed and what we developed and it could

22   enhance the program.

23   QUESTIONS BY MR. BOGLE:

24        Q.      Okay.  So then when the CSMP

25   was developed, was it your understanding that

```
 1    the ultimate goal was to make sure that

 2    customers stayed happy and kept getting the

 3    product that they wanted to get?

 4              MR. EPPICH:  Object to the

 5         form; vague, misstates prior

 6         testimony.

 7         A.    Obviously that wasn't the

 8    purpose.

 9    QUESTIONS BY MR. BOGLE:

10         Q.    Okay.  So is it an accurate

11    statement that the goal was to make sure that

12    there was no disruption in the business

13    activities of any McKesson customer?

14              MR. EPPICH:  Objection to the

15         form; misstates prior testimony.

16         Calls for speculation.

17         A.    As stated before, there were

18    customers that we discontinued doing business

19    with.  So in some cases, customers would be

20    unhappy.  But that doesn't mean that all

21    customers are going to get discontinued

22    business.  They're all going to get reviewed,

23    and again, it doesn't mean it has to disrupt

24    the business between the companies.

25                    --oOo--
```

```
1     QUESTIONS BY MR. BOGLE:

2          Q.     But if it becomes more

3     difficult for customers to get opioid

4     products, isn't that justified if you're

5     facing an epidemic?

6               MR. EPPICH:  Objection to the

7          form.  Vague.  Calls for speculation.

8          A.     I don't know what that would

9     affect to the customer.  Just because you're

10    doing a review and you're knowing your

11    customer, you're making sure they obtain the

12    amount of product that they need for

13    legitimate purposes.  That's not painful for

14    a customer.

15    QUESTIONS BY MR. BOGLE:

16         Q.     Okay.  So it's your testimony,

17    then, that -- I'm trying to make sure I

18    understand what you're saying here.  So the

19    business-as-usual attitude did exist in

20    creation of the CSMP, right?

21              MR. EPPICH:  Objection.

22    QUESTIONS BY MR. BOGLE:

23         Q.     Am I understanding you

24    correctly?

25              MR. EPPICH:  Objection, form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Misstates prior testimony.

 2         A.     No.  We put together processes

 3    and our functions changed.  We had different

 4    procedures that we had to comply with and

 5    that also meant working with customers.

 6    QUESTIONS BY MR. BOGLE:

 7         Q.     Okay.  I'm handing you what I'm

 8    marking as Exhibit 22 to your deposition,

 9    which is Exhibit 1.1962, and that's

10    MCKMDL00543610.

11              (McKesson-Hilliard Exhibit 22

12         was marked for identification.)

13    QUESTIONS BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 7    QUESTIONS BY MR. BOGLE:

 8          Q.    Okay.  I'm going to hand you

 9    what I'm marking as Exhibit 23, which is

10    1.1804, and that's MCKMDL00543971.

11               (McKesson-Hilliard Exhibit 23

12          was marked for identification.)

13    QUESTIONS BY MR. BOGLE:

14          Q.    There you go, sir.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
21          MR. EPPICH:  Are you at a good

22    place to take another break?

23          MR. BOGLE:  Yeah, I was

24    actually about to say the same thing.

25    You read my mind.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. EPPICH:  Let's go ahead and
 2         go off the record.
 3                  THE VIDEOGRAPHER:  Off the
 4         record at 2:34.
 5                  (Recess taken, 2:34 p.m. to
 6         2:50 p.m.)
 7                  THE VIDEOGRAPHER:  Stand by.
 8         The time is 2:50.  Back on the record,
 9         beginning of File 5.
10    QUESTIONS BY MR. BOGLE:
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

10          Q.      Okay.  Then if we go back to

11  Exhibit 3, which is the Rannazzisi letter

12  from September 27, 2006, you recall

13  discussing this letter with me earlier today,

14  right?

15          A.      Yes, I do.

16          Q.      Okay.  If we go to the second

17  page of the letter, there is a paragraph

18  about three-quarters of the way down that

19  says, "Thus, in addition to."

20                  Do you see that?

21          A.      Yes, I do.

22          Q.      It says:  Thus, in addition to

23  reporting all suspicious orders, a

24  distributor has a statutory responsibility to

25  exercise due diligence to avoid filling

1    suspicious orders that might be diverted into

2    other than legitimate medical, scientific,

3    and industrial channels.

4              Do you see that?

5         A.    I see that.

6         Q.    Okay.  And the next paragraph

7    down that we read before talks about the

8    distributor needing to exercise due care in

9    confirming the legitimacy of orders prior to

10   filling.

11             Do you see that reference in

12   the last sentence?

13        A.    Yes, I see that now.

14        Q.    Okay.  So, again, this letter

15   from September 27, 2006, you would agree with

16   me makes clear that the expectation is that

17   McKesson will be reporting suspicious orders

18   and not filling them if it deems them

19   suspicious, right?

20             MR. EPPICH:  Object to the

21        form.  The document speaks for itself.

22        A.    That's what's stated on here.

23   QUESTIONS BY MR. BOGLE:

24        Q.    Okay.  And so the idea, then,

25   is not to report suspicious sales, because

