EXHIBIT 241

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4

 5     ---------------------------x

 6     IN RE: NATIONAL PRESCRIPTION   ) Case No.

 7     OPIATE LITIGATION              ) 1:17-MD-2804

 8     APPLIES TO ALL CASES           ) Hon. Dan A. Polster

 9     ---------------------------x

10          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

11                   CONFIDENTIALITY REVIEW

12

              VIDEOTAPED DEPOSITION OF BLAINE M. SNIDER

13

                        WASHINGTON, D.C.

14

                    THURSDAY, NOVEMBER 8, 2018

15

                          8:34 A.M.

16

17

18

19

20

21

22

23

24     Reported by: Leslie A. Todd
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Deposition of BLAINE M. SNIDER, held at the

 2   offices of:

 3

 4

 5                COVINGTON & BURLING, LLP

 6                One City Center

 7                850 10th Street, N.W.

 8                Washington, DC 20001-4956

 9

10

11

12

13      Pursuant to notice, before Leslie Anne Todd,

14   Court Reporter and Notary Public in and for the

15   District of Columbia, who officiated in

16   administering the oath to the witness.

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                  A P P E A R A N C E S

2

3    ON BEHALF OF PLAINTIFFS:

4         BRANDON BOGLE, ESQUIRE

5         WESLEY BOWDEN, ESQUIRE

6         LEVIN PAPANTONIO THOMAS MITCHELL

7           RAFFERTY & PROCTOR, PA

8         316 S. Baylen Street, Suite 600

9         Pensacola, Florida 32502

10        (850) 435-7043

11

12   ON BEHALF OF McKESSON CORPORATION:

13        KEVIN B. COLLINS, ESQUIRE

14        WEISS NUSRATY, ESQUIRE

15        COVINGTON & BURLING, LLP

16        One CityCenter

17        850 Tenth Street, N.W.

18        Washington, D.C. 20001-4956

19        (202) 662-5598

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):

 2

 3   ON BEHALF OF DEFENDANT CVS:

 4        DANIEL P. MOYLAN, ESQUIRE

 5        ZUCKERMAN SPAEDER, LLP

 6        100 East Pratt Street, Suite 2440

 7        Baltimore, Maryland 21202-1031

 8        (410) 949-1159

 9

10   ON BEHALF OF DEFENDANT WALMART:

11        SARAH G. CONWAY, ESQUIRE

12        JONES DAY

13        555 South Flower Street

14        Fiftieth Floor

15        Los Angeles, California 90071-2300

16        (213) 489-3939

17

18   ON BEHALF OF DEFENDANT HBC CO.:

19        SCOTT D. LIVINGSTON, ESQUIRE

20        MARCUS & SHAPIRA, LLP

21        One Oxford Centre, 35th Floor

22        301 Grant Street

23        Pittsburgh, Pennsylvania 15219-6401

24        (412) 338-4690
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):

 2    ON BEHALF OF DEFENDANT CARDINAL HEALTH:

 3        MIRANDA PETERSEN, ESQUIRE

 4        WILLIAMS & CONNOLLY, LLP

 5        725 Twelfth Street, N.W.

 6        Washington, D.C. 20005

 7        (202) 434-5000

 8

 9    ON BEHALF OF ENDO PHARMACEUTICALS, INC. and

10        ENDO HEALTH SOLUTIONS, INC.:

11        JOHN D. CELLA, ESQUIRE

12        ARNOLD & PORTER KAYE SCHOLER, LLP

13        601 Massachusetts Avenue, N.W.

14        Washington, D.C. 20001-3743

15        (202) 942-6771

16

17    ON BEHALF OF AMERISOURCEBERGEN BERGEN:

18        MOLLY Q. CAMPBELL, ESQUIRE

19        REED SMITH, LLP

20        1301 K Street, N.W.

21        Suite 1000 - East Tower

22        Washington, D.C. 20005

23        (202) 414-9173

24
```

```
 1    APPEARANCES (Continued):

 2

 3    ON BEHALF OF ALLERGAN FINANCE:

 4         MICHAEL LeFEVOUR, ESQUIRE (Telephonically)

 5         KIRKLAND & ELLIS, LLP

 6         300 North LaSalle

 7         Chicago, Illinois 60654

 8         (312) 862-2000

 9

10    ON BEHALF OF PRESCRIPTION SUPPLY, INC.:

11         ERIC J. WILLIAMS, ESQUIRE (Telephonically)

12         PELINI, CAMPBELL & WILLIAMS, LLC

13         Bretton Commons - Suite 400

14         8040 Cleveland Avenue NW

15         North Canton, Ohio 44720

16         (330) 305-6400

17

18    ALSO PRESENT:

19         RICHARD WOODS, Paralegal

20         DANIEL HOLMSTOCK, Videographer

21

22

23

24
```

1                   C O N T E N T S

2    EXAMINATION OF BLAINE M. SNIDER              PAGE

3        By Mr. Bogle                        17, 489

4        By Mr. Collins                     453, 514

5

6

7



Highly Confidential - Subject to Further Confidentiality Review





24

Highly Confidential - Subject to Further Confidentiality Review



24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1                    P R O C E E D I N G S

 2                    ------------------

 3              THE VIDEOGRAPHER:  We are now on the

 4      record.  My name is Daniel Holmstock.  I am the

 5      videographer for Golkow Litigation Services.

 6      Today's date is November 8, 2018, and the time on

 7      the screen is 8:34 a.m.

 8              This deposition is being held at the law

 9      offices of Covington & Burling, LLP, at 850

10      10th Street, Northwest, in Washington, D.C., in

11      the matter of In Re: National Prescription Opiate

12      Litigation.  It is pending before the United

13      States District Court for the Northern District of

14      Ohio, Eastern Division.

15              The deponent today is Mr. Blaine Snider.

16              Counsel will be noted on the

17      stenographic record.  The court reporter is Leslie

18      Todd, who will now administer the oath.

19                    BLAINE M. SNIDER,

20          and having been first duly sworn,

21          was examined and testified as follows:

22                    CROSS EXAMINATION

23      BY MR. BOGLE:

24          Q    Can I get your full name, sir?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A     Blaine Matthew Snider.

 2        Q     And am I correct that you're currently

 3   employed with McKesson?

 4        A     Yes.

 5        Q     Okay.  And have you ever been deposed

 6   before?

 7        A     No.

 8        Q     Okay.  Just a few basic ground rules

 9   that might help both of us here today.  I'm going

10   to be asking you some questions, and if you don't

11   understand the question I ask or don't hear it,

12   it's perfectly okay for you to ask me to repeat or

13   rephrase the question.  Okay?

14        A     Okay.

15        Q     If you need a break at any point in

16   time, just let me know or your counsel know.

17   Happy to take a break whenever you need it.  All

18   I'd ask is if I've got a question pending, that

19   you answer that question, and then we can break

20   for whenever you want.

21              And also I'm going to ask you questions,

22   you're going to provide answers.  I'd ask that we

23   try not to talk over each other.  So I'll ask my

24   question, try to give you ample opportunity to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    answer before I ask my next question.  Is that

 2    fair?

 3         A     Okay.

 4         Q     Okay.  And how long have you been with

 5    McKesson?

 6         A     Almost 40 years.

 7         Q     Okay.  Am I correct that you currently

 8    hold the director of operations position at the

 9    New Castle Distribution Center?

10         A     Yes.

11         Q     Okay.  How long have you held that

12    specific position?

13         A     Eighteen -- eighteen years.

14         Q     Okay.  What was your job at McKesson

15    prior to that?

16         A     I was distribution center manager in

17    Sewickley, Pennsylvania, and North Canton, Ohio.

18         Q     Okay.  How long did you have that role?

19         A     About three years.

20         Q     How about prior to that?

21         A     I was operations manager in Cincinnati,

22    Ohio, and North Canton previous to that.

23         Q     How long did you hold that position?

24         A     Oh, I can't remember now.  Eight, ten
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   years, I guess.

 2        Q    Okay.  What was your job prior to that

 3   at McKesson, just the title?

 4        A    I started as a supervisor almost 40

 5   years ago.

 6        Q    Okay.  So would it be fair to say, just

 7   doing the rough math here, that you have nearly 30

 8   years of experience as a distribution center

 9   operations manager at McKesson?

10        A    Yes.

11        Q    Okay.  Now, McKesson itself as an entity

12   has, as I understand it, 37 distribution centers

13   around the country; is that right?

14             MR. COLLINS:  Objection to the form.

15             THE WITNESS:  I can't answer to -- it

16   sounds like you're including med-surg or something

17   else.  I know there's 28 distributions centers for

18   U.S. pharma.

19   BY MR. BOGLE:

20        Q    Okay.  And New Castle is one of those 28

21   distribution centers for U.S. pharma, correct?

22        A    Yes.

23        Q    And just so I understand, as director of

24   operations for New Castle, it would be your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   general responsibility to run the day-to-day

 2   operations for the facility, correct?

 3               MR. COLLINS:  Objection.  Form.

 4               THE WITNESS:  I'm in charge of the

 5   facility, yes.

 6   BY MR. BOGLE:

 7        Q    Right.  So it's fair to say that you're

 8   the highest ranking McKesson employee at New

 9   Castle that has responsibility exclusive to that

10   distribution center, right?

11               MR. COLLINS:  Objection to form.

12               THE WITNESS:  Well, I'm not sure.  I

13   have a VP/GM I report to, but I run the

14   distribution center.

15   BY MR. BOGLE:

16        Q    Who do you report to?

17        A    Brian Ferreira, the VP/GM.

18        Q    When it comes to decisions specific to

19   the operations of New Castle, would it be fair to

20   say that the buck stops with you?

21               MR. COLLINS:  Objection to form, vague.

22               THE WITNESS:  I don't think so.

23   BY MR. BOGLE:

24        Q    Okay.  Who do you think the buck stops
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   with at New Castle?

 2              MR. COLLINS:  Same objection.

 3              THE WITNESS:  I don't know the buck.  I

 4   know I'm in charge of the distribution center

 5   operations, and I have a boss who is the VP/GM.

 6   BY MR. BOGLE:

 7        Q    Okay.  When you say you're responsible

 8   for distribution center operations, what do you

 9   think that that -- that entails?

10        A    In charge of the distribution center and

11   the employees, and the pick, pack and ship of that

12   operations.

13        Q    When you say "pick, pack and ship," what

14   does that mean?

15        A    The day-to-day filling of orders for our

16   customers out of the New Castle DC.

17        Q    Okay.  And when it comes to pills that

18   are distributed from New Castle, you would agree

19   with me that it's your ultimate responsibility to

20   make sure that those go to the proper customers

21   for the proper purpose.

22              MR. COLLINS:  Objection.  Compound,

23   form.

24              THE WITNESS:  We make sure the orders
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    are correct, accurate, billed correctly, shipped

 2    correctly, on time.

 3    BY MR. BOGLE:

 4         Q    And your job responsibilities also

 5    include, when it comes to controlled substances,

 6    making sure that the customers purchasing are

 7    purchasing for a legitimate medical purpose,

 8    correct?

 9              MR. COLLINS:  Objection.  Form, calls

10    for a legal conclusion, lacks foundation.

11              THE WITNESS:  I can't say for the

12    customers all the time.  I can say that I follow

13    the Code of Federal Regulations.

14    BY MR. BOGLE:

15         Q    Okay.  And part of the Code of Federal

16    Regulations, when it comes to the Controlled

17    Substances Act, talks about the distributor's

18    responsibility to ensure that they're supplying

19    drugs to customers who are buying it for a

20    legitimate medical purpose, right?

21              MR. COLLINS:  Objection.  Form, asked

22    and answered --

23              THE WITNESS:  Can you repeat that?

24              MR. COLLINS:  -- calls for a legal
```

Highly Confidential - Subject to Further Confidentiality Review

1    conclusion.

2           Please let me finish my objections.

3    BY MR. BOGLE:

4        Q    When it comes to the Controlled

5    Substances Act, you understand that part of that

6    act requires that controlled substances that are

7    distributed to customers are being provided for a

8    legitimate medical purpose, correct?

9           MR. COLLINS:  Objection.  Form, calls

10   for a legal conclusion.

11          THE WITNESS:  I can't --

12          MR. COLLINS:  Foundation.

13          THE WITNESS:  I can't say a legitimate

14   medical purpose.  I don't know that phrase.  I'm

15   sorry.

16   BY MR. BOGLE:

17       Q    You've never heard that phrase?

18       A    No.

19       Q    Okay.  You're a member of management at

20   the distribution center for New Castle, right?

21       A    Yes.

22          MR. COLLINS:  Objection to form.

23   BY MR. BOGLE:

24       Q    And the distribution center management

Highly Confidential - Subject to Further Confidentiality Review

1  at McKesson has the full responsibility for

2  ensuring the proper distribution of controlled

3  substances, correct?

4         MR. COLLINS:  Objection to form, calls

5  for a legal conclusion, vague.

6         THE WITNESS:  Can you repeat the

7  question, please?

8         MR. BOGLE:  Can you repeat back, Court

9  Reporter?

10        (Whereupon, the requested record

11        was read.)

12        MR. COLLINS:  Same objections.

13        THE WITNESS:  I believe so, yes.

14 BY MR. BOGLE:

15    Q    Okay.  And that's a job you take

16 seriously, right?

17    A    Yes.

18    Q    Okay.  Just make sure you speak up a

19 little bit.  I'm having sometimes a little trouble

20 hearing you.

21    A    Okay.

22    Q    Is that "yes"?

23    A    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15  BY MR. BOGLE:

16      Q    You would agree with me that protecting

17  the health and safety of the public is the most

18  important consideration for any distributor of

19  pharmaceutical products, correct?

20          MR. COLLINS:  Objection.  Form,

21  foundation, calls for a legal conclusion, argue --

22          MR. BOGLE:  I believe you're supposed to

23  just --

24          MR. COLLINS:  Argumentative.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. BOGLE:  -- stick to form objections.

 2    You're going beyond that considerably here.

 3              MR. COLLINS:  No, my objection is

 4    legitimate.  Your question wasn't.  So my

 5    objection stands.  It's the form, calls for a

 6    legal conclusion --

 7              MR. BOGLE:  I believe the protocol calls

 8    for just form objections.  Not speaking objections

 9    beyond that.

10              MR. COLLINS:  We have a phone here if

11    you want to make a call to the special master.

12              MR. BOGLE:  Well, we can see if this

13    continues.  We may have to.

14              MR. COLLINS:  Listen, it's a proper

15    objection.  Your question wasn't.

16              MR. BOGLE:  I don't want to stop ten

17    minutes in.

18    BY MR. BOGLE:

19         Q    I'll ask my question again.

20              Do you believe that protecting the

21    health and safety of the public is the most

22    important consideration for a distributor of

23    pharmaceutical products?

