EXHIBIT 246

1          IN THE UNITED STATES DISTRICT COURT
2           FOR THE NORTHERN DISTRICT OF OHIO
3                    EASTERN DIVISION
4                       -  -  -
5

6    IN RE:  NATIONAL        :   HON. DAN A.
     PRESCRIPTION OPIATE     :   POLSTER
     LITIGATION              :
7                            :
     APPLIES TO ALL CASES    :   NO.
8                            :   1:17-MD-2804
                             :
9

10          - HIGHLY CONFIDENTIAL -

     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
12                      -  -  -
13               November 28, 2018
14                      -  -  -
15          Videotaped deposition of
     WILLIAM DE GUTIERREZ-MAHONEY, taken
16   pursuant to notice, was held at the law
     offices of Covington & Burling, LLP, The
17   New York Times Building, 620 Eighth
     Avenue, New York, New York, beginning at
18   9:08 a.m., on the above date, before
     Michelle L. Gray, a Registered
19   Professional Reporter, Certified
     Shorthand Reporter, Certified Realtime
20   Reporter, and Notary Public.
21                      -  -  -
22          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
23              deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2

 3         LEVIN PAPANTONIO THOMAS
           MITCHELL RAFFERTY & PROCTOR, PA
           BY:  BRANDON L. BOGLE, ESQ.
 4         BY:  WESLEY BOWDEN, ESQ.
           316 South Baylen Street, Suite 600
 5         Pensacola, Florida 32502
           (888) 435-7001
 6         bbogle@levinlaw.com
           wbowden@levinlaw.com
 7         Representing the Plaintiffs
 8

           COVINGTON & BURLING, LLP
 9         BY:  PAUL W. SCHMIDT, ESQ.
           620 Eighth Avenue
10         New York, NY 10018
           (212) 841-1000
11         Pschmidt@cov.com
12            - and -
13         COVINGTON & BURLING, LLP
           BY:  LAUREN C. DORRIS, ESQ.
14         850 10th Street, NW
           Washington, DC 20001
15         (202) 662-6000
           ldorris@cov.com
16         Representing the Defendant, McKesson
           Corporation and the Witness
17

18         WILLIAMS & CONNOLLY, LLP
           BY:  COLLEEN MCNAMARA, ESQ.
19         725 12th Street, NW
           Washington, D.C. 20005
20         (202) 434-5148
           Cmcnamara@wc.com
21         Representing the Defendant, Cardinal
           Health
22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        APPEARANCES:  (Cont'd.)
2

3        MARCUS & SHAPIRA, LLP
         BY:  SCOTT D. LIVINGSTON, ESQ.
         One Oxford Centre, 35th Floor
4        Pittsburgh, Pennsylvania 15219
         (412) 338-4683
5        livingston@marcus-shapira.com
         Representing the Defendant, HBC
6        Service Company
7

         JACKSON KELLY, PLLC
8        BY:  GRETCHEN M. CALLAS, ESQ.
         500 Lee Street East
9        Suite 1600
         Charleston West Virginia 25301
10       (304) 340-1169
         Gcallas@jacksonkelly.com
11       Representing the Defendant,
         AmerisourceBergen
12

13       JONES DAY
         BY:  LAURA JANE DURFEE, ESQ.
14       2727 North Harwood Street
         Dallas, Texas 75201
15       (214) 220-3939
         Ldurfee@jonesday.com
16       Representing the Defendant, Walmart
17

         PELINI CAMPBELL & WILLIAMS, LLC
18       BY:  PAUL B. RICARD, ESQ.
         8040 Cleveland Avenue NW, Suite 400
19       North Canton, Ohio 44720
         (330) 305-6400
20       Pbricard@pelini-law.com
         Representing the Defendant,
21       Prescription Supply, Inc.
22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          TELEPHONIC APPEARANCES:
 2

            ALLEGAERT, BERGER & VOGEL, LLP
 3          BY:  LUCY N. ONYEFORO, ESQ.
            111 Broadway, 20th Floor
 4          New York, New York  10006
            (212) 616-7060
 5          Lonyeforo@abv.com
            Representing the Defendant,
 6          Rochester Drug Corporation
 7

            KIRKLAND & ELLIS, LLP
 8          BY:  PRATIK K. GHOSH, ESQ.
            300 North LaSalle Street
 9          Chicago, Illinois 60654
            (312) 862-2595
10          Pratik.ghosh@kirkland.com
            Representing the Defendant, Allergan
11

12          FOX ROTHSCHILD, LLP
            BY: EILEEN OAKES MUSKETT, ESQ.
13          1301 Atlantic Avenue
            Midtown Building, Suite 400
14          Atlantic City, New Jersey 08401
            (609) 348-4515
15          Emuskett@foxrothschild.com
            Representing the Defendant, Validus
16          Pharmaceuticals
17

            ALSO PRESENT:
18

            VIDEOTAPE TECHNICIAN:
19             Henry Marte
20

            LITIGATION TECHNICIAN:
21             Mike Kutys
22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



- - -

I N D E X

- - -

Testimony of:

WILLIAM DE GUTIERREZ-MAHONEY

By Mr. Bogle                    20, 550

By Mr. Bowden                        301

By Mr. Schmidt              483, 599

- - -

E X H I B I T S

- - -

Highly Confidential - Subject to Further Confidentiality Review



- - -

E X H I B I T S  (Cont'd.)

- - -





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



- - -

E X H I B I T S   (Cont'd.)

- - -

Highly Confidential - Subject to Further Confidentiality Review



E X H I B I T S  (Cont'd.)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5    Direction to Witness Not to Answer

 6    PAGE    LINE
      None.

 7

 8    Request for Production of Documents

 9    PAGE    LINE
      None.

10

11    Stipulations

12    PAGE    LINE
      None.

13

      Questions Marked

14

      PAGE    LINE

15    None.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1    THE VIDEOGRAPHER:  We are

2    now on the record.  My name is

3    Henry Marte, the videographer with

4    Golkow Litigation Services.

5    Today's date is November 28,

6    2018.  And the time is 9:08 a.m.

7    This videotaped deposition

8    is being held at Covington and

9    Burling LLP, located at 620 Eighth

10   Avenue, New York, New York, in the

11   matter of National Prescription

12   Opiate Litigation.

13   The deponent today is

14   William de Gutierrez-Mahoney.

15   Counsel, please introduce

16   themselves for the record, which

17   after the court reporter will

18   administer the oath to the

19   witness.

20   MR. BOGLE:  Brandon Bogle on

21   behalf of plaintiffs.

22   MR. BOWDEN:  Wes Bowden on

23   behalf of plaintiffs.

24   MR. LIVINGSTON:  Scott

Highly Confidential - Subject to Further Confidentiality Review

1    Livingston on behalf of Defendant,

2    HBC.

3         MR. RICARD:  Paul Ricard on

4    behalf of Prescription Supply.

5         MS. DURFEE:  Laura Jane

6    Durfee on behalf of Walmart.

7         MS. McNAMARA:  Colleen

8    McNamara, on behalf of Cardinal

9    Health.

10        MS. CALLAS:  Gretchen Callas

11   on behalf of AmerisourceBergen.

12        MS. DORRIS:  Lauren Dorris

13   on behalf of McKesson.

14        MR. SCHMIDT:  Paul Schmidt

15   on behalf of McKesson.

16        And let me just say, if I

17   may, I don't know what the prior

18   practice has been, I meant to

19   check this, but my understanding

20   is that everyone in the room and

21   everyone on the phone is

22   subjective to the protective order

23   and the deposition will be covered

24   by the confidentiality provisions

1      of the protective order.  But if

2      that's not true as to anyone,

3      please correct me.

4           MR. BOGLE:  I think that's

5      accurate.

6           MS. MUSKETT:  Michelle, did

7      you get Fox Rothschild.

8           MS. ONYEFORO:  Lucy Onyeforo

9      of Allegaert, Berger & Vogel is on

10     the phone as well for Rochester

11     Drug Corporation.

12               -   -   -

13      ... WILLIAM DE GUTIERREZ-MAHONEY,

14  having been first duly sworn, was

15  examined and testified as follows:

16               -   -   -

17               EXAMINATION

18               -   -   -

19  BY MR. BOGLE:

20      Q.    Good morning, Mr. Mahoney.

21  How are you doing?

22      A.    Good morning.  Good.

23      Q.    My name is Brandon Bogle,

24  I'm going to be asking you some questions

Highly Confidential - Subject to Further Confidentiality Review

1    today.

2           Just starting out for the

3    record, can I get your full name, please?

4           A.    William de

5    Gutierrez-Mahoney.

6           Q.    Okay.  And have you ever had

7    your deposition taken before?

8           A.    I've been deposed in other

9    matters, but not with opioids.

10          Q.    Right.  And I'm talking

11   generally in this sense.  So how many

12   times have you been deposed in any sort

13   of matter prior to today?

14          A.    Once.  Once.

15          Q.    Once.  What was the general

16   subject matter in that deposition?

17          A.    It was -- it was a murder

18   case, and the question was about chain of

19   custody.

20          Q.    Okay.  Were you testifying

21   in some law enforcement capacity?

22          A.    It was a criminal case.  And

23   the state wanted to know if the product

24   that had been used in the crime had come

Highly Confidential - Subject to Further Confidentiality Review

1    from McKesson.

2         Q.    Okay.  So you were working

3    for McKesson at that point in time?

4         A.    Yes.

5         Q.    Okay.  So just to kind of

6    refresh you a little bit on a deposition,

7    just sort of the basics, I'm going to ask

8    you some questions today.  I'll do my

9    very best to ask my question, give you

10   every opportunity to answer before I ask

11   my next question.

12             I'll also ask that even if

13   you think you know where I'm going, if

14   you can let me get my full question out

15   there before you answer so that we don't

16   step on each others' toes, I think that

17   the court reporter will appreciate that.

18   Is that fair?

19        A.    Yes.

20        Q.    Okay.  And you can take a

21   break whenever you want.  It's not an

22   endurance contest.  Just tell myself or

23   your own counsel here.  The only thing I

24   ask is if I've got a question pending, if

Highly Confidential - Subject to Further Confidentiality Review

1   you could answer that question and we can

2   break for whenever -- however you want.

3              And the last thing is if you

4   don't understand or don't hear something

5   that I say, ask me to repeat or rephrase.

6   I'll do my best to make it clear to you.

7   But if you answer my question, I'm going

8   to assume that you understood it.  Is

9   that fair?

10        A.    Yes.

11        Q.    Okay.  Where are you

12   currently employed?

13        A.    At McKesson.

14        Q.    Okay.  And how long have you

15   been with McKesson?

16        A.    I've been with McKesson for

17   17-plus years.

18        Q.    Okay.  So starting

19   approximately 2001; is that right?

20        A.    Yes.

21        Q.    Okay.  What was your job in

22   2001 when you started, job title?

23        A.    I joined McKesson as a

24   business process manager.

1   Q.    Was that at Lakeland?

2   A.    Our facility in Florida at

3   that time was in Tampa.

4   Q.    Okay.  How long did you have

5   that position?

6   A.    I think I had it between

7   let's say one year and two years.

8   Q.    Okay.  What was your next

9   job at McKesson after that?

10   A.    It was assistant

11   distribution center manager.

12   Q.    Was it in the Tampa

13   facility?

14   A.    Yes.

15   Q.    How long did you have that

16   job?  Just the years is fine.

17   A.    Until '04.

18   Q.    Okay.  And beginning in '04,

19   it's my understanding that you took the

20   role as distribution center manager for

21   the Lakeland facility; is that right?

22   A.    Yes.

23   Q.    Okay.  And you held that

24   position from 2004 until approximately

Highly Confidential - Subject to Further Confidentiality Review

1  December 2007; is that right?

2      A.    Yes.

3      Q.    Beginning in January 2008

4  you took over as director of regulatory

5  affairs for the southeast region, fair?

6      A.    Yes.

7      Q.    Okay.  Has that been your

8  job title from January 2008 to the

9  present?

10      A.    Yes.

11      Q.    Okay.  Now, just so I

12  understand, when we talk about the

13  southeast region, can you give me a sense

14  of what that encompasses, whether it be

15  states or distribution centers or however

16  that's divided out at McKesson.

17      A.    Initially, I was responsible

18  for six distribution centers, in

19  Lakeland; Atlanta; Birmingham, Alabama;

20  Memphis, Tennessee; Conroe, Texas; and

21  Oklahoma City.

22      Q.    Okay.  And you said

23  initially.  So at some point in time, did

24  that change?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     When did that change?

3          A.     We brought on another person

4     in 2013.  And at that point I was

5     responsible for Birmingham, Lakeland, and

6     Atlanta.

7          Q.     Who is the person that was

8     brought on in 2013?

9          A.     Linda Martin.  There's been

10    a subsequent change too.

11         Q.     Okay.  What was that?  First

12    of all, when did that subsequent change

13    occur?

14         A.     I believe it happened in the

15    middle of 2014.

16         Q.     Okay.  What changed?

17         A.     Jerry Carmack joined.  And

18    he picked up Memphis and Birmingham.

19    Linda moved to Texas and Oklahoma City,

20    and I was responsible for Atlanta and

21    Lakeland.

22              MR. SCHMIDT:  And I

23         apologize.  I can appreciate if

24         you were running something off the

1   screen.  Do you have a copy of

2   whatever you're running?

3          MR. BOGLE:  I haven't marked

4   anything yet.  I'm not -- we can

5   take that down.  I haven't marked

6   anything yet.  It's not supposed

7   to be on the screen yet.  Yeah, we

8   certainly will when we go through

9   it.

10         MR. SCHMIDT:  I understand.

11  BY MR. BOGLE:

12         Q.    Okay.  So I didn't catch the

13  last part there.  So I apologize.  I'm

14  going to repeat part of this so I

15  understand.  I want to know from your

16  perspective in mid-2014, which facilities

17  you were responsible for from a

18  regulatory perspective?

19         A.    From then on --

20         Q.    Yes, sir.

21         A.    -- I became responsible for

22  Atlanta and Lakeland.

23         Q.    Atlanta and Lakeland.  Has

24  that been true from mid-2014 to present?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Now, going back to the time

3  that you were distribution center manager

4  for Lakeland, would that have encompassed

5  running the day-to-day operations for the

6  distribution center?

7    A.    Yes.

8    Q.    Okay.  And can you just give

9  me a general sense, again, as a

10 distribution center manager for Lakeland,

11 what your general job responsibilities

12 were?

13   A.    I was responsible for hiring

14 and enabling the distribution center to

15 service its customer base.  We would

16 receive product from manufacturers, stock

17 the shelves, and process orders in the

18 evening for delivery the following day.

19   Q.    Okay.  And the time period

20 that you had that role from '04 to '07,

21 there would also have been

22 responsibilities under the Controlled

23 Substances Act that would have fallen

24 within your purview, right?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    Okay.  That would include,

3  for example, suspicious order monitoring

4  for controlled substances, right?

5        A.    Yes.

6        Q.    Okay.  And can you give me a

7  sense of what your role during that time

8  period would have been from that

9  perspective of suspicious order

10  monitoring?

Highly Confidential - Subject to Further Confidentiality Review

11 just asking your recollection.  So if you

12 don't recall, that's fine.

13          A.     Right.

14          Q.     Okay.  The Lakeland

15 distribution center, we'll start with '04

16 to '07 time frame, what -- geographically

17 what states did that cover as far as a

18 customer base?

