EXHIBIT 283

# McKesson Corporation
# Board of Directors' Response to International Brotherhood of Teamsters

## INTRODUCTORY STATEMENT

The Board of Directors of McKesson Corporation created the Special Review Committee to address requests from a stockholder relating to the oversight performed by the Board and senior management over the Company's distribution of prescription opioid medication. In response, the Committee conducted an investigation and presented the results of its investigation to the Board. The Board greatly appreciates the work performed by the Special Review Committee and has accepted the Committee's recommendations in their entirety.

Before presenting the conclusions and recommendations of the Special Review Committee, the Board and the Special Review Committee believe it is important to acknowledge the context in which these findings are issued. The Board and the Committee (which includes a former United States Marine Corps officer, a medical doctor, and a leader of a healthcare company) are mindful of the fact, and it indeed weighs on them, that this investigation involves a public health crisis that continues to afflict the country. While the vast majority of individuals who use controlled substances do so for legitimate healthcare needs, many others and their families have unfortunately felt the devastating impact of opioid abuse and addiction. The Special Review Committee conducted its investigation, and the Board reviewed the Committee's work, with this heavy reality of the opioid epidemic in mind.

In response to the Committee's investigation, and to support the Company's ongoing regulatory enhancements and efforts to combat the opioid crisis, the Board unanimously adopted the Committee's recommendations. The actions taken by the Board include:

- Implementing enhanced Board-level oversight procedures with respect to both currently pending lawsuits and investigations related to opioid distribution and the Company's controlled substance monitoring program.
- Implementing an annual legal and regulatory compliance evaluation of the Company's compliance with laws and regulations relating to controlled substances.

- Adopting (or incorporating into existing policies) a statement that regulatory, compliance, and legal issues shall be considered in determining compensation.  The Board reiterates the importance of consideration of these issues when evaluating executive compensation.

In addition to certain controlled substances program enhancements made over the last several years, the Board also notes the Company's recent implementation of a series of additional Company initiatives to help combat the opioid epidemic.  These initiatives include the formation of a foundation, to which McKesson is contributing $100 million, dedicated to addressing the crisis.  The non-profit organization will focus on providing education for patients, caregivers, and providers, addressing key policy issues, and increasing access to opioid overdose reversal medications.

The Board and each member of the Special Review Committee recognize the seriousness of this public health crisis and are committed to being a part of the solution.  The Board and the Special Review Committee believe that the Company must remain acutely focused on continuing its efforts to be a meaningful partner in addressing the epidemic.  For example, in addition to McKesson's regulatory obligations as a distributor, the Board and the Special Review Committee believe the Company should continue to collaborate with other stakeholders in efforts such as building awareness of opioid abuse and prevention through public education, creating a system to identify patients at risk for addiction, and educating customers on warning signs of prescription opioid abuse.

*       *       *

Note:  As part of its investigation, the Special Review Committee considered evidence, communications, and other information involving McKesson's internal and external counsel.  By releasing this response to the Teamsters publicly, McKesson and the Board do not intend to waive the attorney-client privilege or the protections afforded by the attorney work product doctrine.  For that reason, this response does not contain the content of communications and other information protected by the attorney-client privilege or attorney work product doctrine.

## Table of Contents

I.    OVERVIEW OF INVESTIGATION AND CONCLUSIONS .................................... 1

    A.    The Committee's Investigation ................................................................. 1

    B.    Overview of the Chronology of Key Events ............................................ 9

        1.    The 2008 Settlement and Controlled Substances Monitoring Program ................................................................................................ 9

        2.    DEA Activity and the CSMP from 2009 through 2012 ..................... 16

        3.    Events Leading to the April 2015 Settlement Announcement ........... 18

        4.    The Company's Regulatory Enhancements ........................................ 22

        5.    The Company's Analytics Enhancements ........................................... 24

    C.    Key Findings and Conclusions ............................................................... 26

II.   THE COMMITTEE'S RECOMMENDATIONS ............................................. 30

    A.    No Claims Related to the Company's Recent Settlement ........................ 31

    B.    Ongoing Oversight by the Board ............................................................ 31

        1.    Pending Litigation and Investigations ............................................... 32

        2.    CSMP .................................................................................................. 33

    C.    Additional Recommendations ................................................................ 34

        1.    Annual Legal Evaluation .................................................................... 34

        2.    Annual Compliance and Regulatory Evaluation ............................... 34

        3.    Compensation Proposals .................................................................... 35

    D.    Additional Teamsters Requests .............................................................. 35

III.  CONCLUSION ........................................................................................ 37

I.     OVERVIEW OF INVESTIGATION AND CONCLUSIONS

McKesson Corporation ("McKesson" or the "Company") is a global company focused on

healthcare supply chain management solutions, specialty care, and healthcare information

technology and employs approximately 78,000 individuals worldwide.  The Company's largest

business segment facilitates the distribution of branded and generic pharmaceuticals and other

healthcare-related products to customers (e.g., pharmacies).  McKesson's customers provide the

supplied medication and other healthcare products directly to patients.  Although the Company

does not manufacture pharmaceutical drugs or provide medication directly to patients, it plays an

important role in the supply chain.

Within the Company's distribution business segment, the U.S. Pharmaceutical

Distribution business unit ("U.S. Pharma") supplies branded and generic pharmaceuticals and

other healthcare products to customers in the United States through a network of twenty-seven

distribution centers.  The three primary customers for U.S. Pharma are large national retail

pharmacies, independent retail pharmacies, and institutional healthcare providers such as

hospitals.  Among many other products, U.S. Pharma facilitates distribution of controlled

substances, including opioids, intended for legitimate medical use.

A.     The Committee's Investigation

The International Brotherhood of Teamsters (the "Teamsters"), a McKesson stockholder,

sent the Company's Board of Directors (the "Board") letters raising certain concerns about the

Company's recent settlement with the federal government regarding alleged failures in

connection with the distribution of controlled substances.[1]  The Teamsters also highlighted a

---

[1] In April 2015, the Company reached an agreement in principle with the federal government to settle claims based on such allegations and agreed to pay a civil penalty of $150 million.  The final agreement was executed in January 2017.

lawsuit filed against McKesson by the State of West Virginia regarding the distribution of opioids.

The Board created the Special Review Committee (the "Committee") to investigate the issues raised by the Teamsters and make recommendations to the Board about what actions (if any) would be appropriate in response.  The Committee also evaluated similar allegations raised in derivative lawsuits by stockholders asserting claims against certain of the Company's current and/or former officers and directors.[2]

The Committee consists of directors Donald R. Knauss (Chair), N. Anthony Coles, M.D., and Susan R. Salka.  Each of the Committee members joined the Board after the underlying events that led to the Company's recent settlement with the federal government occurred.  As noted below, the government's allegations were largely focused on the time period of 2009 through 2013.[3]

Mr. Knauss joined the Board in October 2014 and currently serves as Chair of the Governance Committee and a member of the Audit Committee.  Mr. Knauss retired from The Clorox Company in 2015, having served as executive chairman of its board from November 2014 until July 2015 and as its chairman and CEO from October 2006 until November 2014.  Mr. Knauss was executive vice president of The Coca-Cola Company and president and chief operating officer for Coca-Cola North America from February 2004 until September 2006.  He previously held various positions in marketing and sales with PepsiCo, Inc. and The Procter & Gamble Company and served as an officer in the United States Marine Corps.  He currently

---

[2] Motions to dismiss are currently pending in the derivative litigation.  Nothing in the Board's response, or the Committee's investigation or recommendations, is intended to express an opinion as to how the court should rule on those pleading stage motions.

