# EXHIBIT 291-A

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                    -  -  -
 5   IN RE:  NATIONAL     :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                          :  Hon. Dan A.
 9                       :  Polster
10                    -  -  -
           Friday, August 3, 2018
11                    -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
            CONFIDENTIALITY REVIEW
13                    -  -  -
14             Videotaped deposition of
     CHRISTOPHER ZIMMERMAN, taken pursuant to
15   notice, was held at the law offices of
     Reed Smith, LLP, Three Logan Square, 1717
16   Arch Street, Suite 3100, Philadelphia,
     Pennsylvania 19103, beginning at 9:00
17   a.m., on the above date, before Amanda
     Dee Maslynsky-Miller, a Certified
18   Realtime Reporter.
19                    -  -  -
20
21
22
           GOLKOW LITIGATION SERVICES
23      877.370.3377 ph| 917.591.5672 fax
               deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

|  | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | BARON & BUDD P.C. |
| | BY: MARK PIFKO, ESQUIRE |
| 4 | BY: STERLING CLUFF, ESQUIRE |
| | 15910 Ventura Boulevard |
| 5 | #1600 |
| | Encino, California 91436 |
| 6 | (818) 839-2333 |
| | mpifko@baronbudd.com |
| 7 | Scluff@baronbudd.com |
| 8 | - and – |
| 9 | BY: SCOTT SIMMER, ESQUIRE |
| | Washington, DC |
| 10 | (202) 333-4562 |
| | Ssimmer@baronbudd.com |
| 11 | Representing the Plaintiffs |
| 12 | |
| 13 | REED SMITH, LLP |
| | BY: ROBERT A. NICHOLAS, ESQUIRE |
| 14 | BY: JOSEPHY J. MAHADY, ESQUIRE |
| | BY: JEFFREY R. MELTON, ESQUIRE |
| 15 | BY: SHANNON E. MCCLURE, ESQUIRE |
| | BY: THOMAS H. SUDDATH JR., ESQUIRE |
| 16 | Three Logan Square |
| | 1717 Arch Street |
| 17 | Philadelphia, PA 19103 |
| | (215) 851-8100 |
| 18 | Rnicholas@reedsmith.com |
| | jmahady@reedsmith.com |
| 19 | Jmelton@reedsmith.com |
| | Smcclure@reedsmith.com |
| 20 | Tsuddath@reedsmith.com |
| | Representing the Defendant, |
| 21 | Amerisource Bergen Drug |
| | Corporation |
| 22 | |
| 23 | |
| 24 | |

|  | Page 3 |
|---|---|
| 1 | APPEARANCES: (Continued) |
| 2 | |
| 3 | COVINGTON & BURLING LLP |
| | BY: EMILY KVESELIS, ESQUIRE |
| 4 | 850 Tenth Street, NW |
| | Suite 856N |
| 5 | Washington, DC 20001 |
| | 202.662.5000 |
| 6 | ekveselis@cov.com |
| | Representing the Defendant, |
| 7 | McKesson Corporation |
| 8 | |
| 9 | |
| 10 | MARCUS & SHAPIRA LLP |
| | BY: JAMES F. ROSENBERG, ESQUIRE |
| 11 | One Oxford Centre |
| | 35th Floor |
| 12 | Pittsburgh, PA 15219 |
| | 412.338.4683 |
| 13 | rosenberg@marcus-shapira |
| | Representing the Defendant, |
| 14 | HBC Service Company |
| 15 | |
| 16 | JONES DAY |
| | BY: SARAH G. CONWAY, ESQUIRE |
| 17 | 555 South Flower Street |
| | Los Angeles, California 90071 |
| 18 | (213) 489-3939 |
| | sgconway@jonesday.com |
| 19 | Representing the Defendant, |
| | Walmart |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | Page 4 |
|---|---|
| 1 | APPEARANCES: (Continued) |
| 2 | |
| 3 | PELINI CAMPBELL & WILLIAMS, LLC |
| | BY: ERIC J. WILLIAMS, ESQUIRE |
| 4 | 8040 Cleveland Avenue NW |
| | Suite 400 |
| 5 | North Canton, OH 44720 |
| | 330.305.6400 |
| 6 | ejwilliams@pelini-law.com |
| | Representing the Defendant, |
| 7 | Prescription Supply, Inc. |
| 8 | |
| 9 | WILLIAMS & CONNOLLY, LLP |
| | BY: MATTHEW C. MONAHAN, ESQUIRE |
| 10 | 725 Twelfth Street, N.W. |
| | Washington, DC 20005 |
| 11 | 202.434.5000 |
| | mmonahan@wc.com |
| 12 | Representing the Defendant, |
| | Cardinal Health |
| 13 | |
| 14 | |
| 15 | ARNOLD & PORTER KAYE SCHOLER LLP |
| | BY: SAMUEL LONERGAN, ESQUIRE |
| 16 | 250 West 55th Street |
| | New York, New York 10019 |
| 17 | (212) 836-8000 |
| | samuel.lonergan@arnoldporter.com |
| 18 | Representing the Defendant, |
| | Endo Pharmaceuticals |
| 19 | |
| 20 | BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP |
| | BY: KATHERINE M. SWIFT, ESQUIRE |
| 21 | Courthouse Place |
| | 54 West Hubbard Street, Suite 300 |
| 22 | Chicago, Illinois 60654 |
| | (312) 494-4400 |
| 23 | kate.swift@bartlit-beck. |
| | Representing the Defendant, |
| 24 | The Walgreens Company |

|  | Page 5 |
|---|---|
| 1 | VIA TELECONFERENCE: |
| 2 | |
| 3 | LOCKE LORD LLP |
| | BY: BRANDAN MONTMINY, ESQUIRE |
| 4 | 2200 Ross Avenue |
| | Suite 2800 |
| 5 | Dallas, Texas 75201 |
| | (214) 740-8000 |
| 6 | brandan.montminy@lockelord.com |
| | Representing the Defendant, |
| 7 | Henry Schein Medical Systems, Inc. |
| 8 | |
| 9 | |
| 10 | ROPES & GRAY LLP |
| | BY: JESSICA F. SORICELLI, ESQUIRE |
| | BY: FEIFEI (ANDREA) REN, ESQUIRE |
| 11 | 1211 Avenue of the Americas |
| | New York, New York 10036 |
| 12 | (212) 596-9000 |
| | Jessica.Soricelli@ropesgray.com |
| 13 | Andrea.Ren@ropesgray.com |
| | Representing the Defendant, |
| 14 | Mallinckrodt |
| 15 | |
| 16 | MORGAN LEWIS & BOCKIUS, LLP |
| | BY: ELLIOT E. BROWN, ESQUIRE |
| 17 | 1111 Pennsylvania Ave. NW |
| | Washington, D.C. 20004 |
| 18 | (202) 739-3000 |
| | elliott.brown@morganlewis.com |
| 19 | Representing the Defendants, |
| | Teva Pharmaceuticals, Inc., |
| 20 | Cephalon, Inc., Watson |
| | Laboratories, Actavis LLC, and |
| 21 | Actavis Pharma, Inc. |
| 22 | |
| 23 | |
| 24 | |

Page 6

1 APPEARANCES: (Continued)
2 Via Teleconference:
3
      JACKSON KELLY PLLC
4     BY: SAMANTHA M. D'ANNA, ESQUIRE
      500 Lee Street East
5     Suite 1600
      Charleston, WV 25301
6     (304) 340-1347
      samantha.danna@jacksonkelly.com
7     Representing the Defendant,
      Miami-Luken, Inc.
8
9
10    ZUCKERMAN SPAEDER LLP
      BY: VANESSA I. GARCIA, ESQUIRE
11    485 Madison Avenue
      10th Floor
12    New York, New York 10022
      ( 212) 704-9600
13    vgarcia@zuckerman.com
      Representing the Defendant,
14    CVS Pharmacy
15
16
17 ALSO PRESENT:
   David Lane, Videographer
18 Zac Hone - Trial Technician
19
20
21
22
23
24

Page 7

1             - - -
2         I N D E X
3             - - -
4 Testimony of: CHRISTOPHER ZIMMERMAN
5   By Mr. Pifko              11
6             - - -
7         E X H I B I T S
8             - - -
9 NO.         DESCRIPTION          PAGE
   Amerisource Bergen - Zimmerman
10 Exhibit-1     Notice of Deposition   13
11 Amerisource Bergen - Zimmerman
   Exhibit-2     *Skipped*
12
   Amerisource Bergen - Zimmerman
13 Exhibit-3     Notice of 30(b)(6)
               Deposition         19
14
   Amerisource Bergen - Zimmerman
15 Exhibit-4     2001 Chemical
               Handler's Notebook    131
16
   Amerisource Bergen - Zimmerman
17 Exhibit-5     ABDCMDL 00279854-65   137
18 Amerisource Bergen - Zimmerman
   Exhibit-6     ABDCMDL 00269683-694  145
19
   Amerisource Bergen - Zimmerman
20 Exhibit-7     ABDCMDL 00000101-122  170
21 Amerisource Bergen - Zimmerman
   Exhibit-8     ABDCMDL 00270533      248
22
   Amerisource Bergen - Zimmerman
23 Exhibit-9     ABDCMDL 00273425      251
24

Page 8

1             - - -
2         E X H I B I T S
3             - - -
4 NO.         DESCRIPTION        PAGE
5 Amerisource Bergen - Zimmerman
   Exhibit-10    ABDCMDL 00000099-100  283
6
7 Amerisource Bergen - Zimmerman
   Exhibit-11    CAH_MDL_PRIORPROD_
8               DEA_07_00880890-92    303
9 Amerisource Bergen - Zimmerman
   Exhibit-12    MNKT1_0000291614-1620 328
10
   Amerisource Bergen - Zimmerman
11 Exhibit-13    ABDCMDL 00278212      362
12 Amerisource Bergen - Zimmerman
   Exhibit-14    ABDCMDL 00000124-147  380
13
   Amerisource Bergen - Zimmerman
14 Exhibit-15    No Bates
               March 2017
15             AmerisourceBergen Code
               of Ethics and
16             Business Conduct      439
17 Amerisource Bergen - Zimmerman
   Exhibit-16    No Bates
18             West Virginia Case
               Document, Organization
19             Charts              443
20 Amerisource Bergen - Zimmerman
   Exhibit-17    ABDCMDL 00251392-94   451
21
   Amerisource Bergen - Zimmerman
22 Exhibit-18    ABDCMDL 00002325-2334 453
23 Amerisource Bergen - Zimmerman
   Exhibit-19    ABDCMDL 00002405-2418 459
24

Page 9

1             - - -
2   DEPOSITION SUPPORT INDEX
3             - - -
4
5 Direction to Witness Not to Answer
6 Page  Line      Page Line      Page Line
7 195   12
   195   23
8 196   10
   196   17
9
10 Request for Production of Documents
11 Page Line   Page Line    Page Line
12 None
13
14
15 Stipulations
16 Page Line   Page Line    Page Line
17 10    1
18
19
20 Question Marked
21 Page Line   Page Line    Page Line
22 None
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1          - - -
2          (It is hereby stipulated and
3    agreed by and among counsel that
4    sealing, filing and certification
5    are waived; and that all
6    objections, except as to the form
7    of the question, will be reserved
8    until the time of trial.)
9          - - -
10         VIDEO TECHNICIAN:  We are
11   now on the record.  My name is
12   David Lane, videographer for
13   Golkow Litigation Services.
14   Today's date is August 3rd, 2018.
15   Our time is 9:23 a.m.
16         This deposition is taking
17   place in Philadelphia,
18   Pennsylvania, in the matter of
19   National Prescription Opiate
20   Litigation.  Our deponent today is
21   Chris Zimmerman.  Our counsel will
22   be noted on the stenographic
23   record.
24         The court reporter is Amanda

Page 11

1    Miller and will now swear in the
2    witness.
3          - - -
4          CHRISTOPHER ZIMMERMAN, after
5    having been duly sworn, was
6    examined and testified as follows:
7          - - -
8          VIDEO TECHNICIAN:  Please
9    begin.
10         - - -
11         EXAMINATION
12         - - -
13   BY MR. PIFKO:
14   Q.   Good morning, Mr. Zimmerman.
15   My name is Mark Pifko, I'm counsel for
16   plaintiffs in this matter.  Just met a
17   few moments ago for the first time, off
18   the record.
19         You understand that you are
20   here as the company's designated witness
21   for certain topics?
22   A.   Correct.
23   Q.   The court reporter just
24   swore you in.  So you understand that

Page 12

1    your testimony here is under penalty of
2    perjury?
3    A.   Yes.
4    Q.   And that means that if you
5    are untruthful or dishonest in any way
6    you could be subject to penalties from
7    the court.
8          Do you understand that?
9    A.   Yes.
10   Q.   Do you intend to provide
11   cooperative testimony today?
12   A.   I do.
13   Q.   From time to time,
14   Amerisource's counsel might assert
15   objections.  Unless he instructs you not
16   to answer, I'm still entitled to an
17   answer.
18         Do you understand that?
19   A.   Yes.
20   Q.   We can take breaks -- I'm
21   sure that you went over all this in the
22   prep session with your lawyers.  We can
23   take breaks.  The only thing is unless
24   your counsel is going to be conferring

Page 13

1    with you about a privilege, we can't take
2    a break while a question is pending.
3          Do you agree to that?
4    A.   Yes.
5          MR. PIFKO:  Let's start by
6    handing him the 30(b)(6) notice
7    for Number 1.
8    BY MR. PIFKO:
9    Q.   While he's getting that, are
10   you under any medications or undergoing
11   any treatment of any kind that would
12   inhibit your ability to provide truthful
13   and accurate testimony today?
14   A.   No.
15   Q.   Is there any reason that you
16   can state why your deposition should not
17   go forward today?
18   A.   No.
19         - - -
20         (Whereupon, Amerisource
21   Bergen-Zimmerman Exhibit-1, Notice
22   of Deposition, was marked for
23   identification.)
24         - - -

Highly Confidential - Subject to Further Confidentiality Review

Page 14

BY MR. PIFKO:

Q. I've just handed you what's marked as Exhibit-1, which is a first notice of deposition under Rule 30(b)(6).

It's got some topics on here, there are page numbers under there. The topics start on the bottom of the page, Page 6.

Do you see that?

A. Yes.

Q. Have you seen this document before?

A. I don't believe so.

Q. Have you seen these topics before?

A. Let me take a quick look at them.

Q. Sorry?

A. I'm reading through these real quickly.

Q. Just for housekeeping, we didn't go over that, but there are, again, I'm sure your counsel told you some of these things in preparing for the

Page 15

depo, but there's a couple of ground rules that we have to remember because we're on the record here. Try to annunciate clearly if you're providing an answer, give an audible response and don't say words like uh-huh and uh-uh because when you read it on the transcript, you can't tell if it's a yes or no.

Understood?

A. Yes.

Q. So you're reviewing the document right now?

A. Yes.

Q. To be clear, my question was if you had seen these topics before, which start on Page 6, and they're lettered A through O.

A. Yes.

Q. You have seen these topics before?

A. I have.

Q. Okay. When was the first time you saw these?

Page 16

A. A couple of weeks ago, maybe.

Q. And are you prepared to provide testimony on behalf of the company with respect to these topics?

A. Within a certain time frame, yes.

Q. I understand the time frame goes from -- up until the end of 2014; is that correct?

A. Correct.

MR. NICHOLAS: Just for the record, just one of these topics, Topic O, is one which I believe there's an agreement among counsel that we will respond to in writing as opposed to in testimony here today.

MR. PIFKO: Well, we can meet and confer, but I don't intend to take testimony on that topic today in any event.

MR. NICHOLAS: Well, just to be clear, though, I think there's

Page 17

an agreement that we're responding to this in writing.

MR. PIFKO: I'm not aware of such an agreement. I'm not disputing -- or I'm not taking a position.

MR. NICHOLAS: Okay.

MR. PIFKO: But we can be clear that that's not part of the deposition today, however we end up handling it.

MR. NICHOLAS: Okay.

BY MR. PIFKO:

Q. And so you understand that you're also being deposed here in your individual capacity as well.

Do you understand that?

A. Yes.

Q. For the most part, you can imagine, the company is made up of many individuals, and so it's hard to have someone speak for the company.

So what we do in these situations is we have these topics and

Page 18

1  you, right now sitting in that chair for
2  the purpose of this case, are
3  AmerisourceBergen with respect to these
4  topics.
5          Do you understand that?
6          MR. NICHOLAS:  Object to the
7      form.
8          You can answer.
9          THE WITNESS:  Yes, I'm going
10     to be speaking on these topics.
11 BY MR. PIFKO:
12     Q.   And from time to time, I
13 might be asking, does AmerisourceBergen
14 do this or that?  And you'll be
15 answering, you know, so long as it's
16 within the scope of these topics, you'll
17 be answering on behalf of the company.
18         Do you understand that?
19         MR. NICHOLAS:  Same
20     objection.
21         But go ahead.
22         THE WITNESS:  Yes, I'll be
23     answering questions.
24 BY MR. PIFKO:

Page 19

1      Q.   And you understand that
2  you'll be answering them on behalf of the
3  company?  That's what I'm trying to get
4  at.
5          MR. NICHOLAS:  Same
6      objection.
7          You can answer.
8          THE WITNESS:  It depends on
9      whether it's as I'm representing
10     the company.  You also indicated
11     I'll be answering questions for
12     myself.
13 BY MR. PIFKO:
14     Q.   But with respect to these
15 topics, you understand that for the date
16 range we discussed, you'll be answering
17 on behalf of the company?
18     A.   Yes.
19     Q.   Okay.  And then I just
20 handed you what's marked as Exhibit-2.
21         - - -
22         (Whereupon, Amerisource
23     Bergen-Zimmerman Exhibit-3, Notice
24     of 30(b)(6) Deposition, was marked

Page 20

1      for identification.)
2          - - -
3  BY MR. PIFKO:
4      Q.   It's marked as Exhibit-3,
5  which is the notice that calls us here
6  today.
7          And it also, in addition to
8  calling for your 30(b)(6) testimony, it
9  calls for your individual testimony as
10 well.
11     A.   Okay.
12     Q.   Are you familiar with The
13 Controlled Substances Act?
14     A.   Yes.
15     Q.   How long have you been
16 working at AmerisourceBergen?
17     A.   Since January 1990.
18     Q.   And you are currently senior
19 vice president, chief compliance officer?
20     A.   Correct.
21     Q.   And you're also senior vice
22 president in charge of the -- what's your
23 exact title for the aspect of the company
24 that deals with compliance with the CSA?

Page 21

1      A.   So I'm senior vice president
2  of corporate security and regulatory
3  affairs.
4      Q.   And you guys called that
5  CSRA within your company?
6      A.   That's the abbreviation,
7  yes.
8      Q.   So if I use the term "CSRA,"
9  you understand what that means?
10     A.   Yes.
11     Q.   AmerisourceBergen is a
12 registrant under The Controlled
13 Substances Act, correct?
14     A.   We are a DEA registrant,
15 correct.
16     Q.   Have you ever heard the
17 term, I think -- I'm from California, we
18 drive a lot there, there's a phrase they
19 use that says, driving is a privilege,
20 not a right.
21         Have you ever heard that
22 kind of a phrase before?
23     A.   Not really.
24     Q.   AmerisourceBergen sells

Page 22

1  drugs, correct?
2      A.   Correct.
3      Q.   Included among those drugs
4  are controlled substances, correct?
5      A.   Yes.
6      Q.   And it's AmerisourceBergen's
7  position as a registrant that allows the
8  company to sell controlled substances,
9  correct?
10         MR. NICHOLAS:  Object to the
11     form.
12         THE WITNESS:  We have a
13     controlled substance registration
14     that allows us to distribute.
15 BY MR. PIFKO:
16     Q.   And absent that
17 registration, it's not legal for
18 AmerisourceBergen to sell controlled
19 substances, correct?
20     A.   Correct.
21     Q.   So do you understand that
22 along with the privilege and the right
23 to -- the ability to sell controlled
24 substances, certain duties are attached

Page 23

1  to that as well.
2          Do you understand that?
3          MR. NICHOLAS:  Object to the
4      form.
5          THE WITNESS:  I'm not sure
6      what you're referring to as
7      "duties."
8  BY MR. PIFKO:
9      Q.   Okay.  You understand there
10 are restrictions on what you can do as an
11 entity selling controlled substances,
12 correct?
13     A.   There's requirements that we
14 follow.  I don't know if I'd refer to
15 them as restrictions, but there's
16 regulatory requirements that we have to
17 adhere to.
18     Q.   Right.  So my question is,
19 the ability to sell controlled substances
20 also comes with certain obligations,
21 correct?
22         MR. NICHOLAS:  Object to the
23     form.
24         Go ahead.

Page 24

1          THE WITNESS:  Can you say
2      your question one more time?
3  BY MR. PIFKO:
4      Q.   The ability to sell
5  controlled substances also comes with
6  certain obligations that you must follow,
7  correct?
8          MR. NICHOLAS:  Same
9      objection.
10         THE WITNESS:  It's the
11     obligations of the requirements of
12     the Code of Federal Regulations.
13 BY MR. PIFKO:
14     Q.   And specifically, that's The
15 Controlled Substances Act, correct?
16     A.   The regulations from the
17 act, correct.
18     Q.   So The Controlled Substances
19 Act and the regulations that follow,
20 correct?
21     A.   Yes.
22     Q.   Do you know what a duty to
23 maintain effective controls is?
24         MR. NICHOLAS:  Object to the

Page 25

1      form.
2          THE WITNESS:  I'm not sure
3      what your question is.  We -- I'm
4      not sure what your question is.
5  BY MR. PIFKO:
6      Q.   Have you heard the phrase,
7  "duty to maintain effective controls"?
8      A.   No.
9      Q.   You've never heard that term
10 before?
11     A.   No.
12     Q.   Do you have an understanding
13 that under The Controlled Substances Act,
14 AmerisourceBergen has a duty to maintain
15 effective controls to prevent diversion
16 of certain substances?
17     A.   Yes.  We have to maintain
18 effective controls from diversion.  I
19 just don't know duty was included in that
20 or not.
21     Q.   I'll represent to you that
22 the word "duty" is in there.
23         So you do understand that
24 you have an obligation to maintain

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 effective controls as part of your
2 serving as a registrant and selling
3 controlled substances?
4     A.   Yes, we have an
5 obligation -- there's a regulatory
6 responsibility to have effective controls
7 to prevent diversion.
8     Q.   What's your understanding of
9 what that means?
10     MR. NICHOLAS:  Object to the
11 form.  I object to the question.
12 It's too big.
13     THE WITNESS:  I guess --
14 that's an overarching statement.
15     If you can clarify what
16 instances within the Code of
17 Federal Regulations you're
18 referring to with the effective
19 controls, there's several
20 different areas in there.
21     MR. PIFKO:  We're going to
22 have to not have any speaking
23 objections.  Saying "too big" is
24 not an objection, and it's

Page 27

1 obviously influencing the
2 witness's testimony.
3     So you can state your
4 objection with clarity.  You can
5 state form or foundation.  But
6 that's all you can do, okay?
7     MR. NICHOLAS:  Mark, I
8 appreciate the instruction, but
9 I'm going to have to handle my own
10 objections the way I see fit.
11     MR. PIFKO:  If you're going
12 to be coaching the witness
13 throughout the day, we're going to
14 stop the deposition, we're going
15 to seek sanctions and we're going
16 come back here.
17     Do you understand that?
18     MR. NICHOLAS:  You can do
19 whatever you think you need to do.
20 I'm not coaching the witness.  I'm
21 stating what I think are
22 appropriate objections in the
23 appropriate manner.  And you can
24 proceed.

Page 28

1     MR. PIFKO:  Well, if you
2 tell the witness the question is
3 too big and then he responds, I
4 don't know how to answer it, it's
5 too big, then we've got a problem
6 here because you're telling him
7 what to say.
8     Do you understand?
9     MR. NICHOLAS:  No, I'm not
10 telling him what to say.  I'm
11 making an objection.  So why don't
12 you just go ahead?
13     MR. PIFKO:  I hope that we
14 can have compliance with the rules
15 here.  And understanding that
16 we're going to be doing that, I'm
17 going to proceed.
18 BY MR. PIFKO:
19     Q.   You have a duty to maintain
20 effective controls to prevent against
21 diversion, correct?
22     A.   Correct.
23     Q.   Do you understand what that
24 means?

Page 29

1     A.   Yes, I understand what that
2 means.
3     Q.   What is your understanding
4 of what that means?
5     A.   We have to have effective
6 controls to prevent diversion, both on
7 the physical security operational side,
8 as well as ensuring we only distribute to
9 licensed entities, and a duty to report
10 suspicious orders.
11     Q.   You mentioned there, "duty
12 to report suspicious orders."
13     If I refer to that as the
14 "reporting requirement," do you have an
15 understanding of that?
16     A.   If you are referring to the
17 regulation that we have to design and
18 operate a system to identify suspicious
19 orders and report those suspicious orders
20 to DEA, yes.
21     Q.   Okay.  So at various points
22 today we might refer to that as the
23 "reporting requirement."
24     Will you understand that?

Page 30

1    A.   Yes.  If that's the
2  definition we're going to go with, yes.
3    Q.   Okay.  There's also a
4  requirement to provide records of all
5  your shipments through the ARCOS system.
6         Are you familiar with that?
7    A.   Only certain drugs are
8  within the -- are considered ARCOS
9  products.  So not all controlled
10 substances are reported through ARCOS.
11   Q.   Fair enough.
12        But to the extent a
13 substance is under the requirement to
14 report to ARCOS, you understand that
15 there's an obligation to do so, correct?
16   A.   Yes.
17   Q.   Okay.  You understand that
18 the reporting to ARCOS is different than
19 the reporting of a suspicious order,
20 correct?
21   A.   Yes.
22   Q.   So complying with the ARCOS
23 requirement does not equate to compliance
24 with the suspicious order reporting

Page 31

1  requirement.
2         Do you understand that?
3    A.   Yes.
4    Q.   Have you heard of the
5  shipping requirement?
6    A.   No.
7    Q.   Are you familiar with the
8  Masters Pharmaceutical case?
9    A.   I've seen it, yes.
10   Q.   Are you aware that that case
11 discusses something called the shipping
12 requirement?
13   A.   I've seen that reference to
14 shipping requirement.
15   Q.   Do you know what that is?
16   A.   No.
17   Q.   You have no understanding of
18 what the shipping requirement is?
19   A.   I've never seen it in the
20 Code of Federal Regulations.
21   Q.   Do you understand that in
22 addition to reporting a suspicious order
23 to the DEA, AmerisourceBergen is required
24 to -- not to ship a suspicious order as

Page 32

1  well?
2    A.   I don't -- I don't think
3  there's a requirement not to ship.  We do
4  not ship suspicious orders.
5    Q.   So it's your position that
6  there's no requirement under the law to
7  not ship a suspicious order?
8    A.   Not that I know of.
9    Q.   You testified in the West
10 Virginia Attorney General litigation in
11 2016, correct?
12   A.   Yes.
13   Q.   Let's back up for a second.
14        When we talk about this idea
15 to prevent diversion, do you have an
16 understanding of why there is such a
17 requirement?
18        MR. NICHOLAS:  Object to the
19 form.
20        THE WITNESS:  There's
21 certain -- as a distributor, the
22 DEA outlines certain requirements
23 that distributors -- I'll speak as
24 for a distributor -- has to adhere

Page 33

1  to in order to maintain effective
2  controls to prevent diversion.
3         And those are the -- those
4  are the regulations that our
5  company follows, and those are the
6  ones we have implemented in order
7  to maintain our registration.
8  BY MR. PIFKO:
9    Q.   Right.  So what I'm trying
10 to understand is, do you have an
11 understanding about what the purpose is
12 of those rules?
13        MR. NICHOLAS:  Object to the
14 form.
15        THE WITNESS:  The purpose is
16 to maintain effective controls
17 within the distribution center.
18 BY MR. PIFKO:
19   Q.   And why do we want to do
20 that?
21        MR. NICHOLAS:  Object to the
22 form.
23        THE WITNESS:  Because those
24 are the requirements of the

Page 34

1  regulations.
2  BY MR. PIFKO:
3      Q.   Do you have an understanding
4  about why those are the requirements of
5  the regulations?
6          MR. NICHOLAS:  Object to the
7      form.
8          THE WITNESS:  Those are the
9      regulations that we have to follow
10     in order to keep our registration.
11     To be a distributor, you have to
12     meet those requirements in the
13     regulations.
14 BY MR. PIFKO:
15     Q.   Are you familiar with the
16 scheduling system of controlled
17 substances?
18     A.   I understand that there's
19 Schedules 1 through IV, yes.
20     Q.   Do you know what a Schedule
21 I substance is?
22     A.   I believe -- I don't know
23 the official, but it's no -- I believe it
24 references there's no medical purpose.

Page 35

1      Q.   How about Schedule II, do
2  you know what a Schedule II substance is?
3      A.   It's a Schedule II
4  controlled substance, yes.
5      Q.   But what's -- what are
6  attributes of a Schedule II substance --
7          MR. NICHOLAS:  Object.
8  BY MR. PIFKO:
9      Q.   -- based on your
10 understanding?
11         MR. NICHOLAS:  Object to the
12     form.
13     Go ahead.
14     THE WITNESS:  The Schedule
15     II, III, IV, V are all scheduled
16     as to their potential for abuse.
17 BY MR. PIFKO:
18     Q.   Do you understand that a
19 Schedule II substance has a high
20 potential for abuse?
21     A.   It's higher than III and IV
22 and V.
23     Q.   Do you understand that the
24 United States government has said that a

Page 36

1  Schedule II substance has a high
2  potential for abuse?
3          MR. NICHOLAS:  Object to the
4      form.
5          THE WITNESS:  I don't know
6      that.  But it's a Schedule II.
7  BY MR. PIFKO:
8      Q.   What do you mean by, "I
9  don't know that but it's a Schedule II"?
10     A.   You asked if I knew whether
11 the government stated -- I don't know if
12 the government stated that.  But I know,
13 by it being a Schedule II, it has a high
14 potential of abuse.
15     Q.   So you do know that a
16 Schedule II substance has a high
17 potential for abuse, correct?
18     A.   That's why it's a Schedule
19 II.
20     Q.   And you know that this case
21 primarily concerns Schedule II
22 substances?
23     A.   I don't know -- I don't know
24 that.

Page 37

1      Q.   We'll get into that.
2      A.   Okay.
3      Q.   Do you know what a Schedule
4  III substance is?
5      A.   It's a controlled substance
6  that has a -- that has a potential of
7  abuse but not as high as a Schedule II.
8      Q.   So a Schedule I -- Schedule
9  II substance has a high potential for
10 abuse and a Schedule III substance has a
11 potential for abuse but may be less high
12 than Schedule II, correct?
13     A.   Correct.
14     Q.   You understand that this
15 case concerns opioid products, correct?
16     A.   Correct.
17     Q.   Do you know what an opioid
18 product is?
19     A.   A product that contains
20 opioid.
21     Q.   Do you know what the word
22 "opioid" means?
23     A.   I believe that's the active
24 ingredient in the drug.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1     Q.  Do you know what the active
2 ingredient in morphine is?
3     A.  I don't know.
4     Q.  The word "opiate," it
5 derives from opium.
6       Do you understand that?
7     A.  Yes.
8     Q.  Opium comes from a poppy
9 flower.
10       Do you understand that?
11     A.  I understand that, yes.
12     Q.  So a product that is an
13 opioid is derived from the opium.
14       Do you have an understanding
15 of that?
16     MR. NICHOLAS:  Objection.
17     THE WITNESS:  I don't know
18     the medical makeup and how -- of
19     how an opioid is manufactured.  I
20     don't know that.
21 BY MR. PIFKO:
22     Q.  But you understand that the
23 active ingredient is derived from some
24 opiate-like substance?

