# EXHIBIT 294 – A

Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                     EASTERN DIVISION
 4                       -  -  -
 5
      IN RE:  NATIONAL         :   HON. DAN A.
 6    PRESCRIPTION OPIATE       :   POLSTER
      LITIGATION                :
 7                              :
      APPLIES TO ALL CASES      :   NO.
 8                              :   1:17-MD-2804
                                :
 9
              - HIGHLY CONFIDENTIAL -
10
      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                       -  -  -
12
                  October 24, 2018
13
                       -  -  -
14
15            Videotaped deposition of
      STEPHEN MAYS, taken pursuant to notice,
16    was held at the law offices of Reed
      Smith, LLP, 1717 Arch Street,
17    Philadelphia, Pennsylvania, beginning at
      9:37 a.m., on the above date, before
18    Michelle L. Gray, a Registered
      Professional Reporter, Certified
19    Shorthand Reporter, Certified Realtime
      Reporter, and Notary Public.
20
                       -  -  -
21
22         GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

APPEARANCES:

1
2
3 BARON & BUDD, P.C.
BY: MARK P. PIFKO, ESQ.
4 STERLING CLUFF, ESQ.
Encino Plaza
5 15910 Ventura Boulevard, Suite 1600
Encino, California 91436
6 (818) 839-2333
Mpifko@baronbudd.com
7

8    - and -

9 BARON & BUDD, P.C.
BY: SCOTT SIMMER, ESQ.
WILLIAM G. POWERS, ESQ.
10 600 New Hampshire Avenue, NW
The Watergate, Suite 10-A
11 Washington, D.C. 20037
(202) 333-4562
12 Ssimmer@baronbudd.com
Wpowers@baronbudd.com
13

14    - and -

15 BLASINGAME, BURCH, GARRARD,
ASHLEY, P.C.
BY: ALEXANDRIA HUGHES, ESQ.
16 440 College Avenue, Suite 320
Athens, Georgia 30601
17 (706) 354-4000
Ahughes@bbga.com
18 Representing the Plaintiffs
19
20
21
22
23
24

Page 4

APPEARANCES: (Cont'd.)

1
2 BARTLIT BECK HERMAN PALENCHAR &
SCOTT LLP
3 BY: SHARON DESH, ESQ.
Courthouse Place
4 54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
5 (312) 494-4440
Sharon.desh@bartlit-beck.com
6 Representing the Defendant,
Walgreens
7
8 WILLIAMS & CONNOLLY, LLP
BY: MIRANDA PETERSEN, ESQ.
9 MATTHEW C. MONAHAN, ESQ.
725 12th Street
10 Washington, D.C. 20005
(202) 434-5148
11 mpetersen@wc.com
mmonahan@wc.com
12 Representing the Defendant, Cardinal
Health
13
14 ARNOLD & PORTER KAYE SCHOLER, LLP
15 BY: SEAN HENNESSY, ESQ.
601 Massachusetts Avenue, NW
16 Washington, D.C. 20001
(202) 942-5644
17 sean.hennessy@apks.com
Representing the Defendants, Endo
18 Health Solutions, Inc.; Endo
Pharmaceuticals, Inc.; Par
19 Pharmaceutical Companies, Inc. f/k/a
Par Pharmaceutical Holdings, Inc.
20
21 KIRKLAND & ELLIS, LLP
BY: KARL STAMPFL, ESQ.
22 300 North LaSalle Street
Chicago, Illinois 60654
23 (312) 862-2595
Karl.stampfl@kirkland.com
24 Representing the Defendant, Allergan

Page 3

APPEARANCES: (Cont'd.)

1
2
3 REED SMITH, LLP
BY: SHANNON E. McCLURE, ESQ.
JEFFREY R. MELTON, ESQ.
4 ROBERT A. NICHOLAS, ESQ.
Three Logan Square
5 1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
6 (215) 851-8226
smcclure@reedsmith.com
7 jmelton@reedsmith.com
rnicholas@reedsmith.com
8 Representing the Defendant,
Amerisource Bergen Drug Corporation
9 and the Witness
10
11 JONES DAY
BY: SARAH G. CONWAY, ESQ.
12 555 South Flower Street, 50th Floor
Los Angeles, California 90071
13 (213) 489-3939
sgconway@jonesday.com
14 Representing the Defendant, Walmart
15 PELINI CAMPBELL & WILLIAMS
BY: GIANNA M. CALZOLA-HELMICK, ESQ.
16 8040 Cleveland Avenue NW, Suite 400
North Canton, Ohio 44720
17 (330) 305-6400
giannac@pelini-law.com
18 Representing the Defendant,
Prescription Supply, Inc.
19
20 COVINGTON & BURLING, LLP
BY: MEGHAN E. MONAGHAN, ESQ.
21 850 Tenth Street, NW
Suite 586N
22 Washington, D.C. 20001
mmonaghan@cov.com
23 (202) 662-5110
Representing the Defendant, McKesson
24 Corporation

Page 5

TELEPHONIC APPEARANCES:

1
2
3 BLASINGAME, BURCH, GARRARD,
ASHLEY, P.C.
BY: THOMAS HOLLINGSWORTH, III, ESQ.
4 440 College Avenue, Suite 320
Athens, Georgia 30601
5 (706) 354-4000
thollingsworth@bbga.com
6 Representing the Plaintiffs
7
8 REED SMITH, LLP
BY: THOMAS P. REILLY, ESQ.
9 ABIGAIL M. PIERCE, ESQ.
LOUIS W. SCHACK, ESQ.
10 Three Logan Square
1717 Arch Street, Suite 3100
11 Philadelphia, Pennsylvania 19103
(215) 851-8226
12 Treilly@reedsmith.com
Apierce@reedsmith.com
13 Lschack@reedsmith.com
Representing the Defendant,
14 Amerisource Bergen Drug Corporation
15 ROPES & GRAY
BY: COLLEEN B. CREEDEN, ESQ.
16 800 Boylston Street
Boston, Massachusetts 02199
17 (617) 951-7234
Colleen.creeden@ropesgray.com
18 Representing the Defendant,
Mallinckrodt
19
20
21
22
23
24

| | Page 6 |
|---|---|
| 1 | APPEARANCES: (Cont'd.) |
| 2 | |
| 3 | ALSO PRESENT: |
| 4 | VIDEOTAPE TECHNICIAN: |
| 5 | Dan Lawlor |
| 6 | |
| 7 | LITIGATION TECHNICIAN:<br>Zach Hone |
| 8 | |
| 9 | ALSO PRESENT: |
| 10 | Elizabeth Campbell, Esq.<br>(AmerisourceBergen) |
| 11 | |
| 12 | |
| 13 | - - - |
| 14 | |

Page 7

- - -
I N D E X
- - -

Testimony of:          STEPHEN MAYS

By Mr. Pifko          13

- - -

E X H I B I T S

- - -

NO.        DESCRIPTION          PAGE

ABDC-Mays-1  Slide Deck          152
Internet Pharmacy
Data
Meeting with
AmerisourceBergen
DEA Headquarters
8/10/05
ABDCMDL00315887-900

ABDC-Mays-2  Memorandum, 6/29/07  221
Subject, Update:
OMP Distribution
Center Procedures
ABDCMDL00000075-84

ABDC-Mays-3  Industry Compliance  282
Guidelines
ABDCMDL00295009-24

Page 8

- - -
E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION          PAGE

ABDC-Mays-4  E-mail Thread          282
11/11/14
Subject, HDMA OMP
Guidelines
ABDCMDL00295006-07

ABDC-Mays-5  E-mail Thread          287
2/5/12
Subject, CAH gets TRO
ABDCMDL00865762-64

ABDC-Mays-6  E-mail Thread          330
8/20/13
Subject, Low Volume/
High Oxy
ABDCMDL00288025

ABDC-Mays-7  E-mail, 7/1/13          330
Subject, Low Volume
Account Project
ABDCMDL00288026

ABDC-Mays-8  Sales Talking Points  332
Low Volume Accounts
July 2013
ABDCMDL00288028

ABDC-Mays-9  E-mail, 6/17/13          347
Subject, Low Volume
ABDCMDL00282233

ABDC-Mays-10 Slide Deck          347
OMP Strategy
For Retail Accounts
ABDCMDL00282234

Page 9

- - -
E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION          PAGE

ABDC-Mays-11 E-mail Thread          368
9/27/13
Subject, Do Not Ship
List
ABDCMDL00289421

ABDC-Mays-12 E-mail Thread          358
3/14/17
Subject, More WVA
Counties Target
Distributors
ABDCMDL00275491-92

ABDC-Mays-13 E-mail Thread          368
9/27/13
Subject, CIII
Item Received
ABDCMDL00289422-29

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
1              - - -
2       P R E V I O U S L Y   M A R K E D
3           E X H I B I T S
4              - - -
5
6  NO.          DESCRIPTION
7  Zimmerman-5    Settlement and
                  Release Agreement
8                 6/22/07
                  ABDCMDL00279854-86
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 11

```
1              - - -
2       DEPOSITION SUPPORT INDEX
3              - - -
4
5  Direction to Witness Not to Answer
6  PAGE  LINE
   None.
7
8  Request for Production of Documents
9  PAGE  LINE
   None.
10
11 Stipulations
12 PAGE  LINE
   None.
13
14 Questions Marked
15 PAGE  LINE
   None.
16
17
18
19
20
21
22
23
24
```

Page 12

```
1              - - -
2       THE VIDEOGRAPHER:  We are
3  now on the record.  My name is Dan
4  Lawlor.  I'm the videographer with
5  Golkow Litigation Services.
6  Today's date is October 24, 2018,
7  and the time is 9:37 a.m.
8       This video deposition is
9  being held in Philadelphia,
10 Pennsylvania, in the matter of
11 National Prescription Opiate
12 Litigation, MDL No. 2804.
13      The deponent is Steve Mays.
14      Counsel will be noted on the
15 stenographic record.
16      The court reporter is
17 Michelle Gray who will now swear
18 in the witness.
19             - - -
20      ... STEPHEN MAYS, having
21 been first duly sworn, was
22 examined and testified as follows:
23             - - -
24      EXAMINATION
```

Page 13

```
1              - - -
2  BY MR. PIFKO:
3       Q.   Good morning, Mr. Mays.
4       A.   Good morning.
5       Q.   How are you?
6       A.   Good.
7       Q.   Can you please -- let's
8  start by having you state and spell your
9  name for the record?
10      A.   Stephen Mays, S-T-E-P-H-E-N,
11 M-A-Y-S.
12      Q.   And we'll just start by
13 going over basics about depositions.  I'm
14 sure that in preparing for the
15 deposition, your counsel went over this
16 with you.  But we'll hit some of the high
17 points just to make sure that everyone in
18 the room are on the same page.  Okay?
19      A.   Okay.
20      Q.   So first of all, you've just
21 been put under oath.  That means that if
22 you lie or are intentionally dishonest or
23 deceitful, you can be subject to
24 penalties or perjury charges from the
```

Highly Confidential - Subject to Further Confidentiality Review

|  | Page 14 |  | Page 16 |
| --- | --- | --- | --- |

**Page 14**

1  court.
2      Do you understand that?
3      A.  Yes, I do.
4      Q.   Is there any reason why
5  you're unable to give truthful and
6  accurate testimony today?
7      A.  No.
8      Q.   Are you undergoing any
9  treatment or taking any medication that
10  would impair your memory?
11      A.  No.
12      Q.   Is there any reason that you
13  can state that you think that the
14  deposition should not go forward today?
15      A.  No.
16      Q.   I'm going to be asking you
17  questions.  And unless your counsel
18  instructs you not to answer, I'm entitled
19  to an answer.
20      Do you understand that?
21      A.  I understand.
22      Q.   I want to make sure that you
23  understand my questions, so if you don't
24  understand something that I ask you,

**Page 15**

1  please let me know, and I will attempt to
2  rephrase the question in a way that makes
3  it so that you do understand it.
4  Understood?
5      A.  Yes.
6      Q.   From time to time I might be
7  asking you about historical events.  I
8  don't want you to guess.  But I do -- I
9  am entitled under the law to your best
10  recollection.
11      So if you have no idea about
12  something, of course you can say you
13  don't know.  But if you have a general
14  recollection, maybe just don't recall the
15  specifics, I'm still entitled to an
16  answer.  Understood?
17      A.  I understand.
18      Q.   All right.  Well, let's
19  start by talking about -- a little bit
20  about who you are and your background
21  with the company.
22      Let's talk about your
23  educational experience.  I assume you
24  have a college degree?

**Page 16**

1      A.  No, I do not.
2      Q.   Okay.  I'm glad I asked.  We
3  shouldn't make assumptions here.  Did you
4  go to high school?
5      A.  Yes.
6      Q.   Okay.  Where did you attend
7  high school?
8      A.  Hixson High School.
9  H-I-X-S-O-N.  Hixson High School,
10  Tennessee.
11      Q.   Okay.  So high school, did
12  you finish high school?
13      A.  Yes.
14      Q.   Okay.  And that's the
15  highest level of education that you
16  completed?
17      A.  Some college.  I just didn't
18  get a degree.
19      Q.   Where did you take college
20  courses?
21      A.  Middle Tennessee State
22  University in Murfreesboro, Tennessee,
23  and also University of Tennessee in
24  Chattanooga.

**Page 17**

1      Q.   Were you enrolled as a
2  full-time student at any point?
3      A.  At MTSU, I was.
4      Q.   Okay.  And how long were you
5  a full-time student?
6      A.  Just a -- just a semester.
7      Q.   Okay.  And then you took
8  some additional classes on a part-time
9  basis?
10      A.  Mm-hmm.
11      Q.   How long did you do that?
12      A.  Probably about six months to
13  a year.  I can't remember exactly.
14      Q.   Okay.  So you have a year of
15  full-time and then the next year, was it
16  immediately after you kind of switched to
17  doing it part-time?
18      A.   I went to school part-time
19  after I was -- started to work for the
20  company in Chattanooga.
21      Q.   Okay.  So you were full-time
22  student, I assume, right after you
23  graduated high school?
24      A.   Yes, that's correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    Q.   Okay.  Then what happened
2  after that first year of school.  Let me
3  be more specific.  As far as your next
4  career or school movement.  Did you
5  immediately start working for
6  AmerisourceBergen?
7    A.   Pretty much so, as I recall,
8  yeah.
9    Q.   Okay.  And then there was a
10 time when you were working for
11 AmerisourceBergen and attending school as
12 well?
13   A.   Yes.
14   Q.   Was that --
15   A.   Can I correct you on -- it
16 really wasn't AmerisourceBergen at the
17 time.  It was an independent drug company
18 called Duff Brothers --
19   Q.   Okay.
20   A.   -- in Chattanooga.  It was a
21 predecessor company to Amerisource.
22   Q.   Okay.  So during that
23 time -- that was the year immediately
24 following your first full year of

Page 19

1  school --
2    A.   Mm-hmm.
3    Q.   -- of college?
4    A.   Mm-hmm.  Yes.
5    Q.   Okay.  So during that next
6  year, you attended classes part-time and
7  worked part-time?
8    A.   I don't recall when I
9  attended classes.  It wasn't during that
10 first year of employment.  It was
11 sometime after.
12   Q.   Okay.  You said that you
13 took part-time classes for six months to
14 a year.  Was that consecutive or was that
15 spread out over time?
16   A.   I can't recall.  I took -- I
17 think I took an accounting course and
18 something else.  But it was after I was
19 employed.
20   Q.   Okay.  And that first year
21 when you were full-time, what kind of
22 classes did you take?
23        MS. McCLURE:  Objection.
24 BY MR. PIFKO:

Page 20

1    Q.   Do you remember?
2    A.   The first year of college?
3    Q.   Yeah.  When you were a
4  full-time student?
5    A.   Just general courses.
6    Q.   Okay.
7    A.   Yeah.
8    Q.   Did you specialize in any
9  sort of finance classes or business
10 classes or anything like that?
11   A.   I don't recall, because I
12 wasn't really sure what I wanted to do.
13   Q.   Okay.  So then you complete
14 that year, how did you come to work at
15 Duff Brothers?
16   A.   Actually went through an
17 employment agency.  And that's who they
18 used.  And they got me the contact to get
19 the job there at Duff Brothers.
20   Q.   And what was your first job
21 there?
22   A.   As an order filler in the
23 warehouse.
24   Q.   What were your

Page 21

1  responsibilities as an order filler?
2    A.   Stocking the shelves and
3  filling orders for pharmaceuticals.
4    Q.   So Duff Brothers was, you
5  said, a distributor, small distributor?
6    A.   Mm-hmm, yes.
7    Q.   What was its area of
8  regional reach?  What customers, where
9  were they?
10   A.   Mainly the area around
11 Chattanooga, north Georgia, Tennessee,
12 North Carolina.  In kind of that regional
13 area around Chattanooga.
14   Q.   And what time period is
15 this?  Let me ask a more specific
16 question.  When did you graduate high
17 school?
18   A.   '73, June of '73.
19   Q.   Okay.  And then you were a
20 full-time student in the school year of
21 '73 to '74?
22   A.   Mm-hmm, yes.
23   Q.   You started working at Duff
24 Brothers sometime in '74?

Page 22

1    A.    July of '74.
2    Q.    Were you part-time when you
3  started that, or was that a full-time
4  job?
5    A.    Full-time.
6    Q.    And then how long did you
7  serve as an order filler for?
8    A.    I believe about three or
9  four years.
10    Q.    What was your next job?
11    A.    Lead.
12    Q.    It was just called lead?
13    A.    Yes, like lead order filler,
14  where you --
15    Q.    Okay.  How long were you in
16  that role?
17    A.    Just about a year.
18    Q.    And then what was your next
19  position?
20    A.    After that I supervised a
21  merchandising and labeling crew for about
22  two years.
23    Q.    What was your next job?
24    A.    Warehouse supervisor.

Page 23

1    Q.    Next job after that?
2    A.    Warehouse manager.
3    Q.    How about after that?
4    A.    Operations manager.
5    Q.    After that?
6    A.    I remained operations
7  manager for several years.  Moved to
8  Valdosta, Georgia, in I think '94.  And
9  we had acquired a distributor in
10  Valdosta, and we consolidated or closed
11  down that distributor, and then we opened
12  a new distribution center in Orlando.
13    Q.    So you threw out a bunch of
14  information there.  You mentioned -- so
15  you were -- okay.  Let's just make sure
16  that we have time periods on this.
17        So lead order filler for
18  about one year.  You were supervising a
19  merchandising and labeling crew for two
20  years.  Then you were warehouse
21  supervisor for about how long?
22    A.    Couple, a couple of years.
23  I'm not really sure.  I don't remember.
24    Q.    Then you became manager,

Page 24

1  warehouse manager, how long were you in
2  that role?
3    A.    Probably a couple of more
4  years after that.
5    Q.    Okay.  Then you said you
6  were operations manager.
7    A.    Mm-hmm.
8    Q.    Then you mentioned something
9  about Georgia.  So your -- Duff Brothers
10  acquired a company that was based in
11  Georgia?
12    A.    Well, our parent company.
13    Q.    Okay.  Who was the parent
14  company?
15    A.    Alco.  Alco Standard.
16    Q.    How do you spell that?
17    A.    A-L-C-O.  Alco Standard,
18  S-T-A-N-D-A-R-D.
19    Q.    Okay.  So what was the name
20  of that company in Georgia that was --
21    A.    Valdosta Drug Company.
22    Q.    Sorry.  Can you say that
23  again?
24    A.    I'm sorry, Valdosta Drug

Page 25

1  Company.
2    Q.    Can you spell that?
3    A.    V-A-L-D-O-S-T-A.
4    Q.    Okay.  Did you ever move to
5  Georgia?
6    A.    Yes.
7    Q.    Okay.  So at the time of
8  that acquisition, you moved to Georgia?
9    A.    Yes.
10    Q.    And then maybe what you were
11  trying to say is, were you personally
12  involved in the consolidation of the --
13  the facilities?
14    A.    Yes.  Mm-hmm.
15    Q.    Okay.  And so you were
16  personally involved in closing down
17  whatever operations and transferring them
18  to the new operation in Orlando, correct?
19    A.    That's correct, yes.
20    Q.    Do you remember about the
21  time period around when that was, just
22  the year?
23    A.    It was late '94, I believe.
24    Q.    Okay.  And then what did you

Page 26

1 do after opening the Orlando distribution
2 center?
3     A.    After that I went to work
4 for corporate as regulatory affairs
5 manager.  And that was probably around
6 2000 I believe.  Yeah.
7     Q.    Was all that still for --
8 Well, okay, so you worked for Duff
9 Brothers, but Duff Brothers was owned by
10 Alco Standard.  And they acquired -- I
11 don't think I can say it right.
12     A.    Valdosta.
13     Q.    -- Valdosta Drug Company.
14         What -- what was the name of
15 the company at that point?
16         MS. McCLURE:  Objection.
17 BY MR. PIFKO:
18     Q.    Still Duff Brothers?
19         MS. McCLURE:  Objection.
20         THE WITNESS:  Okay.  So
21     originally I went to work for Duff
22     Brothers.  They were acquired by
23     Alco in '79 I believe.  Okay.
24 BY MR. PIFKO:

Page 27

1     Q.    Okay.  And so then in 1994
2 you were still working for Alco, correct?
3     A.    Right about that time.
4     Q.    Okay.  When you opened this
5 Orlando distribution center, who were you
6 employed by?
7     A.    Amerisource.
8     Q.    Okay.  When did Amerisource
9 get involved?
10     A.    While I was in Valdosta.
11 The -- it was the company did -- went
12 public as Amerisource.
13     Q.    Okay.  So you've really been
14 here from the ground floor?
15     A.    Yeah.
16     Q.    Do you know about when the
17 company started using the name
18 Amerisource?
19     A.    Yeah, I think it was '94.
20     Q.    Okay.  And to your
21 knowledge, that's the first time the
22 company now known as AmerisourceBergen
23 was using Amerisource?
24     A.    That's, yeah, when they went

Page 28

1 public, yeah.
2     Q.    Okay.  So then you -- in
3 around the year 2000 you moved into the
4 corporate offices as a regulatory affairs
5 manager, correct?
6     A.    No.  That's not correct.
7     Q.    Oh okay.
8     A.    I went to work as a
9 regulatory affairs manager, but I worked
10 from home in Orlando for approximately
11 two years and traveled significantly.
12     Q.    Were you the only regulatory
13 affairs manager for Amerisource at that
14 time?
15     A.    No.
16     Q.    So were you just the
17 regulatory affairs manager for the
18 Orlando facility?
19     A.    No.  I had a specific
20 assignment for oversight of several
21 distribution centers, but I can't
22 remember, you know, which -- which area
23 of the country it was.
24     Q.    Did it include the Orlando

Page 29

1 distribution center?
2         MS. McCLURE:  Objection.
3     You can answer.
4         THE WITNESS:  I don't -- I
5     don't believe so.
6 BY MR. PIFKO:
7     Q.    Can you name any area that
8 was under your control as a regulatory
9 affairs manager?
10     A.    I can't really recall my
11 main -- my main job responsibility was
12 conducting audits of distribution
13 centers.  And so it was basically just
14 assisting certain ones if they had
15 regulatory questions or anything like
16 that.
17     Q.    Who did you report to when
18 you took that job as regulatory affairs
19 manager in the year 2000?
20     A.    Rodney Bias, B-I-A-S is his
21 last name.
22     Q.    Where was Rodney based?
23     A.    He was based at the
24 corporate offices in Chesterbrook.

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  Q.  Do you know when the company
2  first had its offices in Chesterbrook?
3  A.  I can't remember exactly the
4  date.
5  Q.  How about roughly?
6  A.  I think it probably would
7  have been late '90s.
8  Q.  Around when it went public
9  or after that?
10  A.  I think it was around that
11  time.  They were in the same area but a
12  different office complex.
13  Q.  So you were kind of telling
14  me, but let me just ask you more
15  specifically.  What was your job
16  responsibilities as a regulatory affairs
17  manager when you took that position in
18  the year 2000?
19  A.  Conduct security and
20  regulatory audits of our distribution
21  centers and provide regulatory
22  assistance.
23  Q.  So you would travel to
24  distribution centers to conduct these

Page 31

1  audits?
2  A.  Mm-hmm, yes, sir.
3  Q.  Do you recall about how many
4  distribution centers the company had at
5  that time?
6  A.  It seems like it was in the
7  20s, 22, something like that.
8  Q.  Did you travel all around
9  the country?
10  A.  Yes, sir.
11  Q.  Can you remember any
12  specific locations that you recall
13  traveling to to perform these audits?
14  A.  Quite a few, yeah.
15  Q.  Okay.  Just name some that
16  you remember.
17  A.  Toledo.  Columbus.
18  Portland.  Mira Loma, California.  Grand
19  Prairie, Texas.  Lynchburg, Virginia.  I
20  can't remember any others.  There were
21  others.
22  Q.  Did you receive any special
23  training when you became regulatory
24  affairs manager?

Page 32

1  MS. McCLURE:  Objection.
2  THE WITNESS:  Yes.
3  BY MR. PIFKO:
4  Q.  Okay.  What was the nature
5  of your training?
6  A.  It was called -- I think at
7  that time it was a 12-hour security and
8  regulatory compliance training program.
9  Q.  And how was that conducted?
10  Did someone come and make a presentation
11  to you or was there a video, or do you
12  remember?
13  A.  It was basically in-person
14  training at a compliance conference.
15  Q.  Did you fly to the
16  headquarters in Chesterbrook to receive
17  that training?
18  A.  Sometimes it was there, and
19  other times it was remote.
20  Q.  So there was more than one
21  training session?
22  A.  Yes.  Pretty much annually
23  for the most part.
24  Q.  Okay.  And so annually

Page 33

1  was -- you said 10 to 12 hours I think
2  you said?
3  MS. McCLURE:  Objection.
4  THE WITNESS:  Yes.
5  BY MR. PIFKO:
6  Q.  So is that a couple days a
7  year you would do training?
8  A.  I believe so, yeah.
9  Q.  Do you remember the name of
10  any of the people who performed the
11  training for you?
12  A.  Yes.
13  Q.  Can you tell me those names?
14  A.  Rodney Bias.  Larry Holland.
15  Those two mainly.
16  Q.  Where was Rodney based?
17  A.  In the corporate office.
18  Q.  In Chesterbrook?
19  A.  Yes.
20  Q.  How about Larry Holland?
21  A.  He was prior to Rodney.  I
22  think he hired Rodney and then I think
23  Larry retired, but I think Larry was
24  there also -- he worked out of the

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 corporate office.
2    Q.   Did you receive any
3 documentation when you received these
4 trainings?
5    A.   Yes.
6    Q.   Were there handouts?  Yes?
7    A.   Yes.
8    Q.   Can you describe anything
9 that you remember from the training?
10    A.   It pretty much covered all
11 of the regulatory requirements that we
12 have as a company.  And it was focused a
13 lot on, you know, DEA regulations and how
14 to comply with those.  And how the
15 company complies with them.
16    Q.   But the Controlled
17 Substances Act, have you heard of that?
18    A.   Yes.  Of course.
19    Q.   That kind -- the training
20 about regulations under the Controlled
21 Substance Act; is that correct?
22    A.   That's correct.
23    Q.   Did you receive training on,
24 have you heard the term diversion?

