# EXHIBIT 302 – A

Highley Confidential - Subject to Further Confidentiality Review

```
 1         IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                     -  -  -
 5    IN RE:  NATIONAL     :  MDL NO. 2804
      PRESCRIPTION OPIATE :
 6    LITIGATION           :
      ----------------------------------------
 7                         :  CASE NO.
      THIS DOCUMENT        :  1:17-MD-2804
 8    RELATES TO ALL CASES:
                           :  Hon. Dan A.
 9                         :  Polster
10                     -  -  -
           Saturday, August 4, 2018
11                     -  -  -
12    HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
               CONFIDENTIALITY REVIEW
13
                       -  -  -
14
               Videotaped deposition of
15    DAVID MAY, taken pursuant to notice, was
      held at the law offices of Reed Smith,
16    LLP, Three Logan Square, 1717 Arch
      Street, Philadelphia, Pennsylvania 19103,
17    beginning at 9:01 a.m., on the above
      date, before Amanda Dee Maslynsky-Miller,
18    a Certified Realtime Reporter.
19                     -  -  -
20
21
22
           GOLKOW LITIGATION SERVICES
23      877.370.3377 ph| 917.591.5672 fax
                deps@golkow.com
24
```

**Page 2**

```
1   APPEARANCES:
2
3        BARON & BUDD P.C.
         BY: MARK PIFKO, ESQUIRE
4        BY: STERLING CLUFF, ESQUIRE
         15910 Ventura Boulevard
5        #1600
         Encino, California  91436
6        (818) 839-2333
         mpfiko@baronbudd.com
7        Scluff@baronbudd.com
8        - and -
9        BY:  SCOTT SIMMER, ESQUIRE
         Washington, D.C.
10       (202) 333-4562
         Ssimmer@baronbudd.com
11       Representing the Plaintiffs
12
13       REED SMITH, LLP
         BY: ROBERT A. NICHOLAS, ESQUIRE
14       BY: JOSEPHY J. MAHADY, ESQUIRE
         BY: JEFFREY R. MELTON, ESQUIRE
15       BY: SHANNON E. MCCLURE, ESQUIRE
         BY: THOMAS H. SUDDATH JR., ESQUIRE
16       Three Logan Square
         1717 Arch Street
17       Philadelphia, PA 19103
         (215) 851-8100
18       Rnicholas@reedsmith.com
         jmahady@reedsmith.com
19       Jmelton@reedsmith.com
         Smcclure@reedsmith.com
20       Tsuddath@reedsmith.com
         Representing the Defendant,
21       Amerisource Bergen Drug
         Corporation
22
23
24
```

**Page 3**

```
1   APPEARANCES: (Continued)
2
3        COVINGTON & BURLING LLP
         BY:  EMILY KVESELIS, ESQUIRE
4        850 Tenth Street, NW
         Suite 856N
5        Washington, DC 20001
         202.662.5000
6        ekveselis@cov.com
         Representing the Defendant,
7        McKesson Corporation
8
9
10       MARCUS & SHAPIRA LLP
         BY:  JAMES F. ROSENBERG, ESQUIRE
11       One Oxford Centre
         35th Floor
12       Pittsburgh, PA 15219
         412.338.4683
13       rosenberg@marcus-shapira
         Representing the Defendant,
14       HBC Service Company
15
16       JONES DAY
         BY:  SARAH G. CONWAY, ESQUIRE
17       555 South Flower Street
         Los Angeles, California 90071
18       (213) 489-3939
         sgconway@jonesday.com
19       Representing the Defendant,
         Walmart
20
21
22
23
24
```

**Page 4**

```
1   APPEARANCES:  (Continued)
2
3        PELINI CAMPBELL & WILLIAMS, LLC
         BY: ERIC J. WILLIAMS, ESQUIRE
4        8040 Cleveland Avenue NW
         Suite 400
5        North Canton, OH 44720
         330.305.6400
6        ejwilliams@pelini-law.com
         Representing the Defendant,
7        Prescription Supply, Inc.
8
9        WILLIAMS & CONNOLLY, LLP
         BY: MATTHEW C. MONAHAN, ESQUIRE
10       725 Twelfth Street, N.W.
         Washington, DC 20005
11       202.434.5000
         mmonahan@wc.com
12       Representing the Defendant,
         Cardinal Health
13
14
         ARNOLD & PORTER KAYE SCHOLER LLP
15       BY: SAMUEL LONERGAN, ESQUIRE
         250 West 55th Street
16       New York, New York  10019
         (212) 836-8000
17       samuel.lonergan@arnoldporter.com
         Representing the Defendant,
18       Endo Pharmaceuticals
19
20       BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
         BY: SHARON DESH, ESQUIRE
21       Courthouse Place
         54 West Hubbard Street, Suite 300
22       Chicago, Illinois  60654
         (312) 494-4400
23       sharon.desh@bartlit-beck.com
         Representing the Defendant,
24       The Walgreens Company
```

**Page 5**

```
1   APPEARANCES:  (Continued)
2
     VIA TELECONFERENCE:
3
4
         LOCKE LORD LLP
5        BY: BRANDAN MONTMINY, ESQUIRE
         2200 Ross Avenue
6        Suite 2800
         Dallas, Texas  75201
7        (214) 740-8000
         brandan.montminy@lockelord.com
8        Representing the Defendant,
         Henry Schein Medical Systems, Inc.
9
10       ROPES & GRAY LLP
         BY: JESSICA SORICELLI, ESQUIRE
11       BY: FEIFEI (ANDREA) REN, ESQUIRE
         1211 Avenue of the Americas
12       New York, New York  10036
         (212) 596-9000
13       Jessica.Soricelli@ropesgray.com
         Andrea.Ren@ropesgray.com
14
15       - and -
16       BY:  WILLIAM T. DAVISON, ESQUIRE
         Prudential Tower
17       800 Boylston Street
         Boston, Massachusetts 02199
18       (617) 951-7000
         William.Davison@ropesgray.com
19       Representing the Defendant,
         Mallinckrodt
20
21
22
23
24
```

Page 6

1  APPEARANCES: (Continued)
2  VIA TELECONFERENCE:
3
   MORGAN LEWIS & BOCKIUS, LLP
4  BY: ELLIOT E. BROWN, ESQUIRE
   1111 Pennsylvania Ave. NW
5  Washington, D.C. 20004
   (202) 739-3000
6  elliott.brown@morganlewis.com
7  - and -
8  BY: MONICA C. PEDROZA, ESQUIRE
   77 West Wacker Drive
9  Chicago, Illinois 60601
   (312) 324-1000
10 Monica.pedroza@morganlewis.com
   Representing the Defendants,
11 Teva Pharmaceuticals, Inc.,
   Cephalon, Inc., Watson
12 Laboratories, Actavis LLC, and
   Actavis Pharma, Inc
13
14
15 JACKSON KELLY PLLC
   BY: SAMANTHA M. D'ANNA, ESQUIRE
16 500 Lee Street East
   Suite 1600
17 Charleston, WV 25301
   (304) 340-1347
18 samantha.danna@jacksonkelly.com
   Representing the Defendant,
19 Miami-Luken, Inc.
20
21
22
23
24

Page 7

1  APPEARANCES: (Continued)
2  VIA TELECONFERENCE:
3
   ZUCKERMAN SPAEDER LLP
4  BY: VANESSA I. GARCIA, ESQUIRE
   485 Madison Avenue
5  10th Floor
   New York, New York 10022
6  ( 212) 704-9600
   vgarcia@zuckerman.com
7  Representing the Defendant,
   CVS Pharmacy
8
9
10
11 ALSO PRESENT:
   David Lane, Videographer
12 Zac Hone, Trial Technician
13
14
15
16
17
18
19
20
21
22
23
24

Page 8

1          - - -
2       I N D E X
3          - - -
4
Testimony of: DAVID MAY
5
6   By Mr. Pifko              13
7
8          - - -
9       E X H I B I T S
10         - - -
11
NO.      DESCRIPTION           PAGE
12
   AmerisourceBergen-May
13 Exhibit-1   ABDCMDL 151803-804     13
14 AmerisourceBergen-May
   Exhibit-2   Masters Pharmaceutical Versus
15     DEA Court Opinion,
       861.F. 3rd, 206, 2017 from
16     The DC Circuit          39
17 AmerisourceBergen-May
   Exhibit-3   ABDCMDL 00156582-84    45
18
19 AmerisourceBergen-May
   Exhibit-4   ABDCMDL 00274105-118   116
20 AmerisourceBergen-May
   Exhibit-5   ABDCMDL 00250024-063   153
21
   AmerisourceBergen-May
22 Exhibit-6   ABDCMDL 00158544       159
23 AmerisourceBergen-May
   Exhibit-7   ABDCMDL 00168453-455   178
24

Page 9

1          - - -
2       E X H I B I T S
3          - - -
4
NO.      DESCRIPTION           PAGE
5
   AmerisourceBergen-May
6  Exhibit-8   ABDCMDL 00158342       196
7  AmerisourceBergen-May
   Exhibit-9   ABDCMDL 00216332-33    182
8
   AmerisourceBergen-May
9  Exhibit-10   ABDCMDL 00159072      248
10 AmerisourceBergen-May
   Exhibit-11   ABDCMDL 00140843-44   268
11
   AmerisourceBergen-May
12 Exhibit-12   ABDCMDL 00159415-16   270
13 AmerisourceBergen-May
   Exhibit-13   Tab Printout;
14     Sales Assignment        277
   AmerisourceBergen-May
15 Exhibit-14   ABDCMDL 00002232      285
16
   AmerisourceBergen-May
17 Exhibit-15   Tab Printout          314
18 AmerisourceBergen-May
   Exhibit-16   ABDCMDL 00156364      320
19
   AmerisourceBergen-May
20 Exhibit-17   Tab Printout          322
21 AmerisourceBergen-May
   Exhibit-18   Tab Printout          322
22
23
24

Highley Confidential - Subject to Further Confidentiality Review

Page 10

```
1           - - -
2        E X H I B I T S
3           - - -
4
   NO.      DESCRIPTION        PAGE
5
   AmerisourceBergen-May
6  Exhibit-19  ABDCMDL 00159841    325
7  AmerisourceBergen-May
   Exhibit-20  ABDCMDL 00142341-345  342
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 11

```
1           - - -
2   DEPOSITION SUPPORT INDEX
3           - - -
4
5  Direction to Witness Not to Answer
6  Page Line    Page Line    Page Line
7  76    7
   122   1
8  123   21
   220   17
9
10 Request for Production of Documents
11 Page Line   Page Line   Page Line
12 None
13
14
15 Stipulations
16 Page Line   Page Line   Page Line
17 10    1
18
19
20 Question Marked
21 Page Line   Page Line   Page Line
22 None
23
24
```

Page 12

```
1           - - -
2       (It is hereby stipulated and
3   agreed by and among counsel that
4   sealing, filing and certification
5   are waived; and that all
6   objections, except as to the form
7   of the question, will be reserved
8   until the time of trial.)
9           - - -
10      VIDEO TECHNICIAN:  We are
11  now on the record.  My name is
12  David Lane, videographer for
13  Golkow Litigation Services.
14  Today's date is August 4th, 2018.
15  Our time is 9:01 a.m.
16      This deposition is taking
17  place in Philadelphia,
18  Pennsylvania, in the matter of
19  National Prescription Opiate
20  Litigation.  Our deponent today is
21  David May.
22      Our counsel will be noted on
23  the stenographic record.  The
24  court reporter today is Amanda
```

Page 13

