EXHIBIT 304

```
 1                UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4

 5     -----------------------------)  MDL No. 2804

 6     IN RE NATIONAL PRESCRIPTION   )

 7     OPIATE LITIGATION             )

 8                                   )  Case No. 17-md-2804

 9     This document relates to:     )

10     All Cases                     )

11     -----------------------------)  Hon. Dan A. Polster

12

13                     HIGHLY CONFIDENTIAL

14          SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16            The videotaped deposition of MARY WOODS,

17     called for examination, taken pursuant to the Federal

18     Rules of Civil Procedure of the United States District

19     Courts pertaining to the taking of depositions, taken

20     before JULIANA F. ZAJICEK, a Registered Professional

21     Reporter and a Certified Shorthand Reporter, at Lieff

22     Cabraser Heimann & Bernstein, 8th Floor, 250 Hudson

23     Street, New York, New York, on January 10, 2019, at

24     9:10 a.m.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that had pended in the suspicious order monitoring
 2    system?
 3         A.    Well, so to the best of my recollection, I
 4    mean, that was a significant amount of their time
 5    during the day, because they were in that role all day
 6    long as orders would come in and pend and they would
 7    have to evaluate and review those orders and so that
 8    was a primary part of their role.
 9         Q.    We had talked about -- we had talked about
10    this yesterday, and I just want to make sure I'm clear
11    on the context of it.
12               The suspicious order monitoring system at
13    Actavis and at Watson when you worked there as well,
14    had -- it was applicable to all controlled substances,
15    is that right?
16         A.    That is correct.
17         Q.    And I asked that because the case that we
18    are talking about here relates to substances that were
19    on Schedule II and at some point Schedule III of the
20    suspicious -- or the Controlled Substances Act, but
21    there are five total schedules, is that right?
22         A.    That's correct.
23         Q.    So when you talk about the --
24         A.    The CSA law doesn't specify that you can
```

Highly Confidential - Subject to Further Confidentiality Review

1  exclude other drugs from suspicious order monitoring.
2       Q.    Did you ever do an examination while you
3  were at Actavis, Inc. or Watson of about how much the
4  license master or customer master staff, how much of
5  their time was spent working on Schedule II controlled
6  substances that Watson or Actavis manufactured?
7       A.    We -- we didn't separate out how much time
8  was for C-IIs versus all of the controlleds because
9  they all pended if it's -- you know, they are all
10 under the Act, so we didn't separate out just opioids
11 versus -- or C-IIs versus C-II through V.
12      Q.    Do you remember whether there was ever a
13 time when you worked at Actavis or Watson that the
14 conditions for an order to pend were different for
15 C-II drugs than they were for C-III through V?
16      A.    Yes.
17      Q.    All right.  And when was that?
18      A.    So that was controlled by our controlled
19 substance compliance team --
20      Q.    Uh-huh.
21      A.    -- and they could have made changes to
22 that at any time they felt that there was the need to
23 make that change, and they did that.  I can't recall
24 the exact timeframe of that.  They were very diligent

Highly Confidential - Subject to Further Confidentiality Review

1  about making those changes.  I -- I don't want to give
2  a timeframe because I -- I really don't know the exact
3  timeframe, but it was reviewed frequently and they
4  would make the changes as necessary.
5       Q.   As you think of it, did that change take
6  place while you were in New Jersey or in California?
7       A.   It took -- it happened when I was in both
8  locations.
9       Q.   All right.  Did it happen -- well, I guess
10 it did happen more than once then?
11      A.   Yes.
12      Q.   All right.  Do you remember about how many
13 times it happened?
14      A.   I can't recall the number of times it
15 happened.
16      Q.   So as you think of it, who would be the
17 person most responsible for the issues that we're
18 talking about now deciding the -- the level for which
19 a order would pend on various schedules of the
20 Controlled Substance Act?
21      A.   I'm -- I'm sorry.  What do you mean by
22 "issues"?
23      Q.   Oh, so you had said that the controlled
24 substance compliance team --

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.      Uh-huh.
 2      Q.      -- at Actavis and Watson made changes to
 3   the level at which an order would pend on the
 4   suspicious order monitoring system depending on which
 5   schedule it was under the Controlled Substance Act?
 6      A.      Correct.
 7      Q.      So who would be most responsible for that
 8   issue?
