EXHIBIT 306

Highly Confidential - Subject to Further Confidentiality Review

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

|                        |   |                  |
|------------------------|---|------------------|
| IN RE: NATIONAL        | : |                  |
| PRESCRIPTION           | : | MDL No. 2804     |
| OPIATE LITIGATION      | : |                  |
| _____  | : | Case No.         |
|                        | : | 1:17-MD-2804     |
| THIS DOCUMENT RELATES  | : |                  |
| TO ALL CASES           | : | Hon. Dan A. Polster |

- - -

Wednesday, February 27, 2019

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of JAMES T. SCHOEN,

held at the Hilton Garden Inn, Perrysburg, Ohio,

commencing at 12:59 p.m., on the above date, before

Carol A. Kirk, Registered Merit Reporter and Notary

Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
 1        A P P E A R A N C E S :
 2   On behalf of the Plaintiffs:
 3      McHUGH FULLER LAW GROUP
        BY:  LANCE REINS, ESQUIRE
 4        lance@mchughfuller.com
          ALLAN (A.J.) L. ELKINS, ESQUIRE
 5        allan@mchughfuller.com
           (via teleconference)
 6      97 Elias Whiddon Road
        Hattiesburg, Mississippi  39402
 7      601-261-2220
 8
     On behalf of AmerisourceBergen Corporation (via
 9   teleconference and text/video streaming):
10      JACKSON KELLY PLLC
        BY:  SANDRA K. ZERRUSEN, ESQUIRE
11        skzerrusen@jacksonkelly.com
        50 South Main Street, Suite 201
12      Akron, Ohio  44308
        330-252-9060
13
14   On behalf of HBC (via teleconference and text/video
     streaming):
15
        MARCUS & SHAPIRA LLP
16      BY:  ELLY HELLER-TOIG, ESQUIRE
          ehtoig@marcus-shapira.com
17      One Oxford Center, 35th Floor
        301 Grant Street
18      Pittsburgh, Pennsylvania  15219-6401
        412-338-3345
19
20   On behalf of Walmart (via teleconference and
     text/video streaming):
21
        JONES DAY
22      BY:  PATRICIA OCHMAN, ESQUIRE
          pochman@jonesday.com
23      901 Lakeside Avenue East
        Cleveland, Ohio  44114
24      216-586-3939
```

Page 3

```
 1   On behalf of Prescription Supply, Inc.
 2      FOX ROTHSCHILD LLP
        BY:  JAMES C. CLARK, ESQUIRE
 3        jclark@foxrothschild.com
        STEPHAN A. CORNELL, ESQUIRE
 4        scornell@foxrothschild.com
           (via teleconference and text/video
 5         streaming)
        2700 Kelly Road, Suite 300
 6      Warrington, Pennsylvania 18976-3624
        215-345-7500
 7
 8   On behalf of Johnson & Johnson and
     Janssen Pharmaceuticals:
 9
        TUCKER ELLIS LLP
10      BY:  JEFFREY M. WHITESELL, ESQUIRE
          jeffrey.whitesell@tuckerellis.com
11      950 Main Avenue, Suite 1100
        Cleveland, Ohio  44113
12      216-592-5000
13
     On behalf of McKesson (via teleconference and
14   text/video streaming):
15      COVINGTON & BURLING LLP
        BY:  MARY YANG, ESQUIRE
16        myang@cov.com
        One CityCenter
17      850 Tenth Street, NW
        Washington, DC  20001
18      202-662-5110
19
20   On behalf of HBC:
21      MARCUS & SHAPIRA LLP
        BY:  MOIRA CAIN-MANNIX, ESQUIRE
22        cain-mannix@marcus-shapira.com
        One Oxford Center, 35th Floor
23      301 Grant Street
        Pittsburgh, Pennsylvania  15219-6401
24      412-338-3345
```

Page 4

```
 1   ALSO PRESENT:
 2      Michael Newell, Videographer
        Zachary Hone, Trial Technician
 3
 4            - - -
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1      VIDEOTAPED DEPOSITION OF JAMES T. SCHOEN
 2            INDEX TO EXAMINATION
 3   WITNESS                        PAGE
 4   JAMES T. SCHOEN
 5      CROSS-EXAMINATION BY MR. REINS:        9
        REDIRECT EXAMINATION BY MR. CLARK:   143
 6      RECROSS-EXAMINATION BY MR. REINS:    144
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

2  (Pages 2 to 5)

