EXHIBIT 316

Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION

 3

    IN RE: NATIONAL        )
 4  PRESCRIPTION           )  MDL No. 2804
    OPIATE LITIGATION       )
 5  _____ )  Case No.
                           )  1:17-MD-2804
 6                          )
    THIS DOCUMENT RELATES  )  Hon. Dan A.
 7  TO ALL CASES            )  Polster

 8

              FRIDAY, JANUARY 4, 2019
 9

      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW

11                    - - -

12            Videotaped deposition of Ramona

13  Sullins, held at the offices of JONES DAY, 77

14  West Wacker Drive, Chicago, Illinois,

15  commencing at 7:31 a.m., on the above date,

16  before Carrie A. Campbell, Registered

17  Diplomate Reporter, Certified Realtime

18  Reporter, Illinois, California & Texas

19  Certified Shorthand Reporter, Missouri &

20  Kansas Certified Court Reporter.

21                    - - -

              GOLKOW LITIGATION SERVICES
22        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

6        Q.      And you believe that occurred

7    sometime in 2010; is that correct?

8        A.      '10 or '11.  I don't recall.

9        Q.      Before that rollout occurred,

10   did Walmart have a monitoring program in

11   place?

12       A.      Yes.

13       Q.      And what was that program?

14       A.      I believe it was a 405 report,

15   and they monitored orders as they came in.

16       Q.      Okay.  And what do you mean

17   by -- when you say "they monitored orders as

18   they came in," what does that mean?

19       A.      So the distribution center did

20   and the associates did.

21       Q.      Are the associates at the

22   distribution center?

23       A.      Yes.

24       Q.      Okay.  Anyone other than the

25   associates at the distribution center that

Highly Confidential - Subject to Further Confidentiality Review

1    would monitor orders?

2                    MS. FUMERTON:  Objection.

3         Form.

4    QUESTIONS BY MR. BOWER:

5         Q.    And I'm just trying -- just so

6    the record is clear, I'm just trying to

7    understand your answer.

8                    You said "the distribution

9    center did and the associates did."  Are

10   those two different things in your mind?

11        A.    They're all at the distribution

12   center.

13        Q.    And what were the associates

14   doing prior to the rollout of Reddwerks?

15        A.    So my understanding is that

16   they would -- they would let their manager

17   know if they saw an order that was out of the

18   ordinary.

19        Q.    What do you mean by "out of the

20   ordinary"?

21        A.    Like, for example, ReliOn

22   insulin, we had orders that would -- where

23   the pharmacy would think that they were

24   ordering ten vials of insulin, and they

25   actually ordered a hundred of them because

 1    they were in packs of ten.  So those would be

 2    examples of what they would bring to their

 3    attention.

 4         Q.    And in fact, Walmart had an

 5    automatic cut for those instant orders,

 6    correct?

 7              MS. FUMERTON:  Objection.

 8         Form.

 9              Go ahead.

10              THE WITNESS:  For the what now?

11    QUESTIONS BY MR. BOWER:

12         Q.    For those insulin orders that

13    you just -- the example that you just

14    provided, Walmart actually had an automatic

15    cut for those orders, didn't they?

16              MS. FUMERTON:  Objection.

17         Form.

18              THE WITNESS:  It was a manual

19         cut; it wasn't automatic.

20    QUESTIONS BY MR. BOWER:

21         Q.    A manual cut that was

22    automatically applied to insulin orders,

23    correct?

24              MS. FUMERTON:  Objection.

25         Form.

```
 1                  THE WITNESS:  They would call
 2          the store to inform them that they had
 3          placed -- if they really wanted a
 4          hundred because, I mean, the
 5          refrigerator didn't hold a hundred.
 6   QUESTIONS BY MR. BOWER:
 7          Q.     Right.
 8                 And that was specific to
 9   insulin, correct?
10          A.     That's correct.
11          Q.     Okay.  What about with respect
12   to Schedule II narcotics, what were the DCs
13   doing in 2008?
14                 MS. FUMERTON:  Objection.
15          Form.
16                 THE WITNESS:  My understanding
17          is they would do the same thing with
18          that.
19   QUESTIONS BY MR. BOWER:
20          Q.     And where does that
21   understanding come from?
22          A.     Just from when I was training
23   in 2008, when I was out at the DCs training.
24          Q.     Okay.  So what specifically did
25   you learn in connection with your training
```

1    that the DCs were doing for Schedule II

2    narcotics?

3                    MS. FUMERTON:  Objection.

4        Form.

5                    THE WITNESS:  So again, they

6        would look at that paper and let their

7        supervisor or manager know that this

8        appears to be out of the ordinary or

9        unusual.

10   QUESTIONS BY MR. BOWER:

11       Q.    And at that point -- and we're

12   talking 2008, correct?

13       A.    Yes.

14       Q.    At that point, how was DC 6045

15   receiving orders?  They were paper, correct?

16       A.    So those would come in

17   electronically.  They're printed on paper.

18       Q.    They would come in

19   electronically once a day?

20       A.    That's correct.

21       Q.    And then they would print it on

22   paper at the DC?

23       A.    That's correct.

24       Q.    And then what would happen to

25   those papers?

1    A.    Well, first they would print

2  the 222 form, sign those, and then that and

3  the paper order would be put together in a

4  packet, and the associates would fill orders

5  based on that paper order.

6    Q.    And was it the practice for the

7  orders to be filled and shipped the same day

8  they came in?

9    A.    Yes.

10    Q.    And approximately how many

11  orders came in to DC 6045 on a daily basis

12  during this time period?

13    A.    I don't recall how many orders

14  came in.

15    Q.    Would it have been in the

16  hundreds of orders?  Could it have been in

17  the hundreds of orders per day?

18    A.    Well, they filled store

19  order -- store only got an order once a week

20  of C-IIs.  So if you divide it up, however

21  many stores we had at the time, that's how

22  many orders they would -- processed, four

23  days a week.

24    Q.    That's fine.

25          You said four days a week?

Highly Confidential - Subject to Further Confidentiality Review



1          A.      Yes.

2          Q.      So, for example, if there were

3    4,000 stores, approximately a thousand orders

4    a day, correct?

5          A.      Potentially.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

