EXHIBIT 356

Highly Confidential - Subject to Further Confidentiality Review





Page 70

1 would have occurred to you to do?
2    MS. SWIFT: Object to the form.
3 BY THE WITNESS:
4    A.  Probably not because we didn't fill the
5 orders that were odd or large. You know, when I
6 called the store, like I said, there was only one case
7 that I remember that they actually said, Yes, I really
8 want 80 of those or whatever. So, no, there was -- I
9 wouldn't have thought of calling them.
10 BY MR. GADDY:
11    Q.  Okay. Well, when you say "orders that
12 were odd or large," I mean, you -- you shipped to -- I
13 think we just saw over 5,000 different stores,
14 correct?
15    A.  Um-hum, um-hum.
16    Q.  And I'm sorry. You have to say yes or no
17 for her.
18    A.  Oh, yes. Sorry.
19    Q.  And is it fair to say that -- that those
20 stores are in all different types of markets?
21    A.  Right, that's fair to say, yeah.
22    Q.  For example, there is a Walgreens in
23 Perrysburg, is -- is there?
24    A.  Yes, um-hum.

Page 71

1    Q.  Okay. There is Walgreens in Cleveland,
2 correct?
3    A.  Yes.
4    Q.  Chicago?
5    A.  Yep.
6    Q.  So there is Walgreens in -- in big cities,
7 Walgreens in small towns, correct?
8    A.  Right, yes.
9    Q.  When you were looking at these orders, did
10 you do any evaluation of the population size that --
11 that these stores were serving?
12    A.  No.
13    Q.  Did you do any evaluation of how far the
14 patients were traveling to get to those stores to have
15 their prescriptions filled?
16    A.  No.
17    Q.  Did you do any evaluation of the numbers
18 and types of doctors that were writing the
19 prescriptions for these C-II drugs?
20    A.  No.
21    Q.  Okay.
22       Every time that an order came in, did
23 you -- did you do an historical analysis on that
24 particular store for every single order that you

Page 72

1 received?
2    A.  No.
3    Q.  So when you say you didn't fill the orders
4 that were odd, that would mean the orders that jumped
5 off the page as being very large and would require a
6 follow-up phone call to the store to make sure that
7 they didn't make an error when they were typing in
8 their order?
9    MS. SWIFT: Object to the form.
10 BY THE WITNESS:
11    A.  Well, to make sure that they didn't make
12 an error or that they didn't really need it. But,
13 like I said, again, there was only one case where I
14 recall them actually saying, Yes, that's what I need.
15 BY MR. GADDY:
16    Q.  Okay. Usually it was, Oh, shoot. I meant
17 3 and I typed 300?
18    A.  Usually, yeah.
19    Q.  And in those cases you would just delete
20 the 300 and put in a 3?
21    A.  Right.
22    Q.  It goes on to say in paragraph (b), it
23 says:
24       "Suspicious orders include orders of

Page 73

1 unusual size, orders deviating substantially from a
2 normal pattern, and orders of unusual frequency."
3       Do you see that?
4    A.  Um-hum.
5    Q.  Prior to just now, right here today in
6 this deposition, had you ever read that subsection of
7 this regulation before?
8    A.  I don't remember. I don't remember if I
9 did or not.
10    Q.  Okay. Do you recall anybody at Walgreens
11 ever giving you any training regarding this topic?
12    A.  Regarding orders deviating substantially
13 all -- from a normal pattern, that -- no, because,
14 again, that's something that I thought was done at
15 corporate. They have all of the sales history. In
16 the DCs we don't have that.
17    Q.  Okay. But you were the C-II function
18 manager at Perrysburg, correct?
19    A.  Yep, yep.
20    Q.  Okay. And you were the person, I think,
21 that Mr. Joseph said that your knowledge of C-IIs was
22 second to none, correct?
23    A.  Um-hum, yes.
24    Q.  Okay. Let me show you another policy that

