EXHIBIT 370



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Page 60

1    But the simple question I asked you was:
2   Do you ever recall being educated on what
3   Walgreens' responsibilities as a distributor were?
4   Yes or no.
5       MR. SWANSON:  Asked and answered.
6   BY THE WITNESS:
7       A.  I relied on other people to make sure
8   that they knew that the -- Walgreens was following
9   the policies and procedures.
10  BY MR. MOUGEY:
11      Q.  So, the answer to my question is no,
12  correct?  You can't recall ever being educated on
13  what Walgreens' responsibilities as a distributor
14  were, correct?
15      MR. SWANSON:  Object to form, mischaracterizes
16  her testimony.
17  BY THE WITNESS:
18      A.  If that's how you want to interpret what
19  I'm saying.
20  BY MR. MOUGEY:
21      Q.  You have said repeatedly that you relied
22  on other people, and I don't know if by relying on
23  other people that you just reviewed the reports and
24  someone else implemented.  What I'm asking you is a

Page 59

1   from the beginning, just cut it off at 2015, you
2   don't believe that the work you performed was to
3   ensure that Walgreens was filling its role as a
4   distributor, correct?
5       A.  My role at various times, I was asked to
6   look at reports, look at item movement and
7   determine if the logic was sound.  How that was
8   being interpreted in regards to various
9   regulations, I honestly didn't know how that fit
10  in.
11      Q.  And you can't recall ever being educated
12  on what Walgreens' responsibilities as a
13  distributor were?
14      A.  I'm sure I've heard different bits and
15  pieces of things over the courses of years, but
16  it's hard to pinpoint exactly when I would have
17  learned what types of information.  And, again, my
18  role wasn't involved with determining what the
19  rules were.  I was asked to determine if logic was
20  sound.
21      Q.  My question was a little different.  You
22  said, "I've heard bits and pieces over the years.
23  It's hard to pinpoint exactly when I learned
24  specific types of information."

Page 61

1   simple question, and I'm going to ask it for about
2   the fourth or fifth time.
3       Do you recall ever being educated about
4   what Walgreens' responsibilities were as a
5   distributor?
6       MR. SWANSON:  Asked and answered.
7   BY MR. MOUGEY:
8       Q.  Yes or no.
9       MR. SWANSON:  Asked and answered.
10  BY THE WITNESS:
11      A.  Again, I was relying on other people to
12  determine what the regulations were.
13  BY MR. MOUGEY:
14      Q.  So, the answer is --
15      A.  Our legal.
16      Q.  -- no, you've never been educated --
17      MR. MOUGEY:  I am sick and tired of the head
18  shaking on the yes and no from you two.  I do not
19  want yeses, nos, in answers.
20      I will tell you what.  We are going to
21  take a break.  Do we have an extra camera?  Do we
22  have another camera?  Get the camera off of me and
23  let's put it on Walgreens counsel with the yeses
24  and nos and the head shaking repeatedly in the

16 (Pages 58 to 61)

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    peripheral sight of the witness.  This has been
2    going on for two months with Kate over there
3    shaking her head yes and no.
4        MR. SWANSON:  You are not putting a camera on
5    me.  So, you can turn it off or keep it on you.
6        MR. MOUGEY:  I do not want --
7        MR. SWANSON:  Stop the speech.  Ask questions.
8        MR. MOUGEY:  -- any more gestures.
9            There is no speech.  I do not want any
10   more yes or no head shaking.  It's the most
11   unprofessional.  And your office has done this
12   repeatedly over and over again for two months.
13       MR. SWANSON:  Are you done?
14       MR. MOUGEY:  Are you done?  Are we done with
15   the head shaking?  The witness is right there.
16       MR. SWANSON:  Do you need a breather?
17       MR. MOUGEY:  The witness -- I don't need a
18   breather.  I need you to stop head shaking.
19       MR. SWANSON:  Then calm down.
20       MR. MOUGEY:  Don't tell me to calm down.
21       MR. SWANSON:  And ask questions.
22       MR. MOUGEY:  I am sick and tired of Kate
23   sitting there shaking her head in the direct
24   peripheral sight of the witness for answers.

Page 63

1        THE WITNESS:  I am not even looking at Kate.
2        MR. SWANSON:  Nobody needs your speech, Peter.
3    Go ahead.
4        MR. MOUGEY:  I don't need the head shaking.
5    Are you done with the head shaking?
6        MR. SWANSON:  I'm not going to respond.
7        MR. MOUGEY:  Are you done with the head
8    shaking?
9        MR. SWANSON:  Do you want to go off the record
10   and take a break or not?
11       MR. MOUGEY:  No, I don't need a break.
12       MR. SWANSON:  Then ask a question.
13       MR. MOUGEY:  Are you done with the head
14   shaking?  Yes or no.  Are we done?
15       MR. SWANSON:  Ask a question.
16       MR. MOUGEY:  I will take that as a yes, we're
17   done.  And every time I get a head shake, I'm going
18   to announce it on the record.
19       MR. SWANSON:  That's great.
20       MR. MOUGEY:  That is great.
21   BY MR. MOUGEY:
22       Q.   Do you recall ever being educated on
23   Walgreens' responsibility as a distributor during
24   your tenure at Walgreens?

Page 64

1        MR. SWANSON:  Asked and answered.
2    BY THE WITNESS:
3        A.   Again, as far as regulations, I relied
4    on our legal department to provide that guidance.
5    BY MR. MOUGEY:
6        Q.   Did you -- did you -- were you trained
7    in any shape, form or fashion on Walgreens'
8    responsibilities as a distributor?
9        A.   Again, Walgreens' responsibilities, I
10   left that up to other people to determine.
11       Q.   So, you didn't receive any training from
12   anyone else about what Walgreens' responsibilities
13   and duties were as a distributor?
14       MR. SWANSON:  Objection.
15   BY THE WITNESS:
16       A.   It wasn't my area of responsibility to
17   determine how to interpret rules and regulations.
18   BY MR. MOUGEY:
19       Q.   I understand that your -- you think it's
20   someone else.  But all I'm simply asking is:  Did
21   you get any training about what Walgreens'
22   responsibilities were as a distributor?  It's a
23   simple yes or no answer.
24           And if it's no, it's okay.  Just say no.

Page 65

1    If you didn't get any training about Walgreens'
2    responsibilities as a distributor, no is fine.
3        A.   I relied on other people to interpret
4    the regulations.  So, if you want to interpret that
5    as a no, please do so.
6        Q.   I'm not trying to interpret.  I want you
7    to tell me generally do you ever recall being
8    trained on Walgreens' responsibility as a
9    distributor?
10       A.   And, again, my answer is it's not my
11   responsibility to interpret regulations.
12       Q.   So, I didn't use the word "regulations"
13   in my question.  Okay.  I have taken out "code."
14   I've taken out "regulations."  And I've used the
15   word "responsibilities."  You understand the
16   difference, correct?
17       A.   In this context, I'm not sure I do.
18       Q.   Okay.  I'm not using the word
19   "regulation."  I'm not using the word "code."  You
20   understand that, right?
21       A.   You didn't use those words, yes, I
22   understand that.
23       Q.   And when I use the word "training,"
24   at Walgreens, training was often done through

17 (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  PowerPoints or memos, things along those lines.
2  You understand that, right?
3      A.  More toward to the stores.  I don't
4  remember being trained as a corporate employee
5  using PowerPoint presentations.
6      Q.  So, you went to conferences and attended
7  conferences, correct?
8      A.  I was reminded that I attended one
9  conference.
10     Q.  So, did you attend conferences or
11  meetings or continuing education or anything
12  explaining what Walgreens' responsibilities were as
13  a distributor?
14     A.  I remember at some point.  I don't
15  remember the date.  It was brought up in
16  discussions that I attended one seminar.  It wasn't
17  direct to Walgreens' roles and responsibilities.
18  It was some company's presentation, and they were
19  trying to sell their order patterns.
20     Q.  That's the only time you remember any
21  continuing education, seminar, explanation, about
22  what Walgreens' responsibilities as a distributor
23  were, correct?
24     A.  That wasn't a continuing education

Page 67

1  seminar.  I wish it would have been.  I would have
2  at least gotten some credit.
3      Q.  Right.  But what I asked was:  The only
4  time you remember any educational piece about what
5  Walgreens' duties or responsibilities were as a
6  distributor was a third-party conference that was
7  trying to sell a product?  Yes?
8      A.  Again, I wasn't there to interpret
9  Walgreens' regulations or responsibilities.  I went
10  more interested in to see what this company's logic
11  was doing and how to compare it to ours.
12     Q.  And I appreciate that that you weren't
13  there to interpret.  I know you're not a lawyer.
14  We have gone through your resume.  I didn't ask if
15  you were there to interpret.
16         What I've asked was:  Other than the one
17  seminar given by a third party, was there any
18  instance generally where you were educated on
19  Walgreens' responsibilities as a distributor?
20     A.  I relied on other people to interpret
21  Walgreens' responsibilities.
22     Q.  So, you did not specifically have an
23  understanding of what Walgreens' responsibilities
24  were as a distributor, correct?

