# EXHIBIT 385

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OHIO
EASTERN DIVISION

\- - -

IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION : MDL NO. 2804

---

THIS DOCUMENT RELATES TO ALL CASES : CASE NO. 1:17-MD-2804

: Hon. Dan A. Polster

\- - -

Tuesday November 20, 2018

\- - -

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

\- - -

Videotaped deposition of MARK VERNAZZA, taken pursuant to notice, was held at Zuckerman Spaeder, LLP, 1800 M Street NW, Suite 1000, Washington, DC 2003, beginning at 9:13 a.m., on the above date, before Amanda Dee Maslynsky-Miller, a Certified Realtime Reporter.

\- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com



But the point of this was not to produce results for the purposes of determining whether suspicious orders were made and reporting those to the DEA.

Q. And this PDMR report is printed every three months, true? This is a three-month report? Do you know

that?

A. I believe it's -- perhaps comes out on different cadences over the course of time. To the best of my corporate knowledge, I understood it to be a monthly report.

Q. So this isn't -- certainly isn't looked at before any particular order for a controlled substance is being shipped out to one of your pharmacies, true?

A. It is not.

Q. And would I be correct to say there were no written policies, procedures and protocols for those pickers and the packers in '06, with respect to their obligations? Nothing in writing?

A. In 2006, not in writing. We later have reduced that process to writing, as a part of a policy.

Q. Can you describe to me the training program that the pickers and the packers went through to identify unusual orders of size, frequency or pattern?

MR. DELINSKY: Object to form.

THE WITNESS: Are you speaking -- in which time period?

BY MR. KENNEDY:

Q. In '06. In '06.

A. To the best of my corporate knowledge, there was no formal training program. However, the pickers and the packers who I spoke with who worked in that environment in 2006 told me that they were aware of that component of their job responsibilities and had acquired that knowledge in the course of their employment.

Q. And what were the job requirements to be a picker and a packer at a CVS distribution center in 2006?

Case: 1:17-md-02804-DAP Doc #: 1965-67 Filed: 07/23/19 7 of 18. PageID #: 167858
Highly Confidential - Subject to Further Confidentiality Review

A. I'm unaware of the formal job requirements. I have been told that

Golkow Litigation Services Page 199



Highly Confidential - Subject to Further Confidentiality Review

Q. Well, then, we'll go through this a little bit more carefully.

Do you agree with her

statement here, We are still in the process of writing the suspicious order monitoring section of this standard operating procedure?

As of this date, do you agree that it was still being written, in November of 2007? Do you agree with that statement?

A. To the best of my corporate knowledge, that is true.



Q. All right. So what we're seeing in Exhibit-6 is not the suspicious order monitoring policy that was put into effect on 12/1/07; is that what you're saying?

A. What I'm saying is I don't believe that there was a suspicious order monitoring policy put into place as of that date.

We agree, at this point in time now, it's April of '09, and the standard -- or, excuse me, the suspicious order monitoring section is still not included in the standard operating procedures, correct?

A. A final version is not included in the standard operating procedures being referenced by Mrs. Propatier in this e-mail.



A. Based on my preparation for this deposition and the interviews that I have conducted and my corporate knowledge, the IRR report was the report that would flag orders for additional review. And within the logistics

THE WITNESS: At this point in time, to the best of my corporate knowledge, Mr. Mortelliti was taking the first pass through the IRR himself. And he would reach out for additional resources to help him conduct his due diligence as appropriate.

A. In the first-pass review, I'm unable to provide additional names of folks who helped Mr. Mortelliti during the period of time when he had primary responsibility for the review of that report.

THE WITNESS: I understand that Mr. Mortelliti's practice would have been to review the report on a daily basis and determine whether items on the report warranted further review and due diligence and conduct that review and due diligence as he deemed appropriate.



THE WITNESS: I'm not aware, during that time period, that Mr. Mortelliti identified any orders that were deemed suspicious and reported to the DEA.

Case: 1:17-md-02804-DAP Doc #: 1965-67 Filed: 07/23/19 17 of 18. PageID #: 167868
Highly Confidential - Subject to Further Confidentiality Review

Q. Some rare occasion, something might get flagged for some other reason.

But if you don't get flagged in the IRR report, there's not going to

Golkow Litigation Services Page 392

Case: 1:17-md-02804-DAP Doc #: 1965-67 Filed: 07/23/19 18 of 18. PageID #: 167869
Highly Confidential - Subject to Further Confidentiality Review

be due diligence, true?

MR. DELINSKY: Object to form.

THE WITNESS: I can't say that that's universally true. But for the most part, that would be true.

Golkow Litigation Services Page 393