EXHIBIT 395

Highly Confidential - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF OHIO

 3                     EASTERN DIVISION

 4

 5    ----------------------------) MDL No. 2804

 6    IN RE:  NATIONAL PRESCRIPTION )

 7    OPIATE LITIGATION            )

 8    ---------------------------  ) Case No. 17-md-2804

 9    THIS DOCUMENT RELATES TO:    )

10    ALL CASES                    )

11    ----------------------------) Hon. Dan A. Polster

12

13                   HIGHLY CONFIDENTIAL

14        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16                VIDEOTAPED DEPOSITION OF

17                    TERRENCE DUGGER

18

19                   January 23, 2019

20

21                Indianapolis, Indiana

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5              The videotaped deposition of TERRENCE
 6    DUGGER, called by the Plaintiffs for examination,
 7    taken pursuant to the Federal Rules of Civil Procedure
 8    of the United States District Courts pertaining to the
 9    taking of depositions, taken before JULIANA F.
10    ZAJICEK, a Registered Professional Reporter and a
11    Certified Shorthand Reporter, at the Indianapolis
12    Marriott Downtown, Texas Room, 350 West Maryland
13    Street, Indianapolis, Indiana, on January 23, 2019, at
14    9:16 a.m.
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFFS:

 3         WEISMAN KENNEDY & BERRIS CO LPA
           1600 Midland Building
 4         101 W. Prospect Avenue
           Cleveland, Ohio 44115
 5         216-781-1111
           BY:  DANIEL P. GOETZ, ESQ.
 6             dgoetz@weismanlaw.com

 7
      ON BEHALF OF THE PLAINTIFFS:
 8
           MOTLEY RICE LLC
 9         28 Bridgeside Boulevard
           Mt. Pleasant, South Carolina 29464
10         843-216-9250
           BY:  MICHAEL E. ELSNER, ESQ.
11             melsner@motleyrice.com

12
      ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
13    AMERISOURCEBERGEN DRUG CORPORATION:

14
           REED SMITH LLP
15         Three Logan Square
           1717 Arch Street, Suite 3100
16         Philadelphia, Pennsylvania 19103
           215-851-8100
17         BY:  JACLYN M. SETILI WOOD, ESQ.
               (telephonically)
18             jsetiliwood@reedsmith.com

19
      ON BEHALF OF CARDINAL HEALTH, INC. AND THE DEPONENT:
20
           WILLIAMS & CONNOLLY LLP
21         725 Twelfth Street, N.W.
           Washington, D.C. 20005
22         202-434-5000
           BY:  MATTHEW C. MONAHAN, ESQ.
23             mmonahan@wc.com

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
    ON BEHALF OF CARDINAL HEALTH, INC.:
 2
        ARMSTRONG TEASDALE LLP
 3      7700 Forsyth Boulevard, Suite 1800
        St. Louis, Missouri 63105
 4      314-621-5070
        BY:  SARAH E. HARMON, ESQ.
 5          sharmon@ArmstrongTeasdale.com
 6
    ON BEHALF OF CVS INDIANA, LLC AND CVS RX SERVICES,
 7  INC. AND THE WITNESS IN HIS CAPACITY AS A FORMER
    EMPLOYEE OF CVS:
 8
        ZUCKERMAN SPAEDER LLP
 9      1800 M Street, NW, Suite 1000
        Washington, D.C. 20036
10      202-778-1800
        BY:  R. MILES CLARK, ESQ.
11          mclark@zuckerman.com
12
    ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
13  PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
    INC.:
14
        ARNOLD & PORTER KAYE SCHOLER LLP
15      601 Massachusetts Avenue, NW
        Washington, D.C. 20001
16      202-942-5000
        BY:  DAVID KOUBA, ESQ. (Telephonically)
17          david.kouba@arnoldporter.com
18
    ON BEHALF OF WALMART INC.:
19
        JONES DAY
20      77 West Wacker Drive
        Chicago, Illinois 60601-1692
21      312-269-4164
        BY:  PATRICK L. DUBOIS, ESQ. (Telephonically)
22          pdubois@jonesday.com
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    ALSO PRESENT:

 2          BRIAN ASQUITH, Law Clerk

                   Weisman Kennedy & Berris Co LPA

 3

            KAITLYN EEKHOFF, Law Clerk

 4                Motley Rice LLC

 5          JOHN KNOWLES, Trial Technician

 6

 7    THE VIDEOGRAPHER:

 8          MR. ANTHONY MICHELETTO,

            Golkow Litigation Services

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     I N D E X

 2

 3   WITNESS:                                    PAGE:

 4     TERRENCE DUGGER

 5          EXAM BY MR. GOETZ....................    9

 6          EXAM BY MR. MONAHAN.................   149

 7

 8                     *****

 9

10                E X H I B I T S

11   CVS - DUGGER EXHIBIT              MARKED FOR ID

12     No. 1     Terrence Dugger - LinkedIn        31

13     No. 2     US DOJ DEA Diversion Control      38
                 Division, Title 21 Code of Federal
14               Regulations

15     No. 3     2/21/2008 E-mail with attachment;  40
                 CVS-MDLT1-000091508 - 518
16

       No. 4     IRR Report;                       54
17               CVS-MDLT1-000100925 - 983

18     No. 5     8/27/2010 E-mail chain;           63
                 CVS-MDLT1-000010223 - 224
19

       No. 6     8/26/2010 E-mail with attachment; 105
20               CVS_MDLT1-000088956 - 9025

21     No. 7     PowerPoint titled: Suspicious     69
                 Order Monitoring for PSE/Control
22               Drugs, Summary of Key Concepts and
                 Procedures, August 27, 2010;
23               CVS-MDLT1-000064115 - 127

       No. 8     9/1/2010 E-mail chain;            69
24               CVS-MDLT1-000064114
```

```
 1                    E X H I B I T S (Continued)
 2    CVS - DUGGER EXHIBIT                      MARKED FOR ID
 3     No. 9       10/12/2010 E-mail;                   84
                   CVS-MDLT1-000104883
 4
       No. 15      Fronts of various IRRs from          55
 5                 various dates;
                   CVS-MDLT1-000100722, -681, -775,
 6                 -763, -1022, -851, -1125, -1227,
                   -2659
 7
       No. 21      Excerpt of a document titled:        102
 8                 VIPERx PDMR, Tuesday, June 12,
                   2007; CVS-MDLT1-000068372 - 376
 9
       No. 31      9/24/2009 E-mail with attachment;    123
10                 CVS-MDLT1-000083340 - 343
11     No. 32      9/24/09 E-mail chain;                127
                   CVS-MDLT1-000120422
12
       No. 34      4/9/2010 E-mail with attachment;     129
13                 CVS-MDLT1-000118291 - 295
14     No. 35      Document titled: Transactional       137
                   Analysis - DEA Review;
15                 CVS-MDLT1-000105714 - 721
16     No. 36      The Harvard Drug Group, LLC, Job     140
                   Description, Position Title:
17                 Distribution Center Compliance
18                 Supervisor, signed 6/3/2015;
19                 CAH_MDL2804_01330815 - 819
20     No. 39      Document titled: January 2011 PSE     95
21                 IRR Recap;
22                 CVS-MDLT1-000009740 - 749
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           THE VIDEOGRAPHER:  We are now on the record.  My

 2    name is Anthony Micheletto.  I am the videographer for

 3    Golkow Litigation Services.

 4                Today's date is January 23rd, 2019.  The

 5    time is 9:16 a.m., as indicated on the video screen.

 6                This video deposition is being held in

 7    Indianapolis, Indiana, in the matter of In Re:

 8    National Prescription Opiate Litigation in the

 9    United States District Court for the Northern District

10    of Ohio, Eastern Division.

