EXHIBIT 400

Highly Confidential - Subject to Further Confidentiality Review

1                    IN THE UNITED STATES DISTRICT COURT

                   FOR THE NORTHERN DISTRICT OF OHIO

2                          EASTERN DIVISION

3

4     In re:  NATIONAL PRESCRIPTION   )   CASE NO.

      OPIATE LITIGATION               )   1:17-MD-2804

5                                     )   Judge

      APPLIES TO ALL CASES            )   Dan Aaron Polster

6

7          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

8                    CONFIDENTIALITY REVIEW

9

      DEPOSITION FOR PLAINTIFF

10

11

12                     ***   ***   ***

13    DEPONENT:        GARY MILLIKAN

14    DATE:            JANUARY 11, 2019

15                     ***   ***   ***

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    EXAMINATION INDEX
 2  Examination by Mr. Goetz........................  10
    Examination by Mr. Hynes...................... 251
 3  Re-examination by Mr. Goetz................... 256
    Reporter's Certificate........................ 262
 4
 5                      EXHIBIT INDEX
 6
 7  CVS-Millikan-2................................ 171
    IRR, 8-30-13                CVS-MDLT1-10672-757
 8                              Highly Confidential
 9  CVS-Millikan-3................................ 196
    Email chain                   CVS-MDLT1-83064
10                                     Confidential
11  CVS-Millikan-4................................ 196
    SOM Process                   CVS-MDLT1-83065
12                                     Confidential
13  CVS-Millikan-5................................ 199
    Time study                   CVS-MDLT1-112702
14                                     Confidential
15  CVS-Millikan-6................................ 205
    LP Analyst Time Study        CVS-MDLT1-112686
16                                     Confidential
17  CVS-Millikan-7................................ 208
    LP Analyst Time Study        CVS-MDLT1-112690
18                                     Confidential
19  CVS-Millikan-9................................ 113
    Controlled Drug-DEA SOP Manual  CVS-MDLT1-8506
20                                     Confidential
21  CVS-Millikan-11............................... 198
    Email chain                   CVS-MDLT1-55836
22                                     Confidential
23  CVS-Millikan-13............................... 159
    CVS-MDLT-110268            Highly Confidential
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                EXHIBIT INDEX - Continued
 2   CVS-Millikan-15.................................. 155
     December 2010 PSE IRR Recap      CVS-MDLT1-9740
 3                            Highly Confidential
 4   CVS-Millikan-18..................................  35
     Personnel file
 5
 6   CVS-Millikan-22.................................. 156
     January 2011 Control IRR Recap  CVS-MDLT1-8258
 7                            Highly Confidential
 8   CVS-Millikan-33.................................. 239
     Track One CVS Store Information CVS-MDLT1-7362
 9                                    Confidential
10   CVS-Millikan-36.................................. 173
     List 1 Chemicals, Policies & Procedures
11                                    CVS-MDLT1-25018
                                      Confidential
12
13   CVS-Millikan-37.................................. 233
     Irregular Order Logistics Communication
14                                    CVS-MDLT1-3348
                                 Highly Confidential
15
16   CVS-Millikan-38.................................. 233
     Email chain                     CVS-MDLT1-8483
17     Highly Confidential - Public Health Information
18   CVS-Millikan-45.................................. 153
     Viper PDMR Supplemental         CVS-MDLT1-67863
19                                 Highly Confidential
20   CVS-Millikan-46.................................. 153
     Viper PDMR                      CVS-MDLT1-68377
21                            Highly Confidential
22   CVS-Millikan-47.................................. 153
     Viper PDMR - High Priority      CVS-MDLT1-74450
23                                 Highly Confidential
24   CVS-Millikan-48.................................. 137
     IRR, 11-30-10                    CVS-MDLT1-775
25                                 Highly Confidential
```

```
 1              EXHIBIT INDEX - Continued
 2  CVS-Millikan-100.................................  48
    Email                         CVS-MDLT1-17100
 3                              Highly Confidential
 4  CVS-Millikan-101.................................  53
    McKesson document             CVS-MDLT1-15502
 5
 6  CVS-Millikan-102.................................  60
    Bar Graph, Opioid Analgesics Poisoning Death
 7
 8  CVS-Millikan-103.................................  62
    Bar Graph:  U.S. Rates of Opioid Overdoes Deaths,
 9  Sales and Treatment Admissions, 1999-2010
10  CVS-Millikan-104.................................  64
    2012 Ohio Drug Overdose Deaths
11
12  CVS-Millikan-105.................................  66
    International Narcotics Control Board,
13  Comments on Reported Statistics, 2012
14  CVS-Millikan-106.................................  69
    Email chain,                  CVS-MDLT1-91508
15                                    Confidential
16  CVS-Millikan-107.................................  89
    CVS DEA SOP Manual            CVS-MDLT1-34234
17                                    Confidential
18  CVS-Millikan-108.................................  94
    Controlled Drug - DEA SOP Manual   CVS-MDLT1-66380
19
20  CVS-Millikan-109................................. 100
    CVS Indiana, LLC Controlled Drug, DEA SOP Manual
21              CVS-MDLT1-89315   Confidential
22  CVS-Millikan-111................................. 106
    Email                         CVS-MDLT1-61132
23                                    Confidential
24  CVS-Millikan-112................................. 107
    Email                         CVS-MDLT1-88956
25                                    Confidential
```

Highly Confidential - Subject to Further Confidentiality Review

1                    EXHIBIT INDEX - Continued

2    CVS-Millikan-113................................ 109

     CVS Distribution Center, DEA SOP Manual

3                                  CVS-MDLT1-88957

                                   Confidential

4

5    CVS-Millikan-115................................. 21

     Transcript [excerpt] Nicastro

6

7    CVS-Millikan-117................................. 29

     Transcript [excerpt] Nicastro

8

9    CVS-Millikan-119................................. 39

     Transcript [excerpt] Nicastro

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    A P P E A R A N C E S
 2
     FOR THE PLAINTIFF:      DANIEL P. GOETZ, Esquire
 3                           BRIAN ROOF, Esquire
                             Weisman Kennedy & Berris CO LPA
 4                           1600 Midland Building
                             101 West Prospect Street
 5                           Cleveland, Ohio  44115
                             216-781-1111
 6                           dgoetz@weismanlaw.com
                             broof@weismanlaw.com
 7
 8   Via Speakerphone:       MICHAEL ELSNER, Esquire
                             KAITLYN EEKHOFF, Esquire
 9                           Motley Rice
                             28 Bridgeside Boulevard
10                           Mount Pleasant South Carolina
                             29464
11                           843-216-9250
                             melsner@motleyrice.com
12
13
     FOR THE DEFENDANT:      PAUL B. HYNES, Jr. Esquire
14   CVS entities            R. MILES CLARK, Esquire
                             Zuckerman Spaeder
15                           Suite 1000
                             1800 M Street
16                           Washington, DC  20036
                             202-778-1800
17                           phynes@zuckerman.com
                             mclark@zuckerman.com
18
19   FOR THE DEFENDANT:      SARAH E. HAMON, Esquire
     Cardinal Health         Armstrong Teasdale
20                           Suite 1800
                             7700 Forsyth Boulevard
21                           St. Louis, Missouri  63105
                             314-552-6672
22                           sharmon@ArmstrongTeasdale.com
23
24
25
```

```
 1                  APPEARANCES - Continued

 2

 3    FOR THE DEFENDANT:      SCOTT D. QUELLHORST, Esquire
      Walmart                 Jones Day
 4    via speakerphone        77 West Wacker Street
                              Chicago, Illinois
 5                            312-269-4251
                              squellhorst@jonesday.com
 6

 7    FOR THE DEFENDANT:      CHRISTIAN W. SAUCEDO, Esquire
      AmerisourceBergen       Reed Smith
 8    via speakerphone        Three Logan Square
                              Suite 3100
 9                            1717 Arch Street
                              Philadelphia, PA  19103
10                            215-851-8204
                              csaucedo@reedsmith.com
11

12    FOR THE DEFENDANT:      EMILY DILLINGHAM, Esquire
      Endo entities          Arnold & Porter
13    Par entities           250 West 55th Street
      via speakerphone        New York, New York  10019
14                            212-836-7408
                      emily.dillingham@arnoldporter.com
15

16

17
      ALSO PRESENT:     Ben Stanson, videographer
18                      Jon Knowles, trial technologist

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1           The deposition of GARY MILLIKAN, taken on

2   discovery, pursuant to Notice heretofore filed, in the

3   Latitude Room, 2nd Floor, of Le Meridien Indianapolis,

4   123 South Illinois Street, Indianapolis, Indiana, on

5   January 11, 2019, at approximately 8:59 a.m.; upon

6   oral examination, and to be used in accordance with

7   the Federal Rules of Civil Procedures.

8

9                       *     *     *

10

11          THE VIDEOGRAPHER:  We are now on the record.

12  My name is Ben Stanson.  I'm the videographer for

13  Golkow Litigation Services.  Today's date is

14  January 11, 2019, and the time is 8:59 a.m.

15          This video deposition is being held in

16  Indianapolis, Indiana, in the matter of National

17  Prescription Opiate Litigation, MDL Number 2804,

18  pending in the U.S. District Court, Northern District

19  of Ohio, Eastern Division.

20          The deponent is Gary Millikan.

21          Will counsel please identify yourselves for

22  the record?

23          MR. ROOF:  Brian Roof, for Plaintiff, law

24  firm of Weisman Kennedy and Berris.

25          MR. GOETZ:  Dan Goetz, on behalf of

