# EXHIBIT 415

Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF OHIO
 3                       EASTERN DIVISION
 4                          -  -  -
 5

     IN RE:  NATIONAL             :    MDL NO. 2804
 6   PRESCRIPTION OPIATE          :
     LITIGATION                   :
 7                                :
     -------------------------------------------------
 8   THIS DOCUMENT RELATES TO     :    CASE NO.
     ALL CASES                    :    1:17-MD-2804
 9                                :
                                  :    Hon. Dan A.
10                                :    Polster
11                          -  -  -
12                     January 30, 2019
13                          -  -  -

          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
14                   CONFIDENTIALITY REVIEW
15
16               Videotaped deposition of JANET
     GETZEY HART taken pursuant to notice, was held at
17   the law offices of Morgan, Lewis & Bockius LLP,
     1701 Market Street, Philadelphia, Pennsylvania,
18   beginning at 9:34 a.m., on the above date, before
     Ann Marie Mitchell, a Federally Approved
19   Certified Realtime Reporter, Registered Diplomate
     Reporter, Registered Merit Reporter and Notary
20   Public.
21                          -  -  -
22              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
23                    deps@golkow.com
24
```

Page 114

1  Q. Were any suspicious orders ever
2 reported to you at the corporate office?
3  A. There were none reported to me.
4  Q. And to be clear, you never
5 received a report of a suspicious order your
6 entire time working in the corporate office from
7 1995 through 2018. Correct?
8  A. I did not.
9  Q. Going down to paragraph 5, it
10 says, if a suspicious order is reported to
11 corporate, the corporate government affairs will
12 determine whether to "ship" or "do not ship."
13     Do you see that?
14  A. I do.
15  Q. And this is the same corporate
16 office that we just referred to, the government
17 affairs office. Right?
18  A. That is correct.
19  Q. So that would be you?
20  A. That would be me.
21  Q. How would you make the
22 determination of whether to ship or not ship?
23  A. There would be a number of
24 factors that would come into play. The very

Page 115

1 first factor that I would look at is if it was an
2 auto ship order, that it came through the
3 algorithm and that was what the algorithm
4 provided. That would be a key one.
5     A second one would be to look at
6 the size of the order, to determine if the
7 unusual size of it was due to something at the
8 pharmacy that was placing the order, if there was
9 something unusual happening at that pharmacy.
10  Q. Anything else you would look at?
11  A. That would be it.
12  Q. Was there any written policy or
13 procedure about how to make that decision about
14 whether to ship or not ship?
15  A. To the best of my knowledge, no.
16  Q. So the factors you just testified
17 about that you would use to determine whether to
18 ship or not ship, those were just ones that you
19 yourself personally came up with. Right?
20  A. Yes.
21     MS. McENROE: Objection to form.
22     THE WITNESS: Sorry.
23 BY MR. POWERS:
24  Q. What were those based on, those

Page 116

1 factors based on?
2  A. Based on my knowledge of the
3 industry, based on my years of experience having
4 dealt with the DEA for a period of -- for a long
5 period of time, and knowing how to review a store
6 as far as its book of business, going way back to
7 even my days as the pharmacy district manager in
8 the Baltimore market.
9  Q. But to be clear, you never had to
10 make the decision whether to ship or not ship
11 because you never received any report of a
12 suspicious order. Right?
13  A. That is correct.
14  Q. And going down to paragraph 6, it
15 says, "All discussions, investigations and
16 reports will be maintained in the file designated
17 'Suspicious Orders.'"
18     Do you see that?
19  A. I do.
20  Q. Am I correct to assume that there
21 was no file designated suspicious orders because
22 there were no suspicious orders?
23  A. You are correct.
24  Q. Who would keep that file, if

Page 117

1 there was one?
2  A. Our office would maintain a file.
3 And there would be a file maintained at the
4 individual distribution center.
5  Q. How did you ensure that the
6 policy we just talked about in Exhibit 1
7 reflected on page 46179 was followed at the
8 distribution centers?
9     MS. McENROE: Objection to form.
10     THE WITNESS: The distribution
11     center has constant monitoring. They
12     have audits completed by our internal
13     audit group and by asset protection, and
14     by logistics and transportation, where
15     there are individual groups that go into
16     each of the distribution centers once a
17     year on behalf of Rite Aid and have a
18     checklist of compliance to review at the
19     distribution centers.
20     So there is a review done to make
21     sure that the processes are being
22     followed related to suspicious orders,
23     security. All of the policies and
24     procedures are reviewed and there is a

Page 170

▪ ███████████████████████████
▪ ███████████████████████████
▪ ███████████████████████████.

 4  BY MR. POWERS:
 5      Q.   Did you make a record of those
 6  communications at all?
 7      A.   If I did, it would be in email.
 8  Typically it may be a phone call.
 9      Q.   So besides an email, there was
10  no -- there was no log of these communications
11  that you would have had with the distribution --
12  or, excuse me -- with the individual pharmacy
13  managers about particular stores that you had
14  questions about from the threshold log; is that
15  right?
16      A.   Pharmacy district managers.  And
17  that is right.
18      Q.   Do you ever recall noticing
19  abnormalities of stores consistently ordering
20  hydrocodone products?
21      A.   There could be stores that
22  consistently ordered hydrocodone, of course.
23      Q.   But I'm saying in this process
24  we've just talked about, where you contact the

Page 171

 1  pharmacy district manager as a result of the
 2  threshold log, do you specifically recall any
 3  instances where you contacted the pharmacy
 4  district manager as a result of hydrocodone
 5  orders?
 6      A.   I don't remember specific to
 7  hydrocodone.
 8      Q.   How about specific to any opioid
 9  product that Rite Aid distributed?
10          MS. McENROE:  Objection to form.
11          THE WITNESS:  I do not.
12  BY MR. POWERS:
13      Q.   Did you use these threshold logs
14  that you were reviewing quarterly to determine
15  whether particular orders were suspicious orders?
16      A.   I did not.
17      Q.   Do you know if Chris Belli and
18  Kevin Mitchell used these logs to determine if
19  orders were suspicious orders?
20          MS. McENROE:  Objection to form.
21          THE WITNESS:  I do not.
22  BY MR. POWERS:
23      Q.   To be clear, when you got these
24  threshold logs, these orders reflected in the

Page 172

 1  threshold logs had already been shipped.
 2  Correct?
 3      A.   Yes.
 4      Q.   I'm going to hand you what's been
 5  marked as Rite Aid Exhibit Number -- or Rite
 6  Aid_Hart Exhibit Number 6.  It's a multi-page
 7  document with the Bates number
 8  Rite_Aid_OMDL_46227 through 46319.  It's a pretty
 9  long document.  I'm just going to ask you
10  questions about the first page.
11          MS. McENROE:  And, Will, do
12      you -- can you reference this is a
13      complete document?
14          MR. POWERS:  I believe, once
15      again, it's the range that was identified
16      in the interrogatory responses.
17          - - -
18          (Deposition Exhibit No. Rite
19      Aid-Hart-6, Rite Aid Controlled Drug
20      Reporting Above Average Controlled Drug
21      Purchases Report, Bates stamped
22      Rite_Aid_OMDL_0046227 through
23      Rite_Aid_OMDL_0046319, was marked for
24      identification.)

Page 173

 1          - - -
 2          THE WITNESS:  (Reviewing
 3      document.)
 4  BY MR. POWERS:



Page 186

