EXHIBIT 420

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF OHIO
 3                 EASTERN DIVISION
 4                    -  -  -
 5    IN RE:  NATIONAL     :  MDL NO. 2804
      PRESCRIPTION OPIATE :
 6    LITIGATION          :
      -----------------------------------------
 7                        :  CASE NO.
      THIS DOCUMENT       :  1:17-MD-2804
 8    RELATES TO ALL CASES:
                          :  Hon. Dan A.
 9                        :  Polster
10                    -  -  -
             Friday, January 4, 2019
11                    -  -  -
12    HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW
13
                      -  -  -
14
               Videotaped deposition of
15    DEBRA CHASE, taken pursuant to notice,
      was held at the law offices of Morgan
16    Lewis & Bockius, 1111 Pennsylvania
      Avenue, NW Washington, DC 20004,
17    beginning at 10:17 a.m., on the above
      date, before Amanda Dee Maslynsky-Miller,
18    a Certified Realtime Reporter.
19                    -  -  -
20
21
22
            GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

---

Page 2

1  APPEARANCES:
2
3  BARON & BUDD, P.C.
   BY: WILLIAM POWERS, ESQUIRE
4     EMMA KABOLL, PARALEGAL
   600 New Hampshire Avenue NW
5  Suite 10A
   Washington, DC 20037
6  Wpowers@baronbudd.com
   Representing the Plaintiffs
7
8  MORGAN, LEWIS & BOCKIUS LLP
   BY: JOHN P. LAVELLE, JR., ESQUIRE
9  1701 Market Street
   Philadelphia, Pennsylvania 19103
10 (215) 963-4824
   John.lavelle@morganlewis.com
11
   - and -
12
   BY: JOHN M. MALOY, ESQUIRE
13 101 Park Avenue
   New York, New York 10178
14 (212) 309-6682
   John.maloy@morganlewis.com
15 Representing the Defendant,
   Rite Aid Corporation
16
17
   COVINGTON & BURLING LLP
18 BY: ALISON DICURCIO, LAW CLERK
   One CityCenter
19 850 Tenth Street, NW
   Washington, DC 20001
20 (202) 662-6000
   Adicurcio@cov.com
21 Representing the Defendant,
   McKesson Corporation
22
23
24

---

Page 3

1  APPEARANCES: (Continued)
2
   VIA TELEPHONE/LIVESTREAM:
3
4  ARNOLD & PORTER KAYE SCHOLER LLP
   BY: ZENO HOUSTON, ESQUIRE
5  250 West 55th Street
   New York, New York 10019
6  (212) 836-8000
   Zeno.houston@arnoldporter.com
7  Representing the Defendant,
   Endo Pharmaceuticals, Endo Health,
8  and Par Pharmaceuticals
9
10
   REED SMITH, LLP
11 BY: LUKE PORTER, ESQUIRE
   101 Second Street
12 Suite 1800
   San Francisco, California 94105
13 (415) 543-8700
   Representing the Defendant,
14 AmerisourceBergen Corporation
15
16 JONES DAY
   BY: PATRICK J. BEISELL, ESQUIRE
17 77 West Wacker
   Chicago, Illinois 60601
18 (312) 782-3939
   Pbeisell@jonesday.com
19 Representing the Defendant,
   Walmart
20
21
   ALSO PRESENT:
22 Daniel Holmstock, Videographer
23
24

---

Page 4

1          - - -
2        I N D E X
3          - - -
4
   Testimony of: DEBRA CHASE
5
      By Mr. Powers          7
6
7
8          - - -
9        E X H I B I T S
10         - - -
11 NO.      DESCRIPTION          PAGE
12 RiteAid-Chase
   Exhibit-1  Rite_Aid_OMDL_0016495-498  40
13
   RiteAid-Chase
14 Exhibit-2  Rite_Aid_OMDL_0016297-329  85
15 RiteAid-Chase
   Exhibit-3  Rite_Aid_OMDL_0012503-505  104
16
17 Exhibit-4  Rite_Aid_OMDL_0049994-50031 112
18 RiteAid-Chase
   Exhibit-5  Rite_Aid_OMDL_0016955-956  115
19
20 Exhibit-6  Rite_Aid_OMDL_0003641      129
21 RiteAid-Chase
   Exhibit-7  Rite_Aid_OMDL_0014379-452  149
22
23
24

---

Page 5

1          - - -
2  DEPOSITION SUPPORT INDEX
3          - - -
4
5  Direction to Witness Not to Answer
6  Page Line   Page Line   Page Line
7  None
8
9
10 Request for Production of Documents
11 Page Line   Page Line   Page Line
12 None
13
14
15 Stipulations
16 Page Line   Page Line   Page Line
17 6   1
18
19
20 Question Marked
21 Page Line   Page Line   Page Line
22 None
23
24

