# EXHIBIT 429

Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION
 3   IN RE:  NATIONAL          :   MDL No. 2804
     PRESCRIPTION OPIATE       :
 4   LITIGATION                :   Case No. 17-md-2804
                               :
 5   APPLIES TO ALL CASES      :   Judge Dan Aaron Polster
                               :
 6                             :
 7
 8                    HIGHLY CONFIDENTIAL
 9       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
10
11                          - - - -
12                     DECEMBER 13, 2018
13                          - - - -
14      VIDEOTAPED DEPOSITION OF HBC SERVICE COMPANY'S
15           DESIGNATED 30(B)(6) REPRESENTATIVE,
16                      JAMES TSIPAKIS,
17    taken pursuant to notice, was held at Marcus & Shapira,
18    One Oxford Center, 35th Floor, Pittsburgh, Pennsylvania
19    15219, by and before Ann Medis, Registered Professional
20    Reporter and Notary Public in and for the Commonwealth
21    of Pennsylvania, on Thursday, December 13, 2018,
22    commencing at 9:09 a.m.
23                          - - - -
24                  GOLKOW LITIGATION SERVICES
            877.370.3377 phone | 917.591.5672 fax
25                     deps@golkow.com
```

```
 1   those policies describe the actions that should
 2   have taken place in response to each of these
 3   orders popping on this report?
 4        A.   I think they describe components of it
 5   or general expectations of it, but the exact
 6   pieces, I don't know that it would spell out the
 7   exact procedures.
 8        Q.   Is any -- I use the word investigation.
 9   Are these investigations into each of these line
10   items, are they documented?
11        A.   There is different forms of -- some are,
12   yes.
13        Q.   Are all of them documented?
14        A.   I don't know if all of them are
15   documented.
16        Q.   Is there any policy or procedure that
17   requires any Giant Eagle or HBC employee to issue
18   any type of written report or memorandum or even
19   just a note indicating, for example, the first one
20   listed here, that they looked into this order of
21   Oxydo from store 71 and then issued their
22   determination that it is or is not something that
23   needs to be looked at further?
24        Is there any requirement that any type of
25   report like that be generated?
```

1    A.   I haven't found anything that
2    specifically calls out that something needs to be
3    written down or documented or -- certainly there's
4    an expectation to investigate every one.
5         Q.   And I'm not asking you to point me to a
6    piece of paper as we're sitting here right now
7    today, but if I was to ask you can you justify why
8    this order for store 71 of Oxydo, which is a CII,
9    was shipped over threshold and that it wasn't
10   clawed back or it wasn't reported to the DEA,
11   would you have the ability to go and give me an
12   answer to what was done to approve that?
13        A.   Let me make sure I understand your
14   question.  Can you repeat it one more time,
15   please.
16        Q.   Sure.  Essentially, what I'm trying to
17   figure out is whether or not HBC or Giant Eagle
18   maintains any type of due diligence files.
19        For example, this order for store 71 for this
20   controlled II substance pops on this report, if
21   you wanted to go back now two years after the fact
22   and see what did we do to justify and clear that
23   order, is that possible?
24        A.   I don't know.
25        Q.   As you sit here today, is there any

```
 1   requirement or procedure in place to do any
 2   maintaining or logging of any type of due
 3   diligence or investigatory type efforts to clear
 4   or justify orders that were received that may be
 5   over thresholds or may be otherwise indicative of
 6   diversion?
 7        A.   Yes.  Over time more systems were
 8   developed and abilities, yes.
 9        Q.   When did Giant Eagle or HBC put in place
10   a system that required employees to log or
11   maintain files that explained why particular
12   orders were cleared or not cleared?
13        A.   I can say from the diligence I had in
14   early 2017, a system was developed where
15   investigative notes and information could be
16   entered regarding orders that we wanted to look
17   at, orders of interest.
18        Q.   Prior to early 2017, HBC nor Giant Eagle
19   had any system that was dedicated to maintain
20   notes, reports or memos that would explain or
21   justify why particular orders were cleared or not
22   cleared?
23        A.   We didn't have a repository if that's
24   what you're asking.  There were certainly
25   definitive emails to the field, emails to the
```

Highly Confidential - Subject to Further Confidentiality Review

 1   warehouse, things of sorts that clearly show a
 2   diligence of trying to run the ground on why an
 3   order happened or what triggered, sure.
 4       Q.   Can you say that that's the case for
 5   every order that ever popped up on one of these
 6   reports?
 7       A.   I can say after reviewing and talking to
 8   associates involved and folks that do report to
 9   me, that every order that pops up of interest is
10   investigated and either cleared or not.
11       Q.   But you can't tell me as you sit here
12   today whether or not there's any documentation to
13   prove or disprove whether or not any or all of
14   those investigations actually happened?
15       A.   I can tell you that I don't know that I
16   have specific for each line item on -- well, from
17   2017 on, I can tell you we have a repository that
18   was built.  Prior to that, I cannot.
19       Q.   That's probably the easiest way to do
20   this.  Prior to early 2017, Giant Eagle nor HBC
21   had any repository or location, whether it's
22   physical or digital, to maintain any type of due
23   diligence reports or efforts; correct?
24       A.   There was no central repository.
25   Certainly if there was folders or emails or things

Highly Confidential - Subject to Further Confidentiality Review

