EXHIBIT 430

```
 1              IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

 2                    EASTERN DIVISION

 3   IN RE:  NATIONAL      :  MDL No. 2804

     PRESCRIPTION OPIATE   :

 4   LITIGATION            :  Case No. 17-md-2804

                           :

 5   APPLIES TO ALL CASES  :  Judge Dan Aaron Polster

                           :

 6                         :

 7

 8              HIGHLY CONFIDENTIAL

 9      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                    - - - -

12               DECEMBER 13, 2018

13                    - - - -

14   VIDEOTAPED DEPOSITION OF HBC SERVICE COMPANY'S

15          DESIGNATED 30(B)(6) REPRESENTATIVE,

16                 JAMES TSIPAKIS,

17   taken pursuant to notice, was held at Marcus & Shapira,

18   One Oxford Center, 35th Floor, Pittsburgh, Pennsylvania

19   15219, by and before Ann Medis, Registered Professional

20   Reporter and Notary Public in and for the Commonwealth

21   of Pennsylvania, on Thursday, December 13, 2018,

22   commencing at 9:09 a.m.

23                    - - - -

24            GOLKOW LITIGATION SERVICES

        877.370.3377 phone | 917.591.5672 fax

25                deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   It also included I think, as you just

 3   said, noncontrolled substances such as blood

 4   pressure medicine, acne medication, birth control.

 5   All those types of things would be included;

 6   correct?

 7        A.   Yes.

 8        Q.   And all those things are under the

 9   purview of Mr. Durr; correct?

10        A.   Yes.

11        Q.   Are you aware of any data, reports or

12   information that Mr. Durr had available to him to

13   assist him in identifying any patterns of Schedule

14   III drug orders, specifically HCPs, that would

15   have deviated from the norm?

16        A.   Through this process I did not find

17   any -- you keep asking me reports.  I did not find

18   any reports that he'd be looking at.  But, again,

19   as part of this integrated process, he would be

20   working with our operations folks.  The operation

21   folks oversee the stores.  So it's a closed

22   system.  So there's a negative feedback loop

23   within that system.

24        Q.   And I'm not trying to ask a question

25   that I already know the answer to.  I'm just
```

1    trying to be inclusive when I say data, report

2    information --

3        A.    Sure.  And I'm trying to do my best to

4    answer what it is you're looking for.

5        Q.    I understand.  But I didn't want you to

6    get focused on the word reports.  You're not aware

7    of any information, data that Mr. Durr had

8    available to him to assist him with identifying

9    patterns that deviated from the norm?

10       A.    What I'm saying is I don't have -- other

11   than written documents, I don't have -- I'm not

12   privy to the conversations and the pieces and the

13   things that he did as part of running his

14   warehouse.

15       Q.    When you got information from Mr. Durr,

16   he didn't say, I had this report to review or I

17   had this dataset that I got sent to me on a

18   regular basis.  He didn't say anything like that?

19       A.    I didn't read any of that, no.

20       Q.    I'm going to ask you the same questions

21   as it relates to Mr. Carlson and the other folks

22   that would have been in procurement.

23       Are you aware of any data, information,

24   reports that they had available to them to assist

25   them in identifying any patterns of HCPs ordering

1   that would have deviated from the norm?

2       A.   Certainly the folks in corporate would

3   have information on what's being purchased by our

4   stores and certainly feedback from the operations

5   team that oversee these stores.  But through this

6   process, I didn't have any specific reports or

7   documented -- I go back to reports because we're

8   not privy to the conversations and to how they did

9   their job or didn't do their job on a day-to-day

10  basis from what I could read.

11      Q.   I understand.  What I hear you to be

12  saying is the information you got from

13  Mr. Carlson, who was one of the procurement folks

14  during this timeframe, was that he didn't inform

15  you of any data, reports or information that he

16  was provided on a regular basis for him to review

17  orders to see whether or not there was a pattern

18  that deviated from the norm?

19          MR. BARNES:  You mean other than what

20  he's testified to?

21          MR. GADDY:  I asked the question.

22          MR. BARNES:  Object to form.  Asked and

23  answered.

