# EXHIBIT 431

Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION
 3    IN RE:  NATIONAL         :   MDL No. 2804
      PRESCRIPTION OPIATE      :
 4    LITIGATION               :   Case No. 17-md-2804
                               :
 5    APPLIES TO ALL CASES     :   Judge Dan Aaron Polster
                               :
 6                             :
 7
 8                     HIGHLY CONFIDENTIAL
 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
10
11                         - - - -
12                     DECEMBER 13, 2018
13                         - - - -
14      VIDEOTAPED DEPOSITION OF HBC SERVICE COMPANY'S
15            DESIGNATED 30(B)(6) REPRESENTATIVE,
16                      JAMES TSIPAKIS,
17   taken pursuant to notice, was held at Marcus & Shapira,
18   One Oxford Center, 35th Floor, Pittsburgh, Pennsylvania
19   15219, by and before Ann Medis, Registered Professional
20   Reporter and Notary Public in and for the Commonwealth
21   of Pennsylvania, on Thursday, December 13, 2018,
22   commencing at 9:09 a.m.
23                         - - - -
24                 GOLKOW LITIGATION SERVICES
            877.370.3377 phone | 917.591.5672 fax
25                     deps@golkow.com
```

```
 1        A.    I believe it's for our New Kensington,
 2   PA location.
 3        Q.    Store 8 is flagged as having hit their
 4   threshold for total hydrocodone products.  And he
 5   then asked if Mr. Roahrig had checked to see if
 6   this is an anomaly or that the order should be
 7   considered suspicious; is that correct?
 8        A.    Yes.
 9        Q.    And then ultimately he gets a response
10   from Mr. Roahrig?
11        A.    Yes.  He gets a response, yes.
12        Q.    It appears that Mr. Roahrig had been
13   told by a pharmacist that this prescription,
14   although it did contain hydrocodone, it was for
15   what's called Hydrocan liquid, and he gives the
16   explanation that he got from the pharmacist; is
17   that right?
18        A.    Yes.
19        Q.    Now, we talked before about the daily
20   reports that have thresholds mentioned in them; is
21   that right?
22        A.    Yes.
23              (HBC-Tsipakis Exhibit 24 was marked.)
24   BY MR. ROTTINGHAUS:
25        Q.    I'm going to give you what we've marked
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    as Exhibit 24 and represent to you that I
 2    understand --
 3              MR. ROTTINGHAUS:  And that's 1055, top
 4    right-hand corner, 1055.
 5    BY MR. ROTTINGHAUS:
 6         Q.   We looked at this type of spreadsheet
 7    earlier today; is that right?
 8         A.   Yes.
 9         Q.   And it's my understanding from looking
10    at this, if you look actually back to the first
11    page, the date of this report is January 31 of
12    2014?
13         A.   January 31, 2014?
14         Q.   Yes.
15         A.   Okay.
16         Q.   To the second page, if we look at the
17    spreadsheet, and also referencing --
18              MR. BARNES:  I'm not finding that date.
19    I'm seeing December 31 of '13 on the first page.
20              MR. ROTTINGHAUS:  I apologize.  I may be
21    looking at the wrong.
22    BY MR. ROTTINGHAUS:
23         Q.   You do have the January in front of you.
24    This is all one of one exhibit.  What number is
25    that?
```

```
 1        A.    24.
 2              MR. ROTTINGHAUS:  Let's go off the
 3   record for one second.
 4              THE VIDEOGRAPHER:  3:52.  We are off the
 5   video record.
 6              (Recess from 3:52 p.m. to 3:56 p.m.)
 7              THE VIDEOGRAPHER:  3:56.  We are on the
 8   video record.
 9   BY MR. ROTTINGHAUS:
10        Q.    We just clarified what we're looking at
11   here.  So that the record is clear, I'm going to
12   be referring you to what I understand to be
13   end-of-the-month reports for several months,
14   including January of 2014, December of 2013,
15   November of 2013, October of 2013, and then
16   although it will look out of order, one from May
17   of 2014.  Okay?
18        A.    Yes.
19        Q.    Going back to the January 2014, page
20   1055 at the top right, second page of that appears
21   to be a spreadsheet like we talked about before?
22        A.    Yes.
23        Q.    Does that look familiar to you?
24        A.    Yes.
25        Q.    Again, I think you said before, that
```

