# EXHIBIT 433

35032_Opiates_MDL_Productions
Case: 1:17-md-02804-DAP  Doc #: 1967-9 Filed: 07/23/19  2 of 14.  PageID #: 176186
Tsipakis, James
12/13/2018

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE NORTHERN DISTRICT OF OHIO
 3                        EASTERN DIVISION
 4   IN RE:  NATIONAL          :   MDL No. 2804
 5   PRESCRIPTION OPIATE       :
 6   LITIGATION                :   Case No. 17-md-2804
 7                             :
 8   APPLIES TO ALL CASES      :   Judge Dan Aaron Polster
 9                             :
10                             :
11
12                      HIGHLY CONFIDENTIAL
13        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
14
15                          - - - -
16                    DECEMBER 13, 2018
17                          - - - -
18     VIDEOTAPED DEPOSITION OF HBC SERVICE COMPANY'S
19          DESIGNATED 30(B)(6) REPRESENTATIVE,
20                     JAMES TSIPAKIS,
21   taken pursuant to notice, was held at Marcus & Shapira,
22   One Oxford Center, 35th Floor, Pittsburgh, Pennsylvania
23   15219, by and before Ann Medis, Registered Professional
24   Reporter and Notary Public in and for the Commonwealth
25   of Pennsylvania, on Thursday, December 13, 2018,
26   commencing at 9:09 a.m.
27                          - - - -
28              GOLKOW LITIGATION SERVICES
29         877.370.3377 phone | 917.591.5672 fax
30                    deps@golkow.com
```

```
 1    timeframe.  Also, folks from corporate, from our
 2    operations folks, pharmacy operations as well as
 3    the warehouse operations.
 4         Q.   Let me stop you for a second.  Walter,
 5    is he still with the company?
 6         A.   Yes.
 7         Q.   And what's he do now?
 8         A.   His exact duties I don't know, but it's
 9    something in distribution.
10         Q.   And did you personally speak with him?
11         A.   I did not.
12         Q.   How did you go about obtaining his
13    knowledge base to talk about his role in the
14    suspicious order system?
15         A.   I reviewed his written conversations
16    with our attorneys and other folks within our
17    company.
18         Q.   You mentioned Mr. Durr.  You said you
19    talked to some folks from corporate to find out
20    about what was going on from '09 to 2014.  Who did
21    you talk to from corporate?
22         A.   Greg Carlson, which is one of our
23    operations folks.  Also had responsibility for
24    procurement at the time.
25         Q.   So he was a procurement guy between --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Operations and procurement, yes.
 2        Q.    And he did that -- he served in that
 3   role between '09 and '14?
 4        A.    The exact times I'm not sure, but
 5   somewhere in there.
 6        Q.    Somewhere in there?
 7        A.    Yes.
 8        Q.    Who else other than Greg Carlson?
 9        A.    That was it.
10        Q.    Was Walter able to tell you and through
11   the notes that you reviewed -- let me back up.
12        Did you specifically talk with Greg?
13        A.    I did not.
14        Q.    Same thing there where you just reviewed
15   some notes?
16        A.    Yes.
17        Q.    Through these notes that you happened to
18   review from Walter and from Greg when you were
19   doing your diligence I think you said earlier to
20   prepare to testify here today, did they talk to
21   you about any training that they attended about
22   suspicious order monitoring and different red
23   flags to be on the lookout for?
24        A.    They didn't specifically read anything
25   on training, but certainly through the documents
```

Highly Confidential - Subject to Further Confidentiality Review

 1   that were presented, they were aware of the drugs
 2   and the things that they should look for.
 3        Q.    You agree that the regulation says that
 4   HBC must design and operate a system; correct?
 5        A.    Yes.
 6        Q.    What is that system?
 7        A.    Sure.  As I mentioned earlier, it's an
 8   integrated system between operations, the
 9   warehouse and our pharmacies.
10        Q.    Is there anything else you can tell me
11   about this system other than what you just said?
12        A.    As far as what specific -- can you be a
13   little more -- as far as the system, it's an
14   integrated approach between -- for us, we're a
15   self distributing -- we're a self distributing
16   distributor.  So we own the stores.  We own the
17   warehouse.  We own everything in between.
18        We're very different than a McKesson or a
19   Cardinal or a traditional distributor.  We have
20   line of sight from the time products are delivered
21   to our warehouse all the way to when they're
22   dispensed to customers, patients.
23        Q.    What I'm hearing from you is that your
24   system was the superintendent, the pickers and the
25   procurement folks knew what to look for --

