# EXHIBIT 434

Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
 3   IN RE:  NATIONAL         :  MDL No. 2804
     PRESCRIPTION OPIATE      :
 4   LITIGATION               :  Case No. 17-md-2804
                              :
 5   APPLIES TO ALL CASES     :  Hon. Dan A. Polster
                              :
 6                            :
 7
 8                   HIGHLY CONFIDENTIAL
 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
10
11                        - - - -
12                    JANUARY 4, 2019
13                        - - - -
14       VIDEOTAPED DEPOSITION OF ANTHONY MOLLICA,
15   taken pursuant to notice, was held at Marcus &
16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,
17   Pennsylvania 15219, by and before Ann Medis,
18   Registered Professional Reporter and Notary Public in
19   and for the Commonwealth of Pennsylvania, on Friday,
20   January 4, 2019, commencing at 8:06 a.m.
21                        - - - -
22              GOLKOW LITIGATION SERVICES
           877.370.3377 phone | 917.591.5672 fax
23                   deps@golkow.com
24
25
```

```
 1   training in some way?
 2        A.   I can't imagine you could pass the state
 3   Board exam if you skip it.
 4        Q.   Does Giant Eagle make sure that the
 5   pharmacists when they're hired, they actually
 6   review these guidelines and are trained on them?
 7        A.   Yes.  There's also computer-based
 8   monitoring that had attestations.
 9        Q.   In these so-called PMPs, like the OARRS
10   system, are those in all of the Giant Eagle
11   stores?
12        A.   To my knowledge, yes.
13        Q.   And are pharmacists --
14        A.   I can't recall what the State of West
15   Virginia was with that.  I can't remember if they
16   had electronic or some other system, but whatever
17   West Virginia had, we were complying with that
18   one.  I don't want to say it was exactly like
19   OARRS.  Each state has a right to be a little
20   different there.
21        Q.   Are those a resource tool for the
22   pharmacists to determine the legitimacy of
23   prescriptions?
24        A.   Yes.
25        Q.   You were asked a lot of questions today
```

```
 1    about so-called suspicious orders.  But you talked
 2    about how Giant Eagle was self distributing.
 3         A.   Yes.
 4         Q.   In your understanding of Giant Eagle's
 5    integrated system, should there ever be a
 6    suspicious order?
 7         A.   That's what I was trying to say.  I
 8    don't know by definition how you could have a
 9    suspicious order when the drugs are moving from
10    the warehouse to a shelf that's also owned and
11    operated by Giant Eagle.
12         That's why we have our -- our internal
13    mechanisms could always -- you never have an
14    opportunity where you can't check chain the
15    custody in our system because it's a closed system
16    to ourselves.
17         Q.   Did Giant Eagle Pharmacies report their
18    transactions to the DEA?
19         A.   Which transactions?
20         Q.   Filling prescriptions.
21         A.   Yes.
22         Q.   Did the DEA ever raise any questions
23    with any of the Giant Eagle stores at any time?
24         A.   I'm sure -- that's a little too vague.
25    I'm sure they've had questions over time.  If
```

```
 1   you're saying specific to suspicious drug
 2   monitoring, not to my knowledge.
 3       Q.   You talked about the extensive of record
 4   keeping at the stores.  I don't want to belabor
 5   that point.  But with respect to the physical
 6   security of controlled substances, are they
 7   monitored from the moment they come in to the
 8   moment that they go out?
 9       A.   Yes.
10       Q.   Are they kept in locked cabinets or
11   vaults as necessary?
12       A.   Which controlled substances?
13       Q.   I'm talking about -- let's talk about
14   opioids.
15       A.   Opioids are kept in a locked cabinet.
16       Q.   And who has the keys to that?
17       A.   Only the pharmacist.
18       Q.   And who can dispense opioids?
19       A.   Only the pharmacist.
20       Q.   Incoming orders, are they checked in and
21   monitored closely and added to inventory?
22       A.   Orders are -- for controls you're
23   referring to?  They're checked in in sealed
24   containers for which you have to sign that you're
25   the one opening the container.  They're checked
```

