# EXHIBIT 435

Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3   IN RE:  NATIONAL          :   MDL No. 2804
     PRESCRIPTION OPIATE       :
 4   LITIGATION                :   Case No. 17-md-2804
                               :
 5   APPLIES TO ALL CASES      :   Hon. Dan A. Polster
                               :
 6                             :
 7
 8                   HIGHLY CONFIDENTIAL
 9       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
10
11                        - - - -
12                   DECEMBER 20, 2018
13                        - - - -
14    VIDEOTAPED DEPOSITION OF JOSEPH EDWARD MILLWARD,
15   taken pursuant to notice, was held at Marcus &
16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,
17   Pennsylvania 15219, by and before Ann Medis,
18   Registered Professional Reporter and Notary Public in
19   and for the Commonwealth of Pennsylvania, on
20   Thursday, December 20, 2018, commencing at 9:07 a.m.
21                        - - - -
22              GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
23                    deps@golkow.com
24
25
```

```
 1                THE WITNESS:  Looking at overall
 2    movement.
 3    BY MR. HUDSON:
 4        Q.    And that was something that you did at
 5    the Giant Eagle corporate offices; right?
 6        A.    Correct.
 7        Q.    What particular inventory systems were
 8    you looking at to evaluate the overall movement?
 9        A.    The names of the systems, so PDX, which
10    was the dispensing system.  I don't know the name
11    of the system used on the HBC side.  That's not my
12    area of expertise.  I don't know the system.
13        Q.    So PDX is at Giant Eagle?
14        A.    PDX is a third-party product.  It's a
15    company that Giant Eagle -- it's a dispensing
16    system, essentially, with an inventory component.
17    And that's the name, the company's name, PDX.
18        Q.    When you and Shawn Boyton sat down, was
19    there anyone else in the room?
20        A.    I don't recall.
21        Q.    Other than you, Shawn Boyton and Kayla
22    Voelker, was there anyone else involved in either
23    designing or creating this new process?
24                MR. KOBRIN:  Object to form.
25                THE WITNESS:  George as the compliance
```

