EXHIBIT 436

Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3    IN RE:  NATIONAL        :  MDL No. 2804

      PRESCRIPTION OPIATE     :

 4    LITIGATION              :  Case No. 17-md-2804

                              :

 5    APPLIES TO ALL CASES    :  Hon. Dan A. Polster

                              :

 6                            :

 7

 8              HIGHLY CONFIDENTIAL

 9      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                     - - - -

12                 DECEMBER 20, 2018

13                     - - - -

14    VIDEOTAPED DEPOSITION OF JOSEPH EDWARD MILLWARD,

15    taken pursuant to notice, was held at Marcus &

16    Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17    Pennsylvania 15219, by and before Ann Medis,

18    Registered Professional Reporter and Notary Public in

19    and for the Commonwealth of Pennsylvania, on

20    Thursday, December 20, 2018, commencing at 9:07 a.m.

21                     - - - -

22              GOLKOW LITIGATION SERVICES

            877.370.3377 ph | 917.591.5672 fax

23                 deps@golkow.com

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    investigation as it's not required.

2    BY MR. HUDSON:

3        Q.    Since you are aware of no orders of

4    hydrocodone combination products that were worthy

5    of being flagged, you agree then there's no review

6    or investigation notes that we can look at to

7    determine what HBC did to evaluate whether or not

8    any of their hydrocodone combination product

9    shipments were at risk for diversion?

10            MR. KOBRIN:  Object to form.  It

11   misrepresents the record.

12            THE WITNESS:  Can you restate that again

13   a little differently?

14   BY MR. HUDSON:

15       Q.    Sure.

16       A.    I just want to make sure I understand

17   you thoroughly.

18       Q.    As you sit here today, are you aware of

19   any reviews or investigations that were done by

20   HBC of any orders of hydrocodone combination

21   products?

22       A.    So as we looked at the -- we talked

23   previously and discussed at store 8 inquiring,

24   sending it to the pharmacy district manager to

25   investigate.  So I apologize for not fully
```

Highly Confidential - Subject to Further Confidentiality Review

 1   understanding the force of your question.

 2       Q.    Other than that one, are there any other

 3   investigations you're aware of or reviews that

 4   occurred?

 5       A.    The orders that came up on the flag

 6   reports would all have been reviewed.

 7       Q.    Each and every one of them?

 8       A.    To determine whether there was any

 9   diversion or activity.

10       Q.    So Exhibits 10 through 21 that we looked

11   at earlier, those reports, it's your testimony

12   that each and every one of the orders that were

13   listed on those reports were reviewed or

14   investigated for risk of diversion?

15       A.    Well, I can't recall every individual

16   case and I can speak to store 8 as it's been

17   refreshed.  That information would belong to the

18   pharmacy district manager, pushed to them, to take

19   a look at.  And that was before we had other

20   systems to be able to look into movement

21   centrally.

22       Q.    I don't understand.  What does that

23   mean?  You have those Exhibits 10 through 21.  We

24   talked about them earlier today.  They're these

25   reports.  What did it mean they were pushed to the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pharmacy district managers to take a look at?

 2         A.    That's what the -- when you see the

 3    store 8, Todd the store flagged, I believe.

 4         Q.    Are you saying you or George contacted

 5    the pharmacy district managers?

 6         A.    To have them take a look at it, one of

 7    us, anybody on that distribution list would have

 8    been able to as well.  But to send it to them to

 9    say you have a store that's on the report, take a

10    look, tell me.

11         Q.    Is there any reason why any of those

12    reviews or investigations, why there wasn't a

13    process put in place to track what was being done?

14              MR. KOBRIN:  Object to form.  Asked and

15    answered.

16              THE WITNESS:  You're asking if there was

17    a procedure for recording those investigations?

18    BY MR. HUDSON:

19         Q.    My question is:  Is there any reason

20    why -- so now I'm asking about the reason -- is

21    there any reason why you did not put a process in

22    place to document in writing the reviews or

23    investigations that were occurring?

24              MR. KOBRIN:  Object to form.  Asked and

25    answered.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Not a requirement.

 2    BY MR. HUDSON:

 3        Q.    Would you agree that it would be easier

 4    for us to today to try to figure out what HBC did

 5    if HBC would have documented in writing the

 6    reviews and investigations that occurred?

 7                MR. KOBRIN:  Object to form, as you

 8    repeatedly asked and repeatedly answered for a

 9    long period this morning.  I want that on the

10    record.

11                THE WITNESS:  You're asking an "if"

12    question for me to speculate as to how you would

13    be able to see that.  I don't believe I can answer

14    that.

15    BY MR. HUDSON:

16        Q.    I'm asking:  Would you agree as we sit

17    here today and we're trying to figure out what

18    reviews or investigations occurred, other than

19    store 8 -- is there any other investigation you

20    can tell me about that occurred between November

21    of 2009 and October of 2014 of hydrocodone

22    combination products?

23                MR. KOBRIN:  Object to form.

24                THE WITNESS:  So 2009 to October '10 I

25    wasn't in the role.  Beyond to where after 2013
```

Highly Confidential - Subject to Further Confidentiality Review

 1   when, as we've established, the report was

 2   created, then those reports and movements would

 3   have been pushed.  The only one we have

 4   documentation of, store 8, and it's been three,

 5   five years.