```
1    you're not supposed to make the sale if the

2    order is suspicious, right?

3              MR. EPPICH:  Object to the

4         form.  Calls for speculation.

5         A.    It states "suspicious orders."

6    QUESTIONS BY MR. BOGLE:

7         Q.    And not "suspicious sales,"

8    right?

9              MR. EPPICH:  Object to the

10        form; calls for speculation.

11        A.    I don't recall seeing "sales"

12   listed here.

13   QUESTIONS BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20      Q.    All right.  I'm going to hand

21  you now what I'm marking as Exhibit 24, which

22  is 1.1937, and that's MCKMDL00623568.

23              (McKesson-Hilliard Exhibit 24

24          was marked for identification.)

25                    --oOo--

```
 1    QUESTIONS BY MR. BOGLE:

 2         Q.    I put the sticker at the top so

 3    we don't cover up the writing.  Okay.  This

 4    is a series of e-mails, and again we're going

 5    to kind of work our way earliest in time to

 6    newest -- closest in time.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





20    QUESTIONS BY MR. BOGLE:

21        Q.    Okay.  All right.  Let me hand

22    you what I'm marking as Exhibit 25.  It's

23    1.1443.  It's also MCKMDL00409453.

24            (McKesson-Hilliard Exhibit 25

25        was marked for identification.)

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20   QUESTIONS BY MR. BOGLE:

21        Q.    Okay.  I'm going to hand you

22   now what I'm marking as Exhibit 26, which is

23   1.1432, and that's MCKMDL00409048.

24             (McKesson-Hilliard Exhibit 26

25        was marked for identification.)

1      QUESTIONS BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review



21    QUESTIONS BY MR. BOGLE:

22         Q.    Okay.  I'm just asking if you

23    know one was entered.

24         A.    Yes, I know that one was

25    entered.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.      Okay.  Where there was a

2     $150 million fine assessed?

3                  MR. EPPICH:  Objection; calls

4          for speculation.

5          A.      That was my understanding.

6     QUESTIONS BY MR. BOGLE:

7          Q.      Okay.  And do you also

8     understand that as a part of that settlement

9     agreement, McKesson accepted responsibility

10    for failing to report suspicious orders?

11                 MR. EPPICH:  Objection to the

12         form; calls for speculation.

13         A.      No, I'm not aware of that.  I

14    don't think I was with McKesson when that was

15    finalized.

16    QUESTIONS BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



19    QUESTIONS BY MR. BOGLE:

20         Q.    All right.  We'll mark for you

21    Exhibit 27, which is 1.88.  That's

22    MCKMDL00355350.  And what I've handed you,

23    sir, is the Administrative Memorandum

24    Agreement that accompanied the 2017

25    settlement between DOJ and McKesson, okay?

```
 1          A.      Yes, I have it.

 2          Q.      Okay.  And I want to just point

 3    you to one specific passage here, and it's

 4    on .3.  Number 2 says "Acceptance of

 5    Responsibility."

 6                   Are you with me there?

 7          A.      Yes, I am.

 8          Q.      It says:  On or about

 9    September 27, 2006, February 7, 2007, and

10    December 27, 2007, DEA's Deputy Assistant

11    Administrator, Office of Diversion Control,

12    sent letters to every entity in the United

13    States that was registered with DEA to

14    manufacture or distribute controlled

15    substances, including McKesson.