24              MR. COLLINS:  Same objections.  Form,
```

1    calls for a legal conclusion, foundation.

2              THE WITNESS:  I can't answer to all the

3    health and safety of the public.  I can answer to

4    the Code of Federal Regulations and my duties.

5    BY MR. BOGLE:

6         Q    Okay.  So do you believe that compliance

7    with the Federal Regulations is the most important

8    consideration for a distributor of pharmaceutical

9    products like McKesson?

10             MR. COLLINS:  Objection to form.

11             THE WITNESS:  I think it's a part of it.

12   BY MR. BOGLE:

13        Q    Okay.  Any more important part that you

14   can think of?

15             MR. COLLINS:  Same objections.  Form,

16   foundation.

17             THE WITNESS:  Well, people.

18   BY MR. BOGLE:

19        Q    People, what do you mean by that?

20        A    My employees.

21        Q    Okay.  What about the people that you're

22   supplying the controlled substances to ultimately,

23   the end user?

24             MR. COLLINS:  Object --

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BOGLE:

 2        Q    Do you think you have any responsibility

 3   to those people?

 4             MR. COLLINS:  Objection.  It's a

 5   mischaracterization, lacks foundation, form.

 6             THE WITNESS:  I mentioned before about

 7   on-time, accurate delivery to my customers.

 8   BY MR. BOGLE:

 9        Q    Okay.  So you think you have any

10   responsibility to the -- the end user, the person

11   who's purchasing from your customer?

12             MR. COLLINS:  Objection to form, calls

13   for speculation.

14             THE WITNESS:  I think I mentioned that

15   before.  Yes.

16   BY MR. BOGLE:

17        Q    Okay.  And as to the ultimate purchaser,

18   the person who's going to go to your -- to the

19   pharmacy and purchase the drug, do you think that

20   McKesson has a responsibility to protect the

21   health and safety of those people?

22             MR. COLLINS:  Same objections.  Asked

23   and answered, form.

24             THE WITNESS:  I can't answer for all of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    McKesson.  I can just answer for New Castle.

 2    BY MR. BOGLE:

 3         Q    Sure.  Then I'll rephrase it that way.

 4    Do you think New Castle has such a responsibility?

 5              MR. COLLINS:  Same objections.

 6              THE WITNESS:  I don't -- can you repeat

 7    the question?

 8    BY MR. BOGLE:

 9         Q    Sure.

10              Do you think New Castle has a

11    responsibility for the health and safety of the

12    end user purchasing controlled substances

13    distributed by McKesson?

14              MR. COLLINS:  Objection to form.

15              THE WITNESS:  I can't say that I can

16    control that.

17    BY MR. BOGLE:

18         Q    Okay.  I didn't ask if control.  I asked

19    if you had responsibility.

20              MR. COLLINS:  Objection to form.

21              THE WITNESS:  I can't be responsible for

22    someone that purchases drugs.

23    BY MR. BOGLE:

24         Q    Okay.  So you think you have no
```

Highly Confidential - Subject to Further Confidentiality Review

 1   responsibility for ensuring that people are

 2   purchasing for legitimate medical purposes?

 3           MR. COLLINS:  Objection to form,

 4   argumentative.  Calls for a legal conclusion.

 5           THE WITNESS:  I can't answer to that.

 6   BY MR. BOGLE:

 7       Q    You don't know?

 8       A    I can't answer to that.

 9       Q    Okay.  When you say you can't answer

10   that, what -- what's keeping you from answering

11   that?

12       A    I don't know.

13       Q    Okay.  Have you heard of the term

14   "diversion" when it comes to controlled

15   substances?

16       A    Yes.

17       Q    What does that term mean to you?

18       A    It's in the supply chain where the

19   product could be diverted.  Like inbound trucks

20   that come in, sometimes those are hijacked, or in

21   the building to make sure security is there.

22   There's a chance for diversion there.  And in the

23   truck drivers, there's a chance for diversion

24   there.  And to make sure that that supply chain is

Highly Confidential - Subject to Further Confidentiality Review

1    intact.

2        Q    Okay.  So you talked about ways that

3    diversion can occur, but before we get there, what

4    do you understand the term "diversion" to mean?

5    When somebody diverts something when it comes to

6    controlled substances, what does that mean to you?

7        A    Loss of controlled substance.

8        Q    Loss of product?

9        A    Yes.

10       Q    Okay.  Have you ever heard the term

11   "diversion" used to mean the use of a controlled

12   substance for an illegitimate purpose?

13       A    No.

14       Q    Never heard of that concept?

15       A    No.

16       Q    Okay.  You've talked a couple of times

17   about compliance with Federal Regulations, and

18   that you're familiar with the Controlled

19   Substances Act, correct?

20           MR. COLLINS:  Objection.  Lacks

21   foundation, calls for a legal conclusion.

22           THE WITNESS:  Is that the Code of

23   Federal Regulations?

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

1       Q    I'm just asking if you're familiar with

2   the Controlled Substances Act.

3       A    I'm not sure.

4       Q    You're not -- have you ever heard that

5   phrase used, Controlled Substances Act?

6       A    No.

7       Q    Never heard that?

8       A    No.

9       Q    Okay.  So is that -- have you ever read

10  any portion of that act in conjunction with your

11  responsibilities at McKesson?

12      A    I would have to see it.  I'm not sure it

13  was called the Controlled Substance Act.  I just

14  know the Code of Federal Regulations.

15      Q    Okay.  Do you have any familiarity as to

16  whether the Controlled Substances Act was -- was

17  and is designed to prevent diversion of controlled

18  substances like opioids?

19           MR. COLLINS:  Objection.  Calls for a

20  legal conclusion, form.

21           THE WITNESS:  I can't answer to that.  I

22  don't know.

23  BY MR. BOGLE:

24      Q    Are you familiar with SOP 55?  Ever

Highly Confidential - Subject to Further Confidentiality Review

1    heard of that?

2        A    No.

3        Q    Okay.  And SOP, I'm referring to

4    Standard Operating Procedure, 55.  Does that help

5    at all?

6        A    I don't call it that.

7        Q    Okay.

8        A    I'm not familiar with that.

9        Q    Okay.  I'm going to hand you what I'm

10   marking as -- it's labeled as Exhibit 1.1555,

11   being marked as Snider Exhibit 1.

12            (Snider Exhibit No. 1 was marked

13            for identification.)

14            MR. BOGLE:  There's yours, and there's

15   an extra there too.

16   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



13    BY MR. BOGLE:

14         Q    Okay.  So would you agree that if New

15    Castle complies with the Controlled Substances

16    Act, that goes a long way in preventing diversion

17    of opioids, right?

18              MR. COLLINS:  Objection to the form,

19    vague, calls for a legal conclusion.

20              THE WITNESS:  I think it helps.

21    BY MR. BOGLE:

22         Q    Do you agree there is currently an

23    opioid epidemic in this country?

24         A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q     And do you agree that the diversion of

2     controlled substances is a cause of that epidemic?

3                MR. COLLINS:  Objection.  Calls for a

4     legal conclusion.  Foundation.

5                THE WITNESS:  You keep using the word

6     "diversion."  In the control of McKesson New

7     Castle, I believe if there were diversion, that

8     would not help the opioid crisis.

9     BY MR. BOGLE:

10         Q     All right.  And the opioid crisis that

11    we are dealing with today, do you understand was

12    caused, in part, by diversion of controlled

13    substances?

14               MR. COLLINS:  Objection.  Form, calls

15    for a legal conclusion, lack of foundation.

16               THE WITNESS:  I don't know that.

17    BY MR. BOGLE:

18         Q     You don't know.

19               Are you aware that opioid overdoses are

20    the leading cause of injury-related death in the

21    United States?

22               MR. COLLINS:  Objection.  Form.

23               THE WITNESS:  No, I'm not.

24    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

1      Q    Okay.  I'm going to hand you what I'm

2  marking as Exhibit 1.264, also marked as Snider

3  Exhibit 2.

4           (Snider Exhibit No. 2 was marked

5           for identification.)

6           MR. COLLINS:  Thank you.

7  BY MR. BOGLE:

8      Q    Do you see here, to introduce the

9  document, at the top it says "E&C, U.S. House of

10  Representatives, Committee on Energy and

11  Commerce."

12          Do you see that?

13     A    Yes.

14     Q    And it's dated May 4, 2018?

15     A    Yes.

16     Q    And do you -- below that it says:

17  "Regarding hearing entitled 'Combatting the Opioid

18  Epidemic,' examining concerns about distribution

19  and diversion."

20          Do you see that?

21     A    Yes.

22     Q    Okay.  And if you go to the second page

23  of this document, the paragraph below the chart

24  that starts with "The U.S. continues."  Do you see

```
 1    that?

 2        A    Yes.

 3        Q    It says:  "The U.S. continues to

 4    experience an opioid epidemic which has worsened

 5    over the last two decades.  Opioid-involved

 6    overdose deaths are the leading cause of injury

 7    death in the U.S. and take the lives of 115

 8    Americans per day."

 9             Do you see that?

10        A    Yes.

11        Q    Have you ever seen or heard of that stat

12    before?

13             MR. COLLINS:  Objection.  Foundation.

14             THE WITNESS:  No.

15    BY MR. BOGLE:

16        Q    Any reason to dispute that?

17             MR. COLLINS:  Objection.  Foundation,

18    form, asked and answered.

19             THE WITNESS:  I couldn't say.

20    BY MR. BOGLE:

21        Q    Okay.  It goes on to say:  "According to

22    a recent report issued by the Centers for Disease

23    Control and Prevention, prescription or elicit

24    opioids were involved in nearly two-thirds of all
```

Highly Confidential - Subject to Further Confidentiality Review

1    drug overdose deaths in the U.S. during 2016, a

2    27.7 percent increase from 2015."

3            Do you see that?

4        A    Yes.

5        Q    And it says:  "In total, more than

6    351,000 people have died since 1999 due to an

7    opioid-involved overdose.  The crisis has become

8    so severe that the average life expectancy

9    declined in 2016 from the previous year largely

10   because of opioid overdoses."

11           Do you see that?

12       A    Yes.

13       Q    Okay.  Have you ever heard that before,

14   that the life expectancy in this country has

15   declined largely because of opioid overdoses?

16           MR. COLLINS:  Objection.  Form,

17   foundation.

18           THE WITNESS:  No.

19   BY MR. BOGLE:

20       Q    That's news to you?

21           MR. COLLINS:  Objection.  Argumentative.

22           THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17    BY MR. BOGLE:

18         Q    I'm going to hand you what I'm marking

19    as Exhibit 1.1464, also marked as Exhibit 3.

20              (Snider Exhibit No. 3 was marked

21              for identification.)

22    BY MR. BOGLE:

23         Q    This is a letter from the U.S.

24    Department of Justice, Drug Enforcement

```
 1    Administration, September 27, 2006.

 2            Do you see that?

 3      A     Yes.

 4       Q    Okay.  Have you ever seen this letter

 5    before?

 6      A     No, I haven't.

 7       Q    You have not.  Okay.

 8            Communications from the DEA regarding

 9    your responsibilities at New Castle, do those

10    generally not make their way to you?

11            MR. COLLINS:  Objection.  Assumes facts

12    not in evidence, argumentative, foundation, form.

13            THE WITNESS:  Yes, they made their way

14    to us, and we would adopt -- adapt the manual and

15    follow the SOPs and new procedures.

16    BY MR. BOGLE:

17       Q    Okay.  But you've never seen this

18    letter?

19      A     No, I'm sorry, I don't remember seeing

20    it.

21       Q    Well, let me ask you about a couple of

22    things in here.

23            To start, it says:  "This letter is

24    being sent to every commercial entity in the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   United States registered with the Drug Enforcement

 2   Administration to distribute controlled

 3   substances.  The purpose of this letter is to

 4   reiterate the responsibilities of controlled

 5   substance distributors in view of the prescription

 6   drug abuse problem our nation currently faces."

 7           Do you see that?

 8       A    Yes.

 9       Q    Okay.  And then the third paragraph on

10   the first page which starts with "Distributors

11   are," do you see that sentence?  It's the second

12   sentence in that paragraph.

13           MR. COLLINS:  Third paragraph, the

14   second sentence.

15           THE WITNESS:  Oh, okay.

16   BY MR. BOGLE:

17       Q    It says:  "Distributors are of course

18   one of the key components of the distribution

19   chain.  If the closed system is to function

20   properly as Congress envisioned, distributors must

21   be vigilant in deciding whether a prospective

22   customer can be trusted to deliver controlled

23   substances only for lawful purposes."

24           Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    Yes.

 2        Q    Do you agree with that statement?

 3             MR. COLLINS:  Objection.  Form.

 4   Foundation.

 5             THE WITNESS:  Yes.

 6   BY MR. BOGLE:

 7        Q    It says:  "This responsibility is

 8   critical as Congress has expressly declared that

 9   the illegal distribution of controlled substances

10   has a substantial and detrimental effect on the

11   health and general welfare of the American

12   people."

13             Do you see that?

14        A    Yes.

15        Q    If you go to the second page here, I'm

16   about three-quarters of the way down the page, the

17   paragraph starting with "Thus."  Do you see that?

18        A    Yes.

19        Q    It says:  "Thus, in addition to

20   reporting all suspicious orders, a distributor has

21   a statutory responsibility to exercise due

22   diligence to avoid filling suspicious orders that

23   might be diverted into other than legitimate

24   medical, scientific and industrial channels."
```

1              Do you see that?

2      A      Yes.

3      Q      Okay.  But in 2006, I think we just

4   talked about the fact that when a suspicious order

5   was detected at your facility at least, it was

6   filled, right?

7              MR. COLLINS:  Objection.  Form,

8   foundation.

9              THE WITNESS:  Not always.

10  BY MR. BOGLE:

11     Q      Okay.

12     A      I testified that not always.  We would

13  cut orders down on occasion.

14     Q      When you thought they had fat fingers.

15  I think that was the term you used.

16     A      Or they -- yeah, or they made a mistake.

17     Q      Right.  But if you thought that they

18  were ordering what they were -- intended to order,

19  that order was filled, even though you're saying

20  that a suspicious order report would have been

21  provided to the DEA, right?

22             MR. COLLINS:  Objection.  Form.

23             THE WITNESS:  If the definition is off

24  of that report, three times or the eight times,

Highly Confidential - Subject to Further Confidentiality Review

1    yes.

2    BY MR. BOGLE:

3        Q    Then it would have been filled, right?

4        A    Yes.

5        Q    Okay.  And this letter from the DEA

6    indicates that you shouldn't be filling those kind

7    of prescriptions, right?

8            MR. COLLINS:  Objection.

9    BY MR. BOGLE:

10       Q    If you've identified them as suspicious.

11           MR. COLLINS:  Objection.  Foundation,

12   compound, argumentative, calls for a legal

13   conclusion.

14           THE WITNESS:  I don't see it that way.

15   BY MR. BOGLE:

16       Q    You don't think that's what that says?

17       A    No.

18       Q    Okay.  And the responsibility to avoid

19   shipment of orders deemed suspicious by a

20   distributor, that policy has always been in effect

21   since the Controlled Substances Act was enacted in

22   1970, right?

23           MR. COLLINS:  Objection.  Form, assumes

24   multiple facts, legal conclusion.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  I can't say that.  1970,

 2    I -- I don't know that.

 3    BY MR. BOGLE:

 4         Q    Well, do you think this -- this sentence

 5    I read to you here about avoiding filling

 6    suspicious orders was something new that was added

 7    to the regulations in '06?

 8                MR. COLLINS:  Objection.  Calls for a

 9    hypothetical, speculation.

10                THE WITNESS:  I don't know.

11                MR. COLLINS:  Calls for a legal

12    conclusion.

13    BY MR. BOGLE:

14         Q    You don't know?

15         A    No.

16         Q    And the next paragraph down, the last

17    sentence says:  "Again, to maintain effective

18    controls against diversion, as Section 823(e)

19    requires, the distributor should exercise due care

20    in confirming the legitimacy of all orders prior

21    to filling."  Right?

22         A    Yes.

23         Q    Okay.  And you know that's not a new

24    policy either, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. COLLINS:  Objection.

 2   BY MR. BOGLE:

 3        Q    In '06.

 4                MR. COLLINS:  Objection.  Vague, calls

 5   for a legal conclusion.

 6                THE WITNESS:  I don't know that.

 7   BY MR. BOGLE:

 8        Q    Okay.  Do you have any disagreement that

 9   that's what the law required in '06?

10                MR. COLLINS:  Objection.  Calls for

11   speculation, legal conclusion, asked and answered.

12                THE WITNESS:  I have no disagreement

13   with that it's -- that it's written there.

14   BY MR. BOGLE:

15        Q    Okay.  And would you agree with the

16   notion that reporting a suspicious order to the

17   DEA and not filling it gives the DEA the

18   opportunity to investigate that order without

19   having the potential of getting into the public

20   for potential diversion?

21                MR. COLLINS:  Objection, if that's a

22   question.  Calls for a legal conclusion, it's

23   compound, it's vague.

24   BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q    You can answer.

2           MR. COLLINS:  And it calls for

3      speculation.