19          A.     In '04, I think we covered

20 actually some portions -- the geography

21 that we covered moved between '04 and

22 '06 --

23          Q.     Okay.

24          A.     -- because of the Florida

Highly Confidential - Subject to Further Confidentiality Review

1    pedigree law.

2         Q.    Okay.

3         A.    And the decision was made to

4    basically make Lakeland the primary with

5    only one -- one or two backups, vehicle

6    for delivering -- acquiring and

7    delivering pedigree product to conform

8    with the Florida pedigree law.

9         Q.    When you say pedigree

10   product, I want to make sure that our

11   jury understands what that means.  What

12   is a pedigree product?

13        A.    Because of investigations

14   which observed that there is companies or

15   entities were counterfeiting product or

16   repackaging it in a way that undermined

17   its efficacy and whether it was safe for

18   the public, Florida implemented the

19   Florida pedigree law.  And initially they

20   chose 30 drugs that they viewed as being

21   subject to diversion that way.

22             And they required a pedigree

23   on who had bought the various

24   transactions which took place between the

Highly Confidential - Subject to Further Confidentiality Review

1    manufacturer and -- or actually the

2    distributor who bought it from the

3    manufacturer and the pharmacy or entity

4    to which it was sold.

5         Q.    Would it be fair to say that

6    it's sort of similar to what you

7    mentioned before in the respect that you

8    testified before, sort of a chain of

9    custody throughout the lifecycle of the

10   product to establish at all times it was

11   a legitimate product?

12        A.    Right.

13        Q.    Okay.  And let me ask my

14   other question maybe a different way.

15   From 2004 to present, has the Lakeland

16   distribution center serviced customers in

17   the State of Florida?

18        A.    Yes.

19        Q.    Okay.  You mentioned the

20   term "diversion" in your answer just a

21   minute ago.  What do you understand the

22   term "diversion" to mean?

23        A.    Where a product is

24   inappropriately taken out of the normal

Highly Confidential - Subject to Further Confidentiality Review

1    supply chain.  In this case, one of the

2    modes was that customers would buy a

3    product and then attempt to return

4    altered or not pedigree product into the

5    supply chain.

6         Q.    Okay.  And the concept of

7    diversion is -- it can be broader than

8    that, right?

9         A.    Sure, sure.

10        Q.    Okay.  Are there any other

11   examples of diversion that you can think

12   of?

13        A.    Yeah.  There is -- I guess,

14   not chain.  There's diversion that used

15   to take place between closed door

16   pharmacies and independent retail

17   pharmacies in which pricing which was

18   offered to closed door pharmacies would

19   be diverted into the normal chain of

20   independent flow, at which it would be

21   able to be sold for higher prices.  That

22   was something that the manufacturers

23   really clamped down on.

24             And then there's diversion

1    of controlled substances.

2         Q.    Okay.  And the concept of

3    diversion, as I read it, is sort of

4    generally defined as the use of a drug

5    for an illegitimate medical purpose.  Do

6    you think that's a fair general

7    statement?

8         A.    Particularly in the case of

9    controls.

10        Q.    Right.  Is that a fair

11   general statement for controlled

12   substances?

13        A.    Yes.

14        Q.    Okay.  So prior to taking on

15   your role as director of regulatory

16   affairs in 2008, did you have any prior

17   experience working in a regulatory

18   capacity for any company?

19        A.    No.

Highly Confidential - Subject to Further Confidentiality Review

5      Q.    Okay.  And you said CSA.
6   And, again, I just want to make sure
7   we're clear on what everything means
8   here.  That's the Controlled Substance
9   Act?
10     A.    Yes, sir.
11     Q.    Okay.  I saw a reference
12  somewhere to you previously working for
13  Cardinal Health; is that right?
14     A.    I worked -- yes.
15     Q.    Okay.  What period of time
16  did you work there?
17     A.    I worked for Cardinal from
18  March of '98 to the summer of 2000.
19     Q.    Okay.  What did you do
20  generally for Cardinal?
21          First of all, what was your
22  job title?  Let's start there.
23     A.    Job title was director of
24  operations.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Was that for a distribution

2  center?

3    A.    Yes.

4    Q.    Where?

5    A.    In Lakeland.

6    Q.    Okay.  Were your job

7  responsibilities similar there to what

8  they were at McKesson when you were

9  distribution center manager?

10    A.    Yes.

11    Q.    Okay.  You worked for --

12  did -- had you worked for any other

13  pharmaceutical distributors prior to

14  working for Cardinal?

15    A.    No.

16    Q.    And McKesson is a

17  distributor of pharmaceutical products,

18  right?

19    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

3      Q.    And obviously the deposition

4   today is going to focus largely on opioid

5   products.  You understand that, right?

6      A.    Yes.

7      Q.    That's what we're here to

8   talk about?

9      A.    Yes.

10      Q.    And you are familiar with

11   opioids, right?

12      A.    Yes.

13      Q.    Okay.  And McKesson has

14   distributed opioids during the time that

15   you've worked with the company, right?

16      A.    Yes.

17      Q.    And opioids are a controlled

18   substance, right?

19      A.    Yes.

20      Q.    And opioids are -- fall into

21   the category of a narcotic drug, right?

22      A.    Yes.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20          MR. SCHMIDT:  Objection.

21      Foundation.

22  BY MR. BOGLE:

23          Q.    You can still answer unless

24  he tells you not to answer.

Highly Confidential - Subject to Further Confidentiality Review



1    A.    Okay.  Can you repeat that?

2    Q.    Sure, I can.

8          MR. SCHMIDT:  Same

9    objection.



Highly Confidential - Subject to Further Confidentiality Review

2          MR. SCHMIDT:  Objection.

3      Form.

4             (Document marked for

5      identification as Exhibit

6      MCK-Mahoney-1)

7  BY MR. BOGLE:

8      Q.   Okay.  I'm going to hand you

9  what's marked as Exhibit 1.1464.  Also

10  marked as Exhibit 1 to your deposition.

11  And the beginning Bates number is

12  MCK_MDL_00478906.

13             Here's your copy.  And this

14  is a long table, sir, so I'm not trying

15  to throw stuff at you, I swear.

16             Okay.  So looking at

17  Exhibit 1 here.  Let me introduce it and

18  then I want to ask you some questions

19  about it.

20             Do you see this is a letter

21  from the U.S. Department of Justice Drug

22  Enforcement Administration dated

23  September 27, 2006.  Do you see that?

24      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Have you seen this

2    letter before today?

3    A.    Yes.

4    Q.    Okay.  Did you see it in and

5    around 2006?

6    A.    Yes.

7    Q.    Okay.  How was it -- how did

8    you come to see it in and around 2006?

9    A.    It may have been addressed

10   to me at the DC.  But I also saw it via

11   e-mail internally.

12   Q.    Okay.  All right.  So I want

13   to discuss a few portions of this letter.

14   The first paragraph there

15   says, "This letter is being sent to every

16   commercial entity in the United States

17   registered with the Drug Enforcement

18   Administration to distribute controlled

19   substances.  The purpose of this letter

20   is to reiterate the responsibilities of

21   controlled substance distributors in view

22   of the prescription drug abuse problem

23   our nation currently faces."

24   Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     Okay.  And McKesson in 2006

3    was registered with the DEA to distribute

4    controlled substances, right?

5          A.     Yes.

6          Q.     And if you go down to the

7    third paragraph on the first page.  And

8    I'm in the -- let's start with the first

9    sentence.  It says, "The CSA was designed

10   by Congress to combat diversion by

11   providing for a closed system of drug

12   distribution in which all legitimate

13   handlers of controlled substances must

14   obtain a DEA registration, and as a

15   condition of maintaining such

16   registration, must take reasonable steps

17   to ensure that their registration's not

18   being utilized as a source of diversion.

19   Distributors are, of course, one of the

20   key components of the distribution chain.

21   If the closed system is to function

22   properly as Congress envisioned,

23   distributors must be vigilant in deciding

24   whether a prospective customer can be

1  trusted to deliver controlled substances

2  only for lawful purposes."

3          Did I read that correctly?

4     A.    Yes.

5     Q.    Okay.  There's a reference

6  here to a closed system in this regard.

7  What do you understand a closed system to

8  mean?

9     A.    A closed system is a system

10 in which the -- the drugs are initiated

11 at a manufacturer, usually acquired by

12 distributor.  Could be sent to another

13 distributor, or to a pharmacy.

14          The prescription is

15 initiated with the -- the doctor.  And

16 the distributor delivers the drugs to the

17 pharmacy, and the pharmacy fills scripts

18 which are initiated by the doctor.

19     Q.    And in a closed system in --

20 in the concept of controlled substances

21 means that essentially you have to have

22 this DEA registration in order to be able

23 to prescribe or distribute or manufacture

24 controlled substances, right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    Okay.  Okay.  Look at the

3  next sentence here.  It says, "This

4  responsibility is critical as Congress

5  has expressly declared that the illegal

6  distribution of controlled substances has

7  a substantial and detrimental effect on

8  the health and general welfare of the

9  American people."

10          Do you see that?

11     A.    Yes.

12     Q.    Do you agree with that

13  sentence?

14          MR. SCHMIDT:  Objection.

15     Foundation.

16          THE WITNESS:  Yes.

17  BY MR. BOGLE:

18     Q.    And turning to the second

19  page of this document, one more section

20  that I wanted to look at with you.

21          You see in the middle of the

22  page there where it says the DEA

23  regulations require?  Do you see that?

24     A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    It says, "The DEA

2   regulations require all distributors to

3   report suspicious orders of controlled

4   substances.  Specifically the regulations

5   state in 21 C.F.R. 1301.74(b), "The

6   registrant shall design and operate a

7   system to disclose to the registrant

8   suspicious orders of controlled

9   substances.  The registrant shall inform

10  the field division office of the

11  administration in his area of suspicious

12  orders when discovered by the registrant.

13  Suspicious orders include orders of

14  unusual size, orders deviating

15  substantially from a normal pattern, and

16  orders of unusual frequency."

17           Do you see that?

18      A.    Yes.

19      Q.    And that paragraph I just

20  read that's from the C.F.R., that's a

21  paragraph that you're familiar with,

22  right?

23      A.    Yes.

24      Q.    And then it goes on to say,

1  "It bears emphasis that the foregoing

2  reporting requirement is in addition to,

3  and not in lieu of, the general

4  requirement under 21 U.S.C. 823(e) that a

5  distributor maintain effective controls

6  against diversion.  Thus, in addition to

7  reporting all suspicious orders, a

8  distributor has statutory responsibility

9  to exercise due diligence to avoid

10  filling suspicious orders that might be

11  diverted into other than a legitimate

12  medical, scientific, and industrial

13  channels."

14           Do you see that?

15      A.    Yes.

16      Q.    And these -- this additional

17  duty to avoid filling here, that's what

18  we talked about earlier which is the duty

19  to block suspicious orders when they're

20  detected, right?

21      A.    Yes.

22      Q.    Okay.  And would you agree

23  that reporting suspicious orders to the

24  DEA is important because it allows the

Highly Confidential - Subject to Further Confidentiality Review

1    DEA to decide whether it wants to

2    investigate whether diversion is

3    occurring as to the order you're

4    reporting?

5            MR. SCHMIDT:  Objection.

6        Foundation.

7            THE WITNESS:  I'm not sure

8        what the DEA used the information

9        that we sent to them for.

10   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

3        Q.    Okay.  So do you have a

4  sense as to whether -- actually, strike

5  that.

6            Would you agree with me that

7  blocking a suspicious order is important

8  because it ensures that potential

9  diversion does not occur with that order?

10           MR. SCHMIDT:  Same

11        objection.  Foundation.

12           THE WITNESS:  That's the

13        intent, yes.

14  BY MR. BOGLE:

15        Q.    Okay.  And diversion of

16  controlled substances, including opioids

17  can be prevented by compliance with the

18  Controlled Substance Act, right?

19           MR. SCHMIDT:  Same

20        objection.

21           THE WITNESS:  I think there

22        are a lot of different

23        participants.  And even if

24        Controlled Substance Act is

Highly Confidential - Subject to Further Confidentiality Review

1    complied with by a majority of the

2    participants, diversion can still

3    occur.

4  BY MR. BOGLE:

5        Q.    Okay.  So you would not

6  agree then that diversion of opioids

7  specifically can be prevented through

8  compliance with the Controlled Substance

9  Act?

10       MR. SCHMIDT:  Same

11   objection.

12       THE WITNESS:  Are you

13   talking about relative to

14   distributors?

15 BY MR. BOGLE:

16       Q.    Yeah.  We can start there.

17       A.    Okay.  Can you repeat the

18 question?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Do you agree that

2    there is an ongoing opioid epidemic in

3    the United States?

4    A.    Yes.

5    Q.    And that epidemic has been

6    going on for more than a decade in this

7    country, right?

8         MR. SCHMIDT:  Objection.

9    Foundation.

10        THE WITNESS:  I'm not sure

11        exactly when it began.

12   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



21   opioid overdoses are the leading cause of

22   injury-related death in the United

23   States?

24            A.     I'm not sure about that.

1      Q.    Okay.

2      A.    I've heard that for

3  different age groups and that kind of

4  thing.  But I'm not sure.

5      Q.    Okay.  Why don't we take a

6  look at something here with you on that

7  point.  I'm going to hand you 1.264,

8  which is marked as Exhibit 2.

9          (Document marked for

10         identification as Exhibit

11         MCK-Mahoney-2.)

12  BY MR. BOGLE:

13     Q.    This is a public document.

14  So no Bates numbers.

15         MR. SCHMIDT:  You can throw

16     it.  I know you're not being rude.

17     It's a big table.

18  BY MR. BOGLE:

19     Q.    Okay.  Mr. Mahoney, what

20  I've handed you -- here again, I'll

21  introduce it, and we'll kind of go from

22  there -- is a document from May 4, 2018,

23  from the U.S. House of Representatives

24  Committee on Energy and Commerce.

Highly Confidential - Subject to Further Confidentiality Review

1    Do you see that?

2    A.    Mm-hmm.

3    Q.    Okay.  Have you seen this

4  document before?

5    A.    I don't think I've seen this

6  document.

7    Q.    Okay.  Do you see that the

8  line at the top notes, "Regarding hearing

9  entitled 'Combatting the Opioid Epidemic:

10  Examining Concerns About Distribution and

11  Diversion.'"

12    Do you see that?

13    A.    Yes.

14    Q.    Okay.  And if you look here,

15  on that first page, there's a section

16  that lists witnesses for the hearing.

17    A.    Yes.

18    Q.    Do you see that section?

19    A.    Mm-hmm.

20    Q.    And you see the third person

21  listed there is a John H. Hammergren --

22    A.    Yes.

23    Q.    -- president and CEO of

24  McKesson.  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Mm-hmm.

2        Q.     Okay.  And you are familiar

3  with Mr. Hammergren, right?

4        A.     Yes.

5        Q.     Okay.  I mean, you know who

6  he is, right?

7        A.     Yeah.

8        Q.     Okay.  Were you aware that

9  he testified before Congress in 2018?

10        A.     Yes.

11        Q.     Yes.  What information were

12  you provided about his testimony?

13        A.     I believe I watched it.

14        Q.     Okay.  So you did watch at

15  least portions of this hearing that we're

16  talking about here?