[3] During this period, the Board consisted of current and former members Andy Bryant, Wayne Budd, Alton Irby III, M. Christine Jacobs, Marie Knowles, David Lawrence, Edward Mueller, and Jane Shaw (as well as John Hammergren).

serves as a director of the Kellogg Company and Target Corporation.  Mr. Knauss also serves as the chairman of the board of trustees for the University of San Diego and is a member of the Economic Advisory Council of the San Francisco Federal Reserve Board.  He was formerly a director of URS Corporation.

Dr. Anthony Coles joined the Board in April 2014 and currently serves as Chair of the Finance Committee and a member of the Compensation Committee.  Since October 2014, Dr. Coles has served as chairman and CEO of Yumanity Therapeutics, LLC, a company focused on transforming drug discovery for neuro-degenerative diseases.  Prior to that, starting in October 2013, Dr. Coles served as chairman and CEO of TRATE Enterprises LLC.  Dr. Coles served as president, CEO, and a member of the board of directors of Onyx Pharmaceuticals, Inc., a biopharmaceutical company, from 2008 until 2012 (and as chairman of its board from 2012 until 2013).  He previously served as president, CEO, and a member of the board of directors of NPS Pharmaceuticals, Inc., a public biopharmaceutical company, and held various leadership positions in the biopharmaceutical and pharmaceutical industries, including at Merck & Co., Inc., Bristol-Myers Squibb Company, and Vertex Pharmaceuticals Incorporated.  Dr. Coles currently serves as a director of Regeneron Pharmaceuticals, Inc. and CRISPR Therapeutics, and he is a former director of Laboratory Corporation of America Holdings and Campus Crest Communities, Inc.

Ms. Salka joined the Board in October 2014 and currently serves on the Audit Committee and the Governance Committee.  Ms. Salka has served as CEO and president of AMN Healthcare Services, Inc., a provider of healthcare workforce solutions and staffing services to healthcare facilities across the country, since 2005 and as a director of the company since 2003. She has also served in several other executive roles after joining AMN Healthcare Services in

1990, including chief operating officer, chief financial officer, and senior vice president of business development. Ms. Salka was formerly a director of Beckman Coulter Inc. and Playtex Products. She serves on the board of The Campanile Foundation at San Diego State University and serves on the editorial advisory board of *Directors & Boards* magazine.

After considering several law firms to serve as independent counsel, the Committee retained the law firm of Wilson Sonsini Goodrich & Rosati, P.C. ("WSGR"). WSGR did not represent McKesson or any of the individuals evaluated as part of the investigation in any of the events related to the investigation. The WSGR attorneys who advised the Committee have neither worked on any other matter for the Company, nor have a personal or business relationship with any of the individuals evaluated, witnesses interviewed, or any other individual relevant to the investigation.[4]

The allegations at issue in the Committee's investigation largely pertain to events that occurred between two settlements with the federal government. Specifically, in May 2008, the Company settled claims by the federal government for the Company's alleged failures to prevent diversion of controlled substances and report suspicious orders as required under federal law, and agreed to pay a $13.25 million civil penalty. In April 2015, the Company reached an agreement in principle with the federal government to settle claims based on, among other things, alleged lack of suspicious order reporting from 2009 until 2013, and agreed to pay a civil penalty of $150 million. The federal government's focus in both instances was on the distribution of controlled substances by U.S. Pharma.

In light of the two settlements, the Teamsters questioned whether McKesson had (or has) an errant corporate culture with respect to compliance and oversight of the distribution of

---

[4] In addition, over the last fifteen years, WSGR has worked on only two *de minimis* credit matters for McKesson with insignificant total legal expenses.

controlled substances, as led by senior management and the Board.  Questions raised or implied by the Teamsters include the following:  Did McKesson's senior management and/or the Board intentionally disregard, or turn a blind eye to, the Company's compliance obligations following the 2008 settlement?  Did senior management and/or the Board act in bad faith or recklessly in connection with the Company's distribution of opioids?  Did McKesson's senior management take advantage of the opioid crisis by encouraging or condoning shipments of opioids to customers it knew or should have known were diverting the drugs for illegitimate use?  Did the Company prioritize revenue over compliance?  The Committee recognizes that these are important and serious questions, understands why they have been asked, and sought to answer them through its investigation.

The Committee and its counsel met in person or telephonically on seventeen occasions to formulate an investigative plan and discuss the results of the investigation and next steps at various stages.  The Committee also met telephonically with representatives of the Teamsters in June 2017 (with WSGR attorneys in attendance at the Teamsters' headquarters in Washington, D.C.) and gained additional insight into the Teamsters' perspectives and requests.

At the direction of the Committee, WSGR conducted an extensive document collection and review.  First, WSGR obtained and reviewed litigation pleadings and documents collected in connection with certain books and records demands made on the Company by stockholders.  Second, WSGR collected emails, applied search terms to those emails, and reviewed documents based on application of the search terms.  WSGR also modified its email review protocol to identify additional potentially relevant documents for review throughout the review process.[5]  Third, WSGR requested and received additional supplementary categories of documents from

---

[5] The time period of the email review was January 1, 2005 through April 30, 2015 when the agreement in principle with the government was announced, although WSGR reviewed many post-April 30, 2015 documents as well.

the Company.[6]  Fourth, WSGR reviewed certain publicly available materials such as press releases, as well as information related to the opioid epidemic.  In total, WSGR reviewed hundreds of thousands of pages of documents.  Finally, WSGR conducted interviews of forty-six witnesses at the direction of the Committee.  The Committee greatly appreciated the willingness of these witnesses, including current and former McKesson employees, directors, and counsel, to be interviewed.  A number of the interviewees were former U.S. Drug Enforcement Administration ("DEA") personnel who have since become employed by the Company, and the Committee received significant insight and benefit from their perspectives on the underlying issues.  The Committee obtained substantial information from both documentary evidence and witness interviews, and has no reason to believe that additional interviews would alter its findings and conclusions.

In consultation with WSGR, the Committee investigated the allegations in the Teamsters' requests and the stockholder derivative lawsuits.  The central thesis of those requests and lawsuits is that McKesson's senior executives and the Board engaged in misconduct in connection with the events leading to the settlement announced in April 2015, and therefore the Company should pursue claims against, and seek remedies from, such individuals.  The Committee therefore investigated and evaluated whether senior executives and/or the Board engaged in misconduct in connection with those underlying events that would warrant pursuing claims against any such individuals under governing Delaware law.

---

[6] This included but was not limited to:  Board and Audit Committee meeting minutes and materials regarding the two settlements with the federal government; documents regarding the compliance program and related ongoing litigation; Compensation Committee meeting minutes and materials; documents concerning the recent settlement and prior related federal investigations; sales incentive policies; compensation recoupment policies; policies and documents related to the Company's compliance environment; certain U.S. Pharma materials; and other miscellaneous documents.

With respect to management during the relevant time period, the Committee evaluated potential claims against the Company's CEO (John Hammergren ("Hammergren")), Executive Vice President and Group President (Paul Julian), Executive Vice President, General Counsel, and Chief Compliance Officer (Laureen Seeger), U.S. Pharma Presidents (John Figueroa, Brian Tyler, and Mark Walchirk), U.S. Pharma Chief Operating Officers (Mark Walchirk and Frank Starn), and Senior Vice President of Distribution Operations (Don Walker) (collectively, "Senior Management").