Page 39

1     MR. NICHOLAS:  Objection.
2     Asked and answered.
3     THE WITNESS:  I know it's an
4     opioid.  I don't know the
5     derivatives.
6 BY MR. PIFKO:
7     Q.  Can you name any substances
8 that you understand to be classified as
9 an opioid?
10     A.  Oxycodone, hydrocodone are
11 the two major ones.
12     Q.  Any others?
13     A.  I know those for sure.  I
14 don't want to speculate on some of the
15 others.
16     Q.  Do you have an understanding
17 that at certain relevant time periods in
18 this case certain hydrocodone combination
19 products were classified as Schedule III
20 substances?
21     A.  Yes.
22     Q.  And they were later
23 reclassified as a Schedule II substance.
24       Do you understand that?

Page 40

1     A.  Yes.
2     Q.  When we use the word
3 "diversion," do you have an understanding
4 about what that means?
5     A.  It depends on the context.
6     Q.  In the context of The
7 Controlled Substances Act.
8     MR. NICHOLAS:  Object to the
9     form.
10     THE WITNESS:  So diversion
11     is that a drug that's -- well,
12     again, it depends.  Even with
13     controlled substances, it could
14     be -- it could have several
15     different meanings.  So if it's
16     diverted from theft, it could be a
17     diversion because of a bad
18     prescription.
19     It's when a drug -- I've
20     seen it referenced as a drug that
21     leaves the normal distribution
22     channels.
23 BY MR. PIFKO:
24     Q.  Okay.  What's the normal

Page 41

1 distribution channel?
2     A.  That -- the closed system of
3 manufacture to DEA registrant distributor
4 to DEA registrant dispenser.
5     Q.  Do you have an understanding
6 about what the closed system is?
7     MR. NICHOLAS:  Object to the
8     form.
9     THE WITNESS:  The closed
10     system as it pertains to?
11 BY MR. PIFKO:
12     Q.  Well, you just used it in
13 your answer, so I want to know what you
14 were referring to.
15     A.  The closed system of
16 controlled substances?  I just want to
17 make sure I understand your question.
18     Q.  You talked about a drug
19 leaving the normal channels within the
20 closed system.  So I'm trying to
21 understand what you meant by "closed
22 system."
23     A.  I said distribution channel,
24 I didn't say closed system.

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    Q.   I think you said within the
2  closed system, or something to that
3  effect.
4    A.   I thought I said
5  distribution channel.
6    Q.   We don't need to fight about
7  what you said or didn't say.
8       What I just want to know,
9  your -- do you have an understanding
10 about what the closed system is under The
11 Controlled Substances Act?
12      MR. NICHOLAS:  Object to the
13   form.
14      THE WITNESS:  The closed
15   system, as I've heard it referred
16   to, is that the DEA sets the
17   quotas of how much product can be
18   produced, then manufactured; those
19   products are transferred to the
20   distributor through ARCOS, which
21   is maintained -- transferred to
22   the distributor.
23      And then the distributor
24   transfers to the pharmacy or the

Page 43

1   dispenser with an ARCOS
2   transaction, which closes the
3   distribution, as far as DEA
4   tracking goes.
5  BY MR. PIFKO:
6    Q.   So there are legitimate
7  channels of distribution within that
8  system, correct?
9      MR. NICHOLAS:  Object to the
10   form.
11      THE WITNESS:  That is the --
12   that is the legitimate
13   distribution channel.
14 BY MR. PIFKO:
15    Q.   Okay.  And then there could
16 be -- a channel of distribution outside
17 of that system, that would be
18 illegitimate, correct?
19      MR. NICHOLAS:  Object to the
20   form.
21      THE WITNESS:  I can't say
22   what type of other distribution.
23   I can only comment on our
24   distribution system.

Page 44

1  BY MR. PIFKO:
2    Q.   Well, you said that that's
3  the legitimate one, the one you just
4  described, correct?
5    A.   That's the -- you asked me
6  what the closed distribution was, and
7  that's what the closed distribution is.
8    Q.   And you understand that your
9  duty to prevent diversion is to prevent
10 applicable controlled substances from
11 exiting that system?
12      MR. NICHOLAS:  Object to the
13   form.
14      THE WITNESS:  Our
15   responsibility is to ensure that
16   we distribute FDA-approved drugs
17   from the -- that we maintain in
18   our distribution centers to
19   licensed entities.
20 BY MR. PIFKO:
21    Q.   And what do you mean by
22 "licensed entities"?
23    A.   Pharmacies, hospitals, DEA
24 registrants and State Board of Pharmacy

Page 45

1  registrants.
2    Q.   And you understand that
3  those registrants also have duties to
4  maintain effective controls as well?
5      MR. NICHOLAS:  Object to the
6   form.
7      THE WITNESS:  They have
8   their own regulations that they
9   must follow, correct.
10 BY MR. PIFKO:
11    Q.   So the idea of preventing
12 diversion is to prevent substances from
13 getting into illegal hands, correct?
14      MR. NICHOLAS:  Object to the
15   form.
16      THE WITNESS:  Each
17   registrant has its
18   responsibilities to maintain
19   effective controls to prevent
20   diversion.  We maintain those
21   within our registrant's capacity,
22   correct.
23 BY MR. PIFKO:
24    Q.   Can you give me an example

Page 46

1  of diversion?
2          MR. NICHOLAS:  Objection.
3      Object to the form.
4          THE WITNESS:  As I stated,
5      diversion can be many different
6      things.  So I need some more
7      clarification of what type of
8      diversion you're talking about.
9  BY MR. PIFKO:
10     Q.   Let's make it specific to
11 the issues in this case.
12         So, again, you understand
13 this case concerns opioid products,
14 correct?
15     A.    Correct.
16     Q.    And those are, for the most
17 part, Schedule II substances under The
18 Controlled Substances Act, correct?
19     A.    Correct.
20     Q.    Okay.  Can you give me an
21 example of what it means to have an
22 opioid product diverted, as we were
23 talking about this under The Controlled
24 Substances Act?

Page 47

1          MR. NICHOLAS:  Object to the
2      form.
3          THE WITNESS:  There's a lot
4      of different ways drugs can be
5      diverted from our distribution
6      center.  Diversion could be if
7      we -- if we, not ABC -- but if a
8      company diverted product to an
9      unlicensed location, a
10     nonregistered location, that could
11     be diversion.
12 BY MR. PIFKO:
13     Q.    Any other --
14         MR. NICHOLAS:  Object to the
15     form.
16         THE WITNESS:  I'm not going
17     to sit here and try to list all
18     the areas that could be -- where
19     diversion could occur, because we
20     could be here for a long time.
21         And that's why you have
22     effective controls to prevent
23     diversion.
24 BY MR. PIFKO:

Page 48

1          Q.    Well, it's your -- among the
2      responsibilities you have with the
3      company, one of them is to manage the
4      company's efforts to maintain effective
5      controls against diversion, correct?
6      A.    Correct.
7          Q.    And so I understand that
8      maybe there might be several examples,
9      but I'd like to get your understanding of
10     the types of situations we're talking
11     about here.
12         So you talked about sale to
13     an unlicensed --
14         MR. NICHOLAS:  I'm going
15     to -- I want to interpose an
16     objection.  This is not coaching,
17     but the question is tremendously
18     broad.
19         MR. PIFKO:  You can say
20     broad as an objection.
21     "Tremendously" is not necessary.
22     That's -- we're good here.
23         MR. NICHOLAS:  Okay.  Broad.
24     So I would ask you to narrow it.

Page 49

1          MR. PIFKO:  Your objection
2      is noted.
3          MR. NICHOLAS:  The witness
4      has asked you to narrow it.
5  BY MR. PIFKO:
6      Q.    So you're the person from
7  AmerisourceBergen who is responsible for
8  ensuring compliance with The Controlled
9  Substances Act requirement to maintain
10 effective controls against diversion,
11 correct?
12     A.    Yes.
13     Q.    And so I'd like an example,
14 a bunch of examples, of what diversion
15 is, from you.
16         MR. NICHOLAS:  Same
17     objection.
18         Go ahead.
19         THE WITNESS:  So what we do
20     to prevent diversion is --
21 BY MR. PIFKO:
22     Q.    I'm not asking what you do
23 to prevent diversion --
24         MR. NICHOLAS:  Hold on.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

BY MR. PIFKO:

1   Q.   -- just an example of what
3   diversion is.
4        MR. NICHOLAS:  Hold on.
5   Let's stay on the record.
6        You can't interrupt him when
7   he's answering the question.
8        MR. PIFKO:  He needs to
9   answer the question asked.  I
10  don't -- we're not going to have
11  speeches where he talks about
12  things that aren't asked.
13       MR. NICHOLAS:  You didn't
14  hear his answer.  He said five
15  words, and you interrupted him.
16       MR. PIFKO:  He said what we
17  do to prevent diversion.  And
18  that's not what I asked.  I asked
19  what diversion is.
20       MR. NICHOLAS:  Those were
21  his first five words.  You're
22  going to have to let him answer
23  the question.
24       You're going to have to

Page 51

1   let -- you ask a question, the
2   witness is then entitled to say
3   what he wants in answering the
4   question.
5        MR. PIFKO:  He's not
6   entitled to say anything he wants,
7   he's entitled to answer the
8   question.
9        MR. NICHOLAS:  No, he's
10  entitled to say what he wants --
11  what he believes is answering the
12  question, and then you can ask
13  another question.  So don't
14  interrupt him again, please.
15  BY MR. PIFKO:
16  Q.   I'm sure that in preparing
17  for this deposition, your counsel told
18  you to listen to the question.  So I want
19  you to be very careful and listen to the
20  questions that I ask, okay?
21       Do you understand that?
22  A.   Yes.
23  Q.   And so, again, if you don't
24  understand a question, you let me know,

Page 52

1   and I'll rephrase it.  And we'll work
2   through it.  But I would appreciate your
3   testimony in responding to exactly the
4   questions that I ask.
5        Do we have an agreement
6   about that?
7        MR. NICHOLAS:  Objection.
8   Because he's been doing that.
9        THE WITNESS:  I'm trying to
10  answer your question, but you
11  won't let me give my -- I did
12  state that there's a lot of
13  different areas where diversion
14  could occur.
15       And you asked for a list of
16  them.  I'm going to tell you how
17  we prevent diversion and then from
18  that area, anywhere in there, a
19  diversion can occur.
20       And that's how I was going
21  to answer the question.
22       So we first have physical
23  security controls to prevent
24  diversion; we have cages and

Page 53

1   vaults that are required by the
2   CFR.
3        We have -- we do background
4   checks on our employees.  We do
5   due diligence of our customers to
6   ensure that they're licensed and
7   in good standing with the DEA and
8   Boards of Pharmacy.
9        So there's a whole host of
10  things that we do within the -- as
11  a licensed distributor, to prevent
12  diversion.
13       If we weren't doing those
14  things, diversion could occur at
15  any one of those steps.  So if we
16  didn't --
17  BY MR. PIFKO:
18  Q.   That's not the question I
19  asked.  I asked you to give examples of
20  diversion.  You're giving me examples of
21  prevention of diversion and that's not
22  the question that was asked.
23       MR. NICHOLAS:  I object.
24  BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  Q.  We'll go through it -- we'll
2  go through it again.
3       So let's talk about
4  diversion of a Schedule II controlled
5  substance at a pharmacy.
6       Can you explain what
7  potential areas of diversion are in that
8  context?
9       MR. NICHOLAS:  Object to the
10      form.
11      THE WITNESS:  I'm not
12      responsible for the diversion that
13      occurs within a pharmacy.  If a
14      pharmacy has -- is filling
15      prescriptions that are invalid or
16      if a pharmacy is selling
17      prescriptions -- not
18      prescriptions -- or diverting
19      drugs out the back door, you know,
20      I have no eyes to that.
21 BY MR. PIFKO:
22      Q.  Okay.  But those are some
23 examples of a pharmacy filling
24 prescriptions or selling controlled

Page 55

1  substances without a valid prescription,
2  that would be a diversion, correct?
3       A.  As it stands -- is my
4  understanding, yes.
5       Q.  And if -- you said if
6  there's -- the pills are flowing out the
7  back door without being sold to anyone or
8  theft, or something like that, that would
9  be diversion, correct?
10      A.  That could be a type of
11 diversion, yes.
12      Q.  What about a prescription
13 that's written by a doctor who doesn't
14 have a valid DEA registration, is that --
15 if someone sells pills to somebody who
16 has that kind of a prescription, is that
17 diversion?
18      MR. NICHOLAS:  Object to the
19      form.
20      THE WITNESS:  That would be
21      the responsibility of the
22      pharmacy.  I mean, the distributor
23      has no line of sight on the doctor
24      who is writing prescriptions to

Page 56

1  the pharmacy.
2  BY MR. PIFKO:
3       Q.  Do you understand why we
4  want to prevent these diversion
5  activities to occur?
6       MR. NICHOLAS:  Object to the
7       form.  Asked and answered.
8       THE WITNESS:  When you say
9       "we," I'm not understanding your
10      question of who is the "we."
11 BY MR. PIFKO:
12      Q.  We're all Americans here,
13 and the law is a law of the American
14 jurisprudence, and it's requiring that.
15 And so when I say "we," I mean the people
16 of the United States.
17      So the question is, do you
18 understand why, when enacting that law,
19 we want to prevent diversion in the way
20 we just described?
21      MR. NICHOLAS:  Well, I'll
22      object to the form of that
23      question.
24      THE WITNESS:  That's why

Page 57

1  there's DEA regulations, because
2  of the -- to prevent diversion.
3  BY MR. PIFKO:
4       Q.  And is diversion a good
5  thing?
6       MR. NICHOLAS:  Object to the
7       form.
8       THE WITNESS:  Is diversion a
9       good thing?  I don't think so.
10 BY MR. PIFKO:
11      Q.  Why not?
12      MR. NICHOLAS:  Objection.
13 Object to the form.
14      THE WITNESS:  In the context
15      of -- in the context of diversion
16      from a licensed entity, that's --
17      that's not good.
18 BY MR. PIFKO:
19      Q.  And why not?
20      A.  Because it's in violation of
21 the regulation.
22      Q.  Is there -- other than it
23 violating the regulation, is there any
24 impact of diversion?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    MR. NICHOLAS:  Object to the
2  form.
3    THE WITNESS:  I'm -- I'm not
4  understanding your question.
5    If there's diversion of the
6  product, that's -- as I indicated,
7  that's against the regulations.
8  That's a bad thing.
9  BY MR. PIFKO:
10   Q.   What I'm trying to
11 understand is, these are situations that
12 the regulations are designed to prevent
13 from occurring, correct?
14   A.   Yes.
15   Q.   And I'm trying to understand
16 why is it that we would have regulations
17 to prevent these things from occurring.
18   Do you have an understanding
19 of that?
20   MR. NICHOLAS:  I'll object
21  to the form.
22   THE WITNESS:  It's the same
23  reason why we have regulations for
24  the approval of the drugs, of how

Page 59

1  you store and manage the drugs and
2  how -- you know, that's the basis
3  of our system.
4  BY MR. PIFKO:
5    Q.   And what is the reason for
6  that?
7    MR. NICHOLAS:  This has been
8  asked and answered about seven or
9  eight times now.  I will object.
10   THE WITNESS:  The reason is
11  to have effective controls to
12  prevent diversion.  I think I've
13  said that several times.
14 BY MR. PIFKO:
15   Q.   And why do we want to
16 prevent diversion?
17   MR. NICHOLAS:  Objection.
18  Asked and answered.  You're asking
19  the same question again and again.
20  And he's answering it again and
21  again.
22   THE WITNESS:  What's the
23  question one more time?  I mean --
24 BY MR. PIFKO:

Page 60

1    Q.   I'm going to give you an
2  opportunity to speak.
3    But what I'm hearing -- and
4  so you correct me if I'm wrong, but what
5  I'm hearing from you is that
6  AmerisourceBergen Corporation has zero
7  understanding of why we should stop
8  diversion under The Controlled Substances
9  Act?
10   MR. NICHOLAS:  I'll object
11  to the form of the question.
12  That's a false statement.
13   THE WITNESS:  That's not
14  what I'm saying.
15 BY MR. PIFKO:
16   Q.   The jury is watching the
17 video and that's what they're seeing,
18 because that's what I'm seeing.
19   MR. NICHOLAS:  You don't
20  need to grandstand with references
21  to the jury --
22   MR. PIFKO:  And I --
23   MR. NICHOLAS:  -- just ask
24  the questions.

Page 61

1  BY MR. PIFKO:
2    Q.   I genuinely would like a
3  response.  And I'm sure that you can
4  provide an answer.  I'm trying to get
5  that from you.
6    MR. NICHOLAS:  The witness
7  has been providing an answer.
8    You can go ahead.
9    THE WITNESS:  And what was
10  that, I mean, your last statement,
11  that AmerisourceBergen has --
12 BY MR. PIFKO:
13   Q.   So I've asked you, why do we
14 want to prevent diversion?  And what I'm
15 hearing back is, that's what the rule is.
16   And I'm trying to
17 understand, is it AmerisourceBergen's
18 position in this litigation that other
19 than following the rules, there's no
20 reason, it has no understanding of why
21 we're trying to prevent diversion?
22   MR. NICHOLAS:  Object to the
23  form of the question.
24   THE WITNESS:  I think I've

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  answered the question, and I --
2  your understanding or your
3  statement that we don't have any
4  other intent other than following
5  the regulations is incorrect.
6      I mean, there's rules and
7  regulations in place for the
8  proper manufacture, distribution,
9  dispensing of, in this case,
10 controlled substances.
11     And that's because these
12 items, the opioids, you said, have
13 a potential for abuse.  So you
14 have to have additional
15 requirements to make sure you're
16 handling them properly.
17     And each registrant in the
18 channel has a responsibility.  ABC
19 has our responsibilities.  We take
20 them very seriously.  We make sure
21 we only buy them from
22 manufacturers.  We store them
23 properly.  We make sure they're
24 checked, double-checked,

Page 63

1  triple-checked.  We make sure
2  they're stored appropriately in
3  cages and vaults.  We vet our
4  employees.  We train our
5  employees.  We vet our customers.
6      And we take it very
7  seriously.  So we only distribute
8  products to those pharmacies and
9  dispensers and hospitals that are
10 in good standing with DEA and the
11 Board of Pharmacy.  So we adhere
12 to our requirements.
13     Those drugs aren't diverted
14 while they're under our control.
15 I don't know how much more clearly
16 I can state that.
17 BY MR. PIFKO:
18     Q.  We'll get into that later.
19 There's a lot of misstatements in your
20 thing, but we don't have to argue about
21 that.
22     MR. NICHOLAS:  I'll object
23 to that and --
24 BY MR. PIFKO:

Page 64

1      Q.  We'll establish --
2      MR. NICHOLAS:  Hold on.
3  BY MR. PIFKO:
4      Q.  -- we're going to establish
5  that later.
6      MR. NICHOLAS:  I'm going to
7  object to that and move to strike
8  the mischaracterization and the
9  inappropriate characterization
10 slander in the testimony.
11     Proceed, but please don't --
12     MR. PIFKO:  I --
13     MR. NICHOLAS:  Please don't
14 tell him he's making false
15 statements.
16 BY MR. PIFKO:
17     Q.  I think we were getting
18 closer there when you said we want to
19 prevent diversion because these drugs
20 have a potential for high abuse.
21     You said that, correct?
22     MR. NICHOLAS:  Object to the
23 form.
24     Go ahead.

Page 65

1      THE WITNESS:  Again, I
2  don't -- we, as distributors,
3  don't -- don't identify what drugs
4  are -- have high abuse.  That's
5  done by DEA and FDA.
6      We have a -- we are a
7  distributor, we have our
8  requirements that we must follow
9  to protect those drugs while
10 they're under our control.  And we
11 take that very seriously and we do
12 that.
13     I'm not understanding what
14 more you want from me, other than
15 our regulatory and our obligations
16 to protect and ensure those drugs
17 are not diverted while under our
18 control.
19 BY MR. PIFKO:
20     Q.  And you want to ensure that
21 they're not diverted while they're under
22 your control because they have a high
23 potential -- whether you said it or
24 not -- because they have a high potential

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  for abuse under the system; is that
2  correct?
3        MR. NICHOLAS:  Object to the
4  form of the question.
5        THE WITNESS:  Because they
6  are a controlled substance and
7  because they're a prescription
8  product.
9        We treat our prescription
10  drugs with the same manner as the
11  opioids.  I mean, we have
12  additional controls, depending
13  upon whether it's Schedule II or
14  III through IV, whether they're in
15  a vault or a cage.
16        But we protect all the
17  product, we prevent diversion from
18  all products.
19  BY MR. PIFKO:
20    Q.   Do you have an understanding
21  that we want to prevent the unlawful
22  distribution of opioids to protect the
23  public health?
24        MR. NICHOLAS:  Objection.

Page 67

1    Object to the form.
2        THE WITNESS:  Can you state
3    that question again, please?
4  BY MR. PIFKO:
5    Q.   Do you have an understanding
6  that you're required to prevent diversion
7  of opioid products to protect the public
8  health?
9        MR. NICHOLAS:  Object to the
10    form.
11        THE WITNESS:  I understand
12    that we have an obligation to have
13    effective controls to prevent
14    diversion because of our
15    regulatory responsibilities and
16    duties.  And that's what we
17    implement.
18        I'm not here to comment
19    on --
20  BY MR. PIFKO:
21    Q.   That's not -- you can answer
22  yes or no.  That wasn't an answer to my
23  question.
24        So my question is, do you

Page 68

1  have an understanding that you're
2  required to prevent diversion of opioid
3  products to protect the public health?
4        MR. NICHOLAS:  Objection.
5    The witness is not required to
6    answer yes or no.  And he has
7    answered the question.
8        THE WITNESS:  And I -- I --
9    I think I stated what our
10    obligations are under the
11    requirements.
12  BY MR. PIFKO:
13    Q.   I'm not asking what your
14  obligations are under the requirements.
15    I'm asking you if the
16  company understands that the reason for
17  preventing diversion of opioid products
18  is, in part, to protect public health?
19        MR. NICHOLAS:  I'll object
20    to the form of the question.  And
21    add as a basis at this point that
22    I don't believe any of this is
23    covered in any of the topics of
24    your 30(b)(6) notice.

Page 69

1        So we're way far afield
2    here.
3        THE WITNESS:  And I'm not --
4    I don't want to comment on what
5    our duty is to public health.
6  BY MR. PIFKO:
7    Q.   So you have no comment about
8  whether you have a duty to protect public
9  health?  Is that your answer?
10    A.   We have a duty to have
11  effective controls to prevent diversion
12  as the products are within our
13  distribution channel.
14        And we have a duty to ensure
15  that we only sell products to licensed
16  pharmacies and dispensers and hospitals.
17  And that is our duty.
18    Q.   In carrying out your duty to
19  prevent diversion, does AmerisourceBergen
20  consider the impact on the public?
21        MR. NICHOLAS:  Object to the
22    form of the question.  This is not
23    in your notice.  You're way far
24    afield.  You've asked this

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1   question many, many times.  And
2   it's been answered.
3        THE WITNESS:  I think I said
4   what I feel our duty is, to ensure
5   we have proper controls to prevent
6   diversion while the drugs are
7   within our control.
8   BY MR. PIFKO:
9        Q.   You're not answering the
10  question.  I didn't ask you what your
11  duty was.
12        I asked you if, in carrying
13  out your duty, does AmerisourceBergen
14  consider the impact on the public?
15        MR. NICHOLAS:  Object to the
16  form of the question.  He has been
17  answering the question a number of
18  times.  I suggest that we move on.
19        THE WITNESS:  I think I've
20  answered the question.
21  BY MR. PIFKO:
22        Q.   You haven't.  It's very
23  clear, you have not answered the
24  question.

Page 71

1        MR. NICHOLAS:  Object.
2   That's just a statement.  There's
3   nothing for you to say right now.
4        MR. PIFKO:  Yeah, there is.
5   I've --
6        MR. NICHOLAS:  There's no
7   question pending.
8        MR. PIFKO:  -- I've asked
9   the question and we haven't had an
10  answer.  I've been trying to ask
11  it for the last ten minutes.
12        THE WITNESS:  And I've
13  answered --
14        MR. PIFKO:  And I still
15  haven't gotten an answer --
16        THE WITNESS:  -- the
17  question of what our
18  responsibilities are.
19  BY MR. PIFKO:
20        Q.   I'm not asking you -- but
21  that's not what the question is.
22        A.   That's my answer.
23        Q.   You're not answering the
24  question.  You can't just make up an

Page 72

1   answer to a question that's not being
2   asked.  Let's start over here.
3        I'm trying to ask, does
4   AmerisourceBergen consider public health
5   when it's carrying out its duty to
6   prevent diversion?
7        MR. NICHOLAS:  Object to the
8   form of the question.  Asked and
9   answered.  Outside the scope of
10  the notice.
11        THE WITNESS:  We consider
12  our responsibilities that we're
13  obligated to follow to ensure that
14  products are handled
15  appropriately, safely and securely
16  within the supply channel under
17  our control.
18  BY MR. PIFKO:
19        Q.   Is public health one of
20  those considerations?
21        MR. NICHOLAS:  Object to the
22  form of the question.  Come on.
23        THE WITNESS:  It's not
24  something that -- our

Page 73

1   consideration is how we -- who we
2   purchase the products from, how we
3   store the products and who we
4   distribute those products to.
5        We don't have any effect on
6   the public health through
7   prescriptions that are being
8   written, the pharmacies that are
9   filling them.  We have no control
10  over that.
11        Our responsibility is, in
12  the supply chain, is to ensure
13  that we buy FDA-approved drugs, we
14  keep them securely and we give
15  them to those that dispense those
16  drugs.
17        And the duty that they have,
18  I'm not going to comment on it.
19        And I think I've answered
20  what our responsibility is within
21  the supply chain.
22  BY MR. PIFKO:
23        Q.   And I'm not trying to put
24  answers in your mouth.  I'm trying to

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1  understand what your answer is.
2      A.   But that's my answer.
3      Q.   But my question is, is
4  public health one of those
5  considerations?  Is it or isn't it?
6          You just tell me.  I'm
7  not -- you say whatever answer you want
8  to say.
9          MR. NICHOLAS:  He's answered
10  the question many, many times.
11  You keep asking him the same
12  question over and over.
13          MR. PIFKO:  He's not
14  answering the question.
15          MR. NICHOLAS:  I'll object.
16          MR. PIFKO:  You can object,
17  but he's not answering.
18          MR. NICHOLAS:  I'm
19  objecting.  You're saying he's not
20  answering the question and I'm
21  saying he is and he says he is.
22          THE WITNESS:  I mean, I can
23  restate that again.
24  BY MR. PIFKO:

Page 75

1      Q.   Well, I'll represent to you,
2  you haven't said the word "public health"
3  once when you've talked about what
4  considerations come into
5  AmerisourceBergen's factors when they're
6  complying with the statutes.
7          So I understand from that
8  that public health is not one of those
9  considerations.  Is my understanding
10  correct?
11          MR. NICHOLAS:  Objection.
12  Object to the form of the
13  question.  You're just bullying
14  the witness.
15          THE WITNESS:  Our role
16  within the supply chain is from
17  the manufacturer to
18  the dispenser --
19  BY MR. PIFKO:
20      Q.   I'm not asking what your
21  role is.
22          MR. NICHOLAS:  Don't
23  interrupt him, please.
24          THE WITNESS:  We're not

Page 76

1  selling to the public.
2          So, again, you're asking me
3  a question that doesn't apply on
4  the distribution side, because
5  we're selling it --
6  BY MR. PIFKO:
7      Q.   I'm not asking about
8  compliance.
9          MR. NICHOLAS:  You're
10  interrupting the witness.
11          THE WITNESS:  We're buying
12  it from the manufacturer and we're
13  selling it -- we're selling it to
14  a pharmacy or hospital that has
15  obligations of who they dispense
16  those to and what prescriptions
17  they fill.
18          We're in the middle of the
19  chain.  The public health, we
20  don't deal with the public health.
21  BY MR. PIFKO:
22      Q.   So you don't think about the
23  public health in carrying out your role
24  in the distribution chain, correct?

Page 77

1          MR. NICHOLAS:  Object to the
2  form of the question.
3          THE WITNESS:  I've answered
4  the question several times.  I
5  think I've made it clear what our
6  role is in the distribution --
7  BY MR. PIFKO:
8      Q.   I didn't ask you what your
9  role is.  That's not the question.
10  You've got to answer the question.
11      A.   I did answer the question.
12      Q.   Do you consider public
13  health when you're carrying out your
14  duties under the statute, under The
15  Controlled Substances Act?
16          MR. NICHOLAS:  Objection.
17  I'm going to suggest that the
18  witness does not have to answer
19  this question for the millionth
20  time.
21          MR. PIFKO:  He's not.  This
22  is a yes-or-no question.
23          MR. NICHOLAS:  No, it's not
24  a yes-or-no question.

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    MR. PIFKO:  It is.
2    MR. NICHOLAS:  He does not
3  have to answer any question yes or
4  no.  He's answering the question
5  the way he sees fit.
6  BY MR. PIFKO:
7    Q.   Do you consider public
8  health when you're carrying out your
9  duties under The Controlled Substances
10  Act?
11    MR. NICHOLAS:  Asked and
12  answered.  Same objections.
13    THE WITNESS:  I mean, I
14  am --
15  BY MR. PIFKO:
16    Q.   It's a yes-or-no question.
17    A.   It's not a yes-or-no
18  question.
19    Q.   It is.
20    A.   I've explained it to you,
21  and we can go through it again, of where
22  we fit in the supply channel.
23    Q.   I didn't ask where you fit
24  in the supply channel.