Page 35

1    A.   Yes.
2    Q.   Okay.  Have you heard about
3 the idea of a -- do you know what a
4 registrant is?
5    A.   Yes.
6    Q.   Okay.  Have you heard about
7 the idea that a registrant has a duty to
8 prevent diversion?
9        MS. McCLURE:  Objection to
10    form.
11        You can answer.
12        THE WITNESS:  Yeah, I'm not
13    sure of the exact wording, yes.
14    But yes.
15 BY MR. PIFKO:
16    Q.   Okay.  Do you understand
17 that at that time Amerisource was a
18 registrant under the Controlled Substance
19 Act?
20    A.   The Amerisource registered
21 locations were, yes.
22    Q.   Okay.  And did you
23 understand that those registered
24 locations had a duty to prevent

Page 36

1 diversion?
2        MS. McCLURE:  Objection.
3    You can answer.
4        THE WITNESS:  Again, I don't
5    remember the exact wording of the
6    regulation.  But there is -- there
7    is a requirement.
8 BY MR. PIFKO:
9    Q.   Was there training as
10 regulatory affairs manager geared around
11 what these locations needed to do to
12 prevent diversion?
13    A.   Yes.
14    Q.   Did you have -- so you
15 performed audits, correct?
16    A.   That's correct.
17    Q.   Did you have like a
18 checklist or some sort of outline you
19 would use when you did your audits?
20    A.   Yes.
21    Q.   Did that have a name?
22    A.   It was just security and
23 regulatory compliance audit checklist.  I
24 think something, something like that,

Page 37

1 yeah.
2    Q.   Was it a long document?
3        MS. McCLURE:  Objection.
4    Form.
5        THE WITNESS:  I don't know
6    what do you mean by long.
7 BY MR. PIFKO:
8    Q.   I knew you were going to say
9 that.  Was it more than 50 pages?
10    A.   Again, that depends on like
11 is it printed front and back.  Or, you
12 know, I can tell you that it was
13 approximately 200 questions, but it was
14 constantly changing.
15    Q.   This is in 2000 we're
16 talking about, correct?
17    A.   Mm-hmm, yes.
18    Q.   And so I assume it wasn't
19 digital.  It wasn't on the internet.  You
20 had a physical copy?
21    A.   Right, that's correct.
22    Q.   You take it with you to when
23 you did the audits?
24    A.   That's correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 Q. Okay. Was it in a notebook
2 or something?
3 A. Just typically not in a
4 notebook, basically just stapled
5 together.
6 Q. Okay. So it was big enough
7 that it could be stapled -- small enough
8 that it could be stapled together,
9 correct?
10 A. Or with a binder of some
11 sort, yeah.
12 Q. I've got a bunch of papers
13 in front of me. I've got this notepad.
14 I've got a binder here, that's about two
15 inches thick. Was it more like this
16 notepad?
17 A. Mm-hmm, yes.
18 MS. McCLURE: By "this
19 notepad," do you want to describe
20 that for the record?
21 MR. PIFKO: Yeah, for the
22 record the notepad's maybe a
23 centimeter thick. It's a standard
24 legal pad. 8-and a half-by-11

Page 39

1 piece of paper.
2 BY MR. PIFKO:
3 Q. So -- but something that you
4 can easily just carry along in your
5 hands, correct?
6 A. Correct.
7 Q. Okay. And so you would take
8 that with you when you would do these
9 audits, correct?
10 A. That's correct.
11 Q. And then was there a
12 procedure that you would use when you
13 were conducting these audits?
14 A. Yes.
15 Q. Okay. Can you walk me
16 through what the procedure is?
17 A. Phew.
18 Q. Let me explain what I'm
19 looking for.
20 A. Yeah, that would help.
21 Q. Do you call the facility in
22 advance of conducting the audit, let them
23 know when they are coming, when you get
24 there, do you talk to a manager? Was

Page 40

1 there a way that you walked around the
2 plant?
3 MS. McCLURE: Objection to
4 form.
5 BY MR. PIFKO:
6 Q. That's what I'm asking -- --
7 MS. McCLURE: Compound.
8 BY MR. PIFKO:
9 Q. -- when I say is there a
10 procedure that you followed.
11 A. Yes.
12 Q. Okay. Let me -- I can tell
13 your counsel told you to answer the
14 questions in a very narrow way. So let
15 me just unpack this for you.
16 MS. McCLURE: Object to the
17 commentary for the record.
18 BY MR. PIFKO:
19 Q. Do you call up somebody at
20 the facility before you are going to
21 conduct the audit to let them know that
22 you were coming?
23 A. No.
24 Q. You would just show up at

Page 41

1 random?
2 A. Yes.
3 Q. Okay. When you arrived at
4 the facility, what was the first thing
5 that you did?
6 A. Conduct an opening meeting.
7 Q. And just to be clear, you
8 used the same procedure regardless of the
9 location that you were auditing, correct?
10 A. That's correct.
11 Q. And you used the same audit
12 checklist or document that we talked
13 about, correct?
14 A. That's correct.
15 Q. So you walk in the facility.
16 You ask for somebody. You said you had
17 some sort of meeting. That was the first
18 thing you do?
19 A. Mm-hmm, yes.
20 Q. Who do you ask for?
21 A. I think at that time it
22 would probably have been like the
23 distribution center manager.
24 Q. Okay. And so they had no

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 idea that you were coming?
2     A.   They didn't.
3     Q.   Okay.  They have to drop
4 whatever they're doing and come meet with
5 you?
6     A.   Yes.
7     Q.   So you go meet with them in
8 a conference room?
9     A.   Typically.
10     Q.   And you tell them, "Hi, I'm
11 here to conduct an audit," correct?
12     A.   That's correct.
13     Q.   And then you tell them
14 things that you are going to be doing in
15 the audit, places that you need to go?
16     A.   Correct.
17     Q.   Okay.  What was the next
18 step after you had the initial meeting
19 with the distribution center manager?
20     A.   We would ask them for a list
21 of documents and records that we want to
22 review.  And then we would do a
23 walkthrough of the facility.
24     Q.   Do you recall what the types

Page 43

1 of documents were that you would review?
2     A.   I can't give you an
3 all-inclusive list.  It would be like DEA
4 224 forms, inventory reports, a lot of
5 corporate required records about, you
6 know, associates.  We would ask for
7 training records.  Things like that.
8 Records and reports.
9     Q.   Have you heard the term
10 "suspicious order" before?
11     A.   Yes.
12     Q.   Did you ask for suspicious
13 order reports as part of these audits?
14     A.   I believe so.
15     Q.   And then you said you did a
16 walkthrough of the facility?
17     A.   That's correct.
18     Q.   What did you do in the
19 walkthrough?
20     A.   Just look for any type of
21 obvious security or safety violations.
22     Q.   And then when you document
23 your findings in the walkthrough?
24     A.   Yes.  That's part of the

Page 44

1 audit.
2     Q.   Then you have a document
3 that you're using to guide you through
4 the process, correct?
5     A.   That's correct.
6     Q.   Are you -- you're writing on
7 that document things that you're
8 observing, as you're doing the walk
9 through?
10     A.   Typically not at the same
11 time.
12     Q.   Okay.
13     A.   It's cumbersome to carry a
14 checklist around all over the place with
15 you.  So...
16     Q.   So what happens after you do
17 the walkthrough?
18     A.   Usually go back to wherever
19 they've assigned us to work, a conference
20 room typically.  And wait for them to
21 bring the records and things that we had
22 requested.
23     Q.   And then you would review
24 the records?

Page 45

1     A.   Mm-hmm, that's correct.
2     Q.   And then what would you do?
3     A.   Well, once we review the
4 records, there's typically other parts of
5 the audit.  We would go back and test the
6 doors to the cage and the vault.  Make
7 sure everything was constructed as it's
8 supposed to be, and is secured and
9 operating the way it should.  We do
10 different walkthroughs as part of the
11 audit.
12     Q.   Okay.
13     A.   Inspect the security.
14     Q.   After that, what would you
15 do?
16     A.   Complete the review of the
17 records.  And then at end of the audit we
18 would conduct an exit meeting and go over
19 our observations with the management
20 team.
21     Q.   Then you would go home?
22     A.   Go home.
23     Q.   Okay.  How long does the
24 audit take from start to finish?

Page 46

1    A.    At that time probably close
2  to a full week.  We would usually start
3  on Monday and finish either Thursday
4  afternoon or Friday morning.
5    Q.    You said we.  Did you have a
6  team of people that went with you?
7    A.    No.  Typically it was just
8  one auditor.  Sometimes it would be two
9  depending.
10    Q.    Okay.  So you alone or you
11  and someone else?
12    A.    Typically, yeah.  Typically
13  alone.
14    Q.    Do you remember anyone else
15  that accompanied you on any audits?
16    A.    No, I don't.
17    Q.    So you said, we talked about
18  the walk through and documenting your
19  findings.
20        Would you then document
21  things after that week was over or you'd
22  be doing it along the way while you were
23  in the offices at the facility?
24    A.    Well, each auditor -- each

Page 47

1  auditor may have done things a little
2  differently.  So it wasn't a standardized
3  process.  So, but, you know, typically go
4  back to the office, collect all the notes
5  and observations, and then create a
6  report.
7    Q.    And was that report
8  completed at the end of the week?
9    A.    Typically within a two-week
10  period.
11    Q.    Okay.  So within two weeks
12  after you started the audit, you'd have
13  to report complete?
14    A.    Yes.  It would be called a
15  preliminary report.
16    Q.    Then what did you do with
17  the preliminary report?
18    A.    That would get issued to the
19  audited -- audited entity.  And then they
20  would be given a certain amount of time
21  to provide corrective action responses
22  for any of the observations, written
23  corrective action responses.
24    Q.    And was this preliminary

Page 48

1  report shared with anyone in corporate as
2  well?
3    A.    Yeah.  I mean I had to go
4  over that with my boss to make sure that
5  he was okay with any of the observations
6  and had any comments about, you know,
7  whether they should be revised in any way
8  or...
9    Q.    You'd go over that with him
10  before you shared it with the
11  distribution center?
12    A.    Yeah.
13    Q.    Do you know if the report
14  was filed in any centralized location at
15  the company?
16    A.    At that time, I'm not really
17  sure.  I don't recall how those were
18  maintained.
19    Q.    How frequently did you --
20  what -- how frequently would an audit be
21  conducted at a specific distribution
22  center?
23    A.    For the most part, pretty
24  much every year.  Usually annual basis.

Page 49

1    Q.    Was there some -- okay.  Was
2  there some sort of regular schedule in
3  which they would be conducted?
4        MS. McCLURE:  Objection to
5    form.  You can answer.
6        THE WITNESS:  Yeah, I -- I
7    don't recall exactly.
8  BY MR. PIFKO:
9    Q.    But generally, once a year
10  for every facility?
11    A.    Yes.
12    Q.    Do you remember how many
13  other people had the same job as you at
14  that time?
15    A.    As I recall, I think there
16  were about three or four of us.  I can't
17  remember exactly.
18    Q.    So at some point you
19  transitioned out of that role, correct?
20    A.    That's correct.
21    Q.    What was your role after
22  that?
23    A.    I think it was as director.
24  And that was when I moved to corporate.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1 Q. You were director. So you
2 were still in regulatory affairs, you
3 just moved from manager to director?
4 A. I believe so.
5 Q. At some point you moved away
6 from Orlando, correct?
7 A. Yes.
8 Q. Was it at the time when you
9 moved from manager to director?
10 A. I believe so, yeah.
11 Q. And when was that?
12 A. It was, I believe, October
13 2002.
14 Q. Do you know if there was a
15 written policy about the annual audit
16 requirement?
17 A. I believe so, yes.
18 Q. Do you know if there was
19 like a policy number associated with the
20 policy?
21 A. Well, let me -- let me step
22 back. I don't -- I'm not sure there was
23 a written policy that -- that stated that
24 it was an annual inspection. But there

Page 51

1 was a written -- written policy on
2 conducting the audits.
3 Q. Okay.
4 A. I don't think it had
5 anything -- I don't think it specified
6 the frequency.
7 Q. And do you remember if there
8 was a policy number for that policy?
9 A. I can't remember the policy
10 number. But there is a policy.
11 Q. When you were manager of
12 regulatory -- when you were regulatory
13 affairs manager, did you have any other
14 job responsibilities besides conducting
15 these audits?
16 A. Yes, I just can't remember
17 what they were at the time. It was
18 basically providing regulatory assistance
19 if there were questions or anything like
20 that from the field.
21 Q. So that -- you were one of a
22 few people that someone could call if
23 they had a compliance question?
24 A. Yes.

Page 52

1 Q. Was there a hotline or how
2 would people know how to call -- how to
3 call you?
4 A. I -- I don't remember. I
5 think they -- you know, I'm sure -- no, I
6 don't even want to speculate. I don't
7 remember.
8 Q. Did you have a mobile phone
9 at that time?
10 A. Oh gosh. I don't think so.
11 Q. You worked out of your --
12 your house at that time?
13 A. From?
14 Q. 2000 to 2002?
15 A. 2000 to 2002, yes.
16 Q. So if you had a business
17 call, they would call your house?
18 A. I don't remember.
19 Q. Did you have a separate
20 office in your house where you would
21 work?
22 A. Yeah.
23 Q. Okay. Do you know -- did
24 you have a separate line for doing work

Page 53

1 versus your personal line?
2 A. I can't remember if it was a
3 separate line or not.
4 Q. Okay. But do you know if
5 you had e-mail at that time?
6 A. I believe so.
7 Q. Okay. So when you fielded
8 questions about compliance issues, would
9 those be raised to you by e-mail, or by
10 phone or both?
11 A. Probably both.
12 Q. Okay. Do you recall
13 handling compliance inquiries from your
14 home office?
15 A. I don't remember.
16 Q. Do you know if there is some
17 sort of written documentation that listed
18 you as a contact person for compliance
19 questions?
20 A. There could have been, but
21 I'm not sure.
22 Q. Do you have any idea how
23 someone would know that they could call
24 you if they had a compliance question?

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  A. I assume they had my contact
2  information. I just don't remember
3  exactly what form that was in or whether
4  it was a policy or a sheet or what.
5  Q. Okay. Do you know if there
6  was a company directory?
7  A. I think so.
8  Q. Did you have business cards
9  when you were conducting these audits?
10  A. I think so. But I'm not
11  positive.
12  Q. Did you give people, when
13  you met the distribution center manager,
14  did you give them your business card?
15  A. I think so. But I don't
16  recall 100 percent of the time.
17  Q. Was your name on the audit
18  report?
19  A. Yes.
20  Q. Did you sign it?
21  A. I don't think I signed them,
22  no. But it had my name on them.
23  Q. Do you know if the audit
24  report had my contact information,

Page 55

1  e-mail or phone number?
2  A. I think so. Yeah, I believe
3  it did.
4  Q. Do you recall that --
5  telling the distribution center managers
6  as part of your process, that if they had
7  questions about compliance, they could
8  call you?
9  A. I don't specifically recall
10  telling them that, but that would make
11  sense.
12  Q. So in 2002 you are promoted
13  to regulatory affairs director, correct?
14  A. I believe so.
15  Q. Okay. And you moved to
16  Chesterbrook, Pennsylvania, correct?
17  A. That's correct.
18  Q. Who did you report to at
19  that time?
20  A. Rodney Bias.
21  Q. And did Rodney get a
22  promotion at that same time?
23  A. I don't think so, no.
24  Q. Do you know what Rodney's

Page 56

1  title was at that time?
2  A. You know what, he may have
3  been director. Maybe it was -- maybe I
4  was manager when I went up there. I
5  don't -- I don't distinctly remember the
6  titles. They changed so much.
7  Q. Okay. But you got promoted
8  in 2002.
9  A. Right.
10  Q. And you moved to the
11  headquarters in Pennsylvania?
12  A. That's correct.
13  Q. How did your -- well, what
14  were your job responsibilities when you
15  got promoted in 2002?
16  A. I supervised the -- the team
17  that did the audits for the most part.
18  Q. Did you provide training to
19  the team that did the audits at that
20  time?
21  A. Yes.
22  Q. Did anyone else provide
23  training?
24  A. I'm sure they do -- did, but

Page 57

1  I don't remember who. Again, we had
2  training every year.
3  Q. I guess I'm specifically
4  speaking about the audits, the audit
5  process. Do you know if you -- if you
6  were the only person who provided
7  training to regulatory affairs people who
8  were conducting audits?
9  A. I don't think it was just
10  me. Maybe one of the more experienced
11  auditors would also train them.
12  Q. Do you know any of the names
13  of the people that you're referring to as
14  more experienced auditors?
15  A. Yes. There was a lady named
16  Jan Black. She was probably the most
17  experienced auditor.
18  Q. Anyone else?
19  A. No.
20  Q. Where was Jan Black located
21  physically?
22  A. She worked out of
23  Charleston, South Carolina.
24  Q. Did you interact with her in

Page 58

1 person?
2     A.   Yes.
3     Q.   Okay.  Did you do that in
4 Pennsylvania?
5     A.   Most -- for the most part,
6 yes.
7     Q.   So she would come to
8 Pennsylvania to meet with people --
9     A.   For conferences and meetings
10 and so forth.
11     Q.   So you supervised the
12 auditors when -- when you got promoted.
13 Anything else you did?
14     A.   That's all I can recall.
15     Q.   Did you have -- and part of
16 that supervision of the auditors included
17 training them, correct?
18     A.   Training them, yes.
19     Q.   Did you have written
20 documentation that you used when you were
21 training the auditors?
22     A.   I don't believe so, I don't
23 believe so.  It was pretty much on -- you
24 know, we would go out on training audits

Page 59

1 and observe them going through the audit
2 process and provide assistance to them.
3     Q.   Okay.  So it wasn't like a
4 formal class or office conference room
5 setting --
6     A.   No.
7     Q.   -- it would just be like
8 on-the-job training, you would go with
9 them and walk them through the process?
10     A.   That's correct.
11     Q.   Was there -- was each
12 auditor assigned to a specific region?
13     A.   I think so.  Yes.
14     Q.   Okay.  And we -- we talked
15 earlier about you had some sort of
16 regional assignment when you were an
17 auditor, but you don't remember when it
18 was?
19     A.   I don't --
20         MS. McCLURE:  Objection,
21     misstates the testimony.  You can
22     answer.
23         THE WITNESS:  I don't
24     remember.

Page 60

1 BY MR. PIFKO:
2     Q.   How many auditors -- did the
3 auditors, when you were -- when you were
4 promoted in 2002, did the auditors report
5 to you?
6     A.   Yes.
7     Q.   Okay.  How many were there
8 at that time?
9     A.   I think there were three or
10 four.  I can't remember the number.  It's
11 changed over the years.
12     Q.   Did you receive any
13 additional training from somebody else
14 when you moved into that new role in
15 2002?
16     A.   No.  Just -- no.
17     Q.   Did you provide performance
18 evaluations of the auditors who reported
19 to you?
20     A.   I believe so.
21     Q.   Was there a document that
22 you used to evaluate their performance?
23     A.   I'm sure there would be,
24 yes.

Page 61

1     Q.   But you don't remember?
2     A.   I don't remember exactly
3 what the document is, because again those
4 things change over time.  I don't
5 remember what the process was in that --
6 during that time period.
7     Q.   How frequently did you
8 review the auditor's performance?
9     A.   Well, there's a formal
10 performance review that I believe was
11 every year.  But it was ongoing.
12     Q.   Was there a way to write
13 someone up if you were not satisfied with
14 the way they were performing?
15     A.   Yes.
16     Q.   Okay.  Is there an official
17 name for the document that you would
18 write them up on?
19     A.   I don't remember what it
20 would be.
21     Q.   Okay.  Do you remember doing
22 that from time to time?
23     A.   Not specifics, but I'm sure
24 I did.

Page 62

1  Q.  What -- do you remember what
2  the consequences are if you wrote someone
3  up?
4  A.  Our company had a
5  progressive discipline par -- policy, so
6  it depended on what the issue was.
7  Typically, it's a verbal to start with,
8  then a written.  And then it could be a
9  second written.  It just depends on what
10  it is.
11  Q.  Okay.  Could someone be
12  terminated if they had in -- consistency
13  poor performance?
14  A.  They could.
15  Q.  Did anyone ever review your
16  performance on the job?
17  A.  Yes.
18  Q.  Okay.  Did you ever receive
19  a poor performance review?
20  A.  I don't recall ever
21  receiving a poor performance review.
22  Q.  Do you ever -- ever remember
23  having a verbal warning from someone
24  about your performance?

Page 63

1  A.  I don't recall having one.
2  Q.  How long were you -- you
3  said it was director, but then you
4  weren't sure if maybe it was manager.
5  The role that you took in 2002, how long
6  were you in that role?
7  A.  I don't remember when I was
8  promoted again.  But it was probably
9  sometime around after 2007, I think.
10  Q.  What was your role then?
11  A.  I think it was -- I believe
12  it was director.  And I just can't
13  remember when I was promoted to senior
14  director.  There's been so many changes
15  over the years.  I don't remember the
16  titles and exactly when.
17  Q.  So at some point you were
18  director.  And then at some point you
19  were senior director, correct?
20  A.  Mm-hmm, that's correct.
21  Q.  Okay.  But you distinctly
22  remember a promotion in 2007?
23  MS. McCLURE:  Objection.
24  THE WITNESS:  No.

Page 64

1  BY MR. PIFKO:
2  Q.  Okay.  I asked you when you
3  were promoted from the position that you
4  were in in 2002.  Do you recall me asking
5  that?  And you said around 2007.
6  MS. McCLURE:  Objection.
7  THE WITNESS:  Again, I don't
8  remember.
9  BY MR. PIFKO:
10  Q.  Well, do you remember we
11  talked earlier about your trying to
12  provide your best recollection.  What's
13  your best recollection of the time when
14  you were promoted from the position that
15  you started in in 2002?
16  MS. McCLURE:  You can
17  provide your best recollection.
18  But I'm going to counsel the
19  witness not to speculate.
20  THE WITNESS:  I can't.  I
21  just don't remember, you know,
22  when that change happened.
23  BY MR. PIFKO:
24  Q.  Okay.  You said earlier

Page 65

1  something about 2007.  What struck out
2  about that time for you?
3  A.  My responsibilities, you
4  know, increased.
5  Q.  Okay.  So regardless of the
6  title.  At some point around 2007, your
7  responsibilities increased, correct?
8  A.  That's correct.
9  Q.  Okay.  What were your
10  increased responsibilities at that time?
11  A.  Developing the -- enhancing
12  the order monitoring program.
13  Q.  Was there something that
14  happened that caused you to remember the
15  year 2007?
16  A.  Mm-hmm.
17  Q.  What's that?
18  A.  That was when we had the
19  suspension of our registration at the
20  Orlando facility.
21  Q.  Do you know if the company
22  entered into a settlement with the DEA at
23  that time in connection with the
24  suspension?

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    A.   Yes, they did.
2    Q.   Okay.  I'm handing you
3  what's been previously marked as
4  Zimmerman Exhibit 5.  Have you seen this
5  before?
6    A.   I have, yes.
7    Q.   Is this -- this the
8  settlement agreement to which we were
9  just discussing?
10    A.   Yes, I believe it is.
11    Q.   Okay.  Is there a date on
12  there?
13    A.   The day that it was signed?
14    Q.   Yeah.
15    A.   Yeah.  It looks like June of
16  2007, June 22nd.
17    Q.   So there was a shift in your
18  responsibilities as a result of that
19  settlement, correct?
20    A.   That's correct.
21    Q.   And you said at that time
22  you took over the responsibility of
23  developing and enhancing the company's
24  order monitoring program, correct?

Page 67

1    A.   Or overseeing the
2  development of it.
3    Q.   Okay.  Over -- so you were
4  in charge of overseeing the development
5  of the order monitoring program?
6    A.   Of the enhancement of it,
7  yes.
8    Q.   Okay.  Did the company have
9  an order monitoring program prior to
10  2007?
11    A.   Yes.
12    Q.   Are you familiar with what
13  the company's order monitoring program
14  was prior to 2007?
15    A.   Yes.
16    Q.   How did you come to be
17  familiar with the company's -- can I just
18  call it the pre-2007 order monitoring
19  program for that --
20    A.   Fine with me.
21    Q.   If I use that term, can
22  we -- can we agree that that means the
23  program that was in place prior to the
24  program that was developed from the

Page 68

1  settlement agreement, correct?
2    A.   It was a different program,
3  yes.
4    Q.   Okay.  So I'm just saying if
5  I call it the pre-2007 order monitoring
6  program, can we have a common
7  understanding that that means the program
8  that was in place before the new one that
9  you developed from the settlement
10  agreement?
11    A.   I think so, yes.
12    Q.   Okay.  So the pre-2007 order
13  monitoring program, you had familiarity
14  with that program, correct?
15    A.   Yes.
16    Q.   Okay.  How did you come to
17  be familiar with that program?
18    A.   Just as part of my job
19  responsibilities, my boss helped develop
20  that program, Chris Zimmerman.
21    Q.   Okay.  When did Chris
22  Zimmerman become your boss?
23    A.   In -- well, he -- at the --
24  you mean my direct boss?

Page 69

1    Q.   Well --
2    A.   Or -- he was the head of the
3  department at the time of the merger,
4  became the head of the department.
5    Q.   Okay.  Let's go through some
6  of those details.
7    A.   Okay.
8    Q.   Rodney Bias was your
9  supervisor --
10    A.   That's correct.
11    Q.   -- for a time period?
12    A.   Mm-hmm.
13    Q.   Then you moved to the
14  headquarters in 2002.  And you said
15  Rodney was still your supervisor at that
16  time?
17    A.   Yes.  Yes.
18    Q.   Okay.  At some point there
19  was another corporate merger, correct?
20    A.   Not after 2002, I don't
21  believe.
22    Q.   The only ones that we've
23  discussed -- maybe it's in your head but
24  we haven't discussed it.

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    A.    All right.
2    Q.    So we talked about some of
3  the earlier iterations of the company.
4  But at some point Amerisource merged with
5  the Bergen Corporation, correct?
6    A.    That's correct.
7    Q.    And do you know on or around
8  when that was?
9    A.    Yeah, it was 2001.
10    Q.    And that's while you were
11  serving as regulatory affairs manager,
12  correct?
13    A.    That's correct.
14    Q.    Did anything about your job
15  change after that merger, in that -- in
16  that immediate time period?
17    A.    I don't recall, because I
18  was already working for corporate so.
19    Q.    So you were a regulatory
20  affairs manager from 2000 to 2002. And
21  halfway through that period there was a
22  merger between Amerisource and the Bergen
23  Corporation, correct?
24    A.    That's correct.

Page 71

1    Q.    Okay. And you don't
2  remember anything dramatic changing about
3  your job during that time period?
4    A.    I don't remember anything
5  dramatic, no.
6    Q.    And then in 2002, you moved
7  to the headquarters in Pennsylvania. And
8  at that time, it was the
9  AmerisourceBergen Corporation that we
10  know today, correct?
11    A.    Yes. That's correct.
12    Q.    Okay. And Rodney Bias was
13  still your manager in 2002, correct?
14    A.    Yes.
15    Q.    At some point he wasn't your
16  manager, correct?
17    A.    Yes.
18    Q.    Do you remember who the next
19  person who you reported to was?
20    A.    That would have been Chris
21  Zimmerman, yeah.
22    Q.    Okay. Do you have a
23  recollection about when you started
24  reporting directly to Chris Zimmerman?

Page 72

1    A.    No, I don't remember exactly
2  when it was, but Rodney Bias left the
3  company and I was promoted to his
4  position.
5    Q.    Okay. And that was -- but
6  that was before 2007?
7    A.    Yes.
8    Q.    Okay. So maybe that's in
9  your mind when you moved from manager to
10  director, it was sometime between 2002
11  and 2007?
12    A.    I believe so.
13    Q.    Okay. And at that time you
14  started reporting directly to Chris
15  Zimmerman?
16    A.    That's correct.
17    Q.    Chris Zimmerman came to the
18  company through the Bergen Corporation,
19  correct?
20    A.    That's correct.
21    Q.    Okay. Prior to -- well,
22  when was the first time that you met
23  Chris Zimmerman?
24    A.    I think it was -- it was

Page 73

1  sometime in 2001. It might have been
2  right after the merger. I remember him
3  coming to Orlando, because I think I was
4  still working there then. And I remember
5  meeting him there, at the distribution
6  center. He came for a visit.
7    Q.    Okay. So when he assumed
8  his new role at the merged corporation,
9  one of the things he did was come to the
10  Orlando facility?
11    A.    I believe so.
12    Q.    And in connection with that
13  visit was the first time you met him?
14    A.    Mm-hmm, yes.
15    Q.    Okay. And then you started
16  reporting to him sometime in between 2002
17  and 2007, correct?
18    A.    I believe that's correct.
19    Q.    After you started
20  reporting to him, did you have any
21  involvement with the order monitoring
22  program?
23    A.    After I started reporting?
24    Q.    Immediately after you

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 started reporting to him.
2     A.   Yes.
3     Q.   Okay. And what was the
4 nature of your involvement with the order
5 monitoring program at that time?
6     A.   It was just because it was
7 part of regulatory compliance. It was
8 part of my job responsibilities to make
9 sure that we were reporting.
10     Q.   When you say reporting, what
11 do you mean?
12     A.   Reporting suspicious orders
13 to DEA.
14     Q.   When was the first time that
15 you recall becoming familiar with the
16 idea of reporting suspicious orders to
17 the DEA?
18     A.   Way back when I was in
19 Chattanooga as an operations manager.
20     Q.   Okay. And you just
21 testified that it was part of your job to
22 ensure that the company was reporting
23 suspicious orders to DEA, correct?
24     A.   That we were complying with

Page 75

1 the requirement, yes.
2     Q.   When did you first
3 understand that to be part of your job?
4     A.   Probably sometime after I
5 moved to the corporate office.
6     Q.   Sometime after 2002?
7     A.   Yes.
8     Q.   So you said that Chris
9 Zimmerman developed the pre-2007 order
10 monitoring program, correct?
11     A.   Well, it was developed by
12 Bergen. He oversaw the development, but
13 I don't think he personally developed the
14 program.
15     Q.   Okay. Did Amerisource have
16 an order monitoring program prior to the
17 merger with the Bergen Corporation?
18     A.   Yes.
19     Q.   Are you familiar with what
20 the program was?
21     A.   I don't recall.
22     Q.   Did you have any role in
23 carrying out any attributes of the
24 program when you were at the Amerisource

Page 76

1 Corporation?
2     A.   I don't recall what it was.
3     Q.   Did you ever receive any
4 training from anyone in the time when you
5 were just at the Amerisource Corporation
6 about the order monitoring program?
7     A.   I don't remember.
8     Q.   Sitting here today, can you
9 describe anything about the Amerisource
10 order monitoring program?
11     A.   I can't remember specifics.
12     Q.   Have you ever heard the term
13 "threshold"?
14     A.   Yes.
15     Q.   Do you know what that means?
16     A.   What "threshold" means?
17 Basically, yes.
18     Q.   What's your understanding of
19 what the term "threshold" means?
20     A.   Basically it's a trigger.
21     Q.   A trigger for what?
22     A.   Well, as -- as it relates to
23 suspicious order reporting? Is that what
24 you're asking?