```
1   Miller and will now swear in our
2   witness.
3           - - -
4       DAVID MAY, after having been
5   duly sworn, was examined and
6   testified as follows:
7           - - -
8       VIDEO TECHNICIAN:  Please
9   begin.
10          - - -
11      EXAMINATION
12          - - -
13  BY MR. PIFKO:
14      Q.   Good morning, Mr. May.
15      A.   Good morning.
16      Q.   My name is Mark Pifko.  I'm
17  an attorney for the plaintiffs in this
18  matter.  I'm handing you what's marked as
19  Exhibit Number 1.
20          - - -
21      (Whereupon,
22  AmerisourceBergen-May Exhibit-1,
23  ABDCMDL 151803-804, was marked for
24  identification.)
```

Page 14

1          - - -
2 BY MR. PIFKO:
3      Q.   This is an e-mail, Bates
4 labeled ABDCMDL 151803 through 804.
5      There's various exchanges;
6 you're one of the people on the
7 exchanges.  They are dated January 14th,
8 2016.
9          Please take a minute to
10 review that and let me know when you're
11 done.
12     A.   Sure.  Thank you.
13     Q.   Have you seen this before?
14     A.   I have.
15     Q.   When was the last time you
16 saw this?
17     A.   It would have been on the
18 date that is indicated by the e-mail,
19 which would be, I guess, January 14th,
20 2016.
21     Q.   Do you recall this
22 discussion?
23     A.   I recall this exchange, yes.
24     Q.   Is this a true and correct

Page 15

1 copy of the communications reflected
2 here?
3      A.   Yes, it is.
4      Q.   I'd like to direct your
5 attention to the first page.  About
6 halfway down the page, there's an e-mail
7 from you.  It says, 3:16 p.m. to Sharon
8 Hartman.
9          Do you see that part?
10     A.   I do.
11     Q.   There's a line you say right
12 there, If an order is deemed suspicious,
13 it can never be shipped.
14          Do you see that?
15     A.   I do.
16     Q.   Why do you say that?
17          MR. NICHOLAS:  Object to the
18     form.
19          Go ahead.
20          THE WITNESS:  Under our
21     program and our policy and our
22     understanding of the regulation,
23     and what the regulator expects
24     from us, is when we declare an

Page 16

1     order as suspicious, it's
2     permanently rejected and never
3     shipped.
4 BY MR. PIFKO:
5      Q.   So if you -- it's based on
6 your understanding of the legal
7 requirements that if you identify an
8 order as suspicious, you cannot ship it,
9 correct?
10          MR. NICHOLAS:  Object to the
11     form.
12          THE WITNESS:  It's my
13     understanding of the law and the
14     regulation and the expectation of
15     the regulator.
16 BY MR. PIFKO:
17     Q.   To be clear, that if an
18 order is suspicious, you cannot ship it,
19 correct?
20     A.   Correct.
21     Q.   Do you know what these
22 direct shipments are?
23     A.   I have some knowledge of the
24 direct shipments.

Page 17

1          In reading the back -- or,
2 actually, the beginning of the e-mail
3 chain, there is a refresher on here that
4 explains what direct ships are.
5      Q.   This is a situation where
6 the order goes through
7 AmerisourceBergen's order process but
8 it's shipped directly from the
9 manufacturer to the customer, correct?
10     A.   Actually, my understanding
11 of the direct ship is an order is placed
12 by the customer directly to the
13 manufacturer, AmerisourceBergen has no
14 visibility to the placement of that
15 order.
16          The order is then shipped
17 from the manufacturer directly to the
18 customer, and we have no visibility of
19 that process.
20          What we do have visibility
21 into is the financial transaction after
22 it's completed.  And our role in the
23 process is simply billing the
24 transaction.





Page 22

Page 24

1 we're talking about the period
2 from 2015 forward; is that
3 correct?
4     MR. PIFKO:  I'll get into
5 some dates.  I'm going to ask him.
6 BY MR. PIFKO:
7     Q.   What is --
8     MR. NICHOLAS:  I know.  But
9 I just want to make sure the
10 testimony --
11     MR. PIFKO:  The record is it
12 is.  You can't go back, he's
13 already answered the question.
14     MR. NICHOLAS:  It's unclear
15 and that's why I'm trying to
16 clarify.
17     MR. PIFKO:  Well, it is what
18 it is.  We can't fix it
19 retroactively.
20     MR. NICHOLAS:  Sure we can.
21     MR. PIFKO:  No, we can't.
22     MR. NICHOLAS:  You don't
23 want to.
24 BY MR. PIFKO:

Page 23

Page 25

22     MR. NICHOLAS:  Before we go
23 on, I just want to make clear for
24 the record that -- or confirm that

20 BY MR. PIFKO:
21     Q.   You understand that you're
22 designated to be the company's
23 representative to testify about certain
24 topics today, correct?



Page 26

1    A.   I do.
2    Q.   And there's a time period
3  for which you're designated to provide
4  company testimony, correct?
5    A.   Yes.
6    Q.   And that's 2015 to what?
7    A.   The present.

Page 28

Page 27

Page 29

11    A.   I can't say specifically.
12    Q.   When you joined the company,
13  you took it upon yourself to familiarize
14  yourself with certain past practices of
15  the company?
16    A.   I did.
17    Q.   I'm handing you now what was
18  marked yesterday as Exhibit Zimmerman-1.
19    It is a copy of the first
20  30(b)(6) notice in this case to
21  AmerisourceBergen.  Take a minute to
22  review that and let me know when you're
23  ready to discuss it.
24    I just have a couple of

Page 30

1 simple questions, but take your time.
2      MR. NICHOLAS:  While he's
3 looking at the document, just to
4 clarify the record, Mr. May is
5 designated as a 30(b)(6) witness
6 to testify through May 29th of
7 2018.
8      THE WITNESS:  Okay.
9 BY MR. PIFKO:
10     Q.   Okay.  If you'd go to Page
11 6.  Tell me when you're there.
12     A.   Yes, I'm there.
13     Q.   It's got some letters, A,
14 and it continues on through the next
15 page, A through O.
16     A.   Yes.
17     Q.   Have you reviewed these
18 topics?
19     A.   I have.
20     Q.   When was the first time that
21 you saw these topics?
22     A.   They were presented to me by
23 counsel.
24     Q.   When was the first time?

Page 31

1      A.   Oh, when?  Three weeks ago,
2 possibly, approximately.
3      Q.   And do you understand that
4 you're designated to speak on all of
5 these topics from January 1st, 2015 to
6 May 29th, 2018?
7      MR. NICHOLAS:  We covered
8 yesterday that that's with the
9 exception of letter O.
10     THE WITNESS:  Yes.
11 BY MR. PIFKO:
12     Q.   With the exception of letter
13 O, you're not here to testify about that?
14     MR. NICHOLAS:  Well, we've
15 agreed that he's not here to
16 testify about that.
17     MR. PIFKO:  I'm asking the
18 witness.
19     MR. NICHOLAS:  Then I'll
20 object to the question.
21     THE WITNESS:  Well,
22 apparently there's an agreement,
23 so I won't be talking about O.
24 BY MR. PIFKO:

Page 32

1      Q.   Did you undertake any effort
2 to familiarize yourself with the topics
3 in O?
4      A.   I have not.
5      Q.   But you are prepared to talk
6 about A through N today, from the time
7 period from January 1st, 2015 to May
8 29th, 2018?
9      A.   I am.
10     Q.   You were a DEA employee for
11 some period of time, correct?
12     A.   Yes.
13     Q.   How long did you work for
14 the DEA?
15     A.   I started working for DEA
16 while I was in college, so over 30 years.
17     Q.   What -- when did you first
18 start?  What was the date when you first
19 started working for the DEA?
20     A.   It was approximately June of
21 1982, as a student intern.  And I started
22 my career as an agent in 1985, and was
23 employed as an agent until I retired in
24 2014.

Page 33

1      Q.   When you retired in 2014,
2 what was the position you held at the
3 DEA?
4      A.   I was the assistant special
5 agent in charge of the Atlanta field
6 division.
7      Q.   Was that the highest
8 position that you held when you were at
9 the DEA?
10     A.   I had an equivalent grade
11 but with a different title, assistant
12 regional director in Europe, Africa and
13 the Middle East.  I also had a temporary
14 grade at the same level while assigned to
15 DEA headquarters as an acting section
16 chief of our Europe and Middle Eastern
17 section.
18     Q.   When were you acting section
19 chief?
20     A.   It was during my assignment
21 to DEA headquarters.  So that would have
22 been upon my return from Paris.  I have
23 to sort the years out.
24      So '86 to '91, I was

Page 34

1 assigned to the New York field division;
2 from '91 to '93, I was assigned to the
3 Marseilles resident office in France;
4 from '93 to '96, I was assigned to the
5 Paris country office. From 1996 to 1999,
6 I was assigned to DEA headquarters, that
7 was the acting section chief; from 1999
8 to 2002, I was handed a program, a
9 congressionally funded program, targeting
10 drug trafficking organizations across the
11 country. That ended in 2002, where I
12 became the head of the drug task force in
13 the city of Charlotte, North Carolina.
14 From that, I was assigned Rome, as
15 assistant regional director. And then
16 finally to Atlanta.
17     Q.    And after concluding your
18 employment with the DEA in 2014, you then
19 went to join AmerisourceBergen, correct?
20     A.    Correct.
21     Q.    And what was your title when
22 you joined AmerisourceBergen?
23     A.    Senior director of diversion
24 control.

Page 35

1     Q.    What's your title now?
2     A.    Vice president of diversion
3 control and security.
4     Q.    Did you have any positions
5 in between those two positions?
6     A.    I did not.
7     Q.    Were your job
8 responsibilities essentially the same in
9 those two positions?
10     A.    They are slightly different.
11     Q.    What are the differences?
12     A.    I assumed the security and
13 investigations profile in addition to the
14 diversion control profile within
15 corporate security and regulatory
16 affairs.
17     Q.    Based on your experience
18 with the DEA, does the DEA tell companies
19 it regulates whether their practices are
20 in compliance with the law?
21     MR. NICHOLAS:  Object to the
22 form.  Object to the scope.
23     THE WITNESS:  I have seen
24 statements by DEA where they

Page 36

1 specifically say that they will
2 not approve any specific programs
3 being run by regulators.
4 BY MR. PIFKO:
5     Q.    And what do you mean by
6 that?
7     MR. NICHOLAS:  Object to the
8 form.
9     THE WITNESS:  In terms of
10 the --
11     MR. NICHOLAS:  And to the
12 scope.
13     Go ahead.
14     THE WITNESS:  In terms of
15 the context to your question, I've
16 seen written documents by DEA,
17 including in their guidance
18 letters around the 2006, 2007 time
19 frame, where they say that they
20 will not approve specific systems
21 or programs that regulators have
22 in place.
23     That's my only context for
24 that question.

Page 37

1 BY MR. PIFKO:
2     Q.    You said that they won't
3 approve specific systems or programs that
4 regulators have in place.
5     Do you mean that the
6 regulated have in place?
7     A.    I do.
8     Q.    So what you're saying is the
9 DEA does not approve the specific system
10 or program that a company may implement
11 in connection with regulations that DEA
12 enforces, correct?
13     MR. NICHOLAS:  Object to the
14 form.  Object to the scope.
15 You're outside of the witness's
16 time frame here, by a lot.
17     THE WITNESS:  Again, the
18 only context I can put around this
19 is my review of documents from DEA
20 where -- and I will rely upon what
21 the document says, in terms of
22 what my understanding is, that
23 DEA -- DEA's position around this
24 issue.

Highley Confidential - Subject to Further Confidentiality Review

Page 38

1  BY MR. PIFKO:
2      Q.   Okay.  And what is your
3  understanding about what DEA's position
4  is?
5          MR. NICHOLAS:  Object to the
6  form.  Object to the scope.  Same
7  objections.
8          THE WITNESS:  Again, I would
9  rely upon the content of that
10  written guidance specifically that
11  DEA has in those documents that
12  they released; it was either 2006
13  or 2007.  I believe it was
14  actually a 2007 document, where
15  they make a statement relative to
16  their not approving specific
17  programs of the regulated
18  community.
19  BY MR. PIFKO:
20      Q.   In your experience as a DEA
21  agent for -- how many years?
22      A.   Approximately 30.
23      Q.   -- for 30 years, did you
24  ever tell a company, or somebody that was

Page 39

1  within your regulatory authority, that
2  what they were doing was approved?
3          MR. NICHOLAS:  Object to the
4  form.  Object to the scope.
5          THE WITNESS:  So the
6  majority of my career, almost all
7  of my career, was on the
8  enforcement side of the agency.
9  And I had little to no interaction
10  with the regulated community.
11  BY MR. PIFKO:
12      Q.   You were out there chasing
13  drug dealers?
14      A.   I was out there
15  investigating drug trafficking
16  organizations, yes.
17              - - -
18          (Whereupon,
19  AmerisourceBergen-May Exhibit-2,
20  Masters Pharmaceutical Versus DEA
21  Court Opinion, 861 F.3d 206, 2017
22  from the DC Circuit, was marked
23  for identification.)
24              - - -

Page 40

1  BY MR. PIFKO:
2      Q.   I'm handing you what's
3  marked as Exhibit-2.
4          MR. PIFKO:  He's going to
5  hand it to you in just a second.
6          For the record, it's a copy
7  of the Masters Pharmaceutical
8  versus DEA court opinion, 861 F.3d
9  206, 2017, from the DC circuit.
10  BY MR. PIFKO:
11      Q.   It's got a couple paragraphs
12  highlighted that we wanted to call your
13  attention to.  But take a minute to
14  review it.
15          Just, my first question
16  would just be that, have you seen this
17  opinion before?
18          MR. NICHOLAS:  Can I just --
19  what we're looking at on the
20  screen is not the same as what's
21  in front of him.
22          MR. PIFKO:  It should be.
23          MR. NICHOLAS:  It looks like
24  a different document.

Page 41

1          MR. PIFKO:  Let's go off the
2  record while we fix this.
3          VIDEO TECHNICIAN:  Going off
4  the record.  9:33 a.m.
5              - - -
6          (Whereupon, a discussion off
7  the record occurred.)
8              - - -
9          VIDEO TECHNICIAN:  We're
10  back on record.  The time is 9:35
11  a.m.
12  BY MR. PIFKO:
13      Q.   Okay, Mr. May, we've
14  resolved, and it appears that you have a
15  complete copy of the Masters
16  Pharmaceutical decision in front of you.
17          Please take a moment to
18  review it and let me know when you're
19  done.
20          My first question is just if
21  you've seen this before?
22      A.   Yes, I've seen this before.
23      Q.   When was the first time you
24  saw this?

Page 42

1  A.   I've seen it recently in
2  preparation for today.  And I may have
3  seen it at other times during the course
4  of my work, but I don't recall
5  specifically when that was.
6  Q.   Okay.  I'd like to direct
7  you to Page 7, if you use the very bottom
8  of the page.  There's a paragraph with a
9  bracketed 2 there.
10       Do you see that paragraph at
11 the bottom on the right?
12  A.   I do.
13  Q.   If you go a little bit down
14 it says -- there's a sentence that says,
15 The security requirement.
16       Do you see that part?
17  A.   I do.
18  Q.   I'm going to read that to
19 you.
20       The security requirement, in
21 quotes, at the heart of this case
22 mandates that distributors, quote, design
23 and operate a system to identify
24 suspicious orders of controlled

Page 43

1  substances and report those orders to DEA
2  (the reporting requirement) 21CFR Section
3  1301.74(b).
4       Do you see that?
5  A.   I do.
6  Q.   Do you understand that
7  AmerisourceBergen is bound by the
8  reporting requirement?
9       MR. NICHOLAS:  Object to the
10       form.
11       THE WITNESS:  So I
12       understand that AmerisourceBergen,
13       as a wholesale distributor,
14       registered as a wholesale
15       distributor, is bound by certain
16       provisions of The Controlled
17       Substances Act, as well as the
18       implementing regulations.
19       And so in terms of any
20       requirements imposed upon us, I
21       would refer to the CFR as well as
22       The Controlled Substance Act.
23 BY MR. PIFKO:
24  Q.   As the vice president of

Page 44

1  diversion control at the company, you're
2  responsible for the company's diversion
3  control efforts?
4  A.   I am.
5  Q.   Do you understand that
6  the -- in discharging your duties, that
7  the company is bound by the law as set
8  forth in this decision?
9       MR. NICHOLAS:  Object to the
10       form.
11       THE WITNESS:  I understand
12       in my role and my responsibility
13       is one to meet the requirements of
14       The Controlled Substances Act in
15       implementing regulations that are
16       relevant to the wholesale
17       distributor.  And I rely upon
18       those, as opposed to this
19       particular case.
20 BY MR. PIFKO:
21  Q.   But you took it upon
22 yourself, in connection with your role as
23 the head of the diversion control
24 division of the company, to familiarize

Page 45

1  yourself with this case when it came out?
2       MR. NICHOLAS:  Object to the
3       form.
4       THE WITNESS:  At one point I
5       reviewed this document, and more
6       recently I reviewed it again.
7       - - -
8       (Whereupon,
9       AmerisourceBergen-May Exhibit-3
10      ABDCMDL 00156582-84, was marked
11      for identification.)
12      - - -
13 BY MR. PIFKO:
14  Q.   I'm handing you what has
15 been marked as Exhibit-3.  Please take a
16 minute to look at this and let me know
17 when you're done.
18       For the record, it's some
19 e-mails dated August 2nd, 2017.  It's
20 Bates labeled ABDCMDL 00156582 through
21 84.
22  A.   Okay.
23  Q.   Are you familiar with this
24 document?

Page 46

1  A.  I am.
2  Q.  Is this a true and correct
3 copy of the discussion reflected in this
4 document?
5  A.  Yes, it is.
6  Q.  The first e-mail at the
7 bottom is dated July 13th -- sorry, to be
8 clear, so you know where I'm talking,
9 it's on the 156583.  It's an e-mail from
10 you to Ruth Miller and Kristin Freitas,
11 dated July 13, 2017.
12   Do you see that?
13  A.  I do.
14  Q.  The subject of the -- the
15 substance.  The e-mail is on the next
16 page, but do you see the header on the
17 page I just referenced?
18  A.  Yes.
19  Q.  Looking back to Exhbit-2,
20 the Masters decision, you see that on the
21 first page it was decided on June 30th,
22 2017.
23   Do you agree?
24  A.  I'm sorry.  You just lost

Page 47

1 me.
2  Q.  Go back to Exhibit-2, the
3 decision.
4  A.  Yes.  Thank you.
5  Q.  You see that it was
6 decided -- on the first page on the left,
7 it was decided June 30th, 2017.  Agreed?
8  A.  I see that.  Thank you.
9  Q.  And so you write to Ruth
10 Miller and Christine Freitas or Kristin
11 Freitas about two weeks later, agree?
12  A.  Yes.
13  Q.  And you say, Ruth, Kristin,
14 sorry I could not be on the RAC call
15 today, as I was traveling.
16   RAC is regulatory affairs
17 committee, correct?
18  A.  I'm not precisely certain
19 what it stands for.
20  Q.  That's a committee that you
21 serve on?
22  A.  I don't actually serve on
23 this committee.
24  Q.  It's an had committee?

Page 48

1  A.  I'm familiar with the term.
2 I just don't know precisely what -- the
3 initials.
4  Q.  But that's a committee
5 that's affiliated with the Healthcare
6 Distribution Alliance, correct?
7  A.  Yes, yes.
8  Q.  And you have some
9 involvement in interacting with the
10 Healthcare Distribution Alliance?
11  A.  I do.
12  Q.  Okay.  Going back to this
13 e-mail, you say, I have been meaning to
14 reach out to you, as I am concerned with
15 some of the language and reasoning found
16 in the appellate court's recent decision
17 in the Masters case, particularly
18 surrounding suspicious orders.
19   Do you see that?
20  A.  I do.
21  Q.  What were your concerns
22 about the appellate court's recent
23 decision in the Masters case with respect
24 to suspicious orders?

Page 49

1  A.  To the best of my
2 recollection, without seeing any other
3 documents, other than what's in front of
4 me here, there was information that was
5 new information in the appellate court
6 decision.
7   There was some terminology
8 which I had never seen before in any of
9 the regulations or in The Controlled
10 Substance Act.  And that caused me to be
11 concerned that there was this new
12 language that wasn't in the law or
13 regulation.  And that was a general
14 description of my concern.
15  Q.  What language was that?
16  A.  There was language relative
17 to shipping requirement.  And I had never
18 seen the term, in all of my work at ABC,
19 up until that point in my review of the
20 regulation and the law, anything about
21 shipping requirement.
22   So that would be just an
23 example.  There may have been other
24 concerns that I had.

Page 50

1    Q.   And it was your concern
2  because you had never seen the phrase
3  "shipping requirement"?
4        MR. NICHOLAS:  Object to the
5    form.  Asked and answered.
6        THE WITNESS:  My concern was
7    that I had never seen the term
8    "shipping requirement" in the
9    applicable regulations or the law.
10   And that its first appearance that
11   I recall seeing was in the
12   decision.
13 BY MR. PIFKO:
14   Q.   I'm going to hand you
15 another document that was marked
16 yesterday Exhibit-6.
17       For the record, it's a
18 series of letters from the Department of
19 Justice, DEA administration, which we
20 call the Dear Registrant letters.
21       Take a minute to review
22 those.
23       MR. NICHOLAS:  While he's
24   reviewing them, just so the record

Page 51

1    is clear, since you're about to
2    ask him about documents that
3    precede the period for which he is
4    designated to testify as a
5    30(b)(6) witness, he is now
6    testifying in his individual
7    capacity.
8        MR. PIFKO:  We have to make
9    that judgment based on the
10   question.  But your position is
11   noted.
12 BY MR. PIFKO:
13   Q.   Are you familiar with these
14 letters?
15   A.   I am.
16   Q.   If I call them the Dear
17 Registrant letters, is that a term that
18 you're familiar with?
19   A.   Yes.
20   Q.   Okay.  When was the first
21 time that you've seen these letters?
22   A.   I'm not precisely sure I
23 could provide you a date.  It's been some
24 time.

Page 52

1    Q.   Did you review these letters
2  upon joining AmerisourceBergen?
3    A.   Yes.
4    Q.   And that was part of your
5  effort to familiarize yourself with
6  activity governing the diversion control
7  department for which you were
8  responsible?
9        MR. NICHOLAS:  Object to the
10   form.
11       THE WITNESS:  Yes.
12 BY MR. PIFKO:
13   Q.   So there's four letters in
14 this packet.  I want to turn your
15 attention to the earliest of these
16 letters, dated September 27th, 2006.
17       For the record, that letter
18 covers ABDCMDL 00269691 through 694.
19       Tell me when you're there.
20   A.   I'm there, yes.
21   Q.   Are you familiar with this
22 letter?
23   A.   Yes.
24   Q.   Let's turn to the second

Page 53

1  page of this letter.
2        About two-thirds of the way
3  down it says, Thus, in addition to
4  reporting all suspicious orders, a
5  distributor has a statutory
6  responsibility to exercise due diligence
7  to avoid filling suspicious orders that
8  might be diverted into other than
9  legitimate medical, scientific and
10 industrial channels.
11       Do you see that?
12   A.   I do.
13   Q.   Failure to exercise such due
14 diligence could, as circumstances
15 warrant, provide a statutory basis for
16 revocation or suspension of a
17 distributor's registration.
18       Do you see that?
19       MR. NICHOLAS:  Is that a
20   question?
21       THE WITNESS:  I do see it,
22   yes.
23 BY MR. PIFKO:
24   Q.   Do you have an understanding

Highley Confidential - Subject to Further Confidentiality Review

Page 54

1 that that is saying, if you identify an
2 order as suspicious, you should not ship
3 it?
4         MR. NICHOLAS:  Object to the
5     form.  In addition to which the
6     witness is being asked about a
7     topic for which he has not been
8     designated as a 30(b)(6) deponent.
9         So I'll permit him to
10     answer, but he's only answering in
11     his individual capacity.
12         THE WITNESS:  Could you
13     repeat your question?
14 BY MR. PIFKO:
15     Q.   The sentence I just read --
16     A.   Yes.
17     Q.   -- my question is, do you
18 understand this to be saying that if you
19 identify an order as suspicious, you
20 cannot ship it?
21         MR. NICHOLAS:  Same
22     objection.
23         THE WITNESS:  So in current
24     state, under our program, if we

Page 55

1     identify an order as suspicious,
2     we don't ship.  It's rejected,
3     it's not shipped and it's reported
4     to DEA.
5 BY MR. PIFKO:
6     Q.   Okay.  I didn't ask you
7 about what your program was.  I'm asking
8 you about this letter right now.
9         And my question is, do you
10 understand this language here to be
11 saying that if an order is deemed to be
12 suspicious, it cannot be shipped?
13         MR. NICHOLAS:  Same
14     objection.
15         THE WITNESS:  And, again, I
16     view these letters not as I view
17     the law and the regulation.  It's
18     additional information that's
19     provided by DEA.
20         My understanding of the law
21     and regulation says that if we
22     identify an order as suspicious,
23     we should reject it and report it.
24     That's what we do at

Page 56

1     AmerisourceBergen.
2 BY MR. PIFKO:
3     Q.   And I just want to know if,
4 when you see this language, you
5 understand that that's what this language
6 is saying?  It's saying, if you identify
7 an order as suspicious, do not ship it.
8         MR. NICHOLAS:  Object to the
9     form.  Same objection.  Third time
10     you've asked it.
11         THE WITNESS:  The law and
12     the regulation requires us to
13     reject or report suspicious
14     orders.  They are, thereby, not