 9      A.      For that activity?
10      Q.      Yes.
11      A.      So, the controlled substance compliance
12   team would make a determination on how to -- you know,
13   on what changes needed to be made, and it was the
14   controlled substance compliance team that could go in
15   and make those changes.
16      Q.      And who on the team, as you think of it,
17   was most responsible for that?
18      A.      So, Tom Napoli at that -- at that time --
19      Q.      Okay.
20      A.      -- would be able to do that or -- and
21   Tracey Hernandez's time when she was here, they would
22   be able to make those changes.
23      Q.      Okay.
24      A.      Or give direction to make those changes.
```

Golkow Litigation Services                                    Page 23

```
 1      Q.    Do you remember the first time the --
 2   okay.
 3            Do you remember the first time the level
 4   at which an order pended on the suspicious order
 5   monitoring system was modified based on the drug's
 6   placement on a -- a Controlled Substance Act schedule?
 7      A.    I -- I really couldn't remember the first
 8   time.
 9      Q.    All right.
10            All right.  So we are going to go through
11   some documents, as we did yesterday.
12      A.    Okay.
13      Q.    Oh, so, all right.  You had mentioned
14   earlier that there is a -- this order management
15   group --
16      A.    Uh-huh.
17      Q.    -- as well, right?
18      A.    Correct.
19      Q.    And you had mentioned that -- the term
20   "VMI"?
21      A.    Vendor managed inventory.
22      Q.    Yeah.
23            What does vendor managed inventory mean to
24   you?
```

1     A.    So, vendor managed inventory is a process
2  in which you have the ability to work with a vendor to
3  help them manage their inventory.  Most of the time
4  you are using their systems.  In the case of Walmart,
5  we used their systems and we helped to review their
6  inventory with them and they would make us go into
7  Retail Link and review their systems, make sure they
8  didn't have outs and things like that.
9     Q.    With regard to any -- any shipments or
10 orders that were made through any VMI system at
11 Actavis or Watson, do you know whether those orders
12 would have been monitored by the suspicious order
13 monitoring program at Actavis or Watson?
14    A.    Every single order would have gone
15 through --
16    Q.    All right.
17    A.    -- our system.
18    Q.    All right.  I'm going to hand you what
19 we'll mark as Exhibit 30 for this deposition.
20              (WHEREUPON, a certain document was
21                 marked Allergan - Woods Deposition
22                 Exhibit No. 30, for identification,
23                 as of 01/10/2019.)
24 BY MR. EGLER:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Because of the physical setup, I'm going
 2   to hand you two copies, one for your counsel.
 3        A.    Okay.  Sure.
 4        Q.    And, Ms. Woods, could you look at what
 5   I've marked as Exhibit 30, and as you are looking at
 6   it, I'll read into the record its Bates stamps are
 7   Allergan_MDL_02166476 and 477.
 8              And when you are ready, can you tell me
 9   what this appears to you to be?
10        A.    Sure.  Let me just read this.
11        Q.    Yeah.
12        A.    Okay.  I've read it.
13        Q.    All right.  What does this appear to you
14   to be?
15        A.    So Tracey Hernandez headed up the DEA
16   compliance team.  This appears to me that she is
17   stating filings for the DEA suspicious orders should
18   go through her team.
19        Q.    Does this seem to be a -- an e-mail chain
20   among you and other people at Watson Pharma, Inc.?
21        A.    Correct.
22        Q.    And the date on the e-mails is January and
23   February of 2004, is that right?
24        A.    Yes, that is correct.
```

```
 1      Q.    So about 15 years ago at this point, is
 2   that right?
 3      A.    Yes, correct.
 4      Q.    So for the e-mails that appear on here,
 5   there is a name Tracey Hernandez who we have discussed
 6   a little bit earlier and a woman named Christine
 7   Marino.
 8            Do you see her name right there?
 9      A.    Yes, I do.
10      Q.    Who is Christine Marino?
11      A.    Christine Marino was a supervisor of
12   customer service and she was also a representative.  I
13   don't know which position at this time.
14      Q.    When you say "representative," what does
15   that mean?
16      A.    A customer service representative.
17      Q.    All right.  And then there is another name
18   there, Eileen Mesis, M-e-s-i-s?
19      A.    Correct.  She was a manager of customer
20   service.
21      Q.    All right.  And then Judy Callahan.  Who
22   is Judy Callahan?
23      A.    Judy Callahan was a -- a manager of
24   customer service at this time.