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1   VIDEOTAPED DEPOSITION OF JAMES T. SCHOEN
2            INDEX TO EXHIBITS
3   PSI - J. SCHOEN   DESCRIPTION            PAGE
4   PSI - J. Schoen 1  DEA Notice of Inspection of   124
                Controlled Substances,
5               Bates-stamped PSI-0000077
6   PSI - J. Schoen 2  State of Ohio Board of      142
                Pharmacy, Written Responses
7               for Prescription Supply,
                Inc., Wholesaler/
8               Manufacturer, Category
                Three, Wholesale
9               Distributor Inspection,
                October 25, 2017,
10              Bates-stamped PSI0000007
                through 83
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1              - - -
2          P R O C E E D I N G S
3              - - -
4          THE VIDEOGRAPHER:  We are now
5   on the record.  My name is Michael
6   Newell and I'm a videographer for
7   Golkow Litigation Services.
8          Today's date is
9   February 27th, 2019, and the time
10  is 12:59 p.m.
11         This video deposition is
12  being held in Perrysburg, Ohio, in
13  the Matter of National Prescription
14  Opiate Litigation for the Northern
15  District of Ohio, Eastern Division.
16         The deponent today is James
17  Schoen.
18         Will counsel please identify
19  themselves.
20         MR. REINS:  Lance Reins with
21  McHugh Fuller Law Group on behalf
22  of the Plaintiff.
23         MR. CLARK:  Jim Clark with
24  Fox Rothschild on behalf of

Page 8

1   Prescription Supply.
2          MR. WHITESELL:  Jeff
3   Whitesell of Tucker Ellis on behalf
4   of Johnson & Johnson and Janssen.
5          MS. OCHMAN:  Patricia Ochman,
6   Jones Day, for Walmart.
7          MS. HELLER-TOIG:  Elly
8   Heller-Toig for HBC Services
9   Company from Marcus & Shapira.
10         MS. YANG:  Mary Yang with
11  Covington Burling for McKesson.
12         MR. ELKINS:  A.J. Elkins,
13  McHugh Fuller Law Group,
14  Plaintiffs.
15         MR. CORNELL:  Stephan
16  Cornell, Fox Rothschild, for
17  Prescription Supply.
18         MS. ZERRUSEN:  Sandy Zerrusen
19  from Jackson Kelly for
20  AmerisourceBergen.
21         THE VIDEOGRAPHER:  The court
22  reporter today is Carol Kirk and
23  will now swear in the witness.
24             - - -

Page 9

1          JAMES T. SCHOEN
2   being by me first duly sworn, as hereinafter
3   certified, deposes and says as follows:
4             EXAMINATION
5   BY MR. REINS:
6      Q.   Good afternoon.
7      A.   Hi.
8      Q.   Could you please tell us your
9   name.
10     A.   James T. Schoen.
11     Q.   And have you been through a
12  deposition before?
13     A.   Years ago with an auto accident.
14  I think I was maybe 18.
15     Q.   Got it.  The reason I ask is I'm
16  just going to go over some of the ground rules
17  for depositions.  Your counsel has probably
18  advised you, but better safe than sorry.
19         So, obviously, I'm going to be
20  taking down -- I'm going to be asking the
21  questions here today.  We have a court reporter
22  who types everything that we say.  Because of
23  that, if you could please verbalize all your
24  answers, no huh-uhs, um-hmms, or head nods

3 (Pages 6 to 9)

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    because those can't be taken down, okay?
2        A.   Okay.
3        Q.   If you do so, I may say "Is that a
4    yes or is that a no," because I'm looking for a
5    verbal response.  All right?
6        A.   Okay.
7        Q.   Please let me finish my question
8    before you begin answering.  Let me add a caveat
9    to that.
10           Your counsel is going to object to
11   some my questions.  So after I finish my
12   question, if you could just wait a moment, allow
13   him to object, and then you can respond.  That
14   way we're not talking over one another, okay?
15       A.   Okay.
16       Q.   Lastly, if you answer my question,
17   I'm going to assume that you are doing two
18   things.  One, you understand the question, and,
19   two, most importantly, you're telling the truth;
20   is that fair?
21       A.   Yes.
22       Q.   If you don't know something or you
23   don't understand my question, just let me know
24   and I'll rephrase.

Page 11

1        A.   Okay.
2        Q.   If you need a break for any
3    reason, just let me know.  It's not a marathon.
4    We'll take a break when you need to, okay?
5        A.   Fine.
6        Q.   Can you please tell me what you do
7    for a living.
8        A.   I work at Prescription Supply.
9    I'm presently the controlled substance manager.
10       Q.   And what is Prescription Supply,
11   Inc. in the business of doing?
12       A.   We're a pharmaceutical wholesaler.
13       Q.   And you distribute or provide
14   medications to what type of customers?
15       A.   Mostly independent pharmacies,
16   some doctors, and some outpatient pharmacies
17   that are in hospitals.
18       Q.   And how long have you worked with
19   the company?
20       A.   Since like 1986.
21       Q.   Was your grandfather the founder?
22       A.   Yes.
23       Q.   What was his name?
24       A.   Clarence J. Schoen.

Page 12

1        Q.   Do you know what year he started
2    the company?
3        A.   1955.
4        Q.   Your dad is now the president?
5        A.   Yes.
6        Q.   His name is?
7        A.   Thomas G. Schoen.
8        Q.   And he runs the company along with
9    his sister?
10       A.   Yes.
11       Q.   And what's her name?
12       A.   Jacquelyn Harbauer.
13       Q.   Do you know what her position is?
14       A.   Secretary.
15       Q.   How long have you held the
16   position as controlled substance manager?
17       A.   Around 20 years.
18
19
20
21
22
23
24

9        Q.   PSI deals in the business of
10   distributing narcotics; is that correct?
11       A.   That's some of our business,
12   correct.
13       Q.   Are you aware of the risks and
14   dangers associated with narcotics in our
15   society?
16           MR. CLARK:  Objection to
17   form.
18       A.   Can you repeat?
19       Q.   Sure.
20           Are you aware that there are
21   certain narcotics that you're distributing that
22   are highly addictive?
23           MR. CLARK:  Objection.  Form.
24       A.   I've heard that.