Page 110

1  A. Um-hum.
2  Q. And it talks about training?
3  A. Yes.
4  Q. And it says in No. 1, it says:
5     "The SAIL function manager will be
6  responsible for the training and enforcement of all
7  the procedures."
8     Do you see that?
9  A. Yes.
10 Q. Are -- are you aware of -- of any training
11 ever being provided on this policy to any of the team
12 members at Perrysburg?
13 A. I'm not aware of this written policy being
14 given to anyone, the team members, if that's -- that's
15 what you are asking me.
16 Q. Okay. Do you recall any -- there being
17 any training or guidance given to, whether it's --
18 it's the folks in the computer room or the pickers on
19 what they are supposed to be looking for as far as
20 contacting you about these questionable orders that --
21 that you might need to check for accuracy?
22 A. Well, they just -- they just knew that if
23 it was -- they knew what was high because they picked
24 every day and they picked all stores every week, so

Page 111

1  they knew if something was unusually high. There
2  wasn't really training given to them to identify that.
3  Q. Did you -- I mean, they're -- you are --
4  this is talking about over 5,000 stores, right?
5  A. Um-hum.
6  Q. Would -- would it be safe to say that you,
7  when you see a store number, do you know what store
8  that is?
9  A. No.
10 Q. Okay. So if you see, I want to say the
11 store numbers were five digits?
12 A. Correct.
13 Q. So -- so if you saw Store 12345, that
14 doesn't -- you don't know that -- that, Oh, we're
15 talk -- that's the store in Perrysburg, Ohio, you
16 don't particularly know where that store is or what
17 population it serves or -- or what its typical
18 business is or anything like that, is that correct?
19 A. That's correct.
20 Q. Okay. So when you say the pickers do this
21 every day and they know what they are seeing, you are
22 not telling me that -- that they know exactly how many
23 bottles Store 12345 typically gets on an average
24 order, are you?

Page 112

1  A. No, that's not what I'm telling you.
2  Q. Okay. You are just saying as a whole
3  chain wide they're -- they're aware of what comes in?
4  A. They -- they are aware of what was
5  unusually large.
6  Q. On a chain-wide basis?
7  A. On a chain-wide basis, yes.
8  Q. You -- do you see any -- any potential
9  problems or issues with using a chain-wide basis to
10 evaluate size of -- sizes of orders?
11    MS. SWIFT: Object to the form.
12 BY THE WITNESS:
13 A. Well, I mean, every store would be
14 different based on where it's at. Some were in
15 hospitals, some were in corporate offices, so...
16 BY MR. GADDY:
17 Q. And -- and you would agree with me, it
18 would be fair to say that a -- that a store at a
19 hospital is probably going to need more C-IIs than a
20 store in Perrysburg, Ohio?
21 A. Possibly, that would make sense.
22 Q. And -- and you agree with me that it would
23 be possible that there could be an unusually large
24 number of bottles for Perrysburg, but that might be a

Page 113

1  normal order of bottles for a hospital, is that fair?
2  A. That would be fair, um-hum.
3  Q. Okay. But you didn't have a daily
4  practice of calling all of the Walgreens stores and
5  hospitals, did you?
6  A. No.
7  Q. Okay. So these or -- these orders that
8  were going to hospitals, those weren't popping on a
9  daily basis for you to follow up on, were they?
10    MS. SWIFT: Objection; foundation.
11 BY THE WITNESS:
12 A. No.
13 BY MR. GADDY:
14 Q. Okay. So what you would see is normal
15 orders for stores in a hospital setting were not high
16 enough to flag for you to do any follow-up calls or
17 investigation on, is that correct?
18    MS. SWIFT: Objection; foundation.
19 BY THE WITNESS:
20 A. That would be correct, because what
21 flagged them was, like, triple -- 300 of something.
22 Not even in a hospital do you need 300 of something.
23 I mean, that's what would flag them right away that
24 something was wrong.