Page 68

1      A.  I was trusting --
2      MR. SWANSON:  Object to form.
3  BY THE WITNESS:
4      A.  -- our legal department to interpret the
5  responsibilities.
6  BY MR. MOUGEY:
7      Q.  I understand.  That's not the question
8  about who you were relying on.  I asked did Barbara
9  Martin have an understanding of what Walgreens'
10  responsibilities were as a distributor?  Did you
11  specifically, Barbara Martin, or were you relying
12  solely on other departments to fill that role?
13     A.  I was relying on other departments to
14  fill that role, and as I've said over the course of
15  my years of experience, I've learned things.  It's
16  hard to say what I learned when and when I learned
17  it.  So, if I learned something in '09, I can't
18  recall if I learned it in '09, 2012 or two weeks
19  ago.
20     Q.  I didn't ask what year.  I didn't ask
21  what month.  I didn't ask two weeks ago.  What I've
22  asked is:  Does Barbara Martin have an
23  understanding of what Walgreens' responsibilities
24  generally as a distributor are?

Page 69

1      MR. SWANSON:  Object to form, asked and
2  answered.
3  BY THE WITNESS:
4      A.  And I've relied on other people to
5  interpret what those responsibilities were.  I
6  could -- once they would tell us what the
7  responsibilities were, I could then interpret that
8  into my job as to how to look at reports or
9  something like that if that was needed.
10  BY MR. MOUGEY:
11     Q.  And where did you -- who told you what
12  Walgreens' responsibilities were as a distributor?
13     A.  We would have been relying on our legal
14  department, Dwayne Piñon and his team, to review
15  guidance.
16     MR. MOUGEY:  Let's take a break.
17     THE VIDEOGRAPHER:  We are going off the record
18  at 10:15.
19         (WHEREUPON, a recess was had
20          from 10:15 to 10:31 a.m.)
21     THE VIDEOGRAPHER:  We are back on the record
22  at 10:31.
23  BY MR. MOUGEY:
24     Q.  Ms. Martin, we are in '09, 2010 where

18 (Pages 66 to 69)

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  you are reviewing reports generated by Wayne
2  Bancroft's algorithm.
3       In a general description, can you tell
4  me what other areas of responsibility you had with
5  Walgreens suspicious order monitoring?
6       A.   At that time all I was really doing was
7  looking at these reports in regards to order
8  monitoring.  I had a lot of other roles and
9  responsibility in inventory.
10       Q.   How many hours a week on average in '09
11  were you looking at these reports?
12       A.   One to three maybe.
13       Q.   And do you have an understanding of how
14  many hours a week in '09 Marcie was looking at
15  these reports?
16       A.   I do not.
17       Q.   How many reports would you look at
18  during the one to three hours a week?
19       A.   It's difficult to quantify that.  It
20  would depend on how easy they were to look at.  The
21  one that we looked at, it's simple.  3 is smaller
22  than 5.
23       Q.   Right.
24       A.   There were others that I might have had

Page 71

1  to have done a much deeper dive into.  So, no set
2  number.  Depends on...
3       Q.   Are we talking a dozen, 15?  Are we
4  talking 1,000?
5       A.   Definitely not 1,000.
6       Q.   Are we talking several hundred?
7       A.   Again, it's -- it's hard to quantify.
8  Could be anywhere between 10 to 75.  I really don't
9  know.
10       Q.   How about less than 100, more than 10 a
11  week?  Is that fair?  Somewhere in that range?
12       A.   That sounds fine.
13       Q.   Did you and Marcie Ranick divide them up
14  in any way that she looked at some and you looked
15  at others?
16       A.   No.  When she came down, we would spend
17  time together going through things, and then I'm
18  sure she was looking at stuff on her own.  But I
19  don't know what she was doing.
20       Q.   How would you determine, I'm going to
21  call it a batch that you would look at, the 10 to
22  less than 100 you'd look at a week?
23       A.   Randomly pulling up reports.
24       Q.   Do you have an understanding of how many

Page 72

1  reports were being flagged on a weekly basis in
2  2009?
3       A.   I don't remember.
4       Q.   Thousands?
5       A.   I wouldn't even want to take a guess.
6  Sorry.
7       Q.   Is there anywhere at Walgreens where the
8  orders that were being flagged by Wayne Bancroft's
9  algorithm were kept?
10       A.   I don't believe that data is stored
11  anywhere.
12       Q.   So, a report would populate and it would
13  just disappear into the Internet?
14       A.   The reports populated.  They held for a
15  period of time.  I don't remember what that period
16  of time is or was.  I know that our algorithms and
17  order of monitors and order of logic have been
18  evolved over the years; and with that, there would
19  have been different types of reporting that would
20  have replaced the stuff I was looking at.
21       Q.   There were a batch of I'm going to say
22  20, 25 different individual pieces of paper printed
23  like the document I put in front of you as
24  Martin -- I believe it was 2.

Page 73

1       Do you have an understanding of -- did
2  you have a paper file of 20 or 25 of those reports
3  from Bancroft's algorithm?
4       A.   I don't remember.  I mean, I know I kept
5  a sample of the reports.  How many they were, I
6  don't remember.
7       Q.   Why did you keep a sample of the
8  reports?
9       A.   I guess I just kept them just to see how
10  our system evolved over the years.  I'm not really
11  sure why.
12       Q.   Did you look at them in preparation for
13  today?
14       A.   There were a few that we looked at, yes.
15       Q.   All right.  So, we've gone through your
16  participation in Walgreens' suspicious order
17  monitoring policies up until 2009 I believe.  Okay?
18       Can you give me any more examples moving
19  forward in time of your different roles?
20       A.   In relationship to the order monitoring
21  process or my roles in general with inventory?
22       Q.   Walgreens -- as far as your role is what
23  we're talking about, your role with reviewing
24  procedures and policies, reports for Walgreens

19 (Pages 70 to 73)

Page 74

1  implementing its responsibilities as a distributor.
2      A.   I wasn't responsible for writing SOPs
3  for Walgreens.  I know that I provided information
4  for guidance for the stores and how to look up
5  things, but I wasn't writing SOPs.
6      Q.   Okay.  And I'm -- I'm sorry.  I don't
7  think I used the word "writing SOPs."  So, just
8  we're getting -- going through --
9      A.   Sorry.  I misinterpreted what you said.
10      Q.   General understanding.  Seems to be a
11  little bit of a problem for the last two hours.
12          So, generally your roles with Walgreens
13  and its suspicious order monitoring policies, what
14  are some of the roles you filled?  That's what I'm
15  asking you to describe to me.
16          So, you didn't write the policies.  We
17  got that.  You're not a lawyer.  We got that.
18  You're not interpreting anything.  I got that.  You
19  can't remember any specific education or training
20  with Walgreens as a distributor.
21          Just give me some general descriptions
22  of other duties you filled with Walgreens'
23  suspicious order monitoring policies.
24          MR. SWANSON:  Object to the lawyer testifying,

Page 75

1  but you can answer the question if you understand
2  it.
3  BY THE WITNESS:
4      A.   What time frame are you talking about?
5  BY MR. MOUGEY:
6      Q.   We are moving on from 2009.  So, I think
7  we've captured everything up to 2009, correct?
8      A.   To the best of my recollection.
9      Q.   To the best of your recollection.  So,
10  let's -- moving forward, give me some general
11  descriptions of your duties with Walgreens'
12  suspicious order monitoring policies and
13  procedures.
14      A.   Again, what time -- we're looking at
15  2010 now?
16      Q.   I'm just -- you don't remember dates
17  specifically.
18      A.   No, that's what I'm trying to --
19      Q.   I understand.  I'm saying moving through
20  '09 and afterwards.  I'm giving you a really broad
21  window for you to generally describe to me what
22  Barbara Martin did in relation to Walgreens'
23  suspicious order monitoring policies and
24  procedures.