11                Our deponent is Terrence Dugger.

12                Will counsel please identify themselves

13    for the video record?

14        MR. GOETZ:  Dan Goetz on behalf of the

15    Plaintiffs.

16        MR. ELSNER:  Michael Elsner on behalf of the

17    Plaintiffs.

18        MS. HARMON:  Sarah Harmon, Armstrong Teasdale,

19    on behalf of Cardinal Health.

20        MR. MONAHAN:  Matthew Monahan, Williams &

21    Connolly, on behalf of Cardinal Health and the

22    witness.

23        MR. CLARK:  Miles Clark from Zuckerman Spaeder

24    on behalf of CVS Indiana, LLC, CVS Rx Services, Inc.,
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    and the witness in his capacity as a former employee

2    of CVS.

3         THE VIDEOGRAPHER:  Counsel on the phone?

4         MR. KOUBA:  Good morning.  This is David Kouba

5    of Arnold & Porter on behalf of the Endo and Par

6    Pharmaceutical Defendants.

7         MR. DUBOIS:  This is Patrick Dubois from Jones

8    Day on behalf of Walmart.

9         MS. SETILI WOOD:  And Jaclyn Setili Wood on

10   behalf of AmerisourceBergen.

11        THE VIDEOGRAPHER:  Our court reporter today is

12   Juliana Zajicek.

13             Please swear in the witness.

14                 (WHEREUPON, the witness was duly

15                  sworn.)

16                   TERRENCE DUGGER,

17   called as a witness herein, having been first duly

18   sworn, was examined and testified as follows:

19                     EXAMINATION

20   BY MR. GOETZ:

21        Q.   Mr. Dugger, my name is Dan Goetz.  We met

22   earlier before we started.

23             If I ask you a question that you don't

24   understand, please tell me and I'll clarify it.  By
```

```
 1    the same token, if you answer a question, I'll assume

 2    you understood it.

 3                 Fair enough?

 4         A.     That's fair.

 5         Q.     Okay.  What did you do to prepare for

 6    today's testimony?

 7         A.     I met with the attorneys.

 8         Q.     Which attorneys, when you say "the

 9    attorneys"?

10         A.     Miles Clark and Matthew -- sorry,

11    Matthew -- Monahan is the last name.

12         Q.     And -- and when did you meet with Miles

13    Clark?

14         A.     Yesterday evening, maybe two days prior to

15    that, probably a total of maybe nine hours or so.

16         Q.     And when did you meet with Mr. Monahan?

17         A.     Yesterday.

18         Q.     When?

19         A.     Yesterday around three o'clock or so.

20         Q.     For how long?

21         A.     Three o'clock p.m.

22         Q.     For how long?

23         A.     Maybe an hour-and-a-half.

24         Q.     Was Mr. Clark present?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.     No.

2        Q.     Was anybody else present?

3        A.     No.

4        Q.     Are you currently employed by Cardinal?

5        A.     I am.

6        Q.     And is that your understanding why

7    Cardinal has provided you with an -- an attorney

8    today?

9        A.     Because I'm employed there?

10       Q.     Yes.

11       A.     That's not my understanding.  I'm just --

12   I was told that I needed to be here, so I'm here.

13       Q.     Okay.  Do you understand that Mr. Monahan

14   represents Cardinal?

15       A.     He explained that.

16       Q.     Okay.  And do you understand that when he

17   went on the record, he said that he represented you?

18       A.     I understand that.

19       Q.     Okay.  Are you aware that he represented

20   you before you heard that today?

21       A.     I am now.  It may have been said prior to

22   that, but I'm aware of it now.

23       Q.     You don't have a memory of that?

24       A.     No, I don't.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And so Mr. Monahan, who represents

2    Cardinal and said that he represents you, is it your

3    understanding the reason for that arrangement is

4    because you currently work at Cardinal?

5    MR. MONAHAN:  Counsel, I can confirm I am

6    representing him because he is a current Cardinal

7    Health employee.

8    BY MR. GOETZ:

9    Q.    Where did you go to college?

10   A.    Georgia State -- well, I went to several.

11   So there was West Georgia College in Carrollton,

12   Georgia; there was Atlanta Metropolitan College in

13   Atlanta; there is Georgia State University in downtown

14   Atlanta; and University of Cincinnati Distance

15   Learning.

16   Q.    Okay.  What degree did you receive from

17   Georgia State?

18   A.    Bachelor's of science in criminal justice.

19   Q.    And what degree did you receive from

20   University of Cincinnati?

21   A.    A master's of science in criminal justice.

22   Q.    And when was that degree from the

23   University of Cincinnati?

24   A.    2007, August of 2007, commencement was

```
 1    December of '07.

 2         Q.    That degree that you earned from

 3    University of Cincinnati was while you were working

 4    for CVS?

 5         A.    It was.

 6         Q.    Okay.  And so you worked for CVS from June

 7    of 2005 to November of 2011?

 8         A.    That is correct.

 9         Q.    What -- who was your actual employer?

10         A.    CVS.

11         Q.    CVS what?

12         A.    CVS Pharmacy.

13

14

15

16

17         Q.    Do you have any other degrees other than

18    those two we just spoke about?

19         A.    An associate degree from Atlanta

20    Metropolitan, also in criminal justice.

21         Q.    And do you have any other certificates

22    other than those two we've just spoke about?

23         A.    What do you mean by certificates?

24         Q.    Any other training, any other certificates
```

Highly Confidential - Subject to Further Confidentiality Review

 1    of training?

 2         A.    Several.  There is Wicklander's and

 3    Zulawski's.

 4         Q.    Sorry?

 5         A.    Wicklander and Zulawski, interviewing and

 6    interrogation techniques, I've had that twice.  RCRA

 7    training which is a part -- RCRA.

 8         Q.    Can you spell that?

 9         A.    It's an acronym, R-C-R-A.  It is basically

10    EPA training as it relates to, I think it's a reser --

11    conservation act.  I can't exactly -- remember exactly

12    what the acronym stands for, but it relates to how you

13    handle -- handle -- how you handle hazardous waste,

14    DOT training as it relates to hazardous materials

15    training, probably OSHA 10-hour training, OSHA 30-hour

16    training.  That's all I can remember at this point.

17         Q.    What was the OSHA training about?

18         A.    Really just hazard communication, how you

19    educate your employees, training your employees, just

20    being educated on certain aspects of 29 CFR.