```
 1   Plaintiff.

 2           MS. HARMON:  Sarah Harmon for Cardinal

 3   Health.

 4           MR. CLARK:  Miles Clark, Zuckerman and

 5   Spaeder, on behalf of CVS Indiana, LLC; CVS Rx

 6   Services, Inc., and the witness.

 7           MR. HYNES:  Paul Hynes, Zuckerman and

 8   Spaeder, on behalf of the same parties.

 9           THE VIDEOGRAPHER:  Would counsel on the phone

10   please identify yourselves for the record?

11           MS. DILLINGHAM:  Hi.  Emily -- go ahead.

12           MR. ELSNER:  Michael Elser, from Motley Rice,

13   on behalf of the Plaintiffs.

14           MS. DILLINGHAM:  Emily Dillingham, Arnold

15   Porter, on behalf of the Endo and Par Defendants.

16           MR. SAUCEDO:  Christian Saucedo, from Reed

17   Smith, on behalf of AmerisourceBergen.

18           THE VIDEOGRAPHER:  Thank you.  Our court

19   reporter is Kim Keene.

20           Will you please swear in the witness?

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      *     *     *

 2            GARY MILLIKAN, after having first been duly

 3   administered an oath, testified as follows:

 4            THE WITNESS:  I do.

 5            THE REPORTER:  Thank you.

 6                      *     *     *

 7

 8                      EXAMINATION

 9   BY MR. ROOF:

10       Q.  Good morning, Mr. Millikan.

11       A.  Good morning.

12       Q.  We met off the record.  My name is Brian

13   Roof, and as I said earlier, I represent the

14   Plaintiffs.

15            Can you state your full name for the record

16   and spell it?

17       A.  My name is Gary Lee Millikan.  G-A-R-Y,

18   L-E-E, M-I-L-L-I-K-A-N.

19       Q.  And where do you currently live?

20       A.  I live at Indianapolis, Indiana.

21       Q.  What's the address?

22       A.  10944 Echo Trail, 46236.

23       Q.  And what's your highest level of education

24   that you've achieved?

25       A.  I have a bachelor of science.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.   And what was that in?

2     A.   It was in pharmacy.

3     Q.   Pharmacy?

4          And from what institute did you get that

5     degree from?

6     A.   I graduated from Purdue University.

7     Q.   Do you have any post degrees?  Graduate

8     degrees?

9     A.   No, sir.

10    Q.   Are you a pharmacist?

11    A.   Yes, I am a pharmacist.

12    Q.   Do you have any other certifications or

13    anything like that, besides your degree from Purdue

14    University?

15    A.   No, I don't believe so.

16    Q.   No certifications in DEA regulations or

17    anything like that?

18         MR. HYNES:  Objection to form.

19         THE WITNESS:  No, I don't believe so.

20    Q.   When were you first hired by the Indianapolis

21    distribution center?

22         MR. HYNES:  Objection to form.

23         THE WITNESS:  The -- I was first hired into

24    the distribution center in 1995.

25    Q.   And were you hired by CVS Indiana LLC or CVS

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Pharmacy, Inc?

 2        A.   This is prior to CVS.  I began my career with

 3   Hook drugs, which was purchased by Revco, and in 1995,

 4   I went into the distribution center.

 5        Q.   And in 1995, who was your employer?

 6        A.   Revco.

 7        Q.   And then when did you work for Hook?

 8        A.   I worked for Hook's from 1977 until the Revco

 9   acquisition.

10        Q.   Do you know when that occurred?

11        A.   In 1995.

12        Q.   And then in 1995, when you worked for Revco,

13   you went to the Indianapolis distribution center?

14        A.   Yes, I did.

15        Q.   And where were you before that?

16        A.   I was in the Hook corporate office.

17        Q.   And what did -- was your position in 1995

18   with Revco?

19        A.   I was a pharmacy manager for distribution.

20        Q.   And how long did you hold that role for?

21        A.   Until 1998.

22        Q.   And what happened in 1998?

23        A.   After CVS purchased Revco, I was promoted

24   from pharmacy manager to operations manager for the

25   entire facility.
```

```
 1        Q.   So when CVS purchased Revco in 1998, you were

 2   promoted to operations manager?

 3        A.   Shortly after the purchase.  I don't remember

 4   the exact time frame, but it wasn't long.  It was a

 5   few months.

 6        Q.   So, the year was 1998?

 7        A.   Yes.

 8        Q.   And then what was your next position after

 9   operations manager?

10        A.   I held the position of operations manager

11   until probably 2009 or '10, and they changed my title

12   to production manager because a decision had been made

13   that each facility would only have one operations

14   manager.