```
 9    Q.    And why did you send this to
10  Maggie Perritt?
11        Am I pronouncing her name
12  correctly?
13    A.    Yeah, you're pronouncing it
14  correctly.
15    Q.    Why did you send this email about
16  suspicious order monitoring to Maggie Perritt?
17    A.    Maggie Perritt was in pharmacy
18  operations and was knowledgeable of the
19  suspicious order monitoring algorithm and how the
20  system worked.
21    Q.    When you say "suspicious order
22  monitoring algorithm," what are you referring to?
23    A.    The algorithm for placing the
24  store's order through the -- looking at the 13
```

Page 187

```
 1  weeks and then going a certain percentage above
 2  to place the order.
 3    Q.    Is that also the auto
 4  replenishment system that we talked about before?
 5    A.    Yes.
 6    Q.    Why are you referring to it as a
 7  suspicious order monitoring system?
 8        MS. McENROE:  Objection, form.
 9        THE WITNESS:  In this one, since
10     it's under suspicious monitoring, that's
11     why I was referring to that, is that --
12     because that was the title of this
13     particular meeting and she was bringing
14     that aspect of it into it.
15  BY MR. POWERS:
16    Q.    So Maggie Perritt was the expert
17  on the auto replenishment system that was invited
18  to the suspicious order monitoring meeting; is
19  that right?
20        MS. McENROE:  Objection to form.
21        THE WITNESS:  From the pharmacy
22     operations side, yes.
23  BY MR. POWERS:
24    Q.    And then we talked about Kevin
```

Page 188

```
 1  Mitchell.
 2    Q.    Who was Andrew Palmer?
 3    A.    Andrew Palmer was a director in
 4  asset protection at the time, I believe.
 5    Q.    Why did you invite him to this
 6  meeting about suspicious order monitoring?
 7    A.    Because he was also key as part
 8  of it as well.  Him and his team were involved
 9  with the analytics related to asset protection
10  and the analytics related to the key performance
11  indicators that were looked at from the asset
12  protection side.
13    Q.    How did you use the -- let me
14  back up.
15        Did you use the asset protection
16  analytics to determine whether orders were
17  suspicious or not?
18        MS. McENROE:  Objection to form.
19        THE WITNESS:  We used the asset
20     protection analytics to review orders and
21     look for abnormalities.  We did not use
22     the analytics from asset protection prior
23     to an order being shipped.
24  BY MR. POWERS:
```

Page 189