---

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1              - - -
2           (It is hereby stipulated and
3      agreed by and among counsel that
4      sealing, filing and certification
5      are waived; and that all
6      objections, except as to the form
7      of the question, will be reserved
8      until the time of trial.)
9              - - -
10          VIDEO TECHNICIAN:  We are
11     now on the record.  My name is
12     Daniel Holmstock.  I'm the
13     videographer for Golkow Litigation
14     Services.  Today's date is January
15     4th, 2019.  The time on the video
16     screen is 10:17 a.m.
17          This video deposition is
18     being held at the law offices of
19     Morgan Lewis, at 1111 Pennsylvania
20     Avenue, Northwest, in Washington,
21     D.C. in the matter of In Re
22     National Prescription Opiate
23     Litigation.
24          The case is pending before

Page 7

1      the United States District Court
2      for the Northern District of Ohio,
3      Eastern Division.  The deponent is
4      Debra Chase.  Counsel will be
5      noted on the stenographic record
6      for appearances.  The court
7      reporter is Amanda Miller, who
8      will now administer the oath.
9              - - -
10          DEBRA CHASE, after having
11     been duly sworn, was examined and
12     testified as follows:
13              - - -
14          EXAMINATION
15              - - -
16     BY MR. POWERS:
17     Q.    Good morning, Ms. Chase.
18     A.    Good morning.
19     Q.    My name is Will Powers, and
20     I represent the plaintiffs in this
21     litigation.
22          Before we get going, can you
23     please state your full name and spell it
24     for the record?

Page 8

1      A.    Yes.  Debra Ann Chase.
2      Q.    Can you spell it, please?
3      A.    D-E-B-R-A, A-N-N, C-H-A-S-E.
4      Q.    And we've got a couple of
5      people listening on the phone and in the
6      room, so I'd ask you to just keep your
7      voice up, so everyone can hear.
8           Is that all right?
9      A.    Uh-huh.
10     Q.    And that -- your answer
11     there leads me into one of my further
12     instructions.
13          Because we do have a court
14     reporter taking down the testimony here
15     today, I just ask that all of your
16     answers that you give are verbal answers,
17     a yes or no, something like that, as
18     opposed to nods of the head, uh-huhs,
19     uh-uh, things like that.
20          Is that all right?
21     A.    Okay.
22     Q.    If, for any reason, you
23     don't understand a question I'm asking
24     today or require any sort of

Page 9

1      clarification, explanation of the words
2      I'm using or anything like that, you have
3      to tell me and we'll get that matter
4      resolved before you answer the question.
5           Is that okay?
6      A.    Yes.
7      Q.    So, then, if you answer a
8      question, I'm going to go ahead and
9      assume that you understand it.
10          Is that okay?
11     A.    Yes.
12     Q.    Are you currently suffering
13     from any medical disease or illness that
14     in any way interferes with your ability
15     to answer truthfully and completely my
16     questions here today?
17     A.    No.
18     Q.    Do you understand that the
19     court reporter has sworn you in and
20     you're under oath here just as you would
21     be in a courtroom at trial?
22     A.    Yes.
23     Q.    And because you're under
24     oath, if you lie or provide an

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1 intentionally misleading answer, you may
2 be subject to criminal or civil
3 penalties.
4         Do you understand that?
5     A.   Yes.
6     Q.   And as we go today, we can
7 take breaks if you need them, but I just
8 ask that if there's a question pending,
9 that you answer the question pending
10 before we take the break.
11        Is that all right?
12    A.   Yes.
13        MR. LAVELLE:  The witness
14 will consult with -- I reserve the
15 right to consult with counsel if
16 there's a privilege issue.
17 BY MR. POWERS:
18    Q.   That gets to my next
19 instruction.
20        Your counsel, from time to
21 time, may object to my questions.  But
22 I'm still entitled to an answer, unless
23 your counsel specifically instructs you
24 not to answer.

Page 11

1         Do you understand that?
2     A.   Yes.
3     Q.   Okay, Ms. Chase, I want to
4 start by going over your educational
5 background.
6         Did you ever complete high
7 school?
8     A.   Yes.
9     Q.   Where did you go to high
10 school?
11    A.   Parkdale High in Riverdale,
12 Maryland.
13    Q.   And when did you graduate?
14    A.   1983.
15    Q.   Do you have any education
16 beyond high school?
17    A.   I have some college.
18    Q.   Where did you do your "some
19 college"?
20    A.   Harford Community College.
21    Q.   And when was that?
22    A.   In between '84, '86 -- 1984,
23 1986.
24    Q.   Did you ever receive a

Page 12

1 degree from college?
2     A.   I did not.
3     Q.   Do you have any other
4 education beyond high school, besides the
5 classes you took at Harford Community
6 College?
7         MR. LAVELLE:  Object to
8 form.
9         THE WITNESS:  Could you
10 repeat that again?
11 BY MR. POWERS:
12    Q.   Any education -- did you
13 have any education beyond high school,
14 besides the -- some community college at
15 Harford Community College?
16        MR. LAVELLE:  Same
17 objection.
18        THE WITNESS:  I've had some
19 other education through the
20 military.
21 BY MR. POWERS:
22    Q.   What is the nature of that
23 education?
24    A.   I'm sorry?