```
 1   that were kept -- I've seen some of them, so
 2   definitely I know they exist.
 3        Q.   So fair to say that these orders that
 4   popped on these threshold reports that started
 5   coming out back in 2013 would lead Giant Eagle or
 6   HBC to start to do some type of due diligence; is
 7   that correct?
 8        A.   Yes.
 9        Q.   From 2009 until 2013, when HBC was
10   distributing hydrocodone combination products,
11   what would lead to HBC doing any type of due
12   diligence on any of the orders that were received
13   from the stores?
14        A.   Certainly from as moved on, we improved
15   the processes and continued to add capabilities.
16   Your specific timeframe is what again, please?
17        Q.   2009 until the threshold reports started
18   being generated in 2013.
19        A.   So in addition to other controls, one of
20   the mechanisms we would use is the integrated
21   approach I mentioned earlier to disclose
22   suspicious orders to us, which would prompt
23   investigation, similar diligence, no difference in
24   diligence, and running to ground whether an order
25   of interest was suspicious or not.
```

```
 1         Q.   And that integrated approach would
 2   involve the superintendent of the warehouse, the
 3   pickers at the warehouse and the procurement folks
 4   from HBC's side; correct?
 5         A.   And the stores, yes.
 6         Q.   Store is not HBC, is it?
 7         A.   The store is not HBC, but it's all part
 8   of the same company, same system.  It's part of
 9   our system.
10         Q.   But it's HBC who has the responsibility
11   to design and operate a system that detects
12   suspicious orders; correct?
13         A.   Correct.
14         Q.   Can you tell me between -- we can look
15   at that report, and we can -- assuming that in
16   October of 2016 Giant Eagle followed their
17   policies in place, if we estimate that there's 200
18   entries on that report, we could say that there
19   were 200 separate investigations done, due
20   diligence type investigations done in
21   October 2016; would that be fair?
22         A.   I can tell you just by looking at some
23   of them and understanding the report better, we
24   have stores that are filling 6000 prescription as
25   week that are averaged against stores that are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   doing 300 a week.  So obviously, if you're doing
 2   as a chain-wide average, you're going to have a
 3   ton of false positives, which is predominantly a
 4   lot of these orders on these reports.
 5         Q.   Well, isn't that a reason why having a
 6   chain-wide average isn't a very good idea?
 7         A.   Again, it's our attempt to have a system
 8   in place.  We're not just relying on a threshold.
 9   We're relying on a total system of the threshold
10   being one of those controls.
11         Q.   Well, if you're relying on a system that
12   uses an average and you have some stores that do
13   300 scripts a week and some stores that do 6000
14   scripts a week, you would agree with me that
15   average probably isn't very helpful?
16         A.   I would agree with you it's probably
17   flawed and it could be done better, which is why
18   our second version of our threshold system was
19   improved.
20         Q.   How long did Giant Eagle and HBC utilize
21   this flawed version of the threshold report that
22   used a chain-wide average, from 2013 until when?
23         A.   To be clear, I didn't say this report
24   was flawed.  I said the methodology of averages
25   could lead to a false positive, which is what a
```

```
 1    lot of these reports -- lot of these orders on
 2    these reports are.
 3         Q.   How long did Giant Eagle and HBC use
 4    this report?
 5         A.   As I think was established earlier in
 6    testimony, this report started somewhere around
 7    2013.
 8         Q.   I'm sorry.  Until when?  Tell me if I'm
 9    wrong, but I think you said that you no longer use
10    a chain-wide average and now use a store average.
11         A.   Correct.
12         Q.   As we sit here today in 2018.
13         A.   Correct.
14         Q.   When did you stop using the chain-wide
15    average that you indicated is somewhat of a flawed
16    methodology that can produce false positives?
17         A.   It can produce false positives.  Till
18    2017.  We changed, early 2017.
19         Q.   So if we were to look at the life of
20    HBC's and Giant Eagle's threshold program, from
21    2009 to 2013, there was no threshold program.
22    From 2013 to 2017, there was a threshold program
23    based on a chain-wide average.  And from 2017
24    through present, there's a threshold program
25    that's based on individual stores' metrics setting
```

```
 1   the threshold?
 2        A.   Correct.
 3        Q.   From 2009 to 2013, what would cause HBC
 4   to perform a due diligence investigation?  What
 5   about their system, what flags within the system
 6   would cause HBC to perform a due diligence
 7   investigation?
 8             MR. BARNES:  Object to form.  Asked and
 9   answered.
10        Go ahead.
11             THE WITNESS:  So as we established
12   earlier, we know what products are coming into our
13   warehouse, what products are going out to our
14   stores.  Any pattern that would show -- our
15   procurement team as well as the warehouse team, if
16   they saw a spike in orders or a deviation of sorts
17   from that, they would see that, and they would
18   recognize that.
19   BY MR. GADDY:
20        Q.   From 2009 to 2013, are you able to
21   identify for me any orders of hydrocodone
22   combination products that due diligence was ever
23   performed on?
24        A.   I'm sorry.  Ask that once more, please.
25        Q.   From 2009 until 2013, are you able to
```