24          THE WITNESS:  What I'm saying is through

25  what I reviewed from Mr. Carlson, I couldn't

1    ascertain what he used or didn't use to do this

2    job.

3    BY MR. GADDY:

4        Q.   There was no paper identified, no

5    report, no Excel spreadsheet, nothing like that

6    that was identified by Mr. Carlson, Mr. Durr or

7    any information you received from the pickers, no

8    documents that were identified that were reviewed

9    to assist with this process; correct?

10       A.   Specifically, again, our system

11   continued to be improved and changed over time.

12   And there were certainly procedures that were

13   buttressed and improved over time.  But certainly

14   through what I read, there was nothing on a report

15   or, to your point, Excel spreadsheet that I did

16   glean.  It doesn't mean there wasn't any.  It

17   wasn't in what I had read.

18       Q.   You spent 40 to 50 hours preparing for

19   today; correct?

20       A.   Yes, sir.

21       Q.   You made every effort to get all the

22   information you could; correct?

23       A.   Yes.

24       Q.   You mentioned that the system had

25   improvements over time.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    I think you said that at some point in

 3   time, there was a threshold program implemented?

 4        A.    Yes.

 5        Q.    When did HBC first start utilizing a

 6   threshold program?

 7        A.    A threshold program with some IT

 8   enhancements were put into place roughly in 2013.

 9        Q.    Do you know what month in 2013 or season

10   even?

11        A.    I don't recall exactly in 2013.

12        Q.    And were thresholds set for every

13   prescription drug or just controlled substances?

14        A.    Controlled substances.

15        Q.    And that included Schedule III

16   controlled substances?

17        A.    Yes.

18        Q.    How were thresholds established?  Let me

19   back up before you answer that.  I'm making an

20   assumption that threshold is a monthly ordering

21   threshold.  Am I wrong on that?

22        A.    So the threshold established was using

23   diligence that was ascertained at the time from

24   DEA that a 3X threshold to be established, a

25   monthly threshold, to your point, using 12 months
```

 1    of trailing data, 3X the average for that month.

 2        Q.   Let me say it back to you to make sure I

 3    understand it.  This threshold program which was

 4    first begun in 2013 set a threshold at 3 times the

 5    average amount of that substance that was

 6    distributed over the last 12 months?

 7        A.   So 3X the company average for that

 8    chemical.  So it was at the GPI level.  So the

 9    chemical would include all the drugs having that

10    chemical in it, 3X using 12 months of trailing

11    data, 3X the company average for that chemical,

12    that product.

13        Q.   So you explained two things there.

14    First of all, it was based on the chemical?

15        A.   GPI level, yes.

16        Q.   Does that mean that Lortab and Vicodin

17    don't get different thresholds.  They're all under

18    the same threshold?

19        A.   It's all lumped together as one

20    threshold.

21        Q.   Because that's the same combination of

22    hydrocodone and acetaminophen?

23        A.   It's looking at the active ingredient,

24    yes.

25        Q.   As far as how the threshold is set, if

1    HBC had sold a hundred HCP products over a month

2    for the last 12 months, the threshold for the next

3    month would have been 300; is that fair?

4          A.    Well, the threshold was -- yes.  Let me

5    just play that back.  So it would be 3X again at

6    the GPI level of that GPI using the 12 months

7    worth of data, yes.

8          Q.    So months 1 through 12 Giant Eagle

9    pharmacies had ordered 100 hydrocodone combination

10   products?

11         A.    All included.

12         Q.    Correct.  Then in month 13 the threshold

13   would be 300?

14         A.    Well, it uses the average of the 12

15   months of data.  When the new month comes on, the

16   furthest out drops off.  It's a rolling 12 months

17   worth of data, yes.

18         Q.    But I have that math right, in month 13,

19   the threshold would be 300 because the prior 12

20   months, the average was 100?

21         A.    But again, it uses the last 12 months.

22   So assuming that it was a hundred all those

23   months, it would be 3X which would be 300, yes.

24         Q.    You said it was a rolling system.  So at

25   the 13th month, instead of HBC distributing a

1    hundred HCPs and it distributed 200, the threshold

2    for the 14th month would be different.  It would

3    not be the same 300 because that last month would

4    have affected the average; correct?

5         A.    Each datapoint adds to the average.  And

6    certainly the reason for that is there's

7    seasonality in our business as well where products

8    change over time, yes.  The demand for products

9    change over time.

10        Q.    When you say seasonality, do you mean

11   different times of years or do you mean --

12        A.    Yes.  Different times of year, cough and

13   cold season versus summer months, yes.

14        Q.    Is there a hydrocodone combination

15   product season?

16        A.    Well, certainly hydrocodone products in

17   cough syrups, it is more prevalent during cough

18   and cold season than it is during summer months.

19        Q.    I think I heard you mention that HBC

20   received guidance from the DEA that a 3 times

21   average was an appropriate threshold.

22        A.    What I said is during the due diligence

23   to set the threshold, information was derived from

24   the DEA published websites on a 3X threshold that

25   they used for list chemicals, and that's where our

1    3X number was derived from.

2        Q.    You're talking about the chemical

3    handler's manual?

4        A.    From what I -- to prepare for this, it

5    was based on written DEA inference on a website or

6    a manual, I'm not sure where it was derived from,

7    but the DEA itself was establishing a 3X

8    threshold, and the team adopted that rationale.

9        Q.    Are you testifying that the DEA had

10   suggested a 3X threshold for opioids?

11       A.    I'm testifying that the HBC warehouse

12   and the team involved found data that pointed to a

13   3X threshold tier, and that's what they adopted.

14       Q.    But for opioids.  That's my question.

15   Are you testifying that HBC had information from

16   the DEA that they were approving or ratifying or

17   blessing, whatever verb you want to use, a 3X

18   threshold in 2013 for opioids?

19       A.    No.  That is not what I'm saying.

20       Q.    Then help me understand.

21       A.    What I'm saying is in the diligence to

22   set the threshold, Giant Eagle inferred from

23   information that they gleaned from the website, a

24   manual, whatever it was, that established a 3X

25   threshold is where they want -- the DEA was -- the