```
 1   this looked a little different than you've ever
 2   seen it before, the information; is that right?
 3        A.   I was used to seeing it in this format,
 4   and the multiple pages threw me this morning.
 5        Q.   Does it look somewhat more familiar to
 6   you now?
 7        A.   Yes.
 8        Q.   I was going to ask you, to your
 9   knowledge, is there someone at HBC who would have
10   the most knowledge about how this spreadsheet was
11   designed and how it was operated between 2009 and
12   2014?
13        A.   I don't know.
14        Q.   Would it be a system at Giant Eagle or
15   would it have been a system designed by someone at
16   HBC?
17        A.   Probably within the IT department at
18   corporate.
19        Q.   At Giant Eagle?
20        A.   Yes.
21        Q.   Going back to the email we were just
22   discussing, I think Exhibit 23, from Mr. Roahrig
23   to Mr. Millward, Mr. Roahrig is referring to the
24   Hydrocan liquid and trying to address the concern
25   that was raised about store number 8; is that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   right?
 2        A.   Yes.
 3        Q.   And this is in January of 2014?
 4        A.   Yes.
 5        Q.   If we go back to Exhibit 24 and if we
 6   look four lines down, we'll see store number 8 or
 7   pharmacy number 8.
 8        A.   Yes.
 9        Q.   Looking at this, would it be your
10   understanding that Mr. Roahrig and Mr. Millward
11   were having a discussion about this specific store
12   that we see, store number 8?
13        A.   It references store 8 and I'm reading
14   store 8 on this.  I'm not sure which report
15   they're looking at or which line item or what
16   order they're looking at.
17        Q.   Well, to back up, the email was
18   referenced on January 10th of 2014, and it was
19   started that morning it looks like, maybe even on
20   January 9.  But it's referencing store number 8.
21        A.   Yes.
22        Q.   And if we are correct that this
23   spreadsheet is referencing all of the products
24   that exceeded thresholds for January of 2014, we
25   would see store number 8 did indeed exceed its
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    threshold showing the total quantity shipped of
 2    8514 with the threshold quantity being 6868.
 3        A.    Yes.
 4        Q.    You said before that you thought -- and
 5    this again appears to have a chain-wide average
 6    for the threshold quantity.
 7        A.    Yes.
 8        Q.    You said before that you thought using a
 9    chain-wide average could lead to false positives?
10        A.    For sure, yes.
11        Q.    And by the same token, could using a
12    chain-wide average also lead to false negatives?
13        A.    I'm not a mathematician, but I believe
14    looking here at store 8 that you're asking on,
15    that's one of our busiest stores in the chain, and
16    I'm not surprised that it would have been over
17    threshold from looking at this number.
18        Q.    My question is a little different,
19    however.  Not looking just at store number 8 and
20    not looking at just at the information on this
21    spreadsheet, would you agree that while using a
22    chain-wide threshold can lead to false positives
23    for some stores, could it also lead to false
24    negatives or a sense of reassurance for some
25    stores that may actually be using or ordering a
```

```
 1    lot more of a hydrocodone product than it normally

 2    would?

 3         A.   It's possible.

 4         Q.   If we go to the next document in this

 5    set, 1054, this is the end-of-the-month report for

 6    December 2013.  If you'll go to the page with the

 7    spreadsheet information on it, we see store number

 8    8 again; is that right?

 9         A.   Yes.

10         Q.   I think it's about four stores down.

11    Are you with me?

12         A.   Yes.

13         Q.   And for store number 8 this month, we

14    see a total shipped quantity of 14,663?

15         A.   Yes.

16         Q.   And a threshold quantity of 7175?

17         A.   Yes.

18         Q.   And if you do the math, correct me if

19    you think I'm wrong, but that appears to be a

20    little over six times the monthly average?