```
 1        A.   As well as the stores.  As well as the
 2   stores.
 3        Q.   Let me finish.  What I'm hearing from
 4   you is that your system, HBC's system that was
 5   mandated by these federal regulations was that the
 6   distribution center superintendent, the pickers in
 7   the distribution center, the corporate procurement
 8   officers and the pharmacies knew what to look for
 9   and looked for it?
10             MR. BARNES:  Object to the form of the
11   question.
12   BY MR. GADDY:
13        Q.   Is that your answer as to what HBC's
14   system was from 2009 to 2014?
15             MR. BARNES:  Same objection.
16             THE WITNESS:  I'm telling you it was an
17   integrated systems where the stores were filling
18   legitimate prescriptions which created demand to
19   our warehouse that was fulfilled to those stores.
20   BY MR. GADDY:
21        Q.   If I'm being unclear -- I'm trying to
22   make sure I'm understanding your answer.  As far
23   as the order -- excuse me -- as far as the system
24   to detect any suspicious orders that come from the
25   stores, what I'm hearing you say is that the
```

Highly Confidential - Subject to Further Confidentiality Review

1  system was that the superintendent, the pickers,
2  the procurement folks who would be the only ones
3  with HBC, right, that we just talked about?
4       A.   HBC specific, yes.
5       Q.   So the pickers, the superintendent and
6  the procurement folks knew what to look for and
7  looked for it.  Is that the system that HBC
8  operated to detect suspicious orders?
9       A.   The system also included the frontline
10 scrutiny and professional judgment of the
11 pharmacist filling prescriptions as well together
12 as one whole system, yes.
13      Q.   But otherwise, that's the system?
14      A.   That's the system.  And then over time,
15 the system was continually improved upon which
16 later added the thresholds and some IT
17 enhancements, et cetera, yes.
18      Q.   But when the first hydrocodone pills
19 started rolling out the door in 2009, the system
20 was that the superintendents, the pickers and the
21 procurement officers knew what to look for and
22 looked for it?
23           MR. BARNES:  I'm going to object.  You
24 keep misstating what he said in his prior answer.
25           MR. GADDY:  Bob, if you want to object,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   you can object.
 2            MR. BARNES:  I am.
 3            MR. GADDY:  Well, limit it to that you
 4   don't get to put words --
 5            MR. BARNES:  Be fair with your question.
 6   He told you about an integrated system about five
 7   times now, and every time you ask him another
 8   question, you leave out a piece of it.
 9   BY MR. GADDY:
10       Q.   You can answer the question.
11       A.   As I stated, the system was an
12   integrated system.  Again, we're in a unique
13   situation.  We're distributing to our own stores.
14   We know our stores.  We know they're -- we have
15   line of sight on every prescription that comes
16   through our doors that we fill, and we fulfill
17   orders to those stores.
18        And we have chain of custody of product all
19   the way from the warehouse to our stores,
20   ultimately to the patients.  So what I'm telling
21   you is our system was integrated between store
22   controls, warehouse controls and corporate
23   controls.
24       Q.   You agree that the duties and
25   regulations that apply to the stores, the
```