```
 1   into inventory, and then they're matched to the
 2   dispensing records.
 3        Q.   Are there regular and perpetual
 4   inventories of controlled substances including
 5   opioids?
 6        A.   Yes.
 7        Q.   And you mentioned the monthly so-called
 8   narc audits.
 9        A.   Yes.
10        Q.   Is that where you actually physically
11   recount controlled substances including opioids?
12        A.   Yes.
13        Q.   And there's an annual inventory; is that
14   right?
15        A.   That's correct.
16        Q.   Do the pharmacists double count
17   controlled substance prescriptions?
18        A.   Yes.  That's a policy of Giant Eagle.
19        Q.   Do they back count them?
20        A.   I do not know that means, back count.
21        Q.   Well, making sure that the amount left
22   in the bottle is what the inventory system says
23   should be there.
24        A.   That's correct.
25        Q.   Did the Board of Pharmacy come in and do
```

Case: 1:17-md-02804-DAP Doc #: 1967-10 Filed: 07/23/19 7 of 14. PageID #: 176205
Highly Confidential - Subject to Further Confidentiality Review

```
 1   audits from time to time?
 2        A.   Yes.
 3        Q.   The pharmacy district leaders, did they
 4   oversee stores in their area and do quarterly
 5   internal audits?
 6        A.   Yes.
 7        Q.   Including compliance audits?
 8        A.   Yes.
 9        Q.   Did they supervise the training of
10   pharmacists?
11        A.   Yes.
12        Q.   Did they work with law enforcement and
13   the Board of Pharmacy to deter diversion?
14        A.   Yes.
15        Q.   And criminal acts.  Was there red flag
16   awareness training for the pharmacists?
17        A.   Be more specific.  I'm not sure...
18        Q.   Well, in the dispensing guidelines, the
19   red flags to look for to see if a prescription is
20   legitimate.
21        A.   Oh, yes, yes.
22        Q.   Did Giant Eagle have a loss prevention
23   department?
24        A.   Yes.
25        Q.   With experienced diversion
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   investigators?
 2       A.   Yes.
 3       Q.   Did they spend a lot of time in the
 4   pharmacies?
 5       A.   Yes.
 6       Q.   Do they work with the local police and
 7   the Boards of Pharmacy and the DEA?
 8       A.   Yes.
 9       Q.   Did the pharmacists take any steps
10   individually to flag scripts that they thought
11   might be illegitimate?
12       A.   Yes.
13       Q.   Can you give us some examples?
14       A.   If prescriptions didn't look like --
15   once again, you get intimate with your community,
16   so you recognize physicians' signatures when they
17   don't look right, if they're missing pieces of
18   documentation, when there's obvious errors.
19            You would be very surprised at some of the
20   whacky stuff that you see when the public tries to
21   divert, spelling things wrong, not using the right
22   Latin codes, missing numbers, unusual quantities
23   or frequency, dates that look altered, those types
24   of things, photocopies.  There's all kinds of
25   things that you can pick up on.
```

```
 1        Q.   And are Giant Eagle pharmacists trained
 2   to look for that kind of --
 3        A.   They're trained not just by the
 4   organization, but just in their general practice,
 5   too.  You need to be in a pharmacy to know that
 6   Dr. Smith always writes controls on a blue pad and
 7   this one is yellow.  You can't train that.  But
 8   pharmacists do those things as part of local
 9   awareness as well as the tools that we provide
10   from the company.
11        Q.   Are there security cameras in all of the
12   pharmacies?
13        A.   I actually don't know.  Yes, there are
14   security cameras.  Not for my entire run at Giant
15   Eagle, but when I left, I'm pretty sure every one
16   of them had security cameras.
17        Q.   Are you aware of so-called BOLO notices,
18   Be On The Lookout notices exchanged between the
19   pharmacists?
20        A.   Oh, they do that.  Yeah.  They do that a
21   lot on their own.  It's a very tight network.
22        Q.   You mentioned daily counts of drugs.
23   Did that include hydrocodone combination products
24   when HBC distributed it when it was a Schedule
25   III?
```

```
 1        A.    Daily counts?
 2        Q.    Yes.
 3        A.    Of which ones?
 4        Q.    Of the HCPs.
 5        A.    The combination products?
 6        Q.    Yes.
 7        A.    I don't know that daily counts were
 8   required in terms of physical counts.  I don't
 9   recall.  But you had a virtual inventory that
10   every time you pulled the drug off the shelf, you
11   had to verify.  It that constitutes a physical
12   count, I don't know.
13        Q.    I want to direct your attention back to
14   Exhibit 13.  This is the Ohio Administrative Code,
15   but its looks awfully similar to the DEA
16   regulation.  I want to direct your attention to
17   (A), "All registrants shall provide effective and
18   approved controls and procedures to deter theft
19   and diversion..."
20        Do you know if that's almost identical to the
21   DEA regulation on the same topic?
22        A.    Likely to be, yes.
23        Q.    All these factors that you go through, I
24   want to go through some of these factors to
25   determine whether you meet the security
```