```
 1   manager would have had involvement.  Other people
 2   in the room, I can't speculate, or people that we
 3   consulted or bounced off or sought input from, I
 4   can't accurately tell you who they were and when.
 5   BY MR. HUDSON:
 6        Q.   Was anyone taking notes?
 7        A.   Not that I recall.
 8        Q.   Was there an agenda put together before
 9   the meeting?
10        A.   No.
11        Q.   Were there any like written deliverables
12   from this meeting to memorialize what was being
13   done and why?
14             MR. KOBRIN:  Object to form.
15             THE WITNESS:  Not that I'm aware of.
16   Some of it was kind of ad hoc, spur of the moment.
17   BY MR. HUDSON:
18        Q.   What caused this ad hoc or
19   spur-of-the-moment meeting to occur?
20        A.   Part of a continued evolution of our
21   current practices and how can we go from good to
22   better, go to best.
23        Q.   Was this after you had attended the DEA
24   meeting in Washington, DC?
25        A.   Where it falls in, I'll be honest, I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   don't remember the date of it.  I apologize for
 2   that.  I'm sorry.
 3        Q.   Who from the group was tasked with
 4   figuring out the process to put in place?
 5             MR. KOBRIN:  Object to form.
 6             THE WITNESS:  I can't say there was a
 7   specific "You are a hundred percent in charge."
 8   It was discussions and sharing opinions and vision
 9   and say what can we do, and Shawn being able to
10   brainstorm on his end and taking input from George
11   and anybody else who we may have talked to.
12   BY MR. HUDSON:
13        Q.   As a result of that meeting, what
14   happened?  What did you put in place or what did
15   you do?
16             MR. KOBRIN:  Object to form.
17             THE WITNESS:  It eventually led to the
18   creation of what unfortunately I believe is the or
19   referred to as the Voelker report only because
20   Kayla is nice.  But that's what it...
21   BY MR. HUDSON:
22        Q.   What is the Voelker report then?
23        A.   A report that measured the movement of
24   product and to compare it to some baseline.
25        Q.   Did anything else occur as a result of
```

1 that meeting?

2          MR. KOBRIN:  Object to form.

3          THE WITNESS:  I don't want to speculate

4 on the meeting.  I don't remember specifically

5 what else came beyond that.

6 BY MR. HUDSON:

7     Q.   The main takeaway though from that

8 meeting was the creation of the Voelker report or

9 threshold reports or whatever --

10    A.   However you want to call it.

11    Q.   -- label we want to put on it?

12    I'm going to hand you a number of these.

13         MR. HUDSON:  In fact, let's just go off

14 the record for a minute.  I'll get myself

15 organized and then start and do it quicker.

16         THE VIDEOGRAPHER:  2:31.  We're off the

17 video record.

18         (Recess from 2:31 p.m. to 2:57 p.m.)

19         THE VIDEOGRAPHER:  2:57.  We are on the

20 video record.

21    (HBC-Millward Exhibits 10 - 21 was marked.)

22 BY MR. HUDSON:

23    Q.   Before the break we were talking about I

24 think what you described as the Voelker report.

25 I'm going to hand you what I've marked as

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Exhibits 10 through 21.  And take a minute to look
 2   at those.
 3             MR. HUDSON:  Their internal reference
 4   number is P-HBC-1052 through 1063.
 5             MR. KOBRIN:  We're marking them in
 6   order?  Are they all in the same order?
 7             MR. HUDSON:  Yep.
 8   BY MR. HUDSON:
 9       Q.    I'll represent to you that in HBC's
10   production, we found about 1200 different daily
11   reports.  So what I've done is picked the last day
12   of each month between October of 2013, which was
13   the first month I could find one in the
14   production, and September of 2014.
15       If you look also on the first page of the
16   first exhibit, you can see there the placeholder
17   indicates that it's a document title Microsoft XML
18   Workbook.  Then it's got a title, a number and
19   then _Daily_HBC_Controls.
20       A.    I see that.
21       Q.    Are you familiar with these Excel
22   workbook spreadsheets?
23       A.    Yes.
24       Q.    And do you know when you began creating
25   these daily reports?
```

```
 1        A.   I have no idea.
 2             MR. KOBRIN:  Object to form.
 3             THE WITNESS:  I don't recall the
 4   specific date that they began.
 5   BY MR. HUDSON:
 6        Q.   Any reason to believe it wasn't October
 7   of 2013?
 8        A.   Again, I don't know the date it started,
 9   the exact date, but somewhere.
10        Q.   I've represented to you the earliest
11   ones I could find is October 2013.
12             My question is just:  Is there any reason
13   that you have to believe that these reports were
14   being created before October of 2013?
15        A.   I don't have, based on the refresh, have
16   any documentation to say that they were created
17   before.
18        Q.   So who created -- by the way, is that an
19   SQL?  Have you heard that phrase before?
20             MR. KOBRIN:  Object to form.
21             THE WITNESS:  I've heard it.  I'm not an
22   Excel person, to tell you the truth.  So I
23   couldn't create it.
24   BY MR. HUDSON:
25        Q.   Just tell me what you know about how
```

Highly Confidential - Subject to Further Confidentiality Review

1  this daily control report worked. What would
2  happen?
3            MR. KOBRIN: Object to form.
4            THE WITNESS: It is a report that would
5  be the -- it was a daily report and reviewing or
6  identifying stores that had been shipped
7  quantities to -- based on our first pass at what
8  a, as they call them, fresh quantity, again our
9  first pass at what that would be, how their
10 accumulation for the calendar month would be.
11 BY MR. HUDSON:
12      Q.   Would these be generated each day?
13      A.   Correct.
14      Q.   Then who received them?
15      A.   I don't have the email list. I received
16 them. There were a number of people that received
17 them.
18      Q.   You received the report each day or you
19 received an email or how -- in what form did you
20 receive a report?
21           MR. KOBRIN: Object to form.
22           THE WITNESS: The report came via email,
23 but I cannot recall generated directly from the
24 system or forwarded over after it was -- if it was
25 run, if it was an automatic distribution.

```
 1              (HBC-Millward Exhibit 22 was marked.)

 2   BY MR. HUDSON:

 3       Q.   Let me hand you what I'm marking as

 4   Exhibit 22.

 5            MR. HUDSON:   And Exhibit 22 has been --

 6   our internal number is 1094, P-HBC-1094.

 7   BY MR. HUDSON:

 8       Q.   On Exhibit 22, if you turn to the second

 9   page, there's an email from Kayla Voelker to a

10   distribution list including you.  It says Daily

11   HBC Suspicious Purchasing Report - 11/13/13.

12       A.   I see that.

13       Q.   Is that the email that you received?

14       A.   Yes.  I would have received this email.

15       Q.   When you said you received the report or

16   an email, is this what you were talking about, is

17   you would receive an email like this?

18       A.   I received this, yeah.  I received this

19   email.  Can you rephrase it?  Yeah, this is an

20   email I received.

21              (HBC-Millward Exhibit 23 was marked.)

22   BY MR. HUDSON:

23       Q.   Let me just give you what I marked as

24   Exhibit 23 as well.  It may help.

25       A.   There we go.
```