 6   BY MR. HUDSON:

 7       Q.   Right.  That's all I'm getting at.  If

 8   we had documented each review or investigation and

 9   put those into writing, wouldn't that be easier

10   for us today to be trying to figure out what HBC

11   did between 2009 and 2014?

12            MR. KOBRIN:  Object to form.

13            THE WITNESS:  As a speculation and

14   crystal ball looking into the magic 8 ball of

15   would this be easier, that's an interesting

16   question.

17   BY MR. HUDSON:

18       Q.   Do you want to answer it?

19            MR. KOBRIN:  Object to form.

20            THE WITNESS:  It's hard to say.  I don't

21   have a good -- I'm not going to speculate.

22   BY MR. HUDSON:

23       Q.   We do agree though that HBC never

24   blocked a single shipment of hydrocodone

25   combination products during the time that it was a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distributor of those products; correct?

 2         A.    Again, I can't speak to what happened

 3    before I was in the role, understanding -- with

 4    that qualifier.

 5         Q.    At least while you were there though,

 6    you agree there was never a shipment of

 7    hydrocodone combination products that were blocked

 8    from shipment at HBC; correct?

 9         A.    I'm not aware of any shipment that was

10    blocked.

11         Q.    You agree that during the time you were

12    the senior manager of compliance, there was never

13    a shipment of hydrocodone combination products

14    where you notified the DEA that they were a

15    suspicious order; right?

16         A.    Again, I'm not aware that there was a

17    flag that was deemed to be suspicious.

18              MR. HUDSON:   I don't have any further

19    questions.

20                        EXAMINATION

21    BY MR. KOBRIN:

22         Q.    Mr. Millward, you were asked earlier

23    today about stopping shipments on orders of

24    interest while they were being investigated.

25         Do you recall that line of questioning?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I do.

2          Q.    Tell me, are there different means

3     through which Giant Eagle or HBC investigates an

4     order of interest?

5          A.    Yes.  We talked at length about the

6     threshold or the Voelker report, so to speak, but

7     there were other systems in place.  Giant Eagle

8     invested in two tools from a company by the name

9     of Supply Logics.

10         Supply Logics had two products, Pinpoint

11    Monitor and Pinpoint Audit, one looking at

12    pharmacy purchasing patterns, the other looking at

13    pharmacy dispensing patterns.

14         Giant Eagle also invested in a dedicated

15    person to review those or to have access and

16    review those tools to look for any -- really as a

17    redundant mechanism to look for any kind of

18    movement of controlled substances that could

19    potentially be a flag for investigation.

20         Q.    Just to clarify the record, are there

21    situations where through this investigation you

22    could stop an order of interest before it shipped?

23         A.    That is correct.  If a report was

24    generated or a flag was generated, we had the

25    potential to stop the orders for that store until

Highly Confidential - Subject to Further Confidentiality Review

1    an investigation could be fully fleshed out.

2         Q.    That was if a flag was generated by the

3    person you had hired to do investigation --

4         A.    Correct.

5         Q.    -- with this Supply Logic program?

6         A.    Correct.  His name was Jason Mullen.

7         Q.    And he could do these investigations and

8    he could stop the shipment when that store made an

9    order if he found there was a reason to

10   investigate that store; is that correct?

11        A.    That is correct.

12        Q.    Now, were there other situations in

13   which you could not necessarily stop a shipment

14   even after you identified an order of interest?

15        A.    So the Kayla report was a report that

16   came out the next day after a store had received

17   the order, and that's where that store had already

18   received it.  So it afforded the opportunity to

19   investigate at that point and stop future orders

20   it determined to be suspicious and then

21   subsequently reported as required.

22        Q.    Did you ever do that, stop future

23   orders?

24        A.    We did.

25        Q.    And was there anything else you could do

Highly Confidential - Subject to Further Confidentiality Review

1    even if the order had been started to be filled at

2    the warehouse or even filled at the warehouse and

3    shipped?  Had you lost control of the order?

4         A.    Because, as stated earlier, Giant Eagle

5    distributed to itself, we were our customer, we

6    knew everything about the characteristics of our

7    store and had control of and control of the

8    product from where it entered into the DC till it

9    left in a prescription for an end user patient.