16                   Now, the September 27, 2006

17    letter, that's one that we've actually

18    reviewed here today, right?

19          A.      The Rannazzisi?

20          Q.      Yes, sir.

21                   MR. EPPICH:  Objection to the

22          form; foundation.

23    QUESTIONS BY MR. BOGLE:

24          Q.      You recall reading that letter

25    with me?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      The Rannazzisi letter, yes.

 2          Q.      Okay.  And again, that was a

 3     letter that you received, right?

 4                  MR. EPPICH:  Objection to the

 5          form; foundation.

 6          A.      I did receive it at some point,

 7     yes.

 8     QUESTIONS BY MR. BOGLE:

 9          Q.      Okay.  It continues here:  The

10     DEA Letters contained, among other things,

11     guidance for the identification and reporting

12     of suspicious orders to DEA as required by

13     21 C.F.R. Section 1301.74(b).  McKesson

14     acknowledges that, at various times during

15     the time period from January 1, 2009 up

16     through and including the Effective Date of

17     this Agreement (the "Covered Time Period"),

18     it did not identify or report to DEA certain

19     orders placed by certain pharmacies which

20     should have been detected by McKesson as

21     suspicious based on the guidance contained in

22     the DEA Letters about the requirements set

23     forth in 21 C.F.R. 1301.74(b) and

24     21 U.S.C. Section 842(a)(5).

25                  Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     I see that.

 2               MR. EPPICH:  Objection;

 3        foundation.

 4   QUESTIONS BY MR. BOGLE:
```

16   QUESTIONS BY MR. BOGLE:

17        Q.     Okay.  While you were with

18   McKesson, did you have a sense -- I mean, you

19   were there for nearly 20 years.  Did you have

20   a sense and feeling that McKesson would

21   accept responsibility for things that it

22   didn't do?

23               MR. EPPICH:  Object to the

24        form; calls for speculation.

25        A.     I wasn't part of the agreement

```
 1    and I'm not familiar with this document, so I

 2    don't know.

 3    QUESTIONS BY MR. BOGLE:

 4         Q.    I'm not specifically asking you

 5    about the document right now.  I'm saying,

 6    during your 20 years spent at McKesson, do

 7    you have a belief that McKesson would accept

 8    responsibility for things that it didn't do?

 9              MR. EPPICH:  Object to the

10         form; calls for speculation.

11         A.    I don't know.

12    QUESTIONS BY MR. BOGLE:

13         Q.    Okay.  And can you think of any

14    other instance in the 20 years you were at

15    McKesson where the company paid anything

16    approaching a $150 million fine for something

17    it didn't do?

18              MR. EPPICH:  Object to the

19         form; calls for speculation.

20         A.    I don't know.

21    QUESTIONS BY MR. BOGLE:

22         Q.    Can you think of any off the

23    top of your head?

24              MR. EPPICH:  Same objections.

25         A.    I'm not aware of any.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. BOGLE:  Okay.  No further

 2        questions for you, sir.

 3              THE WITNESS:  Thank you.

 4              MR. EPPICH:  Let's go ahead and

 5        take a break and go off the record.

 6              THE VIDEOGRAPHER:  Off the

 7        record at 3:25.

 8              (Recess taken, 3:25 p.m. to

 9        3:46 p.m.)

10              THE VIDEOGRAPHER:  All right,

11        stand by.  The time is 3:46.  Back on

12        the record.

13                   EXAMINATION

14   QUESTIONS BY MR. EPPICH:

15        Q.    Good afternoon, Mr. Hilliard.

16   My name is Chris Eppich, and I'm just going

17   to ask a few questions of you this afternoon.

18        A.    Okay.

19        Q.    I know it's been a long day so

20   I'll keep it pretty short.

21              You testified earlier today

22   that you joined McKesson in 1997.  Is that

23   right?