4           THE WITNESS:  I can't answer to that.  I

5      don't know.

6      BY MR. BOGLE:

7      Q    Okay.  Do you think the DEA has the same

8      ability to investigate and prevent diversion after

9      you've filled the order versus if you hadn't

10     filled it at all?

11          MR. COLLINS:  Objection.  Foundation,

12     argumentative, compound.

13          THE WITNESS:  I know in New Castle, we

14     had a relationship with the DEA, and I talked to

15     them, they called me.  At one point the DEA agent

16     in charge was my neighbor, so I knew them, and I

17     knew if there was a problem, they would let me

18     know.

19          MR. BOGLE:  Move to strike as

20     nonresponsive.

21     BY MR. BOGLE:

22     Q    My -- my question simply was, if you

23     fill an order that you deem suspicious, then it

24     naturally is going to be harder to the DEA to

Highly Confidential - Subject to Further Confidentiality Review

```
1    prevent diversion from that suspicious order as

2    opposed to if you had reported it and not filled

3    it at all, right?

4              MR. COLLINS:  Objection.  Closing

5    argument.  Assumes facts not in evidence, calls

6    for speculation, form, compound, vague.

7              THE WITNESS:  I don't know that.

8    BY MR. BOGLE:

9         Q    You don't know.

10        A    No.
```

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

2    BY MR. BOGLE:

3         Q    Okay.

4              MR. COLLINS:  Are you moving on to

5    something else?

6              MR. BOGLE:  Yeah.

7              MR. COLLINS:  Can we take a short break?

8    We've been going 70 minutes.

9              MR. BOGLE:  That's fine.

10             THE VIDEOGRAPHER:  The time is 9:42 a.m.

11    We're going off the record.

12             (Recess.)

13             THE VIDEOGRAPHER:  The time is 9:55 a.m.

14    We're back on the record.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

5          THE WITNESS:  According to Diane.

6   BY MR. BOGLE:

7        Q    It -- and that's actually according to

8   Alexandra, right?

9        A    Or Alex -- Alexandra, yes.

10       Q    Okay.  What did she do at McKesson at

11  that point in time?  What was her job?

12       A    Sales.

13       Q    Okay.  When Alexandra said something,

14  was it generally accurate?

15          MR. COLLINS:  Objection.  Calls for

16  speculation.

17  BY MR. BOGLE:

18       Q    Did you find her to be inaccurate

19  frequently in her e-mails?

20          MR. COLLINS:  Objection.  Speculation.

21          THE WITNESS:  I can't -- I can't respond

22  to her accuracy on e-mails.

23  BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15        Q    Okay.  When you got this e-mail in

16   December 2007, did you write back and say, What is

17   this chart?  I don't know what this means?

18             MR. COLLINS:  Objection.  Calls for

19   speculation, foundation.

20             THE WITNESS:  I don't know from 2007.

21   BY MR. BOGLE:

22        Q    Okay.  Well, I can tell you I looked,

23   and I didn't see any e-mail from you that said, I

24   don't understand what this chart means, guys.  Can

Highly Confidential - Subject to Further Confidentiality Review

```
 1   somebody explain this to me?  I didn't see an

 2   e-mail like that.  I'm sure if your counsel has

 3   got one, they'll show it to you in his exam.

 4              MR. COLLINS:  You don't have to answer.

 5   That's not a question.

 6   BY MR. BOGLE:

 7        Q    Do you have any reason to testify under

 8   oath today that you sent a response saying you

 9   don't understand what this chart means?

10              MR. COLLINS:  Objection.  Argumentative.

11              THE WITNESS:  I don't know what it means

12   specifically.  I see what it says.

13   BY MR. BOGLE:

14        Q    Okay.

15        A    I can't remember from 2007.
```



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BOGLE:

 2       Q    Let me ask you this:  If you had

 3   concerns about controlled substances going, and

 4   specifically opioids, going to a New Castle

 5   customer from 2000 to 2018, it was, first of all,

 6   your responsibility to raise that concern, right?

 7            MR. COLLINS:  Objection.  Compound.

 8   Assumes facts not in evidence.

 9            THE WITNESS:  Yes.

10   BY MR. BOGLE:

11       Q    Okay.  You knew that was your job,

12   right?

13       A    Yes.

14       Q    Okay.  And ultimately, if you raised

15   that concern, you were in a position of management

16   at the DC when you did so, right?

17       A    Yes.

18       Q    Okay.  You're somebody that people

19   listen to, right?

20       A    I can't answer that.  I don't know.

21       Q    You don't know if people listen to you?

22       A    I'm sure they do.  Some do, some don't.

23       Q    Okay.  As to Franklin's Pharmacy, for
```

Highly Confidential - Subject to Further Confidentiality Review



23          Q    Okay.  Let's go back to Exhibit 1.1830,

24    I think it's Exhibit 4 to the deposition.  We were

Highly Confidential - Subject to Further Confidentiality Review

```
 1   talking about this --

 2            MR. COLLINS:  I'm sorry, hold on a

 3   second.

 4            MR. BOGLE:  Yeah, it's the PowerPoint

 5   deck you have right next to you, the Lifestyle

 6   Drug.

 7   BY MR. BOGLE:

 8       Q    We were talking about this a few moments

 9   ago.  I want to go to page .7 in this slide deck.

10            It's noted here, the slide is titled
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 8        Q     Sure.  I'm just talking about 1.1 right

 9   now.

10        A     (Peruses document.)

11              Okay.  What was your question?

12        Q     Yeah.  I'm just kind of orienting you at

13   this point.  You said you wanted to look at it, so

14   I didn't really have one.  I was trying to orient

15   you to where we were at.

16        A     Okay.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19    BY MR. BOGLE:

20         Q    I'm going to hand you what I'm marking

21    as Exhibit 1.1679, also Exhibit 7.

22              (Snider Exhibit No. 7 was marked

23              for identification.)

24    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q    Are you familiar with Dave Gustin?

 2         A    Yes.

 3         Q    Okay.  He was in the regulatory

 4    department at McKesson, right?

 5         A    Yes.

 6         Q    Okay.  I want to take a look at page .2

 7    here, the second page.

 8              MR. COLLINS:  I'm sorry.  If you need to

 9    take more time to review it to familiarize

10    yourself with the document, please do.

11    BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24        Q    Okay.  I'm also going to hand you what

Highly Confidential - Subject to Further Confidentiality Review

1    I'm marking as 1.795, Exhibit 8 to your

2    deposition.

3              (Snider Exhibit No. 8 was marked

4              for identification.)

5    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



17   BY MR. BOGLE:

18         Q    Is that your understanding?

19              MR. COLLINS:  Objection.

20   Mischaracterization.

21              THE WITNESS:  Okay.

22              MR. COLLINS:  Foundation.

23   BY MR. BOGLE:

24         Q    Do you understand that to be the case?

Highly Confidential - Subject to Further Confidentiality Review

1            MR. COLLINS:  Objection.  The question

2    is vague.

3    BY MR. BOGLE:

4        Q    Is that threshold increases should be

5    customer generated?

6        A    Yes.



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



2    BY MR. BOGLE:

20   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q    Okay.  I'm going to hand you what I'm

2    marking as Exhibit 1.1568, as Exhibit 9.

3               (Snider Exhibit No. 9 was marked

4               for identification.)

5    BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13    BY MR. BOGLE:

14        Q    Have they ever shown this document to

15    you?

16        A    I don't remember seeing this.

17        Q    McKesson?  Anybody?  So nobody has ever

18    talked to you about what the regional norms are

19    for your -- the region that your distribution

20    center covers --

21            MR. COLLINS:  Objection --

22    BY MR. BOGLE:

23        Q    -- for these controlled substances?

24            MR. COLLINS:  Objection.  The question

```
 1    is compound and argumentative.

 2              THE WITNESS:  No, I've never seen the

 3    Northeast for all these DCs:  Boston, New Castle,

 4    Rockhill, Buffalo.

 5    BY MR. BOGLE:

 6         Q    Okay.  You see this is an internal

 7    McKesson document, right?

 8              MR. COLLINS:  Objection.  Lack of

 9    foundation.

10    BY MR. BOGLE:

11         Q    It says "McKesson" on it.

12         A    I don't -- I don't have any knowledge.

13         Q    It's got a Bates stamp produced from

14    defense counsel for McKesson, coming from

15    McKesson's files.  Do you see that?

16              MR. COLLINS:  Objection.  If you're

17    testifying to that, that's fine.  He doesn't have

18    any knowledge of that.

19    BY MR. BOGLE:

20         Q    Do you see that?

21         A    I'm sorry.  Can you --

22         Q    First of all, McKesson, you see that?

23              MR. BOGLE:  Can we highlight that?

24              THE WITNESS:  I think I'll testify that
```

1    I've never seen this document before.

2    BY MR. BOGLE:

3        Q    Yeah, I'm just asking.

14            MR. COLLINS:  Objection to the word

15   "regionally."

16   BY MR. BOGLE:

17       Q    When you're out there conducting reviews

18   of customers, your due diligence component of --

19   of your job, you would agree with me that

20   assessing whether the customer has significant

21   business coming from pain clinics is relevant in

22   assessing whether to increase an opioid threshold,

23   right?

24            MR. COLLINS:  Objection.  Form,

Highly Confidential - Subject to Further Confidentiality Review

```
1    foundation.

2            THE WITNESS:  I would assess all aspects

3    of the customer.

4    BY MR. BOGLE:

5        Q    Right.  And specifically, whether they

6    do substantial business with pain clinics is

7    relevant to consider whether to increase an opioid

8    threshold, right?

9        A    I'm not sure.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14        MR. COLLINS:  Objection.

15   BY MR. BOGLE:

16        Q    Do you see that's the date?

17        MR. COLLINS:  Objection.  Lack of

18   foundation.  This witness hasn't testified he has

19   any knowledge of this letter, nor to establish

20   that.

21        THE WITNESS:  I have no knowledge of

22   this.  I can't testify -- only to what it says

23   here on the document.

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

1        Q     That's where we're starting.  I'm going

2    from there.

3        A     Okay.

4        Q     So that's what it says, right?

5        A     I'm sorry, you asked me if it was

6    supplied to the DEA or to -- from the DEA.  I

7    don't know that.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

5    Q    I'm asking you a question.  Okay.  Just

6   listen to my question.

7    A    Okay.

8    Q    When McKesson DC management or

9   regulatory staff -- so DC management, that's you,

10   right?

11         MR. COLLINS:  Objection.  You haven't

12   established this witness has any firsthand

13   knowledge of this document.

14         MR. BOGLE:  That's the whole purpose is

15   that if he doesn't, that's a big problem.

16         MR. COLLINS:  The witness has already

17   testified, and you're testifying as to what the

18   contents are.  Typically it goes question and

19   answer where you elicit information from a

20   witness.

21         MR. BOGLE:  You're -- you're -- you're

22   not even objecting.  You're just talking.

23         MR. COLLINS:  No, no, because you're

24   ignoring the objection.  The witness has no

Highly Confidential - Subject to Further Confidentiality Review

1    firsthand knowledge about the document.

2    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



6    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

13            MR. BOGLE:  Yeah.  Let me look real

14    quick.  I think -- yeah.  We can take a break now

15    is good.

16            MR. COLLINS:  Yep.

17            THE VIDEOGRAPHER:  The time is

18    11:14 a.m.  We're going off the record.

19            (Recess.)

20            THE VIDEOGRAPHER:  The time is 11:29

21    a.m., and we're back on the record.

22    BY MR. BOGLE:

23        Q    All right.  Mr. Snider, the -- your New

24    Castle Distribution Center is in -- located in

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Pennsylvania, right?

 2        A     Yes.

 3        Q     Okay.  But you guys service customers

 4   outside of the state of Pennsylvania, correct?

 5        A     Yeah -- oh, yes.

 6        Q     For example, you service customers in

 7   Ohio, right?

 8        A     Yes.

 9        Q     You service customers in West Virginia,

10   right?

11        A     Yes.

12        Q     Okay.  And we talked a little bit about

13   the opioid epidemic earlier in your deposition,

14   but you understand that West Virginia is one of

15   the states that's been hit hardest by the opioid

16   epidemic, right?

17        A     Yes.

18        Q     And In fact, there have been

19   congressional investigations into McKesson's

20   conduct specific to pharmacies supplied in West

21   Virginia.

22              Do you understand that?

23              MR. COLLINS:  Objection.  Form.

24              THE WITNESS:  I don't know that.  I'm
```

```
 1    sorry.

 2    BY MR. BOGLE:

 3         Q    Okay.  You've never been told that?

 4         A    No.

 5         Q    Okay.

 6              (Snider Exhibit No. 12 was marked

 7              for identification.)

 8    BY MR. BOGLE:

 9         Q    I'm going to hand you 1.44, Exhibit 12

10    to your deposition.

11              Okay.  This is noted at the top to be

12    from the House of Representatives, Congress of the

13    United States, February 15, 2008.  Do you see

14    that?

15         A    Yes.

16         Q    Okay.  And it's a letter sent to

17    Mr. John Hammergren.  That's the CEO of McKesson,

18    right?

19              MR. COLLINS:  Objection.  Lack of

20    foundation.

21              THE WITNESS:  Yes.

22    BY MR. BOGLE:

23         Q    Do you see where it's -- he's noted to

24    be the recipient, "Dear Mr. Hammergren"?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A      I would think he got it.

 2             MR. COLLINS:  Objection.

 3   BY MR. BOGLE:

 4      Q      Do you see that this was designed to be

 5   sent to him, right?

 6             MR. COLLINS:  Objection.  The witness

 7   has no firsthand knowledge.

 8             THE WITNESS:  I don't know anything

 9   about this document, so I can't answer to that.

10   BY MR. BOGLE:

11      Q      All right.  But you see it says, "Dear

12   Mr. Hammergren," right?  Do you see that on the

13   first page?

14      A      Yeah, I see that.

15      Q      You see that?

16      A      Yeah.

17      Q      Okay.  And so if you look at the first

18   page of this document, it says in the second

19   paragraph, "As part of our investigation."  Do you

20   see that?

21      A      Yes.

22      Q      It says:  "As part of our investigation,

23   the Committee wrote to you on May 8, 2017,

24   regarding your distribution practices generally,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and in particular with respect to West Virginia.

 2    As we mentioned in the letter, the opioid epidemic

 3    has been particularly devastating to West

 4    Virginia.  For example, in 2015, West Virginia had

 5    the highest opioid overdose death rate in the

 6    nation."

 7           And then it goes on, the last sentence

 8    in that paragraph says:  "Court filings also

 9    indicate that between 2007 and 2012, McKesson

10    distributed 46,179,600 doses of hydrocodone and

11    54,304,980 doses of oxycodone, meaning that

12    McKesson shipped a total of 100,484,580 doses to

13    West Virginia during this time period."

14           Have you ever seen that kind of data

15    talking about the number of hydrocodone and

16    oxycodone pills McKesson distributed to West

17    Virginia during this time frame?

18       A    No, I haven't.

19       Q    Okay.  You know that a fair amount of

20    those pills that are being referenced here came

21    from your distribution center, right?

22           MR. COLLINS:  Objection.  Lack of

23    foundation.  Lack of firsthand knowledge.

24           THE WITNESS:  I don't know that.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BOGLE:

2        Q    Okay.  Well, you know from 2007 to 2012

3    that -- that the New Castle Distribution Center

4    was sending hydrocodone and oxycodone to

5    pharmacies in West Virginia, right?

6        A    Yes.

7        Q    Okay.  So, therefore, you must present

8    some of this number coming from New Castle, right?

9            MR. COLLINS:  Objection.  The question

10   is vague.

11           THE WITNESS:  If I could answer that,

12   the DEA has done audits on us.  We've never been

13   found to do anything wrong.  New Castle has an

14   exemplary record.

15           MR. BOGLE:  Move to strike as

16   nonresponsive.

17   BY MR. BOGLE:

18       Q    My question simply was, of these 100

19   million plus doses referenced here, you know that

20   a portion of those came from your distribution

21   center --

22           MR. COLLINS:  Objection.

23   BY MR. BOGLE:

24       Q    -- during this time frame, correct?