17        A.     Yes.

18        Q.     Okay.  So going to the

19  second page of this document, and I'm

20  looking at the paragraph below the chart

21  that says, "The U.S. continues."

22        A.     Okay.

23        Q.     Do you see that?

24             It says, "The U.S. continues

Highly Confidential - Subject to Further Confidentiality Review

1  to experience an opioid epidemic which

2  has worsened over the last two decades.

3  Opioid-involved overdose deaths are the

4  leading cause of injury death in the U.S.

5  and take the lives of 115 Americans per

6  day.  According to a recent report issued

7  by the Centers For Disease Control and

8  Prevention, CDC, prescription or illicit

9  opioids were involved in nearly

10 two-thirds of all drug overdose deaths in

11 the U.S. during 2016, a 27.7 percent

12 increase from 2015.

13          "In total, more than 351,000

14 people have died since 1999 due to an

15 opioid-involved overdose.  The crisis has

16 become so severe that the average life

17 expectancy declined in 2016 from the

18 previous year largely because of opioid

19 overdoses."

20          Do you see that there?

21      A.    Yes.

22      Q.    Okay.  Prior to looking at

23 this today, were you aware that the life

24 expectancy, at least in 2016, had

1   declined largely because of opioid

2   overdoses?

3           MR. SCHMIDT:  Objection.

4       Foundation.

5           THE WITNESS:  I had heard

6       that life expectancy had gone

7       down.  But I hadn't attributed it

8       necessarily to just opioids.

9           Suicide, depression.  There

10      were a lot of different things in

11      what I had seen.

12  BY MR. BOGLE:

13      Q.   Okay.  But you've never seen

14  the reference similar to the one here

15  that decline, at least from 2016 versus

16  2015, was largely because of opioid

17  overdoses?

18      A.   I hadn't seen that sentence,

19  no.

20      Q.   Any reason to dispute that

21  finding?

22      A.   No.

23          MR. SCHMIDT:  Same

24      objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOGLE:
 2         Q.    We talked a little bit
 3    earlier about your involvement at the
 4    Lakeland distribution center, initially
 5    as the assistant distribution center
 6    manager -- I think that was the title
 7    that you gave me -- then distribution
 8    center manager, and then as director of
 9    regulatory affairs responsible for
10    Lakeland.  We talked about that earlier,
11    right?
12         A.    Yes.
13         Q.    Okay.  So Florida -- let me
14    back up.  Strike that.
15              Do you live in Florida?
16         A.    I do.
17         Q.    Okay.  How long have you
18    lived in Florida?
19         A.    About 20 years.
20         Q.    Okay.  So being a Florida
21    resident in addition to being an employee
22    of McKesson in the capacities that we've
23    discussed, you understand that Florida
24    has been hit very hard by the opioid
```

Highly Confidential - Subject to Further Confidentiality Review

1    epidemic, correct?

2           A.    Yes.

3           Q.    Are you familiar with Gary

4    Boggs at McKesson?

5           A.    Yes, mm-hmm.

6           Q.    Did you know him in any

7    capacity prior to him joining the

8    company?

9           A.    I may have met him before.

10   But I didn't know him.

11          Q.    Okay.  You do know that he

12   was with the DEA prior to joining

13   McKesson, right?

14          A.    Yes.

15          Q.    And he works in the

16   regulatory affairs department at McKesson

17   presently, right?

18          A.    Yes.

19          Q.    And has for the past five

20   years or so, right?

21          A.    Yes.

22                (Document marked for

23          identification as Exhibit

24          MCK-Mahoney-3.)

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. BOGLE:

2      Q.    I'm going to hand you what

3  I'm marking Exhibit 1.851, also marked as

4  Exhibit 3.

5          MR. SCHMIDT:  Bill, when

6      you're done with the exhibits,

7      I'll just put them here.  If we

8      need to go back to any earlier

9      ones --

10         MR. BOGLE:  Yeah, we may

11     bounce a little back and forth.

12     But --

13         MR. SCHMIDT:  I'll help you

14     with that, which should be

15     terrifying to everyone in the

16     room.  I'll do my best.

17 BY MR. BOGLE:

18     Q.    All right.  So Exhibit 3

19 here, also marked as 1.851, is a

23                 Do you see that?

24     A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



1    A.    Mm-hmm.

2    Q.    Is that a yes?

3    A.    Yes.

4    Q.    I'm sorry, I'm not trying to

5    be rude, just want to make sure --

6    A.    No, I understand --

7    understand.

8    Q.    The concept of a pill mill,

9    what does that mean to you?

10    A.    The way I envision the pill

11    mill is a doctor, doctor or doctor's

12    office, in which people are seeing the

13    doctor and getting opioids on the way

14    out.

15    Q.    Okay.

16    A.    So from my exposure or

17    things that I've seen, it would be a high

18    volume-type operation.

19    Q.    Okay.  In the term "pill

20    mill" as used generally in -- strike

21    that.

22          The term "pill mill" when

23    you are talking about the sales of

24    controlled substances is -- has a



1    negative connotation to it, right?

2         A.    Yes.

10        Q.    Okay.  What is DU, do you

11   know what that stands for?

12        A.    Dosage units.



3          MR. SCHMIDT:  Objection.

4     Foundation.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



2        Q.    And you've seen that

3  reference before today, right?

4        A.    I believe so.

Highly Confidential - Subject to Further Confidentiality Review



9          MR. SCHMIDT:  Objection.

10      Vague.

Highly Confidential - Subject to Further Confidentiality Review

2          (Document marked for

3          identification as Exhibit

4          MCK-Mahoney-4.)

5     BY MR. BOGLE:

6          Q.    I'm going to hand you next

7     what I'm marking as Exhibit 1.1968, also

8     marked as Exhibit 4 to your deposition.

9                And the start date here is

10    MCK_MDL_00651331.

11               Okay.  So what I've given

12    you here is Exhibit 4.  The title is

20          Q.    Okay.  And before we get

21    into it, I have a few questions about it,

22    but before we get there, ISMC, what does

23    that stand for at McKesson?

24          A.    Independent and small and

Highly Confidential - Subject to Further Confidentiality Review

1    medium chain.

2           Q.    Okay.

3           A.    So it's a segment of the

4    retail marketplace.

5           Q.    Okay.  It's a type of

6    pharmacy customer; is that fair?

7           A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



9          MR. SCHMIDT:  Objection.

10      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

10          MR. SCHMIDT:  Let me just

11    say, I think there was an issue in

12    one of the earlier depositions

13    about geographic focus

14    restriction.  We're, I think, well

15    outside of it with Florida.  I'd

16    ask you to kind of focus on what's

17    at issue geographically.  And if

18    not, we'll obviously preserve our

19    objection and maybe seek relief on

20    that basis.

21          MR. BOGLE:  Yeah, I mean,

22    you're certainly entitled to

23    object, but there's no geographic

24    restrictions as to what I can ask.

Highly Confidential - Subject to Further Confidentiality Review



1    I'm aware of nothing of the sort.

2         MR. SCHMIDT:  I don't think

3    we understand that in that way in

4    terms of the judge ordering -- the

5    special master ordering that

6    discovery should be focused on the

7    jurisdictions that would be

8    subject to the first trial.

9    BY MR. BOGLE:

10        Q.    My question stands.  Do you

11   recall my question?

12        A.    Can you repeat it, please?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



5          MR. SCHMIDT:  Objection.

6      Foundation.

19          Q.    Okay.  And Florida

20  specifically, is it your understanding,

21  has historically had one of the highest

22  rates of diversion of opioids in the

23  country?

24          A.    Let me see.  Historically?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Yeah.  So, well let me ask

2  you.  Here, we'll just look at the

3  document.  We'll cut to it.

4          (Document marked for

5      identification as Exhibit

6      MCK-Mahoney-5.)

7  BY MR. BOGLE:

8    Q.    I'll hand you what's marked

9  as Exhibit 1.1434, also marked as

10  Exhibit 5, and start with Bates

11  MCKMDL00403517.

12          That's as far as I can get

13  it.

14          Okay.  We'll start with the

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

8    Q.    Are you familiar with the

9  concept known as migration when it comes

10  to controlled substances?

11          MR. SCHMIDT:  Objection.

12      Vague.

13          THE WITNESS:  I have -- I'm

14      not sure.

15  BY MR. BOGLE:

16      Q.    Okay.  Not sure if you ever

17  heard that term used in the context of

18  controlled substances?

19      A.    I may have heard about it in

20  various modes or forms.

21      Q.    Okay.  Do you have any sense

22  of what that means, again focused on

23  controlled substances?

24      A.    I think that one of the

1   things, for example, that was seen was

2   that as the states were doing their part

3   to fight the system, they were making

4   more tools available to doctors and

5   pharmacists that they could track what

6   their patients were doing.

7         So state by state, they were

8   implementing prescription monitoring

9   programs.  And some states were early to

10   embrace them, and some were later.

11         And I think that one of the

12   things that was observed was that that

13   was a strong tool that caused abuse to

14   move to states that did not have those

15   kinds of systems.

16         So as they were

17   implemented -- and I don't know when the

18   first one was implemented.  But they may

19   have moved from states where they were

20   implemented.  Maybe Kentucky and Ohio

21   were among the early ones.  And abuse

22   moved to states where there were less --

23   less strong monitoring programs.

24      Q.   Okay.  Have you heard of the

1    concept of migration used in the sense of

2    when controlled substances or even

3    illegal -- applies equally to illegal

4    drugs -- are supplied to a market,

5    oversupplied to a market, when that

6    market is oversupplied, the excess will

7    tend to migrate somewhere else?

8              MR. SCHMIDT:  Objection.

9        Vague.

10   BY MR. BOGLE:

11       Q.    Are you familiar with that

12   kind of concept, migration?

13       A.    I can understand --

14              MR. SCHMIDT:  Same

15       objection.

16              Go ahead.

17              THE WITNESS:  I understand

18       what you're saying.

19   BY MR. BOGLE:

20       Q.    Okay.  Does that make sense

21   to you?

22              MR. SCHMIDT:  Same

23       objection.  Vague.

24              THE WITNESS:  It sounds like

Highly Confidential - Subject to Further Confidentiality Review

1    it makes sense.

2  BY MR. BOGLE:

3       Q.    Okay.  And specifically

4  talking about the State of Florida, there

5  has been significant migration of drug

6  diversion out of the State of Florida up

7  to the east coast and the Midwest, right?

8       A.    I'm not sure.

9            (Document marked for

10       identification as Exhibit

11       MCK-Mahoney-6.)

12  BY MR. BOGLE:

13       Q.    I'm going to hand you what

14  I'm marking as Exhibit 1.1355, also

15  marked as Exhibit 6.  And it's Bates

16  Number MCKMDL00407451.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1    Do you see that?



19    MR. BOGLE:  This is a decent

20    breaking point if you don't mind.

21    Quick break, I'll reset my

22    documents.

23    MR. SCHMIDT:  Okay.

24    THE VIDEOGRAPHER:  Remove

Highly Confidential - Subject to Further Confidentiality Review

1        your microphones.  The time is

2        10:12 a.m.  Going off the record.

3              (Short break.)

4              THE VIDEOGRAPHER:  We are

5        back on the record.  The time is

6        10:27 a.m.

7   BY MR. BOGLE:

8        Q.    All right, Mr. Mahoney.

9   While you were distribution center

10  manager for Lakeland distribution center,

11  it was -- you had ultimate responsibility

12  for every pill that left the distribution

13  center, correct?

14        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



21    Q.    I'm going to hand you what

22 I'm marking as Exhibit 1.1946, also

23 marked as Exhibit 7 to your deposition.

24            (Document marked for

Highly Confidential - Subject to Further Confidentiality Review

1      identification as Exhibit

2      MCK-Mahoney-7.)

3  BY MR. BOGLE:

4      Q.    And the start Bates number

5  is MCKMDL00496859.

6          You don't need to worry

7  about those numbers.  They just tell me

8  that I have to read them off.

9          Okay.  So Exhibit 7 to

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



            15          MR. SCHMIDT:   Object to

            16     characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



6          MR. SCHMIDT:  Objection.

7     Characterization.



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



23          MR. SCHMIDT:  Objection.

24      Just a second.  Sorry.

Highly Confidential - Subject to Further Confidentiality Review

1       Objection.  Foundation.

■

■

■

■

■

■

■

■

■

■

■

■

■

15      MR. SCHMIDT:  Objection.

16      Foundation.

17      BY MR. BOGLE:

■

■

■

■

■

■

■

Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Object to the

22     characterization.  You've got to

23     give me just a second to lodge an

24     objection.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Okay.  Sorry.

2          MR. SCHMIDT:  That's okay.

3      BY MR. BOGLE:



19          MR. SCHMIDT:  Object to the

20      characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22          MR. SCHMIDT:  Object to the

23      characterization.

24      BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

8          MR. SCHMIDT:  Objection.

9     Characterization.

13   BY MR. BOGLE:

14          Q.   Okay.  I'm going to hand you

15   what I'm marking as 1.1789.  Also marked

16   as Exhibit 8.

17          Start Bates Number is

18   MCK_MDL_00496876.

19             (Document marked for

20        identification as Exhibit

21        MCK-Mahoney-8.)

22   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24                    MR. SCHMIDT:  Object to the



 1          characterization.

17          You see that, right?

18          MR. SCHMIDT:  Same

19     objection.

24          MR. SCHMIDT:  Same

Highly Confidential - Subject to Further Confidentiality Review

1      objection.



11      MR. SCHMIDT:   Objection.

12      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



8          (Document marked for

9          identification as Exhibit

10         MCK-Mahoney-9.)

11   BY MR. BOGLE:

12         Q.    I'm going to hand you what

13   I'm marking as Exhibit 1.1963, also

14   marked as Exhibit 9.  Bates Number

15   MCKMDL00571360.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14          MR. SCHMIDT:   Objection.

15     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





10          MR. SCHMIDT:   Objection.

11      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



15          I'm going to hand you what

16   I'm marking as Exhibit 1.1943, which is

17   also Exhibit 10.

18               (Document marked for

19        identification as Exhibit

20        MCK-Mahoney-10.)

21          MR. BOGLE:  Start Bates is

22        MCK_MDL_00496306.

23   BY MR. BOGLE:

24          Q.    Okay.  Start by sort of

1    orienting you to this document since it's

2    a larger one here.  You see on the front

8         Q.    Okay.  Have you seen this

9    before, this document?

10        A.    I'm not sure.

11        Q.    Okay.  All right.  Let's

12   take a look first at, looking at the

13   Bates numbers, it's 6309, excuse me.

14             I think it's the third page,

15   or the fourth page of the document?

16        A.    Mm-hmm.

17        Q.    And you see this is the

18   actual order to show cause that was filed

19   by the DEA, do you see that?

20        A.    Yes.

21        Q.    Okay.  And you've seen this

22   before, right?

23        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

12          Do you see that?

13     A.     Yes.

14     Q.     This term "rogue internet

15 pharmacies," what do you understand that

16 to mean?

17     A.     I understand it to mean

18 illegal -- pharmacies that are acting

19 illegally to sell hydrocodone or

20 oxycodone or other -- other products.

21     Q.     Okay.

22     A.     In some cases I think it was

23 Viagra and Cialis and that kind of thing.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12          MR. SCHMIDT:  Object to

13     form.  Compound.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22          MR. SCHMIDT:  Objection.

23      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



2          MR. SCHMIDT:  Objection.

3      Foundation.

23          MR. SCHMIDT:  Objection.

24      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:  Objection.

18      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





```
 9              MR. SCHMIDT:  Objection.