As the Committee evaluated potential claims against Senior Management and members of the Board, the Committee analyzed evidence related to the Company's efforts to meet DEA regulatory obligations following the 2008 settlement.  In particular, the Committee reviewed information that was shared with Senior Management and the Board and their knowledge of the underlying events, including if a specific issue regarding a distribution center or pharmacy reached Senior Management and/or the Board.  In that event, the Committee reviewed and evaluated when relevant information was shared, what was shared, how it was shared, and by whom it was shared, focusing on whether Senior Management and the Board acted in bad faith, inappropriately or unreasonably under the circumstances.  The Committee did not otherwise investigate or reach findings regarding specific transactions at distribution centers (e.g., which customer orders were potentially suspicious) or particular customers (of which McKesson has over 40,000 in the United States) because the Committee did not believe that analysis was relevant for purposes of evaluating the conduct of, and potential claims against, Senior Management and/or the Board.[7]  In addition, the Committee evaluated what information was

---

[7] A pharmacy-level review from 2009 to the present regarding suspicious order reporting and/or potential diversion by pharmacies, doctors, or patients would require extraordinary resources and time.  In addition, the Committee notes that the second settlement with the federal government, which released the Company from liability for conduct from January 2009 through January 2017, requires an independent review organization to conduct reviews of the

made available to Senior Management and the Board related to issues raised by the lawsuits filed in West Virginia, as highlighted by the Teamsters.

The Committee also focused on the Company's overall controlled substance compliance program (which was the Company's effort to prevent diversion nationwide) and its evolution during the relevant period.  That investigation of the overall compliance program was also relevant to compliance-related issues raised by other lawsuits, including allegations that McKesson knowingly permitted diversion of controlled substances.  Relatedly, the Committee also reviewed McKesson's corporate culture, including the tone at the top, any potential emphasis on sales over compliance, whether there was any evidence of unethical or improper conduct, and Senior Management's level of commitment to meeting McKesson's DEA regulatory obligations.  The answer to the question of whether Senior Management and/or the Board engaged in any improper conduct with respect to the distribution of controlled substances necessarily also addressed certain compensation-related issues raised by the Teamsters and in the derivative lawsuits.

Importantly, the Committee also evaluated whether additional areas of inquiry or expansion were necessary or warranted based on information learned throughout the course of the investigation.  For example, had the Committee determined that individuals leading the compliance program engaged in misconduct following the 2008 settlement, the Committee would have considered that in assessing the scope of its investigation.

---

Company's compliance program.  The reviews include, but are not limited to, a review of select pharmacy-level data, and the report of the independent review organization will be provided to the Company's Audit Committee.

B.     **Overview of the Chronology of Key Events**

Under federal law, manufacturers and distributors of controlled substances must, among other things, maintain systems to control against diversion of controlled substances and report to the DEA suspicious orders of those substances.

Prior to the Company's 2008 settlement, to satisfy suspicious order reporting obligations, McKesson (and other distributors) provided reports to local DEA offices based on customer orders that exceeded certain quantities, which the DEA referred to as "excessive order" reports. This resulted in large volumes of orders being reported to the DEA as suspicious, and certain local DEA offices communicated to McKesson that it should stop sending the reports because they were inundating the local DEA office fax machines and were not useful.  In those instances, the Company thereafter designated an individual to review the reports of orders that exceeded certain quantities to determine which, if any, order quantities were subjectively suspicious and transmit only those orders to the local DEA office.  The DEA eventually informed distributors that the identification of excessive orders was insufficient to meet distributors' regulatory obligations, but did not offer specific instructions or feedback as to what alternative, or the parameters of a compliance program, a company should implement to ensure compliance with such obligations.

1.     **The 2008 Settlement and Controlled Substances Monitoring Program**

As part of the 2008 settlement, McKesson agreed to maintain a revised compliance program with respect to controlled substances.  Importantly, the Company designed its new Controlled Substances Monitoring Program (the "CSMP") with significant input from both internal counsel and outside regulatory counsel and presented details of the program to DEA personnel.  The program centered on due diligence procedures for onboarding new customers,

9

the use of individualized customer thresholds for controlled substances orders (i.e., monthly customer order limits), and a three-tier review process for orders exceeding customer thresholds.

With respect to scrutinizing potential new customers, the CSMP put certain standardized diligence procedures into place.  For example, sales representatives were required to complete a questionnaire for any proposed new customer detailing the customer's purchase history, background, and business (e.g., whether the pharmacy was located in a medical center or clinic, whether it serviced long-term care or hospice facilities).  The CSMP operating manual contemplated customer site visits and interviews for new customers (except for certain types of customers such as the federal government).  During the on-site interview, McKesson representatives were to observe, among other things, whether customer traffic seemed consistent with the customer's business type, whether the customer's business was in a site that appeared consistent with the pharmacy's business type and volume (considering, for example, the surrounding businesses), and whether the pharmacy had adequate security.  The Company also appointed Directors of Regulatory Affairs ("DRAs") who were responsible for analyzing the customer questionnaires and the supporting documentation and deciding whether to approve new customers and allow such customers to purchase controlled substances.  DRAs noted in the Committee's investigation that they declined to approve many pharmacies as new customers due to these CSMP onboarding processes.

As part of the CSMP, individualized monthly thresholds for orders of controlled substances were established for every McKesson customer.  The Company first evaluated and classified each of its customers into like business segments based on metrics such as business type and monthly dollar prescription sales.  The Company then performed an analysis to

10

determine a default threshold amount for each controlled substance for customers within a particular business segment.

For existing customers, the Company analyzed customers' twelve-month purchase histories and generally set each customer's threshold at the default business segment threshold if the customer's historical purchases were at or below the default threshold for a particular controlled substance (or if the customer had not previously purchased that controlled substance). Alternatively, the DRAs could set a threshold for a particular controlled substance above the default if deemed justified.

For new customers onboarded after the CSMP was first implemented, a DRA assigned the customer to a business segment and sent information regarding the pharmacy's business type and prior three-month purchase history to an analytics center for review and analysis.  The DRA then analyzed the customer questionnaire and report from the analytics center to determine the appropriate threshold.

As part of the threshold process under the CSMP, customers were alerted when they approached their monthly threshold to allow them to monitor their purchases for the remainder of the month and, if necessary, request an increase to their threshold.  The CSMP operating procedures envisioned that customers could request a threshold change due to, for example, new business requirements or an emergency.  When a threshold change was sought, a sales representative or distribution center management was required to complete a Threshold Change Request ("TCR") form documenting the reason(s) the customer was seeking the change and to provide supporting documentation.  For example, a Retail Sales Manager would gather as much information as possible from the customer (e.g., a letter from the pharmacy explaining why it was requesting the increase), fill out the TCR form, and then submit that documentation and

supporting information (such as photographs of the pharmacy, the pharmacy's license numbers, and other information) for review.  If the respective Distribution Center Manager (who was responsible for overseeing individual distribution center operations) approved the request, it was forwarded to the DRA for review and final approval or rejection.  Threshold changes could be permanent or temporary, expiring at the end of the month.

The CSMP operating manual emphasized the importance of conducting due diligence and stated that "[i]f at any time McKesson (this includes sales, operations, regulatory) suspects any wrong doing *[sic]*, inappropriate activity and/or questionable practices, McKesson has the responsibility to react.  This requirement is regardless of customer type, size, tenure, revenue, purchase quantities or threshold amounts."

The CSMP also implemented a three-tier review process to analyze orders that exceeded a customer's threshold.  In this regard, if a customer exceeded its threshold (a "threshold incursion"), the order was automatically blocked, the customer was notified, and the three-tier review process was triggered.  This review process was triggered by exceeding a current threshold, and not where a customer requested and received an increase to its threshold via the TCR process prior to exceeding the original threshold.

During Level I review, distribution center management contacted the customer to ascertain the reason for the threshold incursion and conducted additional analysis as deemed necessary (e.g., analysis of the customer's sales patterns).  If the evaluation indicated that the purchases were reasonable and that no further investigation was required, distribution center management could request a threshold increase through the TCR process whereby the order could be re-submitted by the customer and filled if the increase was deemed justified upon

12

conclusion of the TCR process. If the evaluation of the threshold incursion was not conclusive, the order remained blocked and Level II review was initiated.