Page 79

1    A.   I know, but --
2    MR. PIFKO:  We're going to
3  call Cohen, because this is pure
4  gamesmanship.
5  You know, sir, I asked him,
6  is public health a consideration
7  in your compliance with the
8  statute?  And he won't answer.
9  He's telling me what his duties
10  are.  I'm not asking.  It's a
11  yes-or-no question.
12    MR. NICHOLAS:  He's answered
13  many, many times.
14    MR. PIFKO:  The court is not
15  going to appreciate answers like
16  this, okay?  It's a
17  plain-and-simple situation.
18  BY MR. PIFKO:
19    Q.   I'm asking you, does public
20  health play into your considerations when
21  you're carrying out your duties under The
22  Controlled Substances Act?
23  It's a yes-or-no question.
24    A.   It's not a yes-or-no

Page 80

1  question.  We can -- I guess we can go
2  back-and-forth here for a while, but we
3  aren't -- we do not distribute to the
4  public.  We distribute --
5    Q.   I didn't ask you if you
6  distribute to the public.
7    A.   I know.  I'm explaining --
8    MR. NICHOLAS:  You're asking
9  about public health.  He's
10  describing the public.
11    THE WITNESS:  I'm
12  explaining -- we don't sell -- the
13  public health -- we don't sell to
14  the public.  We sell to the
15  pharmacies who dispense
16  prescriptions written by doctors.
17  And we buy from manufacturers.
18  We aren't -- we do not
19  distribute to the public health.
20  And you're asking me a question --
21  BY MR. PIFKO:
22    Q.   I didn't ask you if you
23  distribute to the public health.
24  When you carry out your

Page 81

1  duties to maintain effective controls,
2  I'm asking if you consider the impact of
3  them on public health when you carry out
4  your duties?
5    A.   We consider the duties and
6  we ensure that we follow those duties.
7  And that's what we consider.
8  However you want to phrase
9  it, we can -- again, we can discuss this
10  for however long you want to spend on
11  this.  But I think I'm being responsive
12  to your question.  I think I've explained
13  it clearly.  And it's not the answer you
14  might want.
15  But I'm just trying to --
16    Q.   But you're not answering --
17  I don't care.  You can say yes or no.  I
18  don't care what your answer is.
19  You've just -- you've got to
20  say whether public health is a
21  consideration of the company when it's
22  carrying out its duties under The
23  Controlled Substances Act.  That's all
24  I'm asking you.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    A.    And I answered the question.
2    Q.    You didn't.
3    A.    I did answer the question.
4    Q.    You never once said that
5  AmerisourceBergen considers public
6  health --
7    A.    And I explained --
8    Q.    -- when carrying out its
9  duties.
10   A.    I explained our process and
11 I explained what we take into
12 consideration, where we are within the
13 supply chain.
14   Q.    And you agree that public
15 health isn't one of those things?
16        MR. NICHOLAS:  That is not
17   what he said.  But you're just
18   arguing.  I mean, why are you
19   arguing?  Why don't you just ask
20   him --
21        MR. PIFKO:  I'm trying to
22   get your answer to the question.
23        MR. NICHOLAS:  You have a
24   30(b)(6) notice with topics.

Page 83

1        MR. PIFKO:  And he's burning
2    the time.  We've burned 20 minutes
3    here.
4        MR. NICHOLAS:  You're
5    burning the time.  It's Topics A
6    through N.  You haven't started on
7    a single topic.  And you haven't
8    asked him -- shown him a single
9    document.
10        So who is burning the time?
11        MR. PIFKO:  I'm going to ask
12   the question one more time.  And
13   if I don't get an answer, we're
14   going to go and we're going to
15   call the court and we're going to
16   discuss your evasive answers here.
17   Because we're not going to be
18   doing this all day.  And this
19   whole last 20 minutes does not
20   count towards my time on this
21   deposition, because you're just
22   wasting everyone's time here.
23 BY MR. PIFKO:
24   Q.    So again for clarity --

Page 84

1        MR. NICHOLAS:  I agree time
2    is being wasted by you.
3  BY MR. PIFKO:
4    Q.    -- for clarity, the question
5  being asked to you:  In carrying out its
6  duties to prevent diversion of Control II
7  substances under the controlled schedules
8  act -- under The Controlled Substances
9  Act, does AmerisourceBergen consider the
10 impact on the public health?
11        MR. NICHOLAS:  Object to the
12   form.  All my same objections.
13        THE WITNESS:  Again, we
14   ensure that we have products that
15   we distribute to the pharmacies
16   that are made available to the
17   pharmacies to be able to dispense
18   to the public.
19        I'm not sure -- you're
20   asking me a question that I've
21   answered several times, given
22   where we fit in the supply
23   channel, given our
24   responsibilities.  And as the head

Page 85

1    of that department, my job is --
2    my -- what we consider is we
3    consider that those products are
4    handled appropriately and
5    distributed in an appropriate
6    manner to the licensed entities
7    that we sell to.
8        And, you know --
9  BY MR. PIFKO:
10   Q.    Is the impact --
11   A.    That's the answer.
12   Q.    -- on the public health one
13 of those considerations?
14        MR. NICHOLAS:  Object to the
15   form.
16        THE WITNESS:  The impact on
17   the public health is -- is the
18   whole supply channel.
19        You're asking me a question
20   that we don't interface with the
21   public.  You're asking me that --
22   we interface with the pharmacy and
23   the dispenser and we only have our
24   obligations.  And our

Page 86

1  understanding and our part in the
2  supply channel is in that -- in
3  that realm.
4      We aren't in the realm of
5  the patient that's coming in or
6  the doctor writing the
7  prescription or what
8  considerations they take before
9  they write a prescription.  We
10  aren't involved in any of that,
11  and nor should we be.
12      We're responsible for making
13  sure the product gets from the
14  manufacturer to the pharmacy.  And
15  we have an obligation, if there's
16  a suspicious order, to report it.
17      We're not -- we don't have
18  an obligation to vet doctors and
19  understand patient/doctor
20  relationships and all these other
21  areas.  That's not our role in the
22  supply chain.
23  BY MR. PIFKO:
24      Q.   So you don't consider public

Page 87

1  health when you're carrying out your role
2  in the supply chain; is that correct?
3      MR. NICHOLAS:  Object to the
4  form of the question.  You're
5  mischaracterizing --
6  mischaracterizing testimony.
7      THE WITNESS:  I think I've
8  answered the question.
9  BY MR. PIFKO:
10      Q.   I asked you a question.
11      You don't consider public
12  health when you're carrying out your role
13  in the supply chain; is that correct?
14      MR. NICHOLAS:  Object to the
15  form of the question.  All the
16  same reasons.
17      THE WITNESS:  I think I've
18  answered -- I've answered the
19  question.  I mean --
20  BY MR. PIFKO:
21      Q.   Answer that question,
22  please.
23      A.   I did answer that question.
24      Q.   You have not.

Page 88

1      A.   I did.  We consider --
2      Q.   Am I correct that
3  AmerisourceBergen does not consider the
4  public health when carrying out its
5  duties to prevent diversion under The
6  Controlled Substances Act?
7      MR. NICHOLAS:  Object to the
8  form.
9      THE WITNESS:  We consider
10  the -- we consider that pharmacies
11  have product accessible to fill
12  the patients' prescriptions.
13  However you want to interpret
14  that, that's up to you.
15      But that is -- the answer
16  is, our consideration is making
17  sure drugs are available.  If that
18  means taking into consideration
19  the public safety -- or whatever
20  the -- what you're hammering on
21  here, what is the question?
22  BY MR. PIFKO:
23      Q.   Public health.
24      A.   Public health.

Page 89

1      We make sure we have
2  products available that are safe and
3  secure to supply to the pharmacies.  If
4  that means that's considering public
5  health, then that's your interpretation.
6      But to say that we don't
7  have any -- that I haven't answered the
8  question, I don't think that's correct.
9      Q.   How about, you're talking
10  about supplying a prescription, a valid
11  prescription.
12      How about, does
13  AmerisourceBergen consider the public
14  health when trying to prevent Control II
15  substances from getting into illegal
16  hands?
17      MR. NICHOLAS:  Same
18  objection.
19      THE WITNESS:  It's the same
20  question.  It's the same answer as
21  the last question.
22  BY MR. PIFKO:
23      Q.   What's your answer?
24      MR. NICHOLAS:  Same

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  objection.
2      THE WITNESS:  We adhere to
3  our regulatory requirements within
4  the confines of a distributor.
5  And whether that's the
6  consideration of our
7  requirements -- I mean, that's --
8  that is our role.  And that is
9  what we consider.
10      We want to make sure that we
11  only buy from appropriate sources,
12  store correctly, and we only sell
13  to legitimate sources.
14  BY MR. PIFKO:
15      Q.   We talked about how Schedule
16  II substances have a high potential for
17  abuse, correct?
18      A.   They are Schedule II drugs,
19  yes.
20      Q.   And the statute says that
21  Schedule II substances have a high
22  potential for abuse, correct?
23      A.   That's why they're Schedule
24  II, correct.

Page 91

1      Q.   Does AmerisourceBergen
2  consider the impact on the communities it
3  serves if these Schedule II substances
4  get into the wrong hands?
5      MR. NICHOLAS:  Object to the
6  form.  Outside the scope of the
7  30(b)(6) notice as well.
8      THE WITNESS:  Can you
9  restate your question?
10      MR. PIFKO:  Can you read
11  back the question, please?
12          - - -
13      (Whereupon, the court
14  reporter read the following part
15  of the record:
16      "Question:  Does
17  AmerisourceBergen consider the
18  impact on the communities it
19  serves if these Schedule II
20  substances get into the wrong
21  hands?")
22          - - -
23      THE WITNESS:  Again, we
24  consider who -- we consider our

Page 92

1  regulatory responsibilities of who
2  we distribute products to.
3      We can only control what we
4  can control.  We can only control
5  who we sell drugs to.  And we
6  consider the impact to ensure that
7  we only sell to licensed
8  registrants.  And that's the
9  consideration we make and that's
10  our obligation under the
11  regulations.
12  BY MR. PIFKO:
13      Q.   Does AmerisourceBergen
14  believe it has a responsibility to
15  protect people in the communities it
16  serves from falling victim to abuse of
17  Schedule II substances?
18      MR. NICHOLAS:  Object to the
19  form.  It is not an appropriate
20  question in this deposition.  It's
21  outside the scope of the 30(b)(6)
22  notice.
23      THE WITNESS:
24  AmerisourceBergen has its

Page 93

1  obligation to ensure that -- I
2  mean, you're asking the same
3  question, and the answer is the
4  same.
5      We have regulatory
6  responsibilities that are imposed
7  on the distributor that we must
8  adhere to in order to prevent
9  diversion, which we do diligently.
10  And we ensure that the customers
11  that we sell to are appropriately
12  licensed and that -- while those
13  drugs are under our control.
14      That's what we take into
15  consideration and that's what we
16  do diligently.
17  BY MR. PIFKO:
18      Q.   So does the company consider
19  the adverse impacts of substances that it
20  sells in the communities that it sells?
21      A.   Our duty is not to determine
22  the types of the products.  We only sell
23  FDA-approved drugs.  We don't approve the
24  drugs.  We don't schedule the drugs.  We

Page 94

1 don't put them into classifications.  We
2 don't prescribe the drugs.  And we don't
3 dispense the drugs.
4         All we do is make sure we
5 buy the drugs that are ordered from our
6 licensed customers, FDA and DEA-approved
7 drugs, and we distribute to them and make
8 sure that they have the appropriate
9 schedules.
10        We have nothing to do with
11 the approval of drugs.  We have --
12 nowhere in our scope do we have that
13 responsibility, nor should we.
14        MR. PIFKO:  We're going to
15 take a break.
16        VIDEO TECHNICIAN:  Going off
17 the record.  The time is 10:20
18 a.m.
19          - - -
20        (Whereupon, a brief recess
21 was taken.)
22          - - -
23        VIDEO TECHNICIAN:  We're
24 back on record.  The time is 10:35

Page 95

1    a.m.
2 BY MR. PIFKO:
3    Q.   One little housekeeping
4 thing we forgot to talk about, although
5 I'm sure your counsel discussed it with
6 you before your -- when you were
7 preparing for the deposition.
8        But one of the rules of the
9 jurisdiction where we're in is that
10 you're not allowed to confer about the
11 substance of your testimony during our
12 breaks.
13        Do you understand that?
14    A.   Yes.
15    Q.   During the last break, did
16 you confer with your counsel about the
17 substance of your testimony?
18    A.   No.
19    Q.   Do we have an agreement that
20 going forward, you're not going to be
21 doing that during any break?
22    A.   Yes.
23    Q.   Okay.  Great.
24        Do you understand that the

Page 96

1 opioid products at issue in this
2 litigation can be dangerous?
3        MR. NICHOLAS:  Object to the
4 form.
5        THE WITNESS:  They're
6 Schedule -- by Schedule II, they
7 are -- that, by itself, identifies
8 them as such.
9 BY MR. PIFKO:
10    Q.   And because they're highly
11 addictive, right?
12        MR. NICHOLAS:  Object to the
13 form.  This is outside the scope
14 of the 30(b)(6).
15        Are you now -- I do want to
16 start making it very clear on the
17 record when we're on -- in
18 30(b)(6) and when we're not.  I
19 understand he's also testifying as
20 an individual.
21        Can we be clear that this
22 line of questioning, for example,
23 is outside the scope of the
24 30(b)(6) notice?

Page 97

1        MR. PIFKO:  You can object
2 to scope, and we can fight about
3 it later.  I don't think we're
4 going to agree on the record about
5 what's part of it or not.
6        MR. NICHOLAS:  Well, okay.
7 Then I'll just have to keep saying
8 the objection all the time.
9        Object to the scope.
10        Would you mind if I ask
11 you --
12        MR. PIFKO:  Let's just ask
13 the question over again.
14        MR. NICHOLAS:  -- can you
15 identify the section?
16        MR. PIFKO:  I'm not going to
17 get into that right now.
18 BY MR. PIFKO:
19    Q.   I'm going to ask you the
20 question again, sir, so we have a clear
21 record.
22        MR. NICHOLAS:  Well, just
23 since we're making a clear record,
24 for the record, I would ask that

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1  you identify, if you consider this
2  to be within the 30(b)(6) notice,
3  tell us which topic we're within.
4      MR. PIFKO:  Understood.  We
5  can meet and confer about that
6  after the deposition.
7      MR. NICHOLAS:  After the
8  deposition is too late.  The
9  deposition will be over.  But,
10  okay.  I've made my request for
11  the record.
12  BY MR. PIFKO:
13      Q.   So sorry.  Let's start over
14  with that.
15      You testified that the
16  controlled substances at issue in this
17  litigation, the opioid products, are --
18  can be potentially dangerous because
19  they're Schedule II and they are highly
20  addictive, correct?
21      MR. NICHOLAS:  Object to the
22  form.
23      Go ahead.
24      THE WITNESS:  They are

Page 99

1  Schedule II because there's a
2  potential for abuse.
3  BY MR. PIFKO:
4      Q.   And because there's a
5  potential for abuse, that makes --
6  there's a potential danger associated
7  with them, correct?
8      MR. NICHOLAS:  Object to the
9  form.  Outside the scope of the
10  30(b)(6).
11      THE WITNESS:  It's their
12  potential for abuse that makes
13  them a Schedule II and they have
14  additional security requirements.
15  BY MR. PIFKO:
16      Q.   So you don't have any
17  understanding about -- beyond the fact
18  that they're Schedule II, about what that
19  means for these products?
20      MR. NICHOLAS:  Object to the
21  form.  Outside the scope of the
22  30(b)(6).
23      THE WITNESS:  I'm not
24  understanding what your question

Page 100

1  is.
2  BY MR. PIFKO:
3      Q.   We agree that they're
4  Schedule II?
5      A.   Correct.
6      Q.   And we agree that a Schedule
7  II product has been classified by the
8  United States government as highly
9  addictive, agreed?
10      A.   High potential of abuse.  I
11  don't know -- you're saying "addictive."
12  I know the regulatory requirement is
13  abuse.
14      Q.   Do you have an understanding
15  that a product that has a high potential
16  for abuse can be dangerous to people
17  taking it?
18      MR. NICHOLAS:  Object to the
19  form.  Outside the scope of the
20  notice.
21      THE WITNESS:  I'm not -- I'm
22  not a medical doctor.  I can't
23  comment on that.
24  BY MR. PIFKO:

Page 101

1      Q.   So you have no
2  understanding?
3      MR. NICHOLAS:  Object to the
4  form.  Outside the scope.
5      THE WITNESS:  I have no
6  understanding of -- that they have
7  a high abuse potential, yes, I do
8  have an understanding of that.  If
9  that correlates to dangerous, I
10  mean, if that's your correlation.
11  BY MR. PIFKO:
12      Q.   I'm not making -- I'm just
13  asking for your answer.  You can give me
14  whatever answer you'd like, as far as --
15  as long as you answer the question.
16      But my question just was, do
17  you have an understanding that if --
18  because the pills have a high potential
19  for abuse, that they could cause
20  potential danger to people?
21      MR. NICHOLAS:  Objection.
22  Outside the scope.
23      THE WITNESS:  I don't know
24  that for sure.

Highly Confidential - Subject to Further Confidentiality Review

Page 102

BY MR. PIFKO:

1 BY MR. PIFKO:

2 Q. Do you have an understanding

3 that a drug that has a high potential for

4 abuse could cause death to people who

5 consume that drug?

6 MR. NICHOLAS: Objection.

7 Outside the scope.

8 THE WITNESS: I don't know.

9 I don't know.

10 I mean, drugs -- people can

11 overdose on drugs, and I'm aware

12 of that, yes.

13 BY MR. PIFKO:

14 Q. Do you have an understanding

15 that someone is more likely to suffer

16 harm from a Schedule II drug than a drug

17 that's not a Schedule II drug?

18 MR. NICHOLAS: Objection.

19 Outside the scope.

20 THE WITNESS: I don't know

21 that.

22 BY MR. PIFKO:

23 Q. Let's go back to our duties

24 to prevent diversion.

Page 103

1 You recall discussing that?

2 MR. NICHOLAS: Object to the

3 form.

4 THE WITNESS: Yes.

5 BY MR. PIFKO:

6 Q. You agree that

7 AmerisourceBergen has a duty to prevent

8 diversion of controlled -- I keep messing

9 that up.

10 You agree that

11 AmerisourceBergen has a duty to prevent

12 diversion of Schedule II substances?

13 MR. NICHOLAS: Object to the

14 form. I'm not sure it's within

15 the scope either. But I

16 definitely object to the form.

17 THE WITNESS: We have a duty

18 to -- we have an obligation to

19 prevent diversion while the drugs

20 are under our control.

21 BY MR. PIFKO:

22 Q. And if you don't carry out

23 that duty, diversion can occur, correct?

24 MR. NICHOLAS: Objection.

Page 104

1 Outside the scope.

2 THE WITNESS: It calls for a

3 conclusion. I don't know that.

4 BY MR. PIFKO:

5 Q. You don't know either way?

6 A. I don't know --

7 Q. If AmerisourceBergen does

8 not maintain effective controls to

9 prevent diversion of Schedule II

10 substances, they can be diverted,

11 correct?

12 MR. NICHOLAS: Object to the

13 form. Outside the scope.

14 THE WITNESS: Again, if we

15 don't adhere to our effective

16 controls to prevent diversion,

17 yes, diversion could occur.

18 BY MR. PIFKO:

19 Q. Let's discuss some of the

20 company's policies and procedures with

21 respect to diversion.

22 Before we do that, do you

23 agree that the laws and regulations with

24 respect to preventing diversion remain --

Page 105

1 have remained unchanged for the last 45

2 years?

3 MR. NICHOLAS: Object to the

4 form. Outside -- definitely

5 outside the scope.

6 THE WITNESS: The CSA was

7 passed in 1970 and in -- the

8 federal regulations that regulate

9 our responsibilities have not

10 changed.

11 BY MR. PIFKO:

12 Q. So it's your understanding

13 that there haven't been changes with

14 respect to the duties to prevent

15 diversion since the passage of the

16 statute?

17 MR. NICHOLAS: Object to the

18 form. Outside the scope. You're

19 asking him a legal question.

20 THE WITNESS: The

21 regulatory -- the regulations have

22 not changed.

23 BY MR. PIFKO:

24 Q. So AmerisourceBergen has the

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1  same duty under the regulations today as
2  it did in 1990, correct?
3        MR. NICHOLAS:  Object to the
4    form.  You're asking him a legal
5    question.  Outside the scope.
6        THE WITNESS:  We have a
7    requirement to have effective
8    controls to prevent diversion.
9  BY MR. PIFKO:
10    Q.    And that requirement hasn't
11  changed since the passage of The
12  Controlled Substances Act, correct?
13        MR. NICHOLAS:  Object to the
14    form.  Calls for a legal
15    conclusion.  Outside the scope.
16        THE WITNESS:  I'm not aware
17    if the regulations have changed.
18  BY MR. PIFKO:
19    Q.    You're familiar with the --
20  AmerisourceBergen's practices and
21  procedures under The Controlled
22  Substances Act going back to the '80s,
23  correct?
24    A.    The '90s.

Page 107

1    Q.    Okay.  The '90s.
2        And you testified about the
3  company's practices with respect to
4  preventing diversion dating back to the
5  '90s in connection with the West Virginia
6  litigation, correct?
7        MR. NICHOLAS:  Objection.
8    Outside the scope.
9        Go ahead.
10        THE WITNESS:  I don't
11    remember, but --
12  BY MR. PIFKO:
13    Q.    You testified in 2006,
14  correct?
15    A.    2006?
16    Q.    '16, sorry.
17    A.    Yes.
18    Q.    In preparing for this
19  deposition, did you review your
20  transcript of that proceeding?
21    A.    I looked at it, yes.
22    Q.    When was the last time you
23  looked at it?
24    A.    A couple of weeks ago.

Page 108

1    Q.    Sorry, I'm not quite as
2  organized as I want to be.
3        From the time you started
4  with AmerisourceBergen -- let's back up.
5        You started working for
6  AmerisourceBergen in the 1990s?
7    A.    January, correct.
8    Q.    Do you remember the exact
9  date and year?
10    A.    January 2nd, 1990.
11    Q.    Okay.  From the time that
12  you started with AmerisourceBergen until
13  about 1998, AmerisourceBergen's
14  monitoring protocol was that every order
15  that exceeded the threshold was deemed to
16  be suspicious, correct?
17        MR. NICHOLAS:  Object to the
18    form.  Outside the scope.
19        THE WITNESS:  So when I
20    started with the company, the
21    process was a two-step process.
22    It was an excessive order report
23    that was produced monthly to send
24    to DEA, and then we also had a

Page 109

1    manual process at the distribution
2    centers where the order fillers
3    would identify suspicious orders
4    and report those.
5  BY MR. PIFKO:
6    Q.    And the orders were reported
7  after they were shipped, correct?
8        MR. NICHOLAS:  Object to the
9    form.  Outside the scope.
10        THE WITNESS:  Correct.
11  BY MR. PIFKO:
12    Q.    Prior to 2007,
13  AmerisourceBergen's system shipped all
14  orders at night and reported any orders
15  that it deemed to be suspicious the next
16  day, correct?
17        MR. NICHOLAS:  Objection.
18    Outside the scope.
19        THE WITNESS:  That was the
20    program that we developed in
21    conjunction with DEA over a
22    two-year process, that we tested a
23    new -- a process of reporting
24    suspicious orders that we

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1   developed with DEA and then worked
2   with them for two years testing
3   the program until they approved
4   the program in '98.
5   BY MR. PIFKO:
6       Q.   I'm not asking for
7   approvals, or I didn't ask you the
8   formulation for the policy.  I just asked
9   if that was a correct statement about
10  what the practice was.
11          So I'll just -- let's get a
12  clear answer to the question.
13      A.   That was the practice that
14  we did in conjunction with DEA's
15  guidance.
16      Q.   Just so we have a clear
17  record, the practice was to ship the
18  orders at night, and then the next day
19  any orders that were identified as
20  suspicious were then reported to the DEA;
21  is that correct?
22      A.   Correct.
23      Q.   Are you familiar with the
24  term "threshold"?

Page 111

1       A.   Yes.
2       Q.   That's an attribute of your
3   suspicious order monitoring system,
4   correct?
5           MR. NICHOLAS:  Object to the
6       form.
7           THE WITNESS:  You need to
8       put it into context of time,
9       because the program has been
10      enhanced over the years.
11  BY MR. PIFKO:
12      Q.   Well, for the time period
13  for which you're here to testify, which
14  ends in 2014, at all times there's been
15  some threshold requirement in the system,
16  correct?
17      A.   Correct.
18      Q.   Can you tell me what a
19  threshold is?
20          MR. NICHOLAS:  Object to the
21      form.
22          THE WITNESS:  A threshold is
23      the -- is a trigger that we have
24      put into the program to create --

Page 112

1   to identify an order of interest
2   for further review.
3   BY MR. PIFKO:
4       Q.   And so the threshold is the
5   first step in the suspicious order
6   monitoring program, correct?
7           MR. NICHOLAS:  Object to the
8       form.
9           THE WITNESS:  It is a step.
10  BY MR. PIFKO:
11      Q.   Is there a step before the
12  threshold?
13      A.   We train our employees at
14  the distribution centers also to be aware
15  of, and train them on suspicious orders.
16  And if they identify a suspicious order,
17  they're to report it.
18      Q.   The threshold is a key
19  factor that's used to identify
20  potentially suspicious orders, correct?
21          MR. NICHOLAS:  Object to the
22      form.
23          THE WITNESS:  It's an
24      identifier that we use

Page 113

1   systematically to trigger a
2   potential order of interest.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 118

BY MR. PIFKO:

18  BY MR. PIFKO:
19      Q.  And the other way an order
20  can be identified as an order of interest
21  is if it exceeds a threshold that's
22  defined by AmerisourceBergen?
23      MR. NICHOLAS:  Object to the
24  form.

Page 119

1      THE WITNESS:  There's a
2  threshold that identifies a
3  potentially -- an order of
4  interest, not a suspicious order.
5  And that is -- that is determined
6  by a threshold.
7  BY MR. PIFKO:
8      Q.  Are there any other ways an
9  order can be identified as an order of
10  interest?
11      MR. NICHOLAS:  Object to the
12  form.
13      I really would appreciate,
14  for the record, some clarity as to
15  the time frame that we're talking
16  about.
17      Are you still unwilling to
18  do that?  It seems very -- it
19  seems very plain vanilla.
20      MR. PIFKO:  We're talking
21  about the time period for which
22  you were designated, sir.
23      THE WITNESS:  Not that I am
24  aware of.

Page 120

1  BY MR. PIFKO:
2      Q.  Let's talk about the
3  pre-2007 period and thresholds within
4  that period.
5      Do you have an understanding
6  of how AmerisourceBergen calculated
7  thresholds before 2007?
8      MR. NICHOLAS:  Objection.
9  Outside the scope.
10      These are being answered in
11  his individual capacity.
12      THE WITNESS:  In what time
13  period?
14  BY MR. PIFKO:
15      Q.  Well, let's start, you
16  testified in West Virginia that there
17  were certain changes made with respect to
18  the calculation of thresholds from the
19  1990s to 2007, correct?
20      MR. NICHOLAS:  Same
21  objection.
22      THE WITNESS:  There was a
23  change in '98.
24  BY MR. PIFKO:

Page 121

1      Q.  Okay.  Before 1998, what was
2  the method of calculating a threshold at
3  AmerisourceBergen?
4      MR. NICHOLAS:  Same
5  objection.  Outside the scope of
6  the 30(b)(6).
7      THE WITNESS:  The method of
8  calculating the threshold prior to
9  that was that you would -- all
10  pharmacies would be in one
11  category, hospitals would be in
12  another category.  You take all
13  the pharmacies within that
14  category and divide by the number
15  of pharmacies to come up with an
16  average volume for the month per
17  drug category.  And then there was
18  a multiplier of three.  Any order
19  that was over the threshold amount
20  would be produced an excessive
21  order report.
22  BY MR. PIFKO:
23      Q.  But it would still be
24  shipped?

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1   A.   The product?
2   Q.   Yes.
3   A.   Yes.
4   Q.   After 1998, what was the
5   practice with respect to calculating
6   thresholds?
7       MR. NICHOLAS:  Same
8   objection.  Outside the scope.
9       THE WITNESS:  So in 1996, we
10  worked with DEA, for two years,
11  on -- in order to provide DEA with
12  more -- we feel, more accurate
13  information, that we worked on a
14  project to where we would identify
15  a customer based upon its own
16  purchase history versus all
17  pharmacies in one big bucket.
18      And then we calculated a
19  rolling four-month average of that
20  pharmacy's purchases.  And then
21  created a multiplier of three to
22  identify a trigger that would
23  identify a suspicious order.
24  BY MR. PIFKO:

Page 123

1   Q.   That practice was in place
2   from 1998 to when?
3       MR. NICHOLAS:  Object to
4   the -- objection.  Scope.  Same
5   objection as I've been stating.
6       THE WITNESS:  So that -- so
7   once we got approval from DEA to
8   enact that program nationally, we
9   tested it for -- with one DEA
10  office and then several, and then
11  Washington, D.C. approved it for
12  national use throughout in 1998.
13      And that was the practice
14  until 2007.
15  BY MR. PIFKO:
16  Q.   So to be clear, from 2007 --
17  I'm sorry, from 1998 to 2007, the
18  practice was to take a specific
19  customer's order history over the prior
20  four-month period and then average the
21  order history and multiply that by three,
22  and that would be its threshold, correct?
23  A.   That was the agreed-upon
24  process through our testing with DEA over

Page 124

1   that two-year period.
2       We continued to make changes
3   in the program, and that was the final
4   calculation that we came up with.
5   Q.   And that calculation was
6   used from 1998 to 2007?
7   A.   Yes.
8   Q.   Something happened in 2007,
9   correct?
10  A.   Yes.
11  Q.   You had an enforcement
12  action brought against you by the DEA,
13  correct?
14  A.   Correct.
15  Q.   The three times multiplier,
16  where does that come from?  Scratch that
17  question for a second.
18      You agree that throughout
19  the time period we just discussed, from
20  the 1990s to 2007, there was always a
21  three times multiplier used in connection
22  with calculating the threshold, correct?
23  A.   So for -- so from 1990 to
24  '98, the excessive report for ARCOS

Page 125

1   items, which would be your Schedule II
2   and reportable IIIs had a three times
3   multiplier.  Non-ARCOS items, I think it
4   might have been six; it might have been a
5   higher multiplier.
6       Our program that we
7   implemented in '98 set them all at three.
8   Q.   And do you know what the
9   methodology was in calculating that three
10  times multiplier?
11      MR. NICHOLAS:  Object to the
12  form.  And same objection, as to
13  outside -- as to the scope here of
14  all these questions.
15      THE WITNESS:  So the three
16  times multiplier had been in place
17  when I came on board in 1990.  And
18  that was the program that we were
19  submitting and working with DEA in
20  1990 all the way up to '96.
21      And then when we started to
22  work on the new program in
23  conjunction with DEA and testing
24  it and refining it for that

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 two-year period, the three times
2 multiplier was the multiplier that
3 we -- that, in conjunction with
4 the DEA, decided to use.
5 BY MR. PIFKO:
6    Q.   So you don't know where it
7 came from, because it was already in
8 place when you started at the company?
9        MR. NICHOLAS:  Object to the
10 form.  Outside the scope.
11        THE WITNESS:  It was --
12 correct, it was in place.
13        And then in '96, '7, '8,
14 right in that time period, the
15 Methamphetamine Control Act was
16 passed.  And part of that act
17 required the -- it didn't require,
18 it mandated a Suspicious Order
19 Task Force to come up with a
20 process to identify suspicious
21 orders and report it to DEA.
22        I participated on that task
23 force, and that was what came up.
24 And it was with enforcement,

Page 127

1 state, federal and industry.  And
2 we met quarterly.  And the
3 Suspicious Order Task Force
4 mandated by the Methamphetamine
5 Control Act came up with the same
6 process with the three times
7 multiplier.  And that's the same
8 one we used, which kind of is in
9 line with what we used in '90,
10 what we used in '98, and what we
11 implemented in 2007.
12 BY MR. PIFKO:
13    Q.   And so your three times
14 multiplier came from being involved with
15 the task force on -- what did you say?
16 The Methamphetamine Act?
17    A.   The three time --
18        MR. NICHOLAS:  Object to the
19 form.  Scope.
20        Go ahead.
21        THE WITNESS:  So the three
22 times multiplier was already in
23 place in 1990, and those were the
24 reports we were submitting to DEA.