Page 77

1     Q.   I'm asking for your
2 understanding. So you tell me.
3     A.   Well, just the word
4 "threshold" --
5     Q.   Okay. Fair enough. We're
6 talking about the order monitoring
7 program.
8     A.   Okay.
9     Q.   So do you have an
10 understanding that threshold has a
11 meaning within the idea of an order
12 monitoring program?
13     A.   Yes, it does.
14     Q.   Okay. And what's your
15 understanding of what a threshold is in
16 the context of an order monitoring
17 program?
18     A.   A threshold would be a
19 quantity of controlled substances,
20 depending on what drug family it is that
21 is being ordered that would trigger an
22 order to be reviewed.
23     Q.   And reviewed for what?
24     A.   Reviewed to determine

Page 78

1  whether it would be considered suspicious
2  or not.
3      Q.   I'm talking about just the
4  time before Amerisource merged with the
5  Bergen Corporation.  Do you know if
6  Amerisource's ordering monitoring program
7  used thresholds?
8      A.   I don't think so.
9      Q.   You don't think it did?
10     A.   I don't think so.
11     Q.   Do you have any idea of what
12 the criteria were under the Amerisource
13 order monitoring program for reviewing an
14 order to determine whether it was
15 suspicious?
16     A.   To the best of my
17 recollection it was just a percentage.
18 It was a formula that I think had been
19 provided by the trade association or
20 something back in the day, or from DEA.
21 I can't remember where the formula came
22 from.  But it was looking at a percentage
23 of that customer's orders, if it exceeded
24 a certain percentage of their normal

Page 79

1  monthly purchase of that drug, that it
2  would be flagged.
3      Q.   Okay.  Then it would be
4  flagged as suspicious?
5      A.   On the report.
6          MS. McCLURE:  Objection.
7          THE WITNESS:  I'm not sure.
8  I don't think it was flagged as
9  suspicious.
10 BY MR. PIFKO:
11     Q.   Okay.  It would be flagged
12 for review?
13     A.   Just flagged for -- for a
14 report to be sent to DEA.
15     Q.   Okay.  And reported --
16     A.   This is -- we're still
17 talking about the Amerisource days,
18 right?
19     Q.   Yes.  Reported to DEA as
20 what?
21     A.   I don't remember what -- how
22 it was reported.  Possible -- possible
23 suspicious order or something like that.
24     Q.   Okay.  You understand --

Page 80

1  have you heard of ARCOS?
2      A.   Yes, I do.
3      Q.   Okay.  So under ARCOS, a
4  distributor is required to report all
5  orders to the DEA, correct?
6      A.   No.  That's not correct.
7      Q.   Of controlled -- sorry,
8  I'm -- I'm making assumptions in my
9  question there.
10         Of controlled substances,
11 certain identified controlled substances,
12 all orders must be reported to DEA
13 through the ARCOS program, right?
14     A.   All ARCOS required -- all
15 ARCOS reportable controlled substances,
16 yes.
17     Q.   Okay.  And so when we are
18 talking about this, again we are just
19 talking about the Amerisource -- prior to
20 the Amerisource and Bergen Corporation
21 merger --
22     A.   Mm-hmm.
23     Q.   -- and we talked about
24 exceeding some sort of percentage of that

Page 81

1  month's order and reporting to DEA.
2  We're -- we're talking about a report
3  that has nothing to do with ARCOS, right?
4  We are talking about a separate report,
5  correct?
6      A.   Yes.
7      Q.   Okay.  And you don't know
8  what that report is, but it's in
9  connection with some sort of suspicious
10 order, regulations or requirements?
11     A.   As I recall, yes.
12     Q.   Okay.  Do you recall if
13 Amerisource, pre-Amerisource and Bergen
14 merger, had any other criteria for
15 evaluating whether an order was
16 suspicious?
17     A.   Yes.
18     Q.   What were those criteria?
19     A.   We had a posting that we
20 required, that was required to be posted
21 in the cage and vault that had quantities
22 listed that -- for order fillers at the
23 time, that they could also -- you know,
24 we didn't want to rely totally on the

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 computer system to identify an order that
2 could be potentially suspicious.  So
3 there were base -- I think it was base
4 quantities that an order filler could
5 review to see if it might be considered
6 suspicious.  I don't remember what it was
7 called.
8     Q.    Okay.  So there's base
9 quantities and then some sort of
10 percentage over that customer's months --
11 prior month's order that could lead an
12 order to be reported to the DEA as
13 suspicious, is that correct?
14         MS. McCLURE:  Objection to
15     form.
16         THE WITNESS:  I think so.  I
17     don't remember how that -- I think
18     it was a monthly report, but I
19     don't remember exactly.
20 BY MR. PIFKO:
21     Q.    When you say a monthly
22 report, you mean the -- the reporting to
23 DEA was -- was monthly or --
24     A.    No.  There was a report sent

Page 83

1 to DEA monthly.
2     Q.    Okay.  So there's some kind
3 of suspicious order report sent to the
4 DEA every month?
5         MS. McCLURE:  Objection.
6     Form.
7         THE WITNESS:  Again, I'm not
8     sure what it was called.  But it
9     was a report that was sent to the
10     DEA I believe every -- I believe
11     every month.
12 BY MR. PIFKO:
13     Q.    Okay.  And again, for
14 clarity, this is separate than the ARCOS
15 reporting, correct?
16     A.    Yes.
17     Q.    Okay.  And so for an order
18 to be included in this report to the DEA,
19 in the pre, before the merger between
20 Amerisource and the Bergen Corporation,
21 it could exceed some absolute number that
22 was posted in the cage or it would exceed
23 that customer -- some percentage of that
24 customer's prior order, correct?

Page 84

1     A.    That's correct.
2     Q.    If an order was included in
3 this monthly report that you're talking
4 about that was sent to the DEA, did the
5 company still ship the order?
6     A.    At that time I believe so,
7 for the most part.
8     Q.    What would be the exception?
9     A.    I think in some cases they
10 may have called a customer.  It depends
11 on how late in the day it was, and ask a
12 question about it.  And if it was unusual
13 for some reason, they may cancel the
14 order.  But for the most part they were
15 shipped.
16     Q.    Okay.  Then 2002, you moved
17 to the headquarters and you start at some
18 point between 2002 and 2007 -- you start
19 reporting to Chris Zimmerman, correct?
20     A.    That's correct.
21     Q.    So you said that
22 Mr. Zimmerman, it was your understanding
23 that Mr. Zimmerman oversaw the
24 development of the suspicious order

Page 85

1 monitoring program at the Bergen
2 Corporation; is that correct?
3         MS. McCLURE:  Objection.
4     Form.
5         THE WITNESS:  Again, I don't
6     know how much involved he was.  I
7     just saw his correspondence back
8     and forth with DEA to get it
9     approved.
10 BY MR. PIFKO:
11     Q.    So ultimately the
12 AmerisourceBergen Corporation decided to
13 use the Bergen Corporation's ordering
14 monitoring program, correct?
15     A.    That's my understanding,
16 yes.
17     Q.    Do you have any knowledge
18 about the decisionmaking process, about
19 how the company came to decide to use the
20 Bergen Corporation's order monitoring
21 program as opposed to Amerisource's order
22 monitoring program?
23     A.    No.
24     Q.    Do you know who might have

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 made that decision?
2      A.   No.
3           MS. McCLURE:  Mark, at some
4 point soon, if there's an
5 appropriate time for a break, I
6 appreciate that.
7           MR. PIFKO:  Yeah, we can
8 take a break right now.
9           MS. McCLURE:  Thank you.
10          THE VIDEOGRAPHER:  We are
11 going off the record.  The time is
12 10:49.
13          (Short break.)
14          THE VIDEOGRAPHER:  Going
15 back on the record.  Beginning of
16 Media File Number 2.  The time is
17 11:05.
18 BY MR. PIFKO:
19     Q.   I believe I asked you
20 earlier, but do you recall ever
21 conducting an audit of the Orlando
22 facility that had its registration
23 revoked?
24     A.   Did you say -- can you

Page 87

1 repeat that?
2      Q.   So, okay.  We talked about
3 the 2007 settlement agreement.  You have
4 a copy of that in front of you, correct?
5      A.   Yes.
6      Q.   And that concerned --
7      A.   Yes.
8      Q.   -- an Orlando facility
9 distribution center, correct?
10     A.   That's correct.
11     Q.   And you, you performed
12 audits of the company's distribution
13 centers, correct?
14     A.   That's correct.
15     Q.   And did you ever audit the
16 Orlando facility?
17     A.   Yes.  Yeah.
18     Q.   How many occasions do you
19 recall auditing the Orlando facility?
20     A.   I think two.  But I'm not --
21 I'm not 100 percent positive.  But I
22 think two times.
23     Q.   Do you remember when that
24 was?

Page 88

1      A.   Probably between -- don't
2 know for sure.  I think it was between
3 2002 and 2007.  Something like that.
4 Somewhere in that time frame.
5      Q.   And when you weren't the
6 actual one who audited that facility, you
7 also managed all the -- all the auditors,
8 correct?
9      A.   After 2002, yes.
10     Q.   Okay.  So whoever it was
11 that audited the facility was a direct
12 report to you, correct?
13     A.   That's correct.
14     Q.   And I believe you said
15 earlier, you -- you actually were the
16 person who established that facility in
17 your -- back in the old days of your
18 original job, correct?
19     A.   As the operations manager,
20 yes.
21     Q.   When you -- on the two
22 occasions that you recall inspecting the
23 Orlando facility, do you recall
24 identifying any concerns that would lead

Page 89

1 you to believe that the registration for
2 that facility would be in jeopardy?
3          MS. McCLURE:  Objection to
4     form.  You can answer.
5          THE WITNESS:  No.
6 BY MR. PIFKO:
7      Q.   At any point when you were
8 supervising the people that conducted the
9 audits of that facility, did anyone bring
10 concerns to you about the Orlando
11 facility that would have led you to
12 believe that its registration was in
13 jeopardy?
14     A.   No.
15     Q.   You talked about when you
16 were -- we talked about the audit
17 process.  And you said that when you
18 conducted an audit, one of the parts of
19 the process was that you had to share it
20 with your boss before you shared it with
21 the facility, just to go over it with
22 them, correct?
23     A.   That's correct.
24     Q.   Was that the same policy

Page 90

1 when you were supervising auditors, they
2 had to also share their reports with you
3 before they sent it to the manager of
4 that facility, is that correct?
5     A.   That's correct.
6     Q.   Okay.  And so the audits of
7 the Orlando facility where you were not
8 the one conducting it, those would have
9 been shared with you, correct?
10     A.   That's correct.
11     Q.   Okay.  And do you ever
12 recall seeing anything in the audit
13 reports that would have led you to
14 believe that the registration would be in
15 jeopardy for that facility?
16     A.   No.
17     Q.   Upon learning that the
18 registration for that facility was
19 suspended, did you revamp the audit
20 process so that you could identify those
21 issues ahead of time?
22         MS. McCLURE:  Objection.
23     Miss -- foundation.
24         THE WITNESS:  Repeat the

Page 91

1     question again just so I'm sure I
2     understand what you're asking.
3 BY MR. PIFKO:
4     Q.   Okay.  Well, we'll --
5 let's -- the audit process failed to
6 identify the issues that led to the
7 registration suspension, correct?
8         MS. McCLURE:  Objection.
9     Assumes facts not in evidence.
10         THE WITNESS:  Disagree.
11         MS. McCLURE:  Foundation.
12         THE WITNESS:  I disagree.
13 BY MR. PIFKO:
14     Q.   Okay.  So the audits did
15 identify the issues that led to the
16 registration suspension?
17         MS. McCLURE:  Objection.
18     Form.
19         THE WITNESS:  We audit for
20     compliance with the regulations,
21     and we were -- the DC was
22     complying with the regulations.
23 BY MR. PIFKO:
24     Q.   What is your understanding

Page 92

1 about what the basis was for suspending
2 the registration of the Orlando facility?
3     A.   My understanding, it was for
4 excessive sales to internet pharmacies.
5     Q.   And that wasn't something
6 that you were examining in connection
7 with the audit process?
8     A.   We --
9         MS. McCLURE:  Objection to
10     form.  You may answer.
11         THE WITNESS:  We -- we --
12     part of the audit process is to
13     ensure that the -- the DC is
14     reporting suspicious orders as
15     required by the regulation.
16 BY MR. PIFKO:
17     Q.   And did -- did the audits of
18 the Orlando facility prior to the 2007
19 suspension, did they review the
20 suspicious orders coming from that
21 facilities -- coming from that facility?
22     A.   As I recall, I believe the
23 suspicious orders were reported
24 centrally, from a central location.  I

Page 93

1 don't think the DC actually sent those
2 in.  I think they may have been sent from
3 headquarters.  But I'm not positive.  But
4 it's a report.
5     Q.   Okay.  But the audit would
6 identify orders from that facility that
7 would have been included in the report?
8         MS. McCLURE:  Objection.
9     Assumes facts not in evidence.
10     Foundation.
11         THE WITNESS:  The audit just
12     ensures that they're reporting.
13 BY MR. PIFKO:
14     Q.   Okay.
15     A.   The company is reporting
16 from the DC.
17     Q.   Okay.  Just so just I
18 understand the process.  The process is
19 for the DC to report them to the company.
20 And then the company sends the report to
21 the DEA?
22     A.   No.  That's incorrect.
23     Q.   Well, you tell me.  What's
24 the process?

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1   A.   The way I understand the
2  process at that -- at that time, was the,
3  I believe the central processing center
4  was in, based in California.  And they
5  would generate the reports from there.
6       I just can't remember if
7  they were sent to the DC, to the DC to
8  send it to local office or whether they
9  were sent directly to the local DEA
10 office.
11     Q.   Okay.  So when you're
12 conducting the audit and you are trying
13 to ensure compliance with the suspicious
14 order requirements, what are you looking
15 at at the distribution center?
16     A.   I can't recall what we were
17 looking at.  I think we may have checked
18 that separately at corporate to make sure
19 that the reports were being sent.
20     Q.   Okay.  And do you recall at
21 any point while you were in your role as
22 a compliance auditor, either a manager or
23 as an actual auditor, checking the
24 suspicious order reports from the Orlando

Page 95

1  facility?
2      A.   I don't recall.
3      Q.   Do you know if anyone else
4  checked the suspicious order reports for
5  that facility?
6          MS. McCLURE:  Objection.
7          THE WITNESS:  I don't
8      recall.
9  BY MR. PIFKO:
10     Q.   Can you recall anything
11 about what would have been done to ensure
12 that the facility was reporting and
13 identifying suspicious orders?
14     A.   I can't remember how we
15 checked that.
16     Q.   So it's your understanding
17 that suspicious orders were part of the
18 basis for the suspension of the
19 registration in 2007?
20     A.   That's my understanding.
21     Q.   At the Orlando facility?
22     A.   That's my understanding.
23     Q.   And so do you believe that
24 the audit process missed something that

Page 96

1  led to that suspension?
2      A.   No.
3      Q.   So you believe the audit
4  process was fine even though the facility
5  had its registration suspended?
6      A.   Yes.
7      Q.   Was there any disciplinary
8  action taken against anyone in the
9  compliance division or department as a
10 result of the suspension of the Orlando
11 facility's registration?
12         MS. McCLURE:  Objection to
13     form.
14         THE WITNESS:  No, not that I
15     recall.
16 BY MR. PIFKO:
17     Q.   Did you undertake to make
18 any modifications to the audit process as
19 a result of the suspension of the Orlando
20 facility's registration?
21     A.   No.
22     Q.   Did you know at that time
23 whether any of the other distribution
24 centers were potentially going to have

Page 97

1  their registration suspended for reasons
2  that were similar to the Orlando
3  facility?
4          MS. McCLURE:  Objection.
5          THE WITNESS:  At the time --
6      I'm sorry.
7          MS. McCLURE:  That's okay.
8      Objection to form.
9          THE WITNESS:  At the time of
10     the Orlando suspension?
11 BY MR. PIFKO:
12     Q.   Yes.
13     A.   No.
14     Q.   You didn't know either way?
15     A.   I didn't know whether any
16 other DC had any concerns.
17     Q.   But you weren't aware of any
18 concerns at the Orlando facility at that
19 time either, correct?
20     A.   No.
21         MS. McCLURE:  Objection.
22     You may answer.
23         THE WITNESS:  Could you
24     repeat the question?

Highly Confidential - Subject to Further Confidentiality Review

Page 98

BY MR. PIFKO:

Q. At that time, you weren't aware of any concerns at the Orlando facility either, correct?

MS. McCLURE: Objection.

THE WITNESS: That's correct.

BY MR. PIFKO:

Q. Did you change anything about the operations at the Orlando facility after its registration was suspended?

A. Not immediately after, no.

Q. Ultimately, you testified earlier you did supervise the development of an enhanced order monitoring program, correct?

A. That's correct.

Q. But that was company-wide correct?

A. That's correct.

Q. Okay. So --

A. Let me correct that. That's for the AmerisourceBergen Drug Company.

Page 99

Q. Okay. As opposed to --

A. Well, they have other subsidiaries. Yeah.

Q. Okay. Is it your opinion that there was nothing wrong with the audit process at the Orlando facility?

A. The audit process? No.

Q. Is it your opinion that there was nothing wrong with the suspicious order identification and reporting process at the Orlando facility?

A. Can you repeat that? I'm sorry.

Q. Yeah. Is it your opinion that there was nothing wrong with the process of identifying and reporting suspicious orders at the Orlando facilities at that time?

A. There was nothing wrong with it, no.

Q. Okay. Did you ever discuss the findings of the DEA that led to its suspension of the Orlando facility's

Page 100

registration with anyone?

A. Yes.

Q. With who?

A. Internally.

Q. Who internally?

A. In our department --

Q. Chris Zimmerman?

A. -- with our company, with Chris.

Q. Anyone else?

A. I can't remember. Pretty much everyone in our department, we discussed what we needed to do.

Q. How many people were in your department at that time?

A. Maybe a dozen? I'm not sure. I don't remember.

Q. And when you say your department, you mean the CSRA department?

A. That's correct.

Q. So let's talk about the order monitoring program that existed after the AmerisourceBergen Corporation merger, Amerisource and Bergen

Page 101

Corporation merger but before 2007. Okay?

A. Okay.

Q. You have an understanding about what that program was?

A. Basically, yes.

Q. Okay. What's your understanding of how that program worked?

A. I believe it was similar to the way I described the AmerisourceBergen report. There was a report that would be generated on a -- I think it was a monthly basis. I don't know if it was a daily. I don't remember if it was monthly. But it was built based on the customer's purchasing history and anything over a certain percentage would be flagged on this report. It was called a possible excessive purchase report, I believe was the name of it.

Q. And then that would be sent to DEA?

A. That would be sent to DEA, the individual field offices.

Page 102

1    Q.   And did you -- did that
2  order monitoring program use thresholds
3  as we discussed earlier?
4    A.   I don't believe it used
5  thresholds, no.
6    Q.   Just some percentage of the
7  customer's prior month's orders?
8    A.   For each -- for each drug
9  item, I believe.
10   Q.   When you say each drug item,
11 what do you mean?
12   A.   I think it was -- I don't
13 want to speculate.  Each drug.
14   Q.   Okay.  You understand that
15 we're here in a -- in connection with a
16 lawsuit about opioids, correct?
17   A.   Yes.  I understand that.
18   Q.   Let's talk about that for
19 just a minute.
20   A.   Okay.
21   Q.   Do you know what an opioid
22 is?
23   A.   Yes, for the most part, yes.
24   Q.   What's your understanding of

Page 103

1  what an opioid is?
2    A.   I believe it's basically any
3  drug that was manufactured that contains
4  some derivative of opium, I suppose.
5    Q.   And so when we talked about
6  drug types that are monitored, that can
7  include opioids, correct?
8    A.   Yes.
9    Q.   Okay.  Do you know what a
10 type -- are there different types of
11 opioids, to your knowledge?
12       MS. McCLURE:  Objection to
13     form.
14       THE WITNESS:  I couldn't
15     tell you.
16 BY MR. PIFKO:
17   Q.   Okay.  Have you heard the
18 term hydrocodone?
19   A.   Yes.
20   Q.   Have you heard the term
21 oxycodone?
22   A.   Yes.
23   Q.   Are those both opioids?
24   A.   I believe so.

Page 104

1    Q.   Do you know of any other
2  types of opioids?
3    A.   Like, morphine, I think.
4  Yeah.  There may be some others.
5  Fentanyl.  Fentanyl I think is synthetic.
6    Q.   Okay.  So those are all
7  types of opioids, to your knowledge?
8    A.   I believe so.
9    Q.   Okay.  And so when we talk
10 about monitoring a customer's purchase
11 history, do you know the level of -- are
12 they just -- are they monitoring
13 oxycodone purchases or hydrocodone
14 purchases?  Do you have any understanding
15 of what specifically is being monitored?
16       MS. McCLURE:  Objection to
17     form.
18       THE WITNESS:  Are you asking
19     in relation to the enhanced
20     program?
21 BY MR. PIFKO:
22   Q.   No.
23   A.   Or what time frame are we
24 talking about here?

Page 105

1    Q.   I made some visual aids to
2  help us do that.
3    A.   Okay.
4    Q.   All right.  Do you see that
5  on the screen in front of you?
6    A.   Yes, I do.
7    Q.   It says, "Before DEA
8  enforcement action (before June 22,
9  2007)."
10       So right now I'm talking
11 about before that time period.
12       And I'm talking about the
13 system that was in place after the
14 merger.  You don't know exactly when that
15 system was implemented, right?
16       MS. McCLURE:  Objection to
17     form.
18       THE WITNESS:  I don't know
19     exactly, no.
20 BY MR. PIFKO:
21   Q.   Okay.  But the merger was in
22 2001?
23   A.   Yes.
24   Q.   Okay.  So there were

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 something, a company's order -- a
2 customer's order history with respect to
3 certain substances would be reviewed in
4 connection with the suspicious order
5 monitoring program?
6     MS. McCLURE: Objection to
7 form. Under what program?
8     THE WITNESS: I guess that's
9 my question. Are you talking
10 about that period?
11 BY MR. PIFKO:
12 Q. Yeah, I'm talking about
13 before the DEA enforcement action. I
14 want to -- I want to understand what --
15 all attributes of the order monitoring
16 program that existed in that time period.
17 A. I thought I described that
18 to you.
19 Q. Okay. Well, so I was asking
20 a follow-up question, so --
21 A. Okay. I'm sorry. You lost
22 me a little bit.
23 Q. That's okay. We'll start
24 over.

Page 107

1     How does -- how does an
2 order get considered for inclusion in
3 this report that we talked about?
4 Actually let me just back up for a better
5 record.
6 A. Okay.
7 Q. You -- you testified that
8 there's a report that would be submitted
9 to DEA. You said you didn't know if it
10 was daily, weekly or monthly.
11 A. I can't remember.
12 Q. Okay. But there is some
13 kind of report that identified certain
14 types of orders and -- and was sent to
15 DEA, correct?
16 A. That's correct.
17 Q. Okay. And then we are
18 talking about the process for how an
19 order is included in that report. Okay?
20 A. I understand. Yeah.
21 Q. Okay. So you said that the
22 company looks at whether the order is
23 over some percentage of the customer's
24 prior order over that month. Is that

Page 108

1 correct?
2 A. Yeah. I think it looked at
3 a three-month rolling average or
4 something like that. I believe it was
5 that.
6 Q. Okay.
7     MS. McCLURE: Mark, can we
8 just clarify. You are talking
9 about 2002 to 2007? Is that an
10 accurate statement of the time
11 period that you're addressing?
12     MR. PIFKO: Well, he doesn't
13 know when the -- between --
14     MS. McCLURE: Is that
15 document visible under the Elmo visible on
16 the video camera?
17     Thank you.
18     MR. PIFKO: You can read my
19 writing.
20 BY MR. PIFKO:
21 Q. Okay. So we are talking
22 about post-AmerisourceBergen Corporation
23 merger but before the enforcement action.
24     Everybody clear on the time

Page 109

1 period here?
2 A. Right.
3 Q. All right. So an order that
4 exceeds some percentage of the customer's
5 order history over the prior three
6 months. You don't know the percentage.
7 But that order gets included in this
8 report to the DEA, correct?
9 A. That's my understanding.
10 Q. And when we talk about
11 exceeding a percentage, a percentage
12 of -- of what? That's what I'm -- that's
13 what we were talking about earlier.
14 A. My understanding, it was --
15 it's a percentage above their average
16 purchase of that drug over the
17 three-month period.
18 Q. Okay. And so like there's
19 different drugs, right? Like --
20 A. Mm-hmm.
21 Q. -- OxyContin is a drug.
22 Dur>agesic is a drug.
23 A. That's correct.
24 Q. Is it your understanding

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 that the -- in that program the actual
2 purchase of that drug over the
3 three-month period was measured or it was
4 just within a drug family?
5     A.   I think it was a specific
6 drug.
7     Q.   Okay.
8     A.   I believe.
9     Q.   Okay.  And then if it
10 exceeded some percentage, it would get
11 included in this report to the DEA,
12 correct?
13     A.   That's my understanding.
14     Q.   Do you know if there was any
15 documentation other than the report to
16 the DEA --
17         MS. McCLURE:  Objection.
18 BY MR. PIFKO:
19     Q.   -- about an order that was
20 included in this report?
21         MS. McCLURE:  Objection to
22     form.
23         THE WITNESS:  I don't think
24     so.

Page 111

1 BY MR. PIFKO:
2     Q.   If an order exceeded the
3 percentage that you talked about, do you
4 know if there was any due diligence
5 conducted on that order?
6     A.   When we're talk --
7         MS. McCLURE:  Objection.
8     You may answer.
9         THE WITNESS:  When we are
10     talking about this DEA approved
11     program that was in place in 2002
12     to --
13 BY MR. PIFKO:
14     Q.   I'm talking about this --
15     A.   Okay.
16     Q.   -- period that's on the
17 slide in front of you.
18     A.   Then what's the question
19 again?  I'm sorry.
20     Q.   If an order exceeded the
21 percentage that you talked about, do you
22 know if there was any due diligence
23 conducted on that order?
24         MS. McCLURE:  Objection.

Page 112

1         THE WITNESS:  I don't -- I
2     don't know for sure.
3 BY MR. PIFKO:
4     Q.   If there was any due
5 diligence, do you know if there would
6 have been any documentation of any due
7 diligence that would have been conducted?
8         MS. McCLURE:  Objection.
9     Form.
10         THE WITNESS:  I don't recall
11     exactly when, you know, we did due
12     diligence investigations, but they
13     would have been documented if we
14     did any.
15 BY MR. PIFKO:
16     Q.   Okay.  So if --
17     A.   If and when we did any.
18     Q.   -- if any due diligence --
19 okay.  So if any due diligence
20 investigation was conducted, it would
21 have been documented, correct?
22     A.   Yes.  That's my
23 understanding.
24     Q.   And do you have an

Page 113

1 understanding about the company's
2 practice of maintaining any such files?
3         MS. McCLURE:  Objection to
4     form.
5         THE WITNESS:  Yes.
6 BY MR. PIFKO:
7     Q.   What's your understanding of
8 what the company's practice is?
9     A.   We had a system we used
10 called Law Track that we would document
11 any -- any material work that we did in
12 Law Track.  So that's where it would have
13 been documented.
14     Q.   How long was that system in
15 place?
16     A.   I don't recall.  I think it
17 was in place during that period, some
18 time in that period between 2002-2007.
19     Q.   Do you think it was in place
20 the entire time?
21     A.   Couldn't tell you.
22     Q.   Okay.  Do you know how long
23 the company retained its records in Law
24 Track?