15     shipped.
16         If this says the same thing,
17     that -- and it agrees with the law
18     and the regulation, then I would
19     let the document stand on its own.
20 BY MR. PIFKO:
21     Q.   That's your understanding of
22 the document?
23         MR. NICHOLAS:  Object to the
24     form.  He's answered the question

Page 57

1     four times.
2         MR. PIFKO:  It's been asked.
3     It hasn't been answered.
4         MR. NICHOLAS:  No, it has
5     been answered.
6 BY MR. PIFKO:
7     Q.   I'm just trying to get --
8 sir, I'm just trying to get your
9 understanding of the document.  I
10 appreciate your explanation of the law.
11         I'm just trying to get --
12 when you read this sentence, do you agree
13 that that's what it says?  That's all I'm
14 asking you.
15         MR. NICHOLAS:  Object to the
16     form.  Object to the repeated
17     question, since he's answered it.
18         THE WITNESS:  And, again, my
19     response would be the same.
20         That I rely on the
21     regulation and the law in terms of
22     how we carry out our
23     responsibility relative to
24     suspicious orders.  And at

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  AmerisourceBergen, when we
2  identify a suspicious order, it's
3  rejected and reported to DEA.
4  BY MR. PIFKO:
5      Q.   When you read this
6  sentence -- can you read this sentence to
7  me out loud, please?
8      A.   Sure.
9      Q.   I mean, that paragraph.
10     A.   Sure.
11         MR. NICHOLAS:  Can I have
12  the question repeated, please?
13  I'm sorry.
14         MR. PIFKO:  I just asked him
15  to read the paragraph aloud.
16         MR. NICHOLAS:  Okay.  You
17  want him to read it out loud.
18         Go ahead.
19         THE WITNESS:  Thus, in
20  addition to reporting all
21  suspicious orders, a distributor
22  has a statutory responsibility to
23  exercise due diligence to avoid
24  filling suspicious orders that

Page 59

1  might be diverted into other than
2  legitimate, medical, scientific
3  and industrial channels.  Failure
4  to exercise such due diligence
5  could, as circumstances warrant,
6  provide a statutory basis for
7  revocation or suspension of a
8  distributor's registration.
9  BY MR. PIFKO:
10     Q.   What does that mean to you?
11         MR. NICHOLAS:  Object to the
12  form.  Asked and answered five
13  times.  Outside the scope.
14         THE WITNESS:  Again, I
15  don't -- I don't think I'm the
16  right person to try to interpret
17  what the meaning is of this
18  sentence that was written by
19  somebody else.
20         And I would rely upon my
21  previous answer relative to
22  suspicious orders.
23  BY MR. PIFKO:
24     Q.   You're unable to tell me

Page 60

1  what this means?
2         MR. NICHOLAS:  Object to the
3  form.
4         THE WITNESS:  Again, in
5  terms of suspicious orders, my
6  understanding of the law and
7  regulation requires us to reject
8  them, cancel them, and report them
9  to DEA.
10  BY MR. PIFKO:
11     Q.   And that's what this is
12  saying here, correct?
13         MR. NICHOLAS:  Object to the
14  form.  The witness has answered
15  this a number of times.  Now
16  you're just trying to put words in
17  his mouth.  So I'll object.
18         THE WITNESS:  Again, I rely
19  on the law and the regulation
20  relative to suspicious orders.
21         MR. PIFKO:  The record will
22  reflect that the witness is
23  unwilling to answer my question.
24         MR. NICHOLAS:  Let the

Page 61

1  record reflect that the witness
2  has answered the question.  And
3  the commentary about it is totally
4  inappropriate.
5  BY MR. PIFKO:
6     Q.   Staying on this document, I
7  want to direct your attention to the
8  letter dated December 27th, 2007.  That's
9  ABDCMDL 00269685.
10         Are you there?
11     A.   Yes.
12     Q.   Second paragraph, at the
13  bottom, it says, Accordingly, DEA does
14  not approve or otherwise endorse any
15  specific system for reporting suspicious
16  orders.  Past communications with DEA,
17  whether implicit or explicit, that could
18  be construed as approval of a particular
19  system for reporting suspicious orders
20  should no longer be taken to mean that
21  DEA approves a specific system.
22         Do you see that?
23     A.   I do.
24     Q.   When I asked you earlier

Page 62

1 about DEA approving conduct by regulated
2 entities, is that what you were referring
3 to?
4     A.   Yes.
5     Q.   And that's consistent with
6 your understanding of the DEA's policy?
7         MR. NICHOLAS:  Object to the
8     form.  Outside the scope.  He's
9     testifying as an individual.
10        THE WITNESS:  Relative to it
11    being consistent with DEA policy,
12    I would have to say that I'm not
13    familiar with DEA's specific
14    written policy around this issue.
15        And I -- my context of my
16    response was strictly relative to
17    this particular statement.
18 BY MR. PIFKO:
19    Q.   When you joined
20 AmerisourceBergen and reviewed these
21 letters to familiarize yourself with
22 them, did you understand this to be DEA's
23 position concerning the activities of
24 preventing diversion?

Page 63

1         MR. NICHOLAS:  Object to the
2     form.  Outside the scope.
3         THE WITNESS:  I'm not sure I
4     understand your question.  If you
5     wouldn't mind repeating it, thank
6     you.
7 BY MR. PIFKO:
8     Q.   I'm just asking, basically,
9 when you came into the company in 2014 --
10 and you reviewed these letters, correct?
11    A.   Yes.
12    Q.   Okay.  And you saw this,
13 this provision, right?
14    A.   Yes.
15    Q.   And you understood, when you
16 joined the company, that this was the
17 DEA's position, correct?
18        MR. NICHOLAS:  Object to the
19    form.
20        THE WITNESS:  Again, I
21    familiarized myself with all of
22    these documents, including this
23    one statement.  And I would let
24    the statement speak for itself.

Page 64

1 BY MR. PIFKO:
2     Q.   But you understood it,
3 correct?
4         MR. NICHOLAS:  Object to the
5     form.
6         THE WITNESS:  I read all of
7     the documents.
8 BY MR. PIFKO:
9     Q.   Did you understand them?
10        MR. NICHOLAS:  Object to the
11    form.
12        THE WITNESS:  I'm not sure I
13    understand your question.
14        Did I understand the written
15    documents?
16 BY MR. PIFKO:
17    Q.   Yes.
18    A.   To the extent that I can
19 read the documents, yes, I can read the
20 documents.
21    Q.   And you understood them when
22 you read them?
23        MR. NICHOLAS:  Object to the
24    form.

Page 65

1         THE WITNESS:  I believe I
2     can read the documents, yes.
3 BY MR. PIFKO:
4     Q.   And when you read them, you
5 can understand them?
6     A.   I have a reading
7 compensation, I guess.
8         MR. NICHOLAS:  Hold on.
9     Object to the form.
10 BY MR. PIFKO:
11    Q.   You read them and understand
12 them, correct?  That's all I'm trying to
13 get -- you're saying "I read them."  But
14 I just want to be clear that -- reading
15 and understanding are different things.
16        So when you read them, you
17 understood what you read?
18        MR. NICHOLAS:  Object to the
19    form.
20        THE WITNESS:  So when I read
21    a document, for reading
22    comprehension, I understand the
23    document.  I guess that's why I
24    was a little confused.

Page 66

BY MR. PIFKO:

Q. No problem. It's part of the deposition process that we have to be clear about our words sometimes.

A. Sure. I appreciate it.

Q. So you had reading comprehension with respect to these documents? I just want to confirm that.

A. Correct. Yes. Thank you.

Q. Okay. Let's go back to Exhibit-3. I want to go to Page 156584. Tell me when you're there.

A. I am there.

Q. You say, I have had discussions at my company and we think it would be a good idea to have a meeting with DEA to raise our concerns and get further clarification from them, particularly as it relates to reporting suspicious orders.

Do you see that?

A. I do.

Q. What did you mean by that?

A. Again, to the best of my

Page 67

recollection, and seeing no other documents, other than this particular e-mail chain -- and I would refer back to my prior response on a similar question, and that is, I was seeing language in the decision that I had not seen before in the regulation and the law.

And that's -- without being more specific than that, that was what my -- what I recall to be my general concern at that time.

Q. What did you want to get clarification from the DEA about?

MR. NICHOLAS: Objection. Asked and answered. Object to the form.

THE WITNESS: Again, just to repeat myself, where I saw that there were new language or different language than the regulation or the laws, I thought that having a meeting with DEA, we could address those issues.

BY MR. PIFKO:

Page 68

Q. What specifically did you want to address with the DEA?

MR. NICHOLAS: Objection. Asked and answered several times now.

THE WITNESS: Again, it was the shipping requirement statement, to my recollection at this point, that was what I was concerned with. There may have been other things that, looking at the -- just at this e-mail that -- that I could have had a concern with.

But at this time, looking at this, that was my major concern.

BY MR. PIFKO:

Q. So we have the opinion in front of you, Exhibit-2.

Can you direct me to the portion of the opinion that you're saying that you were concerned about?

MR. NICHOLAS: Well --

BY MR. PIFKO:

Page 69

Q. Take your time.

MR. NICHOLAS: -- I'll object to the form. But now he's going to have to read the entire opinion while we sit here.

Is that what you want him to do?

BY MR. PIFKO:

Q. Are you able to direct me to the portion of the opinion that you were concerned about?

A. I can flip through the document and try to find it, or I can read the whole document. I'm happy to flip through it to try to find the reference to shipping requirement.

Q. Well --

A. If I don't find it by flipping through it, I'll have to read the whole document.

Q. We had attempted to give you a highlighted version, but let's go back to Page 7.

A. I am on Page 7.

Page 70

1    Q.   Okay.  There's a section
2  there, The reporting requirement.
3        Do you see that?  We read
4  that?
5    A.   In Paragraph 2?
6    Q.   Yes.  On the bottom there.
7    A.   Yes.
8    Q.   Okay.  If you turn to the
9  next page, continuing through that
10  paragraph, it says, Once a distributor
11  has reported a suspicious order, it must
12  make one of two choices:  Decline to ship
13  the order, or conduct some due diligence.
14  And if it is able to determine that the
15  order is not likely to be diverted into
16  illegal channels, ship the order (the
17  shipping requirement).
18        Do you see that?
19    A.   Yes, I do.
20    Q.   Is this what you were
21  talking about?
22        MR. NICHOLAS:  Object to the
23  form.
24        Go ahead.

Page 71

1        THE WITNESS:  It is.
2  BY MR. PIFKO:
3    Q.   What, specifically, was your
4  concern with this language?
5        MR. NICHOLAS:  Object to the
6  form.  Asked and answered.
7        THE WITNESS:  It's
8  contradictory.  And it's
9  contradictory to my understanding
10  of what the regulation, the
11  regulations require.
12        As I stated, when
13  AmerisourceBergen determines,
14  after reviewing an order, that
15  it's suspicious, it's forever
16  rejected and it's reported to DEA.
17        So under our program, there
18  is no other choice.  If that order
19  is deemed suspicious, then it's
20  reported to the DEA and it's
21  rejected.
22        And, here, that -- there
23  seems to offer another alternative
24  where you can treat a suspicious

Page 72

1  order somehow differently.  And
2  that would be -- that was part of
3  my concern.
4  BY MR. PIFKO:
5    Q.   And in what way do you mean
6  you could "treat it differently"?
7        MR. NICHOLAS:  Object to the
8  form.
9        THE WITNESS:  It suggests
10  that you can determine an order
11  suspicious, I guess, and then
12  determine it's not suspicious and
13  ship it.
14        And, again, that's a
15  contradiction to what my
16  understanding of what the
17  regulation and the law requires.
18  BY MR. PIFKO:
19    Q.   Because it's your
20  understanding that once an order is
21  suspicious, it cannot be shipped,
22  correct?
23        MR. NICHOLAS:  Object to the
24  form.

Page 73

1        THE WITNESS:  Under ABC's
2  program, which is designed to meet
3  the requirements of the law and
4  the regulation, once we identify
5  an order as suspicious, it's
6  rejected and reported as
7  suspicious.
8  BY MR. PIFKO:
9    Q.   Let's go back to -- just to
10  be clear, does that summarize your
11  concerns that we were just talking about
12  when we were looking at the e-mail?
13        MR. NICHOLAS:  Object to the
14  form.  It mischaracterizes the
15  testimony as well.
16        THE WITNESS:  Again, in the
17  context of this one e-mail, with
18  no other context and based upon my
19  recollection of the e-mail events,
20  that's one of the concerns.
21        There may have been others
22  that I'm not recalling at this
23  time.
24  BY MR. PIFKO:

Page 74

1　　Q.　Understood.　Going back to
2　the e-mail, Exhibit-3, you say, I have
3　not yet approached my colleagues at
4　Cardinal or McKesson yet, but I am
5　confident we all share similar concerns.
6　　　　Do you see that?
7　　A.　I'll try to get to that.　Is
8　that on the first --
9　　Q.　It's on the last page.
10　　A.　Last page.　Okay, yes.　I
11　see that.
12　　Q.　Did you discuss this issue
13　with people at Cardinal and McKesson?
14　　　MS. KVESELIS:　Objection.
15　　　THE WITNESS:　In the context
16　　of this MDL, I've been provided
17　　the opportunity to meet with my
18　　colleagues at Cardinal and
19　　McKesson where we discussed
20　　general topics related to
21　　diversion control.
22　BY MR. PIFKO:
23　　Q.　Well, let's back up.　I'm
24　just talking about the time period of --

Page 75

1　specifically of this e-mail, not as a
2　general matter.
3　　　　So my question is, you wrote
4　them -- you wrote this e-mail in July
5　13th, 2017 and you talk about approaching
6　colleagues at those two companies.　And
7　my question is more specific than that,
8　in that on or around that time did you
9　specifically reach out to anyone at
10　Cardinal or McKesson to discuss the
11　Masters decision?
12　　A.　Not --
13　　　MS. KVESELIS:　Objection.
14　　　THE WITNESS:　Not to my
15　　recollection, no.
16　BY MR. PIFKO:
17　　Q.　At some point later did you
18　reach out to people at Cardinal and
19　McKesson to discuss this?
20　　　MR. NICHOLAS:　I'm going to
21　　interpose, not just an objection
22　　but an instruction not to respond
23　　to this, to the extent it involves
24　　the attorney-client privilege,

Page 76

1　meaning communications that
2　included attorneys or
3　communications that were -- and,
4　additionally, that may have been
5　communications that may have been
6　court sanctioned or court ordered.
7　　　So I will instruct you not
8　to answer to the extent -- to the
9　extent there were attorneys
10　involved, attorney communications
11　involved.
12　　　MS. KVESELIS:　Objection to
13　form.
14　　　MR. PIFKO:　You can only
15　have one objection for you guys,
16　so you're going to have to pick
17　who is making the objections.
18　　　MR. NICHOLAS:　It's mine.
19　　　MR. PIFKO:　Okay.
20　　　MS. KVESELIS:　You can
21　object on privilege grounds and
22　I'm objecting on form.
23　　　MR. PIFKO:　You can't.　You
24　can't.　Only one -- the protocol

Page 77

1　is clear, only one objection
2　stands.　Tell me which of your --
3　which objection stands.
4　　　MR. NICHOLAS:　Well, she's
5　counsel for another party.
6　　　MR. PIFKO:　It doesn't
7　matter.　The protocol is specific,
8　it says only one objection.　Pick
9　one.
10　　　MR. DAVISON:　That's not
11　correct.
12　　　MR. NICHOLAS:　I didn't
13　think that's what the protocol
14　said.　That's why I'm asking.　We
15　can look it up, though.
16　　　MR. PIFKO:　This isn't a big
17　deal.　Next time we take a break,
18　we'll get it clarified.
19　　　MR. NICHOLAS:　Well, if
20　you'd like, if it will make
21　everyone feel better, I will add
22　an objection to the form to my
23　objection.
24　　　MR. PIFKO:　Done.

1        MR. NICHOLAS:  And scope.
2   BY MR. PIFKO:
3        Q.   Now that we've had all of
4   this discussion, let's get back to the
5   question.  And I'll ask it in a different
6   way so we can get clarity.
7        My question was, aside from
8   communications where counsel was present,
9   did you reach out to McKesson or Cardinal
10  to discuss the Masters decision?
11       MS. KVESELIS:  Objection to
12       form.
13       THE WITNESS:  I did not
14       reach out, to the best of my
15       recollection, to Cardinal or
16       McKesson.  In fact, this meeting
17       with DEA that was anticipated and
18       discussed never took place.
19  BY MR. PIFKO:
20       Q.   Let's go to the first page
21  of the e-mail, 156582.
22       Are you there?
23       A.   I am.
24       Q.   You say, I have reached out

1   to McKesson and will do the same with
2   Cardinal and will get back to you when I
3   have their responses.
4        Do you see that?  Sorry, on
5   the top of the e-mail.
6        A.   Yes, I'm just trying to read
7   that specific e-mail.
8        Okay.  I see that.
9        Q.   It says, I have reached out
10  to McKesson -- we just read that, okay?
11       A.   Yes.
12       Q.   Who did you reach out to at
13  McKesson?
14       MS. KVESELIS:  Objection to
15       form.
16       THE WITNESS:  And, again, I
17       don't have a recollection of
18       specifically reaching out to
19       McKesson to set up any meeting.
20       And no meeting ever took place.
21  BY MR. PIFKO:
22       Q.   Understood.  But you say
23  here that you reached out to McKesson,
24  agree?

1        A.   Yes, I agree.
2        Q.   Is there someone at McKesson
3   that you typically would -- your main
4   contact you would reach out to, if you
5   were going to call them?
6        MR. NICHOLAS:  Object to the
7        form.
8        THE WITNESS:  Again, I don't
9        have any recollection of reaching
10       out.  So I haven't -- I have --
11       don't know who that would have
12       been a reference to, if, in fact,
13       I reached out.
14  BY MR. PIFKO:
15       Q.   Do you interact with
16  McKesson in connection with the had?
17       MS. KVESELIS:  Objection to
18       form.
19       THE WITNESS:  There are
20       phone calls with the had that the
21       distributors participate in,
22       including myself.  And there are
23       other representatives from other
24       wholesalers, including McKesson

1   and Cardinal.
2   BY MR. PIFKO:
3        Q.   Do you know any of the other
4   representatives from McKesson and
5   Cardinal who participate?
6        MS. KVESELIS:  Objection to
7        form.
8        THE WITNESS:  I do know some
9        individuals who I've met at
10       McKesson, but don't know
11       specifically who was on those
12       phone calls.  And it changes from
13       time to time.
14  BY MR. PIFKO:
15       Q.   Who have you met from
16  McKesson?
17       MS. KVESELIS:  Objection to
18       form.
19       THE WITNESS:  A couple of
20       individuals.  Gary Boggs being one
21       of them.
22  BY MR. PIFKO:
23       Q.   He's another DEA agent,
24  correct?  Former DEA agent?

Page 82

1  A.  He is.

2  Q.  Do you know him from working

3 at the DEA?

4  A.  Never met him before until

5 we both were working at these companies.

6  Q.  Anyone else from McKesson

7 that you've met?

8  MS. KVESELIS:  Objection to

9  form.

10  THE WITNESS:  During the

11  course of the last four and-a-half

12  years at the various had meetings,

13  I'm sure I've met other Cardinal,

14  McKesson representatives.

15  But I couldn't list all

16  their names, no.

17 BY MR. PIFKO:

18  Q.  Can you identify any

19 Cardinal representatives that you've met?

20  A.  I would respond the same

21 way.  I've met several over time and at

22 different meetings.  I don't have all

23 their names off the top of my head.

24  Q.  Okay.  You say in the same

Page 83

1 portion of the e-mail, I don't want to

2 wait too long to make the specific

3 request (and want it on the record, in

4 quotes, that we are seeking clarification

5 in this area).

6  Do you see that?

7  A.  I do.

8  Q.  Why did you want it on the

9 record that you were seeking

10 clarification in this area?

11  A.  I thought the subject was

12 important enough to be raised with the

13 DEA.  And so having it as documentation

14 because of its importance, I thought,

15 would be important.

16  Q.  You wanted it documented

17 because you wanted it clear that the

18 company was reaching out to seek

19 clarification?

20  MR. NICHOLAS:  Object to the

21  form.

22  THE WITNESS:  I wanted it to

23  be documented because I thought it

24  was an important matter.

Page 84

1 BY MR. PIFKO:

2  Q.  You mention Demetra Ashley

3 here.

4  Do you see that?

5  A.  I do.

6  Q.  Who is she?

7  A.  She was, at that time, I

8 believe, working as the acting deputy

9 administrator for diversion control.

10  Q.  Can you read the first

11 sentence of that first paragraph in your

12 3:11 p.m. e-mail aloud, please?

13  A.  So where it starts, I know

14 Demetra?

15  Q.  Exactly, yes.

16  A.  I know Demetra and, quite

17 frankly, I would prefer to wait until

18 Administrator Rosenberg names a

19 replacement for Millione to have the

20 meeting.

21  Q.  What did you mean by that?

22  A.  Having someone in an acting

23 capacity at DEA, they don't always have

24 the authority of the position itself.

Page 85

1 And I felt that it would be more

2 appropriate to talk to a

3 permanent-position employee that was

4 occupying that particular position as

5 opposed to somebody that maybe didn't

6 carry the full weight of the office.

7  MR. PIFKO:  With that, we

8  can take a break.

9  VIDEO TECHNICIAN:  Going off

10  the record.  10:19 a.m.

11  - - -

12  (Whereupon, a brief recess

13  was taken.)

14  - - -

15  VIDEO TECHNICIAN:  We're

16  back on the record.  The time is

17  10:40 a.m.

18 BY MR. PIFKO:

19  Q.  We didn't discuss this

20 before we started, but under the rules of

21 law governing this case, you are not

22 permitted to discuss the substance of

23 your deposition during breaks.

24  During the last break, did

Page 86

1  you discuss the substance of your
2  deposition with counsel?
3      A.   No.
4      Q.   And we have an agreement
5  that you're not going to be doing that
6  going forward either?
7      A.   Yes.
8      Q.   Do you have an understanding
9  of the purpose --
10     MR. NICHOLAS:  Somebody is
11     not on mute on the phone, if you
12     guys could just mute your phone.
13     Thanks.
14  BY MR. PIFKO:
15     Q.   Let me restart that.
16         You understand that
17  AmerisourceBergen is a registrant under
18  The Controlled Substances Act, correct?
19     A.   Yes.
20     Q.   And you understand that, as
21  a registrant, AmerisourceBergen has a
22  duty to prevent -- to maintain effective
23  controls to prevent diversion, correct?
24         MR. NICHOLAS:  Object to the

Page 87

1      form.
2          THE WITNESS:  Yes.
3  BY MR. PIFKO:
4      Q.   Do you understand why the
5  law wants you to maintain effective
6  controls to prevent diversion?
7          MR. NICHOLAS:  Object to the
8      form.  Outside the scope.
9          I assume you're asking him
10     this question as an individual at
11     this point, in any event.  But I
12     object to the form of the
13     question.
14         THE WITNESS:  Could you
15     repeat your question, please?
16  BY MR. PIFKO:
17     Q.   What's diversion?
18         MR. NICHOLAS:  Object to the
19     form.
20         THE WITNESS:  Diversion in
21     the context of the pharmaceutical
22     industry?
23  BY MR. PIFKO:
24     Q.   Yes.

Page 88

1      A.   There are a couple different
2  types of diversion.
3          We're not talking about
4  contract diversion here, we're talking
5  about diversion of controlled substances?
6      Q.   Correct.
7      A.   Really, in a very general
8  description, I would say that diversion
9  takes place any time the legitimate
10  intended -- the legitimate intended
11  prescribing and use of a controlled
12  substance is not met, that somehow the
13  controlled substance is not used for the
14  legitimate medical purposes for what it
15  is intended, in a very general way.
16     Q.   Do you understand the
17  concept, under The Controlled Substances
18  Act, of the closed system of
19  distribution?
20     A.   I do.
21     Q.   What is your understanding
22  of that?
23     A.   With the passage of the
24  Controlled Substance Act, there was the

Page 89

1  design of a closed system of distribution
2  of controlled substances.  And the system
3  would be closed effectively by requiring
4  anybody within that system to have a DEA
5  registration; so whether you're a
6  manufacturer, a distributor,
7  practitioner, pharmacist.
8          The goal of -- the goal of
9  the closed system is to create this body
10  of registered entities that, by getting
11  that registration, would give you the
12  authority and permission to carry out
13  whatever that function was that you had
14  within that registrant community.
15     Q.   And you understand that
16  along with authority to carry out that
17  function, you also have certain legal and
18  regulatory obligations that you must
19  comply with, correct?
20         MR. NICHOLAS:  Object to the
21     form.
22         THE WITNESS:  That
23     AmerisourceBergen has, as a
24     registrant, wholesale distributor,

Highley Confidential - Subject to Further Confidentiality Review

Page 90

1  has certain requirements imposed
2  upon it, yes.
3  BY MR. PIFKO:
4      Q.   As a result of being a
5  registrant?
6      A.   Yes.
7      Q.   And one of those
8  requirements is to maintain effective
9  controls to prevent diversion, correct?
10         MR. NICHOLAS:  Object to the
11     form.
12         THE WITNESS:  Yes.
13 BY MR. PIFKO:
14     Q.   Let's just -- are you
15 familiar with the scheduling of