```

```
 1       Q.    And in the first e-mail in time on this

 2   exhibit, which is at the bottom of the second page,

 3   it's a Ms. Marino -- or Ms. Hernandez writing to

 4   Ms. Marino and Ms. Callahan:

 5             "Chris/Judy, Can you please tell me who at

 6   DEA you have on record to send these reports to if you

 7   ever need to?"

 8             And Ms. Hernandez replies:  "I have not

 9   had to forward suspicious reports.  You may want to

10   cover this with Mary Woods."

11             And then you respond on the first page --

12       A.    Uh-huh.

13       Q.    "We have never needed to file a report.

14   Any time there was a question during the order process

15   of a suspicious order quantity, we went," and then in

16   parentheses, "(and still follow the same

17   procedure)," and then close parentheses, "back to a

18   customer to let them know we would need to notify the

19   DEA due to the quantity they wanted to order.  In

20   response, they either reduced the quantity or

21   cancelled the order."

22             Do you see that there?

23       A.    Yes, I do.

24       Q.    And then you -- you go on:
```

```
 1              "Most all customers understand the issues
 2   and do not want to bring attention to these large
 3   purchases."
 4              So at this time in January of 2004, do you
 5   remember whether it was an official policy of Watson
 6   Pharma to allow customers to reduce quantities in
 7   order to avoid having to file a -- a DEA suspicious
 8   order report?
 9       A.     I absolutely do not remember from 2004.
10       Q.     All right.  So with regard to this
11   response that you give on this e-mail, do you
12   remember -- as you sit here today, do you remember
13   writing this e-mail?
14       A.     Not from 2004.
15       Q.     Right.  With that understanding, it's
16   15 years ago.
17              Do you have an understanding about whether
18   it was the case that you and people you worked with
19   would allow customers to reduce the quantity of orders
20   that had pended in a system in order to avoid filing a
21   suspicious order report with the DEA?
22       A.     Nobody would have ever done it with any
23   intention to avoid filing a report with the DEA.  If
24   the customer would have come to us and said, you know,
```

```
 1   reduce the quantity, I don't -- I can't recollect
 2   from, you know, 15 years ago --
 3       Q.   Right.
 4       A.   -- what the policy would have been or the
 5   justification from 15 years ago.
 6       Q.   But in the e-mail you wrote, they either
 7   cancelled the order or reduced the amount --
 8       A.   Yes, I did.
 9       Q.   -- is that right?
10            So do you have any reason to believe it
11   wasn't a regular process to allow customers to reduce
12   their orders at that time?
13       A.   I -- I can't respond to what happened
14   15 years ago.  I'd have to have more information.
15       Q.   As you sit here today, you don't have any
16   reason to believe that that wasn't the case, right?
17       A.   I don't have any be -- reason to believe
18   it was or wasn't.  I don't know.
19       Q.   Well, you -- you wrote it at the time,
20   right, in 2004?
21       A.   I probably wrote a lot of things at the
22   time that I probably can't recollect.
23       Q.   Would you have written something that you
24   didn't believe was true at the time in 2004?
```

```
 1      A.   I wouldn't write something I didn't
 2  believe was true at that point in time for that
 3  e-mail.
 4      Q.   So you must have believed that that was
 5  actually the case, that customers would have
 6  reduced --
 7      A.   For this incident.
 8      MS. LEVY:  Hang on a second.  Let him finish his
 9  question.
10  BY MR. EGLER:
11      Q.   Customers would have been able to reduce
12  their order in order to avoid a DEA report being
13  filed, is that right?
14      A.   I'm reading what's in the e-mail.  That's
15  the best I can respond to it.
16      Q.   All right.
17           All right.  You can set this document
18  aside.
19                (WHEREUPON, a certain document was
20                marked Allergan - Woods Deposition
21                Exhibit No. 31, for identification,
22                as of 01/10/2019.)
23  BY MR. EGLER:
24      Q.   So I'll hand you what we'll mark as
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Exhibit 31.
 2              Again, there is two -- two copies there.
 3         A.   Sure.
 4         Q.   And can you look through what I've marked
 5    as Exhibit 31?  And as you are looking through it,
 6    I'll read on the record, it's Bates numbered
 7    Allergan_MDL_02187196 through 87199.
 8              And when you are ready, can you tell me
 9    what this appears to you to be?