4 (Pages 10 to 13)

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    Q.   What have you heard?
2         MR. CLARK:  Objection to
3    form.
4         A.   That on some of the labels, it
5    says they can be addictive.
6    Q.   Which ones?
7         MR. CLARK:  Objection to
8    form.
9         A.   I think OxyContin was one and
10   maybe hydrocodone.
11   Q.   And your company distributes both
12   of those?
13        MR. CLARK:  Objection to
14   form.
15        A.   Yes.
16
17
18
19
20
21
22
23
24   Q.   Would you agree with me, though,

Page 15

1    that we are in the middle of an opioid epidemic
2    and/or crisis right now?
3         MR. CLARK:  Objection to
4    form.
5         A.   I -- I see that in the news.  I've
6    never been affected, but I don't know anybody
7    that has, you know, a problem with addiction.
8    Q.   I think -- is Candace your aunt?
9         A.   My cousin.
10   Q.   Cousin.  I'm sorry.  She said
11   she's seen it on the news.
12        Have you seen it on the news, that
13   it's a problem?
14        MR. CLARK:  Objection to
15   form.
16        A.   Have I seen -- yes, I've seen
17   stuff on the news regarding opioids.
18   Q.   Have you ever attended any
19   seminars, lectures, or meetings outside of your
20   company regarding the addictive nature of
21   oxycodone?
22        A.   No.
23   Q.   Have you ever read any of the
24   congressional hearings or reports regarding the

Page 16

1    addictive nature of oxycodone?
2         MR. CLARK:  Objection to
3    form.
4         A.   No.
5    Q.   Other than the news, have you
6    educated yourself as to the risks and dangers of
7    oxycodone?
8         MR. CLARK:  Objection to
9    form.
10        A.   Have I --
11   Q.   Educated yourself on what the
12   risks and/or dangers might be.
13        MR. CLARK:  Same objection.
14        A.   No.
15        MR. REINS:  Did you get the
16   answer "I don't know"?
17        THE COURT REPORTER:  Yes.
18   BY MR. REINS:
19   Q.   All right.  Sir, based on the fact
20   that your company does distribute narcotics
21   which have been certified or identified by the
22   government, are you aware that there's federal
23   regulations governing the distribution of the
24   products that you sell?

Page 17

1         A.   Yes.
2    Q.   Okay.  So, for instance, you're
3    aware of the Controlled Substances Act, I would
4    presume?
5         A.   I'm aware of it, yes.
6    Q.   Okay.  Specifically --
7    specifically, are you aware that distributors of
8    controlled substances and Schedule I or II, the
9    Attorney General shall register an applicant to
10   distribute a controlled substance in Schedule I
11   or II unless he determines that the issuance of
12   such registration is inconsistent with the
13   public interest.
14        In determining the public
15   interest, the following factors shall be
16   considered:  Maintenance of effective control
17   against diversion of particular controlled
18   substances into other than legitimate medical,
19   scientific, and industrial channels.
20        Do you agree that PSI has the duty
21   to maintain effective controls against
22   diversion?
23        MR. CLARK:  Objection.  Form.
24        A.   No.  The DEA issues us a license.

5 (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1      Q.   Yes, sir, and that's fair.  But do
2  you agree that your company is responsible for
3  coming up with effective plans to prevent drug
4  diversions of the products that you distribute?
5           MR. CLARK:  Objection to
6  form.
7      A.   That's what the law is.
8      Q.   Yes, sir.  And the law is also
9  that any suspicious orders, pursuant to the
10  federal regulations, include orders of unusual
11  size, orders deviating substantially from a
12  normal pattern, and orders of unusual frequency
13  shall be reported, correct?
14           MR. CLARK:  Objection to
15  form.
16      A.   That's what the law says.
17      Q.   Yes, sir.  And I believe I asked
18  your dad about this.  This is going to be in his
19  deposition when he was taken specifically as the
20  30(b), which means a corporate representative of
21  PSI speaking on behalf of the company.
22           And this is going to be on page 59
23  of that deposition, specifically line 11.
24           Your father was asked, as the

Page 19

1  president -- let me restate that -- as the 30(b)
2  representative of PSI:
3           "What is your understanding of the
4  shipping requirement?  And, quite honestly, it
5  shouldn't be the shipping requirement.  It
6  should be the anti-shipping requirement, right?"
7           "Answer:  That's correct."
8           "Okay.  And is it your
9  understanding that the shipping requirement
10  means that if we have a suspicious order, we
11  need not to ship it?"
12           "Answer:  Yes."
13           "And that has been the obligation
14  not just upon PSI, but all the distributors, to
15  your understanding, since 1971 when this
16  regulation was passed?"
17           Answer on the next page at line 2,
18  "Yes."
19           You understand as -- you
20  understand that that not only is the law but has
21  been the law since 1971, correct?
22           MR. CLARK:  Objection to
23  form.
24      Q.   And I can show you the regulations