Page 114

1  BY MR. GADDY:
2      Q.  It had to be something crazy for it to
3  flag on this report for you to do a follow-up?
4      A.  Well, it had to be something large.  I
5  don't know if I would say crazy, but yeah.
6      Q.  Outside of being told by Anaya at some
7  point in time for -- that -- that it -- excuse me --
8  being told by Anaya at some point in time that at some
9  other point in time there was some type of system in
10 place --
11     A.  Uh-huh.
12     Q.  -- did you ever have any interaction with
13 anybody at Walgreens regarding suspicious orders?
14     MS. SWIFT:  Object to the form and foundation.
15 BY THE WITNESS:
16     A.  Just the computer room supervisor,
17 Matt Nye, the one we talked about earlier.
18 BY MR. GADDY:
19     Q.  Okay.
20         And what, if anything, would Matt tell you
21 about -- and -- and -- and I'm not talking about the
22 questionable orders, the -- not -- not about these
23 policies and this procedure here.
24     A.  Okay.

Page 115

1      Q.  But I'm asking specifically about the --
2  the suspicious order report that you said would come
3  into the C-II SAIL --
4      A.  Uh-huh.
5      Q.  -- or -- or the suspicious orders that's
6  handled by internal audit.
7          Did you have -- did you have any
8  conversations with Matt Nye about that suspicious
9  order report or -- or specifically the -- what
10 Walgreens referred to as suspicious orders?
11     MS. SWIFT:  Object to the form of the question.
12 BY THE WITNESS:
13     A.  Suspicious orders would be the query he
14 ran, I -- that's how I understood it, and then I -- he
15 would talk to me about those.  If he couldn't get
16 ahold of the store, he would tell me.
17         Is that what -- the query you are talking
18 about?  No.
19 BY MR. GADDY:
20     Q.  What you are talking about is what we've
21 been talking about for the last hour or so?
22     A.  Um-hum.
23     Q.  Okay.  So no.  I'm talking about something
24 different than that.

Page 116

1      A.  Okay.
2      Q.  I'm talking about what -- well, let me ask
3  you this:  Did Matt refer to those as suspicious
4  orders?
5      A.  I don't recall --
6      Q.  Okay.
7      A.  -- his verbiage, no.
8      Q.  I'm ask -- what I'm trying to ask about,
9  and -- and -- and I'm just going to be sus -- specific
10 to the phrase "suspicious orders."
11     A.  Okay.
12     Q.  Because that's what's used here in this
13 policy as it relates to internal audit and that's what
14 I think you told me was on that report that the
15 C-II -- that -- that Lori --
16     A.  Right.
17     Q.  -- who was the C-II SAIL coordinator,
18 would get, correct?
19     A.  Correct.
20     Q.  Or -- or -- or Brook was the other one,
21 right?
22     A.  Um-hum.
23     Q.  Did you ever have any conversations or
24 interactions with anybody at Walgreens, other than

Page 117

1  this Anaya conversation you told us about, regarding
2  suspicious order reports or suspicious orders, and --
3  and I'm confining it to that -- to that specific term?
4      MS. SWIFT:  Object to the form.
5  BY THE WITNESS:
6      A.  Not that I recall.
7  BY MR. GADDY:
8      Q.  Okay.  Do you know -- do you know a Mark
9  Betterridge?
10     A.  Yes.
11     Q.  Who is Mark and what did he do?
12     A.  He is another function manager at the DC.
13     Q.  Okay.  What is his purview -- what's under
14 his purview?
15     A.  Right now he is in NAKL mod, one of our
16 pick mods.
17     Q.  Okay.  Has he ever had any
18 responsibilities whatsoever for controlled substances?
19     A.  I didn't really follow C-III through V and
20 their activity when I was in receiving as a manager,
21 so I couldn't really answer that.  He may have during
22 that frame.  I don't know.
23     Q.  He never had any responsibilities over
24 C-IIs?