Page 76

1      A.   So, I would have been continuing to work
2  with Marcie to help her review and understand these
3  reports.  I would also work with her when she came
4  down to look at the monthly and quarterly reports.
5          Again, we had talked previously about me
6  supplying data when it was requested regarding
7  purchases.
8      Q.   So, you continued to work with Marcie
9  and help her review and understand the reports.
10  That's one topic, right?
11      A.   Um-hmm.
12      Q.   You also worked with her when she came
13  down to look at the monthly and quarterly reports,
14  correct?
15      A.   Right.
16      Q.   Kind of the same area, right?
17          And then supplying data or data when
18  asked, right?
19      A.   Um-hmm.
20      Q.   Is there any other roles Barbara Martin
21  filled until the end of 2015 in relation to
22  Walgreens' suspicious order monitoring policies and
23  procedures?
24      A.   It's hard to think of something right

Page 77

1  off the top of my head.  I'm sure I had
2  correspondence and communication with other team
3  members.
4      Q.   So, when we look at your resume,
5  Martin 1, the only entry I see on your entire
6  resume in relation to Walgreens' suspicious order
7  monitoring policies and procedures with regard to
8  its role as a distributor is that last entry,
9  "assisted in the creation of the control drug order
10  monitoring reports."  Do you see anything else?
11      A.   That's -- that's the one that talks
12  about order monitoring, yeah.
13      Q.   Right.
14      A.   For potentially suspicious orders.
15      Q.   Anything else on your resume where
16  you're describing your, Barbara Martin's, roles or
17  duties in relation to Walgreens' suspicious order
18  monitoring policies and procedures as a
19  distributor?
20      A.   I -- I can't think of anything.
21      Q.   All right.  So, let me just make sure if
22  I can get a general understanding of what you were
23  doing.
24          You helped create the drug order

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1   monitoring reports, correct?  By "create," you
2   provided some input into the reports.  Is that --
3   is that fair?
4       A.   Yeah, I mean, I didn't design the
5   report, but I looked at the data that was generated
6   off of the reports.
7       Q.   And you gave input on some of the data
8   that the reports were flagging.  Is that fair?
9       A.   Yes.
10      Q.   All right.  You pulled data kind of on
11  an ad hoc basis when people would ask.  Is that
12  fair?
13      A.   Yes.
14      Q.   All right.  And you helped Nancy --
15  no -- Marcie Ranick interpret some of these reports
16  and understand the flow within the inventory.  Is
17  that fair?
18      A.   Yes.
19      Q.   All right.  Am I kind of capturing your
20  recollection of what Barbara Martin did in relation
21  to Walgreens as a distributor in relation to its
22  suspicious order monitoring policies and
23  procedures?
24      A.   Yeah, I mean, there might have been

Page 79

1   other things.  Nothing comes to mind.  And, again,
2   I was more store-facing than distribution.
3       Q.   Now, let me maybe make sure you and I
4   aren't talking past each other and the use of the
5   word "distributor" maybe is causing you some
6   questions about your answer.
7            So, if I were to change the question and
8   say describe to me your roles, Barbara Martin's
9   roles, at Walgreens in relation to Walgreens
10  filling its role as a pharmacy through, for
11  example, good faith dispensing.  Did you have
12  any -- did you have any duties in that respect?
13      A.   I was aware of good faith dispensing.
14  It was something that I was taught back in pharmacy
15  school.  I practiced it when I was a pharmacist in
16  the stores.  I wasn't involved with writing the
17  Walgreens procedures for good faith dispensing, but
18  generally aware of them through my entire career
19  starting in school.
20      Q.   So, you were a pharmacist, both a
21  staff -- an intern, a staff pharmacist and a
22  pharmacy manager all the way up to 2004, correct?
23      A.   Yes.
24      Q.   So, post-2004, when you were more at the

Page 80

1   corporate level, correct?
2       A.   Um-hmm.
3       Q.   So, post-2004, would you describe to me
4   what, if any, roles you had assisting Walgreens
5   with its compliance in its role as a distributor?
6   I'm sorry.  As a pharmacy.
7       A.   I'm sorry.  I'm struggling with how to
8   answer that question, because when I think of like
9   Walgreens as a pharmacy, I would think of each
10  individual pharmacy.
11      Q.   Fair enough.  And if your answer is no,
12  I really didn't have jobs or duties in relation to
13  ensuring Walgreens was compliant in its role as a
14  pharmacy, that was more at the pharmacy level, then
15  that's a fine answer.
16           I'm just trying to understand what
17  Barbara Martin did and didn't do.  So, if that was
18  something that you didn't do, that's okay.  I just
19  want to know so I can figure out what to do with
20  the rest of our time.
21           Did Barbara Martin have any jobs or
22  responsibilities or duties post-2004 where you were
23  helping Walgreens with its compliance, good faith
24  dispensing, as a pharmacy?

Page 81

1            MR. SWANSON:  Object to form.
2   BY THE WITNESS:
3       A.   So, I mean, I wasn't really responsible
4   for interpreting the regulations.  But what I did
5   focus on, again, we can go back to I was looking at
6   these reports and other data.  You know, I'm sure I
7   had conversations with various groups.  It's hard
8   to remember what I've done in the last 30 years.
9            But, again, these reports were a big job
10  and then as we got out of these reports and the
11  system got more sophisticated, I transitioned back
12  into other inventory supporting roles.
13  BY MR. MOUGEY:
14      Q.   But I think what you told me earlier
15  this morning is that you were pulling the data
16  pulls and you weren't reviewing those.  You were
17  simply giving the data you were asked to pull to
18  the field.  Correct?
19      A.   Correct.
20      Q.   So, let's partition that one aside.
21  Okay?
22           So, the only reports that you were
23  looking at were the ones that you and Marcie were
24  looking at during the pilot phase.  Is that fair?

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

Page 194

Page 196

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

57 (Pages 222 to 225)

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

64 (Pages 250 to 253)

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

**REDACTED**

Page 282

17  BY MR. MOUGEY:

18      Q.   I understand, and I'm not asking you to

19  identify the specific person or the specific time.

20          But you can't remember one instance from

21  June of '08 into now April of 2012 where somebody

22  says, "We need to correct all of these memos.

23  They're wrong.  We need to put the word 'possible'

24  or 'potential' in front of 'suspicious,'" correct?

Page 283

1      A.   I have no memory of that, correct.

2      Q.   Now, if you turn to Bates No. 44

3  under 9.

4          "Start saving 52 weeks of order history

5  data for more accurate observations.  The process

6  was already changed in December 2010 to purge the

7  order history after 52 weeks."

8          Did I read that right?

9      A.   Yes, you read that correctly.

10      Q.   Okay.  I have two questions.  Do you

11  understand what the reason is, as the business

12  owner of this specific memorandum, why 52 weeks of

13  order history data was needed for more accurate

14  observations?

15      A.   Well, that's the reason, to get more

16  accurate observations.

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 286    Page 288

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Page 318

1 regulatory and law, Patty Zagami, correct?
2     A.   Her name is listed here too, yes.
3     Q.   Yes, ma'am.  And now if you look above
4 that, Anika Madarasz.  Can you help me out with
5 that?
6     A.   I vaguely remember her.
7     Q.   Okay.
8     A.   I'm not comfortable correcting your
9 pronunciation.
10     Q.   All right.  And then -- so, that e-mail
11 then is forwarded to several people, correct?
12     A.   Yes, she sent this e-mail to a number of
13 different people, yes.
14     Q.   And then Mike Bleser sent the e-mail to
15 you, correct?
16     A.   Me, Denny and Frank.
17     Q.   I might just be tired.  But do you see
18 Anika, Anika's name anywhere on that e-mail below?
19     A.   I do not.
20     Q.   Do you have any understanding of how
21 Anika could forward an e-mail that we don't see her
22 copied on?
23     A.   Someone cut something out.  I -- I don't
24 know.