21         Q.    I -- I don't -- you need to be a little

22    bit --

23         A.    29 Code of Federal Regulations.

24         Q.    Okay.  Related to what, though?  Was it

Highly Confidential - Subject to Further Confidentiality Review

```
 1   workplace safety?

 2        A.    Yes, workplace safety.

 3        Q.    Okay.  Anything other than workplace

 4   safety related to the OSHA training?

 5        A.    Not that I can recall.

 6        Q.    Okay.  And the -- the first one you

 7   mentioned, Wickland and Zulawski?

 8        A.    Wicklander.

 9        Q.    Wicklander and Zulawski?

10        A.    And Zulawski, yeah.

11        Q.    And you -- you said that was

12   investigation?

13        A.    It's the -- the name of the course is

14   Interviewing and Interrogation Techniques.

15        Q.    Does that relate to theft, is that what

16   that was about?

17        A.    It -- it is about just how you conduct

18   interviews for theft related or whether it is

19   employees or -- whether it is internal or external

20   type of theft, just how you sit down across from an

21   employee and -- or person to elicit information.

22        Q.    It was about theft investigations, though,

23   correct?

24        MR. CLARK:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.    It could be about any investigation.

 3   BY MR. GOETZ:

 4       Q.    Okay.  What other types of investigations

 5   did you cover?

 6       A.    Did they cover in the training or did I

 7   cover?

 8       Q.    Did they cover in the training?

 9       A.    It was really -- they didn't really

10   cover -- I don't recall them covering any types of

11   investigation.  It was more so because the training is

12   supposed to -- sorry.

13           So the training -- the training is

14   supposed to cover any types of investigation that may

15   take place.  So if it's one where a person has taken

16   money from a register, then you would know how to go

17   about getting the information from them.

18       Q.    When did you have that training?

19       A.    I've had it twice.  Once in the '90s, and

20   I can't remember when, and again probably 2012.

21       Q.    The training in 2012 was when you had

22   already left CVS, correct?

23       A.    That is correct.

24       Q.    And the training in the '90s was many
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   years before you came to CVS, correct?

 2        A.    That is right.

 3        Q.    Okay.  And so that -- none of that

 4   training was while you were at CVS, just so we're

 5   clear?

 6        A.    The training for the Zulawski --

 7        Q.    Yes.

 8        A.    -- and Wicklander?

 9              No, that training did not occur when I was

10   at CVS.

11        Q.    After you graduated, can you give me your

12   job history?

13        A.    After I graduated when?

14        Q.    From Georgia State.

15        A.    At the time I was currently employed with

16   Rich's Department Store.  It was -- actually the name

17   of the company was Rich's Lazarus Goldsmith, or RLG.

18   They were a part of Federated Department Stores.  And

19   I was there from '90 -- from '93 to '98.  So, that's

20   where I worked at the time I graduated from Georgia

21   State.

22        Q.    What did you do there?

23        A.    Loss prevention -- well, several roles.

24   It was in loss prevention.  I started out as a store
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    detective where my job was to perform audits on the

 2    floor to ensure that sensormatic tags and things along

 3    those lines were on product, to catch shoplifters.  I

 4    moved from store detective to a senior store detective

 5    where the concentration was more on employee theft.

 6    And then -- and I forget the year, it could have been

 7    '96, I was promoted to a loss prevention manager at

 8    one of the department stores there in Atlanta.

 9        Q.    When I mention "controlled substances," do

10    you know what that refers to?

11        A.    I do.

12        Q.    Okay.  And so that Rich's Department

13    Store, none of that work was related to the monitoring

14    of controlled substances?

15        A.    It did not have any controlled substances.

16        Q.    What did you do after Rich's?

17        A.    After Rich's, I worked -- I went to --

18    moved to Ohio, still with RLG, which is Rich's Lazarus

19    Goldsmiths again, and they have the Lazarus stores up

20    there, nameplate, and that was in Miamisburg, Ohio, it

21    is right outside of Dayton, Ohio.  Don't go there.

22               But -- so I was there for a bit.  And I

23    left there and started working for Sears here in

24    Indianapolis, and that was in the fall of '98.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    At Lazarus did you do the same thing as
 2   you did at Rich's?
 3        A.    I did.  I just had more FHEs, or full-hire
 4   employees.
 5        Q.    And you came to Sears in '98.
 6              How long were you there?
 7        A.    The fall of '98 until May of 2000.
 8        Q.    And what -- what did you do there?
 9        A.    Some of the same things I did with Rich's.
10   The store -- the -- the product base is a little
11   different, but it was an -- as an asset protection
12   manager.  My job really revolves around safety, safety
13   and general liability as well as workmen's comp, which
14   I never really handled at the Rich's Department Store,
15   so it was my first time really, you know, going into
16   that area, but that's what I did until May of 2000.
17        Q.    And, again, that job had nothing to do
18   with the monitoring of controlled substances, correct?
19        A.    It did not.
20        Q.    What did you do after Sears?
21        A.    After Sears I went -- I started working
22   for Airborne Express in Chicago as a corporate
23   investigator.  I started there in June of -- of 2000.
24   And, again, I was there.  My job was to conduct
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    investigations as it related to freight being taken or

2    packages being stolen and handling other

3    security-related events there within the -- within the

4    company.

5         Q.    How long were you there?

6         A.    I was with -- well, the company was bought

7    out by DHL, and I can't remember the year.  I

8    apologize.  It may have been 2002, 2003.  But I was

9    there with Airborne Express/DHL Express USA until

10   June -- May or June of 2005.

11        Q.    Again, that job had nothing to do with the

12   monitoring of controlled substances?

13        A.    I did not monitor any controlled

14   substances there.

15        Q.    In June of 2005 you came to work for CVS?

16        A.    That's correct.

17        Q.    And you were here until November of '11?

18        A.    That's correct.

19        Q.    What was your job when you were hired at

20   CVS?

21        A.    Logistics, loss prevention manager.

22        Q.    How long did you hold that job?

23        A.    During my duration there.

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16    BY MR. GOETZ:

17        Q.    Do you know what this litigation is about?

18        A.    I have an idea.

19        Q.    What's your understanding?

20        A.    That a -- towns in Ohio is suing, I would

21    I think at that point, several companies because of

22    opioids.

23        Q.    What is your understanding as to why CVS

24    was being sued?

Highly Confidential - Subject to Further Confidentiality Review