15        Q.   And so, was that a demotion?

16             MR. HYNES:  Objection to form.

17             THE WITNESS:  I don't -- my role did not

18   change.  My title changed.

19        Q.   And there was another operations manager,

20   though?

21        A.   Before that, there was a senior operations

22   manager, and his title was changed to operations

23   manager.

24        Q.   And who was that?

25        A.   Andy Koropoulis.
```

Highly Confidential - Subject to Further Confidentiality Review

 1      Q.  And then your title was changed from

 2   operations manager to production manager?

 3      A.  Yes, it was.

 4      Q.  But your role did not change?

 5      A.  No, it did not.

 6      Q.  Your duties did not change?

 7      A.  No, they did not.

 8      Q.  And then from 2009/2010, how long did you

 9   hold the production manager?

10      A.  Until June of 2012, when I retired from the

11   company.

12      Q.  Going back to your operations manager

13   position from 1998 to 2009 or 2010, what were your

14   duties?

15      A.  The facility is 1 million square feet,

16   approximately 6- to 900 employees, five days a week,

17   three shift operation.  I had various duties over that

18   time period, over different departments, whether it be

19   shipping, order filling, inventory control,

20   receiving.

21      Q.  Anything else?

22      A.  And pharmacy at times.  I -- I believe I had

23   responsibilities for everything in the facility at

24   some time during that time period.

25      Q.  When you say you had responsibilities for

1   everything at some point, was that on a continuous

2   basis or is that at separate points?

3       A.  At separate points.  Throughout that time

4   period, CVS was acquiring other companies.  There were

5   many times when the director, the senior ops manager,

6   and the HR manager were out of the building for a

7   significant period of time and I was the senior person

8   in the building.

9       Q.  As operations manager, did you report

10  directly to Mark Nicastro?

11          MR. HYNES:  Objection.  Time period.

12          MR. ROOF:  As operations manager.

13          THE WITNESS:  I -- as operations manager

14  during that period --

15      Q.  Yes.

16      A.  -- '98 to '09, he was only there for the

17  period of '08 and '09, and I believe I reported

18  directly to him during that time, although it is

19  possible that I reported to the senior ops manager

20  part of that time.  There's a few different org

21  charts.

22          Q.  I noticed that.

23          And who's the senior ops manager again?

24      A.  Andy Koropoulis.

25      Q.  Okay.  So, it's your testimony that Mark

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Nicastro was only director from '08 to '09?

 2         A.  No.  He came in the building in '08.  I

 3    thought we were talking about the time period up to

 4    '09.  He is still the director of the facility.

 5         Q.  And prior to his -- well, strike that.

 6             When did he arrive at the Indianapolis DC?

 7         A.  He arrived in July of 2008.

 8         Q.  So from the -- the period that you were

 9    operations manager, from '08 to approximately 2010,

10    Mark Nicastro was the director of the Indianapolis DC?

11             MR. HYNES:  Objection.  Mischaracterizes the

12    testimony.

13             THE WITNESS:  Yes, he was.

14         Q.  And who was the director of the Indianapolis

15    DC prior to that?

16         A.  Prior to Mark Nicastro, it was Dana Lilly.

17         Q.  And how long did Dana Lilly have the position

18    of director?

19         A.  I don't remember when he came in.  Early

20    2000s until 2008, when he was promoted.

21         Q.  And who was the director prior to Dana

22    Lilly?

23         A.  That was Gary Kanapka.

24         Q.  And when was he the director of the

25    Indianapolis DC?
```

Highly Confidential - Subject to Further Confidentiality Review

1     A.  I don't remember exactly, but it would be '98

2  or '99 until early 2000s.

3     Q.  And when you were production manager from

4  1998 through 2009, 2010, who did you report to?

5     A.  I was not production manager during that time

6  period.  I was pharmacy manager and then operations

7  manager.

8     Q.  You were pharmacy manager when?

9     A.  1995 to 1998.

10     Q.  And then from 1998 through 2010, you were --

11     A.  From 1998 until about 2009 or '10, I was the

12  operations manager.

13     Q.  Okay.  And then from about 2009 or 2010

14  through June of 2012, when you retired, you were the

15  production manager?

16     A.  Yes, I was.

17     Q.  Okay.  Who did you report to as the

18  production manager?

19     A.  It was probably Mark Nicastro, the director,

20  for that entire time.  It's possible that it was

21  through Andy Koropoulis, the operations manager.

22     Q.  Why do you say it's possible?

23     A.  I -- I don't remember the organization charts

24  as -- during that period.

25     Q.  Who did your reviews during the time you were

```
 1   production manager?

 2       A.  Again, I -- I'm not completely sure.  I

 3   believe it's the director, Mark Nicastro.  It is

 4   possible that it was the operations manager, Andy

 5   Koropoulis.

 6       Q.  And that same is true when you were

 7   operations manager, correct?

 8       A.  Yes, it is.

 9       Q.  Okay.  And when you were operations manager,

10   were you employed by CVS Pharmacy, Inc., or CVS

11   Indiana, LLC?

12       A.  My W2 says:  CVS Indiana, LLC.

13       Q.  And that was the entire time you were

14   employed by a CVS entity?

15       A.  I'm not -- I'm not sure.

16       Q.  But the time you were operations manager and

17   production manager, you were employed by CVS Indiana,

18   LLC?

19           MR. HYNES:  Objection.  Mischaracterizes his

20   testimony.

21           THE WITNESS:  I'm not sure how long that

22   title -- that company was in place without going back

23   and looking at all of those W2s.

24       Q.  So when you were an operations manager,

25   though, you were a CVS Indiana, LLC employee?
```

1           MR. HYNES:  Same objection.

2           THE WITNESS:  I believe that CVS Indiana, LLC

3    was specifically my company.

4       Q.  We're going to talk about suspicious order

5    monitoring and diversion, and I just want to make sure

6    we're on the same page as to what those terms mean.

7           And the way I define suspicious order

8    monitoring is the monitoring of orders that are

9    unusual size, orders that deviate substantially from a

10   normal pattern, and orders that are of unusual

11   frequency.

12          Do you understand that?

13      A.  The suspicious orders that we had to

14   determine would meet that criteria.

15      Q.  Okay.  And diversion would be diverting

16   controlled substances to an illegitimate channel

17   rather than distributing it to medical, scientific, or

18   industrial channels?

19          MR. HYNES:  Objection to form.

20          THE WITNESS:  The -- my role in diversion

21   when I was directly -- part of it was to ensure that

22   the drugs that we shipped went to legitimate

23   pharmacies for legitimate concerns.

24      Q.  So, can we have an understanding, though,

25   that diversion means diverting of controlled

Highly Confidential - Subject to Further Confidentiality Review

 1    substances to illegitimate channels?

 2            MR. HYNES:  Objection to form.

 3            THE WITNESS:  I have -- my role, when I was

 4    directly involved with the suspicious ordering, was to

 5    make sure that what we shipped was legitimate, to a

 6    legitimate store for a legitimate reason.

 7        Q.  We'll use that as you -- the definition of

 8    diversion then, okay?