Page 13

1     Q.   What is the nature of that
2 education?
3     A.   It pertained to the job that
4 I had in the military.
5     Q.   Let me back up here.
6         When were you in the
7 military?
8     A.   From 1983 to 1992.
9     Q.   And what branch of the
10 military were you in?
11    A.   I was in the Army.
12    Q.   During that time period when
13 you were in the military, where were you
14 located?
15    A.   Starting from the beginning
16 or --
17    Q.   Sure.
18    A.   I was -- started in the
19 Army.  I went to Fort Jackson for basic
20 training.  And then I went to Fort
21 Benjamin, Harrison, Indiana for my
22 advanced training.
23        And after that, I was
24 stationed at Aberdeen Proving Ground.

Page 14

1 And then I went to Augsburg, Germany, and
2 back to Aberdeen Proving Ground. And my
3 last station was in Kaiserslautern,
4 Germany.
5     Q.   And you mentioned that you
6 got some education while you were in the
7 Army.
8         What was the education you
9 got while you were in the Army?
10    A.   All the education I got was
11 pertaining to the particular job that I
12 had.
13    Q.   What was the particular job
14 you had?
15    A.   It was called personnel
16 information systems.
17    Q.   And what -- can you describe
18 what personnel information systems was?
19    A.   It actually entailed quite a
20 few things. Mainly, like, data entry
21 information.
22    Q.   Then you said you left the
23 military in 1992, right?
24    A.   Correct.

Page 15

1     Q.   Where -- what did you do
2 after you left the military in 1992?
3     A.   So forgive me, that kind of
4 goes back to the education.
5         I did go to school again and
6 took a couple of classes at Harford
7 Community.
8         But then I was employed by
9 Northeast Foods in Baltimore.
10    Q.   And what did you do for
11 Northeast Foods?
12    A.   I was a payroll clerk and
13 data entry clerk.
14    Q.   When did you first start
15 working at Rite Aid?
16    A.   In 1998.
17    Q.   Between '92 and '98, when
18 you first started working at Rite Aid,
19 did you work anywhere else besides
20 Northeast Foods?
21    A.   Not full time. I had
22 part-time jobs.
23    Q.   Was your job with Northeast
24 Foods a full-time job?

Page 16

1     A.   Yes.
2     Q.   What were the part-time jobs
3 you had in addition to your full-time job
4 at Northeast Foods during the time period
5 of '92 to '98?
6     A.   I worked for Rite Aid
7 pharmacy, the store, for a brief period.
8         And what else?
9         I worked for Riley Mortgage
10 Company part time in Columbia, Maryland
11 as well.
12    Q.   The Rite Aid store you
13 worked at part time before 1998, what
14 were you doing at the store?
15    A.   I was a cashier.
16    Q.   Was cashier your only job
17 you had, before joining Rite Aid full
18 time in '98, at Rite Aid?
19    A.   Yes.
20    Q.   When you first started
21 working at Rite Aid in 1998, what was the
22 position that you had?
23    A.   When I first started, I was
24 hired as the order fulfillment partner.

Page 17

1     Q.   And where were you working
2 at that time as an order fulfillment
3 partner?
4     A.   In the Rx area, pharmacy
5 area.
6     Q.   When you say "the Rx area,"
7 are you referring to a physical area or a
8 topic area?
9         MR. LAVELLE: Object to
10 form.
11        THE WITNESS: I'm sorry?
12 BY MR. POWERS:
13    Q.   You said that you worked in
14 the Rx area.
15        Are you talking about a
16 physical area or, like, a topic area?
17    A.   It was --
18        MR. LAVELLE: Object to
19 form.
20        THE WITNESS: It was the
21 department.
22 BY MR. POWERS:
23    Q.   Where were you physically
24 located when you started working at Rite

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  Aid in '98 as an order fulfillment
2  partner?
3      A.  In the Rx department.
4      Q.  But was that in Maryland?
5  Was that --
6      A.  I'm sorry.
7          Yes, in --
8          MR. LAVELLE:  Object to
9  form.
10         Please let the attorney
11  finish his question before you
12  start answering.
13         THE WITNESS:  I'm sorry.
14  Could you repeat that,
15  please?
16  BY MR. POWERS:
17     Q.  Sure.
18         In 1998 when you started
19  working at Rite Aid full time, where,
20  physically, was the office you were
21  working at?
22     A.  That was in Aberdeen --
23  Perryman, Maryland.
24     Q.  And is that the distribution

Page 19

1  center Rite Aid has in Perryman,
2  Maryland?
3      A.  Yes.
4      Q.  What were your job
5  responsibilities as an order fulfillment
6  partner in -- starting in 1998?
7      A.  I started off in the Rx
8  department, and I was responsible for
9  running the A-frames.
10     Q.  What are the A-frames?
11     A.  A-frames was a machine that
12  was set up to dispense -- to dispense the
13  product into the totes for the stores.
14     Q.  How long were you an order
15  fulfillment partner?
16     A.  As long as you're there, you
17  actually are an order fulfillment partner
18  the whole time, so --
19     Q.  Are you still with Rite Aid
20  today?
21     A.  Yes, I am.
22     Q.  So are you still an order
23  fulfillment partner today?
24     A.  My title is considered an