```
 1   identify for me any orders for hydrocodone
 2   combination products that due diligence was ever
 3   performed on?
 4        A.   I believe there is, but -- when you
 5   say -- so orders, obviously orders were placed
 6   from 2009 to 2013.  I can see emails,
 7   investigative emails going back and forth on
 8   questions on orders or product movement,
 9   et cetera.  So I did see that through my
10   diligence.  I'm sorry.  I'm trying to understand
11   your exact...
12        Q.   I'm trying to determine whether or not
13   from 2009 to 2013 you can identify for me any
14   orders on which due diligence was performed by
15   HBC.
16        A.   I don't know.
17        Q.   Is there a software vendor that HBC or
18   Giant Eagle utilizes for these threshold reports?
19        A.   No.
20        Q.   It's all internal?
21        A.   Yes.
22        Q.   This threshold system that was utilized
23   beginning in 2013, was it developed -- was it
24   developed and designed specifically to monitor for
25   suspicious orders of controlled substances?
```

```
 1      A.   It was developed to continue to improve
 2   our suspicious order monitoring system, not to
 3   replace anything that was done previous.  It was
 4   basically just to continue to improve upon it
 5   using system-generated cues, et cetera.
 6      Q.   We can go back to the document if we
 7   need to, but I'm going back to the regulation, the
 8   1301.74(b), which is the regulation that requires
 9   the registrants to design and operate a system to
10   disclose suspicious orders.
11           Do you recall that regulation also obligates
12   the registrant, in this case HBC, to inform the
13   DEA of suspicious orders when they're discovered?
14      A.   Yes.
15      Q.   And that's the case whether we're
16   talking about Schedule II drugs or whether we're
17   talking about Schedule III drugs; correct?
18      A.   Correct.
19      Q.   Do you understand that the pharmacies
20   are not supposed to receive suspicious orders of
21   drugs?
22           MR. BARNES:  Object to form.
23           THE WITNESS:  Can you clarify?  I don't
24   follow your -- what is your question?
25
```

```
 1   BY MR. GADDY:
 2       Q.   Does HBC agree that orders are not
 3   supposed to be shipped to the pharmacies until
 4   they have been deemed not suspicious?
 5            MR. BARNES:  Object to form.
 6       You can answer.
 7            THE WITNESS:  Again, in our system,
 8   since we have line of sight from the warehouse all
 9   the way out to the dispensing level, our
10   pharmacists are filling prescriptions pursuant to
11   legitimate prescriptions, which then generate
12   orders, and we ship those orders to the
13   pharmacies.
14   BY MR. GADDY:
15       Q.   My question is more about timing of the
16   shipping.  So we looked at some of these threshold
17   or we looked at one of these threshold reports.
18   And the reports indicate on their face that orders
19   of pills that exceeded the threshold were shipped
20   to the stores that were in excess of the
21   threshold.  And you told me that after the reports
22   are generated, they're looked at, and then some
23   level of investigation is done; is that correct?
24       A.   Correct.
25       Q.   You agree with me that any investigation
```

```
 1   that was being done by Giant Eagle or HBC is
 2   happening after the orders have been shipped;
 3   correct?
 4        A.    Perhaps, yes, perhaps.
 5        Q.    Well, that's what the forms indicate;
 6   correct?
 7        A.    Well, some of them -- obviously looking
 8   at some of these -- you mentioned this report is
 9   on the 31st of the month.  So if you look at some
10   of these, as I testified earlier, some of these
11   would have already been cleared and some of them
12   you could already tell that there would be a false
13   positive.
14        So some of them you would have known -- you
15   would have known that -- you would have cleared
16   them early is what I'm trying to say knowing that
17   they were a false positive.
18        Q.    But by the time the procurement folks
19   see this report, the pills have already been
20   shipped; correct?
21        A.    They may have.  The report -- the report
22   generates early in the morning.  Stores don't
23   receive their orders till after they open.  So
24   they would have been shipped, but not received in
25   some cases, in transit.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Break that down for me.  You state the
 2   reports are generated early in the morning.  What
 3   does that mean?
 4        A.   I'm not sure of the exact time, but
 5   certainly before our pharmacies open for business.
 6        Q.   What time do your pharmacies open for
 7   business?
 8        A.   Some open at 9:00.  Some open at
 9   8:00 generally.
10        Q.   Let me just ask it this way.  Did HBC or
11   Giant Eagle have any policy in place that any
12   orders that popped on the threshold report were
13   not shipped until they've been cleared?
14        A.   Not that I could find a policy.
15        Q.   They're still operating under the
16   threshold policy today.  Today are these orders
17   shipped or are they blocked merely because they
18   come up on the report, or are they shipped and
19   then the diligence is performed?
20        A.   So in our experience, having looked at
21   reports having looked at thresholds, we generated
22   very few suspicious orders over the timeframe that
23   we've been operating.  So I guess I'm trying to
24   understand.
25             In our environment, we're able to intercept,
```