```
 1   DEA over the years has not been clear about what

 2   their expectations were of any threshold.

 3        So it left each registrant to set whatever

 4   parameters and controls that they deemed

 5   appropriate.  So our team used whatever they could

 6   find that was reasonably available and reasonable

 7   to set our thresholds.

 8        Q.   The DEA never told HBC that a three

 9   times average was appropriate; correct?

10        A.   Directly, no, never.

11        Q.   Did DEA indirectly tell HBC that a three

12   times average was appropriate?

13        A.   What I'm saying is the HBC set its

14   threshold based on information that it gleaned

15   from a DEA -- just like you showed me earlier, a

16   page from the DEA website.  There was information

17   that they used from DEA and inferred to use a 3X

18   threshold.

19        HBC set the threshold, but it wasn't just

20   some arbitrary number they picked.  There was

21   information they used to get to a 3X threshold.

22        Q.   I'll show you what I'll mark as No. 13.

23          (HBC-Tsipakis Exhibit 13 was marked.)

24   BY MR. GADDY:

25        Q.   I'm showing you a June 2, 2012 letter
```

1  from Joe Rannazzisi with the DEA.  Do you see

2  that?

3       A.   Yes.

4       Q.   Have you ever seen this before?

5       A.   Yes.

6       Q.   Did you have the opportunity to review

7  this document in preparing for your deposition

8  today?

9       A.   Not all of it.

10       Q.   I'll represent to you and you can flip

11  through it and we'll look through some of this,

12  but it's a 2012 letter, and attached to that

13  letter were earlier letters, two from 2007 and one

14  from 2006.

15       Do you see that?

16       A.   Yes.

17       Q.   And are you aware that HBC received this

18  letter?

19            MR. BARNES:  Just the one on top or all

20  of them?

21            MR. GADDY:  The one at the top with the

22  attachments.

23            THE WITNESS:  I'm not aware of whether

24  HBC received these letters or not.  As a matter of

25  common sense, we weren't registered in 2007.  So I