21         A.   Based on this threshold, yes.

22         Q.   Would you expect a daily or a report

23    like this to raise questions about store number 8

24    similar to the questions that were raised in

25    January of 2014?
```

1    A.    Yes.

2    Q.    In getting ready for this deposition and
3  looking through the documents you looked through
4  and in speaking to the individuals you told us you
5  have spoken to, did you become aware of anyone
6  raising any concerns about store number 8 and the
7  amount of shipments to store number 8 in December
8  of 2013?

9    A.    Not specifically, no.

10    Q.    Do you have all of the exhibits in front
11  of you still?

12    A.    Yes.

13    Q.    Could you go back to Exhibit No. 12,
14  which is the suspicious order monitor policy.

15           MR. BARNES:  Are we done with this?

16           MR. ROTTINGHAUS:  We may go back to it,
17  so keep it handy.

18  BY MR. ROTTINGHAUS:

19    Q.    Specifically page referenced under 12.1.

20           MR. BARNES:  Exhibit 12?  It says 12,
21  then 12.2.  You said 12.1?

22           MR. ROTTINGHAUS:  Forgive me.  It's 12,
23  just 12.  I apologize.

24  BY MR. ROTTINGHAUS:

25    Q.    So we're again looking back now at the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    inventory control suspicious order policy that was
 2    enacted back in August of 2014?
 3         A.   Yes.
 4         Q.   I see a name there, the policy owner
 5    being Matt Rogos?
 6         A.   Yes.
 7         Q.   Do you know that person?
 8         A.   I do not.
 9         Q.   Do you know whether Mr. Rogos indeed
10    worked for HBC back in 2014?
11         A.   I do not, no.
12         Q.   Do you know whether he currently works
13    for Giant Eagle?
14         A.   I do not.
15         Q.   Did you have an opportunity to try to
16    speak with Mr. Rogos to find out about his
17    knowledge concerning this policy?
18         A.   Are you asking me if I tried to reach
19    out to Mr. Rogos?
20         Q.   Yes.
21         A.   No.
22         Q.   Stay on that page with me, but go down
23    towards the bottom under Procedures.  You'll see
24    some bullet points.
25         A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Go down to the second bullet point, and
 2   I'm going to read it, and tell me if I'm reading
 3   it incorrectly.  Okay?
 4        A.    Yes.
 5        Q.    It appears to me the second bullet point
 6   states that "Suspicious order criteria include,
 7   but are not limited to, purchases over a defined
 8   period that exceed a predetermined threshold."
 9        Did I read that correctly?
10        A.    You did.
11        Q.    At least if we read that portion of this
12   policy, Exhibit 12, and we apply it to the
13   spreadsheet that we were just looking at for
14   December of 2013, does it appear to you that any
15   amount shipped in excess of the threshold quantity
16   should at least raise a question in someone's mind
17   as to whether there indeed is a suspicious order?
18        A.    Yes.
19        Q.    Are you able to sitting here today tell
20   us whether anybody raised any questions or raised
21   any red flags about the December 2013 order by
22   store number 8 or the shipment to store number 8
23   that month and whether it indeed was a suspicious
24   order?
25        A.    I can't tie back specifically to that,
```

```
 1    but certainly we just discussed a conversation
 2    with the field ops. and corporate regarding store
 3    8.
 4         Q.   We did, and that was actually the month
 5    after December 2013, January 2014.
 6         A.   Yes.
 7         Q.   And at least in January of 2014, someone
 8    wanted to look into the ordering pattern of store
 9    number 8 to find out whether this indeed was a
10    suspicious order for January of 2014?
11         A.   Yes.
12         Q.   But going back to 2013, at least sitting
13    here today, you're not aware of anyone questioning
14    the order by store number 8 in December 2013?
15         A.   I don't have anything in front of me
16    that there was or wasn't; correct.
17         Q.   Have you seen any documents or any
18    emails by anyone concerning any questions about
19    the orders by store number 8 in December of 2013?
20         A.   I did not.
21         Q.   If you go to page 1053, I'll represent
22    to you that this appears to be an end-of-the-month
23    report for November 2013 dated specifically 30
24    November 2013.  Are you with me?
25         A.   For November 2013?
```

```
 1          Q.   Yes.
 2          A.   Yes.
 3          Q.   If you'll go to the spreadsheet, please.
 4   And if you go down to store number 8, which I
 5   believe is the fourth store from the bottom, and
 6   if you look at the amount shipped in November of
 7   2013 to store 8, it appears to be 12,298?
 8          A.   Yes.
 9          Q.   With a threshold quantity being 7257?
10          A.   Yes.
11          Q.   And correct me if you think I'm wrong,
12   but by my math, that's five times the monthly
13   average?
14          A.   Yes.
15          Q.   And knowing what you've told us about
16   your understanding of the store looking into any
17   orders that it thinks should be of concern, would
18   you have expected HBC or someone at HBC to have
19   investigated the amount shipped for the
20   hydrocodone product to store number 8 in that
21   month?
22          A.   I would have expected someone to look at
23   at each line item on the report or daily
24   throughout the month on this report and do their
25   due diligence on each of these line items, yes.
```