Highly Confidential - Subject to Further Confidentiality Review

1   pharmacies, are different than the regulations and
2   duties that apply to the distributor; correct?
3           MR. BARNES:  Object to form.
4           THE WITNESS:  They have different
5   duties, but they have a duty as well to have the
6   safety and security of controlled substances as
7   does our warehouse.
8   BY MR. GADDY:
9       Q.  Sure, but pharmacies -- do pharmacies
10  have a duty to detect suspicious orders?
11      A.  By definition, pharmacists' duty are to
12  fill legitimate prescriptions from legitimate
13  prescribers which would then necessitate orders
14  that are fulfilled from our warehouse.
15      Q.  You keep using the word "integrated."
16  Tell me what you mean by that.
17      A.  It's an integrated system that if you
18  think about it again, the stores are doing their
19  due diligence, making sure they're filling
20  legitimate prescriptions for legitimate needs,
21  right, that generate orders to our warehouse, and
22  we fulfill those orders.
23          So again, we have folks from the warehouse
24  monitoring and having controls, physical controls
25  as well as the controls we discussed.  You have

```
 1   the folks on the procurement side with their
 2   controls and the pieces that they're buying into
 3   the warehouse and selling out of the warehouse, as
 4   well as the folks in the store.  So that is the
 5   system.
 6        Q.   Did HBC provide any training to Mr. Durr
 7   or the pickers that worked underneath him as far
 8   as HBC's obligations under the Controlled
 9   Substance Act?
10        A.   That I don't know.
11        Q.   Did HBC provide any training or
12   education to the procurement officers with
13   corporate I think you referred to it as on HBC's
14   obligations under the Controlled Substance Act?
15        A.   I don't know.
16        Q.   Do you know whether or not there was any
17   list -- you keep kind of saying that these
18   different people in these different roles knew
19   what to look out for.
20        Was there any list of those things that they
21   should be looking out for?
22        A.   There's no list that I could find, but I
23   think you established early on in the testimony
24   that these drugs were commonly known as drugs of
25   interest and certainly drugs that we needed to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   keep an eye on.
 2       Q.   From the education that you did to
 3   prepare to testify here today, do you know of
 4   anything that Mr. Durr or Mr. Carlson or any of
 5   these pickers, do you know anything that they were
 6   looking for, any datapoints that they were looking
 7   at between '09 and 2014 to determine whether or
 8   not an order was suspicious?
 9       A.   I didn't find any specific written
10   documents of what they were looking for or not
11   looking for.
12       Q.   Do you have any idea of what they would
13   have been looking for?
14       A.   They would have been looking for any
15   patterns that deviated from the norm.  Certainly
16   again, as I mentioned, we know our stores.  We're
17   selling product to our stores pursuant to
18   legitimate prescriptions.  And they'd be looking
19   for anything that's out of the norm.
20       Q.   How do you know that they were looking
21   for anything out of the norm.  How do you have
22   that knowledge?
23       A.   Because as part of the diligence,
24   looking at their responses and what they had
25   discussed, that was clearly ascertained from the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   conversation.
 2        Q.   So you understand that what Mr. Durr,
 3   the pickers and the folks in corporate were
 4   looking for was any orders or any patterns that
 5   deviated from the norm?
 6        A.   That were suspicious, that looked
 7   suspicious, yes.
 8        Q.   Anything else?
 9        A.   From what I can delineate and see, they
10   were looking for those things, yes.
11        Q.   What information -- let me back up.  I'm
12   going to ask you some questions about the pickers
13   in particular.
14        Is their sole job function to receive orders
15   and pick the orders and fill the totes and load
16   the trucks?  Is that their sole -- is that their
17   primary function?
18        A.   Primary functions, yes.
19        Q.   And would it be fair to say that they
20   spend most of their day in a warehouse receiving
21   orders, locating product, putting it into a tote
22   and facilitating it getting on a truck so it can
23   go a store?
24        A.   And maintaining the security of that
25   product along the way, yes.
```

```
 1       Q.   What information, reports, data is
 2  available to those pickers to allow them to
 3  identify patterns that deviate from the norm?
 4       A.   I did not find any particular reports or
 5  any specific things that they were looking for.
 6       Q.   With Mr. Durr, the superintendent, can
 7  you kind of generally describe for me what his job
 8  duties were on a daily basis?
 9       A.   His responsibilities would be the
10  security and controls of running our pharmacy
11  warehouse.
12       Q.   And that pharmacy warehouse included not
13  only the Schedule III hydrocodone combination
14  products that we've been talking about today, but
15  it also included a variety of other prescription
16  medication; correct?
17       A.   Nonscheduled, is that what you're
18  asking?
19       Q.   Sure.
20       A.   Yes.
21       Q.   It also included Schedule IVs and
22  Schedule Vs; correct?
23       A.   Correct.
24       Q.   It included Schedule IIIs that are not
25  hydrocodone combination products; correct?
```

```
 1       A.   Yes.
 2       Q.   It also included I think, as you just
 3  said, noncontrolled substances such as blood
 4  pressure medicine, acne medication, birth control.
 5  All those types of things would be included;
 6  correct?
 7       A.   Yes.
 8       Q.   And all those things are under the
 9  purview of Mr. Durr; correct?
10       A.   Yes.
11       Q.   Are you aware of any data, reports or
12  information that Mr. Durr had available to him to
13  assist him in identifying any patterns of Schedule
14  III drug orders, specifically HCPs, that would
15  have deviated from the norm?
16       A.   Through this process I did not find
17  any -- you keep asking me reports.  I did not find
18  any reports that he'd be looking at.  But, again,
19  as part of this integrated process, he would be
20  working with our operations folks.  The operation
21  folks oversee the stores.  So it's a closed
22  system.  So there's a negative feedback loop
23  within that system.
24       Q.   And I'm not trying to ask a question
25  that I already know the answer to.  I'm just
```