```
 1   requirement.
 2         The type of activity conducted, HBC to your
 3   knowledge was a Schedule III, IV, V warehouse that
 4   never distributed controlled substance level IIs.
 5   Did you know that?
 6         A.   Yes.  And noncontrols as well.
 7         Q.   And noncontrols.
 8         A.   That was the majority of what they
 9   distributed.
10         Q.   And did it do branded and unbranded
11   generics, or did it just do a piece of the IIIs,
12   IVs, Vs?
13         A.   It was just the generic portions of it.
14   It was more meant as a generic warehouse, not --
15         Q.   So would you say with respect to factor
16   (B)(3) that the quantity of dangerous drugs
17   handled, considering the fact that they were IIs
18   when handled by HBC and the fact that they were
19   only doing some of the generics, would you say
20   that would be high or a low quantity of dangerous
21   drugs being handled by HBCs?
22              MR. HUDSON:  Object to the form.
23              THE WITNESS:  I would say it would be
24   low, a low quantity as compared to the overall
25   ordering of a pharmacy.  Even when pharmacies
```

1    would get their totes, you know, filled with
2    drugs, the HBC ones were a different color.  You
3    might see one tote from HBC and 20, you know, from
4    the general -- from McKesson or whomever we were
5    ordering from.
6    BY MR. BARNES:
7        Q.   So is it fair statement that between
8    2009 and 2014, the vast majority of opioid
9    products going into the Giant Eagle pharmacies
10   were coming from McKesson?
11       A.   I don't -- I don't recall what the
12   specific formulary for the controls that were at
13   the HBC warehouse were, but my assertion is the
14   minority of them came from the HBC warehouse.
15       Q.   Well, you know most opioids are
16   Schedule IIs and always have been Schedule IIs;
17   correct?
18       A.   In my definition, when you say opioid,
19   I'm including combination drugs.  We got zero
20   Schedule IIs from the warehouse.
21       Q.   And were opioids small or a large
22   percentage of what the warehouse was doing,
23   sending to the pharmacies?
24       A.   The HBC warehouse?
25       Q.   Yes.

1      A.    It was a small percentage.  Like I say,
2  I can't recall the exact NDCs that were in the
3  warehouse, but even in our overall dispensing,
4  it's a small number, small percentage.
5      Q.    This Exhibit 13, number (B)(4) talks
6  about location of the premises.  Were all these
7  Giant Eagle pharmacies inside Giant Eagle grocery
8  stores?
9      A.    Yes, with the exception of the examples
10 that I spoke to the gentleman about earlier.
11 There was two independently-owned grocery stores
12 in the Cleveland market that we had Giant Eagle
13 pharmacies in.
14     Q.    Those were transitioned then to Giant
15 Eagle stores?
16     A.    They were just -- no.  They never
17 transitioned to Giant Eagle stores.  We just took
18 the pharmacies out.
19     Q.    But being inside of a grocery store, is
20 that a level of control that you consider as part
21 of the security analysis?
22     A.    Not only were they delivered to a store,
23 but they were in cases where the pharmacy -- if
24 there was a situation where the pharmacy wasn't
25 open, they had to be delivered to a locked cage

```
 1   within the store.
 2       Q.  Factor (B)(6) six talks about types of
 3   vaults and safes and other secure enclosures.
 4       Did the pharmacies at least to your knowledge
 5   keep any controlled substances in locked secure
 6   locations?
 7       A.  Every drug in the pharmacy is in a
 8   locked location in the pharmacy, and that's the
 9   reason why the state Boards have you send in
10   diagrams of physical barriers so every drug is
11   protected that way.  It doesn't matter if it's
12   controlled or not.  Narcotics inside of that
13   locked pharmacy are in a locked safe or locked
14   cabinet.
15       Q.  Did the Ohio State Board of Pharmacy
16   audit every store at least once per year?
17       A.  I don't know what their frequency was.
18   That sounds reasonable.  If you would ask me how
19   often I think, I would say once a year.
20       Q.  Did anybody from the Ohio State Board of
21   Pharmacy ever come to Giant Eagle to your
22   knowledge and say, hey, you're not meeting those
23   requirements?
24       A.  No.  In fact, we actually had a member
25   of the state Board who worked for us.
```