1      Q.   Again, if you look at Exhibit 23, at the
2  bottom email, again, this is another email from
3  Ms. Voelker to it looks like the same distribution
4  list.  Do you see that?
5      A.   I see that.
6      Q.   Do you know whether this was an
7  automated email that was sent or whether she
8  reviewed the report and then manually sent it out?
9           MR. KOBRIN:  Object to form.
10          THE WITNESS:  It appears that Kayla
11 generated the report on a daily basis and then
12 distributed it.
13 BY MR. HUDSON:
14     Q.   Manually though?
15     A.   That's -- I can't say how or what
16 Kayla -- it appears that way.
17     Q.   What if there was a given day that there
18 were no shipments that exceeded the purchasing
19 thresholds, would an email still be sent?
20     A.   No.
21     Q.   To the best of your knowledge, do you
22 believe it was a manual process where she would
23 review the report and then choose to then email
24 the distribution list if there were pharmacies
25 that had purchases exceeding the thresholds?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MR. KOBRIN:  Objection.  Object to form.
 2    Asked and answered.  Calls for speculation.
 3            THE WITNESS:  Repeat the question,
 4    please.
 5    BY MR. HUDSON:
 6        Q.  Do you believe that the way that the
 7    process worked was that Ms. Voelker would review
 8    the report each morning and then turn around and
 9    each morning that there is a pharmacy that is
10    exceeding the purchasing thresholds, that she
11    would send an email to the group letting them
12    know?
13            MR. KOBRIN:  Same objection.
14    BY MR. HUDSON:
15        Q.  As opposed to it being like an automated
16    process where it automatically happened.
17            MR. KOBRIN:  Same objection.
18            THE WITNESS:  I believe she ran the
19    report on a daily basis and then would forward it
20    out.
21    BY MR. HUDSON:
22        Q.  If we could, on Exhibit 23 is one of the
23    reports that she sent out to the group; right?
24    She indicated there was one pharmacy exceeding the
25    purchase threshold.  Then you wrote back and said
```

Case: 1:17-md-02804-DAP Doc #: 1967-11 Filed: 07/23/19 13 of 14. PageID #: 176225
Highly Confidential - Subject to Further Confidentiality Review

```
 1   to Todd -- is it Roahrig -- you wrote to Todd,
 2   "Store A is flagged as having hit their threshold
 3   for total hydrocodone products.  Can you please
 4   check to see if this is an anomaly or if the order
 5   should be considered suspicious."
 6            MR. KOBRIN:  Object to form.
 7   BY MR. HUDSON:
 8        Q.   Do you see that?
 9        A.   I see my response.
10        Q.   And then he wrote back and said it's
11   actually for a generic and the quantity would be
12   about 17 bottles.
13            And then he said, Renee replied that she had
14   a ton of scripts for this and a lot of owes due to
15   cough/cold season and this is a particular choice
16   of syrup for a prescription there, I believe.  I
17   don't have details, but assuming eight ounces is a
18   typical RF, that's only 34 scripts, so not
19   probably unusual at their volume.
20            Do you see that?
21            MR. KOBRIN:  Object to form.
22   Misrepresents the exhibit.
23            THE WITNESS:  I see Todd's response.
24   BY MR. HUDSON:
25        Q.   So is this the type of review that would
```

1  be done to try to determine whether or not an
2  order was suspicious?
3       A.   So as we spoke earlier -- and this is
4  actually, I think, a good example of the different
5  levels that we go to to ensure our controlled
6  substance integrity, that whenever there is an
7  order of interest or a flag, that it gets
8  investigated.
9       In this case, the pharmacy district leader,
10 Todd Roarhrig, reached out to the pharmacist -- I
11 can't remember Renee -- pharmacy manager, staff
12 pharmacist, to understand why is there -- to
13 understand the purchasing or the orders that the
14 system generated for the store for that, and her
15 response saying that in cough and cold season,
16 seeing an increase in prescriptions from
17 prescribers as the hydrocodone or Hycodan, which
18 is hydrocodone and homatropine, is a cough syrup.
19      Q.   But this is a hydrocodone combination
20 product; correct?
21      A.   Correct, hydrocodone and homatropine.
22      Q.   And this is to store number 8; right?
23      A.   That is correct.
24      Q.   And you're asking your pharmacy district
25 manager is this an anomaly or should the order be