10        If something needed to be quarantined and

11   removed from dispensing stock, we had the ability

12   to have our stores pull that aside, if necessary,

13   to prevent it from being dispensed.

14        Q.    You talked about a visit to Purdue that

15   you made in order to see their practices.  Why did

16   Giant Eagle visit Purdue?

17        A.    It was a conference call.  It was a

18   conference call that we had.  And I believe Purdue

19   reached out to us through the purchasing group,

20   put in contact with me for George and I to have a

21   conference call, again, along the lines of the

22   Thrifty White, for example.

23        It was just another example of reaching out

24   to determine what are some other things other

25   organizations -- now Purdue being very different

Highly Confidential - Subject to Further Confidentiality Review

1    from us as only a manufacturer and then a

2    distributor to distributors, not dispensing.

3         It was essentially used as intel or insight

4    as to what other organizations are doing so we can

5    continue, as I had spoken repeatedly, improve and

6    evolve and tighten our practices.

7         Q.    You said Purdue was very different from

8    you.  Can you elaborate on that?

9         A.    Purdue is a maker of brand -- well, most

10   known for Oxycontin.  We mentioned earlier

11   Hysingla, which was in an email.  And they are a

12   manufacturer that has a worldwide presence.

13        Q.    They are not, as Giant Eagle is, a

14   regional or, rather, as HBC is a regional

15   distributor to captive pharmacy purchasers?

16        A.    No.  They are not a regional distributor

17   for captive pharmacies.

18        Q.    Or a captive orderer, rather.

19        A.    Exactly.  The companies are very

20   different.

21        Q.    You also mentioned one of the things

22   that you found interesting at Purdue was that they

23   were tracking the percentage of cash purchases.

24   Do you recall that?

25        A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     And opposing counsel asked about whether

2    you knew or whether that was something that Giant

3    Eagle did not do.  Do you recall that?

4      A.    I do.

5      Q.    To clarify the record at all, was there

6    any point at which Giant Eagle was able to do that

7    kind of tracking and that kind of investigation?

8      A.    So as I had mentioned, Jason Mullen and

9    the Supply Logics tool, the Supply Logics and I

10   believe -- one that was involved in the dispensing

11   patterns, Jason, his job was to go in and

12   investigate, to parse the data, and had the

13   ability to break it down via what the industry and

14   the DEA have defined as red flags to determine,

15   and one of those being percentage of cash

16   prescriptions for target chemical entities like

17   the oxycodone or hydrocodone and

18   hydrocodone-containing products, which by this

19   time rescheduled.

20        So yes, he absolutely had the ability to

21   review that data and to present to us information.

22      Q.    And he would preemptively review that

23   data, or would he be responding to orders?  What

24   was Jason Mullen doing?

25      A.    The great thing about having the tool

Highly Confidential - Subject to Further Confidentiality Review

```
 1   and having somebody dedicated to use it is they

 2   could go on and they could dive into the data and

 3   search for movement issues unprompted, so not

 4   necessarily directed by intel from a store or a

 5   movement pattern of an individual product.

 6        And he could find -- he could look into that

 7   and get as granular as creating geographical maps

 8   of the patients and the doctors to help better

 9   understand where those prescriptions were coming

10   from.

11        Q.   Did this help you to preempt potential

12   orders of interest?

13        A.   This did.  It did help us prevent and

14   stop orders for stores, again, with buprenorphine.

15        Q.   You mentioned that you attended a DEA

16   conference in 2013.  Do you recall that?

17        A.   I do.

18        Q.   At that conference, do you recall any

19   discussions at all about having written policies

20   in regard to suspicious order monitoring?

21        A.   I do not.

22        Q.   Do you recall there being any discussion

23   at all about requirements to maintain documents of

24   investigations pursuant to your policies?

25        A.   I do not.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Opposing counsel just asked you several

2    questions about if you had retained such documents

3    or if you had had some kind of a retention policy

4    and a recording policy that recorded every single

5    investigation you conducted, it would make things

6    easier for him.  Do you recall that?

7          A.    I do recall that.

8          Q.    We do, however, have the reports that

9    you referred to as the Voelker reports that are

10    daily reports, and those show every single order

11    that was flagged.  Is that accurate?

12          A.    That's correct.

13          Q.    By the Voelker system, not by the other

14    controls that we have in place, but by the Voelker

15    system, does that show everything that was

16    flagged?

17          A.    Correct, based on the thresholds.

18          Q.    And there were over a thousand reports

19    produced from that system; is that correct?

20          A.    To be honest, I don't know an

21    accumulated number.

22          Q.    Well, those came out daily from the

23    period which it started until the end of your

24    tenure at Giant Eagle; correct?

25                MR. HUDSON:  Object to form.