24        A.    That's correct.

25        Q.    And can you briefly describe
```

Highly Confidential - Subject to Further Confidentiality Review

1    for us your duties as director of regulatory

2    affairs from 1997 to, say, 2006?

3         A.    Well, from '97 to

4    approximately '98, the title was manager of

5    regulatory affairs.  Still carried the same

6    job functions when I went to director of

7    regulatory affairs.

8              I had DEA oversight in regards

9    to compliance with DEA's Section 55, which

10   was the operating procedures for all things

11   DEA, and so that also included the suspicious

12   order monitoring program within it as well,

13   which was based on the previous working group

14   from the Suspicious Order Task Force that

15   McKesson was involved with prior to my

16   arrival.  So that product, that result of

17   that meeting was developed into the

18   Section 55.

19             So I worked with our DC

20   managers to ensure that they were in

21   compliance with the Section 55 requirements,

22   including the suspicious order aspect of it.

23   I audited them as well and worked with them

24   with any issues that they may bring to my

25   attention, and I also worked on the ARCOS

Highly Confidential - Subject to Further Confidentiality Review

1    part of it and training the associates there

2    at the facilities in theft and loss reports

3    and sometimes investigations.

4              Also, I mentioned the audits, I

5    conducted the DEA audits as well as other

6    regulatory audits for the operations.  In

7    addition to the DEA responsibilities, I also

8    had responsibilities under the waste

9    management or environmental aspect of it for

10   EPA, also for hazardous materials for DOT and

11   FAA transportation aspects of it; for

12   registrations, including the DEA

13   registrations for our facilities, and our

14   state licensures and state-controlled

15   substance licensures for our facilities.

16             I also worked with FDA

17   compliance for our facilities as well, and

18   that carried up to about 2006.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15      Q.     Now, I interrupted you when you

16  were talking about your responsibilities as

17  the director of regulatory affairs.  What

18  were your responsibilities between the years

19  2006 to 2008?

20      A.     I still had the same

21  responsibilities, with additional

22  responsibilities as it related to working

23  with our DC managers on identified customers

24  by the DEA and then starting to develop the

25  LDMP processes and crafting the SOP, which

Highly Confidential - Subject to Further Confidentiality Review

1    then developed into the CSMP.

2        Q.    So you worked on the

3    development of the LDMP and then the

4    development of the CSMP.  Is that right?

5        A.    Correct.

6        Q.    Now, that -- and do you recall

7    when the CSMP was released?

8        A.    I believe it was 2008.

9        Q.    Okay.  And after 2008, after

10   the release of the CSMP, what were your

11   responsibilities as a director of regulatory

12   affairs at McKesson?

13       A.    I still helped to work with the

14   SOPs, but the regional directors came onboard

15   and so they managed the correlation with the

16   DCs, their respective DCs in those regions as

17   it relates to the CSMP processes and

18   procedures, and I still continued with --

19   again, with the normal DEA audits and then

20   also continued with my other responsibilities

21   under FDA and HAZMAT and EPA.

22       Q.    Now, do you recall -- do you

23   recall who your supervisors were?  Let's go

24   ahead and take it back in time.  Let's take

25   it from about 1997 to the 2006 time period.

Highly Confidential - Subject to Further Confidentiality Review

```
1    Do you recall who your supervisors were?

2         A.    So when I joined in '97, Dan

3    White was my boss and he was a VP of

4    regulatory.  And then after Dan White, I

5    believe it was Don Walker.  Again, I don't

6    remember the exact dates.  I believe it was

7    Don Walker, and then to Ron Bone.  I know I

8    was reporting to Ron Bone in the 2005-2006

9    time frame.

10              Ron left and then I was

11   reporting to Bruce and -- Bruce Russell and

12   Don Walker; and then once Bruce retired, it

13   was directly to Don Walker.  And then finally

14   I reported to Krista Peck.

15        Q.    You testified earlier today

16   that you were familiar with the Controlled

17   Substances Act.

18              Do you remember that testimony?

19        A.    Yes, I do.

20        Q.    Now, during -- and you

21   testified that you were in the regulatory

22   affairs department at McKesson from 1997 all

23   the way to 2016, correct?