```
 1                MR. COLLINS:  The question was asked and

 2    answered last -- a moment ago.

 3    BY MR. BOGLE:

 4        Q    Correct?

 5                MR. COLLINS:  Same -- same objection.

 6    Asked and answered.

 7                THE WITNESS:  A -- a portion probably

 8    did.

 9    BY MR. BOGLE:

10        Q    Well, you know they did, right?  From

11    2007 to 2012, you know that the New Castle

12    Distribution Center was servicing West Virginia

13    pharmacies, right?  So it has to be part of this

14    number, true?

15                MR. COLLINS:  Objection.

16    BY MR. BOGLE:

17        Q    You know that.

18                MR. COLLINS:  Objection.  The question

19    is compound three different ways.  It's

20    argumentative.  It's been asked and answered.

21    BY MR. BOGLE:

22        Q    You know that, don't you?

23                MR. COLLINS:  Objection.  Form.

24                THE WITNESS:  I've never seen this
```

1    document.  And we do have customers in West

2    Virginia.

3    BY MR. BOGLE:

4        Q    Okay.  But you know that -- okay.  I

5    think the document speaks for itself.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23    BY MR. BOGLE:

24        Q    You turned them over for this

Highly Confidential - Subject to Further Confidentiality Review

1    litigation, though, didn't you?

2         A     Yes.

3         Q     Okay.  All right.  I'm going to hand

4    you -- marking as Exhibit 13, also Exhibit 1.1824.

5              (Snider Exhibit No. 13 was marked

6              for identification.)

7    BY MR. BOGLE:

8         Q     Okay.  And you see this is a document;

9    the first page entitled "Mace's Pharmacy"; do you

10   see that?

11        A     Yes.

12        Q     Okay.  Thereafter, this is all provided

13   to us as one document.

14              Does this look like your file from

15   Mace's Pharmacy for 2008 to 2010?

16              MR. COLLINS:  Objection.

17              THE WITNESS:  I don't know all of it.

18   BY MR. BOGLE:

19        Q     You don't -- excuse me?

20        A     I don't know all of it.  I haven't seen

21   it yet.

22        Q     Okay.  Let's take a look at it.

23        A     I'd have to go through them.

24        Q     Okay.  Let's take a look at it.  First



Highly Confidential - Subject to Further Confidentiality Review



22          Q      Okay.  And who is -- who is Jim

23   Gavatorta?  What did he do?

24          A      He was the executive salesperson.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    Okay.  And Brian Ferreira, I think you

 2    said was vice president/general manager?

 3          A    Yes.

 4          Q    What sort of oversight did Brian

 5    Ferreira provide for you?

 6          A    He was in charge of the distribution

 7    center over all the operations, my boss, and Jim

 8    reported to him directly.

 9          Q    Reported to him, you said?

10          A    Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review



7          MR. COLLINS:  Objection.  Lack of

8   foundation.

9   BY MR. BOGLE:

10       Q    To investigate your concerns here.

11          MR. COLLINS:  Objection.  Lack of

12   foundation.

13          THE WITNESS:  I'm sorry, I'd have to

14   look through it.

15   BY MR. BOGLE:

16       Q    Okay.

17       A    You want me to do that?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



    22       Q     Do you know about how many people live

    23    in Philippi, West Virginia?

    24       A     I don't.

```
 1          Q    Is that something you guys would look at

 2    back in 2008 when evaluating a request like this?

 3          A    I can't --

 4               MR. COLLINS:  Object -- objection to the

 5    term we -- "you would look at."

 6    BY MR. BOGLE:

 7          Q    Would you?

 8          A    No, I don't know.

 9          Q    Okay.

10          A    I can't speculate on that.

11          Q    Okay.  So if, for example, the city of

12    Philippi, West Virginia, had fewer than 3,000

13    people in it around this time frame, would that

14    raise concerns to you about how much hydrocodone

15    you're giving this company -- this pharmacy?

16               MR. COLLINS:  Objection.  Assumes facts

17    not in evidence, lack of foundation.

18               MR. BOGLE:  Let's put it into evidence.

19    Exhibit 14, 1.1892.

20               (Snider Exhibit No. 14 was marked

21               for identification.)

22    BY MR. BOGLE:

23          Q    Here is the Census Bureau data for

24    Philippi, West Virginia, from 2010.  Do you see
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    there's a total population there noted to be 2,966

 2    people in 2010?

 3              MR. COLLINS:  Objection.  Lack of

 4    foundation.  You haven't established this witness

 5    has any knowledge of this.

 6              MR. BOGLE:  I think that's the problem.

 7    BY MR. BOGLE:

 8         Q    Do you not -- did you not know that?

 9         A    I did not --

10              MR. COLLINS:  Object --

11              THE WITNESS:  Sorry.

12              MR. COLLINS:  I'm sorry.  Please let me

13    object.

14              Argumentative.  Object to the theatrics.

15              THE WITNESS:  I did not know there were

16    2,966 people in the Philippi -- is that the whole

17    area or is that just the town?

18    BY MR. BOGLE:

19         Q    It's the city.

20         A    Okay.

21         Q    You didn't know that.

22         A    No.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20        Q     Yeah.

21              MR. BOGLE:  Let's go off the record.

22    You can go through it.

23              MR. COLLINS:  No, no, we're going to

24    stay on the record.

```
 1                  MR. BOGLE:  We don't need to stay on the
 2      record.  If he wants time to look at it, he can,
 3      but don't stay on the record.  There's no such
 4      requirement.
 5                  MR. COLLINS:  Well, listen, to go off
 6      the record, you need an agreement.  So if you want
 7      to have him start leafing through documents, we're
 8      staying on the record.
 9                  MR. BOGLE:  Okay.  That's fine.  We'll
10      do that.
11      BY MR. BOGLE:
12          Q    You can't point me to anything that
13      shows that you requested any prescription data,
14      can you?
15                  MR. COLLINS:  He just asked to go
16      through documents.  You want him to go through
17      documents --
18                  MR. BOGLE:  He's not going to blow
19      through hours of my time looking at something that
20      he should already be familiar with.
21                  MR. COLLINS:  Well, no, he -- this isn't
22      a 30(b)(6) deposition.
23                  MR. BOGLE:  Doesn't have to be.
24                  MR. COLLINS:  This is in his personal
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    capacity.  So, listen, if you want him to look

 2    through documents, he will do it for you, but it's

 3    on your time.

 4              Take as much time as you want.

 5              THE WITNESS:  (Peruses document.)

 6    BY MR. BOGLE:

 7         Q    We're in December 2009.

 8         A    (Peruses document.)

 9              On the questionnaire on page .13, Dale

10    reviewed the scripts.

11         Q    .13?

12         A    Yes.

13         Q    So that's from June 2007, right?

14         A    Yes.

15         Q    Okay.  We're talking about December

16    2009.

17         A    Oh.

18         Q    And a specific increase that they're

19    saying -- in request in December 2009.

20         A    (Peruses document.)

21         Q    All right.  I've got too many documents

22    to go through.  I'll strike the question and keep

23    going.

24              Let's look at page .84.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20      Q     Okay.  But you do know the CSMP requires

21   that, right, documentation?

22      A     Not on my file, no.

23      Q     That's not my question, sir.

24            The CSMP requires documentation

Highly Confidential - Subject to Further Confidentiality Review

```
 1    supporting any change made to a threshold based on

 2    business growth, right?

 3              MR. COLLINS:  Objection.  Assumes facts

 4    not in evidence.

 5    BY MR. BOGLE:

 6         Q    We just looked at this a few minutes

 7    ago.

 8              MR. COLLINS:  Objection.  Show it to him

 9    again.

10    BY MR. BOGLE:

11         Q    You don't recall that?

12         A    I'm sorry.  I don't -- you'll have to

13    repeat the question.

14         Q    My question was, to support a threshold

15    change based on business growth, supporting

16    documentation is required under the CSMP, right?

17              MR. COLLINS:  Objection.  Assumes --

18    BY MR. BOGLE:

19         Q    As of 10/2010?

20              MR. COLLINS:  Objection.  Assumes facts

21    not in evidence.

22              THE WITNESS:  I don't know that that

23    wasn't provided.

24    BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    Not my question, sir.  That was

 2    required, wasn't it?

 3               MR. COLLINS:  Objection.  Form.

 4    BY MR. BOGLE:

 5          Q    Yes or no?

 6               MR. COLLINS:  Objection.

 7    BY MR. BOGLE:

 8          Q    Or you don't know?

 9               MR. COLLINS:  Objection to form.

10               THE WITNESS:  I don't know.
```

22          Q    Okay.  So in the McKesson files that

23    have been produced to us pertaining to this

24    increase, we should find some supporting

Highly Confidential - Subject to Further Confidentiality Review

```
 1   documentation if the CSMP was followed, right?

 2   I'm not saying in your files or whose files.  It

 3   should be in somebody's files.

 4        A    I don't know that.

 5        Q    You don't know.

 6        A    I can't testify to what's in their

 7   files.

 8        Q    I didn't ask -- I didn't say "is it."  I

 9   said "should it be."

10        A    I can't --

11             MR. COLLINS:  Objection.  Calls for a

12   legal conclusion.

13             THE WITNESS:  I can't testify.  It was

14   electronic.

15   BY MR. BOGLE:

16        Q    Okay.  Was there a policy at McKesson in

17   2010 to destroy evidence of due diligence review?

18             MR. COLLINS:  Objection.  Argumentative.

19   Object to the theatrics.

20   BY MR. BOGLE:

21        Q    There's a question.

22        A    Can you repeat the question?

23        Q    Was there a policy written or unwritten

24   at McKesson in October 2010 to destroy evidence of
```

1    due diligence review?

2            MR. COLLINS:  Object to the theatrics

3    and the argument.

4            THE WITNESS:  No.

5    BY MR. BOGLE:

6        Q    Okay.  Target, that's another -- that's

7    another large customer for McKesson over time,

8    right?

9            MR. COLLINS:  Objection.  Form, vague.

10           THE WITNESS:  They aren't our customer

11   anymore.

12   BY MR. BOGLE:

13       Q    Okay.  Back in 2008, they were, right?

14       A    I would -- I would think, yes.

15       Q    Okay.  Let's take a look at Exhibit 15,

16   which is 1.1782.

17           (Snider Exhibit No. 15 was marked

18           for identification.)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17          MR. COLLINS:  Objection.  We've been

18     over this --

19     BY MR. BOGLE:

20          Q    Right?

21          MR. COLLINS:  -- a dozen times.

22     Objection.  Mischaracterization.

23     BY MR. BOGLE:

24          Q    Right?



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22          (Snider Exhibit No. 16 was marked

23          for identification.)

24      BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q    Okay.  I'm going to hand you what is

2   marked as 1.1812, Exhibit 16.
```



Highly Confidential - Subject to Further Confidentiality Review



16        Q      Okay.  Do you know about how many people

17   lift in Weston, West Virginia?

18        A      A lot more than Philippi.

19        Q      Think so?

20        A      Yes.

21        Q      Okay.  Would it surprise you that it's

22   fewer than 5,000 people?

23        A      In that area?

24        Q      In Weston, West Virginia.

```
 1       A    Yes.

 2       Q    That would surprise you?

 3       A    Yes.

 4            (Snider Exhibit No. 17 was marked

 5            for identification.)

 6   BY MR. BOGLE:

 7       Q    I hand you Exhibit 1.1909 marked as

 8   Exhibit 17.

 9            It says:  "Population data for Weston,

10   West Virginia," indicated to have a population of

11   4,085 people.  Do you see that?

12            MR. COLLINS:  Objection.  Lack of

13   foundation, lack of authentication, lack of

14   knowledge.

15            THE WITNESS:  What year is this, please?

16   BY MR. BOGLE:

17       Q    This is the current data.

18            MR. COLLINS:  Yeah, I mean -- it's the

19   internet, it's accurate.

20            THE WITNESS:  What's that?

21            MR. BOGLE:  Well, I'm sure you guys are

22   going to produce census data that shows otherwise,

23   so we'll just wait to see that.

24            MR. COLLINS:  I'll withdraw my
```

Highly Confidential - Subject to Further Confidentiality Review

1    objection.

2              MR. BOGLE:  I would hope so.

3              MR. COLLINS:  It's a lack of foundation,

4    lack of knowledge.

5    BY MR. BOGLE:

6         Q    4,085 people, right?  That's what it

7    says.

8         A    That's what it says right here.

9         Q    Right.  That's wrong; is that your

10   testimony?

11             MR. COLLINS:  Objection.  Lack of

12   foundation.  You haven't established the witness

13   has any knowledge about this issue.

14             MR. BOGLE:  Well, he said he thought it

15   was wrong.

16             THE WITNESS:  I said I was surprised,

17   and I am.  I'm sorry.

18   BY MR. BOGLE:

19        Q    You're surprised?

20        A    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
20          MR. COLLINS:  I don't see it either.

21   BY MR. BOGLE:

22          Q    On .43.  Let me check my page here.

23               All right.  So, I'm sorry.  Actually,

24   it's .44.  My fault.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A    Okay.