10         Foundation.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



7          MR. SCHMIDT:  Objection.

8     Foundation.

20          MR. SCHMIDT:  Same

21     objection.  Foundation.

22     BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



15          MR. SCHMIDT:   Objection.

16      Foundation.

Highly Confidential - Subject to Further Confidentiality Review

1           MR. SCHMIDT:  Objection.

2      Foundation.

5  BY MR. BOGLE:

6           Q.   Okay.  I'm going to hand you

7  what I'm marking as Exhibit 1.1947.

8  Exhibit 11.  Start Bates is

9  MCK_MDL_00497154.

10               (Document marked for

11          identification as Exhibit

12          MCK-Mahoney-11.)

13          MR. SCHMIDT:  Are you done

14     with this one?

15          MR. BOGLE:  I'm done for

16     now, but it's one we'll come back

17     to at some point.  So however you

18     want to deal with that.

19          MR. SCHMIDT:  I'll dig it

20     out when we come back to it.

21          MR. BOGLE:  It's an easy one

22     to find.

23  BY MR. BOGLE:

24          Q.   Okay.  So I want to

Highly Confidential - Subject to Further Confidentiality Review

1    introduce this document to you here.  Oh,

2    sorry.



Highly Confidential - Subject to Further Confidentiality Review



24                    MR. SCHMIDT:   Objection.

Highly Confidential - Subject to Further Confidentiality Review



1          Foundation.

2     BY MR. BOGLE:

5               MR. SCHMIDT:  Objection.

6          Foundation.

Highly Confidential - Subject to Further Confidentiality Review



18          MR. SCHMIDT:  Objection.

19     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



22          MR. SCHMIDT:  Objection.

23      Foundation.

Highly Confidential - Subject to Further Confidentiality Review

4          MR. SCHMIDT:  Same

5      objection.

7  BY MR. BOGLE:

8          Q.    Okay.  All right.  I'm going

9  to hand you what I'm marking as

10  Exhibit 12, which is also marked as

11  1.1951.

12              (Document marked for

13          identification as Exhibit

14          MCK-Mahoney-12.)

15          MR. BOGLE:  Bates number

16      MCKMDL00496536.

17          MR. SCHMIDT:  While he's

18      looking at that I think we're

19      about an hour.  Maybe after this

20      document, can we take a break?

21          MR. BOGLE:  Yeah, we can

22      take one now if you want.

23          MR. SCHMIDT:  No, if you

24      want to go through the document.

Highly Confidential - Subject to Further Confidentiality Review

1          I don't want you to get --

2     BY MR. BOGLE:

3          Q.    Well, I'll hand you -- all

4     right.  And again, this is government

5     Exhibit 3.  Do you see that statement on

6     it there?

7          A.    Mm-hmm.

8          Q.    And I'll represent to you

9     this came from McKesson as being part of

10    the show cause exhibits for the Lakeland

11    show cause proceeding that was given to

12    us.

13         A.    Mm-hmm.

14         Q.    You see there's actually a

15    stamp at the bottom, Drug Enforcement

16    Administration.

17         A.    Right.

18         Q.    Right?  Do you see that?

19         A.    Mm-hmm.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14          MR. SCHMIDT:  Objection.

15      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13          MR. BOGLE:  Okay.  We can

14     take a break now.

15          THE VIDEOGRAPHER:  Stand by

16     please.  Remove your microphones.

17     The time is 11:35 a.m.  Going off

18     the record.

19          (Short break.)

20          THE VIDEOGRAPHER:  Okay.  We

21     are back on the record.  The time

22     is 11:55 a.m.

23  BY MR. BOGLE:

24          Q.    Okay.  Mr. Mahoney, if we

1    can start by going back to Exhibit 7.



Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11     Characterization.

Highly Confidential - Subject to Further Confidentiality Review



4          MR. SCHMIDT:  Same

5      objection.  Characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



3            MR. SCHMIDT:   Objection.

4       Characterization.

Highly Confidential - Subject to Further Confidentiality Review



15          (Document marked for

16      identification as Exhibit

17      MCK-Mahoney-13.)

18   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



6          MR. SCHMIDT:   Objection.

7      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



14          MR. SCHMIDT:  Objection.

15      Foundation.  Characterization.

[redacted]

Q. Okay. I'm going to hand you now what I'm marking as Exhibit 14. Also numbered as 1.1953.

(Document marked for identification as Exhibit MCK-Mahoney-14.)

BY MR. BOGLE:

[redacted]

Highly Confidential - Subject to Further Confidentiality Review



15          MR. SCHMIDT:  Object to

16     characterization.

24          MR. SCHMIDT:  Same

Highly Confidential - Subject to Further Confidentiality Review



1       objection.  Foundation.

2  BY MR. BOGLE:

5  Exhibit 15, also marked as 1.1958.

6         (Document marked for

7      identification as Exhibit

8      MCK-Mahoney-15.)

9  BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Object to the

22     characterization.

Highly Confidential - Subject to Further Confidentiality Review

7       Q.     I'm going to hand you what

8   I'm marking as Exhibit 16.  Also marked

9   as 1.1970.

10                 (Document marked for

11             identification as Exhibit

12             MCK-Mahoney-16.)

13   BY MR. BOGLE:

14       Q.     This is an article that I

15   pulled off the internet from the Ledger

16   titled "Pharmacy Raided by DEA Agents,"

17   posted November 17, 2006.

18                 Do you see that?

19       A.     Yes.

20       Q.     Okay.  And it says -- and

21   from Lakeland, "A local pharmacy's

22   license was suspended Thursday after it

23   was raided by agents from the U.S. Drug

24   Enforcement Administration."

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. SCHMIDT:  Can I just
 2         have an ongoing, running objection
 3         to the questions on this document,
 4         this unauthenticated document?
 5              MR. BOGLE:  Okay.
 6    BY MR. BOGLE:
 7         Q.    "Federal agents, with help
 8    from local law enforcement agencies,
 9    seized several boxes of prescription
10    drugs from Medcenter Pharmacy located
11    at" -- and it provides the address in
12    Lakeland.  And it says, "Agents also
13    raided a sister store at 4607 Clark
14    Avenue in Tampa that operated under the
15    name MediPharm-Rx, Inc."
16              Do you see that?
17         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

7    Q.    And it says, "Both

8  pharmacies are owned by a Robert L.

9  Caddick, whose last known address was in

10  Oviedo," also in Florida, right?

11    A.    Oviedo?  Yeah.

12    Q.    And then it says, "Jeannette

13  Moran, spokeswoman for the DEA's Miami

14  field office, said that both pharmacies'

15  licenses to sell controlled substances

16  have been suspended."  And then it goes

17  on to say, "She said the DEA considers

18  the operation as a whole to be an

19  imminent danger to public health and

20  safety."

21        Do you see that reference?

22    A.    Yes.

23    Q.    And she says -- "She said

24  agents pulled 635,000 doses of

Highly Confidential - Subject to Further Confidentiality Review

1    prescription medicines from the Tampa

2    location.   Most of those medicines were

3    hydrocodone, sold as Vicodin, and

4    alprazolam sold as Xanax."

5              Do you see that?

6         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11     Foundation.

14  BY MR. BOGLE:

15          Q.    Okay.  I'm going to hand you

16  what I'm marking as 1.1969, also marked

17  as Exhibit 17.

18               (Document marked for

19          identification as Exhibit

20          MCK-Mahoney-17.)

21          MR. SCHMIDT:  Same running

22     objection on the authenticity of

23     this.

24          MR. BOGLE:  Okay.

1    BY MR. BOGLE:

2         Q.    You see this is an article

3    from the Tampa Tribune published

4    March 17, 2008.

5              Do you see that?

6         A.    Yes.

7         Q.    Okay.  On the second page,

8    in the middle, I'll kind of point to it

9    if it helps you.  It says, "The DEA also

10   arrested."

11        A.    Okay.

12        Q.    It says, "The DEA also

13   arrested two men tied to a Tampa pharmacy

14   the agency had targeted in

15   November 2006."  That's the time frame we

16   just looked at, right, where they were

17   raided; is that right?

18        A.    Yes.

19        Q.    Okay.  And it lists the

20   first person's name.  The second name is

21   "Robert Caddick, 51, of 1007 Eagens

22   Creek, Oviedo, were arrested on federal

23   charges of conspiracy to possess with

24   intent to distribute hydrocodone, an

Highly Confidential - Subject to Further Confidentiality Review

1  opiate nearly equivalent to morphine for

2  pain relief."

3           And it's noted further on

4  down there that Mr. Caddick was the owner

5  registered agent of MediPharm-Rx.  Do you

6  see that?  It's a couple sentences down

7  from there.

8           A.    I see it.  Yes.

Highly Confidential - Subject to Further Confidentiality Review



1          MR. SCHMIDT:  Object to

2     characterization.

18          MR. SCHMIDT:  Object to the

19     characterization.

Highly Confidential - Subject to Further Confidentiality Review

5    I'm going to guide you.  So it should be

6    Exhibit 10.

7           A.    10.

8           Q.    It's the biggest one.

9           A.    Right.

10          MR. SCHMIDT:  It's the big?

11          MR. BOGLE:  The biggest

12   document.  1943.

13          MR. SCHMIDT:  I just wanted

14   to get that on the record twice.

15   No, the second part.  Go ahead.

16   I'm giving you a hard time.

17          MR. BOGLE:  No problem.

18   It's easy to do.

19   BY MR. BOGLE:

20          Q.    All right.  So let's go to

21   Page 6444, on the Bates numbers on the

22   left.  I think this will address what you

23   want to look at.

24               Okay.  And this is some

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



5          Q.     Okay.  I'm going to hand

6   you -- excuse me.

7               Let me hand you what I'm

8   marking as Exhibit 1.1997, also marked as

9   Exhibit 18.

10              (Document marked for

11              identification as Exhibit

12              MCK-Mahoney-18.)

13              MR. BOGLE:  I think I only

14              have three of these instead of

15              four.  I apologize for that.

16  BY MR. BOGLE:





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17      MR. SCHMIDT:  Objection.