During Level II review, the DRA and distribution center management team conducted additional due diligence to determine if the sales were appropriate, which included, for example, a customer site visit, customer interview, internet searches and/or inquiries with the local DEA office. If the secondary review showed that the sales were reasonable, the DRA could implement a threshold change through the TCR process. If the customer was deemed suspicious, Level III review was triggered.

Upon escalation to Level III, in addition to the order remaining blocked, the entirety of the customer's controlled substances purchases were blocked, the matter was escalated to the Senior Vice President of Distribution Operations, Regulatory Affairs and the Regional Senior Vice President (among others), and the customer and its most recent transactions were reported to the DEA as suspicious. The Legal department and Senior Vice President of Distribution Operations also conducted a final review of the customer's purchases and determined whether to continue business with the customer.

While the text of the DEA regulations refers to reporting suspicious "orders," the Company's revised program was focused on identifying and reporting to the DEA suspicious "customers" that were potentially engaged in diversion, and their recent orders. The focus on customers was based not only on the DEA's instruction that excessive order reports were not sufficient, but also on the DEA's direction to distributors at the time: "know your customer." It was also believed that the program was the best way to prevent potential diversion. Of note, by focusing on identifying suspicious customers, the new CSMP's design was going to necessarily reduce the number of suspicious orders the Company would report to the DEA moving forward

(a result the Company believed the DEA sought, given its then-recent denunciation of voluminous excessive order reports). While the DEA later took issue with the program's design in this respect (as well as its execution), it does not appear that any concerns or objections associated with the program's design or its focus on suspicious customers were raised at the time.

McKesson and its outside counsel met with DEA Headquarters in July 2008 to explain the new program to the DEA, including the Company's intention to report to the DEA only those customers the Company deemed suspicious following diligence. At the meeting, the Company made a presentation to the DEA that provided an overview of the program. The presentation emphasized the core tenets of the CSMP, including the focus on knowing the customer, the use of onboarding procedures for new customers (requiring approval by Regulatory Affairs personnel), the establishment of customer thresholds by evaluation of customers' prior year purchase histories, and, perhaps most significant, the three-tier review process for orders exceeding thresholds. The Committee's investigation revealed that Company representatives believed that they were clear with the DEA in this respect and that McKesson would not be reporting, for example, all orders exceeding customer thresholds.

According to representatives of the Company who attended the meeting, the DEA did not raise concerns or objections at the meeting about the CSMP or its focus on customers. In addition, the DEA requested a copy of the CSMP Standard Operating Procedures at the meeting, which stated that "customer/transaction(s) are reported to DEA Headquarters as 'suspicious'" during a Level III review. One DEA official later stated that the Company must conduct due diligence before reporting an order as suspicious to the DEA.

The 2008 settlement also provided for the DEA to conduct audits of the Company's monitoring program at certain distribution centers.  Per the settlement agreement, only if the reviews were satisfactory would the DEA reinstate the Company's licenses to sell controlled substances at two distribution centers which had licenses suspended as part of the 2008 settlement.  In late 2008, the DEA conducted inspections at multiple McKesson distribution centers to evaluate the implementation of the Company's new program.  Contemporaneous documents reflect that DEA agents probed about the low number of suspicious orders the Company had reported under the new program, which supported the Regulatory team's and others' belief that the DEA was aware that the Company would report far fewer suspicious orders to the DEA as it focused on identifying suspicious customers.  Contemporaneous documents also reflect that the Regulatory team and others believed that the DEA inspections generally went well.  Indeed, shortly thereafter, the DEA reinstated the Company's suspended distribution center licenses, which Senior Management believed meant the Company had successfully implemented its program to the DEA's satisfaction.

The Company's Internal Audit department (an independent department which reports directly to the Audit Committee of the Board) also completed an audit of the controlled substances monitoring program following the 2008 settlement.  In its presentation to the Audit Committee in October 2008, Internal Audit rated the audit results "Yellow - Needs Improvement," which was the most common audit rating and signified that certain areas required improvement.  The audit did not, however, reveal significant or systemic issues with the program.  Furthermore, in presenting the audit results to the Audit Committee, Internal Audit explained that the items noted as part of the audit had been addressed by management, which

reassured Senior Management and the Audit Committee that, entering 2009, the Company's program was working as intended.

### 2. DEA Activity and the CSMP from 2009 through 2012

From 2009 to mid-2011, signs largely indicated to Senior Management that the Company's program was working well and meeting the DEA's expectations. For example, as a result of diligence, the Company terminated certain customers and refused to onboard others, which U.S. Pharma management believed reflected the effectiveness of the program. In addition, Internal Audit conducts an annual distribution center audit, the results of which are presented to the Audit Committee. These annual audits assess several distribution centers' operations and compliance with various laws and regulations, including controlled substances regulations, and including the CSMP starting in 2010. Internal Audit's 2010 and 2011 distribution center audits identified no serious issues with the CSMP or DEA compliance issues.

From mid-2011 through 2012, DEA regulatory activity increased. During an April 2011 inspection of a McKesson distribution center in Ohio, for example, a DEA agent raised concerns about the Company's failure to report certain allegedly suspicious orders, and McKesson thereafter received a formal notification of violations from a DEA Field Division Office. The Company responded to the letter, explaining that its suspicious order monitoring program included a process for identifying orders that were then subject to further investigation and review and reported to the DEA if deemed suspicious. The Company noted that, pursuant to the 2008 settlement agreement, McKesson had submitted twenty-two suspicious order reports to DEA Headquarters and terminated twenty-two customers. The Company also noted, among other things, the significant resources it had invested to continually improve the program. U.S. Pharma management did not believe a systemic issue existed with the program at the time.

Also during this period, McKesson learned that its application for a license for a new distribution center was being affected by DEA concerns about an existing (and later closed) distribution center in Maryland.  During a meeting with DEA Headquarters in January 2012, the DEA expressed concern about limited reporting of suspicious customers from the Maryland distribution center, and stated that it believed it had sufficient justification to seek further action against the facility.  Significantly, however, Company representatives involved in that meeting were not left with the understanding that McKesson's compliance program was fundamentally flawed or incorrectly designed to comply with DEA regulations or the 2008 settlement agreement.  The reaction by attendees of the meeting in this regard, along with the fact that DEA Headquarters shortly thereafter granted a license to the Company's new distribution center, indicated to members of Senior Management that its ongoing efforts with respect to the program were sufficiently addressing the DEA's concerns.

Based on the Committee's investigation, it appears that neither the Company's Board nor Audit Committee were made aware at the time of the issues raised by the DEA in connection with the Ohio distribution center inspection or the new distribution center registration application.  The evidentiary record developed in the Committee's investigation did not reveal any intent to withhold information from the Board or Audit Committee.  Nevertheless, with the benefit of hindsight, the Committee notes that Senior Management should have erred on the side of informing the Board of these events under the circumstances.

The Committee's investigation revealed that members of Senior Management did not ignore issues raised by the DEA, treat them less than seriously, or decline to devote adequate resources to address the issues.  Rather, the investigation showed that Senior Management acted in an earnest desire to satisfy the DEA's expectations and fulfill the Company's obligations as to

17

preventing diversion. In this respect, the Company took steps following the January 2012 meeting with the government to demonstrate to the DEA that McKesson was addressing the DEA's concerns, including further limiting purchases of oxycodone in certain states and hiring additional Regulatory personnel. The Company also modified its compensation structure to eliminate the sales of oxycodone and hydrocodone from compensation programs for sales representatives (and later removed other controlled substances from sales compensation as well). While sales of these controlled substances historically factored into salespeople's overall compensation, such sales constituted only a small percentage of the Company's sales.