Page 128

1        And then in '96, when we
2 started working with DEA, we came
3 up and we mutually decided on a
4 three times multiplier.
5        And then the Suspicious
6 Order Task Force was assembled
7 and, again, through their meetings
8 with enforcement agencies and
9 regulators and industry, they came
10 up with a process to identify
11 systematic -- a systematic
12 approach for reporting suspicious
13 orders, and that was a three times
14 multiplier as well.
15 BY MR. PIFKO:
16    Q.   This three times multiplier
17 that you relied on through this task
18 force, was there any written
19 documentation establishing that?
20    A.   It was in the chemical
21 handling handbook published by the DEA.
22    Q.   And that's a document that
23 you relied on for the three times
24 multiplier?

Page 129

1    A.   That was --
2        MR. NICHOLAS:  Same
3 objection.  Objections to the form
4 and outside the scope.
5        Go ahead.
6        THE WITNESS:  Again, what
7 time frame are you talking about?
8        When we worked with DEA, we
9 relied on our negotiations with
10 DEA.  And then in 2007, when we
11 were implementing a new enhanced
12 program, again, in conjunction
13 with DEA, we came up with the
14 three times multiplier.  Referring
15 back to the handling manual that
16 was published by DEA, has --
17 identifying a suspicious order
18 systematically, it was three times
19 multiplier.
20 BY MR. PIFKO:
21    Q.   So what I'm asking you is,
22 the three times multiplier that you're
23 relying on with respect to the handling
24 manual that was published by DEA,

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 that's -- what that's called?
2     A.   Your question is what the
3 manual is called?  Chemical handling
4 guide, I believe.  I can't -- I don't
5 know the exact name.  It was also on the
6 DEA's website for some time.
7     Q.   Did you produce a copy of
8 that guide, to your knowledge?
9         MR. NICHOLAS:  Who are you
10 talking about?  Are you talking
11 about --
12         MR. PIFKO:  The company.
13         MR. NICHOLAS:  -- in this
14 litigation?
15         MR. PIFKO:  Yes.
16         THE WITNESS:  In this --
17         MR. NICHOLAS:  Objection.
18 BY MR. PIFKO:
19     Q.   If you know.
20     A.   I don't know.
21         MR. NICHOLAS:  For the
22 record, since the implication is
23 that maybe we were supposed to
24 produce the document or

Page 131

1 something --
2         MR. PIFKO:  No accusations.
3 Just asking.
4         MR. NICHOLAS:  Good.  It's a
5 DEA document prior to 2006.
6             - - -
7         (Whereupon, Amerisource
8 Bergen-Zimmerman Exhibit-4, 2001
9 Chemical Handler's Notebook, was
10 marked for identification.)
11             - - -
12 BY MR. PIFKO:
13     Q.   I'm handing you what's
14 marked as Exhibit-4.
15     A.   Thank you.
16     Q.   Do you have Exhibit-4 in
17 front of you?
18     A.   Uh-huh.
19     Q.   Are you reviewing Exhibit-4?
20     A.   Yes.
21     Q.   Have you seen this document
22 before?
23     A.   I've seen a version of it.
24 I'm not sure what version this is.

Page 132

1     Q.   I'll represent to you that
2 this is the 2001 version.
3     A.   Okay.
4     Q.   Do you believe you've seen
5 this before?
6     A.   I've seen -- I don't know if
7 I've seen this version, but I've seen it.
8     Q.   And when you refer to the
9 Chemical Handler's Manual, this is what
10 you're referring to?
11     A.   Yes.  And, again, it was
12 also on the website as well.
13     Q.   When you talk about the
14 three times multiplier -- there's page
15 numbers on the bottom here, Page 43.
16 They are side-by-side columns, Appendix
17 E-3.
18         Can you turn to that?
19     A.   Uh-huh.
20     Q.   Are you there?
21     A.   Yes.
22     Q.   On Page 43, the page on the
23 right, you see there it says, Suspicious
24 order reporting system for use in

Page 133

1 automated tracking systems.
2         Do you see that?
3     A.   What page are you on?
4     Q.   It's 43 on the very bottom.
5     A.   Okay.
6     Q.   Are you there?
7     A.   Yes.
8     Q.   Appendix E-3.
9         Do you see that at the top
10 of that page?  Is that the page you're
11 looking at?
12     A.   Yes.
13     Q.   And it says, Suspicious
14 order reporting system for use in
15 automated tracking systems.
16         Do you see that?
17     A.   Yes.
18     Q.   Okay.  Is this where the
19 three times multiplier that you were
20 talking about comes from?
21     A.   This is -- yeah, the basis
22 of it.
23     Q.   And it says there -- there's
24 terms and definitions and then it's got

Page 134

1 these numbers, 1, 2, 3, 4.  And then it
2 has, Note.
3        Do you see that?
4    A.   Yes.
5    Q.   And it says, Factor equals
6 3.
7        Do you see that?
8    A.   Yes.
9    Q.   Is that what you were
10 talking about?
11   A.   Yes.
12   Q.   And you worked with the task
13 force that was responsible for coming up
14 with this manual?
15   A.   I participated on it.  I
16 wasn't the -- the industry could have one
17 member, but there was a group of people
18 within the industry.
19   Q.   Did you help in drafting any
20 of the language that was in the manual?
21   A.   I don't recall.
22   Q.   Do you recall if the DEA
23 asked you for comment on the final
24 version of the manual?

Page 135

1    A.   I don't.
2    Q.   Your work on this task force
3 was through the Healthcare Distribution
4 Alliance, which I guess was under a
5 different name at that time?
6    A.   They had the -- yeah, there
7 was -- I think there was one member, one
8 slot on the task force for the
9 wholesaler.  It was through the HDMA at
10 the time, I believe it was called.
11   Q.   And so the DEA said that the
12 HDMA could have a member participate on
13 the task force, and you were the selected
14 member; is that correct?
15   A.   No.
16        MR. NICHOLAS:  Objection to
17   the form.
18        Go ahead.
19        THE WITNESS:  No.  No, I was
20   not.  I said I participated.  The
21   group --
22 BY MR. PIFKO:
23   Q.   There was someone else who
24 was the HDMA member?

Page 136

1    A.   There was a designee of one
2 person.  It wasn't me.  I wasn't the
3 one-person designee.
4    Q.   Do you know who that was?
5    A.   I don't.
6    Q.   Do you know what company
7 they worked for?
8    A.   I want to say it was
9 Cardinal or McKesson, but I'm not sure.
10 It wasn't ABC.
11   Q.   Did you work with anyone
12 from Cardinal or McKesson -- so I asked
13 you who the designated person was, and
14 you said maybe it was Cardinal or
15 McKesson.
16        Setting aside who the
17 designated person was, when you were
18 involved with this task force, did you
19 work with anyone from McKesson or
20 Cardinal on the task force?
21        MR. NICHOLAS:  Object to the
22   form.  Scope.
23        Go ahead.
24        THE WITNESS:  I can't

Page 137

1   remember who specifically was
2   involved.
3 BY MR. PIFKO:
4    Q.   But you generally feel like
5 maybe McKesson or Cardinal was involved?
6        MR. NICHOLAS:  Object to the
7   form.
8        THE WITNESS:  Again, I don't
9   know exactly who was involved.  I
10   wouldn't be comfortable saying who
11   exactly that would be.
12 BY MR. PIFKO:
13   Q.   In 2007, there was a DEA
14 enforcement action against
15 AmerisourceBergen, correct?
16   A.   Yes.
17        - - -
18        (Whereupon, Amerisource
19   Bergen-Zimmerman Exhibit-5,
20   ABDCMDL 00279854-54, was marked
21   for identification.)
22        - - -
23 BY MR. PIFKO:
24   Q.   I'm handing you what is

Page 138

1  marked as Exhibit-5. This is a document
2  Bates labeled ABDCMDL 00279854 to 65.
3        Have you seen this document
4  before?
5      A.   Yes.
6      Q.   Can you tell me what this
7  is?
8      A.   This is our settlement and
9  release agreement with the DEA for
10  Orlando distribution center.
11      Q.   So as a result of the
12  enforcement action with the DEA, this was
13  the agreement that was reached between
14  AmerisourceBergen and the DEA, correct?
15        MR. NICHOLAS: Object to the
16      form.
17        THE WITNESS: This is the
18      agreement, yes, that was made
19      after the order to show cause.
20  BY MR. PIFKO:
21      Q.   Was there any money paid,
22  under this agreement, from
23  AmerisourceBergen to the United States
24  government?

Page 139

1      A.   No.
2      Q.   But as a result of this
3  agreement, AmerisourceBergen changed its
4  suspicious order monitoring program,
5  correct?
6        MR. NICHOLAS: Object to the
7      form.
8        Go ahead.
9        THE WITNESS: It modified
10      the existing program, yes.
11  BY MR. PIFKO:
12      Q.   Can you tell me how the
13  agreement modified the existing program?
14        MR. NICHOLAS: Object to the
15      form.
16        THE WITNESS: So through
17      negotiations with DEA and in
18      enhancing our existing order
19      monitoring program that we had in
20      place at the time, DEA wanted us
21      to include a more in-depth due
22      diligence process in addition to
23      ensuring that we only distribute
24      products to licensed individuals.

Page 140

1        And they also wanted us to
2  modify our suspicious order
3  monitoring program to stop orders
4  that we believed -- stop orders
5  that could possibly be suspicious
6  and then to any suspicious -- any
7  order we deem suspicious should
8  not be shipped.
9  BY MR. PIFKO:
10      Q.   Did AmerisourceBergen agree
11  to do that?
12      A.   We modified our program per
13  this agreement, correct.
14      Q.   Can we refer to this
15  agreement as the shipping requirement?
16        MR. NICHOLAS: Object to the
17      form.
18  BY MR. PIFKO:
19      Q.   If I say "shipping
20  requirement," can we have an
21  understanding that I'm referring to the
22  idea that you're not supposed to ship an
23  order that's deemed to be suspicious?
24        MR. NICHOLAS: I'll object

Page 141

1  to the form.
2        I want to understand, are
3      you asking the witness if
4      heretofore we can refer to this
5      agreement as the shipping
6      requirement? Because if so, I'd
7      object to that.
8  BY MR. PIFKO:
9      Q.   Do you understand the
10  question?
11      A.   Do you want to repeat it?
12      Q.   All I'm asking is if, for
13  ease of reference, going forward, we can
14  refer to the idea that you don't ship an
15  order that's been identified as
16  suspicious as the shipping requirement?
17        MR. NICHOLAS: I'll object
18      to the form. And the language.
19        THE WITNESS: We never --
20      the shipping requirement was never
21      discussed in this document and is
22      not a term that we had used in
23      presentations or requirements.
24        We chose, through our work

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1 with the DEA, that if we
2 defined -- ABC defined an order as
3 suspicious, that we would report
4 it and would not ship it.
5 BY MR. PIFKO:
6     Q.   Did DEA ever tell you that
7 there was a -- prior to entering into
8 this agreement, did DEA ever tell you
9 that an order that's suspicious should
10 not be shipped?
11        MR. NICHOLAS:  Object to the
12     form.
13        THE WITNESS:  Did DEA ever
14     tell us?  No.
15 BY MR. PIFKO:
16     Q.   We talked about this
17 Chemical Handler's Manual and how it
18 provided guidance on the three times
19 threshold requirement, correct?
20     A.   Yes.
21     Q.   Did you take any guidance
22 from that manual about the idea of not
23 shipping an order that's deemed to be
24 suspicious?

Page 143

1        MR. NICHOLAS:  Object to the
2     form.  Outside the scope.
3        THE WITNESS:  No.
4 BY MR. PIFKO:
5     Q.   Let's take a look at that
6 manual again.  I'd like to direct your
7 attention to Page 21 of that document.
8 Exhibit-4, for the record.
9        Looking at the second full
10 paragraph of Page 21, can you read that
11 to me?
12     A.   On Page 21?  You want me to
13 read it out loud?
14     Q.   Yes, please.
15     A.   When a regulated person
16 suspects that an order may be intended
17 for illicit purposes, good practice
18 requires that every reasonable effort be
19 made to resolve those suspicions.  In
20 addition to making the required reports,
21 the transaction should not be completed
22 until the customer is able to eliminate
23 the suspicions.  The distributor may have
24 to forego some transactions.

Page 144

1     Q.   That's good.  Thank you.
2     A.   Do you want me to read the
3 whole thing?
4     Q.   That's all I was asking you
5 to read.
6        MR. NICHOLAS:  You asked him
7     to read the whole thing.
8        MR. PIFKO:  You can read to
9     yourself the rest of that
10     paragraph, if you please.  But all
11     I wanted you to read for the
12     record was that portion.
13        MR. NICHOLAS:  You asked
14     him, for the record, to read the
15     whole paragraph.  Are you now
16     telling him you don't want him to
17     read the whole paragraph?
18        MR. PIFKO:  You don't need
19     to read any more.
20 BY MR. PIFKO:
21     Q.   Did you ever consider
22 foregoing some transactions, as a result
23 of reading this document?
24        MR. NICHOLAS:  Object to the

Page 145

1     form.  Outside the scope.
2        THE WITNESS:  No.
3        - - -
4        (Whereupon, Amerisource
5     Bergen-Zimmerman Exhibit-6,
6     ABDCMDL 00269683-694, was marked
7     for identification.)
8        - - -
9 BY MR. PIFKO:
10     Q.   I'm handing you what has
11 been marked as Exhibit-6.  For the
12 record, these are a series of letters
13 from the Department of Justice, Bates
14 labeled ABDCMDL 00269683 to 694.
15        For the record, there's four
16 letters in this packet.  This is how they
17 were produced.  They are dated -- the one
18 in the back is the earliest, it's on Page
19 ABDCMDL 00269691, and it's dated
20 September 27th, 2006.  And there's
21 another one dated February 7th, 2007;
22 another one dated December 27th, 2007;
23 and another one with a stamp on it, June
24 12th, 2012.

Page 146

1    Have you seen these before?
2    A.   I have.
3    Q.   These are what we refer to
4  as the Dear Registrant letters.
5    Have you heard that term
6  before?
7    A.   I have, since -- yep.  Yes.
8    Q.   Did AmerisourceBergen
9  receive these letters from the Department
10  of Justice?  Let's start with the first
11  one, dated September 27th, 2006, Bates
12  label ABDCMDL 00269691.
13    Are you there?
14    A.   Yes.
15    Q.   Okay.  Did AmerisourceBergen
16  receive a copy of this letter?
17    A.   I believe one or more of our
18  distribution centers did.
19    Q.   When you were at the
20  company, at that time, did you receive a
21  copy of that letter?
22    A.   I eventually saw a copy of
23  the letter.  I never received one from
24  DEA.

Page 147

1    Q.   But someone in the company
2  provided one to you?
3    A.   Yes.
4    Q.   And it was on or around the
5  time of the letter?
6    A.   It was some time after.  I
7  don't recollect how far after.
8    Q.   Like a month after, or less?
9    A.   It could have been a month
10  or two.
11    Q.   But not, like, a year later?
12    MR. NICHOLAS:  Object to the
13    form.
14    THE WITNESS:  Not that I
15    recollect.
16  BY MR. PIFKO:
17    Q.   I want to point you to some
18  provisions in this letter.  There's a
19  heading, Background.
20    Do you see that?
21    A.   What page are you on?
22    Q.   On ABDC 00269691.
23    MR. NICHOLAS:  Could the
24    witness have the opportunity to

Page 148

1    just review the letter before you
2    ask -- before he's asked questions
3    about portions of it?
4    MR. PIFKO:  You can review
5    the letter.
6  BY MR. PIFKO:
7    Q.   Do you believe this a --
8  while you're reviewing it, do you believe
9  this is a true and correct copy of the
10  September 27th, 2006 letter from the
11  Department of Justice?
12    MR. NICHOLAS:  Object to the
13    form.
14    THE WITNESS:  It looks the
15    same.
16  BY MR. PIFKO:
17    Q.   And this is something that
18  the company would have maintained in its
19  files in the ordinary course of business?
20    MR. NICHOLAS:  Could you let
21    him finish reading the letter,
22    please, before you ask?
23  BY MR. PIFKO:
24    Q.   I just wanted to ask you

Page 149

1  about a couple of provisions in the
2  letter.
3    A.   Just one second.
4    Okay.
5    Q.   My last question was, is
6  this letter something that would have
7  been maintained by the company in the
8  ordinary course of business?
9    A.   We would have it.
10    Q.   So let's go to the first
11  page of this letter which, again, for the
12  record, is ABDCMDL 00269691.
13    Are you there?
14    A.   Page 1, yes.
15    Q.   Okay.  There's a heading
16  here, Background.
17    Do you see that?
18    A.   Oh, yes.  At the top.  Yes.
19    Q.   It says, As each of you is
20  undoubtedly aware, the abuse (nonmedical
21  use) of controlled prescription drugs is
22  a serious and growing health problem in
23  this country.
24    Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    A.   Yes.
2    Q.   Do you agree that the DEA
3  communicated that to AmerisourceBergen on
4  September 27th, 2006?
5         MR. NICHOLAS:  Object to the
6    form.
7         THE WITNESS:  So it states.
8    It's stated in the letter.
9  BY MR. PIFKO:
10   Q.   And you agree that the
11 Department of Justice communicated that
12 to AmerisourceBergen?
13        MR. NICHOLAS:  Object to the
14   form.
15        THE WITNESS:  We received
16   this letter, yes.
17 BY MR. PIFKO:
18   Q.   The letter also says, The
19 CSA was designed by Congress to combat
20 diversion by providing for a closed
21 system of drug distribution in which all
22 legitimate handlers of controlled
23 substances must obtain a DEA
24 registration, and as a condition of

Page 151

1  maintaining such registration, must take
2  reasonable steps to ensure that their
3  registration is not being utilized as a
4  source of diversion.
5         Do you see that?
6    A.   Yes.
7    Q.   Do you agree with that
8  statement?
9         MR. NICHOLAS:  Object to the
10   form.
11        THE WITNESS:  We have a
12   responsibility to make sure we
13   have adequate controls to prevent
14   diversion, yes.
15 BY MR. PIFKO:
16   Q.   And so you agree with the
17 characterization here in this letter?
18        MR. NICHOLAS:  Object to the
19   form.  The letter is the letter.
20        THE WITNESS:  I agree that
21   we must adhere to our regulatory
22   requirements under the Code of
23   Federal Regulations.
24 BY MR. PIFKO:

Page 152

1    Q.   It then says, If the closed
2  system is to function properly as
3  Congress envisioned, distributors must be
4  vigilant in deciding whether a
5  prospective customer can be trusted to
6  deliver controlled substances only for
7  lawful purposes.
8         Do you see that?
9    A.   I do.
10   Q.   Do you agree with that
11 statement?
12        MR. NICHOLAS:  Object to the
13   form.
14        THE WITNESS:  I think -- I
15   think there's a lot of inference
16   there.
17 BY MR. PIFKO:
18   Q.   In what way?
19   A.   Congress -- he's indicating
20 what Congress envisioned.  I'm not sure
21 what they're basing -- I'm not sure where
22 they're drawing that from.
23   Q.   So you don't agree with that
24 statement?

Page 153

1         MR. NICHOLAS:  That's not
2    what he said.  Objection.
3         THE WITNESS:  I'm just
4    stating that there's a statement
5    made in there that Congress
6    envisioned what the scope was.
7         And I'm not sure what
8    they're basing that upon.  If I
9    could see some documentation of
10   what Congress indicated as the --
11   you know, of our duty of
12   vigilant -- deciding whether a
13   customer can be trusted to
14   deliver, that's what they
15   envision, I'd like to know in what
16   context.
17 BY MR. PIFKO:
18   Q.   I'm just asking if -- I'm
19 not asking you what DEA meant.
20        I'm asking, based on your
21 understanding of what that sentence
22 means, do you agree with it?
23   A.   I don't know --
24        MR. NICHOLAS:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1  form.
2      THE WITNESS:  I don't know
3  what they envisioned.  I don't
4  know what they're basing that on.
5      You're asking me to make a
6  conclusion off of something I
7  don't have all the facts about.
8  BY MR. PIFKO:
9      Q.   So you don't have an
10 understanding either way about whether
11 distributors must be vigilant in deciding
12 whether a prospective customer can be
13 trusted to deliver controlled substances
14 only for lawful purposes?
15     A.   We need --
16     MR. NICHOLAS:  Object to the
17 form.
18     Go ahead.
19     THE WITNESS:  We need to
20 ensure that the customers that we
21 sell to have been appropriately
22 licensed and in good standing with
23 DEA and the Boards of Pharmacy.  I
24 agree with that.

Page 155

1  BY MR. PIFKO:
2      Q.   It says, Congress has
3  expressly declared that the illegal
4  distribution of controlled substances has
5  a substantial and detrimental effect on
6  the health and general welfare of the
7  American people.
8      Do you see that?
9      A.   Yes.
10     Q.   Do you agree with that
11 statement?
12     MR. NICHOLAS:  Object to the
13 form.
14 BY MR. PIFKO:
15     Q.   It's cites 21 USC.8012.
16     A.   If Congress has expressly
17 declared that, then I agree that Congress
18 expressly declared that there's a
19 substantial and detrimental effect to the
20 American wellbeing.
21     Q.   Do you have an understanding
22 that in attempting to prevent illegal
23 distribution of controlled substances,
24 the company's actions can have an impact

Page 156

1  on the health and general welfare of the
2  American people?
3      MR. NICHOLAS:  Object to the
4  form.
5      THE WITNESS:  Can you just
6  restate that?
7  BY MR. PIFKO:
8      Q.   I said, do you have an
9  understanding that in attempting to
10 prevent illegal distribution of
11 controlled substances, that the company's
12 actions can have an impact on the health
13 and general welfare of the American
14 people?
15     MR. NICHOLAS:  Object to the
16 form.
17     THE WITNESS:  Yeah, I -- can
18 you break it into two or three
19 questions?  Because you lumped a
20 lot in there.  Can you --
21 BY MR. PIFKO:
22     Q.   What part is tricking you
23 up?
24     A.   The first part.

Page 157

1      Q.   We agree that
2  AmerisourceBergen has a duty to take
3  actions to prevent illegal distribution
4  of controlled substances, agree?
5      MR. NICHOLAS:  Object to the
6  form.
7      THE WITNESS:  We have a duty
8  to make sure that we follow our
9  regulatory responsibilities to
10 prevent diversion, I agree.
11 BY MR. PIFKO:
12     Q.   And then the question is, in
13 carrying out that role, do you believe
14 that AmerisourceBergen's actions can have
15 an impact on the health and general
16 welfare of the American people?
17     MR. NICHOLAS:  Object to the
18 form.
19     THE WITNESS:  Again, we go
20 back to what we were talking about
21 before, is that, yes, we have to
22 follow our policy and procedure to
23 ensure that we have effective
24 controls to prevent diversion.

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    And I'm not sure what more
2  we can say.  We have an obligation
3  to ensure that we get medications
4  to the pharmacies in need.  And,
5  yes, we do have an obligation to
6  help with providing access for
7  medications to the patients that
8  need them, which I guess would be
9  the public.
10  BY MR. PIFKO:
11    Q.   How about in preventing
12  illegal substances from being
13  distributed, do you believe that
14  AmerisourceBergen's actions can have an
15  impact on the health and general welfare
16  of the American people?
17    MR. NICHOLAS:  Object to the
18  form.
19    THE WITNESS:  As long as
20  we -- again, this implies chain
21  under our control, we can do what
22  we can under our control and our
23  responsibilities and we do that
24  diligently.

Page 159

1    And, you know, that's -- and
2  by not having a diversion
3  occurring within the distribution
4  centers, then that's how we impact
5  the health and welfare of the
6  public, by not having that occur
7  within our distribution centers.
8  BY MR. PIFKO:
9    Q.   Okay.  And if it does occur,
10  it could have an adverse impact on the
11  health and general welfare of the
12  American public, correct?
13    MR. NICHOLAS:  Object to the
14  form.
15    THE WITNESS:  I don't know
16  that.  Again, we can go
17  back-and-forth again.  I think we
18  covered this ground.
19    But we have an obligation to
20  have effective controls to prevent
21  diversion, which we follow.  And
22  we also have an obligation to
23  ensure that we get FDA-approved
24  medications to the pharmacies that

Page 160

1  need to dispense them to their
2  patients and that there's access
3  to patients that have been issued
4  a prescription and fill it at the
5  pharmacy, which would have an
6  impact on the health and safety of
7  the public.
8  BY MR. PIFKO:
9    Q.   So you said by not having a
10  diversion occurring within the
11  distribution center, then that's how we
12  impact the health and welfare of the
13  public.
14    MR. NICHOLAS:  Object to the
15  form.
16  BY MR. PIFKO:
17    Q.   Do you recall saying that?
18    MR. NICHOLAS:  Object to the
19  form.  Are you asking what he said
20  a minute ago and just reading the
21  transcript?  Is that what you're
22  doing?
23    THE WITNESS:  We have an
24  obligation to maintain -- I -- I

Page 161

1  don't understand what you mean by
2  that.
3  BY MR. PIFKO:
4    Q.   All I'm asking is, you just
5  said:  By not having diversion occurring
6  within the distribution centers, then
7  that's how we impact the health and
8  general welfare of the public.
9    A.   That's a --
10    Q.   That's a quote I just read
11  from the transcript.
12    A.   Then that's --
13    Q.   Okay.  Do you agree to
14  having said that?
15    A.   -- what I stated.
16    Again, it goes back to the
17  same issue that you have been asking me,
18  and I've answered it several times, of
19  what our role in the supply channel is,
20  how we -- what things we have in place to
21  prevent diversion.  And that is our role
22  and responsibility.
23    We don't touch the patient.
24    Q.   I haven't asked you a

Page 162

1 question.
2     A.   I know you haven't.  But you
3 continue --
4         MR. NICHOLAS:  Let him
5 finish.
6 BY MR. PIFKO:
7     Q.   You're giving a speech.
8         All I asked you --
9     A.   Well, you're reading back
10 what I just said.
11     Q.   The question I asked is what
12 you said.  Did you say that?  And you're
13 giving a speech.
14         MR. NICHOLAS:  Hold on.
15 Hold on.  If you're going to go
16 back and read him a portion of
17 what he just said a minute ago --
18         MR. PIFKO:  I didn't ask him
19 to give a speech.
20         MR. NICHOLAS:  I think you
21 then can also let him answer your
22 question.
23         MR. PIFKO:  No.  I just
24 said, did you say that?  That's

Page 163

1 all the question was.  And he goes
2 on a five-minute speech.
3         That's not what the question
4 was.
5         MR. NICHOLAS:  First of all,
6 it's been about 20 seconds that
7 he's talking.  If he wanted to
8 talk for an hour, he could.  But
9 he's not doing that.  He's trying
10 to answer your questions.
11         MR. PIFKO:  All my question
12 was, was did I read it right?
13         MR. NICHOLAS:  You're just
14 arguing with him.
15         MR. PIFKO:  No, my question
16 was --
17         MR. NICHOLAS:  You're just
18 arguing.
19         MR. PIFKO:  You're wasting
20 our time, okay?
21         MR. NICHOLAS:  Just ask him
22 questions.  Yeah --
23 BY MR. PIFKO:
24     Q.   I'm trying to ask you a

Page 164

1 question, sir.  I don't want a speech to
2 questions I'm not asking.
3         All I asked you was if I had
4 read that portion correctly?
5         MR. NICHOLAS:  You know
6 what, you don't tell him that you
7 don't want a speech or you do want
8 a speech.  Let him answer your
9 questions.  Don't lecture him.
10         MR. PIFKO:  We're going to
11 have to have this transcript
12 evaluated by the court for your
13 lack of cooperation and we're
14 going to seek appropriate remedies
15 at the appropriate time.
16         MR. NICHOLAS:  That's fine.
17 Do whatever you want.  Let him
18 answer your questions.
19         MR. PIFKO:  I'm trying to
20 ask him, but he's not letting me
21 ask questions, because he's
22 talking about and giving speeches.
23         MR. NICHOLAS:  He's not
24 letting you answer questions

Page 165

1 because he is answering questions.
2         MR. PIFKO:  He's talking
3 about things I'm not asking him.
4         MR. NICHOLAS:  You're just
5 arguing.  Go ahead.
6 BY MR. PIFKO:
7     Q.   You said -- I'm reading from
8 the transcript -- By not having diversion
9 occurring within the distribution center,
10 then that's how we impact the health and
11 general welfare of the public.
12         Agreed?
13     A.   That's what I said.
14     Q.   Okay.  And so my question
15 is, if diversion does occur, then that
16 could have an adverse impact on the
17 health and welfare of the public.
18         Do you agree?
19         MR. NICHOLAS:  Object to the
20 form.  You really are arguing.
21         Go ahead.
22         THE WITNESS:  If there's
23 diversion occurring -- I mean,
24 that's the reason why we have

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    controls in place, to protect and
2    to guard against diversion.
3         If a diversion occurs, then
4    that would have an impact.
5    BY MR. PIFKO:
6         Q.   Thank you.
7         Let's go to the second page
8    of the letter, ABDCMDL 00269692.
9         Are you on that page?
10        A.   Yes.
11        Q.   I want to read you a section
12   from the second paragraph there; second
13   paragraph, second sentence.
14        Moreover, all registrants,
15   manufacturers, distributors, pharmacies
16   and practitioners share responsibility
17   for maintaining appropriate safeguards
18   against diversion.
19        Do you agree with that
20   statement?
21        A.   Yes.
22        Q.   It says, a little bit
23   further down, Given the extent of
24   prescription drug abuse in the United

Page 167

1    States, along with the dangerous and
2    potentially lethal consequences of such
3    abuse, even just one distributor that
4    uses its DEA registration to facilitate
5    diversion can cause enormous harm.
6         Do you agree with that
7    statement?
8         MR. NICHOLAS:  I'll object
9    to the form.  And ask if you're
10   going to read portions of this
11   paragraph, that you read the first
12   sentence of the paragraph as well.
13        THE WITNESS:  I don't know
14   the answer to your question.
15   Because -- I don't know.
16   BY MR. PIFKO:
17        Q.   Let's go down a little bit
18   further toward the third-to-last
19   paragraph.
20        In addition -- it says,
21   Thus, in addition to reporting all
22   suspicious orders, a distributor has a
23   statutory responsibility to exercise due
24   diligence to avoid filling suspicious

Page 168

1    orders that might be diverted into
2    other-than-legitimate medical,
3    scientific, and industrial channels.
4         Do you see that?
5         A.   I do.
6         Q.   Do you agree with that
7    statement?
8         MR. NICHOLAS:  Object to the
9    form.
10        THE WITNESS:  Given the --
11   no, I don't agree.
12   BY MR. PIFKO:
13        Q.   And what's the basis for
14   your disagreement?
15        A.   Because up until this
16   letter, all of our interactions with DEA
17   and our consultations and meetings and
18   presentations, there had never been any
19   indication, up until this time, that we
20   were to avoid filling suspicious orders.
21   It's the first time I've seen that
22   statement.
23        Q.   Let's go to the third page,
24   ABDCMDL 00269693.  Tell me when you're

Page 169

1    there.
2         A.   Yes.
3         Q.   Do you see the heading at
4    the top is, Circumstances That Might Be
5    Indicative of Diversion?
6         Do you see that?
7         A.   Yes.
8         Q.   It's got a list of four
9    items.
10        Do you see that?
11        A.   Yes.
12        Q.   Do you believe that the DEA
13   communicated this information to you?
14        MR. NICHOLAS:  Object to the
15   form.
16        THE WITNESS:  In this
17   letter?  We received this letter,
18   yes.
19   BY MR. PIFKO:
20        Q.   And then there's another
21   paragraph with ten items.
22        Do you see that?
23        A.   Yes.
24        Q.   Do you believe that the DEA

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 communicated this information to you?
2          MR. NICHOLAS:  Object to the
3     form.
4          THE WITNESS:  In -- with
5     this letter, yes.
6          - - -
7          (Whereupon, Amerisource
8     Bergen-Zimmerman Exhibit-7,
9     ABDCMDL 00000101-122, was marked
10     for identification.)
11          - - -
12 BY MR. PIFKO:
13     Q.   I'm handing you what has
14 been marked as Exhibit-7.
15          Please take a moment to
16 review this document and let me know when
17 you're done.
18          For the record, it's Bates
19 labeled ABDCMDL 00000101 through 122.
20          Let me know when you're done
21 reviewing the document, sir.
22     A.   Okay.
23     Q.   Have you seen this document
24 before?