Page 114

1     A.   Depends on the record.
2 We -- we complied with the corporate
3 record retention policy. So it depends
4 on what records they are.
5     Q.   And that's a written policy
6 somewhere?
7     A.   There's a -- there's a
8 record retention policy in writing, yes.
9     Q.   Okay. And you -- sitting
10 here today, you don't know what that is?
11     A.   I couldn't tell you
12 specifics about every record -- every
13 type record.
14     Q.   Okay. Well, right now I'm
15 talking about due diligence during the
16 time period that's on the slide in here.
17 Do you know what their record retention
18 policy was for that?
19     A.   I don't.
20     Q.   Okay. Do you know who David
21 May is?
22     A.   Yes, I do.
23     Q.   I'll represent to you that
24 he testified, it's on the slide, but I'll

Page 115

1 just read it for you.
2     He testified: "Under our
3 program and our policy and our
4 understanding of the regulation, and what
5 the regulator expects from us, is when we
6 declare an order as suspicious, it's
7 permanently rejected and never shipped."
8     Have you heard that?
9     MS. McCLURE: Mark, I'm
10 going to ask the witness to step
11 out for a moment.
12     MR. PIFKO: You can't just
13 interrupt the deposition.
14     MS. McCLURE: Or you and I
15 can step out, but I -- I'm happy
16 to --
17     MR. PIFKO: I'm going to ask
18 him -- I'm going to ask him my
19 questions.
20     MS. McCLURE: Okay. So
21 you're -- you've shown for the
22 record -- you've shown --
23     MR. PIFKO: I've -- I asked
24 him -- I read some testimony to

Page 116

1 him, and I asked him if he
2 heard -- did you hear --
3 BY MR. PIFKO:
4     Q.   Did you hear me read the
5 testimony, sir?
6     MS. McCLURE: And I'm going
7 to put my objection on the record,
8 so please let me do that before
9 you answer. Thank you.
10     You've excerpted deposition
11 testimony of David May. You have
12 excerpted eight lines of testimony
13 with absolutely zero context as to
14 what the question was, as to the
15 time period, as to what this
16 testimony is regarding.
17     There is absolutely zero
18 information in here that allows
19 him to discern what this is about.
20     So if you would like to
21 continue down this line of
22 questioning, you are free to do
23 so.
24     MR. PIFKO: You can object,

Page 117

1 but you can't coach the witness
2 and inject --
3     MS. McCLURE: That's why I
4 asked you to step out or him to
5 step out.
6     MR. PIFKO: Well, there's
7 nothing we need to step out and
8 discuss. I'm asking him -- okay.
9 I just --
10     MS. McCLURE: You continued
11 with your questioning. I was
12 willing to have the witness step
13 out to not receive a coaching
14 objection.
15     MR. PIFKO: Okay. I'm going
16 to ask him questions, and if -- if
17 there's a proper basis for you to
18 instruct him, then you can
19 instruct him.
20     But other than that, I'm
21 going to ask him questions and you
22 can -- you can state objections.
23 Of course, you're entitled to do
24 that, but you can't coach the

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  witness. All you can do, if you
2  want to say -- I'm not going to
3  tell you what your objection can
4  be, but you can make a valid
5  objection, and that's the end of
6  it.
7      All right.
8      MS. McCLURE: So I'm going
9  to --
10     MR. PIFKO: So you just made
11  an objection. What -- you're not
12  copying here.
13     MS. McCLURE: -- make my
14  objection up on the record, of
15  having a continuing objection to
16  any questioning --
17     MR. PIFKO: Continuing,
18  okay. Got it.
19     MS. McCLURE: -- regarding
20  anything that's on this document,
21  on any line here.
22     MR. PIFKO: All right.
23  BY MR. PIFKO:
24     Q.  All I'm asking you is --

Page 119

1  okay. Do you know who David May is?
2      A.  Yes, I do.
3      Q.  Who is David May?
4      A.  He is our VP of diversion
5  control.
6      Q.  Okay. He is the head of the
7  diversion control program, correct?
8      A.  That's correct.
9      Q.  And he worked at the DEA for
10  over 30 years, correct?
11     A.  I don't know the time frame.
12     Q.  Okay. But you know he had a
13  long history with the DEA, correct?
14     A.  That's my understanding.
15     Q.  Okay. And I'm telling you,
16  he testified, and I'm quoting: "Under
17  our program and our policy and our
18  understanding of the regulation, and what
19  the regulator expects from us, is when we
20  declare an order as suspicious, it's
21  permanently rejected and never shipped."
22     Okay. Do you -- do you hear
23  that?
24     A.  I heard -- I heard what you

Page 120

1  said, yes.
2      Q.  Okay.
3      MS. McCLURE: And I'm going
4  to note my continuing objection.
5  BY MR. PIFKO:
6      Q.  Do you have an understanding
7  that if an order is identified as
8  suspicious, that it cannot be shipped?
9      MS. McCLURE: Objection to
10  form.
11     THE WITNESS: It depends on
12  what time frame you are relating
13  to and what you're referencing.
14  BY MR. PIFKO:
15     Q.  Okay. Why does it depend on
16  what time frame I'm referencing?
17     A.  Because DEA has changed
18  their policy over the years.
19     Q.  It's your understanding that
20  the DEA has changed its policy about
21  whether you can ship a suspicious order?
22     A.  It's -- that's my
23  understanding. They've changed their
24  belief.

Page 121

1      Q.  I'll show you some more
2  testimony.
3      Mr. Zimmerman testified:
4  "CSA was passed in 1970, and the" -- "the
5  federal regulations that regulate our
6  responsibilities have not changed."
7      Mr. May testified: "I'm not
8  familiar with any changes in the
9  Controlled Substance Act."
10     MS. McCLURE: So.
11     MR. PIFKO: I haven't asked
12  him a question. You can't just
13  object.
14     MS. McCLURE: You're
15  putting -- you are simply just
16  putting documents up on the Elmo
17  and making representations
18  regarding what testimony was.
19     MR. PIFKO: Obviously my
20  representations are correct,
21  because they're quotes and I'm
22  showing --
23     MS. McCLURE: You've
24  represented that they're quotes.

Page 122

1  I'm sure that you would in fact
2  put quotes on the document. So
3  I'm not questioning that, although
4  of course I don't have the ability
5  to independently verify.
6      MR. PIFKO: Okay. I haven't
7  even asked him a question. So you
8  need to let me ask my questions.
9      MS. McCLURE: Mark, I'm
10 trying --
11     MR. PIFKO: You're
12 interrupting the deposition.
13     MS. McCLURE: You want the
14 witness to leave?
15     MR. PIFKO: You're
16 interrupting the question. If you
17 take him out, you're coaching him
18 and that's completely improper.
19     MS. McCLURE: No, I said do
20 you want the witness to leave?
21 I'm happy to take him out. I'm
22 not coaching him.
23     MR. PIFKO: No. I would
24 like to ask -- you're interrupting

Page 123

1  my ability to ask questions.
2      MS. McCLURE: Well, I'm
3  going to continue --
4      MR. PIFKO: I haven't asked
5  the question. All I did was tell
6  him what other people testified
7  to.
8      MS. McCLURE: You
9  represented what other people
10 testified to and that's --
11     MR. PIFKO: It's accurate
12 and true representation. I'm
13 allowed to do that.
14     MS. McCLURE: Mark --
15     MR. PIFKO: I could say do
16 you think that David May testified
17 that his favorite color was blue.
18     MS. McCLURE: Mark --
19     MR. PIFKO: Okay.
20     MS. McCLURE: You are
21 representing --
22     MR. PIFKO: I haven't asked
23 a question.
24     MS. McCLURE: You are

Page 124

1  representing answers up on the
2  screen. We don't even know what
3  the answer to the question was.
4      MR. PIFKO: It doesn't
5  matter. You don't even know what
6  my question is.
7      MS. McCLURE: Okay. So I'm
8  going to make my --
9      MR. PIFKO: Okay. So let me
10 ask the question.
11     MS. McCLURE: -- continuing
12 objection --
13     MR. PIFKO: Okay, continuing
14 objection all you want.
15     MS. McCLURE: -- to this
16 entire line of questioning and you
17 presenting the witness with
18 deposition testimony that is
19 absolutely without context as to
20 time period, what the witness's
21 capacity was in --
22     MR. PIFKO: Okay. You're
23 coaching him by talking about time
24 period and things like that.

Page 125

1      MS. McCLURE: I've offered
2  him --
3      MR. PIFKO: You're telling
4  him what to say. You're offering
5  him guidance.
6      MS. McCLURE: -- that he
7  could leave, and you haven't taken
8  me up on that, so you're putting
9  me in a position and forcing me to
10 document my objection on the
11 record.
12 BY MR. PIFKO:
13     Q.  Okay. So I'm showing you
14 again sir, Mr. Zimmerman -- you know who
15 he is. He was your boss.
16     He testified, "The CSA was
17 passed in 1970 and the federal
18 regulations that regulate our
19 responsibilities have not changed."
20     And Mr. May testified, "I'm
21 not familiar with any changes in the
22 Controlled Substance Act."
23     I asked you if you
24 understood that if an order is identified

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 as suspicious, if it can be shipped. And
2 you said it depends on the time period,
3 correct?
4     A.   Okay.  The regulations don't
5 specify anything about shipping or not
6 shipping suspicious orders.
7     Q.   What's the basis for your
8 understanding?
9     A.   The regulation states that
10 we have to design and operate a program
11 to detect suspicious orders.  As I
12 recall, that regulation mentions nothing
13 about whether they should be shipped or
14 not.
15    Q.   Okay.  So do you disagree
16 with Mr. May's testimony?
17        MS. McCLURE:  Objection,
18        form.  Objection, misstates
19        testimony.
20        THE WITNESS:  Again, it has
21        to be in context of the time frame
22        that he's talking about.
23 BY MR. PIFKO:
24    Q.   Okay.  Do you agree with the

Page 127

1 statements I showed you for Mr. Zimmerman
2 and Mr. May, that the Controlled
3 Substance Act, the law and the
4 regulations have not changed since 1970?
5        MS. McCLURE:  Continuing to
6        this line of questioning.
7        Objection to form.  Objection,
8        misstates testimony.
9        THE WITNESS:  Well I
10       disagree with both, because one --
11       one was about regulations, and one
12       was about the Act itself.  And I
13       know the regulations have
14       changed -- changed several times
15       over the years.
16 BY MR. PIFKO:
17    Q.   Okay.  And so do you believe
18 there's been a change -- well, let me ask
19 you a different question.
20        Is it your understanding
21 that today, an order that's identified as
22 suspicious, cannot be shipped?
23    A.   Today?
24        MS. McCLURE:  Objection to

Page 128

1 form.  You can answer.
2        THE WITNESS:  That's our
3        policy today.
4 BY MR. PIFKO:
5    Q.   I'm not asking what your
6 policy is.  I'm asking what your
7 understanding of the regulations are.
8    A.   The regulation is we are to
9 designed and operate a system to detect
10 suspicious orders and report them.
11    Q.   Okay.  So is it your
12 testimony that -- okay.  But is there
13 some period earlier where you believe an
14 order that was identified as suspicious
15 could be shipped?
16        MS. McCLURE:  Objection to
17        form.
18        You may answer.
19        THE WITNESS:  I don't know
20        the exact dates of when that
21        changed.
22 BY MR. PIFKO:
23    Q.   But you believe that there
24 was some date upon which it was changed?

Page 129

1    A.   The policy of DEA changed
2 about suspicious orders.
3    Q.   And whether you could ship
4 them?
5    A.   I know as of 2007 we were
6 told not to ship.
7    Q.   Okay.  Do you believe that
8 there was any period prior to 2007 where
9 you couldn't ship a suspicious order?
10    A.   Not that I know of.
11    Q.   Okay.  And do you know what
12 communication was from the DEA that told
13 you that you couldn't ship a suspicious
14 order?
15    A.   I believe that was part of
16 our negotiations in the settlement, part
17 of the company's negotiations with DEA.
18    Q.   Okay.  So let's go back to
19 this time period.
20        In the company's program, in
21 this time period that's on the slide in
22 the post merger before the settlement.
23    A.   Okay.
24    Q.   Was it the company's

Page 130

1 practice to ship an order that was
2 identified as suspicious?
3          MS. McCLURE:  Objection.
4     Asked and answered.  You can
5     answer.
6          THE WITNESS:  The company
7     didn't identify it as a suspicious
8     order.  The company created a
9     report and sent it to DEA of
10    possible excessive orders.
11 BY MR. PIFKO:
12    Q.   Okay.  And was it the
13 company's practice to ship all those
14 orders that were identified as
15 suspicious?
16         MS. McCLURE:  Same
17    objection.
18 BY MR. PIFKO:
19    Q.   Or sorry, excessive.
20    A.   In most cases they were
21 shipped.
22    Q.   Okay.  If an order was not
23 shipped, would that have been documented?
24    A.   At that time, probably not.

Page 131

1    Q.   Probably not?
2    A.   Other than the system
3 itself.  The invoice would have reflected
4 the product wasn't shipped.
5    Q.   What's the difference
6 between an excessive order and a
7 suspicious order?
8    A.   A possible excessive order
9 would have been an order that would have
10 exceeded those parameters that were built
11 into the system to produce those reports.
12    Q.   Okay.  What's a suspicious
13 order?
14    A.   Anything that met those
15 guidelines and the regulation that could
16 be a suspicious order.
17    Q.   Do you know what those
18 guidelines are?
19    A.   I couldn't recite it word
20 for word, but you know, unusual quantity,
21 size, frequency.  I can't remember the
22 rest of it.  I don't know the regulation.
23 I can't recite it word for word.
24    Q.   If an order was excessive in

Page 132

1 that it exceeded the customer's prior
2 three months' ordering history, would
3 that be unusual?
4          MS. McCLURE:  Objection to
5     form.
6          THE WITNESS:  Could be.
7 BY MR. PIFKO:
8    Q.   So an order that was
9 excessive can be suspicious, correct?
10    A.   Could be.
11    Q.   Is there anything that would
12 make an order that's excessive not
13 suspicious?
14         MS. McCLURE:  Objection to
15    form.
16         THE WITNESS:  Yes.
17 BY MR. PIFKO:
18    Q.   What would that be?
19    A.   It could be an ordering
20 error of some sort.
21    Q.   Anything else?
22    A.   There's a lot of reasons.
23 The pharmacy could have been robbed and
24 all of their drugs taken and, you know,

Page 133

1 they are ordering an unusually large
2 quantity.
3    Q.   Anything else?
4    A.   Nope.  Can't think of
5 anything right off the top of my head.
6    Q.   Did the company in this time
7 period again on the slide, undertake any
8 effort to investigate an order that was
9 identified as excessive?
10    A.   Yes.  Somewhere after the
11 August of 2005 time frame we started
12 doing some additional due diligence.
13    Q.   And what --
14    A.   On customers and orders.
15    Q.   Okay.  What was the nature
16 of that due diligence?
17    A.   We started using a
18 questionnaire for customers and site
19 visits.
20    Q.   Okay.  How about with
21 respect to a specific order though?  Was
22 there any due diligence that was
23 conducted with respect to a specific
24 order?

Page 134

1    MS. McCLURE:  Objection to
2  form.
3    THE WITNESS:  There was,
4  yeah.  Those reports would be
5  reviewed and we would do some
6  additional due diligence based on
7  some of those orders, those
8  reports.
9  BY MR. PIFKO:
10    Q.    What reports?
11    A.    The reports that we've been
12  talking about.
13    Q.    The excessive order reports?
14    A.    Yeah, the excessive order
15  reports.
16    Q.    Okay.  And what was the
17  nature of the due diligence that was
18  conducted?
19    A.    Again, we would do -- we
20  would send out a questionnaire, and we
21  would have -- actually have the
22  salesperson go in, visit the site, and
23  have the questionnaire filled out.  I
24  believe it was signed by the salesperson

Page 135

1  and the customer.
2    Q.    What was in the
3  questionnaire?
4    A.    Questions that we were
5  provided by DEA that they suggested that
6  we ask to customers.
7    Q.    Do you remember any of the
8  types of questions?
9    A.    There were 10 or 12 -- 10 or
10  12 questions.  All related to internet
11  pharmacy, to ensuring that a pharmacy
12  wasn't engaged in that internet activity.
13    Q.    Okay.  And when did that
14  start?
15    A.    I would say late 2005.
16  Sometime after August.
17    Q.    I want to be clear that we
18  are talking about the right time period.
19  So I just wrote down what we talked about
20  there.
21    Okay.  So we're talking
22  about this time period after August of
23  2005 but before the DEA enforcement
24  action.  Okay?

Page 136

1    A.    The DEA enforcement action
2  wasn't in June 2007.
3    Q.    When was that?
4    A.    I think the action was
5  April, probably.
6    Q.    Okay.
7    A.    Yeah.  That was the date of
8  the settlement.
9    Q.    Okay.  Right.  The company
10  changed its practices in connection with
11  the settlement, correct?
12    MS. McCLURE:  Objection.
13  Form.
14    THE WITNESS:  We changed
15  some practices after the
16  August 2005 period and then
17  changed them more after the
18  enforcement action.
19  BY MR. PIFKO:
20    Q.    Okay.  Right.  So that's why
21  I'm book-ending this particular time
22  period.
23    A.    Okay.
24    Q.    So the questions that you

Page 137

1  asked of pharmacies were designed to
2  determine whether a pharmacy was an
3  internet pharmacy?
4    A.    Yes.
5    Q.    Did they ask any other types
6  of information?
7    A.    When you say they, who are
8  you talking of?
9    Q.    The questionnaire.
10    A.    I -- I don't remember the
11  specific questions at the time.
12    Q.    Okay.  So we got on this
13  track because what I was asking was how
14  you determined whether an order that's
15  excessive is -- is suspicious and whether
16  there was any investigation or due
17  diligence that would have been conducted
18  on an order that was excessive.  Okay?
19    A.    Okay.
20    Q.    So you testified that after
21  August 2005 there were questions that
22  were asked.
23    A.    Mm-hmm.
24    Q.    Were there -- those

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  questions appear to be, as you're
2  testifying, just designed to determine if
3  something is an internet pharmacy,
4  correct?
5      MS. McCLURE:  Objection to
6      form.
7      THE WITNESS:  I don't -- you
8      know, I don't know if it was just
9      totally all the questions were
10     totally specific to internet
11     pharmacy.  There may have been
12     other questions just to -- to try
13     to find out what, you know, what
14     the pharmacy's practices were.
15 BY MR. PIFKO:
16     Q.   What, in the questionnaire,
17 would tell you if an order that was in
18 the excessive order report was
19 suspicious?
20     A.   In the questions on the --
21 that wouldn't tell us an order is
22 suspicious or not.
23     Q.   Okay.  What investigation,
24 if any, did you conduct on an excessive

Page 139

1  order that would tell you whether it was
2  suspicious?
3      A.   To the best of my
4  recollection and -- Eric would review
5  those monthly reports.  And we would --
6  we were looking for specifically at the
7  time the drugs that were being used a lot
8  by the internet pharmacy which was
9  typically the hydrocodone combination
10 products.  And that would be the things
11 that he would look for on those reports.
12 And then he would generate an
13 investigation of that customer based on
14 reviewing those reports, as I recall.
15     Q.   Other than hydrocodone
16 combination products, was there any other
17 feature of an order that you would look
18 at to determine whether it was suspicious
19 if it was an excessive order report?
20     A.   Well, again the system, it
21 looked at all controlled substances.
22     Q.   An order is -- gets included
23 under the order monitoring program as an
24 excessive order.  Are we on the same

Page 140

1  page?  Okay?
2      A.   An order that's generated on
3  that report.
4      Q.   Right.
5      A.   Yes.  Okay.  It could be any
6  controlled substance.
7      Q.   Okay.  In order to -- I'm
8  asking you about types of investigations
9  that were done on those orders to
10 determine whether they were suspicious.
11 And so you said that Eric looked at them
12 to see if they had hydrocodone
13 combination products in them.  And
14 that's -- and then if they did, you would
15 do a further investigation, correct?
16     A.   Well, I think that was a
17 primary --
18     MS. McCLURE:  Objection to
19     form.
20     THE WITNESS:  I'm sorry.
21     MS. McCLURE:  That's okay.
22     THE WITNESS:  I believe that
23     was his primary focus, but he
24     would look -- he would review the

Page 141

1      whole report is my -- as -- as I
2      recall.
3  BY MR. PIFKO:
4      Q.   And you are talking about
5  Eric Cherveny, to be clear?
6      A.   Yes.
7      Q.   Okay.  When did he start
8  doing that?
9      A.   Again, it was probably
10 sometime after August of 2005.  I don't
11 remember the exact date that he started
12 doing that.
13     Q.   What's a hydrocodone
14 combination product?
15     A.   Again, not speaking --
16 speaking as a layman, not a pharmacist
17 or -- or a chemist, but it's a
18 hydrocodone in combination with some
19 other noncontrolled product like
20 acetaminophen or aspirin or something
21 like that.  That would be a combination
22 product.
23     Q.   And you had an understanding
24 that those products were more likely to

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1  be the subject of diversion?
2       MS. McCLURE:  Objection.
3       THE WITNESS:  That was our
4    understanding, that that was the
5    drug that was most -- most likely
6    used by the internet pharmacy.
7  BY MR. PIFKO:
8       Q.   What was the basis of that
9  understanding?
10      A.   Communications from DEA.
11      Q.   So the DEA told you that
12  those products were of particular
13  concern?
14      A.   Yes.
15      Q.   Prior to August 2005, was
16  anybody looking at the excessive order
17  reports to determine if they weren't
18  suspicious?
19      MS. McCLURE:  Objection to
20    form.
21      THE WITNESS:  I believe
22    someone may have reviewed those,
23    but they were -- they were sent to
24    DEA.

Page 143

1  BY MR. PIFKO:
2       Q.   You -- you believe they were
3  reviewed by someone at AmerisourceBergen?
4       A.   I don't recall.
5       Q.   So you don't know either
6  way?
7       A.   I don't.  Yeah, I don't.
8       Q.   So it's your testimony that
9  sitting here today, you don't know if
10  anything was done to determine that an
11  order in the excessive order report
12  wasn't suspicious prior to August 2005,
13  correct?
14      A.   That's correct.
15      Q.   If there was an
16  investigation, it would be put in the Law
17  Track system?
18      A.   I would -- I would think so,
19  yes.
20      Q.   And Eric Cherveny was the
21  person who was responsible for doing
22  that?
23      A.   After August of 2005, yes,
24  he was doing those.

Page 144

1       Q.   And he was the only one who
2  was doing that?
3       A.   I believe so at that time.
4       Q.   And I want to clarify for
5  the record.  We're talking about every
6  order that's in the excessive order
7  report, correct?
8       A.   That he reviewed?
9       MR. PIFKO:  Yeah.
10      MS. McCLURE:  Objection to
11    form.
12      THE WITNESS:  I believe
13    that's correct.
14  BY MR. PIFKO:
15      Q.   And prior to that time, an
16  excessive order report would include an
17  order from any customer, correct?
18      A.   That's my understanding.
19      Q.   Not just a potential
20  internet customer, correct?
21      A.   That's correct.
22      Q.   And you don't have any
23  recollection of whether anyone reviewed
24  any excessive order reports prior to

Page 145

1  August 2005, correct?
2       MS. McCLURE:  Objection.
3       THE WITNESS:  I don't.
4  BY MR. PIFKO:
5       Q.   Do you have an understanding
6  about -- did you ever look at any of
7  those excessive order reports?
8       A.   Yes.
9       Q.   How often did you look at
10  excessive order reports?
11      A.   I couldn't say.  Not very
12  often.
13      Q.   About how many orders would
14  be included in an excessive order report,
15  on the times when you observed them?
16      A.   I have no idea.
17      Q.   Would you say 100 orders,
18  more than 100 orders?
19      MS. McCLURE:  Objection.
20    Form.  Asked and answered.
21      THE WITNESS:  I couldn't
22    say.
23  BY MR. PIFKO:
24      Q.   Okay.  A million orders?

Page 146

1  You have no idea about how many orders
2  are in an excessive order?
3      A.   I doubt it's a million.
4      Q.   Okay.  More than -- these
5  were generated -- you don't know how
6  frequently they were generated, monthly,
7  weekly?
8      A.   I believe they were monthly
9  reports --
10     Q.   Okay.
11     A.   -- and they were generated
12 for each distribution center and reported
13 to DEA.
14     Q.   Okay.  And those were
15 maintained in the Law Track system or how
16 were those maintained?
17         MS. McCLURE:  Objection.
18     Form.
19         THE WITNESS:  Those reports?
20 BY MR. PIFKO:
21     Q.   Yeah.
22     A.   I don't know.
23     Q.   About how many occasions do
24 you recall looking at the excessive order

Page 147

1  reports?
2          MS. McCLURE:  Objection.
3      Asked and answered.
4          THE WITNESS:  I don't know.
5      I just know what they look like.
6  BY MR. PIFKO:
7      Q.   Let's talk about the duty to
8  prevent diversion.
9      A.   Okay.
10     Q.   There's a quote here from
11 the Code of Federal Regulations.
12         It says:  "All applicants
13 and registrants shall provide effective
14 controls and procedures to guard against
15 theft and diversion of controlled
16 substances."
17         MS. McCLURE:  To the extent
18     that that's not a full and
19     complete representation of what
20     the statute says, which I can't
21     say off the top of my head whether
22     it is or it isn't, then I object
23     to the excerpt.
24 BY MR. PIFKO:

Page 148

1      Q.   We talked earlier about the
2  duty for a registrant to prevent
3  diversion.  Do you recall that?
4      A.   Yes.  Yes.
5          MS. McCLURE:  Objection to
6      form.
7  BY MR. PIFKO:
8      Q.   Do you know what diversion
9  is?
10     A.   It's basically the act of
11 diverting something from wherever it was
12 intended in basic terms.
13     Q.   Do you have an understanding
14 of how the company seeks to prevent
15 diversion?
16         MS. McCLURE:  Objection.
17     Form.
18         THE WITNESS:  We seek to
19     prevent diversion by complying
20     with the regulations.
21 BY MR. PIFKO:
22     Q.   Do you understand that -- do
23 you have an understanding about why we
24 want to prevent diversion?

Page 149

1      A.   Yes.
2      Q.   What's your understanding
3  why we want to prevent diversion?
4      A.   We want to prevent --
5  preventing diversion prevents controlled
6  substances from getting -- getting
7  outside of the legitimate channels that
8  they're being intended for.
9      Q.   And why do we want to do
10 that?  Why don't we want controlled
11 substances to get outside of legitimate
12 channels?
13     A.   Because we don't want people
14 that shouldn't be getting them to be
15 getting them.
16     Q.   Because they can abuse them?
17         MS. McCLURE:  Objection.
18         THE WITNESS:  They could.
19 BY MR. PIFKO:
20     Q.   And they could become
21 addicted to them?
22     A.   They could.
23         MS. McCLURE:  Same objection
24     to the inclusion of partial

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  testimony without context from
2  other witnesses.
3  BY MR. PIFKO:
4  Q.  David May testified: "I
5  think there's been several actions that
6  have been taken where it's becoming
7  difficult for people to receive
8  prescription opioids over time.  And
9  there are a number of different reasons
10  why.
11      "I think that people who may
12  be addicted and can no longer get a
13  prescription opioid, can that cause them
14  to go to the illegal market?  I think it
15  can.  Has that caused folks to do that?
16  I think it has."
17      Do you have an understanding
18  that people can get addicted to a
19  prescription and then seek those pills
20  through the illegal market?
21      MS. McCLURE:  Continuing
22      objection to this line with this
23      witness's testimony up on the
24      screen.

Page 151

1      THE WITNESS:  Can you repeat
2      the question?  And I don't really
3      know what the question was that
4      prompted his answer.  So it's kind
5      of difficult for me to --
6  BY MR. PIFKO:
7  Q.  That's okay.  I'm just
8  asking you --
9  A.  -- to comment on what he's
10  stating.
11  Q.  I'm not asking you to
12  comment on what he's stating.
13  A.  Okay.
14  Q.  I'm just asking you if you
15  agree that someone can start with a
16  prescription opioid and then become
17  addicted and then seek to fill their need
18  of their addiction through illegal
19  channels?
20      MS. McCLURE:  Objection.
21      Form.
22  BY MR. PIFKO:
23  Q.  Do you agree with that?
24  A.  I do.