16 prescription drugs or drugs in general,
17 substances?
18         MR. NICHOLAS:  Object to the
19     form.  Outside the scope.
20         THE WITNESS:  Referring to
21     the DEA scheduling?
22 BY MR. PIFKO:
23     Q.   Yes.
24     A.   Yes.  I'm generally familiar

Page 91

1  with it.
2      Q.   Do you know what -- a
3  substance that's classified as a Schedule
4  II, what's that mean?
5          MR. NICHOLAS:  Same
6      objection.
7          THE WITNESS:  Generally,
8      looking at the scheduling of
9      controlled substances, generally
10     speaking, the design of the
11     schedule takes into effect -- or
12     takes into consideration whether a
13     product has some medical value and
14     it takes in the potential of abuse
15     of a product.
16         And so moving from the lower
17     schedule to a higher schedule, you
18     would generally see a higher abuse
19     potential of the products within
20     those different schedules.  And,
21     conversely, you would see less
22     medical use and more medical use
23     as you increase in schedules.
24         That's a general

Page 92

1  description.
2  BY MR. PIFKO:
3      Q.   Do you understand a Schedule
4  I substance has -- the U.S. government
5  has said it has no legitimate medical
6  purpose?  Do you understand that?
7          MR. NICHOLAS:  Objection.
8      Outside the scope.
9          THE WITNESS:  I'm familiar
10     with some of the substances within
11     Schedule I that are illegal drugs.
12 BY MR. PIFKO:
13     Q.   Well, let's focus on
14 Schedule II substances.
15         Do you understand that the
16 litigation for which we're here today
17 concerns opioid products?
18     A.   Yes.
19     Q.   Can you tell me what an
20 opioid product is?
21     A.   Again, there is -- there are
22 opioids and there are opiates.  There
23 tends to be some confusion.  I think most
24 people today generally refer to opioids.

Page 93

1          Opiates would be those
2  products that have the natural derivative
3  coming from a natural plant, whereas
4  opioids would have a synthetic creation
5  and resemble the natural ingredient.
6          And so talking about
7  opioids, you would be talking about
8  oxycodone, for example.  And talking
9  about opiates, you would be talking about
10 opium.  But there's been some mixing of
11 some of this terminology.
12     Q.   An opiate is derived from
13 the poppy plant, correct?
14     A.   Yes.
15     Q.   You mentioned hydrocodone --
16 I mean, you mentioned oxycodone as an
17 opioid, correct?
18     A.   Yes.
19     Q.   What about hydrocodone, do
20 you know what that is?
21     A.   Opioid, yes.
22     Q.   Are there any other opioid
23 products you can identify?
24     A.   Fentanyl would be an opioid

Page 94

1 product. And there's a pretty long list.
2 And to be clear, I'm not a pharmacist.
3     Q.   Understood.
4     A.   I want to make sure that's
5 clear for the record.
6     Q.   Do you understand that those
7 substances are Schedule II substances?
8     A.   Yes.
9     Q.   And do you understand --
10     A.   I'm sorry, just for the
11 record.
12         Oxycodone and hydrocodone?
13     Q.   Yes.
14     A.   Yes.
15     Q.   And fentanyl?
16     A.   Yes.
17         MR. NICHOLAS:  What time
18     period are we talking about?
19         THE WITNESS:  Again, there
20     was a rescheduling of hydrocodone
21     where it was relatively recently
22     put in II, Schedule II.
23 BY MR. PIFKO:
24     Q.   In 2014 it moved from

Page 95

1 Schedule III to Schedule II, correct?
2     A.   Yes, sir.
3     Q.   You understand that a
4 product that is a Schedule II substance
5 has been deemed, under the laws, to have
6 a high potential for abuse, correct?
7         MR. NICHOLAS:  Object to the
8     form.
9         THE WITNESS:  Yes, generally
10     speaking.
11 BY MR. PIFKO:
12     Q.   So when we talk about
13 preventing diversion, why do we want to
14 prevent Schedule II products from being
15 diverted?
16         MR. NICHOLAS:  Object to the
17     form.  Object to the scope.
18         THE WITNESS:  I'm not sure I
19     understand the question.
20 BY MR. PIFKO:
21     Q.   It's your job at
22 AmerisourceBergen to run its efforts to
23 prevent diversion, correct?
24     A.   Correct.  It's to oversee

Page 96

1 our diversion control program, yes.
2     Q.   Okay.  And beyond complying
3 with the legal requirements, do you
4 understand why you want to prevent
5 Schedule II substances from getting into
6 illegitimate hands?
7         MR. NICHOLAS:  Object to the
8     form.  Object to the scope.
9         THE WITNESS:  I'm still not
10     sure I understand the question.
11 BY MR. PIFKO:
12     Q.   You testified earlier that
13 the idea of preventing diversion is to
14 prevent products from getting into
15 illegitimate medical use, correct?
16         MR. NICHOLAS:  Object to the
17     form.  Object to the scope.
18         THE WITNESS:  In part, yes.
19 BY MR. PIFKO:
20     Q.   And what I'm trying to
21 understand is if you have an
22 understanding as to why we want to do
23 that.
24         MR. NICHOLAS:  Object to the

Page 97

1     form.  Object to the scope.
2         THE WITNESS:  Again, as
3     you've stated, as a registrant, we
4     have certain requirements imposed
5     upon us.  And I oversee the
6     programs at ABC that we utilize to
7     adhere to those requirements.
8         In terms of why do we want
9     to prevent diversion, I can offer
10     my individual view.  But, again,
11     that would be not responding to
12     your -- not being responsive as
13     the company representative.
14 BY MR. PIFKO:
15     Q.   I'd like you to give me your
16 view, however we're going to hear it.
17         MR. NICHOLAS:  Object to the
18     form.  Object to the scope.
19         Go ahead.
20         THE WITNESS:  So, again,
21     with that caveat in mind that I
22     mentioned, we have anti-diversion
23     programs in place to prevent the
24     misuse and abuse of controlled

Page 98

1  substances.
2  BY MR. PIFKO:
3      Q.   So if we are not effective
4  in preventing diversion, we can have
5  misuse of controlled substances, agree?
6          MR. NICHOLAS:  Object to the
7      form.  Object to the scope.
8          THE WITNESS:  So, again,
9      here there is conjecture in your
10     question about if we -- I'm not
11     sure who the "we" is, but
12     AmerisourceBergen has effective
13     controls in place to prevent
14     diversion.
15         So I guess that would be my
16     response.
17 BY MR. PIFKO:
18     Q.   Maybe it was a bad question
19 by me using the term "we," so I'll ask it
20 again in a different way.
21     A.   Sure.
22     Q.   And maybe we can work
23 through that.
24         If any registrant, not

Page 99

1  speaking about any specific one, who has
2  a duty to maintain effective controls to
3  prevent diversion, does not maintain
4  effective controls to prevent diversion,
5  we can have drug abuse, correct?
6          MR. NICHOLAS:  Object to the
7      form.  Object to the scope.
8          THE WITNESS:  So two things.
9      Again, if -- starting your
10     question having some conjecture
11     there, I really can't respond to
12     conjecture.  And also would not
13     respond to other registrants'
14     duties and requirements.  I'll
15     respond to ABC's.
16         And, again, my response
17     would be that we have effective
18     controls in place to prevent
19     diversion.
20 BY MR. PIFKO:
21     Q.   Let me ask you this way:  If
22 AmerisourceBergen did not have effective
23 controls to prevent diversion, do you
24 believe that drug abuse could occur as a

Page 100

1  result?
2          MR. NICHOLAS:  Object to the
3      form.  Object to the scope.  Asked
4      and answered.
5          THE WITNESS:  Again, the
6      conjecture there, I can't respond
7      to a situation where there's not a
8      factual bases.
9          So I'll just rely upon my
10     previous response that
11     AmerisourceBergen has effective
12     controls in place to prevent
13     diversion.
14 BY MR. PIFKO:
15     Q.   In carrying out your efforts
16 to prevent diversion, are you trying to
17 prevent drug abuse?
18         MR. NICHOLAS:  Object to the
19     form.  Object to the scope.
20         He's here to answer factual
21     questions today.
22         THE WITNESS:  So on the
23     first part, we have effective
24     controls in place to prevent

Page 101

1  diversion.
2          On the second part of that
3      question, I believe I provided my
4      view relative to drug abuse.
5  BY MR. PIFKO:
6      Q.   Forgive me, but I don't
7  understand.
8          So I'm just asking you --
9  when you say you provided your view, I
10 don't understand the answer yet.  So I
11 just would like you to express it again.
12         MR. NICHOLAS:  Well,
13     obviously, in the form of that
14     question it's clear that it's been
15     asked and answered.  Object to the
16     form.  Object to the scope.  Asked
17     and answered.
18         THE WITNESS:  Maybe we can
19     go back to the question, and we'll
20     start again.
21 BY MR. PIFKO:
22     Q.   Of course.  I'll try to ask
23 it a different way.
24         Do you believe there's a

Page 102

1 linkage between drug abuse and
2 maintaining controls to prevent
3 diversion?
4        MR. NICHOLAS: Object to the
5 form. Object to the scope.
6        THE WITNESS: And, again,
7        the question would call for my
8        personal opinion.
9        And to that, I would only
10       say that I oversee programs at ABC
11       that are effective in terms of
12       preventing diversion.
13 BY MR. PIFKO:
14       Q. That's not my question. And
15 I understand that you're trying to speak
16 to an issue. But you really need to
17 answer the question.
18       And my question is if you
19 believe there's a linkage between drug
20 abuse and maintaining controls to prevent
21 diversion?
22       I don't want an answer about
23 what the policies are or procedures are,
24 that's not what I'm asking. I'm simply

Page 103

1 asking if you believe there's a linkage
2 between drug abuse and maintaining
3 effective controls to prevent diversion.
4        MR. NICHOLAS: Hold on.
5 BY MR. PIFKO:
6        Q. Do you understand the
7 question?
8        MR. NICHOLAS: Hold on.
9        I'll object to the form. I'll
10       object to the scope. The question
11       has been asked a number of times.
12       He's not a social scientist.
13       He's not an epidemiologist.
14       THE WITNESS: So I'd go back
15       to my response, and that is that
16       when it comes to our requirements
17       at ABC to have effective controls
18       in place to prevent diversion, we
19       meet those requirements.
20 BY MR. PIFKO:
21       Q. The record is clear that
22 you're not giving an answer to the
23 question. I didn't ask you if you meet
24 the requirements or anything about

Page 104

1 AmerisourceBergen's procedures in this
2 question.
3        I'm simply asking if you
4 understand that there's a linkage between
5 effective controls to prevent diversion
6 and drug abuse?
7        MR. NICHOLAS: Same
8        objection. All of my same
9        objections.
10       THE WITNESS: And I would
11       rely upon my previous response.
12 BY MR. PIFKO:
13       Q. Your previous response is
14 insufficient. You have not answered the
15 question.
16       Sir, do you understand that
17 you are legally obligated to answer my
18 questions, unless he instructs you not to
19 answer; and he has to have a valid basis.
20 You need to answer my questions. You
21 cannot refuse to answer the questions,
22 okay? Do you understand that?
23       MR. NICHOLAS: He's not
24       refusing to answer the questions.

Page 105

1        MR. PIFKO: He is.
2        MR. NICHOLAS: He's
3 answering the questions.
4        MR. PIFKO: No. In
5 giving --
6        MR. NICHOLAS: He's
7 answering the question.
8        MR. PIFKO: In giving
9 evasive answers --
10       MR. NICHOLAS: You can't --
11       MR. PIFKO: -- and speaking
12 about something that's not
13 responsive to my question is not
14 answering. It's not cooperative.
15 And we will address it.
16 BY MR. PIFKO:
17       Q. You're a man of the law, I
18 don't need to explain that to you. You
19 understand.
20       We need your cooperation.
21 This is a serious matter. You need to
22 answer the question, okay?
23       MR. NICHOLAS: Hold on.
24 BY MR. PIFKO:

Page 106

1   Q.   And if I ask you a question
2 that's a yes-or-no question, you can't go
3 and start meandering about the policies
4 and procedures, okay?  You need to think
5 about what I'm asking and you need to
6 answer it.
7       Do you understand?
8       MR. NICHOLAS:  That's a
9 lecture.  He doesn't need a
10 lecture.  It's inappropriate.
11 BY MR. PIFKO:
12   Q.   Do you understand what I'm
13 telling you, sir?
14       MR. NICHOLAS:  And you can't
15 talk over me.
16       MR. PIFKO:  I can.  You're
17 not objecting.
18       MR. NICHOLAS:  Then you'll
19 keep talking and I'll keep
20 talking.  You're talking over me.
21 You're lecturing him, you're
22 bullying him and harassing.
23       MR. PIFKO:  Because he's not
24 cooperating.

Page 107

1       MR. NICHOLAS:  I'm not
2 instructing him not to answer.
3       MR. PIFKO:  He's not
4 complying with the rules.
5       MR. NICHOLAS:  He's answered
6 the question about eight times.
7       MR. PIFKO:  He's not.
8 And --
9       MR. NICHOLAS:  As you said
10 in the Merrill --
11       MR. PIFKO:  -- the record is
12 clear.
13       MR. NICHOLAS:  As you said
14 in the Merrill Gordon deposition,
15 he's entitled to answer the
16 deposition.  Your witness is
17 entitled --
18       MR. PIFKO:  You can do your
19 lawyering all you want, but he's
20 not cooperating.
21       MR. NICHOLAS:  I disagree.
22       MR. PIFKO:  Okay.
23 BY MR. PIFKO:
24   Q.   Sir, do you understand what

Page 108

1 I just said to you about the instructions
2 about complying about this deposition?
3   A.   Yes.
4   Q.   Do you intend to comply?
5   A.   I have been complying.
6   Q.   I disagree with you,
7 respectfully.  I am asking you very
8 specific questions, and you are not
9 responding to my questions.
10       Do you intend to provide
11 accurate questions -- or answers that
12 respond to exactly what I ask you?
13       MR. NICHOLAS:  Object to the
14 form.
15       THE WITNESS:  I intend to
16 answer your questions accurately,
17 yes.
18 BY MR. PIFKO:
19   Q.   Do you intend to respond to
20 the questions that I ask you?
21       MR. NICHOLAS:  Object to the
22 form.
23       THE WITNESS:  Yes.
24 BY MR. PIFKO:

Page 109

1   Q.   If I ask you what your
2 favorite color is, I don't want to hear
3 what you had for dinner.
4       Do you understand that?
5       MR. NICHOLAS:  Object to the
6 form.  Pretty obnoxious.  No need
7 for that kind of thing.
8       Right?
9 BY MR. PIFKO:
10   Q.   Do you understand that?
11       MR. NICHOLAS:  Object to the
12 form.
13       THE WITNESS:  Yes.
14 BY MR. PIFKO:
15   Q.   So let's try this again.
16       Do you understand there to
17 be a linkage between preventing diversion
18 and drug abuse?
19       MR. NICHOLAS:  Object to the
20 form.  All the same objections.
21       THE WITNESS:  Again, the
22 question has been asked several
23 times and the question concerns
24 having effective controls.

Page 110

1    And I've responded several
2  times relative to the issue of
3  effective controls that we have in
4  place at ABC to prevent diversion.
5    I would rely upon that
6  response again.
7  BY MR. PIFKO:
8    Q.   That's not the question I've
9  asked you.  You're not answering.  You're
10 not cooperating, okay?
11    I'm going to bring you back
12 here, we're going to go all day here, and
13 I'm going to ask you all the questions I
14 want to ask you.  And we're going to have
15 to bring you back here, and we're going
16 to have to get some more answers because
17 you're not cooperating, okay?  I want you
18 to understand that.
19    MR. NICHOLAS:  Object to the
20 form.  Object to the speech.
21    What he's saying isn't true.
22    Go on.
23 BY MR. PIFKO:
24    Q.   If AmerisourceBergen does

Page 111

1  not maintain effective controls to
2  prevent diversion, do you believe that
3  drug abuse can occur?
4    MR. NICHOLAS:  Object to the
5  form.  Outside the scope.
6    THE WITNESS:  Again, you've
7  asked me this question in several
8  different formats and, again,
9  you're asking with this conjecture
10 if we didn't have them in place.
11    And my only response to that
12 is, we have them in place,
13 effective controls, to prevent
14 diversion.  And so I can't respond
15 to a question relative to
16 conjecture.
17 BY MR. PIFKO:
18    Q.   If you fail to prevent
19 diversion, do you believe that drugs can
20 get into illegitimate channels?
21    MR. NICHOLAS:  Object to the
22 form.
23    THE WITNESS:  I've responded
24 to the question.

Page 112

1  BY MR. PIFKO:
2    Q.   You haven't.  Please answer.
3    MR. NICHOLAS:  Object to the
4  form.
5    THE WITNESS:  If we fail to
6  have effective controls in place,
7  is a question that doesn't state
8  facts.  It states conjecture.
9    And I can't respond relative
10 to conjecture.  I can respond
11 relative to the facts of the
12 matter around effective controls.
13 We have effective controls in
14 place to prevent diversion --
15 BY MR. PIFKO:
16    Q.   In joining --
17    A.   -- at ABC.
18    Q.   In joining AmerisourceBergen
19 in 2014, did you review the company's
20 prior practices and procedures regarding
21 diversion?
22    A.   Yes.
23    Q.   How far back did you
24 familiarize yourself with the company's

Page 113

1  practices and procedures concerning
2  diversion?
3    A.   I don't know that I can
4  assign a specific year.  I would say
5  looking back several years, more than two
6  or three.
7    Q.   Are you familiar with the
8  company's practices and procedures prior
9  to 2007?
10    MR. NICHOLAS:  Object to the
11 scope.  This is way outside the
12 scope of his 30(b)(6) domain.
13    THE WITNESS:  I may have
14 some limited knowledge relative to
15 the practices prior to 2007.
16 BY MR. PIFKO:
17    Q.   You testified as the
18 corporate representative in litigation
19 brought by the West Virginia Attorney
20 General on behalf of AmerisourceBergen,
21 correct?
22    A.   Yes.
23    Q.   And you testified about the
24 company's policies and procedures,

Highley Confidential - Subject to Further Confidentiality Review



Page 114

1  correct?  Concerning diversion?
2      A.   Yes.
3      Q.   How far back were you
4  familiar with the company's policies in
5  connection with your testimony in that
6  case?
7          MR. NICHOLAS:  Object to the
8      form.
9          THE WITNESS:  To my
10     recollection, the stated time
11     period was some time in 2007, if I
12     recall correctly.
13 BY MR. PIFKO:
14     Q.   So you have some
15 familiarity, from testifying in that
16 litigation, with the company's practices
17 going back to 2007?
18         MR. NICHOLAS:  Object to
19     the form.  Object to the form.
20     Object to the scope.  He's now
21     testifying individually.
22         THE WITNESS:  Yes.
23 BY MR. PIFKO:
24     Q.   Do you believe that, in

Page 115

1  2007, AmerisourceBergen's policies and
2  procedures for preventing diversion were
3  appropriate?
4          MR. NICHOLAS:  Object to the
5      form.  Object to the scope.
6          THE WITNESS:  Yes.
7  BY MR. PIFKO:
8      Q.   Has anyone ever told you
9  that you have problems with your
10 diversion control program?
11         MR. NICHOLAS:  Object to the
12     form.  And scope.
13         THE WITNESS:  I would say it
14     would be helpful to narrow the
15     question, because anyone is --
16     that's quite broad.  And I would
17     say in the broad context, the
18     answer would be no.
19 BY MR. PIFKO:
20     Q.   No one has ever told you
21 that AmerisourceBergen's program has gaps
22 with respect to maintaining effective
23 controls against diversion?
24         MR. NICHOLAS:  Object to

Page 116

1  form.  Object to the scope.
2          THE WITNESS:  Again, I'd
3  have to ask you to qualify it
4  more, because that's quite broad
5  of a question.
6          So perhaps it would be -- I
7  could be more responsive if the
8  question was narrowed down some.
9                  - - -

Page 117

Highly Confidential - Subject to Further Confidentiality Review



Page 118

Page 120

Page 119

Page 121

Highley Confidential - Subject to Further Confidentiality Review



Page 122

Page 124

Page 123

Page 125

Highly Confidential - Subject to Further Confidentiality Review









Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Page 154

Page 156

Page 155

Page 157

Highley Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Page 166

Page 168

Page 167

Page 169



Page 170
Page 171
Page 172
Page 173



Highley Confidential - Subject to Further Confidentiality Review



Page 178

Page 180

Page 179

Page 181

20     MR. PIFKO:  Okay.  We can
21  take a lunch break.  Thank you.
22     VIDEO TECHNICIAN:  Going off
23  the record.  12:24 p.m.
24         - - -

Page 182

1    (Whereupon, a luncheon
2    recess was taken.)
3        - - -
4        VIDEO TECHNICIAN: We're
5    back on the record. The time is
6    1:06 p.m.
7  BY MR. PIFKO
8        Q.  I'm handing you what's
9  marked as Exhibit-9. I skipped one, I'll
10 come back to it.
11       - - -
12       (Whereupon,
13   AmerisourceBergen-May Exhibit-9
14   ABDCMDL 00216332-33, was marked
15   for identification.)
16       - - -
17 BY MR PIFKO:
18       Q.  Take a moment to review that
19 and let me know when you're done.
20       For the record, it's a
21 document Bates labeled ABDCMDL 00216232
22 through 33.
23       Are you ready?
24       A.  Yes.

Page 183

1        Q.  Have you seen this document
2  before?
3        A.  I have.
4        Q.  Do you know what this is?
5        A.  It's an e-mail from Caroline
6  Conneely to myself and others.
7        Q.  What was the last time you
8  saw this?
9        A.  Date of the e-mail, March
10 15th, 2016.
11       Q.  Is this a true and correct
12 copy of the communications reflected in
13 this e-mail?
14       A.  Yes.
15       Q.  So this is an e-mail, on the
16 first page, it's from Caroline Conneely,
17 dated Tuesday, March 15th, 2016, to you,
18 Eric Cherveny, Sharon Hartman. The
19 subject is OMP reason codes.
20       The first question, Caroline
21 Conneely, she's the consultant who
22 prepared that report?
23       MR. NICHOLAS: Object to the
24   form.

Page 184

1        THE WITNESS: Could you
2    refer me to the report? The FTI
3    Consulting report?
4  BY MR PIFKO:
5        Q.  Correct. Exhibit-4 to be --
6        A.  I believe she prepared that
7  report, yes.
8        Q.  This is later -- as we
9  discussed, that report was dated in 2015.
10       Do you recall?
11       A.  Yes.



Page 185



Highly Confidential - Subject to Further Confidentiality Review



Page 190

Page 192

Page 191

Page 193

Highly Confidential - Subject to Further Confidentiality Review



Page 194

Page 195

Page 196

1 BY MR PIFKO:
2    Q.  I'm handing you what is
3 marked as Exhibit-8.
4     Please take a moment to
5 review that and let me know when you're
6 ready.
7     The document is Bates
8 labeled ABDCMDL 00158342. The electronic
9 data accompanying the document reflects
10 that you were the custodian and that it's
11 dated July 2nd, 2014.
12     And the file name for the
13 document is 2014 Thought Spot Diversion
14 Control Training PowerPoint.
15     MR. NICHOLAS: Just before
16    we go into questioning on this
17    document, a reminder, or whatever
18    you want to call it, that the
19    witness is designated as a
20    30(b)(6) deponent for the period
21    of time from 2015 to May of 2018.
22     So to the extent we're
23    embarking on questions about prior
24    information or prior materials,

Page 197

1    he's testifying as -- in his
2    individual capacity.
3 BY MR PIFKO:
4    Q.  Let me know when you're
5 ready to talk.
6    A.  Thank you.
7     I'm ready.
8    Q.  Do you recognize this
9 document?
10    A.  I do.
11    Q.  Can you tell me what this
12 is?
13    A.  This is a PowerPoint
14 presentation that was put together for a
15 sales meeting, where I was doing some
16 training to our sales staff in the
17 beginning of August 2014.
18    Q.  Is this a true and correct
19 copy of a presentation that you gave at
20 this conference?
21    A.  Yes.
22    Q.  It says the conference
23 occurred from July -- I'm looking at the
24 first page of the document -- from July

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 30th to August 2nd, 2014 at the MGM Grand
2 in Las Vegas; is that correct?
3      A.   Correct.
4      Q.   And you attended this
5 conference during that time period?
6      A.   Yes.
7      Q.   And what day was this
8 presented on?
9      A.   I'm not sure at this time.
10 I'd have to consult my calendar.
11      Q.   And the conference was held
12 at the MGM Grand casino in Las Vegas?
13      A.   Yes.
14      Q.   What's Thought Spot?
15      A.   What is Thought Spot?  It's
16 the name of the conference.  It's where
17 we bring in many of our independent
18 retail pharmacy customers, together with
19 our community and specialty sales staff,
20 and they spend time together during the
21 conference.
22      Q.   When was the last time you
23 saw this document?
24      A.   I believe I saw this

Page 199

1 document last week.  I reviewed several
2 PowerPoint presentations, I believe this
3 was among them, in preparation for today.
4      Q.   Prior to that when was the
5 last time you saw this?
6      A.   It would have been at the
7 time of presentation.
8      Q.   So let's go to Page 6.
9          So we've got the slides
10 here, these are -- if we look just
11 generally at the format of the document.
12          At the top half of the page,
13 it's the slides that you presented at the
14 conference?
15      A.   Yes.
16      Q.   And then on the bottom are
17 notes that you made to yourself?
18      A.   Yes.
19      Q.   This slide is entitled,
20 National Abuse Facts, correct?
21      A.   Yes.