10         A.   Okay.
11         Q.   All right.  Ms. Woods, what does this
12    appear to you to be?
13         A.   This was an e-mail that we were -- that I
14    sent to Andy Boyer, who is the VP of our sales and
15    marketing team.
16         Q.   The e-mail is dated October 4th, 2011, is
17    this right?
18         A.   That is correct.
19         Q.   And at this point you were still working
20    in Corona, California, is that right?
21         A.   That is correct.
22         Q.   And still working for Watson still?
23         A.   Correct.
24         Q.   I don't know if we've raised his name
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    earlier, but, again, who is Andy Boyer?
 2         A.    I believe at this time he was a vice
 3    president of sales and marketing.  I believe that was
 4    his title.
 5         Q.    All right.  And he was at Watson, is that
 6    right?
 7         A.    Yes, that is correct.
 8         Q.    Below his name is the name
 9    Judith Callahan.
10              Do you know who Ms. Callahan is?
11         A.    Yes.  Judy was the -- she -- I'm not sure
12    her title at the time, but she worked on my team.
13         Q.    Okay.  At this time, 2011, late 2011, what
14    was your team at Watson?
15         A.    My team at Watson was customer service and
16    it would have also included order processing and
17    master data and -- order processing, master data,
18    licensing.
19         Q.    Okay.
20         A.    And I think we would have had a small
21    group called account management which was a customer
22    service group that handled orders for, like, contract
23    manufacturing customers.
24         Q.    As you think of it, around this time in
```

```
 1   2011, were you responsible for anybody with, as you

 2   had said before, inside sales responsibilities?

 3        A.    No.

 4        Q.    And were you responsible at this time for

 5   anybody with any sales responsibilities as you think

 6   of it?

 7        A.    No.

 8        Q.    So with regard to the people that you

 9   managed and yourself around this time, you didn't

10   have, as you think of it, any sales responsibilities?

11        A.    No, I did not.

12        Q.    And Mr. Boyer, he did have sales

13   responsibilities, is that right?

14        A.    The national -- to the best of my

15   recollection, the national account managers reported

16   into him or indirectly reported in to him.

17        Q.    And then Ms. Callahan, did she have sales

18   responsibilities?

19        A.    No.

20        Q.    Oh, and she worked for you, is that

21   correct?

22        A.    That's correct.

23        Q.    All right.  So do you remember -- do you

24   remember this particular e-mail that I've marked --
```

```
 1        A.    I do.

 2        Q.    -- as Exhibit 31?

 3              Can you tell me what you remember about

 4   it?

 5        A.    I remember that -- I remember the

 6   communication with our DEA affairs and compliance team

 7   specifically regarding Top Rx.

 8        Q.    Okay.  And what was Top Rx?

 9        A.    To the best of my knowledge, Top Rx was a

10   distributor.

11        Q.    All right.  So do you remember ever

12   meeting anyone from Top Rx in the course of your work?

13        A.    I do not personally remember meeting

14   somebody in person from Top Rx.

15        Q.    Do you remember whether there was ever a

16   meeting with anyone from Top Rx at the Corona site at

17   Watson at any time?

18        A.    At our Corona site?

19        Q.    Yes.

20        A.    I -- I couldn't remember that.

21        Q.    All right.  Do you remember -- all right.

22              So in the e-mail that appears earlier in

23   time, at the bottom of this first page of Exhibit 31,

24   there is a name Lisa Scott.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                Do you see that there?
 2      A.        Yes, I do.
 3      Q.        And who is Lisa Scott?
 4      A.        She worked on Tom Napoli's team as a
 5   security and compliance auditor.
 6      Q.        All right.  And so the Tom Napoli's team,
 7   is that the controlled substance compliance team that
 8   we were talking about before?
 9      A.        Yes, you are correct.
10      Q.        So, going back up to the top of the page,
11   you write to Mr. Boyer:
12                "Andy, I need to meet with you, and most
13   likely, Allan and Tony at the same time, to discuss
14   the results of the Top Rx investigation."
15      A.        Uh-huh.
16      Q.        "We can make some decisions during this
17   call."
18      A.        Um-hum.
19      Q.        Who are Tony and Allan that you refer to
20   in this?
21      A.        Allan was the head of national sales and
22   Tony was the representative that handled Top Rx to the
23   best of my recollection.
24      Q.        Do you remember their last names?
```