Page 20

1  when these were passed in 1970 and '71,
2  respectively.
3           MR. CLARK:  Same objection.
4      Q.   Did your father testify honestly
5  and truthfully?
6           MR. CLARK:  Objection to
7  form.  There's a question pending.
8  I don't think he answered the prior

Highly Confidential - Subject to Further Confidentiality Review



Page 22

12  A.  Okay.  I go about that by -- a lot
13  of things determine that.  How many orders they
14  do per day, how many scripts they fill.  They
15  fill out my questionnaire and I go off of that,
16  okay?
17       So I read the questionnaire, okay?
18  And that's basically the basis point of how I
19  determine what they -- you know, what they
20  receive.
21  Q.  Okay.
22  A.  Okay.  And I also, you know,
23  check -- I can check the population around them,
24  you know.  They have to be a customer for a

Page 23

1  little while before they get controls.
2  Q.  All right.  Take that one at a
3  time, if you don't mind.  Let's start with the
4  questionnaire.
5       Did you come up with the
6  questionnaire?
7  A.  I helped.
8       MR. CLARK:  Objection to
9  form.
10       Go ahead.
11  A.  I helped with it, yes.
12  Q.  Okay.  And this questionnaire is
13  going to be asking what types of questions?
14  A.  It asks pharmacy information, if
15  they're affiliated with any other pharmacies,
16  how long they've been in business, what are
17  their store hours and what days are they open a
18  week, what is the percentage of controls to
19  non-controls they plan on purchasing, also what
20  they dispense, the amount of cash for controlled
21  substance prescriptions compared to credit
22  cards, insurance, Medicaid.
23       It asks certain questions about
24  certain items, all right?  If they plan on

Page 24

1  dispensing more than a certain number of --
2  phentermine is one of them, hydrocodone,
3  oxycodone.  Fentanyl is on there, prometh with
4  codeine.  Tramadol is on there.  Carisoprodol is
5  on there.
6  Q.  And you have them fill out this
7  questionnaire when you first start doing
8  business with them?
9  A.  It's before we do business -- when
10  they fill out their application, that is filled
11  out if they want -- if they expect to get

14  Q.  Okay.
15  A.  So not everybody fills one out.
16  In order to get controls, it must be filled out
17  and completed.
18  Q.  Will the questionnaire also
19  have -- will it ask them kind of their -- well,
20  let me just ask it this way:  You maintain all
21  these questionnaires for your customers?
22       MR. CLARK:  Objection to
23  form.
24  Q.  You keep them?

Page 25

Highly Confidential - Subject to Further Confidentiality Review



Page 26

Page 28

19   Q.   Why not just have unlimited
20   opioids flowing into society?  Why have a limit?
21        MR. CLARK:  Objection to
22   form.
23   A.   That's not the right thing to do.
24   Q.   Why?

Page 29

1        MR. CLARK:  Same objection.
2   A.   Because they have to be prescribed
3   for a legitimate purpose and it's -- you know.
4   Q.   Let me show you what -- your
5   father's words.  This is going to be on page 28
6   of his deposition as a 30(b) rep, line 4.
7        "Tell us, tell the jury why we
8   want to prevent diversion of controlled
9   substances."
10        "Well, as it states, we -- it can
11   be dangerous.  People can die.  People can have
12   bad effects and they can be abused.  None of
13   that is something that we want to happen.  We
14   want the good effects, not the bad effects."
15        Do you agree?
16        MR. CLARK:  Objection to
17   form.
18   A.   I agree that's his opinion.
19   Q.   Not yours?
20        MR. CLARK:  Same objection.
21   A.   I agree it could be dangerous,
22   yes.
23   Q.   People can die, right?
24        MR. CLARK:  Same objection.

8  (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review



Page 30

1      A.   It's a possibility.

19     Q.   But you do know that the law puts
20  the duty on your shoulders as the distributor to
21  ensure that there aren't unusual amounts or
22  frequency of amounts into society, right?
23          MR. CLARK:  Objection to
24      form.

Page 31

1      A.   That's what the law says, yes.
2      Q.   And you're required to abide by
3  the law, right?
4          MR. CLARK:  Objection to
5      form.
6      A.   Yes.

Page 32

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 38

Page 40

1 that time so that they can put an order in,
2 because they'll be on vacation for a week or so,
3 just so they have the stock.
4     Q.   All right.  I want to show you a
5 document.  So this is going to be PSI
6 30(b)-301-001.
7          You're looking at a letter that
8 was issued to Cardinal September 27th, 2006, and
9 I'll tell you that it's basically been
10 stipulated that all the distributors got a
11 letter such as this, similar to this, and I
12 think your dad and your cousin, Candace, has
13 already testified to that.
14          Do you remember seeing this
15 letter?  Not this letter, but obviously a
16 similar letter.
17          MR. CLARK:  Objection to
18 form.
19     Q.   And you can take a moment to look
20 it over.  I'm not trying to rush you.
21          You don't have to read the whole
22 thing.
23     A.   I don't recall.  I don't recall
24 it, no.