Page 319

1     Q.   And then Mr. Bleser forwarded the
2 contents of the e-mail to you, correct?
3     A.   Correct.
4     Q.   So, let's look back down at Mr. Swords'
5 e-mail to Kermit Crawford, amongst others, and what
6 I want to direct your attention to is that he's
7 referencing a November 8th DEA meeting at NAPB,
8 correct?
9     A.   That's the subject line, yes.
10     Q.   I forget the acronym.  National
11 Association of?
12     A.   Boards of Pharmacy.
13     Q.   There you go.
14          And he relays that "I have the sense
15 that today's meeting was a condensed version of the
16 regional meetings the DEA is holding throughout the
17 country for pharmacists."  He references that he
18 thought several of the chains were there.
19          Do you see that?
20     A.   Yes.
21     Q.   But below that, what I want to point
22 out, do you see Joseph Rannazzisi?
23     A.   I see his name, yes.
24     Q.   Yes, ma'am.  And do you recognize his

Page 320

1 name as the gentleman that signed the three letters
2 that we went through earlier from the DEA in 2006,
3 early 2007 and late 2007?
4     A.   I don't remember looking at the
5 signatures of those letters.
6     Q.   And if you'd turn the page to Bates
7 No. 47, at the top of the page, the fourth bullet
8 down, "Reviewed 21 CFR 1301.74."  Are you there
9 with me?
10     A.   Yes, I see that.
11     Q.   And you recognize that language.  That
12 was in all of the letters that we reviewed from the
13 DEA in 2006 and 2007 about the registrant designing
14 and operating "a system to disclose to the
15 registrant suspicious orders of controlled
16 substances."  Correct?
17     A.   That's what this says, yes.
18     Q.   And the bullet below, "If suspicious -
19 you don't ship.  Decreasing the order and shipping
20 is not complying with the regulation."
21          Did I read that right?
22     A.   You read that correctly, yes.
23     Q.   So, we just looked at a Buzzeo
24 presentation that you attended in October of 2012

Page 321

1 and within a month of the Buzzeo presentation
2 Mr. Rex Swords is at another meeting with the DEA
3 where he's being told, "Decreasing the order and
4 shipping is not complying with the regulation,"
5 correct?
6     A.   That's what this says, yes.
7     Q.   And this was sent to you as well,
8 correct?
9     A.   It was forwarded on to me, yes.
10     Q.   And then the next bullet says, "Ignoring
11 suspicious orders will result in civil penalties.
12 Cited Cardinal, ABC and McKesson fines."
13          Correct?
14     A.   That's what that statement says, yes.
15     Q.   Now, let's go down to three-quarters of
16 the page and you see "Red Flags"?
17     A.   Yes, I see that.
18     Q.   And at least some of these red flags are
19 the same red flags that were identified in the
20 Buzzeo presentation, correct?
21     A.   I believe so.
22     Q.   And this is coming directly from the DEA
23 to Walgreens, correct?
24     MR. SWANSON:  Object to form, lacks

81 (Pages 318 to 321)

Page 322

1  foundation.
2  BY THE WITNESS:
3     A.  It's coming from an e-mail that Rex
4  wrote.
5  BY MR. MOUGEY:
6     Q.  Yes, ma'am.  Where he references a
7  meeting with Joseph Rannazzisi, the Deputy
8  Administrator -- Deputy Assistant Administrator,
9  Office of Diversion Control, correct?  First page,
10  middle of the page.
11    A.  Yes.
12    Q.  And he -- Mr. Swords goes on,
13  "Mr. Rannazzisi presented a large PowerPoint deck
14  on prescription drug trafficking and abuse for two
15  hours," correct?  "Approximately two hours,"
16  correct?
17    A.  That's what that says, yes.
18    Q.  So, you, your boss, Mr. Bleser,
19  Mr. Murray and several senior members of Walgreens
20  management were put on alert that decreasing the
21  order and shipping is not complying with the
22  regulation as of November 9, 2012, correct?
23    A.  That's what this document says, yes.
24    Q.  Did Walgreens take the information that

Page 323

1  Mr. Swords passed around and change its algorithm
2  to no longer cut what it internally was calling a
3  suspicious order?
4     MR. SWANSON:  Object to form, lacks
5  foundation.
6  BY THE WITNESS:
7     A.  I know over the years we have made a lot
8  of different changes.  What we did when is a little
9  bit vague to me.  But I would believe that, yes, we
10  did act on this information.
11  BY MR. MOUGEY:
12    Q.  Do you recall that version 5.5, which
13  was entered after these October and
14  November e-mails, still included in the algorithm a
15  suspicious order being cut and not reported to the
16  DEA?
17    MR. SWANSON:  Object to form.
18  BY THE WITNESS:
19    A.  I don't remember that directly off the
20  top of my head.
21  BY MR. MOUGEY:
22    Q.  Ms. Martin, I want to go back in time to
23  August of 2010.  Mark this as Martin 29.  This is
24  an e-mail from Daniel Coughlin to yourself, amongst

Page 324

1  others.  Do you see that?
2     A.  I don't have a copy of the paper yet.
3     Q.  I'm sorry, Ms. Martin.
4        (WHEREUPON, a certain document was
5        marked as Walgreens-Martin Exhibit
6        No. 29:  8/3/10 e-mail with
7        attachments; WAGMDL00660331 -
8        00660337.)
9  BY MR. MOUGEY:
10    Q.  Do you have it in front of you,
11  Ms. Martin?
12    A.  Yes, I do.
13    Q.  All right.  This is an e-mail from
14  Daniel Coughlin to yourself, amongst others, dated
15  August 3, 2010, correct?
16    A.  It's to Marcie, and I'm cc'd among
17  another bunch of people.
18    Q.  Yes, ma'am.  And including Mr. Piñon,
19  correct?
20    A.  Yes, I see his name.
21    Q.  Do you recall who Daniel Coughlin is?
22    A.  I know he had something to do with the
23  distribution centers.  I'm not sure of his exact
24  title.  I want to say vice president.

Page 325

1     Q.  Do you know if he was in a specific
2  distribution center or was he in corporate?
3     A.  I don't remember where he was based.
4     Q.  So, the subject line is "Suspicious
5  Controlled Drug Orders."
6        Do you see that?
7     A.  Yes, I see that subject line.
8     Q.  And he had two questions.  Do you see
9  that it's No. 1 and No. 2?
10    A.  Yes, I see that.
11    Q.  And No. 1, he said, "I recall the old
12  paper report as being inches thick.  This was
13  replaced by same data on disk and eventually
14  electronic transmission.  We were instructed in
15  1985 not to review or contact anyone on the data."
16       Did I get that right?
17    A.  That's what this says, yes.
18    Q.  Okay.  "Who from your group has been
19  reviewing the data collected for the past 25
20  years?"
21       Now, did that give you some pause for
22  alarm in August 3 of 2010 that Mr. Coughlin was
23  asking Ms. Ranick in Loss Prevention and copying
24  you asking who has been reviewing the suspicious

82 (Pages 322 to 325)

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1  controlled drug orders for the last 25 years?
2      MR. SWANSON:  Object to form, foundation.
3  BY THE WITNESS:
4      A.   This e-mail wasn't sent to me.  So, I
5  don't know what Marcie or her team was doing and --
6  BY MR. MOUGEY:
7      Q.   Did you ask?
8      A.   I personally did not.
9      Q.   And did you not ask because when you
10 look at an e-mail like this that you've got Dwayne
11 Piñon from legal on this that you assumed that
12 regulatory and law was ensuring that Walgreens was
13 complying with its obligations as a distributor
14 under the federal code and the federal regs?
15     MR. SWANSON:  Object to form.
16 BY THE WITNESS:
17     A.   I was assuming that if this was
18 addressed to Marcie, that her and her team were
19 taking appropriate action.
20 BY MR. MOUGEY:
21     Q.   25 years.  Who has been reviewing these
22 reports for the last 25 years, somebody from the
23 distribution center, under suspicious drug
24 controlled drug orders.  That doesn't make you stop

Page 327

1  what you're doing for the course of the day and
2  follow up?  25 years?
3      A.   It wasn't my area of responsibility.
4      Q.   Did it not give you any concern that a
5  member of Walgreens distribution center is asking
6  who has been reviewing our suspicious controlled
7  drug orders for the last 25 years?
8      MR. SWANSON:  Object to form.
9  BY THE WITNESS:
10     A.   He's asking a question.  We don't know
11 based on this e-mail who was or who wasn't doing
12 it.  Just because he's asking who doesn't mean it
13 wasn't being done.
14 BY MR. MOUGEY:
15     Q.   And it certainly wasn't you, correct?
16     A.   This reporting was not my area of
17 responsibility.
18     Q.   And not just reporting.  Reviewing.
19 What he is asking is who from the group has been
20 reviewing the data collected for the last 25 years,
21 suspicious controlled drug orders.  That was not
22 you, correct?
23     MR. SWANSON:  Object to form.
24 BY THE WITNESS:

Page 328

1      A.   No, it was not me.  We didn't have --
2  the program that I worked on didn't exist 25 years
3  ago.
4  BY MR. MOUGEY:
5      Q.   At any point in time in your tenure at
6  Walgreens that we have been discussing today from
7  the suspicious order monitoring that you were
8  involved in, so, from 2008 to 2012, were you
9  charged with reviewing suspicious controlled drug
10 orders to perform due diligence to ensure the
11 viability of those orders going to legitimate
12 patients outside of just testing the validity of
13 the reports?
14     MR. SWANSON:  Object to form.
15 BY THE WITNESS:
16     A.   Yes, I was performing due diligence on
17 some of those reports.
18 BY MR. MOUGEY:
19     Q.   And define for me what you mean by due
20 diligence.
21     A.   I would look at data.  I would look at
22 the store's history and see if it made sense.  If
23 something didn't make sense to me, I would call the
24 store or the district manager or the pharmacy

Page 329

1  supervisor and try to obtain additional
2  information.
3      Q.   And that was part of your
4  responsibilities in the, you know, a few hours up
5  to ten hours a week reviewing the reports from the
6  algorithm?
7      A.   Yes.
8      Q.   Let me hand you Martin 30.
9          (WHEREUPON, a certain document was
10         marked as Walgreens-Martin Exhibit
11         No. 30:  1/10/11 e-mail string;
12         WAGFLDEA00000846 - 00000851.)
13 BY MR. MOUGEY:
14     Q.   This is an e-mail chain with you
15 included and Kristine Atwell.  Are you familiar
16 with Ms. Atwell?
17     A.   I remember her name, yes.
18     Q.   Yes, ma'am.  You remember her name from
19 this e-mail exchange?
20     A.   Yeah, I remember we had -- she worked in
21 Jupiter.  We had a number of different
22 conversations via either phone call or e-mails.
23     Q.   She worked at the Jupiter distribution
24 center?

83 (Pages 326 to 329)

Page 330

1    A.    Yes.
2    Q.    The one that was padlocked by the DEA,
3  correct?
4    MR. SWANSON:  Object to form.
5  BY MR. MOUGEY:
6    Q.    Correct?
7    A.    She worked in Jupiter, yes.
8    Q.    Yes, ma'am.  The same Jupiter that the
9  DEA came in and locked up the cage and kept
10  Walgreens from accessing its Schedule II and
11  Schedule III opiates, correct?
12    A.    That's in a different time period than
13  this e-mail.
14    Q.    Yes, ma'am.  That's not what I asked.
15  What I simply asked you was:  This is
16  the same Jupiter that was ultimately where the
17  locks were changed by the DEA, correct?
18    A.    Yes.
19    Q.    And this e-mail chain is dated
20  January 10, 2011, correct?
21    A.    That is correct.  Yes.
22    Q.    And if we start at the bottom of this
23  e-mail chain on Bates No. 51, the very last page,
24  there is two sets of Bates numbers.  This is

Page 331

1  WAGFLDEA851, very last page.
2    A.    Yes, I see that.
3    Q.    You can see this is an e-mail from
4  Kristine Atwell.
5    "What are your thoughts on this matter?"
6    Do you see that?
7    A.    I see that, yes.
8    Q.    Okay.  Let's go to the previous
9  page where Ms. Atwell from the Jupiter distribution
10  center asks you, "I have" -- and I'm on Bates
11  No. 50 -- "I have several stores that are ordering
12  huge quantities of 682971 on a regular basis."
13    And that is a controlled substance,
14  correct?
15    A.    Off the top of my head I don't remember
16  what that WIC number is associated with, but --
17    Q.    This is -- I'm sorry.  Go ahead.  Were
18  you finished?
19    A.    We'll just assume it's some kind of a
20  C-II because she is mentioning the 222 forms.
21    Q.    Yes, ma'am.  The 222 forms need to be
22  filled out when a certain amount of controlled
23  substances are shipped, correct?
24    A.    The 222 form is required by the DEA when

Page 332

1  you're purchasing or returning C-II drugs.
2    Q.    "This is creating an issue in
3  maintaining enough 222 forms to fill all of the
4  orders because a new 222 form is generated for
5  every 128 bottles of this WIC," and that is the --
6  what's WIC stand for again?
7    A.    Walgreens item code.
8    Q.    -- "that are ordered.  For example, when
9  they order 450 bottles, there will be four 222
10  forms printed to accommodate this one order.  I
11  feel that this store needs to justify the large
12  quantity."
13    Did I read that right?
14    A.    That's what she wrote, yes.
15    Q.    "Three stores that come to mind are,"
16  and I'm going to -- I want you to help me remember
17  these.  Write these down.  Do you have a pen over
18  there?
19    A.    I do not.
20    Q.    Okay.  7298, 3836 and 5018.  Okay.  Got
21  it?
22    A.    I might have to flip back and forth.
23    Q.    All right.  We'll just kind of put this
24  document off to the side.

Page 333

1    So, essentially Ms. Atwell is asking
2  you, these stores should justify these large
3  amounts of Schedule II controlled substance,
4  correct?
5    A.    Of this particular item, yes.
6    Q.    Yes, ma'am.  And you respond to her on
7  Bates No. 49 and reply, "I am able to look at store
8  item movement if this helps."
9    Do you see where I am?
10    A.    Yes.
11    Q.    "You can contact the store for more
12  information."
13    So, you didn't contact the store.  You
14  told her to contact the store.  Correct?
15    A.    That's what I wrote, yes.
16    Q.    Somebody in the distribution center,
17  correct?
18    A.    That's what I wrote, yes.
19    Q.    Not Barb Martin performing the due
20  diligence.  You told her to contact the store,
21  correct?
22    MR. SWANSON:  Object to form.
23  BY THE WITNESS:
24    A.    I told Kristine to reach out to the

84 (Pages 330 to 333)

Page 334

1   store, yes.
2   BY MR. MOUGEY:
3       Q.   You said, "These sales are quite high
4   compared to other non-Florida stores."
5           Correct?
6       A.   That's what I wrote, yes.
7       Q.   "Store 7298 sells about 22,000 tabs of
8   682971 every week."
9           Correct?
10      A.   That's what I wrote, yes.
11      Q.   "That translates to 220 bottles per
12  week."
13          Is that "SO"?  Is that supposed to be
14  "of"?
15          Oh, I'm sorry.  Never mind.
16          "That translates to 220 dollars per
17  week, so 450 bottles is more than a two-week
18  supply." (As read.)
19          Did I get that right?
20      A.   I wrote "a little more than a two-week
21  supply."
22      Q.   Yes, ma'am.  And if you turn to Bates
23  No. 47, you e-mailed her again and said, "I ran a
24  query to see how many bottles we have sent to store

Page 335

1   3836 and we have shipped them 3271 bottles between
2   12/1/10 and 1/10/11."
3           Correct?
4       MR. SWANSON:  Object to form, mischaracterizes
5   the document.
6   BY MR. MOUGEY:
7       Q.   "I ran a query to see how many bottles
8   we don't have sent to store 3836 and we have shipped them
9   approximately 3271 bottles between 12/1/10 and
10  1/10/11."
11          Did I read that right?
12      MR. SWANSON:  Same objection.
13      MR. MOUGEY:  What's your objection, Counselor?
14      MR. SWANSON:  You said she wrote it.
15      MR. MOUGEY:  You're right.  These e-mails are
16  so jacked up.
17      MR. SWANSON:  Wasn't hard for me to figure
18  out.
19      MR. MOUGEY:  Yes, because you are so much
20  smarter than me.  I appreciate that.  You all
21  remind me of that every day.  I will work hard to
22  get there.
23  BY MR. MOUGEY:
24      Q.   So here you are.  I apologize.  Let's

Page 336

1   redo that.
2           Ms. Atwell responds to you.  That makes
3   it even better.
4           She runs "a query to see how many
5   bottles we have sent," and she says, "store 3836,"
6   "and we have shipped them 3271 bottles between
7   12/1/10 and 1/10/11."
8           Now do I have that right?  That's from
9   her to you, correct?
10      MR. SWANSON:  Object to the preface.  Go ahead
11  and answer.
12  BY MR. MOUGEY:
13      Q.   That's from her to you, correct?
14      A.   Yes, she wrote this e-mail.
15      Q.   So, she runs the query and then she
16  says, "I don't know how they can even house this
17  many bottles to be honest."
18          Correct?  Did I get that right?
19      A.   That's what she wrote, yes.
20      Q.   "How do we go about checking the
21  validity of these orders?"
22          Correct?
23      A.   That's what she wrote, yes.
24      Q.   Here we are, Barb Martin doing due