```
1        MR. CLARK:  I would just like to caution and
2   remind you not to disclose in answering these
3   questions conversations you and I have had, privileged
4   conversations you and I have had.
5        THE WITNESS:  Okay.
6   BY THE WITNESS:
7        Q.    What was your question again?  I'm sorry.
8   BY MR. GOETZ:
9        Q.    Other than what you've discussed with
10   counsel, what you've learned from counsel, what is
11   your understanding as to why CVS is being sued?
12        A.    I don't have an understanding, no.
13        Q.    Okay.  Other than discussing with Cardinal
14   counsel, do you have an understanding as to why
15   Cardinal is being sued?
16        A.    No idea at all.
17        Q.    I will tell you, I will represent to you,
18   and if I'm wrong, they can correct me, that the
19   current lawsuits --
20        MR. CLARK:  Object to the form.
21   BY MR. GOETZ:
22        Q.    -- the current lawsuits relate to the
23   distribution of opioids into Cuyahoga and Summit
24   County as well as many other states, municipalities
```

Highly Confidential - Subject to Further Confidentiality Review

1    that have filed lawsuits, okay?

2        A.    Uh-huh.

3        Q.    The claims against CVS and Cardinal relate

4    to their failure to monitor when they distributed

5    opioids, okay.

6              Do you understand that?  Can -- can we

7    have that understanding about what this litigation is

8    about?

9        A.    Yes.

10       MR. CLARK:  Object to the form.

11   BY MR. GOETZ:

12

13

14

15

16

17

18

19

20

21

22

23   BY MR. GOETZ:

24       Q.    Are -- are you aware that CVS was a --

Highly Confidential - Subject to Further Confidentiality Review

1    strike that.

2            Are you aware that CVS, the CVS Indiana

3    distribution center where you worked was a licensed

4    DEA distributor for controlled substances?

5        A.    Yes.

6        Q.    Okay.  And so they were a distributor, can

7    we agree with that?

8        MR. CLARK:  Object to the form.

9    BY THE WITNESS:

10       A.    From a DEA perspective in terms of giving

11   them a DEA registrant number, yes.

12   BY MR. GOETZ:

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13     Q.    I -- I -- I appreciate that, but you did

14   spend time with your lawyers, correct, a lawyer from

15   CVS and a lawyer from Cardinal?

16     A.    I did.

17     MR. CLARK:  Object to the form.

18   BY MR. GOETZ:

19     Q.    And you did spend a number of years after

20   you left CVS working in controlled substances,

21   correct?

22     A.    Correct.

23     MR. CLARK:  Object to the form.

24   BY MR. GOETZ:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  So, when we talk about a number of

2   years, that's not really fair to the Plaintiffs to say

3   it's been a number of years because, one, you've had a

4   chance to meet with two sets of lawyers and you did

5   this after you left CVS in 2011?

6      A.    Well, you are asking me about CVS.  You

7   are not asking me about anything that happened after

8   CVS.  So I was really -- my point was making that it's

9   been a while since I worked at CVS.

10     MR. CLARK:  I'm sorry.  I object to the form of

11   that.  And just -- sorry.  I didn't want to interrupt.

12     THE WITNESS:  No, don't apologize.

13   BY MR. GOETZ:

14     Q.    So after you left CVS, what was your

15   understanding about DEA regulations?

16     A.    I didn't have any --

17     Q.    Okay.

18     A.    -- understanding at that point in time

19   because when I left CVS, the job I went to had no

20   dealings with DEA regulations at the time.

21     Q.    Do you have a LinkedIn page?

22     A.    I do.

23     Q.    Do you maintain that LinkedIn page?

24     A.    I try to.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  You try to put honest information

2   on that LinkedIn page?

3      A.    Absolutely.

4      MR. CLARK:  Object to the form.

5   BY THE WITNESS:

6      A.    Absolutely.

7                (WHEREUPON, a certain document was

8                 marked CVS - Dugger Deposition

9                 Exhibit No. 1, for identification, as

10                 of 01/23/2019.)

11   BY MR. GOETZ:

12      Q.    Okay.  I'm handing you what's been marked

13   as Exhibit 1.

14            Do you recognize that?

15      A.    It appears to be a copy, a printout of my

16   LinkedIn page.

17      Q.    And after you left CVS, you worked for The

18   Harvard Drug Group?

19      A.    Well, when I left CVS, I worked for the

20   Stage Stores.

21      Q.    And then after that you went to work for

22   The Harvard Drug Group?

23      A.    That is correct.

24      Q.    And what is The Harvard Drug Group?

1       A.    I believe they are now defunct.  It was a

2   company that had several other companies underneath

3   its umbrella.

4       Q.    Was it affiliated with Cardinal?

5       A.    At the time that I started working there,

6   no.

7       Q.    Okay.  Did it eventually become affiliated

8   with Cardinal?

9       A.    Yes.

10      Q.    Okay.  And so after you left The Harvard

11  Drug Group, you then went to Cardinal, correct, they

12  were affiliated and you moved to Cardinal --

13      MR. MONAHAN:  Object to form.

14  BY MR. GOETZ:

15      Q.    -- as your employer?

16      A.    Well --

17      MR. MONAHAN:  Object to form.

18  BY THE WITNESS:

19      A.    Well, it was just an acquisition, so I

20  don't -- I didn't really leave.  It was just merged

21  together.

22  BY MR. GOETZ:

23      Q.    And -- and can you look at the Cardinal --

24  or The Harvard Drug Group, and tell me if I'm reading

Highly Confidential - Subject to Further Confidentiality Review

```
 1    this correctly.  This is the first sentence you put on

 2    your job.

 3         A.    Okay.

 4         Q.    "Responsible for, but not limited to:

 5    Overseeing, monitoring, and coordinating all aspects

 6    of network's distribution center's compliance

 7    including DEA," and then you list a few other

 8    government entities, correct?

 9         A.    Yes.

10         Q.    Okay.

11               Is that -- is that wrong?  Did -- did you

12    not ensure compliance with DEA regulations while at

13    The Harvard Drug Group?

14         MR. MONAHAN:  Object to the form.

15         MR. CLARK:  Object to the form.

16    BY THE WITNESS:

17         A.    Well, I wrote here that it was all aspects

18    of the network's distribution center's compliance, so

19    that was specifically what The Harvard Drug Group had

20    to comply with.

21    BY MR. GOETZ:

22         Q.    Which was what?

23         A.    Ensuring that the drugs were secure there

24    in that particular location.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.    And -- and that's my question.  That's

 2   your only understanding of DEA regulations?

 3         A.    That's not my only understanding, but

 4   that's the job what I was doing at that particular

 5   time was to secure the drugs.

 6         Q.    What are the other understanding?  What --

 7   what -- what do you understand the distributor's other

 8   obligations are?

 9         MR. MONAHAN:  Object to the form.

10         MR. CLARK:  Object to the form.

11   BY THE WITNESS:

12         A.    To, one, ensure that the 222 forms are

13   completed, to file 601s if there is a loss or a theft

14   regarding controlled substances, and to reconcile

15   your -- your numbers, your drugs to ensure that

16   they're reported.

17   BY MR. GOETZ:

18         Q.    You said the 222 form?

19         A.    Yes.

20         Q.    What's your understanding of what that is?

21         A.    I didn't start doing that right away when

22   I got to The Harvard Drug Group, but it is a job I

23   took on maybe in the last eight to -- six to eight

24   months that I was there, but it is a form that is used
```

Highly Confidential - Subject to Further Confidentiality Review

1    by companies to order controlled substances from at

2    this point The Harvard Drug Group.  It was actually

3    Major Pharmaceuticals, which is under that Harvard

4    Drug Group umbrella.

5        Q.    What type of controlled substances?

6        A.    I can't remember, but they were just

7    Schedule V, IV and III drugs at the time, but I can't

8    remember exactly between.

9        Q.    And what about a Form 601?

10    MR. MONAHAN:  Object to the form.

11  BY THE WITNESS:

12       A.    601s were filed if there were any type of

13   losses occur -- that may have occurred there at the

14   facility, then it was on the -- the onus was on the

15   facility to file the 601.

16  BY MR. GOETZ:

17       Q.    And what about you said rec -- reconciling

18   drugs to make sure reported, what does that mean?

19       A.    Just to ensure that, you know, the drugs

20   that you received and the drugs that you send out and

21   whatever your balance is, that they match, that you

22   don't have any kind of losses there at the -- at the

23   facility.

24       Q.    Essentially your understanding of the DEA

Highly Confidential - Subject to Further Confidentiality Review

```
 1    obligations relate to theft and shrinkage, to make

 2    sure that the -- the inventory you received matches

 3    the inventory you think you -- the inventory you have

 4    matches what you think the inventory you received is?

 5        MR. CLARK:  Object to the form.

 6    BY THE WITNESS:

 7        A.    Well, that was my role, to ensure the

 8    safety and to ensure the welfare and the security of

 9    product there at the -- at those facilities.

10    BY MR. GOETZ:

11        Q.    Can you read -- go to -- back to your

12    LinkedIn?

13        A.    Yep.

14        Q.    Do you see the second paragraph?

15        A.    Where?

16        Q.    The second sentence, it says --

17        MR. CLARK:  I'm sorry.  Are we --

18    BY THE WITNESS:

19        A.    There are a number of jobs there.

20    BY MR. GOETZ:

21        Q.    The LinkedIn.

22        MR. CLARK:  I'm sorry.  The Harvard?

23    BY MR. GOETZ:

24        Q.    I'm -- I'm --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MR. CLARK:   Sorry.

 2   BY MR. GOETZ:

 3        Q.    -- sorry.   The CVS.

 4        A.    Okay.

 5        Q.    And -- and tell me if this is how you

 6   described your job:

 7              "Through auditing and report reviews,

 8   ensured regulatory compliance with OSHA, DEA, FDA,

 9   USDA and Hazardous Materials regulations."

10              Correct?

11        A.    That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5                    (WHEREUPON, a certain document was
 6                    marked CVS - Dugger Deposition
 7                    Exhibit No. 2, for identification, as
 8                    of 01/23/2019.)
 9    BY MR. GOETZ:
10        Q.    I'm handing you what has been marked
11    CVS-Dugger 2.
12              Have you ever seen that document?
13        A.    I don't recall seeing it.
14        Q.    Have you -- I'd like to -- to point your
15    attention to (b), where it says "1301.74(b)"?
16        A.    Um-hum.
17        Q.    Could you read that, please?
18        A.    "The registrant shall design and operate a
19    system to disclose to the registrant suspicious orders
20    of controlled substances.  The registrant shall inform
21    the Field Division Office of the Administration in his
22    area of suspicious orders when discovered by the
23    registrant.  Suspicious orders include orders of
24    unusual size, orders deviating substantially from a
```

Highly Confidential - Subject to Further Confidentiality Review

1    normal pattern, and orders of unusual frequency."

2        Q.    When you were at CVS, were you aware of

3    that DEA requirement?

4        A.    No, not from this particular form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
```

 6                    (WHEREUPON, a certain document was

 7                     marked CVS - Dugger Deposition

 8                     Exhibit No. 3, for identification, as

 9                     of 01/23/2019.)