 9        A.  Okay.

10        Q.  And hydrocodone is a controlled substance?

11        A.  Yes, it is.

12        Q.  And hydrocodone combination products are a

13    controlled substance?

14        A.  Yes, they are.

15        Q.  And another name for hydrocodone combination

16    products is HCPs?

17        A.  I'm not sure that I'm aware of that --

18        Q.  You never --

19        A.  -- term.

20        Q.  You never heard of the term "HCPs" before?

21        A.  HCP?

22        Q.  Yes.

23        A.  No, I don't believe I have.

24        Q.  Okay.  As operations manager and production

25    manager, did you oversee the pharmacy?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.  There were times when I did oversee the

2   pharmacy.  There were some parts of the time when I

3   did not.

4        Q.  Can you tell me those dates?

5        A.  I don't know for sure, but I believe from

6   about 2009 till my retirement in June of 2012, I did

7   not have direct responsibility for pharmacy.

8            Prior to that, from '98 to '08, while I'm not

9   completely sure that I always had it, I feel like I

10  probably did.

11       Q.  Why do you say "probably"?

12       A.  I feel pretty certain that I did.  I just

13  don't remember.

14       Q.  And why from 2009 through 2012 did you not

15  have direct oversight of the pharmacy?

16       A.  The director of the facility redid the

17  responsibilities for Andy Koropoulis and myself, and

18  he gave him the direct responsibility for pharmacy.

19       Q.  And that was Mark Nicastro?

20       A.  Yes, it was.

21           (CVS-Millikan-115 was marked for

22  identification.)

23       Q.  And I want to hand you what is marked as

24  Exhibit 115.

25           MS. DILLINGHAM:  Could you read the Bates
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   number for that document?

 2        MR. ROOF:  It's deposition testimony of Mark

 3   Nicastro.

 4        Q.  Like I said, Exhibit 115, his deposition

 5   transcript -- partial deposition transcript of Mark

 6   Nicastro.  The first page is the cover page for the

 7   deposition transcript of the video deposition of Mark

 8   Nicastro dated December 6, 2018 in Indianapolis,

 9   Indiana.

10        Do you see that on the first page,

11   Mr. Millikan?

12        A.  I'm sorry.  Repeat the question.

13        Q.  First page is a cover page for the video

14   deposition of Mark Nicastro dated December 6, 2018 in

15   Indianapolis, Indiana.

16        Do you see that?

17        A.  Yes.

18        Q.  Okay.  And then the second page is page 23?

19        A.  Yes.  Yes.

20        Q.  And the question on line 15 says:

21        "When you joined in 2008, who was responsible

22   for pharmacy related aspects of the business in

23   Indianapolis?

24        Answer:  "Gary Millikan was my operations

25   manager and he oversaw the pharmacy."
```

Highly Confidential - Subject to Further Confidentiality Review

1          Did I read that correctly?

2     A.  Yes.

3     Q.  Is that a correct statement?

4     A.  I -- I was indirectly responsible.  There was

5   a pharmacy manager, I believe.

6     Q.  So, Mark Nicastro is not directly correct in

7   his testimony here?

8          MR. HYNES:  Object to the form.

9   Mischaracterizes the document.

10          THE WITNESS:  I'm not sure how he meant that

11   on "responsible."

12     Q.  But you're saying you're now indirectly

13   responsible for the pharmacy, correct?

14     A.  In 2008, I -- in 2008, pharmacy fell under

15   me, but there were other people that I managed that

16   directly were involved with pharmacy.

17     Q.  And who were those people?

18     A.  While I -- I'm not sure on that date.  It was

19   either Steve Campbell or Gary Lamberth as the pharmacy

20   manager, and there would have been a pharmacy

21   supervisor or two.

22     Q.  So there was a pharmacy manager under you,

23   correct?

24     A.  Yes.

25     Q.  And then the pharmacy supervisor under you?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  Yes.  And then there would have been another

 2   pharmacy supervisor on the other shift.

 3        Q.  So two pharmacy supervisors under you?

 4        A.  Yes.  Well, the second shift one did not

 5   directly report to me.  They reported through a second

 6   shift manager.

 7        Q.  So the only two direct reports was the

 8   pharmacy manager and the pharmacy supervisor,

 9   correct?

10        A.  My -- one of my direct reports would have

11   been the pharmacy manager.  The pharmacy supervisor

12   would have reported to the pharmacy manager.

13        Q.  And then under the pharmacy supervisor were

14   the pickers and packers?

15        A.  They would have had all of the warehouse

16   associates:  receiving, picking orders, shipping

17   orders, returns.

18        Q.  And that's what is called the pickers and

19   packers?

20            MR. HYNES:  Objection to form.

21            THE WITNESS:  That's a term that is used.  I

22   prefer warehouse associates.

23        Q.  Okay.  We can use warehouse associates.

24            So indirectly, the warehouse associates

25   reported through you, correct?
```

```
 1        A.  Yes, they did.

 2        Q.  What were your duties regarding suspicious

 3   order monitoring of controlled substances and

 4   diversion?

 5            MR. HYNES:  Objection.  Time period.

 6        Q.  While you were operations manager.

 7        A.  While I was operations manager from 1998 till

 8   2009 or '10, I had indirect knowledge and oversight

 9   over the Suspicious Order Monitoring program.

10        Q.  When you said you had indirect oversight over

11   the SOM, what do you mean?

12        A.  I mean that the pharmacy manager, supervisor,

13   admin. personnel, and the warehouse associates in the

14   controlled substance area were actually doing the

15   program.

16        Q.  And so what was your role as indirect

17   oversight over SOM?

18        A.  Just the fact that that reported up through

19   me.  Again, it was a million square feet, the number

20   of associates.  It was one of my responsibilities.

21        Q.  So the people that reported to you, or up

22   through you actually did the work for SOM, and -- but

23   since you were over them or managed them, you had

24   indirect oversight of SOM; is that correct?

25        A.  Yes.
```

1    Q.   Anything else you did regarding suspicious

2    order monitoring or diversion?

3         MR. HYNES:  Objection.  Time period.

4    Q.   Same time period.

5    A.   The same time period?

6         No.

7    Q.   And what about your duties regarding

8    suspicious order monitoring of controlled substances

9    and diversion when you were production manager?

10        MR. HYNES:  Objection.  Compound.

11        Go ahead.

12   A.   When I was production manager, Andy

13   Koropoulis had responsibility of pharmacy, but because

14   of my background in pharmacy, I had -- some knowledge

15   of the process and I continued to work with the DEA on

16   the audits and --

17   Q.   Besides working with the DEA and audits,

18   anything else?

19   A.   I don't believe so.

20   Q.   Did you work with the DEA on audits when you

21   were operations manager?

22   A.   Yes, I did.

23   Q.   And what do you mean by you worked with the

24   DEA on audits?

25        A.   When the DEA came to the facility to do their

Highly Confidential - Subject to Further Confidentiality Review

1    annual -- not annual, but do an audit, I was one of

2    the persons who was with them.

3        Q.  And what do you mean by one of the persons

4    with them?