Page 20

1  order fulfillment partner, yes.
2      Q.  When you started in 1998,
3  did you have any other titles besides
4  order fulfillment partner?
5      A.  At that time, no.
6      Q.  So you testified that your
7  first responsibilities were working with
8  the A-frames.
9          Did you ever switch
10  responsibilities or change
11  responsibilities during your -- after you
12  started in 1998 at Rite Aid?
13         MR. LAVELLE:  Object to
14  form.
15         THE WITNESS:  Yes, I did.
16  BY MR. POWERS:
17     Q.  When was that?  When was the
18  first time that happened?
19     A.  Approximately six months to
20  a year, I switched to another position.
21     Q.  So that would have been some
22  time in 1999, probably, then?
23     A.  Approximately.  I'm not
24  exactly sure.

Page 21

1      Q.  And what was the position
2  you switched into?
3      A.  At that time, I was moved
4  into the Rx control cage.
5      Q.  And what is the Rx control
6  cage?
7      A.  The Rx control cage is the
8  area where controlled drugs were held.
9      Q.  And that's also at the
10  Perryman distribution center in Aberdeen?
11     A.  Yes.
12     Q.  Did your title change when
13  you were moved into the Rx control cage?
14     A.  The added title was control
15  cage partner.
16     Q.  And how long were you a
17  control cage partner for?
18     A.  The -- up until currently,
19  now.
20     Q.  And what are the job
21  responsibilities of a control cage
22  partner at the Aberdeen facility?
23     A.  It included several
24  different jobs within that cage, and that

1 consisted of a paperwork person or a
2 picker or a receiver or a replenisher.
3      Q.   Anything else besides a
4 paperwork person, picker, receiver or
5 replenisher?
6      A.   Not as an actual control
7 cage associate, no.
8      Q.   And just so we're clear,
9 when you -- when we talk about the
10 control cage, is that the area within the
11 distribution center that the controlled
12 substances are held?
13      A.   Yes.
14      Q.   So you mentioned four
15 responsibilities of the control cage
16 partner.
17          The first one you mentioned
18 was paperwork person.
19          Can you describe what you
20 mean by that?
21      A.   The paperwork person was
22 responsible for recording the tote
23 numbers and store numbers onto a log for
24 the totes that were picked for the

1 stores.
2      Q.   Did the log have a name?
3      A.   Yes, it has a name.  Right
4 now it kind of slips my mind.
5      Q.   Okay.  Any other
6 responsibilities of the paperwork person?
7      A.   After they log the
8 information onto the sheet, then they
9 would palletize the totes after they were
10 strapped and tied, according to that log.
11      Q.   Anything else?
12      A.   And run reports.
13      Q.   What kind of reports did the
14 paperwork control cage partner run?
15      A.   The pick list that listed
16 the -- all the drugs that the store was
17 supposed to get on that paper.
18      Q.   So the pick list was a list
19 of all the drugs that any particular Rite
20 Aid store was supposed to get in a
21 shipment?
22      A.   On that particular order,
23 yes.
24      Q.   On that particular order,

1 okay.
2          Any other kind of reports
3 that the paperwork control cage partner
4 ran besides the pick list?
5          MR. LAVELLE:  Object to
6      form.
7          THE WITNESS:  Yes, they did.
8 BY MR. POWERS:
9      Q.   What were those reports?
10      A.   They were -- what did we
11 call them?  Sorry, right now it just kind
12 of slipped my mind, the actual name of
13 it.
14      Q.   Can you describe it?
15      A.   It was a list of the -- all
16 the stores that printed for a wave, what
17 they called a wave.
18      Q.   What is a wave?
19      A.   The wave is set up by
20 transportation, and all the stores that
21 would be picked in that one area -- in
22 that one section, shall I say.
23          I'm sorry, and going back to
24 the other question you asked me, what was

1 the name of the -- it was actually called
2 a tote list.  The --
3      Q.   So the wave you're talking
4 about, is that like a wave of shipments
5 that would go out to a particular set of
6 stores, or is that a wave inside the
7 distribution center itself?
8          MR. LAVELLE:  Object to
9      form.
10          THE WITNESS:  I'm sorry,
11      could you ask that again?
12 BY MR. POWERS:
13      Q.   Sure.
14          You described a wave before
15 when you were talking about the pick
16 list.
17          Can you describe what the
18 wave means when you say "wave"?
19          MR. LAVELLE:  Object to
20      form.
21          THE WITNESS:  Each wave had
22      the stores set up the way
23      transportation had them to be
24      picked.

Highly Confidential - Subject to Further Confidentiality Review

Page 26

BY MR. POWERS:

Q.   When -- you're saying "transportation," so does that have to do with the shipping of the orders to the stores?

A.   I'm not quite sure how they set it up.  But each wave had a separate number to it so you knew which tote, so which stores, went together.

Like, if there was a wave 10, you knew not to put a store from wave 20 on that pallet.

Q.   So the waves would have numbers and those numbers would correspond to a particular group of stores that were being shipped to?

A.   Correct.

MR. POWERS:  We need to go off the record for a second.