24        A.    That's correct.

25        Q.    Now, during your time at
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    McKesson, are you aware of any changes to the

2    Controlled Substances Act?

3         A.    No, I'm not.

4         Q.    The CSA didn't change at all

5    during your tenure at McKesson?

6               MR. BOGLE:  Object to form.

7         A.    That's correct.

8    QUESTIONS BY MR. EPPICH:

9         Q.    Now, have directives from the

10   DEA changed over that period?

11        A.    Yes, they have.

12        Q.    Can you provide us any examples

13   of how DEA directives have changed while you

14   were at McKesson?

15              MR. BOGLE:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

7    QUESTIONS BY MR. EPPICH:

8         Q.    Mr. Hilliard, are you familiar

9    with the ARCOS reporting system?

10         A.    Yes, I am.

11         Q.    What is the ARCOS reporting

12    system?

13         A.    It's a reporting system that's

14    put in place way past when I started in the

15    industry, that the DEA runs.  It's run out of

16    headquarters and it's a reporting system for

17    manufacturers and distributors.

18              So manufacturers and

19    distributors have to submit essentially all

20    the raw data for their transactions for

21    Schedule IIs and Schedule III narcotics, and

22    this included all the sales receipts,

23    returns, theft/loss, no activity, if you had

24    no activity for a registrant during the

25    month.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    So it had monthly reporting
 2     requirements for every registrant that's a
 3     manufacturer or distributor.
 4          Q.     So McKesson has to submit its
 5     sales data to the DEA as a part of this ARCOS
 6     reporting requirement?  Is that correct?
 7                    MR. BOGLE:  Object.  Object to
 8          form.
 9          A.     That's correct.
10     QUESTIONS BY MR. EPPICH:
11          Q.     And do other distributors have
12     to similarly report their sales data for
13     controlled substances to this ARCOS reporting
14     system?
15                    MR. BOGLE:  Object to form.
16          A.     That's correct.
17     QUESTIONS BY MR. EPPICH:
18          Q.     Does McKesson have access to
19     other distributors' data that's reported to
20     ARCOS?
21          A.     No, they don't.  We asked for
22     it.
23          Q.     Who has access to the ARCOS
24     reporting data?
25          A.     Only the DEA.
```

```
 1          Q.      Did McKesson have the ability

 2     to know -- let me strike that.
```

17     QUESTIONS BY MR. EPPICH:

18          Q.      You may recall a few moments

19     ago Mr. Bogle asked you some questions about

20     Exhibit 27.  Do you have Exhibit 27 in front

21     of you?

22          A.      Yes, I do.

23          Q.      Now, Exhibit 27 is titled the

24     Administrative Memorandum of Agreement.

25                  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.      I see it.

 2         Q.      Mr. Bogle had you turn to

 3    page 3 of this document, which is Bates

 4    ending 355352.

 5         A.      I see that.

 6         Q.      Do you remember that, sir?

 7         A.      Yes, I do.

 8         Q.      And he read Section 2,

 9    Acceptance of Responsibility, to you.

10              Do you remember that testimony?

11         A.      Yes, I do.

12         Q.      Now, about halfway down this

13    paragraph, the paragraph reads:  McKesson

14    acknowledges that, at various times during

15    the period from January 1, 2009, up through

16    and including the Effective Date of this

17    Agreement, it did not identify or report to

18    DEA certain orders placed by certain

19    pharmacies which should have been detected by

20    McKesson as suspicious based on the guidance

21    contained in the DEA Letters and -- about the

22    requirements set forth in 21 C.F.R.

23    1307.174(b) and 21 U.S.C. 842(a)(5).

24              Do you see that, sir?

25         A.      Yes, I see it.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Now, before your deposition

2    today, had you ever seen Exhibit 27?

3    A.    No, I haven't.

4    Q.    And while you were at McKesson,

5    did anyone ask you to investigate any of the

6    pharmacies' alleged activity that's described

7    in this document for this period January 1,

8    2009, to the date of this agreement?

9    A.    No.

10    Q.    Do you have any knowledge about

11    the allegations described in Exhibit 27?

12    A.    Not that I recall.

13    Q.    If you could turn to

14    Exhibit 26.  Mr. Bogle introduced Exhibit 26

15    to you.

16          Do you remember that?

17    A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review



6        Q.      If we could turn to Exhibit 25.

Do you have that one in front of you?

8        A.      Yes, I do.

22       Q.      Thank you.

23               We mentioned -- you discussed

24       earlier, testified earlier with Mr. Bogle

25       about the LDMP and the CSMP program.

Highly Confidential - Subject to Further Confidentiality Review