2        Q    All right.  So this is -- let's go back

3    and make sure we're talking about the same thing.
```



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13          MR. COLLINS:  Are you -- I'm sorry.

14     We've been going 70 minutes.  Is this a good time

15     to break?

16          MR. BOGLE:  That's fine.  I'm moving to

17     a different pharmacy.  That's fine.

18          THE VIDEOGRAPHER:  The time is 12:47

19     p.m.  We're going off the record.

20          (Lunch recess.)

21          THE VIDEOGRAPHER:  The time is

22     1:35 p.m., and we're back on the record.

23     BY MR. BOGLE:

24          Q    All right, Mr. Snider, we're back from

Highly Confidential - Subject to Further Confidentiality Review

1   lunch.  I wanted to pick up from where we were

2   talking about before we broke.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

4          Q     All right.  Now, Lumberport, you

5     understand that's another very small city, right?

6                MR. COLLINS:  Objection.

7     BY MR. BOGLE:

8          Q     In West Virginia.

9                MR. COLLINS:  Objection to form.

10               THE WITNESS:  I don't remember.

11     BY MR. BOGLE:

12         Q     Okay.  Have you ever been to Lumberport?

13         A     No, I don't remember being there.

14         Q     Okay.

15               (Snider Exhibit No. 19 was marked

16               for identification.)

17     BY MR. BOGLE:

18         Q     I hand you Exhibit 19.

19               Actually, let me ask you this:  If the

20     census data indicated there were fewer than a

21     thousand people living in Lumberport, would you

22     have reason to dispute that?

23               MR. COLLINS:  Again, foundation.

24               THE WITNESS:  I wouldn't know.  I'd have

Highly Confidential - Subject to Further Confidentiality Review

1   no reason to dispute it.

2   BY MR. BOGLE:

3       Q    Okay.  Let's just take a look real quick

4   then.  Exhibit 19, also marked as 1.1908, is what

5   I'm handing you.

6            All right.  It's another printout with

7   population and other data.  You see it's for

8   Lumberport, West Virginia?

9       A    Yes, I see.

10      Q    And this is the most current data that I

11  was able to obtain.  The population noted here for

12  Lumberport is 881 people.  Do you see that?

13      A    Yes.

14      Q    Okay.  Do you have any specific

15  knowledge that would contradict that being the

16  most current population data for Lumberport?

17            MR. COLLINS:  Objection.  Foundation.

18            THE WITNESS:  I don't have any knowledge

19  of the surrounding area of Lumberport.

20  BY MR. BOGLE:

21      Q    Okay.  All right.  So let's go back to

22  Exhibit 1.1821, and I want to specifically look at

23  .19 is the page.

24      A    Can you give me that exhibit again?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    It's 1.1821, the page is .19.  The page

 2   should look like this (indicating).

 3             MR. COLLINS:  He's referring to the

 4   numbers at the top.

 5             THE WITNESS:  Oh, 1821.19, okay.

 6   BY MR. BOGLE:

 7        Q    Yeah.

 8        A    Thank you.

 9        Q    Are you at that page?

10        A    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

12          A     Yes, I do.

13          Q     Okay.  And Belington, West Virginia, do

14    you know anything about the population for that

15    city?

16          A     No, I don't.  I don't.  I don't think I

17    remember being there.

18          Q     Okay.  Any reason to dispute they have

19    about 2,000 people in Belington, West Virginia?

20                MR. COLLINS:  Objection.  Foundation.

21                THE WITNESS:  I wouldn't dispute that.

22    I don't know.

23                (Snider Exhibit No. 20 was marked

24                for identification.)

Highly Confidential - Subject to Further Confidentiality Review



1    BY MR. BOGLE:

2        Q    Okay.  And I want to look at some of the

3    documentation on the Belington location.  I hand

4    you Exhibit 20, also marked as Exhibit 1.1822.

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21        Q     Okay.  This is the document as produced.

22   I'm giving you what was produced to us.

23              Do you see it in this?

24        A     I didn't produce it.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    Huh?

 2          A    I didn't produce it.  I don't know.

 3          Q    I'm just asking you if you see the

 4     police report in this packet related to this

 5     pharmacy.

 6               MR. COLLINS:  Objection.  Argumentative.

 7               THE WITNESS:  I don't see it in here.

 8     BY MR. BOGLE:

 9          Q    Okay.  Are you aware that ultimately one

10     of the owners of Best Care was prosecuted for

11     illegally diverting opioids?

12          A    I am aware that an owner of Best Care

13     was prosecuted, and we cut them off.

14          Q    Well, you're aware that there was a --

15     there was an arrest and a prosecution for one of

16     the owners of Best Care for diversion of opioid

17     products, right?

18               MR. COLLINS:  Objection.  Foundation.

19               THE WITNESS:  I was aware that he was

20     arrested.  That's all.

21               (Snider Exhibit No. 21 was marked

22               for identification.)

23     BY MR. BOGLE:

24          Q    Okay.  Let me hand you 1.1251,
```

```
 1    Exhibit 21.

 2            This is a news release from the U.S.

 3    Department of Justice, June 3rd, 2014, titled

 4    "Pharmacist charged with illegal distribution of

 5    painkillers."

 6            Do you see that?

 7       A    Yes.

 8       Q    Have you ever seen this press release

 9    related to Best Care?

10       A    No, I haven't.

11       Q    Okay.  How did you become aware of the

12    arrest then?

13       A    I don't remember.  Probably the DRA.

14       Q    Okay.  And if you look in the press

15    release, it says:  "A West Virginia pharmacist has

16    been indicted on charges that he dispensed

17    prescription painkillers outside the scope of his

18    professional practice."

19            And then it says:  "United States

20    Attorney William Ihlenfeld, II, announced that

21    Mario Blount, 51, of Bridgeport, West Virginia,

22    was arrested this morning on charges of conspiracy

23    to possess and distribute Schedule II controlled

24    substances, distribution of oxycodone and a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    failure to report the filling of a prescription."

 2              Do you see that?

 3       A    Yes.

 4       Q    And it says:  "Blount, who was employed

 5    by Best Care Pharmacy, is alleged to have

 6    conspired with two other individuals over the last

 7    three years to distribute prescription painkillers

 8    for non-legitimate medical purposes."

 9              Do you see that reference?

10       A    Yes.

11       Q    Okay.  And skip a paragraph, the next

12    one says:  "The Greater Harrison County Drug Task

13    Force executed search warrants in October 2013 at

14    Best Care Pharmacy locations in the West Virginia

15    towns of Bridgeport, Lumberport and Belington."

16              Do you see that?

17       A    Yes.

18       Q    And that's the three facilities we've

19    just been looking at over the last hour or so,

20    right?

21       A    Yes.

22       Q    And then the last paragraph on this page

23    says:  "Mr. Blount abused the trust of the

24    citizens of Bridgeport and the customers of Best
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    Care Pharmacy.  These arrests serve as a warning

2    that the illicit distribution of controlled

3    substances will not be tolerated in Harrison

4    County, said Karl C. Colder, Special Agent in

5    Charge, Drug Enforcement Administration,

6    Washington, D.C. Field Division.  Over

7    approximately three years, Mr. Blount illegally

8    dispensed over 11,000 oxycodone and oxymorphone

9    pills."

10            Do you see that?

11      A    I see that, yes.

12       Q    And you know McKesson was the supplier

13   of those pills, right?

14            MR. COLLINS:  Objection.  Assumes facts

15   not in evidence, foundation.

16            THE WITNESS:  I don't know that.

17   BY MR. BOGLE:

18       Q    Well, your New Castle facility was

19   supplying Best Care with those very drugs during

20   that very time period, right?

21            MR. COLLINS:  Objection.  Argumentative,

22   assumes facts not in evidence.

23            THE WITNESS:  I don't know that.

24   BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    You don't know if you were supplying
 2    them?
 3          A    No.
 4               MR. COLLINS:  Objection.
 5    BY MR. BOGLE:
 6          Q    You don't know if Best Care Pharmacy was
 7    a customer of yours for 2010 to 2014?
 8               MR. COLLINS:  Objection.  Argumentative.
 9    BY MR. BOGLE:
10          Q    I'm just asking if you know or not.
11               MR. COLLINS:  Objection.  You just asked
12    the same -- you've asked the same question two or
13    three times.
14               THE WITNESS:  I don't know.
15    BY MR. BOGLE:
16          Q    You don't know?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. COLLINS:  Objection.  Assumes facts
 2    not in evidence.  The question is compound.
 3                THE WITNESS:  I don't -- I don't know
 4    that.  He could have other wholesalers.  I don't
 5    know that.
 6    BY MR. BOGLE:
 7        Q    You don't even know if he had other
 8    wholesalers?
 9        A    I don't remember that, no.
10        Q    Okay.
11        A    No.
12        Q    Isn't that something you would need --
13    that you would want to know?
14                MR. COLLINS:  Objection.  Calls for a
15    legal conclusion, argumentative.
16                THE WITNESS:  I would want the director
17    of Regulatory Affairs to know that.
18    BY MR. BOGLE:
19        Q    You would want him to know that.  It's
20    okay, as the guy who is responsible for making
21    sure that the New Castle isn't involved in
22    diversion, you don't care if you know that or not?
23                MR. COLLINS:  Objection.  Argumentative.
24    Object to the theatrics.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              THE WITNESS:  Can you restate the

2   question, if you want?

3   BY MR. BOGLE:

4        Q    Well, I don't think there's anything

5   wrong with that question.

6              MR. COLLINS:  Objection.  It's --

7              THE WITNESS:  Can you repeat it then?

8   BY MR. BOGLE:

9        Q    Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review



10          MR. COLLINS:  Objection.  The

11   question --

12   BY MR. BOGLE:

13          Q     Right?

14          MR. COLLINS:  Well, the question is now

15   compound three times.

16          THE WITNESS:  I -- I answered that, yes.

17   BY MR. BOGLE:

18          Q     Yes, you were.  Okay.

19          And you said this pharmacy was cut off.

20   They were cut off for about two weeks, right, Best

21   Care?

22          MR. COLLINS:  Objection.  Assumes facts

23   not in evidence, foundation.

24          THE WITNESS:  I don't remember.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BOGLE:

 2        Q    You don't remember?

 3        A    No.

 4        Q    Okay.

 5        A    That would be the director of Regulatory

 6   Affairs.

 7        Q    Well, the pills come out of your

 8   facility, right?

 9             MR. COLLINS:  Objection.

10             THE WITNESS:  I don't know that.  I

11   answered to that.

12   BY MR. BOGLE:

13        Q    Does -- does Regulatory Affairs run your

14   facility?

15             MR. COLLINS:  Objection.  Form.  The

16   question is vague.

17   BY MR. BOGLE:

18        Q    I mean, do you defer all responsibility

19   for the pills that go out of New Castle to

20   Regulatory Affairs?

21             MR. COLLINS:  Objection.  Argumentative.

22             THE WITNESS:  No.

23   BY MR. BOGLE:

24        Q    Okay.  Because that's -- it's your job,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   right?

 2              MR. COLLINS:  Objection.

 3              THE WITNESS:  What's my job, please?

 4   I'm not sure --

 5   BY MR. BOGLE:

 6        Q    To know what's leaving your facility and

 7   to whom it's going to and whether they can be

 8   trusted.

 9        A    I didn't --

10              MR. COLLINS:  Objection.  The question

11   is compound, it's vague, calls for a legal

12   conclusion, lacks foundation.

13   BY MR. BOGLE:

14        Q    I think it's a good question, so go

15   ahead.

16              MR. COLLINS:  My objections stand.

17              THE WITNESS:  I stand by my record and

18   what I do at the facility.

19   BY MR. BOGLE:

20        Q    That's -- that's not my question, sir.

21        A    That's the best I can answer.

22        Q    My question is, is it your testimony

23   that your responsibilities as director of

24   operations at New Castle does not include knowing
```

Highly Confidential - Subject to Further Confidentiality Review

1    who you're selling to and what purpose they're

2    using those pills for?

3             MR. COLLINS:  Objection.  Argumentative,

4    compound, vague, calls for a legal conclusion.

5             THE WITNESS:  Can you repeat the

6    question?

7    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 7        Q    Okay.  I'm going to hand you what I'm

 8   marking as Exhibit 1.1794, also marked as

 9   Exhibit 22.

10             (Snider Exhibit No. 22 was marked

11              for identification.)

12   BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19          (Snider Exhibit No. 30 was marked

20          for identification.)

21   BY MR. BOGLE:

22       Q    Okay.  I'm going to hand you what's

23   marked as Exhibit 30, 1.1905.

24          Do you see it's another DOJ press

1    release from November 2nd, 2018, just a few days

2    ago.  And the title is "Johnstown pharmacist

3    charged with -- charged in 109-count indictment

4    with illegally creating bogus prescriptions and

5    then dispensing the drugs."

6            Do you see that title?

7    A    Yes, I do.

8        Q    Okay.  Thereafter it says:  "A

9    Johnstown, PA, pharmacist has been indicted by a

10   federal grand jury in Pittsburgh on charges of

11   dispensing and distributing controlled substances

12   and conspiring to distribute and dispense

13   controlled substances, by United States Attorney

14   Scott W. Brady announced today."

15           Then it says:  "The 109-count indictment

16   returned on October 30th named Joseph M. Martella,

17   53, of Johnstown, Pennsylvania."

18           Then it says:  "According to the

19   indictment presented to the court, Martella owned

20   and operated Martella's Pharmacy located on

21   Franklin Street in Johnstown.  The indictment

22   alleges that Martella, a pharmacist, conspired

23   with Dr. Peter James Ridella, who previously

24   pleaded guilty, and with an individual known as JR

Highly Confidential - Subject to Further Confidentiality Review

1    to create and submit unlawful prescriptions for

2    oxycodone; oxycodone and acetaminophen, also known

3    as Percocet; oxymorphone, also known as Opana;

4    morphine sulfate, also known MS Contin; and

5    hydrocodone and acetaminophen, also known as

6    Vicodin, and then unlawfully dispensed those

7    controlled substances to other persons."

8            Do you see that?

9       A    I see that, yeah.

Highly Confidential - Subject to Further Confidentiality Review

8        Q     Okay.

9              (Snider Exhibit No. 31 was marked

10             for identification.)

11   BY MR. BOGLE:

12       Q     I'm handing you Exhibit 31 to your

13   deposition, 1.1904.

14             This is the actual indictment for

15   Martella's.  And if you look to the point I just

16   asked you about the covered period for this

17   conduct, on page 10, do you see the paragraph

18   starts there "From in and around"?

19             MR. COLLINS:  I'm sorry.  Can I have a

20   proffer as to the relevance of this?  It certainly

21   doesn't involve Summit County, it doesn't involve

22   Cuyahoga County, it doesn't involve the cities of

23   Cleveland or Canton.  Can I have a proffer as to

24   the relevance?

```
 1              MR. BOGLE:  No.

 2              MR. COLLINS:  Okay.

 3              MR. BOGLE:  You're entitled to nothing

 4   of the sort.

 5              MR. COLLINS:  Okay.  Well --

 6   BY MR. BOGLE:

 7      Q    "From in and around April 2011 and

 8   continuing thereafter to in and around June 2016

 9   in the Western District of Pennsylvania, the

10   Defendant Joseph M. Martella," and it goes on to

11   repeat sort of the allegations I talked about as

12   far as the diversion of controlled substances,

13   including opioids.

14              Do you see that?

15      A    Yes, I see it.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18          MR. COLLINS:  What's the question?

19    BY MR. BOGLE:

20          Q    Do you see that?

21          MR. COLLINS:  I'm sorry.  That's not a

22    proper question.  You need to ask a legitimate,

23    proper question.

24          MR. BOGLE:  No, I'm good with that one.

```
 1  BY MR. BOGLE:

 2       Q    Do you see that?

 3            MR. COLLINS:  See what?

 4  BY MR. BOGLE:

 5       Q    See that in the indictment?  The covered

 6  period was just a few months after the threshold

 7  that you said you upped.

 8            MR. COLLINS:  Objection.

 9  Mischaracterization.

10  BY MR. BOGLE:

11       Q    For hydrocodone and methadone for this

12  pharmacy.

13            MR. COLLINS:  Objection.  The question

14  is compound.  It's also argumentative.

15            THE WITNESS:  I see what it says now.

16            MR. BOGLE:  I'm moving to a whole other

17  topic area.  If we can take a break, and we'll

18  reload documents.

19            THE VIDEOGRAPHER:  The time is 2:47 p.m.

20  We're going off the record.

21            (Recess.)

22            THE VIDEOGRAPHER:  The time is 3:03 p.m.

23  We're back on the record.

24  BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q    All right.  Mr. Snider, I want to shift

2     gears to a different topic area.

3               We talked about earlier that Ohio was

4     one of the states that customers -- that your New

5     Castle Distribution Center services, right?

6          A    Yes.

7          Q    And you know that Ohio in recent years

8     has had a high level of abuse and diversion of

9     opioids within that state, right?

10              MR. COLLINS:  Objection.  Form.

11    Foundation.

12              THE WITNESS:  I know it's in the papers,

13    yes.

14    BY MR. BOGLE:

15         Q    Okay.  And you've read those stats,

16    right?

17         A    Yes.

18         Q    On that topic.

19              MR. COLLINS:  Objection.  Form.

20              THE WITNESS:  Yeah.

21    BY MR. BOGLE:

22         Q    Okay.  I want to hand you what I'm

23    marking as Exhibit 1.1434, so Exhibit 32.