18   Foundation.

Highly Confidential - Subject to Further Confidentiality Review



```
17              MR. SCHMIDT:  Objection.

18      Foundation.

19              THE WITNESS:  Can you say

20      that again, please?

21   BY MR. BOGLE:

22      Q.    Sure.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11     Speculation.

18          MR. SCHMIDT:  Same

19     objection.  Speculation.

Highly Confidential - Subject to Further Confidentiality Review



13          MR. SCHMIDT:  I'll object to

14      the speculation.

Highly Confidential - Subject to Further Confidentiality Review



8          MR. SCHMIDT:  Objection.

9     Vague.

17          MR. SCHMIDT:  Same

18     objection.  Vague.

19  BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10          Q.     Okay.  And you are aware

11   that settlement occurred in 2008, true?

12          A.     Yes.

13          Q.     Okay.  And as part of that

14   settlement, McKesson agreed to multiple

15   things, but one was to pay a fine of

16   $13,250,000, right?

17          A.     Yes.

18          Q.     Okay.  And in fairness to

19   the Lakeland distribution center, it was

20   for conduct not just involving Lakeland

21   but involving other distribution centers

22   too, right?

23          A.     Correct.

24          Q.     I'm sorry?

1      A.    Yes.

2      Q.    Okay.  Have you seen the

3 settlement agreement from the 2008

4 settlement?

5      A.    Yes.

6      Q.    You have?  Okay.

7            I want to take a look at a

8 couple aspects of that with you here.

9            I'll hand you what I'm

10 marking as Exhibit 19, also marked as

11 Exhibit 1.889.

12            (Document marked for

13            identification as Exhibit

14            MCK-Mahoney-19.)

15 BY MR. BOGLE:

16      Q.    This is titled "Settlement

17 and Release Agreement and Administrative

18 Memorandum of Agreement" dated, on the

19 first page, 2nd day of May, 2008.

20            Do you see that?

21      A.    Yes.

22      Q.    Okay.  So this is a document

23 that you've seen before, true?

24      A.    I believe so.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Do you want to -- if

2  you want to look at something first, just

3  let me know.

4    A.    Yeah, let me just take a --

5    Q.    Yeah, go ahead.  Just let me

6  know when you're ready.

7    A.    Okay.

8    Q.    Are you familiar with this

9  document?

10   A.    Yes.

11   Q.    And so just to sort of

12  orient ourselves here.  Under the

13  background section, first paragraph says,

14  "Whereas, on August 4, 2006, DEA by its

15  deputy assistant administrator Joseph T.

16  Rannazzisi issued an order to show cause,

17  Order Number 1, to McKesson with respect

18  to its Lakeland distribution center," and

19  then it lists the address.

20       Do you see that?

21   A.    Right.

22   Q.    Okay.  And that's the order

23  to show cause that we've been talking for

24  the last hour and a half or so, right?

1          A.    Yes.

2          Q.    Okay.  So then if we can

3  take a look at Bates page ending 1052, do

4  you see that toward the top, there's a

5  little H?

6          A.    Yes.

7          Q.    It says, "McKesson agrees to

8  pay civil penalties to the United States

9  of America under 21 U.S.C. 842(c) for

10  violations of 21 U.S.C. 842-A(5) in the

11  amount of $13,250,000 in settlement of

12  claims or potential claims made by the

13  United States of America for failing to

14  report suspicious orders of controlled

15  substance and for failing to report

16  thefts or significant losses of

17  controlled substances."

18          Do you see that?

19          A.    Yes.

20          Q.    Okay.  You have a general

21  understanding that that's why -- those

22  are the reasons why the fine was incurred

23  by McKesson, right?

24          A.    Yes.

1              MR. SCHMIDT:  Object to the

2         characterization.

3    BY MR. BOGLE:

4         Q.    And then if you go back to

5    Page 1060, you see there's a section

6    towards the middle of the page, it says,

7    "The covered conduct shall mean the

8    following alleged conduct."

9              Do you see that?

10        A.    Yes.

11        Q.    And first of all, I don't

12   want to go through all six of them.  You

13   would acknowledge there are six different

14   sections here talking about six different

15   distribution centers at McKesson, true?

16             MR. SCHMIDT:  I'm sorry.

17        What page are you on?

18             MR. BOGLE:  Yeah, 1060

19        carrying over to 1061.

20             MR. SCHMIDT:  Thank you.

21   BY MR. BOGLE:

22        Q.    My question was simply that

23   six distribution centers are covered here

24   in the covered conduct section?

1         A.      Yes.

2         Q.      Okay.  So I want to focus

3    the one that we've been talking about,

4    which is Lakeland.  So that's letter B.

5         A.      Mm-hmm.

6         Q.      So it says, "In

7    October 2005, McKesson-Lakeland sold

8    approximately 2.1 million dosage units of

9    hydrocodone to seven pharmacies in the

10   Tampa area."  And then it lists them out.

11        Do you see that?

12        A.      Yes.

16        Q.      Okay.  "And failed to report

17   these sales as suspicious orders to the

18   DEA when discovered as required by and is

19   a violation of 21 C.F.R. 1301.74(b) and

20   21 U.S.C. Section 842-A(5)."

21        Do you see that?

22        A.      Yes.

23        Q.      Okay.  And this is a portion

24   of the settlement agreement that you're

1    familiar with too, right?

2         A.    Yes.

3         Q.    Okay.  And this fine of

4    $13,250,000, more than half of that was

5    related to the conduct at Lakeland,

6    right?

7         A.    Yes.

8         Q.    And specifically, Page 1062,

9    I think, outlines the numbers.

10             So under terms and

11   conditions, Letter B, it says, "McKesson

12   shall pay the sum of $7,456,000.  Payment

13   shall be made by electronic funds."  And

14   it goes on.  And that's related to the

15   conduct at Lakeland, right, the

16   $7,456,000 fine, right?

17        A.    Yes.

18        Q.    Which we can agree is more

19   than half of the overall fine, right?

20        A.    Yes.

21        Q.    Also the highest fine

22   allocated to any specific distribution

23   center, right?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



20    Q.    Okay.  Let me hand you what

21  I'm marking as Exhibit 20, also marked as

22  1.1950.

23         (Document marked for

24    identification as Exhibit

Highly Confidential - Subject to Further Confidentiality Review

1          MCK-Mahoney-20.)

2     BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24      MR. SCHMIDT:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1          Foundation.



18              MR. SCHMIDT:  Object to the

19          characterization.

Highly Confidential - Subject to Further Confidentiality Review



16          MR. SCHMIDT:  Object to the

17     characterization.

18     BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11     Characterization.

Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:  Object to the

18     characterization.

Highly Confidential - Subject to Further Confidentiality Review

BY MR. BOGLE:

      Q.    Okay.

        MR. BOGLE:  I'm actually switching to a whole other topic area.  This might be a decent time to break for lunch if you guys are okay with it.

        MR. SCHMIDT:  Sure.

        How much time have we been on the record for?

        THE VIDEOGRAPHER:  Sure. We've used up 2 hours 58 minutes.

        The time is 12:42 p.m. Going off the record.

          -  -  -

        (Lunch break.)

          -  -  -

        THE VIDEOGRAPHER:  We are back on record.  The time is 1:40 p.m.

1              -  -  -

2       A F T E R N O O N    S E S S I O N

3              -  -  -

4          EXAMINATION (Cont'd.)

5              -  -  -

6   BY MR. BOGLE:

7       Q.    Okay.  Mr. Mahoney, we are

8   back from lunch.  I wanted to shift gears

9   a little bit to another topic.  We talked

10  about earlier in the deposition that you

11  became the director of regulatory affairs

12  in January 2008, true?

13      A.    Yes.

20      Q.    Okay.  And was that a

21  promotion for you to move from

22  distribution manager to director of

23  regulatory affairs?

24      A.    It was a lateral move.

Highly Confidential - Subject to Further Confidentiality Review



11          MR. SCHMIDT:  Object to the

12    characterization.

13    BY MR. BOGLE:

16          MR. SCHMIDT:  Go ahead.  I

17    cut off your question.  You might

18    want to --

19          MR. BOGLE:  Yeah, let me

20    re-ask the question.

21    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



2          MR. SCHMIDT:  And that's

3      where I object to the

4      characterization.



9       Q.     Okay.   I'm going to hand you

10  what's being marked as Exhibit 1.1675,

11  also marked as Exhibit 21.

12              (Document marked for

13          identification as Exhibit

14          MCK-Mahoney-21.)

15  BY MR. BOGLE:

16      Q.     Okay.   So to orient you to

17  the document first, and we'll go from

Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:  Can I say

18     given the header on this, I don't

19     know how -- I think this has been

20     used in prior depositions.

21          MR. BOGLE:  I think it has.

22          MR. SCHMIDT:  I don't know

23     how we've been using it.  I'm just

24     going to make an objection and

1    I'll ask it be a running objection

2    given that this was prepared for

3    settlement purposes.  I don't know

4    that we've sorted that issue out.

5    I think we can sort it out later.

6    If I could make a running

7    objection on that.

8         MR. BOGLE:  That's fine.

9  BY MR. BOGLE:

10        Q.    Let me get back to the

11  question and make sure we are on the same

19        Q.    I'm going to walk you to a

20  place that I don't think is going to be

21  confusing.  So I have to kind of set the

22  table here.

23        A.    Sure.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

5          MR. SCHMIDT:  Object to

6     characterization.

12  BY MR. BOGLE:

13          Q.    Okay.  I'm going to hand you

14  what I'm marking as 1.1960, also

15  Exhibit 22 to your deposition.

16              (Document marked for

17          identification as Exhibit

18          MCK-Mahoney-22.)

19  BY MR. BOGLE:

20          Q.    Okay.  This is a string of

21  e-mails, we're going to start at the

22  bottom.  And actually I think it's all

23  pretty much on the first page.

24          A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review



11        Q.        Okay.  Steve Miller is noted

12   to be VPDO of the south region.  Do you

13   know what VPDO stands for?

14        A.        Yes.

15        Q.        What does that stand for?

16        A.        Vice president distribution

17   operations.

18        Q.        Okay.  Would that be sort of

19   one step below Don Walker on the

20   hierarchy at McKesson on the operation

21   side?

22        A.        He -- he reported to Don.

23        Q.        Okay.  And he was VPDO for

24   the south region which was the same



1    region you had regulatory responsibility

2    for during this time, right?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22    MR. SCHMIDT:  Object to the

23    characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24          MR. SCHMIDT:  Object to

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



5      Q.    Okay.  I'm going to hand you

6   what I'm marking Exhibit 1.1942, also

7   marked as Exhibit 23.

8          (Document marked for

9          identification as Exhibit

10         MCK-Mahoney-23.)

11   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



17    A.    Tom was the vice

18    president/general manager in Birmingham.

19    Q.    Okay.  The term vice

20    president and general manager, what does

21    that person generally do at McKesson?

22    What is that role meant to do?

23    A.    He is -- the director of

24    operations would report to him as well as

Highly Confidential - Subject to Further Confidentiality Review

1    the sales personnel.

2          Q.    So that position is more on

3    the -- on the -- it's sort of a mix

4    between the operation and sales side?

5          A.    Yes.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Object to

22    characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22        MR. SCHMIDT:  Object to

23        characterization.

Highly Confidential - Subject to Further Confidentiality Review



18              MR. SCHMIDT:   Object to

19      characterization.

Highly Confidential - Subject to Further Confidentiality Review



2          MR. SCHMIDT:  Objection.

3      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



MR. SCHMIDT:  Same -- same

objection.  Asked and answered.

MR. SCHMIDT:  Objection.

Foundation.

Highly Confidential - Subject to Further Confidentiality Review



5          MR. SCHMIDT:  Objection.

6     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



9          MR. SCHMIDT:   Objection.

10      Foundation.





13          MR. SCHMIDT:  Objection.

14     Vague.

Highly Confidential - Subject to Further Confidentiality Review



12        Q.      Okay.   All right.

13                Okay.   I'm going to hand you

14    what's marked as 1.7195, also marked as

15    Exhibit 24.

16                (Document marked for

17                identification as Exhibit

18                MCK-Mahoney-24.)

19    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1      MR. SCHMIDT:  Object to

2      characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



2          MR. SCHMIDT:  Objection.

3     Foundation.

22         MR. SCHMIDT:  Object to

23     characterization.

Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Objection.

22     Foundation.





3          MR. SCHMIDT:  Object to

4      characterization.

Highly Confidential - Subject to Further Confidentiality Review



5          MR. SCHMIDT:  Object to

6     characterization.  Asked and

7     answered.

10   BY MR. BOGLE:

11        Q.   Okay.  I'm going to hand you

12   what I'm marking as Exhibit 25.  Also

13   marked as 1.1962.

14             (Document marked for

15        identification as Exhibit

16        MCK-Mahoney-25.)

17   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



14          Do you see that?

15     A.     Yes.

16     Q.     Have you ever seen this

17 document before?

18     A.     I'm not sure.  Do you have a

19 date on this?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18          MR. SCHMIDT:  Object to

19     characterization.



13          MR. SCHMIDT:  Object to

14     characterization.

15     BY MR. BOGLE:

1          MR. SCHMIDT:  Object to

2     characterization.



19          Q.   Okay.  Well, maybe we'll

20     narrow down a few of those issues then.

21     I'll mark as Exhibit 26, also marked as

22     Exhibit 1.1743.

23          (Document marked for

24     identification as Exhibit

1          MCK-Mahoney-26.)

2     BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14          MR. SCHMIDT:  Objection.

15      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

16        MR. BOGLE:  I'm done with my

17   questions.  Mr. Bowden is going to

18   have some additional follow-up.

19   Maybe we can take a break and

20   switch around.  I'm done with

21   mine.

22        MR. SCHMIDT:  Are we at four

23   hours now?

24        THE VIDEOGRAPHER:  We are at

Highly Confidential - Subject to Further Confidentiality Review

1       4 hours and 3 minutes.

2               Shall we go off the record.

3               MR. BOGLE:  Yes.

4               THE VIDEOGRAPHER:  The time

5       2:45 p.m.  Going off the record.

6               (Short break.)

7               THE VIDEOGRAPHER:  We are

8       back on the record.  The time is

9       3:04 p.m.

10                  -  -  -

11                  EXAMINATION

12                  -  -  -

13  BY MR. BOWDEN:

14      Q.    Good afternoon, Mr. Mahoney.

15      A.    What's going on?

16      Q.    My name is Wes Bowden.  I'm

17  going to ask you a couple questions and

18  finish out your deposition.

19      A.    Okay.

20      Q.    Before we left off the break

21  you talked with my partner about some of

22  the larger issues with the CSMP.

23              And one thing that I was

24  going to ask you about -- trying to get



1    my computer booted up here.   You had

11          MR. SCHMIDT:   Object to the

12          characterization.

16    BY MR. BOWDEN:

17          Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Can I just

11      remind the folks on the phone to

12      go on mute, including people who

13      are typing and shuffling papers.

14  BY MR. BOWDEN:

20          Q.    Okay.  I'm going to hand you

21  what I will mark as Exhibit 27.  It's

22  RP-1.1680.

23          MR. SCHMIDT:  Again, can I

24      ask people on the phone to go on

1          mute, including whoever was just

2          typing.

3               (Document marked for

4          identification as Exhibit

5          Mahoney-27.)

6     BY MR. BOWDEN:

7          Q.    I apologize.  I did not put

8     the sticker on yours.  I'll take that

9     back from you.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19          MR. SCHMIDT:  Object to

20      characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14          MR. SCHMIDT:  Object to the

15     characterization.

Highly Confidential - Subject to Further Confidentiality Review



4          MR. SCHMIDT:   Object to the

5      characterization.