In addition, Internal Audit reported to the Audit Committee in April 2012 that its annual distribution center audit received the highest possible rating: "Green - Satisfactory." Similarly, Internal Audit's second full audit of the Company's controlled substances monitoring program was conducted in 2012 and presented to the Audit Committee in January 2013 and received the same "Green - Satisfactory" rating. The Committee believes this Internal Audit report is a critical piece of evidence in its investigation. The audit was conducted specifically for the purpose of auditing whether the CSMP was functioning effectively and whether the Company's procedures to identify, monitor, and report controlled substances to the DEA were adequate. Internal Audit answered those questions to the Audit Committee in the affirmative. The positive results of these audits further demonstrated that the program was working effectively.

### 3. Events Leading to the April 2015 Settlement Announcement

In 2013, the DEA significantly increased its enforcement activity against McKesson. Pursuant to an administrative inspection warrant, DEA agents entered the Company's Aurora, Colorado distribution center and seized records of controlled substances. In an affidavit submitted in connection with the matter, the government stated, among other things, that the Company sold excessive amounts of oxycodone products to three pharmacies between 2008 and

18

2011 when compared to the populations in which the pharmacies were located, and that despite this, McKesson failed to report any suspicious orders to the DEA until March 2012. This event came as a surprise to Senior Management and the Board, particularly in light of Internal Audit's recent reassuring audit results.

In response to the administrative inspection warrant, the Company engaged additional outside counsel to assess and enhance the Company's CSMP. Significantly, this counsel had recently left the DEA, and the Committee understands he was the DEA attorney who led the January 2012 meeting during which the DEA raised concerns to McKesson about a distribution center's suspicious order reporting. McKesson believed that retaining counsel with recent DEA experience would assist the Company in understanding and complying with the DEA's then-current expectations. The Company continued to make enhancements to its regulatory program following the administrative inspection warrant.

Further significant DEA activity occurred in late October 2013 when the United States Attorney's Office for the Northern District of West Virginia provided McKesson notice that, in concert with the DEA, it was preparing to file a civil action against McKesson arising out of alleged failures to identify and report suspicious orders related to the former Maryland distribution center. According to the government, McKesson failed to report at least 318 suspicious orders when they were – or should have been – discovered, and did not report any of those orders until the Company knew the DEA was inquiring about order patterns for certain distribution center customers. The government calculated the penalties for the alleged failures in the hundreds of millions of dollars.

In August 2014, the U.S. Attorney's Office for the District of Colorado sent McKesson a letter in which it threatened litigation against McKesson based on allegations that McKesson

failed to report suspicious orders between 2008 and 2013 and "repeatedly looked the other way" when faced with evidence indicating potential diversion.  The U.S. Attorney's Office claimed, among other things, that: initial thresholds under the CSMP were set too high, thereby allowing evasion of Regulatory review of potential diversion; McKesson preemptively increased thresholds to avoid customers exceeding thresholds and triggering Level I-III review; threshold increases were often approved for "the flimsiest of reasons and without adequate investigation" (e.g., "[n]ormal business with increased volume during the holidays"); and due diligence files often did not include justifications as to why thresholds were increased.  The government also claimed that McKesson should have known that orders were suspicious based on population size, and that the Aurora, Colorado distribution center "made a calculated business decision to avoid reporting suspicious orders."  Multiple investigations involving other locations were also initiated by other U.S. Attorney's Offices, and the Audit Committee and Board were informed of these investigations in 2014.

In contrast to these allegations, the DRAs believed they conducted diligence before approving threshold increase requests and they did not simply rubber stamp such requests.  The DRAs further believed that they did not approve TCRs without concluding that adequate justification existed, but that it was often difficult to second-guess the legitimacy of an order where a prescribing doctor had indicated a medical need.  In addition, none of the DRAs thought they were inappropriately pressured by management to approve threshold increases.

In addition, no witness suggested that the Company had a culture of non-compliance, that it emphasized revenue over its ethical obligations, or that McKesson condoned any misconduct or bad faith with respect to sales and distributions of controlled substances.  Rather, the witnesses (including both current and former employees in both lower-level and more senior-

level positions) recognized that they played an important role in the Company's anti-diversion efforts and compliance framework, and were not aware of any McKesson personnel who behaved to the contrary or disregarded their responsibilities.

In late 2014 and early 2015, the Board engaged in robust discussion regarding a potential comprehensive settlement of the numerous ongoing government investigations.  The Board considered the arguments the government made regarding execution issues at certain distribution centers relating to the prior program, as well as the Company's defenses.  The Board also discussed the positive elements of a settlement, including obtaining a release as part of a settlement agreement.  The Board also considered the costs of litigation and the distraction it would cause management, as well as the fact that the Company would continue to interface with the DEA as a regulatory body while litigation was pending.  Significant to the Board was also that a final settlement include a structure for ongoing interaction with the DEA regarding the Company's CSMP.  After a thorough discussion, the Board concluded that a settlement was in the best interest of the Company and its stockholders and authorized a settlement in March 2015.  Shortly thereafter, McKesson reached an agreement in principle with the DEA and applicable U.S. Attorney's Offices in April 2015 to pay a $150 million penalty in exchange for a release of claims relating to the Company's suspicious order reporting practices for controlled substances.

Among other things, the settlement agreement requires an independent review organization ("IRO") to conduct and report on annual audits of the Company's compliance program.  The Company's current program incorporates significant changes as McKesson has continued to evolve and enhance the program over the course of years, the primary change of which is the use of more robust and sophisticated analytics to set and monitor customer thresholds, as developed by an analytics consulting firm.

21

### 4.     The Company's Regulatory Enhancements

During the period leading to the April 2015 settlement announcement, the Company continued to enhance its regulatory program following the actions by the federal government. With respect to structure, U.S. Pharma separated its Regulatory Affairs function from its Operations function and created the new position of Senior Vice President of Regulatory Affairs and Compliance. The Company also significantly expanded the size of the Regulatory Affairs team.[8] By the end of 2014, the Company had hired twenty-six new full-time employees with a diverse range of experience such as pharmacists, legal and regulatory professionals, and federal and state diversion investigators. In particular, the Company hired former DEA personnel in an effort to retain the most qualified individuals to help achieve the Company's compliance goals. As a result of the Company's hiring efforts, the Regulatory Affairs team accumulated approximately 200 years in collective DEA enforcement experience.

With the expansion of the Regulatory team, the Company began implementing comprehensive standardized protocols and guidelines to assist DRAs in their ongoing diligence and also increased training. For example, the Regulatory team prepared an Investigative Guide, which listed the specific actions that should be taken and questions to be answered when assessing customers.

The Company also started reporting all over-threshold orders to the DEA. With respect to the TCR process, the Company began to require more diligence and conformity. McKesson ceased alerting customers as they approach their thresholds; rather, customers are notified only

---

[8] When the CSMP was created, management envisioned that the TCR process would be used only on occasion, when a customer had a legitimate business need, and that the existing Regulatory team would be able to sufficiently analyze the requests. Management did not anticipate the volume of normal business fluctuations in pharmacies and that analyzing TCRs would come to consume much of the time and resources of the DRAs. While DRAs noted during the investigation that they did not believe there were insufficient resources to handle the TCRs appropriately and did not raise that as a concern to their supervisor, in hindsight, management recognized that additional resources would have been helpful in executing the CSMP.

after they exceed their thresholds and an order is blocked. With respect to diligence, before approving a TCR, the revised standardized operating procedures require that the Regulatory department review: the reason for a TCR; three months' prescription data analysis; the pharmacy's purchase history and threshold adjustment history for the requested controlled substance; and the pharmacy's purchase history of additional controlled substances to determine whether any other thresholds need downward modifications.