Page 171

1     A.   I don't know if I've seen
2 this exact document, but I've seen
3 presentations that have this material in
4 them.
5     Q.   When you say that, what do
6 you mean by that?
7          MR. NICHOLAS:  Object to the
8     form.
9          THE WITNESS:  I'm saying
10     that many of these slides in here
11     look familiar.  I don't know if
12     I've seen this exact presentation.
13 BY MR. PIFKO:
14     Q.   Okay.  You say you've seen
15 some of the slides but maybe not all of
16 the slides, or do you think you've seen
17 all of the slides?
18          MR. NICHOLAS:  Object to the
19     form.
20          THE WITNESS:  I think
21     I've -- I can't say I've seen
22     every single slide, but I'm
23     familiar with the information.
24 BY MR. PIFKO:

Page 172

1     Q.   Do you have any reason to
2 dispute that this is a document from
3 AmerisourceBergen's files?
4     A.   No.
5     Q.   Do you dispute that this is
6 a true and correct copy of what was in
7 this document?
8     A.   I don't know that, because
9 I'm not familiar with this presentation.
10     Q.   You just took some time to
11 review the presentation, correct?
12     A.   Yes.
13     Q.   The title of the
14 presentation, on the first page, is, ABC
15 Diversion Control Program, Effective June
16 25, 2007.
17          Do you see that?
18     A.   Yes.
19     Q.   You're familiar with the
20 changes that AmerisourceBergen made to
21 its diversion control program as a result
22 of the settlement with the DEA, correct?
23     A.   Correct.
24     Q.   Does this reflect changes

Page 173

1 that were made to the policy as a result
2 of that settlement?
3          MR. NICHOLAS:  Object to the
4     form.
5          THE WITNESS:  Yes, I believe
6     so.
7 BY MR. PIFKO:
8     Q.   Having reviewed this
9 document, do you believe this document
10 discusses the nature of
11 AmerisourceBergen's program as of June
12 25th, 2007?
13          MR. NICHOLAS:  Object to the
14     form.
15          THE WITNESS:  I believe so.
16 BY MR. PIFKO:
17     Q.   Do you know who Steve Mays
18 is?
19     A.   Yes.
20     Q.   Is he someone that works
21 under you?
22     A.   Yes, he does.
23     Q.   Does he still work at the
24 company?

Page 174

1  A.  He does.
2  Q.  His title at this time is
3 senior director, corporate security and
4 regulatory affairs.
5       Do you see that?
6  A.  Yes.
7  Q.  When he was in that title,
8 he reported to you?
9  A.  Yes.
10  Q.  Was he a direct report to
11 you at this time?
12  A.  He was.
13  Q.  Did you instruct him to give
14 presentations about AmerisourceBergen's
15 diversion control program as it was
16 changed from the DEA settlement?
17  A.  He did presentations, yes.
18  Q.  Do you know to whom he did
19 presentations?
20  A.  I don't know specifically.
21  Q.  You said you've seen
22 versions of this document.
23       Do you believe this was
24 something that would have been presented

Page 175

1 to people inside the company?
2       MR. NICHOLAS:  Object to the
3   form.  Mischaracterizes the
4   testimony.
5       THE WITNESS:  It doesn't say
6   who this was actually presented
7   to.  So I don't know.
8 BY MR. PIFKO:
9  Q.  Let's go to the first page
10 of the document here.  It says,
11 Regulatory responsibility.
12       Do you see that?
13  A.  Yes.
14  Q.  Have you seen this slide
15 before?
16  A.  I understand -- I don't know
17 if I've seen this slide.  But, yes, I've
18 seen a slide that has this information on
19 it, yes.
20  Q.  Can you tell me what this
21 is?
22       MR. NICHOLAS:  Object to the
23   form.
24       THE WITNESS:  It's just a

Page 176

1 statement of the CFR1301.71.
2 BY MR. PIFKO:
3  Q.  It's a statement of
4 AmerisourceBergen's regulatory
5 responsibility under this provision; is
6 that correct?
7       MR. NICHOLAS:  Object to the
8   form.
9       THE WITNESS:  It's the
10   statement of -- for all
11   distributors.  It's 1301.71(a).
12 BY MR. PIFKO:
13  Q.  I'm not trying to trick you
14 into something.
15       I'm just asking, is it your
16 understanding that 1301.71(a) applies to
17 AmerisourceBergen?
18       MR. NICHOLAS:  Object to the
19   form.
20       Go ahead.
21       THE WITNESS:  It does apply
22   to AmerisourceBergen as a
23   registrant.
24 BY MR. PIFKO:

Page 177

1  Q.  And it says, All applicants
2 and registrants shall provide effective
3 controls and procedures to guard against
4 theft and diversion of controlled
5 substances.
6       Do you see that?
7  A.  Yes.
8  Q.  Do you agree that's what it
9 says?
10  A.  That's what it says.
11  Q.  And you agree that's a
12 regulatory responsibility that
13 AmerisourceBergen has?
14  A.  Yes.
15  Q.  Let's go to the next page.
16 It says, How?
17       Do you see that?
18  A.  Yes.
19  Q.  Do you have an
20 understanding, then, this is how
21 AmerisourceBergen is supposed to carry
22 out its responsibility to provide
23 effective controls and procedures to
24 guard against theft and diversion of

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1  controlled substances?

2      MR. NICHOLAS:  Object to the

3  form.

4      THE WITNESS:  It appears

5  that it lists the different

6  elements under that section and

7  states the relating Code of

8  Federal Regulation's section and

9  how companies may -- again, I

10  don't know who this was to,

11  whether it was internally, to

12  distributors.  I'm not sure who

13  the customer was of the

14  presentation.

15      But it's just reiterating

16  items that fall underneath each of

17  the CFR sections.

18  BY MR. PIFKO:

19      Q.   Do you believe -- or do you

20  have an understanding that

21  AmerisourceBergen has a responsibility to

22  comply with the CFR sections identified

23  here?

24      MR. NICHOLAS:  Object to the

Page 179

1      form.

2      THE WITNESS:  These are

3  sections that we -- that fall

4  under the distributor

5  requirements, yes.

6  BY MR. PIFKO:

7      Q.   And do you believe that they

8  apply to AmerisourceBergen?

9      A.   Yes.

10      Q.   Under CFR1301.74 -- do you

11  see that at the bottom?

12      A.   Yes.

13      Q.   It says -- for all the other

14  ones above, it says a statement of the

15  regulation with a short summary, and it

16  says, No problem.

17      Do you see that?

18      A.   I'm sorry, where?

19      Q.   If you look at each

20  regulation, it's got a number, a bold

21  heading, a subject of that, and then it

22  has a brief summary of it.

23      Do you see that?

24      A.   Yes.

Page 180

1      Q.   And afterwards it says, No

2  problem.

3      Let's look at the first one.

4      A.   Yes.

5      Q.   Physical security controls.

6  No problem.

7      Do you see that?

8      A.   Yes, I see that.

9      Q.   Records and reports of

10  registrants.  No problem.

11      Do you see that?

12      A.   Yes.

13      Q.   Orders for filling -- for

14  Schedule I and II controlled substances.

15  No problem.

16      Do you see that?

17      A.   Yes.

18      Q.   Other security controls-make

19  a good faith inquiry; report suspicious

20  orders; report significant losses.  Gray

21  area.

22      Do you see that?

23      A.   Yes.

24      Q.   Do you have an understanding

Page 181

1  about what it means by "gray area"?

2      A.   I think what they're

3  referring to, under these regulations,

4  are -- say 1301.72, physical security

5  controls, that the DEA has been very

6  specific.

7      So vaults need to have

8  poured-in-place concrete, 8 inches thick,

9  half-inch rebar, 6 inches on center.  And

10  cages have to be developed of 10-gauge

11  steel.  Openings can't be more than 2.5

12  inch diameter across.  The structure has

13  to be built on 6-inch -- 1-inch posts

14  with 6 inches apart.  They're very

15  specific.

16      With regards to reports, it

17  explains exactly how often you have to do

18  inventories, how to annotate it.  It's

19  black-and-white.

20      And then also with the

21  schedule order 222 forms, it states that

22  you can't complete a line that has any

23  alterations.  It's very black-and-white.

24      And when it gets to

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1  reporting suspicious orders, it's very --
2  a gray area, because it's not
3  black-and-white.  It doesn't say over
4  five or less than four.  And with
5  significant losses, there's no
6  definition.  Is it a thousand?  Is it
7  one?  Is it five?  Is it 10,000?
8         So that's, I believe, I
9  don't want to speak for Steve Mays, but I
10  believe that's the inference, is that DEA
11  has been very diligent about laying out
12  responsibilities, black-and-white,
13  through all these requirements, and then
14  this one area is -- they're not very
15  specific at all.  It's very open-ended.
16         If that makes sense.
17     Q.   Let's go to the next page.
18         It's got another CFR section
19  here -- well, actually, the one we were
20  just talking about, part of it.
21         Do you see that?
22     A.   Yes.
23     Q.   It says, The registrant
24  shall design and operate a system to

Page 183

1  disclose to the registrant suspicious
2  orders of controlled substances.  The
3  registrant shall inform field diversion
4  office of the administration in his area
5  of suspicious orders when covered by the
6  registrant.
7         Do you see that?
8     A.   Yes.
9     Q.   Do you agree that that's a
10  regulatory responsibility that
11  AmerisourceBergen has?
12         MR. NICHOLAS:  Object to the
13     form.
14         But go ahead.
15         THE WITNESS:  Yes.
16  BY MR. PIFKO:
17     Q.   Let's go to the next page.
18         Are we there?
19     A.   Yes.
20     Q.   Okay.  Again, it says,
21  Regulatory responsibility.  It's got
22  three bullet points.
23         The first one says,
24  Reporting suspicious orders to DEA does

Page 184

1  not relieve the distributor of the
2  responsibility to maintain effective
3  controls to prevent diversion.
4         Do you see that?
5     A.   Yes.
6     Q.   Do you have an understanding
7  about what that means?
8         MR. NICHOLAS:  Object to the
9     form.
10         THE WITNESS:  That you can't
11     just have a system that has --
12     that reports suspicious orders and
13     not have -- not have effective
14     controls in all the other areas we
15     just mentioned.  It doesn't
16     relieve your responsibility to
17     maintain effective controls.
18  BY MR. PIFKO:
19     Q.   Right.  So just reporting a
20  suspicious order doesn't discharge your
21  responsibility under The Controlled
22  Substances Act, correct?
23     A.   For recordkeeping, all those
24  other ones we kind of just went through.

Page 185

1  They are all grouped under the same
2  section, effective controls to prevent
3  diversion, 1301.  All of these are in
4  1301.
5         So just doing one of 1301,
6  74, doesn't relieve you of all the other
7  items under 1301.71.
8     Q.   The next bullet point says,
9  DEA cannot/will not tell a distributor if
10  an order is or is not legitimate; and/or
11  if the distributor should or should not
12  ship an order.
13         Do you see that?
14     A.   Yes.
15     Q.   Is that consistent with your
16  understanding of the DEA's position?
17     A.   Yes.  At the time of this
18  presentation, yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 190



Page 192

13    Q.    Do you have a copy of that
14  presentation that you believe that DEA
15  made to you in your office somewhere?
16    A.    We may have it somewhere,
17  yes.
18    Q.    Did you make any attempts to
19  look for it?
20        MR. NICHOLAS:  Objection.
21    We're making productions as we're
22    required to do in this case.
23        THE WITNESS:  Is there a
24    question?

Page 191

Page 193

1  BY MR. PIFKO:
2    Q.    I asked if you made any
3  attempt to look for that document?
4    A.    No, I did not.
5    Q.    Is that something -- you
6  said you might have that in your office
7  somewhere?
8    A.    I won't have -- no, I don't
9  have that in my office.  We may have it
10  on file or in storage or something.  It's
11  from years ago.
12        MR. NICHOLAS:  Again, just
13    in case there's any implication on
14    the record that we haven't
15    produced something we were
16    supposed to produce.
17        MR. PIFKO:  Again, the
18    speaking -- I got it.  There's no
19    implication.  The record is what
20    it is.
21        MR. NICHOLAS:  Good.  That's
22    all I want to hear.  There's no
23    implication.  That's fantastic
24    news.

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    Go ahead.
2 BY MR. PIFKO:
3    Q.   Was anyone else present at
4 this presentation that you're referring
5 to?
6    A.   Steve Mays.
7    Q.   And who specifically from
8 the DEA was there?
9    A.   I was not there.  I
10 believe -- I believe Mike Mapes.
11    Q.   Anyone else?
12    A.   I don't know, because I
13 wasn't there.
14    Q.   Did you undertake any
15 effort, in connection with preparing for
16 this deposition, to learn about
17 communications with the DEA that might
18 have occurred?
19    A.   In what context?
20    Q.   Concerning The Controlled
21 Substances Act.
22    MR. NICHOLAS:  Object to the
23    form.
24    THE WITNESS:  I'm not

Page 195

1    understanding your question.  I'm
2    sorry.
3 BY MR. PIFKO:
4    Q.   I'm just asking if you tried
5 to learn about the company's
6 communications with the DEA in connection
7 with preparing for this deposition.
8    A.   Yes.
9    Q.   Did you ask anyone about
10 that meeting that we were just talking
11 about where Steve Mays and maybe Mike
12 Mapes was there?
13    A.   I think --
14    THE WITNESS:  Is that a
15    legal question?
16    MR. NICHOLAS:  To the extent
17    this question invades the
18    attorney-client privilege, don't
19    answer it.  I'll instruct you not
20    to answer it.
21 BY MR. PIFKO:
22    Q.   All I'm asking is if you
23 asked anyone other than counsel about
24 this meeting where -- in 2005 between

Page 196

1 Steve Mays and maybe Mike Mapes from the
2 DEA?
3    MR. NICHOLAS:  If you can
4    answer that and it doesn't involve
5    attorney-client communications,
6    that's fine.  If not, please don't
7    answer.
8    THE WITNESS:  I can't
9    answer.
10 BY MR. PIFKO:
11    Q.   So the only conversations
12 you may have had about this meeting
13 were -- involved counsel?
14    MR. NICHOLAS:  I'm going to
15    instruct him not to answer.
16 BY MR. PIFKO:
17    Q.   You're unable to answer any
18 questions about inquiries about this
19 meeting based on the attorney-client
20 privilege; is that correct?
21    MR. NICHOLAS:  I'll instruct
22    him not to answer.  I'm
23    instructing him not to answer.  He
24    doesn't have to answer questions

Page 197

1    about this.
2    MR. PIFKO:  I'm trying to
3    understand the privilege that's
4    being asserted here.
5    MR. NICHOLAS:  It's the
6    attorney-client privilege.
7    MR. PIFKO:  So the witness
8    is being instructed not to answer
9    any questions about efforts he
10    undertook to learn about this
11    meeting; is that correct?
12    MR. NICHOLAS:  No, not at
13    all.
14    MR. PIFKO:  That's what I'm
15    trying to understand.  So I'm
16    asking the witness --
17    MR. NICHOLAS:  If the
18    witness undertook any efforts
19    in -- at the direction of or, you
20    know, in conjunction with attorney
21    communications, then I'm only
22    instructing him to answer in that
23    respect.
24 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review



Page 198

1    Q.   Aside from any efforts at
2  the direction of counsel or in
3  conjunction with an attorney, did you
4  engage in any efforts to learn about this
5  DEA meeting between Steve Mays and Mike
6  Mapes in 2005?
7    A.   No.
8    Q.   You don't know if anyone
9  else was present besides the two of them?
10   A.   I don't know.
11   Q.   Let's go to the next page.
12      MR. NICHOLAS:  For planning
13  purposes, purely a scheduling
14  thing, after you get through this
15  document --
16      MR. PIFKO:  We'll take a
17  break.
18      MR. NICHOLAS:  For lunch or
19  a short break, whatever you
20  prefer.

Page 200

Page 199

Page 201

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 222

Page 224

24     MR. PIFKO:  We can take a

Page 223

Page 225

1     break.
2          VIDEO TECHNICIAN:  Going off
3     the record.  The time is 12:30
4     p.m.
5          - - -
6          (Whereupon, a luncheon
7     recess was taken.)
8          - - -
9          VIDEO TECHNICIAN:  We're
10    back on the record.  The time is
11    1:19 p.m.
12    BY MR. PIFKO:
13    Q.    Let's go back to Exhibit-6,
14    the stack of Dear Registrant letters.
15         Let's go two pages in to the
16    second -- or the Dear Registrant letter
17    dated December 27th, 2007.
18         Do you see that?  It's on
19    Bates label ABDCMDL 00269685.
20         Are you there, sir?
21    A.    Yes.
22    Q.    Did AmerisourceBergen
23    receive this letter?
24         MR. NICHOLAS:  Could you

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1  just ask him to take -- give him
2  just a minute to take a quick look
3  at it and make sure he's familiar
4  with the document before he
5  responds to these questions.
6          MR. PIFKO:  I think we went
7  over these before.
8          MR. NICHOLAS:  I think you
9  showed him the one and asked him
10  that question.  He didn't look at
11  all the letters.  He looked at
12  one.
13          THE WITNESS:  Okay.
14  BY MR. PIFKO:
15      Q.   Are you ready?  It's a
16  two-page letter here.
17      A.   Yes.
18      Q.   Did AmerisourceBergen
19  receive this letter?
20      A.   I believe so, at the
21  distribution centers.
22      Q.   And that would have been on
23  or around the date of this letter,
24  December 27th, 2007?

Page 227

1      A.   I would assume so.
2      Q.   Let's go to the second
3  paragraph, last sentence -- or, sorry,
4  second-to-last sentence.
5          Accordingly, DEA does not
6  approve or otherwise endorse any specific
7  system for reporting suspicious orders.
8  Past communications with DEA, whether
9  implicit or explicit, that could be
10  construed as approval of a particular
11  system for reporting suspicious orders
12  should no longer be taken to mean that
13  DEA approves a specific system.
14          Do you see that?
15      A.   Yes.
16      Q.   Were you aware that that was
17  a statement that the DEA had made to
18  AmerisourceBergen at that time?
19      A.   Yes.
20      Q.   Did you discuss that with
21  anyone at the company?
22      A.   No.
23      Q.   Earlier you testified that
24  certain aspects of AmerisourceBergen's

Page 228

1  CSA compliance were discussed with DEA.
2          Generally, do you recall
3  that?
4      A.   We've had ongoing
5  communications with DEA since I started
6  with the company.  I referenced our
7  negotiations with them in '96 to '98,
8  with the suspicious order monitoring
9  program, which resulted in an approval
10  letter.  And then the negotiations, in
11  2007.
12          So we've had ongoing -- and
13  we also provided training for DEA
14  diversion investigators from '99 to 2004
15  or '05.  So we've had an open dialogue
16  with DEA since I've been with the
17  company.
18      Q.   Did anyone at the company
19  discuss this statement with the DEA and
20  how it impacted some of the prior
21  discussions that you may have had with
22  them?
23          MR. NICHOLAS:  Object to the
24  form.

Page 229

1          THE WITNESS:  No.
2  BY MR. PIFKO:
3      Q.   For example, with respect to
4  the business decision that we talked
5  about in Exhibit-7 that you recalled
6  having been derived from a meeting in
7  2005, did anyone say to the DEA, as a
8  result of this December 27th, 2007
9  letter, we can no longer rely on that?
10          MR. NICHOLAS:  Object to the
11  form.  Only if you're asking about
12  any conversation anyone at the
13  company ever had.  I don't know
14  how he can answer that.
15          But go ahead.
16          THE WITNESS:  Can you
17  restate that or paraphrase the
18  question, please?
19  BY MR. PIFKO:
20      Q.   Do you remember that
21  Exhibit-7 talked about the business
22  decision about whether to ship an order?
23      A.   Yes.
24      Q.   You remember testifying that

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1 that was derived from a conversation with
2 the DEA in 2005?
3      A.   It wasn't derived from a
4 conversation.  It was -- it was -- you
5 had asked about the quotations of the
6 business decision, and that was a slide
7 on a DEA slide, not ABC slide.
8      Q.   From a -- you said from a
9 presentation between Steve Mays and Mike
10 Mapes in 2005?
11      A.   From a presentation from DEA
12 to Steve Mays.
13      Q.   Did anyone, at this time,
14 reach out to the DEA and say, we can no
15 longer rely on that presentation?
16      MR. NICHOLAS:  Object to the
17 form.
18      THE WITNESS:  No.
19 BY MR. PIFKO:
20      Q.   This letter also says, in
21 the second paragraph, Filling a monthly
22 report -- Filing a monthly report of
23 completed transactions, e.g., excessive
24 purchase report or high unit purchases,

Page 231

1 does not meet the regulatory requirement
2 to report suspicious orders.  Registrants
3 are reminded that their responsibility
4 does not end merely with the filing of a
5 suspicious order report.
6      Do you see that?
7      A.   Are you in the --
8      MR. NICHOLAS:  Could you
9 highlight it on the screen?
10      MR. CLUFF:  We're putting it
11 up now.  It was actually the third
12 paragraph.
13      THE WITNESS:  I didn't see
14 that.  Sorry.
15      What line in the third
16 paragraph?  I just want to make
17 sure, if I'm commenting on this.
18      And your question?  I'm
19 sorry.
20 BY MR. PIFKO:
21      Q.   You see that, first, was the
22 question?  You do see it now?
23      A.   Yes.
24      Q.   Okay.  Did AmerisourceBergen

Page 232

1 agree that its responsibility continued
2 after the filing of a suspicious order
3 report?
4      MR. NICHOLAS:  Object to the
5 form.
6      THE WITNESS:  I mean, the
7 program we developed, which is
8 pretty much two months, three -- a
9 few months before this letter, is
10 pretty much in line with this
11 letter, in that -- in the way that
12 this is written, I'm not sure if
13 they're referring that an order
14 that hits a -- they're calling it
15 an excessive purchase, meet the
16 requirements of suspicious order,
17 is that an order of interest or a
18 suspicious order?
19      So I'm not really sure of
20 the context of their statement.
21 BY MR. PIFKO:
22      Q.   Well, he's saying,
23 Responsibility does not end merely with
24 the filing of a suspicious order report.

Page 233

1      So he's talking about
2 suspicious orders.
3      Do you see that?
4      A.   Yes.
5      Q.   So my question is, does
6 AmerisourceBergen agree that its
7 responsibility extends beyond the filing
8 of a suspicious order report?
9      MR. NICHOLAS:  Object to the
10 form.
11      But go ahead.
12      THE WITNESS:  I'm not really
13 sure of the context of -- once we
14 file the suspicious order report,
15 I'm not necessarily saying that
16 there's any additional
17 responsibility we have after the
18 filing of the suspicious order
19 report.
20 BY MR. PIFKO:
21      Q.   So you disagree with that
22 statement, is that what I'm hearing you
23 say?
24      That's fine, whatever you're

Page 234

saying. I just don't understand your
answer.
          MR. NICHOLAS: Object to the
     form.
          Go ahead.
          THE WITNESS: Yes.
BY MR. PIFKO:
     Q.   Yes, you disagree?
     A.   I disagree -- let me read it
on the page, so I can make sure that --
          So again, it depends on the
context of the sentence. Our registrants
are reminded that their responsibility
does not end merely with the filing of a
suspicious order.
          That's correct. We have
other responsibilities to have adequate
controls to prevent diversion, other than
the filing of a suspicious order. So I'm
not sure if their statement is in the
context of filing a suspicious order and
the totality of the distributor's
responsibility.
     Q.   Well, let me ask a different

Page 235

question.
          Regardless of what this
letter says or doesn't say, does
AmerisourceBergen agree that with respect
to a suspicious order, its
responsibilities under The Controlled
Substances Act don't end by merely filing
a suspicious order report?
          MR. NICHOLAS: Object to the
     form.
          THE WITNESS: I think my
     last answer is the -- is the same
     answer.
          That filing a suspicious
     order does not meet all the
     requirements of -- to have an
     effective controls for diversion.
          So my answer is the same.
BY MR. PIFKO:
     Q.   Do you believe that
AmerisourceBergen is required to conduct
due diligence of a suspicious order even
after a suspicious order report is filed?
          MR. NICHOLAS: Object to the

Page 236

     form. Outside the scope.
          THE WITNESS: I don't think
     that is in line with the
     regulatory responsibilities of a
     distributor, to define a program
     to report suspicious orders.
BY MR. PIFKO:
     Q.   Let's go to the last
sentence of that paragraph.
          It says, Reporting an order
as suspicious will not absolve the
registrant of responsibility if the
registrant knew or should have known that
controlled substances were being
diverted.
          Do you see that?
     A.   I do see that.
     Q.   Do you agree with that
statement?
     A.   If I had more understanding
of what should have -- what they're
constituting as should have known.
     Q.   Do you believe that if
AmerisourceBergen knows that controlled

Page 237

substances are being diverted, it has to
do more to prevent diversion beyond just
reporting it?
          MR. NICHOLAS: Object to the
     form. Could you be more specific
     with the question?
          THE WITNESS: It's a
     hypothetical question, I think.
BY MR. PIFKO:
     Q.   You can't give an answer to
the question?
     A.   If we -- I think, if a
distributor knows that a pharmacy and --
they know that they're diverting, then
they have responsibility to react.
     Q.   So do you agree that the
company has a responsibility to act?
     A.   If they have --
          MR. NICHOLAS: Object to the
     form.
          Go ahead.
          THE WITNESS: If they know
     there's a pharmacy that's -- that
     they know is diverting product.

Highly Confidential - Subject to Further Confidentiality Review

Page 238

BY MR. PIFKO:

Q. Okay. So just, again, I'm not trying to misstate your testimony, I just want to get a clear record.

So it's my understanding that what you just said is if AmerisourceBergen knows that a pharmacy is diverting product, it has a responsibility to act; is that correct?

MR. NICHOLAS: Object to the form.

THE WITNESS: It depends on the circumstances. You asked me a hypothetical question.

So, again, and I'm not sure, again, when we put the context of diversion, what we're talking about.

If a pharmacy has an employee that was arrested for diverting product, they put a bottle in their pocket, the reaction is going to be different. So it all depends upon the

Page 239

totality of the circumstance.

I can't give you a general answer that if there's a pharmacy that's diverting, depending upon what that type of diversion is, what that action will be.

BY MR. PIFKO:

Q. But you agree that some action may be -- it depends on the nature of the diversion -- the action would depend on the nature of the diversion, but some action would be required?

MR. NICHOLAS: Object to the form.

THE WITNESS: It depends on the circumstances. And, again, it's a case-by-case basis, depending upon the totality of the circumstances, of what the reaction would be. There isn't a must.

BY MR. PIFKO:

Q. So is it your testimony that there are circumstances where

Page 240

AmerisourceBergen would know about diversion and not be obligated to act?

MR. NICHOLAS: Object to the form. I think you're now just arguing.

THE WITNESS: Again, it all depends on the circumstances of the case.

BY MR. PIFKO:

Q. Well, so, if it depends on the circumstances, there must be circumstances where AmerisourceBergen would know of diversion and you don't believe they would be required to act.

MR. NICHOLAS: Object to the form. This isn't --

MR. PIFKO: You've got to stop. You have to stop.

You can object in a normal objection way, you can say form. You can say foundation. You can state a legal objection.

But you are coaching the witness. You have done

Page 241

textbook -- there is case law addressing exactly what you're doing in this district, and you need to stop, okay?

MR. NICHOLAS: Listen. Now you're going to let me speak for a minute.

MR. PIFKO: No, I'm not. You need to stop this right now.

MR. NICHOLAS: I read the transcript of your defense of the Merrill Gordon.

MR. PIFKO: We're not talking about anything right now. And all I did -- and all I did was state my objections with clarity and specificity. And I did not coach the witness at one moment of the deposition.

You are telling -- you said things like "if you know." You said that before the last break.

MR. NICHOLAS: Is that so horrible?