Page 152

1  Q.  You do?
2  A.  I agree that they could.
3  Q.  Did the DEA tell you at any
4  point about the propensity of people to
5  get prescription opioids and then turn to
6  the illegal market?
7  A.  I don't recall that
8  specifically, no.
9  Q.  I'm going to hand you an
10  exhibit that was produced to us a couple
11  of days ago.
12      MR. PIFKO:  Just a minute.
13      My colleague is getting that for
14      you.
15      (Document marked for
16      identification as Exhibit
17      ABDC-Mays-1.)
18  BY MR. PIFKO:
19  Q.  I'm handing you what's
20  marked as Exhibit 1.  It's a document
21  that's Bates-labeled ABDCMDL00315887
22  through -- I have the copy in front of me
23  that was e-mailed that doesn't have the
24  Bates number.  My colleague is getting

Page 153

1  the last Bates numbers.  While he's doing
2  that, please take a moment to review this
3  document.
4  A.  Okay.
5  Q.  ABDCMDL00315887 through
6  315900.
7      Let me know when you're done
8  reviewing it.
9  A.  Okay.
10  Q.  You're done reviewing it?
11  A.  Mm-hmm.  Yes, sir.
12  Q.  Okay.  Have you seen that
13  document before?
14  A.  I believe so.
15  Q.  Can you tell me what it is?
16  A.  It looks like a slide
17  presentation that was given to me in
18  August of 2005 the DEA had forwarded.
19  Q.  Is your name on here?
20  A.  I don't think so.
21  Q.  You said -- I just said
22  that, because you said it was given to
23  you.
24      Do you recall being --

Page 154

1  participating in this meeting?
2      A.   Yes.  I represented
3  AmerisourceBergen in that meeting.
4      Q.   Okay.  Who was at this
5  meeting besides you?
6      A.   It was only myself and Mike
7  Mapes from DEA.  And I don't recall the
8  gentleman's name, but I think he was
9  their chief counsel.
10     Q.   If you go to the last --
11     A.   He was an attorney.
12     Q.   -- the last page.
13     A.   Mm-hmm.
14     Q.   It's got Mike Mapes, and
15 it's got Kyle Wright.  Is Kyle the other
16 person that was there?
17     A.   No.
18     Q.   Okay.
19     A.   I don't think Kyle --
20     Q.   It was someone other than
21 Kyle?
22     A.   I don't think Kyle was in
23 the room.
24     Q.   Okay.  You don't remember

Page 155

1  the other person's name?
2      A.   No, I don't.  He was an
3  older gentleman, and he was an attorney.
4  But I don't remember his exact title.  He
5  was an attorney with DEA.
6      Q.   Was this the first time that
7  you met with the DEA as a representative
8  of AmerisourceBergen Corporation?
9      A.   No, I'm sure I met with DEA
10 in the past before that.
11     Q.   What were other types of
12 occasions where you would have met with
13 DEA?
14     A.   I remember when I was in
15 Chattanooga meeting with them in
16 Nashville related to the -- some concerns
17 they had following an inspection, I
18 believe.
19     Q.   That was back in the '70s?
20     A.   Yeah.  Yeah.  '70s, early
21 '80s, maybe.
22     Q.   Okay.  How about more
23 recently, but prior to this meeting?
24     A.   Just me meeting with DEA --

Page 156

1      Q.   You and anybody else
2  meeting --
3      A.   -- or are you talking
4  about --
5      Q.   -- with the DEA in an
6  official capacity --
7      A.   They --
8          MS. McCLURE:  Let him
9      finish.
10         THE WITNESS:  Sorry.
11         MS. McCLURE:  Let him
12     finish, and then you can talk.
13     Otherwise she has trouble getting
14     it all down.
15         THE WITNESS:  I'm sorry.
16 BY MR. PIFKO:
17     Q.   Okay.  So my question is,
18 prior to this meeting with DEA in
19 August 10, 2005, if you had met with them
20 in an official capacity before then.
21     A.   Not other than that
22 situation I told you about.  I may have
23 met with them -- anytime we had an
24 informal hearing or something like that,

Page 157

1  and I can't remember if it was before
2  that.  I went to an informal hearing in
3  Atlanta, based on the Atlanta DC.  They
4  had concerns about order forms during an
5  inspection.  Again, the previous one in
6  Nashville.  Other than that not in an
7  official capacity that I can recall.
8      Q.   When was the Atlanta meeting
9  that you can recall?
10     A.   I don't remember.  It was
11 probably early 2000s, something like
12 that.
13     Q.   So this specific meeting,
14 how did it come about, did someone call
15 you up and say --
16     A.   This one?
17     Q.   Yeah.
18     A.   What prompted the meeting?
19     Q.   Yeah.
20     A.   Kyle Wright approached me at
21 an H -- I believe it was an HDA
22 conference and asked me if I would come
23 and meet with them.  And I said sure.
24     Q.   When was that conference?

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    A.   It must have been earlier in
2  2005.
3    Q.   Did he tell you what he
4  wanted to meet about?
5    A.   I don't recall specifically.
6  He just asked if we would come and meet
7  with them.
8    Q.   Okay.  And so were you
9  concerned about why he was asking you to
10  meet with him?
11    A.   No.  He didn't say anything
12  to me that concerned me about the
13  meeting.  That's why I went by myself.
14    Q.   So you went to DEA
15  headquarters for this meeting?
16    A.   That's correct.
17    Q.   And then they gave you this
18  slide presentation?
19    A.   I think they just gave me
20  the printed slides in a binder.
21    Q.   Okay.  And --
22    A.   And discussed them.
23    Q.   Okay.  Did you discuss the
24  slides in the meeting?

Page 159

1    A.   I believe so.
2    Q.   How long was the meeting?
3    A.   It wasn't real long.  Maybe,
4  maybe an hour.  Maybe less.
5    Q.   So the first slide on the
6  document is internet pharmacy data.  Do
7  you see that?
8    A.   Yes.
9    Q.   Was the meeting focused on
10  specifically internet pharmacies?
11    A.   Yes.
12    Q.   When you saw Mike Mapes at
13  an had meeting, how -- and he invited you
14  to this meeting -- did I get that right?
15    MS. McCLURE:  Objection to
16  form.
17    THE WITNESS:  That's
18  incorrect.  It was Kyle Wright.
19  BY MR. PIFKO:
20    Q.   Oh, sorry.  Okay.  Kyle, how
21  did he know to approach you to request a
22  meeting with AmerisourceBergen?
23    A.   I don't know.  I guess he --
24  he was --

Page 160

1    MS. McCLURE:  Objection to
2  form.  You can answer.
3    THE WITNESS:  -- at the
4  conference.  It's an annual
5  conference, and often DEA is
6  invited to attend and present.
7    And I don't know how he
8  found out who I was, or how he
9  approached me.  But he -- he was
10  waiting outside of one of the
11  sessions I was in and approached
12  me when I walked out.
13  BY MR. PIFKO:
14    Q.   Okay.  And you had never met
15  him before?
16    A.   Never met him before.
17    Q.   And he just introduced
18  himself and said hi, I'm from the DEA, I
19  would like you to come to a meeting?
20    A.   Yeah.  It was a very
21  friendly exchange.
22    Q.   Okay.  So then you go to
23  this meeting.  You said it's about an
24  hour and a half?

Page 161

1    A.   No, I said it was about an
2  hour or less.
3    Q.   Oh okay.  And you just
4  flipped through the slides with them?
5    MS. McCLURE:  Objection.
6    THE WITNESS:  I don't
7  recall.  I just remember they gave
8  me a binder.
9  BY MR. PIFKO:
10    Q.   This document has two slides
11  per page.  But going to the second page,
12  third slide --
13    A.   Okay.
14    Q.   -- it says "Issues to
15  Consider."
16    Do you see that?
17    A.   Yes.
18    Q.   What are these -- do you
19  have an understanding of what these
20  issues to consider are for?
21    A.   Yeah.  My understanding was
22  issues to consider in identifying -- it
23  was related to internet pharmacy, things
24  to look at, things to take into

Page 162

1 consideration when reviewing a pharmacy.
2    Q.   And did you understand --
3 let's go back to the first slide.
4    A.   Okay.
5    Q.   There's a slide that says
6 "Internet Pharmacies."
7    A.   Mm-hmm.
8    Q.   Do you see that?
9    A.   Mm-hmm, yes.
10    Q.   And it talks about some
11 attributes of an internet pharmacy.
12    A.   Correct.
13    Q.   Do -- do you have an
14 understanding about why the DEA was
15 concerned about internet pharmacies?
16    A.   Yes.
17    Q.   What -- what was your
18 understanding?
19    A.   Well, my -- my understanding
20 from this meeting was that it was
21 becoming a big problem.
22    Q.   How so?
23    A.   Because people were able to
24 purchase specifically hydrocodone

Page 163

1 combination products and -- and other
2 drugs over the internet just based on a
3 questionnaire and not seeing a doctor.
4    Q.   Were you aware of this
5 concern about internet pharmacies prior
6 to this August 10th meeting, 2005 meeting
7 with the DEA?
8    A.   I don't -- I think this was
9 the first time that it was brought to my
10 attention, that it was a problem.
11    Q.   You don't recall ever
12 discussing concerns about internet
13 pharmacies within AmerisourceBergen prior
14 to this time?
15    A.   No, I don't.
16    Q.   After attending this
17 meeting, did you discuss the nature of
18 these slides and the discussion with the
19 DEA with anyone at AmerisourceBergen?
20    A.   Yes.
21    Q.   Who did you discuss it with?
22    A.   My boss, Chris Zimmerman.
23    Q.   Anyone else?
24    A.   I can't remember if anyone

Page 164

1 else was involved in the discussion.
2    Q.   Was it as a result of this
3 meeting that you implemented the process
4 where Eric Cherveny would look for
5 hydrocodone combination products in the
6 excessive order reports?
7    A.   Yes.
8    Q.   Did you talk about this
9 meeting with Eric Cherveny?
10    A.   I don't remember talking to
11 him specifically about this meeting.  But
12 that's when we put those procedures in
13 place.
14    Q.   Did you implement any other
15 procedures as a result of this meeting?
16    A.   Not that I -- not other than
17 previously stated.
18    Q.   The only procedure I'm --
19 for clarity of the record, that I'm aware
20 of, is looking for hydrocodone products
21 in the excessive order reports.  Were
22 there any other procedures that you
23 implemented as a result of this meeting?
24        MS. McCLURE:  Objection to

Page 165

1    form.
2        THE WITNESS:  The -- the
3    enhanced due diligence.
4 BY MR. PIFKO:
5    Q.   What specifically --
6    A.   Of customers.
7    Q.   And what specifically was
8 that?
9    A.   The questionnaire and the
10 site visit.
11    Q.   Okay.  The questionnaire
12 that we talked about earlier that you --
13 you would occasionally send these
14 questionnaires to customers after
15 August 2005, is that correct?
16    A.   That's my -- that's my
17 understanding and my recollection.
18    Q.   And the purpose of that
19 questionnaire was to try to learn about
20 whether a pharmacy might be engaging in
21 internet pharmacy conduct?
22        MS. McCLURE:  Objection to
23    form.
24        THE WITNESS:  That was the

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1  primary focus.
2      Sorry.
3  BY MR. PIFKO:
4      Q.   There's a bunch of court
5  cases discussed in here.  Supreme Court
6  case on the third page, and then there's
7  a pharmacy mentioned here with a cite to
8  the Federal Register.  Another pharmacy
9  and a Federal Register cite.  Another
10 Supreme Court case.  Do you recall
11 what -- what they told you when you were
12 looking at these court cases and Federal
13 Register cites?
14     A.   No, I do not.
15     Q.   Sitting here today, do you
16 understand what the significance of these
17 court cases, two court cases and the two
18 pharmacies, why they are included here?
19         MS. McCLURE:  Objection to
20     the form.
21         THE WITNESS:  I don't
22     recall -- I don't remember these
23     cases or specifics of them.
24 BY MR. PIFKO:

Page 167

1      Q.   Do you remember reading
2  any -- did you -- after the meeting, did
3  you read the Federal Register cites that
4  are here about these pharmacies?
5      A.   I don't remember.
6      Q.   Do you believe you would
7  have shared these -- those Federal
8  Register cites with anyone at
9  AmerisourceBergen?
10     A.   I'm sure I did, because I
11 was given binders to take back.
12     Q.   You were given more than one
13 copy?
14     A.   I think I was given two or
15 three.
16     Q.   Okay.  Did they tell you
17 what they wanted you to do with these
18 extra copies?
19     A.   I think they just offered
20 them as extra copies.
21     Q.   Okay.  And who did you give
22 it to?
23     A.   I couldn't tell you
24 specifically.

Page 168

1      Q.   Did you give one to Chris
2  Zimmerman?
3      A.   I couldn't -- I don't
4  remember specifically who I gave them to.
5      Q.   You think you gave them to
6  somebody?
7      A.   I'm sure I did.
8      Q.   Let's go to Page 7 of the
9  document.
10     A.   Okay.
11     Q.   It talks about suspicious
12 orders.  Do you see that here?
13     A.   Yes.
14     Q.   Did you discuss suspicious
15 orders with them in connection with this
16 meeting, the DEA?
17     A.   I don't remember
18 specifically that.
19     Q.   Do you recall the DEA
20 telling you at this time that you had to
21 report suspicious orders when discovered?
22     A.   I don't recall the
23 discussion.
24     Q.   Do you recall the DEA

Page 169

1  telling you that reporting a suspicious
2  order to the DEA does not relieve the
3  distributor of the responsibility to
4  maintain effective controls against
5  diversion?
6      A.   I don't recall that
7  discussion.
8      Q.   Did you have an
9  understanding that that was a
10 requirement --
11     A.   Yes.
12     Q.   -- at that time?
13         MS. McCLURE:  Object to the
14     form.
15         THE WITNESS:  Yes, I
16     understand the requirement.
17 BY MR. PIFKO:
18     Q.   What efforts did
19 AmerisourceBergen have in place at that
20 time to identify suspicious orders?
21     A.   We had the same report that
22 we discussed earlier that was approved by
23 DEA.
24     Q.   Anything else?

Page 170

1    A.   Be excessive suspicious
2  order report.  And that's what we
3  reported to DEA.
4    Q.   Anything else?
5    A.   That -- anything else that
6  we do to --
7    Q.   At that time --
8      MS. McCLURE:  Were you
9    finished answering his question?
10     THE WITNESS:  No.  I guess I
11    want him to repeat the question,
12    the last question.  When you say
13    anything else, related to what?
14  BY MR. PIFKO:
15    Q.   Again, talking about this
16  time period that's up on the slide here,
17  before the suspension of the Orlando
18  facility's registration, but after the
19  AmerisourceBergen merger.  Was there
20  anything else in place besides the
21  suspicious excessive order reports that
22  we talked about?
23    A.   Sure.  Yeah.  Yes.
24    Q.   To identify suspicious

Page 171

1  orders?
2    A.   There's other things in
3  place that the regulations require us to
4  do.
5      We make sure that any
6  pharmacy that we distribute controlled
7  substances to is properly licensed by the
8  state and registered by DEA.
9    Q.   How did you do that?
10    A.   The requirement is that we
11  make a good faith effort to ensure that
12  they are licensed and registered with
13  DEA, and we typically would -- this was
14  before you could check websites to verify
15  it, we would get copies of their licenses
16  to verify that they were properly
17  licensed.
18    Q.   At what stage in the process
19  would you get copies of their license?
20    A.   Upon onboarding of the
21  customer.
22    Q.   Did you ever engage in any
23  effort to check their license after you
24  onboarded them?

Page 172

1    A.   Yes.  At the time of
2  renewal.
3    Q.   What do you mean renewal?
4  What's that?
5    A.   Well, the customer is
6  required to renew their license and
7  required to renew their DEA registration.
8    Q.   Okay.
9    A.   We systematically track
10  that.
11    Q.   So when you onboard a
12  customer, you mark the date of when they
13  were required to renew their
14  registration?
15    A.   It's loaded in the system.
16    Q.   And then you would check at
17  some point after that to see if they
18  still had a valid registration?
19    A.   The system monitored it.
20  Once they hit an expiration date, the
21  system would automatically block orders,
22  depending on which license it is.
23    Q.   Anything else that you would
24  do to check to see if a registration was

Page 173

1  revoked or suspended?
2    A.   Yes.  We'd get a NTIS report
3  that gets reviewed every -- I believe
4  it's every month, and it basically is
5  a -- information about all the customers,
6  DEA registration, it gets matched -- it
7  gets matched up with our customer file
8  and flags any discrepancies, and they get
9  investigated.  That's one way.
10      And DEA also sends out a --
11  they used to mail it out, like a
12  quarterly retired list of any
13  registered -- registration numbers that
14  had been revoked or retired, and that was
15  required to be reviewed.
16    Q.   And all those things were
17  done during this time period?
18    A.   As I recall, yes.
19    Q.   Okay.  So you had the
20  excessive suspicious order reports, the
21  checking of the registration.  Anything
22  else that you did to identify suspicious
23  orders?
24    A.   Again, we had the posting in

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 the vault and cage with the base quantity
2 levels that -- so we didn't want to
3 totally rely on systems. We wanted to
4 make sure that people had an opportunity
5 to report any orders that looked
6 suspicious to them to their supervisor.
7    Q. Okay. Anything else?
8    A. I can't think of anything
9 else. Could be.
10    Q. Going back to Exhibit 1.
11 I'm on Page 7.
12    A. Okay.
13    Q. It looks like you are there.
14    A. Yes, sir.
15    Q. The second slide on Page 7
16 there says, "Reporting a suspicious order
17 to DEA does not relieve the distributor
18 of the responsibility to maintain
19 effective controls against diversion."
20    Do you see that?
21    A. Yes, I do.
22    Q. Did you have an
23 understanding that that was a requirement
24 at that time?

Page 175

1    MS. McCLURE: Object to
2    form.
3    THE WITNESS: I understood
4    the regulation, yes.
5 BY MR. PIFKO:
6    Q. What do you understand that
7 to mean?
8    A. That we still have to have
9 effective controls to prevent diversion.
10 We're required to maintain effective
11 controls.
12    Q. And that even if you report
13 an order to the DEA that's suspicious,
14 you still need to do something to make
15 sure it's not diverted?
16    MS. McCLURE: Object to
17    form.
18    THE WITNESS: We just
19    understand that we're -- it
20    doesn't relieve us of our
21    responsibility to maintain
22    effective controls.
23 BY MR. PIFKO:
24    Q. So reporting it alone is not

Page 176

1 enough necessarily to control diversion,
2 correct?
3    MS. McCLURE: Object to
4    form.
5    THE WITNESS: Again,
6    reporting a suspicious order
7    doesn't relieve us of our
8    responsibility to have effective
9    controls to prevent diversion,
10    which we have in place, we had in
11    place.
12 BY MR. PIFKO:
13    Q. So if diversion occurs even
14 though you reported an order, you're
15 still responsible, correct?
16    MS. McCLURE: Object to the
17    form.
18    THE WITNESS: Can you repeat
19    that again?
20 BY MR. PIFKO:
21    Q. You said reporting a
22 suspicious order doesn't relieve us of
23 our duty to have effective controls
24 against diversion. So I'm just

Page 177

1 clarifying. Merely reporting it, if an
2 order is suspicious, and you report it
3 and it gets diverted, you're still
4 responsible, correct?
5    MS. McCLURE: Object to the
6    form. Calls for a legal
7    conclusion.
8    THE WITNESS: I disagree.
9 BY MR. PIFKO:
10    Q. Okay. Why do you disagree?
11    A. How can we be responsible
12 for a pharmacy or -- that diverts
13 controlled substances after they've
14 received them from us?
15    Q. Well, you just said that
16 reporting -- even if you report it, you
17 still have responsibility to prevent
18 diversion, correct?
19    A. No. We have a
20 responsibility to maintain effective
21 controls against diversion. So we
22 have -- we had the controls in place.
23 That doesn't mean diversion is not going
24 to take place at some point.

Page 178

1     Q.   Okay. So if you report an
2 order though, it's still your job to
3 maintain effective controls to prevent
4 diversion of that order, correct?
5     A.   I think we keep saying the
6 same thing, yes.
7     Q.   Do you agree?
8        MS. McCLURE: Object to the
9     form.
10       THE WITNESS: We have a
11     responsibility to maintain
12     effective controls against
13     diversion. That's the regulation.
14 BY MR. PIFKO:
15     Q.   And so it's your job to
16 maintain effective controls against
17 diversion regardless of whether you
18 report an order as suspicious, correct?
19     A.   That's correct.
20       MS. McCLURE: Mark, at some
21     point, we've been going for almost
22     an hour and a half. Take a break
23     for lunch.
24       MR. PIFKO: Yeah, we can

Page 179

1     take a lunch break as soon as we
2     finish this document.
3 BY MR. PIFKO:
4     Q.   Let's go to Page 8, the next
5 page?
6     A.   Okay.
7     Q.   The next slide says
8 "Suspicious Orders."
9     A.   Mm-hmm.
10     Q.   Do you see that? It says
11 DEA cannot tell a distributor if an order
12 is legitimate or not. Distributor must
13 determine which orders are suspicious and
14 make a sales decision.
15     Do you see that?
16     A.   Yes, I do.
17     Q.   Do you have an understanding
18 of what that means?
19     A.   Yes.
20     Q.   What's your understanding of
21 what that means?
22     A.   My understanding is we're
23 required to develop a system to detect
24 suspicious -- and report suspicious

Page 180

1 orders. And we can't rely on DEA to tell
2 us what should be reported and what
3 shouldn't.
4     Q.   It's not the DEA's job to
5 tell you if an order is suspicious,
6 correct?
7       MS. McCLURE: Object to the
8     form.
9       THE WITNESS: No, it's not
10     DEA's job to tell us what's
11     suspicious.
12 BY MR. PIFKO:
13     Q.   And it's not DEA's job to
14 maintain effective controls against
15 diversion, correct?
16       MS. McCLURE: Object to the
17     form.
18       THE WITNESS: Well, I think
19     DEA has a role to prevent
20     diversion. I think that's why
21     they're in place.
22 BY MR. PIFKO:
23     Q.   But it's your job as a
24 registrant to maintain effective controls

Page 181

1 to prevent diversion, correct?
2       MS. McCLURE: Object to the
3     form.
4       THE WITNESS: Sorry. That's
5     a regulatory requirement.
6 BY MR. PIFKO:
7     Q.   This next bullet point here,
8 "Distributor must determine which orders
9 are suspicious and make a sales
10 decision."
11     Do you see that?
12     A.   Yes, I see it.
13     Q.   What do you understand that
14 to mean?
15     A.   I understand that to mean
16 that we have to make our own decision
17 about what's suspicious and what to
18 report.
19     Q.   And if an order is
20 suspicious, to make a decision on whether
21 to sell it?
22     A.   That's kind of what it says.
23 That's pretty much what it says.
24     Q.   You understand that to mean

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1  if an order is suspicious, if you
2  determine that an order is suspicious,
3  you need to make a decision not to sell
4  it?
5       MS. McCLURE:  Object to the
6  form.
7       THE WITNESS:  No.
8  BY MR. PIFKO:
9     Q.   You don't understand that to
10 mean that?
11    A.   I understand that it means
12 we have to -- it's up to us to determine
13 what's a suspicious order and then we
14 make a business decision about whether to
15 fill the order or not.
16    Q.   Do you believe that selling
17 an order that you've determined to be
18 suspicious is inconsistent with your duty
19 to prevent diversion?
20       MS. McCLURE:  Object to the
21 form.
22       THE WITNESS:  No.
23 BY MR. PIFKO:
24    Q.   So you don't believe that if

Page 183

1  you sell an order that's suspicious, you
2  could be contributing to diversion?
3       MS. McCLURE:  Object to the
4  form.
5       THE WITNESS:  I don't know
6     that diversion takes place just
7     because an order is reported as
8     suspicious.  It doesn't mean it's
9     diversion.
10 BY MR. PIFKO:
11    Q.   The next series of slides
12 are about examples of pharmacies.  The
13 copy we have is essentially illegible
14 with these pictures.  But do you have an
15 understanding about what was portrayed in
16 these slides, and did you discuss it at
17 the meeting?
18       MS. McCLURE:  Object to the
19     form.  Compound.
20       THE WITNESS:  I don't
21     recall.
22 BY MR. PIFKO:
23    Q.   I'm talking about from
24 Pages 9 to 11.

Page 184

1     A.   I don't recall specific
2  discussions about these slides.
3     Q.   Do you recall there being
4  discussion about what attributes are of
5  an internet pharmacy and investigations
6  that you could conduct to determine
7  whether a pharmacy is an internet
8  pharmacy?
9       MS. McCLURE:  Object to the
10     form.  Compound.
11       THE WITNESS:  The first part
12     of your question, I understand
13     that this was a discussion of the
14     attributes of what could be an
15     internet pharmacy.
16 BY MR. PIFKO:
17    Q.   And did you understand that
18 the DEA expected you to conduct
19 investigations to determine if your
20 customers were internet pharmacies?
21    A.   As I recall, they gave us --
22 they are not part of this attachment.
23 But they gave us some questions that they
24 suggested that we ask.  I don't think it

Page 185

1  was called investigations.  But they --
2  they gave us some questions that they
3  felt like would be -- that they
4  recommended we ask of our customers.
5     Q.   And those were included in
6  your questionnaire?
7     A.   Yes.  As I recall.
8     Q.   Let's go to Page 12.
9     A.   Okay.
10    A.   Second slide.
11    A.   Okay.
12    Q.   Well, let's go actually to
13 the first slide, Popular Internet Drugs.
14 Do you see that?
15    A.   Yes.
16    Q.   Hydrocodone.  Do you see
17 that?
18       You have an understanding --
19 we talked about hydrocodone earlier.
20    A.   Mm-hmm.  Right.
21    Q.   Do you recall discussing
22 these drugs being of concern?
23    A.   Yes.
24    Q.   Why is that?

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1    A.   Why -- why they were drugs
2  of concern?
3    Q.   Yeah.
4    A.   As I recall, those were the
5  more common drugs that were being filled
6  from internet activity.
7    Q.   And those drugs were
8  potentially being subject to abuse?
9    A.   Any controlled substance is
10 subject to abuse, yes.
11   Q.   But these were of particular
12 concern?
13   A.   I think these were -- my
14 understanding is these were particularly
15 of concern because these were the popular
16 internet drugs, is what I recall.
17   Q.   Next slide talks about
18 "prescriptions not written in the usual
19 course of professional practice are not
20 valid."
21       Do you have an understanding
22 of what -- what that means?
23   A.   Yes, I do.
24   Q.   What does that mean?

Page 187

1    A.   It basically means that the
2  DEA expects a prescription to be written
3  based on a face-to-face doctor-patient
4  relationship.
5    Q.   And so did the DEA expect
6  you to assess whether your customers were
7  filling prescriptions that may have been
8  generated through an invalid professional
9  practice?
10   A.   I don't think they looked at
11 that as our role.  They looked at that
12 as -- they -- that's why they gave us
13 some of these things, characteristics to
14 look for, and questions to ask.  But
15 not -- not to know whether -- you know,
16 how the prescriptions were written.
17   Q.   But they wanted you to
18 consider whether the prescriptions were
19 not being written face-to-face as part of
20 your assessment of these issues?
21       MS. McCLURE:  Object to the
22       form.  Misstates prior testimony.
23       THE WITNESS:  That's the --
24       that's the pharmacies'

Page 188

1  corresponding responsibility.
2        That was part of a
3  question -- I think that was part
4  of the question in our
5  questionnaire.  If they answered
6  that they didn't fill them based
7  on that, then that was a red flag
8  for us, that it can be an internet
9  pharmacy.
10 BY MR. PIFKO:
11   Q.   And the DEA also told you
12 that drugs dispensed pursuant to invalid
13 prescriptions are not for legitimate
14 medical purposes, the drugs are diverted?
15   A.   I see it, yes.
16   Q.   That's what they told you?
17   A.   I don't recall the
18 conversations.  I just see what's in the
19 slides.
20   Q.   They communicated that to
21 you --
22   A.   It was 13 years ago.
23   Q.   Okay.  They communicated
24 that to you via these slides for sure

Page 189

1  though, right?
2    A.   Yes.
3    Q.   And they said that's not
4  limited to internet pharmacies as well,
5  correct?
6    A.   That's what it says.
7    Q.   Going to the next page,
8  Page 13.
9    A.   Okay.
10   Q.   You see here it says, "A
11 pattern of drugs being distributed to
12 pharmacies who are diverting controlled
13 substances demonstrates the lack of
14 effective controls against diversion by
15 the distributor."
16       Do you see that?
17   A.   I see it.
18   Q.   Okay.  So again, the DEA
19 communicated to you at a minimum through
20 these slides that if you as a distributor
21 are selling drugs in a pattern to
22 pharmacies who are diverting them, that
23 is evidence of a lack of effective
24 controls against diversion.  Agree?