22      Q.   Your notes say, The
23 statistics overwhelmingly demonstrate
24 that we have a terrible prescription drug

Page 200

1 abuse problem in the U.S. and,
2 tragically, people are dying.
3          Do you see that?
4      A.   I do.
5      Q.   Do you agree with that?
6      A.   Yes.
7      Q.   What was the basis for that
8 conclusion that you wrote there that I
9 just read?
10      A.   The statistics.
11      Q.   Like the items referenced up
12 here, the 38,329 unintentional drug
13 overdose deaths in 2010?
14      A.   Yes.  And other data that I
15 was familiar with.
16          But these are two of the
17 statistics that would support that
18 statement.
19      Q.   We talked, I believe, that
20 you joined AmerisourceBergen in 2014.
21          Do you remember the month?
22      A.   I believe it was right
23 around the 1st of March, within a week.
24      Q.   So this is only a few months

Page 201

1 after you had been at the company?
2      A.   Based upon the dates here,
3 yes.
4      Q.   At this time, did you have a
5 belief that members of the pharmaceutical
6 industry, be it manufacturers and/or
7 distributors, had any role in
8 contributing to the prescription drug
9 abuse problem in the U.S. that you
10 reference here?
11          MR. NICHOLAS:  Object to the
12      form of the question.  I'll
13      reiterate the scope objection as
14      well.  But I object to the form of
15      the question.
16          THE WITNESS:  At that time,
17      I have no specific memory of any
18      conclusions that I may have drawn
19      relative to the prescription drug
20      abuse problem.
21 BY MR PIFKO:
22      Q.   Do you believe that we still
23 have a prescription drug problem in the
24 United States?

Highley Confidential - Subject to Further Confidentiality Review

Page 202

1    A.   I believe that we've made
2  great advancements in the last several
3  years.  I still believe there is work to
4  be done.
5    Q.   Have you heard the term
6  "opioid crisis"?
7    A.   I have.
8    Q.   Do you believe that we're
9  still in the opioid crisis?
10   A.   I do.
11   Q.   Do you presently have a view
12 as to whether manufacturers and
13 distributors of opioid products
14 contributed to the opioid crisis?
15         MR. NICHOLAS:  Object to the
16     form.  Outside the scope.
17         THE WITNESS:  I don't have
18     an opinion relative to
19     manufacturers and distributors.
20         I can respond in terms of
21     AmerisourceBergen.  And I do not
22     believe they contributed to the
23     opioid crisis.
24 BY MR PIFKO:

Page 203

1    Q.   Do you believe that as a --
2  let me back up.
3         Do you have a sense of what
4  market share of the United States
5  distribution of opioid products
6  AmerisourceBergen has presently?
7         MR. NICHOLAS:  Objection.
8     Outside the scope.
9         THE WITNESS:  I'm probably
10     not the best person to talk about
11     market share.
12 BY MR PIFKO:
13   Q.   Have you previously heard
14 that AmerisourceBergen, Cardinal Health,
15 and McKesson have approximately 80 to 90
16 percent of the market share of
17 distribution of pharmaceuticals in the
18 United States?
19         MR. NICHOLAS:  Objection.
20     Object to the form.  Outside the
21     scope.
22         THE WITNESS:  Again, I'm
23     probably not the best person to
24     talk about market share.

Page 204

1         I know that
2     AmerisourceBergen delivers
3     medications every day to people
4     who need them, life-saving
5     medications, the majority of which
6     is non-controlled.
7         And in terms of the market
8     share of total medicine delivered,
9     non-controlled and controlled,
10     which is a much smaller aspect of
11     our business as a percentage, I'd
12     have to leave those specific
13     responses to somebody -- somebody
14     else that has that information.
15 BY MR PIFKO:
16   Q.   So you believe that -- have
17 you heard the term the "three big three,"
18 with respect to McKesson, Cardinal and
19 AmerisourceBergen, in terms of their role
20 as distributors in the pharmaceutical
21 industry in the United States?
22         MR. NICHOLAS:  Object to the
23     form.
24         THE WITNESS:  I've seen

Page 205

1     publications and documents that
2     contain that reference.
3     Specifically what those
4     publications are, I couldn't say.
5 BY MR PIFKO:
6   Q.   Do you believe that as major
7  entities in the closed system of
8  distribution of controlled substances,
9  Cardinal, AmerisourceBergen and McKesson
10 have the ability to beneficially impact
11 the opioid crisis through their
12 practices?
13         MR. NICHOLAS:  Object to the
14     form.  Objection on scope as well.
15         THE WITNESS:  You know, in
16     the context of your question, I
17     would say that every registrant
18     has the potential to have an
19     impact, large or small;
20     distributor, practitioner,
21     pharmacy, manufacturer.
22         And, again, my concern is
23     AmerisourceBergen and what we do
24     there every day to fulfill our

Page 206

1 obligations. And that's what my
2 focus is.
3 BY MR PIFKO:
4 Q. Do you believe that
5 AmerisourceBergen has a responsibility to
6 take actions to reduce the impacts of the
7 opioid crisis?
8 MR. NICHOLAS: Objection to
9 the form. Objection as to scope
10 as well.
11 THE WITNESS: I believe that
12 AmerisourceBergen has various
13 requirements that are imposed upon
14 it, as a registrant, through the
15 laws and regulations.
16 BY MR PIFKO:
17 Q. Do you believe that by
18 preventing diversion AmerisourceBergen
19 can make a positive impact on the opioid
20 crisis?
21 MR. NICHOLAS: Object to the
22 form. Objection as to scope.
23 THE WITNESS: I think if
24 AmerisourceBergen fulfills its

Page 207

1 requirements under the
2 regulations, it will accomplish
3 what it's required to do.
4 BY MR PIFKO:
5 Q. And what is it required to
6 do?
7 MR. NICHOLAS: Object to the
8 form. Object -- let me start that
9 again.
10 Objection as to form.
11 Objection as to scope.
12 THE WITNESS: Again, as a
13 registrant and a wholesale
14 distributor, we have certain
15 requirements imposed upon us in
16 the closed system of distribution
17 that you've alluded to.
18 Within the closed system,
19 there are different requirements
20 based upon where you sit. The
21 practitioner certainly has a
22 different requirement,
23 establishing a patient/doctor
24 relationship, for example, that we

Page 208

1 do not have as a wholesale
2 distributor.
3 And generally speaking, I
4 think that if all registrants of
5 all types fulfill their right
6 obligations, that would -- that
7 would have a positive impact.
8 BY MR PIFKO:
9 Q. On the opioid crisis?
10 A. On the opioid crisis.
11 MR. NICHOLAS: Object to the
12 form.
13 THE WITNESS: Yes.
14 BY MR PIFKO:
15 Q. Do you believe that by
16 following its obligation to prevent
17 diversion, AmerisourceBergen can prevent
18 opioid pills from falling into the hands
19 of the black markets?
20 MR. NICHOLAS: Objection as
21 to form. Objection as to scope.
22 THE WITNESS: So, again, you
23 know, you're asking now inserting
24 conjecture. And I have no

Page 209

1 response to a set of facts that
2 aren't real. I can't -- I can't
3 respond to a question that's
4 conjecture. I can respond to a
5 question, you know, where there
6 are facts associated with the
7 question.
8 So as I said before, when it
9 comes to our regulatory
10 requirements at AmerisourceBergen,
11 we meet them. We're constantly
12 evaluating how our performance is
13 and how we're meeting them. We
14 are constantly evaluating things
15 that we could possibly do
16 differently to continuously
17 analyze the results of our work,
18 all in an effort to do everything
19 that we can to meet our
20 requirements.
21 BY MR PIFKO:
22 Q. Do you believe that one of
23 the things that you are striving to do,
24 as the senior-most person in the

Page 210

1 diversion control department, is to
2 prevent pills from getting into illegal
3 markets?
4     MR. NICHOLAS:  Objection as
5 to form.  Objection as to scope.
6     THE WITNESS:  Again, I view
7 my role, as the senior person over
8 our diversion control efforts, as
9 one to make sure that we, as a
10 company, day in and day out,
11 fulfill all of our legal
12 obligations.  That's my number one
13 priority.
14     And when I come to work each
15 day, that's what I try to do.
16 BY MR PIFKO:
17     Q.   In carrying out your duties
18 as the head of the diversion control
19 program for AmerisourceBergen, do you
20 believe that -- is it important to you to
21 prevent pills from falling into the hands
22 of someone who could suffer an overdose?
23     MR. NICHOLAS:  Objection as
24 to form.  Objection as to scope.

Page 211

1     THE WITNESS:  Again, I think
2 I've been pretty clear in terms of
3 what I hope to accomplish and what
4 I believe to be my
5 responsibilities are at
6 AmerisourceBergen.
7     I'm happy to repeat those.
8 BY MR PIFKO:
9     Q.   Do you hope to accomplish a
10 reduction of overdose deaths?  Is that
11 something that you seek to accomplish?
12     MR. NICHOLAS:  Objection as
13 to form.  Objection as to scope.
14     THE WITNESS:  Again, as I've
15 outlined, I think that there are
16 various requirements imposed upon
17 different registrants within the
18 system.  And I think if, that, all
19 registrants concentrate on their
20 requirements and carry out those
21 duties, it will have a positive
22 impact on prescription drug abuse.
23     That's a personal view --
24 BY MR PIFKO:

Page 212

1     Q.   Is that the company's view,
2 too?
3     MR. NICHOLAS:  Objection as
4 to form.  Objection as to scope.
5     THE WITNESS:  -- I think
6 that the company has stated
7 publicly that they recognize the
8 opioid abuse problem and want to
9 do everything they can to
10 contribute to solutions.
11 BY MR PIFKO:
12     Q.   Let's go to Page 9 of this
13 document.
14     Are you there?
15     A.   I am.
16     Q.   It says, More recently, DEA
17 has shifted an increasingly large number
18 of their special agents who are
19 investigating criminal drug trafficking
20 organizations to newly created tactical
21 diversion squads.  And part of their
22 mandate is to use their law enforcement
23 skills at developing criminal
24 investigations, which lead to indictments

Page 213

1 and arrests, of all DEA registrants that
2 are members of the closed system,
3 including manufacturers, distributors,
4 doctors, pharmacies.  These criminal
5 charges may be brought against the
6 organizations themselves and/or the
7 organization's employees.
8     Do you see that?
9     A.   I do.
10     Q.   What was the basis of making
11 that statement?
12     MR. NICHOLAS:  Object to the
13 form.
14     THE WITNESS:  That statement
15 was made in the context of this
16 entire presentation.  It was
17 intended to inform our sales
18 folks, educate our sales folks, in
19 a very general way, about facets
20 of diversion control and our
21 obligations.
22     So there's no specific
23 intent of this statement, other
24 than to say, this is part of the



Page 214

1     regulatory environment, as well as
2     these other things.
3 BY MR PIFKO:
4     Q.   How did you know that there
5 were these newly created tactical
6 diversion squads?
7         MR. NICHOLAS:  Objection as
8     to form.  Objection as to scope.
9         THE WITNESS:  Through my
10     work and experience at DEA.  I
11     oversaw one of these DEA tactical
12     diversion squads.
13 BY MR PIFKO:
14     Q.   You oversaw one of these
15 tactical --
16     A.   Yes.
17     Q.  -- diversion squads?
18         In what part of your career
19 did you oversee one of these tactical --
20     A.   When I was in Atlanta.
21     Q.   What was the -- was the task
22 of the tactical diversion squad
23 consistent with what's reflected here?
24         MR. NICHOLAS:  Object to the

Page 215

1     form.  Scope.
2         THE WITNESS:  Yes, generally
3     speaking.
4 BY MR PIFKO:
5     Q.   What were you seeking to do
6 as part of that task force -- sorry,
7 tactical diversion squad?
8         MR. NICHOLAS:  Object to the
9     form.  Object as to scope.  And I
10     just want to make it clear that
11     the witness is not speaking as a
12     representative of the DEA or
13     purporting to represent any DEA
14     positions.
15         THE WITNESS:  I'm sorry,
16     what was the question?
17 BY MR PIFKO:
18     Q.   I was asking what the
19 purpose -- you said you ran one of these
20 tactical diversion squads, correct?
21     A.   To be specific, I had a
22 group supervisor who reported directly to
23 me who was the direct supervisor of the
24 tactical diversion squad.

Page 216

1     Q.   What was the purpose of the
2 tactical diversion squad that you
3 oversaw?
4         MR. NICHOLAS:  Object as to
5     form and scope.  And with the same
6     caveat that I just interposed a
7     minute ago.
8         Go ahead.
9         THE WITNESS:  And, again,
10     beyond -- going beyond the
11     description I've provided here, I

Page 217



Page 221

Page 218
Page 220
Page 219

1 BY MR PIFKO:
2       Q.   Let's go to Slide 16 -- or
3 Page 16, it says Slide 17.
4           Are you there?
5       A.   Yes, sir.
6       Q.   Okay.  It says, What's being
7 diverted?
8           Do you see that?
9       A.   Yes.
10      Q.   The biggest threat for
11 diversion is our opioids.
12          Do you see that?
13      A.   Yes.
14      Q.   Do you agree with that
15 statement?
16          MR. NICHOLAS:  Object to the
17     form.
18          THE WITNESS:  I agree.
19 BY MR PIFKO:
20      Q.   You see here it says, So it
21 happens frequently that you will see
22 someone who was prescribed hydrocodone
23 following an injury or medical
24 intervention for legitimate medical

Page 222

1 purposes but then continues to use and
2 abuse the drug long after the legitimate
3 medical need has passed.
4          Do you see that?
5     A.   I do.
6     Q.   Do you agree with that
7 statement?
8     A.   I believe that could occur,
9 yes.
10    Q.   Do you believe that in
11 trying to prevent diversion, you're
12 trying to prevent that from occurring?
13          MR. NICHOLAS:  Object to the
14     form.  Object as to scope as well.
15          THE WITNESS:  So as a
16     wholesale distributor in the
17     environment in which we work and
18     the things that we can and cannot
19     do, I cannot, as a wholesale
20     distributor, prevent a
21     practitioner from continually
22     writing a hydrocodone prescription
23     for a patient who suffered an
24     injury a long time ago but

Page 223

1     continues to write those.  There
2     is nothing -- I have no visibility
3     to that patient.  I have no
4     visibility to that practitioner.
5          Likewise, I don't see that
6     patient when he walks through the
7     doors at the pharmacy and he
8     interacts with the pharmacist.
9     And I don't see the information
10     that the pharmacy has at their
11     disposal, the pharmacist, in terms
12     of the diagnostic code on that
13     prescription.  Of course, there
14     are HIPAA concerns there as well.
15          So our role in the supply
16     chain is fairly limited.  I can
17     monitor the orders being placed by
18     that pharmacy, and I can look for
19     orders that meet the definition of
20     suspicious.  And if I find those,
21     I can report those to DEA.  But to
22     make a connection between that
23     sort of work and me being able to
24     prevent overprescribing and

Page 224

1     potential misuse and abuse,
2     there's clearly things, as a
3     wholesale distributor, that we can
4     and cannot do.
5          And that clinical process
6     and that overprescribing, to the
7     extent that we can impact that by
8     identifying suspicious orders, we
9     do that.  But beyond that, there's
10     nothing we can do.
11 BY MR PIFKO:
12    Q.   So in identifying suspicious
13 orders, to the extent you can have an
14 impact on that, you try to do that?
15          MR. NICHOLAS:  Object to the
16     form.  And scope.  Object to the
17     form.
18          THE WITNESS:  Again, as a
19     wholesale distributor, we have a
20     view into the data that that
21     pharmacy, the consumption data,
22     the products that that pharmacy is
23     ordering from us.  And based upon
24     that data, we can make a

Page 225

1     determination if an order is
2     suspicious.
3          But to be clear, even an
4     order that's found to be
5     suspicious and rejected by us,
6     there is not an equation between
7     finding an order suspicious and
8     diversion.  They're separate.
9     They're separate concepts.  There
10     could be an order that we find as
11     suspicious where there's
12     absolutely no diversion taking
13     place.
14          And so, again, as a
15     wholesale distributor, our
16     capabilities are somewhat narrow
17     in this respect.
18 BY MR PIFKO:
19    Q.   The first question here on
20 this note here says, And what's being
21 diverted?
22          Agree?
23    A.   Yes.
24    Q.   And the heading of the

Page 226

1 slide, Is Most Commonly Diverted Drugs,
2 right?
3     A.   Yes.
4     Q.   You're talking about
5 diverted drugs, right, in this slide?
6     A.   We're talking about the most
7 commonly diverted drugs, yes.
8     Q.   And then you're talking
9 about the biggest threat for diversion
10 are opioids.
11         Do you see that?
12    A.   Yes.
13    Q.   So you then make the
14 linkage, you talk about -- you then
15 present the sentence I just read, about
16 someone who is prescribed hydrocodone
17 following an injury or medical
18 intervention for medical -- legitimate
19 medical purposes but then continues to
20 use and abuse the drug long after the
21 legitimate medical need has passed.
22         Why did you feel that you
23 wanted to communicate that information to
24 the people at this conference in

Page 227

1 connection with the discussion of
2 commonly diverted drugs?
3         MR. NICHOLAS:  Object to the
4     form.  Objection as to scope.
5         THE WITNESS:  Again, this is
6     one slide of many where my goal
7     here was to inform and educate our
8     sales staff.  And so that was the
9     intent of this presentation, to
10    make our sales staff aware, who
11    may not be aware, of some of the
12    finer points around diversion.
13    Maybe they read about opioid
14    abuse, maybe there's some other
15    general knowledge they have.
16        Here is simply an attempt by
17    me to describe some of the drugs
18    that are abused, and also a
19    possible scenario on how that
20    abuse might occur.  There could be
21    many other scenarios.  But this
22    was the goal and the intent and
23    the reasons behind the statement.
24 BY MR PIFKO:



Highley Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 234

Page 236

Page 235

Page 237

Highley Confidential - Subject to Further Confidentiality Review

Page 238

1    Q.   Let's talk about the
2  physical red flags of diversion.  Go to
3  the next page.
4        It shows a long line of
5  people outside a pharmacy.
6        Why is that a red flag?
7    A.   Again, we've all been to
8  pharmacies and have picked up
9  prescriptions; and any prescription that
10 I've ever picked up, I don't recall
11 seeing a long line of patrons outside.
12 So just for the sheer fact alone that
13 it's something that you wouldn't
14 typically see.
15       That being said, again, this
16 presentation is a little dated.  I think
17 that some of these red flags were
18 probably more relevant some time ago.  I
19 don't think that -- that sort of activity
20 there would even be more rare in these
21 days.
22   Q.   The next slide has some
23 license plates, and it talks about --
24 well, you say, I was always amazed, in my

Page 239

1  former position with DEA in Atlanta, when
2  we would be observing the activities at a
3  particular pharmacy and you would see
4  vehicles from Tennessee, West Virginia
5  and Virginia show up at the pharmacy,
6  typically with more than one person in
7  the vehicle, where the occupants of the
8  vehicle would go in, fill a prescription,
9  and then head right back to the highway
10 in the direction of their home state.
11       Do you see that?
12   A.   I do.
13   Q.   That's a red flag of
14 diversion?
15       MR. NICHOLAS:  Object to the
16 form.
17       THE WITNESS:  Yes.
18 BY MR PIFKO:
19   Q.   And why is that?
20   A.   So when I go to fill a
21 prescription, you know, unless there's
22 some hard-to-receive medication, I'm
23 going to go to a place that's convenient
24 to my home or my office.

Page 240

1        For people to travel great
2  distances to receive -- or to have
3  prescriptions filled would, therefore, be
4  a red flag.
5    Q.   And in giving this
6  presentation and making these examples,
7  these are things that you wanted the
8  salespeople who are visiting the
9  pharmacies in connection with their jobs,
10 you wanted them to be able to observe
11 these things so they could report it back
12 to the company?
13       MR. NICHOLAS:  Object to the
14 form.
15       THE WITNESS:  We wanted them
16 to be knowledgeable about the red
17 flags.  We wanted them to, if they
18 were to make these observations or
19 other observations that somehow
20 seemed unusual to them, we wanted
21 them to collect that information
22 and pass it back to us in the
23 diversion control section so that
24 we could follow up, yes.

Page 241

1  BY MR PIFKO:
2    Q.   And you believe that by them
3  presenting that information, it can aid
4  the company in preventing diversion,
5  correct?
6        MR. NICHOLAS:  Object to the
7  form.
8        THE WITNESS:  By training
9  our diversion -- I mean, by
10 training our sales staff, I'm
11 sorry, this was just another step
12 that we took that we felt was
13 required to fulfill our
14 responsibilities under the
15 regulations.
16 BY MR PIFKO:
17   Q.   Is this a step that was
18 added to your process?
19       MR. NICHOLAS:  Object to the
20 form.
21       THE WITNESS:  There was some
22 training that took place of our
23 sales staff.  I believe I saw, in
24 the past, other PowerPoints that

Page 242

1    were presented. But I can't talk
2    about the specifics in terms of
3    who and when that was done.
4  BY MR PIFKO:
5    Q.   Well, when you came into the
6  position, you undertook an effort to
7  become familiar with what the protocols
8  and processes were, correct?
9        MR. NICHOLAS:  Object to the
10   form.  Asked and answered a number
11   of times.
12       THE WITNESS:  When I joined,
13   I tried to become aware of as much
14   as I could around the entire
15   diversion control program.
16 BY MR PIFKO:
17   Q.   And was there any effort in
18 2015 -- or, sorry, 2014, when you joined
19 the company, to collect that kind of
20 information and put it in a usable form?
21       MR. NICHOLAS:  Objection.
22   Outside the scope.
23       THE WITNESS:  Could you
24   define your question a little bit

Page 243

1    more?  Because it's a little bit
2    open-ended.
3  BY MR PIFKO:
4    Q.   These red flags of diversion
5  we're talking about, and specifically
6  we're talking about the training that was
7  done and how sales associates can make
8  observations that could help the company
9  in its efforts to prevent diversion.
10       And what I'm asking you is
11 whether you're -- if you're aware of
12 whether the company had any processes or
13 procedures to obtain and use that
14 information, in 2014, to prevent
15 diversion?
16       MR. NICHOLAS:  Objection.
17   Form.  And outside the scope.
18       THE WITNESS:  So I guess I'm
19   a little confused, because this
20   would be an example of the
21   training that we provided to our
22   sales staff.
23       And maybe I'm missing
24   something.  I'm still not

Page 244

1    completely understanding.
2        Did the company have other
3    information like this that it
4    shared with its sales executives?
5  BY MR PIFKO:
6    Q.   It's okay.  Sorry that you
7  don't understand.
8    A.   Sure.  Thanks.
9    Q.   This is after you joined the
10 company, right?
11   A.   Yes.
12   Q.   You gave this presentation?
13   A.   I did.
14   Q.   You had never given this
15 presentation before, right?
16   A.   Correct.
17   Q.   So my question is, before
18 you had given this presentation, were you
19 aware of whether there was any effort by
20 the company to obtain this type of
21 red-flag information from sales
22 associates and use it in their efforts to
23 prevent diversion?
24       MR. NICHOLAS:  Well,

Page 245

1    objection to the form.  And to the
2    scope.  And I think it's a
3    misleading question in light of
4    what the witness has just said
5    back to you.
6        THE WITNESS:  As I responded
7    previous, there was some training
8    that was done, prior to my
9    arrival, of the sales staff.  And
10   I remember seeing some
11   documentation, whether it was a
12   PowerPoint presentation, I don't
13   recall specifically what that was,
14   where similar training was
15   provided to our sales staff.
16       I can't really comment on
17   the specific content at this
18   point, because it was something
19   that I viewed among everything
20   else around our diversion control
21   program when I walked through the
22   doors.
23 BY MR PIFKO:
24   Q.   Do you know if there were

Page 246

1 any systems in place to collect
2 information and use it at the time that
3 you joined, that type of information?
4        MR. NICHOLAS:  Objection.
5     Form.  Scope.  And there was
6     questioning on this yesterday of a
7     witness for whom this was within
8     the scope of his 30(b)(6)
9     deposition.
10       THE WITNESS:  Again, collect
11    this type of information.  So
12    diversion red flags for sales
13    executives.  Again, my response
14    would be the same.  I recall some
15    training that was given.  The
16    content of the training, I
17    don't -- I don't recall.
18 BY MR PIFKO:
19    Q.   My question is not about the
20 training.  It's about whether there was