Page 41

1     Q.   Fair enough.
2          So I do want to talk to you a
3 little bit about kind of some of the things that
4 are brought up in this letter, see if these are
5 concepts that you recall.  So we'll talk about
6 the first paragraph, if you don't mind.
7          It says, "This letter is being
8 sent to every commercial entity in the
9 United States registered with the Drug
10 Enforcement Administration to distribute
11 controlled substances."
12          That would certainly be PSI,
13 correct?
14     A.   Yes.
15     Q.   "The purpose of this letter is to
16 reiterate the responsibilities of controlled
17 substance distributors in view of the
18 prescription drug abuse problem our nation
19 currently faces."
20          Under "Background," it says, "As
21 each of you is undoubtedly aware, the abuse,
22 non-medical use, of controlled prescription
23 drugs is a serious and growing health problem in
24 this country.  DEA has an obligation to combat

4 form.
5     A.   There could be many things.  A
6 pharmacy in the area could have closed.
7     Q.   Okay.
8     A.   There may be new doctors in that
9 particular area.  Population growth.  Maybe
10 they're getting more patients now.
11          There's a lot of reasons that come
12 into play that --
13     Q.   Any others that you can think of?
14 And I know you're not doing an exhaustive list,
15 but any others you can think of?
16          MR. CLARK:  Objection to
17 form.
18     A.   Sometimes the pharmacy will call
19 and let me know that if a pharmacist is going to
20 be off, okay, if the main pharmacist or the
21 pharmacist in charge is going to be off and
22 somebody else is there who has not the
23 capability to buy -- purchase controls, they'll
24 ask me, okay, if I can raise it for them for

11  (Pages 38 to 41)

Page 42

1    this problem as one of the agency's core
2    functions is to prevent the diversion of
3    controlled substances into illicit channels."
4            You're aware that that's one of
5    their duties and responsibilities, the DEA?
6        A.   Yes.
7        Q.   "Congress assigned DEA to carry
8    out this function through enforcement of the
9    Controlled Substance Act and DEA regulations
10   that implement the Act."
11           Specifically, on the second page,
12   middle part there, I want to talk to you about
13   where it says, "The DEA regulations require all
14   distributors to report suspicious orders of
15   controlled substances." Specifically, the
16   regulations state in 21 C.F.R. 1301.74(b), "The
17   registrant shall design and operate a system to
18   disclose to the registrant suspicious orders of
19   controlled substances. The registrant shall
20   inform the Field Division Office of the
21   Administration in this area of suspicious orders
22   when discovered by the registrant. Suspicious
23   orders include orders of unusual size, orders
24   deviating substantially from a normal pattern,

Page 43

1    and orders of unusual frequency."
2            Are you aware that your company,
3    PSI, specifically submitted reports in writing
4    every month from approximately 1997 to 2013?
5        MR. CLARK:  Objection to
6        form.
7        A.   There was a variance report, yes.
8    I did look at that too.
9        Q.   Okay.  And you're aware that the
10   law requires a suspicious order report be
11   submitted?
12       A.   Yes.
13       MR. CLARK:  Objection.  Form.
14       Q.   And that qualified, pursuant to
15   PSI, as meeting your responsibilities under the
16   federal law, specifically the one that you're
17   looking at right here in that regard; fair to
18   say?
19       MR. CLARK:  Objection to
20       form.
21       A.   No, I don't agree with that.  That
22   didn't meet suspicious order monitoring.
23       Q.   Okay.  You had a different
24   monitoring system?

Page 44

1        A.   That wouldn't meet -- if there was
2    a suspicious order, I would have sent them
3    information separate from this.
4        Q.   Separate from that?
5        A.   That's right, yes.  That's
6    correct.
7        Q.   We'll talk about the report
8    specifically, but why don't you tell me what
9    type of information you would send to the DEA
10   before 2008, when you initiated the --
11   specifically, the threshold system.
12       MR. CLARK:  Objection to
13       form.
14       Q.   What did you send?
15       A.   Okay.  Can you repeat that?
16       Q.   Sure.  Yeah.  Your -- Kirk, do you
17   know who Kirk is?
18       A.   Yes, I do.
19       Q.   He testified here today he was the
20   IT guy and he would do these reports pursuant to
21   these rules and submit those reports every
22   month.
23       A.   Yes.
24       Q.   Okay.  As part of the suspicious

Page 45

1    order monitoring requirement under the federal
2    regulations, but you're saying no --
3        MR. CLARK:  Objection to
4        form.  Misstates prior testimony.
5        Q.   You're saying no, he wasn't doing
6    it pursuant to the regulations; is that right?
7        MR. CLARK:  Same objection.
8        A.   No.  No.  These were sent, but
9    this didn't -- just because this was sent
10   doesn't constitute those as suspicious orders.
11   There could have been a suspicious order that
12   wouldn't show up on that report.
13       Q.   That wouldn't have shown up?
14       A.   Yeah.  It's possible, yes.
15       Q.   For example?
16       MR. CLARK:  Objection to
17       form.
18       A.   I -- I -- I never had one, but,
19   you know, it would be possible.  This report was
20   a variance report which just said, you know, if
21   somebody bought more than what the average was
22   we sold per month.
23       Q.   All right.  So you did not -- your
24   testimony here today is that report was not in