Page 337

1   diligence on the store, gets contacted by the
2   distribution center.  There is 3271 bottles.  The
3   distribution center is asking you what do we do.
4   And what do you tell her on the first page,
5   Ms. Martin?
6           Make sure I get this right.  This is
7   from you to her, right?
8           You don't make the call.  You tell her
9   after 3200 bottles of a Schedule II to one
10  pharmacy, you tell her, "Terry Collins is the
11  district pharmacy supervisor.  His cell is," and
12  you give her the cell, "He may be able to shed the
13  light on the subject."
14          Did I get that right?
15      A.   That's what I wrote, yes.
16      Q.   Yes, ma'am.  Now, when you were
17  testifying to this jury about the due diligence you
18  would perform on orders that would -- that were
19  flagged, is this the kind of due diligence you
20  performed where you told the distribution center
21  after they ask you how do we check about the
22  viability, you tell them to contact the district
23  pharmacy supervisor?
24      A.   That is one way of doing it.  I can look

85 (Pages 334 to 337)

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1  at sales history and I can see what was ordered.
2  But I'm not near that store.  I don't have access
3  to the prescriptions that they're filling and I
4  don't have access to any of their patient
5  information.
6        That is why I referred her to Terry who
7  is in the district, and he could go and work with
8  that store to determine why they're filling so many
9  prescriptions for their patients.
10     Q.  So, this is the typical type of due
11  diligence when you mentioned it earlier, you would
12  tell the Jupiter distribution center that was
13  ultimately locked by the DEA that she should call
14  the district pharmacy supervisor, correct?
15     MR. SWANSON:  Object to form.
16  BY THE WITNESS:
17     A.  It's one of the types.  Since I didn't
18  have access to this store's information, that's --
19  I couldn't take any direct action.
20        (WHEREUPON, a certain document was
21        marked Walgreens-Martin Exhibit
22        No. 31:  Binder of documents,
23        "Settlement and Memorandum of
24        Agreement" and various other

Page 339

1        documents; beginning Bates No.
2        WAGMDL00490963.)
3  BY MR. MOUGEY:
4     Q.  I hand you what we're going to mark as
5  Martin 31, and I ask you to remember that store
6  number.
7        So, before we go to Exhibit 31, the
8  store number that she was asking about with the
9  3,200 bottles on Bates No. 47 is 3836.  Okay?
10        Do you see that, 3836?
11     A.  I see that, yes.
12     Q.  Martin 21 -- 31 is titled Settlement and
13  Memorandum of Agreement, correct?
14     A.  That's the title of this document, yes.
15     Q.  Yes, ma'am.  And if you look at No. 4 on
16  Bates No. 63, you'll see that it references
17  "Walgreens' Jupiter Distribution Center is
18  registered with the DEA as a distributor of
19  Schedule II through IV."  (As read.)
20        Do you see that?  Paragraph 4?
21     A.  Yes, I see that.
22     Q.  You will see in paragraph 5, "On
23  September 13, 2012, the DEA by its Administrator
24  issued an Order to Show Cause and Immediate

Page 340

1  Suspension to Walgreens Jupiter," and it cites to
2  Exhibit B.
3        Do you see that?
4     A.  I see that, yes.
5     Q.  Okay.  Let's go to Exhibit B.  Go to the
6  tab.  It says Appendix B.  It's dated September 13,
7  2012.
8        Do you see that?
9     A.  I see that, yes.
10     Q.  That was one day after your e-mail to
11  your boss informing him that the DEA had changed
12  the locks on Walgreens' cage, correct?
13     A.  I don't remember the exact dates.
14     Q.  This document, Exhibit B, Order to Show
15  Cause and Immediate Suspension of Registration on
16  Page No. 28 of 349, correct?
17        Do you see the page numbers in the
18  middle of the page, 28 of 349?
19     A.  At the bottom, yes.
20     Q.  Yes, ma'am.  And you see the title where
21  it says Order to Show Cause and Immediate
22  Suspension of Registration, correct?
23     A.  Yes.
24     Q.  And if you look at paragraph 1, it's

Page 341

1  referencing Walgreens Jupiter Florida distribution
2  center, correct?  Paragraph 1.
3     A.  Yes.
4     Q.  If you look at paragraph 2, the first
5  sentence, "Since at least 2009, the State of
6  Florida has been the epicenter of a notorious,
7  well-documented epidemic of prescription drug
8  abuse."
9        Did I get that right?
10     A.  That's the statement written here, yes.
11     Q.  And follows it up with, "In July of
12  2011, the Florida Surgeon General declared a public
13  health emergency based on the prescription pill
14  epidemic which results in an average of seven
15  overdose deaths per day in Florida."
16        Correct?
17     A.  That's what this document says.
18     Q.  The dates in paragraph 2 from 2009 to
19  2011 cover the exact same time span when you and
20  your colleagues at Walgreens are working on the
21  suspicious order monitoring policy with Mr. -- with
22  Mr. Bancroft, correct?
23     A.  Yeah, that sounds right.
24     Q.  If you turn the page to page 30 of 349,

86 (Pages 338 to 341)

Page 342

1  at the top of the page lists six store locations.
2  Do you see those?
3      A.  Yes, I see those.
4      Q.  And if you look at No. 4, 3836 is the
5  exact same store that Ms. Atwell was e-mailing you
6  about in the beginning of 2011, correct?
7      A.  That is, yes, one of the stores.
8      Q.  When she relays, "I ran a query to see
9  how many bottles we have sent to store 3836.  We've
10 shipped them 3271 bottles from 12/1/10 to 1/10/11.
11 I don't know how they can keep this many bottles to
12 be" -- "how they can even house this many bottles
13 to be honest.  How do we go about checking the
14 validity of these orders?"
15     Correct?
16     A.  That's what she wrote, yes.
17     Q.  Yes, ma'am.  And if you look at No. 4 on
18 store 3836, oxycodone is Schedule II and one of the
19 most highly abused controlled substance --
20 controlled substances, correct?
21     A.  By definition, when the DEA classifies a
22 product as a Schedule II, it's both highly
23 addictive and abusable.
24     Q.  And according to these numbers and the

Page 343

1  agreement between Walgreens and the DEA in 2009,
2  there were 344,000 dosage units of oxycodone in
3  2009, correct?
4      MR. SWANSON:  Object to form, characterization.
5  BY THE WITNESS:
6      A.  I'm not sure where this data is being
7  supplied from.
8  BY MR. MOUGEY:
9      Q.  Yes, ma'am.  Because you certainly
10 didn't go and look.  You told her to contact the
11 pharmacy supervisor, correct?
12     MR. SWANSON:  Object to form, argumentative.
13 BY MR. MOUGEY:
14     Q.  Because you don't know the numbers,
15 correct?  You never looked?
16     A.  For this particular store, if you go
17 back on my e-mail, I was unable to look because I
18 was unable to access the store's system.  Since I
19 didn't have any other information to justify the
20 information, I referred her to someone that was
21 closer to the store and could have helped her.
22     Q.  While seven people a day in the State of
23 Florida are overdosing, the oxycodone purchases by
24 dosage unit from 2009 to 2010, according to the

Page 344

1  agreement with the DEA, Walgreens went from 344,000
2  dosage units to 849,000 dosage units, correct?
3      MR. SWANSON:  Object to form, mischaracterizes
4  the document you're reading from.
5  BY THE WITNESS:
6      A.  I see the changes in numbers.  Again,
7  I'm just not -- I'm not sure where this data is
8  coming from.
9  BY MR. MOUGEY:
10     Q.  I understand.  But let's just look --
11 let's do this just to clear up any confusion.
12     Turn to page 2 of 349 and keep your
13 thumb in 30 of 49.  Do you see "Stipulation and
14 Agreement"?
15     A.  I see that title.
16     Q.  What do you understand, Ms. Martin, that
17 "Stipulation and Agreement" means?
18     A.  I'm not really sure.  This looks like a
19 very complicated legal document, and I would leave
20 it for someone that's more --
21     Q.  Yes, ma'am, like Mr. Piñon to tell us.
22     Paragraph No. 2, "Walgreens acknowledges
23 that suspicious order reporting for distribution to
24 certain pharmacies did not meet the standards