10    BY MR. GOETZ:

11         Q.    I'm showing you what's been marked as

12    Exhibit 3.

13               Do you know who Ron Buzzeo is?

14         A.    I know of him.

15         Q.    And -- and what do you know of him?

16         A.    That he was, I think, a former DEA agent

17    and that he may have done some consulting -- or had a

18    consulting business, and I know his name came up

19    during times when I was at CVS.

20         Q.    Do you know who Amy Lynn Brown is?

21         A.    I do not.

22         Q.    Do you know Amy Propatier?

23         A.    I've heard she is a CVS person, I believe.

24         Q.    Amy Lynn Brown and Amy Propatier are the

Highly Confidential - Subject to Further Confidentiality Review

```
1    same person.  She changed her name.

2         A.    Okay.

3         Q.    I'll represent that to you.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6      Q.      Were you aware when you were there that it

7    was an issue?

8           MR. CLARK:  Object to the form.

9    BY MR. GOETZ:

10     Q.      Strike that.

11             In -- while you were employed at CVS from

12   2005 to 2011, were you aware that -- that opioid abuse

13   was a serious and growing health problem in the

14   country?

15     A.      I did not.

16     Q.      Okay.  Do you think, had -- are you aware

17   of it today?

18     A.      In terms of what, it being a problem?

19     Q.      Yeah.

20     A.      Well, I hear things on the news about

21   there being issues with it, but there are issues with

22   crack cocaine in inner cities that are much bigger

23   than what people are saying here, so, I'm not here

24   because of that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Is -- is -- is it your understanding as

 2   you sit here today that the issues of crack cocaine

 3   are more significant than the opioid crisis?

 4        MR. CLARK:  Object to the form.

 5   BY THE WITNESS:

 6        A.    Me personally, absolutely.  I think issues

 7   in the inner city are never dealt with and I'm not

 8   being deposed about those particular things.  I'm here

 9   because of some sentence here that says it's a serious

10   and growing problem.

11   BY MR. GOETZ:
```



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11     Q.    There is lots of other posters in the

12  break room at CVS Indiana distribution center, aren't

13  there?

14     MR. CLARK:  Object to the form.

15  BY THE WITNESS:

16     A.    I don't know.  I posted several things

17  there from a loss prevention standpoint or safety.

18  BY MR. GOETZ:

19     Q.    Tons of posters about safety, right,

20  about -- about making sure that --

21     A.    I didn't put up a ton.  I mean, I'm just

22  saying I --

23     Q.    Many --

24     A.    -- I put posters up there.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.   -- many --

2     A.   Okay.

3     Q.   -- is -- is that true about -- about

4  safety and about theft in that break room?

5    MR. CLARK:  Object to the form.

6  BY THE WITNESS:

7     A.   I guess I put up maybe -- I put a

8  newsletter up.  There were a few things about injuries

9  at the facility, but that's pretty much all that we

10  put up there in -- in the -- the break room.

11  BY MR. GOETZ:

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13        MR. GOETZ:  Five minutes?

14        THE VIDEOGRAPHER:  We are off the record at

15   10:02 a.m.

16                  (WHEREUPON, a recess was had

17                   from 10:02 to 10:15 a.m.)

18        THE VIDEOGRAPHER:  We are back on the record at

19   10:15 a.m.

20                  (WHEREUPON, a certain document was

21                   marked CVS - Dugger Deposition

22                   Exhibit No. 4, for identification, as

23                   of 01/23/2019.)

24   BY MR. GOETZ:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Mr. Dugger, I'm handing you what's been

2    marked as Exhibit 4.

3         MR. CLARK:  Oh, yeah, this is multiple copies.

4         THE WITNESS:  Oh.

5    BY MR. GOETZ:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20              (WHEREUPON, a certain document was

21               marked CVS - Dugger Deposition

22               Exhibit No. 15, for identification,

23               as of 01/23/2019.)

24    BY MR. GOETZ:

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    Okay.  So let me show you what I've marked

2    as Exhibit 15.

3          THE WITNESS:  Multiple copies again.

4    BY MR. GOETZ:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



    22              (WHEREUPON, a certain document was

    23              marked CVS - Dugger Deposition

    24              Exhibit No. 5, for identification, as

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 of 01/23/2019.)

 2    BY MR. GOETZ:

 3         Q.    I'm going to show you what's been marked

 4    as Exhibit 5.

 5               Do you see that second e-mail?

 6         A.    There -- yeah, there is -- yeah.  So it is

 7    the top from Pamela Hink -- Hinkle and there is a

 8    second one from Frank Devlin.

 9         Q.    Okay.  There -- there is actually a third

10    one, correct, from you to Frank Devlin?

11         A.    There is a third one, correct.

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6    BY MR. GOETZ:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



1
2
3
4
5
6
7
8
9
10
11
12
13            (WHEREUPON, certain document were

14             marked CVS - Dugger Deposition

15             Exhibit No. 7 and No. 8, for

16             identification, as of 01/23/2019.)

17   BY MR. GOETZ:

18        Q.    I'm going to show you Exhibit 7 and

19   Exhibit 8 together.

20             Do you see Exhibit 7?

21        A.    I do.

22
23
24

Highly Confidential - Subject to Further Confidentiality Review

1

2

3      MR. CLARK:  You know, I hate to do this, 7 -- I

4  think you have 7 and 8 reversed.  Just make sure the

5  record is clear.

6  BY MR. GOETZ:

7      Q.    That is 8 we are looking at right now.

8  The e-mail is 8.

9      A.    Yes, I see that, yeah.

10      Q.    I apologize if I misspoke.

11      MR. CLARK:  No, I'm just -- I didn't --

12      MR. GOETZ:  I appreciate it.

13  BY MR. GOETZ:

14      Q.    Looking at Exhibit 8, that is John

15  Mortelliti, correct?

16          Who is John Mortelliti?

17      A.    He is a regional loss prevention manager

18  of logistics.

19      Q.    Was he your boss?

20      A.    At this point he was, at this point in

21  time he was.  Well, he was my supervisor.  I don't

22  have a boss.

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
5
6
```

7      Q.     Who is Sean Humphries, by the way?

8      A.     Sean Humphries was John Mortelliti's

9    counterpart and he was my previous supervisor.

10      Q.     And -- and he was your supervisor where,

11    meaning where -- where did Sean Humphries sit?

12      A.     Where he was out of?

13      Q.     Yes.

14      A.     He was out of Woonsocket, Rhode Island at

15    the Woonsocket distribution center.

16      Q.     And -- and so where was Mr. Mortelliti?

17      A.     I think John Mortelliti was out of the

18    Lumberton, New Jersey facility, if I recall.