5        A.  They had my name, I believe, on the document

6    when they came to the facility.

7        Q.  On what document?

8        A.  I don't remember what that's called.

9        Q.  And so what did you do during these audits?

10       A.  Oh, the information that they requested,

11   balancing of the inventory, answering any questions.

12       Q.  So you provided the information requested,

13   you balanced the inventory, and you answered

14   questions.

15           Anything else during the audit?

16       A.  No, not that I recall.



Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2

 3

 4

 5

 6
```

 7    Q.  Okay.  Who else was involved in the DEA

 8    audits?

 9    A.  Normally, it was two inspectors.

10    Q.  And those two inspectors were from the DEA,

11    correct?

12    A.  Yes.

13    Q.  And who was involved from CVS Indiana?

14    A.  The loss -- someone from loss prevention.

15    And then if they wanted to talk to someone, warehouse

16    associate or --

17    Q.  So it was just you and the loss prevention

18    person handling the DEA audits?

19    A.  As best I can remember.

20    Q.  And who took the lead on the DEA audits, you

21    or the loss prevention?

22        MR. HYNES:  Object to the form.

23    A.  I believe we had shared responsibility.

24    Q.  And again, your responsibility was providing

25    the information requested, balancing, and then

Highly Confidential - Subject to Further Confidentiality Review

```
 1   answering questions?

 2       A.  Yes.

 3       Q.  And that was balancing what again?

 4       A.  The inventory of a selected controlled

 5   substances.

 6       Q.  And you had no other responsibilities during

 7   the DEA audit?

 8       A.  Not that I can recall at this time.  I'm --

 9       Q.  As either operations manager or production

10   manager, were you responsible for implementing the

11   standard operating procedure for controlled drugs?

12           MR. HYNES:  Objection to form.

13       A.  Could you repeat that?

14       Q.  As either -- well, let's start with as

15   operations manager.  Were you responsible for

16   implementing the standard operating procedures for

17   controlled drugs?

18           MR. HYNES:  Objection to form.

19       A.  The -- no, I was not.

20           (CVS-Millikan-117 was marked for

21   identification.)

22       Q.  I'm going to go to Exhibit 117, which is

23   another partial deposition transcript.

24           MR. HYNES:  Thanks, Brian.

25       Q.  Again, first page of Exhibit 117 is the cover
```

Highly Confidential - Subject to Further Confidentiality Review

1    page for the video deposition of Mark Nicastro on

2    December 6, 2018, correct?

3         A.  Yes.

4         Q.  And then the next page is page 46 of

5    Mr. Nicastro's deposition, correct?

6         A.  Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

23          Q.  And it's your testimony, when you were

24     production manager, that Andy had control, or oversaw,

25     the pharmacy?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. HYNES:  Objection.

 2      A.  While I don't remember the exact dates in

 3  that whole time period, there was a time period when

 4  he had responsibility for pharmacy.

 5      Q.  So sometime when you were production manager,

 6  he had responsibility for pharmacy?

 7      A.  I believe so.

 8      Q.  And did you have responsibility for pharmacy

 9  at any time when you were production manager?

10      A.  I don't remember.

11      Q.  Then in January of 2002, you started as a

12  part-time employee with CVS Indiana, LLC?

13              MR. HYNES:  Did you say 2002?

14      A.  No.

15              MR. GOETZ:  2013.  January of 2013.

16              MR. HYNES:  Could you repeat the question.

17  2002.

18              MR. ROOF:  Yeah, sure.

19  BY MR. ROOF:

20      Q.  Then in January of 2013, you started as a

21  part-time employee for CVS Indiana, LLC?

22      A.  I believe it was actually in November of

23  2012.

24              (CVS-Millikan-18 was marked for

25  identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   I want to hand you what has been marked as
 2   Exhibit 18.  Maybe we can just refresh your
 3   recollection here.
 4        A.   Okay.
 5        Q.   This is your personnel file.
 6             For the people on the phone, this document
 7   was produced by CVS in the past couple of days.
 8   There's no Bates number on it, and --
 9             MR. HYNES:  We can do a Bates number if you
10   want.
11             MR. GOETZ:  It doesn't matter.
12             MR. HYNES:  Okay.
13   BY MR. ROOF:
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15          MR. ROOF:  Can we go off the record?

16          MR. HYNES:  Yeah.  Yeah, that would be good

17    for me, too.

18          THE VIDEOGRAPHER:  We're off the record at

19    9:54 a.m.

20          (There was a brief recess.)

21          THE VIDEOGRAPHER:  We are back on record at

22    10:07 a.m.

23    BY MR. ROOF:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20      Q.  Did you know that there was an opioid crisis

21   sweeping the nation in 2006?

22         MR. HYNES:  Objection to form.

23      A.  I'm aware of opioids and the chance for

24   abuse.

25      Q.  But you're not aware of any national epidemic

```
 1   or crisis?

 2          MR. HYNES:  Same objection.

 3      A.  I'm aware that various things are reported.

 4   I'm not privy to all of the facts of it.

 5      Q.  What about in 2007?  Were you aware about the

 6   opioid crisis in 2007?

 7          MR. HYNES:  Same objection.

 8      A.  I don't recall.

 9      Q.  And what about between 2008 and 2012?

10          MR. HYNES:  Same objection.

11      A.  I don't recall.

12      Q.  Did you know that hydrocodone and hydrocodone

13   combination products were at the center of the opioid

14   crisis?

15          MR. HYNES:  Same objection.

16      A.  No.

17      Q.  Did you know that the Indianapolis DC had a

18   role to play in preventing this epidemic?

19          MR. HYNES:  Same objection.

20      A.  CVS distribution center has a role to ship

21   legitimate prescription needs to our legitimate stores

22   for legitimate patients.

23      Q.  And to prevent diversion, correct?

24          MR. HYNES:  Same objection.

25      A.  We want to make sure that those products go
```

Highly Confidential - Subject to Further Confidentiality Review

1    in the correct channels.

2           (CVS-Millikan-101 was marked for

3    identification.)

4       Q.  Handing you what has been marked as Exhibit

5    101.

6           Exhibit 101 is Bates stamped 15502 through

7    15526.

8           Do you see that in the lower right-hand

9    corner?

10      A.  Yes.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7          (CVS-Millikan-102 was marked for

8     identification.)

9          Q.  I'm going to hand you what has been marked as

10    Exhibit 102.

11          102 is not Bates stamped.  Exhibit 102 is

12    called, "Poisoning Deaths, Opioid Analgesics,"

13    correct?

14          A.  Yes.

15          Q.  And it is a bar graph, correct?

16          A.  Yes.

17          Q.  And it is a bar graph showing poisoning

18    deaths from opioid analgesics, correct?

19              MR. HYNES:  Objection to form.

20          A.  That's what is says.

21          Q.  Okay.  And it is from 1999 through 2013?

22          A.  Yes.

23          Q.  And there is a steady increase in deaths from

24    1999 to 2013, correct?

25              MR. HYNES:  Objection to form.

```
 1        A.   That's what it shows.

 2        Q.   And in 1999 there was 4,041 deaths from

 3   opioid analgesics, correct?