VIDEO TECHNICIAN:  The time is 10:36 a.m.  We are going off the record.

- - -

(Whereupon, a brief recess

Page 27

was taken.)

- - -

VIDEO TECHNICIAN:  The time is 10:44 a.m.  And we're back on the record.

BY MR. POWERS:

Q.   Before we took the break, Ms. Chase, we were talking about the duties of a control cage partner.

Before I go further into that, were the control cage partners ever called control cage clerks?

A.   That was a different position.

Q.   Okay.  The control cage clerk is a different position than control cage partner?

A.   Yes.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 34

5    Q.    When were you a control cage
6  associate?
7    A.    The whole time I was there I
8  was considered a control cage associate.
9    Q.    Is control cage associate
10 the same thing as control cage partner,
11 then?
12   A.    Yes.
13   Q.    When did you become a
14 control cage clerk?
15   A.    I can't remember the actual
16 date.
17   Q.    Can you give me an
18 approximate date?
19   A.    I'm not for sure.  I would
20 say within about a year after working
21 there.
22   Q.    So some time before 2000?
23   A.    Yes.
24   Q.    How long were you a control

Page 35

1  cage clerk for?
2    A.    That, I don't remember the
3  exact date either.
4    Q.    Are you still a control cage
5  clerk?
6    A.    I am not.
7    Q.    What is your current
8  position?
9    A.    My current position is a
10 control cage associate.
11   Q.    Did you have any other
12 positions besides control cage associate
13 or control cage clerk?
14   A.    Yes.
15   Q.    What were those positions?
16   A.    After the control cage
17 clerk, I became the DEA coordinator.
18   Q.    Do you know when you became
19 the DEA coordinator?
20   A.    I'm sorry?
21   Q.    When did you become the DEA
22 coordinator?
23   A.    I don't remember the exact
24 dates.  Approximately 2002.

Page 36

1    Q.    Do you know how long you
2  were a DEA coordinator for?
3    A.    Approximately five years.
4    Q.    So you were a DEA
5  coordinator from about 2002 to about
6  2007; is that right?
7    A.    Yes.
8    Q.    And after you stopped being
9  the DEA coordinator, what was your
10 position?
11   A.    I went back to the DEA
12 clerk.
13   Q.    When you say you went back
14 to DEA clerk, were you ever a DEA clerk
15 before?
16   A.    Yes.  I was a DEA clerk
17 before I became a coordinator.
18   Q.    So is control cage clerk the
19 same as DEA clerk?
20   A.    I'm sorry.  Yes, it is.
21   Q.    I'm just trying to get a
22 handle on the different titles.
23   A.    Yes, I apologize.
24       When we say it, it is sort

Page 37

1  of interchangeable.
2    Q.    So after being DEA
3  coordinator, you went back to being a DEA
4  clerk.
5       How long did you remain a
6  DEA clerk after approximately 2007?
7    A.    I can't quite remember.  I
8  believe it was less than a year, because
9  they changed the position -- they kind of
10 got rid of the position as the clerk.
11   Q.    Did you transition to a new
12 position at that point when they got rid
13 of the DEA clerk position?
14   A.    Yes.  Then I became the
15 control cage lead.
16   Q.    And how long were you a
17 control cage lead?
18   A.    Up until currently -- I'm
19 sorry, excuse me, until 2014.
20   Q.    And then after 2014, what
21 was your position?
22   A.    Then I just pretty much
23 became the DEA associate again, or
24 partner.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1　　　Q.　And that -- is that what you
2　referred to earlier as the control cage
3　associate?
4　　　A.　Correct.
5　　　Q.　Okay.  I want to go back to
6　the control cage clerk before you became
7　DEA coordinator.
8　　　　　What were your job
9　responsibilities in that position?
10　　　A.　If I remember, most of the
11　responsibilities were to monitor the
12　billing report and different
13　correspondences with other people within
14　the building, and helping out in the
15　control cage with whatever was needed
16　from the other associates, and assisting
17　the DEA clerk with whatever -- I mean, a
18　DEA coordinator with whatever she needed.
19　　　Q.　Who was the DEA coordinator?
20　　　A.　At the time --
21　　　MR. LAVELLE:  Object to
22　form.
23　BY MR. POWERS:
24　　　Q.　Yeah.  At the time you were

Page 39

1　a control cage clerk, before becoming a
2　DEA coordinator.
3　　　A.　I'm sorry, if you could just
4　repeat that.
5　　　Q.　Sure.
6　　　　　So you said one of your job
7　responsibilities as a control cage clerk,
8　when you were in that position before you
9　became a DEA coordinator in approximately
10　2002 was to assist the DEA coordinator,
11　right?
12　　　A.　Correct.
13　　　Q.　Who was the DEA coordinator
14　you were assisting?
15　　　A.　That was Marian Wood.
16　　　Q.　Do you know how long Ms.
17　Wood has been in that position as DEA
18　coordinator?
19　　　MR. LAVELLE:  Object to
20　form.
21　　　THE WITNESS:  No.
22　BY MR. POWERS:
23　　　Q.　Has she been the DEA
24　coordinator at the Aberdeen facility your