```
1              Do you remember that testimony?
2        A.    Yes, I do.
```

```
17   QUESTIONS BY MR. EPPICH:
18        Q.    You talked briefly earlier
19   about the evolution of the CSMP.
20              Do you remember that testimony?
21        A.    I believe so.
```

Highly Confidential - Subject to Further Confidentiality Review



17        Q.      Thank you, Mr. Hilliard.

18                Mr. Hilliard, you worked at

19    McKesson for over 20 years.  How would you

20    describe McKesson's culture in the area of

21    compliance and regulatory affairs?

22        A.      I enjoyed working at McKesson

23    and working with my colleagues.  I know that

24    myself and my colleagues always worked with

25    the utmost integrity and always believed in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    what we were doing and strived to do the

 2    right thing, and as they brought new folks in

 3    and I worked with some of them, they too were

 4    on the same page and had the same goals that

 5    we had.

 6          Q.    Thank you, Mr. Hilliard.

 7                MR. EPPICH:  I have no further

 8          questions.

 9                MR. BOGLE:  I've just got a few

10          follow-ups.  It's your call,

11          Mr. Hilliard.  If you're okay looking

12          straight ahead, I've probably got like

13          six or seven questions for you.

14                THE WITNESS:  That's fine.

15                MR. BOGLE:  If you want me to

16          move back over there, I really don't

17          care.

18                THE WITNESS:  That's fine.

19                MR. BOGLE:  You good?  Okay.

20          Just -- Chris is going to tell you to

21          look straight ahead.  Don't look at

22          me, which is probably easy for you to

23          do.

24                All right.  I'm ready.

25                      --oOo--
```

Highly Confidential - Subject to Further Confidentiality Review

1                    FURTHER EXAMINATION

2      QUESTIONS BY MR. BOGLE:



[redacted]

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

2    QUESTIONS BY MR. BOGLE:

3         Q.     Yeah.  So I'm not talking about

4    the CSA.  I'm talking about, again, what a

5    good company would do.

6              Do you think it would be a bad

7    thing for McKesson, in an attempt to be a

8    good corporate citizen, to at all times know

9    what its customers were doing with the

10   opioids it was distributing to them?

11             MR. EPPICH:  Object to the

12        form; asked and answered.

13        A.     We had processes in place to

14   comply with the CSA, and I can't specifically

15   speak to everybody in McKesson.

16   QUESTIONS BY MR. BOGLE:

17        Q.     Okay.  And I'm not -- okay.

18   Let me ask it to you this way:  Do you think,

19   as Gary Hilliard, director of regulatory

20   affairs for nearly 20 years at McKesson,

21   that -- is your personal belief that it would

22   be a bad thing for McKesson to know what its

23   customers were doing with opioids McKesson

24   was distributing to them?  What is your

25   personal opinion?

```
 1                 MR. EPPICH:  Object to the
 2         form; asked and answered.
 3         A.      As I say, we believed that we
 4    were doing what was required, and we had
 5    means to investigate and look into our
 6    customers and their business activities.
 7    QUESTIONS BY MR. BOGLE:
 8         Q.      Would it be a bad thing to know
 9    what your customer is doing with the opioids
10    you're giving them?  That's my question.
11                 MR. EPPICH:  Objection, form.
12         Asked and answered.
13         A.      Our customers were registered
14    with the DEA.  We serviced our customers that
15    had DEA registrations and were receiving
16    prescriptions from DEA-registered physicians.
17    We believed we were complying with the CSA
18    requirements.
19    QUESTIONS BY MR. BOGLE:
20         Q.      Okay.  So as long as they were
21    registered with the DEA, that was all you
22    needed to know about your customer, right?
23                 MR. EPPICH:  Objection.
24         Misstates the prior testimony.  Form.
25         A.      Again, we were doing what we
```

Highly Confidential - Subject to Further Confidentiality Review

1    believed was correct under the CSA.