24              (Snider Exhibit No. 32 was marked
```

Highly Confidential - Subject to Further Confidentiality Review

1              for identification.)

2     BY MR. BOGLE:

18          Q    Okay.  So that's a meeting you would

19    have attended, right?

20          A    What year is it?

21          MR. COLLINS:  Objection.

22    BY MR. BOGLE:

23          Q    2014.

24          MR. COLLINS:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I don't know if I attended

 2    that one.

 3    BY MR. BOGLE:

 4         Q    Okay.  Is that a meeting you generally

 5    would attend?

 6         A    Normally, I do.  I'm not sure, in 2014,

 7    I was exempted because I believe I was -- that's

 8    when I was putting up a new distribution center in

 9    Delran.

10         Q    Okay.  Would you have -- if you did not

11    attend this specific session, would you generally

12    have requested the materials that were passed

13    out --

14              MR. COLLINS:  Objection.

15    BY MR. BOGLE:

16         Q    -- so you could catch up to speed?

17              MR. COLLINS:  Objection.  Form.

18              THE WITNESS:  I certainly would think

19    so, yes.

20    BY MR. BOGLE:

21         Q    Okay.  So I want to look at the -- just

22    one slide from this PowerPoint deck that was

23    presented in 2014.  If you go to page .13.

24              Do you see there is a slide titled
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24          Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A     Yes.

 2       Q     Okay.  So does this jog your memory at

 3   all about any discussions about Summit Pain

 4   Specialists?

 5       A     No.  I don't even know if we put them on

 6   as a customer, and I don't know Kim Diemand or

 7   Steve Kravec was a sales exec.  I don't really

 8   know him very well.

 9       Q     Okay.  And you said Acme Pharmacy

10   doesn't ring a bell for you either, huh?

11       A     No, I'm sorry.

12       Q     Okay.

13       A     We don't have them now, I know that.

14       Q     I agree with that.

15             (Snider Exhibit No. 35 was marked

16             for identification.)

17   BY MR. BOGLE:

18       Q     Well, let's take a look then at the next

19   exhibit, 1.1870, which is also Exhibit 35.

20             MR. COLLINS:  What number?

21             MR. BOGLE:  Exhibit 35.

22             MR. COLLINS:  Thank you.

23   BY MR. BOGLE:

24       Q     Okay.  And you see this is an e-mail
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22    BY MR. BOGLE:

23         Q     Do you think he didn't?

24         A     I don't know.

```
 1          Q    Okay.  Well, if you go back to

 2     Exhibit 1.1568, which is Exhibit 9.  Keep that one

 3     out there with the 70,000 doses.

 4          A    That what, keep --

 5          Q    Keep that next to you, but I want you to

 6     pull this one out too, Exhibit 9.

 7          A    Nine?

 8          Q    Yeah.

 9               MR. COLLINS:  I think they should be in

10     order.

11               THE WITNESS:  Well, kind of.

12               MR. COLLINS:  Let me get mine.

13     BY MR. BOGLE:

14          Q    You got Exhibit 9?

15          A    Yes.
```



Highly Confidential - Subject to Further Confidentiality Review



 8        Q    Okay.  And you understand that when you

 9   get copied on something, you get included on the

10   whole -- you get to see the whole chain before it,

11   right?

12             MR. COLLINS:  Objection to the form.

13   BY MR. BOGLE:

14        Q    That's how e-mails work, right?

15        A    I do know how e-mails work --

16        Q    Right.

17        A    -- but I don't remember this e-mail

18   ever.

19        Q    Okay.  That's fair.

Highly Confidential - Subject to Further Confidentiality Review



18       Q    Okay.  Well, you're on the e-mail chain,

19   right?  You're saying you never read this e-mail

20   chain?

21       A    I don't remember reading it, no.

22       Q    Okay.  But are you saying you didn't

23   read it definitively?

24            MR. COLLINS:  Objection.  Argumentative.

Highly Confidential - Subject to Further Confidentiality Review

```
1              THE WITNESS:  I'll testify that I don't

2    remember reading it.  I don't even remember the

3    Acme.

4    BY MR. BOGLE:

5         Q    Do you typically not read e-mails

6    you're -- you're copied on?

7              MR. COLLINS:  Objection.  Argumentative.

8              THE WITNESS:  I can't say typically.

9    BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review

8        Q    Sir, this was provided to us.  I can

9    tell you -- if it's wrong, I guarantee you your

10   counsel will establish it's wrong.  It ain't

11   wrong.  Okay?

12            This is Acme Pharmacy.  This was

13   provided to us from your counsel coming from

14   McKesson's files.

15       A    I'm --

16            MR. COLLINS:  Objection.

17   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

8      Q    Not aware of that?

9            I hand you what I'm marking Exhibit 39,

10   Exhibit 1.1895.

11            (Snider Exhibit No. 39 was marked

12            for identification.)

13   BY MR. BOGLE:

14      Q    This is an article from the Akron Beacon

15   Journal/Ohio.com titled "Stow Pain Clinic closing

16   after court upholds sexual imposition conviction

17   against doctor accused of abusing patients,"

18   posted August 11, 2016.  Do you see that?

19      A    I see that, yes.

20      Q    Okay.  The first sentence says:  "Summit

21   Pain Specialists in Stow is permanently closed

22   Monday after years of wrangling over a sex abuse

23   scandal involving a doctor there."

24            Do you see that?

```
 1        A     I see that, yes.

 2        Q     The third paragraph there says:  "But

 3    the Ohio Supreme Court on August 3 upheld the

 4    Summit County Common Pleas Court conviction a

 5    former doctor James Bressi, who once co-owned the

 6    business with former doctor Robert Stephen

 7    Geiger."

 8              Do you see that?

 9        A     No.  Can you tell me where you are?

10    I -- I was under what prompted the clinic to

11    close.

12        Q     Right here, sir, if you look at my

13    finger.

14        A     I'm sorry.  You skipped around.  I

15    didn't see that.

16        Q     You want me to reread that for you?

17        A     Please.

18        Q     So you can follow along.

19        A     Please.

20        Q     That's fair.

21              The portion I read says:  "But the Ohio

22    Supreme Court on August 3 upheld the Summit County

23    Common Please Court conviction of former

24    doctor James Bressi, who once co-owned the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    business with former doctor Robert Stephen Geiger.

 2    The clinic's troubles started in 2012 when

 3    patients began calling Stow police reporting they

 4    had been sexually abused by Bressi inside the pain

 5    clinic.  Stow police ultimately took reports from

 6    about 95 patients, including some in their 70s,

 7    who made similar claims according to a detective's

 8    court testimony."

 9              Do you see that?

10        A     I see that, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

2        Q    Okay.  Do you have any reason to dispute

3   that pretty quickly after Summit Pain Specialists

4   closed so did Acme 30?

5             MR. COLLINS:  Objection.  Foundation,

6   form.

7             THE WITNESS:  I do not know or remember

8   any of that.  I'm sorry.

9   BY MR. BOGLE:

10       Q    Okay.  Well, let's just close the loop

11  here.

12            (Snider Exhibit No. 40 was marked

13            for identification.)

14  BY MR. BOGLE:

15       Q    Exhibit 40, 1.1911.  I pulled this off

16  of Google before I came, pertaining to Acme

17  Pharmacy in Stow, Ohio.  Same address as we just

18  saw in the investigative report.

19            Do you see it's noted to be permanently

20  closed?

21            MR. COLLINS:  Objection.  Foundation.

22            THE WITNESS:  If you say -- I don't see

23  where it says that.  Please point to it.

24  Permanently closed, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOGLE:

 2         Q    Okay.  But again, this is not a customer

 3    you ever even recall dealing with at all, right?

 4         A    I don't think I was in New Castle at the

 5    time.  I was in Delran, New Jersey.

 6         Q    You weren't in New Castle at all from

 7    when you -- this account started getting serviced

 8    in 2012 to 2016 when that -- it closed?

 9         A    I was there in 2012, yes.

10         Q    Okay.  For what period of time were you

11    not at New Castle then?

12         A    '14 and '15 or '15, '16.  I don't

13    remember.

14         Q    Who was running New Castle while you

15    were gone?

16         A    Andrew Moore, the VP/GM.

17         Q    Andrew Moore?

18         A    Yes.

19         Q    Okay.  Did you have any communications

20    concerning New Castle during that time period that

21    you were in Delran?

22         A    Not too many.

23         Q    Okay.  There are many Giant Eagle

24    Pharmacies that -- in Summit and Cuyahoga County
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that New Castle supplies opioids to, correct?

 2         A     Supplied.  We don't have them any

 3    longer.

 4         Q     Okay.  When did you stop?

 5         A     About a year ago -- less than a year

 6    ago.

 7         Q     Okay.  Do you know why you stopped

 8    providing to them out of New Castle?

 9         A     They got another wholesaler.

10         Q     Okay.  Who?

11         A     Cardinal.

12         Q     Okay.  All right.  So prior to losing

13    that business, you said about a year ago, that was

14    one of the larger customers you had in Summit and

15    Cuyahoga counties, right?

16         A     Yes.

17               MR. COLLINS:  Are we done with these?

18               MR. BOGLE:  Yeah.

19    BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

    9         Q    Okay.  All right.  We're done with that.

   10              MR. COLLINS:  When would be a good time

   11    to take a break?

   12              MR. BOGLE:  It's fine now.  Yeah, if he

   13    needs it, that's fine.

   14              THE VIDEOGRAPHER:  The time is 3:56 p.m.

   15    We're going off the record.

   16              (Recess.)

   17              THE VIDEOGRAPHER:  The time is 4:08 p.m.

   18    We're back on the record.

   19    BY MR. BOGLE:

   20         Q    Okay, Mr. Snider, we had stopped --

   21    broken after talking about some of the Giant Eagle

   22    Pharmacies, and I want to talk about a couple more

   23    of those from Summit and Cuyahoga County.

   24              (Snider Exhibit No. 43 was marked

1            for identification.)

2    BY MR. BOGLE:

3        Q    I'm going to hand you what's marked as

4    1.1811, Exhibit 43.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

8          Q    You do know that McKesson ultimately in

9    2016 paid a $150 million fine for violations of

10   the Controlled Substances Act, right?

11               MR. COLLINS:  Objection.  Calls for a

12   legal conclusion.

13   BY MR. BOGLE:

14          Q    Do you know whether that occurred?

15               MR. COLLINS:  I'm sorry.  Lack of

16   foundation.  Form.

17   BY MR. BOGLE:

18          Q    Do you know that?

19          A    I heard it was a settlement with the

20   DEA.

21          Q    Okay.  Do --

22          A    And that's what I was told.

23          Q    You weren't told how much?

24          A    I was told it was --

1          Q     For how much or for what for?

2          A     I was told it was a settlement for

3     $150 million.

4          Q     Okay.  But you didn't -- you never asked

5     what for?

6          A     I'm sure I did.

7          Q     Okay.  Do you remember being told what

8     it was for?

9          A     Not the people that know, no.

10          Q     Okay.  I'm going to hand you --

11     actually, strike that -- 1.1775, which I'm marking

12     as Exhibit 50.

13               (Snider Exhibit No. 50 was marked

14               for identification.)

15     BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

 9        Q    If you can go back to Exhibit 9 real

10   quick.  And keep this one I'm looking at with you

11   out too, but...

12        A    Eight.

13             MR. COLLINS:  One more.  Getting warmer.

14             THE WITNESS:  10.

15             MR. COLLINS:  Getting warmer.

16             THE WITNESS:  11.  Sorry.  Where is 9?

17   It has to be behind there.  I'm sorry.  15.  I

18   don't see 9 here.  Let me look at that other --

19   BY MR. BOGLE:

20        Q    You can follow me up on the screen if

21   you want.  It doesn't matter to me.

22             MR. COLLINS:  It's got to be in this

23   stack.

24             THE WITNESS:  If it's okay with you, I

1   will go ahead and follow it here.

2   BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20          MR. BOGLE:  No further questions at this

21     time.

22          MR. COLLINS:  Why don't we take five

23     minutes?  I have some redirect.

24          THE VIDEOGRAPHER:  The time is 4:59 p.m.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    We're going off the record.

 2              (Recess.)

 3              THE VIDEOGRAPHER:  The time is 5:12

 4    p.m., and we're back on the record.

 5                 REDIRECT EXAMINATION

 6    BY MR. COLLINS:

 7         Q    Good afternoon, Mr. Snider.

 8         A    Good afternoon.

 9         Q    I'm Kevin Collins.

10         A    Yes.

11         Q    Where do you currently live?

12         A    I currently live in -- south of

13    Youngstown, Ohio -- Poland, Ohio.

14         Q    Can you keep your voice up.  I know it's

15    been a long day.  One more time?

16         A    Poland, Ohio.

17         Q    Okay.  And what county is that?

18         A    It's Mahoning County.

19         Q    All right.  And where is that county

20    related to Summit and Cuyahoga counties?

21         A    It's about three or four counties over

22    east, directly east towards the PA line.

23         Q    And how long have you resided there?

24         A    Twenty -- 18 years.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    All right.  Where were you born and
 2   raised?
 3        A    I was born in Coshocton, Ohio, and was
 4   raised in Cuyahoga Falls in Summit County.
 5        Q    Where did you go to high school?
 6        A    Cuyahoga Falls High School.
 7        Q    What did you do after high school?
 8        A    I went to Kent State University.
 9        Q    And after Kent State, when did you
10   graduate?
11        A    I graduated in -- I'm sorry -- 1978.
12   Sorry.  That's a long time ago.
13        Q    Okay.  And when did you start working
14   for McKesson?
15        A    I believe '79, '80.
16        Q    Can you briefly describe the positions
17   you've held, starting from your earliest position
18   at McKesson to your current position and where --
19   where you were located.
20        A    Okay.  Sure.  Started in North Canton,
21   Ohio.  I don't remember exactly how long, but I
22   was first a trainee for a couple of months, and
23   then a night supervisor after that couple of
24   months of -- in there.  And then I did that for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    quite a few years, and then I got promoted to

 2    operations manager there, and I'm not sure what

 3    year that was.  It would be on -- probably on my

 4    resume, but I don't remember.

 5            And then after that, we built a new

 6    facility in Cincinnati, Ohio.  Fairfield, Ohio, to

 7    be exact.  And I ran -- I went there as the

 8    operations manager.  And I --

 9        Q    What year was that?

10        A    1978.  No, '75.  I think so.

11        Q    Would it be --

12        A    No, no.  No, no.  I'm sorry.  I have the

13    wrong -- '95 or '6.  Sorry about that.

14        Q    I'm sorry.  Where did you go after that?

15        A    After Cincinnati, I went back to North

16    Canton, and then they promoted me to distribution

17    center manager over in Sewickley, Pennsylvania,

18    and after that I was promoted to manager over

19    Sewickley and North Canton.  And we had closed

20    Cincinnati, and then we closed North Canton, which

21    was in Stark County, and we combined it into New

22    Castle in 2000, and I was made the director of

23    operations there.

24        Q    So is it true that the New Castle
```

```
 1   facility opened in 2000?

 2        A     Yes.  May of 2000.

 3        Q     And when it opened, what was your title?

 4        A     I don't remember if it was DCM or DO,

 5   but it was one of those, and I ran the

 6   distribution center.  We got -- started it up, and

 7   then I'm still there.  So I've always been in the

 8   Ohio/PA market.

 9        Q     What geographic territory does the New

10   Castle distribution service -- distribution center

11   service?

12        A     Our distribution center services -- if I

13   could say what towns, you might know, but on the

14   east is State College, which is the -- central PA;

15   on the north is Erie, Pennsylvania, which is the

16   north side; northwest is -- is Cleveland; and then

17   southwest would be down to the Zanesville area;

18   and then south would be -- I believe it was

19   Morgantown, Weston; and then back up to New

20   Castle.  So we're in the geographic center.

21        Q     How many employees do you manage?

22        A     About 133 right now.

23        Q     And how many employees are direct

24   reports to you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A      About ten.

 2        Q      In your almost 19 years of managing the

 3   New Castle Distribution Center, how would you

 4   describe the performance of the distribution

 5   center?

 6               MR. BOGLE:  Object to form, vague and

 7   ambiguous.

 8               THE WITNESS:  The distribution center

 9   won the DC of the year seven times, and that's

10   twice as many as any other distribution center has

11   received that, and that's based on the quality and

12   the performance of the distribution center.

13   BY MR. COLLINS:

14        Q      Are there ever any internal audits

15   performed about the operations of the distribution

16   center at New Castle?

17        A      Yes.  We have four or five kinds of

18   audits.  The first kind is called a STARS audit

19   that we do internally to match our SOPs to our

20   performance.  And that's done -- right now it's

21   done by an accounting team.  But before that, all

22   those years, it was done by McKesson Regulatory

23   Affairs folks.

24               Then we have a specific --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q     I'm sorry.  Can you tell me how often

 2   that's done?

 3          A     Every two, two-and-a-half years.

 4          Q     Okay.  And the next -- the other audit

 5   you were going to describe?

 6          A     Yes.  Sorry.  The next audit is the DEA

 7   cyclic audit or any DEA unannounced audit.  So

 8   we've had cyclic audits average two-and-a-half

 9   years.  They try to do them every two years,

10   but -- so I believe there were four audits at the

11   distribution center by the DEA, and they've all

12   came out as -- a hundred percent as exemplary.  So

13   that was one of the other audits.

14                And then monthly, we did the triannual

15   report, which was a DEA SOPs.  And then also we

16   did a VAWD audit, which is the National Wholesale

17   Association.  We do that every two to five years

18   depending on our licensure.  We were one of the

19   first DCs to get VAWD accreditation.

20                So when the DEA or we do our audits, we

21   check our licensing and numerous other things, but

22   the DEA has been in there a few times, and they've

23   always had exemplary comments for New Castle and

24   our team.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               (Snider Exhibit No. 52 was marked

 2               for identification.)

 3    BY MR. COLLINS:

 4        Q    I'm going to hand you what's been

 5    premarked as Exhibit 52.

 6               Mr. Snider, can I ask you to identify

 7    what is Exhibit 52?
```

16        Q    Has the DEA ever complained to you about

17    your operations at the New Castle Distribution

18    Center?

19               MR. BOGLE:  Object to form.

20               THE WITNESS:  No.  They've always

21    said -- I know Kurt Dittmer, who was there before.