```
 4              MR. SCHMIDT:   Object to the
 5       characterization.
```

Highly Confidential - Subject to Further Confidentiality Review



15          MR. SCHMIDT:  Object to

16      characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1          MR. SCHMIDT:  Objection.

2     Foundation.

13          Q.    Going to mark for you, this

14     will be Exhibit 28 to your deposition.

15     It's our P-1.1783.

16               (Document marked for

17          identification as Exhibit

18          Mahoney-28.)

19     BY MR. BOWDEN:

20          Q.    Do you remember getting this

24     Do you recall reading this?

1        A.    I'd have to take a look at

2    it.

3        Q.    Okay.  And we're going to go

4    through it.

5        A.    Okay.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Objection.

22     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



6    Q.    And Conroe at the time, when

7    we first started the deposition, you had

8    listed six different distribution centers

9    in which you were overseeing.  And Conroe

10   was one of them, right?

11   A.    Yes.  Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21          Q.     In 2011, how many

22     distribution centers did McKesson have?

23          A.     I'm not sure.

24          Q.     You think about 30?

Highly Confidential - Subject to Further Confidentiality Review



1      A.     Approximately 30.  I would

2   say 28 to 30.

3          Q.     28 to 30.  And of those 28

17          MR. SCHMIDT:  Object to the

18   characterization.

Highly Confidential - Subject to Further Confidentiality Review



22    BY MR. BOWDEN:

23         Q.    What was Mr. Walker's

24    position in the company?  He was a senior

Highly Confidential - Subject to Further Confidentiality Review

1    vice president, right?

2           A.    Yes.

3           Q.    And he was the person that

4    you answered to?

5           A.    Yes.



Highly Confidential - Subject to Further Confidentiality Review



14    right.   I'm handing you what I'm marking

15    as Exhibit 29 to your deposition.

16             (Document marked for

17             identification as Exhibit

18             Mahoney-29.)

19    BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13          MR. SCHMIDT:  Objection.

14     Foundation.

15  BY MR. BOWDEN:

16     Q.    Is that correct?

17     A.    I think there was --

18          MR. SCHMIDT:  Same

19     objection.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



 7            MR. SCHMIDT:  Object to the

 8     characterization.

 9     BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



18          MR. SCHMIDT:  Object to the

19     characterization.

Highly Confidential - Subject to Further Confidentiality Review



24          MR. SCHMIDT:  Object to

1          characterization.



Highly Confidential - Subject to Further Confidentiality Review



18          MR. SCHMIDT:  Objection.

19     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



14          MR. SCHMIDT:  Objection.

15     Compound.  Characterization.

16  BY MR. BOWDEN:

17          Q.    Isn't that what you

18     testified to earlier?

19          A.    Could you repeat that?

20          MR. SCHMIDT:  Same

21     objection.

22  BY MR. BOWDEN:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:  Objection.

18     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



2          MR. SCHMIDT:  Object to the

3     characterization, foundation.

15         MR. SCHMIDT:  Object to the

16    characterization.

Highly Confidential - Subject to Further Confidentiality Review



24          MR. SCHMIDT:  Object to the

1      characterization.



13          MR. SCHMIDT:  Just a second.

14     Were you finished with your

15     answer?

16          THE WITNESS:  No, not yet.

17     BY MR. BOWDEN:

18          Q.    I'm sorry, go ahead, sir.



13  BY MR. BOWDEN:

14      Q.   Okay.  You can go ahead and

15  set that one aside, sir.

16           I'm going to mark for you

17  what will be Exhibit Number 30 to your

18  deposition.  Going to be P-1.1936.

19           (Document marked for

20           identification as Exhibit

21           Mahoney-30.)

22  BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13          MR. SCHMIDT:  Object to the

14     characterization.

Highly Confidential - Subject to Further Confidentiality Review

1    MR. SCHMIDT:  Object to the

2    characterization.



19    MR. SCHMIDT:  Object to

20    characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23          MR. SCHMIDT:  Object to the

24     characterization.

1          THE WITNESS:  I'm curious

2          about what you're referring to.

3     BY MR. BOWDEN:

11          Q.    Okay.  I'll hand you what

12     I'm marking Exhibit 31.  It's P1.1979.

13               (Document marked for

14          identification as Exhibit

15          Mahoney-31.)

16     BY MR. BOWDEN:

17          Q.    Why don't you go ahead and

18     flip to the last page of this document.

Highly Confidential - Subject to Further Confidentiality Review



18              MR. SCHMIDT:   Objection.

19       Foundation.

Highly Confidential - Subject to Further Confidentiality Review



4          MR. SCHMIDT:  Objection.

5     Foundation.

6          THE WITNESS:  Can you repeat

7     that again?

8     BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



7        Q.      How many distribution

8    centers are there as we sit here today?

9        A.      My estimate would be around

10   28 plus or minus one or two.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



8          MR. SCHMIDT:  Object to the

9      characterization.

Highly Confidential - Subject to Further Confidentiality Review





17            MR. SCHMIDT:   Objection.

18      Characterization.

Highly Confidential - Subject to Further Confidentiality Review



9          MR. SCHMIDT:  Objection.

10         Speculation.

Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Objection.

22     Vague.

Highly Confidential - Subject to Further Confidentiality Review



24          MR. SCHMIDT:  Objection.

1          Object to characterization.  I'll

2          move to strike the preamble.

3               THE WITNESS:  What's the

4          question?

5     BY MR. BOWDEN:

6          Q.   I'll rephrase it since

7     there's an objection.

16              MR. SCHMIDT:  Objection.

17         Foundation.

Highly Confidential - Subject to Further Confidentiality Review



16          MR. SCHMIDT:  Objection.

17     Characterization.

Highly Confidential - Subject to Further Confidentiality Review



13          MR. SCHMIDT:  Object to

14   characterization.

21          MR. BOWDEN:  I'm about to

22   switch gears.  Do you want to take

23   a break?  We went 56 minutes.

24          MR. SCHMIDT:  Yeah, I just

Highly Confidential - Subject to Further Confidentiality Review

1    figure -- don't want to be here

2    late into the night.

3           MR. BOWDEN:  That's fine.  I

4    just want to get some water.

5           THE VIDEOGRAPHER:  Okay.

6    Stand by, please.  The time is

7    4:01 p.m.  Going off the record.

8           (Brief recess.)

9           THE VIDEOGRAPHER:  We are

10   back on the record.  The time is

11   4:16 p.m.

12 BY MR. BOWDEN:

13        Q.   All right, Mr. Mahoney.

Highly Confidential - Subject to Further Confidentiality Review

4      Q.     Okay.  Well, just in

general, though, having controls in place

to make sure that opioids get into the

right hands is a good thing, right?

8      A.     Yes.

9      Q.     It's a good thing because

opioids can have a dramatic impact on

people's lives, addiction, injury,

potentially death, right?

15     Q.     Right.  But that's not what

the DEA was concerned with, was it?  It

wasn't people such as yourself who might

take it for a brief period of time and

then let go of it.  It was for the

epidemic that had been brewing since the

2000s, right?

22          MR. SCHMIDT:  Objection.

23          THE WITNESS:  I've had

24          interactions actually recently

Highly Confidential - Subject to Further Confidentiality Review

1          with the DEA around Hurricane

2          Michael in which they wanted to

3          make sure that people had access

4          to their opioids.

5     BY MR. BOWDEN:

6          Q.    Okay.  And -- okay.  But

7     you're talking about something that's

8     going to be an act of God or a natural

9     disaster, making sure that the support is

10    there so that people get medication who

11    were prescribed medication and should be

12    legitimately taking it, right?

13         A.    I'm sorry.  Can you repeat

14    the last --

15         Q.    What you're talking about

16    anecdotally is that there might be very

17    narrow circumstances in which the DEA

18    might want drugs to go out there to make

19    sure that people with legitimate medical

20    needs, that their needs are met, correct?

21         A.    I think -- I think that the

22    DEA understands that it's gray in terms

23    of determining, especially from a

24    distributor's point of view, how hard it

Highly Confidential - Subject to Further Confidentiality Review

1    is to determine whether something is for

2    legitimate medical purpose or it's for

3    some other illicit purpose.  And that's

4    why we do what we do.

5         Q.    Okay.  Well, I'm going to

6    hand you what I've marked as Exhibit 32

7    to your deposition.  This would be

8    P1.1845.

9              (Document marked for

10             identification as Exhibit

11             Mahoney-32.)

12   BY MR. BOWDEN:

13        Q.    And you know that McKesson

14   also distributes methadone, right?

15        A.    Yes.

16        Q.    And in 2008, McKesson was

17   distributing methadone, right?

18        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14          Q.     Right.  So let me hand you

15     what I'm marking as Exhibit 33, which

16     will be P1.1848.

17               (Document marked for

18          identification as Exhibit

19          Mahoney-33.)

20               MR. SCHMIDT:  Can we put

21          this to the side, or do you want

22          him to keep it?

23               MR. BOWDEN:  He can probably

24          put it to the side.  That's fine.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BOWDEN:

2        Q.    Now, in January of 2008,

3    were you still the distribution center

4    manager for Lakeland, Florida?



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10          MR. BOWDEN:  In fact,

11    Michael, can we do a split screen

12    with the top paragraph of the last

13    document?

14          If you can put underneath

15    that, yeah, put that at the top

16    for our witness to see.

Highly Confidential - Subject to Further Confidentiality Review



19          MR. BOWDEN:  And can you put

20     the block quote from the other

21     paragraph from the other exhibit

24          That's good enough.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BOWDEN:

2         Q.    While he's doing that we'll

3    go ahead and read it.

21              MR. SCHMIDT:    Objection.

22   Compound.

23   BY MR. BOWDEN:

24         Q.    That's what this document

Highly Confidential - Subject to Further Confidentiality Review

1    says?

2         A.    I think what's happened --

3              MR. SCHMIDT:  Same

4         objection.



Highly Confidential - Subject to Further Confidentiality Review



10    MR. SCHMIDT:  Objection to

11 the characterization.

22    MR. SCHMIDT:  Object to --

23 object to the characterization.

24 BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



7          MR. SCHMIDT:  Object to the

8    characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



3          MR. SCHMIDT:  Objection.

4      Form.

23          MR. SCHMIDT:  Object to

24      characterization.

Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:  Object to

18      characterization.

Highly Confidential - Subject to Further Confidentiality Review

6    BY MR. BOWDEN:

7        Q.    Okay.  All right.  I'm going

8    to hand you what I will mark as 34,

9    Exhibit 34 to your deposition.  That will

10   be P-1.1959.

11           (Document marked for

12           identification as Exhibit

13           Mahoney-34.)

14           MR. SCHMIDT:  Sorry.

15           MR. BOWDEN:  No problem.

16   BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



12          MR. SCHMIDT:  Object to

13     characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



6          MR. SCHMIDT:  Objection.

7     Compound.

8          THE WITNESS:  What's the

9     question?

10   BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:  Object to

18     speculation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1        MR. SCHMIDT:  Objection.

2    Foundation.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16          Q.    Gotcha.  You mentioned

17   Mallinckrodt.  I'm going to show you

18   P-1.1697.

19                (Document marked for

20          identification as Exhibit

21          Mahoney-35.)

22   BY MR. BOWDEN:

23          Q.    That should be Exhibit

24   Number 35, which is P-1.1697.

Highly Confidential - Subject to Further Confidentiality Review



6    And that is a manufacturer of opioids,

7    correct?

8           A.    Mallinckrodt, yes.

9           Q.    Okay.  And they're a

10   supplier -- or rather, McKesson is a

11   purchaser of Mallinckrodt opioids,

12   correct, for distribution?

13          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13          MR. SCHMIDT:  Objection.

14      Asked and answered.

24          MR. SCHMIDT:  Objection.

Highly Confidential - Subject to Further Confidentiality Review



1          Vague.

15              MR. SCHMIDT:   Objection.

16          Vague.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



8        MR. SCHMIDT:  Objection.

9     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Objection.

22     Foundation.

23          THE WITNESS:  I -- and I

24     think --

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BOWDEN:

2         Q.    I'm not asking the context

3    of this e-mail.

4              MR. SCHMIDT:  Let him finish

5         his answer, please.  I think he

6         gets to answer your question.

7              You can answer the question.

23             MR. SCHMIDT:  Objection.

24        Vague.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

7        Q.    Okay.  Switching over to --

8   I'll hand you what I'm marking as

9   Exhibit Number 36.  P-1.1990.

10            (Document marked for

11            identification as Exhibit

12            Mahoney-36.)

13   BY MR. BOWDEN:

19            MR. SCHMIDT:  Object to

20            characterization.

21   BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19          A.     I'll agree with you what?

20     I'm sorry.

21          Q.     Are you having trouble

22     hearing me or just understanding the

23     question?

24          A.     It was a long question and I

Highly Confidential - Subject to Further Confidentiality Review

1    lost the train.

2           Q.    All right.  I'll break it

3    down for you.



Highly Confidential - Subject to Further Confidentiality Review



23        Q.     Okay.    You can set that one

24   aside.

```
1           MR. BOWDEN:  Off the record

2     real quick.  Can you say the time.

3           THE VIDEOGRAPHER:

4     44 minutes on the record.  And

5     total 5 hours and 46 minutes.

6           MR. SCHMIDT:  That's not

7     correct.  We've been going since

8     4:01.

9           THE VIDEOGRAPHER:  You mean

10    the time on the record?

11          MR. SCHMIDT:  This last

12    break, we've been going since

13    4:01.  It was the wrong time down.

14          MR. BOWDEN:  I just wanted

15    to use full time.  I'm not asking

16    to take a break.

17          MR. SCHMIDT:  Maybe I wrote

18    down the wrong time.  But I

19    thought we'd been going for six

20    hours.

21          THE VIDEOGRAPHER:  We've

22    been on the record for 45 minutes.

23    And the record on the camera is

24    five hours and 46 minutes.
```

1           Should I stop the camera?

2           MR. SCHMIDT:  No, let's stay

3       on the record.  Unless you want

4       to --

5           MR. BOWDEN:  No, I just

6       asked to go off to get a count.

7           MR. SCHMIDT:  I might

8       have -- just to be clear, I might

9       have written down the wrong time.

10          THE VIDEOGRAPHER:  No

11      problem.

12          MR. SCHMIDT:  It's just the

13      extra 15 minutes at this time of

14      day, it felt like it crushed my

15      soul.  So I had to react.

16          MR. BOWDEN:  I'll withhold

17      the comments on the soul.

18          MR. SCHMIDT:  That comes in

19      spades, my friend.

20          MR. BOWDEN:  I'll tell you

21      what, let's pause for a second.

22      I'm cutting down some documents.

23      Not to -- I'm not going to leave

24      or anything.  Go off the record

Highly Confidential - Subject to Further Confidentiality Review

1          for a second.

2                    THE VIDEOGRAPHER:  The time

3          is 5:02 p.m.  Off the record.

4                    (Short break.)

5                    THE VIDEOGRAPHER:  The time

6          is 5:05 p.m.  Back on the record.

7     BY MR. BOWDEN:

8          Q.    Sir, you're familiar with

9     the HDMA, correct?

10         A.    Yes.

11         Q.    And that was an industry

12    organization in which McKesson was a

13    member?

14         A.    Yes.

15         Q.    All right.  And that

16    industry trade group -- is that fair to

17    call it an industry trade group?

18         A.    Yes.

19         Q.    -- helped to develop or had

20    developed its own guidelines for

21    monitoring of suspicious ordering; is

22    that right?

23         A.    I think they had worked with

24    members in order to collect some best

Highly Confidential - Subject to Further Confidentiality Review

1    practices, that kind of thing.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



3          Q.     I'm going to hand you what

4    I'm marking as Exhibit Number 37,

5    P1.1941.

6                 (Document marked for

7                 identification as Exhibit

8                 Mahoney-37.)

9    BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



          8           MS. McNAMARA:  Objection to

          9     form.

         10           MR. SCHMIDT:  You can still

         11     answer.  Go ahead.



Highly Confidential - Subject to Further Confidentiality Review



14          MR. SCHMIDT:  Object to

15      characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22    MR. SCHMIDT:  Do you want to

23  review it?

24    THE WITNESS:  Yeah, let me

Highly Confidential - Subject to Further Confidentiality Review

1    review.

2  BY MR. BOWDEN:

3         Q.    Let me know when you get to

4  Page 5.

5         A.    I'm on Page 5.



Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11     Speculation.

Highly Confidential - Subject to Further Confidentiality Review



6        Q.     Okay.   I'm going to hand you

7    what I will mark as Exhibit Number 38,

8    which is P-1.1806.

9              (Document marked for

10             identification as Exhibit

11             Mahoney-38.)

12   BY MR. BOWDEN:



19          MR. SCHMIDT:  Objection to

20      the characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Object to

22      characterization.

Highly Confidential - Subject to Further Confidentiality Review



24          MR. SCHMIDT:  Object to

1          characterization.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11     Mischaracterization.

18     BY MR. BOWDEN:

19          Q.    All right.  Sir, I will hand

20     you what I will mark as Exhibit Number 39

21     to your deposition.  P-1.1971.

22               (Document marked for

23               identification as Exhibit

24               Mahoney-39.)

Highly Confidential - Subject to Further Confidentiality Review



1    BY MR. BOWDEN:

19              MR. SCHMIDT:  Objection to

20         form.

Highly Confidential - Subject to Further Confidentiality Review



5          (Brief white noise

6     interference.)

7               MR. SCHMIDT:  I think the

8        reporter may not have gotten it.

9               THE COURT REPORTER:  Yeah, I

10       didn't want to ask you to repeat.

11               MR. SCHMIDT:  And I wasn't

12        jumping on your question, but I

13        could just see...

14               MR. BOWDEN:  That's okay.

15        Let me re-ask it then.

16     BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1          MR. SCHMIDT:  Let him finish

2     his answer, please.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11          MR. SCHMIDT:   Objection to

12     the assumption.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15          MR. SCHMIDT:  Object to the

16      characterization.

Highly Confidential - Subject to Further Confidentiality Review



6      MR. SCHMIDT:  Objection to

7      the characterization.

20      Q.    I'll hand you what I'll mark

21  as Exhibit Number 40.

22      (Document marked for

23      identification as Exhibit

24      Mahoney-40.)

Highly Confidential - Subject to Further Confidentiality Review

1    MR. BOWDEN:  Let me find an

2    extra copy here.  I only have the

3    one.

4    MR. SCHMIDT:  You don't

5    have more?

6    Thank you.  Appreciate it.

7    BY MR. BOWDEN:





11          Do you see that?

12     A.     Yes.

13          MR. SCHMIDT:  Did you mean

14     to give him a highlighted copy?

15          MR. BOWDEN:  Absolutely not.

16          MR. SCHMIDT:  Okay.  I just

17     saw that.  Why don't we just move

18     the sticker over if you want.  You

19     can give me a clean copy because I

20     already started writing on mine.

21          Do you have a clean copy

22     that you can give us back?

23          MR. BOWDEN:  I appreciate

24     the candor.

1          MR. SCHMIDT:  All right.  He

2      was on Page 11.

3          MR. BOWDEN:  Thank you.

4  BY MR. BOWDEN:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19          MR. SCHMIDT:  Object to the

20      characterization.

Highly Confidential - Subject to Further Confidentiality Review



15      Q.      Set that aside.

16              I'll hand you what I'm

17      marking as Exhibit Number 41.  This will

18      be P-1.1443.

19              (Document marked for

20              identification as Exhibit

21              Mahoney-41.)

22      BY MR. BOWDEN:

23              Q.      Is that a question for your

24      counsel or for me?

Highly Confidential - Subject to Further Confidentiality Review



1      A.    Just curious.

21     Q.    You have seen this letter?

22     A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



18          MR. SCHMIDT:  Objection.

19      Foundation.

20  BY MR. BOWDEN:

24          MR. SCHMIDT:  Objection.



1            Characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





8            MR. SCHMIDT:  Object to the

9        characterization.

12   BY MR. BOWDEN:

18            Q.    I'm going to hand you what

19   I'll mark as Exhibit Number 42.

20            (Document marked for

21        identification as Exhibit

22        Mahoney-42.)

23   BY MR. BOWDEN:

24            Q.    On the first page, you can

Highly Confidential - Subject to Further Confidentiality Review

1    see this is the administrative memorandum

2    of agreement.  It's between the DEA and

3    McKesson Corporation, right?

4         A.    Yes.

5         Q.    And in the background

6    section, in Section Number 5, you can see

7    that there were -- read that together.

8    "Between March 2013 and the present, DEA

9    executed one additional AIW and served

10   numerous administrative subpoenas and

11   conducted a number of cyclic inspections

12   at various McKesson U.S. pharmaceutical

13   distribution centers Nationwide,

14   including McKesson Washington Courthouse,

15   Ohio, distribution center, McKesson

16   Livonia, Lakeland, and Aurora."

17              Do you see that?

18        A.    Yes.

19        Q.    On Page 2, you see Bullet

20   Point Number 7?

21        A.    Page 2, Number 7.

22        Q.    It cites that, "On" -- "On

23   or about November 14, 2014, McKesson

24   received a letter dated November 4, 2014,

Highly Confidential - Subject to Further Confidentiality Review

```
1    from the DEA stating the DEA was

2    separately pursuing administrative action

3    against McKesson-Aurora for the conduct

4    outlined in the August 13, 2014, letter."