Furthermore, the Company evaluated and enhanced its state reporting. In 2014, the Company appointed a state reporting project team to develop systems for reporting suspicious orders to all states with relevant reporting requirements to which the Company was not yet reporting. Because each state required different types of reporting on different types of substances and in different manners, a significant amount of time and work was required to develop a comprehensive plan to ensure proper reporting, determine what needed to be reported at the state level, and develop the necessary IT systems to implement the reporting.[9]

Finally, the Company also enhanced its governance oversight of the CSMP. In April 2014, the Company established the National Controlled Substance Governance Committee ("NCSGC") to oversee U.S. Pharma's compliance with controlled substances regulations.[10] The NCSGC's duties are to provide high-level oversight of the CSMP; propose and adopt changes to

---

[9] In late 2014, the Company received a subpoena from the State of West Virginia requesting information regarding the Company's compliance with West Virginia's suspicious order reporting requirements. The Company began sending suspicious order reports to the state shortly thereafter in 2015 once the state reporting project team had completed its work. It appears from the investigation that the Board was not informed of West Virginia's state reporting obligations prior to the 2016 lawsuit filed by the state, and the first time a member of Senior Management learned of the reporting requirements was around mid-2014 in connection with the state reporting project. While certain individuals at the Company knew of a lawsuit filed by West Virginia in 2012 against fourteen "pill mill" distributors for distributing controlled substances for non-medical purposes, the individuals did not recognize at the time that West Virginia had state reporting requirements or that the lawsuit involved a failure to comply with such requirements. McKesson was not named as a defendant in the 2012 lawsuit.

[10] The NCSGC consists of, among others, the President of U.S. Pharma, the Senior Vice President of Regulatory Affairs and Compliance, and the Senior Vice President of Distribution Operations.

23

the program; assure that concerns and inquiries regarding the program are resolved in a timely manner; monitor drug diversion trends and the effectiveness of the program; review significant compliance risk areas; and ensure proper communication of significant compliance risks. The Company also established a CSMP Regulatory Operating Committee ("ROC") in 2014.[11] The ROC is responsible for program-wide decisions regarding the CSMP, implementation and execution of CSMP enhancements, hiring and onboarding of the Regulatory Affairs team, and supporting the technology and work needs of the Regulatory Affairs team.

### 5.    The Company's Analytics Enhancements

McKesson retained the analytics consulting firm Analysis Group, Inc. ("AGI") in 2014 to assist in evaluating and recommending analytics enhancements to the Company's compliance program. Under AGI's model, orders are analyzed by size, frequency, and pattern, and customer thresholds are dynamic and updated monthly. All threshold-exceeding orders continue to be reported to the DEA as suspicious and are not shipped. The customer is also not permitted to order additional controlled substances that month.

The enhanced CSMP has had a noticeable impact on the number of suspicious orders reported to the DEA in recent years. As part of its investigation, the Committee requested the number of orders reported as suspicious by the Company since 2015 under the enhanced CSMP. The Company provided the following data: in 2015, the Company reported over 230,000 suspicious orders; in 2016, the Company reported over 220,000 suspicious orders; and in 2017, the Company reported over 145,000 suspicious orders.

---

[11] This committee consists of the Senior Vice President of Regulatory Affairs and Compliance, Senior DRAs, Senior Director of Retail National Accounts, Senior Director of Statistics and Analytics, and Staff Counsel for Distribution Operations and Regulatory Affairs.

It is also worth noting that McKesson has been criticized for allegedly distributing more controlled substances into a specific geographic area than the surrounding population reasonably needs.  The suggestion appears to be that the Company's compliance program should be governed, at least in part, by population data.  Significantly, the Committee's investigation did not find that prior to the government raising concerns in 2013, Senior Management or the Board received information reflecting the amount of sales of controlled substances made to geographic regions as compared to local population data (for example, Senior Management and the Board were not provided reports showing the number of controlled substances distributed to a particular county as compared to that county's total population).  In addition, it appears that the DEA did not historically suggest in its guidance that population data was a reliable measure to be used in suspicious order monitoring programs.

Moreover, the Committee understands that utilization of population data alone in setting customer thresholds has inherent infirmities and can lead to unreliable results.[12]  As a result, AGI's analytical model does not set thresholds based directly on population data.  That said, under the model, pharmacies are assessed based on average pharmacies of a similar size and similar geographic area such that population is accounted for in the analytics used to set thresholds.  In addition, the primary measure used to identify a customer's size is a customer's past purchases of *non*-controlled prescription drugs (which ensures that any unusual purchases of controlled substances do not influence the determination of customer size).  Surrounding population is also considered by DRAs on an *ad hoc* basis in conducting diligence.

---

[12] For example, rural pharmacies often service multiple counties, meaning that those pharmacies would legitimately purchase more than what would be needed to supply just the local population in which the pharmacy is located. Similarly, the use of population data can lead to false positives where, for example, patients work next to a pharmacy and order their prescriptions from that pharmacy, yet live in a town many miles away and thus would be counted within that area's population data despite not using that local pharmacy.  Moreover, census data is often out of date and does not account for specific types of populations such as nursing homes or hospices, which often require an above average volume of certain controlled substance prescription medications for end-of-life care.

### C.    Key Findings and Conclusions

As an initial matter, the Committee's investigation revealed a strong moral culture at McKesson, as led by Senior Management and reinforced by the Board, and that the Company's Chief Executive Officer and others in Senior Management created a strong tone at the top of McKesson that encouraged ethical and compliant conduct.  The Committee believes that management's tone at the top is a strong indicator that Senior Management tried in good faith to comply with the Company's obligations with respect to the distribution of controlled substances.

McKesson's corporate culture and tone at the top is reinforced by the Company's corporate governance framework, which includes a Code of Conduct that emphasizes McKesson's "ICARE" principles (Integrity, Customer-First, Accountability, Respect and Excellence); Global Compliance and Ethics department; and robust ethics reporting channels. For example, the Company has robust channels for individuals to report compliance concerns and has maintained a third-party website and phone line since at least 2007 through which employees can report (including anonymously) any concerns.[13]  Complaints submitted through this channel or any other means (such as through a direct manager or the Human Resources or Legal departments) are processed and tracked through an "Ethics Point" integrated case management system.  An investigation is initiated in response to complaints and escalated as appropriate.  The Company's Chief Compliance Officer updates the Audit Committee quarterly on such investigations.[14]

---

[13] The Company has taken steps to ensure that employees are aware of the avenues to report concerns (for example, a "speaking out" campaign was initiated to ensure employees knew how to report issues through channels such as the Human Resources or Legal departments or a third-party service).

[14] In response to an inquiry by the Committee as part of its investigation, the Company searched for any complaints regarding the Company's controlled substances monitoring program or controlled substances and reported that it did not receive any complaints of widespread or systemic issues with McKesson's program from 2008 through the date of the request.

In contrast to recent public reports suggesting that McKesson operated in disregard of its compliance obligations, the Committee notes that no witness was aware of anyone at McKesson condoning the diversion of medication for illegitimate use.  These witnesses included former employees, individuals from Senior Management and directors, as well as individuals from the Company's Legal, Internal Audit, Regulatory, and Sales departments, among others.  Not a single one of these witnesses, including former non-senior level employees who particularly had no motive to try to characterize or distort the facts in any direction, suggested the presence of a misguided corporate culture.  Among the witnesses who commended the Company's culture and tone at the top were also individuals who formerly worked for the DEA.  Notably, during the Committee's investigation, not one witness, including both current and former employees, said the Company prioritized revenue over compliance.