Highly Confidential - Subject to Further Confidentiality Review

|  | Page 242 |
|---|---|

1    MR. PIFKO:  Because there's
2  case law prohibiting that kind of
3  conduct.  That is directing the
4  witness.  If you know, that's
5  directing the witness to say I
6  don't know.
7    You cannot do that.  Just
8  stop.
9    MR. NICHOLAS:
10  Unfortunately --
11    MR. PIFKO:  Am I going to
12  get your agreement that you're
13  going to comply with the law?
14    MR. NICHOLAS:  I've been
15  complying with the law the entire
16  time.
17    I read your deposition.
18    MR. PIFKO:  You've been
19  coaching the witness.
20    MR. NICHOLAS:  I have not.
21    MR. PIFKO:  You have.
22    MR. NICHOLAS:  I read your
23  transcript of the Merrill
24  Gordon --

|  | Page 243 |
|---|---|

1    MR. PIFKO:  I never once
2  said facts --
3    MR. NICHOLAS:  I never saw
4  anything like it.
5    MR. PIFKO:  -- in my
6  objections.
7    MR. NICHOLAS:  It was an
8  incredible thing.  I'm like Mother
9  Teresa compared to you in that
10  deposition.
11    MR. PIFKO:  I disagree.
12    MR. NICHOLAS:  I'm sure you
13  do disagree.
14    MR. PIFKO:  We're moving on.
15  You need to stop, okay?
16    MR. NICHOLAS:  I will
17  continue to do exactly what I
18  think is appropriate in this
19  deposition, as needed.
20  BY MR. PIFKO:
21    Q.   I'm trying to get an answer
22  from you, and I'm just trying to
23  understand what your testimony is, okay?
24    So I've asked you if

|  | Page 244 |
|---|---|

1  AmerisourceBergen is aware of diversion,
2  do you believe that beyond reporting it
3  to the DEA, the company has a
4  responsibility to take some action?
5    A.   It depends on the
6  circumstances.  We had an investigation,
7  we were working with DEA, and they had
8  diversion at a pharmacy and we were told
9  to continue servicing them during the
10  course of the investigation.
11    There's an instance where we
12  knew of diversion and we didn't take any
13  action because we were working with the
14  DEA.
15    Every instance is different.
16  You're asking me to give you a blanket
17  response to situational instances.  And I
18  can't.  There's -- no two are alike.  And
19  I can't give you a single answer to your
20  response, because it depends.
21    It depends.  If DEA wants us
22  to continue servicing them and there's a
23  diversion, then we would have no action.
24    Q.   What pharmacy are you

|  | Page 245 |
|---|---|

1  referring to where there was diversion
2  and the DEA told you to continue
3  servicing them?
4    MR. NICHOLAS:  I'm going to
5  caution the witness that if
6  there's -- for any reason, this is
7  an ongoing investigation and
8  confidential --
9    MR. PIFKO:  He raised the
10  issue.
11    MR. NICHOLAS:  I don't care.
12  If it's confidential and he's not
13  supposed to disclose the name of
14  it for legal reasons, then he
15  shouldn't do it.
16    THE WITNESS:  And it's some
17  time ago and outside the scope.
18    MR. PIFKO:  You're not
19  allowed to object to outside the
20  scope, sir.
21    MR. NICHOLAS:  Well, he's
22  not objecting.
23    MR. PIFKO:  He just said
24  it's outside the scope.

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1      MR. NICHOLAS:  I don't know
2  that --
3      MR. PIFKO:  You're a fact
4  witness here as well as a 30(b)(6)
5  witness.  You need to answer my
6  questions.
7      THE WITNESS:  I don't know
8  the name of the pharmacy, but we
9  received recognition from the DEA
10  for participation in the
11  investigation.
12  BY MR. PIFKO:
13     Q.   When was that?
14     A.   It was 2002 or 2004, I can't
15  remember the time frame.
16        But after the course of the
17  investigation, the prosecution, we
18  received a certificate of recognition
19  from the DEA.  That's the case I'm
20  referring to.
21     Q.   So it was a concluded
22  investigation, correct?
23     A.   Yes.
24     Q.   Okay.  Where was this

Page 247

1  pharmacy?  What state?
2     A.   It was in New Jersey.
3     Q.   Okay.  What type of pharmacy
4  was it?
5     A.   I don't -- I mean, you're
6  talking about something that happened 16
7  years ago.  I know we received a
8  recognition for participation in the
9  investigation.  And, you know, I don't
10  know the name of the pharmacy.  I don't
11  know the --
12     Q.   Can you recall any other
13  pharmacies where the DEA told you to
14  continue shipping to them despite knowing
15  about diversion?
16     A.   I don't.
17     Q.   So that's only happened, to
18  your knowledge, on one occasion?
19        MR. NICHOLAS:  Object to the
20  form.
21        THE WITNESS:  That I'm aware
22  of right now.  And I'm not saying
23  that that hasn't occurred within
24  my department and with other

Page 248

1  individuals.
2        You're asking me as a -- as
3  a -- this gets to the part of am I
4  a 3 -- what is it?
5        MR. NICHOLAS:  30(b)(6).
6        THE WITNESS:  30(b)(6) or me
7  personally.
8  BY MR. PIFKO:
9     Q.   Do you know if that pharmacy
10  in New Jersey was put on the do not ship
11  list?
12        MR. NICHOLAS:  Object to the
13  form.  Outside the scope.
14        THE WITNESS:  I don't know.
15  I don't know.
16  BY MR. PIFKO:
17     Q.   I'm handing you what is
18  marked as Exhibit-8.
19        - - -
20        (Whereupon, Amerisource
21  Bergen-Zimmerman Exhibit-8,
22  ABDCMDL 00270533, was marked for
23  identification.)
24        - - -

Page 249

1        MR. PIFKO:  For the record,
2  it's a single-page document Bates
3  labeled ABDCMDL 00270533.  It's
4  dated Monday, August 7th, 2017.
5  BY MR. PIFKO:
6     Q.   And I will represent to you
7  that the metadata that accompanied this
8  document says that it came from your
9  files, Mr. Zimmerman.
10        So please take a moment to
11  review it and let me know when you're
12  done.
13     A.   Yes.
14     Q.   Are you done?
15     A.   I am.
16     Q.   Okay.  Do you recognize this
17  document?
18     A.   I don't -- I guess it's a
19  document.
20     Q.   Do you recall writing this?
21     A.   It was notes, yes.
22     Q.   What was it notes for?
23     A.   I think I was -- for -- I
24  was probably meeting with somebody, so I

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1  was just jotting down some points.

2      Q.   BOD, is that board of

3  directors?

4      A.   Board of -- where?

5      Q.   It's on the subject line.

6      A.   I think it was supposed to

7  be -- I'm not sure.  I don't know if it

8  should have been BOP or BOD.  Board of

9  Pharmacy.  I'm not sure.  I can't

10  remember.

11      Q.   What would CS mean?

12  Controlled substances?

13      A.   I don't recall.

14      Q.   TPs, does that mean anything

15  to you?

16      A.   I'm guessing -- if I had to

17  guess, I would say talking points.

18      Q.   So it could be board of

19  directors, controlled substances, talking

20  points?

21          MR. NICHOLAS:  Object to the

22      form.

23          THE WITNESS:  I'm not sure.

24              - - -

Page 251

1          (Whereupon, Amerisource

2      Bergen-Zimmerman Exhibit-9,

3      ABDCMDL 00273425, was marked for

4      identification.)

5              - - -

6  BY MR. PIFKO:



Highly Confidential - Subject to Further Confidentiality Review



Page 254

Page 256

Page 257

Highly Confidential - Subject to Further Confidentiality Review



Page 258

Page 260

Page 259

Page 261

BY MR. PIFKO:

3

4    Q.   Do you believe that

5    AmerisourceBergen has any duties to

6    prevent diversion outside of the

7    regulations under The Controlled

8    Substances Act?

9         MR. NICHOLAS:  Object to the

10   form.  Not within the scope of

11   the -- I don't know if you're

12   asking him as an individual or

13   under the 30(b)(6) thing, but it's

14   not covered by 30(b)(6) topics.

15   I'll object to it.

16        THE WITNESS:  I think we

17   have a responsibility to comply

18   with the federal regulations and

19   state Board of Pharmacy

20   regulations as it respects to the

21   handling, storage and distribution

22   of controlled substances.

23   BY MR. PIFKO:

24   Q.   But do you believe that

Page 262

1 there's any other requirements to prevent
2 diversion outside of The Controlled
3 Substances Act or State Pharmacy Board
4 rules?
5       MR. NICHOLAS:  Object to the
6   form.  Same objection I just
7   stated.
8       THE WITNESS:  I'm not aware
9   of any other requirements.
10 BY MR. PIFKO:
11      Q.   Does AmerisourceBergen
12 undertake any actions to prevent
13 diversion for reasons beyond what is
14 required in The Controlled Substances
15 Act?
16      MR. NICHOLAS:  Object to the
17   form.  Outside the scope.  And I
18   don't understand the question.
19   And I don't know if the witness
20   does.
21      THE WITNESS:  Can you state
22   that one more time, please?
23 BY MR. PIFKO:



Highly Confidential - Subject to Further Confidentiality Review



Page 266

Page 268

Page 267

Page 269

7      Q.   You're aware that there's an
8   opioid crisis in America, correct?
9      A.   Yes.
10      Q.   Did AmerisourceBergen ever,
11   at any point, think to itself, could we
12   do more to prevent diversion as a result
13   of the opioid crisis?
14         MR. NICHOLAS:  Object to the
15   form.  It's outside the scope as
16   well.
17         THE WITNESS:  And I'm not
18   sure I understand the time frame
19   you're talking about.
20         We always want to make sure
21   that we're following the
22   appropriate policy and procedures
23   and working with DEA on these
24   issues, you know, whether it's

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 methamphetamine abuse or any other
2 area.
3 And in the past, we had a
4 great working relationship with
5 the DEA to resolve these issues.
6 When it was methamphetamine, they
7 passed a bill, enacted regulations
8 and requirements, as we talked
9 about, with the handling.
10 But in the opioid crisis,
11 there's no implementation of
12 bills, there was no -- there was
13 no input from DEA like they had in
14 past crises, for the opioid
15 crisis.
16 We worked with DEA in 2007.
17 We felt we built a program that
18 was, again, I think,
19 state-of-the-art in the industry.
20 And that was the program we
21 implemented.
22 We shared our program with
23 all the other industry
24 memberships. It wasn't -- we were

Page 271

1 open about our process. And, you
2 know, I think that, on itself,
3 shows the efforts of
4 AmerisourceBergen.
5 BY MR. PIFKO:
6 Q. I'm going to ask this
7 question two different ways.
8 First, from -- for the
9 30(b)(6) period of the deposition, the
10 time period, are you aware of any
11 meetings where the company discussed the
12 opioid crisis and what steps it could
13 take to improve its diversion control
14 measures to address those issues?
15 MR. NICHOLAS: Object to the
16 form.
17 THE WITNESS: We
18 regularly -- the department
19 regularly meets and discusses our
20 programs and processes and what we
21 do at the distribution centers,
22 but also with this program as
23 well. And it's open dialogue.
24 And if there's areas we can

Page 272

1 do that to enhance our program, we
2 do. It's not -- it's not static.
3 We don't just implement it in 2007
4 and there's just no changes. It's
5 a constant.
6 BY MR. PIFKO:
7 Q. Right. But I'm asking if
8 you had a specific discussion about
9 changing or adding to the program as a
10 result of issues stemming from the opioid
11 crisis?
12 MR. NICHOLAS: Object to the
13 form. You're arguing.
14 THE WITNESS: I don't know
15 if there was a specific meeting
16 titled exactly how you're stating
17 it. No, I don't know.
18 BY MR. PIFKO:
19 Q. Okay. I told you I would
20 ask you the question a different way.
21 Now as an individual -- or
22 as the chief compliance officer and the
23 head of the CSRA, are you aware of any
24 conversations, at any time when you

Page 273

1 worked at the company, where there was
2 discussion of improving diversion control
3 measures specifically in response to the
4 opioid crisis?
5 MR. NICHOLAS: Object to the
6 form.
7 THE WITNESS: As I
8 previously stated, there is always
9 discussions about our program and
10 our processes, not just with the
11 suspicious order monitoring but
12 how we handled things across the
13 scope of the distribution center
14 and all of our requirements.
15 So you're asking me, did
16 have -- can I point to one
17 specific meeting? Not that I'm
18 aware of. But it was a topic that
19 we generally discussed.
20 VIDEO TECHNICIAN: Going off
21 the record. 2:01 p.m.
22 - - -
23 (Whereupon, a brief recess
24 was taken.)

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 302

Page 304

1 e-mail?

2　　A.　I don't.

3　　Q.　Do you have any reason to

4 believe this is not a true and correct

5 copy of an e-mail that you received?

6　　A.　No, I don't doubt that.

7　　Q.　We did talk about the HDMA a

8 little bit earlier.

9　　　　Did you serve -- did you

10 serve, in any capacity, on any committee

11 or board or group within the HDMA?

12　　A.　At some point, I was on the

13 regulatory affairs committee.  And now

14 I'm on the public -- I think they call it

15 the public policy committee.

16　　Q.　Do you believe that you were

17 on the regulatory affairs committee at

18 around the time this e-mail was sent in

19 September of 2007?

20　　A.　Could have been, yes.

21　　Q.　Do you recall what your

22 responsibilities were as a member of the

23 regulatory affairs committee?

24　　A.　As a member, I mean, we

Page 303

1　　　(Whereupon, Amerisource

2　　Bergen-Zimmerman Exhibit-11,

3　　CAH_MDL_PRIORPROD_DEA_07_00880890-

4　　92, was marked for

5　　identification.)

6　　　　- - -

7 BY MR. PIFKO:

8　　Q.　I'm handing you what is

9 marked as Exhibit-11.

10　　　It's a document produced by

11 Cardinal Health in this matter, which we,

12 under the protective order, obtained

13 prior approval to use it in this

14 deposition.  It's Bates labeled

15 CAH_MDL_PRIORPROD_DEA07_00880890 to 92.

16　　　It's an e-mail at the top

17 from Steve Reardon, dated September 11,

18 2007, to Mr. Zimmerman.  The subject is,

19 Summary of September 7th meeting with DEA

20 and attachments.

21　　　Let me know when you're done

22 reviewing it.

23　　A.　Okay.

24　　Q.　Do you recall receiving this

Page 305

1 would talk about regulatory issues facing

2 wholesalers.

3　　Q.　Regulatory issues concerning

4 The Controlled Substances Act; is that

5 correct?

6　　A.　It could be a whole host of

7 things.  It could be destruction.  It

8 wasn't only for controlled substances.

9 Anything involving wholesale distribution

10 in the healthcare chain.

11　　Q.　But that could include

12 controlled substances?

13　　A.　Yes.

14　　Q.　Okay.  How about diversion

15 control, would that include that?

16　　A.　Yes.

17　　Q.　Do you recall HDMA setting

18 up a meeting with members of the DEA

19 around this time in 2007?

20　　A.　I don't.

21　　Q.　This is around the time of

22 some of the Dear Registrant letters.

23　　　Do you agree?

24　　A.　Yes.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1  Q.  Do you recall there being
2  more activity between members of the
3  industry and DEA at that time?
4  A.  As I previously stated, I
5  mean, when I started, we met with DEA
6  every six months and it was a regular
7  activity.  And then with the training
8  program, we met with them a lot more;
9  there was a lot more communication.
10  In 2007, this came shortly
11  after -- this is probably within weeks
12  after we got our distribution center back
13  and implemented our new program.  So
14  there was a lot of activity on this
15  subject matter.
16  Q.  Do you know why the HDMA
17  would have been having a meeting with the
18  DEA at this time?
19  MR. NICHOLAS:  Object to the
20  form.
21  THE WITNESS:  As I
22  indicated, at that time, they
23  would meet regularly with them; if
24  not every six months, every year.

Page 307

1  I don't know if this is a regular
2  meeting that they have to discuss
3  issues with distributors or
4  distributors wanting
5  clarification.
6  I'm not really sure what the
7  nexus of this meeting was about.
8  BY MR. PIFKO:
9  Q.  Did you ever attend DEA
10  conferences?
11  A.  Yes.
12  Q.  How often does the DEA put
13  on conferences?
14  A.  I believe every other year
15  for distributors, and then the other
16  years pharmacy practitioners.  I'm not
17  positive about that.
18  But I know our meetings
19  are -- usually every two years, DEA will
20  have an industry meeting for
21  distributors.
22  Q.  Do you always attend those?
23  A.  I attended a lot of them
24  earlier on.  I probably haven't attended

Page 308

1  one in years.  People on my staff attend
2  them.
3  Q.  When do you recall having
4  last attended one?
5  A.  It may have been 2009.  I am
6  not sure if I attended one in 2011.  But
7  I know I haven't attended one for the
8  last, you know, years.
9  Q.  You've always -- someone
10  from Amerisource has always been sent to
11  one of these conferences?
12  A.  Usually, yes.
13  Q.  And do they continue to this
14  day?
15  A.  Yes.
16  Q.  Do you know if there was one
17  in 2016?
18  A.  I don't know if it's 2016 or
19  2017, but they have them every two years.
20  Q.  Okay.  Does anyone take
21  notes at these meetings?
22  A.  I don't know if HDA as --
23  does that or not.  I don't know.
24  Q.  Do you direct any of your

Page 309

1  staff members to take notes of the
2  meetings if you don't attend?
3  A.  They would -- I would assume
4  they would take notes.  DEA usually
5  provides the slides that they produce at
6  the industry conferences.  I'm not sure
7  if they put them on their website -- I'm
8  not sure if they put them on their
9  website or not.
10  Q.  Do you discuss the
11  presentations or the conferences with
12  other members of the HDMA?
13  A.  Do we discuss the DEA
14  conferences with HDMA members?  Most of
15  them are usually there.  I shouldn't say
16  all of them, but a lot of the members are
17  there at the DEA conference.
18  Q.  So you meet with each other
19  while you're at these conferences?
20  You're there together?
21  A.  Yes.
22  Q.  Do you discuss diversion
23  control while you're at these
24  conferences?

Page 310

1      MR. NICHOLAS:  I'm going to
2  just object to the questions, only
3  to the extent that the witness
4  said he hasn't been to one of
5  these conferences himself since
6  2009 or maybe 2011.
7      So I want to make sure the
8  record is clear that we're, you
9  know -- he's not talking about --
10 he can only talk about what he can
11 talk about.
12     Go ahead.
13     THE WITNESS:  Years back,
14 yeah, we would talk about
15 regulatory issues or how we do
16 things or, you know, what -- those
17 type of things.
18 BY MR. PIFKO:
19     Q.  Is there a meeting through
20 the HDMA, after these conferences, where
21 the members get together and discuss what
22 was said at the conference and their
23 views on the information that the DEA
24 might have shared at the conference?

Page 311

1      MR. NICHOLAS:  Same
2  objection for the same reason.
3      THE WITNESS:  My
4  recollection was that, you know,
5  there would be discussions prior
6  to the meetings if there's
7  questions that we wanted to bring
8  up, as an industry.
9      I don't recall if there was
10 a structured debrief or anything
11 like that after.
12 BY MR. PIFKO:
13     Q.  Let's look back at
14 Exhibit-11.
15     It says here -- well, first,
16 do you know who Brian Cherico is?
17     A.  I'm not familiar with Brian.
18     Q.  How about Steve Reardon?
19     A.  Yes.
20     Q.  Who is Steve Reardon?
21     A.  He was -- I don't know if
22 he's director or senior director or vice
23 president of regulatory.  I've known him
24 for quite some time.

Page 312

1      Q.  Do you know if he still
2  works at Cardinal Health?
3      A.  He does not.
4      Q.  Does he work for another
5  distributor, do you know?
6      A.  He's retired.
7      Q.  How about Anita Ducca, do
8  you know who that is?
9      A.  I believe -- yes, I do.
10     Q.  Who is she?
11     A.  I believe she's vice
12 president of regulatory affairs for HDMA.
13     Q.  So then Brian sends this to
14 Steve Reardon, and says, Steve, pasted
15 below please find the summary of HDMA's
16 meeting with the DEA last Friday.  Please
17 let me know if you need anything else.
18     Do you see that?
19     A.  Yes.
20     Q.  And then it's got a summary
21 of the meeting here.
22     It says, Key takeaways from
23 the meeting were -- do you see where that
24 is?

Page 313

1      A.  Yes.
2      Q.  DEA's policy was to expect
3  more than just reporting suspicious
4  orders.  If there was a suspicious order,
5  the distributor should either stop the
6  delivery or should evaluate the customer
7  further before delivering it.
8      Do you see that?
9      A.  Yes.
10     Q.  Did you have an
11 understanding, at that time, that that
12 was DEA's position?
13     A.  Yes.  This was the program
14 that we had just negotiated.
15     Q.  It says, Simply complying
16 with the suspicious orders regulatory
17 requirement does not mean, in the
18 agency's view, that the registrant is
19 maintaining an effective program to
20 detect and prevent diversion.
21     Do you see that?
22     A.  Yes.
23     Q.  Did you have an
24 understanding that that was the DEA's

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1 position at the time?
2     A.   As I previously indicated,
3 there's many requirements to have
4 adequate controls to prevent diversion,
5 other than just to report a suspicious
6 order, yes.
7     Q.   It then says, DEA indicated
8 that they did not have the resources to
9 inspect every pharmacy; therefore, it was
10 important for the distributor to, quote,
11 know their customers, end quote.
12        Do you see that?
13     A.   I see that.
14     Q.   Did you have an
15 understanding that that was the DEA's
16 position at the time?
17     A.   I've never seen it stated as
18 such, that a lack of resources by DEA
19 imposes a requirement upon a registrant
20 over and above their regulatory
21 responsibilities.
22     Q.   Well, they sent this e-mail
23 to you saying this in 2007.
24     A.   Yes.

Page 315

1     Q.   Do you recall discussing
2 that with anyone?
3     A.   No.
4     Q.   Do you recall being shocked
5 that that was a new position of the DEA
6 of which you weren't familiar with?
7     A.   No.
8     Q.   Okay.  So that's consistent
9 with the DEA's position as far as you
10 knew at the time?
11        MR. NICHOLAS:  Object to the
12     form.
13        THE WITNESS:  You had stated
14     that -- in our negotiation, they
15     wanted us to enhance our due
16     diligence process.  What I don't
17     recall them saying is that we
18     can't -- we don't have resources
19     to do this, so we want you to do
20     that.  I don't recall that.
21        I recall them wanting us to
22     enhance our due diligence process,
23     yes.
24 BY MR. PIFKO:

Page 316

1     Q.   Upon receiving this e-mail,
2 did AmerisourceBergen take any steps to
3 respond to the idea that DEA did not have
4 adequate resources to inspect pharmacies
5 and, therefore, it was important for them
6 to, quote, know their customer?
7        MR. NICHOLAS:  Object to the
8     form.
9        THE WITNESS:  No.  This
10     is -- like I indicated previously,
11     this is maybe a couple of weeks
12     after we negotiated our program
13     which contained the "know your
14     customer."  So there's no use to
15     respond to this.  This is our
16     program.
17 BY MR. PIFKO:
18     Q.   Let's go to the next page.
19        It says, DEA provided
20 examples of what a wholesale distributor
21 should do to, quote, know their
22 customers, end quote, and what to look
23 for.
24        Do you see that?

Page 317

1     A.   Yes.  I see that, yes.
2     Q.   Do you recall getting
3 guidance from the DEA on what you should
4 do to know your customers?
5        MR. NICHOLAS:  Object to the
6     form.  It seems like you'd want to
7     call his attention to the
8     additional sentences in the
9     paragraph to help answer the
10     question.
11        THE WITNESS:  As I
12     indicated, we had had these
13     discussions with the DEA in
14     developing our program and the
15     discussions about the form, yes.
16 BY MR. PIFKO:
17     Q.   Did you understand that the
18 DEA wanted you to inspect pharmacies?
19     A.   Part of our due diligence
20 program was to have a site visit and
21 complete a form, yes.
22     Q.   This is what -- the new
23 customer onboarding you talked about?
24     A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review



Page 318

1     Q.    Did you have an
2 understanding that you should inspect
3 customers who are existing customers?
4     A.    No.
5     Q.    It says, They -- referring
6 to the DEA -- also mentioned such actions
7 as, quote, doing Google searches, end
8 quote, to determine if the pharmacy's
9 name was affiliated with an Internet site
10 and getting information from the state as
11 to the nature and number of prior legal
12 actions against a pharmacy.
13      Do you see that?
14     A.    Yes.

Page 320

Page 319

Page 321

Highly Confidential - Subject to Further Confidentiality Review



Page 322

6  BY MR. PIFKO:
7      Q.   It says, towards the bottom,
8  second-to-last bullet point, DEA also
9  indicated that they were not going to
10  make a decision for the wholesale
11  distributor as to when an order was
12  suspicious.  They feel this is up to the
13  distributor.
14         Do you see that?
15      A.   Yes.
16      Q.   Did you understand that the
17  determination of whether an order was
18  suspicious was up to you?
19      A.   Yes.
20      Q.   The last bullet point says,
21  DEA suggested that distributors should
22  check on the pharmacy's prescribing
23  physicians.  They pointed to some states
24  having online systems by which a

Page 323

1  distributor could check to see if a
2  prescribing physician had a valid DEA
3  registration.  DEA suggested that
4  distributors ask who the doctors are that
5  are prescribing, where the pharmacy is
6  geographically with respect to its
7  prescribing doctors, and the patient
8  population.
9         Do you see that?
10      A.   Yes.

Page 324

Page 325

Highly Confidential - Subject to Further Confidentiality Review



Page 326

19  Q.  Do you recall taking any
20 action, as a result of receiving this
21 e-mail describing the DEA's position on
22 the issues we just discussed?
23      MR. NICHOLAS:  Object to the
24 form.

Page 327

1       THE WITNESS:  I'm not sure
2 what action -- I don't recall
3 getting the e-mail, so I don't
4 recall reading the e-mail and then
5 any action.
6       This is two weeks after we
7 put our program in place, which is
8 pretty much the points that
9 they're hitting on.
10      And I think this is in
11 September.  And I spoke at their
12 conference, I think it was
13 November, and covered pretty much
14 these same points.  So our program
15 was already meeting these
16 requirements.
17      MR. NICHOLAS:  Mark before
18 you go to another document, it's
19 been two hours.  Can we take a
20 break?
21      MR. PIFKO:  Sure.
22      VIDEO TECHNICIAN:  Going off
23 the record.  3:05 p.m.
24      - - -

Page 328

1      (Whereupon, a brief recess
2 was taken.)
3      - - -
4      VIDEO TECHNICIAN:  We're
5 back on record at 3:26 p.m.
6      - - -
7      (Whereupon, a discussion off
8 the record occurred.)
9      - - -
10      (Whereupon, Amerisource
11 Bergen-Zimmerman Exhibit-12,
12 MNKT1_0000291614-1620, was marked
13 for identification.)
14      - - -
15 BY MR. PIFKO:
16   Q.   I've just handed you what's
17 marked as Exhibit-12.  It's a document
18 Bates labeled MNKT1_0000291614 through --
19      MR. CLUFF:  This is another
20 one --
21 BY MR. PIFKO:
22   Q.   -- 1620.
23      MR. CLUFF:  -- where we
24 obtained permission from

Page 329

1 Mallinckrodt's counsel prior to
2 its use today.
3      MR. NICHOLAS:  Okay.
4 BY MR. PIFKO:
5   Q.   Could you take a minute to
6 take a look at this document, please?
7   A.   Yes.
8   Q.   Let me know when you're
9 done.
10      I was only going to ask you
11 about a couple of things on here, in the
12 interest of time.  Feel free to look at
13 it, but I can direct you to the couple of
14 questions.
15      Have you seen this document
16 before?
17   A.   I don't recall seeing it
18 before.
19   Q.   It says, HDMA, DMC expo,
20 2011.
21      Do you know what an HDMA,
22 DMC expo is?
23   A.   HDMA has an annual
24 management conference, I'm assuming

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1 that's what they're referring to.
2     Q.   When you were on -- you've
3 been -- you've had a role with respect to
4 the HDMA for a long time now, right?
5 You've had different roles.
6       I think -- I forget, but you
7 were on one committee and then you're on
8 some other committee now, right?
9     A.   That's correct.
10     Q.   So you've always had an
11 affiliation with the HDMA?
12     A.   Yes.
13     Q.   Have you attended this
14 conference in the past?
15     A.   I have.
16     Q.   Do you believe you attended
17 this one?
18     A.   I may have. It's like with
19 the other one, I don't -- I haven't
20 attended them the last -- for years. I
21 just don't know when -- when I stopped
22 attending.
23     Q.   You see at the top here, it
24 says, Attendees included

Page 331

1 AmerisourceBergen, Cardinal, H.D. Smith,
2 McKesson, Lilly, Johnson & Johnson,
3 Purdue, Sanofi, Aventis, AmeriCares and
4 many more.
5       Do you see that?
6     A.   Yes.
7     Q.   So you believe you would
8 always send someone to these conferences
9 if you didn't attend yourself?
10     A.   Yes.
11     Q.   I just want to know, I want
12 to ask you about your familiarity with
13 some of the topics that were discussed
14 here.
15       This is -- the notes here
16 are about a specific DEA session that
17 occurred on March 7th at this conference.
18       Do you see that just on the
19 first page at the top?
20     A.   Yes. ^^
21     Q.   Do you know who Cathy
22 Gallagher is?
23     A.   I do.
24     Q.   Is that someone you've

Page 332

1 interacted with before?
2     A.   I have.
3     Q.   It says she's chief policy
4 and liaison, Drug Enforcement
5 Administration.
6     A.   Correct.
7     Q.   What did she do, as far as
8 your interactions with her?
9     A.   She would be one, if we had
10 a policy question or a process question,
11 that we would either write to her or call
12 her.
13     Q.   It says here, Cathy gave a
14 brief overview of hot topics current
15 within the DEA.
16       Do you see that?
17     A.   Yes.
18     Q.   In conferences -- in HDMA
19 conferences you do remember attending, do
20 you remember the DEA presenting current
21 topics of interest to the members of the
22 industry at these conferences?
23     A.   Yes. There was usually a
24 segment that DEA presented at.

Page 333

1     Q.   One of these, if you scroll
2 way down to the bottom,
3 second-to-the-last bullet point, Increase
4 of ER visits are 97 percent contributable
5 to pharmaceuticals; opioids are the most
6 frequent.
7       Do you see that?
8     A.   Yes.
9     Q.   Do you recall that being a
10 topic of discussion within the industry
11 in 2011?
12     MR. NICHOLAS: Object to the
13    form.
14    THE WITNESS: No.
15 BY MR. PIFKO:
16     Q.   Do you recall discussing
17 that with anyone at the HDMA at any
18 point?
19     A.   I don't recall discussions
20 regarding emergency room visits, no.
21     Q.   Do you have any reason to
22 dispute this fact?
23     MR. NICHOLAS: Object to the
24    form.

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1  THE WITNESS:  I'm assuming
2  that these are bullet points based
3  upon DEA slides.  So, I mean, this
4  is what DEA presented.
5  BY MR. PIFKO:
6  Q.  Let's turn to the next page.
7  Look at the heading, Rogue
8  Pain Clinics in Florida.
9  Do you see that?
10  A.  Yes.
11  Q.  It talks about Operation
12  Pill Nation, it looks like some sort of
13  enforcement initiative.
14  And then it says, Problem
15  now is migration, in quotes, vast
16  majority of patients are visiting Florida
17  from out of state.
18  It mentions various states,
19  including Ohio.
20  Do you see that?
21  A.  Yes.
22  Q.  Do you recall ever
23  discussing the topic of migration amongst
24  members of the industry or with HDA?