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1    MS. McCLURE: Object to the
2 form.
3    THE WITNESS: Let me read
4 this again. Yeah, my read of this
5 is if there is a pattern that a
6 distributor is -- is knowingly
7 distributing drugs to a pharmacy
8 that's diverting them would be a
9 lack of effective controls.
10 BY MR. PIFKO:
11    Q. Where does it say knowingly?
12    A. Well, that's just my
13 interpretation --
14    Q. Okay. But it doesn't say
15 that, right?
16    A. -- pattern -- no, it doesn't
17 say that.
18    Q. Okay. So what they
19 communicated to you was that simply
20 having a pattern of drugs being
21 distributed to pharmacies who were
22 diverting controlled substances
23 demonstrates the lack of effective
24 controls against diversion by the

Page 191

1 distributor, correct?
2    MS. McCLURE: Object to
3 form.
4    THE WITNESS: That's what it
5 says, "a pattern of drugs being
6 distributed to pharmacies."
7 BY MR. PIFKO:
8    Q. And they gave this to you,
9 correct?
10    A. As I recall, yes. Yes.
11    Q. And then it says here, "The
12 DEA registration of the distributor could
13 be revoked under public interest
14 grounds."
15    Do you see that?
16    A. I see that.
17    Q. Do you have an understanding
18 about what that means?
19    A. Yes, I do.
20    Q. What does that mean?
21    A. That if a distributor is --
22 if they feel that the distributor's
23 actions are against the public interest,
24 then they could revoke the registration.

Page 192

1    Q. Okay. Do you have an
2 understanding about why the distributor's
3 action is supposed to be in the public
4 interest?
5    A. Yes.
6    Q. Why is that?
7    A. Well, they want to ensure
8 that drugs are not diverted into
9 illegitimate channels.
10    Q. And that's -- as a
11 distributor, that's your job, among other
12 things, to make sure that doesn't happen,
13 right?
14    MS. McCLURE: Object to the
15 form of the question.
16    THE WITNESS: To have
17 effective controls in place to
18 prevent it.
19 BY MR. PIFKO:
20    Q. The next slide here, it
21 says, "Any distributor who is selling
22 controlled substances that are being
23 dispensed outside the course of
24 professional practice must stop

Page 193

1 immediately."
2    Do you see that?
3    A. I see that.
4    Q. Do you have an understanding
5 about what that means?
6    A. Yes --
7    Q. What's your understanding?
8    A. -- yes.
9    If -- if we're dispensing --
10 if we're distributing controlled
11 substances and we find out that they are
12 being dispensed outside of the course of
13 professional practice, then we should
14 stop distributing to them once we become
15 aware of it.
16    Q. And why is that?
17    A. Because that would be an
18 indication there could be diversion.
19    Q. Next bullet point there.
20 "DEA cannot guarantee that past failure
21 to maintain effective controls against
22 diversion will not result in an action
23 against a distributor."
24    Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    A.  Yes, I do.
2    Q.  Do you have an understanding
3 about what that means?
4    A.  I can tell you what I think
5 it means.
6    Q.  Well, they communicated this
7 to you at the time, they gave you this
8 presentation, correct?
9    A.  Yes.
10    Q.  Did you read it?
11    A.  Yes.
12    Q.  Okay.  Did you tell them you
13 didn't understand what that meant?
14    MS. McCLURE:  Object to the
15 form.
16    THE WITNESS:  I can only
17 tell you what I think it means.  I
18 can't remember what they said
19 13 years ago.
20 BY MR. PIFKO:
21    Q.  I'm just asking you if you
22 recall upon receiving this, telling the
23 DEA that you didn't understand what any
24 of this meant?

Page 195

1    A.  I don't recall.
2    Q.  What's your understanding of
3 what the second bullet point there means,
4 "DEA cannot guarantee that past failure
5 to maintain effective controls against
6 diversion will not result in an action
7 against a distributor"?
8    Will -- will -- yeah.
9 What's your understanding what that
10 means?
11    A.  Well, I think what it means
12 is if you had a failure and even though
13 you may have corrected that, and remedied
14 the situation, that doesn't mean later on
15 that they discover it and they could not
16 come back and take action against you for
17 that past failure.
18    Q.  The next page.  Top slide.
19    A.  Okay.
20    Q.  It talks about -- it says,
21 "DEA is going to meet with other
22 distributors.  Tell you to provide this
23 information to your employees at your
24 request."  And they say they are going to

Page 196

1 meet with industry groups.  Do you see
2 that?
3    A.  Yes, I do.
4    Q.  Do you recall discussing
5 that?
6    A.  No, I don't recall
7 discussing it.
8    Q.  Do you recall them telling
9 you they were going to meet with other
10 distributors?
11    A.  I recall them saying that
12 they will be meeting with -- with other
13 distributors, yes.
14    Q.  What did they say about
15 that?
16    A.  I think they called it their
17 distributor initiative.  And they were
18 going to start meeting with all the
19 distributors.
20    Q.  Did they tell you
21 specifically any other distributors they
22 were going to be meeting with?
23    A.  No.
24    Q.  You were part of the

Page 197

1 Healthcare Distribution Alliance,
2 correct?
3    A.  Our company is a member,
4 yes.
5    Q.  But you specifically
6 participated, correct?
7    A.  Yes.
8    Q.  Did you, at this time -- did
9 they present anything to -- through the
10 had about this issue?
11    MS. McCLURE:  Objection to
12 form.
13 BY MR. PIFKO:
14    Q.  I know it was a predecessor
15 name at that time, but...
16    A.  I can't remember precisely.
17 But DEA was often invited to meet with
18 had and had met with DEA over several
19 topics.
20    MR. PIFKO:  All right.
21 Let's take a break.
22    THE VIDEOGRAPHER:  We are
23 going off record.  The time is
24 12:47.

Page 198

1    (Lunch break.)
2    THE VIDEOGRAPHER:  Going
3  back on the record.  Beginning
4  Media File Number 3.  The time is
5  1:28.
6  BY MR. PIFKO:
7    Q.   Welcome back.
8    I want to start talking now
9  about the, as you said, oversight of the
10  development of the enhanced ordering
11  monitoring program.
12    So that occurred after the
13  DEA settlement, correct?
14    A.   During the settlement
15  process, yes.
16    Q.   Okay.  As part of the,
17  another one of these little slides for
18  you, so we are on the same page.
19    A.   I'm not seeing it yet.
20    MS. McCLURE:  It's okay.
21    THE WITNESS:  Here it is.
22    MS. McCLURE:  Again, your
23  date there is the settlement date.
24    MR. PIFKO:  That's the date

Page 199

1  of the agreement.
2  BY MR. PIFKO:
3    Q.   Okay.  So let's talk
4  about -- so the DEA settlement occurs.
5  And you -- at what point did you get
6  tasked with overseeing the development of
7  the enhanced order monitoring program?
8    A.   Almost from -- it was while
9  the negotiations were going on for the
10  settlement.
11    Q.   Let's talk -- so you said,
12  at this 2007 time period, I asked you
13  earlier how many employees were in the
14  CSRA.  Do you remember --
15    A.   Yeah.
16    Q.   -- how many employees there
17  were around that time?
18    A.   Oh, no, I don't know the
19  exact number specifically.
20    Q.   Okay.  At one point you said
21  13 or 14.
22    A.   No, I think I said 12.
23    Q.   Okay.
24    A.   I said about a dozen --

Page 200

1    Q.   Okay.
2    A.   -- but that's a guess.
3    Q.   Okay?
4    A.   That might be on the high
5  side even.
6    Q.   You think it might have been
7  less than 12 at that time?
8    A.   It could have been.  I
9  just --
10    Q.   Definitely less than 20?
11    A.   When you say CSRA
12  department, I can't remember exactly.
13    Q.   In the hierarchy of things,
14  Chris Zimmerman was at the top of the
15  CSRA, correct?
16    A.   That's correct.
17    Q.   And then you were a direct
18  report to Zimmerman, correct?
19    A.   That's correct.
20    Q.   Did anyone else, other than
21  you, have a role in the diversion control
22  aspect of the CSRA?
23    A.   Yes.
24    Q.   Who else in the CSRA at the

Page 201

1  time of the DEA enforcement action was
2  engaged in performing diversion-related
3  functions?
4    A.   You mean at the time of the
5  action or after we started?
6    Q.   Well, good question.
7    Before you added anybody
8  after the action.
9    MS. McCLURE:  Object to the
10  form.
11    THE WITNESS:  So it was
12  pretty much everyone at the
13  corporate office, in the
14  department, was engaged.  We
15  pretty much engaged everyone that
16  we could.  Kind of
17  all-hands-on-deck.
18  BY MR. PIFKO:
19    Q.   But -- no, I mean -- okay,
20  but before you even knew about the
21  enforcement action, just day to day who
22  in the CSRA had responsibilities that
23  included diversion control?
24    A.   Well, at that time it was

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1 all under regulatory, which was, you
2 know, I was in charge of the regulatory
3 side of our department. And then Eric
4 was -- Eric reported to me at that time
5 as one of my regional directors. And he
6 also had that responsibility that we
7 discussed earlier.
8    Q.  So you were the top person
9 at that time on diversion control issues,
10 correct?
11    A.  Yes.
12    Q.  And you had Eric helping you
13 out underneath you?
14    A.  Mm-hmm, that's correct.
15    Q.  Anyone else?
16    A.  Not that I can recall.
17    Q.  Okay.  And so, then you get
18 tasked with overseeing the development of
19 the enhanced order monitoring program,
20 because at that time you're the
21 senior-most diversion control person,
22 correct?
23    A.  That's correct.
24    Q.  So how did you first learn

Page 203

1 about the enforcement action?
2    A.  I got a call from the
3 distribution center manager in Orlando.
4 And he told me the DEA was there and they
5 were putting a padlock on their cage,
6 that they were suspending their
7 registration.
8    Q.  And do you remember the
9 approximate date of when that happened?
10    A.  Approximate?  Yeah, it was
11 around April 21st, 22nd, something like
12 that, of 2007.  It was in April.  I think
13 it was 21st.
14    Q.  Did you speak to anyone at
15 the DEA immediately upon learning of that
16 information?
17        MS. McCLURE:  Object to the
18    form.
19        THE WITNESS:  Not
20    immediately.  No.
21 BY MR. PIFKO:
22    Q.  What was the first action
23 you took when you learned that?
24    A.  I told my boss.

Page 204

1    Q.  Zimmerman?
2    A.  Yes.
3    Q.  And you had a discussion
4 with him that the license at the Orlando
5 facility had been suspended?
6    A.  That's correct.
7    Q.  And what did he tell you?
8    A.  I can't remember
9 specifically.  I think we went over and
10 told his boss who was the general
11 counsel.
12    Q.  And then did you contact DEA
13 at some point after that?
14    A.  I didn't, no, not
15 personally.
16    Q.  Do you know if Mr. Zimmerman
17 did?
18    A.  Mr. Chou, general counsel,
19 called -- called them from his office,
20 and Chris and I, I believe, were both in
21 the office at the time.
22    Q.  And did the DEA tell you why
23 they suspended the registration at that
24 time?

Page 205

1    A.  I don't remember exactly
2 what they said, because John Chou was on
3 the phone with them.
4    Q.  Did they send you any
5 documentation after suspending the
6 registration?
7    A.  Not that I recall.
8    Q.  So at what point in the
9 process did Mr. Zimmerman tell you that
10 you were going to be in charge of
11 developing an enhanced order monitoring
12 program?
13    A.  It was probably after -- a
14 week later after meetings with DEA to
15 determine what the issue was and what
16 they wanted us to do.
17    Q.  Did you participate in those
18 meetings?
19    A.  No.
20    Q.  No?
21    A.  No.
22    Q.  Do you know who did?
23    A.  I went down the first day.
24 And I don't even recall what was

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1 discussed in that meeting. But I wasn't
2 involved in any of the negotiations after
3 that.
4      Q.    You said you went down to
5 Orlando?
6      A.    No.  To DEA headquarters.
7      Q.    Okay.  And who did you meet
8 with there?
9      A.    There were several DEA
10 people in the room.  Mike Mapes was in
11 there.  And I think even the assistant
12 administrator, I think was in there.  I
13 can't -- I can't recall who from DEA was
14 in there.
15      Q.    And so then approximately a
16 week later, Chris Zimmerman tells you
17 we're going to have an enhanced order
18 monitoring program and you're going to be
19 in charge of developing it?
20      A.    In so many words, yes.
21      Q.    How did you know what
22 features you wanted to make changes to?
23      A.    Well, it was based on -- it
24 was based on information that was relayed

Page 207

1 to us from DEA that they wanted us to be
2 able to stop an order and review it
3 before shipping it.
4      Q.    Anything else?
5      A.    That's all I can recall.
6      Q.    Who communicated to you that
7 DEA wanted you to stop an order and
8 review it before shipping it?
9      A.    I'm assuming Chris but I
10 can't -- don't know -- I can't remember
11 for sure.
12      Q.    Did you pass that
13 information on to anyone else?
14      A.    Just internally.  Just
15 internal discussions.  I couldn't tell
16 you specifically who.
17      Q.    Okay.  So then you -- you
18 said it was all-hands-on-deck at that
19 point.  Who was involved and assisted you
20 at that point?
21      A.    Pretty much everybody in the
22 department.  The -- my direct reports.
23 The -- the investigators.  Pretty much
24 everybody in the department that -- that

Page 208

1 worked at the corporate office was -- was
2 engaged to assist.
3      Q.    And then I was asking about
4 the number of people in the department,
5 and you were asking before or after.  At
6 some point more people were added to the
7 team.  When was that?
8      A.    At some time after that.  I
9 can't remember, you know, how long it
10 took.  But I know we added a couple of
11 other investigators to help to be trained
12 to review orders.
13      Q.    Do you know their names?
14      A.    I can't remember exactly.  I
15 think Ed was hired.  Or he may have
16 already been on board at that point.  Ed
17 Hazewski as an investigator.  A gentleman
18 named Scott Kirsch.  I know he was one of
19 the investigators that reviewed orders in
20 the beginning.
21          David Britmeier, I think he
22 came a little later.
23          Eric helped -- Eric helped.
24          I'm trying to think.  Cliff

Page 209

1 Flood worked in security.  He helped us.
2      Q.    We're talking about new
3 people.
4      A.    New people.  Okay.  So I
5 know David Britmeier and Scott Kirsch and
6 Ed were, I think, the more recent hires
7 right after the -- the action, but I
8 can't remember if there were others.
9      Q.    Their -- they were all --
10 their immediate task was to -- to review
11 orders?
12      A.    Yes, I believe so.  They --
13 and conduct investigations.
14      Q.    Did you make any changes to
15 your threshold system at that point?
16          MS. McCLURE:  Object to the
17 form.
18          THE WITNESS:  There wasn't a
19 threshold system at that point.
20 BY MR. PIFKO:
21      Q.    Okay.  Right.  You said
22 there was a rolling three-month
23 average --
24      A.    Right.

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1    Q.   -- with the percentage?
2        Did you make any changes to
3  that aspect of the order monitoring
4  program at that time?
5    A.   Yeah, when we developed
6  the -- back when we developed the
7  enhanced program, it took the place of
8  the old program.
9    Q.   Okay.  So an entirely new
10 program designed from the ground up?
11       MS. McCLURE:  Object to the
12   form.
13       THE WITNESS:  It took the
14   place -- it replaced it.  Yes.
15 BY MR. PIFKO:
16   Q.   Okay.  So let's talk
17 about --
18   A.   An enhanced version.
19   Q.   Is there a name for that
20 program or?
21   A.   Yeah, order monitoring --
22 OMP.  Order monitoring program.
23   Q.   So let's go over.  What are
24 the general attributes of the OMP?



Highly Confidential - Subject to Further Confidentiality Review





Page 218

Page 220

Page 219

Page 221

 8          (Document marked for
 9      identification as Exhibit
10      ABDC-Mays-2.)
11  BY MR. PIFKO:
12      Q.   I'm handing you what's been
13  marked as Exhibit 2.
14          The record will reflect the
15  witness is reviewing the document.
16          For the record, it's a
17  document Bates-labeled ABDCMDL0000075
18  through 84.
19          It's dated June 29, 2007.
20  It's a memorandum.  The subject is
21  "Update OMP Distribution Center
22  Procedures."
23          Let me know when you're
24  done.

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    A.   I will.  Okay.

2    Q.   Have you seen this document

3 before?

4    A.   I don't remember it

5 specifically.

6    Q.   Your name is on here,

7 correct?

8    A.   Yes.  It looks like I was

9 copied on it.

10   Q.   Is this something that you

11 would have put together or someone -- is

12 this something that you would have put

13 together?

14       MS. McCLURE:  Object to the

15   form.

16       THE WITNESS:  I don't think

17   so, because there's a lot of

18   technical things in here.  So I'm

19   not really sure.  It looked like

20   it might be more of a team

21   approach.  There's IT, you know,

22   print screens of computer screens

23   and things like that, technical

24   stuff that I wouldn't have been

Page 223

1    able to put in here.

2 BY MR. PIFKO:

3    Q.   You said that you were

4 supervising the development of the

5 program, correct?

6    A.   That's correct.

7       MS. McCLURE:  Object to the

8   form.

9 BY MR. PIFKO:

10   Q.   Did you have someone on your

11 team that you would have directed to

12 write a memo like this for you?

13   A.   I don't recall.

14   Q.   You don't remember?

15   A.   I don't remember.

16   Q.   Do you know what this

17 document is?

18   A.   Yes.  It appears to be a

19 document updating the distribution

20 centers on the procedures for OMP, the

21 new OMP.

22   Q.   So this is the way that the

23 company communicated the new OMP to the

24 distribution centers?

Page 224

1       MS. McCLURE:  Object to the

2   form.

3       THE WITNESS:  I'm sure it

4   wasn't the only way.  It looks

5   like -- it looks like it was

6   directed to the distribution

7   center associates.

8 BY MR. PIFKO:

9    Q.   You reviewed this document.

10 Is this consistent with what your

11 understanding of the program was?

12   A.   Yes, it is.

13   Q.   Is there anything that you

14 see in here that's inaccurate?

15       MS. McCLURE:  Objection.

16       THE WITNESS:  I would have

17   to go through it like very

18   carefully.  But I didn't --

19   nothing jumped out at me as being

20   inaccurate.

21 BY MR. PIFKO:

22   Q.   Okay.  Well, let's go to the

23 second page.

24   A.   Okay.

Page 225





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



**Page 234**

**Page 235**

**Page 236**

7    Q.    Was there any specific
8  training provided to distribution center
9  associates about how to identify a
10  suspicious order when you implemented
11  this program?
12    A.    Yes.
13    Q.    Was it put in writing?
14    A.    Yes.
15    Q.    Was -- was there a name for
16  that document?
17    A.    I think it was called
18  responsible -- RPIC training, Responsible
19  Person in Charge.  So anyone that
20  reviewed and had -- had the authority to
21  review and release or reject orders had
22  to complete that training and sign off on
23  it.
24    Q.    Okay.  What was entailed in

**Page 237**

1  that training?
2    A.    I can't recall specifically.
3    Q.    Was it an in-person
4  training?
5    A.    Most of the time I think it
6  was.  As a matter of fact, it may have
7  always been in-person training.
8    Q.    And there was a document --
9  written documentation that went with the
10  training?
11    A.    There should have been, yes.
12    Q.    Do you have a sense of how
13  long the training session would be?
14    A.    No, I don't.
15    Q.    An hour?
16    A.    It's been years ago.  I
17  can't -- I can't remember how they
18  were -- how they were trained.  I just
19  know that they were trained.
20    Q.    Do you know who would have
21  conducted the training?
22    A.    I think initially in some
23  cases -- well pretty much in just about
24  most cases, the compliance manager or the

Page 238

1 CSRA manager, on-site manager conducted
2 the training.
3     Q. And who trained them?
4     A. They would have been trained
5 by, I would think our team. I just don't
6 remember exactly how they were trained.
7 Again, we have annual training
8 conferences.
9     Q. Is there someone specific on
10 your time at that time who was
11 responsible for handling trainings?
12     A. I don't recall. I don't
13 think so.
14     Q. It just could have been
15 anyone under you?
16     A. Yeah.
17     MS. McCLURE: Object to the
18     form.
19     THE WITNESS: Excuse me.
20 BY MR. PIFKO:
21     Q. Do you recall having someone
22 having the job responsibility of
23 conducting training for the distribution
24 centers?

Page 239

1     A. Well, the compliance manager
2 on site was responsible for doing all the
3 training at the distribution center.
4     Q. Well, I mean from your group
5 to train the compliance manager?
6     A. They were trained by our
7 entire team.
8     Q. They would come to you for
9 that training?
10     A. Yes.
11     Q. Annually like you said?
12     A. Annually. Just about every
13 year we have a training conference.
14     Q. And was there documents
15 provided in connection with those
16 training conferences?
17     A. I'm sure we have, you know,
18 the documents as far as the PowerPoints
19 and things like that. I don't know if
20 we've actually got sign offs from each
21 one of them.
22     Q. When a -- going back to
23 Exhibit 2, Page 4.



Page 240

Page 241



Page 242

3          MS. McCLURE:  Object to the
4     form.
5          THE WITNESS:  Something just
6     died here.
7          MR. PIFKO:  I think they
8     just turned it off.

Highly Confidential - Subject to Further Confidentiality Review





Page 250

Page 252

Page 251

Page 253

18    Q.   Who trained the
19  investigators to do the investigation?
20    A.   It would be me and the lead
21  team and -- and CSRA with DEA's
22  assistance.
23    Q.   Was there documentation of
24  the training that was provided to the

Page 254

1 investigators?
2     A.   I don't know.  I don't
3 recall.
4     Q.    You don't know if there was
5 any handouts or anything given to them
6 when they were trained?
7     A.   I don't recall.
8         MS. McCLURE:  Objection.
9     Asked and answered.
10 BY MR. PIFKO:
11    Q.   Was there any regularity
12 with the training?
13        MS. McCLURE:  Objection to
14    form.
15        THE WITNESS:  I don't
16    recall.
17 BY MR. PIFKO:
18    Q.   Did anyone give you specific
19 training on how to conduct a due
20 diligence investigation?
21    A.   DEA.
22    Q.   When did they give you
23 training?
24    A.   Sometime during that

Page 255

1 process.  When they were working with us
2 through the settlement.
3     Q.   Where did you go to do the
4 training?
5     A.   They just gave it.  It
6 wasn't like formal training.  They just
7 gave us general pointers and ideas about
8 how we should conduct our investigations.
9 They gave us the guidelines.
10    Q.   They gave you something in
11 writing?
12    A.   No.
13    Q.   Who -- who told you this?
14    A.   Mike Mapes, Kyle Wright, for
15 the most part.
16    Q.   They came and met with you
17 and told you?
18    A.   Yes.
19    Q.   And when did they come and
20 meet with you?
21    A.   They were there multiple
22 times during the implementation of the
23 enhanced OMP.
24    Q.   And this is in the -- after

Page 256

1 June 2007?
2     A.   No.
3         MS. McCLURE:  Objection.
4 BY MR. PIFKO:
5     Q.   When -- when is this?
6     A.   It was prior to that.
7     Q.   Okay.  When was the enhanced
8 OMP implemented?
9     A.   Around June.  They were
10 there in the development of it.
11    Q.   Okay.  So they were there
12 between April and June 2007?
13    A.   That's correct.
14    Q.   About how many times did
15 they come meet with you then?
16    A.   I don't remember.
17    Q.   More than ten?
18    A.   I don't remember.
19    Q.   And at some point they gave
20 you training on how to conduct due
21 diligence?
22    A.   I explained that.  They gave
23 us general guidelines and -- and
24 observations, and they were there during

Page 257

1 the development.
2     Q.   How long did you meet with
3 them?
4     A.   I don't remember.
5     Q.   All day, or --
6     A.   I don't remember.
7     Q.   Did anyone ever give you
8 formal training on the DEA laws and
9 regulations?
10        MS. McCLURE:  Object to the
11    form.
12        THE WITNESS:  I've had
13    training several times over the
14    years.  I think we talked about
15    that earlier during our training
16    conferences.
17 BY MR. PIFKO:
18    Q.   At this time in 2007 had
19 anyone given you training on DEA rules
20 and regulations?
21        MS. McCLURE:  Object to the
22    form.
23        THE WITNESS:  Yes.
24 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    Q.   Who?
2    A.   People within our
3  department.  DEA.  DEA has provided
4  training in our training conferences.
5  All the regulations.
6    Q.   When -- when did you have a
7  training conference where someone from
8  the DEA gave you training?
9    A.   Multiple times.
10   Q.   In 2005?
11   A.   I don't recall.  I don't
12 recall specific dates.
13   Q.   How about in 2006?
14   A.   I don't know.  I don't
15 remember.
16   Q.   Who from the DEA gave you
17 training on their rules and regulations?
18   A.   Scott Davis from DEA in
19 Philadelphia a couple of times.  Mike
20 Mapes.  Who else?  Mike Mapes more than
21 once.  Brian Reese from DEA provided
22 training for our team.  So there's four
23 or five times specifically.
24   Q.   Okay.

Page 259

1    A.   I just don't know the dates.
2    Q.   Were those before or after
3  2007?
4    A.   Both.
5    Q.   You testified earlier that
6  that meeting in 2005 was only the second
7  time you met with anyone at DEA.  Do you
8  recall?
9       MS. McCLURE:  Objection.
10      Misstates prior testimony.
11      THE WITNESS:  I don't recall
12      saying that.
13 BY MR. PIFKO:
14   Q.   You said that you met
15 someone in the '70s in Tennessee, and
16 then you said that that meeting,
17 Exhibit 1, was the only other time that
18 you recall meeting with someone from the
19 DEA.
20      MS. McCLURE:  Objection.
21      Misstates prior testimony.
22      THE WITNESS:  No, that's not
23      what I said.
24 BY MR. PIFKO:

Page 260

1    Q.   Well, you correct me then.
2    A.   I said I met with DEA in
3  Atlanta once.
4    Q.   Okay.
5    A.   I've met with DEA at
6  different meetings, conference -- trade
7  association conferences.  They've been to
8  the offices to do training at our
9  training conferences. I provided training
10 to DEA people.
11   Q.   When did DEA -- DEA came to
12 AmerisourceBergen's office to do
13 training?
14   A.   Yes.  Yes.
15   Q.   When was that?
16   A.   During our training
17 conferences.
18   Q.   Annually, every year?
19   A.   Not every year.  But they
20 came, they were invited.  Sometimes they
21 were invited and couldn't come.  But we
22 tried to invite them almost every year.
23 That's to our entire department.
24   Q.   Did anyone other than DEA

Page 261

1  train you on DEA rules and regulations?
2       MS. McCLURE:  Object to the
3       form.  Asked and answered.
4       THE WITNESS:  Not other than
5       internal people.
6  BY MR. PIFKO:
7    Q.   Who internally gave you
8  training on DEA rules and regulations?
9    A.   Other directors and managers
10 in our department that were -- that had
11 experience in the past.
12   Q.   Can you name anyone?
13   A.   Rodney Bias.  Larry Holland.
14 Chris Zimmerman.  Myself, I've done
15 training for our team.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



**Page 274**

**Page 276**

14      Q.    You are involved in or have
15  been involved in various committees with
16  the HDA, correct?
17      A.    Yes.  That's correct.
18      Q.    When did you first start
19  having involvement with the HDA on behalf
20  of AmerisourceBergen?
21          MS. McCLURE:  Object to the
22      form.
23          THE WITNESS:  I don't
24  recall.  I don't recall.

**Page 275**

**Page 277**

1  BY MR. PIFKO:
2      Q.    Early in your time working
3  with them?
4          MS. McCLURE:  Objection.
5      Asked and answered.
6          THE WITNESS:  Early in my
7      time working for
8      AmerisourceBergen?
9  BY MR. PIFKO:
10      Q.    Yeah.
11      A.    No.  No.
12      Q.    Do you recall the first time
13  that you were invited to be part of a
14  committee in the HDA?
15          MS. McCLURE:  Objection to
16      the form.
17          THE WITNESS:  It would
18      probably have been sometime after
19      2002.
20  BY MR. PIFKO:
21      Q.    Okay.  And what committee
22  was that?
23      A.    Regulatory affairs
24  committee.