21 processes and protocols in place to use
22 information that sales associates might
23 have provided from these red flags of
24 diversion.  That's what I'm asking you.

Page 247

1        MR. NICHOLAS:  Objection.
2 BY MR PIFKO:
3    Q.   And to be clear, I'm asking
4 you in your personal capacity.
5        MR. NICHOLAS:  Okay.
6     Objection.  Asked and answered a
7     number of times.  This is
8     repetitive.
9        THE WITNESS:  In terms of
10    the latter part of your question,
11    whether there were protocols in
12    place, I don't know.
13       MR PIFKO:  Let's take a
14    break.
15       VIDEO TECHNICIAN:  Going off
16    record.  2:17 p.m.
17          - - -
18    (Whereupon, a brief recess
19 was taken.)
20          - - -
21       VIDEO TECHNICIAN:  We're
22 back on record.  The time is 2:32
23 p.m.
24          - - -

Page 248

1        (Whereupon,
2     AmerisourceBergen-May Exhibit-10,
3     ABDCMDL 00159072, was marked for
4     identification.)
5          - - -
6 BY MR PIFKO:
7    Q.   I'm handing you what's
8 marked as Exhibit-10.  Sorry, I handwrote
9 the date on the copy, I thought it was
10 mine.  That's the only writing that's on
11 there.
12       For the record, this is a
13 document Bates labeled ABDCMDL 00159072.
14 Take a moment to review this
15 and let me know when you're done.
16       For the record, it's dated
17 October 6th, 2016.  The custodian is
18 David May.  The file name is NADDI
19 slides.
20    A.   Okay.
21    Q.   Have you seen this before?
22    A.   I recognize the content as
23 content that I delivered to a NADDI
24 training conference, NADDI being National

Page 249

1 Association of Drug Diversion
2 Investigators.
3    Q.   What was the purpose of this
4 presentation?
5    A.   Again, it was intended to be
6 educational for the law enforcement
7 community about who wholesale
8 distributors were and how we could assist
9 them in their efforts.
10    Q.   This is a presentation that
11 you gave to that organization on or
12 around October 2016?
13    A.   So I've given two
14 presentations.  I believe this is the
15 first presentation, yes.
16    Q.   And you believe it was some
17 time in October 2016?
18    A.   I don't have anything that's
19 dated, but -- I'd have to actually
20 confirm the date unless there's some
21 other document you can point me to that I
22 can confirm the date.
23    Q.   I can just tell you that the
24 data associated with the document said

Page 250

1  that it was dated October 6th, 2016.
2      A.   So let's assume it's around
3  that time period.
4          If I created the document,
5  then, presumably, it would have been in
6  relation time-wise to when I gave the
7  presentation.
8      Q.   Let's go to -- well, the
9  first slide.
10         Do you see the language on
11 the first page here in the notes,
12 McKesson, Cardinal and AmerisourceBergen
13 have a combined market share in excess of
14 90 percent?
15     A.   Yes.
16     Q.   Do you agree with that
17 statement?
18         MR. NICHOLAS:  Object to the
19     form.
20         THE WITNESS:  Again, I would
21     have researched that at that time
22     period and derived information
23     from others at the time period
24     when this was given.

Page 251

1          I recognize that the
2      information I received, I assume
3      that it was correct, that was
4      provided to me.  And it's a
5      general estimate.
6  BY MR PIFKO:
7      Q.   Do you recall before we were
8  talking about market share?
9      A.   I do.
10     Q.   And I had a question about
11 whether if you believed that the three
12 distributors with almost all of the
13 market share played any role in the
14 opioid epidemic.
15         Do you recall that
16 discussion?
17     A.   I do.
18     Q.   So now seeing the data, do
19 you believe that the entities who
20 controlled 90 percent of the
21 pharmaceutical distribution market had an
22 ability to take actions that would have
23 reduced the impact on the opioid crisis?
24         MR. NICHOLAS:  Object to the

Page 252

1      form.  Objection to the scope.
2      Asked and answered.
3          THE WITNESS:  And I would
4      rely upon my previous response as
5      well.  And restate it.
6          I can't sit here and speak
7      to the programs or market share
8      relative to Cardinal and McKesson.
9      I can say that, regardless of
10     market share, regardless of being
11     AmerisourceBergen or one of the
12     other 800 wholesale distributors,
13     it's not about market share, it's
14     really about everyone doing what
15     they're supposed to be doing.
16 BY MR PIFKO:
17     Q.   And that's how we prevent
18 diversion and prevent the opioid crisis?
19         MR. NICHOLAS:  Object to the
20     form.  Object to the scope.
21         THE WITNESS:  I'll rely on
22     my previous response.
23 BY MR PIFKO:
24     Q.   Well, you said regardless of

Page 253

1  market share, regardless of being
2  AmerisourceBergen or one of the other 800
3  wholesale distributors, it's not about
4  market share, it's about, really,
5  everyone doing what they're supposed to
6  be doing.
7          What's everybody supposed to
8  be doing?
9          MR. NICHOLAS:  Object to the
10     form.  Object to the scope.
11     Object to the cross-examination of
12     the witness by his very last
13     answer.  I'll object.
14         THE WITNESS:  Again, from
15     your question, I understand you to
16     mean that, because of market
17     share, that that market share
18     somehow gives us some influence
19     over the opioid issue.  And my
20     statement is that it's not a
21     question of market share.  And at
22     AmerisourceBergen, we have
23     requirements that are put upon us
24     and we fulfill those requirements.

Page 254

BY MR PIFKO:

Q. And if everybody is doing what they can be doing, that's how you impact the crisis, correct?

MR. NICHOLAS: Well, object to the form. Object to the scope. Object to the fact that you've asked the question about seven or eight times, probably more, probably fifteen or twenty times today. Asked and answered.

THE WITNESS: I think I responded several times to this.

And, again, I would just emphasize that throughout the closed system, there are different requirements imposed upon different registrants. And, yes, if all registrants comply with their requirements, then it would have a positive effect on diversion control.

BY MR PIFKO:

Q. Let's go to Slide 5, which

Page 255

is on Page 5.

Are you there?

A. Yes.

Q. There's a picture of a form and then a discussion below about the information you collect from your customers pursuant to the "know your customer" requirement.

A. Yes.

Q. Do you see that?

Is this the Form 590?

A. Yes.

Q. And let's go up to the previous slide. Page 4.

You have a comment here that says, You don't see specific reference to knowing your customer in the law and regulations, but you do see repeated references to the concept in the final decisions and orders issued relative to actions taken by DEA against registrants, as well as in public training sessions by DEA.

Do you see that?

Page 256

A. I do.

Q. Do you agree with that statement?

MR. NICHOLAS: Object to the form.

THE WITNESS: I do agree with that statement in the context of this training. I would also say that you see reference to due diligence in other areas as well; namely being the limited guidance DEA has furnished in the form of those memorandum that were shared.

BY MR PIFKO:

Q. And you believe knowing your customer and due diligence is part of the requirement to maintain effective controls to prevent diversion?

MR. NICHOLAS: Object to the form. Object to the scope.

THE WITNESS: I'm so sorry, can you repeat your question, please?

BY MR PIFKO:

Page 257

Q. Do you believe that knowing your customer and due diligence is part of the requirement to maintain effective controls to prevent diversion?

MR. NICHOLAS: Object to the form. Object to the scope.

THE WITNESS: I believe that knowing your customer and due diligence is an aspect of AmerisourceBergen's program to satisfy their requirements.

BY MR PIFKO:

Q. Do you believe that knowing your customer is required under the law?

MR. NICHOLAS: Object to the form. Object to the scope. And he's not a lawyer.

THE WITNESS: Again, without giving a legal opinion, we have, as part of our program that we administer, our diversion control program, a "know your customer" component, which we exercise in order to accomplish due diligence.

Page 258

1  BY MR. PIFKO:
2      Q.   Do you believe that's a
3  necessary component of the program in
4  order for it to be effective?
5          MR. NICHOLAS:  Object to the
6      form.  Object to the scope.
7          THE WITNESS:  I believe that
8      it's a requirement that we have at
9      AmerisourceBergen, and it's one
10     that we've had in place and it's
11     part of our program.
12 BY MR PIFKO:
13     Q.   You don't have a position
14 about whether it's required?
15         MR. NICHOLAS:  Object to the
16     form.  Object to the scope.  Asked
17     and answered.
18         THE WITNESS:  So, again, I
19     can't furnish a legal opinion.
20         What I can say is that I
21     believe we have and should have a
22     "know your customer" component;
23     and we do have a "know your
24     customer" component at our company

Page 259

1      as part of the diversion control
2      program.
3  BY MR PIFKO:
4      Q.   Let's go to Page 19.
5          Are you there?
6      A.   I am.
7      Q.   So the notes that you wrote
8  here say, Final point, we must be mindful
9  of our actions in addressing the epidemic
10 of prescription drug abuse.  I will use
11 the relationship between prescription
12 opioids and heroin as an example.  When I
13 was overseeing the drug task force in
14 Charlotte ten years ago, there was a rise
15 in the influence of Mexican DTOs in
16 growing the heroin market.  The issue was
17 overwhelming and the cross-culture of
18 people that were using heroin amazed me.
19 Over the last couple of years, the
20 overall tightening of the prescription
21 opioid market has led to increased heroin
22 abuse.  Having confronted both issues, I
23 believe that our chances for success are
24 much better in the public arena working

Page 260

1  with pharmacists and doctors.
2          Do you see that?
3      A.   I do.
4      Q.   Did I read that correctly?
5      A.   You did.
6      Q.   Is that a statement that you
7  made at the time?
8      A.   It was.
9      Q.   Did you present this to
10 the -- at the conference, did you make
11 that statement at the conference?
12     A.   I don't know if I made that
13 precise statement.  These are notes that
14 I used.
15     Q.   Do you believe these
16 statements to be true?
17         MR. NICHOLAS:  Object to the
18     form.
19         But go ahead.
20         THE WITNESS:  I do.
21 BY MR PIFKO:
22     Q.   When you say "the overall
23 tightening of the prescription opioid
24 market has led to increased heroin

Page 261

1  abuse," what do you mean by that?
2      A.   I think there's been several
3  actions that have been taken where it's
4  becoming more difficult for people to
5  receive prescription opioids over time.
6  And there are a number of different
7  reasons why.
8          I think that people who may
9  be addicted and can no longer get a
10 prescription opioid, can that cause them
11 to then go to the illegal market?  I
12 think it can.  Has that caused folks to
13 do that?  I think it has.
14         I guess my only caveat here
15 is, I can't estimate to what extent that
16 this is -- where this is prevalent.
17     Q.   You thought this was a
18 significant enough point to make the
19 conclusion of your presentation, agree?
20         MR. NICHOLAS:  Object to the
21     form.
22         THE WITNESS:  I think it was
23     one of many points I made during
24     the presentation.

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1 BY MR PIFKO:
2    Q.   This was an impactful point
3 you wanted to make at the end of the
4 presentation, agree?
5        MR. NICHOLAS:  Object to the
6    form.
7        THE WITNESS:  I think all of
8    the information I provided during
9    the presentation was important for
10   the audience, including this
11   information.
12 BY MR PIFKO:
13   Q.   Mexican DTO, that just means
14 drug trafficking organization?
15   A.   Correct.
16   Q.   Do you know who the sponsors
17 of NADDI are?
18   A.   Not off the top of my head,
19 I do not.
20   Q.   Do you know if prescription
21 drug manufacturers participate in that
22 organization?
23       MR. NICHOLAS:  Object to the
24   form.  Objection.  Asked and

Page 263

1 answered.
2        THE WITNESS:  I know that
3    there are participants both from
4    the private and public sector.
5 BY MR PIFKO:
6    Q.   Let's go back to Slide 5.
7 This is the Form 590.
8        Is the Form 590 an important
9 part of AmerisourceBergen's diversion
10 control program?
11       MR. NICHOLAS:  Object to the
12   form.  Objection as to scope.
13       THE WITNESS:  I would say
14   that all aspects of our program
15   are important.  I couldn't -- I
16   couldn't categorize this as more
17   or less important than other
18   facets of our program.  It's
19   another facet of our program.
20 BY MR PIFKO:
21   Q.   So this talks about the
22 types of information that are sought in
23 the form.
24       Do you see that?

Page 264

1    A.   I do.
2    Q.   In the interest of time, I
3 won't necessarily read over all of it.
4    A.   Okay.
5    Q.   But what does the company do
6 with this information?
7        MR. NICHOLAS:  Object as to
8    form.  And scope.
9        THE WITNESS:  So when we are
10   onboarding a customer, this
11   information is collected during a
12   site visit.  And then a member of
13   the team will receive this
14   information and they'll go through
15   the form.  We have a related form
16   that's a checklist.  We'll
17   validate, to the extent possible,
18   the contents of the form.
19       And so we would validate
20   licenses, where we ask the
21   questions.  We would collect
22   information relative to certain
23   estimates of drug usage.  We would
24   ask about prior disciplinary

Page 265

1 action.  And we would then, you
2 know -- again, use public
3 resources to collect and validate
4 the information that's on the
5 form, wherever possible; go to the
6 various boards, Board of Pharmacy,
7 boards of medicine, if we have
8 physician information, check for
9 prior disciplinary action.
10       And after that process is
11 complete, we would make a decision
12 whether we wanted to continue with
13 the onboarding of the prospective
14 customer.
15 BY MR PIFKO:
16   Q.   Is there any effort, within
17 the time frame that you're the 30(b)(6)
18 witness, to update that information after
19 a customer is onboarded?
20   A.   There are times that we
21 update this information, yes.  There may
22 be changes at the location.  If there is
23 a change of address, of course that would
24 affect the license of the location, so we

Highley Confidential - Subject to Further Confidentiality Review

Page 266

1  would need to update that information.
2       If there was a change of
3  ownership and the location didn't move,
4  but we needed to get the new information
5  on ownership.  And we would also do it on
6  an as-needed bases.  For example, if we
7  were involved with the customer, in terms
8  of trying to mitigate some red flag
9  information, we may request an updated
10 form.
11      Q.   Let's turn to Slide 17.
12           I'll read you from the notes
13 here.  This is -- the image on Slide 17
14 is an image of The Controlled Substances
15 Act closed system of distribution, agree?
16      A.   Yes.
17      Q.   You have a statement here
18 that says, I truly believe that if we all
19 live up to our individual
20 responsibilities and obligations, we will
21 collectively have a huge, positive impact
22 on the prescription abuse issue.  On the
23 other hand, any weak links in the system
24 will cause all of us to become less

Page 267

1  effective.
2           Do you see that?
3      A.   I do.
4      Q.   Do you agree with that
5  statement?
6           MR. NICHOLAS:  Object to the
7      form.
8           THE WITNESS:  I do.  And I
9      guess in the context, again, of
10     this meeting, if we start to make
11     this a full statement, and, I
12     guess, just as a point of
13     demonstrating our consistency, you
14     know, we all -- registrants have
15     regulations from requirements
16     imposed upon us by virtue of our
17     role in the system.  I think I've
18     answered that several times today.
19          And I believe that if we all
20     live up to those roles, we'll
21     collectively have a positive
22     impact.  I believe that to be
23     true, and I think I've been pretty
24     consistent about that.

Page 268

1  BY MR PIFKO:
2      Q.   You then say, To that end, a
3  wholesaler is responsible for knowing the
4  customer and monitoring the controlled
5  substances and listed chemicals shipped
6  to that customer, rejecting and reporting
7  suspicious orders.
8           Do you see that?
9      A.   I do.
10     Q.   Do you agree with that
11 statement?
12          MR. NICHOLAS:  Object to the
13     form.
14          THE WITNESS:  I agree with
15     the statement.
16               - - -
17          (Whereupon,
18     AmerisourceBergen-May Exhibit-11
19     ABDCMDL 00140843-44, was marked
20     for identification.)
21               - - -
22 BY MR. PIFKO:
23     Q.   I'm handing you what is
24 marked as Exhibit-11.  For the record,

Page 269

1  it's a two-page document, Bates labeled
2  ABDCMDL 00140843 through 44.
3           Have you seen this before?
4      A.   Not directly on here.  But I
5  am included on distribution to CSRA OMP,
6  and so I have some recollection of this
7  e-mail.
8      Q.   Well, let's just talk
9  generally.  You can put this document
10 aside for a minute.
11     A.   Sure.
12     Q.   Do you recall there being
13 issues with deficiencies with the Form
14 590s?
15     A.   I do recall, generally
16 speaking, there have been some occasions
17 where we'll have forms where they are not
18 completely legible, and there may have
19 also been occasions where not all of the
20 responses were provided.
21     Q.   And the company was
22 undertaking efforts to try to address
23 these deficiencies in 2016; is that
24 correct?

Highley Confidential - Subject to Further Confidentiality Review

Page 270

1 MR. NICHOLAS: Object to the
2 form of the question, as it wasn't
3 his testimony.
4 Go ahead.
5 THE WITNESS: Again, I guess
6 I'll comment that, generally
7 speaking, we're always trying to
8 be vigilant to maintain our
9 processes. So I wouldn't identify
10 it as any particular time. It's
11 an ongoing process.
12 - - -
13 (Whereupon,
14 AmerisourceBergen-May Exhibit-12,
15 ABDCMDL 00159415-16, was marked
16 for identification.)
17 - - -
18 BY MR PIFKO:
19 Q. I'm handing you what's
20 marked as Exhibit-12. This document is
21 Bates labeled ABDCMDL 00159415 and 16.
22 Have you seen this document
23 before?
24 And you can continue to

Page 271

1 review it, I'm just trying to speed
2 things along for everybody.
3 A. I have, yes.
4 Q. Do you know what this is?
5 A. It's an e-mail string
6 regarding the CSRA 590 validation
7 project.
8 Q. And the e-mail in the bottom
9 of the first page, you are cc'd on there,
10 correct?
11 A. Yes.
12 Q. It's dated August 5th, 2016,
13 correct?
14 A. Correct.
15 Q. Do you recall receiving this
16 e-mail?
17 A. I recognize the content and
18 recall the e-mail.
19 Q. When was the last time you
20 saw this e-mail?
21 A. I haven't seen it recently.
22 Probably at that time.
23 Q. Is this a true and correct
24 copy of the e-mail?

Page 272

1 A. Yes.
2 Q. It says here that, Over the
3 past several months, the CSRA diversion
4 control team -- that's your team,
5 correct?
6 A. Yes.
7 Q. -- has been working on the
8 CSRA 590 validation project. This
9 project was initiated to validate that
10 all current ABDC customers authorized to
11 purchase controlled substances have the
12 required due diligence documentation in
13 file.
14 Do you see that?
15 A. Yes.
16 Q. Do you agree that that was
17 what the project was?
18 MR. NICHOLAS: Object to the
19 form.
20 THE WITNESS: Yes.
21 BY MR PIFKO:
22 Q. It says, The first phase of
23 this project was to conduct a full review
24 of every ABDC customer authorized to

Page 273

1 purchase controlled substances and
2 identify any with deficiencies.
3 Did I read that right?
4 A. Yes.
5 Q. This initial phase has been
6 completed, and a substantial number of
7 customers have been identified who will
8 be required to have their 590
9 documentation updated. See attached
10 spreadsheet.
11 Do you see that?
12 A. I do.
13 Q. Then you write back
14 approximately a year later.
15 Do you see the top e-mail
16 from you dated July 7th, 2017?
17 A. Yes.
18 Q. And you say, All, I wanted
19 to check in with you on the progress
20 being made on this project.
21 Unfortunately, as of this writing, we
22 have only received about 10 percent of
23 the required customer due diligence
24 documents. If you recall, we originally

Page 274

1 set a June 30th -- set June 30th as a
2 completion date for the continued -- let
3 me start over on that sentence.
4        If you recall, we originally
5 set June 30th as a completion date and
6 the continued deficiency puts us at risk
7 with regulators.
8        Do you see that?
9    A.   I do.
10    Q.   Do you agree with that
11 statement?
12        MR. NICHOLAS:  Object to the
13    form.
14        THE WITNESS:  Yes.
15 BY MR PIFKO:
16    Q.   And you wrote that in this
17 e-mail?
18    A.   Yes.
19    Q.   Do you know how many 590
20 forms were missing or had missing
21 information?
22    A.   I believe there was
23 approximately 3,000.
24        But I do want to get back to

Page 275

1 one thing while you were reading there.
2 You stated, when you started reading the
3 second part of this e-mail, that almost a
4 year later I responded.  And I just want
5 to address that.
6        This was an e-mail that was
7 sent to sales executives.  I don't want
8 to leave you with the impression that
9 there were not other multiple e-mails
10 related to this e-mail and dispel that
11 notion that there was this one e-mail and
12 then there was this one e-mail to these
13 sales executives.
14        I don't know what other
15 e-mails are out there, but I know that
16 there was a lot of communication relative
17 to this project.
18    Q.   Okay.  Understood.
19        All I wanted to point out
20 with the year date difference is that
21 we're a year later, and that a year later
22 after sending the original e-mail about
23 this project, only 10 percent of the
24 required documents had been obtained,

Page 276

1 agree?
2        MR. NICHOLAS:  Object to the
3    form as to his agreeing as to what
4    you were trying to point out.
5        THE WITNESS:  I understood
6    that part of your question.
7        But I didn't want to, again,
8    leave the impression that an
9    e-mail was sent on August 5th and
10    then I didn't respond until a year
11    later.
12 BY MR PIFKO:
13    Q.   I didn't think that that was
14 the case.
15        - - -
16        (Whereupon,
17    AmerisourceBergen-May Exhibit-13,
18    Tab Printout; Sales Assignment,
19    was marked for identification.)
20        - - -
21 BY MR PIFKO:
22    Q.   I just put in front of you
23 Exhibit-13.
24        You see that this e-mail

Page 277

1 references having an attachment of a 590
2 validation master spreadsheet --
3    A.   Yes.
4    Q.   -- dated July 28th, 2016?
5        Do you see that?  You've got
6 to go to Exhibit-12, if you look at the
7 header of the e-mail.
8    A.   Yes.  Attachment.  I see it.
9    Q.   So if you go over to
10 Exhibit-13, there were three tabs in the
11 document, or four tabs.  This is one of
12 the tabs, it's called, Sales Assignment.
13        Do you know what this tab
14 reflects?
15        MR. NICHOLAS:  Where is the
16    tab?  I'm sorry.
17        MR PIFKO:  It was produced
18    natively, but what we do when we
19    produce these is Bates label -- to
20    use it as an exhibit, the Bates
21    label is at the top and the tab is
22    on a footer on the bottom.
23        THE WITNESS:  Again, in the
24    context of this e-mail, and this

Page 278

1  being represented as one of the
2  attachments, this appears to be a
3  list, in the left column, customer
4  DEA number.  And we tracked the
5  DEA registration.
6        And then it tells the
7  various sales folks that are
8  assigned to the registration.  And
9  that would have been produced to
10  help us organize this work.
11 BY MR PIFKO:
12    Q.   And this is a list of all
13 the customers whose Form 590 was missing,
14 correct, or --
15        MR. NICHOLAS:  Object to the
16 form.
17 BY MR. PIFKO:
18    Q.   -- had deficient
19 information?
20        MR. NICHOLAS:  Object to the
21 form.
22        THE WITNESS:  Again, I know
23 we compiled the list.  I know we
24 keep a spreadsheet of it.  I'm not

Page 279

1  sure, in looking at this, you
2  know, multi-page document, if this
3  is an accurate description.
4        I guess what I'll say is
5  that -- well, a couple of things
6  that I want to put in context
7  here.
8        First, in terms of this work
9  itself, and maybe I misinterpreted
10 your question, but this would
11 represent -- this project would
12 represent cases where we could not
13 locate due diligence files, in
14 terms of our customer base, and as
15 a result of that, where we could
16 not locate those due diligence
17 files, we initiated this project.
18        And I guess that's
19 important, I guess, to realize
20 as -- I don't want to leave the
21 impression that we didn't have due
22 diligence for these customers.  I
23 want to make sure that we all
24 understand that this project

Page 280

1  revolved around finding situations
2  where we didn't have the
3  documentation in the file.  And
4  that's what was the focus of the
5  file.
6        So that's the first --
7  BY MR PIFKO:
8     Q.   What's the difference
9  between not having the information and it
10 not being in the file?
11        MR. NICHOLAS:  Object to the
12 form.
13 BY MR PIFKO:
14    Q.   If it's not in the file, you
15 don't have the information, agree?
16        If I don't have anything in
17 my hand, I don't have anything in my
18 hand.
19    A.   So --
20        MR. NICHOLAS:  Object to the
21 form.
22        THE WITNESS:  So, again, I
23 just want to make sure that we
24 understand the context of the

Page 281

1  project.
2        And that is that we
3  identified a number of accounts
4  where we couldn't locate the
5  information.
6        My point there is I'm not
7  acknowledging that there were not
8  due diligence efforts made in
9  documentation collected.  At the
10 time of this review, we couldn't
11 find that information.  And that's
12 what this project involved.
13        So that's just to put this
14 in context.
15        The second part, again, do
16 these represent a part of or the
17 totality of those accounts, I
18 can't say by looking at this
19 stack.
20 BY MR PIFKO:
21    Q.   Is that stack pretty large?
22        MR. NICHOLAS:  Object to the
23 form.
24        THE WITNESS:  Again, I think

Page 282

1  you asked a question about how
2  many accounts there were. I
3  think, to my recollection, there
4  were roughly 3,000 when we
5  initiated that, to the best of my
6  recollection.
7  BY MR PIFKO:
8  Q.   That stack of customers,
9  though, how thick is that in front of
10 you?
11      MR. NICHOLAS: Well, object
12 to the form.
13 BY MR PIFKO:
14 Q.   Can you hold it up?
15 A.   It's about an inch thick, I
16 guess.
17 Q.   Can you hold it up?
18 A.   Sure.
19     MR. NICHOLAS: Objection.
20 Object to the form.
21 BY MR PIFKO:
22 Q.   Thank you.
23     MR. NICHOLAS: Showboating.
24 BY MR PIFKO:

Page 283

1  Q.   If I tell you that the
2  number of files where you could not
3  obtain the due diligence information as
4  of 2016, the number of customers was
5  3,285, would you agree with me?
6      MR. NICHOLAS: I'll object
7  to the form. The witness has
8  already given testimony on this.
9  But I'll object to the form of the
10 question.
11     THE WITNESS: My response
12 was I think there was
13 approximately 3,000, so I think
14 that's pretty consistent.
15 BY MR PIFKO:
16 Q.   So did you continue to
17 obtain this -- attempt to obtain this
18 information over the years?
19 A.   Yes.
20 Q.   Do you know what the status
21 of this project was as of 2017?
22 A.   I cannot say definitively
23 what the status was in 2017.
24 Q.   Do you know if these

Page 284

1  deficiencies have been remedied as of May
2  29th, 2018?
3      MR. NICHOLAS: Object to the
4  form.
5      THE WITNESS: I think the
6  project, in terms of its
7  completion -- and, again, I have
8  to estimate this -- is in the 60
9  percent range of completion, but
10 that's the best of my knowledge,
11 just sitting here today with no
12 documentation.
13 BY MR PIFKO:
14 Q.   At the present time, your
15 estimate, based on your involvement with
16 the project, is that there's still about
17 40 percent of them that have not been
18 rectified yet?
19     MR. NICHOLAS: Object to the
20 form.
21     THE WITNESS: That's my best
22 estimate, based upon my
23 recollection.
24 BY MR PIFKO:

Page 285

1  Q.   Thank you.
2  A.   But I think I'm in the
3  ballpark.
4  Q.   Do you know when the Form
5  590 process was implemented?
6  A.   Not precisely when.
7  Approximately when, I believe it was
8  around 2007, in terms of that particular
9  form. There may have been predecessors
10 that I can't comment on.
11     I'm not the best person to
12 talk about what the due diligence efforts
13 looked like prior to then.
14     - - -
15     (Whereupon,
16 AmerisourceBergen-May Exhibit-14,
17 ABDCMDL 00002232, was marked for
18 identification.)
19     - - -
20 BY MR PIFKO:
21 Q.   I'm handing you what's
22 marked as Exhibit-14.
23     For the record, this is a
24 one-page document Bates labeled ABDCMDL

Highley Confidential - Subject to Further Confidentiality Review

Page 286

1 00002232. It's some e-mails dated
2 December 9th, 2016.
3        Let me know when you're done
4 reviewing this.
5    A.   Okay.
6    Q.   Have you seen this e-mail
7 before?
8    A.   I have, during -- I guess it
9 would be December 9th, 2016.
10   Q.   Do you recall the discussion
11 in this e-mail?
12   A.   Generally, based upon the
13 content.
14   Q.   Is this a true and correct
15 copy of the e-mail?
16   A.   Yes.
17   Q.   Can you tell me about what's
18 discussed in the e-mail here?
19       MR. NICHOLAS:  Object to the
20 form.
21       THE WITNESS:  You know,
22 according to the content here that
23 I'll rely upon, it's an exchange
24 between a member of Purdue's

Page 287

1 compliance group and Eric
2 Cherveny, who works on our
3 diversion control team, about
4 media reports relative to
5 physicians.
6 BY MR PIFKO:
7    Q.   Eric says, FYI, Purdue
8 Pharma sends me this list periodically.
9 It's a list that Purdue maintains
10 regarding prescriber action.  Not sure
11 how they collect the data.  Yellow
12 highlighting indicates new action since
13 the last submission.  Blue highlighting
14 indicates a physician who was on a
15 previous report but who has had
16 subsequent action.  We need to discuss if
17 we're going to use this list and, if so,
18 how.
19       Do you see that?
20   A.   I do.
21   Q.   Do you recall getting this
22 list from Purdue Pharma?
23   A.   I do not recall whether we
24 did or did not get that list from Purdue

Page 288

1 Pharma.  And I'm guessing, from the
2 context here I'm seeing as you just read
3 it, Eric is stating that he doesn't know
4 how they provide the information.  But
5 from the lower e-mail, it looks like it's
6 generated from media reporting.
7    Q.   Do you recall getting this
8 list and doing anything with it?
9       MR. NICHOLAS:  Object to the
10 form of the question.  Asked and
11 answered.
12       THE WITNESS:  So, yeah, just
13 to repeat my response, I don't
14 know whether we did or did not get
15 a copy of that list.
16       I do know, as part of our
17 program, we do maintain a -- what
18 we refer to as a suspect
19 subscriber list, which is distinct
20 from this list.  I don't know if
21 Eric added this information to
22 that list or not at this point.
23 BY MR PIFKO:
24   Q.   The suspect subscriber list,

Page 289

1 can you tell me what that is?
2    A.   Again, when we receive
3 information relative to doctors, we
4 receive the DEA reports, the register
5 reports, as they come out, where DEA
6 announces their actions they've taken
7 against practitioners.
8       So if we were to receive one
9 of those reports where they've taken an
10 action against a practitioner, we would
11 add that information to the list so that
12 in doing our due diligence, if we came
13 across those doctors, we would have that
14 information.
15   Q.   Does AmerisourceBergen --
16 sorry.
17       With respect to the suspect
18 subscriber list, do you know when that
19 effort to collect that list was
20 initiated?
21       MR. NICHOLAS:  Objection
22 only as to scope.
23       THE WITNESS:  Previous to my
24 arrival.  It was -- to my

Page 290

1  recollection, it existed when I
2  arrived.
3  BY MR PIFKO:
4      Q.   With respect to the suspect
5  subscriber list, do you know if it was
6  AmerisourceBergen's practice to inform
7  customers in the area where the suspect
8  prescribers were about these physicians
9  and that they shouldn't fill
10 prescriptions from them if they had their
11 licenses revoked?
12      MR. NICHOLAS:  Objection as
13  to scope.
14      THE WITNESS:  Well, the
15  answer is no.  And I'm not even
16  sure how we would do that.
17 BY MR PIFKO:
18     Q.   How about with respect to
19 this list that Purdue Pharma sent you,
20 was there ever any effort to communicate
21 the company's knowledge of these
22 prescribers of concern identified by
23 Purdue to customers in the area where
24 these physicians were?

Page 291

1      MR. NICHOLAS:  Objection to
2  the form of the question.  The
3  witness has twice said he doesn't
4  know whether they received the
5  list or not.  So I don't want
6  there to be a misleading record
7  here.
8      THE WITNESS:  Same response.
9  I'm not sure what the outcome of
10 this e-mail string was relative to
11 the list provided by Purdue at
12 this time.
13 BY MR PIFKO:
14     Q.   Well, if there was a
15 practice of sharing it with your
16 customers, you would be aware of that,
17 right?
18      MR. NICHOLAS:  Object to the
19 form.
20      THE WITNESS:  I'm not
21 aware -- again, I've answered the
22 question.
23      But I'm not aware of us
24 sharing information, through some

Page 292

1  broadcasting, to our customers in
2  particular areas.  Again, I don't
3  even know how we would do that.
4      And I guess along that
5  point, the obligation of the
6  pharmacist really is preeminent
7  when it comes to knowing the
8  physicians for whom he's filling
9  prescriptions under his
10 corresponding responsibility.
11      So, again, that would be an
12 area that, as a wholesale
13 distributor, you know, that's --
14 that's within the responsibility
15 of the pharmacist, in my view.
16 BY MR PIFKO:



Page 293



Page 294

Page 296

1  or maybe it was four different
2  tabs.
3      MR. CLUFF:  I believe it's
4  four tabs.
5      MR. NICHOLAS:  Okay.  We
6  have gone back, on the break, we
7  have not talked to the witness
8  about this, and checked the tabs
9  and checked the stack of -- the
10 stack of -- that you displayed,
11 that you gave him, that purports
12 to represent the 3,000 files.
13      This stack is a stack of
14 approximately 13,000 files.  It is
15 not -- it does not display the
16 3,000 that you discussed.  The
17 3,000 that you discussed are
18 contained in Tabs 1 and Tabs 2,
19 which are identified as a red tab
20 and a blue tab.  If you print
21 those out and add them up, it does
22 appear to be about 3,000 or so.
23      So what I'm seeing is that
24 you gave him a list -- a stack of

Page 295

2      MR. PIFKO:  We're going to
3  take a short break.
4      VIDEO TECHNICIAN:  Going off
5  the record.  3:30 p.m.
6          - - -
7      (Whereupon, a brief recess
8  was taken.)
9          - - -
10     VIDEO TECHNICIAN:  We're
11 back on record at 3:44 p.m.
12     MR. NICHOLAS:  There was
13 testimony in the previous set of
14 questions about a list of --
15 concerning a list of due diligence
16 files that were missing or not
17 available.  And there was
18 testimony about the fact that
19 there was approximately 3,000 such
20 documents -- 3,000 such files.
21      There was also testimony
22 about the fact that these files
23 were contained or illustrated or
24 displayed on three different tabs,

Page 297

1  13,000, which does not represent
2  what you said it did; you asked
3  him questions about it; and then
4  you even had him hold it up on
5  camera.
6      Now, I'm going to ask you to
7  withdraw the line of questioning.
8      MR. PIFKO:  I will not
9  withdraw the line of questioning.
10     MR. NICHOLAS:  And I will
11 ask you to correct the record.
12     MR. PIFKO:  We can meet and
13 confer about it after this
14 deposition.
15     MR. NICHOLAS:  Wait a
16 minute.  Hold on.
17     MR. PIFKO:  I do not know
18 the facts that you are
19 representing to be true.
20     MR. NICHOLAS:  We can check
21 right now.  We have it right here.
22 I can show it to you in two
23 seconds.  I have the tabs.
24     MR. PIFKO:  We can do it off

Page 298

1  the record. I'll be happy to look
2  at it off the record.
3       If you want to go off the
4  record, I can take a look.
5       MR. NICHOLAS: Let's go off
6  the record, and you'll take a look
7  and then you tell me what you want
8  to do about it.
9       VIDEO TECHNICIAN: Going off
10 the record. 3:46 p.m.
11            - - -
12      (Whereupon, a discussion off
13 the record occurred.)
14            - - -
15      VIDEO TECHNICIAN: We're
16 back on record at 3:58 p.m.
17      MR. PIFKO: Let me represent
18 that when we went off the record,
19 counsel for defendants is stating
20 things to be facts, based on their
21 research of documents, in front of
22 the witness and trying to
23 influence the outcome of this
24 deposition and making accusations

Page 299

1  about improper conduct that we, in
2  his mind, allegedly did.
3       I can assure you that we had
4  no intention to misrepresent a
5  document or the record. We asked
6  the witness what it was.
7       And to be frank with you, if
8  you want to cross -- or if you
9  want to direct examine your
10 witness about something
11 afterwards, that is the
12 appropriate way to handle it.
13      And what you've done by
14 making these statements about what
15 facts you believe to be true in
16 front of the witness and in front
17 of all counsel here in the room is
18 you have tainted the process and
19 you testified and you created
20 facts.
21      And that -- you are done
22 with this whole thing. You lost
23 your opportunity to get the
24 witness to say, on his own

Page 300

1  volition, what it is or isn't.
2       MR. NICHOLAS: Okay. Let's
3  make sure the record is clear.
4       MR. PIFKO: It's -- I'm
5  taking this deposition. You're
6  not talking anymore.
7       MR. NICHOLAS: No, no. I'm
8  going to talk, okay?
9  BY MR. PIFKO:
10      Q.  Sir, I'm going to hand you
11 Exhibit --
12      MR. NICHOLAS: I'm going to
13 talk. Because you haven't let
14 me -- we went off the record so
15 you --
16      MR. PIFKO: No. No. We're
17 done. You are not talking during
18 this deposition. I am taking this
19 deposition, okay?
20      MR. NICHOLAS: We went off
21 the record so we could show you
22 the basis for why I'm saying --
23      MR. PIFKO: And you did not
24 show an adequate basis.

Page 301

1       MR. NICHOLAS: Well, that's
2  what you say. You looked at it.
3       Now, what you're telling
4  me --
5       MR. PIFKO: And did all of
6  this in front of the witness.
7  This is totally improper.
8       MR. NICHOLAS: I'm going to
9  ask you --
10      MR. PIFKO: I'm not
11 listening to you. It's my
12 deposition. You need to be quiet.
13      If you want to meet --
14      MR. NICHOLAS: Hold on.
15 Hold on.
16      MR. PIFKO: If you want to
17 meet and confer with me about
18 something after this deposition,
19 I'll be happy to listen to you.
20      MR. NICHOLAS: Listen to
21 your question before you say that.
22 Listen to the question you asked
23 on the record.
24      MR. MAHADY: Question: And

Highley Confidential - Subject to Further Confidentiality Review

Page 302

1  this is a list of all --
2       MR. PIFKO:  You're
3  continuing to influence the
4  process --
5       MR. MAHADY:  -- incorrect or
6  deficient --
7       MR. NICHOLAS:  I'll read it.
8       Question by you, Mr. Pifko:
9  And this is all -- and this is a
10  list of all the customers whose
11  Form 590 was missing, correct?  Or
12  had deficient information?
13      MR. PIFKO:  And then I asked
14  him, is that true?
15      And he can say whatever he
16  can say.  If I'm wrong, I'm wrong.
17  He can say whatever he said.  He
18  answered.
19      I didn't -- I can't put
20  facts into his mind.
21      MR. NICHOLAS:  You
22  deliberately --
23      MR. PIFKO:  I did not
24  deliberately do anything.

Page 303

1       MR. NICHOLAS:  Not only did
2  you deliberately print the wrong
3  list, but then you had him hold
4  the list up.
5       MR. PIFKO:  You have no
6  evidence I deliberately printed
7  anything.
8       MR. NICHOLAS:  Are you
9  denying it?
10      MR. PIFKO:  Yes.  I did not
11  deliberately --
12      MR. NICHOLAS:  Are you
13  denying that you did not know --
14  you did not know this is the wrong
15  list?
16      MR. PIFKO:  I did not
17  deliberately do anything here.
18      MR. NICHOLAS:  Do you agree
19  this is the wrong list?
20      MR. PIFKO:  No.  Based on
21  what you've shown, I do not know
22  that that's the wrong list.
23      MR. MAHADY:  So you skipped
24  the first three tabs, went to Tab

Page 304

1  4 and ignored the summary?
2       MR. PIFKO:  We had the
3  summary.  And I just read him the
4  summary, and I asked him if that
5  was the number.  I read the exact
6  number, you all heard it, 3,285.
7  That was the number.  I asked him
8  if that was the number.
9       MR. NICHOLAS:  Yes.  We're
10  all agreeing that there were
11  approximately -- the record says
12  what it says --
13      MR. PIFKO:  Right.  So
14  there's no --
15      MR. NICHOLAS:  -- which is
16  approximately 3,000 files.
17      MR. PIFKO:  So there's no --
18  there's no problem with the
19  record.
20      MR. NICHOLAS:  You gave him
21  a stack of 13,000 --
22      MR. PIFKO:  There's no
23  problem with the record.
24      MR. NICHOLAS:  -- and asked

Page 305

1  him if that is the list of 3,000.
2       MR. CLUFF:  Let me just ask
3  one question here.
4       Do you agree that that is a
5  tab from the spreadsheet in
6  question?
7       MR. NICHOLAS:  It is the
8  wrong -- no.
9       MR. CLUFF:  I'm asking just
10  for foundation.
11      That's not in the tab?
12      MR. NICHOLAS:  No.
13      MR. CLUFF:  That's not in
14  the spreadsheet?
15      MR. MAHADY:  It's in the
16  spreadsheet and there's a summary.
17      MR. NICHOLAS:  There were --
18      MR. PIFKO:  That's what I'm
19  asking, it was in the spreadsheet.
20      MR. NICHOLAS:  -- four tabs.
21  There were four tabs.
22      MR. PIFKO:  It doesn't
23  matter --
24      MR. NICHOLAS:  There were

Page 306

1  four tabs. And you gave him the
2  wrong one.
3      MR. CLUFF: And we printed
4  all four of them.
5      MR. NICHOLAS: And you're
6  taking the wrong one --
7      MR. CLUFF: We were prepared
8  to ask the witness further
9  questions --
10     MR. NICHOLAS: You
11 deliberately --
12     MR. CLUFF: You told us that
13 that was not the list. You did
14 not tell us that was not the list.
15 That's the record.
16     MR. MAHADY: You skipped the
17 first three --
18     MR. CLUFF: You say what you
19 want.
20     MR. MAHADY: -- tabs and
21 went right to Tab 4.
22     MR. CLUFF: This is
23 discovery, Zach.
24     MR. MAHADY: If you have the

Page 307

1  other three, show him the list.
2  If you have the other three tabs,
3  show him the other three tabs.
4      MR. CLUFF: You are free to
5  show him the other tabs. We asked
6  him a line of questions about the
7  tab that we wanted to talk about
8  to begin with.
9      His testimony was that was
10 the tab, when he was asked, of the
11 customers.
12     MR. NICHOLAS: You poisoned
13 the record.
14     MR. PIFKO: No, you did,
15 okay?
16     MR. NICHOLAS: You poisoned
17 the record. You guys poisoned the
18 record by deliberately giving him
19 the wrong thing.
20     MR. PIFKO: If it makes you
21 feel better, I will hand him the
22 other tabs. I was honestly trying
23 to be quick. You've mentioned on
24 multiple occasions that you want

Page 308

1  to get out of here. It's a
2  Saturday --
3      MR. NICHOLAS: No, I know we
4  are going seven hours, there's no
5  question about that. We went
6  seven hours yesterday and we're
7  going seven today.
8      I'm not trying to harass --
9      MR. PIFKO: If I go seven
10 hours, that's my right, okay? I'd
11 like to be done as soon as I can
12 as well, okay? And this time
13 arguing does not count towards the
14 record.
15     If it would make you feel
16 better, I would be happy to show
17 him the other tabs. The numbers
18 he discussed are the numbers.
19 That's the fact.
20     MR. NICHOLAS: I'm not --
21     MR. PIFKO: So it doesn't
22 make any difference.
23     MR. NICHOLAS: -- saying
24 anything about the numbers. I'm

Page 309

1  talking about this BS display that
2  you made to the jury.
3      MR. PIFKO: That's not -- do
4  you agree or disagree that that is
5  a document that was attached to
6  that e-mail? Did we misrepresent
7  that that's part of the e-mail,
8  that that's part of the
9  attachment?
10     MR. NICHOLAS: Mark, there's
11 an unlimited number of documents
12 in the world, you can throw to
13 someone. So what? You have --
14     MR. PIFKO: Is that --
15     MR. NICHOLAS: You gave him
16 the wrong document. And you did
17 it on purpose.
18     MR. PIFKO: Is that a
19 document that was attached from
20 that spreadsheet; yes or no?
21     MR. NICHOLAS: It's the
22 wrong spreadsheet, as you well
23 know.
24     MR. CLUFF: It's not the

Page 310

1  wrong spreadsheet.
2      MR. PIFKO:  No, it's not the
3  wrong spreadsheet.
4      MR. NICHOLAS:  It's the
5  wrong part of the spreadsheet,
6  which you knew.
7      MR. PIFKO:  It's part of the
8  spreadsheet --
9      MR. NICHOLAS:  Look, guys,
10 you do you agree that this list of
11 13,000 -- 13,000 files is not the
12 list of the 3,000 you were asking
13 him about?
14     MR. PIFKO:  You
15 completely --
16     MR. NICHOLAS:  Right?
17     MR. PIFKO:  You
18 completely --
19     MR. NICHOLAS:  You know
20 this, why don't you just correct
21 the record?
22     MR. PIFKO:  You completely
23 bungled the attempt to correct the
24 record by disclosing all of this

Page 311

1  in front of the witness.
2      MR. NICHOLAS:  I don't think
3  so, Mark.
4      MR. PIFKO:  Yes, you did.
5  We could have fixed it.  But you
6  screwed it all up, and now we
7  can't do it because you disclosed
8  it in front of the witness.
9      MR. NICHOLAS:  We can fix
10 it.  You can --
11     MR. PIFKO:  No.
12     MR. NICHOLAS:  It's very
13 easy to fix.  You show him the
14 correct -- show him the correct
15 spreadsheets, and you say, I
16 showed you the wrong spreadsheet
17 before, I'd like --
18     MR. PIFKO:  Again, now
19 you're telling him what to say.
20 You're walking us through the
21 conversation in front of the
22 witness.
23     MR. NICHOLAS:  No, no, no.
24 I'm telling you what to say, so

Page 312

1  you make an honest record.
2      You're big on let's have a
3  clean record, let's get answers to
4  questions.
5      MR. PIFKO:  I am.
6      MR. NICHOLAS:  Do you want
7  real answers?
8      MR. PIFKO:  Your witness has
9  been dodging the questions all
10 day.
11     MR. NICHOLAS:  Do you want
12 straight stuff or not?
13     MR. PIFKO:  I do.
14     MR. NICHOLAS:  Do you want
15 to be straight or not?
16     MR. PIFKO:  I do.
17     MR. NICHOLAS:  This is
18 not --
19     MR. PIFKO:  I do want to be
20 straight.
21     MR. NICHOLAS:  -- playing it
22 straight.  This is not just
23 playing it straight, guys, and you
24 know it.

Page 313

1      MR. PIFKO:  We're going to
2  move on.
3      MR. NICHOLAS:  So you're not
4  going to do anything?  You're not
5  going to correct the record?
6      MR. PIFKO:  I'm going to
7  move on and ask the questions that
8  I want to ask.  This is my
9  deposition.
10 BY MR. PIFKO:
11     Q.   I'm handing you what is
12 marked --
13     MR. NICHOLAS:  So for the
14 record --
15 BY MR. PIFKO:
16     Q.   -- Exhibit-15.
17     MR. NICHOLAS:  For the
18 record, counsel is refusing to
19 correct the record, knowing that
20 it's inaccurate and knowing --
21     MR. PIFKO:  I do not have
22 any information --
23     MR. NICHOLAS:  Knowing that
24 he put an inaccurate document

Page 314

1 that's not only misleading, but a
2 wrong document, in front of the
3 witness.
4          - - -
5          (Whereupon,
6 AmerisourceBergen-May Exhibit-15,
7 Tab Printout, was marked for
8 identification.)
9          - - -
10 BY MR. PIFKO:
11     Q.   Sir, I want to direct you
12 back --
13          MR. NICHOLAS:  We reserve
14 all rights on this.
15 BY MR. PIFKO:
16     Q.   I want to direct you back to
17 Exhibit-14, which was the prescriber
18 action document that Purdue sent to
19 AmerisourceBergen.
20          Do you recall discussing
21 that?
22     A.   Yes.
23     Q.   And your counsel, again,
24 trying to influence the proceedings

Page 315

1 improperly, made some objections about
2 whether there even was such a list.
3          Well, I've just handed you
4 what's marked as Exhibit-15, a copy of
5 the list, which if you look at
6 Exhibit-14, it says, Attachment
7 prescriber action weekly grid.
8 Exhibit-15 is a printout of that grid.
9          MR. NICHOLAS:  I object to
10 the form.
11 BY MR. PIFKO:
12     Q.   It's Bates labeled --
13          MR. NICHOLAS:  I object to
14 the characterization.
15 BY MR PIFKO:
16     Q.   -- ABDCMDL 00002239.
17          MR. NICHOLAS:  What's your
18 question?
19 BY MR PIFKO:
20     Q.   Take your time to review the
21 document, sir.
22          MR. NICHOLAS:  So we don't
23 have a repetition of what happened
24 last time, in case anyone asks the

Page 316

1 witness to hold this up --
2          MR PIFKO:  Stop making false
3 accusations.
4          MR. NICHOLAS:  In case
5 anyone asks the witness to hold up
6 this stack of paper, half of it is
7 blank.  Half of these page are
8 blank.
9 BY MR PIFKO:
10     Q.   Have you seen this -- have
11 you seen this document before,
12 Exhibit-15?
13     A.   I'm not familiar with this
14 document.
15     Q.   You were -- you did receive
16 the e-mail attaching it, correct?  We
17 established that earlier?
18          MR. NICHOLAS:  Object to the
19 form.  You're representing that
20 this was attached to the e-mail.
21 He just said he's never seen the
22 document.
23          MR. PIFKO:  Again, you're
24 coaching the witness.

Page 317

1          MR. NICHOLAS:  No, now I
2 have to be this way because of
3 what you did the last time with
4 that stack of documents that was
5 so inaccurate.  Now I have no
6 choice.
7          MR PIFKO:  You have no right
8 to be this way.  You're coaching
9 the witness.  You've been doing it
10 yesterday and today.
11          MR. NICHOLAS:  No, I --
12          MR. PIFKO:  All day long.
13          MR. NICHOLAS:  -- really
14 haven't.
15          MR. PIFKO:  Yes, you have.
16          MR. NICHOLAS:  No, I
17 haven't.
18          THE WITNESS:  So I have this
19 list in front of me.  I don't
20 recognize this list.  I see there
21 was an attachment on the e-mail
22 sent to me.  I don't recall
23 specifically opening the
24 attachment, but I don't recall not



Page 318

1    opening the attachment.
2        MR PIFKO:  Clearly, your
3    counsel has influenced your