Page 46

1    fulfillment of the duties and responsibilities
2    of the Code of Federal Regulations, correct?
3            MR. CLARK:  Objection to
4        form.
5            A.   I can't answer that.  I don't
6    know -- I mean, it requires more than that.
7            MR. CLARK:  Objection.  Calls
8        for legal conclusion.
9            Q.   You said, "We sent" -- "I sent
10   other reports."  What other reports did you
11   send?
12           MR. CLARK:  Objection.
13       Misstates his testimony.
14           A.   Yeah.  I didn't say I sent
15   reports.
16           Q.   All right.  What did your company
17   do, PSI, in regards to -- well, first of all,
18   let's get on the same page.  What's a suspicious
19   order?  How do you define a suspicious order?
20           A.   How do I define -- a suspicious
21   order to me is if I contact the customer after
22   an order goes on hold that I'm curious about, an
23   order of interest, and I don't get an answer
24   that I believe I can be comfortable with, then

Page 47

1    that is a suspicious order.



Page 48

13           Q.   Yeah, what defines as a -- well,
14   let me say this:  Can you and I agree that the
15   law defines what a suspicious order is, right?
16           MR. CLARK:  Objection to
17       form.
18           A.   That's what the law is, yes.
19           Q.   Unusual size, orders deviating
20   substantially from a normal pattern, an order of
21   unusual frequency.  That is a suspicious order,
22   correct?
23           MR. CLARK:  Objection to
24       form.

Page 49

1            A.   According to the law, correct.
2            Q.   According to the law?
3            A.   Yes.
4            Q.   Do you have a different
5    understanding in PSI?
6            A.   No.  I go -- do I have a different
7    understanding?  No.

13  (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

Page 52



14    Q.   Okay.  Let's go beyond Kirk.
15  Let's go beyond his testimony.  Let's talk about
16  the company's policies and procedures.
17        Are you aware there's policies and
18  procedures?
19        MR. CLARK:  Objection to
20    form.
21    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 54

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 56

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 62

Page 63

```
1       Q.   That's okay.  I'll ask it
2   differently.
3           Look at page 3, if you don't mind,
4   on the DEA letter.
5       A.   Okay.
```

Page 64

17 (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

| Page 70 | Page 72 |
| --- | --- |



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

| | Page 78 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 80

1
2
3
4      THE VIDEOGRAPHER:  We're
5    going off the record at 2:03.
6      (Recess taken.)
7      THE VIDEOGRAPHER:  We're back
8    on the record at 2:11.
9  BY MR. REINS:
10     Q.   You discussed with us today about
11  the setting of the threshold limits and then the
12  elevating or raising of those limits.
13       Are there any policies and
14  procedures within PSI which provides some
15  guidance or parameters for doing either of those
16  tasks?
17       MR. CLARK:  Objection to
18    form.
19     Q.   That you've seen.
20     A.   No.
21     Q.   So not to oversimplify it, it
22  really comes down to your discretion, right?
23       MR. CLARK:  Objection to
24    form.

Page 81

1      A.   Yes.
2      Q.   Based on the things you've already
3  talked to us about?
4        MR. CLARK:  Same objection.
5      Q.   The criteria you said?
6      A.   And my experience.
7      Q.   Yeah.
8        I'm going to now show you a chart,
9  and this is a summary which we have created from
10  PSI600, which is transactional data that PSI has
11  produced to us.  So we're going to look at that
12  real quick.
13       MR. REINS:  I have an extra
14     copy for you, but I'm going to have
15     to use it from the last deposition,
16     which I believe it was Number 6.
17     So the witness can have one.
18  BY MR. REINS:
19     Q.   All right.  So I tell you where it
20  comes from so that you understand where it comes
21  from, okay?  So what we've done is we've
22  isolated some transactions in certain periods of
23  time.  And if you zoom in to the top left there
24  column, there's a pharmacy.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1      Are you familiar with this
2  pharmacy?
3      A.   Yes.
4      Q.   And you can see the screen in
5  front of you it may be helpful because this is
6  small.
7      A.   Yes.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 84

1
2
3
4
5
6
7

Highly Confidential - Subject to Further Confidentiality Review

Page 86                    Page 88



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 102

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 104

```
 1        Well, before we do that, you
 2   understand we talked in the very beginning of
 3   this deposition about you don't want to ship a
 4   suspicious order.
 5
 6
 7
 8
 9
10
11
12
13
14
15        Q.   Let me --
16        MR. CLARK:  Were you done
17   answering?
18        MR. REINS:  I think he was
19   done.
20        THE WITNESS:  Yes.
21   BY MR. REINS
22        Q.   Let's look at this one, and this
23   may be what you're talking about.  Again, I'm
24   not here to trick you or anything.
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19        Q.   Okay.
20        A.   I know I went to the store to talk
21   to him, spoke to him on the phone a few times.
22        Q.   All right.  Moving along.  Let's
23   go back to the policy dealing with inventory
24   controls.
```