Page 345

1  identified by DEA in three letters from DEA Deputy
2  Assistant Director, Office of Diversion Control,
3  sent to every registered manufacturer and
4  distributor, including Walgreens, on September 27,
5  2006, February 7, 2007 and December 27, 2007."
6      Did I get that right?
7      MR. SWANSON:  Object to the preface to that
8  question.  Go ahead and answer.
9  BY MR. MOUGEY:
10     Q.  Did I get that right, Ms. Martin?
11     A.  I believe you read the words correctly.
12     Q.  Do you recognize those dates as the
13 letters we went through earlier, September of '06,
14 February of '07 and December of '07?
15     A.  Vaguely.
16     Q.  Yes, ma'am.  And you understand that
17 Walgreens is acknowledging that its suspicious
18 order reporting for the Jupiter distribution center
19 did not meet the standards identified in those
20 letters?
21     A.  That's the verbiage on this form.
22     Q.  Yes, ma'am.  That Walgreens signed and
23 agreed to, correct, ma'am?
24     A.  I have no direct knowledge of who signed

87 (Pages 342 to 345)

Page 346

1 it.
2 Q. I thought you might say that, so why
3 don't we turn to page 11 of 349, less than ten
4 pages after the Stipulation and Agreement wherein
5 "Walgreens acknowledges that suspicious order
6 reporting for distribution to certain pharmacies
7 did not meet the standards identified by the DEA,"
8 you see that Thomas Sabatino, executive vice
9 president, general counsel and corporate secretary,
10 signed on behalf of Walgreens on June 10, 2013,
11 correct?
12 A. I see that, yes.
13 Q. Yes, ma'am. So let's go back to page 30
14 of 349 and store 3836.
15 So, in the data provided in this
16 agreement, Walgreens dosage units of oxycodone from
17 the store that you were contacted about in
18 January of '11 went from 344,000 dosage units
19 according to this document to 849,000, correct?
20 MR. SWANSON: Object to the characterization.
21 BY THE WITNESS:
22 A. That's what the numbers on the form say.
23 BY MR. MOUGEY:
24 Q. And you understand that that is an

Page 347

1 increase of approximately 150% in the course of
2 that one year, correct?
3 A. I don't -- I wouldn't be able to do
4 those calculations in the top of my head.
5 Q. How about this. It's more than double?
6 344,000 times 2 is 688,000, right, more than
7 double?
8 A. I'll agree to that, yes.
9 Q. Now, you were contacted by Ms. Atwell
10 and asking you to check the validity of those
11 orders in the very beginning of 2011, January,
12 correct?
13 A. Got the dates on the e-mail.
14 Q. Yes, ma'am.
15 A. Okay.
16 Q. Very beginning of 2011, correct?
17 A. Yes, I see that.
18 Q. And in 2011, the dosage units to this
19 one store that you were contacted by -- about in
20 January, the annual dosage units for just oxycodone
21 were 1.4 million.
22 Do you see that?
23 A. I see that number, yes.
24 Q. Do you have any idea how large the

Page 348

1 community is in store 3836, Port Richey, Florida?
2 A. I -- I don't know that area.
3 Q. Do you have Google on your computer?
4 A. I do now. I don't know if I had it back
5 then.
6 Q. So, if you would have Googled Fort
7 Pierce back then, you would know -- I'm sorry --
8 Port Richey, you would have looked and found that
9 Port Richey, Florida has a population of
10 approximately 5,000 people.
11 5,000 people in January '11, over
12 1.4 million dosage units of oxycodone, correct?
13 MR. SWANSON: Object to form, assumes facts
14 not in evidence, foundation.
15 BY THE WITNESS:
16 A. I'm not sure I understand what you're
17 trying to ask me.
18 BY MR. MOUGEY:
19 Q. Yes, ma'am. If you would have looked in
20 January -- at the beginning of January '11, you
21 would have been able to determine that Port Richey,
22 Florida has a population of approximately 5,000
23 people and potentially prevented Walgreens from
24 dispensing 1.4 million dosage units in that

Page 349

1 community, correct?
2 MR. SWANSON: Object to form.
3 BY THE WITNESS:
4 A. Again, I'm still not sure what your
5 question is.
6 BY MR. MOUGEY:
7 Q. Yes, ma'am. As part of your due
8 diligence, did you even look to see how many people
9 lived in this community that you were contacted
10 about in January '11 about 3271 bottles coming off
11 the shelves?
12 A. I personally did not --
13 Q. Yes, ma'am.
14 A. -- look at the population. Quite
15 frankly, I would think that that would be -- do
16 more harm than good.
17 As a pharmacist, I wouldn't want to turn
18 away a patient just because they didn't live in the
19 same city my store was in. I personally live in
20 Chicago and I shop in a store in Park Ridge.
21 So, if I looked at just the population
22 of each city, and I said I can only fill that many
23 prescriptions, I think we would be doing more harm
24 than good to our patient population.

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1    And that's why I referred her to Terry
2  because he was in the area.  He would know what
3  that store is doing and if they had patients that
4  they were serving from other areas.
5    Q.   So, the fact that when you looked, that
6  849,000 dosage units of oxycodone was given -- was
7  being dispensed into a town of 5,000 people would
8  not have caused Barb Martin any alarm in the
9  beginning of 2011?
10    MR. SWANSON:  Object to form.
11  BY THE WITNESS:
12    A.  I wasn't looking at that data.
13  BY MR. MOUGEY:
14    Q.   Yes, ma'am, and that's not what I asked,
15  if you looked at it.  We've already established you
16  didn't know that there was 5,000 people in that
17  community.  What I asked was a little different.
18    If you had looked in the beginning of
19  2011 and you would have seen that 849,000 dosage
20  units of oxycodone were being dispensed by
21  Walgreens where you had spent almost 25 years at
22  this point, would that have caused you any alarm?
23    MR. SWANSON:  Object to form.
24  BY THE WITNESS:

Page 351

1    A.   I would need to know more history than
2  just a couple of the numbers on a piece of paper.
3  BY MR. MOUGEY:
4    Q.   And that's exactly the point of
5  performing due diligence, correct, Ms. Martin, is
6  that you gather information to make an educated
7  decision, correct?
8    A.   And if I'm not capable of gathering that
9  information, I find other people that can.
10    Q.   So, when you told this jury earlier that
11  you were performing due diligence on stores, your
12  realm of expertise, your wheelhouse does not even
13  include Googling the city where the pharmacy is
14  located to see what the population is?
15    A.   Again, I don't see how that's relevant.
16  I wouldn't want to limit patients to only go to
17  pharmacies in the city they live in.
18    Q.   Do you understand what the word
19  "systemic" means, Ms. Martin?
20    A.   I guess it depends in what context you
21  want to use the word.
22    Q.   Just systemic.  Corporate-wide.  Do you
23  understand what "systemic" means?
24    MR. SWANSON:  Object to form.

Page 352

1  BY MR. MOUGEY:
2    Q.   I'm sorry?
3    A.   I understand what the word means.  I'd
4  like to know in what context you're trying to use
5  it.
6    Q.   Turn to page 38 of 349 of this same
7  document.  Paragraph No. 23.  The context that I'm
8  referring to the use of the word "systemic" is
9  "Voluntary dispensing restrictions enacted either
10  in anticipation of" -- are you there?
11    A.   I'm sorry.  I guess I'm -- because I
12  don't --
13    Q.   Let's do the bottom --
14    A.   You said page 48, right?
15    Q.   The bottom page numbers, 38 of 349.
16    A.   I'm sorry.
17    Q.   38.  That's okay.
18    A.   I turned to 48.
19    Q.   Paragraph 23.
20    A.   Okay.  I see 23.
21    Q.   "Voluntary dispensing restrictions
22  enacted either in anticipation of, or in reaction
23  to regulatory action, do not indicate to me that
24  the Respondent and its parent company have