```
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



BY MR. GOETZ:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



 4    BY MR. GOETZ:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
 6
```

 7      MR. GOETZ:  I don't understand the -- the basis

 8   of that.  I -- I -- Miles, we -- I -- I -- you've

 9   objected every time.  I -- I don't understand the

10   basis of that objection.  There has been so many, but

11   now I'm finally asking.

12      MR. CLARK:  The basis of the objection to that

13   particular question?

14      MR. GOETZ:  Do you want me to ask him if he did

15   do anything?  Do you want me to ask him first if he

16   did do anything, is that -- you are -- you are

17   suggesting that he didn't do anything so it's

18   inappropriate to ask what he did?

19      MR. CLARK:  I am not suggesting anything.  I'm

20   just...

21      MR. GOETZ:  But I -- I'm -- I'm curious as to

22   why, why -- why that's a proper objection?

23      MR. CLARK:  Well, there -- you haven't

24   established the foundation that he did anything.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. GOETZ:  That's what I'm saying.  So you're

2     objecting because we don't know that he did anything.

3     BY MR. GOETZ:

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24                    (WHEREUPON, a certain document was

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    marked CVS - Dugger Deposition

 2                    Exhibit No. 9, for identification, as

 3                    of 01/23/2019.)

 4    BY MR. GOETZ:

 5         Q.    I'm showing you what's been marked as

 6    Dugger Exhibit 9.

 7              Who -- who -- before we do this, who --

 8    Gary Lamberth was the DC Rx, is that correct, at -- at

 9    this time?

10         A.    He was --

11         MR. CLARK:  I'm sorry.

12              Object to the form.

13    BY THE WITNESS:

14         A.    Gary --

15    BY MR. GOETZ:

16         Q.    Who was the DC Rx in 2010 for the Indiana

17    distribution center?

18         MR. CLARK:  Object to the form.

19    BY THE WITNESS:

20         A.    DC Rx what?

21    BY MR. GOETZ:

22         Q.    Well, we just looked at a spreadsheet,

23    correct?  Or we looked at a PowerPoint that talks

24    about DC Rx?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    Who was in that department in 2010?

3        A.    I can't recall everyone that was --

4    MR. CLARK:  Object to form.

5    BY THE WITNESS:

6        A.    I can't recall everyone that was in the

7    DC Rx department.  They had a number of picker and

8    packers, there was a supervisor there, there was a

9    manager there, they had office personnel.

10   BY MR. GOETZ:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12    BY MR. GOETZ:

13        Q.    Mr. Dugger --

14        A.    Yes.

15        Q.    -- I -- I -- I will represent to you that

16    the way discovery is done in this case, and Mr. Clark

17    can object if I am wrong, is that we only get

18    suspicious orders if there was a store contained

19    within Cuyahoga or Summit County that was identified

20    on that day's report.

21        A.    Okay.

22        Q.    So unless by chance this day had a -- an

23    order of Cuyahoga and Summit, we would not get the

24    follow-up E -- we would not get that order.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MR. CLARK:  I object to the testimony from

 2   counsel and the --

 3        MR. GOETZ:  Am I wrong --

 4        MR. CLARK:  -- form of the question to the

 5   extent it is a question.

 6        MR. GOETZ:  Am I wrong about -- about how

 7   discovery works?  Am I wrong about what's being

 8   produced?

 9        MR. CLARK:  I'm not being deposed.

10        MR. GOETZ:  Am I -- I'm -- I'm asking if I'm

11   wrong?  I'm -- I'm trying to -- he says he needs the

12   other documents.

13   BY THE WITNESS:

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5

 6

 7

 8        THE VIDEOGRAPHER:  We are off the record at

 9    10:59 a.m.

10                    (WHEREUPON, a recess was had

11                     from 10:59 to 11:14 a.m.)

12        THE VIDEOGRAPHER:  We are back on the record at

13    11:14 a.m.

14    BY MR. GOETZ:

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



18          MR. GOETZ:  Can you mark this, please, 21.

19                      (WHEREUPON, a certain document was

20                       marked CVS - Dugger Deposition

21                       Exhibit No. 21, for identification,

22                       as of 01/23/2019.)

23    BY MR. GOETZ:

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
```

```
4       Q.    Who is Don Dugger?

5       A.    It looks like he is a regional loss

6  prevention manager somewhere.

7       Q.    Do you know him?

8       A.    I do not, no relation.

9       Q.    I -- I figured it was you under -- and I

10  apologize -- under some other name.  I -- I -- I

11  apologize.

12              This is kind of what you were talking

13  about, these are the theft reports, correct, these

14  are -- are reports to help determine whether or not

15  there was theft?

16      A.    That's my understanding of what a Viper

17  analyst did, but I -- I don't -- I don't recall seeing

18  this report before.

19      Q.    This is a Viper Rx report, correct?

20      MR. CLARK:  Object to the form.

21  BY THE WITNESS:

22      A.    It says "Viper Rx PDMR," correct.

23                  (WHEREUPON, a certain document was

24                   marked CVS - Dugger Deposition
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Exhibit No. 6, for identification, as

 2                    of 01/23/2019.)

 3    BY MR. GOETZ:

 4        Q.    I'm going to show you what's been marked

 5    as Exhibit 6.

 6              That is an e-mail from Amy Propatier to

 7    Annette Lamoureux?

 8        A.    Yes.

 9        Q.    Do you know who Annette Lamoureux is?

10        A.    Yes.

11        Q.    Who is Annette Lamoureux?

12        A.    She was a supervisor at -- under Sean

13    Humphries at the Woonsocket distribution center there

14    in Woonsocket, Rhode Island.

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14      Q.      Standard operating procedures are

15   critical.

16              Do you agree with that?

17      A.      I agree.

18      Q.      Important that you follow them to the

19   letter.

20              Do you agree with that?

21      A.      If they are written in such that they

22   should be followed to the letter, yes.

23      Q.      Could you go back to Exhibit 2, please.

24              Do you see Exhibit 2?

1      A.    I have it here.

2      Q.    And then if we go back to 1301.74(b), the

3    last sentence reads:

4            "Suspicious orders include orders of

5    unusual size."

6            Did I read that correctly?

7      A.    That's correct.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



BY MR. GOETZ:

Q.    Could we go back to your LinkedIn page,

please.

A.    Was that the very first thing?

Highly Confidential - Subject to Further Confidentiality Review

1        MR. CLARK:   Exhibit 1.

2   BY MR. GOETZ:

3        Q.    Yes.

4             Do you see the -- the paragraph we had

5   read earlier about CVS, and it says:

6             "Through auditing and report reviews

7   ensured regulatory compliance with DEA regulations."

8   And I -- I shortened some of the other stuff, but

9   that's what you wrote, correct?

10       A.    That's what I wrote.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7     Q.     I might have asked you this, but would you

8  agree that the ability to audit a system or a process

9  is critical?

10     A.     I would agree.

11               (WHEREUPON, a certain document was

12               marked CVS - Dugger Deposition

13               Exhibit No. 31, for identification,

14               as of 01/23/2019.)

15  BY MR. GOETZ:

16     Q.     I'm showing you what's been marked as

17  Exhibit 31.

18               Do you see that?

19     A.     The exhibit you just gave, yes.

20     Q.     Yes, sir.

21               That is an e-mail from Pam Hinkle?

22     A.     Yes.

23     Q.     And it's to a number of people?

24     A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Are -- are there any people on there that

2   are at the Indiana distribution center?

3      A.    Other than myself, at this time, no.

4      Q.    Okay.

5      A.    I don't know who is there now.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (WHEREUPON, a certain document was

 2                     marked CVS - Dugger Deposition

 3                     Exhibit No. 32, for identification,

 4                     as of 01/23/2019.)

 5   BY MR. GOETZ:

 6        Q.    Mr. Dugger, I'm going to show you what's

 7   been marked as Exhibit 32.

 8        A.    That's almost ten years ago.

 9        Q.    Again, I appreciate it is ten years ago.

10        A.    No, I'm just saying --

11        Q.    You just met with counsel, two sets of

12   counsel representing CVS and Cardinal within the last

13   few days, correct?

14        A.    Yes.

15        Q.    Okay.  I'm showing you what's been marked

16   as Exhibit 32.

17              Do you see that?

18        A.    Yes.

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2

 3

 4

 5

 6          MR. GOETZ:  Can I have 33 to 35.

 7                     (WHEREUPON, a certain document was

 8                      marked CVS - Dugger Deposition

 9                      Exhibit No. 34, for identification,

10                      as of 01/23/2019.)

11   BY MR. GOETZ:

12        Q.    Mr. Dugger, I'm going to hand you what's

13   been marked as Exhibit 34.

14              Do you see that?

15        A.    Yes.

16        Q.    That is an e-mail sent from Wendy Foor?

17        A.    Yes.

18        Q.    And that is sent -- you are one of the

19   recipients, correct?

20        A.    That is correct.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Could you turn to the next page, please?

 2                    (WHEREUPON, discussion was had

 3                     off the stenographic record.)

 4        MR. GOETZ:  Let's take a break.

 5        THE VIDEOGRAPHER:  We are off the record at

 6   11:46 a.m.

 7                    (WHEREUPON, a recess was had

 8                     from 11:46 to 12:07 p.m.)

 9        THE VIDEOGRAPHER:  We are back on the record at

10   12:07 p.m.

11                    (WHEREUPON, a certain document was

12                     marked CVS - Dugger Deposition

13                     Exhibit No. 34, for identification,

14                     as of 01/23/2019.)

15   BY MR. GOETZ:

16        Q.    Mr. Dugger, I think what's been put in

17   front of you is Exhibit 34, is that correct?

18        A.    Yes.

19        Q.    I apologize for the confusion and I

20   appreciate you taking the break.

21              That is an e-mail from Wendy Foor?

22        A.    Yes.

23        Q.    Who is Wendy?  Did I pronounce it

24   correctly?  Who is Wendy Foor?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I can't recall who Wendy Foor is.  I think

 2   the last name is pronounced correctly, but I can't

 3   remember what Wendy did or who she worked for.

 4        Q.    And -- and that is to many people, that

 5   e-mail?

 6        A.    It is to a number of people, correct.

 7        Q.    And -- and you are one of those

 8   recipients?

 9        A.    I am.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16               (WHEREUPON, a certain document was

17                marked CVS - Dugger Deposition

18                Exhibit No. 35, for identification,

19                as of 01/23/2019.)

20  BY MR. GOETZ:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
 6
 7
```