 4             MR. HYNES:  Objection to form.

 5        A.   That is what it alleges.

 6        Q.   And then it peaks out in 2011 at 16,917,

 7   correct?

 8             MR. HYNES:  Same objection.

 9        A.   Again, that's what it alleges.

10        Q.   And then it tapers off at -- in 2013 at

11   16,200, correct?

12             MR. HYNES:  Same objection.

13        A.   Again, that is what it alleges.

14        Q.   Yeah.  And the source of this is the

15   CDC/NCHS, National Vital Statistics System --

16             MR. HYNES:  Same objection.

17        Q.   -- correct?

18        A.   Yes.

19        Q.   And the U.S. Drug Enforcement Administration,

20   Office of Diversion Control published this document?

21             MR. HYNES:  Same objection.

22        A.   I'm not sure.

23        Q.   It says --

24        A.   I see where it says that, but I don't see

25   where it says it published it, but...
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  But do you see where it says U.S Drug

 2   Enforcement Administration, Office of Diversion

 3   Control in the lower right-hand corner?

 4        A.  Yes.

 5        Q.  Did you know about the information conveyed

 6   in Exhibit 102?

 7            MR. HYNES:  Objection to form.

 8        A.  I don't believe so.

 9            (CVS-Millikan-103 was marked for

10   identification.)

11        Q.  Handing you what has been marked as Exhibit

12   103.

13            And this is the document that you referred to

14   earlier and said you reviewed with your attorneys in

15   preparation for this deposition, correct?

16            MR. HYNES:  Objection.  Don't answer the

17   question.

18        Q.  He already answered the question.  Go ahead

19   and answer it.

20            MR. HYNES:  Don't answer it.

21        Q.  Have you seen this document before?

22            MR. HYNES:  Objection.  Instruct the witness

23   not to divulge anything that happened during prep

24   session.

25        Q.  Have you seen this document before?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.  I guess I can't answer.

2        Q.  So, that's a yes?

3            MR. HYNES:  Objection.  Asked and answered.

4        Q.  We are relying on your earlier testimony

5   then.
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7          (CVS-Millikan-104 was marked for

8   identification.)

9     Q.  Handing you what has been marked as Exhibit

10  104.  Again, this document is not Bates stamped.

11     Exhibit 104 is dated 2012, Ohio Drug Overdose

12  Deaths, correct?

13     A.  Yes.

14     Q.  Have you seen this document before?

15     MR. HYNES:  Objection, to the extent this

16  calls for the witness to divulge what he reviewed

17  during prep.

18     Q.  Have you seen this document before?

19     A.  I don't believe so.

20     Q.  The first sentence says, "Drug overdose

21  deaths continue to be a public health crisis in Ohio

22  with 366 percent increase in the number of deaths from

23  2000 to 2012."

24     And then it cites to see Figure 1, correct?

25     A.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.  I read that correctly?

2        A.  Yes.

3        Q.  And the source for that is the Ohio

4   Department of Health, correct?

5            MR. HYNES:  Objection to form.

6        A.  Yes.

7        Q.  The first bullet point says, "Unintentional

8   drug overdoses caused 1,914 deaths to Ohio residents

9   based on data in 2012.  This is the highest number of

10  deaths on record for drug overdose, and surpasses the

11  previous highest number (1,765) in 2011, by 8.4

12  percent."

13           Did I read that correctly?

14       A.  Yes.

15       Q.  And then the next bullet point says, "In

16  2012, five Ohioans died every day from unintentional

17  drug overdose, or one every five hours," correct?

18           MR. HYNES:  Objection to form.

19       A.  That's what it says.

20       Q.  And the next bullet point says,

21  "Unintentional drug overdose continues to be the

22  leading cause of injury related deaths in Ohio, ahead

23  of motor vehicle traffic crashes, suicide and falls.

24  This trend began in 2007 and continues through 2012."

25           Did I read that correctly?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.  Yes.

 2      Q.  And then the next sentence says, "Opioids

 3  (prescription or heroin) remain the driving factor

 4  behind the unintentional drug overdose epidemic in

 5  Ohio.  Approximately two-thirds (1,272; 66.5 percent)

 6  of the drug overdoses involved any opioid in 2012,

 7  similar to 2011 (1,154; 65 percent)."

 8          Did I read that correctly?

 9      A.  Yes.

10      Q.  Did you know about the information conveyed

11  in Exhibit 104?

12          MR. HYNES:  Objection.  Time period.

13      Q.  Before today.

14      A.  I'm not sure.

15      Q.  You have no idea?

16      A.  I'm not sure if I knew or not.

17      Q.  Did anybody from CVS tell you about the

18  information conveyed in Exhibit 104?

19      A.  I'm not sure if they have or not.

20          (CVS-Millikan-105 was marked for

21  identification.)

22      Q.  Handing you what has been marked as

23  Exhibit 105.  This is also not Bates stamped.

24          Exhibit 105 is titled, International

25  Narcotics Control Board Comments on Reported
```

```
 1    Statistics on Narcotic Drugs-2012, correct?

 2        A.  Yes.

 3        Q.  Have you seen Exhibit 105 before?

 4            MR. HYNES:  Objection and instruct the client

 5    not to answer with respect to what he reviewed during

 6    prep.

 7            He can answer with respect to whether he's

 8    reviewed this document outside of his prep session.

 9            Go ahead.

10        A.  I don't believe so.

11        Q.  The first entry says:  U.S. was the country

12    with the highest consumption of hydrocodone

13    (approximately 45.5 tons, or 99 percent, of global

14    consumption).

15            Did I read that correctly?

16        A.  Yes.

17        Q.  Were you aware of this?

18        A.  No.

19        Q.  After reviewing Exhibits 101 through 105,

20    does this change your opinion that there was an opioid

21    epidemic between 2006 and 2013 in the United States?

22            MR. HYNES:  Objection to form.

23        A.  No, I can't comment on that wording based on

24    these documents without looking into it more.

25        Q.  If you had known the information in
```

Highly Confidential - Subject to Further Confidentiality Review

1   Exhibits 101 through 105, and that there was an opioid

2   crisis in the U.S., would you have done your job

3   differently?

4          MR. HYNES:  Objection to form.  Lack of

5   foundation.

6       A.  No.  We had a duty to make sure that

7   legitimate prescriptions went to legitimate stores for

8   legitimate patients.  So despite anything, we would

9   make sure that we were following the correct.



Highly Confidential - Subject to Further Confidentiality Review



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

23          (CVS-Millikan-106 was marked for

24    identification.)

25          Q.   I'm going to hand you what has been marked as

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Exhibit 106.

 2           106 is Bates stamped 91508 through 91518,

 3   correct?

 4       A.  Yes.

 5       Q.  Have you seen Exhibit 106 before?

 6           MR. HYNES:  Objection to the extent it calls

 7   for the client, the witness, to divulge documents

 8   reviewed during prep.  I instruct the witness to only

 9   answer as to what he's reviewed outside of his prep

10   session.

11           MR. GOETZ:  What is the grounds for that?  I

12   mean, is -- is there a -- are you referencing a case

13   management order?  I'm curious.

14           MR. HYNES:  No, no.  I just -- I don't

15   think -- what we discussed during his prep session, I

16   think that's privileged.

17           MR. GOETZ:  You're not asking what you

18   discussed.  You're asking if he saw that document.

19           MR. HYNES:  But I think documents I choose to

20   show him, I think that's privileged.

21           MR. GOETZ:  We're not asking him:  What

22   documents did the lawyer choose to show you?

23           MR. HYNES:  He's asking --

24           MR. GOETZ:  Asking:  Did you see this

25   document?  It's a different question than,
```

 1   Mr. Millikan, what documents did Mr. Hynes choose to

 2   show you during the prep?