Page 40

1　entire time there?
2　　　A.　No.
3　　　Q.　When you moved on to the
4　position of DEA coordinator in around
5　2002, what were your job responsibilities
6　there?
7　　　A.　My main responsibilities
8　were to make sure that the associates in
9　the cage were adhering to different
10　procedures and policies within the cage
11　and to maintain the inventory, and it
12　included correspondence with DEA agents
13　and Board of Pharmacy agents, and other
14　clerical things.
15　　　　　- - -
16　　　　　(Whereupon, Exhibit
17　　　RiteAid-Chase Exhibit-1,
18　　　Rite_Aid_OMDL_0016495-498, was
19　　　marked for identification.)
20　　　　　- - -
21　　　MR. POWERS:  I'll hand you
22　what I marked as Exhibit-1.  For
23　the record it's Bates stamped
24　Rite_Aid_OMDL_0016495.  And it's

Page 41

1　　　an e-mail with the included
2　　　attachments.
3　BY MR. POWERS:
4　　　Q.　Just take a second and look
5　over the e-mail, and just let me know
6　when you've had a chance to review it.
7　　　MR. LAVELLE:  Are you using
8　any prefix for the exhibit?  Are
9　you just calling it Exhibit-1?
10　　　MR. POWERS:  I'll just refer
11　to it as Exhibit-1.
12　　　MR. LAVELLE:  Okay.
13　　　MR. POWERS:  I think on the
14　stickers it says Chase as the
15　witness.
16　　　MR. LAVELLE:  So it's
17　Chase-1.  Thank you.
18　BY MR. POWERS:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 46

Page 48

1    A.    Yes.
2    Q.    Did she work out of the
3 Perryman distribution center?
4    A.    Yes.

Page 47

Page 49

20    Q.    And the corporate office is
21 where?
22    A.    In Harrisburg, Pa.
23    Q.    And Marian Wood was located
24 in Maryland?

Highly Confidential - Subject to Further Confidentiality Review



Page 50

Page 52

Page 51

Page 53

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 66

Page 67

Page 68

Page 69

16    Q.    Are you familiar with the
17  term "diversion" in the context of
18  controlled substances?
19    A.    Yes.
20    Q.    What does diversion mean, in
21  your own words?
22    A.    In my own words, diversion
23  means something that is taken and used
24  for other than what is the purpose.

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    MR. LAVELLE:  Counsel, are
2  you finished with Chase-1?
3    MR. POWERS:  Yes.
4    MR. LAVELLE:  I'll give it
5  to the court reporter.  She needs
6  to keep all the exhibits.
7    Thank you.
8  BY MR. POWERS:
9    Q.   Does Rite Aid have an
10 obligation to prevent diversion?
11   A.   Yes.
12   MR. LAVELLE:  Object to
13 form.
14 BY MR. POWERS:
15   Q.   Why does Rite Aid have an
16 obligation to prevent diversion?
17   MR. LAVELLE:  Object to
18 form.
19   THE WITNESS:  Could you
20 repeat that?  I'm sorry.
21 BY MR. POWERS:
22   Q.   Why does Rite Aid have an
23 obligation to prevent diversion?
24   MR. LAVELLE:  Object to

Page 71

1  form.
2    THE WITNESS:  As a
3  distributor, they would have an
4  obligation to make sure their
5  items aren't going other than
6  where they're supposed to go.
7  BY MR. POWERS:
8    Q.   Any other reason besides by
9  virtue of being a distributor?
10   MR. LAVELLE:  Same
11 objection.
12   THE WITNESS:  Not that I can
13 necessarily think of right now.
14 BY MR. POWERS:
15   Q.   Are you familiar with the
16 concept -- are you familiar with the
17 concept of a suspicious order in the
18 context of controlled substance
19 distribution?
20   A.   Yes.
21   Q.   What does that mean to you?
22   A.   To me, that means that
23 there's an order that we have a question
24 about, that is possibly not what it

Page 72

1  should be.
2    Q.   When you say "we," in an
3  order that we have a question about, do
4  you mean Rite Aid?
5    A.   Yes.  In the context of who
6  was working with me.
7    Q.   And you said that it's an
8  order that is possibly not what it should
9  be.
10   What do you mean by that?
11   A.   As in if we thought
12 something was going to happen to -- other
13 than what was supposed to, other than
14 going to the pharmacist, or if we thought
15 something was happening with it.
16   Q.   We talked a little bit
17 before about sort of how the operations
18 worked at the DC, and I want to just get
19 clarity on a couple of points.
20   The Rite Aid distribution
21 centers only distributes to Rite Aid
22 stores, correct?
23   A.   Yes.
24   Q.   And the Rite Aid

Page 73

1  distribution centers only distributed
2  controlled substances up until 2014,
3  right?
4    A.   Yes.
5    Q.   How often would orders for
6  controlled substances be received at the
7  distribution center?
8    A.   Like --
9    Q.   Like, would an order come in
10 daily?  Weekly?  Every hour?  How did
11 that work?
12   MR. LAVELLE:  Object to
13 form.
14   THE WITNESS:  Oh, I'm sorry.
15 The orders came -- they came
16 through daily.
17 BY MR. POWERS:
18   Q.   And once the orders came
19 through, what happened next?
20   A.   I was not in a position
21 to -- how can I put it?  The way they
22 came through the building, I didn't have
23 access to that.  That wasn't part of my
24 job.