2    QUESTIONS BY MR. BOGLE:

3         Q.    Which was if they had a

4    registration, they were good to go, right?

5              MR. EPPICH:  Objection to form;

6         asked and answered.



Highly Confidential - Subject to Further Confidentiality Review



19          MR. BOGLE:  Okay.  No further

20      questions.

21          MR. EPPICH:  Thank you.

22          Before we get off the record,

23      let me designate the transcript as

24      highly confidential, and we'll read

25      and sign.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE REPORTER:  Thank you, sir.

 2                    MR. EPPICH:  Thank you.

 3                    THE VIDEOGRAPHER:  Off the

 4          record at 4:20.

 5                    (Deposition recessed at

 6          4:20 p.m.)

 7                         --oOo--

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      CERTIFICATE
 2
 3            I, SUSAN PERRY MILLER, Registered
       Diplomate Reporter, Certified Realtime
 4     Reporter, Certified Court Reporter and Notary
       Public, do hereby certify that prior to the
 5     commencement of the examination, GARY
       HILLIARD was duly sworn by me to testify to
 6     the truth, the whole truth and nothing but
       the truth;
 7            That pursuant to Rule 30 of the
       Federal Rules of Civil Procedure, signature
 8     of the witness was reserved by the witness or
       other party before the conclusion of the
 9     deposition;
10            That the foregoing is a verbatim
       transcript of the testimony as taken
11     stenographically by and before me at the
       time, place and on the date hereinbefore set
12     forth, to the best of my ability.
13            I DO FURTHER CERTIFY that I am
       neither a relative nor employee nor attorney
14     nor counsel of any of the parties to this
       action, and that I am neither a relative nor
15     employee of such attorney or counsel, and
       that I am not financially interested in the
16     action.
17
18
19     _____
       Susan Perry Miller
20     CSR-TX, CCR-LA, CSR-CA-13648
       Registered Diplomate Reporter
21     Certified Realtime Reporter
       Certified Realtime Captioner
22     NCRA Realtime Systems Administrator
       Notary Public, State of Texas
23     My Commission Expires 03/30/2020
24
       Dated: 14th of January, 2019
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4           I, GARY HILLIARD, do hereby
       certify that I have read the foregoing pages
 5     and that the same is a correct transcription
       of the answers given by me to the questions
 6     therein propounded, except for the
       corrections or changes in form or substance,
 7     if any, noted in the attached
       Errata Sheet.

 8

 9

10

11

12     _____
        GARY HILLIARD                        DATE
13

14

15

16

17

18     Subscribed and sworn
       to before me this
19     _____ day of _____, 20_____.
20     My commission expires:_____
21


       _____
22     Notary Public

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    __ __ __ __ __ __

 2                        ERRATA

                      __ __ __ __ __ __

 3

 4      PAGE   LINE   CHANGE

 5      _____  _____  _____

 6      REASON: _____

 7      _____  _____  _____

 8      REASON: _____

 9      _____  _____  _____

10      REASON: _____

11      _____  _____  _____

12      REASON: _____

13      _____  _____  _____

14      REASON: _____

15      _____  _____  _____

16      REASON: _____

17      _____  _____  _____

18      REASON: _____

19      _____  _____  _____

20      REASON: _____

21      _____  _____  _____

22      REASON: _____

23      _____  _____  _____

24      REASON: _____

25                    __ __ __ __ __ __
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

                         __ __ __ __ __ __

 2

 3       PAGE      LINE

 4       _____     _____     _____

 5       _____     _____     _____

 6       _____     _____     _____

 7       _____     _____     _____

 8       _____     _____     _____

 9       _____     _____     _____

10       _____     _____     _____

11       _____     _____     _____

12       _____     _____     _____

13       _____     _____     _____

14       _____     _____     _____

15       _____     _____     _____

16       _____     _____     _____

17       _____     _____     _____

18       _____     _____     _____

19       _____     _____     _____

20       _____     _____     _____

21       _____     _____     _____

22       _____     _____     _____

23       _____     _____     _____

24

25
```