22    Patty Robson is there right now as interim agent

23    in charge, and before that we had -- I knew Jim

24    Crawford, and all of them have given us exemplary

1   records.

2   BY MR. COLLINS:

3       Q    Have you ever received -- or has the

4   distribution center ever received any kind of

5   minor infraction or citation from the DEA?

6            MR. BOGLE:  Object to form.

7            THE WITNESS:  Never.

8   BY MR. COLLINS:

9       Q    In terms of the New Castle Distribution

10  Center operations, on average, what's the volume

11  of the pharmaceuticals that you distribute per

12  day?

13      A    We do about 150,000 pieces a day to

14  200,000, depending on the day.

15      Q    And when you say "pieces," what do you

16  mean?  Is that -- is that a tablet or --

17      A    A bottle or pill, or even sometimes a

18  case.  It depends on the selling unit.

19      Q    150,000 pieces?

20      A    Minimum.

21      Q    And how many -- what portion of that is

22  controlled substances?

23      A    About fourteen to 15,000.  Total for

24  Class II, III, IV and V.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q    And in terms of opioids, what's the

2   percentage of the product that is moved out of the

3   distribution center each day that is an opioid?

4             MR. BOGLE:  Object to form as to time,

5   vague and ambiguous.

6             MR. COLLINS:  And I -- fair enough.  I

7   will -- Mr. Bogle's objection is well founded.

8   BY MR. COLLINS:

9        Q    Over the course of the last 20 years,

10  can you tell me how the volume of opioids, what

11  it's been relative to the rest of the product

12  that's been moved?

13            MR. BOGLE:  Object to form.

14            THE WITNESS:  Two percent.

15  BY MR. COLLINS:

16       Q    What other products besides controlled

17  substances does the distribution center

18  distribute?

19       A    We sell pharmaceuticals, legend drugs,

20  over-the-counter merchandise, some medical

21  devices, everything from syringes to -- we used to

22  sell wheelchairs and that, but we got out of that

23  business locally.  But we would sell anything you

24  would see in a pharmacy.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q    How significant in terms of the

2   resources are controlled substance to your daily

3   distribution needs?

4             MR. BOGLE:  Object to form.

5             THE WITNESS:  Currently we have about 10

6   or 12 people that do nothing but the controls.  I

7   have two clerks that do nothing but the paper 222

8   forms or sorting those out, and I have one that

9   answers the phone and balances those edits.  We

10  send an edit every day to the DEA, electronically.

11  I believe it's the Philadelphia office.

12  BY MR. COLLINS:

13       Q    Let's take an opioid that is received in

14  your distribution center, and I'd like you to

15  describe how it's received, how it's handled, how

16  it's stored, and how it's then further

17  distributed.

18            MR. BOGLE:  Objection.  Form, compound.
```

Highly Confidential - Subject to Further Confidentiality Review



16    BY MR. COLLINS:

17         Q    I'm going to hand you a series of

18    photographs and ask you to identify them for me.

19         A    Okay.

20         Q    They've been premarked as Exhibits 2

21    through -- 2 through 11.  So I'm going to hand you

22    each of those, and I want you to tell me -- I'll

23    hand them to you.  You can have a seat.

24              I'm sorry, 53 through 62.

```
 1                (Snider Exhibits No. 53 through 62

 2                were marked for identification.)

 3    BY MR. COLLINS:

 4        Q    So I'm handing you 53.  Do you recognize

 5    what's depicted in Exhibit 53?

 6        A    Yes.

 7        Q    What is it?

 8        A    This is our control substance cage for

 9    Class III, IV and V merchandise.

10        Q    And where is that perspective from?

11        A    It's from the mezzanine level looking

12    down.

13        Q    And does that fairly and accurately

14    depict the cage --

15        A    Yes.

16        Q    -- in its current state?

17        A    Yeah, the bottom right is our

18    self-closing door.  And then I'll -- which has a

19    scanner on it so we know only people can enter

20    that are accessed to that.  And there's quite a

21    bit of -- well, you don't see the security here,

22    but there's quite a bit there.

23        Q    Let me hand you what's been premarked as

24    Exhibit 54.  Can you identify what's depicted in
```

Highly Confidential - Subject to Further Confidentiality Review



```
 1    Exhibit 54?
```

```
21        Q    Does that fairly and accurately depict
22   the area that you just described?
23        A    Yes.
24        Q    I'm going to hand you what's been
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    premarked as Exhibit 55.  Describe what -- tell me

2    if you identify -- can identify what's in that

3    picture.
```

11        Q    Let me show you what's been -- I'm going

12   to -- actually, does that fairly and accurately

13   depict the area that you just described?

14        A    Yes.

15        Q    I'm going to hand you what's been

16   premarked as Exhibit 56.

17        A    Thank you.

18        Q    Do you recognize what's depicted in

19   Exhibit 56?

20        A    Yes, I do.

21        Q    What is it?

Highly Confidential - Subject to Further Confidentiality Review



8        Q     You -- you indicated this -- well, does

9    this fairly and accurately depict the area you

10   just described?

11       A     Yes.

12       Q     You indicated this is relatively recent.

13   What did you have there before?

Highly Confidential - Subject to Further Confidentiality Review

2        Q     Let me show you what's been premarked as

3    Exhibit 57, and ask you to tell me whether you can

4    identify that.

10       Q     Does it fairly and accurately depict

11   that area you just described?

12       A     Yes.

13       Q     I want to show you -- hand you what's

14   been premarked as Exhibit 58.  Ask you to identify

15   or tell me whether you can identify that.

Highly Confidential - Subject to Further Confidentiality Review



3          Q     And when you say '13 or '14, 2013 and

4     2014?

5          A     Yes.

6          Q     And who has access to this area?

Highly Confidential - Subject to Further Confidentiality Review

7        Q    Let me show you what's been premarked as

8    Exhibit 59.  Can you identify what's in Exhibit 59

9    for me?

17       Q    Does this fairly and accurately depict

18   the area you just described along with these

19   cages?

20       A    Yes.

21       Q    I show you what's been premarked as

22   Exhibit 60.  Ask you to identify what's depicted

23   there, if you can.

Highly Confidential - Subject to Further Confidentiality Review



14        Q    And does it fairly and accurately depict

15   the area you just described?

16        A    Yes, it does.

17        Q    I'm showing you what's been premarked as

18   Exhibit 61.  Please tell me whether you can

19   identify this area for me.

Highly Confidential - Subject to Further Confidentiality Review



12        Q    And I don't recall if I already asked

13  you, but does this fairly and accurately depict

14  the area you just described?

15        A    Yes.

16        Q    I'm showing you what's been premarked as

17  Exhibit 62.  Ask you to identify what's depicted

18  in Exhibit 62.

Highly Confidential - Subject to Further Confidentiality Review

 9      Q    Other than that one occasion I think you

10   said in 2010 where you had an employee that was

11   involved in some theft, have you ever had any

12   other type of incident at your distribution

13   center?

14      A    Yes, we had -- up in Cleveland, someone

15   approached one of the drivers with a gun, and he

16   actually yelled for them to get out, and they

17   actually did.  But they asked him to open the back

18   of his truck, which is always locked, and produce

19   the totes.  And he actually used to run a

20   Mini-Mart is how he did that.

21           And I know that because our delivery

22   service has worked for me for almost 40 years, and

23   it's a dedicated delivery service, and no other

24   wholesaler has that.  And these guys carry

Highly Confidential - Subject to Further Confidentiality Review

1  scanners so they can scan the totes.  We know when

2  they bring them back how many totes were

3  delivered.  They call if there's an error, they

4  had ten instead of nine.  So we investigate that,

5  et cetera.  But the drivers have been dedicated

6  service only for McKesson totes, which I think is

7  a differentiator for us.

8         Q     Do you see any totes in this Exhibit --

9  is it 62?

16        Q     And does this fairly and accurately

17  depict the -- sort of the various views of the

18  cameras?

19        A     Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

10      Q      Does the distribution center communicate

11   with local DEA?

12      A      Yes.

13      Q      How often?

14      A      Not as much right now, but they will

15   call me.  I talked to Patty Robson last week.  And

16   I also used to talk to Kurt Dittmer quite a bit

17   before he retired.  And I've known these folks for

18   a long time, and I would probably say at least

19   twice a month there was some contact.

20      Q      Has the DEA -- the local DEA ever given

21   you a complaint about the operation of the

22   distribution center?

23            MR. BOGLE:  Object to form.

24            THE WITNESS:  They've never.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. COLLINS:

 2        Q    I'm sorry?

 3        A    No, they have never.

 4        Q    In earlier questioning by Mr. Bogle, he

 5   mentioned a settlement agreement with the -- the

 6   Justice Department.  Do you recall that?

 7        A    Yes.

 8        Q    Do you know if the New Castle

 9   Distribution Center was mentioned in that

10   settlement agreement?

11        A    I know it was not.

12             (Snider Exhibit No. 64 was marked

13             for identification.)

14   BY MR. COLLINS:

15        Q    I'm going to show you what's been

16   premarked as Exhibit 64.

17             Do you recognize that document?

18        A    Yes.

19        Q    What is it?

20        A    It's the controlled substance compliance

21   process.

22        Q    And what's the purpose of this document?
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q     When the New Castle Distribution Center

 2    first became operational in 2000, did you have

 3    access to customer information in terms of who

 4    else was supplying them?

 5          A     No, I didn't.

 6                MR. BOGLE:  Object to form.

 7    BY MR. COLLINS:

 8          Q     Do you have that now?

 9          A     The DRAs have all the access to that,

10    yes.

11          Q     And when did that start?

12          A     I'm -- I'm not sure if that was 2008,

13    but -- with the Lifestyle drugs, but I know that

14    the fact that they could see the wholesalers'

15    information, I think Izzy told me it was just

16    within the last few years.

17                (Snider Exhibit No. 66 was marked

18                for identification.)

19    BY MR. COLLINS:

20          Q     I'm going to show you what's been now

21    premarked as Exhibit 66, and ask you to identify

22    it for me.

23                What is Exhibit 66?
```

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

12       Q    You've mentioned the director of

13   Regulatory Affairs a number of times.  What's his

14   or her role?

15            MR. BOGLE:  Object to form.

16            THE WITNESS:  They're vetting out the

17   regulations and the customers that we either

18   onboard or sell to.

19   BY MR. COLLINS:

20       Q    Given your almost four decades of

21   experience with McKesson, including almost 20

22   years as the director of operations of the New

23   Castle Distribution Center, what do you think

24   about all of these allegations about McKesson

1    fueling the opioid crisis?

2         MR. BOGLE:  Object to form.

3         THE WITNESS:  I spent most of my life in

4    Summit County.  I know Cuyahoga County.  I'm

5    probably the last Browns' fan you'll ever meet.

6    So it means a lot to me, and I would never do

7    anything willingly to create an opiate crisis.

8    I -- I feel it is terrible and I feel bad for it,

9    but I don't say that I caused it at -- at New

10   Castle.

11   BY MR. COLLINS:

12        Q    Besides your handling of distribution of

13   pharmaceuticals in a routine way, are you aware of

14   any other things that you've done as a head of

15   operations at the distribution center --

16        MR. BOGLE:  Object.

17   BY MR. COLLINS:

18        Q    -- that would impact the community?

19        MR. BOGLE:  Object to form.

20        THE WITNESS:  Yeah, I guess that's where

21   I say about some of the things we do.

22        I know in -- I think it was Summit

23   County, Stark County, there was a meningitis

24   outbreak several years ago, and one of the high

```
 1   school kids, one or two of them died, and so we

 2   had to provide the antidote or the medicine for

 3   that.  And I called in helicopters, and they

 4   landed in the parking lot and they distributed to

 5   the County Board of Health, I believe it was, and

 6   one of the hospitals.  And that's kind of what we

 7   do.

 8            I also -- just recently one of my

 9   managers from UPMC Pittsburgh Hospital, they had a

10   snake bite, and they must have been in central PA.

11   I'm not sure how that happened.  But we -- he

12   didn't know if the courier could get there quick

13   enough, so he grabbed it and drove it down

14   himself, and that saved the kid.

15            And then we were in McKesson Today for

16   New Castle recently for the Washington Courthouse

17   distribution center in Ohio that we provided and

18   had a life-saving medicine, and my manager drove

19   it halfway, they had someone pick it up, and it

20   saved the patient.  It was a mother who was

21   pregnant and needed this medicine to save the

22   baby, and I know that's what we did.

23            It was written up in the McKesson Today,

24   et cetera, and Bev did most of the work.  I just
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   was standing there.  But that's the kind of thing

 2   we do that I wanted to make sure I got on the

 3   record.

 4             MR. COLLINS:  I have no further

 5   questions.  You want to switch?

 6             MR. BOGLE:  Yeah, just give me a couple

 7   of minutes.

 8             THE VIDEOGRAPHER:  The time is 5:55 p.m.

 9   We're going off the record.

10             (Recess.)

11             THE VIDEOGRAPHER:  The time is 6:02

12   p.m., and we're back on the record.

13                  RECROSS-EXAMINATION

14   BY MR. BOGLE:

15       Q    All right.  Mr. Snider, I have a few

16   follow-up questions for you.

17             You made reference to opioids being

18   2 percent of the overall volume at your

19   distribution center.  Do you recall that

20   testimony?

21       A    Yes.  At one time, yes.

22       Q    Yeah, that number has not been stagnant,

23   right?  For example, when you started in 2000,

24   that number increased over time, didn't it?
```

```
 1              MR. COLLINS:  Objection.  Vague.

 2              THE WITNESS:  Over time, yes, it did.

 3   BY MR. BOGLE:

 4      Q    Right.  So when you say that opioids

 5   were 2 percent of the total volume at New Castle,

 6   you're not representing to our jury that that was

 7   true for the entire period of 2008 -- or 2000 to

 8   present, right?

 9      A    No.  I just got the data from present.

10      Q    From today?

11      A    Recently.

12      Q    Right.  So, for example, you have the

13   2018 data is what you're talking about.

14      A    Yes.

15      Q    Okay.  And it was higher than that, for

16   example, in 2010.

17      A    I don't -- I don't know that, what it

18   was.

19      Q    You don't know.  So you didn't check

20   anything other than 2018.

21      A    Correct.

22      Q    Okay.  You provided some -- some

23   testimony about -- to the effect that the DEA has

24   never had any complaints about any activities
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   involving New Castle.  Is that right?

 2        A     Yes.

 3        Q     Okay.  Have you reviewed any of the DEA

 4   and DOJ letters that led to the -- the $150

 5   million settlement agreement?

 6        A     I looked at them, yes, briefly.

 7        Q     Did you just look at the settlement

 8   agreement, or did you look at any of the internal

 9   letters that led up to that?

10        A     I looked at the distribution centers

11   listed.

12        Q     Okay.  Did you review the letters in

13   detail beyond that?

14        A     No.

15        Q     Okay.  So, for example, if the -- some

16   of the letters from the DEA indicate that they

17   found nationwide and systemic violations regarding

18   controlled substance monitoring at McKesson,

19   that's something you were not aware of when you

20   provided that testimony, right?

21             MR. COLLINS:  Objection.  Assumes facts

22   not in evidence.  Lack of foundation.

23   BY MR. BOGLE:

24        Q     Right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A     Can you ask me -- I'm not sure what you

2    mean by --

3        Q     Sure.

4        A     -- "provided that testimony."

5        Q     You provided testimony there's been no

6    complaints about -- about New Castle from the DEA.

7        A     Yes.

8        Q     And my question to you was, did you

9    review any of these letters from the DEA to assess

10   whether they made any comments about the fact that

11   they found nationwide and systemic violations as

12   to McKesson's suspicious order monitoring

13   programs?

14            MR. COLLINS:  Object to form.

15            THE WITNESS:  I did not discuss it with

16   the DEA.

17   BY MR. BOGLE:

18       Q     No, I'm talking about in the letters.

19   Did you see that in the letters anywhere?

20            MR. COLLINS:  Objection.  I'm not

21   sure --

22   BY MR. BOGLE:

23       Q     All right.  Let's just take a look at

24   one.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A     No, I didn't.

 2        Q     Okay.  Let's take a look at one.

 3        A     I thought you said did I review it with

 4   the DEA.  That's what I heard.

 5        Q     All right.  That's fine.

 6              (Snider Exhibit No. 67 was marked

 7              for identification.)

 8   BY MR. BOGLE:

 9        Q     Exhibit 67, I'm going to hand you here,

10   also marked as 1.1443.
```

Highly Confidential - Subject to Further Confidentiality Review



10        Q      Okay.  When you looked through the DEA

11   correspondence prior to testifying today, do you

12   recall reading that statement?