5              Do you see that?

6         A.   Yes.

7         Q.   And they go --

8         A.   The prior letter?

9         Q.   Right.

10        A.   Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

        Q.    Go on to Page 3.  As part of

this agreement, McKesson did accept

responsibility.  You're aware of that,

right?

        A.    I'm not sure the details of

the settlement.

        Q.    Well, let's look at

bullet --

        A.    You're talking about Number

2 there?

        Q.    Right.  Number 2, acceptance

of responsibility.

        A.    Mm-hmm.

        Q.    The -- halfway down, it

says, "McKesson acknowledges that at

various times during the period from

January 1, 2009, up through and including

the effective date of this agreement, it

did not identify or report to DEA certain

orders placed by certain pharmacies which

should have been detected by McKesson as

suspicious based on the guidance

contained in the DEA letters about the

1    requirements set forth in the CSA, right?

2         A.    Yes.

3         Q.    Underneath that on or

4    about -- excuse me.  Strike that.



11              MR. SCHMIDT:  Object to the

12         characterization.

Highly Confidential - Subject to Further Confidentiality Review



2          MR. SCHMIDT:  Object to the

3     characterization.

15          MR. SCHMIDT:  Object to the

16     characterization.

Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Same

11     objection.

12          THE WITNESS:  Can you repeat

13     the question?

14  BY MR. BOWDEN:

15          Q.    Sure.  Another item they

16  took issue with was the fact that

17  McKesson should have been reporting

18  suspicious orders and was failing to do

19  so, right?

20          A.    Yes.

21          Q.    And if you go down to the

22  bottom of Page 3, says, "McKesson failed

23  to maintain effective controls against

24  diversion of particularly controlled

Highly Confidential - Subject to Further Confidentiality Review

1  substances into other legitimate medical,

2  scientific, and industrial channels by

3  sales of certain" -- "by sales to certain

4  of its customers in violation of the CSA

5  and the CSA implementing regulations."

6          Do you see that?

7      A.    Yes.

8      Q.    And then it gives a list of

9  some of those distribution centers that

10  failed to maintain effective controls

11  against diversions, right?

12      A.    Yes.

13      Q.    And Lakeland, Florida, is

14  one of those distribution centers, right?

15      A.    I see that.

16      Q.    And Lakeland, Florida, was

17  one of the distribution -- distribution

18  centers of which you had responsibility

19  for during that time period, right?

20      A.    Yes.

21      Q.    In fact, during that entire

22  time period from 2008 up until this

23  agreement was signed in 2017, you had

24  responsibility for Lakeland, Florida,

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2          A.     From a regulatory

3    perspective?

4          Q.     Correct.

5          A.     Yes.

6          Q.     Now, as a result of this

7    action, if you turn to Page 7, bullet

8    point G.  G, yes.

9                 "McKesson agrees that its

10   authority to distribute controlled

11   substances containing the drug code for

12   Schedule II hydromorphone products, that

13   is DEA drug code 9150 from its

14   McKesson-Lakeland distribution center,

15   DEA certificate of registration

16   PM0000771, will be suspended for a period

17   of one year commencing from the effective

18   date of the agreement except for orders

19   placed by permitted registrants."

20                Do you see that there?

21         A.     I do.

22         Q.     So as part of the penalty

23   for Lakeland distribution center not

24   appropriately sending suspicious order

Highly Confidential - Subject to Further Confidentiality Review

1    reports to the DEA, their license to

2    distribution center Schedule II products

3    was suspended for a period of one year,

4    right?

5                  MR. SCHMIDT:  I'll object to

6         the characterization.

7                  THE WITNESS:  Hydrocodone,

8         or hydromorphone?

9    BY MR. BOWDEN:

10        Q.    Hydromorphone.

11        A.    Was suspended for one year.

12   So that was a very narrow -- that's --

13   that's one base code.

18        Q.    Okay.  And ultimately, as a

19   result of the settlement agreement,

20   McKesson agreed to pay $150 million fine,

21   correct?

22        A.    Yes.

23                 MR. BOWDEN:  Take a break.

24                 THE VIDEOGRAPHER:  Remove

Highly Confidential - Subject to Further Confidentiality Review

1      your microphones.  The time is

2      6:02 p.m.  Going off the record.

3              (Short break.)

4              THE VIDEOGRAPHER:  We are

5      back on the record.  The time is

6      6:14 p.m.

7                  -   -   -

8              EXAMINATION

9                  -   -   -

10  BY MR. SCHMIDT:

11      Q.    Mr. Mahoney, my name is Paul

12  Schmidt.  I represent McKesson in this

13  case.  We've been here for a very long

14  day.  We're now into the evening, and

15  upside, so I'm going to be targeted in my

16  questions to you.

17              Can you tell the jury how

18  long you have been at McKesson.

19      A.    Almost 18 years.  17 to

20  18 years.

21      Q.    And what is it about your

22  work at McKesson that's made you stay

23  there for that period of time?

24      A.    Has good culture, and I

Highly Confidential - Subject to Further Confidentiality Review

1   think the mission is something that I

2   enjoy, empowering healthcare.

3        Q.    Can you describe for the

4   jury the role that McKesson

5   Pharmaceutical place in how prescription

6   medicines get from the companies that

7   make them to patients?

8        A.    McKesson buys

9   pharmaceuticals from lots of different

10  manufacturers and brings them into our

11  local DC where customers, i.e.,

12  pharmacies and hospitals, are able to

13  order them for next-day delivery so they

14  have them when they need them.

15       Q.    Does McKesson

16  Pharmaceutical's work focus on

17  interacting directly with doctors?

18       A.    Not generally, no.

19       Q.    Do you have an understanding

20  of -- about whether when McKesson ships a

21  prescription medicine to a pharmacy, a

22  patient is only able to get that medicine

23  from the pharmacy if they've seen a

24  doctor and the doctor has made a judgment

1   that that patient should get a

2   prescription for that medicine?

3              MR. BOGLE:  Object to form.

4              THE WITNESS:  McKesson

5       provides the supply for pharmacies

6       who are responding to scripts that

7       patients bring them generated by a

8       doctor.

9   BY MR. SCHMIDT:

10      Q.    If a physician is writing

11  more prescriptions for opioids, does that

12  increase the overall distribution level

13  for opioids?

14             MR. BOGLE:  Object to form.

15             THE WITNESS:  Can you repeat

16      that.

17  BY MR. SCHMIDT:

18      Q.    Yeah, if physicians write

19  more prescriptions for opioids, does that

20  increase the overall level of

21  distribution of opioids?

22      A.    Yes.

23             MR. BOGLE:  Object to form.

24  BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Does your level of

2   distribution follow from what

3   prescriptions do, or do you actually

4   influence what prescriptions -- what

5   physicians do?

6              MR. BOGLE:  Object to form.

7   BY MR. SCHMIDT:

8      Q.    And let me re-ask it.  I

9   think I misspoke in my question.

10             Does your level of

11  distribution follow from decisions that

12  physicians make, or do you actually

13  influence the decisions physicians

14  make --

15             MR. BOGLE:  Object to form.

16  BY MR. SCHMIDT:

17     Q.     -- in terms of prescribing

18  medicines?

19     A.    In the distribution center

20  we don't have any influence on

21  prescribing habits.  We are just

22  responding to what is pulled from us by

23  the pharmacies.

24     Q.    Is this role that you've

1  been talking about true for opioids as

2  well as other prescription medicines that

3  McKesson distributes?

4          A.     Yes.

5          Q.     And can you give us a sense

6  of whether, from your experience, opioids

7  are a substantial majority, a majority, a

8  minority, a substantial minority of the

9  medicines that McKesson distributes?

10              MR. BOGLE:  Object to form.

11              THE WITNESS:  Substantial

12         minority.

13  BY MR. SCHMIDT:

14         Q.     Do you have an understanding

15  of the responsibility that a pharmacy has

16  in terms of when they pass along an

17  opioid to a patient that they have

18  purchased from McKesson?

19         A.     Do I --

20              MR. BOGLE:  Object to form.

21  BY MR. SCHMIDT:

22         Q.     Do you understand the

23  responsibility that a pharmacy has when

24  they pass along an opioid purchased from

Highly Confidential - Subject to Further Confidentiality Review

1   McKesson to a patient?

2          A.     Yes.  They have

3   corresponding responsibility.

4          Q.     Is part of your work -- does

5   part of your work involve trying to

6   identify where pharmacies might not be

7   meeting their responsibilities in terms

8   of whether you interact with those

9   pharmacies?

10         A.     Yes.

11         Q.     And you've discussed

12  McKesson's regulatory programs today.  Am

13  I understanding correctly from your

14  testimony over the course of the day that

15  McKesson's programs for doing diligence

16  into pharmacies have changed over time?

17         A.     Yes.

18         Q.     Have developed?

19         A.     Yes.

20         Q.     What are those changes made

21  in response to?

22         A.     They've been made to give us

23  greater granularity of what we see in a

24  pharmacy as they are buying from us and

Highly Confidential - Subject to Further Confidentiality Review

1  dispensing to their patients.

2          Q.      Are those changes made as

3  you develop more information about

4  practices with regards to opioids,

5  concerns about diversions, information

6  you get from your diligence, things like

7  that?

8          MR. BOGLE:  Object to form.

9          THE WITNESS:  Yes.

10  BY MR. SCHMIDT:

16          Q.      Do you have a view as to

17  whether that's a good thing to try to

18  improve your processes over time?

19          MR. BOGLE:  Object to form.

20          THE WITNESS:  It's

21          absolutely a good thing.

22  BY MR. SCHMIDT:

23          Q.      Let's take one example.  You

24  have Exhibit 26, please.

Highly Confidential - Subject to Further Confidentiality Review

1             MR. BOGLE:  Can you give me

2      the corresponding -- the other

3      exhibit number at the bottom?

4             MR. SCHMIDT:  The Bates

5      number?

6             MR. BOGLE:  No.

7             MR. SCHMIDT:  It's 1743, I

8      think you're thinking of.

9             MR. BOGLE:  Yeah.

10  BY MR. SCHMIDT:

11      Q.   And if you look at Page 26

12  of this exhibit.

13      A.   26?

Highly Confidential - Subject to Further Confidentiality Review



6          MR. BOGLE:   Object to form.



6                    MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



10          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



11          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



3          MR. BOGLE:  Object to form.

4     BY MR. SCHMIDT:

17    BY MR. SCHMIDT:

21         MR. BOGLE:  Object to form.

22    BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

3          MR. BOGLE:  Object to form.

6   BY MR. SCHMIDT:

7          Q.     Do you have Exhibit 1 handy?

8   Do you remember being asked questions

9   about this 2006 letter from the DEA by

10  the plaintiff lawyer?

11         A.     Yes.

12         Q.     And if you look at the

13  second page of this letter -- it's 1464.

14  If you look at the second page of this

15  letter, about halfway down the letter,

16  before and after the block quote is

17  language getting at this idea of blocking

18  orders.  Do you see that?  Do you

19  remember being asked questions about

20  that?

21         A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review



4                          MR. BOGLE:  Object to form.



14          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



7              MR. BOGLE:  Object to form.

22              MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



22    Q.    In the time that you've

23  served as director of regulatory affairs,

24  am I correct that your territory is

Highly Confidential - Subject to Further Confidentiality Review

1    focused on the Southeastern United

2    States?

3              A.      That's true.

4              Q.      Have you, other than filling

5    in for people or doing backup duty,

6    has -- has the primary focus of your work

7    ever been on Ohio?

8              A.      Well --

9              Q.      On Cuyahoga County or Summit

10   County in Ohio?

14             Q.      Did you have primary

15   responsibility for opening or closing any

16   pharmacies in Cuyahoga or Summit County?

17             A.      No, I didn't.

Highly Confidential - Subject to Further Confidentiality Review



9          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



22          MR. BOGLE:  Object to form.

23   BY MR. SCHMIDT:

24          Q.    So let me re-ask the

1    question.



Highly Confidential - Subject to Further Confidentiality Review



8          MR. SCHMIDT:  Does someone

9      have the last exhibit number?

10     I'll call this Exhibit 50.

11          (Document marked for

12     identification as Exhibit

13     Mahoney-50.)

14  BY MR. SCHMIDT:

15     Q.    I've marked as Exhibit 50 a

16  document --

17          MR. SCHMIDT:  I'll pass it

18     down.  I'm sorry, I need that

19     back.  Apologies.

20  BY MR. SCHMIDT:

21     Q.    I've marked as Exhibit 50 a







10          MR. BOGLE:   Object to form.

11     BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review



11          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



4      Q.     I've marked as Exhibit 51 --

5             MR. SCHMIDT:  Thank you.

6             (Document marked for

7      identification as Exhibit

8      Mahoney-51.)

9  BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



8          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



14          MR. BOGLE:  Object to form.

15     BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review



8          First off, prior to 2006,

9     was Lakeland responsible for supplying

10    opioids to Summit County, Ohio or

11    Cuyahoga County, Ohio?

12          A.    No.

21          MR. BOGLE:  Object to form.

22    BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review



5           MR. BOGLE:  Object to form.



21          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16        MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



14          MR. BOGLE:   Object to form.



4        Q.    Let's look at Exhibit 9,

7              Do you see that?

8        A.    Yes.

9              MR. BOGLE:  What's the --

10       what's the number?

11             MR. SCHMIDT:  1963.

12  BY MR. SCHMIDT:

13       Q.    Do you see that,

14  Mr. Mahoney?

15       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



6                    MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



5          MR. BOGLE:  Object to form.



14          MR. BOGLE:  Objection to

15     form.

Highly Confidential - Subject to Further Confidentiality Review



21          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



21          Q.     Let me ask you about a

22    couple other exhibits.  Exhibit 11,

23    please.

24                 Do you have that in front of

Highly Confidential - Subject to Further Confidentiality Review

1    you?

2              MR. BOGLE:  What's the

3         cross-reference?

4              MR. SCHMIDT:  1947.

5    BY MR. SCHMIDT:





MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



18    Q.    Do you have Exhibit 16 and

19  17 in front of you?