The Committee found that sales of controlled substances constitute a small portion of McKesson's overall revenue.  For fiscal years 2009 through 2017, Company revenue data shows that the two schedules of controlled substances that include opioids (but that include other drugs as well) constituted only about 3.1% to 4.2% of the Company's total enterprise revenue, and constituted only about 4.3% to 5.2% of the Company's total U.S. Pharma prescription medication revenue.  In fact, the bulk of the Company's revenue is from sales of non-controlled substances and McKesson's other product offerings, such as over-the-counter health products (e.g., cold and flu products, first-aid antibiotics, wound care, vitamins).  This data is inconsistent with the recent public narrative that has suggested that McKesson's revenue is largely from sales of controlled substances.

Based on the investigative procedures performed, the Committee concluded that pursuing claims against Senior Management and/or the Board is not warranted.  The Committee did not

find that Senior Management or the Board acted in bad faith or engaged in reckless conduct with respect to the distribution of controlled substances.  Instead, the Committee's investigation revealed that Senior Management and the Board acted in good faith to meet McKesson's compliance obligations following the first settlement.  The chronology of events, contemporaneous documents, and witnesses make clear that Senior Management placed great emphasis on compliance, encouraged ethical conduct, and provided the resources McKesson's Regulatory team sought for its controlled substances monitoring program.  The investigation similarly showed that the Board exercised appropriate oversight, reasonably relying on information from Internal Audit, members of Senior Management, and counsel.

Relatedly, the Committee concluded that the Compensation Committee did not breach its fiduciary duties in deciding, after independent analysis, not to reduce the Chief Executive Officer's compensation related to the recent settlement due to, among other factors, his good faith, lack of misconduct, and his support of the Company's compliance efforts.  When making this determination, the Compensation Committee's process included, among other things, consideration of the Chief Executive Officer's lack of day-to-day responsibility over the compliance program and the fact that he responded with the appropriate level of diligence and concern when informed of the DEA issues.

Central to the Committee's conclusions was the fact that Senior Management: (i) attempted in earnest to meet the DEA's suspicious order reporting regulations, despite a lack of specific instructions or feedback as to the parameters of a program that the DEA would find acceptable; (ii) routinely worked closely with experienced outside counsel on the Company's compliance program; and (iii) had oversight procedures in place, including Internal Audit reviews of the Company's compliance program and distribution facilities.

*Good Faith Compliance Efforts and Consultation with the DEA.*  A key aspect supporting the Committee's conclusions was that the Company's CSMP was designed in an effort to both meet regulatory obligations and achieve practical results in preventing diversion, largely based on the DEA's consistent message to distributors to "know your customer."  The Company also shared details of the program with the DEA following the 2008 settlement and sought DEA feedback.  Had the DEA reacted negatively about the program to McKesson, the evidence suggests that the Company would have re-designed or revised its program.  Further supporting Senior Management's belief that the program was satisfactory was the fact that the Company passed the DEA's distribution center inspections and the DEA reinstated the facilities' licenses to sell controlled substances.

*Consultation with Counsel.*  The Company's consistent practice of consulting internal counsel and outside counsel with significant DEA experience was likewise important to the Committee.  The Committee found that management involved internal and outside counsel in the development and implementation of the CSMP and reviewed the results of the program with counsel throughout the relevant time period.  The Committee also found that counsel regularly provided ongoing advice to the Company about the CSMP.  Counsel also routinely participated in the Company's meetings and communications with the DEA.

*Internal Audit Reviews.*  The investigation further found that, following the 2008 settlement, the Company had oversight procedures in place, which Senior Management and the Board relied on to identify issues with the Company's compliance program, including Internal Audit reviews of the Company's compliance program and distribution facilities.  The positive Internal Audit review results (including findings that management had addressed, or was

29

addressing, any identified issues) supported Senior Management's and the Audit Committee's belief that the compliance program was satisfactory and working effectively.

*    *    *

While the investigation found that the Company designed and implemented its controlled substance monitoring program in good faith, there were, with the benefit of hindsight, areas where the Company's program fell short. For instance, the program likely would have benefitted from additional staffing resources and more standardized processes from an earlier date in time. The Committee's investigation, however, did not show that Senior Management or the Board believed (or were informed) that the program was suffering from any serious defects or operating ineffectively. Instead, the investigation showed that Senior Management was confident in the program's effectiveness and eager to enhance it as the program evolved (including by devoting a significant amount of time and resources to it), and that the Board reasonably relied on Senior Management to execute the program and identify any issues.

Finally, the Committee found particularly meaningful that former DEA personnel hired by the Company in late 2013 and early 2014 to help improve the current program believe it compares favorably to programs at other companies. Certain former DEA personnel also emphasized that they would not have agreed to join McKesson unless they believed that the Company took its compliance obligations seriously. Further, one of the individuals noted that he served the DEA for four decades and has spoken to parents who have lost their children to opioids, and he would not work for McKesson if he did not believe that the Company was doing everything it should as far as compliance.

## II.    THE COMMITTEE'S RECOMMENDATIONS

While the Committee determined that pursuing claims against members of Senior Management and/or the Board is not warranted, the Committee made certain recommendations

30

based on its investigation, which are discussed below.  The Committee notes that it found the Company's compliance environment to be comprehensive, but it offered these recommendations in the interest of further strengthening the Company's current compliance framework.[15]

### A.    No Claims Related to the Company's Recent Settlement

For the reasons discussed above, the Committee concluded that pursuing claims against Senior Management and/or the Board related to the $150 million settlement and implementation and oversight of the CSMP is not in the best interests of the Company and its stockholders, including because the claims are not warranted based on the Committee's investigation.  Further, the costs and risks of pursuing any such litigation, if initiated, far outweigh any potential benefit to the corporation.  Accordingly, the Committee did not recommend that the Company pursue any claims under Delaware law against Senior Management or the Board.

In evaluating these claims, the Committee considered the legal standards applicable under governing Delaware law.  Among other things, the Committee considered whether members of Senior Management or the Board breached their fiduciary duty of loyalty by failing to act in good faith or breached their fiduciary duty of care by acting with gross negligence.[16]

### B.    Ongoing Oversight by the Board

The Committee recommended that the Board implement enhanced oversight procedures with respect to both the currently pending lawsuits and investigations related to opioid distribution, and the CSMP.  The Committee believes independent counsel should assist the Board with the proposed oversight activities.

---

[15] On March 30, 2018, the Board unanimously adopted the Committee's recommendations in their entirety.
[16] Consistent with Section 102(b)(7) of the Delaware General Corporation Law, McKesson's certificate of incorporation exculpates the Company's directors from personal liability for breaches of fiduciary duty, except for acts or omissions not in good faith or which involve intentional violations of law; an unlawful payment of dividend, stock purchase or redemption; or any transaction from which the director derived an improper personal benefit.  This exculpation provision does not apply to the Company's officers.

### 1.  Pending Litigation and Investigations

With respect to pending federal and state litigation and other investigations related to opioid distribution, including the lawsuit filed by the State of West Virginia, none of these lawsuits or investigations has been adjudicated or settled, and no monetary damages have been imposed against the Company.  Thus, the Committee believes it would be premature to fully and conclusively investigate and assess any potential claims against individuals related to these lawsuits and investigations.  Among other things, the Committee believes that:  (i) the Company's right to relief may be impacted by the outcome of the lawsuits and investigations; (ii) it would preserve Company resources to defer investigation of the allegations until a final adjudication or resolution, when the Board can obtain full advantage of what the lawsuits and investigations reveal; and (iii) the Company could leverage information learned during the lawsuits and investigations for any potential future investigation, should one be appropriate.  As a result, the Committee believes any specific evaluation of the claims raised in these lawsuits and investigations should be deferred.