Page 335

1  MR. NICHOLAS:  Objection.
2  Not to the form, but to the fact
3  that I think this is completely
4  outside the scope of the 30(b)(6),
5  unless you can tell me --
6  MR. PIFKO:  He's the had
7  representative.  I believe you
8  designated him for that topic.
9  THE WITNESS:  I don't
10  recall.
11  BY MR. PIFKO:
12  Q.  Did you undertake any
13  activities, in preparing for this
14  deposition, to familiarize yourself with
15  HDMA presentations?
16  A.  I did not review any HDMA
17  presentations.
18  Q.  Did you talk to anybody to
19  familiarize yourself with
20  AmerisourceBergen's role in participating
21  in HDMA-related events?
22  MR. NICHOLAS:  Hold on.
23  I'll object only to the extent
24  that this may invade the

Page 336

1  attorney-client privilege.
2  Otherwise, you can answer.
3  THE WITNESS:  No.
4  BY MR. PIFKO:
5  Q.  Aside from communications
6  with the HDMA and this conference, are
7  you familiar with the idea of migration?
8  MR. NICHOLAS:  Objection.
9  Outside the scope of the 30(b)(6).
10  THE WITNESS:  I'm not -- in
11  what context?
12  BY MR. PIFKO:
13  Q.  Well, okay, you're the top
14  dog with respect to the CSRA and
15  compliance at the company.
16  And I just want to know, in
17  serving in that role at the company, if
18  this idea of out-of-state people going to
19  different states to buy pills and
20  migrating them back to their hometown, if
21  that's something that you are familiar
22  with?
23  A.  I've seen articles that
24  reference that.

Page 337

1  Q.  When do you believe you've
2  seen articles about that?
3  A.  I can't cite specific ones.
4  Q.  How about general ones?
5  A.  I can't cite general ones.
6  Q.  So you can't cite any is
7  what you're saying?
8  MR. NICHOLAS:  You're asking
9  him to cite an article?
10  BY MR. PIFKO:
11  Q.  You've referenced that
12  you've seen articles, but you can't
13  identify a specific article, correct?
14  A.  Correct.
15  Q.  When do you believe you
16  might have first heard of the idea of
17  migration?
18  MR. NICHOLAS:  Objection.
19  Outside the scope.
20  Are you asking him in the
21  30(b)(6) context or otherwise?
22  MR. PIFKO:  Individually.
23  MR. NICHOLAS:  Individually.
24  Go ahead.

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    THE WITNESS:  Was it ever
2    discussed, the term migration, as
3    you're stating it, of people that
4    were getting prescriptions filled
5    and then -- from out of state?  I
6    mean, I had read articles on that
7    and I was aware of it.
8  BY MR. PIFKO:
9    Q.   Okay.  So migration is not a
10 term that you're familiar with, but you
11 are familiar with the idea of someone
12 traveling to a state and getting a
13 prescription and exporting it back to
14 somewhere else, correct?
15   MR. NICHOLAS:  Object to the
16   form.
17   THE WITNESS:  The specific
18   information that I had on that, on
19   the articles, was that -- whether
20   they were referring to some
21   arrests that were made by some
22   individuals who had gotten
23   prescriptions filled in another
24   state, and they arrested them in

Page 339

1    another state.  If that makes
2    sense.
3  BY MR. PIFKO:



Highly Confidential - Subject to Further Confidentiality Review

Page 342



Page 343

20 BY MR. PIFKO:
21     Q.   How would I find that
22 information out?
23         MR. NICHOLAS:  Objection.
24     Object to the form of the

Page 344

1     question.
2         THE WITNESS:  You have to
3     ask the person that's performing
4     that function.
5 BY MR. PIFKO:
6     Q.   Who is responsible for
7 performing that function currently?
8     A.   David May is the one who
9 oversees that department.
10     Q.   So someone under him would
11 be responsible for doing that?
12     A.   Yes.
13     Q.   Okay.  David May joined the
14 company in 2014.
15         Who served in his role prior
16 to him?
17     A.   Ed Hazewski.
18     Q.   If I wanted to know, for an
19 earlier time period, what the company's
20 practices were with respect to what they
21 look at, with respect to prescribing
22 physicians, would I ask him?
23     A.   Yes.
24     Q.   And how far back was his

Page 345

1 tenure in that position?
2     A.   2008, I believe.  Somewhere
3 around there.
4     Q.   Is he still with the
5 company?
6     A.   Yes.
7     Q.   What's his current role?
8     A.   He's director diversion
9 control.
10     Q.   In obtaining information
11 about a pharmacy, does AmerisourceBergen
12 investigate the type of doctor who is
13 writing prescriptions in comparison to
14 the type of pills he's prescribing, he or
15 she is prescribing?
16         MR. NICHOLAS:  Hold on.
17     I'll object to the form.  I also
18     would appreciate it if you would
19     put this into some time frame.
20         MR. PIFKO:  For the time
21     period for which you're a
22     30(b)(6).
23 BY MR. PIFKO:
24     Q.   Let me ask the question,

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1 just to get a cleaner record.
2          During the time from prior
3 to -- from -- prior to 2015, in obtaining
4 information about a pharmacy's
5 prescribing physicians, does
6 AmerisourceBergen undertake any effort to
7 evaluate the nature of the physician in
8 comparison with the nature of the
9 medicine that's being prescribed?
10          MR. NICHOLAS:  Object to the
11     form.
12          THE WITNESS:  I don't know
13     what medicine -- we get the top
14     prescribers for the form, but it
15     doesn't indicate what medicines
16     they're prescribing.
17 BY MR. PIFKO:
18     Q.   Do you ask, with respect to
19 opioids or controlled substances -- let
20 me just -- with respect to controlled
21 substances, do you ask who the top
22 prescribers are of controlled substances?
23          MR. NICHOLAS:  Objection.
24          THE WITNESS:  I don't know

Page 347

1     exact -- if that's the wording of
2     the question.  I don't know.
3 BY MR. PIFKO:
4     Q.   So you don't know if the
5 question just asks for the top
6 prescribing physicians for all things
7 that they sell, or if it's just for
8 controlled substances?
9     A.   Correct.
10     Q.   Based on what you know,
11 would it be a red flag if a pharmacy was
12 writing -- filling a substantial number
13 of prescriptions from an out-of-area
14 doctor?
15          MR. NICHOLAS:  Object to the
16     form.
17          THE WITNESS:  Again, I don't
18     know the specific circumstances.
19     I don't know.
20 BY MR. PIFKO:
21     Q.   That's not something that
22 you're familiar with?
23          MR. NICHOLAS:  That's not
24     what he said.  Objection.

Page 348

1          Go ahead.
2          THE WITNESS:  I'm not
3     understanding your question.
4 BY MR. PIFKO:
5     Q.   I'm trying to assess
6 whether, in evaluating activity at a
7 pharmacy, AmerisourceBergen considers the
8 fact that a large volume of prescriptions
9 are being written by an out-of-area
10 doctor for that pharmacy?
11          MR. NICHOLAS:  Objection.
12          THE WITNESS:  I would need
13     to know the totality of the
14     information.  It goes back to a
15     hypothetical of giving me a
16     specific, if X then Y.  I can't
17     give you that.  I don't know.
18          I don't know if the pharmacy
19     is on the border of -- he's in one
20     state and the pharmacy is across
21     the border.  I don't know.  I
22     don't know.
23 BY MR. PIFKO:
24     Q.   I'm asking a more general

Page 349

1 question.
2          Is that -- is that --
3 generically, is that information that you
4 would seek out, or is that something that
5 you're not interested in?
6          MR. NICHOLAS:  I'll object
7     to the form of the question.
8          THE WITNESS:  I would have
9     to defer to the people that are
10     doing the checks on the
11     prescribers.
12 BY MR. PIFKO:
13     Q.   Let's talk a little bit more
14 about this document, Exhibit-12.
15          It says, below the migration
16 discussion, Identifying a rogue clinic.
17          Do you see that?
18     A.   Yes.
19     Q.   Cash-only operation.
20          Do you see that?
21     A.   Yes.
22     Q.   Does AmerisourceBergen
23 evaluate the percentage of cash versus
24 insurance payments that are made to a

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1 pharmacy with respect to controlled
2 substances?
3　　　MR. NICHOLAS: Object to the
4　　form.
5　　　THE WITNESS: We -- part of
6　　the 590 form has that information.
7 BY MR. PIFKO:
8　　Q. Do you do anything to verify
9 that information, like check accounting
10 records from a pharmacy?
11　　　MR. NICHOLAS: Object to the
12　　form.
13　　　THE WITNESS: We do not have
14　　any way to confirm whether people
15　　are paying cash or not.
16 BY MR. PIFKO:
17　　Q. It says down here, Drugs
18 prescribed are cocktail drugs.
19　　　Do you see that?
20　　　Oxy/hydro/Xanax. Do you see
21 that?
22　　A. Yes.
23　　Q. Do you know what
24 oxy/hydro/Xanax is referring to?

Page 351

1　　A. I do not.
2　　Q. Oxycodone, hydrocodone and
3 Xanax, does that sound right?
4　　A. I mean, I see those -- that
5 on here. I'm not sure what they're
6 referring to as "cocktail."
7　　Q. Does AmerisourceBergen
8 evaluate whether a pharmacy is filling
9 multiple prescriptions at one time for
10 certain combinations of controlled
11 substances?
12　　A. We don't have that
13 information. We don't have patient -- or
14 prescriber dispensing information.
15　　Q. It talks about site visits
16 in the next line.
17　　　Do you see that?
18　　A. Yes.
19　　Q. Do you train your sales
20 associates to observe signs of diversion
21 when they are at a customer site?
22　　A. Yes.
23　　Q. What do you train them to
24 look for?

Page 352

1　　A. We have a presentation that
2 they go through of some of -- long lines,
3 a lot of cash transactions. There's a
4 whole host of things that we ask them to
5 take a look at.
6　　Q. And then what do you do with
7 that information if they report it back
8 to you?
9　　A. If they report it back to
10 us, we would investigate.
11　　Q. What would an investigation
12 entail? Who would take that up?
13　　　MR. NICHOLAS: Let me just
14　　interpose an objection to make
15　　sure I understand the time frame
16　　that we're talking about and
17　　whether he's talking about as an
18　　individual or in his 30(b)(6)
19　　capacity.
20 BY MR. PIFKO:
21　　Q. In his 30(b)(6) capacity is
22 what I'm asking.
23　　　MR. NICHOLAS: 2007 to 2014.
24　　　THE WITNESS: And what was

Page 353

1　　your question? I'm sorry.
2 BY MR. PIFKO:
3　　Q. So we talked about efforts
4 that the company may undertake to have
5 its sales associates observe signs of
6 diversion at a pharmacy, okay?
7　　A. Yes.
8　　Q. So I asked, if a sales
9 associate reports back to the company,
10 during the time period for which you're a
11 30(b)(6) representative, what does the
12 company do with that information?
13　　A. We would investigate.
14　　Q. And is there a specific
15 department who is responsible for
16 investigating it?
17　　A. It could be the diversion
18 control department. It could be the
19 security group. It could be our
20 consultant that we utilize. It could be
21 any of those areas.
22　　Q. Is there a set way that you
23 decide who is going to investigate it?
24　　A. It depends on the

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1 circumstances, location, those type of
2 criteria.
3      Q.   So you evaluate the
4 circumstances and location of the
5 incident, and that's how you decide who
6 is going to investigate it?
7      MR. NICHOLAS: Object to the
8 form.

[redacted]

15 BY MR. PIFKO:
16      Q.   Can you identify any
17 occasions where a sales associate, during
18 the relevant time period for which you
19 are a 30(b)(6), has identified suspicious
20 conduct and the company conducted an
21 investigation?
22      A.   I'd have to result back to
23 those records. I don't --
24      Q.   What records would I look at

Page 355

1 to know that information?
2      MR. NICHOLAS: Let me make
3 sure I clarify that you're talking
4 about the Track 1 jurisdictions
5 now, right?
6      MR. PIFKO: Well, I'm
7 talking about their policies and
8 procedures in general.
9      MR. NICHOLAS: But you asked
10 him about identifying particular
11 instances. So I assume that we're
12 talking about Track 1
13 jurisdictions; is that correct?
14      MR. PIFKO: I was talking
15 about any jurisdiction.
16      MR. NICHOLAS: Well, then, I
17 object. It's overbroad and not
18 within the scope of the deposition
19 at all.
20      Go ahead.
21 BY MR. PIFKO:
22      Q.   So my question was, what
23 records would I look at to know whether a
24 sales associate had reported suspicious

Page 356

1 activity?
2      MR. NICHOLAS: Same
3 objection. And objection to form.
4      THE WITNESS: It would --
5 the time frame you're talking
6 about, it would be in our
7 investigative -- investigation
8 records.
9 BY MR. PIFKO:
10      Q.   Is there a specific name?
11 Just investigative records?
12      MR. NICHOLAS: Object to the
13 form.
14      Go ahead.
15      THE WITNESS: It's where we
16 maintain our investigations, yes.
17 BY MR. PIFKO:
18      Q.   Have you ever heard the term
19 "due diligence files"?
20      A.   Yes.
21      Q.   Is that the same thing as
22 your investigation records, or is that
23 something different?
24      A.   It could be. There could be

Page 357

1 a record of the investigations within the
2 due diligence file. But it also could be
3 in an investigation file, depending upon
4 the type and scope of the investigation.
5      Q.   Who is responsible for
6 maintaining investigation files at the
7 company?
8      A.   Bruce Gundy.
9      Q.   How long has he had that
10 responsibility?
11      A.   During the scope of 2007 to
12 2014.
13      Q.   Okay. Do you know who has
14 that responsibility currently?
15      A.   Bruce Gundy, same person.
16      Q.   Does AmerisourceBergen
17 believe it's everybody in the company's
18 responsibility to prevent diversion?
19      MR. NICHOLAS: Object to the
20 form. It's an unfair question.
21      Go ahead.
22      THE WITNESS: We believe
23 that everyone has a responsibility
24 for compliance and need to conduct

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1  themselves such.
2  BY MR. PIFKO:
3     Q.   Do you know if your sales
4  associates receive bonuses from hitting
5  sales targets?
6     A.   I don't know --
7        MR. NICHOLAS:  Hold on.
8     This witness is not designated on
9     the topic of compensation, as you
10    know.  So he's not in a position
11    to answer that.  There are other
12    people who can answer that
13    question, but not him.
14       MR. PIFKO:  It's a
15    foundational question.
16       MR. NICHOLAS:  Well, I mean,
17    this isn't his topic.
18       MR. PIFKO:  Okay.  But he
19    said he doesn't know, so we got
20    the answer.
21  BY MR. PIFKO:
22    Q.   Do you think there's a
23  potential conflict in having someone who
24  is bonus driven be responsible for

Page 359

1  identifying diversion?
2        MR. NICHOLAS:  Objection.
3     Hold on.  This isn't his area.
4     It's not his area.  You didn't
5     designate him for this area.  You
6     have someone who you're going to
7     depose on the issue of
8     compensation.
9        MR. PIFKO:  It has to do
10    with suspicious order monitoring
11    processes and protocols.
12       THE WITNESS:  Can you
13    restate the --
14       MR. PIFKO:  Yeah.
15       In any event, you can object
16    to scope, and we can fight about
17    the impart of his testimony later.
18  BY MR. PIFKO:
19    Q.   So the question is, do you
20  think there is a potential conflict in
21  having someone who is bonus driven be
22  responsible for identifying diversion?
23       MR. NICHOLAS:  Same
24    objection.  Also, object to the

Page 360

1  form.
2        THE WITNESS:  When the
3     premise of your question is if
4     they're bonus driven, I don't know
5     that.  And as you -- and as I
6     indicated previously, all of our
7     associates have a role in their
8     responsibility to make sure that
9     we operate in compliance,
10    regardless of what their role is;
11    whether they're an order filler,
12    salesperson, record keeper.
13  BY MR. PIFKO:
14    Q.   Okay.  But if someone has a
15  compensation structure that's based on
16  increasing sales, do you see that as at
17  odds with identifying diversion?
18       MR. NICHOLAS:  Objection.
19    Not within the scope of his areas.
20    And I object to the form of the
21    question.  It's a hypothetical
22    question as well.
23       THE WITNESS:  It's a
24    hypothetical question.

Page 361

1        It goes back to the --
2     you're giving me a set of
3     potential facts and asking me to
4     arrive at a conclusion.  It would
5     depend upon the situation.
6        I don't think -- what you're
7     inferring, I don't think, is
8     correct.
9  BY MR. PIFKO:
10    Q.   What am I inferring?
11       MR. NICHOLAS:  Hold it.
12    Hold it.  Object to the form of
13    the question.
14       The question is, what am I
15    inferring?  I object to the form
16    of the question.  I suggest we
17    move on to some facts and not
18    looking for sound bites.
19  BY MR. PIFKO:
20    Q.   I asked you what you thought
21  I was inferring.
22       MR. NICHOLAS:  Same
23    objections.
24       THE WITNESS:  Can you repeat

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1  the question?
2  BY MR. PIFKO:
3      Q.   I asked you, do you think
4  there's a potential conflict in having
5  someone who is bonus driven be
6  responsible for identifying diversion?
7      A.   My answer is no.
8              - - -
9      (Whereupon, Amerisource
10  Bergen-Zimmerman Exhibit-13,
11  ABDCMDL 00278212, was marked for
12  identification.)
13             - - -
14  BY MR. PIFKO:
15     Q.   I'm handing you what is
16  marked as Exhibit-13.  For the record,
17  it's a single-page document, Bates
18  labeled ABDCMDL 00278212.  And the
19  metadata reflects that it's from your
20  files, Mr. Zimmerman.
21         Let me know when you're done
22  reviewing it.
23     A.   Okay.
24     Q.   Do you recall this document?

Page 363

1      A.   I do not.
2      Q.   Do you recall writing this
3  document?
4      A.   No.
5      Q.   Do you have any reason to
6  dispute that this is a true and correct
7  document that came from your files?
8          MR. NICHOLAS:  Object to the
9      form.
10         THE WITNESS:  I don't know
11     where it came from.
12  BY MR. PIFKO:
13     Q.   Well, you understand that in
14  litigation, documents come with
15  information that tells you where they
16  came from, as far as whose computer, et
17  cetera?  Do you understand that?
18     A.   Yes.
19     Q.   Well, this came from your
20  computer.
21         MR. NICHOLAS:  I think the
22     hang up here is you're just
23     telling him stuff, and he has,
24     really, no way of knowing.

Page 364

1  BY MR. PIFKO:
2      Q.   That's what the document
3  says, okay?
4          Do you dispute that it came
5  from your computer?
6          MR. NICHOLAS:  Object to the
7      form.
8          THE WITNESS:  I don't know
9      if it came -- I mean, you're
10     telling me it came from my
11     computer.  I don't recall ever
12     seeing this document.
13  BY MR. PIFKO:
14     Q.   Do you know what this
15  document is about?
16     A.   I've never seen this
17  document.
18     Q.   Your testimony is you've
19  never seen this document?
20     A.   I don't recall ever seeing
21  this document.
22     Q.   Do you recall ever
23  discussing this with anyone?
24         MR. NICHOLAS:  Object to the

Page 365

1      form.
2          THE WITNESS:  This document?
3  BY MR. PIFKO:
4      Q.   The subject matter of this
5  document.
6      A.   As we previously discussed,
7  we talked about low-volume accounts, so
8  I've had discussions regarding that.
9      Q.   Do you see here it says --
10  it's talking about -- so it's talking
11  about those types of customers,
12  low-volume, high-controlled substances
13  customers.
14         It says, I'm rather
15  concerned -- I'm in the middle of the
16  document.
17         I'm rather concerned about
18  your pharmacy for a different reason.
19  Based on your overall volume with us,
20  your percentage of C-II orders is high
21  and may be deemed suspicious by either
22  our OMP system or regulatory authorities.
23  This puts your account with
24  AmerisourceBergen at significant risk of

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1 closure or exposure to regulatory and
2 enforcement agencies.
3      Do you see that?
4      A.  I do.
5      Q.  Do you recall being
6 concerned about certain customers because
7 of their percentage of controlled
8 substances with respect to their overall
9 volume?
10      MR. NICHOLAS:  Object to the
11      form.
12      THE WITNESS:  As I
13      indicated, that was one of the
14      areas we were looking at, our
15      low-volume, higher-percentage
16      secondary accounts and whether
17      we -- you know, how we handled
18      those accounts.
19 BY MR. PIFKO:
20      Q.  Did you ever undertake
21 efforts to report accounts for such
22 activity?
23      MR. NICHOLAS:  Object to the
24      form.

Page 367

1      THE WITNESS:  Report in what
2      way?
3 BY MR. PIFKO:
4      Q.  As being suspicious.
5      A.  If they placed an order that
6 met our suspicious order criteria, we
7 would have.
8      Q.  Do you think it's
9 appropriate to provide guidance to a
10 customer on how to circumvent your
11 suspicious order monitoring program?
12      MR. NICHOLAS:  Object to the
13      form.
14      THE WITNESS:  I don't
15      think -- I'm not sure what your
16      question -- again, you're asking
17      me another hypothetical question
18      and asking me to give you a
19      response that -- again, I can't --
20      I'm not going to answer a
21      hypothetical.
22 BY MR. PIFKO:
23      Q.  So your position, the jury
24 is watching --

Page 368

1      A.  Yes.
2      Q.  -- is, you don't have a
3 position on whether it's appropriate to
4 give guidance to a customer on how to
5 escape your suspicious order monitoring
6 program?
7      MR. NICHOLAS:  Well, that is
8      not what he said.  I object to the
9      characterization of his testimony.
10      I object to the reference to the
11      jury, which is bullying and
12      harassing.
13      And why don't you just ask
14      him a factual question?
15      Go ahead.
16      THE WITNESS:  We don't give
17      guidance to our customers on how
18      to circumvent our system.
19 BY MR. PIFKO:
20      Q.  Do you believe that it's
21 inappropriate to do so?
22      MR. NICHOLAS:  Object to the
23      form.
24      THE WITNESS:  Again, to do

Page 369

1      what?
2 BY MR. PIFKO:
3      Q.  To tell a customer how not
4 to be caught by your system or the DEA's
5 system for engaging in suspicious
6 activity.
7      MR. NICHOLAS:  Object to the
8      form.
9      THE WITNESS:  Again --
10      MR. NICHOLAS:  What DEA
11      system are you talking about?
12      THE WITNESS:  Again, we have
13      a program that we implement and we
14      have our processes in place.  And
15      we don't -- and part of that
16      process is not to tell customers
17      how to get around the system, or
18      however you worded it.
19      But that's not how our
20      program works.
21 BY MR. PIFKO:
22      Q.  So here, after saying to
23 this category of customers, based on your
24 overall volume with us, your percentage

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1  of C-II orders is high and may be deemed
2  suspicious by either our OMP system or
3  regulatory authorities, this document
4  then goes on to say, The way I see it is
5  that you have a couple of options.
6  First, you can make ABDC your primary
7  wholesaler and shift all purchases to us.
8  The second option is we arrange a
9  short-term transition process and you
10 stop buying controlled -- Schedule II
11 controlled substances from ABDC and shift
12 them to whomever you're buying other
13 products. The third option would be to
14 do nothing, but this is not a feasible
15 long-term decision.
16        Do you see that?
17    A.  I see that.
18    Q.  Do you think that's
19 appropriate guidance to give to a
20 customer?
21        MR. NICHOLAS: Hold on.
22 Objection. You are
23 mischaracterizing the witness's
24 testimony. The witness has said

Page 371

1  he never -- he didn't write the
2  document. He's never seen the
3  document.
4        So I object to the line of
5  questions. This is not 30(b)(6)
6  material. I don't know why --
7  it's not within --
8        MR. PIFKO: You're over the
9  top with your objections.
10       MR. NICHOLAS: It's not
11 within --
12       MR. PIFKO: Okay. Scope.
13       MR. NICHOLAS: -- his
14 personal knowledge.
15       MR. PIFKO: Scope. Scope,
16 and all the objections you want to
17 make. You need to stop speaking
18 to the witness, okay?
19       MR. NICHOLAS: I'm not
20 speaking to the witness. I'm
21 speaking to you.
22       MR. PIFKO: You are. He's a
23 smart guy. Obviously, he picks up
24 on this stuff. It has happened

Page 372

1  throughout the day.
2        MR. NICHOLAS: I'm speaking
3  to you. And I'm speaking for the
4  record.
5        THE WITNESS: I don't know
6  who this document was --
7  BY MR. PIFKO:
8    Q.  That's not my question. I
9  didn't ask you who wrote the document, I
10 didn't ask you any of that.
11       I asked you if this kind of
12 language is an appropriate communication
13 to a customer?
14       MR. NICHOLAS: Objection to
15 the form of the question.
16       THE WITNESS: I don't know
17 if -- I don't know if it's a
18 communication to a customer.
19 You're asking me a question with a
20 conclusion that this is a
21 communication to a customer. And
22 you want me to answer the
23 question. I don't know it's a
24 communication.

Page 373

1  BY MR. PIFKO:
2    Q.  If this is communicated to a
3  customer, is this an appropriate message
4  to be communicated to a customer? It's a
5  simple question.
6        MR. NICHOLAS: Object to the
7  form of the question. Whether
8  it's a simple question or not,
9  it's not a fair question.
10 BY MR. PIFKO:
11   Q.  AmerisourceBergen's position
12 is you don't know if this is an
13 appropriate type of conduct; is that what
14 I'm hearing from you?
15       MR. NICHOLAS: That's not
16 what he said.
17       THE WITNESS: I don't know
18 what -- who wrote it, who the
19 audience is, and what the
20 conversation is. It says, Talking
21 points.
22       Is it -- either you bring us
23 your full business or we can't
24 sell you controls, that's the --

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1  that's the option.  Is that an
2  appropriate discussion?  I think
3  so.
4  BY MR. PIFKO:
5      Q.   How about telling someone
6  that they can stop buying controlled
7  substances from you and shift them to
8  somebody else?
9          MR. NICHOLAS:  Object to the
10  form of the question.  You're just
11  arguing.
12          THE WITNESS:  I think I
13  answered your question.
14  BY MR. PIFKO:
15      Q.   You talked about the first
16  suggestion.  I'm asking about the second
17  one.
18          MR. NICHOLAS:  Object to the
19  form.  Object to the debating.
20          THE WITNESS:  I answered one
21  and two.  One is bring us all your
22  business or, two, stop buying
23  C-IIs from us.
24  BY MR. PIFKO:

Page 375

1      Q.   And buy them from someone
2  else?  Do you think it's an
3  appropriate --
4      A.   Buy it from their primary
5  vendor.
6      Q.   So you think this is an
7  appropriate message to send to people?
8          MR. NICHOLAS:  Object to the
9  form of the question.  It's not
10  his message.
11          THE WITNESS:  Is your
12  question is it appropriate for
13  customers to buy from a
14  wholesaler?
15  BY MR. PIFKO:
16      Q.   My question is, is this an
17  appropriate message to communicate to
18  customers?
19          MR. NICHOLAS:  Object to the
20  question.  We're obviously
21  disagreeing as to what is the
22  "this."  So it's an unfair
23  question.
24          But he's answered it anyway.

Page 376

1  It's asked and answered.
2          THE WITNESS:  It's the same
3  answer.
4  BY MR. PIFKO:
5      Q.   I don't believe I've gotten
6  an answer, so I'm going to ask you again.
7      A.   Is it appropriate to tell a
8  secondary customer that either they bring
9  us their full book of business or we're
10  going to stop selling you controlled
11  substances?  Is that your question?
12      Q.   I'm asking this message in
13  here.
14          I'm asking if this message
15  is an appropriate message to communicate
16  to customers?
17          MR. NICHOLAS:  Object to the
18  form.  Because that's how he's
19  reading the message in here.  So
20  he's answering --
21          MR. PIFKO:  Again, you're
22  coaching him.
23          MR. NICHOLAS:  No, I'm not.
24  You're not listening to his

Page 377

1  answers.
2          MR. PIFKO:  You're coaching
3  him.  And, honestly, if you keep
4  this up, I'm going to seek to have
5  you removed from defending any
6  depositions in this case, okay?
7          MR. NICHOLAS:  That's fine.
8          MR. PIFKO:  It's fine to
9  object vigorously and be
10  passionate about your position.
11  But you're going way above and
12  beyond, and you've been doing it
13  all day long.
14          And we are going to read the
15  transcript and it's going to show
16  all the discussion you're having,
17  asking facts, telling me what to
18  ask.  That is not okay.
19          MR. NICHOLAS:
20  Unfortunately --
21          MR. PIFKO:  You look like
22  you've been practicing long enough
23  to know that.
24          MR. NICHOLAS:  If you're

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1 telling me -- if you're telling
2 me --
3     MR. PIFKO:  I understand
4 it's a big case and you're
5 stressed out.
6     MR. NICHOLAS:  If you're
7 telling me I look old, I'm
8 insulted.
9     MR. PIFKO:  But you have to
10 conduct yourself accordingly.
11     MR. NICHOLAS:  I think
12 you're making a comment on my
13 personal look.  You think I look
14 old?
15     MR. PIFKO:  I don't think
16 you look old.  I think you're an
17 established practitioner and I
18 think you know better and you know
19 that you know better.  And you're
20 playing games here, and it needs
21 to stop.
22     MR. NICHOLAS:  Are you going
23 to let me say something?
24     MR. PIFKO:  No, I'm not here

Page 379

1 to ask you questions.
2     MR. NICHOLAS:  Whether you
3 do or not, I'm --
4     MR. PIFKO:  No, you're not
5 entitled -- you're not the
6 witness.  You're not entitled to
7 talk.  You're just continuing the
8 problem right now.
9 BY MR. PIFKO:
10     Q.   So I'm asking you, sir, you
11 read this document, you did, do you think
12 this is a message that is appropriate to
13 communicate to consumers -- customers?
14     MR. NICHOLAS:  Object to the
15 form.
16     THE WITNESS:  I don't know
17 what the message was.  I don't
18 know who wrote the message.  I
19 don't know who the audience of the
20 message was.  I don't know.
21     You're asking me to commit
22 to something -- I don't know who
23 wrote this.  I don't know the
24 talking points.  I don't know -- I

Page 380

1 don't know what their inference
2 was in writing this.
3 BY MR. PIFKO:
4     Q.   So you can't provide an
5 opinion about whether this is an
6 appropriate message to send to somebody?
7     MR. NICHOLAS:  Object to the
8 form.
9     THE WITNESS:  And, again,
10 it's a talking point, and it's not
11 being sent to anyone.  I don't
12 know -- you're asking me to give
13 you an answer to something I don't
14 know about.
15 BY MR. PIFKO:
16     Q.   All right.  That's your
17 position.  That's fine.
18         - - -
19     (Whereupon, Amerisource
20 Bergen-Zimmerman Exhibit-14,
21 ABDCMDL 00000124-147, was marked
22 for identification.)
23         - - -
24 BY MR. PIFKO:

Page 381

1     Q.   I'm handing you what is
2 marked as Exhibit-14.
3     A.   Thank you.
4     Q.   Bates labeled ABDCMDL
5 00000124 through 147.
6     According to the metadata on
7 this document, it has a doc date of
8 December 31st, 2007.
9     A.   Okay.
10     Q.   Have you seen this document
11 before?
12     A.   It looks like a
13 presentation.
14     Q.   Do you know what it's a
15 presentation for?
16     A.   It says the sales associate
17 role.
18     Q.   And the sales associate role
19 in what?
20     A.   In diversion control.  I
21 mean, that's the title of the
22 presentation.
23     Q.   Is this something you
24 reviewed in preparing for your

Highly Confidential - Subject to Further Confidentiality Review



Page 382

1  deposition?
2      A.   I believe I've seen a copy
3  of this, yes.
4      Q.   In your undertaking to
5  familiarize yourself with the company's
6  diversion control practices and policies,
7  did you obtain an understanding of what
8  the purpose of this presentation was for?
9      A.   It was for the sales -- I
10 believe it was for the sales group.
11     Q.   Do you know when it was
12 given to them?
13     A.   I don't.
14     Q.   Do you know who would have
15 given this presentation to them?
16     A.   I believe it was Ed
17 Hazewski.
18     Q.   He was someone who was under
19 your chain of authority?
20     A.   Yes.
21     Q.   At that time, was he a
22 direct report to you?
23     A.   I don't believe so.
24     Q.   There was one person in

Page 384

1      A.   That's correct.  A lot of
2  the information is the same that we've
3  reviewed.
4      Q.   Let's look at Page ABDCMDL
5  00000130.
6          Are you there?
7      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 402

Page 404

8    Q.   Let's look at the next one.
9         Have you seen this before?
10   A.   I don't recall seeing this
11   one before.
12        Q.   Do you understand what it's
13   communicating here?
14        A.   It's communicating that --
15   it's communicating that people are in
16   Florida getting their prescriptions
17   filled.
18        Q.   And they're not from
19   Florida, right?
20        MR. NICHOLAS:  Object to the
21        form.  You're asking him now in
22        his individual capacity, right?
23        Because this is not part of a
24        30(b)(6).