Page 278

1 Q. What were your
2 responsibilities on the regulatory
3 affairs committee?
4     MS. McCLURE: Objection.
5 Assumes facts not in evidence.
6 Form.
7     THE WITNESS: Not really any
8 distinct responsibilities. Just
9 participated in calls that they
10 had.
11 BY MR. PIFKO:
12 Q. How often did you do that?
13 A. I can't remember. I know
14 the calls now are, like, biweekly. I
15 don't remember what the frequency was
16 when I first participated.
17 Q. Who else participated in the
18 calls?
19     MS. McCLURE: Objection
20 to -- to form.
21     THE WITNESS: Just about
22 any -- it was -- it was mostly
23 regulatory affairs counterparts
24 from within our industry. But

Page 279

1 just about any member could
2 participate in the call or listen
3 in.
4 BY MR. PIFKO:
5 Q. Do you remember the names of
6 any specific individuals?
7 A. That are on the committee?
8 Q. Yes.
9 A. Yes.
10 Q. Can you name them?
11 A. From other companies?
12 Q. Yes.
13 A. Gosh. Steve Reardon from
14 Cardinal was. Gary Hilliard who was with
15 McKesson. Brad Pine from Smith Drug.
16 I'm trying to think if there was anybody
17 else. That's the ones that I remember.
18 George Hewson from HD Smith.
19 Q. So you had regular calls
20 with them, correct?
21     MS. McCLURE: Objection to
22 form.
23     THE WITNESS: Well, we
24 participated in the HDA regulatory

Page 280

1 affairs committee calls, yeah.
2 BY MR. PIFKO:
3 Q. And then did you meet with
4 them in person ever?
5 A. Typically during their
6 annual meetings, annual distribution
7 management conference. Typically we
8 would meet sometimes during those. But
9 rarely -- rarely were they in person
10 meetings. Typically it was just the
11 phone calls.
12 Q. What type of issues did you
13 discuss in the phone calls?
14 A. Any regulatory issues that
15 were of interest to the members.
16 Q. And what do you mean by
17 regulatory issues?
18 A. It could be ranging from
19 HAZMAT issues with DOT, OSHA issues, DEA,
20 Board of Pharmacy, any type of issues
21 that affected the members that applied to
22 the members, regulations, pending
23 regulations.
24 Q. Are you familiar with the

Page 281

1 HDA's industry compliance guidelines?
2 A. Yes, I'm familiar with them.
3 Q. Were you involved in helping
4 put those together?
5     MS. McCLURE: Objection to
6 the form.
7     THE WITNESS: Well, HDA put
8 those together. I participated in
9 a meeting when they were getting
10 input from their members in how to
11 develop those guidelines.
12 BY MR. PIFKO:
13 Q. Just one meeting?
14 A. There may have been more
15 than one. But I just remember the one.
16 Q. Was that on the phone or in
17 person?
18 A. That was in person at HDA's
19 offices.
20 Q. So when was that?
21 A. I'm thinking probably 2008
22 sometime, or '9, sometime in that time
23 frame.
24 Q. To help your recollection,

Page 282

1 I'll represent to you that the guidelines
2 were first published in 2008.
3     A.   Okay.
4     Q.   Okay.  So do you think that
5 it was around that time?
6     A.   I would think so.
7     Q.   Do -- were there other
8 members of the industry present at that
9 meeting?
10     A.   The discussion to develop
11 them?
12     Q.   Yes.
13     A.   Yes, but I don't remember
14 who was there.  Who was in attendance.
15         (Document marked for
16     identification as Exhibit
17     ABDC-Mays-3.)
18         (Document marked for
19     identification as Exhibit
20     ABDC-Mays-4.)
21 BY MR. PIFKO:
22     Q.   I'm handing you two exhibits
23 at one time, Exhibits 4.
24     A.   Thank you.

Page 283

1     Q.   And Exhibit 5.
2         MR. PIFKO:  You know what, I
3     skipped 3.  So --
4         MS. McCLURE:  3.
5         MR. PIFKO:  -- I'm going to
6     give you 3.
7         MS. McCLURE:  Okay.
8         MR. PIFKO:  4 and 3.
9         MS. McCLURE:  So this is 4.
10     The single page e-mail.
11         MR. PIFKO:  4.
12         THE WITNESS:  Okay.
13 BY MR. PIFKO:
14     Q.   Take a minute to review
15 that.  One of the documents is the
16 guideline.  You don't need to sit there
17 and read the whole thing.  We'll get into
18 it.  If I'm asking about it and you want
19 to read it, you can.  But just for right
20 now, you can look at the e-mail and the
21 attachment.
22     A.   You're not going to ask
23 specific questions about the guidelines?
24 Because I'll need to read it if you are.

Page 284

1     Q.   Yeah, you can.  I just --
2     A.   Okay.
3     Q.   We don't need to sit here
4 while you are reading the whole thing.
5 Exhibit 4 is this e-mail Bates-labeled
6 ABDCMDL00295006.
7         On the second page there.
8     A.   On the back?
9     Q.   Yeah.
10     A.   This is the e-mail chain?
11     Q.   Yeah, it's an e-mail from
12 Chris to you.  And he's asking if you
13 know when HDMA published the guidelines.
14 He remembers going to DC with Cardinal,
15 McKesson.
16     A.   Yep.  Yes.
17     Q.   Does that refresh your
18 recollection about anyone who was there?
19     A.   No, I mean not -- not the
20 sparse specific individuals.  I would
21 assume Cardinal and McKesson would have
22 been in that meeting, because they were
23 members.
24     Q.   Do you know if Chris went

Page 285

1 with you.  He says, "We spent some time"?
2     A.   Yes, I remember Chris and I
3 both went.
4     Q.   Okay.  Anyone else from
5 Amerisource go with you?
6     A.   I don't think so.
7     Q.   Then you write back to him
8 that the guidelines were put together in
9 October 2008 after Cardinal's DEA
10 suspension.
11     A.   It sounds right.
12     Q.   What do you know about
13 Cardinal's suspension in 2008?
14     A.   I don't know a lot of
15 specifics.  I know in general what it was
16 about.
17     Q.   What do you know generally?
18     A.   It was tied to their
19 distribution to, I think CVS stores in
20 Florida.  Other than that I couldn't tell
21 you any specifics.
22     Q.   Do you know if they entered
23 into a settlement agreement?
24     A.   I think they did, but I'm

Page 286

1 not positive. I'm assuming they did.
2     Q.   Do you know if they paid a
3 fine?
4     A.   I believe they did.
5     Q.   Do you have a sense of how
6 much?
7     A.   It was like in 32 million,
8 something like that. I think.
9     Q.   Do you remember that being
10 significant or a topic of discussion in
11 the industry?
12     A.   I can't remember. I would
13 assume it was.
14     Q.   Hmm?
15     A.   I would -- I would think it
16 would be.
17     Q.   Then this talks about
18 another one in 2012?
19     MS. McCLURE: Sorry, where
20 are you, Mark?
21     MR. PIFKO: Same document,
22 Document 4.
23     MS. McCLURE: Oh.
24 BY MR. PIFKO:

Page 287

1     Q.   I can't -- the same e-mail
2 that you're saying there, "They had
3 another one in 2012." Do you see that,
4 related to Walgreens?
5     A.   Yes. Yeah, I see that.
6     Q.   Do you know what that one
7 was about?
8     A.   Not specifically.
9     Q.   Do you know it's related to
10 Walgreens?
11     A.   Yeah, I remembered it was
12 related to Walgreens.
13     Q.   Do you have -- oh, sorry.
14     (Document marked for
15     identification as Exhibit
16     ABDC-Mays-5.)
17 BY MR. PIFKO:
18     Q.   I'm handing you what's been
19 marked as Exhibit 5. For the record it's
20 a document from Cardinal Health
21 production, Bates labeled
22 CAH_MDL2804_00865762 and 86574.
23     MS. McCLURE: I need just a
24 moment to review this, please.

Page 288

1     I just want to clarify for
2 the record. So, Sterling, your
3 position, and I'm -- I'm not
4 saying it's correct or incorrect.
5 I'm just trying to make sure I
6 understand your position.
7     Your position is you did not
8 have to --
9     MR. PIFKO: The order says
10 if you're -- if you're aware of
11 the information in the document,
12 then you don't have to show it at
13 the time. You're already --
14 you're already a covered person
15 who is allowed to see the document
16 if you're a recipient or a
17 participant in the document. That
18 provision only applies if you're
19 not a covered person.
20     MS. McCLURE: Thank you for
21 the explanation.
22     MR. PIFKO: No problem.
23     MS. McCLURE: And the
24 interruption.

Page 289

1     But -- and you're talking
2 about the currently in effect
3 protective order for this case has
4 that exception in it?
5     MR. PIFKO: Yes.
6     MS. McCLURE: And is there
7 someone here from Cardinal?
8     MS. PETERSEN: Yes. Miranda
9 Petersen.
10     MS. McCLURE: I just want to
11 make sure that there's no dispute
12 about their ability to use this
13 document.
14     MS. PETERSEN: I haven't
15 seen the document.
16 BY MR. PIFKO:
17     Q.   Exhibit 5 is an e-mail from
18 you --
19     A.   Mm-hmm.
20     Q.   -- in response to a Cardinal
21 Health press release where Cardinal
22 announces that it got an injunction
23 against -- or a restraining order that
24 allowed them to resume shipments at their

Page 290

1 Lakeland facility despite the DEA having
2 suspended their registration. Do you see
3 that?
4     A.   Mm-hmm, yes.
5     Q.   And you write to Steve
6 Reardon and Michael Mone and say "Nice
7 work!" Agreed?
8     A.   Agreed.
9     Q.   Why did you say that to
10 them?
11     A.   Well, because I've known
12 both of those guys personally for a long
13 time. I was just congratulating them on
14 successfully getting the restraining
15 order.
16     Q.   You were pleased that they
17 got a court to allow them to overrule a
18 DEA decision to suspend their
19 registration?
20     A.   Well, I would think --
21     MS. McCLURE: Object to the
22     form. You can answer.
23     THE WITNESS: I would think
24     maybe DEA has made some mistake or

Page 291

1     a judge wouldn't have put a
2     restraining order in place. So I
3     think that they -- you know, they
4     should be able to continue doing
5     business.
6 BY MR. PIFKO:
7     Q.   You were pleased that they
8 pointed out some mistake the DEA had
9 made?
10     MS. McCLURE: Objection to
11     the form.
12     THE WITNESS: No, I'm just
13     pleased -- I'm just pleased for my
14     people that I knew for a long time
15     personally. I was just pleased
16     for them that they were able to
17     get some success.
18 BY MR. PIFKO:
19     Q.   And who are Steve Reardon
20 and Michael Mone?
21     A.   Well, Steve Reardon and
22 Michael Mone work for Cardinal Health.
23 Steve has since retired. Known him for
24 probably 20 years or so.

Page 292

1     Q.   What do they do at Cardinal
2 Health?
3     A.   Steve doesn't do anything
4 there. He's retired.
5     Q.   At the time you knew them or
6 at that time.
7     A.   He was my counterpart for
8 the most part. Regulatory. I don't know
9 what his exact title was.
10     Q.   You were friendly with them?
11     MS. McCLURE: Objection to
12     the form.
13     THE WITNESS: Not so much
14     personal friends, but just -- just
15     associates, you know, that we have
16     know -- known each other for a
17     long time.
18 BY MR. PIFKO:
19     Q.   And you interacted with them
20 a lot in the course of your dealings?
21     MS. McCLURE: Objection to
22     form.
23     THE WITNESS: Not a lot, no.
24 BY MR. PIFKO:

Page 293

1     Q.   Well --
2     MS. McCLURE: We've been
3     going about an hour and a half, so
4     when you get a moment.
5     THE WITNESS: Yeah, I -- I
6     need a potty break myself.
7     MR. PIFKO: We are in the
8     middle of this question. So let
9     me just ask a question.
10 BY MR. PIFKO:
11     Q.   You said they were people
12 that you knew for a long time personally.
13 They were personal friends
14 of yours?
15     A.   Not --
16     MS. McCLURE: Objection to
17     form. Asked and answered.
18     THE WITNESS: I think I
19     answered that.
20 BY MR. PIFKO:
21     Q.   I'm asking you again.
22     A.   I don't know how you define
23 personal friend versus personal versus
24 friendly business associate. But I have

Page 294

1 known -- gotten to know them for -- over
2 the years, as -- as members of regulatory
3 affairs committee and meeting -- seeing
4 them in meetings and things like that.
5 But no, we don't go take family vacations
6 together.
7        MR. PIFKO:  Okay.  Thank
8 you.  We can take a break.
9        MS. McCLURE:  Thank you.
10        THE VIDEOGRAPHER:  We are
11 going on break.  The time is
12 3:00 p.m.
13        (Short break.)
14        THE VIDEOGRAPHER:  We are
15 going back on the record.
16 Beginning of Media File Number 4.
17 The time is 3:18.
18 BY MR. PIFKO:
19    Q.   Do you know what the -- the
20 outcome of the 2012 suspension order with
21 Cardinal Health was that you referred to
22 here in these exhibits?
23    A.   I don't remember distinctly,
24 no.

Page 295

1    Q.   Do you know if they paid a
2 fine in connection with that?
3    A.   I don't remember.
4    Q.   So let's turn to Exhibit 3,
5 the industry compliance guidelines?
6    A.   Okay.
7    Q.   For the record, Bates
8 labeled ABDCMDL00295009 through 5024.
9        So these are -- have you
10 seen these before?
11    A.   I'm sorry?
12    Q.   Exhibit 3, the final
13 guidelines published in 2008.  Have you
14 seen them before?
15    A.   I believe I have.  Yes.
16    Q.   These are the best practices
17 you were talking about in -- in Exhibit 4
18 developed at the -- I'm quoting, Chris'
19 e-mail to you, the best practices that
20 HDMA ultimately sent to DEA, and that you
21 met with Cardinal and McKesson and DC to
22 discuss this, correct?
23    A.   No.  Where did you get
24 meeting Cardinal?  Oh, you're talking

Page 296

1 about --
2    Q.   Exhibit --
3    A.   Developing the guidelines.
4    Q.   Yes.
5    A.   Yes, and it seems like they
6 did a revision at some point.  But I
7 don't remember when that was.
8    Q.   Okay.  Yeah.  I think there
9 was a later version in 2012 or something.
10    A.   Maybe a later revision --
11 okay.
12    Q.   Says that every time
13 Cardinal gets a DEA enforcement action.
14        I want to focus your
15 attention to ABDCMDL 295015.
16    A.   Which would be like Page 7
17 of 16?
18    Q.   Right, right.
19    A.   Okay.
20    Q.   We can use whichever page
21 you prefer.
22    A.   Okay.  All right.
23    Q.   All right.  You see under a
24 heading Monitoring For Suspicious Orders.

Page 297

1 Heading 2.  Do you see that?
2    A.   I see that.
3    Q.   Okay.  System design.  "It
4 is recommended that a distributor develop
5 an electronic system with accompanying
6 written standard operating procedures to
7 meet the DEA's requirement in
8 Section 1301.74(b), that a distributor
9 'design and operate a system to disclose
10 to the registrant suspicious orders of
11 controlled substances.'"
12        Do you see that?
13    A.   Mm-hmm.  Excuse me.
14    Q.   Do you agree with that?
15        MS. McCLURE:  Objection to
16 the form.
17        THE WITNESS:  Give me a
18 second to read it again.
19 BY MR. PIFKO:
20    Q.   No problem.
21    A.   I believe that's -- I
22 believe that's accurate.
23    Q.   Let's go to the next page
24 here.

Page 298

1    A.   Okay.
2    Q.   Heading C, "Develop
3  Thresholds to Identify Orders of
4  Interest."
5        Do you see that?
6    A.   Yes, I do.



Page 299

11    Q.   What's your current position
12  at AmerisourceBergen?
13    A.   Senior director, corporate
14  security and regulatory affairs.
15    Q.   You still have
16  responsibilities for diversion under your
17  purview?
18    A.   No.
19    Q.   When did you switch into a
20  role where you no longer had diversion
21  control function and --
22    A.   When -- I'm sorry.  When
23  David May was hired.
24    Q.   Okay.  And that was in 2014?

Page 300

1    A.   I believe so.  I'm not sure
2  the exact date.
3    Q.   Up until that time, you had
4  responsibilities that included diversion
5  control, correct?
6    A.   On and off during the
7  time -- during the time period.
8    Q.   You said in 2007 you were
9  the top person that had diversion control
10  responsibilities, correct?
11    A.   That's correct.  Yes.
12    Q.   At some point someone came
13  in and you didn't have diversion control
14  responsibilities?
15    A.   That's correct.
16    Q.   Who was that?
17    A.   Well, when Ed Hazewski was
18  put in charge of the diversion control
19  program.  He reported directly to Chris.
20    Q.   Do you know when that was?
21    A.   Sometime in 2008, or '9, I
22  believe.
23    Q.   And at that time you had no
24  responsibilities for diversion control

Page 301

1  issues?
2    A.   No direct -- no direct
3  responsibilities, no.
4    Q.   But then you reassumed them
5  at some point?
6    A.   At some point, Chris had Ed
7  start reporting to me.
8    Q.   And when was that?
9    A.   I think it was around 2012.
10    Q.   Did Chris tell you why he
11  wanted Ed to start reporting to you
12  instead of him?
13    A.   No, he didn't or I don't
14  remember why.
15    Q.   Did Ed tell you why?
16    A.   I don't think he did.  I
17  don't recall why.
18    Q.   So from 2012, at that point
19  in 2012 to 2014, your involvement with
20  diversion control was overseeing Ed?
21    A.   Right.
22    Q.   Anything else?
23    A.   That's correct.  That was
24  pretty much it.  He just reported up to

Page 302

1 me. But he ran the program.

[REDACTED]

11  Q. If you look on this -- Page
12 8 of this document.
13  A. Okay. I'm there.
14  Q. It's talking about
15 thresholds for identifying orders of
16 interest. Do you see that?
17  A. I do.
18  Q. First paragraph.
19  Then, second paragraph says,
20 "When evaluating thresholds, orders of
21 unusual size and unusual frequency can be
22 used to signal that an order may need
23 further review."
24  Do you see that?

Page 303

1  A. Yes, I do.
2  Q. Do you have an understanding
3 about what the criteria are that make
4 something an order of interest?
5  MS. McCLURE: Objection to
6 the form.
7  THE WITNESS: In general, if
8 an order hits one of those
9 thresholds, that would make it an
10 order of interest.
11 BY MR. PIFKO:
12  Q. One of those thresholds
13 being, if it's an unusual size or unusual
14 frequency?
15  MS. McCLURE: Objection to
16 the form.
17  THE WITNESS: I think it's
18 related to the threshold that's --
19 again, this is HDA -- HDMA's
20 created guidelines. I'm not sure
21 what they meant.
22  But my thinking is when it
23 hits a threshold, it becomes an
24 order of interest.

Page 304

1 BY MR. PIFKO:
2  Q. But this says when
3 evaluating threshold, orders of unusual
4 size and unusual frequency can be used to
5 signal that an order may need further
6 review. Do you see that?
7  MS. McCLURE: Objection to
8 the form.
9  THE WITNESS: I can't really
10 interpret what HDMA put together.
11 It's not -- it's not my document.
12 BY MR. PIFKO:
13  Q. Okay. Well, let's talk
14 about you. You said that you are
15 familiar that Amerisource has used the
16 term "order of interest," correct?
17  A. I'm not sure if it's
18 officially. It's just "order of
19 interest" is an easy way to say it's in
20 review. Just another way of saying it's
21 in review.
22  Q. What criteria does
23 AmerisourceBergen use to determine
24 whether an order is an order of interest?

Page 305

1  MS. McCLURE: Objection.
2 Asked and answered.
3  THE WITNESS: Which time
4 period?
5  MS. McCLURE: You can
6 answer.
7 BY MR. PIFKO:
8  Q. At any time period.
9  A. I can't tell -- I can't
10 speak to how it's determined today.
11  During this time period, if
12 an order hit the threshold, it was -- it
13 was considered to be in review or an
14 order of interest.
15  Q. And an order hitting the
16 threshold is an order that exceeds what
17 was the three times the average, right?
18  MS. McCLURE: Objection to
19 the form.
20  You can answer.
21  THE WITNESS: Excuse me.
22  It would -- it would be an
23 order that exceeded the threshold
24 for that customer for whatever

Page 306

1  peer group they are in and size
2  they are.
3  BY MR. PIFKO:
4      Q.   And that's an order of
5  unusual size, because it exceeds the
6  average, correct?
7          MS. McCLURE:  Objection to
8      the form.
9          THE WITNESS:  Those
10     thresholds were -- ask the
11     question again.
12  BY MR. PIFKO:
13     Q.   An order that exceeds its
14  threshold is an order of unusual size.
15  That's the point of the threshold.  It's
16  an average, and you're saying it's three
17  times more, correct?
18     A.   It could be.  It could be.
19         MS. McCLURE:  Objection to
20     the form.
21  BY MR. PIFKO:
22     Q.   Do you have an understanding
23  that AmerisourceBergen under any policies
24  that AmerisourceBergen would halt the

Page 307

1  shipment of an order of interest?
2      A.   Would we halt the shipment
3  of --
4      Q.   You don't ship an order
5  because it's an order of interest?
6      A.   If it's an order of
7  interest, it's in review and during this
8  period it would be held until that order
9  is adjudicated.
10     Q.   What I'm trying to
11  understand is, is it -- at any time was
12  it AmerisourceBergen's policy that it
13  could refuse or reject a shipment that
14  was categorized as an order of interest?
15         MS. McCLURE:  Objection to
16     the form.
17         THE WITNESS:  I'm not sure.
18     I can't answer that.
19  BY MR. PIFKO:
20     Q.   You don't know either way?
21     A.   I don't know either way.
22     Q.   In AmerisourceBergen's
23  contracts with its customers, does it
24  have a right to halt the shipment of an

Page 308

1  order that is suspicious?
2      A.   I'm not familiar with what's
3  in the customers' contracts.
4      Q.   Have you ever discussed that
5  with anybody?
6      A.   As far as what would be in
7  the contract?
8      Q.   And whether you're allowed
9  to halt the shipment of a suspicious
10  order.
11     A.   Well, that's what we did.
12  If we reported an order as suspicious, it
13  was halted.
14     Q.   Have you ever heard pushback
15  from a customer, you're not allowed to do
16  that?
17     A.   No.  I can't remember ever
18  having a customer telling me that we're
19  not allowed to do that.
20     Q.   How about if an order is in
21  review?  Have you ever heard a customer
22  complain that an order is in review and
23  they're frustrated it's not being shipped
24  while it's in review?

Page 309

1      A.   Yes.
2      Q.   Yes?
3      A.   Yes.  Customers complain
4  frequently.
5      Q.   What do you tell them?
6      A.   It doesn't --
7          MS. McCLURE:  Objection to
8      the form.
9          THE WITNESS:  It depends on
10     the circumstance.
11  BY MR. PIFKO:
12     Q.   Does the company have a
13  policy about communicating to customers
14  when their orders are held in review?
15         MS. McCLURE:  Objection to
16     the form.
17         THE WITNESS:  I don't know
18     what the policy is.
19  BY MR. PIFKO:
20     Q.   Do you think they have one?
21         MS. McCLURE:  Objection to
22     the form.
23         THE WITNESS:  I don't know.
24  BY MR. PIFKO:

Page 310

1    Q.   You're not familiar with it?
2    A.   I don't know.
3    Q.   Do you know if there's any
4  training to employees about whether --
5  the extent to which they're allowed to
6  communicate with customers when their
7  orders are held in review?
8        MS. McCLURE:  Objection to
9    the form.
10       THE WITNESS:  Don't know.
11 BY MR. PIFKO:
12   Q.   Looking at Page 9.
13   A.   Okay.
14   Q.   Under Heading 3.
15   A.   Okay.
16   Q.   "Suspend/stop an order of
17 interest shipment."
18       Do you see that?
19   A.   Yeah, I see it.
20   Q.   Do you recall discussing the
21 concept of orders of interest when you
22 met in D.C. with the HDA and the other
23 members of industry to discuss these
24 guidelines?

Page 311

1    A.   No, I don't remember
2  specifically discussing that.
3    Q.   What do you remember
4  discussing?
5    A.   I don't remember any
6  specifics about the meeting.  I just
7  remember that we were discussing HDMA
8  putting those guidelines together.
9    Q.   Did you discuss what
10 AmerisourceBergen's OMP practices were at
11 that meeting?
12   A.   In general, yes, we did.
13   Q.   Did the other members --
14 well, let me just -- did the
15 representatives from Cardinal explain
16 what their system was at that meeting?
17   A.   I don't recall that they
18 did.
19   Q.   How about McKesson.  Did
20 anyone from McKesson describe their
21 suspicious order monitoring program at
22 that meeting?
23   A.   No, I don't recall that they
24 did.

Page 312

1    Q.   You don't recall either way?
2    A.   I don't recall anyone else
3  discussing their programs other than us.
4    Q.   But you know you did?
5    A.   Yeah.
6    Q.   And that was in their
7  presence?
8    A.   If they were there it was in
9  their presence, yes.
10   Q.   When you attend an HDA
11 meeting, is there a sign-in sheet?
12       MS. McCLURE:  Objection to
13   the form.
14       THE WITNESS:  No.  Typically
15   not, no.
16 BY MR. PIFKO:
17   Q.   Someone circulate meeting
18 minutes after the meeting?
19   A.   I believe they do.
20   Q.   Does it list the attendees?
21   A.   Which type of -- let me ask
22 you a question.  Which type of HDA
23 meeting are we talking about?
24   Q.   A regulatory --

Page 313

1    A.   A conference or --
2    Q.   A regulatory affairs
3  meeting.
4        MS. McCLURE:  Objection to
5    the form.
6        THE WITNESS:  They are
7    generally conference calls and
8    they take a rollcall and really
9    all they keep up with is how many
10   companies, which companies are on
11   the call, not so much which
12   individuals.
13 BY MR. PIFKO:
14   Q.   And they --
15   A.   From what I can tell the way
16 they take rollcall.
17   Q.   They circulate meeting
18 minutes after those calls?
19   A.   Not normally, no.
20   Q.   And then from time to time
21 there's in-person meetings?
22   A.   Rarely for regulatory
23 affairs committee.
24   Q.   Do they circulate meeting

Page 314

1  minutes of those?
2      A.   Not normally.
3      Q.   But they have?
4      A.   I'm trying to remember.  I
5  don't think they do.  I don't remember
6  ever getting minutes from a regulatory
7  affairs committee meeting.
8      Q.   How about from this industry
9  compliance discussion.  Do you know if
10 there was any notes or anything
11 circulated to anybody who participated
12 afterwards?
13      MS. McCLURE:  Objection to
14     form.
15      THE WITNESS:  No.  Not that
16     I recall.
17 BY MR. PIFKO:
18      Q.   Did you serve on any other
19 committees besides the regulatory affairs
20 committee?
21      A.   As far as serving, no.  I
22 participated in other committees, but
23 just to listen in on their calls.
24      Q.   What other committees?

Page 315

1      A.   Like federal government
2  affairs.  State government affairs.
3      Q.   Any others?
4      A.   That's it that I can think
5  of.
6      Q.   Have you attended meetings
7  in person for other committees?
8      A.   I filled in on a state
9  government affairs in-person meeting for
10 our state government affairs person
11 because she couldn't make the meeting and
12 she asked me to fill in for her.
13      Q.   Who was that?
14      A.   Her name was Julie Eddy,
15 E-D-D-Y.
16      Q.   Do you recall there being
17 any sort of final outcome when you
18 attended this meeting in D.C. concerning
19 the industry compliance guidelines?
20      MS. McCLURE:  Objection to
21     the form.
22      THE WITNESS:  I don't -- as
23     far as the outcome?  I -- other
24     than them creating the guidelines.

Page 316

1  BY MR. PIFKO:
2      Q.   Did -- did everybody review
3  drafts of the guidelines and ultimately
4  weigh in on them?
5      A.   I can't say.
6      MS. McCLURE:  Objection to
7     the form.
8      THE WITNESS:  I can't say
9     for sure.
10 BY MR. PIFKO:
11      Q.   Did you take any notes of
12 your meeting --
13      A.   No.
14      Q.   -- concerning the
15 guidelines?
16      A.   No.
17      Q.   Do you know if Mr. Zimmerman
18 did?
19      MS. McCLURE:  Objection to
20     the form.
21      THE WITNESS:  Don't know.
22 BY MR. PIFKO:
23      Q.   Did the two of you discuss
24 the guidelines after the meeting?