4    testimony.  And that is wholly
5    inappropriate.
6        Move to strike that
7    response.
8    BY MR. PIFKO:
9        Q.   You talk --
10       MR. NICHOLAS:  Object to the
11   form.
12   BY MR PIFKO:
13       Q.   You talk, in the --
14       MR. NICHOLAS:  Object to the
15   form.
16   BY MR PIFKO:
17       Q.   -- in Exhibit-14 about, We
18   could add this to our due diligence list
19   on the S drive.
20       Do you see that?
21       A.   I do.

Page 319

Page 320

Page 321

Highley Confidential - Subject to Further Confidentiality Review



Page 322

Page 324

1    MR PIFKO:  Stop.

2    MR. NICHOLAS:  You said you

3 wanted --

4    MR. PIFKO:  I asked him if

5 there was anything he wanted to

6 do, and now you're trying to tell

7 him what to do.  Stop.

8    MR. NICHOLAS:  You said you

9 wanted to correct the record.

10    MR. PIFKO:  I asked him -- I

11 gave him a full opportunity.

12    MR. NICHOLAS:  You said you

13 wanted to correct it.

14    MR. PIFKO:  I'm moving on.

15    MR. NICHOLAS:  Do you want

16 to correct it or not?  Ask him to

17 hold them both up.

18    MR PIFKO:  You're coaching

19 him.  No.

20    MR. NICHOLAS:  I'm not

21 coaching him.  I'm asking him to

22 hold -- you asked him to hold up

23 something and I'm asking him to

24 hold up something.

Page 323

Page 325

1    MR PIFKO:  You need to stop

2 talking.  Seriously, we're going

3 to go to court on you.

4    MR. NICHOLAS:  If we go to

5 court on this, that's probably

6 something you want to do.

7    MR. PIFKO:  I feel fine.

8 I've done nothing wrong.

9    MR. NICHOLAS:  Doubt it.

10    - - -

11 (Whereupon,

12 AmerisourceBergen-May Exhibit-19,

13 ABDCMDL 00159841, was marked for

14 identification.)

15    - - -

16    MR PIFKO:  I want to make

17 one other comment about that

18 document.  It also had hidden tabs

19 that our review team had to --

20 hidden columns in the spreadsheet

21 that our review team had to

22 unhide.

23    So your production of the

24 document was not a fair production

12 BY MR PIFKO:

13    Q.   Okay.  Thank you.

14    MR. NICHOLAS:  Can you ask

15 him to hold that list up in

16 contrast to the one --

17    MR. PIFKO:  I'm not going to

18 ask him --

19    MR. NICHOLAS:  -- you

20 mistakenly held up.

21    MR PIFKO:  You're trying to

22 testify for him, stop.

23    MR. NICHOLAS:  No, you said

24 you wanted --

Page 326

1 that allowed us to review it in a
2 proper way.
3       MR. MAHADY:  It was produced
4 in a native format.
5       MR. NICHOLAS:  It was
6 produced --
7 BY MR. PIFKO:
8    Q.   I'm handing you --
9       MR. NICHOLAS:  -- the way it
10 was supposed to be produced, which
11 was in native format.
12 BY MR PIFKO:
13    Q.   I've handed you what has
14 been marked as Exhibit-19.  It's a
15 PowerPoint presentation marked ABDCMDL
16 00159841.  I'll represent to you that the
17 metadata from that document states that
18 you are the custodian.  It's a file
19 called CSRA Diversion Control General
20 Awareness Training, Draft.  And the
21 document is dated April 20th, 2016.
22       Please review that and let
23 me know when you're done.
24    A.   Okay.

Page 327

1    Q.   Have you seen this document
2 before?
3    A.   Yes.
4    Q.   This is a presentation that
5 you made?
6    A.   Yes.
7    Q.   What was this for?
8    A.   To the best of my
9 recollection, this was to our compliance
10 managers during our annual training
11 process for compliance managers.  And we
12 held this training conference at our
13 corporate headquarters.
14    Q.   And this is -- do you agree
15 that this presentation was made in April
16 2016, as it states here?
17    A.   Correct.
18       I guess the only caveat here
19 is, you mentioned that it said draft.
20 There may have been a final copy of this.
21 But, generally, that would represent
22 here, in draft form, at least, what I
23 presented.
24    Q.   Do you recall making this

Page 328

1 presentation?
2    A.   I do generally recall.
3    Q.   I want to direct your
4 attention to Page 4, which is also Slide
5 4.
6    A.   Yes.
7    Q.   Can you tell me what this
8 slide reflects?
9    A.   Again, this was an effort by
10 me to sensitize the compliance managers
11 to certain data relative to the opioid
12 problem.
13    Q.   Why did you want to
14 sensitize them to this data?
15    A.   General awareness training
16 for diversion.
17    Q.   Why would you want to make
18 them aware of this information?
19       MR. NICHOLAS:  Object to the
20 form.  Asked and answered.
21       THE WITNESS:  Again, it was
22 a diverse group of people, and I'm
23 not sure of everyone's level of
24 knowledge relative to some of the

Page 329

1 issue, in a very general way.
2       So it's just my attempt to
3 provide information, share
4 information and educate and inform
5 people.
6 BY MR PIFKO:
7    Q.   As the head of the diversion
8 control division, you wanted other people
9 in the company to be aware of the
10 diversion and prescription drug abuse
11 statistics that are provided here --
12       MR. NICHOLAS:  Objection.
13 BY MR. PIFKO:
14    Q.   -- is that correct?
15       MR. NICHOLAS:  Object to the
16 form of that question.
17       THE WITNESS:  Again, my
18 response is the entire
19 presentation was intended to --
20 again, General Awareness was the
21 title.
22       And not knowing everyone's
23 level of information relative to
24 diversion control, and even some

Page 330

1 of the things that we do in the
2 diversion control team versus
3 maybe some of their
4 responsibilities at the
5 distribution center, it's an
6 effort to educate and inform
7 everybody.
8 BY MR PIFKO:
9 Q. What does this timeline
10 reflect on this slide?
11 MR. NICHOLAS: Object to the
12 form.
13 BY MR PIFKO:
14 Q. While you're reviewing it,
15 on the left of the timeline, it says,
16 1983, Vicodin becomes available as a
17 generic.
18 1986, published paper
19 concludes that opioid pain killers could
20 be prescribed safely on a long-term
21 basis.
22 1995, OxyContin receives
23 approval from FDA. American Pain Society
24 introduces a campaign entitled, quote,

Page 331

1 Pain is the Fifth Vital Sign, end quote.
2 1996, Purdue Pharma begins
3 multiyear educational programs promoting
4 long-term use of opioid pain killers.
5 2000s, physicians expand
6 their treatment of pain through use of
7 the growing number of approved
8 prescription opioids. Prescription pain
9 killers flood the market.
10 2014, four times annual
11 increase in prescriptions from 1999 to
12 2014. Five times annual increase in
13 overdose deaths related to opioids.
14 Did I read that correctly?
15 A. You did.
16 Q. What is this timeline
17 intended to reflect?
18 MR. NICHOLAS: Object to the
19 form. You just read it.
20 THE WITNESS: So this
21 timeline -- I can't tell you the
22 source. I acquired it from
23 somewhere, some sort of public
24 document. And I inserted it in

Page 332

1 here as part of the training
2 program.
3 BY MR PIFKO:
4 Q. What did you want people to
5 see when you -- by putting this in here?
6 What were you trying to communicate?
7 MR. NICHOLAS: Object to the
8 form. You just read it.
9 THE WITNESS: The timeline
10 represents certain information
11 relative to the opioid
12 prescribing, with dates associated
13 with it.
14 And, again, other than it
15 offering background and a timeline
16 and information relative to dates,
17 it was intended to be educational.
18 That was my intent.
19 BY MR PIFKO:
20 Q. Is it intended to educate
21 people about the relevant milestones with
22 respect to the opioid crisis, agree?
23 MR. NICHOLAS: Objection to
24 the form of the question.

Page 333

1 THE WITNESS: And, again,
2 going back to my related response,
3 all of this was intended to be
4 general training and information
5 purposes for our compliance
6 managers around the issue of
7 opioids.
8 BY MR PIFKO:
9 Q. Right. And this timeline --
10 by showing this timeline, you were
11 intending to educate people of the
12 relevant milestones with respect to the
13 opioid crisis; is that correct?
14 MR. NICHOLAS: Object to the
15 form of the question. Asked and
16 answered at least twice.
17 THE WITNESS: Again, it
18 was -- I had no specific goal
19 relative to the content or the
20 dates. It was part of general
21 awareness training, sharing that
22 information that I saw, as well as
23 all this other information as part
24 of the general awareness training.

Highley Confidential - Subject to Further Confidentiality Review

Page 334

1       I did not have a specific
2   objective in mind with sharing
3   this particular part of the
4   training, beyond my general
5   awareness and education intent.
6   BY MR PIFKO:
7       Q.   Let's go to the next page,
8   Page 5.
9       This slide says, Causes,
10  with a subheading, Driving factors behind
11  diversion and prescription drug abuse.
12      Can you tell me what's
13  reflected here?
14      A.   Again, information that I've
15  gathered through my own experience and
16  exposure to various data and stories and
17  content.  I put together this general
18  PowerPoint bullet/slide.
19      Q.   And it's your view that
20  these are driving factors behind
21  diversion and prescription drug abuse; is
22  that correct?
23      MR. NICHOLAS:  Object to the
24  form.

Page 335

1       THE WITNESS:  These are some
2   of the factors behind diversion
3   and prescription drug abuse.
4   BY MR PIFKO:
5       Q.   You don't have any actions
6   committed by distributors here; is that
7   correct?
8       MR. NICHOLAS:  Object to the
9   form.
10      But go ahead.
11      THE WITNESS:  I do not.
12  BY MR PIFKO:
13      Q.   Let's go to the next slide.
14      It says, Trends, diversion
15  and substance abuse statistics.
16      Do you see that?
17      A.   I do.
18      Q.   And then it's got a chart,
19  Prescription painkiller sales and
20  age-adjusted rates for drug poisoning
21  deaths by drug -- by type of drug, United
22  States, 2000 to 2014.
23      Do you see that?
24      A.   I do.

Page 336

1       Q.   What's reflected here?
2       MR. NICHOLAS:  Object to the
3   form.
4       THE WITNESS:  I would rely
5   upon the description here.  Again,
6   this was -- this was content,
7   public content, that I took from
8   somewhere and put it on this
9   slide.
10      I see 2016 PDMP report on
11  the bottom.  I'm not sure why it
12  would say that if they're talking
13  about -- if it purports to be
14  national rates.  I'm not sure,
15  quite frankly.
16      I would rely upon what's on
17  there as --
18  BY MR PIFKO:
19      Q.   This chart shows sales of
20  opioids -- what does it show, do you
21  know?
22      MR. NICHOLAS:  Object to the
23  form.  And I'll object to the
24  scope of this line of questioning

Page 337

1   in general.
2       THE WITNESS:  Again, I'm
3   just looking at the title,
4   Prescription Painkiller Sales and
5   Age-Adjusted Rates For Drug
6   Poisoning Tests By Type of Drug.
7       But it doesn't really give
8   you by type of drug, other than
9   saying opioid analgesics versus
10  heroin deaths, and then sales.
11      So, again, it's a little bit
12  hard to decipher at this point.  I
13  probably, at the time of the
14  presentation, was more familiar
15  with where it was derived from and
16  could speak to it.  But at this
17  point --
18  BY MR PIFKO:
19      Q.   Let's go to the next page,
20  Slide 7.
21      The slide says, What is
22  diversion control.
23      Correct?
24      A.   Yes.

Highley Confidential - Subject to Further Confidentiality Review

Page 338

1 Q. And the speaker notes on the
2 bottom, it says, So what is diversion?
3 In my own words, diversion is any
4 activity, including negligence, which
5 results in a prescription drug being
6 removed from its intended, legitimate
7 medical use. Diversion can take place
8 anywhere along the closed system path,
9 from manufacturer, to distributor,
10 prescriber, dispenser and end user.
11 Do you see that?
12 A. I do.
13 Q. Do you agree with that?
14 MR. NICHOLAS: Object to the
15 form.
16 THE WITNESS: Again --
17 MR. NICHOLAS: Object to the
18 scope as well.
19 Go ahead.
20 THE WITNESS: I do agree
21 with it, in terms of it -- of the
22 definition.
23 But I do want to point out
24 it's in my own words. You know,

Page 339

1 words, it should be. It says "in
2 my own works" there, but it's my
3 own words.
4 So this was my, kind of
5 off-the-top-of-my-head definition.
6 BY MR PIFKO:
7 Q. But you believe this to be
8 true?
9 MR. NICHOLAS: Object to the
10 form. Object to the scope. Asked
11 and answered.
12 THE WITNESS: I generally
13 believe this to be true, yes.
14 BY MR PIFKO:
15 Q. Let's go to the next page.
16 The heading of the slide is,
17 Commonly Diverted Drugs.
18 Do you see that?
19 A. I do.
20 Q. And it says, Misuse of pain
21 killers represents three-quarters of
22 overall prescription drug abuse.
23 Do you see that?
24 A. I do.

Page 340

1 Q. Do you agree with that
2 statement?
3 MR. NICHOLAS: Object to the
4 form.
5 THE WITNESS: I agree to
6 that statement at that time and,
7 presumably, I did the -- my own
8 due diligence before I included a
9 statement like that at that time.
10 BY MR PIFKO:
11 Q. The speaker notes below say,
12 And what's being diverted? The biggest
13 threat for diversion continues to be
14 opioids. Unfortunately, these drugs have
15 very addictive qualities. So it happens
16 frequently that you will see someone who
17 was prescribed hydrocodone following an
18 injury or medical intervention for
19 legitimate medical purposes, but then
20 continues to abuse and abuse the drug --
21 use and abuse the drug long after the
22 legitimate medical need has passed.
23 Do you see that?
24 A. Yes.

Page 341

1 Q. Did I read that correctly?
2 A. Yes. I used that more than
3 once, that example.
4 Q. I was going to say, we saw
5 that in another one of your presentations
6 earlier, right?
7 A. Yes.
8 Q. And you agree with that
9 statement?
10 MR. NICHOLAS: Object to the
11 form.
12 THE WITNESS: I generally
13 agree that could be one example of
14 how abuse could take place.
15 - - -
16 (Whereupon,
17 AmerisourceBergen-May Exhibit-20,
18 ABDCMDL 00142341-345, was marked
19 for identification.)
20 - - -
21 BY MR PIFKO:
22 Q. I'm handing you what is
23 marked as Exhibit-20.
24 Take a moment to review that

Highley Confidential - Subject to Further Confidentiality Review

Page 342

1  and let me know when you're done.
2          For the record, Exhibit-20
3  is Bates labeled ABDCMDL 00142341 through
4  2345.
5          MR. NICHOLAS:  I'm going to
6  interpose an objection to the
7  questioning on this document on
8  two grounds, before we proceed.
9          The first is that it appears
10  to pertain to a pharmacy and
11  information that is not contained
12  in the Track 1 jurisdictions.  It
13  looks like it's a Pennsylvania
14  situation.
15          And, secondly, which takes
16  us out of his, I believe, the
17  30(b)(6) testimony.  And to the
18  extent you're asking him
19  individual questions, he's not on
20  large portions of this document.
21  He's not copied on large portions
22  of this document.
23          So for those two reasons, I
24  object to the use of the document.

Page 343

1  BY MR. PIFKO:
2      Q.  Are you done reviewing it?
3      A.  Yes, yes.
4      Q.  Do you know what this
5  document is?
6      A.  It's an e-mail string.
7      Q.  I just wanted to ask you a
8  simple question about this document.
9          If you'd go to the second
10  page, ABDCMDL 00142342.
11          Are you there?
12      A.  Yes.
13      Q.  About a third of the way
14  down, there's an e-mail from Eric
15  Cherveny, dated January 17th, 2017, at
16  6:02 p.m.
17          Do you see that?
18      A.  Yes.
19      Q.  He says, I don't see the
20  need to order a dispensing report here
21  due to their extreme low volume and high
22  controls.  They're clearly using us as
23  secondary for controls.
24          Do you see that?

Page 344

1      A.  I do.
2      Q.  Do you have an understanding
3  about what's being discussed there?
4          MR. NICHOLAS:  Objection for
5  the reasons I stated in my prior
6  objection.
7          THE WITNESS:  So I'm happy
8  to talk about this a little bit.
9  It's always a little bit difficult
10  when addressing specific
11  customers.  But I think I can talk
12  a little bit about the theme here.
13  BY MR PIFKO:
14      Q.  And that's what I'm trying
15  to get at.
16      A.  And so, I guess, to this
17  commentary here, one of the challenges
18  that we face, as a wholesale distributor,
19  is the lack of visibility, in terms of
20  customers who are utilizing two, three,
21  four different distributors.
22          And there are times when we
23  can see, simply from the data, and
24  it's -- again, I'm going to speak

Page 345

1  generally here, because you can't even
2  read the volumes on this first page.  But
3  simply from the data, it becomes clear
4  that the customer is using us for the
5  purchase of controls versus their total
6  purchasing, which may be a perfectly
7  legitimate reason by the pharmacy.  If
8  I'm an independent pharmacist and I can
9  buy and shop among three or four
10  distributors and get controls at certain
11  prices, then they're going to do that.
12  That's perfectly legitimate.
13          Sometimes it's not
14  legitimate.  Sometimes we're being used
15  to supplement other purchasing where a
16  pharmacy may have a distributor that is
17  holding them to certain levels.
18          And so that's a general
19  challenge that we face as a wholesale
20  distributor.  And so what is the -- how
21  do we handle those situations?  And,
22  again, in speaking generally, when the
23  data is very apparent that the customer
24  is using us just to purchase controls,

Page 346

1  well, we may just make the decision, hey,
2  you know, we're not going to assume all
3  that risk, even though you may have a
4  legitimate reason for doing so, it
5  doesn't make sense for us to assume all
6  that risk. So you know what, we're just
7  going to terminate the relationship with
8  you.
9          And we would just send them
10 a letter to say that, you know -- and we
11 would provide them that reason, that
12 we're not going to assume risk on a
13 secondary basis here.
14         And so that's a general
15 theme. And without seeing, before and
16 after, what occurred here, that's my
17 general theme explanation.
18     Q.   That's helpful. Thank you.
19 That's what I was getting at.
20         So I understand a little bit
21 more, when you talk about this risk, I
22 completely understand that you don't know
23 for sure what the reason is, there could
24 be a legitimate reason.

Page 347

1          But the risk is that there's
2  a potential illegitimate reason that
3  maybe they're -- someone else had a
4  threshold for them and they've gotten to
5  it, and they're coming to you to get
6  more.
7          And that's the concern that
8  potentially that could be happening; is
9  that correct?
10         MR. NICHOLAS:  Object to the
11 form.
12         THE WITNESS:  Yes.  There is
13 a concern that they could be
14 getting controls from multiple
15 sources.
16 BY MR PIFKO:
17     Q.   And as of 2017, when this
18 e-mail was written, that's not a risk
19 that the company wanted to take on, like
20 you said?
21         MR. NICHOLAS:  Object to the
22 form.
23         THE WITNESS:  Again, we
24 handle these similar scenarios on

Page 348

1  a case-by-case basis, not knowing
2  the complete context there.
3          And when the data is evident
4  to us that it's a secondary
5  situation and there's risk
6  involved relative to the
7  customer's activity, we may make
8  the decision we're not even going
9  to pursue the relationship any
10 longer, for the sheer fact that
11 there's risk involved with the
12 customer.  And we would make that
13 decision.
14         I'm not sure that that
15 ultimately was the case here.
16 That's --
17 BY MR PIFKO:
18     Q.   We can put that aside.
19         When you talk about that
20 risk, what do you mean?  What kind of
21 risk do you mean?
22         MR. NICHOLAS:  Object to the
23 form.  And scope.
24         THE WITNESS:  So the data,

Page 349

1  in and of itself, presents a red
2  flag.  Because you have a
3  customer, like in this case, has a
4  high percentage of controls.
5  That's risk.  And that -- because
6  of that risk, we may make that
7  decision.
8  BY MR PIFKO:
9      Q.   When you say "red flag,"
10 that's a red flag for diversion, like we
11 saw in the presentation?
12         MR. NICHOLAS:  Object to the
13 form.
14         THE WITNESS:  There are
15 several red flags that we monitor
16 for, that we investigate.  I don't
17 believe I said for diversion, I
18 believe I said there's just red
19 flags relative to their ordering
20 activity that we investigate, if I
21 recall correctly.
22 BY MR PIFKO:
23     Q.   But I was just trying to
24 understand, is a red flag indicia of what

Highly Confidential - Subject to Further Confidentiality Review



Page 350

1  something that gives rise -- your
2  division is diversion control?
3          MR. NICHOLAS:  Hold on.  Is
4      that a question?  It isn't a
5      question yet.
6  BY MR PIFKO:

23          MR PIFKO:  We can take a
24      break.

Page 351

1          VIDEO TECHNICIAN:  Going off
2      the record.  4:35 p.m.
3          - - -
4          (Whereupon, a brief recess
5      was taken.)
6          - - -
7          VIDEO TECHNICIAN:  We're
8      back on record at 4:48 p.m.
9  BY MR. PIFKO:
10      Q.   Can you get Exhibits-16 and
11  18 and 17 and 13 in front of you again?
12          - - -
13          (Whereupon, a discussion off
14      the record occurred.)
15          - - -
16  BY MR. PIFKO:
17      Q.   Specifically, I want you to
18  look at 13.
19          Can you tell me what 13 is?
20  And you can refer, remember, this is an
21  attachment to Exhibit-12, if you want to
22  look at the one-page e-mail.
23          So there's a lot of numbers
24  in front of you.  Take your time to get

Page 352

1  what you need to look at this.
2          MR. NICHOLAS:  What are you
3      asking him?
4          MR PIFKO:  I'll get there.
5          THE WITNESS:  Okay.  I have
6      12 and I have 13.
7  BY MR PIFKO:
8      Q.   And I want you to have 16,
9  18 and 17 in front of you as well.
10      A.   16, 18, and 17, okay.
11  Things aren't very well organized over
12  here, so.
13      Q.   Same on my side.
14          MR. NICHOLAS:  Is that what
15      you want, 16, 17, 18 and 13?
16          MR PIFKO:  He needs to look
17      at the official copies.
18          MR. NICHOLAS:  Then he has
19      to find them.  It's these.  16,
20      17, 18, 13.
21          THE WITNESS:  So do I have
22      them all together, then?
23          So I have 12, 13, 16, 17 and
24      18.

Page 353

1  BY MR PIFKO:
2      Q.   Do you have -- it looks
3  like, in front of you, you just have two
4  documents.
5          You've got to use your
6  copies.  You've got to use the official
7  exhibits.
8      A.   I don't have them.
9      Q.   They've got to be there
10  somewhere.  They're not those.  So you
11  can put them -- I'm not talking about --
12  maybe they're in that stack there.
13      A.   No, I went through this
14  already.
15          MR. NICHOLAS:  I don't care
16      if he uses these.
17          MR PIFKO:  It's concerning
18      to me that -- there they are.
19      They are in front of you, Bob.
20      Stolen exhibits.
21          - - -
22          (Whereupon, a discussion off
23      the record occurred.)
24          - - -

Highley Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

**Page 358**



**Page 359**

2  MR PIFKO:  I don't know if
3  AmerisourceBergen's counsel has
4  any questions for you, but if they
5  do, I may have some additional
6  questions for you.
7  And if additional documents
8  may be produced in this case, I
9  may seek to call you back, at
10  which time I would confer with
11  AmerisourceBergen's counsel.
12  Subject to that, I don't
13  have any further questions of you
14  at this time.
15  MR. NICHOLAS:  I have no
16  questions at this time.  Thank
17  you.
18  Thank you, Mr. May.
19  VIDEO TECHNICIAN:  This ends
20  today's deposition.  We're going
21  off the record.  The time is 4:57
22  p.m.
23  - - -
24  (Whereupon, the deposition

**Page 360**

1  concluded at 4:57 p.m.)
2  - - -

**Page 361**

1  CERTIFICATE
2
3
4  I HEREBY CERTIFY that the
5  witness was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
   Amanda Maslynsky-Miller
11  Certified Realtime Reporter
   Dated:  August 7, 2018
12
13
14
15
16
17  (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

| | |
|---|---|
| **Page 362** | **Page 364** |

**Page 362**

## INSTRUCTIONS TO WITNESS

1
2
3     Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8     After doing so, please sign
9  the errata sheet and date it.
10     You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14     It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

**Page 364**

## ACKNOWLEDGMENT OF DEPONENT

1
2
3          I,_____, do
hereby certify that I have read the
foregoing pages,  1 - 360, and that the
4  same is a correct transcription of the
answers given by me to the questions
5  therein propounded, except for the
corrections or changes in form or
6  substance, if any, noted in the attached
Errata Sheet.
7
8  _____
    DAVID MAY                DATE
9
10
    Subscribed and sworn
11 to before me this
    _____ day of _____, 20____.
12
    My commission expires:_____
13
14 _____
    Notary Public
15
16
17
18
19
20
21
22
23
24

**Page 363**

1          - - - - - -
            E R R A T A
2          - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6     REASON: _____
7  ____  ____  _____
8     REASON: _____
9  ____  ____  _____
10    REASON: _____
11 ____  ____  _____
12    REASON: _____
13 ____  ____  _____
14    REASON: _____
15 ____  ____  _____
16    REASON: _____
17 ____  ____  _____
18    REASON: _____
19 ____  ____  _____
20    REASON: _____
21 ____  ____  _____
22    REASON: _____
23 ____  ____  _____
24    REASON: _____

**Page 365**

1          LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____