Page 105

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

27  (Pages 102 to 105)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 114

Page 116

Page 116 text:

1   A.  Zero.
2   Q.  Zero.  All right.

Page 114 lower text:

5       Q.  All right.  Sitting here today,
6  can you testify under oath that you recall how
7  many times you refused to raise a threshold
8  since 2008?
9       MR. CLARK:  Objection to
10  form.
11   Q.  If you know.
12   A.  I have no idea.
13   Q.  Got it.
14       Can you tell me -- now, let's say
15  you do that analysis, okay, and then you go --
16  well, let's just say this:  You do that
17  analysis.  When if ever -- because after 2013
18  you all stopped sending those forms monthly.
19       So when, if ever, after 2013, when
20  those forms stopped, would you report a
21  quote/unquote "suspicious order"?  Since then,
22  how many times?
23       MR. CLARK:  Objection to
24  form.

Highly Confidential - Subject to Further Confidentiality Review

Page 118



Page 120

1 substances.
2           "The regulation also requires that
3 the registrant inform the local DEA division
4 office of suspicious orders when discovered by
5 the registrant."
6           Is that what you understand the
7 rules to include?
8           MR. CLARK:  Objection to
9 form.
10          Q.    That when you get a suspicious
11 order, you should let them know when you receive
12 it, correct?
13          MR. CLARK:  Objection to
14 form.
15          A.    I've heard different things with
16 that from DEA.
17          Q.    You have?
18          A.    Yes.
19          Q.    What else have you heard?
20          A.    I went to a wholesaler -- DEA
21 wholesaler meeting -- I believe it was in
22 Indianapolis -- where the DEA has
23 representatives there and they talk to the
24 wholesalers and keep us updated on the laws and

Page 121

1 regulations.
2           One of the attorneys that works
3 for DEA had said that do our due diligence first
4 and then, you know, make that judgment.  So she
5 was an attorney that worked for DEA.
6           Q.    "Make that judgment," meaning
7 what?
8           A.    On if it's a suspicious order or
9 not.
10          Q.    Okay.  And if you think it's a
11 suspicious order, you should report it
12 immediately, correct?
13          A.    Yes.
14          MR. CLARK:  Objection to
15 form.
16          Q.    Okay.  All right.
17          "Filing a monthly report of
18 completed transactions ergo excessive purchase
19 report or high unit purchases does not meet the
20 regulatory requirement to report suspicious
21 orders."
22           Sitting here today, you're aware
23 that the reporting you guys did from 2000 -- I'm
24 sorry -- from 1997 to 2013, that that monthly

2           Q.    Sure.  All right.  We're going to
3 talk about another DEA letter.
4           All right.  And this is after the
5 other one.  This is going to be PSI
6 30(b)-301-001.  This is dated December 27th,
7 2007.  Again, this letter was sent to all the
8 distributors.
9           It says, "This letter is being
10 sent to every entity in the United States
11 registered with the Drug Enforcement
12 Administration, DEA, to manufacture or
13 distribute controlled substances.
14           "The purpose of this letter is to
15 reiterate the responsibilities of the controlled
16 substance manufacturers and distributors to
17 inform DEA of suspicious orders in accordance
18 with 21 C.F.R. 1301.74(b).
19           "In addition to and not in lieu of
20 the general requirement of 21 USC 23 that
21 managers and distributors maintain effective
22 controls against diversion, DEA regulations
23 require all manufacturers and distributors to
24 report suspicious orders of controlled

31  (Pages 118 to 121)

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1  report that Kirk did, that was after those had
2  all been shipped; you're aware of that, right?
3           MR. CLARK: Objection to
4     form.
5       A.  Yes, on the report, correct.
6       Q.  "Registrants are reminded that
7  their responsibility does not end merely with
8  the filing of a suspicious order report.
9  Registrants must conduct an independent analysis
10 of suspicious orders prior to completing a sale
11 to determine whether the controlled substances
12 are likely to be diverted from legitimate
13 channels."
14
15
16
17
18
19
20
21
22
23
24

1
2
3
4
5
6       Q.  Okay.  All right.  I'll take that
7  back from you.
8           I've got a document here, and I'm
9  sorry, I don't have extra copies.  I just don't
10 know what it is.  We'll make it Plaintiffs'
11 Exhibit Number 1, I guess.  I haven't been
12 marking a bunch because we've used the same
13 documents.
14          So I'll show it to your attorney
15 first, if you don't mind, and then I'm just
16 going to have you identify what that is.
17      A.  It's a DEA inspection.
18      Q.  Okay.  And you're signing off that
19 you're aware that there's an inspection, I
20 guess, in the building?  Strike that.
21          What is the purpose of this form,
22 if you know?
23          MR. CLARK: Objection to
24     form.