Page 353

1  recognized and adequately reformed the systemic
2  shortcomings discussed herein."
3    So, in that context, language from the
4  DEA about Walgreens' systemic shortcomings, what
5  does that mean to you, Ms. Martin?
6    MR. SWANSON:  Object on foundation.
7  BY THE WITNESS:
8    A.   It's not my responsibility to determine
9  what the DEA means.  I left that up to our legal
10  department.
11  BY MR. MOUGEY:
12    Q.   Sitting here today in 2018, to this
13  jury, when I'm asking you what the word "systemic
14  shortcoming" means in this document from the DEA,
15  you don't have the wherewithal or the ability to
16  tell me what that means?
17    MR. SWANSON:  Object to form.
18  BY THE WITNESS:
19    A.   Again, I'm not comfortable making a
20  legal decision on a legal document.
21  BY MR. MOUGEY:
22    Q.   I'm asking you to tell us what the
23  meaning of a word, "systemic," is in a sentence.
24    You're not comfortable making that

89 (Pages 350 to 353)

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1 determination today?
2     MR. SWANSON:  Objection; foundation.
3 BY THE WITNESS:
4     A.  I'm not comfortable responding on a
5 legal document.
6 BY MR. MOUGEY:
7     Q.  Yet you're telling this jury that from
8 the middle of 2008 until the end of 2012, you were
9 a material participant in developing Walgreens'
10 suspicious order monitoring policies and
11 procedures, correct?
12     A.  I was one of a number of people involved
13 with the processes, yes.
14     Q.  You were one of a number of people who
15 were charged with the objective of identifying and
16 reporting suspicious orders to the DEA, correct?
17     A.  I thought our objective was more coming
18 up with system enhancements.  I wasn't involved
19 with the reporting part.
20     MR. MOUGEY:  Let me take a quick break and let
21 me review what I got left.  How much time do we
22 have left?
23     THE VIDEOGRAPHER:  Got about 27 minutes.
24     MR. MOUGEY:  Thank you.

Page 355

1     THE VIDEOGRAPHER:  We're going off the record
2 at 5:33.
3     (WHEREUPON, a recess was had
4         from 5:33 to 5:53 p.m.)
5     THE VIDEOGRAPHER:  We're back on the record at
6 5:53.
7     MR. MOUGEY:  I don't have any further
8 questions other than the issue of the performance
9 review.  I just wanted a confirmation that if we
10 are not getting performance reviews in specific
11 years, does that mean that they don't exist or that
12 there is no reference to opiate-related performance
13 in that review.
14     So, subject to that answer, because I
15 believe we're supposed to be receiving them prior,
16 72 hours prior to the depos, that's the only
17 caveat.  I don't have any questions and don't
18 anticipate a problem, but I would just appreciate
19 an answer.
20     MR. SWANSON:  Okay.  So I don't have an answer
21 right now, as I told you.  You understand.  My
22 understanding is we have tried to answer that
23 question for you.  If it hasn't been done to your
24 satisfaction, I can't speak to that but we will

Page 356

1 look into it and respond if required.
2     MR. MOUGEY:  That's fine.  Thank you.
3     MR. SWANSON:  Thanks.
4         EXAMINATION
5 BY MR. SWANSON:
6     Q.  So, Ms. Martin, it's been a long day,
7 and I know you're tired; and I promise that I'm not
8 going to take a whole lot more of your time, but I
9 do have just a few questions that I hope I can ask
10 and you can help clarify some questions that I had
11 from your earlier testimony.
12     Earlier, actually for a good part of the
13 afternoon today, Mr. Mougey went through several
14 documents with you, memoranda, business requirement
15 documents, et cetera, that related to the
16 suspicious order monitoring system that you had
17 some involvement in working on.
18     Do you recall that generally?
19     A.  Yes.
20     Q.  And he focused a lot of his attention on
21 a specific word that was contained in those
22 reports, and that was "suspicious orders."  Do you
23 remember that?
24     A.  Yes.

Page 357

1     Q.  And there were some back-and-forth
2 between you and Mr. Mougey over whether that was a
3 reference to actual suspicious order or a
4 potential or possible suspicious order.  Do you
5 recall that?
6     A.  Yes.
7     Q.  And can you tell us what your
8 understanding of that term "suspicious order" as it
9 was used in those business requirement documents
10 referred to?
11     A.  Even though the document didn't use the
12 word "potentially," that was what my belief was,
13 that we were looking for orders that had the
14 potential to be suspicious.  But until we did more
15 evaluations of those orders, we weren't sure
16 whether they were suspicious or not.
17     Q.  And he pulled out or he showed you
18 during the course of the day a couple of different
19 reports, and I'd like to ask you about those now.
20     The first is, was marked Martin
21 Exhibit No. 2.  Could you pull that out, please.
22     A.  Here I have it.
23     Q.  Okay.  And is Martin Exhibit No. 2 one
24 of the reports that was generated by the system

90 (Pages 354 to 357)

Page 358

1  that you were asked questions about today?
2      A.   Yes.
3      Q.   And if you look, it's a document dated
4  August 25 of 2009, right?
5      A.   Correct.
6      Q.   And in the top right corner, it says
7  "Suspicious Order," right?
8      A.   Right.  That's the name that we were
9  using.
10     Q.   Okay.  And as you review Martin
11 Exhibit 2, is this a document that you -- well, let
12 me ask you first a prefatory question.
13          Was this a document, Martin 2, a
14 document that was flagged by the system for you to
15 review?
16     A.   This item was flagged, yes.
17     Q.   If you look at Martin Exhibit 2, do you
18 consider this to be a suspicious order as you
19 understand that term?
20     A.   I do not consider this to be a
21 suspicious order.  My reasoning for that is that
22 the suggested order quantity and the ordered
23 quantity are both 3.  So, there was no changes that
24 the store made from what our system wanted to

Page 359

1  order.  And then that number 3 is well below the
2  tolerance limit of 5.
3      Q.   So, even though Martin Exhibit 2 was a
4  report that was flagged by the system, it said
5  "Suspicious Order" on it, you don't consider this
6  to be a suspicious order?
7      A.   No.
8      Q.   And then the only other document he
9  showed you a report that he showed you was Martin
10 Exhibit 20.  Can you pull that one out, please.
11     A.   Might be faster if I just look on the
12 screen.
13     Q.   Okay.  That's fine.  Thank you.
14          This is another report that Mr. Mougey
15 showed you, again, with a title or a -- the words
16 on there "Suspicious Order."
17          Do you see that in the upper right
18 corner?
19     A.   Yes.
20     Q.   And was this a report that was flagged
21 by the system that Mr. Mougey asked you about
22 today?
23     A.   Yes.
24     Q.   Do you consider Martin Exhibit 20 to be

Page 360

1  a suspicious order?
2      A.   I do not consider this order to be
3  suspicious either.  While the suggested quantity,
4  the system order was zero, there was an order by a
5  store user with a user ID of Zulic that ordered a
6  quantity of 2.  This is equal to the tolerance
7  limit, so I would not consider this suspicious.
8          They could have been punching this order
9  manually for a number of different reasons.  The
10 first one that would come to my mind would be the
11 fact that it's possible without seeing any other
12 different information that this store never had an
13 order history in the past.  If they hadn't had it
14 before and a new patient presented a prescription,
15 the system wouldn't know to order it.  They would
16 have to order it manually.
17     Q.   So, even though Martin Exhibit 20 was a
18 report that was flagged by the system marked as a
19 suspicious order, you don't consider this to be in
20 fact a suspicious order?
21     A.   I do not think this is a suspicious
22 order.
23     Q.   Was it flagged as a potential suspicious
24 order?

Page 361

1      A.   It was flagged for our review, which is
2  why I kept using the term "potentially suspicious."
3      MR. SWANSON:  Thank you.  That clarified it
4  for me.  I don't have any more questions.
5      MR. MOUGEY:  I have a couple follow-up
6  questions, Ms. Martin.
7          FURTHER EXAMINATION
8  BY MR. MOUGEY:
9      Q.   So, how many years did you review these
10 reports?
11     A.   Somewhere between 2 and 4.
12     Q.   Somewhere between 2 and 4.  So,
13 beginning of 2009 to late 2012, right?
14     A.   Middle 2012 when the Rx Integrity team
15 came and there were various iterations of this form
16 as well.
17     Q.   Now, what was produced out of your file
18 was about 22 or 23 of these suspicious order
19 reports.  Do you have any idea why you had 22 or 23
20 of these reports isolated?
21     A.   I have no idea why I chose to kept
22 those.
23     Q.   You just happened to keep 22 or 23 of
24 these reports?

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

**REDACTED**

REDACTED

**REDACTED**

Case: 1:17-md-02804-DAP  Doc #: 1965-52  Filed:  07/23/19  116 of 117.  PageID #: 167582
Highly Confidential - Subject to Further Confidentiality Review

Page 393

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**