 8    BY MR. GOETZ:

 9         Q.    I'm handing you what's been marked as

10    Exhibit 36.

11              Do you recognize that doctor -- document,

12    Mr. Dugger?

13         A.    I see what it says, but I -- I don't

14    recall ever seeing it.

15         Q.    Could you go to the last page, please.

16              Is that your signature?

17         A.    Where it says "associate signature," yes.

18         Q.    And -- and that's the date, 6/3/15?

19         A.    Yes.

20         Q.    This document is a summary of your job

21    responsibilities at The Harvard Drug Group?

22         A.    Yeah, someone typed this up.  I don't

23    know.

24         Q.    Let -- let's go back to the last

Highly Confidential - Subject to Further Confidentiality Review

```
 1    page again.

 2         A.    Okay.

 3         Q.    It -- it says -- why don't you read in the

 4    acknowledgment?

 5         A.    "I have read, fully understand and agree

 6    to the responsibilities outlined in this job

 7    description.  I also assert that my background and

 8    experience satisfy the minimum requirements of the

 9    position.  I have discussed what needs to be

10    accomplished with my manager and intend to fully" --

11    I'm sorry -- "to fulfill my commitment to the Harvard

12    Drug Group to the best of my abilities.  The Harvard

13    Drug Group reserves the right to change and/or modify

14    the duties and essential functions of this position at

15    any time."

16         Q.    And you signed it?

17         A.    I did.

18         Q.    Okay.  Can you go back to the first page,

19    please.

20               Before we -- I ask you that, and I'm --

21         MR. GOETZ:  Man -- Manahan is your last name?

22         MR. MONAHAN:  Monahan.

23    BY MR. GOETZ:

24         Q.    When you spoke with Mr. Monahan, did you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    speak at all about what you did at CVS?

 2         MR. MONAHAN:  Objection.

 3              You can answer that question yes or no.

 4    BY THE WITNESS:

 5         A.    Yes.

 6    BY MR. GOETZ:

 7         Q.    You -- you spoke about what your job was

 8    at CVS?

 9         A.    Yes.

10         Q.    How long did you speak about what your job

11    was at CVS?

12         A.    How long was the duration of the

13    conversation or the time that I was there?

14         Q.    That portion.

15         A.    Probably, I don't know, five minutes.

16    Less than that.

17         Q.    Okay.  And how long did you speak

18    generally?

19         A.    I don't know.  From 3 o'clock to 4:30.

20         Q.    Was the rest of the conversation about

21    what your duties and roles were at the Harvard Drug or

22    at Cardinal?

23         MR. MONAHAN:  Objection.

24              You can answer that yes or no.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    The majority.

 3              No, it was not.

 4   BY MR. GOETZ:

 5        Q.    What was the -- the rest of that

 6   conversation about?

 7        MR. MONAHAN:  Objection; calls for

 8   attorney/client privilege.

 9              Instruct him not to --

10        MR. GOETZ:  Mr. Monahan, I -- I don't understand

11   how it is attorney/client privilege when you speak to

12   him about what he did while he was at CVS.  That I --

13   I don't fully understand because it's related to --

14   that is -- is CVS's privilege and it relates to that.

15              So you can talk to him all you want about

16   what he does at the Harvard Drug Group and what he

17   does at Cardinal, but I don't understand how you have

18   a privilege as to what he did at CVS or any of those

19   conversations.

20        MR. MONAHAN:  The conversation between myself

21   and the witness was privileged in its entirety.  You

22   are not -- I am not going to permit this witness to

23   testify about what he talked to me about in that room

24   with all counsel.
```

```
 1   BY MR. GOETZ:

 2        Q.    Are you going to listen to your counsel?

 3        A.    I am.

 4        Q.    Could you go back to the position summary.

 5              Do you see that?  It says:

 6              "Under general supervision of the vice

 7   president, quality assurance and regulatory affairs,

 8   the distribution center compliance supervisor is the

 9   main point of contact for the oversight of regulatory

10   compliance, safety, and security for the distribution

11   center."

12              Did I read that correctly?

13        A.    You did.

14        Q.    And were you the distribution center

15   compliance supervisor?

16        A.    I served that role there, yes.

17        Q.    And the -- the next paragraph says:

18              "The pish" -- "position is responsible

19   for, but not limited to:  Overseeing, monitoring and

20   coordinating all aspects of the distribution center

21   compliance including DEA," and then it lists some

22   other things.

23              Did I read that correctly?

24        A.    You did.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Okay.  And then down below under 36, it

2   says:

3              "Remains current with emerging/revised DEA

4   and FDA regulations."

5              Do you see that?

6        A.    What line, what number was this?

7        Q.    Down in Paragraph 2,

8   "regulatory/compliance"?

9        A.    I see that.

10       Q.    Okay.  And do you see Paragraph 7, it

11  says:

12             "Ensures compliance with all appropriate

13  policies, procedures, safety rules and" -- "and state

14  and federal regulations with relation to

15  pharmaceutical diversion, regulatory compliance and

16  profit protection."

17       A.    I see that.

18       Q.    I read that correctly?

19             And you signed that, that this was your

20  job, correct?

21       MR. MONAHAN:  Objection to form.

22  BY THE WITNESS:

23       A.    I signed it.

24  BY MR. GOETZ:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  That -- and you signed it that

 2   these were your responsibilities, you understood them

 3   and you could comply with them?

 4        MR. MONAHAN:  Objection to form.

 5   BY THE WITNESS:

 6        A.    I signed it, but a lot of these weren't my

 7   full responsibilities there during my time at the

 8   Harvard Drug Group.

 9   BY MR. GOETZ:

10        Q.    Mr. Dugger, can you go back to the

11   acknowledgment?

12        A.    Yeah, I can go back to the acknowledgment.

13   And I'm not -- I'm not disputing that I didn't sign

14   it.  What I'm telling you, sir, is that everything in

15   here, just because I signed it doesn't mean that I was

16   responsible for everything here.  There were other

17   responsibilities.

18            Now, if they gave me that responsibility,

19   if you look at the last sentence there under the

20   Acknowledgments, things could be modified and, you

21   know, as relates to some of these things, I may not

22   have been a part of that.  It may have been someone

23   else's responsibility, so.  Yes, I signed the