 3          MR. HYNES:  But -- but if the answer is, I

 4   saw this during prep --

 5          MR. GOETZ:  Totally different question.

 6          MR. HYNES:  But if his answer is, I saw this

 7   during prep, that's, to me, privileged.

 8          Do you agree?

 9          MR. GOETZ:  Those are the documents -- no, I

10   don't because those are the documents we chose to use.

11          It's a different question than, what

12   documents did Mr. Hynes show you?

13          If we have a document that we choose to use,

14   we have a right to know if he saw them before he

15   walked in here.

16          MR. ROOF:  And Eric allowed that yesterday.

17          MR. GOETZ:  I mean, it just -- and I'm just

18   curious.  I -- I -- I wanted to know if you're looking

19   at a CMO because there was --

20          MR. HYNES:  It's not a CMO.

21          MR. GOETZ:  -- as to what -- as to whether

22   you had to identify everything you showed to your

23   witnesses.  There was that issue.  And what it was

24   resolved at, no, but everything he used for prep has

25   to have been produced.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. HYNES:  That was for 30(b).

 2              MR. GOETZ:  Okay.  I -- I --

 3              MR. HYNES:  And that's for 30(b), not

 4    everything -- but, listen, I'll -- I'll give it some

 5    thought.  This is what I've always done in

 6    depositions, and I've never had a problem with it.

 7              Miles and I will talk about it at the

 8    break.

 9              MR. GOETZ:  Okay.  Fair enough.

10              MR. HYNES:  Okay.

11              MR. ROOF:  Okay.  So, my question --

12              MR. HYNES:  Do you want to ask the question

13    again and I'll just say --

14              MR. ROOF:  Yeah.

15              MR. HYNES:  -- "same objection"?

16    BY MR. ROOF:

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15          Q.  You've never seen or read 21 USC 823(e)?

16          A.  I don't know that.  This is 12 years ago.

17    I've basically been retired for six years.  I can't

18    quote that code.

19          Q.  My question is:  Have you seen that code

20    before?

21          A.  I believe so.

22          Q.  Okay.  As part of your job?

23          A.  Or as a student.

24          Q.  You can't recall which one?

25          A.  No.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12          MR. HYNES:  Can we would take a two-minute

13  break?  We've just been going for a while.

14          MR. ROOF:  Sure.  Absolutely.

15          THE VIDEOGRAPHER:  Off the record at

16  11:35 a.m.

17          (There was a brief recess.)

18          THE VIDEOGRAPHER:  We are back on the record

19  at 11:52 a.m.

20  BY MR. ROOF:

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



3            (CVS-Millikan-111 was marked for

4      identification.)

Highly Confidential - Subject to Further Confidentiality Review



22          (CVS-Millikan-112 was marked for

23      identification.)

24          Q.  Handing you what has been marked as

25      Exhibit 112.

1          Back up.

2          Have you seen Exhibit 111 before?

3          MR. HYNES:  Same objection as to documents

4   reviewed during prep session.

5      A.  Yes.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13          MR. GOETZ:  Do you want to break for lunch

14    now?

15          MR. HYNES:  We might as well.

16          THE VIDEOGRAPHER:  We are off the record at

17    12:03 p.m.

18          (There was a luncheon break.)

19          THE VIDEOGRAPHER:  We are back on record at

20    12:55 p.m.

21    BY MR. GOETZ:

22        Q.  Mr. Millikan, my name is Dan Goetz.  We met

23    earlier.

24          (CVS-Millikan-9 was marked for

25    identification.)

Highly Confidential - Subject to Further Confidentiality Review

1                I'm going to hand you what has been marked as

2       Millikan Exhibit 9.

3                Do you recognize that document, sir?

4        A.   Yes.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2            MR. GOETZ:  Off the record.

 3            THE VIDEOGRAPHER:  We're off the record at

 4   1:27 p.m.

 5            (There was a brief recess.)

 6            THE VIDEOGRAPHER:  We're back on the record

 7   at 1:28 p.m.

 8            (CVS-Millikan-48 was marked for

 9   identification.)

10   BY MR. GOETZ:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17          MR. GOETZ:  Do you want to take a break or

18   keep going?

19          Mr. Millikan, would you like a short break or

20   would you like to keep going?

21          THE WITNESS:  Whatever you want to do is fine

22   with me.

23          THE VIDEOGRAPHER:  We are off record at

24   1:46 p.m.

25          (There was a brief recess.)

Highly Confidential - Subject to Further Confidentiality Review

1           THE VIDEOGRAPHER:  We are back on record at

2     2:00 p.m.

3     BY MR. GOETZ:

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2          (CVS-Millikan-36 was marked for

3    identification.)

4      Q.  I'm going to hand you Exhibit 36.

5          I just want to find out if these are the

6    instructions you're speaking about.

7      A.  Oh, sorry.

8          These are not the instructions I'm referring

9    to.

10     Q.  Oh.  Have you -- and you can object -- have

11   you seen the instructions during your prep?

12         MR. HYNES:  Let me -- I'm going to object and

13   tell him not to answer.

14         We've produced the instructions if that's

15   what you're getting at.

16         MR. GOETZ:  I -- I would like for you to

17   identify.  We --

18         MR. HYNES:  Okay.

19         MR. GOETZ:  I have no idea where they --

20         MR. HYNES:  Yeah, I can identify.  It's not a

21   problem.  I can't do it, like, right now, but...

22   BY MR. GOETZ:

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14          Q.  Mr. Millikan, you spent 35 years in a

15    distribution center distributing controlled drugs,

16    correct?

17          A.  No.

18          Q.  How long?

19          A.  '95 to 2012.

20          Q.  Seventeen years?

21          A.  Yes.

22          Q.  Okay.  You spent 17 years in a distribution

23    center distributing controlled substances.

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18      Q.  And where is the analyst -- did you say the

19  analyst office?

20      A.  Yes.

21      Q.  Where was that at the Indianapolis

22  distribution center?

23      A.  Near the southeast end of the building.

24      Q.  Where was the pharmacy office?

25      A.  Near the northeast end of the building.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1    Review Report as potentially suspicious as identified

2    by the computer algorithm model?

3        A.  Yes.

4        Q.  When that order was on there, would you

5    automatically look at additional information that was

6    not shown on that Item Review Report?

7        A.  No.

8        Q.  No.

9            So, there were oftentimes, and that's where

10   we started, and I apologize.