Page 74

1       I didn't see it until it
2   actually came to the control cage and
3   when they downloaded what we called the
4   wave, as I explained earlier.
5       Q.   So you would see a wave come
6   through.
7       And was that electronic on a
8   computer or was it on a hardcopy
9   document?  How would that come through to
10  you?
11      MR. LAVELLE:  Object to
12  form.
13      THE WITNESS:  Could you
14  repeat it for me, please?
15  BY MR. POWERS:
16      Q.   Sure.
17      So you said that you would
18  get the orders through the waves in the
19  control cage, right?
20      A.   Correct.
21      Q.   How would you receive those
22  waves?  Would it be electronic?
23  Hardcopy?  Verbal?  What?
24      MR. LAVELLE:  Object to

Page 75

1   form.
2       THE WITNESS:  Computer,
3   electronic.
4   BY MR. POWERS:



Highly Confidential - Subject to Further Confidentiality Review



Page 78

Page 80

Page 79

Page 81

Highly Confidential - Subject to Further Confidentiality Review



Page 82

Page 84

8      MR. LAVELLE:  Counsel, we've
9  been going about an hour.  When we
10  get to a convenient spot for a
11  break, I'd like to take one.
12      MR. POWERS:  We can do it
13  right now.  That's fine.
14      VIDEO TECHNICIAN:  The time
15  is 11:43 a.m.  We are going off
16  the record.
17      - - -
18      (Whereupon, a brief recess
19  was taken.)
20      - - -
21      VIDEO TECHNICIAN:  The time
22  is 11:58 a.m.  We are back on the
23  record.
24  BY MR. POWERS:

Page 83

Page 85

1   Q.   Welcome back, Ms. Chase.
2      MR. POWERS:  I'm going to
3  hand you what has been marked as
4  Exhibit-2.  And the beginning
5  Bates on this exhibit is
6  Rite_Aid_OMDL_0016297.
7      And, once again, it's an
8  e-mail with a bunch of attachments
9  that are also included in this
10  exhibit.  It's somewhat lengthy,
11  the number of exhibits on here.
12  I'm going to tell you to take a
13  look at it, but I'm going to tell
14  you that I'm going to direct your
15  attention to a couple particular
16  pages in the exhibit.  So maybe
17  that will help move things along a
18  little quicker.
19      - - -
20      (Whereupon, Exhibit
21  RiteAid-Chase Exhibit-2,
22  Rite_Aid_OMDL_0016297-329, was
23  marked for identification.)
24      - - -

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 90

Page 91

Page 92

Page 93

1    Q.    Were there any orders that
2  were -- that came to the distribution
3  center above the threshold that you did
4  not ship any part of the order?
5    A.    I do recall we had some.  I
6  don't recall specifics, but I have had
7  some.
8    Q.    Do you remember why the
9  orders were not shipped at all?
10    A.    Most of the time, that phone
11  call, the pharmacist would say they
12  didn't understand why they even ordered
13  it, and then they would say we don't need
14  that so you don't have to ship it to us.
15    Q.    Did you ever ask any
16  questions beyond just verifying whether
17  they needed that particular amount?
18        MR. LAVELLE:  Object to
19  form.
20        THE WITNESS:  No.
21  BY MR. POWERS:
22    Q.    Let me be clear.
23        We're talking about when
24  you're calling the pharmacies when they

Highly Confidential - Subject to Further Confidentiality Review



Page 94

1 place orders above threshold, right?
2        MR. LAVELLE:  Object to
3    form.
4 BY MR. POWERS:
5    Q.   So let me ask it this way --
6    A.   Okay.
7    Q.   -- when you called the
8 pharmacists or the pharmacies about
9 orders that came in that were above the
10 threshold, you did not ask any other
11 questions besides whether or not the
12 pharmacy needed that particular amount,
13 right?
14        MR. LAVELLE:  Object to
15    form.
16        THE WITNESS:  I would only
17    ask them if that order was
18    correct.
19 BY MR. POWERS:
20    Q.   Looking at the page in
21 Exhibit-2 that we've been looking at,
22 ending in Bates 16305, in the second full
23 paragraph there, it says, If the store
24 verifies the quantity is correct, the

Highly Confidential - Subject to Further Confidentiality Review



Page 98

Page 100

Page 99

Page 101

Highly Confidential - Subject to Further Confidentiality Review



Page 102

Page 104

6        MR. POWERS:  You can put
7    aside Exhibit-2.
8        MR. LAVELLE:  Let's give
9    this to the court reporter.
10           - - -
11       (Whereupon, Exhibit
12    RiteAid-Chase Exhibit-3,
13    Rite_Aid_OMDL_0012503-505, was
14    marked for identification.)
15           - - -
16       MR. POWERS:  I'm going to
17    hand you what's been marked as
18    Exhibit-3.  It is another e-mail,
19    and the starting Bates number is
20    Rite_Aid_OMDL_0012503.  And the
21    e-mail has an attachment which is
22    included in Exhibit-3.
23       THE WITNESS:  Okay.
24 BY MR. POWERS:

Page 103

Page 105

Highly Confidential - Subject to Further Confidentiality Review



Page 106

Page 108

Page 107

Page 109

Highly Confidential - Subject to Further Confidentiality Review



Page 110

Page 112

6    MR. LAVELLE:  Are you
7  finished with Exhibit-3?
8    MR. POWERS:  Yes, we're
9  finished with that exhibit.
10    - - -
11    (Whereupon, Exhibit
12  RiteAid-Chase Exhibit-4,
13  Rite_Aid_OMDL_0049994-50031, was
14  marked for identification.)
15    - - -
16    MR. POWERS:  I'm going to
17  hand you what's been marked as
18  Exhibit-4.  It's Bates number
19  Rite_Aid_OMDL_0049994.

Page 111

Page 113

Highly Confidential - Subject to Further Confidentiality Review



Page 114

Page 116

Page 115

8    MR. POWERS:  We're done with
9  that one.
10      -  -  -
11      (Whereupon, Exhibit
12  RiteAid-Chase Exhibit-5,
13  Rite_Aid_OMDL_0016955-956, was
14  marked for identification.)
15      -  -  -
16      MR. POWERS:  I'm going to
17  hand you what's been marked as
18  Exhibit-5, which is Bates numbered
19  Rite_Aid_OMDL_0016955.
20  BY MR. POWERS:

Page 117

Highly Confidential - Subject to Further Confidentiality Review



Page 118

Page 120

Page 119

Page 121

Highly Confidential - Subject to Further Confidentiality Review



Page 122

Page 124

Page 123

Page 125

Highly Confidential - Subject to Further Confidentiality Review

Page 126

Page 128

Page 127

Page 129



7       - - -
8           (Whereupon, Exhibit
9       RiteAid-Chase Exhibit-6,
10      Rite_Aid_OMDL_0003641, was marked
11      for identification.)
12          - - -
13          MR. POWERS:  I'm going to
14      hand you what's been marked as
15      Exhibit-6.  This is Bates number
16      Rite_Aid_OMDL_0003641.
17          THE WITNESS:  Okay.
18  BY MR. POWERS:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 134

Page 135

Page 136

Page 137

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 142

Page 144

Page 143

Page 145

Highly Confidential - Subject to Further Confidentiality Review



Page 146

Page 148

5    MR. LAVELLE:  Counsel, it's
6  about five minutes after 1:00.
7    MR. POWERS:  Yes.  I think I
8  may be done, so do you want to
9  take a quick ten-minute break and
10  we may be done for the day.
11    MR. LAVELLE:  That's fine.
12    VIDEO TECHNICIAN:  The time
13  is 1:04 p.m.  We are going off the
14  record.
15    - - -
16    (Whereupon, a brief recess
17  was taken.)
18    - - -
19    VIDEO TECHNICIAN:  The time
20  is 1:17 p.m.  We are back on the
21  record.
22  BY MR. POWERS:
23    Q.  Welcome back, Ms. Chase.
24    I just have a couple of

Page 147

Page 149

1  follow-up questions, and then I think
2  I'll be done.
3    - - -
4    (Whereupon, Exhibit
5  RiteAid-Chase Exhibit-7,
6  Rite_Aid_OMDL_0014379-452, was
7  marked for identification.)
8    - - -

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 154

Page 155

7    MR. POWERS:  That's all I
8  have.
9    MR. LAVELLE:  Any other
10  questions?
11    We have no questions for the
12  witness.  The witness reserves the
13  right to read and sign.
14    VIDEO TECHNICIAN:  The time
15  is 1:23 p.m., January 4th, 2019.
16  Going off the record, completing
17  the videotape deposition.
18      - - -
19    (Whereupon, the deposition
20  concluded at 1:23 p.m.)
21      - - -
22
23
24

Page 156

1    CERTIFICATE
2
3
4    I HEREBY CERTIFY that the
5  witness was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
11    Amanda Maslynsky-Miller
    Certified Realtime Reporter
    Dated:  January 7, 2019
12
13
14
15
16
17    (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)
22
23
24

Page 157

1    INSTRUCTIONS TO WITNESS
2
3    Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8    After doing so, please sign
9  the errata sheet and date it.
10    You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14    It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 158

    - - - - - -
    E R R A T A
    - - - - - -

PAGE  LINE  CHANGE/REASON

Page 160

LAWYER'S NOTES
PAGE  LINE

Page 159

ACKNOWLEDGMENT OF DEPONENT

I,_____, do
hereby certify that I have read the
foregoing pages,  1 - 155, and that the
same is a correct transcription of the
answers given by me to the questions
therein propounded, except for the
corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.

_____
DEBRA CHASE              DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.

My commission expires:_____

_____
Notary Public