13              MR. COLLINS:  Objection.  Lack of

14   foundation.  Form.

15              THE WITNESS:  No, I don't.

16   BY MR. BOGLE:

17        Q      You don't.  Okay.

Highly Confidential - Subject to Further Confidentiality Review

7        Q     Okay.  Do you recall seeing that in the

8    letter that you reviewed?

9            MR. COLLINS:  Objection.  Asked and

10   answered.

11           THE WITNESS:  No.

12   BY MR. BOGLE:

13       Q     You reviewed quite a few photos of the

14   New Castle Distribution Center.  Do you recall

15   that?

16       A     Yes.

17       Q     Okay.  Now, those photos all pertain to

18   security measures contained within your facility

19   at New Castle, right?

20       A     Yes.

21       Q     Okay.  None of those photos pertain to

22   anything that involved trying to make sure that

23   the controlled substances once they are sold get

24   into the right hands, right?

Highly Confidential - Subject to Further Confidentiality Review



18       Q     You talked too about these -- these

19   totes that the controlled substances are carried

20   in.  Do you recall discussing that generally?

21       A     Yes.

22       Q     And I think you said something about

23   having dedicated drivers delivering these totes,

24   and that was something that you thought

```
1    differentiated McKesson from other wholesalers.

2    Am I summarizing that fairly?

3         A     Yes.

4         Q     Okay.  Now, you've had at New Castle

5    problems with lost totes that carried controlled

6    substances in them, right?

7              MR. COLLINS:  Objection.  Form.

8              THE WITNESS:  No.

9    BY MR. BOGLE:

10        Q     You've never lost a tote?

11        A     I didn't say that.  We don't have a

12   problem with it.

13        Q     Okay.  Well, we talked about Giant

14   Eagle, for example, earlier, right, and you recall

15   back in 2014 losing several totes that included

16   controlled substances for deliveries to Giant

17   Eagle, right?

18        A     No, I don't.

19        Q     You don't?

20        A     Nope.

21        Q     Okay.  All right.

22              (Snider Exhibit No. 68 was marked

23              for identification.)

24   BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q     I'm going to hand you Exhibit 68, also

2     marked as 1.1878.
```



Highly Confidential - Subject to Further Confidentiality Review



15        Q      That contained controlled substances.

16        A      If you give me time to read it, I will.

17    I'm not -- it's HBC --

18        Q      Sure.  It's a one-page e-mail.  Go

19    ahead.

20        A      Sorry, there's other pages here.  Okay.

21    (Peruses document.)

Highly Confidential - Subject to Further Confidentiality Review



20          MR. COLLINS:  Objection.  Lack of

21     foundation.

22          THE WITNESS:  Yes, from -- from someone

23     else.

24     BY MR. BOGLE:

```
 1        Q    Right.  But it's -- it's certainly these

 2   delivery drivers -- either delivery drivers or HBC

 3   that lost these totes.  We can agree on that,

 4   right?

 5        A    Yes.

 6        Q    Okay.

 7        A    Also there's no manifest to show that.

 8   So the -- I'm sure that Greg Carlson and the Giant

 9   Eagle folks reported that to the DEA, that they

10   have missing totes, or I don't even know that they

11   found them at another store or where --

12        Q    Right.  You don't know either way,

13   right?

14        A    No.

15        Q    But you do agree with me this discusses

16   missing totes?

17             MR. COLLINS:  Objection.  The question

18   is vague.

19   BY MR. BOGLE:

20        Q    Right?

21        A    Yeah.

22             MR. COLLINS:  The question is vague.

23   BY MR. BOGLE:

24        Q    Now, you talked about McKesson always
```

Highly Confidential - Subject to Further Confidentiality Review

1    having standard operating procedures for

2    controlled substances.

3              Do you recall testifying to that a few

4    minutes ago?

5        A    Yes.



Highly Confidential - Subject to Further Confidentiality Review



13        Q     Okay.  Now, you said that there were

14    reports sent to the DEA, unusual order reports, I

15    think you called them, from 2000 to 2006.  Do you

16    recall that?

17        A     Yes.

18        Q     Do you have any documentary proof of

19    that at this point in time?

20        A     No.

21        Q     And you also said that at some point in

22    time, the D -- a DEA agent told you on the phone

23    that he didn't want daily unusual reports anymore.

24    Do you recall that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A      Yes.

 2        Q      Do you have any documentary proof of

 3   that today?

 4        A      I don't have the e-mail.  He actually

 5   put it in writing for me.

 6        Q      But you don't have that, right?

 7        A      No, not from two -- whatever year that

 8   was.

 9        Q      So we don't have any way to verify by

10   documentation either of those statements, do we?

11              MR. COLLINS:  Objection.  It's a

12   mischaracterization.  You can ask the DEA.

13              THE WITNESS:  From Kurt Dittmer would be

14   the only way to verify that.

15   BY MR. BOGLE:

16        Q      We don't have any documentary evidence

17   that you can provide us as to providing reports

18   from 2000 to 2006, number one, right?

19        A      Number one?

20        Q      First thing.  You can't point me to any

21   documents that show that you actually did what you

22   said you did?

23        A      No, I don't have those e-mails from 2004

24   or whatever year it was.
```

```
 1          Q    And you don't -- and you don't have any

 2    e-mail that you can show me or to the jury or to

 3    anybody else about the DEA agent specifically

 4    calling you and telling you that you didn't need

 5    to provide daily reports anymore, correct?

 6          A    I don't have that.

 7          Q    You were asked about obtaining data from

 8    other -- strike that.

 9               You talked about being able to obtain

10    data regarding your customers receiving controlled

11    substances from other manufacture -- other --

12    other wholesalers.  Do you recall that?

13          A    Yes.

14          Q    And you talked about when you thought

15    that was available, and I won't go back into the

16    exact years, but you recall talking about a

17    timeline --

18          A    Yes.

19          Q    -- when you thought that was available,

20    right?

21          A    Yes.

22          Q    The bottom line is, McKesson at all

23    times was able to ask the customer for that data,

24    right?
```

```
1                 MR. COLLINS:  Objection.  Compound,

2     argumentative.

3                 THE WITNESS:  I don't know that.

4     BY MR. BOGLE:

5         Q    You don't know whether McKesson at all

6     times could ask their own customers, Listen, give

7     me all of the drugs that you're getting from all

8     the wholesalers, give me proof of that, I want to

9     see?

10        A    From 2000 on, I don't know that -- if

11    that was legally feasible.

12        Q    Legally feasible?

13        A    Yeah, I don't know --

14        Q    You've asked --

15        A    -- if we could legally give them the

16    other wholesalers' information.

17        Q    Do you recall anybody ever asking, that

18    you were aware of?

19                MR. COLLINS:  Objection to form.

20                THE WITNESS:  Yes.

21    BY MR. BOGLE:

22        Q    You recall somebody asking for it?

23        A    Yes.

24        Q    And somebody saying that was legally not
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    possible?

2         A    No.

3         Q    Okay.  So -- but what you do know is you

4    guys can get it today, right?

5         A    I -- yes, as he showed me.

6         Q    Any -- are you aware of any changes to

7    the laws that would allow it today that didn't

8    exist before?

9              MR. COLLINS:  Objection.  Calls for a

10   legal conclusion, among other things.

11             THE WITNESS:  I don't know anything

12   about the laws, no, right now on that.

13   BY MR. BOGLE:

14        Q    Okay.  Well, you talked about the fact

15   that you guys could get it.  I'm just trying to

16   follow up on that.

17        A    It depends --

18             MR. COLLINS:  I'm sorry, is that -- I'm

19   not sure that's a question.

20             MR. BOGLE:  No, it's not.  It's just a

21   comment.

22   BY MR. BOGLE:

23        Q    Now, you talked about blocked orders and

24   suspicious order reports generally.  Do you recall
```

1    that?

2         A    Yes.





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15          MR. COLLINS:  Objection.  Lack of

16  foundation what this --

17  BY MR. BOGLE:

18      Q    So you don't know what this report is

19  even about?

20          MR. COLLINS:  I'm sorry, let me finish

21  my objection.  Lack of foundation.  You haven't

22  established this witness's knowledge as to what

23  this document --

24  BY MR. BOGLE:

```
1         Q    Geez, it should, man.  I mean, you don't

2   know when orders were blocked from your

3   distribution center?

4              MR. COLLINS:  You don't have to answer

5   that.

6   BY MR. BOGLE:

7         Q    No, you do.  You don't know that?

8              MR. COLLINS:  Actually -- actually, lack

9   of foundation.  You haven't established this

10  witness has any knowledge about this document.  He

11  keeps telling you he doesn't know anything about

12  the document, and you keep asking him questions

13  about a document he doesn't know anything about.

14             THE WITNESS:  I don't know anything

15  about this document, and you say it's a blocked

16  item document, and this cover page is on it, but

17  I've never seen this before.

18  BY MR. BOGLE:

19        Q    I put the cover page on there.

20  Everything else --

21        A    Oh --

22        Q    -- is provided to us by --

23        A    -- I did not know that.

24        Q    That's a summary of the data included in
```

1    there.

2         A    If you say so, but I don't -- can't

3    testify to that.

4         Q    Okay.  You have no reason to dispute the

5    accuracy of either of those statements, do you, on

6    the first page?

7              MR. COLLINS:  Objection.  Lack of

8    foundation.

9    BY MR. BOGLE:

10        Q    Do you?

11             MR. COLLINS:  Objection.  Lack of

12   foundation.

13             THE WITNESS:  I don't trust what you put

14   on here.

15   BY MR. BOGLE:

16        Q    You don't trust what I put on there?

17        A    No.

18        Q    Show me where I'm wrong in the document.

19        A    I don't know the document.

20        Q    Okay.  You don't have any idea, right?

21             MR. COLLINS:  Objection.  Argumentative.

22             MR. BOGLE:  No further questions.

23             MR. COLLINS:  Actually I have a couple

24   of follow-ups.

1                    REDIRECT EXAMINATION

2     BY MR. COLLINS:

12          Q     All right, Exhibit 68, Mr. Bogle

13    questioned you about this allegedly lost tote.

14                Did McKesson ever lose any totes in

15    connection with servicing whatever customer this

16    is?

17          A     No.

18          Q     Do you have any idea what this -- what

19    is being discussed in this e-mail?

20          A     This is --

21                MR. BOGLE:  Object to form.

22                THE WITNESS:  This is their Giant Eagle

23    warehouse that they contracted with SSD to fill --

24    to deliver orders, and their due diligence would

Highly Confidential - Subject to Further Confidentiality Review

```
1    have been their manifest.

2             But Barb is trying to find out because

3    she's doing due diligence to make sure controls

4    don't get out on the street.

5    BY MR. BOGLE:

6        Q    Does this document reflect that McKesson

7    lost totes?

8        A    No.

9             MR. BOGLE:  Object to form.

10            MR. COLLINS:  No further questions.

11            MR. BOGLE:  All right, we're done.

12            THE VIDEOGRAPHER:  All right.  The time

13   is -- sorry, anything else?

14            MR. BOGLE:  No, I'm good.

15            MR. COLLINS:  We're good.

16            THE VIDEOGRAPHER:  Anybody on the phone

17   either?

18            I just want to make sure --

19            MR. COLLINS:  I didn't even know -- was

20   there anybody participating by phone?

21            THE VIDEOGRAPHER:  The time is

22   6:23 p.m., November 8, 2018.

23            Going off the record, completing the

24   videotaped deposition.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  (Whereupon, the deposition of

 2                  BLAINE M. SNIDER was concluded

 3                  at 6:23 p.m.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2      The undersigned Certified Shorthand Reporter

3    does hereby certify:

4      That the foregoing proceeding was taken before

5    me at the time and place therein set forth, at

6    which time the witness was duly sworn; That the

7    testimony of the witness and all objections made

8    at the time of the examination were recorded

9    stenographically by me and were thereafter

10   transcribed, said transcript being a true and

11   correct copy of my shorthand notes thereof; That

12   the dismantling of the original transcript will

13   void the reporter's certificate.

14      In witness thereof, I have subscribed my name

15   this date:  November 13, 2018.

16

17                    _____

18                    LESLIE A. TODD, CSR, RPR

19                    Certificate No. 5129

20   (The foregoing certification of

21   this transcript does not apply to any

22   reproduction of the same by any means,

23   unless under the direct control and/or

24   supervision of the certifying reporter.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2        Please read your deposition over carefully and

 3   make any necessary corrections.  You should state

 4   the reason in the appropriate space on the errata

 5   sheet for any corrections that are made.

 6   After doing so, please sign the errata sheet

 7   and date it.

 8        You are signing same subject to the changes

 9   you have noted on the errata sheet, which will be

10   attached to your deposition.  It is imperative

11   that you return the original errata sheet to the

12   deposing attorney within thirty (30) days of

13   receipt of the deposition transcript by you.  If

14   you fail to do so, the deposition transcript may

15   be deemed to be accurate and may be used in court.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                  E  R  R  A  T  A

 3                    - - - - - -

 4    PAGE LINE CHANGE

 5    _____ _____ _____

 6    REASON: _____

 7    _____ _____ _____

 8    REASON: _____

 9    _____ _____ _____

10    REASON: _____

11    _____ _____ _____

12    REASON: _____

13    _____ _____ _____

14    REASON: _____

15    _____ _____ _____

16    REASON: _____

17    _____ _____ _____

18    REASON: _____

19    _____ _____ _____

20    REASON: _____

21    _____ _____ _____

22    REASON: _____

23    _____ _____ _____

24    REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2        I,_____, do hereby

 3    certify that I have read the foregoing pages, and

 4    that the same is a correct transcription of the

 5    answers given by me to the questions therein

 6    propounded, except for the corrections or changes

 7    in form or substance, if any, noted in the

 8    attached Errata Sheet.

 9

10    _____

11    BLAINE M. SNIDER                    DATE

12

13

14    Subscribed and sworn to

15    before me this

16    _____day of_____,20___.

17    My commission expires:_____

18    _____

19    Notary Public

20

21

22

23

24
```