20    A.    Yes.

21    Q.    These are, I believe, web

22  page articles that the plaintiff lawyer

23  said he pulled down and asked you

24  questions about.  Do you have any way to

Highly Confidential - Subject to Further Confidentiality Review

1    vouch for the accuracy of what they

2    report?

3             A.    I don't.



15               MR. BOGLE:    Same objection.

16   BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review

5          MR. BOGLE:  Object to form.

6   BY MR. SCHMIDT:

7          Q.    Do you have in front of you

8   Exhibit 19, the agreement in 2008?

9          A.    Yes.

10         Q.    Look with me if you would at

11  Page 2 of the document.  It's 889.  Do

12  you see where it says, "No admission or

13  concession"?

14         A.    Yes.

15         Q.    Tell me if I read this

16  correctly:  "This agreement is neither an

17  admission by McKesson of liability or of

18  any allegations made by DEA in the orders

19  and investigations nor a concession by

20  DEA that its allegations in the orders of

21  investigations are not well founded."

22                Did I read that correctly?

23         A.    Yes.

24         Q.    If you look at Page 0714 of

Highly Confidential - Subject to Further Confidentiality Review

1    this document.  Down below.  14 at the

2    top?

3            A.     That's easier.

4            Q.     I'm going to read

5    Paragraph 9 and ask you if I've read this

6    correctly.  "By entering into this

7    agreement McKesson does not admit to the

8    violations alleged as a result of any DEA

9    investigation or to any violation of law,

10   liability, fault, misconduct or

11   wrongdoing.  McKesson explicitly denies

12   any allegations of violations of the CSA

13   or DEA regulations and represents that

14   the company has defenses to the

15   violations alleged by the government."

16           Did I read that correctly?

17           A.     Yes.

22           MR. BOGLE:  Object to form.

23   BY MR. SCHMIDT:

24           Q.     Just a few more.

1          Do you have exhibit -- do

2    you have Exhibit 3 in front of you?  851.

3          A.    Yes.

4          Q.    Turn with me if you would to

5    Page 18.  Do you remember being called --

6    asked questions about this slide deck?

7          A.    18, 19?

19          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review





12          MR. BOGLE:  Object to form.

13    BY MR. SCHMIDT:

22          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



16          MR. BOGLE:  Sorry, what was

17      the cross-reference?

18          MR. SCHMIDT:  1355.

Highly Confidential - Subject to Further Confidentiality Review



17          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



21          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



10    BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review



16          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16            MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



15        MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



11          MR. SCHMIDT:  That's all I

12     have, Mr. Mahoney.  Thank you.

13          MR. BOGLE:  I've got some

14     follow-up, and you guys have a

15     chance to ask questions if you

16     want.  I just want to mark the

17     time.  Let's go off the record.

18          THE VIDEOGRAPHER:  Sure.

19     Okay.  The time is 7:05 p.m.

20     Going off the record.

21          (Short break.)

22          THE VIDEOGRAPHER:  We are

23     back on the record.  The time is

24     7:09 p.m.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              -  -  -

 2           EXAMINATION

 3              -  -  -

 4   BY MR. BOGLE:

 5        Q.    Mr. Mahoney, I have a few

 6   follow-up questions for you.  I know you

 7   probably want to get out of here.  So you

 8   were asked some questions about when

 9   McKesson supplies drugs to pharmacies.  I

10   think you provided testimony along the

11   lines of that McKesson only distributes

12   when there's a prescription from a

13   doctor, right?

14        A.    I think what I was saying is

15   that we -- we don't -- we don't push the

16   drugs.  We respond to orders from

17   pharmacists who are filling scripts from

18   doctors.
```

Highly Confidential - Subject to Further Confidentiality Review



8          MR. SCHMIDT:   Objection.

9       Foundation.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. SCHMIDT:  Objection.

2     Form.



13          MR. SCHMIDT:  Objection.

14     Form.

Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Objection.

22      Characterization.



10          MR. SCHMIDT:  Objection.

11      Characterization.



15          MR. SCHMIDT:  Objection to

16     the characterization.

17  BY MR. BOGLE:

18          Q.    You recall that discussion,

19  don't you?

20          A.    Yes, I recall that

21  discussion.

Highly Confidential - Subject to Further Confidentiality Review



13      Q.     Okay.  And you were asked

14  some questions about the 2008 settlement

15  agreement and whether McKesson accepted

16  liability or responsibility for those

17  actions outlined in the agreement.  Do

18  you recall that?

19      A.     Yes.

20      Q.     Okay.  I believe you

21  testified that there was no admission of

22  guilt.  Something to that effect, right?

23      A.     That was just asked, right?

24      Q.     Right, right.  By your

1    counsel.

2         A.    Right.

3         Q.    And so, listen, in your

4    experience at 18 years at McKesson, does

5    the company routinely pay

6    $13-plus-million fines for things that

7    they didn't do?

8              MR. SCHMIDT:  Objection.

9         Foundation.

10             THE WITNESS:  I don't

11        believe so.

12   BY MR. BOGLE:

21             Q.    They don't have to roll over

22   and just say we quit, right?

23             MR. SCHMIDT:  Objection.

24        Foundation.  Calls for a legal

Highly Confidential - Subject to Further Confidentiality Review

1        conclusion.

2    BY MR. BOGLE:

10        Q.    Right.  And McKesson quit on

11    that fight, right?

12            MR. SCHMIDT:  Object to

13        characterization.

14            THE WITNESS:  There was a

15        settlement.

16    BY MR. BOGLE:

17        Q.    Right.  $13-plus-million

18    settlement, right?

19            MR. SCHMIDT:  Objection.

20        Asked and answered.

21            THE WITNESS:  Yes.

22    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



6          MR. SCHMIDT:  Objection,

7    calls --

8  BY MR. BOGLE:

9          Q.     They didn't have to settle?

10         MR. SCHMIDT:  Objection.

11   Calls for a legal conclusion.

12  BY MR. BOGLE:

13         Q.     True?

14         A.     That's my understanding.

Highly Confidential - Subject to Further Confidentiality Review



         Q.    You were asked -- I'm trying
to find the exhibit number.  1.1962 which
is Exhibit 25.  If you can track that one
down.



10          MR. SCHMIDT:  Objection.

11      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



5          MR. SCHMIDT:  Object to the

6     preamble; move to strike the

7     preamble.  Object to form.

8   BY MR. BOGLE:

22          MR. SCHMIDT:  Objection to

23     form.

Highly Confidential - Subject to Further Confidentiality Review



12          MR. SCHMIDT:  Objection to

13     form.

Highly Confidential - Subject to Further Confidentiality Review



23          MR. SCHMIDT:  Objection.

24     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



7          MR. SCHMIDT:  Objection.

8     Vague.

17          MR. SCHMIDT:  Objection.

18     Form.

23  BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



8          MR. SCHMIDT:  Objection.

9     Form.

24          MR. SCHMIDT:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1           Form.  Vague as to time.

2    BY MR. BOGLE:

3           Q.    Any time.

4                 MR. SCHMIDT:  Objection to

5           form.

6    BY MR. BOGLE:

20                MR. SCHMIDT:  Objection.

21    Asked and answered three or four

22    times now.



7          MR. SCHMIDT:  Objection.

8      Form.  Foundation.

9  BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

1      MR. SCHMIDT:  Let him finish

2  his answer, please.



13      MR. SCHMIDT:  Objection.

14  Form.  Asked and answered.

Highly Confidential - Subject to Further Confidentiality Review



6          MR. SCHMIDT:  Objection.

7      Foundation.  Vague as to time.

8  BY MR. BOGLE:

9      Q.      Anytime.

10          MR. SCHMIDT:  Objection.

11      Foundation.  Asked and answered.

Highly Confidential - Subject to Further Confidentiality Review



4           MR. SCHMIDT:  I'll just

5     object to the lecturing of the

6     witness.  It's not inappropriate.

7     I'll move to strike the preamble.

8     Asked and answered.  Form.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



3           MR. SCHMIDT:  Object to

4      characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20        MR. BOGLE:  How much time

21   have I used?

22             THE VIDEOGRAPHER:

23   20 minutes.

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    I'm going to hand you what

2   I'm marking as Exhibit 43.  Also marked

3   as 1.1864.

4              (Document marked for

5              identification as Exhibit

6              Mahoney-43.)

7   BY MR. BOGLE:

12              MR. SCHMIDT:  I'm just going

13         to enter an objection on the

14         scope.  I think this is well

15         outside the scope of anything that

16         I did.  If I could have a running

17         objection.

18              MR. BOGLE:  He raised the

19         issue.  I wasn't going to go here,

20         but he raised the issue.

21              MR. SCHMIDT:  I still think

22         it's outside the scope.  May I

23         have a running objection?

24              MR. BOGLE:  Sure.

1    BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review



20          MR. SCHMIDT:  Object to the

21     characterization.  Foundation.

22  BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



12          MR. SCHMIDT:  Object to

13     foundation.

1          MR. SCHMIDT:  Objection.

2     Foundation.

3  BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review



7          MR. SCHMIDT:   Object to

8     characterization.   Foundation.

22          MR. SCHMIDT:   Objection.

23     Characterization.

Highly Confidential - Subject to Further Confidentiality Review



18          MR. SCHMIDT:  Object to the

19    characterization.

20    BY MR. BOGLE:

21          Q.    You were asked about

22    Exhibit 1.1464, which was Exhibit 1 to

23    the deposition.  It's the September 27,

24    2006, letter from Mr. Rannazzisi.  You

Highly Confidential - Subject to Further Confidentiality Review

1    again talked about the reference to

2    potentially blocking orders being new in

3    this letter.  Do you recall saying that?

4              A.    Yes.

10             MR. SCHMIDT:  Objection.

11        Foundation.

12   BY MR. BOGLE:

23             Q.    Okay.  Well, you're familiar

24   with the statistic I believe that's even

Highly Confidential - Subject to Further Confidentiality Review

1    on McKesson's website that one-third of

2    all pills distributed in the United

3    States come from your company, right?

4    Are you familiar with that stat?

5         A.    I'm not sure that I've seen

6    it on the website.  But I know that our

7    market share is roughly in line with

8    that.

9         Q.    Right.  So to say that you

10   guys at McKesson don't have an impact on

11   the amount of pills, and specifically

12   controlled substances that might appear

13   in any region in this country, is a bit

14   overstated if you guys, in fact, supply

15   one out of every three pills in the

16   United States, right?

17             MR. SCHMIDT:  Objection.

18        Characterization.

19             THE WITNESS:  I think that

20        an expression of our market share

21        in saying that one out of every

22        three opioids, I don't see the

23        linkage there necessarily as cause

24        and effect.

Highly Confidential - Subject to Further Confidentiality Review



1    BY MR. BOGLE:

7            MR. SCHMIDT:  Objection.

8        Foundation.

23           MR. SCHMIDT:  And I think he

24       did answer your question.  Asked

Highly Confidential - Subject to Further Confidentiality Review

1      and answered.

2   BY MR. BOGLE:



11          MR. SCHMIDT:  Objection.

12   Compound.  And form.

Highly Confidential - Subject to Further Confidentiality Review



6      MR. SCHMIDT:  Objection.

7   Objection.  Argumentive.

16     MR. SCHMIDT:  Objection.

17   Foundation.

Highly Confidential - Subject to Further Confidentiality Review



2          MR. SCHMIDT:  Objection.

3     Foundation.

16          MR. SCHMIDT:  Objection to

17     characterization.

Highly Confidential - Subject to Further Confidentiality Review



2        MR. SCHMIDT:  Objection.

3    Form.

14        MR. SCHMIDT:  Objection.

15    Argumentive.

Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:  Objection.

18      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



23          MR. SCHMIDT:  Objection.

24      Foundation.  Characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10      MR. SCHMIDT:  Objection.

11  Asked and answered.

23      MR. SCHMIDT:  Were you --

24  were you finished with your

Highly Confidential - Subject to Further Confidentiality Review

1        answer?



12        MR. SCHMIDT:   Object to

13       characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12          MR. SCHMIDT:  Objection.

13     Characterization.

14  BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



10        MR. SCHMIDT:  Objection.

11    Characterization.

12    BY MR. BOGLE:

20        MR. BOGLE:  No further

21    questions.

22        MR. SCHMIDT:  I just need a

23    minute.

24        THE VIDEOGRAPHER:  Off the

Highly Confidential - Subject to Further Confidentiality Review

 1     record, right?  The time is

 2     7:46 p.m.  Going off the record.

 3              (Short break.)

 4              THE VIDEOGRAPHER:  The time

 5     is 7:49 p.m.  Back on the record.

 6                  -   -   -

 7              EXAMINATION

 8                  -   -   -

 9     BY MR. SCHMIDT:

17              MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



11           MR. SCHMIDT:  Thank you.

12      That's all.

13           MR. BOGLE:  Got nothing.

14           THE VIDEOGRAPHER:  Okay.

15      Stand by, please.  This marks the

16      end of today's deposition.  The

17      time is 7:50 p.m.  Off the record.

18           (Excused.)

19           (Deposition concluded at

20      approximately 7:50 p.m.)

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2                    CERTIFICATE

3

4

5          I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.

7

8          It was requested before
   completion of the deposition that the
   witness, WILLIAM DE GUTIERREZ-MAHONEY,
9  have the opportunity to read and sign the
   deposition transcript.

10

11

12
        _____
        MICHELLE L. GRAY,
13      A Registered Professional
        Reporter, Certified Shorthand
14      Reporter, Certified Realtime
        Reporter and Notary Public
15      Dated:  December 3, 2018

16

17

18          (The foregoing certification

19  of this transcript does not apply to any

20  reproduction of the same by any means,

21  unless under the direct control and/or

22  supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

1          INSTRUCTIONS TO WITNESS

2

3          Please read your deposition

4   over carefully and make any necessary

5   corrections.  You should state the reason

6   in the appropriate space on the errata

7   sheet for any corrections that are made.

8          After doing so, please sign

9   the errata sheet and date it.

10          You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14          It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
1            -   -   -   -   -   -

                E  R  R  A  T  A

2            -   -   -   -   -   -

3

4    PAGE   LINE    CHANGE

5    _____  _____   _____

6        REASON:    _____

7    _____  _____   _____

8        REASON:    _____

9    _____  _____   _____

10       REASON:    _____

11   _____  _____   _____

12       REASON:    _____

13   _____  _____   _____

14       REASON:    _____

15   _____  _____   _____

16       REASON:    _____

17   _____  _____   _____

18       REASON:    _____

19   _____  _____   _____

20       REASON:    _____

21   _____  _____   _____

22       REASON:    _____

23   _____  _____   _____

24       REASON:    _____
```

Highly Confidential - Subject to Further Confidentiality Review

1

2 ACKNOWLEDGMENT OF DEPONENT

3

4 I,_____, do

5 hereby certify that I have read the

6 foregoing pages, 1 - 606, and that the

7 same is a correct transcription of the

8 answers given by me to the questions

9 therein propounded, except for the

10 corrections or changes in form or

11 substance, if any, noted in the attached

12 Errata Sheet.

13

14

15 _____

16 WILLIAM DE GUTIERREZ-MAHONEY        DATE

17

18

19 Subscribed and sworn

to before me this

20 _____ day of _____, 20____.

21 My commission expires:_____

22

_____

23 Notary Public

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____   _____

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____
```