In the interim, the Committee recommended that the Board continue to receive regular updates regarding the ongoing lawsuits and investigations related to opioid distribution.  The process for implementing this recommendation will be decided by the Board, and the Board will seek the advice of independent counsel, as necessary on an ongoing basis.  If any lawsuit or investigation results in a significant monetary sanction or comparable reputational impact to the Company, or if any other interim events warrant, the Committee recommended that the Board evaluate whether additional independent investigation of the underlying events is appropriate at that time.

2.    **CSMP**

As reflected above, the Committee found the Company's compliance environment to be comprehensive.  In the interest of enhancing it further, the Committee made certain recommendations regarding ongoing oversight by the Board to further strengthen the Company's current compliance framework.  Specifically, the Committee recommended that certain procedures be implemented to ensure that issues relevant to the Board's oversight of the CSMP are timely brought to the Board's attention.  The Board has adopted these recommendations in their entirety and is working with management to create processes to implement the Committee's recommendations.

First, the Committee recommended that a CSMP review be included in every regularly scheduled Board meeting, with an appropriate allocation of time, during the pendency of the IRO required by the recent settlement.

Second, the Committee recommended that the Board receive the CSMP updates from a rotating group of individuals with responsibilities in areas such as Internal Audit, Compliance, U.S. Pharma, Regulatory Affairs, Legal, and outside counsel.  The process for implementing this recommendation will be decided by the Board, and the Board will seek the advice of independent counsel, as necessary on an ongoing basis.

Third, the Committee recommended that the Board (in addition to the Audit Committee) review the CSMP Internal Audit and IRO reports with the assistance of independent counsel and assess whether additional independent investigation of any underlying issues is appropriate in light of the findings in such reports.

Fourth, the Committee recommended that the Board be informed of communications from federal, state, and international regulatory agencies where executive management learns of such communications and they involve substantive criticisms of the Company's current

compliance with applicable DEA regulations.  The process for implementing this
recommendation will be decided by the Board, and the Board will seek the advice of independent
counsel, as necessary on an ongoing basis.

Finally, the Committee recommended that executive management continue to update the
Board, as part of the regular CSMP updates, on the Company's continuing efforts to actively
participate as a meaningful partner to help mitigate and address the opioid epidemic.

### C.      Additional Recommendations

The Committee made certain additional recommendations, as noted below.

#### 1.      Annual Legal Evaluation

The Committee recommended that the Company's General Counsel, with the assistance
of the Company's outside regulatory counsel, conduct an annual evaluation of the Company's
compliance with laws regulating controlled substances (including state, federal, and international
laws).  The results of this annual evaluation should be shared with the Board at the first regularly
scheduled Board meeting following completion of the evaluation.  As part of this annual
evaluation, the General Counsel shall evaluate and report to the Board whether the Company is
complying with the provisions of the Compliance Addendum that was included in the
Company's recent settlement.

#### 2.      Annual Compliance and Regulatory Evaluation

The Committee recommended that executive management and the General Counsel
conduct an annual assessment of the Company's regulatory and compliance programs and report
to the Board on whether current oversight, procedures, and organizational structure achieve the
Company's compliance goals, and whether there are any potential areas for improvement (e.g.,
enhanced training for management).

34

### 3.  Compensation Proposals

The Compensation Committee's historical and current practice is to consider regulatory, compliance, and legal issues in evaluating executive management compensation.  To ensure that stockholders are aware of this practice, the Committee recommended that the Compensation Committee consider clarifying to the public that regulatory, compliance, and legal issues shall be, and have historically been, considered in determining compensation.  Because the Compensation Committee already has the discretion to modify executive compensation based upon regulatory, compliance, and legal issues, the Committee did not believe additional amendments to the Company's annual and long-term incentive plans or clawback policies were necessary (as recommended by the Teamsters), but deferred such evaluation to the Compensation Committee for its review in connection with its consideration of this Committee recommendation.

### D.  Additional Teamsters Requests

In addition to items discussed above, the Teamsters sought certain additional changes. First, the Teamsters requested that, under the Company's executive clawback policy, the Board recover all or a significant portion of Hammergren's incentive pay awarded or vested and suspend payouts or vesting of any future awards until the Company has implemented a robust compliance metric to its incentive plans.  The Committee did not find that Hammergren breached a fiduciary duty or otherwise engaged in any misconduct with respect to the events that led to the recent settlement.  Moreover, the Compensation Committee already has discretion to, and did, in fact, carefully consider whether the $150 million payment made as part of the recent settlement should be factored into Hammergren's compensation.  After thorough independent analysis, including discussions with its independent advisors, the Compensation Committee ultimately determined that multiple factors warranted not reducing Hammergren's compensation.

35

Accordingly, the Committee did not recommend recouping or suspending future payouts or vesting of awards with respect to Hammergren.

The Committee likewise did not recommend the Teamsters' request of seeking to claw back the incentive pay for other top executives for the same reasons discussed above (i.e., the Committee did not find underlying breaches of fiduciary duty or misconduct and the Compensation Committee already considered this issue).  The Committee further notes that the incentive pay of U.S. Pharma management was already negatively impacted by the recent settlement, and therefore no further monetary impact would be warranted under the circumstances.

Second, with respect to the Teamsters' request that the Board suspend the use of incentive pay related to the sales of controlled substances at all levels of the Company, the Committee notes as discussed above that (as of April 1, 2012) sales of oxycodone and hydrocodone were eliminated from all compensation programs for Sales representatives, and other controlled substances have since been eliminated.  Moreover, the Committee notes that witnesses uniformly rejected the notion that the Company emphasizes revenue over compliance, and the investigation did not reveal that salespeople believe they were (or are) incentivized to sell controlled substances at the cost of compliance.

Third, the Teamsters sought the appointment of an independent chairman of the Board. The Committee notes that, at the Company's July 2017 annual meeting, the Company's stockholders voted to reject a stockholder proposal to split the role of Chairman and Chief Executive Officer.  That said, the Board announced its decision to split the role of chairman and Chief Executive Officer in the future, commencing with the Company's next Chief Executive Officer.  The Company also announced that the Board "would continue its practice of evaluating

36

at least annually whether its leadership structure continues to be in the best interest of the company and its shareholders." Therefore, the request will be evaluated on an annual basis and will be implemented no later than the next Chief Executive Officer's tenure.

Finally, the Teamsters also suggested the Board consider establishing a stakeholder advisory council. While the Committee appreciates the Teamsters' suggestion, the Committee recommended that, given the findings of its investigation, a standing stakeholder advisory council is not necessary at this time. The Committee notes that the recommendations outlined above included improvements to the Company's ongoing compliance framework and the involvement of independent counsel as an additional resource for the Board's oversight in this regard. The Committee further notes that it appreciates stockholder feedback and will continue to encourage the Board to engage with stockholders as appropriate on an *ad hoc* basis.

## III.  CONCLUSION

The Board appreciates the Teamsters raising its concerns regarding these matters to the Board. The Board takes these issues very seriously and values the Teamsters' involvement and input during this process. The Board's decision not to pursue claims against, or seek damages from, current and former officers and directors in connection with the events leading to the recent settlement is in no way meant to minimize the seriousness of the opioid epidemic. The Board believes that the adoption of the Special Review Committee's recommendations will build on the significant steps taken by McKesson to enhance the Company's CSMP and regulatory compliance functions. The Board and the Special Review Committee encourage each of McKesson's employees, officers, and directors to remain united partners and active participants in the Company's adherence to its compliance goals and efforts to help combat the opioid crisis.