Page 403

Page 405

1         MR. PIFKO:  It's a training
2         document about the company's
3         diversion policies.
4         MR. NICHOLAS:  Object to the
5         scope.  Object to the form.
6         Go ahead.
7         THE WITNESS:  That's what
8         the comic infers.
9    BY MR. PIFKO:
10        Q.   That they're out-of-state
11   people coming to Florida to buy pills,
12   right?
13        A.   It doesn't say out of state.
14        Q.   It says, tourists.
15   Tourists, thank God.  May I suggest
16   restaurants?  Hotels?  Destinations?
17        And the guy says back, We're
18   just here to buy some pills -- some pain
19   pills.
20        So it's suggesting that
21   they're from out of state.
22        A.   Suggesting they're tourists.
23        Q.   And they came from out of
24   state to Florida, he has a shirt that



Page 406

1 says Florida, to buy pills?
2          MR. NICHOLAS:  Object to the
3     form.
4 BY MR. PIFKO:
5     Q.    Is that what it's saying?
6     A.    It's not saying they're from
7 out of state.  But that's what it's
8 inferring, that tourists are buying pills
9 in Florida.
10    Q.    That's consistent with the
11 issue that we talked about in Exhibit-12,
12 do you recall that?  The HDMA meeting
13 with the DEA, people coming to Florida to
14 buy pills and take them to other states.
15         Do you recall that?
16    A.    Yes.
17    Q.    This is consistent with that
18 idea, right?
19         MR. NICHOLAS:  Object to the
20    form.
21         THE WITNESS:  That's --
22    that's what this is inferring,
23    yes, this comic strip.
24 BY MR. PIFKO:

Page 407

1     Q.    So as of the date of this
2 document, the company knew that that was
3 a concern, agree?
4     A.    It was another -- again, I
5 don't know who put this in here and what
6 the inference of the comic strip was.
7 It's not a picture of the red flags like
8 the previous ones are.
9         But that's the inference, is
10 that people were coming to Florida to get
11 their prescriptions filled.
12    Q.    And then it says, Coming to
13 a state near you.
14    A.    That's the title.
15    Q.    What does that mean?
16    A.    I don't know.
17         MR. NICHOLAS:  Object to the
18    form.
19 BY MR. PIFKO:
20    Q.    This is a company training
21 document about diversion control
22 practices, agree?
23         MR. NICHOLAS:  Object to the
24    form.

Page 408

1 BY MR. PIFKO:
2     Q.    It's what you said it was.
3     A.    It's -- yes, a presentation
4 to the sales group.  Yes.
5     Q.    So the company is
6 acknowledging that there are -- there is
7 an issue with people from out of state
8 buying pills somewhere, agree?
9          MR. NICHOLAS:  Object to the
10    form.
11         THE WITNESS:  It indicates
12    that that is another flag that
13    should be considered, correct.
14 BY MR. PIFKO:
15    Q.    This is a comic.
16         Does the company think that
17 diversion is a -- is funny?
18         MR. NICHOLAS:  Object to the
19    form.  That's a pretty obnoxious
20    question.
21         THE WITNESS:  Absolutely
22    not.
23 BY MR. PIFKO:
24    Q.    Does the company take its

Page 409

1 diversion control practices serious?
2     A.    Yes.
3     Q.    Do you know why they would
4 use a comic in a document like this to
5 communicate this message?
6          MR. NICHOLAS:  I'll object
7    to the form.
8         THE WITNESS:  It's the slide
9    that's -- that's the slide that --
10    I mean, I'm not sure what your
11    question is.
12         Why would they pick this
13    slide?
14 BY MR. PIFKO:
15    Q.    And use humor to communicate
16 something serious like this.
17         MR. NICHOLAS:  I'll object
18    to the form and to the
19    offensiveness of the question.
20         Go ahead.
21         THE WITNESS:  I don't think
22    it's depicted in humor.  I think
23    it's stating another red flag, if
24    you see people that are not from



Page 410

1    the area getting their
2    prescription filled.
3    BY MR. PIFKO:
4        Q.   Did the company do anything
5    to address the potential for out-of-state
6    people potentially coming somewhere and
7    buying pills from a pharmacy?
8        A.   We have no control over
9    where people go and get their
10   prescriptions filled.  We don't know
11   where they come from.

Page 411

15       Q.   Have you heard the term
16   "blue highway" before?
17       A.   No.
18       Q.   You don't know what that is?
19       A.   I have not heard that term.
20       Q.   How about The Oxy Express,
21   have you heard of that before?
22       A.   I'm not sure what it's in
23   reference to, but --
24       Q.   You don't know anything

Page 412

1    about that?
2        A.   No.
3        Q.   The last page has some
4    individuals.
5            We talked about Ed?
6        A.   Yes.
7        Q.   Do you know who he is?
8        A.   Ed Hazewski?  Yes, director
9    of diversion control.
10       Q.   How about the other people
11   in here?
12       A.   Dave Breitmayer was in the
13   diversion control group, as well as Kevin
14   Kreutzer.  And I'm not sure if their
15   title is investigator or specialist, but
16   they're in the diversion control group,
17   as well as Joe Tomkiewicz.
18           MR. PIFKO:  Let's take a
19   break.
20           VIDEO TECHNICIAN:  Going off
21   the record.  The time is 4:40 p.m.
22           - - -
23           (Whereupon, a brief recess
24   was taken.)

Page 413

1            - - -
2            VIDEO TECHNICIAN:  We're
3    back on the record at 5:00 p.m.
4    BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 430

Page 432

22      MR. PIFKO:  I'm going to
23  play a video.
24          (A video was shown.)

Page 431

Page 433

1          MR. NICHOLAS:  Before you
2      ask --
3  BY MR. PIFKO:
4      Q.    Did you think --
5          MR. NICHOLAS:  -- a
6  question, I'm going to interpose
7  an objection to the playing of
8  this video in this context in this
9  deposition.
10          I think it's totally
11  inappropriate, and I object to it.
12  BY MR. PIFKO:
13      Q.    Did you think that you
14  should be providing protection to anyone
15  else other than AmerisourceBergen when
16  implementing your diversion control
17  practices?
18          MR. NICHOLAS:  I object to
19  the form of the question.  It's
20  outside the scope.  It's an
21  inappropriate question.  It
22  doesn't seek any information
23  that's pertinent to any of the
24  topics on your list.  I object to

Page 434

1  it.
2      THE WITNESS:  Your question?
3  BY MR. PIFKO:
4      Q.   Having seen the video, do
5  you think that you should provide
6  protection to anyone else besides
7  yourself when you're implementing your
8  diversion control practices?
9      MR. NICHOLAS:  I'll object
10  to the form of the question.  It
11  mischaracterizes prior testimony.
12      THE WITNESS:  As I
13  indicated, that we take our
14  responsibility very seriously,
15  regardless of the video.
16      I understand about the
17  opioid crisis, and it doesn't --
18  it's impacted my family as well.
19  It's impacted a lot of our
20  employees as well.  We understand
21  what the circumstances are.
22      And no, we aren't just about
23  protecting AmerisourceBergen.  We
24  have a job to do.  We have a job

Page 435

1  to make sure that the medications
2  that we receive are properly
3  stored and secure, in order to
4  make them available for customers
5  and patients that need them.
6      These are -- these drugs are
7  approved by the FDA.  And we sell
8  them to licensed pharmacists who
9  fill prescriptions written by a
10  licensed doctor.
11      Again, I'm not -- what we do
12  is to ensure that the integrity of
13  the product makes it to a licensed
14  pharmacy in order for the patient
15  to have that product available.
16  We implement our policy and
17  procedures to ensure that we don't
18  have diversion.  And that is the
19  responsibility we take, not just
20  because -- just looking out for
21  AmerisourceBergen, we supply 30
22  percent of the -- 25 to 30 percent
23  of the products within the United
24  States.

Page 436

1      And in order to do so, we
2  need to continue to do our
3  business diligently and in
4  compliance and in a safe -- in a
5  safe manner, to ensure that
6  product supply to the hospitals
7  and pharmacies and doctors is
8  available.  So it's not just about
9  AmerisourceBergen.
10  BY MR. PIFKO:
11      Q.   This is one of the biggest
12  public health crises in America.  And you
13  guys are in the center of it.
14      Do you think that you could
15  have done more to protect the communities
16  around you?
17      MR. NICHOLAS:  I'll object
18  to the form of the question.  It's
19  argument.  It's unfair.
20      I'm going to let him answer.
21      THE WITNESS:  I've
22  explained -- I've explained the
23  process and the safeguards that we
24  have in place and the things that

Page 437

1  we've done and the training that
2  we've done in this area.
3      It's a crisis.  I don't know
4  why, when we had a methamphetamine
5  crisis, that there was call to
6  action by legislature to include
7  additional requirements.  I'm not
8  sure why they didn't do that in
9  1990, '91, '92, all the way to
10  today.  They issue a guidance --
11  they issue -- DEA has issued
12  guidance letters.
13      And if it's a crisis, I
14  would expect them to have a
15  call-to-arms and have everybody
16  come to Washington, D.C. and --
17  like we did with the chemicals,
18  and create a solution, or at least
19  work on a solution.
20      We are -- as a private
21  industry, we are trying to do --
22  we are not trying to do, we are
23  doing what we need to do to
24  protect the supply channel with

Page 438

1    the information that we have and
2    that's available to us.
3        And we take that very
4    seriously. I take that very
5    seriously. The company takes it
6    very seriously.
7  BY MR. PIFKO:
8    Q.   Do you think that you have
9    any responsibility for the opioid crisis?
10       MR. NICHOLAS: Object to the
11   form of the question. It's
12   outside the scope.
13       Go ahead.
14       THE WITNESS: As I
15   indicated, that our responsibility
16   in the opioid crisis is to ensure
17   that those products that we buy
18   from the manufacturers that have
19   been -- that have been approved by
20   DEA, through quotas to manufacture
21   and distribute, and our job is to
22   make sure when those opioids are
23   within our control, that we
24   maintain adequate security for

Page 439

1    those products, and recordkeeping.
2        We also make sure that we
3    vet our customers that we sell to,
4    which are licensed pharmacies by
5    the DEA and the Board of Pharmacy.
6    And we distribute those products
7    in a safe and secure manner.
8  BY MR. PIFKO:
9    Q.   Do you think you've done
10   enough?
11   A.   I think we are doing -- we
12   are always continuing to try to do more.
13   We're continually working with our
14   partners. We've been working with
15   legislation to try to create solutions
16   that would impact distribution that may
17   help in this situation. And we continue
18   to do that.
19       - - -
20       (Whereupon, Amerisource
21   Bergen-Zimmerman Exhibit-15, No
22   Bates, March 2017
23   AmerisourceBergen Code of Ethics
24   and Business Conduct, was marked

Page 440

1    for identification.)
2        - - -
3  BY MR. PIFKO:
4    Q.   I'm handing you what has
5    been marked as Exhibit-15.
6    A.   Thank you.
7    Q.   For the record, this is a
8    March 2017 code of ethics and business
9    conduct of AmerisourceBergen, which was
10   obtained from the company's website. I
11   just want to ask you a quick couple of
12   questions about this.
13       You're the chief compliance
14   officer, right?
15   A.   Correct.
16   Q.   You have responsibility --
17       MR. NICHOLAS: These are in
18   his individual capacity; is that
19   right?
20       MR. PIFKO: Yes.
21   BY MR. PIFKO:
22   Q.   You have responsibility for
23   this document?
24   A.   Yes.

Page 441

1    Q.   This document doesn't
2    mention The Controlled Substances Act
3    once.
4        You can look through it, but
5    would you agree with me?
6    A.   I don't know. I mean, I can
7    read it.
8    Q.   I'll represent to you it
9    doesn't refer to The Controlled
10   Substances Act. You can look at the
11   table of contents here, compliance with
12   laws, Page I here.
13       Is The Controlled Substances
14   Act one of the laws that's mentioned
15   here?
16       MR. NICHOLAS: I'll object
17   to the form of the question.
18       You probably need to read
19   the entire document to really
20   answer a question like this.
21       But go ahead.
22       THE WITNESS: What was your
23   question? I'm sorry.
24   BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1    Q.   It's got a discussion of
2  compliance with laws here in the table of
3  contents.
4    A.   Okay.
5    Q.   You agree that The
6  Controlled Substances Act is not one of
7  those laws that's listed here?
8        MR. NICHOLAS:  Object to the
9    form.  I'll object to the form.  I
10   think the question is misleading.
11       THE WITNESS:  In the section
12   that says, Associates must comply
13   with all applicable laws,
14   regulations and rules, including
15   but not limited to those described
16   below.
17 BY MR. PIFKO:
18   Q.   Does it mention The
19 Controlled Substances Act?
20       MR. NICHOLAS:  Object to the
21   form.
22       THE WITNESS:  It doesn't
23   state that.
24        - - -

Page 443

1        (Whereupon, Amerisource
2        Bergen-Zimmerman Exhibit-16, No
3        Bates, West Virginia Case
4        Document, Organization Charts, was
5        marked for identification.)
6        - - -
7  BY MR. PIFKO:
8    Q.   I'm handing you what is
9  marked as Exhibit-16.  It's a document
10 that was used in your deposition in the
11 West Virginia litigation.
12       Do you recall this document?
13   A.   Yes.  I believe from the
14 West Virginia case.
15   Q.   Do you agree this is a true
16 and correct copy of the exhibit that
17 was -- 1 was attached to your West
18 Virginia litigation as referenced here on
19 the first page of the document?
20       MR. NICHOLAS:  Object to the
21   form --
22       THE WITNESS:  Do I --
23       MR. NICHOLAS:  -- in the
24   sense that I don't know if he

Page 444

1  remembers or knows.
2        MR. PIFKO:  You're coaching
3    him.
4        MR. NICHOLAS:  Well, this is
5    just housekeeping.  It's silly.
6    It's stupid.
7        THE WITNESS:  Your question
8    was?
9  BY MR. PIFKO:
10   Q.   Is this a true and correct
11 copy of the document that was --
12   A.   It appears to be.  It
13 appears to be.
14   Q.   Okay.  Is this from your
15 files?
16       MR. NICHOLAS:  Objection to
17   the form.
18       THE WITNESS:  I don't know
19   where it came from.
20 BY MR. PIFKO:
21   Q.   What is this document?  Can
22 you tell me what it is?
23   A.   It looks like -- it looks
24 like a series of org charts.

Page 445

1    Q.   Is this an accurate
2  depiction of the -- your department, the
3  CSRA?
4        MR. NICHOLAS:  When?
5        THE WITNESS:  Yeah, which --
6  BY MR. PIFKO:
7    Q.   Well, it's got various
8  periods on it.  The whole document.
9        MR. NICHOLAS:  I think you
10   have to focus the question for
11   him.
12       THE WITNESS:  Which one?
13 BY MR. PIFKO:
14   Q.   Every single page, you're at
15 the top.
16       MR. NICHOLAS:  I'll object
17   to the form.  I'm not seeing any
18   dates on the document at all.
19       THE WITNESS:  I don't see
20   any dates either.
21 BY MR. PIFKO:
22   Q.   Your name is at the top of
23 each one of these pages, correct?
24   A.   But what year?

Page 446

1    Q.   You're going to tell me.
2  You're the expert here.  It's your
3  department.  This is your document, not
4  mine.
5         Let's look at the first
6  page.
7    A.   Okay.
8    Q.   That's your name at the top
9  of this, right?
10   A.   Yes.
11   Q.   When you look at this and
12 see the people here and the positions
13 here, can you tell me when this was?
14        MR. NICHOLAS:  Objection.
15 Outside the scope.  Object to the
16 form.
17        THE WITNESS:  Possibly 2007.
18 I'm not sure exactly.
19 BY MR. PIFKO:
20   Q.   It says, Associates assigned
21 to provide resources for the diversion
22 control program.
23        Do you see that?  On the
24 left at the top, under the word, Current.

Page 447

1    A.   Yes.
2    Q.   And then underneath there,
3  it says, Everyone already has a full-time
4  job.
5         Do you see that?
6    A.   Yes.
7    Q.   That's because the people
8  responsible to provide resources for the
9  diversion control program had other
10 responsibilities, right?
11        MR. NICHOLAS:  Object to the
12 form.
13        THE WITNESS:  We already had
14 diversion control.  We just --
15 this is in 2007.  So part of their
16 jobs was already in diversion
17 control.
18 BY MR. PIFKO:
19   Q.   Part of their job what?
20   A.   Was part -- was for
21 diversion control.
22   Q.   Right.  So all of these
23 people had other jobs as well, correct?
24        MR. NICHOLAS:  Object to the

Page 448

1  form.
2         THE WITNESS:  In a sense
3  they had other duties in addition
4  to diversion control.  As we
5  indicated with investigations,
6  they also investigated theft.  You
7  had -- you have regional directors
8  that also ensure compliance with
9  other -- not just the controlled
10 substance requirements but also
11 security and prescription drug
12 requirements that always had
13 controlled substances and
14 diversion as well.
15 BY MR. PIFKO:
16   Q.   Let's look -- can you point
17 me to where the investigations department
18 is?  Who it that -- who is on this first
19 page?
20   A.   Bruce Gundy.
21   Q.   So there's four
22 investigators underneath him?
23   A.   Correct.
24   Q.   Does he perform

Page 449

1  investigations himself?
2    A.   Yes.
3    Q.   If we look at the next page,
4  there's Bruce Gundy.
5         And how many people are
6  under him?
7    A.   Three.
8    Q.   The next page?
9    A.   I can't really read it.
10   Q.   It's next to Mr. Hazewski.
11        MR. NICHOLAS:  Hazewski.
12        MR. PIFKO:  Sorry.
13        THE WITNESS:  Are you
14 referring to Bruce or Ed?
15 BY MR. PIFKO:
16   Q.   Bruce.
17        You were trying to look for
18 his department.  How many people were
19 in --
20   A.   Yes.
21   Q.   -- his department on the
22 third page?
23   A.   He has two.
24   Q.   Two.

Highly Confidential - Subject to Further Confidentiality Review

Page 450

1 And then let's look at the
2 next page, how many?
3 A. Two.
4 Q. And the last page?
5 A. Two.
6 Q. And all those investigators
7 have duties other than diversion control,
8 correct?
9 MR. NICHOLAS: Object to the
10 form.
11 THE WITNESS: Yes. But
12 as -- so after the first one,
13 there's a diversion control
14 department, which had
15 investigators contained within
16 there that moved from Bruce to
17 diversion control.
18 So now you had diversion
19 control doing investigations, as
20 well as Bruce's people doing
21 investigations.
22 The regional directors also
23 performed investigations, and same
24 with the senior directors as well.

Page 451

1 And then you had a
2 compliance staff at each of the
3 distribution centers. We have 26
4 distribution centers, all with a
5 compliance staff of either two to
6 six individuals. So -- also with
7 a role within -- looking into
8 these issues.
9 BY MR. PIFKO:
10 Q. Let's look at the last page
11 for completeness here.
12 Four people as investigators
13 there?
14 A. Yes. Four investigators
15 under Bruce. And then you see
16 investigators under diversion control.
17 - - -
18 (Whereupon, Amerisource
19 Bergen-Zimmerman Exhibit-17,
20 ABDCMDL 00251392-94, was marked
21 for identification.)
22 - - -
23 BY MR. PIFKO:
24 Q. I'm handing you what is

Page 452

1 marked as Exhibit-17.
2 Have you seen this before?
3 It's ABDCMDL 00251392 through 94. I just
4 have some quick questions about this.
5 Are you familiar with this
6 policy and procedure?
7 A. I've seen it, yes.
8 Q. It says that this is retail
9 pharmacy targeted visits.
10 What is that?
11 A. Retail targeted visit; that
12 we've identified a pharmacy that they
13 want to do additional investigation --
14 Q. Okay.
15 A. -- which consisted of a
16 targeted visit.
17 Q. I want to direct your
18 attention to the bottom where it says, 2,
19 pre-visit preparation.
20 Are you there?
21 A. Yes, I am.
22 Q. It says, The CSRA
23 representative conducting the visit will
24 request, in writing, that the account

Page 453

1 manager contact the owner/pharmacist in
2 charge, inform him/her of the visit and
3 ensure that the owner, person in charge,
4 or their designee, will be present on the
5 arranged date in order to give their
6 undivided attention to the CSRA
7 representative for a minimum of one hour.
8 The account manager is responsible for
9 coordinating the visit date and time with
10 the owner and/or person in charge or
11 their designee.
12 Do you see that?
13 A. Yes.
14 Q. So I just want to confirm,
15 under AmerisourceBergen's policy for
16 investigating and visiting pharmacies,
17 the owner or person in charge or designee
18 is provided advanced notice of those
19 visits, correct?
20 A. Yes. We need them there in
21 order to conduct our site visit.
22 - - -



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 478

8     MR. PIFKO:  We're going to
9   take a break.
10     VIDEO TECHNICIAN:  Going off
11   the record.  6:02 p.m.
12       - - -
13     (Whereupon, a brief recess
14   was taken.)
15       - - -
16     VIDEO TECHNICIAN:  Back on
17   the record at 6:11 p.m.
18   BY MR. PIFKO:
19     Q.   If I wanted to ask you about
20   the company's records regarding specific
21   sales of controlled substances products
22   in the Track 1 jurisdictions -- are you
23   familiar with what the Track 1
24   jurisdictions are?  If I use that term,

Page 479

1   does that mean anything to you?
2     A.   Not exactly.  I've seen it,
3   but I don't --
4     Q.   Sorry.  Let me ask it a
5   different way.
6         If I wanted to talk to
7   someone who was familiar with the
8   company's records of which products they
9   shipped to specific customers and amounts
10   and when, who would that be?
11     MR. NICHOLAS:  I'll object
12   to the form.
13     THE WITNESS:  I believe if
14   you're just looking for data, it
15   would be somebody in our IT
16   department.
17   BY MR. PIFKO:
18     Q.   But to understand how the
19   system works?
20     MR. NICHOLAS:  Object to the
21   form.
22     THE WITNESS:  The system --
23   the suspicious order monitoring
24   system or our operating system?

Page 480

Page 481

7     Q.   Is there someone, though,
8   from the CSRA who would be familiar about
9   how the system works and what the data in
10   the different databases reflects?
11     MR. NICHOLAS:  Object to the
12   form.
13     THE WITNESS:  I am not sure
14   who that would be.  It would be
15   somebody, I would think, in our IT
16   group.
17   BY MR. PIFKO:
18     Q.   Is there a specific type of
19   title that that person would have?
20     MR. NICHOLAS:  Object to the
21   form.
22     THE WITNESS:  I don't know
23   who would -- I don't know that
24   person.

Highly Confidential - Subject to Further Confidentiality Review

Page 482

BY MR. PIFKO:
1
2     Q.   What about for your
3 investigations and due diligence files,
4 who would be familiar with those?
5     A.   That would be, if they are
6 CSRA files, that would be my department,
7 or our department.
8     Q.   Who within your department
9 would have the most expertise about that?
10        MR. NICHOLAS:  Object to the
11     form.
12        THE WITNESS:  What time
13     frame?
14 BY MR. PIFKO:
15     Q.   Well, let's -- any time
16 frame.  Tell me.
17     A.   We've changed systems
18 through the course.  In addition to the
19 SAP, we have also changed internal
20 systems within CSRA.
21     Q.   Okay.  How about for the --
22 2007 to 2012?
23     A.   The investigation,
24 investigations would probably be, you

Page 483

1 want a name?
2        It would probably be Bruce
3 Gundy.  And Steve Mays, who you've
4 mentioned.  He has some system
5 responsibilities -- not responsibilities,
6 but knowledge within CSRA as well.
7     Q.   And then how about for the
8 more recent period, 2012 to present, do
9 you know?
10        MR. NICHOLAS:  Object to the
11     form and to the scope, to some
12     extent.
13        THE WITNESS:  If your
14     question is who in CSRA would have
15     that information up to the
16     present, I assume, would be --
17     David May would have information
18     regarding that process.
19        And then Bruce Gundy is also
20     still in investigations.  He would
21     be that person for investigations.
22 BY MR. PIFKO:
23     Q.   Okay.  Thanks.
24        In preparing for this

Page 484

1 deposition, did you understand yourself
2 to be designated to testify about topics
3 concerning the company's involvement with
4 the had?
5     A.   Yes.
6     Q.   What steps did you take to
7 become familiar with the company's
8 involvement with the had?
9     A.   I had my personal
10 involvement with the -- we talked about
11 the committees I participated on.  I
12 reviewed the had document, I can't
13 remember the title of it, the guidelines.
14        And that's pretty much it.
15     Q.   Did you talk to anyone
16 besides reviewing your own documents?
17     A.   Outside -- no.  Outside of
18 counsel, no.
19     Q.   Did you review any documents
20 that weren't your own documents?
21     A.   I indicated the document of
22 the had guidelines.  That's not my
23 document, but I reviewed that document.
24     Q.   There's many people at the

Page 485

1 company who have participated with the
2 had, correct?
3     A.   Yes.
4     Q.   Who all, to your knowledge,
5 has participated in the had?
6     A.   It's a lot.
7     Q.   Okay.
8     A.   It could be 50.  Because
9 they have different segments, whether
10 it's tax, whether it's procurement,
11 whether it's government affairs.
12     Q.   How about with respect to
13 diversion issues?
14     A.   It would be Steve Mays,
15 David May.
16     Q.   Steve Mays, has he been
17 involved in the had?  What is the time
18 period?
19     A.   He's been involved with the
20 regulatory affairs committee for years
21 prior to 2007.
22     Q.   Prior to 2007?
23     A.   Yes.  I believe so.
24     Q.   Does he still have

Page 486

1  involvement with the had?
2      A.   Yes.
3      Q.   I understand that there's a
4  gap in your document production from
5  August 24th, 2007 to July 15th, 2010.
6          Do you have any reason to
7  believe that there would be documents not
8  in your system from then from you?
9      A.   No.
10     Q.   Were you still working for
11 the company during that time period?
12     A.   Yes.
13     Q.   Did you have a computer and
14 e-mail during that time period?
15     A.   I did.
16     Q.   Are you aware of any system
17 crashes during that time period?
18         MR. NICHOLAS:  Let me
19     interpose an objection to the
20     extent that I personally don't
21     know if the representation you're
22     making is right about the
23     documents.
24         But go ahead and ask your

Page 487

1  questions.
2          THE WITNESS:  What was the
3      last question?  Sorry.
4  BY MR. PIFKO:
5      Q.   I was just asking if you
6  were aware of any system failures or
7  crashes of servers during that time
8  period at the company?
9      A.   Not that I know of.
10         MR. PIFKO:  Okay.  Well,
11     it's my understanding that there's
12     that gap in those documents and
13     there may be other documents that
14     might come into the production.
15         So subject to additional
16     documents that might be produced,
17     we will reserve our right to
18     recall.  And I'm sure we can meet
19     and confer about it if we have a
20     dispute.
21         And other than that, I don't
22     have any questions for you at the
23     moment.
24         MR. NICHOLAS:  Give me,

Page 488

1  like, ten seconds to decide
2  whether to ask him any questions.
3          MR. PIFKO:  Sure.
4          VIDEO TECHNICIAN:  Going off
5  the record.  6:19 p.m.
6          - - -
7          (Whereupon, a brief recess
8  was taken.)
9          - - -
10         VIDEO TECHNICIAN:  Back on
11 record at 6:22 p.m.
12         MR. NICHOLAS:  I have no
13 questions for the witness.  So,
14 Mr. Zimmerman, thank you very much
15 and you're excused.  Although you
16 can sit here to listen to us argue
17 about one last thing.
18         Just you said -- you said,
19 you know, five minutes ago that
20 there was a gap in the documents.
21 It's the first I've heard of that.
22 You haven't raised that with us up
23 until now.
24         I suspect there's not a gap

Page 489

1  in the documents.  But in any
2  event, this is all my way of
3  saying we don't necessarily agree
4  that you're going to be able to
5  come back, you know, for another
6  deposition.  That's something
7  we'll have to fight about.
8          MR. PIFKO:  I agree.  That
9  was my statement, that we can meet
10 and confer about it.
11         So we can dispute about
12 whether that happens or not.
13         MR. NICHOLAS:  Okay.  I've
14 got nothing else.
15         VIDEO TECHNICIAN:  This ends
16 today's deposition.  We're going
17 off the record at 6:23 p.m.
18         - - -
19         (Whereupon, the deposition
20 was concluded at 6:23 p.m.)
21         - - -
22
23
24

Page 490

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

Amanda Maslynsky-Miller
Certified Realtime Reporter
Dated: August 6, 2018

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 491

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 492

- - - - - -
E R R A T A
- - - - - -

PAGE LINE CHANGE
_____ _____ _____
_____ _____ REASON: _____
_____ _____ _____
_____ _____ REASON: _____
_____ _____ _____
_____ _____ REASON: _____
_____ _____ _____
_____ _____ REASON: _____
_____ _____ _____
_____ _____ REASON: _____
_____ _____ _____
_____ _____ REASON: _____
_____ _____ _____
_____ _____ REASON: _____
_____ _____ _____
_____ _____ REASON: _____
_____ _____ _____
_____ _____ REASON: _____
_____ _____ _____
_____ _____ REASON: _____

Page 493

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 489, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____    _____
CHRISTOPHER ZIMMERMAN        DATE

Subscribed and sworn to before me this _____ day of _____, 20____.

My commission expires:_____

_____
Notary Public

Highly Confidential - Subject to Further Confidentiality Review

Page 494

1      LAWYER'S NOTES
2  PAGE  LINE
3    _____  _____  _____
4    _____  _____  _____
5    _____  _____  _____
6    _____  _____  _____
7    _____  _____  _____
8    _____  _____  _____
9    _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   _____  _____  _____