Page 317

1      A.   Well, the guidelines weren't
2  present at the meeting.
3      Q.   The idea of the guidelines?
4      A.   Well, we discussed it before
5  and after the meeting.  We knew what the
6  purpose of the meeting was.
7      Q.   What did you think about the
8  idea of having industry compliance
9  guidelines?
10      MS. McCLURE:  Objection to
11     the form.
12      THE WITNESS:  What did I
13     think about the idea?  I think
14     it's good for the rest of the
15     industry to have programs.
16 BY MR. PIFKO:
17      Q.   What did you and
18 Mr. Zimmerman discuss about the
19 guidelines after the meeting?
20      A.   Nothing specifically.
21      Q.   How about before?
22      A.   Just whether or not they
23 put -- you know, follow what -- what we
24 had explained we did.

Page 318

1    Q.   You wanted the guidelines to
2  be consistent with what you were doing?
3        MS. McCLURE:  Objection to
4    the form.
5        THE WITNESS:  No, I'm not
6    saying that.  I just think that
7    DEA asked us to present our
8    program twice to the industry
9    conference.  So we -- we kind of
10   made the assumption that the rest
11   of the industry wanted to try to
12   follow our guidelines as closely
13   as possible.
14 BY MR. PIFKO:
15   Q.   Do you believe that they do?
16   A.   Don't know.  I don't know
17 what they do.
18   Q.   How about the HDMA
19 guidelines, do you feel like they follow
20 your policies?
21   A.   I think it's modeled after
22 them.  I'm not sure it exactly follows
23 it.  It's been a long time since I've
24 gone through it and read it.

Page 319

1    Q.   I mentioned earlier about
2  the idea of communicating with customers
3  about a canceled order.
4    A.   Mm-hmm.
5    Q.   Is there a specific person
6  whose job it is to communicate with
7  customers about canceled order?
8        MS. McCLURE:  Objection to
9    the form.
10       THE WITNESS:  From our
11   department?
12 BY MR. PIFKO:
13   Q.   Anyone in the company --
14       MS. McCLURE:  Objection.
15 BY MR. PIFKO:
16   Q.   -- that you're aware of.
17   A.   I wouldn't know who they
18 would talk to.
19   Q.   Are the sales associates the
20 first line of communications with
21 customers?
22   A.   Probably customer care.
23 Or -- or the sales associates.
24   Q.   What customer care, is that

Page 320

1  like a call-in center?
2    A.   It's more like -- yeah, like
3  customer service.  They would take calls
4  from customers.
5    Q.   Do you know if they are
6  trained on how to field an inquiry from a
7  customer about an order that's held?
8    A.   They may have been, but I
9  don't know any specifics.
10   Q.   Let's talk about the -- the
11 role of a sales associate in preventing
12 diversion.
13   A.   Okay.
14   Q.   Do sales associates have any
15 job responsibilities in preventing
16 diversion?  And let me -- let me put a
17 time frame on that to make it a better
18 question.
19       Prior to the new OMP system
20   that you put in place in 2007, did sales
21   associates have any role in assisting the
22   company in preventing diversion?
23       MS. McCLURE:  Objection to
24   the form.

Page 321

1        THE WITNESS:  The sales
2    associates are -- are required to
3    comply with all the laws and
4    regulations.  And they were asked
5    prior to the suspension to -- to
6    do site visits, due diligence
7    visits of customers.
8  BY MR. PIFKO:
9    Q.   What were they supposed to
10 look for at these visits?
11   A.   They had a questionnaire
12 that they would fill out with the
13 customers and there were certain things
14 that they were told to look for, like,
15 you know, FedEx, or boxes stacked up in
16 the back, and there were other signs of
17 internet pharmacy that we talked about
18 briefly.
19   Q.   Anything else?
20       MS. McCLURE:  Objection to
21   the form.
22       THE WITNESS:  I can't think
23   of anything right offhand.
24 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1 Q. Are you familiar with the
2 idea of red flags of diversion? Have you
3 ever heard that term before?
4 A. Yes, yes.
5 Q. What about things like a
6 pharmacy that only takes cash, is that a
7 red flag of diversion?
8 A. Yes. That's a red flag.
9 Q. Are sales associates
10 supposed to look out for that?
11 A. I believe so.
12 Q. In the pre-2007 time period,
13 were they trained to look out for that?
14 A. I can't remember when those
15 red flag -- red flags came out as far as
16 when we started using those to train
17 salespeople. I don't remember the time
18 frame, but they -- at some point they
19 were trained that that was a red flag to
20 look for.
21 Q. You don't know if they were
22 trained for that prior to 2007?
23 A. No.
24 Q. Do you know if sales

Page 323

1 associates were paid on commission based
2 on sales that the customers would make or
3 purchase?
4 A. My --
5 MS. McCLURE: Objection to
6 the form.
7 THE WITNESS: My
8 understanding is they are not paid
9 on commission anymore. Not for
10 years.
11 BY MR. PIFKO:
12 Q. All right. How about in
13 2007 -- prior to 2007, before?
14 A. Even then. It's been years
15 since they were paid commission, from
16 what I understand.
17 Q. Do you have any kind of
18 sense of whether their performance was
19 evaluated based on increasing sales or
20 meeting sales targets?
21 A. I have no knowledge of how
22 their -- what their compensation is based
23 on.
24 Q. You don't know either way?

Page 324

1 A. I'm sorry?
2 Q. You don't know either way?
3 A. No, I don't.
4 Q. As someone who is the
5 highest person in the company in
6 diversion control for many years, do you
7 think it's appropriate for salespeople to
8 have performance tied to sales --
9 MS. McCLURE: Objection.
10 BY MR. PIFKO:
11 Q. -- of controlled substances?
12 MS. McCLURE: Objection to
13 the form of the question.
14 THE WITNESS: Okay. That's
15 not my area of responsibilities as
16 far as determining how they are
17 paid and compensated.
18 As long as -- as long as
19 they comply with the laws and
20 regulations. That's not my role.
21 BY MR. PIFKO:
22 Q. I'm not asking if it's your
23 role. I'm asking -- you had a role. You
24 were the top person responsible for

Page 325

1 diversion control at the company for many
2 years.
3 I'm asking you if, in your
4 experience, you think it's appropriate to
5 have someone have their -- their
6 performance of their job measured by how
7 much controlled substances they sell?
8 MS. McCLURE: Objection to
9 the form of the question.
10 THE WITNESS: I don't think
11 that's the case with our
12 salespeople, that I know of.
13 BY MR. PIFKO:
14 Q. Do you think it's
15 appropriate?
16 MS. McCLURE: Objection to
17 the form of the question.
18 THE WITNESS: I guess it
19 depends on what context you're
20 asking. Just generally to sell
21 more controls, I wouldn't -- I
22 would not think that would be
23 appropriate.
24 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1    Q.   Why not?
2    A.   I'm not -- I'm not sure that
3 that's, you know -- I wouldn't think
4 that's a good practice, especially once
5 controls are a very small percentage of
6 what we distribute.
7    Q.   Why wouldn't you think
8 that's a good practice?
9    A.   To be compensated for
10 selling more controls?
11    Q.   Yeah.
12    A.   I just think it would put
13 more controls -- it would be encouraging
14 customers to buy more controls than they
15 need possibly.  I don't -- I don't know
16 why they would be.
17    Q.   Right.  And so you wouldn't
18 want any policies at the company that
19 would encourage customers to buy more
20 controls than they need, right?
21        MS. McCLURE:  Objection to
22    the form.
23        THE WITNESS:  Yeah, I
24    wouldn't want to encourage

Page 327

1    customers to buy more controls.
2 BY MR. PIFKO:
3    Q.   What about -- do you think
4 it's appropriate to encourage customers
5 to manipulate their ordering behavior to
6 circumvent the order monitoring program?
7        MS. McCLURE:  Objection to
8    the form.
9        THE WITNESS:  No, I wouldn't
10    want them to try to circumvent the
11    program at all.  I wouldn't want
12    to help them encourage it.
13 BY MR. PIFKO:
14    Q.   Would you want to guide
15 customers in any way to help them avoid
16 being the subject of regulatory activity
17 in connection with controlled substances
18 purchases?
19        MS. McCLURE:  Objection to
20    the form.
21        THE WITNESS:  Only to keep
22    them out of trouble.  Not to guide
23    them to circumvent anything.
24    Maybe to educate them on what the

Page 328

1 consequences are and what their
2 responsibilities are.
3 BY MR. PIFKO:
4    Q.   What's the difference?
5        MS. McCLURE:  Objection to
6    the form.
7        THE WITNESS:  The difference
8    in what?
9 BY MR. PIFKO:
10    Q.   Keeping them out of trouble
11 versus guiding them.
12    A.   Well, from my experience,
13 some pharmacists are fairly ignorant of
14 what their responsibilities are.  And so
15 we've tried -- you know, we've tried over
16 the years to educate them as much as we
17 could, as far as what their corresponding
18 responsibilities are.
19    Q.   You wouldn't want to tell
20 them to change their ordering practices
21 in a way that would allow them to order
22 controls without getting in trouble?
23    A.   No.
24        MS. McCLURE:  Objection to

Page 329

1    the form.
2 BY MR. PIFKO:
3    Q.   A quote here from David May,
4 I want to read to you.
5        He testified:  "I don't
6 believe our customers need to know some
7 of the proprietary information that's
8 sensitive around the program."
9        He's talking about the order
10 monitoring program.
11        "And again, the reason being
12 is, if there was a customer that wanted
13 to defeat it, we want -- to the extent
14 possible that we can prevent that from
15 happening, we want to do that."
16        MS. McCLURE:  Continuing
17    objection to putting up other
18    witness's testimony without
19    context in front of this witness.
20 BY MR. PIFKO:
21    Q.   Do you agree that you want
22 to prevent customers from being aware of
23 how the order monitoring program works so
24 that they can't defeat it?



Page 330

1 MS. McCLURE: Objection to
2 the form.
3 THE WITNESS: I -- I agree
4 with David's comments, his
5 testimony here.
6 (Document marked for
7 identification as Exhibit
8 ABDC-Mays-6.)
9 BY MR. PIFKO:
10 Q. I'm giving you what's been
11 marked as Exhibit 6 and a document that
12 was attached to it, Exhibit 7.
13 (Document marked for
14 identification as Exhibit
15 ABDC-Mays-7.)
16 BY MR. PIFKO:
17 Q. For the record, Exhibit 6 is
18 ABDCMDL00288025, and Exhibit 7 is
19 ABDCMDL00288026.
20 Take a moment to review that
21 and let me know when you're done.
22 A. Okay. I've reviewed them.
23 Q. Have you seen this document
24 before?

Page 331

1 A. I don't recall either one of
2 them. It looks like I was copied on one
3 of them.
4 Q. Who is James Rice?
5 A. I'm not sure he's still in
6 that role, manager buying groups,
7 community & specialty pharmacy.
8 Q. Do you remember discussing
9 this issue with people?
10 A. Tell me what you think the
11 issue is.
17 Do you see that?
18 MS. McCLURE: Objection to
19 form.
20 THE WITNESS: No. I -- go
21 ahead.
22 MS. McCLURE: Did you just
23 characterize this as a document
24 that was sent to customers? I

Page 332

1 could be incorrect.
2 MR. PIFKO: I didn't say
3 that.
4 BY MR. PIFKO:
5 Q. I'm also handing you --
6 A. That's what I heard you say
7 too. A memo that was sent out to
8 customers.
9 Q. I said there was a memo sent
10 out to customers.
11 A. Oh. Not one of these?
12 (Document marked for
13 identification as Exhibit
14 ABDC-Mays-8.)
15 BY MR. PIFKO:
16 Q. I've also handed you
17 Exhibit 8 which is ABC --
18 ABDCMDL00288028.
19 MS. McCLURE: Is there a
20 question pending or are you asking
21 him to --
22 BY MR. PIFKO:
23 Q. I want you to review --
24 review Exhibit 8 as well. And I meant to

Page 333

1 hand that to you originally, but I didn't
2 realize it wasn't in the pile.
3 MS. McCLURE: Okay. He
4 wants you to read 8.
5 BY MR. PIFKO:
6 Q. You've got three documents.
7 A. Okay. Okay.



Highly Confidential - Subject to Further Confidentiality Review







Page 346

Page 348

1   A.   No.  I don't remember it.
2   Q.   The first, Exhibit 9, is an
3  e-mail from Ed Hazewski to you dated
4  June 17, 2013.
5   A.   Yes, I see it.

Page 347

Page 349

8   (Document marked for
9   identification as Exhibit
10   ABDC-Mays-9.)
11  BY MR. PIFKO:
12   Q.   I'm handing you what's been
13  marked as Exhibit 9 and 10.
14   (Document marked for
15   identification as Exhibit
16   ABDC-Mays-10.)
17  BY MR. PIFKO:
18   Q.   For the record Exhibit 9 is
19  an e-mail Bates-labeled ABDCMDL00282233,
20  and Exhibit 10 is an attachment to that,
21  Bates-labeled ABDCMDL00282234.
22   A.   Okay.
23   Q.   Do you recall seeing these
24  documents?



Page 350

Page 352

Page 351

Page 353

9     Q.   Earlier you said, from your
10  experience, some pharmacists are fairly
11  ignorant of what their responsibilities
12  are.  Do you recall that?
13     A.   Mm-hmm.
14     Q.   What experience --
15     A.   I said some.  Not all.
16     Q.   What experience do you have
17  about pharmacists being ignorant of their
18  responsibilities?
19     A.   On the experience of some of
20  my visits to some pharmacies, asking
21  questions and getting the answers that I
22  got.
23     Q.   What kind of questions did
24  you ask and answers that you get that

Page 354

1 made you think they were ignorant of
2 their responsibilities?
3     A.    Just some of the statements
4 that some would make about, if the doctor
5 writes it, then I have to fill it.  You
6 know, who am I to question the doctor,
7 things like that.  They have a -- it's in
8 the regulations, they have a
9 corresponding responsibility.
10     Q.    They can question that --
11 the doctor?
12     A.    Absolutely.
13     Q.    They don't have to fill
14 every prescription that's presented to
15 them?
16     A.    No, they do not.
17     Q.    Did you do anything to
18 educate customers about those -- those
19 regulations?
20     A.    Yes.  During -- during those
21 visits to certain pharmacies, and also we
22 did some training at what they call
23 cluster meetings.
24     Q.    What's a cluster meeting?

Page 355

1     A.    Its customers are -- it's a
2 group of retail pharmacy customers that
3 are part of one of the programs, one of
4 our corporate programs.  And they would
5 have what they call cluster meetings, and
6 they would discuss a lot of things and
7 maybe talk about programs and things like
8 that.  And we were -- I know I was
9 invited to present to some customers on a
10 couple of occasions on the whole
11 diversion control issue and try to
12 educate them on their responsibilities.
13     Q.    Do you remember any specific
14 pharmacies who fit in this category?
15     A.    No.  Most of the ones I did
16 were in Florida.  I think a couple
17 that -- the couple that I did were in
18 Florida.
19     Q.    Did you ever witness any of
20 these pharmacies filling questionable
21 prescriptions?
22     A.    No.  No.
23     Q.    Did you ever report any of
24 them to the DEA?

Page 356

1     MS. McCLURE:  Objection to
2 the form.
3     THE WITNESS:  Report the
4 actual pharmacy to the DEA?  At
5 one time we reported pharmacies to
6 the DEA that we had determined
7 that we were going to stop doing
8 business with, that we were going
9 to cut off.  We would report those
10 to DEA.
11 BY MR. PIFKO:
12     Q.    When was that?
13     A.    There was a period in, I
14 think it was between -- after 2007, DEA
15 had actually encouraged different members
16 of the industry to report to DEA
17 customers that they had cut off.  And the
18 DEA would send an e-mail out to the other
19 distributors to tell them that this
20 customer had been cut off by another
21 distributor.
22     Q.    And what's the idea there?
23     A.    I think that got stopped at
24 some point.

Page 357

1     Q.    Do you have an understanding
2 of why they were doing that?
3     A.    Well, I think -- I think it
4 probably is some people at DEA don't have
5 a real good understanding of antitrust
6 laws and things like that.  And I think
7 they were trying to, you know, kind of
8 blacklist pharmacies to keep other
9 distributors -- because what was
10 happening, one distributor would cut a
11 pharmacy off, they would just open up an
12 account with another one.  I think DEA
13 was trying to -- I think DEA was trying
14 to prevent that as much as they could.
15     Q.    Do you recall the names of
16 any pharmacies that you reported to the
17 DEA?
18     MS. McCLURE:  Objection to
19 the form.
20     THE WITNESS:  There's been
21 several, yeah, I just don't know
22 specifics.  We had a couple.  I
23 remember a few.
24     I'm going to grab a glass of

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1　water while you're doing that.
2　　　　MR. PIFKO:　Do you want to
3　take a quick -- we don't have to
4　all leave the room.　We can go off
5　the record for five minutes.
6　　　　MS. McCLURE:　Yeah, let's
7　take a five-minute.
8　　　　THE VIDEOGRAPHER:　Going off
9　the record.　The time is 4:27.
10　　　　(Short break.)
11　　　　THE VIDEOGRAPHER:　Back on
12　the record.　Beginning Media File
13　Number 5.　The time is 4:45.
14　BY MR. PIFKO:
15　　　Q.　I'm handing you what's
16　marked as Exhibit 12.
17　　　　(Document marked for
18　　　　identification as Exhibit
19　　　　ABDC-Mays-12.)
20　BY MR. PIFKO:
21　　　Q.　Document Bates-labeled --
22　　　　MS. McCLURE:　What was 11?
23　BY MR. PIFKO:
24　　　Q.　ABDCMDL00275491-2.

Page 359

1　　　　MS. McCLURE:　Did we skip 11
2　or am I --
3　　　　MR. PIFKO:　No, it's
4　hardly --
5　　　　MS. McCLURE:　No, I'm
6　just --
7　　　　THE WITNESS:　There's not an
8　11.　Maybe that's the one that you
9　sent to be printed.　Is that going
10　to be 11?
11　　　　MR. PIFKO:　I don't know
12　where 11's sticker is.　It doesn't
13　matter.　This one's 12.　We'll
14　figure it out.
15　　　　MS. McCLURE:　Okay.　Well,
16　for the record, I don't believe
17　there was an 11.　So let's go to
18　12.
19　BY MR. PIFKO:
20　　　Q.　It's an e-mail from you to
21　Chris Zimmerman, forwarding something
22　with the subject, "More West Virginia
23　counties target distributors in opioid
24　crisis; related media likely to get

Page 360

1　congressional attention."　It's dated
2　March 14, 2017.
3　　　　Take a moment to review it
4　and let me know when you're done.
5　　　A.　Okay.
6　　　Q.　So this is an e-mail
7　describing some lawsuits about the opioid
8　crisis.　And you reply:　"I guess if all
9　the distributors stopped shipping
10　controlled substances into West Virginia
11　the problem would be solved, correct?"
12　　　　Do you see that?
13　　　A.　Yeah, I see it.
14　　　Q.　Do you agree that if
15　distributors stop selling controlled
16　substances into West Virginia, the opioid
17　crisis there would have been stopped?
18　　　　MS. McCLURE:　Objection.
19　　　　THE WITNESS:　No.
20　BY MR. PIFKO:
21　　　Q.　What did you mean by this?
22　　　A.　It was just a snarky
23　comment.
24　　　Q.　Do you think the opioid

Page 361

1　crisis was a joke?
2　　　A.　No, I don't at all.
3　　　Q.　Apparently you think it's
4　worth making snarky comments about with
5　your colleagues?
6　　　A.　No.
7　　　Q.　You did here?
8　　　A.　Yeah, it was, yeah.　It
9　was -- it was an inappropriate snarky
10　comment out of frustration that we're
11　getting sued by all these people.　Yeah.
12　　　Q.　Why were you frustrated --
13　　　A.　By distributing
14　pharmaceuticals into the state.
15　　　Q.　Why were you frustrated?
16　　　A.　Because I don't think we are
17　guilty of anything.　It's a little
18　frustrating to be getting sued by all
19　these counties --
20　　　Q.　Do you think that --
21　　　A.　-- and cities and so forth,
22　and -- and we haven't done anything wrong
23　in my opinion.
24　　　Q.　Do you think that

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1  AmerisourceBergen as a distributor had
2  any role in the opioid crisis?
3          MS. McCLURE:  Objection to
4      the form.
5      THE WITNESS:  No.
6  BY MR. PIFKO:
7      Q.   Did you sell pills into West
8  Virginia?
9      A.   We distribute to pharmacies
10  and customers in West Virginia, yes.
11      Q.   You don't think any of the
12  sales that you made contributed to the
13  epidemic?
14      A.   I don't know if they did or
15  not.
16      Q.   Between you and
17  AmerisourceBergen, are you -- and
18  Cardinal Health and McKesson control
19  about 90 percent of the market, you don't
20  think any of you guys together had a role
21  in selling the pills that created this
22  crisis?
23          MS. McCLURE:  Objection to
24      the form.  I'm going to ask you if

Page 363

1      you want the witness to be excused
2      or if you want me to interpose my
3      objection on the record with the
4      witness present.
5      MR. PIFKO:  You can make a
6      valid objection.  You don't need
7      the witness to leave.
8          MS. McCLURE:  Sure.  My
9      valid objection is that pursuant
10      to Special Master Cohen's ruling
11      on the legal interpretation and
12      conclusion about whether --
13      when -- when witnesses are asked
14      questions about whether, for
15      example here AmerisourceBergen,
16      caused and/or contributed to the
17      opioid epidemic, the Special
18      Master ruled that --
19      MR. PIFKO:  I think it's
20      different in the context of this
21      e-mail.
22          MS. McCLURE:  I'm not --
23      wasn't finished talking.  You can
24      talk after I talk.

Page 364

1          MR. PIFKO:  I understand
2      your objection.  I've read the --
3      I've read the direction.
4          MS. McCLURE:  No, I'm going
5      to make it for the record.  Not
6      just for you, Mark.
7          So Special Master ruled that
8      such a topic was inappropriate for
9      discussion in the 30(b)(6)
10      context.
11          I also note that in the fact
12      witness context, this witness has
13      not been designated as a 30(b)(6)
14      witness.  And so in a fact witness
15      context, it's even more
16      inappropriate to ask witnesses
17      whether they believe that there
18      was any role played or whether any
19      company or defendant contributed
20      to the crisis.
21          So I -- we object to this
22      continuing line of questioning.
23  BY MR. PIFKO:
24      Q.   Same question --

Page 365

1      A.   Do you want to repeat the
2  question?
3      Q.   Yeah.  I asked if you along
4  with McKesson and Cardinal Health
5  controlled 90 percent of the market, you
6  don't think that you've had any
7  contribution to the crisis in West
8  Virginia?
9      A.   I don't think --
10          MS. McCLURE:  Again,
11      objection to this continuing line
12      of questioning under the Special
13      Master's prior ruling.
14          THE WITNESS:  Do you want me
15      to answer?
16  BY MR. PIFKO:
17      Q.   Yes.
18      A.   I don't think so.
19      Q.   You said you didn't do
20  anything wrong.  Do you recall saying
21  that?
22      A.   I'm sorry?
23      Q.   You said we didn't do
24  anything wrong.  Do you recall saying

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1 that?
2     A.   I just said that, yes.
3     Q.   Yeah.  What about the DEA
4 enforcement action.  Do you think you had
5 bad conduct that led to that?
6     A.   The enforcement action --
7         MS. McCLURE:  Objection to
8     the form of the question.
9 BY MR. PIFKO:
10     Q.   The one that we've been
11 talking about, the 2007 one.
12     A.   In 2007?  I don't believe we
13 admitted to any -- any wrongdoing or any
14 violations.
15     Q.   So you don't think you did
16 anything wrong.  We're talking about
17 whether the company --
18     A.   I don't think we did
19 anything wrong, no.
20     Q.   You think the DEA was out to
21 lunch when they went out to get you?
22         MS. McCLURE:  Objection to
23     the form of the question.
24         THE WITNESS:  I'm not -- no,

Page 367

1     I'm not -- I don't say -- I am not
2     saying that.
3 BY MR. PIFKO:
4     Q.   Well, what are you saying?
5 Why would they go after you if you didn't
6 do anything wrong?
7     A.   Because in their opinion
8 they thought we did.
9     Q.   And you think they are
10 wrong?
11     A.   I think they are wrong, yes.
12     Q.   Why do you think they are
13 wrong?
14     A.   Because we comply with the
15 regulations.
16     Q.   Did your company pay money
17 to the West Virginia Attorney General in
18 connection with the lawsuit they brought
19 against you?
20     A.   I believe we did.
21     Q.   Do you think you did
22 anything wrong there?
23     A.   No.
24         MR. PIFKO:  The document I'm

Page 368

1 waiting to be printed just
2 arrived.
3     I found 11.
4     MS. McCLURE:  Magic.
5     (Document marked for
6 identification as Exhibit
7 ABDC-Mays-11.)
8 BY MR. PIFKO:
9     Q.   I'm handing you what's
10 marked as Exhibit 11 and Exhibit 13.
11     (Document marked for
12 identification as Exhibit
13 ABDC-Mays-13.)
14     THE WITNESS:  Thank you.
15 BY MR. PIFKO:
16     Q.   Take a minute to review
17 that.
18     MR. PIFKO:  This is 11.  And
19 this is 13.
20     MS. McCLURE:  Thank you.
21     MR. PIFKO:  For the record,
22 Exhibit 11 is Bates labeled
23 ABDCMDL00289421.  And Exhibit 13
24 is Bates labeled ABDCMDL00289422

Page 369

1 through 429.
2 BY MR. PIFKO:
3     Q.   Let me know when you're done
4 reviewing those.
5     A.   Okay.
6     Q.   Let's go to the last page of
7 Exhibit 13.
8     A.   Okay.
9     Q.   289429.
10     A.   Okay.





Page 374

Page 376

Page 375

Page 377

15      MR. PIFKO:  We are going to
16  take a short break.  I think we're
17  done.
18      THE VIDEOGRAPHER:  Going off
19  the record.  The time is 5:04.
20      (Short break.)
21      THE VIDEOGRAPHER:  Go back
22  on the record.  Beginning Media
23  File Number 6.  The time is 5:14.
24      MR. PIFKO:  All right.

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1  Unless you have any direct
2  examination, I have no further
3  questions.
4      MS. McCLURE:  I have no
5  further questions -- I have no
6  questions.  How about that.
7      MR. PIFKO:  All right.
8  Thank you.
9      THE VIDEOGRAPHER:  This
10 concludes today's deposition.  We
11 are going off record.  The time is
12 5:14.
13     (Excused.)
14     (Deposition concluded at
15 approximately 5:14 p.m.)
16
17
18
19
20
21
22
23
24

Page 380

1      INSTRUCTIONS TO WITNESS
2
3      Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8      After doing so, please sign
9  the errata sheet and date it.
10     You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14     It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

Page 379

1
2      CERTIFICATE
3
4
5      I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
       It was requested before
8  completion of the deposition that the
   witness, STEPHEN MAYS, have the
9  opportunity to read and sign the
   deposition transcript.
10
11
12
       _____
13 MICHELLE L. GRAY,
   A Registered Professional
   Reporter, Certified Shorthand
14 Reporter, Certified Realtime
   Reporter and Notary Public
15 Dated:  October 29, 2018
16
17
18     (The foregoing certification
19 of this transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24

Page 381

1      - - - - - -
        E R R A T A
2      - - - - - -
3
4  PAGE  LINE  CHANGE
5  _____  _____  _____
6  _____  _____  REASON: _____
7  _____  _____  _____
8  _____  _____  REASON: _____
9  _____  _____  _____
10 _____  _____  REASON: _____
11 _____  _____  _____
12 _____  _____  REASON: _____
13 _____  _____  _____
14 _____  _____  REASON: _____
15 _____  _____  _____
16 _____  _____  REASON: _____
17 _____  _____  _____
18 _____  _____  REASON: _____
19 _____  _____  _____
20 _____  _____  REASON: _____
21 _____  _____  _____
22 _____  _____  REASON: _____
23 _____  _____  _____
24 _____  _____  REASON: _____

Page 382

```
 1
 2       ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do
 5  hereby certify that I have read the
 6  foregoing pages, 1 - 383, and that the
 7  same is a correct transcription of the
 8  answers given by me to the questions
 9  therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  STEPHEN MAYS              DATE
17
18
19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20____.
21  My commission expires:_____
22
    _____
23  Notary Public
24
```

Page 383

```
 1       LAWYER'S NOTES
 2  PAGE  LINE
 3  _____ _____ _____
 4  _____ _____ _____
 5  _____ _____ _____
 6  _____ _____ _____
 7  _____ _____ _____
 8  _____ _____ _____
 9  _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____
```