Page 124

1       Q.  Just that you acknowledge that
2  they're there?
3           MR. CLARK: Same objection.
4       A.  They always give me this form and
5  I always sign it, okay, when they come in, all
6  right.
7       Q.  Okay.
8       A.  You know, I have no reason not to
9  sign it.  They're there for an inspection.  I'm
10 fine with that.
11      Q.  Okay.
12      A.  I'm not sure why they give you
13 this paper.  I'm not with DEA.
14      Q.  Fair enough.  Can I see it back if
15 you don't mind.  We'll just mark that.
16          - - -
17      (PSI - J. Schoen Exhibit 1 marked.)
18          - - -
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 142

8       MR. REINS:  Mark that as
9   Plaintiffs' Exhibit Number 2.
10           - - -
11   (PSI - J. Schoen Exhibit 2 marked.)
12           - - -
13       MR. CLARK:  Are we continuing
14   from Kirk or are these new?
15       MR. REINS:  They're new, but
16   I'll tell you what I've done here.
17   I've gotten really revolutionary.
18   I've identified a number of the
19   documents that have been exhibits
20   in other depos by Bates numbers so
21   we know what they are, but I
22   haven't attached them all again
23   because, frankly, I have one copy
24       left.

Page 143

1       MR. CLARK:  That's fine.
2       MR. REINS:  Okay.
3       THE WITNESS:  Are we done
4   with this, then?
5       MR. REINS:  Yes, sir, we are.
6   And honestly, we're going to take a
7   quick break because I may be done.
8       THE VIDEOGRAPHER:  We're
9   going off the record at 3:04.
10   (Recess taken.)
11       THE VIDEOGRAPHER:  We're back
12   on the record at 3:14.
13       MR. REINS:  I have no more
14   questions.
15           - - -
16       REDIRECT EXAMINATION
17   BY MR. CLARK:

Page 144

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

| Page 150 | Page 152 |
|---|---|

**Page 150**



21     MR. REINS:  Gotcha.
22     I have no more questions.
23     Thanks for your time.
24     MR. CLARK:  Nothing further.

**Page 152**

1     CERTIFICATE
2     STATE OF OHIO    :
           SS:
3     COUNTY OF _____:
4
5     I, JAMES T. SCHOEN, do hereby certify that I
6   have read the foregoing transcript of my
7   cross-examination given on February 27, 2019; that
8   together with the correction page attached hereto
9   noting changes in form or substance, if any, it is
10   true and correct.
11   _____
           JAMES T. SCHOEN
12
13     I do hereby certify that the foregoing
14   transcript of the cross-examination of JAMES T. SCHOEN
15   was submitted to the witness for reading and signing;
16   that after he had stated to the undersigned Notary
17   Public that he had read and examined his
18   cross-examination, he signed the same in my presence
19   on the _____ day of _____, 2019.
20
21   _____
           NOTARY PUBLIC - STATE OF OHIO
22
23   My Commission Expires:
24   _____, _____.

| Page 151 | Page 153 |
|---|---|

**Page 151**

1     THE VIDEOGRAPHER:  We're
2   going off the record at 3:20 p.m.
3     (Signature not waived.)
4     - - -
5     Thereupon, at 3:20 p.m., on Wednesday,
6   February 27, 2019, the deposition was concluded.
7     - - -

**Page 153**

1     CERTIFICATE
2     STATE OF OHIO    :
           SS:
3     COUNTY OF FRANKLIN :
4     I, Carol A. Kirk, a Registered Merit
   Reporter and Notary Public in and for the State of
5   Ohio, duly commissioned and qualified, do hereby
   certify that the within-named JAMES T. SCHOEN was by
6   me first duly sworn to testify to the truth, the whole
   truth, and nothing but the truth in the cause
7   aforesaid; that the deposition then given by him was
   by me reduced to stenotype in the presence of said
8   witness; that the foregoing is a true and correct
   transcript of the deposition so given by him; that the
9   deposition was taken at the time and place in the
   caption specified and was completed without
10   adjournment; and that I am in no way related to or
   employed by any attorney or party hereto or
11   financially interested in the action; and I am not,
   nor is the court reporting firm with which I am
12   affiliated, under a contract as defined in Civil Rule
   28(D).
13
14     IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my seal of office at Columbus, Ohio
15   on this 4th day of March 2019.
16
17
18   _____
           CAROL A. KIRK, RMR
19         NOTARY PUBLIC - STATE OF OHIO
20   My Commission Expires:  April 9, 2022.
21     - - -
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 154

```
 1        DEPOSITION ERRATA SHEET
 2     I, JAMES T. SCHOEN, have read the transcript
       of my deposition taken on the 27th day of February
 3     2019, or the same has been read to me.  I request that
       the following changes be entered upon the record for
 4     the reasons so indicated.  I have signed the signature
       page and authorize you to attach the same to the
 5     original transcript.
 6     Page  Line  Correction or Change and Reason:
 7     ____ ____ _____
 8     ____ ____ _____
 9     ____ ____ _____
10     ____ ____ _____
11     ____ ____ _____
12     ____ ____ _____
13     ____ ____ _____
14     ____ ____ _____
15     ____ ____ _____
16     ____ ____ _____
17     ____ ____ _____
18     ____ ____ _____
19     ____ ____ _____
20     ____ ____ _____
21     ____ ____ _____
22     ____ ____ _____
23     ____ ____ _____
24     Date _____ Signature _____
```

Golkow Litigation Services - 877.370.DEPS