24   acknowledgment.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.     And -- and it says:

 2               "I have read, fully understand, and agree

 3    to the responsibilities outlined in this job

 4    description"?

 5        A.     It says that.

 6        Q.     When you signed that, you understood these

 7    responsibilities and you agreed to perform them,

 8    correct?

 9        A.     If -- if those responsibilities were given

10    to me, absolutely.

11        Q.     Okay.  This says they were given to you.

12    Am I wrong?

13        A.     It says that, but that doesn't mean that

14    they were.

15        Q.     Okay.  So you didn't do this for -- for

16    the Harvard Drug Group either?

17        A.     I had nothing to do -- I had nothing to do

18    with pharmaceutical diversion unless it involved

19    the -- a theft, that's the only diversion that I would

20    have been involved with there at the -- at the site.

21        Q.     Did you have anything at the Harvard Drug

22    Group, anything to do with suspicious order

23    monitoring?

24        A.     Absolutely not.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Nothing?

 2      A.    Zero.

 3      Q.    These responsibilities that you agreed to

 4   are false?

 5      MR. MONAHAN:  Objection; mischaracterizes the

 6   document.

 7            You can answer.

 8   BY THE WITNESS:

 9      A.    I don't know if they are false or not, but

10   in terms of what I was responsible for, there are a

11   number of things on here, I would need to read it in

12   its entirety to tell you what I was fully responsible

13   for or wholly responsible for, things that I may have

14   done, but I didn't do anything with any type of

15   pharmaceutical diversion there at the site.

16      MR. GOETZ:  I think we might be done.  Give me

17   five minutes.

18      THE WITNESS:  Okay.

19      THE VIDEOGRAPHER:  We are off the record at

20   12:27 p.m.

21               (WHEREUPON, a recess was had

22                from 12:27 to 12:35 p.m.)

23      THE VIDEOGRAPHER:  We are back on the record at

24   12:35 p.m.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      EXAMINATION

 2  BY MR. MONAHAN:

 3      Q.    Good afternoon, Mr. Dugger.  My name is

 4  Matthew Monahan.  I represent Cardinal Health.  I just

 5  have a few of questions for you.

 6            Do you mind bringing out Exhibit 36 that

 7  you discussed with Plaintiffs' counsel, please.

 8            And do you remember you were asked some

 9  questions about this document?

10      A.    I do.

11      Q.    And you were directed to review Nos. 2 and

12  7 under the Primary Duties and Responsibilities,

13  correct, sir?

14      A.    Yes.

15      Q.    You were not directed to No. 5, were you?

16      A.    I was not.

17      Q.    Could you read No. 5 out loud, please?

18      A.    "With assistance from corporate,

19  regulatory and compliance personnel, hosts and

20  supports all distribution center-specific DEA, state

21  boards of pharmacy, FDA and other government agency

22  audits and inquiries."

23      Q.    Do you have an understanding of what this

24  document mean -- means when it refers to corporate,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    regulatory and compliance personnel?

 2         A.    Yes.

 3         Q.    Can you tell me what that means?

 4         A.    It's referring to the individuals that

 5    were in Livonia, Michigan that were corporate office.

 6         Q.    And -- sorry.  I didn't mean to interrupt.

 7         A.    I'm sorry.  Headquarters.

 8         Q.    And that was Harvard Drug's corporate

 9    headquarters, correct?

10         A.    That's correct.

11         Q.    And those individuals, to your knowledge,

12    did they have any responsibility for complying with

13    DEA regulations?

14         A.    They did.

15         Q.    Okay.  You can set this document aside,

16    sir.

17               You were asked some questions earlier

18    about individuals named "pickers" and "packers."

19               Do you remember that testimony?

20         A.    I do.

21         Q.    Do you know what a picker or a packer is?

22         A.    As relates to CVS, pickers were

23    individuals that picked product and the packers were

24    those individuals that packed the totes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Did -- did Harvard Drug have pickers and

2    packers, to your knowledge?

3        A.    There were -- they had pickers, yes.

4        Q.    Were you ever a picker, sir?

5        A.    I was -- I was never a picker.

6        Q.    Did you ever supervise pickers?

7        A.    I never supervised pickers.

8        MR. MONAHAN:  No more questions.

9        MR. GOETZ:  I don't have anything further.

10       MR. CLARK:  We are done.

11       THE VIDEOGRAPHER:  We are off the record at

12   12:37 p.m.  This concludes the videotaped deposition

13   of Terrence Dugger.

14            (Time Noted:  12:37 p.m.)

15             FURTHER DEPONENT SAITH NOT.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 4   a Certified Shorthand Reporter, do hereby certify:

 5            That previous to the commencement of the

 6   examination of the witness herein, the witness was

 7   duly sworn to testify the whole truth concerning the

 8   matters herein;

 9            That the foregoing deposition transcript

10   was reported stenographically by me, was thereafter

11   reduced to typewriting under my personal direction and

12   constitutes a true record of the testimony given and

13   the proceedings had;

14            That the said deposition was taken before

15   me at the time and place specified;

16            That I am not a relative or employee or

17   attorney or counsel, nor a relative or employee of

18   such attorney or counsel for any of the parties

19   hereto, nor interested directly or indirectly in the

20   outcome of this action.

21            IN WITNESS WHEREOF, I do hereunto set my

22   hand on this 27th day of January, 2019.

23

24            JULIANA F. ZAJICEK, Certified Reporter
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION ERRATA SHEET

 2

 3

 4   Case Caption:  In Re:  National Prescription

 5                   Opiate Litigation

 6

 7         DECLARATION UNDER PENALTY OF PERJURY

 8

 9            I declare under penalty of perjury that I

10   have read the entire transcript of my Deposition taken

11   in the captioned matter or the same has been read to

12   me, and the same is true and accurate, save and except

13   for changes and/or corrections, if any, as indicated

14   by me on the DEPOSITION ERRATA SHEET hereof, with the

15   understanding that I offer these changes as if still

16   under oath.

17

18                              TERRENCE DUGGER

19

20   SUBSCRIBED AND SWORN TO

21   before me this       day

22   of                , A.D. 20__.

23

24           Notary Public
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24                    TERRENCE DUGGER
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24                   TERRENCE DUGGER
```