11       A.  Oh, yes.

12       Q.  So when I said to you, Mr. Burtner, according

13   to those notes, looks at additional information not

14   shown on the Item Review Report two to three times,

15   per hundred orders -- and we have been going through

16   those control studies to show you when he looks at an

17   IRR, how often he would look at additional due

18   diligence.

19           How often would you do additional due

20   diligence that was not reflected on the Item Review

21   Report for an order that was flagged?  What

22   percentage?

23       MR. HYNES:  Object to form.

24           Go ahead.

25       A.  I don't remember the percent, but it would

Highly Confidential - Subject to Further Confidentiality Review

```
 1   not be a large percent.

 2       Q.  And so, under five?

 3           MR. HYNES:  Objection to form.

 4           Go ahead.

 5           Under 5 percent or under five --

 6           MR. GOETZ:  Under 5 percent.

 7           THE WITNESS:  Five percent.

 8           MR. GOETZ:  Under 5 percent.

 9           MR. HYNES:  Objection to form.

10   BY MR. GOETZ:

11       Q.  Under 5 percent?

12       A.  I don't know, but, yes, probably.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
5
6
7
8
9
10
```

11          (CVS-Millikan-37 was marked for

12    identification.)

13          (CVS-Millikan-38 was marked for

14    identification.)

15      Q.  I'm going to show you what has been marked as

16    Plaintiff's Exhibit 37 and Plaintiff's Exhibit 38.

17          Here's 37 and 38.

18          MR. HYNES:  We're short a copy on 38.

19          MR. GOETZ:  I -- I apologize.

20          Do you have a 38 for you?

21          MR. HYNES:  I do.

22          MR. GOETZ:  And does the witness have a 38?

23          THE WITNESS:  Yes.

24          MR. GOETZ:  Okay.

25    BY MR. GOETZ:

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.  Exhibit 37, do you see that?

 2          A.  Yes.
```

 3

 4

 5

 6

 7

 8

 9

10

11

```
12          Q.  And it's to Dan Deaton.

13              Who's Dan Deaton?

14          A.  He would have been a pharmacy supervisor

15     probably at that time.

16          Q.  And who's ████████████

17          A.  The pharmacy manager at that time.

18          Q.  And who's Joseph Shohll?

19          A.  Was probably the logistics manager -- or I'm

20     sorry -- the loss prevention manager.
```

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
10        Q.  I will represent to you that from a period of
11   2-6 of 2013 to December 30th of 2013 -- strike that.
12             Mr. Millikan, I'm handing you what has been
13   marked as Exhibit 13.  You're going to want to keep
14   that.  It doesn't matter.
15        A.  Oh.
16        Q.  That is a list of what says, Track One CVS
17   Store Information.
18             Do you see that?
19        A.  Yes.
20        Q.  All right.  Do you understand that the first
21   opioid litigation case involves the County of
22   Cuyahoga?
23        A.  I don't know that it's the first.
24        Q.  Okay.  Do you understand that the County of
25   Cuyahoga, the City of Cleveland, the County of Summit,
```

```
 1   and the City of Akron are joined together in one

 2   lawsuit to be tried together?

 3       A.  Yes, I believe so.

 4       Q.  Okay.  I will represent to you they are the

 5   first case that are scheduled to be tried.

 6       A.  Okay.

 7          (CVS-Millikan-33 was marked for

 8   identification.)

 9       Q.  These stores that you see on Exhibit 33,

10   they, according to what has been produced by CVS,

11   represent those stores that are part of what we're

12   calling track one, because that's the first case to be

13   tried.

14          Do you see up top:  Track One CVS Store

15   Information?

16       A.  Yes.

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          MR. GOETZ:  Let's take a break.

16          THE VIDEOGRAPHER:  We are off record at

17  4:36 p.m.

18          (There was a brief recess.)

19          THE VIDEOGRAPHER:  We are back on the record

20  at 4:49 p.m.

21          MR. GOETZ:  Mr. Millikan, I don't have any

22  further questions for you, pending what Mr. Hynes asks

23  you.

24          THE WITNESS:  Okay.  Thank you.

25          MR. GOETZ:  And thank you for your time

Highly Confidential - Subject to Further Confidentiality Review

1    today.

2              THE WITNESS:  Thank you.

3                        EXAMINATION

4    BY MR. HYNES:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



      1

      2

      3

      4

      5

      6

      7

      8

      9

     10

     11          Q.   Okay.

     12               MR. HYNES:   No further questions.

     13                       RE-EXAMINATION

     14     BY MR. GOETZ:

     15

     16

     17

     18

     19

     20

     21

     22

     23

     24

     25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
 6
 7
```

 8              MR. GOETZ:  That's all I have.  Thank you,

 9     sir.

10              THE WITNESS:  Okay.  Thank you.

11              THE VIDEOGRAPHER:  We are off the record at

12     5:02 p.m.

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    STATE OF KENTUCKY      )

                             ) SS

 2    COUNTY OF JEFFERSON    )

 3        I, Kimberley Ann Keene, a notary public, within

 4    and for the State at Large, do hereby certify that the

 5    foregoing deposition of

 6                    GARY MILLIKAN

 7    was taken before me at the time and place and for the

 8    purpose in the caption stated; that the witness was

 9    first duly sworn to tell the truth, the whole truth

10    and nothing but the truth; that the deposition was

11    taken before me stenographically and transcribed by

12    me; that the foregoing is a full, true and complete

13    transcript of the said deposition so given; that there

14    was a request that the witness read and sign the

15    transcript; that the appearances were as stated in the

16    caption.

17        I further certify that I am neither counsel or of

18    kin to any of the parties to this action, and am in no

19    way interested in the outcome of said action.

20        Witness my signature this 14th day of January,

21    2018.  My Commission Expires on September 16, 2020.

22

23    _____

      Kimberley Ann Keene

24    Registered Professional Reporter

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  - - - - - -

                 E  R  R  A  T  A

 2                  - - - - - -

 3    PAGE   LINE   CHANGE

 4    _____  _____  _____

 5       REASON:  _____

 6    _____  _____  _____

 7       REASON:  _____

 8    _____  _____  _____

 9       REASON:  _____

10    _____  _____  _____

11       REASON:  _____

12    _____  _____  _____

13       REASON:  _____

14    _____  _____  _____

15       REASON:  _____

16    _____  _____  _____

17       REASON:  _____

18    _____  _____  _____

19       REASON:  _____

20    _____  _____  _____

21       REASON:  _____

22    _____  _____  _____

23       REASON:  _____

24    _____  _____  _____

25       REASON:  _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2
                 I,_____, do

 3    hereby certify that I have read the
      foregoing pages, and that the same

 4    is a correct transcription of the answers
      given by me to the questions therein

 5    propounded, except for the corrections or
      changes in form or substance, if any,

 6    noted in the attached Errata Sheet.

 7

      _____

 8     GARY MILLIKAN                    DATE

 9

10

11

12

13

14

      Subscribed and sworn

15    to before me this
      _____ day of _____, 20_____.

16
      My commission expires:_____

17

18    _____

      Notary Public

19

20

21

22

23

24

25
```